# EXHIBIT 38

PAGE 1 OF 6

STATEMENT OF

## JOHN MARTINEZ

Taken February 9, 1999 At 6:45 a.m.

At Area 5 Violent Crimes

Present ASA Jake Rubinstein

Detective R. Troche #21212

This statement taken regarding the Fatal beating

of Daniel Garcia which occurred on October 12, 1998

at 1946 N. Whipple at about 1:55 a.m.

I understand I have the right to remain silent and that anything I say can be used against me in a court of law. I understand that I have the right to talk to a lawyer and have him present with me during questioning, and if I cannot afford to hire a lawyer one will be appointed by the court to represent me before any questioning. Understanding these rights, I wish to give a statement. _JW Rubinstein_ A.S.A.

_John Martinez_ & _R. Troche #21212_

After being advised of his constitutional rights and after stating that he understood each and every one of those rights and after being advised that Assistant State's Attorney Jake Rubr is a lawyer and a prosecutor and not his lawyer and not the lawyer for Angel Serrano, Thomas Kelly, or Jose Tinajero, John Martinez agreed to give the following statement which is a summary and not word for word.

John Martinez states that he is 19 years old and that his birthday is ▮▮▮▮ ▮▮▮▮ John lives at 1910 N. Mozart and has lived there all of his life. John lives there with his mother ~~and father~~ Norma

_JW Rubinstein_ A.S.A.   _John Martinez_   JM   _Det. R. Troche #21212_

RFC-Martinez 000162

PAGE 2 OF 6

Rodriguez ~~and Cesar Martinez~~ his sister Arlene Martinez, and Arlene's three children. John can read and write English. John went to High School at Schurz in chicago but only finished one year.

John Martinez states that on october 12, 1998 he was hanging out on the Block. John states that the Block is the 1900 block of North whipple, right off of Armitage. John states that the 1900 block of whipple is the territory of the Latin Kings, a gang. John has been a Latin King for seven years. John has no rank as a Latin King. John has the letters LK tatooed on the inside of his left forearm. John also has a crown tatoo next to his left eye. John also has a crown tatoo on his left back shoulder. The Crown is the symbol of the Latin Kings. John has been hanging out on the 1900 block of whipple for about four years. The Latin Kings on the 1900 block of whipple sell drugs, including crack.

John states that when he got to the 1900 block of whipple on october 12, 1998, it was some time after 1:00 a.m. when he got to the 1900 block, some other Latin Kings were already there hanging out. One of the Latin Kings on the block was Jose Tinajero, whose nickname is Baby Toy. John recognizes Jose Tinajero from Exhibit A, a photograph of him.

John Nulinaire A.S.A.  john Martinez

RFC-Martinez 000164

John has known Jose for five or six years. Another Latin King on the block that night was Thomas Kelly, whose nickname is Snoop or Snoopy. John recognizes Thomas from Exhibit B, a photograph of him. John has known Thomas for about five or six years. Another Latin King on the block that night was Angel Serrano, whose nickname is Rabbit. John recognizes Angel from Exhibit C, a photograph of him. John has known Angel for about six years. Jose, Thomas, and Angel do not hold any rank in the Latin Kings.

John states that after arriving on the block on October 12, 1998, he walked up and down the block for a while. He stopped from time to time to talk to friends who were also hanging out on the block. John states that "on the block" is a term the Latin Kings use to refer to the 1900 Block of North Whipple. As John was walking on the block, he heard a commotion coming from an alley which makes a "T" into Whipple, Just south of Armitage. The commotion sounded like men's voices.

John states that when he heard this commotion, he walked down to the alley which is just south of Armitage. In the alley is a parking lot, which is almost part of the alley because the entrance to the parking lot is in the alley. When John

_JW Nuluman_ A.S.A.          _John Martin_ Ser. R. Jacob 9/21/2012

RFC-Martinez 000166

got to the alley, he saw a man lying face down on the pavement. The man appeared to be Hispanic and John thought he looked Mexican. John recognizes the man from Exhibit D, a photograph of him. John now knows this man's name to be Daniel Garcia. John saw several Latin Kings from the block standing around Garcia as Garcia lay there. The Latin Kings John saw were Jose Tinajero, Angel Serrano, and Thomas Kelly.

When John saw this, he walked over to where Garcia was lying. This was in the parking lot that borders on the alley just south of Armitage. As John walked up, someone told him that Garcia was a "D." John states that a "D" means a Disciple. Disciples are a rival gang and Disciples and Latin Kings are enemies and fight each other constantly. John cannot remember who told him that Garcia was a "D." When John got close to Garcia, he saw some blood around Garcia's head. John approached Garcia and gave Garcia a hard KICK with John's foot. This first KICK landed on Garcia's side in the area of his ribs but below his shoulders. John KICKed him because Garcia was a "D" and John is a Latin King. John then KICKed Garcia again in the same place. The second KICK was not as hard as the first one. The second KICK

JW Rubinlau A.S.A.      John Martiny See. D. Turocteo 727372

RFC-Martinez 000168

was to tell Garcia to get out of there because he did not belong around there. After John kicked Garcia the second time, John used his foot to roll Garcia over onto his back. When Garcia rolled onto his back, John heard a sucking sound coming from Garcia like he was having a hard time breathing. When John rolled Garcia over, he saw that Garcia's face was bloody and had been beat up. After John rolled Garcia over, he heard Garcia gasping for breath. John then turned around and walked away. John walked up the block and got in his car. John then drove around for a while. After driving around for a while, John went home and went to sleep.

John Martinez states that he has been treated well by the police and by Assistant State's Attorney Jake Rubinstein. John states that he has been given pop to drink, chips and salsa to eat, and was offered other food to eat. John has been allowed to use the bathroom whenever he needed to. John is giving this statement freely and voluntarily. No threats or promises were made to John to get him to make this statement. John states that Assistant State's Attorney Jake Rubinstein explained to him that there are three ways to record his statement: orally, in handwritten

*JAV Rubinstein* A.S.A.          *John Martinez*   *Det. Brooks #20232*



PAGE 6 OF 6

form, or recorded ~~verbat~~ by a court reporter. Assistant State's Attorney Rubinstein explained the difference between these types of statements and John decided that he wanted to record his statement in a handwritten form. John states that he is not under the influence of drugs or alcohol at this time.

John Martinez states that he can read English and he demonstrated his reading ability by reading the first paragraph of this statement out loud. Assistant State's Attorney Jake Rubinstein then read the rest of the statement out loud while John followed along reading to himself. John was allowed to make any changes or corrections to the statement that he wanted to.

# EXHIBIT 39

**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| JACQUES RIVERA, | ) | |
| | ) | Case No. 12 C 4428 |
| *Plaintiff*, | ) | |
| | ) | Hon. Joan B. Gottschall, |
| *v.* | ) | District Judge |
| | ) | |
| REYNALDO GUEVARA, *et al.*, | ) | Hon. Mary M. Rowland, |
| | ) | Magistrate Judge |
| *Defendants*. | ) | |
| | ) | JURY TRIAL DEMANDED |

**PLAINTIFF'S CONSOLIDATED RESPONSE IN
OPPOSITION TO DEFENDANTS' SUMMARY JUDGMENT MOTIONS**

Arthur Loevy
Jon Loevy
Russell Ainsworth
Anand Swaminathan
Steve Art
**LOEVY & LOEVY**
311 N. Aberdeen St., Third Floor
Chicago, IL 60607
(312) 243-5900
steve@loevy.com

Locke E. Bowman
Sheila Bedi
David Shapiro
Alexa Van Brunt
**MACARTHUR JUSTICE CENTER**
Northwestern University School of Law
375 E. Chicago Ave., 8th Floor
Chicago, IL 60611
(312) 503-0844

J. Samuel Tenenbaum
**BLUHM LEGAL CLINIC**
Northwestern University School of Law
375 E. Chicago Ave., 8th Floor
Chicago, IL 60611
(312) 503-8576

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ............................................................................................................... 1

SUMMARY OF DISPUTED FACTS .................................................................................. 3

ARGUMENT ....................................................................................................................... 6

A.      SUMMARY JUDGMENT IS UNAVAILABLE TO GUEVARA IN
LIGHT OF HIS INVOCATION OF THE FIFTH AMENDMENT .................................. 6

B.      A JURY MUST DECIDE RIVERA'S DUE PROCESS CLAIMS ................................... 9

      1.      A Reasonable Jury Could Conclude That Defendants Fabricated
False Evidence .............................................................................. 10

            (a)      Overwhelming Evidence Supports Rivera's Fabrication
Claim.................................................................................. 10

            (b)      Defendants' Arguments for Judgment on the Fabrication
Theories Fail ..................................................................... 15

      2.      Independently, A Reasonable Jury Could Conclude That
Defendants Suppressed Material Exculpatory and Impeachment
Evidence........................................................................................ 18

            (a)      Defendants Suppressed Exculpatory Evidence........................................ 20

            (b)      Defendants Suppressed Exculpatory Police Files..................................... 24

            (c)      Defendants' Reasonable Diligence Arguments Fail ................................. 27

      3.      Independently, A Reasonable Jury Could Conclude That
Defendants Utilized Unduly Suggestive Lineup Procedures That
Tainted Rivera's Criminal Trial.................................................... 33

            (a)      The Identification Procedures Were Unduly Suggestive........................... 34

            (b)      Lopez's Identifications of Rivera Were Not Reliable............................... 35

            (c)      The Identification Tainted Rivera's Criminal Proceedings ...................... 36

            (d)      Defendants' Arguments for Summary Judgment on the
Unduly Suggestive Lineup Theory Lack Merit ................................. 38

**TABLE OF CONTENTS (cont.)**

**Page**

C.    A JURY MUST DECIDE THE SECTION 1983 CONSPIRACY CLAIMS ...................38

D.    A JURY MUST DECIDE THE FAILURE-TO-INTERVENE CLAIMS ........................40

E.    DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY ......................41

F.    A JURY MUST DECIDE RIVERA'S MALICIOUS PROSECUTION CLAIMS ...................................................................................................................42

       1.    Defendants Commenced and Continued A Criminal Proceeding.........................43

       2.    Defendants Lacked Probable Cause to Prosecute Rivera .....................................45

G.    A JURY MUST DECIDE RIVERA'S STATE-LAW CLAIM OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS ......................................47

H.    A JURY MUST DECIDE RIVERA'S STATE-LAW CONSPIRACY CLAIMS ...................................................................................................................48

I.    DEFENDANTS RINALDI, WEINGART, MINGEY, NOON, GUZMAN, SPARKS, ZACHARIAS, AND FALLON PARTICIPATED IN THE MISCONDUCT AND ARE NOT ENTITLED TO SUMMARY JUDGMENT ...................................................................................................................48

J.    A JURY MUST DECIDE PLAINTIFFS' *MONELL* CLAIMS ........................................50

       1.    Defendants Do Not Argue for Judgment on All of Rivera's *Monell* Theories, and So A *Monell* Trial Is Necessary No Matter What ...........................51

       2.    The City Is Estopped From Re-Litigating the Street Files Theory ........................53

       3.    The City's Request for Judgment on the Street Files Theory Is Frivolous ...............................................................................................................54

       4.    The City's Request for Judgment on the Filler Lineup Theory Lacks Merit ...............................................................................................................59

       5.    A Trial Is Necessary on the Failure to Discipline Theory ....................................62

K.    THE DERIVATIVE CLAIMS SURVIVE SUMMARY JUDGMENT ...........................69

CONCLUSION .................................................................................................................................69

ii

**TABLE OF AUTHORITIES**

**Cases**                                                                                                    **Page(s)**

*Acceptance v. Bathalter*, 705 F.2d 924 (7th Cir. 1983) ...............................................................8

*Alexander v. City of South Bend*, 433 F.3d 550 (7th Cir. 2006) ......................................33, 37, 46

*Allen v. Berger*, 784 N.E.2d 367 (Ill. App. Ct. 2002) ................................................................. 45

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..................................................................6

*Armstrong v. Daily*, 786 F.3d 529 (7th Cir. 2015).................................................................... 42

*Avery v. City of Milwaukee*, 847 F.3d 433 (7th Cir. 2017)................................................ 10, 17, 27

*Avery v. Milwaukee*, 2015 WL 247991 (E.D. Wis. Jan. 20, 2015)................................................59

*Baxter v. Palmigiano*, 425 U.S. 308 (1976)..................................................................................7

*Beck v. Pittsburg*, 89 F.3d 966 (3d. Cir. 1996) ..........................................................................65

*Bell v. City of Milwaukee*, 746 F.2d 1205 (7th Cir. 1984)........................................................... 39

*Bordanaro v. McLeod*, 871 F.2d 1151 (1st Cir. 1989) ............................................................... 63

*Boss v. Pierce*, 263 F.3d 734 (7th Cir. 2001)......................................................................29, 30

*Boyd v. City of Chicago*, 225 F. Supp. 3d 708 (N.D. Ill. 2016)..................................................... 31

*Boyle v. Torres*, 756 F. Supp. 2d 983 (N.D. Ill. Dec. 21, 2010) ...............................................44, 45

*Branion v. Gramly*, 855 F.2d 1256 (7th Cir. 1988) .......................................................................12

*Briscoe v. LaHue*, 460 U.S. 325 (1983).....................................................................................17

*Brown v. Mississippi*, 297 U.S. 278 (1936) ...............................................................................42

*Bryant v. Whalen*, 759 F.Supp. 410 (N.D. Ill. 1991) ...................................................................46

*Byrd v. Brishke*, 466 F.2d 6 (7th Cir. 1972)...............................................................................40

*Calhoun v. Ramsey*, 408 F.3d 375 (7th Cir. 2005) ......................................................................51

*Calusinski v. Kruger*, 24 F.3d 931 (7th Cir. 1994) ......................................................................65

*Canton v. Harris*, 489 U.S. 378 (1989).................................................................................52, 62

*Carmichael v. Village of Palatine*, 605 F.3d 451 (7th Cir. 2010)...............................38, 47, 48, 52

**TABLE OF AUTHORITIES (cont.)**

**Cases**                                                                                       **Page(s)**

*Cathedral of Joy Baptist Church v. Village of Hazel Crest*,
    22 F.3d 713 (7th Cir. 1994) ...................................................................................27

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................7

*Chicago Truck Drivers v. Century Motor Freight*, 125 F.3d 526 (7th Cir. 1997).........................54

*Collier v. City of Chicago*, 2015 WL 50814408 (N.D. Ill. Aug. 26, 2015) ...................................46

*Connick v. Thompson*, 563 U.S. 51 (2011) ...................................................................68

*Cooper v. Chicago Heights*, 2011 WL 2116394 (N.D. Ill. May 27, 2011) ...................................59

*Cosby v. Ward*, 843 F.2d 967 (7th Cir. 1988)...............................................................68

*Costello v. Grundon*, 651 F.3d 614 (7th Cir. 2011)...........................................................15, 47, 52

*Cottrell v. Clemons*, 2014 WL 3649185 (W.D. Ky. July 23, 2014) ............................................27

*Crivens v. Roth*, 172 F.3d 991 (7th Cir. 1999)..............................................................31

*Daniel v. Cook Cty*, 833 F.3d 728 (7th Cir. 2016)..........................................................55

*Davis v. Carter*, 452 F.3d 686 (7th Cir. 2006)..............................................................52

*DiRico v. City of Quincy*, 404 F.3d 464 (1st Cir. 2005) ...................................................62

*Dixon v. Cook County*, 819 F.3d 343 (7th Cir. 2016).......................................................55

*Dominguez v. Hendley*, 545 F.3d 585 (7th Cir. 2008) ...........................................................18, 41

*Engel v. Buchan*, 710 F.3d 698 (7th Cir. 2013) ...........................................................42

*Estate of Moreland v. Dieter*, 395 F.3d 747 (7th Cir. 2005)..............................................55, 68

*Evans v. City of Chicago*, 2006 WL 463041 (N.D. Ill. Jan. 6, 2006) ...........................................52

*Ewing v. O'Brien*, 60 F. Supp. 2d 813 (N.D. Ill. 1999)..................................................44

*Fields v. City of Chicago*, 2014 WL 477394 (N.D. Ill. Feb. 6, 2014) ...........................................24

*Fields v. City of Chicago*, 2017 WL 3987356 (N.D. Ill. Sep. 11, 2017) ...................................3, 53

**TABLE OF AUTHORITIES (cont.)**

**Cases**                                                                        **Page(s)**

*Fields v. Wharrie*, 672 F.3d 505 (7th Cir. 2012) ...................................................19, 20

*Fields v. Wharrie*, 740 F.3d 1107 (7th Cir. 2014) ...........................................10, 17, 41

*Foley v. Lowell*, 948 F.2d 10 (1st Cir. 1991) ...................................................................65

*Fox v. Hayes*, 600 F.3d 819 (7th Cir. 2010) ...................................................................47

*Fox v. Peters*, 2011 WL 6378826 (N.D. Ill. 2011) ........................................................52

*Franks v. Delaware*, 438 U.S. 154 (1978)................................................................45, 46

*Freeman v. Brown*, 2012 WL 3777074 (N.D. Ill. Aug. 29, 2012)..................................44

*Freides v. Sani-Mode Mfg. Co.*, 211 N.E.2d 286 (Ill. 1965) .........................................43

*Gable v. City of Chicago*, 296 F.3d 531 (7th Cir. 2002)................................................68

*Garcia v. City of Chicago*, 2003 WL 1715621 (N.D. Ill. Mar. 20, 2003) .....................68

*Gauger v. Hendle*, 349 F.3d 354, 360 (7th Cir. 2003).....................................22, 23, 41

*Giglio v. United States*, 405 U.S. 150 (1972) ...................................................19, 20, 32

*Glisson v. Indiana Dep't of Corrections*, 849 F.3d 372 (7th Cir. 2017)............50, 51, 55

*Grandstaff v. Borger*, 767 F.2d 161 (5th Cir. 1985).......................................................65

*Graves v. Thomas*, 450 F.3d 1215 (10th Cir. 2006) .......................................................62

*Hampton v. City of Chicago*, 2017 WL 2985743 (N.D. Ill. July 13, 2017)..............30, 33

*Hampton v. Hanrahan*, 600 F.2d 600 (7th Cir. 1979) ...................................................39

*Hart v. Mannina*, 798 F.3d 578 (7th Cir. 2015)............................................................38

*Henry v. County of Shasta*, 132 F.3d 512 (9th Cir. 1997) .............................................63

*Henry v. Ramos*, 1997 WL 610781 (N.D. Ill. Sept., 28, 1997).....................................47

*Hensley v. Carey*, 818 F.2d 646 (7th Cir. 1987)............................................................42

*Holland v. City of Chicago*, 643 F.3d 248 (7th Cir. 2011)............................................18

**TABLE OF AUTHORITIES (cont.)**

**Cases**                                                            **Page(s)**

*Hollins v. City of Milwaukee*, 574 F.3d 822 (7th Cir. 2009) ........................................................62

*J&J Sports Productions, Inc. v. Resendiz*, 2009 WL 1953154 (N.D. Ill. July 2, 2009) ...............41

*Jackson v. Marion County*, 66 F.3d 151 (7th Cir. 1995) ...............................................................52

*Jenkins v. Bartlett*, 487 F.3d 482 (7th Cir. 2007) .........................................................................52

*Jimenez v. City of Chicago*, 830 F. Supp. 2d 432 (N.D. Ill. 2011) ....................................27, 30, 32

*Johnson v. Dossey*, 878 F. Supp. 2d 905 (N.D. Ill. 2012) .............................................................21

*Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988) ......................................................... *passim*

*Julian v. Hanna*, 732 F.3d 842 (7th Cir. 2013)..............................................................................17

*Kadia v. Gonzales*, 501 F.3d 817 (7th Cir. 2007) ........................................................................12

*Kindle v. City of Harvey*, 2002 WL 230779 (N.D. Ill. Feb. 15, 2002) .........................................69

*King v. Kramer*, 680 F.3d 1013 (7th Cir. 2012) ...........................................................................51

*Kluppelberg v. Burge*, 2017 WL 3381717 (N.D. Ill. Aug. 7, 2017)..........................................3, 53

*Kotarski v. Binks Mfg. Co.*, 837 F. Supp. 247 (N.D. Ill. 1992) .....................................................12

*Kyles v. Whitley*, 514 U.S. 419 (1995)..............................................................................18, 19, 27

*Larez v. Los Angeles*, 946 F.2d 630 (9th Cir. 1991) ......................................................................65

*LaSalle Bank Lake View v. Seguban*, 54 F.3d 387 (7th Cir. 1995).............................................7, 8

*Lawson v. Veruchi*, 637 F.3d 699 (7th Cir. 2011)..........................................................................46

*LiButti v. United States*, 178 F.3d 114 (2d Cir. 1999) .....................................................................7

*Logan v. Caterpillar*, 246 F.3d 912, (7th Cir. 2011) .......................................................42, 43, 44

*Logan v. City of Chicago*, 891 F. Supp. 2d 897 (N.D. Ill. 2012).....................................................9

*Lopez v. City of Chicago*, 464 F.3d 711 (7th Cir. 2006)...............................................................47

*Manson v. Brathwaite*, 432 U.S. 98 (1977) .............................................................................33, 42

**TABLE OF AUTHORITIES (cont.)**

**Cases**                                                                                                                    **Page(s)**

*Maxwell v. City of Indianapolis*, 998 F.2d 431 (7th Cir. 1993).......................................................46

*Monaco v. City of Camden*, 2008 WL 8738213 (D. N.J. Apr. 14, 2008) ......................................63

*Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978)...................................................................50

*Mooney v. Holohan*, 294 U.S. 103 (1935) ...............................................................................10, 41

*Moore v. City of Chicago*, 2011 WL 1231318 (N.D. Ill. 2011).....................................................47

*Myett v. Heerdt*, 2017 WL 75738 (N.D. Ill. Jan. 9, 2017) ............................................................45

*Napue v. Illinois*, 360 U.S. 264 (1959) ...................................................................................19, 41

*Neil v. Biggers*, 409 U.S. 188 (1972).............................................................................................42

*Nelson v. LaCrosse Cty*, 301 F.3d 820 (7th Cir. 2002)..................................................................52

*Newsome v. James*, 2000 WL 528475 (N.D. Ill. Apr. 26, 2000) ...................................................12

*Newsome v. McCabe*, 256 F.3d 747 (7th Cir. 2001).................................................................18, 42

*Newsome v. McCabe*, 319 F.3d 301 (7th Cir. 2003).................................................................19, 20

*Obrycka v. Chicago*, 2011 WL 2633783 (N.D. Ill. July 5, 2011)............................................59, 67

*Olson v. Tyler*, 771 F.2d 277 (7th Cir. 1985).................................................................................46

*Ott v. Milwaukee*, 2015 WL 1219587 (E.D. Wis. Mar. 17, 2015)..................................................59

*Otto v. Variable Annuity Life Ins. Co.*, 134 F.3d 841 (7th Cir. 1998) ...........................................40

*Padilla v. City of Chicago*, 2009 WL 4891943 (N.D. Ill. Dec. 14, 2009)......................................65

*Padilla v. City of Chicago*, 2013 WL 1208567 (N.D. Ill. Mar. 26, 2013)......................................44

*Paine ex rel. Eilman v. Johnson*, 2010 WL 785398 (N.D. Ill. Feb. 26, 2010) ..............................59

*People v. Arcos*, 228 Ill App. 3d 870 (1st Dist. 1996)...................................................................65

*Perez v. Thorntons*, 731 F.3d 699 (7th Cir. 2013) ..........................................................................6

*Petty v. City of Chicago*, 754 F.3d 416 (7th Cir. 2014) .................................................................10

**TABLE OF AUTHORITIES (cont.)**

**Cases**                                                                     **Page(s)**

*Proffitt v. Ridgway*, 279 F.3d 503 (7th Cir. 2002) ........................................................39

*Purghoraishi v. Flying J, Inc.*, 449 F.3d 751 (7th Cir. 2006) ........................................15

*Pyle v. Kansas*, 317 U.S. 213 (1942) .............................................................................41

*Rehberg v. Paulk*, 566 U.S. 356 (2012) .........................................................................17

*Robinson v. City of Harvey*, 2001 WL 138901 (N.D. Ill. Feb. 16, 2001) .......................69

*Salvato v. Miley*, 790 F.3d 1286 (11th Cir. 2015) .........................................................65

*Sanders v. City of Chicago Heights*, 2016 WL 1730608 (N.D. Ill. May 2, 2016) ...........62

*SEC v. Graystone Nash, Inc.*, 25 F.3d 187 (3d Cir. 1994) ...............................................8

*Sherrod v. Berry*, 827 F.2d 827 F.2d 195 (7th Cir 1987) ...............................................65

*Simon v. Northwestern Univ.*, 2016 WL 1237666 (N.D. Ill. Mar. 29, 2016) ..................45

*Smith v. Northeastern Ill. Univ.*, 388 F.3d 559, 569 (7th Cir. 2004) ..............................40

*Sornberger*, 434 F.3d 1006, 1029-30 (7th Cir. 2006) ....................................................52

*Steidl v. Fermon*, 494 F.3d 623 (7th Cir. 2007) .............................................................49

*Steidl v. Gramley*, 151 F.3d 739 (7th Cir. 1998) ...........................................................51

*Stichting Ter Behartiging Van de Belangen v. Schreiber*,
    407 F.3d 34 (2d Cir. 2005).......................................................................................7, 8

*Stinson v. Gauger*, Nos. 13-3343, 13-3346 & 13-3347
    (7th Cir. Aug. 18, 2017) (*en banc*).............................................................................17

*Streckenbach v. Vandensen*, 2017 WL 3585074 (7th Cir. Aug. 21, 2017)......................53

*Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731 (7th Cir. 2006) .............................15, 52

*Thomas v. Cook County*, 604 F.3d 293 (7th Cir. 2010) .............................................55, 68

*Thompson v. Boggs*, 33 F.3d 847 (7th Cir. 1994) ...........................................................52

*Thompson v. City of Chicago*, 2009 WL 674353 (N.D. Ill. Mar. 12, 2009) .....................9

*Titran v. Ackman*, 893 F.2d 145 (7th Cir. 1990) ...........................................................52

**TABLE OF AUTHORITIES (cont.)**

**Cases**                                                                                       **Page(s)**

*Turner v. City of Chicago*, 2013 WL 4052607 (N.D. Ill. 2013) ......................................................44

*United States v. 4003-4005 5th Ave.*, 55 F.3d 78 (2d Cir. 1995).......................................................8

*United States v. Agurs*, 427 U.S. 97 (1976) ....................................................................................19

*United States v. Bagley*, 473 U.S. 667 (1985) .................................................................................20

*United States v. Jackson*, 546 F.3d 801 (7th Cir. 2008) ..................................................................40

*United States v. Morris*, 80 F.3d 1151 (7th Cir. 1996) ....................................................................31

*United States v. Rylander*, 460 U.S. 752 (1983)................................................................................9

*United States v. Useni*, 516 F.3d 634 (7th Cir. 2008).......................................................................47

*Valentino v. Village of S. Chicago Heights*, 575 F.3d 664 (7th Cir. 2009) .....................................50

*Vodak v. City of Chicago*, 639 F.3d 738 (7th Cir. 2011) .................................................................51

*Wallace v. City of Zion*, 2011 WL 3205495 (N.D. Ill. July 28, 2011)..............................................44

*Wearry v. Cain*, 136 S. Ct. 1002 (2016) ....................................................................................18, 19

*Whitlock v. Brueggemann*, 682 F.3d 567 (7th Cir. 2012)..........................................10, 17, 18, 21

*Williams v. City of Chicago*, 733 F.3d 749 (7th Cir. 2013) .............................................................45

*Woodward v. CMS*, 368 F.3d 917 (7th Cir. 2004) ...........................................................................68

*Yang v. Hardin*, 37 F.3d 282 (7th Cir. 1994).................................................................................40

## INTRODUCTION

Jacques Rivera was wrongly convicted of the 1988 murder of Felix Valentin. His conviction was based entirely on false evidence fabricated by Defendants. For decades Rivera fought from prison to prove his innocence. In 2011, based on the revelation that false eyewitness evidence had been used against him, Rivera was granted post-conviction relief, and state prosecutors dropped the charges against him. The next year, Illinois courts awarded Rivera a certificate of innocence. Rivera has amassed overwhelming evidence that the Officer Defendants and the City of Chicago violated his rights protected by the U.S. Constitution and Illinois law.

Rivera had nothing to do with Valentin's shooting and Defendants knew it all along. In fact, shortly after the crime, while the victim was still alive, he identified two other men, Jose Rodriguez and Felipe Nieves, as the perpetrators. Instead of pursuing those suspects, Defendants determined on the first day of their investigation that they would frame Rivera, and they fabricated evidence to implicate him. That evidence included manufactured eyewitness identifications of Rivera from Valentin and from a 12-year-old boy named Orlando Lopez, who was the only other witness to the crime.

At the same time, Defendants suppressed highly exculpatory evidence that would have shown that their identifications were fabricated and that Rivera was innocent. For example, they covered up that Lopez viewed a first live lineup early in the investigation and picked a filler instead of Rivera. In addition, pursuant to the widespread practice among Chicago Police Department (CPD) employees at the time, they suppressed police documents that contradicted their official version of the investigation in a secret "street file," which they kept buried in the CPD's files for years after Rivera's wrongful conviction.

1

Rivera's wrongful conviction was orchestrated by Defendant Reynaldo Guevara, a notorious Chicago policeman who is responsible for sending numerous young men on Chicago's northwest side to prison for crimes they did not commit. Guevara moves for summary judgment despite the fact that he invoked his Fifth Amendment right not to incriminate himself in response to every question he was asked about his misconduct in this case. Given the foregoing, the Officer Defendants' summary judgment motion is plainly inappropriate.

The same is true for the City's motion. The misconduct at issue was undertaken pursuant to the City's official policies. Among other things, the City failed to discipline officers like Guevara, who engaged in egregious and repeated acts of misconduct that violated the rights of citizens. In addition, the City's written policies and practices caused routine false reporting of the results of lineup identification procedures, and systematic suppression of police investigative materials in clandestine street files. These policies and practices contributed to Rivera's wrongful conviction and the violation of his constitutional rights.

Reading Defendants' briefs, one would think that the undisputed record shows that Defendants were simply duped by Lopez's false identification of Rivera and did nothing wrong. But Defendants' skewed version is fully dependent on construing facts and drawing inferences in their own favor. As Defendants know full well, each of the facts they call undisputed in their briefs is in fact hotly disputed and contested by a substantial volume of evidence.

In fact, with respect to most material issues, it is Defendants who cannot point to anything in the record supporting their position. Guevara, for example, has no hope for summary judgment, considering that he has asserted his Fifth Amendment right to silence on all issues material to the case—on the grounds that if he told the truth, he risked subjecting himself to criminal liability. Similarly, the City asks the Court to grant it judgment on policy and practice

2

theories despite having lost a recent trial, *Fields v. City of Chicago*, 2017 WL 3987356, at *3-4 (N.D. Ill. Sep. 11, 2017), on the very same theories on which they move for summary judgment. Not only did Judge Kennelly conclude in *Fields* that the existence of the City's street files practice was a proper issue to be decided by a jury, but the jury rejected the City's denials and evidence regarding that practice. Given the jury's verdict in *Fields*, Judge Lefkow recently concluded in *Kluppelberg v. Burge*, 2017 WL 3381717 (N.D. Ill. Aug. 7, 2017), that the City was estopped from denying the existence of the street files practice. This demonstrates the folly of the City's present attempt to win summary judgment on the ground that there is supposedly no evidence to support Rivera's claim. This Court should deny the motions in their entirety.

## SUMMARY OF DISPUTED FACTS

Rivera has prepared an extensive account of the facts relevant to summary judgment in his Local Rule 56.1 statements. Given space constraints, the number of Defendants' arguments, and the vast record, Rivera summarizes the factual disputes rather than repeating all of the facts here. Where appropriate, additional facts are discussed below within the argument.

Defendants' motions are based on a version of facts where Orlando Lopez supposedly made an unprompted identification of Rivera in a photo mugbook on the day Valentin was shot, confirmed that identification three weeks later in a legitimate live lineup procedure, and then testified consistent with those identifications at trial, leading to Rivera's conviction. Defendants now apparently concede that Lopez's identifications of Rivera were false, but they contend they did not know he was lying. Defendants' facts are contradicted by ample evidence.

Properly viewing the record in Rivera's favor, as the Court must at this stage, the Defendants caused Rivera to be arrested, charged, indicted, prosecuted, and convicted by knowingly fabricating false evidence and by suppressing material evidence, in violation of

3

Rivera's constitutional rights and Illinois law. AS ¶¶ 22-79, 80-85, 90-93.[1] Rivera had nothing to do with the murder whatsoever. AS ¶¶ 96-97. Evidence buried in a clandestine street file throughout Rivera's wrongful conviction now shows that Defendants selected Rivera as their suspect on August 27, 1988, the day Valentin was shot, *before* any identification procedure had taken place. AS ¶¶ 22-24. Two days later, on August 29, the Defendants instructed the 12-year-old eyewitness Lopez to identify Rivera in a book of mugshots, pointing out Rivera's photograph to Lopez, and fabricating a story for Lopez to tell about recognizing Rivera as someone he had seen playing baseball in Humboldt Park. AS ¶¶ 25-28.

Defendants then put Rivera in a live lineup on August 31. AS ¶¶ 29-38. To Rivera's knowledge at the time, he was simply acting as a filler in a line-up for an unknown crime. Plaintiff has since discovered that it was actually a lineup in the Valentin investigation, Lopez viewed it, failed to pick Rivera, and instead picked one of the non-suspect fillers. AS ¶¶ 39-41. Because Lopez's selection of a filler would have burned their eyewitness, the Defendants responded by suppressing all evidence that the lineup had ever occurred and by falsely reporting that Lopez had *not* viewed a lineup on August 31. AS ¶¶ 36, 43-44, 67-68, 76-77.[2]

Valentin succumbed to his wounds and died on September 14, and the next day the Defendants brought young Lopez in for a second live lineup. AS ¶¶ 7, 51. Before that second lineup, Lopez told Guevara and McLaughlin that Rivera was not the person he had seen shoot Valentin. AS ¶¶ 50-53. Defendants buried that statement as well. AS ¶¶ 57-60, 65. They instructed Lopez to continue with the second lineup, and they manipulated him into falsely identifying Rivera. AS ¶¶ 58-60.

---

[1] Rivera's affirmative statement of facts is cited as "AS ¶ XXX," his response to the City's statement as "RCS ¶ XXX," and his response to the Officer Defendants' statement as "ROS ¶ XXX."

[2] At every deposition in the case, Defendants strenuously denied this problematic lineup ever occurred, but for summary judgment purposes they have now properly conceded that it did. Officer Br. at 2 & n.3.

4

To seal the deal, Defendants then wrote a false report, saying for the first time that the victim Valentin, four days before his death, on September 10, had identified Rivera as the shooter in a photo identification procedure performed at his bedside in Cook County Hospital. AS ¶¶ 65-66. This identification was both impossible and a complete fabrication. AS ¶¶ 5-6, 45-47, 65-66. Valentin was in a medically-induced coma on September 10 and was totally unable to respond, let alone identify anyone. AS ¶¶ 4-5, 46. Defendants also reported falsely that, following the second lineup, Lopez had been shown photos of the alternative perpetrators Rodriguez and Nieves and had excluded them as suspects. AS ¶¶ 48-49, 65. Such an identification procedure never occurred. AS ¶¶ 48-49.

After their investigation was complete, Defendants took every document they had created during their investigation that could have been used to prove they had framed Rivera, and they suppressed those documents in a street file. AS ¶¶ 72-77. That street file was never shared with prosecutors, Rivera, or his attorneys. AS ¶¶ 86-88. It came to light during this litigation. AS ¶ 79.

Finally, to solidify Lopez's identification of Rivera as the shooter at trial, the Defendants fabricated an additional false story. They told Lopez to lie at trial and say that Valentin's shooter had worn a distinctive gold ponytail. AS ¶¶ 61-63. When Guevara took the stand at trial, he lied, too, saying that he noticed that Rivera had dyed gold hair at the time of his arrest. AS ¶¶ 64, 92. That was false—Rivera had never dyed his hair. AS ¶ 63.

The record construed in Rivera's favor unambiguously supports the conclusion that Defendants' fabricated evidence caused Rivera to be charged, prosecuted, and convicted of Valentin's murder, and that Defendants hid from Rivera and his attorneys all of the exculpatory evidence that would have avoided this gross injustice. A similar volume of evidence, discussed below, supports Rivera's claim that this misconduct occurred because of the policies and

5

practices of the City. All material facts are disputed and Defendants' legal arguments lack merit. This Court should deny their motions.[3]

**ARGUMENT**

This Court examines all evidence in the light most favorable to Rivera and draws all inferences in his favor. *Perez v. Thorntons*, 731 F.3d 699 (7th Cir. 2013). Summary judgment is warranted only if Defendants show that there is no genuine issue of fact on any of Rivera's claims and that they are entitled to judgment as a matter of law. *Id.* "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

**A.      SUMMARY JUDGMENT IS UNAVAILABLE TO GUEVARA IN LIGHT OF HIS INVOCATION OF THE FIFTH AMENDMENT**

At the outset, Guevara cannot shift the burden at summary judgment because he asserted his Fifth Amendment right not to incriminate himself in response to hundreds of questions about his misconduct during the Valentin investigation and Rivera's arrest, prosecution, and conviction. *See*, *e.g.*, AS ¶¶ 22, 26-27, 29, 40-41, 46, 49, 52, 61, 65. Guevara did the same in response to Rivera's written discovery requests. AS ¶¶ 46, 65, 79. In total, Guevara pleaded the Fifth in response to questions about making Rivera a suspect on the day of the crime (before any identification of Rivera had purportedly been made), fabricating Lopez's mugbook identification, suppressing the first lineup and Lopez's selection of a filler, fabricating Lopez's identification of Rivera at the second lineup, suppressing Lopez's statement that Rivera was not the perpetrator, fabricating Valentin's identification of Rivera, creating false police reports, providing false reports and information to prosecutors, falsely arresting Rivera, securing false charges against

---

[3] The Officer Defendants correctly point out that Rivera has never asserted a claim that he was compelled to involuntarily incriminate himself, in violation of the Fifth and Fourteenth Amendments. Officer Br. at 4. Rivera has never confessed involvement in the Valentin murder.

6

Rivera, testifying falsely, preparing Lopez's false testimony for Rivera's trial (including false testimony about Rivera's hair color), destroying and suppressing evidence of Rivera's innocence, maintaining street files in the case, and suppressing the investigation of Rodriguez and Nieves. AS ¶¶ 22, 26-27, 29, 40-41, 46, 49, 52, 59, 61, 65, 79, 85. Because Guevara exercised his right to remain silent on every question material to Rivera's claims, he cannot seek summary judgment.

Where a defendant moving for summary judgment asserts his Fifth Amendment rights rather than denying the alleged misconduct, summary judgment is almost never appropriate. This is because a party who seeks summary judgment bears the burden of showing that no material fact is disputed, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), and a party who asserts the Fifth Amendment on material facts cannot meet that burden. That result is dictated by Rule 56 standards and Supreme Court precedent.

In a civil case, juries are expressly instructed that they may draw adverse inferences against the person asserting the Fifth Amendment, and the decision about whether or not to draw adverse inferences is by definition a question for the jury. *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976); *LaSalle Bank Lake View v. Seguban*, 54 F.3d 387 (7th Cir. 1995); *see also LiButti v. United States*, 178 F.3d 114, 120 (2d Cir. 1999) (An "adverse inference may be given significant weight because silence when one would be expected to speak is a powerful persuader"). A court at summary judgment cannot resolve this factual question, but instead, as Rule 56 commands, must draw the inference in favor of the non-moving party. Accordingly, where a defendant asserts his Fifth Amendment rights on material facts and then moves for summary judgment, the Court must draw an inference against the defendant on those facts, the defendant cannot meet his Rule 56 burden, and summary judgment must be denied. *See Stichting Ter Behartiging Van de Belangen v. Schreiber*, 407 F.3d 34, 55 (2d Cir. 2005) (noting that while "a *jury* might draw" an

7

inference from the assertion of privilege, "*we* [the court] are required at summary judgment to draw all reasonable inference in favor of the non-moving party").

Rivera acknowledges that courts may not enter judgment based solely on an invocation of the Fifth Amendment, for the invocation alone is not an admission of guilt. Adhering to this rule, courts have refused to grant summary judgment where the *non-moving* party invoked the Fifth Amendment, *e.g.*, *Seguban*, 54 F.3d at 391, and they have refused to grant judgment on the pleadings where a complaint is answered with an invocation of the privilege, *National Acceptance v. Bathalter*, 705 F.2d 924, 932 (7th Cir. 1983). These cases stand for the proposition that automatic judgment for a plaintiff when a defendant asserts the Fifth Amendment is too high a cost for the invocation. They do not, however, undermine the proposition stated above that a party cannot both invoke the Fifth Amendment and win at summary judgment. The fact that a jury *may* draw an inference against a defendant who invokes the Fifth Amendment on material facts means that a court can neither grant that defendant summary judgment nor enter a judgment as a matter of law in favor of the plaintiff.

The law imposes costs on parties who invoke the Fifth Amendment in civil proceedings. *See Graystone Nash, Inc.*, 25 F.3d 187, 191 (3d Cir. 1994) ("The principle that the invocation of the privilege may be too 'costly' does not mean that it must be 'costless.'"). A party who invokes this privilege deprives the opponent of an essential source of information, obstructs discovery and proceedings, and hinders the search for the truth. *See Seguban*, 54 F.3d at 390 n.4 (7th Cir. 1995); *SEC v. Graystone Nash, Inc.*, 25 F.3d 187, 190 (3d Cir. 1994); *United States v. 4003-4005 5th Ave.*, 55 F.3d 78, 84 (2d Cir. 1995). Consistent with the established notion that the Fifth Amendment cannot be wielded as a sword by the invoking party to free that party of its burdens in a proceeding, one of the costs to invoking the Fifth Amendment is that summary judgment is

8

not available. *See United States v. Rylander*, 460 U.S. 752, 758 (1983) (noting that the privilege "has never been thought to be in itself a substitute for evidence that would assist in meeting a burden of production" and that deciding otherwise would "convert the privilege from the shield against compulsory self-incrimination which it was intended to be into a sword whereby a claimant asserting the privilege would be freed from adducing proof in support of a burden which would otherwise have been his").

Properly construed, Supreme Court and Seventh Circuit precedents and Rule 56 dictate that Guevara cannot meet his summary judgment burden. Rivera acknowledges, however, that some district courts require more, and hold that where a moving party asserts the Fifth Amendment, the non-movant must still present "some evidence," independent of the invocation, to survive summary judgment. *Logan v. City of Chicago*, 891 F. Supp. 2d 897, 901 (N.D. Ill. 2012); *Thompson v. City of Chicago*, 2009 WL 674353, at *3 (N.D. Ill. Mar. 12, 2009). These courts regard this "some evidence" standard as something less than the normal summary judgment burden. *Logan*, 891 F. Supp. 2d at 903. Regardless whether this court applies Rivera's reasoning set out above, these courts' "some evidence" standard, or normal summary judgment principles (ignoring Guevara's Fifth Amendment invocation entirely), there is sufficient evidence to deny summary judgment to Guevara on each of Rivera's claims.

**B.      A JURY MUST DECIDE RIVERA'S DUE PROCESS CLAIMS**

Defendants move for summary judgment on Rivera's due process claims. But the evidence in the record supports Rivera's due process claim on each of three, independent theories—fabrication of evidence, suppression of evidence, and unduly suggestive identification procedures. Rivera discusses each theory in turn.

**1. A Reasonable Jury Could Conclude That Defendants Fabricated False Evidence**

The Supreme Court and Seventh Circuit "'have consistently held that a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of [his] liberty in some way.'" *Avery v. City of Milwaukee*, 847 F.3d 433, 439 (7th Cir. 2017) (citing *Mooney v. Holohan*, 294 U.S. 103, 112 (1935); *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012)). This due process theory is entirely distinct from the due process theory based on suppression of evidence, which is discussed below. *Petty v. City of Chicago*, 754 F.3d 416, 421-24 (7th Cir. 2014). Applying this law, the Court need look no further than Defendants' fabrication of Lopez's identification of Rivera to deny summary judgment.

Where a due process violation concerns witness testimony, the Seventh Circuit has been careful to distinguish between coerced testimony and fabricated testimony. Police coercion of witnesses that produces truthful testimony does not by itself violate due process, absent a violation of the *Brady* duty to disclose facts about the police coercion that was used to obtain the testimony. *Avery*, 847 F.3d at 439 (citing *Fields v. Wharrie*, 740 F.3d 1107, 1123 (7th Cir. 2014) (*Fields II*)). Police fabrication of witness testimony that the officers know to be false, however, violates due process without need for further analysis. *Id.* at 439-40 (citing *Petty*, 754 F.3d at 423. There is no question this case concerns false witness testimony—Defendants concede that Lopez's identification was a lie, they just argue that they did not know that it was false.

**(a) Overwhelming Evidence Supports Rivera's Fabrication Claim**

Defendants' assertion that they did not knowingly fabricate Lopez's identification of Rivera is the most self-serving version of the factual record possible, and it is flatly contradicted by the evidence. AS ¶¶ 22-28, 52, 58-60. Viewed in Rivera's favor, the record shows that the

10

Defendants settled on Rivera as a suspect before any identification of him took place. AS ¶¶ 22-24. On August 27, Rivera's rap sheet was requested, it was stamped by central records, it was provided to Defendants, and it was placed in their investigative file. AS ¶¶ 22, 76-77. August 27 was two days before the August 29 mugbook identification procedure with Lopez. AS ¶¶ 22-24.[4] In short, rather than follow where the evidence led them, Defendants decided Rivera was their perpetrator first, and then made up evidence implicating him as their suspect. *Id.*

On August 29, according to Defendants' own police reports and testimony, Guevara, Gawrys, McLaughlin, Leonard, Noon, Guzman, Sparks, and Zacharias were all involved in the mugbook procedure with Lopez. AS ¶¶ 23-25.[5] During that mugbook procedure, according to Lopez, these Defendants "pointed him [Rivera] out," and Lopez selected the photo of Rivera, who, as stated, was already Defendants' suspect at the time. AS ¶¶ 22, 26.

After the photo selection, to make Lopez's identification of Rivera credible, these Defendants created a false story, suggesting to Lopez that he previously had seen Rivera playing baseball in Humboldt Park. AS ¶ 27. Lopez adopted this story to explain how he could have identified Rivera's photo from among hundreds of others, despite seeing the shooter only for a moment during the shooting. AS ¶¶ 19(g), 27, 69. These Defendants, along with Rinaldi and Mingey, then wrote and approved police reports, which stated falsely that Lopez had picked Rivera in the mugbook of his own accord. AS ¶ 69. This mugbook identification, as reported by Defendants, was used to procure Lopez's later false identification of Rivera, criminal charges against Rivera, a grand jury indictment, and Rivera's conviction. AS ¶¶ 59, 80-81, 84, 91-94.

---

[4] Defendants will likely dispute that this mugbook procedure took place on August 29 at trial, but they will have to explain why every one of their reports reflects that it in fact occurred on August 29. AS ¶¶ 23-25.

[5] Defendants argue that only Sparks, Zacharias, Guevara and Gawrys were involved in this identification procedure, Officer Br. at 12 n.4, but that fact is disputed by the Defendants' own reports, AS ¶¶ 25, 28, 69.

11

Over the next two days, Guevara, Zacharias, Sparks, Fallon, McLaughlin, Leonard, and Rinaldi arrested Rivera, held him overnight, and placed him in a live lineup, which Lopez viewed. AS ¶¶ 29-38. Lopez picked a filler from the lineup and Rivera was released. AS ¶¶ 33, 39-40.[6] In response, these Defendants worked to bury that the first lineup had ever occurred, writing false reports stating that they had attempted to perform a lineup, had not found Lopez, and had instead made a photo array that they tried to show to Valentin at Cook County Hospital. AS ¶¶ 36-37, 67-68. It is important to point out that Defendants' concession at summary judgment that the first lineup did in fact occur has a significant consequence: it means that Defendants' August 31 report covering up the first lineup is admittedly false.

On September 15, again according to their own reports, Guevara and Gawrys arrested Rivera and conducted a second lineup. AS ¶¶ 51, 59. Lopez testified that before that lineup began he told Guevara and McLaughlin that Rivera was not the perpetrator he had seen shoot Valentin. Nonetheless, these Defendants instructed Lopez to proceed with his identification of Rivera. AS ¶¶ 50-60. When asked at his deposition, "Isn't it true that you coerced Orlando Lopez to identify Jacques Rivera in the second line-up even though he had just told you that Jacques

---

[6] Defendants argue that Rivera is attempting to draw selectively from Lopez's testimony, crediting some aspects and denying others. Officer Br. at 7-8. There is nothing wrong with that approach. With Defendants trying to dispose of the case on summary judgment, Rivera is entitled to the benefit of all doubts, and need not adopt all of any witness's testimony wholesale. *Kadia v. Gonzales*, 501 F.3d 817, 821 (7th Cir. 2007) (noting that the judicial system could not function if it adopted the discredited doctrine that a witness who testifies incorrectly about one thing must be disbelieved on all things); *Branion v. Gramly*, 855 F.2d 1256 (7th Cir. 1988) ("Selective disbelief . . . is an ordinary incident of trial[.]"); *Kotarski v. Binks Mfg. Co.*, 837 F. Supp. 247, 252 (N.D. Ill. 1992) ("[F]or purposes of summary judgment, ambiguities in a witness' testimony must be resolved against the moving party."); *see also Newsome v. James*, 2000 WL 528475, at *2 (N.D. Ill. Apr. 26, 2000) ("Variations in the testimony of disinterested witnesses, as our court of appeals has noted, raise questions about credibility that must be answered by a jury, not by the Court."). A jury will be entitled to disbelieve witnesses' testimony to the extent that their testimony does not square with other facts. There is nothing about summary judgment that requires Rivera to accept all of a witness's testimony as correct if he accepts that some of that testimony is correct.

With respect to Lopez, Rivera accepts nearly everything that Lopez now says, with the exception of his testimony that it was Rivera who Lopez picked in the first lineup. Rivera has no doubt that Lopez was brought into the police station and made a selection from the first lineup, but it contradicts too much other evidence to credit that he picked Rivera from that first lineup. Lopez knows that he picked someone, and while he mistakenly believes (to this day) that it was Rivera, drawing inferences in Rivera's favor, it could not have been. Indeed, if he had picked Rivera, then Rivera would have been arrested right away, he would never have been released, and there would have been no need for a second lineup two weeks later. AS ¶ 33.

Rivera was not the perpetrator?" Guevara refused to answer, citing his constitutional privilege to avoid incriminating himself. AS ¶ 59. Defendants' position that they did not tell Lopez who to pick and that Lopez lied without their input is fatally contradicted by evidence that they conducted the lineup after being told by Lopez that Rivera was not the perpetrator. AS ¶¶ 50-52.[7] After the lineup, Guevara, Gawrys, Mingey, and Weingart (as well as Dorsch and Boyle, who are not Defendants) wrote and approved false reports saying that Lopez selected Rivera in a legitimate lineup. AS ¶ 60.

These identifications were not the only false evidence that the Defendants created. At midnight on September 15-16, Guevara and Gawrys wrote, and Mingey approved, a false report (the "September 16 report") saying that Valentin—who had died a day earlier—had identified Rivera from a mugbook on September 10. AS ¶¶ 65-66. Of course, there was no contemporaneous record of that identification, and it could not be verified, given that Valentin

---

[7] In attempt to avoid this result, Defendants argue there is not sufficient evidence to conclude that Guevara and McLaughlin are the officers with whom Lopez interacted during the second lineup. Officer Br. at 8-10. But there is ample evidence from which jury could reasonably conclude that Lopez was talking to Guevara and McLaughlin, and it is unclear what more evidence Rivera could muster short of Lopez remembering 20+ years later the name of the police officers with whom he interacted.

Among other things, reports reflect that Guevara and Gawrys conducted this lineup. AS ¶ 65. Lopez describes the officer to whom he spoke as one that was familiar to him with a "'fro, mustache, and glasses." AS ¶ 53. Guevara is the only officer on the investigative team fitting that description, as his photographs produced in this case show. AS ¶ 56.

For her part, McLaughlin was the detective in charge of the investigation. AS ¶¶ 9, 54. She was present at the photobook and first lineup with Lopez. AS ¶¶ 25, 32, 36, 67-69. In addition, she was the only woman on the investigative team and the only woman with reason to participate in a conversation or lineup procedure with Lopez on September 15. AS ¶¶ 54-55. Moreover, Lopez testified that the woman to whom he spoke before the lineup was a blonde or white-haired, older woman, and McLaughlin fits that description. AS ¶ 54. The only other woman present on the evening of September 15, ASA Rosner, had brown hair and did not arrive until after the lineup. AS ¶ 55. This evidence is more than sufficient at summary judgment to support the inference that Guevara and McLaughlin were the detectives to whom Lopez spoke.

Were there any doubt, Guevara had every opportunity to set the record straight. When he was asked at his deposition in this case, "Isn't it true that Orlando Lopez told you and Detective Gillian McLaughlin that Jacques Rivera was innocent before you conducted the second line-up—the second live in-person line-up in this case?" Guevara answered by invoking the Fifth Amendment. AS ¶¶ 52-56 (citing Guevara Dep. at 23:3-11). Disputed facts prevent Guevara and McLaughlin from claiming they were not the officers with whom Lopez spoke.

Along the same lines, Defendants make a nonsensical argument that, even if they did speak with Lopez before the second lineup, they did not properly understand the significance of what Lopez was saying to them. Officer Br. at 10-11. The notion that Defendants are entitled to an inference that they misheard a statement from the sole eyewitness that their suspect Rivera was not the perpetrator is at best a weak defense for trial—it is not remotely an argument for summary judgment.

13

had just died. AS ¶¶ 45, 65-66. Nor did Guevara, Gawrys, or Mingey give any reason for why, if Valentin identified Rivera as the shooter on September 10, they waited days to arrest him. AS ¶¶ 47. Most importantly, it turned out that on September 10, Valentin was in a coma such that the fabricated identification would have been impossible. AS ¶¶ 5-6, 46. These Defendants have provided no explanation of how they extracted an identification from someone who was in a vegetative state. AS ¶¶ 46-47, 66. The boldness of this fabrication is staggering, and it puts to rest any argument Defendants make that their framing of Rivera was a mistake.

The fabrication in Guevara, Garwys, and Mingey's September 16 report did not stop there. They also reported falsely that after the manufactured identification of Rivera in the second lineup, Lopez viewed photos of Rodriguez and Nieves, and he said that they were not the perpetrators. AS ¶ 48. Again, this purported photo exclusion never occurred. AS ¶ 49.

Finally, in advance of trial, Guevara fabricated false witness testimony for Lopez to provide at trial. AS ¶¶ 61-64. Specifically, Guevara invented a story that the shooter had long hair dyed gold and that Rivera had a similar hairstyle at the time of the shooting. AS ¶ 1. There was not a single mention of gold hair in any of the police reports or witness descriptions. AS ¶ 62. Yet at trial, Lopez testified that he had told the police all along that the shooter had long gold hair. AS ¶ 91. After that, Guevara took the stand and stated falsely that Rivera had gold hair at the time of his arrest. AS ¶ 92. That, of course, was not true. AS ¶ 63. Asked at his deposition why he provided this false testimony, Guevara took the Fifth. AS ¶ 64. Given this evidence and the other fabrications described above, Rivera is entitled to the inference at summary judgment that before trial Guevara fabricated this false testimony about gold hair for him and Lopez to provide, in order to further bolster Lopez's false identification.

14

Through these sequential acts of fabrication, each and every one of the Defendants helped to construct an entirely false story, in which the eyewitness Lopez had purportedly seen a man he recognized from Humboldt Park shoot Valentin, after which he picked a photo of Rivera from a mugbook without any help, and then confirmed that identification of Rivera in a legitimate live lineup three weeks later. The false story continued that the victim, Valentin, who earlier in the investigation had identified Rodriguez and Nieves from a photobook, had later identified Rivera as the perpetrator as well. At the same time, Lopez excluded Rodriguez and Nieves after being shown photos of them. The criminal justice system could be sure that Lopez's identification was accurate, the false story concluded, because he had seen a shooter with a distinctive gold pony tail, and Guevara had noticed the same pony tail at the time of Rivera's arrest.

This false evidence was presented to prosecutors and others in the criminal justice system, and it caused Rivera to be charged, prosecuted, and convicted. AS ¶¶ 80-85, 90-93. A jury could find each Defendant liable on this theory, and summary judgment must be denied.

### (b) Defendants' Arguments for Judgment on the Fabrication Theories Fail

Defendants offer little in the way of argument for summary judgment on Rivera's fabrication theories.[8] Defendants assert that summary judgment is warranted because, in their view, their fabricated evidence—more specifically, their actual police report—was not used at Rivera's trial. Officer Br. at 14-16. This argument fails as a factual matter, because construing

---

[8] In fact, they provide no counterargument at all to Rivera's contention that Defendants fabricated Rivera as a suspect in the first place, before any identification, or to the theory that Defendants fabricated Lopez's initial mugbook identification. There is a direct causal link between these fabrications and Rivera's arrest, prosecution, and conviction, and the Defendants cannot hope for summary judgment on Rivera's fabrication claims having failed to even address those theories. *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 736 (7th Cir. 2006) ("[I]f the moving party does not raise an issue in support of its motion for summary judgment, the nonmoving party is not required to present evidence on that point, and the district court should not rely on that ground in its decision."); *Purghoraishi v. Flying J, Inc.*, 449 F.3d 751, 765 (7th Cir. 2006) (same). It will obviously be too late for Defendants to raise these arguments in their reply. *Costello v. Grundon*, 651 F.3d 614, 635 (7th Cir. 2011) (reversing summary judgment granted on issue first raised in a reply).

the record in Rivera's favor, the evidence fabricated by Defendants was absolutely introduced at trial. AS ¶¶ 90-93. Indeed, it was the only thing that led to Rivera's conviction. AS ¶¶ 90-93, 95.

The in-court identifications provided by Lopez and Guevara at trial were precisely the fabricated story just discussed, which was manufactured by the Defendants and set out in their false reports. AS ¶¶ 60, 65-69, 91-92. The false story about having seen the shooter previously in Humboldt Park, the fabricated mugbook identification, the false identification of Rivera at the second lineup, and the invented story about the shooter and Rivera having gold hair were all explicitly introduced at trial through the testimony of Lopez, Leonard (by stipulation), and Guevara. AS ¶¶ 91-93. The photograph of the second lineup was introduced into evidence, it was authenticated by Guevara, and Lopez placed an "X" over Rivera's head on the exhibit during his testimony. AS ¶¶ 91, 92. Moreover, the testimony of Lopez and Guevara followed the script of pretending as though the first lineup had never occurred. *Id.*

Defendants' fabricated evidence was used before trial as well to deprive Rivera of his liberty—it was given to prosecutors to support charges and it formed the basis, through Guevara's testimony, for the indictment. AS ¶¶ 80-84. Rivera is entitled to the inference at summary judgment that, immediately following the second lineup, Guevara, Gawrys, and McLaughlin spoke with prosecutors and provided them the same false information included in their reports to bring about the charges. AS ¶¶ 81-82. At the grand jury, Guevara presented the false story that an "eyewitness"—either Lopez or Valentin—had implicated Rivera as the killer, and that was the only evidence presented during that proceeding. AS ¶ 84.

Defendants' argument that their police reports did not get introduced as evidence at the criminal trial fundamentally misunderstands the principles of causation that govern fabrication claims. When the police fabricate evidence, they are liable if that fabrication causes any

16

deprivation of liberty, whatever form the fabricated evidence takes, and whether it is presented at trial or is used to bring charges or to help indict. *See Avery*, 847 F.3d at 441-42 (due process violated when fabricated confession introduced at trial through police testimony); *Stinson v. Gauger*, Nos. 13-3343, 13-3346 & 13-3347 (7th Cir. Aug. 18, 2017) (*en banc*) (slip opinion attached as Ex. 150) (due process violated when fabricated expert opinion introduced at trial by testimony); *Whitlock*, 682 F.3d at 582-84 (due process violated when witness testimony fabricated by police introduced at trial by an immune prosecutor at trial); *Fields II*, 740 F.3d at 1112 (noting that a where a fabrication was used to support charges it "harmed the defendant before and not just during trial, because it was used to help indict him"); *Julian v. Hanna*, 732 F.3d 842, 847 (7th Cir. 2013) (fabrications of evidence affect liberty interests both before and after conviction). Thus there is no support for Defendants' position that they can be liable only if particular false police reports are actually introduced as evidence.

Finally, Guevara argues that he is not liable for his fabrications because witnesses are immune for the testimony they give at trial or to the grand jury. Guevara is correct that *Briscoe v. LaHue*, 460 U.S. 325, 332-33 (1983), and *Rehberg v. Paulk*, 566 U.S. 356, 368-69 (2012), respectively, establish that testimonial immunity. But as the Supreme Court and Seventh Circuit have said repeatedly, testimonial immunity does not extend to pre-trial acts of fabrication that are then presented by way of testimony at trial. *Rehberg*, 566 U.S. at 370 n.1; *Stinson*, Ex. 150, slip op. at 22-23 (pretrial acts of fabricating false testimony violate due process even if witness is immune for later testimony at trial); *Avery*, 847 F.3d at 441-42 (an officer cannot immunize himself simply by testifying about his false evidence at trial and noting that "[i]f an officer who fabricates evidence can immunize himself from liability by authenticating falsified documentary

17

or physical evidence and then repeating the false 'facts' in his trial testimony, wrongful-conviction claims premised on evidence fabrication would be a dead letter.").

Under this case law, Rivera does not seek to hold Guevara liable for his lies at the grand jury and trial. Instead, Guevara is liable for fabricating evidence before those proceedings—a false identification from Valentin and false identifications and testimony from Lopez—that was used to secure charges, obtain an indictment, and cause a conviction at trial, when the false evidence was introduced through testimony and exhibits. AS ¶¶ 90-93; *see also* 22-28, 29-41, 45-46, 48-49, 50-60, 61-64, 65-69. This is precisely the type of fabrication claim recently blessed by the Seventh Circuit in *Avery*, 847 F.3d at 441-42.

In summary, all of the evidence that implicated Rivera in the Valentin shooting was created by the Defendants. To the extent that the Defendants disagree, it is because there are genuine disputes of fact. Summary judgment on Rivera's fabrication theories should be denied.

**2. Independently, A Reasonable Jury Could Conclude That Defendants Suppressed Material Exculpatory and Impeachment Evidence**

*Brady* requires that exculpatory and impeachment evidence material to the criminal case be disclosed to the defense, "[a]nd police officers can be held liable under *Brady* and its progeny when they withhold exculpatory evidence from prosecutors[.]" *Holland v. City of Chicago*, 643 F.3d 248, 255 (7th Cir. 2011); *see also Kyles v. Whitley*, 514 U.S. 419, 438 (1995). The Seventh Circuit has long recognized that section 1983 due process claims may be brought against police who withhold exculpatory and impeachment evidence, causing wrongful convictions. *Whitlock*, 682 F.3d at 572; *Dominguez v. Hendley*, 545 F.3d 585 (7th Cir. 2008); *Newsome v. McCabe*, 256 F.3d 747, 752 (7th Cir. 2001); *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988).

The Supreme Court recently reaffirmed that "[e]vidence qualifies as material when there is '"any reasonable likelihood"' it could have '"affected the judgment of the jury."'" *Wearry v.*

18

*Cain*, 136 S. Ct. 1002, 1006 (2016) (quoting *Giglio v. United States*, 405 U.S. 150, 154 (1972);

*Napue v. Illinois*, 360 U.S. 264, 271 (1959)). A litigant "need not show that he 'more likely than

not' would have been acquitted had the new evidence been admitted. . . . He must show only that

the new evidence is sufficient to 'undermine confidence' in the verdict." *Id.* (citing *Smith v.

Cain*, 132 S. Ct. 627, 629-31 (2012)); *see also Kyles*, 514 U.S. at 434.

The question as to whether suppressed evidence was material must be answered

considering all of the suppressed evidence together in the aggregate, and not by assessing

evidence piece by piece. *Wearry*, 136 S. Ct. at 1007. Whether evidence is material also depends

on the strength of other evidence used in the criminal proceedings—it might take only a little

evidence to disturb an already-weak conviction. *United States v. Agurs*, 427 U.S. 97, 113 (1976).

Importantly, it is firmly established that evidence that would impeach a key eyewitness is

material. *Giglio*, 405 U.S. at 153-54; *see also Smith*, 565 U.S. at 75 (impeachment evidence

regarding eyewitness material when eyewitness was the only evidence connecting defendant to

the crime); *Fields v. Wharrie*, 672 F.3d 505, 517 (7th Cir. 2012) (*Fields I*) ("The constitutional

violation occurs when the means by which the testimony was acquired are not disclosed at

trial—or when other information that impeach the testimony's reliability are not shared with the

defense."); *Newsome v. McCabe*, 319 F.3d 301, 302-05 (7th Cir. 2003) (holding that "the details

about how [the police] induced the witnesses to finger Newsome" was "information vital to

probe whether manipulation occurred").

The case against Rivera was exceedingly thin and based on fabricated evidence. Any one

of the pieces of exculpatory evidence suppressed by Defendants would have undermined

confidence in his conviction. When the suppressed evidence is considered as a whole, there is no

chance Defendants are entitled to summary judgment on the suppression claim.

#### (a) Defendants Suppressed Exculpatory Evidence

1. *Defendants Suppressed Their Fabrications*. At the outset, it is worth noting that Defendants suppressed that they had fabricated the false evidence discussed above. Specifically, Defendants did not disclose to state prosecutors, to Rivera, or to his criminal defense attorney, now-Judge Kenneth Wadas that they had pointed out Rivera in the mugbook when they showed it to Lopez, or that they had fed Lopez a story about recognizing Rivera from the baseball fields in Humboldt Park. AS ¶¶ 25-28, 69, 87, 89. They also suppressed that they told Lopez to pick Rivera from the second lineup, that they invented an identification from Valentin at a time when he was in a coma, and that they had fabricated the story about the perpetrator having gold hair. AS ¶¶ 45-46, 57-60, 61-62, 65-69, 73-77. Had the Defendants disclosed any of this information, it would have immediately halted the criminal prosecution and conclusively shown Rivera's innocence. Even if it had not, this suppressed evidence is the sort of impeachment evidence that is conclusively material, within the meaning of *United States v. Bagley*, 473 U.S. 667, 676 (1985), and *Giglio*, 405 U.S. at 154-55. It could have been used to cross-examine Lopez and Guevara in a manner that would have left the state without good evidence. *Smith*, 565 U.S. at 75; *Fields I*, 672 F.3d at 517; *Newsome*, 319 F.3d at 302-05. As a result, Defendants' suppression of their own fabrications is enough for Rivera's suppression claims to survive summary judgment.

2. *Defendants Suppressed Lopez's Exculpatory Statement*. Rivera's claim here is not based solely on the suppression of Defendants' fabrications, because Defendants suppressed other material evidence as well. As discussed, before the second lineup, Lopez told Guevara and McLaughlin that Rivera was not the shooter. AS ¶¶ 50-56. It is hard to imagine more powerful impeaching evidence than a prior statement from the state's star eyewitness that the person he

20

identified in a mugbook, in a lineup, and at trial was in fact not the perpetrator he had seen.[9] This evidence was, without question, material. *Jones*, 856 F.2d 985 (affirming a due process verdict in a case with almost precisely the same fact pattern); *Whitlock*, 682 F.3d at 574 (affirming denial of summary judgment in the same circumstances).

3. *Defendants Suppressed the First Lineup*. The same is true of Defendants' suppression of the first lineup on August 31. Again, Defendants concede, as they must under Rule 56, that the lineup occurred. AS ¶¶ 29-38. If it did, Defendants also must concede that they *falsely reported* to prosecutors, Rivera, and his criminal defense attorneys that no such lineup ever occurred. AS ¶¶ 36, 43, 67-68. Rivera stood in that lineup, Lopez viewed it, and Lopez picked a filler. AS ¶¶ 39-40. Again, information that Lopez viewed a lineup and picked someone other than Rivera would have been powerful impeachment of his other identifications. AS ¶ 83. Indeed, proof that a first lineup with Lopez occurred would have been material evidence impeaching Lopez's trial identification, even if one construes the facts in Defendants' favor and assumes that Lopez did not pick a filler. AS ¶¶ 29-38. Rivera and his attorney could have impeached Lopez's and Guevara's testimony at trial that Lopez identified Rivera in an unbroken sequence of identification procedures—first the mugbook and then the September 15 lineup—with evidence that Lopez had viewed a lineup in which Rivera stood, after which Rivera was released without charge. AS ¶¶ 83, 90-93. In many scenarios the first lineup was material exculpatory evidence.

---

[9] Rivera has already explained the reasons that Defendants' factual arguments—that Lopez did not tell them this, or that if he did they did not understand—are inappropriate for summary judgment.

Defendants also argue they cannot be held accountable for failing to appreciate the ramifications of the evidence that they did not produce, and they cite to this Court's decision in *Johnson v. Dossey*, 878 F. Supp. 2d 905, 921 (N.D. Ill. 2012), in support. Officer Br. at 10-11. *Johnson* does not support Defendants. In *Johnson*, the record showed (at best) that the trial prosecutor and police conspired together to suppress evidence, and the issue was whether there was evidence that the police had failed to disclose a particular piece of exculpatory evidence to the prosecutor. *Id.* at 920-21. The Court concluded that there was no evidence in the record that the police had failed to do so. *Id. Johnson* has no application here, where the evidence shows that police learned from the eyewitness that their suspect was not the perpetrator, that the police never disclosed that information to prosecutors, and that they instead told prosecutors that the witness had identified their suspect. AS ¶¶ 52, 57, 60, 65, 80-83.

21

Defendants' argument that the first lineup was not suppressed because Rivera and his attorney, Wadas, knew about it is riddled with errors. Of course Rivera was always suspicious that the first lineup he stood in a couple of weeks before he was charged with Valentin's murder was related to the case—he told Wadas as much, and Wadas attempted to investigate it. AS ¶¶ 42, 87. But Rivera (and Wadas, and state prosecutors) had no way of proving that the first lineup Rivera stood in was related to the Valentin case. AS ¶¶ 42-43, 87. That is because Guevara told Rivera when he was arrested that he was going to be a filler in a lineup, Defendants wrote false reports stating that the lineup had not occurred, and they suppressed other reports that could have been used to show that in fact the lineup had occurred and was related to the Valentin case. AS ¶¶ 36-37, 42, 67-68, 76-77. Moreover, Rivera certainly had no way, standing in the lineup, to know that Lopez had viewed the lineup, much less that he had picked a filler. AS ¶¶ 42-44.

Defendants refer the Court to *Gauger v. Hendle*, 349 F.3d 354, 360 (7th Cir. 2003), a case that stands generally for the proposition that evidence is not suppressed within the meaning of *Brady* if it is already known to the criminal defendant. Because Rivera was in the first lineup, Defendants' argument goes, exculpatory evidence was not suppressed. Precisely this misapplication of *Gauger* was expressly rejected by the Seventh Circuit earlier this year in *Avery*, 847 F.3d at 443-44.

*Avery* considered whether police officers could be liable for failing to disclose impeachment evidence regarding their interrogations of three jailhouse informants, who testified falsely at a criminal defendant's trial that the criminal defendant had confessed the murder to them. *Id.* at 436-37, 443-44. The district court, relying on *Gauger*, concluded that because the criminal defendant had himself participated in conversations with the jailhouse informants, he knew that they were lying when they implicated him, and therefore the police had no *Brady*

22

obligation to disclose information about the informants when the criminal defendant could have impeached the informants himself. *Id.* at 443-44. Rejecting the same argument Defendants raise here, the Seventh Circuit held that the district court "correctly stated the *Gauger* rule but misapplied it to this case," and it held that where the police have knowledge of impeaching facts that will help to prove that a witness's statements are false, they must disclosed that impeachment evidence under *Brady*. *Id.*

Rivera knew he was in a lineup and suspected it was related to this case, but he was deprived of all of the proof in Defendants' possession with which he could have impeached Lopez at trial—the fact that the lineup was tied to the Valentin investigation, the fact that Lopez viewed the lineup, and the fact that he picked a filler. AS ¶¶ 42-44. All of that would have been powerful impeachment evidence, and all of it was suppressed by Defendants. Worse yet, they replaced this impeachment evidence with false evidence. *Gauger* does not apply to this situation, *Avery* does. Defendants are not entitled to summary judgment.

4. *Defendants Suppressed That Rivera Was Their Suspect on Day One.* Last but certainly not least, Defendants suppressed the fact that Rivera was their suspect on the day the crime occurred, before any witness had identified him. AS ¶¶ 22-24. This is perhaps the most profound fact withheld in the case. Defendants requested Rivera's rap sheet on the day Valentin was shot, that rap sheet was produced by central records with an August 27 date stamp, and the Defendants put the rap sheet in their file. AS ¶¶ 22, 76-77. The rap sheet was therefore produced two days before Lopez made his August 29 mugbook identification of Rivera. AS ¶¶ 22-24. Rivera is fully entitled to the inference at this stage of the case that this sequence of events demonstrates that Defendants decided he was a suspect first and created evidence to implicate him second. That inference is strengthened by the fact that the rap sheet itself was hidden in the street file and was

23

never turned over to prosecutors, Rivera, or his defense attorneys. AS ¶¶ 76-77, 87. If it had been disclosed, it too would have been powerful impeachment evidence at trial.

### (b) Defendants Suppressed Exculpatory Police Files

The summary judgment record also amply supports Rivera's claim that Defendants violated his right to due process by suppressing investigative documents generated during the Valentin investigation in a street file—a clandestine parallel file that was not produced to prosecutors, to Rivera, or to his attorneys.[10] The documents Defendants suppressed in the street file were additional material exculpatory and impeachment evidence that were withheld from Rivera, in violation of his right to due process. *See Jones*, 856 F.2d 985 (noting that suppression of exculpatory evidence in clandestine street files violates due process); *see also Fields v. City of Chicago*, 2014 WL 477394, at *6-7 (N.D. Ill. Feb. 6, 2014) (denying summary judgment on a similar street files claims).

The City and Officer Defendants argue that there was no street file in this case. Their argument boils down to a word game—one that they lost in both *Fields* and *Kluppelberg*—where they define the many types of parallel investigative files kept within the Chicago Police Department, pronounce that the usual type of investigative files were kept during the Valentin investigation, and conclude that, as a result, there was no street file withheld from Rivera. To the extent that files were not turned over to Rivera, Defendants continue, that must have been the fault of state prosecutors or Rivera's attorneys. The Defendants' self-serving characterization of the types of files that they kept during the Valentin investigation and their conclusion that they

---

[10] Rivera explains the history of the street files practice in his Local Rule 56.1 statement, AS ¶¶ 98-109, and in greater detail below. What is important to bear in mind about the street files practice for present purposes is that investigative materials generated during police investigations were kept by officers in a series of parallel files. When an investigation concluded, certain reports were made part of the official file routinely produced to the criminal justice system and others were not. At the end of the day, information in the parallel investigative files was systematical suppressed and was not handed over to prosecutors or to criminal defendants. The parallel investigative files for any given case that were not turned over are referred to as street files throughout this brief.

did not cause the police file suppression in this case depend entirely on a version of the facts in which every inference is drawn *against* Rivera. That is impermissible at summary judgment, and Defendants' assertion that the record shows they did not suppress documents in a clandestine street file must be rejected.

To be clear, Defendants produced a street file in this litigation they had never produced before. AS ¶¶ 70(a), 79. That street file is attached as Exhibit 4 to Rivera's brief. AS ¶¶ 79, 76-77.[11] A number of the police reports in the street file were made part of the official permanent retention file kept by the Chicago Police Department at the time of Rivera's criminal prosecution. AS ¶¶ 70(b), 73-75. The permanent retention file is attached as Exhibit 42 to Rivera's brief. AS ¶¶ 70(b). Other police documents generated by Defendants during the Valentin investigation, however, were not put in the permanent retention file and instead were kept only in the street file. AS ¶¶ 70(a)-(b), 75-77.[12]

In response to requests from prosecutors and Rivera's attorneys in the lead-up to Rivera's criminal case, Defendants turned over the permanent retention file, but they did not turn over the street file. AS ¶ 75. The police documents that were produced by Defendants to the criminal justice system in Rivera's criminal case are in the case file of Rivera's criminal defense attorney, Wadas. AS ¶¶ 72-75. Wadas's file is attached as Exhibit 16 to Rivera's brief. AS ¶¶ 72-75.[13]

---

[11] Defendants argue that this file is a color copy of another file produced at the beginning of this civil litigation. City Br. at 2. That is not so. The police files produced by Defendants at the beginning of this case were an amalgamation of various police documents, from different sources, apparently assembled by defense counsel—they were not an actual copy of the street file. RCS ¶¶ 41-42, the key point here is not that the complete copy of the street file showed up for the first time after substantial discovery in this case, it is that the complete street file—whether in color or black and white—was never produced at all until this civil litigation. AS ¶ 79.

[12] Defendants argue that the fact that the file is in an 8.5 x 11" folder, has an index, and contains general progress reports shows that it is not a street file. City Br. at 11-12. This argument not only construes the evidence in the light most favorable to Defendants, it also does not make sense. The evidence that this is a street file is that it was never turned over to prosecutors or defense attorneys, not the size of the file folder. AS ¶¶ 72-77, 79, 87-88.

[13] Defendants spend significant space arguing that it is not clear what files prosecutors received from the CPD and which files Wadas received from prosecutors. City Br. at 12-14. These arguments depend on an incredible obfuscation of the record. Indeed, the City in its brief recognizes that there are disputes of fact on these questions. *See id.* at 13 ("[T]here is a dispute as to whether the documents Wadas disclosed . . . constitute his entire file[.]").

25

Contrary to the City's cursory argument otherwise, City Br. at 14, investigative documents included in the street file and not produced to the criminal justice system included plainly exculpatory evidence. For example, the rap sheet bearing the August 27 date stamp, showing that Rivera was a suspect before he was first "identified" by Lopez, was hidden in the street file. AS ¶¶ 76-77. While Defendants produced other rap sheets as part of criminal discovery, they suppressed the rap sheet with the date stamp. *Id.*

Perhaps more importantly, every scrap of paper from the investigation that suggested that a first lineup had been conducted in the Valentin investigation—every document that would have allowed Rivera or Wadas to connect the first lineup Rivera stood in to the Valentin shooting— was suppressed. AS ¶ 77. In other words, after writing their false report about the August 31 lineup, Defendants put all other documents suggesting that there had been an August 31 lineup in the street file, and those documents stayed hidden from Rivera during his entire wrongful conviction. AS ¶¶ 76-77, 79.[14]

---

Put simply, now-Judge Wadas testified that the file that he produced to the parties in this litigation was his complete file from the criminal case, which included all of the police documents that he received in discovery. AS ¶¶ 72-74. Further, Wadas testified that he always received all of the police reports in the State's Attorney's Office's possession on the cases that he defended. AS ¶¶ 74, 87. The trial Assistant State's Attorney Victorson, who prosecuted Rivera, similarly testified adamantly that he provided Wadas all of the police documents that he had received from the CPD. AS ¶ 74. Nothing in the record casts any doubt, particularly for purposes of summary judgment, on the conclusion that Wadas's file produced in this case accurate reflects what state prosecutors, Rivera, and Wadas had at the time of Rivera's criminal prosecution.

Moreover, Defendants' contention that Wadas never asked for the file is obviously contradicted by the record. City Br. at 12-13. Rivera's attorney sent a subpoena to the CPD's keeper of records asking for the investigative files before Rivera's trial, but they were not produced. AS ¶¶ 71, 76-77, 79. Wadas made normal discovery requests to prosecutors, and prosecutors provided all police materials they had in response. AS ¶¶ 73-74, 86. Those records appeared to be a complete record as far as Wadas and state prosecutors could tell. AS ¶¶ 87-88. Despite these efforts, the street file was not produced. AS ¶ 79. Defendants' arguments that there was no street file or that Rivera and his attorneys did not ask for it are at best fact disputes for trial.

[14] Defendants argue there is no evidence that they ever wrote an accurate report recording the August 31 lineup, and therefore that there is no report of that first lineup that was suppressed. Officer Br. at 13 & n.6. Rivera is not arguing about the suppression of some hypothetical report. He is arguing that the Defendants hid in the street file things like hold forms, release forms, and general progress reports that demonstrated that the Defendants had held a live lineup on August 31. AS ¶ 77.

26

These documents in the street file were documentary evidence Rivera and Wadas could have used to investigate the case, impeach witnesses, and prove Rivera's innocence, as discussed above. Defendants' suppression of the street file violated Rivera's right to due process.[15]

### (c) Defendants' Reasonable Diligence Arguments Fail

Defendants' arguments that the evidence they suppressed was available to Rivera through the exercise of reasonable diligence is without legal support, and it once again depends on a version of the facts skewed impermissibly in Defendants' favor. *See* Officer Br. at 11-13. This argument must be rejected at summary judgment.[16]

As in *Jimenez v. City of Chicago*, "[w]hat was available through reasonable diligence . . . is very much in dispute." 830 F. Supp. 2d 432 (N.D. Ill. 2011); *see also Cottrell v. Clemons*, 2014 WL 3649185, at *2 (W.D. Ky. July 23, 2014) (whether defense counsel exercised reasonable diligence is a question for the jury); *cf. Cathedral of Joy Baptist Church v. Village of Hazel Crest*, 22 F.3d 713, 719 (7th Cir. 1994) (issue of diligence in discovering an injury is a question of fact for the jury unless "the relevant facts are undisputed and only one conclusion may be drawn from them"). Defendants contend that if Rivera's attorney Wadas had worked harder, he might have uncovered the first lineup that they had covered up, Lopez's unreported statement before the fabricated second lineup that Rivera was not the perpetrator, and their secret street file. Officer Br. 6-7, 11-13. The record categorically does not permit Defendants to establish that the evidence they suppressed was available to Rivera and his attorneys.

---

[15] In a single sentence, the Officer Defendants argue that they were not responsible for transmitting their file to prosecutors. Officer Br. at 13-14. It is unclear what they mean. There can be no doubt that due process required the Officer Defendants to transmit the exculpatory reports in their file to prosecutors. *Kyles*, 514 U.S. at 438; *Avery*, 847 F.3d at 443-44. To the extent the Officer Defendants mean that they had no control over the process that the CPD uses to transmit investigative files to the criminal justice system, that is at best an argument that a jury should decide if the City's policies and practices are responsible for the due process violation (an issue discussed below), it is not an argument that undisputed facts justify summary judgment for the officers.

[16] Defendants' reasonable diligence argument has no impact at all on Rivera's fabrication and unduly suggestive lineup due process theories, neither of which requires suppression as an element.

27

It is important to note that each item of exculpatory evidence that Defendants contend was available through reasonable diligence is evidence they fabricated or actively took steps to cover up: After the first lineup, Defendants wrote a false report stating that it did not happen and hid documents discussing it in their street file, AS ¶¶ 36, 67-68, 77; at the second lineup, Defendants had Lopez identify Rivera after he said Rivera was not the perpetrator and falsely reported that the lineup was legitimate, AS ¶¶ 52, 57-60; and Defendants buried their street file so that neither police or prosecutors had access to it, AS ¶¶ 74-75, 79. Defendants cannot contend that Rivera's attorneys could have discovered what Defendants intentionally hid.

Moreover, the contention that Rivera could have learned Lopez's true story or the circumstances of the first lineup are themselves disputed facts. Wadas testified that he attempted to investigate the first lineup after Rivera told him that he thought one had occurred—Wadas made multiple requests to prosecutors for reports of the first lineup and also requested photographs—but he hit a dead end when he was told that there were no such documents and that there was no first lineup. AS ¶¶ 43-44, 86-87. The reason he hit a dead end is that Defendants hid the evidence, from Wadas and from the prosecutors. AS ¶¶ 43-44, 74-75, 86-87.

In addition, Wadas had no access to Lopez because he was controlled by Defendants, who were fabricating false evidence with him while preparing him for trial, and because he was a minor whom Wadas could not have talked to, even absent Defendants' misconduct. AS ¶¶ 85, 89. At summary judgment, Rivera is entitled to the inference, based on this evidence, that Lopez was not available to Wadas for an interview. At the same time, there is a vigorous dispute of fact about whether an interview of Lopez would have yielded anything but the false story that Defendants had concocted. AS ¶¶ 20(a), 21(a). Indeed, Lopez was asked under oath for his honest testimony, and he repeated Defendants' false story. AS ¶¶ 20(a)-(b), 21(c), 91.

28

Finally, disputes of fact preclude any suggestion that Wadas did not work hard enough to discover Defendants' street file. This was not an open file system. RCS ¶ 31; AS ¶ 73. By definition, a street file is a clandestine file not turned over to the criminal justice system. AS ¶ 103. Before Rivera's trial, one of his attorneys sent a subpoena to the Chicago Police Department keeper of records for the investigative files in the case, Wadas made discovery requests, and prosecutors provided everything in their possession. AS ¶ 71. Those records they received appeared to be complete per Wadas's experience and as far as prosecutors knew. AS ¶ 88; *see also id.* ¶ 74. The street file was not produced in response. AS ¶¶ 75-77. Indeed, even after his conviction Rivera made FOIA requests for the police files in the case without success. AS ¶¶ 78-79. It is implausible, based on the record construed in Rivera's favor, to suggest that reasonable diligence would have led to discovery of the street file. These factual disputes preclude judgment as a matter of law without need for further analysis.

It is also important to point out that Defendants' "argument rests on far too expansive an understanding of what sort of evidence should be considered available to a defendant through the exercise of reasonable diligence." *Boss v. Pierce*, 263 F.3d 734, 740 (7th Cir. 2001). Reasonable diligence does not require defense attorneys to seek evidence they "had no reason to believe existed," and the Seventh Circuit regards "as untenable a broad rule that any information possessed by *a defense witness* must be considered available to the defense for *Brady* purposes." *Id.* at 740, 743 (emphasis added). The Court observed that such defense witnesses "may be uncooperative or reluctant," it can be difficult to "extract all the favorable evidence a defense witness possesses," and "the defense may have forgotten or inadvertently omitted some important piece of evidence[.]" *Id.* Importantly, this is the view of the Seventh Circuit in the case of a witness *controlled by the defense*. "These concerns have even more weight in a case, like

29

this one, involving information possessed by a *prosecution* witness." *Hampton v. City of Chicago*, 2017 WL 2985743, at *22 (N.D. Ill. July 13, 2017).

Not only was Lopez a prosecution witness, he was a witness for whom Defendants had fabricated identifications and an entirely false story—a story that Lopez stuck with throughout Rivera's trial. As Judge Kennelly observed in *Jimenez*, reasonable diligence would not be a tenable legal rule if courts determined that fabricated stories in the minds of prosecution witnesses were discoverable through the exercise of reasonable diligence:

> Defendants' argument seems to assume the existence of a Perry Mason-like world in which prosecution witnesses readily give up impeaching information when interviewed or questioned by defense counsel. Real life does not work that way, or at least the governing legal rule cannot realistically be premised on the assumption that it always works that way. Witnesses coerced or persuaded to testify in a particular way often tend to identify with, and to ally themselves with, their persuaders. A legal rule that assumes that such a witness will readily describe the circumstances of the coercion or persuasion simply because the other side's lawyer asks the witness the right question would defy common sense.

830 F. Supp. 2d at 444-45. As Judge Dow observed recently in *Hampton*, in cases where "the evidence that was allegedly withheld was in the minds of the prosecution witnesses, . . . and there is some evidence that the prosecution witnesses provided misleading information about the detectives' use of suggestive identifications with them," summary judgment should not be granted on reasonable diligence grounds. 2017 WL 2985743, at *22.

More generally, the Seventh Circuit has made clear that the reasonable-diligence doctrine does not extend to information in the heads of witnesses the same way that it does to information in accessible documents. *Boss* observed that "[i]n the typical reasonable diligence case, the question is whether defense counsel had access to the documents containing the *Brady* material, through an open file policy," and not "whether defense counsel had access to *Brady* material contained in a witness's head." 263 F.3d at 741. The Court continued: "In cases like the present one, the question is whether defense counsel had access to *Brady* material contained in a

30

witness's head. . . . Because mind-reading is beyond the abilities of even the most diligent attorney, such material simply cannot be considered available in the same way as a document." *Id.* (citation omitted). At the same time, the Court has concluded that information may be deemed unavailable if the defense has less of an opportunity to obtain it, *e.g.*, *United States v. Morris*, 80 F.3d 1151, 1168 (7th Cir. 1996) (focusing on whether "defendants had been given the same opportunity as the government to discover the identified documents"); or where there is evidence that a witness would have lied about it, *e.g.*, *Crivens v. Roth*, 172 F.3d 991, 996-97 (7th Cir. 1999) (holding that evidence in a prosecution witness's head not discoverable through the exercise of reasonable diligence where there was evidence that the witness would have lied about that evidence). Here there is no support in the record for a conclusion that Rivera's attorney could have discovered the truth from a lying prosecution witness conspiring with Defendants.

Defendants contend that this case is similar to *Boyd v. City of Chicago*, 225 F. Supp. 3d 708 (N.D. Ill. 2016), but there are critical differences between the eyewitness discussed in *Boyd* and Lopez in this case: the eyewitness in *Boyd* (a woman named Bonanno) did not testify at the plaintiff's criminal trial, she was accessible to the plaintiff's defense attorneys, and there was no evidence whatsoever that she was provided a false story to tell by the police defendants in the case. *Id.* at 721-23. Specifically, Bonanno viewed a lineup and told the police that the plaintiff was not the perpetrator. *Id.* She was then disclosed as a witness, was not interviewed by the plaintiff's criminal defense attorneys, and was not called at the plaintiff's criminal trial. *Id.* at 713, 721-23. The court concluded that there was no basis in the record to conclude that Bonanno would not have simply told plaintiff's defense attorneys what she had told the police detectives if they had interviewed her, and therefore that the police defendants could not be held liable for suppressing evidence. *Id.* at 721-23.

31

Here, by contrast, the Defendants told Lopez to fabricate a false identification of Rivera directly after he told them Rivera was not the perpetrator, and they continued to control him and fabricated additional false testimony for him at all points between that moment and Lopez's ultimate false testimony at Rivera's criminal trial. AS ¶¶ 52, 58-60, 61-64, 91. Even if the record allowed an inference that Wadas had some opportunity to access and interview Lopez (which he did not for the reasons discussed already), there is nothing in record that entitles Defendants to the inference that Lopez, in the midst of Defendants' fabrication of evidence, would have suddenly come clean. AS ¶¶ 20(a), 21(a). That proof problem is fatal to Defendants' motion as movants—if it was undisputed that Lopez would have told Wadas the truth had he been asked, Defendants should have provided admissible testimony from Lopez to that effect. As it stands, Defendants seek an inference in their favor on this point, which is obviously improper.

The combination of Defendant's control of Lopez, their fabrication of his false testimony, and his presentation of that false evidence at trial renders any argument that suppressed evidence was available to a diligent attorney utterly inconsistent with the law governing these claims.[17] Adopting Defendants' position "would effectively render *Brady* and its progeny, including *Giglio v. United States*, 405 U.S. 150 (1972), a dead letter: if the governing rule is predicated on the assumption that a prosecution witness will, if interviewed by the defense, disclose impeaching information, then the prosecution effectively is relieved of the legal responsibility under *Brady* and *Giglio* to disclose that information." *Jimenez*, 830 F. Supp. 2d at 445. The law and disputes of fact preclude summary judgment on this basis.

---

[17] These factors also distinguish this case from *Patrick v. City of Chicago*, 103 F. Supp. 3d 907, 915 (N.D. Ill. 2015), in which the suppressed evidence was known to co-defendants to whom defense attorneys had access, and from *Mosley v. City of Chicago*, 2009 WL 3097211, at *5-7 (N.D. Ill. Sep. 22, 2009), in which the police defendants never suggested that the eyewitness had identified the plaintiff in a lineup, the eyewitness testified at the grand jury that he did not see the plaintiff commit the crime, and the defense attorney had access to the witness and the grand jury testimony.

32

Given the blatant *Brady* violations above, Defendants' only defense is to deny they ever occurred. That defense must be mounted at trial and not in a motion for summary judgment.

### 3. Independently, A Reasonable Jury Could Conclude That Defendants Utilized Unduly Suggestive Lineup Procedures That Tainted Rivera's Criminal Trial

Disputed facts also preclude summary judgment on Rivera's claim that Defendants conducted unduly suggestive identification techniques that violated Rivera's right to due process when the identifications were used in his criminal proceedings. Police violate due process when they employ unduly suggestive lineup techniques that taint a criminal case. *Manson v. Brathwaite*, 432 U.S. 98 (1977); *Alexander v. City of South Bend*, 433 F.3d 550, 555 (7th Cir. 2006); *Hensley v. Carey*, 818 F.2d 646, 648-50 (7th Cir. 1987). Section 1983 liability does not attach simply because an unduly suggestive lineup procedure is employed. Instead, the improper lineup must have had a prejudicial impact on the criminal proceedings. *Alexander*, 433 F.3d at 555-56 ("A plaintiff with this kind of [section 1983] claim must demonstrate, by reference to the *Brathwaite* standard, that unduly suggestive identification procedures led to an unreliable identification that undermined the fairness of his trial."). The assessment of whether identification procedures were so unduly suggestive that they gave rise to a misidentification turns on two questions: (1) whether the procedures were unnecessarily suggestive; and (2) whether there is evidence that the identifications were nonetheless reliable. *Hampton*, 2017 WL 2985743, at *23 (citing *Lee v. Foster*, 750 F.3d 687, 691 (7th Cir. 2014)). If the identification techniques were unduly suggestive, the question is whether they rendered the criminal proceeding unfair. *Id.* (citing *Alexander*, 433 F.3d at 555). Each of these questions must be resolved in Rivera's favor at summary judgment.

33

### (a) The Identification Procedures Were Unduly Suggestive

As discussed above, Defendants decided on Rivera as their suspect at the outset, directed Lopez to pick him from the photobook, and then told Lopez (who, remember, was just 12 years old) to select him again at the second lineup, after Lopez had told the Defendants that Rivera was not the perpetrator. That is enough at summary judgment to demonstrate that the identification procedures were unduly suggestive.

But even if that misconduct were not in the record, there is still sufficient evidence to show that the lineup procedures Defendants used were unduly suggestive. Rivera's expert, Dr. Jennifer Dysart, explains in detail the peer-reviewed research on eyewitness identifications that supports Rivera's contention that the identification procedures in this case were unduly suggestive and resulted in an unreliable identification. Ex. 21.

For starters, Dr. Dysart opines that the fact that Lopez was just 12 rendered him especially susceptible to police suggestion and influence. *Id.* at 9. Dr. Dysart also points to various "system variables"—investigative circumstances in the Defendants' control—that rendered the identification procedures used on Lopez unduly suggestive, including: (1) requiring Lopez to search through hundreds of mug shots in photobooks, which increased the risk of false identifications because of commitment effects and unconscious transference effects produced by mugbook searching, *id.* at 9-10; (2) only two of fillers in the first lineup and two of the fillers in the second lineup had the ponytail that Lopez later testified was worn by the perpetrator, meaning that the fillers did not all match the witness's description of the suspect, which in turn increased the chances that Rivera would be wrongly selected, *id.* at 10; (3) Lopez was told before the identification procedures that he was looking at photo and live lineups that included the suspect, which dramatically increased the chance of false identifications, *id.* at 11; (4) the use of

non-blind simultaneous lineups (where Defendants knew the identity of their suspect and all lineup subjects were viewed together), instead double-blind sequential lineups (where the administrator does not know the identity of the suspect and subjects are viewed one at a time), increased the probability that Lopez's selection would be influenced, *id.* at 13; (5) post-identification confirmation from Defendants that Lopez had selected the "right" person from the lineup increased the chances of erroneous identifications, *id.* at 15; (6) repeated identification procedures in which Rivera was the only common subject increased the chances of Lopez selecting Rivera incorrectly, *id.* at 15-16.

At minimum, this evidence shows a robust dispute about whether the identification procedures used with Lopez were unduly suggestive, even setting aside the evidence that Defendants fabricated the identifications out of whole cloth. A reasonable jury could find Dr. Dysart's opinions credible, thereby rendering summary judgment inappropriate.

### (b) Lopez's Identifications of Rivera Were Not Reliable

Lopez's identification was also undeniably unreliable. Most importantly, the record viewed in Rivera's favor shows that Lopez identified Rivera as the Valentin shooter even though Rivera had nothing to do with the crime and was not at the scene. AS ¶¶ 20(d), 21(e), 50, 52, 96-97. Indeed, there is nothing in the Defendants' summary judgment filing that even hints that Lopez accurately identified Rivera as the shooter—their story is that he lied. Moreover (and not to beat a dead horse), the Defendants' instruction to Lopez that he should pick Rivera, even after Lopez had picked a filler and told the Defendants that Rivera was the wrong guy, conclusively renders the identification unreliable for purposes of summary judgment.

Again, additional evidence supports this view. The reported initial descriptions of the perpetrators—whether from Valentin or Lopez—lack any detail that might suggest that Rivera

was one of the perpetrators. AS ¶¶ 8, 10-11. Valentin for example described a 16- to 18-year-old boy as the shooter, but Rivera at the time was 23 years old. AS ¶ 8. As Dr. Dysart notes, the initial descriptions are devoid of details about the distinctive long hair, dyed gold, which Lopez and Guevara later attributed to Rivera at trial. Ex. 21 at 8-9. These emergent details suggest the invention of new and inaccurate memories. *Id.* In short, the initial descriptions on their face provide strong proof that Lopez could not identify the perpetrator at all, let alone accurately identify Rivera. AS ¶¶ 8, 10-11. This conclusion is strengthened by the considerable variation in Lopez's stories about the shooting, which suggest he did not see anything with sufficient clarity to make an identification. AS ¶¶ 17-19(a)-(h), 21(b), 61-62.

In addition, Dr. Dysart identifies various "estimator variables"—environmental circumstances not in Defendants' control—that demonstrate that Lopez's identifications were unreliable, including: (1) Lopez's limited exposure to the shooter, which reduced the chances of an accurate identifications, Ex. 21 at 6-8; (2) Lopez's focus on the weapon, which drew attention from the perpetrator's face and reduced accuracy, *id.* at 8; and (3) the stress caused by the incident, which would have had a similar effect, *id.* at 8. Finally, Dr. Dysart opines that Lopez's non-identification of Rivera in the first lineup is strongly indicative of Rivera's innocence. *Id.* at 16. No evidence in the record suggests Lopez's identifications of Rivera were reliable.

### (c) **The Identification Tainted Rivera's Criminal Proceedings**

The final factor necessary to support this due process theory is whether the unduly suggestive and inaccurate identifications rendered Rivera's criminal case unfair. Based on this record, the question must be answered in the affirmative.

Under Seventh Circuit case law, whether unduly suggestive identifications made criminal proceedings unfair is answered by reference to the following questions: "What identification

36

evidence was actually admitted at trial? What did the victims, eyewitnesses, and police officers say? Were they cross-examined? Were the circumstances surrounding the identification and the police procedures put before the jury? What exhibits were admitted on this issue? Was any objection or motion to suppress the identification evidence made? What other evidence tended to link the defendant to the crime?" *Alexander*, 433 F.3d at 555.

At trial, Lopez and Guevara implicated Rivera as the perpetrator from the stand—based on the identification procedures that Defendants utilized before trial. AS ¶¶ 91-92. Lopez and Leonard testified about the mugbook identification Lopez made of Rivera. AS ¶¶ 91, 93. Both Lopez and Guevara testified about the identification of Rivera at the second live lineup. AS ¶¶ 91-92. And a photograph of the second lineup was introduced as evidence at trial, at which time Lopez placed an "X" above Rivera's head on the photo. *Id.*

Though Wadas attempted to cross examine these witnesses, Defendants' suppression of the true circumstances of these identification procedures—the fact that Rivera was a suspect before any identification, the fact that they told Lopez who to pick from the mugbook, the fact that Lopez picked a filler from the first lineup, and the fact that Lopez said before the second lineup that Rivera was not the perpetrator—rendered cross examination effectively impossible.[18]

The identifications were used to convict Rivera at trial. Other than the evidence fabricated by the Defendants discussed above, nothing else even implied Rivera was guilty. The record shows that the unduly suggestive false identifications made Rivera's trial unfair.

---

[18] Defendants argue that Wadas should have done a better job cross examining at trial or should have filed a motion to suppress Lopez's identifications. Officer Br. at 18. But they tied Wadas's hands behind his back, hiding the evidence that would have allowed Wadas to undermine the identifications.

37

**(d) Defendants' Arguments for Summary Judgment on the Unduly Suggestive Lineup Theory Lack Merit**

Defendants' remaining arguments for summary judgment on this due process theory have been addressed already. Defendants again argue that Lopez's identification of Rivera at trial was "his own intentional lie, not the result of police manipulation." Officer Br. at 16-18. But there is ample evidence that, after selecting Rivera as the suspect, Defendants told Lopez who to pick in multiple lineups, including after Lopez said Rivera was not the perpetrator, *supra* at 9-18, as well as the evidence just discussed that Defendants' identification procedures were unnecessarily suggestive, even ignoring the fabrication, *supra* at 33-37. Defendants' citation to *Hart v. Mannina*, 798 F.3d 578, 587-88 (7th Cir. 2015), a case involving four eyewitness identifications and no evidence of manipulation, does not help Defendants given the facts of this case. Rivera's evidence of manipulation is not thin or speculative. On the contrary, it is largely uncontroverted. This Court should deny summary judgment on the unduly suggestive lineup due process theory.

**C.     A JURY MUST DECIDE THE SECTION 1983 CONSPIRACY CLAIMS**

In cursory fashion, Defendants argue for summary judgment on Rivera's section 1983 conspiracy claims, asserting that these claims are derivative of his due process claims and unsupported by evidence. Officer Br. at 18-19. To the extent Defendants' argument is based on a purported deficiency in Rivera's due process claims, that argument is rebutted by the discussion above of the reasons that the due process claims survive. *Supra* at 9-33. Moreover, Defendants' bald assertion that there is no evidence of conspiracy is insufficient to shift the summary judgment burden. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010) ("The defendants, the moving party on the summary judgment motion, never fulfilled the obligation of setting forth the basic facts and law which, in their view, warranted summary judgment on this claim."). Regardless, there is ample evidence supporting Rivera's conspiracy claims.

38

To prove a section 1983 or civil conspiracy, Rivera must point to evidence from which a jury could infer an agreement among two or more people acting in concert to commit an unlawful act, or a lawful act by unlawful means. *Hampton v. Hanrahan*, 600 F.2d 600 (7th Cir. 1979), *rev'd in part*, 446 U.S. 754. The Seventh Circuit has explained that

> [t]o be liable as a conspirator you must be a voluntary participant in a common venture, although you need not have agreed on the details of the conspiratorial scheme or even know who the other conspirators are. It is enough if you understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do your part to further them.

*Jones*, 856 F.2d at 992. Conspirators are liable "for the wrongful acts of the other conspirators committed within the scope of the conspiracy." *Proffitt v. Ridgway*, 279 F.3d 503, 507 (7th Cir. 2002). "Rarely in a conspiracy case will there be direct evidence of an express agreement among all the conspirators to conspire," and so "circumstantial evidence may provide adequate proof of conspiracy." *Bell v. City of Milwaukee*, 746 F.2d 1205, 1256 (7th Cir. 1984); *see also Hampton*, 600 F.2d at 621 ("The question whether an agreement exists should not be taken from the jury in a civil conspiracy case so long as there is a possibility that the jury can infer from the circumstances (that the alleged conspirators) had a meeting of the minds and thus reached an understanding to achieve the conspiracy's objectives.").

There is ample evidence of agreement between the Defendants, and Rivera's conspiracy claims against each of them should proceed to trial. The facts viewed in Rivera's favor show Defendants settling on Rivera as a suspect before he was ever identified, and working from there to fabricate evidence implicating him in the crime, because there was no evidence to speak of otherwise. AS ¶¶ 22-24, 90-93. Where evidence contradicted Defendants' official version, it was hidden from sight. AS ¶¶ 36-37, 40, 57-60, 76-77. As discussed above, each of Defendants participated in fabricating Lopez's mugbook identification, arresting Rivera, and orchestrating and then covering up the first lineup. AS ¶¶ 22, 25, 32, 36, 40; ROS ¶¶ 65-72. Even before the

39

second lineup and the fabricated identifications from Lopez and Valentin, which no doubt involved fewer of the Defendants directly, each of them had engaged in a scheme to fabricate evidence and Rivera for a crime that they had no evidence he had committed. *Id.*; *see Jones*, 856 F.2d at 992 ("We cannot say that the jury acted unreasonably in finding that all of the individual defendants were voluntary participants in a common venture to railroad [the plaintiff].").

The conspiracy continued after Valentin's death, but its object and scope remained the same. *See United States v. Jackson*, 546 F.3d 801, 815-16 (7th Cir. 2008) ("[C]o-schemers are jointly responsible for one another's acts in furtherance in the scheme," and a "participant in conspiracy is liable for foreseeable acts of his co-conspirators in furtherance of the conspiracy[.]"). A reasonable jury could find for Rivera on his conspiracy claims.

## D.     A JURY MUST DECIDE THE FAILURE-TO-INTERVENE CLAIMS

The Officer Defendants also state in a sentence of their brief that there is no evidence supporting Rivera's failure-to-intervene claim because there is no evidence that any of them knew of unconstitutional conduct by any other. This argument, too, is not developed in a way that permits a response and is therefore forfeited. *See Smith v. Northeastern Ill. Univ.*, 388 F.3d 559, 569 (7th Cir. 2004) (holding that an undeveloped argument is forfeited); *Otto v. Variable Annuity Life Ins. Co.*, 134 F.3d 841, 854 (7th Cir. 1998) (refusing to consider unsupported or cursory arguments).

It also lacks merit. A defendant who has a realistic opportunity to step forward and prevent a fellow officer from violating the constitutional rights of another but who fails to do so is liable. *Byrd v. Brishke*, 466 F.2d 6, 11 (7th Cir. 1972); *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). The discussion of Rivera's conspiracy and due process claims, above, demonstrates that a reasonable jury could find that each of Defendants had the opportunity to intervene to

40

prevent the fabrication and suppression of evidence that caused Rivera's 20-year wrongful incarceration. *See supra* at 9-33. Indeed, Defendants had decades to so intervene and did not. Summary judgment is not appropriate on this claim either.

## E.    DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY

The Officer Defendants assert as an afterthought that they are entitled to qualified immunity on Rivera's due process claims. Officer Br. at 21-22.[19] To the extent that Defendants are arguing in this section that they did not violate Rivera's constitutional rights, material disputes of fact foreclose those arguments, as discussed above.[20] To the extent Defendants are actually arguing that the law governing Rivera's claims was not clearly established in 1988, that is plainly incorrect—the illegality of the Defendants' conduct was established long before the events at issue in this case.

With respect to fabrication, "it was established law by 1985 (indeed long before)" that fabricating evidence for use against a criminal defendant violated due process. *Fields II*, 740 F.3d at 1114 (citing *Napue*, 360 U.S. at 269, *Pyle v. Kansas*, 317 U.S. 213, 215-16 (1942), and *Mooney*, 294 U.S. at 110-13); *see also Dominguez*, 545 F.3d at 589 ("There was and is no disputing that such conduct [fabricating evidence in 1989] violates clearly established

---

[19] Defendants do not argue they are entitled to qualified immunity on Rivera's other constitutional claims, and so they have now forfeited any argument for immunity on those claims, *J&J Sports Productions, Inc. v. Resendiz*, 2009 WL 1953154 (N.D. Ill. July 2, 2009).

[20] In fact, most of this section of Defendants' brief in fact repeats arguments already addressed above about whether Defendants violated Rivera's rights, but here Defendants have dressed them up as arguments about the contours of clearly established law.

For example, Defendants argue that the law was not clearly established that they had to disclose evidence about a first lineup that Rivera knew about. Officer Br. at 21. That is not an argument about the state of clearly established law, it is an argument that they did not suppress evidence because, in their view, Rivera knew about it. That misplaced *Gauger* argument about Rivera's *Brady* claims is disposed of above—Rivera did not know the facts impeachment evidence about the first lineup hidden from him.

Defendants similarly state that the law did not require them to disclose every "tidbit" of evidence helpful to Rivera. Officer Br. at 21-22. Whether that is correct or not, that argument, too, is disposed of above—the suppressed evidence was profoundly material and easily would have shown Rivera's innocence.

Finally, Defendants' argument that the law was not clearly established that fabricated evidence violates the Constitution when it is not used in criminal proceedings is nothing more than an reassertion of the flawed factual argument that evidence fabricated by Defendants was not used in criminal proceedings.

41

constitutional rights"). Indeed, more than 80 years ago, the Supreme Court held in *Brown v. Mississippi* that the use of fabricated witness statements in criminal proceedings violated due process, even where the police actually disclosed all of the circumstances of their coercion of those witnesses. 297 U.S. 278, 283-86 (1936).

The *Brady* obligation and the application of those due process principles to police were equally well established before the Valentin investigation. *See Newsome*, 256 F.3d at 752-53 (concluding that it was clearly established in 1979 that police could not suppress information about the conduct of a lineup, and noting that "[t]he *Brady* principle was announced in 1963, and we applied it in *Jones* to affirm a hefty award of damages against officers who withheld exculpatory information in 1981"); *see Engel v. Buchan*, 710 F.3d 698, 708-09 (7th Cir. 2013) ("It is beyond dispute that the *Brady* right was well established [by 1984]"); *Armstrong v. Daily*, 786 F.3d 529, 549-50 (7th Cir. 2015) (holding that it was clearly established by 1980 that police could not destroy exculpatory evidence).

Finally, it has been the law since at least 1977 that subjecting a criminal defendant to unduly suggestive identification procedures that taint a criminal proceedings violates due process. *Manson v. Brathwaite*, 432 U.S. 98 (1977); *see also Neil v. Biggers*, 409 U.S. 188 (1972). It was clear in the Seventh Circuit that police officers could be held liable for this misconduct at latest the year before the Valentin investigation. *Hensley*, 818 F.2d at 648-50. Defendants are not entitled to qualified immunity on Rivera's due process claims.

## F.  A JURY MUST DECIDE RIVERA'S MALICIOUS PROSECUTION CLAIM

Rivera also brings a state-law claim for malicious prosecution. To succeed, Rivera must show (1) initiation or continuation of criminal proceedings, (2) without probable cause, (3) with malice, (4) terminating in the plaintiff's favor. *Logan v. Caterpillar*, 246 F.3d 912, 921-22 (7th

42

Cir. 2011). Defendants claim they are entitled to summary judgment on the first two of these elements. Officer Br. at 22-24. Neither argument has merit.

### 1. Defendants Commenced and Continued A Criminal Proceeding

Defendants' argument that they did not commence or continue criminal proceedings against Rivera is based entirely on the assertion that they did not talk with prosecutors, sign the criminal complaint against Rivera, or influence the grand jury. Those are all disputed facts. Rivera is entitled to the inference at summary judgment that at least Guevara, Gawrys, and McLaughlin provided the fabricated September 15 Lopez identification directly to ASA Rosner, who immediately approved charges. AS ¶¶ 51-56, 65, 80-82. These Defendants were present for the lineup, Rosner was called in immediately to approve charges, and she talked with Lopez about the identification procedure that these Defendants performed. *Id.*

While Guevara did not sign the criminal complaint on September 15, he signed an arrest report under oath that day supporting the charges, which falsely reported the results of the lineup and noted that ASA Rosner was approving the charges. AS ¶ 80. Consistent with Guevara's sworn report, the felony minute sheet by which ASA Rosner approved charges lists Guevara and Gawrys as "prosecuting witnesses." AS ¶ 81. Finally, Guevara lied to the grand jury when he testified that an eyewitness had seen Rivera kill Valentin, consistent with his fabricated evidence that Lopez and Valentin had both identified Rivera. AS ¶ 84 (JR 1932).[21] The record construed in Rivera's favor shows direct influence by Defendants over the decision to prosecute Rivera.

---

[21] Guevara's contention that he did not lie to the grand jury when he testified that an eyewitness identified Rivera ignores one of the most fundamental factual disputes in the case—Rivera contends that Guevara's testimony about fabricated eyewitness identifications was all lies. Indeed, when asked at his deposition whether he lied under oath during Rivera's criminal case, Guevara invoked the Fifth. AS ¶ 85.

So while Defendants are correct that a grand jury indictment can break the chain of causation or establish a *prima facie* case of probable cause in some malicious prosecution cases, those effects are "rebutted by other evidence such as proof that the indictment was obtained by false or fraudulent testimony before the grand jury, or by failing to make a full or complete statement of facts, or by other improper or fraudulent means." *Freides v. Sani-Mode Mfg. Co.*, 211 N.E.2d 286, 289 (Ill. 1965); *see also Jones*, 856 F.2d at 994 ("[A] prosecutor's decision to

But such a showing is not even necessary under Illinois law. A defendant who is liable for malicious prosecution "must have initiated the criminal proceeding or his participation in it must have been of so active and positive a character as to amount to advice and cooperation." *Logan*, 246 F.3d at 922. The cases stress that this standard does not depend on who made the decision to prosecute (by definition the prosecutor, not the officer), who signed the criminal complaint, who testified at the grand jury, or who led the investigation. Instead, "liability extends to all persons who played a significant role in causing the prosecution of plaintiff." *Turner v. City of Chicago*, 2013 WL 4052607 (N.D. Ill. 2013); *see also Alexander v. United States*, 721 F.3d 418, 423 (7th Cir. 2013) (noting that a defendant "causes" an action to be commenced "even if that person does not conduct the prosecution personally"). As discussed already, the Defendants each fabricated evidence that was presented to prosecutors and suppressed other evidence, causing Rivera's wrongful criminal prosecution and conviction. That alone is enough to demonstrate that they commenced and continued Rivera's criminal proceedings.

Moreover, police who engage together in misconduct to deceive other actors in the criminal justice system are routinely found to have commenced and continued criminal prosecutions. *E.g.*, *Padilla v. City of Chicago*, 2013 WL 1208567, at *16 (N.D. Ill. Mar. 26, 2013) (police who engage in misconduct cannot blame others involved in the prosecution); *Freeman v. Brown*, 2012 WL 3777074, at *6 (N.D. Ill. Aug. 29, 2012); *Ewing v. O'Brien*, 60 F. Supp. 2d 813, 818 (N.D. Ill. 1999). Indeed, a material false statement to a prosecuting authority supports a finding that the commencement element is satisfied. *Wallace v. City of Zion*, 2011 WL 3205495, at *5 (N.D. Ill. July 28, 2011); *Boyle v. Torres*, 756 F. Supp. 2d 983, 1000 (N.D. Ill.

---

charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial—none of these decisions will shield a police officer who deliberately supplied misleading information that influenced the decision[.]"). That is precisely what the evidence, construed in Rivera's favor, shows here. The grand jury indictment therefore has no effect on the analysis.

Dec. 21, 2010); *Allen v. Berger*, 784 N.E.2d 367, 370 (Ill. App. Ct. 2002) ("[W]hen a person makes a knowingly false report to a prosecuting officer, the resulting prosecution is attributable to that person."). In short, what prosecutors did and whether police interacted with them matters little when the police fabricate false evidence. *Myett v. Heerdt*, 2017 WL 75738, at *16 (N.D. Ill. Jan. 9, 2017) (deciding that where police provided prosecutors with false reports, they could not hide behind prosecutorial decisions to charge); *Simon v. Northwestern Univ.*, 2016 WL 1237666, at *7 (N.D. Ill. Mar. 29, 2016) (holding that investigators who supply false information to prosecutors may be liable for malicious prosecution even if prosecutors investigate independently). Defendants each commenced and continued the criminal case against Rivera, within the meaning of Illinois law.

### 2. Defendants Lacked Probable Cause to Prosecute Rivera

Defendants also argue that there is no genuine dispute about whether there was probable cause to suspect that Rivera killed Valentin. Officer Br. at 23-24.[22] Defendants assert that they believed at the time that Lopez accurately and truthfully identified Rivera, and they cite a case that says that probable cause can be based on a single eyewitness identification. Again, Defendants' argument is founded on utterly disputed facts and inapplicable case law.

"In a malicious prosecution case, probable cause is defined as a state of facts that would lead a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion that the accused committed the offense charged." *Williams v. City of Chicago*, 733 F.3d 749, 759 (7th Cir. 2013). It is established that knowingly fabricated evidence and false statements never support probable cause. *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978);

---

[22] Defendants suggest in this section of their argument that Rivera bears the burden at this stage to demonstrate a lack of probable cause. That is not the case. While Plaintiff can and will be required to prove an absence of probable cause at trial, he is only required at this stage to show that there is a dispute of fact over whether Defendants had probable cause to commence or continue his prosecution.

*Alexander*, 721 F.3d at 423; *Lawson v. Veruchi*, 637 F.3d 699 (7th Cir. 2011) (reversing grant of summary judgment where false statements precluded finding probable cause); *Olson v. Tyler*, 771 F.2d 277, 281 & n.5 (7th Cir. 1985) (holding that when officer includes false facts or omits facts in the probable cause analysis, "he cannot be said to have acted in an objectively reasonable manner"). Along the same lines, police cannot manufacture their own probable cause. *Collier v. City of Chicago*, 2015 WL 50814408, \*4 (N.D. Ill. Aug. 26, 2015).

Moreover, probable cause is a quintessential question of fact. The Seventh Circuit holds that a court cannot decide the probable cause question "if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them." *Maxwell v. City of Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1993); *see also Bryant v. Whalen*, 759 F.Supp. 410, 417 (N.D. Ill. 1991). "Accordingly, a conclusion that probable cause existed as a matter of law is appropriate only when no reasonable jury could find that the officers did not have probable cause[.]" *Maxwell*, 998 F.2d at 434.

As discussed at length already, there is a huge difference of opinion about whether Defendants had any evidence whatsoever to entertain an "honest and sound" suspicion that Rivera had killed Valentin. Viewed in Rivera's favor, the record demonstrates that Defendants wholly fabricated the evidence against Rivera, including Lopez's and Valentin's identifications. *See supra* at 9-33. There is similarly strong evidence that Defendants hid evidence demonstrating that Rivera was innocent. *See id.* There is nothing that the Defendants can point to that establishes probable cause. *See, e.g.*, AS ¶ 83. This dispute of fact precludes summary judgment on the malicious prosecution claim.

**G.    A JURY MUST DECIDE RIVERA'S STATE-LAW CLAIM OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

In a one-sentence argument, Defendants assert that Rivera's state-law claim of intentional infliction of emotional distress fails because there is no genuine dispute of fact about whether Defendants engaged in extreme or outrageous conduct. Officer Br. at 24. This bald assertion is insufficient to shift the burden at summary judgment. *Carmichael*, 605 F.3d at 460; *United States v. Useni*, 516 F.3d 634, 658 (7th Cir. 2008) ("We have repeatedly warned that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived[.]"). Additional arguments on this point are now forfeited. *Costello v. Grundon*, 651 F.3d 614, 635 (7th Cir. 2011) (reversing summary judgment granted on issue first raised in a reply).

Even if they were not, Defendants manufactured evidence to prosecute and convict Rivera of a murder he did not commit, and they withheld other evidence that would have allowed Rivera to defend himself against the false charges. *See supra* at 9-33. As a result, Rivera spent more than 20 years in prison. "For conduct to be extreme and outrageous it must go 'beyond all bounds of decency' and be 'considered intolerable in a civilized community.'" *Fox v. Hayes*, 600 F.3d 819, 842 (7th Cir. 2010) (quoting *Lopez v. City of Chicago*, 464 F.3d 711, 721 (7th Cir. 2006)). An important factor in deciding whether conduct is "extreme and outrageous" is whether "a defendant abused a position of authority." *Fox*, 600 F.3d at 842. Rivera's allegations fit this tort perfectly, and disputes of fact prevent summary judgment for Defendants on this claim. *See Henry v. Ramos*, 1997 WL 610781, at *2 (N.D. Ill. Sept., 28, 1997) ("An average member in the community would consider it outrageous for police officers to falsely frame, arrest and imprison an innocent citizen."); *Moore v. City of Chicago*, 2011 WL 1231318, at *4 (N.D. Ill. 2011).

47

**H.      A JURY MUST DECIDE RIVERA'S STATE-LAW CONSPIRACY CLAIM**

The Officer Defendants make an additional perfunctory argument for summary judgment on Rivera's state-law conspiracy claims. Officer Br. at 24. Again, these arguments are insufficient to require a response at summary judgment. *Carmichael*, 605 F.3d at 460; *Useni*, 516 F.3d at 658. Regardless, Defendants' argument that they are entitled to summary judgment on the state-law conspiracy claims fails for the same reasons that their argument for summary judgment on the section 1983 conspiracy claim failed. *See supra* at 38-40. Their argument that there is no evidence of any tortious activity by Defendants is put to rest by the ample evidence in the record of the federal and state torts discussed above. Finally, Defendants' argument that the Illinois Tort Immunity Act renders them immune for the misconduct of others is inapposite given that they are being sued for the own misconduct and not anyone else's.

**I.      DEFENDANTS RINALDI, WEINGART, MINGEY, NOON, GUZMAN, SPARKS, ZACHARIAS, AND FALLON PARTICIPATED IN THE MISCONDUCT AND ARE NOT ENTITLED TO SUMMARY JUDGMENT**

All of the Officer Defendants but Guevara, Gawrys, McLaughlin, and Leonard separately assert that they are entitled to summary judgment because, in their view, they had minimal personal involvement in the Valentin investigation. Officer Br. at 19-20. But these Defendants were each intimately involved in the misconduct described above. None of them is entitled to summary judgment due to lack of personal involvement.[23]

Defendants argue that Rinaldi, Weingart, and Mingey were simply supervisors who signed reports. There are a number of problems with this argument. First, supervisors who approve police reports are not passive rubber stampers who sign whatever crosses their desks—

---

[23] It is strange that a subset of Defendants argue in a separate section of their brief that they are entitled to summary judgment on the ground that the records show they were not involved in misconduct. Of course, each of the Defendants must show that they undisputedly were not involved in misconduct to achieve summary judgment. The fact that a subset of the Officer Defendants argue separately that they were not involved in the constitutional violations and torts asserted is tantamount to an admission that there is no hope of summary judgment for Guevara, Gawrys, McLaughlin, and Leonard.

48

they are in fact leaders of the team, responsible for oversight of investigative tasks and verification of results. The record supports the conclusion at summary judgment that these Defendants were involved in misconduct that occurred in the investigation they oversaw.

Rinaldi oversaw Defendants' suppression of the first lineup and approved the false police reports of August 29, regarding the fabricated mugbook identification, and the false September 1 report, concealing the first lineup. ROS ¶ 65. Weingart was Guevara's supervising sergeant and at summary judgment Rivera is entitled to an inference that Weingart was told by Guevara that Lopez had said Rivera was not the shooter before the second lineup. ROS ¶¶ 66. In addition, Weingart signed off on the false police report dated September 15, which reported Lopez's fabricated identification of Rivera in the second lineup. *Id.* Mingey approved Guevara and Gawrys's false report of September 16, which falsely reported that Lopez had selected Rivera from the second lineup, that Valentin had selected Rivera from a photo identification procedure on September 10, and that Lopez had excluded Rodriguez and Nieves as suspects. ROS ¶ 72.

Moreover, as supervisors, these Defendants can be liable "for their subordinates' violation of others' constitutional rights when they 'know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Steidl v. Fermon*, 494 F.3d 623, 631-32 (7th Cir. 2007). Defendants Rinaldi, Weingart, and Mingey were the direct supervisors of the other Officer Defendants, had direct knowledge of their investigation, made assignments, and approved reports, thereby ratifying the misconduct contained in those reports. ROS ¶¶ 65-66, 72. Their participation as supervisors was essential to the scheme. *Id.* They are liable on that basis as well.

Finally, the arguments of Noon, Guzman, Sparks, Zacharias, and Fallon ignore substantial disputes of fact. Noon argues that he got a copy of the first police report and

49

"perhaps" looked for Lopez; Guzman says that he searched for Rivera and Lopez; Sparks suggests that he performed a legitimate mugbook identification with Lopez; and Fallon submits that he does not recall the case. When the record is construed in Rivera's favor, however, there is evidence that Noon, Sparks, Zacharias, and Guzman participated in fabricating Lopez's mugbook identification of Rivera, and in feeding Lopez the false story about seeing the shooter previously in Humboldt Park. AS ¶¶ 25, 28; ROS ¶¶ 67-71. In addition, Sparks, Zacharias and Fallon, along with McLaughlin, Leonard, and Guevara, participated in the first lineup and the suppression of that lineup. AS ¶¶ 32. They are not entitled to summary judgment.

## J.     A JURY MUST DECIDE PLAINTIFFS' *MONELL* CLAIMS

Under familiar principles, the City can be liable under section 1983 for constitutional violations caused by (1) an express policy, (2) a widespread custom or practice, or (3) a decision made by a final policymaker. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978); *Glisson v. Indiana Dep't of Corrections*, 849 F.3d 372, 379 (7th Cir. 2017) (*en banc*); *Valentino v. Village of S. Chicago Heights*, 575 F.3d 664, 674 (7th Cir. 2009).

The City seeks judgment on three widespread practice *Monell* theories: (1) the City's practice of systemically suppressing investigative materials in street files (the "street files" theory); (2) its practice of suppressing lineup identification procedures where fillers are selected (the "filler lineup" theory), and its failure to discipline police officers. The City does not address any of Rivera's other *Monell* theories in the case, and so a *Monell* trial against the City will be necessary no matter how the Court resolves the City's motion. Moreover, as explained below, the City is estopped from re-litigating the street files theory, given the recent verdict in *Fields v. City of Chicago*, No. 10 C 1168 (N.D. Ill.), in which a jury found against the City on precisely

50

that theory. Overwhelming evidence supports Rivera's *Monell* theories, and the City's motion

should be denied as well.

### 1. Defendants Do Not Argue for Judgment on All of Rivera's *Monell* Theories, and So A *Monell* Trial Is Necessary No Matter What

The City's brief states without explanation that the only *Monell* theories Rivera is

pursuing relate to the City's widespread practices regarding street files, filler lineups, and failure

to discipline officers. City Br. at 1. That is not so. Rivera's additional *Monell* theories are not

addressed by the City. These include but are not limited to:

(1) the theory that the Chicago Police Department's express written policies governing the creation, maintenance, and production of investigative files were deficient (or non-existent) and caused the suppression of exculpatory investigative materials in this case, AS ¶¶ 98-131,[24] *e.g.*, *Glisson*, 849 F.3d at 379-80 (holding that a conscious municipal decision not to adopt or to omit needed policies creates liability under the express policy framework of *Monell*); *Calhoun v. Ramsey*, 408 F.3d 375, 379-80 (7th Cir. 2005) (holding that a single application of a deficient express policy resulting in a constitutional violation is enough to establish liability);

(2) the theory that the City's final policymakers, who admittedly were on notice of the problem of systemic suppression of investigative materials, chose not to adopt obviously needed policies to ensure transmission of police files, and in so doing made a decision that caused suppression of exculpatory materials in Rivera's case, AS ¶¶ 98-131, *e.g.*, *Vodak v. City of Chicago*, 639 F.3d 738, 747-48 (7th Cir. 2011) (policymakers' decision about how to implement policy gives rise to liability when it violates constitutional right); *King v. Kramer*, 680 F.3d 1013, 1021 (7th Cir. 2012) (where municipality has "actual or constructive knowledge that its agents will probably violate constitutional rights, it may not adopt a policy of inaction"); *Steidl v. Gramley*, 151 F.3d 739, 741 (7th Cir. 1998) (final policymaker who is aware of a systematic lapse in policy and who fails to correct it renders municipality liable);

(3) the theory that the City is liable for its failure to adequately train its officers: (a) to retain investigative materials, maintain investigative files, and produce those materials to the criminal justice system; (b) to properly conduct identification procedures and to accurately record the results of those identification procedures; and (c) to write accurate police reports documenting their investigation regardless of the path the investigation takes, AS ¶¶ 98-131, *e.g.*, *Canton v. Harris*, 489 U.S. 378, 390 (1989) (deliberate indifference exists if the "need for more or different training" was "obvious"); *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007) (municipality liable "when the inadequacy in training amounts to deliberate indifference to the rights of the individuals with whom the officers come into contact");

---

[24] Among other things, the City's express policies authorized individual police investigators to subjectively determine what materials to maintain and turn over, they mandated a system of parallel investigative files in homicide investigations, they were devoid of any requirements governing the CPD's transmission of investigative files to prosecutors and others in the criminal justice system, and they included no rules binding the CPD's subpoena service unit, which was charged with responding to requests for documents and subpoenas.

51

(4) the theory that the City is liable for failing to adequately supervise or discipline employees to ensure disclosure of investigative files, given: (a) the lack of policies on supervision of file production; (b) the lack of any effort to audit the City's file-production procedures promulgated after *Jones* and *Palmer*; and (c) the lack of any training or policies governing the subpoena service unit, among other things, AS ¶¶ 98-131, *Sornberger*, 434 F.3d 1006, 1029-30 (7th Cir. 2006) (holding that municipalities are liable if they knew more supervision was needed); and

(5) the theory that the City had notice of and was deliberately indifferent to a widespread practice among its police officers of fabricating false evidence, primarily through witness coercion and corrupt identification procedures, for use in criminal cases, which resulted in violations of due process and numerous wrongful convictions, AS ¶¶ 98-131, *e.g.*, *Jackson v. Marion County*, 66 F.3d 151, 156 (7th Cir. 1995); *Davis v. Carter*, 452 F.3d 686, 694 (7th Cir. 2006); *Evans v. City of Chicago*, 2006 WL 463041, at *13 (N.D. Ill. Jan. 6, 2006).[25]

The fact that the City has not moved for summary judgment on these *Monell* theories means that they must be tried. *See*, *e.g.*, *Carmichael*, 605 F.3d at 460 ("The burden of defeating summary judgment did not shift to the plaintiffs on this issue simply because, without citation to relevant facts or authority . . . defendants sought summary judgment on all claims against all parties."); *Sublett*, 463 F.3d at 736 ("As a general matter, if the moving party does not raise an issue in support of its motion for summary judgment, the nonmoving party is not required to present evidence on that point, and the district court should not rely on that ground in its decision."); *Titran v. Ackman*, 893 F.2d 145, 148 (7th Cir. 1990) ("When a party moves for summary judgment on ground A, the opposing party need not address grounds B, C, and so on; the number of potential grounds for (and arguments against) summary judgment may be large, and litigation is costly enough without requiring parties to respond to issues that have not been raised[.]"). Any arguments that the City might have made regarding these theories are now forfeited, *Thompson v. Boggs*, 33 F.3d 847, 854 (7th Cir. 1994); *Fox v. Peters*, 2011 WL 6378826, at *8 (N.D. Ill. 2011), and it will be too late for the City to raise them for the first time in reply, *Costello*, 651 F.3d at 635; *Nelson v. LaCrosse Cty*, 301 F.3d 820, 836 (7th Cir. 2002).

---

[25] Part of the extensive evidence supporting this theory is set out in the discussion of the City's failure to Guevara, below. But this theory is distinct from that one, and it is not addressed by the City.

To the extent the City tries to suggest in reply that it was not on notice of these *Monell* theories, that contention is without merit. These theories have been litigated exhaustively throughout this case, Rivera has explained them in detail in response to discovery requests, RCS ¶¶ 13, 15, they are discussed in the parties' expert reports, AS ¶¶ 119-131, and the City just had an extensive trial that involved Rivera's counsel on all of these theories and it briefed them post-trial in *Fields v. City of Chicago*, No. 10 C 1168, Ex. 66, Doc. No. 1184 (Post-Trial Motion) at 12-25 (explaining each of these theories). The City cites to Rivera's complaint in its brief, but the Seventh Circuit has repeatedly reminded that legal theories need not be spelled out in a complaint, and the limitation of theories in a complaint is not relevant at summary judgment. *Streckenbach v. Vandensen*, 2017 WL 3585074, at *1 (7th Cir. Aug. 21, 2017). A trial is necessary on these *Monell* theories.

### 2. The City Is Estopped From Re-Litigating the Street Files Theory

With respect to the street files theory, the City is estopped from re-litigating that issue in this case, given that it just lost a jury trial on the issue in *Fields v. City of Chicago*, 2017 WL 3987356 (N.D. Ill. Sep. 11, 2017) (denying the City's post-trial motion); *see also Kluppelberg v. Burge*, 2017 WL 3381717, at *1 (N.D. Ill. Aug. 7, 2017) (concluding in another street files case that the *Fields* jury verdict estops the City from "arguing that it did not have a policy of concealing material exculpatory and/or impeachment evidence contained in so-called 'street files' in the late 1980s"); *see also* Ex. 151 (*Kluppelberg*, No. 13 C 3963, Doc. No. 586, Motion to Apply Collateral Estoppel), which Rivera incorporates here by reference.

*Fields* concerned the suppression of exculpatory police documents in a street file during a 1984-1985 investigation of a double homicide, which resulted in the wrongful conviction and decades-long incarceration of Nathson Fields. *See* 2017 WL 3987356. Like Rivera, Fields

53

claimed that the files were suppressed pursuant to the City's widespread practice of suppressing street files. *Id.* at \*3-4. The case was tried in late 2016, and a jury found for Fields on his *Monell* claim and awarded more than $22 million in damages. *Id.* at \*1.

As Judge Lefkow later found in *Kluppelberg*, 2017 WL 3381717, the elements of collateral estoppel (issue preclusion), *see generally Chicago Truck Drivers v. Century Motor Freight*, 125 F.3d 526, 530 (7th Cir. 1997), are all satisfied here as far as the street files *Monell* theory is concerned: (1) the issue the City seeks to litigate here is the same as that in *Fields*;[26] (2) that issue was actually litigated in *Fields*;[27] (3) the determination of the issue was essential to the final judgment in *Fields*;[28] and (4) the City had a full and fair opportunity to litigate the issue in the *Fields*.[29] The City should not be able to litigate this issue again in this case.[30]

### 3. The City's Request for Judgment on the Street Files Theory Is Frivolous

Even if the City were not precluded from re-litigating the street files issue, it has no colorable argument for summary judgment. A jury just entered a verdict against the City on precisely this theory—a verdict that has been upheld on post-trial motions, *Fields*, 2017 WL 3987356—after considering much of the same evidence that the jury in this case will hear. The only difference is that here Rivera, building on the prior cases, has marshalled even more

---

[26] The issue in the cases is precisely the same. Though *Fields* involved a homicide investigation in 1984 and 1985 and a wrongful conviction lasting until 2009, and this case involves a homicide investigation in 1988 and a wrongful conviction lasting until 2011, both cases were governed by the same written policies, and the City concedes there was no change it its policies and procedures in that time frame. AS ¶¶ 135-136.

[27] A full trial on the merits is the "situation most clearly contemplated by the 'actually litigated' standard." *In re Tapper*, 123 B.R. 594, 601 (Bankr. N.D. Ill. 1991).

[28] The jury in *Fields* was instructed that, to find against the City on the policy claim, Fields had to prove, among other things, that "[a]t the time of the concealment, it was the policy of the City of Chicago to conceal material exculpatory and/or impeachment evidence." No. 10 C 1168, Doc. No. 1169 (Jury Instructions) at 14.

[29] In the five-week trial in *Fields*, the City presented testimony from its experts Jeffrey Noble and Bernard Murray, who contested Fields's expert Brasfield, and from James Hickey, its Rule 30(b)(6) designee. Precisely same witnesses are offered by the City in the present case, and they evaluate precisely the same evidence. RCS ¶¶ 20-26, 57-60, 76.

[30] Rivera acknowledges that the City will still be able at trial to argue that its policies were not the cause of Rivera's injuries, by attempting to demonstrate that there was no file withheld from Rivera or that it had no exculpatory value, theories on which Defendants not entitled to summary judgment, as discussed above.

evidence in support of his claim than was presented in *Fields*. Under these circumstances, the City's position that undisputed facts support judgment in its favor is a nonstarter.

The City is liable for widespread practices to the extent that City policymakers were on notice of the risk of harm presented by those practices and disregarded that risk. *Glisson* 849 F.3d at 381-82 (reminding that it is the *risk of harm* that policymakers must be on notice of and ignore). To prove such a claim, Rivera can show that either a repeating pattern of constitutional violations or a repeated pattern of behavior gave the City notice of a risk of harm to which the City did not respond. *Daniel v. Cook Cty*, 833 F.3d 728, 734 (7th Cir. 2016) (custom and notice shown by "evidence tending to show a general pattern of repeated behavior," without "evidence that . . . systemic failings affected other[s]").[31] The City's argument that Rivera has "adduced no evidence of a 'street file' practice," City Br. at 14-17, depends on two assertions: (1) that Michael Brasfield's expert report is the *only* evidence supporting Rivera's *Monell* theory, and (2) that Mr. Brasfield's methodology is deficient. Both premises are wrong.

Ignoring Mr. Brasfield's report completely, there is a huge volume of evidence in the record supporting Rivera's street files theory, including but not limited to:

- The litigation in *Palmer* and *Jones*, which demonstrate that City policymakers had notice in the early 1980s that police officers were engaging in an unconstitutional pattern of suppressing investigative materials in street files, AS ¶¶ 98-100;[32]

---

[31] *Dixon v. Cook County*, 819 F.3d 343, 348-49 (7th Cir. 2016) (notice of a systemic deficiency and inaction establishes liability); *Thomas v. Cook County*, 604 F.3d 293, 303 (7th Cir. 2010) (policymakers "must have been aware of the risk created by the custom" of delayed responses to medical requests); *Davis*, 452 F.3d at 694-95 (rejecting same arguments City makes here); *Estate of Moreland v. Dieter*, 395 F.3d 747, 760-61 (7th Cir. 2005) ("[T]he plaintiff need not show that the policy, practice, or custom resulted in past deprivations of rights.").

The City asserts that Rivera must identify a pattern of constitutional violations caused by the City's street files practice and has failed to do so. City Br. at 17. The same argument was made and rejected in *Fields*, where Judge Kennelly correctly observed that evidence of widespread underproduction of police documents is sufficient proof of a systemic failing to support a *Monell* verdict under the established law just cited. 2017 WL 3987356, at *3-4. That said, the City is wrong on the facts as well—Rivera does have evidence of repeating constitutional violations caused by the street files practice, as outlined below.

[32] The City engages in a long, largely revisionist history regarding the *Jones* and *Palmer* litigation. City Br. at 6-9. This discussion is largely irrelevant to the disputes between the parties at summary judgment. To the extent, however, that the City is suggesting that the *Jones* and *Palmer* cases are themselves ultimately not evidence of a widespread practice of file suppression, that is not correct. *Jones* involved the suppression of critical exculpatory

- James Hickey, the City's designated Rule 30(b)(6) witness on this topic, who testified, among other things, that (a) in light of *Palmer* and *Jones*, City policymakers knew that they had a street file problem, (b) that he reviewed file disclosure practices across the department prior to 1983 and determined that the problem as citywide, (c) that the problem stemmed from a citywide practice of using a "decentralized" file system for homicide investigations, whereby investigative steps were being documented in informal notes and internal to-from memoranda between investigators, all of which were treated as the personal property of the investigators and were stored in parallel files; and (d) entire branches of an investigation, including investigation into alternate suspects, were not getting documented in official reports, and were instead sitting in memos and notes that were not disclosed and eventually destroyed, AS ¶¶ 102-103;
- City officials were aware both of substantial resistance within the Police Department to changing the street files practice of keeping parallel, "personal" files not available to the criminal justice system, and of the risk of wrongful prosecutions and convictions if the street file problem was not solved, AS ¶¶ 101, 104;
- Special Orders 83-1, 83-2, and 86-3, put in place in an attempt to solve the problem, required that notes and memoranda were to be taken in a new official form called a "General Progress Report" and preserved (rather than destroyed) in a new "Investigative File" kept in the Detective Area, but the new policies had obvious, facial deficiencies, including (a) the absence of any express instruction to disclose to prosecutors and criminal defendants all police documents in newly-created "Investigative Files"; and (b) a lack of training, instructions or directives to subpoena service unit staff responsible for producing records to prosecutors and criminal defendants to ensure the production of all General Progress Reports and other documents kept in the Investigative Files at the Area, AS ¶¶ 105-109;
- A total absence of auditing, or any other efforts to monitor compliance to the new policies, AS ¶ 111;
- The Defendant officers in this case testified almost uniformly to having no knowledge of the requirements in the new Special Orders, to receiving no training on the Special Orders, or the obligation to preserve notes or disclose exculpatory information, and further testified to continuing to keep unofficial, personal notes that they destroyed, AS ¶¶ 113, 114;
- The street file kept and suppressed in this case, which contained exculpatory evidence, as discussed above, *supra* at 9-18; AS ¶¶ 70-79;
- The street file kept and suppressed from Nathson Fields, who was convicted of the 1984 double murder and eventually re-tried and acquitted in 2009, a case in which civil discovery revealed a street file—sitting among hundreds of other files in a file cabinet at Area Central—of over a hundred pages of handwritten notes, memos, and other documents identifying multiple alternate suspects and potential leads demonstrating that Fields was innocent, AS ¶ 115, 117, 118;
- The ample evidence presented during the December 2016 Fields trial, in which a jury found that the failure to disclose the street file to Fields was the result of a pattern and practice of the Chicago Police Department and awarded Mr. Fields compensatory damages of $22 million, including (a) dozens of other street files in the Area Central basement, including the cases of Jon Fulton, Timothy Malone, and James Crockett, (b) the testimony of Defendant officers in that case about the continued use of informal notes and memoranda and a lack of training on the new Special Orders, and (c) the testimony of the City's defense experts, the same ones here, supporting the conclusion that the street files practice continued, AS ¶¶ 118(a)-(b); and

information and resulted in a large damages verdict approved by the Seventh Circuit. 856 F.2d 985. *Palmer* caused numerous City policymakers to take notice of a widespread problem of file suppression, *according to the testimony of those City policymakers themselves*, AS ¶¶ 98-104, and the City's pronouncement that none of the *Palmer* files revealed exculpatory information is undermined by the fact that those files were never analyzed in a systematic fashion, Ex. 155 (affidavit of Haas). As the Seventh Circuit noted in *Jones*, the *Palmer* litigation was resolved "without a formal ruling on the lawfulness of the practice," thought the Court in *Jones* concluded that the record supported that the practice was in place and that "[t]he City sensibly does not attempt to defend such behavior in this court." *Jones*, 856 F.3d at 995-96.

- The street file kept and suppressed from James Kluppelberg, who was convicted for a 1984 fire that killed six people and later exonerated, a case in which civil discovery in 2014 revealed a newly-discovered file from the original investigation that contained numerous handwritten notes and memoranda, including a memo between detectives about an alternate suspect who had started a fire in a building nearby just hours before the fire for which Kluppelberg was convicted and was intoxicated at the time, AS ¶ 115, 116.

In addition to this evidence, Rivera will present Mr. Brasfield's expert testimony in support of the street files theory. Mr. Brasfield, who testified over the City's objection in *Fields*, provides an abundance of evidence supporting the street file theory, including but not limited to:

- The written policies put in place were deficient on their face to solve the street files problem because the policies (a) allowed for the continued use of a decentralized, parallel file system in which investigative material was kept in different places, creating the risk that material would not be gathered from all of those locations; (b) failed to cover gang crimes officers, despite their significant role as investigators in homicide cases, like this one; (c) left too much discretion to detectives about what to record in the official files; and (d) did nothing ensure that the subpoena service unit, detective division, or anyone else produced all of the parallel files created for an investigation, AS ¶ 121;
- The Chicago Police Department's efforts to implement the new Special Orders were woefully inadequate, including a failure to provide proper training and oversight to ensure compliance with the Special Orders, AS ¶ 122;
- His analysis and findings from the review of 190 homicide files from Area 5 for the period 1985-1991 (the three-year period surrounding the Valentin homicide), as well as criminal defense files corresponding to 44 of the homicide files, and Chicago Police Department permanent retention files corresponding to 132 of the homicide files were also obtained in discovery in this case, AS ¶ 123-24;
- Those findings included an assessment of the homicide files themselves, which showed that the street files practice as it existed prior to the new Special Orders continued unabated, and more specifically, that 61% of homicide files contained notes not taken on general progress reports; and 20% of files contained to-from memos not on official police forms, overall 100% of the homicide files contained evidence that the Special Orders were not being followed, AS ¶ 125;
- His assessment of permanent retention files themselves, which are intended to be a repository of all typed up, official police reports containing pertinent information, from which he concluded that, while in most police departments around the country the official reports contain multiple storylines, CPD official reports only tell one storyline, leading to the suspect charged, AS ¶ 126;
- His comparison of the homicide files to criminal defense files , showing that over 90% of the criminal defense files were missing documents contained in the corresponding homicide files, AS ¶ 128;
- And his finding that in a number of specific cases investigative material of potentially significant exculpatory value withheld from criminal defendants was also missing from State's Attorneys' Office files, including in the cases of (a) criminal defendants David Quinones, Bruce Andras, Marc Johnson); (2) Miguel Borroto; (3) Samuel Slack, (4) Jesse Swanigan, (5) Curtis Kirkland, and (6) Tomas Nieves, AS ¶ 129; and
- Finally, in further support of his conclusions, he relied on and incorporated his findings from the review of hundreds of homicide files in the cases of James Kluppelberg and Nathson Fields, AS ¶¶ 130-31.

The record supports the street files *Monell* theory and summary judgment should be denied.

Moreover, even if Mr. Brasfield's report was the only evidence supporting the theory (which is hardly the case), the argument that his methodology is flawed lacks merit. City Br. at 15-16. The City contends that Mr. Brasfield's file-comparison was so unreliable that his opinions should all be excluded.[33] Judge Kennelly persuasively rejected this exact argument in *Fields*, concluding that the City's criticisms went to the weight of the evidence and not to its admissibility. 2017 WL 3987356, at *3 n.8; *see also* Ex. 152 (*Fields*, Doc. No. 1076) at 1-6.

Among many other pieces of evidence, Mr. Brasfield reviewed hundreds of police investigative files in this case, and in *Fields* and *Kluppelberg*, and he compared those files to criminal defense files in order to see what police documents criminal defendants received in their cases. AS ¶¶ 121-131. That permitted him to draw the conclusion that the CPD systematically suppressed police files. AS ¶¶ 125-131. The City contends that Mr. Brasfield conducted too few comparisons of police investigative files to their corresponding criminal defense files;[34] that the criminal defense files that Mr. Brasfield reviewed might have been incomplete;[35] and that Mr. Brasfield should have looked at a greater number of corresponding files from the Cook County State's Attorney's Office (CCSAO), to determine whether the State's Attorney was responsible for the suppression of police files that he observed.[36] Those views have little merit given the evidence, but at best they are points to be made on cross or at trial. Ex. 152 at 3.

---

[33] The City's argument is not sufficiently developed to require a response. For example, the City does not identify any errors in Brasfield's analysis. Nor does it explain why if Brasfield's file-comparison methodology is flawed (which it is not), every one of Brasfield's opinions unrelated to that comparison should be excluded.

[34] The argument is factually incorrect, considering that Brasfield relied on analyses and comparisons of hundreds of case files in arriving at his opinions. AS ¶ 125 (190 files). Moreover, the City stipulated that the file set Brasfield reviewed in this case was representative of its policies and practices for *Monell* purposes. AS ¶¶ 135-36.

[35] This is raw speculation, and it is another argument rejected by the *Fields* jury. There is no evidence that the City points to that shows any criminal defense file reviewed by Brasfield to be incomplete. It is undisputed at summary judgment that the criminal defense files are the best evidence of what the criminal defendant in a particular case had at the time of trial. RCS ¶ 59.

[36] It is notable on this point that the City's brief states only that analysis of the CCSAO files *might* have shown that the fault for non-production of police files lay with the CCSAO and not the CPD. City The City does not cite to a single piece of evidence supporting that hypothesis. That is because there is no such evidence.

Mr. Brasfield's opinions are the type routinely provided by police practices experts on both sides of cases in this District and others. *E.g.*, *Obrycka v. Chicago*, 2011 WL 2633783, at *4 (N.D. Ill. July 5, 2011); *Cooper v. Chicago Heights*, 2011 WL 2116394, at *6 (N.D. Ill. May 27, 2011); *Paine ex rel. Eilman v. Johnson*, 2010 WL 785398, at *4 (N.D. Ill. Feb. 26, 2010); *Ott v. Milwaukee*, 2015 WL 1219587, at *13 (E.D. Wis. Mar. 17, 2015); *Avery v. Milwaukee*, 2015 WL 247991, at *2 (E.D. Wis. Jan. 20, 2015). There is no reason to exclude Mr. Brasfield's testimony.[37] Summary judgment on the street files theory must be denied.

### 4. The City's Request for Judgment on the Filler Lineup Theory Lacks Merit

The City also argues there is no evidence supporting Rivera's *Monell* theory that the City systemically suppressed the results of lineups in which witnesses identified fillers. City Br. at 18-21. On the contrary, there is no evidence supporting the City's view of the facts. If anything, it is Rivera who should be moving for summary judgment on this claim. In response to Rivera's overwhelming evidence that the City engaged in this practice, the City has not produced a single item of evidence contradicting the theory. In fact, the City has not identified a single instance ever where a member of the CPD recorded in a lineup report that a witness selected a filler from a lineup. The City's arguments that the undisputed facts show that it did not engage in such a practice is meritless and summary judgment should be denied.

Rivera's evidence of the practice is comprehensive and unrebutted. After discovering that he in fact had been placed in a first lineup, in which Lopez selected a filler,[38] Rivera asked the City to produce a sample of homicide files for the five years surrounding the Valentin investigation, so that the parties could determine whether police officers routinely failed to

---

[37] Given space constraints, it is difficult to provide a detailed response here to the City's perfunctory motion to exclude Brasfield under Rule 702. Because the record precludes summary judgment on this *Monell* theory with or without Brasfield's testimony, this Court need not decide the expert admissibility issue in this context. To the extent that the Court is interested in additional briefing on that question, Rivera would of course provide it.

[38] The disputes on the questions of whether Rivera stood in a first lineup (now conceded by Defendants) and whether Lopez selected a filler from that lineup (still disputed) have been addressed exhaustively already.

59

document filler identifications.[39] The City stipulated that the files were reflective of its policies and practices citywide during the relevant timeframe. AS ¶¶ 135-136.

Of the files produced by the City, 138 involved either live or photo lineup procedures. Official lineup reports and ancillary police reports in those files reported a total of 386 different lineup procedures, and in many of these lineup procedures, multiple witnesses viewed multiple suspects, so that there were a total of 980 "possible identifications" (the number of witnesses viewing each lineup multiplied by number of suspects in each lineup) reflected in these files. AS ¶¶ 141, 147, 149. Rivera's counsel reviewed the entirety of every file involving a lineup and coded each lineup report, noting for each possible identification whether it was reported that the witness made a positive identification, a tentative positive identification, no identification, or a filler identification. AS ¶¶ 139, 145, 147, 149. Remarkably, there was not a single example in the set of files where a police officer reported the identification of a filler. AS ¶¶ 140, 147, 149. The stipulated data thus show an absence of filler identifications in the reports of the CPD.

Needless to say, that is statistically impossible. People who do not recognize an offender but nonetheless guess have a strong chance of selecting a filler. There had to be at least some unrecorded filler identifications.

To demonstrate that this was so, and that the City's non-recording of filler identifications was the result of policy, Rivera retained the services of renowned eyewitness identification expert Dr. Gary Wells to perform statistical analysis of the data and compare the findings in the CPD's files to those reported in existing field studies. AS ¶ 138. Dr. Wells opines that published

---

[39] A filler is a non-suspect participant who is placed in the lineup with the suspect. The selection of a filler by a witness during a lineup has obviously detrimental effect on the prosecution's ability to use that witness in a criminal proceeding. AS ¶ 132. In short, a witness who has picked a filler cannot later come to trial and testify credibly that the suspect was the perpetrator, at least not without facing the damning impeachment that the witness viewed a lineup before trial and concluded that a random filler looked more like the perpetrator than the suspect did. *Id.* Accordingly, a filler selection in a lineup is tremendously exculpatory evidence. *Id.* In cases where the police have an interest in ensuring that witnesses can later testify at trial and that suspects are inculpated, there is a strong incentive against recording filler identifications. *Id.*

60

peer-reviewed field studies examining the rates at which witnesses identify suspects, fillers, or no one in lineups demonstrate that fillers are identified in lineups approximately 24% of the time. AS ¶¶ 144-145. Considering all of the field studies, Dr. Wells concluded that one would expect to see between 232 and 321 instances of filler identifications in the 980 lineup procedures reported in the files produced by the City. AS ¶ 151. Instead there were zero. AS ¶¶ 140, 147, 149. Applying commonly-accepted statistical analysis, Dr. Wells concluded that this could not be explained by chance, and further, that the only possible explanation was that the City had a practice of not reporting filler identifications. AS ¶¶ 148, 150. In response, the City disclosed its own eyewitness identification expert, who did not review the files and produced no evidence to rebut Dr. Wells's data.[40] Even if there were a battle of the experts, it would be a battle for trial.

Dr. Wells's conclusions are consistent with the raw data discussed above and with other evidence in this case. The City was asked to identify a single file—from anywhere at any time— in which a lineup report reflected the identification of a filler. AS ¶ 137. The City responded that it would identify such a file if it found it, and it never updated that response with reference to any such file. *Id.* Contrary to the City's representation, its written policy governing lineup procedures during the relevant time period provided zero guidance on what had to be reported when a filler was selected during lineup procedures. AS ¶ 133. Moreover, the City's own Rule 30(b)(6) witness, James Hickey, testified in his deposition that if a filler was identified in a lineup, there would be no documentation of the fact that the witness had identified anyone. AS ¶¶ 134.

---

[40] The City asserts in its brief that these statistics are explained by the fact that filler lineups were being recorded as non-identifications. It suggests that there is no difference between these results in a lineup. First, there is a difference. The situation where a witness does not make an identification at a lineup can be explained away if that witness later identifies the suspect in court, but the situation where the witness is recorded as having positively identified a *different person* from a lineup that included the suspect is exculpatory evidence of a different kind. AS ¶ 132. Second, contrary to the City's argument, the records do not support a conclusion that filler identifications were recorded as non-identifications. There are two few reported non-identifications for that to be the explanation for zero filler identifications. In any event, the City's argument is at best one for the jury.

The City makes a half-hearted attempt to suggest Dr. Wells's methodology is unsound. Leaving aside that the record is amply sufficient without his testimony, Dr. Wells's statistical analysis is very sound—indeed it is straightforward. The fact that Rivera's counsel's law firm analyzed all of the data in the files—a method that experts and litigants, including the City, routinely use in litigation—does not undermine any of the conclusions above. *Sanders v. City of Chicago Heights*, 2016 WL 1730608, at *6 (N.D. Ill. May 2, 2016 ("[A]n expert may rely on his client's version of the facts when forming his opinions."). Indeed, the City in its brief does not point to a single error in that data analysis. Any complaint that the City has about Dr. Wells's methodology is an argument about the weight of the evidence for trial.

At the end of the day, all of the evidence in the record supports Rivera's filler lineup *Monell* theory. The City has nothing to offer in response. Summary judgment should be denied.

**5.     A Trial Is Necessary on the Failure to Discipline Theory**

Independently, the record also amply supports Rivera's theory that the City is liable for failing to discipline officers. The City's motion focuses solely on Rivera's contention that it failed to discipline Guevara, permitted him to engage in repeated acts of misconduct, including Rivera's wrongful conviction, City Br. at 21-24, and so that is the only failure-to-discipline theory Rivera will addresses in this brief. A failure to discipline officers provides a basis for municipal liability when the failure amounts to deliberate indifference to the citizens whom the officers encounter. *See City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *Hollins v. City of Milwaukee*, 574 F.3d 822, 827 (7th Cir. 2009); *Graves v. Thomas*, 450 F.3d 1215, 1218 (10th Cir. 2006); *DiRico v. City of Quincy*, 404 F.3d 464, 469 n.12 (1st Cir. 2005). Factual disputes preclude judgment for the City on the theory that it was deliberately indifferent in its failure to discipline Guevara.

62

First, Guevara's misconduct in this case is strong evidence supporting this *Monell* theory. The City repeats the assertion that Rivera's rights were not violated, City Br. at 22, but for the reasons discussed exhaustively already there is no question the evidence supports that Guevara fabricated and suppressed evidence, in violation of Rivera's rights. What happened in this case and the City's failure to impose any discipline as a result can itself "shed some light on what policies existed in the city on the date of an alleged deprivation of a constitutional right." *Bordanaro v. McLeod*, 871 F.2d 1151, 1166-67 (1st Cir. 1989). As the Ninth Circuit has put it, such "evidence is not only admissible for purposes of proving the existence of a municipal defendant's policy or custom, but is highly probative with respect to that inquiry." *Henry v. County of Shasta*, 132 F.3d 512, 519 (9th Cir. 1997). As such, "a jury could look to the City's inaction in the face of Rivera's own allegations of serious police misconduct as evidence of the custom that existed prior to the . . . incident." *Monaco v. City of Camden*, 2008 WL 8738213, at *8 (D. N.J. Apr. 14, 2008).

Guevara's invocation of the Fifth Amendment in response to all questions about the City's failure to discipline him after he repeatedly violated individuals' constitutional rights provides additional support for the conclusion that City policymakers were on notice of and indifferent to Guevara's pattern of framing innocent individuals. *See* Exhibit 24 (Guevara Dep.) at 36:1-5 (pleading Fifth when asked whether he "framed Jacques Rivera pursuant to an official policy or practice whereby members of the Chicago Police Department were never disciplined for this type of misconduct, creating an environment of lawlessness"); *id.* at 37-38 (same when asked whether he engaged in misconduct repeatedly because he was never disciplined); *id.* at 397 (same when asked whether he was promoted despite misconduct); *id.* at 530 (same when asked whether the City refused to discipline him in the face of admitted misconduct).

63

Moreover, there is substantial evidence of incidents of Guevara's misconduct before

Rivera's wrongful conviction for which the City imposed no discipline, including:

- In 1982, Guevara physically assaulted Annie Turner by hitting her across the face with a metal bracelet and called her a "n**** bitch," among other misconduct. AS ¶ 160. Although Ms. Turner complained using the City's disciplinary mechanisms, no discipline was imposed, *id.*;
- In 1982, Guevara broke through Almarie Lloyd's locked front door and conducted a warrantless search of her home. AS ¶ 160. Ms. Lloyd complained using the City's disciplinary mechanisms, but again no discipline was imposed on Guevara, *id.*;
- In 1983, Guevara and others beat Leshurn Hunt until he confessed to murder. AS ¶ 160. Mr. Hunt complained using the City's disciplinary mechanisms and sued Guevara, but no discipline was imposed, AS ¶ 160;
- In 1984, Guevara physically assaulted Graciela Flores, AS ¶ 160;
- In 1985, Guevara used threats and violence to attempt to coerce a false identification from Reynaldo Munoz, AS ¶ 160;
- In 1986, Guevara beat Rafael Garcia, and the City's disciplinary body found that Guevara had lied about the incident and recommended that Guevara be suspended for two days, AS ¶ 160;
- In 1986, Guevara coerced a confession from Daniel Pena by beating him, AS ¶ 160;
- In 1986, Guevara called Melvin Warren a "n***** dog" and beat him, and the City's disciplinary body initially sustained Warren's allegations and recommended five-day suspension, only to later overturn the suspension and impose a reprimand for calling a citizen "n*****," AS ¶ 160;
- In 1989, Guevara coerced a false confession from Victor Vera, AS ¶ 160;
- In 1989, Guevara coerced Virgilio Muniz into falsely implicating Manuel Rivera, AS ¶ 160;
- In 1989, Guevara threatened Virgilio Calderon Muniz (unrelated to the Virgilio Muniz referenced above) into making a false identification, AS ¶ 160;
- According to Dorsch, a few months before Guevara was promoted in 1990, Dorsch witnessed Guevara tell a witness to select a particular suspect from a photo array. Although Guevara's superiors knew about that misconduct, Guevara was promoted rather than disciplined, AS ¶ 154; and
- In 1989, Guevara framed Juan Johnson for murder by showing Sam Perez a photo of Johnson before an identification procedure and by telling Perez that he wanted Johnson to take the blame for the murder. Johnson was exonerated and sued Guevara in *Johnson v. Guevara*, No. 05 C 1042 (N.D. Ill.), eventually obtaining a $21 million verdict against him, AS ¶ 153.

A reasonable jury could easily conclude based on the evidence referenced about that Guevara

engaged in repeated police misconduct prior to Rivera's wrongful conviction and that the City

did next to nothing in response.

There is additional evidence of the City's indifference. Incidents of Guevara's

misconduct post-dating Rivera's conviction went undisciplined by the City as well and are

evidence of the City's policies and its indifference. To be sure, firing Guevara for misconduct

that occurred after Rivera was wrongly convicted likely would not have undone the harm to

64

Rivera, *see* City. Br. at 24, but that does not render this evidence irrelevant. As the Seventh Circuit and numerous courts have recognized, incidents that post-date a particular case are probative of the policies and practices that were in place at the time of the case, and they are evidence of City policymakers' deliberate indifference. *Sherrod v. Berry*, 827 F.2d 827 F.2d 195, 205 (7th Cir 1987), *vacated on other grounds*, 835 F.2d 1222 (7th Cir. 1988) ("[S]ubsequent conduct by a municipal policymaker may be used to prove preexisting disposition and policy[.]"); *Padilla v. City of Chicago*, 2009 WL 4891943 at \*7 (N.D. Ill. Dec. 14, 2009).[41]

Guevara's pattern of wrongful misconduct is truly staggering. It may be no exaggeration to say that he is the single worst offender in the history of the Chicago Police Department in terms of framing innocent people, even considering Jon Burge.[42] There is a pervasive pattern of Guevara's misconduct and the City's indifference to that misconduct continuing after Rivera's conviction, including but not limited to:

- In 1991, Guevara coerced Wilfredo Rosario into falsely identifying Xavier Arcos, AS ¶ 160;[43]
- In 1991, Guevara coerced David Rivera into falsely confessing to murder, AS ¶ 160;
- In 1991, Guevara coerced a false confession from Daniel Rodriguez, AS ¶ 160;
- In 1991, Guevara physically coerced sixteen year-old David Velazquez into falsely implicating Daniel Rodriguez in a murder, AS ¶ 160;
- In 1991, Guevara told Efrain and Julio Sanchez to pick David Colon out of a lineup, AS ¶ 160;
- In 1992, Guevara obtained an involuntary confession from 15 year-old Jacqueline Montanez, AS ¶ 160;
- In 1993, Guevara coerced Francisco Vicente to falsely implicate Armando Serrano and Jose Montanez in a murder. The City of Chicago has since determined that Montanez and Serrano were wrongfully convicted. In 2016, both men were exonerated and received certificates of innocence. Guevara has taken the Fifth in regard to all allegations regarding Montanez and Serrano, AS ¶ 160;
- In 1993, Guevara tried to coerce 15 year-old Eliezar Cruzado into implicating himself in a murder, AS ¶ 160;

---

[41] *See also Salvato v. Miley*, 790 F.3d 1286, 1297 (11th Cir. 2015); *Beck v. Pittsburg*, 89 F.3d 966, 972 (3d. Cir. 1996); *Foley v. Lowell*, 948 F.2d 10, 14 (1st Cir. 1991); *Larez v. Los Angeles*, 946 F.2d 630, 644 (9th Cir. 1991); *Grandstaff v. Borger*, 767 F.2d 161, 171 (5th Cir. 1985). The City's contrary position (*see* City. Br. at 24) is not supported by its citation to a *dictum* in *Calusinski v. Kruger*, 24 F.3d 931, 936 (7th Cir. 1994), in which the Court concluded that a lower court had properly excluded a *single instance* of later alleged misconduct. *See Padilla*, 2009 WL 4891943, at \*7.

[42] Additional background information on Guevara is available here: https://www.buzzfeed.com/melissasegura/detective-guevaras-witnesses?utm_term=.ma2n6JRBn#.uvpVZAv0V

[43] Mr. Arcos was convicted based on the false evidence, but the appellate court overturned his conviction based on a lack of evidence. *See People v. Arcos*, 228 Ill App. 3d 870, 876 (1st Dist. 1996).

- In 1993, Detective Guevara manipulated the results of the line-up in which Mr. Bouto was identified. Ultimately, the City of Chicago concluded that Mr. Bouto is more likely than not innocent. Guevara has taken the Fifth in regard to all allegations regarding Bouto's case, AS ¶ 160;
- In 1993, Guevara used physical force and threats to coerce a false confession from Adolfo Frias-Munoz, AS ¶ 160;
- In 1994, Guevara framed Roberto Almodovar and William Negron. The City of Chicago has determined that Almodovar was wrongfully convicted. In that case, Guevara framed Almodovar for a murder he did not commit by surreptitiously showing his photograph to witnesses before they viewed a lineup and then falsifying reports to make it seem as if the witnesses had picked Almodovar out of a lineup without any influence by Guevara. Almodovar, and his co-defendant Negron, have both since been exonerated. Guevara has taken the Fifth in regard to all allegations regarding the case against Almodovar and Negron, AS ¶ 157;
- In 1994, Guevara used violence to coerce a confession from Adrian Duta, AS ¶ 160;
- In 1995, Guevara and others coerced an involuntary confession from Santos Flores, AS ¶ 160;
- In 1995, Guevara coerced Evelyn Diaz into falsely identifying Luis Serrano, AS ¶ 160;
- In 1995, Guevara told Luis Figueroa to falsely identify Angel Diaz, AS ¶ 160;
- In 1995, Guevara coerced Gloria Ortiz Bordoy into falsely implicating Santos Flores, AS ¶ 160;
- In 1995, Guevara coerced Rodolfo Zaragoza into falsely identifying Ricardo Rodriguez, AS ¶ 160;
- In 1995, Guevara told Jose Melendez to falsely identify Thomas Sierra, framing him for murder, AS ¶ 160;
- In 1996, Guevara coerced Maria Rivera into falsely identifying Angel Gaya and all charges were later dropped in the case, AS ¶ 160;
- In 1997, Guevara coerced Robert Ruiz into falsely identifying Freddy and Concepcion Santiago as the murders of Guevara's nephew, AS ¶ 160;
- In 1997, Guevara falsely reported that witness Ruth Antonetty implicated Ariel Gomez in a murder, when she had not, AS ¶ 160;
- In 1997, Guevara coerced a false confession from Voytek Dembski by beating him while chained to a wall in a locked interrogation room, AS ¶ 160;
- In 1998, Guevara used violence against Rosauro Mejia in an attempt to coerce a confession from him, AS ¶ 160;
- In 1998, Guevara used violence against Adriana Mejia during her interrogation, AS ¶ 160;
- In 1998, Guevara repeatedly beat Gabriel Solache into giving a false confession, causing Solache to sustain permanent hearing loss. In the same investigation, Guevara repeatedly threatened and beat Arturo Reyes to coerce Reyes into falsely implicating himself. The City subsequently determined that Solache and Reyes were abused during their interrogations and that their convictions should not stand. Guevara has taken the Fifth in regard to all allegations regarding Solache and Reyes, AS ¶ 158; and
- Finally, the FBI authored a 302 report detailing the criminal activity of CPD Officer Joseph Miedzianowski and Guevara in the 1980s and 1990s. The report explains that Guevara would apprehend drug and gun dealers and then allow them to "buy their way out of trouble," that and he would take bribes to alter the results of lineups. The FBI report also states that Guevara would receive cash in exchange for the dismissal of murder cases he investigated. Guevara has taken the Fifth in regard to all allegations regarding the topics covered in the 302, AS ¶ 159.[44]

---

[44] All of the above incidents in which Guevara framed innocent men for crimes they did not commit and committed other misconduct are evidence Rivera will use in support of his other widespread practice theories, discussed above, which the City does not challenge in its motion for summary judgment..

That the City made no effort to investigate, discipline, or terminate Guevara in light of this repeated misconduct is far more than sufficient evidence to survive summary judgment. Indeed, it was not until after this civil lawsuit was filed, when the City hired Sidley Austin to review Guevara cases that it took any steps to investigate him. The City has been utterly indifferent to Guevara's misconduct and has failed to discipline him at all relevant times.

Finally, Mr. Brasfield provides additional support for the *Monell* theory that the City failed to discipline Guevara. He explains professional standards when it comes to supervision and discipline of police officer misconduct, and the cultural issues that develop when there is lax oversight on the part of police administrators. Ex. 12 (Brasfield Report) at 23-24. Mr. Brasfield concludes based on his review of Guevara cases that for years internal affairs and direct supervisors failed to meaningfully investigate and discipline a pattern of gross misconduct. *Id.* at 24. Reviewing the City's designated Rule 30(b)(6) testimony, Mr. Brasfield notes that the sustained complaint rate in the Chicago police department is extremely low. *Id.* at 25 n.3. Mr. Brasfield also opines that Guevara's multiple confirmed cases of framing innocence civilians represents "a complete failure of supervision and that fellow officers turned a blind eye or condoned the misconduct." *Id.* at 27. Finally, as Mr. Brasfield notes, *id.* at 29, a federal jury found that the Chicago had a code of silence and a culture of turning a blind eye to officer misconduct as of 2007, *Obrycka v. City of Chicago*, 913 F. Supp. 2d 598, 603-04 (N.D. Ill. 2012). The persistent pattern of Guevara's misconduct is evidence that this lack of oversight was continuous between 1988 and 2007. Ex. 12 (Brasfield Report) at 29.

None of the City's remaining arguments for summary judgment have any merit, and so Rivera addresses them only briefly. The City argues, without citing authority supporting its position, that it cannot be liable because of the misconduct of a single officer, City Br. at 22-23,

67

but what the cases actually say is that municipal liability is rarely based on a single *incident* of misconduct, not that it cannot be based on an single officer who engages in a long pattern of misconduct, especially one as extraordinary and obvious as Guevara's.[45] The City's citation to cases that refuse to impose *Monell* liability based on a single incident of misconduct are inapposite given the pattern just discussed. *See* City Br. at 21-22.[46] Finally, the City's contention that Brasfield's opinion is the only evidence Rivera has of the City's failure to discipline Guevara is obviously not accurate, given the evidence above. *Id.*

In *Thomas v. Cook County*, the Seventh Circuit concluded, "We do not adopt any bright-line rules defining 'widespread custom or practice,'" and "there is no clear consensus as to how frequently such conduct must occur to impose *Monell* liability, 'except that it must be more than one instance,' . . . or even three[.]" 604 F.3d 293, 303 (7th Cir. 2010) (quoting *Cosby v. Ward*, 843 F.2d 967, 983 (7th Cir. 1988); *Gable v. City of Chicago*, 296 F.3d 531, 538 (7th Cir. 2002)); *but see Estate of Moreland v. Dieter*, 395 F.3d 747, 760-61 (7th Cir. 2005) ("[T]he plaintiff need not show that the policy, practice, or custom resulted in past deprivations of rights."); *Woodward v. CMS*, 368 F.3d 917, 929 (7th Cir. 2004) (no "one free suicide" pass). Rivera must identify evidence that the City's failure to discipline was a policy and not a random event. *Thomas*, 604 F.3d at 303. There is ample evidence to support that conclusion, and the Court should deny summary judgment. *Garcia v. City of Chicago*, 2003 WL 1715621, *6-7 (N.D. Ill. Mar. 20, 2003) (denying summary judgment to City given evidence of indifference to a pattern of abuse

---

[45] Indeed, to the extent that a single officer engaged in repeated acts of misconduct that go unanswered by City officials, that evidence is perhaps even more powerful evidence than a general failure of disciplinary systems across a wider group of officers—it shows a failure to discipline the most prolific and frequent offenders.

[46] For example, the City's citation to *Connick v. Thompson*, 563 U.S. 51, 61 (2011), does not support its position. Instead, that case holds that liability for a failure-to-train *Monell* claim cannot be "based on a single Brady violation." *Id.* at 54. In *Thompson*, the plaintiff conceded that he had put no evidence in the record of any other instances of misconduct. The case has nothing to say about whether the repeated misconduct used to prove a *Monell* claim must be committed by a single officer, multiple officers, or either.

68

by its officers); *Kindle v. City of Harvey*, 2002 WL 230779, \*4-5 (N.D. Ill. Feb. 15, 2002)

(same); *Robinson v. City of Harvey*, 2001 WL 138901, at \*7 (N.D. Ill. Feb. 16, 2001) (same).

## K.  THE DERIVATIVE CLAIMS SURVIVE SUMMARY JUDGMENT

Finally, the City asserts they it is entitled to judgment on Rivera's *respondeat superior*

and indemnification claims, arguing these claims are derivative of others. Rivera's underlying

claims survive, and so should these derivate claims.

## CONCLUSION

For all of these reasons, Defendants' motions for summary judgment should be denied.

RESPECTFULLY SUBMITTED,

**JACQUES RIVERA**

By:  /s/ Steve Art
*One of Plaintiff's Attorneys*

Arthur Loevy
Jon Loevy
Russell Ainsworth
Anand Swaminathan
Steve Art
**LOEVY & LOEVY**
311 N. Aberdeen St., Third Floor
Chicago, IL 60607
(312) 243-5900
steve@loevy.com

Locke E. Bowman
Sheila Bedi
David Shapiro
Alexa Van Brunt
**MACARTHUR JUSTICE CENTER**
Northwestern University School of Law
375 E. Chicago Ave., 8th Floor
Chicago, IL 60611
(312) 503-0844

J. Samuel Tenenbaum
BLUHM LEGAL CLINIC
Northwestern University School of Law
375 E. Chicago Ave., 8th Floor
Chicago, IL 60611
(312) 503-8576

## CERTIFICATE OF SERVICE

I, Steve Art, an attorney, hereby certify that, on September 22, 2017, I filed the

foregoing PLAINTIFF'S CONSOLIDATED RESPONSE IN OPPOSITION TO

DEFENDANTS' SUMMARY JUDGMENT MOTIONS using the Court's CM/ECF system,

which effected service on all counsel of record.

/s/ Steve Art
*One of Plaintiff's Attorneys*

Arthur Loevy
Jon Loevy
Russell Ainsworth
Anand Swaminathan
Steve Art
**LOEVY & LOEVY**
311 N. Aberdeen St., Third Floor
Chicago, IL 60607
(312) 243-5900
steve@loevy.com

Locke E. Bowman
Sheila Bedi
David Shapiro
Alexa Van Brunt
**MACARTHUR JUSTICE CENTER**
Northwestern University School of Law
375 E. Chicago Ave., 8th Floor
Chicago, IL 60611
(312) 503-0844

J. Samuel Tenenbaum
BLUHM LEGAL CLINIC
Northwestern University School of Law
375 E. Chicago Ave., 8th Floor
Chicago, IL 60611
(312) 503-8576

70

# EXHIBIT 40

CASE REPORT
CHICAGO POLICE | BATTERY | 0.4.1.A | AGGRAVATED: HANDGUN | K-371,95.

**SCENE**

4. ADDRESS OF OCCURRENCE NO. 3,3,24 W. DIR STREET CORTLAND | APT. NO | 5. FIRE RELATED ☐1 YES ☒2 NO | 6. DATE OF OCCURRENCE – TIME DAY MO. YR. 27, AUG, 88, 1545 | 7. BEAT OF OCCUR. 1422 | 8. BEAT/UNIT ASSI 1413

9. TYPE OF LOCATION OR PREMISE WHERE OFFENSE OCCURRED (GIVE NAME OF LOCATION IF APPLICABLE) STREET | 10. LOCATION CODE B, 0, 4 | 11. DATE R.O. ARRIVED – TIME 27, AUG, 88, 1638 | 12. ASSIGNED BY ☒1 C.D.S. ☐2 ON VIEW ☐3 SUPERVISOR

All information, descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

| 20 NO. VICTIMS | 21 NAME (LAST-FIRST-M.I.) | IDENTITY VERIFIED | 22 HOME ADDRESS (NO., DIR., STREET, APT. NO) | 23 SEX-RACE-AGE CODE | 24. HOME PHONE | 25. BUSINESS PHONE | 26 TIME AVAIL. | 27 OCCUPATION | 28. IN-JURED YES/NO | 29 VIC REL COD |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | VALENTIN, FELIX | ☒ | 1458 N. CAMPBELL | M,4,16 | 235 1821 | NONE | ANY | — | A | 24 |

ADDITIONAL VICTIMS

PARENT/GUARDIAN, IF JUVENILE (Cont'd. 1 of 2)

**WITNESS**

| 30. NO. WIT | 31 ☒1 DISCOVERED ☒2 WITNESSED ☒3 REPORTED OFFENSE | 32. HOME ADDRESS | 33 SEX-RACE-AGE | 34. | 35. |
|---|---|---|---|---|---|
| | VALENTIN, ISRAEL | 1458 N. CAMPBELL | M,4,22 | 235 1821 | NONE |
| | LOPEZ, MACHO | 3324 W. Cortland 1st | M,4,15 | N-O-N-E | |

RACE CODES
1-BLACK 3-BLACK-HISPANIC 5-AMER. IND./ALASK. N.
2-WHITE 4-WHITE-HISPANIC 6-ASIAN/PACIFIC ISLAND

OFFENDER/VICTIM RELATIONSHIP CODES (Use for Member of the Same Family or Household)
01-WIFE · 09-BROTHER · 17-BROTHER-IN-LAW
02-HUSBAND · 10-SISTER · 18-SISTER-IN-LAW
03-FORMER WIFE · 11-AUNT · 19-OTHER RELATIVE
04-FORMER HUSBAND · 12-UNCLE · 20-GIRL FRIEND
05-MOTHER · 13-MOTHER-IN-LAW · 21-BOYFRIEND
06-FATHER · 14-FATHER-IN-LAW · 22-FRIEND/ACQUAINTAN
07-SON · 15-SON-IN-LAW · 23-OTHER-SPECIFY
08-DAUGHTER · 16-DAUGHTER-IN-LAW · 24-NO RELATIONSHIP

**OFFENDER**

| 40. NO. OFF. | 41. OFFENDER'S NAME (OR DESCRIBE CLOTHING, ETC.) | 42. HOME ADDRESS | 43. SEX-RACE-AGE | HEIGHT | WEIGHT | EYES | HAIR | COMPL. | MARKS, SCARS, ETC. | 44. C.B./I.R. NO. | 45. OFFEND REL. COD |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | DRIVER N.F.D | U — N — K | M,4,18 | U | — | N | K | | | 24 |
| | PASSENGER yellow Baseball hat | U — N — K | M,4,16 | U | — | K | DRK MD | LIGHT MD | | 24 |

90. | 51. OBJECT/WEAPON ☒1 USED ☐2 DISPLAYED ☐3 UNK | 52. FIREARM FEATURES | 53. POINT/ENTRY | 54. POINT/EXIT | 55. BURGLAR ALARM | 56. SAFE BURGLARY METHOD | 57. IF RESIDENCE, WHERE WERE OCCUPANTS

51. OBJECT/WEAPON
☒01 HAND GUN ☐08 EXPLOSIVE
☐02 SHOTGUN ☐09 LIQUID/GAS
☐03 RIFLE ☐10 BOTTLE/GLASS
☐04 KNIFE ☐11 RAZOR
☐05 VEHICLE ☐12 PRY TOOL
☐06 BLUNT INSTRUMENT ☐13 HAND, FEET
☐07 THROWN OBJECT ☐14 OTHER
☐15 DNA

52. FIREARM FEATURES
☐01 CHROME/NICKEL
☐02 BLUE STEEL
☐03 SHORT BARREL
☐04 LONG BARREL
☐05 SAWED OFF
☐06 OTHER
☒07 UNKNOWN
☐08 DNA

53. POINT/ENTRY
☐01 FRONT DOOR
☐02 REAR DOOR
☐03 WINDOW
☐04 ROOF
☐05 FLOOR
☐06 SIDE DOOR
☐07 OTHER
☐08 UNKNOWN
☐09 DNA

54. POINT/EXIT
☐01 FRONT DOOR
☐02 REAR DOOR
☐03 WINDOW
☐04 ROOF
☐05 FLOOR
☐06 SIDE DOOR
☐07 OTHER
☐08 UNKNOWN
☐09 DNA

55. BURGLAR ALARM
☒ONA
ON PREMISE
☐1 YES ☐2 NO
ALARM CIRCUMVENTED
☐1 YES ☐2 NO

56. SAFE BURGLARY METHOD
☐01 PUNCH ☐06 PEEL
☐02 TORCH ☐07 OPEN
☐03 EXPLOSIVE ☐08 UNKNOWN
☐04 DRILL
☐05 REMOVED ☒09 DNA

57. IF RESIDENCE, WHERE WERE OCCUPANTS
☐01 WORK ☐06 OTHER
☐02 VISITING ☐07 UNKNOWN
☐03 VACATION ☒08 DNA
☐04 WEDDING
☐05 FUNERAL/WAKE

58. UNUSUAL CHARACTERISTICS OF OFFENSE
SEE NARRATIVE

59. GANG RELATED – AFFILIATION
☒VICTIM CARRETIANO BOY
☒OFFENDER LATIN KING

71. DESCRIBE PROPERTY IN NARRATIVE T = TAKEN, R

**PERMANENT RETENTION FILE**

| I MONEY ☐T S ☐R | 12 JEWELRY ☐T S ☐R | 13 FURS ☐T S ☐R | I 4 CLOTHING ☐T S ☐R | | | | (-) FIREARMS ☐T S ☐R | 18 Narc./Dang. Drugs ☐T S ☐R | 1 SOTHER ☐T S ☐R | 16 NONE ☐T ☐R |

72. VEHICLE/TRAILER YEAR | MAKE | BODY STYLE COLOR | V.I.N. | STATE LICENSE NO. | STATE EXPIR. MO/YR | 73. PROPERTY INVENTORY NO(S). | 74. VEH. INVENTORY NO. PO
☐STOLEN ☐THEFT FROM
☒OFFENDER'S | 1/DI TOYOTA | 2 DN ORN | U — N — K | U — N T.K

NARRATIVE (Do not duplicate or repeat information — for explanation or additional information only)

IN SUMMARY: VICTIM AND WITNESS 1, VALENTIN, ISRAEL, went to ABOVE ADDRESS to pick up, witness VALENTIN'S Girl friend, as they were going to a wedding. Witness VALENTIN went upstairs to pick up his Girlfriend, victim waited in car behind steering wheel, in Drivers Seat. Witness VALENTIN went DOWNSTAIRS AND COULD NOT see his BROTHER.

81. SOBRIETY OF VICTIM ☒1 SOBER ☐2 HI

82. FLASH MESSAGE SEN ☒1 YES ☐2 NO

91. EXTRA COPIES REQUIRED ☒NORMAL CDP TANKS NORTH | ☒CONT'D. OTHER SIDE | 92. NOTIFYING FOLLOW-UP INVESTIG. UNIT MACHAIN 7963 | UNIT NOTIFIED BSVC | PERSON ☒NOTIFIED ☐ARRIVED SGT GARRETTA | DATE (DAY-MO-YR) 27 AUG 88 | TIME 1700

93. FIRST OFFICER AT SCENE | ☒R.O. | 94. OFFICER NOTIFYING ☒1ST D/S ☐2ET. ☐3 M.E. MACHAIN | PERSON ☒NOTIFIED ☐ARRIVED GARDN | DATE (DAY-MO-YR) 27 AUG 88 | TIME 1700

95. REPORTING OFFICER'S NAME (PRINT) E.M. CRAWFORD | STAR NO. 15602 | OFFICER'S SIGNATURE | DATE INVEST. COMPLETED-TIME 27 AUG 88 1930

96. REPORTING OFFICER'S NAME (PRINT) S. MACHAIN | STAR NO. 7963 | OFFICER'S SIGNATURE | 97. SUPERVISOR APPROVING (PRINT NAME) Sgt G. Peterson | STAR NO. 2111 | APPROVAL SIGNATURE | DATE APPROVED 27 AUG 88 | TIME 210

D-11.380 (REV 8/83)

PLAINTIFF'S TRIAL EXHIBIT 11
PAGE 1 OF 4

CONTINUATION OF NARRATIVE

R.D. NO. K 371-955

IN the Car, approached and observed his brother slumped across seat, bleeding. Victim was sprawled across seat, stating "they shot me, they shot me," and began screaming. Witness Valentin, pushed his brother across seat and drove him to Norwegian Hospital. While enroute, witness Valentin struck 3 parked MV's in the 1200-1300 blks of N. Kedzie. A passer-by in another MV came by, and drove victim and witness valentin to Norwegian. Victim treated at Norwegian, to be transferred to Northwestern Hospital. R/O's were able to somewhat communicate with victim & learned the following:

Suspect auto: older model BRN 2DR, possibly hatch back, Toyota, clean windows, Puerto Rican FLAG hanging from rear view mirror.

Suspect offenders (1) m/wht, Latin King Gang affiliation, driver of car, N.F.D. at this time. (2) m/wht, Latin King Gang affiliation, passenger in above auto, LSW yellow baseball hat, light to med. complexion, 16-18 yoa, armed with an unk type handgun) this time. NFD AT this time.

I HAVE REVIEWED THIS REPORT AND BY MY SIGNATURE INDI-CATE THAT IT IS ACCEPTABLE. | SUPERVISOR'S SIGNATURE | DATE (DAY-MO-YR)

FOR USE BY BUREAU OF INVESTIGATIVE SERVICES ONLY

PERMANENT RETENTION FILE

| I-UCR OFFENSE CODE | REV. CODE | I-UCR METHOD CODE | METHOD ASSIGNED | UNIT NO. | OFFICER ASSIGNED STAR NO. | DATE ASSIGNED | SUPR STAR NO. | INVESTIGATIVE FILE | REASSIGNED |
|---|---|---|---|---|---|---|---|---|---|
| ☐1 CORRECT ☐2 REVISED | | ☐1 FIELD ☐3 SUMMARY | | | | | | ☐1 YES ☐2 NO | ☐1 YES ☐2 |

| OFFICER REASSIGNED STAR NO. | DATE | STATUS ☐0 PROGRESS ☐3 CLEARED CLOSED ☐6 EXC. CLEARED OPEN | ☐1 SUSPENDED ☐4 CLEARED OPEN ☐7 CLOSED—NON-CRIMINAL | ☐2 UNFOUNDED ☐5 EXC. CLRD. CLOSED | IF CASE IS CLEARED, HOW CLEARED (USE THIS BOX FOR SINGLE CLEAR UP OR FIRST CLEAR UP OF MULTIPLE CLEAR UP LIST) ☐1 ARREST & PROSECUTION ☐2 DIRECTED TO FAMILY COURT ☐3 COMPL. REFUSED TO PROSECUTE ☐4 COMMUNITY ADJUSTMENT ☐5 OTHER EXCEPTIONAL | | | | ☐ ☐ |

| VICTIM IDENTIFIERS ☐1 CORRECT ☐2 REVISED | VICTIM NO. | REVISED NAME | | | | REVISED ADDRESS | | REVISED PHONE NO. ☐HOME ☐BUSINESS |

| VALUE OF PROPERTY TAKEN/RECOVERED | ☐1 DNA | ☐2 VERIFIED | ☐3 CORRECTED | | | FILL IN THE FULL AMOUNT OF ONLY THOSE VALUES WHICH EITHER DIFFER FROM OR WERE NOT REPORTED ON THE REVERSE, THE NARRATIVE OR A SUPPLEMENTARY REPORT. |

| 1 MONEY ☐T $ ☐R | 2 JEWELRY ☐T $ ☐R | 3 FURS ☐T $ ☐R | 4 CLOTHING ☐T $ ☐R | 7 OFFICE EQUIPMT ☐T $ ☐R | 8 TV, RADIO, STEREO ☐T $ ☐R | 9 HOUSEHOLD GOODS ☐T $ ☐R | 10 CONSUM. GOODS ☐T $ ☐R | 11 FIREARMS ☐T $ ☐R | 8 NARC/DANG. DRUGS ☐T $ ☐R | 5 OTHER ☐T $ ☐R | 6 N ☐ ☐ |

| SERIAL NOS. OR IDENTIFICATION NOS. | ☐1 DNA | ☐2 VERIFIED | ☐3 CORRECTED | | | LIST ALL CORRECTIONS & NEW OR ADDITIONAL NOS. OBTAINED |

REMARKS (PERTINENT INFORMATION NOT ON ORIGINAL REPORT)

| PREPARED BY – SIGNATURE | STAR NO. | DATE (DAY-MO-YR.) | APPROVED BY – SIGNATURE | STAR NO. | DATE (DAY-MO-YR.) |

Wron 00023

Opt-Out: +

From: (None)

Page 4 of 6

TO: 1312/445130 06/07/12 03:25 PM

**CASE REPORT / CHICAGO POLICE**

Battery 041 A AGGRAVATED — HANDGUN K-371 955

| | | |
|---|---|---|
| 4. ADDRESS OF OCCURRENCE: 3324, W. Cortland Street | APT. NO. | 5. FIRE RELATED: ☐1 YES ☒2 NO |

6. DATE OF OCCURRENCE – TIME: 27 AUG 88 1545

7. BEAT OF OCCUR. 1422  8. BEAT/UNIT ASSI. 1413

9. TYPE OF LOCATION OR PREMISE WHERE OFFENSE OCCURRED (GIVE NAME OF LOCATION IF APPLICABLE): Street

10. LOCATION CODE: 3,0,4

11. DATE R.D. ARRIVED – TIME: 27 AUG 88 1638

12. ASSIGNED BY: ☒1 C.O.S. ☐2 ON VIEW ☐3 SUPERVISOR

All information, descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

**VICTIMS**

| 20 NO VICTIMS | 21 NAME (LAST–FIRST–M.I.) | IDENTITY VERIFIED | 22 HOME ADDRESS (NO., DIR., STREET, APT. NO.) | 23 SEX–RACE–AGE CODE | 24. HOME PHONE | 25. BUSINESS PHONE | 26. TIME AVAIL | 27 OCCUPATION | 28 INJURED YES NO | 29. VIC REL |
|---|---|---|---|---|---|---|---|---|---|---|
| | CONT. 2 of 2 | | | | | | | | | |

PARENT/GUARDIAN, IF JUVENILE

RACE CODES: 1-BLACK  3-B BLACK-HISPANIC  5-AMER. IND./ALASK. N.
24-WHITE  4-WHITE-HISPANIC  6-ASIAN/PACIFIC ISLAND

**WITNESS**

| NO. WIT. | 31. ☐1 DISCOVERED ☐2 WITNESSED ☐3 REPORTED OFFENSE | 32. | | 33. | 34. | 35. |
|---|---|---|---|---|---|---|

OFFENDER/VICTIM RELATIONSHIP CODES (Use for Member of the Same Family or Household)
01-WIFE  09-BROTHER  17-BROTHER-IN-LAW
02-HUSBAND  10-SISTER  18-SISTER-IN-LAW
03-FORMER WIFE  11-AUNT  19-OTHER RELATIVE
04-FORMER HUSBAND  12-UNCLE  20-GIRL FRIEND
05-MOTHER  13-MOTHER-IN-LAW  21-BOYFRIEND
06-FATHER  14-FATHER-IN-LAW  22-FRIEND/ACQUAINTA
07-SON  15-SON-IN-LAW  23-OTHER–SPECIFY
08-DAUGHTER  16-DAUGHTER-IN-LAW  24-NO RELATIONSHIP

**OFFENDER**

| 40. NO. OFF. | 41. OFFENDER'S NAME (OR DESCRIBE CLOTHING, ETC.) | 42. HOME ADDRESS | 43 SEX–RACE–AGE CODE | HEIGHT | WEIGHT | EYES | HAIR | COMPL. | MARKS, SCARS, ETC. | 44. C.B./I.R. NO. | 45. OFFENC REL. COD |
|---|---|---|---|---|---|---|---|---|---|---|---|

**PERMANENT RETENTION FILE**

**CIRCUMSTANCES**

| 50 | 51 OBJECT/WEAPON ☐1 USED ☐2 DISPLAYED ☐3 UNK | 52. FIREARM FEATURES | 53. POINT/ENTRY | 54. POINT/EXIT | 55. BURGLAR ALARM | 56. SAFE BURGLARY METHOD | 57. IF RESIDENCE, WHERE WERE OCCUPANTS |
|---|---|---|---|---|---|---|---|
| | ☐01 HAND GUN  ☐08 EXPLOSIVE | ☐01 CHROME/NICKEL | ☐01 FRONT DOOR | ☐01 FRONT DOOR | ☐DNA | ☐01 PUNCH  ☐06 PEEL | ☐01 WORK  ☐06 OTHER |
| | ☐02 SHOTGUN  ☐09 LIQUID/GAS | ☐02 BLUE STEEL | ☐02 REAR DOOR | ☐02 REAR DOOR | ON PREMISE | ☐02 TORCH  ☐07 OPEN | ☐02 VISITING  ☐07 UNKNOWN |
| | ☐03 RIFLE  ☐10 BOTTLE/GLASS | ☐03 SHORT BARREL | ☐03 WINDOW | ☐03 WINDOW | ☐1 YES  ☐2 NO | ☐03 EXPLOSIVE  ☐08 UNKNOWN | ☐03 VACATION  ☐08 DNA |
| | ☐04 KNIFE  ☐11 RAZOR | ☐04 LONG BARREL | ☐04 ROOF | ☐04 ROOF | ALARM CIRCUMVENTED | ☐04 DRILL  ☐09 DNA | ☐04 WEDDING |
| | ☐05 VEHICLE  ☐12 PRY TOOL | ☐05 SAWED OFF | ☐05 FLOOR | ☐05 FLOOR | ☐1 YES  ☐2 NO | ☐05 REMOVED | ☐05 FUNERAL/WAKE |
| | ☐06 BLUNT INSTRUMENT  ☐13 HAND, FEET | ☐06 OTHER | ☐06 SIDE DOOR | ☐06 SIDE DOOR | 58 UNUSUAL CHARACTERISTICS OF OFFENSE | | |
| | ☐07 THROWN OBJECT  ☐14 OTHER | ☐07 UNKNOWN | ☐07 OTHER | ☐07 OTHER | | 59. GANG RELATED – AFFILIATION | |
| | ☐15 DNA | ☐08 DNA | ☐08 UNKNOWN  ☐09 DNA | ☐08 UNKNOWN  ☐09 DNA | | ☐VICTIM  ☐OFFENDER | |

**PROPERTY**

70. 71 DESCRIBE PROPERTY IN NARRATIVE   T = TAKEN; R = RECOVERED

| 1 MONEY | 2 JEWELRY | 3 FURS | 4 CLOTHING | 7 OFFICE EQUIPMT. | 8 TV, RADIO, STEREO | 9 HOUSEHOLD GOODS | 0 CONSUM. GOODS | (-) FIREARMS | & NARC./DANG. DRUGS | 5 OTHER | 6 NONE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐T S | ☐T S | ☐T S | ☐T S | ☐T S | ☐T S | ☐T S | ☐T S | ☐T S | ☐T S | ☐T S | ☐T S |
| ☐R | ☐R | ☐R | ☐R | ☐R | ☐R | ☐R | ☐R | ☐R | ☐R | ☐R | ☐R |

| 72 VEHICLE/TRAILER ☐STOLEN ☐THEFT FROM ☐OFFENDER'S | YEAR | MAKE | BODY STYLE | COLOR | V.I.N. | STATE LICENSE NO. | STATE EXPIR. MO/YR | 73. PROPERTY INVENTORY NO(S). | 74. VEH. INVENTORY NO. PO |
|---|---|---|---|---|---|---|---|---|---|

**NARRATIVE**

90. NARRATIVE (Do not duplicate or repeat information – for explanation or additional information only)

PASSENGER. OFFENDER EXITED AUTO, WALKED UP TO VICTIM AS HE SAT IN AUTO AND BEGAN FIRING. VICTIM STRUCK 5 times IN NECK AND CHEST. VICTIM SAT IN A RED 2 OR ? 86 MAZDA, IL PLATE FS 8461 IL 3/89 UN # LA 235147886, THAT WAS DECORATED WITH PINK CARNATION TYPE PAPER, IN PREPARATION FOR WEDDING.

81. SOBRIETY OF VICTI: ☒1 SOBER  ☐2 F

82. FLASH MESSAGE SE: ☐1 YES  ☐2 N

91. EXTRA COPIES REQUIRED: ☐NORMAL  ☐CONT'D OTHER SIDE

92. OFFICER NOTIFYING FOLLOW-UP/INVESTIG. UNIT: UNIT NOTIFIED  PERSON ☐NOTIFIED  ☐ARRIVED  DATE (DAY-MO-YR) – TIME

93. FIRST OFFICER AT SCENE: SAO

94. OFFICER NOTIFYING: ☐1ST D/S ☐E.T ☐M.E.  PERSON ☐NOTIFIED  ☐ARRIVED  DATE (DAY-MO-YR) – TIME

95. REPORTING OFFICER'S NAME (PRINT): S. MACHAIN  STAR NO. 7963  OFFICER'S SIGNATURE  DATE INVEST. COMPLETED – TIME: 27 AUG 88 1930  97. SUPERVISOR APPROVING (PRINT NAME) Sgt G. Petersen  STAR NO. 2111

96. REPORTING OFFICER'S NAME (PRINT): M. REED  STAR NO. 1562  OFFICER'S SIGNATURE  APPROVAL SIGNATURE  DATE APPROVED – 88: 27 AUG 88  TIME 2100

CPD-11.380 (REV. 8/83)

Page 5 of 6

To: 13127445130   06/07/12 03:25 PM

From: (None)

WRofI'00024   Opt-Out : +

CONTINUATION OF NARRATIVE

Gang Crimes North notified Sherman-Moon

E.T. notified

014 Desk notified – 013 notified

BJ1480 notified

Zone notified – also to have a car

protect crime scene, victim's auto at

1253 N. Kenzie.

Gang Crimes Assist Inv- Moon W

off for follow up inv.

Related RD# K875-233 – traffic

Accident – 1253 N. Kenzie.

Gang affiliation witness Valentin, Campbell Rey.

R.D. NO.
K371-955

Wron 00025

Opt-Out : +

I HAVE REVIEWED THIS REPORT AND BY MY SIGNATURE INDI- CATE THAT IT IS ACCEPTABLE.    SUPERVISOR'S SIGNATURE    DATE (DAY-MO-YR.)

FOR USE BY BUREAU OF INVESTIGATIVE SERVICES ONLY

| I-UCR OFFENSE CODE  REV. CODE | I-UCR METHOD CODE | METHOD ASSIGNED | UNIT NO. | OFFICER ASSIGNED STAR NO. | DATE ASSIGNED | SUPV. STAR NO. | INVESTIGATIVE FILE | REASSIGNED |
|---|---|---|---|---|---|---|---|---|
| ☐1 CORRECT ☐2 REVISED | | ☐1 FIELD ☐2 ADMIN. ☐3 SUMMARY | | | | | ☐1 YES ☐2 NO | ☐1 YES ☐ |

| OFFICER REASSIGNED STAR NO.  DATE | STATUS | | | IF CASE IS CLEARED, HOW CLEARED (USE THIS BOX FOR SINGLE CLEAR UP OR FIRST CLEAR UP OF MULTIPLE CLEAR UP LIST) | | | | |
|---|---|---|---|---|---|---|---|---|
| | ☐0 PROGRESS ☐3 CLEARED CLOSED ☐6 EXC. CLEARED OPEN | ☐1 SUSPENDED ☐4 CLEARED OPEN ☐7 CLOSED NON CRIMINAL | ☐2 UNFOUNDED ☐5 EXC. CLRO. CLOSED | ☐1 ARREST & PROSECUTION | ☐2 DIRECTED TO FAMILY COURT | ☐3 COMPL. REFUSED TO PROSECUTE | ☐4 COMMUNITY ADJUSTMENT | ☐5 OTHER EXCEPTIONAL |

| VICTIM IDENTIFIERS | VICTIM NO. | REVISED NAME | | REVISED PHONE NO. |
|---|---|---|---|---|
| ☐1 CORRECT ☐2 REVISED | | | | ☐HOME ☐BUSINESS |

PERMANENT RETENTION FILE

| VALUE OF PROPERTY TAKEN/RECOVERED | ☐1 DNA | ☐2 VERIFIED | ☐3 CORRECTED | FILL IN THE FULL AMOUNT OF ONLY THOSE VALUES WHICH EITHER DIFFER FROM OR WERE NOT REPORTED ON THE REVERSE, THE NARRATIVE OR A SUPPLEMENTARY REPORT. |

| 1 MONEY | 2 JEWELRY | 3 FURS | 4 CLOTHING | 7 OFFICE EQUIPMT. | 8 TV, RADIO, STEREO | 9 HOUSEHOLD GOODS | 10 CONSUM. GOODS | 11 FIREARMS | 12 NARC/DANG. DRUGS | 13 OTHER | 14 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ T $ ☐ R | ☐ T $ ☐ R | ☐ T $ ☐ R | ☐ T $ ☐ R | ☐ T $ ☐ R | ☐ T $ ☐ R | ☐ T $ ☐ R | ☐ T $ ☐ R | ☐ T $ ☐ R | ☐ T $ ☐ R | ☐ T $ ☐ R | ☐ |

| SERIAL NOS. OR IDENTIFICATION NOS. | ☐1 DNA | ☐2 VERIFIED | ☐3 CORRECTED | LIST ALL CORRECTIONS & NEW OR ADDITIONAL NOS. OBTAINED |

REMARKS (PERTINENT INFORMATION NOT ON ORIGINAL REPORT)

| PREPARED BY – SIGNATURE | STAR NO. | DATE (DAY-MO-YR.) | APPROVED BY – SIGNATURE | STAR NO. | DATE (DAY-MO-YR.) |
|---|---|---|---|---|---|

FROM: (None)

Page 6 of 6

TO: 1312/445130
06/07/12 03:26 PM

# EXHIBIT 41

**OFFENSE INCIDENT REPORT TO POLICE**

1. OFFENSE/INCIDENT–PRIMARY CLASSIFICATION: BATTERY
0,4,1,A AGGRAVATED: HANDGUN — K-371,455

ADDRESS OF OCCURRENCE: 3,324 W CORTLAND — ALLEY

APT. NO.:
5. FIRE RELATED: ☐1 YES ☒2 NO
6. DATE OF OCCURRENCE – TIME: 27 AUG 88 1545
7. BEAT OF OCCUR.: 1422
8. BEAT/UNIT ASSIGN.: 1413

TYPE OF LOCATION OR PREMISE WHERE OFFENSE OCCURRED (GIVE NAME OF LOCATION IF APPLICABLE)
10. LOCATION CODE: 3,0,4
11. DATE R.O. ARRIVED – TIME: 27 AUG 88 1638
12. ASSIGNED BY: ☒1 C.O.S. ☐2 ON VIEW ☐3 SUPERVISOR

All information, descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

| 21. NAME (LAST–FIRST–M.I.) | IDENTITY VERIFIED | 22. HOME ADDRESS (NO., DIR., STREET, APT. NO.) | 23. SEX–RACE–AGE CODE | 24. HOME PHONE | 25. BUSINESS PHONE | 26. TIME AVAIL. | 27. OCCUPATION | 28. INJURED YES/NO | 29. VICTIM REL. CODE |
|---|---|---|---|---|---|---|---|---|---|
| VALENTIN, FELIX | ☒ | 1458 N. CAMPBELL | M,4,16 | 235 1821 | NONE | ANY | | x | 24 |

PARENT/GUARDIAN, IF JUVENILE

☒1 DISCOVERED ☐2 WITNESSED ☒3 REPORTED OFFENSE

| VALENTIN, ISRAEL | 32. 1458 N. CAMPBELL | 33. M,4,22 | 235 1821 | NONE |
|---|---|---|---|---|

RACE CODES: 1-BLACK 2-WHITE 3-BLACK-HISPANIC 4-WHITE-HISPANIC 5-AMER. IND./ALASK. NAT. 6-ASIAN/PACIFIC ISLANDER

OFFENDER/VICTIM RELATIONSHIP CODES (Use for Member of the Same Family or Household)
01-WIFE 02-HUSBAND 03-FORMER WIFE 04-FORMER HUSBAND 05-MOTHER 06-FATHER 07-SON 08-DAUGHTER 09-BROTHER 10-SISTER 11-AUNT 12-UNCLE 13-MOTHER-IN-LAW 14-FATHER-IN-LAW 15-SON-IN-LAW 16-DAUGHTER-IN-LAW 17-BROTHER-IN-LAW 18-SISTER-IN-LAW 19-OTHER RELATIVE 20-GIRL FRIEND 21-BOYFRIEND 22-FRIEND/ACQUAINTANCE 23-OTHER–SPECIFY 24-NO RELATIONSHIP

| 41. OFFENDER'S NAME (OR DESCRIBE CLOTHING, ETC.) | 42. HOME ADDRESS | 43. SEX–RACE–AGE CODE | HEIGHT | WEIGHT | EYES | HAIR | COMPL. | MARKS, SCARS, ETC. | 44. C.B./I.R. NO. | 45. OFFENDER REL. CODE |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | 24 |
| | | | | | | | | | | 24 |

51. OBJECT/WEAPON ☒1 USED ☐2 DISPLAYED ☐3 UNK
- ☒01 HAND GUN
- ☐02 SHOTGUN
- ☐03 RIFLE
- ☐04 KNIFE
- ☐05 VEHICLE
- ☐06 BLUNT INSTRUMENT
- ☐07 THROWN OBJECT
- ☐08 EXPLOSIVE
- ☐09 LIQUID/GAS
- ☐10 BOTTLE/GLASS
- ☐11 RAZOR
- ☐12 PRY TOOL
- ☐13 HAND, FEET
- ☐14 OTHER
- ☐15 DNA

52. FIREARM FEATURES
- ☐01 CHROME/NICKEL
- ☐02 BLUE STEEL
- ☐03 SHORT BARREL
- ☐04 LONG BARREL
- ☐05 SAWED OFF
- ☐06 OTHER
- ☐07 UNKNOWN
- ☐08 DNA

53. POINT/ENTRY
- ☐01 FRONT DOOR
- ☐02 REAR DOOR
- ☐03 WINDOW
- ☐04 ROOF
- ☐05 FLOOR
- ☐06 SIDE DOOR
- ☐07 OTHER
- ☐08 UNKNOWN
- ☒09 DNA

54. POINT/EXIT
- ☐01 FRONT DOOR
- ☐02 REAR DOOR
- ☐03 WINDOW
- ☐04 ROOF
- ☐05 FLOOR
- ☐06 SIDE DOOR
- ☐07 OTHER
- ☐08 UNKNOWN
- ☒09 DNA

55. BURGLAR ALARM ☒ONA
ON PREMISE ☐1 YES ☐2 NO
ALARM CIRCUMVENTED ☐1 YES ☐2 NO

56. SAFE BURGLARY METHOD
- ☐01 PUNCH
- ☐02 TORCH
- ☐03 EXPLOSIVE
- ☐04 DRILL
- ☐05 REMOVED
- ☐06 PEEL
- ☐07 OPEN
- ☐08 UNKNOWN
- ☒09 DNA

57. IF RESIDENCE, WHERE WERE OCCUPANTS
- ☐01 WORK
- ☐02 VISITING
- ☐03 VACATION
- ☐04 WEDDING
- ☐05 FUNERAL/WAKE
- ☐06 OTHER
- ☐07 UNKNOWN
- ☒08 DNA

58. UNUSUAL CHARACTERISTICS OF OFFENSE: SEE NARRATIVE

59. GANG RELATED – AFFILIATION
☐ VICTIM
☒ OFFENDER LATIN KING

71. DESCRIBE PROPERTY IN NARRATIVE — T = TAKEN; R = RECOVERED

| MONEY | 2 JEWELRY | 3 FURS | 4 CLOTHING | 7 OFFICE EQUIPMT. | 8 TV,RADIO,STEREO | 9 HOUSEHOLD GOODS | 0 CONSUM. GOODS | (-) FIREARMS | & Narc./Dang. Drugs | 5 OTHER | 6 NONE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐T $ ☐R | ☐T $ ☐R | ☐T $ ☐R | ☐T $ ☐R | ☐T $ ☐R | ☐T $ ☐R | ☐T $ ☐R | ☐T $ ☐R | ☐T $ ☐R | ☐T $ ☐R | ☐T $ ☐R | ☐T ☐R |

VEH ☐STOLEN ☐THEFT FROM ☒OFFENDER'S
MAKE: D. TOYOTA
BODY STYLE: 2DN
COLOR: BRN
V.I.N.: U — N — K U — N — T K

81. SOBRIETY OF VICTIM ☒1 SOBER ☐2 HBD

NARRATIVE (Do not duplicate or repeat information or additional information only)
IN SUMMARY: VICTIM AND WITNESS #1, VALENTIN, ISRAEL, went to ABOVE ADDRESS to pick up, witness VALENTIN'S Girlfriend, as they were going to a wedding. Witness VALENTIN went upstairs to pick up his Girlfriend, victim will be in CAR Behind steering wheel, in Drivers seat. Witness VALENTIN went downstairs, and could not see his Brother

82. FLASH MESSAGE SENT? ☒1 YES ☐2 NO

EXTRA COPIES REQUIRED ☒NORMAL
☒CONT'D. OTHER SIDE

FIRST OFFICER AT SCENE ☒R.O.

REPORTING OFFICER'S NAME (PRINT): E.M. CRAWFORD — STAR NO. 15602 — DATE INVEST. COMPLETED–TIME: 27 AUG 88

REPORTING OFFICER'S NAME (PRINT): S. MACHAIN — STAR NO. 7963

(REV. 8/83)

Wrdn 00043

PLAINTIFF'S TRIAL EXHIBIT 19C
1 of 2

in the car, approached and observed his brother slumped across seat, bleeding. Victim was sprawled across seat, saying "they shot me, they shot me," and began screaming. Witness Valencia pushed his brother across seat and drove him to Norwegian Hospital. While enroute, witness Valencia struck 3 parked MV's in the 1200-1300 Blks of N. Kenzie. A passer by in another MV came by, and placed victim and witness Valencia to Norwegian. Victim went to at Norwegian, to be transferred to Northwestern Hospital.

R/Os were able to sustain communicate with victim & learned the following:

K 371-955

Suspect auto: older model BAM 2DR, possibly _____ ____, Toyota, clean windows, _____ _____ rear handbush _____ rear view mirror

Suspect offenders (1) m/wt, Latin King Gang affiliation, driver of car N.F.D. at this time. (2) m/wt, Latin King Gang affiliation, passenger in above auto, used yellow baseball hat, light to med. complexion, 16-18 yrs, armed N.F.D. at time handgun this time

| | |
|---|---|
| I HAVE REVIEWED THIS REPORT AND BY MY SIGNATURE INDICATE THAT IT IS ACCEPTABLE. | SUPERVISOR'S SIGNATURE / DATE (DAY-MO-YR.) |

**FOR USE BY BUREAU OF INVESTIGATIVE SERVICES ONLY**

| I-UCR OFFENSE CODE — ☐1 CORRECT ☐2 REVISED | REV. CODE | I-UCR METHOD CODE | METHOD ASSIGNED ☐1 FIELD ☐2 ADMIN. ☐3 SUMMARY | UNIT NO. | OFFICER ASSIGNED STAR NO. | DATE ASSIGNED | SUPV. STAR NO. | INVESTIGATIVE FILE ☐1 YES ☐2 NO | REASSIGNED ☐1 YES ☐2 |

| OFFICER REASSIGNED — STAR NO. | DATE | STATUS ☐0 PROGRESS ☐1 SUSPENDED ☐2 UNFOUNDED ☐3 CLEARED CLOSED ☐4 CLEARED OPEN ☐5 EXC. CLRD. CLOSED ☐6 EXC. CLEARED OPEN ☐7 CLOSED—NON-CRIMINAL | IF CASE IS CLEARED, HOW CLEARED (USE THIS BOX FOR SINGLE CLEAR UP OR FIRST CLEAR UP OF MULTIPLE CLEAR UP LIST) ☐1 ARREST & PROSECUTION ☐2 DIRECTED TO FAMILY COURT ☐3 COMPL. REFUSED TO PROSECUTE ☐4 COMMUNITY ADJUSTMENT ☐5 OTHER EXCEPTIONAL |

| VICTIM IDENTIFIERS ☐1 CORRECT ☐2 REVISED | VICTIM NO. | REVISED NAME | REVISED ADDRESS | REVISED PHONE NO. ☐HOME ☐BUSINESS |

VALUE OF PROPERTY TAKEN/RECOVERED ☐1 DNA ☐2 VERIFIED ☐3 CORRECTED — FILL IN THE FULL AMOUNT OF ONLY THOSE VALUES WHICH EITHER DIFFER FROM OR WERE NOT REPORTED ON THE REVERSE, THE NARRATIVE OR A SUPPLEMENTARY REPORT.

| 1 MONEY ☐T $ ☐R | 2 JEWELRY ☐T $ ☐R | 3 FURS ☐T $ ☐R | 4 CLOTHING ☐T $ ☐R | 7 OFFICE EQUIPMT. ☐T $ ☐R | 8 TV, RADIO, STEREO ☐T $ ☐R | 9 HOUSEHOLD GOODS ☐T $ ☐R | 0 CONSUM. GOODS ☐T $ ☐R | (-) FIREARMS ☐T $ ☐R | a NARC/DANG. DRUGS ☐T $ ☐R | 5 OTHER ☐T $ ☐R | 6 ☐ ☐ |

SERIAL NOS. OR IDENTIFICATION NOS. ☐1 DNA ☐2 VERIFIED ☐3 CORRECTED — LIST ALL CORRECTIONS & NEW OR ADDITIONAL NOS. OBTAINED

REMARKS (PERTINENT INFORMATION NOT ON ORIGINAL REPORT)

| PREPARED BY — SIGNATURE | STAR NO. | DATE (DAY-MO-YR.) | APPROVED BY — SIGNATURE | STAR NO. | DATE (DAY-MO-YR.) |

Wron 00044

# EXHIBIT 42

**GENERAL PROGRESS REPORT**
**DETECTIVE DIVISION/CHICAGO POLICE**

| DATE OF ORIG. CASE REPORT | | | DATE OF THIS REPORT | | | |
|---|---|---|---|---|---|---|
| DAY | MONTH | YEAR | DAY | MONTH | YEAR | WATCH |
| 28 | AUG | 88 | 27 | AUG | 88 | 3 |

| OFFENSE CLASSIFICATION—LAST PREVIOUS REPORT | VICTIM'S NAME AS SHOWN ON CASE REPORT | BEAT/UNIT ASSIGNED |
|---|---|---|
| NO 6 BATT | VALENTIN, Felix | 5537 |

This form is designed for recording handwritten notes and memoranda which are made during the conduct of investigations, including: inter-watch memoranda (handwritten or typewritten), witness and suspect interview notes, on-scene canvas notes, and any handwritten personal notes made by detectives during the field investigation of violent crimes which are used to prepare official Department case reports.

LOPEZ, ORLANDO

12 - ~~5st~~ MAY 7 - ■

MOZART

STANDING 3324
Shooting - 3322.
18 yoa - KINGS - HASSEEN BEFORE
235-3373 - Neighbor

#1    BLACK JacKeT -
Dark PANTS
gym shoes

#2 #
By STORE - CAR came through
Alley - TURNED EAST AND STOPPED Shooter
GOT OUT STARTED TO walk THEN
RAN - VICTIM BENT OVER ˢᵘᵃⁿ LEANED ĩN CAR ᵗᵒ ᴾⁱᶜᵏ
AND WAS shot - # Possible
SiLencer - E oN CORT - South oN Spaulding
ᴮᴿᴼⁿᶻᵉ
COPPER COLOR MED Size CAR - Chev.

PRINTED CP
S81 S   TP - 7355106
568 - 145 -

| REPORTING OFFICER'S SIGNATURE—STAR NO. | RECEIVED BY: SUPERVISOR'S SIGNATURE—STAR NO. | DAY | MONTH | YEAR |
|---|---|---|---|---|
| SMc ___ 50678 | | 29 | AUG | 1988 |

CPD-23.122 (Rev. 2/83)

John J. Leonard #8679

Wron 00053

PLAINTIFF'S TRIAL EXHIBIT 12
PAGE 1 OF 1

# EXHIBIT 43

Property inventory numbers. If property taken was identified for Operation Identification indicate ID numbers at end of Narrative. Offender suspect make descriptions, i.e., sex race code age height weight color eyes & hair complexion scars marks etc. If suspect is arrested give name sex race code use C.B. or I.R number if known and state in Custody. CRC 2c

## SUPPLEMENTARY REPORT
### CHICAGO POLICE

All descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise

4. DATE OF ORIG. OCCURRENCE - TIME
DAY 27  MO Aug  YR 88   1545

| 1. INCIDENT OFFENSE CLASSIFICATION LAST PREVIOUS REPORT | UCR OFF CODE | 2. ADDRESS OF ORIG INCIDENT OFFENSE | VERIFIED / CORRECTED | 3. BEAT OF OCCUR |
|---|---|---|---|---|
| BATTERY:Aggravated,Handgun | 041A | 3324 W. Cortland | X VERIFIED | 1422 |

| 5. VICTIM S. SUBJECT'S NAME AS SHOWN ON LAST PREVIOUS REPORT | CORRECT | 6. FIRE RELATED | 7. BEAT ASSIGNED |
|---|---|---|---|
| VALENTIN, Felix | X1 YES 2 NO | 1 YES X2 NO | 1464B |

| 8. VICTIM'S/SUBJECT'S ADDRESS | 9. TYPE OF LOCATION OR PREMISE WHERE INCIDENT OFFENSE OCCURRED | LOCATION CODE |
|---|---|---|
| 1458 N. Campbell | Street | 304 |

**10. DESCRIBE PROPERTY IN NARRATIVE** — T = TAKEN;  R = RECOVERED

FILL IN THE FULL AMOUNT OF ONLY THOSE VALUES WHICH EITHER DIFFER FROM OR WERE NOT REPORTED ON THE ORIGINAL CASE REPORT OR THE LAST PREVIOUS SUPPLEMENTARY REPORT

PROPERTY

| 1 MONEY | 2 JEWELRY | 3 FURS | 4 CLOTHING | 7 OFFICE EQUIPMENT | 8 TV RADIO, STEREO | PROPERTY INVENTORY NO(S) |
|---|---|---|---|---|---|---|
| T $ / R | T $ / R | T $ / R | T $ / R | T $ / R | T $ / R | |
| 9 HOUSEHOLD GOODS | 0 CONSUM. GOODS | (-) FIREARMS | & NARC / DANGEROUS DRUGS | 5 OTHER | 6 NONE | |
| T $ / R | T $ / R | T $ / R | T $ / R | T $ / R | T / R | |

### OFFENDERS

| 11. OFFENDER'S NAME (OR DESCRIBE CLOTHING, ETC.) | 12. HOME ADDRESS | | 13. SEX–RACE–AGE CODE | HEIGHT | WEIGHT | EYES | HAIR | COMPL |
|---|---|---|---|---|---|---|---|---|
| 1  RODRIGUEZ,Jose | 2040 N. Spaulding | 1st | M/4/22 | 5-10 | 120 | Brn | Blk | Lt |
| 2  NIEVES,Felipe | Unk | | M/4/24 | 5-06 | 150 | Brn | Brn | Lt |

| 14. C.B. NO. | I.R. NO., Y.D. NO OR J.D.A. NO. | OFFENDER REL. CODE | C.B. NO. | I.R. NO., Y.D. NO OR J.D.A. NO. | OFFENDER REL. CODE | 15. NO. ARRESTED | ARREST. UNIT NO |
|---|---|---|---|---|---|---|---|
| OFF. 1 | | OFF. 2 | | | | | |

| 16. OFF'S VEHICLE | YEAR | MAKE | BODY STYLE | COLOR | V.I.N. | STATE LICENSE NO. | STATE |
|---|---|---|---|---|---|---|---|
| X USED ☐ STOLEN Unk | | Toyota | 2dr | Brn | UNK | UNK | |

**80. NARRATIVE**

IN SUMMARY: R/O's had occassion to interview above victim regarding above RD#. Victim related that the person who shot him and the driver were members of the Imperial Gangster street gang. R/O's returned to show the victim the Imperial Gangster photo album. Above victim picked out offender#1 as the person who shot him and offender#2 as the driver of the vehicle used. Offender#1 taken into custody,advised rights per Miranda in Spanish and English and processed in 014.

Additional Arresting Ofcrs:WOJCIK#4408,VERGARA#14416

| 90. EXTRA COPIES REQUIRED (NO. & RECIPIENT) | 91. DATE THIS REPORT SUBMITTED – | TIME | 92. SUPERVISOR APPROVING (PRINT NAME) | STAR NO. |
|---|---|---|---|---|
| | DAY 31  MO Aug  YR 88 | 0230 | | |

| 93. REPORTING OFFICER (PRINT NAME) | STAR NO. | 94. REPORTING OFFICER (PRINT NAME) | STAR NO. | SIGNATURE | |
|---|---|---|---|---|---|
| C.LETRICH | 6198 | J.MORIARTY | 16633 | | |
| SIGNATURE | | SIGNATURE | | 95. DATE APPROVED (DAY–MO.–YR.) | TIME |

CPD-11 411-A (REV. 8/85) • MUST BE COMPLETED IN ALL CASES

K-371955  17 RD NO

☐ CONTINUED OTHER SIDE

Wron 00039

PLAINTIFF'S TRIAL EXHIBIT 19B
1 of 1

# EXHIBIT 44

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 101 of 1254 PageID #:104234

STATEMENT OF

Thomas L. Kelly

Taken February 9, 1999 At 8:50 P.M.

At Area 5 Violent Crimes

Present ASA Jake Rubinstein

Detective Guevara

This statement taken regarding the Fatal beating

of Daniel Garcia which occurred on October 12, 1998

at 1946 N. whipple at about 1:55 P.M. a.m.

I understand I have the right to remain silent and that anything I
say can be used against me in a court of law. I understand that I
have the right to talk to a lawyer and have him present with me
during questioning, and if I cannot afford to hire a lawyer one
will be appointed by the court to represent me before any questioning.
Understanding these rights, I wish to give a statement. JW Rubinstein A.S.A.

Thomas Kelly Det R Guevara

After being advised of his constitutional
rights and after stating that he understood
each and every one of those constitutional
rights, and After being advised that Assistant
State's Attorney Jake Rubinstein is a lawyer
and a prosecutor and not his lawyer
and not the lawyer for anyone else
connected to this case, Thomas L. Kelly
agreed to give the following statement
which is a summary and not word for
word.

Thomas L. Kelly states that he
is 17 years old and his birthday is
███████████ Thomas lives at 1543 W.
Fullerton in chicago. He has lived there

JW Rubinstein A.S.A.    Thomas Kelly    Det R Guevara

RFC-Martinez 000182

Since June, 1998. Thomas lives there with his aunt Virginia Bucio, who is his guardian. Thomas went to Lincoln Park High School for one year. Thomas then went to Lawrence Hall Alternative School for about eight months. Thomas is now working on a GED. Thomas can read and write English.

Thomas states that he is a member of the Latin Kings, which is a gang. Thomas has been a Latin King since 1993 and holds no rank in the gang. At the head of the Latin Kings is the "Inca" which is like the chief of the gang. Below the Inca in the Latin Kings is the Chief Enforcer. The Chief Enforcer is the top assistant to the Inca. Below the Chief Enforcer are Enforcers. Next in rank are the Soldiers who are the Latin Kings who have no rank. Thomas states that many areas on the Northwest side of Chicago are Latin Kings territory. This includes the area from Armitage and Kedzie to Augusta and Kedzie. The area between Humboldt and Armitage to Sawyer and Armitage is also Latin Kings territory. The area of Armitage and Whipple, including the 1900 block of North Whipple is Latin Kings territory. The 1900 block of North Whipple is where Thomas hangs out and he has been hanging out there since 1993. The Latin

J.M. Nuliminni A.S.A.    Thomas Kelly    Det. R. Guevara

RFC-Martinez 000184

Kings sell drugs on the 1900 Block of North Whipple. Thomas has a tatoo on his left leg with the letters "LK" for Latin Kings, and a crown, which is the symbol of the Latin Kings. Thomas also has his nickname, Snoop, tatooed on the same ankle.

Thomas states that on october 12, 1998 in the early morning hours, he was "on the block." "On the block" means hanging out on the 1900 block of North whipple. Somewhere around 1:30 or 2:00 a.m. Thomas was driving around the block in his car, which was a Pontiac Station wagon. Thomas was driving alone. As Thomas drove, he saw a group of people in the alley that connects whipple and Albany just south of Armitage. Thomas saw several Latin Kings from the block arguing with a Mexican guy. One of the Latin Kings was Jose Tinajero. Thomas recognizes Jose Tinajero from Exhibit A, a photograph of him. There were three or so other Latin Kings with Tinajero, but Thomas does not remember who they were. The Mexican man they were arguing with was a Stranger. Thomas recognizes the Mexican man from Exhibit B, a photograph of him. Thomas now Knows this man's name to be Daniel Garcia.

ASW Rulimber A.S.A. Thomas Kelly Det R. Guevara

RFC-Martinez 000186

After Thomas saw the Latin Kings arguing with Garcia, he parked his car, got out and walked over into the alley where the argument was. There is a parking lot in the alley that forms part of the alley. This is where the argument was. Tinajero seemed to be the main one arguing with Garcia. Thomas cannot remember what they were saying.

Tinajero then punched Garcia once in the face and Garcia fell down. At this point all of the other Latin Kings there "bum rushed" Garcia. "Bum rushed" means to attack. Everybody was kicking, stomping and punching Garcia. Tinajero was doing the most kicking, stomping and punching. Thomas stepped up to where Garcia was lying and punched Garcia several times on Garcia's face and stomach. Thomas remembers hitting Garcia about three times. As Thomas punched Garcia, one of the Latin Kings stomping Garcia accidently kicked Thomas in the eye so Thomas stood up. As Thomas did this, he saw a blue-and-white police car driving down Armitage. When Thomas saw the police car, he told the other Latin Kings that the police had just rolled down Armitage and said let's leave before they come back. Thomas said this because he did not want anyone to get locked up for bum

J.W. Rubinstein A.S.A.    Thomas Kelly    Det. R. Guevara

RFC-Martinez 000188

rushing Garcia.

After Thomas told the others about the police, two Latin Kings ran away, one walked away and Tinajero started going through Garcia's pockets. Thomas does not remember who it was that ran away and who it was that walked. Thomas walked back to his car, got in, and drove away.

Thomas drove down to Cortland, turned right, went one block to Albany, drove one block to Armitage, turned right again and drove to Armitage and Whipple. Thomas pulled up to the alley again and stopped his car where the alley makes a "T" into Whipple, just south of Armitage. No one else was around but Garcia and Tinajero. Garcia was lying on his back and Tinajero was stomping on Garcia's face with Tinajero's feet. Thomas told Tinajero to jump in the car with him so they could get out of there. Tinajero just kept stomping on Garcia and acted like he didn't hear Thomas. Thomas then drove away and went to a friend's house and went to bed.

The next day, Thomas was back on the block hanging out with Tinajero. Tinajero told Thomas that the reason they had beat Garcia up was that the previous day, Garcia

JM Rubinstein A.S.A.    Thomas Kelly    Det. R. Guevara

had taken some crack cocaine rocks from Tinajero without paying for them. Tinajero also told Thomas that Garcia was a Disciple. The Disciples are a rival gang of the Latin Kings and the two gangs are constantly fighting.

Thomas states that he has been treated well by the police and by Assistant State's Attorney Jake Rubinstein. Thomas has been given a quarter pounder, fries, and a pop to drink from McDonald's. Thomas also got some rice to eat with pork chops. Thomas was allowed to sleep at the police station and was allowed to go to the bathroom whenever he needed to. Thomas is giving this statement freely and voluntarily. No threats or promises were made to Thomas to get him to make this statement. Thomas is not under the effects of drugs or alcohol at this time.

Assistant State's Attorney Jake Rubinstein explained to Thomas that there are three ways to record his statement. Jake Rubinstein explained that Thomas could give a court reported statement, a handwritten statement, or an oral statement and explained the differences between the three. Thomas stated that he wanted to give a handwritten statement.

JW Rubinstein A.S.A.    Thomas Kelly    Det. R. Guevara

RFC-Martinez 000192



Thomas states that he can read English and he demonstrated his reading ability by reading the first paragraph of this statement out loud. Assistant State's Attorney Jake Rubinstein then read the rest of the statement out loud while Thomas followed along, reading to himself. Thomas was allowed to make any changes or corrections that he wanted to.

_Rubinstein_ A.S.A.      _Thomas Kelly_      _Det. R. Guevara_

RFC-Martinez 000194

# EXHIBIT 45

322

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JACQUES RIVERA,                                    ) No. 12 CV 4428
                                                   )
            Plaintiff,                             )
vs.                                                ) Chicago, Illinois
                                                   )
REYNALDO GUEVARA, STEVE GAWRYS, DANIEL NOON,)
JOHN GUZMAN, JOSEPH FALLON, JOSEPH SPARKS,  )
PAUL ZACHARIAS, GILLIAN MCLAUGHLIN, JOHN    )
LEONARD, EDWARD MINGEY, RUSSELL WEINGART,   ) June 7, 2018
ESTATE OF ROCCO RINALDI, City OF CHICAGO,   )
                                                   )
            Defendants.                            ) 9:15 o'clock a.m.

VOLUME 3 A
TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JOAN B. GOTTSCHALL
and a jury

APPEARANCES:

For the Plaintiff:      LOEVY & LOEVY
                        BY:  MR. JONATHAN I. LOEVY
                             MR. STEVEN E. ART
                             MR. ANAND SWAMINATHAN
                        311 North Aberdeen Street
                        3rd Floor
                        Chicago, Illinois  60607

                        MacArthur Justice Center
                        Northwestern University School of Law
                        BY:  Locke E. Bowman , III
                        357 East Chicago Avenue
                        Chicago, Illinois 60611
                        (312) 503-0844


Court reporter:             Blanca I. Lara
                        Official Court Reporter
                        219 South Dearborn Street
                            Room 2504
                        Chicago, Illinois 60604
                         (312) 435-5895
                        blanca_lara@ilnd.uscourts.gov

323

Appearances (continued:)

For the Individual    THE SOTOS LAW FIRM
Defendants:           BY:  MR. JEFFREY N. GIVEN
                           MR. JAMES G. SOTOS
                           MS. CAROLINE P. GOLDEN
                           MR. JOSEPH M. POLICK
                           MR. DAVID A. BRUEGGEN
                      550 E. Devon Avenue, Suite 150
                      Itasca, Illinois  60143

For the Defendant     ROCK FUSCO & CONNELLY, LLC
City of Chicago:      BY:  MS. EILEEN E. ROSEN
                           MS. CATHERINE M. BARBER
                           MS. THERESA B. CARNEY
                      321 N. Clark St., Suite 2200
                      Chicago, Illinois  60654

For the Defendant     LEINENWEBER BARONI & DAFFADA, LLC
Guevara:             BY:  MR. THOMAS E. LEINENWEBER
                           MR. JAMES V. DAFFADA
                      120 N. LaSalle St., Suite 2000
                      Chicago, Illinois  60602

(The following proceedings were had out of the presence of the jury in open court:)

THE MARSHAL: All rise.

THE COURT: A couple of things. No. 1, I'm just going to tell the jury that Mr. Flores had a family emergency and that I had to excuse him, unless somebody has a better suggestion.

Okay. No. 2, one of the jurors told Ms. Cowan this morning that she's concerned about her name being in the press. I don't think we've done anything to seal jurors' names to this point, and I'm not sure what we can do. I guess she should just tell us if she notices anything, because -- you know, I don't know. I've never had this happen before, but the cat is out there. So anyone have any suggestions?

MS. ROSEN: Well, I don't know if I would tell her to let us know if she notices anything, because we told her not to look at the media. So I don't want her to like look for her name, because it would only be coming up in connection --

THE COURT: So I have to respond to her.

MS. ROSEN: Yeah.

THE COURT: Anybody have any ideas?

MR. ART: At this point the attorneys are the only people who really know the names, and I don't think any of us are sharing it with anyone.

MR. SOTOS: Judge, Ms. Golden has additional

325

information.

MS. GOLDEN: I think it was the woman who came back in and talked about her --

THE COURT: And who was it?

Well, I guess it doesn't matter who it is.

MS. GOLDEN: I think it was in the paper. A friend of mine told me about a juror that came back in and started talking about her grandfather and that --

THE COURT: That's somebody else, I think, isn't it?

BARBER: That was Ms. Thayer.

THE COURT: Ms. Thayer.

MR. LOEVY: She got mentioned and the other one has a concern now.

MS. ROSEN: Oh, that would mean that the other one saw the article about Ms. Thayer --

THE COURT: Well, okay, we don't have a lot of time, so let's stop speculating and figure out what I can tell her.

MR. LOEVY: I guess we could tell her, you know, this is the normal procedure. That lawyers aren't going to share their names with the press and that this happens in every trial.

THE COURT: It's public, isn't it?

THE CLERK: Well, we don't put it out there until the end of the trial.

THE COURT: Oh, it's not public?

326

THE CLERK: It's not public, yes. We don't put it out there.

MR. LOEVY: We have no objection to not putting it out there.

THE COURT: Well, so why don't we, as of now, just seal it and release it at the end of the trial.

MS. ROSEN: The only way that it would be public is, obviously, they were telling us their names in the courtroom and if there were press in the courtroom, they knew their names.

THE COURT: Well, that's what I'm thinking. I mean, we can't really --

MR. SOTOS: Well, just checking of how somebody got the paper, it's not public. She didn't review it? I'm just confused.

THE COURT: I don't know. Why don't I just tell her, I've never had a problem, don't worry about it. I think that's --

And that is who, Marlan? I need to know.

THE CLERK: Okay.

THE COURT: Find out for me.

So let me make a ruling on the 613(b) issue. 613(b) has two requirements: (1), that the witness be given an opportunity to explain or deny the statement. And (2), that the adverse party is given an opportunity to examine the

witness about it.

There's also an interest of justice provision to give the trial judge some discretion. The objectives of 613(b) I believe were met in this case, even if the circumstances are not precisely what the rule had in mind.

Specifically, Lopez testified at his deposition about the multiple efforts he had to review the affidavit to make sure all of it was correct. If this were not sufficient -- and I think he talked about 3 or 4 passes through it -- if this were not sufficient, he was represented by counsel, and all this communications about the affidavit after his first meeting with the innocence project were through his attorney.

Then at the deposition he was asked if the affidavit were true in all particulars, and he said yes. And then the defense had an opportunity to examine him about it, although nobody went into the details about that, but, you know, you can take a horse to water, but you can't make him drink, I guess. If this doesn't fall within the explicit corners of the rule, I will rely on the interest of justice exception because it comes so close.

Now, we're only talking about the affidavit right? We're not talking about ex-witnesses or anything like that, correct?

MR. ART: At this point, Your Honor, yes, just the affidavit.

THE COURT: That's all I'm ruling on, the affidavit.

Okay. Well, we have 3 minutes. Anything further?

MR. LOEVY: Your Honor, we would like -- Mr. Sotos and I talked about this issue, can we do this at sidebar? These are issues that should be talked about at sidebar.

THE COURT: We can.

MR. LOEVY: Thank you.

(Proceedings heard at sidebar on the record).

MR. SOTOS: We think that the door was opened yesterday to a couple of significant pieces of evidence by the plaintiff's testimony.

First with respect to his gang activity. He testified that he was a member of the Latin Kings at the time he was arrested and that he was transitioning in his life, had lived quickly with the idea that he was moving on to a different part of life.

THE COURT: And what is it that you want to do with that?

MR. SOTOS: We want to introduce the fact that at the time of his arrest, he was still immersed in gang activities as the leader of the Inca and the Latin Kings controlling the street corner --

THE COURT: What evidence do you have that he was immersed in gang activity?

MR. SOTOS: We have his testimony that he was an Inca

329

Latin Kings who controlled the street corner at Beach and Spaulding --

THE COURT:  He was a member?

MR. SOTOS:  He was an Inca.  He was a leader.

THE COURT:  An Inca?

MR. SOTOS:  You learn something.  And that he went into prison as an Inca.  So it's not only relevant to dispel the notion that he was taken out of a life that he was transitioning out of, it's also very relevant to the idea he testified at length to the hostile environment that he faced in prison, the fear.  And as an Inca in the Latin Kings, we think his experience was much very different.

THE COURT:  What's your response?

MR. LOEVY:  Your Honor, absolutely nothing has changed.  When you consider the gang issues in limine and we said it's limited for very narrow purposes, they got the foot in the door by talking you into putting some gang evidence in. So we stayed within your ruling.  Said exactly what we're supposed to say.

THE COURT:  Well, he testified at length that he was in a gang in prison.

MR. LOEVY:  They asked -- we didn't want that in. They said let us -- we believe he's in a gang in prison, so we said okay.  And now they're like, Oh, he said he's in a gang in prison, we need to talk about he's an Inca.

330

To be clear what that means, he testified -- it's always been the case, he's a gang member. He's not the foot soldier, he's one up. This prejudicial scarry term, "Inca," it doesn't change anything. That was the evidence you considered when you ruled. It's limited to this.

THE COURT: I never heard of this before. And, I mean, I did not know how this was going to come out.

MR. LOEVY: It was limited to some discrete purposes.

THE COURT: Well, you're just going to ask him if he before he went into prison had a leadership position?

MR. SOTOS: We want to establish two things --

THE COURT: Yes.

MR. SOTOS: -- one, that when he went into prison, he was not transitioning out of the gang --

THE COURT: Well, he said that like 10 years later, 20 years later.

MR. SOTOS: No. No, it was argued in opening extensively that at the time the police arrested him, he was transitioning out of that life, and that they robbed him of the opportunity to do that. That's not true. He was still running that corner the day he was arrested.

MR. LOEVY: That's not true either.

THE COURT: Hold on. Hold on.

MR. SOTOS: I think it is, Judge.

And then the second part of that is that when he went

331

into prison, he went in as -- he didn't join the gang in prison for protection.  He went in as an Inca, a leader of the gang. So his experience was much different than what he described.

So the jury may or may not agree with that, but we think that to portray the idea that he was in prison as a fearful kind of environment he described it, that's not correct.

MR. LOEVY:  Your Honor --

THE COURT:  Go ahead.

MR. LOEVY:  There's two purposes they said, the first is that he was in a gang when he got arrested.  He just said that.  He said it on the stand.  We did it within the ruling. He said, "I'm in a gang."  He didn't say he wasn't in a gang. And it wasn't even supposed to be part of the case at all.  You said it's relevant because he's in the gang book.  They got their foot in the door by saying, "we want to say he's in a gang --"

THE COURT:  I understand how it happened.

MR. LOEVY:  So he said he's in the gang.  What has changed?  Nothing has changed.

THE COURT:  Well, I'll think about it, because I think that -- but I'm not going to let you do a lot.

MR. LOEVY:  Your Honor, but I want to talk about the prison one --

THE COURT:  You got to give me one or two questions.

332

MR. SOTOS: Actually, Judge, I don't want to, I'm not trying to --

THE COURT: Well, let me make a final ruling before the cross, which we're going to get to probably this afternoon.

MR. LOEVY: We are.

MR. LOEVY: Your Honor, what I'm going to do this morning, what I'm going to do is front this, because I viewed this as unfair. We had the rulings. I did my whole exam with the rulings. Nothing has changed. So I'm going to say, "isn't it true you were in a gang when you got arrested?" "Yes." That's not disputed.

THE COURT: He's already said that.

MR. LOEVY: He's already said that.

MR. SOTOS: The last thing I want to say is, because he won't address it, but he did, he got him to say really quickly, and it will become a focus of closing, that at the time he was arrested he was transitioning out of gang life.

THE COURT: Well, I don't remember that, so you'll have to show me the transcript.

MR. SOTOS: Well, he did say it.

THE COURT: You'll have to show me.

MR. LOEVY: I can fix that on this exam. I will get him to say, I was in a gang. And you know what? There's no evidence otherwise. The only thing Mr. Sotos is talking about is Mr. Rivera's own testimony. They don't have anything

333

extrinsic, nobody else says anything different.  So it's his sorry.  So he's going to say:  I was in a gang.  I was older now, I'm not --

THE COURT:  Did he say he was transitioning out of the gang when he went into prison?

MR. SOTOS:  He said that he was moving out of it, yes. And I can't remember the words --

MR. LOEVY:  He was involved --

THE COURT:  Please, one at a time.

MR. SOTOS:  He was going so fast, it was hard, but we did write it down and it will be in the transcript.  He said he was --

THE COURT:  Let me ask you this, are we going to have a break before -- I don't know how much longer you have.

MR. LOEVY:  About half an hour.

And on the cross, that's what he's going to say, I was in the gang, I had this rank, you know, throughout.  I didn't get a new rank, and then I was still in the gang, and then I left the gang.

THE COURT:  And what's the relevance of it?

MR. SOTOS:  The relevance is to demonstrate that the life that he's going to portray during his testimony in closing is not an accurate reflection of what he was doing.  He was in the middle of his gang life --

MR. LOEVY:  He was not.

MR. SOTOS: I can finish?

THE COURT: I don't think there's any evidence of that but --

MR. SOTOS: We can develop that.

MR. LOEVY: In front of the jury?

MR. SOTOS: That he continued with that when he went into prison as a Latin King gang member. He said he needed to join the gang for protection.

MR. LOEVY: No, he didn't say that.

THE COURT: Well, let me see, get the transcript and we'll take a brief.

And what else?

MR. SOTOS: The last thing with respect to this is, when he says there's no evidence about him being in the gang, his ex-wife says he's still in a gang.

MR. LOEVY: No, that's not true.

THE COURT: Well, that's ridiculous. We're not going there. We're not going there. I've already ruled on that.

MR. SOTOS: And I'm not asking you to --

THE COURT: But if I see the transcript -- Okay, so go on to the next issue, because I made that clear.

MR. SOTOS: The next issue has to do with reasonable diligence. I was surprised he talked at length about Ken Wadas and their discussions about the entire case. Mr. Loevy specifically asked him, "Did you feel like he did a good job?"

335

He said, "Yeah, I thought so." So they completely opened the door to reasonable diligence element.

THE COURT: No, we're not going there. The fact that he thought his lawyer did a good job, what is he going to say?

MR. SOTOS: But there was more. And I don't even know what to cross him with now, because he talked at length about, I had these discussions with Ken Wadas, I saw him twice in two years, we talked about the fact that I wanted a jury, he wanted a judge.

THE COURT: I think you can go into that.

MR. LOEVY: I don't object to that, Your Honor.

THE COURT: Well, I don't think you could because you opened it put.

MR. SOTOS: Well, I think he's opened it up with respect to the conversations they had and the decisions that were made beyond just a couple that he mentioned. There were a few more, too.

He talked about why he didn't testify at sentencing. His lawyer told him not to testify at sentencing. There were a number of things he talked about, and we want to ask him about it.

THE COURT: Well, I think he's opened it up, and I think you can basically do that. We're not going into reasonable diligence. I've ruled on that.

MR. SOTOS: That's different, Judge. In connection

with the reasonable diligence, I understand that.

THE COURT:  So you can go on to this.  You're going to have to make objections if you think --

MR. LOEVY:  Well, I didn't object, Your Honor.

THE COURT:  Okay.

MR. LOEVY:  I mean, it sounds fair.

THE COURT:  Okay.  Anything else?

MR. SOTOS:  There was one other thing.

MR. LOEVY:  They wanted to bring up domestic violence, which the door is not open to domestic violence.

MR. SOTOS:  Thank you for reminding me.

MR. LOEVY:  Well, it's absurd.

MR. SOTOS:  He testified about his relationship -- I don't think it's absurd.  But he testified to his relationship with his wife in prison.  And he got very tearful and said that she left and never came back.

Well, the real story about that was that he was haunted all through prison.  He would testify to this, about the way he treated her, and what he did to that relationship.  And that the reason she left was he sent her a -- he said he tried to reconcile with her.  She said, "Then I need to know all the women you've been with."  I don't want to go through the list.  He actually sent her a list.  And she said, no, she wouldn't get back with him.

And then when he got out of prison, they did try to

reconcile after prison. And then after that, he broke it off because she was too controlling. So he testified that he was haunted in prison by the way that he had treated her, which included both emotional and physical abuse.

THE COURT: What actually happened? What is the evidence of what happened? You say physical abuse.

MR. LOEVY: It was hair pulling.

MR. SOTOS: That was Lori Amaro.

THE COURT: Tell me. Tell me. Tell me.

MR. LOEVY: He was arrested for an incident with his girlfriend, Lori Amaro, for pulling her hair.

THE COURT: Who is Lori Amato?

MR. LOEVY: His girlfriend.

MR. SOTOS: That was the girlfriend that he had another child with when he was with Sophia.

THE COURT: He pulled her hair?

MR. LOEVY: Allegedly.

MR. SOTOS: He got arrested for it.

THE COURT: And did he get -- was he found guilty or acquitted?

MR. SOTOS: He was arrested and dropped.

THE COURT: Oh, come on. No, no, no, arrest and dropped.

MR. LOEVY: Your Honor, domestic violence is an extremely prejudicial subject.

338

THE COURT: I understand that, but he's testified that he had problems and that he was responsible for part of them. So the question is, what we can do without opening the kitchen sink. I mean, opening the whole kitchen sink.

MR. LOEVY: Your Honor, I felt like I asked him 16 times, you are not claiming this was a perfect relationship, you bare responsibility.

And you probably remember, they were supposed to raise it at the earliest opportunity, which would have been last night. But I said over and over again, You are not claiming this was a perfect relationship, you were bore responsibility, you were not a good boyfriend. I was not saying this is rosy-rosy. But there's got to be a line we can walk without opening the door to seriously prejudicial --

THE COURT: Well, I'm not sure. I'm trying to figure out what it is.

MR. SOTOS: Judge, I don't want to harp on this. All I want to ask him is, when you described the deterioration of that relationship, much of that had to do with your having both emotionally and physically mistreated her, emotionally and physically mistreated her, and no details at all.

THE COURT: Emotionally and physically mistreated who?

MR. SOTOS: Sophia, before he went into prison.

MR. LOEVY: Your Honor --

THE COURT: Listen to what they're saying.

MR. SOTOS: Without any details, because I don't want the false portrayal at closing argument that --

THE COURT: Well, physically abused her when all you've got so far that you've told me about is he's accused of pulling her hair and he wasn't convicted of it.

MS. GOLDEN: What he actually did was put a loaded gun in her mouth, and what he actually did was backhand her and break her front teeth --

MR. LOEVY: No true. Not true.

MS. GOLDEN: That's what Sofia testified to in the deposition.

MR. LOEVY: Not true, Your Honor. If we're going to have a mini-trial about whether abuse happened, we're going to have a completely different trial, because then we have to call witnesses --

THE COURT: Well, what happened with this? Did he get convicted of it or was he just accused?

MR. LOEVY: No, he wasn't even accused. He wasn't even accused.

THE COURT: He wasn't accused?

MR. LOEVY: No. And we dispute it. And it's completely prejudicial and it's an alleged prior bad act.

THE COURT: All right. We'll talk about this at the break because I need to get the jury in here. You know, that will be a good time to take a short break.

But I want to know exactly what we're going to do, okay. I don't want any surprises.

(Proceedings resumed in open court).

THE COURT: Okay. Are we ready, everybody?

Okay, I'm ready. Are you ready?

MR. POLICK: Judge, we just have one short matter. Judge, I assume Mr. Loevy is going to get to that Certificate of Innocence in the evidence this morning. In the instruction conference you said you would undertake an in limine instruction if we composed one on that issue. We did. We've given it to Mr. Loevy. He is in agreement. The only disagreement is when it should be read.

MR. LOEVY: We want it to be read with the jury instructions. And also, we did want to look at the pattern, but they proposed a very nice and fair instruction.

THE COURT: Well, I haven't seen it. So I don't have any idea on how to rule on this.

MR. POLICK: Could we tender it, Judge?

THE COURT: Yes. Could you give it to this gentleman (indicating).

Well, here's what I suggest, I'm not going to give it over and over again. So if the defense wants it now, I will give it now, but I don't think we have to go over it again twice. So I can say this before we begin this morning, that you're going to hear about the Certificate of Innocence.

They've already heard this. When do you want it? I'm not going like do it like keep beating this horse.

MR. POLICK: No, we're not suggesting that.

THE COURT: You want it this morning?

MR. POLICK: That's fine with us.

THE COURT: I think we'll start with that, okay.

MR. POLICK: Thank you, Judge.

THE COURT: All right. Let's get the jury.

MR. LOEVY: Your Honor, may we see the instruction?

THE COURT: Yes. Yes. But then you have to give it back to me because otherwise I won't be able to read it.

(Said item tendered.)

MR. LOEVY: Thanks, Judge.

(Said item tendered back to the Court.)

THE COURT: So on this publicity thing, I'm just going to tell the juror that I've never had any issue with it. What else should I tell her? Just we don't expect it to be a problem?

MR. LOEVY: And we haven't released the names and that we won't. Or that the attorneys aren't going to release the names --

THE COURT: Right. But if somebody was in court hearing it, then it doesn't matter.

Of course, I doubt that -- I mean, I just don't know what's out there, I really don't.

342

I'm just going to say, If anyone gives you any trouble about it, you tell me right away; okay.

MR. LOEVY: That's fine, Judge.

THE MARSHAL: All rise.

(The following proceedings were had in the presence of the jury in open court:)

THE COURT: Good morning, ladies and gentlemen. Please be seated.

A couple of things I want to cover with you before we start:

First of all, Mr. Flores had a family emergency and it was necessary for me to excuse him. So he will not be with us for the reminder of the trial.

Secondly, one of you asked a question about your name being out in the public. I don't know if it is. It may be. I have never in my experience had a problem with that. And I don't expect that it will be a problem in this case. But let me just say to all of you that if anyone bothers you about this, or starts asking you questions during the trial, or tries to approach you and talk about the case, please let me know, because there are things that I can do in response to difficulties that I can't do if basically nothing is happening. So please be assured that I need to know if any of you -- you know, nobody should be contacting you or anything like that.

Now, when the trial is over, all kinds of different

things happen, and we'll take that up. But, at this point, it should not be an issue. And please let me know if it is.

Then I want to get to something that's going to happen this morning. You are, I expect, going to hear evidence about the plaintiff's Certificate of Innocence. The certificate of Innocence is to be considered by you for the purpose of establishing that plaintiff's innocence is not contested in this case. And for that issue only, no other purpose.

The state court that issued the certificate of innocence was not asked to, nor did it decide, whether plaintiff's Constitutional rights were violated or whether the defendants' engaged in any misconduct under federal or state law. Those issues are for you to decide.

Okay. So I think with that, we can begin.

MR. LOEVY: Mr. Rivera was on the stand, Your Honor.

THE WITNESS: Good morning, Your Honor.

THE COURT: Good morning.

JACQUES RIVERA, PLAINTIFF WITNESS, SWORN

DIRECT EXAMINATION (resumed)

BY MR. LOEVY:

Q. Good morning, Mr. Rivera.

A. Good morning, John.

Q. All right. We talked last night about the state made you that offer that you turned down. So what happened when you turned it down? Where were the proceedings?

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 132 of 1254 PageID #:104268
Rivera - direct by Loevy

344

A. Ah --

Q. Getting ready for a hearing?

A. We were getting for an evidentiary hearing.

Q. Tell the jury what the context is.

A. Excuse me?

Q. Tell the jury what the context. What kind of hearing, what was the purpose of it.

A. It's an evidentiary hearing that they hear of the newly discovered evidence of the recantation of the eyewitness in my case, Orlando Lopez. That was the matter that was before the court.

Q. And you were asking the court for what? What relief?

A. Freedom.

Q. All right. And if they agreed with you, you would get a new trial, correct?

A. Yes, sir.

Q. All right. Who were your attorneys at that hearing?

A. The late chain Raley and Judy Royal.

Q. And the late Jane Raley, she worked at Northwestern. Correct?

A. Yes, sir.

Q. She passed away a few years ago?

A. Yes, sir.

Q. Were you close with her?

A. Yes, I was.

Q. All right. Were you during these proceedings still incarcerated during the post-conviction proceedings you're talking about?

A. Yes, sir.

Q. How would you attend the hearing?

A. Ah -- ah -- ah, the correctional facility had a bus that would transfer inmates from the prison to the county jail.

Q. And how did the hearing go when you started going?

A. It was -- it was -- it was looking good, and it was looking bad. You know, it went both ways.

Q. Did you get your hopes up?

A. Yes, I did.

Q. All right. What happened toward the end of the hearing when it was all coming to a conclusion? Tell us the story.

A. Well, the last part of it was, we had to make a decision, an offer of proof. The judge set it for another 30 days.

When we came back, me and my attorneys decided not to open an offer of proof. And we believed that the Judge was going to continue it again to come back with her findings. But unbeknownst to us, she said that day she was going to bring back her finding on the case.

Q. All right. Did you view this as your last hope to get out of prison?

A. That was my last hope. Last hope.

Q. All right. What were your emotions as you were waiting for

the judge to come with the finding?

A. I was, you know, just shaking. You know, a lot of praying.

Q. All right. Then what happened?

A. As we sat there, we moved to another courtroom. We resumed at 1:00 o'clock. And she -- we came back to another courtroom, and she started reading her decision in the case. And before she could get almost to the end of it, I -- she was granting me a new trial. I broke down crying. Me and my attorneys, Jane Raley and Judy Royal, we hugged. She granted me a new trial.

Q. Who was present there with you in court there?

A. My family was there. They all have walked out for a moment. And my brother-in-law was the only one in the courtroom (crying).

Q. This didn't set you free, though, correct?

A. No, sir.

Q. Why not? The state still had an option to do what?

A. The state had an option to whether they were going to charge me again for the crime.

Q. All right. And did they schedule a trial against you?

A. Within 3 weeks they would come back and tell the judge whether they were going to re-try me or just cut me lose.

Q. All right. Did you agree to be interviewed during that process or was that before?

A. That was before that.

Q. Okay. What happened in 3 weeks? Who came to court on that

day in 3 weeks?

A. Family, friends, of course, the attorneys, the Assistant State's Attorney, my attorneys; yeah.

Q. And did the judge give any -- or did -- yeah, did the judge give any warnings to the people in the courtroom?

A. Just like Judge Gottschall, she warns everybody about their phones.

Q. How about quietness?

A. Oh, she said she didn't want no sudden outbursts. Whatever the decision she rendered, she didn't want no sudden outbursts.

Q. All right. And then what happened in court?

A. The state got up and said they were -- they wasn't going to try me for it. So the Judge Neera Walsh said, "You're free to go home" (crying).

Q. What was the reaction in the courtroom?

A. People --

MR. SOTOS: Objection to reaction in the courtroom.

MR. LOEVY: Without words --

THE COURT: Overruled.

BY THE WITNESS:

A. You can hear people muffling their cries.

BY MR. LOEVY:

Q. So when the judge said you're free to go, what did you do?

A. I was ready to go. I was free to walk out. Of course, there's a process that the Cook County Sheriff's do, which is a

fine job.  They make sure they're not releasing somebody who has other cases or has been convicted of another crime.  So there was -- I had to wait a period of time to be processed out.

Q.  All right.  How much time?

A.  Wow!  It was like almost -- if I remember, it was several hours I had to wait.

Q.  And then what happened?

A.  I was confronted by a Cook County Sheriff.  I believe he was a sergeant.  And I was happy.  Everything, you know, was going good for me.  He approached me and said, They're making a big deal about your PS.  And I looked at him and I said, "excuse me?"  He said, "They're making a big deal about you." And I said, "No, what's that last part?"  He said nothing else to me.

They sent me to the side where inmates are coming in, either where they've been convicted or sent into the Cook County Jail.  And another female county sheriff came up to me and says, "Who's this --"

MR. SOTOS:  Judge, I'm going to relevance and hearsay again.

MR. LOEVY:  I'll move forward, Your Honor.

THE COURT:  Okay.

BY MR. LOEVY:

Q.  Did some people start treating you differently now that you

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 137 of 1254 PageID #:104268
Rivera - direct by Loevy
349

were free to go?

A. Good and bad.

Q. All right. Were there some good, too?

A. Yeah.

Q. What happened that was good?

A. There was a sheriff that was in plainclothes that made sure that, you know, things were going properly with me. My attorney, Jane Raley, was complaining about what was taking so long. It took quite a long time. And family and friends were waiting patiently outside.

Q. All right. You get to the door. When was the last time you used the door, like a door?

A. (Laughing) back in 1988.

Q. What happened at the door?

A. Jane Raley was sitting there waiting on me, and I had no possessions. I had no clothing to walk out in. They took me downstairs, they gave me another inmate's clothing, shoes that I could walk home in. I was waiting for I believe it was a $78 check that I had in my trust fund account. Me and Jane hugged again, and we cried again. And the sheriff was like, you know, "You're free to go."

Q. Did you go out the door?

A. We walked out the door together. Again, I was crying. Hyperventilating, very hard hyperventilating.

Q. What do you mean hyperventilating?

A. I couldn't catch my breath.

Q. When you walked out the door you were --

A. I was hyperventilating. It was surreal. I couldn't believe that I was walking out of jail.

Q. Where did you go that night or that day?

When you walked out, where did you walk out to?

A. We walked out to a crowd of my family members, the media. The sheriff was kind of enough to sit and tell me and asked me if I wanted to go back, you know --

Q. What do you mean?

A. If I wanted to just go back and take a moment to the county jail. And I told him this was -- this was far too long, no, I'm moving forward with my life from here. And he said, That's fine.

Q. Where did you go?

A. I was walking towards the front gate. And, again, I had my head down. And upon when I looked up, there comes my 3 kids.

Q. Where did you go?

A. Well, we went to the front of the Cook County Jail, spoke with the media. Friends and family members were there. I left with my ex-wife and my kids and we went back to my sister's house.

Q. And what did you do there?

A. Trying to eat pizza. I couldn't eat nothing. My stomach was in knots. Tried to stay away from the media. They

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 139 of 1254 PageID #:10427б
Rivera - direct by Loevy
351

followed me all the way to the house. And I just wanted to be with my kids.

Q. All right. So you remember that first night being home and free?

A. Oh, yes, I do.

Q. Was it easy to sleep?

A. Not at all.

Q. What do you mean?

A. I couldn't sleep. I couldn't sleep at all. Maybe 30 minutes, at the most, 30, if that. You know, I can't quite remember, but it wasn't very much sleep.

Q. How about during that first week were you able to sleep?

A. Oh, no. No. As a matter of fact, I heard gunshots, which scared me. I started locking all the windows.

We live on the second -- I still live with my mother in the second floor. And I was locking all the window to the house. She was like, why are you locking the windows? I was paranoid. I just told her in case somebody wants to come in and get me. She's like, "Why would somebody want to do that?" I was like, "You know, I don't know. But if they decided to, the windows would be locked, they wouldn't get in."

They knew I was paranoid and had troubles.

Q. When you're talking about your re acclamation, you mentioned paranoid, but how about adjusting, in general. Was it difficult to adjust to life on the outside, a different

Rivera - direct by Loevy

pace?

A. Oh, yeah. You know, 21 years, I mean from 1988 to 2011, things has changed dramatically.

Q. All right. Did you go back to court for a Certificate of Innocence?

A. Yes, I did.

Q. And just describe briefly what that process was.

A. Ah, the state and my attorneys present the evidence to a judge, Judge McCall (phonetic). They find and say why I was innocent. They say why they believed I was innocent.

Q. Did you receive a Certificate of Innocence?

A. Yes, I did.

Q. Was that important to you, sir?

A. Most definitely.

Q. Why was that?

A. Because you can't move forward with your life. They don't -- although, you know, they didn't press charges, the state was still saying they believed I was still guilty. So it would remain on my record and it would be hard for me to obtain a job, the murder conviction is still on my record. With the Certificate of Innocence, I could show up that was innocent of those charges.

Q. All right. Let me ask you a few questions. I'm going to go back to some subjects we covered yesterday. I just want to be 100 percent clear. You were in a gang at the time Guevara

arrested you, correct?

A. Yes, I was.

Q. All right. And when you got to prison, you didn't join a gang, did you?

A. No. No. No.

Q. You were --

A. I just picked up where I left off at.

Q. All right. And is that what you said yesterday too? You're not implying otherwise, are you?

A. Oh, no. No. No. If I understand the question correctly, I mean, it's not that I wanted to, it's something that hadn't been done in a maximum security prison.

Q. Were most of the people in prison in a gang?

A. The majority of them were, yeah.

Q. But you weren't joining a gang new. You were already in a gang when --

A. Oh, no. No.

Q. -- when you got arrested?

A. Yes, sir.

Q. All right. Let's talk about your adjustment. You said you did leave the gang on what day?

A. It was May 9th, 1999.

Q. All right. When you got out of prison and you got to adjust, now you're many years past that, correct?

A. Yes, sir.

Q.  All right.  Has it been -- did there come a point in time when your euphoria wore off, when you were super excited to get out, and that sort of wears off and now you got to figure out the next years?

A.  Oh, yeah.

Q.  How was that adjustment for you?

A.  Very difficult from the simplest thing.  You know, now you walk into the bathroom, you could just put your hands underneath the sink and the water comes on.  I walked into the washroom and said, "Where's the handles at?"  "How do you control the water?"

Q.  That's a small example.

A.  Yeah.

Q.  Do you find sometimes that when you were with other people, that you don't understand what everybody else understands?

A.  Yes.  People didn't understand why I was reacting the way I was reacting to certain things.  Anytime I'm sitting in a restaurant or something, I would like to face the door to see who's coming in, who's coming out.  I was very paranoid.

Q.  When you say paranoid, did you do anything with receipts that would --

A.  I've got bags of receipts in my home.  I've learned that on receipts now, they put the date and the time that are on receipts.  So I said, they would never wrongfully convict me again.  I have a receipt that has a date and time that I could

Rivera - direct by Loevy

355

prove where I was at, and cameras there to show that I was at that place at that time. So I got bags. And I still save my receipts. I got a receipt in my pocket from the parking yesterday.

Q. All right. Nobody will accuse you of doing anything to you now.

All right. How about when you walked out of prison. You said you didn't own anything, what did you own in the world at that point?

A. Nothing.

Q. All right. Where did you live when you were first released?

A. My sister owns a bungalow in the Belmont neighborhood. My mom has an added addition upstairs. So I lived with my mom.

Q. And how long did you live over there with your mother?

A. Ah, for a couple of years.

Q. All right. And you were how old at that point? You were in your late 40's?

A. 43, 44.

Q. All right. Did you enjoy spending time with your mother after having lost time?

A. I mean, she was the one that was in my corner.

Q. All right. Was it always easy to live with your mother when you're that old?

A. I invaded her space, you know. She wanted me there, but I

realize what it was for her to be living alone for 15 years and then here I come. And, yeah, we had -- we had our moments.

Q. All right. Did there come a time when you decided to move somewhere else?

A. Yes, I did.

Q. Where did you move to?

A. Rogers Park.

Q. And who lived there?

A. I moved there with Juan Rivera.

Q. And Juan Rivera is the guy you mentioned yesterday, right?

A. Yes, sir.

Q. Just remind us who he was.

A. He was another inmate that was in prison with me that was wrongfully convicted as well.

Q. And where do you live in this house?

A. I live in the basement apartment -- the basement of the house.

Q. Do you pay rent over there?

A. Yes, I do.

Q. How long have you lived there?

A. A little over a year.

Q. Do you like living there?

A. Ah, yeah, I do. Rogers Park is a great neighborhood. Dog friendly, a lot of dogs.

Q. All right. Let's talk about other areas of you adjustment.

Rivera - direct by Loevy

Do you do good in crowds and stores and places?

A.  No.

Q.  Why is that?

A.  Well, I'm slowly getting there, but, ah, I just -- you know, a crowd of people, I just don't -- I can't -- I have an issue with trust.

Q.  Let's talk about post-prison employment.  That first year or so when you got out, how did you support yourself?  What did you do?

A.  My little sister, Kenita, her husband is an investor.  They live in California.  And he was amazed at my story.  You know, sympathetic to what I've been through.  And he -- he decided to give me $300 a month.

Q.  Well, did you accept it?

A.  On one term, that if, you know, if I got some money, that I would pay him back.  I thought it was just right to pay him back for it.

Q.  And did you, in fact, go get a job?

A.  Yes, I did.

Q.  Was it hard to find a job?  Tell the jury if it was hard to find a job with your situation.

A.  It took me a year to find -- you know, it took me a year just to get the feel of things.  I wasn't ready to jump out there.  There was other fears that I have -- that I had.  And I don't know if I can mention it, but I had some fears and I just

-- I just wanted to take my time and spend time, you know, getting to know my kids and the new technology.

Q. All right. And when you started looking for work, did you find that employers were open to hiring somebody with your resume?

A. No, they weren't.

Q. Can you explain.

A. Being convicted of a murder is not somebody you want working for you. And that was before my Certificate of Innocence, so it was still on my record.

Q. Did you have a resume with experience?

A. Yes, I did.

Q. Why? Explain.

A. Well, people want to know where I was for the last 21 years. I could've simply lied and told them I was in another state, but those days of lying are over. You know, I wanted to be honest. And I put my employment what I did in prison, so they would know. And then I put, honestly, you know, that I was in prison.

Q. And did you explain, though, that you were wrongfully in prison?

A. Yes.

Q. All right. Did you eventually get a job that you have now?

A. Yes, sir.

Q. And where is that?

A.  Northwestern University, the Feinberg School of Medicine.

Q.  And did you make the most of that opportunity?

A.  Most definitely.

Q.  How long have you been there?

A.  A little over 6 years.

Q.  And what are your -- are you working -- did you get off this week or how did it work for the trial?

A.  I have to use my vacation time and my sick days.

Q.  All right.  And I think you said you like working at Feinberg?

A.  I love working there.

Q.  All right.  Drawing on your experience with wrongful convictions and your life experience, have you spoken to groups about wrongful convictions?

A.  Yes.

Q.  Can you explain.

A.  I've been to colleges, and I have wrote everything down. I've been to colleges.  I've been to churches.  I've been to the Juvenile Detention Center.  With a group called Circles & Ciphers.  I did -- oh, what is that group?  Restore to Justice work with some of professors at Northwestern.  Speak to some of their new classes that come in at the law school on unlawful convictions.

Q.  Why is that important for you to speak about wrongful convictions?

A. It's a part of my therapy. I'm a people person and I love to speak. It's important that, you know, I let these kids know that the -- especially with the kids that I spoke with, I mean, I like to inform them of the decisions they make in their lives can, you know, become bad consequences for them. I like to, you know, bring awareness to people on wrongful convictions. If you ever sit on a jury, you know, don't find somebody guilty because somebody is tired, you know, go by the law.

Q. All right. Did you see your ex-wife at that point, Sophia, after you got out of prison?

A. Ah, we -- yeah. Yes, I did.

Q. All right. And you and her were no longer a couple?

A. No, sir.

Q. And that was for all kinds of reasons, correct?

A. Yes, sir.

Q. And some of those reasons are your responsibility, too, correct?

A. Yes, sir.

Q. Were you a perfect boyfriend when you were with Sophia?

A. No, sir.

Q. All right. And you and Sophia, are you still friends to this day?

A. Yes, we are.

Q. But do you have -- well, do you have a relationship with her of --

A.   A friendship.

Q.   Did you go visit Judge Walsh -- before we leave the Sophia thing, you're not claiming that the wrongful conviction was the only reason why you and Sophia are not together, are you?

A.   Yes -- I mean, I believe it is.

Q.   You had other deep relationship problems with Sophia when you were single, too?

MR. SOTOS:  Objection; leading, Judge.

THE COURT:  Sustained.

MR. LOEVY:  I'm leading on purpose, Your Honor, so we don't run afoul of the problems that we talked about.  I don't want to ask an open-ended question.  Could I ask a careful question?

THE COURT:  Yes, you can ask a careful question.

MR. LOEVY:  All right.

BY MR. LOEVY:

Q.   Sir, you bare responsibility, in part, for the fact that you and Sophia are not a couple, correct?

A.   Most definitely.

MR. SOTOS:  Objection, Judge.  That's a carefully leading question.

MR. LOEVY:  I thought I was supposed to do that.

THE COURT:  Well, I think you got to put together a question that isn't leading.

MR. LOEVY:  Okay.

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 150 of 1254 PageID #:104286
Rivera - direct by Loevy
362

BY MR. LOEVY:

Q. In your -- in your view, does the fact that you were wrongfully convicted -- well, you answered, "I was wrongfully convicted," let me ask you this, do your responsibilities and your actions and your personal responsibility bare some relationship on why Sophia and you are not together?

A. Yes, it does.

Q. All right. And have you since moved on?

A. Yes. We both have.

Q. All right. Did you go back and visit Judge Walsh, the judge who freed you?

A. Yes, I did.

Q. Tell us what happened.

A. I went into her courtroom. I was debating whether if I should tell her she did the right thing, because I know judges do the right thing. I just wanted to say thanks.

Q. What happened?

A. I was in her courtroom, it was during a recess. And the sheriff asked me did I have a court hearing before Neera Walsh. And I said, no, I didn't, but that I wanted to speak to her. He found that strange. So he walked back to Neera Walsh, said something to her, and he came back at me --

MR. SOTOS: Objection.

THE COURT: I'm sorry, what?

MR. SOTOS: I'm going to object to hearsay.

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 151 of 1254 PageID #:104287
Rivera - direct by Loevy
363

THE COURT: It's not being introduced for the truth of anything. It's just what happened.

MR. SOTOS: Relevance.

THE COURT: Overruled.

BY THE WITNESS:

A. She -- the sheriff came back at me in what I thought was an aggressive manner. He said, "Sir, you have to leave this courtroom now." And I automatically put my hands up. I didn't want no problems. I was like, Yes, sir, I'll leave.

She stood up from the bench and said, Sir, do you have a court hearing in front of me today? I said, "How you doing, Judge Walsh?" I said, "no..." I says, "... It's me, Mr. Rivera, Jacques Rivera." And she said, "Mr. Rivera," she said, "approach the bench."

And as I approached the bench, she goes, "oh, I didn't recognize you." Then she goes, "You gained some weight." I said, "Yeah. Well, thanks to you, I'm not in prison no more," and she laughed. And, you know, she went on to say, "You know, here was other people --"

Q. Well, Jacques, why was it important for you to be in court?

A. I wanted to let her know what I was doing with my life. I mean, it wasn't too long into my freedom, but I just wanted to show her or tell her that her -- her decision to set me free, it wasn't going to go in vein.

Q. All right. Did you go visit Judge Wadas and thank him as

well?

A. Yes, sir.

Q. And he wasn't a judge then, he was the person who was your lawyer --

A. He was my trial attorney.

Q. And tell us about that.

A. I walked in, the same situation. I went to his courtroom on a recess. And the sheriff approached me, and he went back to say something to Judge Wadas. And Judge Wadas says, "Mr. Rivera, come here." And I approached him. And I don't know if I could say what he told me.

Q. Well, let's stay away from specifics.

A. Okay.

Q. But was that part of your closure to --

A. I wanted to know -- I wanted to let Ken know that he did the best that he could with fighting my wrongful conviction.

Q. All right. And at the time, by the way, you made allegations on your appeal about your attorney, correct?

A. Yes, I did.

Q. What was the allegations during your appeal?

A. In effect, assistance of counsel.

Q. All right. And what was the nature of that?

A. The nature of trying to get a new trial.

Q. All right. Did you make peace and when --

A. Oh, yeah. Yeah.

Q. All right. Let's talk about your children after the release. You had missed quite a bit of time in their childhood?

A. Excuse me.

Q. You had missed a bunch of their childhood?

A. Oh, yeah. Yeah.

Q. How would you characterize your relationship with your daughter Jennifer after your wrongful conviction -- first of all, she was the one who was a baby when you --

A. She was a baby, yeah.

Q. Tell us about your relationship with her after you got out?

A. Ah, it was a difficult one. She doesn't know me. I don't know her. She went through all these years. She's a young lady now without a father. She -- you know, we had our difficulties of building a relationship.

Q. Are you trying? Is it working?

A. Oh, I mean, it's not like we don't see each other and we don't -- you know, we hug, we kiss each other when we see each other. "I love you, dad," "I love you, daughter." You know, she's a young lady who's trying to make a living in the world and it's been difficult for her.

Q. How about your son, how is your relationship with your sons after?

A. You know, almost the same thing. It was a struggle to get to know them, to get them to know me. We meet up for breakfast

every other weekend, we try to come together.

Q. And they have kids now, too, you said?

A. My oldest son, yes. He has a daughter and a son, and I got two grand kids from him. And my youngest son, Richard, he has a son -- I mean a daughter, sorry. She's like 6 months old, and his wife has another baby on the way.

Q. All right. Is the relationship the same as it would've been if you hadn't lost these 20 years of --

A. Is the relationship the same?

Q. Yeah.

A. No.

Q. Have you been able to repair it?

A. We're working on it.

Q. Tell us about that.

A. We talk. We have family -- we had family gatherings. The reason why that kind of stopped was because everybody, you know -- Sophia had a house in Berwyn. So we would meet at the house in Berwyn. She since lost the house and moved further out to by O'Hare Airport. So me not having a vehicle, and, you know, that's kind of stopped, but not as to my kids, though. As the mother, we would meet as a family and have talks. But now, you know, as we go to breakfast, whether if it's breakfast, lunch, or dinner with my kids, we do a lot of talking.

Q. All right. Let's talk about a few more areas. Do you

still experience the stress from prison in dreams, or in sleeping, or in life?

A. I always have dreams of being in prison. Not back in prison, like I was arrested for something else, but for the same situation that I was in the first time.

Q. Do you have some negative emotions?

A. You know, if I didn't, I wouldn't be human.

Q. Who did you speak to in your life about your negative feelings about this experience?

A. I now see a therapist.

Q. Who else do you speak to?

A. My kids, friends.

Q. What is your strategy for dealing with anger or bitterness about this?

A. I see a therapist now about it.

Q. Does that help?

A. Oh, yes.

Q. What else do you do in your life when you feel negative emotions about what's happened to you?

A. Praying. I do a lot of praying.

Q. All right. Has this trial forced you to go back and confront a lot of negative emotions, you know, reliving the experiences?

A. You have to.

Q. All right. That's not their fault. You are the one that

brought the trial, right?

A. Yes, sir.

Q. But has it been stressful for you to relive these things?

A. Oh, yes, it has.

Q. Has it affected your health?

A. Yes, it has.

Q. Can you explain.

A. I have my documentations over there, but I was just admitted to the hospital last Thursday --

MR. SOTOS: Judge, objection. Could we have a sidebar?

THE COURT: Okay.

(Proceedings heard at sidebar on the record).

MR. SOTOS: He prefaced the question by saying this isn't any of their fault.

THE COURT: Yes.

MR. LOEVY: So relevance is one objection. Beyond that, none of this has been disclosed by something that they were going to go into. There was an agreement.

THE COURT: I think it goes to damages.

MR. SOTOS: But actually, Judge, there was an agreement that there would be no testimony -- the specifics on the agreement on it is there would be no further --

MR. BRUEGGEN: They never supplemented any discovery about his medical treatment or damages since his deposition in

20- --

MR. SOTOS:  And it was an agreement that they wouldn't, that they wouldn't present anything.  So we did not ask out of --

THE COURT:  I get it.

MR. SOTOS:  Out of respect, we didn't ask for like affidavits or anything.  They did that with one of our witnesses who was sick in Florida.  They asked for affidavits to prove how sick he was.  We didn't do that last week with Mr. Rivera.

THE COURT:  My guess is he wasn't that sick.  I'm assuming it was stress.

MR. LOEVY:  He spent 3 days in the hospital in the ER.

THE COURT:  Yeah, but it was stress.

MR. LOEVY:  They thought he was having a heart attack. They kept him for 3 days.

But, Your Honor, if I could address it?

THE COURT:  Yes.

MR. LOEVY:  I thought we talked about this yesterday, they brought it up.  And I thought you said we could.  When I said it wasn't they're fault, I said, you know, the fact that you brought this litigation -- remember, his objection yesterday was, you brought the litigation, you can't complain about stress from trial, that's what Mr. Sotto said.  That's when I met and said we'd talk about it yesterday.  So my

preface question was, you're not blaming them, you're the one who brought the trial. But reliving it, this is a fair line of questioning.

THE COURT: You know, I think it's okay. And let me just tell you that on the -- so I'm going to allow this. You know, you don't go into it on and on and on. And then you can cross-examine him on it.

MR. SOTOS: Judge, I can't because I made a conscious decision to not ask him to prove what had happened and never got any medical records.

THE COURT: Well, do you have any records on that?

MR. LOEVY: I presume we do. You know, they're talking about discovery that happened on Friday --

THE COURT: This is just --

MR. LOEVY: It happened on Friday.

MR. SOTOS: It's being used to significantly enhance the damages.

THE COURT: It's not.

MR. SOTOS: Oh, yes, it is. Wait till you hear the closing on this, that he still has lingering physical effects, it's not their fault.

THE COURT: I ruled. Sorry.

Now, wait a minute. On the subject of domestic violence, I don't think you can limit the examination to just what you choose to limit it to. On the other hand, it's

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 159 of 1254 PageID #:10429
Rivera - direct by Loevy
371

extraordinarily prejudicial.

MR. LOEVY:  Absolutely.

THE COURT:  And I think I have to make a 402 balancing, and I think you got to help me by telling you what you're going to do.

MR. SOTOS:  I think I've got the right resolution, Judge.  You want me to tell you now?

THE COURT:  We're going to take a break before the cross, okay, but I need to know what you're going to do.

MR. LOEVY:  And we would like to front it.  You know, so we would like to know what the ruling is going to be.

THE COURT:  Well, I can, except that the plaintiff doesn't get to just dictate the scope of cross-examination.

MR. LOEVY:  Well, we just want to front it if you're going to change the ruling.  It was barred before trial.  And I don't think we've opened any doors.  We haven't done anything we didn't say we were going to do.  It was barred and we relied on that.

THE COURT:  Well, you examined on it.  So what is your resolution?

MR. SOTOS:  Okay.  I'll tell you, Judge, but then he's going to do what he wants to do, is front it with --

THE COURT:  Yeah.  I mean, it's a problem.  You know what?  I'm going to tell you, you don't get a roadmap of cross-examination.  I'm going to make a 403 balance.  I'm going

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 160 of 1254 PageID #:10429 6
Rivera - direct by Loevy
372

to require you to tell me what you're going to do, and that's what we're going to do. On the gang thing, we'll talk about it at the break, I haven't made a decision.

(Proceedings resumed in open court).

MR. LOEVY: Proceed, Your Honor?

THE COURT: Yes.

BY MR. LOEVY:

Q. Mr. Rivera, Jacque, you were saying on Friday where did you go?

A. Last Thursday. I was experiencing some chest pain. I had made an appointment, I believe it was Tuesday, last week Tuesday to see the doctor on a Friday.

Q. Did you get admitted somewhere?

A. Yes, I did. I got admitted to Northwestern Memorial Hospital.

Q. How many days did you spend there?

A. From Thursday to Saturday. I was released Saturday.

Q. And what did you think was happening? Physically, what did you feel?

A. I thought I was having a heart attack.

Q. All right. Is it stressful for you to relive these events?

A. Definitely. Yes.

Q. All right. Changing subjects. Are you -- you know, I put words in your mouth, though, but are you angry and bitter? What is your frame of mind here?

A. Well, I thought I wasn't. And, you know, who could tell you better about yourself than people who are around you. I had some issues with anger, and that's when it was suggested that I see a therapist.

Q. All right. And has that helped you?

A. Yes, it has.

Q. Would you say you've received any closure around your wrongful conviction?

A. It's getting there, but I can't say I have closure, no.

Q. Are you working hard to get there?

A. I have to.

Q. You hope to have closure in your life, or at least --

A. Definitely.

Q. Is this lawsuit the final chapter?

A. This is it. This is the final chapter.

MR. LOEVY: I have no further questions, Your Honor.

THE COURT: Ladies and gentlemen, before we begin the cross-examination, I think this is a really good time, even though it's a little early, to take our morning recess. So we'll take ten minutes and then we'll start again.

THE MARSHAL: All rise.

(The following proceedings were had out of the presence of the jury in open court:)

THE COURT: Okay. All right. So the problem is that I have no idea what was going to come out on direct

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 162 of 1254 PageID #:10429
Rivera - direct by Loevy
374

examination.

MR. LOEVY: Your Honor, may we go to sidebar for this?

THE COURT: Of course.

MR. LOEVY: Thank you, Your Honor.

THE COURT: Let me ask you this, I need to know, because this is such a Rule 403 issue, what the defense wants to do. And are you ready to give me that in writing or -- I mean, jot it down?

MR. SOTOS: I can -- we can give it to you in writing for sure, if you prefer that.

THE COURT: Well, I feel safer if we all know what it's going to be.

MR. SOTOS: That's fine. We'll write it down.

THE COURT: Okay. Because I think in the ruling -- let's go to the sidebar.

(Proceedings heard at sidebar on the record).

THE COURT: I was struggling with the ruling, which I now have in front of me, on the level of generality that was presented to me, and this has not gotten any easier. I don't think that the plaintiff can prevent cross-examination on the issues that were opened up simply by saying that the cross-examination is going to be more prejudicial than the direct examination is. So, I mean, that's my concern.

And as I say, I think we ought to take a few minutes, we ought to come back before the jury comes back, I see what

Rivera - direct by Loevy

375

the defense wants to do, I'll make a 403 balancing, and we'll go from there.

MR. SOTOS: Judge, while we're here, can I put one other thing on the record?

THE COURT: Yes.

MR. SOTOS: I want to correct something. I said before that the plaintiff's wife had testified that Mr. Rivera was still in a gang. Mr. Loevy said that wasn't true. And he's right. It isn't true. I had misheard.

MR. LOEVY: I'm sure it was in good faith.

MR. SOTOS: It was. And I apologize.

THE COURT: Let's try to keep it to 5 so we've got some time to resolve these issues.

(Recess.)

(Proceedings heard at sidebar on the record.)

THE COURT: All right. If you're ready, we'll have another sidebar.

Come on, people, let's do it. I don't like to keep juries waiting.

MR. LOEVY: Could we have an opportunity to make a record, too?

THE COURT: Yes, but I have to hear one person at a time. So getting started would be helpful.

MR. LOEVY: Your Honor, here is our position on this issue. We moved before the trial to bar allegations of

domestic violence because they're enormously, enormously prejudicial.

THE COURT: I understand that.

MR. LOEVY: And we picked a jury with 9 women. He testified on exam that, "My relationship with Sofia ended." That's what they're saying opened the door. They said, Hold on a second, she left you, that opens the door to abuse. That is not logical --

THE COURT: Well, I can't rule on this until I hear what they want to do. So what good is it for you to tell me what I already know, and I don't know anything yet. I just have this incredibly general motion in limine.

Go ahead.

MR. SOTOS: I want to ask him whether part of the reason for the deterioration of his relationship with Sophia was that he had physically and emotionally mistreated her, and another follow-up question would be that was something that ate at him while he was in prison. It's from his deposition.

THE COURT: That aided him?

MR. SOTOS: Ate at him while he was in prison.

THE COURT: And what is the physical -- the emotional is lack of fidelity, right?

MR. SOTOS: Yes. Yes. And I'm going to ask about that. I was planning on asking him about that, anyway. I don't think that's affected by --

MR. LOEVY: We do. Why is that relevant?

MR. SOTOS: Well, then I should make that clear that that was --

THE COURT: Okay. So lack of fidelity.

MR. SOTOS: Lack of fidelity.

THE COURT: And what was the physical abuse?

MR. SOTOS: The physical abuse is actually extraordinary, but we're not asking to go into it, because he'll argue that it's ridiculous. But what the ex-wife says, as Ms. Golden said, you know, that he put a gun in her mouth and did things of that nature, but we understand the balancing and we're not asking to put that in but --

THE COURT: But when you say physical abuse, I think the jury's imagination can go all over the place.

MR. SOTOS: Well, that's why I would use the word "mistreatment," because it was a softer way than abuse.

THE COURT: I think -- well, go ahead.

MR. LOEVY: Thank you. The fact -- this is only coming in for one reason, because he said they're not a couple anymore. They're saying, oh, my God, that changes everything, now we have to say they're not a couple anymore.

THE COURT: You lost it at that point. Go ahead.

MR. LOEVY: All right. Actually, the reason they're not a couple is because she was in a 15-year lesbian relationship, and that is why, among other reasons why they're

not there.  It's not relevant why they're not together.  This evidence, he wasn't charged --

THE COURT:  Well, you're not going into why they're not --

MR. LOEVY:  Well, he wants to bring --

MR. SOTOS:  First of all, I never heard about this, ever.

THE COURT:  Fine.  Fine.

MR. SOTOS:  But we're going into it because he said -- he testified that after they got married, she walked away from him.  She just walked away from him and never came back, and he understood it.  The idea being that he was in prison --

THE COURT:  Let me ask you this, let me ask you this, there's no proof that he abused her physically, fight?

MR. LOEVY:  He denied it sharply.

THE COURT:  Was he convicted?

MR. LOEVY:  He wasn't convicted, arrested, or charged.

THE COURT:  I got your pointed.

Go ahead.

MR. SOTOS:  The proof of it is from his ex-wife. We're not seeking to have that kind of issue --

THE COURT:  No, it's got to be that she has accused you of it.

MR. SOTOS:  Yes.  And we're not seeking to do that. We could seek that, Judge, but we're not.  We're just seeking

to have him acknowledge what he has already acknowledged, is that that was part of the reason for the deterioration of this relationship.

THE COURT: The main issue, I'm going to allow some cross-examination, it seems to me that "she's accused you" is less prejudicial given the lack of a conviction or anything than you were guilty of. I don't know. That's a question you want to ask.

MR. LOEVY: But, Your Honor, there's 9 women on this jury, and we relied on that jury --

THE COURT: I understand that, but you cannot --

MR. LOEVY: We have a case law, after case law, after case law, if you are physically abusing women --

THE COURT: Well, I'm telling you, you cannot prevent cross-examination on something you've gone into.

MR. LOEVY: Gone into? What did we do to go into it? She's not your girlfriend anymore.

THE COURT: So you don't want to talk anymore?

MR. LOEVY: I'm sorry.

THE COURT: I'm giving you a choice of how you -- it seems to me there are two ways of doing this. Your question was, what?

MR. SOTOS: My question was, part of the reason for the deterioration of your relationship with Sophia is that you physically and emotionally mistreated her.

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 168 of 1254 PageID #:104294
Rivera - direct by Loevy
380

THE COURT: And I think the question -- he's going to say, "no," of course, because he didn't.

MR. LOEVY: No. But see --

MR. SOTOS: If I could just talk.

MR. LOEVY: Compound question.

THE COURT: Go ahead.

MR. SOTOS: That's what he said. He actually used the word. Mr. Rivera said in his deposition that part of his remorse is that he physically and emotionally abused her. And he said it. I'm not going to use the word "abuse."

MR. LOEVY: Can we see what you're talking about?

MR. SOTOS: Yeah.

(Said item tendered.)

MR. LOEVY: He's going to be confused.

THE COURT: I can't help it. I'm not going to get reversible error for not allowing cross-examination.

MR. LOEVY: Your Honor --

THE COURT: Why don't I see this transcript?

MR. LOEVY: If you were accused of it, then -- if there's an allegation of one physical abuses, which they said this thing is disputed which we don't want mini-trial on, if you just asked "physical abuse" it would suggest that it was like a recurrent or a chronic thing, and he's not saying that and she's not saying that. There was the pulling hair thing, and there was this allegation which has now been denied, and we

shouldn't have a mini-trial on it because nobody is saying that --

THE COURT:  I'm still waiting to see this transcript.

MR. SOTOS:  On the woman who's hair he pulled, or he said he didn't, I'm not asking to get into it --

MR. LOEVY:  But that's not the wife.

MR. SOTOS:  The woman who had the hair pulled.

MR. LOEVY:  That's a different woman.  That's not Sophia.

THE COURT:  You know, this is not helpful.  Why don't you just go out and punch each other, because with you all talking to me, I can't make a ruling.

MR. LOEVY:  But you're reading the wrong transcript. He's not talking about the same woman.

THE COURT:  Well, this is what you're telling me you want to ask him about, right?

MR. SOTOS:  Yes.  Yes.

MR. LOEVY:  That's a different woman, Your Honor.

THE COURT:  Yeah, you said that six times title.

Go ahead.

MR. SOTOS:  There's two women here, Sophia and Lori. He testified that with respect to both of them he has remorse that he physically and emotionally abused them.  That passage is with respect to Lori.

MR. LOEVY:  So he pulled her hair.

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 170 of 1254 PageID #:104306
Rivera - direct by Loevy
382

MR. SOTOS: And he said the same thing with respect to Sophia. I don't have it right there.

THE COURT: Well, I need to --

MR. SOTOS: MR. LOEVY: It doesn't help to show you that he admitted pulling Lori's hair, and so then they say therefore we can talk about abuse against Sophia?

THE COURT: Well, I said I need to know what's going on. And I said it 20 times, and you just keep talking, and you're not giving me what I need.

MR. SOTOS: I do have from Sophia --

MS. GOLDEN: Here is the transcript here.

(Said item tendered.)

THE COURT: I don't want to rule on stuff that you're not asking for. What are you asking for?

MS. CARNEY: He broke her teeth when he back-handed her in front of her kids. And he continued on, she says that he punched her, slapped her, put a gun in her mouth, had affairs with other welcome.

MR. LOEVY: This is disputed.

MS. CARNEY: This is what the wife says.

THE COURT: This is what the wife said. I think, and unless the plaintiff tells me that the plaintiff wants it differently, I think you've been accused by Sophia, but --

MR. SOTOS: It's his deposition.

THE COURT: Oh, he admitted that?

MR. SOTOS:  Yes.

(Said item tendered.)

MR. LOEVY:  Can I look over your shoulder, Your Honor?

THE COURT:  Yes.

MR. LOEVY:  Thank you.

Your Honor, this is --

THE COURT:  What am I going to do, okay?  Because I already told you that you're losing on the issue that you get to say exactly how far this goes, okay.  They get to do something.

MR. LOEVY:  Can I make another argument, Your Honor?

THE COURT:  Go ahead.

MR. LOEVY:  It is a bad act to abuse women.  It needs to be relevant to something at the trial.  If he got arrested for it, it would barred.  If he got convicted for it 30 years ago, it would be barred.

THE COURT:  All right.  I'm just going to let them do what they want.  If you don't want to deal with me where I am --

MR. LOEVY:  All right.  Then change the thing to say "accuse."

THE COURT:  In terms of Sophia?

MR. LOEVY:  Yes.  Can I see the exact language, Jim?

THE COURT:  Here it is.

MR. LOEVY:  No, the question that is proposed.

MR. SOTOS:  I want to read from the transcript.

MR. LOEVY:  No way.  Your Honor, we might as well have a mistrial here.

THE COURT:  You don't say it six times.

MR. LOEVY:  We would ask for a mistrial.

THE COURT:  You're not going to get a mistrial, I'm just going to try and do this right and you're not helping me.

MR. LOEVY:  Your Honor, they proposed a question and they wrote it out --

THE COURT:  Where is that question?

MR. SOTOS:  Right here (indicating).

(Said item tendered.)

THE COURT:  Okay.  The question is:

"... part of the reason for the deterioration of the relationship with Sophia was that you physically and emotionally mistreated her."

Okay.

MR. LOEVY:  Can I talk to him so he doesn't deny it? Because he's denying it.  So can I tell him you have to say yes to that question and we'll move on?

MR. SOTOS:  Judge, hold on.  Hold on.  He's under cross-examination.  If he denies it, I do have a deposition. Now, that's how it's supposed to work.  It's not the way as Mr. Loevy says --

THE COURT:  I get that.  I get that.

MR. SOTOS: I tried to soften it.

MR. LOEVY: Your Honor, the other thing is, we're going to have a mini-trial, because she isn't going to say it happen, and he said it didn't happen. So now you got nobody saying it happened. It's not relevant to anything. What does it go to at this trial --

THE COURT: Well, let me read this deposition, because if there's impeachment, that's where it would come from.

The same sort of physical abuse is what?

MR. SOTOS: You have to go back to the previous page, Judge.

MR. LOEVY: You could not get a more prejudicial subject.

THE COURT: This is the question you're going to ask? You're not going to go into Lori's?

MR. SOTOS: No, no, no. About both of them. That's the one about Sophia but we have one for --

MR. LOEVY: Why would abuse of Lori matter?

MR. SOTOS: Because he testified to it.

THE COURT: Yeah, because he went into it.

MR. LOEVY: What did he say about Lori? That's the girlfriend. He abused his girlfriend? What does this trial have relevance to? That he allegedly used violence against his girlfriend?

THE COURT: I'm sorry. This you can do. I mean, I

don't know what --

MR. LOEVY: Why?

THE COURT: Because you went into it and they're entitled to cross-examination.

MR. LOEVY: Go into what?

THE COURT: The deterioration of the relationship and what caused it.

MR. LOEVY: Your Honor, we fronted --

THE COURT: You confronted it in a way that I criticized because I was given such generalities.

Now, in terms of the gang, there I think -- what is it you want to do with what, if anything?

MR. SOTOS: So we found the words from yesterday, because he said it really quick, he said that he was on his way -- now, it's a critical time, because it's --

THE COURT: Tell me that you want to do.

MR. SOTOS: So, okay. What he said was that he was on his way to the straight and narrow and they took him away and put in prison. We want to show he was not.

THE COURT: And how are you going to do that?

MR. SOTOS: Cross-examine him about whether he was still active in gang activity --

THE COURT: Well, does active in gang activity mean?

MR. SOTOS: He was still controlling the street corner where he was arrested when he went to prison.

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 175 of 1254 PageID #:104306
Rivera - direct by Loevy
387

THE COURT: He was controlling the street corner?

MR. SOTOS: Yes. Yes. He said, "I was still in the gang."

MR. LOEVY: So what are we trying to rebut? He said he just said it, he made it clear, "I was in the gang."

THE COURT: Because he's trying to get damages for what they did to him.

MR. SOTOS: A lot of damages, Judge, and we want to be able to cross-examine him.

MR. LOEVY: Prejudicial things like Inca?

THE COURT: Well, we're not going to talk about Inca.

MR. SOTOS: I can ask him what an Inca is.

THE COURT: No. No. You can ask him if he had a leadership position.

MR. SOTOS: Okay. I'll do it that way.

MR. LOEVY: Well, Your Honor, we object to that.

THE COURT: I know you do.

MR. LOEVY: All right. Thank you, Your Honor.

THE COURT: But, you know, we're not going to go on, and on, and on.

MR. SOTOS: We're not going to, Judge.

(The following proceedings were had out of the presence of the jury in open court:)

THE COURT: Mr. Sotos, do you have the transcript that you relied on talking about the straight and narrow?

MR. SOTOS:  We can get it quickly.

THE COURT:  Would you show it to me?

Oh, we might have it.

MR. SOTOS:  We have one right here, Your Honor, if you'd like one.

MR. LOEVY:  And, Your Honor, and then we would like to tender the Court transcripts where he said repeatedly that he was not saying he was a saint --

THE COURT:  Yeah, I remember all of that.

We're ready.

THE MARSHAL:  All rise.

(The following proceedings were had in the

presence of the jury in open court:)

Please be seated everyone.

Let's go ahead.

CROSS EXAMINATION

BY MR. MR. SOTOS:

Q.  Good morning, Mr. Rivera.

A.  Good morning, Mr. Sotos.

Q.  How are you doing this morning?

A.  A lot better.

Q.  Good.  I want to ask you some questions about your case first, then I'll follow up with some questions about what you had talked about yesterday afternoon and this morning; okay?

A.  Sure.

Rivera - cross by Sotos

Q. With respect to the individuals who you sued, Mr. Guzman, you don't know him, right?

A. No, sir.

Q. You don't ever remember him from the 1080's or never remember seeing him before?

A. Not that I can remember, no, sir.

Q. All right. And this is Mr. Guzman right here on the end (indicating). So you don't have any -- you don't know of any reason why Mr. Guzman would try and cause you any harm?

A. No.

Q. Same thing with Mr. Gawrys, you don't know him?

A. Right. I didn't recognize him now, but I believe he was with Detective Guevara the day they picked me up.

Q. No, I understand. But my question is, though, you don't know any reason why Mr. Gawrys would have had any animosity toward you or trying to create any difficulty?

A. No, sir.

Q. And with respect to Gillian McLaughlin, do you see her sitting at counsel table?

A. Yes, sir.

Q. You never seen her before trial, right?

A. I've seen her at the evidentiary hearing. She testified, yeah.

Q. Right. And same question for her, you had no prior problems with her or know any reason why they she would try and

cause you any harm or --

A. No, sir.

Q. -- or fabricate a case against you or anything like that?

A. No, sir.

Q. And I think I left one of my clients out. There he is, Mr. Noon. Same thing. I think you knew him, right?

A. We talked a few times.

Q. Again, you never had any kind of issues, any kind of negative encounters?

A. No, sir.

Q. That would you lead you to believe that she would have any reason to try to convict you for a crime that you didn't commit?

A. No, sir. Not that I was aware of, no.

Q. And so I don't represent Mr. Guevara in the case, but even with respect to Mr. Guevara, you don't know any reason why he would fabricate a case against you based on your prior relationship with him?

A. I'm going to say we had a prior relationship. We had a few run-ins.

Q. You knew him?

A. You know, I don't know how you would define I knew him. I knew of him.

Q. His lawyer would be able to ask you questions. But just basically for present purposes, you didn't have any problems

with him?

A.   No.

Q.   And you have become very familiar with your case over the last many years, correct?

A.   Yes.

Q.   You testified extensively about some of the details in the case, what happened like with the criminal trial, with your efforts to obtain your release, post-conviction hearing, correct?

A.   Yes, sir.

Q.   The Certificate of Innocence proceeding, correct?

A.   Yes, sir.

Q.   And with respect to the post-conviction petition, you indicated that you had read the judge's opinion on the day that she granted you a new trial?

A.   I don't understand the question.

Q.   The day you were granted a new trial by Judge Walsh --

A.   Yes.

Q.   -- you described for the jury how you talked to her and things you talked about in the courtroom that day where she didn't know who you were at first and you said, "I'm Mr. Rivera --"

A.   Oh, afterwards.

Q.   She was happy to see you.

A.   What was the question, though?

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 180 of 1254 PageID #:104316
Rivera - cross by Sotos
392

Q.  You had read the opinion that she wrote in the PC petition where she granted you a new trial?

A.  I can't say that.  I don't remember that if I did or if I didn't.

Q.  You sat throughout.  You were there when she --

A.  Yeah.  Sure.

Q.  And she found that you had presented sufficient evidence of your innocence that you were entitled to a new trial?

A.  Yes, sir.

Q.  And she also determined in that case that the claims that you're advancing in this case about what we call Brady violations --

MR. LOEVY:  Objection, Your Honor.  We're not getting into court rulings.

THE COURT:  I'm sorry, what?

MR. LOEVY:  We shouldn't be talking about court rulings about Brady claims.  It's got nothing to do with this witness or even the jury.

THE COURT:  Well, you're just going to ask -- I assume you're going to ask him just what we did in the instruction earlier, is that what you are going to do?  Just ask whether that was part of it?

MR. SOTOS:  Part of the PC petition, the way the judge resolved that when he was in court.  He's already testified at length of those proceedings.

THE COURT: Was it in the PC petition?

MR. LOEVY: Your Honor, may we approach?

THE COURT: I don't think we have to go into what was in the PC petition. We've already -- the jury understands what was decided in the Certificate of Innocence, and I don't know that there's any claim that anything else could've been decided.

MR. SOTOS: I'm actually talking about the decision on the post-conviction. He has already testified that the judge granted him a new trial.

THE COURT: Isn't this hearsay?

MR. SOTOS: Well, I don't know, but he testified on direct examination to his -- it was brought out by plaintiff's counsel that he was in the courtroom and the judge granted him a new hearing and he was reading the decision. He's testified a lot about documents in this case and he's familiar with it.

THE COURT: Well, I guess we got to go to the side, because I don't understand how this comes into evidence.

MR. SOTOS: Judge, I'll move past this. It's not important. I don't want to waste the jury's time this morning.

BY MR. MR. SOTOS:

Q. So let's go back to the -- to how you first got involved in the case.

So you've testified that you were picked up by Officer Guevara on Beach and Spaulding?

A. Yes, sir.

Q. And that was a corner that was familiar to you, correct?

A. Yes, sir.

Q. That's where you conducted gang activities with the Latin Kings at the time?

A. I wouldn't say gang activities, but that's -- that's where the Latin Kings hung out at.

Q. And you did?

A. Yes, sir.

Q. You were a leader in that organization at the time, correct?

A. You would have to define "leader." You know, I had a position with them, but it wasn't -- you know, I wasn't below rank, I wasn't the highest rank. I was in between.

Q. It was a rank that allowed you to at least control the corner that you were on?

A. I wouldn't say control, but to oversee, yes, sir.

Q. Okay. And you said that when Mr. Guevara approached you there to pick you up -- and this was on August 30ht of 1988?

A. If I remember correctly. You know, 30 years ago, I -- if I remember correctly, it was August 30th as you stated.

Q. And I think you testified that he said he wanted you to be a filler in a line-up?

A. Yes, sir.

Q. And so you went down to the station after that, correct?

A. Yes, sir.

Q. And you testified on direct examination that when you were taken down to the station, that you were kept overnight and the next day -- the next evening you were put in a lineup?

A. Yes, sir.

Q. You had about 5 or 6 conversations with the lockup keepers, the first night you brought in and then the next day?

A. Yes, sir.

Q. And it's your position in this case that you were held in a lineup on the second night and that you were then released after that?

A. Yes, sir.

Q. And so you've seen all of the police reports in the case throughout the many years you were in prison and were reading your cased, correct?

A. The ones I was given, yes, sir.

Q. And so you've seen that the police have actually documented you being in the police station that night, correct?

A. Yes, sir.

Q. In fact, there's documents that reflect that you were picked up, as you said, on August 30th and brought to the station and held there for what was intended to a lineup, correct?

A. Yes, sir.

Q. And you have seen the police documents that suggest that

the officers had talked to the parents of the eyewitness, Orlando Lopez?

MR. LOEVY: Objection. Hearsay, Your Honor.

MR. SOTOS: Judge, his entire direct examination was about documents he's looked at, what he knows about his proceedings. I'm just asking him follow-ups on all the same questions.

THE COURT: Well, you're asking if the document showed --

I'm sorry. Could I hear that back again?

(Record read.)

THE COURT: Well, I mean, you can't go into what they said or anything like that.

MR. SOTOS: That's fine. I can do it another way.

BY MR. MR. SOTOS:

Q. Your understanding that the police's position is that they tried to talk to Orlando Lopez, but his parents said it was too late and they wanted to do it the next day?

A. There was one part where it said that, yes.

Q. And that they couldn't find him the next day?

A. That's a part of the police report, yes.

Q. And that's what the police documents that you've reviewed showed that they held Orlando Lopez -- excuse me, that they held you overnight, not Orlando Lopez, and that the next day you were released after they couldn't find Orlando Lopez?

A.  I -- I -- I didn't know at that moment they didn't find Orlando.  I didn't even know who Orlando Lopez was at that time.  I just knew I was supposed to be put in a lineup and a filler, and that was it.

Q.  And you've heard your counsel talk in opening statement about little Orlando Lopez?

A.  Yes, sir.

Q.  Playing with Lego's?

A.  I don't know if he said that.

Q.  You didn't hear that part?

So as a 12-year old in Humboldt Park, it's your understanding that Orlando Lopez was called a pee wee Maniac Latin Disciple?

A.  He was?

Q.  First time you've heard of that?

A.  Most definitely.

Q.  So as a -- that's the first time you ever heard of that?

A.  Yes, sir.

Q.  So if he was a pee wee Maniac Latin Disciple, based on your experience in the neighborhood, is it fair to say he probably wasn't playing with Lego's at the time?

A.  He could've been.  I doubt it, but he could've been.

Q.  Now, you were -- and it's your testimony that you were again on the 30th, you were held at the station overnight, and you had these 5 or 6 conversations with lockup keepers that

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 186 of 1254 PageID #:104317
Rivera - cross by Sotos
398

night and the next day, and then you were put in a lineup the following night?

A. Yes.

Q. So if that's true, then the police who had documented that they weren't able to find the witness, those documents had to be untrue, correct?

A. I don't understand the question.

Q. Well, if, in fact, you were held in a lineup on the second day and released after that, police documents saying that you were in a lineup and -- and you were released because they couldn't find the 12-year old, those wouldn't have been true?

A. What the officer in the lockup told me was I supposed to be put in a lineup at 2:00 o'clock the next day. That never happened. So they said it would be at 7:00 o'clock that same day.

Q. Which is the second day you were in custody?

A. Yes, sir. But on the same day, both times occurred. They told me I was going to be put in a lineup at 2:00 o'clock, which never occurred. They said the lineup would proceed at 7:00 o'clock that evening.

Q. So after you were convicted, you were initiating efforts on your own behalf trying to get released from prison, correct? Considers?

A. I had to, yes.

Q. You were filing documents even without the assistance of a

lawyer at that time, correct?

A. Yes, sir.

Q. Okay.

MR. SOTOS: Exhibit 9, please.

BY MR. MR. SOTOS:

Q. So on your screen --

(Exhibit published to the jury.)

BY MR. MR. SOTOS:

Q. Can you see the screen in front of you what's been marked as Defendant's Exhibit Number 9. Can you --

Let me see if we can change. And turn the page on it.

MR. SOTOS: Can we move the page? Go to the next page.

BY MR. MR. SOTOS:

Q. So do you recognize this document?

A. Yes, sir.

Q. And what do you recognize it to be?

A. A write of mandamus.

Q. And that's something that you filed with the Court back in February of 1997, correct?

A. I'm not sure of the date, but I found it with the clerk.

Q. But you do recognize it, anyway?

A. Yes, sir.

MR. SOTOS: If we could go to page 1.

BY MR. SOTOS,

Q. Do you see there on the bottom where it says, "February 21, 1997"?

A. Yes, sir.

Q. That's your signature next to it?

A. Yes, sir.

Q. So you filed that before you had any lawyers representing you on your post-conviction and your appeal proceedings?

A. I filed it on my own, but it was from another inmate's writ of mandamus. We were on a lockdown and had some time on my hands. I was talking to him about it. He passed over his of mandamus. He just said, "Write what's on mine the same way, but indicate your information," and that's what I did.

Q. But it's fair to say that the information that's on this document is your information?

A. Yes, sir.

Q. Okay.

MR. SOTOS: If we could go to the next page. The one after that, and the one after that.

BY MR. MR. SOTOS:

Q. So I want to refer you to --

MR. MR. SOTOS: The one after that.

BY MR. MR. SOTOS:

Q. To paragraph 8.

A. Uh-huh.

Q. You have that in front of you there?

A. Yes, sir.

MR. SOTOS: Judge, we would move for the admission of Defendant's Exhibit 9.

THE COURT: Any objection?

MR. LOEVY: Relevance, Your Honor.

THE COURT: Well, I will take it provisionally. Let me what the relevance is.

BY MR. MR. SOTOS:

Q. So do you see paragraph 8?

A. Yes, sir.

Q. And you talk about your Constitutional rights being violated. And you say that, "on August 30th, between 5:00 and 6:00, the officers --" And you don't name any specific officers, correct?

A. Uh-huh.

Q. You say, "arrested the petitioner." The petitioner is you, right?

A. Yes, sir.

Q. And you were taken to Belmont and Western police station, correct?

A. Yes, sir.

Q. And that's what happened, right?

A. Yes, sir.

Q. And then you were moved to Area 5 Grand and Central police station, correct?

A. Yes, sir.

Q. And that also occurred on August 30th, correct?

A. Yes, sir.

Q. You said at Area 5 a lineup was held at 7:00 p.m. which consisted of alleged organization known as Latin Folks?

A. Yes, sir.

Q. Okay. And that also was on August 30th, at least according to this?

A. Yes, sir.

Q. Okay. Then you go on to say that -- so let me step back for a second. So in this petition, you were saying that the lineup that you were held in occurred on the same day that you were picked up, right?

A. Ah, yes.

Q. And you say anything about it other than that, right?

A. No. No.

Q. Because when Detective Guevara picked you up, he told you he wanted you to be a fill-in in a lineup?

A. Yes, sir.

Q. And what did you know a fill-in to be?

A. Somebody who would participate in a lineup for the police officers.

Q. But not as a suspect, right?

A. No, not as a suspect.

Q. You had done that once or twice before?

Rivera - cross by Sotos

403

A.  Yes, sir.

Q.  Okay.  So that is what Mr. Guevara told you initially, that that's what he wanted to you do?

A.  Yes, sir.

Q.  Okay.  And so when you did that lineup, you didn't know who the people in the lineup there were, right?

A.  Not at first I didn't.

Q.  Right.  And you didn't know who the witness, if anybody was, who was watching the lineup?

A.  It's a two-way mirror.  That's the whole purpose of that.

Q.  So at the time you were doing that lineup, you felt you were being a fill-in in a lineup where somebody else was a suspect, correct?

A.  Yes, sir.

Q.  And that's not something that would be noted in the police records on this case, as far as, you know, right?

A.  As far as I know, no.

Q.  And in this petition you then went on to say that your lawyer called the police station asking when -- what you were being held for and on what charge.  That didn't actually happen, did it?

A.  I don't know if it was during the first pick-up or the second one, but there was a period of time between the two that I remember.  I can hear -- I can hear the -- I was in an interview room, and I can hear one of the detectives say, "Is

Rivera - cross by Sotos

404

this a lawyer again, he wants to know what's going on with his client," that's all I heard.

Q. But you didn't even have a lawyer that night, did you?

A. I can't remember which night it was. I don't know if was the first time they picked -- I believe it was the second time they picked me up.

Q. Right. A couple of weeks later, you testified about that on direct.

A. Yeah.

Q. But I'm talking about the first time.

A. Okay.

Q. And the first time, you didn't have a lawyer there?

A. No, sir.

Q. And that's what you're describing here. So that's just a mistake?

A. It could be, yes, sir.

Q. And then you go on to say that after spending the night, you were then moved to 11th and State the following day for the traffic warrant that you talked about, and then you were released after that?

A. I believe it was that same day that I went to the lineup. They sent me later on, that night to 11th and State.

Q. Okay. And in your petition you state that the name of the captain is unknown that worked at 7:00 p.m. on August 30th, which, again, is the first night?

Rivera - cross by Sotos

A.   Yes, sir.

Q.   Which, again, is after the lineup that you described?

A.   Yes, sir.

Q.   Where you thought you were a filler?

A.   Yes, sir.

Q.   And that there is a part here about your lawyer calling the police, which is probably a mistake.  And then you said, after spending that night and part of the following night, you were moved to 11th and State on a traffic warrant?

A.   Yes, sir.

Q.   Okay.  And you wouldn't have had a need for a lawyer because you thought you were -- at least you thought you were a filler at that point?

A.   Yes, sir.

Q.   And then you were released sometime after that without there being any kind of charge or anything like that?

A.   Yes, sir.

Q.   So when you left, you still thought you had been a filler in a lineup?

A.   Yeah.  Yeah.

Q.   And then a couple of weeks went by and you didn't -- you didn't have any further contact with the case until you got picked up by Officer Guevara, correct?

A.   Yes, sir.

Q.   And when he picked you up, you said you had a conversation

Rivera - cross by Sotos

with him?

A.   In the vehicle, yes, sir.

Q.   So I think you estimated on direct that this was about 3 or 4 weeks after the first lineup.  If I told you it was closer to 2 weeks, would you quarrel with me?

A.   Give or take.

Q.   It's a long time ago, I know.

A.   Yes, sir.

Q.   So you testified on direct that you said to him, "Why are you picking me up again and put me in a lineup?"  And he didn't say anything, Guevara didn't say anything in response?

A.   In the second time?

Q.   Yeah, the second time, so there's no confusion.  So this is the second time when he picked you up --

A.   In front of my workplace.

Q.   -- a couple of weeks after the first time, you said to him, "Why are you picking me up?  I was in a lineup a couple of weeks ago"?

A.   I was working with him, you know, he asked me to be a filler, which could be dangerous.  But we was in the car, and I told him:  What's going on?  You know, I participated with you, you know, all I want to know what's going on.  And he slammed on the brakes of the car.  I was handcuffed.  I wasn't seatbelt.  Didn't put no seatbelts on me.

Q.   You described that on direct.  I just want to ask you about

the conversation at this point.

A. Okay. Sure.

Q. So are you thinking before that happened, that he wants you to be a filler again?

A. I don't know what he wanted me to be, but it was scaring me.

Q. But when you said that to him, when you asked him why he picked you up, and since he had put you in a lineup a couple of weeks earlier, I think you said on direct he didn't say anything, but he did respond to you, didn't he?

A. Oh, no, he said something to me.

Q. What did he say?

A. He said, "You're being charged with murder MF."

Q. Well, didn't he -- before that, didn't he first say to you that the only reason we're picking you up this time is because we couldn't find the witness the first time?

A. No, sir.

Q. Never happened?

A. No, sir, not to my recollection. He didn't say nothing to me.

Q. Okay. So you remember giving a deposition in the case, correct?

A. Yes, sir.

Q. And that was under oath?

A. Yes, sir.

Q.   In fact, it was a videotape deposition?

A.   Yes.

Q.   So I'm going to show you a clip from deposition and ask you whether or not that testimony was accurate.

A.   Sure.

        MR. SOTOS:  If I may have a second, Judge?

        THE COURT:  Sure.

        MR. LOEVY:  Can I have the page?

        MR. SOTOS:  Yes.  It starts 331 and goes to 333.  I just wanted to make sure it's loud so everybody can hear it.

        THE COURT:  The jury's monitors are not on.  I don't know if you're expecting them to be on.

        MR. SOTOS:  Oh, I'm sorry.  Thank you for that, Judge.

        THE COURT:  I don't know who is in charge of that, but I can just see that it isn't on.

        MR. SOTOS:  It's on the in the jury box.

        THE COURT:  Oh, it's on the in the jury box.  Thank you.  So everybody's got a monitor.

BY MR. SOTOS:

Q.   Just to reacquaint the jury with what I'm asking you about: This, again, is the second time that you were picked up, and it relates to when you asked Mr. Guevara why were you being picked up again because you were in a lineup a couple of weeks earlier.

A.   Sure.

Q. Okay. And so in your deposition, do you remember being handed a report that a State's Attorney had done of a summary of an interview with you and you were asked to read through it and point out anything that you felt was inaccurate?

A. That probably took place.

Q. If I show you the transcript, would it help remind you?

A. Sure.

MR. SOTOS: Can I do that first, Judge?

THE COURT: Sure.

MR. SOTOS: Judge, we need a couple of minutes.

THE COURT: Okay.

BY MR. MR. SOTOS:

Q. This is page 331.

MR. LOEVY: He's being asked to read to read 7 pages, Your Honor.

THE COURT: Yeah, that's going to some time. Does the witness need to read all of it?

MR. SOTOS: He might not have to. Let me try to see if I can make it easier.

BY MR. MR. SOTOS:

Q. So it has to do with an exhibit that you were given at the deposition. It was a State's Attorney's summary of an interview that he did with you in connection with your post-conviction proceedings.

A. Sire.

Q. And the lawyers who were questioning you had asked you to review it. Then your lawyer said to make sure you review all of it, and let us know as you're reading it which part of it isn't accurate.

A. Sure.

Q. Is that coming back to you?

A. More or less.

MR. SOTOS: Maybe if I show him the exhibit, too, to the deposition.

THE COURT: You know, maybe give it to Mr. Rivera and he can tell us how much time he needs to read it.

BY MR. MR. SOTOS:

Q. Okay. Starts right about here (indicating)?

A. And it goes to where?

Q. Right the bottom of 324 and just continues --

A. Oh, this here (indicating)?

Q. Yes. And I'll show you the report.

MR. SOTOS: Judge, may I approach again? I want to show the witness Defendant's Exhibit 131, which is the report that I referenced that he was reading from in the deposition.

THE WITNESS: I understand the question.

BY MR. SOTOS:

Q. Okay. So you remember being asked about --

A. Yes, sir.

Q. So you don't need to see the report again?

A. No. No.

Q. Well, let me show it to you, anyway.

A. Is it right here (indicating)?

Q. Yeah. Right there.

A. Sure.

Q. So you remember being asked to review the report?

A. Yes, sir.

Q. And reading it for accuracy.

And there's a part of the report that says -- he recalls asking an unidentified officer why he was placed in a lineup, the officer said they only went through the lineup because they were unable to find a witness. And so you were asked about that, and then did you give this answer in your deposition. Go ahead.

(Whereupon, videotape played in open court) .

BY MR. MR. SOTOS:

Q. Fair to say that's what you said back in November of 2014?

A. Most definitely, yes.

Q. Do you remember now?

A. Yes, sir.

Q. So, in fact, even back at the time when all of this was actually happening, in September of 20th -- excuse me, of 1988, Mr. Guevara told you at that time that the only reason we're here again is because we couldn't find an eyewitness the first time?

A.  I rather -- just like I testified to, whether he was in the station -- in the car or in the station -- it probably most likely happened at the station that he revealed that to me.

Q.  But it happened that night?

A.  Yes, sir.

Q.  And that was -- that September 15th date, that's the date you were taken down to the station and you were put in a lineup where Mr. Lopez viewed the lineup and he said that he picked you out as the shooter, correct?

A.  From what the officer told me, yes.

Q.  And you're aware from your review of all the documents in the case and the videos, everything that you've watched, you're aware that Orlando Lopez has always said that no police officer ever told him who to pick, or coerced him, or encouraged him in any way, you're aware of that, correct?

A.  Yes, I am.

        MR. LOEVY:  Your Honor, that's argument.

        MR. SOTOS:  Judge --

        THE COURT:  Let's just go on.  Overruled.

        MR. SOTOS:  Okay.

BY MR. MR. SOTOS:

Q.  And after you were identified, you said you had a conversation with Officer Guevara, but you also had a conversation with an Assistant State's Attorney, correct?

A.  Yes, sir.

Rivera - cross by Sotos

Q. And you knew enough about the system by that point to know that an Assistant State's Attorney is not a police officer, correct?

A. Oh, yes, sir.

Q. You understood that the police investigate the case and then prosecutors are the ones who make the decision about whether to charge you, whether to go to trial, then judges make decisions about guilt or innocence or juries, correct?

A. Yes, sir.

Q. And so after you talked to Officer Guevara -- and, by the way, before you talked to the State's Attorney, you testified this back and forth you had with Officer Guevara when he asked you about whether you could tell him who the other person was who was involved, and, if you could, he would put you down as the driver, and you said you couldn't do that because you had nothing to do with the case, right?

A. Exactly.

Q. Okay. But at that point, if you're not -- neither Officer Guevara nor any other police officer here did anything to try and force you to make a statement, correct?

A. Ah, not force me, no.

Q. Nobody tried to coerce you, or use any kind of physical force, or anything of that nature?

A. No, sir.

Q. Okay. And your lawyer asked you questions about the fact

that there really was no physical evidence against you.  There was no DNA, no fingerprints, right?

A.  There was, but they didn't have it.

Q.  There was none of that.  There was just the testimony of this 12-year old boy?

A.  Yeah.

Q.  And you're not claiming that the police tried to do anything during that time period to create a case against you beyond giving the prosecutors the identification that was made by 12-year old boy?

A.  Well, that was the conclusion I came to because I know I didn't do the case.

Q.  Right.

A.  I said they're fabricating this case against me, in my mind.

Q.  But, again, the only thing that you know of that the police did was give the prosecutors the identification of a 12-year old boy?

A.  Sure.

Q.  Who always said that --

        MR. LOEVY:  Objection.  Argument, Your Honor.

        THE COURT:  Yeah, we don't have to go over that. Sustained.

BY MR. MR. SOTOS:

Q.  All right.  And you don't have any reason to believe that

the police did anything beyond to give that identification to the prosecutors to try and create a case against you?

A. Other than trying to fabricate the case against me, in my mind, that's what I thought.

Q. Based on the testimony of a 12-year old boy?

A. Yes.

Q. And when you met with the prosecutor, did you know what her role was there?

A. Not really. I had an idea, but I didn't really know, you know.

Q. What did you think? What did you think -- her name is Julie Rosner. You gleaned that from the documents.

A. Yes, sir.

Q. What did you think her role was there?

A. To talk to me about the case.

Q. And you knew -- you decided not to make a statement at that point?

A. She gave me that option.

Q. And that was your right to do that?

A. Yes, sir.

Q. Even though you were innocent, you knew enough to know that you didn't think it would help you to give a statement at that point?

A. Well --

Q. Just based on your familiarity with how things work?

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 204 of 1254 PageID #:104335
Rivera - cross by Sotos
416

A. Well, she gave the opportunity, too. She told me, "You have the right to tell me or you don't. You have the right to a lawyer." And I said, "I exercise my right." Because I already knew in my mind, I didn't do it. So I was like, what's going on here? You know, I tried to work with the Chicago police, you know, being a filler. At this point I didn't trust nobody.

Q. Even though you knew you were innocent, you chose not to do that?

A. Most definitely.

Q. And at that lineup that day, you didn't see, other than Officer Guevara, you didn't see any of the other individuals here in the courtroom, correct?

A. Yes, everybody has changed, but not that I can recall, no.

Q. . You didn't see Gill McLaughlin, the detective who was on the case, correct?

A. No, sir.

Q. And you don't have any reason to think she was in the police station that day, do you?

A. I mean, she could've been. I would have no idea.

Q. All the paperwork you looked at and everything, you didn't see her name on it?

A. I've seen her name on a few documentations, if I remember.

Q. Back like August 27th through like August 30rh, 31st, right in that initial timeframe after the shooting?

A.  If that's -- you know, I would have to look at it, but, yeah.

Q.  But the second lineup where you were identified and then arrested, that was September 15th?

A.  Yes, sir.

Q.  Okay.  You don't see any documents that give you any reason to think that Gill McLaughlin was even in the police station that day?

MR. LOEVY:  Objection, Your Honor.  His review of the documents is totally irrelevant.

THE COURT:  Well, I guess the question is, did any documents tell Mr. Rivera that.

MR. SOTOS:  I probably could rephrase it better.

BY MR. SOTOS:

Q.  Were there any documents --

A.  Not that I can recall.

Q.  And you said you don't recall seeing her there?

A.  No, sir.

Q.  There were a couple other detectives there, though, weren't there?

A.  Yes, sir.

Q.  And that was Officers Dorsch and Boyle?

A.  Ah --

Q.  You remember Dorsch?

A.  You know, if I said I did, I'd be lying.

Rivera - cross by Sotos

418

Q. Well, the only reason I asked about Dorsch is because you know him a little bit now, right?

A. Yes, sir.

Q. You know he works at Northwestern?

A. I've been told.

Q. You got -- you actually met him there, right?

A. Yes, sir.

Q. You've seen him around at Northwestern from time to time?

A. Yes, sir.

Q. All right. But when you saw him, you didn't recognize him as having been the detective who conducted the lineup on the day that you were arrested?

A. Other than Guevara and Gawrys that was in the police station that night when I was put through the lineup, another detective came out, I don't know who he was, and indicated by saying, "bing, bing, bing, we have a winner," that was it.

Q. And he didn't look to you -- like when you saw Dorsch, you didn't think that was the guy that --

A. I can't say if I saw Dorsch there or not.

Q. So did the lawyer who you talked to, did she tell you that she had actually talked to the eyewitness on her own with no police officers present after you had been identified in the lineup?

A. Did she tell me that after I was identified in the lineup?

Q. Yes. I mean, after your were identified by Mr. Lopez,

Orlando Lopez, you said you had a conversation with an Assistant State's Attorney of Cook County?

A. Yes, sir.

Q. There were no police officers in the room there at the time?

A. No, sir.

Q. And did she tell you -- did she say anything about her conversations with the police officers?

A. No, sir.

Q. Did she tell you that she actually participated in the lineup?

A. That she did?

Q. Do you remember seeing her there?

A. Oh, no.

Q. I'm not saying that she was there --

A. Oh, no. No. No.

Q. And did she tell you that she had talked with Orlando Lopez on her own?

A. If she did, I don't remember. All I remember saying when they took me to the room, she -- I had a Late Night With David Letterman shirt on, and she stated to me, "Oh, you like Letterman?" I said, "Yes, I do." She says, "You watch him frequently." I said, "Yes, I watch him." And she asked me, "You know what you're being charged with?" And I said -- I don't remember what I told her, but she read it back to me, and

then she offered me to either speak about the case or get an attorney. And I exercised that right in getting my attorney.

Q. And so you just don't remember 30 years later whether or not she told you that I talked to the witness, he seemed credible to me, or anything like that --

MR. LOEVY: Objection, Your Honor.

THE COURT: Sustained.

BY MR. SOTOS:

Q. You don't the remember her mentioning a conversation with the eyewitness --

MR. LOEVY: Objection. Asked and answered.

THE COURT: Sustained.

BY MR. MR. SOTOS:

Q. On the day then that you were arrested, Sophia arranged for you to get a lawyer?

A. I believe -- she was the one who got the lawyer, yes.

Q. So you were allowed to make a phone call to get a lawyer?

A. No, sir.

Q. How did you get in touch with him?

A. I had just dropped my kids off with her. As a matter of fact, she came out of the workplace with my daughter in her hands, like, "What's going on?" And I don't her, "I don't know what's going on." So she knew I had been arrested.

Q. All right. And then you went to Cook County jail?

A. After the police station, yes, sir.

Rivera - cross by Sotos

Q. You had been there before, right?

A. I have.

Q. You testified on direct examination, you testified about the kind of things that could happen to people in jail at Cook County, about people who can get raped or stabbed. You're not saying any of those kinds of things happened to you when you were at Cook County Jail?

A. No, sir.

Q. You met Mr. Wadas at the bond hearing?

A. Yes, sir.

Q. And so the judge set the bond, correct?

A. Yes, sir.

Q. And you said it was for $100,000?

A. Yes, it was.

Q. And then you talked to Mr. Wadas a little bit anyway about your case?

A. Well, he talked to me about it, because I didn't know nothing about it.

Q. What did he tell you?

A. I can't recall what he was talking about.

Q. You don't remember anything about the conversation?

A. It was probably most likely along the lines if I could raise the bonded. You know, if Sophia could get the bond money together or --

Q. So he was a private lawyer, not a public defender. You

Rivera - cross by Sotos

422

paid to get your own lawyer, right?

A.  Yes, sir.

Q.  And you gave him the $10,000?

A.  I gave him the bond slip.

Q.  So the only conversation you remember with him on that first day was about how he was going to get paid?

A.  Oh, no.  No.  No.  No.  About the bond, was I able to raise the bond or get the bond.

Q.  How to get out?

A.  Yes, sir.

Q.  And then you did get out.  You were released after a couple of weeks?

A.  A couple of weeks, I would say.

Q.  And so going back to that first, that bond hearing, though, you don't remember talking with Mr. Wadas about your case or what the case was against you at all?  He didn't say anything about that?

A.  If he did, I don't remember.  I mean, you got remember now, in mine mind, I know I've been wrongfully convicted.  This case, I believed in my mind, was put on me.  I'm 24 years old, 23 years old, you know.  Things have just -- you know, I had a lot of things on my mind.  So I don't recall it, though.

Q.  No, I understand it.  The reason I'm inquiring is like there are some things that you remember pretty specifically and other things you don't.

A.  Sure.

Q.  So I'm asking you about this conversation with your lawyer because of what you testified to that you had no idea what case it even was at the time, is that right?

A.  I believe that was when we started going to the courthouse.

Q.  When the prosecutor met with you, she didn't tell you even what the charge was?

A.  She told me what the charge was.

Q.  But not --

A.  She said what I was being charged with.

Q.  I didn't mean to interrupt you.  I'm sorry.  But nothing about the actual case?

A.  No, sir.

Q.  That you've been identified in a lineup or anything like that?

A.  Not that I can recall.

Q.  Did you presume that because you knew you stood in the lineup and then you got arrested?

A.  All I know is I was scared, and she telling me that I had the right to an attorney, and I had a right to speak to her. And when I exercised my right to call an attorney, she closed the notebook and got up and left.

Q.  So you -- your bond hearing was like a day later?

A.  Give or take.

Q.  And so you talked to your lawyer about something, right?

About the bond?

A. I believe he was asking me if I was able to make the bond, was Sophia able to get the money.

Q. You don't remember like saying to him, So what's this all about? Why am I here?

A. No, sir. Not that I can recall, you know.

Q. So you sat in Cook County Jail for a couple of weeks?

A. Yes, sir.

Q. And then you bonded out. You were able to raise the money?

A. Yes, sir.

Q. And during that 2 weeks, did you ever talk with your lawyer about like what's the case against me? Why am I sitting in jail?

A. Ah, well, I knew it was first degree murder.

Q. Because the prosecutor told you that much? Or from the bond hearing you knew that?

A. Oh, Guevara told me that in the squad car.

Q. Okay. But you don't remember the prosecutor telling you that, and your lawyer didn't tell you that?

A. Ah, well, I knew it already. He probably did, I just don't remember.

Q. But in terms of the circumstances of the case, so the whole time that you're in Cook County Jail, your lawyer never came by and talked to you and said, So here's what this case is about, you know, there was somebody who was shot on Cortland and on

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 213 of 1254 PageID #:104344
Rivera - cross by Sotos
425

August 27th, 1988, and they've got a 12-year old witness?  None of that happened?

A.  It happened, but not at the time that you're inquiring that it happened.

Q.  Do you remember when you first -- first learned what you were -- what case you were being charged with aside from the fact that it was first degree murder?

A.  If I could tell you that, I'd be lying.  I don't remember. We talked about it eventually, me and Ken.  When did it happen? I can't tell you that.

Q.  Did I hear you right on direct examination, did you say you only talked to him twice in 2 years?

A.  Probably.

Q.  With a first degree murder charge hanging over your heard, your lawyer only talked to you twice during all that time?

A.  You can get him on the stand and ask him, sir.

Q.  I'm sure he will testify.

But you don't remember meeting with him more than twice?

A.  If it was that, yes.

Q.  If it was even that.  You don't even know if it was that?

A.  It could've been more, but that's what I remember.

Q.  And you didn't discuss the circumstances of the case against you with him during that time?

A.  There was a moment we did, but I don't know when it was

that we talked about that.

Q. Did you tell him that you were home with Sophia on the day of the shooting after having a late night out the night before so that's how you knew you were there?

A. Yes, sir.

Q. You'd be out like till 5:00 o'clock in the morning?

A. Yes, sir.

Q. Got home. So you knew you were home that next day?

A. Yes, sir.

Q. And did you talk to him about having Sophia -- you weren't married at the time. She was your girlfriend?

A. Yes, sir.

Q. Did you talk with your lawyer about having Sophia get on the witness stand and testify in your criminal case that you were home with her that night?

A. Yes, sir.

Q. And he didn't put her on the stand?

A. No, he didn't put her on the stand.

Q. How did you feel about that?

A. Well, she wasn't sure of the hours that she left the house. So he decided, you know, we're not going to put her up there, she can't remember the hours that she left.

Q. So you didn't think that was a problem with something he was doing?

A. I didn't want her to get up there and lie about nothing.

If she knew the hours that she was there when she left, that I was still in the house, that would've been fine. But she said she couldn't remember the time that she left. So we decided, you know, we're not going to put her on stand if she can't remember, you know.

Q. Okay. So, again, going back to this time period where now this is after you were convicted, but when you were still kind of representing yourself, do you remember again filing affidavits and things with the Court, correct?

A. True house-lawyer, yes, sir.

Q. So I'm going to show you a document that has been marked as Defendant's Exhibit 119, ask you to take a look at it. It will be on your screen and not the jurors here.

Do you recognize that document?

A. Yes, I do.

Q. So is that an affidavit that you, in fact, filed with the Court in, looks like March of 1995, sometimes in 1995?

A. I believe it is, yes, sir.

MR. SOTOS: Your Honor, we move to admit Defendant's Exhibit 1.19.

MR. LOEVY: We object on relevance grounds, Your Honor.

THE COURT: Yes, how is this relevant?

MR. LOEVY: Your Honor, it shouldn't be on the screen.

THE COURT: I'm sorry?

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 216 of 1254 PageID #:104347
Rivera - cross by Sotos
428

MR. LOEVY: It shouldn't be on the screen if it hasn't been admitted in evidence.

MR. SOTOS: It's not on the jury's screen.

THE JURORS: Yes, it is. It is here.

THE COURT: Okay. Can we fix this? Because that's not in evidence yet.

MR. SOTOS: No, it's not. I actually told him that it wasn't in evidence.

MS. CARNEY: It's gone now. Okay.

THE COURT: So why is this relevant?

MR. LOEVY: I can use this as impeachment. This is an affidavit we filed with the court. It relates to the question I asked.

THE COURT: Then we don't need to admit it into evidence.

BY MR. SOTOS:

Q. So do you remember filing an affidavit with the Court in which you said that Sophia and Ada Rosario would swear that you were in their presence and/or that your description did not match that of the offender as recorded, and that you were represented by attorney Kenneth Wadas. And you told him about the names and locations of those witnesses, Sophia and Ada, and that it became his duty to conduct a reasonable investigation, to interview them for court examination? You remember doing that?

A. Yes, sir.

Q. And then you said as a direct result of his failure to do that, you were subsequently found guilty of an offense you didn't commit and sentenced to 85 years, correct?

A. Yes, sir.

Q. So is it fair to say that you believe that part of the reason that you were convicted of the crime is because of your lawyer not doing what it was you would've expected him to do on your behalf?

A. If I may explain that. There was a gentleman that was in the prison with me, African-American gentleman, his name is Genie Boy. He was a jailhouse lawyer. He was trying to get -- at that time a lot of African-Americans which were put in prison for crimes they committed, and Latinos, and he was just trying to establish that there was racism against Blacks and Latinos in the criminal justice system. And when you're sentenced to 85 years, you're going to jump in any bandwagon to try to get at least somebody to hear your case.

So I do remember that petition, that affidavit, and that's what it was all about. If anything was accurate on it, that's what he did and I signed it.

Q. I wasn't asking about the portion of the affidavit that concerns discrimination.

A. Sure.

Q. I was talking about the portion where you said that it was

Rivera - cross by Sotos

430

your lawyer's obligation to put Sophia on the stand to testify that she was with you that night --

A. Sure.

Q. -- and that because he didn't do that, you were found guilty of an offense you didn't commit and sentenced to 85 years in prison, that was something you were saying back then?

A. Again, I wasn't saying that, the other gentleman was. I okayed it, I admit that I okayed it, but that's what he put in. After reading my documentations on my case, that's what he drew up.

Q. Oh, somebody else wrote it?

A. No, sir. No.

Q. You just signed it?

A. Yes, sir.

Q. You allowed that to be filed on your behalf?

A. Yes, sir.

Q. Which were your essentially blaming your lawyer for not putting that out?

A. Yes, sir.

Q. You had other issues with the work that your lawyer was doing in connection with the case while it was going on, correct?

A. Not that I can recall.

Q. Well, I mean, you had what was commonly called a single

witness I.D. case, correct?

A. Sure.

Q. So was it fair to say that you viewed demonstrating that that witness was incorrect was the key to winning the case?

A. Yeah. Eventually, yeah.

Q. You didn't have to deal with some of the things that criminal defendants have to deal with in a lot in cases, like physical evidence and things of that nature.

A. Sure.

Q. It was just basically you had this witness?

A. Yeah.

Q. So like, for instance, you saw during opening statement your lawyer had that map up there where he was showing that what Mr. Lopez said occurred, he didn't think was plausible like that. How could you believe that, correct?

A. Sure.

Q. Right. Did your lawyer make those kinds of arguments in your criminal case? Did he get a map like that and have diagrams of things to show that it wasn't realistic what he was saying?

A. No, sir.

Q. He didn't do that?

You testified that -- you testified that -- wait a second.

Did you talk to him about the possibility of filing

motions with the Court so you could get the witness under oath and he could examine him about what it is that he was saying that he saw since you know he couldn't have seen it, at least as it pertains to you?

A. I don't understand the question.

Q. Let me try again.

There's no dispute in this case that Orlando Lopez was, in fact, at the scene of the shooting, correct?

A. Sure.

MR. LOEVY: Objection, Your Honor. No foundation for that.

MR. SOTOS: I'll rephrase.

THE COURT: Sustained.

BY MR. SOTOS:

Q. As far as, you know -- I mean, you've been involved in this case for literally 30 years, correct?

A. Yes, sir.

Q. Every document that you can get your hands on over those times?

A. Yes, sir.

Q. A ton of them in prison, right? You got an awful lot of free time in prison to read about the case and trying to do what you need to do to get yourself out, things of that nature?

A. Yes, sir.

Q. So you haven't seen anything during all of those reviews to

Q. suggest that the 12-year old boy, Orlando Lopez, wasn't there at the scene of the shooting when it occurred?

A. That he wasn't?

Q. Correct.

A. No.

Q. Your point is, you got the wrong guy who said did it?

A. Definitely.

Q. Okay. And so did you ever talk with your lawyer about whether he had tried to talk to Orlando Lopez?

A. The discussion never came up, not that I can recall.

Q. Or whether did tried to talk to Orlando Lopez's parents?

A. Not that I recall.

Q. Because you did see documents that reflected that Orlando Lopez's parents did not want him involved in this case, correct?

A. After I was convicted, yes, sir.

Q. Based on your familiarity with the gangs in the area, that's not surprising?

A. Oh, know.

Q. Because there was always concern with witnesses in gang cases that there could be retaliation, and things of that nature?

A. I seen it happen.

Q. So it wouldn't be surprising to hear that the parents of a 12-year old boy would not want their child involved in court

proceedings about gang shootings?

A. Sure.

Q. And but as far as you know, your lawyer never reached out to the parents to talk to them about what it was that their son saw, claimed he saw?

A. As far as I know, I'm not aware of it.

Q. And there was like almost 2 years in between the time that you were charged and the time that your case went to trial, right?

A. Yes, sir. Yes, sir.

Q. And aside from just interviewing him, did you have a discussion with your lawyer about that he could file like what's called a motion to suppress with the court, and then maybe get the witness under oath and ask him questions about what it was that he claimed that he saw?

A. I know nothing about the law then, so I don't -- you know, the terms that you're using I'm not familiar with. To suppress, I mean, I know what it means now. I -- I would imagine. I don't know why if he did or if he didn't. The eyewitness testified, anyways. So if he wanted to do any questioning, he would've did it at the trial.

Q. But that's what I'm asking you. You don't remember talking to him about whether or not you wanted to get him for the trial and so you would explore --

A. No, that conversation never took. Not that I remember.

Q. Okay. How about, you know, you had told him that you had been in a lineup couple of weeks earlier right?

A. Sure.

Q. Which you thought at the time you were a filler, correct?

A. Sure.

Q. And did you know -- did you talk to him about trying to get any photos from -- from that array when you were there that day?

A. Mr. Soto, you know, I really wish I had the knowledge of the law that I have now back then. I had no idea what to do, how to do it. Sophia got the lawyer, I left it in his hands to do what he had to do.

Q. I understand.

You were bothered by the fact later, after you looked back and learned what had happened, you were bothered by the fact that he didn't get those photos, right?

A. That he never received them.

Q. Right. Well, you were here during opening statement. You saw Ms. Rosen show the jury those little Polaroid's that were in the file?

A. Yes, sir.

Q. So your lawyer didn't, as far as you know, go down to the evidence room, what is called ERPS, Evidence Recovered Property Section, they went there, as far as you know, and got those photos?

MR. LOEVY: Your Honor, his lawyer made a discovery request for all the relevant documents. This is more like an argument.

THE COURT: Okay. Well, you're asking if Mr. Rivera had a conversation with his lawyer about these things.

MR. SOTOS: Right.

THE COURT: I don't think so. Overruled.

MR. SOTOS: Okay.

BY MR. MR. SOTOS:

Q. You don't remember talking to him about that?

A. Not that I can recall.

Q. You remember learning later after, you know, when it was too late, after you were convicted, that those photos were available if somebody wanted to get them, right?

A. I didn't know that.

Q. You sent a Freedom of Information request yourself because you wanted to get those photos, right?

A. Yes, sir.

Q. And you didn't get the photos in response to that Freedom of Information request?

A. No, sir.

Q. But it's your understanding today that those photos are in existence and they have been ever since that first lineup?

A. I don't know if they were available since that first lineup, but, you know, as she stated, they've been in evidence,

so ....

Q. Because you spent a lot of years thinking that you went to this first lineup when you were asked to be a filler, and that nobody took any photos and they weren't in existence, that they just didn't exist, correct?

A. Sure.

Q. It wasn't until relatively recently that you found out that they -- in fact, even all the way up to your post-conviction petition when Judge Walsh gave you a new hearing, you still thought those photos didn't exist?

A. Yes.

Q. And so you found out after that, since you filed the lawsuit, that those photos were, in fact, in existence the whole time?

A. I believe it was after I got out that I found out that they -- well, no, I never knew. I found out that they were there. I didn't know they were in existence all that time, but I did just learned that they founded the copies -- or copies of photos.

Q. And you didn't review documents as part of this case which showed you that Detective McLaughlin actually noted those, the inventory for those numbers, those photos on the police report all the way back on August 31st, 1988?

A. What's the question? Have I seen what? I seen some numbers. I didn't know if it was evidence numbers or not.

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 226 of 1254 PageID #:104357
Rivera - cross by Sotos
438

Q. Okay. But, in any event, as far as you know, anyway, your lawyer never got those photos back before you were convicted?

A. Yes, sir.

Q. So in addition to not interviewing the witness or his parents, he never went to talk to the so-called people who were in the lineup, right?

A. That I can recall, no. I don't know what he was doing.

MR. SOTOS: One second, Judge.

THE WITNESS: May I have some water, Your Honor?

THE COURT: Yes. Help yourself.

BY MR. MR. SOTOS:

Q. Since this lawsuit was filed and all this occurred, have you seen the photos that Ms. Rosen showed the jury during opening?

A. I'm sure I had glanced at them.

MR. SOTOS: Your Honor, these are Defendants' Exhibit 92 through 97. We move to have them admitted in evidence.

MR. LOEVY: No objection, Your Honor.

THE COURT: They are admitted.

( Defendants' Exhibit 92 through 97 admitted into evidence.)

(Exhibit published to the jury.)

BY MR. MR. SOTOS:

Q. So in front of you is Defendant's Exhibit 94, and that, in

fact, was a photo that was taken of you at the police station on August 31st, correct?

A.  Yes, sir.

Q.  That's how you looked back in August 1988?

A.  Yeah.

Q.  And do you recognize that photograph?

A.  I recognize it yes.

Q.  As you sit here today, now you know who that is, right?

A.  Now I know, yeah.

Q.  And that, in fact, is Mr. Rodriguez who has been talked about through the trial, that's a photo of him that was taken at the police station and documented by Detective McLaughlin on August 31st, correct?

A.  It's supposed to be, yes.

Q.  And 92.  Do you know who that is?

A.  No, sir.

Q.  Okay.  So if I told you that was another one of the fillers in the lineup, you wouldn't dispute that?

A.  I stood in a lineup with 4 or 5 guys.  I didn't know who any of them were.

Q.  And 93.

93, a picture of somebody else who was in the lineup?

A.  He could've been, yes.

Q.  95.

95, somebody else who was in the lineup?

A. He could've been.

Q. And 96, the sixth person who was in the lineup?

A. Could've been.

Q. And so you have seen reports that reflect that the inventory number for these photos was recorded by Detective McLaughlin on her report all the way back on August 31st, 1988?

MR. LOEVY: Objection, Your Honor. Asked and answered. And it wasn't relevant the first time, but same question.

THE COURT: Overruled. Go ahead.

BY THE WITNESS:

A. Repeat the question, please?

BY MR. MR. SOTOS:

Q. So have you seen the Detective McLaughlin's police report which documents and references the inventory number for all these photos?

A. Ah, I -- I don't know whose documentation, who was, what detective ran them up, but I'm pretty sure it's in there.

Q. And, in fact, not just the photos, there's the listing of the names of all six people, right?

A. Yes, sir.

Q. And also it has all of their addresses, correct?

A. Yes, sir.

Q. So even if your lawyer didn't want to go through the trouble of getting the photos, he had the address and name of

all these people right on this report, right?

A.  If it was the correct address, yes, sir.

Q.  And you had told him right from the beginning that you were in an earlier lineup a couple of weeks earlier?

A.  Yes, sir.

Q.  So nothing would've prevented him from talking to any of the people -- we know he could to you, but any of the other five people, there was nothing to prohibit him from talking to them if he wanted to do that?

A.  Again, he would have to answer that question.  I don't know what's prohibiting him from doing his job or --

Q.  Well, would you agree with me that that's when the information would've been fresh in their minds if you asked somebody in September or October of 1988 if you were in a lineup a couple of months ago, it's a lot easier to remember than if you asked them 25 years later to view a lineup?

A.  Yes, sir.

Q.  Okay.  As far as, you know, that was never done?

A.  As far as I know, no.

Q.  And with respect to Mr. Rodriguez who has been talked about in the case, you were, in fact -- your lawyer, in fact, had documents that reflected that the victim, Felix Valentin, before he had died, had made some kind of identification of him at the Cook County Hospital, correct?

A.  I can't say for certain.

Rivera - cross by Sotos

Q. You don't remember seeing those reports?

A. No, sir.

Q. Okay. As you sit here today, I'm just trying to keep the time straight, as you sit here today you've seen them?

A. Yes, sir.

Q. You don't remember if you saw them back at the time --

A. Yes, sir.

Q. He never told you that I got these police reports that suggest that some -- the victim -- excuse me. Strike that.

He never showed you the reports that said, so we got the identification of the 12-year old witness, and then we've got some kind of an identification that the victim is making this guy Rodriguez, he never said that?

A. I'm sure he spoke to it, but I just don't recall it.

Q. In fact, that's something he did do, right? He subpoenaed the officer who testified here yesterday to come and testify at the criminal trial?

A. Yes, sir.

Q. And he also subpoenaed him to bring in the gang photos books that -- which he said -- remember he testified yesterday he was showing the victim and he was kind of blinking his eyes and nodding?

A. Uh-huh.

Q. So your lawyer subpoenaed him to bring those in, correct?

A. Again, you know -- no, I don't recall it.

Q. I'm just asking, because you testified about some of the things that occurred in the criminal case. I think you said yesterday that the witness Lopez, he seemed a little jittery, inconsistent to you?

A. Yes, sir.

Q. But you don't remember that police officer testifying?

A. I remember Detective Letrich, yeah.

Q. You just don't remember he brought in the book?

A. I don't remember if he brought in a book or not, no.

Q. Do you know whether your lawyer went to talk to anybody at Norweigian Hospital or Cook County Hospital where the victim, Felix Valentin, was -- when he got transferred from Norweigian to Cook County, do you know if he ever went and talked to any of those doctors?

A. Not that I'm aware of.

Q. You don't know if he ever subpoenaed any of the medical records from that hospital?

A. Not that I can recall.

Q. How about the witness said that he ran from -- he ran from an area to a store at the end of the block, and he talked to the store owner and said there's a shooting going on, call the police, do you remember that?

A. Yes, sir.

Q. Okay. And so do you know if your lawyer drove over to the scene and like went and just talked to the store owner and

said, "Did a kid come in here and do that?"  "Did he come in here and say there was a shooting and call the police"?

A.  Not that I can recall.

Q.  And you don't ever remember talking to him about that?

A.  No, sir.

Q.  Never came up that that might be good evidence to suggest maybe the kid didn't see what he said he saw?

A.  If I told you yes, Mr. Sotos, I would be lying.  I don't remember.

Q.  I just want you to be candid.

A.  Yes, sir.

Q.  You don't even know for sure whether your lawyer ever actually even went to the crime scene, do you?

A.  Not sure at all, no.

Q.  He never told you that he did, anyway?

A.  If he did, I don't remember.

Q.  You testified that you decided to take a -- you said that you wanted to go before a jury and have your case heard?

A.  Yeah, he asked me that -- there was -- that I had to decide if we were going to take a jury or a bench trial.

Q.  Okay.  And then he decided that he wanted you to take a bench trial, he thought it would be better?

A.  He thought it was a good idea, yes, sir.

Q.  Did he tell you that the judge before whom he was going to take a bench trial was involved in a federal investigation into

whether he took bribes to acquit people of crimes --

MR. LOEVY: Objection, Your Honor. Do we really want to go into this subject?

THE COURT: I don't see why. Maybe we need to talk about this at the side. This is going --

MR. LOEVY: There's an allegation of corruption.

THE COURT: I mean --

MR. SOTOS: It's because the lawyer told him to take a bench trial, Judge, that's why I'm asking. If the lawyer didn't tell him to take the bench trial, we wouldn't go into it but --

MR. LOEVY: The argument is that the judge was corrupt?

MR. SOTOS: I don't know.

THE COURT: Okay. You're asking this witness whether his lawyer told him about this?

MR. SOTOS: Yes.

MR. LOEVY: The predicate for the question seems objectionable, Your Honor.

THE COURT: Boy, it's taking us -- I don't know. Go ahead. I don't know where it's taking us, frankly.

BY MR. SOTOS:

Q. When you had conversations with your lawyer, you were told -- it's a pretty big decision whether you're going to have our case tried to a jury or to a judge, right?

A. From his telling me, yes.

Q. In a first degree murder case, your case, that's a big decision you have to make?

A. I would assume, yes.

Q. Your impulse was to have your case tried to a jury?

A. I spoke and tell individuals about it, and said I would rather have 12 people decide my fate, I would agree with that assessment.

Q. And your lawyer said that he thought you should have the case tried to the judge?

A. Well, he stated that -- when I told him that I would like a jury, he in turn said he was out of Skokie. He said people are not really familiar with gang-related murders. That's when I first realized that it was a gang-related murder. I didn't even know it was a gang-related murder.

And when he told me that, he goes, you know, I think we stand a fair chance with this judge. And I said, "You're my attorney, if you advise that, then we'll go with the judge."

Q. That's what I'm asking. So in that conversation, he didn't tell you that he was personally aware, whether it was true or not, that he was aware of the fact that the judge was implicated --

MR. LOEVY: Objection.

THE COURT: Do you know that the lawyer was a lawyer?

MR. SOTOS: I believe the evidence is that --

MR. LOEVY:  He certainly was, Your Honor, or he would've call the police.

MR. SOTOS:  What we do is it was all over the media, Judge.

THE COURT:  Well, it may well have been, but I don't think that this witness -- you know, he's explained why he made the decision he made.

MR. SOTOS:  If he doesn't remember --

MR. LOEVY:  Your Honor, they're almost suggesting that Judge Wadas is corrupt.

MR. SOTOS:  I'm not saying that.  I would not say that.  I'm not saying that.

THE COURT:  Let's talk about this at the side.

(Proceedings heard at sidebar on the record).

THE COURT:  So is Wadas going to testify?

MR. LOEVY:  Yes.

MR. SOTOS:  Yes.

THE COURT:  So you think this witness is -- I mean, I just think this is assuming all kinds of facts not in evidence. Go ahead, but tell me.

MR. SOTOS:  I can move beyond that.  That's fine.

THE COURT:  You can what?

MR. SOTOS:  I can move beyond?  This.

THE COURT:  Good.  Good.  Let's hear from Wadas, if we're going to hear about it at all.

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 236 of 1254 PageID #:104367
Rivera - cross by Sotos
448

MR. LOEVY:  We can take it up --

THE COURT:  Yeah, we can take it up at another time.

(Proceedings resumed in open court).

BY MR. MR. SOTOS:

Q.  When you talked to your lawyer about whether you should take a bench or a jury trial.  Did he tell you that one of the reasons he thought a bench trial would be good is because there was a weak case?

A.  He just told me that we would stand a fair shake with this judge.

Q.  That's all you remember about the conversation?

A.  That's all, yeah.

Q.  So there were -- there were a number of other people involved in your case other than the people that you sued here, correct?

A.  I don't understand.

Q.  Well, I guess my point is, I'm asking you about, you testified there were a number of things during your direct examination about decisions that were made.  I think you said that the state continued to oppose your post-conviction petition even after the witness came forward 22 years later and said that he didn't -- that you weren't the guy that he saw do the shooting?

A.  So what's the question?

Q.  Well, do you recall testifying to that, that the state

Rivera - cross by Sotos

449

continued to oppose your petition?

A.   Well, they fought it.

Q.   They continued to take the position that you were involved in the crime?

A.   Yes, sir.

Q.   Okay.  But when you're testifying to that, you're talking about the position that Cook County prosecutors took on your case, correct?

A.   I don't understand that question.

Q.   I guess what I'm asking, you're not saying that these police officers during your post-conviction petition took any position on whether you were innocent or not?

A.   In the newly discovered evidence post-conviction?

Q.   If it's not clear, it's probably my fault.  So let me put it in context, because I've been living with the case.

A.   Sure.

Q.   So you had been trying to find a way to get yourself out of prison for a lot of years until you were fortunate enough to get the help of Northwestern University lawyers, correct?

A.   Yes, sir.

Q.   Okay.  And then they were able to meet with the witness, Orlando Lopez, and he recanted his testimony, he said that was not the guy I saw do the shooting?

A.   Yes, sir.

Q.   Okay.  And I think you testified on direct in response to

Mr. Loevy's questions, so there were proceeding were brought back around 2010, 2011, to bring this information to the Court to try to get you be released?

A. Yes, sir.

Q. And I think you testified that the state opposed your -- your petition, your post-conviction petition, even after the witness had recanted?

A. When did I testify to that?

Q. Either this morning or yesterday afternoon.

A. Oh, oh, here?

Q. Yes?

A. I thought that you meant -- because I gave no testifying at my evidentiary hearing.

Q. I'm still not being clear.

A. You're not.

Q. So you testified in this trial that that's what happened. In this trial, you testified that the state opposed your post-conviction petition even back in 2010 and 2011?

A. Yes, sir.

Q. Okay. But I just want to be clear, you're not saying that any of the police officers in this room took any position, one way or the other, on whether or not you were innocent or guilty back in 2010 or 2011?

A. Mr. Sotos, if they did, I was unaware of it. So I would have to say "no."

Q. Okay. And, similarly, you testified about your Certificate of Innocence proceeding. And did you that the state opposed that as well?

A. Yes, sir.

Q. Okay. And, again, as far as you know, that was the Cook County prosecutors who took that position?

A. Yes, sir.

Q. Okay. You don't have any reason to believe that any of these police officers took any position on that, one way or the other?

A. If they did, sir, I wasn't aware of it, no.

Q. May I have one moment before we move to another area?

THE COURT: Sure.

BY MR. SOTOS:

Q. When you talked to Mr. Wadas, did you tell him that Mr. Guevara had told you on September 15th, that the reason that they brought you back from the 15th is because they couldn't find a witness back on August 30th or 31st?

A. If I did, I couldn't recall it. I don't recall it.

Q. Okay. Thank you.

I want to turn to a different area, some of the things you talked about this morning, yesterday afternoon.

MR. LOEVY: May I confer with Mr. Sotos for one moment, Your Honor?

THE COURT: Sure.

MR. SOTOS: Judge, would it be acceptable to the Court if we had a break for lunch at this point?

MR. LOEVY: What time did you plan to go to, Your Honor?

THE COURT: I was wondering how close you were, but if this is a convenient time for a lunch break --

MR. SOTOS: It is.

THE COURT: As good a time as any.

MR. SOTOS: We're going to a whole different area. It's the last area.

THE COURT: This is the last area?

MR. SOTOS: But not completely. I think it probably makes sense to take a break right now.

THE COURT: Well, let me see you briefly at the side, because I still have to make some progress.

(Proceedings heard at sidebar on the record.)

THE COURT: So I normally go until about 12:15 and a whole bunch of visiting judges just came in. So that hardly matters, but do both sides think that this is an appropriate time?

MR. SOTOS: Here's the thing, Your Honor. John wanted to talk to me about something very briefly, and we didn't want to disrupt the proceedings to do it.

THE COURT: Okay.

MR. SOTOS: So I can continue, but it's something that

Rivera - cross by Sotos

453

he --

MR. LOEVY:  He says he has a half hour to 45 minutes.

THE COURT:  Is that what you've got?

MR. SOTOS:  I think so.

MR. LOEVY:  You think you could finish, if we finish?

THE COURT:  You know, let me just be very frank, because, I mean, it's sort of up to you.  You're about to go into something that Mr. Loevy has been claiming is like dynamite, okay.  Do we want to just finish this up or do we want to go back, go to lunch, and come back, and bang, bang, bang.

MR. SOTOS:  I think we should take the break and let us have --

MR. LOEVY:  I got an idea.  What if we covered some ideas that weren't subject to that and made more progress.

THE COURT:  Let's take a lunch break.  I mean, I told him to be here by noon, anyway.

(Proceedings resumed within the hearing of the jury.)

THE COURT:  Ladies and gentlemen, rather than have a long conversation with you sitting in the jury box, I think we'll take a lunch break.  Maybe we'll have all this worked out by the time you come back for lunch.

Five after 1:00, okay.

THE MARSHAL:  All rise.

(The following proceedings were had out of the presence of the jury in open court:)

THE COURT: Okay. Is there something that we need to talk about, that you want to talk about? What do you want to do?

MR. LOEVY: Your Honor, there are two issues we wanted to raise and this is the earliest opportunity.

THE COURT: Okay.

MR. LOEVY: This is unrelated to what we talked about before. But Mr. Sotos said to Mr. Rivera, Do you know of any reason why Guevara would frame you, do you know any reason at all, any reason at all. If that's not opening the door, I don't know what it is. Mr. Rivera has been instructed not to talk about --

THE COURT: So you're talking about something I don't know about.

MR. LOEVY: Right. Yes. I think he opened the door --

THE COURT: To what.

MR. LOEVY: He said to Mr. Rivera, Isn't it true you can't think of any reason why Guevara would frame you, you have no basis to believe Guevara would frame you; Nothing.

THE COURT: Okay.

MR. LOEVY: And Mr. Rivera respected your motion in limine and did not talk about all the reasons --

THE COURT: You know, I did 40 motions in limine in about three days, and I asked you to give me the motion if you were referring to it.

MR. LOEVY: This is the Guevara misconduct motion, Your Honor. So I guess I should've given you more context.

You know, Mr. Guevara --

THE COURT: I'd love to see the ruling.

MR. SOTOS: Just so it's clear, I asked at the time, 1988.

THE COURT: Well, we may have to go back to the transcript, but I need to see this ruling if you are relying on this ruling.

MR. LOEVY: It's the Guevara misconduct ruling. The 404(b) ruling, we'll get it to you.

THE COURT: Oh, the 404(b) one.

MR. LOEVY: Yes. You know allegedly did a lot of things to a lot of people. And the question that Mr. Sotos just --

THE COURT: Hold on. Hold. Let me get the ruling now that I know what I'm looking for.

We don't have a printer here, do we?

THE LAW CLERK: We do, Your Honor.

THE COURT: Oh we do. Yay. And I wasn't even counting all the different parts of the 404(b) motion when I talked about 40.

It's printing?

COURT'S LAW CLERK:  Yes.

MR. LOEVY:  Your Honor --

THE COURT:  Just give me a second to get the ruling. Which I, by the way, asked the lawyers to give if they wanted me to rule on it.

MR. LOEVY:  Here, I can hand you a copy.

THE COURT:  Perfect.  Thank you.  Give me one second to look it over.

(Document tendered to the Court.)

THE COURT:  What part of this?  What page on this one?

MR. LOEVY:  Your Honor, it's more of a general context, if I could just to provide the context?  The idea was, we said we have a whole bunch of allegations that Guevara has framed a whole bunch of people.

And they said, We don't want that in this trial.  And then they said to Mr. Rivera, You don't know any reason at all, you can't think of any reason at all why Mr. Guevara would have tried to frame you.

THE COURT:  Could I see the transcript?  Because I don't remember the question being in exactly those terms.  I thought it was something more like "at the time."  I need to -- how can I get this transcript?

MR. LOEVY:  Well, the implication would be -- you know, we don't have the transcript.  It just happened.

THE COURT:  Well, there are a lot of ways of fixing this without getting into a 404(b) morass.  If the question was clear, but you think the question was unclear, you can clarify the question, but I have to see the transcript, because that's not exactly how I remember it.

MR. LOEVY:  All right.  Well, we don't have the transcript.  It just happened an hour ago.

THE COURT:  Well, then we better be back at I would say five to 1:00, five to 1:00.

MR. LOEVY:  Thank you, Your Honor.

THE COURT:  And you'll have the transcript by then.

MR. LOEVY:  If we can get cooperation from the court reporter, we will have it for you.

THE COURT:  If I can just get it up on my screen, but it was long series of questions.

MR. LOEVY:  He started with Noon -- he started with Guzman, and then he went to Gawrys, and --

THE COURT:  It's Guevara that we're concerned about.

MR. LOEVY:  That's what we're talking about.

MS. ROSEN:  And it's right at the beginning of the cross, actually.

THE COURT:  So maybe you can help the court reporter and get it up on my screen.  All right, five to 1:00.

(Luncheon recess taken from 12:11 o'clock p.m.

to 12:50 o'clock p.m.)

Rivera - cross by Sotos

Rivera - cross by Sotos

0

*     *     *     *     *     *     *     *

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER


/s/Blanca I. Lara     June 7, 2018

458

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JACQUES RIVERA,                              ) No. 12 CV 4428
                                             )
            Plaintiff,                       )
                                             )
vs.                                          ) Chicago, Illinois
                                             )
REYNALDO GUEVARA, STEVE GAWRYS,              )
DANIEL NOON, JOHN GUZMAN, JOSEPH FALLON,     )
JOSEPH SPARKS, PAUL ZACHARIAS, GILLIAN       )
MCLAUGHLIN, JOHN LEONARD, EDWARD MINGEY,     )
RUSSELL WEINGART, ESTATE OF ROCCO            )
RINALDI, CITY OF CHICAGO,                    ) June 7, 2018
                                             )
            Defendants.                      ) 1:00 o'clock p.m.

VOLUME 3 B
TRANSCRIPT OF PROCEEDINGS - Trial
BEFORE THE HONORABLE JOAN B. GOTTSCHALL
and a Jury

APPEARANCES:

For the Plaintiff:     LOEVY & LOEVY
                       BY:  MR. JONATHAN I. LOEVY
                            MR. STEVEN E. ART
                            MR. ANAND SWAMINATHAN
                       311 North Aberdeen Street
                       3rd Floor
                       Chicago, Illinois  60607

                       MacARTHUR JUSTICE CENTER
                       Northwestern University School of Law
                       BY:  LOCKE E. BOWMAN III
                       357 East Chicago Avenue
                       Chicago, Illinois  60611
                       (312) 503-0844

Court reporter:            Blanca I. Lara
                        Official Court Reporter
                       219 South Dearborn Street
                            Room 2504
                       Chicago, Illinois 60604
                          (312) 435-5895
                  blanca_lara@ilnd.uscourts.gov

459

APPEARANCES:   (Continued)

For the Individual       THE SOTOS LAW FIRM
Defendants:              BY:   MR. JEFFREY N. GIVEN
                               MR. JAMES G. SOTOS
                               MS. CAROLINE P. GOLDEN
                               MR. JOSEPH M. POLICK
                               MR. DAVID A. BRUEGGEN
                         550 East Devon Avenue, Suite 150
                         Itasca, Illinois   60143

For the Defendant        ROCK FUSCO & CONNELLY, LLC
City of Chicago:         BY:   MS. EILEEN E. ROSEN
                               MS. CATHERINE M. BARBER
                               MS. THERESA B. CARNEY
                         321 North Clark Street, Suite 2200
                         Chicago, Illinois   60654

For the Defendant        LEINENWEBER BARONI & DAFFADA, LLC
Guevara:                 BY:   MR. THOMAS E. LEINENWEBER
                               MR. JAMES V. DAFFADA
                         120 North LaSalle Street, Suite 2000
                         Chicago, Illinois   60602

460

(Jury out. Witness in. Proceedings heard in open court:)

THE COURT: Can I ask something? In terms of the issue that is on the -- this domestic violence issue, were both Sofia and the other --

MR. LOEVY: Your Honor, could we talk about this at sidebar? Because, actually, the witness is in the room, too. I mean, the witness is here.

THE COURT: Oh. Okay. What are the other issues you want to take up?

MR. LOEVY: That's pretty much it.

THE COURT: Oh, that was the issue that you told the court -- yeah.

Okay. Well, let me talk about this. I read carefully the transcript in terms of what was asked about Mr. Guevara, and the question was -- where? Where? Where?

"You don't know any reason" -- and I assume we can do this in open court, right?

MR. LOEVY: Yes.

THE COURT: "You don't know any reason why he would fabricate a case against you based on your prior relationship with him?"

I think that does not raise the issue. Okay.

(Proceedings heard at sidebar on the record:)

MR. LOEVY: Your Honor, the issue was I wanted to -- Mr. Sotos has showed me the questions he's going to ask Mr.

461

Rivera, but Mr. Rivera was instructed in no uncertain terms before the trial started not to mention physical abuse, and what I'm worried about is if we don't tell Mr. Rivera that the Court has changed on that question that he will say, "I was instructed by the lawyer not to talk about it. I've got to say no."

So all I wanted to do -- and I said I would do it in Mr. Sotos' presence -- is to tell him the Court has changed her ruling on that, he shouldn't deny it, so that we don't have a problem, and then we move on.

You know, we have -- furthermore, as long as I got the floor --

THE COURT: Well, just tell him --

MR. LOEVY: -- domestic violence, which is super prejudicial --

THE COURT: Yeah, I know. I've got -- I want to talk to you about that in a minute, but I think the question is -- I want you to tell the truth on that. Okay?

MS. ROSEN: Correct, yeah.

THE COURT: Not what he should say.

MR. SOTOS: That's fine -- yeah.

MR. LOEVY: But he said -- I told him -- like, for example, they asked him about arrests or something. "You're not lying. The Court told you not to mention it. So you have to get around motion *in limine* rules by respecting what the

462

Court said."

THE COURT: Well, just tell him that any -- anything you told him about not mentioning the subject is -- you're retracting. It's been --

MR. SOTOS: That's what I suggested.

THE COURT: -- retracted.

MR. SOTOS: That's what I said.

THE COURT: Okay? And you should just tell the truth.

But I want to know -- it seems to me we have different information about Sofia and -- what's her name?

MR. SOTOS: Lori.

MS. ROSEN: Lori.

THE COURT: Lori. What came out on direct examination about -- was it identical or were there different -- what --

MR. LOEVY: No. Lori was -- it was two questions. Just because we were scared they were going to mention that he had another child, so we fronted it. That's all we said.

THE COURT: So what did you ask him about Lori?

MR. LOEVY: Nothing, nothing. We just said, "There was a time when you were with her and then you had another kid," you know, because we had to cover that subject.

THE COURT: So in terms of the relationship, was it --

MS. ROSEN: Yes. Sorry.

MR. SOTOS: Sorry. But I remember now. It's like a test, but I remember. He said that he was with Lori, and Lori

463

gave him the ultimatum, and he didn't like the ultimatum -- he didn't say -- said she gave him an ultimatum, so he tried to get back with Sofia. But Lori, if she were to testify, would say that the incident, when he pulled her hair, is what ended the relationship. She called the police, and it was over.

Now, again, we're not asking to bring that out, but it supports the question being directed with respect to both.

MR. LOEVY: No.

MR. SOTOS: The question that you -- that we had talked about being asked of both women.

THE COURT: I wish I had transcript, you know.

MR. LOEVY: 403 means something.

THE COURT: Well, it means something, but I can't say you can -- here's the problem. I mean, I got motions *in limine*, which are never useful because they never tell you what the evidence is. These will -- but this one was particularly useless, as I pointed out in the ruling. And then I sit here and hear all of this testimony about, "Yeah, I bore some responsibility, and it was" -- "I was not perfect," and blah, blah, blah, and then I am going to say that there's going to be no cross-examination.

MR. LOEVY: Your Honor, the issue was, why is it relevant to the trial at all? You know, it's got to be relevant to something. So it's relevant, arguably, to damages. So we had to explain, "You lost your girlfriend because you

spent 20 years in prison," but then to make sure they couldn't say, "Oh, you said you lost your girlfriend because you spent 20 years in prison," "You're not claiming you were a saint. You're not claiming it was a perfect relationship."  I was trying to help them, not hurt them.  I kept saying over and over again --

THE COURT:  Well, it may have been.  I just don't know how -- I don't know how to do this --

MR. LOEVY:  Why would --

THE COURT:  -- given what the record is.

MR. LOEVY:  Why would --

MR. SOTOS:  Judge --

MR. LOEVY:  -- domestic violence be part of the trial at all?  You know --

THE COURT:  Because --

MR. LOEVY:  It's a prior bad act.  It's extremely prejudicial.  The case law is very clear, you know, it has to be super-relevant for something to come in.

THE COURT:  Well, because he certainly testified as to at least one of them, that the relationship -- that the -- his being away for 20 years caused the relationship to fall apart.

MR. SOTOS:  But he also --

MR. LOEVY:  He did --

THE COURT:  Wait.

MR. LOEVY:  It's a fact that he was away for 20 years

and, you know, that's going to harm a relationship. I mean, you're away for 20 years.

THE COURT: Of course, of course, but --

MR. LOEVY: So he didn't say it exclusively because of that. He said he was a bad boyfriend.

THE COURT: Yeah, I got the argument.

MR. LOEVY: So where's --

THE COURT: I know it's --

MR. LOEVY: But then where's --

THE COURT: -- terribly prejudicial.

THE COURT REPORTER: Wait.

MR. LOEVY: Then the 403 comes in.

THE COURT: But -- well --

MR. LOEVY: Because there's no probative --

THE COURT: Yeah, well, I know, but I am trying to figure out how they get to cross-examine him in a meaningful way given what's going on in direct, and I guess I just don't --

MR. SOTOS: Judge, I rarely get to get a word in --

THE COURT: Yeah, you rarely get -- yeah.

MR. SOTOS: -- because he keeps talking until --

THE COURT: Yeah. Please say something.

MR. SOTOS: -- something happens.

So he said with respect to both women, he described the end of the relationships in ways that weren't correct, both

466

of them.  He said that the wife walked away in prison because he was in prison, and the fact is there's more to it than that. There's a lot more to it.  And we're not asking to get into it.

With respect to Lori Amaro, he specifically said, "I was with her.  She gave me an ultimatum, and so then I wanted to go back to Sofia."  All we want to demonstrate is that --

THE COURT:  Well, what do you want to say?

MR. SOTOS:  We want to say specifically is another reason -- not even going to cross.

THE COURT:  Yeah, yeah, yeah, yeah.

MR. SOTOS:  Is another reason the -- for the deterioration of those relationships the physical mistreatment of those women and then the emotional mistreatment.

THE COURT:  Well, I think with Lori --

MR. SOTOS:  With no specifics.

THE COURT:  -- there's only an accusation.

MR. LOEVY:  An accusation of hair pulling.  And he denies it.

MR. SOTOS:  No.  She would testify to that's the reason --

THE COURT:  No, but --

MR. SOTOS:  -- the relationship ended.

THE COURT:  But she -- he doesn't admit it.

MR. SOTOS:  No, but I'm saying that she would rebut him saying why we broke up.

467

THE COURT: Well, we're not going there, though.

MS. ROSEN: No, Judge. Actually, he did admit it. That's in the deposition --

MR. SOTOS: Oh, no. I'm sorry.

MS. ROSEN: -- transcript that you --

MR. SOTOS: He did.

MS. ROSEN: -- reviewed --

MR. SOTOS: Yeah, he did.

MS. ROSEN: -- this morning.

MR. SOTOS: Both of them.

MR. LOEVY: There's a -- he got arrested once for pulling her hair.

THE COURT: Yeah.

MR. LOEVY: And that's not the kind of thing that would ordinarily be part of the trial, and it shouldn't be part of this trial.

THE COURT: I didn't think he was convicted of it.

MR. LOEVY: He wasn't arrested.

MR. SOTOS: He wasn't, but he admitted it with respect to both women.

I promise, I showed you the testimony this morning, Judge.

THE COURT: Well, I remember it -- I remember him admitting it as to Sofia --

MR. SOTOS: No, both. He --

468

THE COURT:  -- but I don't -- well, I don't remember that.

MR. SOTOS:  We can show you again.

THE COURT:  Show me.

MS. ROSEN:  Your Honor --

MR. SOTOS:  Okay.  Can you get that transcript on Lori?

MR. LOEVY:  You know, you need a really good reason for it to be relevant.

THE COURT:  Yeah, I know that.

MR. LOEVY:  And the prejudice with nine women on this jury is overwhelming.

THE COURT:  It's not -- but that's not the right analysis as far as I see it.  The right analysis is cross-examination.

MR. LOEVY:  But he was gone for 20 years.  His relationship ended.  He said, "I'm not" --

THE COURT:  Yeah, could I just wait and see this?

MR. LOEVY:  "I'm not blaming everything."  If he says that there was --

THE COURT:  Am I getting it?

MR. SOTOS:  Yeah, yeah.  It's coming.  We put it away, actually.  470 something.

THE COURT:  Because I remember him saying something very vague on Lori.

469

MR. SOTOS:  Both within a page of each other.  We just have to find the page.

MR. LOEVY:  Well, Lori --

THE COURT:  Let me see it, because I -- that's why I asked for it.

MR. LOEVY:  Lori is before --

MS. GOLDEN:  On the right.

MR. LOEVY:  -- his wrongful conviction.

MR. SOTOS:  He keeps talking, Judge.

THE COURT:  Yeah, if you keep talking, I can't read.

(Court reading document.)

MR. LOEVY:  He's not blaming his wrongful conviction.

THE COURT:  I'm reading, I'm reading.

MR. LOEVY:  He's not blaming the loss of --

THE COURT:  Yeah, I can't read if you're talking.

(Court reading document.)

THE COURT:  Well, we're not going with the gun in the mouth, that's for sure.

MR. SOTOS:  No, I'm not asking for it.

MR. LOEVY:  Your Honor, Your Honor, with Lori, he was with her for a few months before he was wrongfully convicted and then he went back to Sofia.  What's the difference why he broke up with Lori?  It's got nothing to do with this case.

He doesn't blame his wrongful conviction.  The girlfriend he had before he got arrested, why do we need to go

470

into --

THE COURT: All right. I think --

MR. LOEVY: -- why she broke up --

THE COURT: I think --

MR. SOTOS: I got to be honest with you --

THE COURT: All right. Are you going to stop? Lawyers, just shut up.

MR. SOTOS: All right.

THE COURT: Okay. If I did a 403 analysis, it would be more prejudicial than probative. But I don't think it is just a 403 analysis. I think it's the defendants have a right to cross-examine on matters that were covered in direct.

Now, I know you think you were, in a sense, misled, and I probably agree with you except that I didn't know what was coming. I just don't think I can take an area and just say it was covered in direct and it can't be covered in cross.

MR. LOEVY: May I -- with respect to Lori, though, the reason he broke up with Lori is not relevant to the trial, so -- because he broke up with her before he got wrongfully arrested. So why are we bringing in arrests 30 years ago, Your Honor, where the charges were dropped and the events --

THE COURT: Well, why did we talk about Lori?

MR. LOEVY: Because he's the mother of one of his children, and that's it. That's it.

THE COURT: So what did it -- is this the direct on

471

Lori?

MS. ROSEN:  No.  That's the dep transcript.

THE COURT:  Well, where's the direct on Lori?

MS. ROSEN:  Here we go.

(Court tendered iPad.)

THE COURT:  Okay.  Hold on.

(Court reading on iPad.)

THE COURT:  And Mrs. Amaro is Lori, right?

MS. ROSEN:  Yeah.

MR. LOEVY:  Right.

THE COURT:  Am I --

MS. ROSEN:  Yep.

THE COURT:  I don't think there's enough about Lori.  Okay?  We can -- you can do Sofia.

MR. LOEVY:  And we --

THE COURT:  Lori is barely mentioned.

MR. LOEVY:  I don't want to move for a mistrial in front of the jury --

THE COURT:  Yeah, but I am going to deny the motion --

MR. LOEVY:  All right.

THE COURT:  -- for a mistrial.

MR. LOEVY:  Thank you.

THE COURT:  You don't have to make it again.

MR. LOEVY:  Thank you.

THE COURT:  Okay.

472

(End of proceedings at sidebar.)

THE COURT:  So ground rules are clear, right?  Yes or --

MR. SOTOS:  Yes, Judge.

MR. LOEVY:  So I have -- I should talk to Jacques?  I have to tell him something.

THE COURT:  Yes.  But why don't you just bring him in here and why don't we just talk over at the side.

MR. LOEVY:  All right.  Jacques?

(Proceedings at sidebar on the record.  Witness enters.)

THE COURT:  Let's see.

THE COURT REPORTER:  Right here, sir.

THE COURT:  Okay.  The ground rules have shifted due to me a little bit.  Okay?  Contrary to things your lawyer told you.  So we don't want you to be surprised.

So what do you want to say, Mr. Loevy?  And I will correct it if I think we ought to say something different.

MR. LOEVY:  Fair enough.

Your Honor, I instructed Mr. Rivera before the trial that you had ruled that domestic violence was a subject that's prejudicial.  It's not to be talked about at trial.

I told you the judge isn't -- you're not lying if you don't talk about it.  The judge ruled it's out.  The judge has changed her mind on that.

THE COURT:  On Sofia.

473

MR. LOEVY: On Sofia. So Mr. Sotos is going to ask you a question that we've written out. If it's true, answer truthfully.

MR. SOTOS: I thought that's --

MR. LOEVY: I thought --

MR. SOTOS: -- what you told me --

MR. LOEVY: -- that's what you told me to do.

MR. SOTOS: -- to not do.

THE COURT: No. I said it --

MR. SOTOS: Okay. It's fine.

THE COURT: I said if it --

MR. LOEVY: I told him --

THE COURT: If -- he answer --

MR. LOEVY: -- then you tell them the answer.

THE COURT: No. Answer truthfully.

MR. SOTOS: Truthfully. That's fine.

MR. LOEVY: Okay. That's what I thought you told me to do.

THE COURT: No. You did. You did exactly --

MR. SOTOS: You're right. Yeah, I take it back. You're right.

MR. LOEVY: All right. You're on the stand, Buddy.

(End of proceedings at sidebar.)

THE COURT: Okay. And, Mr. Rivera, you may retake the witness stand.

We're ready, right?  We are ready?

MR. LOEVY:  Yes.

(Pause.  Jury in.)

THE COURT:  Please be seated, everyone.

Ladies and gentlemen, before I forget, which I may do, I had told you that on Fridays, we may start a little later because I have other things I have to do.  Those things are going to take me 15 minutes tomorrow.  So instead of 9:30 tomorrow, we'll start at 9:45.

Mr. Sotos?

MR. SOTOS:  Thank you, Your Honor.

JACQUES RIVERA, PLAINTIFF HEREIN, PREVIOUSLY SWORN

CROSS-EXAMINATION (Resumed)

BY MR. SOTOS:

Q.  Good afternoon, Mr. Rivera.

A.  Mr. Sotos.

Q.  Just a few more minutes.

I'm going to take you back to 1988 before you got involved in this case.

I think you testified on direct examination that you had to join a gang in the 1980s?

A.  Sure.

Q.  Okay.  Is it fair to say that that was a bit of an exaggeration?  You didn't really have to?  I mean, it was your choice?

A. If you can't remove -- I believe that if you can't remove yourself or, as a young man being underneath the guise of my mom and my dad, which he passed, I can't leave them out. I didn't know how to leave them out. My mom would have to move the whole family, and she had five other kids to be concerned about, so I was born and raised in a gang-infested neighborhood.

MR. LOEVY: Your Honor, we object to relevance, and the subject's been covered.

THE COURT: Well, there's no question pending.

MR. LOEVY: All right.

BY MR. SOTOS:

Q. So you didn't feel like you had a choice?

A. I -- I didn't feel like I had a choice.

Q. Would you agree with me that there's plenty of kids who lived in the Humboldt Park neighborhood that made different choices?

A. Most definitely.

Q. You just went a different direction?

A. Yes, sir.

Q. You knew that was a bad path?

A. I know that now.

Q. You'd been told by older gang members that you were --

MR. LOEVY: Objection, irrelevant.

BY MR. SOTOS:

Q. -- either from bad --

THE COURT: Yeah, I think -- sustained.

BY MR. SOTOS:

Q. You testified that you were working at Humboldt Park Institute, helping dropouts get GEDs?

A. Yes, sir.

Q. Okay. But at the time, you actually received a -- like a promotion in the Latin Kings after you were working --

MR. LOEVY: Objection, Your Honor.

BY MR. SOTOS:

Q. -- at HP --

MR. LOEVY: Objection, Your Honor.

THE COURT: Sustained.

BY MR. SOTOS:

Q. You testified that the money wasn't good at HPI, is that correct?

A. HPI? I didn't understand.

Q. Was it a security firm?

A. Three Star Security?

Q. You said you were working somewhere where the money wasn't good?

A. That's new to me. I don't -- I don't --

Q. You didn't -- you weren't receiving any income before you went to prison outside of any of your activities with the gang, correct?

MR. LOEVY: Objection, Your Honor. He's implying there's gang income.

THE COURT: Just -- look, I think the question is were you receiving income from any employment before you went to prison.

THE WITNESS: Yeah, at the Humboldt Park Institute.

BY MR. SOTOS:

Q. You were?

A. Yes, sir.

Q. And what was that for?

A. The payment?

Q. The money you were getting paid.

A. It was for working at the Humboldt Park Institute.

Q. Okay. Let me refer you again to your deposition --

A. Sure.

Q. -- back on --

MR. LOEVY: What page, Jim?

BY MR. SOTOS:

Q. -- November 11th, 2014.

MR. SOTOS: Page 6 -- 65, 66.

BY MR. SOTOS:

Q. Do you recall being asked this question and giving this answer?

"Question" --

MR. LOEVY: Well, we object. Are you -- 65 and 66?

Rivera - cross by Sotos

478

MR. SOTOS:  Yes.

THE COURT:  Could you just consult so we're not having to stop because of page numbers?

MR. LOEVY:  Jim, can you show me what --

MR. SOTOS:  Okay.  Just 66.

MR. LOEVY:  Okay.

(Counsel conferring.)

MR. LOEVY:  I -- Judge, I think we should see Your Honor.

(Proceedings heard at sidebar on the record:)

MR. LOEVY:  Your Honor, Mr. Sotos is apparently going for broke, throwing motions *in limine* out the window.

If I hadn't said anything --

THE COURT:  What are we talking about?

MR. LOEVY:  If I hadn't said anything, he was going to read him questions about how you're earning money, drug sales. That's what he just showed me, drug sales.

THE COURT:  We're not going there.

MR. SOTOS:  Judge --

MR. LOEVY:  That's been barred.

MR. SOTOS:  -- can I say something?

MR. LOEVY:  He can't do that in front of the jury.

THE COURT:  Go ahead.

MR. SOTOS:  This is what happens when Mr. Loevy could direct on that, because he asked him about his job, and he said

it wasn't paying a lot, so he's conveying the impression --

THE COURT: We're not going -- you know, you've got a lot from me. Okay? We are not going into another super --

MR. SOTOS: Judge --

MR. LOEVY: Judge, I'd like to say something further, too.

THE COURT: And, you know -- I would not.

MR. SOTOS: I'm just -- okay.

MR. LOEVY: What I want to say is you can't just take it upon yourself to overrule a motion *in limine* and start reading about drug sales. That's outrageous.

THE COURT: It's not happening. Okay?

MR. LOEVY: But what about the idea that if I didn't stop it --

THE COURT: Could we have --

MR. LOEVY: -- he would have?

THE COURT: Well, I don't care. Okay? Because he's not -- we're not going into --

MR. SOTOS: That's not what I was doing. He testified that he had income from working, which is specifically contradicted. If there's a way for me to ask that without mentioning the drug sales, I'm fine. I don't know how to ask that.

THE COURT: How --

MR. SOTOS: I thought he was going to admit that he

Rivera - cross by Sotos

480

didn't have any income.  Maybe if they'll stipulate to that, I don't have to --

THE COURT:  I don't know what you're talking about.

MR. SOTOS:  Here.

THE COURT:  Wasn't he -- wasn't --

MR. LOEVY:  Yes.

THE COURT:  Wait, wait.

MR. LOEVY:  He was working.

THE COURT:  Wait, wait, wait.  Wasn't he working at the Humboldt Park --

MR. LOEVY:  Yes.

THE COURT:  And wasn't -- please.

MR. LOEVY:  Yeah.

THE COURT:  Can I talk to Mr. Sotos?  And weren't they paying him?

MR. SOTOS:  No.

MR. LOEVY:  Yeah.

MR. SOTOS:  He said he didn't receive any money other than drug sales.  So they weren't --

MR. LOEVY:  Where does it say that?

MR. SOTOS:  "Were you earning any money while you were a member of the Latin Kings?"

"Drug sales.

"Okay.  Any other way that you were earning money?

"No."

MR. LOEVY:  Well, through the Latin Kings.

MR. SOTOS:  That's directly --

MR. LOEVY:  That's -- he's testified about --

THE COURT:  No, we're done.  We're done.

MR. SOTOS:  Judge, but -- if he can just stipulate that he didn't have income, because --

MR. LOEVY:  He did.

MR. SOTOS:  -- my concern is he's going to ask in closing for income, and I can't -- and I can't --

MR. LOEVY:  We aren't asking --

MR. SOTOS:  -- impeach him on it.

MR. LOEVY:  -- for income.

THE COURT:  You know, you're --

MR. LOEVY:  That's simple.

THE COURT:  You are not helpful.  I've already ruled.  You insist on ruling yourself.

MR. SOTOS:  Can I ask him that?  Can I ask him whether or not he's seeking lost wages in the case?  And then I don't have to do this.

THE COURT:  Lost wages from before 1988?

MR. SOTOS:  From anything.

MR. LOEVY:  I don't know how he's going to answer that question if he doesn't know.

THE COURT:  I can't -- I can't follow if every time I have a thought, you jump in.

You -- he can't -- are you going to be arguing that before 1988, he lost wages --

MR. LOEVY: No.

THE COURT: -- because of this arrest? So it's done. We're not there.

(End of proceedings at sidebar.)

MR. SOTOS: Ready?

THE COURT REPORTER: Yes.

BY MR. SOTOS:

Q. You had mentioned yesterday that you had a criminal conviction for joyriding?

A. Yes, sir.

Q. That was actually possession of a stolen car, is that correct?

A. Possession of a stolen motor vehicle, yes, sir.

Q. Thank you.

You had testified about your relationship with Sofia --

A. Yes, sir.

Q. -- and you said that it wasn't perfect, correct?

A. Yes, sir.

Q. And you said that after you were married, she never came back?

A. Yes, sir.

Q. And you were saying that was because of the fact that you

were in prison, correct?

A. And other things of my own -- of --

Q. Okay. One of the reasons the relationship deteriorated is because you had physically mistreated her, correct?

A. I wouldn't say that's the cause of it, no, sir.

Q. So that's not one of the reasons your --

A. One of the reasons, yes, sir.

Q. That's my question.

A. Yes, sir.

Q. Did -- all right. And another reason was because you had emotionally mistreated her?

A. Yes, sir.

Q. You had mentioned yesterday that you testified in a criminal case. You remember that you --

A. At my criminal trial?

Q. At your criminal trial, correct.

A. Yes, sir.

Q. Okay. And you recall being asked questions during that trial about your membership in the Latin Kings?

A. Sure.

Q. Okay. You recall at that trial denying that you were a member of the Latin Kings?

A. Yes, sir.

Q. Okay. And the testimony wasn't true, correct?

A. Yes, sir. That wasn't true.

Rivera - cross by Sotos

484

Q. I think you testified yesterday that the 3200 block of Cortland where the shooting occurred --

A. Yes.

Q. -- that that was Imperial Gangsters territory?

A. Yes, sir.

Q. Okay. Do you remember testifying in the criminal trial that that's Spanish Cobras territory?

A. What I was referring to was at the moment -- at -- it was Imperial Gangsters territory.

Q. Let me ask you this.

Do you remember testifying in the criminal trial that the 32 block -- 3200 block of Cortland where this incident occurred was Spanish Cobras territory?

A. Sure.

Q. You didn't --

A. Yeah, yeah.

Q. Okay.

MR. SOTOS: Thank you. I don't have anything further, Judge.

THE COURT: Okay. I think we have more defense questioning.

MR. LOEVY: All right.

THE COURT: Mr. Leinenweber?

MR. LEINENWEBER: Thanks, Judge. Judge, it will be pretty quick.

Thanks, Your Honor.

CROSS-EXAMINATION

BY MR. LEINENWEBER:

Q. Good afternoon, Mr. Guevara. Excuse me.

Good afternoon --

A. Now I'm Guevara.

Q. -- Mr. Rivera.

A. Mr. Guevara. Don't know my name.

Q. As you know -- sorry. As you know, I represent Mr. Guevara.

A. Yes, sir. I'm just --

Q. I believe you were asked a couple of questions prior, taking you back to 1988.

At that time, you didn't know my client, Mr. Mingey; is that correct?

A. Yes, sir.

Q. Okay. And if I had him stand up --

(Defendant Mingey stands.)

BY MR. LEINENWEBER:

Q. This is what he looks like. Is this -- you've seen him before, but just through the context of this case; is that correct?

A. Yes.

Q. Okay. Thank you.

MR. LEINENWEBER: You may sit down. Thanks.

BY MR. LEINENWEBER:

Q.  And with regard to Mr. Guevara -- if I could take you back to 1988, you know, the summertime.

You were working, I think, at the Humboldt Park Institute; is that correct?

A.  Yes, sir.

Q.  Okay.  And you knew Mr. Guevara at that time, correct?

A.  Yeah.  I knew of him, yeah.

Q.  Right.  But you actually knew -- he knew you as Ace, right?  That was your nickname at the time?

A.  Yes, sir.

Q.  Okay.  And while you were working at Humboldt Park, he would occasionally come in there and he would say "Hello," that type of thing; is that correct?

A.  Yes, sir.

Q.  Okay.  And at that point -- and I'm talking, obviously, August of 1988, before all this happened to you.

You didn't have any problems with Mr. Guevara, is that correct?

A.  No, sir.

Q.  He'd never arrested you, is that right?

A.  No, sir.

Q.  Okay.  He'd never arrested anyone you knew, is that correct?

A.  That I remember.  I, you know --

Q. That you recall at this time. I know it was a long time ago.

A. Yeah.

Q. Okay. But the point was you had no problems with him at that point, is that right?

A. No, sir.

Q. And I think you said -- you expressed a little surprise this morning when Mr. Sotos had said to you that Mr. Lopez was a, I think -- let me get this correct -- a pee wee Maniac Latin Disciple; is that correct?

A. Yes, sir.

Q. All right. But you obviously were at your post-conviction hearing. You talked about it. You were before Judge Walsh, is that correct?

A. Neera Walsh, yes, sir.

Q. And you were at that hearing, right?

A. Yes, sir.

Q. And that hearing took place at 26th Street --

A. Yes, sir.

Q. -- right? And I think it was, if I look at the transcript here, June 23rd, 2011. Does that sound right?

A. If -- I don't remember the date, but sure.

Q. Somewhere around there --

A. Sure.

Q. -- correct? And Mr. Lopez testified at that hearing,

Rivera - cross by Leinenweber

didn't he?

A. Yes, sir.

Q. Okay. And you were there --

A. Yes, sir.

Q. -- correct? And you heard him testify that he was, in fact, a Maniac Latin Disciple, correct?

A. I -- if he did testify to that, I didn't -- I don't recall it.

Q. Fair enough.

And then one of the people who worked to help free you was, I think, Cynthia Estes, correct?

A. The investigator of my case.

Q. Yeah. And she's an investigator, I think, with Northwestern or with --

A. Yes, sir.

Q. Okay. And I think she -- she kind of specializes in wrongful conviction cases, right?

A. I don't know what she specialize -- I know she's an investigator. That's all I know.

Q. In any event, she was working for you on your wrongful --

A. Yes, sir.

Q. -- conviction, correct? And you know at some point, she was one of the people that actually located Mr. Lopez, correct?

A. Yes, sir.

Q. Okay. And she went out with Ms. Linzer, I think; is that

right?

A. Jennifer Linzer, yes.

Q. Sometime in 2010, I think early 2010, they go and they see Mr. Lopez, and they interview him; is that right?

A. Sure.

Q. Okay. And you talked to Ms. Estes about that, correct?

A. No. I talked to Jennifer Linzer about it. I don't recall talking to Ms. Estes about it.

Q. Okay. But Jennifer Linzer, she told you what Mr. Lopez said, correct?

A. Yes, she did.

Q. She said, "Great news. We found him," correct?

A. Yes, sir.

Q. He says he lied, correct?

A. Yes, sir.

Q. And he said that at the time, he was a pee wee Maniac Latin Disciple? She told you that, correct?

A. No, I can't -- I -- if I told you yes, I'd be lying.

Q. No problem, sir. Thank you very much.

MR. LEINENWEBER: Thanks, Judge.

THE COURT: Okay. Ms. Rosen, do you have anything?

MS. ROSEN: I do not.

THE COURT: Okay. Redirect.

MR. LOEVY: Thank you, Your Honor.

REDIRECT EXAMINATION

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 280 of 1254 PageID #:104416
Rivera - redirect by Loevy
490

BY MR. LOEVY:

Q. The conversation you were just asked about about Mr. Lopez, what were you told about Mr. Lopez when they found him all those years later in Cleveland?

A. That -- that he had wrongfully identified me.

Q. And did he say anything about whether he had told the police at the time that he had wrongfully identified you?

A. He said he had told two officers at the time that it was -- in the second lineup. After he said he saw the perpetrator --

MR. LEINENWEBER: Judge, I object. It's beyond the scope of the cross.

MR. LOEVY: I asked about this exact interview.

THE COURT: Overruled.

BY THE WITNESS:

A. He said that if -- in between the first lineup and the second lineup, he had actually saw the perpetrator who done the shooting, and that he had the same jacket or the pants on, or something to the other. And that when he brought him -- when they brought him into the station to view the lineup, he said he told two officers --

MR. LEINENWEBER: Judge, I'd object to the narrative at this point.

THE COURT: Object to?

MR. LEINENWEBER: Narrative.

MR. LOEVY: I'll insert a question.

THE COURT:  Okay.

BY MR. LOEVY:

Q.  What did he tell the two officers?

A.  That it was not me who shot Felix Valentin.

Q.  And who did Orlando say that he told?

A.  He said he told a woman officer and a male officer.

Q.  And did he give further descriptions?

A.  Yes, he did.

Q.  Do you remember what those were?

A.  The -- it was a Spanish officer, short afro, mustache, with glasses, and apparently it was a Caucasian woman with blonde/white hair.

Q.  All right.  Let's change topics.

You were asked by Mr. Sotos about possession of a stolen motor vehicle, and you called it joyriding.

Can you explain what the crime was there?

A.  Somebody had a car.  They didn't realize it was stolen.  It was the sight of it.  It was just joyriding.

Q.  Did people ride around in cars that didn't belong to them sometimes?

A.  Yeah.  You know, yeah.

Q.  And then what would happen when you're done riding around in the car?

A.  Just park it and leave it there.

Q.  All right.  Was that a dumb, dumb, dumb thing to do?

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 282 of 1254 PageID #:104413
Rivera - redirect by Loevy
492

A.   That was very dumb to dumb.

Q.   All right.  Let's talk about the lineup that Mr. Sotos asked you about.

He showed you Defendants' Trial Exhibit 9, and he put --

MR. LOEVY:  And, Your Honor, can we please have the jury screen published again?  This is already in evidence.

THE COURT:  Yes.

MR. LOEVY:  And it's not on my screen.

THE COURT:  It's not on my screen either.

(Pause.)

BY MR. LOEVY:

Q.   All right.  Sotos asked you a number of questions this morning about whether you spent the night on the 31st.

Do you see that in your handwriting?

A.   Yes, sir.

Q.   All right.  But showing you the next page -- we haven't seen the next page yet -- that paragraph continues that after you spent the night here, on the part Mr. Sotos read you, you were put in a lineup and released 'cause you were not identified, correct?

A.   Yes, sir.

Q.   Have you always said that you were put in a lineup and released, even before you learned all this new information?

A.   Yes, I did.

Q.  Now, you were asked some questions by Mr. Sotos about whether you had a conversation with Guevara about whether they couldn't find the lineup person.

Do you remember those questions he was asking you?

A.  Yes, sir.

Q.  All right.  Do you know if Guevara was lying or telling the truth if he said he couldn't find the witness?

A.  At that point, I didn't trust none of them.

Q.  All right.

A.  I thought he was lying.

Q.  Well, do you have any way to know for sure --

A.  (Witness nodding.)

Q.  If Guevara said to you, "We couldn't find a witness," you -- do you have any basis to know if Guevara is making that up or if it's true?

A.  I didn't -- I didn't trust him, so it didn't matter either way.  I didn't trust him at that point.

Q.  All right.  Did the lineup happen?

A.  Yes, it did.

Q.  All right.  And after the lineup, what happened to you, the --

A.  The first lineup?

Q.  Yeah.

A.  I was released.

Q.  All right.  And you were asked some questions about whether

Rivera - redirect by Loevy

494

that conversation happened in the car or at the station with Guevara, and do you remember which it was?

A.  It might have been at the station.

Q.  You -- I'll --

A.  I can't remember.

Q.  All right.  Let's talk about the questions you were asked about your attorney, Mr. Wadas.

You were asked if -- how many times he visited you or you saw him.  Do you remember those questions?

A.  Yes, sir.

Q.  And I'm talking about during the months and then became years between your trial when you were arrested, right?

A.  Sure.

Q.  All right.  Did your attorney have business to come to the Cook County Jail and talk to you if there was no trial on deck?

A.  Well, he wouldn't come to the Cook County Jail because I was no longer in there after I bonded out.

Q.  All right.  And then once you bonded out, when it became time for trial, did you meet with Mr. Wadas?

A.  Yeah.

Q.  When it wasn't time for trial, what were you doing?

A.  Trying to figure out my next job.

Q.  All right.  Were you paying Mr. Wadas a ton of money?

A.  No, sir.  I didn't --

Q.  Would you interact with him in court?

A.   Yes, I would.

Q.   Did you expect that Mr. Wadas was going to be spending a whole lot of time with you during the year before the trial got started?

A.   Again, I don't -- this is my first experience.  I don't know what attorneys do.

Q.   And when you say first experience, you had other experience with the criminal justice system.  You --

A.   Yes, sir.

Q.   -- just told us about the stolen motor vehicle.

A.   First-degree murder.

Q.   When you say first experience, what do you mean?

A.   In a first-degree murder case.

Q.   All right.  Let's talk about the alibi.

     You -- did you shoot Felix Valentin?

A.   No, sir.

Q.   So you -- did you have an alibi?

A.   Yes, I -- I thought I did, yeah.

Q.   All right.  Now, when you got arrested and found out the crime you were being charged with, how much time had passed between the day that the crime supposedly took place?

A.   I'm sorry?

Q.   When you got arrested and they said you're being charged with murder --

A.   Okay.  That's the second lineup, September 15th.

Q. Right. Some period of time had passed since the day the murder happened, correct?

A. Yes, sir.

Q. All right. On the day of the murder, did you have any reason to note that as an important day?

A. Only -- only the fact that we do our family chores on the weekends, you know, laundry and grocery shopping.

Q. All right. So that's a typical weekend, you're saying?

A. Yeah, a typical weekend for us.

Q. What were you doing the weekend before that?

A. Shopping or laundry.

Q. What were you doing the weekend before that?

A. Shopping or laundry.

Q. All right. Did you -- at the time the murder happened, did you have any reason to note the specific time you left home on the 27th?

A. No.

Q. All right. If Sofia -- you were asked a number of questions by Mr. Sotos about whether Sofia remembered the exact time and all that.

Had she written down what time she left on the 27th?

A. I -- I can't -- I don't know if she did or didn't.

Q. There -- would there have been any reason for her to have made a note of the time, or claim to remember the time?

A. Not that I -- that I remember.

Q. All right. Did you think it would be a good idea to put an alibi witness up there if they would say, "Yeah, I remember it was 2:45," if there's no reason they would remember it's 2:45?

A. If they weren't telling the truth, no, it wouldn't have been a good idea.

Q. All right. Let's talk about the affidavit Mr. Sotos asked you about.

You -- this was the affidavit you said was created trying to get back in -- what were the circumstances when you created this affidavit?

A. Again, it was a gentleman that was also an inmate, a jailhouse lawyer.

Q. But what were you trying to do? We heard your --

A. I'm trying to get back into court, to somebody hear my story.

Q. It looks like the date is '95. How many years had you been in prison at that time?

A. It was five years.

Q. All right. You -- do you stand by the information in the affidavit, having -- have you had a chance to read it?

A. No.

Q. Want me -- do you want to take a look at it?

A. Sure.

Q. All right.

MR. LOEVY: This is Defendants' Exhibit 119, Your

Honor.

BY MR. LOEVY:

Q.  Mr. Sotos was asking you some questions about the beginning allegations about your hair and the ponytail.

Do you have your reading glasses or are you --

A.  No.  I left them in my other suit jacket.

Q.  All right.  Well, let me -- can I have it back?  I will help you out.

A.  Sure.

Q.  Thank you.

All right.  You were asked some questions about this. Did you have blond hair that matched the description that was given at your trial?

A.  No, sir.

Q.  And you were asked about whether you made an allegation about your attorney, that maybe you could have gotten back in court on that.

Do you remember those questions?

A.  Yes, sir.

Q.  All right.  You did sign the affidavit, correct?

A.  Yes, sir.

Q.  And did it work?  Did you get a new trial?

A.  No, sir.

Q.  All right.  Let's talk about Orlando Lopez again.

Mr. Sotos asked you isn't it true he definitely saw

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 289 of 1254 PageID #:104426
Rivera - redirect by Loevy
499

something.  Do you remember Mr. Sotos asking you that?

A.  Yeah.

Q.  Do you have any idea if Orlando, a young 12-year-old -- 11 -- 12-year-old Orlando Lopez saw anything?

A.  I -- I'm sure he -- he did.

Q.  That's your guess, right?

A.  Yeah.  I'm sure he -- yeah.

Q.  Because he says he did.

A.  And I wasn't there, so --

MR. SOTOS:  Objection, leading, commentary.

MR. LOEVY:  It was the question.

THE COURT:  You know, it's leading, it's leading.

MR. LOEVY:  All right.

THE COURT:  Sustained on that ground.

BY MR. LOEVY:

Q.  Did you know, when Mr. Sotos was asking you questions, that his parents didn't want him involved?  Did you -- is this something that's new to you or --

A.  Yeah.  I didn't know that at all.

Q.  When's the first time you heard that Mr. Lopez apparently didn't want -- or his parents didn't want him to be involved in this?

A.  When Mr. Sotos spoke about it.

Q.  Would that have been interesting to you at the time, if you had been told that Orlando Lopez, the guy pointing his finger

at you, his parents didn't even want him to go to court and say it?

A. Definitely, that would have been interesting to know.

Q. Could you have probed whether his parents were saying he didn't see anything?

A. That would've -- yeah, I wish I would've, yeah.

Q. All right. You were asked a number of questions about photographs.

Do you remember Mr. Sotos asking you those questions?

A. Yes, sir.

Q. Was it your understanding before your criminal trial that your attorney was asking for the documents that were in the police file?

A. He was asking for every documentation that they have.

Q. Okay. Did these photographs that we've now seen, with the pictures from the first lineup, did those get to you before the first trial?

A. No, sir.

Q. In prison --

MR. LOEVY: I'm going to -- well, actually, Your Honor, at this time, we would move to admit Plaintiff's Exhibit 39, which is a motion for discovery.

THE COURT: Any objection?

MR. SOTOS: No objection, Judge.

THE COURT: It is received.

(Said Plaintiff's Exhibit 39 received in evidence.)

BY MR. LOEVY:

Q.  All right.  This is a -- I'll represent to you this is a motion that your attorney filed on your behalf seeking discovery before the criminal case.

A.  Yes, sir.

Q.  You didn't file this, I take it?

A.  No, sir.

Q.  And you didn't probably read it or review it or know about it, right?

A.  It would do me no good.  I didn't know the law then, so --

Q.  But was it your understanding that your attorney was asking the police department to turn over everything relevant?

A.  Yes, sir.

Q.  All right.  Later, when you got to prison, did you file what's known as a Freedom of Information Act request?

A.  Yes, sir.

Q.  Explain to the jury what you were trying to do.

A.  Obtain the records from August 30th.  'Cause of my rap sheet, it stated that I was being charged with aggravated battery.

Q.  All right.

A.  So --

Q.  But what were you seek -- what documents were you seeking in the FOIA?

A.  What pictures, whatever documentations that they had.  Any paperwork, any pictures, whatever they had that I -- I felt that they were still there that they never -- I never got.

MR. LOEVY:  All right.  And, Your Honor, we would move Plaintiff's Trial Exhibit 25 into evidence, his FOIA request.

MR. SOTOS:  No objection.

THE COURT:  Okay.  It is received.

(Said Plaintiff's Exhibit 25 received in evidence.)

BY MR. LOEVY:

Q.  All right.  And when you sent -- and a FOIA, by the way, is a Freedom of Information Act request, correct?

A.  Yes, sir.

Q.  That's what it stands for.

Do you remember the date of your Freedom of Information Act request to the police department?

A.  No, I -- I can't remember the date.

Q.  All right.  Would it refresh your recollection, it looks like about December '96?

A.  Okay.

Q.  Does that sound like the right time frame?

A.  Sure.

Q.  All right.  When you sent your Freedom of Information request to the police department, what were you trying to do?  What were you asking for?

A.  Specific documentations and photos of the arrest of -- on

August 30th, 1988.

Q. All right. Did the police department send back any photographs in response to that?

A. They sent me a letter saying that they denied it.

Q. All right. Northwestern, when you got them involved, they sent a Freedom of Information Act request as well, correct?

A. I believe so.

Q. As part of the post-conviction proceeding?

A. I believe so.

Q. And the photographs still didn't come back, did they?

A. No.

Q. When is the first time the photographs -- you became aware that there were photographs?

A. I believe when my lawyers (indicating) received them.

Q. In this case?

A. Yes, sir.

Q. How many years too late was that?

A. Almost 25.

Q. All right. You were asked about -- by Mr. Sotos if -- isn't it true that Orlando Lopez allegedly said he wasn't coerced by the police.

Do you remember Mr. Sotos asking you those questions?

A. Yes, sir.

Q. All right. But he also said he told -- what did he also say about whether he told the police or didn't tell the police?

A.  Sorry?

Q.  That -- did he tell the police who did it and who didn't do it?

A.  Oh, yes, he did.

Q.  Who did -- what did he tell the police?

A.  He said that it wasn't Jacques Rivera; that he had saw the man while on his way to school.

Q.  All right.  You were asked by Mr. Sotos that you don't know how these men violated your rights.

Remember Mr. Sotos asking you those questions?

A.  Yes, sir.

Q.  All right.  You are not a lawyer, correct?

A.  Yes, sir.

Q.  Is it your understanding if they withheld the documents from you that would have helped you prove your innocence, that that violates your rights?

A.  I know that now.

Q.  All right.  And if they had withheld the investigative file for almost 20 years after your conviction, does that violate your rights?

A.  I know that now, yes.

Q.  All right.  You were asked a few questions about whether you saw these men or women at the police station (indicating).

Do you remember those questions?

A.  Yes, sir.

Rivera - redirect by Loevy

Q.  Are you saying they weren't there or they were there, or you have no idea?

A.  I just didn't see them.

Q.  Are you saying you remembered?  "I can look at that person (indicating), and he wasn't there?"  Or are you saying, "I don't remember either way"?

A.  I know Gawrys and Detective Guevara were there, because they took me to the station.  All these other officers, I don't -- I didn't -- I didn't see them, so I can't say if they were there or they weren't there.

Q.  Well, you said both things.  "I didn't see them, so I can't say if they were or they weren't."

A.  Well, I didn't see them there.  I --

Q.  Do you remember 30 years later who was there --

A.  I --

MR. SOTOS:  Objection, Judge, asked and answered.

THE COURT:  Overruled.

BY THE WITNESS:

A.  I -- I don't remember who was there.

BY MR. LOEVY:

Q.  All right.  Can you describe physically what the police officers you interacted with were?

A.  It was the officers that were doing the lineup.

Q.  All right.  Do you remember anymore, you know, physically all these years later?

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 296 of 1254 PageID #:104427
Rivera - redirect by Loevy
506

A. No, I don't.

Q. All right. Do you remember officers who talked to you or did paperwork or did processing of you?

A. That was Detective Guevara.

Q. Other than Detective Guevara, do you remember any other officers?

A. No, sir.

Q. All right. So can you say either way whether if I pick one of these older gentlemen that they -- that was or wasn't there 30 years ago? Can you say either way?

A. That if they were there?

Q. Yes.

A. Oh, I wouldn't remember if they was.

Q. All right. You were asked by Mr. Sotos whether any of the police officers took a position when you petitioned for your innocence.

Do you remember Mr. Sotos asking you those questions?

A. Yes, sir.

Q. Okay. One of those police officers testified for the State against you, didn't she? Or do you remember?

A. I don't recall it.

Q. Isn't it true that when you rested your case, the State called --

MR. SOTOS: Objection, Judge, leading.

THE COURT: Sustained.

MR. LOEVY: All right.

BY MR. LOEVY:

Q. Last area, sir.

Mr. Sotos asked you about whether you exercised your right to a lawyer. Do you remember those questions?

A. Yes, sir.

Q. So when they said they wanted to talk to you, why did you want a lawyer with you?

A. 'Cause that was the first time Detective Guevara told me I was gonna be a filler. I had participated in fillers before. You know, you go in, you come right out. When all these other officers are giving me the runaround why I was there, and Detective Guevara was not coming back and answering, telling me nothing, from that point on, I didn't have no trust in them.

Q. All right. But specifically, why did you think -- when they told you, you know, "You have a right to talk to us with a lawyer, or you cannot talk, or you can talk without a lawyer," why did it make more sense to say you wanted a lawyer?

MS. ROSEN: Objection, asked and answered.

THE COURT: Overruled.

BY THE WITNESS:

A. I didn't do this crime, and I didn't trust Detective Guevara and I -- I wanted to speak to a lawyer.

BY MR. LOEVY:

Q. All right. Now, you were asked by Mr. Sotos that you

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 298 of 1254 PageID #:104429
Rivera - redirect by Loevy
508

exercised your right not to talk without a lawyer present.

Do you remember that?

A. Yes, sir.

Q. So you didn't get a lawyer. Did you talk?

A. No, sir.

Q. All right. Eventually, you did get a lawyer, right?

A. Yes, sir.

Q. And did that lawyer advise you of your rights in the situation?

A. Yes, he did.

Q. And then there came a point at trial where you had a lawyer, right?

A. Yes, sir.

Q. And your lawyer and the court explained to you, you don't have to testify. You know, you can remain silent, right?

A. Yes, sir.

Q. Okay. Once you had a lawyer and you had the opportunity to understand the situation that was in front of you, did you make a decision to remain silent or did you make a decision to testify?

A. I wanted to testify.

Q. And what did you tell the court?

A. That I did not -- I did not kill and shoot Felix Valentin August 30th -- 27, 1988.

Q. Why didn't you remain silent at your criminal trial?

A.   Because I had -- again, I didn't trust Detective Guevara and --

Q.   No, at your criminal trial.  Why didn't -- why did you not remain silent at your criminal trial?

A.   Because I wanted to speak on my behalf.  I was innocent of these charges.

MR. LOEVY:  I have no further questions, Your Honor.

THE COURT:  Okay.  Anything further, Mr. Sotos?

MR. SOTOS:  I have a little follow-up, Judge.

RECROSS-EXAMINATION

BY MR. SOTOS:

Q.   Your lawyer asked you some questions about why you would have -- you or -- why you would have any reason to remember at the time of your trial what you had done back on August 27th, 1988.

Do you recall that?

A.   I don't understand the question.

Q.   Your lawyer asked you questions about why you wouldn't be able to distinguish August 27th from any other day, so how would you have a strong alibi.

A.   Yes, sir.

Q.   Would you agree that, you know, an ability to remember something that happened in your life two weeks ago is a lot easier than remembering what happened two years ago?

A.   It depends on the individual.

Rivera - recross by Sotos

510

Q. I mean, it's really hard to remember, like, where you were on a specific weekend two years ago for the most part, right?

A. Yes, sir.

Q. Okay. But two weeks ago is a little bit easier, right?

A. I would say that.

Q. You can kind of talk to people, put things together, and they're like, "Oh, yeah. Remember we went to Six Flags," or, "We did this?" There's different things you might be able to come up with in two weeks.

A. Sure.

Q. So that's why I was asking you about your lawyer. He was assigned to your case on September 15th at -- the day that you were identified in the lineup, correct?

A. I believe so.

Q. Within a day or so, because he was in bond court the next day, right?

A. Sure.

Q. That would have been the time for him to talk to you or Sofia about, "Hey, where were you guys on the day of this shooting?" It was just two weeks ago, right?

A. Uh-huh.

Q. You don't remember if he did that?

A. I can't recall it.

Q. Mr. Loevy asked you if you -- you said you didn't pay him a lot of money.

You paid him $10,000, right?

A.   Yeah, on my bond slip.

Q.   Yeah.  And you expected that he was going to investigate you and defend you in a first-degree murder case, right?

A.   Yes, sir.

Q.   You didn't feel that was an insignificant amount of money to give to a lawyer to defend a case, right?

A.   Not for my freedom.

Q.   Mr. Loevy asked you questions about expecting that he would be there at the trial for you, correct?

A.   Yes, sir.

Q.   The whole trial lasted about a half a day over the course of two days, right?

A.   Yes, sir.

Q.   About -- I don't know -- a third of the time we've already spent here so far, right?

A.   Yes, sir.

Q.   You had good reason to expect that your lawyer would investigate your case during the two years before the trial --

MR. LOEVY:  Objection.

BY MR. SOTOS:

Q.    -- with the $10,000 he was paid, correct?

MR. LOEVY:  The scope, Your Honor.

THE COURT:  Sustained.

BY MR. SOTOS:

Q.  Mr. Loevy asked you some questions about who was at the police station on the day of the -- the day you were identified and who you remembered and who you didn't remember.

You didn't remember seeing a female police officer there, do you?

A.  I -- not that I recall, no.

Q.  Mr. Loevy asked you some questions about Exhibit 9, which was the mandamus that we went over --

A.  Sure.

Q.  -- the first time.

MR. SOTOS:  Can you put that back up there?  Do I have to hit something?  One second, Judge.

(Pause.)

MS. CARNEY:  We need the defense table one.

THE COURT:  Are you waiting for us?

MR. SOTOS:  I think we are, Your Honor.  It just came -- it just popped up.

THE COURT:  Oh, okay.

MR. SOTOS:  We were just waiting to get it up. Paragraphs 9 -- paragraphs 8 and 9, 258.

BY MR. SOTOS:

Q.  So we had talked about this on direct examination.  And you had said that if -- at the time, you had stated in regards to this petition that you were stating here that you were in a -- one lineup on the night you were brought in, 7:00 o'clock that

Rivera - recross by Sotos

513

night, correct?

A. Yes, sir.

Q. Okay. Then Mr. Loevy asked you about the next page, which says: Petitioner was put in a lineup and was released on charges because he was not identified.

You weren't referring to a second lineup there, were you? You're not saying you were held in two lineups?

A. I'm sorry, Mr. Sotos. Are you referring to the top? I can't --

Q. Yeah, at the very -- here, do you know what? Let's go back to the previous page for a second. And at the bottom, so it puts it in context: Petitioner was moved to 11th and State for a traffic warrant on this case, he explains, which was an aggravated battery. Next page. Case cited as 8101323. Petitioner was put in a lineup and was released on charges, because he was not identified. Two other people were identified.

So you're not referring -- saying that there was a second lineup that you're referring to that happened after you were held overnight in this petition, are you?

A. This is the first lineup I'm referring to, I believe.

Q. Okay. Thank you.

And then just to clear up any ambiguity --

MR. SOTOS: Exhibit 11, please. Oh, not for the jury. Okay. Then don't -- take it off the screen.

Judge, we want to show the witness Exhibit 11.

THE COURT: Right. I'm not -- I don't know how this technology works --

MR. SOTOS: No, I understand.

THE COURT: -- so you have to tell me if you know.

MR. SOTOS: Okay. I wish I did.

THE COURT: It's a mystery to me.

MR. SOTOS: I wish I did.

(Court conferring with law clerk.)

THE COURT: Okay. So the jury doesn't have it, but I have it. Okay.

MR. SOTOS: If it makes it easier -- I don't think there's an objection to this being in evidence -- maybe we can just --

MR. LOEVY: I don't know what it is. Do you want to show me what you want to show him? Show me what you want to show him, that's fine.

MR. SOTOS: Okay.

(Counsel conferring. Court conferring with law clerk.)

THE COURT: Oh, okay. Thank you. Thank you. I now understand more than I did a few minutes ago.

BY MR. SOTOS:

Q. So the first document that we talked about was the handwritten mandamus that you had filed back in 1997.

A. Yes, sir.

Rivera - recross by Sotos

515

Q. And you were still unable to convince the authorities to release you as a result.

A. Yes, sir.

Q. And you kept trying. And in 2000, you filed another petition for post-conviction relief, correct?

A. If -- if -- I believe so.

Q. Okay. Well, in front of you is a document that's marked Defendants' Exhibit 11, Petition for Post-Conviction Relief.

A. Okay.

Q. I would ask you to look at that and tell me whether or not that's a document that you, in fact, filed in 2000.

A. It can be. I -- we filed -- I filed, you know -- not so many, but I filed, you know --

Q. Okay. If we can direct you to the last page, maybe you could tell us whether that's your signature.

A. Sure. Yes, sir.

Q. Okay. And that's dated July 6th, 2000?

A. This 6th day of July, 2000, yes, sir.

Q. And in this document -- this is, again, in 2000, ten years before you had been represented by Northwestern -- you again described the circumstances surrounding that lineup on the 30th.

MR. SOTOS: And if we could turn to page 112.

Do you see there in the -- oh. And, Your Honor, I would move this into evidence.

THE COURT: Any objection?

MR. LOEVY: No, Your Honor.

THE COURT: 11 is received.

(Said Defense Exhibit 11 received in evidence.)

BY MR. SOTOS:

Q. So if you could look at the middle of the page, you say on -- in the middle: Petitioner also contends -- again, petitioner is you, right?

A. Uh-huh.

Q. That on August 30th, he was also arrested by Officer Guevara, taken to the Belmont and Western police station, and he was later taken to Area 5, Grand and Central; at which time, he was arrested and charged with assault and battery on the victim, Felix Valentin.

Petitioner was placed in a lineup with members of the street gang known as the Imperial Gangsters, but it is not yet known as to who viewed the lineup.

But the petitioner was not charged due to no identification during lineup.

Do you see that?

A. Yes, sir.

Q. Okay. So you don't refer to anything happening on the day after you were arrested in this petition, correct?

A. The day after I was arrested? On September 15th?

Q. No, no, no. The day after you were picked up on the 30th,

in your petition here, you don't reference anything happening in the next day?

MR. LOEVY:  Objection, Your Honor.  It says "later."

BY MR. SOTOS:

Q.  Where it says "later."

THE COURT:  Well, I think the question is fine.

BY MR. SOTOS:

Q.  So in --

A.  I just want -- I don't understand what you're asking me.

Q.  Do you want me to rephrase it?

A.  Please.  Or you can ask it clearer.  I don't --

Q.  Okay.  So in this paragraph when you're describing what happened on August 30th --

A.  Uh-huh.

Q.  -- stating you were taken to Area 5, Grand and Central; at which time, you were arrested.  And then in the next paragraph, you say you were placed in a lineup with members of the street gang known as the Imperial Gangsters.  It's not yet known who viewed the lineup, but the petitioner was not charged due to no identification.

My question is, you're not referring in this to anything that happened on the day after the 30th?

A.  Oh, no.  That was the first lineup.

Q.  That was the first night you were there?

A.  Yes, sir.

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 308 of 1254 PageID #:104434
Rivera - recross by Sotos
518

Q.  All right.  And then a couple months later, you filed another amended petition for post-conviction relief, and I'm going to place in front of you Defendants' Exhibit No. 7 for identification and ask you whether or not that's your signature on --

A.  Yes, sir.

Q.  -- the Notice of Filing, reflecting that this was filed on September 11th, 2000?

A.  Sure.

Q.  Okay.

        MR. SOTOS:  Jon, do you have any objection?

        MR. LOEVY:  We haven't seen this one yet.  I'm -- let me just get a copy.

        But we sort of do object to scope, Your Honor.  You know, we covered all this on both exams.

        MR. SOTOS:  This is the last document.

        THE COURT:  Go ahead.  I think let's just do it.

        MR. LOEVY:  Okay.

        MR. SOTOS:  We would move for the admission of the exhibit so we can publish it to the jury.

        THE COURT:  Of 7?

        MR. SOTOS:  Exhibit 7, correct.

        THE COURT:  7.  Any objection to 7?

        MR. LOEVY:  Let me just take a look.  If I may, Your Honor?

This is the post-conviction petition?  No objection, Your Honor.

THE COURT:  Okay.  7 is received.

(Said Defense Exhibit 7 received in evidence.)

MR. SOTOS:  And then if you go to the bottom of page 299, page 5.  Okay.

BY MR. SOTOS:

Q.  Do you see at the bottom of this petition, you state that on August 30th, you were arrested by Guevara, taken to Belmont and Western --

A.  I'm sorry, I'm sorry.  I don't see that.  Are you in the middle there?

Q.  I'm sorry.  I'm on the very bottom paragraph.

A.  Okay.  I see it, yeah.

Q.  I'm reading from the bottom paragraph.

A.  Yes, sir.

Q.  Where it states -- in fact, somebody just highlighted it for me.

A.  Sure, sure.

Q.  That you were arrested by Guevara, taken to Belmont and Western, and then to -- then later taken to Grand and Central; at which time, you were arrested and charged in connection with an assault and battery on victim, Felix Valentin.  And then go to the next page.

And then at the very top, you say:  Petitioner was

placed in a lineup along with known members of the Imperial Gangsters. It is not yet known who viewed the lineup, but petitioner was charged [sic] due to no identification during this lineup.

Petitioner was then taken to the 11th and State police station and then bonded out on a traffic warrant.

THE COURT: I think you misread the third line on the first paragraph.

MR. SOTOS: And it is -- okay. Let me do it again.

THE COURT: Yeah.

MR. SOTOS: I'll just read the paragraph.

So: "Petitioner was placed in a lineup along with known members of the Imperial Gangsters. It is at this time yet to be known just who viewed that lineup, but petitioner was not charged due to no identification during this lineup."

BY MR. SOTOS:

Q. Do you see that?

A. Yes, sir.

Q. Okay. And, again, you're referring to the lineup on the night you were brought in? You're not referring to anything happening the next day?

A. The first lineup.

Q. First night. Yeah. On the first night that you were brought in on --

A. Yes, sir.

Rivera - recross by Sotos

Q. -- this case? Okay. Your lawyer asked you several questions about those photos --

A. Yes, sir.

Q. -- and the fact that you didn't get them until 2000, and your lawyer had made a request for discovery.

Do you recall that?

A. I don't know about the 2000, but I didn't -- I didn't --

Q. 2000's wrong. I'm sorry. You didn't get it until well after that, like --

A. Yes, sir.

Q. Maybe like 2010 or --

A. The first lineup?

Q. Right. The photos.

A. Photos.

Q. Actually, it was after everything. It was when this case was going on, right?

A. Yes, sir, yes, sir.

Q. Okay. All right. And he said that your lawyer had asked the State, the prosecutors, to turn over all the discovery, right?

A. Yes, sir.

Q. And your lawyer had police reports from the case, too, correct?

A. I would assume.

Q. That --

A.  I would assume that.

Q.  That the police officers gave to records people at the police department who then turned over to your lawyer, correct?

A.  I would assume that, yes, sir.

Q.  So at that age, when you were in your early 20s, were you reading reports on your case at that time, or was it after you were convicted when you started really doing a deep dive into your case?

A.  Not really, because in the appeal process -- you know, I hate to say in the State of Illinois, you have -- what is it called?  It's -- you have limited time to file things, so you got to get on it.

I didn't know nothing about the law.  I had to turn to jailhouse lawyers to help me file these petitions.

Q.  Okay.  So you don't remember if you were reading police reports back when you were on bond before you were convicted or anything like that?

A.  No, I don't remember that.

Q.  But you would expect that your lawyer read whatever reports he was given, right?

A.  I would -- yes.

Q.  And if your lawyer had a report that specifically identified the photos by inventory number --

MR. LOEVY:  Objection to scope again --

BY MR. SOTOS:

Q.   -- and --

MR. LOEVY:  -- Your Honor.  I didn't talk about inventories.

MR. SOTOS:  Specifically --

THE COURT:  Well, hold on a minute.  I think -- I think -- you know, I am going to have to hear the question. Let me hear the question.

Don't answer until I have heard the question.

THE WITNESS:  Yes.

BY MR. SOTOS:

Q.   If your lawyer had police reports while you were out on bond that specifically identified the inventory number for those photos that your lawyer asked about and listed the names and addresses of the people who were in the array, you would have expected him to try and get the photos, right?

MR. LOEVY:  Your Honor, the objection was he covered that and that I didn't.

THE COURT:  I am going to sustain that objection.

MR. SOTOS:  Okay.  I don't have anything further. Thank you, Judge.

THE COURT:  Okay.

MR. LEINENWEBER:  Judge, could I have just one moment to confer?

THE COURT:  Sure.

(Counsel conferring.)

MR. LEINENWEBER:  Just very briefly.  I'm sorry.  Yes.

RECROSS-EXAMINATION

BY MR. LEINENWEBER:

Q.  Mr. Rivera, when Mr. Loevy was asking you some follow-up questions to my question about whether you were aware, like, when Ms. Linzer and Ms. Estes, what they told you about what Mr. Lopez had said -- do you recall that?

A.  Yes, sir.

Q.  And you had said that -- I believe you said something along the lines that they informed you that Mr. Lopez had told them you obviously didn't do it and that he tried to tell, like, a white-haired lady and Hispanic cop; is that correct?

A.  Yes, sir.

Q.  Are you aware that the first time that they met with him -- and this would have been February 28th, 2010.  This was the one they met out, I think, in Cleveland.

A.  Cleveland, yes, sir.

Q.  You're aware that the first time they met with him, first time they met with him, Mr. Lopez said that he talked to a white-haired lady and a cop, that that's how he described them?  Are you aware that that's what he said when he said, "Wrong guy, wrong guy"?

A.  That's what they related to me.

Q.  Correct.  They relayed to you that he had said a white-haired lady and a cop, correct?

A.  A Spanish cop, I believe it was.

Q.  Well, are you aware that they actually said -- that he actually said to them a white-haired lady and a cop, not a Spanish or a detective?

A.  Oh, I would -- I can't recall that, sir.

Q.  Okay.  Are you also aware that the first time they talked to him, the first time they talked to Mr. Lopez, he said there was one lineup?  Did they tell you that?

A.  No, sir.

MR. LEINENWEBER:  Okay.  Thanks, Judge.  I have nothing further.

MS. ROSEN:  Judge, I actually have --

THE COURT:  Okay.

MS. ROSEN:  -- one follow-up to Mr. Loevy's redirect.

RECROSS-EXAMINATION

BY MS. ROSEN:

Q.  Mr. Rivera, you remember Mr. Loevy was asking you some questions about the FOIA request that --

A.  F-O-I.

Q.  The F-O-I-A request.  Not yours, but the ones that the Northwestern lawyers did during the post-conviction proceedings.

Do you remember that?

A.  Yes, sir.

Q.  And you --

A. I mean -- I'm sorry -- yes, ma'am.

Q. That's okay.

And you were asked questions about that FOIA request by Mr. Loevy and asked whether or not your lawyers actually received photos from the Chicago Police Department, correct?

A. Yes, ma'am.

Q. Did your lawyers tell you that they got a response from the Chicago Police Department, and the Chicago Police Department informed them that since there was a pending post-conviction proceeding, and since they wanted evidence out of Evidence & Recovered Property, they should subpoena those photographs? Did you know that?

A. No, no, ma'am.

Q. And do you know that they never did subpoena those photographs during your post-conviction proceeding?

A. I -- I wasn't aware of that.

MS. ROSEN: I don't have any more questions. Thanks.

THE COURT: Okay. Mr. Loevy, anything further?

MR. LOEVY: Yes.

FURTHER REDIRECT EXAMINATION

BY MR. LOEVY:

Q. Showing you Plaintiff's Trial Exhibit 20 at 31. I'm going to call it 20-A. This is the subpoena from the criminal case.

Do you remember being asked if Northwestern was told they should send a subpoena to get these photographs?

A.   Yes, sir.

        MS. ROSEN:  Judge --

        MR. LOEVY:  Your Honor, we'd move to publish this subpoena into evidence from --

        MS. ROSEN:  Judge, we object.  Well, first, it's beyond the scope.

        THE COURT:  Well -- okay.  Well, were we talking about the question that you asked about what Northwestern did in terms of a subpoena?

        MS. ROSEN:  In terms of the instruction they got from the police department in response to the FOIA.

        THE COURT:  Well, I -- I think -- I thought that you asked whether the witness was aware of whether the Northwestern lawyers had subpoenaed --

        MS. ROSEN:  Correct.

        THE COURT:  -- documents --

        MS. ROSEN:  But this is not the Northwestern subpoena.

        THE COURT:  Oh, this is something else?

        MS. ROSEN:  Correct.

        THE COURT:  I don't know what it is.

        MR. LOEVY:  All right.  May I ask a question, Your Honor?

        THE COURT:  Sure.

BY MR. LOEVY:

Q.   You were asked by Ms. Rosen if the police department says

to Northwestern, "You should send a subpoena."

Do you remember those questions?

A. Yes, sir.

Q. Okay. Isn't it true back in 1988, your attorney did send a subpoena, in addition to the discovery request, and you never got the photographs?

A. Yes, sir.

MS. ROSEN: Objection, Your Honor.

MR. GIVEN: Objection, Your Honor.

THE COURT: Well, this is beyond the scope, I think, yeah.

MR. LOEVY: All right.

THE COURT: Sustained.

BY MR. LOEVY:

Q. Mr. Sotos, just very briefly, asked you a number of questions about when you got arrested on August 30th and then he asked you about the first lineup, right?

A. Yes, sir.

Q. Do you remember all those questions? The August 30 arrested, first lineup.

Did the calendar flip or not flip before the first lineup?

You know what I mean by "calendar flip"?

MR. SOTOS: Objection --

BY THE WITNESS:

A.  No.

MR. SOTOS:  -- Judge.  I would like if he could continue --

MR. LOEVY:  I don't --

MR. SOTOS:  -- until the question --

MR. LOEVY:  I might not have asked --

MR. SOTOS:  -- has been answered.

MR. LOEVY:  -- a clear question.

THE COURT:  Wait a minute.  First of all, I don't think this is beyond the scope.  If that's -- is that the objection?

MR. SOTOS:  No.  I just wanted him to let him -- give him a chance to answer the question that he asked.

THE COURT:  Well, he's rephrasing the question.

BY MR. LOEVY:

Q.  Do you know what I mean by "calendar flip"?

A.  No, sir.

Q.  All right.  What I meant was how long were you in custody on the August 30th arrest before there was a lineup?

A.  Almost a day and a half.

Q.  All right.

A.  If I remember.

Q.  And when you filed your first petition and your second petition, your handwritten petition, and all the petitions Mr. Sotos showed you, did you always say the same thing?

A. Yes, sir.

Q. What did you say?

A. I said I was picked up on the 30th, was held there, and -- at the police station. Lineup wasn't conducted till the 31st.

Q. All right. Just to -- last question. Then you were asked about how short your trial was.

Do you remember Mr. Sotos asking you that question?

A. Yes, sir.

Q. Might the trial have been a little bit longer if you had actually gotten the investigative file and been able to use it to cross-examine witnesses?

A. I believe that would've, yeah.

MR. LOEVY: I have no further questions, Your Honor.

THE COURT: Mr. Sotos?

MR. SOTOS: Just one more area, Judge, one more, with respect to what Mr. Loevy asked.

FURTHER RECROSS-EXAMINATION

BY MR. SOTOS:

Q. Your first three documents we looked at speak for themselves.

A. Sure.

Q. Do you remember filing in 2010 now -- this is ten years after the documents we looked at --

A. Sure.

Q. -- an affidavit in connection with your post-conviction

proceedings?

A.   To --

Q.   Let me show it to you.

MR. SOTOS:  Can you place 116 on the screen, please?

MR. LOEVY:  Can we --

MR. BOWMAN:  116.

MR. LOEVY:  116?  Thank you.

MR. BRUEGGEN:  Can you turn off from the jury?

BY MR. SOTOS:

Q.   Okay.  We placed in front of you an affidavit marked as Defendants' Exhibit 116.

Can you look at the second page of that and tell me whether or not that's your signature on the bottom of that page?

A.   Yes, sir.

Q.   Okay.  And this is dated December 9th, 2010, correct?

A.   Yes, sir.

MR. LOEVY:  We have no objection to this being in evidence, Your Honor.

MR. SOTOS:  I was just going to ask.  Move to admit it in evidence.

THE COURT:  Let me see.  What's the number?

MR. SOTOS:  Defendants' 116.

THE COURT:  1-1-6?  16?

MR. SOTOS:  116.

THE COURT:  It is received.

(Said Defense Exhibit 116 received in evidence.)

BY MR. SOTOS:

Q.  So this is an affidavit that you filed with the court in 2010, ten years after you had filed all the previous documents we had talked about.

Okay.  And in this document, you describe what you described during your direct examination about being picked up by Detective Guevara on the 30th and then being held into the 31st, and then the lineup occurring on the 31st as opposed to the 30th.

Do you see that in that affidavit?

A.  I don't see the dates on there, though.

Q.  Well, let me ask you another way.

Do you see that you describe six different conversations you recalled having with lockup keepers back in 1988?

A.  If -- if it was six of them -- I know I had a few conversations with the lockup officers.

Q.  And I don't want to take up the afternoon --

A.  Sure.

Q.  -- going through all of it until the jury has a chance to see it, but is it fair to say that this is the first time in 2010, which was 22 years after the shooting, that you had ever described having been picked up on the 30th and then held

overnight, put in a lineup on the 31st, and having all these different conversations with unidentified lockup keepers?

A.   There might have been some changes in it, but I think it -- I've always stated that I was picked up one day, went into a lineup the next day, and was released.

Q.   Except that you didn't -- you didn't ever say it before you were working with Northwestern on the PC, right?

A.   I believe I have, that I have mentioned that I was -- the first lineup -- that I was picked up on the 30th, I did go into a lineup on the 31st, and was released, wasn't charged.

Q.   And you think there's documents out there that show that you had said that before this --

A.   I believe I --

Q.   -- December of 2010?

A.   I believe that.

Q.   Okay.  And same thing with respect to all of these conversations you had with lockup keepers, about looking for Guevara and things like that.

A.   Yes, sir.

Q.   Were those -- are these statements about these conversations that you had ever talked about in the 22 years prior to this?

A.   To who?

Q.   To anybody.

A.   I'm sure -- I'm sure I have.

Q. You don't remember who?

A. No, I don't.

Q. Okay. And there's no documents that would reflect any of those conversations?

A. Yes, sir.

MR. SOTOS: Okay. Thank you.

THE COURT: Well, Mr. Leinenweber, anything else?

MR. LEINENWEBER: No. Thanks, Judge.

THE COURT: Ms. Rosen?

MS. ROSEN: No. Thank you.

THE COURT: Mr. Loevy?

FURTHER EXAMINATION

BY MR. LOEVY:

Q. Mr. Sotos just asked you if you ever made this allegation before Northwestern got involved that it went the next day.

I'm showing you Plaintiff's -- Defendants' Exhibit 9.

MR. LOEVY: If we could put this back up on the screen?

BY MR. LOEVY:

Q. And I bet we're drawing at the end, Mr. Rivera, so bear with us here.

But you did say -- this is dated in the 1990s, correct?

A. '97. Yes, sir.

Q. Long before you had lawyers, correct?

A. Yes, sir.

Q. You said, "On August 30th, I got arrested." And then after spending that night and part of the following night, which would be the 31st, you were moved to the police station.

And then the following page, you say you were put in a lineup and released because you weren't identified, right?

A. Yes, sir.

Q. That's what you've always said?

A. Yes, sir.

Q. And that's what happened?

A. Yes, sir.

MR. LOEVY: No further questions.

MR. SOTOS: Judge, I'm sorry, I hate to belabor --

THE COURT: You have more questions? Go.

MR. SOTOS: I hate to belabor it.

Can you put that back up on the screen, that document that Mr. Loevy just put up there, please?

MR. LOEVY: Want to use the Elmo?

MR. SOTOS: No. I'm fine.

FURTHER EXAMINATION

BY MR. SOTOS:

Q. When Mr. Loevy read you this -- you see how he pointed to the top paragraph and said you were arrested on August 30th and then he skipped over to the next page, on page 10, and talked about being held in a lineup? Do you see on No. 9 that he just

skipped over?

A. Yes, sir.

Q. That it said that at this time, at work at 7:00 p.m. on August 30th, the first night you were picked up, which was Tuesday night. During and after that lineup -- it's also referred in the previous paragraph, in paragraph 8? That lineup? Do you see that?

A. Yes, sir.

Q. Then we go to the next page, after reading about the lineup, where you state that you were put in a lineup and released on charges because petitioner was not identified.

And I asked you pretty specifically were you referring then to the lineup that you had described that occurred in the previous night, and you said yes.

So that's correct, right?

A. If I understand the question correctly, yes, sir.

Q. I don't want to make it more confusing than it has to be.

A. Yes, sir.

Q. These documents will speak for themselves.

MR. SOTOS: Thank you, sir.

THE WITNESS: Thank you.

MR. SOTOS: Appreciate it.

THE COURT: Anything further?

FURTHER EXAMINATION

BY MR. LOEVY:

Q.  Why don't we read it.  Let's see what it says.

After spending that night, and part of the following night, which would be August 31st, 1988, petitioner was moved to 11th and police station [sic] for a traffic warrant on this case.  Petitioner explains, which was an aggravated battery, case cited as this case number, petitioner was put in a lineup and was released because he wasn't identified.

Am I missing something or are you missing something?  Doesn't it say after spending the night, which would be August 31st, you were put in a lineup?

A.  Yes, sir.  That's what it says, August 31st.

Q.  And showing you a copy of Plaintiff's Trial Exhibit 6.

MR. LOEVY:  Which I'm not sure is in evidence yet, Your Honor.  We'd move this into evidence.

THE COURT:  Any objection?

MR. SOTOS:  No objection.

THE COURT:  6 is received.

(Said Plaintiff's Exhibit 6 received in evidence.)

BY MR. LOEVY:

Q.  This is a document with your name on it, and it says that the investigation -- it is expected you will be, et cetera, et cetera, for the lineup on what date, sir?

A.  31st of August of 1988.

Q.  All right.  And, by the way, do you have any idea why it matters, why we've been talking about whether this happened on

the 30th or the 31st?

A.  I have no idea.

MR. LOEVY:  All right.  No further questions.

THE COURT:  Anything further, Mr. Sotos?

MR. SOTOS:  One second, Judge.  I'm -- I apologize, Judge.  I have to show the document that goes with --

THE COURT:  Just see if you have a question.

(Counsel conferring.)

FURTHER EXAMINATION

BY MR. SOTOS:

Q.  Mr. Rivera, I'm now going to place in front of you, to you, what's been marked as Defendants' Exhibit 1.22, which is hard to read.

A.  Yes, sir.

Q.  Can you see it?

A.  Yeah.

Q.  And this is --

MR. SOTOS:  And I would move for the admission of 1.22.

MR. LOEVY:  Foundation, Your Honor.

THE COURT:  Okay.  I don't know what it is, and what's the foundation?

MR. SOTOS:  Well, I mean, it's -- did he just move into evidence the last one?  The one before that?

THE COURT:  Well, that was without objection.  Now

Rivera - further exam by Sotos

539

there's an objection.

MR. SOTOS: The only reason I didn't object is because in the pretrial order, there's no objection, so this is --

THE COURT: There's been an objection. I -- if there's something in the pretrial order, you have to show it to me.

MR. LOEVY: I'll tell you what. We'll withdraw the objection.

THE COURT: You'll withdraw the objection.

MR. LOEVY: Thank you. All right.

THE COURT: Okay. So this is 6 -- no. I'm sorry. What is this?

MR. SOTOS: Defendants' 1.22.

THE COURT: Plaintiff's 1.22?

MR. SOTOS: Defendants'.

THE COURT: Defendants' 1.22. And it's received.

(Said Defense Exhibit 1.22 received in evidence.)

BY MR. SOTOS:

Q. Mr. Loevy just showed you the document that said you were being held pending finding the witness, correct?

A. Yes, sir.

Q. All right. And you see this document, which was prepared the very next day, it says, if you can read it: Reason For Arrest: Identified in a photo by witness as the person that shot Felix Valentin. And then it says: Reason For Release:

The undersigned were unable to locate the witness for a lineup.

Do you see that?

A. Yes, sir.

MR. SOTOS: Thank you. Nothing further.

THE COURT: Anything further?

MR. LOEVY: No, Your Honor. Somebody's got to stop. I guess it's me.

(Laughter.)

THE COURT: Okay, okay. And I assume there are no more questions? Okay.

Thank you, Mr. Rivera.

THE WITNESS: Thank you for counsel.

THE COURT: You may step down.

THE WITNESS: Thank you.

(Witness excused.)

THE COURT: Well, I wonder if we ought to take a little break.

Does anybody need a short break or should we press onward for another 15, 20 minutes? Break? Break. I'm trying to --

(Jurors nodding.)

MR. SOTOS: No.

THE COURT: No break. Okay. Let's go forward.

MR. LOEVY: At this time, Your Honor, the plaintiff calls Ms. McLaughlin.

THE COURT: Okay. Please.

(Witness duly sworn.)

THE COURT: You may be seated.

THE WITNESS: Thank you.

GILLIAN ELIZABETH McLAUGHLIN, DEFENDANT HEREIN, SWORN

DIRECT EXAMINATION

BY MR. LOEVY:

Q. If you'd state your name, please, for the record.

A. Gillian Elizabeth McLaughlin.

Q. And you are retired from the Chicago Police Department?

A. Yes, I am.

Q. What years did you work there?

A. I began on the 19th of February, 1974, and my exact retirement date was about 2010. I'm not quite sure. October, I'll say, 2010.

Q. All right. I want to shift forward from your start.

There was a time you became promoted to detective, correct?

A. Yes.

Q. And you were the one who led the investigation that led to the arrest and conviction of Mr. Jacques Rivera, correct?

A. I was involved in the investigation, yes.

Q. No. You led the investigation, right?

A. I led the investigation until someone else took it over, yes.

Q. All right. At what point did somebody take it over?

A. Detective Dorsch and Boyle took it over.

Q. What date was that?

A. That would have been the 15th of September.

Q. All right. So from August 27th till the shooting, till the 15th of September, it was your investigation?

A. Yes.

Q. And you were charged by the police department with carrying it through, correct?

A. Yes.

Q. All right. You were the one who developed the evidence that led to the arrest and conviction of Jacques Rivera, correct?

A. I don't quite understand that question.

Q. It was your investigation, right?

A. Yes.

Q. And your investigation yielded evidence that led to the arrest and conviction of Jacques Rivera, correct?

A. Our investigation led to an identification through a photo book of a suspect of Jacques Rivera.

Q. And without getting into the particulars, the State agreed to prosecute the case you developed, correct?

A. I did not present that case to the State.

Q. All right. And then Mr. Rivera was convicted, correct?

A. Yes.

McLaughlin - direct by Loevy

543

Q. So since you led the investigation, fair to say you deserve the credit for bringing Mr. Rivera to justice? Would you agree with that or disagree with that?

A. I would disagree with that.

Q. You and Leonard were the principal detectives on the case, correct?

A. Yes.

Q. And let's back up, then.

You were -- what was your assignment at the time?

A. Detective at Area 5, Homicide.

Q. By the way, when you say you would disagree with that -- maybe lawyers shouldn't argue with people, and I apologize in advance, but --

A. Well --

Q. I mean, did you develop evidence that Jacques Rivera was guilty of this crime?

A. Did I develop evidence --

Q. Yeah, that's the question. Did you develop evidence?

A. We developed evidence --

Q. I'm asking about you. You.

A. I? Okay. I developed evidence that he was a suspect in the shooting.

Q. All right. Suspects don't get tried or convicted, right? They're just suspects?

A. I did not present this case to the State's Attorney.

Q. My question was, suspects don't get tried or convicted, right?

A. Yes.

Q. Okay. Did you develop any evidence, as the head of this investigation, that Mr. Guevara [sic] should go from suspect to criminal defendant? Did you develop any such evidence personally?

A. I'm sorry. I really don't understand your question.

Q. All right. You personally -- what do homicide detectives do? They investigate crimes, right?

A. Yes, we do.

Q. And they develop evidence, right?

A. Yes, we do.

Q. And when you got assigned to prosecute the Valentin murder, you made it your job to investigate the crime and develop evidence, right?

MR. POLICK: Objection to the form, Your Honor. She didn't prosecute.

MR. LOEVY: If I misspoke, I didn't --

THE COURT: I don't know that you did.

Oh, okay. The question was when you got assigned to prosecute the Valentin murder, so --

MR. LOEVY: Sorry. I was speaking too fast.

THE COURT: Okay. Sustained.

BY MR. LOEVY:

Q. When you got assigned to investigate the Valentin murder, your job was to search the whole universe and see if there's any evidence that somebody's committed the crime, right?

A. Yes.

Q. Okay. In the whole universe, did you personally, during the whole time you were in charge of the investigation, develop any evidence that would have led to Jacques' conviction?

A. Our investigation --

Q. No, not "our." Sorry to cut you off.

A. Okay. My investigation -- okay. My investigation showed that he was picked out of a photo book by an eyewitness.

Q. You were told that, right?

A. Yes.

Q. Okay. I'm not talking about what other people did and what you were told. I'm talking about you, what you developed.

Did you develop any evidence?

A. Independent of the eyewitness?

Q. Did you develop the eyewitness, ma'am?

A. I spoke with the eyewitness, yes.

Q. Did the eyewitness tell you that Jacques Rivera had anything to do with it?

A. The eyewitness picked him out of a photo array.

Q. In your presence?

A. No, sir.

Q. All right. Well, I'm talking about you. I'm talking about

you and your involvement, not what you were told.

Did the eyewitness, when you spoke to him, say anything at all that incriminated Jacques Rivera?

A. Not by name, no.

Q. Did he incriminate Jacques Rivera indirectly?

A. He said that he could identify the person that he saw shooting the gun as someone he knew from the neighborhood that played baseball at Humboldt Park.

Q. All right. Were you able to obtain an identification of Jacques Rivera?

That's a yes/no question. Were you able to obtain an identification?

A. There was an identification, yes.

Q. By you? I mean, it's a fair question. I'm just asking, did you obtain an identification?

A. Yes.

MR. SOTOS: Objection to him describing it as a fair question, Judge. I think that's your call.

THE COURT: All right. Well, the jury will disregard whether it's fair or unfair, but I think the question's okay.

BY THE WITNESS:

A. He was identified through a photo array.

BY MR. LOEVY:

Q. I'll ask it again.

Did you procure the identification?

A. I am really confounded on what you're trying to say here.

Q. All right. Let's back up. Let's -- and I guess we sort of jumped ahead, and it's my fault. Let's talk about your detective duties here.

What was your assignment in the mid-'80s?

A. In the mid-'80s?

Q. Right.

A. In the mid-'80s, I believe I was at Area 4.

Q. And then you got a transfer after that?

A. Yes.

Q. Where was that?

A. Area 5.

Q. And what were your duties at Area 5?

A. I worked Homicide.

Q. And there were not a lot of women working Homicide at the time, correct?

A. No. There weren't a lot, but there were women working.

Q. There were some, but not a lot, right?

A. Yes.

Q. All right. And what was your job once you got the assignment to Area 5?

A. On a particular day or in general?

Q. In general.

A. In general? Homicide, sex cases, aggravated batteries, shootings.

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 338 of 1254 PageID #:104469
McLaughlin - direct by Loevy
548

Q. All right. Were you good at investigating?

A. Yes.

Q. What makes somebody a good homicide investigator?

A. Attention to detail and thoroughness.

Q. What do you mean by that?

A. What do I mean by that?

Q. Yes.

A. Well, we develop information from witnesses, evidence on the scene, circumstantial evidence, and then we try to put the pieces together to make a case.

Q. And you don't know in advance which pieces are going to turn out to be important, correct?

A. No, we don't, right.

Q. So you -- what you do is you have to write down all the pieces, right?

A. Yes.

Q. And, in fact, a big part of the homicide detective's job is to document information, correct?

A. Yes.

Q. And it might be that the case could go to court months or years later, even, right?

A. True.

Q. So it's very important to write down all the details, correct?

A. Yes.

Q. And on something that might seem insignificant at the beginning might turn out to be significant later, correct?

A. Yes.

Q. So homicide detectives have to take notes, would you agree with that?

A. Yes.

Q. And then they're supposed to also create police reports, right?

A. Yes.

Q. And tell the jury what a supp. report is.

A. A supplementary report was a form set that was generated by detectives to relate formally the information that they prepared on their progress, general progress report, which was handwritten notes. So that would be the formal translation for the department to save permanently.

Q. And those reports were very important, correct?

A. Yes.

Q. And those reports apprised the other members of the investigation of what's being developed, right?

A. I'm sorry. Again?

Q. In other words, a lot of reports get created on some investigations, right?

A. Yes.

Q. And you don't have to wait till the crime's over till you make a report, right?

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 340 of 1254 PageID #:104476
McLaughlin - direct by Loevy
550

A. No.

Q. The idea is something happens, you make a report. Something else happens, you make a report. And you keep making supplemental reports. Is that a fair summary?

A. It's a general summary, but it's -- it's adequate.

Q. All right. And are you supposed to take notes in addition to making reports?

A. You do both.

Q. It's all supposed to become part of the file, correct?

A. Yes.

Q. And you mentioned general progress reports. Those are also called GPRs, correct?

A. GPRs, yes, they are.

Q. All right. Because there came a time when the police department made a new rule you can't make notes on regular paper; you have to make reports on GPR reports, right?

A. When at all possible, yes.

Q. What do you mean possibly?

A. I said when at all possible.

Q. Oh, when it all -- obviously, if you're in a situation where you can't, then you could move them over later, right?

A. No, you'd never transfer it. You would -- if I was somewhere and someone gave me information, and I didn't have a GPR, which was a form set from the police department, and I had to write it on a yellow piece of scratch paper or a napkin or

whatever, that would go into an envelope and it would be part of the permanent retention file.

Q. All right. I'd like to show you Plaintiff's Exhibit 16.

MR. LOEVY: This is the GPR of Israel.

And, Your Honor, we would like permission to publish this and move it into evidence.

THE COURT: This is -- I'm sorry. Could I have that number again?

MR. LOEVY: Plaintiff's 16.

THE COURT: Okay. And there's no objection to that or it's been agreed?

MR. POLICK: No, no, Your Honor.

THE COURT: Okay. It's received.

(Said Plaintiff's Exhibit 16 received in evidence.)

THE COURT: You may publish it.

MR. POLICK: Which --

MR. LOEVY: It's Israel Valentin's.

(Counsel conferring.)

BY MR. LOEVY:

Q. This is an example of a GPR, correct?

A. Yes, it is.

Q. It's got the date at the top.

I'm just saying, it's got the date at the top, right?

A. Yes.

Q. And it's got your signature and name at the bottom, right?

A. Yes.

Q. That's probably you and your partner, Leonard?

A. Yes, sir.

Q. And this is exactly how it's supposed to be done, right? By the book?

A. Everyone does these differently.

Q. This is how you did it?

A. This is how I did it.

Q. And you did it the way you're supposed to do it, right?

A. I did it the way that I did it, yes.

Q. And Israel Valentin has this address.

This GPR report reflects your notes of your interview with Israel Valentin, right?

A. Yes.

Q. He's the guy who was the brother of Felix?

A. Yes.

Q. And you had to interview him after the shooting, right?

A. Yes.

Q. And you wrote down what he told you, right?

A. Yes, I did.

Q. And you wrote down all the important details, correct?

A. Yes.

Q. Because you don't know later what's going to turn out to be important, right?

A. Yes.

Q. And another reason you write down all the important details is you have to lock the witness in, right?

A. Yes.

Q. Because people could sometimes change their story, right?

A. Yes.

Q. So you have to get their first story on paper so that they can't shift it; or if they do shift it, they've got some explaining to do, correct?

A. Or they could also have more memories.

Q. All right. But then if they claim to have more memories, at least you have a document, "Hey, this is what you told me the first time" --

A. Yes.

Q. -- right?

A. Absolutely.

Q. And at the police department, there's an obligation to write down all that kind of information, correct?

A. Absolutely, yes.

Q. Because, for example, it might turn out to be exculpatory, correct?

A. Yes.

Q. And by exculpatory, you're familiar with the term, meaning if someone like Jacques Rivera is accused of murder, he's entitled to not just the material that points at him, but he's also entitled to material that would help him, correct?

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 344 of 1254 PageID #:104475
McLaughlin - direct by Loevy
554

A.  Yes.

Q.  And that includes things that witnesses say, right?

A.  Yes.

Q.  So, absolutely, all notes should be memorialized and, you know, in an official report and provided to the criminal defendant?  You don't have any objection with that proposition?

A.  Absolutely not.

THE COURT:  I'm sorry.

BY MR. LOEVY:

Q.  You agree with me?

A.  I do.

THE COURT:  Was there an objection?  No.  I'm sorry. I misheard.

BY MR. LOEVY:

Q.  Oh, I -- my question was, you don't have any objection with that proposition.  All right.

A.  No, I don't.

Q.  Sorry.  All right.  Let's talk about Jose Rodriguez.

Do you remember getting the assignment for the Valentin shooting?

A.  Yes.

Q.  You have a recollection of it?

A.  Vaguely.

Q.  Do you remember being asked this question at your deposition?  And I guess -- this is on page 159, line 24

through 160, line 3.

Do you remember being asked these questions and giving these answers?

"Do you have" -- "What recollection do you have about being first assigned or called to this case?

"Answer: I don't."

Do you remember that answer? First, let me start with that. Do you remember that question?

A. I don't -- I don't have whatever's on the -- I don't have anything on my screen.

MR. LOEVY: Are we able to play it, Anne?

MS. SCOTT: Yes.

MR. LOEVY: All right. Your Honor, at this time, we'd -- I think -- do we have to make any technological change to play it?

MS. SCOTT: Yes. Can we switch back to the table, please?

MR. LOEVY: Do I do it here?

MS. SCOTT: No. The staff has got it.

MR. LOEVY: You guys got that?

MS. SCOTT: And if I could get a page and line number?

MR. LOEVY: This is page 159, line 24 through 160, line 3.

(Said video/audio played in open court.)

BY MR. LOEVY:

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 346 of 1254 PageID #:104472
McLaughlin - direct by Loevy
556

Q. All right. Did you have that -- give that answer?

A. Yes.

Q. Was it true?

A. At that time, yes.

Q. All right. At the beginning of the case, it wasn't a murder yet because the guy hadn't died yet, right?

A. Correct.

Q. And you're investigating an aggravated battery, right?

A. Yes.

Q. Did you take it seriously?

A. Yes.

Q. Did you have enough time to do it correctly and do it the right way?

A. Yes.

Q. And did you owe it to the Valentin family to do it -- put in enough time to do it the correct way?

A. Yes.

Q. All right. You've now had a chance to review the paperwork in the case, correct?

A. Yes, I have.

Q. And you spent quite a bit of time reviewing the paperwork before your deposition, did you not?

A. I don't know what you mean by "quite a bit of time." I did have time to review it.

Q. You had about three meetings of at least five or six hours

each with the attorneys going over the paperwork, didn't you?

A. Yes.

Q. All right. So you -- before you gave the deposition and said, "I don't recall," you had already spent probably close to 20 hours going over the paperwork with the attorneys, correct?

A. Yes.

Q. All right. You've had a chance to go over the paperwork before this trial, too, I take it?

A. Yes, I have.

Q. All right. Tell the jury a little bit about -- let's talk about what you knew about the shooting at the time, having reviewed the paperwork.

You knew that, for example, Felix and Israel were in a car, right?

A. Yes. Felix and Israel were in a car. They were going to a wedding.

They drove over to 3320 on Cortland to pick up Israel's date. Felix was driving.

Israel got out of the car. He went up to the first floor where the girlfriend lived and was gone, he thought, for about five minutes.

He came back down. He noticed that his brother was slumped over, leaning towards the passenger seat. He looked in the car. He saw that he was shot. He pushed him all the way in.

By this time, his girlfriend had come down. He yelled for her to go tell Mrs. Valentin what had happened, call the police, and he was going to -- he didn't say, "I'm going to the hospital," but what he did was he tried -- he was 14 years old -- to drive his brother to the hospital to save his life.

Q. And he didn't do such a good job with the driving, right?

A. Well, he's 14 and in a panic. That's expectable.

Q. Yeah. But, I mean, he got partly the way there and then they were able to get the rest of the way?

A. He actually had three car accidents. He had -- not three separate, but he hit three cars on the way, and the car was disabled.

Q. He was frantically trying to save his brother's life?

A. He was. He was frantic, yes, absolutely.

Q. And they got to the hospital, and maybe somebody helped them get the rest of the way?

A. It was a good samaritan, and we never found out who that was.

Q. All right. And when the kid got admitted to the hospital, it turned out he'd been shot a number of times, right?

A. Ten times, I believe.

Q. All right. Now, you get the job of trying to catch the guilty person, correct?

A. Yes.

Q. All right. And you're not just trying to close the case,

but you want to actually catch the real killer, right?

A. That's what we are doing.

Q. All right. And you got a pretty good lead early on by Officer Letrich, correct?

A. No.

Q. You were in court when Officer Letrich testified, right?

A. Yes.

Q. All right. And you would have interacted with Officer Letrich back in 1988, would you not have?

A. I don't remember really interacting with Officer Letrich at all.

Q. All right. Because it's been too many years, right?

A. He's just not a familiar officer to me, someone I didn't work with.

Q. All right. He said he's in the 14th District tactical team? Is that --

A. Yes.

Q. -- what he said?

A. That's what he said.

Q. All right. So he's not solving the murders. The detectives are solving the murders --

A. Yes.

Q. -- right?

A. Right.

Q. So he's like, "Hey, I got some information," and his job is

to bring it to the detectives to solve the crime, right?

A. Yes.

Q. So the information that he recorded in his report would have been exactly the kind of information that would have come to your attention, right?

A. Yes. We did receive that information.

Q. All right. That's all I meant.

A. But you said early on.

Q. Well, it was the 29th of -- 31st of August, was it?

A. Yes. And the incident happened on the 27th.

Q. All right. So within four days of the murder, you learn that the victim was claiming to know who shot him, correct?

A. Yes, but the -- but the -- on the 27th --

Q. Well, we'll talk about the 27th.

A. Okay.

Q. I mean, had you already made up your mind?

A. No, of course not.

Q. In fact, tunnel vision is a problem for investigators, isn't it, potentially, if you're not careful?

A. We don't have tunnel vision.

Q. In other words, if on the 27th you lock into one suspect, you have to be nimble enough four days later to get a new suspect? You got to maybe reexamine what you thought, right?

A. Well, we included Rodriguez in our photo array.

Q. I'm just saying as far as tunnel vision, detectives have to

avoid falling in love with their first hypothesis, correct?

A.  Tunnel vision isn't something that you're taught.  We don't do theories.  We just take the information that is given to us and we develop that information, and where it leads us, it leads us.  If it leads us to an outcome that someone is convicted, that's one thing.  If it leads us somewhere where the witnesses are wrong, that's another thing.

Q.  All right.  All I'm asking --

A.  That's what investigations do.

Q.  All your years being a homicide detective, were you familiar of the risk of this phenomenon that sometimes an investigator can have a theory and then start only seeing evidence that supports that theory and rejecting evidence that comes later that doesn't support that theory?  Is that a phenomenon you're aware of?  Tunnel investigation?

        MR. POLICK:  Objection to what other detectives may have done, Judge.  Objection to the form.

        THE COURT:  It's overruled.

BY MR. LOEVY:

Q.  Do you understand what I'm asking?

A.  I understand what you're asking.  That's not how I operated.

Q.  All right.  You tried to avoid that, right?

A.  I -- I never did it.

Q.  All right.  But you said on the 29th, when you heard from

McLaughlin - direct by Loevy

562

Letrich about Jose Rodriguez, you had already had some other things going in your mind, right?

A. No. You had phrased the question that it was early in the investigation that he brought it to us. I said it wasn't early. That's all I said.

Q. All right.

A. I didn't say it wasn't good information. I said it was not early in the investigation.

Q. In fact, Officer Letrich said this is good information, didn't he?

A. Yes. He believed it was.

Q. But that's a good start to your investigation that the guy who's the victim, who got shot 11 times, there's good information that he's identified the killer as Jose Rodriguez.

We're not detectives, but would you regard that as a good clue?

A. Yes.

Q. Tell the jury all the steps you took to investigate whether Jose Rodriguez had anything to do with this crime.

A. On the 30th of August, Mr. Rivera --

Q. Can we talk about you, though? I don't want to get off on the wrong track. I'm asking about you first. Okay?

A. It's very difficult for me to separate all that.

Q. Well, you know, I'm going to ask you to try because I'm -- you can't talk about other people. That's sort of the rules.

I just want to ask you about your actions or if you learned things.

But how about this.  I'll start with you?

MR. POLICK:  Judge, I'm going to object to the commentary, Judge, and the editorializing.  Can he just ask a question of this witness?

THE COURT:  That would be great, but I think what Mr. Loevy was just saying was just what the last objection was.  So I -- let's just go on.

MR. LOEVY:  All right.

BY MR. LOEVY:

Q.  Do you understand I'm going to ask you about your actions.  Okay?

As the lead investigator, did you take any steps whatsoever to talk to Mr. Rodriguez, Jose Rodriguez?

A.  No.

Q.  All right.  Did you think, as part of your investigation, it might make sense to say, "Mr. Rodriguez, we got a few questions for you.  You know, where were you on Saturday?"  Wouldn't that have made some sense?

A.  Not at the time in the investigation, no.

Q.  Maybe ask Jose Rodriguez, you know, "Did you shoot Felix Valentin?"  That would have been a good thing to ask him, right?

A.  I wouldn't do that at that time.

McLaughlin - direct by Loevy

564

Q. How about at any time?

A. If he had been identified in a lineup, then I would have something to go on.

There's very little evidence in this case, so --

Q. Well, how about the fact that the victim is saying, "I know who shot me. It's the guy who lives a few blocks away named Jose Rodriguez"? Why is that not something to go on?

A. The victim never said it was a guy that lived two blocks away.

Q. But it turned out, according to Officer Letrich --

A. Well, it might have turned out, but the victim didn't say that.

Q. All right. But Officer Letrich told you, "The victim told us it was Jose Rodriguez, and then I arrested Jose Rodriguez a few blocks down on Spaulding."

So you got that information. Wouldn't it have made sense to talk to Jose Rodriguez if this was a legit investigation?

A. It was a legitimate investigation.

Q. So what --

A. And it was not at that time what I talked to him, no.

Q. All right. If he was interviewed by anybody, there should be a police report, correct?

A. Yes.

Q. Okay. Have you seen any police report that suggests that

anybody asked him any questions?

A.   I know that I didn't ask him any questions or make a report.

Q.   All right.  Did you say to any of your fellow detectives that are working on the team, "Hey, maybe somebody should track down this Rodriguez lead"?  Did you direct anybody to track down that lead?

A.   He was in custody when we found out that there was a lead.

Q.   All right.  How about on --

A.   He was tracked down.

Q.   How about September 2nd, September 3rd, September 4th?  Did anybody at your direction go say, "Hey, you know, we got a pretty good lead.  Let's follow up on this"?

A.   On the -- on the 31st of August, he was -- his photo, along with other people's photos, were in a photo array.

Q.   Okay.

A.   Okay?  With the intention of having a lineup with the eyewitness of those same people, that was a photo array.

So both Jacques Rivera and Jose Rodriguez were in that lineup/photo spread.  We couldn't take six bodies to Cook County Hospital for an identification, so we used that photo spread.  And we took that to Cook County Hospital to see if the victim could identify at that time anyone in that photo spread.

Q.   And I'm not sure where we -- why we're talking about that. We're talking about Jose Rodriguez, right?

McLaughlin - direct by Loevy

566

A.   He was in that -- you're asking me what steps I took.
That's -- that's a step I took.

Q.   All right.  So after what you just described happened --

A.   Uh-huh.

Q.   -- then the next day, why didn't you go talk to Jose
Rodriguez?

A.   The doctor had said it would be better if you -- are we
going to talk about this in detail or is this going to be --
there's a lot of things going on.  He was on a bed that was
motioning.  He was in --

Q.   You're talking about the victim now, right?

A.   The victim.  I'm sorry.

Q.   I'm not talking about the victim.

A.   Okay.  Well --

Q.   I'm talking about Jose Rodriguez.

A.   I understand that.

Q.   All right.  So you would agree with me that you probably --
with the benefit of hindsight, somebody should have asked Jose
Rodriguez a few questions about whether or not he killed Felix
Valentin?  Can we agree about that?

A.   No.  I don't.

Q.   And you have a high degree of confidence, though, that if
somebody had interviewed him, there would be a police report
reflecting that, correct?

          MR. POLICK:  That's been asked and answered, Your

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 357 of 1254 PageID #:104488
McLaughlin - direct by Loevy
567

Honor.

THE COURT: Overruled.

BY THE WITNESS:

A. I did not speak with him, and I did not make a report.

BY MR. LOEVY:

Q. Okay. Well, I asked a different question.

I asked, based on your knowledge of the police department's policies and practices, if somebody had interviewed Jose Rodriguez, there should be a -- if a detective had interviewed him, they should have created a supp. report, right?

A. Yes, I would think there would be.

Q. And they would indicate, for example, "I tried to speak to Jose Rodriguez. He asserted his Fifth Amendment rights," or, "I talked to him, and he said he didn't know anything."

Those are the details you got to write down, right?

A. Yes.

Q. And you spent at least 20 hours looking at the documents in this case, right?

A. Yes.

Q. There is no such report, correct?

A. No.

Q. So would you infer, then, that you guys forgot to talk to Jose Rodriguez?

A. No.

Q.  Okay.  Well, then did you make an intentional decision not to talk to Jose Rodriguez?

A.  Jose Rodriguez was placed in a photo array.  He was never placed in a live lineup.

Q.  Okay.  We will talk about that, but my question was, did you make an intentional decision not to talk to him?

A.  Yes, because I had nothing to talk to him about at the time that he was in custody.

Q.  Well, how about after he got out of custody?  Did you make an intentional decision, "You know, I think I'm not going to talk to Jose Rodriguez"?

A.  No.  The investi -- I -- the --

Q.  All right.  Let me show you Plaintiff's Exhibit 19-B.

MR. LOEVY:  I think this is in evidence, Your Honor.  This is the hold-fast call report.

MR. POLICK:  Jon, could I see it?

THE COURT:  Yes, it is.

(Counsel conferring.)

BY MR. LOEVY:

Q.  All right.  At some point, Jose Rodriguez got arrested, correct?  You know that?

A.  Officer Letrich arrested him, yes.

Q.  All right.  And this document was created -- this -- what is this document here?

A.  I'd have to see the top of it.

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 359 of 1254 PageID #:10449⑤
McLaughlin - direct by Loevy
569

Q. I think this is the top.

Do you recognize this area?

A. It's a request to hold a prisoner over.

Q. Okay. I want to focus your language here. The investigation is recorded under this RD number, and the victim is Felix Valentin. "It is expected that the prisoner" -- by the way, the prisoner was Jose Rodriguez, right?

A. Yes.

Q. "It is expected that the prisoners will be charged with agg. battery when the investigation is completed" on September 2nd, 1988, right?

A. That's what this report says.

Q. Okay. Why was it expected that you were going to charge somebody other than Jacques Rivera for this murder?

A. Well, this is not my report.

Q. Do you know Boyle? I think you mentioned Boyle -- is that Boyle's signature? Maybe it's not. Do you know who that is?

A. It's a Boyle, but it's a P. Boyle, and they're from the 14th District.

Q. All right. Do you know either of these guys?

A. No, I do not.

Q. They are detectives, correct?

A. No. This is just a form that was at the 14th District.

He was being -- he was at the 14th District when he was arrested, like at 1:00 o'clock in the morning.

Q. All right.

A. All right? So we had a 12-year-old witness to view a lineup. It was too late at night, so hold papers -- what we call hold papers -- if you arrest someone during the day or during a -- before court time --

Q. All right. But we're getting off the track.

A. Well, I'm just -- that's -- I'm trying to explain what a hold paper -- we're holding him past court call.

Q. All right.

A. So he'd be available for a lineup, a physical lineup.

Q. The question I'm asking, though, was it expected that Rodriguez -- that Jose Rodriguez was going to be charged with this crime?

A. This is not my report.

Q. Okay. Did it ever come to your attention that Jose Rodriguez was going to be charged with this crime?

A. Not through my investigation.

Q. Okay. But as the detective that was in charge of the Valentin murder, nobody mentioned to you that somebody else was going to be charged with a crime ever?

A. As a detective in charge of this investigation, I don't know who's going to be charged until we have the evidence from a live lineup, an interview, and whatever else we would compile.

Q. All right. Now, you claim that there was only one lineup,

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 361 of 1254 PageID #:104497
McLaughlin - direct by Loevy
571

correct, in this case?  Not two?  One?

A.  We didn't hold the lineup.

Q.  Well, how many lineups is your understanding in the case? Was there two lineups, like Jacques is describing and Orlando is describing, or was there one lineup?

A.  One lineup.

Q.  All right.  When was that?

A.  I believe it was the 15th of September.  I'd have to refer -- it's not my -- I didn't -- wasn't there, so --

Q.  All right.  That's the 15th of September.  And that was a lineup that everybody agrees little Orlando participated in, correct?

A.  Yes.

Q.  Okay.  Shouldn't Jose Rodriguez have been in that lineup?

A.  Yes.

Q.  Okay.  Was Orlando Lopez -- was Jose Rodriguez in that lineup on September 15th when he picked out Jacques?

MR. LOEVY:  Could I get the lineup photo?

BY MR. LOEVY:

Q.  Do you remember the question?

A.  Absolutely.  You're asking me if Jose Rodriguez was in that live lineup?

Q.  Yep.

A.  He was not.

Q.  Okay.  Why?

McLaughlin - direct by Loevy

572

A. You would have to ask Detective Dorsch and Boyle.

Q. It was your investigation, wasn't it?

A. Not at that time.

Q. Who --

A. I was not working that day.

Q. Is there any paperwork that says that you were relieved of your command for this investigation?

A. I believe there's a report somewhere in the file where Jack Leonard shows that it was -- it's just -- it's like inside baseball. But anyway, Jack signed a report where the aggravated battery became a homicide, and that was -- that was kind of after the fact. So --

Q. Do you remember my question? Is there any document that reflects that this went from being your investigation to somebody else's investigation?

A. Well, it would be the fact that I didn't run the lineup. My name's not on any reports, and I didn't -- my -- was not involved in the investigation after the 31st.

Q. All right. So -- but the answer to my question, then, is no?

A. No. I wouldn't know what kind of paperwork there would be.

Q. All right. Were you frequently relieved of your investigations?

A. If you're not working and somebody dies, they have to give it to somebody.

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 363 of 1254 PageID #:104494
McLaughlin - direct by Loevy
573

Q. But you'd been working on it for two weeks. You'd been working on it from August 27th till September 15th. You just got fired?

A. Well, they're not gonna hold it for you until you come back from your days off, no.

Q. But it could still be your --

A. That's not how the police department works.

Q. All right. Were you frequently relieved of your investigations two weeks in?

A. It was -- it had turned into a homicide.

Q. You investigated homicides, didn't you?

A. Absolutely.

Q. All right. Was there anybody --

A. They're not --

Q. -- explaining --

A. -- going to call me at home and have me come in. They gave it to two other detectives. This happens all the time.

Q. All right. Did you ever ask anybody why they didn't put Rodriguez in the lineup if the victim was saying it was Rodriguez?

MR. LOEVY: And this is Plaintiff's Exhibit 63. This is the lineup. This has already been on the screen, Your Honor.

BY MR. LOEVY:

Q. Why didn't you ask the detectives, "Hey, why are we showing

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 364 of 1254 PageID #:104495
McLaughlin - direct by Loevy
574

a lineup to little Orlando and not putting in the guy who the victim says shot me"?

A. I wasn't there. I don't know --

Q. How about --

A. -- what they did.

Q. -- when you got back? How about the next day?

A. How about the next day?

Q. Yeah. You got back to work. You find out, apparently, your investigation's not your investigation anymore, and you find out that the victim's -- or that the witness supposedly picked out Jacques.

Did you ask anybody, "Well, wait a minute. Jose" -- "The victim says it's Jose Rodriguez. Why wasn't Jose Rodriguez in the lineup?" Did you ask anybody that?

A. How would I know he wasn't in the lineup?

Q. Well, maybe you look at the report and the picture.

A. I don't remember having any conversation with anyone about that.

Q. All right. Let's back up.

At some point in the investigation, somebody gave you a tip that Jacques Rivera had something to do with this, right?

A. Yes.

Q. Okay. Who was -- that was Gang Crimes who gave you this tip, right?

A. Based on eyewitness identification.

Q. No. I asked who. Who gave you --

A. Oh. Gang Crimes, yes.

Q. Yeah. Thank you.

And do you recall exactly how you learned about it from Gang Crimes?

A. Yes, but how narrow do you -- I mean, I don't know what you want me to say.

Q. All right. How did you learn about -- that Lopez had supposedly identified Rivera? Is that something you have an independent recollection of?

A. They called -- independent --

Q. Independent recollection first.

A. No.

Q. All right.

A. It's from our reports.

Q. All right. Explain to the jury who Gang Crimes were.

A. Who they were?

Q. Yeah. What is Gang Crimes?

A. Gang Crimes was a specialized unit of officers who didn't wear uniforms, but they didn't wear suits. They wore jeans and shirts. And they worked in -- I really don't know what their territory was, but I'm gonna say all of Area 5, probably the same as ours. And they specialized in gathering information, knowing the gangs, knowing the people in the neighborhood.

It may sound a little strange, but Gang Crimes

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 366 of 1254 PageID #:104497
McLaughlin - direct by Loevy
576

people -- you know, sometimes your victim is your victim. Sometimes your victim is your offender. Because of the gangs, that's just how it is. So they would develop relationships with these people and try to be as fair as they could with them. That's -- that's what I know.

Q. And you, as your detective job, would sometimes work with Gang Crimes people who had a better finger on the pulse, right?

A. Absolutely.

Q. All right. At some point, the Gang Crimes people broke open this case, right?

A. Broke open this case?

Q. They identified the person who got prosecuted, Jacques Rivera, right?

A. They identi -- they -- he didn't identify them.

Q. Well, they obtained an identification.

A. They obtained an identification.

Q. And who was the name of the person they supposedly identified, came to the identification of? Do you remember?

A. Macho Lopez.

Q. No. That's who did the identifying.

Whose photo did Gang Crimes supposedly have him identify? Somebody named Jose Rios?

A. Jose Rios, yes.

Q. So they give you a call and said, "Hey, we got a witness. He's identified, Jose Rios"?

A.   Yes.

Q.   And then they said, "But Jose Rios is a name that Jacques Rivera gave as a 16-year-old when he got arrested for disorderly conduct.  It's Jacques Rivera," right?  Something like that?

A.   Well, that would have been after they pulled his rap sheet.

Q.   All right.

A.   I --

Q.   You had -- I'm sorry.

A.   Okay.  I'm just going to --

THE COURT:  You need really -- I'm sorry, but, you know, at some point in the next couple of minutes, I think we really ought to take a mid-afternoon break.

MR. LOEVY:  All right.  This might be --

THE COURT:  I'm not saying it has to be now.

MR. LOEVY:  All right.  Let me take a couple more minutes?

THE COURT:  Yeah, yeah, sure.

BY MR. LOEVY:

Q.   Who was it in Gang Crimes who gave you this big tip?

A.   Specifically, I don't have an independent recollection.

Q.   Well, how about from the paperwork?  If this is the big break in the case, that you now got a witness who's going to point a finger, somebody must have written down who procured the identification, right?

A. No.

Q. And you've reviewed the paperwork high and low, correct?

A. Yes.

Q. Nobody wrote down anywhere who supposedly got this kid to identify Jose Rios/Jacques Rivera, correct?

MR. POLICK: Objection to the form of the question.

THE COURT: Can you specify what the objection is?

MR. POLICK: Got, got somebody in to identify.

THE COURT: Oh, okay.

MR. LOEVY: All right. Let me --

THE COURT: Rephrase.

MR. LOEVY: -- rephrase. All right.

BY MR. LOEVY:

Q. Somebody called you and said, "Good news. There's a witness, and he's identified Jacques Rivera," right?

A. No.

Q. Okay. How did you learn that somebody was claiming there was a witness to identify Jacques Rivera? How did you learn that?

A. Well, Gang Crimes first found the witness.

Q. Right.

A. Then we went and interviewed him.

Q. No. I want to talk about how you learned it.

A. Well --

Q. I mean, seriously, just --

A.   Well --

Q.   -- one question at a time.

How did you learn about it?  Before you interviewed him, how did you learn about it?

A.   Didn't learn about it till after I interviewed him.

Q.   Well, I guess maybe we're missing each other.

I'm saying at some point -- you've never heard of Jacques Rivera, right?

A.   No, I've never heard of Jacques Rivera.

Q.   And you'd never heard of Orlando Lopez either, right?

A.   Orlando Lopez?  Macho?  Well, I learned from him at the hospital that he was a possible eyewitness.

Q.   I guess we're getting bogged down.  But you did not participate in whatever procedure was used by which young Orlando identified Jacques Rivera, right?  Somebody else did that?

A.   Gang Crimes did that.

Q.   Okay.  And that somebody told you about it, right?

A.   Yes.

Q.   And nowhere in any of the paperwork is it written down who that somebody was, right?

A.   Right.

Q.   And that -- one of the Gang Crimes people you worked with was Rey Guevara, correct?

A.   Yes.

Q. And you also sometimes worked with his partner, Mr. Gawrys, correct?

A. Yes.

Q. Were they the ones who told you about Jacques Rivera?

A. I don't know.

Q. Do you remember -- you've heard now Orlando Lopez described a Latino officer with an afro and glasses.

Do you remember that description?

A. Yes.

Q. Okay. That's how Mr. Rivera appeared, correct?

A. Yes.

Q. Do you have any reason to dispute that it was Guevara who called you?

A. We're talking about -- I'd have to look at the paperwork, but I'm not --

Q. But you're not --

A. -- sure that they worked that night. I don't know. I'd have to look.

Q. You have looked at the paperwork, right?

A. Yes.

Q. And you've looked pretty closely trying to figure out how Jacques got in the case, haven't you?

A. How he got into the case?

Q. It's just not documented who supposedly procured this identification.

A.   No, I -- no.  You're right, it's not documented.

MR. LOEVY:  All right.  Maybe this is where we take a break, then.

THE COURT:  Good.  Let's take ten.

(Jury out.)

THE COURT:  All right.  I am going to take a couple minutes.

(Recess at 2:54 p.m.)

THE COURT:  I suggest if you have somebody in the hall, you get them, because I intend to start.

(Brief pause.)

THE COURT:  Okay.  Is everybody here now?  I guess.

COURT SECURITY OFFICER:  All rise.

(Jury in.)

THE COURT:  Please be seated, everyone.

MR. LOEVY:  May I proceed, Your Honor?

THE COURT:  You may.

BY MR. LOEVY:

Q.   All right.  We were talking about at some -- at some point it came to your attention that there was a 12-year-old witness, Orlando Lopez, correct?

A.   Yes.

Q.   And you spoke to Orlando Lopez, correct?

A.   Yes.

Q.   And you interviewed him as a matter of fact, right?

A.   Yes.

Q.   And are you a good interviewer?

A.   Yes.

Q.   And you had to take care because this is a 12-year-old kid, right?

A.   Yes.

Q.   You don't want to be leading or suggestive to him, right?

A.   Correct.

Q.   Was there a time limit on your interview?

A.   No.

Q.   Did you have every opportunity to make sure you were going to extract as much information that the kid had?

A.   Yes.

Q.   All right.  Did -- it's very important to memorialize the witness' first story; would you agree with me?

A.   Yes.

Q.   So Orlando Lopez, this is the first time he's telling the detectives what happened, you wanted to take careful notes, correct?

A.   Yes.

Q.   And then if he changed his story later, you'd at least have him locked in on his first story, right?

A.   If you want to call it locked in, yes.

Q.   All right.  Well, that's what detectives do, in fairness; they lock witnesses in, right?

A. Yes.

Q. And then -- then if they want to tell a different story a different time, you at least can impeach them if you're Jacques Rivera with what they said originally, right?

A. Yes.

Q. And, in fact, that's -- in an eyewitness case like this one where the only evidence is an identification, the witness' story is actually the critical piece of evidence in the case, isn't it?

A. Yes.

Q. And, in fact, that has to be treated like -- if you heard it said, it has to be treated like trace evidence; you have to be careful with it, not to tamper with it?

A. Well, the victim was still alive also.

Q. All right. But we're talking about the eyewitness --

A. Yes.

Q. -- this 12-year-old?

A. Yes.

Q. And you realize there's a danger you could be suggesting things if you're not careful with your questions, right?

A. In that case, I really -- it was just -- we just let him talk.

Q. All right. So you got it from his words?

A. Yes.

Q. And you didn't put any restriction on his ability to

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 374 of 1254 PageID #:104505
McLaughlin - direct by Loevy
584

communicate with you?

A.   No, I did not.

Q.   All right.  And you took careful notes, correct?

A.   I took notes, yes.

Q.   You took careful notes, right?

A.   Careful notes.

Q.   Trying not to leave out any important details, right?

A.   Yes.

Q.   All right.  I'd like to show you at this time Plaintiff's Exhibit 12.

MR. LOEVY:  Can we have the Elmo going?  If this isn't in evidence, Your Honor, we move it into evidence.  This is the Lopez notes.

THE COURT:  Any objection to 12?

MR. POLICK:  Let me see it, Judge.

MR. LOEVY:  It's the Lopez notes.

(Counsel conferring.)

MR. POLICK:  No objection, Your Honor.

THE WITNESS:  It's not -- it's not on here again. Okay.

THE COURT:  Received.

(Plaintiff's 12 admitted in evidence.)

BY MR. LOEVY:

Q.   All right.  Do you -- I'm going to hand you a copy, so it's probably easier for you if you had the hard copy.

A.   Thank you.

Q.   If you could identify for the jury what we're looking at here.

A.   That is a General Progress Report.

Q.   And what does this General Progress Report reflect?

A.   It reflects the interview of Orlando Lopez.

Q.   Taken by you, correct?

A.   Yes.

Q.   And that's your signature at the bottom?

A.   My signature, my printing.

Q.   And the date is August -- is August 28th, correct?

A.   At the top of the report?

Q.   Yes.

A.   Yes, it is.

Q.   All right.  And you took some preliminaries, Orlando Lopez, May the 17th, right?

         That's probably his birthday maybe?  Twelve -- twelve years old, May 17th?

A.   Yes.

Q.   All right.  This No. 1 and No. 2 reflects the description that you were given by Orlando of the shooter and the driver; would you agree?

A.   Yes.

Q.   So tell us everything Orlando Lopez was able to tell you about the shooter.

McLaughlin - direct by Loevy

A. He said he had a black jacket and dark pants and gym shoes.

Q. All right. Was Orlando Lopez able to tell you anything about the shooter's height?

A. I think he said he was, like, medium height.

Q. All right. But you didn't write that down, did you?

A. No, I did not. It was --

Q. But you're not claiming to remember that 30 years later, are you?

A. No.

Q. If he had said medium height, you sure as heck would have taken the pen and wrote down medium height, right? That's the question.

You would have written it down if he told you, correct?

A. Yes.

Q. Because that could turn out to be very important, right?

A. Yes. And I probably did write it down somewhere.

Q. Well, these are your notes, are they not?

A. Yes, yes, they are.

Q. And you heard in opening that detectives have it drilled into their heads to write down everything that matters on these General Progress Reports, correct?

A. Yes.

Q. All right. The victim -- was the witness able to tell anything about the perpetrator's complexion, whether they were

McLaughlin - direct by Loevy

587

light or dark or anything?

A. It's not reflected on this GPR, no.

Q. All right. But if it's not reflected on the GPR, then he didn't tell you anything? Do we agree about that?

A. Not necessarily.

Q. All right. Did he tell you things about the perpetrator that you didn't write down, ma'am?

A. He told me that he --

Q. Can you answer that question, though?

Did he tell you things about the perpetrator that you didn't write down?

A. I did -- if I didn't write it down, it would have been because he said he recognized him from the ballpark.

Q. So you made an intentional decision not to write down some details?

A. I don't know if you'd call that intention. It was -- well, if you have someone that knows who they're looking at --

Q. Then you don't have to write it down?

A. -- recognize him -- no, it's not that you don't have to write it down. But he said that he would recognize -- he would know him if he saw him. He knew him.

Q. All right. So when you became confident that he'd know him when he saw him, you stopped writing his description? Is that what you're saying?

A. He didn't give me a description. He said --

McLaughlin - direct by Loevy

Q. Well, then --

A. When I asked him what did he look like, he said, "I know him. I recognized him from Humboldt Park. He plays baseball there."

Q. Okay. I'm just looking for where it says that on here.

A. Well, that's what he told -- that's what he told me.

Q. Okay. But it doesn't say that in your notes?

A. It doesn't say that in my notes, but that's what he told me.

Q. And you remember this all these years later?

A. It's in my -- it's in my report, yes. That's one of the things I do remember because that --

Q. You wrote a report two days later, right?

A. I wrote a report -- I wrote a report two days later?

Q. Was your report dated the 29th of August?

A. It's the 28th.

Q. The 28th of August. All right.

Did you memorialize in your report the details that the kid had told you that you wrote in your notes?

A. Yes.

Q. All right. I'll ask it again.

Do your notes reflect everything he told you?

A. When I asked him --

Q. Okay. Do your notes reflect everything that he told you?

A. When I asked him what the offender looked like, he replied

to me that he recognized him from Humboldt Park --

Q.  All right.  I'm just --

A.  -- the ballpark.

Q.  There's nowhere on here --

A.  No, there isn't anywhere on there, but that's what he told me.

Q.  Okay.  When you wrote down what he told you, you wrote down black jacket, dark pants, gym shoes, right?

A.  Yes.

Q.  And you had -- you had wrote down "has seen before"?

A.  Yes.

Q.  And --

A.  And that he was a King.  He thought he was 18 years old, and he was a King.

Q.  All right.  Did he give you any other physical description?

A.  No.

Q.  All right.  Let's talk about some problems with this kid's viewing opportunity.  There were a few, weren't there?

A.  What do you mean by that?

Q.  Do you remember when you're interviewing him thinking, boy, this guy was almost 200 feet away from the shooting?

A.  He told me he was on his way home from the store.  So I wasn't -- I don't know what all your graphics are, but he told me he was on his way home from the store.

Q.  Well, fortunately, we have an exact record of what he told

you, don't we?  We have your notes.

Can you read what I'm circling here?

A.  By the store, car came through the alley, and he was coming back from the store.

Q.  You just said that, but it doesn't say he was coming back from the store, does it?  It says he was by the store?

A.  Yeah, it says that he was by the store.

Q.  Okay.  Did he tell you he was by the store?

A.  He told me he was by the store, and he was coming home from the store.

Q.  Okay.

A.  That's where he start -- that's where this started.

Q.  You remember all these years later that you wrote it down wrong?

A.  I didn't write it down wrong.

Q.  No, you wrote down "by the store."  That's what he told you, right?

Now you're saying, you know, really if I would have been thinking, I would have written down he was by the store, but he was coming home?  That's what you should have written?

A.  I believe in my typed report it says he was coming home from the store, does it not?

Q.  The details evolved later on once you typed it up, right?

A.  They didn't evolve.  They -- these are -- these -- this is a summary.

Q. Well, this is your notes?

A. I know they're my notes.

Q. All right.

A. But that's what he told me, and that's what I remember.

Q. Here is the Plaintiff's Demonstrative Exhibit No. 1. Just to orient you --

A. Oh, hang on. I got my foot caught. Okay.

Q. All right. This is Cortland here, this street? Do you --

A. Yes.

Q. And then this is an alley running north-south, right?

A. Yes.

Q. And then where would Spaulding be? Off to the east?

A. Spaulding would -- Kimball is here, I think.

Q. Kimball is on the -- on the west?

A. On the west, and Spaulding is on the east.

Q. All right. So where I'm drawing this X here -- I guess I've drawn it horribly. I'm going to start again.

But where the victim's car was was in this alley right about here, right?

A. As far as we know, yes.

Q. All right. And that's -- that's what everybody -- that's what the witnesses said?

A. Yes.

Q. And then what Little Orlando Lopez told you in your notes was he saw -- he was -- well, he said in his notes you wrote

down he was by the store, right, at the corner?

A.   He said he was coming --

Q.   All right.  Well --

A.   -- home from the store.

Q.   -- let's just say he really said he was by the store.  Are you with my hypothetical --

A.   No.

Q.   -- saying he was by the store?

A.   I'm not with your hypothetical.

Q.   Okay.  In my hypothetical, what you wrote down here "by the store" is actually what he told you.  I realize it's hypothetical.  But if he's by the store, he's over here, right?

A.   He was over there when he saw the car coming.

Q.   This -- all I'm establishing is this corner of Kimball and Cortland --

A.   Yes.

Q.   -- is by the store, right?  This corner store?

A.   Yes, that's by -- that's the food store.

Q.   And when you said "saw the car coming" -- he says when he was by the store, he saw the car coming north through the alley, turned east, and parked about right here, right?

A.   I think it was like --

Q.   You want it closer to the alley?

A.   No.

Q.   Where do you want the car?

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 383 of 1254 PageID #:104514
McLaughlin - direct by Loevy
593

A.  That's fine.

Q.  Is that what he told you where the car stopped?

A.  Well, it would have been on that side of the street at about 3311, I believe, but I don't want to be -- without the report in front of me.

Q.  Would you agree with me that if Orlando Lopez was by the store, he would have been too far away to see anything?  That's almost -- that's more than 200 feet, right?

Just -- just focusing on my question, if hypothetically he was by the store, that would have been too far to see anything, right?

A.  Hypothetically?

Q.  Right.

A.  It would all depend upon what he was able -- what he was actually able to see.

Q.  All right.  But just in terms of distances, how far would you say this court is?  Is it 50 feet?

A.  Maybe 50 feet.

MR. ART:  60.

BY MR. LOEVY:

Q.  Maybe 60 -- about 60.

Let's say it was three times this court.  That would be probably too far to make out the details of somebody's face; would you agree?

If you went to that wall and then started again and

then did it again, that's too far to catch the details of somebody's face; would you agree?

MR. SOTOS: Judge, I'm going to object. This courtroom is only 20 feet?

THE COURT: The courtroom is what?

MR. SOTOS: Twenty feet?

MR. LOEVY: Well, we'll take that, Your Honor --

THE COURT: Twenty feet?

MR. LOEVY: -- because that would make this nine times the courtroom.

THE COURT: I have no idea what the courtroom is. You're out of my comfort zone here.

MR. SOTOS: I'm just saying he's throwing out the numbers, and there's no foundation for any of it.

THE COURT: Well, why don't we just -- whatever the court -- well, I guess we can't do that. We have to --

MR. LOEVY: I'll move on, Your Honor.

THE COURT: Okay.

BY MR. LOEVY:

Q. This is a full city block -- well, between Kimball and this alley, that's a pretty good distance, right?

A. Yes.

Q. And I will represent to you that we have measured the distance from the corner to the car is 191 feet.

A. Okay.

Q. That's a good distance --

MR. POLICK: Objection to the foundation, Your Honor.

THE COURT: Well, do you want the measurer to come in?

MR. LOEVY: He's here.

MR. POLICK: Objection, Judge.

THE COURT: I mean, I think we can -- you know, unless somebody wants to contradict it, I think if counsel says that they measured it and that's what it was, I think we can --

MR. LOEVY: All right.

THE COURT: -- we can go forward on that.

BY MR. LOEVY:

Q. Now, if he was by the store, he would have had parked cars blocking his view of the car, too, as well, correct?

A. If he was stationary by the store. But he was on his way home. He was walking towards the corner where the car was parked.

Q. All right. And your understanding is he saw two men get out of the parked car, walk up to Felix, shoot him, and then run back to the car and drive away, correct?

A. The driver never got out of the car.

Q. I'm sorry. The shooter got out of the car, right?

A. Yes.

Q. And -- and did the shooter do -- tell the jury what he described the shooter doing.

A. He said that the shooter started walking towards the car

that was parked in the alley, which was Felix Valentin.  Right?

And he's on his way.  He's on his way.  He gets to -- he gets close to home, and then he sees the man running towards the car and shooting.

Q.  And then what does the shooter do?  What did he tell the shooter did?

A.  The shooter turned around -- turned around and got back into his car, and they drove off.

Q.  All right.  Now, didn't the -- the boy say something about maybe there was a silencer -- possible silencer?

A.  He did.  I did write that down.  He said it wasn't very loud.

Q.  Yeah, that's because he was 200 feet away, right?

A.  Well, not necessarily.  Small caliber guns don't make a lot of noise.

Q.  He was too far away to even hear the gunshots?

A.  I don't know what he heard --

MR. POLICK:  Objection.

BY MR. LOEVY:

Q.  Well, the --

A.  -- or what he didn't hear.

I just wrote down what he told -- you told me I should write down what he told me.  That's what I wrote down.

Q.  Well, basically if we can infer from your notes that you wrote down silencer, can we infer he heard no gunshots?  He

heard no gunshots?

A. He said they weren't very loud. That's what he said.

Q. All right. What age did the shooter -- did Lopez describe the shooter as?

A. About 18.

Q. All right. So that's basically a kid in high school, correct?

A. Yes.

Q. All right. Let's take a look at Orlando's testimony from the criminal trial. This is Defendants' Exhibit 5.1 and this is Plaintiff's Exhibit 3519. This is in evidence.

So I'm going to represent to you that when Orlando -- oh, by the way, before I ask this --

A. Okay.

Q. -- when you're having this interview with Orlando and he's describing what he described about the car, you were not the first one who interviewed him, correct?

A. I don't know who else interviewed him.

Q. Well, you were --

A. Well, the gang -- the gang people located him, yes.

Q. Yeah. So you weren't -- you got to talk to him after the gang people got to talk to him, correct?

A. Yes.

Q. Okay. Have you ever seen any document about what story he told the gang people?

McLaughlin - direct by Loevy

598

A.   No.

Q.   Okay.   There probably should be a record of what his first story was, shouldn't there?

        MR. POLICK:  Objection to the foundation, Your Honor.

        MR. LOEVY:  Let me withdraw it, Your Honor.

BY MR. LOEVY:

Q.   Based on your familiarity with the policies and the practices of the police department, was it your understanding that if the gang crimes people did a first interview with this kid, they should have written down what he said the first time?

A.   I don't know if they did do a first interview with him.

Q.   All right.  But I'm asking --

A.   If they did -- if they did, I don't know what the gang crime policies are because I never worked gang crimes.

Q.   Al right.  So you --

A.   I don't know what their paperwork was, what they're -- what they were supposed to do.  I don't have any knowledge of that.

Q.   Well, as a detective --

A.   I don't have any knowledge.

Q.   -- did they usually write down, "Hey, here's what the victim told me," or were they sort of, like, off the paper kind of with this stuff, based on your familiarity with their practices?

        MR. POLICK:  Objection to the foundation.

        THE COURT:  Well, based on the witness' familiarity

with the practices, if any. If the witness has none, she has none.

BY MR. LOEVY:

Q. They didn't write a lot of stuff down, the gang people, did they?

A. I don't know what they did.

Q. Well, you worked with them on a lot of investigations, right?

A. I worked with them on a lot of investigations.

Q. All right. So you don't know if yours is the first interview or the second interview or the third interview?

A. No, I do not.

Q. All right. Let's look at Orlando's testimony here at the criminal trial.

"When you came out of your house, did you see anything unusual that caught your attention?"

And his answer was:

"Yes, sir. When they were shooting Felix, when they were shooting, I started running to the store. Instead of going to the store, I --"

And then the next question was:

"When you came out of the house and you saw they were shooting Felix, exactly

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 390 of 1254 PageID #:104526
McLaughlin - direct by Loevy
600

what did you see?

"They were shooting at him."

Do you see that testimony?

A. Yes, I do.

Q. Okay. That's a very, very different story than what he told you, isn't it?

A. Yes, it is.

Q. That's materially different, isn't it?

A. Yes, it is.

Q. Because -- did you talk to him before the criminal trial?

A. I talked to him once that night on the street.

Q. All right. Apparently in subsequent interviews after yours, he's put himself much closer to the shooting, has he not?

MR. POLICK: Objection.

MR. SOTOS: Objection, Your Honor, to the foundation for subsequent interviews. That's --

THE COURT: This is -- this witness was not involved in those, right?

MR. LOEVY: Well, let me ask it this way. How about --

THE COURT: All right.

MR. LOEVY: Thank you, Your Honor.

BY MR. LOEVY:

Q. Mr. Lopez lived -- this is his doorway, correct?

A.   3320, I believe.

Q.   All right.  So he -- he's -- at the trial he was saying he saw the shooting when he came out his door, right?

MR. POLICK:  Objection to the foundation.

BY THE WITNESS:

A.   Well, that's what you showed me, but I have no knowledge of that.

MR. POLICK:  Judge, there's no foundation.  She's not at the trial.  There's no foundation for this question.

THE COURT:  Well --

MR. LOEVY:  We just read it.

THE COURT:  -- we just read it, but --

MR. POLICK:  We just read it but --

THE COURT:  -- the witness has no particular --

BY MR. LOEVY:

Q.   All right.

THE COURT:  -- knowledge of it.

BY MR. LOEVY:

Q.   Well, here's my question.

Well, I already asked, but this isn't what he told you?

THE COURT:  You know, actually, I mean, if you want to just establish there's some difference, I think you can go ahead and do it.

MR. LOEVY:  All right.  Thank you.

BY MR. LOEVY:

Q. You have no idea how this witness' story went from "I was by the store" to "I was coming out of my house"? That's -- you had no involvement in that?

A. No.

Q. If you had known that the kid was changing it from "I was by the store" to "I was coming out of the house," would that have troubled you?

A. Yes.

Q. Why?

A. Because it's different than what he told me.

Q. All right. Let's take a look at his testimony on page 25.

"When you came out of the house, how far was your house from where Felix car was?

"It was close."

He didn't tell you that, did he?

A. No. Well, I knew the car was close to the entrance of the house, but he didn't say he was at the house.

Felix's car was parked in the alley next to the building.

Q. And then he's told on page 26:

"You come down, and the car's, like, over to your right."

And that's because he's coming out, and the car is

over here to his right.

"Yes, sir.

"And someone whose back to you

was firing at Felix?

"Yes, sir."

Do you see that?

A. Yes, I do.

Q. Okay. Did Little Orlando tell you that when the shooting was happen, the shooter had his back to him?

A. Actually, he did. And that --

Q. Did you write that down?

A. -- when he turned --

Q. That's the question.

A. When he turned, that's when he saw him.

No, I didn't write that down, but that's --

Q. All right. Don't you think --

A. I mean -- okay.

Q. I'm sorry. We're both talking, and it was your turn. I apologize.

A. I'd have to look at my written report.

Q. All right. Well, take a look at your notes.

A. It's not in my notes. That's why I said I'd have to look at my written report.

Q. All right. Well, if he had told you that his back was turned, would you agree -- the shooter -- he was looking at the

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 394 of 1254 PageID #:104525
McLaughlin - direct by Loevy
604

shooter's back, that would have been an exculpatory detail, correct?

A. Not necessarily.

Q. Even though Orlando two years later went to trial, pointed his finger at Jacques and said, "That's who I saw," it wouldn't have been exculpatory that he was actually looking at the shooter's back?

A. Because I said he turned and he recognized him.

Q. Well, where does it say he turned?

A. As he was getting into the car, he saw him, and that's where he recognized him.

Q. All right. Let's take a look at what he said. This is page 27 of the transcript. They're talking about the part we've been talking about.

"Now, at that point in time, you didn't see the man's face?

"No, sir.

"Question: Did you then run to the store?

"Answer: Yes, sir, to call the police.

"Question: Just told somebody else to call the police?

"Yes, sir.

"Then you ran back to your house?

"To hide in one of the -- those, you know, where I was hiding at.

"Was that back at your house?

"Answer: No.

"Question: Where was that?

"In front where they were shooting at him. They were right there. It's just like grass."

Did he tell you anything about that?

A. No.

Q. Did he tell you that he hadn't seen the shooter's face until he ran to the store?

A. No.

Q. You would have written that down, right?

A. Yes.

Q. Because that would have been an exculpatory detail, right?

A. Yes.

Q. This is a very different story than what you were told, correct?

A. Yes, it is.

Q. All right. I'm showing you further from Orlando Lopez's trial testimony, page 35.

"When you went to the store after the shooting, how many shots did you hear initially?

"Answer: When I went to the store --

"Question: When you first came out of your house, there was the shooting thing going on right away?

"Yes, sir, like four times.

"Question: You ran to the store?

"Yes, sir.

"And the store is, like, the next building over? How far is it away?

"Not far from the house. It's at the corner."

So would you agree with me that what he's saying at trial is that he came out of his door, saw a shooting happen, ran to the store, told the clerk there's a shooting happen, and then ran back and hid? That's the trial story, right?

A. That's what the paper you just showed me, yes.

Q. Okay. How positive are you that he said nothing like that to you?

A. I'm very positive he never said anything like that to me.

Q. Did he say something sort of like that to you?

A. No.

Q. Then he was saying -- on page 36 he was asked:

"So it took you about 10 seconds to get to the store, right?

"Answer: Yes, sir.

"How long were you in the store?

"Five seconds.

"Question: To tell them to call the police?

"Yes, sir.

"Who did you talk to in the store?

"Answer: The one who owns the store.

"Question: What did he say?

"He said he didn't see nothing, so I started running back."

Do you see that?

A. I see -- I see that, yes.

Q. All right. If you had known that Orlando Lopez -- and then it continues:

"Yes, sir.

"And you ran back real fast, like 10 seconds or less to get back?

"Yes, sir.

"And the man was still shooting?

"After he got back, he shot the last time, and then he ran."

Do you see that testimony?

A. Yes, I do.

Q. So apparently the story is that he came out of his house,

he saw a shooting, he ran to the store, told the store clerk, "call the police, call the police," ran back and hid, and then saw the rest of the shooting?

That's the story that he's testifying to at trial; would you agree?

A. That's what was just recorded, yes.

Q. Not only did he not -- he didn't tell that to you, but if he would have told that to you, you would have disregarded him as a witness, wouldn't you have? Because that doesn't make any sense, does it?

A. I would have written that down.

Q. But you would have said, you know what, a lot of people in murder investigations tell me a lot of things. This kid ain't credible, right?

A. Well, you'd have to wait to see what happened with the investigation. If he thought he could identify someone and we took him to look at -- you know, if he went to look at the books and he picked somebody out, then we'd go back and interview -- reinterview him, get more details.

And if it didn't make any sense, then it wouldn't make any sense.

Q. That's what happened here, isn't it?

He told you he was by the store. Then he picked somebody out. Then somebody went back and reinterviewed him, and he moved himself closer to his house coming out of the

store?  That's what happened, isn't it?

MR. POLICK:  Objection to the form of that question, Your Honor.

THE COURT:  Overruled.

BY THE WITNESS:

A.  I don't know what happened there.  I only know what he told me.

BY MR. LOEVY:

Q.  All right.  Take a look at -- this is page 16 and 17 of his testimony.

"So approximately how far were you from where you came back from the store and you say you hid in the indentation?

"Yes, sir."

And by the way, the indentation is presumably this indentation in the building there.  Do you see that?

A.  Okay.  Yes, I see.

Q.  So he says he ran to the store, came back, hid in the indentation.

"Approximately how far were you when you were hidden from the man and the gun?

"Not far.

"When you got back -- when you got

to your hiding place, what was going on?

"He shot the last time, and he ran back to the car. And when he ran back to the car -- to that red car and he turned around to look who was around so he didn't see nobody, he put the gun right here. So he ran to the car, to the passenger and start, and the car went.

"When he ran back to the car, did he run by where you were?

"No.

"When he turned, did he pass you?

"No. Yes, sir, he did. He passed by me, but he didn't see me.

"Because you were hidden in the indentation?

"Yes, sir.

"How far was he when he turned and ran back to the car?

"Like, I don't know. Three feet away."

Do you see that testimony?

A. I do.

Q. Okay. That doesn't even make any sense, does it?

A. Not from where the car was and where he said he was hiding,

McLaughlin - direct by Loevy

611

no.

Q.  Because if he said he's hiding here --

A.  Right.

Q.  -- and the car's over here --

A.  Right.

Q.  -- the shooter isn't running past him?

A.  No.

Q.  If you would have taken this interview from Orlando Lopez, you would have said to this 12-year-old:  "Thank you for your help.  We've written down your story.  We'll call you if we need you," right?

A.  All this trial testimony, it would have been -- it would have been a different investigation.

Q.  Yeah, you would have -- you would have written it down, right?

A.  Yes.

Q.  But you wouldn't have built your murder case around this -- this story, would you have?

A.  I don't know what else might have come in, but it doesn't seem -- it doesn't seem like it makes any sense, no.

Q.  Let's look at page 30.

            "When was the first time you

        saw what you say is Mr. Rivera's face?

        Was it right after he stopped shooting?

            "Answer:  When he stopped shooting,

that's when he ran and tried to look around.

"That's when you saw his face?

"That's when I saw his face. You were not three feet from him at that point. Three feet, do you know what three feet is?

"Yes, sir.

"This would be like three feet, for the record, from me to you. You were not three feet from where he's being shot?

"Yes, sir, because I was like -- because it was, like, you know.

"Were you three feet from where he was being shot?

"Answer. No."

That doesn't make any sense either, does it?

A. It doesn't read right.

Q. Let me ask you a question.

When you were interacting with 12-year-old Felix -- I'm sorry -- 12-year-old Orlando, was he a mature young -- young 12-year-old?

A. He was credible, yes.

Q. If he would have told you this story, you wouldn't have found him credible, correct?

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 403 of 1254 PageID #:104534
McLaughlin - direct by Loevy
613

A. I think there would have been a lot more interaction with questions as to "Are you sure" or "What's going on?"

Q. Okay. Who had that interaction with him? Who had the are-you-sure interaction? Was it the gang detectives or you?

A. I didn't have an opportunity to have another interaction with him because we never had him for a lineup.

Q. All right. So you never spoke to him again?

A. No.

Q. So if his story did change from when you spoke to him to a new story, that was not your involvement?

A. I was not involved in that.

Q. All right. He was asked on page 39:

            "Did you ever tell the police
            that you were already in the store
            and coming out of the store and that
            the shooting didn't happen until you
            were -- after you came out of the
            store? Did you ever tell the police
            that?"

        And he says:

            "When I went down, he was shooting,
            and I went to the store --
            "Question: Just listen to me.
            When you talked to the police officers,
            did you tell them that there was no

shooting until after you came out of

the store?

"Answer: No."

Do you see that?

A. Yes.

Q. He's denying what he told you, isn't he?

A. Yes, he is.

Q. Is he lying there?

MR. POLICK: Objection, Your Honor.

BY MR. LOEVY:

Q. Well, let me ask it this way.

THE COURT: Sustained.

BY MR. LOEVY:

Q. Is that testimony truthful?

A. It doesn't match what he told me.

Q. All right. He gave you -- you've heard -- you were here in openings, and you've heard that there was an issue with the shooter's hair color, correct?

A. Yes.

Q. What did Orlando on the first time he was interviewed tell you about the shooter's hair color?

A. I don't recall any discussion because, as I said, he said he knew him.

Q. Well, I'm asking about hair.

A. Right. And I'm saying that I don't remember a discussion

about hair.

Q. Does that mean you didn't ask him about his hair?

A. Well, I asked --

Q. Let me --

A. -- him what he -- what this person looked like, and he volunteered that he knew him.

Q. All right. He gave you a description, black jeans, gym shoes --

A. Yes.

Q. -- jacket?

A. That was before he said that he knew him.

Q. All right. Showing you the transcript here, 33.

"His hair was?

"Not black, brown."

And then the prosecutor says:

"Brown, but was there a, like,

a color?"

And he says:

"Yes, sir.

"Dyed thing?

"Yes, sir, dyed.

"Ponytail like?

"Answer: Yes, sir."

Do you see that trial testimony?

A. I do.

Q. Okay. He didn't tell you that, did he?

A. No, he did not.

Q. Did you give him every opportunity to describe the shooter?

A. Well, he said that he'd recognized him from -- that he recognized him.

Q. Okay. But did you give him an opportunity to describe him?

A. Well, he could -- if he wanted to say that he had a blonde ponytail, he could have --

Q. All right.

A. -- but he didn't tell me that.

Q. As a detective, you have to consider the possibility that he did recognize him or he was wrong about recognizing him, right? You don't know if he's -- he's right or not?

A. Well, if he was wrong about knowing who he was, that would come out later in the investigation.

Q. And it would sure matter a lot how he described him physically, correct?

A. He said he recognized him from the park.

Q. All right. All right.

          "That night at your house,
     did some police officers come over?"
  This is page 21.
          "Yes, sir.
          "Did he tell you -- did you
     tell them what you had seen?

"Answer: Yes, sir.

"Did you tell them what color you had seen Rivera wearing and the fact that his hair was dyed yellow?

"Answer: Yes, sir."

Were you one of the people he told that?

A. No.

Q. Okay. Then he's asked these questions on page 14.

"Aside from him dressed in black, did he have any other color on?

"His hair was gold -- brown or gold.

"His hair was what?

"Brown or gold.

"Was part of it dyed, you mean?

"Yes, sir.

"But this is the question I want to ask you."

It's crossed off here, but I think you can still read it.

"Was he wearing the colors of black and yellow, black and gold?"

Do you see that question?

A. Yes.

Q. Now, that has significance, right? That is the colors of Latin King, correct?

A.   Yes.

Q.   All right.   Did Little Orlando Lopez tell you that the shooter was wearing black and gold?

A.   No.   He had a black jacket on --

Q.   So this --

A.   -- but he didn't mention anything about gold.

Q.   And you would have written it down if he said gold, correct?

A.   Yes.

Q.   All right.   Are you -- I mean, is that troublesome to you that he's adding in details that are implicating Jacques Rivera?

MR. POLICK:   Objection, Judge.   Can we get some foundation here?   Is he talking about the trial?   Is he talking about when she interviewed him?

THE COURT:   Can you clarify that?

BY MR. LOEVY:

Q.   All right.   Let's say during your investigation you talked to him and he said the guy's wearing black.   And then some gang crime people get involved, and now all of a sudden the guy's wearing black and gold, the colors of the Latin Kings.

Do you understand my hypothetical?

A.   I understand your hypothetical.   On the original case report -- on the original case report, it did say he had a gold hat on.

Q. All right. Gold hat?

A. Gold hat.

Q. That -- that -- you didn't take that --

A. No, I did not take that.

Q. But somebody said he had a gold hat, right?

A. Yes.

Q. Not Orlando Lopez?

A. No.

Q. All right. So I'm just getting back to you, though.

If you would have been involved and you found out this kid is switching the description to fit the police theory that it was a Latin King, you would have done some digging to get under that, right?

MR. POLICK: Objection to the --

THE COURT: Sustained.

MR. POLICK: -- form of the question.

THE COURT: Sustained.

BY MR. LOEVY:

Q. All right. You were asked -- he was asked:

"He got to the brown car. The

car took off?

"Yes, sir.

Do you see that?

A. I should just leave my glasses on.

MR. LOEVY: I'm sorry. This is page 20.

MR. POLICK: Thank you.

BY MR. LOEVY:

Q. Do you see that? And it says:

"Where did it go?

"Right through Spaulding."

Right? Do you see that?

A. Yes, I do.

Q. All right. So that means when he was asked at the criminal trial, he said, "It went this way and went right through Spaulding," right?

A. Yes.

Q. And Spaulding would have been an east -- a north-south street. If it's not shown on the map, he went through it, right?

A. Yes.

Q. All right. And what did he tell you about where the car went?

A. I think he said it went east on Spaulding. I'd have to look --

Q. Take a look.

A. -- myself.

East on Cortland, south on Spaulding.

Q. And that was significant, wasn't it?

A. Yes.

Q. Because if he went south on Spaulding, that's why he

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 411 of 1254 PageID #:104547
McLaughlin - direct by Loevy
621

thought it was a Latin King, right?

A. No. He said he recognized him from the park and that he knew he was a King. That's what he said.

Q. Well, we don't have his exact words because you didn't write it down, right?

But what I'm getting at is, if the car had turned on Spaulding and went south, that would have been into Latin King territory, right?

A. You may find this hard to believe, but I don't know where the gang territories were. That was up to gang crimes officers.

Q. All right. But the first time he told the story, he went south, right, the car?

A. Yes.

Q. And then apparently he changed his story at the trial?

A. Yes.

Q. All right. What was your understanding of how long that Orlando Lopez looked at the books before he picked out the photo of the police's suspect?

A. I don't have any recollection of that.

Q. All right. Did you understand that it was as long as an hour?

A. I'm not sure.

Q. I mean, you're saying that the kid supposedly knew the shooter. It wouldn't have taken an hour to make an

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 412 of 1254 PageID #:104543
McLaughlin - direct by Loevy
622

identification?

A.  Well, depending upon where the photo was.  I don't know how many Latin King books they have.  I don't know that.

Q.  Who explained it to you?

A.  Who explained what to me?

Q.  The fact -- how Orlando Lopez supposedly picked out Jacques Rivera?

MS. ROSEN:  Objection, asked and answered.

THE COURT:  Hold on a second.

I think the question has been asked.  I'm not sure it's been answered, but maybe I'm misrecollecting.

MR. LOEVY:  I'll tell you what, Your Honor, I will move on anyways.

THE COURT:  Okay.

BY MR. LOEVY:

Q.  Now, at some point there was -- Little Orlando Lopez, after he made this identification, there was going to be a lineup, correct?

A.  Yes.

Q.  And you were told by the gang people that he'd picked out Jose Rios, Jacques Rivera, but you didn't -- you didn't witness that, right?

A.  No, I did not witness that.

Q.  So you have to duplicate it at a lineup, right?

MR. POLICK:  Objection to the form.

BY THE WITNESS:

A.   Duplicate what?

MR. LOEVY:  Maybe duplicate's the wrong word.

THE COURT:  Yes.

THE WITNESS:  Duplicate's wrong.

BY MR. LOEVY:

Q.   A gang -- identifying a photograph doesn't -- isn't going to work unless you can duplicate it, unless it can repeat or confirm it at a lineup, right?

A.   Confirm it in a lineup.

Q.   All right.  So you guys set out to put Jacques in a lineup late that August, right?

A.   Yes.

Q.   And you arrested Jacques?

A.   Yes.

Q.   You didn't personally do it, but you had it done?

A.   Yes.

Q.   And you also went out and got some fillers at your direction, correct?

A.   Yes.

Q.   And you're supposed to not get the fillers until you have the witness ready; would you agree with that?

A.   It was an unusual circumstance, because Jacques was arrested on the 30th of August late in the evening.  Called the neighbor -- the Lopezes didn't have a phone, so I called the

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 414 of 1254 PageID #:10454
McLaughlin - direct by Loevy
624

neighbor's house.

They brought the mother to the phone, explained that the man that her son had picked out in the photo book --

Q. By the way, none of this is written down, right?

A. I believe it's in my written report.

Q. That you talked to the Lopez's parents?

A. The mother?

Q. Yeah.

A. We -- I know I called her, and it was too late to view the lineup.

Q. All right. So she said, "My son is sleeping. We can do it tomorrow"?

A. "Can we do it tomorrow," yes.

Q. All right.

A. And that's reasonable.

Q. All right. So that's reasonable.

So then Jacques got held overnight, right?

A. He did, along with Mr. Rodriguez, we found out.

Q. All right. But just staying with --

A. Okay. Well --

Q. All right. On the 30th, he gets arrested, and then he had to stay till the 31st because the mother said, "You know what, it's late. Let's do it in the morning," right?

A. Yes.

Q. All right. How are lineups conducted?

A. How are lineups conducted?

Q. Yes.

A. Depends upon how many offenders there are.

Q. Well, you got -- you got some fillers, and you got some suspects, right?

A. Yes, you do.

Q. And they're put in a room, and they turn to the side, and the witness is through two-way glass, right? Explain it to us, please.

A. Well, it all depends upon where the lineup happens, but a lineup in an area usually has two-way glass. So you would put them there so that the person doing the lineup isn't afraid or if he happens to know him or whatever the situation.

He's looking through a window, and the person inside the lineup room is looking in a mirror.

Q. All right. And the next morning, Jacques and the other people who were going to be in the lineup were taken to the lineup room, correct?

A. No.

Q. And they were all photographed -- this is Plaintiff's Exhibit 62. These are the people from the lineup --

A. There wasn't a --

Q. -- on August 31st, are they not?

A. There was not a lineup.

Q. All right. But these were the people that were going to be

in the lineup, right?

A. Yes.

Q. All right. And you're aware that Jacques claims there was a lineup, right?

A. Yes.

Q. And you're aware that Orlando Lopez claims there's a lineup, correct?

A. Yes.

Q. And he claims he picked somebody, right?

A. If he claimed he picked someone, it wasn't with me, because we did not hold the lineup on the 31st of August.

Q. But you are aware he is making the claim that on the 31st of August -- there was two lineups, and on the first lineup, he picked out somebody that he believes is Jacques Rivera, correct? That's his claim?

A. If that's his claim, that's his claim.

Q. Well, you're aware of that, are you not, that --

A. Yes.

Q. All right. And can we say unequivocally that there is no doubt in your mind that whoever -- if he picked somebody, it was not Jacques Rivera on the 31st?

A. I don't understand that question.

Q. You're probably right. It's not a good question. How about this?

Jacques Rivera was not identified on August 31st; that

we agree with, correct?

A. There was no lineup for him -- to be held for him to be picked out. I had no eyewitness.

Q. Right. You say the lineup --

A. So who is picking him out?

Q. You said the lineup didn't happen. He said it did happen. We won't resolve that.

But all I want to establish through you is, you don't dispute that Jacques Rivera was not identified that day?

MS. ROSEN: Objection, foundation.

THE COURT: Overruled. In the lineup.

THE WITNESS: There was no lineup.

BY MR. LOEVY:

Q. Okay. He says there was; you say there wasn't.

All I'm asking is, if Jacques Rivera was not identified on the 31st, he was let go, right?

A. Along with Rodriguez.

Q. Everybody was let go?

A. Yes, they were all let go.

Q. And if he had, in fact, been identified on the 31st, he would have been arrested, correct?

A. Yes.

Q. All right. And did Orlando Lopez participate in that lineup and pick a filler?

A. There was no lineup.

McLaughlin - direct by Loevy

628

Q.  What happens when people pick fillers?

A.  Is this a hypothetical?

Q.  Yeah.  I mean, in your whole career, did anybody ever pick fillers?

A.  We call them negative lineups.

Q.  All right.  So let's say I go into the lineup, and I pick nobody.  I say I can't make a pick.  That's a negative lineup, right?

A.  Yes, it is.

Q.  All right.  Let's say I go in the lineup, and I -- and I pick the wrong guy, not the suspect but somebody who has been in lockup for 30 days who was guilty; you call that a negative lineup, right?

A.  It's still a negative lineup.

Q.  All right.  They're both basically in the paperwork treated the exact same?

A.  Yes.

Q.  Would you agree with me that there's actually a material difference between those two things?

     Do you want me to explain more?

A.  No, I understand what you're saying now.  But practices now and practices then are two different things.

Q.  All right.  Because if Orlando Lopez, who believes that he picked somebody, if he picked a filler, then that would be very important cross-examination against him if he later picked

Jacques Rivera the second time? Would you agree with that? It's hypothetical.

MR. POLICK: Again, objection to the foundation and the competence of the witness to answer that. She's not an attorney.

THE COURT: Overruled. Overruled.

BY THE WITNESS:

A. Well, you're going to have to repeat it again, because it's very convoluted.

BY MR. LOEVY:

Q. I apologize.

Orlando Lopez says he picked somebody, and he believes it was Jacques Rivera. Okay? Do you understand that?

And you're saying --

A. I understand it, but I'm saying that there was no lineup.

Q. And you do agree that if he picked somebody, it wasn't Jacques Rivera because he didn't pick Jacques Rivera that day? Nobody picked Jacques Rivera, right?

A. Nobody picked --

MR. POLICK: Objection to the form, Your Honor.

MR. LOEVY: We're dealing with two different sets of assumptions. It's a fair question.

THE COURT: You know --

MR. POLICK: If he wants to ask a hypothetical, Judge, fine. But that's not what he's doing.

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 420 of 1254 PageID #:104556
McLaughlin - direct by Loevy
630

THE COURT: Well, I think we all understand that the witness is saying there was no lineup.

Counsel is hypothetically or at least assuming for the purpose of the question that there was a lineup.

Let's get past that, because that's not what this is about.

MR. POLICK: Okay.

BY MR. LOEVY:

Q. If he had picked a filler, you would have -- you would have not written down that he picked a filler? That's really the question, right?

A. If someone picked a filler, anybody picked a filler, it would be a negative lineup report.

Q. So --

A. And all the people named in that lineup would be -- it would be just like a regular lineup report, but the heading on the paper would be "This is a Negative Lineup Report."

Q. All right. But it wouldn't say -- my question was, it wouldn't say that Orlando picked the wrong guy, right?

A. Orlando did not view a lineup on the 31st of August.

Q. All right. Let's talk about Valentin.

After the 31st of August happened, you released Jacques. We all agree about that, right?

A. Yes.

Q. And you decided as part of your investigation to go back

and talk to the victim in the hospital, correct?

A. I think you have that turned around.

Q. What was the date you went to go talk to the victim in the hospital?

A. 31st.

Q. All right. When did you actually speak to the victim?

Oh, your -- when was your report dated? Was that September 1st?

A. September 1st.

Q. All right. But the actual hospital visit was what date?

A. We went there on the 30th. I'd have to look at my report, but I -- we went there on the 30th.

Q. All right. What was your intention in going to the hospital?

A. We went to the hospital after we found out that gang crimes couldn't find the victim to view a lineup.

Q. Okay. And what was your intention? Were you trying to --

A. And so my intention was to find out if the victim was in any condition to view a photo spread.

Q. And by the way, you know, when you went back to the kid's house the next day -- because, remember, mom said he'd be ready for the lineup the next day? Do you remember that?

A. Yes.

Q. Okay. Well, when you knocked on the door and said, "All right, we need to do this lineup," what did mom say?

McLaughlin - direct by Loevy

632

A.   I didn't personally go look for him.  Gangs --

Q.   What did gang crimes tell you about why Orlando Lopez wasn't doing a lineup that his mom said he would do?

A.   They couldn't find him.  It was our feeling that the parents were not happy that he had gotten involved in this.

Q.   Do you know if the parents told the gang crimes guy, "Look, our kid didn't see anything.  He's being manipulated and used"?

A.   No, I don't.  I am unaware of that totally.

Q.   All right.  But all you know is the kid apparently got lost?

A.   I don't -- they said he went to visit his father, that he might be visiting his father.

Q.   Okay.  Paperwork doesn't say anything about not wanting to get involved, does it?

A.   No.

Q.   The paperwork says we couldn't find him?

A.   Right.

Q.   All right.  It's not hard to find 12-year-olds, is it?

A.   It's not hard to find a 12-year-old, but if --

Q.   I mean, they have to live with a parent, right?

A.   They have to live with a parent.

Q.   So if they're not living with mom, they're living with dad, and you could find him at bedtime, right?

A.   If you knew where dad lived, I suppose.

Q.   You know, and you guys are detectives.  You get paid to

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 423 of 1254 PageID #:104554
McLaughlin - direct by Loevy
633

find things, right?

A. Yes. Well -- yes.

Q. You could ask the mom, for example, where does dad live?

A. She said she didn't know.

Q. And so you guys -- that was it? Oh, I guess we're done with that lead?

A. No, we weren't done with that lead.

Q. All right. So why didn't --

A. We couldn't find -- so when we couldn't find him --

Q. No, find the dad. We're talking about --

A. We couldn't find -- we couldn't find Macho or Orlando.

Q. I'm talking about the dad. The mom said he's at dad's house. So why didn't you go to dad's house?

A. I don't know where dad lived.

Q. Well, why didn't you ask mom, "Where does dad live"?

A. Because I wasn't there.

Q. All right. Did anybody explain to you why this 12-year-old couldn't be found?

A. He couldn't be found because he didn't -- didn't want to be found.

Q. Because he didn't want to have anything to do with this murder investigation, did he?

A. No, I don't think that's true.

Q. Because he didn't see anything?

A. I think the 12-year-old wanted to be involved and saw

whatever he saw, but the parents didn't want him involved.

Q.  All right.  So what happened on September 1st when you're looking for the kid to put Jacques in a lineup?

A.  It wasn't September 1st.

Q.  Okay.  What happened on September 2nd?  You couldn't find the kid on September 2nd?  You couldn't find the kid on September 3rd?  Was he just lost all those -- all those days?

A.  No.  When we talked to the doctor, the doctor said it would be better for us to come back at the end of the week.

Q.  I'm talking about the kid still.

A.  Yeah, I know, but you're saying what did we do.

Q.  No, I'm talking about the kid.

Why didn't you -- if Jacques -- if the kid identified Jacques, the longer you wait, the weaker his memory is going to get, right?  Right?

You don't want to do an identification procedure a week later if you could do it a day later, right?

A.  Yes, but this is not the only case we were working.

Q.  All right.  But did you owe it to the Valentin family and to Jacques Rivera to do it right?

A.  We made every attempt to do it right.

Q.  All right.  Did you write down anywhere in any paperwork that the parents were claiming that they didn't want this kid involved?  That would have been exculpatory, wouldn't it of?

A.  That was nothing that was said to us -- that was -- as a

mother, that was my assumption.

Q.   Oh, it was assumption.

It wasn't that it was written down anywhere?

A.   No, no.

Q.   Okay.  All right.  Let's go back to the hospital.

You wanted to have the victim pick out Jacques' photo, right?

A.   I wanted him to pick out anybody that was involved that was in that photo, which included Jacques Rivera and Jose Rodriguez.  Both of them were in our photo spread.

Q.   All right.  So you went to the hospital with a photograph of, among others, Jacques Rivera?

A.   Yes.

Q.   And did the doctors tell you whether Valentin in his hospital bed could participate in a lineup process?

A.   We went to the hospital twice that day.

Q.   Let's start on the first time.

A.   Okay.  When --

Q.   Did the doctors tell you --

A.   The doctor said that he could.

Q.   All right.  Then you met with Valentin?

A.   Talked to him a little bit, yes, asked him if he was willing.

Q.   And what did he -- and he nodded yes?

A.   He nodded yes.

Q.  Now, his condition was getting -- was worse than when he first started or do you --

A.  No, actually, he was -- he was holding his own.  They were very surprised.

Q.  All right.  So this is the end of August.

What date it was -- do you have your reports with you?

A.  I don't have it up here, but I'm going to say it was the 31st of August.

MR. LOEVY:  May approach, Your Honor?

THE COURT:  Yes.

BY MR. LOEVY:

Q.  This is Plaintiff's Exhibit 19-F.  This is the report dated September 1st.

Does that refresh your recollection, just on the date?

A.  Yeah, it was the 31st.

Q.  All right.  So on the 31st of August, you went back there, and you asked Valentin, "Hey, can you participate in an identification procedure"?

A.  Asked him if he wanted to view a photo spread.

Q.  And did he indicate no or yes?

A.  He said yes.  He didn't say, but he nodded yes.

Q.  All right.  Now, you specifically asked him if he could identify the shooter, correct?

A.  At Norwegian Hospital --

Q.  All right.

A. -- that was asked.

Q. This is page 168, line 15, through 169, line 5.

Do you remember being asked these questions and giving these answers? 168, lines 15 through 169, 5.

MS. GOTTSCHALK SCOTT: I'm sorry, can I have --

MR. LOEVY: Yes.

(Said video/audio recording played in open court.)

BY MR. LOEVY:

Q. All right. And you came away from this interaction believing that he knew the guy who shot him, correct?

A. I don't know if he knew him personally, but he could identify him.

Q. Your understanding was the victim knew who shot him, correct?

A. My understanding was that he could identify him if he was shown.

Q. All right. This is page 169, lines 9 through 16.

(Said video/audio recording played in open court.)

MR. LOEVY: This is 169, lines 9 through 16?

MR. ART: It's playing.

(Said video/audio recording played in open court.)

BY MR. LOEVY:

Q. All right. And by the way, the shooting 11 shots, that's like an assassination attempt, correct?

A. It was a lot, yes.

MR. POLICK: Objection to the form of the question.

THE COURT: Sustained.

BY MR. LOEVY:

Q. All right. It felt like the shooter might have been trying to eliminate him as a witness. Would you agree with that characterization as a homicide detective?

MS. ROSEN: Objection.

MR. POLICK: Objection as to what someone else would have intended to do.

MR. LOEVY: I'm just saying as a homicide detective, her inference.

THE COURT: I think that's okay. Overruled.

BY THE WITNESS:

A. There was a lot of shooting.

BY MR. LOEVY:

Q. I mean, sometimes it's a drive-by. It's bang, bang. But somebody was trying to kill Valentin, correct?

A. Yes, I would say somebody's trying to kill him.

Q. And then you came away with a sense that he knew who killed him or at least that shot him, correct?

That's what we just showed you on the screen.

A. Well, no one identified -- you're interchanging them, but yes.

Q. All right.

THE COURT: We are about five minutes from quitting.

MR. LOEVY: I'll rap it in five.

THE COURT: Okay.

BY MR. LOEVY:

Q. So then you went and got the photos because he told you he could participate, correct?

A. Yes. But what we did with those -- but --

Q. We're -- not a lot of time, so I'll just go question and answer, and I'll try to ask fair questions.

When he told you that, you went to get the photos, right?

A. Yes, but we developed the photos.

Q. Okay. Then you went to get the photos?

A. Yes.

Q. All right. And you wouldn't have done that unless he told you he could identify the shooter, right?

A. Yes.

Q. And then you went back to the hospital?

A. Yes.

Q. And you had one of Jacques?

A. I had one of Jacques, four fillers --

Q. And did you explain --

A. -- and one of Rodriguez.

Q. Did you explain to the victim how the procedure was going to work?

A. When -- when we returned, which wasn't like a half hour

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 430 of 1254 PageID #:104566
McLaughlin - direct by Loevy
640

later.  It was hours later.

Q.  If you could just answer the question.

A.  I'm just trying to explain.

Q.  All right.  But the question was, did you explain to him how it was going to work?  Did that happen or not happen?

A.  I told him we were just going to hold up single photos. They weren't in any particular order.

Q.  All right.  And did you give him the usual disclaimer, like, "Hey, it might not be one of these people; it might be one of these people," that kind of thing?

A.  No.

Q.  All right.  He agreed to participate in the photo array process, correct?

A.  Yes, he did.

Q.  All right.  You -- and you said you were going to hold them up one at a time, right?

A.  Yes.

Q.  And you did show them one at a time, correct?

A.  I never completed the photo --

Q.  But you started?

A.  I started.

Q.  All right.  So you show him the first photo, right?

A.  Yes.

Q.  And you show him the second photo, right?

A.  I started, and I saw that his eyes were tearing up; the bed

McLaughlin - direct by Loevy

641

was moving. He didn't seem focused. He just was unaware.

So I went out and talked to the nurses at the nurses' station and asked if they had changed his medication or -- because he was in a different place.

Q. All right.

A. They said they put him on a morphine drip for pain.

Q. You were showing him photos, though, right?

A. We were attempting to do a fair photo array, but the victim was in no condition to identify --

Q. My question was, you were showing him photos, right?

A. Yes.

Q. And he wasn't nodding, right?

A. He wasn't doing anything.

Q. All right.

A. He was not --

Q. And when you had this conversation, when you said, "If you see the photo of your guy, nod," and he said -- he indicated to you he could participate in that process, correct?

A. Yes.

Q. All right. So you showed him pictures, and he didn't nod. Can we agree he didn't nod at Jacques' photo? You would have written it down if he nodded, right?

A. He didn't nod at anything --

Q. All right. Because maybe --

A. -- of the photos.

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 432 of 1254 PageID #:104563
McLaughlin - direct by Loevy
642

Q.  -- none of the six people were --

A.  No.  I --

Q.  Maybe none of the six people were the shooter?

MS. ROSEN:  Objection.

MR. POLICK:  Objection to the form of that question.

THE COURT:  Well, I think, you know, we're exploring hypotheticals, but I'm going to overrule that objection.

BY MR. LOEVY:

Q.  He didn't nod at any photo, right?

A.  He was in no condition to view a photo array at that time. It was stopped.

Q.  Okay.  Of course, you had already asked the doctors and him whether he could participate, and you explained to him, "If you see the photo, nod," and he agreed to participate?

A.  That was earlier.

Q.  All right.  In any event, we all agree you left the hospital without an identification of Jacques?

A.  That's true.

Q.  Did you go back later and get an identification of Jacques?

A.  No.

Q.  Did you go back the next day?

A.  No.

Q.  Did you go back the day after?

A.  No.  They said that they wanted us to wait -- wait until he was on -- they thought he was going to survive.  That was

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 433 of 1254 PageID #:104564
McLaughlin - direct by Loevy
643

number one.

They thought they were taking the tubes out of his throat at the end of the week. And so that's where that left.

Q. All right. Not only did you not procure an identification from the victim or Orlando, you yourself didn't procure any evidence suggesting Jacques was guilty, correct?

A. No.

Q. Now, you agree with me, right?

A. Well, if you're saying that I had --

Q. You said no. It's ambiguous.

A. Well --

Q. That was a no/yes, wasn't it?

A. It's a no -- well, I really don't understand that question.

Q. All right. When people are charged with murder, there has to be evidence, right?

A. Yes.

Q. And Orlando Lopez pointed the finger at Jacques. That was the evidence introduced, right?

A. Yes.

Q. Sometimes there's actually other evidence, right?

A. Yes.

Q. Sometimes there could be DNA, fingerprints, motive, murder weapons; there could be a lot of evidence, right?

A. There wouldn't be any DNA in this evidence.

Q. Well, maybe somebody -- did people look at the shell

casings --

A. Yes.

Q. -- for example? Sometimes there's evidence, right?

A. Yes.

Q. In this case, there was no evidence except --

A. There was -- there was -- yes. No.

Q. All right. And I guess then back to my question, you didn't develop any evidence at all, did you?

A. There wasn't any evidence to develop other than the victim or the eyewitness identification. That's the evidence that this case had.

Q. All right. And it turned out that wasn't good evidence, right, we now know?

MR. POLICK: Objection to the form.

THE COURT: Well, it's the end of the day.

MR. LOEVY: All right.

THE COURT: So I think we should start tomorrow. I think it's -- things take a certain course as it gets late, and I think they're on that track.

So 9:45, ladies and gentlemen.

COURT SECURITY OFFICER: All rise.

(Jury out.)

THE COURT: Okay. I've got the transcript. You are planning on calling this witness who is the subject of the objections tomorrow, right?

MS. ROSEN: Yes, Dr. Sharkey, yes.

THE COURT: Okay. We should -- I think I'm going to be tied up from 9:30 to 9:45. So maybe if you want these rulings ahead of time, maybe like 20, 25 after.

Is there anything else we have to meet about in the morning?

MR. BOWMAN: I have one small point if you have just a couple of minutes now.

THE COURT: I don't have a lot now, but why don't you tell me what it is.

MR. BOWMAN: I hope it's short.

There's a 404(b) witness whose name is Melendez. He is incarcerated in the federal --

THE COURT: We talked -- is this the one I did the writ for?

MR. BOWMAN: Yes, Your Honor.

THE COURT: Okay.

MR. BOWMAN: We have had conversations with him, and he has expressed to Mr. Art the view that he does not wish to participate in these proceedings.

THE COURT: Okay.

MR. BOWMAN: In light of that, our intention would be to read his deposition in lieu of the video testimony that your order had provided for.

THE COURT: Well, do you want to go with that, or do

you want to get him on and have him refuse?  If he refuses and I order him to answer the questions, we can do this outside the presence of the jury, I think.  But, you know, if that's what you want to have happen, I suppose we could do that.

MR. BOWMAN:  Your Honor, our view is, based on the conversations, that his -- his position is pretty clear.  And the concern is --

THE COURT:  When are you supposed to call him?  Because this is not great for me to be hanging around at this point.  Tomorrow, were you going to call him?

MR. BOWMAN:  Yes.

THE COURT:  Okay.  Go ahead.

MR. ART:  Monday.

MR. BOWMAN:  I'm sorry.  Monday.  We can deal with it later.

THE COURT:  So we can deal with it tomorrow.  I would much prefer to -- why don't you -- have you explained to the defense what these conversations --

MR. BOWMAN:  I have not.  I'll raise it.

THE COURT:  Okay.  Then let me know how you all suggest we should handle it.  Okay?

MR. BOWMAN:  Thanks, Your Honor.

MR. LEINENWEBER:  Thanks, Judge.

MS. ROSEN:  Thanks, Judge.

     (Adjournment at 4:03 p.m. until 9:20 a.m., 6/8/18.)

C E R T I F I C A T E

We, Colleen M. Conway and Nancy L. Bistany, do hereby certify that the foregoing is a complete, true, and accurate transcript of the Trial proceedings, Volume 3-B, had in the above-entitled case before the HONORABLE JOAN B. GOTTSCHALL, one of the Judges of said Court, at Chicago, Illinois, on June 7, 2018.

/s/ Colleen M. Conway, CSR, RMR, CRR          06/07/18

/s/ Nancy L. Bistany, CSR, RPR, FCRR          06/07/18

Official Court Reporters                      Date
United States District Court
Northern District of Illinois
Eastern Division

# EXHIBIT 46

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 6.2.2**
**Eastern Division**

Jacques Rivera

                  Plaintiff,

v.

                                   Case No.: 1:12–cv–04428
                                   Honorable Joan B. Gottschall

Reynaldo Guevara, et al.

                  Defendant.

**NOTIFICATION OF DOCKET ENTRY**

This docket entry was made by the Clerk on Friday, June 29, 2018:

      MINUTE entry before the Honorable Joan B. Gottschall: Jury trial held. Jury deliberations began and concluded. The jury returns its verdict in favor of the plaintiff and against the defendants Reynaldo Guevara, Steve Gawrys, Edward Mingey, and the City of Chicago in the amount of $17,000,000.00 for compensatory damages on all five claims; $75,000.00 in punitive damages against Reynaldo Guevara; $25,000.00 in punitive damages against Steve Gawrys; and $75,000.00 in punitive damages against Edward Mingey. The jury returned a verdict for defendant Gillian McLaughlin and against plaintiff on all claims against her. Mailed notice(mjc, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at *www.ilnd.uscourts.gov*.

# EXHIBIT 47

# SUPPLEMENTARY REPORT
CHICAGO POLICE

27 Aug 88    1545

| 1. INCIDENT/OFFENSE CLASSIFICATION LAST PREVIOUS RE | 1. UCR OFF. CODE | 2. ADDRESS OF ORIG. INCIDENT | NSE 1 VERIFIED 2 CORRECTED | 3. BEAT OF OCCUR |
|---|---|---|---|---|
| Murder/Homicide | 0110 | 3320 W. Cortland | | 1422 |

| 5. VICTIM'S/SUBJECT'S NAME AS SHOWN ON LAST PREVIOUS REPORT | CORRECT | 6. FIRE RELATED | 7. BEAT ASSIGNED |
|---|---|---|---|
| VALENTIN,Felix | X YES ☐2NO | ☐1YES X2NO | 4627 |

| 8. VICTIM'S/SUBJECT'S ADDRESS | 9. TYPE OF LOCATION OR PREMISE WHERE INCIDENT/OFFENSE OCCURRED | LOCATION CODE |
|---|---|---|
| 1458 N. Campbell | Alley | 092 |

PROPERTY

10. DESCRIBE PROPERTY IN NARRATIVE T = TAKEN; R = RECOVERED

FILL IN THE FULL AMOUNT OF ONLY THOSE VALUES WHICH EITHER DIFFER FROM OR WERE NOT REPORTED ON THE ORIGINAL CASE REPORT OR THE LAST PREVIOUS SUPPLEMENTARY REPORT

| 1 MONEY ☐T ☐R | 2 JEWELRY ☐T ☐R | 3 FURS ☐T ☐R | 4 CLOTHING ☐T ☐R | 7 OFFICE EQUIPMENT ☐T ☐R | 8 TV, RADIO, STEREO ☐T ☐R | PROPERTY INVENTORY NO(S). |
| 9 HOUSEHOLD GOODS ☐T ☐R | 0 CONSUM. GOODS ☐T ☐R | (-) FIREARMS ☐T ☐R | & NARC./DANGEROUS DRUGS ☐T ☐R | 5 OTHER ☐T ☐R | 6 NONE ☐T ☐R | |

OFFENDERS

| 11. OFFENDER'S NAME (OR DESCRIBE CLOTHING, ETC.) | 12. HOME ADDRESS | 13. SEX-RACE-AGE CODE | HEIGHT | WEIGHT | EYES | HAIR | COMPL. |
|---|---|---|---|---|---|---|---|
| 1 RIVERA,Jacquez | 4231 W. Division | M 4 23 | 5-9 | 160 | Br | Br | Med |
| 2 | | | | | | | |

| 14. C.B. NO. | I.R. NO., Y.D. NO. OR J.D.A. NO. | OFFENDER REL. CODE | C.B. NO. | I.R. NO., Y.D. NO. OR J.D.A. NO. | OFFENDER REL. CODE | 15. NO. ARRESTED | ARREST. UNIT NO. |
|---|---|---|---|---|---|---|---|
| OFF.1 8112-639 | 614010 | 24 | OFF.2 | | | | |

| 16. OFF'S. VEHICLE ☐USED ☐STOLEN | YEAR | MAKE | BODY STYLE | COLOR | V.I.N. | STATE LICENSE NO. | STATE |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

80. NARRATIVE

VICTIM: VALENTIN,Felix;M/WH/16;1458 N. Campbell 3 rd. flr.

Deceased, former member of the Campbell Boys/014

DATE,TIME,LOC. OF INC: 27 Aug 88;1545 hrs.;3320 W. Cortland,Alley

DATE,TIME,LOC. OF ARREST: 15 Sep 88;1930 hrs.;5555 W. Grand,A/5 VC

OFFENDER: RIVERA,Jacquez;M/WH/23;30 Apr ████;5-9,160;

AKA. RIOS,Jose;4231 W. Division 3rd. flr.

nickname, ACE;member of Latin Kings/014

CHARGES: Murder 1st. Degree;38-9-1a

COURT DATE & BRANCH: 16 Sep 88;66-2

INVESTIGATION: Reporting officers along with other Gang Crime

Specialists were investigating an Aggravated

Battery in which the victim was shot ten times. GCSp. Noon, Guzman, Sparks,

and Zacharias located a witness on 29 Aug 88. This witness was brought

into Gang Crimes North to view gang photo books. On that date witness

positively identified the photo of Jose RIOS from book 16-D,page 40 X CONTINUED OTHER SIDE

17. RD NO. K-371955

| 90. EXTRA COPIES REQUIRED (NO. & RECIPIENT) | 91. DATE THIS REPORT SUBMITTED — DAY MO YR | TIME | 92. SUPERVISOR APPROVING (PRINT NAME) | STAR NO. |
|---|---|---|---|---|
| | 16 Sep 88 | 0030 | Sgt. Mingey | 1731 |

| 93. REPORTING OFFICER (PRINT NAME) | STAR NO. | 94. REPORTING OFFICER (PRINT NAME) | STAR NO. | SIGNATURE |
|---|---|---|---|---|
| GCSp. S. Gawrys | 16899 | GCSp. R. Guevara | 16345 | |

| SIGNATURE | SIGNATURE | 95. DATE APPROVED (DAY—MO.—YR.) | TIME |
|---|---|---|---|
| S. Gawrys | R. Guevara | 16 Sep 88 | 0030 |

CPD-11.411-A (REV. 8-85)    •MUST BE COMPLETED IN ALL CASES

Wron 00040

Plaintiff's Trial Exhibit 1
1 of 2

CONTINUATION OF NARRATIVE

INVESTIGATION CON'T: photo D, Latin King gang book. Numerous attempts were made to interview the victim at Cook County Hospital, on 10 Sep 88 r/i's were able to have victim view gang photo book were then an idetification was made of Jose RIOS as the person that shot victim.

On 15 Sep 88, reporting officers located Jose RIOS, AKA. RIVERA,Jaqcuez on the street and he was asked to accompany r/o's to A/5 VC to stand in a line-up for Murder. Subject agreed and he was read his Miranda warnings.

Once in A/5 VC Jose RIOS was placed in a line-up and he was positively identified as the person that shot the victim Felix VALENTIN on 27 Aug 88. Review by A.S.A. Rosner with witness, charges of 1st. Degree Murder were approved.

Orlando LOPEZ, witness, was shown photos of Jose RODRIQUEZ and Felipe NIEVES and he stated to r/i's that these two individuals were not involved in this incident.

R.D. NO. K-371955

| I HAVE REVIEWED THIS REPORT AND BY MY SIGNATURE INDICATE THAT IT IS ACCEPTABLE. | SUPERVISOR'S SIGNATURE | STAR NO. | DATE (DAY-MO-YEAR) |
|---|---|---|---|

Wron 00041

Plaintiff's Trial Exhibit 1
2 of 2

# EXHIBIT 48

CITY OF CHICAGO, DEPARTMENT OF POLICE / 1121 South State Street
IDENTIFICATION SECTION          Chicago, Illinois   60605

CRIMINAL HISTORY OF **RIOS, Jose**     M/WH

DATE          **29 July 1981**

DATE OF BIRTH     **30 April 1964**

| I.R. NO. 614010 | FBI NO. 970150 AA5 | I.S.B. NO. 2423829 |
|---|---|---|

| NAME & ADDRESS | C.B. NO. | DATE OF ARREST / ARRESTING OFFICER & DIST. / CHARGE | DISPOSITION |
|---|---|---|---|
| Jose RIOS 3449 W. North 30 April ▮ | 6187986 | –28 Jul 81. Off. Rogers, 14th Dist, Disorderly Conduct. | |
| Jacques RIVERA 3335 W. Beach 30 Apr ▮ | 6776065 | – 27 Feb 83 Off Chavez 14 dist ▮▮▮ 28 Feb 83, ▮▮▮ FPC, TRANSFER TO CHIEF JUDGE. Judge Sodini 14 Mar. 83, INFO#83-2690, ▮▮▮ | (95½-4-103a) |
| Jack RIVERA 3335 W Beach 30 Apr ▮ | 6851273 | – 02 Jun 83 Off Gruber Summer Mobile Force (14)▮ 24 June 83, ▮▮▮ Fail Exib Reg. (MCC) Fail Poss. I.D. (38-83-2a) BFW, Judge Laurie (Docket No. 83235069) | |
| | SEE CB 6776065 | 28 June 83. ▮▮▮ Nolle Prosse, ▮▮▮ 2yrs PROBATION, Judge Hall. | |
| | SEE C▮ 6857273 | –2▮ Aug ▮3, ▮▮▮ Fail to Exhibit Reg (MCC) Fail Poss ID Card (3▮-▮3-2a) SOL, Judge ▮acellaio (Docket No. ▮323 50▮9) | |
| ▮aques RIVERA ▮032 W. Division ▮0 Apr ▮ | 7355806 | –20 May 85, Off. Fnuelly GCU-North (014th) ▮▮▮ 17 Jul 85, ▮▮▮ (56½-1402), ▮▮▮ (38-83-2), SOL, Judge Kowalski, (Dk#85-1172594) | |
| ▮acques RIVERA ▮32 W. Division ▮ Apr ▮ | 7849197 | –23 Jul 87, Off. Clark, 14th Dist., ▮▮▮ 10 Aug 87, ▮▮▮ SOL Judge Chrones (Doc# 8718 1956) | |
| Jacques RIVERS 4448 W. Cortez 30 Apr. ▮ | 8034413 | –24 May 88, Off. RRamirez, 14th dist. Poss. Cann. | |

ISSUED ON INQUIRY
AUG 27 1988
BY NAME CHECK ONLY

Wron 00055

CONFIDENTIAL –Further dessemination of information contained in this record is forbidden. When this record has served the purpose for which it was issued it must be destroyed. (U.S. Dept. of Justice Rules & Regulations

PLAINTIFF'S TRIAL EXHIBIT 4
1 of 1

# EXHIBIT 49



Bluhm 045097

PLAINTIFF'S TRIAL EXHIBIT 66
PAGE 1 OF 1

# EXHIBIT 50

647

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JACQUES RIVERA,                              ) No. 12 CV 4428
                                             )
              Plaintiff,                      )
vs.                                          ) Chicago, Illinois
                                             )
REYNALDO GUEVARA, STEVE GAWRYS, DANIEL NOON,)
JOHN GUZMAN, JOSEPH FALLON, JOSEPH SPARKS,   )
PAUL ZACHARIAS, GILLIAN MCLAUGHLIN, JOHN     )
LEONARD, EDWARD MINGEY, RUSSELL WEINGART,    ) June 8, 2018
ESTATE OF ROCCO RINALDI, City OF CHICAGO,    )
                                             )
              Defendants.                     ) 9:20 o'clock a.m.

VOLUME 4 A
TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JOAN B. GOTTSCHALL
and a jury

APPEARANCES:

For the Plaintiff:       LOEVY & LOEVY
                         BY:  MR. JONATHAN I. LOEVY
                              MR. STEVEN E. ART
                              MR. ANAND SWAMINATHAN
                         311 North Aberdeen Street
                         3rd Floor
                         Chicago, Illinois  60607

                         MacArthur Justice Center
                         Northwestern University School of Law
                         BY:  Locke E. Bowman , III
                         357 East Chicago Avenue
                         Chicago, Illinois 60611
                         (312) 503-0844


Court reporter:              Blanca I. Lara
                         Official Court Reporter
                         219 South Dearborn Street
                            Room 2504
                         Chicago, Illinois 60604
                            (312) 435-5895
                         blanca_lara@ilnd.uscourts.gov

648

Appearances  (continued:)

For the Individual          THE SOTOS LAW FIRM
Defendants:                 BY:  MR. JEFFREY N. GIVEN
                                 MR. JAMES G. SOTOS
                                 MS. CAROLINE P. GOLDEN
                                 MR. JOSEPH M. POLICK
                                 MR. DAVID A. BRUEGGEN
                            550 E. Devon Avenue, Suite 150
                            Itasca, Illinois  60143

For the Defendant           ROCK FUSCO & CONNELLY, LLC
City of Chicago:            BY:  MS. EILEEN E. ROSEN
                                 MS. CATHERINE M. BARBER
                                 MS. THERESA B. CARNEY
                            321 N. Clark St., Suite 2200
                            Chicago, Illinois  60654

For the Defendant           LEINENWEBER BARONI & DAFFADA, LLC
Guevara:                    BY:  MR. THOMAS E. LEINENWEBER
                                 MR. JAMES V. DAFFADA
                            120 N. LaSalle St., Suite 2000
                            Chicago, Illinois  60602

649

(The following proceedings were had out of the presence of the jury in open court:)

THE COURT: Did Mr. Leinenweber, was he responsible for any of these objections or designations in the deposition?

MR. LOEVY: No, Your Honor.

THE COURT: Okay. So I think we can proceed even though he is not here and then you can tell him.

All right. Page 85 in the transcript.

You all have the transcript?

MR. ART: Yes, Your Honor.

MR. BRUEGGEN: 85?

THE COURT: 85.

What's the relevance of this?

MR. ART: The relevance is simply that the doctor is getting paid. He got paid once for preparation, he got paid once for his deposition, and if we leave out the additional lines explaining what the extra $3,500 is for, it's unclear why he got paid again.

MR. BRUEGGEN: Judge, I think it's irrelevant, and misleading, and confusing.

THE COURT: It's ridiculous, but, you know, if somebody thinks that it's important to explain how he got paid, it really makes very little difference. So I'll allow it, if you understand it at all. I hope you're not wasting the jury's time with stuff that they don't need to hear.

650

But, in any event, okay, 93.  Again, I didn't have a clue about why anybody thought this was relevant.

Whose objection is this?

MR. BRUEGGEN:  This is my objection, Your Honor.  It's irrelevant, misleading, wastes time.

THE COURT:  Well, let's see what it is.

(Brief pause).

THE COURT:  So you are asking the doctor if he interviewed the victim about this offense?

MR. ART:  Well, he's being asked a series of questions about his conversation with the victim.  And we designated that he doesn't have a recollection talking to him about who shot him in this incident.  And that, you know, on September 3rd he was -- he was -- his condition was getting worse, but we can withdraw this designation.

THE COURT:  Okay.  Fine.  It's withdrawn.

All right.  Then on 109, again, I did not quite understand who was objecting and who wasn't, but it doesn't matter because I don't see why that should come in.  You know, if somebody wants it, fine, but I the objection should be sustained.

MR. BRUEGGEN:  So, Judge, if I could just respond very quickly?

THE COURT:  Yes.

MR. BRUEGGEN:  He's asked -- so there's an issue of

651

whether the police are actually there in the hospital. And so the question is, "For all you know, these visitors...," because hospital records show visitors are there, they're just not designated as police.

THE COURT: I get it.

MR. BRUEGGEN: So I say, "So for all you know, those visitors could be police?" He goes, "Correct. I wouldn't know, correct."

THE COURT: Well, that's a typical speculative question that you're not supposed to put in front of juries. I mean, it could've been -- you know, the FBI could've been there, the President of the United States could've been there. I'm goofball. No, I'm going to sustain that objection.

Then the next one I have a question about -- well, not really, but let me see. I have 114.

MR. LOEVY: It's just that one line, Your Honor, line 15.

THE COURT: This joking?

MR. LOEVY: Mr. Given's joke. He wants to leave it in because it's humorous.

THE COURT: I don't think that humor is appropriate at this point, frankly, and I don't see why the jury needs to waste it's time hearing it. So that's sustained.

How anybody could read this, and you know, it's gallows humor. It's horrible.

652

147. Okay, so this one I was a little bit clueless about. So let me just go over what it is. Somebody is talking about taking a break, and then it goes into a discussion of bacterial infection, and whether antibiotics can treat it or not.

MR. ART: Your Honor, in this one we were just designating the rest of the conversation, part of which was designated by defendants. So we designated, and now they're objecting to the part of it that we designated.

THE COURT: Well, is it necessary to explain anything that this jury needs to know, because I don't get it.

MR. ART: We think the entire discussion could be withdrawn. So it's --

THE COURT: Well, that wasn't presented to me, though, right?

MR. ART: No.

THE COURT: So, Okay.

MR. LOEVY: Maybe we can agree right here, though.

THE COURT: Well, I don't know. But I find this, you know, a lark and a frolic that this jury doesn't need to hear about.

MR. BRUEGGEN: Judge, I just want to make sure. We're at the bottom of 147 and 148.

THE COURT: Correct.

MR. BRUEGGEN: Is that what we're referring to, the

653

infection?

THE COURT: We're talking about antibiotic infections and how you treat them.

MR. BRUEGGEN: Right. I objected here at the bottom of 147 and 148. And I agree, I don't think it's --

MR. ART: Judge, it sounds like we can withdrawn the designations on both sides.

THE COURT: Excellent. Okay, 147, 148 gone. That saves us two minutes.

The next one is 149 and 150.

MR. BRUEGGEN: Judge, but you just struck -- I'm sorry, here's the problem: They just struck something that they didn't object. My -- my designation, it's important for the jury to know that there was this infection going around because that's what they died from.

THE COURT: Well, I read the deposition and I knew there was an infection way before I got here.

MR. BRUEGGEN: But the jury doesn't know that. And so my short objection on 148 is that he had this objection, and then they add this whole thing about --

THE COURT: So you're telling me that given the designations, they would otherwise not know anything about this infection?

MR. ART: No, they would be told that at least 6 or 7 times, Your Honor.

654

THE COURT:  Well, that was my impression.

MR. BRUEGGEN:  All right, Judge, you know what?  You've ruled.  That's fine.

THE COURT:  Okay.  Good.

All right, I think the next one, may have missed my place, but I think it's 149 to 150.

MR. ART:  Yes, Your Honor.

MR. BRUEGGEN:  And, Judge, these are just to orient the jury and the doctor to which page I'm showing him.

THE COURT:  Why does the jury care what page you're showing him?

MR. BRUEGGEN:  Well, because I think we will be using exhibits, so I need to introduce the exhibit --

THE COURT:  Oh, I see.

MR. BRUEGGEN:  -- by showing what page we're on.

THE COURT:  So you're showing the doctor Exhibit 6.

MR. BRUEGGEN:  Right.  And then what I'm doing at the dep is, I'm reading to him to make things go faster --

MR. ART:  Your Honor --

MR. BRUEGGEN:  -- instead of having him --

May I finish, please?

MR. ART:  I withdraw the objection.

THE COURT:  Oh, good.  The objection is withdrawn.  Fine.

MR. BRUEGGEN:  Thank you.

655

THE COURT: Okay. Then we go to 154 through -- 154 -- yeah, 154.

MR. BRUEGGEN: This is my objection, Your Honor.

THE COURT: All right. Hold on a minute. Let me refresh my recollection.

(Brief pause).

THE COURT: Okay, so why does the plaintiff -- the plaintiff wants this? Why?

MR. ART: Your Honor, these are two halves of a single answer to a single question.

THE COURT: Where is the question?

MR. ART: The question begins on 153-14.

THE COURT: 154-14. The question is?

MR. ART: 14 through 20.

THE COURT: Okay:

"... is there any medical reason to doubt that the victim was unable to verbalize?

And the answer is:

"... I have to be honest. I have got to go back and look at all the records. I've got a decent memory. I think we already surmised that he had some awareness on the 22nd. And I think I may have misstated what I handed you what I just -- did I call it an exhibit."

What is he even saying?

MR. ART:  So the first part of the answer is from 153-24 to 154-01.

THE COURT:  Which is what?

MR. ART:  Which is:

"... I can give you a general recollection, that would be reasonable."

"Yes."

And then Given says, "okay."  And then there's an objection.  And then he says -- the answer continues and he says, 154-10:

"... so, I mean, I have to -- to be honest, to give you a formal answer, I have to go back and look at the records --"

THE COURT:  So are you trying to show that on the 22nd, which I didn't think was an issue, he did not have the ability --

MR. ART:  No, I'm just trying to make sure there's a complete answer.

THE COURT:  Well, we don't need a complete answer if this jury doesn't need to hear it, okay.  I mean, we're not here to waste time.  Tell me what he says here.  You know, "I have great memory," "but I don't remember."  I don't get it.  I mean, for completeness, completeness is good, but only if it says something that the jury needs to hear.

MR. GIVEN:  And, Judge, I just want to add, the 22nd

657

is before he's even in the hospital. The doctor just said the wrong date, that's why it's confusing, and it ultimately doesn't add anything.

MR. ART: What Mr. Given is trying to get in is that the doctor in a response to a question, "Could Felix Valentin verbalize," starts an answer and says, "I can't -- I can't -- I have to go back to these record, essentially, but you have a general recollection, I would say yes ..." and then he stops the answer, but the doctor continues and says:

So, I mean, to be honest, to give you a formal answer I have to go back and look at the records."

He's not saying "yes."

MR. LOEVY: It's the rest of his answer, Your Honor.

THE COURT: So the point of this is that whatever he said previously, he's not sure is correct.

MR. ART: Exactly.

THE COURT: Fine. Okay. Then it can come in.

And then the next one is 160.

MR. BRUEGGEN: And I'm not sure what is the problem here. I'm just pointing to him to the section of the page that we're looking at.

(Brief pause).

THE COURT: Okay. And the last sentence of what are we talking about?

658

MR. ART: So I think our objection is to -- actually, we withdraw this objection.

THE COURT: Okay. So the defense can use this?

MR. ART: Yes.

THE COURT: Good.

And then the next one is 175, and the objection is leading.

MR. BRUEGGEN: Right. He's leading his own witness.

THE COURT: Yeah, I get it.

MR. BRUEGGEN: Okay.

THE COURT: And lawyers think, I think incorrectly, that on redirect you're allowed to lead, which, as far as I know, you're not.

But I'm trying to figure out -- I think there's a fine line in whether you're directing the witness's attention on something that happened on cross or whether you're actually leading.

So why doesn't the defense -- first of all, let me try to get to the substance and find the question, because this is like stream of consciousness, sort. So the question is:

"... as of September 10th or September 9th, Mr. Valentin was failing to respond to all those things ..."

that's pretty leading.

And the answer is:

659

"... I have to give the fact that I said he's less responsive today on a note, I think, and I can't review that again if it's important, reflect the responsibility of the 10th, but from reviewing the entire record, looking at the medications and other notes, it's my impression that he would not have been able to answer any questions on the 10th or the 11th ...."

Is this -- you know, this is the critical issue; is it elsewhere in this deposition?

MR. ART: Yeah. And so on redirect I'm going back to a subject that on cross-examination Mr. Given questioned him about to reiterate what he said earlier in the examination, and he reiterates it here.

THE COURT: So on cross-examination it's going to come out that he didn't know this or didn't remember this?

MR. ART: No, on cross-examination the issue is muddied a little, I would say. And so we're coming back to it here.

MR. LOEVY: Well, the real issue, Your Honor, is on page 177, which is our only objection that really matters. The middle box from 6 to 13, that is a repeat -- that's a repeat, too. You know, this is a deposition that went on 180 pages --

THE COURT: Yeah, I get it.

660

MR. LOEVY:  So this exact question was asked earlier.  We feel strongly that that should be cut.

THE COURT:  Well, wait, wait.  You feel strongly what?

MR. LOEVY:  That 177, lines 6 through 13, is an exact duplicate of a question that was asked on page 149, Lines 21 through 24.  And it's really the only thing that the deposition that is being read for, and they should not get to read it twice.  And the reason I jumped ahead to this one is, I think that might inform you're ruling on the earlier one, too.  We're taking the position that --

THE COURT:  Well, you know --

MR. BRUEGGEN:  Judge, can I respond very quickly?

THE COURT:  You can respond quickly, but we're not going to repeat a whole lot of things in reading this deposition.

MR. BRUEGGEN:  I understand.  This is their question, not mine.  They saw it was important enough to bring it up again.

THE COURT:  That doesn't matter.  I'm not going to make a ruling on that.  I think that's kind of, you know, "they question, not mine," I'm not going to rule based on that.

MR. BRUEGGEN:  And, in fact, it is a key issue, and so the answer is important.  And it's not the only why this deposition is being read, despite what Mr. Loevy wants to --

MR. LOEVY:  Your Honor, if we could turn your

661

attention to page 116, Lines 11 through 25, that is the exact --

THE COURT: All right. Let me look at this.

(Brief pause).

THE COURT: All right. You want me to look at 116?

MR. LOEVY: 116, lines 11 through 25. The score is the point that defendants are trying to score.

THE COURT: 116 --

MR. LOEVY: Lines 11 through the bottom. So Line 11 in the middle there to the bottom.

(Brief pause).

MR. LOEVY: Then it goes to page 177, lines 6 through 13.

THE COURT: Well, what happens if all of this stuff on 175 goes out and 177 goes out. I mean, aren't we just avoiding a lot of repetition?

MR. LOEVY: That is why I brought this up out of order. I mean, it's just repetition. And you wouldn't allow it in court, so you shouldn't allow it ---

THE COURT: I think that's what I'm going to do, I'm going to sustain the objection to both 175 and 177. Enough is enough.

Okay, let me do my call and I'll be back to you as soon as I can.

MR. BRUEGGEN: Thank you, Judge.

662

MR. ART:  Thank you.

(Whereupon, the Court directed his attention to other matters on his call, after which the following further proceedings were had herein:)

THE COURT:  Oh, and we'll have the 404(b) ruling written ruling for you --

Do we have that yet?  Is it ready, that 404(b)?

COURT'S LAW CLERK:  We have it.

THE COURT:  Can we give it to the lawyers?

COURT'S LAW CLERK:  Absolutely, Your Honor.

THE COURT:  Nothing is changing.  It's just being clarified.

(Recess.)

THE COURT if the jury is here, let's go for it.

Okay, and is the witness here?

You may re-take the witness stand at your convenience.

(Brief pause).

THE MARSHAL:  All rise.

(The following proceedings were had in the presence of the jury in open court:)

THE COURT:  Good morning, ladies and gentlemen of the jury.  Please be seated.

Counsel.

MR. LOEVY:  Thank you, Your Honor.

GILLIAN MCLAUGHLIN, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

DIRECT EXAMINATION (resumed)

BY MR. LOEVY:

Q.  Good morning.

A.  Good morning.

Q.  All right.  Ms. McLaughlin, when we left off last night we were talking about the interaction you had with the victim at the hospital; do you remember that?

A.  Yes.

Q.  Do you remember us talking about it?

MR. POLICK:  Objection; foundation.  Which interaction are we talking about?

MR. LOEVY:  I'll rephrase.

THE COURT:  Okay.

BY MR. LOEVY:

Q.  If I show you this chronology here, and I orient you to it before I show the jury.  The shooting happens on the 27th, you're to Valentin on the 31st of August, correct?

A.  At Cook County?

Q.  Where you talked to him with the photo?

A.  Yes.

Q.  All right.  And then if I could publish the same to the jury.

(Exhibit published to the jury).

BY MR. LOEVY:

Q. We're talking about early in your investigation, 31st. Now, nothing happens on the investigation between the 31st and Valentin's death, to your knowledge, correct?

A. Correct.

Q. All right. Let's talk about the interaction you had with Mr. Valentin, if possible, on the 31st.

Just to back up so we can reorient. The doctors did tell you that Mr. Valentin could participate in this procedure based on his medication, correct?

A. Yes.

Q. And after you came back with the photographs to show him --

MR. LOEVY: Ann, I forgot the Polaroids, the six Polaroids.

MS. SCOTT: Yes.

(Brief pause)

BY MR. LOEVY:

Q. After you came back with the Polaroid's, he told you, by nodding, "I'm ready to do this," right?

A. Yes.

Q. Okay. So then you explained to him how it's going to work. You're going to nod if you see the guy, right?

A. Yes.

Q. And you did start showing him the photos one at a time?

A. (Nodding.)

McLaughlin - direct by Loevy

665

Q.  That's a "yes" "no."

A.  I did start, yes.

Q.  All right.  One at a time.

And at Jacques' photo, I realize you say that you didn't think it was working so good, but it's not disputed that he did nod at Jacques' photo, right?

A.  I never said that I got to Jacques' photo.

Q.  Well, there was only 6 photos, right?

A.  There was, but this photo identification stopped very early in the process.

Q.  All right.  Do you remember if you stopped at two or three?

A.  I would say two.

Q.  You would say two, but you might've stopped at three?

A.  No.

Q.  Well, you don't remember --

A.  The photographs were not in order.

Q.  All right.  Let me just ask you if you actually remember this or you're just sort of guessing 30 years later?

A.  No, I'm not guessing 30 years later.  This was very emotional to see this victim in this bed, in this condition.  His eyes were watering.  He couldn't focus.  My responsibility is for a fair and true identification.  So I stopped it.

Q.  Your responsibility was to get a fair and true identification so somebody can go on trial for murder, right?

A.  Absolutely.

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 467 of 1254 PageID #:104598
McLaughlin - direct by Loevy
666

Q.   All right.  It is like you said to Jose Rodriguez, "Jose, you're not up to this, are you?" "Yes?" "No?"  "Nod."  There was no interaction like that, right?

A.   We asked if he would be willing to do this.  And he -- as far as I know, he felt that he could, but he couldn't.

Q.   All right.  I'm past that part.

He said, Okay, I can do this."  You started showing him the photographs, but you decided to stop --

A.   Yes.

Q.   -- but my question is, you didn't say -- you're not claiming you said anything like, "Listen, Felix, are you okay?" "Should we do this?" "Yes or no, are you up to this or not?" There was no such question, right?

A.   No, I chose to go and talk and see if they had changed his medication because his condition seemed to have changed to me since the morning.

Q.   All right.  And you did, in fact, stop before you got to the 6th photo, you agree with that, right?

A.   Absolutely.

Q.   All right.  Showing you Plaintiff's Exhibit 14.  This is already in evidence, I believe.

(Exhibit published to the jury.)

MR. LOEVY:  May I tender a copy to the witness, Your Honor?

MS. ROSEN:  Judge, it's actually not in evidence, but

we don't have an objection.

THE COURT:  Okay.  I'll receive it.

(Exhibit 14 was received in evidence).

(Brief pause)

BY MR. LOEVY:

Q.  Tell the jury what this is.

A.  This is a general progress report which identifies each person and correlates with the number on the back of a photo for the photo array at the hospital.

Q.  All right.  So the photos you were showing Mr. Valentin are listed here 1 through 6, right?

A.  It's the name of the person and the address that was given.

Q.  And each person has a number on it which photo, right?

A.  Yes.

Q.  And then that corresponds to Plaintiff's Exhibit 62, which are these photographs of these people, right?

A.  Yes.

Q.  So the one thing you're sure of is, you did not get to all the way to Jose Rodriguez before you quit doing the photo arrangement, correct?

A.  As I stated before, the photos were in random order.

Q.  Well, they appear to be numbered, don't they?

A.  Well, the photos were numbered, but in presentation to the victim they were in a random order.

Q.  Well, you have to write down what the number is.  You said,

"I'm going to show you number 6"?

A. The end of the photo array, if it had been completed, then I would have written down, 4, 5, 3, 2, 1, or whatever the situation was. That didn't happen.

Q. You would have to agree with me, that is self-serving testimony in the sense that that would be good for you if you didn't go in order, correct?

MR. POLICK: Objection, Your Honor.

THE COURT: I'm going to sustain the objection.

BY MR. LOEVY:

Q. All right. Do you have any proof or reason to believe that you, in fact, went out of order or are you just say, I went out order"?

A. It's in the report somewhere.

MR. POLICK: Again. Objection, Your Honor.

THE COURT: Overruled.

BY MR. LOEVY:

Q. Do you understand the question?

What I'm asking is, you've now said you went out of order, that's written down. Do you have any proof of that or are you just saying it?

MR. SOTOS: Objection. She didn't say she went out of order. She said the photos were not in the order that were assigned. She never said she went out of any order.

THE COURT: I think the testimony was it was random.

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 470 of 1254 PageID #:104601
McLaughlin - direct by Loevy
669

THE WITNESS:  Random.

BY MR. LOEVY:

Q.  And I'm saying the photos are numbered in order, correct?

A.  Yes.

Q.  And they are recorded for a record in court in order, correct?

A.  Yes.

Q.  And now, as Mr. Sotos has pointed out, you're saying, "Well, although that's the way it's recorded, I remember that I didn't use that order," that's your testimony, right?

A.  It's my testimony because I believe it's written in a report that I showed the photos in random order.  It's in a report.

Q.  All right.  Do you usually show photos in random order?

A.  Yes.

Q.  Not in the -- if he picked number 4, then George Ruiz would say, Well, he didn't pick me because I wasn't the 4th because he did it in random order?

A.  No.  You're confusing the issue.

Q.  Maybe I am.  I apologize if I am.

When Mr. Valentin didn't pick Jacques' photo, you never went back to the hospital, correct?

A.  No.

Q.  All right.  So if the doctors told you he could do this, but you decided you couldn't, why didn't you ask Mr. Valentin

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 471 of 1254 PageID #:104607
McLaughlin - direct by Loevy
670

the next day to see if he could identify Jacques Rivera?

A.  Because the doctors told us they expected him to survive and that to come back, it was more than a couple of days.

They said they were going to try and take -- he was intubated.  They were going to try and take the tubes out.  We thought it would be a lot better if we could speak with him and he could verse back with us, so that's why we waited.

Q.  Okay.  Well, once you waited, why didn't you go back?

A.  That I don't know.  Whether there was another homicide that came in or something else, I couldn't tell you.

Q.  You would agree with me that the victim, who had already told the Letrich, or Mr. Letrich, "Hey, I know who shot me, it was an IG and I know his name," that would be a very important witness to go back to, would it not?

MS. ROSEN:  Objection.  Mischaracterizes the evidence, Your Honor.  He never said he knew his name.  Letrich did not testify that he knew his name.

THE COURT:  All right.  Let's stick with whatever it was that Letrich said.

BY MR. LOEVY:

Q.  You were in court when Letrich testified, right?

A.  Yes.

Q.  You heard Letrich say that he asked Felix, the same way you communicated with him, was it a Latin King or an IG.  Felix told him it was IG, right?  Imperial Gangster, not a Latin

King?

A.   I wasn't there, so I'm not sure what he said.

Q.   But that was what he indicated to you back in 1988?

A.   Yes.  Well, that was what was on report, yes.

Q.   And, in fact, Officer Letrich communicated to you that he believed that the guy, who got shot 11 times by somebody, knew the kid who shot him, that's what he communicated to you, correct?

        MS. ROSEN:  Objection, Judge; foundation.

        THE COURT:  I think the witness can say "yes" or "no." Overruled.

BY THE WITNESS:

A.   I received Officer Letrich's report.  He did not verbally that I know verbally communicate anything to me.

Q.   All right.  Let's go back to how Jacques -- by the way, if it was your investigation, would it have made sense to talk to Officer Letrich?

A.   If our investigation -- we probably would've if we had the lineup and gone to that extent, but --

Q.   But you guys went a different way.  You went to the Jacques Rivera way instead of the Jose Rodriguez, correct?

        MR. POLICK:  Judge, argumentative.

        THE COURT:  Sustained.

BY MR. LOEVY:

Q.   All right.  Let's talk about how Jacques Rivera became part

of the case.  I'm going to show you a copy of Plaintiff's Exhibit 1.  This is Mr. Guevara and Mr. Gawrys' police report. We've been talking about this at the trial.  You're familiar with this closing report, correct?

A.  Well, I've looked at it.  It's not my report.

Q.  It's Gawrys and Guevara's report, correct?

A.  (No response).

Q.  Correct?

A.  Yes.

Q.  All right.  Now, I'm going to show you the second page here, and in particular -- actually, I guess it's on the first page.  I'm going to show where it says that some officers located a witness on August 29th, 1988; do you see that?

A.  Yes, I do.

Q.  August 29th, '88, is an important date in the case, correct?

A.  Yes.

Q.  On that date the witness positively identified the photo of Jose Rios from the book, right?

A.  That's what the report says.

Q.  All right.  Is that fraudulent or was that your understanding?

A.  It didn't happen on the 29th of a August.

Q.  This is a lie?

A.  It's a mistake, is what I would call it.

Q. Did you ask Mr. Guevara and Mr. Gawrys why they made a mistake?

A. I didn't see this report until way after this all happened.

Q. So you didn't know that the gang book identification happened on the 29th of August?

A. It didn't happen on the 29th, it happened on the 27th.

Q. All right. You would agree with me this report says it happened on the 29th?

A. I see that.

Q. All right. And the reason -- by the way, you don't know what happened. You weren't there, right?

A. I wasn't there when?

Q. When this event that's being reported happened on the 29th when Orlando positively identified this photo of Jose Rios, supposed to be Jacques Rivera, when that happened on the 29th, you were not present, right?

That's an easy question, you weren't present, right?

MS. ROSEN: Objection, Judge. Asked and answered.

MR. POLICK: Objection, Judge, to the form.

THE COURT: All "that's an easy question" will be stricken.

BY MR. LOEVY:

Q. You were not present, correct?

A. The identification happened on --

MR. LOEVY: That's why I said I was looking for a

"yes" "no."

THE COURT:  Let's just go on.

MR. LOEVY:  All right.

BY MR. LOEVY:

Q.  You weren't present, right?

MR. POLICK:  Could he please not interrupt her.

THE COURT:  I'm sorry, what?

MR. POLICK:  Could he please not interrupt her when she's trying to answer.

MR. LOEVY:  Your Honor --

THE COURT:  Why doesn't everybody just sit down, breathe, and put a question to the witness.

MR. LOEVY:  Yes, Your Honor.

BY MR. LOEVY:

Q.  All right, this is a simple "yes" or "no" question.  An explanation can come later in a different question.  I'm just trying to keep it moving forward.

You weren't present, correct?

A.  (No response).

Q.  On the 29th when this gang book identification happened, you weren't there, correct?

A.  The identification of Mr. Rivera occurred on the 27th. This date I have no idea, but this is not one he was identified --

Q.  So I figure the answer to my question then is "yes."

Whatever is being reported here on 29th, you weren't present, correct?

A.  I was not present.

Q.  So you have no way to know whether it happened or didn't happen the way Mr. Guevara reported it, correct?

A.  I suppose so, yes.

Q.  All right.  Now, you claim it happened on the 27th.  You weren't there on the 27th either, were you?

A.  For the identification?

Q.  Right.

A.  No, I was not.

Q.  So if you don't know if it happened on the 27th -- if you weren't there, but you're positive it happened on the 27th?

A.  Yes, I'm positive.

Q.  All right.  Isn't it true you don't remember anything about August 27th, 1988?

A.  Isn't it true that I don't remember anything about August 27th, 1988?

Q.  Without looking at the police reports, you don't have any independent memory?

A.  That's not exactly true.

        MR. LOEVY:  If you could show her deposition, please, Ann.

        Do we need to switch it over?

        MS. SCOTT:  Yeah, we need to switch over.

MR. LOEVY:  Thank you.

(Brief pause)

BY MR. LOEVY:

Q.  This is page 159 line 24, through 160 Line 21.

(Brief pause).

MR. POLICK:  What page?

MR. LOEVY:  This is page 159 line 24, through 160 Line 21.

MR. POLICK:  Thank you.

(Whereupon, videotape played in open court)

BY MR. LOEVY:

Q.  You don't remember the 27th independently, correct?

A.  I remember the 27th after reviewing the paperwork, but in that deposition I was not allowed to review any paperwork.

Q.  You weren't allowed at the deposition?

A.  No.  I kept asking and Mr. Shapiro would not let me view it.

Q.  All right.  Before the deposition you had three meetings, correct?

A.  Yes.

Q.  The first one lasted about 5 hours with your attorneys, right?

A.  Yes.

Q.  And you went over the paperwork with your attorneys for

about 5 hours, right?

A. Yes.

Q. And then he had another meeting before the deposition with your attorneys, Ms. Golden, Mr. Given. And that meeting lasted from 10:00 till 5:00 p.m. just going over the paperwork, right?

A. I'm sure we probably had lunch or something.

Q. All right. Fair enough. And then there was a third meeting before the deposition where you studied the paperwork with your attorneys, correct?

A. Yes.

Q. And then you were prepared for the deposition. And then you were asked, "Do you remember," and you said, "Not without looking at the paperwork," right?

A. Because I wanted to testify accurately and fairly, and I think I have that right to check my paperwork.

Q. And there's nothing wrong with not remembering something that happened in 1988 on a random case, in a random part of your career, right?

A. (No response).

Q. It's okay not to remember, right?

A. Yes.

Q. All right. So we have the paperwork, right?

A. Yes.

Q. You have notes from August 27th. This is Plaintiff's Exhibit 16.

MR. LOEVY:  If we could back to the Elmo, please.

MS. SCOTT:  Yes.

(Brief pause)

MR. LOEVY:  Thank you.

BY MR. LOEVY:

Q.  This is your report dated August 27th, correct?

A.  I just have the seal of United States there (indicating).

(Brief pause).

BY THE WITNESS:

A.  Yes.

BY MR. LOEVY:

Q.  And it says on the 27th, Lopez has not yet been interviewed, correct?

A.  This was from the hospital at the very beginning.  Yes, it says, but that's where it's from.

Q.  This is wrong?

A.  (No response).

Q.  Your notes from the 27th saying, "Lopez has not been interviewed," this is wrong?

A.  No, that's not wrong.

Q.  All right.  I misheard you.

We have your notes from the 28th, as well.  Also doesn't say anything about a gang book identification, correct?

A.  At the bottom of the page it says printed CV number.

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 480 of 1254 PageID #:104616
McLaughlin - direct by Loevy
679

Q. All right. But your notes here doesn't say anything about a gang book identification, correct?

A. No, it does not.

Q. And then we have your report from the 27th, correct?

A. I don't have that in front of me.

Q. You've had a chance to review it, have you not?

A. I'd like to see it.

Q. All right. I will tender you all of your reports.

(Brief pause).

BY MR. LOEVY:

Q. Would it surprise you that your report from the 27th doesn't say anything about a gang book identification?

A. I'd like to see that report.

On the 27th?

Q. The 27th.

A. The hospital interview?

Q. No. You made a report at five minutes to midnight on the 27th. If there had been a gang book identification by then, would you have written it down?

A. We did have an identification on the 27th.

Q. My question was, you wrote a report at five minutes to midnight on the 27th of August documenting the steps that you'd taken in the investigation --

MR. SOTOS: Objection, Your Honor.

THE COURT: I'm sorry. What is the objection?

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 481 of 1254 PageID #:104617
McLaughlin - direct by Loevy
680

MR. SOTOS: He's testifying to what time she wrote the report and not asking when she wrote the report. He's testifying to it.

THE COURT: Overruled.

BY MR. LOEVY:

Q. You would agree with me that the report says August 27th at 2355?

A. That's when it was rendered.

Q. All right.

A. That's not when it was typed.

Q. All right. You typed in August 27th --

MR. LOEVY: May I publish Plaintiff's Exhibit 19 D as the August 27th report?

THE COURT: Yes, you may.

(Exhibit published to the jury).

BY MR. LOEVY:

Q. Plaintiff's Exhibit 19 D is the August 27th report.

This is, in fact, your report, correct?

A. Yes, it is.

Q. You're talking about, "Hey, Felix Valentin is the victim," "he got some suspects," "he got gunshot." And what date is your report dated?

A. 27th August '88, 2355 hours, which is five minutes to midnight.

Q. All right. And it looks like it got approved a couple of

days later by your supervisor on the 30th.

A. No, that's not true.

Q. This box says --

A. Yes, but this is not the signature.

Q. All right. There is no signature, but it says "date approved." You stamped in there --

A. I believe there's two separate.

Q. Fair enough. There may be another version with a signature?

A. Yes.

Q. Okay. But the point is, you did finish your typing at 2355, which is five minutes to midnight on the --

A. No, that's the time that that report was handed in, was 2355.

Q. All right. Would you agree with me that if you had, in fact, had a gang book identification on the 27th, you would've put it in your report?

A. That report was already typed prior to my knowledge of the gang book identification.

Q. My question was, supposedly if Jacques Rivera had been identified on the 27th, would you have put that in your report?

A. That report was fully typed before the identification.

Q. I understand that part. The report was typed before the identification. Now, my question is, if you had had an

identification by the time you made that report, that would've gone in the report, right?

A. Not that report.

Q. All right. We have a report dated August 29th that talks about the gang book identification, correct? A mugshot identification. That's your report.

Do you have it in front of you? It's 19E.

A. You never gave it to me.

Q. I think I gave you two reports, did I not?

A. All I have up here is the lineup.

Q. I'm sorry. I'll hand it again. 19E.

(Brief pause)

(Document tendered to the witness:)

BY MR. LOEVY:

Q. That is your report on the 29th?

A. Yes, it is.

Q. And that report suggests that the identification was made on the 29th, correct?

A. No.

Q. Well, if the report is dated the 29th, do we agree about that?

A. The report is dated the 29th, but that's --

Q. All right. Let's just take it one question at a time. The report --

THE COURT: You're interrupting the witness.

MR. LOEVY: The question was, is the report dated on the 29th, Your Honor, that was the question.

THE COURT: Okay.

BY MR. LOEVY:

Q. Did you answer that one?

A. Yes.

Q. All right. The report talks about the mugshot identification, correct?

A. Yes.

Q. All right. And so is that report wrong?

A. The date is wrong.

Q. All right. So your report is wrong, Guevara's report is wrong; they're both wrong?

A. Well, the date is wrong.

Q. All right. Let's talk about why it matters.

There is a document, this is Plaintiff's Exhibit 12, that's dated the 28th of August, correct?

Do you see that?

A. Yes.

Q. All right. And this document has a printed CV number, 7355806, correct?

A. Yes.

Q. This is your document in your handwriting?

A. Yes, it is.

Q. Somebody must've given you this information, correct?

A. Yes.

Q. And it wasn't Orlando Lopez who gave you a 7355806, right?

A. No.

Q. Who was it?

A. It was one of the gang guys.

Q. Do you remember which gang guy?

A. No.

Q. Think, because it matters. Think. Who was it?

A. I don't know.

Q. All right. Could it have been Mr. Guevara?

A. I don't know who it was.

Q. All right. Let's talk -- I take it because you don't remember, right?

A. No, I don't remember.

Q. Let's look at Plaintiff's Exhibit 30.

This is the rap sheet, the Jacques rap sheet. The CV number we just read, 7355806, that refers to an arrest, right?

A. Yes.

MR. LOEVY: Oh, is this on the jury screen?

THE COURT: No.

MR. ART: No.

MR. LOEVY: Well, sorry. If we could switch back, if we could, Ann.

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 486 of 1254 PageID #:104617
McLaughlin - direct by Loevy
685

(Exhibit published to the jury).

MR. LOEVY: Thank you.

MR. POLICK: Judge, I don't know if that's been admitted.

THE COURT: Yeah, I don't know it's been admitted.

MR. LOEVY: I think I'm using the wrong number. It's the rap sheet.

What's the other number?

MS. SCOTT: It's 4.

MR. LOEVY: It's 4. Plaintiff's Exhibit 4.

MR. POLICK: That's not in.

MS. ROSEN: That's not been admitted.

MR. LOEVY: All right. We move to admit Mr. Rivera's, the rap sheet.

THE COURT: Plaintiff's Exhibit 4, any objection?

MR. POLICK: No, Your Honor.

THE COURT: Received.

(Plaintiff's Exhibit 4 admitted into evidence.)

MR. LOEVY: May I publish then?

Do the jury screens have it?

THE COURT: Yes.

BY MR. LOEVY:

Q. You wrote a report dated the 28th of August, correct?

A. Yes.

Q. And it has, "somebody has given you this I.D. you got."

You're talking about Orlando Lopez, right?

A.   Yes.

Q.   And somebody says, "print this ID and CV number," right?

A.   No.   It didn't tell me to print it.   It's a printed CV.

Q.   So you had it?

A.   Pardon?

Q.   You had it?

         MR. POLICK:   Objection to the form.

         MR. LOEVY:   It's a question.

         THE COURT:   Overruled.

BY THE WITNESS:

A.   I don't know what you're asking me.

BY MR. LOEVY:

Q.   You said it's a printed CV.

A.   The printed CV.   He was fingerprinted at the time of that CV, that's what that means.

Q.   Okay.   All right.   That number, 7355806, corresponds to an arrest in the Chicago Police Department recording keeping, correct?

A.   Yes, it does.

Q.   That arrest was Jacques Rivera, the 20th of May, 1985, correct?

A.   Yes.

Q.   And that arrest, the 20th of May 1985, corresponds to a photograph.   614010 is the IR number, correct?

A.   Yes.

MR. LOEVY:  Your Honor, I'm sorry, this is Plaintiff's Exhibit 66, a photograph of Jacques Rivera, Your Honor.  We move this into evidence, too.

THE COURT:  Any objection?

MR. POLICK:  Can we see it?

(Brief pause)

MR. POLICK:  All right.  No objection.

THE COURT:  66 is received.

( Plaintiff's Exhibit 66 admitted into evidence.)

BY MR. LOEVY:

Q.   It looks like on the 28th of August, some gang guy told you that this guy had something to do with the crime, Jacques Rivera, right?

A.   No.

Q.   Did you decide that this arrest and this photograph had something to do with the crime on the 28th?  Was that your investigative work?

A.   Well --

Q.   It's a "yes" "no" question:  Was that your investigative work that determined that Mr. Rivera was in the crime on the 28th?

A.   No.

Q.   Was it the same gang guy you can't remember?

A.   (No response).

Q.   Who told you on the 28th of August that Jacques Rivera had something to do with this crime?

MS. ROSEN:   Objection; asked and answered.

THE COURT:   Overruled.

BY THE WITNESS:

A.   I did not receive that phone call on the 28th.  It was the 27th.

BY MR. LOEVY:

Q.   Well, you got the phone call on the 27th telling you that Jacques Rivera was involved in the crime.

And, in fact, the photo issued on inquiry.  Do you see this stamp?  This is on the screen as well on Plaintiff's Exhibit 30.  That means somebody pulled this photo on the 27th, correct?

A.   Yes.

Q.   All right.  So memory is that, you know, is what it is, but you at the police department had some reason to have Jacques Rivera as your suspect on the 27th of August, right after the shooting, right?

A.   Yes.

Q.   Now, the paperwork that we looked at, this is the Guevara report, when the case is closed a couple of weeks later in September, this is Plaintiff's Exhibit 1, this suggests that the witness didn't ID Jacques, Orlando didn't ID Jacques until

two days after Jacques was your suspect, that's what that says, right?

A. That's their report. It's not my report.

Q. All right. But that's what it says, right?

A. That's what it says.

Q. All right. So you're saying that's a fraudulent date?

MR. POLICK: Your Honor, Objection; asked and answered.

THE COURT: Overruled.

BY THE WITNESS:

A. I'd have to say it's a mistake. It's not my report, but I'm --

BY MR. LOEVY:

Q. All right. But we did --

A. -- I'm sure it's a mistake.

Q. I'm sorry. I cut you off.

A. It's not my report.

Q. But we did look at your report, right? You had a report on the 27th that doesn't talk about it, right?

A. Yes.

Q. And you had a report on the 28th that doesn't talk about it, right?

A. Doesn't talk about --

Q. The gang book identification that happened apparently, rightly or wrongly, on the 29th. Your report on the 29th is

the one that talks about the gang book identification, correct?

A. Yes. And I said that I had typed that on the 28th, but that interview happened on the 27th.

Q. All right. But your report is dated the 29th, right?

A. Yes, it is.

Q. And it says, in your report dated the 29th that you say you typed on the 28th, that's when you're reporting that the kid supposedly picked out Jacques, right?

A. I was looking -- say that again, please.

Q. Whether your report is dated the 29th or you typed it on the 28th, that's the report where you memorialize that the kid picked out Jacques, right?

A. Yes.

Q. Okay. But that is a full at least 24 hours before someone called you and said, "Jacques is the suspect," right?

I'm sorry, after. That would've been after you guys already suspected Jacques?

MR. POLICK: Objection to the form.

THE COURT: Could you rephrase the question.

MR. LOEVY: Sure.

BY MR. LOEVY:

Q. You always believed that Orlando Lopez picked him out randomly out of a book, that's how it was told to you, right?

A. Yes.

Q. And if, in fact, he was the suspect before -- I'm sorry. If Jacques was the suspect before that random book procedure happened, that would bother you, correct?

A. Okay, you're going to have to say that one again.

Q. All right. To this day you've always believed that when he picked it out of the book, it was just a random, "that's the guy I saw," right?

A. Yes.

Q. Okay. If you had knowledge now that the person doing the book procedure, actually that person's suspect was Jacques Rivera before this kid randomly, from of all the people he picked out Jacques Rivera, as a detective that would bother you, would it not?

A. Yes.

Q. Because a detective could be suggestive in doing a procedure like that, couldn't they?

A. (No response).

Q. Just hypothetically; right?

A. As far as I know, the gang procedures were to show him the entire book and let him look.

Q. All right.

A. And he looked -- and he looked at these books at his home.

Q. Okay. And you weren't there, right?

A.   No, I wasn't there.

Q.   All right.  And you don't know if Mr. -- and who had the photograph?  Was this photograph in your possession?

A.   No.

Q.   You don't know if on the 27th Mr. Guevara showed him this photograph and said, "Hey, does that guy look familiar"?  That might've happened.

         MR. POLICK:  What photograph is this?

         MR. LOEVY:  This is Plaintiff's Exhibit 66.

         MR. POLICK:  Thank you.

BY MR. LOEVY:

Q.   The photograph that got pulled on the 27th of August, two days before the identification procedure was memorialized.  You know which photograph I'm talking about, correct?

         MS. ROSEN:  Objection; foundation.

         THE COURT:  Yeah, I'm going to sustain the objection.  That is sort a speech before a question.  The objection is sustained.

BY MR. LOEVY:

Q.   This is the photograph that was issued on inquiry on August 27th, correct?

A.   If you say so, yes.

Q.   Well, we went through the number --

A.   Yes, it's an IR photo.

Q.   You would've looked at this identification differently if

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 494 of 1254 PageID #:104625
McLaughlin - direct by Loevy
693

the detective had shown the kid the photo and started asking him questions about the photo, right?

A. To my knowledge, that didn't happen.

Q. Because you weren't there. You have no knowledge either way, right?

A. I have no direct knowledge, but I trust the gang officers to do a proper identification.

Q. You're saying you trust Mr. Guevara to do a proper identification?

A. Yes, I would've.

MR. LOEVY: All right. Well, Your Honor, we suggest that opens the door. She says she has trust in him. She was the one who brought it.

THE COURT: I don't know what it opens the door to.

MR. SOTOS: Objection, Your Honor.

BY MR. LOEVY:

Q. All right. Is there any reason why you might not trust him?

MR. SOTOS: Objection. Objection, Judge. He can't open the door through his questioning of an adverse witness that --

THE COURT: You know what? This has not been presented to me properly by anybody. So if you're going to ask any questions based on opening the door, whatever that is, I think we need to talk about it.

MR. LEINENWEBER: I apologize, Your Honor. Could we be heard at sidebar, please?

THE COURT: Yeah. Sure.

(Proceedings heard at sidebar on the record).

MR. LEINENWEBER: If I may. The whole line of questioning or phrases "open the door" is an inflammatory statement.

THE COURT: No, it isn't. They don't know what that means.

MR. LEINENWEBER: Yes --

THE COURT: No. No. Let's get to the guts of this so I can make a ruling.

MR. LEINENWEBER: That's my objection.

THE COURT: So there is no objection other --

MR. SOTOS: Oh, no. There is an objection --

MR. LOEVY: Judge, let me --

THE COURT: I know what you are going to argue.

Go ahead.

MR. SOTOS: He can't open the door to an adverse witness on cross-examination.

THE COURT: Why not?

MR. SOTOS: Because that's not how it works. We bring in evidence that opens the door through our case, he can't ask questions.

THE COURT: You are going to get me some law on this

because this is an adverse witness, she made a statement, which I gather had not been made before.  I think that cross-examination -- let me just say this, I think cross-examination on the basis for her opinion, it seems to me where we go from here.

MR. LOEVY:  What I asked her was, "You weren't there," and then sua sponte, not responsive to the question, she said, "Oh, I wasn't there.  I trust the gang crimes people."

THE COURT:  So why do you think --

MR. SOTOS:  She didn't --

THE COURT:  Well, hold on.

MR. SOTOS:  I apologize.

THE COURT:  Why do you think it opens the door to?

MR. LOEVY:  MR. LOEVY:  When she says, "I had a right to rely on him because I trust him," I would like to bring up reasons that there were not to trust him.

THE COURT:  Not to trust him.

MR. LOEVY:  Yes.

THE COURT:  At that time?

MR. LOEVY:  Yes.

MR. SOTOS:  In 1988 that she, that she had reasons not to trust him in 1988.

THE COURT:  Well, that would have to be it.

MR. SOTOS:  Because, Judge, there is no evidence that she did.  No evidence that she did so.  He is going to start

doing --

THE COURT: No evidence that she did so what?

MR. SOTOS: There is no evidence that she had any basis to question anything that any of those Gang Crimes detectives did in 1988.

THE COURT: Okay. So --

MR. LOEVY: We're stuck with her answer, then.

MR. SOTOS: No, that's the problem, because he wants to ask the questions --

THE COURT: Can I find out what Mr. Loevy wants to ask so I can --

MR. SOTOS: Yes. I apologize.

MR. LOEVY: I said, "You weren't there?" She said, "I wasn't there, but I totally trust them." I'm going to ask her, "Isn't it true you did have reasons not to trust the gang people even in 1988?" We now know that she did have reasons not to trust them. You know, I'm not going -- depending on what her answer is --

THE COURT: Well, she's going to say "no," okay.

MR. LOEVY: Then I'll leave it alone for now and them I'm going to be stuck with her answer. And I hope I'll be able to impeach her, if we could persuade you, maybe not now.

THE COURT: Anything else you want to say?

MR. SOTOS: I think we're correct in saying he can't open the door through this adverse examination.

THE COURT: She opened the door.

MR. SOTOS: No, no, not this question. I don't think that's how it works. But we will get you authority.

THE COURT: Get me authority.

MR. SOTOS: But until then --

THE COURT: I think that next question is fine.

MR. SOTOS: Fine.

THE COURT: Let's see what the answer is, and we may have to meet again.

(Proceedings resumed in open court).

MR. LOEVY: May I proceed, Your Honor?

THE COURT: You may.

BY MR. LOEVY:

Q. You said that you weren't there at the photo procedure, correct, when it happened?

A. Correct.

Q. And, obviously, if it was done in a suggestive manner, it would bother you, correct?

A. Correct.

Q. And if they had shown just Jacques' photo and said, "hey, I want to ask you some questions about this guy. It could've it been him, you ever seen this guy," that would've bothered you, right?

A. Yes.

Q. Because that would be improperly tainting the witness's

memory of the events, right, if that happened?

A.  If that happened.

Q.  All right.  And sometimes a witness might not even realize that suggestive things are going on, correct?

A.  Is this hypothetical?

Q.  Yes.  Hypothetically.

A.  This photo was shown at his home.  I doubt very much that the officers were suggesting anything in front of his family.

Q.  Well, do you have any reason to believe that they had the kid's family watching?

A.  Well, I believe the family was there.

Q.  They should have been in the room, should've they have?

A.  Yes.

Q.  And that's how you would have done it, right?

A.  Yes.

Q.  Okay.  You said that you assume it was done right because you had no reason not to trust the gang people, correct?  That's what you said earlier?

A.  Yes.

Q.  Okay.  Isn't it true that you had plenty of reasons not to trust Officer Guevara and the Gang Crimes unit even back in 1988?

A.  First of all, I don't think Officer Guevara was there on the 27th.  I'd have to look at the paperwork, but I don't

remember him being -- I don't remember him on the 27th --

Q. My question was about reasons not trusting Officer Guevara and the gang unit.

A. I don't have any recollection of that at all.

Q. All right. Is it your understanding that the gang book -- or that the mugshot thing happened twice?

A. No.

Q. All right. So if it was as reported by Officer Guevara and officer Gawrys that it did happen on the 29th, this would've been a second time, right?

A. If they actually did one on 29th, it would've been a second one.

Q. Did you ever ask Officer Guevara, How come you typed that number wrong -- or actually it would've been Gawrys.

A. As I stated before, I never saw this report until all this came up.

Q. All right. Would you agree with me that there is no report or note in existence that says that the supposed photo ID happened on the 27th?

A. It's in my report on the 28th.

Q. On the 28th; right. I just asked you, are you aware of any scrap of paper anywhere that says that this thing happened on the 27th?

A. It's in my GPR with printed CV from the 27th, I believe --

Q. Well, is it --

A. Oh, on the 28th.

Q. Yeah. All right. So let me ask it again, then.

A. Okay.

Q. Is there any document whatsoever that suggests the gang book identification happened on the day you insist it happened on?

A. A printed CV information, that I don't have in front of me at the moment, which I'd like --

Q. This one right here (indicating)? Your report on the 28th?

A. Right.

Q. So this says on the 28th somebody pulled his photo, right? Or at least it refers to Jacques.

It looks like this photo was pulled on the 27th, right?

A. It was pulled on 27th.

Q. And then somebody told you about Jacques on the 28th, right?

A. This is my interview of Orlando Lopez, which happened on the 27th.

Q. All right. But Orlando Lopez didn't know this number, did he?

A. No, he didn't know that number.

Q. All right. So somebody involved with Gang Crimes told you

about Jacques Rivera on the 28th, right?

A.  No, this -- this interview and this sheet of paper happened on the 27th.

Q.  So this date is wrong, the 28th?

A.  Yes.

Q.  All right.  Let's -- let's move forward.

Yesterday Mr. Sotos and I and Mr. Rivera spent a lot of time asking about when the first lineup happened.  Whether it happen on the day he was arrested on the 30th or it happened the next day on the 31st.  Do you remember when we went back and forth about that?

A.  Yes, I do.

Q.  Do you know why that matters?  Does that mean anything to the case at all?

MR. POLICK:  Objection to the form of the question.

MS. ROSEN:  Objection to the form.

THE COURT:  It calls for a "yes" or "no" answer.  I don't see anything wrong with the question.  Overruled.

BY MR. LOEVY:

Q.  Does it have any significance, to your knowledge?

MR. SOTOS:  Judge, I'm going to object because what it does, he's asking her to testify on another witness's testimony, this back and forth.  It goes right to work product --

THE COURT:  Overruled.

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 503 of 1254 PageID #:104634
McLaughlin - direct by Loevy
702

BY THE WITNESS:

A.  I'm sure it's important to you or you wouldn't be arguing about it.

BY MR. LOEVY:

Q.  Well, we're just trying to be factual.  It did happen like Jacques said, right?

MS. ROSEN:  Objection.

MR. POLICK:  Objection.

THE COURT:  That is asking the witness to comment on another person's testimony.

BY MR. LOEVY:

Q.  Jacques was, in fact, arrested on the 30th of August, held overnight for a lineup that was supposed to happen on the next day -- no, he was arrested on the 30th and held him on the 31st, right?  That's what happened factually, right?

A.  What factually happened was, he was arrested on the 30th, held over to the 31st.  No lineup, physical lineup occurred.

Q.  All right.  But the answer to my question then was "yes," correct?

MR. POLICK:  Objection.  What question are we talking about?

THE COURT:  Sustained.

BY MR. LOEVY:

Q. All right. And, in fact, that's exactly how -- showing you again the document that we spent the time with yesterday, Plaintiff's Exhibit 9. This is Jacques' document. He wrote in the 1990's he was arrested on August 30th. After spending that night and part of the following night, which would be the 31st, he was moved to a police station, and that's where he was put in a lineup and then released on charges; right?

MR. SOTOS: Objection, Judge. Could we have him read the entire three sentences he just skipped over when he went from one sentence to the other?

MR. LOEVY: Your Honor, I'd be happy to read the whole document if he wants me to.

THE COURT: I'm not sure that -- what is important in all those other sentences?

MR. LOEVY: Well, I'll read any part Mr. Sotos would like me to read.

MR. SOTOS: That he claimed that he was in a lineup on the 30th.

THE COURT: Well, he just read that.

MR. SOTOS: He skipped over three.

MR. LOEVY: I'll read the whole thing.

BY MR. LOEVY:

Q. (Reading:)

"... after spending the night and part of the following night"... which would be August 31st

"... petitioner ws moved to 11th and State police station for a traffic warrant on this case. Petitioner explains... " which was on this case "... petitioner explains which was an aggravated battery, case cited as ..."

And that's the Valentin case, correct (indicating)?

A. I don't know what that number refers to.

Q. All right:

"... petitioner was put in a lineup and was released on charges because petitioner was not identified."

And then he believes other people were identified, which is why he was released.

You don't agree with this part, right? You don't believe other people were identified?

A. I don't believe he was in a lineup.

Q. All right. But the part that Mr. Rivera testified to yesterday, he was, in fact, arrested on the 30th, held overnight, and then you guys prepared to do a lineup on the 31st, right?

A. Yes.

Q. And that's the lineup -- I'm going to show you now Orlando Lopez's criminal testimony.

This is page 34 from Defendants' Exhibit 5.1. This is Lopez's criminal testimony. And this is line 10 through the

next page:

".. when this person stopped shooting, he then turned around, but like farther away, he ran and he went -- he ran behind the car, he turned, and I saw his face."

"Is this the first time you saw his face?"

"Yes, sir."

"You saw his face for a very brief moment?"

"Yes, sir."

"And then you didn't see his face again until you say you picked him out of the photograph later?"

Orlando says:

"Yes, sir."

"Then the police brought you to the police station a few days later?"

"Yes, sir."

"And then you viewed a lineup?"

"Yes, sir."

Do you see that?

A.   I do.

Q.   Okay.  Is Orlando Lopez testifying truthfully?

          MR. POLICK:  Objection.

          MS. ROSEN:  Objection.

          THE COURT:  Sustained.

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 507 of 1254 PageID #:104638
McLaughlin - direct by Loevy
706

BY MR. LOEVY:

Q. Is that true? Is that true?

MR. POLICK: Judge same question. Objection.

THE COURT: Well, it's so compound.

BY MR. LOEVY:

Q. All right. Did this happen, Orlando Lopez saw the shooting, identified a photograph, and then a few days later was brought to the police station and viewed a lineup, did that happen?

A. Orlando Lopez did not view a lineup with me present. So what else happened? I think it was the 16th whenever he viewed that lineup.

Q. Well, everybody agrees he viewed one several weeks later, right?

A. Yes.

Q. All right. But I'm talking about the first lineup that you say didn't happen, Orlando and Jacques say it did happen All right. You guys got ready to do a lineup on the 31st, right?

A. We couldn't find Orlando.

Q. Now, you used the pronoun "we." You didn't look for him --

A. Okay. I'm sorry. It's a general term that you do an investigation. I apologize.

Q. Right. You said, "I've got Jacque here. I've got a bunch of fillers. We're good to go on this lineup," that's what you

told the Gang Grimes people, correct?

A. We had Rodriguez, too.

Q. So you were all ready to go, right?

A. Yes.

Q. And, in fact, you've been holding Jacques for 24 hours because his parents said, "Look, it's too late, but do it in the morning," right?

A. Yes.

Q. And then you got a call from Gang Crimes, right?

A. Yes.

Q. And they said, you know what? Maybe we shouldn't do this?

A. What?

Q. What did they tell you?

A. That they could not find Orlando.

Q. All right. Did you find that, you know, suspicious? His mom said he'll be ready in the morning. You know, why couldn't they find him? He's 12?

MR. SOTOS: Objection, Judge, to the mischaracterization of testimony.

THE COURT: Sustained.

BY MR. LOEVY:

Q. All right. Did you say to the Gang Crimes people, "Well, where is he"?

A. They said they were going to continue to look, that's when we decided we -- we had everybody there for what we wanted to

McLaughlin - direct by Loevy

708

have a physical lineup.  We didn't have our eyewitness that was able to view a physical lineup.  So we thought we'd line them all up, that their photos so they were uniform, and take them to the hospital.

Q.  All right.  So that's what you do when there's usually a lineup.  You line them all up, you take their photos, right?

A.  If there -- if there's a positive identification, you have to take a photo.  But that was not what we did.  We -- we lined them up to take a photo to take it to the hospital so that we would have the same people in the photo array at the hospital, and then we were hoping later that they have a physical lineup with the same people to make it a good investigation.  That was --

Q.  All right.  Just to break --

A.  -- our intent.

Q.  Sorry.  Just to break it down:  When there is a lineup, you take a picture of the guys in the lineup, right?

A.  Yes, we do.

Q.  And you did take a picture of Jacques and Jose Rodriguez and the other four fillers, correct?

A.  They were individual photographs.

Q.  And did --

A.  It was not -- it was not a lineup photo.  They were individual photographs.

McLaughlin - direct by Loevy

709

Q.   And do you see this brick wall?  Can you see it in the photo in Plaintiff's Exhibit 62?

A.   Yes.

Q.   Okay.  That is the brick wall in the lineup room, correct?

A.   I'm not sure where they took the photos at.  And I believe I said that in my deposition, that cement, whatever they call that, the cheap brick that the City uses, it was uniform throughout the showing.

Q.   What you said at your deposition was it's the brick in the lineup room and just outside it, right?

A.   I think it's the whole station, but I also said my memory of that.

Q.   All right.  You have no recollection speaking to Orlando's mother, right?

A.   No.  I mean, I don't have --

Q.   Yeah --

A.   I don't have -- I remember speaking to Orlando, I don't remember speaking to the mother.  I spoke to someone on the phone.

Q.   But you didn't speak to the mother on the phone?

A.   We called the neighborhood's house and then she went --

Q.   But you --

        I'm sorry.  I didn't mean to interrupt you.

A.   That's all right.

Q. You didn't speak to the mother, right?

A. I don't have a recollection of talking to the mother.

Q. All right. And if the Gang Crimes said, "Look, we couldn't find Orlando. We're not going to do this lineup today after all," you don't know if they did it without you, correct?

A. How could they do it without us?

Q. Well, didn't they do it without you on the 16th?

A. There were other detectives present there.

Q. Didn't they do one without you on the 16th?

MR. SOTOS: Judge, objection; Asked and answered.

MR. LOEVY: She didn't answer until the second time.

THE COURT: Overruled.

BY MR. LOEVY:

Q. So you don't know if they did one without you the first time, do you?

A. It would not have been possible for them to hold a lineup in Area 5 without detectives present, no.

Q. No, without you present. They might have done it without you present, right?

A. Well, then what detective was present?

Q. On the 15th, how did they manage to have a lineup without you?

A. There are other detectives present at the area.

Q. All we know is that the report say that they couldn't find the witness, so they didn't do a lineup, right?

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 512 of 1254 PageID #:104643
McLaughlin - direct by Loevy
711

A.   Yes, that's what the report says.

Q.   All right.  But you are aware that some of the fillers actually remember this and claim that there was a lineup that day, you're aware of that, correct?

A.   Yes.

Q.   And you're aware that Orlando Lopez is certain that he did participate in this first lineup.  And not only participated in it, but pointed his finger and picked somebody.  You're aware of that, correct?

A.   That's what he said.

Q.   And whoever he picked, it wasn't Jacques Rivera, correct?

          MS. ROSEN:  Objection.

          MR. POLICK:  Mischaracterizes the testimony.

BY MR. LOEVY,

Q.   Jacques Rivera wasn't picked in the 31st, right?

          MR. POLICK:  Objection.

          MS. ROSEN:  Objection, Your Honor, foundation.  If he's going off Orlando Lopez's testimony, Orlando Lopez's testimony is, "I picked Jacques Rivera."

          THE COURT:  Well, the question is, did the witness know this.  I think that's the only question, and I don't see why it raises a foundation objection.

          MR. LOEVY:  Can I clarify it, then, Your Honor?

          THE COURT:  Yes.

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 513 of 1254 PageID #:104644
McLaughlin - direct by Loevy
712

BY MR. LOEVY:

Q.   On the 31st Orlando Lopez says, "Look, I was in two lineups, and on the first one I pointed my finger and I picked somebody, and I believe that was Jacques Rivera," that's what Mr. Rosen said, right?

A.   That's Mr. who said?

Q.   You understand --

THE COURT:   I think that's something that's getting very confusing.

MR. LOEVY:   All right.

BY MR. LOEVY:

Q.   Orlando's story is there was two lineups, "I participated in that first one, I pointed my finger at somebody, and I picked out Jacques Rivera," that's what he's saying, right?

MR. SOTOS:   Judge, I'm going to object to him about what other witnesses are saying.  The jury will hear --

THE COURT:   This is getting incredibly confusing.  And I think part of the reason it's confusing is, we're not clarifying what the witness knows, and what the witness doesn't know, and who said what.

MR. LOEVY:   All right.  I'll move on, Your Honor.

THE COURT:   Yes.  Okay.

BY MR. LOEVY:

Q. Should detectives or Gang Crime people be showing loose photographs to witnesses? Loose photographs being not in an array, but showing a photograph?

MR. POLICK: Objection to the foundation.

THE COURT: What's the foundation objection? I don't understand.

MR. POLICK: Where? When? Under what circumstances?

THE COURT: Well, any circumstance. The question, I think, was in any circumstance is it appropriate for a detective to show a witness. He is talking about one photograph.

BY MR. LOEVY:

Q. Exactly. Or like just the suspect or if there's two suspects, both --

MS. ROSEN: Actually, the question wasn't a detective, it was Gang Crimes Specialist. She's a detective.

THE COURT: And we have gone over this, but I'm going to overrule the objection. But let's move on.

BY MR. LOEVY:

Q. You're supposed to do it in an array procedure, right?

A. At the time that we were doing it, yes.

Q. All right. So it wouldn't be proper just to show the suspects to the witness, right?

A. That's not what I would do.

Q. All right. And, in fact, you know when you got the Sup.

Report on the 16th, this Plaintiff's Exhibit 1, it says in the last paragraph here, "Lopez witness was shown photos of Rodriguez and Nieves." He's the guy who may have been the driver, right?

A. Yes, I believe so.

MR. SOTOS: Objection to the mischaracterization that he may have been the driver.

BY MR. LOEVY:

Q. Well, there was a time when the police thought Nieves might have been the driver, right?

MR. POLICK: Objection.

MR. LOEVY: That's a question.

THE COURT: I don't think it matters. Let's just go on.

BY MR. LOEVY:

Q. And he stated that the two individuals were not involved in the incident, right?

A. That's what this typed thing says, yes.

Q. And if you had -- if that had come to your attention, that would've bothered you, correct?

A. Yes.

Q. Because you shouldn't be showing the witness your suspects and saying, "Is this them," right?

A. Rodriguez should've been in that lineup.

Q. My question --

A.   Okay.

Q.   -- wasn't about Rodriguez or lineups.

A.   Okay.

Q.   You shouldn't show the witness your suspects and say, "Is that them," right?

A.   It's not something I would've done.

Q.   Why not?

A.   Because if I had done that lineup, that person would've been in there, Rodriguez, that's why.

Q.   You wouldn't show him the suspects because that's suggestive and leading, isn't it?

A.   That report that's at the end of the day that that lineup occurred, is that not right?  Because I don't have it front of me.

Q.   Would you like a copy of the report?

A.   Sure.

     (Document tendered to the witness:)

BY MR. LOEVY:

Q.   Let me ask you a question.  If Officer Guevara was going around showing witnesses pictures of suspects, that would bother you, wouldn't it?

A.   I have no context for that.

Q.   All right.  If Mr. Guevara was going around -- were you carrying around Jacques' photo?  Was that in your file or your possession?

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 517 of 1254 PageID #:104648
McLaughlin - direct by Loevy
716

A. I don't believe so.

Q. So who was carrying around Jacques' photo when he was talking -- who was carrying it around --

MS. ROSEN: Objection.

MR. SOTOS: Objection.

MR. POLICK: Objection.

BY MR. LOEVY:

Q. This photo was printed, correct?

MS. ROSEN: Objection; foundation.

MR. LOEVY: He already said it was printed, Your Honor.

THE COURT: I think that's already been established.

BY MR. LOEVY:

Q. What happened to it? Did you have it?

A. I don't -- I don't know.

Q. So who had it and who was showing it to people?

MR. POLICK: Objection as to who's showing it.

THE COURT: Sustained.

BY MR. LOEVY:

Q. Who had it?

MS. ROSEN: Objection.

MR. SOTOS: Objection.

THE COURT: If the witness knows, she can answer the question.

BY THE WITNESS:

A.   I don't know who had it.

BY MR. LOEVY:

Q.   But it wasn't you?

A.   No.

Q.   Let's talk about another subject.

After August 31st, did you -- we talked about the fact that you didn't investigate Jose Rodriguez as a suspect.  You didn't talk to him, you didn't ask him any questions, right?  We talked about that yesterday?

A.   Yes.  I didn't ask him any questions, no.

Q.   And how did you exclude him as a suspect?  You yourself on this intervening time between the 31st, when you couldn't do the identification until Valentin died, this kid that the victim said shot him, how did you exclude him as a suspect?

A.   I didn't exclude him as a suspect.

Q.   All right.  At any point are you aware of anybody who excluded him as a suspect?

A.   Am I aware he was excluded as a suspect?

Q.   Yeah.

A.   Well, obviously Detective Dorsch and Boyle did.

Q.   That's in Guevara and Gawrys's report, right?

A.   No -- oh, I'm sorry.

Q.   Yeah.  Shouldn't some police work have been done to explore

Rodriguez's potential guilt?

A.   Rodriguez should've been in the lineup.

        MR. POLICK:  Objection.

        THE COURT:  I'm sorry, what is the objection?

        MR. POLICK:  I withdraw it, Judge.

        THE COURT:  Okay.  Go ahead.

BY MR. LOEVY:

Q.   Shouldn't some police work have been done to try to exclude Rodriguez's guilt?

A.   Yes.  And that would've been done if he stood in the lineup.

        MR. LOEVY:  Okay.  This is page 130, lines 11, through 131, lines 23.

        (Whereupon, videotape played in open court) .

BY MR. LOEVY:

Q.   Did you give those answers, ma'am?

A.   Yes.

        MR. POLICK:  Judge, it's not impeaching.

        THE COURT:  You know, I would have to go back and -- I'm going to allow it.  I'm not sure if it is or it isn't.

BY MR. LOEVY:

Q.   All right.  You just testified that what should've happened is, he should've been put in a lineup, correct?

A.   Yes.

Q.   All right.  And, in fact, at some point on the 16th,

Orlando participated in what he claims was his second lineup, right? Or was it the 15th of September?

A. I don't have the paper in front of me. I'd say it was the 15th and the report was typed on the 16th, or something.

Q. All right. And no question in your mind that Jose Rodriguez should've been in that lineup, right?

A. No question in my mind.

Q. All right. So that's not legit, is it?

MS. ROSEN: Objection to the form --

MR. POLICK: Objection to the form of the question.

MS. ROSEN: -- of the question.

THE COURT: Sustained.

MR. LOEVY: Okay.

BY MR. LOEVY:

Q. All right. The police department had their witness, Orlando Lopez. And Jacques was in the lineup, wasn't he?

A. Are you talking about on the 15th?

Q. Yes. The second lineup.

A. That's what the paperwork says, yes.

Q. All right. And the suspect that the victim said did it, he should've been in that lineup, too, right?

MS. ROSEN: Objection; Asked and answered.

THE COURT: Overruled.

BY THE WITNESS:

A. Yes.

McLaughlin - direct by Loevy

720

BY MR. LOEVY:

Q. If this was a legitimate investigation, Orlando Lopez should've been given the chance to pick out the guy that the victim said shot him, correct?

A. Both suspects should've been in the lineup.

Q. All right. And was Rodriguez ever put in a lineup?

A. Not that I can see in any records, no.

Q. All right. Let's move ahead. The case broke open on the 15th, right?

MR. POLICK: Objection to form.

THE COURT: Sustained.

BY MR. LOEVY:

Q. You guys caught the perpetrator on what date?

MR. POLICK: Again, objection. No foundation. She's already testified she wasn't there on the 15th.

MR. LOEVY: Well, I think she might have some foundation to know when they --

THE COURT: Well, look, if you know the answer, answer it. If you don't, don't.

BY MR. LOEVY:

Q. What date did they catch the perpetrator?

A. Who?

Q. The man who was prosecuted for the murder of Felix Valentin.

A.   No, no.  Who?  Who?

Q.   The Chicago Police Department.

A.   Specifically who are you asking?

Q.   Anybody in the Chicago Police Department.

        MS. ROSEN:  Objection.

        THE COURT:  Overruled.

BY MR. LOEVY:

Q.   When was he arrested and brought to justice?

A.   (No response).

Q.   The 15th of September, correct?

        MR. SOTOS:  Objection to the term "and brought to justice."

        MR. LOEVY:  Fine.

BY MR. LOEVY:

Q.   He wasn't brought to justice, was he?

        MR. POLICK:  Objection; argumentative.

        MS. ROSEN:  Objection.

        THE COURT:  Sustained.  Just ask a question that's not argumentative, please.

BY MR. LOEVY:

Q.   Now, it was your investigation, correct?

A.   To start, yes.

Q.   Well, true.  From August 27th until the 15th, it was your investigation, correct?

A.   (No response).

Q.  Is that true?

A.  Technically, yes.

Q.  Okay.  And then on the 16th of September, it looks like Gawrys and Guevara wrote the closing report, correct?  This is Plaintiff's Exhibit 1.

A.  They don't do closing reports, no.

Q.  All right.  Well, this says that the offender was Jacques Rivera, the charges were first degree murder, and the court date was the 16th of September, correct?

A.  That's what that report says.

Q.  And then it goes out to outline all the evidence against Jacques, correct?

A.  (No response).

Q.  You have a copy up there, right?

It says they did the gang book photo, and then they got an identification, then they did another lineup, and then they identified him, right?

A.  They did one lineup.  I don't know what you mean by another lineup.

Q.  The point is, this is the evidence that Jacques Rivera committed the crime, right?

A.  This is the evidence -- this is a Gang Crimes report.

Q.  All right.  Are you aware of any other closing report in this case?

A.  I would've thought that Dorsch and Boyle did a closing

report.

Q. Well, it was your investigation, wasn't it?

A. Not once they gave it to two other detectives.

Q. Who gave it to those detectives? Who at the Chicago Police Department gave it away from you?

A. Whatever sergeant was working that.

Q. What person at the Chicago Police Department said, "you know what, McLaughlin? This isn't your investigation anymore. It's somebody else's," is there a person who did that?

MR. POLICK: Objection. Mischaracterizes the witness's testimony.

THE COURT: Overruled. You can answer the question.

BY THE WITNESS:

A. To the best of my knowledge, I wasn't working that day. And when Mr. Valentin died, the investigation had to continue. They were not going to wait until my days off --

BY MR. LOEVY:

Q. I'm not really talking about that. I'm just saying --

MR. POLICK: Objection, Your Honor.

THE COURT: No, don't interrupt.

MR. POLICK: Okay.

MR. LOEVY: I'm looking for the identification --

MR. SOTOS: Judge, objection. I have an objection.

MR. LOEVY: -- of a person and she's talking about something else.

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 525 of 1254 PageID #:104656
McLaughlin - direct by Loevy
724

MR. SOTOS: I have an objection. He interrupts her when she says things he doesn't like.

THE COURT: I just sustained that.

MR. SOTOS: He kept talking. Your Honor, you did sustain it, but he just kept --

THE COURT: Look, we don't have to have speeches about it. If you make an objection on that basis, it has always been sustained, it will be sustained.

BY MR. LOEVY:

Q. You testified in court many times, correct, as a detective?

A. Yes.

Q. And you understand that lawyers ask questions and witnesses answer them, correct?

A. If allowed to, yes.

Q. And they're not supposed to go up in different directions. They're supposed to answer the question that's posed, correct?

MR. POLICK: Objection to commenting on the testimony, Your Honor.

THE COURT: Overruled.

BY THE WITNESS:

A. To testify to the best of your ability.

BY MR. LOEVY:

Q. All right. You said that you were taken off the

McLaughlin - direct by Loevy

investigation. My question is, tell us the identity of the person, if any, who took you off the investigation so we could talk to that person. Who is the person?

A. I was not at the office. So I would not know who was working that day to give that investigation to somebody else.

Q. All right. When you got back the next day, you still thought it was your investigation, right?

A. I don't know when I came back.

Q. All right. Whenever you came back --

A. I could've been gone for two weeks, for all I know. I don't know.

Q. All right. But whenever you came back, you thought it was your investigation, right?

A. I actually believed it was Jack's. It's ours, we're going to work together, we work on it, but different people are assigned.

Q. All right. When you came back, it did come to your attention that on the 10th of September Guevara and Gawrys were claiming that the victim got an identification of Jacques -- of somebody named Jose Rios, correct?

A. After the 31st of August, I have no knowledge of this, whatever happened to this case after that.

Q. All right. It does say that on the 10th of September, Gawrys and Guevara had Felix Valentin identify Jose Rios, correct?

A.  Yes, that's what it says.

Q.  And then it was explained to you that Jose Rios was the name that Jacques Rivera had given when he was 16 in an disorderly conduct arrest, correct?

A.  Yes, I know that.

Q.  So did you ever ask Guevara how he managed to get an identification from a boy at the hospital that you thought wasn't able to give an identification?

A.  I was unaware of that report until after all this all occurred.

Q.  Did you know that, in fact, Valentin by the 9th of September was nonresponsive in the hospital?

A.  No.

Q.  Did you know that his condition had worsened, and he was effectively living by a machine, unconscious and nonresponsive to pain stimuli and lights in the eyes by the 9th and the 10th?

MR. POLICK:  Objection.

MS. ROSEN:  Objection; foundation.

THE COURT:  The question is did the witness know it, and I think there is going to be some evidence to support that. So I'm going to overrule the objection.

BY THE WITNESS:

A.  Did I know on the 9th of September that his condition had worsened on the 10th or --

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 528 of 1254 PageID #:104659
McLaughlin - direct by Loevy
727

BY MR. LOEVY:

Q. Did you know when you found out that in your absence somebody had solved the case by saying on the 10th that the victim made this identification, did you know that the victim was essentially in a coma when that supposedly happened?

A. I was unaware of any of these reports until after this all came back to light.

Q. All right. Now, the second lineup is the lineup that you say you weren't there and you got nothing to do with it, right? The September 15th lineup?

MR. SOTOS: Judge, objection.

THE COURT: Sustained.

BY MR. LOEVY:

Q. You know what I'm talking about, right?

A. (No response).

Q. I'm orienting you to the second lineup.

MR. SOTOS: Objection.

THE COURT: Sustained.

BY MR. LOEVY:

Q. I'd like to orient you to the second lineup.

Do you know what I'm talking about?

THE COURT: Please identify it by a date, because there's a debate about which one it was.

MR. LOEVY: Now I get it. I'm sorry. I didn't

understand the objection.

BY MR. LOEVY:

Q. When I say second lineup, you guys -- the first lineup, you did agree to set up a first lineup, right?

A. We wanted to have one.

Q. And you set it all up, right?

A. We had the people in place there, yes.

Q. And so if I say the second lineup, I'm not presuming that you being the first one who actually went through it, because I understand you contest that it went through. But when I'm saying the second lineup, I'm talking about the next one, okay.

A. I would prefer to be the lineup on the 15th.

Q. Fair enough. That's what I'll call it.

You know that there was an allegation made against you about the lineup on the 15th of September, correct?

A. An allegation made against me?

Q. Right.

A. For what?

Q. The kid says that when he got brought to the station on the 15th, he told the woman police, or the woman that he was dealing with the paperwork, that it wasn't Jacques Rivera; you are aware of that, correct?

A. I was aware that he said that he had talked to a woman, but it was not me.

Q. All right. But you are also aware that he's claiming he tried to tell that woman it's not Jacques Rivera, right?

A. Something to that effect, yes.

Q. All right. And you're saying you know it wasn't you because you weren't there that day?

A. Yes.

Q. All right. Now, although you remember not being there that day, is there any paperwork that says you weren't there? Any like, you know, a record of an off day, or, you know, any objective paper?

A. Well, to the best of my ability, if I had been working, this case would've continued to have been Jack's and mine.

Q. All right. So that's your answer.

A. So that's what I'm basing it on.

Q. And that's your answer. Now I'm asking a different question.

There's no piece of paper that says Gillian McLaughlin had that day off on the 15th, right?

A. Well, I'm sure it is there somewhere, but where that would be, I would have no idea.

Q. And you haven't gone looking for it, right?

A. It's 30 years ago.

Q. All right. But here we are, we've been talking about this case since 2010, maybe earlier, you've never been able to find a piece of paper that proves that you were off duty on that

day, correct?

A.   No.

Q.   No, that is correct, right?

A.   I didn't look for any paper to say that I was not working that day.

Q.   Now, if that was -- and it might've been an off day, it might've not been have been off day.  You believe it was an off day, is that fair?

MR. SOTOS:   Judge, objection.  She's testified that it was.  He's mischaracterizing her testimony.

THE COURT:   You know, I think the jury has heard this.  Ask a question that doesn't characterize and gets us into all this difficulty.

BY MR. LOEVY:

Q.   All right.  Why wasn't this -- if this is the important identification in the case, why wasn't it scheduled for a day that you were on duty?

A.   I don't know.  That's why I said, we might've been off for two weeks and they had no choice but to give it to somebody else, I don't know.

Q.   All right.  Because obviously a delay would be bad.  You wouldn't want the kid's memory to fade, right?

A.   The change in the case was that the victim unfortunately died.

Q.   All right.  Now that created pressure on the police

McLaughlin - direct by Loevy

731

department to solve it, right?

A. Well, not to solve it, but to continue, because now it's a homicide.

Q. And you don't want unsolved homicides on the books, right?

A. There's lots of unsolved homicides on the books.

Q. All right. But the less, the better, right?

A. That's all 11th and State or headquarters. We do the best we can to investigate all our cases.

Q. All right. But the kid dies on the 14th, by the 16th Guevara had created a report saying case is closed, Jacques Rivera, right?

A. Yes.

Q. All right. Did it bother you as an investigator that this event that's supposedly happened on the 10th where the victim picked out Jacques' photo, that there was no prior record of that? Did that bother you?

A. I was unaware of any of these reports until this post-conviction hearing came up.

Q. Fair enough. But you are aware of the policies and practices of the police department, correct?

A. Yes.

Q. If this report created on the 16th of September, after the kid dies, memorializes that the now dead kid supposedly picked out somebody on the 10th of September, there should've been documents from the 10th of September, right?

McLaughlin - direct by Loevy

732

A. I don't know what Gang Crimes does, what their procedures are.

Q. Based on your knowledge of the -- how long did you work at the Chicago Police Department, ma'am?

A. 37 years.

Q. And in that course of time, did you have a lot of experience working with the Gang Crimes people?

A. Yes.

Q. Were they -- your understanding of the policies and practices of the police department, were they required to make documents about things like this?

A. I don't know what the requirements were. I never worked Gang Crimes.

Q. Did you get the sense that they weren't always documenting things over at Gang Crimes?

A. I'd see -- I would see a typed report when they typed a report. I don't know what -- I don't know what they needed to do or -- they talk about thumpers. I don't know what a humpier is; never worked it.

Q. All right. If this had been in the Detective Division and there was an ID on the 10th, it absolutely, 100 percent would've been memorialized before the 16th, do we agree about that?

A. Yes.

Q. No question about it?

A. Yes.

Q. And there should've been notes about that, right?

A. Depending upon who did it.

Q. There should've been at least paperwork created, right?

A. I would think.

Q. And you have, in the course of all of the review of this case, you've never seen any paperwork, other than the 16th of September, that documents that this actually happened on the 10th, right? You've seen no such note, no such document, no such paper?

A. No.

Q. No, you agree with me?

A. I agree with you.

Q. All right. If -- by the way, there weren't a lot of women working on homicide cases, correct?

A. There were some.

Q. To your credit, you were something of a pioneer at the time, were you not?

A. It was 1980. From '80 to '88 there were a lot of improvements.

Q. And you were someone who was helping push that barrier and make it more representative, right?

A. Yes.

Q. But at the time you sometimes found that you were the only woman in the room as a result, correct?

McLaughlin - direct by Loevy

734

A.  No.

Q.  In this particular homicide investigation, there's literally no other females who worked on it, correct?

A.  No.

Q.  What other females worked on this?

I think that was a, "no, I agree with you," or you disagree?

A.  Well, there wasn't anybody that, quote, worked on it --

Q.  That's what I meant.

A.  -- but there were youth officers on that floor.

Q.  But my question was --

A.  Well, but --

Q.  All right.

A.  -- you're talking about field work investigation.  I'm talking about anybody that might've had access to Orlando.  And if he was there to view a lineup, I would think he'd be in the youth office.

Q.  All right.  You've jumped quite a bit ahead.

A.  Well, you asked a question and I answered.

Q.  But let me ask my question now.  You were the only female detective working on the case, correct?

A.  Yes.

Q.  And did little Orlando tell you and a Latino gentleman with an Afro and glasses that, you know what, it wasn't Jacques Rivera?

A.  No.

Q.  Mr. Guevara did have an Afro and glasses, correct?

A.  The Afro I'm pretty sure.  The glasses, I remember seeing him in sunglasses.  If he's wearing glasses now, I don't know.

Q.  I'll show you Plaintiff's Exhibit 33.

MR. LOEVY:  We move this into evidence.

MR. BRUEGGEN:  Objection, Judge; foundation.  There's no foundation for when that photograph was taken.

THE COURT:  Okay.

MR. LOEVY:  May I approach the witness and ask her to lay some foundation?

THE COURT:  Does the witness know when that photograph --

MR. LOEVY:  I'm going to ask her if she can date this photograph for us.  I won't show the jury.

THE COURT:  Okay.

(Document tendered to the witness:)

BY MR. LOEVY:

Q.  Does that look to you like a photograph of Mr. Guevara in the late 1980's as he appeared back at the time?

A.  I would say this is after he made detective, because he's got a suit on and I only saw him in jeans.

Q.  Okay.

A.  So I don't know what the date would be and I don't know when he made detective.

Q. Would you it was early '90s, late '80s? What do you think?

A. I don't know when he made detective.

Q. All right. Now, Orlando says that when he said, "Look, it wasn't Jacques Rivera," the adults he was interacting with said, "Don't worry. It's okay. You're going to be safe. It's okay," did that happen?

MR. SOTOS: Judge. Objection. He's just reciting evidence --

MR. LOEVY: No, Mr. Sotos is --

THE COURT: Hold on. Hold on.

(Brief pause).

THE COURT: Hold on a second.

(Brief pause).

THE COURT: Sustained.

BY MR. LOEVY:

Q. Did you say something to Orlando Lopez to the effect of, "It's okay. You'll be safe. You can do this. You'll be safe. You don't have to worry," when he told you, "Look, it wasn't Jacques Rivera," did that happen?

MR. SOTOS: Objection, Judge.

THE COURT: Sustained.

BY MR. LOEVY:

Q. Would you have said that if that happened?

MR. SOTOS: Same objection.

MR. POLICK: Objection.

THE COURT: Overruled.

BY THE WITNESS:

A. If Orlando Lopez had ever come to me and said that his memory was wrong or that he thought it was somebody else, that would've been the end of Mr. Rivera's participation in the this investigation.

BY MR. LOEVY:

Q. You certainly would not have participated in a lineup on September 15th with Orlando Lopez with Mr. Rivera in it if Orlando had told you it wasn't Jacques, you would have participated in such a lineup, correct?

A. Correct.

Q. And that may have been why you weren't present for the lineup that was your case?

A. No, because --

MS. ROSEN: Objection.

MR. POLICK: Objection.

THE COURT: Sustained.

BY MR. LOEVY:

Q. All right. Changing subjects --

THE COURT: Let's take our break.

Ten minutes, ladies and gentlemen.

THE MARSHAL: All rise.

(The following proceedings were had out of the presence of the jury in open court:)

THE COURT: We're in recess for ten minutes.

Are we making any progress?

MR. LOEVY: Yes.

THE COURT: Okay. I'm seeing this case is lasting until Christmas.

MR. LOEVY: No. Ms. McLaughlin is the only witness who is substantive.

THE COURT: Okay. Okay.

(Recess.)

THE CLERK: All rise.

THE COURT: Okay. Marlan, could you get that door, please (indicating).

Are we ready?

MR. SOTOS: Let me grab Mr. Leinenweber.

THE COURT: Yeah.

(Brief pause).

THE COURT: We'll hold the jury before if we're not all here.

(Brief pause).

THE COURT: Okay. He's here.

THE MARSHAL: All rise.

(The following proceedings were had in the presence of the jury in open court:)

THE COURT: Please be seated, everyone.

Mr. Loevy.

MR. LOEVY: Thank you, Your Honor.

BY MR. LOEVY:

Q. All right. Ms. McLaughlin, do you recall making statements about there was sort of an issue or problem with illegal lineups being conducted in the 14th District?

A. I called them unauthorized.

Q. All right. Unauthorized lineups in the 14th District.

Who were they not unauthorized by?

A. I tried to explain that in my head, this was not department policy. In my way of thinking, that a detective should be present at all lineups.

Q. And the problem that came to your attention that you didn't participate in where sometimes that didn't happen, right?

A. Well, there was discussion of it.

Q. All right. But if you weren't there, you never participated in one.

A. No.

Q. But it bothered you that sometimes they would do lineups without the detectives?

MR. POLICK: Objection; foundation.

THE COURT: Overruled.

BY THE WITNESS:

A. If they were happening, it would bother me.

BY MR. LOEVY:

Q. And you felt that it was happening at the time.

McLaughlin - direct by Loevy

740

A.  Well, what I said was, there was a rumor that they were happening.

Q.  All right.  And you did work with Detective Guevara sometimes, correct?

A.  Yes.

Q.  And in your experience, you thought he was an aggressive police officer, made a lot of arrests, correct?

A.  I thought he was a good Gang Crimes Specialist.

Q.  Now, he wasn't so good at the paperwork documenting things, in your experience, correct?

A.  That was -- that was something that I remember hearing after he made detective.

Q.  That he wasn't so good at documenting things in the paperwork?

A.  Well, there's partnerships.

Q.  All right.

A.  Some people are good at it, some people aren't, and they pair up so that they make a complete partnership.

Q.  Last fast forward.  Years later the case came back, Mr. Rivera's case?

A.  Yes.

Q.  Did you always wonder who was going to come?  Or did you remember the case at all?

A.  I really didn't.  When they first presented that it was coming back, I had to really think about what case they were

talking about, because my involvement was so slight.

Q. Well, you were the lead investigator --

A. I was the lead investigator, but I did not complete it. I did not testify in court. So there was nothing to, like, permanent memories.

Q. And you didn't actually develop any evidence against Mr. Guevara, right -- I mean, sorry, against Mr. Rivera?

MS. ROSEN: Objection; asked an answered.

THE COURT: Sustained.

BY MR. LOEVY:

Q. All right. There was a post-conviction hearing, correct?

A. Yes, there was.

Q. And you testified for the State against Mr. Rivera, correct?

A. I testified for the State because they asked me to be there, yes.

Q. And you were the only Chicago police officer they asked to testify -- by the way, Mr. Rivera was saying, "Let me out of prison. I want a new trial. Newly discovered evidence," correct?

A. Yes.

Q. And the State asked you to be their witness, correct?

A. I think I was the only witness they could find.

Q. All right. And Mr. Rivera was granted a new trial, correct?

McLaughlin - direct by Loevy

742

A.   Yes.

Q.   And did the State's Attorney consult you about whether it would be appropriate to give Mr. Rivera a new trial?

A.   I don't know if that would be anything they would discuss with me.

Q.   Well, I mean, you were the lead investigator, and they had to make a decision, should we dismiss the charges or should we forward with a new trial, right?

A.   I'm not the person that spoke with the State's Attorney's Office to bring charges against Mr. Rivera, why would they discuss that with me?

Q.   All I'm asking is --

A.   Yes, I know what you're asking, but, "no."

Q.   Did they in your consultation in the post-conviction hearing, did it ever come up with the State, "Hey, should we let this go or should we keep trying to keep this guy in prison," did that come up?

A.   I don't recall a conversation like that.

Q.   All right.  You mentioned Mr. Dorsch a few times in this testimony, right?

A.   Yes, I have.

Q.   Dorsch and Boyle were the two detectives who did the September 15th lineup, right?

A.   Yes, they are.

Q.   And they did it together:  Dorsch-Doyle, Doyle-Dorsch,

right?

A. Yes.

Q. All right. But you keep talking about Dorsch, right?

A. Okay.

Q. And the reason you keep talking about Dorsch is, Dorsch, after he retired, went to work for Northwestern as an investigator, correct?

A. Yes.

Q. And you're trying to suggest that this wrongful conviction is this police officer, Mr. Dorsch's fault, is that what you're trying to suggest?

MR. POLICK: Objection.

MR. SOTOS: Objection.

MR. LOEVY: It's a question, Your Honor.

THE COURT: Overruled.

BY THE WITNESS:

A. Okay, ask me the question again.

BY MR. LOEVY:

Q. Mr. Dorsch's role in this entire investigation was limited to one day, correct?

A. Well, that's what he chose to do on his --

Q. My question --

A. That's his participation because that's what he chose to do.

Q. And my question was, Mr. Dorsch's involvement in this

investigation was limited to one day, correct? That's a "yes," "no" question.

A. Correct.

Q. All right. And he created -- out of all the paperwork in the case, he's on exactly one report, correct?

MR. SOTOS: Objection; mischaracterization, Judge.

MR. LOEVY: It's a question.

THE COURT: It's a question. Overruled.

BY THE WITNESS:

A. I suppose so. I'd have to look and see how many reports he did.

BY MR. LOEVY:

Q. His entire role in the investigation was, on the 15th Mr. Boyle and Mr. Dorsch were asked to do a lineup procedure and they did it, right?

A. (No response.)

Q. With Orlando Lopez, right?

A. (No response).

Q. Can you answer that "yes," "no"?

A. I would think that on the 15th of September, if that's the date we're agreeing on, is the 15th?

Q. Let me give you the report and you can tell us. It's Plaintiff's Exhibit 19G, you'll tell us for sure.

(Document tendered to the witness:)

MR. POLICK: What report?

McLaughlin - direct by Loevy

MR. LOEVY:  19G.

BY THE WITNESS:

A.  So that's basically saying that at 10:30 at night they did the lineup -- or they submitted this report.  So I'll say it's the 15th based on this.

BY MR. LOEVY:

Q.  All right.  Because usually the day on the report is the day it happened, right?

A.  Usually.

Q.  All right.  And it's actually Boyle's report, is it not?

A.  It's --

MR. LOEVY:  Your Honor, we move this in evidence.  I think I forgot to do that.

THE COURT:  Any objection?

MR. POLICK:  No objection.

THE COURT:  19G is received.

(Plaintiff's Exhibit 19G admitted into

evidence.)

BY MR. LOEVY:

Q.  So it's actually Boyle's report --

A.  Usually it's the first officer on the report.

Q.  So Dorsch was there, too, though, right?

A.  Yes.

Q.  And you don't know if Dorsch or Boyle spoke to Orlando Lopez anytime prior to the 15th, right?

A. I would think they'd didn't have any reason to.

Q. They would not have, right?

A. No.

Q. All right. So Mr. Dorsch's entire role in the investigation was to be the backup with Boyle, to do this one lineup procedure in the case, right?

A. No. Mr. Valentine had died or Valentin had died --

Q. Right.

A. So the Violent Crimes Office handed over the homicide to them. It's now their responsibility to fully investigate and continue the investigation into whatever evidence is in the file.

Q. Okay. What you just explained, would you agree with me there's no piece of paper in existence that says that, right?

A. (No response.)

Q. "Yes" "no" question.

A. I suppose after all these years there isn't a piece of paper that would memorialize that.

Q. And yesterday you said, Well, when the case became a shooting case and turned into a homicide, that's when it became this guy Boyle's case, is that what you said?

A. I said when it became a homicide and we weren't working, it went to them.

Q. It went to Boyle?

MS. ROSEN: Objection, Judge.

BY THE WITNESS:

A. I don't know who it was assigned to.

THE COURT: What's the objection?

MS. ROSEN: To the form of the question, that it went to Boyle. She has consistently said it was --

THE COURT: Sustained.

BY MR. LOEVY:

Q. Would you agree with me that the only role documented on paper made by Mr. Dorsch or Mr. Boyle was that they participated in this lineup and then were a part of signing the criminal complaint?

A. That was their investigation.

Q. All right. But I'm just talking about on paper, though, that's all we got?

A. Yes.

Q. All right. Now I want to talk about just a couple more areas, but one of them is your notes. You only spoke to Orlando Lopez one time, correct?

A. Yes.

Q. And these GPR notes that we've been talking about, this is the way you're supposed to do it if you do it by the book, right? You write your notes on a report, right?

A. Yes.

Q. Because the police department prior to the GPR form had a

problem where people were keeping notes sort of outside the reports, right?

A.   That was before my time.

Q.   All right.  But it was explained to you that if you're going to be a police officer and a detective, you can't just take notes anywhere, you got to take them on an official form so that it's memorialized, right?

A.   That's what the procedure was, yes.

Q.   All right.  And you played by the rules and did that, correct?

A.   Most of time, yes.  I mean, there were occasions where you didn't, but yes.

Q.   All right.  Now, why didn't the GPR's that got created in the investigation get into the official file, do you know?

        MS. ROSEN:  Objection to the form of the question.  Foundation as to the official file.

        MR. LOEVY:  I can lay some more background.

        THE COURT:  I think that would be work.

        MR. LOEVY:  All right.

BY MR. LOEVY:

Q.   Okay.  There's a Permanent Retention File with all the police reports typed up and in the Permanent Retention File, right?

A.   Yes.

Q.   And they have it stamped "permanent retention," right?

A. Yes.

Q. If I use the term "official file" you know what I'm talking about? That's the Permanent Retention official file that is kept --

A. I would prefer that you call it Permanent Retention File.

Q. All right. I'll call it Permanent Retention.

That Permanent Retention File would go to the criminal defendants and to the prosecutors in the criminal justice system, correct?

A. I think that's where they -- I think when they subpoenaed a case file, that's where it came from, yes.

Q. All right. Now, there was another file, was there not?

A. Yes.

Q. That was called the Investigative File?

A. That was kept in the office.

Q. And that was kept in the homicide office?

A. Yes.

Q. And that file contained things beyond what was in the Permanent Retention File, correct?

A. That was the entire investigation as --

Q. Right.

I'm sorry. May I ask a question?

A. Yeah. I'll stop.

Q. You guys are working an investigation n the street, you're creating notes and you're putting them in the Investigative

File, right?

A. Well, we're submitting them to the supervisors for approval, and then they're giving them to the administrative staff whoever made those files up. We didn't make the files.

Q. All right. Do you have any knowledge or explanation for why the GPR notes didn't get into the Permanent Retention File that was produced to Mr. Rivera at the criminal trial?

MS. ROSEN: Object to the form of the question, "get into."

MR. LOEVY: We're not in?

THE COURT: Is the objection is that the file didn't into?

MS. ROSEN: Why the notes didn't get into the Permanent Retention File, yes. So the form of that question.

THE COURT: Let me hear the question back.

Court reporter, can I hear the question back, please.

(Record read.)

THE COURT: I think it's compound for me to rule on this objection. If you could break it down.

MR. LOEVY: All right.

BY MR. LOEVY:

Q. There's no dispute in the case that some of the -- actually all of the GPR notes that were in the area file did not get into the Permanent Retention File. And my question to you is, if you know why.

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 552 of 1254 PageID #:104683
McLaughlin - direct by Loevy
751

A. Well, One, I don't know that's a clear dispute, because that's beyond me.

Q. Take it hypothetically, would there be any explanation for why those notes wouldn't have gotten into the official file?

A. All I know is that we hand our notes into the sergeant supervisor, and then they put them in the Investigative File, which is -- how they get copied and how they get downtown is totally beyond whatever I do.

Q. All right. When you took your notes with Orlando, you took contemporaneous handwritten notes, correct?

A. I did.

Q. And then you typed it up into a report, correct?

A. Yes, sir.

Q. And your notes didn't get typed up until the 29th, right?

A. (No response).

Q. I think you have the report of the 29th. It's 19E.

Would you like another copy?

A. No, I just have to pull the chair up. I'm sorry.

Q. So your notes have the date the 28th, and then you typed your report on the 29th; do we agree about that?

A. No, this report was typed on the 28th.

Q. Let's go by what's typed, okay.

A. Yes, it says the 29th, but --

Q. That's a mistake?

A. It was typed on the 28th.

McLaughlin - direct by Loevy

752

Yes, it is.  It's a typographical -- it's a typo.

Q.  What's that?

A.  I mistyped it.

Q.  So what you meant to type was an "8" instead of a "9" right here (indicating)?

A.  Yes.

Q.  Your supervisor, of course, has to approve that, right?

A.  Yes.

Q.  And they're supposed to check for typos, right?

A.  Yes.

Q.  All right.  So your report on the 28th, Jacques Rivera is, in fact, the suspect, correct?

A.  Yes.

Q.  Now the notes you took from your interview with Orlando, they're a little bit different than the report you typed, correct?

A.  I don't have them up here.

Q.  Well, let me just ask some questions.  The part about, "oh, I've seen him in the park playing baseball, I can identify him," that's not in your notes, is it?

A.  I believe I have seen him in the neighborhood.

Q.  My question is about the baseball part, that's not in the notes, right?

A.  I really like to see them --

Q.  Well, you have the notes.  I will hand you another copy.

This is Plaintiff's Exhibit 12.

(Document tendered to the witness.)

BY THE WITNESS:

A.  No, I have it.

BY MR. LOEVY:

Q.  So the part about baseball didn't get added to the report until Jacques was a suspect, correct?

A.  That got -- that got put into the one when I typed the report.

Q.  All right.  But he didn't tell you that.  We talked about this yesterday --

A.  No, he told me that.

Q.  All right.  But we talked about this yesterday.  But you wrote down what he said, right?

This is Plaintiff's Exhibit 16.

You took notes -- oh, I'm sorry.  This is the wrong one.

(Brief pause).

BY MR. LOEVY:

Q.  This is Plaintiff's Exhibit 12.  It's dated the 28th -- by the way, has that number changed?  Did that used to be a "7" and turned into an "8"?

A.  That's what it looks like to me.

Q.  He doesn't say -- there is the one when you took his first story, right?

A.   This is when I interviewed him.

Q.   He didn't say anything about baseball?

A.   I mean, that's the only time I talked to him.

Q.   Right.  I just want to establish that small point:  He didn't say anything about baseball at that time, correct?

A.   Yes, he did.

Q.   All right.  Well, you didn't write down anything about baseball?

A.   No.

Q.   All right.  The part about a possible silencer that you put in your notes here, that could be a exculpatory detail, could it not?

A.   It was something he said, so I wrote it down.

Q.   Because if he admitted to you that, "You know, boy!  Maybe it was a silencer," the person cross-examining Orlando Lopez could say, "Boy, you must have been far away if you couldn't even hear the shots."  That would be an exculpatory-type detail, correct?

A.   (No response).

Q.   Would you agree with that, that that's an exculpatory type of --

A.   Well, I don't know.  You're asking me to judge what would happen in a court case.  All I know is what I wrote down on here, because it was an unusual thing for somebody to say.  We don't have a lot of silencer things, so that's why I wrote it

down.

Q. If you go to trial for murder and the only evidence against you is a 12-year old pointing their finger at you, you need to be able to cross-examine that 12-year old, right?

That's an easy one, you need to be able to cross-examine, right?

A. Absolutely.

Q. All right. So details like a possible silencer, if that's what he told you the first time, that's the kind of detail that a good lawyer can say, "isn't it true, Orlando, you were so far away, you couldn't even hear the shot?" That's the kind of detail that needs to be turned over, right?

A. It was in my notes.

Q. But it didn't get into your report, did it?

A. (No response.)

Q. Want to check?

A. Oh, no, I didn't put it in the report, but both of these would be part of the court file in my -- in my -- because you hand this in, and you hand this in (indicating).

Q. All right. But you didn't know or understand that this one wasn't going to the court file, your notes?

MS. ROSEN: Objection; foundation.

THE COURT: The question is, the witness does not know. Overruled.

But you're asking if she knew or not.

BY MR. LOEVY:

Q. Did you know?

A. Did I know that this wasn't going to make it to the court? How would I know them?

Q. I'm asking.

A. No, I hand them in to the supervisor. They approve them, and then they take the original, I believe, and send them down to the Permanent Retention File and they make copies for the Investigative File that is kept in the area.

Q. All right. You would agree with we that all notes that you took should have been produced to the criminal defense attorney, correct?

A. Yes.

Q. All right. There are some GPR's that are missing, are there not?

A. Possibly. I don't --

Q. Police reports aren't supposed to get missing, are they?

A. No.

Q. That's real serious, isn't it?

A. Yes.

Q. In fact, it's a crime to destroy a police report, correct?

A. It's a crime to destroy a police report?

Q. It's a felony to destroy a police report, isn't it?

A. I really don't -- I really don't know what you're -- you mean like I write up a report and I ripped it up, that's a

felony?

Q.   No, not like a copy report.  You could rip up something like that.  What I'm saying is, there's an official report and you cause it to be no longer in existence, no copies, nothing, you can't do that, right?

A.   No, you can't do that.

Q.   Once it's submitted, it's evidence, right?

A.   Yes.  I would say, yes.

Q.   Evidence in a court of law that needs to be preserved, right?

A.   Yes.

Q.   And in your entire career, have you lost a police report, all copies of a police report, the once that were submitted?

A.   I don't believe so.

Q.   Have you ever had of police reports going lost or missing?

A.   I'd have to say I don't know.  I don't remember any discussions of anybody saying they went to court and the entire file was missing.

Q.   No, not the entire file.  I'm saying, you were a police officer for many years.

A.   Yes.

Q.   In your investigations, do you ever remember police reports being missing?  "Hey, we can't find the police report.  Not in the official files.  Not in the Permanent Retention File, it's

gone," have you ever heard that happening in your entire career?

A. I can't say that I have; I can't say that I haven't.

Q. All right. Did it happen regularly in the Chicago Police Department?

A. I doubt that it happened regularly in the Chicago Police Department.

Q. It would be extremely unusual?

A. I would think so.

Q. Let's take a look at Plaintiff's Exhibit 19.

MR. LOEVY: We move this into evidence.

I believe there's no objection, Your Honor.

THE COURT: All right.

MR. POLICK: No objection, Judge.

THE COURT: All right. 19 is received.

MR. LOEVY: Oh, I'm sorry. It's page 3 of 69.

Do you know the other number for it?

We'll call it 19A, Your Honor, because it's one page of an exhibit.

THE COURT: 19 A is received.

(Plaintiff's Exhibit 19 A was received in evidence.)

BY MR. LOEVY:

Q. All right. Can you tell the jury what this is.

A. Okay. This is a police department form, which is called an

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 560 of 1254 PageID #:104696
McLaughlin - direct by Loevy
759

Investigative File Inventory. So would document each piece of paper that came in for an investigation, and it would correlate to like the original case report that the beat officers took. The next one is GPR, three pages. And so it would document what paperwork had been turned over for the case.

Q. All right.

A. And then this is kept inside that Investigative File.

Q. All right. The yellow, I'll represent to you, we added. That's not on the original; okay.

A. Right.

Q. This is the Investigative File for the Felix Valentin murder, correct?

A. Yes.

Q. All right. And it lists three GPR's on the 27th, correct?

A. Yes.

Q. It lists three GPR's on what used to be the 27th that somebody has typed over the 28th, would you agree with that?

A. That's what that looks like to me, yes.

Q. And it lists one GPR for the 31st, right?

A. Yes.

Q. So that's a total of seven GPR pages that should exist, correct?

A. Yes.

Q. Now, showing you Plaintiff's Exhibit 14. This is the GPR from --

MR. LOEVY:  May I have a moment, Your Honor?

THE COURT:  Sure.

(Brief pause)

BY MR. LOEVY:

Q.  Sorry.  I actually have it.  This is Plaintiff's Exhibit 14.  This is the one we talked about earlier today; right?

A.  Yes, I have it.  Yes.

Q.  All right.  And it says date of report August 31st, right?

A.  Yes.

Q.  So that is the GPR that's listed here as the 31st GPR. That one is accounted for, correct?

A.  I believe so, yes.

Q.  All right.  Let's talk about the GPR's from the 27th.  We also talked about your GPR from the 27th.  This is the day of -- this is Plaintiff's Exhibit 16, this is your notes we talked about at the very beginning.  Your interview of Israel Valentin on the first day, right?

A.  Yes.

Q.  All right.  So that accounts for one of the reports on the 27th.

Showing you a copy of your notes.  This is Plaintiff's Exhibit 15.

MR. LOEVY:  We move this into evidence, Your Honor.

THE COURT:  Any objection to 15?

MR. POLICK:  No objection, Your Honor.

THE COURT:  15 is received.

(Plaintiff's Exhibit 15 admitted into evidence)

BY MR. LOEVY:

Q.  If you could just quickly identify what this is.  It looks like you might've talked to the doctor.

A.  Dr. Perez at Norwegian American Hospital.

Q.  And you did what you're supposed to do, was create notes, right?

A.  Yes.

Q.  All right.  So that's the second GPR from the 27th, correct?

A.  Yes.

Q.  Showing you the GPR's from the 28th.  We spent a lot of time with Plaintiff's Exhibit 12.  This is the Orlando Lopez notes, correct?

A.  Yes.

Q.  And this one is -- this one is the 28th?

A.  Yes.

Q.  Either the 27th or 28th, but somebody has made it the 28th, right?

A.  Yes.

Q.  And I'm going to put on the 28th as one of the pages.  And that looks like a strikeover, right?

A.  I mean it could either have been -- yes, it's something.

Q.   Showing you Plaintiff's Exhibit 13.

MR. LOEVY:  This is, Your Honor, a new one, as well. We move this into evidence.

THE COURT:  Any objection?

MR. POLICK:  No objection.

THE COURT:  13 is received.

(Plaintiff's Exhibit 13 admitted into evidence)

BY MR. LOEVY:

Q.   This is the canvas report.  When people go talk to witnesses, they're supposed to write down what they hear, right?

A.   Yes.

Q.   That also is on the 28th.  So that is the second --

A.   I don't know if that's -- was it a combined?  Oh, it's a canvass.  Okay, never mind.

Q.   The 28th.  So now we have five GPR's.  Now, they're supposed to be seven, right?

A.   Yes.

Q.   Have you ever seen where the other two GPR's are?

A.   No.

Q.   Do you have any explanation for why two are missing?

A.   I wouldn't have any explanation.  We handed them in, what happened to them after that, I don't know.

Q.   Well, what did the two missing GPR's used to say?

A.   I don't have any idea.  I mean, I don't know.

Q. There's no memorialization, for example, of the gang book discussion in any GPR, correct?

A. Not that we have.

Q. Not existing GPR, right?

A. Right.

Q. So that could be what happened on the 27th, right?

A. Yes.

Q. Or it could be what happened on the 28th, right?

A. (No response).

Q. Those GPR's are gone, right?

A. Yes.

Q. That shouldn't be?

A. Well, they're -- if you don't have them, then they're not there.

Q. And you don't them, right?

A. And I don't have them.

Q. And the Chicago Police Department doesn't have them, right?

A. Right.

Q. So that should not be the case, right?

A. No.

Q. All right. Those GPR's should've been made available to Jacques Rivera in 1988, shouldn't they have?

A. Well, if they were in the file, they would've been, I suppose.

Q. And we still have the actual Investigative File.

MR. LOEVY:  Is this Plaintiff's Exhibit 19?

MS. ROSEN:  No, it's actually the original that the City marked Exhibit 43.

MR. LOEVY:  All right.  So Plaintiff's Exhibit 19 it the photocopy, Your Honor.  We're going to call the original it sounds like City 43.

THE COURT:  Okay.

MS. ROSEN:  Oh, actually I misspoke.  Is there a sticker on there?  It's 45?  I'm sorry, City 45.

BY MR. LOEVY:

Q.  Take a look --

MR. LOEVY:  May I approach, Your Honor?

THE COURT:  Yes.

(Document tendered to the witness:)

BY MR. LOEVY:

Q.  And then --

A.  And this is the area file?  The Investigative File?

Q.  That's what I'm asking you.  Can you identify that?

That's what it appears to be, right?

A.  Yes.

Q.  Tell the jury why you believe that's the area file from the homicide, from the Valentin homicide.

A.  Well, because it has -- it has the Investigative File and stapled on the left side, which is how they made these files.

Q.  If you could show the jury what you're talking about?

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 566 of 1254 PageID #:104697
McLaughlin - direct by Loevy
765

A.   I'm sorry.  I'm talking about, this page is how it starts and all the documents that are turned in, and then this is the last document that was turned in (indicating).

Q.   You can remove and add documents.  Show the jury how the hole punch at the top there.

A.   There's a -- I forgot how you call these things, but there's a bracket faster, or something.  And so they punch holes and they would -- you know, the files could get bigger.

Q.   And you're supposed to add things, right?

A.   You're supposed to add things, yes.

Q.   You're not supposed to get things out, though, right?

A.   No.

Q.   And all the GPR's are in there?  The existing GPR's, right?

A.   Yes.

Q.   All right.  So where are the missing GPR's?

A.   I don't know.

Q.   They really should be in there, right?

A.   Yes.

Q.   All right.  May I have it back, please.

A.   You sure can.

     (Document tendered.)

BY MR. LOEVY:

Q.   Now, you were present when Ms. Rosen gave her opening statement, correct?

A.   Yes.

Q. And she said that you were the one who found this file in 2010, is that true?

MS. ROSEN: Objection, Your Honor. I didn't say it, he said it.

MR. LOEVY: Well, let's ask her.

THE COURT: Let's ask the question, because I don't remember who said it.

BY MR. LOEVY:

Q. Were you the one who found this file?

A. I didn't find the file. I mean, you make it sound like it was hidden somewhere.

Q. Well, it was hidden, wasn't it?

MS. ROSEN: Objection, Your Honor.

MR. LOEVY: Well, let me as this, Your Honor?

THE COURT: Please.

BY MR. LOEVY:

Q. Mr. Rivera didn't get his file back in 1988 when the criminal case happened, right?

A. I don't know what files he got and what files he didn't get.

Q. All right. He should have gotten this file, we agree about that, right?

A. Yes.

Q. Would you agree there are information in this GPR notes that was exculpatory?

A.   Whatever is in that file should've been turned over to the defense.

Q.   And it probably -- I'm not going to use the word "probably."  It was a violation of his Constitutional rights if he didn't get that information?  I'm not saying you did it, but that would violate his rights, correct?

MS. ROSEN:  Objection, Judge, to the form of the question.

THE COURT:  What about the form?

MR. LOEVY:  Should I try better?

THE COURT:  Yeah.  Sure.  If you can.

BY MR. LOEVY:

Q.   You're saying it wasn't your fault that the file didn't get to Mr. Rivera.  You weren't in charge of getting files to the criminal defense, right?

A.   Correct.

Q.   But now I'm going to ask you a different question.  It would have violated his constitutional rights if he didn't get the information in these GPR's and these reports back when he was on trial for murder, would you agree with that?

MS. ROSEN:  Objection, Judge.  It misstates the law.

MR. LOEVY:  It's a question, Your Honor.

THE COURT:  Well --

MR. SOTOS:  Excuse me, Judge.  She's a police officer.  She's not a lawyer.  She's not a judge.  She's a police

officer.

THE COURT: I'm going to sustain that objection.

BY MR. LOEVY:

Q. Do you have a subjective understanding, as a police officer, that information contained in the GPR reports in this file had to get to the criminal defendant or his Constitutional rights would be violated? Was that your understanding, subjectively?

MS. ROSEN: Objection.

THE COURT: Sustained.

BY MR. LOEVY:

Q. Did you believe, as a police officer, you could withhold violation like this without violating anybody's rights?

A. It sounds like a double negative, so rephrase it for me, please.

Q. Would withholding this information have violated Mr. Rivera's Constitutional rights, from your perspective?

MS. ROSEN: Objection.

MR. POLICK: Objection.

MR. LOEVY: It is relevant, Your Honor.

MR. POLICK: Objection, Judge.

THE COURT: Overruled.

MS. ROSEN: What information are we talking about?

THE COURT: Well, that would help, yeah.

BY MR. LOEVY:

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 570 of 1254 PageID #:104701
McLaughlin - direct by Loevy
769

Q.   The information in the file contained in the GPR's in the Investigative File, my question is, did you understand and believe at the time, back in '88, that there was a constitutional responsibility to provide this kind of information to Mr. Rivera?

MR. SOTOS:  Objection, Judge, because he's not identifying what information.  He's suggesting --

MR. LOEVY:  I just did.

THE COURT:  The GPR's.  The GPR's.

MR. SOTOS:  But the GPR's have lots of information.  So he's not saying --

THE COURT:  Maybe I need to talk to you at the side, because I don't know what all the information that goes into GPR's.

MR. LOEVY:  The GPR's we've been talking about in court, the ones that we've gone through and the information that we've gone through in the GPR's weren't --

THE COURT:  Let me see you at the side.

(Proceedings heard at sidebar on the record).

THE COURT:  All I know about Brady is that if it's exculpatory, it has to be turned over.  So I don't know what we're talking about.

MR. LOEVY:  I'm asking her, subjectively, if she understood that the material that we've been talking about in court was exculpatory --

THE COURT: Well, we're talking about all kinds of material. That wasn't the question. You asked her about the silencer, and then we went into whether that was exculpatory.

MR. LOEVY: I'd like to ask any of the information we've discussed in any of the GPR's --

THE COURT: I think that is really unfair. I mean, I don't know -- because I don't know what you're talking about.

MR. LOEVY: Well, I think they're just trying to save the witness.

THE COURT: Well, they are.

MR. SOTOS: Actually what we're doing, Judge, is we're trying to get him to identify it, because some of the information in the GPR's, a lot of it, is in sub-reports, some of it isn't.

MR. LOEVY: No, they are not.

THE COURT: I don't know --

MR. LOEVY: Not --

MR. SOTOS: Look, if I can finish. But your point about the silencers is a good point. That's a piece of information that was not in the police reports, and he asked about that.

THE COURT: You could just ask her if she knew if it was exculpatory, as to her understanding.

MR. LOEVY: That's what I'll do.

THE COURT: Okay.

MR. SOTOS: You know he's going to go back and ask generally about --

THE COURT: Just let's go.

(Proceedings resumed in open court).

(Name plate dropped on floor)

THE COURT: What does it say?

COURT'S LAW CLERK: Your name.

(Laughter in the courtroom.)

THE COURT: Okay. I share the courtroom. I didn't know if it was mine or somebody else's.

BY MR. LOEVY:

Q. Ms. McLaughlin, was it your understanding back in the '80s that exculpatory information, the information that would help Mr. Rivera prove his innocence, there was a constitutional obligation to turn over?

A. I would say my understanding was all information gathered in an investigation, whether pro or con, should be turned over.

Q. All right. This file in 2010, Mr. Rivera is pursuing his post-conviction, correct?

A. If that's the date.

Q. Sounds around that time?

A. I suppose so, yes.

Q. The State said, Hey, you know, we've got the Permanent Retention File, but can you find the Investigative File. They said that to you, something to that effect, correct?

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 573 of 1254 PageID #:104704
McLaughlin - direct by Loevy
772

MS. ROSEN:  Objection, Judge.  That assumes facts not in evidence.

THE COURT:  It's a question.  Overruled.

The question is, did somebody say that to you.

BY THE WITNESS:

A.  I got a call from a State Attorney's investigator who asked if I could request the Investigative File.  So I put in a request to downtown to get it.

BY MR. LOEVY:

Q.  And you got it?

A.  I got it.

Q.  And that's this (indicating)?

A.  I guess.

Q.  And then you gave it to the State?

A.  Made copies.  I mean, they didn't send me the file.

Q.  Oh, you got copies.

A.  I got copies.

Q.  All right.  So it was as easy as sending a request and it came back to you?

A.  Yes.

Q.  Do you know where it was for the 21 years in between?

A.  Probably in a warehouse somewhere.  I don't know.

Q.  All right.  This happened a long time ago, these events, correct?

A.  Yes, sir.

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 574 of 1254 PageID #:104705
McLaughlin - direct by Loevy
773

Q. Your memory -- would it be fair to say that you really don't remember your cases from 1988, 1989, 1990? It's been too long?

A. There's bits and pieces that stand out that you remember. You're not going to remember every note you took or every --

MR. LOEVY: All right. This is page 79, Line 17 through 80, Line 2.

(Whereupon, videotape played in open court).

BY MR. LOEVY:

Q. After you reviewed the documents in this case --

(Video still playing).

MR. LOEVY: Stop there. Sorry. Thanks, Ann.

BY MR. LOEVY:

Q. After you reviewed the documents in this case, you were asked, "Hey, it's been a long time, do you actually remember your interactions with Orlando Lopez or you're just going off the paper?" And you don't actually remember them, correct?

A. When I was first asked about the case, I did not remember it.

Q. I'm talking about at your deposition. After you spent the 20 hours reviewing the paperwork, you still didn't actually remember. You're just talking about, "I can read the documents, I know what happened," correct?

A. Well, it triggers memories.

MR. LOEVY: All right. This is page 182, Line 6,

through 184, Line 8.

(Whereupon, videotape played in open court).

MR. LOEVY: We didn't finish.

It looks like we can read it. It says:

"... say it again.

Whatever conversation is reflected in my

reports."

Let me see if I can find the rest of it.

It stopped there, Ann?

(Brief pause)

BY MR. LOEVY:

Q. Well, that's the gist of it. You can read the reports, you can tell us what they say, but you don't actually remember these events, correct?

A. I do remember bits and pieces of the investigation, yes.

Q. Because you went to work every day back in the '80s, and you had a lot of different things?

A. Yes, we did.

Q. And, you know, unless there was some special reason to remember, they start to run together. This is what you did for a living, right?

A. That's what I did for a living.

Q. All right. So when you were examined by your counsel, you're also going to be testifying to what's on the paper, not what you actually remember, would that be fair?

A.  Well, what's on the paper is what you remember, I mean because of the investigation.

MR. LOEVY:  I don't have any further questions, Your Honor.

THE COURT:  Okay.  Cross-examination.

Or this is your direct examination?

MR. POLICK:  Correct, Judge.

THE COURT:  Okay.

DIRECT EXAMINATION

BY MR. POLICK:

Q.  Did you show any of those notes or reports at your deposition save for the August 27th report?

A.  No.

Q.  Did you ask for them?

A.  I did.

Q.  Why did you want to see your reports at your deposition?

A.  Because it was a long time ago, you're under oath, and you want to tell what you remember and what the truth is.

Q.  You told us you became a police officer in February of 1974, correct?

A.  Yes, I did.

Q.  Okay.  Did you go and attend the police academy?

A.  Yes, I did.

Q.  Okay.  How many women were at the academy at the time you attended?

A. There were 70.

Q. Okay. Was that a new program with the academy?

A. Ah, yes. They usually only hired like 10 women at a time.

Q. Okay. And eventually you were hired, correct?

A. Yes.

Q. Where were you first assigned when you were hired?

A. Well, about -- about 65 of the women went to the Youth Division. And then 14 of us, some youth officers and 8 of us from the academy went to a pilot program for women. We were the first women in squad cars. So we stayed in the academy for extra training.

Q. I see. And then from that pilot program you were assigned to a patrol district?

A. Yes, I was. The 16th District.

Q. Okay. And approximately how long did you work in the 16th District?

A. I believe it was July of '74, and in May of '75 I went to the mounted unit.

Q. When say the mounted unit --

A. I'm sorry. The horse patrol.

Q. Okay. And were there any other woman in the horse patrol?

A. No, there were not.

Q. All right. And how long were you in the horse patrol?

A. 5 years.

Q. All right. An then after that?

A.  I took the detective's exam and I made detective in the spring of '80.

Q.  All right.  And after becoming a detective, were you assigned to what's called an area station?

A.  I was.

Q.  What area were you assigned to?

A.  The old Area 5 at Shakespeare and California.

Q.  Okay.  And how long were you there working?

A.  I was there -- I was there a couple of years, but I took time off.  I had a child.

Q.  Okay.  Your son was born?

A.  He was born in February of '81.

Q.  All right.  And when you first started working at Area 5, were you working violent crimes like you were in this case or were you working --

A.  No, I worked burglary.

Q.  All right.  So that's how you started out?

A.  That's how I started out.

Q.  So then you had your child, right?

A.  I had my child.

Q.  You took paternity leave, correct?

A.  I did.  I was off for about a year.

Q.  And did you return to work?

A.  I did.

Q.  When you returned to work, where did you go?

McLaughlin - direct - cross by Polick

778

A. They had built a new Area 5. So that was at Grand and Central.

Q. All right. And you went to that building?

A. I went to that building.

Q. Okay. Can you just describe that to the jurors when you're talking about the building, what an area station is, so they have some idea. I know the term has bee used but maybe if you can just explain.

A. Okay. There's local district stations, like the 16th, 17th, they're all numbered. I don't know how they're numbered, but they're numbered. But then there's areas, which sometimes they have a courthouse there, they have -- it's a large building. They usually have the detectives there, they have a youth division there. They also will have a district station on the first floor, administrative staff. Gang crimes works out of some of these buildings. And there's also maybe a maintenance yard where he repair squad cars and where you get gasoline. That's all in an area building.

Q. So you said the district station was on the first floor and a Detective Division was on the second floor?

A. Yes, sir.

Q. Now, we've heard testimony in this case about the Gang Crimes unit. Was that in that building or in another location at the time of the events --

A. At the time of the events they were located at Western and

Belmont, which was Area 6 at the time.

Q. Okay. So when you returned to the new building now at Area 5, how long were you there?

A. Maybe a year, year and a half.

Q. Okay. What was your next assignment then?

A. Area 4, Violent Crimes.

Q. All right. When you say Violent Crimes, what types of crimes were you working on?

A. There you worked anything that came in: Sex, homicides, aggravated barter, whatever.

Q. All right. And how long did you remain in Area 4 working homicides and other Violent Crimes?

A. Maybe -- I'm going to say a little over a year.

Q. All right. And what was your next assignment?

A. I went -- I bid back to go to Area 5.

Q. When you say you bid back -- -

A. I'm sorry, it's part of the union thing. You could make a move. I was placed in Area 4, and when I was allowed to bid back, I bid back to Area 5.

Q. So you wanted to go back to Area 5?

A. I did want to go back to Area 5.

Q. And you did?

A. And I did.

Q. All right. When you went back to Area 5, what were you working on there?

A.  I went to Violent Crimes.

Q.  And that's where you were working at the time of the events in this case?

A.  Yes.

Q.  Now, what was your next assignment in your career?

A.  I was promoted to sergeant.

Q.  What year were you promoted to sergeant?

A.  December of '88.

Q.  And how many years were you a sergeant in the police department?

A.  I was in a patrol division in the 18th District for 12 years.  And then I went to Area 3 detectives, and I think in December of 2000, I think.

Q.  And did you retire as a sergeant from the Chicago Police Department?

A.  I did.

Q.  I think you told us that was 2010, 2009, I can't remember.

A.  Yeah, something like that.  Sorry, but I don't remember.

Q.  Okay.  Now, you told us you were working at the Area 5 Violent Crimes unit in August and September in 1988?

A.  Yes.

Q.  You were a Violent Crimes detective, right?

A.  Yes.

Q.  Who was your partner at the time?

A.  John Leonard.

Q. All right. Mr. Leonard is now deceased, correct?

A. Yes, he is.

Q. A couple of times during your testimony you referred to a person named Jack. When you said "Jack," is that who you are referring to?

A. Yes.

Q. Okay. You mentioned your son earlier, was born. How old was he in 1988, August?

A. 7.

Q. And what shift were you working at the time of the events in this case?

A. It's called third shift, which would be 1630 hours, which is 4:30 in the afternoon until 1:00 o'clock in the morning.

Q. Okay. So who cared for your child while you were at work?

A. My mother.

Q. Okay. Were you a single parent at the time?

A. I was.

Q. So at the time of the events in this case, based on your testimony, you were detective for approximately 8 years, correct?

A. Yes.

Q. And about half that time you spent investigating Violent Crimes?

A. Yes.

Q. So let's talk about the events of this particular case.

This began on the 27th of August, correct?

A. Yes.

Q. This aggravated battery or shooting of Mr. Valentin, right?

A. Yes, it did.

Q. All right. And your shift started at approximately what time?

A. 16 -- 4:30 in the afternoon.

Q. All right. And if you could use not the military time. If you do, please explain it to the jury, we would appreciate it.

A. Yes.

Q. So how did you become aware of this shooting?

A. I think it was a radio assignment.

Q. All right. And you were in a car, were you at the office? Do you know where you were when you got the radio assignment?

MR. LOEVY: Your Honor, we object to the foundation. This is actual recollection or from the reports?

THE COURT: Well, I guess it would be useful to find out if the witness refreshed her recollection with the reports.

THE WITNESS: It's from a report.

BY MR. POLICK:

Q. Okay. So you've looked at your reports?

A. Yes.

Q. And it's in your report?

A. Yes, it is.

Q. And that's the report that's been marked as -- we'll call

it Defendants' 136 -- or 1.36, I'm sorry, which I believe is also plaintiff's 15.

Do you have that report in front of you, the August 27th report?

A. Possibly.

(Brief pause).

BY THE WITNESS:

A. No.

(Brief pause).

(Document tendered to the witness:)

BY MR. POLICK:

Q. See if that refreshes your recollection how you got notified.

A. It says, "on today's date at approximately --"

Q. No, don't read. Just look it over and see it if refreshes your recollection.

A. A radio assignment.

Q. Okay. So you got a radio assignment to go?

A. Yes.

Q. Where were you told to go?

A. To Norwegian American Hospital.

Q. And you were with your partner, Detective Leonard?

A. Yes.

Q. What did you do next?

A. We went to Norwegian American Hospital.

Q.  All right.  And at the hospital, what did you do when you got there?

A.  Talked to the beat personnel.  The person personnel would be the uniformed officers that are originally -- they do what's called an original case report to document the facts when they first arrive on the scene.  So they were at the hospital also.

Q.  Okay.  So do you recall the names of the beat officers you spoke to?

A.  Not without looking at the report.  I didn't know them.

Q.  If you need to look at the report to refresh your recollection, go ahead.

A.  It looks like it would be Crawford and Machain or Machain.

Q.  Okay.  And what did you learn from the beat officers, the patrol officers who did the general case report?

A.  They had said that the victim had arrived at the hospital and that he had been shot about ten times.  And that you could communicate with him, but he couldn't speak to you.  And that they had asked him some questions.  And that there was no -- there was no, quote, crime scene, because what had happened was the victim that was shot in his car, and the younger brother had discovered that he was shot, and naturally he wanted to get him to the hospital.  So he pushed his brother -- drove the car.  But he was 14 years old, so he crashed the car 3 times on the way to the hospital.

Q.  All right.  So after getting that information from them,

what did you do next?

A. Next we talked to the doctor, Dr. Perez.

Q. And did the beat officer say anything to you about the victim at all before speaking to the doctor?

A. About the victim?

Q. Yes.

A. You mean as far as how many times he had been shot or --

Q. Yes.

A. Yes. He was shot ten times. He was in -- he was in critical condition, but he was alert. They also said that -- that the brother was still in the emergency room, but we hadn't talked to him yet.

Q. So it sounds like the next step was then to talk to the doctor, correct?

A. Yes.

Q. What information did you get from the doctor?

A. Dr. Perez again repeated that he had ten wounds. He showed us the x-ray where there were 6 pellets in I want to say his right chest cavity, but there were 6 pellets in his chest. If he survived, he would be paralyzed from the waist down.

He was intubated. He was being transferred, because Norwegian American Hospital is not a trauma center, and this type of an injury needed a trauma center. So he was being transferred to Cook County Hospital, kind of like when we got there.

McLaughlin - direct - cross by Polick

So we asked if we could talk to the victim. And he's like, "You got about a minute because we're moving him. As soon as a private ambulance gets here, he's got." So we went in and tried to talk to the victim.

Q. So the next step was to attempt to talk to the victim?

A. Yes.

Q. Tell us what happened there.

A. Well, we went in and told him who we were. And then asked him if he knew, you know, who the offenders were. And he just said, yes. And if he could identify them. He didn't say anything, but nodded that he could. And that was about the end of the conversation.

Q. When you spoke to the beat officers, did they give you any information about what the victim had said?

A. Yes, they said that it was a Latin King, that's what they had been told.

Q. All right. So how long was your conversation with the victim there at Norwegian?

A. Very, very limited and very short. I mean, they wanted to get him out of there.

Q. All right. And you prepared a note about your general -- I'm sorry, a general progress report about your conversation with the doctor, correct?

A. Yes.

Q. And that's been shown to you as Plaintiff's Exhibit 15,

correct?

A. That --

Q. It's also Defendants' 1.36. Do you need a copy?

A. No, I've got a bunch of stuff up here. Let me look.

Q. Okay.

(Document tendered to the witness).

BY THE WITNESS:

A. Okay.

BY MR. POLICK:

Q. Please look at Defendants 1.36 and if you could please identify that.

A. It's the progress report from the doctor.

Q. Reflecting your conversation with him about the victim's condition, correct?

A. Yes.

Q. All right. So after speaking --

MR. POLICK: And if that hasn't been admitted, Judge, we move to admit Defendants' 1.36.

THE COURT: 1.36 I think has been received, but I will receive it with that number.

MR. LOEVY: It had a plaintiff's number, Your Honor.

MR. POLICK: Yeah, I think it was plaintiff's 15.

THE COURT: Received.

MR. POLICK: Thank you.

(Defendants' Exhibit 1.36 was received in

evidence.)

BY MR. POLICK:

Q. And so what was your step after speaking to the doctor?

A. We went to speak to the victim.

Q. And after speaking to the victim?

A. We went to the adjacent waiting room and talked to the victim's brother, Israel Valentin.

Q. And what did you learn from Mr. Israel Valentin, the brother?

A. Okay. He related that on -- there was a wedding that he was attending with his girlfriend and that Felix, who is the victim, was driving. They drove over to 3320 Cortland. And he went upstairs to the first floor apartment to pick his date up for the wedding.

When he came down about five minutes, he said he was only gone about five minutes, and when he came back down he looked at the car and he noticed that his brother was slumped over towards the passenger seat.

So when he looked in the window, he saw that he had been shot. So he pushed him. He yelled back to his girlfriend, who was now -- because he came out alone -- that was now coming down the sidewalk or the front of the apartment, and said, "Call Mrs. Valentin, I'm going to the hospital."

So he drove, took off and tried to get him to Norwegian Hospital.

Q. Okay. Did the brother give you any -- well, let me ask you this, did the brother himself indicate to you whether he had witnessed the incident?

A. He did not witness, nor did he hear any gunshots.

Q. Okay. He came out after the fact?

A. He came out after the fact.

Q. What other information did you get from the brother?

A. (No response.)

Q. Do you have your note in front of? It should be Plaintiff's 16, this is Defendants' 1.37.

A. I got it, but I'm just looking.

Q. Here you go --

A. I got it.

Q. You got it?

A. Uh-huh.

(Brief pause).

BY THE WITNESS:

A. And your question is?

BY MR. POLICK:

Q. Did he give you any other information other than the fact that what had happened and that he didn't see it?

A. I don't -- I don't believe so.

Q. Well, where did you get the information about the witness?

A. Oh, I'm sorry. That's in my GPR. I'm sorry.

Q. Let me show you the note.

A.   I don't have the GPR.  Macho Lopez, was -- his girlfriend -- Israel, who is the brother that drove the victim to the hospital, his girlfriend's younger brother is Orlando Lopez.

Q.   What did he tell you --

A.   I'm sorry, that he had seen the shooting.

Q.   All right.  So now you knew that there was a witness?

A.   That there was a witness.

MR. POLICK:  Judge, I see we're past the noon hour. Would you like me to continue or --

THE COURT:  Do you think if we went 10, 15 minutes you could reach a convenient stopping point?

MR. POLICK:  Yes.

THE COURT:  Okay.  Why don't we press on a little.

MR. POLICK:  All right.

BY MR. POLICK:

Q.   So with that information ow that you knew there was a witness, what did you do next?

A.   Contacted the gang unit and told them we were looking for the witness, you know, where he lived and where he was last seen.

Q.   Why would you contact the gang unit about that?

A.   Because the Gang Crimes officers actually worked in the various areas and were familiar with people in the neighborhood.  And that was really what their expertise was, was dealing with the community and knowing who all the players

were.  And the citizens in the area knew them.  They recognized them.  If we showed up in suits and ties, it might be a little intimidating.

Q.  So you asked them to locate Macho Lopez?

A.  Yes.

Q.  What did you do after alerting the Gang Crimes to locate the witness?

A.  After --

Q.  Yes.  You and Detective Leonard, at some point you must have left the hospital, right?

A.  We did.  We left the hospital, I'm going to say we grabbed a bite to eat.

Q.  And after that?

A.  After that went back and started typing the report of the information that we had obtained from the hospital.

Q.  Had Gang Crimes located the witness by that point or given you any information that they had located Macho Lopez at that point?

A.  If they did?

Q.  At the point where you returned to do this report.

A.  When I started the report, no, I did not know there was a witness.

Q.  And when you started your report, had you gone back to the area?

A.  Yes.  My station.

Q. All right. And the report you're referring to is your August 27th report, correct?

A. Yes, I am.

Q. Do you have the 1.12 in front of you?

A. I do.

Q. What does that report detail, detective -- or Ms. McLaughlin?

A. It details the name of the victim. A description at the time of who the assailants might be. The injuries. The brother, what he had said. Where the hospital was. If there was any weapon; that type of information. Personnel assigned. And then it was typed what we had done: The interview of the doctor, the interview of the victim in the hospital, the interview of the brother.

Q. Okay. When you say the personnel assigned, you've already told us about the beat officers who did the initial report, correct?

A. Yes.

Q. Okay. What about the gang unit that was contacted to go to try to find this witness, Macho Lopez, who were they? Is that reflected in your report, who the Gang Crimes officers were?

A. Yes, detective Noon, Guzman, Zacharias, and Fallon -- or Sparks, I'm sorry.

Q. Fallon, no, correct?

A. No.

Q. All right. And you said detectives. They were not detectives at the time?

A. Yeah, they were Gang Crimes Specialists.

Q. All right. And the report also reflects your interviews of the doctor, the victim, and Mr. Israel Valentin, correct?

A. Yes.

Q. Okay. So at some point after preparing your report, now you're back at the area, what was the next thing you recall happening?

A. We received a phone call that they had located the witness.

Q. Macho Lopez?

A. Macho Lopez.

Q. And with that information, what was the next thing that you did?

A. We went -- we went to -- back to the area. I don't want to call it the scene, because the car that he was shot in was not found that night. It was in an accident and then it got relocated. But the area where it happened, we went back to.

Q. You mean --

A. 3320 Cortland.

Q. Where Mr. Macho Lopez resided?

A. Resided, right.

Q. And when say "we" you're talking about --

A. I'm sorry, Jack. Detective Leonard and myself.

Q. All right. And what happened when you got to the scene

there?  I'm sorry to call it the scene, but when you got to that address.

A.   When I got to the address, got out of the car, on the street, I was approached by this young man who had been with one of Gang Crimes officers.  And he said this, is -- this is the young man who saw the shooting.  So Jack and I started to interview him.

Q.   Okay.  And can you explain to the jurors how you did that? How you spoke to this Macho Lopez.

A.   Well, he was -- he was young.  I asked him how old he was. And he was 12.  And what school he went to.  Just asked him what he had seen, and so he could tell me.  I didn't ask him like, were you here, were you there.  Just what did you see, and, you know, what were you doing when the incident happened.

And then he related that he was coming from the store, which was on the corner, and on his way he was going from the store, coming home.  And on the way there, he notices this car coming down the street.  And it was actually pulling into an alley, but anyway approaching and he saw him parked.

And then he saw this guy get out of the car.  And you have to understand that these are dangerous neighborhoods. These kids -- they're older than a 12 year old.  But, you know, he's watching.  And then he sees this guy running towards Valentin's, the victim's auto, and then he sees the shooting.

So that's what he related to me.  And I'm like, "well,

can you give me a description of the offender." And he's like, "I know him. I know him." I said, "how do you know him? Does he live here?" And he's like, "No, from Humboldt Park. He plays baseball there." He's, like, "I've seen him at the park."

Q. So you asked follow-up questions, correct?

A. I did.

Q. All right. Did you ask him questions like the lawyers are doing in this case, cross-examining him?

A. No you're dealing with a 12 year old. I mean, this is a traumatic incident, for anyone, no more than a 12-year old. Plus, he felt very close to this family. So I let him speak and talk to us.

And then Jack, I remember hearing Jack saying, take him -- you know, give this kid the books and let him look at it. And because he's young, they brought the books to him.

Q. Let me stop you there.

A. I'm sorry.

Q. When you're referring to the books, what are you talking about?

A. Gang Crimes keeps a compilation of photographs in gang books. There would be a book for Latin Kings, and Saint Fish, Gangster Disciples. Whatever gangs they have, they would have separate books for these people.

Q. And what book did you and Detective Leonard ask the Gang

Crimes Specialists to show Macho Lopez?

A.  Latin Kings, because that's the information we had.  And Macho Lopez says hat he knew he was a king.

MR. POLICK:  Your Honor, if this is a good point?

THE COURT:  It is.  All right.

Ladies and gentlemen, let's start at 1:15.

THE MARSHAL:  All rise.

(The following proceedings were had out of the presence of the jury in open court:)

THE COURT:  Couple of things.  Where do we stand on the Melendez?

MR. ART:  We have an agreement to read his deposition.

THE COURT:  So we can tell the institution that I'm withdrawing the writ, essentially?

MR. BRUEGGEN:  Judge, so we had talked about Mr. Art relayed his the conversation with Mr. Menendez, expressed some concerns about it.  I've not spoken with him.  I don't know what it is.  We talked about making sure we had deposition designations so that if we had to proceed with the deposition, but from the defense side, we'd like to hear -- I'd like to confirm that Mr. Menendez is, in fact, the problem that they say he is.

THE COURT:  Well, so when are we supposed to hear from him?  I thought there was an agreement.  I guess I'm getting bad information.

MR. ART:  Your Honor, there was an agreement.

MR. LEINENWEBER:  Judge, I don't tell him when Mr. Art and Art spoke --

THE COURT:  I'm sorry.  Say it louder.

MR. LEINENWEBER:  I'm sorry, Your Honor.  I did tell him, when Mr. Art and I spoke yesterday, did tell him that that sounded like a satisfactory answer.  Obviously, it was before I spoke with Mr. Given.  In fact, we haven't even spoken about it, so I apologize.  But I did say that to Mr. Art.

MR. GIVEN:  Judge, if there was an agreement --

THE COURT:  Thank you.

MR. GIVEN:  Thank you, Judge.

THE COURT:  All right.  So can I tell the institution or the marshals that we're withdrawing the requirement that he be available?

MR. ART:  Yes, Your Honor.

THE COURT:  Okay.  All right.  Then number 2, I gather that we're going to have Mr. Lopez by video conference?

MR. LOEVY:  Monday is our understanding.  If he's willing to participate.  I understand we're trying.

MS. ROSEN:  This is the first we've heard of it.

MR. LOEVY:  Well, he's a witness.  And we've been saying we're trying to get him to participate.

MR. BRUEGGEN:  Judge, I've been trying to reach Mr. Lopez.  I can not disconnected -- not disconnected.  I get

rings and then it disconnects, so for weeks.

THE COURT: What do you want me to do? Because I need to make arrangements depending on what we're going to do.

MR. LOEVY: May we have a moment, Your Honor?

THE COURT: Sure.

(Brief pause).

MS. ROSEN: Judge, we don't even know what witnesses they're planning on calling Monday, so --

THE COURT: Hold on.

MR. LOEVY: We're hoping to get the technical side from Cleveland?

MR. SWAMINATHAN: For him to be able to go to the federal courthouse in Cleveland and testify from there by video, that's the goal.

THE COURT: You're dealing with that?

MR. ART: With the staff here and in Cleveland, yes.

THE COURT: Okay. Defense?

MS. ROSEN: This is the first we've -- it has been our understanding all along that we were proceeding by deposition, and videotaped deposition, with some thought, idea that they were trying to reach him, but we have never been informed that they had confirmed him.

THE COURT: Well, I don't know. I had the idea from the beginning that we didn't know in what form we were going to get him to attend.

MR. LOEVY: Nothing has changed. I would say the odds are that he's not going to testify. He doesn't want to testify. He may testify. Nothing has changed.

MR. SOTOS: Well, if that's the case, Judge, we just want to proceed in an ordinarily fashion. If he's going to testify, we want to have notice so that we can reach out to him and talk to him about --

THE COURT: Let me ask you, Mr. Sotos, because you're hearing exactly what I'm hearing --

MR. SOTOS: Right.

THE COURT: -- what I'm hearing is, it's a crapshoot, okay.

MR. SOTOS: I'm hearing something much different. I'm hearing that they have -- you know, they made a supplemental disclosure yesterday about an investigator --

Can we just address this at sidebar? There's a reason for it.

THE COURT: Okay.

MR. LOEVY: That's fair.

(Proceedings heard at sidebar on the record).

MR. SOTOS: So we got a supplemental disclosure from the plaintiff last night. It's a statement from an investigator named Mortimer Smith.

THE COURT: Okay.

MR. SOTOS: I think he said he's out in Cleveland, I

think he said now. The witness doesn't want to come here.

THE COURT: Okay.

MR. SOTOS: He says that the witness doesn't want to come here because he's afraid of the police. Well, Judge, that's -- that's a huge issue. He has never in 30 years said he was afraid of the police. He said he left Chicago --

THE COURT: Well, that's not coming into this case.

MR. LOEVY: Well, we haven't talked yet. I would like to address that before you decide.

MR. SOTOS: Well, that's our concern. Now they want to put him on video and say he's not coming to Chicago because he's afraid of the police. And if anything like that is going to happen, we have a right to --

THE COURT: Well, absolutely.

So you may go ahead. Go ahead.

MR. LOEVY: Well, Your Honor, the issue is --

THE COURT: It's not complicated.

MR. LOEVY: Mr. Lopez said in his deposition, "Look, Jacques was the wrong guy. I told the police he was the wrong guy."

THE COURT: I know that. I know that.

MR. LOEVY: "But the police didn't coerce me. It's not the police fault." And then they wrapped themselves in Mr. Orlando saying, "Not the police fault. They didn't do anything wrong."

THE COURT: I know that.

MR. LOEVY: We said, "Orlando, we'd like to cross-examine you." He said, "No." "We want you to come to Chicago or do it by video." He said, "No." We said, "Why not?" Because he's afraid of the police.

You know, we don't have to decide it right now.

THE COURT: When did he say that?

MR. LOEVY: This weekend when Mort talked to him -- or maybe not --

THE COURT: Yeah, that's what I just heard, this weekend.

MR. LOEVY: Or maybe it's not this last weekend.

When did Mort talk to him?

MR. SWAMINATHAN: I think it was this weekend.

THE COURT: So let me --

MR. ART: To be clear, it was earlier this week.

MR. LOEVY: It was earlier this week. It just happened.

THE COURT: Well, I understand that it just happened, but if you're going to put him on in a video conference and elicit that, I think the defense should have an opportunity to examine him, and good luck if that's going to happen.

MR. LOEVY: Well, we actually wanted -- he probably won't testify because he says, "Look --"

THE COURT: I know that.

MR. LOEVY: "-- I want my testimony to stand that the police didn't do anything wrong."

THE COURT: That's why I say it's a crapshoot.

MR. LOEVY: And we want to call Mort to say he won't give testimony.

THE COURT: Ahhhhhh ...

MR. SOTOS: This is so far beyond --

MR. LOEVY: This is the eye-rolling and like groan argument. That's relevant evidence.

MR. SOTOS: It's actually well beyond the realm of propriety.

THE COURT: You know what? You're way ahead. Don't argue it, okay. It's not happening. It's not happening.

MR. LOEVY: Well, we will continue to brief it and make an issue. We believe it's extremely relevant that when he says, "The cops didn't do anything to me," and they're going to wrap --

THE COURT: There's absolutely no reason, there's absolutely no reason why he should be afraid to testify either by video conference or by coming here because of the police.

MR. LOEVY: He doesn't want to go on record that the police caused a wrongful conviction, because he fears retaliation.

And they elicited from Jacques, "Isn't it true witnesses fear gang retaliation." They elicited that.

THE COURT: So what do you think -- what do you think is going to happen? We're going to put him in front of the jury that we can't get any testimony from him because he's afraid of the police?

MR. LOEVY: Yeah, because he's afraid of the police.

MR. SOTOS: After 30 years.

MR. LOEVY: They elicited that there's gang retaliation, which is why witnesses don't want to say things against them. This is -- I mean, you don't have to decide it on a fly. It's a big issue. Let us file a brief and let us show you.

THE COURT: All right. File a brief. But let me tell you something, if you file a brief, they're going to have to respond. My guess is, this is not going to be happening.

MR. LOEVY: Well, if he testifies -- I think he's too afraid of the police to testify. I don't think he's going to testify.

THE COURT: You know --

MR. LOEVY: If he doesn't testify, I think --

THE COURT: Do you think I give a damn? Please.

MR. LOEVY: Just think about this.

Is it his turn or mine?

THE COURT: I don't know. I would just like to get to lunch. And I don't know what you want to say. I mean, what do you want to say?

MR. SOTOS: I want to say that this is so far beyond the realm of propriety.

THE COURT: Yeah, that's why --

MR. SOTOS: They could've asked if they had any issues about fear of police 30 years ago.

THE COURT: Let me tell you something. Why are you fighting with me when I already said that it's not happening.

MR. SOTOS: You're right.

THE COURT: And Mr. Loevy says he wants to file a brief to convince me that it should happen. And then I said, if he does that, then you get to file a brief.

MR. SOTOS: You're right. You're just right.

THE COURT: Thank you.

MR. LOEVY: So what we'd like to do is, I don't think it's going to be an issue with this witness. I think it's going to be --

MR. BRUEGGEN: We don't want the press to hear this.

THE COURT: Well, that's why we're here.

MR. BRUEGGEN: Well, but we don't want the filing to be out there. With the filing, he's going to put that out there. It's going to be in the front page him saying, Orlando Lopez, the star witness, is afraid of police.

MR. LOEVY: We're here at sidebar. This is an issue in the case. They put out gang retaliation. We're not trying to do anything with the press. We're trying to tell this jury,

Mortimer just found out this week, we disclosed it. What I'm suggesting to you is --

THE COURT: Well, rather than going on and on forever, what are you suggesting? That it be sealed? Because I don't think there's a ground for sealing this. It's just some witness' whatever.

MR. BRUEGGEN: It's highly prejudicial.

MR. SOTOS: Judge, it's actually more than that. It's the Chicago Tribune front-page story that the witness secreted in another state because of police intimidation.

THE COURT: All right. Well, let's get the briefs filed under seal and we'll see what we do.

MR. LOEVY: Your Honor, if we tried to pull something, we wouldn't have told you or them. We would just file it.

THE COURT: Let's not talk about that, because I don't, you know, that's -- what do I care if anybody is trying to pull anything or not?

MR. SOTOS: We would go with the brief.

THE COURT: You know what? A very simple issue was raised, whether this is so prejudicial that it ought to be sealed. Let's seal it and let's see what happens.

If you can keep -- you know, maybe we can keep the part that needs to be sealed to something very narrow, and then after the trial we'll deal with --

MR. LOEVY: And let it come down at the trial. What

we want to do is have Mort testify.

THE COURT: Yeah, I know that. I know that.

Okay. I'm done.

MR. SOTOS: And, Judge, before the jury comes in, it would be after lunch, I have one other issue I want to address.

THE COURT: Why don't you tell me what it is now.

MR. SOTOS: Okay. It's in regard to Mr. Loevy's questioning. We're objecting a lot and some of them have been sustained and overruled. But he asked a question that was overruled, he said to Ms. McLaughlin, "It's your theory that Mr. Dorsch is responsible for this wrongful conviction because he works for Northwestern." He's asked three or four questions about, "What do you think," and it goes right to the heart of work product, the things we discussed, and her thoughts about what we're contending, because she's a defendant who is a witness about facts --

THE COURT: You're saying that this is work product?

MR. SOTOS: Well, when he asks her, "Are you saying that Mr. Dorsch is responsible --"

THE COURT: That's a question. Okay.

MR. SOTOS: It's a question, but it's a question that when he says, "Are you saying that Mr. Dorsch is responsible for everything that happened here because he works for Northwestern," that's asking him -- asking her about things we all talk about when we're getting ready for trial. That's work

product.  What she believes as a result of talking to us about Dorsch or anything else --

THE COURT:  Well, I don't think that -- well, first of all, I think if it is coming out of her mouth and it's what she believes, it's not work product.

MR. SOTOS:  Only as a result of all of us talking, that's the only way she would get that information.  Our theories --

THE COURT:  She answered the question.

MR. SOTOS:  Judge, I don't even know if she was ever in the room when we discussed our theories in regards to --

THE COURT:  How did she answer the question then?  She said, "no," right?

MR. LOEVY:  She didn't admit it.  Your Honor, I didn't ask her what conversations did you have with your attorneys.  Every chance she gets she says --

THE COURT:  I think if the witness had said, "yes," I still don't think it's work product.  It's what she believes.  But she said "no."

MR. SOTOS:  I understand, Judge.

(Proceedings resumed in open court).

THE COURT:  Okay.  So we resolved that.  So 1:15.

(Luncheon recess taken from 12:26 o'clock p.m.

to 1:15 o'clock p.m.)

McLaughlin - direct - cross by Polick

0

* * * * * * * *

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER

/s/Blanca I. Lara                    June 8, 2018

808

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JACQUES RIVERA,                              ) No. 12 CV 4428
                                             )
            Plaintiff,                       )
                                             )
    vs.                                      ) Chicago, Illinois
                                             )
REYNALDO GUEVARA, STEVE GAWRYS,              )
DANIEL NOON, JOHN GUZMAN, JOSEPH FALLON,     )
JOSEPH SPARKS, PAUL ZACHARIAS, GILLIAN       )
MCLAUGHLIN, JOHN LEONARD, EDWARD MINGEY,     )
RUSSELL WEINGART, ESTATE OF ROCCO            )
RINALDI, CITY OF CHICAGO,                    ) June 8, 2018
                                             )
            Defendants.                      ) 1:20 o'clock p.m.

VOLUME 4 B
TRANSCRIPT OF PROCEEDINGS - Trial
BEFORE THE HONORABLE JOAN B. GOTTSCHALL
and a Jury

APPEARANCES:

For the Plaintiff:        LOEVY & LOEVY
                          BY:  MR. JONATHAN I. LOEVY
                               MR. STEVEN E. ART
                               MR. ANAND SWAMINATHAN
                          311 North Aberdeen Street
                          3rd Floor
                          Chicago, Illinois  60607

                          MacARTHUR JUSTICE CENTER
                          Northwestern University School of Law
                          BY:  LOCKE E. BOWMAN III
                          357 East Chicago Avenue
                          Chicago, Illinois  60611
                          (312) 503-0844

Court reporter:              Blanca I. Lara
                          Official Court Reporter
                          219 South Dearborn Street
                          Room 2504
                          Chicago, Illinois 60604
                          (312) 435-5895
                    blanca_lara@ilnd.uscourts.gov

809

APPEARANCES:   (Continued)

For the Individual        THE SOTOS LAW FIRM
Defendants:               BY:   MR. JEFFREY N. GIVEN
                                MR. JAMES G. SOTOS
                                MS. CAROLINE P. GOLDEN
                                MR. JOSEPH M. POLICK
                                MR. DAVID A. BRUEGGEN
                          550 East Devon Avenue, Suite 150
                          Itasca, Illinois  60143

For the Defendant         ROCK FUSCO & CONNELLY, LLC
City of Chicago:          BY:   MS. EILEEN E. ROSEN
                                MS. CATHERINE M. BARBER
                                MS. THERESA B. CARNEY
                          321 North Clark Street, Suite 2200
                          Chicago, Illinois  60654

For the Defendant         LEINENWEBER BARONI & DAFFADA, LLC
Guevara:                  BY:   MR. THOMAS E. LEINENWEBER
                                MR. JAMES V. DAFFADA
                          120 North LaSalle Street, Suite 2000
                          Chicago, Illinois  60602

810

(Jury out.  Proceedings heard in open court:)

THE COURT:  Are we ready?  Yes?

MR. LOEVY:  Yes from the plaintiff, Your Honor.

THE COURT:  Yes.

MR. POLICK:  Judge, there's an issue.

MR. GIVEN:  Judge, can I just raise something very quickly?

THE COURT:  Yes.

MR. GIVEN:  So last night, you know they filed this motion to clarify.  You ruled on it this morning.  We didn't have a chance to respond.  There's -- we believe there's an issue with Mr. Perez and Mr. Ortiz.

THE COURT:  But I ruled on that already.  The fact that it was unclear was my fault.  It was --

MR. GIVEN:  Well --

THE COURT:  I know what I intended.

MR. GIVEN:  -- with Mr. Perez, we had a motion to bar him --

THE COURT:  Yes.

MR. GIVEN:  -- and you ruled way back when that it was denied without prejudice, because we'd wait and see if he was even going to be a witness.  We'd like a chance to raise that again now that we may have --

THE COURT:  Well, go ahead, but we have to go forward because you've got a jury waiting.

MR. GIVEN:  Right.

THE COURT:  When is this going to come up?

MR. GIVEN:  We'll file it by Monday morning.

MR. ART:  And, Your Honor --

THE COURT:  Okay.

MR. ART:  -- we won't need to call him before then anyway.

MR. LOEVY:  No, but -- well --

THE COURT:  Okay.

MR. LOEVY:  -- the issue might come up in Mr. Guevara's exam.  We won't bring it up today in respect to Mr. Given.

THE COURT:  Fine.  All right.  Let's get the jury.

Give me what you've got, but I -- but this was fully aired, I thought, at the 404(b) stage.

MR. GIVEN:  Well, it's -- in fact, part of our motion to bar him was, in fact -- I'm sorry.  Part of our 404(b) motion *in limine* referred to the motion to bar him from a couple years ago.

THE COURT:  Well --

MR. GIVEN:  And then when you granted the motion to bar him, there was nothing else to say until this morning.

THE COURT:  Well, I didn't grant -- you're telling me I've got -- I mean, I'd have to go back and look.

MR. GIVEN:  You, you --

812

THE COURT: If I granted the motion to bar him or I said I'd reconsider it.

MR. ART: Not at all, Your Honor. I -- all these issues were briefed. But it doesn't affect Mr. Guevara's cross which is going to be on subjects that will be crossed about --

THE COURT: Well, we're not -- so it's not -- I don't deal with this this afternoon, you're telling me?

MR. ART: Correct.

THE COURT: Fine. But all I'm telling you is I thought that everything was laid out in the 404(b) --

MR. LOEVY: It was.

THE COURT: -- brief then.

MR. LOEVY: It was. It was fully aired.

MR. GIVEN: Well --

THE COURT: And there was actually no --

MR. GIVEN: -- it wasn't. So we'll just put it in -- Judge, I don't want to waste your time --

THE COURT: Yes.

MR. GIVEN: -- and the jury's time.

THE COURT: That's great. But all I'd tell you is I tried to strike a balance, and, you know, the balance goes off and the balance goes a different way. That's the way things are.

MS. ROSEN: Judge, I think the point on Mr. Perez was that --

THE COURT: Well, let's do it later.

MS. ROSEN: Okay.

THE COURT: We're ready.

(Jury in.)

THE COURT: Please be seated, everyone.

Mr. Polick?

MR. POLICK: Thank you, Judge.

GILLIAN ELIZABETH McLAUGHLIN, DEFENDANT HEREIN,

PREVIOUSLY SWORN

CROSS-EXAMINATION (Resumed)

BY MR. POLICK:

Q. Ms. McLaughlin, you've made a report, a general progress report, of your interview with Mr. Lopez, correct?

A. Yes.

Q. Okay. And that was done on the 27th, right?

A. I typed it on the 2 -- the interview --

Q. Oh, your --

A. -- was on the 27th.

Q. Your general progress report, what I'm showing you now, which is Plaintiff's 12 and also --

MR. LOEVY: Joe, you cut off the date by accident.

MR. POLICK: I'm sorry. I haven't --

BY MR. POLICK:

Q. Your general progress report I'm referring to.

Do you remember Mr. Loevy showed you that?

A. Yes, I do.

Q. It's No. 12?

A. Yes.

Q. Okay. Are you seeing that on the screen --

A. I am.

Q. -- or do you have that in front? Okay. And that interview of Mr. Lopez was done on the 12th, correct?

Or, I'm sorry, on the 27th, correct?

A. Yes.

Q. All right. And that's what you have here on -- in this box (indicating) that's entitled Date of Report, right?

A. Yes.

Q. All right. And then next to it is a box entitled Date of Original Case Report. That's the case report you talked about that Officers Machain and Crawford did, right?

A. Yes.

Q. All right. We know the incident happened on the 27th, correct?

A. Yes.

Q. All right. So that 28th date, is that an error?

A. Yes.

Q. All right. Now, in your GPR or general progress report, about your interview of Mr. Lopez, you noted the fact that the offenders were Kings, right?

A. Yes.

Q. And that he had seen him before, correct?

A. Yes.

Q. All right. So he knew him from the neighborhood, right?

A. Yes.

Q. All right.

MR. LOEVY: Objection to leading, Your Honor.

THE COURT: Is that the --

MR. POLICK: I'm moving to another --

THE COURT: But there's no question pending.

BY MR. POLICK:

Q. All right. So when we left off before lunch, you had told us that you and Detective Leonard directed the Gang Crimes officers to show them the Latin King photo books?

A. Yes.

Q. All right. So did you and Detective Leonard remain at the Lopez residence there on Cortland for the showing of these books to Mr. Lopez?

A. No.

Q. All right. You left that to the Gang Crimes officers?

A. Yes.

Q. All right. So where did you go while they -- while the Gang Crimes officers were doing that?

A. I have a vague recollection that might have gone to County just to see what condition the victim was in.

Q. Last you heard from Dr. Perez at Norwegian was that he was

going into surgery?

A. He was going into surgery.

Q. Okay.

A. Okay.

Q. And --

A. And he was in surgery at that time.

Q. All right. And then after going to County and checking out that, where did you go?

A. Back to the Area.

Q. Meaning your --

A. I'm sorry. Back to Area 5 at --

Q. Okay.

A. -- Grand and Central.

Q. Okay. And did you learn of any results of the Gang Crime officers showing the books?

A. Yes. They called and said that they -- that Orlando had picked out a suspect in the book, and they gave me a printed CB number.

Q. Okay. And that CB number, can you just explain what that is to the jury, please.

A. It's a -- a CB is a central booking number. When you're arrested, whether you're released or you're charged, you get a central booking number. That's how they keep track of you.

Q. And that would appear on what's --

A. And that would --

Q. -- called somebody's criminal history --

A. Criminal history --

Q. -- or rap sheet?

A. -- sheet.

Q. Yes?

A. Yes.

Q. All right. And you noted that CP -- CB number on your general progress report from the 27th, correct?

A. Yes.

Q. All right. Now, Mr. Loevy asked you some questions about a photograph that related to that CB number.

A. Yes.

Q. Do you recall that photograph? Do you have any idea where that photograph came from?

A. No.

Q. Did you pull that photograph?

A. No.

Q. Did you have it that day?

A. No.

Q. All right. All right. So after learning that a witness had been identified, did he give you the name of who had been identified?

A. Most likely, yes.

Q. And who was that?

A. Jose Rios, I believe is what his name in the book was.

Q. And --

A. And then it was Jacques Rivera.

Q. All right. So after getting that information, did you remain at work that day? Did you leave? What did you do?

A. No. We -- we went home.

Q. All right.

A. Well --

Q. Yes. And then you went to -- the next day would be -- would have been the 28th --

A. Yes.

Q. -- correct? All right. So you returned to work on the 28th?

A. Yes.

Q. All right. And you're still working with Detective Leonard?

A. Yes.

Q. All right. And what did you -- what do you recall doing on the 28th?

A. The 28th, we went back to 3320 on Cortland.

Q. All right. And what was the purpose of going back to 3320 Cortland on that day?

A. The purpose was that they had -- someone had located the car with -- they believed was the car, and we wanted to look for shell casings and anything of that nature that we could find. So the ETs were called out.

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 621 of 1254 PageID #:104757
McLaughlin - cross by Polick
819

Q. And who are what you're referring to as the ETs?

A. Evidence technicians.

Q. All right. And what do the evidence technicians do?

A. They gather evidence of crimes to help in investigations.

Q. All right. They also photographed?

A. They photograph.

Q. Do they do that as well?

A. Yeah. They took pictures of the car, I believe, and they gathered shell casings.

Q. All right. If there was a live lineup conducted and someone was selected, would ETs be called to photograph that?

A. Absolutely.

Q. Okay. You wouldn't do that yourself? You would call them?

A. No. It's in the order. They need to be called in.

Q. All right. All right. So you and Detective Leonard go back to the scene with the evidence technicians, correct?

A. Yes.

Q. All right. And --

A. Well, we met them there. We didn't go with them.

Q. I see.

A. That's right.

Q. All right. So you met them there. And while they were processing the scene, what did you do?

A. Did a canvass, which a canvass is to see if there's any other witnesses or anybody heard or saw anything. So we --

that's what we did.

MR. POLICK:  Okay.  Can I put up 1.24?  Jon, I think that's your 13.

MR. LOEVY:  Okay.

MR. POLICK:  I think this one's in evidence, Judge, already.  It's Plaintiff's 13.

THE COURT:  Yes, it is.

MR. POLICK:  Okay.  I'll try to keep it consistent.

BY MR. POLICK:

Q.  And this is another general progress report, correct?

A.  Yes, it is.

Q.  And who prepared this, you or Detective Leonard?

A.  Detective Leonard did that.

Q.  All right.  And what are we seeing on this general progress report?

A.  You're seeing that -- the people that were assigned, which was the ETs, their names.  You're seeing the addresses that we went to to see if anyone else had witnessed anything on the shooting.  And then what the evidence technicians recovered and what they did.

Q.  All right.  Now, you were shown a supplementary report, and Mr. Loevy asked you some questions about that.

It's dated the 29th, but you said that that's incorrect, true?

A.  Yes.

Q.  Okay.  1.11.

A.  I have that, but I don't have my notes.

MR. POLICK:  I think he's got it up on the screen for you.

And, Judge, I think that's Plaintiff's 19-E.  That's already been admitted.

THE COURT:  Plaintiff's 19?

MR. POLICK:  19-E, I believe.

THE COURT:  Oh, 19-E.  Yes, it has been.

BY MR. POLICK:

Q.  Do you see the report on the screen, Detective?

A.  Yes.

Q.  Okay.  And how did you -- how do you know that the report is incorrect as to the date submitted, which is being shown at the bottom of this -- of the report there, where we see August 29th, 1988.  Time submitted:  23:55?

That's what that box says, right?  Date This Report Submitted?

A.  Yes.

Q.  Okay.

A.  Okay.

Q.  You've told us that's incorrect.  How do you know that's an incorrect date?

A.  Okay.  When I was reviewing the reports for this trial, I looked at the signature of Sergeant Rinaldi, who was the

supervisor that approved it, and I noticed that he had approved it on the 29th of August, 1988. And to me, that didn't make any sense because the sergeants start earlier than we do and they go home earlier than we do.

So I asked to see the permanent retention file. And when we looked at the permanent retention file, he had actual -- I don't have it in front of me, but he -- it would have been a -- well, his signature and time would have been approving the report before I even typed it.

Q. All right. I'm going to show you what's been marked as Defendants' Exhibit 3-A.

MR. POLICK: You have to switch over.

(Document tendered to witness.)

BY MR. POLICK:

Q. And that's your report that you're referring to that was approved by Sergeant Rinaldi?

A. Yes.

MR. POLICK: Judge, I would move that into evidence, Defendants' 3-A.

THE COURT: Any objection?

MR. LOEVY: No objection, Your Honor.

THE COURT: It's received.

(Said Defense Exhibit 3-A received in evidence.)

MR. POLICK: Thank you.

BY MR. POLICK:

Q. So we're looking at 3-A. You can see that or you have it in front of you as well?

A. Yes.

Q. Okay. So you're talking about the sergeant's approval date here --

A. Yes, I am.

Q. -- correct? And there, it shows -- that's -- you recognize that to be your sergeant -- or at least Sergeant Rinaldi's signature?

A. Yes.

Q. He was one of the sergeants or supervising sergeants in your unit?

A. Yes, he was.

Q. All right. And can you -- and the date there is the 29th of August?

A. Yes.

Q. All right. And the time there?

A. Well, 15:30 is 3:30 in the afternoon.

Q. Okay. So you're indicating, going back to the date submitted, 29 August of '88, you've got your time submitted there of 23:55, right?

A. Which is five minutes to midnight, yes.

Q. Okay. And what you're --

A. So obviously, I typed the wrong date, and Sergeant Rinaldi didn't catch it and --

McLaughlin - cross by Polick

824

Q. All right. And then on the 29th, you wouldn't have started until -- your shift started at 4:30?

A. Correct.

Q. All right. Now, that report itself, what does it detail, when we get to the body of the report? Just explain to us the --

A. Okay. It details the identification from the photo book at -- it details the evidence that was recovered. It details the personnel assigned. The interview of Orlando Lopez and what the ETs did as far as their processing, which I believe was the last paragraph.

Q. Okay. So the first paragraph on the second page there where you get to the body of your report -- or, first, you indicate the victim's vehicle, correct?

A. Yes.

Q. And then we have a section there, next paragraph, that details your interview of Mr. Macho Lopez or Orlando Lopez, right?

A. Yes.

Q. All right. And then the next paragraph, is that when you received the information from the Gang Crimes officers that the --

        MR. LOEVY: Objection, leading, Your Honor.

BY MR. POLICK:

Q. Well, let me ask it this way.

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 627 of 1254 PageID #:104758
McLaughlin - cross by Polick
825

What is the second paragraph? What is that detailing there?

A. The second paragraph details that Orlando could identify the shooter. That we asked him to go and look at photos at his home, and that he did, indeed, pick out a suspect, and it details the name of that identification.

And the 16-D Latin King book, 40-D is -- they had these books all somehow numbered. And so if they -- if somebody picked out a photo from a gang book, you couldn't take that huge book and inventory it every time because the book would be missing.

So I don't know how it happened, if it happened at a court or how it -- but that's how they did it. They just numbered the book, and those photos never got inventoried. Does that make any sense? They're in a big book, a big binder. They stayed in the station, and we just inventoried or notated the picture that was identified.

Q. All right. And then the last paragraph you referred to, what's detailed there?

A. The last paragraph is what the -- the shell casings -- there were five shell casings at the mouth of the alley -- the photographs of the car, and then our negative canvass, which meant that we canvassed, but no one else came forward.

Q. All right. So you told us on Mr. Loevy's examination that the next activity in the case was on the 30th, correct?

McLaughlin - cross by Polick

A. Yes.

Q. You arrived at the Area that day?

A. Yes.

Q. All right. And tell us what occurred on the 30th.

A. Well, late in the evening on the 30th, we were notified that Mr. Jacques Rivera had been placed in custody.

Q. And when you say he was placed in custody, was he at a district station? Was he at your unit? Where was he?

A. I think he was -- I think he was arrested in the -- by the Gang guys, and I don't know where they brought him to.

Q. Well, you yourself did not make physical --

A. I did not make the arrest, no.

Q. Okay. But you were made aware of it?

A. Yes. We were made aware of it.

Q. And at some point, was he brought over to the Area?

A. Well, it was late. It was -- it was late in the evening.

Q. All right.

A. We needed him for a lineup with a 12-year-old child, so I reached out to the home to find -- you know, and --

Q. When you say you're reaching out to the home, can you explain a little bit --

A. They --

Q. -- what you mean?

A. The Macho Lopez family did not have a phone, so they were allowed to use their neighbor's phone. And so we reached and

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 629 of 1254 PageID #:10476 5
McLaughlin - cross by Polick
827

tried to explain that there was a lineup. They did not want him to come in to the lineup because it was late -- that's perfectly understandable -- so we said that we'd do it in the next mid-morning.

Q. All right. Now, because you were going to do it the next morning, what did you have to do with Mr. Rivera that was --

A. Mr. Rivera then -- according to procedure, we had to place papers on him to keep him from going to court. Otherwise, he'd be leaving the lockup and going to court without any charges or anything.

MR. POLICK: Okay. Can we see 1.27?

Judge, I'll ask that that be admitted, if it were -- hasn't been already by Mr. Loevy.

MR. LOEVY: No objection, Your Honor.

THE COURT: It is received.

(Said Defense Exhibit 1.27 received in evidence.)

MR. POLICK: Thank you.

BY MR. POLICK:

Q. And can you explain what this whole document means?

A. It's a documentation that we are requesting the watch commander of the 25th District, which was downstairs from us, which had a lockup, to hold Mr. Rivera past the court call.

And it says that: "The witness in this case will not be available until tomorrow's date, and Felony Review will not approve charges until they can interview the witness."

Q. All right. Mr. Loevy also asked you about Mr. Rodriguez.
Do you recall that?

A. Yes.

Q. When did you find out about Mr. Rodriguez?

A. Well, I don't know if we found out about him late that night or if we found out about him -- I personally found out about him the next day. But there were hold papers placed by, I'm going to say, 14th District officers on him. We didn't place the holds on him.

MR. POLICK: May I have a moment, Judge?

THE COURT: Sure.

MR. POLICK: Thank you.

(Counsel conferring.)

BY MR. POLICK:

Q. Okay. Showing you what's 1 -- Defendants' 1.29.
Can you identify what that document is, please.

A. It's a similar report, different people involved. It's dated the 31st of August because it's after midnight.
Pete Boyle and R. Tapkowski, who -- I don't know who they are. I'm assuming they're 14th District --

Q. No.

A. Okay.

Q. Let's not assume.

A. All right. I'm sorry.
They're not detectives.

MR. POLICK: Judge, I would go ahead and admit -- or ask that Defendants' 1.29 be admitted.

MR. LOEVY: No objection, Your Honor.

THE COURT: Okay. 1.29 is admitted.

(Said Defense Exhibit 1.29 received in evidence.)

BY MR. POLICK:

Q. Okay. So we heard some talk about a Detective Boyle.

Is that the same Boyle that's on this form?

A. No.

Q. All right. And just looking at those names, Boyle and Tapkowski, looks like, were those detectives that worked in your unit?

A. No.

Q. All right. Do you know what unit they worked in?

A. I'd say the 14th District, but only because they're putting hold -- they're putting a hold on him in the 14th District, and those are star numbers that belong to patrolmen.

Q. Okay. So now you know you have Mr. Rivera and Mr. Rodriguez in custody, correct?

A. Yes.

Q. Were you aware of Mr. Rodriguez's gang affiliation?

A. No.

Q. Okay. Is there anything in your report or did anybody indicate to you --

A. Well, I -- at that -- yes. When we did the -- after we did

the report and got the information from the -- Officer Letrich and then I knew.

Q. Okay. And what information -- you don't -- do you know that you spoke to Letrich personally?

A. I don't think I spoke to Letrich personally, no.

Q. All right. But you got information either through him or people in his unit?

A. From his report, I believe.

Q. Okay. And what did you learn about Mr. Rodriguez's gang affiliation?

A. That he was an IG, which is an Imperial Gangster.

Q. All right. And you told us earlier that you really didn't know the boundaries or affiliations of the gangs, correct?

A. Right. No, I don't.

Q. But that was obviously different than what you had heard -- or what you had learned up to this point in the investigation, correct?

A. Correct.

Q. All right. Mr. Macho Lopez had told you it was Kings, right?

A. Yes.

Q. So what was your intention now that you had both of these gentlemen in custody and they had different gang affiliations?

A. Well, they both needed to be identified by the eyewitness and by the victim, either to identify that they were part of it

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 633 of 1254 PageID #:104764
McLaughlin - cross by Polick
831

or identify that they weren't part of it.  That's what the investigation is for.

Q.  I see.  And how did you intend to do that?

A.  Well, we intended to hold a live lineup at the Area.

Q.  Okay.

A.  And the --

Q.  Let me stop you there.  When you referred to the victim, you're referring to?

A.  I'm referring to Felix Valentin.

Q.  Okay.  And when you referred to the eyewitness?

A.  Macho/Orlando Lopez.

Q.  Okay.  Before we go further, I just wanted to ask you, because Mr. Loevy asked you, why you didn't talk to Mr. Rodriguez, and can you tell us why you didn't speak to Mr. Rodriguez?

A.  Well, your investigation is all depends upon evidence and what knowledge that you have of the crime at the time.  And this investigation was in a preliminary state.

And the only thing I could have asked Mr. Rodriguez is, "Did you shoot him?"  I don't have anything -- I don't have anything to talk to him about.  I -- he's going to know I know nothing -- if he did shoot him, he's going to know I know nothing about the crime.  So we wait to see if we have an identification and then I can say, "Well," you know, "you were identified by an eyewitness," so -- and then you can talk to

him, if they choose to talk to you.

But that was just way too early to talk to Mr. Rodriguez. It would not have been a smart thing to do.

Q. By the way, did you talk to Mr. Rivera?

A. I did not for the same reason.

Q. Okay. And when you're referring to other things, can you just explain to the jury, when you're saying, "I didn't have other things," what other things are you -- for example, are you talking about?

A. We had no gun. There's very little crime -- I mean, the word DNA is thrown around a lot, but DNA really was not used in crimes until 1986, and that was in Leicester, England for a -- a wrong man was charged with rape, and they used DNA evidence to -- excuse me. They used DNA to clear him.

So in 1988, I highly doubt that the Chicago Police Department DNA -- they were doing anything with DNA. Now, they might have collected blood. That could have been done ten years later when they were doing DNA, but there really wasn't any DNA --

Q. Okay.

A. -- at that time.

Q. Did you have any fingerprints on this case?

A. There was no fingerprints on this case. There was no -- we just had the single eyewitness identification.

Q. Okay. How about the evidence technicians? Did they --

A. They found shell casings. We had no gun to compare it to.

MR. POLICK: Okay. And if we could just put up Defendants' 1.31.

BY MR. POLICK:

Q. And if you could just take a look at that and identify what that is.

A. It's a blank screen.

Q. Sorry about that.

A. That's an evidence -- it's a crime lab report, which evidence technicians and mobile crime lab people make.

Q. All right. And that report is dated what date?

A. The 28th.

Q. All right.

A. Of --

Q. And that -- is that the report that you were referring to when you and Detective Leonard went out on the 28th and met with the evidence technicians?

A. Yes.

MR. POLICK: All right. Judge, I would move Defendants' Exhibit 1.31 into evidence.

MR. LOEVY: No objection, Your Honor.

THE COURT: Okay. It is received.

(Said Defense Exhibit 1.31 received in evidence.)

MR. POLICK: Thank you.

BY MR. POLICK:

Q. All right. So you wanted to have the eyewitness or the victim, Mr. -- view both Mr. Rivera and Mr. Rodriguez?

A. I wanted them both to view him.

Q. Okay. How were you going to do that?

A. Well, when Macho Lopez could not be found, Jack and I discussed it and, since we had both suspects in custody, the logical thing for us was to ask -- well, the first thing we actually did was we went back -- we went to the hospital to see if it was possible that he was in any condition, instead of going through all the work, we --

Q. And if I could interrupt you --

A. I'm sorry.

Q. -- right there to get you -- just to put this in context.

Okay. So Mr. Rivera was arrested on the 30th, he told us, correct?

A. Yes.

Q. Okay. So -- and there was a hold placed on him, correct?

A. Yes.

Q. Also a hold placed on Mr. Rodriguez?

A. Yes.

Q. Okay. So have we now moved to the next day?

A. We're on the 31st.

Q. Okay.

A. So --

Q. What happened? Tell us what happened on the 31st.

A. Okay. On the 31st in the morning when -- we started early that day because we wanted to do the lineup with Orlando Lopez.

When we found out that they couldn't find him, we decided that the next best thing is to do a photo array. But we went to Cook County Hospital to see what condition the victim was in because --

Q. All right.

A. -- of -- well --

Q. Let me just --

A. I'm sorry.

Q. I just want to stop you for -- because I have a question about that.

Okay. So when you say, "We went to the Cook County Hospital," who are you talking about?

A. Jack Leonard and myself went to the Cook County Hospital.

Q. All right.

A. Okay?

Q. And when you got there at Cook County Hospital, what did you do?

A. Talked to the nursing staff.

Q. And what did you find out from the nursing staff?

A. Found out that he was on medication, but that he was alert, and that they felt that he could, you know, do a -- look at photos. They didn't think that there would be any problem with that.

Q. All right. And based on that information, did you at that time go talk to the victim, Mr. Valentin?

A. I don't have a clear memory of that. Possibly we did.

Q. Okay.

A. But --

Q. Would looking at your report maybe help refresh your recollection? I'm referring to Defendants' 1.13.

A. 1.13.

Q. Just take a look at that yourself and see.

(Counsel conferring.)

BY MR. POLICK:

Q. Can you just for a second identify what that document is that you're looking at, Ms. McLaughlin?

A. What report I'm looking at?

Q. Yes.

A. I don't have a front page. It's my -- it's a supplementary report of --

Q. Here you go. Let me give it to you.

A. Thanks.

It's a supplementary report dated the 1st of September, 1:00 o'clock in the morning.

Q. Okay. Who prepared that report?

A. I did.

Q. All right. And that relates to the Felix Valentin investigation, correct?

A.   Yes, it does.

MR. POLICK:  Okay.  Judge, I would move to admit Defendants' 1.13 into evidence.

THE COURT:  Any objection?

MR. LOEVY:  No objection, Your Honor.

THE COURT:  Not -- no objection?

MR. LOEVY:  No objection.

THE COURT:  It is received.

(Said Defense Exhibit 1.13 received in evidence.)

BY MR. POLICK:

Q.   All right.  So just take a look at that for a moment and see if that refreshes your recollection about your trip to the hospital, to Cook County Hospital.

A.   Yes.  This says that we did talk to him.

Q.   All right.

A.   We talked.  He nodded.

Q.   Meaning you and Detective --

A.   Leonard.

Q.   -- Leonard?  What condition was he in at that point?

A.   He was on a ventilator.  He was intubated.  He was on a bed that was moving back and forth.  Because he had those bullet -- you know, all those gunshot wounds in his chest, they were concerned about pneumonia, so they had to keep the -- his chest fluids to a minimum, I would imagine.  I'm not a nurse, but --

Q.   So how were you going to communicate with him, given his

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 640 of 1254 PageID #:104776
McLaughlin - cross by Polick
838

condition?

A. Well, my intent was to hold up photographs and have them -- one at a time and have him look at them, and if he recognized anybody, he could nod or shake his head. That was the intent.

Q. Okay.

A. And he said -- he indicated to us that he'd be willing to look at photos.

Q. All right. So after that meeting with Mr. Valentin, the victim, what did you do next?

A. We went back to the Area, Area 5, Grand and --

Q. Your office?

A. My office.

Q. And what --

A. And --

Q. -- did you do when you got back --

A. Well --

Q. -- to your office?

A. -- Gangs was still looking for Macho Lopez, so we asked the 14th District officers, since they were involved with their suspect, Rodriguez, to find fillers that would closely resemble both suspects.

Q. Can you just explain that to the jury, what you --

A. Okay. So in order to have --

Q. You said fillers were used, fillers and --

A. Filler. In order to have a fair lineup, you're going to

need people that are similar. If you have four jockey -- you have a jockey that's a suspect, you can't have six people that are eight feet tall and one guy that's four feet tall. So they have to be similar.

And fillers are people that are not under suspicion for a crime. They're just helping the police out. And sometimes these kids did this because -- maybe the policemen did them a favor or did them a solid, or whatever you want to say. But they would volunteer to come in and do a lineup, knowing that they weren't a suspect.

Sometimes we used people from the lockup. That was always our first choice. If somebody was already in custody for something else, we could use them as a filler also, if they fit the description.

Q. And the lockup would be located where?

A. Right down below us in the 25th District.

Q. In the Patrol Division?

A. Patrol Division, yes.

Q. Okay. All right. So you had the 14th District officers go out and see if they could find people who were similar in description, correct?

A. Yes.

Q. And then what happened?

A. Well, they found some, and they brought them in. And --

Q. What did you do then?

A.   Well, it was getting late, and we still had no -- not late-late, but it was -- anyway, we decided to take photographs.  We had both suspects in custody.  We had decent material for a lineup.  So we thought we'd line them all up and take individual photos so we could use that in a photo array and went -- wanted to go back to the hospital and do that --

Q.   Okay.  So let me ask you, when you're saying -- when you're talking about the photographs, who is going to be in these photographs that you're taking?

A.   It was going to be Rodriguez and Rivera and the four other people that were not under suspect.

Q.   All right.  And did you, in fact -- you and Detective Leonard, in fact, do that?

A.   Yes, we did.

Q.   Okay.  Now I'm going to show you what I believe is already in evidence as Defendants' 92 through 97.

        MR. LOEVY:  No objection, Your Honor.

    (Documents tendered to witness.)

BY MR. POLICK:

Q.   Take a look at that and let us know what that is.

A.   They're the individual photos that -- copies of the individual photos that we took.

Q.   Okay.  What kind of camera did you take them with?

A.   A Polaroid.

Q.   All right.  So you have six photos there, correct?

A. Yes.

Q. Mr. Rivera, Mr. Rodriguez, and the four fillers?

A. Yes, sir.

Q. And those were taken at?

A. Area 5.

Q. What did you do next?

A. Okay. We went back to the hospital.

Q. Cook County?

A. Cook County Hospital.

Q. And tell us what happened there.

A. Okay. Some time had passed since the first time that we visited earlier that day. And when we got there, attempted to do this photo identification, his eyes were filled with tears. I held up the first photo, and that doesn't mean it was number 1 because I put the photo -- I shuffle them like a deck of cards and just put up the -- whatever the first photo was. And his eyes were tearing. He had no focus. And the bed was moving.

And I'm like, I'm like, "Jack, this" -- so I went out. It doesn't look right. So I went out and talked to the nurse, and they're like, "We had to put him on a morphine drip for the pain."

Well, I didn't think it was gonna be a good lineup, you know, photo array, so I stopped it. You want to have a proper identification.

Q. Did you feel Mr. Valentin could make a proper identification --

A. Not --

Q. -- at that time?

A. I did not -- I'm not a doctor, but I am a policeman, and I did not think that he could do that.

Q. All right. And you prepared a report about this, correct?

A. Yes.

Q. That's been admitted as Defendants' 1.13, right?

A. It's here somewhere.

Q. You need another copy --

A. No. I'm sure it's here. It's just buried in paperwork.

Q. I have another copy, Ms. McLaughlin, if it will help you.

A. I got a 1.37.

Q. He's got it up on the screen.

A. Oh, okay.

Q. You got it? Is that helpful? That's your September 1 report?

A. Well, it's the third page of a report.

        MR. POLICK: Okay. Can we get her on the first page?

BY MR. POLICK:

Q. Okay?

A. Yes, that is.

Q. Okay. And then going to the second page --

A. Yes.

Q. Okay. And there, tell us what you're recounting there in this report on the second page.

A. Well, it's a recount of what we did that day, efforts to find the witness, going to the hospital. Well, before we went to the hospital, you know, we recounted that 14th had found a suspect, so now that, you know, was another addition to the investigation. And then we tried to find the eyewitness for the lineup. That wasn't possible. To the hospital to see if he could view a lineup.

Q. Okay.

A. And then --

Q. So these are basically the events of the --

A. The steps.

Q. -- 30th and the 31st?

A. Yes.

Q. All right. And you mentioned that at the hospital, the -- when you went to see Valentin, the bed was moving.

Do you know why that was? Did the --

A. I believe it was because of a constant fluid in his lungs, that they were trying to keep pneumonia from setting in.

Q. All right. And when you say it was moving, in like --

A. It just -- it was like roll -- you know, it wasn't like the exorcist, but it was like rolling to just -- to keep him moving.

Q. I see. And then you noted in your report on page 2 in the

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 646 of 1254 PageID #:104772
McLaughlin - cross by Polick
844

last paragraph there that when you attempted to show him the photographs, they were not done in a numerical order there.

A. Yes. I noted that.

Q. Okay. That's what you were referring to when you said you kind of shuffled the deck?

A. Yes.

Q. All right. All right. So you weren't able to go ahead with the identification. You felt it would not be proper.

What did you do next? Did you leave the hospital?

A. We left the hospital, returned to our office, Area 5.

Q. All right. And upon returning to Area 5, what did you do with the photographs?

A. Well, they were inventoried.

Q. All right. Explain that to the jurors, what you mean by inventoried.

A. They're -- these photographs are part of the investigation. In order for them to be preserved for court or the investigation, we inventoried them. And there's a procedure where there's a big inventory book, you write it all out, and there's a number applied to it, and they're put in an envelope and they're sent to Evidence & Recovered Property section.

Q. Okay. And when you say there's a number applied to it, is that number specific to that piece of evidence?

A. Absolutely.

Q. Okay. And did you note that in your report that we were

just looking at?

A. I believe I did.  Inventory 544-08.

Q. Okay.

A. 008.

Q. That's in the section on page 2 -- I'm sorry, page 2?

A. At the last paragraph.

Q. Page 2, please.  That's entitled Evidence?

A. Yes.

Q. And then you go across and there's a number there?

A. Yes.  But I was looking at -- I was looking at the -- my paragraph.  But it's -- would be in the -- it would be on the first page also.  But it's in the body of the report also. It's in two places.

Q. All right.  So you have it there in the Evidence section on the second page, correct?

A. Yes.

Q. And the number there?  544 --

A. 544-008.

Q. All right.  Then I'm going to show you -- what's going to be called City Exhibit 43.

MR. POLICK:  Any objection?

MR. LOEVY:  No.

BY MR. POLICK:

Q. Can you identify what that is?  You referred to an envelope.

A.   Well, this is the Chicago Police Department, Evidence & Recovered Property envelope that the photographs were held in.

Q.   All right.  And it bears the number we just looked at?

A.   Yes, it does.

        MR. POLICK:  All right.  Judge, I would move City Exhibit 43 into evidence.

        THE COURT:  Any objection?

        MR. LOEVY:  No, Your Honor.

        THE COURT:  Received.

   (Said City Exhibit 43 received in evidence.)

        MR. POLICK:  Okay.  And if you could -- I'm sorry, Judge.

        THE WITNESS:  Do you want me to open it?

        THE COURT:  Received.

        MR. POLICK:  Okay.

BY MR. POLICK:

Q.   And what -- first of all, how many photographs do you have there?

A.   Two, three, four, five -- six.

Q.   All right.  And can you just show them, hold up to the -- for the jurors to see.

   (Witness holding up exhibits.)

BY THE WITNESS:

A.   And on the back, they're numbered.

BY MR. POLICK:

Q. Okay. And those are Polaroid photographs?

A. They're Polaroid photos.

Q. Okay. Now, there's another piece of paper in there.

Do you have to prepare some type of separate report for the evidence?

A. The Evidence & Recovered Property was a multi-layered, carboned form set that the original -- I don't quite remember the distribution, but the -- there was a distribution. And this one says Copied To: Forward to Evidence & Recovered Property immediately, you know, with the evidence, and that's what --

MR. LOEVY: Your Honor, I guess we'd just object to foundation. She already said she's not good at how documents get where. She doesn't have a foundation for --

THE WITNESS: Well, we --

THE COURT: I'm sorry.

MR. POLICK: That's all right. I'll ask another question, Judge.

THE COURT: Yes.

MR. POLICK: Could we get 1.32 up?

BY MR. POLICK:

Q. All right. Just looking at that particular document, can you just tell us what that is? It's on your screen now.

A. That's the -- that's another copy -- it's the same form set of the inventory. But it's Copy 4, which is on the bottom. It

says: "Give or send to finder, arrestee or owner." Well, we're the owners.

Q. I see. And this inventory slip is for the photographs?

A. For the photographs.

Q. All right. And does it bear the number that we've been talking about, the inventory number you spoke of?

A. Yes.

Q. All right.

MR. POLICK: Judge, I'd move to admit Defendants' 1.32 into evidence.

MR. LOEVY: No objection, Your Honor.

THE COURT: It's received.

(Said Defense Exhibit 1.32 received in evidence.)

MR. POLICK: Thank you.

THE WITNESS: This poor envelope.

(Documents tendered back to counsel.)

BY MR. POLICK:

Q. After you inventoried the photographs, as you've described, what did you do with Mr. Rivera and Mr. Rodriguez?

A. We released them.

Q. And why were they released?

A. Because we couldn't find the eyewitness and there was no photo identification made at the hospital.

Q. All right. And were records prepared for those releases?

A. Yes.

McLaughlin - cross by Polick

849

MR. POLICK: 1.22.

BY MR. POLICK:

Q. Take a look at what's on the screen and just identify what that is.

A. Release of Person in Custody form.

Q. And who is being released on this form?

A. Jacques Rivera.

MR. POLICK: Okay. And if that's not already in, Judge, it's -- move to admit Defendants' 1.22.

MR. LOEVY: No objection, Your Honor.

THE COURT: 1.22 is received.

(Said Defense Exhibit 1.22 received in evidence.)

MR. POLICK: 1.33.

BY MR. POLICK:

Q. And can you look at this document and -- Defendants' 1.33.

A. Reason for -- was the -- reason for the arrest and then it's reason --

Q. Now, what is the title of this document?

A. Oh, the title is Release of Person in Custody.

Q. Okay. And who was being released on this particular form?

A. I still have -- oh, I'm sorry. No. It's Jose Rodriguez.

Q. All right. And that's dated August 31st of 1988, correct?

A. It is.

Q. All right.

MR. POLICK: Your Honor, I'd move Defendants' 1.33

into evidence.

THE COURT:  Any objection?

MR. LOEVY:  No, Your Honor.

THE COURT:  It is received.

(Said Defense Exhibit 1.33 received in evidence.)

BY MR. POLICK:

Q.  Now, Mr. Loevy asked you if there was a lineup, a live lineup that was conducted on either August 30th or August 31st.

Was there?

A.  No.

Q.  Was anybody identified in a live lineup on either August 30th or August 31st --

A.  No.

Q.  -- relating to the Felix Valentin case?

A.  No.

Q.  All right.  Hypothetically, if there had been a live lineup and somebody had been identified, would there be -- have to be reports prepared for that?

A.  There'd have to be an ET called for a lineup photo, and there'd --

Q.  All right.

A.  -- have to be reports, corresponding reports.

Q.  All right.  So you said an evidence -- if there were an identification, an evidence technician would have to be recalled?

A. Yes.

Q. And when the evidence technicians come out, their role is to what?

A. Photograph a lineup that resulted in the identification of a suspect.

Q. All right. And do they have to prepare a report that they're photographing a lineup and who was identified?

A. Yes.

Q. All right. And that's their part of the reporting.

What about detective reporting if there's a live lineup and somebody is identified?

A. Well, we would document that in our report, too, because depending upon what the crime was or whatever, you'd be charging --

Q. Well, let's say it was a felony --

A. A felony.

Q. -- and somebody's charged.

A. Right. Well, then --

Q. Put it in context.

A. -- you'd need to put that --

THE COURT REPORTER: Sorry.

BY THE WITNESS:

A. You have to put that in your report so it could be a complete file for the Felony Review assistant.

BY MR. POLICK:

Q. All right. Before we get to the Felony Review assistant, let's just focus on the detective reporting end of this. Okay?

A. Okay.

Q. All right. So you said you would have to do a report of the lineup. What's that report called?

A. It's a lineup report.

Q. All right. And if the person was charged and the case was now ready to present to the State, what report would the detective have to do?

A. We would do a lineup report which enumerates where each person was in the lineup.

Q. Yes.

A. The fact that the suspect was allowed to pick where he wanted to stand, who picked -- I don't have one in front of me, but pick one out --

Q. No, I'm just --

A. -- to get the details.

Q. -- asking you to tell us what reports you would have to do.

A. You'd have to do a lineup report.

Q. Okay.

A. And then we would also incorporate it in our supp.

Q. All right. Now, you're talking about a supplemental report.

There would be some type of report indicating that somebody was identified in a lineup and charged, and it was

presented to the State, correct?

A. Yes.

Q. What do you call that type of report?

A. A supplemental report.

Q. Okay. Is there anything specific about it, indicating the case has now been closed, cleared, or anything like that?

A. Well, it would be -- if it's the last -- if that -- if it's the last report of the investigation, it's a -- either cleared/closed, cleared/open.

Q. Okay.

A. Exceptionally cleared/closed.

Q. All right. Let's just explain those terms.

When you say "clear/closed," explain that, what that means to the jury.

A. Cleared/closed is if you have -- let's just say we had two suspects. Two people were identified for whatever part in the crime they were. Then that case is cleared/closed because both suspects had been identified and charged.

Q. And if it's clear/opened?

A. Cleared/open means that one person has been identified and charged, but the case is not officially closed because there's one suspect out there that has not been charged in that case.

Q. Okay. And because there was no lineup that was conducted, a live lineup where that occurred on either the 30th or the 31st of August, none of that reporting was necessary, correct?

A. Correct.

MR. LOEVY: Objection, leading, Your Honor.

MR. POLICK: All right. Let's --

THE COURT: Sustained.

BY MR. POLICK:

Q. Was any report of that type done that you've just described on August 30th or August 31st?

A. No.

Q. All right. You were also asked some questions about the lineup that did occur on the 15th of September of 1988.

A. Yes.

Q. Do you recall those questionings -- or those questions?

A. Do I recall? I just remember I was asked questions.

Q. Yes. Okay. So you told us that you were not present at work that day.

A. Yes.

Q. All right. Now, in the unit that you work in, was it just you and Detective Leonard working as detectives?

A. No.

Q. How many other detectives would be working in your unit on that afternoon shift that you talked about?

A. In Homicide, there might be -- there might be eight. There might be six in Robbery.

Q. Let's focus on the --

A. Okay.

Q. -- Violent Crimes.

A. Violent Crimes, probably -- between 8 and 14.

Q. All right.

A. Depending upon days and vacations.

Q. And would there also be supervising sergeants --

A. Supervising --

Q. -- assigned to that --

A. -- sergeants.

Q. -- unit?

A. Yes.

Q. All right. So who makes the assignments of what detective is going to work on what cases? How is that done? Who makes the case assignments?

A. Case assignments -- well, for a --

Q. Well, is it the sergeant or the detectives?

A. No, it's not the detectives.

Q. So who makes the assignment? Who says, "Go work on this case"?

A. Okay. There's two ways to get an assignment.

Q. Okay. Go ahead. Tell us --

A. Okay.

Q. -- what the two assignments are.

A. So there's handouts that we -- we not only work on cases that are happening in realtime, we also are working on cases that happened and were reported later, or old homicides. So

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 658 of 1254 PageID #:104784
McLaughlin - cross by Polick
856

if -- we would call those handouts that you were assigned so that they could distribute the paperwork among all the detectives on an equal manner.

Those were assigned by an organization -- not an organization, but a group called case assignment officers. But for an ongoing investigation where they needed immediate attention, the sergeant would assign those.

Q. Okay. So now we know that on September 14th of 1988, Mr. Valentin passed away, correct?

A. Yes.

Q. And now we don't have that witness anymore, right?

A. Right.

Q. So this needs immediate attention, correct?

MR. LOEVY: Objection. We're leading, Your Honor.

THE COURT: Sustained.

BY MR. POLICK:

Q. When the victim passed, what was the next thing that needed to be done?

A. Well, the case needed to be picked up and taken to its next logical conclusion.

Q. Okay. Were you at the office on September 15th of 1988?

A. No.

Q. And how do you know that you're not there?

A. Because Detective Leonard and I were the original officers on -- detectives on the case, and that the police department

did everything they could to keep continuity of investigations together. So based on that, if we were working, we would have had it.

Q. All right. Did any supervising sergeant ever tell you, "McLaughlin, you're off this case"?

A. They don't do that.

Q. Okay. So this got handed over to Detectives Dorsch and Boyle, right?

A. Yes.

MR. LOEVY: Objection, leading, Your Honor.

MR. POLICK: I'm just -- I'm heading to another area, Judge.

THE COURT: Okay.

MR. LOEVY: It's still leading.

THE COURT: Well, it is leading, but --

MR. POLICK: All right. I'll rephrase it.

THE COURT: Let's go on.

BY MR. POLICK:

Q. Who would have assigned Detectives Doyle and Dorsch to this case?

A. Whatever sergeant was working that day, and I wouldn't have any idea who that was.

Q. All right. Now, you knew who Detective Dorsch was, right?

A. Yes, I did.

Q. Did you know Detective Boyle?

A. Yes.

Q. And they were -- who were they in terms of your -- well, who were they?

A. They were Violent Crime detectives.

Q. Okay. Part of the group of 8 to 14 that you spoke of?

A. Yes.

Q. All right. Had you worked with them before?

A. Possibly, but -- no. I mostly worked with Jack.

Q. All right. But you knew who they were?

A. I knew who they were, yes.

Q. They weren't strangers to you?

A. No, absolutely not.

Q. And you -- you're now aware that they conducted a lineup, correct?

A. Yes, I'm aware of that.

Q. All right. Now, Mr. Loevy asked you about some report -- or referred to reporting by Detective Dorsch, right?

MR. LOEVY: Objection. It was by Detective Boyle.

THE COURT: I'm sorry.

MR. LOEVY: I referred to the Boyle report.

I withdraw the objection, Your Honor.

THE COURT: Why don't we just -- yeah. Just ask a question. Let's go.

BY MR. POLICK:

Q. He talked to you about a lineup report, right?

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 661 of 1254 PageID #:104797
McLaughlin - cross by Polick
859

A. Yes.

MR. POLICK: 1.20.

BY MR. POLICK:

Q. Take a look at that, Defendants' 1.20. Just identify for us what that document is.

A. It's a supplementary report where they did a lineup report on it.

Q. All right. So this -- is it a supp? Oh. Specifically, it's a lineup report?

A. It's a lineup report.

Q. Okay. And who was this prepared by?

A. I would say it was prepared by John Boyle.

Q. And why do you say that?

A. Because he's the first officer.

Q. Does he indicate who he's working with on that report?

A. Indicates he's working with William Dorsch.

Q. Okay. And that's Detective Dorsch, correct?

A. Detective Dorsch, yes.

Q. And the date of this report?

A. Is the 15th of September.

Q. Okay.

MR. POLICK: Your Honor, I'd move to admit Defendants' 1.20. I think that may be admitted.

THE COURT: Any objection?

MR. LOEVY: No, Your Honor.

THE COURT: It is received.

(Said Defense Exhibit 1.20 received in evidence.)

BY MR. POLICK:

Q. All right. So that's the -- is this the lineup report that you referred to earlier if there's an identification in a live lineup?

A. Yes.

Q. Okay.

MR. POLICK: If we can go to page 2?

MR. LOEVY: Your Honor, I guess we object to foundation. She said she wasn't there that day. She wasn't there that day and doesn't know about it, so maybe --

MR. POLICK: She said --

MR. LOEVY: -- we need to talk to a witness who does.

MR. POLICK: Just asking her about the context of the report.

THE COURT: I think we've been doing a lot of this today, so I am not going to sustain the objection at this point.

THE WITNESS: So I can answer or what?

BY MR. POLICK:

Q. Let me -- let me go ahead and rephrase the question.

The report that's in front of you now, that's what's referred to as the lineup report, correct?

A. Yes.

Q. Okay. And then earlier you spoke about this clear/closed or clear/open report. Do you remember that?

A. Yes.

Q. All right. Let me show you Defendants' 1.10.

MR. POLICK: Can we pull that up?

BY MR. POLICK:

Q. Take a look at that and tell us what that is.

A. Okay. This is a -- this is a supplementary report which says that it's cleared by arrest/open.

Q. Okay. And you explained what that is to us, correct?

A. Yes.

Q. All right. And who was this report authored by?

A. William Dorsch. And Detective Boyle was working with him.

Q. All right. And what's the date of this report?

A. The 15th of September, '88.

MR. POLICK: All right. And, Judge, I would admit that -- Defendants' 1.10.

THE COURT: Any objection?

MR. LOEVY: No objection, Your Honor.

THE COURT: Any objection?

MR. LOEVY: No objection, Your Honor.

THE COURT: Okay. Received.

(Said Defense Exhibit 1.10 received in evidence.)

BY MR. POLICK:

Q. And just looking at those two reports that we've just

marked, Defendants' 1.10 and 1.20 -- you can take a look at my copies, if you want. Take a look at those and I have a question about that.

My question is, Ms. McLaughlin, does your name appear anywhere on either of those reports?

A. No.

Q. Does Detective's Leonard name prepare -- appear on either of those reports?

A. No.

Q. I'm going to show you 1.19. Do you have 1.19 on the screen, Ms. McLaughlin?

A. Oh, I'm sorry. Yes.

Q. Okay. Can you take a look at that and tell us what that is.

A. It's called felony minute sheets. It's --

Q. Can you explain to the jury what a felony minute sheet is?

A. It's a form 101 that the State's Attorney Office needs to have done encapsulating minimally what the crime is that this person's being charged for, when he was arrested, people involved in the case. So that when it comes to trial or next court date, they know who to call the officers that were involved in it for witnesses.

Q. All right. And can you tell us when this report was prepared?

A. On the 15th of September, 1988.

Q. Okay. And do you know who prepared the report? Is this done -- that the detectives do?

A. Normally.

Q. Okay. And who are the detectives that would have prepared this?

A. Dorsch or Boyle.

MR. POLICK: All right. Judge, I would move to admit Defendants' 1.19.

MR. LOEVY: No objection, Your Honor.

THE COURT: Received.

(Said Defense Exhibit 1.19 received in evidence.)

BY MR. POLICK:

Q. And, again, the same question, does your name appear on -- anywhere in this report?

A. No, it does not.

Q. Does Detective Leonard's name appear anywhere on this report?

A. No, it does not.

MR. POLICK: 1.21.

BY MR. POLICK:

Q. Do you see that report on the screen?

A. Yes, I do.

Q. Okay. Can you identify what that is?

A. It's an arrest report detailing --

Q. Who is it for?

A. It's for Jacques Rivera.

Q. And the date of the arrest?

MR. LOEVY: Which exhibit?

(Counsel conferring.)

BY MR. POLICK:

Q. And the date of the arrest?

A. I'm looking.

Q. I'm sorry.

A. 15 September '88, 19:30.

Q. Okay. And who prepared this particular arrest report based on what you're looking at?

A. Gang Crime Specialist Reynaldo Guevara.

Q. All right. And do you see --

MR. POLICK: Well, Judge, I'm going to go ahead and ask to admit the Defendants' 1.21.

THE COURT: Any objection?

MR. LOEVY: No -- no, Your Honor.

THE COURT: It is received.

(Said Defense Exhibit 1.21 received in evidence.)

BY MR. POLICK:

Q. All right. And looking at Defendants' 1.21, do you see Detective Dorsch and Detective Boyle's name on that report?

A. Yes, I do.

Q. Okay. Do you see your name on that report anywhere?

A. No.

Q. Do you see Detective Leonard's name on that report anywhere?

A. No.

MR. POLICK: Could I just retrieve those reports?

THE WITNESS: Which ones do you want?

MR. POLICK: The ones, yes, right there. Thank you.

BY MR. POLICK:

Q. Now, you looked at a lineup report that was prepared by Detectives Dorsch and Boyle or Boyle and Dorsch, correct?

A. Yes.

Q. Was Mr. Rodriguez in that lineup?

A. No, he was not.

Q. Would you have conducted the lineup that way?

A. No.

Q. Why not?

A. Because you had two identifications. You needed to clear that aspect of the investigation up.

Q. So what would you have done if you had conducted this lineup?

A. Would have found Mr. Rodriguez and put him in the lineup.

Q. With Mr. Rivera?

A. Yes.

Q. Did you ever prepare a clear/open or clear/closed supplementary report regarding this investigation?

A. No.

McLaughlin - cross by Polick

866

Q. Did you ever present this case to a prosecutor to be charged?

A. No.

Q. Mr. Loevy asked you some questions about the witness, Macho Lopez/Orlando Lopez, having a conversation with a woman, correct?

A. Yes.

Q. Did you have such a conversation with Mr. Lopez on September 15th of 1988?

A. No.

Q. By the way, what color was your hair back in August/September 1988?

A. It was dark brown.

MR. LOEVY: Is that one of the exhibits, Joe?

MR. POLICK: Yeah. It's the --

MR. LOEVY: No. Is it one in the pretrial order?

MR. POLICK: I'm pretty sure.

(Counsel conferring.)

MR. POLICK: May I approach, Judge?

THE COURT: Sure.

BY MR. POLICK:

Q. Take a look at that photograph and tell us what that is.

A. That's a photograph of myself and my son.

Q. And when was that photograph taken?

A. 1988.

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 669 of 1254 PageID #:104806
McLaughlin - cross by Polick
867

Q. And does it fairly and accurately depict you and your hair color as it was in 1988?

A. Yes.

MR. POLICK: Judge, I would move to admit Defendants' Exhibit 101.

THE COURT: Any objection?

MR. LOEVY: No, Your Honor.

THE COURT: 101 is received.

(Said Defense Exhibit 101 received in evidence.)

MR. POLICK: May I go ahead and publish that --

THE COURT: You may.

MR. POLICK: -- exhibit? Thank you.

(Exhibit published.)

MR. POLICK: Judge, may I have a moment?

THE COURT: Sure.

(Counsel conferring. Counsel showing documents to counsel.)

MR. LOEVY: No objection to --

MR. POLICK: I think it's yours.

MR. LOEVY: Yeah.

BY MR. POLICK:

Q. Okay. Ms. McLaughlin, I'm going to show you what's been admitted as Plaintiff's Exhibit 63.

It's represented that was the photograph of Mr. Rivera in the lineup that was conducted on September 15th of 1988.

A. Yes.

Q. Do you know where this picture was taken? I know you weren't there, but based on just the background, can you explain where in the office this particular photograph was taken based on its background?

A. No. I'm sorry, but I can't.

Q. All right. And going back to detective reporting on lineups, just give you another hypothetical.

If you conducted a live lineup and either somebody -- no identification was made or the eyewitness picked out what you termed the filler, would you still have to do a report?

A. Yes.

Q. What type of report would you have to do?

A. It's called a negative lineup report.

Q. All right. And what -- can you explain what that is.

A. Well, it says that you held the lineup for this -- whatever the purpose was, and it says that the witness picked -- was not able to identify the suspect, and so it's a negative lineup report.

Q. Okay. And when you had a negative lineup, would you still have to call the evidence technician to come out and photograph that negative lineup?

A. No.

Q. And why not?

A. Because no one's being charged.

Q. All right. When you were working as a detective back in

August and September of 1988, typically how would you dress? What would you wear on a daily basis?

A. I wore slacks, a shirt, and -- well, depending upon the weather, and a suit coat.

Q. Did you ever wear a dress to work?

A. Rarely. I don't -- it's not practical.

Q. Were you ever a blonde?

A. I was never a blonde.

Q. Now, you're aware that because Dorsch and Boyle presented this case to the prosecutor, ultimately there was a criminal trial, correct?

A. Yes.

Q. And you've heard evidence in the case that there was a criminal trial against Mr. Rivera?

A. Yes.

Q. All right. Were you subpoenaed to testify at that criminal trial?

A. No.

Q. Not subpoenaed by the State?

A. No.

Q. Not subpoenaed by Mr. Rivera's attorney, Mr. Wadas?

A. No.

Q. And you didn't testify at that criminal trial, correct?

A. No.

Q. All right. You told us during Mr. Loevy's questioning that

you did testify years later at that post-conviction proceeding, correct?

A. Yes.

Q. Were you subpoenaed by the State there to testify?

A. Yes.

Q. And that was in 2011?

A. Possibly.

Q. Okay.

A. I was retired. I know that.

Q. All right. And you retired in 2010?

A. '10, I think, yes.

Q. All right. And these reports that we've gone through here that you prepared or authored, what would you do with those reports at the end of the day when you're done with them? What'd you do with them?

A. We would put the whole package together, which would be the GPRs and the supplementary report, and there's baskets for different watches, Homicide, Robbery -- they just had them broken down that way. So you'd put them in the Homicide basket or Aggravated Battery basket, whatever it was, for the sergeant to sign. That's what they were for.

Q. All right. And that was your obligation to do that?

A. Yes.

Q. And did you do that in this case?

A. Yes.

Q. You've heard about the claims that Mr. Rivera has made against you.

A. Yes.

Q. Okay. Did you ever fabricate any evidence against him?

A. No.

Q. Did you ever withhold or suppress any favorable evidence from him?

A. No.

Q. Did you ever conspire with anyone to frame Mr. Rivera?

A. No.

MR. POLICK: Judge, I don't have any further questions.

THE COURT: Okay. Any further defense questioning?

MS. ROSEN: Yes, Judge. I have some questions.

Judge, do you want to take a break before I start, an afternoon break, or -- I mean, I might have --

THE COURT: Well, actually, I'd like to press on a little bit --

MS. ROSEN: Okay.

THE COURT: -- longer, if we could.

MS. ROSEN: That's fine.

THE COURT: If anybody needs a break, let me know, but, otherwise, maybe another 15 minutes.

CROSS-EXAMINATION

BY MS. ROSEN:

Q.  Good afternoon, Ms. McLaughlin.  How are you?

A.  I'm fine.  Thank you.  Good afternoon.

Q.  I just have some -- a few questions for you.

You testified earlier that you had been a detective for a number of years, right?

A.  Yes.

Q.  How many years had you been a homicide detective, approximately?

A.  Four.

Q.  Okay.  And then at some point in time, you testified earlier you became a sergeant, I think you said, in December of 1988?

A.  Yes.

Q.  And then I believe you testified that at some point after you made sergeant, you were a homicide sergeant, correct?

A.  Yes, I was.

Q.  And how many years were you a homicide sergeant?

A.  Nine years.

Q.  Okay.  And as a homicide sergeant, what are your responsibilities?

A.  Responsibilities are to keep track of the homicide investigations, approve reports, make sure that the files are accurate.

Q.  Okay.  Before you made detective, did you have to go for any particular training?

A.  Yes.

Q.  And what -- can you describe for the ladies and gentlemen of the jury, generally speaking, the type of training you'd get once you become a detective.

A.  It was -- it was related to gathering evidence, writing reports.  I think there were blocks of legal -- they just had blocks of time for -- and they covered all the different divisions of the Detective Division, because, as you were a new detective, you never knew where you were going to end up.  They didn't tell you in the beginning you're going to be Homicide, Robbery, or Burglary, so they had to cover the gamut with each -- every one in the class.

So it covered a lot of information.  Because at the time, there was General Assignments, Burglary, and that was considered Property Crimes, and then there's Homicide, Sex, and Robbery.

Q.  Okay.  And how long was your training to become a -- once you became a detective?

A.  I'm going to say it was about four weeks.  That's what I think.

Q.  Okay.  And the -- where did the training occur?

A.  The training was at the academy over on Jackson.

Q.  Okay.  And was it a classroom setting?  How did that work?

A.  A classroom setting.  We were -- there was one class of detectives, and we were with the detectives all day.

Q. Okay. And was there also practical training of some sort, depending on the topic matter?

A. Yes. They had speakers come in. They had detectives come in. They had state's attorneys come in. They had all sorts of people, you know, all sorts of different blocks of class time.

Q. Okay. And let's just go back to the beginning when you first became a police officer.

Did you have to go through training?

A. Yes.

Q. And how long, approximately, was the training you did when you first became a police officer?

A. It was at a different location, but it was -- 19th of February to, I think, the end of June --

Q. Okay.

A. -- of that -- of that year.

Q. Okay. And that you were in training before you even were assigned to go out on the street, correct?

A. Yes.

Q. And that applies for all new police officers, correct?

A. Yes.

Q. And the training -- and before you became -- were allowed to go out on the street was obviously more extensive than the training that you got before you became --

MR. LOEVY: Objection to leading, Your Honor.

MS. ROSEN: I'll rephrase.

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 677 of 1254 PageID #:104808
McLaughlin - cross by Rosen
875

BY MS. ROSEN:

Q. Can -- there was four months, you said, approximately, of training in the Patrol Division, is that -- before you became a patrol officer?

A. No. We were all women. They were training us to go to the Youth Division.

Q. Oh, okay. So that was back in the, what, early '70s, right?

A. Yes.

Q. Okay. So you were all being trained differently than --

A. Yes.

Q. -- the male patrol officers?

A. Yes, absolutely.

Q. Okay. But that training lasted for three or four months --

A. Yes.

Q. -- is that right? Okay. And you said that the detective training was three or four weeks?

A. Yes.

Q. Okay. While you were -- during the course of time that you were a detective, once you were out on the street and working, did you get additional training from time to time?

A. Yes.

Q. Okay. And do you recall a point in time where there was a change in the Chicago Police Department regarding how detectives were supposed to record their investigations?

MR. LOEVY: Objection, Your Honor. She came after the change. Her training wouldn't matter.

MS. ROSEN: She came in 1980.

MR. LOEVY: I'll withdraw it.

THE COURT: Overruled.

BY MS. ROSEN:

Q. So let me --

MR. LOEVY: Sorry.

BY MS. ROSEN:

Q. -- repeat the question.

MS. ROSEN: That's okay.

BY MS. ROSEN:

Q. Was there a time, after you were out on the street as a detective, that you had additional training related to record-keeping of detectives as it related to preparing reports and notes and things of that nature?

A. Yes.

Q. Okay. And do you recall approximately when that training occurred?

A. Well, maybe '83.

Q. Okay. And can you tell us a little bit about what that training was, what that -- what you were trained to do?

A. Well, I started out as a burglary detective, so -- those cases are totally different than these cases.

For these cases, they were homicide. And in felony

cases, they wanted a more accurate compilation of notes. They wanted those notes all to be retained and turned in with the written report that you would -- you know, the typed report that you would do. They didn't want any notes scrabbled on any paper. And if that happened to happen, then you had to retain that note.

They didn't want you to take that napkin back to the Area and then transcribe that on to a general progress report. Whatever the original documentation was, they said that had to be included in the file. And if it was, there'd be an envelope to put it in.

So they were really stringent in this training about note-taking. They just were. They just said it was just so important to do it that way.

Q. Okay. And I'm going to --

MS. ROSEN: May I approach, Your Honor?

BY MS. ROSEN:

Q. -- show you what we've marked as City Exhibit No. 44 and ask you to take a look at that.

Can you tell me what -- if you recognize what that is?

MR. LOEVY: Could I have a copy?

MS. ROSEN: Yes.

MR. LOEVY: Thank you.

BY MS. ROSEN:

Q. Do you recognize what that is?

A.   Well, it's a training report.

Q.   And whose training report is it?

A.   It's mine.

Q.   Okay.

MS. ROSEN:  Move to admit the City's Exhibit 44.

MS. CARNEY:  Can you turn on --

THE COURT:  Any objection to City 44?

MR. LOEVY:  No, Your Honor.

THE COURT:  It is received.

(Said City Exhibit 44 received in evidence.)

BY MS. ROSEN:

Q.   Okay.  So we're taking a look at what is the -- that there in front of you is the first page, right, of your training report?

MR. LOEVY:  Actually, Your Honor, we would object to relevance, training in the 2000s.

MS. ROSEN:  I'm just orienting.

MR. LOEVY:  Fine.  Sorry.

MS. ROSEN:  Yep.

BY MS. ROSEN:

Q.   That's the first page of your training record, correct?

A.   Yes.

Q.   Okay.  And, as Mr. Loevy noted, this is training that happened more currently towards the end of your career, correct?

A. Yes.

Q. Okay. So I'm going to ask you to flip to the last page of your report -- I mean, of the training record, and can you identify on that training record the course number of the training that you received in -- I think you said 1983 as it relates to reporting procedures.

A. It's Course 104, In-Service Detective Division Reporting Procedures.

Q. Okay. And when it's listed there "in-service," do you have an understanding of what that means?

A. Yes. That means that we're actually at the academy for the training in person.

Q. Okay. So at this point in time, in July of 1983, you've been a detective for three years or so. And at that point, the City asked you -- the police department had you come in to be trained on this topic, correct?

A. Yes.

Q. And were you there with other police officers, detectives?

A. Yes.

Q. And do you recall approximately how many detectives were in the class that you were in for this training?

A. No, I -- I don't.

Q. Okay. And the training that you received as it relates to the note-taking -- there's been some discussion here about the general progress reports, correct?

A.   Yes.

Q.   And that's the report that they were talking to you about for taking notes, correct?

A.   GPRs, yes.

Q.   Okay.  And GPRs is the shorthand for general progress reports, right?

A.   Yes.

Q.   Okay.  And everybody refers to them as GPRs, right?

A.   Yes.

Q.   Okay.  Now, you also made mention if you happened to be somewhere where you didn't have the GPR form, and can you explain, like, how was that form available to you as a detective?

A.   They came in -- I don't know what you'd call them, but they're like glued at the top and you could, you know, take as much -- I usually took a pad.  And so when you used them, you used them, and then you'd go get another pad.  And then -- but when you're done with them, you -- not done with them, but you could take them off that pad individually.  They weren't loose sheets.  They were a -- about this thick (indicating), so maybe 50 in a pad.  I don't know.

Q.   Okay.  And if you happened to be somewhere conducting an investigation and either you ran out of paper or forgot to bring the paper or something like that, what was expected of you, was your understanding, on how to memorialize your

activity at that point in time?

MR. LOEVY:  Objection, asked and answered, Your Honor.

THE COURT:  I'm going to overrule it.  I think it was asked and answered, but not on exactly which one.

MS. ROSEN:  Thank you.

BY THE WITNESS:

A.  Let's just say I had a napkin available to me, and that's all I had to write on.  I would write whatever information someone was giving me on that napkin and then that napkin was turned in as a GPR.

And there was an envelope -- they didn't put envelopes in each case file, but if you had a piece of evidence like that, you know, on note-taking, then they would put an envelope there and that would be in there.

BY MS. ROSEN:

Q.  And did you ever have occasion to -- you're out on the street.  You're taking a note regarding your investigative activity, you're filling out your GPR, and you're continuing the information that you're recording there.  Did you ever write on the backside of a GPR?

A.  I may have.  And I know that it's happened.

Q.  Okay.  In the course of your being a sergeant -- a detective/sergeant reviewing these reports, have you seen that detectives have written on the backside of a GPR?

A.  Yes, I have.

Q. Okay. And these GPRs -- you know, there's been discussion about a lot of paper that -- reporting that goes on in the Chicago Police Department, so I just want to ask you a little bit about numbers. We've heard a bunch of numbers, CB number. And there's been talk about Records Division and files. So I just want to run through some of the terms with you.

A. Okay.

Q. What is a Records Division number or RD number?

A. Each case that -- each police call that needs to be answered by a police officer is recorded under a Records Division number, and that number stays with that case report all the way through the investigation.

Q. Okay. So we talked a little bit earlier about a general offense case report.

Is that -- it's my understanding your testimony today was that's the initial report, is that correct?

MR. LOEVY: Objection, Your Honor, relevance and asked and answered.

MS. ROSEN: We're talking about -- well --

THE COURT: Well, overruled.

BY MS. ROSEN:

Q. Is that the original report that's created when a crime is reported?

A. Yes. And it's usually -- it's usually done by beat officers, not the office -- the district officers.

Q.  Okay.  Does that report have an RD number on it?

A.  It's an RD number.

Q.  Okay.  And then if it's a case that would be assigned to a detective for follow-up, the reports that you'd generate, does that same RD number from that general offense case report appear on the reports you create?

A.  Yes.

Q.  Okay.  And we saw the inventory sheet that was prepared with the Polaroids.

A.  Yes.

Q.  Does that inventory sheet have an RD number on it?

A.  It's got the inventory number on it and then you would -- there's a place to put the RD number on, but it's not preprinted on there.

Q.  Okay.  But typically, you'd put the RD --

A.  Yes.

Q.  When you're --

A.  Well --

Q.  -- creating that inventory, you include that RD number?

A.  Yes.

Q.  And we had some discussion earlier today about the ET or evidence technician reports.

Did those have the RD number on it?

A.  Well, there's a place for them to put it.

Q.  Okay.

A. It would be blank, and they would fill it in.

Q. Because that's a form set, right?

A. Because it's a form set, yes.

Q. And the GPR, the general progress report, there's a place on the GPR for the RD number, right?

A. That's along the side.

Q. Okay. And for the supplementary reports that you prepare during the course of your investigation, there's a place for the RD number?

A. Yes, there is.

Q. And that RD number that's related, any of the work that's done on that case, it's that same RD number that's supposed to be typed in on all of those reports?

MR. LOEVY: Objection.

BY THE WITNESS:

A. Yes.

MR. LOEVY: Leading and asked and answered, Your Honor.

THE COURT: It is leading.

BY MS. ROSEN:

Q. All of the reports that are prepared in connection with a case that's related -- that's all the same case -- all the reports we've been talking about so far, the general offense case report, the supplementary report, the inventories, the ET reports, the RD number that's on there, what's that in

reference to?

A. It's referencing back to the original report that the officer took so that all the papers can be related and stay in the same file.

Q. Okay. And with respect to evidence and -- that's obtained during the course of an investigation -- like, for example, in this case, we've seen today the Polaroids that you inventoried. Is that something that's maintained in the detective area where you work, the evidence?

A. No. Evidence & Recovered Property section is its own little entity.

Q. Okay. So when you recover any kind of evidence or have evidence recovered during the course of your investigation, where does all of that evidence go?

A. It goes to the Evidence & Recovered Property section, ERPS commonly referred to.

Q. Okay. And any time that you either recover or direct that evidence be recovered during the course of your investigation, do you memorialize the inventory number in your report somewhere so that there's a doc -- so that there's documentation that that evidence was recovered?

A. Yes.

Q. So, for example, in this case, related to the Felix Valentin investigation -- we've already heard you testify about the Polaroids. That was noted in the report, right?

A.  Yes, it was.

Q.  How about the shell casings that were recovered by the ETs?

A.  Yes.

Q.  And was there any other evidence in this case?  The photographs?

A.  The photographs.

Q.  Okay.  Okay.  Now I just want to switch topics for a minute.

THE COURT:  About how much more do you expect you have?

MS. ROSEN:  Probably about 10 or 15 minutes.

THE COURT:  I think we ought to take a short break.

MS. ROSEN:  Okay.

THE COURT:  Ten minutes, everyone.

(Jury out.)

THE COURT:  The issue with Samuel Perez, the defense did not do a very good job of jogging my memory, but now I remember.  This was somebody who did not show up for a deposition, after deposition?

MR. GIVEN:  Correct --

MS. ROSEN:  Correct.

MR. GIVEN:  -- Your Honor.

THE COURT:  I think there was an issue about whether there should be a contempt?

MR. GIVEN:  I was trying to save time and --

THE COURT: Well, whatever.

MR. GIVEN: Yes, that's correct.

THE COURT: But I think it did take time because I didn't know what you were talking about.

MR. GIVEN: Yes.

THE COURT: So what I did was I said that since -- until it was clear he was going to testify, there was no need to deal with what to do about his recalcitrance.

MR. SWAMINATHAN: To be clear, I believe he did come and testify. He testified at length on a number of issues. They moved to other issues where he had some concerns about his own potential criminal liability, something like that. They wanted to call him back for another day.

THE COURT: He did show up?

MR. SWAMINATHAN: He showed up initially and testified --

MR. GIVEN: Well --

MR. SWAMINATHAN: -- on a number of issues. He then -- they called him back for another date, and he missed that date. So he's missed one time.

THE COURT: Well, I know, but --

MR. SWAMINATHAN: And then since then, there was a motion, and then you said we would take it up again down the road.

THE COURT: Well, that's what I am saying. I am

saying that now we have to pick it up.

MR. SWAMINATHAN:  That's right.

THE COURT:  So how are we going to take it up? Because we don't have a whole lot of time to argue things.

MR. LOEVY:  Well, he can't testify unless he cooperates.  And if we offer to try to facilitate him for a deposition -- if he's going to testify, I guess he could finish the deposition.  Because I didn't -- I wasn't aware, but it sounds like he started his deposition and then --

THE COURT:  Well, it sounds like the defense didn't get much opportunity is what it sounds like.  It sounds like you got your opportunity --

MR. LOEVY:  Was it our dep or their dep?

MR. SWAMINATHAN:  It was theirs.

MR. GIVEN:  It was our deposition, to be clear.

THE COURT:  Oh, it was your deposition.

MR. GIVEN:  It was our deposition.  We started asking him questions.  We got to a point where he felt uncomfortable and wanted a lawyer.  Plaintiff's counsel found him a lawyer.

THE COURT:  Okay.

MR. GIVEN:  And then we tried to get him to come back. He never called his lawyer.  We worked through the lawyer several times to try to get him to come to finish the deposition.

THE COURT:  Okay.  So I think --

MR. GIVEN: He would never come.

THE COURT: I think under those circumstances, if we can facilitate a further deposition where you will have plenty of notice, I think that makes sense. Okay?

MR. SWAMINATHAN: And we'll confer with counsel, because his deposition was taken by their firm once in an earlier case along Johnson. It was taken again in this case.

THE COURT: Well, I -- you know, that's all complicated, and, you know, that's going to require some briefing, but I think if -- given the problems -- and it sounds like everybody was trying to cooperate to get him to do what he needed to do.

Why don't we see if we can't get him deposed, like, over the weekend or something.

MR. LOEVY: All right.

MR. SWAMINATHAN: Okay.

MR. LOEVY: That's what we'll do. Thank you, Your Honor.

MR. GIVEN: Judge, the one further prejudice we'll have, however, is that we won't have a chance to get any rebuttal for him. We -- you know, this was --

THE COURT: Well --

MR. GIVEN: -- two years ago when he was supposed to show up. And I don't want to keep taking your time, Judge, but this is a witness who goes over to 26th Street. Whenever they

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 692 of 1254 PageID #:104828
McLaughlin - cross by Rosen
890

have a post-conviction proceeding, he magically shows up at 26th Street --

THE COURT: Look, I --

MR. GIVEN: -- and testifies.

THE COURT: You know, I -- this has been presented to me twice, one time very recently. Okay? I did the best I could. I can't --

MR. SOTOS: But, Judge, we --

THE COURT: -- make any miracles.

MR. SOTOS: We just got it last night, too. That's what keeps happening with the trial. They've got two "will call" witnesses on a list of 56.

THE COURT: Can you close that, Eugene?

MR. SOTOS: They've got two "will call" witnesses on a list of 56.

THE COURT: I entered that 404(b) ruling as fast as anybody could do it.

MR. SOTOS: No, I'm not talking about you, Judge. We're talking about them.

THE COURT: Well, I am telling you, I gave you all the notice that I could.

MR. SOTOS: Fine, Your Honor.

THE COURT: I got to -- let's take a break.

MR. SOTOS: Yeah. Thank you.

(Recess at 2:55 p.m.)

(Proceedings had in open court:)

THE COURT: I was saying on the Perez matter, you know, trying to figure out what of this 404(b) evidence to allow in and how much of it to allow in, it's a balancing process. It seems to me that one of the things we could do if Perez is going to be a huge problem, is I could go back to all the 404(b) and see if anyone else comes close. I thought I was allowing in the most probative and the least prejudicial.

But if this is going to cause an explosion and all kinds of inconvenience and delay, it is conceivable that maybe there's another close case --

MR. LOEVY: Your Honor, there's one that's even closer, and actually Mr. Art can speak to it.

THE COURT: Just tell me who it is and I'll go back and read the stuff when there's time.

MR. ART: In the Montanez and Serrano case, it's the one that involves the rap sheet that has a date stamp that's three days before they're first identified by a suspect.

THE COURT: Okay. Montanez and Serrano.

MR. ART: Yep.

MR. GIVEN: Judge, not surprisingly, we vigorously disagree --

THE COURT: Well, you can't fight everything.

MR. GIVEN: I understand, but --

MR. SOTOS: The problem, Judge, is that that's a

separate lawsuit and there's all sorts of defenses in that case that we would then have to just generate and try here.

THE COURT: Well, this isn't -- we're not talking about somebody who didn't show up at depositions, though, right?

MR. LOEVY: No.

MR. GIVEN: No, they just filed their own lawsuits.

MR. SOTOS: In fact, we're --

THE COURT: I know, but you've been on notice of -- you had a chance to depose this person, right?

MR. SOTOS: No, because --

MR. GIVEN: No.

MR. SOTOS: -- the case just got filed recent -- sometime in the last several months. They haven't been deposed.

Judge, here's what happens. They've been involved in this for years because they did the post-conviction stuff.

THE COURT: Yes. You know --

MR. SOTOS: We get the lawsuits --

THE COURT: -- Mr. Sotos, if we could just kind of keep focused on the issue. You always bring in everything and I can't follow it.

MR. SOTOS: I apologize.

MR. LOEVY: Can we talk about it after the break so we don't lose an hour with the jury?

THE COURT:  Let's talk about -- well, I can't talk about it at 4:00 o'clock.  So --

MR. ART:  Perhaps what makes sense is if the parties confer --

THE COURT:  Monday morning I can talk to you about it.

MR. ART:  Okay.

We'll confer in the meantime and we'll talk further --

THE COURT:  Yes.

MR. ART:  -- about Mr. Perez.

THE COURT:  To talk to you Monday morning.

MR. SOTOS:  If we're not going to talk again until Monday, can we get some kind of an indication about where we're going with witnesses?  They've got 56 people.

THE COURT:  That would be nice.

MR. SOTOS:  We're on the third witness.

THE COURT:  But you know that we don't know what's going to happen with Lopez, right?  They don't know what's going happen.

MR. SOTOS:  But, Judge, see, that's what I'm saying.  At some point, this has to stop.  I think they do --

THE COURT:  They can't stop because nobody knows.

MR. SOTOS:  But they've had an investigator out there for a long time working this guy to try and get him to testify, and then they filed a supplemental production.

THE COURT:  Okay.  Well, that's --

MR. SOTOS:  These shenanigans have to --

THE COURT:  -- what I'm telling you about Lopez.

You're going to have to -- you know, maybe you people have never tried criminal cases.  You sit on the edge of your seat --

MR. SOTOS:  I haven't.

THE COURT:  -- all the time without knowing.

MR. SOTOS:  I haven't.  You're right.  I haven't.  But I've tried a lot of civil cases, Judge, and these are shenanigans.

MR. LOEVY:  Oh --

MR. SOTOS:  That's not how civil discovery is supposed to work.

THE COURT:  Let's get the jury.  I don't have the patience for this.

You wanted some help on a certain issue.  I was trying to help you and we got distracted with something where I can't help you.  So, you know, what can I do?

And give me the proof that it's shenanigans, okay?  That would help.  I mean, having proof would be helpful.

MR. LOEVY:  It's not our fault the guy doesn't want to testify.

THE COURT:  Well, they say it is.  So, I don't know.

MR. LOEVY:  We want him to testify.

MR. SOTOS:  They've had an investigator out there for

a long time just working him and working him. And I have the sense that he is going to appear at some point. He did the same thing with Rodriguez from Minnesota. Carrie Golden gets a text at 11:00 o'clock at night "I'm on my way" after telling everybody he's not the right guy. It's not how civil cases are supposed to work. This case is six years old, Judge.

THE COURT: Well, this --

MR. LOEVY: Your Honor, that's an accusation.

MR. SOTOS: And I wasn't --

MR. LOEVY: This man is in Cleveland. We would like him to --

THE COURT: Well, it's not only that, but this is not your typical civil case. This case is steeped in all the things that drives people in criminal cases stark raving mad day and night, and we're dealing with that and we have to deal with it.

MR. LOEVY: The guy doesn't want to testify. We want him to testify. We're asking him to testify. He either will or he won't.

THE COURT: I get that.

MR. SOTOS: But the kind of things that were disclosed in that supplemental production that we talked about at sidebar are the kinds of things that have to be explored if that's going to be something that we're going to hear about. And so --

THE COURT: Look, Mr. Sotos, all I can do is say that if he's going to testify, I think you need his deposition. I think you need it in advance. Then you tell me why that's not good enough; then we get into something else. Enough. Let's get the jury.

MR. SOTOS: The reason I say it's not good enough, Judge --

THE COURT: It's enough. It's enough.

MR. SOTOS: -- is because now we're talking about two depositions over the weekend and 53 witnesses we're preparing for. He said he's going to finish his case next week. This is all gamesmanship.

MR. LOEVY: Your Honor, Mr. Sotos is just trying to over -- blow it all out --

THE COURT: I've had to shut it off because I have too much on my mind. So, I'm sorry, Mr. Sotos, but I cannot hear this right now.

MR. SOTOS: Understood, Judge.

(Jury in.)

THE COURT: Please be seated, everyone.

Ms. Rosen.

MS. ROSEN: Thank you, your Honor.

BY MS. ROSEN:

Q. All right. Ms. McLaughlin, I'm going to hand you what's been marked as City Exhibit No. 34 and ask you to take a look

at that.

Do you recognize that document?

A. Yes.

Q. And what is it?

A. It's a -- excuse me -- Detective Division Special Order.

Q. And what is a Detective Division Special Order?

A. Well, there's policy and procedures by the Chicago Police Department that are covered under General Orders. These Detective Division Special Orders may actually be part of a General Order, but they specifically apply to detectives. So, they made a separation for them so you could easily attain that and see what you're supposed to do. Because the General Order book is like this (indicating), and the Detective Division's is like that (indicating). So --

Q. And the books that you're describing, the General Order book that's like this (indicating) and the Special Order book that's smaller, where are those kept?

MR. LOEVY: Objection to relevance, your Honor.

THE COURT: Overruled.

BY THE WITNESS:

A. I believe each station has them. We received them when we became new officers. We were given to them. And, then, when these come out, they're available at the front -- they're available in the office for you to keep your records up to date.

BY MS. ROSEN:

Q. Okay.

And as a detective in 1988, were you expected when these new orders came out to review them, become familiar with them, things of that nature?

A. Yes.

Q. Okay.

So, taking a look at --

MS. ROSEN: Actually, could I -- the City seeks to admit City Exhibit No. 34.

MR. LOEVY: No objection, your Honor.

THE COURT: It is received.

(City Exhibit No. 34 received in evidence.)

BY MS. ROSEN:

Q. So, this order, could you tell us the effective date of the order? Can you see it there?

A. Effective is 29 May of '86.

Q. Okay.

And the title of the order?

A. "Investigative Files."

Q. Okay.

And just for -- to be clear, the investigative file, right, in this case, you were shown earlier today by Mr. Loevy, correct?

A. Yes.

Q.   And I'm going to hand this up to you --

MS. ROSEN:   What was the exhibit number on this one?

THE COURT:   34.

MS. ROSEN:   No, for the investigative file.

40 --

MS. CARNEY:   45.

MS. ROSEN:   45, yeah.

So, this would be City 45.

(Document tendered.)

BY MS. ROSEN:

Q.   So, that's the investigative file related to the Felix Valentin investigation, correct?

A.   Yes.

Q.   Okay.

If you could take a look at the Section 2 of the Special Order where it indicates the policy of the Chicago Police Department as it relates to criminal investigations.

And I don't want you to necessarily read it all, but could you explain to the jury what your understanding is of the policy based on what's written there in the Special Order with respect to these files?

A.   They want you to do a fair and objective investigation, which would be detailed in your notes, and then memorialize a Supplementary Report.

Q.   Okay.

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 702 of 1254 PageID #:104838
McLaughlin - cross by Rosen
900

And, then, if we look to Section 3 of the Special Order, the "Definition" section, if you take a look at Subsection A. where it's identified as investigative file, do you see that there?

A. Yes.

Q. Okay.

And if you look in the content of that definition, do you see the second -- or the last sentence where it relates -- describes what the intent of the investigative file is and what it's designed to provide? Do you see that sentence there?

A. It's designed to provide a complete picture of the investigation for judges, state's attorney, defense attorney, and the assigned department members.

Q. Okay.

And, then, Subsection B., that's titled, "Investigative File Case Folder."

Do you see that there?

A. Yes.

Q. Is the Valentin file that you've got up there, does it have an investigative file case folder as described in the Special Order?

A. Yes.

Q. And does it have the two-hole metal punch fastener to secure all of the documents as described --

A. Yes, it does.

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 703 of 1254 PageID #:104834
McLaughlin - cross by Rosen
901

Q. -- in the order? Okay.

And, then, Subsection C. discusses the miscellaneous document repository.

Do you see that there?

A. Yes.

Q. Is that the envelope that you were talking about --

A. Yes.

Q. -- earlier?

A. Yes, that is.

Q. Okay.

And, then, if you take a look at Subsection D., the investigative file inventory sheet, do you see that there?

A. Yes, I do.

Q. Can you tell us if the investigative file for the Valentin homicide has that in the--

A. Yeah, that would be this (indicating).

Q. And that was the -- there was an exhibit used by plaintiff earlier today --

A. Yes.

Q. -- that had that document, right? Okay.

And, then, if we go to the next page of the Special Order, Subsection E., entitled, "General Progress Report," do you see that? Top of the second page.

A. I must have skipped a page. I'm sorry.

Q. It's also on your screen.

A.   I got it.

Q.   Okay.

The General Progress Report, that's the document we've been talking about today, right?

A.   Yes.

Q.   It's described there as an 8-and-a-half-by-11 size piece of paper to be utilized for standardizing for taking notes, correct?

A.   True.

Q.   Is there anything in that section that prohibits taking notes on a document other than a General Progress Report?

A.   No.

Q.   Okay.

And, then, Subsection F. entitled, "Investigative File Control Card."  Can you describe for the ladies and gentlemen of the jury what that is?

A.   That was a card that was placed in the investigative file. And if another set of detectives were coming on and taking over the case to continue the investigation and they wanted to look at the file, they had to sign the file out and they were responsible for that file.

These files didn't leave the office, but they'd be on the floor for somebody to review or make a copy of a report or whatever they needed it for.

Q.   Okay.

And there isn't a file control card in that investigative file, right?

A. Not that I can see.

Q. Okay.

But that card is, you said, intended to remain where it was to denote --

A. To denote that the file is missing and who has it.

Q. Okay.

Now, if we move down on Page 2 to the bottom of the page, it's Section 4, Subsection C., where it says, "Detectives are required to."

Do you see that there?

A. Yes.

Q. Subparagraph 1 of that paragraph, can you tell us what your instruct- -- what detectives are required to do as related in that subparagraph?

A. To record and preserve relevant information as fully and accurately as possible.

Q. Okay.

And, then, Subparagraph 2, what is that instructing detectives that they're required to do?

A. To transcribe the handwritten notes into the typed notes for the investigation.

Q. Okay.

And in that description, does it refer to the variety

of investigative materials that could be created in the course of an investigation?

A.  It does.

Q.  And what are those?

A.  Major incident worksheets, miscellaneous investigative documents, official department case reports.

Q.  Okay.

And, then, if we go to Subparagraph 3, can you tell us what that subparagraph requires detectives to do?

A.  Requires us to submit all our General Progress Reports, which are the handwritten notes, with the report that was based on them together.

Q.  Okay.

And, then, Subparagraph 4, what does that instruct detectives that they're required to do?

A.  To preserve them.

Q.  To preserve --

A.  And submit.

Q.  Okay.

And now changing topics a little bit, you talked about General Orders.  And I'm going to hand you what's been marked as City Exhibit No. 11.

(Document tendered.)

BY MS. ROSEN:

Q.  Can you describe what that document is?

A.  It's a General Order speaking to lineup procedures.

Q.  Okay.

And what's the effective date of that order?

A.  17 March, 19 -- it looks like '83.

Q.  And just to explain to the jury, when it says "effective date," what does that mean?

A.  The date that these -- there was probably other lineup procedures, but now these are new lineup procedures.  So, that's when they go into effect.  That's when you have to change your recording or your procedure.

Q.  Okay.

And these orders throughout the years, the department changes them, correct?

A.  Constantly.

Q.  Okay.

And in terms of the lineup procedure report, I'm going to actually hand -- or General Order, I'm going to hand you what's been previously marked City Exhibit No. 10 and ask you to take a look at that.

(Document tendered.)

BY MS. ROSEN:

Q.  Do you recognize what that is?

A.  It's a lineup procedure General Order effective date 24 September, '88.

Q.  Okay.

So, that -- this one went into effect after Mr. Rivera was arrested, correct?

A. Yes.

Q. Okay.

MR. LOEVY: We object to relevance, your Honor.

MS. ROSEN: I'm only establishing that the other one was in effect, the previous one.

THE COURT: Oh, that this was not in effect?

MS. ROSEN: Correct, yeah.

THE COURT: Okay.

MS. ROSEN: Yeah.

BY MS. ROSEN:

Q. And, then, this one where it says -- do you see where it says "rescinds"?

A. Yes.

Q. What is it rescinding?

A. It's rescinding -- the newer one is rescinding this older one.

Q. Okay.

A. And that's what they did. They would rescind the old one, otherwise you'd have a book as high as this building.

Q. Okay.

So, the lineup -- the General Order as it related to lineup procedures is the one that we've marked as City Exhibit No. 11, correct?

A. Yes.

MS. ROSEN: We move to admit 11.

MR. LOEVY: No objection, your Honor.

THE COURT: So, 11 is received.

(City Exhibit No. 11 received in evidence.)

BY MS. ROSEN:

Q. Okay. So, taking a look at No. 11, first of all, General Order, who does that apply to?

A. Everyone.

Q. In the entire police department?

A. In the entire police department.

Q. Okay.

So, that means every member of the Chicago Police Department theoretically would have been provided this order at some point in time?

A. Yes.

Q. If they were on the job at that time?

A. Absolutely.

Q. Okay.

I'm going to ask you to take a look at the General Order, section -- Subsection G., at the bottom of the first page.

Can you tell us what instruction that gives you about how many people to put in a lineup if there's only one suspect?

A. If there's one suspect, it's five people; two or more, six.

McLaughlin - cross by Rosen

908

Q. And this is referencing live lineups, correct?

A. Live lineups.

Q. Okay.

Now move to the second page of the order, Subsection H. And can you tell us what that section instructs with respect to when it's appropriate to order an evidence technician during the course of a lineup?

A. If any formal -- they call it a formal lineup -- that's a live lineup -- in which the -- results in the identification of a suspect.

Q. Okay.

And, then, if you move down to J., can you explain to us what that subparagraph instructs with respect to the reporting that's required when any lineup is held?

A. When any lineup is held, a Supplementary Report must be made.

Q. Okay.

And there's a line in Paragraph -- Subparagraph 3 that's underlined. Could you read that?

A. Yeah.

"In no case will a lineup be conducted without a Supplementary Report being completed."

Q. Okay.

And does that paragraph also address who is expected, pursuant to the Chicago Police Department directives, to

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 711 of 1254 PageID #:104847
McLaughlin - cross by Rosen
909

conduct the lineup.

A.   They would prefer to have detectives at the lineup; but, if circumstances are such that a detective is not present at the lineup, these report procedures have to be done by a supervisor, I believe.

Q.   Okay.

And a supervisor would be a sergeant or a lieutenant or something like that?

A.   Yes.

Q.   Okay.

And, then, with respect to documenting -- you testified earlier about documenting a negative lineup.  What is your understanding of what the orders require as it relates to documenting a negative lineup?

A.   A negative lineup is when you have a live lineup, formal lineup, and the witness picks someone out other than the suspect.  Then you need to document that, that your witness couldn't identify the suspect.

Q.   Okay.

And in that circumstance -- I think we covered this, but just to be clear, in that circumstance, you don't call out an ET, correct?

A.   No, we do not call out an ET.

Q.   And there's no photographs?

A.   There's no photographs.

Q. Okay.

MS. ROSEN: If I could have just a minute?

THE COURT: Sure.

(Brief pause.)

BY MS. ROSEN:

Q. I don't have a hard copy of it, but I'm going to ask you to take a look at what's been previously marked as City Exhibit 31.

MS. ROSEN: Just for the witness and counsel.

BY MS. ROSEN:

Q. I'm going to ask you to take a look at that, City Exhibit 31, and we're going to page through it for you.

Do you recognize what that is?

A. It's a inventory form set.

Q. Okay.

That you were discussing earlier when you were talking about the inventorying of property, correct?

A. Yes.

MS. ROSEN: At this time we seek to admit City Exhibit 31.

MR. LOEVY: Your Honor, we object to foundation and mostly relevance, but this is --

THE COURT: I don't have anything but this one page.

MS. ROSEN: Oh.

Can you go back through that to the beginning of it.

MR. LOEVY: She's not a record keeper, your Honor.

THE COURT: What is the relevance of this?

MS. ROSEN: Well, she discussed earlier that she would prepare the documents and it was a form set, and it's simply to show what the form set is and how the different -- she couldn't remember the different numbers and where the copies went.

THE COURT: All right. I think it's okay. I'll receive it.

MS. ROSEN: Thank you.

(City Exhibit No. 31 received in evidence.)

MS. ROSEN: Can we go to the first page of it.

BY MS. ROSEN:

Q. Okay. So, taking a look at the first page of the document, do you see at the bottom there, it says "Copy 1"?

A. Yes.

Q. Okay.

And what's the instruction there with respect to that copy?

A. Keep with the property.

Q. And when you say "form set," what do you mean?

A. It was -- it was X amount of sheets of paper -- four, five, six, I don't remember -- and it had carbon between the -- and you would make it out.

Q. So, when you wrote on the first page, was the idea that --

A. It would go all the way through, yes.

Q. Okay.

So, this is before, like, photocopy machines everywhere?

A. Yeah.

Q. Okay.

MS. ROSEN: All right. And now if we can go to the next page.

BY MS. ROSEN:

Q. What's that at the -- what does it say at the bottom there?

A. "Forward to Evidence & Recovered Property Section immediately."

Q. Okay.

So, what happens with that copy from that form set?

A. That goes --

MR. LOEVY: Objection, your Honor.

I'll withdraw it.

We can all read what happens to that copy.

BY MS. ROSEN:

Q. What happens to that copy?

A. It goes with the property to the ERP Section.

Q. Okay.

So, that was the page that was in the envelope that we saw --

A. Yes.

Q. -- earlier?

A.   Yes.

Q.   Okay.

           MS. ROSEN:  Next page.

BY MS. ROSEN:

Q.   What does it say at the bottom there?

A.   "Attach to court papers."

Q.   Okay.

           So, where does that copy go?

A.   This copy would probably stay in the investigative file until it went to court.

Q.   Okay.

           MS. ROSEN:  And the next.

BY MS. ROSEN:

Q.   Copy 4?

A.   "Give or send to finder, arrestee or owner."

           I mean, you could find somebody's wallet and that's what that is.

           MS. ROSEN:  And, then, the next.

BY MS. ROSEN:

Q.   Copy 5?

A.   "To be left in the book."

Q.   And where were these forms kept at the Area?

A.   I don't know.  Somewhere in the office somewhere.  I really don't know.

           MR. LOEVY:  Your Honor, foundation again.  This isn't

a record keeper. You know, it's just not relevant testimony.

THE COURT: The witness just testified she didn't know. So, I don't think we have to worry about foundation, because there certainly is none.

MR. LOEVY: Then we move to strike it all.

THE COURT: Well, I think the witness has been able to --

Did you use this document?

THE WITNESS: We used these, but I don't know where they kept the books --

THE COURT: Yes, no --

THE WITNESS: -- physically.

THE COURT: -- I understand.

I think if the witness used it and if she can explain it, it's fine.

MS. ROSEN: Okay.

I don't have any further questions.

THE COURT: Okay.

MR. LEINENWEBER: Your Honor, I just have a couple brief ones.

CROSS-EXAMINATION ON BEHALF OF DEFENDANT GUEVARA

BY MR. LEINENWEBER:

Q. Good afternoon, Ms. McLaughlin.

A. Good afternoon.

Q. And you'll have to forgive me if you already said this, but

if you go back to that August, 1988, you're an Area 5 detective, correct?

A. Yes.

Q. Okay.

And in terms of like the hierarchy, is it fair to say that a detective is higher on the police scale than a gang specialist?

A. In terms of prestige? In terms of work ethic? In terms of, what?

Q. No.

A. I mean, I don't understand.

Q. I apologize. That's a bad question.

Typically -- it's a paramilitary organization, correct?

A. Yes, it is.

Q. Like all police departments?

A. Yes.

Q. So, there's lieutenants, there's sergeants, detectives. Is detective on that list as a lieutenant or captain, that type of thing?

A. Well, you have to take an exam --

Q. Okay.

A. -- to become a detective. Gang Crime Specialists are appointed or -- you know, by whoever makes them Gang Crime Specialists.

McLaughlin - cross by Leinenweber

916

Q. And I take it from the questions that Ms. Rosen was asking you in terms of some of the police regulations in terms of, let's say, running a lineup, it was the police department would want -- if at all possible, would want -- detectives to run the lineups?

A. That was my understanding.

Q. Okay.

And in terms of -- so, you're at Area 5, which at that point was where? And I'm sorry. I know this is --

A. Grand and Central.

Q. Grand and Central.

And the Gang Crime Specialists, where?

A. Western, Belmont. Area 3, Western and Belmont.

Q. Okay. So -- okay. Western and Belmont.

And in terms of your day-to-day activities if you're going back 30 years ago, 1988, how often would you, let's say, interact with Mr. Guevara or Mr. Mingey or the other Gang Crime Specialists?

A. Well, I rarely interacted with Eddie Mingey because he was a supervisor and he supervised other people.

Q. I see.

A. It all depended upon -- we would work with the Gang Crimes when we had a Gang Crime crime. If we didn't have a gang -- like if we had, you know, some poor citizen murdered his wife, we wouldn't call them in.

Q. I see. I see.

So, it could be something that happened everyday and then something that couldn't happen for a couple weeks; is that --

A. Absolutely.

Q. -- fair to say?

MR. LEINENWEBER: Judge, can I have just one moment, please?

THE COURT: Sure.

(Brief pause.)

MR. LEINENWEBER: Thanks, Judge. I have nothing further.

MR. LOEVY: Can I have the investigative file, please?

THE WITNESS: Sure, sir.

MR. LOEVY: Thank you.

THE WITNESS: Do you want any of your other stuff?

MR. LOEVY: No.

REDIRECT EXAMINATION

BY MR. LOEVY:

Q. Ms. McLaughlin, Ms. Rosen walked you through the policy about investigative files, right?

A. Yes.

Q. It's a very good policy, right?

A. Yes.

Q. It says you have to take all the notes, you got to preserve

them all, you got to put them in this file, and you got to make an inventory and you got to keep them all, right?

A. It says it had to be -- it doesn't say that I have to put them in that file. I give them to the sergeant.

Q. The policy says then the file is supposed to be produced to the criminal defendant in a criminal case, correct?

A. Yes, it does.

Q. All right.

But it doesn't do any good to have a policy that says we're going to make this great useful file and then it doesn't make it to the criminal defendant. That doesn't help, does it?

Was it the practice to turn over these files to the criminal defendants or not?

A. That's not my responsibility.

Q. But in the course of your interaction with the criminal justice system -- well, in this case, the file didn't get turned over. You're aware of that, correct?

MS. ROSEN: Objection, Judge. That's disputed.

THE COURT: Okay. That's disputed.

BY MR. LOEVY:

Q. Is it your understanding that this file did get produced to the criminal justice system?

MS. ROSEN: Objection, Judge. Same question.

THE COURT: Well, does the witness know? I mean, the witness knows something about this file, I assume, right?

MR. LOEVY: There is no dispute that this didn't get produced to the criminal justice system.

MS. ROSEN: That is absolutely not true.

THE COURT: Well, let's see what the witness knows. Okay? Let's stop the lawyers arguing.

BY MR. LOEVY:

Q. All right. Would it be unusual if this investigative file didn't get turned over to Jacques Rivera during the criminal trial?

A. I would say so, yes.

Q. All right.

As a matter of practice, did these files get turned over or not get turned over?

A. As a matter of practice, they would get turned over.

Q. All right.

Do you have any explanation -- hypothetically, if it didn't get turned over and there was no GPRs in the criminal justice system, do you have any explanation for why that was in this case?

A. No.

Q. All right.

You were asked about the lineup policy that Ms. Rosen showed you. And the policy does say that you're supposed to write down the people identified in a lineup, right?

A. Yes.

Q. All right.

So, if someone picks a filler, you're supposed to write down that a filler got picked. That's what the policy says, right?

A. I don't believe that that's what it says.

Q. All right.

If we could show the Elmo here, the document camera, it says when a lineup is held --

A. You're looking at that --

Q. I'm sorry, this is --

A. You're looking at 80- --

Q. -- City Defendant Exhibit 11, showing you the same paragraph Eileen just showed you.

The Supplementary Report's supposed to include the name of the person identified in the lineup, right?

A. Yes.

Q. All right.

So, that's what it says on the books, but was that how it was in the practice?

A. If a filler was identified, it would be in a negative lineup report. This is a positive lineup. This would be a -- I don't know if you call it -- positive lineup report. It's two different things. It would be documented that it was negative.

Q. All right.

So, if someone picked somebody, you wouldn't write down the name unless it was the person the police wanted or were hoping they would pick?

MS. ROSEN:  Objection to form.

BY MR. LOEVY:

Q.  That's what you're saying, right?

A.  No, that's not what I'm saying.

THE COURT:  It's a little argumentative.  Sustained.

BY MR. LOEVY:

Q.  Let's move on to your training.

I see some training that you received, including you had some CPR, some deadly force, dignitary protection, Spanish, in-service.  But I want to ask you specifically about photo arrays.

Did the department provide you any training about photo arrays?

A.  Possibly.  I'd have to review this total thing.  So --

Q.  All right.

Do you remember being asked this question at your deposition and giving this answer.  This is Page 57, Lines 22 through 24.

"Do you have any recollection -- " I'll just read it.

"Do you have any specific recollection of receiving training in photo arrays?

"I don't."

Do you remember those answers?

A. I basically said the same thing now. I'd have to look at this to see if I did.

Q. All right.

Do you remember any training about eyewitness identifications?

A. You mean like on the street? What do you mean?

Q. Eyewitness identifications.

Isn't it true you said at your deposition you received no training on that?

A. I said I didn't have any recall of it. I didn't -- I needed to look at the training that I had. I wasn't allowed to look at any reports.

Q. The same for preserving notes and retaining them to provide them to defense counsel. You didn't remember any training about that either, correct?

A. Not without seeing the list of things that I had done, yes, no.

Q. All right.

You did tell Ms. Rosen that the department was very stringent you got to retain the notes, right?

A. Yes.

Q. Okay.

That didn't apply to the Gang Crimes people, did it?

A. I know how -- I know the training that I received. I don't

know what training they went to.

Q.  Why didn't you -- why was there -- in this investigative file, why was there no notes from the Gang Crime people?

A.  I don't know.

Q.  Did you typically --

A.  They don't work in the Detective Division.  Their files and things would probably be kept --

Q.  All right.

You're keeping the official investigation file, right?

A.  Yes.

Q.  Was it your practice to have the Gang Crimes people submit their notes?

A.  We'd have their -- a copy of the reports that they made.

Q.  The question was about notes.

A.  I know it's about notes, but I don't know what their procedure was.

Q.  All right.

Was it the practice that Gang Crimes notes got into the file that you talked about with Ms. Rosen?

A.  I don't know if they took notes.

Q.  All right.

Assuming some Gang Crime people took notes, they didn't get into the file; would you agree with that?

MS. ROSEN:  Objection.  Foundation as to the assumption.

THE COURT: If the witness knows.

BY THE WITNESS:

A. I never worked Gang Crimes. I never supervised Gang Crimes. I do not know what their responsibilities and what they were told to do and not to do. So, I don't have any reference for it.

BY MR. LOEVY:

Q. All right.

Let's talk about your memory. You would agree that at your deposition, your memory was not as strong as it is today. Would you agree with that?

A. At my deposition, I was not allowed -- a deposition is a big deal. Maybe not to you, but to me it was.

Q. I'm sure it was. You spent 20 hours preparing for it --

A. Yeah.

Q. -- right?

A. And I wanted to review my notes, and I was not allowed to review my notes. So, I was very careful for what I said.

Q. And at the deposition, you had spent 20 hours reviewing the paper to prepare for it; and, when you got there, you were asked do you have any independent recollection aside from what's written on the page, and you said, "I'm only going to read off the page," right?

A. He asked for independent, and then he said "and plus what you remember from the notes." So, he combined it.

Q. All right.

When you were on --

MR. SOTOS: Judge, I'm going to object at this point. If he's going to talk to her about a deposition, there's a way to do that, not just saying, "Did you say that in your several-hundred-page deposition?" If you point to a page where she said something --

THE COURT: Well, if the witness remembers, I don't think we have to do that. If the witness doesn't remember, we'll go through the usual form.

BY MR. LOEVY:

Q. Mr. Sotos is right. I was referring to the ones we played before -- I don't want to play them again -- where you said, "I have no independent recollection. I have no independent recollection." That's the pages I was talking about.

Is that true that you have no independent recollection?

A. I want -- I'm just saying that I wanted to be extra special careful and not say a misstep for the deposition, so I wanted to refer to my notes. I thought I was entitled to that.

Q. All right.

Now, when you testified with Mr. Polick you talked about -- I want to bring your attention back to August 27th. You said you went to the Area to type the report; then you went back to the house; then you went to the Area to type; then you

heard from Gang Crimes.

Just to be clear, none of that is in the paperwork, right? We have the 8-27 paperwork and it talks about none of that, right?

A. The 8-27 paperwork was done on the night of the -- of 8-27 in between the time of learning of the identification because all I could --

Q. All right.

All I'm asking --

A. Okay.

Q. All I'm asking is the 8-27 paperwork --

A. Yes.

Q. -- doesn't contain any of that story you were talking to Mr. Polick about, correct?

A. Any what story?

Q. When you were on -- talking to Mr. Polick, you were talking about it like it was last week -- then we went to the house; then we went back to the station; then I got a call. None of that is written down in the 8-27 paperwork; that's true, right?

MR. SOTOS: Objection --

MR. POLICK: Objection --

MS. ROSEN: Objection.

MR. POLICK: -- to the form.

MR. SOTOS: -- to the characterization she was talking about it like it was last week.

THE COURT: Well, okay.

I think the characterization should be stricken.

And it's also kind of compound. I think if you could ask a simple --

MR. LOEVY: All right.

If we could play Deposition 179-11 through 180-2 -- 180, Line 2.

BY MR. LOEVY:

Q. Weren't you asked at your deposition the same questions on the same subject matter that you discussed with Mr. Polick and gave these answers?

(Video played in open court.)

BY MR. LOEVY:

Q. Did you give those answers?

A. Yes.

Q. Were they true?

A. Yes.

Q. All right. I'm going to turn to another subject.

We talked about your 8-29 report. This is Plaintiff's Exhibit 19-E. This is the report that has the date, the 29th, that you say is the wrong date, right?

A. Yes.

Q. Now, if you look at Page 2 of the same report, it looks like you made the same typo twice, doesn't it?

A. Well, yes.

Q. And you would have -- you know, that's not an auto fill; that you literally typed it in the old days twice with the wrong date, you're saying?

A. Yes.

Q. And you're saying the reason you want to say -- you believe it's the wrong date is because there's a supervisor's stamp of the same date?

Do you see that?

MR. SOTOS: Judge, objection. That's not the document she was reading from when she said that.

MR. LOEVY: It was, your Honor. It's a different version of it.

MR. SOTOS: No.

MR. LOEVY: This version is not signed.

THE COURT: Wait a minute.

MR. SOTOS: No.

THE COURT: Wait a minute. It's a different version of it?

MR. SOTOS: Yes.

MR. POLICK: 3-A.

MR. SOTOS: 3-A, your Honor. There's more information.

MR. LOEVY: It's the same document, your Honor.

MR. SOTOS: No.

MR. LOEVY: I'll put them side by side.

THE COURT: I don't have any idea what you have. So, all I'm hearing is argument --

MR. SOTOS: There's a timestamp on one.

THE COURT: -- without being able to resolve it.

MR. LOEVY: That's what I'm getting at.

This is -- your Honor, I object to being interrupted. I'm doing exactly proper --

THE COURT: I'm sorry, it was an objection. You've got the same document now. Why don't we go forward.

MR. LOEVY: All right.

BY MR. LOEVY:

Q. There are two versions of this identical document, one of which has a date stamp on it and one of which doesn't, correct?

A. Yes.

Q. All right.

So, I'm looking at the one from August 27th -- I'm sorry, when I said "date stamp" -- it looks like the supervisor signed the one that Joe went over -- Mr. Polick went over -- with you, right?

A. Yes.

Q. And the version that was produced in the --

MR. LOEVY: Is this the Area file or the --

BY MR. LOEVY:

Q. -- in the Area file or the investigative file has no stamp, no date, time, correct?

A.  No time.

Q.  All right.

And you don't dispute that it says 29th of August, 2355, 11:00 o'clock?

A.  No.

Q.  So, at 29th of August, 11:00 o'clock -- 11:55, when you finished these, you put them in the box on the sergeant's office -- on the sergeant's desk, correct?

A.  Yes.

Q.  And the sergeants don't get to them immediately, correct?

A.  Correct.

Q.  For example, you know, the report from the 27th, which is 19-D that's dated the 27th, looks like it's got the same stamp on it, right?

A.  Yes, but we went over this.  That's -- that's a bad date on that stamp.

Q.  All right.

So -- all right.  This is an independent new bad date?

A.  Well, this report was signed by two different sergeants.  I explained that somewhere along the line.

Q.  So, this date here, August 30th, that is the third bad date in the case, you're saying?

A.  This was a brand-new sergeant in the Detective Division and he signed the report that was hanging on a clipboard for information.  If somebody would call from downtown and say

what's going on with the, you know, Smith investigation, there were copies of this. And I believe that he signed it because there's another one that's signed by Sergeant Rinaldi sooner than that.

Q. Are there usually this many misdated police reports in investigations?

A. I don't have any idea because --

Q. How about in yours? In your investigations, are all the police reports misdated in your usual police investigations?

A. I'm sure I made mistakes.

Q. All right.

The 20- -- let's say that this report that says typed the 29th was on the 28th, all right? You believe it was on the 28th, not the 29th, right?

A. I do.

Q. All right.

That is still 24 hours after somebody pulled Jacques' photo, showing you Plaintiff's Exhibit 4, isn't it?

A. Yes.

Q. So, Jacques' photo was pulled before the events reported in the -- whenever this report was dated, whether it was the 29th or the 28th, his photo was pulled before there's a report that the victim -- I'm sorry, the witness -- picked out Jacques. Whether it was the 29th or the 28th, both those dates are after the 27th; isn't that true?

MR. POLICK: Objection to form.

BY THE WITNESS:

A. You're really confusing me with that question.

THE COURT: I'm sorry, there's an objection.

I didn't hear it.

MR. POLICK: Just to the form, Judge.

THE COURT: All right.

BY MR. LOEVY:

Q. We've been arguing a lot about dates today, right?

A. Yeah, we have.

Q. And the reason is because somebody pulled Jacques' photo on the 27th. We all --

A. Yes.

Q. -- agree about that, right?

A. Yes.

Q. And you're trying to say, well, the kid picked out Jacques on the 27th; that's why he pulled his photo. That's your belief, right?

A. Yes, that's my belief.

Q. But the problem is the report is dated the 29th and that's inconsistent with your belief, right?

But even if we move the report to the 28th, it's still after Jacques' photo got picked out, isn't it?

A. Well, yes, it was typed after. But --

Q. All right.

Do we agree that there is no report dated August 27th that says that there was a gang book identification made? Can we agree about that? The hour's late, but I think we can agree about that, right?

A. No.

Q. All right.

Show me the report -- here are the two reports that the gang book identification. The one we just talked about, which is dated either the 29th or the 28th --

A. Okay. I'm talking about Plaintiff's Trial Exhibit 12, Page 1 of 1.

Q. All right. Then let's go in order.

There's your report dated the 29th. That talks about the ID in the gang book. There is Guevara's report, says it happened on the 29th, right? And you're saying that's the wrong date, too, right?

A. I'm sure he took it off the other report.

Q. And now you're saying, well, wait a minute, here's a report dated August 28th that has a reference to the photo being pulled?

MR. SOTOS: Objection, Judge. He moved that down and she talked about that date.

MR. LOEVY: Your Honor, I think he shouldn't be testifying; she should.

THE COURT: I think that's right, but I think it's

going awfully fast and I'm not -- I have a hard time following.

MR. LOEVY: All right. I'll slow down. All right.

BY MR. LOEVY:

Q. This is the document you wanted to refer us to, right? I jumped --

A. Yes, it is.

Q. All right. So, I'm sorry I wasn't clear about that. All right.

And you're saying this document dated the 28th refers to Jacques' photo, right?

MR. POLICK: Objection to the form.

BY THE WITNESS:

A. If you look at the top, it says, "Date of original case report," 28th.

BY MR. LOEVY:

Q. That's all I'm asking. That is a day after --

A. But -- no, no, no, no, no.

BY MR. LOEVY:

Q. That is a day after somebody --

A. No.

Q. -- had pulled the photo of Jacques on the 27th, isn't it?

MR. SOTOS: Objection, Judge.

THE COURT: The witness wants --

MR. SOTOS: She didn't finish her answer.

THE COURT: You know what? I was just saying that,

Mr. Sotos.

MR. SOTOS: I'm sorry. Thank you.

THE COURT: The witness wants to answer.

BY THE WITNESS:

A. Can you put that other one back on the screen, please?

BY MR. LOEVY:

Q. The question was the date, the 28th --

A. But you're not reading the top of it. It says, "Date of original case report," 28th. We all know this happened on the 27th. That was just -- and that was originally a "7," and how it turned into an "8" I don't know.

Q. Well, I guess that's the next question.

A. But the date of this report says 27 August, '88, and that printed CV number is on the bottom of that report.

Q. I guess that's the next question. Who turned that "7" into an "8"?

A. I don't have any idea.

Q. Is it possible they turned the "8" into a "7"? They wanted to move it to the 27th; isn't that what happened?

MR. POLICK: Objection. Calls for --

MS. ROSEN: Objection.

MR. POLICK: -- speculation; argument.

BY MR. LOEVY:

Q. Take a look at the inventory. The inventory's got the strikeover 28th and 27th, doesn't it? Do you see the

strikeover?

A. I see the strikeover. I don't know --

Q. All right.

A. -- who did it.

Q. That is a different typewriter than the ones that are input on the 27th; would you agree with me?

MS. ROSEN: Objection. Foundation.

BY MR. LOEVY:

Q. Can you tell that the typewriter of the reports on the 27th was -- looks like a different typewriter than the one with the strikeover on the 28th?

MR. LOEVY: It's a question, your Honor.

MR. POLICK: Objection to the foundation.

THE COURT: Overruled.

BY MR. LOEVY:

Q. Does it look like a different typewriter, is the question pending.

A. Yes, it does look like a different.

Q. All right.

That's because it was created on the 28th, wasn't it?

MS. ROSEN: Objection.

BY THE WITNESS:

A. No, that's when -- that's -- I don't know who typed those in. That could have been the office that typed them in.

BY MR. LOEVY:

Q. All right.

A. We handwrote them in.

Q. Going backwards, Mr. Polick asked you about the people at the scene. Officer Machain said that it was a Latin King. You remember that question there --

A. Yes.

Q. -- by Mr. Polick?

Now -- so, it was the beat officers who told you it was a Latin King, not a witness, correct?

A. Beat officer.

Q. All right.

So -- but the beat officer didn't have firsthand knowledge of who shot the kid, right?

A. Well, he spoke with the --

Q. With somebody?

A. Well, my belief was he spoke with the victim when he came in.

Q. But it was at least -- maybe he spoke to the victim; maybe he spoke to Israel. You're not sure who he spoke to, right?

A. I know he spoke to the victim because he said he both spoke to the victim.

Q. All right.

So, the -- all right.

In any event, it's secondhand knowledge that it's a King, correct?

A.   It's secondhand knowledge possibly to me, but we take the facts in those case reports.

Q.   All right.

Now, you were asked by Mr. Polick if the kid said, you know, "I can see him, I've seen him before -- " that's what you wrote in the notes -- "I've seen him before."

Now, you weren't the first guy -- first person, sorry -- talking to Orlando Lopez, right?

A.   We were the first detectives to speak to him.

Q.   Right.

The Gang Crimes people had already had some interactions with Orlando before he got to you, correct?

A.   Yes.

Q.   And you have no personal knowledge either way whether or not things were suggested to Orlando or not suggested, correct?

A.   I have no idea.

Q.   Because you weren't there, in fairness to you?  All right.

So, your notes, though, are what he told you on whatever date it is, right?

A.   Yes.

Q.   And what you told Mr. Polick was a pretty incriminating story, wasn't it, that the kid said, "I was coming from the store, I was coming home and I know him -- " I wrote down, "I know him.  I know him.  I've seen him in the park."

That's what you told Mr. Polick the kid's story was,

right?

A.   No.   I said, "I know him from the baseball field."

Q.   All right.

"I know him.   I know him from the baseball field," right?

A.   Right.

Q.   And if you're Jacques Rivera on trial for murder and a kid is pointing his finger at him saying, "I know him.   I know him from the baseball field," that's very devastating information, right?   That's very devastating, right?

A.   It's in the written report.   It's in the typed-up report. It's not negated anywhere.

Q.   I'm not asking about that, though.

A.   Well --

Q.   I'm just asking this question:   If an eyewitness says, "I know that guy.   I know him.   I've seen him at the park.   I know him.   That's the man I saw shoot," that's devastating information, right?

A.   Has seen before.

Q.   All right.

What your notes say that Orlando told you is "by store."   It doesn't say anything about "I know him.   I know him.   I've seen him in the park."   You know, "I know this person."

It doesn't say any of that in your notes, correct?

A. He didn't stand there and say 14 times that he knew him, he knew him.

Q. All right.

A. He's like I -- he said, "I've seen him before." I asked him, "Where? In the neighborhood?" He's like, "He plays baseball at the park."

Q. All right.

Would you agree with me that if he got to trial and told that story -- and he did -- these notes would have been exculpatory because Jacques could have proved he didn't say that to you the first time; Jacques could have said this is what he said the first time?

A. The written Supplemental has it in there --

Q. Well, the --

A. -- from the baseball --

Q. -- written Supplemental was written two days later, right? Right?

A. It was written --

Q. After Jacques --

A. It was written the next day.

Q. All right.

Well, it's dated 29th and it says after Jacques' arrest, doesn't it? Doesn't it have Jacques as the suspect?

A. Yes.

Q. Doesn't that mean it had to have been written on the 29th

actually?

He was arrested on the 29th, wasn't he?

MS. ROSEN:  Objection.

MR. SOTOS:  Objection.

MR. POLICK:  That misstates that evidence.

MR. SOTOS:  Mischaracterization.

MR. LOEVY:  All right.  Maybe I got that wrong.

Did I get that day wrong?

30.  Sorry.  Nobody's perfect.

BY MR. LOEVY:

Q.  Back to the question.  If you were on trial for murder and somebody was pointing the finger at you and saying, "I know him.  I know him.  I played baseball with him," you would want the original notes that didn't have that story, wouldn't you?

A.  He never said he played baseball with him.  He said he saw him at the park and he played baseball.

Q.  All right.

A.  That's what he said.

Q.  All right.

Would you agree with me that this document is exculpatory and should have been provided to the criminal defense attorneys?

A.  All of our documents should have been provided to --

Q.  I'm not asking about all of them.  I'm asking about this document.

A. Yes.

Q. And, in fact, it would be a violation of Jacques' constitutional rights if this document wasn't provided to him; would you agree with that?

MR. SOTOS: Objection, Judge. We went through this last time.

THE COURT: I don't think this is the right witness for that. The witness can testify as to what her procedure was and what was appropriate to do, but not to get into the constitutional issues.

MR. LOEVY: All right.

BY MR. LOEVY:

Q. I'm going to move forward. You said that you got a call that the witness had identified a José Rios and then it was a Jacques Rivera?

A. Well, José Rios, I believe, was in the gang book as the name.

Q. All right. So, that's what you were told.

And you told Mr. Polick that there was nothing to ask José, so that's why I didn't ask him any questions -- sorry, I switched Josés on you and I went too fast.

José Rodriguez, okay? Let's switch to José Rodriguez.

A. Okay.

Q. You told Mr. Polick the reason you didn't interview Mr. Rodriguez because you couldn't think of any questions?

A.   No.   I said it was preliminary in the investigation and with the evidence and the facts that we knew, it would not be a good idea.

Q.   All right.

Sometime over the next two weeks, wouldn't it have been a good idea to say to José Rodriguez, "Hey, do you know Felix Valentin?  Do you got a beef with Felix Valentin?  Where were you on Saturday?"

A.   I don't know what I was doing during the next two weeks, and he wasn't in custody for the next two weeks.

Q.   All right.

Mr. Polick showed you a document that said that Jacques was released because he couldn't -- the witness could not be located, right?

A.   Yes.

Q.   Now, that's what it says, right?

A.   I don't have it in front of me, but I'll say yes.

Q.   But you don't know if that's true or not, right?

A.   Wait a minute.

Q.   You don't know if the witness couldn't be located, right? You weren't there.  You had no personal interaction with the witness or his parents?

A.   Well, I have to --

THE COURT:  Hold on.

BY THE WITNESS:

A.  -- believe the Gang Crime guys that were looking for him. I don't understand.

MR. LOEVY:  That's the answer.

THE COURT:  Well, I couldn't hear the answer because I was trying to hear the objection.  I'm sorry.

MR. POLICK:  I just wanted some foundation what conversation she's talking about.

THE COURT:  I think we're way beyond that at this point.

If there's an objection, I need to rule on it.

But I think we got an answer.

MR. LOEVY:  May I proceed then, your Honor?

THE COURT:  Yes.

BY MR. LOEVY:

Q.  Ms. McLaughlin, your answer was you trusted the Gang guys; if they told you that, then that was the information you had, right?

A.  Yes.

Q.  And you don't know either way if little Orlando's parents said, "Go away.  He doesn't want to be a witness.  We don't want anything to do with your investigation?"  You don't know if that happened?

A.  No, I don't know if that happened.

Q.  All right.

As far as there being no lineup on August 31st, you

were not present at a lineup on August 31st, correct?

A.  Correct.

Q.  But it could have happened without you, correct?

A.  I just don't see how that's possible.

Q.  Well, it happened without you on September 15th, didn't it?

A.  I wasn't working on September 15th.

Q.  Well, again, you're inferring you weren't working, but you don't know either way whether you were working, correct?

MR. POLICK:  Objection.  Misstates the testimony.

THE COURT:  I don't --

Do you know whether you were working on that day?

THE WITNESS:  I don't believe I was working, no.

BY MR. LOEVY:

Q.  And that's your belief, but you have no proof, no document, no records, right?

A.  It was 30 years ago.

Q.  Now, you were shown a photograph with your son, who is older now?

A.  Yes, he it.

Q.  And it's a nice photograph, but your hair is not -- it does show white and blonde in the front of the photo; does it not?

A.  It's a little bit of silver.

Q.  Little bit of silver.

So, you're not ruling out that in 1988 your hair had a little bit of silver, right?

A. No, I'm not.

Q. All right.

And Orlando is saying the woman with the paperwork who had the light or gray or blonde hair, right?

MR. SOTOS: Objection, Judge. It's a mischaracterization of what the witness said.

BY MR. LOEVY:

Q. What is your understand- --

MR. LOEVY: May I ask it this way?

BY MR. LOEVY:

Q. What is your understanding of who Orlando -- what Orlando Lopez was saying about the woman he was dealing with was?

A. My understanding was his first statement it was blonde hair.

Q. And, then, it turned into white or blonde hair?

A. Yes.

Q. Something like that. He wasn't sure, right?

A. Well, I think it was after your investigators came to my house and saw I had white hair.

Q. All right.

Let's talk about your role in the investigation. Counsel pointed out that your name is not on the second lineup report, correct?

A. It's not on the lineup report of the 15th of September.

Q. And by the way, I used second lineup. You dispute there

was a first lineup?

A. I do.

Q. I did not mean to imply that you said there was two.

Showing you 19-G, Ray Guevara and Steve Gawrys were present at that lineup?

A. They were present at the lineup on the 15th of September.

Q. And that's the lineup that you think had some real problems, didn't you?

A. Yes.

Q. And what were the problems with that lineup?

A. Well, the other suspect wasn't in it.

Q. That's not legit, is it?

A. Well, if that was the only --

MR. POLICK: Objection --

BY THE WITNESS:

A. -- lineup they were --

THE COURT: Sorry, what was the objection?

MR. POLICK: Objection to the form of the question, Judge. "Legit."

THE COURT: Okay. Sustained.

BY MR. LOEVY:

Q. All right. Showing you the criminal complaint, if Guevara and Gawrys are the first two --

MS. ROSEN: That's not the criminal complaint.

MR. LOEVY: I'm sorry. I misspoke. It's Plaintiff's

Exhibit 19.

What is this, the felony -- how would you describe it?

MR. POLICK: Felony 101.

MS. ROSEN: Felony 101.

MR. LOEVY: Felony 101.

BY MR. LOEVY:

Q. This is the charging document, if I'm not mistaken. It says Jacques Rivera charged --

MR. SOTOS: Judge, objection. It's not a charging document.

BY MR. LOEVY:

Q. All right. You tell us what the document is.

A. This is a form from the State's Attorney's Office -- it's a 101 -- which needs to go with the file for the state for the preliminary hearing.

Q. It's the felony minute sheet, correct?

A. Right.

Q. This is the preliminary hearing where Jacques Rivera is going to face murder charges, right?

A. Yes.

Q. And it sort of has the date of the offense and a summary, right?

A. Yes.

Q. And it's got the prosecuting witnesses. The first two police officers listed are Guevara and Gawrys, correct?

A.  Yes.

Q.  Even though they weren't detectives, they were the prosecuting witnesses, among others, correct?

A.  Yes.

Q.  And showing you Jacques' arrest report, that is Detective Guevara, correct?

A.  Yes.

Q.  So, just to summarize, the September 15th lineup at which Jacques was identified, you weren't there, right?

A.  Correct.

Q.  The August 31st lineup, if it happened -- and I realize you dispute it happened, but if it happened -- you weren't there?

A.  There was no lineup on the 31st that I'm aware of.

Q.  The gang book identification of José Rios for Jacques Rivera you were not present at?

A.  No, I was not.

Q.  And you never saw Orlando Lopez identify Jacques Rivera at all, correct?

A.  Correct.

Q.  In fact, you were told by Gang Crimes, Guevara and Gawrys, that the kid had ID'd Jacques and that's what you knew, right?

A.  Are you talking about on the 27th?

MR. LOEVY:  Your Honor, I have no further questions.

THE COURT:  You know what?  It's the end of the day.  Are you finished?

MR. LOEVY: Yes.

THE COURT: Are there going to be any follow-up from the defense?

MR. POLICK: Yes.

THE COURT: All right. It's going to have to be Monday.

All right. Monday morning, 9:30, ladies and gentlemen.

Have a good weekend.

(Adjournment taken at 4:00 o'clock p.m., until 9:30 o'clock a.m., the following Monday, June 11, 2018.)

* * * * *

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Joseph Rickhoff          June 8, 2018
Official Court Reporter

/s/ Colleen M. Conway        June 8, 2018
Official Court Reporter

# EXHIBIT 51

1184

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JACQUES RIVERA,                              ) No. 12 CV 4428
                                             )
            Plaintiff,                       )
vs.                                          ) Chicago, Illinois
                                             )
REYNALDO GUEVARA, STEVE GAWRYS, DANIEL NOON, )
JOHN GUZMAN, JOSEPH FALLON, JOSEPH SPARKS,   )
PAUL ZACHARIAS, GILLIAN MCLAUGHLIN, JOHN     )
LEONARD, EDWARD MINGEY, RUSSELL WEINGART,    ) June 12, 2018
ESTATE OF ROCCO RINALDI, City OF CHICAGO,    )
                                             )
            Defendants.                      ) 9:20 o'clock a.m.

VOLUME 6 A
TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JOAN B. GOTTSCHALL
and a jury

APPEARANCES:

For the Plaintiff:     LOEVY & LOEVY
                       BY:  MR. JONATHAN I. LOEVY
                            MR. STEVEN E. ART
                            MR. ANAND SWAMINATHAN
                       311 North Aberdeen Street
                       3rd Floor
                       Chicago, Illinois  60607

                       MacArthur Justice Center
                       Northwestern University School of Law
                       BY:  Locke E. Bowman , III
                       357 East Chicago Avenue
                       Chicago, Illinois 60611
                       (312) 503-0844


Court reporter:              Blanca I. Lara
                        Official Court Reporter
                        219 South Dearborn Street
                           Room 2504
                        Chicago, Illinois 60604
                          (312) 435-5895
                      blanca_lara@ilnd.uscourts.gov

1185

Appearances  (continued:)

For the Individual         THE SOTOS LAW FIRM
Defendants:                BY:  MR.  JEFFREY N. GIVEN
                                MR.  JAMES G. SOTOS
                                MS.  CAROLINE P. GOLDEN
                                MR.  JOSEPH M. POLICK
                                MR.  DAVID A. BRUEGGEN
                           550 E. Devon Avenue, Suite 150
                           Itasca, Illinois  60143

For the Defendant          ROCK FUSCO & CONNELLY, LLC
City of Chicago:           BY:  MS. EILEEN E. ROSEN
                                MS. CATHERINE M. BARBER
                                MS. THERESA B. CARNEY
                           321 N. Clark St., Suite 2200
                           Chicago, Illinois  60654

For the Defendant          LEINENWEBER BARONI & DAFFADA, LLC
Guevara:                   BY:  MR. THOMAS E. LEINENWEBER
                                MR. JAMES V. DAFFADA
                           120 N. LaSalle St., Suite 2000
                           Chicago, Illinois  60602

(The following proceedings were had out of the presence of the jury in open court:)

COURT SECURITY OFFICER: All rise.

THE COURT: Sorry to be late. Am trying to get the deposition rulings so that you can have.

I only have one copy of one of the -- the thing called plaintiff's objections in responses to Orlando Lopez's designated deposition testimony. The rest will be forthcoming in minutes. It's just being typed.

Who needs to work on the video? Because I've only got one copy right now.

MR. ART: I can take it to them, Your Honor.

THE COURT: Okay.

MR. LOEVY: Your Honor, on that subject, we filed a motion about police and gang last night that --

THE COURT: Yeah. Yeah. Yeah. It's being denied, right?

MR. SOTOS: Yes, Your Honor.

THE COURT: Let me tell you, No. 1, on the 404(b), there will be an opinion. The person that I'm going to allow instead of Perez is Ruiz. And there will be a little opinion sometime today talking about the balancing.

There's going to be an order issued about motions for reconsideration and how they're going to be summarily denied unless the rule standards are laid out and satisfied.

And on motions in things that are basically motions in limine, like asking me to bar this, bar that, there was a deadline, people. And the reason for the deadline, and the reason that I knocked myself out to get the rulings done before the opening statements is, once there's an opening statement, fooling around with barring evidence is very dangerous. So, you know, don't exhaust yourself, because the chance that I'm going to grant any of those, unless you point to some significant problem that's developed in the trial that was not foreseeable, I'm just not going to mess around with it very much.

So is there anything else that we need?

MR. GIVEN: Two questions, Your Honor, very quickly.

THE COURT: Yes.

MR. GIVEN: Number one, with the gang retaliation that they filled whenever it was last night, do you want any sort of a response oral or otherwise?

THE COURT: I had already made -- you know, my law clerk proposed a ruling. I have already made all my rulings on the deposition overnight and the other things that you sent me home with. I'm going to go with what I ruled on. It would've been too difficult to see if we saw eye to eye on that. So you're going to get something, I hope, eventually that explains the deposition rulings, but the deposition rulings are going to go on. Okay.

1188

MR. LOEVY: We would then argue, that opens the door to the subject that we want to talk about.

THE COURT: No. No. No, it doesn't.

MR. LOEVY: Okay.

THE COURT: But that's another issue for another day.

MR. LOEVY: Okay.

MR. GIVEN: And then one other thing, and we can bring it up at lunch or whenever --

THE COURT: Yeah.

MR. GIVEN: There was an exhibit that was introduced during Ms. McLaughlin's testimony. It was an exhibit that Mr. Swaminathan and I had -- were at issue over.

THE COURT: Okay.

MR. GIVEN: They had one version, we had another version. We didn't have a chance to bing it to Your Honor's attention to decide which version. It's about how to redact something.

MR. LOEVY: Can I hand both copies to Your Honor?

THE COURT: You can. But, you know, I'm thinking that I probably need to hear you on this and lunchtime would probably be a better --

MR. GIVEN: It's less than five minutes. It's your call --

THE COURT: Can we do it at lunchtime?

MR. LOEVY: It's not going to come up before lunch,

1189

right?

MR. ART:  Right.

MR. LOEVY:  Oh, then, why are we talking about it?

MS. ROSEN:  Let's do it at lunch.

MR. GIVEN:  I just wanted to bring it to her attention, that's all.

THE COURT:  That's fine.  We'll do it at lunch.

MR. SOTOS:  It could come up in the cross-examination of Wadas.

MR. LOEVY:  Your Honor, here's the issue:  There's two versions of the rap sheet I would you like to hand you.

THE COURT:  Sure.

(Document tendered to the Court.)

MR. GIVEN:  If I could see what you're giving her, Jon?

(Brief pause)

MR. LOEVY:  There's two versions, one has a bunch of black ink on it.  Our concern is --

MR. GIVEN:  It's been --

MR. LOEVY:  -- when you look --

THE COURT:  One person at a time.

MR. GIVEN:  Okay.  Go ahead.

MR. LOEVY:  There's two versions.  We used the one on top.  And, Your Honor, if we look at the succeed one, it has a lot of redactions in a different way.  So they're identical

documents and contents and substance.  We thought we had an understanding that we weren't going to draw attention by using a bunch of black ink.  There's no dispute about the substance or content, the only question is how you want to present it to the jury.

THE COURT:  Well, how do you want --

MR. GIVEN:  Can I respond, Judge?

THE COURT:  Well, you can.  Go ahead.

MR. GIVEN:  Thank you.  What they did was not just redacting manipulated the information, it's misleading.

THE COURT:  Well, that's why I want to talk about it.  We can talk about it at the break.  Who is this going to be -- what witness is this going to be used?

MR. ART:  Judge Wadas, Your Honor.

MR. GIVEN:  Judge Wadas.

THE COURT:  And when is he testifying?

MR. LOEVY:  This morning.

MS. ROSEN:  Probably later this morning, though.

MR. LOEVY:  What we did is, instead of having black boxes or giant white spaces which would invite jury speculation, when he --

THE COURT:  Well, you know, jurors -- I don't understand why we are detracting anything.

MR. GIVEN:  I'm going to hand it up.  This is a copy of the original and there are little boxes around it --

1191

THE COURT:  I have it.  I have it.

MR. GIVEN:  Right.  And I wanted you to be able to see what was actually redacted.

MS. ROSEN:  That's not the original, Judge.

THE COURT:  Well, you mean what plaintiff gave me is not the original?

MS. ROSEN:  Correct.

MR. GIVEN:  What he gave you was the exhibit that was entered with their manipulations and whiteouts --

MR. LOEVY:  Your Honor, you ruled that parts of Mr. Rivera's rap sheet are inadmissible because he had certain arrests that were admissible and certain that weren't.  You instructed us to redact --

THE COURT:  Now I'm hearing what this is about.  Thank you.

MR. LOEVY:  Right.  You instructed us to take out the prejudicial references that were not before the jury.  The only thing we're arguing about, Your Honor, is in what form it's presented to the jury.

THE COURT:  All right.  I get that.  Now, very quickly -- well, we don't really have time, but what has the plaintiff taken out of the original?

MR. LOEVY:  There's no dispute about what comes out or in, Your Honor.

MR. GIVEN:  Judge, I'm sorry, I can answer your

1192

question directly.

THE COURT: That would be useful.

MR. SOTOS: The thing I just handed you was the original with all the information on it there are little boxes around the information that was redacted.

MR. LOEVY: Your Honor, there is no dispute --

THE COURT: I can only hear one person at a time. The court reporter can take one person at a time. You're wasting my time by talking over each other.

Go ahead.

MR. GIVEN: The last document that I just handed you, Your Honor, is a copy of the original. And it has boxes, not blackout boxes, but it has it has little boxes around the information that's been redacted by both of us.

So in the very -- in the second box, do you see the word "robbery"?

THE COURT: Yeah.

MR. GIVEN: And it has a box around it. That's been redacted by both parties. We put a transitional redaction on it, and they took it out entirely and then moved --

THE COURT: That's what you're fighting about, whether it's taken out or --

MR. GIVEN: Yes.

MR. LOEVY: Yes. The substance is the same.

THE COURT: It does not matter, people. I will tell

the jury that this is information that doesn't relate to this case or it should be ignored by them and that's why we blacked it out. The blackout is fine. I don't see -- I mean, this is a fight over nothing.

MR. LOEVY: Well, Your Honor, we've been using the plaintiff's version. If we now use the one with black ink on it, it's going to draw undue attention to it. The substance is the same, you're correct. So can we use the one we've been using.

MR. GIVEN: Well, Judge, that's the problem, is that they introduced it when --

THE COURT: I know what you're fighting about --

MR. GIVEN: -- they new there was a dispute.

THE COURT: --- and it's trivial, people. It's trivial. We will use the one with the visible redactions.

You're using a different one? Have they had the other one?

MR. LOEVY: Yes, Your Honor. It's been on the screen.

THE COURT: All right. So I'm going to tell them there are two versions, one has black boxes and one we've just taken out the material; okay?

MR. GIVEN: Thank you, Judge.

THE COURT: It's not so complicated.

Hopefully they're not going to be focused on this trivial nonsense.

MR. LOEVY: We'll start using their version. We don't want to draw even more attention to it, Your Honor.

THE COURT: That's fine.

Okay. We're ready.

(Brief pause).

MS. ROSEN: Judge, do you want Dr. Wells on the stand?

THE COURT: Yes, Dr. Wells.

Sorry that we had to hold you here.

THE WITNESS: You need to swear me in?

THE COURT: No, I don't.

So this rap sheet will be used for Judge Wadas (indicating)?

MR. ART: Yes, Your Honor.

THE COURT: So I think I'll explain to them --

No? You don't want me to?

MR. LOEVY: Our preference is not to draw more attention to it, so just let it go.

THE COURT: Fine.

MS. ROSEN: Dr. Wells, I'm going to hand up to you again your report.

(Said item tendered.)

THE WITNESS: Okay. Thanks.

THE COURT SECURITY OFFICER: All rise.

(The following proceedings were had in the presence of the jury in open court:)

THE COURT: Good morning, ladies and gentlemen. Please be seated.

Ms. Rosen, as soon as you're ready.

MS. ROSEN: Thank you, Your Honor.

GARY WELLS, plaintiff's WITNESS, previously SWORN

CROSS EXAMINATION (resumed)

BY MS. ROSEN:

Q. Good morning, Dr. Wells.

A. Good morning.

Q. Just a couple of more areas to discuss this morning.

Now, it's true, isn't it, that resemblance identification is not an identification, correct?

A. Well, I mean, I think that's up to the -- the detectives. I mean, I think they need to use -- whatever they're using, they need to use the same system. But, I mean, it would go down as whatever the statement of the witness is.

Q. Okay. But if there's a notation in an investigative report that says that the individual looks like the perpetrator, that you would call a resemblance identification, correct?

A. I -- I wouldn't call it a resemblance identification. I'd say that the witness said, "Looked like."

Q. For purposes of coding if you're trying to do an archival study, isn't it true that you would say that the resemblance

identification is no identification at all?

A. I think that would be a typical way of coding it, yes.

Q. Okay. And you would code a tentative identification something like for purposes of coding when you're doing your archival studies, "It's number 3, but I can't be positive," or words to that effect, correct?

A. Well, I believe that's how these were coded, yes, into that tentative column.

Q. "Looks like number 3, but I can't be positive," words to that effect would be tentative in the coding in this case?

A. Well, I think it would be tentative if the detective wrote the report saying "tentative."

Q. Okay. So let's not talk about how the detective wrote the report. I want to know how you, as the searcher would code it if you were looking through the data and trying to code it as was done in this case with respect to the Chicago data; okay.

So can we focus there for a minute?

A. Okay.

Q. Okay. So in this case, right, you did not do the coding?

A. Right.

Q. You relied on Mr. Rivera's attorneys to do the coding, correct?

A. Yes.

Q. Okay. So as a researcher if you were to do the coding, if there was a statement in the report that said, this individual,

the perpetrator, or the filler, or whoever resembles the perpetrator, that would be something you would categorize as a resemblance identification and not an identification, correct? You wouldn't code it as an identification?

A.  Right, because -- I mean, I would have to look at the individual report, but, I mean, you're describing something where the detective's report never said it was an identification.

Q.  Correct.  It just says --

A.  Then I wouldn't say it was an identification.

Q.  So if it just says "looks like," that's not an identification?

A.  That's right.

Q.  Okay.

MS. ROSEN:  Let's take a look at City 190 just for Dr. Wells for the moment.

BY MS. ROSEN:

Q.  And if you take a look at the report, it's H 380013.  It's hard to see.  Actually, I'm looking at the wrong one.  I'm sorry.

It's M287641, do you see that on the first page?

A.  Yes.

Q.  You might see it a little more clearly on the second page because that's not a good copy.

Do you see it on the top there on the right, 287641?

A. Yes.

Q. Okay. And that's a rap sheet that was part of the data that was coded for you in this case, correct?

A. Yes.

Q. Okay. And then if you --

MS. ROSEN: At this time the City wishes to admit City 190.

MR. LOEVY: No objection, Your Honor.

THE COURT: It is received.

(City Exhibit 190 admitted into evidence).

MS. ROSEN: And if we could publish it to the jury.

THE COURT: Sure.

(Exhibit published to the jury.)

BY MS. ROSEN:

Q. And if we take a look at the first page of the report.

This is a lineup report that occurred on September 18th, 1989, at 1630 hours, do you see that there?

A. Yes.

Q. There's 3 people viewing the lineup, right?

A. Yes.

Q. Okay. And then if we look to the second page of the report, it says:

"The number one man, Clarence Roberts ..."

referencing one of the participants, "... was

identified by Terry Casaccio as looking like the

man, except that this man is clean-looking and the man who robbed us was dirty. This man has on a pressed shirt and his face is clean."

Do you see that?

A. Yes.

Q. Okay. So that is a "looks like" and you would code that - you wouldn't code it as positive ID because it's simply a resemblance ID, correct?

A. Well, that's not exactly the statement that you hypothetically gave me.

Q. So you would code this as a positive?

If you were doing the coding, Dr. Wells, would you code this in your data as a positive?

A. I would have to look at more of this report. I mean, I -- I -- I need the whole report. I wouldn't -- you know, we -- the coding here, and everything that when I would go in, I made sure I was looking at any supplementals, and so on and so forth. So I don't know just on the basis of this statement that -- that that was the only thing that was used in the coding. I don't yet know that. It might be.

Q. Okay. Let's take a look at -- can you tell from looking at the appendix, the data that was provided to you, whether or not the information was gleaned from what you called official reports versus ancillary reports?

A. Ah, there appears to be some information here. Ah, well,

let's see.  Well, so this is stated in the negative.

Under, "are results not in an official report, in the Lineup Report," and the answer is, "For one of these 3 witnesses, yes."  So there's information yet to be gleaned.

Q.  From --

A.  Out of that file.

Q.  Okay.  So let's move on to the next one, which is City 19 P.

THE COURT REPORTER:  19?

MS. ROSEN:  "P" like Paul.

BY MS. ROSEN:

Q.  I ask to take a look at this report, Dr. Wells, and it's H 376814.  Do you see that there?

A.  Yes.

Q.  Okay.  And this is a lineup that was conducted on August 26, 1986, at 2230 hours, right?

A.  Yes.

Q.  Okay.

MS. ROSEN:  At this time the City seeks to admit City 19 P.

MR. ART:  No objection, Your Honor.

THE COURT:  It is received.

(City 19 P admitted into evidence).

MS. ROSEN:  And if we could get this in front of the jury.

(Exhibit published to the jury.)

BY MS. ROSEN:

Q. So this is a lineup that occurred with one individual, Mr. Garcia, viewing the lineup. Do you see that on the first page of the report?

A. (No response.)

Q. Do you see that on the first page of the report, who the witness is that's viewing the lineup, Mr. Garcia?

A. (No response.)

Q. At the bottom of the page?

A. Yes. Yes.

Q. Okay. Now, if we go to the second page of the report, the person identified in the lineup, it says:

"Suspect, Pedro Martinez, was identified as the person who looks like the driver of the wanted vehicle. Martinez was not positively identified."

Do you see that there?

A. Yes.

Q. And if you were coding this document based solely on that information, would you call that a positive ID?

A. No.

Q. Would you call that a tentative positive ID?

A. No.

Q. Okay. So if you take a look at the table that you were

provided that was coded for you by Mr. Rivera's attorneys. It is page 58 in the Bates stamp.

A. Yes, I have it.

Q. Okay. And if you can tell us how that's coded?

A. I -- I can't without -- I need to go back to page 1.

Q. Okay. Go ahead.

A. No, I need go back to your page 1. I don't have this document in front of me.

Q. You don't have the table in front of you?

A. I've got the table, I need to go back to your page 1 of he report that you have --

Q. Oh, I'm sorry. I misunderstood. Yeah. Sure.

A. I need to know what time of day this was done.

Q. Sure. Absolutely. Go ahead. It's right there in front of you.

A. 2230, okay.

Now I need to lineup the headers because that's awkward in this document (laughing).

(Brief pause.

BY THE WITNESS:

A. You know what I mean about lineup up the headers --

BY MS. ROSEN:

Q. Yeah, I understand. It's hard to read it because the headers are only on the first page of the appendix and don't carry over.

But the tentatives if you count it over from either line "live" or "photo," that cell, tentative is 6 over.

So 6 over, do you see where it says "1"?

A. 6 over from which? From the right or --

Q. So if you look at the cell that describes either live or photo lineup, right. So that's an easy place to mark it.

A. Right.

Q. So "tentative" is the 6th cell to the right from that if you look at the headers on the first page of the appendix.

(Brief pause).

BY THE WITNESS:

A. Right.

BY MS. ROSEN:

Q. So that's coded in the document that was provided for you -- to you as a tentative positive, right?

A. It appears to be, yes.

Q. Yeah. Okay. And as we discussed yesterday, you included tentative positives in the numbers that you totalled for purposes of determining how many suspect identifications occurred in the Chicago data, right?

A. Right. So, you know, it went down another 1 out of that --

Q. Correct.

A. -- huge number. But, again, suspect identifications are not --

Q. Are not fillers. Right. I understand your point, is that

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 774 of 1254 PageID #:104905
Wells - cross by Rosen
1204

there's zero fillers.  But you also said that when look at that data, and you look at that 56 percent number of suspect identifications, that percentage is very large to you.  And you surmised yesterday that that meant that there were possibly, oh, I don't know 100 missing reports where lineups occurred and no documentation at all was made, right?  Did I understand you yesterday correctly?

A.  It wasn't based on that figure, no.

Q.  No?  It was based on some other figure that you surmised --

A.  I said it would bring down that -- it would bring down that figure if 100 fillers were found, but -- but that 56 percent, if you do the math, I mean, that's 540 or so.  If you came up with 10, that -- I mean, you come up with a couple that should have been suspect picks that weren't, and now you come up with maybe another 5 that maybe, maybe should not have been suspect picks that would, that doesn't even budge that 56 percent.

Q.  Okay.  So let's take a look at the table.  So table 1 from your report.

MS. ROSEN:  If we could just show it for the doctor.

MS. ROSEN:

Q.  Table 1, right, is the aggregate, the 11 studies that you looked at where you aggregated the totals as a way to compare the Chicago data, right?

A.  Yes.

Q.  Okay?

MS. ROSEN: At this time the City seeks to admit Table 1.

MR. ART: No objection.

THE COURT: Table 1 is received.

(City Exhibit Table 1, City 1 A admitted into evidence).

THE COURT: And you're marking it?

MS. ROSEN: It's City 1 A.

THE COURT: Thank you.

MS. ROSEN: So if -- can you just pull out the table.

BY MS. ROSEN:

Q. Okay. And this is -- you discussed this a little bit yesterday both on your direct and on your cross, this is the 11 studies that you relied on to come up with a total, the aggregate total that you used to compare the Chicago data, right?

A. Correct.

Q. And just to orient the jury a little bit. We discussed yesterday some of the particular studies, the Behrman & Davey studies, I think we talked about some of the others. And we talked about some are archival and some are perspective, right?

A. Yes.

Q. Okay. So if we look down the table, just taking it from top to bottom, the Behrman & Davey study, that's an archival study, right?

A.   Yes.

Q.   At the top.

     And that's where the researchers looked at pulled data, police reports, and then coded them, correct?

A.   Yes.

Q.   And do you know whether or not Behrman & Davey did the coding themselves, meaning that they personally or at their direction have the coding from the police reports done?

A.   I -- I -- I don't know.  I'm -- I'm guessing they had -- might've had graduate students do it.

Q.   They didn't have plaintiff's attorneys doing it, right?

A.   No.

Q.   Okay.  And I think the Behrman & Davey study is the one where the photo identifications were excluded because the reports were too ambiguous to be improperly coded, do I have that, right?

A.   Right.

Q.   And then with respect to the Behrman & Davey study, the suspect identifications that they found from their archival study was 50 percent, right?

A.   Right.

Q.   Okay.  And then Behrman again did another archival study, that the Behrman & Richards study in 2005, is that right?

A.   Right.

Q.   And do you know were any of the police reports, that was

archival?  I'm sorry, did I ask that already?  I might have.

A.  Yes.

Q.  And those police reports, do you know if any of those were discarded because they were too ambiguous, or for any other reason?

A.  No.

Q.  And the total --

A.  I know that they were not.

Q.  They were not.

So everything that they -- what police department were they looking at?

A.  They -- they just stepped out the City of Sacramento and did surrounding areas in Sacramento County and a couple of other counties in northern California and had no difficulty scoring fillers.

Q.  Okay.  So that police department -- and do you know what -- what years the data was coming from?

A.  Not off the top my head.

Q.  Okay.  So that police department did reports sufficient so that they could --

A.  There were multiple police departments they used.

Q.  Oh, Okay.  So the multiple police departments they used, the data was sufficient for them to code it, right?

A.  Yes.

Q.  And that was -- the total number of possible ID's was 461,

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 778 of 1254 PageID #:104909
Wells - cross by Rosen
1208

right?

A.  Yes.

Q.  And in that archival study, the suspect identification percentage was 51.6 percent?

A.  Right.

Q.  Okay.  And then if we go down to the Horry, Halford & Brewer study in 2014, that also was an archival study, right?

A.  Yes.

Q.  And total number of possible ID's there was 833, right?

A.  Yes.

Q.  And we don't know -- or do you know was there any other data eliminated either because it was ambiguous, or it was familiar perpetrator, or anything like that?

A.  Apparently not or they would've noted it.

Q.  Okay.  And in that study, the suspect percentage identification rate was 45.9 percent, right?

A.  Correct.

Q.  Okay.  And hen if we go to Horry, Memon & Wright, that's a 2012, was that archival?

A.  Yes.

Q.  Okay.  And they had 1039 possible identifications, and they found the suspect percentage rate at 39.1 percent, right?

A.  Yes.

Q.  So already down the four lines, we see variation, right, in the suspect identification rates?

A. Oh, yes.

Q. Within each of the studies right?

A. Sure.

Q. And do you know, did the Horry study discard any of the information or not utilize any of information because it was ambiguous in some way?

A. I don't believe so. They would've said so.

Q. Okay. And the Klobuchar study, that's the one we talked about yesterday where the phenomenon about familiar perpetrator rates that the suspect identification rate in those circumstances jumped to either 91 or 96 percent, right?

A. Right.

Q. Okay. And in that data that's listed here, though, that familiar perpetrator data was eliminated, right?

A. Yes.

Q. So when you eliminate the familiar perpetrator data out of these number 178 possible ID's, the suspect identification rate is 35.4 percent?

A. Yes.

Q. Do you know how many were eliminated due to familiar perpetrator?

A. I don't know. It's a relatively small number, but they had a small number of cases to start with.

Q. Right.

A. And so it could have a big impact, so they needed to get

them out of there.

Q. Okay. The Memon & Havard study, that is also another archival study, right?

A. Yes.

Q. 1044 possible ID's with suspect identification rate of 43.7 percent, right?

A. Yes.

Q. And did that one -- did the Memon study, I can't remember, eliminate familiar perpetrator data?

A. Ah --

Q. You said --

A. I think they tried to, as well as they could.

Q. Okay. And the Valentine & Pickering study, another archival study, right?

A. Yes.

Q. They, too, eliminate the familiar perpetrator data, right?

A. Yes.

Q. And there you had a number of 584 possible ID's and got the suspect identification rate at 44.6 percent?

A. Yes.

Q. And then the Wixted study, that's a prospective study, right?

A. Yes.

Q. So that was the researchers actually contemporaneously involved with the law enforcement agency when the lineups were

occurring and standardizing the identification procedures and the data collection, right?

A.  Yes.

Q.  So that's -- that's a completely different type of study that gives you much more information for your purposes than any of the archival studies do, because you're actually collecting information as you, as researchers, want them, not as a law enforcement agency might, right?

A.  Yes.

Q.  And in the Wixted study, there were 348 possible ID's, and that suspect identification rate actually is 32.8 percent, right?

A.  Right.

        MR. LOEVY:  Your Honor, could we object to relevance, or maybe covered, or asked and answered?

        THE COURT:  Well, you know, counsel, how much more do you have?

        MS. ROSEN:  Just couple of more.

        THE COURT:  Go ahead.  We're moving far afield to what the doctor testified to yesterday.  But go ahead.

BY MS. ROSEN:

Q.  With respect to the remaining studies there, the Wells -- your study, we talked about that one yesterday, right?

A.  Yes.

Q.  And then the Wright & Skagerburg study, was that another

prospective or was that archival?

A. Yes, that was prospective.

Q. Okay. And did they eliminate -- well, when you do the prospectives, what do you do with the familiar perpetrator? Do you categorize that separately?

MR. LOEVY: Same objection.

THE COURT: I'm going to overruled it, but you're close.

MS. ROSEN: I am.

THE COURT: Have two or three questions away.

BY THE WITNESS:

A. You -- you just sort them out of the data.

MS. ROSEN:

Q. Right. And you want to isolate that, right?

A. Right.

Q. Okay. And here, you didn't isolate that, right? It wasn't isolated for you, I guess, right? The familiar perpetrator data?

A. They just didn't include familiar perpetrators. Wright & Skagerburg, just didn't include them.

Q. No, I'm say -- I'm sorry. My question wasn't clear. In the Chicago data, the familiar perpetrator data was not sorted or isolated for you, correct?

A. Right.

Q. So you don't have those numbers, correct?

A. Correct.

Q. Okay. Now we're just about wrapping up here.

Let me ask you, you have worked with the attorneys that represent Mr. Rivera with Mr. Loevy and his firm three or four times, and Mr. Bowman and his firm once or twice, correct?

A. Yes, I guess. I mean, I'm not sure -- I'm not -- I'm not sure I can confirm three or four or the one or two.

Q. Well, that was --

A. I have worked -- I have worked with Mr. Loevy's firm before. Ah -- ah -- I -- ah, I don't know if I've worked with Mr. Bowman's firm or not.

Q. Have you worked with Mr. Bowman? I think at your dep you said you thought you worked with Mr. Bowman once or twice?

A. You know, I've met him, I known him, we've interacted. I -- I wouldn't be surprised if I had worked -- had worked with him.

I mean, I can tell you this, before the trial started he came up to me and I didn't know who he was, but I recognized the name. I know he has some association, I think, with Northwestern.

Q. Okay. Just a couple more questions.

You would agree with you, wouldn't you, Dr. Wells, that eyewitness memory is malleable?

A. Yes.

Q. And that improper techniques can cause people to have false

memories?

A.   Yes.

Q.   Suggestion of facts are stronger when memories are weak?

A.   Yes.

Q.   And you would agree with me that memories can be weak if the length of time between the event and the later questioning is long?

A.   Yes.

Q.   And possible for someone to gain a false memory from an interviewer.  Even if the interviewer is not acting intentionally, the false memory can still be implanted, correct?

A.   That can happen.

        MS. ROSEN:  I have no further questions.

        MR. GIVEN:  Judge, just a few.

        THE COURT:  Yes.

                CROSS EXAMINATION

BY MR. GIVEN:

Q.   Good morning, Dr. Wells.

A.   Good morning.

        MR. GIVEN:  Good morning, ladies and gentlemen.

BY MR. GIVEN:

Q.   Yesterday you mentioned the double-blind lineup procedure --

A.   Yes.

Q.  -- that you referred to as probably the greatest accomplishment in your life, do you remember that?

A.  Right.

Q.  And you said you think that about 50 percent of law enforcement agencies around the country now use that procedure, correct?

A.  I think the figure is higher.  It's almost 50 percent of States now require it.

Q.  Okay.  And I just want to be clear, there's no opinion in your expert report in this case about the use or non-use of the double-blind procedure in the 1988 Valentin investigation, correct?

A.  I -- I didn't even come up with -- I came up with the idea of double-blind, but I didn't come up with it until 1988.

Q.  Well that's not my question --

A.  So I did not consider a relevant criticism that they didn't use it in 1988.

Q.  You absolutely anticipated my next question, but I just wanted to be clear that we get an answer to my first question, which is that there is no opinion in your report in this case about double-blind procedures, correct?

A.  The word "double-blind" I doubt even appears in my report.

Q.  In fact, it does not.

And anticipating what I was about to ask you:  In fact, you introduced the concept of the double-blind procedure

in 1988, correct?

A.  That's right.

Q.  Okay.  And you know hat the investigation in this case occurred in 1988, right?

A.  I do know that.

Q.  Okay.  And last, I just want to be sure after listening to your testimony yesterday afternoon and this morning, your expert report in this case does not express an opinion that a filler was picked in this case, correct?

MR. LOEVY:  Objection, Your Honor.  That's way beyond the scope of what he was allowed to do.  If he wanted an opinion on that --

MR. GIVEN:  In fact, Judge, that is a misstatement.

THE COURT:  Well, I don't know.  I don't have any idea there was no --

MR. LOEVY:  Are they asking for his opinion on whether a filler was picked?

THE COURT:  I don't know.  You are asking whether that was part of opinion in this case?

MR. GIVEN:  I was confirming that his expert report in this case does not express an opinion that a filler was picked in this case.  And, in fact, I have that from his deposition, if I need to --

MR. LOEVY:  Same objection.

THE COURT:  Well, I'd have to read the whole report

and --

MR. GIVEN:  It's a simple question.  It's a "yes" or "no."

THE COURT:  Do you want to talk at sidebar?

MR. LOEVY:  Let's not talk at sidebar.

I'll withdraw it --

MR. GIVEN:  Judge, you know what?  I withdraw it.

THE COURT:  Okay.

MR. LOEVY:  -- and let's keep going.

THE COURT:  All right.

MR. GIVEN:  So we both withdraw at the same time.  I'd rather have my question answered.

THE COURT:  Go ahead, then.

BY MR. GIVEN:

Q.  No opinion in your report in this case that a filler was picked back in 1988, correct?

A.  That's correct.  I -- I was not retained to say -- to have any opinion in -- and you'll see no opinion in my report, I say nothing about this case in my report.

MR. GIVEN:  I have no other questions.

THE COURT:  Okay.  Anything further from the defense?

MR. LEINENWEBER:  No, Your Honor.

THE COURT:  Okay.

MR. ART:  Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. ART:

Q. It was not your function in this case to opine about the facts of Jacques Rivera's case, correct?

A. It was not my function.

Q. Okay. You were asked a number of questions on many different topics yesterday afternoon. At any time did anyone show you a single example of a recorded filler identification in the City of Chicago data?

A. No.

Q. Did any of the questions you were asked on cross-examination change in any way your opinion about the rate of zero filler identifications in the City of Chicago?

A. No.

Q. You were asked about what's happening in other police departments, and specifically the Tollestrup study of Vancouver, do you recall those questions?

A. Yes.

Q. How unusual is it for a police department simply to not record filler identifications?

A. Well, we only know of a couple of cases, and that's that Vancouver suburb, and then for some reason the City of Sacramento, although not the County.

Q. Okay. Other than the City of Sacramento, have you ever heard of an American City that just doesn't record filler

identifications?

A.   Not as a practice.  I could imagine it happening on a given case.  I mean, it's not like it's probably never happened, but not as a practice so that you couldn't even go in and score the files.

Q.   Okay.  Yesterday Ms. Rosen emphasized that eyewitness identification science develops as we grow and learn new things, do you recall that questioning?

A.   Yes.

Q.   Even in 1988, were there reasons to question the accuracy of eyewitness identifications?

A.   Definitely.

Q.   And in 1988, did science tell us that factors like youth, stress, distance, short-viewing opportunities, reduce the accuracy of eyewitness identifications?

        MS. ROSEN:  Objection.  Beyond the scope.

        MR. ART:  It's responsive to the questions asked yesterday about developing science.

        THE COURT:  Overruled.

BY THE WITNESS:  Yes.

BY MR. ART:

Q.   In 1988 would any police officer have known about this is factors?

        MS. ROSEN:  Objection, Judge; foundation.

        THE COURT:  Sustained.

BY MR. ART:

Q. Ms. Rosen also asked you questions about the City's written policy, we discussed that as well. Do you recall the questions on cross-examination?

A. Yes.

Q. With respect to reporting filler identifications, is there anything wrong with the City's policy as it is written on the paper?

A. No.

Q. Is the practice on the street in the City of Chicago the same as the policy on the books?

A. Well, according to the City's own spokesperson on this, it's dramatically different.

Q. And what about what you viewed in the data?

A. And that data are not at all consistent with the policy.

Q. If this -- if the Chicago Police Department followed the policy as the text is written, would there be a problem with filler identification recording?

A. Well, we would be able to get in there and count them, we would see them, and, you know, presumably we would be producing some kind of number that was comparable to what you find in other jurisdictions.

Q. In your view, would it be a pretty good policy if it was actually followed?

A. It would. I mean, at least that element of the policy.

Q.  You were asked a lot of questions about the plaintiff's attorneys preparing the data for your review, do you recall those questions?

A.  Yes.

Q.  You said at one point that you used graduate students for that sometimes, is that right?

A.  Yes.

Q.  Explain why you do that.

A.  Well, to not have to do it ourselves (laughing).

Q.  Okay.  So is it common that you do that sort of thing in your field?

A.  It is.  You know, you also -- you spot-check.  You look for things that might, you know -- and then, you know -- and -- but, I mean, it depends on how straightforward the coding is. I mean, if it's really quite straightforward, you need two people looking at it, and it's very mechanical, then -- then you can put almost anybody on the task.

Q.  Even a plaintiff's lawyer?

A.  Well, even a plaintiff's lawyer, I suppose.

Q.  Okay.  So did you charge in this case by the hour?

A.  Yes.

Q.  Would it have been efficient in any way for you to code all 980 lineup attempts?

A.  Well, that would've been -- first of all, I wouldn't have done it.  I just -- life is too short to sit down and do all

that coding.  I've got better things to do.  I have more, you know, writing, and so-and-so forth.  But it's just -- it's not necessary that you have an expert coding such routine data.

Q.  Okay.  We went over some of the errors in the coding during your cross-examination.  I believe Ms. Rosen pointed out three to five errors in how things were recorded.  Do you recall those questions?

A.  Yes.

Q.  Showing you --

MR. ART:  If I could get the Elmo, please.

BY MR. ART:

Q.  Showing you what has been marked and admitted as Plaintiff's Exhibit 150.

One of the mistakes that Ms. Rosen pointed out was this row here (indicating), which I put a box around where there appears to be no suspect in the lineup, do you see that?

A.  Yes.

Q.  And she said, "Obviously there has to be a suspect in the lineup," right?

A.  Yes.

Q.  Okay.  So showing you what has been marked as Plaintiff's Exhibit --

MR. ART:  And, I guess, we should do this not on the jury's screen for now.

THE COURT: Okay.

BY MR. ART:

Q. What's been marked as Plaintiff's Exhibit 154G.

Does that appear to be the same RD number here on the side and data report as this row of data (indicating)?

A. Yes.

Q. Okay.

MR. ART: We would move admission of Plaintiff's Exhibit 154G.

MS. ROSEN: No objection.

THE COURT: 154G is received.

(Plaintiff's Exhibit 154G admitted into evidence).

BY MR. ART:

Q. Okay. So in this Lineup Report that Ms. Rosen pointed out to you, how many people are standing in the lineup?

A. Four.

Q. Okay. What does it say about the number of identifications made?

A. No identification was made.

Q. All right. What does it say about who's the suspect?

Does it say anything?

A. No.

Q. In fact, at the bottom here it says:

"Subject 2, Larry Minfeld, was present on the bus when she overheard a conversation."

Right?

A. Yes.

Q. It doesn't say that that person was the suspect in the crime?

A. No.

Q. Okay. Do you recall whether there was any information in this file about who the suspect was?

A. Not unless it was some other part of the file, but --

Q. Okay. If there was no information about who the suspect was, how would you code how many suspects in the lineup?

A. Well, you -- you simply -- you either couldn't code it, or, you know, you put in a zero, I guess.

Q. So some of these -- some of these coding errors may actually be errors, correct?

A. They it could be. Sure.

Q. If there are three to five of them, what does that change about the data that you looked at?

A. Nothing. I mean, they could've -- you could've shifted any three to five and it's not going to impact the nine, the pattern and the overall 980.

Again, I would be especially interested in finding instances where that zero filler becomes some real number, but that never happened. So, I don't know, some -- some of these

errors almost cancelled out. I mean, there are a couple that should've been coded the suspects picks that weren't. There were maybe three or four that maybe should -- perhaps should not have that were. You know, that means that you really only changing that number by three. It's three out of, you know, 500-and-something on suspect picks, that has no real impact on the percentage.

So, I guess, you know, there's always a little bit of error. I mean, there's no such thing as a relatively large dataset that is completely free of error.

Q. Has anyone at any point in time during this case pointed out to you any error or set of errors that causes you any concern about your conclusions?

A. No.

Q. Has anyone ever said to you, "Here's a report that shows the recording of a filler identification"?

A. No.

Q. Okay. You were asked some questions about redacted reports, do you recall those questions?

A. Yes.

Q. First, was it the City who redacted those reports?

A. Yes.

Q. Okay. Did we extract the data from those files that we could?

A. Yes. It appears so.

Q. And do you acknowledge that it's difficult to extract data from some of those files?

A. Yes.

Q. Okay. So suppose we excluded --

A. The redacted files you're talking about?

Q. Yes. The redacted ones.

Suppose we excluded all 18 redacted files, any change to your conclusions?

A. No.

Q. Please explain why.

A. Well, it doesn't change the fact that there's zero filler picks. The redacted files aren't really driving much any of the numbers. It's just -- it's just too -- too small of a number.

Q. Okay. You were also asked questions about familiar perpetrator ID's, do you recall those questions?

A. Yes.

Q. You said a familiar perpetrator is like someone you used to go to school with, right?

A. Yes.

Q. So if I went to school with Jon 10 years ago and I said, you know, in an identification procedure "Hey, it's Jon," that's a familiar perp ID, right?

A. That's a familiar person. You can name them. There's some factual basis for the fact that there was prior familiarity.

Q. Okay. Is it the same thing when a witness -- just assume hypothetically that this happened, but the witness says, "I might've seen that person before in the park," is that a familiar perp ID?

A. You can't code that as a familiar perp ID because, first of all, we didn't know who they saw in the park. It may or may not be the same person that they're talking about now. The confusion could've occurred right then.

So, you know, if they see a person later engage in some criminal act and say, "Yeah, I've seen that person in the park," that doesn't make a familiar person ID.

They may just simply be confused about that, about that familiarity.

Q. Okay. And do --

A. You need -- you need factual grounds for familiarity, "I can name the person. I went to school with the person. I can tell you the person that I'm talking about, that I'm familiar with lives in that building right there," that's a familiar person situation.

Q. Okay. And so if a witness says, you know, "In fact, I've never seen this person before in my life. I never knew him before," that person can't have made a familiar person ID in the past, right?

A. Right.

Q. Okay. As far as your data or the data you looked at is

Wells - redirect by Art

1228

concerned, what would removing the familiar perpetrator cases do to that data?

A. Well, the familiar perpetrator cases that were shown to me were just too trivial of a number to have an impact. And, again, the only impact would be to reduce those -- the number of those accurate ID's.

Again, if you pull them out, it not only changes the number of suspect ID's, but it changes the denominator. So it's not even equivalent to pulling out a suspect ID and keeping everything else the same. The denominator changes as well. So it's not out of 980 anymore. And so it tends to hold a similar percentage. It's just a trivial impact.

Q. Okay. Does it have any perceivable impact on the rate of filler identifications?

A. No.

Q. Okay. You were also asked questions about tentative identifications, do you recall those questions?

A. Yes.

Q. And we reviewed the data. And you see tentative identifications as we coded it in about 5 percent of cases, right?

A. Yes.

Q. Do you have any reservations about categorizing an identification as an identification even if there is some language about it being tentative?

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 799 of 1254 PageID #:104930
Wells - redirect by Art
1229

A. No. And one reason is because there are ways in which things happen that turn that tentative into positive. I mean, an identification, even low confidence or tentative, tends to become more positive over time. So if, you know, calling it -- you know, it's an identification or it isn't for purposes of this kind of category.

Q. Okay. On that subject, is there a risk that the term "tentative identification" can you abused by police?

MS. ROSEN: Objection, Judge.

MR. ART: I'll withdraw it and keep moving, Your Honor.

BY MR. ART:

Q. You were asked questions about whether you worked with Loevy & Loevy law firm and Mr. Bowman before, do you recall that?

A. Yes.

Q. You do a lot of work in the wrongful conviction world, correct?

A. I do.

Q. And that brings you to Chicago sometimes, does it not?

A. Yes.

Q. Is it possible that you've worked with him on wrongful conviction cases in the past but you can't recall as you sit there?

A. I'm pretty much I have. I mean, most of the people who are

deeply into the wrongful conviction problem, I've done some kind of work with, yes.

Q. Okay. Consider everything Ms. Rosen showed you during the cross-examination, all right. All the different reports and categories of identification. Is any -- does anything that she showed you change in any way the fact that zero filler identifications are recorded in the City of Chicago's data?

A. No.

Q. Now, the jury has heard the stipulation. They've heard this is a representative sample. What does that mean in terms of being able to draw conclusions about what this data that you looked at means for the rest of lineups occurring all across the City of Chicago?

MS. ROSEN: Objection, Judge. Beyond the scope.

THE COURT: Overruled.

BY THE WITNESS:

A. Well, it appears that -- that at least during that period of time, and maybe, you know, a much broader period of time, but at least for that period of time there was a practice of avoiding, writing any kind of report that would ever tell anyone that a witness had picked a filler.

Q. And that was across the entire City, correct?

A. And so, you know, given the stipulation, it must be true across the City. They're all working presumably under the same practice.

Q. Is the fact that there's zero filler identifications in this context, is "zero" a special number?

A. A zero is a special number, because, I mean, you know, if it were 10 percent, 12 percent, 20 percent, you know, maybe some of these other kinds of explanations, maybe there is some other level of explanation. They use an awful lot of suspects per filler in these lineups. But "zero" indicates that there is something systemic in the -- in the practice of, you know, explicitly doing whatever possible to use any kind of language or approach to never say that an eyewitness ever mistakenly identified a filler from a lineup.

Q. Thanks, Dr. Wells.

MR. ART: Nothing further.

THE COURT: Ms. Rosen?

MS. ROSEN: Yes. I will be brief.

RECROSS EXAMINATION

BY MS. ROSEN:

Q. Dr. Wells, Mr. Art asked you some questions about any other law enforcement agencies who documented filler identifications as no identifications. And you indicated that the only ones are the Tollestrup one and the Sacramento photo lineups from the Behrman study, right?

A. The only ones that -- that I'm clearly aware of, yes.

Q. Isn't it true in your study on double-blind lineups you note:

Wells - recross by Rosen

1232

"... for example, researchers using archival methods have noted the failure of --"

THE COURT REPORTER: I'm sorry.

BY MS. ROSEN:

Q. I'll slow down:

"... for example, researchers using archival methods have noted the failure of lineup administrators reports to document filler identifications, citing Behrman & Tollestrup. Documentation of the witness's responses, of course, should be independent of whether they identified the suspect or identified a filler. And yet, as shown recently in controlled experiments, non-blind administrators tend to faithfully report all suspect picks, but not filler picks. Whereas double-blind administrators, faithfully report both suspect and filler picks citing to Rodriguez & Barry 2014. Moreover, a recent national survey of U.S. law enforcement agencies indicated that 37 percent of agencies do not prepare lineup reports if the witness does not pick the suspect, citing to the Police Executive Research Forum in 2013. Hence, accurate records of suspect picks, filler picks, and

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 803 of 1254 PageID #:104934
Wells - recross by Rosen
1233

non-identifications are particular problematic for Field Studies that use archival methods going back through case files and for other Field Studies that do not involve non-blind administration."

Those are your words, correct?

A.  Those -- those are my words.

Q.  And the reason that you didn't look through the Chicago data yourself and didn't hire grad students to go through the data at your direction with communication about how it was to be coded is because you had better things to do and life is too short, correct?

A.  I gave a very long answer at my deposition, as you may recall.  I'd like to give that one.

Q.  Go ahead.

A.  My answer at my deposition was, I believe that with a very big and strong defense team, any errors that are in this coding would be revealed.  If there are filler ID's in there that the plaintiff's team missed, you will show them to me.  That's what I told you in the deposition.  So there's a checks-and-balances in this system.  Not only did I go in and do some spot-checking, but now there's a very powerful and very expensive defense team that can --

MS. ROSEN:  I move to strike that, "very expensive."

MR. ART:  Judge -

BY THE WITNESS:

A.   -- that can -- hat can address these issues.

THE COURT:   You want to strike "expensive"?

MS. ROSEN:   Yes, "expensive."

THE COURT:   "Expensive" will be stricken.

BY MR. GIVEN:

Q.   You're aware, Dr. Wells, don't you, that it's plaintiff that has the burden of proof in this case and not the defendants?

A.   That's -- of course, I'm aware of that.  Actually, I think it's a balance of probabilities in a case like this.

Q.   But it's their burden?

A.   Well, I don't know.  I mean, it's not a criminal case.  I'm not sure I'm -- that language is not language that I apply to a civil case.

Q.   Okay.  That's fine.

A.   I mean, are you --

Q.   That's all right.  Don't worry about it.

A.   Are you testing me on my knowledge of civil versus criminal law?

Q.   No, I'm not at all.

A.   Okay.

Q.   I'm not at all.

A.   Okay.

Q.   The question I have for you, though, is, you're content to

rely on the data not knowing whether or not it's accurate and coded to your standards, because it's up to the defendants to poke holes in it, that's what you're saying, right?

A.  I'm actually more confident now in the accuracy of this data than I was when I began.

Q.  Of course you are.

MS. ROSEN:  Thank you.  I have no further questions.

MR. GIVEN:  Nothing more, Your Honor.

FURTHER REDIRECT EXAMINATION

BY MR. ART:

Q.  Why are you more confident now?

A.  For the reason I indicated.  They've had this for -- they've had this data for -- for a couple of years, at least. They have every file.  They have plenty of resources to show that there's some errors.  The errors that were shown were trivial, questionable, and have no impact on my conclusions.

Q.  Well, right, but more importantly, has anyone ever held a piece of paper up to you from any of these thousands of files and said, "This is a filler being identified"?

A.  No.

Q.  Okay.  You were asked about other jurisdictions.  You've trained police officers in dozens of jurisdictions, right?

A.  Yes.

Q.  Hundreds of departments, correct?

A.  Right.

Q.  Have you ever seen this problem before?

A.  I have not.

MR. ART:  No further questions.

THE COURT:  Anything further?

MS. ROSEN:  I have one.

FURTHER RECROSS EXAMINATION

BY MS. ROSEN:

Q.  Those files that Mr. Art just talked to you about, you've had them for a couple of years too, right?

A.  Yes.

MS. ROSEN:  I've no further questions.

MR. ART:  Nothing further.

THE COURT:  Thank you, sir.  You may step down.

THE WITNESS:  Thank you.

(Witness excused.)

MR. SWAMINATHAN:  Plaintiff calls Guillermo David Osorio.

THE COURT:  I think this may be our witness?

MR. SWAMINATHAN:  Yes.

THE COURT:  Sir, if you would come right down here, please (indicating).

Please raise your right hand.

(Witness duly sworn.)

THE COURT:  You may be seated.

DAVID D. OSORIO, PLAINTIFF'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. SWAMINATHAN:

Q.  Sir, please tell us your name.

A.  My name is Guillermo D. Osorio.

Q.  Are you currently employed?

A.  Yes.

Q.  And where do you work?

A.  I work for Safe Haven.

Q.  Can you tell us what that organization does?

A.  It's a non-for-profit.  We deal with homeless veterans.  We help them get back off the street, find them jobs, and get them housing.

Q.  How long have you worked there?

A.  I've been there for about a year and a half.

Q.  And where did you work previous to that?

A.  Build, Inc.  It's a non-for-profit.  I was there for 17 years.

Q.  And just tell us briefly what kind of work did Build, Inc., do?

A.  Basically we work more with the young people, with the court system.  Making sure that the juveniles that were getting released from the juvenile department came back and we help them get back to school, back in the jobs, trades, whatever we can to help them succeed.

Osorio - direct by Swaminathan

1238

Q.  I think you might've said this but I wasn't clear, how long did you work at Build, Inc.?

A.  17 years.

Q.  Did you work or interact with police officers at all when you worked with Build, Inc.?

A.  Yes; basically I ran sport leagues with adults, and I used to work with the commanders for the districts to get their teams together to play against the community teams.

Q.  Have you ever worked for the City of Chicago?

A.  Yes.

Q.  Tell us where you worked for the City of Chicago.

A.  I worked with the Mayor's Office of employment and training for 5 years.

Q.  Did you enjoy working for the City?

A.  Yes, I did.

Q.  I want to take you back to 1988.  Did you know Jacques Rivera at that time?

A.  Yes, I did.

Q.  How did you come to meet Jacques Rivera?

A.  I started working at Humboldt Park Institute.  Jacques was one of the people that started working there in the recruiting young people in the programs.

Q.  And did you know him in any other capacity other than at the Humboldt Park Institute?

A.  He was a friend of my girlfriend at the time who became my

wife a couple of years later.

Q. What was her name?

A. Ida Serrano now.

Q. Are you still with Ida?

A. No, I'm not.

Q. And Humboldt Park Institute you mentioned, what kind of work did the Humboldt Park Institute do?

A. Basically it was more like a GED program. We get young people in the community or adults getting their GED, getting back to college.

Q. In that timeframe, would you see Jacques Rivera often?

A. Yes, I did.

Q. And you said you knew him in some way through your wife. Where would you see him, in terms of your personal life, outside of work?

A. Basically when I moved in the neighborhood, when I got married, he was friends with my brother-in-law and my wife, and he'd come over.

Q. He would come over to your house?

A. Yes.

Q. What would he do when he came over to you house?

A. You know, hang around my brother-in-law, sometimes get haircuts from my wife because she was going to school as a beautician.

Q. And what about at the Humboldt Park Institute, what kind of

work did Jacques Rivera do there?

A. He recruited young people into the programs, and we also started a rec center across the street from the institute. And he was in charge of working with the kids, with the young people in the gym.

Q. Now, in 1988 were you still working at the Humboldt Park Institute or did you move to another job?

A. I started with the City I think in '85, but I was still working with the Institute because I lived like a few blocks away. And to sign the checks off for the workers, they had two signatures, and I was one of the people that was able to sign off.

Q. So in 1988, were you still seeing Jacques Rivera at the Humboldt Park Institute even though you'd left that position?

A. Yes.

Q. Back in 1988, would you say Jacques Rivera was someone you knew pretty well?

A. Yes.

Q. And between work and home, did you see him regularly then?

A. Yes, he was still around the neighborhood. I see him in the center. And yes, we talked.

Q. And at that time did Jacques Rivera ever dye any part of hair gold or blond?

A. Never.

Q. Have you ever seen Jacques Rivera with any part of his hair

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 811 of 1254 PageID #:104947
Osorio - direct by Swaminathan
1241

dyed gold or blond?

A. Never.

Q. And you said earlier that your wife cut his hair, correct?

A. Yes.

Q. Was she a stylist?

A. Yes.

Q. She did that at your house, right?

A. Yes.

Q. Did your wife ever dye hair? Was that something she did?

A. No.

Q. I'm going to show you a photo. This is Plaintiff's Exhibit 62. It's in evidence. Will show this to the jury.

(Exhibit published to the jury.)

BY MR. ART:

Q. Do you see that on your screen, sir?

A. Yes.

Q. Do you recognize this person?

A. Yes.

Q. Who is that?

A. That's Jacques Rivera.

Q. Is that how he looked approximately in 1988?

A. Yes.

Q. Now, I want to be clear. We were talking about Jacques Rivera in 1988. Do you have a perfect memory of exactly how Jacques looked in your mind, and what his hair looked like, and

those kinds of things in 1988?

A. At that time we all wore our hair that style. So that's the kind of hair style I had.

Q. Okay. But in terms of exactly what color it was, and exactly how long it was, and exactly how he wore his facial hair, are you claiming to remember all that?

A. Not 100 percent, but yes.

Q. Okay. But you said a lot of people wore their hair in a certain style. Was this idea of having gold tips in your hair, would that have been distinctive to you in 1988?

A. Yes.

Q. And if Jacques Rivera had had this kind of hair style in 1988, do you think it's something you would've remembered?

A. Yes.

Q. And is is something you remember ever seeing?

A. Never seen him wear hair that color.

Q. Now, I want to just ask you this, you said Ida cut Jacques Rivera's hair, correct?

A. Yes.

Q. Do you know whether anybody else every cut Jacques Rivera's hair?

A. Don't know.

Q. Okay. And if other people cut his hair, would you know or you wouldn't know?

A. I wouldn't know.

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 813 of 1254 PageID #:104944
Osorio - direct by Swaminathan
1243

Q.  And exactly how they cut his hair, and what they did with it, would you know or you wouldn't know?

A.  I wouldn't know.

Q.  Okay.  Based on what you saw, you never saw him with his harried dyed, is that right?

A.  Never.

Q.  I want to ask you about something else.

At the time you knew Jacques Rivera back in 1988, did he play baseball at Humboldt Park?

A.  No, he didn't.

Q.  Did you play baseball?

A.  Yes.

Q.  Tell us about your experience with baseball back in those days.

A.  I played from little league all the way on to college.  And through the youth programs I worked with throughout my years, I coached, managed, and ran sports leagues throughout Humboldt Park and all around the City.

Q.  Did you ever play baseball with Jacques Rivera?

A.  No.

Q.  So are you able to confidently say that Jacques Rivera was not someone you ever saw would be playing baseball?

A.  No.

MS. ROSEN:  Objection.

Osorio - direct by Swaminathan

1244

BY MR. SWAMINATHAN:

Q. How do you know that?

MS. ROSEN: Objection; foundation.

THE COURT: Sustained to the form of the question.

BY MR. SWAMINATHAN:

Q. How do you know Jacques Rivera did not play baseball back in 1988?

A. When the guys used to get together to play baseball, they would come around the house to play. And he was out there, and when he got the ball and threw it, he kind of threw it like a girl, and the guys would try and make fun of him.

Q. My wife does baseball better than me.

But my point is, you're saying he wasn't very good?

A. Yes, he wasn't very good.

Q. Is that something he got made fun about?

A. Yes.

Q. Sir, did you testify at Jacques Rivera's criminal trial in 1990?

A. Yes.

Q. Have you had a chance to review your testimony from that criminal trial?

A. Yes.

Q. Would you say that your memory of Jacques Rivera's hair style and his whereabouts in 1990, that it would've been better back when you were testifying in 1990?

A.   It's the same.

Q.   Say again?

A.   It's the same memory.  I still remember it.

Q.   Okay.  You still remember.  And in 1990, would you have some memory of Jacques Rivera a year and a half earlier in 1988?

A.   Yes.

Q.   And you testified at the criminal trial about Jacques Rivera's hair and his hair style in 1988?

A.   Yes.

Q.   And what was your testimony about that?

A.   He never had his hair dyed.

Q.   And did you testify then, as you have today, about your wife being a hair stylist during that period?

A.   Yes.

Q.   And did you testify then at the 1990 criminal trial about whether Jacques played baseball at Humboldt Park?

A.   Yes.

Q.   And what was your testimony about that?

A.   Basically he threw like a girl and he never played baseball.

Q.   Was your testimony at that trial accurate?

A.   Yes.

Q.   Is it consistent with your memory today?

A.   Yes.

Osorio - direct by Swaminathan

1246

Q.  Since Jacques Rivera was convicted, have you stayed in touch with Jacques Rivera?

A.  No.

Q.  But you've come today to testify anyway, correct?

A.  Correct.

Q.  Are you missing work today to testify?

A.  Yes.

Q.  Would you miss work and come here today to do anything other than tell the truth?

A.  Just come down and tell the truth.

Q.  So I think you've been open about this, I want to ask you, were you ever a member of a gang?

A.  Yes.

Q.  What gang?

A.  The Latin Kings.

Q.  And why did you become a member of the Latin Kings?

MR. LEINENWEBER:  Judge, I object on the basis of relevancy.

THE COURT:  I'm sorry?

MR. LEINENWEBER:  I'm sorry, I object on the basis of relevancy.

THE COURT:  Overruled.

BY MR. SWAMINATHAN:

Q.  Go ahead.

A.  For protection, basically.  I lived on the other side of

the neighborhood, I would have to cross Division Street to go to school, Clamente High School. At that time, the gangs, if you lived on the other side, you'd get harassed.

Q. What is the period that you were in the gang? Was it in the '70s '80s?

A. I think the '70s. I was 14 years old to 18.

Q. And so you left the gang when you were 18?

A. 17, 18, yes.

Q. Why did you leave the gang?

A. Ah, we didn't have mentors back then. And then when I started working summer job with the Mayor's Office, summer programs, we had a lot of mentors that got us involved working with communities, measure relevance, Art worth and just doing in communities, murals, artwork, and just doing things which kind of got me motivated.

Q. So did you move on?

A. Yes.

Q. And is that something you've seen other people from your community do, move on from that?

A. Yes.

        MR. LEINENWEBER: Objection. Grounds.

        THE COURT: I'm sorry, I didn't hear the objection.

        MR. LEIN WEBER: Still object on the basis of relevance.

        THE COURT: Well, let's --

MR. SWAMINATHAN: I'll move on.

THE COURT: Sustained.

MR. SWAMINATHAN: Can he answer this question or do you want to move on.

MR. ART: I think he did.

MR. SWAMINATHAN: He might've answered it, Your Honor.

THE COURT: I think the question was answered.

BY MR. SWAMINATHAN:

Q. Okay. Turning to another topic.

A few years ago you were asked to give a deposition in this case, correct?

A. Correct.

Q. Before that deposition, did some investigators from the City of Chicago come to talk to you?

A. Yes, they did.

Q. Did you tell them the same things that you told the jury today?

A. Yes.

Q. Tell us about what happened when they came and talked to you.

MR. LEINENWEBER: Judge, I'm going to object.

MR. ART: In fact, Judge, I'd like a sidebar on this. This.

THE COURT: Yes. Okay.

(Proceedings heard at sidebar on the record).

MR. GIVEN:  This was the subject of a motion in limine that we had originally filed.

THE COURT:  Let me say this, because I don't know what's come in, so maybe you need to start by telling what's happening.

MR. GIVEN:  Right.  They have an allegation that our investigators when they talked to Mr. Osorio engaged in some sort of improper questioning, et cetera.  It was totally debunked at his deposition.  They actually then later deposed our investigator.  And this is an entire sideshow that has no basis.

THE COURT:  Okay.  What motion in limine is it?

MR. GIVEN:  It's number 16.

MR. LOEVY:  And I'm not saying it was withdrawn from them.  Your Honor, if I could speak when it's my turn?

THE COURT:  Yes.  Go ahead.  But I don't want to waste a lot of time.  We are taking so much time.

MR. LOEVY:  Your Honor, all day yesterday we heard them say, "isn't it true the Northwestern investigator tried to put words in your mouth?"  He will say the City of Chicago officers or investigators came and tried to persuade me.  There's nothing wrong with the testimony.  It's the flip side of what they have been doing the whole trial and what the will continue to do.

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 820 of 1254 PageID #:104951
Osorio - direct by Swaminathan
1250

THE COURT: Was there an agreement or something about this?

MR. LOEVY: They had a motion in limine and they withdrew it.

THE COURT: All right. Let's go ahead.

MR. SOTOS: Judge, can I say one thing?

THE COURT: Yes.

MR. SOTOS: Whether or not he was manipulated into changing, people were manipulating and changing testimony that lead to the reversal of a conviction is relevant. Whether or not he was talked to by the City of Chicago investigators during discovery that didn't lead to anything is not relevant. There's a huge difference.

Well, I've overruled the objection. Nothing you say changes that. So let's go ahead.

(Proceedings resumed in open court).

BY MR. SWAMINATHAN:

Q. So tell us what happened when the investigators from the City and talked to you.

A. At the beginning or just --

Q. When they came and talked to you, tell us -- did they talk to you at all about Jacques Rivera's hair style?

A. Yes.

Q. Tell us what they talked to you about on that subject.

A. They first came out saying that if I knew Jacques. I said,

"I don't know who that is." When they showed me picture, I said, "Yes, I knew him as his nickname Ace or Jackie, not Jacques."

So they showed me a picture. They said, "Did he have his hair dyed?" And I'm like, "No." And they kept on pushing forward about his hair being dyed. I said, "Never did. Never seen him. Never did." Even in the picture it didn't show that his hair was dyed.

Q. Did they -- in the course of that conversation, did you feel like they were trying to get you to say that he had his hair dyed?

A. Yes.

MS. ROSEN: Objection. Leading.

THE COURT: It is leading, but it's been answered.

Go ahead.

BY MR. SWAMINATHAN:

Q. And you said they showed you photos. Did they say anything to you about those photos and what they indicated about Jacques's hair style?

A. They just said that, "was his hair dyed?" I said, "No, it was not. It was never -- as long as I knew him, he never had his hair dyed."

Q. And when you looked at those photos, did the photos show you in any way that Jacques' hair was dyed in those photos?

A. No.

Q. When the investigators came to see you, did you feel somewhat pressured on this subject?

A. Yes, because they were pushy about his hair being dyed.

Q. Did the investigators also talk to you about some legal issue that you had had back in the '90s?

A. Yes.

Q. And what did they say about that subject?

A. They basically stated that, "We know you have a felony, and we also know that we can work with you on getting it a lesser charge."

Q. Were they indicating they could help?

A. Yes.

Q. This is something from way back in the '90s that you're referring to?

A. Yes.

Q. Handing you a document marked Plaintiff's Exhibit 54.

        (Said item tendered.)

BY MR. SWAMINATHAN:

Q. Sir, did you ever sign an affidavit discussing the things you just been telling the jury about in terms of your interaction with the City's investigators?

A. Yes.

Q. Is what I've handed you Plaintiff's Exhibit 54 a copy of that affidavit?

A. Yes.

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 823 of 1254 PageID #:104954
Osorio - cross by Leinenweber
1253

MR. SWAMINATHAN: Nothing further.

THE COURT: Cross-examination.

MR. LEINENWEBER: Yes.

CROSS EXAMINATION

BY MR. LEINENWEBER:

Q. Good morning, Mr. Osorio.

A. Good morning.

Q. Let's start at least with your memory at that time.

How old are you today, sir?

A. 53.

Q. 53. And so you were born n 1965?

A. Correct.

Q. Okay. And so the time you've been talking about is, I guess, 30 years ago, so you were 23 years old at the time, correct?

A. Yes.

Q. 1988. Okay. And is it fair to say that -- I think you said before that after Mr. Rivera was convicted, you did not see him after that for a long period of time, is that correct?

A. Yes.

Q. Okay. And that -- and from the time you testified in the criminal trial time and the time he was convicted, that was 1990, is that correct?

A. Yes.

Q. Okay. So you were then -- I think counsel asked you, you

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 824 of 1254 PageID #:104955
Osorio - cross by Leinenweber
1254

gave a deposition in this matter, is that correct?

A. Yes.

Q. And that was approximately, was it like 5 years ago?

A. I think so.

Q. The thing I have is November 6th, 2013, does that sound about right?

A. Yes.

Q. Okay. So at that time, that was approximately 25 years after the events that they -- that the lawyers at the deposition were asking about, is that correct?

A. Yes.

Q. Okay. And at that time you said, you know, you didn't really have any memory of what Jacques looked like at that time, is that correct?

A. No, I said I didn't know who the name was when they said "Jacques."

Q. Okay. My I guess question was, until they showed you pictures, like the pictures you just saw of Mr. Rivera, you had no independent recollection? You couldn't remember what he looked like, correct?

A. Oh, I remember how he looked like, I just didn't know the name.

Q. Okay. But at that point you didn't know -- you couldn't answer the question of whether he had facial hair at the time, correct?

A. Yes.

Q. I'm sorry, that's a bad question.

I guess my question was, at that time, you didn't remember whether he had facial hair, correct?

A. Oh, yes, I did.

Q. You did remember he had facial hair?

A. Yes.

MR. LEINENWEBER: If I can just have one moment, Judge.

(Brief pause).

MR. LEINENWEBER: At the deposition I'm looking 71, counsel.

MR. ART: And the lines, counsel?

MR. LEINENWEBER: Sure. Starting at Line 4 to Line 7.

MR. ART: Thank you.

BY MR. LEINENWEBER:

Q. The question you were asked, and let me if your memory is correct as to that:

"... do you remember if he had facial hair --"

MR. LOEVY: No. Objection. You read it wrong. You said "he." It says, "do you remember if you had facial hair."

MR. LEINENWEBER: Oh, I'm sorry. I apologize.

BY MR. LEINENWEBER:

Q. How about this question, do you remember how long his hair was at that time in 1988?

A.   Yes, because I had about the same length of hair.

Q.   Okay.  But let me ask you this question, at that time deposition were you asked this question, I'm at line 10, counsel:

"Question:  Do you remember how long Jacques' hair was back in 1988?"

MR. LOEVY:  Objection, Your Honor.

THE COURT:  I'm sorry.  What?

MR. LOEVY:  Not impeaching.  He asked him how long his hair was, and then he switched it to Jacques.

THE COURT:  That's the same.  Sustained as to form.

MR. LEINENWEBER:  Very well, Judge.

BY MR. LEINENWEBER:

Q.   At the time you were deposed in 20- -- I lost my memory. In 2013, you did not know at that time how long Jacques' hair was in 1988, correct?

A.   In '88, yes, because, like I said, we were -- had the same size hair, same style hair.

Q.   Okay.  Well, at that deposition, I'm at Line 10 again, were you asked this question and did you give this answer:

"Question:  Okay.  Do you remember how long Jacques' hair was back in 1988?"

And the answer was, "no."

Do you remember being asked that question and giving that answer?

A.  I'm not sure.

Q.  And you didn't remember at the time of that deposition in 2013 what style his hair either, is that correct?

A.  I don't think that was a question that they were asking me.

Q.  Okay.  Well, the question is, I guess now, until you were shown a picture of him at that deposition, you did not know what his hair looked like, correct?

A.  No, I basically stated I don't who his name was till -- that's when they said his name was "Jacques."

Q.  You know his name for "Jack"?

A.  Yes.

Q.  And they said -- but the question then would be, at that deposition you were asked the question, "Do you know what style hair he had back in 1988"?

A.  And I said, "Similar to mine."

Q.  Well, I'm at Line 13, page 71:

        "... do you remember what style his hair was cut

        in 1988?

         "Answer:  Only with the picture the

        investigator showed.  He said it was similar to

        mine, that was it."

A.  Yes.

Q.  Was that question --

        MR. LOEVY:  Objection.  Not impeaching, Your Honor.

BY MR. LEINENWEBER:

Q. Was that question asked of you --

MR. LOEVY: Objection. Not impeaching, Your Honor.

BY MR. LEINENWEBER:

Q. Was that question asked of you --

THE COURT: You know, overruled.

BY MR. LEINENWEBER:

Q. Was that question asked of you and did you give that answer?

A. Yes.

Q. Okay. So it's fair to say, if someone asked you 25 years ago what a friend of yours hair looked like, you might not know it off the top of your head, is that fair to say?

A. Yes.

Q. Okay. And I believe you said that at that time your wife, Ida -- am I saying that correctly?

A. Correct.

Q. Ida was in beautician school, or something like that, is that correct?

A. Yes.

Q. And so there were a period of years there where she occasionally cut Mr. Rivera's hair, correct?

A. Yes.

Q. And you were there sometimes when he got his haircut and you were not there sometimes, correct?

A. Yes.

Q.   And she would do that out of your home?

A.   Correct.

Q.   And you did not know during that time period, going back in 1988, did you not know if at that time someone else was cutting Mr. Rivera's hair, is that correct?

A.   No, I didn't.

Q.   You would have no way of knowing, right?

A.   Right.

Q.   So you would have no way of knowing if someone else was dying his hair who was also cutting his hair, is that correct?

A.   Yes, I wouldn't know.

Q.   And Mr. Rivera was someone you knew, I think you said, you met him at the Humboldt Park Institute?

A.   Correct.

Q.   And you knew he was a Latin King at that time, correct?

A.   Yes.

Q.   And you yourself were a Latin King at some point in your life, correct?

A.   Yes.

Q.   Did you intersect with each other at all?  Were you Latin Kings at the same time?

A.   I think so, we were, but we were in different neighborhoods.

Q.   Okay.  And I believe I may have asked this question, but you didn't socialize with him, is that correct?

A.  Yes; not socialize.  We just worked together.

Q.  Right.  You've seen him at the Humboldt Park Institute, you'd see him occasionally in your house when he got his hair cut, fair to say?

A.  Yes.

Q.  And at that time, and going back to the '80s, late '80s, the Latin King colors were black and gold, correct?

A.  Correct.

Q.  And one thing I want to touch on when counsel was asking you, you had spoken to some investigators from the City of Chicago, correct?

A.  Correct.

Q.  Okay.  You didn't feel threaten by them in any way, though, isn't that right?

A.  No, I wasn't threatened.  It was just what they were saying at the beginning, trying to get me to say about his hair.  And then when they knew I wasn't changing my mind, they just, you know, stopped questioning me.

Q.  Okay.  They probed you a little bit about your memory because it was a long time ago, right?

A.  Yes.

Q.  They said, "Are you sure his hair wasn't gold," something like that?

A.  Yes.

Q.  And you said, "No."

Osorio - redirect by Swaminathan

1261

And you never felt threatened by these gentlemen in any way, is that correct?

A.   (Shaking head.)

Q.   I'm sorry?

A.   No.

Q.   And they didn't promise you anything or anything like that, is that correct?

A.   No, they didn't promise me anything.

MR. LEINENWEBER:  Judge, if I may have just one moment?

THE COURT:  Sure.

(Brief pause).

MR. LEINENWEBER:  Sir, if finished.  Thank you very much.

THE COURT:  Anymore defense questions?

MS. ROSEN:  No, Judge.

THE COURT:  Any redirect?

MR. SWAMINATHAN:  Very short, Your Honor.

REDIRECT EXAMINATION

BY MR. SWAMINATHAN:

Q.   Sir, you were asked some questions about your present memory or your recent memory of Jacques Rivera's hair, correct?

A.   Correct.

Q.   I want to ask you about your memory of Jacques Rivera's hair back in 1990 when you testified at his criminal trial.

You did testify there, correct?

A. Yes.

MS. ROSEN: Objection, Judge. This is beyond the scope.

MR. SWAMINATHAN: Directly responsive to the questioning.

THE COURT: Overruled.

BY MR. SWAMINATHAN:

Q. At the criminal trial you were asked:

"... did Jacques Rivera, in 1988, have any part of his hair dyed?

"Answer: Never."

Did you give that answer at that criminal trial in 1990?

A. Yes.

Q. You were asked:

"... and are you sure that he's never had hairs hair worn in a dyed ponytail behind his hair:

"Answer: Never."

Did you give that testimony in 1990?

A. Yes.

THE COURT: Recross? Anything?

MR. LEINENWEBER: No, Your Honor.

THE COURT: Thank you, sir. You may step down. Watch your step.

(Witness excused.)

THE COURT:  Ladies and gentlemen, I think we should take a ten-minute break.

COURT SECURITY OFFICER:  All rise.

(The following proceedings were had out of the presence of the jury in open court:)

THE COURT:  I've got the rulings on the material you gave me last night on Lopez.  There are two sets.

Ben, could you kind of make sure that everybody has a copy.  Thank you.

MR. SOTOS:  Judge, we have an issue.  Can I raise it now?

THE COURT:  Yes.

MR. SOTOS:  I think this witness' testimony has opened the door to the evidence that you didn't allow us to go into during Mr. Rivera's cross-examination with respect to gang activities.  They used this witness specifically to sanitize what it was like to be a Latin King at the time.  They had him testify that he joined only because of protection, that they needed to the that.

But there's more, Judge.  And he also specifically testified to Mr. Rivera's work routine back in 1988, which is working for the Humboldt Park Institute, which was intended to help young children get GED's.  Mr. Rivera specifically testified in his deposition, we were prohibited from getting

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 834 of 1254 PageID #:104965
Osorio - redirect by Swaminathan
1264

into it, that he was a Latin King at that time, he was a leader in the Latin Kings, and that he made all of his income from drug sales.

THE COURT:  Can you prove that he didn't work at Humboldt Park Institute?

MR. SOTOS:  I can prove that he didn't make any money working there and --

MR. LOEVY:  This has nothing to do with money.  And you're bringing it all in open court on purposes.

MR. SOTOS:  Well, if I can finish --

THE COURT:  Yeah, finish.  Could you please finish, because I need to take a break.

MR. SOTOS:  I will, Judge.  But, I mean, I think this is significant --

THE COURT:  Just finish.  Finish.

MR. SOTOS:  Okay.  So I think we're being prohibited from defending the damages aspect of the case, Judge.  That's what I believe that by not being allowed to --

THE COURT:  I'm not convinced.  Thank you.

(Recess.)

COURT SECURITY OFFICER:  All rise.

THE COURT:  Are we ready?

MR. LOEVY:  Yes, Your Honor.

THE COURT:  Who is our next witness?

MR. LOEVY:  Mr. Guevara.

THE COURT:  Okay.  We're ready.

How long do you anticipate this is going to take?

MR. LOEVY:  Before lunch, Your Honor.  We'll be done before lunch.

(Brief pause).

COURT SECURITY OFFICER:  All rise.

THE COURT:  Please be seated.

Sir, would you please raise your right hand.

(Witness duly sworn.)

THE COURT:  You may be seated.

MR. LOEVY:  Your Honor, we're missing the computer here.

THE COURT:  Okay.

(Brief pause)

MR. LOEVY:  Sorry about that, Your Honor.

May I proceed?

THE COURT:  You may.

REYNALDO GUEVARA, PLAINTIFF'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. LOEVY:

Q.  All right.  Sir, if you would state your name.

A.  Reynaldo Guevara.

Q.  And how old are you?

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 836 of 1254 PageID #:104967
Guevara - direct by Loevy
1266

A.   I am 75 years old.

Q.   And we heard Ms. McLaughlin's testimony --

MR. LOEVY:   Is it ready yet?

MR. ART:   It is not ready.

MR. LOEVY:   May I have one moment, Your Honor?

(Brief pause)

(Brief pause).

BY MR. LOEVY:

Q.   All right.  We heard in opening a little bit about your personal history.  We also heard that Ms. McLaughlin has a son.  In your words, sir, you have about 15 children?

A.   Yes.

Q.   And is that you had 15 children or about 15 children?

A.   15.

Q.   All right.  This is page -- remember giving a deposition in this matter?

A.   Yes.

MR. LOEVY:   This is page 98, lines 12 through 15, and continuing on 99, Line 16.

MR. LOEVY:   Anne, if you can play it, please.

(Whereupon, videotape played in open court).

BY MR. LOEVY:

Q.   Did you give those answers under oath, sir?

MR. LEINENWEBER:   Judge, I'm going to object.  That's improper impeachment.  He said from the beginning he --

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 837 of 1254 PageID #:104968
Guevara - direct by Loevy
1267

THE COURT: Overruled.

BY MR. LOEVY:

Q. Did you give those answers under oath?

A. Yes.

Q. And that created substantial financial obligations for you if you were paying child support on those children, correct?

A. I would say so.

Q. And it wasn't all with the same woman, to be clear, you had financial child support obligations, correct?

A. Yes.

Q. All right. Let's turn to the matters we're here for.

During the Felix Valentin investigation, isn't it true that you intentionally and knowingly violated Jacques Rivera's Constitutional rights?

A. Upon advice of my counsel, I respectfully decline to answer the questions on the grounds that I'm being compelled to be a witness against myself.

MR. LOEVY: All right. Your Honor, we move to strike the part about advice of counsel, unless they want to put his counsel at issue what his advice was. If he's putting his advice, he's saying he's doing on advice of counsel, can I can him questions about his advice of counsel?

THE COURT: Well, I think -- I think if the witness relies on the advice of counsel, it sort of opens that up. So why --

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 838 of 1254 PageID #:104969
Guevara - direct by Loevy
1268

MR. LOEVY: Should we give it another chance?

THE COURT: I think that's probably --

Do you want to say anything, Mr. Leinenweber?

MR. LEINENWEBER: (No response).

THE COURT: No? Okay. Go ahead.

BY MR. LOEVY:

Q. All right. You did frame Jacques Rivera for murder by manipulating witnesses, fabricating evidence, and withholding exculpatory evidence, didn't you?

A. Upon advice of my counsel, I respectfully decline to answer the questions on the grounds that I'm being compelled to be a witness against myself.

Q. And when you say "advice of counsel," are you intentionally intending to inject into this case what your attorney has told you about why you shouldn't testify?

MR. LEINENWEBER: Judge, objection. Could we have a quick sidebar?

THE COURT: Sure.

(Proceedings heard at sidebar on the record).

MR. LOEVY: He was given a second chance not to open the door.

THE COURT: Well, maybe he doesn't --

MR. LOEVY: Because otherwise I should be able to ask him, Isn't it true your attorney has told you if you testify --"

THE COURT: Mr. Leinenweber, this is your client, right?

MR. LEINENWEBER: He is, Judge.

THE COURT: Do you want -- should I send the jury out and just counsel him that he shouldn't say "on advice of counsel."

THE COURT REPORTER: Judge, I'm sorry. My laptop is up and the witness can see the realtime feed, what we're saying at sidebar. Just a moment.

(Brief pause)

MR. LEINENWEBER: So, Judge, I don't represent him criminally. So it's Fahey who is his criminal defense attorney. He's the one who gave him that advice. I'm fine with the answer. If they want to put Mr. Fahey in and ask him why he's doing it, then that's their --

MR. LOEVY: If they're going to open the door to his attorney's advice, I want to ask him, "Isn't it true your attorney told you if you testify you're putting yourself in criminal jeopardy for 18 people who say you could be prosecuted for." And what's he's done is imply to the jury, "Hey, I'm just following my attorney's advice."

THE COURT: Yeah.

MR. LOEVY: We have to counsel him maybe --

THE COURT: Well, I don't know, because I don't -- you know, I was never able to even rule on whether there is a value

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 840 of 1254 PageID #:104976
Guevara - direct by Loevy
1270

privilege here.  But this is not -- this is not a way that seems to me is appropriate to raise it in front of the jury. He ought to just say that he declines to answer on the grounds of the Fifth Amendment.

MR. LEINENWEBER:  Perhaps we should speak to him, Your Honor?

THE COURT:  All right.  So send the jury out?

MR. LEINENWEBER:  Yes.

THE COURT:  Okay.  I'll send the jury out.

(Proceedings resumed in open court).

THE COURT:  Ladies and gentlemen, I'm going to ask you to leave the courtroom.  It's going to be a very brief break. A very brief break.

COURT SECURITY OFFICER:  All rise.

(The following proceedings were had out of the
    presence of the jury in open court:)

THE COURT:  Okay.  Mr. Leinenweber, do you want to just go out in the hall with your client for just a few seconds?

MR. LEINENWEBER:  Yes.

THE COURT:  Why don't you go out to speak to your lawyer.  There are some choices to be made here.

(Long break).

THE COURT:  Defense counsel, is there anyone who can find out why this break is taking so long?  If it really has to

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 841 of 1254 PageID #:104972
Guevara - direct by Loevy
1271

be a prolonged break, I think we're going to have to re-group.

(Brief pause).

MS. GOLDEN:  They said five more minutes.

THE COURT:  Five more minutes.

MS. GOLDEN:  That's what they said.

THE COURT:  Thanks.

(Brief pause).

THE COURT:  All right.  Are we ready?

MR. LEINENWEBER:  We are, Judge.

THE COURT:  Okay.

MR. LOEVY:  Your Honor, I'm informed that he's going to say, "advice of counsel" and they're doing it knowing opening of the door.  I intend to cross-examine him on why his attorney is advising him.  You know, everybody understands the situation.

MR. LEINENWEBER:  Yes, Judge, that's the situation.

THE COURT:  Okay.

(Brief pause).

COURT SECURITY OFFICER:  All rise.

(The following proceedings were had in the presence of the jury in open court:)

THE COURT:  Please be seated, everyone.

Mr. Loevy.

BY MR. LOEVY:

Q.  All right.  Sir, when we left off I was asking you, "Did

you intentionally and knowingly frame Jacques Rivera?" What's your answer?

A. Upon advice of my counsel, I respectfully decline to answer the questions on the grounds that I'm being compelled to be a witness against myself.

Q. By "counsel" you're talking about Mr. Fahey, your criminal defense attorney, correct?

A. Upon advice of my counsel, I respectfully decline to answer the questions on the grounds that I'm being compelled to be a witness against myself.

Q. And isn't it true that what Mr. Fahey told you was, if you deny committing misconduct in the 18 cases that you worked on that have turned out to have exonerations and wrongful convictions, then they'll prosecute you for perjury? That's what advice of counsel is, correct?

MR. LEINENWEBER: Judge, I object. Compound, foundation.

THE COURT: Overruled.

BY THE WITNESS:

A. Upon advice of my counsel, I respectfully decline to answer the questions on the grounds that I'm being compelled to be a witness against myself.

BY MR. LOEVY:

Q. And in the case of -- and your attorney advised you that the case of Jacques Rivera, Juan Johnson, Thomas Sierra, Jose

Montenez --

MR. LOEVY: I'll give you that list later, Blanca.

BY MR. LOEVY:

Q.  -- Armando Serrano --

MR. LEINENWEBER: Objection.

THE COURT: Yeah. Wait. Wait.

I'm going to sustain the objection to this question.

BY MR. LOEVY:

Q.  All right. You have a well-founded fear that if you deny misconduct in light of all of the investigations that you've worked on that have resulted in allegations of misconduct, that you would be prosecuted, correct?

A.  Upon advice of my counsel, I respectfully decline to answer the questions on the grounds that I'm being compelled to be a witness against myself.

Q.  And when you say "compelled to be a witness against yourself," it is your understanding that you are only permitted to assert the Fifth Amendment if a truthful answer would implicate you in a crime? That is correct, is it not, sir?

MR. LEINENWEBER: Objection, Your Honor, that is not th Fifth Amendment.

MR. LOEVY: That is the Fifth Amendment, Your Honor.

THE COURT: Overruled.

BY THE WITNESS:

A.  Upon advice of my counsel, I respectfully decline to answer

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 844 of 1254 PageID #:104975
Guevara - direct by Loevy
1274

the questions on the grounds that I'm being compelled to be a witness against myself.

BY MR. LOEVY:

Q.  And you do understand that you're not permitted to refuse to answer questions just because you don't feel like it or it would put it in a bad light, but only if it would require you literally to testify against yourself and implicate yourself in a crime, correct?

A.  Upon advice of my counsel, I respectfully decline to answer the questions on the grounds that I'm being compelled to be a witness against myself.

Q.  All right.  Sir, if you want to say "on advice of counsel, I take the Fifth," I think we can stipulate from our side that your whole litany would be referenced and incorporated so we don't have to spend the time just for you to say that each time.  You can just say, "I plead the Fifth" or "on advice of counsel, I plead the Fifth," and we'll know that the whole thing you said counts, is that fair, sir?

MR. LEINENWEBER:  Judge, I object.  He should be permitted --

MR. LOEVY:  It's going to slow us way down.

THE COURT:  Well, let me just say this, if the witness just wants to say, "same answer" --

MR. LOEVY:  There you go.

THE COURT:  -- I think that would do it.  I don't know

if that is acceptable or not.

BY MR. LOEVY:

Q. All right. Let's try it. I want to bring you back to the investigation of Jose Valentin back in the late '80s --

MR. ART: Felix Valentin.

MR. LOEVY: I'm sorry. Felix Valentin.

BY MR. LOEVY:

Q. Felix Valentin. In the late '80s you were working Gang Crimes and then later as a detective, and you made a lot of arrests and helped send a lot of people to prison, correct?

A. Upon advice of my counsel, I respectfully decline to answer the questions on the grounds that I'm being compelled to be a witness against myself.

Q. And your specialty was closing cases that were hard to solve. And you had a real knack for finding eyewitnesses who claimed to have seen things that other people couldn't find, is that a fair summary, sir?

MR. LEINENWEBER: Objection, Judge. Foundation, assumes facts not in evidence.

THE COURT: Overruled.

BY THE WITNESS:

A. Upon advice of my counsel, I respectfully decline to answer the questions on the grounds that I'm being compelled to be a witness against myself.

BY MR. LOEVY:

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 846 of 1254 PageID #:104972
Guevara - direct by Loevy
1276

Q. All right. In the case that Jacques went to prison for 21 years, you and your partner, Mr. Gawrys, are the ones who crack the case open, correct?

A. Upon advice of my counsel, I respectfully decline to answer the questions on the grounds that I'm being compelled to be a witness against myself.

MR. GIVEN: Objection to form. Inflammatory.

THE COURT: I'll sustain the objection as to the form of the question.

BY MR. LOEVY:

Q. All right. And, again, the same answer will suffice if you want to help move it forward, sir.

Taking a look at your report, this is Plaintiff's Exhibit 1.

MR. LOEVY: If we could have the Elmo, please.

(Exhibit published to the jury.)

BY MR. LOEVY:

Q. This is your signature on the report that named Jacques Rivera as the offender on the charge of murder, correct?

MR. LOEVY: We need this for the jury, too.

THE COURT: I don't know who -- I don't know the technology.

Can we do that?

COURT'S LAW CLERK: I got it.

MR. ART: It's up.

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 847 of 1254 PageID #:104978
Guevara - direct by Loevy
1277

MR. LOEVY:  It's up?

MR. ART:  Yes.

(Exhibit published to the jury.)

BY MR. LOEVY:

Q.  All right.  This is your signature on the report that named Jacques Rivera as the offender for the charge of first degree murder, correct?

MR. LEINENWEBER:  Your Honor, I'm not sure this is in evidence.

MR. LOEVY:  It is, Your Honor.  This is Plaintiff's Exhibit 1.  We've seen it many times with Ms. McLaughlin.

THE COURT:  Well, I'm going to have to look through my whole list.

(Brief pause).

THE COURT:  You said it's Plaintiff's Exhibit 1.

MR. LOEVY:  Yes, among other names.  This is the report --

THE COURT:  Well, is there any objection to it, receiving it into evidence?

MR. SWAMINATHAN:  This was admitted June 8, 2018.

THE COURT:  All right.  Then it's in.  Thank you.

BY MR. LOEVY:

Q.  All right.  Sir, this is the report where you wrote, on the 29th of August, the witness has positively identified the photograph of Jose Rios from the mugshot book, correct?

Guevara - direct by Loevy

1278

A.   Upon advice of my counsel, I respectfully decline to answer the questions on the grounds that I'm being compelled to be a witness against myself.

Q.   And that didn't happen, did it?

A.   Upon advice of my counsel, I respectfully decline to answer the questions on the grounds that I'm being compelled to be a witness against myself.

Q.   And the reason you would be compelled to be a witness against yourself if you answered it is because even though you claimed that this ID didn't happen until the 29th--showing you a copy of Plaintiff's Exhibit 4--you had actually pulled Jacques Rivera's rap sheet two days early on the 27th, correct?

A.   Upon advice of my counsel, I respectfully decline to answer the questions on the grounds that I'm being compelled to be a witness against myself.

Q.   And on that day, two days later, when you made that little kid believe that he actually picked the photo out randomly, you had already shown him Jacques Rivera's photo, and you had already decided Jacques was the suspect, didn't you?

        MR. LEINENWEBER:   Object to the form of the question.

        THE COURT:   Overruled.

BY THE WITNESS:

A.   Upon advice of my counsel, I respectfully decline to answer the questions on the grounds that I'm being compelled to be a

Guevara - direct by Loevy

1279

witness against myself.

BY MR. LOEVY:

Q. Showing you Plaintiff's Exhibit 1 again.

We heard some testimony last week that this is a typo, "August 29, 1988," and that the events recorded actually happened on the 27th. That's not a typo, is it, sir?

A. Upon advice of my counsel, I respectfully decline to answer the questions on the grounds that I'm being compelled to be a witness against myself.

Q. And not only is that not a typo, but the other six typos that Ms. McLaughlin identified that tried to move the chronology back to the 27th, those weren't typos either, were they?

A. Upon advice of my counsel, I respectfully decline to answer the questions on the grounds that I'm being compelled to be a witness against myself.

Q. And when you say you're being compelled to be a witness against yourself, are you aware of an ongoing criminal investigation into whether or not you committed rampant and systemic misconduct back in the late '80s and early '90s?

MR. LEINENWEBER: Judge, I'm going to object to form.

THE COURT: Sustained.

BY MR. LOEVY:

Q. Is there a criminal investigation of your conduct that your attorney has advised you to be careful about?

Guevara - direct by Loevy

1280

A. Upon advice of my counsel, I respectfully decline to answer the questions on the grounds that I'm being compelled to be a witness against myself.

Q. Has a grand jury been convened into the way that you were going around in the '80s framing people -- excuse me. Let me ask the question carefully.

Did your attorney advise you that the reason you shouldn't answer any questions is because a grand jury has been convened to inquire into whether you were going around systemically violating people's constitutional rights?

MR. LEINENWEBER: Objection, to form.

THE COURT: Sidebar, counsel.

(Proceedings heard at sidebar on the record).

MR. LOEVY: Your Honor, at the pretrial conference Mr. Leinenweber represented that there is, in fact, an ongoing criminal investigation, and that is his basis for taking the Fifth. And, you know --

THE COURT: I thought I asked whether that was so, and I thought you argued that there was no evidence on it.

MR. LOEVY: He said there was. Mr. Leinenweber said there was.

THE COURT: Well, I think that we have to --

MR. LEINENWEBER: He's --

THE COURT: Let me say this, let me say this, I don't think you can suggest a whole bunch of things to him as to

which there's no foundation.  So the question is, is there any foundation for this.  Is there a grand jury?  Is there a live investigation going or not?

MR. LOEVY:  And, Your Honor, I'm relying on what Mr. Leinenweber --

THE COURT:  I know that.

MR. LEINENWEBER:  I don't recall saying that definitely.  It's my understanding that there is, Judge.

THE COURT:  Okay.

MR. LEINENWEBER:  No firsthand knowledge.

THE COURT:  I think it's fair, then.

Where is the criminal defense lawyer?  He's not here?

MR. BRUEGGEN:  No.  There's an lawyer that has been assigned to him.

THE COURT:  If he were my client, I'd want his lawyer here.  I mean, if he were my client, I'd want to be here, I guess is what I want to say.

MR. BRUEGGEN:  He said "systemic," "rampant," that's unnecessary.

THE COURT:  No.  No.  No.  No.  If there is a good-faith basis for that, we're going down this road, okay.  So I guess there must be, so let's go forward.

(Proceedings resumed within the hearing of the jury.)

THE COURT:  All right.

BY MR. LOEVY:

Q. All right. Sir, there is a criminal investigation that your criminal defense attorney has warned you about whether you framed a dozen and a half or more men back in the '80s and '90s as a Chicago police detective, isn't there?

MR. LEINENWEBER: Judge, I'm going to object as to form.

THE COURT: Overruled.

BY THE WITNESS:

A. Upon advice of my counsel, I respectfully decline to answer the questions on the grounds that I'm being compelled to be a witness against myself.

BY MR. LOEVY:

Q. And in those other examples of investigations like Jacques Rivera, you committed the same exact sorts of misconduct that you're accused of here, thereby showing absence of mistake, intent, and knowledge, correct?

MR. LEINENWEBER: Objection, Judge. Foundation assumes facts.

THE COURT: Overruled.

BY THE WITNESS:

A. Upon advice of my counsel, I respectfully decline to answer the questions on the grounds that I'm being compelled to be a witness against myself.

BY MR. LOEVY:

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 853 of 1254 PageID #:104984
Guevara - direct by Loevy
1283

Q.  Let's talk about some of those investigations.

Do you remember the prosecution of a man named Thomas Sierra for the shooting of a guy named Noel Andohar in Logan Square for which there were two eyewitnesses, Jose Melendez and Alberto Rodriguez?  Do you remember that case, sir?

A.  Upon advice of my counsel, I respectfully decline to answer the questions on the grounds that I'm being compelled to be a witness against myself.

Q.  You joined that investigation the next day.  And you saw the report saying that Melendez and Rodriguez couldn't say anything about the shooter's physical description other than the fact that they were Latinos, and they described the car being a Buick, black with tinted windows, correct?

A.  Upon advice of my counsel, I respectfully decline to answer the questions on the grounds that I'm being compelled to be a witness against myself.

Q.  And then you joined the investigation -- when you joined the investigation, there was no evidence that Sierra had anything to do with this, but you determined in your mind, "You know what?  I have a reason to suspect Sierra because I've seen him riding around in a Buick," right?

MR. LEINENWEBER:  Objection.  Form and foundation. Assumes facts not in evidence.

THE COURT:  Overrule.

BY THE WITNESS:

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 854 of 1254 PageID #:104985
Guevara - direct by Loevy
1284

A.   Upon advice of my counsel, I respectfully decline to answer the questions on the grounds that I'm being compelled to be a witness against myself.

BY MR.   LOEVY:

Q.   And according to the police reports, on May 30th, 1995, you had Melendez and Rodriguez come to Area 5 to look at a lineup. And according to you, they identified Sierra and Thomas spent more than 20 years in prison, correct?

A.   Upon advice of my counsel, I respectfully decline to answer the questions on the grounds that I'm being compelled to be a witness against myself.

Q.   But the truth is, sir, that Mr. Melendez later testified truthfully that you showed him photographs, laid them out, and told him, "This is the guy who did it."  You did that, didn't you?

        MR. LEINENWEBER:  Objection, Judge.  Assumes facts not in evidence.

        THE COURT:  Overruled.

BY THE WITNESS:

A.   Upon advice of my counsel, I respectfully decline to answer the questions on the grounds that I'm being compelled to be a witness against myself.

BY MR.   LOEVY:

Q.   And Mr. Rodriguez also truthfully related that you showed him the same photographs and told him that you thought the

killer was probably the guy in the photo that you were pointing to. And on that basis, you wrote police reports saying that they said that they were the eyewitnesses who identified your suspect, correct?

MR. LEINENWEBER: Objection; compound question.

MR. LOEVY: It is getting a little compound to move it forward, but I'd ask to have leave from the compound.

THE COURT: Okay. If at any point the compound, that is two questions together, are problematic for the witness, let me know. Overruled.

BY MR. LOEVY:

Q. All right. And you took the two eyewitnesses out to the parking lot, showed them the suspect car, and they told you, "That's not the car we saw. The car we saw had tinted windows and different wheels," right?

A. Upon advice of my counsel, I respectfully decline to answer the questions on the grounds that I'm being compelled to be a witness against myself.

Q. And you nonetheless wrote up the report saying that both guys picked him out legit, and that they supposedly identified the car, right?

A. Upon advice of my counsel, I respectfully decline to answer the questions on the grounds that I'm being compelled to be a witness against myself.

Q. All right. Let's talk about the case of Juan Johnson.

Do you remember being involved in 1989 in the prosecution of Juan Johnson for the beating/murder of Richard Fernandez outside the Cogwes Nightclub in Humboldt Park?

A.   Upon advice of my counsel, I respectfully decline to answer the questions on the grounds that I'm being compelled to be a witness against myself.

Q.   Now, when you joined that investigation, it's true, sir, is it not, that there was no evidence to suggest that Johnson had any involvement.  And you developed a theory that was going to get him convicted of murder until he was later exonerated absent any other evidence other than your supposed eyewitness, that's what happened, isn't it?

        MR. LEINENWEBER:  Judge, I have to object.  It's compound to form and seems a fact not in evidence.

        THE COURT:  All right.  Why don't you break that down.

BY MR.  LOEVY:

Q.   All right.  The facts are in evidence, aren't they, in the Johnson case?

A.   Upon advice of my counsel, I respectfully decline to answer the questions on the grounds that I'm being compelled to be a witness against myself.

Q.   Because the witnesses in the Juan Johnson case, the eyewitnesses, have testified multiple times, in multiple proceedings, that you showed them the photographs, and you told them who to pick.  That's in evidence in multiple places, isn't

it?

MR. LEINENWEBER: Objection. Assumes facts not in evidence in this case.

THE COURT: Overruled.

BY THE WITNESS:

A. Upon advice of my counsel, I respectfully decline to answer the questions on the grounds that I'm being compelled to be a witness against myself.

BY MR. LOEVY:

Q. And then both of those men later truthfully related what happened, and Mr. Johnson was released from prison, but not until he had spent more than a decade in prison, that happened, didn't it?

A. Upon advice of my counsel, I respectfully decline to answer the questions on the grounds that I'm being compelled to be a witness against myself.

Q. All right. In regard to your practice of showing eyewitnesses the photos of your suspect and suggesting that that was guy, you would agree with me, you're not supposed to do that, right?

MR. LEINENWEBER: Objection to form, Judge.

THE COURT: Overruled.

BY THE WITNESS:

A. Upon advice of my counsel, I respectfully decline to answer the questions on the grounds that I'm being compelled to be a

witness against myself.

BY MR. LOEVY:

Q.   Now, there's a Chicago police detective named William Dorsch who you worked with back in the '80s, correct?

A.   Upon --

Q.   You can say "same answer," if you want?

A.   Same answer.

Q.   Thank you.

All right.   And Mr. Dorsch has accused you, you're aware, of laying out photos.   And there were two juvenile witnesses in a murder, and pointing out to the juveniles who they should pick.   This is one Chicago police officer accusing you, "you can't do that.   You can't tell people who to pick," that happened, didn't it?

MR. LEINENWEBER:   Objection, Judge, to foundation. Assumes facts not in evidence.

THE COURT:   There's going to be a factual foundation --

MR. LOEVY:   We've had a lot of talk from Mr. Dorsch.

THE WITNESS:   Overruled.

BY THE WITNESS:

A.   Same answer.

BY MR. LOEVY:

Q.   All right.   And, in fact, Dorsch tried to fix it.   He said, "You can't do that.   You can't tell the witness that the guy,

the suspect in the picture is the guy," and you repeated the procedure with the other juvenile. You did it again, didn't you?

MR. LEINENWEBER: Objection to form. That is not the testimony.

THE COURT: Overruled.

BY THE WITNESS:

A. Same answer.

BY MR. LOEVY:

Q. And that person that you identify was charged with murder, correct?

A. Same answer.

Q. All right. Let's talk about the prosecution of a man named Xavier Arcos. Do you remember a witness named Wilfredo Rosario who was at a party with a man named Guirola, G-u-i-r-o-l-a? Do you remember that case, sir?

A. Same answer.

Q. And Arcos was convicted based on Rosario's eyewitness testimony and grand jury testimony identifying Arcos as the killer, right?

A. Same answer.

Q. And then his conviction was later overturned because Rosario admitted that the whole thing was a fraud concocted by you, is that a fair summary?

A. Same answer.

Guevara - direct by Loevy

1290

Q. What had happened was, 2 years after the murder, back in 1991, you arrested Rosario at his home. And you told him, "If you don't cooperate with me and give me some information, I'm going to charge you with the Guirola murder," correct?

MR. LEINENWEBER: Objection, Judge, to the form of the question, compound.

THE COURT: Overruled.

BY THE WITNESS:

A. Same answer.

BY MR. LOEVY:

Q. And you told Mr. Rosario you had enough information to charge him, and unless he cooperated with you in implicating somebody else, you were going to charge him?

A. Same answer.

Q. And you fed him the details of the murder to make it seem like he was a credible eyewitness, correct?

A. Same answer.

Q. And then Mr. Rosario testified that you had coached him into identifying Mr. Arcos, correct?

A. Same answer.

Q. And you did, didn't you?

A. Same answer.

Q. All right. Let's talk about a few more cases. The case of Louis Serrano.

Do you remember the prosecution of Louis Serrano for

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 861 of 1254 PageID #:104997
Guevara - direct by Loevy
1291

the August 19th, 1995, shooting of Raul Rodriguez in Lincoln Square?

A.   Same answer.

Q.   You got into the case, and you saw that the beat cops had written the scene report from that murder saying that there were no eyewitnesses, nobody had seen the shooting, right?

A.   Same answer.

Q.   And then you decided that for reasons unknown, Serrano was going to be your suspect, right?

A.   Same answer.

Q.   And you went to one of the victim's neighbors, Evelyn Diaz, and you interviewed her about this shooting.  And she told you, "I didn't see the shooting."  That's what happened, right?

A.   Same answer.

Q.   And you lied to her.  You told her that someone had told you, Detective Guevara, that she had seen the shooting from her window and that she had been be an eyewitness, right?

A.   Same answer.

Q.   And she continued to resist, so you threatened her by telling her you were going to take her child away and possibly put her in jail if she didn't cooperate with an identification procedure even after she told you, "I didn't see anything," right?

A.   Same answer.

Q.   And you showed her a book of photos at the police station.

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 862 of 1254 PageID #:104993
Guevara - direct by Loevy
1292

And she repeatedly told you she didn't see the shooting, right?

A. Same answer.

Q. And you kept pointing to the photo Serrano and asking her, "Could it be this? Could it be this guy?" trying to get her to pick Serrano?

A. Same answer.

Q. And then three days after the crime, you submitted a false report saying that Diaz had positively identified Serrano in response to a photo, but she never actually did, did she?

A. Same answer.

Q. And she later testified under oath that you had done all of this, and it was true, wasn't it?

A. Same answer.

Q. All right. Let's talk about the Santiago brothers.

Do you remember the prosecution of Freddie and Concepcion Santiago for the July 1st, 1997, shooting of Oscar Arman in Humboldt Park?

MS. ROSEN: Objection, Judge; foundation.

THE COURT: Overruled.

BY THE WITNESS:

A. Same answer.

BY MR. LOEVY:

Q. There were two witnesses in that case, Robert Ruiz and Jose Reyes, correct?

Guevara - direct by Loevy

1293

A.   Same answer.

Q.   And when you joined the investigation five days after the crime, there was no indication in the file anywhere that either of these two witnesses had actually seen the shooter, right?

A.   Same answer.

Q.   In fact, in the initial report, the only descriptions given were male Hispanics, one of them had a black hood.  That was the only thing the witnesses could say, right?

A.   Same answer.

Q.   And than somehow you were able to get these two guys to identify your suspect, right?

A.   Same answer.

Q.   And you never wrote down why you suspected the Santiago brothers in any report, did you?  You never explained why they were your suspects, right?

A.   Same answer.

Q.   You claimed it was like an anonymous situation or you just never wrote down why you thought they were the suspects, correct?

A.   Same answer.

Q.   And you went to a wake a few days after -- no, I'm sorry.  It's the night of the murder, and you found Ruiz and Reyes, correct?

A.   Same answer.

Q.   And Reyes told you, just as he testified later, that he

didn't get a good look at the shooter and couldn't identify the shooter's race or nationality, that's what Reyes told you, right?

MR. LEINENWEBER: Judge, object to form of the question; compound.

THE COURT: Overruled.

BY THE WITNESS:

A. Same answer.

BY MR. LOEVY:

Q. In fact, he gave a statement to that effect that -- I'm sorry, Ruiz gave a statement that he also told you he couldn't see the shooter, right?

A. Same answer.

Q. And you nonetheless showed Ruiz two photographs in total of the Santiago brothers and tried to get them to pick out the perpetrator, right?

A. Same answer.

Q. And Ruiz wasn't a 12-year-old kid, was he? He was a teenager or a young man, right?

A. Same answer.

Q. So you had to pick them up multiple times, keep bringing them back to the station, keep pointing to the photo, keep trying to get him to identify your suspect, right?

A. Same answer.

Q. And after numerous rounds of detention and pressure, he

Q. finally gave up and signed your statement, correct?

A. Same answer.

Q. And that you took the witness stand at the Santana brothers' trial and you lied and you said these investigations were legit, right?

A. Same answer.

Q. And Ruiz took the stand and said he couldn't identify the shooter, right?

A. Same answer.

Q. And the men we've been talking about who's cases you investigated, many of them went to prison, right?

A. Same answer.

Q. They spent decades in prison until at least for some of them their convictions were overturned based on your misconduct?

A. Same answer.

Q. And your criminal defense attorney has told you, if you deny that misconduct, you could be prosecuted for perjury for lying, right?

A. Same answer.

Q. That's why you're in court today not denying any of that misconduct, because you don't want to be prosecuted for perjury, right?

A. Same answer.

Q. All right. Let's go back to the Valentin investigation.

You are the police officer -- you manipulated then 12-year old Orlando Lopez into picking your suspect on the 27th of August without his even realizing what you were doing, isn't that true?

A.   Same answer.

Q.   It did happen at the police station on the 29th.  We haven't focused on this, but I want to show you --

(Brief pause).

(Exhibit published to the jury.)

BY MR. LOEVY:

Q.   Focus on this sentence here:

"... the witness was brought into Gang Crimes

North to view the photographs."

First of all, that's what was written in the report that you signed, correct?

A.   Same answer.

Q.   So tell the jury, did this photo book procedure happen in Orlando Lopez's kitchen like Ms. McLaughlin was led to believe, or did it happen on the 29th in Gang Crimes at the police station?

A.   Same answer.

Q.   The fact is, the mug books weren't allowed to leave the police station, isn't it true, sir?

A.   Same answer.

Q.   Do you remember giving this testimony at the Juan Johnson

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 867 of 1254 PageID #:104998
Guevara - direct by Loevy
1297

civil trial -- this is Plaintiff's Exhibit 185, page 427: When you were testifying, you gave this answer --

MR. LOEVY: Your Honor, I would like to publish so the jury can read along with the testimony. May I, Your Honor?

MR. LEINENWEBER: I object. This is not in evidence.

MR. LOEVY: This is the transcript, rather than doing it by video, I would like to show them.

THE COURT: You're going impeach with it?

MR. LOEVY: Yes. I'm basically -- he won't testify, so I'm showing his prior testimony.

THE COURT: Overruled.

BY MR. LOEVY:

Q. (Reading:)

"... counsel asked you some questions about whether or not you showed photos, whether you've ever shown photographs to people out of the department. What are some circumstances in which you would take photographs and show them to people out on the streets? And I mean, just mean generally in terms of out of the department?

"Answer: Well, if a victim of the crime is not able to make it to our office to see the books, well we do show them photos. We get -- because those books cannot come out of the area. The

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 868 of 1254 PageID #:104994
Guevara - direct by Loevy
1298

area is the police station.  But you would gather photos, loose photos, and you would go to their houses and lay them on the table and ask them to look through them.  Yes, that's been done.  I've done it many times."

First question, sir, did you give those questions under oath?

A.  Same answer.

Q.  The next question is, that is true, the books never leave the station.  So if you're going to go to somebody's house, you bring loose photos, right?

A.  Same answer.

Q.  So when you went to Orlando Lopez's house the night of the shooting, he didn't pick Jacques Rivera's photo out of a bunch of books, he picked Jacques Rivera's photo because you showed him Jacques' photo, correct?

MS. ROSEN:  Objection; foundation, compound.

THE COURT:  Overruled.

BY THE WITNESS:

A.  Same answer.

BY MR.  LOEVY:

Q.  And you also testified in the Johnson trial that you would take photos out into the field and put them on people's kitchen tables and ask people to identify people, correct?

A.  Same answer.

Q. All right. Do you remember being asked this question at the same trial. This is page 1485, Line 25:

"... photographs, you told Ms. Ekl that you've laid out photographs on the table many times.

"Answer: I have, yes.

"Question: Over the course of your career many, many times --"

I stuck an extra "many" in there:

"... would you say many, many times?

"Answer: I have."

A. Same answer.

Q. And when you did take the photographs into the field and show them to witnesses, you would not make a written record, correct, if they picked your suspect?

A. Same answer.

Q. This is page 1395 at the same trial:

"... but you aren't obligated if you get a witness who makes an identification to make a written record about how you figured out that the guy might know something?"

Your answer was, "No," correct?

A. Same answer.

Q. And, in fact, you also testified that you don't make copies of the pictures when witnesses make identifications under these circumstances, correct?

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 870 of 1254 PageID #:105006
Guevara - direct by Loevy
1300

A.   Same answer.

Q.   So there is no paperwork in existence whatsoever about whatever happened on the 27th at Orlando's house, do we agree about that?

A.   Same answer.

Q.   And what actually happened was, you showed Orlando your picture of Jacques Rivera that you had pulled on the 27th and that you were carrying around, and you asked him, "Hey, could this have been the guy?  Does this guy look familiar?  Can you help me out here?"  That's what happened, right?

A.   Same answer.

Q.   If the kid supposedly picked out Jacques Rivera's photo on the 27th the way it was described in court last week, then why did you have to repeat the book procedure two days later here at the police station?

     Showing you Plaintiff's Exhibit 1 again.

A.   Same answer.

Q.   It took a while to get the kid down with the idea that your suspect, Jacques Rivera, was the person whose face he got a glimpse of from 200 feet possibly, didn't it?  It was a process, wasn't it?

A.   Same answer.

Q.   All right.  Let's talk about how you got the identification on the 29th.

     You were in court when Dr. Wells testified, correct?

A.   Same answer.

MR. LOEVY:   Your Honor, that doesn't incriminate him. We'd ask that he be compelled to answer that question.  He was in court when Dr. Wells testified this morning.

THE COURT:   I think that you can answer that question, just whether you were in court this morning during that testimony.

BY MR. LOEVY:

Q.   That one won't incriminate you, will it?

MR. LEINENWEBER:   Objection.  I'll stipulate that he was here.

THE COURT:   All right.  Stipulated.  Good.  We can do that.

BY MR. LOEVY:

Q.   So we have a situation where on the 27th Jacques is your suspect and you showed him a picture of Jacques on the 27th. And then on the 29th, supposedly this kid looks through page after page of photos in a mug book.  And all of the crazy coincidences, he stops right on the guy that you suspected of murder, that's what you're claiming happened, right, sir?

MS. ROSEN:   Objection to form; foundation.

THE COURT:   I'm sorry, what was the objection?

MR. LEINENWEBER:   Form and foundation.

THE COURT:   Overruled.

BY THE WITNESS:

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 872 of 1254 PageID #:105003
Guevara - direct by Loevy
1302

A.   Same answer.

BY MR.   LOEVY:

Q.   And not only was that a crazy coincidence that looking supposedly through pages and pages of books, he happened to stop on the exact guy you were asking about on the 27th, but we now know that Jacques is not the man that was out there shooting Felix Valentin, correct?

A.   Same answer.

Q.   So there has to be another explanation for how this crazy coincidence happened, and that explanation is, you suggested to him who to pick, isn't it?

A.   Same answer.

Q.   And, in fact, you suggested it to him without him even realizing what happened, right?

A.   Same answer.

Q.   Dr. Wells explained when you have a witness, especially a young witness, you could show him a bunch of photos and say, "Does this one look familiar?  How about this one?"  If they start getting interested in one, you can move the discussion to another one.  When they finally get to yours, you can keep asking him more questions and increase their confidence level, right?

A.   Same answer.

Q.   That is something you did over and over again in the field. You manipulated identifications until the witness stopped on

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 873 of 1254 PageID #:105004
Guevara - direct by Loevy
1303

the photo you were interested in?

A. Same answer.

Q. And, in fact, you took advantage of the fact that this 12-year old wanted to catch the perpetrator who had killed his good friend Felix, didn't you?

A. Same answer.

Q. And you took advantage of the fact that you were an authority figure. And you were are telling him, "Little Orlando, you really want to help the police catch the guy, don't you? You're doing great. You got it, didn't you?" You were encouraging him to be a witness, right?

MS. ROSEN: Objection to the form, foundation compound.

THE COURT: Overruled.

BY THE WITNESS:

A. Same answer.

BY MR. LOEVY:

Q. And in that way you manipulated a boy who may or may not have gotten a glimpse of something into becoming confident that your suspect was the killer, right?

A. Same answer.

Q. Because the fact is, sir, if someone -- and this is Plaintiff's Exhibit 62.

Let's say someone from 200 feet, you know, as far as the store -- this is Plaintiff's Demonstrative No. 1.

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 874 of 1254 PageID #:105005
Guevara - direct by Loevy
1304

Supposedly the kid tells the police he's at the store, right? That's what he told Officer McLaughlin, that he's by the store?

A. Same answer.

Q. And the shooting happens over here in the alley (indicating). Almost a full block away, right?

A. Same answer.

Q. So if the kid -- and also the kid said, "Hey, I just caught a glimpse," that's what he told you, right?

A. Same answer.

Q. So if someone got a glimpse of somebody from kind of a distance -- now I'm showing you 62.

If the glimpse was that guy, or that guy, or that guy, or on that guy, or that guy, or that guy (indicating), it would be pretty hard to make an identification out of hundreds of photos and say for sure he knew who it was, wouldn't it?

A. Same answer.

Q. Eyewitnesses, in your experience in the field, if they get a short view from distance, a human mind is not a video recorder that just takes a picture of a person, is it?

A. Same answer.

Q. You had a subjective understanding that if you suggest to the witness, "Hey, how about this guy? I think this guy might be a suspect," you can actually affect their memory. They can come to believe that the person they picked out was their idea.

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 875 of 1254 PageID #:105006
Guevara - direct by Loevy
1305

You can do that to witnesses, especially 12 years old, can't you?

A.   Same answer.

Q.   All right.  Lets talk about what happened after what you claim happened with the mug book on the 29th at the station. After that happen, you did go and arrest Jacques Rivera, correct?

A.   Same answer.

Q.   And you were in court when Mr. Rivera described that arrest on the street on the 30th.  And, in fact, it happened exactly like Jacques described.  He was on the street, he said, "I need to talk to you," that's what happened, right?

A.   Same answer.

Q.   And showing you Plaintiff's Exhibit 5.  This is the arrest report.

        MR. LOEVY:  I believe this is in evidence.  If it's not, we move it into evidence.  It's the arrest report, Your Honor.

        THE COURT:  I don't know if it is.

        Any objection?

        MR. LEINENWEBER:  No, Judge.

        THE COURT:  It is received.

        (Plaintiff's Exhibit 5 admitted into evidence).

BY MR. LOEVY:

Q.   All right.  That is your signature, "R. Guevara," correct?

A.   Same answer.

Q.   And this is the arrest report for Jacques Rivera, right?

A.   Same answer.

Q.   Now, you did proceed to set up the lineup, the first lineup?

There's the lineup that happened later on September 15th, now I want to focus you back on the first lineup that Officer McLaughlin believed didn't get consummated. Do you know which lineup I'm talking about?

A.   Same answer.

Q.   Although you claim that lineup -- well, at a minimum, that lineup got set up, correct?

Showing you Plaintiff's Exhibit 14.  These are the guys that you had all set up to be on the lineup on the 31st, right?  Villafane, Olivero, Jacques Rivera on the 31st, right?

A.   Same answer.

Q.   And you went and got little Orlando.  And you asked him to look at the six guys in the lineup and see if he could pick out Jacques Rivera, knowing that you'd already shown him Jacques Rivera's photo, right?

A.   Same answer.

Q.   And when Mr. Villafane came to court, and when Mr. Olivero came to court, and when Mr. Lopez comes to court, they are all accurately describing that they were put in a room, told to look at a glass, had to turn left, had to turn right, while you

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 877 of 1254 PageID #:105008
Guevara - direct by Loevy
1307

Q. had little Orlando look at them. That happened, didn't it?

A. Same answer.

Q. And before you sent little Orlando in there, you showed him Jacques Rivera's picture again, you said, "Hey, remember when you told me this is the guy? Is this the guy? Is this the guy?" And he didn't even realize he was being couched, did he?

A. Same answer.

Q. But he screwed up, didn't he? He didn't pick Jacques Rivera at the August 31st lineup, did he?

A. Same answer.

Q. And, in fact, at the August 31st lineup what happened was, the kid picked a filler, didn't he?

A. Same answer.

Q. So we've heard from Gary Wells today. Showing you again Plaintiff's Demonstrative 25, about the Chicago data.

You see here, 56 percent of the time they get a suspect identification. 31 percent, no identification/filler, because filler is zero. But that's not 100 percent, is it? That's only 87, 88 percent, right?

A. Same answer.

Q. And it's true, just like Dr. Wells said, isn't it, that the other 14 percent of missing results in Chicago is when you guys got a lineup result and you didn't like when the kid picked a filler, you simply didn't document it. That's how you did,

right?

MS. ROSEN: Objection, Judge. There's no foundation for that.

MR. LOEVY: There's 14 percent undocumented --

MS. ROSEN: There's no foundation that Dr. Wells testified to that.

THE COURT: I'm going to sustain that to the form of the question.

BY MR. LOEVY:

Q. Dr. Wells testified that, in the dataset, there are 56 percent of lineups that showed a suspect was identified, and in 31 percent negative or no identification and there was zero filler, but that only adds up to 87, 88 percent, correct?

A. Same answer.

Q. What Dr. Wells said is, because there is 12 or 13 percent where there is no indication in the file at all what happened during the identification procedure, that's true?

MS. ROSEN: Judge, Dr. Wells testified that that was "no outcome reported."

MR. LOEVY: That's what I'm talking about.

THE COURT: Overruled.

BY MR. LOEVY:

Q. All right. And what you guys did in "no outcome reported" was, if a guy like Orlando Lopez picked a filler, you weren't going to write down that he picked a filler, were you?

A. Same answer.

Q. So what you did is, you just didn't write down anything. You said you couldn't find him. You made up an excuse that you couldn't find him, that's what you did, right?

A. Same answer.

Q. And it's not hard to find a 12-year-old, is it?

A. Same answer.

Q. 12-year olds live with their parents. You knew his address, you knew father's address, right?

A. Same answer.

Q. You didn't have any trouble finding Orlando Lopez, did you?

A. Same answer.

Q. All right. But after Orlando picked out a filler on the 31st of August, Jacques was released. We agree with that, right?

A. Same answer.

        MS. ROSEN: Compound answer.

        THE COURT: Sustained.

BY MR. LOEVY:

Q. Whatever happened on the 31st -- well, you're not disputing that he picked a filler, are you, sir?

        MR. LEINENWEBER: Objection, Judge.

BY MR. LOEVY:

Q. You're not disputing that he picked a filler, are you,

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 880 of 1254 PageID #:105016
Guevara - direct by Loevy
1310

sir?

MR. LEINENWEBER:  There is no foundation.

THE COURT:  Overruled.

BY THE WITNESS:

A.  Same answer.

BY MR.  LOEVY:

Q.  All right.  After what happened in that room happened, Jacques got released, correct?

A.  Same answer.

Q.  And then a couple of weeks went by, correct?

A.  Same answer.

Q.  And then on the September 14th, which is about two weeks, later Valentin died, right?

A.  Same answer.

Q.  He had survived the shooting.  And he was -- he was -- looked like he was going to make it, but he got an infection around the 4th or 5th of September and his condition dropped off precipitously until his death on the 14th, right?

A.  Same answer.

Q.  Now you've got not just a shooting, but an unsolved homicide, correct?

A.  Same answer.

Q.  And unsolved homicides are bad for the statistics, right?

A.  Same answer.

Q.  So you and your partner, Gawrys, decided that you were

Guevara - direct by Loevy

1311

going to solve this homicide, right?

A.  Same answer.

Q.  So two days after he died, you created the report we've been talking about, Plaintiff's Exhibit 1, right?

A.  Same answer.

Q.  Gawrys is the typer, but you signed it as well, right?

A.  Same answer.

Q.  You worked with Gawrys to create this report?

A.  Same answer.

Q.  All right.  And in this report you recorded that:

"... now that the victim is dead, I'd like to put in writing that on September 10th numerous attempts were made to interview the victim ..." that's Felix "... at Cook County Hospital.  On September 10th, 1988, RI ..." that's you "... were able to have the victim view a gang book, where then an identification was made of Jose Rios as the person who shot the victim."

Do you see that language there, sir?

A.  Same answer.

Q.  All right.  First of all, that didn't happen because the gang book didn't leave the station, did they?

A.  Same answer.

Q.  And when you wrote that on September 10th, six days before your report, the victim had supposedly picked out Jacques.

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 882 of 1254 PageID #:105013
Guevara - direct by Loevy
1312

That was just a bald-faced complete and total lie, wasn't it?

A.  Same answer.

Q.  Because by the time you wrote this report on the 16th, the victim was no longer alive to contradict you that he supposedly picked Jacques out of a photo book a week earlier, right?

A.  Same answer.

Q.  And you would agree with me, would you not, sir, that there is no document, no piece of paper, no paperwork anywhere in existence where you memorialized that the victim supposedly picked out Jacques six days, on September 10th, is there? There's no such paperwork?

A.  The same answer.

Q.  And that's not how it's supposed to work.  If there is an identification on September 10th, then you're supposed to create a document on September 10th saying, "We showed the pictures to the victim, the victim picked out Jacques," and then you submit paperwork on the 10th of September, correct?

A.  Same answer.

        MR. LOEVY:  Your Honor, what is your intention as far as time?

        THE COURT:  Well, we did have to take a short break, but I would like to finish at lunch time, if we can.

        MR. LOEVY:  All right.  Let me try to that then, Your Honor.

BY MR. LOEVY:

Q.   The other thing about that identification on 10th of September is that the victim was in a coma on the 10th of September, basically, wasn't he?

A.   Same answer.

Q.   You didn't know it at the time, but when you wrote that report on 16th and made up the fact that the victim had supposedly picked out Jacques Rivera's photo, the fact is, Felix Valentin by then was completely paralyzed on the drug Parsol, which paralyzed him from his eyeballs to his toes.  He had a bacterial infection that was ultimately going to kill him.  He was full of morphine.  And most importantly, he was recorded as nonresponsive to pain stimuli, things like rubbing knuckles on sternum and shining lights on his eyes.  He was completely nonresponsive on the 10th of September, wasn't he?

        MR. LEINENWEBER:  Objection, Judge.  Form, compound.

        THE COURT:  Overruled.

BY THE WITNESS:

A.   Same answer.

BY MR.  LOEVY:

Q.   All right.  When you encountered Felix Valentin in the hospital and got him to pick out Jacques Rivera's photo, did you happen to notice that he was comatose and nonresponsive?

A.   Same answer.

Q.   If you had actually known that he was comatose and nonresponsive, you wouldn't have made up this lie in your

police report that the victim supposedly picked out Jacques, would you?

A.   Same answer.

Q.   All right.  There was a second lineup --

          MR. LOEVY:  Your Honor, we did lose a little time.  I hate to keep everybody from lunch.

          THE COURT:  Well, we usually take a break at about 12:15 and I think we could press on for a few more minutes.

          MR. LOEVY:  All right.  Let me keep going, then.

BY MR. LOEVY:

Q.   There was a lineup on the 15th of September in which Jacques participates in what we're calling the second lineup, correct?

A.   Same answer.

Q.   You went and arrested Jacques just like he described in court.  You went back and found him -- by the way, he wasn't hiding, was he?  He was right where you left him.  Right on the street where he worked, where he lived, right?

A.   Same answer.

Q.   And if Jacques Rivera was supposedly a killer who had been identified by the victim on the 10th and the witness way back in August, why would this cold-blooded killer be allowed to remain on the all the way until after the victim died?

          MS. ROSEN:  Objection, Judge.  Argumentative, foundation.  How he would you why --

THE COURT: Sustained.

BY MR. LOEVY:

Q. All right. Let's break that down. In your mind, on the 31st of August you had a eyewitness saying that Jacques Rivera was a cold-blooded killer, right?

A. Same answer.

Q. And in your mind, if we believe your police report, the victim told you on the 10th of September that Jacques Rivera was a cold-blooded killer, right?

A. Same answer.

Q. Well, if that was true, or even a little bit true, or even maybe true, you wouldn't have left Jacques on the street, right?

A. Same answer.

Q. You made all that stuff up later after the victim died on the 16th, and you decided you were going the frame Jacques, that's what happened, isn't it?

A. Same answer.

Q. All right. In any event, after the victim dies, you went and found Jacques at work, right where you expected to find him, right?

A. Same answer.

Q. And you went and arrested him and put him in another lineup, right?

A. Same answer.

Q. And at that point you went back to get little Orlando Lopez and said, "We got to do this again," right?

A. Same answer.

Q. And Orlando Lopez did not particularly want anything to do with this at this point, did he?

A. Same answer.

Q. Orlando Lopez told you and Officer McLaughlin, "Wrong guy. Wrong guy. It's not Jacques Rivera," that happened, didn't it?

MR. LEINENWEBER: Objection. Foundation.

BY THE WITNESS:

A. Same answer.

MR. LOEVY: So it was a foundation objection.

THE COURT: Overruled.

BY MR. LOEVY:

Q. You've seen Orlando Lopez's testimony, correct?

A. Same answer.

Q. And part of the reason you're taking the Fifth and refusing to testify is because Orlando Lopez has testified under oath that he told you and a woman working on the case, "Not the right guy. Not the right guy. Not him," before the second lineup. That's his allegation, correct?

MR. LEINENWEBER: Objection. Assumes facts not in evidence; foundation.

THE COURT: My guess is that the jury is going to hear

Guevara - direct by Loevy

1317

how maybe later in the day, I'm assuming.

MR. LOEVY: Probably tomorrow.

THE COURT: Tomorrow. Okay. Overruled.

BY THE WITNESS:

A. Same answer.

BY MR. LOEVY:

Q. All right. And that did happen, little Orlando told you, "Not the guy," and you ignored him, right?

A. Same answer.

Q. You told him, "it's going to be okay. You don't have to be afraid. We can do this. We can close this case," that's what you told him, right?

A. Same answer.

Q. Now, the only woman working on the case was Detective McLaughlin, right?

A. Same answer.

Q. And he described a woman who had some gray in her hair or light hair. That photo we saw in court, that is how she appeared, correct?

A. Same answer.

MR. SOTOS: Objection, Judge. That's not what he said about the color of her hair.

BY MR. LOEVY:

Q. Let me ask the question precisely.

That photo we saw in court was exactly how Ms.

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 888 of 1254 PageID #:105019
Guevara - direct by Loevy
1318

McLaughlin appeared back in 1988, correct?

A. Same answer.

Q. And she was the only woman working on the case back at the time, correct?

A. Same answer.

Q. All right. And the reason was because for the first time women were starting to integrate the Detective Division, right?

A. Same answer.

Q. And a lot of the men detectives weren't so keen on having women detectives in the Detective Division, is that fair to say?

A. Same answer.

Q. You guys thought you could do it and you didn't need any help from female investigators, right?

MR. LEINENWEBER: Objection. Relevance and foundation.

MR. LOEVY: It goes to them pushing her out of the case, Your Honor; remember? There's going to be testimony that she was taken --

THE COURT: All right. You don't need to argue. I get the point.

MR. LOEVY: All right.

THE COURT: Sustained.

BY MR. LOEVY:

Q. All right. You were the Latino officer who had Afro and

glasses, correct?

A.  Same answer.

Q.  Showing you a copy of Plaintiff's Exhibit 33.

MR. LOEVY:  May I approach, Your Honor?

THE COURT:  You may.

(Said item tendered.)

BY MR. LOEVY:

Q.  Would it incriminate you to identify yourself in that photo, sir?

MR. GIVEN:  Judge, there's been no foundation for this.

MR. LOEVY:  That's what we're trying to ask a foundation, Your Honor, and he won't cooperate.

THE COURT:  Overruled.

BY THE WITNESS:

A.  Same answer.

MR. LOEVY:  Your Honor, we'd like permission to publish the photograph.

MR. LEINENWEBER:  Objection, Judge.

MR. GIVEN:  Objection.

THE COURT:  Wait.  Wait.  Wait.  One person at a time, please.

MR. GIVEN:  There's no foundation for the date of the photograph.

MR. LOEVY:  Your Honor, we can't get a foundation

unless he answers questions, and he refuses to answer questions.

THE COURT: Well, let me ask you this, I think -- you know, there's no one who can date this photograph?

MR. LOEVY: May I have a moment, Your Honor?

THE COURT: Sure.

(Brief pause).

MR. LOEVY: Your Honor, we can call another officer to say that this is how he appeared back in the late '80s, early '90s.

THE COURT: Well --

MR. LOEVY: Why don't I move forward.

THE COURT: I think that would be a better way to proceed.

MR. LOEVY: All right.

BY MR. LOEVY:

Q. You did have an Afro and glasses back in the late '80s, early '90s, correct, sir?

A. Same answer.

Q. All right. After Orlando told you and McLaughlin, "You know, wrong guy. Wrong guy. I saw the right guy. I don't want anything to do with this," and you told him, "You know what? You can do this. You'll be okay," and McLaughlin refused to participate in the second lineup, correct?

A. Same answer.

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 891 of 1254 PageID #:105027
Guevara - direct by Loevy
1321

Q. She said, "I don't want anything to do with this. You guys are going to do this lineup without me because that kid says he didn't participate," right?

MS. ROSEN: Objection, Judge; foundation.

THE COURT: Sustained.

BY MR. LOEVY:

Q. All right. You went ahead with that lineup anyways, didn't you?

A. Same answer.

Q. And her name is nowhere on the paper for that lineup, right?

A. Same answer.

Q. When I say her name is nowhere on the paper, that means when the police report came out, it had your name on it, right?

A. Same answer.

Q. But if the defense attorney got that police report, they wouldn't know that McLaughlin was there because her name is not on it, they wouldn't be able to ask her any questions about it, right?

MS. ROSEN: Foundation.

MR. GIVEN: Objection, Judge. Three's no testimony she was there. No evidence of that at all.

THE COURT: Why don't you just limit it to what we know, which is about the report.

BY MR. LOEVY:

Q. All right. Did you push Officer McLaughlin off the case?

MS. ROSEN: Objection, Judge, foundation.

THE COURT: Sustained.

BY MR. LOEVY:

Q. All right. Do you remember giving this testimony at Mr. Guevara's trial back June 8th, 2009 --

MR. LOEVY: Mr. Guevara.

BY MR. LOEVY:

Q. I'm sorry, Mr. Johnson's trial testimony. I misspoke. Mr. Johnson's trial on June 8th, 1999. This is Plaintiff's Exhibit 185, page 426. Do you remember giving this testimony:

"Question: For instance, when a murder would occur, if you were assigned to the case what would be your duties and responsibilities in connection with that investigation?

"Answer: As a detective, once you're assigned to it, you have to close that investigation. That's your investigation."

MR. LEINENWEBER: Objection.

MR. SOTOS: Objection.

MR. LOEVY: If I could finish reading.

Well, I think there's an objection Your Honor. Sorry.

THE COURT: There is an objection.

MR. SOTOS: Objection, Your Honor. That is not

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 893 of 1254 PageID #:105024
Guevara - direct by Loevy
1323

impeaching of the question or the answer to the question that he just asked about whether he pushed McLaughlin off.

THE COURT: Overruled.

MR. LOEVY: May I proceed?

THE COURT: Yes.

BY MR. LOEVY:

Q. That was the protocol back then. If that's your investigation, you finish the investigation, right?

A. Same answer.

Q. So if this was Officer McLaughlin's investigation, why didn't she finish the investigation?

MR. LEINENWEBER: Objection, Judge. No foundation.

THE COURT: Overruled.

BY THE WITNESS:

A. Same answer.

BY MR. LOEVY:

Q. And you were in court when Officer McLaughlin said that that September 15th lineup procedure was not legit, do you agree with that or disagree?

A. Same answer.

Q. And one of the reasons it wasn't legit is because the victim had already told you who committed the crime. He told Detective Letrich, right?

A. Same answer.

Q. On August 31st, after you guys had already decided Jacques

Rivea was guilty, the victim told Detective Letrich it wasn't a Latin King, it was an Imperial Gangster, and he identified Jose Rodriguez.  That's what happened, right?

A.  Same answer.

Q.  But it was too late to do any investigation of Jose Rodriguez because you already had an eyewitness who was saying it was Jacques Rivera, right?  The kid was already saying it was Jacques Rivera by then, right?

A.  Same answer.

Q.  You guys just ignored the Jose Rodriguez angle because that didn't come in until the 31st, too late, right?

A.  Same answer.

Q.  And you asked Jose Rodriguez exactly zero questions about, "Hey, Jose, did you have anything to do with the murder on Saturday?  Do you know Felix Valentin?  You got any beef with them?"  No such questions were asked or no such questions were written down, which of those things is true?

A.  Same answer.

Q.  You went through with the second lineup and Orlando Lopez was shown the second lineup, correct?

A.  Same answer.

Q.  And at this time he's now seen Jacques Rivera's photo at least three times, right?  The 27th, the 29th, and the 31st, he's already seen Jacques' photo, right?

A.  Same answer.

Q. So with your help, he finally got it right at the second lineup. He finally picks Jacques Rivera, right?

A. Same answer.

Q. All right. Sir, was your mentality it's better to get a conviction than actually catch the killer?

A. Same answer.

Q. After he finally picked out your suspect with your help, you told him, "Great job, Orlando. You're doing a real good service here. You got the guy. We have evidence that's the guy. You're helping take a killer of your friend off the street," you gave him that positive reinforcement, didn't you?

MR. LEINENWEBER: Objection, Your Honor. Compound; no foundation.

THE COURT: Overruled.

BY THE WITNESS:

A. Same answer.

BY MR. LOEVY:

Q. All right. And then you went into Jacques Rivera's room where he was arrested, and you did exactly what he described in court. You said, "Look, buddy, you got a problem. You're going down for murder. I tell you what, if you just say you were the driver and give me somebody else to be the shooter, I'll get a two-for-one, we'll switch right out," you said that to him, right?

A. Same answer.

Q. And he told to go to hell. He's innocent, he's not implicating anybody else, he doesn't know what you're talking about, right?

A. Same answer.

Q. Because you didn't care if he was the driver or the shooter, you just wanted to put two guys away, right?

A. Same answer.

Q. Now, there was a loose end in the investigation, Jose Rodriguez. Because you didn't include Jose Rodriguez -- and, by the way, why didn't you let Jose Rodriguez be in the second lineup where the kid was picking out the killer?

MR. LEINENWEBER: Objection; foundation.

THE COURT: Overruled.

BY THE WITNESS:

A. Same answer.

BY MR. LOEVY:

Q. If the victim says, "I know who killed him, it was Jose Rodriguez," wouldn't it have made sense to give Orland Lopez at least the chance to pick out Jose Rodriguez?

A. Same answer.

Q. So when you went and talked to the prosecutors--we're ahead--but you explained how Jose Rodriguez got ruled out of the case, right?

A. Same answer.

Q. And I'm going to show you Plaintiff's Exhibit 1 again.

This is the last paragraph of that same report. This is the report that you and Gawrys wrote on the 16th after the whole thing was over. You said:

"... Orlando Lopez, witness, was shown photos of
Jose Rodriguez and Felipe Nieves met the person
who at one was suspected to be the driver, and
he sated to the RI's that those two individuals
were not involved in this incident."

That's what you and Gawrys wrote, right?

A. Same answer.

Q. Would that have been proper to show little Orlando two photos and say, "Hey, these weren't the guys, were they"?

A. Same answer.

Q. You would agree with me that that's how your report reads, that that's exactly what you did, you showed him not an array, you just showed him two photos of suspects and said, "Hey, were those them," right?

A. Same answer.

Q. That would be highly, highly improper, wouldn't it?

A. Same answer.

Q. And, in fact, that's exactly what you did with Jacques Rivera's photo on the 27th, you showed him a photo of your suspect and you said, "Hey, that's the guy, isn't it"?

MR. LEINENWEBER: Objection; foundation.

Guevara - direct by Loevy

1328

THE COURT:  Overruled.

MR. LOEVY:  This is the foundation, Your Honor.

THE COURT:  Overruled.

BY THE WITNESS:

A.  Same answer.

BY MR. LOEVY:

Q.  All right.  The last subject is the criminal trial.

MR. LOEVY:  You want me to press on a little bit more, Your Honor?

THE COURT:  What do you estimate?

MR. LOEVY:  I would say less than then minutes.  About ten minutes.

THE COURT:  Unless somebody needs a break, I think we should press on.

Is everybody okay?

(No response from the jury).

THE COURT:  Okay.

MR. LOEVY:  Okay.

BY MR. LOEVY:

Q.  After you wrote this September 16th report, you spoke to Gawrys and Mingey as well about it, right?

A.  Same answer.

Q.  And Sergeant Mingey was your sergeant.  He was the boss, right?

A.  Same answer.

Q. So you had to account to him for your actions in the case, right?

A. Same answer.

Q. And Sergeant Mingey is the guy who is noted as approving the report on September 16th, correct?

A. Same answer.

Q. This copy isn't signed, but there's presumably one with his signature on it, right?

A. Same answer.

Q. But you don't deny that you apprised Sergeant Mingey of all the facts in your report, and that he was a part of what you were doing?

A. Same answer.

Q. Do you have any knowledge as to why Mr. Mingey is taking the Fifth in this case?

MR. LEINENWEBER: Objection. He had no possible way of knowing.

THE COURT: I'm sorry. I can't hear the objection.

MR. LEINENWEBER: Objection. He has no possible way to know. Foundation.

MR. LOEVY: What? Did you ask him --

THE COURT: Sustained.

BY MR. LOEVY:

Q. All right. Let's talk about the prosecution of Jacques. After you wrote up the September 16th report, you did that with

the intention of influencing the prosecutors to pursue murder charges against Jacques, correct?

A.   Same answer.

Q.   And, by the way, counsel found me individual Trial Exhibit 1.13, which is the same report but a different version with Sergeant Mingey's rather complicated signature, do you see that?

A.   Same answer.

Q.   All right.   Usually Detective McLaughlin would have been the one writing up the report saying that Jacques was accused of murder because it was her case, right?

MR. LEINENWEBER:   Objection; foundation, Judge.

THE COURT:   Overruled.

BY THE WITNESS:

A.   Same answer.

BY MR. LOEVY:

Q.   But you and Gawrys decided to write up the report summarizing the evidence, right?

A.   Same answer.

Q.   And the Felony Review prosecutor, Ms. Rosner, came to the station and interviewed you and others about the murder charges, correct?

A.   Same answer.

Q.   And you vouched for the legitimacy of your investigation and the charges against Jacques Rivera for murder, correct?

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 901 of 1254 PageID #:105037
Guevara - direct by Loevy
1331

A.   Same answer.

Q.   And you put your credibility as a Chicago police detective behind it, giving the prosecutors confidence that you had done your job and that Jacques had committed the murder.  You conveyed that to the prosecutors, correct?

        MS. ROSEN:  Objection, Judge, foundation as to detective.  He was not a detective at the time --

        MR. LOEVY:  Gang Crime Specialists.

        THE COURT:  Okay.

        MR. GIVEN:  Also lacks foundation from what the prosecutor said.

        THE COURT:  That's overruled.

BY THE WITNESS:

A.   Same answer.

BY MR. LOEVY:

Q.   So the murder charges did get approved and you went home and enjoyed your dinner, right?

        MR. GIVEN:  Objection.

        THE COURT:  Sustained.

BY MR. LOEVY:

Q.   All right.  Let's talk about the criminal trial.

        2 years went by before Jacques goes on trial for murder, right?

A.   Same answer.

Q.   And by then, Mr. Lopez and his parents just didn't want to

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 902 of 1254 PageID #:105033
Guevara - direct by Loevy
1332

go, didn't want to do anything with this, right?

MS. ROSEN:  Objection; foundation.

MR. LEINENWEBER:  Objection; foundation.

THE COURT:  Overruled.

BY THE WITNESS:

A.  Same answer.

BY MR.  LOEVY:

Q.  You went and picked him up to make sure you could get him to the trial, correct?

MR. LEINENWEBER:  Objection; foundation.

THE COURT:  Overruled.

BY THE WITNESS:

A.  Same answer.

BY MR. LOEVY:

Q.  And that was something you commonly did for witnesses in your case to bring them to trial, correct?

A.  Same answer.

Q.  Showing you page 409 of the Johnson testimony.

Edwin Gomez was an eyewitness who claimed that you showed him a photo and told him who to pick out in the Johnson case, correct?

A.  Same answer.

Q.  (Reading:)

"... did you go pick up Edwin Gomez for the trial?

"Answer: I don't remember if I did, but it could happen, yes.

"Question: Would that be unusual for you in the case you're investigating to pick up the State, one of the State's two witnesses and bring them to trial?

"Answer: No, it's not unusual. It happens all the time."

That was your answer back when you were testifying, correct?

A. Same answer.

Q. And that's what you did with Orlando Lopez to make sure that he remembered the story, isn't that what happened?

A. Same answer.

Q. All right. 2 years have now gone by. In August of '88, he had just turned 12, now he's 13 going on 14, right?

A. Same answer.

Q. And back in 1988, when the crime first happened, did he tell you that he was by the store when the shooting happened?

A. Same answer.

Q. And in the car ride, did you help him remember -- showing you the map again. Did you help him remember that he wasn't really by the store, which is too far away, but he was coming out of his house?

MR. LEINENWEBER: Objection, Judge. No foundation for

Guevara - direct by Loevy

1334

that.

THE COURT: Overruled.

BY THE WITNESS:

A. Same answer.

BY MR. LOEVY:

Q. Was there a discussion in the car about what you remember two years ago? I mean, surely you would've talked about it, right?

A. Same answer.

Q. And then when he got to trial, his testimony was sort of, "I was coming out of my house. I saw three shots. I ran to the store, told the storekeeper, there's a shooting, there's a shooting. I ran back and hid, and then I saw the final eight-shot." First of all, that was his testimony at trial, right?

A. Same answer.

MS. ROSEN: Objection; foundation.

MR. LOEVY: That is his testimony.

THE COURT: Is the jury going to hear that?

MR. LOEVY: Yes. And already has with McLaughlin, too.

THE COURT: Overruled.

BY MR. LOEVY:

Q. Did he tell you that story in the car?

A. Same answer.

Guevara - direct by Loevy

Q. In fact, when you told him, "Orlando remember? Remember you're closer. You're by the door." And he ended up with a jumbled story where he tried to incorporate both the door and the store in a story that made no sense, right?

MR. LEINENWEBER: Objection, Judge, compound.

THE COURT: Overruled.

BY THE WITNESS:

A. Same answer.

BY MR. LOEVY:

Q. The fact is, the kid knew he was at the store and knew he talked to the clerk, and to incorporate a whole new story where you were telling him he was coming out, so he ran to the store, and then he ran back, and it ended up a jumbled mess, didn't it?

A. Same answer.

Q. All right. You also talk about the fact that, "Orlando remember, the shooter had a dyed ponytail," do you remember talking about with Orlando?

MR. LEINENWEBER: Objection, Judge. No foundation.

THE COURT: What's the foundation?

MR. LOEVY: The foundation is, he testified at the criminal trial.

THE COURT: Overruled.

BY THE WITNESS:

A. Same answer.

BY MR. LOEVY:

Q. And showing you Orlando's testimony from the trial. This is page 33. Orlando was asked:

".... his hair was not black, brown."

Question: Brown. But was there like a color?"

And then he remembers:

"... yes, sir."

And then the question is:

"Dyed thing?"

"Answer: Yes, sir, dyed."

"Question: Ponytail-like?"

"Answer: Yes, sir."

And then also in the testimony, when he's asked on page 14:

"Question: Aside from him dressed in black, did he have any other color on?"

"Answer" his hair was brown or gold.

"... his hair was what? Gold or brown?"

Then he's asked a leading question:

"... was part of it dyed, you mean?"

"Yes, sir."

Did you talk about that with him in the car, sir?

A. Same answer.

Q. Because the fact is, there is no reference in any piece of paper from 1988 where Orlando said anything about Jacques

CCase: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 907 of 1254 PageID #:1050383
Guevara - direct by Loevy
1337

Rivera's hair being gold, or dyed, or ponytailed. You agree with that, correct, sir?

A. Same answer.

Q. And you helped Orlando remember that, "Oh, yeah, the shooter had dyed ponytail," that was the conversation you had before he got to trial, right?

MR. LEINENWEBER: Objection, Judge. There's no foundation.

MR. LOEVY: Let me ask it in a different way, Your Honor.

THE COURT: Overruled.

BY MR. LOEVY:

Q. You knew what the witness was going to say at the trial because you were prepared to testify to corroborate him, correct?

A. Same answer.

Q. You had discussed with the prosecutor, "I can be a witness in this case. I want to take the witness stand," that happened, right?

MR. LEINENWEBER: Objection; foundation.

THE COURT: Overruled.

BY THE WITNESS:

A. Same answer.

BY MR. LOEVY:

Q. And the prosecutor asked you, "Well, Detective Guevara,

what evidence could you possibly lend to this investigation? You have no personal knowledge." And you told the prosecutor, "I can corroborate that Jacques had a gold ponytail," correct?

MS. ROSEN: Objection, Judge. There's no foundation.

THE COURT: Sustain.

BY MR. LOEVY:

Q. Showing you your testimony from the criminal trial. This is Plaintiff's Exhibit 35, page 82. This is your testimony from Jacques Rivera trial.

You took the witness stand, right?

A. Same answer.

Q. And you were asked:

"Question: At the time you arrested him, did you notice his hair style?"

And you answered:

"Answer: Yes, I did."

"Question: Was there anything unusual about his hair at the time you arrested him?"

And your answer:

"... yes, there was."

Then you were asked:

"... what was that?"

And your answer, back in 1990, was:

"... at the back, it was like, it was gold. Like a little pigtail dyed in gold."

CCase: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 909 of 1254 PageID #:1050405
Guevara - direct by Loevy
1339

That was your testimony back in 1990, correct?

A. Same answer.

Q. And you also said you played ball in Humboldt Park and that you had seen him in Humboldt Park numerous times, correct?

A. Same answer.

Q. That corroborated the kid say, "Oh, yeah, I think I've seen him in Humboldt Park." You were trying to lend credibility to this prosecution, weren't you?

MR. LEINENWEBER: Objection. Foundation.

THE COURT: Overruled.

BY THE WITNESS:

A. Same answer.

BY MR. LOEVY:

Q. And showing you Plaintiff's Exhibit 58, the eyewitness stuff. Jacques didn't have a dyed ponytail, did he?

A. Same answer.

Q. He didn't have a dyed from the side either, did he?

A. Same answer.

Q. And if there was anything true about the allegation that this kid supposedly saw a shooter with a dyed ponytail back in 1988, you all would've photographed Jacques Rivera's hair. You would've turned him around and said, Look," there's a gold ponytail," right?

A. Same answer.

Q. And the reason you didn't photograph a gold ponytail in

Guevara - direct by Loevy

1340

1988 is because it got made up 2 years later.  That's what happened, didn't it?

A.  Same answer.

Q.  It got made up so you could take the witness stand and lend your credibility as a detective and tell that judge, "You should convict him.  This is legit," that's what you did?

MS. ROSEN:  Objection, Judge.  Again, as to "detective."

THE COURT:  Oh, to that, right.

MR. LOEVY:  Gang Crimes.

THE COURT:  Yes.  That's sustained.

BY MR. LOEVY:

Q.  Just a couple more questions.

You have no subjective understanding.  In your mind, you didn't even understand you have to turn over exculpatory evidence, did you?

MR. LEINENWEBER:  Objection, foundation.

MR. LOEVY:  I have a foundation, Your Honor.

THE COURT:  Overruled.

BY MR. LOEVY:

Q.  Do you remember being asked this question at the Johnson criminal trial:

"You have a subjective understanding that you have an obligation to provide information that could be exculpatory, sir?"

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 911 of 1254 PageID #:1050427
Guevara - direct by Loevy
1341

"Answer: I have the obligation to put down information."

"Question: You have a subjective understanding that you have an obligation to provide exculpatory information?"

Your answer back was, "No," correct?

A. Same answer.

Q. Was that true?

A. Same.

Q. Sir, you knowingly and intentionally framed Jacques Rivea for this murder, did you not?

MR. LEINENWEBER: Objection; foundation.

THE COURT: Overruled.

BY THE WITNESS:

A. Same answer.

BY MR. LOEVY:

Q. Do you have any remorse at all for your actions?

MR. LEINENWEBER: Objection, Judge.

THE COURT: Overruled.

BY THE WITNESS:

A. Same answer.

BY MR. LOEVY:

Q. All right. And no matter what questions I ask you about this investigation, you're going to say "same answer," aren't you?

Guevara - direct by Loevy

1342

A. Same answer.

MR. LOEVY: No further questions, Your Honor.

THE COURT: Anyone else want to ask any questions of this witness?

MR. SOTOS: No, Your Honor.

MR. GIVEN: No.

THE COURT: Okay. Thank you, sir. You may step down.

(Witness excused.)

THE COURT: Okay, ladies and gentlemen. Let's take our lunch break. We'll start again at 1:30.

COURT SECURITY OFFICER: All rise.

(The following proceedings were had out of the presence of the jury in open court:)

MR. SOTOS: Can I raise an issue before you leave?

THE COURT: Yes.

MR. SOTOS: We believe that the testimony elicited not only from this witness but throughout the trial about the focus on Jose Rodriguez is suggesting to the jury that Jose Rodriguez may, in fact, have been the actual killer in this case. And it's always brought up just in the context of Rodriguez, but, as the Court knows, the victim identified both Rodriguez and Nieves, and we know for certain that Nieves was incarcerated in Nebraska at the time of the murder so --

THE COURT: All right, it was mentioned -- it probably would've been better not to mention it, but the way it was

CCase: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 913 of 1254 PageID #:1050449
Guevara - direct by Loevy
1343

mentioned, I picked it up, it was very graceful. I don't remember the exact words he used. And, you know, I'm not changing my mind on Rodriguez. I don't think we've gone over the line.

Anything further that we need to talk about before we start again?

MR. LOEVY: Not from the plaintiff.

MR. SOTOS: No, Judge. Thank you.

MS. ROSEN: What time, Judge.

THE COURT: 1:30.

(Luncheon recess taken from 12:36 o'clock p.m. to 1:30 o'clock p.m.)

*      *      *      *      *      *      *      *

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER

S/Blanca I. Lara                    June 12, 2018

1344

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JACQUES RIVERA,                              ) No. 12 CV 4428
                                             )
          Plaintiff,                         )
                                             )
vs.                                          ) Chicago, Illinois
                                             )
REYNALDO GUEVARA, STEVE GAWRYS,              )
DANIEL NOON, JOHN GUZMAN, JOSEPH FALLON,     )
JOSEPH SPARKS, PAUL ZACHARIAS, GILLIAN       )
MCLAUGHLIN, JOHN LEONARD, EDWARD MINGEY,     )
RUSSELL WEINGART, ESTATE OF ROCCO            )
RINALDI, CITY OF CHICAGO,                    ) June 12, 2018
                                             )
          Defendants.                        ) 1:30 o'clock p.m.

VOLUME 6 B
TRANSCRIPT OF PROCEEDINGS - Trial
BEFORE THE HONORABLE JOAN B. GOTTSCHALL
and a Jury

APPEARANCES:

For the Plaintiff:     LOEVY & LOEVY
                       BY:  MR. JONATHAN I. LOEVY
                            MR. STEVEN E. ART
                            MR. ANAND SWAMINATHAN
                       311 North Aberdeen Street
                       3rd Floor
                       Chicago, Illinois  60607

                       MacARTHUR JUSTICE CENTER
                       Northwestern University School of Law
                       BY:  LOCKE E. BOWMAN III
                       357 East Chicago Avenue
                       Chicago, Illinois  60611
                       (312) 503-0844


Court reporter:            Blanca I. Lara
                       Official Court Reporter
                       219 South Dearborn Street
                             Room 2504
                       Chicago, Illinois 60604
                          (312) 435-5895
                   blanca_lara@ilnd.uscourts.gov

1345

APPEARANCES:  (Continued)

For the Individual      THE SOTOS LAW FIRM
Defendants:             BY:  MR. JEFFREY N. GIVEN
                             MR. JAMES G. SOTOS
                             MS. CAROLINE P. GOLDEN
                             MR. JOSEPH M. POLICK
                             MR. DAVID A. BRUEGGEN
                        550 East Devon Avenue, Suite 150
                        Itasca, Illinois  60143

For the Defendant       ROCK FUSCO & CONNELLY, LLC
City of Chicago:        BY:  MS. EILEEN E. ROSEN
                             MS. CATHERINE M. BARBER
                             MS. THERESA B. CARNEY
                        321 North Clark Street, Suite 2200
                        Chicago, Illinois  60654

For the Defendant       LEINENWEBER BARONI & DAFFADA, LLC
Guevara:               BY:  MR. THOMAS E. LEINENWEBER
                             MR. JAMES V. DAFFADA
                        120 North LaSalle Street, Suite 2000
                        Chicago, Illinois  60602

(Jury out.  Proceedings heard in open court:)

THE COURT:  What I was saying -- Mr. Sotos is now here, and I think everybody is here -- is I think part of what's happening is that you can just overwhelm a human being to such an extent that it's very impossible to keep a mind that's fresh and -- I don't know.  I am just finding this constant "we hear this and reconsider this" really difficult.

But let me say that I saw the motion that plaintiff filed sometime this morning and the light went on, which did not go on when I was balancing all this stuff on the train last night and trying to read this unbound hundreds of pages of deposition, and I finally understood what the concern is with what I thought was just evidence about Mr. Lopez's credibility.  Okay?

I get it now.  And it seems to me that the evidence that we're talking about is of so little probative value.  And now that I understand the prejudice that's involved in it, it seems to me that it's probably pretty great.

So I think I am willing to change my ruling on the four issues that have been pointed out.  That's plaintiff's 1 to the post-conviction testimony and 1, 3, and 4 to the Lopez designated deposition testimony.

And I will tell you that I did not get beyond page 1 of the motion.  So I don't know if the best thing to do is just -- you know, all the weeds on page 2, I never -- I really

was having trouble seeing the connection. So when I saw that was what it was all about, I did not go any farther than page 1.

So maybe the easiest way to manage this is just to withdraw it and re-file page 1 and forget about the rest. Then we won't have any issues with sealing or anything else. I don't know.

MR. LOEVY: Well, do you need to see it or you just -- do you want us to give you the full copy or are you worried about the record, the official record?

THE COURT: I have the full copy.

MR. LOEVY: Okay.

THE COURT: But I am just telling you what I considered. I considered page 1.

MR. LOEVY: Okay.

THE COURT: Paragraphs 1 and 2.

MR. LOEVY: Oh, I get it.

THE COURT: I did not consider any of the rest. And I know that the rest is I think what everybody is so concerned about sealing.

MR. ART: That's correct.

THE COURT: Since I've really never --

MR. LOEVY: I gotcha.

THE COURT: -- seen the connection between what's asserted on page 1 and what's asserted on page 2.

When I quickly saw what page 2 was about, I just said no, this is not -- I do not need to think about that.  What I need to think about is the issues being raised as to the prejudicial effect on the plaintiff, not on what the plaintiff would want to do if --

MR. LOEVY:  That happened.

THE COURT:  -- that happened.  Okay?  Because I -- it's just -- to me, it's pretty far-fetched on the --

MR. LOEVY:  You're going to let us know, then, what you decide or -- on the objections?

THE COURT:  What I am telling you is that I am changing my ruling on the four points you asked me to change my ruling on.

MR. LOEVY:  So those objections are sustained?

THE COURT:  Those objections are sustained.

MR. LOEVY:  All right.

MR. SOTOS:  And just --

THE COURT:  Were they -- they were overruled, and now they're sustained, I guess.

MR. LOEVY:  Some of them were sustained the first time.

THE COURT:  They were sustained, and now --

MR. LOEVY:  The few of them --

(Sound system interruption.)

THE COURT:  That's nice.

Let me get this.  Plaintiff's -- let's see.  On the post-conviction one, here's the confusion.  I guess I could go get the transcripts to be really sure.  Maybe that's what I need to do.

MR. SOTOS:  And, Judge, this all has to do with Mr. Lopez's fear that he was leaving because of --

THE COURT:  Precisely.

MR. SOTOS:  -- gang retaliation.

THE COURT:  Precisely.

MR. SOTOS:  That's what this all is about?

THE COURT:  That's what this all is about.

MR. SOTOS:  Okay.  Understood.

MR. LOEVY:  And, again, we want to put in Mr. Lopez's fear of the police.

MR. SOTOS:  But she'd already --

THE COURT:  Right.  But what I am telling you is --

MR. SOTOS:  You just won.

THE COURT:  -- that we're not doing that.

MR. LOEVY:  I know.  I was --

THE COURT:  Because I am going to --

MR. LOEVY:  -- digging at it with Mr. Sotos.

THE COURT:  I am going to rule in your favor on not allowing in the gang evidence concerning Mr. Lopez.

MR. LOEVY:  We're good.

MR. ART:  So those four objections are sustained, and

1350

we'll edit --

THE COURT: Well, I am not sure, because the notes I have indicated that, one, page 42, pages 8 to 9 on the post-conviction testimony, my -- I think the order that I put out this morning said sustained.

MR. ART: Correct, Your Honor.

THE COURT: So --

MR. ART: So some of the rulings aren't changing, but all four of those objections are now sustained?

THE COURT: Without having the transcript in front of me, I would not be sure, but you must know.

MR. LOEVY: We do, and we will.

THE COURT: Okay. So then on the designation deposition testimony, the No. 1 is sustained. Number -- well, I better get the transcript because I -- this is really confusing. Because I have No. 3 that was sustained this morning.

MR. LOEVY: You did sustain some of them the first time, but you let -- you overruled on a few of them, and it sounds like now they're all going to be sustained.

THE COURT: So you're asking to have all of them sustained for the same reason?

MR. ART: Correct, Your Honor.

THE COURT: Based on a motion *in limine*?

MR. LOEVY: Right.

THE COURT: So the only one -- one on the post-conviction was sustained this morning --

MR. ART: Right.

THE COURT: -- right? You're asking that the -- No. 1 on the deposition testimony be sustained.

MR. LOEVY: For the same reason.

THE COURT: For the same reason, which it is.

No. 3 was already sustained this morning but on another ground, but I am going to sustain it now on the ground of the ruling on the motion *in limine* about gang evidence.

And No. 4 was overruled this morning, but now I am going to sustain it for the same reason.

MR. LOEVY: All right. We're with you, then.

THE COURT: Okay. And then we don't need to get into any of your other arguments.

MR. LOEVY: Correct, Your Honor.

MR. ART: Correct.

THE COURT: As I say, I did not consider them.

MR. LOEVY: Very good. Thank you.

THE COURT: Okay? So can we -- can we now -- is there some way that you can just withdraw that motion and refile it --

MR. LOEVY: Yes.

THE COURT: -- so that the --

MR. LOEVY: I think we've already addressed it.

THE COURT:  -- part I considered is what's in the record and not stuff I didn't consider?

MR. ART:  So we have withdrawn the version that was unintentionally filed publicly.

THE COURT:  Correct, correct.

MR. ART:  We refiled it under seal.  What we can do is withdraw that and we'll refile page 1.

THE COURT:  And refile it with just paragraphs 1 and 2.

MR. ART:  Very good.

THE COURT:  Because that was -- I don't know why the light went on, because nothing was explicitly stated in anything I read.  But when I read it at lunchtime, the light went on.

MR. ART:  Very good, Judge.

THE COURT:  And so --

MR. BOWMAN:  Your Honor?

THE COURT:  Yes.

MR. BOWMAN:  Thank you.  During the cross-examination of Mr. Rivera --

THE COURT:  Yeah.

MR. BOWMAN:  -- a door was opened as to Judge Wadas' reasonable diligence in his representation of Mr. Rivera.

There had been a ruling with respect to that.  And on consideration, plaintiff is -- I am just going to examine Judge

Wadas about issues relating to reasonable diligence, and I wanted to front that before we start with the next witness.

MR. LOEVY: In other words, we're --

THE COURT: Well --

MR. LOEVY: -- waiving our objection. We had objected. You had sustained the objection. Mr. Sotos did a lot of it with Mr. Rivera.

THE COURT: Well, that's what I wonder. I mean, if something happened this morning, I missed it. Because I listened to about a whole three hours of it the other day.

MR. LOEVY: Right. So we -- it's moot for us to try to maintain the objection --

THE COURT: Correct.

MR. LOEVY: -- at this point, is our view, so we waive our objection.

THE COURT: But I understood something different was going on. I thought -- there are two -- the same factual problem seems to me to arise in two different ways. One is it arises under *Brady* as reasonable diligence. And secondly, I thought what the defense was doing was making a causation argument; that is, that it wasn't any action of the defendants that caused the conviction. It was --

MR. BOWMAN: Right. I --

THE COURT: That's why I thought --

MR. BOWMAN: That may be a --

1354

THE COURT:  -- there was no objection.

MR. BOWMAN:  Right.  And there is no objection in either --

THE COURT:  Right.

MR. BOWMAN:  In either scenario.

THE COURT:  But then, I think we then need to go back and consider the issue of Judge Wasilewski.

MR. BOWMAN:  Right, right.  And there were multiple reasons for excluding his opinion.  And we could file something to briefly revisit it.

THE COURT:  Well, I will say that the one that struck me was *Daubert*.

MR. BOWMAN:  Right.

THE COURT:  Because --

MS. ROSEN:  Was what?

THE COURT:  Was *Daubert*.

MR. BOWMAN:  *Daubert*.

THE COURT:  Because as somebody who was a defense lawyer for many years and then has spent decades on the bench, it seemed to me that somebody who had been a prosecutor for many years and then spent decades on the bench was not in a particularly good position to talk about what defense lawyers should do.

And I thought that a lot of the problems with his testimony that bothered me were that he didn't -- he didn't

evaluate the case in the way that I would expect a defense lawyer to evaluate the case, figuring out how strong the case is, what you have to go on in terms of resources.  All of these things go into a mix.

That bothered me.  But I didn't think that that was the main -- I thought the main reason was reasonable diligence and whether that defense -- not defense, but whatever it is is --

MR. LOEVY:  Element.

MS. ROSEN:  Element.

THE COURT:  -- was -- element was part of this case or should be part of this case.

MR. BOWMAN:  The Court most definitely did, did make both points in the ruling.

THE COURT:  I am not sure I did, but it keeps me up at night, yeah.

MR. BOWMAN:  I think you did.

THE COURT:  All right.

MS. ROSEN:  Well, so just so that we're clear -- I mean, we can deal with -- I mean, the Wasilewski issue doesn't need to get resolved right now, because obviously it's --

THE COURT:  You know, we've got a little time.

MS. ROSEN:  We've got time, yes.

THE COURT:  But I think if you're waiving your objection that was raised in the motion *in limine* to reasonable

1356

diligence, then I think we need to go back and look at Wasilewski.

MS. ROSEN: Yeah. And then that would bring in the instruction then back, if we're -- you know, the -- bring that language back into the jury instruction.

THE COURT: I guess so.

MS. ROSEN: Right. Yeah. Okay.

MR. BOWMAN: It might, depending on the evidence, but --

THE COURT: I guess so.

MS. ROSEN: Well --

MR. BOWMAN: Right.

THE COURT: All right. Well, what are we going to do about -- I don't want to have Wasilewski -- to decide the night before --

MS. ROSEN: No.

THE COURT: -- he's going to hit the witness stand.

MS. ROSEN: Yeah. We'll talk about timing and then we'll get you something as quick as we can.

MR. LOEVY: Well, we'll also look at your order, Your Honor.

MR. BOWMAN: Yes.

MR. LOEVY: It sounds like our side's confident you made a *Daubert* finding already, before you even knew.

THE COURT: Could have been. Was -- there was --

maybe in the Wasilewski ruling.

MR. LOEVY:  That's what --

MR. BOWMAN:  Yes.

MR. LOEVY:  -- we're saying.

MR. BOWMAN:  Correct.

THE COURT:  Yeah.  Maybe in the Wasilewski ruling.

MR. BOWMAN:  That's right.

THE COURT:  Not in the reasonable diligence ruling.

MR. LOEVY:  That's what our understanding is.

MR. BOWMAN:  Right.

THE COURT:  Yeah.  That could be.  That could be.

MR. SOTOS:  I think we all should go back and look at it a little more.

THE COURT:  All right.

MR. SOTOS:  Because I remember it a little bit differently, but I don't want to start making representations if I'm not --

MR. LOEVY:  We'll all look at it.

MR. SOTOS:  -- a hundred percent sure.

MR. LOEVY:  We agree.

THE COURT:  But there's no reported case on this at all, right?  I mean, I could find no reported case on --

MR. LOEVY:  Depends what "it" is.

THE COURT:  On what?

MR. LOEVY:  You said "on this."  It depends what --

THE COURT: On the question of whether a judge with experience as a prosecutor can opine on what a defense lawyer needs to do to be reasonably diligent.

MR. BOWMAN: I'm not aware of that.

MR. SOTOS: We didn't find one on that.

THE COURT: Yeah. And I didn't either.

All right. Are we ready for the jury?

MR. BOWMAN: We are.

THE COURT: Do we -- who's our next witness?

MR. BOWMAN: Judge Wadas.

THE COURT: Oh.

MR. LOEVY: Are you going to get him on?

MR. SOTOS: Oh, but I think there's -- I just want to make sure they're -- we're all on the same page.

(Witness enters.)

MR. SOTOS: There's an agreement that we're just going to refer to him as "Mr." He'll describe his background, the fact that he's a judge, but then he'll be described as "Mr." as opposed to "Judge."

MR. LOEVY: That's not what --

THE COURT: What's the convention on that?

MR. BOWMAN: Judge, there was a --

MR. SOTOS: That's actually how we've done it. We had the same issue --

THE COURT: All right.

MR. SOTOS:  -- in front of Judge Lefkow in a case last year.  And I think it was raised in front of the Court.  And the idea was that he would be able to describe his background, but then describing him throughout his testimony --

THE COURT:  Okay.  Is this agreeable to everybody?

MR. BOWMAN:  Well --

THE COURT:  Are we fighting about something or nothing?

MR. BOWMAN:  I -- you know, I don't want to slip and accidentally refer to him as "Judge."  It's what I always do, but --

MR. LOEVY:  Is there a reason we can't call him "Judge" if he is a judge?

MR. SOTOS:  Well, Judge, this is like when Lincoln says the argument --

THE COURT:  Well, I understand that, but I think in the state court, my experience is once a judge, always a judge.  Whereas, in the federal court, once you are off the bench, you are no longer a judge.

MR. BOWMAN:  He's on the bench.

MR. SOTOS:  But that's not --

THE COURT:  Oh, he is?

MR. BOWMAN:  Yes.

MR. SOTOS:  But, Judge, that's --

MR. BOWMAN:  He's a sitting judge.

MR. SOTOS: But that's not the issue. The issue is whether -- I mean, this issue was just decided by Judge Lefkow. And the plaintiff asked that a judge not be referred to as a "judge" during his examination.

THE COURT: Well, we're going --

MR. SOTOS: So we --

THE COURT: -- to do the same thing with -- is Judge Wasilewski still on the bench?

MR. GIVEN: He's retired, Your Honor.

MR. SOTOS: He's retired.

MR. GIVEN: But the difference is -- never mind.

MR. SOTOS: But so we --

THE COURT: We can't afford to waste more time.

MR. LOEVY: We'll defer to the defense, what -- however they want to do it.

MR. SOTOS: So we think that he should be referred to as "Mr." after --

THE COURT: Okay.

MR. SOTOS: -- of course, describing the fact that he is a judge.

THE COURT: Fine. The jury's not going to know, and they're not going to care. Okay. It's going to be "Mr."

MR. BOWMAN: "Mr." it is.

(Pause.)

THE COURT: Sir, if you want to come up here, you may,

or you can wait until the jury is in the box.  Either way.

THE WITNESS:  Whatever.

THE COURT:  It's --

MR. BOWMAN:  Why don't you --

THE COURT:  You want to get a running head start, come on up.

MR. BOWMAN:  Yeah, why don't you, yeah.

THE COURT:  You may be standing here for a long time because there are a lot of people who have to come in here. And you can be seated, if you want, and then I'll swear you once they're in.

One of the circumstances I'm glad I didn't allow the interlocutory appeal.

MR. SOTOS:  What is that, Judge?  I didn't hear.

THE COURT:  I'm saying under the circumstances, I am glad I didn't allow the interlocutory appeal.

MR. SOTOS:  Okay.

THE COURT:  Proves why the Seventh Circuit doesn't like interlocutory appeals.  Things have a way of disappearing.

MR. SOTOS:  I see your point.

(Jury in.)

THE COURT:  Ladies and gentlemen, we stand for you. So as soon as you're at your seat, you may sit down.  You do not have to wait for us.

Please be seated.

Sir, would you please raise your right hand.

(Witness duly sworn.)

THE COURT:  You may be seated.

MR. BOWMAN:  Microphone is a little temperamental.

THE COURT:  It doesn't like to be touched.

THE WITNESS:  Okay.

KENNETH J. WADAS PLAINTIFF'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. BOWMAN:

Q.  Could you, sir, please tell us your name.

A.  Kenneth J. Wadas, W-a-d-a-s.

Q.  And what is your occupation, sir?

A.  I'm a lawyer and currently a sitting judge in Cook County.

Q.  Can you tell us where you preside in Cook County?

A.  I'm a supervising judge in the Criminal Division of the Circuit Court of Cook County, 26th and California.

Q.  Can you tell us what types of cases are heard in your courtroom, sir.

A.  Major felonies, murders, rapes, armed robberies, attempt murders, to narcotics.

Q.  And how long have you been in that assignment at 26th Street?

A.  22 years.

Q.  And how long have you been a judge?

A.  22 years.

Q.  22 years.

Now, I am -- no disrespect -- intended -- going to refer to you as "Mr. Wadas."

A.  That's fine.

Q.  Prior to becoming a judge, what was your occupation?

A.  I was a -- immediately prior to becoming a judge, I was basically a criminal defense lawyer.

Q.  And how long did you practice in the area of criminal defense?

A.  Ten years.

Q.  And prior to being a criminal defense lawyer, did you have another job?

A.  I was a Cook County assistant state's attorney for ten years prior to that.

Q.  And could you give the jury a sense of the responsibilities you had during your ten-year career as an assistant state's attorney.

A.  Initially, you go through the early stages, traffic court, the other low-echelon assignments in the office, Felony Review, preliminary hearing courts.

Then you go into the Felony Trial Division as a trial assistant.  And the way the State's Attorney's Office is broken down, the Felony Trial Division has three assistant state's attorneys to each felony courtroom, a first chair, a second chair, and a third chair.  Your promotions or whatever are

based on the amount of juries you try.  So you become a first chair after usually 20, 25 juries.

I did that for a number of years.  And then my last three years in the office, I was made supervisor or bureau chief of the Narcotics Division.  So I was just involved in narcotics prosecutions.

Q.  Now, I gather from your answer that you have a substantial amount of experience -- had a substantial amount of experience by the time you left the State's Attorney's Office in trials of serious felony cases.

A.  I tried approximately 50 juries to verdict -- 30 of those or so were murder cases -- and hundreds of bench trials and motions to suppress and other types of pretrial motions.

Q.  And so it's clear for folks, what was the year in which you left the State's Attorney's Office?

A.  1986.

Q.  And so in 1988, you'd been a defense lawyer for a couple years?

A.  Correct.

Q.  In your career after you left the State's Attorney's Office, did you ever have occasion to represent police officers?

A.  My last two years in private practice, I was working for a lawyer named Joe Roddy, and he was an FOP lawyer.  So the bulk of my practice, those last two years in private practice, was

representing the Chicago police.

Q. And you used the term "FOP."  What does that sand for?

A. Fraternal Order of Police.  That's the union that Chicago police officers are members of, and their dues entitles them to certain benefits and legal representation.

Q. And so you would represent police officers accused of wrongdoing?

A. Almost every day.

Q. Now, taking you to 1988, were you retained to represent Jacques Rivera?

A. Yes.

Q. Can you tell us how that came about, sir.

A. I do -- I do not remember who referred Jacques Rivera in, but I distinctly remember talking to his wife, Sofia Matarazzo, pretty much as the first person that I spoke to about the case, and --

Q. Was -- you call him Jacques Rivera.  Was Jacques somebody who you had ever represented before?

A. Not that I recall.

Q. So when you start as a lawyer working on a case, do you typically do anything in the way of organizing paperwork?

A. Yes.  I mean, you create a file and basically you start by interviewing the client and getting a feel for what the case is all about.

Q. So I want to begin by asking you some questions about your

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 936 of 1254 PageID #:1050672
Wadas - direct by Bowman
1366

file in the case.

Did you follow the standard practice when you were assigned to -- or when you were retained to represent Jacques of opening a file?

A.  I opened a file and waited for -- to see where the case was going to go.

Q.  And then at that --

A.  The case was not a murder case initially.

Q.  And then over the course of your representation, did you add to your file?

A.  Yes.

Q.  And jumping ahead -- we'll go back, of course, but jumping ahead, did you, after you were finished representing Jacques Rivera, keep the file that you had opened in his case?

A.  I kept it.

Q.  Can you explain, in general terms for the jury, why lawyers keep files after they're finished working on a case.

A.  You have to keep files for -- well, in Jacques' case, I -- I was involved in the appeal also, so I maintained the file for that.

After the appeal was finished, I just kept the file. You have to maintain files for -- I don't even know what the exact number of years is now.  But I still have some files from the time that I was in private practice.  But Jacques' file was always with me in every office I was ever in.

CCase: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 937 of 1254 PageID #:1050683
Wadas - direct by Bowman
1367

Q. Did you take any kind of special care with respect to Jacques Rivera's file?

A. I -- I had it organized, and I -- I kept it in the state that I used for trial and -- just kept it in the same state.

Q. And where did you keep this file?

A. When I was in private practice in different locations, I always had it with me in my office.

When I became a judge, I initially did not have the benefit of a chambers my first three years on the bench because I was assigned to night narcotics court and then I was a floater judge. So I didn't really have a facility within 26th and California to -- that was secure, so I kept the file at home.

Once I got to -- assigned to a felony trial court, then I kept the file with me in a locked file cabinet.

Q. Did you do this with all your old files?

A. No.

Q. Was there something special about Jacques Rivera's case that caused you to treat it differently?

A. I thought that some day I'd be sitting in a place like this, testifying about that case and about that file.

Q. So, Mr. Wadas, did you eventually receive a subpoena in this litigation to provide the lawyers here with a copy of your file?

A. Yes.

Wadas - direct by Bowman

1368

Q. And did you comply with the subpoena?

A. Yes.

Q. Mr. Wadas, I'm going to place before you two items. The first is Plaintiff's Exhibit 43, and the second is Defendants' Exhibit 24.

My question for you is if you could tell us, sir, what those are.

A. These are portions of my file, some handwritten notes and what looks like -- the complete file as far as I know.

Q. Okay. Do you have any reason to doubt that that is your entire and complete file?

A. This is -- whatever was contained in that file that I complied with on a subpoena was the entire contents of the file that I had, that I obtained through discovery and whatnot.

Q. Okay. And I gave you separately twelve pages of notes.

Did you produce those separately?

A. Yes.

Q. And can you explain the circumstances that led you to produce your notes as a separate package.

A. I -- I can't remember if the notes were in the file. Some of these notes are handwritten notes that I was taking in the course of the trial. But nevertheless, they were in the file, and ultimately I produced them.

Q. So to the best of your knowledge, sir, is the file that I've placed before you comprised of those two exhibits in the

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 939 of 1254 PageID #:1050705
Wadas - direct by Bowman
1369

same or substantially the same condition as it was when you finished representing Jacques Rivera?

A. Yes.

Q. So I want to take you now, staying on the subject of your file, ahead to the year 2002.

Did anybody make a request of you at that time for a copy of your file?

A. Yes. The -- I think it was the group from Northwestern Law School had -- were involved in -- or were getting ready to be involved in a post-conviction type of petition, and they contacted me to get the file.

Q. And were you agreeable to providing the folks from Northwestern with a copy of your file?

A. Yes. And -- well, prior to that, Cook County state's attorneys also asked to see the file.

Q. Well, we'll get there in a minute.

Sticking with Northwestern just for the minute, did you -- how did you go about providing Northwestern with the materials in your file?

A. I had my secretary photocopy the file. And they gave me, actually, an authorization from Jacques Rivera to be able to -- be authorized to give them the file. So I had that. And I had the file photocopied and gave them the photocopy. They gave me a receipt.

Q. Did you at any point surrender the original of your file to

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 940 of 1254 PageID #:1050716
Wadas - direct by Bowman
1370

anyone at Northwestern?

A. No.

Q. The original remained with you, sir?

A. I still have it.

Q. Now, you mentioned a minute ago that you provided -- or that you were provided with a receipt.

A. Correct.

Q. I am going to be asking you some questions about this big file of yours. There's a rubber band around it. Maybe if you could take it off.

And I want you to look at page 808. It's a Bates number that's in the bottom right-hand corner of the packet.

Do you see it?

A. 808, I have it.

Q. Is that the receipt that you referred to in your earlier answer?

A. That's the receipt I got from Northwestern.

Q. Did you prepare that receipt?

A. No.

Q. Do you have any information to provide to anybody about how that receipt was prepared?

A. I can only assume they counted up the pages that they had and someone there drafted a receipt based on their analysis of the file. They prepared the receipt, gave me the copy of the receipt.

Q.  You didn't do the counting?

A.  I didn't count.

Q.  Now, you started to tell us a minute ago that you also were contacted by a representative of the State's Attorney's Office about your file.

A.  Correct.

Q.  Can you tell the folks about that contact.

A.  The assistant state's attorney was a supervisor in, I think, either Felony Review or Post-Convictions, or he had -- he had just been promoted, I think, and was involved in Post-Convictions.

He came -- he came down to my chambers and said, "Do you remember the Jacques Rivera case?"  I said right.  He asked me, do I -- do I want to talk about the case?  I said yes.  I said, "In fact, I have the original file, trial file, of Jacques Rivera.  You're welcome to have it, if you want it."

Q.  And what did he say in response to that?

A.  He didn't take the file, he didn't ask for a copy of it, but he asked me some questions about, you know, my view of the case and my position in the case.

Q.  All right.  And what did you tell him?

A.  I told him that I thought Jacques was innocent of the charges.  He should have been found not guilty, but wasn't, and maybe something in his file will make the situation correct.

Q.  All right.  Now, we've talked about your file.  I want to

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 942 of 1254 PageID #:1050738
Wadas - direct by Bowman
1372

go back and ask you about your work in the case preparing to assist Mr. Rivera after he retained you. Okay?

First question. You said in an earlier answer it's important to meet with a client.

A. Correct.

Q. Did you meet with Jacques Rivera?

A. Yes. He and his wife.

Q. And did you talk with him about the charges that he was facing?

A. Yes.

Q. Did -- do you recall in any degree the conversation that the three of you had on that subject?

A. He told me that he had been arrested, that he was in a -- stood in a lineup, was not identified, and was released.

And at that point in time, I think the charge would have been aggravated battery, maybe attempt murder. I don't know if that was formulated. But the victim was still alive, of the shooting.

Q. And did you -- and then, eventually, this became a murder case?

A. Correct.

Q. And did you talk with Jacques Rivera about whether he was guilty of the charge?

A. Yes.

Q. What'd he tell you?

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 943 of 1254 PageID #:1050749
Wadas - direct by Bowman
1373

A.  He denied it.  He said he did not kill, was involved in that shooting.

Q.  Did -- now, stepping back, just generally speaking, is it important when you're a criminal defense lawyer to get assistance from your client in coming to understand the nature of the charges and the circumstances that the client is facing?

A.  That's true.

Q.  Was Jacques Rivera able to be of any assistance to you, for example, in explaining who Felix Valentin was?

A.  He outlined the situation amongst the gangs that were vying for control, you might say, in the Humboldt Park area.  He told me about his past background in a gang and how he had been out of that now for --

Q.  Okay.  I'm going to --

A.  -- a while.

Q.  He'd been out of it, he said?

A.  (Nodding.)

Q.  The -- did he know Felix Valentin?  Did you ask him?

A.  I -- I did ask him, but I can't remember if he actually knew the victim or not.

Q.  There was an eyewitness in the case.  Do you remember his name?

A.  I think it was Lopez, I think.

Q.  If I were to suggest Orlando Lopez to you, would that refresh your recollection?

A.   Orlando Lopez.  He was the eyewitness.

Q.   Did he know --

A.   Teenager.

Q.   Did Jacques Rivera know Orlando Lopez?

A.   I don't think so.

Q.   Did you ask him about some of the other names in the case when you got the discovery back from the State?

A.   Once I started getting the discovery, I did ask him about other names.

Q.   Did he know any of these people?

A.   He told me that he didn't really know anyone.

Q.   Now, you mentioned that one of the early things Jacques said to you was he'd been in a lineup -- he'd stood in a lineup and then he was released.

A.   Correct.

Q.   Did you have occasion to raise that in court?

A.   I -- I raised it initially at the bond hearing when -- after Jacques was arrested and he was taken before Judge Bolan, as a matter of fact, on a bond hearing, I tried to raise that issue to the judge as one factor to be considered.  But Judge Bolan -- maybe he factored in, I don't know, but he -- he ultimately set a high bail.

Q.   And have you gone back and looked at the records and confirmed that you -- there's actually a record of you raising this?

A.  Yes.  I looked over the bond hearing transcript and saw that I did, in fact, raise that issue with Judge Bolan.

Q.  Now, what's the purpose of a bond hearing, just so folks can understand?

A.  A couple of things.  Making sure that the defendant will -- is he a flight risk or does he have a background where he's been -- like a bond forfeiture in prior cases, does he pose a risk for recommitting some other type of violent crime coupled with the ability to pay, and the fact that usually when you're on bond, you're in a better position to be able to help your lawyer with the case than in custody.

Q.  So as a result, after the bond hearing, what eventually happened with respect to Jacques, whether he was in custody or in jail before his trial?

A.  He was -- he made bond.

Q.  And was he able to meet with you in your office after --

A.  Yes.

Q.  -- he made bond?  Now, I want to change to a different subject now and talk about criminal discovery.

Can you tell the folks on the jury how a criminal defendant, through his lawyer, learns about the information that the police had developed in the investigation that led to the charges.

A.  You file a form motion, pretty much a motion for discovery.  You file that with the court.  State's attorneys get a copy of

it, and they start complying.  They start comply -- compiling all the police reports, photographs, whatever evidence is available in the case, and give you the copies of all that, police reports and photocopies of pictures, whatever.

Q.  So this is standard practice?

A.  Yes.

Q.  And did you in Jacques' case file a motion for discovery with the State?

A.  I filed a motion for discovery with the State in this case.

Q.  Let me hand you what's been marked for identification as Plaintiff's Exhibit 39, and I'll ask you if you could tell us what that is.

A.  That's the motion for discovery that I filed with the Circuit Court, with a copy to the State, in Jacques Rivera's case.

MR. BOWMAN:  Your Honor, we move Plaintiff's Exhibit 39.

THE COURT:  Any objection?

MR. SOTOS:  No objection, Judge.

THE COURT:  It is received.

(Said Plaintiff's Exhibit 39 received in evidence.)

MR. BOWMAN:  So I've -- if we could -- the jury could see this?

BY MR. BOWMAN:

Q.  The document that you've just described for us is filed in

CCase: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 947 of 1254 PageID #:1050783
Wadas - direct by Bowman
1377

the Circuit Court of Cook County, right?

A.  Correct.

Q.  And you signed the document as --

A.  That's my signature.

Q.  As Mr. Rivera's counsel, right?

A.  Yes.

Q.  Now, I want to ask you about a couple of the requests that you made in your motion for discovery.

If you would turn to paragraph 14.  And I'll show this to the jury as you consider it.

This is a specific request that you made for information that would be favorable to Jacques' case, right?

A.  *Brady* material.

Q.  Tell the folks on the jury what you mean when you say "*Brady* material."

A.  It's a case that was decided by the U.S. Supreme Court years back.  Everybody refers to it the *Brady* case.  And that case stood for the proposition that if there's anything in the case that is favorable to the defense, it can't be held back. It must be tendered to the defense.

Q.  So when you were representing Jacques Rivera in 1988, did you have an understanding that the prosecutors had an obligation to give you everything favorable to Jacques Rivera?

A.  Absolute obligation.

Q.  And that's the point of request No. 14?

CCase: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 948 of 1254 PageID #:1050794
Wadas - direct by Bowman
1378

A. Yes.

Q. Did you believe that apart from asking and the understanding of law that you needed to take any additional steps in order to obtain the information favorable to Jacques Rivera in the possession of the State?

A. No. I knew the assistant state's attorneys involved in the case well. I had known them for over ten years.

Q. And just as a matter of law, was there anything else that you had to do in order to get the *Brady* material?

A. No.

MS. ROSEN: Objection.

BY THE WITNESS:

A. They had to tender all --

THE COURT: Hold on one sec.

MS. ROSEN: Objection, Judge, as to "as a matter of law."

MR. LOEVY: Not disputed, Your Honor.

THE COURT: Well, we're in territory -- we had a discussion, I think, when the jury was out that left me a little confused. Maybe we need to talk about what's in dispute at this point. No?

MR. LOEVY: Let's keep moving.

MR. BOWMAN: I think we can just keep moving. I'll withdraw the question.

THE COURT: Okay. I'm sorry. Because I was just a

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 949 of 1254 PageID #:1050805
Wadas - direct by Bowman
1379

little confused by --

MR. BOWMAN: Yeah.

THE COURT: -- what went on.

MR. BOWMAN: Let me move to another chart.

THE COURT: All right.

BY MR. BOWMAN:

Q. I also wanted to ask you about a separate request that's also in your motion for discovery, and this is item No. 2.

You asked for written or recorded statements by the witnesses. And you also asked for any memoranda reporting or summarizing statements of police [sic] attorneys and any memoranda reporting or summarizing oral statements by such witnesses.

Do you see that?

A. Yes.

Q. And what is the reason for making that request in furtherance of defending a client in a criminal case?

A. You want to know if -- if witnesses made statements to the police officers and the police officers made notes of those statements that the witnesses made, then you would want to know what the officer wrote down about what the witness said.

Q. Now, we'll talk about it a little bit more in a minute, but in a -- this was an eyewitness case?

A. Yes.

Q. And in an eyewitness case, is there any particular

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 950 of 1254 PageID #:1050816
Wadas - direct by Bowman
1380

importance to having the statements that the eyewitness might have made to police officers?

A. Yes.

Q. Can you explain that?

A. The -- there might be an initial description, for example, that the eyewitness gave to the officer, which would be relevant. How much time the witness had to view the incident, that might be in the notes. The date of the time that the witness made an identification to the police would be relevant. Things like that.

Q. Now, did you -- actually, let me ask you this.

What -- after you served the motion for discovery, what's the next thing that happens with respect to your requests for information?

A. I try to review the -- whatever I get back from the State and see if there's anything that I think might still be missing.

Q. And let me hand you Plaintiff's Exhibit 40 for identification.

Can you tell us what that is?

A. This is the Cook County state's attorney's answer, long form answer to discovery.

Q. And is -- and did you receive this answer to discovery in Jacques Rivera's case?

A. Yes.

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 951 of 1254 PageID #:1050827
Wadas - direct by Bowman
1381

MR. BOWMAN:  We move the admission of Plaintiff's 40, Judge.

THE COURT:  Any --

MR. SOTOS:  No --

THE COURT:  -- objection?

MR. SOTOS:  No objection.

THE COURT:  It is received.

(Said Plaintiff's Exhibit 40 received in evidence.)

BY MR. BOWMAN:

Q.  And so the answer to discovery, that's how the State goes about answering the questions that you asked, right?

A.  Right.  Time, date, and location of the offense, witnesses, list of witnesses, who were police officers, who's civilians, things like that.  And if there's a statement -- if the defendant made a statement, you'd find out about that.  That might be outlined in that State's answer.

Q.  You find out about the *Brady* material.

A.  Correct.

Q.  And you find out about the witness statements.

A.  Yes.

Q.  Supposed to, right?

A.  Yes.

Q.  Now, there were some numbers on your request for discovery, your motion for discovery, a number of paragraphs.

Does the State's answer correspond numerically to what

you asked?

A. Sometimes they do. I don't think they actually did in this case.

Q. Not perfect?

A. They don't have to match point for point.

Q. Okay. Well, let's look --

THE COURT: This is not up, counsel. If you want to -- did you want this -- it's in evidence. I don't think -- does the jury -- the jury doesn't have this? No.

MR. BOWMAN: No. I'm going to put it on the screen just now.

THE COURT: Okay. Sorry.

BY MR. BOWMAN:

Q. So this is the document that you've been talking about. It's called Answer to Discovery.

A. Correct.

Q. And it's also filed in the case against Jacques Rivera in the Circuit Court of Cook County, right?

A. Yes.

Q. Now, let's look at paragraph 14.

You were told: "The People have no knowledge, at this time, that any other person was identified in this matter except as mentioned in the police reports."

And then it's actually got the same statement there twice, right?

A.  Yes.

Q.  So there was some information in the police reports that we'll talk about in a minute about another person being identified, right?

A.  Correct.

Q.  Did you have any information that there was -- or did you have any reason to believe that there was any information outside of the police reports about somebody else being identified?

A.  That was it, what was in the police reports.

Q.  That's what you were told?

A.  Right.

Q.  And then I want you to look on page 2 at the answer that you were given about "written statements of witnesses."

Do you see where I am?

A.  Yes.

Q.  And, in fact, you were told:  All memoranda reporting or summarizing oral statements made by witnesses are contained in the police reports tendered in open court, right?

A.  Correct.

Q.  Did you have any reason to believe that there were statements of witnesses that had not been tendered to you in open court?

A.  No.  I thought I had everything.

Q.  Now, did you also receive police reports in -- from the

prosecution in response to your motion for discovery?

A. Yes.

Q. And I want you to look in your file, Plaintiff's Exhibit 43, which you still have up there, and I am going to ask you to examine pages 507 to 535.

Again, referring to those numbers in the bottom right that have been placed on the copies of your file.

A. That -- that appears to be the police reports that I received.

MR. BOWMAN: And, Your Honor, at this time, there is a redaction issue with respect to one of those documents that we talked about at the beginning of the day, and subject to correcting that, I'd like to designate the documents at those page range -- at that page range as Plaintiff's Exhibit 43-A and move it into evidence.

THE COURT: Any objection, subject to that redaction issue?

MR. SOTOS: No, Judge. I just didn't hear the page range. I just wanted to hear it again.

THE COURT: How about --

MR. BOWMAN: It's 507 to 535.

MR. SOTOS: Thank you. No objection, Judge.

THE COURT: It is received.

(Said Plaintiff's Exhibit 43-A received in evidence.)

BY MR. BOWMAN:

CCase: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 955 of 1254 PageID #:1050861
Wadas - direct by Bowman
1385

Q.  So, Mr. Wadas, when you received the police reports, did you study them?

A.  Pardon me?

Q.  When you received the police reports, did you study them?

A.  Yes.

Q.  And from your review of the case, from your review of the police reports in particular, did you get an understanding of what the evidence was against Jacques Rivera?

A.  Yes.

Q.  And can you explain?

A.  Well, it's what they call a single-finger case, one witness identification.  No other physical evidence to support the charge.  It's a -- one witness briefly viewed identification.  It's an I.D. case.

And there is one -- and there's -- there's a -- there's also a police officer who went out and interviewed the victim before he died.  And took a mug book, photo book to the victim, and the victim made an identification of someone else as the shooter.  So that's basically the case.

Q.  So based on your -- in 1988, based on your years of experience as a prosecutor and a defense lawyer, how did you assess the strength of the case against your guy, Jacques Rivera?

A.  I thought the State's case was weak.

Q.  Did you develop a theory, sir, of how you were going to

CCase: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 956 of 1254 PageID #:1050872
Wadas - direct by Bowman
1386

defend Jacques Rivera against these charges?

A. I first -- the first thing I did was -- I was going to just try it as a straight I.D. case. I thought there was sufficient evidence to raise reasonable doubt.

But I did pursue the idea of whether there was an alibi, whether Jacques had an alibi for that time frame, and I -- we didn't have a solid alibi.

Q. Well, we'll talk about that in a minute.

In terms of your answer about trying the case as a straight I.D. case, does that mean cross-examination of the witness?

A. Cross-examination of the eyewitness. That's it.

Q. Heart and soul of the case?

A. Pretty much.

Q. Now, in the police reports, materials that you reviewed, did anybody reveal to you or did you see written down anywhere that Orlando Lopez, that single-finger I.D., had told law enforcement that the guy he'd been identifying, Jacques Rivera, your client, was actually the wrong guy?

A. No.

Q. Did you learn that from what you were provided with in discovery in this case?

A. That's not in the reports.

Q. So suppose that there had been a report in your file with that information in it. Can you explain how you would have

CCase: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 957 of 1254 PageID #:1050883
Wadas - direct by Bowman
1387

made use of it?

A. Well, then you got to -- you got to try to bring in that officer to testify about that fact.

Q. And would that be a helpful fact in your judgment?

A. It'd -- a first attack on the identification --

Q. Would it --

A. -- is a recantation, basically.

Q. Would that be an extremely helpful fact?

A. I'd be looking for a *nolle* from the State's Attorney's Office.

Q. What do you mean by that?

A. Dismissing the case.

Q. Based on the thinness of the evidence?

A. Correct.

Q. So you told us at the beginning of your testimony that Jacques Rivera told you that on August 31, he'd stood in a lineup. Or he said at some point, he'd stood in a lineup, and he had been released afterwards.

As you reviewed the information that you had received, did you see any reference to that?

A. No.

Q. If, hypothetically, you had been told in a report or otherwise that Jacques Rivera had stood in a lineup, been viewed by the single-finger I.D., and released after standing in the lineup because he was not identified, would that have

CCase: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 958 of 1254 PageID #:1050894
Wadas - direct by Bowman
1388

been helpful information to you in defending Jacques against these charges?

A. Further evidence that they had the wrong guy.

Q. And would that be very helpful?

A. It'd be the case.

Q. Explain what you mean by that.

A. Once again, it would seem like it would be -- I don't know how they could have gone forward with the prosecution if they had -- if I have that information.

The eyewitness is making a statement to the police that he's not the individual that he identified. That's it. Ball game over.

Q. Now, you reviewed the police records, as you've told us. You didn't see any reference to this lineup that Jacques had told you about.

Did you take any further steps to attempt to determine if such a record existed?

A. I was pretty good friends with Larry Victorson, who was the state's attorney on the case. I had known him for a long time. We were both chairs in the State's Attorney's Office.

I asked him repeatedly, "Where's the lineup report where Jacques Rivera does not get identified?" He said -- his exact answer was, "Here's my file. It's not" -- "We don't have that. There's nothing about that. Didn't happen."

Q. And when Victorson, who you knew, told you that there was

no such report, did you take him at his word?

A. Yes.

Q. Why?

A. Larry Victorson was a tremendous trial lawyer, an honest individual. I knew him well, and I -- you know, he wouldn't try to cheat on a case.

Q. So you figured if he was saying he didn't have it, it meant --

A. He didn't have it.

Q. -- he didn't have it? Why didn't you -- it's been -- or will be suggested that you should have taken an additional step of filing a motion to compel production of a document that Victorson was saying he didn't have.

Why didn't you do that?

A. I don't think the document existed, so filing a motion to compel or something like that is not going to make any difference.

Q. All right. What about -- another suggestion that's been made is you should have sent out a subpoena.

Did you do that?

A. I didn't send a subpoena to the Chicago Police Department. I trusted Victorson. And you wouldn't be able to subpoena a document that doesn't exist.

Q. Now, let's talk about some of the things that you did do, some of the additional things beyond what you've said so far.

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 960 of 1254 PageID #:1050916
Wadas - direct by Bowman
1390

Did you take an opportunity to go and look at the scene of the crime?

A.  I did.

Q.  Is that an important thing to do when you're representing a person criminally accused?

A.  You try to get an idea of what the vantage point is of the witness and where the crime occurred.  And, you know, you have photos, so you're matching it against that, too.

Q.  And in addition to talking with your client, reviewing the discovery, and so forth, did you conduct any interviews of any police personnel?

A.  I interviewed Officer Letrich, who was -- and his partner, who were tactical officers that did the interview of the victim when he was still alive.

Q.  And what was the purpose of going to interview these two guys?

A.  They were the key, key to the case, the way I saw it.  They were -- they're the ones that are going to testify that there's another identification of someone else as the shooter.  So Letrich was the key.

Q.  And was it helpful to speak with him?

A.  Yes.  He talked to me.

Q.  And did his information that he provided to you differ in any way from what was in his report?

A.  No.  I think he pretty straightforwardly told me what

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 961 of 1254 PageID #:1050927
Wadas - direct by Bowman
1391

had -- what happened, and that's what was in his report.

Q. Stood by his paper?

A. Yes.

Q. Now, you mentioned a few minutes ago that you considered an alibi defense.

What's an alibi defense?

A. If you can establish that through competent witnesses or documentation that you were not at the scene of the crime some way, that is helpful, especially in an identification case.

So I asked Jacques and Sofia about what -- where were they, what did they do, do they have any receipts, do they have any other witnesses or people that they ran into on that time that can support an alibi, and they really couldn't come up with anyone other than Sofia herself being the alibi witness.

Q. For them, it was a day like any other day?

A. That's her -- she told me that she couldn't exactly remember where specifically they were, but that they usually went to the laundromat, usually went to the grocery store, did their shopping, things like that. And I told her that was -- you know, that wasn't really going to be good enough. But nevertheless, that's what they had.

Q. Were you concerned about what would happen if your former colleague, Larry Victorson, subjected her to cross-examination?

A. He would have torn her to shreds, wife of the defendant trying to help him out. Wouldn't have worked. Victorson was

too savvy as a trial lawyer.  She would have been, you know -- she wouldn't have made it.

Q.  Now, a suggestion is going to be made that you should have -- well, first of all, let me ask you, did you interview the single eyewitness, Orlando Lopez?

MR. SOTOS:  Judge, objection to the form of the question, what suggestions are going to be made or whether they are or they're not.  Form of the question.

THE COURT:  Well --

MR. BOWMAN:  Well, I --

THE COURT:  -- I am not sure -- could you just give me something --

MR. SOTOS:  Sure.  I'm objecting to the form of the question, when he says suggestions are going to be made.

THE COURT:  Oh, oh, oh.  Okay.

MR. SOTOS:  I'm sorry.

THE COURT:  Could you rephrase it?

MR. BOWMAN:  I'll stop that, yes.

BY MR. BOWMAN:

Q.  Did you conduct an interview of Orlando Lopez?

A.  No.

Q.  Can you tell -- was that a conscious decision on your part?

A.  Yes.

Q.  Can you tell the folks on the jury why you decided not to interview Orlando Lopez before Jacques' trial.

CCase: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 963 of 1254 PageID #:1050949
Wadas - direct by Bowman
1393

A.  I wouldn't have been able to get near him.  For one thing, he -- he's a teenager.  He's underage.  He's under control of his parents.  I mean, there was no way I could, like, go out to his house, knock on the door and say, "I'm Jacques Rivera's lawyer and would like to talk to your son," or some scenario like that.  It wouldn't have worked out.  I wouldn't have been given access to him.  Victorson would not have -- would have fought it tooth and nail.

Q.  Now, you say Victorson would have fought it tooth and nail.  Explain that a little bit.  How would --

A.  Yeah.  He would even think that I was -- the allegation could be made that I'm trying to reach out to the witness, get to the witness in the case, influence the witness' testimony in some way.  He would've -- he would've blocked it.

I mean, victims were not really produced to be interviewed by defense counsel.  If they did produce the witness, the witness would say always, "I don't want to talk to you."

Q.  And you've -- and this wasn't your first time around this block?

A.  This would've -- it would've been futile.

Q.  Did you consider gaining an opportunity to talk to Lopez in court by filing a motion to suppress his identification?

A.  If a judge gets the idea that you're trying to run a discovery deposition through a bogus motion, they're going to

be annoyed, very annoyed.  It's not going to work out in your favor.

And the lineup that was viewed was -- you know, looked legitimate to me.  It didn't look like it was attackable.  And I wanted to be able to use the side view of that lineup photo in the trial anyway.  So I wasn't going to try to tear down and get that suppressed.

Q.  Again, you --

A.  So it was a tactical situation.

Q.  And, again, you hadn't been told about Orlando making this statement about "wrong guy" before he viewed that lineup, right?

A.  Correct.

Q.  Did you talk with any of the cops other than Letrich?

A.  No.

Q.  And Moriarty?

A.  No.

Q.  Why not?

A.  I didn't see what good it would be do.  I mean, they're not going to admit that they ran a lineup and didn't write paper on it, so -- I'm sure Jack Leonard had his theory on the case.  It was Jacques Rivera was the shooter.  They had a witness, whatever the quality of that witness was, and that was it.  It wouldn't have -- I wouldn't have benefited by -- they wouldn't have even talked to me, I'm sure.

Wadas - direct by Bowman

1395

Q. Okay. Let's talk for a minute about the trial.

You represented Jacques Rivera in an actual trial.

A. Yes.

Q. And it was up in the Skokie courthouse?

A. Correct.

Q. You remember about when it took place?

A. I think in '90, 1990.

Q. So a couple --

A. A year and a half or so, two years after.

Q. And did you and Jacques decide on a bench trial or a jury trial in this particular case?

A. It's a defendant's right to decide what kind of trial he wants, bench or jury. I can't make him take a bench trial if he wants a jury trial.

I explained the advantages and disadvantages of both and told him that I thought our best shot was at a bench trial.

Most trials in Cook County are tried by bench. And single-finger identification cases are almost always tried by bench. And that's what I told him. We -- and he agreed to waive a jury and go to a bench trial.

Q. All right. And you remember who the judge was?

A. Judge Close.

Q. Now, I'd appreciate it if you could walk us through the evidence that the State presented in its case-in-chief to begin with.

Wadas - direct by Bowman

1396

Who were the witnesses that the State called?

A. They called a life and death witness, some family member of the victim, and they called the eyewitness, and I think we stipulated to the medical examiner's protocol. That was it.

Q. Was there any fingerprint evidence in the case?

A. There was no physical evidence. And they didn't call any police.

Q. No police officers --

A. No police --

Q. -- testified?

A. -- officers.

Q. Was that unusual?

A. Usually, at least, the detective in charge of the case does take the stand to testify about the case.

Q. Were you surprised when no officer showed up?

A. I thought Jack Leonard would, or his partner, or some other detective would have been called.

Q. But that didn't happen?

A. No.

Q. So Orlando testified?

A. Correct.

Q. And can you describe this witness for the jury as you observed him testify in 1990.

A. He was kind of sympathetic. He was, you know, a young teenager who had to be handled -- you couldn't, like, go for

CCase: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 967 of 1254 PageID #:1050983
Wadas - direct by Bowman
1397

the throat on somebody like that. You had to handle him carefully, almost like a rape victim, just be real cautious. And you don't want to give him an opportunity to bolster the identification, if possible.

Q. Now, in his testimony, did Orlando provide a description of the person he claimed he saw shoot Felix Valentin?

A. Yes.

Q. Do you recall that description?

A. The key part of the description was that the shooter had -- I think he initially said that he only -- that he had a rear view of the shooter; and then at another point in time, he had a facial view.

But the rear view of the shooter -- the shooter had dark hair, but there was a -- like a tail or ponytail, long at the back of the shooter's head that was dyed blond.

Q. Now, you told us that before the trial, you studied the police reports that you'd been provided.

A. Yes.

Q. And you relied on those reports to prepare for trial.

A. Yes.

Q. Was there anything in the police reports that you saw in which the shooter was described as being a person with a ponytail in the back of his head dyed blond or yellow?

A. I don't remember.

Q. Well, do you -- I -- do you want to take a look and see?

A.  I thought that the shooter was described with that.

MR. LOEVY:  Locke, show him the trial, show him that part of the transcript where he's --

(Counsel conferring.)

BY MR. BOWMAN:

Q.  If you would take a look at the report from August 29, you'll see the interview of Mr. Lopez in the information that you were provided.

A.  That's not part of his -- that's not part of the report.

Q.  Not part of his description in the report?

A.  Correct.

Q.  So would it be fair to say that when you heard Orlando say on the stand this business about the ponytail dyed blond that you were hearing it for the first time?

A.  True.

Q.  And, in fact, later on in the case, you made a point of explaining to the judge that you'd been surprised by this evidence, right?

A.  Yes.

Q.  Now, do you recall what the gist of Orlando's testimony was about what he had seen and how this went down?

A.  I can't remember specifically his -- it -- the testimony didn't make sense in terms of -- he describes a scenario where he goes to a -- he's either going to a store or en route to the store when the shooting starts.  He goes to the store.  He has

a conversation with somebody at the store and then comes back and reviews the shooting for the final shot.

Basically, that was it. I mean, it would seem -- it seemed like the firing of these shots took a lot longer than they usually do.

Q. Right. And you'd mentioned it was -- this was a delicate cross-examination of this young boy, right?

A. Correct.

Q. Did you have an opportunity to cross-examine Orlando about having viewed a lineup on -- at an earlier time, at the end of August, seeing Jacques Rivera in the lineup and then Jacques being released because he was not identified by Orlando at the end of that procedure?

A. No, I didn't touch that.

Q. You didn't have that information?

A. Correct.

Q. Would that have been helpful cross-examination if you'd had it?

A. Yes.

Q. Did you have an opportunity to cross-examine Orlando about the fact that he told law enforcement just before he picks Jacques out on September 15 that actually the guy he'd been identifying was the wrong guy? Were you able to cross-examine on anything --

A. No, I couldn't --

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 970 of 1254 PageID #:1051016
Wadas - direct by Bowman
1400

Q. -- about that?

A. I couldn't cross him on that because I didn't know that happened.

Q. Would that have been helpful cross-examination?

A. Yes.

Q. So at the end of the prosecution's case, you put on evidence?

A. Yes.

Q. Who testified on your side?

A. Jacques Rivera and Letrich.

Q. Now, for the information of our jury, could you explain whether the defendant has to testify in a criminal case.

A. It's his choice. I can't force him on. I can't tell him, "You're not going to testify." It's his choice. All I could do is explain the advantages and disadvantages, make a recommendation, but it's his choice.

Q. And so you left it up to Jacques?

A. Correct.

Q. And what did Jacques want to do?

A. He wanted -- he wanted to testify, and he did.

Q. And when he testified, what did he say about --

A. He --

Q. -- whether he had killed Felix Valentin?

A. He denied it.

Q. That's what he wanted to get on the stand and say?

A. Correct.

Q. Now, you said that Letrich also testified in your case.

A. Correct.

Q. How did that go?

A. I had him under subpoena. There was a little skirmish. I can't remember if it was right before he testified or during where we went to sidebar.

Victorson, I think, was raising the objection that he -- Letrich shouldn't be able to testify to what was not really a dying declaration. I think that was the approach. I argued that -- the opposite, that, in effect, it was. And Judge Close let it in, but I don't know how much weight he gave it.

Q. So what's this about a dying declaration? What does that mean?

A. He really -- the victim should be aware that he's on the way out before he makes an identification, but I don't think -- I don't actually think that was the case here. I think he was of sound mind and -- granted, he was probably some under medication, maybe hurting.

But he's the one that mentioned the gang not being the Latin Kings, that it was some other gang, to the police, and then they went and got that book, and he made an identification out of that book.

Q. Somebody who wasn't Jacques Rivera?

A.  Right.

Q.  So --

A.  So Letrich arrested the guy that the victim identified.

Q.  Now, after Jacques and Letrich testified, was there any other testimony in this criminal trial?

A.  The State called Detective Guevara in rebuttal.

Q.  And what did Detective Guevara say?

A.  He -- I can't remember his exact testimony, but he -- at issue was Lopez said that Rivera had played -- was playing baseball in Humboldt Park.  Jacques Rivera was working in Humboldt Park, but he wasn't playing baseball.

Detective Guevara testified to this -- corroborating this ponytail idea with the blond-dyed ponytail and that he had seen Jacques Rivera in Humboldt Park on, you know, numerous times.

Q.  So it's 1990.  You're finding out that Orlando is saying this business about a blond ponytail for the first time.

What did you do to try to respond to what Orlando was saying and Detective Guevara was corroborating about the ponytail?

A.  Well, I had the side view of the lineup photo which did not show a blond ponytail on Jacques' hair and wanted that in.

And then I also tried to get some witnesses to -- who would be able to testify that his hair was not dyed blond.  So I put on two witnesses.

Q. Okay. So have you now told us about the whole trial?

A. About it.

Q. How long did the -- how long did the trial take?

A. It -- well, it wasn't that long. It was over a couple of days, basically.

Q. Unusually short?

A. Pardon me?

Q. Was it unusually short?

A. Yes.

(Counsel conferring.)

BY MR. BOWMAN:

Q. Mr. Wadas, I am going to hand you what's been received in evidence as Plaintiff's Exhibit 5 -- 4, Plaintiff's Exhibit 5, Plaintiff's Exhibit 6, Plaintiff's Exhibit 7, Plaintiff's Exhibit 8, Plaintiff's Exhibit 9, Plaintiff's Exhibit 10, Plaintiff's Exhibit 12, Plaintiff's Exhibit 13, Plaintiff's Exhibit 14, Plaintiff's Exhibit 15, Plaintiff's Exhibit 16, and Plaintiff's Exhibit 19-A.

And I showed you these documents, just to move things along, before you got on the witness stand earlier this afternoon, right?

A. Yes.

Q. And did you confirm for me that none of the documents that I've handed to you were in your file --

A. Correct.

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 974 of 1254 PageID #:1051050
Wadas - direct by Bowman
1404

Q.   -- as information that you received?

A.   They were not in my file.  I never got them.

MR. BOWMAN:  To the extent, Your Honor, that the group I've handed Mr. Wadas has not already been received in evidence, I move them at this time.

THE COURT:  Any objection to any of those documents?

MR. SOTOS:  No, Judge.

THE COURT:  They are received.

(Said Plaintiff's Exhibits 4 - 10, 12 - 16, and 19-A received in evidence.)

MR. BOWMAN:  Thank you.

BY MR. BOWMAN:

Q.   There are a number of documents, and I am not going to ask you about all of them, but I do want to cover just a couple.

If you'd take a look first at Plaintiff's Exhibit 12. This is what's called a general progress report, correct?  Do you have it?  I'm sorry to get ahead of you.

The exhibit markings are down at the bottom.  If you'll hand them back to me --

A.   I got it.

Q.   Perfect.

A.   12.  General Progress Report.

Q.   And did you receive any general progress reports in discovery in this case?

A.   No.

Q. This particular general progress report appears to be relating to information provided by the eyewitness, right?

A. Correct.

Q. And do you see at the middle of the page where there is a note by the store?

A. Correct.

MR. SOTOS: You have to move it up a little bit.

MR. BOWMAN: Thank you.

BY MR. BOWMAN:

Q. Now, you had also received, had you not, if you look in your file, a copy of this police report from August 29 that we looked at a few minutes ago, correct?

A. Correct.

Q. And that's Plaintiff's 19-E, which is already in evidence.

That report also relates to information provided by Orlando Lopez --

A. Lopez.

Q. -- correct?

A. Right.

Q. And specifically, it says, "Lopez was coming from the store," right?

A. Yes.

Q. Now, that's different from by the store?

A. By the store, coming from the store. Looks like two different physical locations.

Q. And you'd been out to the scene of this crime, you told us, right?

A. Yes.

Q. I'm going to show everyone -- and I'll put it on the screen so you can see it -- give me just a minute -- a Google map that we made of the scene. I've got it.

THE COURT: Counsel, this is normally the time we take an evening -- an afternoon recess. Do you have any sense of how much you have?

MR. BOWMAN: I have a little bit. I have probably another 15 to 20 minutes. I could finish this point in about two minutes and then would be --

THE COURT: Why don't you do that and then we'll take a short break.

MR. BOWMAN: Okay.

BY MR. BOWMAN:

Q. So I've put on the screen for your benefit, Mr. Wadas, the map that is also on the easel.

And from your trip to the scene of the crime, you determined where the corner store is, right, of the corner of Kimball and Cortland? Right here (indicating).

A. Okay. I see it. I see that location. That's the store.

Q. And if you look at Exhibit 19-E, that's exactly where he identifies the store as being, right? Corner of Kimball and Cortland?

A. Yes.

Q. And you also knew from the reports that the crime happened in the alley just beyond where Felix --

A. Half a block away.

Q. Half a block away. A very considerable distance.

So if you had had the information on the general progress report that the -- that Lopez was saying that he made the observations by the store, would that have been useful to you in cross-examination?

A. Well, now I have two different things, so I could have possibly impeached him with prior inconsistencies or asked him, "Were you by the store or were you coming from the store?" But I -- I didn't -- no, I would -- I wasn't able to develop that.

Q. And if he had actually been by the store, would that have been useful in terms of proving Lopez's lack of opportunity to observe anything from where he was?

A. Yes. He was too far away to be able to see it.

MR. BOWMAN: Your Honor, I think this would be a good time to stop.

THE COURT: Okay. Let's -- no more than ten minutes, ladies and gentlemen.

(Jury out.)

THE COURT: We're in recess. Ten minutes, ten minutes.

(Recess from 2:56 p.m. to 3:05 p.m.)

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 978 of 1254 PageID #:1051094
Wadas - direct by Bowman
1408

THE COURT: Let's see. Is everybody back?

MS. ROSEN: Mr. Sotos.

MR. GIVEN: Mr. Sotos.

MS. ROSEN: Let me go see where he is.

THE COURT: If you can get the jury ready, if they're ready, but don't bring them in yet. Okay?

THE COURT SECURITY OFFICER: They're ready.

THE COURT: Thank you. They're ready? Okay.

(Mr. Sotos and Mr. Leinenweber reenter.)

THE COURT: Okay. Everybody is back.

(Pause. Jury in.)

THE COURT: Please be seated, everyone.

Mr. Bowman, whenever you're ready.

MR. BOWMAN: Thank you, Judge.

BY MR. BOWMAN:

Q. Mr. Wadas, when we stopped for our break, we were going through some documents that you had not received in the discovery in Jacques' case, and there is in the package that I gave you a document marked Plaintiff's Exhibit 4. It's a criminal history report.

Do you see that?

A. (Witness holding up document.)

Q. Yes. And it has a date stamp on it. Can you remind us of that date stamp?

A. It looks like the "be advised" sheet was generated on

August 27th, 1988.

Q. And you had, did you not, a report in your file that was signed by Detective Guevara and Detective Gawrys?

MR. GIVEN: Objection, form, Your Honor, "detective."

MR. BOWMAN: Oh, I'm sorry.

THE COURT: Oh.

BY MR. BOWMAN:

Q. By Gang Specialist Guevara and Detective -- and Gang Specialist Gawrys, right?

A. I see it.

Q. Yes. You had that document in your file?

A. Yes.

Q. And among other things, it says that the witness had been located on August the 29th, right?

A. Correct.

Q. Then it says on that date, the witness positively identified the photo of Jose Rios.

A. Yes.

Q. And Jose Rios was a name that Jacques had used in his past, correct?

A. Yes.

Q. So if you had been provided with the report relating to Jacques Rivera that's date-stamped August 27, two days before the witness identifies Jacques as the offender in the case, would that have been of any value to you in representing

Jacques in the trial?

A. It would have because it looks like he was a suspect two days before the identification. So I might have been able to exploit that; maybe I wouldn't be able to exploit that. I don't know. But if I had the "be advised" sheet that was date-stamped, I had an option.

Q. And you were provided with some reports relating to events on August the 31st, right? I'm sorry. Let me withdraw that question. I spaced out for a minute.

Among the things that you didn't get was a report of -- that's Plaintiff's Exhibit 9 in the stack that I just handed you of things that you didn't receive relating to holding a prisoner by the name of Jose Rodriguez.

Do you have Exhibit --

A. Correct. I never got that.

Q. And this is -- I'll put it on the screen for us. This is a report with a date on it of August 31st, right?

A. Correct.

Q. And it relates to an individual named Jose Rodriguez, right?

A. Yes.

Q. And then it says that this individual -- and it's also about a victim, Felix Valentin. And it says this individual, Jose Rodriguez, is expected to be charged with aggravated battery when the investigation is completed, doesn't it?

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 981 of 1254 PageID #:1051127
Wadas - direct by Bowman
1411

A.  Yes.

Q.  Would you say that's at least interesting information to have as you're preparing to defend another guy who is being charged with a crime?

A.  Yes.

Q.  And one last thing I wanted to show you.  It's in front of you, Plaintiff's Exhibit 19-A.

A.  I have it.

Q.  And at least at the -- what it says here, this is an Investigative File Inventory, right?

A.  Yes.

Q.  And what this is is it's a list of documents that were created by the police in the course of the investigation.

A.  That's what it says.

Q.  It goes on for a couple of pages.  There's an entry on page 2 as well, right?

A.  Yes.  Two-page document.

Q.  And you didn't get this?

A.  I didn't get this.

Q.  And without this, you can't look through your file and determine what you -- what's there that you don't have in your file, right?

A.  Well, if I had this, I could have asked Victorson where are the GPRs that I didn't have or other things that I could match or not match with my file.

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 982 of 1254 PageID #:1051138
Wadas - direct by Bowman
1412

Q. So without this, you're handicapped, right?

A. Yes.

Q. Now, you don't have this information.

And at the end of the trial, what happens to Jacques?

A. He was sentenced, 80 years.

Q. And first thing that happened, of course, was that he was convicted?

A. Yes.

Q. And then there's a sentencing?

A. Sentencing hearing.

Q. So I want you to explain, if you could, a little bit for the jury about the right of allocution.

Can you tell the folks what that is?

A. Before anybody can be sentenced, the last thing that the judge says is, "Before I sentence you, do you want to make a statement before I impose sentence?" It's the defendant's absolute right of allocution.

Q. So it's a chance for the defendant to stand up and say something on his own behalf before the judge imposes sentence?

A. Correct.

Q. And it could be a big deal, right?

A. Yes. Judges look for the act of contrition, if there is one.

Q. Right. Now, in Jacques' case, did he exercise his right of allocution?

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 983 of 1254 PageID #:1051149
Wadas - direct by Bowman
1413

A.   I don't think he did.

Q.   Did he express contrition?

A.   No.

Q.   And did that have something to do with the fact that he was saying, "I didn't do this crime that I was convicted of committing"?

A.   Absolutely.

        MS. ROSEN:  Objection, Judge, foundation.

        THE COURT:  Sustained.

BY MR. BOWMAN:

Q.   So after Jacques was sentenced, you said to 80 years --

A.   80.

Q.   -- what happens then is that he goes on the bus and he goes downstate, right?

A.   Correct.

Q.   Did you make a request on Jacques' behalf relating to his opportunity to speak with his family before he went downstate on the bus to serve his 80-year sentence?

A.   I think I asked for bond pending appeal, actually, from Judge Close, which was denied.

Q.   Pretty quickly, right?

A.   Yes.

Q.   And did you also ask if Jacques could have the opportunity to hug his girlfriend and his children before he left on the bus?

A.  I believe so.

Q.  And what did Judge Close say?

A.  He denied it.

Q.  So you told us that you also worked on Jacques' appeal.

A.  Yes.

Q.  And, first of all, why don't -- well, let me ask you.

Working on an appeal is a fair amount of work, is it not?

A.  Yes.

Q.  Can you tell us what the process is, from a lawyer's perspective, of doing an appeal in a criminal case?

A.  You got to file a motion -- you got to file a notice of appeal.  Then there's a set -- series of deadlines for filing of briefs.

The notice of appeal has to be filed within 30 days and then both sides compile the record.  So it's like a joint effort with the Clerk's Office to compile the total record, including all the trial transcripts, things like that, all the documents in the court file.

And then you file your briefs and, ultimately, you go to oral argument.

Q.  Now, did Jacques and his girlfriend, Sofia, have the money to pay you to do all this work?

A.  No.

Q.  Why did you work on an appeal that you weren't going to get

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 985 of 1254 PageID #:1051161
Wadas - direct by Bowman
1415

paid to do?

A.  Just figured I owed it to him.

Q.  And why do you say that, sir?

A.  I felt bad that he went down on the case.

Q.  So what happened in the appeal?

A.  The case was argued, and the appeal was denied by the appellate court.

Q.  So Jacques stays in prison.  The conviction stands.

A.  Correct.

Q.  Could you look in your file for No. 698.  It's a letter that you wrote to Jacques Rivera on October 21, 1991.

A.  It's a letter I wrote to Jacques when he was in the penitentiary.

Q.  And is this how you informed Jacques that his appeal had been denied?

A.  Right.  I told him to file a post-conviction petition.

MR. BOWMAN:  And, Your Honor, I would move this letter as what I'll designate as Plaintiff's Exhibit 43-A.

THE COURT:  Any objection?

MR. BOWMAN:  Actually, I think this is 43-B.  Sorry.

THE COURT:  43-B.  Any objection?

MR. SOTOS:  No objection, Judge.

THE COURT:  It is received.

(Said Plaintiff's Exhibit 43-C received in evidence.)

MR. LOEVY:  43-C.

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 986 of 1254 PageID #:1051172
Wadas - direct by Bowman
1416

MR. BOWMAN:  43-C.

BY MR. BOWMAN:

Q.  Could you read the letter that you wrote to Jacques.

A.  I said:  "Dear Jacques:  It is with great regret that I must inform you that the Appellate Court ruled against us on your appeal.  I have enclosed a copy of the Court's written opinion affirming the judgment and the sentence.

"Your next option would be to file a post-conviction petition or PC.

"I am truly sorry that the Court rejected both of our arguments.  If you need any additional information or advice, do not hesitate to contact me."

Q.  Now, you point out to Jacques that the next step is a post-conviction petition.

A.  Correct.

Q.  Do you -- are you aware that Jacques did file, actually, multiple post-conviction petitions?

A.  I -- I didn't know that he did that.  I found out about it later.

Q.  And did you learn that Jacques had charged you with ineffective assistance of counsel?

A.  Later on, I found that out.

Q.  Did it rub you the wrong way, Mr. Wadas, that you'd been -- that you'd had this claim made against you that you were ineffective?

MR. SOTOS: Objection, relevance, Judge.

THE COURT: Overruled.

BY THE WITNESS:

A. No, it didn't. It's routine.

BY MR. BOWMAN:

Q. Can you explain what you mean by that?

A. After all options are exhausted, the only thing left for the petitioner, who's in custody, is to file either a post-conviction petition or a -- what they call a 2-1401 petition, which is a civil petition.

But usually, the piece -- if you're going to go with ineffective assistance or ineffective of appellate assistance, you're going to go with a post-conviction petition. And it's filed in the trial court where the case originated, back to that same judge, actually, that hears it. And 99% of the post-convictions, in fact, allege that.

Q. Now, you're a judge in the criminal courthouse. Right now, do you have dozens of post-conviction petitions pending in front of you in which lawyers are being charged with ineffective assistance?

A. About 30.

Q. You -- let me just ask you about one incident.

You found out that Jacques had been released from prison. That is, the conviction had been thrown out.

A. Yes.

Q. And that he received a certificate of innocence.

A. Yes.

Q. Did Jacques at any point after he was released come by to pay his respects to you, sir?

A. He did. Came to 26th and California. We had a brief meeting, wished each other well, and, you know, had a -- I was thrilled to see him.

Q. Well, that was going to be my question.

Were you more than happy to see him?

A. Yes.

Q. Why?

A. I don't think he ever did this murder, and he shouldn't have done the time for it.

MR. BOWMAN: Thank you, sir. I have no further questions.

THE COURT: Cross-examination.

MR. SOTOS: Thank you, Judge.

CROSS-EXAMINATION

BY MR. SOTOS:

Q. Good afternoon, sir.

A. How are you doing?

Q. Good. I want to start out by just asking you a couple questions about your background.

A. Okay.

Q. When you were doing criminal defense work, you did mostly

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 989 of 1254 PageID #:1051205
Wadas - cross by Sotos
1419

narcotics cases, correct?

A. Predominantly, yes.

Q. You handled a handful of murder cases as well?

A. Yes.

Q. Okay. At the time of the case -- at the time you were representing Mr. Rivera, do you remember how many murder cases you were handling at that time?

A. I -- I think I handled a total of three murder trials and one solicitation to commit murder. I think there was like four cases like that within the time frame. But I don't know which came first, second, or third.

Q. But in kind of a bundled-together time frame?

A. Well, one was at 26th Street, there was another one in Skokie, and there was a second one at 26th Street. Two murders at 26th Street, Jacques', and then one other in Skokie.

Q. All right. Let's talk about your representation of Mr. Rivera.

So you -- you testified that when you first met with him, it wasn't a murder case yet.

Are you certain that that was the case?

A. I'm pretty sure that the victim was not dead yet. I think, but I can't be certain.

Q. Okay. So you actually -- I mean, it was a long time ago, right?

A. 30 years.

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 990 of 1254 PageID #:1051216
Wadas - cross by Sotos
1420

Q. All right. So you don't remember as you sit here today whether you were involved in the case back at the time a couple weeks before the victim actually died or at the time that he actually passed away; is that fair to say?

A. I thought I had contact with them before the victim died, but I could be wrong.

Q. All right. And you said that you met with Mr. Rivera and his wife, and you discussed the case?

A. Yes.

Q. Okay. And that he told you that he was in a lineup and he wasn't released?

A. Correct.

Q. Okay. I'm sorry. And he was released?

A. Released, right.

Q. He did get released, right.

And that you had actually raised that in the bond hearing, correct?

A. Yes.

Q. After you raised it in the bond hearing, did you ever raise it again after that?

A. No, other than asking Victorson for the report.

Q. And at the bond hearing, you said that your client had been in a prior lineup, he'd been released.

And so other than asking Mr. Victorson for a report, that's the only other time you ever raised anything in

connection with it, correct?

A. Correct.

Q. All right. And do you remember what Mr. Rivera told you specifically about that, what he described as a lineup?

A. He said he stood in a lineup, and he did not get identified.

Q. Well, I mean, as an experienced practitioner, that could mean a lot of different things, right?

A. Sure.

Q. And so he has one perspective of it from his place in the process, correct?

A. Correct.

Q. So that's why I am asking. Do you remember if you talked to him about what it was that he actually said happened?

A. I don't remember.

Q. Okay. And you didn't keep any notes of that conversation?

A. I don't think he -- I don't -- I don't remember if he had a detail about that first lineup other than, "I wasn't identified."

Q. Okay. And you --

A. But, again, there's different ways to run those lineups. You know, you can -- through a one-way viewing mirror, in face, face to face, a couple of different formats.

Q. Right.

A. But I didn't know how that was -- how it was run.

CCase: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 992 of 1254 PageID #:1051238
Wadas - cross by Sotos
1422

Q. Okay. So -- I mean, whether he actually was in what was -- is referred to by lawyers and judges as a lineup or not, you didn't really know one way or the other?

A. Correct.

Q. Right. He -- but you knew at least he had -- according to what he told you, he'd been at the police station, and he had been in a room, something at least along those lines?

A. And stood in a lineup. That's what he said.

Q. All right. So -- but, again, that's why I'm asking, like, the more detailed questions. Like, if he ever said anything about what that meant, like he was seen in a room with other people, did they stand shoulder to shoulder, were there photographs taken, things like that.

A. I don't think I got those details. If I did, I do not remember them.

Q. Okay. Because there's been a lot of testimony in this case about the fact that there is no report of a lineup, correct?

A. Correct.

Q. You've testified to some of that yourself, correct?

A. Correct.

Q. And you testified that if you would have had a report of a lineup, that was something you certainly could have done something with.

A. Correct.

Q. You could have used it to undermine the strength of the

eyewitness' identification, correct?

A. Correct.

Q. Maybe if you had such a report, then you actually could have filed a worthy motion to suppress the actual identification on the grounds that it wasn't reliable based on a prior non-identification.

A. Maybe.

Q. All right. And is it your understanding that -- you know, this isn't a case where a lineup report has surfaced in the last few years, and you didn't have that.

It's your understanding that there still is no lineup report, correct?

A. Correct. I've never seen one.

Q. Okay. You did have documentation, though, that your client was in the police station a couple years before -- excuse me, a couple weeks before he was charged with a crime, correct?

A. Yes.

Q. All right. And so let me ask you to take a look at --

MR. SOTOS: Can you put up the -- go with the 917, 23-F, 23-F.

BY MR. SOTOS:

Q. And, you know, before we get to this, I want to ask one other question.

So you don't recall talking to Mr. Rivera, when you had this discussion about the prior lineup, about him

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 994 of 1254 PageID #:1051250
Wadas - cross by Sotos
1424

describing for you five or six conversations he had with lockup keepers specifically in relation to what he was being told or anything of that nature?

A.  Correct.

Q.  Okay.  So this document that's in front of you is Defendants' Exhibit 23-F.  This is the -- a September 1st Supplementary Report.

MR. SOTOS:  If this isn't already in evidence, Judge, I'd move that it be in evidence.  I know it is in one form or the other.  I just don't know if it's --

THE COURT:  Any objection?

MR. BOWMAN:  None, Your Honor.

THE COURT:  It is received.

(Said Defense Exhibit 23-F received in evidence.)

BY MR. SOTOS:

Q.  All right.  So this is a document, Mr. Wadas, that you definitely did have at the time you were representing Mr. Rivera, correct?

A.  Yes.

Q.  Okay.  So this document had quite a bit of information in it about it in regards to what your client was saying about having been in the police station two weeks earlier, correct?

A.  It -- it says that there's two people in custody.

Q.  Right.  So -- yeah.  If we start on the first page there, it shows that both Mr. Rivera and a Jose Antonio Rodriguez were

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 995 of 1254 PageID #:1051261
Wadas - cross by Sotos
1425

Q. In custody on that date, correct?

A. Yes.

Q. In the police station. And you've -- you know Jose Antonio Rodriguez to be the Mr. Rodriguez who has been talked about during your direct examination who was identified by the victim at one point as having been the suspect, correct?

A. Yes.

Q. Okay. And do you see on the bottom there that document is signed by Gillian McLaughlin, and it looks like John Leonard next to her name, correct?

A. Yes.

Q. And you knew John Leonard at the time, right?

A. Yes.

Q. And you had a lot of respect for him at the time?

A. Had him on another case, too.

Q. Right. He did you a favor on another case at one point?

A. Yes.

Q. And you didn't know Gillian McLaughlin, though?

A. I didn't really know her that well.

Q. Okay.

A. If at all.

Q. You knew Jack Leonard well enough to have a conversation with him, if you were inclined to do that?

A. Yes.

Q. So if you go to the second page -- that's page 511. Give

it a second to appear.

MR. SOTOS: Apparently, we're having -- we're having --

THE COURT: Something's happened.

MR. SOTOS: We were having technological difficulties.

BY MR. SOTOS:

Q. So, Mr. Wadas, you see -- and have you looked at this report in preparation for your testimony?

A. Did I what?

Q. Did you look at this report in preparation for your testimony today?

A. I reviewed -- I have reviewed the documents, but not like yesterday or anything like that. But I have reviewed them, correct.

Q. Understood. It won't be a memory test. We'll go through it carefully here.

So right at the -- up near the top of the page, do you see where it says -- it shows the time and location of the arrest of both Mr. Rivera and Mr. Rodriguez?

A. Yes.

Q. Okay. And then right below that, it says: "Evidence: 544008 (652) Photos," correct?

A. Yes.

Q. All right. Did you know what that meant when you saw that? Assuming --

Wadas - cross by Sotos

1427

A.  It seemed like there would be lineup photos, or that could be photos, like booking photos or something, of the two individuals.

Q.  You can't tell just from reading that?

A.  I --

Q.  You --

A.  I don't know.

Q.  Just that there's some photos that have been inventoried, right?

A.  Correct.

Q.  And can you please tell the jury what that means when photos are inventoried.

A.  That means the police would take those photos, put them in a plastic bag, assign a number to it, give it to a sergeant, he signs off, and it goes into evidence.

Q.  So you knew, upon reading this report, that if you wanted to see those photos, whatever they were, you would have been able to get them?

A.  Yes.

Q.  If you look at the paragraph right below that, you see there that it states that the undersigned detectives -- again, referring to Detective McLaughlin and Detective Leonard -- were assigned to the continuing investigation and that their efforts to locate Mr. Rivera were successful, and he was taken into custody, advised of his Miranda warnings and transported to

CCase: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 998 of 1254 PageID #:1051294
Wadas - cross by Sotos
1428

Area 5. And that due to the lateness of the hour, the parents of the witness indicated that the daytime hours would be better for viewing of a lineup.

A. Yes.

Q. So that he was -- a hold was placed on him for lineup purposes.

A. Correct.

Q. Now, during your direct examination, I think you were showed documents that you didn't have, like release and hold documents.

Do you recall seeing those?

A. Yes.

Q. Do you remember -- when you saw those, was there anything in those release and hold documents that you weren't already aware of through reading the supp. reports that the detectives did that were provided to you by the Chicago Police Department?

A. I've never really looked at those reports closely.

Q. All right. So -- that's fair.

So, as you sit here today, you don't know that there's anything in those release and hold documents that the police department didn't provide to you that wasn't already contained in the supp. reports that you did have?

A. Correct.

Q. And if you go into the next paragraph -- I think it's the one after that. Oh, no. That's -- that's the right one. I'm

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 999 of 1254 PageID #:1051305
Wadas - cross by Sotos
1429

sorry.

So this next paragraph, this talks about the fact that Mr. Rodriguez was also -- a hold was also placed on him so that the witness, Mr. Lopez, could view him in a lineup, and that the lateness of the hour also prevented an interview with the victim at the hospital who was in surgical intensive care, correct?

A.   Correct.

Q.   So you didn't get the perspective from reading this that the detectives were trying to hide anything about what happened on the 30th, at least when you read that report, right?

A.   That's true.

Q.   And the next paragraph, it essentially details that attempts were made to locate Mr. Lopez in order to have him view a lineup.  And this is on the next day, so this is moving on to August 31st.  And that "numerous visits to witnesses' residence proved negative."  And the family indicated that they were unaware of his whereabouts, but that he may have been visiting his father, address unknown.

Do you see that?

A.   Yes.

Q.   Okay.  Did that strike you as particularly unusual when you read that?

A.   No.

Q.   And that after they were unable to find the witness, that

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 1000 of 1254 PageID #:105136
Wadas - cross by Sotos
1430

the detectives, again, Detective McLaughlin and Detective Leonard, went to Cook County Hospital and attempted to talk to the victim, correct?

A. Correct.

Q. And that they described for a variety of reasons that they were unable to really effectively communicate with him. They had talked with -- well, let me just read it so I'm not just paraphrasing it.

Do you see where it states that: Verbal communication was next to impossible due a ventilator hookup through his mouth and throat. The victim appeared to understand questions of a yes and no nature. That the detectives inquired of the physician staff that photos could be shown to the victim, and staff indicated yes, but that the victim is regularly medicated and the response would be dependent of that medication. That the detectives then went back to Area 5 and requested 14th District personnel to locate persons fitting the description of both suspects to produce a photo spread so they could then show them to the victim at that time?

A. That's what it says.

Q. Is that what it says? Okay.

And upon reading that paragraph, you didn't think there was anything unusual or suspicious about what you read in that paragraph; is that fair to say?

A. Correct.

Q. And, in fact, if the officers were in any way exaggerating the victim's medical condition at the time, you certainly could have talked to personnel at the hospital or subpoenaed medical records in order to confirm that what they were saying was true?

A. No. It looked like what they were saying was accurate.

Q. Right. So you didn't feel any need to determine whether, in fact, it was or it wasn't?

A. Correct.

Q. The next paragraph, it states that the detectives then returned to Cook County Hospital with six photos, and there's an inventory number next to that, "Inventory #544-008 652."

It should be noted that they were not shown numerically to the victim. And that's something that -- did you -- well, you know what? Let me just show them to you at this point.

MR. SOTOS: Could we go to the Elmo? What group is this?

(Counsel conferring.)

BY MR. SOTOS:

Q. Mr. Wadas, I'm going to place in front of you a series of photographs. See if I can put them next to each other. And these are in evidence as City's Exhibit No. 43.

And I'll represent to you that these are the photos that were contained in the inventory envelope at the Chicago

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 1002 of 1254 PageID #:105133
Wadas - cross by Sotos
1432

Police Department ever since this report was filed.  Okay?

And on the back of each one of these photos -- and do you -- by the way, do you recognize anybody in any of those photos?

A.  Jacques.

Q.  The top, top-right corner?

A.  Correct.

Q.  Okay.  So on the back of all of these photos is a number.  Do you see those?

A.  Yes.

Q.  All right.  And that's to basic -- is it your understanding that that would be so that each photo could be identified for purposes of establishing an appropriate photo array?

A.  Right.

MR. SOTOS:  And if you go back to that report -- could we go back to the --

BY MR. SOTOS:

Q.  If you go back to that report, in that bottom paragraph, do you see where it states the photos were numbered 1 to 6, but they were not shown numerically to the victim?

A.  Yes.

Q.  Okay.  And is it -- was it appropriate for the detectives to note in the report that they were not going to show the pictures in any particular order?

A.  Yes.

Q. Okay. And that's not the kind of thing that is any -- in any way inappropriate, correct? To make sure that the photos are shown in random order rather than from 1 through 6?

A. Well, I don't know if it makes any difference what order they're being shown, but the idea that they're shown one at a time is the preferred way.

Q. Right. And it's particularly appropriate if you're going to show them in any random order that you document that, correct?

A. Correct.

Q. All right. And that's documented here, correct?

A. Yes.

Q. And then the report goes on to say that the -- oh. And, by the way, you do see on the bottom line of that page that the photos were individually held for the victim to view in random order?

A. Yes.

Q. Right. And it's your understanding that that's the preferred way to do that?

A. Correct.

Q. And then the report goes on to state that the photos were being shown -- as they were being shown to the victim, it appears he was having a difficult time -- and we'd have to move on to the next page, 512 -- a difficult time focusing on the photos and that the victim's eyes were constantly tearing. And

the detectives inquired of the staff about the victim's medication at the time, and that they learned the victim had been placed on a morphine drip for the pain.

It states that it should also be noted that the victim was in constant motion from side to side, as the whole bed moved to help keep lungs from filling with fluid.  Staff indicated that the victim was presently in danger of contracting pneumonia.  It was then decided to cease the photo identification until later in the week when the physician indicated that the tubes would be removed from the victim's throat.

So according to the detectives' report, they attempted to do a photo array of the victim and were unable to do it because of his medical condition, correct?

A.  Correct.

Q.  And if you had any reason to doubt that what Detective McLaughlin was saying and Detective Leonard were saying about the victim's medical condition was anything other than a hundred percent accurate, you could have gotten that information from the hospital without too much difficulty, right?

A.  Correct.  And I believe that that was his condition, what they said there.

Q.  Correct.  And then going further on in the report, the officers -- the detectives actually included the names of all

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 1005 of 1254 PageID #:105136
Wadas - cross by Sotos
1435

Q. of the individuals whose pictures I just showed you, correct?

A. Correct.

Q. Along with their addresses.

A. Yes.

Q. So that's not the kind of thing that reads to you like a detective who was trying to cover up a lineup involving Mr. Rivera, does it?

MR. BOWMAN: Object to the form of the question.

THE COURT: Sustained.

MR. SOTOS: I'll move on.

BY MR. SOTOS:

Q. So when -- when we talked during this trial about, you know, if you would have had a photo of an actual -- or, excuse me, a report of an actual lineup, that that would have helped you in connection with representing your client, you had what you needed if you wanted to create an issue further on in the proceedings about whether or not there was, in fact, an actual lineup the first time, correct?

I mean, this report gave you the information that you would have needed if you thought at the time that there was any point to making an issue out of it?

A. No. I -- it wouldn't have been enough, just this report.

Q. Well, your client --

A. If there really was a lineup.

Q. Well, but your client had told you that he was in a lineup,

Q. correct?

A. Correct.

Q. But he didn't really specify what he meant by that, correct?

A. Correct.

Q. And these reports indicated to you that the police officers -- that these officers, in fact, documented that he was in the station, that they were trying to do a lineup, that they took pictures of him and several other people --

A. Yes.

Q. -- and preserved those for anybody who wanted them, correct?

A. Yes.

Q. So at the time, did you reconcile what your client was telling you with what you saw in the report and conclude, "Well, that must be what he was talking about"?

A. It's a possibility, but I think he stood in a real lineup based on what he told me.

Q. Which was, "I was in a lineup"?

A. Well, not a photo array, right.

Q. But, again, if you still doubted what the police officers were saying -- let me strike that and go back.

MR. LOEVY: Objection, asked and answered.

MR. SOTOS: Well --

THE COURT: Well, but there's no question pending.

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 1007 of 1254 PageID #:105133
Wadas - cross by Sotos
1437

MR. LOEVY: He said he was going to go back.

MR. SOTOS: Isn't that what -- well, back --

MR. LOEVY: Sorry.

MR. SOTOS: -- to the beginning of the question.

MR. LOEVY: All right.

BY MR. SOTOS:

Q. Is that what your testimony is, that even after reviewing the report that we just reviewed, you still felt that there was something more that had happened with your client at the police station beyond what he told you?

A. No, not beyond what he told me.

Q. Okay. Or be -- I'm sorry. Beyond what the officers reported?

A. I don't understand.

Q. Taking you back in time to when you had a conversation with your client, when he told you he was in a lineup, and then having reviewed that supp. report that detailed everything that the detectives did on the 30th and the 31st, when you knew he was, in fact, in custody.

Was it your perception at the time that what Mr. Rivera was describing was basically what the officers had documented, and so you were able to reconcile them that way?

A. I couldn't really reconcile them, but it's very likely that this actually happened just the way they said.

Q. The way the officers did?

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 1008 of 1254 PageID #:105139
Wadas - cross by Sotos
1438

A. Right.

Q. And if you had any suspicions, based upon what your clients had told you and based upon the report that you had, there were a lot of things you could have done, if you had been so inclined, to determine whether there was more to it?

A. Not that much, but a couple of things.

Q. Well, you could have just talked to Detective McLaughlin, right?

A. She would've talked to me about that?

Q. Do you have some reason to believe she wouldn't?

A. Usually, they don't talk to you. Usually, detectives don't talk to defense lawyers.

Q. Well, you -- you only tried to talk to two detectives, right? You only tried to talk to one or two detectives, Letrich and Moriarty, right?

MR. LOEVY: Objection, Your Honor. Neither was a detective.

MR. SOTOS: That's right. I apologize.

BY MR. SOTOS:

Q. You only tried to talk to one police officer, and that was Officer Letrich or Officer Moriarty, correct?

A. Correct.

Q. Was it -- do you remember which one you talked to? Was it Letrich, since he testified at the trial?

A. Letrich.

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 1009 of 1254 PageID #:105145
Wadas - cross by Sotos
1439

Q. Okay. And he talked to you willingly?

A. Correct.

Q. And you didn't try and talk to Detective McLaughlin?

A. No.

Q. Okay. Because that could have just been a phone call.

And, again, if you had reason to be suspicious.

A. I could've made a phone call.

Q. Okay. And -- or you could have called Detective Leonard, who you knew.

A. Correct.

Q. All right. And, you know, even beyond that, if you didn't -- if you thought for some reason that the police officers wouldn't talk to you, you could have contacted any one of those fillers who were in the lineup -- or in the photo array, correct?

A. I could've tried to contact those people.

Q. Well, you had addresses for all six of them, right?

A. Correct.

Q. So, I mean, I can tell you already that two of them have testified during the trial here, 30 years later.

So if you had any suspicions, based upon reading Detective McLaughlin and Detective Leonard's report, there's nothing that would've stopped you from talking to the fillers and saying, you know, "Hey, were you in a lineup a couple weeks ago? Were you at the police station? And what happened

there?"

A.  Yes.

Q.  Okay.  And there's no reason to think that they would have been reluctant to talk to you, correct?

A.  I don't know.

Q.  So you don't remember, then, having any concerns about what Mr. Rivera was telling you about the first lineup after you had reviewed that August 31st report in which the detectives explained everything that had happened that day?

A.  Correct.

Q.  Okay.  Mr. Bowman asked you about some other documents that weren't provided to you by the Chicago Police Department, and I want to ask you about a couple of them.

So there's been some talk about general progress reports.  And you know what those are, right?

A.  Yes.

Q.  Can you tell the jury briefly what they are?

A.  Anytime an officer is talking to witnesses or people that are involved in the case -- and even if it doesn't get involve -- if it doesn't get reduced to a full-blown supplementary report, they're supposed to prepare GPRs, general progress reports.  Basically, they're notes.

Q.  All right.  So I'm going to show you -- well, what's in front of you is a document that's marked as Defendants' Exhibit No. 1.24.

MR. SOTOS:  And, again, I believe this is in evidence as a plaintiff's exhibit, Judge, but we would offer it as Defendants' 1.24.

THE COURT:  I assume no objection?

MR. BOWMAN:  It is in evidence.  No objection.

THE COURT:  It's received.

(Said Defense Exhibit 1.24 received in evidence.)

BY MR. SOTOS:

Q.  Okay.  Mr. Wadas, is this one of the supp. reports that was handed to you during your direct examination in regards to documents that weren't provided by the Chicago Police Department?

A.  Right.

MR. BOWMAN:  Objection, form.

MR. LOEVY:  You said "supp. report."

MR. BOWMAN:  You said "supp. report."

MR. SOTOS:  Oh.  I -- and I've said that a lot.

BY MR. SOTOS:

Q.  Is this one of the general progress written -- handwritten reports that was provided you -- to you during your direct examination with the representation that they had not been turned over by the Chicago Police Department?

A.  Correct.

Q.  And so looking at that supp. report, Defendants' 1.24, do you see anything on that supp. report that you didn't already

have in some other fashion?

If you don't remember, just let me know, and I can show you another document.

A. Looks like they ran a canvass and didn't get any information.

MR. SOTOS: All right. Can we go side by side?

Judge, we're going to try and expand the technology to go side by side with Defendants' 23-J.

I think I put him on the spot, Judge. Oh, there it is. Okay.

BY MR. SOTOS:

Q. So, Mr. Wadas, due to the miracles of technology, we now have before you a general progress report that was not provided to you by the Chicago Police Department next to a supplementary report, again, from Detective McLaughlin and Detective Leonard that was in your possession and was in your file.

Do you see those two documents?

A. Yes.

MR. SOTOS: And, Judge, we would move to admit Defendants' 23 -- we've marked this as 23-J.

MR. BOWMAN: It's not --

MR. SOTOS: It's page 513 and 514. And, again, I believe it's already in in another form, but --

THE COURT: Assume, then, no objection?

MR. BOWMAN: None, Your Honor.

(Said Defense Exhibit 23-J received in evidence.)

BY MR. SOTOS:

Q.  So in the supp. report, at the top, it has the names of D. Keating and J. McDonald.

Do you see those same two names in the supp. report that you were provided by the Chicago Police Department?

A.  Yes.

Q.  All right.  Then if we could turn the supp. report over to the next page.  Okay.

The remaining information on this general progress report, the written report, 3300 through 3318, abandoned building, down through -- I didn't do that as well as I wanted to.  Well, okay.  Down -- yes, right there.  Down through 3321.

That looks to you like it reflects a canvass that was done, correct, where the detectives were unable to come up with any significant information?

A.  That's what it looks like.

Q.  All right.  And then you see on the general -- the supp. report that you were provided, the bottom -- second-to-bottom paragraph describes that same canvass in the last couple of sentences?

A.  Yes.

Q.  So there was no information that you needed -- well, you know what?  Let me finish first with the progress report.

You see on the left side where it says:  "5 recovered

22," something, "shell casings, mouth of alley," and below that, "photos of scene, photos of victim's car"?

A. Yes.

Q. That's also -- that same information is also contained in the supp. report, in that paragraph: The scene was processed, shell casings were found, photographs were taken, et cetera, et cetera.

A. Correct. The supp. report was put into it. I mean, the GPR was put into a supp. report.

Q. Correct. And, by the way, that's commonly what happens, correct? Is it your understanding the police officers complete the GPRs while they're actually engaged in the investigation?

A. Yes.

Q. And that they later incorporate those into supp. reports?

A. Usually.

Q. All right. And then they're required to take their GPRs, their notes, and -- well, the police officers turn them in to their superiors and then they go through the Chicago Police Department processes and presumably get turned over to you when you're representing a criminal defendant?

A. Yes.

Q. All right. So beyond the fact that that -- that the -- these GPRs did not end up in your hands, what I'm trying to explore right now is whether there was actually any information that was useful in the GPRs that you didn't get.

MR. LOEVY: Objection. GPRs generally or the one he just asked about?

MR. SOTOS: Well, this one so far. We'll ask about others.

BY THE WITNESS:

A. Looks like this GPR was incorporated into a supplementary report.

BY MR. SOTOS:

Q. Okay. Thank you. All right. Let's --

A. Same information.

Q. Thank you. Let's go --

MR. LOEVY: Your Honor, we could stipulate that there's plenty of GPRs that were not -- that nothing was withheld, if that would speed it up.

MR. SOTOS: Judge, if they'll stipulate that all of them --

MR. LOEVY: Not all of them.

MR. SOTOS: Well, I don't know which ones they won't stipulate to.

THE COURT: I'll tell you what. We're going to take our break in a couple of minutes. Maybe this evening, you could identify the ones that were incorporated, and we don't have to spend all this time tomorrow.

MR. SOTOS: That would be great, Judge.

MR. LOEVY: That'll work.

MR. SOTOS:  That'd be fine.

THE COURT:  So let's just -- we've got a couple more minutes, Mr. Sotos.  Let's -- assuming that we're going to be able to get this worked out overnight, let's move on to something else.

BY MR. SOTOS:

Q.  You testified on direct examination that this was a really weak case, correct?

A.  In my view, yes.

Q.  I don't know if you said "really weak," but you said "weak," right?

A.  Yes.

Q.  And, in fact, it seemed like a really weak case?

A.  Yes.

Q.  You had a single-witness I.D., and that was basically it, right?

A.  That's it.

Q.  No physical evidence.  No confession.

A.  Correct.

Q.  You didn't have any information that the police had tried to force your client to confess.  They had this one 12-year-old boy.

A.  That's it.

Q.  And that's what the prosecution had, and that's the case that the prosecution presented, correct?

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 1017 of 1254 PageID #:105143
Wadas - cross by Sotos
1447

A. Yes.

Q. Now, you've heard the phrase that, you know, you take your witnesses as you find them?

A. Yes.

Q. All right. So the police didn't really have any control over who was standing at the scene on August 27th, 1988 when somebody shot Felix Valentin, correct?

A. True.

Q. All right. And so by all accounts, you don't -- you never had any reason to doubt that Orlando Lopez was actually there at some place when the shooting occurred?

A. Correct.

Q. You didn't think that the police went and found a 12-year-old boy witness out of nowhere and said --

A. No.

Q. -- "We're going to make you our witness in this case"?

A. No.

Q. So you didn't have a dispute about the fact that he was there. Your issue was what was he -- what did he actually see?

A. See, right.

Q. And your defense was pretty much based along that -- that defense, right?

A. Correct.

Q. Okay. And you also had a report from two other police officers which indicated that the victim had identified

somebody else in the hospital.

A. Correct.

Q. Okay. And, in fact, identified two people in the hospital.

A. Yes.

Q. All right. And so there's been some talk -- you talked about what exculpatory evidence is during your direct examination.

A. Yes.

Q. Okay. So that was exculpatory information, right?

A. Yes.

Q. All right. And the Chicago Police Department turned that information over to you, correct?

A. Yes.

Q. And so you were able to use that to the best of your ability to develop a defense during the criminal case?

A. True.

Q. Based upon that?

A. True.

Q. Okay. And --

THE COURT: All right. Mr. Sotos, we've got about another minute. So when you can reach a convenient wrapping-up point, let's take our evening recess.

MR. SOTOS: You know, Judge, this is fine. We can pick it up tomorrow. That's fine.

THE COURT: Okay.

MR. SOTOS:  Thank you.

THE COURT:  9:30, ladies and gentlemen.

(Jury out.)

THE COURT:  So if it's possible to figure out which of these documents -- we don't have to -- I mean, because it took -- I don't know.  What'd it take, a half an hour?  It would save us probably two hours or something if we could do that.

MR. SOTOS:  We'll do that right now.

THE COURT:  That would be great.

Okay.  Anybody need to see -- if you need to see me before 9:30 in the morning, just send us an e-mail and let us know that.  Okay?

MR. SOTOS:  All right, Your Honor.

MR. LOEVY:  Thank you, Your Honor.

MR. SOTOS:  Have a good afternoon.

THE COURT:  All right.

MR. ART:  Thank you, Judge.

THE COURT:  And 9:30 works for you?

THE WITNESS:  I'll be back.

THE COURT:  Okay.  All right.  Good night, everybody.

MS. ROSEN:  Good night, Judge.

(Adjournment at 4:00 p.m. until 9:30 a.m., 6/13/18.)

CERTIFICATE

I, Colleen M. Conway, do hereby certify that the foregoing is a complete, true, and accurate transcript of the Trial proceedings, Vol. 6 B, had in the above-entitled case before the HONORABLE JOAN B. GOTTSCHALL, one of the Judges of said Court, at Chicago, Illinois, on June 12, 2018.


*/s/ Colleen M. Conway, CSR, RMR, CRR*                    *06/13/18*

Official Court Reporter                                       Date
United States District Court
Northern District of Illinois
Eastern Division

# EXHIBIT 52

1450

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JACQUES RIVERA,                              ) No. 12 CV 4428
                                             )
            Plaintiff,                       )
vs.                                          ) Chicago, Illinois
                                             )
REYNALDO GUEVARA, STEVE GAWRYS, DANIEL NOON, )
JOHN GUZMAN, JOSEPH FALLON, JOSEPH SPARKS,   )
PAUL ZACHARIAS, GILLIAN MCLAUGHLIN, JOHN     )
LEONARD, EDWARD MINGEY, RUSSELL WEINGART,    ) June 13, 2018
ESTATE OF ROCCO RINALDI, City OF CHICAGO,    )
                                             )
            Defendants.                      ) 9:20 o'clock a.m.

VOLUME 7 A
TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JOAN B. GOTTSCHALL
and a jury

APPEARANCES:

For the Plaintiff:     LOEVY & LOEVY
                       BY:  MR. JONATHAN I. LOEVY
                            MR. STEVEN E. ART
                            MR. ANAND SWAMINATHAN
                       311 North Aberdeen Street
                       3rd Floor
                       Chicago, Illinois  60607

                       MacArthur Justice Center
                       Northwestern University School of Law
                       BY:  Locke E. Bowman , III
                       357 East Chicago Avenue
                       Chicago, Illinois 60611
                       (312) 503-0844


Court reporter:          Blanca I. Lara
                       Official Court Reporter
                       219 South Dearborn Street
                           Room 2504
                       Chicago, Illinois 60604
                         (312) 435-5895
                       blanca_lara@ilnd.uscourts.gov

1451

Appearances   (continued:)


For the Individual          THE SOTOS LAW FIRM
Defendants:                 BY:   MR.  JEFFREY N. GIVEN
                                  MR.  JAMES G. SOTOS
                                  MS.  CAROLINE P. GOLDEN
                                  MR.  JOSEPH M. POLICK
                                  MR.  DAVID A. BRUEGGEN
                            550 E. Devon Avenue, Suite 150
                            Itasca, Illinois  60143


For the Defendant           ROCK FUSCO & CONNELLY, LLC
City of Chicago:            BY:   MS.  EILEEN E. ROSEN
                                  MS.  CATHERINE M. BARBER
                                  MS.  THERESA B. CARNEY
                            321 N. Clark St., Suite 2200
                            Chicago, Illinois  60654


For the Defendant           LEINENWEBER BARONI & DAFFADA, LLC
Guevara:                    BY:   MR.  THOMAS E. LEINENWEBER
                                  MR.  JAMES V. DAFFADA
                            120 N. LaSalle St., Suite 2000
                            Chicago, Illinois  60602

1452

(THE following proceedings were had out of the presence of the jury in open court:)

COURT SECURITY OFFICER: All rise.

THE COURT: Okay, the jurors are here.

I just want to mention that this issue of the investigator and Lopez has come up a number of times. I don't know if it's ever going to come up again, but I just want to tell you that we did some research and we don't know how it comes in under the hearsay rules. So definitely next time, if ever, this arises --

MR. LOEVY: We've done some research, too, that we'd love to share with you.

THE COURT: That would be great. I'm not saying I've exhausted it, it just seems to me that there is an issue and it's complex.

MR. LOEVY: We should talk about it.

THE COURT: Yeah.

MR. LOEVY: Thank you, Your Honor.

COURT SECURITY OFFICER: All rise.

(The following proceedings were had in the presence of the jury in open court:)

THE COURT: Is the witness here?

(Brief pause).

THE COURT: Please be seated, ladies and gentlemen. Good morning.

We're just getting the witness, right?

MR. ART: We are. Yes, Judge.

THE COURT: Okay.

(Brief pause).

THE COURT: Mr. Wadas, you may retake the witness stand.

THE WITNESS: Thank you. Good morning.

THE COURT: Mr. Sotos, whenever you're ready.

MR. SOTOS: Thank you, Your Honor.

KENNETH J. WADAS, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

CROSS EXAMINATION (resumed)

BY MR. SOTOS:

Q. Good morning, Mr. Wadas.

A. How you doing.

Q. You had talked a little bit during your direct examination yesterday about learning at some point that Mr. Rivera had accused you of ineffectively assisting him as his attorney, do you recall those questions?

A. Yes.

Q. I think you said that that comes up in 99 percent of the cases?

A. Quite a lot.

Q. All right. That was a bit of an exaggeration, right?

A. I don't think so.

Q. You really think that that's the case in 99 percent of the

cases that --

A.   A high percentage, I'll say that.

Q.   Okay.  I won't quarrel with you.

Were you aware specifically that Mr. Rivera had signed an affidavit stating that you had failed to diligently represent him and failing to call his wife, Sophia Matarazzo, to the stand to present an alibi defense for him?

A.   I didn't know that.

Q.   Is this the first you're hearing of that?

A.   I -- I don't know the details of post-convictions.

Q.   So is this the first you're hearing of that accusation that he had made?

A.   Someone might've told me that before, but I don't really remember.

Q.   Maybe one of Mr. Rivera's attorneys?

A.   Possibly.

Q.   Okay.  Did you meet with them to prepare for your testimony?

A.   Did I meet with them after my testimony?

Q.   No, to prepare for your testimony in court.

A.   Yes.

Q.   And when was that?

A.   Last week.

Q.   About how long did you meet for?

A.   Pardon me?

Q. About how long did you meet for?

A. I would say a couple of hours.

Q. That was you and Mr. Bowman?

A. Correct. Mr. Bowman.

Q. Anybody else?

A. That's it.

Q. Are you also aware that Mr. Rivera in a post-conviction petition that he filed had accused you of not exercising reasonable diligence in failing to determine the identity of the people who were in the photo array, or as he described it, lineup back in August 30th?

A. I didn't know that.

Q. This is the first you're hearing that as well?

A. No, I probably heard it before, but not at the time that the post-conviction was filed.

Q. Something that probably came up during your discussions with --

A. Correct.

Q. -- plaintiff's counsel?

A. Correct.

Q. Something they told you that I might be asking you about?

A. It might've been raised during a deposition, I don't remember.

Q. I think you testified yesterday during direct examination that you recall meeting with Mr. Rivera and him telling you

that he was not a member of the Latin Kings at the time?

A.   At the time, correct.

Q.   Are you aware that that's not true, that he was a member of the Latin Kings at the time that you represented him?

A.   I don't know that to be true or not true.

Q.   Is this also the first time you've heard that?

A.   That he was a member of the Latin Kings at the time of the shooting?

Q.   Correct.

A.   I don't know if it's the first time I heard it, but --

Q.   When you met with lawyers for Mr. Rivera, did they telling you that, in fact, Mr. Rivera was a member of the Latin Kings at the time of the shooting?

A.   I think they might've mentioned that.

Q.   And I think you testified yesterday that your conversation with him when you first met with him, how many times do you think you discussed the case with Mr. Rivera during the time you represented him?

A.   Ah, I don't know the total number of times, but we went over things that were on the police reports, repeated discussions about possible alibi witnesses things like that.  I would say multiple times, but I don't remember how many.

Q.   If I told you that he testified that he only met with you twice over the years, would that not be, correct?

A.   I don't think that's accurate.

Q.  If I told you that he testified here that he didn't know what his case was about until his case went to trial, would that be accurate?

MR. LOEVY:  Objection.  Mischaracterization.

THE COURT:  Sustained.

BY MR. SOTOS:

Q.  We talked about -- we started to talk a little bit about GPR's yesterday.  You told the jury that GPR's are handwritten notes that police officers prepare when they're doing investigative work, like interviewing witnesses, things like that, correct?

A.  Yes.

Q.  And you didn't have those -- it's your testimony that you didn't have those GPR's during the case?

A.  Correct.

Q.  Or they would've been in your file that you turned over to Northwestern 22 years later?

A.  It would've been part of the police reports, yes.

Q.  So do you know for sure whether or not those GPR's were somewhere in your office, one way or the other?

A.  No, everything was -- everything relating to the case was in the file.

Q.  You know that for sure?

A.  Yes.

Q.  Okay.  Because when you gave us your file, at one point

your notes, you had 12 pages of notes that weren't in the file, correct, and you had to give them to us later?

A.   That's correct.

Q.   So you're certain that's not the case with GPR's?

A.   Actually, I think those notes were in the file, but somehow they just didn't not photocopied.

Q.   All right.  Somehow in your office, you intended to get everything to us, and then the notes were somewhere in your office, and they didn't get copied, and you don't know why that is?

A.   Correct.

        MR. BOWMAN:  Objection.  That's not what he said.

        MR. LOEVY:  He said the notes were in the file.

        THE COURT:  Overruled.

BY MR. SOTOS:

Q.   Oh, I'm sorry.  Sp it's your testimony that you know that that the notes were, in fact, in the file and they still didn't get copied?

A.   I thought they would've been in the file.

Q.   But, again, you don't know one way or the other whether they were found someplace else in your office and then copied -- strike that.

        The way this came up was, you gave a deposition in the case right?

A.   Correct.

Q. And you had given us a list of the documents that were in your file, correct?

A. Correct.

Q. And the list contained a reference to 12 pages of notes?

A. Yes.

Q. And then you had testified at that time that you didn't think there really were 12 pages of notes, but you weren't sure?

A. Correct.

Q. So you were going to go back to your office and check?

A. Correct.

Q. And then you did, right?

A. Yes.

Q. Okay. And you found the notes?

A. I found the notes.

Q. Do you remember where you found the notes?

A. With the file or with a file next to the file. This file became very large, and there were multiple files together.

Q. Okay. So you found it somewhere near the file.

A. Somewhere near the file, right.

Q. Then you provided them to us?

A. Correct.

Q. Okay. And all I'm asking you is, do you know for certain, one way or the other, whether or not GPR's could've been somewhere in your office as well and they got misplaced over

the 20 years or so that --

A.   No, I never got them.

Q.   Okay.  So let's talk about those, just briefly.

GPR's, again, are notes that police officers make when they're investigating -- while they're actually investigating a case?

A.   Yes.

Q.   And then it's your understanding that those GPR's then get transformed into what are called supplementary reports which are supposed to contain much of that information?

A.   They may.

Q.   But sometimes they don't?

A.   Correct.

Q.   All right.  And you knew at the time you were representing Mr. Rivera all about GPR's, correct?

A.   Yes.

Q.   And so if it's your testimony that you didn't have the GPR's and you wanted them, you would've been able to get them, correct?

A.   Yes.

Q.   All right.  If you thought that there might be something important in them, you knew a variety of ways that you could get the GPR's?

A.   I could've subpoenaed the GPR's.

Q.   I want to ask you about that, because Mr. Bowman asked you

yesterday about -- I think his question was, "They're going to suggest to you that you should have subpoenaed lineup reports that didn't exist," do you recall that question?

A. Yes.

Q. Okay. And I haven't asked you about whether or not you should've subpoenaed a Lineup Report that didn't exist, right?

A. Right.

Q. Okay. But what I am asking you about is with respect to the GPR's, the handwritten notes, if you wanted those documents, as you said, you could've subpoenaed them?

A. Yes.

Q. Or you could've -- you could've asked the State's Attorney to ask the police officers, "Hey, we didn't get the notes, can you get us the notes"?

A. Yes.

Q. Or filed a motion with the Court. There's a variety of things you could've done, if you wanted them?

A. Yes.

Q. And then we talked yesterday about -- we started talking about a couple of GPR's and the information that was in the GPR's, which was also contained in the supplementary reports, do you recall that?

A. Yes.

Q. All right. Let's go to another one.

MR. SOTOS: Defendants' 23 J, please.

(Exhibit published to the jury.)

BY MR. SOTOS:

Q. Mr. Wadas, in front of you is a side-by-side depiction of two documents, one is a General Progress Report, the notes which is on your left, and that is Defendants' Exhibit Number 1.23. And that looks like a GPR, correct?

A. Yes.

Q. And is that one of the GPR's that you testified that you believe you didn't get in this case?

A. I didn't get.

Q. All right. And then to the right of that is a Supplementary Report, which is Defendants' 23J, which you did get, correct?

A. Supplementary Report, yes.

Q. And if you start with the one on the left, it appears -- the General Progress Report, that appears to summarize the conversation that detectives McLaughlin and Leonard, whose names are at the bottom there, do you see that?

A. Yes.

Q. Okay. Had with Orlando Lopez, the only eyewitness in the case, correct?

A. Yes.

Q. And the document on the right, the Supplementary Report, on you go to the very bottom line, it -- well, just above that, actually, where it says "interviewed," that indicates, in fact,

that Detective McLaughlin interviewed -- Detective McLaughlin and Detective Leonard interviewed Orlando Lopez, correct?

A. Yes.

Q. So you knew that, in fact, the officers had interviewed Orlando Lopez back at the beginning of the investigation, right?

A. Yes.

MR. SOTOS: If we go to the second page of 23 J, please.

(Exhibit published to the jury.)

BY MR. SOTOS:

Q. Now, yesterday when you were examined by Mr. Bowman he pointed out a difference between the two documents. And the document on the left, in describing the interview, Detective McLaughlin wrote, "by store," correct? Do you see that?

A. Yes.

Q. In describing where Orlando Lopez was?

A. Yes.

Q. And then in the GPR, she wrote Lopez was coming from the store?

MR. BOWMAN: You said GPR.

MR. SOTOS: Did I call it GPR?

MR. BOWMAN: You did.

MR. SOTOS: I apologize. I've been doing that a lot.

BY MR. SOTOS:

Q. So in the sub-report she wrote that Lopez was coming from the store, correct?

A. Correct.

Q. Now, other than that difference, did you see any distinction when you reviewed -- you know what? Let me back up for a second.

So before you came in and testified, I assume you reviewed the General Progress Report, correct?

A. Correct.

Q. And then you reviewed the sub-report, correct?

A. Right.

Q. And you reviewed those with Mr. Rivera's lawyers, right?

A. Correct.

Q. And they talked to you about the difference between two documents that they were going to ask you about, correct?

A. Yes.

Q. Okay. And so that was the big difference, was the difference between the word "by" and then "coming from the store," correct?

A. Correct.

Q. And you testified, I believe, yesterday that if had the sub-report that said Orlando Lopez was "by the store" as opposed to "coming from the store," you then could've made a better argument that the distance he was from the shooting was further because "by the store" suggests he was right at the

store, and "coming from the store" could put him anywhere between -- let's say if this is the store here (indicating), and then where the shooting is if it was up by you, fair to say?

A. Correct.

Q. Okay. And so it's your testimony that that difference is something that you could have or would have used at the trial if you had the sub-report?

A. Yes.

MR. BOWMAN: You mean the GPR.

BY MR. SOTOS:

Q. If you had the GPR, that's something you could have used or is it your testimony you would have used?

A. I could used it if I chose to develop that through cross-examination.

Q. And you don't know whether you would've or not at this point?

A. Correct.

Q. Now, Orlando Lopez testified at the trial, correct?

A. Yes.

Q. And his story at the trial was different from both of those reports, correct?

A. Yes.

Q. At the trial Orlando Lopez testified that -- if we say the jury box is where he lived, and the shooting was where you're

at, he testified that he came out of the house and that he saw the shooting, he saw the gunman shooting at the victim right when he came out of the house, correct?

A. Yes.

Q. And then he said he saw the -- saw the shooting and he ran all the way down to the store, which was all the way down at the end of the block, correct?

A. Correct.

Q. And that he ran into the store and he talked to the store owner, right?

A. Yes.

Q. And he said, "There's somebody shooting, there's somebody shooting, call the police"?

A. Correct.

Q. And then he testified at the criminal trial that the store owner kind of blew him off and didn't want to get involved?

A. Yes.

Q. And that he then ran back from the store, and that when he got back he went and hid in a little indentation?

A. Some type of hiding location, correct.

Q. Okay.  In fact, let me see if I can find the photos.

        MR. SOTOS:  Can you put the scene photos up.  Lets say, can you put up 90.

        (Exhibit published to the jury.)

BY MR. SOTOS:

Q. So on your screen, Mr. Wadas, there is a document that's been marked as Defendants' Exhibit 90, and I'm going to ask you if recognize that.

MR. SOTOS: That's not 90.

THE COURT: I got 35 on mine.

(Brief pause).

BY MR. SOTOS:

Q. Now in front of you is a document --

THE COURT: 34.

MR. SOTOS: That says Exhibit 34.

(Brief pause)

THE COURT: Oh, sorry. I couldn't see that number.

MR. SOTOS: No, Judge, you were right. We had to put it on Elmo to get the number up. I apologize.

BY MR. SOTOS:

Q. Anyway, do you see that photo, Defendants' Exhibit 90?

A. Yes.

Q. Okay. Do you recognize that as one of the scene photos that was utilized at the criminal trial?

A. I believe it was utilized at the trial.

MR. SOTOS: Your Honor, we move Defendants' Exhibit 90 into evidence.

THE COURT: Any objection?

MR. BOWMAN: None.

THE COURT: It is received.

(Defendants' Exhibit 90 received in evidence).

BY MR. SOTOS:

Q.  So if you look at that photo, Orlando Lopez testified that he came out of his house and was running towards that -- do you see that, like that little yellow building on the left side of the picture that's got some yellow in it?  All the way down at the end of the picture.

A.  A building with yellow in it?

Q.  A building with a sign on it.

A.  I see that.

Q.  Okay.  And is it your understanding that that's the store that Orlando Lopez said that he ran to?

A.  I believe so.

Q.  All right.  So it was his testimony, then, that he came out of his house, which is approximately at the point this picture was taken from, is that about right?

A.  I think so.

Q.  And that he saw the shooting, ran to the store, talked to the store owner, and then ran back, correct?  And hid in a little indentation area?

A.  Yes.

Q.  Okay.  And that when he got back, the gunman was still shooting?

A.  One more shot, I believe.

Q.  For all that time?

A.  Correct.

Q.  By the way, did you ever interview the store owner?

A.  No.

Q.  Because you could have, right?

A.  Yes.

Q.  It's a small -- small store.  It couldn't be more than three or four employees?

A.  I don't know about that.

Q.  You could've tried to talk to the store owner and say, Hey, did this young kid come running to the store at the time of the shooting and talk to you about it?

A.  I could've tried to interview him.

Q.  Because if he told you that that didn't happen, that would be a critical witness for you to use at trial, correct?

A.  If he told me that he did not come to the store, then that would -- I don't know if it's critical, but it would be something important.

Q.  Well, the whole case against your client was just the testimony of this 12-year-old boy, correct?

A.  That's it.

Q.  And as far as, you know, the 12-year-old boy was the only witness to the shooting aside from the victim who ended up dying, correct?

A.  Yes.

Q.  So if the store owner would've been able to tell you that

Orlando Lopez didn't come to the store and talk to me about a shooting while it was happening, that would've helped you undermine the only witness against your client, correct?

A. Possibly.

Q. Okay. And in terms of demonstrating the implausibility of Orlando Lopez's story --

A. Yes.

Q. -- the story he gave you at trial was, in fact, more different from the story that's depicted in Detective McLaughlin's sub-report than the differences between the sub-report and the GPR, right?

A. Correct.

Q. So if you had been so inclined, you could've taken measurements of the street, shown how far it was, and how long it would take to get from one spot to another, and then back while the shooting was -- all while the shooting was taking place, right?

A. Yes.

Q. You didn't feel that was necessary?

A. Correct.

Q. Because you thought the State's case was weak enough that you were going to be able to defeat it without going through that?

A. Pretty much so.

Q. Now, we had talked right before we broke yesterday about

the fact that you understood that Orlando Lopez was, in fact, a witness to something, that he was out there when this happened. You didn't doubt that?

A.   Yes.

Q.   Okay.  And, in fact, you had a police report that was turned over to you --

        MR. SOTOS:  If we can put up 23B.

        (Exhibit published to the jury.)

BY MR. SOTOS:

Q.   I've placed in front of you a document that's been marked as Defendants' Exhibit 23, and we're calling this 23B.

        MR. SOTOS:  Is this in evidence?

        MR. LOEVY:  Your Honor, we actually do object to the use being made of this.  We can explain, if necessary.

        THE COURT:  Okay.  Are you going to offer it?

        MR. SOTOS:  I am going to offer it in evidence, Judge.

        THE COURT:  So do we need a sidebar or can you just tell me?

        MR. LOEVY:  Well, there's a version of this report that doesn't have Orlando's name on it.  So the statements in this report can't be attributed to Orlando.

        MR. SOTOS:  Actually, Judge, we can take this up at sidebar.

        THE COURT:  Maybe sidebar, because I have never seen

---

MR. SOTOS:   There were two versions, one later than the earlier.

THE COURT:   Can you bring those versions over to me, please.

(Proceedings heard at sidebar on the record.)

THE COURT:   Okay.  What do I have to look at?

MR. SOTOS:   Judge, we have two different reports.  The first one is earlier version.

Do we have the first version?

MR. LOEVY:   Here's what I think we're dealing with here.  In the street file, which is Plaintiff's Exhibit 19, page 43, there's a scene report by two officers who haven't testified, Crawford and Machain, who took information from Israel Valentin, that's the information in the report.

Later the report is completely filled out before Orlando's name gets on it, they then talk to Orlando and added him later as witness.  But this information that Mr. Sotos wants to imply from Orlando couldn't have come from Orlando because the witness is Israel.  So all I'm saying is, he should not be able to imply that Orlando told anybody the information in this report.

MR. SOTOS:   No, I'm not going to do that.

THE COURT:   I assume both can come out.

MR. SOTOS:   Yes.

THE COURT:   All right.  Let's go back.

MR. SOTOS:  I'm not going to say that this came from Orlando.

(Proceedings resumed in open court).

BY MR. SOTOS:

Q.  Mr. Wadas, in front of you is a document that's been marked as Defendants' Exhibit Number 23.  We'll call it 23B.

And it's a general case offense report that was in your file throughout your representation of Mr. Rivera, correct?

A.  I believe so.

Q.  Is this something that you spoke with Mr. Rivera's attorneys about when you were preparing for your testimony?

A.  I'm sure I did.

Q.  And do you see on the bottom there, it's signed by two officers.  The names of the reporting officers Crawford and Machain?

A.  Yes.

Q.  And that the date of the report is August 27th, 1988.  It says 19:30 p.m., but it's 7:30 p.m., correct?

A.  Correct.

Q.  And looking up towards the upper left-hand portion of the --

MR. SOTOS:  Oh, I'm sorry.  Judge, we move this into evidence so the jury can see it.

MR. LOEVY:  No objection, Your Honor.

THE COURT: Okay. 23B is received.

(Defendants' Exhibit 23B was received in evidence).

MR. SOTOS:

Q. And then, again, just to recap quickly, this is signed by two officers, Crawford and Machain, and it's dated August 27th at 7:30 p.m., correct? 1930 means 7:30.

A. Yes.

Q. And that was on the day of shooting, correct?

A. Correct.

Q. And up in the left hand, towards the left-hand corner there's boxes that are hard to read, it says "witness," and then two witnesses are listed, Israel Valentin and Macho Lopez, correct?

A. Correct.

Q. Macho you know to be the nickname for Orlando Lopez, correct?

A. Yes.

Q. And then if you look over on the right side of this exhibit, there's a section for "gang related" and it states "victim, Campbell Boy, offender, Latin King," correct?

A. Yes.

Q. All right. So that's information that the police had on the day of the shooting, August 27th, 1988, by 7:30 p.m., correct?

A. Yes.

Q. And then if you go to the next page, the second page.

All right. If you look at the right side of that page it states -- on the left-hand side describes an interview with Israel Valentin who was the brother of the victim, correct?

A. Correct.

Q. All right. And then on the right-hand side, we won't go through all of that now because I don't take to take up too much time, on the right-hand-side it says "suspect offenders --" does that look like "male WH," is that like white Hispanic? Do you know what "WH" stands for?

A. Yes.

Q. So "male white Hispanic, Latin King, gang affiliation, driver of car, NFD at this time." Do you know what "NFD" stands for? No further something?

A. No further descriptio. I don't know.

Q. Makes sense.

A. I think it might be that.

Q. And then "2" it says, "male, white Hispanic, Latin King gang affiliation, passenger in above auto, LSW." Do you know what that is?

A. No.

Q. "Yellow baseball hat, light to medium complexion"?

A. Yes.

Q. "16 to 18 years old"?

A.   Yes.

Q.   Armed with some type of handgun.

A.   Unknown-type handgun.

Q.   Unknown-type handgun, okay.

Then if you go two more pages in, please.

All right.  It states on the top left-hand corner, "Gang Crimes north," and can you read the word next to that after the word "notified"?  Sherman?  And do you see next to that the name Noon, N-o-o-n.

A.   Sherman, Noon.

Q.   All right.  Did you know any Gang Crimes detectives named Sherman or Noon at the time?

A.   Not at the time.

Q.   All right.  And further on down it also says, several lines down, "Gang Crimes" looks like "North, investigator Noon, in 14 for follow-up," correct?

A.   Yes.  14th District.

Q.   By "14" means 14th District, right?

A.   14th District.

Q.   All right.  Thank you.

So you knew upon reviewing the police reports that that on the day of the incident the police knew that they had a witness named Macho Lopez, that the suspect offender was Latin King gang affiliation, that Gang Crimes North and Detective Noon, Gang Crime Specialists Noon had been notified all by that

time, correct?

A.  Yes.

Q.  And your understanding of what Gang Crimes officers did was to essentially support detectives in their investigations, right?

A.  Yes.

Q.  Use their knowledge to find witnesses, things of that nature?

A.  Specialized knowledge.

Q.  Specialized knowledge.  All right.

And so you would've expected those -- the police department to interview Macho Lopez as soon as possible, correct?

A.  Yes.

Q.  Especially in a gang shooting, right?

A.  Yes.

Q.  Not unusual for witnesses who you've got one day, the next day they're no longer witnesses, right?

A.  True.

Q.  And why is that?  Why is it hard for the police to keep witnesses in gang shooting cases?

MR. LOEVY:  Objection to relevance, Your Honor.

THE COURT:  Overruled.

BY THE WITNESS:

A.  Multiple reasons:  Fear, intimidation, not wanting to be

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 1050 of 1254 PageID #:105186
Wadas - cross by Sotos
1478

involved, and about four or five probably more reasons, but those are the three main ones.

MR. SOTOS:

Q. So just generally stated, it's difficult for police to keep witnesses in gang shootings?

A. Yes.

Q. That's pretty much common knowledge, right?

A. True.

Q. So you would expect that if the police have knowledge of a witness on the first day of an investigation by 7:30 in the evening, they're going to talk to that witness as soon as possible, right?

A. Yes.

Q. Preferably that very same evening?

A. Yes.

Q. Now, you were asked on direct examination about a rap sheet that you testified that you didn't have during your representation of Mr. Lopez, do you recall that?

(Brief pause).

BY MR. SOTOS:

Q. Mr. Wadas, I'm placing in front of you two documents that are marked as Defendants' Exhibit --

MR. SOTOS: They don't appear to be marked.

Judge, can I have one moment, please?

THE COURT: Sure.

MR. SOTOS:  Thank you.

(Brief pause).

MR. SOTOS:

Q.  Mr. Wadas, I'm going to place in front of you a side-by-side depiction of two documents that have been marked as Defendants' Exhibit 1.25 and Defendants' Exhibit 23N. And I'll represent to you that Defendants' Exhibit 1.25 is already in evidence as Plaintiff's 4.

MR. SOTOS:  And the document on the right is the unstamped version of that same document, which we would move into evidence, Your Honor, as Defendants' Exhibit 23N.

THE COURT:  Any objection?

MR. LOEVY:  No, Your Honor.

THE COURT:  23 is received.

(Defendants' Exhibit 23N received in evidence).

MR. SOTOS:

Q.  So my the question to you is, you were asked on direct examination by Mr. Bowman about the document on the left, Defendants' Exhibit 1.25, which is the same as the one on the right except it doesn't have that time stamp, correct?

A.  Correct.

Q.  All right.  And the time stamp shows that the rap sheet of Mr. Rivera was issued on August 27th, 1988, correct?

A.  Yes.

Q.  So what does that mean to you that it was issued on August

27th, issued on inquiry August 27th, 1988?

A.   It means that they were looking at -- the police were looking at Jacques Rivera on the day of the shooting.

Q.   Right.  And that wasn't something that took you by surprise when you saw that.  You knew they were looking at him on the day of the shooting anyway, correct?

A.   No, I don't know if they were looking at him exactly on the day of the shooting.

Q.   Did you have an impression, one way or the other, whether they were or they weren't?

A.   If they were pulling up rap sheets of all supposed Latin Kings, then they might've been looking at him.

Q.   Well, again, Mr. Lopez testified in the criminal case, correct?

A.   Yes.

Q.   And he specifically testified that the police came to his house on the night of the shooting and showed him gang book photos, correct?  Do you recall that testimony?

A.   Yes.

Q.   And so he described at the criminal trial how the police came to his house on August 27th and showed him gang book photos from the Latin Kings?

A.   Yes.

Q.   And that he went through the photos on his own?

A.   Yes.

Q. And that he picked out Mr. Rivera when he got to Mr. Rivera, correct?

A. Yes.

Q. And he never testified to anything about having been pressured by any police officer to do that?

A. He never testified to that.

Q. You never heard that he was pressured by any police officer, correct?

A. Correct.

MR. BOWMAN: Okay. Objection.

THE COURT: The objection is to the form, I assume.

MR. LOEVY: Yes. And argumentative.

THE COURT: Well, I think you want to ask about Lopez, so if that's the question.

MR. SOTOS: I understand. That's fair.

BY MR. SOTOS:

Q. So he didn't testify that anybody told him who to pick out, correct?

A. Correct.

Q. He testified that he did that on his own?

A. Correct.

Q. And that he did that on August 27th the day of the shooting, correct?

A. Yes.

Q. So you were asked questions yesterday about a report that

Mr. Guevara and Mr. Gawrys did from September 16th, 1988, do you recall that?

A.  Yes.

Q.  And in that report it reflects gang book identification from August 29th, correct?

A.  Yes.

Q.  So your testimony yesterday was that if you had this rap sheet on the left-hand corner of this -- on the left side of this display, that you may have been able to do something with that to show that, in fact, that report was wrong or that they saw him earlier, do I have that right?

A.  It's possibly, but, you know, not for sure.

Q.  You don't know really know what you could've done with it, right?

A.  Correct.

Q.  And once you had Orlando Lopez testifying at trial that he was interviewed by the police on the day of -- on the day of the shooting and that he identified the books at -- Mr. Rivera from the books at his house that same day, you had all that you needed if you wanted to use that September 16th report to suggest there was a mistake in it, or something done intentionally wrong, or whatever you wanted to say about it?

A.  I probably had all I needed.

Q.  All right.  And, by the way, while we're talking about that September 16th report, none of the information on that report

was ever used in the prosecution of Mr. Rivera, correct?

A. Correct.

Q. There's some inference to victim identification that occurred and that was never used in the case?

A. I believe that's right.

Q. The prosecution didn't use any of that evidence?

A. Correct.

Q. So you would agree with me that nothing in that report had anything to do with Mr. Rivera's conviction?

   MR. BOWMAN: Objection.

   THE COURT: What's the objection?

   MR. BOWMAN: I withdraw it. That's all right, Judge.

   THE COURT: Okay.

MR. SOTOS:

Q. Is there any information on that report that had any impact on Mr. Rivera's conviction if it wasn't used?

A. I don't know.

Q. All right. Let's turn to another topic.

   MR. LOEVY: Your Honor, it's still up on the screen, the exhibit here.

   MR. SOTOS: I can take it down. We're done with that.

   Oh, it's the Elmo.

   (Brief pause).

BY MR. SOTOS:

Q. I want to ask you some questions about the September 15th

identification in which your client was identified by Mr.

Rivera ]sic] which led to his arrest and your retention.

A.  Okay.

Q.  Mr. Wadas, in front of you now is a document that's been

marked as Defendants' Exhibit 23F and it's the September 1st

Supplementary Report that we talked about yesterday.

          So this is the report that we talked about at length

that concerned when Mr. Rivera was in custody on the 30th and

the 31st and the back and forth about whether there was a

lineup or a photo array, do you remember that?

A.  Yes.

Q.  All right.  So this is that same report.

          MR. SOTOS:  And if you go to the last page.

          If you go to the second page.

          (Brief pause).

          MR. SOTOS:  Third page.  I'm sorry.

          (Exhibit published to the jury.)

MR. SOTOS:

Q.  So this is the document, again, that we talked about at

length about the 30th and 31st.  And do you see the last line

on the report states --

          MR. SOTOS:  No, not there.  Right before the names.

BY MR. SOTOS:

Q.  It states:

          ".... it was then decided to cease the photo

identification until later in the week when the physician indicated that the tubes would be removed from the victim's throat."

Correct?

A. Yes.

Q. And that that refers to the time when Detective McLaughlin and Leonard documented that they took the photos to the hospital to show to the victim and that they concluded that he was too -- he wasn't able to participate then enough to get a valid identification, correct?

A. Yes.

Q. All right. So the last thing they said was they were going to stop until later in the week when the physician indicated tubes would be removed from his throat?

A. Yes.

Q. And so there's no further activity on the case for the next two weeks, correct?

A. I believe so.

Q. Because at some point in time in this process, the victim, he didn't get better, he took a turn for the worse?

A. Yes.

Q. Caught an infection and sadly passed away?

A. Yes.

Q. So after he passed away, the case was no longer an aggravated battery, now it was now a homicide, correct?

A.   Correct.

        MR. SOTOS:   23G, please.

BY MR. SOTOS:

Q.   So I've placed in front of you a document that's been marked as Defendants' Exhibit 23.  We're calling it 23G.  And it's a Supplementary Report that was prepared by reporting officers John Boyle and Detective William Dorsch; do you see that?

A.   Yes.

Q.   Did you know either John Boyle or William Dorsch at the time?

A.   I don't believe so.

Q.   And this document, this Supplementary Report is a document that you did have, it was in your file all throughout your representation of Mr. Rivera, correct?

A.   Yes.

        MR. SOTOS:   Your Honor, we move to admit Defendants' Exhibit 23G.

        THE COURT:   Any objection.

        MR. BOWMAN:   No.

        THE COURT:   23G is received.

        (Defendants' 23 G was received in evidence.)

        (Exhibit published to the jury.)

MR. SOTOS:

Q.   And so if you look at the front page of this report, it

reflects that the -- it says, "persons conducting lineup," do you see that?

A. Yes.

Q. And it lists Detective William Dorsch and Detective John Boyle, the same two officers who signed the report on the bottom of this page, correct?

A. Yes.

Q. And then if you go to page 2 --

MR. SOTOS: It doesn't move quite as nimbly as we were hoping, Judge.

(Brief pause)

MR. SOTOS:

Q. If you go to page two, it describes the people who were present during the lineup, correct?

A. Yes.

Q. And it says, Detective William Dorsch, Detective John Boyle, Gang Crime Specialists Rey Guevara and Gang Crime Specialists Steve Gawrys, correct?

A. Yes.

Q. It doesn't say that Detective McLaughlin was there, correct?

A. True.

Q. Or Detective Leonard?

A. True.

Q. And as you sit here today do you have any reason to believe

that either one of them was there?

A.  No.

Q.  And then below that, it states that Orlando Lopez viewed the lineup?

A.  Yes.

Q.  And then it lists several people who were in the lineup, correct?

A.  Yes.

Q.  And then at the bottom paragraph it says that subject 3, Jacques Rivera, was positively identified by the witness, correct?

A.  Yes.

        MR. SOTOS:  And Defendants' Exhibit 23 H.

MR. SOTOS:

Q.  I'm now placing in front of you a document that's marked Defendants' Exhibit 23.  We'll call it 23 H.

        And I'll represent to you that this is another report that was prepared by Detective Dorsch and Detective Boyle, do you see that?

A.  Yes.

Q.  And this Supplementary Report was also in your file throughout the entire time you represented Mr. Rivera, correct?

A.  Yes.

Q.  And the last document I showed you was a Lineup Report, correct?

A.  Yes.

Q.  All right.  This is an another Supplementary Report.

A.  Correct.

Q.  And it lists four arresting officers on the first page, correct?

A.  Yes.

Q.  William Dorsch, John Boyle, Rey Guevara and Steve Gawrys, correct?

A.  Yes.

Q.  And it's signed by Dorsch and Boyle?

A.  Correct.

Q.  So those are the two detectives that were on the case on September 15th?

A.  Looks that way.

Q.  All right.  And if you go to page 2 of that document, it states that -- it summarizes the case, what happened to the victim, Orlando Lopez was a witness, and below that it states that, the undersigned reporting detectives were assigned by Sergeant Rinaldi of Area 5 Violent Crimes to continue into the investigation, do you see that?

A.  Yes.

Q.  And in the very next paragraph, it states that upon reviewing the case file, the RS's contacted Gang Crimes North to notify them of the death of the victim, correct?

A.  Yes.

Q. So that indicates to you that Dorsch and Boyle notified Gang Crimes about the death of the victim and requested their assistance in locating the offenders along with any known witnesses, correct?

A. Yes.

Q. Presumably to do a lineup?

A. Yes.

Q. And then it goes on to state that the lineup was conducted and Jacques Rivera agreed to cooperative. And he was identified and that he was -- at the bottom paragraph, that he was advised of his rights per Miranda to which he replied that he understood, correct?

A. Yes.

Q. And what did you understand that to mean when it says he was advised of his rights per Miranda?

A. They told him, You have a right to remain silent, you have a right to have a lawyer present. The five or so Miranda warnings, and asked him if he understood those rights, and he said yes.

Q. And that's a constitutional right that he had not to talk to be a witness against himself if he chose not to be, correct?

A. Correct.

Q. And he told you that, in fact, he declined to talk to police that night, correct?

A. Right.

Q. And you didn't have any issue with that, that's what he should have, correct?

A. Correct.

Q. And it didn't affect your perception of whether or not he was innocent or guilty of the crime, correct?

A. Correct.

Q. That's a constitutional right that everyone has?

A. Yes.

Q. And so the record indicates that Mr. Rivera was positively identified by the eyewitness. And then if you go to the next page, on top it states that "ASA," and ASA stands for what?

A. Assistant state's attorney Julie Rosner.

Q. Do you know Ms. Rosner?

A. No.

Q. But, in any event, as an assistant state's attorney, she's not somebody who works for the Chicago Police Department, correct?

A. Independent, Felony Review.

Q. All right. And can you tell the ladies and gentlemen of the jury what you mean when you Felony Review? What does Felony Review actually do?

A. Really started in Los Angeles. It was, I think, the first police department that had it. Chicago -- or Cook County State's Attorney's Office developed felony review in gradual stages over a period of years.

By the time of this case, Felony Review had assistant state's attorneys that were on duty 24/7 in 12-hour shifts. If you picked up a murder towards the end of your shift, you worked the murder until you finished the murder, either charged, or not charged, or whatever.

The State's Attorney's Office has the final authority or review with respect to all felonies other than narcotics. They don't use Felony Review on narcotics cases, but anything else, the State's Attorney's Office reviews all charges and makes a determination on whether to charge or not.

In a murder -- in anything, but a murder, if the detectives disagree with the state attorneys rejecting the charges, then they can go to a deputy Superintendent of Police who can override the state's Attorney, but not in a murder case. They have the final say so.

Q. So the state's attorney has the final say in a murder case?

A. Yes.

Q. Do you know why there's a difference the way that's approached in murder cases and every other type of case?

A. I -- I -- I have an idea, but it's -- it's a long discussion of how that all came about.

Q. Does it have something to do with the seriousness of a murder charge?

A. Correct. And interpersonal relationships between the police department and the State's Attorney's Office.

Q. All right. That's fine.

And according to this document, assistant state's attorney Julie Rosner notified and responded to Area 5, correct?

A. Correct.

Q. And are you aware in a murder case when an assistant is -- and that's how that works, right, like when the police have a case they want to charge, they will call the State's Attorney's Office --

A. Felony Review.

Q. -- Felony Review, and say actually come out to the station and let us know if you can charge this case?

A. Correct.

Q. All right. And then the state's attorney actually comes to the police station and does whatever work she thinks needs to be done in order to decide whether to bring a charge?

A. Interviews the detectives, a witness if necessary, reads the reports, and that's it, makes a decision.

Q. And according to this report that was prepared by Detectives Dorsch and Boyle, it states that upon reviewing the file and interviewing the witness and police officers, the charge of murder was approved against the subject Jacques Rivera, correct?

A. Correct.

Q. All right. So you had that report, if you wanted to talk

to Julie Rosner at any point you could have, right?

A. Yes.

Q. And you had mentioned before that the State's Attorneys could interview the detectives. Is that your understanding, that their interviews would more likely be with the detectives opposed to Gang Crimes officers that resisting detectives?

A. The detectives are asking for the charges, that's who they're going to talk to.

Q. And that's what I wanted to ask you about. So in a case like this, it's the detectives who are on the case and not the Gang Crime Specialists who are asking the State's Attorney for the charges?

A. Correct.

Q. All right. So you would expect that if Ms. Rosner had -- if the State's Attorney had any questions for the police officers, it would be directed to the detectives on the case?

A. Talking to a homicide detective.

Q. Right. And Dorsch and Boyle, to your understanding of this report, were homicide detectives?

A. Correct.

Q. So I want to ask you, so you had the August -- or excuse me, the September 1st sub-report, and the August 29th sub-report, and the August 27th sub-report that were prepared by Detective McLaughlin and Detective Leonard, correct?

A. Yes.

Q. And then you saw this September 15th Lineup Report and sub-report that were prepared by Detectives Borsch and Boyle, correct?

A. Yes.

Q. Did that strike you as unusual?

A. No, it's -- one detective goes off duty, the next one is working and picks up the case. Multiple detectives from an area are assigned to homicide or robbery or whatever division, and, you know, it's not unusual at all.

Q. Okay. So the natural inference would be, as you testified, that maybe the detectives who were on the earlier reports just were off that day?

A. Correct.

MR. LOEVY: Objection, Your Honor.

THE COURT: I'm sorry?

MR. LOEVY: No foundation. He doesn't know.

MR. SOTOS: He's already testified that he does know.

THE COURT: Overruled.

BY THE WITNESS:

A. It's possible. I mean, that's what I would assume.

BY MR. SOTOS:

Q. That would be your natural inference?

A. Correct.

Q. Okay. And you didn't have any reason upon reviewing these reports to think that anybody threw Detective McLaughlin off

the case, right?

A.  No.

Q.  So I now want to place in front of you a document that has been marked as Defendants' Exhibit number 23I, and ask you if you recognize that document.

A.  Felony, charging document.

Q.  And can you -- that was in your file, too, correct 23I?

A.  Correct.

MR. SOTOS:  Judge, we would move to admit Defendants' Exhibit 23I.

THE COURT:  Any objection?

MR. LOEVY:  No, Your Honor.

THE COURT:  It is received.

(Defendants' Exhibit 23I received in evidence).

(Exhibit published to the jury.)

BY MR. SOTOS:

Q.  Can you tell the ladies and gentlemen of the jury what a felony charging document is?

A.  The State's Attorney's Office can proceed at that time, and to this day actually, one of two ways:  They initially bring a felony complaint for preliminary examination.  It's called a preliminary hearing.

If they were going to proceed by a preliminary hearing, they would go into Branch 66 at 26th and California, and put on a preliminary hearing in a murder case.  But I

believe by 1988, they were not going forward on prelims anymore, but going direct to the grand jury and putting their -- presenting their case in front of a grand jury.  It's the State's Attorney option.  They don't have to go to a prelim, they could go to the grand jury, or they can put on a preliminary hearing.

Q.  All right.  So this -- this document is what's called the charging document?

A.  To get him before a judge at a preliminary hearing, correct.

Q.  So that's after the State's Attorney approves felony charges that a officer or a detective signs a charging document?

A.  Correct.

Q.  And this one is signed by Detective Dorsch, correct?

A.  Correct.

Q.  So, Mr. Wadas, there's been a lot of testimony in this case about the victim's identification of two individuals named Jose Rodriguez and Philip Nieves when he was in the hospital.  That you had testified on direct that Letrich said that he had made some kind of identification by nodding or some kind of an identification, correct?

A.  Yes.

Q.  Okay.  And you saw the August 30th and August 31st sub-reports in which Detective McLaughlin and Detective Leonard

tried to get Mr. Rodriguez and Mr. Rivera in the same lineup, correct?

A.  Yes.

Q.  And they couldn't find the witness, and so then they tried to get both of them in a photo array to the victim at the hospital, correct?

A.  Yes.

Q.  And that they wrote in the report and documented at the time that the victim was unable to make -- make -- to really participate in the process effectively because of his medical condition?

A.  Medical condition, right.

Q.  All right.  And none of that surprised you because you knew about his medical condition?

A.  Correct.

Q.  So when Detective Dorsch and Detective Boyle did the lineup two weeks later with Mr. Rivera, did you notice that Mr. Rodriguez wasn't in that lineup?

A.  Yes.

Q.  And did that surprise you?

A.  I guess so.

Q.  Because if you felt there was an issue there, you could've explored that, right?

A.  Yes.

Q.  Why -- why -- why Detective Dorsch and Detective Boyle

didn't put Mr. Rodriguez and Mr. Nieves and/or Mr. Nieves in a lineup before proceeding forward with the case against Mr. Rivera?

A. True.

Q. Okay. And that's something you just chose not to do, correct?

A. Yes.

Q. And what you did do was subpoena Officer Letrich to come to the trial?

A. Yes.

Q. And he did come to the trial?

A. Correct.

Q. And you also subpoenaed the gang book photos that Officer Letrich had testified he showed to the victim in the hospital, correct?

A. Yes.

Q. And so now that we're 30 years down the line, you don't remember whether he brought the gang book photos or not?

A. I don't remember.

Q. Is it your assumption just based on your practice that he likely did?

A. He might've.

Q. Because if he didn't -- because that was the only thing you subpoenaed from him, right?

A. Correct.

Q. You said, I want you to come and I want you to bring that gang photo book?

A. Yes.

Q. So if he showed up without the gang photo book and you had any issue with that, there's a lot of things you could've done to get the gang photo book?

A. Yes.

Q. All right. So as you sit here today, 30 years later, you don't have any reason to doubt that he actually did bring the gang photo book?

A. He might've.

Q. And that you were able to make use -- whatever use you thought to make of it?

A. His testimony was the key.

Q. Okay. I understand that, but I'm just asking about the gang photo books --

A. We didn't use it. If I had it, we didn't use it.

Q. Whether you saw and decided this isn't going to help me, or you didn't have it and decided not to ask for it, you didn't do anything for that?

A. Correct.

Q. And, again, just so the ladies and gentlemen of the jury are clear, your issue representing Mr. Rivera isn't necessarily so much on did Rodriguez and Nieves actually do this crime as opposed to "will I be able to develop them, his alternate

suspects to help me get my client acquitted," correct?

A.  Reasonable doubt, correct.

Q.  And whether you can reach that threshold of evidence that you need in order to admit that evidence of an alternate suspect?

A.  Correct.

Q.  Okay.  And I think you testified that Officer Letrich testified at the criminal trial to what occurred between him and Mr. Valentin, right?

A.  Yes.

Q.  All right.  But he wasn't actually allowed to testify that the victim made an identification, was he?  Do you remember?

A.  I don't remember what his exact words were at the trial.

Q.  You don't remember him testifying that --

Well, here.  Do you remember there being what's called -- you know, how we have sidebars during the testimony?

A.  Right.

Q.  And you have them in court, I'm sorry, yourself right?

A.  Correct.

Q.  So do you remember there being a sidebar before Mr. Letrich testified?

A.  Yes.

Q.  All right.  Can you tell the ladies and gentlemen of the jury what the sidebar was about?

A.  Victorson was trying to block Letrich's testimony.

Q. The State's Attorney was?

A. Yes.

Q. He didn't want you to be able to use Rodriguez or Nieves as alternate suspects?

A. Correct.

Q. Okay. And your argument was that you should be allowed to do that?

A. It's a virtual dying declaration, and that was argued before Judge Close.

Q. And then the judge came out of that sidebar and said, "I'm only going to allow competent evidence" without really explaining what that meant, right?

A. Right.

Q. And then Mr. Letrich was able to testify that he went and he showed Rodriguez -- excuse me. That he went and showed the victim photos, and that after he showed the victim photos he went and picked up Mr. Rodriguez, correct?

A. Correct.

Q. But he wasn't able to actually able to testify that Mr. Rodriguez was selected by the victim during that identification?

A. Correct.

Q. Okay.

A. All I got was an inference.

Q. And that's all the judge allowed?

A.  Correct.

Q.  So you got a little bit, but not everything you were looking for?

A.  Correct.

Q.  Okay.  You think he should've made a record of what happened at that sidebar for purposes of appeal, in retrospect?

A.  I don't know.  There were other things that were said off, out of context by Judge Close in that trial, and I had a hard enough time getting -- getting the record corrected on those other things.

Q.  I understand.  So you were having a hard time with the judge.

A.  Yes.

Q.  And you had to decide, you had to make decisions about like "what am I going to press" "what am I not going to press"?

A.  Correct.

Q.  And so making a record of the judge's refusal to allow Letrich to testify to the identification that he said Rodriguez -- the victim made of Rodriguez, was something that you just chose, "I'm going to let that one go"?

A.  Yes.

Q.  Okay.  But it could've been a potential appeal issue for you?

A.  True.

Q.  So you were having difficulty, you felt like you were

having difficulty with this judge throughout the trial?

A. Correct.

Q. So I want to ask you about that.

You testified that you made a decision to take a bench trial?

A. Yes.

Q. By the way, before we turn to that, all these things that are happening in court, like with judges deciding whether or not a police officer can testify about another suspect, and things like that, those are things that occur completed independent of anything the police officers do, correct?

A. Yes.

Q. I mean, that's how the system is set up, right?

A. Correct.

Q. Police officers do the investigation, in a murder case they bring the assistant state's attorney in from Felony Review to make the call about whether to charge the case, correct?

A. Yes.

Q. One of your biggest problems with in this case is that it was -- it was a really weak case however you looked at it, right?

A. That was my view.

Q. One witness, no physical evidence?

A. Correct.

Q. No confession?

A. Correct.

Q. All right. But, in any event, the decision to charge that case was the prosecutors?

MR. LOEVY: Objection; asked and answered, Judge.

THE COURT: Sustained.

BY MR. SOTOS:

Q. We talked about Felony Review.

The decision to pursue the case through trial was another prosecutor's, correct?

A. Correct.

Q. Victorson?

A. Correct.

Q. And if at any point he lost confidence in the case, didn't think it was a good enough case, he could've dismissed the case on his own at any point?

A. No.

MR. LOEVY: Same objection Your Honor.

BY MR. SOTOS:

Q. He couldn't have done it?

A. Ye could not have done that.

THE COURT: What was that --

MR. LOEVY: I'll withdraw the objection.

THE COURT: Okay.

BY MR. SOTOS:

Q. Tell us.

A.   First chair in the trial division at one time in the glorious history of the State's Attorney's Office had the authority to do that, but -- but long after that period of time they didn't have that authority.  He could not have done that.

Q.   Would he have had to get approval from a supervisor?

A.   Chief of the felony trial division, right.

Q.   Okay.  But whatever it is, it would come from within the State's Attorney's Office, not from the police department?

A.   Correct.

Q.   And so you indicated that you were having difficulty with this judge?

A.   Yes.

Q.   And I wanted to ask you about that because Mr. Rivera testified initially that it was your decision to -- for him to take a bench trial as opposed to a jury --

         MR. LOEVY:  Objection.

         THE COURT:  Sustained.  That was not exactly --

         MR. SOTOS:  I think he clarified it.

         THE COURT:  I'll sustain the objection.

BY MR. SOTOS:

Q.   So you advised Mr. Rivera that he should take a bench trial, right?

A.   Correct.

Q.   And that's a huge decision, right?

A.   That is what?

Q. That's a huge decision in the case?

A. Correct.

Q. Especially in a murder case?

A. Yes.

Q. Because you're basically saying that you are going to have the judge decide the facts rather than a jury decide the facts?

A. Yes.

Q. All right. You felt on this case that that was the best course of action?

A. Yes.

Q. Because it was a weak case?

A. Yes.

Q. Single finger ID, you would call it, right?

A. Correct.

Q. Okay. So what I want to ask you about is, in making that decision, you knew at the time that Judge Close was under a federal investigation for accepting bribes in other cases, correct?

MR. LOEVY: Your Honor, there's no evidence of that.

THE COURT: Well, the question is, did the witness know.

MR. LOEVY: There has to be a basis for believing he's under federal investigation. That's the first we've heard of it.

THE COURT: Let us see if the witness knew. If he

witness did not know, I'm going to strike that.

MR. LOEVY: It might not be true.

THE COURT: I don't have any idea.

MR. LOEVY: Neither do we. I mean, maybe Mr. Sotos should show us what he's talking about.

MR. SOTOS: I can.

MR. LOEVY: Okay.

MR. SOTOS: How do you want to proceed?

THE COURT: I overruled the objection.

BY THE WITNESS:

A. I didn't specifically know that.

MR. SOTOS:

Q. You weren't aware of that?

A. That he was under federal investigation?

Q. Were you aware that it had been reported publicly that he was?

A. No.

MR. SOTOS: May I have one moment, Your Honor?

THE COURT: Sure.

(Brief pause)

MR. LOEVY: Your Honor, we haven't yet taken a mid-morning break. Maybe we should talk about this issue, anyway.

THE COURT: Yeah. Unless you are very close to the end --

MR. SOTOS:  I am not, Judge.

THE COURT:  Okay.  Well, let's take a ten-minute break.

COURT SECURITY OFFICER:  All rise.

(The following proceedings were had out of the presence of the jury in open court:)

THE COURT:  Do we want the witness to be excused while we're discussing this?

MR. SOTOS:  Yes.

MR. LOEVY:  Yes.

THE COURT:  Okay, Mr. Wadas, please leave us be.

We have 10 minutes.

MR. LOEVY:  Your Honor, could we address this point now or the end of the break?

THE COURT:  I think now would be helpful.

MR. LOEVY:  All right.  Your Honor, we are upset because --

THE COURT:  Well, let's wait until the witness is gone.

(Witness exited the courtroom)

MR. LOEVY:  Where we left off with this is was they tried to bring it up with Mr. Rivera, we had a sidebar.  And defense counsel told Your Honor before he went in front of this in front of the jury he would bring it up again outside the presence of the jury at that sidebar.  He ignored that.  That

happened during Mr. Rivera's, at sidebar. It came up, "Are you suggesting Mr. Wadas is corrupt," and the way we agreed to do it was, nobody is going to talk about it unless it comes up outside the presence of the jury.

THE COURT: Wait. Mr. Wadas or Judge Close?

MR. LOEVY: No, it was during Mr. Rivera's examination --

THE COURT: What is --

MR. LOEVY: Mr. Sotos --

THE COURT: Well, what you just said, you said we were going to bring up whether Mr. Wadas is corrupt?

MR. LOEVY: Yes. They brought up with Mr. Rivera the suggestion that Judge Close was corrupt, that Judge Wadas told Rivera to take a bench trial, the implication being Mr. Wadas is somehow, "hey, this is a weak case, I told you to take a bench trial, you must be corrupt." We left the issue with, we're not going to do it in front of the jury until it's raised with the Court; that's my preface. Mr. Sotos just plowed through it in front of the jury and made me object in front of the jury after you instructed him you can't bring up --

THE COURT: You know what? I cannot remember exactly what was said at sidebar however many days ago. So you're going to need to get transcript, but maybe we can resolve this.

MR. LOEVY: We can get to the substantive issue, which we have an objection with. Why is this relevant? He's

implying that Mr. Wadas is corrupt, that the judge is corrupt. He says he has a basis for --

THE COURT: I don't know what Mr. Sotos is doing. So maybe I should hear that.

MR. SOTOS: Thank you. I'm not trying to suggest that this witness is corrupt. I'm trying to suggest that he knew that this judge was the subject of widespread allegations in the media about having taken bribes in three different cases at the very time he made the decision to recommend to Mr. Rivera that he take a bench. And Mr. Rivera brought it up on direct that Mr. Wadas advised him to do that.

Actually, first he did say that it was Mr. Wadas' decision.

THE COURT: I remember that part.

MR. SOTOS: Yeah, it was clarified, and that's fine. And then Mr. Wadas talked about it in direct.

THE COURT: So -- so -- so, okay. So now I see what you're doing. There's really no way that you could establish that Mr. Wadas knew that Judge Close was corrupt without suggesting that Mr. Wadas is corrupt.

MR. LOEVY: Exactly.

MR. SOTOS: No, that's not --

MR. LOEVY: Why else is it relevant? Why is it even relevant?

MR. SOTOS: That's not what my inference is. It's

like, Why would you decide to go in front of that judge knowing all that, that it's a bad decision and it was a critical decision. And there's been widespread testimony in the case about how weak this case was, and it was. And a decision to take a bench in front of a judge who was under -- he was under -- well, at least according to the media --

THE COURT: Okay. I got your point.

Do you want to say?

MR. BOWMAN: It is, it's a Rule 403 issue, because the other inference that any reasonable person might draw is that Mr. Wadas was corrupt, and that's the problem. I mean, I get his observation --

THE COURT: Well, I don't understand how it's a 403 issue.

MR. LOEVY: It's relevance. What is it relevance to? And it's enormously prejudicial to start saying judges are corrupt. Why is this part of the trial, I guess is what I'm --

THE COURT: Well, I think it goes to the same issue that, to my surprise, we've been talking about for a long time, which is causation. I mean, that's been -- even after that out-on-the-limb reasonable diligence ruling, I heard a day and a half, I think, right after that about causation.

And so if the lawyer recommends a bench trial knowing that the judge -- you know, he has lots of options. He has lots of options. He can ask for a new judge, he can do all

kinds of things. So let's do this, because we need to have a break, and I'll come and rule when it's over.

But, Mr. Sotos, what do you want to do?

MR. SOTOS: I want to ask him whether he was aware --

THE COURT: Well, he already said he wasn't.

MR. SOTOS: Okay. Then I want to refresh his recollection from several newspaper stories that were reported right at the time he was representing Mr. Rivera. I can provide the Court with copies of those.

MR. LOEVY: Your Honor, they're dated December '88, after the criminal charges. We haven't seen this. They are just handing them to us now. They are not in pretrial order. This is a total ambush. They're not in the pretrial. They've never been part of the case.

THE COURT: Well, this is not a surprise to me, so I don't know how it's a surprise to you.

MR. SOTOS: This is not an ambush --

THE COURT: No, don't talk about ambush, just tell me what you want to do.

MR. SOTOS: All right. Okay. So I want to ask him whether or not he was aware of these widespread allegations about Judge Close, whether it impacted on his decision to go in front of Judge Close. And, basically, why would you go in front of a judge under these circumstances.

THE COURT: Your Honor, I'm going to let you do one

thing at this point, I'm going to let you show him these clippings, ask if it refreshes his recollection. And if he says "no," I think we are done with this witness on this issue. Then we're going to talk about can you prove this some other way. I don't want this be paraded in front of jury if the witness has no recollection and his recollection is not refreshed.

MR. BOWMAN: The other issue is that as a matter of tort law, proximate cause, I mean, this is not a separate -- it is not a separate instigating factor in the harm that Mr. Rivera suffered.

THE COURT: Well, I don't understand, because we've been going on and on and on about all the things that Mr. Wadas could have, should have, whatever done, and it seems to me that this is no more or less relevant than all of that that we've been doing.

MR. BOWMAN: Except that it is in a separate category of being inflammatory and suggestive even of the possibility of the plaintiff somehow being implicated, that's the problem.

THE COURT: The plaintiff being implicated?

MR. LOEVY: The suggestion --

MR. BOWMAN: The suggestion is out here.

THE COURT: I don't get that at all. So you're going to have to be real specific, and then we're going to take a break and I'll rule at the end of the break.

MR. LOEVY: All right. The cross-examination was, you talked a lot with Mr. Rivera about taking a bench or a jury. And everybody said this is a real weak case, and you and Mr. Rivera decided to take a bench, and here's four articles that we've never shown plaintiff saying this is a corrupt judge.

THE COURT: I think that's really -- I'll have to think about that. It's just --

MR. SOTOS: And I'm not going --

MR. BOWMAN: May I say one more thing. Testimony was elicited from Mr. Rivera to the effect that he'd been informed that Judge Close would give him a good hearing or something to this effect.

THE COURT: Right.

MR. LOEVY: And now they're going to do this.

MR. BOWMAN: And now they're going to do this.

THE COURT: If that's what the lawyer told him, that's what the lawyer told him, but there's no suggestion that Mr. Rivera -- he testified that Mr. Wadas told him that because of the gang elements of this case, he'd be better off in Skokie with a bench. That's all Mr. Rivera said. I don't see how there's any implication. You're not going to try to show that Mr. Wadas knew this and shared it with Mr. Rivera?

MR. SOTOS: No. No, I don't have any evidence of that.

THE COURT: All right. We only have a few minutes

left.  Maybe three minutes.

(Recess.)

COURT SECURITY OFFICER:  All rise.

(The following proceedings were out of the presence of the jury:)

THE COURT:  All right.  Let me tell you what I want done.  I want to hear the last bit of testimony from the witness before we had the sidebar and all these breaks, because -- well, I just want to hear it, okay.

Let's take a second and let the court reporter find it.

MR. SOTOS:  Judge, could we have Judge Wadas step out while we're discussing this?

THE COURT:  I just want to hear the testimony.

So this is testimony before the sidebar.

(Brief pause)

THE COURT REPORTER:  You can look at it on your screen.  Lots of interruptions.

THE COURT:  Oh, I keep forgetting.

THE COURT REPORTER:  Scroll up, Judge.

THE COURT:  Oh, like this (indicating)?

I don't even know how far to go.  I'm looking but --

(Brief pause).

THE COURT:  Okay, I think I found it.

All right.  I'm at a question, the witness is on the

stand because we get an answer eventually after all kinds of things:

" Okay.  So what I want to ask you about is, in making that decision, you knew at the time that Judge Close was under a federal investigation for accepting bribes in other cases, correct?"
And the witness answers:
"... I didn't specifically know that."
I guess what I want to say to the lawyers --
Mr. Wadas, if you could just give us a second.
THE WITNESS:  Sure.
THE COURT:  Don't go far.
(Witness exited the courtroom).
MR. LOEVY:  Wasn't there one more question after that? "Weren't you aware" and he said "no."
THE COURT:  Oh ...
"... were you aware that it had been reported publicly that he was?
"No."
The thing is, if there is no expression of failure of recollection, then we can't refresh recollection.  So I think we are done with this witness on this subject.
MR. SOTOS:  I thought he said specifically he didn't. I mean, that was about whether he was aware of a federal investigation.  There's more questions to ask:  Was he

generally aware of allegations against him.  It's the same point that we're trying to make.  When he said --

THE COURT:  All right.  You have to say things once, okay.  Saying it 20 times doesn't help me.

MR. SOTOS:  I understand.

THE COURT:  I suppose you could ask him given how that answer came out, was he aware of allegations.

MR. SOTOS:  Yes.

THE COURT:  And if he says "no" we're done.  If he says "yes," we're going to have talk about it.  But the sidebar transcript, which I now have, does not alert me to this issue, okay.  It was an inconclusive.  So maybe you talked to each other, but I can give you the sidebar transcript, but I don't see it.

Anyway, so you're going to ask was he aware of allegations involving Judge Close?

MR. SOTOS:  Involving allegations of bribery, were you aware of those, generally aware of them against the judge.

MR. LOEVY:  And we have a relevance objection, Your Honor, and a 403 objection.  Why are we asking this guy about bribery and Judge Close?

MR. SOTOS:  I can respond --

THE COURT:  Well, I'm going to allow it.  I'm going to allow Mr. Sotos to do this, but I want to have the question framed so it's as non-prejudicial as possible.

Were there bribery allegations against Judge Close?

MR. SOTOS: Yes, by at least three different people. They were reported in the Chicago Tribune --

THE COURT: Dated?

MR. SOTOS: The first article is earlier, August of 1985, the other three are between October and December of 1988 when he was --

THE COURT: The only relevant one would be the one before the trial.

MR. SOTOS: All four are before the trial. One is 2 years before he represented -- three years before he represented Mr. Rivera.

THE COURT: Okay.

MR. SOTOS: The other three are right during the representation.

THE COURT: Okay. What's the question you're going ask? Write it down, please.

MR. SOTOS: Okay.

THE COURT: Let's know what the question is going to be.

MR. SOTOS: I write kind of sloppy, Judge.

"Were you generally aware --"

THE COURT: Don't ask "generally," that's what got us the trouble the first time, that specifically got us in trouble.

MR. SOTOS: "Were you aware at the time you were advising Mr. Rivera --"

THE COURT: Okay.

MR. SOTOS: "-- that allegations had been advanced publicly against Judge Close for taking bribes in other cases."

THE COURT: "Advanced publicly"?

MR. SOTOS: Correct.

THE COURT: This was already public?

MR. SOTOS: Yes.

MR. LOEVY: We don't know because we didn't get the articles until one minute ago but --

THE COURT: Why don't you say "advanced." Forget "publicly," just "advanced." We can fight about publicly if we have to go down that road.

MR. SOTOS: "Were you aware at the time you were --"

THE COURT: Advising Mr. Rivera.

MR. LOEVY: I thought we were trying to say you weren't implying that Mr. Rivera was in on the bribery, who are you --

THE COURT: It doesn't.

MR. SOTOS: I'm not.

THE COURT: Go ahead. Go ahead.

MR. SOTOS: "You were aware at the time you were advising Mr. Rivera that --"

THE COURT: There were allegations.

MR. SOTOS: ".... that there were allegations against Judge Close involving taking bribes in other cases."

THE COURT: Okay. I'm going to allow that. Let's get the witness, and let's get the jury, and let's see where we go. We're going to need to have a sidebar if he says "yes."

(Witness enters the courtroom).

THE COURT: Thank you. Please be seated.

THE WITNESS: Thank you.

THE COURT: We have an ill juror. I'm going to see what's going on.

(Recess.)

THE COURT: It's a juror named Kelly.

COURT SECURITY OFFICER: Kelly, yes, Your Honor.

THE COURT: Tall juror. And she had a tooth extraction I don't know when.

COURT SECURITY OFFICER: Last week.

THE COURT: And she apparently is in excruciating pain and can't get in to see her dentist until tonight, and is on medication, but it's working.

COURT SECURITY OFFICER: Well, the RN in the building here.

THE COURT: Well, right. I think we're going to see if we can get her to see the nurse in the building. I don't know what kind of delay we're dealing with. And I don't know --

Did she say anything about when this problem arose?

THE COURT'S LAW CLERK:  She said she had the tooth extracted last week so she could be here for this.

THE COURT:  Right.  But like today, she's been here all morning, right?

COURT SECURITY OFFICER:  Yes.

THE COURT:  Something happened over the break?

COURT SECURITY OFFICER:  She's like just having pain.

THE COURT:  I don't know if she wants us to recess the trial or what --

COURT SECURITY OFFICER:  Do you want me to bring her in?

THE COURT:  No, just wait.

MR. LOEVY:  Maybe we can make it to lunch.

MS. ROSEN:  Judge, I mean, if she's in pain ...

THE COURT:  Well, there's pain and there's pain.

MS. ROSEN:  Well, right.  Agreed.

THE COURT:  And there is pain that can be alleviated with medication and there's pain that can't.  I don't know anything -- I mean, I don't know if she's -- I don't know what she's taken.

Has she had aspirin?  One of those oxy things?  I don't know.

Well, let's let Marlan ---- you know, Marlan is checking on it, right?

COURT SECURITY OFFICER:  Yes.

(Brief pause).

THE CLERK:  Okay.  She's having a toothache she put off having surgery to get it removed.  Now she thinks it's infected.  So she says she's already taken something, but she's in excruciating pain right now.

THE COURT:  So what does she want to do?

THE CLERK:  She said she would go down --

THE COURT:  The nurse?

THE CLERK:  Yes.  But she does have a doctor's appointment hopefully tonight.

THE COURT:  So I guess she is saying she can't get through the day or --

THE CLERK:  She's been putting up with it.  She has been getting through it but it has been bothering her, but today she's just in a lot of pain.

MR. BOWMAN:  Your Honor, we're not clear on which juror this is.

THE COURT:  Guzman.

MR. BOWMAN:  Thank you.

THE COURT:  Well, she wants to go the nurse.  We need to have her see the nurse.

Why don't you do that, so we can get back to work at some point.  Thanks.

THE CLERK:  Okay.

THE COURT: All right. So I guess we take about a ten-minute break and we see if we can learn anything else. Maybe there's something the nurse can give her that would -- or if the nurse can look at it and say it's not infected, maybe she'll feel better.

All right. Let's take a break, people. It's going to take at least ten minutes, probably longer.

(Recess.)

THE COURT: Let me tell you, it's better forgotten, that's why I blacked it out.

Okay, is everyone back?

Mr. Loevy?

MR. LOEVY: We just wanted to raise something. If we're going to be talking about bribery, and were you aware of bribery, Plaintiff's Exhibit 141, which is --

COURT SECURITY OFFICER: She is back. The nurse gave her Tylenol. And she's going to go to the doctor tonight. She's good to go.

THE COURT: She's good to go. Okay, give us just three minutes. Say we'll be ready for them very soon.

Go ahead.

MR. LOEVY: Plaintiff's Exhibit 141 contains allegations that Mr. Guevara was involved in bribery in exchange for fixing identification and fixing cases with Cook County Judges, in fact. And we still object to -- the

articulation for why it's relevant, "were you aware there was bribery by Judge Close" would open the door to "were you aware there was bribery allegations by Mr. Guevara."

THE COURT: You're going to ask Mr. Wadas that?

MR. LOEVY: Well, either him or other witness, it seems-- I don't know exactly why it's relevant for Wadas anymore than his is. If "are you aware bribery" is relevant, then --

THE COURT: Well, here's why it's relevant: First of all, if that reasonable diligence thing is not part of this case, I think there would've been an argument, which actually wasn't made, that all of this causation stuff was inadmissible. But once all the causation evidence is admissible -- now, you know, it's almost enough to make me vomit, but the point is, it is a defense that this system was -- the judge was corrupt, everybody was corrupt, the judge was taking bribes, that's what created this conviction.

MR. LOEVY: That's an issue we've actually briefed and looked at Your Honor, because we actually had it in another case --

THE COURT: Well, I haven't been privy to that.

MR. LOEVY: No. And that's why I'm laying it out now.

THE COURT: So do you think I could see that at some point?

MR. LOEVY: Yes, we'll have it for you at lunch.

THE COURT: Wonderful.

MR. LOEVY: The issue is, it is not a causation argument, and I'll explain why: It's relevant to the trial, reasonable diligence is part of the trial. You postulated, maybe it could be a causation issue. First of all, our main argument is, they have to have a lot more than "were you aware there was an allegation" before they could make a causation argument, but the more important argument is the superseding cause argument that Art has briefed and he would like --

THE COURT: Because we don't have much time and we're going to take lunch in the next 40, 45 minutes, let me ask you this, I know the defense would like to go forward, but because this is blowing up right now, would the plaintiff prefer that I have this question put to Mr. Wadas outside the presence of the jury?

MR. LOEVY: Either way, Your Honor.

THE COURT: Okay. Then I think we get the jury in and do it that way.

MR. LOEVY: All right.

THE COURT: So Mr. Sotos is going to ask his question. If he says "yes," we're going to have to have a sidebar and figure out --

MR. LOEVY: All right. Then maybe we should ask it. I misunderstood. If he says "no," we're done with the issue?

THE COURT: That's what I asked you.

MR. LOEVY: All right. I apologize, Your Honor. You're right.

THE COURT: You want to have it outside the presence of the jury?

MR. LOEVY: Yes.

THE COURT: Let's do that, and then we'll talk later about later about where we go with this.

(Witness entered the courtroom).

THE COURT: Okay. Mr. Wadas, you can come in.

We're ready -- oh, hold the jury for a second. I'm so sorry. I forgot.

Why don't you have a seat, Mr. Wadas. We're going to ask you a question outside the presence of the jury and then try to figure out where we go from there.

THE WITNESS: Okay.

THE COURT: Go ahead, Mr. Sotos.

MR. SOTOS:

Q. Were you aware, sir, at the time that you were advising Mr. Rivera that there were allegations against Judge Close involving taking bribes in other cases?

A. No.

THE COURT: We're outside the presence of the jury.

MR. SOTOS: We're outside the presence of the jury, can I follow up?

THE COURT: Yeah. Go ahead.

MR. SOTOS:

Q. Is it your recollection that you know that you were not aware of those allegations or that you don't recall as you sit here today?

A. You're talking about rumors? Word on the street?

Q. Yes.

A. Or re you talking about an actual allegation?

Q. Rumors, word on the street, correct?

A. There were rumors.

Q. Okay. Do you recall that those rumors were published in the Chicago Tribune?

A. No, I don't remember seeing anything like that.

Q. Is there something that might refresh your recollection?

A. I doubt it, but --

Q. Did you follow the Greylord scandal back in the 1980's?

A. Yes, from start to whatever.

Q. And did you follow stories about judges being accused of corruption in the Chicago newspapers, including the Chicago Tribune at that time?

A. Yes.

Q. And was that something that you talked about with your colleagues? It was --

Answer taking question first, please.

A. Yes.

Q. It was a huge issue in Chicago in the late 1980's, correct?

A.   Even before that, yes.

Q.   Would you read newspaper articles that reported about those allegations?

A.   Yes.

Q.   So if I showed you Chicago Tribune articles from the time period in which these allegations were addressed, might that refresh your recollection as to your awareness of these allegations having been reported in the Chicago media?

A.   If I saw the article, maybe it would.

         MR. SOTOS:  If I could, Judge?

         THE COURT:  Yes.

         (Brief pause).

         THE COURT:  Ben, could you tell the CSO we're going to be five minutes.  If the jury wants to wait in the jury room or if they just want to wait there.  It's not going to be long.

MR. SOTOS:

Q.   I'm showing you what has been marked as Defendants' Exhibits 223 through 226 for identification.

         (Document tendered to the witness).

BY MR. SOTOS:

Q.   These are Chicago Tribune articles, first from August 1985, the next three from October through December of 1988, and ask you to review those.  Let me know when you're done.

         (Brief pause).

BY THE WITNESS:

A.   I might've seen these articles in the paper.

MR. SOTOS:

Q.   All right.  And so at the time of your representation of Mr. Rivera, you were aware of publicly reported allegations against Judge Close for accepting bribes?

A.   Yes.

Q.   Okay.

MR. SOTOS:  So, Judge, I would like to follow up with the jury present, how it impacted or affected his decisionmaking.

MR. LOEVY:  It's the same inference, Your Honor. There is no admissible argument you can go to from there other than that Mr. Wadas was trying to get to do something corrupt. I'm not seeing where we're going with this.

MR. SOTOS:  I do want to respond to that in front of the witness, just so it's clear, I'm not saying that.

THE COURT:  Here is what I think, if the plaintiff says that this has been considered in other trials and --

MR. SOTOS:  Yes.

THE COURT:  -- it didn't go anywhere, I think at the risk of having Mr. Wadas have to come back, I would prefer that we not do this until I've been able to flesh this out a little bit, because it's -- it's very prejudicial, obviously.  I don't know that it's not probative, but I don't want to risk painting this jury if it turns out that I'm not going to allow it.  You

know, I'd like to consider what's available. So I don't even know if we're going to be finished -- maybe by the end of lunchtime we'll be in a position to go forward on it.

MR. SOTOS: That's what I would suggest, because I don't want to make the witness come back either.

THE COURT: Well, how much more do you have? Are you the only defense lawyer who is going to cross-examine?

MR. SOTOS: No, I know Ms. Rosen has some.

THE COURT: All right. So we have nothing to worry about. We'll take a lunch break at about 12:15 and I'll consider all of this.

You're going have a memo for me, right?

MR. LOEVY: Yeah, I am.

THE COURT: And then I'll come back and I'll rule before we go back after lunch.

MR. SOTOS: Will we have a chance to review and address the memo?

THE COURT: Well, I would certainly hope so, but you need me to tell you that? I mean, I can't see anything that hasn't been given to everybody.

MR. SOTOS: I'm just saying, we don't have a written memo on it.

THE COURT: Yeah. Neither do I, Mr. Sotos. Neither do I.

MR. SOTOS: I understand.

THE COURT: So, just, you know, wait.

MR. SOTOS: All right.

THE COURT: We'll ready. Let's go ahead without this and we'll go back to it if it turns out that I'm going to allow it.

(Brief pause).

THE COURT: So we're going to go to another area?

MR. SOTOS: Yes. So I'll just go straight to another area, Judge. I understand.

THE COURT: Thank you.

Can you keep us busy with other thins until about 12:15?

MR. LOEVY: Well, it sounds like Ms. Rosen is next. So she will.

MS. ROSEN: No, I only have a couple of things, and then I think Mr. Leinenweber.

THE COURT: So let me get a sense of how much Mr. Sotos has.

MR. SOTOS: 10, 15 minutes. I can extend it, but --

(Laughter in the courtroom).

MR. SOTOS: That's not what you're asking, right?

THE COURT: No. We'll take a early lunch. I think we should break before you give up the floor.

MR. SOTOS: Understood.

Judge, would it be all right if I advised the witness

that by these questions I am not this witness of any misconduct?

THE COURT: Be my guest.

MR. LOEVY: We object, Your Honor. He did.

MR. SOTOS: I'm not. It has to do with the other person, not Mr. Wadas, and I want him to know that.

THE COURT: Okay.

(Brief pause).

COURT SECURITY OFFICER: All rise.

(The following proceedings were had in the presence of the jury in open court:)

THE COURT: Please be seated, everyone.

Mr. Sotos.

MR. SOTOS: Thank you, Judge.

MR. SOTOS:

Q. Mr. Wadas, before we took a break we were talking a little while ago about -- (coughing). Excuse me. Bad time to get something in your throat.

We were talking about the fact that if you had wanted -- we were talking about the gang book photos that you had subpoenaed for officers Letrich to bring to court, correct?

A. Yes.

Q. All right. And I just want to ask you now, the same applied for the gang book photos that you had been told the eyewitness picked Mr. Rivera out from, correct?

A.   Yes.

Q.   So you had information that Mr. Rivera was selected by the witness from gang book photos that he was shown?

A.   Yes.

Q.   All right.  And if you felt that was an issue in the case, you could have done the same thing with respect to those photos that you did for the Letrich photos and just sent a subpoena out and asked them to bring those gang book photos to court?

A.   Yes.

Q.   Okay.  And, presumably, those photos back in the 1990, '88, '89, and '90 would still be in existence, correct?

A.   I would presume so.

Q.   As opposed to 30 years later today, right?

A.   Yes.

Q.   There was a little talk about the discovery process.  And you said you served what's called a standard form discovery request to the prosecutor's office?

A.   Yes.

Q.   Saying you basically wanted everything that was relevant to the case, including everything that was helpful for you, correct?

A.   Yes.

Q.   All right.  And then the State served the response to you, served the response to that discovery request?

A.   Yes.

Q. Okay. The discovery process is a little bit more involved than that, though, right? I just want the jury understand, it's something that goes --

A. Ongoing.

Q. Right. It's an ongoing process throughout the case, right?

A. Yes.

Q. You have pretrial hearings before the case goes to trial, correct?

A. Yes.

Q. And if there are issues about discovery, you having all the discovery, you can bring that up with the Court, correct?

A. Yes.

Q. You can talk to the state's attorney and say, you know, I didn't get this, I'm looking for this, correct?

A. Yes.

Q. And that's very common in pretty much all criminal prosecutions, right?

A. Yes.

Q. And based on your experience, that's not an indication of misconduct, is it? It's more the kind of thing that happens when everybody is trying to get all the papers together?

A. No, my experience is -- my experience with Larry Victorson was that he was above-board, stand-up, and would give me whatever was in his file.

Q. Right. And in this case in particular, that process went

on throughout the course of the pretrial proceedings?

A. Correct.

Q. And those pretrial proceedings lasted for like a year and a half, right?

A. Yes.

Q. So the charge was in September of 1988?

A. Yes.

Q. And the case went to trial in April of 1990, correct?

A. Yes.

Q. So it's not like it is on TV where, you know, the guy gets charged at the beginning of the show and then by the middle of the show he's on trial?

A. Correct.

Q. Much longer process.

And during that year and a half, that's when you're supposed to be doing your investigation in the case?

A. Correct.

Q. To prepare for trial?

A. Prepare for trial.

Q. And we saw yesterday the State's answer to the discovery request that you filed.

MR. SOTOS: Can you put 23L up, please.

MR. SOTOS:

Q. Mr. Wadas, in front of you is Defendants' Exhibit Number 23. We're calling it 23L.

And that's the answer to discovery that you saw yesterday, correct?

A.  Yes.

Q.  And I believe that's already in evidence as Plaintiff's Exhibit --

MR. SOTOS:  You guys know?

MR. LOEVY:  40.

MR. SOTOS:  40.  So we would introduce it as Defendants' Exhibit 23L.

THE COURT:  Any objection?

MR. BOWMAN:  Not at all.

THE COURT:  It is received.

(Defendants' Exhibit 23L received in evidence).

BY MR. SOTOS:

Q.  And this answer to discovery that the State's Attorney's Office provided you had a list of upwards of 20 people who the State had said may or may not be called as witnesses in the case, correct?

A.  Correct.

Q.  Family of the victim.  The eyewitness Orlando Lopez, he was disclosed to you, correct?

A.  Yes.

Q.  Medical personnel from the two hospitals that the victim was at?

A.  Yes.

Q.   Norwegian and Cook County Hospital, correct?

A.   Yes.

Q.   So if you wanted to talk to them about any issues concerning the victim's medical condition during these two weeks that he lingered --

A.   Yes.

Q.   -- you could've done that.

     ASA Rosner, who was the assistant state's attorney who was out on Felony Review, correct?

A.   Yes.

Q.   And, by the way, do you know from your experience at the time whether in a murder case an assistant state's attorney who comes out on Felony Review because of the magnitude of the case has a supervisor in addition to the assistant that's called out?

A.   On a murder case -- well not -- it's structured different now, but then the ASA that went out on a case in a murder would call back to the head of Felony Review or the deputy of Felony Review to, you know, let them know or her know what was going on and, you know, authorize the charge.

Q.   Okay.  And you don't know whether or not they were actually -- the practice at that time that the assistant state's attorney who went on the scene was required, because of the magnitude of the charge, to have another supervisor come out to the scene as well?

A.  No, not -- that wouldn't be required.  A phone call a lot of times would cover it.

Q.  Okay.  And then on the next column there's a number of CPD, under CPD it lists --

A.  Yes.

Q.  Looks like 16 -- well, if we go to the third column, lists 18 different police officers?

A.  Yes.

Q.  And of those you interviewed Mr. Letrich, correct?

A.  Maybe his partner, too.  I can't remember if they were together.

Q.  Boyle could've been with Letrich?

A.  I think it was Moriarty.

Q.  Oh, Moriarty.  I misspoke.  I'm sorry.

Moriarty could've been with them?

A.  He might've been with them.

Q.  And these were police officers who were involved in the case at the very beginning on August 27th, as well as the August 30th and 31st point when Mr. Rivera was in custody, as well as at the end of the case when he was charged on September 15th, correct?

A.  Yes.

Q.  You could've talked to any of those officers at any point if you -- if you thought it important?

A.  Yes.

Q. Moving on to a different topic. We won't be going much longer.

I want to talk to you about when you were contacted again on this case in 2002 by representees of Northwestern University, okay?

A. Yes.

Q. All right. You remember talking to Jane Raley who was a representative of Northwestern?

A. Yes.

Q. All right. Before that, you described on direct examination a _ you had with the State's Attorney about your file, correct?

A. Daren O'Brien, right.

Q. O'Brien, right. That didn't involve any of the police officers in this case, correct?

A. No.

Q. Okay.

A. Post-conviction issue.

Q. All right. And in your conversation with Jane Raley, that was back in 2002?

A. I believe so.

Q. So it's your understanding that she was representing Mr. Rivera in 2002?

A. Yes.

Q. And what she talked to you about -- you know, you talked on

direct examination about Brady claims, do you recall that?

A.  Yes.

Q.  Which is essentially, in layman's terms, the obligation of the police and the prosecutors to disclose evidence that is helpful to your case?

A.  Correct.

Q.  And so back in 2002, Ms. Raley was talking to you about a Brady claim regarding the absence of any paper for the so-called first lineup that we talked about, correct?

A.  I believe she talked about that.

Q.  We talked about that yesterday.  We don't have to go over it again.

        But there was nothing when you talked to her at that point about Mr. Lopez, the eyewitness, recanting and saying that he didn't see what he had previously testified that he saw, right?

A.  I didn't that.  If that happened at that time, I didn't know about it.

Q.  And certainly there was nothing about Mr. Orlando or the eyewitness, Orlando Lopez saying in 2002 that he had said "wrong guy.  Wrong guy" before he went into the lineup on September 50, correct?

A.  I didn't know that.

        MR. LOEVY:  Objection to foundation, Your Honor.  He didn't know.

THE COURT:  The witness is saying he didn't know.  So I think that's okay.

MR. SOTOS:

Q.  You don't remember Ms. Raley saying anything about that back in 2002?

A.  No.

Q.  So 8 years later, you were approached by Ms. Raley again correct?  By 2010?

A.  Yes.

Q.  Is that about right, 2010?

A.  I believe so.

Q.  Okay.  And so as far as you know, Northwestern had been representing Mr. Rivera for at least 8 years from the time she talked to you about this Brady lineup claim and to when she told you that Orlando Lopez had recanted his testimony?

MR. BOWMAN:  Objection, foundation.

MR. LOEVY:  Yes, he doesn't --

MR. SOTOS:  His conversation is with Northwestern, Judge.

THE COURT:  Well, you can ask whether the witness knows something, but I think the question is -- I'm going to sustain an objection to the form of the question.

MR. SOTOS:  I can establish foundation.

MR. SOTOS:

Q.  You prepared for your testimony by meeting with

representatives of Mr. Rivera, correct?

A. Correct.

Q. You talked about a number of issues in the case?

A. Yes.

Q. One of the issues you talked about were your contacts with Northwestern University that you were asked about on direct examination, correct?

A. I believe so.

Q. Okay. And the first conversation with Northwestern you talked about was when they came and asked you for your file, right?

A. Yes.

Q. That was back in 2002, correct?

A. Yes.

Q. And at that time you spoke with Ms. Raley?

A. Yes.

Q. And she talked to you about this Brady claim involving the lineup, correct?

A. I believe so.

Q. All right. And she didn't talk to you about the witness recanting, correct?

A. I don't believe she did.

Q. All right. Now, moving forward 8 years, do you recall that that was the next time you were contacted by Northwestern on he case or do you not remember what year it was?

A.   Not really.

Q.   Let me see if I can give you something to refresh your recollection.

          MR. SOTOS:  May I have one moment, Your Honor.

          THE COURT:  Sure.

          (Brief pause)

MR. SOTOS:

Q.   Mr. Wadas, I'm showing you what has been marked as Defendants' Exhibit 13A and ask you to review that.  Take a look at the date, tell us if this refreshes your recollection.

          (Document tendered to the witness:)

BY THE WITNESS:

A.   My affidavit.

BY MR. SOTOS:

Q.   And do you see that it's dated on the second page?

A.   2011.

Q.   Does that give you a rough timeframe of when Northwestern contacted you again?

A.   Yes.

Q.   Fair to say sometime around 2010, 2011?

A.   Correct.

Q.   And it was at that point that you were advised for the first time that the witness had recanted his testimony, correct?

A.   I'm still not sure if she actually told me that.

Q. Why don't you take a look at your affidavit and see if it refreshes your recollection.

I can direct you to --

A. Okay, I see that. She must have shown me or told me that there was a recantation.

Q. And do you recall that she had told you in 2010 or 2011 that it was around that time the witness had recanted?

A. No, I don't know when the witness actually recanted.

Q. She didn't tell you?

A. I don't know if she did or not.

Q. And she didn't tell you anything about what had occurred during the 8 years of her representation of Mr. Rivera that led to the recantation?

MR. LOEVY: Objection, Your Honor. That implies that there was 8 years of investigation.

THE COURT: I'm going to sustain the objection to the form of the question.

MR. SOTOS:

Q. Do you remember anything specifically that she told you about the recantation in 2010 and 2011 as you sit here today?

MR. LOEVY: Objection, asked and answered, Your Honor. I think we've covered that a lot.

THE COURT: Overruled.

BY THE WITNESS:

A. I don't think she gave me a lot of details. I think she

just told me factually that that happened, that kind of a scenario.

Q. Thank you, Mr. Wadas.

MR. SOTOS: I don't have anything further.

THE COURT: All right. I think we should probably take our lunch break at this point. We'll start again, ladies and gentlemen, at 1:00 o'clock.

COURT SECURITY OFFICER: All rise.

(The following proceedings were had out of the presence of the jury in open court:)

THE COURT: All right. When am I going to have the memorandum?

MR. LOEVY: I'm going to go get it hopefully, Your Honor.

THE COURT: So could you just drop it off in chambers?

MR. LOEVY: Yes. I'll give Mr. Sotos a copy.

THE COURT: Thank you.

All right. We better get together at no later than five to 1:00.

THE WITNESS: And here's these other documents (indicating).

MS. ROSEN: You can just leave those there.

THE COURT: You can leave them because there's more coming.

THE WITNESS: Okay.

THE COURT:  THE COURT:  We don't need the witness until 1:00 o'clock.

(Luncheon recess taken from 12:03 o'clock p.m. to 12:50 o'clock p.m.)

*       *       *       *       *       *       *       *

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER

/s/Blanca I. Lara                    June 13, 2018

1548

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JACQUES RIVERA,                          ) No. 12 CV 4428
                                         )
          Plaintiff,                     )
                                         )
vs.                                      ) Chicago, Illinois
                                         )
REYNALDO GUEVARA, STEVE GAWRYS,          )
DANIEL NOON, JOHN GUZMAN, JOSEPH FALLON, )
JOSEPH SPARKS, PAUL ZACHARIAS, GILLIAN   )
MCLAUGHLIN, JOHN LEONARD, EDWARD MINGEY, )
RUSSELL WEINGART, ESTATE OF ROCCO        )
RINALDI, CITY OF CHICAGO,                ) June 13, 2018
                                         )
          Defendants.                    ) 1:00 o'clock p.m.

                         VOLUME 7 B
          TRANSCRIPT OF PROCEEDINGS - Trial
     BEFORE THE HONORABLE JOAN B. GOTTSCHALL
                       and a Jury

APPEARANCES:

For the Plaintiff:    LOEVY & LOEVY
                      BY:  MR. JONATHAN I. LOEVY
                           MR. STEVEN E. ART
                           MR. ANAND SWAMINATHAN
                      311 North Aberdeen Street
                      3rd Floor
                      Chicago, Illinois  60607

                      MacARTHUR JUSTICE CENTER
                      Northwestern University School of Law
                      BY:  LOCKE E. BOWMAN III
                      357 East Chicago Avenue
                      Chicago, Illinois  60611
                      (312) 503-0844


Court reporter:         Blanca I. Lara
                      Official Court Reporter
                      219 South Dearborn Street
                      Room 2504
                      Chicago, Illinois 60604
                      (312) 435-5895
                blanca_lara@ilnd.uscourts.gov

APPEARANCES:  (Continued)


For the Individual        THE SOTOS LAW FIRM
Defendants:               BY:  MR. JEFFREY N. GIVEN
                               MR. JAMES G. SOTOS
                               MS. CAROLINE P. GOLDEN
                               MR. JOSEPH M. POLICK
                               MR. DAVID A. BRUEGGEN
                          550 East Devon Avenue, Suite 150
                          Itasca, Illinois  60143


For the Defendant         ROCK FUSCO & CONNELLY, LLC
City of Chicago:          BY:  MS. EILEEN E. ROSEN
                               MS. CATHERINE M. BARBER
                               MS. THERESA B. CARNEY
                          321 North Clark Street, Suite 2200
                          Chicago, Illinois  60654


For the Defendant         LEINENWEBER BARONI & DAFFADA, LLC
Guevara:                  BY:  MR. THOMAS E. LEINENWEBER
                               MR. JAMES V. DAFFADA
                          120 North LaSalle Street, Suite 2000
                          Chicago, Illinois  60602

(Jury out.  Proceedings heard in open court:)

THE COURT:  So I read the memo the plaintiffs gave me. You filed it in another case, you said?  Or I don't know.  It doesn't matter.  It looks like it was filed in this case.

MR. ART:  This memo we wrote in this case.  It's adapted off one that was filed in the *Fields* litigation.

MR. LOEVY:  But we don't want you to think we did all that research on the fly.

THE COURT:  Yeah.

MR. LOEVY:  We just looked --

THE COURT:  Yeah.

MR. SOTOS:  Judge, we have --

THE COURT:  But -- yeah, I'll hear -- I am going to hear everybody.

MR. SOTOS:  Okay.

THE COURT:  So is there precedence?  Has somebody decided this issue?

MR. LOEVY:  We had a case where a guy actually did bribe -- or a co-defendant did bribe the judge.  So it was more directly than this case, so -- that's a different fact pattern.

MR. SOTOS:  And I think in that case, that bribe actually did go into evidence.  But we couldn't tell from the research we did over -- but they know --

MR. ART:  That's right, that's right.

MR. SOTOS:  -- whether Judge Kennelly either admitted

it or they -- I'm not sure.

MR. ART: Judge, the situation in that case is the plaintiff was Nathan Fields. He went on trial, and his co-defendant actually bribed the trial judge. And so the question was whether that bribe came in in the later wrongful conviction case, and we made the same argument.

And there, Kennelly decided that the evidence was a bit too close, right, to keep out. And we'd submit that it's a bit of a different situation here where it's all speculative.

THE COURT: Okay.

MR. SOTOS: Well --

THE COURT: Go ahead, Mr. Sotos, say what you want to say.

I think that whatever I do, it's bound to be a huge problem for one side or the other, so I --

MR. SOTOS: Well, Judge, I --

THE COURT: That's where I start.

MR. SOTOS: So our view of it is -- you know, in the Fields case, we're just learning it.

I do have the response that the City filed in that case, the motion you have. We didn't prepare it, but it was prepared by lawyers representing the City in that case.

Should I tender it to you?

THE COURT: Fine. I don't -- not that I have time to read it, but fine.

1552

MR. SOTOS: That's -- no, that's -- is that theirs or is it -- is that it? Is that it?

MS. ROSEN: That's the *Fields*.

THE COURT: I'd rather talk to you than --

MR. SOTOS: Okay.

THE COURT: -- have something I can't read now anyway.

MR. SOTOS: All right. But I just wanted you to have it, Judge.

THE COURT: Yeah.

MR. SOTOS: So that's --

THE COURT: No, that's fine. I would like to have it.

(Document tendered to Court.)

MR. SOTOS: And -- but in the *Fields* case, my understanding is that the allegation was that the trial judge actually was bribed. They just did it by co-defendant. I thought it was one of the plaintiffs -- maybe --

MR. LOEVY: No.

MR. SOTOS: -- it was the plaintiff's co-defendant -- actually did bribe the trial judge.

THE COURT: Yeah.

MR. SOTOS: But then the trial judge was under scrutiny, so he returned the bribe.

THE COURT: Oh.

MR. SOTOS: And then Fields was convicted.

MR. ART: But the causation --

MR. SOTOS: So --

MR. ART: Not to interrupt, but just to complete the picture of that --

THE COURT: All right. This is not going to help us. It's too different.

MR. SOTOS: Well, but my point is in that case, the -- there was actually a direct inference that the plaintiff himself bribed the judge, and it did come in.

We're pretty far removed from that. We are not -- no matter what they say about what they think we're doing, we are not going to argue and we are not trying to suggest that Mr. Rivera --

THE COURT: I know that, I know that.

MR. SOTOS: That anybody bribed anybody.

THE COURT: And I know that.

MR. SOTOS: So --

THE COURT: I told you that.

MR. SOTOS: But we do think it's different than the *Fields* case because it's important to why he made that decision -- like whether that was part of the calculus to go ahead in front of a judge who was under scrutiny for that. Didn't he think it was more likely --

THE COURT: I got it.

MR. SOTOS: -- that --

THE COURT: That -- yeah, we --

MR. SOTOS:  Judge, would you --

THE COURT:  That, you explained this morning.

MR. SOTOS:  Right.

THE COURT:  So let me ask you this.  This was in Judge Kennelly's case, *Fields*.  The jury heard all of this?

MR. ART:  Yes, Your Honor.

THE COURT:  And what happened?

MR. ART:  They returned a verdict for plaintiff.  But we don't -- I mean, that doesn't solve evidentiary issues.

(Laughter.)

MR. SOTOS:  A big verdict.

MR. LOEVY:  It was a big verdict, Your Honor, but that case, the evidence couldn't be kept out.  I mean, the judge in the plaintiff's case took a bribe.

THE COURT:  Well, let me tell you what my problem is in terms of keeping it out and then I'll tell you what my problem is in terms of keeping it in, and then we have to get the jury with the -- I'll give you, like, 60 seconds per side.

Okay.  I ruled, I thought, going out on a limb, but I thought it was a strong limb, that reasonable diligence did not come in.  Then, all of a sudden yesterday, I find out that reasonable diligence does come in.

And we've had a lot of evidence, whether you call it causation or reasonable diligence, about things that could have happened that would have avoided this conviction that didn't

have anything to do with the detectives.  I've been hearing that for days.

The strongest argument for this evidence at this point, it seems to me, is -- and, I mean, you know, part is causation, but part is why Mr. Wadas didn't move for a change of judge if he knew about this.  Okay?  Because the problem is that Mr. Wadas, I think quite reasonably, believed that this was a very weak case, and he thought he was going to win it, and then he goes to some judge, and he not only loses it, but he loses it big, big, big, big.  Okay?  And he was surprised and he was upset.  You can tell.

Okay.  So that's number one.  And then, you know, causation, I think -- we've done a little research, and we've certainly found law that says that 1983 is not a comparative fault statute, which suggests that if there were multiple contributing causes, it probably is not appropriate for the jury to try to figure out which of all of these causes did it. But I think it goes pretty directly to reasonable diligence.

MR. ART:  So can I address that point?

THE COURT:  Yeah.

MR. ART:  So reasonable diligence is a question about whether evidence was suppressed or not, right?  So you -- what you have to consider is -- in the *Brady* context is --

THE COURT:  Yeah.

MR. ART:   -- whether the evidence that was allegedly

suppressed was available through the exercise of reasonable diligence.

THE COURT: Well, that was the theory.

MR. ART: Right. And so the question whether a judge should -- or Judge Wadas, Mr. Wadas should have changed --

THE COURT: Okay.

MR. ART: -- judges has nothing to do with --

THE COURT: All right. So I think --

MR. ART: -- suppressed evidence.

THE COURT: -- that goes to the causation issue.

MR. ART: And only causation.

THE COURT: Yeah. Okay.

MR. ART: For which it's not admissible.

THE COURT: Yes.

MR. SOTOS: And we have a much different view of the causation --

THE COURT: Go ahead.

MR. SOTOS: -- issue, Judge, because we do think that Section 1983 is -- it's a constitutional tort. There's a lot of law that talks about that. And so you have to satisfy tort principles, duty, breach of duty, causation, and damages.

We -- the *Whitlock* case, as cited in the brief that we submitted in response to that --

THE COURT: You know what? You know, I said to my law clerk -- I didn't say this -- probably shouldn't say this out

loud, but, you know, it's one of these Seventh Circuit opinions that doesn't tell you anything.

MR. SOTOS: It was our case, Judge. I can't --

THE COURT: This is -- it's very exciting and then it's like, whoah.

(Laughter.)

MR. SOTOS: But --

THE COURT: They sliced that onion so thin.

MR. SOTOS: Right. It was a confusing opinion. I agree with that.

THE COURT: Yeah.

MR. GIVEN: Talk to Mr. Art about that one.

MR. SOTOS: But the -- well, they were not on that case.

MS. ROSEN: No. He was in the appellate court.

MR. ART: I was. I just figured out --

THE COURT: All right. Let's --

MR. ART: -- that I just --

THE COURT: Guys, let me just say, I got nothing out of it.

MR. SOTOS: But what the Court did say in that case is that the plaintiff has to show but-for causation, that you have to show that if not for --

THE COURT: Do they say that?

MR. SOTOS: -- the defendant -- I think the *Whitlock*

case says it.  It's cited on page 5 of that brief --

THE COURT:  It's on my desk.

MR. SOTOS:  -- we gave you and --

THE COURT:  Oh.  The brief you just gave me?

MR. SOTOS:  Yes.  And it references the *Whitlock* case --

THE COURT:  Okay.

MR. SOTOS:  -- at page 583, Judge.

THE COURT:  Okay.  Hold on, hold on.

MR. SOTOS:  So we're arguing the City's --

THE COURT:  Hold on.

MR. SOTOS:  -- brief in *Fields* now.

THE COURT:  Hold on.  5 -- 583.  Where -- could --

MR. SOTOS:  There's a quote.

THE COURT:  Oh, okay.  So *Whitlock* says that -- I didn't even see this in what I was reading.  They must prove that the conviction would not have occurred absent the alleged conduct.

MR. ART:  But that's the -- that's normal but-for causation.

THE COURT:  Yeah, it is.

MR. ART:  So *Whitlock* just says normal tort principles apply.  The first thing you got to show is that the misconduct caused your conviction.

But when it comes to multiple proximate causes, what

the Court said before is exactly right.  You don't get to say unless there's a comparative fault regime, oh, this other alternative proximate cause caused the injury unless it's a superseding cause and it can actually cause the liability.

THE COURT:  Well, yeah, but you could make that argue -- I mean, it's an argument you can make here.  You could make the argument that this was a really weak case.  And the wild part was that the judge decided what the judge decided.

MR. ART:  But I guess our point is as a matter of law, they don't get to make that argument.  Because if they want to say we're not liable, then what they need to show is that there's some superseding cause that got between, for example, a fabrication of evidence and the wrongful --

THE COURT:  So you have to prove through the mouth of the judge -- is that how you would do it?  You'd prove from the mouth of the judge that this is the decision he made?

MR. ART:  No.  I think that --

THE COURT:  For this reason?

MR. ART:  That a judge being bribed -- so say an officer fabricates evidence a judge's bribe to convict and a conviction occurs.  That bribe can never be a superseding cause because the foreseeable consequence of fabricating evidence is a wrongful conviction.

There's nothing about a judge being corrupt in the middle of that chain of causation that renders the consequence

an unforeseeable result of the constitutional tort.  That's our point.

THE COURT:  Mr. Sotos?

MR. SOTOS:  Not true, Judge.  Not true that a foreseeable result of fabricating the evidence is always going to be a wrongful conviction.

Fabricated evidence sometimes comes in at trials in some ways; sometimes it doesn't come in at all.  This -- there's this big issue about the September 16th report that the Court's already addressed, that despite the appearances of that report, it's not -- it doesn't go to the due process claims because it wasn't used in the criminal case.

So we do believe that there were intervening causes that led to this conviction, completely independent of the accusations against the police officers, and I think that that's a quintessential question for a jury.

You know, they can argue that they're trying to blame everybody else and not take responsibility themselves, and we can say that there's --

THE COURT:  So what is the argument --

MR. LOEVY:  Yeah.  What is the argument?

THE COURT:  -- that you would make in front of the jury?

MR. LOEVY:  Exactly.  That's what we've been asking.

MR. SOTOS:  That the cause -- that the reason that Mr.

Rivera was convicted did not have anything to do with what these police officers did. That the witness surfaced, he identified him without any coercion, without any pressure, and that was the case that the police gave to the prosecutors; and from that point, we hear you loud and clear, this is a really weak case.

Should this case have been prosecuted? Were there things that should have been done to keep this from happening? A million things. And we want to be able to point those out and let the jury decide for itself if they think that the things that the police officers did are what caused the conviction or the myriad of things that we've talked about this morning. I can go through the list, Judge, but --

THE COURT: So your idea is that they have to choose which was the but-for? Is that the idea, which was the but-for cause?

MR. SOTOS: Well, that's -- they -- no. They have to find that the conduct of the police officers was a but-for cause. In other words, if not for the police officers not -- well, here.

THE COURT: And -- but let me just ask you this and then I am going to take a short break. How can they possibly evaluate what was going on in Judge Close's mind?

MR. SOTOS: Well, it's not about what's going on in Judge Close's mind.

THE COURT: Yeah, it is. Because --

MR. SOTOS: It's about -- no.

THE COURT: -- if Judge Close was the cause of this, they have to assume that he would have acquitted but for the fact that he was on the take.

MR. SOTOS: I don't think so. That's not what we're saying. It's -- it's what the lawyer did. And that's why we went through everything that he didn't do, because the idea is --

THE COURT: But he ran -- wait. So the -- but the most you could say is he ran a risk.

MR. SOTOS: No.

THE COURT: Let's say he knew. Let's say he knew that this was a judge who was accused of corruption. I don't think we -- there's any reason to believe that Judge Wadas knew he was corrupt. I think at that point, the allegations were going around, and it was somebody who'd been at the State's Attorney's Office. My guess is people in the State's Attorney's Office, I'm guessing, were kind of slow, probably slow to accept this. But where does that take us?

MR. SOTOS: We're not --

MR. LOEVY: Exactly.

MR. SOTOS: We're not saying that he knew that he was corrupt. We're saying he knew that there were widespread allegations --

THE COURT: Right.

MR. SOTOS: -- about that.

THE COURT: Right.

MR. SOTOS: And given that, the decision to go forward in front of the judge is what caused -- is one of the causes of his conviction.

THE COURT: No.

MR. SOTOS: Not what --

THE COURT: He was running a risk, and we don't know if the risk actually caused the conviction or not.

MR. LOEVY: Yeah.

THE COURT: If Judge Close was -- let -- you know, let's say he -- he could have said, you know, "I may be on the take, but this case is just too weak." That could -- that was a possibility, right?

MR. SOTOS: We don't know what was in Judge -- I mean, that's one --

THE COURT: Well, that's what I'm saying. We don't know what was in his mind and --

MR. LOEVY: And there's about three steps missing.

THE COURT: And am I -- am I sending this jury down a path of utter confusion?

MR. BOWMAN: Right.

MR. LOEVY: With about three steps missing.

THE COURT: Because they have -- they'd have to

speculate on to what extent did the judge's, perhaps, corruption cause this result. They -- how could they possibly know that?

MR. SOTOS: Because our view of that is that they can consider that as one piece along with another -- a lot of other pieces that demonstrate that the lawyer didn't do his job. And if he had, his client wouldn't have been convicted.

THE COURT: Right. But --

MR. SOTOS: I think everybody -- I think most people here probably know that on some level.

THE COURT: Right. But you can say -- you can make the argument -- I don't think it's a good argument, but I -- I've let everybody know that. You can make the argument that he could have tried to interview Lopez, that he could have tried to subpoena the police, he could have done all these things, and had he done them, then, you know, you've got to at least suggest to this jury that something would have happened.

MR. LOEVY: Right.

THE COURT: He would have gotten something that would have changed things. But if he had made -- if he had chosen a different judge --

MR. SOTOS: Because --

MR. LOEVY: There's too many missing steps.

MR. SOTOS: But because, as we've said, the case was so abominably weak, that that's another reason --

THE COURT: So why didn't your prosecutor press this case?

MR. SOTOS: That's another one, Judge. The prosecutors, too. All of the different people in the justice system.

This idea that a wrongful conviction case is -- it's always the police that do everything -- sometimes you've got different forms of evidence. This case is much, much different. These prosecutors knew it was one eyewitness. And, you know --

THE COURT: They knew that -- they must have known that the judge has these accusations against him, too.

MR. SOTOS: And then they can be cross-examined. I don't know what they can really do about it --

MR. LOEVY: Judge, the only --

MR. SOTOS: -- because it's not their decision to take a bench. But to --

MR. LOEVY: The only thing they could elicit from Judge Wadas is, did you hear this rumor? There's like three missing steps to: You therefore -- that something else caused the conviction.

THE COURT: Well, he -- I think he already told us that he did have some familiarity with the --

MR. LOEVY: With a rumor.

THE COURT: -- rumors.

MR. LOEVY: So that doesn't -- I guess what Mr. Sotos is articulating is a not-infinitesimally-nil probative value. I mean, you could say it, and it's not, like, completely illogical, but it is so minuscule --

THE COURT: I think it's a --

MR. LOEVY: It's a 403 argument.

THE COURT: I think it's a complex chain. I give you that.

MR. LOEVY: With a lot of missing links. And 403 becomes an easy one at this point. He starts talking about corruption and bribery.

THE COURT: Okay.

MR. LOEVY: He says he wasn't trying to imply --

THE COURT: And let me give Mr. Sotos a few seconds more and then I am going to take a very short break and then I am going to rule.

MR. SOTOS: So our view, Judge, is that his decision to take a bench trial, first of all, was testified to by both the plaintiff on direct and by Mr. Wadas on direct. They both talked about that decision.

And so to carve that out and say you can introduce evidence --

THE COURT: Well, but I think he had good reasons for that. I mean, I -- you know, being a defense lawyer for years, you know that if you're going to be putting some case on in

front of suburban jurors, there are certain issues that you don't want to -- I mean, that's a -- that makes total sense, that part of it.

MR. SOTOS: Well, it doesn't unless you're going to put the case in front of a judge who's going to be --

THE COURT: Well, that's true.

MR. SOTOS: That's -- that's the issue.

THE COURT: That's true.

MR. SOTOS: That you're not going to make that decision. So the decision appears superficially plausible when, upon further inquiry, it's anything but that. And that's the argument that's going to be made to the jury by the plaintiff, that this was a --

THE COURT: Okay. I think -- I think we probably argued this *ad nauseam*. I am just going to take, like, two minutes because the jury is waiting. I at least want to think outside of this courtroom for a second.

(Recess.)

THE COURT: Well, as I say, I think whatever I do, it's probably the wrong answer. But I think that the causation chain is just too confusing to the jury. And I think on 403 grounds, we're not going to go there.

Now, let me ask the defense this. Do you want to put Mr. Wadas on the stand and ask him some questions and make a record so that -- I mean, it just -- if you want to do that,

I'll give you the opportunity to do that before we get the jury back in here.

MS. ROSEN:  If we could just have one minute?

MR. SOTOS:  Yeah.  Could we have a minute?

MR. LOEVY:  Is Mr. Wadas by the door?  We should get him ready.

(Defense counsel conferring.)

MR. SOTOS:  Yeah.  Judge, I think that would be helpful, to create a record.

THE COURT:  Okay.  We can't take a lot of time, but why don't we get the witness on the stand and do that very quickly.

MR. LOEVY:  We're going to get him now, Your Honor.

THE COURT:  Thank you.  Tell the jury we'll be five.

(Witness reenters.)

THE COURT:  Mr. Wadas, I have ruled that a certain area of questioning is prohibited, but I am going to let the defense make a record of the questions that they would like to ask you if I had ruled the other way.

THE WITNESS:  Okay.

THE COURT:  So --

THE WITNESS:  And you want me to answer?

THE COURT:  I do.

THE WITNESS:  Okay.  Go ahead.

KENNETH J. WADAS, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

VOIR DIRE EXAMINATION

BY MR. SOTOS:

Q. Good afternoon, sir.

Before we took a break, you had an opportunity to review the Tribune articles?

A. Yes.

Q. Okay. And I think you testified that they did refresh your recollection about being aware of the allegations of bribery against Judge Close?

A. Yes.

Q. Okay. Did you see that they were advanced in three different cases?

A. I knew that Jimmy Cutrone was part of the allegation, but I don't know if there were three separate cases.

Q. So, as you sit here today, you don't remember.

But did you look at the August 25th article and see if that refreshes your recollection that the allegations have been advanced in regards to three different cases, one involving a Robert Bridges, one involving a James Lefevre, and one involving a police officer named Ira Blackwood?

A. Yes.

Q. All right. So at the time you were representing Mr. Rivera, you were aware of those allegations?

A. Yes.

Q. Okay. Now, it was after you became aware of those

allegations that you made the recommendation to Mr. Rivera that he proceed with a bench trial, correct?

A. Correct.

Q. Did those allegations against Judge Close factor into your decision-making on any level?

A. No.

Q. Did you think that given the fact that the judge had been publicly accused of corruption involving the taking of bribes that he would be less likely to acquit in a case where -- in any murder case going forward?

A. I had been in front of other judges that were also suspect, accused, investigated, and I never exercised one SOJ in ten years except for one judge at 26th and Cal. My policy was not to SOJ any judges, and I pretty much followed that policy.

Q. So you could have SOJ'd Judge Close if you wanted to and got a different judge?

A. Another tainted judge in Skokie? Yes, I could have.

Q. Another what judge?

A. I could have SOJ'd Close and possibly got in front of another tainted judge in Skokie.

Q. Tainted?

A. Tainted.

MR. SOTOS: Could I have one second, Judge?

(Counsel conferring.)

BY MR. SOTOS:

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 1143 of 1254 PageID #:105274
Wadas - voir dire by Sotos
1571

Q. Then why not risk it with a jury?

A. Pardon me?

Q. Then why not take a jury?

A. Because I thought Close would be fair in this case.

Q. After you -- after he convicted Mr. Rivera, did you look back on it and wonder whether or not the public allegations against him may have influenced his decision-making?

A. I don't know.

Q. You don't remember that? Because you were pretty disappointed when your client was convicted, I understand that, correct?

A. Correct.

Q. All right. So in trying to figure out what went wrong, do you ever remember thinking that, you know, Judge Close may not have been the guy to go with?

A. Might he made up a statistic on me instead of some, you know, dishonest lawyer? Yes. I guess it might have crossed my mind.

Q. You recall the sentencing comments that were made by Judge Close, correct?

A. Yes.

Q. They were pretty inflammatory, is that fair to say?

A. Yes.

Q. Were you shocked by them?

A. Close was ultimately, I think, chastised by the judicial

inquiry board for similar-type comments. But nevertheless, it took a long time before that happened.

Q. And after hearing those comments, did you think that perhaps his own personal public controversy may have impacted on his decision-making as a judge?

A. It's possible.

Q. You remember whether you felt that, that way?

A. The thought crossed my mind.

Q. Okay.

MR. SOTOS: Thank you, Judge.

THE COURT: All right. Let's get the jury. Thank you.

MR. LOEVY: Your Honor, when we finish, we're going to -- next witness is going to be a transcript witness we're going to be reading.

THE COURT: Okay.

MR. LOEVY: Of the PC.

MR. BOWMAN: And there was a hearsay issue, just to flag it for you, a hearsay issue that was briefly touched on this morning that pertains to the witness after the transcript.

THE COURT: After the transcript?

MR. BOWMAN: Correct, yes.

THE COURT: Yeah. Okay. Well, we'll take a break at some point.

MR. BOWMAN: Right.

MS. ROSEN:  And Linzer has to leave today?

MR. LOEVY:  Yes.

MS. ROSEN:  Well, what time do you think she's getting on?  I thought you were going to do her first and not do a --

MR. LOEVY:  Well, we're going to -- she's going to impeach Orlando, so we're going to go Orlando, Linzer.

Unfortunately, you told us you only have a few more minutes.  Lots isn't so long.  Let's see what we do.

MS. ROSEN:  There's no guarantee that she's going to be done, then.

MR. LOEVY:  Well, the thing is she can't testify -- she can't impeach before the witness.  So we need to call --

THE COURT:  Wait a minute.  Who is the "she"?

MR. LOEVY:  Jennifer Linzer.  What we're going to do is read Orlando's PC testimony and then Jennifer Linzer.  If we go from 1:20 --

THE COURT:  Is she the investigator?

MR. LOEVY:  Yes.

THE COURT:  Oh, you better give me your hear --

MR. SOTOS:  Judge --

THE COURT:  Yeah.  What do you have on hearsay?

MR. LOEVY:  We want to talk about hearsay.  Do you want to talk about it now or at the break?

THE COURT:  No, I don't want to talk about it.  I want to read it.

MR. LOEVY: Okay. Let's write it.

(Jury in.)

THE COURT: Please be seated, ladies and gentlemen. I'm sorry for the delay. I will just tell you, we were busy.

Okay. Ms. Rosen, I think you're up.

MS. ROSEN: Yes. Thank you, Judge.

CROSS-EXAMINATION

BY MS. ROSEN:

Q. Good afternoon.

A. Hi.

Q. I just have a few questions for you.

A. Okay.

Q. You talked -- excuse me one second. Sorry.

You talked earlier about your file, in talking to Ms. Raley, in 2002 about the case.

A. Yes.

Q. And your representation of Mr. Rivera. And that you provided Ms. Raley and the people at Northwestern with a copy of your file, correct?

A. Correct.

Q. Okay. And do you recall that after the Northwestern people got a copy of your file, they prepared a receipt for you for the contents of the file?

A. Yes.

Q. Okay. I am going to ask you to take a look at Defendants'

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 1147 of 1254 PageID #:105273
Wadas - cross by Rosen
1575

Exhibit No. 27.

MS. ROSEN:  I don't recall if that's been admitted or not, so why don't we just put it up for Mr. Wadas.

Mr. -- I don't see it.  Defense table.  There we go.

BY MS. ROSEN:

Q.  Is that the receipt that was provided to you --

A.  Yes.

Q.  -- by the people at Northwestern?

A.  Yes.

MS. ROSEN:  At this time, defendants seek to admit Defendants' 27.

MR. BOWMAN:  There is an objection, Your Honor. There's no foundation for this through his testimony.  He's already said it's not his receipt.

THE COURT:  Well, this was given to you by Northwestern?

THE WITNESS:  Yes.

THE COURT:  You know, I am going to -- well, let's see.  Overruled.

MS. ROSEN:  If we could -- it's overruled.  We can get it in front of the jury.

THE COURT:  The exhibit is received.

(Said Defense Exhibit 27 received in evidence.)

MS. ROSEN:  Thank you, Your Honor.

BY MS. ROSEN:

Q. And it was your understanding that the people at Northwestern created this receipt, indicating all of the documents that were contained within your file at that time, correct?

A. Yes.

Q. And do you recall exactly how it was that the receipt was provided to you? Did they take your file, make a copy, and then provide the receipt? Or how did that work?

A. No. I had the file photocopied and handed the file to them. They reviewed what I gave them and then they came back at a later point in time with a receipt.

Q. Okay. And based on their review, these are the documents that they itemized from your file, correct?

A. Yes.

Q. Okay. And then if you look at item No. 3, there's Notes indicated there. It says "12 pages." Do you see that?

A. Yes.

Q. And you testified earlier, both on direct examination and when Mr. Sotos was asking you questions, about the notes that were in your file, correct?

A. Yes.

Q. And I think you testified earlier that, in fact, in this case, in connection with this litigation, the defendants issued a subpoena for a copy of your file, correct?

A. Yes.

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 1149 of 1254 PageID #:105286
Wadas - cross by Rosen
1577

Q. And you provided -- you responded to the subpoena and provided a copy of your file, correct?

A. Correct.

Q. And then we had took a deposition with you, correct?

A. Yes.

Q. And we had marked as an exhibit your file. And we actually were talking about this receipt, correct?

A. Yes.

Q. And during the course of the discussion about this receipt, you were asked specific questions about the notes, and we pointed out to you that, in fact, there were no notes in the file that you had provided to us, right?

A. Yes.

Q. Okay. And then we broke the deposition, suspended it and reconvened it, and allowed you to go back and look for your documents, correct?

A. Correct.

Q. Okay. And it was at that point that you identified the 12 additional pages of notes, correct?

A. Yes.

Q. Okay. And so when you initially provided the response to the subpoena, unbeknownst to you, the file was incomplete, correct?

A. Correct.

Q. Okay. And also on this receipt, if you look at item No.

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 1150 of 1254 PageID #:105286
Wadas - cross by Rosen
1578

14 -- you see that there?

A. Yes.

Q. And that's a bill from Rock Investigation. Do you see that?

A. Correct.

Q. And it says 11 pages, right?

A. That's what it says.

Q. Okay. And who is Rock Investigation?

A. He is a retired sheriff's deputy who was an independent investigator and -- I mean, that's his nickname, but the name of the investigating firm was Rock Investigations.

Q. Got it. And you would utilize this investigator in the course of your representation of defendants in criminal cases, correct?

A. Yes.

Q. And he would do things for you, like serving subpoenas?

A. Yes.

Q. Interviewing witnesses?

A. Correct.

Q. And when you compared the receipt to your file, you noticed that there was only one receipt from Rock Investigations as it relates to Mr. Rivera's representation, correct?

A. Correct.

Q. And it's your belief that that is some kind of a typo or something, correct?

A. I believe that should be one page instead of 11 pages.

Q. Because you didn't use Rock Investigations extensively in connection with your representation of Mr. Rivera?

A. I can only remember using him one time.

Q. Okay. And so, for example, you didn't ask the investigator to go out and talk to the store owner, for example?

A. Correct.

Q. Or Mr. Lopez?

A. Yes.

Q. Okay. But that was something you could have done?

A. I could've.

Q. Okay. And then with respect to the receipt, as you will recall, separate and apart from the issue of the potential typo regarding the Rock Investigation bills, there is another discrepancy, right? Between the receipt and the contents of your file as they exist today, at least at the time of your deposition, right?

The numbers of pages don't match, right?

A. You're talking about the Rock Investigation pages?

Q. No, no, no. I'm talking about the receipt generally.

So other than -- we've already talked about that there's this discrepancy about the Rock Investigation entry, because it's your belief that there should have only been one page and the receipt says 11, right?

A. Correct.

Q. Okay. But separate and apart from that error -- or potential error in the receipt, there also is the problem that the number of pages, when you total them, of documents, just pure number of pages listed in the receipt compared to the number of pages in your file don't match, correct?

We talked about that at your deposition?

A. Yes.

Q. And that there is actually more pages in your file than is documented on the receipt, as it existed in -- at the time of your deposition?

A. True.

Q. Okay. And you have no explanation for that, right? Because you didn't prepare this --

A. I think it's an error, but --

Q. And since the time that you provided Northwestern with a copy of the file -- of your file, have you ever seen that copy again?

A. Northwestern's copy of the file?

Q. Correct.

A. No.

Q. Okay. Now, let's talk about the contents of the file.

I know you've testified earlier that you believe that we have now the entirety of the file, but what we don't have, right, are any photographs? There's no photographs in your file, correct?

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 1153 of 1254 PageID #:105284
Wadas - cross by Rosen
1581

A.   Correct.

Q.   And you would have had photographs, right, at the time that you were defending Mr. Rivera during the criminal prosecution?

A.   I would have viewed the photographs from the State.

Q.   You might not have had copies yourself?

A.   Correct.

Q.   And how about medical records of the victim, Felix Valentin?  Isn't that something you typically would obtain during the course of a murder defense representation?

A.   If cause of death or something like that was the issue, I would've.

Q.   But there were no medical records in the file?

A.   Correct.

Q.   Okay.  Now, I also want to talk to you about a document that you discussed with Mr. Bowman, I believe yesterday.

MS. ROSEN:  The inventory file, if we could put that up.

BY MS. ROSEN:

Q.   This document, which is Defendants' 1.2.

You indicated that that document was not in your file, correct?

A.   Correct.

Q.   But you knew, didn't you, based on your -- certainly your experience at the Cook County State's Attorney's Office that this document was a document that existed in police files, in

Chicago Police Department police files, right?

A. It could have existed, yes.

Q. Well, do you recall that in -- sometime in 1983, a memo -- well, let me back up.

Do you know who Lawrence O'Gara is? Deputy State's Attorney Lawrence O'Gara?

A. Yes. O'Gara.

Q. O'Gara. Okay. And he was the chief of the Criminal Prosecutions Bureau at one point in time, correct?

A. Yes.

Q. And do you recall a memorandum that was issued in June of 1983 regarding discovery compliance at the State's Attorney's Office?

A. Discovery compliance?

Q. Yeah. That was the title of the memorandum.

A. No.

MS. ROSEN: Can I approach? Maybe I can --

THE COURT: Sure.

MS. ROSEN: -- refresh his recollection.

BY MS. ROSEN:

Q. I'm going to hand you what's been marked as City Exhibit No. 47. Ask you to take a look at that and let me know if you --

MS. ROSEN: Do you know what I'm talking about?

MR. LOEVY: Yeah.

BY MS. ROSEN:

Q. If you've ever seen that before.

Does that refresh your recollection at all about a memo that was issued after a court order was entered regarding discovery compliance?

A. I would have gotten a copy of this memorandum.

Q. Because you would have been in the Criminal Prosecutions Bureau in June of 1983, right?

A. I'm -- I can't remember when I took over Narcotics, but it would have been about the same time.

Q. Okay. And if you take a look at subsection (c) of the memo, you see there that there's a direction to assistant state's attorneys that they have to provide the criminal defendant with an investigative file inventory sheet where it exists, right?

A. Yes.

Q. So obviously, you would have known about that document?

A. Yes.

Q. The document that we've marked as Defendants' Exhibit 1.2, right? The log that was shown to you in --

A. If it --

Q. -- Mr. Rivera's case?

A. If it existed at that time, I would've known that they should have given it to me.

Q. Okay. So when you received the discovery from the State's

Attorney's Office, the response to your discovery requests, if you didn't have that investigative file inventory sheet and you wanted it, you could have requested it, right?

A. Yes.

MS. ROSEN: Okay. And the City seeks to admit City's Exhibit No. 47, which is the memo.

THE COURT: Any objection?

MR. BOWMAN: No objection.

THE COURT: City 47 is received.

(Said City Exhibit 47 received in evidence.)

BY MS. ROSEN:

Q. And so if we take a look at this memorandum dated June 13th, 1983, it describes what is expected, right, of assistant state's attorneys after an order was issued on April 27th, 1983 by Judge Shadur, correct?

A. Yes.

Q. And it instructs assistant state's attorneys that they are to "maintain familiarity with the Chicago Police Department system (including any changes from time to time) for filing and maintaining police writings in a criminal case."

Do you see that there?

A. Yes.

Q. And then it also instructs assistant state's attorneys that: Upon being advised of any discovery motion, or upon the filing of any "answer to discovery" in connection with any

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 1157 of 1254 PageID #:105283
Wadas - cross by Rosen
1585

contemplated or pending criminal prosecution, that the assistant state's attorneys are instructed to obtain all police files and records from the various divisions of the Chicago Police Department, correct?

A. Yes.

Q. So you were aware both in 1983 and in 1988 when you were representing Mr. Rivera that the locations of police records are not in a centralized location, right?

And let me make that a little clearer.

So you knew when you were representing Mr. Rivera that when you made requests either to the assistant state's attorney that was prosecuting the case or if you chose to issue a subpoena directly to the police department, that there's an ident. section, for example, where mug shots and rap sheets and things are located, right?

A. Yes.

Q. And you knew that there was evidence in Recovered Property. And if you wanted evidence from Evidence & Recovered Property, you knew that you could request that during the course of your case?

A. Yes.

Q. And you also knew that detectives maintained files during the course of their investigation, correct?

A. Yes.

Q. Okay. And so during the course of your representation of

Wadas - cross by Rosen

1586

Mr. Rivera, if you felt at any time that you didn't get everything that you needed in discovery, you knew the various places within the Chicago Police Department where these items might be maintained and that you could request them either through the prosecutor or through your own subpoena, right?

A. Yes.

Q. Okay. And then we already talked about subsection (c). If we look to (d), the instruction to assistant state's attorneys are that: Upon any request for documents pursuant to discovery, or upon the filing of an "answer to discovery" in anticipation of such a motion, that the assistant state's attorney is to provide the defendant with all police writings that are discoverable and notice of the existence of others that the State's Attorney claims are not.

Do you see that there?

A. Yes.

Q. And let's talk about that for a little bit.

MR. LOEVY: Your Honor, could we just object? None of this is in dispute, that the state's attorney was obligated to turn it all over.

MS. ROSEN: Well --

THE COURT: Is there something in dispute here?

MS. ROSEN: Well, Judge -- well, it is as it -- yes. I think that there will be based on what I expect plaintiff's expert to say.

THE COURT: All right. Let's go on.

MS. ROSEN: Okay. I am almost done, so --

BY MS. ROSEN:

Q. With respect to what's discoverable and what's not discoverable, assistant state's attorneys make decisions about documents that they receive from the police department, and sometimes they make decisions that the documents that they receive are not discoverable for reasons related to the case or case law or whatever, right?

A. Not that I know of. I mean, if they get a document from the police department that has an RD number relating to that case, they have an obligation to tender it.

Q. Sure, when we're talking about that example. But in terms of other discovery that a state's attorney might obtain during the course of a criminal prosecution, there are documents or evidence that a state's attorney might decide are not discoverable, correct?

A. I -- I -- theoretically, yes.

Q. Okay. And certainly if you were to make that decision as an assistant state's attorney, your obligation would be to let the other side know that you have the document, but that you dispute -- or the evidence, that you dispute that it's discoverable, but then they're on notice, right?

MR. LOEVY: Objection. Nothing to do with this case, Your Honor.

THE COURT: Overruled.

BY THE WITNESS:

A. You give it to the judge and then you have an *in camera* -- he or she has an *in camera* and the judge makes the decision on whether it should be tendered or not.

BY MS. ROSEN:

Q. Got it. Okay.

And then if we look to subsection (e) at the end there, the instruction is to the assistant state's attorneys that they are to "compare all files or notes produced by detectives at Felony Review, preliminary hearings, pretrial workups, and trial with materials in the state's attorney's file to assure that no police writings have been withheld from the State's Attorney's Office."

Do you see that there?

A. Yes.

Q. And each state's attorney -- state's attorney was instructed to do that?

A. Correct.

Q. And you knew all of that at the time that you were defending Mr. Rivera in 1988 through 1990 and beyond, correct?

A. Yes.

Q. And if you ever had a concern that you weren't getting the notes or any other documents, you could have raised it, correct?

A. Yes.

Q. Okay. And then with respect to the order that was issued by Judge Shadur, you're aware, aren't you, that that order had to do with a class-action lawsuit that was filed in 1981 or so, challenging or taking issue with the Chicago Police Department's practices as it related to record-keeping and file maintenance, correct?

A. Street files case.

Q. The street files case, right. And that Judge Shadur entered this order -- entered an order, and part of it was to direct the State's Attorney's Office to do the things that we've just gone through in the memo?

A. Yes.

MS. ROSEN: I don't have any further questions.

MR. LEINENWEBER: Very briefly, Judge. I promise.

CROSS-EXAMINATION

BY MR. LEINENWEBER:

Q. Good afternoon, sir.

I believe yesterday you were speaking a little bit about the trial of Mr. Rivera that took place in April of 1990.

You recall that testimony?

A. Yes.

Q. And I think that you had said that Officer Guevara had testified as part of the State's rebuttal, is that --

A. Correct.

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 1162 of 1254 PageID #:105293
Wadas - cross by Leinenweber
1590

Q. -- correct? And I think that one of the issues that you had said that Officer Guevara testified to was like a physical description of Mr. Rivera's hairstyle at the time, correct?

A. Correct.

Q. But he also answered some questions of yours regarding another matter, is that correct?

A. Yes.

Q. I believe you had asked him if -- or the State perhaps asked him if he had been familiar with Mr. Rivera prior to his arrest.

Do you recall that line of questioning?

A. Yes.

Q. And I think at one point, you had asked Mr. Rivera if he had -- excuse me.

You had asked Officer Guevara if he'd seen Mr. Rivera playing baseball in Humboldt Park. Do you remember asking him that question?

A. Yes.

Q. And Officer Guevara said he had never seen him playing baseball, is that correct?

A. Correct.

MR. LEINENWEBER: Judge, I have nothing further. Thank you, sir.

THE COURT: Okay. Anything further from plaintiff?

MR. BOWMAN: Thank you, Judge.

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 1163 of 1254 PageID #:105294
Wadas - redirect by Bowman
1591

REDIRECT EXAMINATION

BY MR. BOWMAN:

Q.  Good afternoon, Mr. Wadas.

A.  Hi.

Q.  The questions that Mr. Sotos and Ms. Rosen have been asking you are implying that you were not reasonably diligent --

MR. SOTOS:  Objection.  Objection, Judge, to what anybody's implying.  He's a fact witness.  He can testify.

THE COURT:  Well, how about phrasing it differently?

MR. BOWMAN:  Yes, ma'am.

BY MR. BOWMAN:

Q.  Were you reasonably diligent in performing your job on behalf of Jacques Rivera?

MR. SOTOS:  Objection, Judge.  It's a question for the jury, an opinion that's a question for the jury.

THE COURT:  I think the witness has got to answer. It's his point of view.

MR. SOTOS:  All right.

THE COURT:  Overruled.

BY THE WITNESS:

A.  I thought I was.

BY MR. BOWMAN:

Q.  I mean, you had been working in the criminal courts of Cook County by the time we get to 1988 for over a dozen years; is that right?

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 1164 of 1254 PageID #:105295
Wadas - redirect by Bowman
1592

MR. SOTOS: Objection, leading, Your Honor.

THE COURT: Sustained.

BY MR. BOWMAN:

Q. How long had you been practicing in the criminal courts of Cook County by the year 1988 when you began working for Jacques Rivera?

A. From 1976 to 1988.

Q. How many years is that?

A. 12, I believe.

Q. And how familiar were you with the manner in which criminal law was practiced in the buildings that you were in and out of every day for those dozen years?

A. Very familiar.

Q. And was there a set of expectations that you'd internalized about how lawyers in the buildings were to comport themselves?

A. There were.

Q. And as you look back on this case, with the benefit of hindsight, do you find any fault with yourself for not living up to the standards that you understood were to be complied with when you took this very serious responsibility on of representing a man charged with murder?

A. I gave it my best shot.

Q. Did you cause Jacques Rivera to be wrongfully convicted?

MR. SOTOS: Judge, objection. These are all legal questions.

THE COURT: I think that's --

MR. SOTOS: He's not an expert.

THE COURT: That is a legal conclusion. Sustained.

BY MR. BOWMAN:

Q. Well, there have been -- you had how many jury trials under your belt at this point?

A. As a state's attorney, about 50, and then maybe about four or five as a defense lawyer.

Q. You were asked some questions about whether you put -- should have put a sidebar on the record, whether you should have filed a motion to suppress, whether you should have -- should or shouldn't have had a bench trial.

In your judgment, was it your fault that Jacques Rivera was convicted?

MR. SOTOS: Judge, objection. Same question.

THE COURT: I'm going to sustain the --

MR. SOTOS: Inappropriate.

THE COURT: -- objection.

BY MR. BOWMAN:

Q. Did you do your job?

MR. SOTOS: Objection, Judge, asked --

THE COURT: Overruled.

MR. SOTOS: -- and answered.

THE COURT: Overruled.

BY THE WITNESS:

A.  Yes.

BY MR. BOWMAN:

Q.  Did you do your job to the best of your ability?

A.  I believe so.

Q.  Do you think you would be criticized by any of your peers --

        MR. SOTOS:  Judge --

BY MR. BOWMAN:

Q.  -- in the criminal courts of --

        MR. SOTOS:  I'm sorry.  Let him finish the question.

BY MR. BOWMAN:

Q.  Do you think you would be criticized by any of your peers in the criminal courts of Cook County for the job that you did on behalf of Jacques Rivera?

        MR. SOTOS:  Objection, Your Honor, relevance, undisclosed expert.  It's not a question of what he thinks about what others --

        THE COURT:  Well --

        MS. ROSEN:  Foundation.

        THE COURT:  -- I think there's a --

        MS. ROSEN:  Speculation.

        THE COURT:  I think, basically, there's a way to ask that that doesn't raise these issues, which is what Mr. Wadas' view of his per -- what he was doing given the standards he had internalized.  I don't think we have to ask what other people

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 1167 of 1254 PageID #:105293
Wadas - redirect by Bowman
1595

would have thought.

MR. BOWMAN:  Yes, ma'am.

BY MR. BOWMAN:

Q.  What is your view, Mr. Wadas, of your performance in -- on behalf of Jacques Rivera in this case in light of the standards of practice that you'd internalized over a dozen years?

MR. SOTOS:  Objection, Your Honor, asked and answered.

THE COURT:  Overruled.

BY THE WITNESS:

A.  The case was not complex.  The case involved, basically, three witnesses.  And maybe I, you know, could have taken a measurement or not, but in essence, this case came down to one eyewitness, the defendant, and Letrich -- that was it -- and what could be developed, and could I raise reasonable doubt within that.  I thought I did.  Evidently, I didn't.

BY MR. BOWMAN:

Q.  So let me -- let me ask you some questions about some specific reports and things that you were shown and questioned about over the past couple of days.

Remember, you were shown a report about a series of events on August 31 documented by the police.

A.  Yes.

Q.  And you were asked a bunch of questions about what the report said had happened in a hospital.

A.  Yes.

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 1168 of 1254 PageID #:105294
Wadas - redirect by Bowman
1596

Q. Yes? And what the report said had been done in terms of attempting to find Orlando Lopez.

A. Correct.

Q. And who had been attempted to show photographs and so on. You remember those questions?

A. Yes.

Q. And you had that report?

A. Correct.

Q. Did you have any way of knowing whether what was in that report was true or not true?

A. No.

Q. I mean, what you had was a report, and you accepted it on its face; is that fair?

MS. ROSEN: Objection. He's leading.

THE COURT: Sustained.

BY MR. BOWMAN:

Q. How did you approach the police reports?

A. They're sworn reports, they're sworn documents. I'd read them and take them at face value.

Q. And did you also have information from Jacques Rivera that wasn't documented in a report?

A. Correct.

Q. And what was your impression of the information that you had from Jacques?

A. My impression was that he stood in a lineup prior to the

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 1169 of 1254 PageID #:105305
Wadas - redirect by Bowman
1597

lineup where he was identified, and that he was not identified in that first lineup. That's the impression I had.

Q. Did you believe him?

A. Yes.

Q. Now, was it something in your experience, based on your twelve years of being in and out of the buildings in which criminal law is practiced in our county, was it part of your experience that if you would go to a detective, that he would admit to you that stuff that was written down in his report, that that actually wasn't the way it would happen -- had happened? Was that something that was in your realm of experience?

A. It was in my realm of experience.

Q. Do you think it would have happened?

A. No.

Q. And do you think that if you had gone to Gillian McLaughlin and to Reynaldo Guevara that they would have told you, "Yes, we actually had a lineup with Jacques Rivera, and we didn't write it down"? Did you think that would happen?

A. No.

Q. Did you believe that that was what happened?

A. Yes.

Q. So --

MR. BOWMAN: Could I have the Elmo?

BY MR. BOWMAN:

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 1170 of 1254 PageID #:105306
Wadas - redirect by Bowman
1598

Q.  We talked about this before.  You actually did --

MR. BOWMAN:  This is a transcript that's in his file at pages 1 and 4.  It's actually our Exhibit 35, pages 1 and 4, which I move into evidence at this time.

THE COURT:  How are you marking that?

MR. BOWMAN:  35-A.

THE COURT:  Okay.  Any objection?

MR. SOTOS:  No, Judge.

THE COURT:  It is received.

(Said Plaintiff's Exhibit 35-A received in evidence.)

MR. BOWMAN:  Could the jury see this, please?

THE COURT:  Yes.

BY MR. BOWMAN:

Q.  So you talked about a bond hearing when I was asking you questions yesterday.

And at the bond hearing, there was a court reporter like we have here in court with us this afternoon, correct?

A.  Correct.

Q.  And the court reporter prepares what's called a transcript of the bond hearing, right?

A.  Yes.

Q.  And this particular transcript relates to a hearing on the 16th day of September, 1988.

A.  Yes.

Q.  And when is that in relation to when Jacques Rivera got

arrested for this crime?

A. Shortly thereafter.

Q. If I were to suggest to you that it was the day after, would that refresh your recollection?

A. Yes.

Q. And a record was made of what you said to Judge Bolan, right?

A. Yes.

Q. And this is you, "Mr. Wadas"?

A. Yes.

Q. And you told Judge Bolan on September 16, 1988: "The Defendant was arrested two or three weeks ago stood in a murder was not identified by anyone and was released so what whatever that is worth."

A. Correct.

Q. You told that? And what was that representation that you made to Judge Bolan based on?

A. Based on what Jacques Rivera had told me, that he stood in a lineup and was not identified.

Q. All right. Now, let me switch subjects just for a minute.

You were asked some questions about your file when Ms. Rosen was examining you just a few minutes ago. Is that right?

A. Correct.

Q. And this here (holding up document) is a copy of your file, right?

A.   Correct.

Q.   And you have told us -- let me just ask you one question to be very clear.

     Did anybody from Northwestern ever get your original personal file that you had kept in your office for all those years?

A.   No.

Q.   What did they get?

A.   I had my file photocopied, either by myself or by a secretary, and that's what I gave them, the photocopy of the file.

Q.   Okay.  You were asked some questions about a receipt --

A.   Yes.

Q.   -- which is now in evidence.  And if I can do this -- did you make this receipt?

A.   No.

Q.   You were asked some questions about how many of this and how many of that.

     You see where it says Police Reports, item 12?

A.   "Police Reports (29 pages)."

Q.   Right.  You told us yesterday -- we actually identified it as an exhibit -- that you had police reports in your file.

A.   Yes.

Q.   And they were pages -- certain number of pages, starting at page 505 and going to page 537, right?

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 1173 of 1254 PageID #:105304
Wadas - redirect by Bowman
1601

I'm sorry.  I may not have those numbers right.

But, in any event, we could all look and see how many pages of police reports there were in your file, right?

A.  Correct.

Q.  You talked about it yesterday, and you identified them.

A.  Yes.

Q.  Right.  And would it surprise you to discover that the number of pages in your file is 29, the same that's on the receipt?

A.  No.

Q.  And you looked through those police reports for us yesterday.

A.  Yes.

Q.  Identified them.  Did you find any GPRs, any general progress reports in your file?

A.  No.

Q.  So you were asked some questions about things you might have done to obtain GPRs in this particular case.

You remember?

A.  Yes.

Q.  What did you do to get the GPRs?  I mean, let me ask you a better question.

What did you do to get the police records in this case?

A.  I dealt with the State, state's attorney --

Q.  And you took --

A.  -- who I knew, and asked him, and was reasonably sure that he was complying with everything and giving me everything he had.  At one point, he said, "Here's my file.  Look at it."

Q.  And did you get GPRs in response to those inquiries?

A.  No.

Q.  Was it diligent for you to handle this the way you handled it based --

MR. SOTOS:  Object to --

BY MR. BOWMAN:

Q.  -- on your experience practicing criminal law for over a dozen years in Cook County?

MR. SOTOS:  Objection, Your Honor.  That's an opinion.  That's a conclusion for the jury.  He's an undisclosed expert, and it's a legal conclusion.

THE COURT:  I think the witness can certainly -- I mean, maybe asking the form of an opinion is a problem, I don't know, but I think it -- I am going to overrule the objection.

BY THE WITNESS:

A.  I think I was diligent in the sense that I trusted Victorson and thought I would get everything.

BY MR. BOWMAN:

Q.  Did you talk with your friend, Mr. Victorson, about concerns you had about whether you actually had all the documents?

A.   Yes.  I asked him about a lineup report that didn't exist.

Q.   And tell us what he said to you.

A.   He said there wasn't one.  There was no prior lineup, and there was no lineup report.

Q.   So let me just pause for a minute and ask you if you could clarify one thing for the jury.

Police reports are prepared by police officers.

A.   Correct.

Q.   And can you walk us through how a police report gets from the police officer to you as a criminal defense lawyer in our county.

MS. ROSEN:  Objection, foundation.

MR. BOWMAN:  I -- he was --

THE COURT:  All right.  To the extent the witness knows, he can answer.

BY THE WITNESS:

A.   Okay.  In a given case, an RD number is assigned to the case.  Any report that's generated relating to that case has the same RD number.  Those are now in a computer format.

All of those -- all those documents go to the state's attorney.  Then I make a motion to the State, and I get the documents from the State.  That's pretty much the way it worked.

BY MR. BOWMAN:

Q.   And when you say you make a motion to the State, who are

Q. you referring to?

A. Cook County state's attorney.

Q. Cook County state's attorney. So the state's attorney's responsibility then is what?

A. To turn over every single piece of discovery and every single police report that they have.

Q. Okay. Now, Ms. Rosen was asking you questions about this memo. It's dated June 13, 1983.

You were still in the State's Attorney's Office at that point.

A. Yes.

Q. And you believe you may have received this?

A. Yes.

Q. And she directed you to -- in the memo does -- is intended to do what?

A. What this memo's intended to do?

Q. Right.

A. To make sure that we are beyond the idea of street files and that state's attorneys are supposed to comply with discovery fully.

Q. Right. And in particular, there's a responsibility on state's attorneys that's written right here -- and you were asked about it -- compare all files or notes produced by detectives to the state's attorney at Felony Review, et cetera, to assure that no police writings have been withheld from the

Q. State's Attorney's Office, right?

A. Right. They're obligated.

Q. And obviously, the state's attorney can only produce those things that the state's attorney has, right?

A. Yes.

Q. Do you have any reason to believe that Mr. Victorson cheated you and didn't give you something like a GPR that he, Victorson, had?

A. No. If he would have had it, he would have given it to me.

Q. So as far as you could tell, what -- if there were GPRs, Victorson didn't get them?

A. Correct.

Q. All right. Now, we looked at some GPRs yesterday, and we identified them as Plaintiff's Exhibit 12, Plaintiff's Exhibit 13, Plaintiff's Exhibit 14, Plaintiff's Exhibit 15, and Plaintiff's Exhibit 16.

A. Correct.

Q. A total of five general progress reports that were not in your file, right?

A. Yes.

Q. Now, I want you to look again with me at Plaintiff's Exhibit 19-A, which you were asked about this morning.

This is the inventory of the file, right?

A. Yes.

Q. And among other things, it lists GPRs that existed, and you

didn't have this, right?

A. Correct.

Q. This lists GPRs that were in the police file. At item 2, it says three pages of --

A. Three.

Q. -- GPRs, right?

A. Correct.

Q. And then at item 4, again, it says three pages of GPRs, right?

A. Correct.

Q. And finally, down on item 15, it says one page of GPRs, right?

A. Correct.

Q. If my math is right, that adds up to seven pages of GPRs, right?

A. Correct.

Q. Do you know where the two pages of GPRs are that none of us has ever seen?

A. No.

Q. Now, about the GPRs, you're not -- you're not claiming, are you, that every item on any GPR that you didn't receive is important, right?

A. Correct.

Q. I mean, Mr. Sotos asked some questions of you and showed that some of what's in the GPRs is not that consequential,

right?

A.  Correct.

Q.  But some of what's in the GPRs, on the other hand, is consequential, right?

A.  Yes.

Q.  I mean, I don't know if I can expand low-grade technology here.  I don't want to even give it a -- well, wait a second. I'm going to get a technological assist here.  There I go.

Here's a GPR, Plaintiff's Exhibit 12.  We talked about it yesterday.  It says Lopez is --

A.  "By the store."

Q.  -- "by the store."  And here is a supplementary report that's in evidence as Plaintiff's Exhibit 19-E, and it says Lopez was "coming from the store," right?

A.  Correct.

Q.  And you agreed with Mr. Sotos that that's a pretty significant difference, right?

MR. SOTOS:  Objection, Judge.  I didn't say that.

THE COURT:  Sustained.

BY MR. BOWMAN:

Q.  Well, it's different?

A.  It's different.

Q.  Mr. Sotos did ask you some questions about different stories that Lopez told about where he was at the time he made his observations, right?  He asked you to explain to the jury

what Lopez had said in the trial, right?

A. Yes.

Q. And in the trial, Lopez had the story about going down to the corner store, having a conversation, coming back, the shooting still going on.

A. Back and forth, yes.

Q. What was your judgment about the credibility of that story?

A. I didn't think it was credible because the timing -- I don't think he would have had enough time to go back and forth within the time frame that the shooting occurred.

Q. Right.

A. Have a conversation with the store owner, come back, hide, and then see one final shot fired.

Q. Right. And then there was another story that comes up in the GPR, right? It was "by the store"?

A. Correct.

Q. And if we look again at our demonstrative exhibit, by the store all the way down here (indicating) is a very long way from where the crime happened.

A. Like a half a block.

Q. So what's your sense of how credible it is that Lopez could make an identification from that distance?

A. I don't think he could make a good identification from that distance.

Q. But then if you look at the version that you got in the

police report, "Lopez was coming from the store," that's possible, right?

A. Yes. It looks like he's walking from the store to where the shooting starts.

Q. Right.

A. Closer.

Q. You were asked some questions about -- did you have any information in any report or from any other source that Orlando Lopez had told the police that Jacques Rivera was the wrong guy, wrong guy? Did you have that information from any source?

A. No.

Q. Did you have from any source any information that there had been a lineup in which Jacques Rivera was not identified and released?

A. No.

Q. And when I say a lineup, I mean a lineup viewed by Orlando Lopez himself.

A. Correct.

Q. You were asked some questions about your friend Victorson's authority with respect to dismissal of cases.

A. Yes.

Q. If Victorson had information that Lopez, his witness, had told the police that Jacques Rivera, who was on trial, was the wrong guy, what would Victorson's responsibility have been to do?

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 1182 of 1254 PageID #:105313
Wadas - redirect by Bowman
1610

A.  To report that back to his supervisors, chief of the Felony Trial Division, take a second look at the case.

Q.  And if Victorson had information that Jacques Rivera had actually not been identified, had been excluded as the perpetrator of this crime in a lineup, and yet Jacques Rivera was on trial anyway, what would Victorson's responsibility have been in that circumstance?

A.  Would have had to tell me about it.

Q.  And in terms of his own chain of command, what should he have done?

A.  Make that information available to at least the chief of Skokie, who was the supervisor of those trial courts.

Q.  Let me ask you about -- you provided some testimony about Gillian McLaughlin's role in this case.

If the truth was, just hypothetically, that Gillian McLaughlin had been relieved of her responsibilities in the case at some point in the investigation, you would have wanted to know that, right?

MR. SOTOS:  Objection, Your Honor.  Assumes facts in evidence, and there are none.

MR. BOWMAN:  I am asking --

MR. SOTOS:  And, and --

THE COURT:  Hold on, hold on.

MR. SOTOS:  And the question is leading.

THE COURT:  Hold on a second.  I got it.

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 1183 of 1254 PageID #:105314
Wadas - redirect by Bowman
1611

I am going to sustain the objection.

BY MR. BOWMAN:

Q. Very briefly, Mr. Wadas.

You were shown a copy of a general progress report, and it was pointed out to you that Macho Lopez was listed on that report, right?

A. Correct.

MR. BOWMAN: Could I have the Guevara Exhibit 1?

BY MR. BOWMAN:

Q. And just to orient everybody, this is the report that you were asked about. It shows Macho Lopez as one of the witnesses appear in the witness --

A. Witness box.

Q. -- box, right? And you can tell -- it's page 532 -- it's part of your file, right?

A. Yes.

Q. So you got this. Did you ever see another version --

MR. BOWMAN: And this is our Exhibit 19-C, which is in evidence, Judge.

BY MR. BOWMAN:

Q. -- another version of the same report without Macho Lopez's name on it?

A. I don't think so.

Q. Right. And to be clear, in terms of when Macho Lopez/Orlando Lopez comes into this case, this report here,

Plaintiff's Exhibit 1, signed by Gawrys and Guevara, dated September 16, says that that date on which Lopez was located was August 29, 1988, right?

A. 29 August, correct.

Q. That's the information you had, right?

A. Right.

Q. Now, you were also asked some questions about interactions you'd had with Northwestern lawyers in 2002 and then again in 2009.

A. Yes.

Q. Or, actually, the suggestion was 2010.

A. '10, right.

Q. And you surmised that Northwestern had been working on this case for all those intervening eight years, right?

MR. SOTOS: Objection, Your Honor, leading.

THE COURT: Well, I haven't heard a question yet.

BY MR. BOWMAN:

Q. The question was, did you surmise, in response to Mr. Sotos, that Northwestern might have been working on this case for all those intervening years?

That was the question that Sotos asked.

A. Yes.

Oh, I'm sorry.

THE COURT: You may answer.

THE WITNESS: Okay.

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 1185 of 1254 PageID #:105316
Wadas - redirect by Bowman
1613

BY THE WITNESS:

A.  Yes, I believe that.

By MR. BOWMAN:

Q.  All right.  But you don't obviously have any inside information on that, right?

A.  Post-convictions take a long time.

Q.  Well, it's also -- would it surprise you to learn -- let me ask that.

Would it surprise you to learn that, actually, Northwestern was asked to look at the case in 2002, and the case went dormant and Northwestern didn't do anything on the case --

MR. SOTOS:  Oh.

BY MR. BOWMAN:

Q.  -- until there --

THE COURT:  I think --

BY MR. BOWMAN:

Q.  -- was a request?

MR. SOTOS:  Objection, Your Honor.  He's testifying.

THE COURT:  That's not in evidence yet, so I think we shouldn't go there.

MR. BOWMAN:  It was Mr. Sotos' question that implied, Judge, the contrary.

THE COURT:  Well, wait a minute.

MR. SOTOS:  Judge, objection.

THE COURT: We don't know what happened. So I think the witness can testify as to what he knows.

MR. BOWMAN: Okay. So in any -- thank you, Your Honor.

BY MR. BOWMAN:

Q. In any event, you have no personal knowledge about whether Northwestern was or wasn't doing anything for Jacques Rivera for all those years in --

A. Correct.

Q. -- between, right?

A. I don't know.

Q. All right. It's come up, so I am going to ask you this, sir.

You told us you've been a judge of the Circuit Court of Cook County for how many years?

A. Going to be 22.

Q. And it was --

MR. SOTOS: Judge, I'm going to object. There was discussion about this before the testimony, and it's beyond the scope.

MR. BOWMAN: It was testified to before.

THE COURT: Well, that was testified to, but I don't think we went into that. I don't know what you're about to do.

MR. BOWMAN: That would -- that's my only question. I'm moving on.

THE COURT: All right.

BY MR. BOWMAN:

Q. You've said you were a state's attorney for ten years?

A. Correct.

Q. Have you served your profession honorably throughout the decades of your career, sir?

A. I believe so.

Q. Okay. Have you ever had any involvement whatsoever in bribing anyone?

A. No.

Q. Okay. Did you somehow try to influence some judge to give Jacques Rivera a fair shake or some shenanigans like that? Did you do such a thing?

A. No.

Q. You told us that as you look back on it, you believe you did your best and you thought you proved reasonable doubt in Jacques' case, right?

A. Yes.

Q. And you've seen now that there are documents and information that you didn't have back in the day, right?

A. Correct.

Q. Knowing what you know now about what you didn't know then, could you have done more and better if you had gotten the missing GPRs and been told the information that you weren't told?

MR. SOTOS: Objection, Judge. This is just testimony. Could we have some specifics or some document or some information?

THE COURT: You know, I am going to overrule this. A few questions, we can cover them, but this is overruled.

BY THE WITNESS:

A. If you have everything, you probably can do a better job.

BY MR. BOWMAN:

Q. Sure. So there have been a lot of questions about this file that we have, your file.

A. Yes.

Q. Can you remind the jury why it was that you kept this particular file all of these years?

MR. SOTOS: Objection, Your Honor, asked and answered, beyond the scope.

THE COURT: I think that's been covered, so sustained.

MR. BOWMAN: That's all I have, Judge.

THE COURT: Okay. Any questioning, Mr. Sotos? Ms. Rosen?

MS. ROSEN: I have a couple questions, Judge.

THE COURT: Okay.

RECROSS-EXAMINATION

BY MS. ROSEN:

Q. I just have a few more.

You were asked some questions about conversations you

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 1189 of 1254 PageID #:105320
Wadas - recross by Rosen
1617

had with Mr. Victorson about documents you might be missing, and you referenced the conversation about records related to the lineup that your client said that he was in and then released.

Do you recall that?

A. Yes.

Q. Did you have a conversation with Mr. Victorson about the fact that you received no general progress reports or no GPRs?

A. I did not have a specific conversation with him about that.

Q. Okay. And did you have a conversation with Mr. Victorson about the fact that you didn't have the inventory file log?

A. No.

Q. Okay. And you've testified about the general progress report that talks about "by the store" and the supp. report that says "coming from the store," and the jury's heard about, actually, Lopez's trial testimony which was different from both of those versions, right?

A. Yes.

Q. It was the going back and forth from the door to the store and back again, correct?

A. Correct.

Q. Okay. Did you call Detective Leonard as a witness in your case to rebut or contradict or impeach Mr. Lopez based on that testimony?

A. No.

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 1190 of 1254 PageID #:105326
Wadas - recross by Rosen
1618

Q. Did you call Detective McLaughlin in your case-in-chief to rebut or impeach Orlando Lopez's testimony regarding what he was doing when the shooting was occurring?

A. No.

Q. But that's something you could have done, correct?

A. If I had a GPR to compare it with, yes.

Q. Well, but you had the supp. report, right?

A. Yes.

Q. So you had the supp. report that was dramatically different from what he testified to at trial.

A. Correct.

Q. So you could have called Detective Leonard to testify and rebut what was now a different story than what was in the supp. report.

A. I could have.

Q. But you didn't?

A. Correct.

Q. And by the same token, you could have called Detective McLaughlin to do the same thing.

A. Yes.

Q. But you didn't?

A. Correct.

        MS. ROSEN:  If I could have one moment?  Oh, I have one more question.

BY MS. ROSEN:

Q. The file -- your file --

A. Yes.

Q. -- that you've kept all these years -- you've moved around from office to office to office, right?

A. Right.

Q. And you've taken that file with you?

A. Yes.

Q. And, in fact, when you first became a judge, you didn't have your own chambers, so the file went home?

A. I kept it at home, right.

Q. Yeah. And then eventually when you had chambers, you brought it back?

A. Correct.

Q. And so you've been transporting it all these 30 years from location to location to location?

A. Yes.

Q. And it's a big file?

A. Yes.

Q. And, in fact, the notes were in a separate file from the big file. That's why you didn't see them to produce them when the subpoena was first issued by the defendants in this case, right?

MR. BOWMAN: Objection, asked and answered.

THE COURT: Sustained.

MS. ROSEN: I have no further questions.

MR. SOTOS:  Just a few more, Judge.

RECROSS-EXAMINATION

BY MR. SOTOS:

Q.  Mr. Wadas?

A.  Yes, sir.

Q.  I thought we had covered this, but with respect to this first lineup that counsel keeps talking about, there still is no report of a lineup, correct?

A.  Correct.

Q.  There is the report that we went through at some length this morning or yesterday afternoon -- I think it was yesterday afternoon -- about the reports that you did have, correct?

A.  Correct.

Q.  Which documented that Detective McLaughlin and Detective Leonard had Mr. Rivera and Mr. Rodriguez in custody, held them over to have the witness view them the next day, couldn't find the witness, and then went to the hospital, correct?

A.  Yes.

Q.  Where they showed Mr. Valentin -- whoop.  Let me get this --

MR. LOEVY:  We object to foundation.  He can't say what they showed him.  He wasn't at the hospital.

BY MR. SOTOS:

Q.  Where the report reflects that they showed these photos to Mr. Valentin, correct?

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 1193 of 1254 PageID #:105324
Wadas - recross by Sotos
1621

A. Photo array, right.

Q. Yes. And again, you reviewed that supp. report that detailed all of this --

A. Correct.

Q. -- and compared it against what your client had told you and reconciled the two, correct? I think --

A. I don't know --

Q. -- you talked about --

A. I don't know what that means, reconciled the two.

Q. Okay. Let me try it again.

So you concluded after reading that supp. report that what Mr. Rivera was talking to you about when he said he was in a lineup was what the officers had described in the report?

A. It could've been that.

Q. Right. Well, that's why you didn't go talk to any of these guys who the pictures are there from, correct?

A. Yes.

Q. Because you had the report that had all their names and addresses, correct?

A. Correct.

Q. And this incident in the police station was two weeks before he was charged and you were retained by him --

A. Correct.

Q. -- or -- correct?

A. Yes.

Q. And you could have gone and talked to them if you had -- after reading that report, if you had any concerns about what happened at the police station that day -- you know, we -- there's been a lot of talk about could you have interviewed police officers, and they wouldn't have told you if they lied in the report, or Mr. Lopez wouldn't have talked to you, but you could have gone and talked to these guys if you had any concerns, right?

MR. LOEVY: Objection, Your Honor. That was covered in his last exam, maybe the one before it.

MR. SOTOS: It's directly responsible.

THE COURT: Overruled.

MR. SOTOS: Responsive.

BY THE WITNESS:

A. If I could've tracked these guys down, I could've tried to talk to them.

BY MR. SOTOS:

Q. And also, by the way, in terms of this idea of Mr. Victorson would have prevented you from somehow interviewing the witness, you understand that Illinois Supreme Court rules prohibit state's attorneys from interfering with a defense attorney's right to interview a witness, correct?

A. Correct.

Q. All right. And defense attorneys hire investigators all the time to interview witness -- witnesses, correct?

A.  Correct.

Q.  That's one of the primary purposes that criminal defense lawyers use investigators for?

A.  Correct.

Q.  So you could have done that here.  You decided not to, right?

A.  Correct.

Q.  Okay.  So -- okay.  Let me just ask you.  You were asked questions by Mr. Bowman.  He said if you had known everything about all of the documents and information that you didn't have then, you could have done some other things to defend this case and have a better -- can you please tell the jury, what document are you talking about?  Is --

MR. LOEVY:  Objection, asked and answered --

BY MR. SOTOS:

Q.  Do you have any --

MR. LOEVY:  -- Your Honor.  Are we going to go through the whole exam again?

BY MR. SOTOS:

Q.  Any document?

THE COURT:  All right.  I --

BY MR. SOTOS:

Q.  Is there any document in particular?

THE COURT:  Overruled.

BY THE WITNESS:

A.   The lineup report for the lineup that was conducted, according to Jacques Rivera, that there was no paper on.

BY MR. SOTOS:

Q.   Okay.

A.   The report that documented a GPR that documented that the eyewitness recanted.

Q.   Okay.  But there is no lineup report, right?

A.   And there is no report on that recantation.

Q.   Didn't you just tell this jury that when you read Detective McLaughlin's supp. report from September 1st that you satisfied yourself that that was describing with what Mr. Rivera was talking about, and that if you had any further concerns, you could have gone and talked to a number of people about it?

MR. LOEVY:  Objection to the characterization, Your Honor.

THE COURT:  I think the witness can answer this. Things might be confusing, they might not, but I think the witness can answer this.

BY MR. SOTOS:

Q.   Didn't that just happen?

THE COURT:  Do you want to hear the question again?

BY MR. SOTOS:

Q.   Didn't you just tell the jury that after Mr. Rivera told you he was in a lineup, you read Detective McLaughlin's report --

A.  Correct.

Q.  -- describing what occurred in those days, and you satisfied yourself that what they described is likely what Mr. Rivera was talking about?

A.  I could've -- what I'm saying is that is a possibility.

Q.  Because all you know is that Mr. Rivera said he was in a lineup, correct?

A.  Correct.

Q.  And you told the Court that on September 16th, like Mr. Bowman showed you the bond hearing, correct?

A.  Bond hearing, right.

Q.  I actually asked you about that bond hearing before he showed it to you, didn't I, this morning?

A.  Right.

Q.  And my point to you was I said after that, you didn't do anything further with it, correct?

A.  Correct.

Q.  And that was because you had read the September 1st report, correct?

A.  I don't know if it was strictly because of that.

Q.  Well, that was one of the reasons?

A.  Correct.

Q.  You had satisfied yourself that there was nowhere to go with it?

A.  Correct.

Q. Okay. And there's no -- and you don't have any further information today, other than maybe what Mr. Rivera's current lawyers are telling you, that leads you to believe you had any -- there was any more reason to believe there was an actual lineup then than at the time?

MR. BOWMAN: Objection.

BY MR. SOTOS:

Q. Is that fair to say?

THE COURT: Overruled.

BY THE WITNESS:

A. They haven't told me anything. All they've done is asked me questions.

BY MR. SOTOS:

Q. And what you know, then, about what's been described as the first lineup is that Mr. Rivera told you he was in a lineup, right?

A. Correct.

Q. And you don't remember what he told you about it other than that?

A. Correct.

Q. Okay. Mr. Bowman asked you some questions about -- talked about the things you could have done if you knew more.

We talked this morning and yesterday afternoon about a lot of the things that you didn't do, correct?

A. Correct.

Q. All right. And I understand that you feel like -- you testified this morning that you did your job and you gave it your best shot.

A. Yes.

Q. Can you see why other people might look at it differently?

MR. LOEVY: Objection, Your Honor. Isn't that the question Mr. Sotos wouldn't let him answer?

MR. SOTOS: Well --

THE COURT: It is sustained.

MR. SOTOS: Thank you. Nothing further.

MR. LOEVY: Maybe he should be able to answer it, then.

THE COURT: Well --

MR. SOTOS: Well, I don't know if he's objecting or he isn't.

THE COURT: I don't know. Do you want an answer to that question? If the objection's been withdrawn, let him --

MR. LOEVY: Objection's withdrawn.

MR. SOTOS: Judge, you know what? I don't have anything further. We can --

THE COURT: Good. The day is getting late.

Anything more from the defense side?

MR. LEINENWEBER: No, Judge.

THE COURT: Anything more from the plaintiff's side?

MR. BOWMAN: Briefly.

FURTHER REDIRECT EXAMINATION

BY MR. BOWMAN:

Q. Just a couple more, Judge, Mr. Wadas.

The -- you were asked some questions about the Supreme Court rules on access to witnesses.

A. Yes.

Q. Can you explain how it worked in practice back in 1988 when the State's Attorney's Office had control of a witness, just what would happen when a defense lawyer would attempt to interview the witness?

MR. SOTOS: Objection, Your Honor. Assumes facts in evidence with respect to have control of a witness.

THE COURT: The witness can talk about his own experience. Overruled.

BY THE WITNESS:

A. In my experience, you weren't going to get access to that witness, and that witness was going to be prepped or at least told that he didn't have to talk to a lawyer or a lawyer's investigator in very forceful terms.

And the way you would try to get a hold of the witness, you could ask the -- you could ask that the witness be produced. It may or may not happen. The defense would've prob -- I mean, the State would object. And the reality was you weren't going to get to the guy.

BY MR. BOWMAN:

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 1201 of 1254 PageID #:105337
Wadas - further redirect by Bowman
1629

Q.  Thank you.  So there's been a lot of questions back and forth.

We can all agree there was no report of a lineup in which Jacques Rivera was not identified on August 31st, right?

A.  Yes.

Q.  And when you went through the police records, were you looking for such a report?

A.  Yes.

Q.  And did you expect that when there had been such a lineup that you would see such a report?

A.  Yes.

Q.  And your conversation with Mr. Victorson was what, sir?

A.  About where's that report.

Q.  And what did he say?

A.  He said he -- he doesn't believe there was a lineup, and he doesn't have a report that reflects that.

Q.  And at that point, were you satisfied that you had nowhere else that you could go with this?

A.  Correct.

        MR. BOWMAN:  Thank you.  That's all I have.

        THE COURT:  Anything further?

        MR. LEINENWEBER:  No, Your Honor.

        THE COURT:  No?

        MR. SOTOS:  Just one.

                FURTHER RECROSS-EXAMINATION

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 1202 of 1254 PageID #:105333
Wadas - further recross by Sotos
1630

BY MR. SOTOS:

Q. You just testified that in practice, the state's attorneys wouldn't let criminal defense attorneys talk to the witness?

A. Sure.

Q. That's not what criminal -- that's not what the investigators for the defense attorneys did. Didn't they go out and find the witnesses and talk to them?

A. Investigators could go out and try to find witnesses and talk to them, yes.

Q. You could've hired an investigator, right?

A. Yes.

MR. SOTOS: Okay. Nothing further, Judge.

MR. BOWMAN: Nothing further. Thank you, Judge.

THE COURT: Okay. Everybody finished?

Thank you, sir. You may step down. Watch your step.

THE WITNESS: Thank you.

(Witness excused.)

THE COURT: All right. Let's --

MR. LOEVY: Your Honor, our next witness is that video -- is a deposition. We should probably consider an afternoon break, do you think?

THE COURT: Yeah, I --

MR. LOEVY: It's going to be about 45.

THE COURT: -- think we probably should take a ten-minute break, ladies and gentlemen.

Counsel, don't go anywhere.

(Jury out.)

MR. LOEVY:  Your Honor, I'm going to tender you our hearsay memo.  I've already given a copy to the defendants.

THE COURT:  Great.  That would be very helpful.  Thank you.

(Document tendered to Court.)

MR. GIVEN:  Judge, I'm going to orally argue today as the day for, you know, lengthy submissions on the fly from them, but I can respond to it.

THE COURT:  Well, I haven't read it yet, so hearing a response -- I mean, we just don't have -- let me quickly -- what is -- hit the bullet points fast.

MR. BOWMAN:  Judge, the thing, as we see it, comes down to Rule 806.  The issue is that there is a lot of hearsay with respect to Orlando Lopez that is coming into this case. There's Lopez's affidavit, there's Lopez's post-conviction hearing testimony, Lopez's criminal court testimony.  And Mr. Lopez is not here and available to testify at trial.  He's going to testify by deposition.

So Rule 806 covers the situation when a hearsay -- here's what the rule says.

THE COURT:  I can read the rule.  I don't need to hear it --

MR. BOWMAN:  Yes.

THE COURT: -- read to me. Okay. Anything else you -- I know you're relying on 806. Is that it?

MR. BOWMAN: Just one further point with respect to the rule.

You focused properly on Rule 613 with respect to the issue when it was at a different stage of development, but when you are in the land -- in 806 land, the requirement of 613 that the witness have had an opportunity to be confronted with and explain the statement falls out. And that's explicit in Rule 806 which basically says that when some hearsay comes in, it all comes in. That's essentially the bottom line under that rule.

THE COURT: And the hearsay that's coming in is what?

MR. BOWMAN: The hearsay that's coming in is Jennifer Linzer's testimony as to what Orlando Lopez said to her. Specifically --

THE COURT: No, no. You're saying that -- you're saying when a hearsay statement comes in --

MR. BOWMAN: Oh, the hear --

THE COURT: -- then everything comes in.

MR. BOWMAN: I'm sorry. I misunderstood your question.

The hearsay that is in the affidavit of Lopez that is in the case, the post-conviction hearing testimony that's in the case, the criminal court testimony that's in the case. And

if you parse through a Seventh Circuit decision called *Vaughn*, V-a-u --

THE COURT: Yeah, I see it.

MR. BOWMAN: Which is cited there, the video deposition of Lopez also falls in the category of hearsay for purposes of the 806 analysis.

So that initial requirement of 806 is satisfied, and that's our position.

THE COURT: Okay. Can I hear from the defense?

MR. GIVEN: Judge, this deals with -- and what he didn't answer your question specifically, this has to do with Ms. Linzer writing a note in March of 2010, a couple days after they met Lopez in Cleveland, and that she had a phone conversation with him where she writes down, "I can't believe I was coached," or something to that effect.

And, by the way, this came up in the summary judgment. You ruled it was double-hearsay, but might be available to use for impeachment down the road.

I need two minutes to run through what --

THE COURT: Yeah. I am giving it to you.

MR. GIVEN: I know.

THE COURT: So let's start.

MR. GIVEN: I'm going to give you a chronology. Because Ms. Linzer's note was suppressed by Northwestern in this case, and you can only imagine what would have been said

if the defendants had done what I'm about to lay out for you.

So Ms. Linzer and Ms. Estes meet Mr. Lopez in Cleveland in February -- late February of 2010.

On March 2nd, according to this note, Ms. Linzer speaks on the phone with Mr. Lopez, and she handwrites a note that says something to the effect of, "I can't believe I was coached."

Now, that note -- and, by the way, significantly, nothing in the June 2010 affidavit that started the whole PC says anything about "I was coached" or coaching.

THE COURT:  Yeah, I know that.

MR. GIVEN:  Okay.  So Ms. Linzer's note was not turned over to the ASA who was handling the PC.  He's testified to that in his deposition.

Lopez did not testify at the PC about being coached or not being coached.  He was not confronted by Ms. Linzer's statement by either the State or Mr. Lopez's attorneys from Northwestern.

And then where we next go to is Mr. Lopez was deposed in this case in May of 2013.  Ms. Linzer's note had still not been turned over to the defendants in this case despite discovery requests.  So at Mr. Lopez's deposition, defense was not able to ask him anything about being coached and he wasn't asked anything by Mr. Bowman about being coached.

Then what happened is that Ms. Linzer's deposition was

taken on April 15th, 2014, almost a year after Mr. Lopez.

And for the first time, the night before her deposition, we get her note e-mailed to us. I forget if it was late afternoon --

MS. ROSEN: Yeah, it was the day before.

MR. GIVEN: -- or early evening. We get her note for the first time the night before her dep. And at the dep, we asked her about this "I was coached" thing.

And you may remember from the summary judgment -- it's on page 38 and 39 -- she says, "I know I wrote it. And I think it was within this phone conversation, but I don't really remember what he said. And I can't really remember what else he said. And I don't have any other memory about it."

So that's what we're talking about here. And Rule 613 requires that the party seeking to introduce the statement must give the witness an opportunity to explain or deny the prior statement. That means Mr. Lopez. And he wasn't allowed to do that.

THE COURT: Yeah, I do not need an explanation of the rule.

MR. GIVEN: Okay. I'm done.

THE COURT: I can figure it out. I need a break more than I need that.

MR. GIVEN: Okay. I'm done, Your Honor.

THE COURT: Okay. So you're relying on 613 and the

plaintiff is relying on 806.

MR. GIVEN: Well -- right. And I suppose I should have put the closing remark, which is that we don't think Ms. Linzer should be allowed to testify about this "I was coached" statement.

THE COURT: She is testifying in person or not in person?

MR. BOWMAN: She's here.

THE COURT: She's here. Okay. All right. We'll take just -- let's -- no more than five minutes and then we'll continue.

(Recess.)

THE COURT: I looked at *Vaughn versus Willis*. I don't think it establishes that 806 trumps 613(b). I don't think this Linzer testimony would be admissible under 613(b). And I think there are also prejudice issues because of the difficulty the defense had in getting a hold of it and dealing with it.

So I am going to exclude it.

MR. LOEVY: All right, Your Honor. We will move on from that.

We do have a PC witness next. There's actually -- if Your Honor would be inclined -- maybe you'd be the best one to explain that the date of the testimony and that this is testimony that Mr. -- I'd like to actually hand you a copy.

THE COURT: Sure. Why don't you tell me what you want

me to say.

(Document tendered to Court.)

MR. LOEVY:  What I would propose you say is the date, maybe lay some context that this is testimony given at a hearing before that judge on that date.

There's going to be two readers, and I have marked it there.  The -- Ms. Raley represented Mr. Rivera, who's going to be read by Rachel Brady, if you are inclined to read the real names.  But they're actually going to switch then.  And there was a lawyer for the State, a guy named -- Jake Stortz who's going to read for the State.

THE COURT:  You know what?  Let me start somewhere else.  What is this?

MR. LOEVY:  That is Orlando Lopez's testimony from the PC hearing --

THE COURT:  Okay.

MR. LOEVY:  -- in 2010.

THE COURT:  Post-conviction.

MR. LOEVY:  Right.  And --

THE COURT:  From Mr. Rivera's post-conviction --

MR. LOEVY:  Correct.

THE COURT:  -- hearing.

MR. LOEVY:  And then there's cross-examination by the State and --

THE COURT:  Hold on.

MR. LOEVY: Yeah. And the date is June 23rd, 2011.

THE COURT: June 23rd, 2011. And there's going to be one witness reading for Mr. Lopez and one witness reading for?

MR. LOEVY: Mr. Rivera's attorneys are going to examine first and then a guy named Jake Stortz is going to read for the State.

THE COURT: Jake Stork?

MR. LOEVY: Stortz. I wrote it on the front there. And then Ms. Brady is going to read for Ms. Raley.

THE COURT: All right.

MR. LOEVY: There's -- the only other variable, Your Honor, is I tabbed it for you. There's actually a cameo for the Court.

THE COURT: I don't understand.

MR. LOEVY: Do you want us to read it or you want to read it? The Court says something. Would you like -- how would you like to handle it?

THE COURT: No. I would rather not get involved in it, yeah.

MR. LOEVY: All right. Who should -- we'll designate maybe your clerk or should we ask somebody in the back to be the Court? Or maybe the readers.

THE COURT: Why don't you have somebody in the back to be the Court.

I'd like to get the jury.

MR. SOTOS: Judge, just --

THE COURT: Yeah.

MR. SOTOS: Before we get to this, we have a significant objection to what's happening here.

They told us yesterday they wanted to do this this way. Here's what they want to do. They want to read Orlando Lopez's PC testimony. Then they have said, Mr. Loevy told me, at some other point we may or may not introduce his deposition testimony or his criminal trial testimony.

And he is a single witness. And we object to the idea of part of his testimony being introduced today, some being introduced at some other point. We think that the witness should be --

THE COURT: You know what?

MR. SOTOS: Should testify.

THE COURT: I think that is a nice objection. I don't think it's going to govern the day at this point. And I want to get this jury back in here. Okay? I do not think this is the worst thing that could possibly happen.

MR. SOTOS: Time will tell.

THE COURT: Not even close.

MR. SOTOS: All right.

MR. LOEVY: All right. Rachel, you're up.

THE COURT: Now, if I get this all wrong, you're going to have to -- I am going to ask you to correct me. Okay?

MR. LOEVY: Yes, Your Honor. I'd be happy to explain it, if it's agreeable.

MR. SOTOS: What's that?

THE COURT: Mr. Loevy to explain what they're going to hear.

MR. SOTOS: What they're going to hear?

THE COURT: Yeah. Rather than me trying to remember. But I'll just say --

MR. SOTOS: Can --

THE COURT: You know what? I'm just going to say it's his post-conviction hearing on this day and then I'm going to turn it over to you to say who's going to be playing roles.

MR. SOTOS: But, Judge, could we at least put it in context for the jury, so they know, like, this was given in 2010 after -- you know, the criminal trial testimony was at one point. Later, there'll be a deposition. Just so the jury has an --

THE COURT: Well, no, you can't, because I don't know what you're talking about.

MR. SOTOS: Well, he -- I'll tell you real quickly, one minute.

He testified three times, once in the criminal trial. It's very short. It probably won't take more than 10, 15 minutes.

THE COURT: You know what? I am just going to read

what this is.  That is what I am going to do.  Okay?  I am not taking on a job of this complexity.  Transcripts get read all the time.

(Jury in.)

THE COURT:  Okay.  Please be seated, ladies and gentlemen.

What you're going to hear now is a reading from the transcript of testimony that -- it's -- Mr. Orlando Lopez gave --

MR. LOEVY:  Correct, Your Honor.

THE COURT:  -- in Mr. Rivera's post-conviction hearing which took place on June 23rd, 2011.

Now, the reading is going to be done by, I guess, some lawyers or some assistants to lawyers who are going to kind of read the parts for you.  They're not going to be sworn because they're not -- they're just basically acting.  Okay?

Let's see.  Mr. Jake Stortz is going to read what part?

MR. LOEVY:  The part for the State, Your Honor.

THE COURT:  The part for the State.  And Ms. Rachel Brady is going to be -- act as Mr. Rivera's attorney and read the parts that were stated by Mr. Rivera's attorney.

Is there anything else I need to explain?

MR. LOEVY:  No, Your Honor.

THE COURT:  Okay.  So this is the post-conviction

Case: 1:18-cv-01028 Document #: 827 Filed: 11/22/25 Page 1214 of 1254 PageID #:105345
Hearing Transcript of Orlando Lopez

1642

testimony on June 23rd, 2011 in the Circuit Court of Cook County.

MR. LOEVY:  All right.  And Sean Starr is going to be the part of Orlando.

THE COURT:  Okay.  Tell me your name again.

A READER:  Sean Starr.

THE COURT:  Okay.  Mr. Starr is going to be reading Mr. Lopez's part.

RACHEL BRADY, JAKE STORTZ, SEAN STARR, called as readers herein, to read all questions by Ms. Abraham and Mr. O'Brien and answers given by Mr. Lopez:

STATE COURT HEARING TESTIMONY OF ORLANDO LOPEZ

"DIRECT EXAMINATION

"BY MR. ABRAHAM" (Read by Ms. Brady):

Q.  "Good afternoon, Mr. Lopez.  Please state your name for the record and spell your last name for the court reporter.

A.  (Read by Mr. Starr) "My name is Orlando Lopez, last name L-o-p-e-z.

Q.  "Mr. Lopez, we have met before, have we not?

A.  "Correct.

Q.  "And you understand that I'm the attorney for Mr. Jacques Rivera who's present in court this morning?

A.  "Correct.

Q.  "And is it your understanding that we are here in court today because of an affidavit you signed in June 2010?

A. "Correct.

Q. "How long have you lived in Ohio?

A. "Approximately 11 years.

Q. "And where did you live before that?

A. "Pennsylvania.

Q. "Have you ever lived in Chicago?

A. "Yes.

Q. "On August 27th, 1988, did you witness a shooting outside of your home in Chicago?

A. "Yes.

Q. "And where were you living at the time?

A. "3320 West Cortland.

Q. "Did you know Felix Valentin?

A. "Yes.

Q. "And how did you know him?

A. "Through my brother -- through his brother.  He was married to -- not married, but with my sister.

Q. "And so what is your relationship to Felix Valentin?

A. "Friend, family friend.

Q. "At the time of the shooting, how would you describe your relationship to Israel Valentin?

A. "Looked up to him as a brother.

Q. "And is Israel Valentin, the victim's brother, living today?

A. "No.

Q. "When did he die, do you remember?

A. "I do not remember when.

Q. "And did you testify as a witness in the murder trial of Jacques Rivera?

A. "I did.

Q. "Were you a witness for the State?

A. "Yes.

Q. "Do you remember when that trial took place?

A. "It's been a while, a long time.  I don't recall exactly when.

Q. "If I told you it took place in April of 1990, does that sound about right?

A. "Yes, I guess, I guess.

Q. "Did you testify in court that Jacques Rivera was the person who shot and killed Felix Valentin?

A. "I did.

Q. "And was that court testimony a lie?

A. "Yes.

Q. "Did you know your testimony was a lie at the time?

A. "Yes.

Q. "And as you sit here today under oath, is it your testimony that you consciously lied when you identified Jacques Rivera as the shooter of Felix Valentin?

A. "Yes.

Q. "Mr. Lopez, do you see the man at counsel table who is

wearing the yellow jumpsuit?

A. "Yes.

Q. "And do you know who that is?

A. "Yes.

Q. "Is that Jacques Rivera?

A. "Yes.

Q. "When is the last time you saw Mr. Rivera?

A. "At court, at the trial.

Q. "When you testified --

A. "That's when I testified against him, yes.

Q. "So that would have been --

A. "The last time.

Q. "-- over two decades ago?

A. "Yes.

Q. "Have you had any contact with Mr. Rivera since you testified against him at trial?

A. "No.

Q. "Have you ever had any contact with members of Mr. Rivera's family?

A. "No.

Q. "Mr. Lopez, is Jacques Rivera the person you saw shoot and kill Felix Valentin?

A. "No.

Q. "Were you alone at the time you witnessed the shooting?

A. "Yes.

Q. "Where were you located when you first noticed the occurrence or the shooting?

A. "I walked down the stairs to the door and then I hid to the corner.

Q. "When you say you walked down the stairs, from where?

A. "From my apartment, through the door, and I went outside, saw the gentleman running. Then when he started shooting, I was hiding on the corner of the building.

Q. "Okay. Where were you going?

A. "To the corner store.

Q. "Okay. Where was Felix Valentin located when you first noticed --

A. "He was in the alley.

Q. "-- the shooting?

A. "In the alley.

Q. "So now continue and tell us what you observed, what you saw.

A. "I saw the suit" -- "the suspect shooting at Felix. I ran away from the scene, went to the corner store to tell the people from the corner store, 'Call the police,' that somebody is getting shot, and he not tend to believe me, so he said, 'Get out of here.' So I left, ran back to the corner, and the gentleman was still shooting at Felix. As I --

Q. "Okay. So during the shooting, you ran to the corner store?

A.    "Correct.

Q.    "And then you ran back from the store and the shooting is still in progress?

A.    "It was ending, it was pretty much ending, and then the gentleman -- the suspect ran out, he ran and turned where I was hiding, and I saw his face, and that's when he ran and got into the car and left and turned down, drove down and turned down Spaulding.

Q.    "So the suspect eventually got into a car?

A.    "Correct.

Q.    "Can you describe the car for us?

A.    "It was a Chevy Caprice.

Q.    "Do you remember the color?

A.    "If my memory helps me out, it was, I think, a blue or a beige, in between blue and beige for some reason.

Q.    "Okay.  And was there anyone else in the car?

A.    "Yeah, the gentleman -- the suspect ran into the passenger side.  So there was also a driver, but I never saw the driver.

Q.    "Okay.  And during the shooting incident, you were able to see the shooter's face?

A.    "Correct.

Q.    "When did you see the shooter's face?

A.    "As opposed to when he shot?  When he turned around and -- before he ran and then he ran towards the car, I saw his face. And then when he got done and ran back to the car, I saw his

face again, twice.

Q. "Okay. Did you get a clear view of the shooter's face?

A. "Yes.

Q. "Did you recognize the shooter?

A. "At the moment, no.

Q. "Okay. Was the shooter anyone you had ever seen before?

A. "I saw him after --

Q. "At the time of the shooting?

A. "Oh, no, I never seen the gentleman, I never saw the suspect ever.

Q. "At the time of the shooting?

A. "At the time of the shooting, no, I never saw the suspect.

Q. "Okay. Over two decades ago, you testified that you recognized the shooter as someone who played baseball at Humboldt Park. Do you remember testifying to that?

A. "Correct.

Q. "Was that testimony false?

A. "Yes.

Q. "Do you remember what the shooter was wearing?

A. "He was wearing a black jacket, some gloves, black gloves, and he had -- his hair was dyed in the back like blond, more like a mullet-type deal, his hair was dyed, you know, dyed, like a yellowish/brownish color.

Q. "Later that night after the shooting, did you speak to police about what you had witnessed?

A.  "Yes, I did.

Q.  "And what did you tell the police?

A.  "That I saw -- I saw who did it, and I assumed, I assumed it was a Latin King that did it.

Q.  "And why did you assume it was a Latin King who was the shooter?

A.  "Because when they drove off, they made a right on Spaulding and went towards the territory of Latin Kings, so that was my assumption, why I said he was a Latin King.

Q.  "At the time of the shooting, was Felix Valentin a member of a gang?

A.  "Yes.

Q.  "What about Israel Valentin?

A.  "Yes.

Q.  "What gangs were they?

A.  "They were Maniac Camel Boys.

Q.  "Were you a member of a gang at the time of the shooting?

A.  "No, I wasn't.

Q.  "Did you become a member of a gang later?

A.  "Yes.

Q.  "What gang was that?

A.  "Maniac Latin Disciples.

Q.  "Are you a member of a gang now?

A.  "No.

Q.  "When did you leave the gang?

A. "Fourteen years ago. As I left and went -- when I moved to -- when I moved out, I left 14 years ago.

Q. "After you told the police that the shooter was the Latin King, did the police ask you to look at some photos?

A. "Yes.

Q. "What did you look at?

A. "I saw a lot of Latin King pictures.

Q. "Okay. And what were the pictures in?

A. "They were -- the books were just Latin Kings, and I saw more than probably a hundred pictures, probably.

Q. "Okay. And where were you looking at these Latin King photographs?

A. "At my house.

Q. "At your house?

A. "At my house.

Q. "And you said that you looked at hundreds. Is that what you just said?

A. "Yes.

Q. "Okay. And did you eventually pick out a photo?

A. "Yes, I did.

Q. "Did you later learn the name of the person you picked out?

A. "No, I did not -- oh, later, yes, I did. That's what I remember.

Q. "And what was the name?

A. "Jacques Rivera.

Q. "Were the names in the books that you were looking at, are the names of the people in the book?

A. "No, they weren't.

Q. "Okay. At the time you picked out the photo of Jacques Rivera, did you think that Jacques Rivera was the shooter?

A. "Yes. He resembled -- the hair -- the picture that I saw resembled the shooter, the suspect.

Q. "Okay. At some point did you view a live lineup of possible suspects?

A. "Yes.

Q. "And you know what I'm talking about when I say live lineups?

A. "Yes. I was there looking through a window glass and looking at the suspects.

Q. "And you were looking at real people --

A. "Yes.

Q. "-- as opposed to photographs?

A. "Correct.

Q. "To the best of your memory, how many live lineups did you view?

A. "Two.

Q. "Okay. Let's talk about the first lineup. Do you remember how long after the shooting this first lineup took place?

A. "Not really. Everything was just quick. Not really, no, no.

Q. "Do you remember if Felix Valentin was still alive at the point that you looked at the first lineup?

A. "At that moment, no, I did not. So, like, he was after -- like I be say, it's been a long time, so I'm like --

Q. "And if you don't know, please --

A. "Yeah, it's been a long time, so I'm trying to, like, tell you based on what I remember as best I" -- "best I can for you guys.

Q. "Okay. Do you remember where this lineup took place?

A. "It was at the police station, obviously, but I don't recall, you know, I don't recall exactly what station it was.

Q. "Do you know how you would have arrived at the police station?

A. "A detective. With my mother accompanying me in the first one.

Q. "And do you remember, was it one detective or more than one detective who took you to the police station?

A. "All I can tell you, the only thing I remember was my mom was in the back seat and she was pretty upset with me. That's about what I can remember.

Q. "Do you remember what the detective looked like, the name of the detective?

A. "The detective, like I be said, he had a fro, had some glasses, a mustache, and he was white-complected.

Q. "White-complected, was he Caucasian?

A. "He was Hispanic.

Q. "And you don't remember whether there was another detective?

A. "No, I don't. I don't recall. I don't remember that.

Q. "At this first lineup, do you remember if you identified anyone?

A. "Yes.

Q. "Who did you identify?

A. "Rivera.

Q. "At the time you made your identification of Jacques Rivera, was there any family member who was with you at the time of your actual identification?

A. "Not in the room per se, but, like I said, my mom went with me. But as far as in the room, I don't recall too many people with me in there, just, you know, the detectives, you know, and stuff like that.

Q. "And do you recall how many detectives would have been in the room with you?

A. "No, I can't recall, no.

Q. "Now, at the time that you identified Jacques Rivera in this lineup, did you believe Jacques Rivera was the shooter?

A. "Yeah, at the time, yes.

Q. "Okay. Now I'd like to direct your attention to an event that occurred after the shooting at the time when you were in the vicinity of Funston School. Did you make an observation?

A. "Yes. I was walking Armitage towards Avers. I was going to my father's house that day, and I was just walking. I saw the shooter coming around the corner shake hand with another gang member, and he was wearing the same black jacket and had the same hairstyle.

Q. "Okay. Now, you just said, 'I saw the shooter.' Was this person someone other than Jacques Rivera?

A. "Yes.

Q. "This was not Jacques Rivera?

A. "Correct.

Q. "And you just said, 'I saw the shooter.' What made you think at the time that you were looking at the shooter?

A. "Because that was the shooter, no doubt in my mind. He was wearing the same jacket, the hairstyle, the face was imprinted my head. So when I saw him, I ran, you know, ran for my life because I was scared.

Q. "Did this person that you saw near Funston School, did this person look like the person you had picked out of the gang book?

A. "From the picture, the same gentleman, the hair, they had resemblance.

Q. "Okay. And you said you observed a handshake?

A. "It was an Imperial Gangster handshake.

Q. "Okay. And when you saw this Imperial Gangster handshake, did you come to a conclusion?

A.   "I had the wrong guy.

Q.   "Did you draw a conclusion as to this person's affiliation when you saw this handshake?

A.   "Yes.

Q.   "And what was that?

A.   "It was a Latin King, the other one was a Gangster.

Q.   "So who was the Gangster?

A.   "The shooter.

Q.   "And when you say Gangster, are you saying Imperial Gangster?

A.   "Correct.

Q.   "At some point you were asked to view another lineup, a second lineup?

A.   "Correct.

Q.   "Now, do you recall when this would have happened?

A.   "I remember the lineup, but I just don't recall the date.

Q.   "Did it happen after you had this observation near Funston School?

A.   "Yes.  I saw -- after that -- when I saw that, I went to the second lineup and I end up telling some lady with white hair that he was the wrong -- it was the wrong guy.

Q.   "Do you remember where this lineup took place?

A.   "The same place, but, like I say, I don't recall which precinct it was, that just -- you know, I don't recall.

Q.   "Okay.  And do you remember how you got to this lineup?

A.  "I don't remember.  I just remember being there.

Q.  "Okay.

A.  "That's all I remember.

Q.  "And do you remember if any family member accompanied you?

A.  "Like I said, I don't remember.  I just remember the lineup.

Q.  "Okay.  So you're at the lineup and you -- tell us again, there is a white-haired lady?

A.  "Yes.

Q.  "And you tell her something?

A.  "I tell her, you know, I tell her that the gentleman I picked is the wrong guy.  And I repeated myself twice.  I said that's the wrong guy, that's the wrong guy.

Q.  "And then what did she say to you?

A.  "She said don't be afraid.  She was trying to, you know, console me in the sense of, 'Don't be afraid.  We're gonna protect you.  Nothing's gonna happen to you.'  And that was pretty much it of the conversation.

Q.  "Okay.  And could you describe this lady, this white-haired lady to us?  Can you give us any more detail about her?

A.  "She had like one of those things you guys carry, like a notebook, you know, stuff that you guys carry around for cases or whatnot.

Q.  "Are you referring to what we call a Redweld?

A.  "Yes, a Redweld.

"She was dressed, you know, with long, you know, a nice, long dress, I guess, whatever you want to call it.

Q. "Is it possible that this person was a non-uniformed police officer?

A. "Yes, I believe so.

Q. "And it's also possible that this person was a lawyer?

A. "Could have been, yeah. Like I said, she never gave me her title.

Q. "And so then she consoles you and then what happens?

A. "Then I just picked out Rivera again, and that was pretty much it, you know, because it fell into, you know, it fell into dead ears. Nobody wanted to -- no one thought -- they thought that I was just afraid and that that was it. They thought I was afraid.

Q. "Okay. When you had this conversation with the white-haired lady, was anybody else present?

A. "Yes, the gentleman, the detective with the fro and the glasses and the mustache. Then after I walked away, they had a conversation. What conversation they had, I do not know.

Q. "Okay. At the time of the second lineup when you identified Jacques Rivera, at the time you were identifying Jacques Rivera, you knew in your mind he was not the shooter?

A. "Correct.

Q. "Did the police or anyone else in authority at the station that night ever force you to identify Jacques Rivera as the

shooter --

A. "None at all.

Q. "-- during that second lineup?

A. "No.

Q. "I'd like to transition now and talk about how it is that you have come now" -- "that you have now come forward.

"On February 28th, 2010, did something happen that made you start thinking about this case again?

A. "I had two, I guess, Jennifer and Cynthia showed up at my house and --

Q. "Do you know Jennifer's last name?

A. "Honestly, I don't.

Q. "Do you know Cynthia's last name?

A. "I don't.

Q. "Jennifer and Cynthia show up at your house. Do you know who they are?

A. "As far as they didn't -- not really. I did not know who they were. But I pretty much knew it was something from my past when they said they were from Chicago. And they gave me a card" -- "and they gave a card to my kids, and I right there knew right away it was part of my past catching up.

Q. "So when they first arrived, you were not at home?

A. "Correct.

Q. "And they had a conversation with --

A. "My children.

Q. "Okay. And then they came back or they waited or --

A. "No, they came back, and that's when they saw me. They knocked on the door, and I decided to go with them, and we ended up going to Starbucks.

Q. "Did Cynthia and Jennifer pressure you or force you into saying anything at the time that you spoke with them at Starbucks?

A. "No, they did not.

Q. "How long did you talk to them at Starbucks?

A. "Probably an hour or more.

Q. "Has anyone threatened you to come to court today and tell a lie or to tell the truth?

A. "No.

Q. "Has anyone paid you any money to come to court today to tell a lie or to tell the truth?

A. "No.

Q. "You are here of your own free will?

A. "Correct.

Q. "Are you missing work today in order to be here?

A. "Yes.

Q. "In fact, you flew to Chicago yesterday from Cleveland?

A. "Correct.

Q. "Who paid for your travel?

A. "Northwestern.

Q. "Did the police pressure you into falsely identifying

Jacques Rivera at trial?

A. "No.

Q. "Did a prosecutor pressure you into falsely identifying Jacques Rivera at trial?

A. "No.

Q. "Did anyone pressure you into lying at trial?

A. "No.

Q. "Over two decades ago, you told a lie that sent Jacques Rivera away for 80 years. Do you have any regrets, Mr. Lopez?

A. "Yes.

Q. "Do you wish you would come forward with the truth sooner?

A. "Yes.

Q. "Why are you coming forward now?

A. "I like to look at myself in the mirror. I like to, you know, correct the wrong. I got children and need to look at them in their face every day.

"CROSS-EXAMINATION

"BY MR. O'BRIEN" (Read by Mr. Stortz):

Q. "Mr. Lopez, when Northwestern contacted you, who was the first person from Northwestern you spoke to?

A. "Cynthia and Jennifer at the same time, pretty much.

Q. "And they told you that they were here investigating an innocent person that might be locked up based on your testimony?

A. "Correct.

Q.  "What also they tell you about the case?

A.  "That they wanted to know the truth about my -- they wanted to hear my side of the story, my testimony.

Q.  "Mr. Lopez, I want to go back to August of 1988.  And I know you went through this on direct examination, but I just want to touch on a few things.

"You were 12 years old on the date of Felix's shooting, right?

A.  "Correct.

Q.  "He was a friend of yours through his relationship with his brother who was dating your sister?

A.  "Correct.

Q.  "You liked Felix?  He was your friend?

A.  "Like I said, he was my friend and pretty much that was it, based on my brother-in-law's brother being brother.

Q.  "And when you came outside, you saw the person that had shot him get out of the parked car across the street?

A.  "Yes.

Q.  "Run up right past you?

A.  "Not past me.  I was hiding.

Q.  "He ran up towards the car that was parked right next -- kind of close to where you were hiding?

A.  "Correct.

Q.  "A few feet away?

A.  "Correct.

Q. "And you saw his face?

A. "Correct.

Q. "Got a good look at him?

A. "Correct.

Q. "He shot Felix a bunch of time, like 10" -- "10 or 11 times?

A. "Yes.

Q. "During the course of that shooting, though, you left to run down a couple of buildings down the street to a store to call the police?

A. "Correct.

Q. "It was important for you to get the police there so that the person who was shooting your friend would get caught?

A. "Correct.

Q. "And maybe your friend would be saved?

A. "Correct.

Q. "Is that right?

A. "Correct.

Q. "And after the people in the store did not call the police, you came back out and the shooting was still going on?

A. "Correct.

Q. "And you got a good look at the shooter at that time, too?

A. "Correct.

Q. "And after you got a good look at the shooter, he drove away?

A. "Correct.

Q. "Now, by the way, the neighborhood at that time where the shooting took place, was it a neighborhood controlled by the Latin Kings?

A. "It was a buffer zone between the Gangsters and the Kings.

Q. "And that person that did the shooting, he was wearing, I think, and correct me if I'm wrong, black pants, black jacket, black gloves?

A. "Yeah, I remember the black jacket and the black gloves.

Q. "And the person who did the shooting had dark hair with a gold, kind of like a tail?

A. "Correct.

Q. "By the way, the gang colors for the Latin Kings are black and gold, aren't they?

A. "Yes.

Q. "The shooter, after he left, got in the car and drove, and I think you said he turned on Spaulding?

A. "Made a right.

Q. "And that would be -- at the time, that would be turning into Latin King territory?

A. "Correct.

Q. "And that's where you'd expect a Latin King shooter to go after shooting somebody by your house?

A. "Correct.

Q. "It would have been foolish for a member of a rival gang to

drive into Latin King territory under the circumstances?

A. "Correct.

Q. "Now, it was later that day or the next day that the police first spoke to you?

A. "That night.

Q. "And they came to your house and told you" -- "and they came to your house and you told them what you'd seen?

A. "Correct.

Q. "You also told the police that you didn't know the name of the guy that shot Felix, you had seen him a few times in the baseball playing in Humboldt Park [sic]?

A. "That's what I said.

Q. "Now, you also told them that you thought the shooter was a Latin King?

A. "Correct.

Q. "Based upon the way he was dressed?

A. "Cor -- no, based on him going to Spald -- making the right on Spaulding.

Q. "So they leave and they get" -- "they leave and they came back with the Latin King gang members?

A. "Correct.

Q. "Can you show me with your hands -- well, I'll just ask, do you know how many pages were in the gang book?

A. "I saw over a hundred pictures, probably.

Q. "So in these books are -- contain about four pictures per

page?

A. "Probably. I don't recall. I don't recall that as far as how many are in there.

Q. "And at the time, you were anxious to make sure you got the person that you could identify the person who shot your friend Felix?

A. "Correct.

Q. "You wanted to make sure you got the right guy?

A. "Correct.

Q. "And you were very careful?

A. "Correct.

Q. "You went through the gang book, page after page?

A. "Correct.

Q. "In fact, you went through more than one book. You got to the second book before you picked out Jacques Rivera, is that right?

A. "I don't remember. I just remember picking out an individual and looking at a book, looking at a book.

Q. "Okay. And it was -- you said it was approximately a hundred pictures until you got to the picture of the person --

A. "Correct.

Q. "-- you believe shot Felix?

A. "Yes.

Q. "And that person was Jacques Rivera?

A. "Correct.

Q. "And you told the police that you were certain it was him?

A. "Correct.

Q. "And some time thereafter, the police came back and spoke to you about this, or did they bring you to the police station to speak to you?

A. "Yeah, I guess, yes.

Q. "Now, I know you've testified --

"Wait, wait."

MR. LOEVY: The part of the Court. Mr. Swaminathan will read the part for the Court.

MR. SWAMINATHAN: The Court says --

MS. SCOTT: Right here.

MR. SWAMINATHAN: The Court says: "Wait, wait. You guess which?"

"BY THE WITNESS:

A. "Yes, they came and got me, and I spoke to the detective.

"BY MR. O'BRIEN:

Q. "And tell me, what did they say to you about the next step in the procedure?

A. "That I will have to go to -- well, they really spoke -- I don't remember that conversation, like I said.

Q. "So they brought you to the police station, you said, to look at the lineup?

A. "Correct.

Q. "And it's your testimony that you viewed two lineups here?

A. "Correct.

Q. "And the first lineup that you viewed, you said that you identified Jacques Rivera as the person who shot Felix, is that right?

A. "Correct.

Q. "And your mom and your sister came with you to the police station?

A. "I just recall my mom.

Q. "When you identified Jacques Rivera, were you behind one-way glass, so you look at the glass" -- "you look at the glass at him or was he in the same room with you?

A. "No, I was behind the glass.

Q. "And there was five people in the lineup?

A. "There were a few people in the lineup, yes.

Q. "And you picked him out right away?

A. "Correct.

Q. "And you told the police he's the guy that shot Felix?

A. "Correct.

Q. "When you came out, did you talk to your mom about that?

A. "No, no conversation whatsoever.

Q. "Your mom didn't ask you what had happened?

A. "My mother was upset with me.  She wanted me to keep my mouth shut.

Q. "So then did she say, 'Did you keep your mouth shut or did you identify somebody?'  Did she ask you what happened?

A. "No, she didn't say nothing about it, nothing.

Q. "So you had no conversation with your mom about picking out Jacques Rivera?

A. "Correct.

Q. "Now, some time thereafter, it's your testimony that you came back to the -- by the way, you know that they released Jacques Rivera after the first time he was at the police station, correct?

A. "I wasn't aware.

Q. "Do you know now?  Did anybody ever tell you that?

A. "You are just telling me right now.

Q. "So after that" -- "Okay.  So after that, you came back, the police brought you back to the police station to look at a second lineup that Jacques" -- "that had Jacques Rivera in it?

A. "Correct.

Q. "And correct me if I'm wrong here again, before you looked at the lineup is when you encountered the lady with the white hair that you are talking about; is that right?

A. "Correct.

Q. "That same day, though?

A. "That same day.

Q. "And when you saw the lady with the white hair -- you said she had white hair -- how old would you say she was?

A. "I couldn't tell you.

Q. "I believe you described her previously as an older lady

with blonde hair with white in it, is that accurate?

A. "I said white hair.

Q. "No blonde?

A. "I don't recall saying blonde.

Q. "Do you remember having a conversation with Cynthia and Jennifer back in February in which you said to them about the lady, she was older with blonde hair and some white hair? Isn't it true that you told them that?

A. "I remember saying, like I said, I remember saying white, sir. That's all I kept on saying.

Q. "So you never told them that she was older with blonde hair?

A. "She was older than me, obviously. I was 12 years old.

Q. "Well, she was, but when you're making this statement, you were 35 years old. So that's my question. When you describe her as older, how old was she?

A. "I couldn't tell you her age, if that's what you're asking.

Q. "I'm asking, when you used the phrase -- well, let me back up.

"Is it true that you told Cynthia and Jennifer that she was -- you used the term she looked older?

A. "Yes, she was older.

Q. "Okay. So in reference to -- I mean, I assume when you say older, you don't mean older than 12. You mean older than --

A. "Older than me.

Q. "Older than you at 35?

A. "At the age of 12 years old, older than me.

Q. "Okay. So your statement to them was that she was older than -- "older and you meant that she was 13 or older? That's what you meant?

A. "No, I did not.

Q. "So when you use the word older, what did you mean by that? Really, what I'm trying to get at is how old was she?

A. "If I knew her age, I would be glad to tell you her age. I do not know her age group.

Q. "My question is, when you told the lady that you had the wrong guy, the older lady with white hair, she was not -- was she a police officer?

A. "She was dressed up as a nice dress, she had on a nice dress, and she had, like I said, that binder, whatever you want to call it, and that was pretty much it. That's what I recall.

Q. "And you just testified a little while ago, you thought that she was a police officer; is that right?

A. "A prosecutor, a detective.

Q. "All right. When the police officer" -- or, "Was she a police officer working on your case?

A. "The person that was working on my case was the guy with the fro hair. That was the first time I saw the lady at the second lineup. That was the first time I ever encountered the lady.

Q. "So, as far as you know, she was not working on your case?

A. "I assumed she was. I guess. She was there. I don't know. I couldn't tell you.

Q. "How tall was she, if you remember?

A. "I do not recall.

Q. "Was she thin or heavy?

A. "Thin-set in my eyes.

Q. "And glasses, no glasses?

A. "No glasses, I recall.

Q. "And how was it that you came to encounter her at the police station? I don't mean what led you there. How did you meet her specifically at the police station?

A. "When I said I had the wrong guy, I had the wrong guy.

Q. "Well, did" -- "why did you choose to tell her that instead of the guy with the fro, for instance?

A. "Because she was the one to" -- "that came to me to talk to me.

Q. "She came to talk to you about this case?

A. "About why I said no.

Q. "About what?

A. "Why I said no, that it wasn't Jacques Rivera.

Q. "Who was the first person you said it wasn't Rivera to? I thought that was her.

A. "That was her, she was the only one. When I said no, she came to talk to me, she sat down, she came towards me, she

started talking to me, say everything was going to be fine, you know, giving me the okay stuff, you know, that normally cops will say to a, you know, frightened person at the time.

Q. "Maybe I'm confused. You keep saying, 'When I said no, then she came over to talk to me.' Who did you say 'no' to prior to her coming over to talk to you?

A. "I told her that I got the wrong guy, it's the wrong guy.

Q. "So you sought her out?

A. "She didn't seek me out -- she sought me out when I said this. Like I said, it's been a long time. I only remember the lineups, I remember her coming to me after I said that it was the wrong guy, and that's how, that's how, I guess, we encountered one another.

Q. "When you told her it was the wrong guy, you didn't have -- she didn't have the photographs with her?

A. "No, she did not.

Q. "Tell me the words you used.

A. "Wrong guy, the wrong guy.

Q. "So you walked up to her and said, 'Wrong guy'?

A. "She came up to me. That's when I said it's the wrong guy, the wrong guy.

Q. "And what did she say then to you?

A. "When I said that, she said everything is going to be fine, 'Don't be afraid, he's not going to harm you,' and that, you know, telling me everything is going to be okay, in other

words.

Q. "So when you were interviewed by Jennifer and Cynthia, isn't it true that you told them that you pointed to the guy that you picked" -- "that you had picked in a photograph and said that's not the right guy? Isn't it true you told them that?

A. "If I recall something like, yes.

Q. "So yes, you did tell them" -- "you did tell him that?

A. "When I picked him out, yes.

Q. "So you just told this Court --

A. "I'm just -- like I said, everything is going, you know -- remember, it's been a long time. I can't, you know, I can tell you that it's not the shooter. I can tell you that I picked the wrong guy. That's the whole conversation.

"Now, all the events that was going on, I cannot tell you exactly this happened first, this happened second within the lineup. I cannot tell you that.

Q. "So is the truth that you pointed to a photo and said it's not the right guy or is it that you said verbally, without pointing to a photograph -- I just want to know the -- I just want to know the truth is, and you've answered both ways here.

A. "The truth is, I said, in the picture, I pointed him out. In the lineup, I said that was -- I pointed him out and then I said it was the wrong guy.

Q. "Well, isn't it true that you said it was the wrong guy and

then looked at the second lineup with Jacques Rivera in it and picking him out?

A. "This was within the same content, yes, I did do that.

Q. "So you tell the lady if it's" -- "You tell the lady it's the wrong guy?

A. "Uh-hum. Yes.

Q. "And you know by picking out the wrong guy, you may send an innocent man to jail, right?

A. "At 12 years old, I was not thinking like that.

Q. "Okay. Well, let me ask you a question. You weren't talk" -- "You weren't taking special ed. classes at the time, were you?

A. "No, sir.

Q. "So at 12 years old, you know that pointing your finger and saying that you shot somebody, whether 12, 13, 14, 25, or 30, you know that the wrong guy could go to jail, don't you?

A. "Correct.

Q. "And you also know that if you point out the wrong guy, the man that really -- that shot your friend and killed your friend might get away with this, don't you?

A. "Correct.

Q. "So your testimony, then, is after you told the lady it was the wrong guy, within a matter of minutes, the same day, you walked into a lineup and picked him out again; isn't that right?

A. "Correct.

Q. "And said that he was the shooter who shot Felix?

A. "Correct.

Q. "Now, jumping ahead to the trial, you came to court and testified in court that Jacques Rivera was the person that shot Felix Valentin?

A. "Correct.

Q. "And you talked to the state's attorney before you testified?

A. "Yes. Like I said, it's been -- I just remember showing up to court and testifying against Rivera. That's what I remember.

Q. "Okay. And you never told the state's attorneys or the prosecutors in the case that it was the wrong guy?

A. "Correct.

Q. "During the course of the trial, they went through some of the questions at first in which they asked you if you knew the difference between a truth and a lie?

A. "Correct.

Q. "And you knew -- they asked you if you knew what happened to somebody who lied in court?

A. "Correct.

Q. "And you said they would be punished?

A. "Correct.

Q. "You knew it was wrong to lie?

A. "Correct.

Q. "But you lied under oath anyways?

A. "Correct.

Q. "Nobody forced you?

A. "Nobody forced me.

Q. "In fact, during the course of the trial, you did not, when asked, do you see the person that shot Felix, you didn't say, 'Ah, you know, this can't go on anymore. It's not him'?

A. "Correct.

Q. "It's been now 20-some-odd years since the crime happened and about 20 years since you testified. During that time period, from time to time" -- "from the time this crime happened until Northwestern came to you, you never told anybody, except for the white-haired lady, that you picked out the wrong guy, did you?

A. "Correct.

Q. "And you never told the police after the fact?

A. "Correct.

Q. "I mean, granted, you can chalk that up now to being 12 years old at the time, but you became an adult at 18. You never went to the police then?

A. "Correct.

Q. "At 25, you never went to the police?

A. "Correct.

Q. "At 35, you finally came forward after Northwestern comes

to you.  You don't even go to them, right?

A.  "Correct.

Q.  "Between the time you got married and before Northwestern got there, you never told your wife you picked the wrong guy?

A.  "I've told my wife.

"REDIRECT EXAMINATION

"BY MS. RALEY" (Read by Ms. Brady):

Q.  "Mr. Lopez, was a gold streak in the hair only the hairstyle that Latin Kings had 20 years ago?

A.  "No.

Q.  "Could you explain?

A.  "There was more of Puerto Rican thing, the style for Puerto Ricans to do that.

Q.  "So Puerto Ricans of different gangs might have that same kind of hairstyle?

A.  "Yes.

Q.  "Now, you testified at trial that you had seen the shooter play baseball at Humboldt Park, correct?

A.  "Correct.

Q.  "And you testified here today that that testimony was a lie, correct?

A.  "Correct.

Q.  "Why did you testify at the time of trial that you had seen the shooter play baseball at Humboldt Park?

A.  "Because, you know, what happened was the cops were like,

when they pointed him out, they were asking me, have you seen him playing baseball or have you seen him anywhere else? And I said yes. And that was the reason why I said that I seen him playing baseball at a park."

MR. SWAMINATHAN: Judge said: "Just a minute. Did you say when they pointed him out?

"THE WITNESS: Who, me?

"THE COURT: Yes.

"THE WITNESS: No, they didn't point it out to me. When I pointed him out, they were asking me, have you seen him anywhere else, at a park, playing, you know, baseball, stuff like that, and I said yes.

"THE COURT: Okay. Go ahead.

"BY MS. RALEY:

Q. "And, Mr. Lopez, why didn't you tell the prosecutors that it was the wrong guy at the time of trial?

A. "Because I was worrying about how it was being perceived, I was worrying about being liked.

Q. "Liked by whom?

A. "By my brother-in-law, my sister, and the Valentins, pretty much, worrying about what their" -- "what they thought about me and, you know, stuff like that. I wanted to be accepted, pretty much.

Q. "And then once you're older, you -- and you moved away from Chicago, why didn't you come forward sooner? Why didn't you

tell the police that you had lied at trial?

A. "Because I didn't know how to do it. I don't know how to go about" -- "I don't know how to go about going and searching out who, what, where, and why. So I kept it all to myself, kept the burden on me.

Q. "And finally, Mr. Lopez, when you had a conversation with Mr. Darren O'Brien and his investigator, why didn't you tell them that you had told your wife about this --

A. "Because there was too many things going, being -- too many questions, a lot of things were being questioned, a lot of things, so -- like I said, I didn't -- when he was asking the question, I thought he was pretty much saying the Israel family and stuff like that. That's pretty much where I took that out -- I took, you know, the context out of" -- "that have question.

Q. "One final question. As you sit here today under oath, did Mr. Jacques Rivera shoot and kill Felix Valentin?

A. "No, he did not.

Q. "And did you lie at trial?

A. "Yes, I did.

Q. "And did you lie at trial knowing that you were lying at trial?

A. "Yes."

THE COURT: Okay. That concludes the reading, correct?

MR. LOEVY: It does, Your Honor.

Our next witness is also unavailable. It's Dr. Sharkey. And we're going to proceed by video --

THE COURT: Okay.

MR. LOEVY: -- for Dr. Sharkey. Hopefully, we can get it playing on the screen.

(Said video with audio played in open court.)

MR. LOEVY: Could we make it louder, Your Honor?

THE COURT: It would certainly be nice. Who controls the -- we control it? Let's make it louder. Thank you.

(Said video with audio played in open court.)

MR. LOEVY: Your Honor?

THE COURT: Okay. It's about 30 seconds to 4:00, and we're not finished yet, right?

MR. LOEVY: Correct.

THE COURT: So can we start tomorrow morning?

MR. LOEVY: We can.

THE COURT: Okay. Let's take our evening recess, ladies and gentlemen. 9:30 tomorrow.

(Jury out.)

THE COURT: Okay. Before we go, my law clerk has found a case which may bear on this 806/613 issue. I have not read it myself, but I will be reading it tonight.

I will give you the name of it in a moment. It's called *United States versus McClain*, 934 Fed.2d 822.

MR. LOEVY:  We'll check that out, Your Honor.  Thank you.

THE COURT:  Okay.  And I will see you -- again, you know, I'm here at 8:00.  If anyone needs me before 9:30, just send us an e-mail.  Okay?

MR. LOEVY:  Thank you, Your Honor.

(Adjournment at 4:02 p.m. until 9:30 a.m., 6/14/18.)

C E R T I F I C A T E

        I, Colleen M. Conway, do hereby certify that the foregoing is a complete, true, and accurate transcript of the Trial proceedings, Vol. 7 B, had in the above-entitled case before the HONORABLE JOAN B. GOTTSCHALL, one of the Judges of said Court, at Chicago, Illinois, on June 13, 2018.

_/s/ Colleen M. Conway, CSR, RMR, CRR_      _06/14/18_

Official Court Reporter        Date
United States District Court
Northern District of Illinois
Eastern Division