Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 1 of 1335 PageID #:105386

# EXHIBIT 53

1682

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JACQUES RIVERA,                              ) No. 12 CV 4428
                                             )
            Plaintiff,                       )
vs.                                          ) Chicago, Illinois
                                             )
REYNALDO GUEVARA, STEVE GAWRYS, DANIEL NOON, )
JOHN GUZMAN, JOSEPH FALLON, JOSEPH SPARKS,   )
PAUL ZACHARIAS, GILLIAN MCLAUGHLIN, JOHN     )
LEONARD, EDWARD MINGEY, RUSSELL WEINGART,    ) June 14, 2018
ESTATE OF ROCCO RINALDI, City OF CHICAGO,    )
                                             )
            Defendants.                      ) 9:25 o'clock a.m.

VOLUME 8 A
TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JOAN B. GOTTSCHALL
and a jury

APPEARANCES:

For the Plaintiff:      LOEVY & LOEVY
                        BY:  MR. JONATHAN I. LOEVY
                             MR. STEVEN E. ART
                             MR. ANAND SWAMINATHAN
                          311 North Aberdeen Street
                          3rd Floor
                          Chicago, Illinois  60607

                        MACARTHUR JUSTICE CENTER
                        Northwestern University School of Law
                        BY:  Locke E. Bowman, III
                        357 East Chicago Avenue
                        Chicago, Illinois 60611
                        (312) 503-0844


Court reporter:         Blanca I. Lara
                        Official Court Reporter
                        219 South Dearborn Street
                        Room 2504
                        Chicago, Illinois 60604
                        (312) 435-5895
                        blanca_lara@ilnd.uscourts.gov

Appearances  (continued:)

For the Individual        THE SOTOS LAW FIRM
Defendants:               BY:  MR.  JEFFREY N. GIVEN
                               MR.  JAMES G. SOTOS
                               MS.  CAROLINE P. GOLDEN
                               MR.  JOSEPH M. POLICK
                               MR.  DAVID A. BRUEGGEN
                          550 East Devon Avenue
                          Suite 150
                          Itasca, Illinois  60143

For the Defendant         ROCK FUSCO & CONNELLY, LLC
City of Chicago:          BY:  MS. EILEEN E. ROSEN
                               MS. CATHERINE M. BARBER
                               MS. THERESA B. CARNEY
                          321 North Clark Street
                          Suite 2200
                          Chicago, Illinois  60654

For the Defendant         LEINENWEBER BARONI & DAFFADA, LLC
Guevara:                  BY:  MR. THOMAS E. LEINENWEBER
                               MR. JAMES V. DAFFADA
                          120 North LaSalle Street
                          Suite 2000
                          Chicago, Illinois  60602

1684

(The following proceedings were had out of the presence of the jury in open court:)

THE COURT: Before the jury comes in, No. 1, our juror who was ill yesterday is back feeling great on antibiotics. Got a nice sleep. All is well.

Second, I want to try to figure out how we can waste less of the jury's time than we've been doing. I have a few suggestions. I think on the witnesses who are being called for one side and not both, I ought to try to look very seriously at scope objections.

I think what the experts -- and goes for both sides -- it's fine to ask them some questions to make clear what the scope of their expertise is and is not, but to go on-and-on-and-on asking questions about something that the person is not here to opine on, we just don't have time to do that and I don't think it's necessary. I think you can do it, you know, with 10 or 15 minutes of carefully-phrased questions.

2, I'm going you to please try to get the exhibits all ready overnight. And if there are things to which there is likely to be an objection, maybe we can get some offered and admitted outside the jury's presence either before we start in the morning or at lunchtime so that we don't have to spend a lot of time going through those motions.

And, thirdly, I would urge everybody to try to -- I don't know, I mean, with the legal research, I just think I'm

1685

not getting the help I need. And yesterday for us to find what I think is the key case on the subject that we spent a lot of time talking about yesterday, all I would say is, we could've saved a lot of time if I had been able to get my hands on the Seventh Circuit case before I went through all that balancing and difficulty that we dealt with yesterday.

I think this case, McClain, says pretty strongly what the plaintiffs were citing something else for, which is that 806 trumps 613. And, you know, I think that basically changes the whole balance to have a case from the Seventh Circuit that says that in so many words.

MR. BRUEGGEN: Judge, the difference is, here the notes were sandbagged. We didn't have --

THE COURT: Well, I know that. And I took that into consideration yesterday. And I'm still taking it into consideration, but I think you can bring all that out on cross-examination.

MR. BRUEGGEN: But that is --

THE COURT: Let me ask you this, when you talk about "sandbag," you had this before bench trial, right?

MR. BOWMAN: Before Jennifer Linzer's deposition it was produced.

MR. BRUEGGEN: The night before.

MR. BOWMAN: Right.

THE COURT: Well, I mean, it's not highly complex.

1686

MR. BRUEGGEN: But the context of it. It's not complex, but the timing of it was after -- this was a year after Mr. Lopez's deposition. And this was a note that should've actually been used during the PC, but wasn't. So it was a huge surprise that --

MR. BOWMAN: It was irrelevant to --

THE COURT: Well, when is she testifying?

MR. BRUEGGEN: Today.

MR. LOEVY: Today.

THE COURT: When today?

MR. BOWMAN: This afternoon.

THE COURT: Well, you know, if you feel like you didn't get to depose her adequately on it, maybe you can take 5 minutes and do it before trial.

But when I got a case like that, it says what it says, I'm going to follow that case; okay? You know, I think there are a lot of discovery problems in a case like this, and it's not the end of the world. We just go of soldier-on, we do the best we can.

So that's where it is. We spent a lot of time on this yesterday with no case. I felt more comfortable keeping it out, I'm going to let it in.

All right. I think we need to just get the jury.

MR. LOEVY: Your Honor, we're going to finish the Sharkey deposition and then read a couple of stips and then

1687

move on to Mr. Gawrys.

(Brief pause).

COURT SECURITY OFFICER:  All rise.

(The following proceedings were had in the presence of the jury in open court:)

THE COURT:  Good morning.  Please be seated, ladies and gentlemen.

We are going to continue with the deposition that we started yesterday.

(Brief pause).

(Said video with audio played in open court.)

MR. LOEVY:  Your Honor, may we read the answer that got cut off on the video?

THE COURT:  Yeah.  We can't get the video going again?

MR. LOEVY:  Yes.  Maybe if we could just read the last question and answer, Your Honor?

THE COURT:  Okay.

MR. ART:  So the question is:

"Okay.  And then on that day, based on your review of the record, do you still believe that he could not have reliably looked through a photo album?"

And the answer is "yes."

And that is the end.

THE COURT:  Okay.  All right.

1688

MR. LOEVY: Your Honor --

MR. SWAMINATHAN: We have a stipulation in relation to that witness as well that we'll read to the jury.

THE COURT: Okay.

MR. SWAMINATHAN: The parties have agreed to stipulations about Dr. Sharkey's testimony so that they can shorten the deposition for your benefit:

One, after Felix Valentin's death in 1988, other than routine hospital reviews, Dr. Sharkey did not speak to anyone about Mr. Valentin, including plaintiff, any police officers, assistant state's attorneys, or plaintiff's criminal defense attorney.

Dr. Sharkey's first communication about Mr Valentin after his death was in 2015 in relation to this lawsuit.

Number two, Dr. Sharkey charged $6,000 to review 500 pages of Felix Valentin's medical records, which was paid by plaintiff's attorneys.

Plaintiff's attorneys also compensated him $1,250 for his participation in telephone conference to discuss his review of Valentin's medical records, $3,500 to give his deposition in this case.

Definitives attorneys compensated Dr. Sharkey $500 for his participation in a telephone conference to discuss his review of Valentin's medical records.

Dr. Sharkey explained that the charges were less than

1689

his professional fees for the same amount of time.

Number 3, it was not uncommon for police officers to be in the trauma unit at Cook County Hospital in 1988. Felix Valentin's medical records specified that police visited the hospital for the first few days of his treatment, but the records do not specify police visits on any later dates, including September 9th and 10th.

The records do contain references to visits from family members and multiple notes of unidentified visitors. Dr. Sharkey testified that it is possible that police could have visited Valentin during his admission without the visits being noted in the records.

Judge, at this time we'd also like to move Plaintiff's Exhibit 31A into evidence. Those are the medical records that were shown during the testimony.

THE COURT: Any objection to 31A?

MR. GIVEN: No objection, Your Honor.

THE COURT: It is received.

(Plaintiff's Exhibit 31A was received in evidence)

MR. ART: Your Honor, next plaintiff is going to proceed by way of stipulation regarding the testimony of Anthony Wronkowski.

THE COURT: Okay.

MR. LOEVY: Your Honor, we might've forgotten to

explain to the jury what a statistician is.

THE COURT: Yeah. A stipulation is an agreement, ladies and gentlemen. That means both parties have agreed on what you're hearing.

MR. ART: And if we could publish this for the jury.

(Exhibit published to the jury.)

MR. LOEVY: Anthony Wronkowski was Area 5 detective with the Chicago Police Department. He became a detective at Area 5 in 1996 and retired in 2015.

In 2011, the detective areas were consolidated. And the Area 5 homicide files all were moved to Belmont and Western. Between then and until he retired, Mr. Wronkowski was in charge of maintaining homicide files.

Mr. Wronkowski would testify that in 2004 both homicide files --

MR. ART: You misread.

THE COURT: 2014.

MR. ART: I'm sorry. 2014, I apologize.

Both homicide files would be stored at the area and closed files would be stored in the records warehouse. He would testify that when homicide files are taken out of where they are stored, they should be checked in and out with the file control card. The file control card for the Valentin homicide file is Plaintiff's Exhibit 22.

In 1988, the Valentin homicide investigation was

1691

cleared open because there were two perpetrators of the crime and only ne person, Jacques Rivera, was arrested and charged.

In October 2011, when Jacques was exonerated, Mr. Wronkowski was assigned to locate and preserve the investigative file for the Valentin investigation.

The file was not located in the Detective Division area. Mr. Wronkowski obtained it from the records warehouse.

Mr. Wronkowski produced that file in this case, and it is marked as Plaintiff's Exhibit 19 and City Exhibit 45.

Mr. Wronkowski has no knowledge of where the file was prior to 2011. He has no knowledge of the condition of the file. He has no knowledge of the rules that would have governed the creation and maintenance of files in 1988.

So I would like to show the jury City Exhibit 45. (Indicating).

And then we're going to move for the admission of Plaintiff's Exhibit 19, which is a copy of that entire file.

THE COURT: Okay. And there's obviously no objection, I assume, so that will be received.

(Plaintiff's Exhibit 19 received in evidence).

MR. ART: And then, Your Honor, the other document referenced is Plaintiff's Exhibit 22 and we move admission of that as well.

THE COURT: Any objection?

(No respond).

THE COURT:  To Plaintiff's Exhibit 22?

MS. ROSEN:  No objection.

(Plaintiff's Exhibit 22 received in evidence).

MR. ART:  May we publish it to the jury?

THE COURT:  You may.

MR. ART:  That is Plaintiff's Exhibit 22, the file control card.

(Exhibit published to the jury.)

MR. LOEVY:  At this time, Your Honor, we call Mr. Gawrys.

THE COURT:  Okay, sir.  Would you come up here, please.

(Brief pause).

THE COURT:  Please raise your right hand.

(Witness duly sworn.)

THE COURT:  You may be seated.

STEPHEN GAWRYS, PLAINTIFF'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. LOEVY:

Q.  Good morning, sir.  If you state your name, please.

A.  Stephen Gawrys.  First name is spelled S-t-e-p-h-e-n, the G-a-w-r-y-s.

Q.  And your career, sir, was as a police officer, correct?

A.  Correct.

Q.  With which department?

Gawrys - directy by Loevy

1693

A.   Chicago.

Q.   Are you presently retired?

A.   Yes, I am.

Q.   At various times in your career, you were what we've been calling a gang specialist as well as detective, would that be fair to say, sir?

A.   Yes.

Q.   And backing up, when did you join the department?

A.   1977.

Q.   Originally you were at the patrol division and then you spent sometime with the Special Operations Unit, correct?

A.   Correct.

Q.   And about what time period would it have been when you became a Gang Crimes person?

A.   Probably in 1984, '85.

Q.   Mid '80s.  And then when did you become a detective?

A.   A detective, 1990.

Q.   All right.  When you first got to Gang Crimes North, who was your partner?

A.   I had several partners in the beginning to work with, but eventually I teamed up with Rey Guevara.

Q.   And you were with Mr. Guevara for more than 5 years, correct?

A.   Well, probably around 5 years, yeah, I would say.

Q.   All right.  And then when you and Mr. Guevara went in 1990

Gawrys - directy by Loevy

1694

from Gang Crimes to the Detective Division you stayed partners, correct?

A. After a while we teamed up again. They separated us to work with other detectives.

Q. All right. We've heard in court that Gang Crime Specialists sort of assisted detectives with their investigations, would you agree with that characterization?

A. Yes.

Q. You guys in the Gang Crimes had more familiarity with the people on the streets and you would assist when crimes involved gang-related issues, right?

A. Correct.

Q. All right. Let's talk about the Felix Valentin murder. At some point you and Mr. Guevara got involved in that crime because there was an allegation that it had to do with gangs?

A. Correct.

Q. And you know, you've read the paperwork to prepare for your testimony, correct?

A. Correct.

Q. And you know what gang Mr. Valentin was allegedly in?

A. Yes, Latin Kings.

Q. No, Mr. Valentin, the victim.

A. Oh, Valentin?

Q. Yeah.

A. Campbell Boys.

Gawrys - directy by Loevy

1695

Q. That's a different gang, right?

A. Yes.

Q. Was that a gang you were familiar with back in the 1980's?

A. Somewhat.

Q. And the murder happened in the territory of a different gang, the Imperial Gangsters, correct?

A. Correct.

Q. And that is -- you had the Campbell Boys visiting the neighborhood, I guess, for a wedding and he drove into Imperial Gangsters testimony, correct -- sorry, Imperial Gangsters territory, correct?

A. Correct.

Q. Did you know at that time either way whether there was any trouble between the Imperial Gangsters and the Campbell Boys?

A. I don't recall.

Q. All right. You and Mr. Guevara eventually solved the crime, did you not?

            MR. GIVEN: Objection to form.

            THE COURT: Overruled.

BY THE WITNESS:

A. We solved the crime?

BY MR. LOEVY:

Q. Yeah. You found and developed to evidence that Mr. Guevara -- sorry, that Mr. Rivera had been guilty of this crime, correct?

A. Yes.

Q. And you got the credit? You and Mr. Guevara were the ones who got the credit for closing the case, would you agree?

A. Yes.

Q. All right. And that was you in conjunction with Mr. Guevara, correct?

A. Correct.

Q. When I say you got the credit, I mean somebody at the police department, as far as closing a case, it was acknowledged that you were the one that developed the evidence that led to the prosecution and conviction of Jacques Rivera, correct?

A. Not really, no.

Q. When you said before you got the credit, would that go to Mr. Guevara as well?

A. It would go to Mr. Guevara, along with other officers.

Q. All right. You were the ones, for example, you and Mr. Guevara arrested Jacques on, what was it, the 15th of September?

A. Correct.

Q. And that's your name on the police report that we've seen, right?

A. Yes.

Q. And your signature, right?

A. Yes.

Q. And were you involved when Mr. Guevara arrested Jacques the first time on the 30th of August?

A. I believe not.

Q. It doesn't look like your name is on the paperwork, right?

A. Yes.

Q. Who arrested Jacques the first time on the 31st?

A. I don't know. I don't recall.

Q. Take a look at Plaintiff's Exhibit 5 and see if that refreshes your recollection about who arrested Jacques the first time.

(Document tendered to the witness).

BY THE WITNESS:

A. The first time is Paul Zacharias, Joseph Sparks, Joseph Fallon, Detective Leonard and McLaughlin, along with Rey Guevara.

Q. May I have that back, please.

(Document tendered).

BY MR. LOEVY:

Q. Now at the Chicago Police Department -- this is the arrest report, right? Of Mr. Rivera, right, Jacques Rivera?

A. Correct.

MR. LOEVY: This is Plaintiff's Exhibit 5, Your Honor.

BY MR. LOEVY:

Q. Rey Guevara is the one who created and typed this police report, did he not?

Gawrys - directy by Loevy

1698

A.  I'm assuming so, yes.

Q.  Now, it says additional arresting officers on the 31st. Does that mean based on your familiarity with the police department that all these people went and arrested Jacques Rivera on the 31st?  The people you just named, to Zacharias, Sparks, Fallon, Leonard, McLaughlin, did they all go and arrest him?

A.  I have no idea.

Q.  Well, you're familiar with the policies and practices of the police department, correct?

A.  Correct.

Q.  And about how you guys create the paperwork, right?

A.  Right.

Q.  If Mr. Guevara wrote that all these people arrested Jacques Rivera, is that true?

A.  I don't -- I don't know.  I Mean, I wasn't there.

Q.  Well, I guess what I'm asking is, are you allowed to write arresting officers as 5 people if they didn't actual go arrest? Are you allowed to do that?

A.  It might've been to give them credit.

Q.  So you are allowed to write people who helped in the arrest even if they didn't or you're not?

A.  I'm not sure.

Q.  Well, I'm asking your familiarity with the policies.  You can sometimes give other people credit even if they weren't

Gawrys - directy by Loevy

1699

arresting officers, is that what you said?

A.  I don't think it's policy.

Q.  All right.  So your belief in reading this document that all 5 of these -- all 6 of these people on the 30th of August went and arrested Jacques Rivera?

A.  I have no idea if they did or not.

Q.  All right.  You were also present at the lineup where Mr. Guevara was picked out, 19 G, right?

A.  Correct.

Q.  That's your name and Mr. Guevara's name?

A.  Correct.

Q.  And you, in fact, wrote the report that we've heard a lot about in court, Plaintiff's Exhibit 1, where the offender is Jacques Rivera, murder first degree.  We've been talking about you and Guevara's report.

A.  Correct.

Q.  You've seen that and talked about it in court, right?

A.  Correct.

Q.  You typed this report, right?

A.  Yes, I did.

Q.  And you signed it?

A.  Yes.

Q.  And then when it came time for the Felony Review process -- this is Defendants' Exhibit 1.19 I don't know the plaintiff's number -- you were listed, along with Mr. Guevara, as the first

two prosecuting witnesses right after Orlando Rivera, right?

A.   Right.

Q.   So it would not be a mischaracterization at all to say that you and Mr. Guevara were the prosecuting witnesses against Mr. Jacques Rivera, correct?

MR. GIVEN:  Objection form, foundation.

THE COURT:  Sustained.

BY MR. LOEVY:

Q.   Was it your understanding that you and Mr. Guevara were the main prosecuting witnesses against Mr. Rivera?

MR. GIVEN:  Same objection, Your Honor.

THE COURT:  Sustained.

The problem is with the term, right?

MR. LOEVY:  Well, the document here says "prosecuting witnesses."

THE COURT:  Oh, okay.  Overruled.

BY MR. LOEVY:

Q.   Sir, would it be fair to say that Mr. Guevara and yourself, aside from Orlando Lopez, were the first two prosecuting witnesses against Mr. Rivera?

A.   Were listed as the first two, yes.

Q.   And that's because you and Mr. Guevara developed all the evidence, didn't you?

A.   No.

Q.   All right.  Who else developed evidence besides you and Mr.

Guevara?

A. There was the photo ID.

Q. From who?

A. From reading the reports.

Q. No, give me a name. Who else developed evidence? A name, please.

A. I think other Gang Specialists.

Q. No, a name, sir. If you could just tell me the name of somebody else who developed evidence other than you and Guevara.

A. I'd have to look at reports.

Q. Sir, you've looked at the reports, haven't you?

A. Yes.

Q. How many meetings would you say you've had to prepare for your testimony?

A. I would have to guess then with the photo ID --

Q. No, I'm asking about how many meetings. How many meetings, sir?

A. Oh, I don't. I don't count them.

Q. All right. But you've had a lot of meetings and you've a lot of time with these documents, right?

A. Yes.

Q. Okay. Can you tell the jury the name of any Chicago police officer, other than you and Guevara, who developed evidence? Who?

Gawrys - directy by Loevy

1702

A.  If I remember correctly --

Q.  I'm sorry to cut you off.  As you said --

MR. LOEVY:  Let me clarify.

BY MR. LOEVY:

Q.  This is actual memory or memory from the documents.  And I apologize for cutting you off, but if you could clarify.

A.  Memory from the documents.

Q.  Okay.  Continue.

A.  It would be Noon, Sparks, Zacharias, Fallon.

Q.  All right.  Let's talk about each of those.  What evidence did Mr. Sparks develop?

A.  I think they were there for the initial photo ID.

MR. SOTOS:  Judge, I'm going to object.  He said he doesn't know personally.  He's asking him for his interpretation of documents when he wasn't personally involved.

THE COURT:  I think the question is, the witness testified -- I gather that he looked at documents and he's testifying from what he remembers.

MR. LOEVY:  Yes.

THE COURT:  I think he can answer the question.  If he can't, he should tell us.

BY MR. LOEVY:

Q.  All right.  I'm going to show you a stipulation regarding Mr. Sparks.

MR. LOEVY:  This is agreed to, Your Honor.

BY MR. LOEVY:

Q. Another stipulation:

"... the parties hereby stipulate that Joseph Sparks was not directly involved in the gang book identification.

Do you see that, sir?

A. Yes.

Q. All right. So Mr. Sparks didn't develop any evidence, did he?

A. I don't know.

Q. All right. Well, you don't know any police officers, other than you and Guevara, who developed any evidence, would that be a fair summary?

A. I would say that detectives did.

Q. All right. McLaughlin?

A. McLaughlin and Leonard probably did.

Q. All right. Anybody else other than Ms. McLaughlin, yourself, and Mr. Guevara developed evidence?

MS. GOLDEN: Objection, foundation. He said Detective Leonard.

MR. LOEVY: He did.

BY MR. LOEVY:

Q. Any other living person? Mr. Leonard has passed away, correct?

A. I don't know. I have no idea.

Gawrys - directy by Loevy

1704

Q. You don't know if Mr. Leonard is alive or not?

A. No, I know he passed way.

Q. Oh, okay. Then we missed each other there.

Let's talk about how you broke open the case. You actually the one who developed the key evidence, you and Mr. Guevara?

MR. GIVEN: Objection to the form, Your Honor.

THE COURT: Sustained.

MR. GIVEN: These are argumentative.

THE COURT: I sustained the objection.

MR. LOEVY:

Q. You developed the key critical piece of evidence that led to the prosecution of Mr. Jacques Rivera, correct?

A. I don't think so, no.

Q. In fact, on the report that you wrote, Plaintiff's Exhibit 1, showing you the second page, you developed the evidence "on the 10th of September 1988, RI's," that's you and Guevara, right?

A. Correct.

Q. "... were able to have the victim," that's Felix Valentin, right?

A. Right.

Q. "View gang book photo and then an identification was made of Jose Rios as the person who shot the victim," that's what you wrote in your report, right?

A.   Correct.

Q.   And Jose Rios, you're saying, is Jacques Rivera, right?

A.   Right.

Q.   All right.  September 10th, 1988, is the date that Dr. Sharkey was talking about on the video with the boy, Felix Valentin, that we just saw, correct?

A.   Correct.

Q.   All right.  So you were in the hospital room with Felix Valentin that day on September 10th, and you believe or claim or wrote in your report that you got that kid to identify a photograph?  That is your claim, correct?

A.   Correct.

Q.   And that actually was a critical part of the case, wasn't it?  You got the victim identifying Jacques Rivera.  That's the break in the case, wasn't it?

        MR. GIVEN:  Objection to form, Your Honor.

        THE COURT:  Sustained.  It's compound.

BY MR. LOEVY:

Q.   Was that the break in case?  On September 10th, 1988, when you got the victim to identify Jacques Rivera, was that the big break in the case?

A.   I don't think so.

Q.   Well, just looking at the timeline, the investigation after August 31st went dormant, correct?

A.   Correct.

Gawrys - directy by Loevy

1706

Q. And then nothing happened until Valentin died on the 2014, right?

A. Right.

Q. And then you wrote your report on the 16th, saying, Oh, yeah, the 10th, before he died, the victim picked out Jacques Rivera, right?

A. Correct.

Q. All right. Did you happen to notice that while you got the victim to pick out Jacques on the 10th, that he was basically in the coma?

A. I think we wrote the wrong date down, because if we would've, we would've filed a report on the identification.

Q. Sir, is this fraudulent that on September 10th, 1988, you and Guevara were able to have the victim view a gang book and then an identification was made? Did you invent that?

A. No. It was from memory.

Q. So on September 10th you went to the hospital, you got an identification for the victim of Jacques and you didn't make any notes, that's what you're saying?

A. We went to the hospital --

MR. GIVEN: Object as compound. There's a couple of different questions in there and.

MR. LOEVY: Mr. Given might be right, Your Honor. May I try again?

THE COURT: Yes.

BY MR. LOEVY:

Q. When you were to the hospital talking to Felix Valentin and he supposedly identified Jacques Rivera, did you write anything down?

A. I don't remember.

Q. Would the policies and practices of the Chicago Police Department have required you if the victim identified your suspect, on whatever date it happened, to actually write pen to paper and memorialize that?

A. Yes, but we --

Q. May I have the answer to that?

A. Pardon me?

Q. The question was, would the policies have required you to do it?

A. Yes.

Q. Okay. Now you wanted to explain. Do you deviate from the policies?

A. No, we did not.

Q. All right. So did you write down, Hey, I just got the identification of the suspect on September whatever day it happened, did you write it down?

A. No, we did not, because we felt that when we were there that the ID was not reliable. So we didn't file a report.

Q. So when the victim identified Jacques Rivera, you thought the victim wasn't reliable? I don't understand that.

Gawrys - directy by Loevy

1708

A.   We didn't think the ID was reliable, so we waited.  We thought we would come back a few days or several days and try it again if his condition improved.

Q.   Was the reason the ID wasn't reliable was because he was in a coma?

A.   I don't remember that.

Q.   All right.  Was he responsive to pain stimuli?

        MR. GIVEN:  Objection.  Foundation.

        THE COURT:  If the witness knows.

MR. LOEVY:

Q.   All right.  When you encountered Felix Valentin that day, was he completely paralyzed, was his neurological function no longer working, was he on a ventilator to keep him alive, and was he completely nonresponsive to shakes and all attempts to rouse him?

        MR. GIVEN:  Foundation.

        THE COURT:  Overruled.

BY THE WITNESS:

A.   I don't recall.

BY MR. LOEVY:

Q.   Might have been, might not have been, right?

A.   Pardon me?

Q.   You said you don't recall.  So you're saying he might have been or he might not have been, right?

A.   I don't recall.

Gawrys - directy by Loevy

1709

Q. All right. It's hard to get an identification from someone who is basically comatose by September 10th, correct?

A. Yes.

Q. All right. But if you didn't get an identification why did you write down that you did?

A. We -- well, I decided that I should mention something about it.

Q. Well --

A. But --

Q. I'm sorry. Go ahead.

A. But there was no report made.

Q. All right. Why didn't you tell the prosecutors -- you understood that the prosecutors were going to read your report at some point, right?

A. Yes.

Q. So when you wrote in your report, "On September 10th we were able to have the victim view a gang book and the an identification was made of the person we're claiming is Jacques Rivera," why didn't you tell the prosecutors, or did you, by the way, that wasn't reliable, it's not what it seems like on that page? Why didn't you tell somebody that?

A. I don't know. I don't recall.

Q. All right. You would agree with me that the impression you left in this report if the prosecutor picked it up was, "The victim claimed Jacques Rivera shot him," that's the impression

your report gives, right?

A. It could.

Q. All right. So would you agree that you pretty much had an obligation to tell somebody that it was fake?

MR. GIVEN: Objection to form.

THE COURT: Overruled.

BY THE WITNESS:

A. No one asked. I wasn't called to court.

BY MR. LOEVY:

Q. No one asked --

A. I wasn't called to court.

Q. All right. If someone would've asked you, you would've said "what we are doing here is fake," but nobody asked?

MR. GIVEN: Judge, objection, to the argumentative. Nobody said anything about "fake."

THE COURT: Sustained to the argumentative nature.

BY MR. LOEVY:

Q. Just want to get clarification. This was not only you, this was you and Guevara, right?

A. Correct.

Q. All right. You mentioned you think this is a typo, September 10th?

A. Yes.

Q. And you have no memory either way, right?

A. Either way, no.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 31 of 1335 PageID #:105416
Gawrys - directy by Loevy
1711

Q. All right. You were a detective for a long time, right?

A. Correct.

Q. You're not supposed to make typos about things like that, are you?

A. No, you shouldn't.

Q. All right. Is there any other time in your career where you made a typo on the key date when the victim supposedly identified the murder suspect?

A. I have no recall of that.

Q. And when you say "typo," did you accidentally hit the wrong typewriter keys or you were just flat-out guessing?

A. We were doing it from memory.

Q. All right. So you and Guevara, at the end of the investigation Felix Valentin has died, you're saying, "gee, you know what? I remember last week, didn't we get the victim to identify Jacques," and that came back to you from memory?

A. Well, we probably picked the wrong date.

Q. Why did you have to rely on your memory instead of your notes?

A. I didn't have any notes on it, because we thought we were going to come back.

Q. Well, you never went there did you, sir?

A. Went where?

Q. If you had seen him in the hospital around the 9th or 10th or the 11th or the 12th of September, you would've realized

that he was on his death bed, wouldn't you?

A. I don't know. I mean, I wasn't there on the 12th.

Q. All right. Do you remember -- you're saying that this is inaccurate now, correct? This date?

A. It could be.

Q. It could be or it is?

A. It could be. It could be wrong.

Q. That's different than what you said a minute ago. I thought you said it is wrong. Are you saying it is wrong --

MR. GIVEN: Objection, Judge.

BY MR. LOEVY:

Q. -- or it could be?

MR. GIVEN: Objection to him commenting on his testimony. It seemed that it was different than what he said.

THE COURT: Overruled.

BY MR. LOEVY:

Q. It is wrong or it could be wrong?

A. I guess it could be wrong.

Q. Because you said it was a typo, right?

A. Well, we did it -- not really a typo. It's done from memory, because we couldn't remember the date.

Q. All right. You were asked at your deposition about whether or not that report was accurate, correct?

A. I don't remember.

Q. All right. This is page 119, Line 16, through 23.

Remember being asked this question and giving this answer:

(Videotape played.)

MR. LOEVY:

Q. All right. Back when you gave that deposition, it was accurate, right?

MR. SOTOS: Objection, Your Honor. That is not impeaching. There's no reference to it.

MR. LOEVY: Your Honor, the question was, "is this report accurate, anything in your report inaccurate," and he said "no."

MR. SOTOS: It did not impeach the question as to the date.

THE COURT: Overruled. Overruled.

BY MR. LOEVY:

Q. The question asked you at the deposition was:

"... the reports you reviewed in the Felix
Valentin shooting, was there anything in those
reports that was inaccurate?"

"Not that I know of."

And the question was:

"Was your report about going to see Felix
Valentin in this hospital inaccurate?"

"No, I don't think so."

Did you give those answers?

A. Yes.

Q. Were they truthful?

A. Yes.

Q. And you had studied for the deposition by meeting and thinking about the documents before the deposition, correct?

A. Somewhat, yes.

Q. And the only thing that's changed is that you Dr. Sharkey's testimony last night and this morning, correct?

A. Correct.

Q. And now you're saying, "You know what? I think I made a typo"?

A. Well, we did it from memory.

Q. All right. On the 10th of September did you call Detective McLaughlin, the lead investigator, and say, There's been a development. The victim has picked out our suspect," did you call her on the 10th?

A. I don't think so.

Q. If it actually really truly happened that the victim picked out Jacques on the 10th, you would have called the lead detective and say, "Detective McLaughlin, there's been a develop," wouldn't you have?

A. If it was a good identification, yes.

Q. All right. So it wasn't a good identification, was it?

A. No, I said that. It was unreliable.

Q. All right. Is that from memory, too?

A. Which part?

Gawrys - directy by Loevy

1715

Q.   The fact that the identification was unreliable, where are you getting that from?

A.   I'm guessing it was.

Q.   You're guessing, you said?

A.   Yes, I'm guessing.

Q.   Okay.  You have no memory of these events, do you?

A.   No, I don't.

Q.   You don't remember being at the hospital?

A.   No.

Q.   And you don't remember speaking to Felix Valentin, do you?

A.   No.

Q.   In fact, showing you 119, Line 10 through 15.

     (Videotape played.)

MR. LOEVY:

Q.   Was that truthful, sir?

A.   Yes.

Q.   So if you don't --

        MR. GIVEN:  Objection, Your Honor.  Non-impeaching.

        THE COURT:  Overruled.

        MR. LOEVY:  It's a party admission, Your Honor.

        THE COURT:  Overruled.

BY MR. LOEVY:

Q.   If you don't remember going to the hospital, then how do you remember that when you wrote in the report that you got an ID, it was actually an unreliable ID?  How do you remember that

Q. if you don't remember it at all?

A. Say that again.

Q. You wrote in your report it was a reliable ID, right?

A. Okay.

Q. And you're saying, "I don't remember this at all, it happened too long ago," you're saying that, right?

A. Right.

Q. So how are you saying, "I just remembered that the reason I didn't tell anybody at the time is because it was not a unreliable ID," how do you remember that if you don't remember anything?

A. I can only surmise that because we didn't leave a report as to the reliability of the ID.

Q. So you're guessing that it must've been a bad ID?

A. Well, yes, based on that.

Q. All right. When you read your own police reports and they say things in simple, straightforward declarative statement, do you sometimes guess, "you know what? I probably meant the opposite" or this is an unusual situation?

A. What? Right now?

Q. Yeah. This is an example of you wrote on September 10th, they were able to get an denitrification. And you're saying, "you know what? Now that I think about it, I probably meant the opposite of that"? Does that happen to you a lot?

A. I have no idea. I don't recall any situations.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 37 of 1335 PageID #:105422
Gawrys - directy by Loevy
1717

Q. All right. Let's talk about how Mr. Rivera got into this murder investigation. A guy gets shot, right?

A. Right.

Q. And your job is to figure out who done it, right?

A. Right.

Q. And at some point Mr. Rivera became your suspect, correct?

A. Correct.

Q. And that ordinarily is the kind of thing that detectives would write down, how a suspect became a suspect, would you agree about that?

A. Yes.

Q. All right. And the story in this case has always been that Orlando Lopez was looking through a book --

THE COURT: Hold on one second.

MR. LOEVY: Sure.

THE COURT: Okay. The jury needs a break. We'll take a break. 10 minutes.

COURT SECURITY OFFICER: All rise.

(The following proceedings were had out of the presence of the jury in open court:)

THE COURT: 10 minutes, everybody.

(Recess).

.

(The following proceedings were had out of the presence of the jury in open court:)

Gawrys - directy by Loevy

1718

COURT SECURITY OFFICER: All rise.

THE COURT: If they need a break. Just let us know. Not a problem.

Okay. Are we ready?

MR. LOEVY: I am, Your Honor.

THE COURT: Whenever the jury is ready, we're ready for them.

(Brief pause).

THE COURT: Counsel, the juror is taking medication and it's making her stomach upset. So Just told the CSO that if she needs to leave, he should just go with her and I'll be watching and I'll cue you if that's what happens; okay.

COURT SECURITY OFFICER: All rise.

(The following proceedings were had in the presence of the jury in open court:)

THE COURT: Please be seated, everyone.

BY MR. LOEVY:

Q. All right. Sir, in court the last week we've been talking about this as a single-finger eyewitness identification case, right?

A. Correct.

Q. It's a boy pointing his finger saying, "that's who did it." That's pretty much the evidence in this case, right?

A. Right.

Q. Now, even in the late '80's you guys were aware, you guys

Gawrys - directy by Loevy

1719

being people at the Chicago Police Department, were aware that there were problems with eyewitness testimony, correct?

MR. SOTOS: Objection to form; foundation.

MR. LOEVY: His knowledge matters, Your Honor.

THE COURT: Overruled.

BY THE WITNESS:

A. Say that again.

BY MR. LOEVY:

Q. Even in the 1980's time period, back then even you were aware -- you were in court for Dr. Wells' testimony, right?

A. Yes.

Q. All right. You were aware even then that eyewitness testimony was fallible? Often was not reliable, correct?

MR. SOTOS: Judge, objection to "then." Like does he mean when the doctor testified or back in --

THE COURT: Back in 1980's. Overruled.

BY THE WITNESS:

A. I didn't know --

MR. GIVEN: I'm sorry. Dr. Wells did not offer that kind of testimony.

THE COURT: Let's forget about Dr. Wells.

MR. LOEVY: Okay.

BY MR. LOEVY:

Q. We know more about -- do you know more about eyewitness testimony now than you did then?

A. What do you mean? I don't understand.

Q. All right. Even --

A. Oh -- go ahead.

Q. What do you understand?

A. No, go ahead. Explain it. I don't want to assume what you're asking.

Q. Let's focus on 1988. There were a lot of reasons to believe that it's hard for eyewitness to make identifications, correct?

A. I guess you could say it from his history.

Q. Stress, distance, small opportunity to see somebody, those can interfere with the ability to make an identification, correct?

MR. GIVEN: Judge, I'm sorry. Competence and foundation.

THE COURT: The question is whether the police and Officer Gawrys were aware of that. Overruled.

BY MR. LOEVY:

Q. You had to evaluate whether this witness had value to you or not, right?

A. You would have to, yes.

Q. All right. So would you take into consideration that if it's a stressful situation, if there's a lot of distance, if he didn't have a good viewing opportunity, that would reduce the reliability of it, right?

Gawrys - directy by Loevy

1721

A.   That what is he is saying, yes.

Q.   All right.  Was that your experience, sir?  That's all I'm asking.

A.   I don't know.  I don't recall.

Q.   You and Mr. Guevara made a lot of cases based on eyewitness identifications, didn't you?

A.   Yes.

Q.   All right.  So you talked to a lot of people that ultimately supported your theory of who was guilty, right?

A.   Yes.

Q.   All right.  Let's look at the map.

          MR. LOEVY:  If we could have the Elmo, please.

          (Exhibit published to the jury.)

BY MR. LOEVY:

Q.   You would have been at the scene at some point back in '80s, right?

A.   No, I was not.  I don't recall that.

Q.   Well, at some point during the investigation were you familiar with this neighborhood?

A.   Yes.

Q.   All right.  If the store is over here on this corner, Kimball and Cortland, and the shooting happened over here in this alley (indicating).  And I will represent to you that it's been measured carefully by our side as 191 feet, that is a pretty good distance for an eyewitness make an identification

Gawrys - directy by Loevy

1722

if he is, in fact, by the store as the notes indicate, correct?

A.  It could be.

Q.  All right.  What would you estimate the corner of that courtroom to the other corner of the courtroom (indicating), the diagonal here?

A.  40 feet.  I don't know.

Q.  Maybe about 65 feet?

All right.  If you triple that distance, that's 191 feet.  So if you went from that diagonal to the diagonal, then you did it again, and then you did it again, that's pretty far to be making an eyewitness identification, would you agree?

A.  I don't know.  I have no idea.

Q.  All right.  Well, you're a homicide person, you were a detective in 1990, if someone said, "I got a glimpse of a guy from the distance of that corner to that corner tripled," you'd say to yourself, "boy, you probably didn't see too much," wouldn't you?

A.  It depends:  Obstruction, lighting.

Q.  All right.  Well, let's say there was cars obstructing --

A.  Is this hypothetical?

Q.  Yeah.  Hypothetically, if the kid told you in 1988 that he was by the store, and you knew that the store was 191 feet from where the shooting happened, you would say to yourself, "boy, if you just got a glimpse of this guy," that's probably not very valuable as a detective, right?

MR. SOTOS: Objection, Your Honor, there's no evidence this witness talked to that -- this witness ever talked to that witness about anything that he saw.

MR. LOEVY: Then call it hypothetical, Your Honor. He doesn't remember.

MR. SOTOS: No relevance to what this witness knows about any of this.

THE COURT: And you pose it as a hypothetical.

BY MR. LOEVY:

Q. All right. You don't remember, right? You don't remember if you spoke to Orlando or not, right?

A. No.

Q. All right. So we're going to have to go hypothetically given your memory.

A. Okay.

Q. If a kid told you he was by the store and he caught a glimpse of a guy from behind, running, and maybe saw his face from that distance, you would say that's not very helpful to my investigation, right?

A. By the store is what? What does that mean?

Q. Well, let's just say it means what it says, "by the store." Let's say he meant what said, "I was by the store."

A. But I don't know what distance he was from the store.

Q. All right. Now, showing you Orlando Lopez's trial testimony. This is Plaintiff's Exhibit 35, page 26.

Gawrys - directy by Loevy

1724

"... did Orlando -- or was it your understanding that Orlando's story was, "He came down, and the car is like over to your right?"

"Yes, sir."

"... and someone whose back to you was firing at Felix?"

"Yes, sir."

My question --

MR. SOTOS:  Objection.  Your Honor.

BY MR. LOEVY:

Q.  My question to you, sir, is --

THE COURT:  I'm sorry?

MR. GIVEN:  He didn't ask the question, Your Honor.

THE COURT:  That's true?

MR. GIVEN:  I apologize.

BY MR. LOEVY:

Q.  My question is, was it your understanding that little Felix -- I'm sorry, little Orlando who was 12.  I keep calling him "little."  He was 11 just turned 12 --

A.  Okay.

Q.  -- saw the back of the shooter --

MR. SOTOS:  Objection, Your Honor.  There's no evidence in the case that this witness ever in this courtroom in connection with this case or ever talked to this witness about --

THE COURT:  Well, wait a minute.

MR. GIVEN:  -- what he saw.

THE COURT:  Well wait a minute.  Wait a minute. You're saying that the witness is not familiar with the trial testimony?

MR. SOTOS:  True.

THE COURT:  Is that the objection?

MR. SOTOS:  Correct.  There's no evidence that he was ever in court or --

MR. LOEVY:  I'm asking a different question.

BY MR. LOEVY:

Q.  Was it your understanding that Orlando saw the guy from behind?

MR. SOTOS:  Objection, Your Honor.  There's no evidence that he ever talked to him about his story.

THE COURT:  I think his understanding when.

BY MR. LOEVY:

Q.  When you were investigating this crime, was it your understanding that Orlando's story was, he saw the shooter from behind, and then he ran to the store, talked to the store clerk, ran back and hid, and saw the end of the shooting, and then caught a glimpse of the guy's face as he ran away, was that the theory of the case when you were investigating it?

THE COURT:  Hold on.

MR. SOTOS:  The objection, Your Honor, is that there

Gawrys - directy by Loevy

1726

is no evidence in the case that he ever talked to the witness or anybody else about what his story was.

THE COURT: So the question was, did he have an understanding. Now, Detective Gawrys was on this investigation. So whether he was aware of that I think is a fair questions. That's the question.

MR. SOTOS: Whether he was aware of it, I agree, Judge.

THE COURT: Well, was this his understanding, when he was working on the case, right? That's the question.

MR. LOEVY: That's exactly what I'm asking.

THE COURT: Overruled.

BY THE WITNESS:

A.  I don't recall.

BY MR. LOEVY:

Q.  It's actually very hard to make eyewitness identification, isn't it?

MS. ROSEN: Objection the form to "make eyewitness identification."

MR. LOEVY: Let me ask it better, Your Honor.

BY MR. LOEVY:

Q.  When you were a detective you had to take into consideration that if someone saw this guy from 191 feet, or he saw this guy, or he saw this guy, or he saw this guy, or he saw this guy, or he saw this guy (indicating), with the passage of

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 47 of 1335 PageID #:105432
Gawrys - directy by Loevy
1727

time it's a little hard to remember exactly who you saw, right? That was your understanding as an investigator?

A. Passage of time?

Q. Right. A day goes by, two days, three days, it gets harder and harder, right?

MR. SOTOS: Objection, Your Honor, to the testimony about somebody being 191 feet away, because there's no facts in evidence as to specifically how far the witness was when he saw anything.

MR. LOEVY: Your Honor, the only fact we've suggested as evidence is 191 feet from by the store to after the shooting.

THE COURT: So the question is, do we have to get a witness in here who did a measurement or are we going to assume this is the -- I mean, if we need a witness, we'll get a witness.

MR. LOEVY: We have one.

MR. SOTOS: What I'm objecting to, Your Honor, I'm objecting because there's no evidence as to specifically at what point the person was standing --

THE COURT: Okay. The witness has already told us that. So, obviously, all of this has to be subject to not knowing what "by the store" means.

MR. SOTOS: So when he asks him seeing a witness form 191 feet away, there's no testimony in the case about --

THE COURT: Well, I think the jury can weigh this. I think the jury can weigh this. The jury has heard this evidence. Overruled.

BY MR. LOEVY:

Q. All right. The story when you were a detective was always that Orlando was shown lots of books and lots of photos and all of a sudden he supposedly picked out Jacques Rivera photos, right?

MR. GIVEN: Judge, I'm sorry, but he wasn't a detective.

MR. LOEVY: Your Honor --

MR. GIVEN: He wasn't a detective during this investigation. They keep making that slip of the tongue.

THE COURT: All right.

MR. GIVEN: And there's an important distinction.

THE COURT: Re-ask the question. If he apparently used "detective" I missed that, but --

MR. LOEVY: I apologize if I did.

THE COURT: Rephrase the question.

BY MR. LOEVY:

Q. The understanding you always had was that this little kid was looking through books and all of a sudden he stopped on Jacques' photo and that's why you and the detectives all decided that Jacques must've been the guilty guy, that's the theory of the case, right?

A. We were -- we were basing our investigation on Orlando Lopez's.

Q. All right. I get that. So let's get one step past that. The theory is that Jacques became a suspect because supposedly Orlando Lopez looking through books and he says, "ah-hah, that's the guy," and he points to Jacques, that's your theory, that's what you guys were doing, right?

A. It's not our theory. It's what the witness provided.

Q. All right. That's what you told the prosecutors, correct?

MR. GIVEN: Objection, foundation. There's no evidence that he talked to the prosecutors, ever.

THE COURT: Okay. Sustained.

BY MR. LOEVY:

Q. Was that your theory of the case, sir?

A. The theory was based on Orlando's identification.

Q. All right. And that's what I'm asking you about. Your theory on Orlando's identification was, supposedly he's looking through books and he says, "that's the guy," that was the theory you were talking about, right?

A. Correct.

Q. All right. And if you're careful you can suggest to a witness which photo they should pay attention to, "could it be that guy." You can steer a witness, would you agree with that?

A. You can do it?

Q. Yeah.

A.  I guess so.  I don't know.

Q.  And you have to careful not to do it, right?

A.  Oh, sure.

Q.  Even if you're well-intentioned, you might spend a lot of time on one photo, ignore his interest in another photo.  You can steer somebody if you're not careful, right?

A.  I suppose it could happen.

Q.  Like, for example, if you're through the books, he's having trouble, lots of pictures, he says, "maybe that guy," you could ignore him and say, "keep looking," right?  You could do that, right?

A.  I wouldn't do that.

Q.  All right.  And then maybe he goes a few more pages, and you say, Hey, anybody look interesting?  Maybe that guy?"  You could say, "oh, tell me more about that?  Why do you think that?  Why do you think that?"  You could steer him without him even realizing, would you agree that that is a possibility?

        MR. GIVEN:  Objection, asked and answered, Judge. We've covered this now for several questions.

        THE COURT:  Overruled.

BY THE WITNESS:

A.  I would not steer anyone.

BY MR. LOEVY:

Q.  All right.  But you wouldn't do it because it's improper, right?

Gawrys - directy by Loevy

1731

A.   Correct.

Q.   But it is not impossible that a witness, particularly a child, could be steered without their knowing it, that's why you wouldn't do it, right?

A.   I guess it could happen, yes.

Q.   Especially with a 11- or 12-year old, right?

A.   Depends.  Some 12-year-olds are pretty savvy.

Q.   With some 12-year-olds you might be able to steer them to a particular photo without them even realizing they were being steered, that is a risk, right?

          MR. GIVEN:  Judge, once again, asked and answered.

          THE COURT:  Sustained.

BY MR. LOEVY:

Q.   Now, when he was looking through the book and supposedly stopped on Jacques' photos, Jacques already was the suspect, wasn't he?

A.   I have no recall of that at all.

Q.   Jacques was the suspect on the 27th of August, was he not?

A.   I'm guessing from reports, yes.

Q.   And that's the stamp we've looked at.  It looks like Jacques, Jose Rios, Jacques Rivera, that was pulled on the 27th, right?

A.   Correct.

Q.   So that suggests to you sometimes Gang Crime Specialists would pull criminal histories and your suspects, right?

Gawrys - directy by Loevy

1732

A.   Correct.

Q.   And it's not like you guys weren't doing a real good job of writing down why you thought what you thought right?

A.   Why he what?

Q.   Were you making notes on why you thought a particular person was a suspect or not?

A.   From this -- from the IR sheet?

Q.   Were you making notes on that kind of thing back in the '80s?

A.   We would.  Yes I think so; sometimes.

Q.   All right.  Well, where are all your notes in this case?

A.   I was not working in the beginning of this case.

Q.   Where are all your notes in this case?

A.   I have no notes.

Q.   There are no existing notes, that's a fair summary, right?

A.   Correct.

Q.   Do you remember I took no notes, or you can't remember if you lost them, or you can't remember if you shredded them, or are you positive you never took notes, which is it?

        MR. SOTOS:  Compound.

        THE COURT:  Overruled.

BY THE WITNESS:

A.   I don't recall.

BY MR. LOEVY:

Q.   All right.  Mr. Rivera was a suspect on the 27th of August,

Gawrys - directy by Loevy

1733

correct?

A.   Correct.

Q.   And we know that because of that stamp I showed you, right?

A.   Right.

Q.   So we're going to put on the board on the 27th that Jacques becomes a suspect.

        MR. GIVEN:  Can I see what you're putting on the board.

        MR. LOEVY:  I'm going to put it all on the Elmo, too, so you can follow along.

        MR. GIVEN:  Can I actually see it before you put it up and publish it to the jury?

        MR. LOEVY:  Your Honor, I apologize.  I think he's talking to me.

        MR. GIVEN:  I am.

        MR. LOEVY:  He should be talking to the Court.

        MR. GIVEN:  Judge, can I see them before he puts them up?

        THE COURT:  Yes, you may.

        MR. GIVEN:  Thank you.

        MR. LOEVY:  Okay.  I just didn't want to breach any protocol, Your Honor.

BY MR. LOEVY:

Q.   All right.  On the 28th --

        MR. GIVEN:  Jon, she said I could see them before you

put them up.

MR. LOEVY: Oh, I misunderstood.

MR. GIVEN: If you could show them to me one at a time.

(Said item tendered.)

MR. LOEVY: All right. Your Honor, I ask permission to put up "Jacques becomes a suspect."

MR. GIVEN: I'm not quite done looking at them yet, Jon.

(Brief pause)

THE COURT: Just the first box at this point.

MR. LOEVY: Correct, Your Honor.

MR. GIVEN: Judge, this is the first time we're seeing these.

THE COURT: Well, I'm waiting. I'm waiting.

MR. SOTOS: Judge, we object to this. There's information on here that we don't agree with and --

MR. LOEVY: Your Honor, I could be writing in on an easel.

MR. SOTOS: And we should've been shown this before.

THE COURT: This is a demonstrative exhibit. Counsel could be writing on an easel. That is overruled. You have a right to see it before it gets disclosed in open court, and I think we've agreed on that. So let's go ahead. We're only on Box 1.

BY MR. LOEVY:

Q. All right. Jacques became a suspect on the 27th, correct sir?

A. It's my understanding.

Q. All right. Showing you the report -- this is Plaintiff's Exhibit 12 that we talked about in court before -- this is the report dated -- date of original it says 28th, and there's some confusion because it says 27th and 28th, right?

A. Correct.

Q. All right. And there is -- this is the interview of Orlando. And at the bottom it says, "printed CV number." Can you read the number? 7355806?

A. Is that an "8"? Okay.

Q. I think that's the number that corresponds to this arrest here for Mr. Rivera, 735806, right?

A. Okay.

Q. And that's how we know that Jacques was a suspect on the 28th or the 27th, correct?

A. See it -- no, the IR is a different arrest, isn't it?

Q. Well, this is Jacques, right (indicating)? This is Jacques, right (indicating)?

        Want to go slower?

A. No, what's the IR's?

Q. 7355806, right?

A. That was the date of 20 May something.

Gawrys - directy by Loevy

1736

Q. Right. So somebody asked to pull a photograph of Jacques Rivera on this date, would you agree with that?

A. Let me see. Could I see those dates on top again, on the GPR?

Q. This is what you are looking for, sir (indicating)?

A. Yeah, I just want to make sure that I remembered it.

MR. GIVEN: Judge, I'm just going to have an ongoing foundation objection to these sorts of questions. This is not his report. He didn't write it. He hasn't testified that he knows who did write or what --

THE COURT: All right. This is something -- I don't think there should be confusion about this, but whose report is this --

MR. LOEVY: This is McLaughlin's. It's already in evidence.

THE COURT: Okay. And the rest can be brought out on redirect or on your direct.

BY MR. LOEVY:

Q. All right. And, in fact, this number corresponds to Jacques, and you have an IR number up here. Tell the jury what an IR number is.

A. It's an identification record.

Q. 614010?

A. Right.

Q. And that corresponds to the photograph 614010 of Jacques

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 57 of 1335 PageID #:105442
Gawrys - directy by Loevy
1737

Rivera May the 21st, 1985, right?

A. Okay.

Q. That is, in fact, the arrest looks like May 20th, 1985, the photo must have been taken on the 21st. This suggests to you, in combination, that on the 28th somebody pulled Jacques' photo, can we agree on that?

A. I don't know.

MR. LOEVY: All right. I'm going to ask then permission to show the second, Your Honor, on the 28th.

MR. GIVEN: I just have a standing objection.

THE COURT: Wait a minute. The witness said that he can't tell.

BY MR. LOEVY:

Q. Well, we're going to take it slow. This is 7355806, right?

MS. ROSEN: Objection, asked and answered.

THE COURT: You know what? Overruled, because we're trying to clear up some confusion.

BY MR. LOEVY:

Q. You agree with me, sir, that the totality of these documents we've been looking at, you've seen these documents before, right?

A. Correct.

Q. And these are the kind of documents you relied on in your work, right?

A. Correct.

Q. It looks like they pulled his CV number, right?

A. Yes.

MR. LOEVY: Then, Your Honor, we ask permission to show the second box.

THE COURT: Okay. Can we tell what date?

MR. LOEVY: It is either the 28th or the 27th.

MR. LOEVY:

Q. Should we use the date on the report, sir?

A. Well, the date of the original case report is wrong.

Q. All right. Which date would you prefer, the 28th or 27th?

A. I believe this all happened on the 27th.

Q. All right. So somebody just wrote "28" by accident?

A. Yes.

Q. It does look like they changed the "7" and the "8," would you agree with me?

MR. SOTOS: Judge, I'm going to object. This witness has no familiarity with any of this.

THE COURT: I'm going to sustain the objection to that.

BY MR. LOEVY:

Q. All right. The CD number you want it on the 27th instead of the 28th, right? You say the --

MR. SOTOS: Judge, I'm going to object. He said, "the CD you number wanted," the witness --

MR. LOEVY: This is argumentative.

THE COURT: Overruled. Overruled.

BY THE WITNESS:

A. Ask me again, please.

BY MR. LOEVY:

Q. We have to decide where to put this box, Jacques CD, you want it on the 27th or the 28th based on your reading of this document?

MR. SOTOS: Judge objection to where he wants the box and what.

THE COURT: Okay. It's an unfortunate phrasing. Let's get rid of "wants."

MR. LOEVY: All right.

THE COURT: And with that, the objection was overruled.

BY MR. LOEVY:

Q. Can you tell us the date that you're reading of the document says this happened, sir?

A. The case happened on the 27th of August 1988.

Q. All right. So we'll put this on the 27th.

So Jacques is a suspect and his photo is pulled on the 27th. He gets -- now, we have a report that says when the gang book identification happened, correct?

A. I believe so.

Q. And you wrote it, right? You wrote it? You wrote a report that says when the gang book identification happened, correct,

sir?

A. Yes. Yes.

Q. All right. And you take care to get those dates, correct, right?

A. Yes.

Q. And you don't guess, right?

A. No, we shouldn't.

Q. Because it's a homicide investigation with significant consequences, correct?

A. Correct.

Q. And you can't falsify dates, right?

A. No.

Q. All right. So what day, if Jacques was a suspect on the 27th, what day did the kid go through the book and stop at Jacques' photo?

A. I have no idea.

Q. Well, let's take a look at what you wrote down. This is Plaintiff's Exhibit 1.

(Exhibit published to the jury.)

BY MR. LOEVY:

Q. This is your report, correct?

A. Yes.

Q. I want to focus your attention to this paragraph, how it starts:

"... reporting officers along with Gang Crimes

Specialists were investigating an aggravated
battery in which the victim was shot  ..."
That's Valentin, right?

A. Correct.

Q. (Reading:)
"...Noon, Guzman, Sparks and Zacharias located a
witness on the 29th of August, 1988 ...."
Right?

A. Right.

Q. And read the next sentence.

A. (Reading:)
".. the witness was brought into the Gang Crimes
North to view gang photo books."

Q. And then I want to focus your on that date.  You're talking about August 29th, correct?

A. Right.

Q. Witness positively identified the photo of Jose Rios from the book, and then you claim Jose Rios is Jacques Rivera, right?

A. Right.

Q. All right.  So we do know --

MR. LOEVY:  And then, Your Honor, we ask permission to put Orlando allegedly picks Jacques from the book on the map that I've been using.

THE COURT:  All right.

BY MR. LOEVY:

Q. I'm going to have to move to the 28th to the 27th. You say he was a suspect and the CV was pulled on the 27th, do you understand the change I made? The "28" goes here (indicating). I can't reprint it, but that's what you're saying should happen, right?

A. That's when it happened, yes.

Q. All right. Now, you would agree, though, that the book thing happened two days after you'd already decided Jacques was the suspect, right?

A. No.

Q. All right. When you said, "no," we did agree that Jacques became a suspect and his CD number was pulled on the 27th, right?

A. Correct.

Q. And we do agree that Orlando went through a gang book and stopped on Jacques' photo on the 29th, we agree on that, right?

A. No.

Q. Okay. What is inaccurate then? Is this more typo, sir? What is inaccurate about what you wrote?

They located the witness on the 29th. The witness was brought in to view a gang book. On that date he positively identified the photo of Jose Rios, is that fraudulent?

A. No, not fraudulent.

Q. Is it accurate?

A.   No, I put the wrong date down.

Q.   Are you saying that from memory?  You remember putting the wrong date down or are you guessing again?

A.   I base it on detective supplementary reports.

Q.   So are you guessing that you put the wrong date down or you remember you put the wrong date down?

A.   Well, first of all, I wasn't working that day, and I was going through --

Q.   Okay, fir, if you can focus on my question now --

MR. GIVEN:  Judge, he's answering and he's being interrupted.

THE COURT:  Sustained.

BY MR. LOEVY:

Q.   Are you saying, "I remember I put the wrong date down --"

MR. SOTOS:  Objection.

MR. LOEVY:  -- or are you guessing?

MR. GIVEN:  Judge, you sustained the objection and then he still didn't let im answer.

MR. LOEVY:  Well, I have to ask the question.

THE COURT:  Let me hear the question.

BY MR. LOEVY:

Q.   Are you saying you're sure you got the wrong date because you remember you got the wrong date or are you saying, "I'm guessing, summarizing I got the wrong date"?  Which is it and then we can explain.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 64 of 1335 PageID #:105449
Gawrys - directy by Loevy
1744

A.   I'm surmising because I based it off other reports going through them.

Q.   All right.  Take a look at your deposition, page 119, 16 through 20.

(Videotape played).

BY MR. LOEVY:

Q.   And then 236, Line 3 through 12.

(Videotape played)

MR. LOEVY:  All right.  Actually go through 12.

THE COURT:  I think the rest is not relevant.

MR. LOEVY:  All right.

BY MR. LOEVY:

Q.   You had three meetings, long meetings with Mr. Given and Mr. Sotos before your deposition, correct?

A.   Correct.

Q.   You carefully went over the records, right?

A.   Right.

Q.   And at your deposition you believed that was the right date, right, the 29th of August?

A.   Yes.

Q.   And you were a good detective who made sure to get details, correct, right?

MR. GIVEN:  Judge, once again, "detectives," "Gang Crime Specialists."  We need accuracy.

THE COURT:  All right.

Gawrys - directy by Loevy

1745

BY MR. LOEVY:

Q.  You were a detective in 1990, right, sir?

A.  Yes.

Q.  All right.  And during this investigation you were a Gang Crime Specialists, right?

A.  Yes.

Q.  How long were you a detective, sir?

A.  About 6 years.

Q.  All right.  Did -- is there really that much difference between detective and Gang Crime Specialists?  You both solve crimes, right?

A.  There's a big difference between them.

Q.  All right.  Are detectives only allowed to get dates accurately but Gang Crime Specialists aren't supposed to get dates accurately?

MR. GIVEN:  Objection.  Argumentative, Judge.

THE COURT:  Sustained.

BY MR. LOEVY:

Q.  All right.  Do Gang Crime Specialists take it seriously to get dates right, too?

A.  Yes.

Q.  Okay.  You knew that Jacques Rivera was going to be prosecuted for murder based on this report, right?

A.  No.

Q.  Well, you wrote down here, "offender, Jacques Rivera a/k/a

Gawrys - directy by Loevy

1746

Jose Rios" and the charge was murder in the first degree, right?

A. Yes, but there's other reports that were made prior to this.

Q. All right. And this is one that kind of sums it all up, right?

A. Not really.

MR. GIVEN: Objection, Judge.

THE COURT: Overruled.

BY MR. LOEVY:

Q. Now I guess my last question on this area is, did you literally hit the wrong key like typo "29th" or you guessed wrong, which is it?

MR. GIVEN: Objection, Your Honor. He's answered that question.

THE COURT: Sustained.

BY MR. LOEVY:

Q. All right. If Mr. Rivera was the suspect before the book thing happened on the 29th. If you would go with my hypothetical.

A. Okay.

Q. All right. Then that is a crazy coincidence, is it not, that out of all those hundreds of picture, he somehow stopped on Jacques' picture even though he was the suspect? That would be a coincidence right?

A. You're talking hypothetically?

Q. Yes. Hypothetically, your report is accurate about the 29th and the other documents are accurate about the 27th. Under that hypothetically, that is unlikely coincidence, would you agree?

A. Ah, I'm a little confused. Say it again.

Q. All right. It's even more unlikely that the witness supposedly stopped on Jacques' photo without steering two days after the Jacques was a suspect when you consider that Jacques wasn't the guy who shot Felix Valentin, was he?

A. I don't know what you mean.

Q. You can see Jacques wasn't the guy who shot Felix Valentin, right?

A. We know that now, yes.

Q. All right. And so somehow this kid managed to stop on the wrong photo two days after he was your suspect, correct?

A. I have no idea.

Q. All right. You said that there were some typo -- you got it off McLaughlin's report, that's why you think this is a typo?

A. It was one of two detective subs in the beginning.

Q. All right. You're talking about Plaintiff's Exhibit 19 E. This is the report we showed Ms. McLaughlin dated the 29th of August, right?

A. Correct.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 68 of 1335 PageID #:105453
Gawrys - directy by Loevy
1748

Q. And this is the report dated the 29th of August that says Lopez viewed the books, made an identification of Rios as the guy who shot the victim, Rios being Jacques, right?

A. Right.

Q. And you were in court when Ms. McLaughlin said this is a typo the 29th. On the second page his is a typo, on the first page it actually happened on a different date, right?

A. Correct.

Q. Is she getting the typo from your report or are you getting the typo from her report?

A. I got it from her report, because I'm reviewing the reports.

Q. All right. How do you know it's a typo? If both of you are saying it happened on the 29th, how come you don't just say it happened on the 29th?

A. Well --

MR. SOTOS: Objection, Your Honor. Mischaracterizing his testimony.

THE COURT: Sustained.

BY MR. LOEVY:

Q. All right. If both documents say that it happened on the 29th, hers and yours, then why do we have to assume it's a typo?

A. I don't know.

Q. All right. Are you professionally embarrassed to have made

such an important typo?

A.   I probably could've done a better job with the report.

Q.   Yeah, given the stakes involved, right?

A.   Yes.

Q.   You can't say for certain that's a typo, right?

A.   What part?

Q.   The 29th.  You can't say for certain that's a typo?

A.   I think it is.

Q.   You think it is but you're just guessing, right?

A.   I wrote -- I wrote the wrong date down.

Q.   All right.  That's your guess, but all I'm trying to establish is, you can't say for certain that that's wrong, can you?

A.   Yes.

Q.   You say for certain --

A.   Based on other reports.

Q.   That's wrong?

     On the report that says it happened on the 29th that McLaughlin wrote?

A.   I think that's where I got it from.

Q.   All right.  Now, your report also says -- by the way, the gang book thing only happened once, right?

A.   I have no idea.

Q.   I mean, there wouldn't be a point them having to pick out Jacques photos on the gang book and then doing it again, right?

Gawrys - directy by Loevy

1750

A. I wouldn't think so, no.

Q. I mean, because that's a very different story that you've every been told, that it happened more than once, right?

A. I wasn't there.

Q. All right. But your understanding of the case was, he's looking through books, he picks out Jacques' photo, and then, boom, you got a suspect. That's always been your understanding of the case, right?

A. Right.

Q. So if he looked through books and picked out Jacques's photo, you wouldn't on another occasion say, "Hey, look through books, see if you can pick out Jacques's photo," that's not how it works, right?

MR. GIVEN: Asked and answered.

THE COURT: Sustained.

BY MR. LOEVY:

Q. All right. Now, the report says where the photo book identification happened, doesn't it?

A. Yes.

Q. Where does it say it happened?

A. Gang Crimes North.

Q. And that is a location, right?

A. That's correct.

Q. What's the address there?

A. It's Belmont and Western, our offices.

Q. All right. So according to your report, this book procedure where he stopped on Jacques's photo, it happened on the 29th at the police station, right?

A. Based on my report, yeah.

Q. Is that a typo?

A. No, that was an assumption on my part. A mistake.

Q. So that's wrong? That's wrong you're saying?

A. That part, yes, from what I understand now.

Q. Well, if it -- when you wrote this report in September of '88, you had to have a reason to write down that it happened at the police station, I presume, right?

A. I assume that he came to the police station.

Q. You have no memory of these events whatsoever, right?

A. No.

Q. None? You would agree with me, you have no memory of any of this, right?

A. No. Not of this part here, no.

Q. And you said --

A. About the ID.

Q. You said "no," I think you meant "yes."

You have no memory of any of this, right?

A. Of anything? Anything in this case?

Q. Yes.

A. No, I remember writing my report.

Q. All right. Do you remember being asked this question and

giving this answer.  This is page 115, Line 19 through 116, Line 8.

MR. SOTOS:  I'm sorry, 115 what line?

MR. LOEVY:  115 line 19, through 116 Line 8.

MR. GIVEN:  Okay.

(Brief pause)

MR. LOEVY:  It's not playing the audio.

THE COURT:  Wait, what's the problem?

MS. SCOTT:  The audio.

THE COURT:  I can't hear you.

MR. LOEVY:  There's no volume.

THE COURT:  Oh, there's no volume.

MR. LOEVY:  Is it on mute?

(Brief pause).

COURT'S LAW CLERK:  I don't think it's our end.

MR. LOEVY:  We got it.

THE COURT:  Oh, okay.

BY MR. LOEVY:

Q.  Do you remember being asked these questions and giving these answers --

MR. LOEVY:  Is it not going to work, Anne?

(Brief pause).

MS. SCOTT:  Yes, it's ready.

(Videotape played)

MR. SOTOS:  Your Honor, I object.  If it's being

presented for impeachment, it's not impeachment. If it's been presented as a party admission, it should be presented that way.

THE COURT: Let me go back and try to see what we were talking about before this --

MR. LOEVY: Your Honor, if he wants it as a party admission, maybe we can move forward. We can call it a party admission.

THE COURT: Okay.

MR. LOEVY: How about page 90, lines 7 through 21.

(Videotape played).

MR. LOEVY: Stop. I don't know how -- excuse me? Is that the right page?

MR. GIVEN: Judge, we object.

MS. ROSEN: Judge, objection.

MR. LOEVY: Take it off the screen, please.

THE COURT: First of all, I can only hear one person at a time, even though everybody seems to have --

MR. GIVEN: Judge, I think we need a sidebar on this. I can't discuss it in front of the jury.

THE COURT: All right. Bring me the transcript.

(Proceedings heard at sidebar on the record.)

MR. LOEVY: This is page 90, and it was line --

THE COURT: Can I find out what the issue is? Because I don't know what you're talking about.

MR. GIVEN: Judge, page 90 discussing investigation by the FBI of Majanowski (phonetic) and how Mr. Gawrys' name came up.

THE COURT: All right. So is this a mistake?

MR. LOEVY: Yeah.

THE COURT: All right.

MR. LOEVY: And I said we can take it down.

MR. GIVEN: But it was on the screen.

THE COURT: I'm sorry --

MR. LOEVY: And I apologize. Sometimes --

THE COURT: I'm sorry. I'm sorry. Things happen.

MR. ART: It was not on the jury's screen.

MR. LOEVY: If it was not on the jury's screen, then we have no problem.

MS. ROSEN: Oh, no, it was. It was.

MR. GIVEN: We think it was.

(Defense attorneys speaking at a distance, inaudible.)

THE COURT REPORTER: Is this on the record? Is this all on the record, Judge?

THE COURT: Could I see the page, the source of this? What, arguably, went up?

MR. GIVEN: At the very top (indicating).

THE COURT: All right. I mean, I can't really do much without drawing more attention to it, but I'll them to

disregard.

MR. LOEVY: And I would like to apologize, because I'm going to try to figure what happened.

THE COURT: Yes. Okay.

MR. LOEVY: But I apologize. I'm not trying to screw up this trial.

(Proceedings resumed within the hearing of the jury.)

THE COURT: Ladies and gentlemen, if something was just up on your screen page 90, that was a mistake and it is not evidence in this case and you should disregard it.

BY MR. LOEVY:

Q. All right. Sir, the gang book identification did happen at the station, did it not?

A. I don't know.

MR. LOEVY: This is page 236, lines 13 through 24.

MR. GIVEN: Jon, give me a second, okay?

MR. LOEVY: Sure.

MR. GIVEN: 236?

MR. LOEVY: 236, lines 13 through 24.

MR. GIVEN: Okay. Thank you.

MR. LOEVY: Your Honor, could we show that to the jury, please?

THE COURT: Sure.

(Videotape played.)

BY MR. LOEVY:

Q. Did you give that answer under oath?

A. Yes.

Q. Was it true?

A. I was mistaken.

Q. How do you know you were mistaken?

A. Because later on I find out that it went to his house.

Q. Well, later on you found out. By "later on" you mean after your deposition you found out it went to his house?

A. From reading the reports here.

Q. All right. You read the reports before your deposition, right?

A. Yes.

Q. And during those three meetings with Mr. Sotos -- was Mr. Sotos and Mr. Given at all of them or some combination?

A. I don't know if it was three meetings.

Q. All right. In any event, you have since come to believe that the report is inaccurate?

A. Yes.

Q. And, again, you're not sure it's inaccurate, you're just guessing it's inaccurate?

A. I assumed that they came to Gang Crimes North.

Q. All right. And the reason you're saying that it didn't happen at the police station is because you since come to learn that apparently something happened in the kid's kitchen earlier

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 77 of 1335 PageID #:105462
Gawrys - directy by Loevy
1757

in the investigation, right, or something is claiming it?

A. I don't know.

Q. All right. There's no paper on anything happening in the boy's kitchen, right?

A. I don't remember any.

Q. And you've looked through the whole file, there's not a single scrap of note, report, or anything, that documents that police officers went to Orlando Lopez's house and showed him photos at his house? We agree about that, right?

A. I believe you're right.

Q. All right. If, in fact, police officers went to Orlando Lopez's house and showed him photographs, that should've been documented somewhere, right?

A. Could've been.

Q. I mean, it should've been, right?

A. "Yes" and "no."

Q. What's that?

A. It could be "yes" or "no."

Q. I mean, especially if Lopez on the 29th picked Jacques from a book, and then if he's been shown photos in his kitchen on an earlier date, that has to be memorialized, right?

        MR. GIVEN: Objection; Form, foundation.

        THE COURT: Overruled.

BY MR. LOEVY:

Q. You remember the question?

A.   No, repeat it.

Q.   All right.  If the detective -- sorry.  If the investigation is going to claim that the kid supposedly picked out Jacques from a book on the 29th, and, in fact, he's been shown photos on an earlier date at least one of which was Jacques, did the policies and practices of the police department require you to write down, "We showed this kid of picture of Jacques before the book procedure"?

A.   You could, yes.

Q.   You could, but I'm asking does the policy and practices, as you understand them, require that kind of information to be disclosed to Jacques Rivera?

A.   Released to who?  To Jacques?

Q.   Does the policies and practices of the Chicago Police Department require the investigators to write down that kind of information, that the witness was shown a photo, at least one photo of the suspect before he picked him out of a book?  "Yes" or "no"?  You are required to write that kind of thing down?

A.   You're saying he saw two photos?

Q.   Does the policy and practices of the Chicago Police Department require investigators to write it down if prior to the book identification procedure he had been shown pictures of the suspect, among other people?  Is that the kind of thing you had to write down?

          MR. GIVEN:  Judge, I'm going to object as to form.

The word "investigators" is ambiguous in the context of this case where we have detectives and Gang Crime Specialists.

THE COURT: That is overruled.

BY MR. LOEVY:

Q. You remember the question?

A. Yeah. I don't -- well, say it one more time.

Q. All right. I'm going to use the word "investigators" collectively to include Gang Crime Specialists and detectives. You'll know what I'm talking about if I use "investigators"?

A. Yes.

MR. GIVEN: Judge, we do object to that because he's already said there's big differences between detectives and Gang Crime Specialists.

THE COURT: I think the question is, it doesn't -- let's just assume it doesn't matter who did it, that's the question.

MR. LOEVY: Yes, it is, Your Honor.

THE COURT: Anybody who was conducting the investigation. I mean, I don't know if the term is misleading if that's the understanding.

MR. LOEVY: No.

THE COURT: Overruled.

BY MR. LOEVY:

Q. All right. If the witness was shown pictures of Jacques, among other people, before he supposedly picks him out of a

Gawrys - directy by Loevy

1760

book, that could be exculpatory information, right?

A.  Correct.

Q.  Is that the kind of thing that the policies and the practices of the police department required you to memorialize or gave you the discretion to not memorialize?

A.  As a detective or as a Gang Specialists?

Q.  Let's say as a Gang Specialists.

A.  You can get the ID and then just call the detectives that you have an identification and they would put it in their report.

Q.  And you remember my question was, is it required to write it down.

MR. SOTOS:  Objection, Your Honor.  I think he answered that question.

THE COURT:  Overruled.

BY THE WITNESS:

A.  I don't recall it's a policy.

BY MR. LOEVY:

Q.  Would detectives have been required to write it down?

A.  I believe so.

Q.  All right.  Now, you've looked at the files and no detective wrote down that the kid was shown photos on the 27th, right?

A.  (No response.)

Q.  That's true?

A. I'm not sure.

Q. There's no report from the 27th of August -- we went through this with Ms. McLaughlin. The report in her notes don't talk about a gang book identification, correct?

A. I don't remember there --

MR. SOTOS: Objection. That mischaracterizes the reports and this witness has already answered the question --

THE COURT: All right. Let's do it a different way.

BY MR. LOEVY:

Q. All right. Mr. Sotos just said that this mischaracterizes the 27th report. Do you see the report, the 27th?

MR. SOTOS: Objection. I did not say it mischaracterized this particular report that he put on the screen. I said it mischaracterizes all the reports.

THE COURT: Well, let me hear a question and then just let's not characterize what the objection was.

BY MR. LOEVY:

Q. We have the notes from the 27th and we have the detective reports from the 27th, correct?

A. I believe you do.

Q. And neither one of them says anything about the kid being shown photographs, correct? We did that with Ms. McLaughlin.

A. I don't quite remember all of it.

Q. Would you like to take a look?

A. Sure.

(Document tendered to the witness).

BY MR. LOEVY:

Q.   It's not in there, is it, sir?

I tell you what, on redirect if your counsel can find it, I'm sure he'll point it out to you.  I'm going to keep moving?

A.   Okay.

Q.   How about -- we have the notes from the 27th, don't we?  It says, Macho Lopez has not been interviewed, correct?

A.   Correct.

Q.   All right.  So if the notes in the reports say it happened on the 29th --

A.   What was the date on that report?  It went by fast.

Q.   I'm sorry.  Just trying to keep it moving.  Let's make sure we get it right.

(Brief pause).

BY MR. LOEVY:

Q.   Can you tell the jury the date?

A.   Okay.  27th August.

Q.   Do you feel comfortable about that?

A.   Okay.

Q.   And then it says Macho Lopez has not been interviewed, right?

A.   Right.  Is there a time on the top?

Q.   There (indicating).

A. Okay.

Q. All right. So even though all the documentary evidence suggests one thing, you're saying you remember it's probably wrong?

MR. SOTOS: Objection, Your Honor, to the form of the question.

THE COURT: Sustained.

BY MR. LOEVY:

Q. All right. If, in fact, you learned that he didn't actually pick him out cold from the photo on 29th, he'd been shown pictures in his kitchen on the 27th, among at least one of which was Jacques Rivera, you would've looked at this case differently, wouldn't you have?

A. Say it again.

Q. If you had known today --

A. Yes.

Q. I'm sorry, if you had known then that when he supposedly went through the book and stopped on Jacques' photo in the station on the 29th, and then on the 27th he'd actually been shown Jacques' photos, would that have caused you concern?

MR. GIVEN: Objection. Mischaracterizes.

THE COURT: Overruled.

BY THE WITNESS:

A. Yeah, I would be concerned.

BY MR. LOEVY:

Q. Why?

A. Because he's shown the photo twice.

Q. All right. Who participated in this kitchen in Orlando Lopez's kitchen photograph shown?

A. I don't know.

Q. Well, you know, what happened in the station, right, because you wrote it down?

A. Right.

Q. All right. So shouldn't there be a report on what happened in Orlando's house when he was shown photographs?

MR. GIVEN: Asked and answered several times.

THE COURT: Sustained.

BY MR. LOEVY:

Q. You've looked throughout all documents, there's no attribution to any detective who obtained any identification at Orlando's house, would you agree with that?

A. Detective? No.

Q. How about Gang Crime Specialists?

A. Yes.

Q. There is no such attribution in the reports, right?

A. Of where it took place?

Q. No. There is no report that if Orlando Lopez really picked out Jacques' photo in his kitchen at his house, there is no report that says that any member of the Chicago Police Department participated in that procedure, right?

A.   I wouldn't say so, no.

Q.   Which report?  Tell me which report?

A.   It was a detective sub that mentioned Gang Crime Specialists.

Q.   On the 29th?

A.   That showed --

Q.   You're talking about the McLaughlin report?

MR. GIVEN:  I'm sorry, he was -- once again --

THE COURT:  Yeah, the witness didn't finish his answer.

BY MR. LOEVY:

Q.   All right.  Please do, sir.

THE COURT:  Would the court reporter find where we were and let the witness finish if he had anything further to add.

(Question read)

THE COURT:  And the witness started to answer?

(Answer read)

BY MR. LOEVY:

Q.   And I'm sorry I cut you off.  Can you finish?

THE COURT:  If you want to add anything.

THE WITNESS:  No, I can't add anything.  I lost track there.

BY MR. LOEVY:

Q.   All right.  Were you thinking of maybe the report on the

Gawrys - directy by Loevy

1766

29th, the only one that talks about the ID book thing here?  Is that possible what you were thinking of?

A.  Probably.  Yes.

Q.  All right.  That report doesn't say who got the ID either, does it?

A.  No, it does not.

Q.  All right.  So have you ever seen any report that says who was in the kitchen showing Jacques' photo to the victim?

A.  I don't recall, no.

Q.  All right.  Are you saying it was Mr. Guzman?

A.  No, I'm not saying anything.

Q.  Are you saying it was Mr. Noon?

A.  There were four Gang Crime Specialists that are listed on this 27th of August report.

Q.  All right.  Was Mr. Noon or Mr. Guzman, to your belief, the ones who did this kitchen thing?

A.  I believe they did.

Q.  Why, if it's not on the paper, why do you believe that they're the two that were in the kitchen?

MR. GIVEN:  Objection, Judge.  He didn't testified specifically to the kitchen or anything --

BY MR. LOEVY:

Q.  Oh, I'm sorry.  It's the victim's house.

If it's not on the paper that it was Noon and Guzman who got the photo ID at the victim's house before the 29th, why

are you saying it was them?

A. They're listed on the 27th and supposedly, I'm guessing, that the next sub that came out listed the identification.

Q. When you saying they're listed on the 27th, that's the report you just looked through, right?

A. Yeah, this is the one with the four Gang Crime Specialists listed on it.

Q. Okay. But, of course -- and I'm going to show you that report. There is the four Gang Crime Specialists, right?

A. Correct.

Q. But without the reading this whole report --

MR. SOTOS: Objection, Judge. Can he at least identify the document that he's put on the screen.

(Exhibit published to the jury.)

BY MR. LOEVY:

Q. This is 19D the report you're talking about, right, sir? The 27th of August?

You have a copy, right?

A. Yes, I have something here. Defendants' Trial Exhibit 1.2?

Q. Which is also Plaintiff's Exhibit 19D.

Can you see it on your screen, sir? It says the 27th of August, McLaughlin's report?

A. Correct.

Q. All right. And what you're referring to is that their names are listed, right?

A.   Correct.

Q.   And take your time, I don't want to rush you.  There's nothing in this report that says anything about them going to the house and getting a gang book identification, would you agree?  Take your a time.

MR. GIVEN:  Once again, Judge, we've covered this.

THE COURT:  Overruled.

BY THE WITNESS:

A.   Correct, there's nothing listed.

BY MR. LOEVY:

Q.   All right.  So you can't say that your report is probably wrong if there's no report that contradicts it?

A.   Whose report?  My report?

Q.   Yes.  You're trying to say that this is wrong that they did it at Gang Crimes North, right?

MR. SOTOS:  Objection, Your Honor, the characterization that "you're trying to say."  He's testifying.

THE COURT:  Overruled.

BY THE WITNESS:

A.   Are you talking about the date or where it was done?

BY MR. LOEVY:

Q.   Now we're talking about the location.

A.   The location?  Well, that's -- I was -- it was an assumption on my part.

Q.   All right.  I'm going to show you a couple of stipulations,

additional stipulations in the case.

MR. LOEVY:  I think I showed Sparks.  Is that the one I showed, Your Honor?

THE COURT:  You know, don't ask me, because it's past my memory.

MR. LOEVY:  All right.

BY MR. LOEVY:

Q.  The other Gang Crimes Specialists you thought might've been in the kitchen were these guys, right (indicating)?

A.  Correct.

Q.  Now, I'm going to show you a stipulation regarding Paul Zacharias.

MS. ROSEN:  Actually, Judge, that mischaracterizes. He put him back in the kitchen again.

MR. LOEVY:  I'm sorry, at the house.

BY MR. LOEVY:

Q.  If I say "the house" you'll what I'm talking about, right, sir?

MR. SOTOS:  Except, Your Honor, there's a big difference being in the house and being in the kitchen.

THE COURT:  Okay.  We don't need any lawyer speeches right now.  There's no question pending.  Let's go.

MR. LOEVY:

Q.  All right.  Where is it your understanding that it happened in the house, this gang book identification?

A.  I don't recall.

Q.  It was in the kitchen, right?

A.  I don't understand what you're asking.  Whether it was in the kitchen or --

Q.  Does it matter what room it happened?

A.  No, it doesn't matter.

          (Exhibit published to the jury.)

BY MR. LOEVY:

Q.  All right.  Let's move on.

          As to Zacharias:

          "... the parties hereby stipulate that Paul
          Zacharias has no recollection of the Valentin
          investigation.  However, based on his review of
          the record, he does no believe he was directly
          involved in the gang book identification."

          Do you see that?

A.  Yes.

Q.  And showing you Mr. Fallon:

          "... the parties hereby stipulate that Joe
          Fallon has no specific recollection of the
          Valentin homicide investigation.  However, based
          on his review of the record, he does not believe
          he was directly involved in the gang book
          identification."

          Do you think Mr. Zacharias and Mr. Sparks are wrong?

A.  I don't know.

Q.  All right.  After the 29th -- assuming it happened on the 29th that he picked Jacques from the book, okay.  I'm asking you to stray with me that the reports are accurate.  Jacques was arrested on the 30th, correct?

A.  Correct.

MR. LOEVY:  And permission to show that Jacques was arrested on the 30th, Your Honor.

THE COURT:  Okay.

(Exhibit published to the jury.)

BY MR. LOEVY:

Q.  And Jacques was held overnight, correct?

A.  That's my understanding.

Q.  And you guys set up a lineup for Orlando Lopez to look at Jacques Rivera, right?

A.  Yes.

Q.  And it was set up just like Jacques Rivera testified, would you agree with that?

A.  I don't know.  I wasn't there.

Q.  Mr. Villafane, Mr. Olivero, Jacques Rivera -- showing you Plaintiff's Exhibit 14 -- these are the people who stood in that first lineup on the 31st of August, correct?

MR. GIVEN:  Objection; Form, foundation, characterization.

THE COURT:  Offender.

Gawrys - directy by Loevy

1772

BY THE WITNESS:

A. I have no idea.

BY MR. LOEVY:

Q. How do you know you weren't there?

A. Because my name is not on the report anywhere.

Q. You have no memory either way, right?

A. No.

Q. Okay. And at the point of this first lineup on the 31st of August, the boy has seen Jacques's photo at least once, right?

A. Yes.

Q. And possibly more times if it happened in the house, too, right?

A. I don't understand the two places he saw a photo.

Q. Well, I thought you said although it happened at Gang Crimes, you be believe there was one not written down that also happened at the house?

MR. SOTOS: Objection, Your Honor. He did not testify to that.

THE COURT: Sustained.

BY MR. LOEVY:

Q. Is that what you're saying, sir?

A. No.

Q. It only happened once?

A. I have no idea. I was not present for it in the beginning.

Q. All right. Now, he picked a filler, didn't he, Orlando

Lopez, on the 31st of August?

A.  He did what?  I'm sorry.

Q.  He picked the wrong guy, didn't he?

MR. GIVEN:  Objection, foundation.

THE COURT:  If the witness knows, he can answer.

BY THE WITNESS:

A.  Picked the wrong guy where?

BY MR. LOEVY:

Q.  After Jacques was arrested and Orlando Lopez viewed the first lineup on the 31st of August, Orlando Lopez picked the guy who wasn't your suspect, right?

A.  I have no idea.

Q.  All right.  How did the Chicago Police Department record that situation?

So let's say it happened.  Just let's say it happened the way Orlando, Mr. Villafane, Mr. Olivero, and Mr. Rivera remembered it, that there was such a lineup, and Orlando Lopez says, "I know I picked somebody.  I believe it was Jacques Rivera, but picked somebody."  If he had picked the wrong guy, how does the police department document that?

A.  It's a negative lineup.

Q.  So let's say he picked Mr. Villafane.  Would they write down, "Boy, Orlando picked Mr. Villafane, that's awkward"?

MR. GIVEN:  Objection, Your Honor, to the form of the question.

THE COURT: Overruled.

BY MR. LOEVY:

Q. Would that get documented that Orlando picked number 1?

A. Should be, yes. It would be a negative -- it would be a negative lineup.

Q. Well, a negative lineup is, he didn't identify the suspect, riot?

A. Correct.

Q. Okay. Well, let's say he did something different. If Steve is my suspect, and I'm Orlando Lopez, and he's in a lineup, instead of pointing to Steve he points to Anna, and says, that's the guy I saw," that's more exculpatory than he didn't identify the suspect, right?

MS. ROSEN: Objection, Judge. Foundation.

MR. GIVEN: Objection.

THE COURT: Overruled.

BY THE WITNESS:

A. And what's the question again?

BY MR. LOEVY:

Q. Two possible scenarios: Orlando Lopez is supposed to pick out Steve, and he says, "I can't make an identification." That's one scenario, okay.

A. Right.

Q. Let's say Orlando Lopez is you're hoping he picks Steve and he says Anna was the shooter. That actually discredits Orlando

as a witness, doesn't it?

A. Correct.

Q. Shouldn't he write down -- instead of writing down he couldn't pick the subject, shouldn't you written down he picked the filler, he picked Anna?

A. Yes.

Q. All right. But the Chicago Police Department didn't write it down when the suspect picked the filler -- I'm sorry, the witness picked a filler, correct?

MR. SOTOS: Objection, Judge. Is he talking about in this case or are we in the hypothetical world now?

THE COURT: Well, I think you need to specify what you're asking about.

BY MR. LOEVY:

Q. Let's talk generally. For all the years you were a detective and a Gang Crime Specialists, when your witnesses picked a filler, you recorded it as no identification made, right?

MR. GIVEN: Judge, we have to break that. That's compound where he's mixing the Gang Crime Specialists and the detective again. It's an important distinction.

THE COURT: Well, which one -- let's -- I don't know. Let's be specific.

MR. LOEVY: Can I call it "investigators" so we don't have that problem?

MR. GIVEN: No, Judge.

THE COURT: Why not? There's no good reason. Define your terms.

BY MR. LOEVY:

Q. All right. Were Gang Crimes officers allowed to do it differently than the detectives, sir? That the Gang Crimes had to write it down if they picked a filler but the detectives didn't?

MR. GIVEN: Objection, foundation.

THE COURT: If the witness knows, he can answer.

MR. GIVEN: The question assumes facts not in evidence, Your Honor.

THE COURT: Overruled.

BY THE WITNESS:

A. You're talking about a physical lineup?

BY MR. LOEVY:

Q. Yes.

A. Okay. Gang Crime Specialists don't run physical lineups.

Q. How about a photo array?

A. We run photo arrays, yes.

Q. All right. If the witness picks the wrong photo, would you guys write down he picked the wrong photo array or you just say he didn't get the suspect? What was the policy?

A. No, you'd write it down.

Q. You'd write down --

Gawrys - directy by Loevy

1777

A.   That he picked the wrong picture.

Q.   Picked the filler.  You pick the filler.

A.   Sure.

Q.   You were in court when Dr. Wells testified to zero, correct?

A.   Yes.

Q.   Was that your experience that you've never seen a lineup report where it actually acknowledged that the witness picked the wrong person?

MR. SOTOS:  Objection, Judge.  He's asking him photo arrays, Dr. Wells testified about lineups, mixing --

MR. LOEVY:  Well, he testified --

THE COURT:  You know, you're confusing me at this point.  Let's hear a question.

BY MR. LOEVY:

Q.   How about in this case, if Orlando Lopez had picked a filler, you wouldn't have written that down, right?

MR. GIVEN:  Judge, I'm confused if we're in a hypothetical world or Gang Crime Specialists --

THE COURT:  The witness testified that he didn't do this.

BY MR. LOEVY:

Q.   Was it your understanding that the Chicago Police Department -- I'll say the Chicago Police Department.  You were with the Chicago Police Department for a long time, right?

Gawrys - directy by Loevy

1778

A.  Yes.

Q.  All right.  If Orlando Lopez says, "I'm picking a guy and it's the wrong guy," would the Chicago Police Department have written down he picked a filler?

        MS. ROSEN:  Objection, Judge, to the form of the question.

        THE COURT:  Overruled.  If the witness knows.

BY THE WITNESS:

A.  Are you asking about policy or --

BY MR. LOEVY:

Q.  I'll ask it both ways.  We'll start with what's on the books.  The letter in the policy says you're supposed to write it down, right?

A.  Yes.

Q.  Now, let's talk about the practice --

        MR. SOTOS:  Judge, I object because he's asking him if he was supposed to write it down at the time of this --

        MR. LOEVY:  Your Honor, he is a --

        THE COURT:  You know, if we need to have a sidebar to get this worked out, I guess we have to do it, but I'm not having any lawyer speeches, let me say that, okay.  If there's an objection, just tell me the basis for the objection.

        MR. SOTOS:  Objection, foundation, Judge.

        THE COURT:  And, again, as long as the question is clear, the witness should be able to say he knows or he doesn't

know.

BY THE WITNESS:

A.   Would you ask it again, please.

BY MR. LOEVY:

Q.   Sure.  Was it the policy or the practice, I want to start with the policy.

        The policy on the books as written required you to write it down if Orlando Lopez had picked a filler.  You have to write down the name of the filler, that was the policy on the books, right?

A.   I'm not sure, but I believe so.

Q.   All right.  In practice, though, while you were at the Chicago Police Department, if he picked the wrong guy you didn't write down the name of the guy he picked, that's true, is it not?

A.   I'm not sure.

Q.   All right.  After the first lineup -- and you don't know if there was or wasn't a lineup.  It sounds like you just don't, remember, right?

A.   I don't recall.  I wasn't working.

Q.   All right.  But you know Jacques was released on the 31st, correct?

A.   I know now, yes.

Q.   Yes.  So if Orlando had picked Jacques at a lineup, and that's hypothetical, he certainly wouldn't have been released,

right?

A. Correct.

Q. All right. And Orlando believes he picked somebody, right?

MR. GIVEN: Objection; mischaracterizes.

MR. LOEVY: I'll move on Your Honor.

BY MR. LOEVY:

Q. All right. Let's change topics. After Mr. Rivera was released on the 31st, the investigation kind of went dormant, right?

A. Correct.

Q. Nothing happened --

A. On our part, yes. On the Gang Crime Specialists part.

Q. Well, you know from the paperwork it went dormant on the detective part, too, right?

MR. GIVEN: Jon, I'm sorry. Can I see what you're putting up?

MR. LOEVY: It's the same chronology, Jeff, that we've been using.

Do we have a hardcopy of this one to give, Jeff.

(Brief pause).

(Exhibit published to the jury.)

BY MR. LOEVY:

Q. All right. So it kind of went dormant after Jacques was released on the 31st?

A. Yes; my understanding.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 101 of 1335 PageID #:105486
Gawrys - directy by Loevy
1781

Q. All right. And I want to ask you some questions about Mr. Guevara. Would it be fair to say that he made more arrests than the average Gang Specialists?

A. I have no clue.

Q. You were his partner for 51/2 years, weren't you?

A. Yes.

MR. GIVEN: Judge, I really apologize to Mr. Loevy and the Court, but this is the first time we were handed this, and I do object to something that's on here.

MR. LOEVY: This is the chronology, I think, he's talking about. I could hand Your Honor a copy. We've been using it the whole trial.

(Document tendered to the Court.)

MR. LOEVY: Your Honor, if it would move things along we'll stipulate that the defense doesn't agree to it, how about that?

MR. GIVEN: The word at the end of the timeline, Judge, "fake report."

THE COURT: Oh, okay. Well, obviously that's argumentative.

MR. LOEVY: I'm sorry, Your Honor.

BY MR. LOEVY:

Q. The September 16th report uses the word "fake." It's got the wrong dates in it, right?

A. Yes.

Q. You said that the victim identified Jacques even though the victim didn't identify Jacques, right? Remember it was the September 10th you said --

A. Oh, in the hospital?

Q. Yes.

A. Yes, I wrote the wrong date down.

Q. And you said it's Gang Crimes North, but it really should've the house, right? That's three material problems with that report, right?

A. Correct.

Q. Now, I used the borrowed "fake." What adjective would you prefer to use? Inaccurate? Unreliable? How would you characterize that report?

A. Mistake.

Q. Mistake in the report. All right.

All right, back to Mr. Guevara. He -- when detectives -- I'm sorry when Gang Crime Specialists made more arrests, they got more overtime opportunities, correct?

A. It depends.

Q. And, in fact, when you make arrests and initiate criminal cases, you get to go to court. And that generates more income from overtime, correct?

A. It depends. Well, it depends on what you're working, what shift.

Q. We had some confusion about Mr. Guevara's child support

obligations, but he was under considerable financial pressure, he wasn't?

MR. GIVEN: Judge, objection. Form, foundation. It's argumentive.

THE COURT: Sustained. I don't know why that is relevant.

Q. He had considerable financial pressure, correct?

MR. GIVEN: Objection.

MR. LOEVY: We're going to tie it up in the overtime, Your Honor.

MR. GIVEN: Same objection. Foundation and competence. And I object to him asking this question again in front of the jury.

THE COURT: Well, I think we need to talk about it. I don't understand why you're asking this of this witness.

MR. LOEVY: Would you like me -- it's a financial motive. It's motive. He was under --

THE COURT: All right. So if the witness knows.

MR. LOEVY: All right.

BY MR. LOEVY:

Q. Mr. Guevara, in your experience being his partner all those years, he had substantial child support obligations that made him frequently hard-up for money, would you agree with that?

A. He did pay child support.

Q. How many children did he have?

A.  I only knew about 12.  10 or 12.

Q.  All right.  But he was always looking for overtime hours, correct?

A.  He wasn't looking, no.

Q.  All right.

MR. LOEVY:  This is page 271, lines 2 through 7.

(Videotape played).

BY MR. LOEVY:

Q.  Does that refresh your recollection that Rey was looking for overtime to get more money?

A.  Yes.

Q.  All right.  And when he made as arrests and made cases, he got to go to court and he got paid overtime, right?

A.  Yes, it was an option.

Q.  All right.  Before your deposition you called Mr. Guevara, correct?

A.  When?  I don't understand.

Q.  You knew you got sued in the case, right?

A.  Pardon me?

Q.  You got sued and you had to give a deposition?

A.  Yes.

Q.  And you called Mr. Guevara, right?

A.  Yes, we talked.

Q.  And did you ask him why he was refusing to answer questions on the ground he was taking the Fifth and refused to answer

questions?

A. I don't recall asking him.

Q. All right. You didn't ask him, did you?

A. I'm not sure.

MR. LOEVY: This is page 87, lines 4 through 6.

(Videotape played).

BY MR. LOEVY:

Q. All right. You didn't ask him why he was taking the Fifth, right?

A. Are you asking me?

Q. Yes.

MR. GIVEN: He said "I did not ask him."

MR. LOEVY: Right.

BY MR. LOEVY:

Q. Was that was truthful what you said on that, right?

A. Yes.

Q. All right. And so you didn't say to him, "Rey, why aren't you denying Mr. Rivera's allegations? Why are you refusing to answer the questions?" Those are not the questions you asked him?

A. I don't think so. I don't recall.

Q. Have you seen Mr. Guevara commit some of the misconduct that we talked about during his exam? Were you his partner when any of that occurred?

MR. GIVEN: Judge, objection to the form of the

question.

THE COURT:  I think you need to be specific.

MR. LOEVY:  All right.

BY MR. LOEVY:

Q.  Do you remember I was asking Mr. Guevara questions about you the Thomas Sierra investigation?

A.  Basically, yes.

Q.  And that was in May 1995.  Were you Mr. Guevara's partner during that time period?

A.  I may have been.

Q.  Did you participate in that investigation?

A.  I don't remember.

Q.  All right.  Did you see Mr. Guevara show photographs of Mr. Melendez and Mr. -- to Mr. Melendez and Mr. Rodriguez and try to get them to identify his suspects?

A.  I don't remember any of that.

Q.  Might have, might not, you can't remember either way?

A.  I don't remember anything.

Q.  All right.  But you're not denying it happened, you're just saying you don't remember?

A.  I don't remember the case.

Q.  All right.  But you're not denying it happened, you're just saying you don't remember?

A.  I don't remember the case.

Q.  Would Mr. Guevara sometimes show the witnesses the pictures

and say, "Hey, this is the guy.  This is the guy," did that happen sometimes?

A.  Never saw that.

Q.  All right.  That you do remember?

A.  Yes.

Q.  All right.  Did it happen in the Juan Johnson case?

A.  No, nothing happened in Juan Johnson case.

Q.  Well, did Mr. Guevara suggest to Sam Perez and Sal Ortiz, "Hey, these are the suspects, maybe you should pick them"?  Are you saying "I don't remember" or that didn't happen?

        MR. GIVEN:  Objection; foundation.

        THE COURT:  Overruled.

BY THE WITNESS:

A.  That didn't happen.

BY MR. LOEVY:

Q.  In at least your presence, right?

A.  Right.

Q.  All right.  What would you have done if you saw Mr. Guevara showing a witness a picture and saying, "Hey, this could be the guy.  Is this the guy"?

A.  Is this hypothetical again?

Q.  Yes.

A.  Then I would've stopped him.

Q.  Why?

A.  Because it's not right.

Q. Why isn't it right?

A. Because you're telling witnesses what to do.

Q. How about if he was just suggesting, he showed him the pictures and says, "Hey, does this guy look familiar? Could've it been this guy? What do you think," is that improper?

A. Are we saying hypothetical "what if" again?

Q. Yeah. Yeah. Hypothetically, is that improper if Mr. Guevara had said, "Orlando, you know, could've been this guy? Does this guy look familiar?" Is that proper or improper?

A. That's improper.

Q. That's suggestive, would it not?

A. It would be.

Q. How about the Xavier Arcos case, did you witness any of that misconduct?

A. I don't remember the case at all.

MR. SOTOS: Objection, Your Honor.

MR. LEINENWEBER: Objection, Your Honor, the phrasing of the question, "witness misconduct."

THE COURT: Sustained.

BY MR. LOEVY:

Q. Are you familiar with the allegations that Mr. Wilfredo Rosario claimed that Guevara pressured him and basically coached him into identifying a man named Xavier Arcos? You're aware of the allegation, correct?

A. No.

Q. This is the first you're hearing it?

A. I remember the name coming up I think at a news media.

Q. All right. Did you participate in that investigation with Mr. Guevara?

A. I don't remember.

Q. July 29th, 1988, would you have been his partner?

A. Could've been.

Q. How about Freddie Concepcion Santiago, do you remember that one?

A. No, I do not.

Q. July 1st, 1997, shooting, would you have been involved then?

A. No.

Q. How do you know?

A. Because I was -- I made sergeant. Was promoted to sergeant in 1986.

Q. Evelyn Diaz in the Luis Serrano investigation in 1995 was the conviction. Did you witness Mr. Guevara framing Louis Serrano for the murder of Paul Rodriguez?

A. I don't remember the case.

Q. How about Phill Dorsch, do you remember when he made an allegation that Mr. Guevara had shown a witness a picture and told him who to pick?

A. There's some word about it, yes.

Q. All right. Bill Dorsch is a Chicago police detective,

Q. correct?

A. Correct.

Q. Tell the jury what he was alleging.

A. I don't remember all the facts.

Q. But, basically, he was saying in his presence Guevara took a juvenile, showed him the photo, and said, "This is who you should pick. This is who you should pick," right?

A. It was a juvenile? I don't remember that.

Q. You don't remember him being a juvenile. You remember him being a witness, right?

A. A witness.

Q. Did you talk to Mr. Dorsch about those allegations?

A. No.

Q. Why not?

A. I had no reason to.

Q. All right. Did Mr. Mingey make any admissions to you about anything he had improper in this investigation?

A. Never said anything.

Q. Do you know why he's refusing to answer questions on the ground that the truth could incriminate him?

A. I have no idea.

Q. All right. Changing topics again. Ms. McLaughlin back in 1988, did she have light-colored hair?

A. I think I said in my deposition that she did.

Q. Well, let's focus on the question. Did she have

light-colored hair?

A. I know now no.

MR. LOEVY: Playing 174, lines 9 through 15.

(Videotape played).

BY MR. LOEVY:

Q. First of all, did you give those answers?

A. Yes, I did.

Q. Is that how you remembered her when you thought back on her?

A. That's what I thought.

Q. All right. Let's change again. The photo that Mr. Valentin picked out and Mr. Lopez picked out, what was the name of that person?

Something about Jose Rios or something?

A. What are you saying again?

Q. What was the name of the person whose photo that the witness supposedly picked out?

Would it refresh your recollection to look at your report, sir?

A. Which witness?

Oh, Rios, Jose Rios.

Q. All right. Who's Jose Rios?

A. Listed as Jacques Rivera.

Q. All right. Jose was a common name in Humboldt Park, right?

A. It was, yes.

Q. And Rios was a common name in Humboldt Park, correct?

A. Yes.

Q. So the name Jose Rios is basically like John Smith, right?

MR. GIVEN: Objection; form.

BY THE WITNESS:

A. Could it be.

THE COURT: Overruled.

BY MR. LOEVY:

Q. All right. So the victim and the witness picked out Jose Rios. And you decided or you believed you had at least some reason to believe that Jose Rios was a name that Jacques had used when he was 16, correct?

A. Yes.

Q. And he had been arrested for disorderly conduct and he told the police his name was Jose Rios, right?

A. Correct.

Q. And you guys didn't find any evidence he'd ever used that name other than that one time when he was 16, right?

A. I don't know.

Q. And was the victim and the witness shown a picture in the gang book, in the mugshot book, of when Jacques was 16?

A. I have no idea.

Q. Well, how could we don't know what the picture was from the gang book?

A. I don't understand the question.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 113 of 1335 PageID #:10549B
Gawrys - directy by Loevy
1793

Q. Was it photocopied?

A. The picture in the gang book?

Q. The picture that the victim and the witness supposedly said, "that's the guy," was any record made of what that picture was?

A. I don't remember seeing one.

Q. You've never seen one, have you?

A. I don't think so, no.

Q. All right. So was it the practice back then if a witness is going to pick a picture from a mugshot book that you'd at least photocopy it?

A. You could, yes.

Q. But you didn't have to, apparently?

A. Not sure.

Q. I mean, the pictures in the book would get taken out and put in sometimes, wouldn't they?

A. That was done by staff, administrative staff.

Q. But the question was, just sometimes people would take the pictures out of the book, put in pictures, right?

A. Other people?

Q. No, the book wasn't a static. You could take them out and put them in, right?

A. Yeah, you could remove them.

Q. All right. Because, for example, as time passed you don't want guys from the 70's, now you want guys from the 80's,

right?

A. Probably, yes.

Q. All right. So if the pictures were going in and out, then how do we know what picture Orlando picture when he was going through the book?

A. I have no idea.

Q. Was the policy and practices of the police department, did those require you to make a record so there's a firm memorialization of what picture he picked?

A. I guess there should be, yes.

Q. All right. You didn't do that in this case, though, right?

A. I didn't do it?

Q. Nobody did in this case, right?

A. I don't remember seeing any documents.

Q. All right. How about training, did you ever get any training on how to conduct a photo identification with gang books?

A. As a Gang Crime Specialists?

Q. Any training about how to conduct photo identifications with gang books during your career?

A. Yes, there was informal training.

        MR. LOEVY: This is lines 14 through 18.

        MR. GIVEN: I'm sorry, what page, Jon?

        MR. LOEVY: 27th, lines 14 through 18.

    (Videotape played).

MR. LOEVY:

Q. You don't remember any training about any arrays, correct?

A. As Gang Crimes Specialists?

Q. As a Chicago police officer. We're not going to get hung up on --

MR. GIVEN: Objection.

THE COURT: No, the deposition question was about a specific position.

BY MR. LOEVY:

Q. Let's focus on Gang Crime Specialists, all right.

A. Okay.

Q. As a Gang Crime Specialists you didn't receive any photo array training, right?

A. No formal training.

Q. And, by the way, on the last question, only the gang people were doing gang book identifications, right?

A. No, detectives would come over to the office and use our books, I think, once in a while.

Q. All right. So sometimes McLaughlin might've been using the gang books, too, right?

A. It could be. They were available.

Q. All right. How about training on photo arrays, do you recall any training as a Gang Crime Specialists on photo arrays?

A. Informal training.

Gawrys - directy by Loevy

Q. But no formal training by the Chicago Police Department?

A. As a Gang Crime Specialists?

Q. Yes.

A. I don't think so.

Q. How about -- would you -- would you shred your notes, as a Gang Crime Specialists would you shred your notes after you wrote up your report?

A. Yes, I did.

Q. All right. Was that part of your job training that once you got notes, you should shred them?

A. No.

Q. As a Gang Crime Specialists in the late '80s.

A. I don't believe so.

MR. LOEVY: This is page 37, Lines 5 through 20.

MR. GIVEN: Can you hold on a minute until I get there.

(Brief pause).

MR. GIVEN: Thank you.

(Videotape played).

BY MR. LOEVY:

Q. Did you give those answers, sir?

A. Yes.

Q. Were they true?

A. Yes.

Q. All right. Did anybody ever tell you, you know what, you

really shouldn't be shredding your notes?

A. I don't recall.

Q. Was it -- were you thinking you were the only one shredding your notes or where you stood and your vantage point did you feel like all the Gang Crime Specialists were shredding their notes?

A. I don't know.

Q. Well, you worked with a lot of Gang Crime Specialists, right?

A. Yeah, but I don't recall.

Q. Did you feel like you were the only one shredding them?

A. I don't recall.

Q. Was there a shredder?

A. Yes.

Q. All right. Did you see people using it?

A. I don't remember.

Q. All right. Let's go back to the investigation. Now, according to you, Jacques has been identified in the lineup, right, as a suspect?

A. Yes.

Q. All right. So why wasn't Jacques arrested on September 1st, September 2nd, September 3rd, all those other dates?

MR. LOEVY: I'm going to show this calendar. I don't think this is controversial, Your Honor it's a calendar.

MR. GIVEN: So far it's fine, Your Honor. I'd like to see whatever he's going to put on it.

MR. LOEVY: I'm not putting anything on it. I won't put anything on it.

MR. LOEVY:

Q. All right. Jacques is released on the 31st, right?

A. Yes.

Q. And on the 1st, the 2nd, the 3rd, the 4th, the 5th, the 6th. If Jacques was really a cold-blooded killer, why didn't anybody go find the kid and see if we could close this case?

A. I have no idea.

Q. You were the Gang Crime Specialists, right?

A. Yes.

Q. And the Gang Crime Specialists are the ones that were interfacing with Orlando Lopez, right?

A. Correct.

Q. All right. If, in fact, he really did identify Jacques and he really did not identify a filler at that lineup, you guys would not have left someone you thought was a killer on the street for 2 weeks, would you have?

MR. GIVEN: Judge, objection, foundation. Assumes a fact not in evidence.

THE COURT: Actually, it's been asked and answered.

MR. GIVEN: Okay.

BY MR. LOEVY:

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 119 of 1335 PageID #:105509
Gawrys - directy by Loevy
1799

Q. All right. No later than the 10th of September you claim you have the victim identifying Jacques, right?

A. Right.

Q. And the reason you didn't identify Jacques back then is because it wasn't a good identification?

A. Right.

Q. Because he was in a coma?

A. We wrote to wrong date down.

Q. Now, your report also says that you tried to visit him numerous times, right, at the hospital?

A. Yes.

Q. All right. Where are your notes on what happened during those numerous attempts to visit the victim?

A. Don't know. I have no idea.

Q. Well, you do know. They're shredded, right?

A. I don't remember doing that.

Q. All right. Did you find the victim -- you saw Dr. Sharkey said that until September 4th or September 5th the victim could talk -- I'm sorry, could nod and neurological functions dropped off a little bit. Do you remember having any interactions with him where you actually interacted with him during these numerous attempts?

A. I don't remember being at the hospital.

Q. You do remember being at the hospital? Did I mishear you? Did you say you do or you don't? I didn't hear you.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 120 of 1335 PageID #:105505
Gawrys - directy by Loevy
1800

A.  I don't remember.

Q.  Okay.  I'll try and move forward here.

Now, I asked you a few questions about why you didn't write it down, but you would agree with me that if you got it on the 10th, you're supposed to write it down on the 10th, you're supposed to make a report on the 10th, right?

MR. GIVEN:  Asked and answered.

THE COURT:  I think it has been asked and answered. Are you using it to say when and getting into something else?

MR. LOEVY:  Yes, Your Honor.

THE COURT:  I'll overrule it.

BY THE WITNESS:

A.  Say it again.

MR. LOEVY:

Q.  If it really happened on the 10th, you're supposed to write it down on the 10th, right?

A.  Correct.

Q.  And we have talked about why you didn't.

A.  Right.

Q.  Okay.  Now, you did arrest Jacques on the 15th, right?

A.  Correct.

Q.  And what happened was, the victim died on -- do you remember what day the victim died?

A.  The 14th.

Q.  The 14th.  Now you got an unsolved homicide, right?

A. Correct.

Q. And unsolved homicides are bad for the staff, bad for the department, right?

MR. GIVEN: Objection to form.

THE COURT: Well, it's compound --

MR. GIVEN: And characterization also.

THE COURT: Overruled.

MR. GIVEN: Bad for the staff? Come on.

THE COURT: Let's hear how it's broken down.

BY MR. LOEVY:

Q. Unsolved homicides aren't good for the staff, right?

A. No.

Q. All right. So, you know, it's a reflection on the Gang Crime Specialists how well they close cases, is that a fair summary?

A. We don't close homicide cases.

Q. All right. But in this case you helped the detectives close this case?

A. Yes, we help detectives.

Q. All right. And that's how you are rewarded at work if do good work and get prosecutions, right?

MR. GIVEN: Objection, form.

THE COURT: Overruled.

BY THE WITNESS:

A. There's no reward.

BY MR. LOEVY:

Q. Well, if you went to work every day and didn't arrest anybody, that wouldn't look so good, right?

A. Right.

Q. And all things being equal, your preference was, let's see if we can prosecute somebody, right?

A. That's not the way it works.

Q. All right. You found Jacques on the street on September 15th, correct?

A. Correct.

Q. He wasn't hiding, right?

A. No.

Q. Wasn't hard to find. He was just living his life, right?

A. Correct.

Q. And he came to the station voluntarily, correct?

A. Correct.

Q. He had a right to refuse to leave, right?

A. Yes.

Q. Now, you waited until after the second lineup when Orlando picked him out to arrest him on the 15th? Was it the 15th or 16th the second lineup?

You arrested him on 15th, right?

A. Yes.

Q. When was the second lineup?

MR. GIVEN: Objection.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 123 of 1335 PageID #:105508
Gawrys - directy by Loevy
1803

BY THE WITNESS:

A.   The same day.

BY MR. LOEVY:

Q.   Same day --

          MR. SOTOS:  Objection, Judge, to the characterization of a second lineup.

          THE COURT:  Sustained.

BY MR. LOEVY:

Q.   It was the second lineup, wasn't it?

A.   I'm -- I'm guessing -- yeah, it was the lineup we picture him up for.  My first.

Q.   Your first.  Let's move on.

          You arrest him on the 15th.  You do a lineup on the 15th.

A.   Correct.

Q.   And then you arrested Jacques Rivera, right?

A.   He was then charged after.

Q.   You didn't arrest him until that second lineup, did you?

          MS. ROSEN:  Objection, Judge, to the second lineup.

          THE COURT:  Sustained.

          MR. LOEVY:  I said "that lineup."

          THE COURT:  That lineup, okay.

          MR. LOEVY:  Maybe I misspoke.

BY MR. LOEVY:

Q.   You didn't arrest Jacques until after that lineup, correct?

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 124 of 1335 PageID #:105509
Gawrys - directy by Loevy
1804

A. He was charged after the lineup.

Q. That is not charging. You didn't arrest Jacques until after that lineup, correct?

A. He was arrested at the time we picked him up.

Q. All right. And that's not what your report says, correct?

A. Correct.

Q. Showing you a report. Your report says he didn't get arrested until he was brought to the station at 555 West Grand, correct?

MR. LOEVY: This is Defendants' Exhibit 1.12, Your Honor.

(Exhibit published to the jury.)

BY MR. LOEVY:

Q. That's what this report says, right?

A. Right.

Q. And the problem with that is, if he didn't get arrested until he got to the station, then it wouldn't have made sense that he was identified before he was brought to the station, right?

A. He came in voluntarily.

Q. All right. And you claim that this is another typo, don't you?

A. I don't claim anything, no.

Q. Do you remember giving a deposition.

MR. LOEVY: This is page 232, lines 3, through to 235

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 125 of 1335 PageID #:105510
Gawrys - directy by Loevy
1805

line 3.

BY MR. LOEVY:

Q. And let me ask the question first. Isn't it true you claim that the only thing you remember about this case is that this address on this arrest report is shown where Jacques was arrested is a mistake?

A. Yeah, it could be. I would think he was arrested, wrong address.

MR. GIVEN: What page?

MR. LOEVY: It's page 232 line 3 through 235 line 3.

MR. SOTOS: Okay.

(Videotape played) .

MR. LOEVY: If you could keep going. I got the wrong clip. I apologize.

BY MR. LOEVY:

Q. Do you remember saying at your deposition that the only thing you remember about the case was that that was a mistake?

A. I don't remember that. No, I don't.

Q. All right. And the reason the mistake mattered is because you didn't arrest him until he got to the station because he was never identified at the hospital, right?

A. No, that's not the reason.

Q. In the second lineup, you were involved in that lineup, correct?

MS. ROSEN: Objection.

BY MR. LOEVY:

Q. I'm sorry. The lineup on the 15th, the September 15th lineup?

A. Yes.

Q. You were involved in that lineup, correct?

A. Yes, I was there.

Q. All right. Why wasn't -- and showing you 19G.

(Exhibit published to the jury.)

BY MR. LOEVY:

Q. Why wasn't Jose Rodriguez in the second lineup, the guy that the victim said did it?

A. I have no idea.

Q. All right. You knew something about the case back then, right?

A. Yes.

Q. Do you agree that it's not legit to do a lineup for Orlando Lopez if the boy that the victim said did it, Jose Rodriguez, isn't even in the lineup, is that legit?

A. You could run a second lineup.

Q. All right. But no such second lineup was run correct?

A. Correct.

Q. So that wasn't legit, was it?

MS. ROSEN: Object to the form, Judge "legit."

THE COURT: Sustained.

BY MR. LOEVY:

Q. Orlando Lopez was never given a chance to see Jose Rodriguez, correct?

MR. GIVEN: Objection to form, foundation.

THE COURT: If the witness knows.

BY THE WITNESS:

A. I don't know.

BY MR. LOEVY:

Q. You have seen all the paperwork, right?

A. Right.

Q. Did it give any explanation for why Orlando was never given the opportunity to identify the boy that the victim said did it?

A. I have no -- no, no explanation for it.

Q. All right. A September 15th lineup did occur, correct?

A. Correct.

Q. And the boy had -- Orlando had seen photos of Jacques prior to that lineup, correct?

A. (No response.)

Q. At least he had seen the gang book photo at a minimum, right?

A. Yeah. Prior, way prior.

Q. All right. And this time he picked out Jacques, correct?

A. Where? What do you picked out?

Q. At the September 15th lineup he picked Jacques, correct?

A. Yes. Yes.

Q. All right. So now you had a murder case, right?

A. Correct.

Q. And here was a lose end, though, right?

A. Yes.

Q. And that loose end was, Jose Rodriguez was still sort of floating out there, right?

A. Correct.

Q. And if we were to do the chronology back to the timeline, after you guys, the people working on the case, after Jacques was arrested on the 30th --

MR. GIVEN: Judge, I'd like to see it.

MR. LOEVY: I've already shown this to him, Your Honor. He has the exhibit.

MR. GIVEN: Where are you going to put that?

BY MR. LOEVY:

Q. Well, tell me where I should put this. When did the victim say it was Rodriguez?

Would you like the report, sir?

(Document tendered to the witness).

BY MR. LOEVY:

Q. It's dated 31st of August, correct?

A. Yes.

Q. All right. May have it back?

A. Sure.

(Said item tendered.)

MR. LOEVY: Your Honor, we would like to put the victim's name is Rodriguez on the 31st of August.

Any objection?

MR. GIVEN: Go ahead.

(Exhibit published to the jury.)

BY MR. LOEVY:

Q. All right. Now, that was inconvenient in the investigation, correct?

MS. ROSEN: Objection to the foundation "inconvenient."

THE COURT: Sustained.

BY MR. LOEVY:

Q. By the 30th you had already built a case, "you" being the investigators working on the case, that Jacques Rivera was the killer, right?

MR. SOTOS: Objection. Judge, first of all, there's no killer on the 30th. Second, I object to the use of th word "you."

THE COURT: Sustained.

BY MR. LOEVY:

Q. Okay. The shooter, you being the Gang Specialists and he detectives working on the case, you had already developed evidence that Jacques was supposedly the shooter prior to the victim saying, "I know would shot me, it was Jose Rodriguez," correct."

A. I didn't develop that information.

Q. All right. But you did learn after the fact that the victim was saying it was Jose Rodriguez, right?

A. Yes; from reports.

Q. All right. And you were the guy -- you and Guevara were the Gang Crime Specialists, right?

A. Correct.

Q. So you were supposed to go talk to the gang members, right?

A. I don't understand what you're asking.

Q. That was your whole role was the detectives say, "We don't know these kids that are in gangs. Gawrys and Guevara know the kinds in the gang," that's why you're part of this, right?

A. We were asked to pick him up.

Q. All right. Pick up Rodriguez?

A. No, pick up Rivera.

Q. I'm talking about Rodriguez.

A. I have no knowledge of Rodriguez.

Q. You have no notes, right?

A. No.

Q. No reports, right?

A. No.

Q. But you acknowledge, that although you have no memory, that you're the one whose role it would've been, you and Guevara, to go out and find to the gang member witnesses, correct?

MR. GIVEN: Judge I'll object to the foundation with

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 131 of 1335 PageID #:105516
Gawrys - directy by Loevy
1811

regard to Nieves and Rodriguez.

THE COURT: Overruled.

BY THE WITNESS:

A. It could been any number of officers.

BY MR. LOEVY:

Q. All right. Well, we did hear from Ms. McLaughlin that she said that the detectives say, You know what? We need help. We'll call the Gang Crimes guys because they know the guys that are in the, so we called them to go talk to the gang guys. That's how it works, right?

A. Sometimes.

Q. And they called you and said, "Go get Jose Rodriguez," right?

A. I don't remember that.

Q. All right. But you know he was arrested and brought to the station --

MR. GIVEN: Judge, we're now --

MR. LOEVY: -- on the 31st, correct?

MR. GIVEN: -- hearing a mischaracterizing evidence that doesn't even exist in the record.

MR. LOEVY: Your Honor, the question was, you now know Jose Rodriguez was brought to the station on the 31st, that's accurate.

THE COURT: Overruled.

BY MR. LOEVY:

Q. That's accurate, wasn't it?

A. I wasn't working on the 31st, I don't believe.

Q. All right, I said you now know. His name is on that report we showed with the six names, right, on the 31st of August.

MR. LOEVY: Do we have a copy of that? I don't want to misrepresent anything.

MR. GIVEN: I'm loath to do a speaking objection, but the evidence shows that Rodriguez and Nieves were 14th District tactical officers, not Gang Specialists.

THE COURT: Well, the question is were they in a lineup. That's the question, right?

MR. GIVEN: But this is all about him bringing them in --

MR. LOEVY: That's a speech, Your Honor.

THE COURT: Let me just hear an objection, if there is one. Go ahead.

MR. GIVEN: Objection misleading. Assumes facts not in evidence.

THE COURT: Let me hear the question.

MR. LOEVY:

Q. On the 31st of August Rodriguez was in the station, right?

A. I assume, but I wasn't there, so ....

Q. And Guevara might've been, right?

A. I don't know. May have.

Q. All right. All I'm trying to establish, though, is,

whoever brought him in, the gang guys are the ones that interact with the guys who are in the gangs, right? That's your role?

A. We're one of the people that do, yes.

Q. All right.

THE COURT: And, Mr. Loevy, when reach a breaking point, I think we need to take a lunch break.

MR. LOEVY: Let's do that right here, Your Honor.

THE COURT: All right. 1:15, ladies and gentlemen.

And let me just say before I forget that tomorrow is Friday, but I don't have to do anything in court tomorrow morning, so we can start at 9:30.

COURT SECURITY OFFICER: All rise.

(The following proceedings were had out of the presence of the jury in open court:)

MR. SOTOS: Judge, we'd ask the Court for permission to file with the Court a very brief rebuttal to the issue about Ms. Linzer's hearsay testimony.

THE COURT: Sure.

MR. SOTOS: I don't the specifics of it, but apparently there is a case decided on the very same day as the McClain case also by the Seventh Circuit.

THE COURT: Just give it to me.

MR. SOTOS: So we'll get it filed very, very shortly so you can read it.

Gawrys - directy by Loevy

1814

THE COURT: Do you have a copy that I could have?

MR. SOTOS: Right now I have in iPad. It's getting copied right now.

THE COURT: Do you the case?

MR. SOTOS: Yes, the case is United States versus Finley, 934 F.2d 837.

THE COURT: 934 F.2d 837?

MR. SOTOS: Yes. Seventh Circuit's 1991. I won't argue it now --

THE COURT: I'm going to read it. That's probably all I need to do.

MR. SOTOS: All right.

THE COURT: You're saying it was the same day as the other case?

MR. SOTOS: Same day. I think it was the same case.

THE COURT: All right. I think it was the same case, actually, but it wasn't in the reported case, I don't think. I think the reported case on McClain was just one defendant.

MR. SOTOS: Correct.

THE COURT: But there was a reference to Finley.

MR. BRUEGGEN: We also raise another argument in our motion.

THE COURT: I'll look.

MR. SOTOS: Your Honor, we're going to get this to you very, very shortly.

THE COURT: Right. That's fine.

MR. LOEVY: We had an issue, but it can wait right before the end of the break. It's a short issue.

THE COURT: Tell me what it is, because I have a legislature I want to listen to online, so ...

MR. LOEVY: We are going to hand you a memorandum here. There was a procedure used in the Fields trial with Judge Kennelly. I think it's self-explanatory. I'll hand it to you and you'll be able to see it. I've given a copy to defense, too.

(Document tendered to the Court.)

THE COURT: Okay. Thank you.

All right. So unless something comes up and you need me, we'll aim for like ten after, okay.

MR. LOEVY: See you then. Thank you.

MR. SOTOS: Thanks, Judge.

(Luncheon recess taken from 12:16 o'clock p.m.
to 12:50 o'clock p.m.)

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JACQUES RIVERA,                          ) No. 12 CV 4428
                                         )
            Plaintiff,                   )
vs.                                      ) Chicago, Illinois
                                         )
Rey GUEVARA, STEVE GAWRYS, DANIEL NOON,  )
JOHN GUZMAN, JOSEPH FALLON, JOSEPH SPARKS, )
PAUL ZACHARIAS, GILLIAN MCLAUGHLIN, JOHN )
LEONARD, EDWARD MINGEY, RUSSELL WEINGART, ) June 14, 2018
ESTATE OF ROCCO RINALDI, City OF CHICAGO, )
                                         )
            Defendants.                  ) 1:10 o'clock a.m.

VOLUME 14
TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JOAN B. GOTTSCHALL
and a jury

APPEARANCES:

For the Plaintiff:      LOEVY & LOEVY
                        BY:  MR. JONATHAN I. LOEVY
                             MR. STEVEN E. ART
                             MR. ANAND SWAMINATHAN
                          311 North Aberdeen Street
                          3rd Floor
                          Chicago, Illinois  60607

                        MACARTHUR JUSTICE CENTER
                        Northwestern University School of Law
                        BY:  Locke E. Bowman, III
                        357 East Chicago Avenue
                        Chicago, Illinois 60611
                        (312) 503-0844


Court reporter:             Blanca I. Lara
                        Official Court Reporter
                        219 South Dearborn Street
                             Room 2504
                        Chicago, Illinois 60604
                          (312) 435-5895
                        blanca_lara@ilnd.uscourts.gov

Gawrys - directy by Loevy

1817

Appearances  (continued:)

For the Individual        THE SOTOS LAW FIRM
Defendants:               BY:  MR. JEFFREY N. GIVEN
                               MR. JAMES G. SOTOS
                               MS. CAROLINE P. GOLDEN
                               MR. JOSEPH M. POLICK
                               MR. DAVID A. BRUEGGEN
                          550 East Devon Avenue
                          Suite 150
                          Itasca, Illinois  60143

For the Defendant         ROCK FUSCO & CONNELLY, LLC
City of Chicago:          BY:  MS. EILEEN E. ROSEN
                               MS. CATHERINE M. BARBER
                               MS. THERESA B. CARNEY
                          321 North Clark Street
                          Suite 2200
                          Chicago, Illinois  60654

For the Defendant         LEINENWEBER BARONI & DAFFADA, LLC
Guevara:                  BY:  MR. THOMAS E. LEINENWEBER
                               MR. JAMES V. DAFFADA
                          120 North LaSalle Street
                           Suite 2000
                           Chicago, Illinois  60602

(The following proceedings were had out of the presence of the jury in open court:)

COURT SECURITY OFFICER: All rise.

THE COURT: Okay. Very quickly. I've gotten in red the defense brief. I read Finley. I do not share the defense's interpretation of what these cases mean. It seems to me that McClain confirms as 806 establishes that the deponent in the circumstances when somebody is not on the witness stand does not need to be a witness statement. And what Finley says is that you have to be sure that the impeaching statement is independently admissible as an impeachment statement. That's all I think. So I'm not altering my rule.

Now, in terms of the brief that the plaintiff gave me, I think we have two things that have to be established. If you have a Google map confirmation of the distance of that street, from the store to that corner, I think I can take judicial notice of that. If you have a way that I can figure out what the hallway length is --

MR. LOEVY: We got a tape measure here, Your Honor.

THE COURT: All right. Maybe everybody needs to look at that. I think it's okay to take the jury out. I think they'd be thrilled to get out from their chairs and go out into the hall; I would be.

Is there anything else you're asking?

MR. LOEVY: No.

THE COURT:  All right.

MR. LOEVY:  Although, we have to decide on the preparatory language, I guess.  The judge gave a qualifier --

MR. ART:  That's in our motion.

MR. LOEVY:  All right.  The motion says Judge Kennelly puts out an --

What do you call it?

MR. ART:  An instruction.

MR. LOEVY:  An instruction to the jury.

THE COURT:  An instruction of what?

MR. LOEVY:  You have the brief there --

MR. ART:  Well, we --

THE COURT:  You know what?  Do we have a brief here?

MR. ART:  Your Honor, we listed the entire instruction in that brief.

MR. LOEVY:  So we might just use Judge Kennelly's instruction.

THE COURT:  Well, I'd be happy to look at it, but I don't know where it is.  My desk is covered with stuff.

MR. LOEVY:  We don't have to that it now.  We're not going to do it this afternoon.

THE COURT:  We're not going to do it this afternoon?

MR. LOEVY:  No.

THE COURT:  All right.  And I would ask you, Mr. Loevy, if you could just slow down enough so that I don't have

a million objections based on errors and questions, because it is very difficult to be dealing with this constant interruption.  I'm having trouble, I'm sure the jury is having trouble, too.  So I think you just need to slow down a little bit and make sure the questions -- you know, if there is some other objection, I can deal with that, but if I have to start trying to figure out if the question is right or wrong, or there's stuff on the board that board shouldn't on the board, that's really troublesome.

Okay.  Anything else?

MR. LEINENWEBER:  Yes, Your Honor.  Judge, during Detective Gawrys' testimony we met at sidebar.  Someone's deposition was published to the jury from the video.  It's something that I believe was on the screen in front of the jury for about thirty seconds was, about the FBI --"

THE COURT:  Yeah, we dealt with that at sidebar.

MR. LEINENWEBER:  Obviously, Judge, and I do accept counsel's representation --

THE COURT:  Well, what do you want?

MR. LEINENWEBER:  What I'm saying is I'm moving for a mistrial on that basis.

THE COURT:  And it is deny.

MR. LEINENWEBER:  Thank you.

MR. LOEVY:  Your Honor, it was on the screen for about three seconds.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 141 of 1335 PageID #:105526
Gawrys - directy by Loevy
1821

THE COURT: You know what? Listen, as Judge Will used to say, and this is before your time, when you've won, stop arguing.

MR. LOEVY: I want to put on the record it was less than three seconds.

MR. GIVEN: That's not true.

MR. LOEVY: So let's say we have a dispute. Four seconds?

MR. SOTOS: There shouldn't be a dispute about that. That was wasn't less that three seconds. People were looking at it.

MR. LOEVY: How many seconds?

THE COURT: You know, why don't you get some pistols and go out and shoot one another.

Let's get the jury.

MR. GIVEN: Jon, Jon --

THE COURT: I'm not spending anymore time on this.

MR. GIVEN: Have you told her what we agreed?

MR. LOEVY: We haven't agreed. We're going to see how the exam goes. You may break in and you may not.

THE COURT: And I've got 2:15, 2:30 we're going to have to switch court reporters. So we'll have to take a short break at that point.

Let's go off the record for a second.

(Discussion had with court reporter off the

record.)

MR. SOTOS: Judge, I've got an issue. I didn't think I was going to have an issue, but I have to make the issue now because counsel made a motion for a mistrial. Respectfully, the court denied it. He said that the language was up on the screen for thirty seconds. I think it was longer than that. We estimated thirty seconds. Mr. Loevy injected into the record that it was three seconds.

So for purposes of the record for the Court to review it, in the event the Appellate Court wants to review it, there should be a clear record. Maybe we need to talk to some other people to find out what people remember --

THE COURT: Well, give me the timing. I've got nothing better to do with my life, I'll time it. You can time it.

MR. LOEVY: It was up there for three seconds. As soon as I saw it, Your Honor, I said "pull it off."

MR. SOTOS: He didn't see it for some time.

THE COURT: That's enough. That's enough. You can talk about this for the next six weeks. You can talk about it for the next twenty years.

MR. SOTOS: Except that, Judge, I just --

THE COURT SECURITY OFFICER: Judge --

THE COURT: Keep the door closed for a second.

What do you want?

MR. SOTOS: I'm trying to make the record clear that he didn't see for some time, was surprised when he saw it, and then --

THE COURT: Well, what do you want me to do, because I'm sick of this.

MR. SOTOS: Judge, I just want the record to be clear in case --

THE COURT: Well, we don't know what to put on the record, Mr. Sotos.

MR. SOTOS: I'm trying to put on the record, Judge.

THE COURT: Well, what are you going to say? Say something. Stop talking about crap and give me how many seconds it was on the screen.

MR. SOTOS: It was on there at least thirty seconds. Mr. Loevy did not see it initially. Said that it wasn't on the screen. Then when he saw that it was on the screen, said get it off the screen, and then sometime after that it came off the screen. It was at least thirty seconds and I just want the record to be clear we dispute that.

THE COURT: I'm assuming it was thirty seconds. I am denying the motion for a mistrial. Let us get the jury.

MR. LEINENWEBER: Thank you, Judge.

THE COURT: I have no idea how long it was up on the screen.

Ben, could you tell them to get the jury.

I don't whether our technology will confirm that, but if you want to confirm it and there's something we can put on the record to be certain, it's fine with me.

(Brief pause).

COURT SECURITY OFFICER:  All rise.

(The following proceedings were had in the presence of the jury in open court:)

THE COURT:  Please be seated everyone.

MR. LOEVY:  May I proceed, Your Honor?

THE COURT:  Yes, you may.

STEPHEN GAWRYS, PLAINTIFF'S WITNESS, SWORN

DIRECT EXAMINATION (resumed)

BY MR. LOEVY:

Q.  All right.  When we left off we were talking about something important happening in the investigation on August 31st?

A.  Correct.

Q.  And you were in court when Officer Letrich described that the victim had communicated to him, "Saw the guy who shot me, wasn't a Latin King, it was an Imperial Gangsters identified as Jose Rodriguez," correct?

A.  Wrong, I was not in court.

Q.  Oh, you were not in court?

A.  No, I was not.

Q.  Is that how you remembered it --

I mean in court, in this court. In this trial, you weren't here that day?

A. Oh, I was here, yes. I thought you meant --

Q. I'm sorry.

A. -- the other trial, sorry.

Q. All right. The way Officer Letrich described what he described, did that trigger your memory that that's what you knew back in 1988?

A. No.

Q. All right. You have no memory either way?

A. No.

Q. At the time, though, that's the kind of information that would've been deemed important, correct?

A. I would think so.

Q. Because this was not just a drive-by bang, bang in a car. Somebody walked up to Felix, shot him 11 times. He was trying to execute him, right?

A. You could argue that.

Q. And you were the Gang Crimes person that had to solve crimes, that was an inference you would have made at the time, right?

A. Maybe.

Q. All right. Another inference you might've drawn was, the shooter was trying to eliminate Valentin as a witness so that Valentin wouldn't be able to identify him, correct?

A. I know nothing about that.

Q. All right. But as a detective you have to solve cases and draw inferences, right?

A. If it takes you in that direction.

Q. All right. And in this direction where it took you was, the victim said, "Jose Rodriguez's photo is the guy that shot him," that's the direction you took, right?

MR. GIVEN: Judge, I'm sorry, but the foundation again. Mr. Loevy is mixing detective and Gang Crime Specialists.

THE COURT: Let's try to get it right.

BY MR. LOEVY:

Q. All right. Did you and Mr. Guevara do any investigation of Jose Rodriguez?

A. No, I believe not.

Q. Is this "I don't remember"? "Yes" or "no"?

A. I don't remember doing anything.

Q. All right. So that is different than "no," right? "I don't remember" and "no" are two different things. I'd like to --

A. Yes. Sorry.

Q. All right. So which is it, "I don't remember" or "we didn't investigate"?

A. I don't remember.

Q. All right. Wouldn't you have tried to talk to Jose

Gawrys - directy by Loevy

1827

Rodriguez and find out if he knew the victim, where he was, those kinds of things?

A. When?

Q. At any point during the entire investigation?

A. Maybe, but we didn't do it. We didn't talk to him.

Q. Let's focus on the maybe. You would have, the would've been the kind of thing that was your job to do, right?

A. Yes.

Q. All right. And are you saying you don't remember if you talked to him or you did not talk to him?

A. I didn't. I do not remember talking to him.

Q. How is it that you remember not talking to him as opposed you don't remember either way?

A. I just don't recall ever taking to him.

Q. All right. So those are two different things, then, right?

A. Okay. Yeah, you could say that.

Q. So which is it?

A. I don't recall talking to him.

Q. You might've, you might not have, right?

A. Yeah.

Q. If you did talk to him, there are no existing notes or reports about what his story was, correct?

A. Correct.

Q. Showing you Plaintiff's Exhibit 9.

(Exhibit published to the jury.)

BY MR. LOEVY:

Q. This is the whole call for Jose Rodriguez. Do you remember that it was expected that Jose was going to be charged with this shooting on September 2nd, 1988, about five days after the shooting? Do you remember that?

A. No.

Q. Any memory at all? Sparking any memory at all?

A. No.

Q. All right. Well, now we're going to fast forward, because we talked a lot this morning about your investigation. And when it came time to the end and Jacques was in handcuffs and the prosecutors were looking at the case -- that's what they do, right? Prosecutors look at the case, right?

A. Right.

Q. Police investigate and they make a hypothesis about who they thought did it, right?

A. Could be, yes, based on the evidence.

Q. And they pick up the phone and hey tell the prosecutors, "Based on our investigation, based on the evidence, we believe we've apprehended somebody who should be charged with a crime," right?

A. That's -- oh, to the ASA? State's Attorney's Office?

Q. Yeah. That's who we're talking about.

A. Yes.

Q. All right. And the State's attorney relies and to some

extent trusts the police department that it's a legitimate case being presented, correct?

A. Correct.

Q. Now, in this case there was a loose end when you -- I'm sorry. You didn't call -- or you don't remember you didn't call the State's attorney or you didn't?

A. It's not my responsibility.

And I have one other thing about the question before you had --

Q. Gh ahead.

A. -- about handcuffing.

Q. Right.

A. I don't think we handcuffed him when we brought him in.

Q. Well, if he shot this guy in cold blood 11 times, why didn't you handcuff him?

A. Because he voluntarily came in.

Q. At some point he was handcuffed, wasn't he?

A. Not from us. No, it's not our procedure.

Q. Fair enough.

Let's go back to where I was talking about the point in the process where the State's attorney gets involved for prosecution. At that point in the process, there was a little problem in the case, wasn't there?

A. I have no idea.

Q. In other words, Orlando Lopez was pointing his finger at

Jacques, but the victim had identified Jose Rodriguez. That's two different people, right?

A. Correct.

Q. And when I said a loose end, it's hard to prosecute a case if the to witnesses are pointing at different people, correct?

MR. GIVEN: Objection, foundation. How does he know how hard it is to prosecute a case?

THE COURT: Overruled.

BY THE WITNESS:

A. Once again, please.

BY MR. LOEVY:

Q. This created a problem for the case, from your percent as a Gang Crime Specialists, that there's only two witnesses and they're both pointing at different people, that is a concern in the investigation, right?

A. Yes.

Q. And you solved that problem, did you not?

A. Yes.

Q. Tell the jury how you solved that loose end, you and Mr. Guevara.

A. I don't really remember.

Q. All right. Well, showing you your report.

MR. LOEVY: This is Plaintiff's Exhibit 1.

(Exhibit published to the jury.)

BY MR. LOEVY:

Q. You wrote in the last paragraph here, this is a new paragraph we haven't looked at yet, "Orlando Lopez, witness ..."

That's young Orlando, right?

A. Correct.

Q. (Reading:)

"... was shown photos of Jose Rodriguez and Phillip Nieves and he stated to RI's..."

That's you and Guevara, right?

A. Correct.

Q. (Reading:)

"... that's these individuals were not involved in the incident," do you see that?

A. Yes.

Q. Now, that's what you wrote in your report, right?

A. Right.

Q. Right?

A. Correct.

Q. So that solved the loose end. Now Rodriguez has been absolved and Jacques has been implicated, correct?

A. Could be, yes.

Q. All right. Did you add this paragraph to the report after the fact to tie up the case, this last paragraph?

A. No.

Q. That would've been a real problem if this paragraph got

added in after-the-fact, wouldn't it?

A.   Sure.

        MS. ROSEN:  Objection "after the fact."  After what fact?

        THE COURT:  Sustained.

BY MR. LOEVY:

Q.   Okay.  This report gets submitted, right?

A.   Yes.

Q.   And you type it and then you submit it, right?

A.   Correct.

Q.   You sit down and type it?

A.   Yes.

Q.   Okay.  Okay.  Did you submit it?

A.   Yes.

Q.   Did you add -- did you add this paragraph after you added all the other information?

A.   No.

Q.   You added it all at the same time?

A.   Yes.

Q.   All right.  In fact, if you added this paragraph at a different point in time, that would be real problem, right?

A.   Correct.

Q.   Explain to the jury why.

A.   Well, you're adding information after a report was already submitted through channels.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 153 of 1335 PageID #:105533
Gawrys - directy by Loevy
1833

Q. All right. And there's no reason why this information would've been added in a different time than the rest of the information, correct?

A. Correct.

Q. Is what happened that the State's attorney raised concern about the fact that Jose was still implicated and you went back and added this paragraph to exclude Jose, is that what happened?

A. I didn't talk to the State's attorney.

Q. All right. Now, this report was created back in the day of typewriters, correct? We've heard about that.

A. Yes.

Q. And typewriters all have their individual quirks and personalities, didn't they?

A. Correct.

Q. And for those of us that are older, you push the button and the thing strikes the -- strikes the --

A. Correct.

Q. And some typewriters acted differently, correct?

A. Correct.

Q. So I'm going to show the typewriter that you used.

MR. LOEVY: Your Honor, this is still Plaintiff's Exhibit 1, but this is the original report from the original file, the Permanent Retention File. I don't know if we need a different number or just the record can reflect this is the

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 154 of 1335 PageID #:105539
Gawrys - directy by Loevy
1834

original.

MS. ROSEN: The Permanent Retention File has a different exhibit number. The original is City Exhibit 15.

THE COURT: That's fine.

MS. ROSEN: But, Judge, we're not going to admit that. That is the original document and so it has to go back to the Chicago Police Department at the conclusion of the trial.

THE COURT: Okay.

MR. LOEVY: We'll call this Exhibit 50A, which is the original version of the report.

MR. GIVEN: Judge, I have an objection to where I believe this is probably headed. And it's an objection based on foundation and competence as to document comparison or something along those lines is what I'm guessing.

THE COURT: You know, it's very difficult for me to anticipate what's happening. You gentlemen and ladies all know the case much better than I do. I've got to hear the question. So make the objection once there's a question if there's a problem.

BY MR. LOEVY:

Q. This is your report, right?

A. Yes.

Q. Take a look at it. This is a report you typed back in 1988, correct?

A. Correct.

Q. You have a foundation to identify this document?

MS. ROSEN: Objection to the form of the question.

THE COURT: Sustained.

MR. LOEVY: May I have it back, please?

THE WITNESS: Sure.

(Said item tendered.)

BY MR. LOEVY:

Q. So you probably haven't touched this document in 30 years, right?

A. Yes.

Q. But 30 years ago, you're the one who created it?

A. Yes.

Q. Now, let's take a look at the typewriter that's typed at the beginning of the document.

And I want to draw your attention to the e's.

MR. GIVEN: Judge, I renew my objection.

THE COURT: This witness is going to be asked to give an opinion on typewriters?

MR. LOEVY: It's not a typewriter. It's a physical piece of paper of a lay opinion --

THE COURT: Let me see what -- let me look at it.

MR. LOEVY: All I'm drawing attention to, Your Honor -- could we put it just on the Judge's screen?

THE COURT: Yes.

MR. LOEVY: All I'm drawing attention to, Your Honor,

Gawrys - directy by Loevy

is the way that this typewriter typed e's and g's, the way they're filled in.  Do you see that, Your Honor?

MR. GIVEN:  Judge, the same objection.

THE COURT:  I'm going to sustain the objection.

MR. LOEVY:  We're going to deal with this.

BY MR. LOEVY:

Q.  I'd like to draw your attention to the last paragraph, the one that may or may not have been added later --

MR. GIVEN:  Judge --

MR. LOEVY:  -- and I would like to draw your attention to the --

MR. GIVEN:  Judge, please.  He's doing the same thing.

MR. LOEVY:  Could we have sidebar, Your Honor?

THE COURT:  Yes.

(Proceedings heard at sidebar on the record)

THE COURT:  I mean, you know, if you just want to give it to the jury, we can fight about that, but whether this gentleman is in any position to give an opinion on this --

MR. LOEVY:  I just want him to acknowledge.  It's not an opinion.  It's an acknowledgement that those are different characteristics.  And also I want him to --

THE COURT:  I don't -- what is the different characteristics?

MR. LOEVY:  Do you see the g's the e's?

THE COURT:  Yes.

MR. LOEVY:  See how they're filled in on every paragraph on this report except this bottom one (indicating). There's no e's that are filled in differently.

And the second thing, Your Honor, is, do you see how this one goes all the way to the margin (indicating)?  Remember when you put a typewriter on a roller?  Every other paragraph here does not go to the margin.

THE COURT:  I'm not comfortable with that myself, to tell you the truth.

MR. LOEVY:  Well, can I show the jury?  I mean, this is evidence.

MR. GIVEN:  Judge -- I'm sorry.

Are you done, Jon?

MR. LOEVY:  I'm saying I would like to show the jury this and have them draw a conclusion.

And the second thing I want to do --

THE COURT:  Well, I think we need to figure that out, but I don't think we need to figure it out right now.  But I don't think it's fair to ask him.

MR. LOEVY:  I think he should have an opportunity -- well, first of all, I'd like to ask his opinion, "Don't you acknowledge that these margins are different?"  Second of all, "don't you acknowledge --"

THE COURT:  Wait.  I don't even see that they are different.

MR. LOEVY: Well, it is small, but this is easily a sixteenth of an inch on every line on this page except this one (indicating). This goes to the left. See the brown line?

THE COURT: I can't -- I can't see it. I guess I see it barely.

MR. LOEVY: These two lines, Your Honor, these two lines here (indicating), they go to the left or equal with the line on the page. Every other line above it is to the right of it.

If you remember, when we had typewriters --

THE COURT: Give me another piece of paper.

MR. GIVEN: Your Honor, may I say something?

THE COURT: Yes.

MR. GIVEN: This is exactly what expert document examiners are called for and to do. And it's outrageous that he's pretending it's anything but something that requires expert testimony.

MR. LOEVY: I just want to ask him is --

THE COURT: I know what you want to ask him. That I understand.

(Brief pause).

MR. LOEVY: Your Honor, if you could use the brown lines as the baseline. The edge of the brown line (indicating).

THE COURT: Yeah, but that's what I can't see.

MR. LOEVY: May I set it up?

THE COURT: Go ahead.

MR. LOEVY: Thank you.

(Brief pause).

MR. LOEVY: The edge of the brown line on the bottom is even --

THE COURT REPORTER: Mr. Loevy, I can't hear you.

MS. ROSEN: She can't hear you.

MR. GIVEN: None of the rest of us can.

MR. LOEVY: The brown line here is to the left --

THE COURT REPORTER: "...the brown line here is to the left ..."

MR. LOEVY: The brown line here is to the left or even with this (indicating). The one above it, there is a space between the brown line and the typing.

What I want him to acknowledge is, this is the typed one (indicating). The bottom one merely goes to the left of the brown line, and on the top one there literally is a sixteenth of an inch --

MR. GIVEN: Judge --

THE COURT: That's who I am, yes.

MR. GIVEN: -- Mr. Loevy is now pretending to be a document examiner expert, he's asking them to draw expert inferences without any foundation.

MR. LOEVY: I want to ask him --

Gawrys - directy by Loevy

1840

THE COURT: Shh. Shh.

MR. LOEVY: This witness typed it himself.

THE COURT: Right. Wait. I understand this.

MR. LOEVY: And then the e's is the other thing.

THE COURT: Yeah. Yeah.

(Brief pause).

MR. LOEVY: And the third question is, does the type look different. It is a different writer.

MR. GIVEN: Judge, another expert opinion.

THE COURT: You know what? I don't know where we're going to go with this. You can ask him if he sees that and then that's all we're going to do with this.

MR. LOEVY: I'd like to publish it to the jury, Your Honor.

THE COURT: No, not today. I have to figure this out.

MR. LOEVY: All right. So I'll ask him if he acknowledges it.

THE COURT: If he --

MR. GIVEN: Judge, I'd like to know what the question is going to be because I can see --

MR. LOEVY: Do you acknowledge --

THE COURT: Don't assume any facts at this point. Just ask him if he sees it.

MR. LOEVY: Right. Okay.

THE COURT: And on the lines and on the e's, you want

to ask him about "g's," and then we can argue about this later.

MR. LOEVY:  All right.

(Proceedings resumed in open court).

MR. LOEVY:  May I approach the witness, Your Honor?

THE COURT:  Yes.

(Document tendered to the witness).

BY MR. LOEVY:

Q.   Take a look at the report.

A.   Okay.

Q.   You're looking at the second page of it, right?  The back?

A.   Right.

Q.   All right.  In the last paragraph do you see that none of the lowercase e's are filled in?  Would you agree with that?

When I say e's are filled in, the circle at the top of the "e."

A.   Okay.

Q.   Do you agree with that?

A.   Yes.

Q.   Now, every other paragraph on that page, the e's look different?  Would you agree with that, they're filled in?

A.   Okay.  Yes.

Q.   You agree with that, don't you?

A.   Yes.

Q.   All right.  And when -- in the old days when you put a document --

MS. ROSEN:  Objection, Judge.

MR. GIVEN:  Objection, Judge.

You told him two questions.

MR. LOEVY:  No, I want to do the margins as well, Your Honor.

THE COURT:  Ask the question about whether he -- whether he sees that that is what you say and we'll go from there at some other time.

MR. LOEVY:  All right.  Can I ask him how you create a margin on a piece of paper? I mean, that's not a controversial question.

MR. GIVEN:  Judge, that's beyond what we talked about.

THE COURT:  I think that's okay if he was the typist.

BY MR. LOEVY:

Q.  All right.  You were the typist to this document, right?

A.  Correct.

Q.  And in the old days when you put something into a typewriter, you fed it into the roller and you had it like that (indicating) and then the typewriter typed, right?

A.  Yes.

Q.  All right.  And if you took it out, you had to re-line it up again,, right?

A.  Correct

Q.  All right.  Would you agree with me that the last paragraph is not lined up exactly with the paragraphs above it?

And I'd ask you to look closely at the left margin and the two lines from the bottom, and whether those two lines go farther to the left than all the other paragraphs by at least a sixteenth of an inch?

MS. ROSEN:  Objection.

MR. GIVEN:  Objection, Your Hono.

BY THE WITNESS:

A.   Not much.

BY MR. LOEVY:

Q.   Not much, but it is different, is it not?

MR. GIVEN:  Objection.

THE COURT:  Overruled.

BY THE WITNESS:

A.   Yes.  Slightly.

BY MR. LOEVY:

Q.   Would you agree with me that from your -- that that paragraph was not typed at the same time as the other paragraphs?

MS. ROSEN:  Objection, Judge.

THE COURT:  Sustained.

BY MR. LOEVY:

Q.   Looking at the text itself from the original, would you agree that it looks like it was typed with a different amount of boldness?  It looks like a different typewriter?

MR. GIVEN:  Judge, objection.

THE COURT: Sustained.

BY MR. LOEVY:

Q. All right. Did you create that paragraph at the bottom at a different time than you created the rest of the paragraphs?

A. No.

Q. You would agree with me that it appears that that would be the case, correct?

MS. ROSEN: Objection.

MR. GIVEN: Objection, Your Honor.

THE COURT: Overruled.

BY THE WITNESS:

A. I've no idea.

BY MR. LOEVY:

Q. As appearance?

A. Appearance? Maybe.

Q. All right. And you have no explanation today for why it would have that "maybe" appearance?

A. That I what?

Q. You have no explanation today for that, correct?

A. No.

Q. All right. Now, the paragraph that we've been talking about says:

"... Orlando Lopez was shown photographs of Rodriguez and Nieves and stated to the RI that these two individuals were not involved in the

incident."

Right?

A. Right.

Q. Isn't it true that Orlando Lopez was never shown photos of Rodriguez and Nieves?

A. I don't remember.

Q. So that might be a mistake, right?

A. I don't think so, but I don't remember doing it.

Q. All right. Well, you wrote it, right?

A. Right.

Q. But it might not be true, it sounds like what you're saying, right?

A. No.

MS. ROSEN: Objection, Judge, to the form of the question.

THE COURT: Overruled.

BY MR. LOEVY:

Q. Was that what you were saying?

A. What is it again.

Q. It happened or not?

A. Well, I typed it, but I don't remember what's contained in that paragraph.

Q. Would you have typed it if it wasn't true?

A. No. Of course, not.

Q. All right. I'm going to show you Orlando's trial

testimony.  This is page 40.

(Exhibit published to the jury.)

BY MR. LOEVY:

Q.  He was asked this question:

"...  were you ever shown a photograph of a man

named Rodriguez that was in the Imperial

Gangsters, did the police ever show you this

photograph?"

His answer at trial was "no," correct?

A.  Correct.

Q.  Does that refresh your recollection that it just didn't

happen --

MS. ROSEN:  Judge, if he could read the rest of it.

MR. GIVEN:  There's more to that exchange.

THE COURT:  Can I hear the same thing from one person.

BY MR. LOEVY:

Q.  Would you like me to keep reading, sir?

A.  Go ahead.

Q.  (Reading:)

".. they did not."

"Answer:  They showed me some other pictures of

some other gang members."

"Question:  Did you see any Imperial Gangsters

phonographs.  I do not remember gangsters.  I

didn't even know the gangsters."

"Question: Do you remember telling the police that a man named Rodriguez was not the shooter?"

"Answer: I don't know."

MR. LOEVY: I don't know how far counsel wants me to go. I'll keep going.

"After looking at this photograph, did that ever happen?"

"I don't remember."

Shall I keep reading, Your Honor?

MR. SOTOS: No, that's --

MS. ROSEN: That's fine.

MR. LOEVY: All right.

BY MR. LOEVY:

Q. He, in fact, did give this testimony, correct?

A. I guess so, yes.

Q. All right. Does that refresh your recollection that he was not shown those photos?

A. No.

Q. Now, what you said in the report was that Lopez was able to rule out not just the shooter, but the alleged driver, right? That's Nieves?

A. No, I don't know that.

Q. All right. Well, I'm going to show you a copy of Letrich's report again.

Do you remember that the allegation at the time was

that Lopez had allegedly -- I'm sorry, Valentin the victim --

MR. LOEVY: Could we get that report, Anne. Thank you.

(Exhibit published to the jury.)

BY MR. LOEVY:

Q. This is Plaintiff's Exhibit 19B. This Letrich's report. We've seen this in court.

He identified offender number 1 and number 2, the shooter was Rodriguez and Nieves was the driver. And without saying if they actually were or weren't the shooter and the offender, the only fact I'm trying to establish is at the time the police had a hypothesis that maybe Philip Nieves was the driver, right?

MS. ROSEN: Objection to the form and to what the police hypothesis was.

MR. SOTOS: Foundation also.

MR. LOEVY: I was trying to deal with their objection earlier --

THE COURT: Well, you know, maybe this is something we need to talk about. I don't know --

MR. LOEVY: Your Honor, I don't think so.

THE COURT: You want sidebar about this?

MR. LOEVY: I don't think so, Your Honor. I understand all the rulings. My question didn't go any near any problem that they've raised. All I'm asking -- may I ask

another question?

THE COURT:  I'm going to sustain the objection to the form of the question.

BY MR. LOEVY:

Q.  When wrote this report, you said that you showed Valentin photos and he was able to exclude not only the shooter, but the driver, correct?  Nieves?

A.  We showed who photos?

Q.  Orlando Lopez was shown photos of both Rodriguez and the driver and he ruled them out, right?

A.  That's what -- that's what it says there.

Q.  All right.  Now, Lopez actually hadn't even seen the driver, had he?

A.  I don't know.

Q.  All right.  I'm going to show you his testimony.

(Exhibit published to the jury.)

BY MR. LOEVY:

Q.  Is is page 27th:

          "... did you see the man inside the car, by the

          way?

            "No".

            "Could you tell how he was dressed?

            "... I didn't see him because I was looking

          right there at the guy that was shooting Felix.

            That was his trial testimony.

Gawrys - directy by Loevy

1850

And then showing you Officer McLaughlin's report, the one with the date 28/27 where Orlando Lopez gives the following description by the store, he describes the shooter, black jacket, dark pants, gym shoes, and there's no description at all lof the other man.  Was that your understanding at the time that young Orlando Lopez wasn't claiming to have made any observation of the other guy.

A.  I'm not sure, no.  I don't know.

Q.  All right.  If Orlando Lopez was never claiming to have have even seen the other guy and now I guess I'll ask the question:  How was it that you were able to show him photographs of the other guy and he said that they weren't involved?  How could you rule them out if he never saw the guy?

        MR. GIVEN:  Objection to form.

        THE COURT:  Overruled.

BY THE WITNESS:

A.  I don't remember showing photos.

BY MR. LOEVY:

Q.  Well, this "RI" is you, right?

A.  Yes; investigators.

Q.  You said investigators?

A.  RI?

Q.  Investigators?  You were an investigator?

A.  Yes.

Q.  Okay.  You and Guevara were the investigators that we're

talking about in this report, right?

A. Correct.

Q. So explain how you're able to get a kid to rule out somebody that he's never seen?

A. I don't remember doing this.

Q. Tell us how you would've done that. What would've been your procedure to him to rule out those two -- I'm sorry, to rule out the second one that he didn't see?

A. Well, if he didn't see --

MR. GIVEN: Your Honor, object to the form.

THE COURT: Overruled.

BY THE WITNESS:

A. Ask the question again, please.

BY MR. LOEVY:

Q. Tell us how that procedure would've gone down. You would've said, "Orlando, I have to show you two photographs, Rodriguez and Nieves, were these the guys?" Is that how it went down?

A. I don't remember.

Q. I know you don't remember, so now I'm asking how you would've done it. How you would you have done it based on your familiarity and your practices, how would this have happened?

A. Would have to show a photo array.

Q. All right. Of couse, this doesn't say photo array, doesn't it?

A.  No.

Q.  It says you showed him the photos of your two suspects, right?

A.  Correct.

Q.  Nieves and Rodriguez, right?

A.  Right.

Q.  That's improper, isn't it?

A.  Yes.

Q.  Did you make a typo or did you do it the improper way?

A.  I don't remember doing this improper way, if you want to call it improper.

Q.  I'm sorry.  What you've written on the page is improper, right?

A.  Yes, it would be wrong.

Q.  All right.  Did you do that with Jacques?  Did you show the kid a picture of Jacques and say, "was this the the guy"?

A.  I never showed pictures.

Q.  Well, you did.  It says right here.

A.  Well, here, but not of Jacques.

Q.  How do you remember?

A.  He was originally picked out of a gang photo book.

Q.  No, but you were going around showing pictures of suspects to the witness, weren't you?

        MR. GIVEN:  Objection, Judge.  Foundation, mischaracterizes..

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 173 of 1335 PageID #:105553
Gawrys - directy by Loevy
1853

THE COURT: Sustained.

BY MR. LOEVY:

Q. All right. At the end of the report, after you're done typing it, you had to give it to your boss, Sergeant Mingey, right?

A. Correct.

Q. Did you tell Sergeant Mingey that this paragraph had or had not been added at a different time?

A. I never talked about it.

Q. All right. Sergeant Mingey's name is here in the bottom right as the supervisor, right?

A. Correct.

Q. What is the supervisor's role in the investigation?

A. Approved the report.

Q. And was your supervisor apprised of the investigation as it was ongoing?

A. He knew about it, I'm sure.

Q. That's his job, right? To keep an eye on how things were going, right?

A. Right.

Q. And as the investigation unfolded you would've been telling him about the steps you were taking, right?

A. Maybe.

Q. And as a sergeant, he was more experienced, he would've been giving you feedback, right?

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 174 of 1335 PageID #:105559
Gawrys - directy by Loevy
1854

A. Could have.  There wer a lot of cases going on.

Q. Was Sergeant Mingey a hands-on supervisor?

A. Pretty much so, yes.

Q. All right.  Was he good at making sure he knew what was going on in these investigation?

A. Yes.

Q. Do you have any knowledge why he's the Fifth in this case?

A. I have no idea.

Q. Have you ever asked him?

A. No.

Q. All right.  You typed in the date for the approval, correct?

A. Correct.

Q. So, in other words, you wrote the report on September 16th and you typed in that Mingey was going to approve it on the same day, right?

A. Correct.

Q. And that's unusual, isn't it?

        MR. SOTOS:  Objection; form.

        THE COURT:  Overruled.

BY THE WITNESS:

A. Could've been, yes.

BY MR. LOEVY:

Q. All right.  When you were a sergeant you never would've let people do that, right?

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 175 of 1335 PageID #:105560
Gawrys - directy by Loevy
1855

A. Right.

Q. Why not?

A. I don't know. I was in the patrol division.

Q. No, when you were a sergeant. You were a sergeant for along time, right?

A. Right. I was in a patrol division.

Q. You did not let people tell you when you approved it, right?

A. Right.

Q. And, in fact, this is the only time in your career that you could ever recall putting in the date and time for your supervisor, correct?

A. Yes; right now.

Q. And Sergeant Mingey did eventually sign this report, correct?

A. Correct.

Q. And that is the different version that defendants' -- Plaintiff's Exhibit 19, that is Sergeant Mingey's signature. I'd ask you if you recognize it? You probably do. It's pretty distinctive, isn't it?

A. Yes.

Q. All right. And then on page 2, Sergeant Mingey signs but didn't write the date in the report, correct?

A. Correct.

Q. That's unusual, too, isn't it?

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 176 of 1335 PageID #:105561
Gawrys - directy by Loevy
1856

A.   Maybe an oversight.

Q.   Yeah.  But his whole job is to sign, date, and time,, right?  That's what he's doing?

A.   Right.

Q.   And it's missing here, isn't it?

A.   It's missing.

Q.   So that's unusual, right?

A.   Okay.  Yes.

Q.   All right.  I want to just fast forward.  We're close to the end here.  Do you remember either way whether you and Guevara brought Lopez to the criminal trial?

A.   Did not.

Q.   Okay.  Is this "I don't remember," "I don't think so," or "I remember not doing it"?

A.   I remember not going to the trial at all.  Wasn't called.

Q.   All right.  Do you know if you TRPTed witnesses?

A.   No.

Q.   Sometimes you transported witnesses, right?

A.   Sometimes we do, yes.

Q.   Sometimes you and Guevara would bring your eyewitnesses to the criminal trials, right?

A.   Right.

Q.   So how can you know that in this case you didn't, during this case you did?

A.   I don't remember doing this.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 177 of 1335 PageID #:105562
Gawrys - directy by Loevy
1857

Q. All right. That's a different answer. You're saying you don't remember if you brought Orlando to the trial, right?

MR. GIVEN: Your Honor, objection to the characterization.

THE COURT: Overruled.

BY MR. LOEVY:

Q. That would be more accurate, right? You don't remembe either way anymore --

A. I don't remember.

Q. Do you remember whether there was any discussion either during a transport or otherwise with Orlando Lopez about a yellow ponytail that the shooter supposedly had?

A. I don't remember doing a transport.

Q. I'm asking any time. Do you remember there being a discussion about a gold ponytail?

A. No.

Q. Is that, "it didn't happen," "yes," "no," or "I don't remember"?

A. I don't remember.

Q. And, in fact, there's not much you remember about this investigation is there?

A. No, not much at all.

Q. Is there anything you remember about this investigation?

MS. ROSEN: Objection, asked and answered.

MR. LOEVY: Well, I'm almost done, Your Honor. This

is the last line of inquiry.

THE COURT: Well, that's a really unanswerable question.

MR. LOEVY: I think it's true, Your Honor.

BY MR. LOEVY:

Q. Isn't it true you don't remember anything about this?

MS. ROSEN: Objection; asked and answered.

MR. GIVEN: Asked and answered.

THE COURT: That's been asked and answered. It was a question about, is there anything you do remember.

MR. LOEVY: That is not the converse, though. I'll ask it differently. Sorry, Your Honor.

BY MR. LOEVY:

Q. The only thing you remember -- and I found the page -- is that that arrest report was dated with the wrong date, correct?

MS. ROSEN: Judge, asked and answered.

MR. LOEVY: This is the impeachment I didn't perfect before.

THE COURT: Overruled.

MR. LOEVY: This is page 234, lines 10 through the following page, Anne.

(Videotape played)

BY MR. LOEVY:

Q. That was your answer under oath, correct, sir?

A. Right.

Q.  A few more questions.

But the only thing you know about your role then was from reading the reports, correct?

A.  Correct.

Q.  And even reading the reports, as you had a chance to do,, doesn't actually spark any memories for you, that's accurate, isn't it?

A.  Yes.

Q.  So if I was to ask you questions about what you did, what you didn't do, it wouldn't help because you actually don't remember, is that fair?

A.  Yes, that's fair.

Q.  Is that going to be the same standard when Mr. Given asks you questions?

A.  I don't know.

MR. GIVEN:  Objection to the form.

THE COURT:  Sustained.

MR. LOEVY:  I have no further questions.

MR. GIVEN:  Judge, I do not want to interrupt my examination of this witness.  They have a witness who they want to get in and out.  So I would like to just --

THE COURT:  Wait a minute.  Wait a minute wait a minute.

MR. LOEVY:  We are going to move it forward.  We're going to withdraw the other witness --

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 180 of 1335 PageID #:105565
Gawrys - cross by Given
1860

THE COURT: You're not going to be calling somebody out of order.

MR. LOEVY: Right.

MR. GIVEN: Different from what they said earlier.

THE COURT: Well, it may be. But thank you.

CROSS EXAMINATION

BY MR. GIVEN:

Q. Good afternoon, Mr. Gawrys.

A. Hello. Good afternoon.

MR. GIVEN: Good afternoon, ladies and gentlemen.

BY MR. GIVEN:

Q. Did you frame Jacques Rivera for the murder of Felix Valentin?

A. No.

Q. Did you conspire with anyone to frame Jacques Rivera for the murder of Felix Valentin?

A. No.

Q. Did you lie on reports in order to frame Jacques Rivera?

A. No.

Q. Well, okay, so we'll go through all the reports. I want to slow things down a little bit and talk a bit about your background.

Your name causes some people a little difficulty in pronouncing it. What's its origin?

A.  It's Polish and maybe Latvian.

Q.  And it's pronounced Gawrys?

A.  Gawrys.

Q.  Okay.  Are you married?

A.  Yes.  38 years almost.

Q.  And who do you live with currently?

A.  Yes, I do.

Q.  Huh?

A.  Yeah.

Q.  And you live with anybody else?

A.  Oh, I live with my son, his fiancée, and a grandson who is 4 and a half, along with three dogs and a cat.

Q.  Are you a college graduate?

A.  Yes, I am.

Q.  And when did you graduate from college?

A.  I graduated maybe 2002 to get my bachelor's, and then I went on to get my Master's in 2004.

Q.  Master's in what?

A.  Management.

Q.  When did you join the Chicago Police Department?

A.  1977.

Q.  And what was your first assignment out of the academy?

A.  I was placed in the Second District on the south side.

Q.  And how long were you there?

A.  Maybe 3 years, I believe, something like that.

Q. And were you a patrol officer?

A. Yeah, I was patrol officer in uniform.

Q. Can you summarize very briefly for the jury what your duties as a patrol officer were.

A. We were in uniform, marked car, and we responded to radio assignments.

Q. Where did you go after the Second District?

A. From there I went to Special Operations Group.

Q. Where was that located?

A. It was in the same building, 51st and Wentworth.

Q. And how long were you there?

A. Maybe 3 years.

Q. And can you tell the jury very briefly what your duties were in the Special Operations Group.

A. Special Operations Group was a tactical unit that was in uniform. And we were a mobile unit that if anything happened they would create special missions for us. We had the south side. There were three units altogether. It was the south side, west side, and then north unit. And we were a south unit and we would have specific directed missions in different districts.

Q. What was your next assignment after Special Operations?

A. Promoted to Gang Specialists.

Q. And how did you become a Gang Crime Specialists?

A. There was a testing process and then was promoted.

Q. Do you remember what year?

A. It was like 1984, '85.

Q. And where were you assigned?

A. Gang Gang Crimes North.

Q. I think we've established this, but could you briefly tell the jury where that is located?

A. Oh, that's Belmont and Western on the north side.

Q. And how long were you a Gang Crimes Specialists?

A. For about 5 years.

Q. Until about --

A. Until 1990.

Q. We'll come back to Gang Crimes in a little bit.

What happened in 1990 that you stopped being a Gang Crime Specialists?

A. Promoted to detective.

Q. Okay. And where were you assigned as a detective?

A. Area 5.

Q. And --

A. Grand and Central.

Q. Any group within Area 5?

A. Gang Crimes.

Q. And did you receive training as a detective?

A. Oh, yes.

Q. How long were you a detective?

A. 6 years I was a detective.

Q. And then so that takes us to about 1996?

A. 1996 I was promoted to sergeant.

Q. And did you have to take a test?

A. Yes, there's this process that you go through.

Q. Once you becam a sergeant where were you assigned?

A. I was assigned to the 22nd District on the south side.

Q. Is that a patrol division?

A. That's a patrol division job, yes.

Q. And briefly tell the jury what you did as a patrol division sergeant.

A. In the patrol division I worked in uniform. You have maybe --- it varied on how many people were underneath you that you had to supervise. You logged their calls, you went on assignments with them to see that things were done properly.

Q. How long were you at the 22nd District?

A. Only about a one year.

Q. And then where did you go next?

A. Then I went to the training division.

Q. You were still a sergeant at this time?

A. Yes.

Q. And how long were you at the training division?

A. About 6 years, 7 years.

Q. That would take us to about 2004?

A. Yeah, about 2004 I moved on from there.

Q. And before we move on, can you briefly summarize for the

ladies and gentlemen of the jury your duties and what you did while you were at the training academy.

A. At the training division I was in charged in what was called the instruction design section. And we design, we researched, and wrote lesson plans involving recruits. And we also had in-service training which took in the suburban police where we had classes for them.

And also the testing where you had test questions that were given to the recruits. And for promotional exams where people were promoted and we brought them in.

Q. I think you said -- well, where did you go after the training division?

A. Oh, then I transferred to Internal Affairs Division.

Q. And how long were you in Internal Affairs?

A. Until I retired in 2008 officially.

Q. So that was about 4 years you were this?

A. Yeah, about 4 years.

Q. Can you summarize what your duties were when you were at the Internal Affairs Division?

A. Well, I was a sergeant there. And I was in a section that I think it was called General Assignments. And there was -- I had a small team that I worked with, monitored them investigating violations of policy and regulations by police officers.

Q. So you retired in 2008 -- let me be clear. When you say

retired -- when I asked if you were retired, you mean retired from the Chicago Police Department?

A.    Yeah, retired from Chicago Police Department.

Q.    That was in 2008?

A.    Yes.

Q.    What did you do next in terms of your employment?

A.    I took a job immediately at the end of January towards Mason University as an adjunct professor, working on research of gangs and Trinidad, Tobago

Q.    That's the country of Trinidad.

A.    Yeah, it's a country.  It's about 7 miles from Venezuela, south ent of the Caribbean.

Q.    How long were you down there?

A.    About 2 1/2 years.

Q.    And can you tell the jury very briefly what you were doing in Trinidad.

A.    Briefly, I established doing a research through created a gang unit down there.  We had maybe 35, 40 people in the unit. And I just established how we were going to monitor, make maps, and do things like that to track the gangs, they're leadership and all that.

Q.    Are you currently employed?

A.    Yes, I am.

Q.    And what is your current job?

A.    I am at Chief Investigations with the Cook County

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 187 of 1335 PageID #:105572
Gawrys - cross by Given
1867

Assessor's Office.

Q. And how long have you had that job?

A. 4 1/2 years now.

Q. Is that a political job? Is that how you get those jobs?

A. No, I was hired under the federal Shakman decree that the Assessor's Office is under. It's a brand new unit. It started in 2014 and we've been operating since then.

Q. That's where you're currently employed?

A. Yes.

Q. Are there any other jobs that you've had that we haven't covered that are law-enforcement related?

A. Yeah, back in 1997 when I was in the academy, I was contacted -- I was hired by the Department of Justice to write a Gang Crimes course for their police in South Africa. So I did that. And then after putting that whole thing together, I went down and taught at Capetown and taught some other courses in Johannesburg.

Q. So let's talk a little bit about when you were at Gang Gang Crimes North. You said that was approximately 1985 to 1990, is that correct?

A. Correct.

Q. Can you tell the ladies and gentlemen of the jury very briefly what the duties of a Gang Crime Specialists were back then?

A. Well, it was -- specialists by the title. We monitored the

gangs. We had to collect information, it was our job to. And that would include the leadership, membership, who was in prison, who was not, cars, girlfriends, their colors, things like that. And every 6 months I believe we had to make what's called a synoptic report. And that was that we had to update what was going on with the gangs that you were assigned to. So you were assigned specific gangs and that's what you tracked.

Q. Do you remember what gangs you were assigned to?

A. I had the Latin Kings at 11th and Schiller, and I had the Insane Unknowns on Armitage and Damen, I think.

Q. And just to be clear, the fact that you were assigned to those two gangs doesn't mean you couldn't investigate and work with --

A. Oh, no.

Q. Involving other gangs, right?

A. Right.

Q. So is one of the jobs that Gang Crime Specialists had would be to assist other units in investigations?

A. That was a big job, yes, because we were -- we were like on the ground. So if they needed information, they wanted help, then that was what we did, we helped other units out.

Q. And can you give the ladies and gentlemen of the jury an idea of the kinds of things you would do to help out other units like the Detective Division?

A. Specifically a lot of things. Like nicknames is real big.

A lot of these, the members of these gangs and clubs, they don't -- they might not know a person's real name. They'll just know for years that this is what they're called by. And so they would ask us because we had files on it.

Q. Would you go out into the field as part of helping --

A. Yes, we went out in the field if we were looking for something. Maybe something specific about a car or something, they would ask us and then we've move on from there.

Q. Would you do photo arrays or gang book identifications?

A. Yes.

Q. Would you do lineups?

A. No.

Q. Who does lineups?

A. Detectives.

Q. And in these cases where you're assisting other units like detectives, who's in charge of those cases when you're assisting them?

A. The detectives are.

Q. And I just want to make something clear. Were you in court when Mr. Loevy was accusing you and Rey Guevara of pushing Gillian McLaughlin off the case? Do you remember that?

A. Yeah, I remember that.

Q. Is that something Gang Crime Specialists could do?

A. No.

Q. Who's -- well, when you first started at Gang Crimes, who

was your partner?

A.   I worked with several people in the beginning just to get a feel for the job.  So I think my first ride was with Gang Crime Specialists Sparks and Fallon.  Later I remember working with Danny Noon.  It usually was a three-person car, and that was for a while.

Q.   And you eventually become partners with Rey Guevara?

A.   Yes.

Q.   How long were you partners as Gang Crime Specialists?

A.   About 5 years.

Q.   Could you tell the jury a little bit about how Gang Crimes was set up in terms of the two shifts, three shifts, one shift, how did it work?

A.   Gang Crimes is not like -- well, we were part of the patrol division, technically, but basically it's a two-shift.  You start either 9:00 to 5:00, around there.  And then there's 5:30 to 2:00 o'clock in the morning shift.  And that would be -- that's the two shifts that we usually work.  There isn't a third shift.

Q.   So there were basically days and nights?

A.   Yeah, that's what I refer to it.

Q.   The day shift was from when to when?

A.   Which one?

Q.   On days.

A.   Oh, days was from 8:30 to 5:00 o'clock or 9:00 to 5:00,

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 191 of 1335 PageID #:105576
Gawrys - cross by Given
1871

something.  I don't remember.

Q.  And night was?

A.  It would be like 5:30 to 2:00 in the morning.

Q.  And when you're a partner with someone in that period of time, does it mean that the two of you would always work together on the same shift on every day?

A.  Yes.

Q.  Were there times when if one of you was working, that the other one was not working?

A.  Yes.

Q.  Can you explain to the jury --

A.  Well, we had the same -- everybody in the department is -- is assigned a day off group.  And then -- but you don't have -- you have a different seniority that you have.  So your furloughs, you would take full furlough, you take a short furlough, whatever, two weeks.  So that would fluctuate between your partner and yourself.

Q.  So there could be times when your partner would be working, but you'd be on furlough?

A.  Yes.

Q.  Or for some other reason --

A.  Or extra days off or something like that.

Q.  Okay.  So approximately how long were you partners with Rey Guevara at Gang Crimes?

MR. LOEVY:  Asked and answered, Your Honor.  Three

times.

MR. SOTOS:  I'm not sure that he said --

THE COURT:  Overruled.  Overruled.

BY THE WITNESS:

A.   About 5 years.

BY MR. GIVEN:

Q.   And then in 1990 you made detective, correct?

A.   Correct.

Q.   And did you have partners when you were a detective?

A.   Yes.

Q.   And how many partners did you have during the time you were a detective?

A.   Well, I had several partners.  In the beginning you work with other detectives to see what the job is about.  After a while, Rey and I got together again.  And then --

Q.   You meaning as partners?

A.   As partners.  And then after a couple of years of that, I think I went to a different shift and then other people you work with.

Q.   Okay.  You've been in court where there's been some discussion about the differences between detectives and Gang Crime Specialists.  Could you tell the jury what some of the major differences are in terms of responsibilities and duties.

A.   Well, like I said earlier, specialists are just there to assist.  That was our main function.

If there was something that some other unit not only detective unit but say a tactical unit in another district wanted something or wanted some help or asked some questions, then we would try to help them out and we would assist them. But our main function was to always -- seemed like to assist the Detective Division with cases.

Q. And then as a detective, what were the responsibilities --

A. Well, a detective, that's a different job. You're saddled with the whole responsibility of working on this case and you have bigger responsibilities as far as what's to be done with the case.

Q. And I think you said detectives can conduct physical lineups when Gang Crimes couldn't?

A. Yes.

MR. LOEVY: Objection; asked and answered and leading.

MR. GIVEN: Trying to move things along.

THE COURT: Well, no, I don't think you can lead to move things along; otherwise, it's overruled.

BY MR. GIVEN:

Q. What kind of responsibilities did detectives have with regard to conducting lineups?

A. It was their responsibility to run the lineups.

Q. And did detectives have responsibility for just murders or what kind of crimes did they have responsibility for?

A. Well, they covered murders, aggravated batteries, violent

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 194 of 1335 PageID #:105579
Gawrys - cross by Given
1874

crimes, sexual assaults, robberies, arm robberies, things like that.

Q.   Were those limited to cases that involve gangs?

A.   Sometimes, sometimes not.

Q.   But they included both gangs and non-gangs, is that fair?

A.   Yes.

Q.   Okay.  Let's talk a little bit about this case.

I think you made fairly clear, do you remember the Valentin investigation?

A.   Not a lot of it, no.

Q.   How many investigations would you say you worked on in your years as a Gang Crime Specialists or a detective?

A.   It would be in in the hundreds, I would think.

Q.   Several hundreds or --

A.   Yeah.

Q.   A hundred or --

A.   Several hundred.

Q.   Okay.  And it's fair to say -- well, let me ask this, in the late 1980's and early 1990's do you remember what Chicago was like in terms of crimes, violent crimes that you worked on?  Was it a lot?  A little?

A.   Yeah, it was very busy times back in '80s.  I mean, you could almost say that the homicide rate was almost twice as much as it is now.  So there was a lot of shooting, a lot of murders, a lot of chaos with these gangs.  We were busy.

MR. LOEVY. Objection, Your Honor, motion in limine ruling.

THE COURT: Overruled. But let's --

MR. GIVEN: We're moving on, Judge.

BY MR. GIVEN:

Q. So is it fair to say that to one degree or another you did work on the Felix Valentin investigation?

A. Yes.

Q. And when is the first time you recall hearing about the Felix investigation -- let me start over.

Based on everything we've seen in terms of the paperwork, when did -- do you recall when the Felix Valentin investigation was concluded back in the day, do you remember?

A. When it was concluded?

Q. What year did Felix Valentin's investigation conclude, as far as you were concerned?

A. It was 1988.

Q. And since 1988, when is the first time you recall hearing about the Felix Valentin investigation again?

A. I don't recall what that was, but it was -- I know it was off in the beginning of the investigation, so --

Q. No. No. You misunderstand my question. After it was -- the investigation was done in 1988 --

A. Yes.

Q. -- when is the last time -- when is the last time you

remember --

A. Oh, after. I'm sorry.

Q. Yes.

A. Okay. I didn't hear that. With the lawsuit, I was notified of the lawsuit.

Q. And do you remember what year that lawsuit was filed?

A. Maybe 2012 or something, '13.

Q. Back in the day when you had recently worked on the Valentin investigation, had you ever been contacted by Mr. Wadas? Do you remember when you were in court when Mr. Wadas testified yesterday?

A. Oh, yes.

Q. He was Mr. Rivera's criminal attorney, do you remember that?

A. Right.

Q. Did Mr. Wadas ever contacted you back in 1988 through 1990 to talk to you about this case?

A. No.

Q. If Mr. Wadas had tried to reach out to you to talk to you about the case, would you have talked to him?

A. I would have with the State's attorney.

Q. You wouldn't have told Mr. Wadas --

A. No. No.

Q. -- "can't talk to you, sorry"?

A. No, I would have to have a State's attorney there with me.

Q. I think Mr. Loevy called you earlier this morning, referred you as one of key witnesses for the criminal case, do you remember that?

A. Yes.

Q. Were you a key witness to the criminal case?

A. No.

Q. Did you testify at all in the criminal case?

A. No.

Q. Now, we've heard some testimony in court that Northwestern was investigating on behalf of Mr. Rivera starting back in 2002. Were you in court when you heard that?

A. Yeah. Here? Yes.

Q. Did Northwestern ever contact you about your role in the investigation back in 2002?

A. No.

Q. Were you contacted by Northwestern in 2010 or '11 during Mr. Rivera's post-conviction proceedings?

A. No.

Q. Now, since you've been sued, you've had a chance to review some documents and reports from the Valentin investigation, correct?

A. Correct.

Q. And have they helped at all to refresh your recollection of things?

A. Not much, no.

Q. Did it help in any way?

A. Very little.

Q. You have gone through some of those reports, correct?

A. Did I what?

Q. You've gone through some of those reports and looked at them?

A. Yes.

Q. Okay. So what I'd like to do is go through some of them now in chronological order instead of jumping around from one to the other.

MR. GIVEN: Judge, I think what I'd like to do --

BY MR. GIVEN:

Q. Do you have other documents up in front of you?

A. Yes, there are some here.

MR. GIVEN: I have a set of documents. I think they've all been admitted, Judge, that I'd like to hand up.

May I approach, Your Honor?

THE COURT: Sure.

(Document tendered to the witness).

BY MR. GIVEN:

Q. And I'm going to come back to the ones I just handed you, but let's start with do you remember what day Felix Valentin was shot?

A. Yeah, 27th, August.

Q. And --

A.   1988.

Q.   And I can promise you that the report I'm about to ask you about is not in the stack that I just gave you --

MR. GIVEN:   But could you pull up, please, Defendants' Exhibit 1.9.   And this is the Permanent Retention -- I'm sorry, this is General Investigation Report by Machain and Crawford, I believe.

MR. LOEVY:   Your Honor, I guess we just object to foundation.   He doesn't remember it.   He didn't write it.   So irrelevant.

THE COURT:   Again, I need to hear the question before I can tell what's going on.

(Exhibit published to the jury.)

BY MR. GIVEN:

Q.   Do you remember seeing this report?

A.   Yes.

Q.   And is this the kind of report you would have seen when you were writing your closing report back in September when you wrote your last report?

A.   Yeah, I would've seen this report.

Q.   Again, is this the kind of report that you rely on regularly back in the day when you were trying to piece together what was going on in an investigation?

A.   Yes.

MR. GIVEN:   Judge, I would like to continue asking him

questions about this.

THE COURT: Go ahead.

(Exhibit published to the jury.)

BY MR. GIVEN:

Q. Can you tell from that document who wrote that document?

A. It's on the bottom left, Crawford and Machain.

Q. Are they Gang Crime Specialists?

A. No, they're I think from the 14th District.

THE COURT: Counsel, we're ready to switch court reporters. We don't need to actually take a break or anything, we just need to break for a minute or two to unplug things and plug them back in.

MR. GIVEN: Thanks, Your Honor.

(Brief pause).

(Change of court reporter).

THE COURT: Mr. Given.

MR. GIVEN: Ready to go. And, Judge, let me -- I should have said this. The document that I'm asking about right now is Defendants' Exhibit 23-B, as in boy.

BY MR. GIVEN:

Q. If you could go to the second page of that document.

MR. GIVEN: Dave, if you could pull up the next page.

BY MR. GIVEN:

Q. Do you see anywhere in that report where the victim may have identified any suspect by gang affiliation?

MR. LOEVY: Objection to any foundation about who made the identification, Your Honor. All we know is what's written on the report.

THE COURT: I'm going to need to hear that question back. I was switching out my computers, too.

BY MR. GIVEN:

Q. Does the report reflect any gang affiliation of the suspects as written in the report, is my question?

THE COURT: And what's the objection?

MR. LOEVY: The first time he asked that the victim identified.

THE COURT: Oh.

MR. LOEVY: So --

MR. GIVEN: I changed the question, Judge. Thank you.

To move things along, can I direct his attention, Judge?

THE COURT: Sure.

BY MR. GIVEN:

Q. If you look on the upper -- on the right-hand side of the page, about a quarter of the way down, do you see that?

A. Yes. Okay.

Q. And were there any gang affiliations mentioned in this report?

A. Yes. Offenders No. 1, white Hispanic, Latin King gang affiliation, driver of car, no further description at this

time.

No. 2 is a white Hispanic Latin King, gang affiliation, passenger in above auto.

Q. That's good.

A. Okay.

Q. Thank you.

MR. GIVEN: If you could go to the last page, Dave.

BY MR. GIVEN:

Q. In that report, does it reflect that Gang Gang Crimes North was notified?

A. Yes.

Q. And who does it indicate was notified at Gang Gang Crimes North?

A. Sherman and Noon.

Q. And who's -- who is Sherman?

A. Sherman was an officer in the -- in the office -- Gangs office, as I remember.

Q. And what was his general assignment, if you remember?

A. You know, I don't know. Sometimes he might have been working the street once in a while as a tactical officer, I think, and then maybe today he just took the call that -- the notification.

Q. Took the call and assigned the case?

A. Pardon me?

Q. Took the call and then assigned it to --

A. Yeah, just told that and needed to send one of the gang specialists to started working on it.

Q. Do you know if your name appears anywhere in this general --

A. No, it does not.

Q. -- case report? Okay.

Any reason to think that you were involved in the case at this point?

A. No.

Q. Okay. So let's stay on August 27th. And we've heard testimony in court from Detective McLaughlin that Orlando Lopez -- she believes Orlando Lopez was shown gang books at his house on the day of the shooting. Were you --

MR. LOEVY: Objection, Your Honor.

BY MR. GIVEN:

Q. -- present for that?

MR. LOEVY: McLaughlin did not have any personal knowledge about what Mr. Given just said.

MR. GIVEN: I'll rephrase.

THE COURT: Okay.

BY MR. GIVEN:

Q. Have you heard any evidence in this case that Orlando Lopez was shown gang books at his house on the day of the shooting?

MR. LOEVY: Same objection, Your Honor. There's no witness who said it.

MR. GIVEN: Orlando Lopez says it, among others, Judge.

MR. LOEVY: How about if we just --

THE COURT: Well, I've read so many transcripts. This was read to the jury?

MR. GIVEN: Yes, it was part of what was read --

MR. LOEVY: I'm not sure what he --

MR. GIVEN: -- yesterday.

MR. LOEVY: All right. I withdraw --

THE COURT: I would say go ahead, because if it hasn't been read, it will be read, I assume.

MR. GIVEN: Correct.

BY MR. GIVEN:

Q. And Orlando Lopez was shown -- as far as you understand it, Orlando Lopez was shown gang books at his house on the day of August 27th; is that correct?

MR. LOEVY: Objection, foundation, Your Honor.

THE COURT: Are you asking the witness just to comment on somebody else's testimony?

MR. GIVEN: I'm asking what his understanding was. He wrote a report. I want to get --

THE COURT: That included this?

MR. GIVEN: No.

THE COURT: Well, then --

MR. GIVEN: I want to get --

THE COURT: Okay. I don't think -- if the witness didn't write a report including this, then he's just commenting on somebody else's testimony.

BY MR. GIVEN:

Q. Well, let me ask you this.

If Orlando Lopez says that he was shown gang books at his house, is that something that would be possible?

MR. LOEVY: Objection --

BY MR. GIVEN:

Q. Could gangs books -- in your experience, could --

THE COURT: Overruled.

BY MR. GIVEN:

Q. -- gang books be taken to someone's house to show them gang books?

A. Yes, usually the books were -- well, they're locked up. Okay. They're big books.

Q. And where are they typically --

A. They're locked in the office -- in the administrative office. So you have to go through the administrative door, and then you have to get into a closet. It's like a walk-in closet, and the books are all in there.

Q. And this is this at Gang Gang Crimes North?

A. This is at Gang Gang Crimes North.

And then I remember, they didn't -- it wasn't a policy to remove the books from the office unless there was some kind

of circumstance that existed, that then you can take them.

Q. And can you give the jury some examples of the kind of circumstance that would allow for the gang books to leave the office and go to the person looking at them.

A. Well, there would be underage, late at night, or whatever, and then maybe hospitals. Definitely hospitals, you have to.

Q. Is that unusual, in your experience, to take gang books to hospitals?

A. No, not at all, no.

Q. I think you've told the jury you have no memory of being at Lopez's house for gang book identification; is that correct?

A. No.

Q. Is there any other reason that in your review of the documents that you've reviewed in this case that you believe you were not present at Mr. Lopez's house for a gang book identification?

A. Well, several documents that were in the -- or typed up in the beginning, my name does not appear anywhere on it. So I can only assume that I was off.

Q. Let's look at another report. This would be Defense Exhibit 1.12. It is a Supp. Report dated 27th August 1988.

MR. GIVEN: Dave, can you pull that up, please.

BY MR. GIVEN:

Q. It's a three-page report.

MR. GIVEN: Dave, could you flip through all three

pages just for a second.

BY MR. GIVEN:

Q.   And, Mr. Gawrys, if you could look just to see if that refreshes your recollection as to whether you've ever seen that document before.

A.   Yeah, I've read it.

Q.   Okay.  And who wrote this report?

A.   Detective McLaughlin and Leonard.

Q.   And just generally, could you tell the ladies and gentlemen of the jury typically how you know who writes a report, a CPD report?

A.   Usually the person that writes the report would be in the first box.

Q.   In the lower left --

A.   It is typed with the name --

Q.   In the lower left --

A.   -- and then the signature below it.

        THE COURT REPORTER:  I'm sorry.  One at a time, please.

        THE WITNESS:  Oh, I'm sorry.

BY MR. GIVEN:

Q.   It's my fault.  Go ahead, Mr. Gawrys.

        I was just trying to direct your attention, when you were saying the first box, you mean in the lower left-hand corner?

A.   Yeah, there's a number on it.  It looks like 93 and 94.

Q.   Okay.  If you could look at the second page of that exhibit, do you see whether any Gang Crime specialists are named in that report?

A.   Yes, there's four of them.  Gang Specialist Noon, Guzman, Sparks, and Zacharias.

Q.   And in your experience, if you or Ray Guevara had been assigned to this case on August 27th, would your names have been on that report?

A.   Yes.

Q.   Okay.  Let's look at another report.  This is going to be Defendants' Exhibit 1.11.  It's a Supplementary Report dated 29 August 1988.

A.   Okay.

Q.   Do you see that?

        MR. GIVEN:  And it's two pages, Dave.  If you could just flip through it briefly.

BY MR. GIVEN:

Q.   Have you seen that report before?

A.   Yes.

Q.   And who wrote that report?

A.   Once again, it was McLaughlin and Leonard.

Q.   And are there any Gang Crime specialists listed on this report?

A.   No.

Q. Based on your experience, as well as the testimony that's been given in this case, do you have an idea why there's no Gang Crime specialist listed in this report by name?

MR. LOEVY: Objection to speculation.

THE COURT: Overruled.

BY THE WITNESS:

A. Probably weren't involved in this part or something.

BY MR. GIVEN:

Q. Well, and actually, on the second page, it talks about a Gang Crime -- an identification of Gang Crimes -- I'm sorry -- of gang book identifications on page 2.

You just -- you're saying you don't know?

A. I just don't know, no.

Q. Okay. So on page 2, in fact, with regard to that Gang Crime -- gang book identification, do you see that in the one, two -- third paragraph down?

A. Correct.

Q. Were you involved in this gang book procedure in any way, to the best of your recollection?

A. No, I was not.

Q. And why do you say that?

A. I say it, once again, because my name doesn't appear anywhere in the report.

Q. And while we're on that paragraph, earlier today Mr. Loevy was saying: Well, jeez, if somebody identifies a photograph

from a gang book, and you don't make a photocopy of it, then how's anybody supposed to know what picture was selected?

Do you remember those questions?

A.   Yes.

Q.   In fact, is there a way to tell which photograph was selected?

A.   Oh, yeah, it's -- it's marked 16-D, Latin King Book.  So it's -- then it gives the page, page 40, and then D would be the picture.

Q.   And maybe now would be a good time to just -- if you could just very briefly tell the ladies and gentlemen how these gang books are set up.

How big are they?  How many photos --

A.   Well, they vary in size, and the number of the books depends on the size of the gangs.

So the Latin Kings are a big organization.  I don't know how many books we had.  I don't remember.  But the books are -- they're placed in clear sheets, and each photo is just marked with a letter.  There's no names or anything like that. And it will be four photos to a page.  And then you flip the page, and there will be four more there, four more on this side.  So you're always looking at probably eight total pictures when you're going through the books.

And if they -- it can hold so many -- I don't know how many they hold, but they get pretty thick, big.

Q. Okay. Let's move on to another document.

THE COURT: Mr. Given --

MR. GIVEN: Yes, ma'am.

THE COURT: -- I think it's getting to the time for our afternoon break, so --

MR. GIVEN: This is fine.

THE COURT: This is good?

MR. GIVEN: Yes.

THE COURT: Okay. Let's take 10 minutes, ladies and gentlemen.

COURT SECURITY OFFICER: All rise.

(Jury out. Recess from 2:32 p.m. until 2:42 p.m.)

MR. LOEVY: All right. Your Honor, by agreement of counsel, we have worked out something that we would prefer mutually -- now we do want to break into this witness. It turns out the defense wants to call Ms. Linzer after all. She's under subpoena.

So by agreement, we would like to explain to the jury we're going to interrupt Mr. Gawrys --

THE COURT: Okay.

MR. GIVEN: I think you were calling her.

MR. LOEVY: Yeah, we're calling her.

THE COURT: Okay.

MR. LOEVY: But they wanted her called because she's under subpoena.

THE COURT: Can we finish her by 4:00?

MR. LOEVY: I sure hope so. Locke says 20 minutes, because she has been -- she's been here since Tuesday.

THE COURT: Okay.

THE WITNESS: Okay. I understand.

THE COURT: You heard earlier. All right. Let's get the jury.

(Witness enters courtroom.)

THE COURT: You can have a seat, and I'll ask you to stand and be sworn as soon as the jury is here.

THE WITNESS: Thank you.

THE COURT: And the record reflects the objection that's been made, so I don't think we'll need to do that here unless --

MS. ROSEN: Oh, yes, yes.

THE COURT: I mean, it's been briefed and --

MS. ROSEN: Yes.

(Jury in.)

THE COURT: Please be seated, everyone.

Ladies and gentlemen, we're going to interrupt Mr. Gawrys' testimony to hear another witness who should be fairly brief. So that is what we're going to do.

Mr. Bowman.

MR. BOWMAN: May I proceed, Judge?

THE COURT: You may.

MR. BOWMAN:  Thank you, Judge.

MR. LOEVY:

Q.  Good afternoon.  Would you please --

THE COURT REPORTER:  I need to swear in the witness or the Judge does.

THE COURT:  Oh, I do.  Thank you.  Please stand and raise your right hand.

(Witness duly sworn.)

THE COURT:  Please be seated.  Thank you.

MR. BOWMAN:  All right.  Thank you.

JENNIFER LINZER, PLAINTIFF'S WITNESS, SWORN

DIRECT EXAMINATION

MR. LOEVY:

Q.  Good afternoon.

A.  Good afternoon.

Q.  Could you introduce yourself, please, to the folks on the jury.

A.  My name is Jennifer Linzer.

Q.  Can you tell us where you live now, Ms. Linzer?

A.  I live in Tucson, Arizona.

Q.  And was there a period, Ms. Linzer, when you worked at the Center on Wrongful Convictions at Northwestern University School of Law?

A.  Yes.  I began working there in 2001.

Q.  And do you currently work there?

A.   I do not.

Q.   Have you -- when did you leave?

A.   I left in November of 2014.

Q.   Tell us why you left, if you could.

A.   Well, I had been there for roughly, well, almost 13 years, and I was -- you know, it was just time to move on.  My boss had retired, and one of the attorneys was leaving, and it was time to do something else.

Q.   So let's start at the beginning, then.

Tell us what your position was at the Center on Wrongful Convictions, please.

A.   When I began working there in August of 2001, I was hired as the -- an events coordinator, but it was quickly apparent that there was not a lot of apparatus in the Center.  So I began doing other things, answering --

Q.   When you started working at the Center, did you get a salary?

A.   Yes.

Q.   Was it a lot of money or a little bit of money?

A.   No, it was not a lot of money.

Q.   So your title was event coordinator.  Did you actually coordinate events?

A.   A couple.

Q.   And you did other things as well.  Tell us just a little bit about that.

A. Well, there were not many employees at the Center, so there were a lot of tasks that needed to be done. I answered the phone. I responded to mail.

When I first started there, one of the founders had recently been on Oprah, and we had a file room full of letters from prisoners, and they hadn't been responded to. So I started building a database of all letters, reading the letters, basically labeling them from the states they were from, and then organizing a spreadsheet with all the letters. And we began responding to all the requests for counsel, is what we called them.

Q. Were there a lot of those letters?

A. There were a lot of those letters.

Q. Can you approximate, just in rough terms, how many?

A. Well, by the time I left, we had tracked more than 30,000 requests for counsel.

Q. So I want to take you to the period around 2009, 2010 and specifically ask you some questions about Jacques Rivera's case.

Did you -- were you requested to do any work in relation to an investigation of Jacques Rivera's claim of innocence?

A. Yes, his attorney asked me to look for the principal witness in the case.

Q. And you say "his attorney." Can you identify that person

by name?

A.  Jane Raley.

Q.  So who was Jane Raley asking you to locate?

A.  She was asking me to locate Orlando Lopez.

Q.  And can you tell the folks how you went about trying to find this man named Orlando Lopez, what you did?

A.  I had tried to find him in 2005 and didn't feel that I had a credible address.  And the search kind of got back burnered because of another case we had that was very intense and involved.

And in 2009 we were using a different database, a different search mechanism.  And I think at that point, it just -- the information was better.

We -- I obtained an address in the fall of 2009, and we believed it might actually be him.

Q.  And why did you believe that?

A.  Well, you get a report on a name that you're looking -- I had his birthdate, and it appeared that he was a property owner.  There were just facts within his search report that made you think this could very well be the person we'd be looking for.

Q.  So you mentioned Jane Raley.  Is Jane Raley able to come here and testify today?

A.  No.

Q.  Why not, ma'am?

A.   Jane Raley passed away.

Q.   And did you know before her death what Jane Raley's reputation for honesty was?

A.   Impeccable.

          MS. ROSEN:  Objection.

          THE WITNESS:  Sorry.

          THE COURT:  Maybe we -- I didn't -- maybe we need to talk about this.

          MR. BOWMAN:  Okay.

   (Proceedings heard at sidebar on the record:)

          MR. BOWMAN:  There has been through the questioning attacks on the integrity of the Northwestern investigation, the suggestion that with respect, for example, to the witnesses in the lineup with Jacques Rivera that they had been pressured or it was suggested to them that they should say certain things.

          THE COURT:  So are you calling her as a character witness?

          MR. BOWMAN:  I just -- that was my only question.

          MR. SOTOS:  Well, that's -- that's a big question. That's what it is, and there's no basis for it, Judge.  They're going to attack Jane Raley's character in this case --

          THE COURT:  Are you going to attack -- was she a Northwestern lawyer?

          MR. BOWMAN:  Yes, she was.

          THE COURT:  Are you going to be attacking the

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 218 of 1335 PageID #:105608
Linzer - direct by Bowman
1898

Northwestern Innocence Project in your closing argument?

MR. SOTOS:  Well, I am going to be raising issues about how certain information was developed over time.  I am not going to challenge anybody --

THE COURT:  And is some of it by Jane Raley?

MR. BOWMAN:  She was the lead --

MR. SOTOS:  I don't think so, but I'm not --

THE COURT REPORTER:  She was the lead -- I'm sorry?

MR. BOWMAN:  She was the lead lawyer in the case.

MR. SOTOS:  But, Judge, bottom line, I am not even remotely attacking her character.  And so this testimony --

THE COURT:  Well, whose character were you attacking?

MR. SOTOS:  I'm not attacking anybody's character from Northwestern.

THE COURT:  Well, who besides Linzer will you be attacking?

MR. SOTOS:  Nobody.  I'm not attacking character --

THE COURT:  So, you know, this is a commitment.

MR. SOTOS:  Let me be --

THE COURT:  If I'm not going to allow this, then there's not going to be any attack on anybody at Northwestern other than Linzer.

MR. SOTOS:  Let me be clear.  The only thing we're going to do is point out how information developed over time while we were trying to develop claims.

THE COURT: Well, I don't know what that means.

MR. SOTOS: Well, that's -- but that's what it is.

THE COURT: Well, then I better get this -- we better get this testimony and just be done with this. And then you're making no commitment to me, and it doesn't -- I don't care what you do. Okay? Because I don't --

MR. SOTOS: So I have to commit to not developing that information so he can ask that question?

THE COURT: Well, if you -- if there's going to be an attack on what Northwestern did and she was the lead lawyer --

MR. SOTOS: Judge --

THE COURT: -- I don't see what's wrong with that.

MR. SOTOS: Okay. So I just want to be clear for the record that I am not attacking Jane Raley's character in the least. We never have. We never intended to, and we --

THE COURT: Well, I don't want to take a lot of time, but I'm asking what you're going to do. And you're telling me, well, you're going to be attacking the way the investigation proceeded.

MR. SOTOS: I didn't say -- I didn't say I'm going to be attacking --

THE COURT: Well, then why don't you tell me what you're going to do.

MR. SOTOS: Well, a lot of it depends on how the evidence develops in the trial, because I don't know yet what

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 220 of 1335 PageID #:105605
Linzer - direct by Bowman
1900

I'm going to say.

THE COURT:  I'm going to allow this.  Let's be done.

(End of sidebar proceedings.)

MR. LOEVY:

Q.  You said you were aware of Jane Raley's reputation for integrity?

A.  Yes.

Q.  And can you tell the folks on the jury what that reputation was?

A.  Jane was an extraordinarily kind and generous person --

Q.  Let me just interrupt you, Ms. Linzer.  The question is just a very simple one, of what her reputation for integrity was.

Was it a good reputation?

A.  It was a good reputation.

Q.  Thank you.

A.  Sorry.

Q.  Now, you were telling us you did a database search at Ms. Raley's request.

What did you do after you determined that you might have located the correct Orlando Lopez through a database?

A.  I discussed it with Jane Raley and the --

Q.  Without going into the discussion --

A.  Sorry.

Q.  -- what is the next step that you took in the case?

A. We decided on a date to go to that address to try and find out if this is the correct Orlando Lopez.

Q. And where was the address that you decided to go to?

A. Outside of Cleveland, suburbs of Cleveland.

Q. In Ohio?

A. In Ohio.

Q. And you said "we." Who did you go there with?

A. I went with Cynthia Estes.

Q. And who is she?

A. Cynthia Estes was -- is an investigator.

Q. And who did she work for?

A. She was hired by the Center on Wrongful Convictions.

Q. And so how did the two of you get to Ohio?

A. I drove.

Q. And did you locate this particular address?

A. Yes.

Q. And can you tell us what happened when you got to the address in the suburb outside of Cleveland that appeared to be the address for Orlando Lopez?

A. We went up to the door.

Q. And then what happened?

A. Knocked on the door. A young teenager answered.

We asked if this is where Orlando Lopez lived, and he said yes, but he was not at home.

Q. So he wasn't at home. What did you do at that point?

A. This teenager said he'd be back in maybe an hour and a half.

And so we said, "Okay, we'll come back."

Q. Did you come back?

A. We came back.

Q. And tell us what happened when you came back.

A. We parked the car, and we were walking up the sidewalk, and Cynthia was behind me. And the door opened, and it was -- there were a couple of steps up. And this gentleman looked out at us.

And Cynthia said, "Are you Orlando Lopez?"

And he said, "Yes."

And she said, "Did you live at 3320 West Cortland in August 1988?"

And he said, "Yes."

And we said -- one of us said, "You know, we're from Northwestern. We've come to talk to you about an old case."

And he said, "I know why you're here. Come on in."

Q. And then did Orlando Lopez eventually suggest to you and Cynthia Estes that the three of you should go to another location?

A. Yes.

Q. So tell us how that came about.

A. We went into the house. We walked through the kitchen and into the living room. We began to sit down, and as we did, he

turned to us and said, "Let's go for a drive." And so at that point, you know, we said fine.

And so we followed him out of the house. We went out to get in the car. Cynthia said -- I was driving. Cynthia said to Orlando, "Why don't you ride up front with Jennifer?" He said, "Okay."

So we got in the car. And as -- I believe I was in the driveway. As I was backing out, he turned and looked out his window and said, "This is going to be all about redemption."

Q. Now, where did you eventually go to talk with Orlando?

A. To a Starbucks.

Q. I don't want to have you get into the substance of the conversation, but did Orlando Lopez say or do anything to suggest to you that he recognized the importance of the conversation that he was about to have with you?

A. Yes.

Q. Can you tell us about it?

A. Well, he said he was waiting 20 years for somebody to show up at his door and ask him about this case.

Q. As you observed him, was there anything about his appearance or the manner in which he spoke that suggested anything to you about his emotional state?

A. He was incredibly emotional. It was very intense. He was crying at times. He was just filled with anxiety.

This had been a, I think he used the word, "burden" on his soul for 20 years, and it was like a dam had broke.

Q.  Now, when you and -- and then, again, without getting into the substance, did he, in substance, in general, tell you that Jacques Rivera was not the person who he saw shoot Felix Valentin?

A.  Yes.

Q.  And he provided some details about that --

A.  Yes.

Q.  -- without getting into them?

So did -- let me ask you this question.  When you and Cynthia Estes set out for Ohio on this particular date, did I ask you when it was?  If I didn't, let me do that.

A.  Oh, it was a Sunday in February 2010.

Q.  If I were to suggest February 28 --

A.  That's correct.

Q.  -- would that refresh your recollection?

A.  Yes.

Q.  When you set out on February 28, 2010, to talk with Orlando Lopez, did you have any idea this was going to happen?

A.  No.

Q.  Were you surprised?

A.  Totally.  We were shocked.

Q.  Did you or Cynthia Estes do or say anything to Orlando Lopez to try and push him or provoke him in any way to

Q. providing you with this very surprising information?

A. No.

Q. Did you suggest anything that he should say?

A. No.

Q. Did you push him in any way to recant?

A. No.

Q. How long approximately did you spend -- well, let me ask you this before I get there.

Who did most of the talking?

A. Orlando.

Q. About how long did you and Cynthia spend talking with Orlando Lopez at the Starbucks on February 28?

A. I -- it was more than an hour, less than two hours.

Q. And then you went home?

A. We took him home. We dropped him off.

Q. And what did you do then?

A. And then we -- it was nighttime. We went to -- you know, we went out to dinner, and we stayed overnight in the Cleveland area, and then we drove back to Illinois the next day.

Q. Okay. Now, I want to direct your attention to a couple or three days later, March 2, 2010.

Did you have any interaction with Orlando Lopez on March 2, 2010?

A. Yes.

Q. Can you tell us, was this a conversation in person or over

Q. the phone?

A. Over the phone.

Q. Did you call Orlando or did he call you?

A. You know, to the best of my recollection, I called him.

Q. And was anybody else on the phone other than you and Orlando when you talked to him on March 2, 2010?

A. No.

Q. He'd given you his phone number?

A. Yes.

Q. What -- why were you calling Orlando Lopez on March 2, 2010?

A. I was calling to follow up on our meeting, to just touch base with him, see how he was doing, and to -- well, he talked about wanting to make this right.

And so part of my goal was to encourage him to come to Chicago when it would be necessary, if we were ever able to get a hearing. So it was a -- it was touching base. It was reaching out. It was making contact. It was a typical step that I would take after an interview.

Q. Okay. You had talked about this before with him when you were in his presence?

A. We had talked about?

Q. About his -- things he might do to make it right?

A. Yes.

Q. Now, when you spoke -- and about how long did you spend

talking with Orlando on March 2, if you remember?

A. You know, I would be speculating. I'd be guessing. I'd guess 10 to 15 minutes. It wasn't a long conversation.

Q. Was there anything that struck you that Orlando said in that phone call when you spoke to him on March 2, 2010?

A. Yes.

Q. Can you tell the folks on the jury what that was?

A. He said that he -- now that he had been thinking about it, he realized he had been coached.

Q. And --

MR. LEINENWEBER: Your Honor, I'm just going to object for the record. I believe that's hearsay and also witness nonimpeachment.

THE COURT: Right. And the record will note that.

MR. LEINENWEBER: Thanks. I appreciate it, Your Honor.

MR. LOEVY:

Q. And in the context of the conversations you'd been having with him on February 28 and in this conversation, what did you understand that to mean?

A. That the police officer -- there were two individuals that had been sort of caring for him through the whole process of the identification process and that they had somehow coached him.

Q. And did you on March 2, 2010, make a notation of this

Q. information that Orlando Lopez was providing?

A. Yes.

Q. Let me hand you what's been marked for identification as Plaintiff's Exhibit 260. Can you identify that for us?

A. Yes. It's my handwriting.

Q. Is that the notation that you made?

A. Yes.

Q. Did you make this notation -- well, when did you make this notation?

A. Well, I made it on March 2nd, 2010.

Q. Was it at about the time of the phone call?

A. It was during the phone call.

Q. And can you explain to us why you made this -- you made this notation?

A. Well, this was not intended to be an interview, and I was -- I was, again, shocked by what he was saying and thought I should write it down.

MR. BOWMAN: Okay. Your Honor, at this time we'd move the admission of Plaintiff's 260. I can put it on the screen for you to see if you would like.

THE COURT: Well, hold on a second.

Is there an objection?

MR. LEINENWEBER: There is an objection, Judge.

THE COURT: I don't know that the notes come in since the witness is here. Okay? We can talk about it later if you

want to.

MR. BOWMAN: Very well. I'll move on.

THE COURT: Okay.

MR. LOEVY:

Q. So, Ms. Linzer, after you made this note, what did you do with it?

A. Told Jane Raley about it, gave it to Jane Raley.

Q. And at some point earlier in this -- in the process of this litigation, did you also give a deposition?

A. Yes.

Q. And as you were preparing for your deposition, did you discover any materials that pertained to the case?

A. Yes.

Q. Can you tell the folks on the jury what you -- what you discovered as you were preparing for your deposition?

A. That this -- I had this note and that it had not been given to Jacques' current attorneys.

Q. And so you --

A. Gave it --

Q. -- gave it to his current attorneys?

A. Right.

Q. And in your deposition, were you questioned about the note?

A. Yeah, I believe so.

Q. The -- I didn't ask you this.

Did you explore the reasons for what Orlando was

saying?  You've related that he said he believed he'd been coached.  Did you delve into that with him in this conversation?

A.  I did not.

Q.  Can you tell the folks on the jury why not?

A.  I didn't think it was appropriate, because it was the two of us on the call, and there was not an investigator and attorney present with me.

Q.  All right.  So you alluded in an earlier answer to a process that you were asking Orlando to participate in to make things right.

Was there a request that the Northwestern lawyers were making of Orlando Lopez based on what he had revealed in the February meeting, specifically to do something to help Jacques?

A.  To come to Chicago.

Q.  And did you also understand that he was being requested to -- to prepare or to sign an affidavit?

A.  Correct, yes.

Q.  Can you -- we've looked at some affidavits.  Can you just tell the folks on the jury, just to refresh and orient folks, what an affidavit is?

A.  Essentially, it's a statement of facts by the witness that's then agreed upon.  We -- he had a lawyer, and it was a statement of facts from the event from that crime -- the day of the crime, and it was notarized and --

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 231 of 1335 PageID #:105616
Linzer - direct by Bowman
1911

Q.   Now, was there, to your knowledge, a process of preparing -- and then eventually Mr. Lopez did sign an affidavit?

A.   Yes.

Q.   Was there a process of preparing that affidavit for him to sign?

A.   Yes.

Q.   Did you have any role in that process?

A.   My only role in the process was sending it to his attorney.

Q.   Now, you said "his attorney."  How did it come about that Orlando Lopez had an attorney?

A.   Well, we suggested he get one when we met with him on February 28th.

Q.   And did he do so?

A.   He did.

Q.   Do you recall the name of the person that he got?

A.   I believe her last name was Adams.

Q.   If I were to suggest Stephanie Adams to you --

A.   Yes.

Q.   -- would that refresh your memory?

A.   Yes.  Yes.  Sorry.

Q.   How did Stephanie Adams come to be Orlando's lawyer, do you know?

A.   I think he knew her through his work.  He might have worked in her building.

Q. Did anyone at Northwestern suggest that he should work with this particular lawyer --

A. No.

Q. -- as opposed to some other lawyer?

A. No.

Q. And so when the affidavit was being prepared, what was the role of Orlando's lawyer in that process?

A. She was advising Orlando --

Q. And did she --

A. -- and put --

Q. Did she look at drafts of the affidavit?

A. Absolutely.

Q. Now, on Northwestern's side, who was involved in discussing with Orlando's lawyer how the affidavit would be phrased? Was that you?

A. No.

Q. Who was it?

A. Jane Raley.

Q. Do you have any knowledge yourself as to whether the subject of your note, police coaching of Orlando, was or was not an issue that was legally relevant for the affidavit in Orlando's post-conviction petition?

A. I have no idea.

MS. ROSEN: Objection, Judge.

THE COURT: Sustained.

MR. LOEVY:

Q. And then after the affidavit, what was the next thing that Northwestern asked Orlando to do to make things right?

A. To come to Chicago and testify.

Q. And did he do that?

A. Yes, he did.

Q. Now, how many in-person meetings total did you have with Orlando Lopez?

A. Three.

Q. And can you estimate how many phone calls you had with him?

A. At least a half a dozen.

Q. At -- in any of those conversations, did you ever push Orlando to make a particular statement?

A. No.

Q. Did you ever ask him to say something in a particular way as opposed to some other way?

A. No.

Q. Did you ever ask him to adopt some particular version of what happened?

A. Never.

Q. All right. So let me shift gears.

There was a hearing. Orlando testified. And what was the outcome of that hearing?

A. Well, Jacques was released not that far after that.

Q. And do you happen to remember the day on which Jacques

Rivera was released from prison?

A. Yes.

Q. Can you tell us the date?

A. Yes. October 4th, 2011. Sorry.

Q. Was that a big day for you?

A. Yeah, it was a big day.

Q. Were you present when --

A. I was present.

Q. Can you tell -- Jacques had been in custody, obviously, for a long time. Where was he released from?

A. He was released from the jail at 26th and California.

Q. And did you see him walk out of the jail?

A. I did. We waited all afternoon. It took about six hours to release him. His mom was there, and his kids were there.

And by the time he got out, it was dark. And, yeah, he walked along with -- in fact, Jane Raley was with him, behind him. And his kids -- his kids ran up to him and just, you know, he was surrounded by his children.

Q. And did you observe Jacques Rivera's demeanor at that time?

A. Yeah.

Q. What did you see?

A. He was sobbing. It was -- yeah.

Q. After Jacques was released from prison, have you stayed in touch with him?

A. Yes.

Q. Does he have a name for you, Ms. Raley -- I'm so sorry -- Ms. Linzer?

A. That's okay. Yes.

Q. What is it?

A. He calls me Ma.

Q. Did you have close contact with Jacques Rivera in the, you know, few weeks, the few months after he got out of prison?

A. Yes.

Q. Did you -- what did you observe about his process of adjustment?

A. It was really difficult, a lot of anxiety, a lot of fear. We were trying to get him to come into the offices to get out of his mom's house. He wouldn't take the El. He was afraid to take the El.

    We'd send somebody out to pick him up; but, you know, he needed to get out of the house. He needed to start living again.

Q. Did you observe that he was reluctant to take public transportation?

A. Yes.

Q. What did you notice about that?

A. He was afraid to.

Q. And what about walking on the streets, what was his reaction to that?

A. Very stressful.

Q. Did you observe Jacques having any difficulties navigating just the basics of life?

A. Yeah. Yes. Just -- it was a completely different world, and it was very difficult.

Q. Any specifics you can give us? Cell phones, for example?

A. Just dealing with technology, computers, cell phones, microwaves. You know, it was just a different place.

Q. Did you encourage Jacques Rivera in the area of -- in the area of his personal emotions as he made his adjustment?

A. Yes.

Q. Did you make any recommendations to him?

A. Absolutely. To get counseling, and that it would help to get his life back on track.

Q. And to your knowledge, did he do that, do you know?

A. Oh, yes.

Q. And did you encourage Jacques Rivera to seek employment?

A. Yes.

Q. Do you know whether that was easy or hard for him to do?

A. It was really hard.

Q. And what happened?

A. Well, I felt that Northwestern should be hiring some of the exonerees that were getting out, that that was the right thing to do.

And there was a loading dock job that had opened, and I wanted him to be able to interview for it, because I thought

it was perfect for him.

Q.  Did you personally take any steps to make it possible for him to get an interview?

A.  Yes.

Q.  And did you see him on the morning of his interview?

A.  Yes.

Q.  Tell us about how he looked.

A.  He came to the clinic.  He was all dressed up with a purple tie.  You know, North -- everything is purple at Northwestern.

He just -- he was just sparkle.  We were just so proud of him.  It was -- yeah.

MR. BOWMAN:  Thanks, Ms. Linzer.  That's all I have.

THE COURT:  Okay.

MR. LEINENWEBER:  Thanks, Judge.

CROSS-EXAMINATION

BY MR. LEINENWEBER:

Q.  Good afternoon, Ms. Linzer.

I take it it's fair to say that this is a great highlight of your life?

A.  My work at the Center was the best work of my life.

Q.  But particularly with Mr. Rivera, this obviously was emotional to you?

A.  Yes.

Q.  It's, like I said, for the past 15 years, this is one of the greatest things that at least in your professional

Q. capacity, has happened to you. Would you agree with that?

A. Yeah.

Q. And, you know, you were -- you were looking for him, I think, for a long time. I think you said that you first started in 2005?

A. That's right.

Q. Okay. And then in 2009, you were able to look at him -- look for him a little easier -- or a little more successfully. That's fair to say?

A. Yeah, we refocused in 2009.

Q. Okay. And eventually, I think you said you figured out the person you thought -- thought -- the Orlando Lopez you thought you found him, you believed, outside of Cleveland, Ohio, correct?

A. Correct.

Q. And I believe you said you went to Cleveland in February of 2010 with Ms. Estes?

A. Correct.

Q. And Ms. Estes was the investigator for the Center?

A. She was an independent investigator, and so she was hired, you know, case by case?

Q. Okay. But -- but while you were working there, she was someone you interacted with and worked --

A. Yes.

Q. -- with on several occasions?

A. Regularly, yes.

Q. And you understood that she was -- she'd been doing this for a long time. I think she'd been in the business for, like, 30th years, is that --

A. Long time.

Q. Okay. And she was something that -- someone who was obviously, in your eyes, good at -- good at her job, correct?

A. Yes.

Q. Okay. And so I think you stated it was a Sunday, February 28th, you guys drove from Chicago or Evanston to Cleveland, correct?

A. That's correct.

Q. Okay. And I think you said you were driving, and she was the other passenger, correct?

A. That's right.

Q. Okay. And during that time, the seven hours from here to Cleveland --

A. Right.

Q. -- you're talking about the case. Fair to say?

A. We talked about a lot of things.

Q. Right. It's a long drive?

A. Yeah, it's a long drive.

Q. Okay. But you're finally -- let me ask you this question.
        Had you -- had you ever visited any of the other Orlando Lopezes you were looking for?

A.   No.

Q.   Okay.   So this was kind of a big moment at the time?

A.   Yes.

Q.   Okay.   You were hopeful, correct?

A.   Very.

Q.   Okay.   And while you're driving, Ms. Estes was making some notes; is that correct?

A.   I don't know that she was making notes on the drive.   That I don't recall.

Q.   Okay.

A.   It's possible.

Q.   Okay.

A.   I mean, I was driving.   Yeah, it was very snowy.

MR. LEINENWEBER:   Okay.   Judge, if I could approach.

THE COURT:   Sure.

BY MR. LEINENWEBER:

Q.   If I could just ask, Ms. Linzer, if you could just take a look at that.

A.   Sure.

Q.   And just let me know when you've had a second to take a look --

A.   Okay.

Q.   -- please.

MR. LOEVY:   Your Honor, these are not the witness' notes.   So I'm not sure even what purpose these are being made.

THE COURT: Well, I'm in the same position, so --

BY THE WITNESS:

A. Yeah, I've seen these notes before.

BY MR. LEINENWEBER:

Q. Okay. And those notes you've seen before, you saw them, I believe, at your deposition in the matter?

A. Yes.

Q. That sound about right?

A. Probably, yes.

Q. Okay. And those aren't your notes, I take it?

A. That's correct. Those are Cynthia's.

Q. Okay. And those are Ms. Estes' notes?

A. Correct.

Q. Okay. And prior to your deposition, you had not seen those notes before?

A. Not that I recall.

Q. Okay.

A. I mean, it's possible. I don't recall.

Q. Okay. Well, on the drive from here to Cleveland, I know you said you touched on several topics, but one of the topics, obviously, was what you hoped to speak to Orlando Lopez about. Fair enough?

A. Sure.

Q. Okay. And if you could see on the list, it says a bunch of questions about --

MR. LOEVY: Objection to hearsay, then, Your Honor. We don't know when these notes were taken, at what point in the process. There's no foundation.

THE COURT: Yeah, there's probably a hearsay problem with these notes. What are you --

MR. LEINENWEBER: I'll try and clear it up, Judge.

THE COURT: Okay.

BY MR. LEINENWEBER:

Q. Some of the things you talked about on the way down there was you wanted to talk to Orlando about where he was living at the time, correct? At the time -- and when I say "at the time" -- and I don't mean to confuse you.

A. Okay. I'm thinking this is --

Q. You're not --

THE COURT REPORTER: I'm sorry.

THE WITNESS: Sorry.

BY MR. LEINENWEBER:

Q. I know you're not a professional witness.

What you're going to talk to Orlando about was 1988, '89, '90, right?

A. We first wanted to know if he was the right person.

Q. Right.

A. That was key. And everything else was going to come as it came.

Q. Correct. Okay.

And if he was the right person, some of the things you wanted to ask him about was, you know, did he lie?  Did he lie and -- or was he mistaken about Jacques Rivera being the shooter, correct?

A.  We wanted to know what he recalled.  I think we -- Cynthia conducted the interview, and I think that was the beginning. What do you recall?

Q.  Right.  And she was conducting the interview, and she was taking notes at the time, too, correct?

A.  She was taking notes.

Q.  Okay.  And she took a lot of notes?

A.  She took the notes.

Q.  Do you recall?  Yeah.

And some of the things you wanted to ask him was, like, how -- you wanted to ask Orlando -- having established Orlando was the person, the witness, you were trying to find out what he remembered about the incident, where he was living, those types of things; is that right?

A.  Well, as I said earlier, this was like a floodgate.  So we were just trying to follow what was coming.  I mean, he was just unburdening himself, and so we were trying to follow him and get it all down and understand --

Q.  Right.

A.  -- his story.

Q.  Right.  And so Ms. Estes was trying to get it all down.

Far from prodding him, you just asked him, and he started talking; is that correct?

A.  I think that's fair.

Q.  In fact, you had said that even before anyone asked him a question, you get in the car, and he said, "This is all about redemption," correct?

A.  Yes.

Q.  Is that right?

And then you drive to the Starbucks, and you grab a seat.  And he -- as you said, in your words, the floodgates open.  He's been waiting 20 years for this, and he just starts talking, correct?

A.  Right.

Q.  And at that point, again, Ms. Estes is taking notes, right?

A.  Yes.

Q.  Okay.  Sorry.  It's not a normal conversation.

And so he tells you -- he sits there, and he says, "You know what, it wasn't Jacques Rivera that killed Felix Valentin."  He told you that, right?

A.  He said, "I picked the wrong person."

Q.  Right.  And he said that at some point -- strike that.

You asked him, like, "Well, how did this come about," right?

A.  We asked him what happened that day.

Q.  Right.  And he said that -- he described the shooting,

correct?  He said he was walking out his door, and he saw the shooting, correct?

A.   Correct.

Q.   And then at some point, the police came to his house, correct?

A.   Yes.

Q.   And when the police came to his house, they had some Latin King gang books, correct?

A.   They had gang books.

Q.   Right.

A.   You know, gang mug books, yes.

Q.   Right.  And they told him to take a look, go through the gang book, and see if you see who you think might be the shooter?

A.   Yes.

Q.   Is that correct?

A.   Yes.

Q.   Sorry.  He said he looked -- he looked for hours.  He looked at hundreds of photos at his house --

A.   Yes.

Q.   -- right?

A.   Yes.

Q.   In fact, he said something, like, "I just got tired of looking, and I found a guy who looked the shooter, and I told them that's who it was," right?

A.   Yes.

Q.   And, in fact, he told you that the police said, "Are you sure it's him," and he said, "Yeah, that's him," correct?

A.   That's possible, yeah.

Q.   All right.  And then, again, since he's -- since this is all rushing out, there were a couple instances where you or Cynthia had to stop and say, "Wait a second.  Let's -- can we start this over and take us through exactly what happened"; is that right?

A.   Probably.

Q.   Okay.  And at some point you said, "Okay.  Tell us, like, your interactions with the police," correct?

     Well, let me withdraw that question.  Sorry.  It's a bad question.

     At some point you said how did he make the identification, correct?

A.   You know, I think he was doing the talking.  He was leading the way.

Q.   In your conversation?

A.   In our meeting on February 28th.

Q.   Okay.  And he said -- again, I already talked about one. He said that the police came, showed him some gang books.  He picked out who he thought the shooter was, right?

A.   He picked out someone he thought resembled the shooter.  He used the word "resembled."

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 247 of 1335 PageID #:105632
Linzer - cross by Leinenweber
1927

Q. Okay. And then what he said what happened next was he thinks a few days later, he went to a lineup, and he picked out the guy?

A. He said that within a week of, you know, picking out someone from, you know, the mugshots, he saw the actual shooter near Funston School --

Q. Okay.

A. -- and realized he had made a mistake.

Q. But at some point he said to you, when the question was asked how did this go about, he said, well, one, I picked him out from the mug book. Two, a couple days later, a few days later, I went and picked out a lineup.

And then on the third time, he said, "They were asking me to look at some pictures, and that's when I told them they had the wrong guy."

That's what he told you that day, correct?

A. He told us that he went to a lineup, and he went in without his mother and his sister --

Q. Right.

A. -- that he was 12 years old. And he went in.

And I don't recall if he said he picked someone out from that lineup, but I do recall that he said that there were more mugshots, more pictures to look at. And he just got tired of looking at them.

And then there was another lineup, and he tried to

tell them at that point that he had picked the wrong person because he had seen the actual shooter.

Q. Okay. So it's your recollection that in that conversation at Starbucks that Mr. Lopez told you that he'd viewed two lineups; is that correct?

A. I believe so.

Q. Okay. And he spoke or you asked him some questions about, well, did he tell the police or anyone that he had the wrong guy, and he said, "Yeah, at some point I told someone wrong guy," correct?

A. Yes.

Q. And, in fact, then you asked or Ms. Estes asked: "Well, who did you tell?" Do you recall that?

A. Yes.

Q. And he said, "I told a woman with white hair"; is that correct?

A. Yes.

Q. And, in fact, over that course of that hour or two hours you're with him, he mentioned speaking to this woman with white hair five times; is that correct?

A. Multiple times, yeah.

Q. Okay. And at some point, you or Ms. Estes asked, "Well, did you tell anyone else?"

And he said, "Well, I -- I told the woman in white hair and the cop that was there."

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 249 of 1335 PageID #:105634
Linzer - cross by Leinenweber
1929

Do you remember him saying that?

A. Yes.

Q. And he made no further identification. He just said "the cop," correct?

A. He said it was -- he described -- he described the older woman with white-ish, blondish hair and a cop -- a male cop that had glasses, a fro -- let's see -- a Latino name and Caucasian features.

Q. Okay. So at this meeting at the Starbucks, he not only mentioned the woman with the white hair, but he said Hispanic cop with Caucasian features with a fro and -- what else did you --

A. Glasses, I believe.

Q. He said that to you at that meeting?

A. Yes.

Q. Okay.

MR. LEINENWEBER: If I can approach, Judge.

BY MR. LEINENWEBER:

Q. I'm going to show you what's been marked as Defendants' Exhibit 103.

A. Right.

Q. Could you take a look at that, please?

And just let me know when you've had a chance to take a look at that.

MR. LOEVY: Your Honor, we do object to any use of it.

It's a 17-page document written by somebody else.

MR. LEINENWEBER: Well, let me ask a few questions about that.

THE COURT: Yeah. Well, let me hear what the questions are.

BY MR. LEINENWEBER:

Q. This document on the front page of it, it says --

MR. LOEVY: Well, we object to whatever it says. It sounds like hearsay, Your Honor.

BY MR. LEINENWEBER:

Q. What does it say on the front page?

MR. LOEVY: That's our objection, Your Honor.

THE COURT: Do I need to look at this, because I don't have it?

MR. LEINENWEBER: Sure, Judge. Let me approach.

THE COURT: Thank you. Hold on a second.

Well, it's hearsay, but I don't know if you're going to be using it for the truth or what you're going to be using it for.

MR. LEINENWEBER: One, Judge, I would argue it's not hearsay. First of all, I think it's an admission of a party opponent because the witness was working for Mr. Rivera's attorney, number one.

Number two, I believe it's a business record kept in the normal course of business, written by the investigator for

the Center about -- it's a 17-page document about their interview with this witness.

So I don't think it's hearsay.

MR. LOEVY: Well, actually, it looks like it's written by a witness who wasn't there. It says Attorney Raley.

THE COURT: Wait a minute. First of all -- first of all, I have a view of business records that's maybe different from some people, but I don't think this kind of thing is a business record.

And the other -- you're saying a statement of a -- I don't know what you're going to do with this.

Why don't I hear -- you're just asking the witness to identify what it is, right?

MR. LEINENWEBER: Correct.

THE COURT: Let's go to there.

BY MR. LEINENWEBER:

Q. What's that document, ma'am?

A. This -- Cynthia Estes created a typed report after our meeting on February 28th, 2010.

Q. Okay. And that report indicates, at least on the top, the people at the meeting were yourself, Ms. Estes, and Mr. Lopez, correct?

A. That's correct.

Q. Okay. And you've seen this report and read it before; is that correct?

A. Yes, yes.

Q. Okay. And it was written by Ms. Estes, correct?

A. Yes.

Q. Okay. And she was the one taking notes during the interview?

A. Yes.

Q. Okay. And she was, to your mind, a good investigator; is that correct?

A. Yes.

Q. Okay. And so this -- this record or this -- this report, it's accurate? You've read it?

A. It's -- yes, I've read it. I think everything in here is accurate.

Q. Okay. Okay.

So in that report, it says that there was one lineup, correct?

A. Again, I would have to go back and reread it.

Q. I'll show you what page it's on, if I can direct your attention.

A. Which page? Yeah, I mean, I don't want to sit here and read it.

Q. Okay. I'll direct your attention to -- I'm sorry -- page 11, first full paragraph.

A. Okay. Where --

MR. LOEVY: Your Honor, it doesn't say there was one

lineup.  Unless the --

THE COURT:  Wait, wait, wait.

MR. LOEVY:  I'm sorry.

THE COURT:  The witness -- there's a question to the witness.  The witness can answer the question.  I don't --

MR. LOEVY:  Fine.  Hearsay is the objection, Your Honor.

THE COURT:  Okay.  Overruled.

BY MR. LEINENWEBER:

Q.  So if you turn to page 11 --

A.  Okay.  I'm on page 11.

Q.  -- that first paragraph, it says, "I asked Mr. Lopez if we could go through the order in which he identified our client. Mr. Lopez said the cops brought the mugshots to his house" --

MR. LOEVY:  This is hearsay, Your Honor, isn't it?

BY MR. LEINENWEBER:

Q.  -- "then he thinks he may have picked him up out of the lineup a few days ago" --

THE COURT:  Hold on a second.  Let me see counsel at the side.

(Proceedings heard at sidebar on the record:)

THE COURT:  Why isn't this more impeachment of Lopez? That's what we've been doing all day.

MR. LOEVY:  Your Honor, they're reading somebody else's document who is not here.  There's no foundation for it.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 254 of 1335 PageID #:105639
Linzer - cross by Leinenweber
1934

THE COURT: Well, she can say whether this is the way she remembers it or not.

MR. LOEVY: All right. Well, I guess reading somebody else's document, Your Honor -- I'll tell you what. I'll withdraw it. Let's go.

THE COURT: Okay. Thank you.

(End of sidebar proceedings.)

MR. LOEVY: We'll withdraw the objection, Your Honor.

BY MR. LEINENWEBER:

Q. If we could just go back to page 11.

A. Yes.

Q. I'll guess I'll start my question over.

The report says: I asked Mr. Lopez if we'd go through the order in which he identified our client. Mr. Lopez said the cops brought the mugshot to his house, and he picked the guy. Then he thinks he may have picked him from a lineup a few days later. He thinks a few days after that that they showed him more photos and that this is when he told them Rivera was not the guy, but the lady wouldn't listen. We asked which lady. He said she was not in uniform. Maybe she was a lawyer. She was older with blonde hair and some white hair. Mr. Lopez pointed to my hair and said, kind of like yours. Then Mr. Lopez says he thinks it's the third time he's brought back he tried to tell them they had -- he tried to tell them they had the wrong guy, but by then no one wanted them to hear it.

He said he kept saying to him he didn't need to be afraid.

Is that what the report says?

A. Yes.

Q. Okay. And does that jibe with your recollection of what he said about how he identified Mr. Rivera?

A. Yes.

Q. Okay. And I won't make you read the entire document, but would it surprise you that the document does not refer to anyone with a fro or glasses?

A. That was a crazy interview, and there was a ton of information that he was unloading on us.

And, yeah, do I wish we had had a tape recorder? Today we would have had a tape recorder.

Q. But obviously, in 2010 you didn't have a tape recorder or video recorder, correct?

A. Right. Right.

Q. Okay. So I guess my question when I said does it surprise you, you said he was telling you so much information that I guess, in your mind, Ms. Estes couldn't get it all down?

A. Correct.

Q. Okay. So the fact that that report doesn't say anything about a second lineup, does that surprise you?

A. I think I remember his story. His story was at the second lineup, he tried to tell them that he had picked the wrong man.

Q. But --

A. Now, whether or not it's in Cynthia's report --

Q. Well --

A. -- it may not be a perfect report.

Q. It may not be a perfect report, perhaps, but you would think that the identification of a person that Mr. Lopez said he told that he was lying to or is wrong to, that would be an important fact to write down, correct?

A. Sure.

Q. Okay. And so the fact that Ms. Estes, when she was writing down these notes, wrote down white-haired lady five times, an Hispanic person or detective with a fro zero times, wouldn't that indicate to you the time you were speaking to Mr. Lopez that he told you about a white-haired lady and not about a Hispanic detective with a fro?

A. Well, I remember him talking about that there were two people. There was a guy, you know, the cop, and the white-haired lady.

Q. Right. And he mentions that, and you're right?

A. Yes.

Q. And you're right. I understand, look --

A. And I --

Q. This was eight years ago, and no one has a photographic memory. You probably don't. I certainly don't. So you're not going to remember everything. But that's why people write notes, correct?

A. Sure.

Q. You write notes or an investigator writes notes at or near the time that they do an interview because they want to be sure they get everything that was said, correct?

A. As much as you can.

Q. Right. And part of that reason is that at this point when you're sitting at the Starbucks in suburban Cleveland, you have no idea what's going to be important later on, correct?

A. Sure.

Q. And you also want to get the witness' statements written down just in case that witness changes his mind, correct?

A. Sure.

Q. Because if he does change his mind, at least there's two witnesses, yourself and Ms. Estes, going "Whoa, whoa, whoa, whoa, Orlando" --

A. I --

Q. -- "this is what you told us," right?

A. Yeah, I don't -- that didn't -- would not have entered my mind.

Q. Well, part of your job -- and I understand you started as event planner, but then it seems like you whipped that place into shape, correct?

A. You know, I just did what needed to be done. Every day it was different.

Q. And you helped make it the success it is? I mean, you

share part of the success for the center for wrongful convictions, correct?

A.   Center on Wrongful Convictions.

Q.   I'm sorry.  You share that success, though, right?

A.   Sure.

Q.   Right.  And part of the jobs you did were, as you said, a little bit of everything, but part of those was conducting interviews sometimes, too, correct?

A.   Yes.

Q.   And I think you said at your deposition that in that year 2010 you probably did 25 or 30th interviews yourself, correct?

A.   In -- yeah, that's possible.  Or, perhaps, prior to 2009 there were a lot of interviews.

Q.   You've done a lot of interviews?

A.   Yes.

Q.   Okay.  And even though --

A.   I've participated in a lot of interviews.  Typically the routine was, I went along with Cynthia.  We went as a team.  She conducted the interview.  Yeah.

Q.   Right.  And she was the professional?

A.   She was a licensed investigator.

Q.   Correct.  She's the professional investigator.

        And so you would let her write the notes and lead the questions because she's the professional, correct?

A.   Yes, I deferred to her.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 259 of 1335 PageID #:105649
Linzer - cross by Leinenweber
1939

Q. Right. And so by deferring to her --

MR. LEINENWEBER: Excuse me. Sorry, Judge.

BY MR. LEINENWEBER:

Q. By deferring to her, it's because she was good at it, right?

A. Sure.

Q. She was good at asking questions, right?

A. Yes.

Q. She was good at writing up reports?

A. Yes.

Q. She was thorough, correct?

A. Yes.

Q. Okay. And a couple of the other things that Mr. Lopez told you that day in Cleveland, he said at some point, you know, he knew that Mr. Rivera was not guilty of this but that he didn't care because Mr. Lopez at the time was a Pee Wee Manic -- Maniac Latin Disciple; he was in a different gang, correct?

A. That's what he said.

Q. And he said, "I don't care what happens to a Latin King." He said that, correct?

A. He said that -- I think I believe he said something about that at trial, yes.

Q. Right. He didn't -- he didn't care, right? Well, as a young man.

He certainly did later because, you know, this had,

obviously, as you said, worn on him. It was a burden, and he wanted to be -- he wanted redemption. He wanted to make it right.

But at least at that time, your memory of his conversation was he didn't care; it's another gang, right?

A. That's his -- yeah, that's what he said.

Q. That's your recollection of what he said?

A. That's what he said, yes.

Q. Right. And he also told you in that conversation -- and Ms. Estes made a note of it -- he said, "You know, the police didn't tell me what to say." You remember he said that, correct?

A. Yes.

Q. So he said there was one lineup, right?

MR. LOEVY: Objection, Your Honor. He didn't say there was one lineup.

BY THE WITNESS:

A. Yeah, I'm --

THE COURT: Sustained.

BY MR. LEINENWEBER:

Q. The report indicates there was one lineup; is that right?

MR. LOEVY: Objection to that as well.

THE COURT: Wait, wait. I couldn't even hear the question.

MR. LEINENWEBER: My question was, Judge -- and you

don't have to answer for a second -- the report indicates that there was one lineup.

MR. LOEVY: Your Honor, he read the language. I didn't hear it saying there was one lineup.

MR. LEINENWEBER: I can ask the witness to look.

THE COURT: Yes, why -- I think the report, if you're going to go by that, it's a little complicated in what it says about that.

MR. LEINENWEBER: So I may go into the report? I don't want to make the witness read the report.

THE COURT: Well --

MR. LOEVY: He read it to her.

You read it to her.

MR. LEINENWEBER: I didn't read the 17 pages, Your Honor.

THE COURT: Wait. Let's not have an argument. It's late in the day and -- hold on a second.

MR. LEINENWEBER: Perhaps I can short circuit, Judge.

THE COURT: Maybe you could just direct the witness to where in the report and what you want her to -- I mean, we already talked about it.

MR. LEINENWEBER: Right.

THE COURT: But go ahead.

MR. LEINENWEBER: I can't direct her to any part of the report, Judge, that says lineup because that's the only

Linzer - cross by Leinenweber

1942

part that says lineup on page 11.

THE COURT: Well, so we're talking about page 11.

MR. LEINENWEBER: Correct.

BY MR. LEINENWEBER:

Q. So I'm sorry, Ms. Linzer. If you could look again at page 11. In that second sentence again, Mr. Lopez said the cops brought the mug book to his house, and he picked the guy. Then he thinks he may have picked the guy from a lineup a few days later, and he thinks a few days after that, they showed him more photos, and that's when he told them that Rivera was not the guy, but the lady wouldn't listen.

Nowhere else in the report does it say anything about a lineup, does it?

A. You know, I'd have read the whole report.

Q. Would you take my word for it that that's the only part that says lineup?

A. I'd have to read the report. You know, I don't mean to be difficult --

Q. Yeah, I understand --

A. -- but I'd have to read the report.

Q. -- I understand you're in a difficult spot.

A. Yeah.

MR. LEINENWEBER: Judge, may have one moment?

THE COURT: Sure.

(Counsel conferring.)

BY MR. LEINENWEBER:

Q. Ms. Linzer, when Mr. Bowman was asking you some questions, you were talking about the phone call you had with Mr. Lopez that was a couple days after when you had seen him in Cleveland, correct?

A. Correct.

Q. Okay. And that's when he told you, "The more I think about it, I was coached," or something along those lines?

A. Yes.

Q. Okay. But he -- at least in the meeting at the Starbucks, he didn't say anything about that, correct?

A. I think that's correct.

Q. Okay. In fact, he said the opposite. He said, "The police didn't tell me what to say," correct?

A. You know, I'd have to read her report to remember exactly what he said or I'd have to read her notes to --

Q. Okay. And the fact that he said he was coached, according to you in this conversation, he never said that anywhere else, did he?

A. I think that was the only time that I recall that he said that.

Q. He didn't say that at the PC hearing in this matter?

A. You know, I wasn't in the courtroom. I couldn't be in the courtroom, so I don't -- I haven't read his testimony.

Q. He didn't say at the deposition in this matter?

A. Not that I'm aware.

Q. He certainly didn't say it to you in the meeting, and it's certainly not in the papers from that; is that correct?

A. I think only on the phone.

MR. LEINENWEBER: Sorry, Your Honor.

BY MR. LEINENWEBER:

Q. He also told you that when he in the event with Mr. Lopez -- in your conversation at Starbucks when he testified at the trial in 1990, he said he exaggerated at that time, correct?

A. Yes.

Q. Okay. And I think Ms. Estes or you asked him, "Did you -- did you say you'd seen the -- see Mr. Rivera playing baseball in Humboldt Park?"

He said, "I don't remember, but I may have said that," correct?

A. Yes.

Q. All right. And, again, a couple times he said in that conversation that was -- I think he said three times in that conversation that the third time that he spoke to the police?

A. Are you talking about the February 28th?

Q. Correct. I'm sorry.

A. Okay. That's all right.

Q. At that February 28th conversation, he told you three times on three different occasions in that conversation that it was

in the third time that he told the police that they had the wrong guy, correct?

A. I recall that he said at the second lineup, he told the police that he had the wrong person, that he had picked the wrong person, that he had the wrong man.

Q. Okay. I'm going to point you out to the bottom of page 16.

A. Okay.

Q. Take a look at that.

A. Okay.

Q. Just let me know when you get there.

A. Okay.

Q. And it says there, "I asked about the white-haired lady. He said I can't remember much. She was older and had blondish hair with white in it. Mr. Lopez said he was pretty sure it was the third time he was brought in and shown the photos. He pointed to the guy and picked and said, that's not the right guy."

Does that -- does that refresh your recollection as to what the actual conversation with him was?

A. I think that's pretty accurate.

Q. Okay. That he was shown the photos, and that's when he said wrong guy?

A. And he was shown -- he -- yeah, he was in for the second lineup, and he was trying to tell them at that point that, yeah, he had picked the wrong guy.

Q. But at least in that section that I just read to you, it doesn't say anything about a second lineup?

A. Well, this is Cynthia's report.

Q. Right.

A. So, yeah.

Q. But Cynthia's report, because you trusted Cynthia to correctly write it down, right?

A. Sure. I -- yeah.

Q. And as you said, she was the professional, correct?

A. Yeah.

Q. You didn't write the notes, correct?

A. Correct.

Q. You trusted her to write the notes and ask the questions, correct?

A. Well, I was asking questions, too. But, yes, she was writing the notes. I trust -- I definitely trusted her.

Q. You trusted her to write what was said?

A. As much as she could get down.

Q. Correct. But she seems to have written that down, correct?

A. It -- yes, it was difficult --

MR. LOEVY: I'm just going to object, because we have six minutes. She wants to leave on an airplane. So I object to asked and answered.

THE COURT: Well, you know, I --

MR. LOEVY: That's my objection.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 267 of 1335 PageID #:105652
Linzer - cross by Leinenweber
1947

THE COURT: Nothing has gone according to schedule, so I'm not going to interrupt the cross.

MR. LEINENWEBER: Thank you, Judge.

BY MR. LEINENWEBER:

Q. But that's what -- that's what the report says, right? It says when he was shown photos, correct?

A. All right. Let me go back, because I'm --

Q. This is at the top -- bottom of page 16, top of page 17.

A. And, again, this is Cynthia's report.

Q. Understood.

A. Okay. "The third time he was brought in and shown the photos. He pointed to the guy he had picked and said that is not the right guy."

Q. And so you think that Ms. Estes was incorrect in writing that down, or does that sound like what he said?

A. It's possible that there are -- there might be an error in the report. But as I said, it was a very intense conversation, and it was at times difficult to follow.

Q. Understood. So it was an intense conversation. It was difficult to follow?

A. He didn't know we were coming.

Q. Right. Because it's -- according to Ms. Estes, it's better that way, right?

MR. BOWMAN: Objection, according to Ms. Estes.

THE COURT: Sustained.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 268 of 1335 PageID #:105653
Linzer - cross by Leinenweber
1948

BY MR. LEINENWEBER:

Q. Is it a better way to talk to witnesses, in your opinion, to not call first?

A. This was too important to make a phone call. We needed to knock on his door, and we needed to introduce ourselves and explain who we were and ask him what he recalled.

Q. And the reason it was important to do it in that way was, it's more likely that the witness will be forthcoming and tell you everything, correct?

A. You never know.

Q. Right. But as you said, in this instance, it was like a movie, right?

A. It was -- we were shocked.

Q. It was like a dam breaking, correct?

A. It -- yes.

Q. He told you everything. He was hard to follow, but he told you everything, correct?

A. You know, I don't know if he told us everything. He did --

Q. Well --

A. -- a good job of -- he had a good memory of that day, and he tried very hard to get it all out, but there was -- it was very difficult for him.

Q. Right. He'd been waiting 20 years to get this off his chest, and when he got it off of his chest, he told you a lot of things. He told you 17 pages worth of things, correct?

A.   Yes.

Q.   And among those things that he told you was, the police never told me to lie or forced me to pick him, correct?

A.   Yeah, I don't recall him saying that.

Q.   Well, let me direct you to -- I believe it's -- if you could look at page 12 at the top, the end of the first paragraph.

A.   Okay.  Just a second.  Okay.

Q.   So in the middle of that, it says, "Mr. Lopez said he never told me he was afraid.  He told me it wasn't the right guy, and then he went into this whole speech about him being young and afraid.  Mr. Lopez said he wants us to know that the cops did not coerce him in picking anybody out.  They just didn't want to hear it when he tried to make it right."

        Is that your recollection of what --

A.   Yeah.

Q.   That's what he said, correct?

A.   I think that's correct.

Q.   Right.  He said, the cops didn't force me to pick this guy out?

A.   That's what the report says.

Q.   But that's your memory, too?

A.   Yes.

        MR. LEINENWEBER:  Okay.  Judge, can I have just one moment?  I'm sorry.  I just wanted to --

THE COURT: Yes. But are there going to be more defense questions?

MR. LEINENWEBER: I believe there are, Judge.

MR. GIVEN: There are, Judge. And we have kind of an issue with that, I think with the time and the way that this witness was brought --

THE COURT: I just asked a question. Okay? And I got an answer. We're not going to finish today. Okay.

And there's something that we need to take up outside the presence of the jury, is that what you're saying?

MR. GIVEN: No.

MS. ROSEN: No.

THE COURT: Okay. Fine. Go ahead. Take your minute.

MR. LEINENWEBER: Okay. Thanks, Judge.

(Counsel conferring.)

BY MR. LEINENWEBER:

Q. Ms. Linzer, on the way to Cleveland from Chicago before you met with Mr. Lopez, one of the things that you wanted to talk about or one of the things you spoke about with Ms. Estes about wanting to speak to Mr. Lopez about was Rey Guevara, correct?

A. You know, I'm not sure that, you know, that was one of the topics. We wanted -- you know, we were just trying to get started with this person and find out if he was the right guy.

Q. Right.

A. And we would let it go where it was supposed to go. We'd

let him lead the way. And so we wanted to know what happened. We wanted to know what he saw.

Q. Okay. And in that conversation you had with him that day, he didn't mention Rey Guevara, he didn't mention any Hispanic detective, correct?

A. I recall that he did mention -- he didn't mention any police officers by name. But, you know, I recall that he did describe the male cop and the white-haired lady. And he -- he had a good visual description of the male cop.

Q. Would it surprise you, then, that Ms. Estes did not write down any physical description of the male cop?

A. Yeah, I suppose -- you know, would it surprise me? That was a crazy experience. Yeah, yeah, maybe she didn't write it down.

Q. Okay. And she didn't write it down. Perhaps it didn't happen, correct?

A. You know, that's not true. I don't agree with that statement.

Q. Okay. So --

THE COURT: It's 4:00.

MR. LEINENWEBER: Thanks, Judge.

THE COURT: You're not one question away from done?

MR. LEINENWEBER: I'm not.

THE COURT: No. Okay. Let's take our evening recess. Don't forget, ladies and gentlemen, 9:30 tomorrow as usual.

COURT SECURITY OFFICER: All rise.

(Jury out.)

THE COURT: Okay. 9:30. You know, if nobody objects when questions -- and I'm not blaming anybody in particular -- when questions have been asked and answered, I heard some things three and four times this afternoon.

So, you know, I think at some point, we're going to -- this jury is going to start going crazy, because it just taking a really long time.

And I will say -- and I'm not going to blame any -- Mr. Bowman, I was promised 20 minutes. You were with the witness at least for 35. So there's plenty of blame to spread around.

MR. BOWMAN: Thank you.

(Adjournment at 4:01 p.m. until 9:30 a.m., 6/15/18.)

C E R T I F I C A T E

We, Blanca Lara and Nancy L. Bistany, do hereby certify that the foregoing is a complete, true, and accurate transcript of the Trial proceedings, Volume 8, had in the above-entitled case before the HONORABLE JOAN B. GOTTSCHALL, one of the Judges of said Court, at Chicago, Illinois, on June 14, 2018.

/s/ Blanca I. Lara, CSR                  06/14/18

/s/ Nancy L. Bistany, CSR, RPR, FCRR     06/14/18

Official Court Reporters                 Date
United States District Court
Northern of District Illinois
Eastern Division

# EXHIBIT 54

2451

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JACQUES RIVERA,                              ) No. 12 CV 4428
                                             )
            Plaintiff,                       )
vs.                                          ) Chicago, Illinois
                                             )
REY GUEVARA, STEVE GAWRYS, DANIEL NOON,)
JOHN GUZMAN, JOSEPH FALLON, JOSEPH SPARKS,   )
PAUL ZACHARIAS, GILLIAN MCLAUGHLIN, JOHN     )
LEONARD, EDWARD MINGEY, RUSSELL WEINGART,    ) June 19, 2018
ESTATE OF ROCCO RINALDI, CITY OF CHICAGO,    )
                                             )
            Defendants.                      ) 9:20 o'clock a.m.

VOLUME 11 A
TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JOAN B. GOTTSCHALL
and a jury

APPEARANCES:

For the Plaintiff:     LOEVY & LOEVY
                       BY:  MR. JONATHAN I. LOEVY
                            MR. STEVEN E. ART
                            MR. ANAND SWAMINATHAN
                         311 North Aberdeen Street
                         3rd Floor
                         Chicago, Illinois  60607

                       MACARTHUR JUSTICE CENTER
                       Northwestern University School of Law
                       BY:  Locke E. Bowman, III
                       357 East Chicago Avenue
                       Chicago, Illinois 60611
                       (312) 503-0844


Court reporter:             Blanca I. Lara
                       Official Court Reporter
                        219 South Dearborn Street
                            Room 2504
                       Chicago, Illinois 60604
                          (312) 435-5895
                       blanca_lara@ilnd.uscourts.gov

2452

Appearances (continued:)

For the Individual        THE SOTOS LAW FIRM
Defendants:               BY:  MR. JEFFREY N. GIVEN
                               MR. JAMES G. SOTOS
                               MS. CAROLINE P. GOLDEN
                               MR. JOSEPH M. POLICK
                               MR. DAVID A. BRUEGGEN
                          550 East Devon Avenue
                          Suite 150
                          Itasca, Illinois  60143

For the Defendant         ROCK FUSCO & CONNELLY, LLC
City of Chicago:          BY:  MS. EILEEN E. ROSEN
                               MS. CATHERINE M. BARBER
                               MS. THERESA B. CARNEY
                          321 North Clark Street
                          Suite 2200
                          Chicago, Illinois  60654

For the Defendant         LEINENWEBER BARONI & DAFFADA, LLC
Guevara:                  BY:  MR. THOMAS E. LEINENWEBER
                               MR. JAMES V. DAFFADA
                          120 North LaSalle Street
                          Suite 2000
                          Chicago, Illinois  60602

2453

(The following proceedings were had out of the presence of the jury in open court:)

COURT SECURITY OFFICER: All rise.

THE COURT: Okay. Everybody here?

MR. SWAMINATHAN: Mr. Loevy just stepped out for a second.

MR. GIVEN: Mr. Sotos stepped out, as well.

THE COURT: Okay. So much for telling everybody twenty after.

(Brief pause).

COURT SECURITY OFFICER: We're still one juror short.

THE COURT: Oh, we are?

COURT SECURITY OFFICER: Yes.

THE COURT: They don't need to be here yet, so ....

(Brief pause).

MR. LOEVY: Good morning, Your Honor.

(Brief pause).

THE COURT: Well, I think we can go ahead with Mr. Leinenweber's issue even though Mr. Sotos is not here.

It is true that in docket 479, the plaintiff stated that he would introduce other evidence only as to Guevara. So I think Mr. Leinenweber has a point.

MR. LOEVY: Of course our response, Your Honor, is, during the Gawrys exam, Mr. Gawrys not only said specifically, "We would never do anything like misconduct alleged in this

2454

case," but he had answered a series of questions only about Mingey. He said, "My supervisor Mingey wasn't like that." And, you know, obviously we just got this motion. We're going to have pull those transcripts, but he singled out Mingey as someone who would not engage in wrongful conviction conduct. I'm confident defense can confirm that if that's what happened.

THE COURT: Well, I think that there's a problem with Gawrys. How much of a problem there is with Mingey, I don't know. It isn't Mingey who volunteered that --

MR. LOEVY: We have the unresolved issue about whether to recall Gawrys about the 404(b).

THE COURT: Right.

MR. LOEVY: I mean, there's three cases we want to talk about, the Johnson case, which has already been mentioned, the Montanez case, and Thomas Sierra. Mingey was involved in six cases, but we only want to ask him about those three.

THE COURT: Well, I don't know when you're talking him, but I don't think it's fair to switch gears in midstream like this. And, you know, unless he's not going to be on today, I think that you ought to focus on Gawrys.

MR. LOEVY: All right. The only variable is, he is taking the Fifth on everything. So it's not a surprise issue.

THE COURT: Well, Mr. Leinenweber makes the good point, that he might want to get some rebuttal evidence. I mean, I think it really is unfair to hit him with this with no

2455

notice.  I don't know when this all arose, but it hit me this morning.  So let's move on.  There's too much to deal with today.

On the issue of ASA O'Brien, I gather there's an agreement?

MR. LOEVY:  There is, Your Honor.

THE COURT:  Okay.  So we don't need to spend time on that.

On the issue of -- oh, here's another.  This is another case.  Hold on a second.

(Brief pause)

THE COURT:  All right.  On the issue of post-conviction petition, first of all, let me just say that I don't think that Mr. Rivera opened anything up.  And I do also believe that -- I mean, how anybody could testify with the constant objections that were going on, I don't even know, but he did.  And I don't think that what he said could be construed the way the defense construes it.  However, unless I've done this already, and I do think we've been down this road before, I think the idea of a limiting instruction at some point is a good idea.  I am perfectly happy with what the plaintiff has proposed to me with a certain amount of change, which is -- if I can find it.

(Brief pause).

THE COURT:  Oh, here it is.  To me, it's enough to

2456

say:

> "Plaintiff was granted post-conviction relief
> and a new trial on the basis of his actual
> innocence.  No other issues were decided that
> had an impact on this case, because that
> decision is not admissible in this case."

Because that decision is not admissible in this case. There's no -- I mean, it's hearsay up the wazoo, and it's really going to confuse this jury.

So I don't know if you want to tinker with an instruction and tell me when you want it.  All of that is malleable, but that's all I think we need to tell them.

MR. LOEVY:  Very good, Your Honor.  We'll work on that.

THE COURT:  And so unless somebody tells me otherwise, I will assume that the defense will remind me of this at about the time you open your case.

MR. SOTOS:  We will.

THE COURT:  And I will give an instruction to that effect.

Okay.  Is there anything else?  Now, I've got all the Wasilewski material this morning.  I assume --

MR. LOEVY:  We would like to respond, actually.  They filed a more fulsome --

THE COURT:  I'm sorry.  Say that again.

2457

MR. LOEVY:  We'd like to file a response to their motion.

THE COURT:  I'm sure you would, but I just wanted to clarify that this is not up today.

MR. LOEVY:  No.

THE COURT:  Good.  When can you file the response?

MR. ART:  Today.

THE COURT:  Good.  Okay.

Anything else we need to talk about this morning?

MR. LOEVY:  As to the schedule, I think we have an hour-and-twenty left on the video.

THE COURT:  Okay.

MR. LOEVY:  After that, if you don't take a break, we are going to call Mr. Gawrys for the short reopening that we just mentioned, those three cases.

THE COURT:  Are you in agreement about -- I know there were issues about what that reopening would be, and I just want to know what's coming.

MR. LOEVY:  I don't think we have any agreement. Their position was zero.

MR. GIVEN:  Well, Judge, he just mentioned three cases that he wants to address with Mr. Gawrys, one of which is the Johnson case, and Mr. Gawrys does have knowledge of that.  The other two, I don't think they have a reasonable basis for even asking him, because he doesn't know anything, and he's not

2458

implicated in those other two cases.

THE COURT:  Well, Mr. Gawrys made a global statement. So I think if he doesn't know, that's important for plaintiff to be able to determine or to at least let the jury know, because he seemed to talk about everybody, and everything, and every case.  So, you know, if there were ever an opening-the-door situation, I think this is it.

MR. GIVEN:  Well, I understand the Court's position. I'm just trying to say, in terms of what he's allowed to be asked, there has to be a good-faith basis --

MR. LOEVY:  There is, Your Honor.

MR. GIVEN:  -- for asking the question.  And these are about two cases that are new lawsuits.  He's not named as a defendant in any of them.  So I'm not sure what the basis is of -- I'm not sure what the questions are and what the basis for the questions are.

THE COURT:  Well, I don't know either, but, you know, it's --

MR. GIVEN:  I think, Judge --

MR. LOEVY:  Your Honor, if we are still arguing -- I thought we were done with the issue -- we have a good-faith basis, because what we're going to do is ask Mr. Gawrys about his statement that Mr. Mingey, his supervisor, would never do anything about that, and Mr. Guevara.  And I'm going to confront him with a case when Mingey and Guevara did exactly

2459

what he said they would never do.

THE COURT: But it's an accusation or a finding at this point?

MS. ROSEN: It's an accusation.

MR. LOEVY: Well, the guy was exonerated, and, you know, based on a new trial, and then --

THE COURT: Yeah, but exoneration, as we've been talking about, does not established, as far as I know, that the police were responsible for the wrongdoing.

MR. LOEVY: Well, actually Guevara was tried and found civilly liable on the Johnson case and 21 million dollars was awarded against him.

MR. SOTOS: That's the Johnson case, we understand that. It's the other two that we're talking about.

THE COURT: Well, I think if it's a case that's only an accusation at this point, I think that's what the questioning needs to be limited to.

MR. LOEVY: All right. Well, that it's an accusation. We'll actually show him the proof, because we have the documents, that's what we intend to do.

MR. SOTOS: But it's not proof in relation to anything that he would know, that's the issue. So I understand that he said "we," but he didn't say in relation to this case.

THE COURT: You know, when somebody says that nobody did anything like this, okay, I think it's fair game to ask him

2460

if he knows.  If he doesn't know, he should say he doesn't know.

MR. LOEVY:  Actually, he's not denying it.

THE COURT:  I mean, at least that establishes that he doesn't know.

MR. LOEVY:  He's not denying it, Your Honor.  This isn't the usual scenario where he would say he didn't know. He's not going to deny it.

THE COURT:  Well, you know, I don't think we need to go into this anymore, because that was a universal -- I mean, whatever it was, Officer Gawrys made it -- talked about everybody, and all the cases, and all of his experience.  So I think going into whether he knows or has familiarity with certain of these things is important to plaintiff at this point to rebut that.

MR. SOTOS:  Last point I want to make, because I know you want to get the jury in, Judge, is that we understand everything the Court is indicating.  Our only issue is that it's our feeling that unless there's a good-faith basis to believe that this particular witness knows about those cases, then the witness just becomes a conduit for a closing argument, and we think that's the purpose of asking the questions the way they're going to be asked.

THE COURT:  Well, I think the time --I mean, that's an interesting point, but the time for that was when he was on the

2461

stand and was saying nobody ever did anything like this. I mean, that's where we are. That's where we are. So I don't think -- you know, let me hear the questions. I mean, I think I've set some ground rules. But that was not a limited statement. That was a statement, basically, it was almost like character testimony for the whole police department.

MR. LOEVY: Or at least these defendants.

THE COURT: These defendants. Yeah.

All right. Are we ready?

MR. LOEVY: Yes, Your Honor.

THE COURT: Okay. So let's get the jury.

And you're saying you have an hour and -- how much on the video?

MR. LOEVY: An hour-twenty, Your Honor.

THE COURT: So it seems to me like that would bring us right to about the time that we need to take a break.

MR. LOEVY: Well, we would actually hope we could call one short witness, Mr. Gawrys, which is going to take about 5 to 10 minutes.

THE COURT: So we're talking about going to about 11:00?

MR. LOEVY: That would be our request, Your Honor.

THE COURT: Okay. I think unless somebody asks me for a break, it doesn't matter.

MR. LOEVY: Okay.

THE COURT:  Then we can go a little bit later before we get to lunch.

COURT SECURITY OFFICER:  All rise.

(The following proceedings were had in the presence of the jury in open court:)

THE COURT:  Is that the right height?

JUROR CICCARELLI:  Yeah.  I just need to have it up.

THE COURT:  Okay.

Good morning.  Please be seated.

We will pick up with where we left off yesterday with the videotape.

(Audio-video recording of Orlando Lopez was played in open court:)

THE COURT:  Can we stop it for a second?

How much more do we have?

MS. SCOTT:  We're very close to the end.  I don't want to move the dial --

MR. LOEVY:  Probably less than 5 minutes, maybe less than 3.

THE COURT:  I really need a break.  I assume I'm not the only one.  So let's take a break until 11:00.

COURT SECURITY OFFICER:  All rise.

THE COURT:  Take your time.

(The following proceedings were had out of the presence of the jury in open court:)

THE COURT: Sorry, I know I made a commitment to you, but --

MR. LOEVY: Fair enough.

THE COURT: Okay. 5 minutes.

(Jury in.)

THE COURT: Please be seated, everyone.

Counsel, can we get the tape to where we were when I interrupted?

MR. LOEVY: Sure.

THE COURT: Thank you.

(Videotaped deposition of Orlando Lopez was continued to be played.)

MR. LOEVY: That's it, your Honor.

THE COURT: Okay.

MR. LOEVY: At this time, we would recall Mr. Gawrys for the limited purpose we discussed.

THE COURT: Okay.

Sir, could you retake the witness stand, please.

Do you understand that you are still under oath?

THE WITNESS: Yes.

THE COURT: You may be seated.

STEVE GAWRYS, DEFENDANT HEREIN, PREVIOUSLY SWORN

DIRECT EXAMINATION

BY MR. LOEVY:

Q. All right, Mr. Gawrys, last time you were on the stand, you

made a statement that neither you nor any of the other defendants would manipulate witnesses into identifying your suspects in photo identification procedures, right?

A. Right.

Q. And you said that you would -- you and the other defendants would never steer a suspect to a certain photo by doing it in a suggestive way or telling the witness that the suspect was the suspect, right?

A. Right.

Q. Now, you were involved, were you not, in the Juan Johnson case?

A. Yes.

Q. And you and your partner, Mr. Guevara, were the ones who solved the crime and obtained the conviction of Mr. Johnson, correct?

A. Correct.

Q. And that conviction was later overturned based on misconduct to the effect that witnesses had been told which photos to pick out, correct?

A. I don't recall that.

Q. All right.

You do recall that Mr. Guevara was adjudicated liable for having violated Mr. Johnson's rights, correct?

MR. GIVEN: Objection, Judge.

MR. LOEVY: He said he would never do it and he was

adjudicated liable.

THE COURT:  Overruled.

BY THE WITNESS:

A.  Ask that again.

BY MR. LOEVY:

Q.  You remember that Mr. Guevara was, in fact, adjudicated liable for having violated Mr. Johnson's rights by telling the witnesses who to pick out?

A.  That, I don't know.  I know it was adjudicated, was liable.

Q.  All right.

So, when you said he would never do that, you meant except for the time that he was found liable for doing that, right?

A.  No.

Q.  All right.

You were personally involved in the Juan Johnson case, correct?

A.  Yes.

Q.  And Mr. Ortiz and Mr. Perez made allegations that Guevara would come around the neighborhood with his photos and tell people who he thought committed the crimes and tried to get witnesses to buy into his suspects, correct?

A.  I don't know anything about that, no.

Q.  All right.

How about the Montanez case?

Gawrys - direct

2466

Let me ask you this question:  You said that Mr. Mingey also would never be engaged in any kind of misconduct.  Do you remember making that statement the other day?

A.  Yes.

Q.  All right.

Were you aware --

MR. LOEVY:  And this is Plaintiff's Exhibit 270-A from the Montanez file, your Honor.  We'd move this into evidence and permission to show it.

THE COURT:  Okay.

Any objection?

MR. GIVEN:  I'm sorry, can I see what that is?

MR. LOEVY:  That is what we sent around last night.

MR. GIVEN:  I'd like to see it.

(Brief pause.)

THE COURT:  Any objection?

MR. GIVEN:  No.

THE COURT:  It is received.

(Plaintiff's Exhibit No. 270-A received in evidence.)

BY MR. LOEVY:

Q.  Showing you 270-A, a report signed by Detective Guevara, does that refresh your recollection?

A.  No.

Q.  All right.

And showing you the second page, the theory of the case was that José Montanez --

MR. GIVEN: Judge --

BY MR. LOEVY:

Q. -- was wanted --

MR. GIVEN: I'm sorry, Judge, I have to object on foundation grounds to asking him something that doesn't have his name on it and he says he hasn't seen it.

THE COURT: Well, if he says he doesn't remember --

MR. LOEVY: This is in evidence, your Honor. So, I'd like to see if this is --

THE COURT: All right. Go ahead.

BY MR. LOEVY:

Q. Does this refresh your recollection that José Montanez, the theory of the case against him was that Guevara supposedly got an anonymous tip that Mr. Montanez was guilty?

MR. GIVEN: Judge --

MS. ROSEN: Objection to the form of the question -- "the theory of the case" -- and foundation.

THE COURT: Well --

MR. GIVEN: As well as refreshing --

THE COURT: Could I see the document again?

MR. LOEVY: Sure, your Honor.

(Document tendered to the Court.)

THE COURT: Thank you.

I'm going to sustain the objection to the form of the question.

I will give you this back if you need it.

MR. LOEVY: All right.

BY MR. LOEVY:

Q. The date on the report is June the 2nd, correct?

A. Correct.

Q. Now, do you have any explanation --

MR. LOEVY: At this time we'd move into evidence Plaintiff's Exhibit 270-B, which is a rap sheet for Mr. Montanez.

MR. GIVEN: Judge, I do object to this. And, frankly, I would like to renew my -- I would like to object to the previous exhibit, as well. There's no foundation for these --

THE COURT: All right. Let me just say this. I don't need to hear a speech. I think that if the witness has no recollection of the case, if that's his testimony, I don't think he's the right witness for introducing all of this material.

MR. LOEVY: Well, there's only one more document and I don't -- this document, and I don't -- think there's a foundation objection. It's a Chicago Police Department document produced by us. There is a foundation for it. This is the only document I'm seeking to introduce.

THE COURT: Well, let me hear the question before I

rule on whether the document can come into evidence.

BY MR. LOEVY:

Q. Isn't it true that the rap sheet for Mr. Montanez was dated May the 25th, more than a week before the suspect was supposedly identified by an anonymous tip?

MS. ROSEN: Objection, Judge, to the form, to the foundation, to the argument.

MR. GIVEN: Competence of this witness.

THE COURT: You know what? I'm going to -- well, you just want him to look at this and tell the date on which --

MR. LOEVY: Yes.

THE COURT: If you limit the question to that, I'll allow it.

MR. LOEVY: All right.

Then permission to publish 270-B, your Honor?

MS. ROSEN: Judge, we object to the entry of this exhibit based on this procedure.

THE COURT: Well --

MS. ROSEN: He's already said he doesn't know.

THE COURT: I think the witness can probably -- if this is an actual police department document --

MR. LOEVY: It is, your Honor.

THE COURT: -- I think the witness can talk about just what it is. It doesn't mean he remembers the case.

I'm going to receive 270-B for that purpose.

(Plaintiff's Exhibit No. 270-B received in evidence.)

BY MR. LOEVY:

Q. All right. This is a rap sheet for José Montanez, a document of the type you're familiar, correct?

MR. LOEVY: We need this on the jury screen, too.

BY MR. LOEVY:

Q. Correct, sir?

A. Are we ready?

What was -- it's what?

Q. This is, in fact, a rap sheet for Mr. Montanez with an Issued on Inquiry Date of May the 25th, a week before he supposedly became a suspect, correct?

MS. ROSEN: Object to the form of the question.

THE COURT: Sustained.

MS. ROSEN: Supposedly he became a suspect.

THE COURT: Sustained.

I don't need a speech. I'm trying to sustain the objection and you're talking over me.

Go ahead.

BY MR. LOEVY:

Q. We'll break it into two questions.

The date of the rap sheet is the 25th, right?

A. Right.

Q. Isn't it true that sometimes Guevara would get a suspect first and then make the evidence fit the suspect later?

MR. GIVEN: Objection.

MS. ROSEN: Objection.

MR. GIVEN: Form, foundation, argumentative, competence. It's exactly what we talked about, Judge.

THE COURT: The witness can answer if he knows.

BY THE WITNESS:

A. What's the question again? I'm sorry.

BY MR. LOEVY:

Q. Isn't it true that during the time you and Mr. Guevara were partners, sometimes Mr. Guevara would come up with the suspect first and then make the evidence fit by inventing witnesses, doing suggestive procedures, that kind of thing?

MR. GIVEN: Same objection.

MS. ROSEN: Objection, Judge.

THE COURT: Same ruling.

THE WITNESS: I didn't hear what you -- I'm sorry.

THE COURT: Overruled.

THE WITNESS: Oh.

BY THE WITNESS:

A. No, I never --

BY MR. LOEVY:

Q. And in the Maysonet case, the Montanez/Serrano case, the Almodovar/Negron case, the Sierra case, and the Gomez case --

THE REPORTER: Mr. Loevy, slow down.

MR. LOEVY: Sorry.

THE REPORTER:  Start again, please.

MR. LOEVY:  Sure.  Sorry.

MR. GIVEN:  Judge, I'm sorry, this goes way beyond what we talked about.

THE COURT:  Yes, I'm going to sustain the objection.

If the witness doesn't know, you can't do an argument through this witness.

MR. LOEVY:  All right.

BY MR. LOEVY:

Q.  Last question, then, sir:  Showing you a copy of Plaintiff's Exhibit 33 --

(Document tendered.)

MR. GIVEN:  Judge, I object to this exhibit.  We objected before.  And it lacks any foundation whatsoever.

THE COURT:  I don't even know what it is.

MR. LOEVY:  It's the photo of Mr. Guevara.

MS. ROSEN:  And it's beyond the scope --

MR. GIVEN:  And it --

MS. ROSEN:  -- of the --

THE COURT:  Okay.  Stop, lawyers.  This is impossible.

Give me the exhibit so I know what you are talking about.

(Document tendered to the Court.)

THE COURT:  And you're going to ask the witness if he recognizes the person?

MR. LOEVY: I'd like him to lay the foundation that that's how Mr. Guevara appeared.

THE COURT: Well, you can ask him if he recognizes. Before this goes into evidence, I think we need to know if the witness recognizes the person.

BY MR. LOEVY:

Q. Do you recognize the person in the photograph, sir?

A. Yes.

Q. Who is that?

MS. ROSEN: I'm going to make an objection this is beyond the scope of what he's being recalled for.

THE COURT: Overruled.

BY THE WITNESS:

A. Looks like Rey Guevara.

BY MR. LOEVY:

Q. Does that look like how Mr. Guevara appeared in the late '80s, early '90s?

A. I don't recall.

Q. He was your partner in the late '80s, early '90s, right?

A. I don't remember. I don't remember.

Q. You don't remember that he was your partner in the late '80s, early '90s?

A. No, I don't remember --

MR. GIVEN: Objection.

BY THE WITNESS:

Gawrys - direct

2474

A.   -- how he looked.

          MR. GIVEN:  Asked and answered.

          THE COURT:  Overruled.

BY MR. LOEVY:

Q.  So, during those ten years, did he bear a resemblance to the man in the photograph?

          MR. GIVEN:  Objection.  Form and foundation. Relevance to ten years, Judge.

          THE COURT:  Overruled.

BY THE WITNESS:

A.  So, what are you asking me now?  I'm sorry.

BY MR. LOEVY:

Q.  During the ten years you were partners with him, did he, in fact, bear a resemblance to what's shown in that picture?

          MR. GIVEN:  Objection.  Form.

          THE COURT:  Overruled.

BY THE WITNESS:

A.  Yes.

          MR. LOEVY:  All right.  Your Honor, at this time we move this photograph into evidence.

          MR. GIVEN:  Judge, I would object because there is no foundation for --

          MR. LOEVY:  He just laid it.

          MR. GIVEN:  -- when this photograph was taken.  Ten years?  A ten-year span?

THE COURT:  I think I need to know that.

MR. LOEVY:  All right.

THE COURT:  Okay?  And --

BY MR. LOEVY:

Q.  How old was Mr. Guevara in 1990?  That would have been 28 years ago.

A.  I have no idea.

Q.  Well, if you subtract 30 from 75, it looks like he would have been about in his late 40s, right?

A.  Yes.

Q.  Or maybe -- wait.  1990, 28 years ago, he's 75.  I'm going to do some math on the fly here.  Seven -- 47.

That picture looks like approximately a 47-year-old man --

MR. GIVEN:  Judge --

BY MR. LOEVY:

Q.  -- would you agree?

MR. GIVEN:  -- objection.  Foundation.

THE COURT:  You know, I'm looking for a foundation for the admission of a photograph, and there's a way to do that. And you have to establish that this picture was taken at a certain date and it looks like what it's a picture of.  That's what I need.

MR. LOEVY:  All right.

BY MR. LOEVY:

Q. Does that look like what it's a picture of?

MR. GIVEN: Objection.

BY MR. LOEVY:

Q. It's a picture of Mr. Guevara in his 40s, isn't it?

MR. GIVEN: Objection.

THE COURT: Sustained.

MR. GIVEN: Foundation.

THE COURT: Sustained.

MR. LOEVY: All right. I'll try one more time.

BY MR. LOEVY:

Q. Does that look like a picture of Mr. Guevara in his 40s?

A. I can't tell. I have no idea.

MR. LOEVY: We would move to admit the photograph.

THE COURT: I can't admit a photograph unless there's a better foundation than that.

MR. LOEVY: No further questions, your Honor.

THE COURT: Okay.

Any further questions?

MR. GIVEN: May I have a second?

THE COURT: Sure.

(Brief pause.)

MR. GIVEN: No questions, your Honor.

THE COURT: Okay.

Thank you, sir. You may step down.

THE WITNESS: You're welcome.

(Witness excused.)

MR. LOEVY: All right. At this time, your Honor, we call Mr. Mingey.

THE COURT: Okay.

EDWARD J. MINGEY, DEFENDANT HEREIN, SWORN

DIRECT EXAMINATION

BY MR. LOEVY:

Q. Sir, if you'd state your name, please.

A. Edward J. Mingey, M-i-n-g-e-y.

Q. And you're a retired member of the Chicago Police Department, correct?

A. Yes, sir, I am.

Q. How many years did you work for the police department?

A. 37.

Q. And isn't it true that as the supervisor of the investigation led by Mr. Gawrys and Mr. Guevara into the murder of Felix Valentin, that you turned a blind eye while they violated Mr. Rivera's constitutional rights?

A. On advice of counsel, I respectfully decline to answer the question on the grounds that I'm being compelled to be a witness against myself.

Q. And when you say on the advice of counsel, I take it you spoke to your attorney about all the facts in the case, right?

A. Upon advice of counsel, I respectfully decline to answer the question on the grounds that I am being compelled to be a

Mingey - direct

2478

witness against myself.

Q. And after you spoke to your attorney and told him all the facts about the case and were truthful, you asked him, "Do you think I should testify or might I be implicating myself in a crime?" That's what you asked your attorney, right?

MR. LEINENWEBER: Judge, object to foundation. Compound.

MR. LOEVY: He brought in his attorney advice again, your Honor.

THE COURT: It's probably compound.

MR. LOEVY: It was compound.

MR. LEINENWEBER: Can we have a sidebar, Judge?

THE COURT: A sidebar?

MR. LEINENWEBER: Yes, Judge.

(Proceedings had at sidebar:)

MR. LEINENWEBER: Judge, I think it's improper to ask about what the advice of counsel was. I think there is, in my mind, a mistake. Advice of counsel is a defense of: So, why did you leave the scene of the accident when you were drinking? Well, my lawyer told me to get out of there.

So, I don't think that -- I think that that's misconstruing what his rights are. I think he has the absolute right we discussed before --

THE COURT: You know, I --

MR. LEINENWEBER: -- not to answer the question.

THE COURT: I can't call that without a case -- without cases, it does not seem obvious to me in the least when he -- you know, you can easily take the Fifth. You do not have to go into a whole thing about how you're following the advice of your lawyer. That's an attempt to bolster somehow what's going on.

So, if you want to find me a case, I'd be happy to look at it. But I think these witnesses are inviting this. I don't know why, but they are.

(Proceedings had in open court:)

THE COURT: Another sidebar?

(Proceedings had at sidebar:)

MR. DAFFADA: Can we speak to Mr. Mingey about his assertion?

THE COURT: Well, we went through this before and with no result; but, if you want to, it's okay with me.

MR. LOEVY: I find this bizarre that we had this happen with Guevara when he took the witness stand --

THE COURT: Well, so do I, but that's what's happening. And I don't -- I think if the witness is willing to take advice that he not do this --

MR. LOEVY: Well, we would object at this point to conferring with the witness on the witness stand.

THE COURT: We're going to have --

MR. LOEVY: This is not an anticipated development.

THE COURT: No, I think we'll take a break. We'll take a break.

MR. DAFFADA: Take five minutes.

THE COURT: Well, it means sending out the jury and it's -- you know, there's no way to take a two-minute break, unless you want to just leave the courtroom.

MR. DAFFADA: That's what we were going to do.

THE COURT: All right.

And everybody else will stay put?

MR. DAFFADA: Yeah.

MR. LEINENWEBER: That's fine.

THE COURT: Fine.

(Proceedings had in open court:)

THE COURT: Do you want me just to explain what's happening to the witness?

MR. LOEVY: Sure.

THE COURT: All right.

Mr. Mingey, counsel would like to have a quick word with you. So, we're just going to let you go out in the hall and talk to them for a second.

MR. LOEVY: Thanks, Judge.

THE WITNESS: Sure.

(Brief pause.)

THE COURT: You may be seated.

Mr. Loevy.

BY MR. LOEVY:

Q. All right, sir, with the advice of counsel that you've already referenced, when you told your attorney your story, he said, "I don't think you should answer any questions or you could incriminate yourself," didn't he?

A. Respectfully decline to answer the question on the grounds that I'm being compelled to be a witness against myself.

Q. All right.

And the same with Mr. Guevara: If you want to say the "same response" and you choose to move it faster, I think that would be an acceptable procedure.

MR. LOEVY: Would it not, your Honor?

THE COURT: It would.

MR. LOEVY: All right.

THE WITNESS: Thank you.

BY MR. LOEVY:

Q. Isn't it true -- you were in court when we played the video of Mr. Orlando Lopez, correct?

A. Same answer.

Q. And isn't it true that, although he didn't realize it at the time because he was 12, that you and the men who worked for you steered him toward the photograph of your suspect?

MR. GIVEN: Objection. Argumentative. Foundation. Form.

THE COURT: Overruled.

BY THE WITNESS:

A.   Same answer.

BY MR. LOEVY:

Q.   And that answer -- same answer -- is if you told the truth, you would be implicating yourself in a crime, correct, sir?

A.   Same answer.

Q.   All right.

     To this day, that kid who is now grown up and believes that he picked that photo out of the book without assistance, that doesn't mean he picked him out of the book without assistance, does it?

          MS. ROSEN:  Objection, Judge.

          MR. SOTOS:  Objection, your Honor.

          Your Honor, should we just have a continuing objection --

          THE COURT:  Yes.

          MR. SOTOS:  -- based on --

          THE COURT:  You can have a continuing objection to this entire line of testimony.

          MR. SOTOS:  Based upon lack of foundation for any of it.

          THE COURT:  And it's overruled.

BY MR. LOEVY:

Q.   Was it a coincidence that he just -- of all those pictures in that whole book, that he happened to land on the suspect

that you guys had before that happened?

A. Same answer.

Q. And although there's no doubt in his mind, according to that video, that he identified Jacques at two lineups, that didn't happen, did it?

A. Same answer.

Q. Because at the first lineup, he identified somebody other than Jacques Rivera and Jacques was released, right?

A. Same answer.

Q. All right. Let's back up.

Back when you were a supervisor, you were a hands-on supervisor; were you not?

A. Same answer.

MR. LOEVY: This is his deposition, Page 49, Lines 5 through 13.

BY MR. LOEVY:

Q. And by the way --

MR. LOEVY: Stop for a second.

BY MR. LOEVY:

Q. Back when you took your deposition, you were answering questions, right?

A. Same answer.

Q. Something must have changed when you decided it was no longer in your interest to give testimony under oath, right?

A. Same answer.

Q. What has changed that made you answer questions at your deposition and then get up here at this trial and decide that you don't want to testify anymore?

A. Same answer.

Q. If you wanted to deny that you framed Jacques Rivera, you could say it's not true, right? You could do that?

A. Same answer.

Q. You've instead chosen to assert your constitutional right to remain silent on the grounds that truthful answers would incriminate you?

A. Same answer.

Q. All right.

MR. LOEVY: The hands-on supervisor, this is Page 49, Lines 5 through 13.

(Said video was played in open court.)

BY MR. LOEVY:

Q. And, then, during these investigations, the supervisor's job is to remain apprised of the steps in the investigation, correct?

A. Same answer.

Q. And they would -- guys in the Gang Crimes would keep you apprised of what was going on as it was going on, correct?

A. Same answer.

MR. LOEVY: Page 149, Lines 23, through 150, Line 6.

(Said video was played in open court.)

BY MR. LOEVY:

Q. All right. So, you were aware of what was going on in this investigation, weren't you?

A. Same answer.

Q. And, in fact, you knew about all the misconduct that's been described in court over the last two weeks, didn't you?

MR. LEINENWEBER: Objection, Judge. Argumentative.

THE COURT: Overruled.

BY THE WITNESS:

A. Same answer.

BY MR. LOEVY:

Q. All right.

At your deposition, you said you had no role but just signing reports, but that wasn't true, was it?

A. Same answer.

MR. LOEVY: If you could play Page 67, Lines 6 through 10.

(Said video was played in open court.)

BY MR. LOEVY:

Q. All right, sir, my question is: If your role in the case was nothing more than signing the report, then why do you have to assert the Fifth Amendment?

A. Same answer.

Q. All right.

In fact, your job was to review with your

subordinates, Gawrys and Guevara, to make sure at the time that what they were writing was factually correct; isn't that true?

A. Same answer.

MR. LOEVY: Page 149, Lines 17 through 22.

(Said video was played in open court.)

BY MR. LOEVY:

Q. All right. So, that would have been conversations you would have had with Gawrys and Guevara back in 1998 -- '88. You would have satisfied yourself that you were exercising your supervisory role over what they were doing, right?

A. Same answer.

Q. All right.

When Mr. Orlando Lopez described looking at photos at his home and whether the books were at his home or at the station, the truth is he looked at the books at the station just like that report says and he was shown other photographs at his home on the 27th; isn't that what really happened?

MR. LEINENWEBER: Objection, Judge. Compound.

THE COURT: Overruled.

MR. SOTOS: Objection, Judge. Mischaracterizes testimony of the case.

BY MR. LOEVY:

Q. Well, if that mischaracterizes anything, sir, deny it.

Is that true, sir?

MS. ROSEN: Objection, Judge.

THE COURT: That will be stricken.

MR. LOEVY: All right.

THE COURT: The objection is overruled.

BY MR. LOEVY:

Q. That's not a mischaracterization, is it?

A. Same answer.

Q. All right.

This notion that he looked at hundreds of photos of guys who looked, you know -- some of them looked similar, some of them didn't, all kinds of guys. This idea that he could look through hundreds of photos and, from the distance he was and the short opportunity he had, really indicate with any kind of certainty, that was nonsense, wasn't it?

MR. LEINENWEBER: Objection, Judge. Compound. Argumentative.

THE COURT: Overruled.

BY THE WITNESS:

A. Same answer.

BY MR. LOEVY:

Q. And, in fact, back then when you were the supervisor, if a kid said that he came out of his house, ran to the store, ran back, got a glimpse of a face and he claimed to be certain, you would have been very skeptical of that; wouldn't you have?

MR. LEINENWEBER: Objection, Judge. Compound.

THE COURT: Overruled.

BY THE WITNESS:

A.  Same answer.

BY MR. LOEVY:

Q.  All right.

Let's talk about the report that you signed.  This is Plaintiff's Exhibit 1.

And I want to show you the second page.

MR. LOEVY:  If I could have the Elmo, please.

Can we get this on the jury screens, too, please.

BY MR. LOEVY:

Q.  I want to obviously draw your attention -- that's your signature, correct?

A.  Same answer.

Q.  Sir, you can't even tell me that that's your signature without implicating yourself in a crime?

MR. LEINENWEBER:  Objection, Judge.  He answered the question.

THE COURT:  Sustained.

BY MR. LOEVY:

Q.  On September 10th, 1988, RIs -- being Guevara and Gawrys -- were able to have the victim view a gang book photo book where an identification was made of José Rios as the person who shot the victim.  All right?

At the time that you signed this report, did Gawrys and Guevara explain to you that what's written on that page is

false?

A.   Same answer.

Q.   Did they explain to you that when they wrote that the victim supposedly identified the person who they were claiming was Jacques, in fact, the victim was non-responsive, near death and gave them an unreliable identification?

     MR. LEINENWEBER:  Objection, Judge.  Compound and argumentative.

     THE COURT:  You know, most of these questions are compound.  And I know that it saves us some time, but I think if you're going to want to argue any of this, you better break the questions down.

     MR. LOEVY:  All right.

BY MR. LOEVY:

Q.   Sir, isn't it true that you knew that on September 10th, from your conversations with Gawrys and Guevara, that the victim was non-responsive?

A.   Same answer.

Q.   You knew that he was near death?

A.   Same answer.

Q.   You knew he was almost -- he was completely paralyzed?

A.   Same answer.

Q.   And you knew that the victim could not make a reliable identification, according to your own men?

A.   Same answer.

Q. And why then didn't you tell your men, "You know what? We can't write that he made an identification if he didn't make an identification"?

MR. LEINENWEBER: Objection, Judge. Argumentative. Foundation.

THE COURT: Overruled.

BY THE WITNESS:

A. Same answer.

MR. LOEVY: All right. If you could play Page 175 through 5 -- Lines 5 through 17.

(Said video was played in open court.)

MR. LOEVY: All right. Did I read the wrong one? This is Page 176, Lines 5 through 17, Anne.

Is that what we played?

MS. GOTTSCHALK: You said 175.

MR. LOEVY: Sorry. At least the contents weren't bad, so -- 175 --

(Said video was played in open court.)

BY MR. LOEVY:

Q. All right, sir, those were false answers, weren't they?

A. Same answer.

Q. All right.

Showing you this last paragraph here of this report --

MR. LOEVY: Back on the Elmo, if we could, please. This is Plaintiff's Exhibit 1.

BY MR. LOEVY:

Q. -- this business about Lopez being shown photos of Rodriguez and saying that they weren't involved, that was added later, wasn't it?

A. Same answer.

Q. And if it was added later, that would be totally inappropriate and a violation of Mr. Rivera's rights; wouldn't it be?

A. Same answer.

Q. But you as the supervisor, were you the one who told Gawrys and Guevara that we had to tie up a loose end -- that José Rodriguez had not yet been resolved, so we have to tie up a lose end?

MR. LEINENWEBER: Objection.

BY MR. LOEVY:

Q. Was that your suggestion?

MR. LEINENWEBER: Objection, your Honor. There's no foundation.

THE COURT: Overruled.

BY THE WITNESS:

A. Same answer.

BY MR. LOEVY:

Q. And on the question of foundation, as the supervisor, you would have been the one reading the report and saying to your men, "Hey, you know what? We got a problem here. There's this

loose end because you say you've got a case against Rivera, but we have the victim identifying Rodriguez. Can you do something about that so we can prosecute the case?"

That would have been your role, right?

MR. LEINENWEBER: Objection, Judge. It's compound. There's no foundation. It's argumentative.

THE COURT: I would watch the compound questions. I think that's very compound.

BY MR. LOEVY:

Q. That would have been your role, sir?

A. Same answer.

Q. All right.

Talking about the victim's account, was it your understanding that when Orlando Lopez first was interviewed by the detectives and he first told his story, he said he was by the store at the time of the shooting?

A. Same answer.

Q. At what point -- and, by the way, did you talk about, with Guevara and Gawrys, that if he really was by the store like he said he was when he was first interviewed, he couldn't have seen it because it was too far away?

A. Same answer.

Q. Did you talk with Gawrys and Guevara about maybe re-interviewing him and seeing if you could maybe get him to remember that maybe he was closer, maybe he was coming out of

his house?

MR. SOTOS:  Objection, Judge.

MR. LEINENWEBER:  Compound.

MR. SOTOS:  Foundation.

MR. LEINENWEBER:  Form.  Foundation.

MR. SOTOS:  There's no good-faith basis for these questions.

THE COURT:  It's compound.

MR. LOEVY:  All right.

BY MR. LOEVY:

Q.  Did you talk to your subordinates about the possibility of re-interviewing Orlando Lopez and seeing if you could get him to get more information?

A.  Same answer.

Q.  All right.

Just because he said that, "I was coming out of my house; I saw the back of a shooter; I ran to the store, talked to the clerk; and, then, decided to run back toward the scene of a murder; hid; and, then, saw the last eight shots and saw a glimpse of his face," you didn't have to accept that story, did you?

MR. SOTOS:  Objection, your Honor.

MR. LEINENWEBER:  Objection, Judge.

MR. SOTOS:  The witness is being used as a conduit for a closing argument on a theory.

THE COURT: Overruled.

BY MR. LOEVY:

Q. You didn't have to accept that story, right?

A. Same answer.

Q. As a homicide detective, you have to bring a healthy amount of skepticism to what witnesses are telling you, right?

A. Same answer.

Q. Would you agree that it's easier to manipulate a child witness than an adult?

MR. LEINENWEBER: Objection, Judge. Foundation. Argumentative.

THE COURT: Overruled.

BY THE WITNESS:

A. Same answer.

MR. LOEVY: If you could play his deposition, Page 199, Lines 18 through 24, please.

(Said video was played in open court.)

BY MR. LOEVY:

Q. All right. And this 11, 12 -- this 12-year-old wanted to help the Valentins, wanted to be a team player, wanted to do something to catch the killer, right?

MR. SOTOS: Objection, your Honor. No foundation for that.

MR. LOEVY: Well, the witness testified to that.

THE COURT: I'm going to sustain that objection.

BY MR. LOEVY:

Q.  Mr. Valentin -- I'm sorry.  Mr. Lopez in court said he didn't want to let down the Valentins, right?

A.  Same answer.

Q.  And as a homicide detective, you can take advantage of a child's over-respect for authority, unwillingness to let people down, positive reinforcement.  That's something you can manipulate as an investigator, isn't it?

MR. LEINENWEBER:  Objection, your Honor.

MR. SOTOS:  Objection, your Honor.

MR. LEINENWEBER:  Compound question.

MR. LOEVY:  Should we break it down, each one, your Honor?

THE COURT:  Yes.

MR. LOEVY:  All right.

BY MR. LOEVY:

Q.  As a child witness, you have -- there's a real concern that they're going to be overly deferential to authority, correct?

A.  Same answer.

Q.  And if it's a child witness that gets positive reinforcement from Guevara or Gawrys -- "Hey, you did it.  You helped us catch the killer.  Good job" -- a child would be more vulnerable to that, too, wouldn't he?

A.  Same answer.

Q.  And a child would also be more vulnerable to:  "Hey, wait a

minute. You told us you saw something. Are you sure you didn't see something?" and have the kid say, "Okay, okay, I saw it."

He would be more vulnerable to authority figure pressure; wouldn't that be true?

MR. LEINENWEBER: Objection, Judge. It's compound. There's no foundation. It's argumentative.

THE COURT: Overruled.

BY THE WITNESS:

A. Same answer.

BY MR. LOEVY:

Q. And, in fact, a child can be steered much easier without even realizing that he's being steered; would you agree with that?

A. Same answer.

Q. And Mr. Guevara, under your supervision, did that on a number of other occasions, didn't he?

A. Same answer.

Q. How was it that your investigators were able to interview him outside the presence of his parents on multiple occasions?

MR. LEINENWEBER: Objection, Judge. Foundation.

THE COURT: Overruled.

BY THE WITNESS:

A. Same answer.

BY MR. LOEVY:

Q.   And showing you his trial testimony --

MR. LOEVY:  This is Defendants' Exhibit 5.1, Page 35 and 36.  This is already in evidence, your Honor.  This is his testimony from the criminal trial.

BY MR. LOEVY:

Q.   "Mr. Lopez, you talked to the police; is that right?

"Right.

"Question:  When at first?  When at first?  Night?

"Answer:  In the night.

"Question:  And they interviewed you about this case; is that right?

"Yes.

"Question:  Did you -- were you re-interviewed about the case at a later point in time?

"Answer:  First they asked me and then they came. Some other police came again.

"Question:  You were interviewed quite a few times about this; is that right?

"Answer:  Yes."

Sir, my question to you is:  Where are all the notes and reports for all the other interviews?

A.   Same answer.

Q.   Did Gang Crimes create notes and reports when they had sequential interviews with the same witness?

A.   Same answer.

Q. And, in fact, when he says, "First they asked me," and he said he thought it was a Latin King, "and then they came," the gang book thing happened on a different night than when he first said it was a Latin King, didn't it?

MR. LEINENWEBER: Objection, Judge. No foundation.

THE COURT: Overruled.

BY THE WITNESS:

A. Same answer.

BY MR. LOEVY:

Q. Because the police wouldn't have known to bring Latin King gang books unless he told them at the house that it was a Latin King, right?

MR. LEINENWEBER: Objection, Judge. No foundation.

THE COURT: Overruled.

BY THE WITNESS:

A. Same answer.

BY MR. LOEVY:

Q. All right.

Let's talk about Mr. Guevara.

Would it incriminate you to acknowledge that in the late '80s and early '90s, Guevara did have an Afro, glasses and a mustache?

MR. LEINENWEBER: Objection, Judge. Foundation.

THE COURT: Overruled.

BY THE WITNESS:

A.   Same answer.

BY MR. LOEVY:

Q.   So, if I showed you a picture of Mr. Guevara, you're not going to identify him, are you?

A.   Same answer.

Q.   All right.

Mr. Guevara did have a lot of financial problems, correct?

MR. LEINENWEBER:   Objection, Judge.   Foundation.

MR. LOEVY:   Well, this witness loaned him money, your Honor.

MS. ROSEN:   Objection, Judge.

THE COURT:   Well, there's a foundation or there's not.

Overruled.

BY THE WITNESS:

A.   Same answer.

BY MR. LOEVY:

Q.   And, in fact, the reason for his financial problems was he had, like, five or ten women that he owed child support to, correct?

MR. LEINENWEBER:   Objection, Judge.   Foundation.

THE COURT:   Overruled.

BY THE WITNESS:

A.   Same answer.

MR. LOEVY:   If you could play Page 191, Lines 1

through 5.

(Said video was played in open court.)

BY MR. LOEVY:

Q. And that created all kinds of financial pressure on Mr. Guevara, didn't it?

MR. LEINENWEBER: Objection, Judge. Foundation.

THE COURT: Overruled.

BY THE WITNESS:

A. Same answer.

BY MR. LOEVY:

Q. And the reason you know that is because back in the '80s, you had to loan Rey Guevara money. You signed a car loan for him; he was behind on his gas and his electric, right?

MR. LEINENWEBER: Objection. Foundation.

THE COURT: Overruled.

BY THE WITNESS:

A. Same answer.

BY MR. LOEVY:

Q. And Mr. Guevara was always looking for overtime opportunities; was he not?

MR. LEINENWEBER: Objection. Foundation.

THE COURT: Overruled.

BY MR. LOEVY:

Q. This is your deposition --

A. Same answer.

Q. -- 194, Lines 2 through 11.

(Said video was played in open court.)

BY MR. LOEVY:

Q. And the question, sir, is then: He seemed to have a lot of arrests, a lot of court cases, didn't he?

A. Same answer.

Q. And all those convictions he got led to a lot of overtime opportunities, which inured to his financial benefit, didn't it?

MR. LEINENWEBER: Objection, Judge. Foundation.

THE COURT: Overruled.

BY THE WITNESS:

A. Same answer.

BY MR. LOEVY:

Q. All right.

After you got sued in this case, you drove over and spoke to Rey Guevara about the case at his home?

MR. LEINENWEBER: Objection. Foundation.

THE COURT: Overruled.

MR. LOEVY: And this is --

BY THE WITNESS:

A. Same answer.

MR. LOEVY: -- Page 78, Line 21, through 79, Line 3.

(Said video was played in open court.)

BY MR. LOEVY:

Q.   Was that a truthful answer, sir?

A.   Same answer.

Q.   So, you drove all the way to his house and you didn't even -- after you got sued and you didn't even talk about why maybe somebody had done something wrong?

A.   Same answer.

Q.   All right.

And Rey Guevara called you later and said he was going to assert his Fifth Amendment right not to incriminate himself, correct?

MR. LEINENWEBER:  Objection, Judge.  Foundation.

THE COURT:  Overruled.

BY THE WITNESS:

A.   Same answer.

MR. LOEVY:  And on the foundation, this is Page 80, Lines 14 through 20.

(Said video was played in open court.)

BY MR. LOEVY:

Q.   Did Mr. Guevara ever explain to you why answering questions truthfully about his actions in this case would incriminate him?

MR. LEINENWEBER:  Objection, Judge.  Foundation.

THE COURT:  Overruled.

MR. LEINENWEBER:  Argumentative.

BY THE WITNESS:

A.  Same answer.

BY MR. LOEVY:

Q.  All right.

You were aware of the case that I asked Mr. Guevara about involving an allegation by a Chicago police investigator named Bill Dorsch, where he accused Mr. Guevara of steering a witness toward a photograph, right?  You were aware of that?

A.  Same answer.

MR. LOEVY:  This is Page 251, Line 3, through 252, Line 7.

(Said video was played in open court.)

BY MR. LOEVY:

Q.  And Dorsch told you that Detective Guevara basically hooked up an innocent -- hooked up, meaning framed -- an innocent guy, right?

MR. LEINENWEBER:  Objection.  Form.

THE COURT:  Overruled.

BY THE WITNESS:

A.  Last answer.

MR. LOEVY:  All right.  Page 256, Lines 4 through 15.

(Said video was played in open court.)

BY MR. LOEVY:

Q.  All right.  That's a serious --

MR. LEINENWEBER:  Your Honor, I would object.  For completeness, I think they should play the next question and

next answer.

MR. LOEVY: Your Honor, on his exam, he can play the whole deposition if he wants.

THE COURT: Well, you know, you have to give it to me, because it's a rule of completeness objection.

MR. LOEVY: Do we have a copy of the deposition?

THE COURT: Or you can just put it on my screen and turn off the rest of the screens.

MR. LOEVY: It's Page -- I just read 256, 4 through 15, your Honor.

THE COURT: Okay.

MR. LEINENWEBER: This would be 256, 16 through 18, your Honor.

THE COURT: Right.

(Document tendered to the Court.)

MR. LEINENWEBER: Just the next question and answer.

(Brief pause.)

THE COURT: I think the 16 through 18 are probably necessary to understand the answer that was given.

MR. LOEVY: All right.

Can we play the whole clip again so it's in context?

THE COURT: I'm sorry?

MR. LOEVY: Should we play the whole clip so it's in context?

THE COURT: That's fine.

MR. LOEVY: All right.

So, this is Page 256, Anne, Lines -- what did we say it was? 4 through 18?

(Said video was played in open court.)

BY MR. LOEVY:

Q. All right, sir, the allegation Dorsch made was that Guevara had two juveniles and he showed him a photograph -- not a lineup, but he showed the juvenile the photograph -- and that Guevara, in Dorsch's presence, told the juvenile that's the suspect. That's what Dorsch was saying, wasn't it?

A. Same answer.

Q. And, then, they had that juvenile go out and then another juvenile came in, and Dorsch tried to get Guevara to cut it out and he didn't cut it out. That was what he was saying, right?

A. Same answer.

Q. It did have nothing to do with a lineup, did it?

A. Same answer.

Q. That's a very serious thing, one Chicago police officer accusing another Chicago police officer of hooking somebody up for murder, isn't it?

MR. LEINENWEBER: Objection, Judge. Foundation.

THE COURT: Overruled.

MR. LEINENWEBER: Argumentative.

THE COURT: Same answer.

BY MR. LOEVY:

Q. And Bill Dorsch was perceived as a rat, was he not, for not going along with the crowd?

MR. LEINENWEBER: Objection, Judge. Form, foundation, argumentative.

THE COURT: Overruled.

BY THE WITNESS:

A. Same answer.

BY MR. LOEVY:

Q. All right.

Let's turn to your report. This is Plaintiff's Exhibit 1.

Now, we've already talked about your signature on this report. This is the report we've been talking about in court all -- the last two weeks, correct? That would not incriminate you, would it, to answer that question?

MR. LEINENWEBER: Objection, Judge.

THE COURT: Overruled.

BY THE WITNESS:

A. Same answer.

BY MR. LOEVY:

Q. All right.

You did not type the approval date in there, did you?

A. Same answer.

Q. And that's extremely unusual to have the person who prepared the report self-approve the date, isn't it?

MR. LEINENWEBER: Objection, Judge. Foundation. Argumentative.

THE COURT: Overruled.

BY THE WITNESS:

A. Same answer.

BY MR. LOEVY:

Q. Then on Page 2 where you signed the second page, you neglected to put the actual date and time, didn't you?

A. Same answer.

Q. And, in fact, that's one of your main jobs when you're signing off on these is to date and time them, isn't it?

MR. LEINENWEBER: Objection. Foundation.

THE COURT: Overruled.

BY THE WITNESS:

A. Same answer.

BY MR. LOEVY:

Q. And you claim that was oversight, right?

A. Same answer.

Q. And, in fact, Steve Gawrys, in your estimation, is an excellent report writer. Didn't you say that at your deposition?

A. Same answer.

Q. This is not an excellent report, is it?

A. Same answer.

Q. Is there anything true in Plaintiff's Exhibit 1?

A.   Same answer.

Q.   All right.

Whatever happened at Orlando Lopez's house on the 27th, the night of the shooting, there's no paper, no documents anywhere memorializing what happened on his night -- at his house on the 27th, right?

A.   Same answer.

Q.   The only two reports in existence talk about it happening two days later, on the 29th, that the victim picked out the books, right?

A.   Same answer.

Q.   So, have you ever in your life seen any kind of documents or paperwork that described what Orlando was describing happened at his house two days earlier, on the 27th?  Is there any such paperwork?

A.   Same answer.

Q.   There should be such paperwork; should there not?

A.   Same answer.

Q.   And showing you the chronology we've been using in court, the reality is Guevara and Gawrys --

MR. LEINENWEBER:  Objection, Judge.  I don't have a copy of this.

THE COURT:  Well, that's two of us.  But why don't you come over so you can see it.

MR. LEINENWEBER:  Thanks, Judge.

Mingey - direct

2509

MR. LOEVY: Your Honor, it's the chronology we used.

THE COURT: Right, right, right. I've seen it, but I don't have it now.

BY MR. LOEVY:

Q. And what actually happened was that somehow José Rios, Jacques Rivera became your suspect on the 27th, according to the rap sheet documents, two days before Orlando Lopez supposedly looked through books and picked him out. That's what happened, isn't it?

MR. LEINENWEBER: Your Honor, I object to the foundation. Argumentative.

THE COURT: Overruled.

BY THE WITNESS:

A. Same answer.

BY MR. LOEVY:

Q. And as far as the foundation, we know from the rap sheet, which is Plaintiff's Exhibit 4, that Jacques was the suspect on the 27th, right?

A. Same answer.

Q. If what happened at the house on the 27th was they showed Orlando pictures and they showed him Jacques's picture and said, "Hey, could this be the guy? Does this look like the guy? Does this guy look familiar?" would that be suggestive?

MR. LEINENWEBER: Objection. Argumentative. Foundation, Judge.

THE COURT:  Overruled.

BY THE WITNESS:

A.  Same answer.

BY MR. LOEVY:

Q.  In your experience, did Guevara sometimes show photos of his suspects -- not in an array procedure, just show photos of his suspects -- to witnesses and say, "Hey, could this be the guy?"

MR. LEINENWEBER:  Objection.  Argumentative.

THE COURT:  Overruled.

BY THE WITNESS:

A.  Same answer.

BY MR. LOEVY:

Q.  And according to Guevara and Gawrys' report in this very case, there's a suggestion that they did just that, isn't it? This last paragraph says Lopez was shown photos of Rodriguez and Nieves, the alleged driver, and asked to say if they were the guys, right?

MR. LEINENWEBER:  Objection, Judge.  Form. Argumentative.

THE COURT:  Overruled.

BY THE WITNESS:

A.  Same answer.

BY MR. LOEVY:

Q.  You as a supervisor, you knew they were going around

showing witnesses photos of suspects without doing photo array procedures, didn't you?

MR. LEINENWEBER: Objection, Judge. There's no foundation for that.

THE COURT: Overruled.

BY THE WITNESS:

A. Same answer.

BY MR. LOEVY:

Q. When we say there's a foundation, you put your signature on a page that said that Gawrys and Guevara had shown photographs of just their two suspects to the witness. That's what you did, right?

A. Same answer.

Q. Or was this last paragraph added after you signed it?

MR. LEINENWEBER: Objection, Judge. Asked and answered. Foundation.

THE COURT: Overruled.

BY THE WITNESS:

A. Same answer.

BY MR. LOEVY:

Q. In fact, you probably wouldn't have put your signature on a piece of paper that said that Guevara showed pictures of the suspects without a photo array to a witness. That's improper, isn't it?

A. Same answer.

Q. You cannot answer without incriminating yourself that it is improper to show a suspect -- I'm sorry, show a witness pictures of just your suspects without a photo array?

MR. LEINENWEBER: Objection, Judge.

MS. ROSEN: Objection, Judge. Argumentative.

THE COURT: Overruled.

BY THE WITNESS:

A. Same answer.

BY MR. LOEVY:

Q. Now, because you were apprised of the investigation at the time, you would have known that after Jacques got arrested on the 30th, Officer Letrich had that conversation with the victim at the hospital where the victim told him it was José Rodriguez. That would have been something that came to your attention, right?

A. Same answer.

Q. And the victim back on the 31st of August was still coherent and able to communicate, and he was very clear to Gang Crimes North that your assumption it was a Latin King was wrong; in fact, it was an Imperial Gangster, right?

MR. LEINENWEBER: Objection, Judge. Foundation.

MS. ROSEN: Objection, Judge. Foundation.

THE COURT: Sustained.

BY MR. LOEVY:

Q. Well, you were in court when Officer Letrich said that. It

wouldn't incriminate you to acknowledge that, would it?

MR. LEINENWEBER: Objection, Judge.

MS. ROSEN: Objection. Argumentative. Form.

THE COURT: Overruled.

BY THE WITNESS:

A. Same answer.

BY MR. LOEVY:

Q. And if the victim says, "I can identify the guy who shot me; it was José Rodriguez, an Imperial Gangster," that's a very important clue, isn't it?

A. Same answer.

Q. Would you have expected and asked Guevara and Gawrys to have investigated that clue?

A. Same answer.

Q. So, why did you tolerate a situation where the official file has no documents whatsoever reflecting that Rodriguez was asked any questions?

MR. LEINENWEBER: Objection, Judge. Foundation, compound, argumentative.

THE COURT: Overruled.

BY THE WITNESS:

A. Same answer.

BY MR. LOEVY:

Q. That would have been your responsibility, to make sure that legitimate clues were investigated. That's the supervisor's

role, right?

A.   Same answer.

Q.   Because if the supervisor's not supervising, then nobody's watching, right?

A.   Same answer.

Q.   During this time period, the gang crimes investigators would keep street files, correct?

MR. LEINENWEBER:  Objection, Judge.  Foundation.

MR. LOEVY:  He has a foundation, your Honor.

THE COURT:  Overruled.

BY THE WITNESS:

A.   Same answer.

BY MR. LOEVY:

Q.   And what I mean by "street files" is, after the Jones/Palmer litigation revealed the existence that the Chicago Police Department was keeping parallel files, the police department made a rule that the Detective Division was supposed to cut it out, right?

MR. LEINENWEBER:  Objection, Judge.  This witness is a Gang Crimes sergeant --

THE COURT:  Overruled.

MR. LEINENWEBER:  -- not a detective.

THE COURT:  Overruled.

BY THE WITNESS:

A.   Same answer.

Mingey - direct

2515

BY MR. LOEVY:

Q.   And when they made that rule, they exempted Gang Crimes, didn't they?

A.   Same answer.

Q.   So, Gang Crimes, even after the Special Orders that we talked about in court yesterday, Gang Crimes was allowed to maintain private personal files that didn't get disclosed, wasn't it?

         MS. ROSEN:  Objection, Judge.

         MR. LEINENWEBER:  Objection.  Foundation.

         MS. ROSEN:  There's no foundation for that.

         THE COURT:  Overruled.

BY THE WITNESS:

A.   Same answer.

BY MR. LOEVY:

Q.   Do you remember your deposition?

         MR. LOEVY:  This is Page 135, Line --

BY MR. LOEVY:

Q.   There is a foundation; isn't there, sir?

         MR. LEINENWEBER:  Objection, Judge.

         MR. LOEVY:  All right.  Page 135, Lines 3 through 12.

         (Said video was played in open court.)

BY MR. LOEVY:

Q.   So, they did keep a file, didn't they?

A.   Same answer.

Q.   And in that file were notes, right?

A.   Same answer.

        MR. LOEVY:  If you could play 158, Line 21, through 160, Line 3, please, Anne.

        (Said video was played in open court.)

BY MR. LOEVY:

Q.   All right, sir.  The Gang Crimes people, even after the City made changes about how detectives were supposed to do things, they went right along keeping personal files with notes and memos that didn't get disclosed to the criminal justice system; isn't that true?

        MR. LEINENWEBER:  Objection, Judge.  Argumentative.  Foundation.

        THE COURT:  Overruled.

BY THE WITNESS:

A.   Same answer.

BY MR. LOEVY:

Q.   And they would keep these street files in file cabinets or in their lockers, right?

A.   Same answer.

        MR. LOEVY:  Page 147, Lines 2 through 20.

        (Said video was played in open court.)

BY MR. LOEVY:

Q.   Sir, why didn't you or some other supervisor say, "We have a constitutional obligation to disclose these street files to

the criminal justice system"?

A.   Same answer.

Q.   You were a detective sergeant later in your career; were you not?

A.   Same answer.

Q.   It would incriminate you to acknowledge you were a detective, sir?

MR. LEINENWEBER:  Objection, Judge.

THE COURT:  It's the same.

MR. LOEVY:  We'd ask to adjudicate that, that he can't acknowledge he's a detective without incriminating himself.

THE COURT:  Well, if we go down that road, I don't know where it's going to end.  So, maybe we should talk about it at the break.

MR. LOEVY:  All right.

BY MR. LOEVY:

Q.   You have a subjective understanding, do you not, sir, that you are not allowed to assert the Fifth Amendment, as you have, in response to questions unless a truthful answer would implicate you in a crime, correct?

MR. LEINENWEBER:  Objection, Judge.

THE COURT:  Overruled.

BY THE WITNESS:

A.   Same answer.

BY MR. LOEVY:

Mingey - direct

2518

Q. All right.

These street files would also -- the Gang Crimes street files would also contain something called humper reports, correct?

A. Same answer.

Q. For example, if a Gang Crimes officer got an identification from a witness, they would write it in what's called a humper report, right?

A. Same answer.

Q. And these humper reports never got disclosed, were never part of discovery and were never made known to the criminal justice system, were they?

MR. LEINENWEBER: Objection, your Honor.

MS. ROSEN: Objection. Foundation.

THE COURT: Overruled.

BY THE WITNESS:

A. Same answer.

MR. LOEVY: Take a look at Page 90, Line 19, through 91, Line 1.

(Said video was played in open court.)

BY MR. LOEVY:

Q. All right. And these humper reports, they would go into the Gang Crimes files that didn't get disclosed, correct?

MS. ROSEN: Objection. Foundation.

BY THE WITNESS:

A.   Same answer.

          THE COURT:  Overruled.

BY MR. LOEVY:

Q.   And you would acknowledge, would you not, that that is information that should have been produced to criminal defendants accused of murders; can we agree about that, sir?

A.   Same answer.

Q.   Because those kinds of reports could have been used to cross-examine witnesses at trial, right?

A.   Same answer.

Q.   And the City of Chicago instead institutionalized a system where the gang crime stuff was immune from discovery, didn't it?

          MS. ROSEN:  Objection, Judge.  Foundation. Argumentative.

          THE COURT:  Overruled.

BY THE WITNESS:

A.   Same answer.

BY MR. LOEVY:

Q.   And the Gang Crimes kept the closed Gang Crimes street files in the office, in the file cabinets, right?

          MR. LEINENWEBER:  Objection, Judge.  Foundation.

          MS. ROSEN:  Judge, foundation.

          And can we have a sidebar, please?

          THE COURT:  Sure.

(Proceedings had at sidebar:)

MS. ROSEN: Judge, I just want to make an objection to every single question that's being asked that's directed at this Monell claim that's now being created solely around this Gang Crimes, which there's been no evidence about street files or files or anything like that.

THE COURT: Didn't Hickey testify to that?

MR. LOEVY: Brasfield did yesterday.

MS. ROSEN: Hickey did not --

THE REPORTER: I'm sorry, I didn't hear that.

MR. LOEVY: I thought you meant Brasfield yesterday. Did you misspeak or did you mean Hickey?

THE COURT: No, I thought Hickey is the one --

MS. ROSEN: Hickey has not testified yet.

THE COURT: Right, but didn't --

MS. ROSEN: No. Mr. Hickey is going to testify about -- assuming he gets called, is going to testify about -- the change in 1982 to 1983 in the Detective Division. There is also a 30(b)(6) witness that was identified by the City to speak to Gang Crimes.

THE COURT: But where is the source of the information that's been circulating throughout this case, not just in this trial, that Gang Crimes was not subject to this order?

MR. LOEVY: Hickey.

MS. ROSEN: He will say that they're not subject to

the order, except that the fact that they're not subject to the order doesn't get you to all of this detailed information that, from the City's perspective, that there's no evidence of other than this adverse inference; that they're not going to elicit any of this information; and, they're simply going on this testimony to utilize the adverse inference against the City. That's my objection.

MR. LOEVY: And I don't even know how to respond, because it's not a coherent objection. We're reading from the deposition.

THE COURT: Let me ask -- let me say this. How much more of this do we have? Because it's --

MR. LOEVY: Not too much more.

THE COURT: -- torture.

Number two, this business about can he testify that he was a detective --

MR. LOEVY: Right.

THE COURT: -- I think this whole Fifth Amendment thing in this case is illegitimate. I mean, the man testified at his deposition. So, I don't know where we are. But that's -- I've been making that complaint for a long time about, you know, who's adjudicating this. So, I'm not going to open that up at this point.

And you're saying that -- tell me this again. You're saying that he is going to create an adverse inference against

the City based on, what?

MS. ROSEN:  Based solely on all of these questions and inferences about -- that are being portrayed in an incomplete way about what the files are, what's in the files, what's kept in the files, humpers, how they're being utilized.

And, so, my concern is, is that --

THE COURT:  I know your concern, but since I don't know about this, I mean, how am I supposed to figure this out?

MR. LOEVY:  To me it's like he acknowledges that there's a parallel set of files.

THE COURT:  Yeah, I got that.

MR. LOEVY:  Another witness --

THE COURT:  I got that.

MR. LOEVY:  Another witness says one day they all got purged.

THE COURT:  I get that.  I get that.

MR. LOEVY:  No, this is still coming.

THE COURT:  Okay.

MR. LOEVY:  Another witness says those files that he's describing in those file cabinets, one day they all get --

THE REPORTER:  Mr. Loevy.

MR. LOEVY:  Sorry.

One day -- those files that he just talked about in the file cabinets in Gang Crime, the one day they all got purged, they all got shredded.  So, that's bad for the City.

MS. ROSEN: Judge --

THE COURT: Well, is there going to be a witness for that or is this just going to be from this guy?

MR. LOEVY: Well, no.

MS. ROSEN: It's going to be this adverse witness.

MR. LOEVY: A witness named Zacharias testified to that at his deposition. I have a basis to ask it because he explained it.

THE COURT: Is Zacharias going to testify at this trial?

MR. LOEVY: If we need to, then we'll do that.

MS. ROSEN: Judge, we were told he's not -- we were given what we thought was the list for the end of the case and Zacharias isn't on it.

THE COURT: Well, I'm trying to figure this out, because I don't know. I don't know who all these people are.

MR. LOEVY: If we need to call him.

MR. SWAMINATHAN: The 30(b)(6) witnesses, James Spratte is the Gang Crimes witness that the City designated on this topic. He testifies about this issue at length. Mr. Hickey talks about the issue of this policy not applying to Gang Crimes at length. And Mr. Brasfield --

THE COURT: All right. I --

MR. SWAMINATHAN: -- explained it yesterday in his testimony.

THE COURT: You know, let me just say one other thing. I think -- we're going to go forward. There have been a lot of foundation objections and 90 percent of the time when there's a foundation objection, it turns out that he testified about it in his deposition. How can there be -- I mean, how can I take seriously a foundation objection when that's what's happening? I mean, it's just really tough. I would be careful about these objections.

This objection at this point I'm overruling.

(Proceedings had in open court:)

THE WITNESS: Your Honor?

THE COURT: Yes.

THE WITNESS: Is it possible to use the washroom?

THE COURT: Yes, I think so. If you're going to do that, we probably ought to take our lunch break. Okay?

Let's take our lunch break, ladies and gentlemen, and we'll start again at 1:15.

                    *     *     *     *     *


I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


/s/ Blanca Lara                          June 19, 2018
Official Court Reporter


/s/ Joseph Rickhoff                      June 19, 2018
Official Court Reporter

2525

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JACQUES RIVERA,                          ) No. 12 CV 4428
                                         )
          Plaintiff,                     )
                                         )
vs.                                      ) Chicago, Illinois
                                         )
REYNALDO GUEVARA, STEVE GAWRYS,          )
DANIEL NOON, JOHN GUZMAN, JOSEPH FALLON, )
JOSEPH SPARKS, PAUL ZACHARIAS, GILLIAN   )
MCLAUGHLIN, JOHN LEONARD, EDWARD MINGEY, )
RUSSELL WEINGART, ESTATE OF ROCCO        )
RINALDI, CITY OF CHICAGO,                ) June 19, 2018
                                         )
          Defendants.                    ) 1:12 o'clock p.m.

VOLUME 11-B
TRANSCRIPT OF PROCEEDINGS - Trial
BEFORE THE HONORABLE JOAN B. GOTTSCHALL
and a Jury

APPEARANCES:

For the Plaintiff:     LOEVY & LOEVY
                       BY:  MR. JONATHAN I. LOEVY
                            MR. STEVEN E. ART
                            MR. ANAND SWAMINATHAN
                       311 North Aberdeen Street
                       3rd Floor
                       Chicago, Illinois  60607

                       MacARTHUR JUSTICE CENTER
                       Northwestern University School of Law
                       BY:  LOCKE E. BOWMAN III
                       357 East Chicago Avenue
                       Chicago, Illinois  60611
                       (312) 503-0844

Court reporter:            Blanca I. Lara
                       Official Court Reporter
                        219 South Dearborn Street
                             Room 2504
                       Chicago, Illinois 60604
                         (312) 435-5895
                   blanca_lara@ilnd.uscourts.gov

APPEARANCES:  (Continued)

For the Individual        THE SOTOS LAW FIRM
Defendants:               BY:  MR. JEFFREY N. GIVEN
                               MR. JAMES G. SOTOS
                               MS. CAROLINE P. GOLDEN
                               MR. JOSEPH M. POLICK
                               MR. DAVID A. BRUEGGEN
                          550 East Devon Avenue, Suite 150
                          Itasca, Illinois  60143

For the Defendant         ROCK FUSCO & CONNELLY, LLC
City of Chicago:          BY:  MS. EILEEN E. ROSEN
                               MS. CATHERINE M. BARBER
                               MS. THERESA B. CARNEY
                          321 North Clark Street, Suite 2200
                          Chicago, Illinois  60654

For the Defendant         LEINENWEBER BARONI & DAFFADA, LLC
Guevara:                  BY:  MR. THOMAS E. LEINENWEBER
                               MR. JAMES V. DAFFADA
                          120 North LaSalle Street, Suite 2000
                          Chicago, Illinois  60602

(Jury out.  Proceedings heard in open court:)

THE COURT:  So Mr. Loevy --

MR. LOEVY:  Yes, ma'am.

THE COURT:  -- you told me eight days.  Tomorrow starts week three.  We're going to run into the fourth.  It's going to cut off this jury from being able to deliberate.  It's going to be unfair to everybody.  I think it's got to end.

MR. LOEVY:  We, we --

THE COURT:  So when is it going to --

MR. LOEVY:  We plan on closing our case tomorrow, Your Honor.  We did start a day late, so we --

THE COURT:  You start -- of course we started a day late, but I am counting the days.

MR. LOEVY:  Okay.  Well, we --

THE COURT:  Okay?  Wednesday, Thursday, Friday, all last week, and now it's two days in this week.

I think at the middle of the day tomorrow, you better be done, because this has a sense -- honestly, I don't know what points you're scoring, but it has the sense of piling on, and it's very difficult to sit here and listen to it, truthfully.

MR. SOTOS:  Judge, we have a brief motion I'd like to address to the Court --

THE COURT:  Of course you do.

MR. SOTOS:  -- as quickly as I can.  We are requesting

a mistrial at this point.  We believe that our clients have been prejudiced beyond repair by what we believe is unprecedented exploitation of the Fifth Amendment.

Counsel was in the middle of what to us appears to be like a second unrebutted closing argument in which he seems to be using the Fifth Amendment.

THE COURT:  Listen, let me just say something.  Number one, I don't want any more speaking motions.  I need law.  If you want law -- I mean, if you want me to think of something, you got to give me something.  Just don't make a speech.

MR. SOTOS:  All right.  We'll file something in --

THE COURT:  Number two --

MR. SOTOS:  I'm sorry.

THE COURT:  -- all I heard was foundation objection after foundation objection after foundation objection.  In 90% of the time, there was deposition testimony that supported the answer that you were raising foundation objections to.

So what am I supposed to think is going on here?

MR. SOTOS:  Understood, Judge.  Aside from --

THE COURT:  And it's hard to take seriously anything --

MR. SOTOS:  Understood, Judge.

THE COURT:  -- when that happens.

MR. SOTOS:  Aside from foundation, I tried to say a couple times that it appeared to us what's happening is that

the witness is being used as a conduit for a closing argument to basically obscure and blunt everything that the witness who testified before him testified to.

And he was asked several questions about what other people did to Orlando Lopez when it was un -- there's no evidence in the record that he had any interaction with him, and it was specifically strategic in order to --

THE COURT: Well, if you made 20 foundation objections and 2 of them were good, which I would say is about the score, it's really difficult for me being -- playing a referee when every time you make -- when 90% of the time when you make those objections, it turns out there is a foundation.

MR. LOEVY: And if I could --

THE COURT: So what am I supposed to do?

MR. SOTOS: Well, Judge, I'm --

MR. LOEVY: If I could respond, too?

THE COURT: Yeah, go ahead.

MR. SOTOS: Judge --

MR. LOEVY: You know, part of the problem is he -- by not responding, he ties our hands. So I'm asking questions.

THE COURT: Well, that's right.

MR. LOEVY: He could deny them. And we -- every question I asked, we had a basis and a foundation. He said he's a supervisor. He said he's a hands-on supervisor. He says he would have been involved in the investigation. So now

he says, "You can't ask me if I met the witnesses because I won't answer that question." That's not fair.

MR. SOTOS: So, Judge, again, you know -- well, but I understand the Court's point.

(Court security officer enters.)

THE COURT: We'll be just a second.

MR. SOTOS: We will file something in writing at the end of the day.

THE COURT: That would be very helpful.

MR. SOTOS: All right. Thank you.

THE COURT: All right.

MR. LOEVY: Yeah. And then Steve wanted to address one point.

MR. ART: Your Honor, we have one issue. We have two --

MR. LOEVY: Our next witness, next witness.

MR. ART: The next witness is Juan Rivera. We have two demonstratives of Stateville Correctional Center that we'd --

THE COURT: Yeah.

MR. ART: -- like to use. The defendants object.

THE COURT: What's the objection?

MS. GOLDEN: The objection is the -- they're not demonstratives. They're photographs. And so they're evidence that was not disclosed to us during the course of discovery,

despite --

THE COURT:  Why can't photographs be demonstrative?

MS. GOLDEN:  So maybe they are demonstratives, but this is -- this is supposed to be not like an exhibit or --

MR. ART:  We don't intend to introduce --

MS. GOLDEN:  -- a replica of where he was --

THE COURT:  I can only take the one person at a time.

MS. GOLDEN:  A replica of where he was.  This is supposed to be the actual place.  But besides that, it's prejudicial.  We don't need at this late stage in the game for them to bring to court things that we've never before seen. We're having a hard-enough time --

THE COURT:  Well, you've seen -- we've all seen Stateville.  I mean, come on.  What are you using it for?

MS. GOLDEN:  This picture is a picture of a cell that I have no idea where it's from --

MR. ART:  Well --

MS. GOLDEN:  -- what time it was taken.

THE COURT:  Well, could I hear what it's being used for before I figure out why it shouldn't be used?

MR. ART:  This is an aerial photograph of Stateville (holding up picture).  We don't intend to introduce it as evidence.  We intended to --

THE COURT:  Well, why do we need it?

MR. ART:  Well, because, you know, there's an issue

about how much time they spent together.  It's to show that it's quite a large facility.  And when he's testifying about the time --

THE COURT:  That's goofy.  You know, if we had six weeks with this jury, we could show them big pictures of how large Stateville is.  I don't -- I think the point is that they were together, not that they were in a big space.

MR. LOEVY:  All right.  The other one is --

MS. GOLDEN:  The plaintiff said --

MR. LOEVY:  -- for damage --

MS. GOLDEN:  -- they weren't together.

MR. LOEVY:  -- testimony, Your Honor.

THE COURT:  Wait.

MS. GOLDEN:  The plaintiff says they weren't together. The plaintiff says that he saw him -- he talked to him one time in the first couple of months they were together; and then after that, he saw him not very often at all.

MR. ART:  They were together for eight years.

THE COURT:  Well, that's what I thought you told me.

MR. ART:  Yeah.  And so for the starting period of time, they were in two separate buildings, which is the only thing that we want to show with this, and that explains why they weren't --

THE COURT:  You know, I just think it's wasteful.

MR. LOEVY:  This other picture, Your Honor --

MS. GOLDEN: Thank you, Your Honor.

MR. LOEVY: -- would be for the damages. It corroborates the cell.

MR. ART: This is where they met (hold up picture).

MR. LOEVY: It is a picture of what he's describing.

THE COURT: So he's just going to say that's what it looked like?

MR. LOEVY: Yes.

THE COURT: I think that's okay.

MR. LOEVY: Okay.

THE COURT: All right.

MR. LEINENWEBER: Judge, one final issue.

THE COURT: Yes.

MR. LEINENWEBER: Darren O'Brien will be testifying sometime this afternoon.

THE COURT: Yes.

MR. LEINENWEBER: He has indicated to us that he's diabetic, and apparently he takes -- he has a new type of medication. He doesn't think it's going to happen, but it could be possible that if -- I think if his blood sugar goes too high or too low, he could have to step down from the stand. I just wanted to alert the Court.

THE COURT: Well, I have not -- any witness who needs a break I've been giving breaks to, and I will do the same with him, but he has to tell me, because I am not --

MR. LEINENWEBER: Agreed. And --

THE COURT: Yeah. Okay.

MR. LEINENWEBER: -- he -- but he did tell us that -- but he said sometimes it takes him like a half an hour. I just want to let you -- to, I guess, get back the equilibrium.

MS. ROSEN: To recover.

MR. LEINENWEBER: So I just want to let Your Honor know.

THE COURT: Well --

MR. LEINENWEBER: Hopefully, it won't be an issue, but I wanted to let you know.

THE COURT: All right.

MR. LEINENWEBER: Thanks, Your Honor.

THE COURT: Well, we'll have to deal with it.

MR. LEINENWEBER: Thanks, Your Honor.

THE COURT: But, you know, if you could -- you got to wrap this case up.

MR. LOEVY: Oh, I agree.

THE COURT: And I don't -- not all day tomorrow, because that will be day 11, I think.

MR. LOEVY: Understood.

THE COURT: Noontime. Okay. Let's get the jury.

MR. LOEVY: Eileen, are we going to agree on taking out both witnesses?

Now, part of the thing is we're trying to get some

agreements that witnesses don't get called.

THE COURT:  Well, that's all wonderful, but it does have a -- it really does feel at this point as if we're just beating the horse and beating the horse and beating the horse.

Maybe I'm missing it.  You know, I'm not the lawyer. I don't know what everybody's trying to prove.  But that's the feeling I have.

MR. LOEVY:  Very good.

THE COURT:  Agreements are wonderful.

MR. LOEVY:  Looks like it's not to be, though.

MR. SOTOS:  Well, we do have a few witnesses.

MS. ROSEN:  Well, I'd have to --

MR. LOEVY:  No.  There's one witness that I said we should both not call.

MS. ROSEN:  Well, I -- not after what you've done this morning, so --

MR. LOEVY:  Well, then that's why it gets longer.

MR. GIVEN:  Are you -- Jon, are you accounting for O'Brien's need to go on today?

MR. LOEVY:  Yes.

MR. GIVEN:  Okay.

MR. LOEVY:  And I talked to Joe.  He's a rebuttal witness.

MR. GIVEN:  Okay.

MR. LOEVY:  So it should be pretty limited.

THE COURT: You're calling him?

MR. LOEVY: Yes.

THE COURT: O'Brien?

MR. LOEVY: Yes.

THE COURT: So --

MR. LOEVY: He's here, Judge.

THE COURT: -- if he may need a half-an-hour break at some point, it might be a good idea to get him on so that if there's going to be a break, we can --

MR. LOEVY: All right.

THE COURT: He can take his break and we can get back.

MR. LOEVY: It is a short exam, and we have a witness who's really giving us grief about going next.

THE COURT: All right.

MR. LOEVY: So we're all doing the best we can with a lot of variables.

THE COURT: Okay.

(Pause.  Jury in.)

THE COURT: Please be seated, everyone.

MR. LOEVY: May I proceed, Your Honor?

THE COURT: Yep.

EDWARD MINGEY, DEFENDANT HEREIN, PREVIOUSLY SWORN

DIRECT EXAMINATION (Resumed)

BY MR. LOEVY:

Q.  All right, sir.  A few more areas.

Before we broke, to reorient you, it is true, is it not, that the City of Chicago's policies and practices permitted Gang Crimes to maintain a separate parallel set of files for their notes and memos that did not get disclosed to the criminal justice system?  That's true, correct?

MS. ROSEN:  Your Honor, I have a standing objection --

THE COURT:  Yes.

MS. ROSEN:  -- to each and every one, also.

THE COURT:  The record will note that.  Overruled.

BY THE WITNESS:

A.  Same answer.

BY MR. LOEVY:

Q.  And those files were kept in the Administrative Office. They were filed with the Administrative Office, correct?

A.  Same answer.

MR. LOEVY:  This is page 140, line 3 through 141, line 23.

(Said video with audio played in open court.)

BY MR. LOEVY:

Q.  All right.  Sir, why was it --

MR. LEINENWEBER:  Your Honor, just for the sake of completion, if we could finish --

MR. LOEVY:  We could read the whole deposition, Your Honor.

MR. LEINENWEBER:  I don't do want to do that.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 362 of 1335 PageID #:105747
Mingey - direct by Loevy
2538

THE COURT: I don't think that's a good idea, so --

MR. LEINENWEBER: I don't --

THE COURT: But how many lines?

MR. LEINENWEBER: Judge, I just believe until the next page, line --

THE COURT: Is there an objection --

MR. LEINENWEBER: -- 10.

THE COURT: -- to doing that? Do you want me to --

MR. LOEVY: No.

THE COURT: -- read the --

MR. LOEVY: He's --

THE COURT: Go ahead.

MR. LOEVY: -- playing what the question was.

MR. LEINENWEBER: Just to line 10 of the next page, if Your Honor please.

(Said video with audio played in open court.)

MR. LOEVY: And keep reading?

MR. LEINENWEBER: No. That's fine. Thank you.

MR. LOEVY: All right.

BY MR. LOEVY:

Q. So some of these documents were transferred within Gang Crimes, correct?

A. Same answer.

Q. All right. But none of those documents ever under any circumstances got transmitted to the Records Division or to the

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 363 of 1335 PageID #:105748
Mingey - direct by Loevy
2539

criminal justice system, isn't that true?

MS. ROSEN:  Objection, Judge, to the form of the question.  Ever --

MR. LOEVY:  Ever.

MS. ROSEN:  -- in the criminal justice system.

THE COURT:  Overruled.

BY THE WITNESS:

A.  Same answer.

BY MR. LOEVY:

Q.  And then one day and a little bit around that time period, maybe a few years later, all of those file cabinets, all of those Gang Crimes files that we talked about in the Administrative Office, they all got administratively purged, correct?

A.  Same answer.

Q.  They were all destroyed or shredded, but they just all disappeared, right?

A.  Same answer.

Q.  I want to double to the subject of the first lineup.

If Jacques picked -- I'm sorry.  If Orlando Lopez at the first lineup picked Jacques, you would have made a report that he picked Jacques, right?

A.  Same answer.

Q.  So we can infer by the fact that Jacques was released and no such identification report was created at the first lineup

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 364 of 1335 PageID #:105749
Mingey - direct by Loevy
2540

that he must have picked somebody else, right?

A. Same answer.

Q. And the policy and practice of the police department at the time was if Orlando Lopez pointed his finger and picked a filler, that would not be recorded as he picked the filler. It would be recorded as just a negative, right?

A. Same answer.

MR. LOEVY: This is page 103, 19 through 104, line 1.

(Said video with audio played in open court.)

BY MR. LOEVY:

Q. All right. Before you started taking the Fifth, you acknowledge that you wouldn't have written down if he picked the filler, right?

A. Same answer.

Q. And there was no trouble finding Orlando Lopez. You knew exactly where he lived. He lived with his mother and he lived with his father, right?

A. Same answer.

Q. That's the kind of detail you would have been apprised with -- about as a hands-on supervisor during the course of this investigation. You would have been consulted on things like that, correct?

A. Same answer.

Q. And when he came back for the second lineup after Felix died and he started telling human beings that it was the wrong

guy, wrong guy, that, too, is the kind of information that would have gotten to the supervisor, isn't it?

A.   Same answer.

Q.   And let's say he told someone who was not Guevara and not McLaughlin, "It's the wrong guy, wrong guy."  The way the police department worked is that information would have been transmitted to the lead people working on the case, right?

A.   Same answer.

Q.   So there can be no doubt in your mind that whoever he told, "Wrong guy, wrong guy," the lead investigator and the lead Gang Crimes person would have been privy to that information, correct?

A.   Same answer.

Q.   All right.  A decision had to be made if you were going to go forward with the kid saying, "Wrong guy, wrong guy," you were just going to say, "Look, you're just afraid," and go forward or call off the Jacques Rivera angle?  That decision had to be made, right?

A.   Same answer.

Q.   Were you part of that decision along with Guevara and Gawrys?

A.   Same answer.

Q.   Did you foster the kind of supervisory atmosphere where your subordinates could make decisions like that without consulting you as a supervisor?

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 366 of 1335 PageID #:105751
Mingey - direct by Loevy
2542

A. Same answer.

Q. Did you turn a blind eye to what was going on here?

A. Same answer.

Q. When the kid said it wasn't Jacques Rivera, you guys could have let it go, couldn't you have?

A. Same answer.

Q. All right. This 12-year-old boy didn't dupe anybody, did he?

A. Would you repeat that?

Q. This 12-year-old boy didn't fool anybody about anything, did he?

A. Same answer.

Q. All right. And it's not Orlando's fault and it's not Northwestern's fault, this wrongful conviction, is it?

A. Same answer.

Q. It's not Bill Dorsch's fault either, is it?

A. Same answer.

Q. And it's not Jacques' attorney, Mr. Wadas? It's not his fault either, is it?

A. Same answer.

Q. It was you and your co-defendants who committed misconduct and violated the constitutional rights of Jacques Rivera that caused this wrongful conviction, isn't it, sir?

A. Same answer.

Q. The same answer being you assert the Fifth. A truthful

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 367 of 1335 PageID #:105752
Juan Rivera - direct by Art
2543

answer would incriminate you, right?

A.  Same answer.

MR. LOEVY:  No further questions, Your Honor.

THE COURT:  Any defense questions?

MR. LEINENWEBER:  No, Your Honor.  Thank you.

THE COURT:  Thank you, sir.  You may step down.

THE WITNESS:  Thank you, ma'am.

(Witness excused.)

MR. ART:  Your Honor, plaintiff calls Juan Rivera.

(Witness enters.)

THE COURT:  Ah, sir, could you come up here, please.
Please raise your right hand.

(Witness duly sworn.)

THE COURT:  You may be seated.

JUAN RIVERA, PLAINTIFF'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. ART:

Q.  Hi, Juan.  Could you introduce yourself to the jury,
please.

A.  Yes.  My name is Juan Rivera.

Q.  Are you related to Jacques by blood, Juan?

A.  No, I am not.

Q.  What year did you two first meet?

A.  In mid-1995.

Q.  And where did you meet?

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 368 of 1335 PageID #:105753
Juan Rivera - direct by Art
2544

A. At Stateville Correctional Center.

Q. How did you come to be incarcerated there?

A. I was wrongly convicted for a crime I did not commit.

Q. Okay. And were you ultimately exonerated?

A. Yes, I was.

Q. And did you receive a Certificate of Innocence?

A. Yes, I did.

Q. Very briefly, describe the circumstances of your exoneration.

MS. GOLDEN: Objection, Your Honor, relevance.

THE COURT: I am not sure that this is relevant.

MR. ART: Okay.

THE COURT: I am going to sustain that objection.

BY MR. ART:

Q. What -- when did you walk out of prison?

A. January 6th of 199 -- 2012.

Q. So were you exonerated before or after Jacques Rivera?

A. After Jacques Rivera.

Q. Okay. Let's talk about your relationship with Jacques.

Back in 1995, where did you meet Jacques?

A. I met Jacques at -- it's called I-house, which is a segregation unit.

Q. Okay. Is this a picture of I-house?

A. Yes, it is.

Q. Okay. Describe for the jury your first meeting with

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 369 of 1335 PageID #:105754
Juan Rivera - direct by Art
2545

Jacques Rivera in I-house.

A. I was -- what is called the overflow section. I had just arrived to Stateville, and they placed me in the overflow waiting to get classified.

Q. Okay. What were you -- what did you have within your cell?

A. Absolutely nothing.

Q. Okay. And describe for us what Jacques was doing in I-house.

A. Jacques is --

MS. GOLDEN: Foundation, Your Honor.

THE COURT: Excuse me?

MS. GOLDEN: Object to foundation, what Jacques was doing, unless he observed it.

THE COURT: Only what you observed.

THE WITNESS: Yes.

BY THE WITNESS:

A. Jacques is considered a kitchen worker. He --

MS. GOLDEN: Objection.

MR. ART: Your Honor, he's describing what he observed in I-house.

MS. GOLDEN: I don't hear that yet, but --

BY MR. ART:

Q. Did you observe Jacques there that day?

A. Yes.

Q. Describe what you observed him doing.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 370 of 1335 PageID #:105755
Juan Rivera - direct by Art
2546

A.  I observed Jacques working in I-house unit as a kitchen worker, serving the trays -- or the portion of the trays to be passed out to every other inmate.

Q.  Okay.  Had you eaten since you arrived?

A.  No.

Q.  Describe the interaction you had with Jacques.

A.  I just happened to call the individual out that was working, which was Jacques Rivera -- I didn't know his name at the time -- and asked him if he could offer me some food.

Q.  And what did he do?

A.  He said, "I'll be right back," and came back with a tray full of chicken and handed it to me.

Q.  Was that a common interaction to have the first time you met someone in prison?

A.  No.

Q.  What did that first meeting tell you about Jacques?

        MS. GOLDEN:  Object to foundation, Your Honor, and relevance.

        THE COURT:  Overruled.

BY THE WITNESS:

A.  I mean, just let me know that someone that I might be able to talk to.

BY MR. ART:

Q.  Okay.  Was he a kind and generous person from the first day you met him?

Juan Rivera - direct by Art

2547

A. Very kind. He spoke to every individual all the way in the whole gallery.

Q. Is that the Jacques Rivera you've known since that day?

A. Yes.

Q. Okay. Did it take you a long time before you and Jacques actually got to know each other?

A. Yes.

Q. Let's talk about that a bit.

Where were you housed after I-unit?

A. I was housed in Edward unit.

Q. And describe --

THE COURT REPORTER: I'm sorry. "I was housed in" --

THE WITNESS: Edward, E-house.

BY MR. ART:

Q. Describe what E-house is.

A. E-house is another section of the prison, which has two sections, Edward house and Delta house, which is general population. Or, excuse me, Bravo house.

Q. And where was Jacques at that time?

A. Jacques was in X-house.

Q. And who lived in X-house?

A. X-house are generally all workers that work in the institution.

Q. Are these two different buildings in the prison complex?

A. Yes.

Juan Rivera - direct by Art

2548

Q. Okay. What kind of jobs could you have as a prisoner at Stateville Correctional Center at the time you met Jacques?

A. There was numerous jobs. They had a workshop, tailor shop, a soap shop, commissary, kitchen, porter, groundskeeper, a painter, floor maintenance. There was numerous jobs.

Q. And if you had a job, would you always live in the X-house?

A. No. You could live in X-house depending on your -- the area that you're working.

Q. Okay. But nonetheless, you and Jacques lived in separate areas, correct?

A. Correct.

Q. Would you see him from time to time?

A. Here and there, whenever I went to the yard or went to religious services.

Q. Would you greet each other when you saw each other?

A. Not really at first. Eventually, I did.

Q. Okay. Do you remember how long after you arrived you started to form an actual bond with Jacques?

A. I would say, I mean, I really got to speak to him about a year and a half, somewhere in that effect, after I got to prison, when I asked him to try to find me a job.

Q. Okay. Is it hard for you to recall how much time passed in particular moments when you were in prison?

A. Yes.

          MS. GOLDEN: Objection, leading.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 373 of 1335 PageID #:105753
Juan Rivera - direct by Art
2549

THE COURT:  Overruled.

BY MR. ART:

Q.  Tell the jury what happens to time when you're in prison.

A.  Time stands at a standstill.  You're in the --

MS. GOLDEN:  Objection, Your Honor, to the relevance, to this witness' understanding of the passage of time.  It has nothing to do with this case.

MR. ART:  Your Honor, they're sharing --

THE COURT:  Overruled.

BY THE WITNESS:

A.  Time in prison is at a standstill.  Everything is the same. You're in an 8-by-10 concrete/metal room.  So whenever you have the opportunity to go to religious services or recreation, which is the yard, in passing, I would see him and try to speak to him as best as I can.

BY MR. ART:

Q.  Okay.  Describe for the jury the first time that you actually formed a relationship with Jacques.  What happened?

A.  He was in the yard, and I happened to be going to the gym, gymnasium, and I asked him if he could find me a job.

Q.  And what did he say?

A.  He said he will try to see what he could do.

Q.  Did he ultimately find you a job?

A.  Yes.  He spoke to Ms. Allen, which was the officer in charge of the job placements in I-house, and she got me a job

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 374 of 1335 PageID #:105759
Juan Rivera - direct by Art
2550

in I-house.

Q. And then what did that mean in terms of where you were housed in the prison once you got a job?

A. I was transferred from unit Edward to unit X, which was the unit that Jacques was housed in.

Q. Okay. Were you guys ever in the same cell?

A. No.

Q. Were you ever in cells close to one another?

A. Yes.

Q. Okay. As you started to get closer to Jacques, what did you learn about him?

A. We had that same last names.

Q. Okay. What else?

A. I mean, he was a religious person, very humble, very giving. I mean, didn't seem like he was upset. He a very religious person.

Q. Okay. Did you -- did you learn about Jacques' family?

A. Yes.

Q. What would he say about his family?

A. Has three sons, one daughter, and, I mean, just the hardship of communicating with his kids from the years of separation.

Q. Okay. Would you occasionally see Jacques and his family during visitation?

A. Yes.

Juan Rivera - direct by Art

2551

Q. When you guys would have visitation together, would you sit with one another?

A. Side by side, yes.

Q. Okay. Was it difficult to maintain relationships with family from prison?

A. Very difficult.

Q. Describe why. How -- well, let me put it this way.

How did visitation work in the prison? What were the rules?

A. There's -- depending. If you get a visit Monday through Fridays, you're allowed to have two hours with the visits with your family. You get five visits per month. You get to choose one for the weekend, which is only for one hour with your family; and then if you choose to do the other four, it will be during workweek, so the families will have to take off of work, or your family and all that, to go visit you.

Q. When your family would -- when families would come to visit inmates at the prison, would you have contact with them?

A. It would be a --

MS. GOLDEN: Objection, Your Honor. Can we talk specifically as it relates to Jacques Rivera as opposed to Juan Rivera?

BY MR. ART:

Q. Did you guys have the same visiting rules when you were in prison? Were you in the same prison?

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 376 of 1335 PageID #:105766
Juan Rivera - direct by Art
2552

A. Yes.

Q. Did different inmates have different visiting rules?

A. No.

Q. Okay. So I'm going to ask you questions about your time in Stateville with Jacques. Okay?

A. Okay.

Q. And if I ask you a question where your experiences differed, let me know that it was different. Okay?

A. Okay.

Q. So in terms of visitation, would you be allowed to have contact with family members?

A. It will be a quick hug and a peck on the cheek, and that's as far as it went.

Q. Did you have the opportunity to use the phone to call family members in prison?

A. Yes.

Q. Describe for the jury how the phone system worked at Stateville.

A. At count check, which is when the officers finished doing their count, make sure that every inmate is in the assigned cell, a worker will actually come out with a list and will have an X amount of time per shift to allow inmates to use the phones.

So you got 30 minutes per cell. So if I had a cellmate, I would only get 15 minutes to talk to my family. I

Juan Rivera - direct by Art

2553

will have to hang up and pass it to my cellmate.  If he doesn't use it, then I get to use the whole half hour.

Q.  Okay.  After a period of years, did you and Jacques become close in prison?

A.  Yes.

Q.  Why did you form a bond with Jacques?

A.  I just felt comfortable with him.  I mean, he showed me love.  He never looked at me weird, never looked at me different, and just always there to support me.

Q.  Okay.  Was it a unique relationship to have a relationship like that in prison?

A.  It's very unique.

Q.  All right.  Switching topics.  Let's talk about what Stateville was like.  Okay?

Is prison a comfortable place?

A.  No.

Q.  Is it a mess?

A.  Very messy.

Q.  Describe it for us.

A.  You have bird feces, birds flying everywhere.  You have rodents, roaches, garbage all over the floor.  I mean, it's a nasty place to live in.

Q.  And you said that cells were about 10 by 12?

A.  More like 8 by 10.

Q.  Okay.  8 by 10.  How many people were supposed to be in

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 378 of 1335 PageID #:105768
Juan Rivera - direct by Art
2554

each of those cells?

A.   One inmate per cell.

Q.   And how many were in there?

A.   Two.

Q.   Describe what was in the cell other than your two people and your bunks.

A.   There are two --

MS. ROSEN:  Your Honor -- objection, Judge.  This is cumulative of everything Mr. Rivera testified to about his cell, so I don't understand why we have to hear it again.

MR. ART:  The Court's already ruled on this, Your Honor.

THE COURT:  Yeah.  Overruled.

BY THE WITNESS:

A.   There are two steel beds, one steel toilet bowl, a faucet with a sink, and that's all you have.

BY MR. ART:

Q.   How often were you allowed to leave your cells?

A.   It all depends.  If you go to the chow hall to get -- eat your lunch and dinner, you have an opportunity to walk in a line escorted by the officers.  Your rec, you know, which will be your yard or gymnasium, or your visits, religious services.  That's basically all you get.

Q.   How often do you get to exercise in prison?

A.   Twice a week.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 379 of 1335 PageID #:105764
Juan Rivera - direct by Art
2555

Q. For how long?

A. Two-and-a-half hours each time.

Q. Is that something that happens outside?

A. Excuse me?

Q. Would you do that outside or inside?

A. Outside of your cell.

Q. Other than that, would you get to go outside at all while you're in prison?

A. No.

Q. What time was lights out each day?

A. There is no lights out.

Q. Describe for the jury what you mean.

A. Basically, it's like a light such as this (indicating). It would be kind of a dim light, and it stays on 24 hours a day, 7 days a week for the officers to be able to observe the inmates in the cells.

Q. Did that cause trouble sleeping?

A. There is no sleep -- such thing as sleeping in prison.

Q. What do you mean?

A. There's a lot of noise. You have inmates screaming from one cell to another. TVs, radios, the intercom.

MS. GOLDEN: Your Honor, objection. Now we're talking about him not sleeping, and he's never even shared a cell with Mr. Rivera.

THE COURT: He's describing the environment, and I

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 380 of 1335 PageID #:105765
Juan Rivera - direct by Art
2556

think I ruled on this and allowed it.  Overruled.

BY THE WITNESS:

A.  They have a lot of noise.  The PA system, which is the intercom, wherein the officers call for visitations.  Chow hall, yard.  Or the exhaust fan, which is two big, giant fans that are in the cell house.  When they turn it on, they never oil it or clean it, so it has a lot of big squeaky noise that disturbs the whole unit.  So the officers don't turn it on either.

BY MR. ART:

Q.  So you have all these noises going on at once.  How many cells are in the cell house?

A.  Three hundred cells.

Q.  And what are the surfaces in the cell house made of?

A.  It's made out of concrete and steel.

Q.  Is the noise in there constant?

A.  It's a constant echo all the way around.

Q.  Okay.  Is it something that you adapt to over time?

A.  Yes.

Q.  All right.  When you could sleep, what time do prisoners wake up at Stateville?

A.  They wake up at 3:00 o'clock in the morning when the officer does his unit check and he does a bar rap, which is a metal steel that he has to hit every single bar to make sure nobody 's hacking through the bars or anything.  So the whole

Juan Rivera - direct by Art

2557

cell house hears the noise and wakes up.

Q. How many -- so they rap against the bars and it makes a noise, right?

A. Yes.

Q. How many bars in the whole cell house?

A. I mean, there's two sections to a cell. So you have in a fashion a bar that doesn't move and then you have the sliding door. So you have 300 cells. You could say it's been -- it gets hit over a thousand times.

Q. Is it -- and is that loud every morning?

A. Very loud. And that's all during shift change.

Q. What's the climate like in the prison?

A. The same climate as it is outside. If it's cold outside, it's cold inside. If it's hot outside, it is definitely hot inside.

Q. Were there windows in the cell block?

A. No windows.

Q. Were there glass blocks?

A. Yes.

Q. Could you see out of them?

A. No.

Q. Would they open up ever?

A. No.

Q. Okay. What's the air quality like?

A. Very poor. There's no circulation of air at all in the

cell houses.

Q. Okay. Tell the jury what medical care is like in the prison.

A. You fill out a money voucher, which you have to pay, you know, a portion, $5 to get there, and the remedy is Tylenols for everything.

Q. What's the food like that the prison served?

A. Depending. If we cook it, of course we try to cook it as best as we can so that it has some flavor. But if the institution's in a lockdown or the officers are the ones cooking it, then you will have another section of the prison cooking the meal, which they put no seasoning. They just put the food as best as they can, cook it, and they pass it out.

Q. And did you guys have the opportunity to do some cooking in prison?

A. Yes.

Q. All right. Did the cell block get shaken down as a routine matter?

A. Yes.

Q. Describe how that would happen.

A. There's two different shakedowns. You have a cell-house shakedown and an institutional shakedown.

Q. And describe the institutional shakedown.

A. The institutional shakedown is when the institution basically gets a group of officers that are dressed in an

orange jumpsuit with shields and batons, and they come marching in into the cell house, two officers per cell, and they ask the inmate -- or tell the inmates to strip naked; then they go through their routine of shakedown, which they make you put your fingers inside your lip, stick your tongue out, wiggle it, behind your ears, fingers through your hair, lift up your private parts, turn around, raise your bottom of your feet, wiggle your toes, spread your butt cheeks, and then you got to cough and squat.

Q.  And then what would they do to your cells?

A.  And then they would go inside the cell and shake the cell down.

Q.  Did you have any sense of personal space while in prison?

A.  No personal space.

Q.  Switching topics.  Is prison dangerous?

A.  Very dangerous.

Q.  Describe the danger just very generally.

A.  Well, you got to have eyes behind your head.  You can't trust really no one in prison 'cause people have, you know, hidden agendas.

Q.  Are folks always on guard in the prison?

A.  Even the guards are on guard.

Q.  Okay.  Did you and Jacques come up with a special way to help manage that danger?

A.  Yes.  After a while of being around each other, we came up

with a -- I guess you could say a code, a whistle so that --

Q.  Okay.

A.  -- we could identify --

Q.  Explain to the jury --

A.  -- where we're at.

Q.  -- what it is.

A.  We started calling each other brothers while we was in prison, having the same name, Jacques Rivera, Juan Rivera, both J.R.s.  We became very close, started talking about our families and stuff like that.  And so that we could know that we weren't in danger and that we knew where we was at, we came up with a whistle, which is --

THE WITNESS:  Do you mind?

THE COURT:  No.

(Witness whistles.)

BY THE WITNESS:

A.  But it's a lot louder than that, you know, so that we could hear it through the whole institution, you could say, in the yard.

So I'll go whistle towards him and he would have to reply back with the same whistle to let me know that he's safe and he's okay.

BY MR. ART:

Q.  When -- what did that whistle represent to you guys while you were in prison?

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 385 of 1335 PageID #:105750
Juan Rivera - direct by Art
2561

A. Security.

Q. Okay. Let's talk about being an innocent person in prison. All right?

A. Okay.

Q. Tell us what the overriding feeling is for an innocent person who's waiting in prison.

A. Trapped. I mean, who can you tell that you're innocent when everybody in prison claims that they're innocent? So who's going to believe you?

Q. Did you ever have a sense that you and Jacques would see the outside of the prison?

A. No.

Q. And did that feeling subside at any time up to the moment when you guys actually were released?

A. No.

Q. Okay. Let me switch topics and ask you just to set the scene.

Was there a time that you left Stateville for a while?

A. Yes.

Q. And you had a second trial, correct?

A. Correct.

Q. What year was that?

A. I left in '97 and came back in '99.

Q. Okay. When you came back, did the whole prison know about your case?

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 386 of 1335 PageID #:105761
Juan Rivera - direct by Art
2562

A. Yes.

Q. Okay. And we're not going to talk about the details of your case, but after you returned, was it a while till you and Jacques got to reconnect?

A. Yes.

Q. Okay. Explain what caused that delay.

A. Again, when you leave an institution, you have to come back through orientation. That means they gotta make sure, you know, that you're not violent, that you're not, you know, doing anything that is unconducive to the institution, so they have to classify you again.

So I was in classification, which is outside of the unit. They classified me back into the unit into Stateville, and then from there, I went back to my working assignment.

Q. Okay. And at some point, did you have the opportunity to reconnect with Jacques?

A. Yes.

Q. And at that point, did he know about your case?

A. Yes.

Q. And after that, did you two talk to one another about being innocent in prison?

A. Yes.

Q. And did that become a shared part of your experience as well?

A. Yes.

Juan Rivera - direct by Art

2563

Q. Okay. Let's talk about legal representation.

Who represented you in your wrongful conviction case?

A. Northwestern, the Center of Conviction.

Q. Okay. And they came to represent Jacques as well?

A. Correct.

Q. Were you both represented by the same lawyer?

A. Yes.

Q. Okay. Tell the jury quickly about what happened in your case and how Jacques came to be represented full time by the Center on Wrongful Convictions.

A. Sure. After my third trial, I was convicted again for the third time. I went back to Stateville. And I had a legal visit with Jane Raley and Jennifer Linzer, and I requested of them to look into Jacques' case and that -- you know, to get him home, since I would never have a chance of going home, and that I would live my life through him.

Q. Okay. What do you remember happening next in Jacques' case?

A. He left. He went back to Cook County.

Q. And explain what you mean by he left.

A. He was granted a retrial. So, of course, everybody --

MS. GOLDEN: Objection.

BY THE WITNESS:

A. -- in prison --

THE COURT: I'm sorry?

MS. GOLDEN: Foundation.

MR. ART: Well, Your Honor, maybe I can just cut to the chase here. Okay?

THE COURT: Yeah. I think it's a lot of hearsay.

MR. ART: All right.

BY MR. ART:

Q. So describe how you found out that Jacques had been exonerated.

A. He --

MS. GOLDEN: Relevance.

BY THE WITNESS:

A. In the news.

THE COURT REPORTER: I'm sorry?

MS. GOLDEN: Relevance, how he found out about Jacques' release.

THE COURT: Overruled.

BY MR. ART:

Q. Okay. Where were you?

A. I was in my cell.

Q. And what did you see?

A. I saw Jacques on the TV with a -- I believe it was a Bears jacket coming out, you know, holding his mother, crying, you know, stepping out of Cook County Jail.

Q. Okay. How'd that make you feel?

A. Made me feel happy.

Juan Rivera - direct by Art

2565

Q. And did you continue your fight to get home?

A. Absolutely.

Q. What's the next thing that happened in the story of your relationship with Jacques?

A. I called Northwestern, and he was there. I got a chance to talk to him and see how he was doing, you know, how the family was doing and how his mom was doing. So I got a chance to actually talk to him and see how he felt.

Q. Okay. Did you eventually get released?

A. Yes.

Q. And remind the jury when you said you walked out.

A. I walked out on January 6th of 2012.

Q. And who was the first person you saw when you walked out?

A. Jacques.

Q. Okay. What'd you do next that day?

A. We -- after stepping out of the prison, we ended up at Northwestern, and there was, I guess you'd say, a welcome home party. You know, a lot of my family was there, friends, attorneys welcoming home. And I hear Jacob -- excuse me, Jacques whistling, you know, and, of course, I whistled back, and that was kind of like reconnecting again with my brother.

Q. Describe for the jury, just in general terms, what it feels like to be exonerated.

A. Scary. Unknown. You know, I mean, it's like an empty void. You got to start all over again. So you don't know what

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 390 of 1335 PageID #:105775
Juan Rivera - direct by Art
2566

to expect.

Q. Do you have any idea what life is going to be like once you got out?

A. No. I'm still trying to figure that out today.

Q. Okay. Had you forgotten what the world was like?

A. Yes.

Q. Describe how that struck you when you got out.

A. My niece, a nine-year-old girl, gives me a cell phone. I didn't know how to turn it on, so I had to ask her to turn on the phone for me, and then she showed me how to swipe it to the side in order for me to see the actual phone.

So just technology was very difficult. Everybody moves at a hundred miles an hour. There's no such thing as stopping and taking a break, so everything moves real fast. So that was nerve-wracking for me.

Q. What is the difference in the noise like when you come out of prison?

A. Well, you get accustomed to screaming, you know, the banging on the bars, TVs. Now you're out here in the free world, you hear shoes clanking on the sidewalks, the bell on a bike, you know, just different noises that we're not used to that we always wonder where it comes from now.

Q. Is it difficult to sleep in the dark?

A. Very difficult. I sleep with my TV on and my light on.

Q. Well, what about Jacques?

A. He does the exact same thing.

Q. Okay. Since your release, have you maintained a close relationship with him?

A. Yes. He lives with me.

Q. And why'd you guys decide to live together?

A. I mean, our mother passed away, so he was there to, you know, help his mother. So there was no reason for him to be where he was at, so -- it was more convenient and easier for him to move in with me.

Q. Okay. You have kids, correct?

A. Yes.

Q. Does Jacques have a relationship with your family?

A. Yes, he does.

Q. Describe that relationship.

A. My daughter calls for him before she even calls for me, so --

Q. All right. How many kids do you have?

A. I have two and one on the way.

Q. And does Jacques see them every day?

A. Every single day.

Q. And have you gotten close with his family as well?

A. Yes.

Q. Tell the jury some of the experiences you guys have shared since you've both been released from prison.

A. We've had barbecues together at the house, going to the

Juan Rivera - direct by Art

2568

park, just phone conversations, pictures. Just, you know, what normal family gatherings do.

Q. And do you do speaking events together?

A. Yes. We do a lot of speaking events together.

Q. Describe that a little bit.

A. I have a non-for-profit organization called Justice For Just Us, and I try to help the public understand our plight, our dilemma of, you know, being incarcerated for 20-plus years, not knowing the world and, you know, seeking help, you know, counselors, school, learning how to be a productive member of society. Those are things that it's very difficult for us.

Q. And has Jacques helped with that non-profit?

A. Yes, he has.

Q. In what ways?

A. He helps raise money, you know, so that we could help exonerees when they come home, medical, you know, help them get their driver's license, you know, walk them to a bus station. You know, a lot of us -- I still don't take public transportation. You know, so those kind of things we try to help them out.

Q. And you call Jacques "Jacob," right?

A. Yes.

Q. When did you start calling him Jacob?

A. From the very first time I actually met him, basically.

Q. Okay. Tell the jury some of the struggles you've seen

Jacob endure since his release.

A. A lot. I mean, the struggles of reconnecting with his kids. I mean, 20-plus years away from his three sons. His daughter was barely born, you know. So just trying to be a father to his kids, it's very difficult.

He lives in fear constantly. I mean, I had to put up an alarm, cameras and everything in my house because he wants every door, every window locked. So, I mean, those are the kind of struggles that he has.

Q. Okay. You mentioned his mom. Describe Jacques' relationship with his mom when he got out.

A. Very close. I mean, he moved in with her, you know, to help her with her illness, with her medical health and everything.

Q. Did he care for her after he was released?

A. Yes, he did for four -- I think over -- about four years.

Q. Okay. Did they have a chance to reconnect?

A. Yes, they did.

Q. And how long after his release did his mom pass?

A. I believe it was approximately four years.

Q. How did that affect Jacques?

A. Very hard. I was there, so I know how he -- how he was acting.

Q. Okay. Did Jacques lose another person who's important to him after his release?

A.  Yes.

Q.  And to you, too, right?

A.  Yes.

Q.  Describe that.

A.  Her name is Jane Raley.  She is the attorney that fought hard for our innocence, to provide -- and assist in court. Soon after, you know, she got us both out of prison, she was diagnosed with cancer and she passed away.

Q.  Okay.  And then just in general, describe for the jury how Jacques' wrongful conviction has affected him as a person, to the extent that you've observed it.

A.  He -- I mean, he's an overachiever.  He tries to be a regular civilian.  You know, he feels that everybody is looking at him, judging him, and he just wants to be a regular individual just living his life, working and being with his kids.  He's trying to be a good grandfather to his grandkids since he wasn't able to do that with his own kids.

Q.  Have you seen him work hard to learn how to function in the world?

A.  Yes.

Q.  And has he devoted himself to his job?

A.  Yes, he has.

Q.  And has he devoted himself to becoming a productive member of our society?

A.  Yes.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 395 of 1335 PageID #:105780
Juan Rivera - cross by Golden
2571

Q. Do you consider Jacques Rivera one of your good friends to this day?

A. Not just a friend. He's my brother.

MR. ART: That's all the questions I have. Thanks.

THE COURT: Cross-examination.

CROSS-EXAMINATION

BY MS. GOLDEN:

Q. Good afternoon.

A. Good afternoon.

Q. I think you said that you know him by Jacob, and you've always known him by Jacob?

A. Well, yeah. That's -- you don't learn people's real name while you're in prison that quick.

Q. And you met him in 1995 --

A. Correct.

Q. -- at Stateville?

A. Correct.

Q. Okay. And at the time, he was a member of the Latin Kings, correct, when you first met him?

A. Not that I'm aware of.

Q. Okay. Did you ever know him to belong to the Latin King organization?

A. Not at that time, no. Now.

Q. So I think we've heard testimony from Mr. Rivera that he gave up his membership in the Latin Kings in 1999, which would

Juan Rivera - cross by Golden

2572

have been four years after you first met him.

So are you saying that you don't remember him being a gang member in the first four years that you met him?

A.  Correct.

Q.  Okay.  And did you know him by a different name other than Jacob and Jacques?

A.  No.  Just Jacques.

Q.  So you never knew him by Ace?

A.  I mean, people called him Ace, but I knew him as Jacques.

Q.  Okay.  And Jacob, then?

A.  Jacob, correct.

Q.  But Jacob not until 1999 when he found God?

A.  Excuse me?

Q.  But Jacob -- he didn't go by Jacob until 1999 when he found God, right?

A.  No.

Q.  You knew him as Jacob even as far back as 1995?

A.  Yes.  That's what they were calling him then.

Q.  Well, Jacques told us that he took that name when he found religion in 1999.

Are you maybe confused about the timing of that?

A.  Could be, but I -- I don't know.  Maybe not.  I mean, that's part -- like, they call me Yajour, and I didn't found my religion until later.  It's just like attributes that you pick up.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 397 of 1335 PageID #:105782
Juan Rivera - cross by Golden
2573

Q. Okay. So, Mr. Rivera, would you agree that different people experience prison differently?

A. Of course. Everybody does it differently.

Q. And you, in particular, had to suffer some particular indignities due to the nature of the crime that you were wrongfully convicted of, correct?

MR. ART: Objection, Your Honor, relevance and opens the door.

THE COURT: I think that you objected, and I kept this out, so --

MS. GOLDEN: We've talked about -- well, this goes directly to his damages. He's testified in his deposition that due to the nature of the crime that he was convicted of, he had to -- he was viewed a certain way and had to --

THE COURT: It just -- you know, if you're going to do this, it's going to open the door, because you managed not to object and keep it -- and kept it out. So I -- you know, if you feel you need to go into this, we'll go into it.

MS. GOLDEN: All right. Let me think about it.

BY MS. GOLDEN:

Q. Now, I think you said on direct examination that you shared some visits with Jacques?

A. When -- not share in the sense that they came in together. We just happened -- they just happened to come in at the same day, and we sat next to each other.

Q. And were any of those visits with his daughter?

A. I can't recall.

Q. Okay. Do you -- would you be surprised to learn that she visited him twice in the ten years before he was released?

A. I wouldn't be surprised. I mean --

Q. Do you know how many times she visited him?

A. No, I do not.

Q. Do you know how many times his sons visited him?

A. No, I do not.

Q. And you were wrongfully convicted, right, sir?

A. Correct.

Q. Your situation with -- had nothing to do with Cook County or the Chicago Police Department or any of the officers that are here, correct?

A. Not that I'm aware of.

Q. And in the time -- now -- and so now it sounds like Jacques' doing pretty well, right?

A. I don't know about pretty well, but --

Q. He has a job at Northwestern that he loves?

A. Yes.

Q. Are you still working at Northwestern?

A. No, I do not.

Q. Okay. He likes working by the lake, I think? Is that true?

A. Yes.

Q. He has a health -- does he have a girlfriend?

A. Yes.

Q. Okay. Has he had more than one girlfriend in the time that you've known him since his release?

A. Yeah, one other girlfriend prior to the one he has now.

Q. He goes to family parties. You guys go to the park. You go to the beach?

A. Yes.

Q. Okay. And he spends time with his children?

A. Yes.

Q. And your grandchildren, did I hear you say?

A. No. His grandchildren.

Q. His grandchildren.

A. Yes.

Q. Okay. Your children?

A. Right.

Q. Okay. How many grandkids does he have?

A. I think two, about to have another one.

Q. One on the way, I think?

A. Excuse me?

Q. One on the way?

A. Yes.

Q. Okay. And you have shared a lot with him. You've shared the wrongful conviction experience, right?

A. Correct.

Juan Rivera - cross by Golden

2576

Q. Shared the same lawyers?

A. Yes.

Q. And I think you had 32 lawyers working on your case at some point, right?

A. I'm pretty sure it was a lot.

Q. It was a lot, right? Law students, lawyers, different firms, different organizations?

A. Correct.

Q. And you share the same name.

A. Yes.

Q. And you live together.

A. Yes.

Q. Okay. And in all of that time, has he ever discussed with you what his life was like before he went to jail?

A. No.

Q. You have no idea how -- what his home life was like or how he treated his family before he went to jail?

A. No.

MS. GOLDEN: That's it.

THE COURT: Anything further?

MR. ART: Nothing further, Your Honor.

THE COURT: Thank you, sir. You may step down.

THE WITNESS: Thank you.

(Witness excused.)

THE COURT: All right. Let's press onward.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 401 of 1335 PageID #:105786
O'Brien - direct by Loevy
2577

MR. LOEVY: We'll call Darren O'Brien.

Can you get him, Joe? Thanks.

(Witness enters.)

THE COURT: Sir, could you come up here, please. Please raise your right hand.

(Witness duly sworn.)

THE COURT: Please be seated.

DARREN O'BRIEN, PLAINTIFF'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. LOEVY:

Q. All right, sir. If you'd state your name, please.

A. Darren O'Brien.

Q. And you are an attorney?

A. I am.

Q. And you spent the vast majority of your legal career with the State's Attorney's Office, correct?

A. I did until I retired and became a defense attorney the last five years.

Q. All right. And I want to focus the time you were in the State's Attorney's Office when you worked of about -- for five years in the Post-Conviction Unit.

A. Yes.

Q. So when people were in prison, after their appeals were exhausted, sometimes they would file petitions saying that they were innocent, and they wanted you, the state's attorney, to

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 402 of 1335 PageID #:105787
O'Brien - direct by Loevy
2578

take a look and see if there's something that could be done about their conviction, correct?

A.   In general.

Q.   And hundreds of those people over the five years you did that made arguments and presented evidence that they were innocent, correct?

A.   Probably.  That's probably a good number.

Q.   And your job, you were primarily responsible for investigating, looking at those, and deciding what the State's position was going to be, correct?

A.   In post -- doing post-convictions, there was many different claims all the time, so I wasn't limited to actual innocence as a claim.

Q.   Well, I'm asking you about the actual innocence ones.

You were the guy whose job it was to decide what the State's position was going to be, right?

A.   Sometimes.

Q.   All right.  And in all of those hundreds of petitions, you never did find one petition that got filed where you thought that an injustice had happened and somebody should be released, correct?

A.   No.  I thought Thaddeus Jimenez should be released.  I worked on that case.  And he was wrongfully convicted, and I recommended that he be released, and he was released.

Q.   All right.  I was going to get to that.  Because he didn't

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 403 of 1335 PageID #:105788
O'Brien - direct by Loevy
2579

file a petition, did he?

A. You know, I'm not sure.

Q. All right. Well, he didn't file a petition.

Now, let's talk about Mr. Jimenez for a minute. That was a guy that Northwestern represented, correct?

A. Stuart Chanin, I think, was his lawyer.

MS. ROSEN: Objection, Judge.

MR. POLICK: Objection to the relevance, Judge.

BY THE WITNESS:

A. But I'm not sure, I'm not sure.

THE COURT: Well -- you --

BY MR. LOEVY:

Q. All right. We don't have to talk about the *Jimenez* case.

THE COURT: All right.

BY MR. LOEVY:

Q. I'm talking about the ones where people filed petitions and you had to review them. Fair to say you took a very skeptical view of people claiming that they were innocent, correct?

A. No, that's not --

Q. Well --

A. -- correct. I took a -- I took a view that I would look at it and draw a conclusion based upon what the evidence was.

Q. All right. But the evidence, in your view, in those five years never did support a claim that somebody was innocent?

A. I don't remember if I ever concluded someone was innocent.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 404 of 1335 PageID #:105789
O'Brien - direct by Loevy
2580

I might have, but I might not have.

Q. So in those five years, you can't -- I mean, don't you think it would come to your mind if you had thought somebody was innocent? I mean, you did remember Mr. Jimenez.

A. I do remember Mr. Jimenez because he --

Q. Yeah. Because that was the only time --

A. -- testified for you on that case, as I recall.

Q. Because that was the only time you ever found somebody innocent, right?

A. No, I don't think so.

Q. All right. Ms. Raley brought you Jacques Rivera's case, correct?

A. Yes.

Q. And she asked you to take a look at it?

A. She did.

Q. And she made her client available for interview, correct?

A. She did.

Q. And then she also told you about a witness in Ohio that was named Orlando Lopez, correct?

A. She did.

Q. And you went and interviewed Orlando Lopez, correct?

A. I did.

MS. ROSEN: Judge, I'm going to object to the leading.

THE COURT: Sustained.

MR. LOEVY: Well, this is an adverse witness, Your

Honor.

THE COURT: Oh, okay.

MS. ROSEN: Well --

MR. LOEVY: I'm calling him an adverse witness.

MR. POLICK: Well, how is he adverse?

MS. ROSEN: How is he adverse?

THE COURT: Well --

MR. LOEVY: Should I establish it?

THE COURT: Yeah, why don't you establish a foundation for that.

MR. LOEVY: All right.

BY MR. LOEVY:

Q. Sir, when it came time for Mr. Rivera's post-conviction to be decided on, you took the position he should remain in prison, right?

A. Ultimately, I took the position that he should remain in prison.

MR. LOEVY: All right. So that's pretty adverse, Your Honor.

MR. POLICK: Judge --

MS. ROSEN: I --

MR. SOTOS: Objection. Nobody's contesting Mr. Rivera's innocence in this case.

MR. LOEVY: Well, he is.

THE COURT: Well, the question is whether the

examination can proceed as with an adverse witness, and I think there's an adequate foundation.

BY MR. LOEVY:

Q. All right. So when you went and talked to Orlando Lopez -- I'm going to show you --

MR. LOEVY: If I could have the Elmo, please --

BY MR. LOEVY:

Q. This is Plaintiff's Exhibit 12. I'll represent to you these are notes that were taken of a witness, Orlando Lopez, back on either the 27th or the 28th of August, depending on which date is correct.

A. Uh-huh.

Q. And his account was he was by the store when a car came through a stop and then a shooting happened.

Do you see that there?

A. I see that's written on the GPR, yes.

Q. All right. Did you know when you went to talk to Orlando Lopez that his original version was that he had been by the store?

A. I don't remember.

Q. All right. You did ask Orlando Lopez a series of questions, correct?

A. Yes.

Q. And he talked to you voluntarily, correct?

A. Yes.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 407 of 1335 PageID #:105792
O'Brien - direct by Loevy
2583

Q. And you took -- you were with an investigator, right?

A. Yes.

Q. Do you remember the investigator's name?

A. Tom -- I was with Tom McGreal, and I was with -- Mr. Lopez's lawyer was also there.

Q. All right. And you guys created an investigative report, correct?

A. Mr. McGreal wrote the report, yes.

Q. Do you have a copy up there with you?

A. I don't.

MR. LOEVY: All right. May I approach, Your Honor?

THE COURT: You may.

MR. LOEVY: This is Defendants' Trial Exhibit 130. So I'll --

THE WITNESS: Thanks.

MR. LOEVY: -- also put it up. Sure.

And, Your Honor, if this is not in evidence, we'd move it into evidence.

THE COURT: Any objection?

MR. POLICK: No objection, Your Honor.

THE COURT: It is received.

(Said Defense Exhibit 130 received in evidence.)

BY MR. LOEVY:

Q. All right. This is the investigative report we've been speaking about, correct?

A.  Yes.

Q.  I want to focus you to the bottom here.  Just to summarize, on -- this shows the date that this interview took place, right?

A.  Yes.

Q.  In the presence of the witness' attorney, Stephanie Adams, right?

A.  Yes.

Q.  All right.  Turning to the next page.  The idea was you guys introduced yourself and requested an interview of him about Jacques Rivera, the offender, right?

A.  Yes.

Q.  Now, there were no attorneys for Mr. Rivera present, correct?

A.  No.

Q.  Just you --

A.  I mean, yes, that you're correct.

Q.  Yeah, that's the -- all right.

Do you remember what Mr. Lopez told you about where he was when the shooting happened?

A.  In general, yes.

Q.  Okay.  What was -- I'll show you a map here, and let's see if we can -- when you went to interview Mr. Lopez, what did he -- where did he tell you -- and I'll orient you.  Here's the store at the corner of Kimball --

A. Uh-huh.

Q. -- and Cortland. Do you see that?

A. Yes.

Q. And this is the alley (indicating) where the car was, where the victim was shot.

A. Uh-huh.

Q. And do you remember anything else about this? Let me ask you from your memory. And you reviewed documents, I take it?

A. Before I interviewed him?

Q. No. Before today, have you --

A. Yeah. Yes, I did. I reviewed some documents.

Q. So you've reacquainted yourself with the facts of the case, right?

A. Yes.

Q. All right. And what was the -- the shooter's car came up through this alley (indicating) and parked about here somewhere (indicating)?

A. I know nearby, but I don't remember.

Q. All right. What is your understanding -- when you talked to Orlando Lopez in Cleveland, where did he tell you he was when the shooting started?

A. I believe he told me he came out of the building --

Q. The doorway here (indicating)?

A. Somewhere there. And then he was hiding in a nook. There was a little niche or something that he was hiding in. And

that the shooting took place -- initially at least began when he -- that's where he was.

Q. And then where did he go after that, once the shooting started?

A. According to what he told me when I interviewed him or --

Q. Yeah, no.

A. -- according to what he said initially?

Q. When you interviewed him, sir.

A. What's that?

Q. When you interviewed him. All these questions are about when you sat down with him in Cleveland. You asked him to tell you his story.

He went from the nook to where?

A. He ran across the street to a store and then returned.

Q. All right. Where in the report does it -- let's show you the report. I don't see it says "return."

Let's just take a look at what you wrote. "When the shooting began, the offender had his back turned towards Orlando."

A. Uh-huh.

Q. "Orlando said he ran to a nearby store once the shooting began. He asked the person in the store to call the police, but the person did not believe anyone was shot."

He told you this, right?

A. Say it again?

Q. He told you the things that are written on this page, right?

A. Yes.

Q. That's why you guys wrote them down, right?

A. Yeah, yeah, uh-huh.

Q. All right. "Orlando speculated that the person could not hear the gunshots." He told you --

A. Uh-huh.

Q. -- that, right?

A. Yes.

Q. Then Orlando told you he bought some stuff at the store for his mother and then went outside, right?

A. Right.

Q. Are you sure you got that fact right?

A. Am I sure that he told me that or did I --

Q. Yeah.

A. -- am I -- do I believe it?

Q. No, no. The question is -- you wouldn't have written down that unless Orlando Lopez said, "Yeah. When I was in the store, I bought some stuff," right?

A. My investigator would not have written it down unless he said that.

Q. All right. Then he said the shooting was still occurring when he exited, right?

A. Right.

Q. So he ran -- and then the offender got back into the car, exited the car, and drove eastbound toward Latin King, right?

A. Yes.

Q. All right. So the story he told you was he came out of his house, he saw a shooting and hid, ran to the store and then watched the car drive away?

A. No. He ran back.

Q. No, I didn't see that in there. Maybe I missed it.

Is it in here, sir?

A. No, it may not be in there, but that's what he -- that's what he told me, and that's what he did.

Q. Well, sir, if he ran back, you would have written that down, right? If he told you that?

A. No.

MS. ROSEN: Objection, Judge.

BY THE WITNESS:

A. I mean --

MS. ROSEN: He didn't write this report.

BY THE WITNESS:

A. It's -- it --

THE COURT: You know, we're kind of -- this is just clarification. Let's --

MR. LOEVY: All right. Maybe ask some foundation questions.

THE COURT: Yeah.

BY MR. LOEVY:

Q.  As the state's attorney looking at a case, it's extremely important to get the information correct, right?

A.  Sure.

Q.  And you took that very seriously?

A.  Of course.

Q.  So did your investigator, right?

A.  I would presume.  He was an investigator for a long time.

Q.  He's good at what he did, Mr. McGreal?

A.  Yeah, yes.

Q.  And he probably would have been operating off notes and then typed up the report, right?

A.  Probably.

Q.  All right.  So do you have any doubt that -- were you guys asking open-ended questions, leading questions?  How did this go down?

A.  More open-ended questions.  Because at that point, it wasn't an adversarial situation.  I was trying to find out what the truth was --

Q.  All right.

A.  -- and so I was trying to let him explain it.

Q.  And when you were trying to find out the truth and let him explain it, what he told you was he ran to the store and then saw the car drive away, right?

A.  No.  He told me that he went back and then saw the car

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 414 of 1335 PageID #:105799
O'Brien - direct by Loevy
2590

drive away.

Q. Okay. This was eight years ago, this interview, right?

A. Uh-huh.

Q. Correct?

A. Yeah.

Q. Okay. Are you claiming to have an independent memory that although it's not written on the page anywhere that he ran back from the store, you remembered him telling you that?

A. I remember that he told me that, but I also read it somewhere when I was reviewing some of the documents.

Q. Where?

A. I don't remember where, but --

Q. Is it fair to say he told a lot of different stories at a lot of different times?

A. Oh, yes.

Q. All right. So you are not claiming that this is not what he told you on that day in 2010 that he saw it from the store? You're not denying that, right?

A. I'm telling you that he told me when he came out of the store, he went back towards the -- where the shooting was taking place.

So if that's your question, yes, I am claiming that he told me that.

Q. All right. But you acknowledge -- take your time. You acknowledge you didn't write that down -- or McGreal didn't

write that down in 2010?

A.  I acknowledge his return to the shooting scene is not in this report.

Q.  All right.  Would you acknowledge that that's an extremely important fact -- if he's going to -- if he's going to come out of the house, see the guy's back -- are you with me?

A.  Uh-huh.

Q.  He's going to say, "I only saw his back.  I ran to the store.  And I didn't see his face till I ran back from the store," running back to the store would be an important fact, right?

A.  Yeah, that's not what he said, though.  What he said was that he saw the shooter running up on the car when he first came out of the house.  At the time the shooting started, the shooter's back was facing towards him, but he saw the face before then.  Then he went to the store.  And when he came back out, he saw the face again when he returned.  That's what he told me.

Q.  That's -- you're going from memory there?

A.  I'm going from memory and from the other things that I read in preparation for testifying.

Q.  Actually, did you read his criminal testimony?

A.  At the original trial?

Q.  Yeah.

A.  No.

Q. He actually said, "I didn't see his face -- I saw him from behind -- until I ran back from the store," correct?

A. I didn't read his -- I didn't read his criminal trial. I know that in something I read recently, and my recollection of him talking to me, was he said he saw the face initially as the shooter ran up on the deceased person's car. Then when the shooting started, at that point, the shooter's back was to him. He then ran away and returned. When he returned, he saw the face again.

Q. All right. He didn't say that at the PC hearing either, did he?

A. You know, I don't remember where I read that he said it. It's in there somewhere, but I don't remember where I read it.

Q. All right. He didn't say it at the PC hearing, he didn't say it at the criminal trial, and he didn't say it at your interview. So where did he say it?

A. You know, if you want to give me all the documents and let me fish through them, I'll fish through them, where I saw that, but I also remember that he told me that. And --

Q. All right.

A. So --

Q. And that's really why you create records like this, so that eight years later, you'll have a record of what happened, right?

A. So -- oh, of course. That's one reason, sure.

Q. All right. You are not claiming to be someone without bias in this proceeding, correct?

A. I have no bias in this proceeding.

Q. You're not more closely aligned with the police table than this table (indicating)?

A. What do you mean more closely aligned? They subpoenaed me, so I guess in that sense that, yes, I'm a lot more aligned with them.

Q. Mr. Bowman, for example, brought a lawsuit against you, correct?

A. He did.

        MS. ROSEN: Objection.

        MR. POLICK: Objection to the relevance.

        MR. LOEVY: It goes to bias, Your Honor.

        THE COURT: Overruled.

BY MR. LOEVY:

Q. He alleged -- made serious allegations against you in your handling of evidence in the *Kochman* case, correct?

A. He did.

        MS. ROSEN: Objection --

        MR. POLICK: Objection --

        MS. ROSEN: -- Judge.

        MR. POLICK: -- Judge. Objection.

        THE COURT: Or maybe we should have a sidebar.

        MR. LOEVY: All right.

THE COURT: I thought that counsel had reached an agreement about the scope of this examination.

(Proceedings heard at sidebar on the record:)

MR. LOEVY: Your Honor --

THE COURT REPORTER: Hold on, hold on.

MR. LOEVY: Sorry.

THE COURT: Let me start by asking, what's the point of all this?

MR. LOEVY: The scope of the examination is impeachment, as represented. Now he's fighting me.

THE COURT: I know, but why --

MR. LOEVY: I'm establishing bias.

THE COURT: -- are we doing this?

MR. LOEVY: Because he has bias. He's trying to say --

THE COURT: Yeah, no, no, no. But why do we care if he's on the street or here? I mean, I don't understand --

MR. LOEVY: Well, Your Honor, I guess -- you know, it's very important to us that he -- he never came back from the store, and I'm a little --

THE COURT: Oh.

MR. LOEVY: He said he never came --

THE COURT: That's the point?

MR. LOEVY: Yes.

THE COURT: That's the point of this whole

examination?

MR. LOEVY: Well, impeaching, among other things. That's a pretty big impeachment.

THE COURT: No. I want to know, when we're in day 10 or whatever we are, why we're screwing around like this.

(Court drops item, counsel bumps court reporter's machine.)

THE COURT REPORTER: Hold on.

MR. SOTOS: Sorry.

THE COURT: No, I could -- don't worry about it.

MR. LOEVY: I got it.

THE COURT: I got it.

MR. SOTOS: I'm already there.

MR. LOEVY: All right. Your Honor --

THE COURT: Why would --

MR. LOEVY: -- we would like to establish --

THE COURT: Why are we messing around with this witness?

MR. LOEVY: We would like to establish bias. He also represented Guevara's co-defendant.

THE COURT: But bias for what? What's the --

MR. LOEVY: He --

THE COURT: -- relevance for his bias?

MR. LOEVY: He just said -- the thing that I'm trying to impeach him on, he said, "Although it's not in this report, I remember" --

THE COURT: Yeah, I know that.

MR. LOEVY: -- "eight years later."

THE COURT: I know you're having a great time impeaching him, but why?

MR. LOEVY: Because I would like to show that he is not disinterested. He just gave testimony --

THE COURT: Yeah, yeah --

MR. LOEVY: -- that's bad for me.

THE COURT: -- yeah, but --

MR. POLICK: He said that.

THE COURT: But there are probably six people we could get on the street who are not disinterested, and we don't have them on the witness stand.

MR. LOEVY: Well --

THE COURT: I'm asking you a more fundamental question. What is this about?

MR. LOEVY: Well, I'll try to -- he said --

MR. POLICK: Judge --

MR. LOEVY: -- "Although my report is bad for me, I remember that my report is bad for you." And I said, "Well, you're biased," and I don't have to do --

THE COURT: Is he going to testify that the Certificate of Innocence was wrong?

MR. LOEVY: He fought the Certificate of Innocence. He fought --

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 421 of 1335 PageID #:105806
O'Brien - direct by Loevy
2597

THE COURT:  I know that, I know that, I know that.

MR. LOEVY:  He's not, no.

THE COURT:  But who cares?

MR. LOEVY:  Well, what I would like to ask him -- and I'll move off *Kochman*.  What I'd like to ask him is -- he represented a police officer who was basically a defendant with Guevara.  So he is not a disinterested person.  He represents --

MS. ROSEN:  Who?  Who?

MR. POLICK:  Who is that?

THE COURT:  Listen, listen --

MR. LOEVY:  -- Thomas Wojcik.

THE COURT:  Listen, Mr. Loevy, I buy that he's interested, that he's adverse, I buy all of that, but I don't understand why we're listening to him.

MR. LOEVY:  Because it's bias.  He just tried to tank the impeachment I did by saying --

THE COURT:  Yeah.  But why did you even bother calling him?

MR. LOEVY:  Because he impeaches Orlando Lopez.  He says Orlando Lopez told him he's by the store.

MR. SOTOS:  Could I say something, Judge?

THE COURT:  Oh.

MR. SOTOS:  Can I say something?

MR. LOEVY:  Orlando Lopez --

THE COURT: This whole --

MR. LOEVY: -- never went back.

THE COURT: The whole -- wait a minute. The whole point of this is to show that Orlando Lopez is inconsistent?

MR. LOEVY: Yeah. He's lying. That, you know, he says, "I saw that gang book" --

MR. SOTOS: Can I --

THE COURT: Yeah. All right. I get if --

MR. LOEVY: It's really --

THE COURT: -- that's the point.

MR. LOEVY: -- important. It's really important.

THE COURT: No, I get it. I don't know why you're doing it, but I get it.

Go ahead.

MR. SOTOS: Except, of course, that we're not saying that Orlando Lopez was telling the truth. We're not contesting Mr. Rivera's innocence.

And that was a really high-profile case he just injected into this case --

THE COURT: Oh, I never --

MR. SOTOS: -- by mentioning it by name.

THE COURT: -- even heard of it --

MR. SOTOS: *Kochman*, Judge.

THE COURT: -- and I don't even think they heard of it either.

MR. POLICK:  It was all over --

MS. ROSEN:  *Kochman*?

MR. POLICK:  -- this courthouse.

THE COURT:  No.

MR. SOTOS:  Judge, you remember --

MR. POLICK:  In front of Judge Pallmeyer.

MR. SOTOS:  -- the *Kochman* case.

THE COURT:  I have not.  But anyway, I don't care, and I don't think they have either, so --

MR. POLICK:  I don't know --

MR. LOEVY:  Well, I would like to --

MR. POLICK:  I don't know that.

MR. LOEVY:  I'll move on --

THE COURT:  Could we do something?

MR. LOEVY:  I want to ask him --

THE COURT:  Could we just talk --

MR. LOEVY:  He represented Guevara's --

THE COURT REPORTER:  Wait.  One at a time, please.

MR. LOEVY:  -- co-defendant.  Sorry.

THE COURT:  Could we talk about what we're going to do with this and if we're going to be here with him for a week? Because I don't get it.

MR. LOEVY:  I would like to ask him, "Isn't it true you represented a police officer who was a co-defendant with Guevara in at least a half dozen cases?"

THE COURT: What does that have to do with this case?

MR. LOEVY: Because he's -- he says it's connected to Guevara. He is connected to Guevara. A guy named Thomas Wojcik is accused --

THE COURT: But, but --

MR. LOEVY: -- of framing people --

THE COURT: But what are you --

MR. LOEVY: -- with Guevara.

THE COURT: -- trying to prove? Maybe he'll admit what you want him to prove.

MR. LOEVY: I asked him, "Isn't it true you're not disinterested?" He said, "I am disinterested. I have no bias either way. I have no dog in the fight." That is not true. He represents a police officer.

THE COURT: Well, you can't -- I tell you -- I'm tired of talking about this. You can't just --

MR. LOEVY: All right.

THE COURT: -- call a witness to show that he's a liar. You could do that. Okay? But that's no good reason to be wasting our time.

MR. LOEVY: Then I'll move on, Your Honor.

THE COURT: You got to have some reason for calling him.

MR. LOEVY: Well, the impeachment is a good reason. We'll see how that exam goes. I may re-raise that we'd like to

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 425 of 1335 PageID #:105815
O'Brien - direct by Loevy
2601

show his bias.  I will move on.

THE COURT:  Okay.  I don't --

MR. LOEVY:  I hear what you're saying.

THE COURT:  -- understand why he's here other than to impeach Orlando Lopez.

MR. LOEVY:  That's basically it.

THE COURT:  And that ought to be a ten-minute examination.

MR. LOEVY:  It is.

THE COURT:  All right.

MR. GIVEN:  Judge, is -- I'm sorry.

THE COURT:  What?

MR. GIVEN:  Is he going to be allowed to ask about representing some co-defendant in some --

MR. LOEVY:  I understood --

MR. GIVEN:  -- other cases?

MR. LOEVY:  -- your ruling, that I'm going to move on.

THE COURT:  Yeah, let's move on.

MR. GIVEN:  Okay.  I wanted to be clear.

(End of proceedings at sidebar.)

BY MR. LOEVY:

Q.  All right, sir.  When you went to interview Orlando Lopez, you knew that where Orlando Lopez was when the shooting ended was an important fact in the case, right?

A.  Sure.  I mean, I was looking to try to see whether I or not

Mr. Rivera -- whether I thought Mr. Rivera was innocent, so I wanted to know everything about what Orlando Lopez had to say.

Q. Because Orlando Lopez was the case against --

A. Yeah, right.

Q. And if he was, in fact, 219 feet away, that's pretty far, right?

A. Yes.

Q. All right. So you and your investigator must have focused on, "Where were you when the shooting ended," right?

A. We discussed the whole procedure -- the whole shooting, so before, during, and after.

Q. All right. Is this report a typo (indicating)?

A. No, I don't see a typo in there, but --

Q. So it's accurate?

A. -- direct me -- direct me where you're showing me.

Q. Is this report -- you've now had a chance to review it. Is this an accurate summary that what he told you was the shooting was occurring, and he never ran back -- he was by the store, and there's no explanation about coming back from the store? Is that accurate?

A. Because that's two different questions you asked me.

So it's accurate for what's in there, but I'm telling you, he told me he ran back.

Q. All right.

A. And it's written somewhere else, too, so --

Q. Okay. Where else is it written, sir?

A. I -- you know what? You want --

Q. Anywhere else. Anywhere. Anywhere in the universe.

A. It's written in reports in this case that he went back, that he came back. I just don't remember which document.

As I said, if you want to give them to me and let me look at them, I'll look at them.

Q. There's no contemporaneous document from 1988 that says he ran back, correct?

A. You know, it's been eight -- it's been -- that's 30 years ago, and this is 8 years ago, so -- I don't know the answer to that question. I'm telling you what I remember, though.

Q. He did also tell you that he believed he -- well, he didn't believe. He said he was in two lineups, right?

A. He did.

Q. And he said he made picks at both lineups, right?

A. He said he identified Mr. Rivera in both lineups.

Q. He said he made picks at both lineups, right?

A. He said he identified Mr. Rivera in both lineups.

Q. And then you went back and investigated and discovered that wait a minute, there's only one time the police say he identified Rivera, right?

A. There's only one time the police say it, and there's only one time I believe that it was actually a lineup that was completed.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 428 of 1335 PageID #:105818
O'Brien - direct by Loevy
2604

Q. Leaving aside your belief, though --

A. Uh-huh.

Q. -- the police were claiming he only I.D.'d him once and that the first time they actually didn't do a lineup. That was what the police were saying, right?

A. I don't know if I would call it the first time. Mr. Lopez said that he looked at two lineups. There was an attempted lineup to be run by the police where they couldn't find Mr. Lopez.

I don't know if Mr. Lopez is referring to that as the first lineup. Wouldn't seem so since Mr. Lopez wasn't there. But maybe that's what he's talking about. So --

Q. You said Mr. Lopez wasn't there?

A. No. They couldn't find -- the first lineup the police attempted, they couldn't find Mr. Lopez.

Q. That's what the police said, right?

A. Yes, right.

Q. Okay. But Mr. Lopez said, "Actually, I was there, and I made a pick," right?

A. That he was there at some time. Whether that's the same date or the same circumstance, I don't know. But Mr. Lopez did say that he was present for two lineups and identified Mr. Rivera both times.

Q. All right. And Mr. Lopez was very clear he didn't want to accuse any police officers of anything, right?

A.  Repeatedly, he has --

Q.  He did not want --

A.  -- always said --

Q.  -- any trouble?

A.  -- this was on --

MR. DAFFADA:  Objection.

BY THE WITNESS:

A.  -- him, not on the police.

MR. DAFFADA:  Your Honor --

THE COURT:  Wait.  You know, why do we have three people talking at once?  Yes.  What do you want to say?

MR. DAFFADA:  Let the witness answer.  He's talking over him.

THE COURT:  All right.  Could you let the --

MR. LOEVY:  Sure.

THE COURT:  -- witness answer?

BY MR. LOEVY:

Q.  Sir, Mr. Lopez made very clear to you that he in no way or any shape or form wanted to have any problem with any police.  That's what he was saying, like they didn't do anything?

MS. ROSEN:  Objection.

MR. POLICK:  Objection.

BY THE WITNESS:

A.  Well, again, it --

MR. POLICK:  Form of the question.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 430 of 1335 PageID #:105815
O'Brien - direct by Loevy
2606

THE COURT: Hold on. What's the objection?

MS. ROSEN: The form of the question, problem with any police.

MR. LOEVY: I'll try to ask it better, Your Honor.

BY MR. LOEVY:

Q. When you talked to Mr. Lopez, you got the distinct impression he was trying very hard not to create any problems for himself by accusing police officers of anything, right?

A. No, I got --

MS. ROSEN: Objection.

MR. POLICK: Objection.

BY THE WITNESS:

A. -- no such impression.

MR. POLICK: As to what Mr. Lopez was trying to do.

THE COURT: You know, that's a perfectly -- overruled. That's a perfectly fine question.

BY THE WITNESS:

A. I had no such impression. My impression was that Mr. Lopez felt bad about this, and he wanted to make it clear that this was on him.

Every time he talked about it, he said over and over, "The police didn't force me. The police didn't coerce me. This is my fault. This is what I did," in general, not so many of those words. So I never concluded that he was worried about, you know, taking a shot at the police. I just wanted --

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 431 of 1335 PageID #:105816
O'Brien - direct by Loevy
2607

I believe he wanted me to understand this was on him.

BY MR. LOEVY:

Q. All right. Sir, he did --

A. That's what I understood.

Q. -- tell you he told the police, "You got the wrong guy," right?

MS. ROSEN: It's not --

MR. DAFFADA: Let him finish.

THE COURT: You know --

MR. LOEVY: I think the witness was finished, Your Honor.

THE COURT: He was finished. I think the court reporter will tell us if she can't get the answer.

MR. LOEVY: I mean, that was a pretty long answer.

THE COURT: Go ahead.

MR. LOEVY: All right.

THE COURT: Ask a question.

BY MR. LOEVY:

Q. He did tell you he told the police they had the wrong guy, right?

A. He told me that he told a lady who might be the police that they had the wrong guy. He's made statements to other people that he told --

Q. Let's focus on you.

THE COURT: Don't interrupt.

MR. LOEVY: I mean, he's making statements to other people.

THE COURT: Yeah, but you can't --

MR. LOEVY: All right.

THE COURT: -- interrupt him. I'm going to have to deal with this chaos --

MR. LOEVY: Fair enough.

THE COURT: -- if you do that.

BY THE WITNESS:

A. He's made statements that he told a plain-clothes police officer and a lady who might be the police or a lawyer, but me he said he told the lady.

BY MR. LOEVY:

Q. All right. And so when you said it was on him, on him, on him, he did tell you, "When I was 12 years old, I tried to make it stop by telling the police they had the wrong guy"? He did tell you that, right?

A. By telling the lady he had the wrong guy. He's never said the lady was the police --

Q. All right.

A. -- to me, so --

Q. He said -- I thought you said it was a plain-clothes cop.

A. No, no. In other places, he said he told a blonde-haired lady, who had white in her hair, and someone who was a plain-clothes -- who he -- was a plain-clothes -- clothed cop

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 433 of 1335 PageID #:105813
O'Brien - cross by Polick
2609

that it was wrong guy.  But he didn't say anything about that cop to me.

MR. LOEVY:  All right.  I -- may I have a moment, Your Honor?

THE COURT:  Yep.

(Counsel conferring.)

MR. LOEVY:  We're done.  Thank you, Your Honor.

THE COURT:  Cross.

CROSS-EXAMINATION

BY MR. POLICK:

Q.  Mr. O'Brien, you mentioned that you would -- were employed with the State's Attorney's Office for a number of years, correct?

A.  I was.

Q.  And what year were you assigned to Mr. Rivera's post-conviction?

A.  Well, 2010 for the -- but the post-conviction petition wasn't filed till the end of 2010.  So I had involvement with the review of Mr. Rivera's innocence, we'll call it, from probably the fall of 2010 until the end of 2010.

At some point thereafter, Mr. Rivera's lawyers filed a post-conviction petition.  So the period of time of post-conviction, the fall of 2010, but the actual petition itself I don't think was filed till like -- the initial petition till like the end of December 2010 and then the final

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 434 of 1335 PageID #:105819
O'Brien - cross by Polick
2610

petition until February of 2011, if that answers your question.

Q. So when you were assigned to the case, your role in the Post-Conviction Unit, were you new to that unit?

A. Relatively new.

Q. Okay. How many years did you work in the State's Attorney's Office prior to being assigned to that particular unit?

A. 25, maybe.

Q. Okay. And were you in the Post-Conviction Unit up until the time that you retired or left the State's Attorney's Office?

A. From that 26th year on, yes.

Q. Okay. So what you're telling us, in 2010 when you got assigned to the case, there's nothing pending before the court as far as a petition, correct?

A. Right. What happened was --

Q. So what you're trying to do is reinvestigate the case at this stage?

A. Re-review the case at that stage, yes.

Q. Okay. Now, had you worked on any aspect of Mr. Rivera's criminal case --

A. No.

Q. -- prior to this?

A. No.

Q. Okay. You weren't involved in his criminal trial?

A. No.

Q. You weren't involved in any of his direct appeals?

A. No.

Q. Okay. So you're reinvestigating the case, and as part of that investigation, did you attempt to locate the state's attorney's original file of the criminal case?

A. I did.

Q. And what did you do to locate that?

A. Called their file room several times. They couldn't find it. I went to the file room and looked for it. Couldn't find it. And in the end, had to try to recreate the file, what would have been the file that was used during the prosecution way back when.

Q. And at the time that you eventually left the State's Attorney's Office and went into private practice, had that original file from the criminal trial of Mr. Rivera ever been located?

A. Not as far as I know, but --

Q. Now, in terms of your reinvestigation of the case, did you become aware that Mr. Rivera was represented by Mr. Wadas at the time of the criminal trial?

A. Yes.

Q. Okay. And Judge Wadas worked in the same building you did?

A. He did.

Q. Okay. As part of your reinvestigation of the case, did you

speak to Mr. Wadas or Judge Wadas?

A. Yes.

Q. And do you recall what year that would have been?

A. 2010.

Q. Okay. And where did that conversation take place?

A. In his chambers.

Q. Okay. And did you inquire whether he had a file --

A. Yes.

Q. -- regarding this matter?

A. Yes.

Q. Okay. And did you take a copy of that file?

A. No. I asked him if I could have a copy. He told me his file was not complete. He had given it to Northwestern. And so I decided to go through Jane Raley to try to get copies of whatever Judge Wadas had.

Q. Now, when you interviewed Mr. Lopez, his attorney was present?

A. Yes.

Q. Okay. And that was done out somewhere in the Cleveland area?

A. It was.

Q. And you were also given the opportunity to interview Mr. Rivera in the presence of his attorney, too?

A. Yes.

        MR. POLICK:  May I have a moment, Your Honor?

O'Brien - cross by Polick

2613

THE COURT: Yep.

(Counsel conferring.)

BY MR. POLICK:

Q. Going back to your interview of Mr. Lopez.

You were discussing on Mr. Loevy's examination this woman that he said that he had spoke to at the time of the lineup.

A. Yes.

Q. Do you recall that?

A. Yes.

Q. And how did he describe that woman to you in his -- your interview of Mr. Lopez?

A. He -- he had described her before with --

MR. LOEVY: Objection.

BY THE WITNESS:

A. -- the blonde hair --

MR. LOEVY: He didn't answer it.

THE COURT REPORTER: I'm sorry? "Objection."

MR. LOEVY: Objection. The question -- he wasn't answering the question, his interview.

THE COURT: I think -- yeah. The question was during your interview with him.

BY THE WITNESS:

A. He didn't -- I think that she was tall, but I don't remember any other physical description. Maybe thin, but --

BY MR. POLICK:

Q. Do you have the report in front of you?

A. Yeah. Let me take a look.

(Witness reviewing document.)

BY THE WITNESS:

A. According to the report, it doesn't -- I don't see a spot -- anything in here that he's described her to me at all. I'm missing that. Please direct me to the paragraph you're talking about.

BY MR. POLICK:

Q. You reviewed other documentation relating to the case?

A. I have.

MR. LOEVY: Well, then that would be a relevance objection, Your Honor.

THE COURT: Overruled.

MR. LOEVY: He said --

THE COURT: Overruled.

BY MR. POLICK:

Q. And how did he describe the -- this woman that he had spoke to in the other documentation that you reviewed as part of your reinvestigation of the case?

A. Blonde hair with some white in it.

Q. Did he ever indicate to you that he believed that woman was a police officer?

A. No.

Q. Let me --

A. Wait. Let me ask you, did he ever indicate to me during my interview or --

Q. Yes.

A. -- in other --

Q. At any time.

A. -- things I've read? He never --

Q. That he --

A. -- told me that.

Q. -- discovered years ago.

A. Never told me that.

THE COURT: You're both talking at once.

MR. POLICK: All right.

THE WITNESS: I'm sorry.

BY MR. POLICK:

Q. In your review during your reinvestigation, did he ever mention anything about this woman being a police officer?

A. Not to me, no.

Q. Okay.

MR. POLICK: I don't have anything further.

THE COURT: Any more defense questions?

MR. LEINENWEBER: No, Your Honor. Thank you.

MS. ROSEN: No, Your Honor.

THE COURT: Mr. Loevy.

REDIRECT EXAMINATION

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 440 of 1335 PageID #:105825
O'Brien - redirect by Loevy
2616

BY MR. LOEVY:

Q. You've read -- he's given a lot of different descriptions about a lot of different things on all aspects of this case over the years, right?

A. I need to be -- have you be more specific. He's given different versions of the stories, if that's what you're asking --

Q. Yes.

A. -- in general, yes. But --

Q. And --

A. But descriptions, the only description I remember him giving specific --

Q. All right. Sometimes he said white-haired lady, sometimes he said blonde-haired lady.

MR. DAFFADA: Objection.

BY THE WITNESS:

A. More recently, he said --

THE COURT: Hold on, hold on. There -- what did -- what?

MR. DAFFADA: Again, he's -- won't let him finish testifying.

THE COURT: But let's have one person at a time. This is just wasting our time to have to keep stopping this for people.

MR. LOEVY: They're correct. My bad.

THE COURT:  Yeah, I know.  One -- wait till the answer is finished.

BY THE WITNESS:

A.  Could you repeat the question?  I'm sorry.

BY MR. LOEVY:

Q.  My fault because I did interrupt you.

He's given -- sometimes he calls her lady, sometimes he says she had white in her hair, sometimes she had white hair, sometimes she has blonde hair, sometimes he says, "She's older than me."

He's given a lot of different descriptions, right?

A.  As far as the hair is concerned.  It is now -- it seems the more recent statements are that it's a white-haired lady as opposed to before, it was a blonde-haired lady with white.

Q.  And he has over time given statements to the effect of there was a lady and there was a cop with an afro and glasses who basically shepherded him through the process, right?

A.  The afro and glasses is really new, but he's -- originally, there was a -- that there was a plain-clothes cop with no description and a lady who could be a lawyer or a policeman. It had -- that has now become a cop with an afro and glasses and a white-haired lady.

Q.  All right.  And these aren't the only details that Orlando Lopez's story has evolved over time about, correct?

A.  Give me an example.

Q.  Like all the details that you want to rely on also came evolving over time, too, with Orlando Lopez, right?

A.  I need you to give me an example what you mean.

Q.  For example, his first story was he was by the store.  Then he was by the door.  Then he's by the store.  Then he's running back toward the murderer.  He's given -- every time he tells it, he tells it differently, right?

A.  I think his first story, the one in the police reports, was he came out, saw the shooting.  I don't think he even mentioned going to the store at the time of the shooting there.  I think that -- that evolved, that he went to the store.

Q.  Did you --

A.  That --

Q.  -- believe him when he told you -- sorry to cut you off --

A.  Yeah, go ahead.

Q.  -- but this is to get us to the end.

When he told you when he was at the store, he was buying something for his mom, did you believe him?

A.  The only way I could reconcile that version of the story would be if the shooting started, he went to the store, and for some reason, the killer stayed on the scene and continued shooting when he returned.

The idea that he -- the shooting was continuous to the store, no, I didn't believe that.

Q.  All right.  Let me give you another way to reconcile it.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 443 of 1335 PageID #:105823
O'Brien - redirect by Loevy
2619

What if he really was at the store buying candy, came out of the store, and a block and a half away or two blocks away or whatever it is, he sees the shooting, and that's all he saw? Maybe that's what happened.

MS. ROSEN: Objection.

BY THE WITNESS:

A. Well, except for --

MS. ROSEN: Form of the question.

THE COURT: Overruled.

MR. DAFFADA: Beyond the scope, Your Honor.

THE COURT: Overruled.

BY THE WITNESS:

A. Except for that would omit his original story and the basis of his testimony, which was he saw the shooter's face when he came out of the building. So --

BY MR. LOEVY:

Q. All right.

A. -- whether he went to the store and the shooting continued continuously or not was the only issue I was thinking about, and that didn't seem logical to me. I thought it would have had to have been a continuing shooting or that was not true.

Q. All right. On --

A. Not true.

Q. On the subject of Judge Wadas' file, you said two things. You said he told you he gave a copy to Northwestern,

correct?

A.  He said he gave the file to Northwestern, but I don't -- I don't know whether he meant he gave a copy or the original.

Q.  All right.  Well, I thought you said he said he gave a copy.  He claims he gave a copy.  Is Judge Wadas a liar?

MR. POLICK:  Objection, Judge.

MS. ROSEN:  I'm sorry.

BY THE WITNESS:

A.  He's never lied to me.

THE COURT:  It's sustained.

BY MR. LOEVY:

Q.  All right.  And you say he volunteered to you, "Hey, by the way, my file's not complete"?  That's how you remember it?

A.  No, no.  What happened was I asked him if I could take a look at his file and make copies of it.  He said, "You can, but it's not complete.  I gave it to Northwestern."  So I then went and sought it from Northwestern.

Q.  Do you have any notes on that conversation?

A.  No.

Q.  All right.  So this was how long ago, this conversation?

A.  Seven or eight years.

Q.  Probably more if the hearing was in 2010, right?

A.  The hearing was in 2011.

MR. POLICK:  Judge --

BY THE WITNESS:

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 445 of 1335 PageID #:105830
O'Brien - redirect by Loevy
2621

A.  So my conversation with him was probably sometime in the fall of 2010.

BY MR. LOEVY:

Q.  All right.  So if it was that long ago, would you defer to his recollection that that file has never once left his possession and he has maintained it in the same file -- same condition he had it during the trial?

A.  No.  I would rely on my recollection.

MR. LOEVY:  All right.  No further questions, Your Honor.

THE COURT:  Anything further?

MR. POLICK:  No further questions, Judge.

THE COURT:  Thank you, sir.

THE WITNESS:  Thank you.

THE COURT:  You may step down.

(Witness excused.)

MR. LOEVY:  Maybe an afternoon break, Your Honor?

THE COURT:  Yeah, I think that works.

Ten minutes, ladies and gentlemen.

(Jury out.)

THE COURT:  All right.  A little before a quarter to.

(Recess at 2:35 p.m. until 2:45 p.m.)

THE COURT: Are we ready?

MR. LOEVY: Yes, Your Honor.

THE COURT: Okay. We're ready.

Who are you calling?

MR. LOEVY: Ms. Rosner. And somebody better grab her. Do you know where to find her? Anybody know where to find her?

MR. BOWMAN: She was out in the lobby.

(Witness enters courtroom.)

THE COURT: Are you the witness?

THE WITNESS: Yes.

THE COURT: You can come on down here if you want.

THE WITNESS: Thank you.

COURT SECURITY OFFICER: All rise.

(Jury in.)

THE COURT: Please be seated, everyone.

And would the witness please raise your right hand.

(Witness duly sworn.)

THE COURT: You may be seated.

THE WITNESS: Thank you.

JULIE ROSNER, PLAINTIFF'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. LOEVY:

Q. All right. If you'd state your name, please.

A. My name is Julie Rosner.

Q. And you are a lawyer by training, correct?

Rosner - direct by Loevy

2623

A. Yes, I am.

Q. And for a period of time in the mid-'80s to late '80s, you were in the Cook County State's Attorney's office, correct?

A. That's correct.

Q. Some time in the Juvenile Division?

A. Yes, I spent three years in the Juvenile Division.

Q. And some time on the Felony Review, right?

A. About -- a little over a year in Felony Review.

Q. All right. Just as a little bit of background, oftentimes police officers investigate crimes, and then they refer cases to the prosecutors to prosecute. Is that a fair summary?

A. Yes.

Q. And then the prosecutors is the State's Attorney's office, right?

A. That's correct.

Q. And then the prosecutor's office has to make a decision if they're going to go forward with the case, right?

A. They do make a decision, yes.

Q. And the person on the Felony Review is someone in the front lines of helping to decide if we're going to prosecute this case, right?

A. That's correct.

Q. So the idea is if you're working on Felony Review, you would get summoned to the police station, and the police would say, "Hey, we think we have a crime. We think we have an

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 448 of 1335 PageID #:105833
Rosner - direct by Loevy
2624

accused, and we think it should be prosecuted," something --
that's generally it, right?

A. Right, they put it all together, and they're asking us to approve the charges.

Q. And you know from looking at the documents that you were the one who got asked to approve the charges in Jacques Rivera's case, right, back in the --

A. That's correct.

Q. -- back in the late '80s?

A. Yes.

Q. Now, you have no memory of the case, correct?

A. I don't remember the case because it was 30 years ago, but I have looked at some stuff to -- to try to remember the case --

Q. But you don't --

A. -- review stuff.

Q. You did say at your deposition and you told me this afternoon that you're not going to stray from your deposition, right?

A. Well, I'm not going to stray from my deposition, but even at my deposition, you showed me a stipulation that I saw.

Q. All right. So you know it was true because you wouldn't have stipulated to that if it wasn't true, right?

A. That's correct. And -- that's correct.

Q. All I'm just getting at is your memory, though. You don't

actually remember the events?

A. I don't remember the events because it happened 30 years ago.

Q. All right. That's what -- that's what I'm establishing.

So what you would have done is you would have gone to the station, and you would have been briefed by the people who worked on the investigation, correct?

MR. SOTOS: Objection, Judge, leading.

MR. LOEVY: Again, it's another adverse witness, Your Honor.

MR. SOTOS: There's no basis for finding as an adverse --

THE COURT: I think somebody who -- you know, why don't -- can you lay a foundation for that?

MR. LOEVY: All right.

BY MR. LOEVY:

Q. You were the one who approved the felony first degree murder charge to go forward against Jacques Rivera, correct?

A. Actually, I don't think that I was the one who approved it.

Norma Reyes, who was my supervisor, is actually the one who approved it. I could not approve those charges.

Q. But you know from the documents that you went to the station that night, and that's why you're here today, right?

A. I know from the documents?

Q. Yeah. You've reviewed the documents, and you have seen on

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 450 of 1335 PageID #:105835
Rosner - direct by Loevy
2626

those documents that on that day in 1988 you were the one who got in her car, went to the police station, and talked to the police about the murder case against Jacques Rivera?

A. From the police reports it says that, yes, that I looked at the case concerning Jacques Rivera. But I actually do not have my Felony Review notes, and that would tell me that I specifically approved the case.

Q. All right. You certainly didn't suggest that Jacques shouldn't be prosecuted for murder after you were done that night?

MR. SOTOS: Judge, I'm going to object to the leading of this witness.

THE COURT: Yeah, I think all I know about this witness is that four years 30 years ago she worked for the State's Attorney's office.

MR. LOEVY: Right.

THE COURT: I don't think that's a basis for me to make any conclusion.

MR. LOEVY: All right. I'll lay a further foundation.

BY MR. LOEVY:

Q. Did you or did you not go to the police station the night that Jacques -- charges were approved for murder?

A. To the best of my recollection -- I mean, I don't remember the specific case --

Q. Right.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 451 of 1335 PageID #:105836
Rosner - direct by Loevy
2627

A.  -- 30 years ago, but looking at the police reports, I believe that I went to the -- the station 30 years ago.

Q.  And you were part of the decision-making process that approved the murder charges against Jacques Rivera, correct?

A.  Yes, I was part --

Q.  All right.

A.  -- I was part of it, although Norma Reyes, who was my supervisor, would have had to approve that case.

Q.  Fair enough.

MR. LOEVY:  Well, then if she approved murder charges against Jacques Rivera, Your Honor, we request permission under the liberal federal -- federal rules to treat her as an adverse witness.

THE COURT:  You know, I don't know.  Maybe we need to talk at the side.  I don't know if that's a foundation for this or not.

MR. LOEVY:  Can you guys bring the federal rule book?

THE COURT:  Yeah, bring me the rule book.

(Proceedings heard at sidebar on the record:)

THE COURT:  Okay.  This woman 30 years ago worked for four years for the State's Attorney's office.

In the intervening time, I don't know if she worked for Northwestern's Innocence Project, if she was a public defender, if she became the common law wife of Jacques Rivera.

(Laughter.)

THE COURT: I don't have any idea. Okay? I don't think four years 30 years ago, as far as I know, doesn't establish for me that she's adverse.

Now, it may be that if she testifies, it will be clear that she was adverse. I mean, I thought the other gentleman was pretty adverse. I didn't have much problem with that, but I don't have any sense of her yet.

MR. LOEVY: Under the case law in federal court, the rules are liberal on adverse --

THE COURT: Do you have a case for me? Do you have anything?

MR. LOEVY: We didn't anticipate the objection because this woman approved the murder charges against Jacques Rivera. That's as adverse as you could be.

THE COURT: Well, I don't know.

MR. SOTOS: That's our position.

THE COURT: Thirty years ago -- what's your position?

MR. SOTOS: And that's our position. Our position is that the fact that she approved murder charges is helpful to our position, not harmful to us. So we don't see her in any way adverse to --

MR. LOEVY: The rule says aligned with --

THE COURT: Well, I don't know --

THE COURT REPORTER: I'm sorry.

THE COURT: I don't want to hear any more

conversation. I don't know the law. There's a dispute. I don't have any sense of who this witness is or what she's going to be like.

And I don't know that the cases say that based on being a state's attorney 30 years ago, I assume that she's adverse to you.

Can you ask her a couple of questions that aren't leading --

MR. LOEVY: Yeah.

THE COURT: -- and maybe I'll get some sense?

MR. LOEVY: We'll see how the exam goes.

THE COURT: Let's do that.

MR. LOEVY: All right. Sounds good.

THE COURT: And I will make a ruling. I understand everybody's arguments.

(End of sidebar proceedings.)

BY MR. LOEVY:

Q. All right. When you would go to the station, was it part of your protocol that you would be briefed by the investigators who worked on the case?

A. No, not the investigators. Only the detectives.

Q. Now, when say "only the detectives," that's a subject you've spoken about with counsel for the defendants, right?

A. I have only talked to Jim Sotos.

Q. All right. And you've specifically discussed that exact

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 454 of 1335 PageID #:105839
Rosner - direct by Loevy
2630

point, that it matters in this case whether you talked to a detective or a Gang Crime person, correct?

A. No.

Q. You did not talk about that with Mr. Sotos?

A. I talked about -- he asked me who I talked to, but we talked about this in the deposition when -- I can't remember who was representing you in the deposition, but I said that in the deposition that was in 2014 -- that I only would speak with the detectives.

Q. But, again, if we can focus on my question.

When you've been talking to defense counsel in preparation for this trial, didn't they tell you they were going to ask you about whether it was a detective or a Gang Crime person you would usually speak to? Did that come up?

And they will correct you if you're wrong, so --

A. I'm really -- I mean, I talked to them about what I testified to in the deposition, and I just told them what my procedure was.

Q. All right. Did this come up --

A. So that is my -- I don't know, because actually we talked about other points. And I'm not sure if this -- this specific point that you're talking about came up.

Q. All right.

A. They just talked about kind of that you talk very fast. That's what they actually told me.

Q. They were right, weren't they?

A. Right. So that's what I heard --

THE COURT: Compared to everybody here, you don't even talk fast. I assure you.

MR. LOEVY: All right. I think she was talking about me.

BY MR. LOEVY:

Q. When you would talk to the investigators back in the day, sometimes you would talk to detectives, sometimes you would talk to supervisors, sometimes you would talk to Gang Crime people; is that true?

MR. SOTOS: Objection to the leading.

MR. LOEVY: That's a --

THE COURT: Overruled.

BY THE WITNESS:

A. Okay. Actually, I -- I never would talk to anybody but the detectives in a murder case. It's only the detectives that you talk to.

BY MR. LOEVY:

Q. All right. Would you ever talk to a supervisor?

A. I don't know what you mean by a supervisor in the police department.

Q. Well, how would you be able to tell a detective from a Gang Crime person if they were both wearing plain clothes and they were both knowledgeable about the investigation?

A. Because we just know who the detectives are from working in the different areas.

Q. All right.

A. I know the detectives from -- just from working the area, especially after you work, you know, more than a month and have been in Area 5 or Area 2 or any of the areas that you go to, so --

Q. But did you know the players here?

A. Actually, I don't.

Q. All right. Do you remember any more who you spoke to?

A. Who I spoke to? When are you talking about now?

Q. When you went to the police station the night the charges were approved against Jacques Rivera, fair to say you don't remember who you talked to?

A. I -- I don't remember who I spoke to on that evening.

Q. All right. Part of the -- would part of the process be to review the police reports?

A. Right.

Q. And rely on the police reports?

A. If there were police reports that were ready. Usually there are on the police reports --

Q. Really?

A. -- because -- can I finish my answer?

Okay. Usually there's not police reports because the incident just happened. But in this case, the -- the victim

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 457 of 1335 PageID #:105842
Rosner - direct by Loevy
2633

was injured before, earlier -- about 14 days earlier than he died.  So there were police reports that were made.

Q.  All right.  But aren't most murder cases not solved on the first night?

A.  No, a lot of murder cases can be solved on the first -- in the first 24 hours.

Q.  All right.  But some murder cases weren't solved on the first night, right?

A.  Well, most of them that I went out to were solved within, I would say, 24, 48 hours.  So there were not -- they're either handwritten police reports that sometimes you can review, but there's rarely a typed police report --

Q.  Although --

A.  -- that you -- that you review.

Q.  Although in this case, you said you've looked at the paperwork, and you see there was some time distance, so there would have been police reports, right?

A.  There would have been police reports that were done in August, not in September probably.  Probably at the time of the original injury.

Q.  Are you trying to say that you remember not relying on Mr. Guevara's police report?

A.  You know what, now you're bringing up a detective -- not a detective.

Q.  What's that?

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 458 of 1335 PageID #:105843
Rosner - direct by Loevy
2634

A.   You're bringing up somebody I don't know.

Q.   You don't know Detective Guevara?

A.   No.

Q.   Then how did you know he wasn't a detective?

A.   Because I read in a police report that he was involved in something, but he's not a detective.

Q.   But how -- if you don't know the man, how do you know he's not a detective?

A.   Because he's not in any police reports that I've read where it says he's a detective.

Q.   Is that a subject you discussed with Mr. Sotos?

A.   No, it wasn't a subject I discussed --

Q.   Mr. Guevara's name didn't come up at all?

A.   Yes, his name did come up.

Q.   And sort of the conversation was, Mr. Guevara wasn't a detective, so you wouldn't have been talking to him?  Was that the gist of the conversation?

        MR. SOTOS:  Objection, Your Honor, leading.

        THE COURT:  Overruled.

BY THE WITNESS:

A.   I don't believe that was the gist of the conversation.

        The gist of the conversation with Guevara was probably that -- just that he was involved in a suit against the police department.

BY MR. LOEVY:

Q. All right. Sometimes Felony Review would get called in to participate in the lineup, right?

A. Yes, that's correct.

Q. Okay. In this case, you didn't get called in until the Orlando Lopez lineup was completed, right?

A. That is something that I don't remember. I saw a police report that looks like that's correct --

Q. Right.

A. -- but I testified that I wasn't -- I wasn't sure if I was called in before the lineup or after the lineup.

Q. But you saw in the police report that it lists the people present, and your name's not on it, right?

A. Well, it said in the police report -- it looks like I was called in -- just from reading the police report, it looks like they did the lineup before I came.

Q. Yeah. And you have certainly no memory to rebut that, right?

A. Right, I don't have any memory to rebut that, that's correct.

Q. All right. So whatever identification procedure was used with Orlando Lopez to identify Jacques procedure -- to identify Jacques Rivera, all of that preceded you, right, before you got to the station --

A. The lineup preceded me.

Q. Well, whatever happened before the lineup preceded you,

right?

A. Right. When you're saying identification, you're talking about the lineup. And so the lineup preceded me, yes.

Q. Well, and any photos that were shown to the boy before the lineup preceded you?

A. Right.

Q. When you got there, you were informed that Orlando Lopez had identified Jacques Rivera, correct?

A. Yes.

Q. All right. Were you told that Orlando Lopez had failed to identify Jacques Rivera at a first lineup?

A. As far as I know, I was never told that. That did not happen.

Q. And certainly you would have looked at the case much differently if you had been told that?

A. Well, that is a hypothetical that -- you know, it's hard to answer that kind of a hypothetical.

Q. Well, try. If you had been told by the police that, "Yeah, Orlando identified Jacques, but we had another lineup a couple weeks ago, and he picked a filler," you would have looked at the case very differently, right?

A. I'm sure I would have looked at the case differently, but I doubt that that ever happened because that would not -- when I talked to the victim, I would have found that out.

Q. All right.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 461 of 1335 PageID #:105846
Rosner - direct by Loevy
2637

A. I'm sorry. When I talked to the witness, I would have found that out.

Q. When you say you doubt that would ever happen, do you know if the Chicago Police Department wrote it down if a witness picked a filler?

Was that -- did you have any understanding either way about that?

A. I had no understanding either way about that.

Oh, but I would assume if there was a prior lineup, they would write it down. It would just be part of something they would put in a report. But I don't know for a fact.

Q. Okay. Now, did -- obviously Orlando didn't tell you that it was the wrong guy?

A. You're talking about Orlando Lopez?

Q. Yes.

A. No, Orlando Lopez did not tell me it was the wrong guy. He specifically told me it was the right person.

Q. All right. If he had been -- if you had been the woman that Orlando told "Wrong guy, wrong guy," you would not have pursued a murder charge against Jacques Rivera, right?

A. That's correct.

Q. And there's no doubt in your mind about that, right?

A. Correct.

Q. Now, your hair is blonde here, correct?

A. I think it's light brown, but that's right.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 462 of 1335 PageID #:105847
Rosner - direct by Loevy
2638

Q. Sometimes hard to tell, light --

A. Right.

Q. -- brown or blonde?

A. Right.

Q. But for your entire life until this month, your hair has been dark brown, right?

A. That's correct.

Q. All right. So until this trial started, your hair was never light blonde?

A. It was never this color, right. Recently I changed it because I was getting grayer, so I decided to go to a lighter color.

Q. All right. So you would not have looked like this back then?

A. Right.

Q. In fact, you wouldn't have looked like this last month?

A. Right.

Q. All right. And you do know that the color of the hair of the woman that Orlando talked to is an issue in the case, right?

A. Right.

Q. How do you know that?

A. I know that because I've told that somehow from almost from about 2011 on that somehow there was a question about some woman that Orlando thinks he talked to that was -- either had

blonde hair, is what I was told.

And I never -- I had very dark brown hair.

Q. And so did your supervisor, Norma Reyes, correct?

A. Right.

Q. So it was -- he did not -- neither you nor Norma Reyes was the woman with either white in her hair or blonde in their hair, right?

A. Right. Norma Reyes is Hispanic, and she had even darker hair than I had.

Q. And you were both in your early 30s at the time?

A. That's correct.

Q. And you are making it very clear, you are not the person Orlando Lopez said, "Wrong guy, wrong guy," correct?

A. He definitely would not -- did not tell me that, because if he did tell me something about him having the wrong person, I would not have charged it.

And I definitely believed what he told me, and I definitely believed whatever he said was very compelling, so that I would have charged this case.

Q. You have no memory of speaking to him, right?

A. I do not have a memory of speaking to him, but I looked at the stipulation, which was shown to me and made in 2011, much closer to the time, and I'm sure that that stipulation is correct.

Q. All right. But 2011, that was, what, 24 years after the

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 464 of 1335 PageID #:105849
Rosner - direct by Loevy
2640

night, right?  Your stipulation was quite a bit after the night, too?

A.  Right.

Q.  All right.  So you don't recall anything at all about your conversation with Orlando Lopez, right?

A.  No, I do not.

Q.  All right.  But you can infer that you believed him at the time, right?

A.  Right.

Q.  And you didn't see him point at Jacques or anything, right?

A.  Oh, I did not see him point.  No, I did not.

Q.  All right.  But he told you a story, and you -- you talked to the police about it, right?

A.  Right.

Q.  And did the police convey to you that this was a legitimate case?

A.  The detectives conveyed that to me --

Q.  All right.

A.  -- when I first came, and they told me -- they told me what it was.

Q.  All right.  Did they convey to you that it was a legitimate case?

A.  Yes, they -- the detectives conveyed to me that it was a strong case.  And then I went and I interviewed Lopez by myself, because that's what I do.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 465 of 1335 PageID #:105850
Rosner - direct by Loevy
2641

Q. Why do you make it a point to make sure that you're interviewing them without the police in the room?

A. Just so I -- there's no influence from anybody else when I interview --

Q. Back -- sorry.

A. -- when I interview a witness.

Q. Sorry to interrupt there.

Back in the '80s, was there a concern that if you did the interview in the presence of the police officers, maybe not such a good idea?

A. Just all the time. I don't think it was just -- that's just what we always do. We just -- even if there's a parent present, you don't know how somebody is going to be influenced. So you always interview -- interview them alone.

Q. All right. Do you remember being asked these questions and giving these answers at your deposition about whether you spoke to a detective or a Gang Crimes specialist?

"Question" --

MR. SOTOS: Page? Page?

MR. LOEVY: I'm sorry, Jim. 24, line 7 through 15.

BY MR. LOEVY:

Q. And we'll read all the way to 20. Are you ready?

"Do you have any idea who you spoke with?

"Answer: No. Most probably

Rosner - direct by Loevy

2642

the detectives.

"Question: Okay. If the --
okay. But I feel like it's going
to be a hopeless exercise to try to
suggest names of detectives, Gang
Crimes specialists who were involved
in this matter. You would tell me
that you just don't have any idea who
you spoke with?

"Answer: I don't.

"Question: Okay. But the
protocol would have been to speak with
the detective or other investigator who
was involved in the investigation and
familiar with what had transpired in
the investigation?

"Answer: That's correct."

Those were your answers at the deposition, correct?

A. Right.

Q. Was that true?

A. No, I -- what was not true of that is the part -- I definitely said the detectives. I wouldn't have spoken to the other investigators in the case. It would only be the detectives.

Q. All right. Now, you know, lawyers are not supposed to ask

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 467 of 1335 PageID #:105852
Rosner - direct by Loevy
2643

open-ended questions like this, but if it wasn't true, why did you say it?

A.  I think that if you look at the statement in the whole part, that it was detectives that I spoke to, that's who I always speak to, just the detectives.  I don't speak to anybody else in the case.

There's no reason to speak to anybody else, because the detectives gather all the information.  If you go out in a case and you just start speaking to every single police officer, it's going to take too long to figure out the case.

Q.  All right.  Well, let's say, just to give you a hypothetical, there was a detective who had just come on to the case the same day you did and, therefore, didn't know very much about the case.  But there's a Gang Crimes specialist who had been working the case for the entire two weeks, had all the interactions with the witness, and had developed all the interactions -- evidence in the case.

Wouldn't it have been logical that you wouldn't have said, "No, I don't want to talk to you"?

A.  It's just not the way it works, because the detectives know how to put -- to actually put together the case.

The Gang Crimes officers don't really know how to put together a case that's going to be good for court, and so --

Q.  Well, how do you know that if you never talked to them?

A.  Because I have worked with them in other cases.  They

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 468 of 1335 PageID #:105853
Rosner - direct by Loevy
2644

are -- you work with them in robberies, some other kind of lower kind of cases, but not in murders.

Q. Okay. So you --

A. You never work with them in -- in a murder case.

Q. Sometimes when you went for Felony Review, you would talk to Gang Crimes specialists?

A. Right, in a different kind of a case --

Q. Okay.

A. -- but not in a murder case. You don't deal with them.

Q. All right. Showing you Plaintiff's Exhibit 12 -- if we could have the Elmo, please -- did Orlando Lopez, when you talked to him, tell you that when he saw the shooting, he was by the store about 219 feet away from the shooting?

MR. SOTOS: Objection, Judge. She's testified she doesn't have any recollection of the conversation.

MS. ROSEN: And I believe actually the feet is 191.

MR. LOEVY: Sorry. I'm not good at numbers. I didn't mean to make it longer.

THE COURT: I'm going to overrule the objection but as long as --

MR. LOEVY: 191.

THE COURT: Yeah.

MR. LOEVY: 191.

BY THE WITNESS:

A. No, he didn't tell me that.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 469 of 1335 PageID #:105854
Rosner - direct by Loevy
2645

BY MR. LOEVY:

Q.  Well, you have no notes, do you?

A.  I don't have my notes.

Q.  Do you have any notes?

A.  I saw -- do I have any notes?  No, I don't have any notes.

Q.  All right.  Well, if you don't remember the case, you don't remember the conversation with Orlando Lopez, how do you know he didn't tell you that?

A.  Because I think if he had told me he was that far away, I might have questioned him further.  And I'm not sure about, you know, the case.  I'm just not sure.

I just remember it happening -- I mean, I looked over a police report from August 29th, and it said that he was on Cortland.  It said that he -- I see something about Cortland here, and it said that -- it didn't say anything about him being this far away.

It said that he knew the defendant.  It said that he had seen him several times at a baseball game.  So --

Q.  Fair --

A.  -- I don't know anything about this -- this report that you're showing me now.

Q.  That's my next question.

Fair to say, then, that this GPR report was not information that you had available to you at the time you made the charging decision?

I think you already answered that, right?

A. Right. I don't remember this report.

Q. And if you had had this report, it might have caused you to look at the case differently; wouldn't you agree?

A. It might have. I really don't know, because it really depends on what Lopez told me. It really depended -- I think he was a very good witness.

Q. You don't remember him. You just said he was a very good witness. You have no memory of him whatsoever --

A. Well, I wouldn't have charged a murder case on somebody who's not a compelling witness.

And I've looked over the report from August 29th where he said that he knew the defendant, had seen him at several baseball games.

You don't charge a murder case on somebody who's not a good witness.

Q. Especially a 12-year-old boy, right? The whole case is going to be based on a 12-year-old boy. You got to be really sure, right?

A. Well, you have to be sure that he's going to be a good witness when he gets up for the trial.

Q. All right. Now, at some point, you and your supervisor did pursue charges or approve charges, right?

A. That's correct.

Q. And I'm going to show you a document that we've had

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 471 of 1335 PageID #:105856
Rosner - direct by Loevy
2647

previously in this case.  And this is Defendants' 119.  I don't know the corresponding Plaintiff's number.

Can you see it on the screen?

MR. ART:  It's Plaintiff's 19-I.

BY MR. LOEVY:

Q.  Plaintiff's 19-I.

A.  Okay.

Q.  Is it on everybody's screen?

All right.  Can you tell us what this document is?  It says, "Felony Minute Sheet for State's Attorney's Use Only"?

A.  No, I don't know what a Felony Minute Sheet is.

Q.  All right.  Do you know what "For State's Attorney's Use Only" is, Assistant state's attorney?

A.  No, because mine is usually handwritten notes.

Q.  All right.  You've never seen --

A.  It's kind of -- hold on.  It's coming in and out, so let me just see what it is.

Q.  All right.  I'll try and adjust it.

A.  Okay.

Q.  Why don't I give you a hard copy.

A.  That's better.

MR. LOEVY:  May I approach, Your Honor?

THE COURT:  Sure.

BY MR. LOEVY:

Q.  This is the kind of document that you would have created

Rosner - direct by Loevy

2648

back in 1988, correct, the case number, the charge, the court branch?

A. You know what, I would not have -- I'm sorry, I'm too close to this.

I would not have created this. I'm not sure who created this, because my stuff was always handwritten out in a Felony Review.

Q. All right. This -- you are ASA Rosner who approved felony charges?

A. Yes.

Q. All right. The prosecuting witnesses are listed here as Orlando Rivera, Guevara, Gawrys, Dorsch, and Boyle.

Do you see that?

A. Yes.

Q. And do you see this phone number here, 744-8260?

A. Yes.

Q. Do you know if that phone number was the phone number for the area where the detectives are or the phone number for where the Gang Crimes people are?

A. I don't -- I don't know what it's for. It's obviously for the police department, but I don't know which police department.

Q. All right. You testified to your belief that you only talked to detectives at that time.

And I'm asking you if you believe that this phone

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 473 of 1335 PageID #:105853
Rosner - direct by Loevy
2649

number would be the area detectives phone number or the Gang Crime phone number when the prosecuting witnesses had to be reached by the prosecutor? Which would be your expectation?

A. I don't know. There's no way I can -- I'm not going to guess on that because I just -- there's no way that I would know.

MR. LOEVY: All right. I'd like to introduce at this time, Your Honor, Plaintiff's Exhibit 154-H, which is a document from the lineup files that we previously looked at with Dr. Wells, which is another similar document from one of those files, Your Honor.

THE COURT: So is this in evidence yet?

MR. LOEVY: I'm moving it into evidence, Your Honor.

THE COURT: Oh. Is there any objection?

MS. ROSEN: There's no foundation for this witness to talk about it.

MR. LOEVY: It's a similar-type document, Your Honor.

THE COURT: I haven't seen it, so I don't know what it is.

MR. LOEVY: I'm going to hand Your Honor a copy.

(Counsel conferring.)

MR. LOEVY: All right. Your Honor, we move this into evidence.

THE COURT: Is there an objection?

MR. SOTOS: Judge, our objection is that through this

witness -- there's no foundation through this witness.

MR. LOEVY:  The found --

THE COURT:  Well, why don't without -- I'm not going to introduce it unless there's some foundation through this witness.

If this witness doesn't know what the document is, that's a whole different issue.

MR. LOEVY:  Your Honor, we had testimony about -- that this is from the Chicago Police Department's own files, the lineup files.  If there's no foundation --

THE COURT:  Yeah, but there's a witness on the stand, and you're trying to introduce it through this witness.  And I have no idea if the witness knows what it is.

MR. LOEVY:  Well, we have already -- it's the same --

THE COURT:  So, you know, we're going to have to talk about it after the break.

MR. LOEVY:  Fair enough.

THE COURT:  But let's see if the witness knows what it is.

MR. LOEVY:  All right.  Should I show it on the screen to the witness?

THE COURT:  That would be a good idea.

BY THE WITNESS:

A.  Are we talking about this first document that I just saw?

BY MR. LOEVY:

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 475 of 1335 PageID #:105860
Rosner - direct by Loevy
2651

Q. Yeah, a similar document in another case.

MR. LOEVY: Your Honor, I -- we better make sure the jury doesn't see it, if I understand your ruling.

THE COURT: Well, I don't think the jury has it. I think --

MR. LOEVY: Okay.

THE COURT: -- that just the witness has it.

BY MR. LOEVY:

Q. All right. This is a similar document, "state's attorney for State's Attorney's Use Only" document, would you agree?

A. Yes.

MR. LOEVY: And I would represent, Your Honor, that this came from the Chicago Police Department and their files, and there should not be a foundation objection in that sense.

MR. SOTOS: Judge, the only -- the reason there's a foundation objection is because she is not affiliated with the Chicago Police Department.

THE COURT: Well, I think that's the problem.

MR. SOTOS: And he's --

THE COURT: The problem is if this witness doesn't know anything about this, then this witness is not the right person to provide a foundation to offer this in evidence.

We can argue about it at the close of the day if it comes from somebody's files, and we can figure that out, but I --

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 476 of 1335 PageID #:105861
Rosner - direct by Loevy
2652

MR. LOEVY: Your Honor, all I'm -- I'll move on, but I think they have to stipulate that it is from the CPDs files. And I'm doing it out of order. I didn't call a record keeper, because we haven't been making record keeper objections.

THE COURT: Well, yeah, but you've got a witness on the stand. So could we get through this witness? If the witness --

MR. LOEVY: All right.

THE COURT: -- doesn't know what it is, then that's that.

MR. LOEVY: Fair enough.

BY MR. LOEVY:

Q. Let's move back to Plaintiff's Exhibit 1.19.

Would it surprise you, Ms. Rosner, that when the police department created the document for the state's attorney charging Jacques Rivera with murder, describing the offense, and listing the prosecuting witnesses as Orlando, Guevara, Gawrys, Dorsch, and Boyle, as you see there --

A. Right.

Q. -- that the phone number that is provided to reach the prosecuting witnesses is the Gang Crimes phone number?

MS. ROSEN: Objection, asked and answered.

MR. LOEVY: Different question, Your Honor. Would it surprise her if they used the Gang Crimes phone number?

THE COURT: I'll allow it. I think it has been asked

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 477 of 1335 PageID #:105862
Rosner - cross by Sotos
2653

and answered, but let's move along.

BY THE WITNESS:

A.  You know, I don't know anything about this.  I mean, I don't even know what number this is.

MR. LOEVY:  All right.  I have no further questions, Your Honor.

BY THE WITNESS:

A.  I really can't answer -- I really can't answer that question.

MR. LOEVY:  Thank you.

THE COURT:  Okay.  Any cross?

MR. SOTOS:  Thank you, Judge.

CROSS-EXAMINATION

BY MR. SOTOS:

Q.  Good afternoon, Ms. Rosner.

A.  Good afternoon.

Q.  Was I right?  He goes kind of fast?

A.  Right, he does go kind of fast.  Right, he does.

Q.  Let me just ask you a few questions about your background first.

Did you -- when did you finish law school?

A.  I finished law school in 1983.

Q.  And what did you do after law school?

A.  Okay.  I worked for about eight or nine months for somebody named Maurice McCarthy, who is a sole practitioner, while I

waited to get into the State's Attorney's office.

Q. All right. That's what I want to get to. Let's talk a little bit about the State's Attorney's office.

A. And then I got into the State's Attorney's office in 1984.

Before -- before I got into the State's Attorney's office, I was a probation officer in the juvenile court for a year.

Q. So you worked with a lot of juveniles during that time?

A. Yes, I did.

Q. Did you interview a lot of juveniles during that time?

A. I interviewed a lot of juveniles who were charged with crimes or who were neglected juveniles. So I worked with a lot of youths and neglected juveniles.

Q. And then from 1985 through 1988, you still continued to work with juveniles --

A. Yes, I was at juvenile court. I was assigned to juvenile court, and I worked with a lot of juveniles at that point, either who were victims of crimes or accused of crimes.

So at that point, the court really worked to try to keep them, you know, out of jail and not into the system.

Q. You worked abuse and neglect cases, I think, for some time?

A. I worked abuse and neglect cases for about a year and a half and then the delinquent side for a year and a half.

Q. What does that mean, delinquent side?

A. That's kids who are accused of crimes, any kind of crimes,

but mostly like robberies, burglaries.

We didn't do a lot of murders at that point, because if they were, like, 14 or 15, they were usually sent over to 26th and California and charged as adults, but every other crime was done at juvenile court.

Q. So how many juvenile witnesses would you estimate that you interviewed during all those years?

A. Oh, I would say -- I don't know -- a couple hundred definitely, just -- I mean, every day it would be a lot.

Q. And some --

A. I would interview quite a few.

Q. Some of those juveniles were suspects?

A. Yes, some were suspects.

Q. Some were witnesses?

A. Some were witnesses.

Q. And what was your task with these -- with juveniles?

Were there things that you would do in order to make sure the information you were getting was, from your perspective, credible?

A. Well, I would spend time with them, make sure that they, you know, felt comfortable talking to me and make sure that what they were telling me was, you know, true.

And, you know, if a parent was with them, I would -- either if they -- you know, if they felt comfortable, I would try to talk to them without their parents so that I could get,

you know, a true story with them, because sometimes they didn't feel comfortable telling me something in front of their parents.

And that's why I got used to talking to the -- to the kids without their parent being present. Sometimes I'd have to talk to them with their -- with their lawyer being present and sometimes without that. But I would spend a lot of time with them.

Q. All right. And you were in juvenile court from 1985 through 1988?

A. Right.

Q. I'm essentially going by the deposition --

A. That's -- that's correct.

Q. -- that you gave before?

A. And then I went to Felony Review.

Q. I'm sorry. I was talking -- I talked over your answer. I apologize. I'm just trying to take you through this from the deposition answers you gave to try and move things along a little bit.

And so you said you were there from '85 through '88, and then you went to Felony Review?

A. That's correct.

Q. And that was in 1988?

A. Right.

Q. And that was at the same -- the same year of the events

that we're all here in court to talk about?

A. Right.

Q. Okay. So your experience interviewing juveniles was still very fresh in your mind at the time of the events that led ultimately to this lawsuit, correct?

A. Right.

Q. All right. And so when you -- you said you were on Felony Review in 1988 and 1989?

A. Yes.

Q. Is that right?

A. Most of -- most of 1988. And then I think '89 and '90, I was at 26th Street.

Q. By the way, just -- we'll go back in a second, but when did you retire from the State's Attorney's office?

A. Sometime in '90 I left, and I went to the -- sometime maybe starting in '90 -- the end of '90, I went to the Equal Employment Opportunity Commission, the EEOC, and then I did employment discrimination, age, sex --

Q. Okay. Are you --

A. -- race.

Q. Are you working today? Do you do anything today?

A. Today, right now I'm -- I just do some pro bono work and doing immigration discrimination. There's a pro bono legal clinic near me in Highland Park that works with immigrants from -- in Lake County, because there's a great need in Lake

Rosner - cross by Sotos

2658

County for immigration attorneys.  So I just started to do that.

Q.  All right.  So let's go back to the night that led us all here.

And before we do that, you talked a little bit about what the Felony Review unit -- the Felony Review unit and how it worked.  You mentioned something about notes?

A.  Right.

Q.  Can you explain that a little bit better for the jury, like what function notes serves in your Felony Review responsibilities?

A.  Yeah, when we'd go out and we'd do a case, we have a -- we keep kind of a file -- I'm sure they do this all different, and everything is typed now and computerized.

But when I was doing it back then -- this is 1988 -- we had, like, a folder with, like, three pages on it, and you took notes as to what -- what police officers you talked to -- so this would be the detectives -- and who you met with, and you -- I just put down handwritten notes as to what -- what the victim was -- who the victim was, what witnesses I talked to.

So I would have taken a statement from the victim and written it out.  And then I would say who else I talked to at that time, all the police officers, which would have been those detectives.

And this folder would have carried through to where

they charged him later on at 26th Street.

Q. And so when you were asked to -- in 2010 or 2011 in connection with the post-conviction proceedings to discuss this case, you asked somebody at the State's Attorney's office for your notes, correct?

A. That's correct.

Q. Okay. Do you remember who that was?

A. I think I asked Darren O'Brien at that point or Steve Garcia. I can't -- I think it was Darren O'Brien, who was handling it at that point.

Q. And what do you remember him telling you?

A. They couldn't find my Felony Review folder.

Q. So --

A. It was just, like, lost. Now, this was a long time after the incident, so after the crime had happened. So it was just lost.

Q. So you weren't able to refresh your recollection about the specifics of your interactions with Orlando Lopez because the State's Attorney's office had misplaced or somehow lost the file?

MR. LOEVY: Objection, leading, Your Honor, and asked and answered.

THE COURT: Sustained.

BY THE WITNESS:

A. Okay. I --

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 484 of 1335 PageID #:105869
Rosner - cross by Sotos
2660

BY MR. SOTOS:

Q. So is it a fact that you were unable to refresh your recollection about the events of this night because you didn't have your notes?

A. That's correct.

MR. LOEVY: Same objection, Your Honor.

THE COURT: It's leading.

MR. LOEVY: It's still leading.

MR. SOTOS: So I'm not -- I just want to make sure I understand, Judge. I'm not allowed to lead now?

THE COURT: Just ask it in a nonleading way.

BY MR. SOTOS:

Q. Can you tell the jury why it is that you were unable to refresh your recollection about the events of September 15th, 1988?

A. Because this folder that I had all my notes in is missing. But it was, like, 20 years later, so it was -- you know, I assume they thought this case wasn't going to come up again. But I don't know where they put it, if it's in some basement at 26th Street or something, whatever. It's not around anymore for me to refresh my memory with.

If it's there -- if it is somewhere, that would refresh my memory.

Q. So as a result, your testimony about what occurred is essentially based upon your review of some reports and your

general practice of the way you did things in connection with --

MR. LOEVY:  Objection, leading.

BY MR. SOTOS:

Q.  -- your duties?

MR. LOEVY:  He just told her what she was testifying to.

THE COURT:  I think you better ask a nonleading question.

BY MR. SOTOS:

Q.  Can you tell the ladies and gentlemen of the jury, then, how it is that you're able to testify to the extent that you are about the events that occurred on September 15th, 1988?

A.  Well, basically by, yes, reviewing the police reports and knowing what the procedures are when you go out on Felony Review.

Q.  And as -- when you were first asked to talk about this, this, again, was 2010 or 2011, correct?

A.  Yes.

Q.  And you remember doing a stipulation for the -- for that post-conviction proceeding?

A.  Yes, I do.

Q.  Was that a document that you submitted in lieu of your testimony?

A.  Yes.  I thought I was going to testify, but they decided to

do a stipulation instead.

Q. Okay. I'm going to place in front of you, just not on the jury screen yet, a document that's been marked as Defendants' Exhibit 16.

And can you review that document and let me know whether you recognize it?

A. Yes, I do.

Q. What do you recognize it as?

A. The stipulation that I agreed to on that date.

MR. SOTOS: And, Your Honor, we'd move for the admission of Defendants' Exhibit 16.

THE COURT: Any objection?

MR. LOEVY: No objection, Your Honor.

THE COURT: It is received.

(Defendants' Exhibit No. 16 received in evidence.)

MR. SOTOS: Can we publish it for the jury, please?

THE COURT: You may.

BY MR. SOTOS:

Q. Ms. Rosner, in front of you is Defendants' Exhibit 16, and that's the stipulation that you entered into in connection with the post-conviction proceedings, correct?

A. That's correct.

Q. And after some general background information, it states that when you arrived at Area 5 on September 15th that you spoke to Orlando Lopez, among others, correct?

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 487 of 1335 PageID #:105872
Rosner - cross by Sotos
2663

A.  Right.

Q.  So how do you know that you spoke to Orlando Lopez?

A.  One, because the stipulation says so, but also because I happen -- I always speak to the witness.

Q.  And you were asked some questions about whether anybody else was present when you spoke with the witness, correct?

A.  Right.

Q.  And your answer was nobody else was present except -- except when your supervisor showed up?

A.  Right.

MR. LOEVY:  Objection to leading.

THE COURT:  Sustained.

MR. LOEVY:  And asked and answered.

MR. SOTOS:  Judge, I'm just trying to place her in context so it -- to and move things along a little bit.

THE COURT:  Yeah, I know, but I think you could ask a nonleading question.

BY MR. SOTOS:

Q.  Was anybody else present when you met with the witness?

A.  I first met with the witness alone and interviewed him completely alone, just me and the witness, Orlando Lopez.

And then after I found -- I reviewed the whole case, I called my supervisor in, because it's a murder case and she would have to come in and review it.

And then Norma Reyes, who's my supervisor, reviewed

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 488 of 1335 PageID #:105873
Rosner - cross by Sotos
2664

every -- I called her, and then she came in, and we reinterviewed the witness, because he is the main person in this case.

And we would have asked him all the same questions again, the two of us alone in a room without any police officers, and gone through the case and checked off everything in this case to make sure it was still a good case and that he was a compelling witness.

Q. And your supervisor, Norma Reyes, has since passed away; is that true?

A. That's correct. Unfortunately, she has passed away.

Q. And so Mr. Loevy asked you some questions about if you had known that the witness had said to somebody before the lineup that you were there, that you arrived afterwards, would you still have approved charges, and you said that you wouldn't, correct?

A. Right.

Q. When you had the opportunity to interview the witness, Orlando Lopez, do you know whether or not he said anything to give you any indication that he was uncertain about his identification?

MR. LOEVY: Objection, Your Honor. She has no memory of the events whatsoever.

THE COURT: Overruled.

BY THE WITNESS:

A.  He definitely would not have told me -- he definitely did not tell me anything different than this -- than this statement says, that he definitely saw what happened and that he identified the defendant.  And he --

BY MR. SOTOS:

Q.  And if he had given you -- did you give him every opportunity to express any kind of --

A.  Yes, I would have given him a lot of time.  I would have questioned him very slowly, had him go through the facts very carefully.

Q.  And does any of that have to do with his age?

A.  Yes, because somebody's 12, I'm just very -- I'm very careful when they talk, and I give them a lot of time to tell me what happens.

Q.  And if Orlando Lopez -- Lopez had expressed any concerns to you about his identification, what would you have done?

A.  I wouldn't have charged this case, because it depended on him as the main witness in this case.

        And also, since then, you know, I told you that he has -- he said he knew this defendant; he was familiar with him.

Q.  Mr. Loevy asked you some questions about who you spoke to.  Do you recall those?

A.  Right.

Q.  And you had indicated that you had spoken to detectives,

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 490 of 1335 PageID #:105875
Rosner - cross by Sotos
2666

correct?

A. Right.

Q. All right. And then he asked you about your deposition in which you used the word "probably" in describing who you had talked to. Do you recall that?

A. Yes.

Q. And you said that if you looked at the whole context, that's who you would have talked to?

A. Right.

Q. Do you recall later in that same deposition being asked this question and giving this answer? The question was by Mr. Bowman.

"You don't have any reason" --

MR. LOEVY: Page, counsel.

MR. SOTOS: I'm sorry, page 55, line 18.

BY MR. SOTOS:

Q. "Question: And you don't have any reason
to believe that it was detectives
in particular as opposed to Gang
Crimes specialists who briefed you
on this particular case; is that
fair?

"Answer: I'm pretty sure it
would have been detectives, because
I don't speak to Gang Crimes people,

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 491 of 1335 PageID #:105876
Rosner - cross by Sotos
2667

you know, usually.  It's just not the norm in a -- especially in a murder case."

A.  Right.  That's correct, I don't.

Q.  Mr. Loevy asked you about this report where it describes the witness' statement stating "By store."  Do you see that?

A.  Yes.

Q.  Do you recall when he asked you questions about that?

A.  Yes.

Q.  And then he added in that it was 191 feet from the -- a specific point at the store to the mouth of the alley where the shooting occurred?

A.  Yes.

Q.  Okay.  The document that he placed in front of you doesn't say anything about the specific distance from the -- his vantage point in comparison to what he actually saw, correct?

A.  Right, it doesn't.

Q.  All right.  And if the witness had said to you that night that --

MR. LOEVY:  Objection, leading.

MR. SOTOS:  Judge, I'm following up on what --

THE COURT:  Overruled.

MR. SOTOS:  -- his questions were.

BY MR. SOTOS:

Q.  If the witness had said to you that night that he was by

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 492 of 1335 PageID #:105877
Rosner - cross by Sotos
2668

the store or coming from the store or at the store when he saw the shooting, would that have in any way changed your decision to approve charges in this case without the information about the -- how many feet it was?

A.  I don't think -- you know, I didn't have anything to know that he was at a store.  So I don't think -- I think, you know, I really don't know what would have changed my mind about it.

Q.  But it wasn't your job to go out to the scene and then --

A.  No --

Q.  -- measure distances or anything --

A.  -- it was not.

Q.  -- like that?

A.  It was the -- it was definitely the job of the detectives to figure out the distances.

And I don't remember anything, you know, in this case that would involve any kind of long distance.  And the witness, as far as I know, told me, you know, since he told me he already knew the person, that it wouldn't be anything that -- you know, if he can identify the person, it wouldn't be a long distance.

Q.  And is a -- as a criminal case goes on, is that the kind of thing you would expect a criminal defense attorney to do in terms of trying to demonstrate problems in the witness' vantage point --

MR. LOEVY:  Objection.

BY MR. SOTOS:

Q. -- as it's been described?

MR. LOEVY: It's got nothing to do with this testimony.

THE COURT: Sustained.

MR. SOTOS: May I have one minute, Judge?

THE COURT: Sure.

(Counsel conferring.)

MR. SOTOS: I don't have anything further. Thank you.

THE COURT: Any more defense questions?

MR. LEINENWEBER: No, Your Honor. Thank you.

THE COURT: Mr. Loevy.

MR. LOEVY: Thank you.

REDIRECT EXAMINATION

BY MR. LOEVY:

Q. All right. You just told Mr. Sotos that it really wasn't your job to go out to the scene and measure distances and things like that, right? That was the police's job?

A. Right.

Q. So fair to say that although you have no memory of this, it was conveyed to you by the police, whoever they were that you were interacting with, that this kid had a legitimate opportunity to see what he saw?

A. Yes.

Q. And you as Felony Review prosecutor trusted the Chicago

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 494 of 1335 PageID #:105879
Rosner - redirect by Loevy
2670

Police Department in that regard, right?

A. I'm sorry, what -- you're talking about the witness first. Now you're changing it to the police. So I'm not sure what you're saying now.

Q. To do your job, you have to place some degree of trust in the Chicago police officers that you interacted with that what they're presenting to you as legit is legit? There's a measure of trust on your side, right?

A. There's a measure of trust that I'm trusting what the detectives present me with is true.

Q. All right. You are very clear you didn't know anything about the kid being by the store, right?

A. Right.

Q. In fact, the police reports you reviewed sort of gave the opposite impression, right, that he was coming from the store?

A. It had something about him coming from a store, yes.

Q. All right. Mr. Sotos read you part of the deposition -- and by the way, if you're coming from the store, you could be anywhere on the map, right?

A. Anywhere where?

Q. Sorry. I'm going to move on. It's been a long trial.

A. Okay.

Q. Mr. Sotos read you some questions and answers where you said, "I'm pretty sure I would have spoke to the detectives, because, you know, that's usually the norm," right? That's

Q. what you said at your deposition, right?

A. I said that in my deposition.

Q. All right. That was true, right?

A. Well, I -- I always talk with the detectives.

Q. Okay.

A. I can tell you that.

Q. Well, the question was what you said at your deposition was you're pretty sure it would have been the detectives, because, you know, usually I don't talk to the Gang Crime people; it's not the norm. Did you -- was that truthful?

A. It's truthful that I always talk to the detectives. I think if you read that deposition in its entirety, which you need to do, you're going to see that it's the detectives that I talk to in a murder case.

Q. You do understand that that is important to the defense case? Do you have any subjective understanding?

MR. SOTOS: Objection.

BY THE WITNESS:

A. Actually, I don't have any subjective understanding that it's important to their side. To tell you the truth, I don't.

BY MR. LOEVY:

Q. All right. All right. You are certainly not claiming to recall any conversation where Orlando Lopez was claiming -- you don't remember him saying he knew Jacques Rivera, right? You have no memory of that?

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 496 of 1335 PageID #:105886
Rosner - redirect by Loevy
2672

A. I don't have a memory of it, but now that --

Q. Well, that's the question.

A. -- when I looked at the August 29th report --

Q. All right. I'm not talking about the police reports --

A. Okay.

Q. -- because, believe me, we've talked about the police reports.

I'm just asking your memory, your testimony, you don't remember him saying that to you?

A. No.

Q. Okay. You have -- in fact, you have no notes about what he told you, right?

A. I don't have any notes.

Q. You don't have your -- any reports that you wrote about what he told you, right?

A. That's correct.

Q. And you have no memory of what he told you?

A. I don't have any memory separate, but I looked at stuff according to the stipulation which I've made, and I've looked at the police reports, so --

Q. But just focusing on memory, you have no memory, right?

A. I don't have --

Q. Okay.

A. -- any memory.

Q. And you did a lot of work with children. Mr. Sotos went

through with you, right?

A.   Right.

Q.   Sometimes children can be more suggestive than adults. Would you agree with that?  Suggestible.  Excuse me.

A.   No, I absolutely would not agree with that.

Q.   You don't think a child might be more vulnerable to being manipulated or having thoughts put in their head than an adult would?

A.   I think that that's just not true.  I think most children actually are more truthful than adults can be.

Q.   Well, obviously, young children have trouble even with truth and not truth when you're real young, right?

A.   Well, when you're really young --

Q.   Right.

A.   -- but I don't think that's true of a 12-year-old.

Q.   Well, let's just start with, when you're really young, you haven't even figured out what is true and what's not, right?

A.   Well, there is an age in which you can figure out what's true and what's not true.

Q.   All right.  And there's -- and there's a continuum.  As you get mature, you get more and more sophisticated, right?

A.   Yes, that's true.

Q.   And when you're in your 20s, you know, it's pretty hard to get tricked, right?

A.   I'm not sure about that.  I have a 20-year-old.  But yes.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 498 of 1335 PageID #:105883
Rosner - recross by Sotos
2674

Q. Well, I guess the point is, a 12-year-old is not done on this maturity process, right?

A. Well, they're not done, but they tend to be pretty truthful, from my perspective.

Q. All right. And a child could be truthful and believe they're telling the truth and be wrong, right?

A. Well, anybody can be wrong. You and I can be wrong.

Q. Fair enough. And you said if Mr. Lopez had expressed a concern to you about "Wrong guy, wrong guy," you would have not pressed this case, right?

A. That's true.

Q. Now, you had a trust that if the Chicago Police Department had information that the kid had said "Wrong guy, wrong guy," that that information would have been conveyed to you; that's fair, too, isn't it?

A. Yes, that's fair.

MR. LOEVY: All right. Then with that, I conclude. Thank you.

THE COURT: Anything further?

MR. SOTOS: Just a couple more, Judge.

RECROSS-EXAMINATION

BY MR. SOTOS:

Q. Ms. Rosner, you said that you did review an August 29th report?

A. Yes.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 499 of 1335 PageID #:105884
Rosner - recross by Sotos
2675

Q. All right. And you didn't have any recollection that a store was ever mentioned in that report, correct?

A. No.

Q. So I'm correct in that, or you didn't have that recollection?

A. I don't -- no, it was just the street of Cortland Street.

Q. All right. Let me place that in front of you.

MR. SOTOS: Judge, I'm going to place on the screen Defendants' Exhibit 1.11. This is already in evidence with another number that we'll have to work out.

BY MR. SOTOS:

Q. But this is the August 29th report. And do you see -- not the highlighted portion -- the paragraph above that where it states: "The undersigned detectives, in continuation of the investigation of the above-captioned incident, interviewed an eyewitness who stated, in essence but not verbatim, that on the date and time of this incident, Lopez was coming from the store at the corner of Kimball and Cortland"?

Do you see that --

A. Yes.

Q. -- on there?

A. Yes, I do.

Q. Okay. Does that refresh your recollection --

A. Yes.

Q. -- that the report actually did mention the store?

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 500 of 1335 PageID #:105885
Rosner - recross by Sotos
2676

A. Yes, that he was coming from the store, yes.

Q. And so if -- and you indicated that the -- you did have some reports on this night because the incident had happened two weeks before you were brought in for the Felony Review, correct?

A. That's correct.

Q. Okay. And so if this was one of the reports that you had reviewed, that information about him coming from the store would have been available to you, correct?

A. Right.

Q. And so if you had, in addition to that information, a report that said, "by the store" as opposed to "coming from the store," would that have been the kind of difference that would have caused you to decline felony charges in this case?

A. No, I don't think I would have declined it, because you've got "coming from the store," which is totally different than "by the store."

Q. But is that difference significant enough that it would have made a difference to you in terms of whether you would have charged the case?

MR. LOEVY: Objection. She just answered.

MR. SOTOS: I don't think she did, Judge.

THE COURT: Sustained.

BY MR. SOTOS:

Q. One last point. You were asked several times about your

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 501 of 1335 PageID #:105886
Rosner - recross by Sotos
2677

conversations with detectives and whether you talked to Gang Crimes specialists or not. And you mentioned your deposition, that if it was read fully in context, it should be.

So I want to ask you about one other question that you were asked in your deposition that I didn't ask about before.

After stating that "I am pretty" --

MR. LOEVY: What line and page --

MR. SOTOS: Page 55, lines 23, through 56, lines 7.

MR. LOEVY: Jim, that's what you just read.

MR. SOTOS: No, it's not. It's the next one. It's 4 through 7. The first two are just to set it up.

BY MR. SOTOS:

Q. So after stating that "I'm pretty sure it would have been detectives, because I don't speak to Gang Crimes people, you know, usually, it's just not the norm, especially in a murder case," do you recall being asked this question and giving this answer:

"Okay. And why is that?

"Answer: It's just -- you
always go to the -- you always get
the information from the top, and
that would be the detectives,
not anybody else."

A. Yes, I recall giving that answer. And that's -- is how it's done.

MR. SOTOS:  Nothing further.  Thank you.

REDIRECT EXAMINATION

BY MR. LOEVY:

Q.  The next question said, "So that's your best estimate," right?  All right.  I withdraw that.

A.  Yes.

Q.  Just on the question of "by the store" or "coming from the store," you said those are totally different stories, right?

A.  Yes.

Q.  Because if he's by the store, he's over here, right, with the shooter -- the victim being over here?  This is by the store.

If he's coming from the store, he could be standing right here, right?

MS. ROSEN:  Objection, leading.

THE COURT:  I think I'm going to allow that.

BY MR. LOEVY:

Q.  If he's by the store, he's over here?  If he's coming from the store, he could be anywhere, right?

A.  Yes, he could be anywhere.

Q.  And your understanding and recollection from having reviewed the documents is you had the police document that said he was coming from the store, but you didn't have the police documents saying he was by the store, correct?

A.  As far as I recall, I had a written document.  But, again,

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 503 of 1335 PageID #:105883
Rosner - recross by Sotos
2679

I can't remember everything because, again, this is 30 years ago. But this is my recollection, that I definitely had the written report.

Q. All right. If --

A. It's more likely I would have the written report than a handwritten report.

Q. If you had the notes that said he was 191 feet away, which I'll represent to you is about triple the diagonals of this courthouse, that would have caused you some concern, right?

A. You know, it's a hypothetical. I don't know what the angle exactly is without looking at it. I don't know. It might have caused me some concern at that point.

Q. You certainly would have had to resolve that concern before you pursued charges, right?

A. I probably would have resolved that concern before I approved it.

MR. LOEVY: All right. No further questions, Your Honor.

THE COURT: Mr. Sotos?

MR. SOTOS: Just one more, Judge.

Jon, can I have that?

(Counsel conferring.)

RECROSS-EXAMINATION

BY MR. SOTOS:

Q. Ms. Rosner, when you gave your deposition, do you recall

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 504 of 1335 PageID #:105889
Rosner - recross by Sotos
2680

the report that you did review that night back 30 years ago?
Do you recall that it was a handwritten or a typewritten
report?

MR. LOEVY: Objection. Her memory of that? She
doesn't remember anything about the case.

THE COURT: Overruled. Overruled.

BY MR. SOTOS:

Q. Do you remember?

A. I really don't remember what I -- what I reviewed 30 years
ago. My guess is I reviewed --

MR. LOEVY: Objection to speculation, Your Honor.

THE COURT: Yeah, if you don't remember, don't guess.

BY THE WITNESS:

A. Okay. I would have recalled anything that was typewritten.
They don't usually give me anything that's handwritten at that
point.

MR. SOTOS: All right. Thank you. Nothing further.

MR. LOEVY: Nothing, Your Honor.

THE COURT: Okay. Thank you. You may step down.
Watch your step.

(Witness excused.)

MR. LOEVY: All right. Your Honor, we have time for a
short witness.

THE COURT: Yes.

MR. LOEVY: Mr. Guzman.

THE COURT: Okay.

MR. LOEVY: Thank you for coming to court.

THE COURT: Please raise your right hand.

(Witness duly sworn.)

THE COURT: You may be seated.

JOHN GUZMAN, PLAINTIFF'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. LOEVY:

Q. All right. If you'd state your name, please.

A. John Guzman.

Q. And you are a retired Chicago police officer?

A. Yes, I am.

Q. How long did you work for the Chicago Police Department?

A. In excess of 22 years.

Q. And during that time, you investigated a lot of cases?

A. Yes, sir.

Q. And since that's what you did when you went to work every day, sometimes the cases ran together on you?

A. That's true.

Q. Do you have any memory of this case at all, sir?

A. Sir, I know I did work the night the incident was reported.

Q. You know you worked it because you've read the documents, right?

A. That's correct.

Q. Except I'm asking you a different question.

As you sit there in this chair, do you have any memory of these events?

A. After reviewing the reports, I do.

Q. Okay. This is your deposition. Do you remember giving a deposition in this case, sir?

A. Yes, I did.

Q. And did you ask -- were you asked these questions and give these answers? This is page 74, lines 2 through 19.

"Question: Having reviewed reports in connection with the investigation, do you remember anything that occurred in the investigation?"

You said, "Do I recall that specifically?

"Question: Did the police reports that you reviewed trigger any recollection whatsoever about the investigation?

"Answer: Sir, not anything specific.

"Question: Any recollection -- was any recollection at all triggered by your review of the reports, whether specific or not?

"Answer: Yes.

"What recollection

was that?

"Is that I don't recall

specifics dealing with the case."

Did you give those answers, sir?

A. Yes, I did.

Q. And was it true?

A. Yes.

Q. And do you remember also being asked at your deposition on page 93, lines 18 through 24:

"Reviewing -- having reviewed

this report, has it refreshed your

recollection about any events in

connection with the Valentin

homicide investigation other than

those to which you have already

testified today at today's deposition?

"Answer: Not really."

Is that truthful, sir?

A. Yes, it is.

Q. I guess that's a bad question, because it suggests that there were others.

But at the deposition, you were very clear that you had no specific recollection; isn't that true?

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 508 of 1335 PageID #:105893
Guzman - direct by Loevy
2684

A. Sir, I answered the question honestly.

Q. What's that?

A. I answered the question honestly.

Q. All right. Do you remember being asked this question at page 75?

    "Question: Do you recall anything that you did in the Valentin homicide investigation?

    "Answer: Not specifically."

    Did you give that answer?

A. Yes.

Q. Was it true?

A. Yes, it was.

Q. All right. Did you -- you don't recall any witness interactions whatsoever; is that also true?

A. That is true.

Q. So you're not -- they're gone from your memory, right?

A. Yes.

Q. And you gave those answers about not having recollection after you'd had a couple of meetings with Mr. Given and Ms. Golden before the depositions, correct?

A. That's correct.

Q. One meeting was at least four or five hours?

A. As I recall.

Q. And then there was another meeting that was maybe four more

hours?

A. I don't know if it was four hours.

Q. All right. And then during that -- those meetings, without getting into what you talked about, you reviewed reports. You tried to see if anything came back to you, right?

A. That's correct.

Q. Then you gave this deposition where you said you had no memory, correct?

A. That's correct.

Q. All right. Is that true?

A. It is true.

Q. All right. Isn't it true that you never met Orlando Lopez?

A. That's correct.

Q. Orlando Lopez and Mr. Guzman were never in the same place, same time; we agree on that, right?

A. Yes.

Q. All right. Showing you Plaintiff's Exhibit 1 -- can I please have the Elmo? Thanks.

        MR. LOEVY: Can I get the highlighter? Yellow.

BY MR. LOEVY:

Q. All right. It says here, "Gang Crimes Specialists Noon, Guzman, Sparks, and Zacharias." That's you, right, Guzman?

A. Yes, it is.

Q. It says, "Located a witness on the 29th of August. This witness was brought into Gang Crimes North to view a gang book

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 510 of 1335 PageID #:105895
Guzman - direct by Loevy
2686

and then identified Jose Rios," right?

A.   That's what it says.

Q.   All right.   That's what it says, but you've already told us you were not involved in that, correct?

A.   I didn't author this report.

Q.   No, but you already said you and Orlando Lopez never been in the same place at the same time, right?

A.   That's correct.

Q.   All right.   So if this happened, you were not part of it because you were never in the same place and the same time as Orlando Lopez, correct?

A.   That's correct.

Q.   And you have no -- you obviously never saw Orlando Lopez pick Jacques' photo out of a photo book, correct?

           MR. LOEVY:   Can I have a copy of the stipulation for the Zacharias?

BY MR. LOEVY:

Q.   That's true, right?

A.   Sir, can you repeat that, please?

Q.   You never saw Orlando Lopez pick Jacques' photo out of a photo book, right?

A.   That's correct.

Q.   And whatever happened at Orlando Lopez's house on the night of the murder, that did not involve you, right?   Right?

A.   Sir, again, please.

Q. Whatever happened -- you've been at trial, right?

A. Yes, I have.

Q. And you've heard that there may or may not have been interactions with Orlando either at Gang Crimes North or at his house on different dates, right?

A. That's correct.

Q. All right. If -- if Orlando was shown pictures two days before this gang book procedure at his house, you were not involved in that procedure because you never met him, correct?

A. Sir, my involvement in this case was on the 27th of August.

Q. All right. But you never met Orlando on the 27th, right?

A. Not that I can recall.

Q. All right. So if we were to cross off Paul Zacharias here on the stipulation and write Mr. Guzman, it would be accurate that Mr. Guzman has no specific recollection of the Valentin investigation. However, based on your review of the record, you do not believe you were directly involved in the gang book identification; that's true, right?

A. Sir, when I gave my deposition --

Q. That's true, right?

A. Sir, when I gave my deposition, I said I didn't recall anything about an identification at a residence or at the station.

Q. My question is, that's true, isn't it? What's written on this page, you could have stipulated to this, and that would

have been true?

MR. POLICK:  Objection to what he could have done.

THE COURT:  Overruled.  I think the question is already clear.

MR. LOEVY:  Let me ask it -- if I may, Your Honor.  May I rephrase the question?

THE COURT:  Sure.

BY MR. LOEVY:

Q.  If we put Mr. Guzman's name instead of Paul Zacharias' name, that's a true statement, isn't it?

A.  Yes, it is.

Q.  So why didn't you accept this stipulation?

MR. SOTOS:  Objection, Judge.

THE COURT:  Sustained.

BY MR. LOEVY:

Q.  All right.  You -- you're not going to say that this happened on a different date, right?

MR. POLICK:  Objection to the form of the question.

THE COURT:  Overruled.

BY THE WITNESS:

A.  Sir, what I am going to say is my involvement in the case was only on the 27th of August.

BY MR. LOEVY:

Q.  All right.  I get that.  But I'm asking -- well, first of all, you have no memory of the case at all, right?

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 513 of 1335 PageID #:105898
Guzman - direct by Loevy
2689

A.  Sir, it's just what I said.

Q.  Okay.

A.  My involvement was on the 27th.

Q.  Okay.  But you have no memory of the case, right?

A.  I don't have any specifics.

Q.  All right.  So when you're saying your involvement was only on the 27th, what you mean is -- sorry -- what you mean is, you've looked at paperwork, and you believe your involvement was on the 27th, right?

A.  Sir, my involvement in the case was on the 27th of August only.

Q.  But if we could clarify, when you give that answer, that your involvement was on 27th of August, what you mean is, I have no memory, but I've looked at paperwork, and it is my belief I was involved on the 27th, right?

A.  Sir, again, I was involved on one day, and it was the 27th.

Q.  What did you do on August 26th?

A.  I don't know.

Q.  What did you do on August 25th?

A.  I don't know.

Q.  So how -- why do you know you were on duty and involved in this case on the 27th?

A.  Because the paperwork that I looked at, my name is mentioned.

Q.  All right.  But your paperwork is mentioned right here,

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 514 of 1335 PageID #:105899
Guzman - direct by Loevy
2690

Guzman, 29th. Look at that, right?

A. And I'm looking at that I did not author that report.

Q. All right. Fair to say you don't know if you worked the 26th, the 27th, the 28th, or the 29th anymore because you got no memory?

A. I would assume that I worked the days prior to this.

Q. All right. That's just an assumption. I think we're on the same page.

You have no knowledge whatsoever what days you were working, right?

A. I know I worked the 27th of August.

Q. You know that?

A. Yes, I do.

Q. Did you write a report?

A. No.

Q. Do you have any notes?

A. No.

Q. So if -- if Mr. Guevara and Mr. Gawrys say you worked on the 29th, why don't you take their word for it?

A. Sir, again, I didn't author this report.

Q. Why won't you take Mr. Guevara and Mr. Gawrys' word that you were working not the 27th but the 29th? Why won't you credit them?

A. Sir, there's other officers that were involved in this.

Q. Okay. Why won't you accept what they've written as true?

A. Sir, again, I only worked one day on this investigation. It was the 27th of August.

Q. All right. From what you know of Mr. Guevara and Mr. Gawrys, if they wrote that you were involved on the 29th, you're saying, "You know, they might have wrote it, but I don't trust them because I don't believe that paper"? That's what you're saying, right?

MR. SOTOS: Objection, form, Judge.

MR. POLICK: Objection, Judge.

THE COURT: Overruled.

BY THE WITNESS:

A. What they could be saying in the report is that the date is wrong.

BY MR. LOEVY:

Q. What? They're saying -- what they could be saying is that they got the wrong date? Can you explain what you mean?

A. Sir, the witness in this case was identified on the 27th.

Q. Something did happen with the witness and photographs on the 27th; isn't that true?

Something did happen with the witness in his kitchen, right? And it involved photographs, didn't it?

A. Sir, it's my understanding the identification was made on the 27th.

Q. Did somebody show Orlando Lopez that picture of Jacques Rivera and say, "Could this be the guy? Could this be the

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 516 of 1335 PageID #:105906
Guzman - direct by Loevy
2692

guy," two days before he picked him out of the book on the 29th?

A. Sir, again, my understanding is an identification was made on the 27th.

Q. You are not claiming to have witnessed Orlando Lopez pick out Jacques Rivera on the 27th; that much we agree on, right?

A. Yes.

MR. LOEVY: All right. The second arrest report, if I could have that. Thank you.

BY MR. LOEVY:

Q. Now, showing you Plaintiff's Exhibit 3 --

MR. LOEVY: Actually, there's three minutes -- I went too long. I'm sorry.

THE COURT: Do you want to pick up tomorrow?

MR. LOEVY: I think we should. Sorry. I was almost done. But if I finish, could we finish the witness? We're probably not going to finish the witness. I'd rather pick up tomorrow.

THE COURT: I have never seen that happen.

(Laughter.)

MR. LOEVY: I accidentally went -- slowed down.

THE COURT: See you in the morning, ladies and gentlemen, 9:30.

COURT SECURITY OFFICER: All rise.

(Jury out.)

2693

THE COURT: How many more plaintiff's witnesses do we have?

MR. LOEVY: We're going to finish Mr. Guzman. We're going to call Mr. Noon.

We're going to try to get an agreement that Hickey doesn't testify for either side. We're going to try, maybe by stipulation.

We're going to try to do the same with Zacharias. If not, he'll be a short witness.

(Discussion off the record.)

MR. LOEVY: What's that? No, he has a stip but just like Sparks. Sparks is on stand-by. We'll probably --

THE COURT REPORTER: I'm sorry. If you talk to each other, I can't hear you.

MR. LOEVY: Sorry. Your Honor, we probably should regroup as a team, but we heard you tell us we are finishing tomorrow. And we are.

And we heard you telling us it's your strong, strong preference it's by noon, and we're going to try our best.

THE COURT: That's what I said, noon.

MR. LOEVY: Thank you.

THE COURT: Okay. So I don't know what's going to happen at noon, you know, if the balloons come down from the ceiling or what happens.

(Laughter.)

2694

THE COURT:  But you need to be ready to go at noon -- at 1:00.

MS. ROSEN:  We understand.

MR. LOEVY:  Thank you.  Let's talk.

MS. ROSEN:  We don't believe it, but we understand.

THE COURT:  Yeah, 5 minutes, I hear that is like 45, but whatever.

(Adjournment at 4:01 p.m. until 9:30 a.m., 6-20-18.)

C E R T I F I C A T E

We, Colleen M. Conway and Nancy L. Bistany, do hereby certify that the foregoing is a complete, true, and accurate transcript of the Trial proceedings, Volume 11-B, had in the above-entitled case before the HONORABLE JOAN B. GOTTSCHALL, one of the Judges of said Court, at Chicago, Illinois, on June 19, 2018.


/s/ Colleen M. Conway, CSR, RMR, CRR          06/19/18


/s/ Nancy L. Bistany, CSR, RPR, FCRR          06/19/18

Official Court Reporters                      Date
United States District Court
Northern District of Illinois
Eastern Division

# EXHIBIT 55

2695

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JACQUES RIVERA,                                ) No. 12 CV 4428
                                               )
          Plaintiff,                           )
vs.                                            ) Chicago, Illinois
                                               )
REY GUEVARA, STEVE GAWRYS, DANIEL NOON,)
JOHN GUZMAN, JOSEPH FALLON, JOSEPH SPARKS,    )
PAUL ZACHARIAS, GILLIAN MCLAUGHLIN, JOHN      )
LEONARD, EDWARD MINGEY, RUSSELL WEINGART,     ) June 20, 2018
ESTATE OF ROCCO RINALDI, CITY OF CHICAGO,     )
                                               )
          Defendants.                          ) 9:20 o'clock a.m.

VOLUME 12 A
TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JOAN B. GOTTSCHALL
and a jury

APPEARANCES:

For the Plaintiff:      LOEVY & LOEVY
                        BY:  MR. JONATHAN I. LOEVY
                             MR. STEVEN E. ART
                             MR. ANAND SWAMINATHAN
                          311 North Aberdeen Street
                          3rd Floor
                          Chicago, Illinois  60607

                        MACARTHUR JUSTICE CENTER
                        Northwestern University School of Law
                        BY:  Locke E. Bowman, III
                        357 East Chicago Avenue
                        Chicago, Illinois 60611
                        (312) 503-0844


Court reporter:            Blanca I. Lara
                        Official Court Reporter
                        219 South Dearborn Street
                           Room 2504
                        Chicago, Illinois 60604
                          (312) 435-5895
                        blanca_lara@ilnd.uscourts.gov

2696

Appearances  (continued:)

For the Individual        THE SOTOS LAW FIRM
Defendants:               BY:  MR. JEFFREY N. GIVEN
                               MR. JAMES G. SOTOS
                               MS. CAROLINE P. GOLDEN
                               MR. JOSEPH M. POLICK
                               MR. DAVID A. BRUEGGEN
                          550 East Devon Avenue
                          Suite 150
                          Itasca, Illinois  60143

For the Defendant         ROCK FUSCO & CONNELLY, LLC
City of Chicago:          BY:  MS. EILEEN E. ROSEN
                               MS. CATHERINE M. BARBER
                               MS. THERESA B. CARNEY
                          321 North Clark Street
                          Suite 2200
                          Chicago, Illinois  60654

For the Defendant         LEINENWEBER BARONI & DAFFADA, LLC
Guevara:                  BY:  MR. THOMAS E. LEINENWEBER
                               MR. JAMES V. DAFFADA
                          120 North LaSalle Street
                          Suite 2000
                          Chicago, Illinois  60602

2697

(The following proceedings were had out of the presence of the jury in open court:)

COURT SECURITY OFFICER:  All rise.

THE COURT:  Okay.  So, well, my clock inside says 25 after, this clock doesn't (indicating).

So, nobody needs me, although Mr. Loevy wanted me to --

MR. LOEVY:  Just quickly.  We are going to move into evidence, and I don't want to waste the jury's time with that, it's the document -- and we are going to close our case this morning, Your Honor.

THE COURT:  Okay.

MR. LOEVY:  So we just wanted to make sure we're all on the same page.

So that document, which is Plaintiff's Exhibit 19 I, was the one that we were not permitted to introduce through Mr. Guzman -- or maybe it was through Ms. Rosner.

THE COURT:  Yeah.  Through Ms. Rosner.

MR. LOEVY:  154 H was the one that I'll hand you another copy, Your Honor.

THE COURT:  Okay.

(Document tendered to the Court)

MR. LOEVY:  And this is part of the files that were stipulated to be from the Chicago Police Department.  It's a document not unlike the other ones that we've been introducing.

2698

We intend to rely on it. And there's no legitimate foundation for --

THE COURT: Well, let's see. I thought that Ms. Rosner knew nothing about it but --

MR. LOEVY: Well --

THE COURT: -- but it's -- is this relevant? Is this one of the 404(b) issues? Or what is this?

MR. LOEVY: No, what it's relevant to is that it shows Guevara and Gawrys, and Dorsch and Boyle at the bottom.

THE COURT: Yeah.

MR. LOEVY: And handing you a copy of the felony minute sheet from our the case.

(Document tendered to the Court.)

MR. LOEVY: It's done differently, if you look at the phone numbers. So our argument is, it's very relevant because it looks like whoever prepared the felony minute sheet in our case put Guevara and Gawrys as the contact phone number as opposed to both Gawrys and Dorsch.

THE COURT: Do we know if this 744-8260 number is the Gang Crimes number?

MR. ART: It is.

MR. LOEVY: We do, Your Honor. That's the exhibit we want to introduce. The first one I gave you. If you look at the bottom, the phone number --

THE COURT: I know that, but it doesn't establish the

2699

key issue, which is what is this number.  I mean, you asked a number of witnesses, "What is this number?"  I don't think you got an answer.

MR. LOEVY:  We will show you --

MS. GOLDEN:  Could we see what you're handing her?

MR. LOEVY:  Sure.

(Document tendered).

MR. LOEVY:  154 L would be more particular.  And that is Gang Crimes North, 744-8260.

THE COURT:  Hold on.  Hold on.  I'm looking at 154 L. And what am I looking at?

MR. LOEVY:  It's in yellow.  It says, "Sparks, Gang Crimes North phone number 744-8260."  So we can introduce both, but there it is.

THE COURT:  Okay.  So what you want to establish is that that is the number for Gang Crimes North and that is the number that was used for all of the investigating -- well, so-called prosecuting witnesses, except Guevara on 19 I.

MR. LOEVY:  And an additional point, when Dorsch and Boyle wanted to be contacted at Area 5, there's a different phone number on 154 H.

The issue in the case is, was this -- you know, who should the prosecutors been talking to, should they be talking to Dorsch or should they been talking to Guevara.

THE COURT:  Yeah.  I get it.

2700

MR. LOEVY:  Yeah.

THE COURT:  So let me ask you this, is there a witness that you're going have this morning who can actually tell us that that -8260 number is Gang Crimes North?  I'm just curious.

MR. LOEVY:  Well, Mr. Sparks, on the third document I gave you, which has the yellow on it --

THE COURT:  Yep.

MR. LOEVY:  -- it says, This is me, Gang Crimes North, that's the phone number.

THE COURT:  Right.  But I'm asking if there's a witness.

MR. LOEVY:  Sparks is going to testify this morning.

THE COURT:  Oh, he is?

MR. LOEVY:  Yes.

THE COURT:  Oh!  So if he can establish that --

MR. LOEVY:  What if he says, "I don't remember," which, you know --

THE COURT:  Well, you could try to refresh his recollection.

MR. LOEVY:  All right.  And if he is un-refreshable --

THE COURT:  Well, then I think we have to get to this other issue.  It would certainly be nice to have -- well, unless the defense is willing to agree to it, it would be nice to have a witness testify to it.

MS. ROSEN:  Judge, there's two points, as I'm

understanding it, is what's the phone number at Gang Crimes North --

THE COURT: Correct.

MS. ROSEN: -- which the witnesses may or may not be able to establish, but it's not something that we particularly care about one way or the other. So that part of it I think we can agree to.

The separate part of it, though, that the second document was prepared differently to suggest how Dorsch and Boyle -- I don't know which witness. But Plaintiff's Exhibit 154 H, that next leap, logical leap that if Dorsch and Boyle wanted to be contacted, they would've typed in a different number, the document doesn't establish that. And I don't think it's proper to admit the document to establish that. They can try to get it --

THE COURT: Well, let me just see. I guess you're getting more complex than I understand this is. I thought that what the plaintiff wanted to establish is the -8260 number is Gang Crimes North.

MR. LOEVY: Well, that's part of what we want to establish.

THE COURT: Well, what's the other part?

MR. LOEVY: The other part is, we want this second document into evidence.

THE COURT: Which is?

2702

MR. LOEVY: 154 H.

THE COURT: 154 H. Okay.

MR. LOEVY: So if we put that into evidence, it would show that Dorsch and Boyle are contacted at a different phone number other than this one.

THE COURT: On this document?

MR. LOEVY: Yes.

THE COURT: So --

MS. ROSEN: But, Judge, there's no foundation for who prepared the documents as to why -- so to make the logical leap that the reason that -- well, what I think plaintiff wants to do is to make the logical leap that the reason that Plaintiff's Exhibit 190 is cut off -- I don't know, the one that is relevant.

Oh, 190 I --

MR. LOEVY: 19 I.

MS. ROSEN: Oh, 19 I. Sorry. The reason 19 I is different is because 19 I is the one from our case whereas all --

THE COURT: I get. I get it. Tell me quickly, because I understand what the issue is.

MS. ROSEN: Right. Well, I don't think that they can get to that point that if Gawrys and Guevara wanted to be contacted or Dorsch and Boyle wanted to be contacted with simply admitting the document. You need testimony.

2703

THE COURT: Well, I think we need to know something about -- I mean, the fact that they had a different number at a different time on a different document --

MR. LOEVY: I just want to move it into evidence. We're not asking --

THE COURT: Well, I know. But you're going to use it to argue, and you're going to make an argument from it that I'm not sure the facts support.

Why don't -- Boyle is going to testify, right?

MR. LOEVY: Not Boyle. Sparks.

THE COURT: Sparks. Dorsch is not going to testify?

MR. LOEVY: Dorsch is going to testify.

MS. ROSEN: Dorsch is going to testify this afternoon, we're calling him, or later this morning.

THE COURT: Well, I think we ought to see if we can get this through a witness.

MR. LOEVY: Fair enough. So we'll -- can we defer -- we want to move it in if it doesn't go our way.

THE COURT: And I will think about that, but I think if we can get it from a witness, then there's no issue.

MR. LOEVY: Very good, Your Honor.

THE COURT: Okay. I think we're ready, right?

MR. LOEVY: Yes, Your Honor.

THE COURT: Okay. Still on Mr. Guzman, right?

MR. LOEVY: We are, Your Honor.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 530 of 1335 PageID #:105915
Guzman - direct by Loevy
2704

THE COURT: Mr. Guzman, you can retake the witness stand.

(Brief pause).

MR. GIVEN: Judge, we have a courtesy copy of a reply brief that was filed this morning.

THE COURT: Okay. Thank you:

(Document tendered to the Court:)

COURT SECURITY OFFICER: All rise.

THE COURT: Good morning, ladies and gentlemen. Please be seated.

Mr. Loevy, whenever you're ready.

MR. LOEVY: Thanks, Judge.

JOHN GUZMAN, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

DIRECT EXAMINATION (resumed)

BY MR. LOEVY:

Q. Good morning, Mr. Guzman.

A. Good morning, sir.

Q. All right. We left off yesterday, you had no memory of these events 30 years ago. I just want to establish, your memory has not improved since we spoken last, correct?

A. As I mentioned yesterday, I do recall working that night.

Q. You did not say yesterday that it's been 30 years and you have no independent recollection of any specifics than what we read from your deposition?

A. Sir, what I said, I remembered working that night, but I

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 531 of 1335 PageID #:105916
Guzman - direct by Loevy
2705

don't have any specific information.

Q. All right. So you don't remember anything specifically?

MS. GOLDEN: Objection to form.

THE COURT: Overruled.

BY THE WITNESS:

A. (No response.)

BY MR. LOEVY:

Q. That's still the question.

A. Sir, could you repeat the question.

Q. All right. Do you remember signing interrogatory answers in this case?

A. Yes, I do.

Q. All right. Do you remember explaining that because the event had happened 22 years ago, that you don't specifically recall any interactions with interviews, or witnesses, or anything specific?

A. That's correct.

Q. All right. Now, we haven't yet talked about your partner, but your partner at the time was Danny Noon, correct? Was that his first name?

A. Yeah, Danny Noon.

Q. All right. And he was your partner during the Valentin investigation. You know that from looking at the documents, correct?

A. That's correct.

Q. He was a very good police officer, was he not?

A. Yes.

Q. All right. Now, since you and Noon were partners on this investigation, you were presumably driving around in the same car?

A. Yes.

Q. Doing the same things?

A. Basically, yes.

Q. All right. And you don't have any independent memory of anything you and Noon did differently, right?

A. That's correct.

Q. So you never met Orlando Lopez. You also said that yesterday, right?

A. That's correct.

Q. So Mr. Noon never met Orlando Lopez, correct?

A. I can't say.

Q. But you were with him, weren't you?

A. He might've met him on a previous occasion.

Q. Oh, you mean outside of this investigation?

A. Yes.

Q. All right. But in this investigation, he never met Orlando Lopez?

A. No.

Q. No, you agree with me?

A. Yes, I agree with you.

Q. All right. Thank you.

All right. In a case like this, if a witness says, you know, "Wrong guy. Wrong guy," let's say they say it to a detective, or a Gang Crimes specialist, or a police officer who's not the primary lead in the investigation. Do you understand my question?

A. And this is hypothetically?

Q. Yes. As you understand the policies and practices of the police department, that information would be transmitted to the investigators who were working the investigation, do we agree?

A. Hypothetically, yes.

Q. All right. So, for example, if Orlando told a different woman detective other than McLaughlin, hypothetically -- and I know you don't know if he told McLaughlin, or didn't tell McLaughlin, et cetera. But you would expect that that information would be transmitted to the lead detective either way, correct?

A. That would correct.

Q. And same with Gang Crime Specialists Gawrys and Guevara. If they were taking the lead in this investigation, and young Orlando told someone other than a person with an afro and glasses, that that information would've been conveyed to Mr. Guevara on this investigation, you have no doubt about that, right?

A. Yes, it would be correct.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 534 of 1335 PageID #:105919
Guzman - direct by Loevy
2708

Q. All right. And there was some discussion yesterday about what shift you were working in in August of 1988, right? Or what day you were working.

A. Sir, it was August 27th, the afternoon watch.

Q. Okay. And have you seen assignment and attendance records that confirm to you you were working on that shift?

A. No.

Q. Have you seen attendance records that says you weren't working on the 28th, were working on the 28th, weren't working on 29th, were working on the 29th?

A. Sir, it's my understanding those records were destroyed.

Q. But you're not basing your testimony on seeing any records, right?

A. That's correct.

Q. Have you looked for those records?

A. No.

Q. Well, you've been in court when we were talking about sheets, administrative documents sometimes in the investigative file, correct?

A. I have no idea if they'd be contained therein.

Q. All right. But those were the kinds of records that were sometimes in investigative files, right?

MS. ROSEN: Objection, Judge. Foundation. It was not court attendance reports.

MR. LOEVY: It was both, Your Honor.

THE COURT:  The witness can answer.  Overruled.

BY MR. LOEVY:

Q.  You had experience with investigative files, correct?

A.  Not really.

Q.  All right.  Now, when you say that you know you were working on the 27th, are you saying you weren't working on the 28th, you weren't working on the 29th, you weren't working on the 26th?

A.  I'm saying I worked on the 27th.

Q.  Very well.  My next question was, are you saying you didn't work on the 26th, the 28th, and the 29th?

A.  I would assume that I worked for the previous few days.

Q.  Just guessing, though, huh?

A.  An educated guess.

Q.  All right.  And your assumption is that you were working on the 27th, also an educated guess, right?

A.  No, I know I was working that day.

Q.  All right.  You have no notes, right?

A.  That's correct.

Q.  You created no reports, right?

A.  That's correct.

Q.  And this was not your case, right?

A.  I worked on the case.  It wasn't just assigned to me.

Q.  All right.  There are two reports that have your name on them, correct?

A.  I believe so.

Q.  Neither of which was created by you, right?

A.  That's correct.

Q.  One of the reports is dated the 27th of August?

MR. LOEVY:  May I approach?

THE COURT:  Yes.

BY MR. LOEVY:

Q.  This is the report where you're basing a lot of your testimony on, right?

(Document tendered to the witness).

BY MR. LOEVY:

Q.  Is this the report that makes you so confident you were working on the 27th?

A.  Well, sir, yesterday you showed me a different report.

Q.  Well, I'm showing you the report dated August 27th, 1988.

Is that what you have in front of you?  That's Plaintiff's Exhibit 19 D, correct?

A.  Yes.  Is dated the 27th.

Q.  All right.  And does it have your --

A.  And my name is on here.

Q.  -- name on it?

A.  Yes, it does.

Q.  All right.  Now, this report dated August 27th, 1988, has no reference whatsoever to any involvement in a gang mugshot book identification; do we agree about that?

Guzman - direct by Loevy

2711

A.   (No response.)

Q.   Talks about the victim at the hospital, he's going to survive, talks about Israel Valentin.  Nothing about Orland Lopez or any mugshot identification, correct?

A.   Sir, I don't see anything on this report to reflect that.

Q.   All right.  Your name is also on a report dated the 16th of September, 1988, created by Guevara and Gawrys, correct?

        MR. LOEVY:  If we could have the Elmo, please.

BY MR. LOEVY:

Q.   This is your name, right here, right (indicating)?  Guzman?

A.   Yes, sir.

Q.   And this report suggests that on the 29th, on that date, the gang book ID happened at Gang Crimes North, right?

A.   That's what it says.

Q.   All right.  And you're saying based on your review of these two reports, you know you were working on 27th, but you know you weren't working on the 29th, is that what you're saying?

A.   Yes.

Q.   So this report is false?  Plaintiff's Exhibit 1 is false?

A.   Sir, as I mentioned yesterday, there's errors in it.

Q.   Okay.  Well, let's establish definitions, then.

        "False" means not true, okay.  Plaintiff's Exhibit 1, when it says you were involved in the 29th, you're saying that is not true?

A.   I'm saying it's inaccurate.

Q.   Did you ever ask Guevara and Gawrys why they wrote an inaccurate report stating that you were involved in a photo identification procedure on the 29th?

A.   Sir, after the 27th of August, I had no follow-up with this case.

Q.   All right.  Whatever happened with photos and Orlando, that didn't involve you, correct?

A.   That's correct.

          MR. LOEVY:  I have no further questions, Your Honor.

          THE COURT:  Any questions?

          MR. POLICK:  Yes, Your Honor.

                    CROSS EXAMINATION

BY MR. POLICK:

Q.   Good morning, Mr. Guzman.

A.   Good morning.

Q.   Would you tell us when you joined the Chicago Police Department.

A.   December 11th, 1978.

Q.   And what was your education prior to joining the Chicago Police Department?

A.   I had a bachelor's degree from Saint Xavier University.

Q.   Some time later did you continue your education?

A.   Yes, I got a Master's Degree from Chicago State.

Q.   All right.  And upon joining the Chicago Police Department, did you attend the police academy?

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 539 of 1335 PageID #:105924
Guzman - cross by Polick
2713

A.  Yes, I did.

Q.  And what was your first assignment out of the academy?

A.  I went to the 11th District on the west side.

Q.  All right.  And how long were you at the 11th District?

A.  Approximately a year and a half.

Q.  And what were your duties while you were in the 11th District?

A.  I was in the patrol division.

Q.  And after working in the 11th District, what was your next assignment with the police department?

A.  I went to Special Operations Group at 51st and Wentworth.

Q.  And what was your duties at that unit?

A.  It was uniform patrol and also plainclothes assignments.

Q.  Okay.  And what was your next assignment with the police department?

A.  Well, the unit reorganized and we became the gang unit.

Q.  And when the unit was reorganized, did your assignment change?  Did you go somewhere else?

A.  No, sir.  Basically it was the same, uniform patrol and also plainclothes assignments.

Q.  Where did the unit move?  Did the unit move at some point?

A.  I got promoted to Gang Crime Specialists in 1986.

Q.  Okay.  So that was your next role with the police department, correct?

A.  Yes.

Q. And what were your duties as a Gang Crimes specialist?

A. Basically monitoring gang activity. I went to Gang Crimes North, Belmont and Western. It was a plainclothes assignment.

Q. All right. And is that the location you were working out of during the events in this case, Belmont and Western?

A. Yes, sir.

Q. And how long did you remain at that location in the department?

A. Sir, again, the unit reorganized, and I believe we left there in 1985.

Q. And were you still a Gang Crimes specialist?

A. That's correct.

Q. And would it be -- when did you retire from the Chicago Police Department?

A. In 2001.

Q. And were you a Gang Crimes specialist up until the point that you retired from the department?

A. Yes, sir.

Q. Okay. Now, yesterday you testified that you recalled working the night that the incident was reported on August 27th?

A. That's correct.

Q. You testified to that in your deposition, right?

A. Yes.

Q. All right. And you told us today that you recalled that

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 541 of 1335 PageID #:105926
Guzman - cross by Polick
2715

Danny Noon was your partner that day, correct?

A. Yes.

Q. Okay. Now, you don't have any specific recollection of the date as you testified. Do you have any general recollection of what you did on the 27th?

A. Ah, generally, when we start working the case.

Q. Any other recollection, in general, what you did when you worked that shift on the 27th?

A. I know we spent a lot of time in the 14th District station.

Q. All right. And do you recall working any other date of this case?

A. No.

Q. You told us that you didn't prepare any reports in connection with this case, is that correct?

A. That's correct.

Q. And did you participate in any arrest of Mr. Rivera?

A. No.

Q. Did you testify at Mr. Rivera's criminal trial?

A. No, I didn't.

Q. Were you asked to testify?

A. No, sir.

Q. Did you fabricate any evidence or reports in this case, sir?

A. No.

Q. Did you withhold any favorable evidence from the

Guzman - redirect by Loevy

2716

prosecutors in this case?

A. No.

Q. Did you conspire to frame Mr. Rivera?

A. No, I didn't.

MR. POLICK: I don't have any further questions, Your Honor.

THE COURT: Any other defense questions?

(No response.)

THE COURT: Mr. Loevy.

REDIRECT EXAMINATION

BY MR. LOEVY:

Q. So whatever happened with those photographs and Orlando Lopez, they had nothing to do with you, notwithstanding what it says in the report, right?

A. That's correct.

Q. And you didn't do anything wrong, did you?

A. No.

MR. LOEVY: No further questions.

THE COURT: Anything further?

MR. POLICK: No, Your Honor.

THE COURT: Thank you, sir. You may step down.

THE WITNESS: Thank you.

THE COURT: Watch your step.

(Witness excused.)

MR. LOEVY: At this time we call Mr. Noon.

THE COURT: Okay.

(Brief pause).

THE COURT: Sir, please raise your right hand.

(Witness duly sworn.)

THE COURT: You may be seated.

DANIEL NOON, PLAINTIFF'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. LOEVY:

Q. Sir, if you would state your name, please.

A. Dan Noon, N-o-o-n.

Q. You are a retired Chicago police officer?

A. Yes.

Q. How long did you work for the police department?

A. Over 30 years.

Q. And when did you retire?

A. Summer of 1995.

Q. All right. You've been in court when we've been talking about the events involving the Valentin investigation, correct?

A. Correct.

Q. You yourself, though, have no independent recollection of those events 30 years ago, is that true, sir?

A. That's correct.

Q. And even -- you had a few meetings with the other people involved, right?

A. Yes.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 544 of 1335 PageID #:105929
Noon - direct by Loevy
2718

Q.   And you've reviewed the reports, right?

A.   Yes.

Q.   And even after reviewing the reports and having those meetings, it doesn't bring back any memories, right?

A.   That's correct, yes.

Q.   That's because, you know, for you this was another day at the office back in 1988, is that a fair summary?

A.   Yes.

Q.   All right.  You did work with Mr. Guzman, the last police officer?

A.   Yes.

Q.   And back in the 1980's you did not know Jacques Rivera, correct?

A.   I knew him.

Q.   This is your deposition.  Do you remember giving a deposition?

A.   Yes.

Q.   Do you remember being asked this question, this is page 17, lines 9 through 19:

          "Question:  You met the defendant during the
       investigation, is that what you meant?

          "Answer:  Yeah, I didn't know him.  I never
       seen him.

          "Question:  Did you recognize the name when
       you heard he was the plaintiff in this case?

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 545 of 1335 PageID #:105930
Noon - direct by Loevy
2719

"Answer: No, until somebody brought it to my attention, no.

"Question: Did you know who Jacques Rivera was in the late '80s?

"Answer: Not that I can remember, no."

Did you give those answers at your deposition, sir?

A. Yes, I did.

Q. All right. You heard Mr. Guzman say that he never met the boy, Orland Lopez, during the investigation, right?

A. Yes.

Q. You were with Mr. Guzman during these events, correct?

A. Yes.

Q. And you never met the boy either, then, correct?

A. Not that I can recall, no.

Q. All right. You certainly, since you don't recall meeting him, were not present at any identification procedures or book procedures, correct?

A. That's correct. Not that I can recall.

Q. All right. And your assumption is that you would've been with Guzman at all times during this investigation, correct?

A. To a certain degree, that's correct, sir.

Q. All right. Now I want to talk about just a couple of random sort of subjects. But if the Gang Crimes people wanted to create a photo array to show people, say at a hospital, there was a big box of photographs that were sitting in the

office that they could use, correct?

A. Yes.

Q. So if you wanted -- if I wanted to create a photo array at the hospital, I wouldn't have to bring in people from the outside to take pictures of them. I could just go to the box and say, "I'm going to show you these 6 photos," right?

A. Yes.

Q. And that's what you guys did not infrequently, right?

A. Myself personally?

Q. Well, you and the other Gang Crimes people, when you needed to do a photo array, you'd go to the box, right?

A. I can't testify to other people --

Q. How about yourself?

A. Yes. I've done that, yes.

Q. All right. Now, there were books, too, with photographs in them, correct?

A. Yes.

Q. And at various times some of the pictures would be taken out, and purged, and new ones would be put in, right?

A. Yes. That was done by the admin people.

Q. All right. So there was no guarantee that a book you looked on Tuesday would look the same as the book you looked on Thursday, right?

A. I've no knowledge of that, sir.

Q. Well, you did have knowledge that the admin people would

sometimes move around the photos, people might take them out. It wasn't a fixed book, right?

A. The book was made up to be added and deleted, that's correct, sir.

Q. All right. We've heard a lot of talk about detectives and Gang Crime Specialists. Both wear plain clothes, dressed not unlike you are today, correct?

A. No, the dicks are referred to as the suits.

Q. All right. The Gang Crime people did not wear suits?

A. No; we wore jeans, T-shirts, jeans and flannel shirts.

Q. And you guys were out on the streets?

A. Every day.

Q. And you were investigating crimes, right?

A. Yes, we do.

Q. Including homicides, right?

A. Yes, we do.

Q. All right. So it would not be inaccurate to say the Gang Crime Specialists did detective work to solve crimes, although they didn't have the label "detective," right?

MS. GOLDEN: Objection to form.

THE COURT: Overruled.

BY THE WITNESS:

A. Our function as Specialists was to get out on the street. See what's going on out on the street.

BY MR. LOEVY:

Q. Tried to solve crimes, right?

A. Tried to also solve crimes. And also gather intelligence, find out what's going on, who's who, where they work, what they drive, who they're going out with. That was our function.

Q. So if there's a shooting, try to develop clues, right?

A. Use your resources, if necessary, and do what you have to do to try to solve the crime, that's correct, sir.

Q. All right. So labels aside, that is detective work, isn't it?

A. It is to a certain degree. However, we were not in suits, we're on the street.

Q. You're on the streets doing detective work?

A. Our job was on the street.

Q. All right. And you described it at your deposition as a Gang Crimes specialist detective rating, right?

A. That basically is, if you will, the financial status. A Gang Crimes specialist, as well as a detective, are on the same pay grade, that's what that refers to. We make the same money, as such.

Q. And eventually did they give you your detective stars toward the end of your career?

A. Yeah. When we get ready to retire, they gave us detective stars.

Q. All right. I'm going to show you a photograph here. This is Plaintiff's Exhibit 33. And I'll also show you Plaintiff's

Exhibit 272, which is a photograph from which it is drawn.

I will represent to you that we have found the file from which that came from. It's a crime that took place on the 14th of May 1993. My question to you is, who's in the picture? Who's in that photograph?

A. It appears to be a male Hispanic, glasses, mustache. Could be Guevara's twin brother, I don't know.

Q. Could be Guevara's twin brother, did you say?

Tell the jury who it is.

A. I have never seen this photo before. It appears to be Rey Guevara.

MR. LOEVY: All right. We move it into evidence, Your Honor.

THE COURT: Any objection.

BY THE WITNESS: May I add to that?

MR. LOEVY: It's up to the judge.

I think he wants to add something.

THE COURT: Oh. Sure.

BY THE WITNESS:

A. Your Honor, I never seen Rey on the street with his coat and a tie. If he had jeans on and a flannel shirt, would be more easy to identify.

BY MR. LOEVY:

Q. To clarify, Mr. Guevara became a detective around in 1990. So this may be a picture of him once he became a detective.

Noon - direct by Loevy

2724

A.   I have no knowledge as to when it was taken or where it was taken from, but it appears to be a male Hispanic.

MR. LOEVY:  Your Honor, we move it into evidence.

THE COURT:  Any objection?

MR. POLICK:  No objection.

MS. GOLDEN:  No objection.

THE COURT:  It is received.

I'm sorry, that's 33?

MR. LOEVY:  33 it says, Your Honor.

THE COURT:  Okay.

(Plaintiff's Exhibit 33 was received in evidence).

BY MR. LOEVY:

Q.   Showing you this picture of a male Hispanic with glasses and an afro hair style, would you agree that that is how Mr. Guevara appeared in the early '90s, either Mr. Guevara or his twin brother?

A.   As I testified to, it could be Rey.  There's some various similarities to what Rey looks like.  Can I say for sure?  No.

Q.   You have reviewed the paperwork in this case, correct?

A.   Yes.

Q.   And in the Valentin investigation, what was your understanding of who took the lead in the Valentin investigation?

A.   The detectives from Area 5 homicide.

Q. All right. Do you remember giving a deposition and giving these answers, this is page 153, Line 2 through 7.

MS. GOLDEN: Just a moment.

MR. LOEVY: Sure.

(Brief pause).

MR. LOEVY: Got it, Caroline?

MS. GOLDEN: Right. But I wanted you to back up to --

MR. LOEVY: All right. Where would you like me to start?

MS. GOLDEN: Page 4, 1916.

MR. LOEVY: All right.

BY MR. LOEVY:

Q. (Reading:)

"Question: Was there a lead Gang Specialist on the investigation?

"Answer: Not that I can recall.

"Question: Was there generally a lead Specialist in large cases where multiple Specialists worked on the case?

"Answer: Depending on the circumstances, there could be."

And now to my question:

"Question: But you don't know who was the lead in this case?"

And your answer:

"Answer: I think it was Gawrys and Guevara. Guzman and I were off the next day. We were working on something else."

Did you give those answers, sir?

A. Yes, sir.

Q. All right. And did you also, on page 187, from lines 12 to the bottom, give the following:

"Question: Do you recollect receiving any information from other investigators about a lineup in this case?

"Answer: No. John and I started working with something else. This was Rey and Steve's case. They were doing everything, the lineups, the arrests, and we moved on to something else."

And your answer continues, but you did say this is Rey and Steve's case, right?

A. They basically were if you want to use the term "lead investigators," it would be Rey and Steve, that's correct.

Q. And that's --

A. And from the Detective Division it be Gillian and Jack Leonard.

Q. All right. And that's Guevara and Gawrys, right?

A. From the gang section, that's correct, sir.

Q. And your understanding on the lead on the detective side was Ms. McLaughlin?

A.   That's correct.

MR. LOEVY:  I don't have any other questions, Your Honor.

THE COURT:  Okay.  Any questions from the defense.

MS. GOLDEN:  Yes.

CROSS EXAMINATION

BY MS. GOLDEN:

Q.   Okay.  Mr. Noon, back in 1988, you were a Gang Crimes specialist working out of Belmont and Western?

A.   Yes.

Q.   Okay.  And for some years prior to that time you had been a Gang Crimes specialist, correct?

A.   That's correct.

Q.   And how long had you been working -- you were working -- you were assigned to the Latin Kings?

A.   The Humboldt Park section of the Kings, Beach and Spaulding, I worked from probably mid '70s on.

Q.   And did you know a man who went by the name of Jacques Rivera at that time?

A.   Around the '80s, '85, Ace.

Q.   The name Jacques Rivera, does that ring a bell for you?

A.   Yes.

Q.   Okay.  How so?

A.   As being from the Beach and Spaulding section of the Latin Kings, known on the street by the name of Ace.  I knew him as

Ace.

Q. You know him as Ace, right?

A. That's correct.

Q. And you didn't know him at the time as Jacques Rivera, correct?

A. No, I just knew -- I knew the street names.

Q. And in your deposition you were asked if you knew Jacques Rivera, correct?

A. I believe I was.

Q. You were not asked whether or not you knew a Latin King by the name of Ace who worked at Beach and Spaulding in the '80s, is that fair?

A. That's fair to say, yes.

Q. Okay. You are a defendant in this case, right?

A. That's correct.

Q. We haven't heard your name very much. So I want to put it in context.

I just want to ask you a little bit about your background, okay, sir. Can you tell me, you went to high school in Chicago?

A. Graduate of Taft High School in June 1964.

Q. And what did you do after high school?

A. I joined the United States Marines Corps for 3 years. Was in California, Vietnam, another year in North Carolina, was a platoon sergeant, and came on to the police department in

February of '68.

Q.  I'm sorry, I didn't hear the last part.  If you could just talk a little more slowly.

A.  Yes, ma'am.

Q.  What was the last part?

A.  The last part, I finished Vietnam.  I came out, came on to the police department when my father was on, and spent the next 41 years.

Q.  So you were discharged from the Marine Corps honorably?

A.  Sergeant platoon infantry, that's correct, ma'am.

Q.  Okay.  And you joined the Chicago Police Department shortly thereafter?

A.  February of 1968.

Q.  Okay.  And your first few jobs at the police department were as patrolman?

A.  That's correct.

Q.  Okay.  And when did you transition from a job as a patrolman at the Chicago Police Department?

A.  In September of 1970, I left the specialized unit called a Task Force up north in Chicago.  I went to the Shakespeare station to work in the District Tactical Unit specializing in street gangs.

Q.  And for how many years did you specialize in street gangs at the Chicago Police Department?

A.  30.

Q. 30 years. And you were assigned to a particular gang?

A. Yes, I basically had the Latin Kings in the 14th District area, also Gaylords and other smaller gangs.

Q. And the Latin Kings in the 14th District, is that the Humboldt Park area that we've been talking about at this trial?

A. Yes, that's correct.

Q. And so what does it mean to -- you know, what do you do as a Gang Crimes specialist?

A. Be on the street.

Q. Okay. What does that mean?

A. You worked the street.

Q. What does that mean?

A. You find out who is who. Who's Flaco, who's Tall Boy, who's Watusi. Find out where they live, what they do, where they work, what they drive, who they're going with. It's your responsibility as a Specialists to know your gang. Something goes down with a gang, you're supposed to know about it.

Q. And how is that helpful information?

A. You have to develop a rapport on the streets with gang members. They don't like us, we really don't like them, but we have to live with each other.

It's a different type of scenario. The average police officer probably wouldn't be part of it, because normally in a gang world, this week's offender might be the next week's victim. It would be very versatile. Nobody cares about it.

And then dope came along, it changed the whole scenario out there.

It's a different type of work, and to do it you have to gain respect of the people you're working with. We're not friends. I'm not out there to be their friend or homeboy. I'm there to do my job, they got their job. We gotta get alone. We gotta survive. What we try to do is make the neighborhood safer.

Q. And is that what you do, working Gang Crimes, making the neighborhood safer?

A. I was known as the street guy. I talked to them. Didn't party with them. Wasn't there to be their friend. I was fair.

Q. Did you have any problems with Ace?

A. No. He's known me for years. I didn't have any problem with Ace.

Q. Did you have any ancillary duties at the department relating to your specialty in Gang Crimes?

A. Yes. From the years of '85 to 1995, I was the instructor at the Chicago Police Academy. Everyone we recruited in that 10-year period, they went to the Academy. Had me for a two-hour block on street gangs.

All the recruits went to our Academy from the metro classes, such as your suburban classes. I would also instruct those recruits for another two-hour block.

I was the liaison between the street and the

penitentiary. I spent a lot of time in the joint. I knew all about the sizes of cells, where the cells were at. It was my -- one of my responsibilities in my jobs is to go to the penitentiary, interview certain people about certain things, gain information on unsolved cases.

And it was just one washes the other. Suppose a guy is down in Pontiac, he wants to get to Stateville. I do what I have to do to help him get moved. It was basically another form of gathering intelligence and solving a lot of unsolved murders and shootings that we had responsibility for.

Q. Mr. Noon, are you familiar with -- were you familiar in the 1980's with the Imperial Gangsters street gang?

A. Yes, I was.

Q. Okay. And the colors of the Imperial Gangsters were?

A. Pink and black.

Q. And the colors of the Latin Kings were?

A. Gold and black.

Q. In the 1980's -- so the Imperial Gangsters and the Latin Kings were both foes, right?

MR. LOEVY: Objection. Leading and relevance, Your Honor.

MS. GOLDEN: Let me ask it differently, then.

THE COURT: Okay.

BY MS. GOLDEN:

Q. Back in 1988, was there any animosity that you were aware

of between Imperial Gangsters and Latin Kings?

A.   Yes, they hated each other.

Q.   Okay.  And what about between the Imperial Gangsters and Campbell Boys?

A.   They were basically from the same Folk Nation.  They normally will get along, unless there be an adult problem or a romantic problem.  But for the most part, they would normally hang together, that's correct.

Q.   And in the 1980's in Chicago, in the area of Humboldt Park, what was -- how often was there a shooting --

          MR. LOEVY:  Objection, your Honor.  Not relevant.

          THE COURT:  I don't see the relevance.

          MS. GOLDEN:  I'm trying to get some context for why he might not remember this particular investigation.

          THE COURT:  I think going into this kind of thing is --

          MS. GOLDEN:  I'm done with like talking about specific gangs.

          THE COURT:  Right.  But we're going into what was going on on the street.

          MS. GOLDEN:  Okay.

          THE COURT:  I think that's opening up a whole new can of worms, and I'm not sure we need to do that.

          MS. GOLDEN:  Okay.

BY MS. GOLDEN:

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 560 of 1335 PageID #:105945
Noon - cross by Golden
2734

Q. You testified on direct that you have no independent memory of this particular investigation, correct?

A. That's correct.

Q. Okay. About how many different shootings did you assist in let's just say in the course of a year, in late 1980's?

A. The '80s was referred to in Chicago as the war of insanity. Major, major war in Humboldt Park. You had 900 incidents Involving street gang activity. It was battleground. I thought I was back in Vietnam.

Shootings every day. That's why in gang unit, you get on one, you work it, you get another one. You can't stay with it as long as you'd like to because there's just too many of them. It's a revolving door. It's payback. It's never going to stop.

MR. LOEVY: There is a narrative, objection.

THE COURT: Pose another question.

BY MS. GOLDEN:

Q. Mr. Noon, I'm going to show you what's previously been marked as Defendants' Exhibit 63, which is a map of the area of the shooting.

And I ask you, if you know if a car is heading down Cortland and it turns right on Spaulding, is that heading into one particular gang territory?

A. Yes. If you're going eastbound on Cortland and then make a right turn going southbound on Spaulding, you're going into

Latin King territory. It's like a whole new world. The Mason-Dixon Line.

Q. Mr. Noon, you knew Ace, right?

A. Yes.

Q. You had no problems with him?

A. No; I'd seen him on Beach and Spaulding with other Kings and talked after a while.

Q. As far as you know, he has no problems with you. I think he said that in court, right?

A. Yes. I had no animosity towards Ace. He was what he was and I was what I was.

Q. Okay. Do you remember, or based on the police reports, you have no independent memory of doing anything in this case, correct?

A. That's correct.

Q. But you have looked at the police reports?

A. That's correct.

Q. And based on the reports, can you tell us what you did?

A. Yes. I was notified per the report of a gang incident shooting where a victim was at Orwellian American Hospital.

And I had to proceed to that location. I don't really recall all of the particulars about it, but I would be required to go to that location, meet the beat officer from the 14th District, obtain a copy of the police report he makes up. Then I would be required to go back to my office, prepare a major

incident report so our unit, the gang unit, would be notified as to another gang shooting. That was part of our responsibility, that was part of our workload, if you will.

I don't remember actually doing it in this case, but I must have done it because I was required to do it. If I could be shown a report that I produced, I could probably testify off of that, but I don't recall exactly.

Q. All right. So, Officer Noon, I'm putting up on the street in front of you what we've marked as Defendants' Exhibit 1.9, which is the case report from the shooting in this case. That was made on -- the date of the report is August 27th, and the time that the beat officer signed it was 7:30.

Is this a copy of the report that you're talking about?

A. Yes, I was required to get a copy of, that's correct.

Q. So you went to -- do you remember going to the hospital in between?

A. I remember the detail. I had to have gone to it because I had to make a report on it, but I don't recall the particulars, no.

Q. So based on the paperwork, do you think that --

MR. LOEVY: Objection, Your Honor. Leading.

THE COURT: Sustained.

BY MS. GOLDEN:

Q. And then did you -- is this a copy of the report that you

brought back to the office.

A.   Yes, I was required to bring that back to the office, make an a report for downtown for the gang investigation section.

Q.   And do you remember what, if anything, you did after you got a copy of the report?

A.   Particulars, no.  I would assume I would go back on the street and see if I could assist the rest of the gang guys that worked on the case, but I don't recall the particulars of it, no.

Q.   Did you fabricate any evidence against Ace?

A.   No.

Q.   Did you hide any evidence from him?

A.   No.

Q.   Did you see -- did you conspire with anyone else to do either of those things?

A.   No.

MS. GOLDEN:  That's it.

THE COURT:  Anything further?

REDIRECT EXAMINATION

BY MR. LOEVY:

Q.   If I understood your testimony, you did have a copy of the case report, that's Defendants' Exhibit 1.19, correct?

A.   Which I obtained from the beat officer in the 14th District.

Q.   Right.  That is Crawford and Machain, right?

A. Yes, sir, that's what it says.

Q. All right. If I might have misunderstood. You're not saying this is your report. This is the report you obtained, right?

A. This is the original case report made up from the beat officer, that's correct, sir.

Q. That you obtained?

A. That I received from him, that's correct.

Q. All right. So what I want to ask you about is, it sounds like you just told Ms. Golden that you created a major incident report?

A. I'm required through my unit, if there's a major gang shooting assigned to me, I have to make a report for downtown, that's correct.

Q. Well, where is that report?

A. I have no knowledge. I turned it into the office and the admin people take over.

Q. Have you seen it in the last since getting ready for discovery? Did you say, "Hey, where's my report"?

A. I haven't seen it in 30 years. I have no idea where the report was. That's the admins people. I'm on the street, they take care of the paperwork.

Q. So if I understood what you're saying, the Gang Crimes people in every shooting would create something that they called the major incident report?

A. Sir, that's correct. A major report has got to be made up by the Crime Specialists to send downtown to the bosses as to what happened on the street the night before; if there was a shooting, where was it at, who was involved.

Q. So it would be loaded with important information, right?

A. Whatever the specialist put in that report is required to be sent downtown, that's correct.

Q. Would you agree that Mr. Rivera had a Constitutional right to receive that report if it's got all that information?

MS. GOLDEN: Objection. Relevance, information.

THE COURT: Overruled.

BY THE WITNESS:

A. I have no knowledge of his Constitutional rights. I understand what we had to do. We were required to make a report that was sent down to the admin people. As to what took place at that point, I'm on the street, I don't know.

Q. All right. But focusing on your knowledge and your understanding. You did understand that people accused of crimes have a right to receive all the information in the case, right?

A. Certainly.

Q. Okay. And this report you've described sounds like the kind of information that he would have had a right to receive, correct?

A. I would have no knowledge. I'm just on the street. I'm

required to do certain things.  As to where it goes from that point, I have no knowledge.

Q.  All right.  I'm not asking you again about your knowledge about what happened to it; okay?  But I am asking you for your understanding that the kinds of things you wrote in that report, that would have included the facts of the case, right?

A.  It would be a brief summation as to what would take place. It's not like a closing Supp. or a full report, no.  It's a brief summary as to what happened.

Q.  So, for example, there's no doubt that would contain information about Orlando Lopez, right?

A.  I don't know the particulars.  I would imagine should, though.

Q.  All right.  Well, why were those reports never part of the criminal justice system?

MS. GOLDEN:  Foundation.

THE COURT:  If the witness knows.

BY THE WITNESS:

A.  I'm on the street.  I have no clue as to what admin people are doing to the reports, where it goes, or who's it supposed to go to.  That's not my responsibility.

BY MR. LOEVY:

Q.  Al you know is, in shootings you would create this -- what did you call it, a major --

A.  Major incident report.

Q. All right. You would create these major incident reports, you'd turn it, and you have no knowledge about whether the police department did or didn't turn these over as a matter of course, right?

A. That's correct. It's not my responsibility.

Q. Understood.

All right. You were asked by Ms. Golden about if the car had turned right on Spaulding it would've been driving into Latin King territory, correct?

A. That's correct.

Q. And just to orient everybody, this is Cortland (indicating). Looks like this "X" is probably where the shooting happened. Near this alley (indicating). And then if you went right on Spaulding, that's down toward -- toward Latin King territory?

A. That's correct.

Q. Showing you Defendants' trial exhibit 5.1, page 18, Orlando Lopez -- Orlando Lopez's trial testimony. He says:

"Where did he go?"

"Right through Spaulding."

Do you see that?

A. Yes, sir.

Q. If he had not turned on to Spaulding but went right through Spaulding, he's on Cortland going east and he goes right through Spaulding, what territory does that put him?

A.   He's going from Latin King turf down to Humboldt Boulevard where we call the DMZ, if you will.  That divides Folk and People Nation, the Kings and Disciples.  So had that vehicle gone, continued to go eastbound on Cortland --

Q.   Right.  It would have gone right through Spaulding and kept going.

A.   Kept going, he'd go right down to the boulevard, which is now all MLD's, Latin Disciples, Cobras.

Q.   All right.  Now, you said at your deposition, you did say you didn't know the plaintiff in the lawsuit, right?

A.   Mr. Rivera?

Q.   Well, you knew -- at the deposition you knew that Jacques Rivera, Ace, was suing the police department, right?

A.   That's correct.

Q.   All right.  You gave some explanation that it was a very busy time in the '80s and there were a lot of cases.  Let me ask you this, sir, were there too many cases to do your job right?

A.   We did the best we could with what we had to work with.

Q.   Did you cut corners, sir?

A.   I wouldn't use the term "cut corners."  We did what we had to do to solve cases.

Q.   And it's an important responsibility, right?

A.   Trying to keep people alive out there is very important.

Q.   And protecting people's rights and making sure they're not

Q. wrongfully convicted, that's important, too, right?

A. So is the fact that a little kid catches a stray bullet out there.

Q. All right. But, sir, I take it you guys didn't have the mentality that, "Hey, there's shootings on, I don't care who gets convicted," was that your mentality?

MR. GIVEN: Objection, Judge.

MR. LEINENWEBER: Objection.

THE COURT: Overruled. Overruled.

BY THE WITNESS:

A. My position was, I was trying to save lives and keep these young kids safe.

BY MR. LOEVY:

Q. All right. Was that the kind of attitude that you experienced with your colleague, say Mr. Guevara, like, "Hey, there's a lot of shootings going. We can't be worried about people's rights, we just got to start arresting people"?

MR. LEINENWEBER: Objection to form.

THE COURT: Overruled.

BY THE WITNESS:

A. You're in the gang unit for a reason. You want to be there, you want to help. You're trying to solve some of the stuff that's going on.

BY MR. LOEVY:

Q. All right. But you gotta do it right, we agree on that?

A. You have to do your job correctly, that's correct.

Q. All right. You were asked about being a defendant. And you did -- you were in court when you say Mr. Zacharias' stipulation, right?

MS. GOLDEN: Your Honor, I'm going to object to this. This is an offer of settlement that he is about to go into.

THE COURT: Oh! That stipulation is?

MS. GOLDEN: That was what was offered, yes. So it's completely improper and it invades --

THE COURT: Well, I don't know anything about this. So if you're going --

MR. LOEVY: The question was --

MS. GOLDEN: But --

THE COURT: Hold on.

MR. LOEVY: I'm sorry. The question was, you were in court when the stipulation got read.

MS. GOLDEN: It's the same place he went into yesterday with this. It invades the attorney-client privilege and --

THE COURT: All right. You're going to have to tell me, because you're talking about something you know about. I certainly don't know anything about it.

MS. GOLDEN: He said --

THE COURT: You want to meet at the sidebar?

MS. GOLDEN: I tell you what, let me ask this

question.

BY MR. LOEVY:

Q. If we cross off the question "Paul Zacharias" --

MR. SOTOS: Judge, he shouldn't be able to ask this question --

THE COURT: Well, do you want a sidebar or can you go ahead?

MR. SOTOS: Yes.

THE COURT: As I say, I have no idea what you're talking about.

MR. LOEVY: Well, I would like to ask the question. I won't say it in front of the jury.

THE COURT: Well, I guess we need to meet, because it's causing a lot of consternation.

(Proceedings heard at sidebar on the record.)

MR. LOEVY: The question I would like to ask the witness --

THE COURT: Hold on. Hold on. And, please, everybody, one person at a time. I don't want to deal with this screaming.

MR. SOTOS: Who do you want to go first, Judge?

THE COURT: Well, let me hear what you want to do with this.

MR. LOEVY: The question, and the only question I want to ask is:

"... if we crossed off this name and said:

'Stipulation regarding Daniel Noon:  The parties

hereby stipulate that Daniel Noon has no

recollection of the Valentin investigation.

However, based on his review of the record, he

does not believe he was directly involved in the

gang book identification, is that true?'"

That's the only question I want to ask.

THE COURT:  Go ahead, Mr. Sotos.

MR. SOTOS:  This started weeks ago with settlement negotiations.  They first wanted money from defendants --

THE COURT:  Yeah.  Tell me what's wrong with the question.

MR. SOTOS:  Because it goes directly to settlement negotiations.  It violates the Court's rules on settlement discussions can't be made public.

THE COURT:  So there was a settlement with Mr. Zacharias?

MR. SOTOS:  Yes, there was.  It was a stipulation that they would say a certain thing and then they would be dropped from the case.

MR. LOEVY:  Your Honor --

THE COURT:  Now, wait a minute.  Wait a minute.  Wait a minute.  This is -- All right.  So what this is saying is, this stipulation was created in order to let Mr. Zacharias out

of the case.

MR. SOTOS:  Correct.

THE COURT:  So he wouldn't have a defendant in this case, it would just be this factual --

MR. LOEVY:  Uh-huh.

THE COURT:  All right.  And you want to ask if the facts are true for Mr. Noon.

MR. LOEVY:  Right.  And then I will have a set of them.

THE COURT:  You know what?  Let's --

MR. LOEVY:  Then I will have a set of them.  I'll have a Noon, I'll have a Fallon, I'll have a Zacharias, and the only people left are Guevara and Gawrys.  So I want to --

THE COURT:  Well, let me ask you something.  I think the idea of a stipulation is part of our problem.  If you can just ask him factually if this is true.

MR. SOTOS:  He asked him yesterday, he asked Guzman yesterday, "Why didn't you take this stipulation --"

THE COURT:  All right.  Well, I didn't hear an objection yesterday.  And I'm telling you, I don't know anything about it.  This is the first I'm hearing this.

MR. SOTOS:  There was an objection immediately.

THE COURT:  Well, maybe you didn't make it clear what it was.

MR. SOTOS:  It was sustained.

THE COURT: All right. Well, then, you must be happy.

MR. SOTOS: No, because now he's going through the same thing again.

THE COURT: Well, it's -- factually, there's no problem with this. It's just that it's a stipulation that's the problem.

MR. LOEVY: Which is crossed off.

MS. GOLDEN: Why can't he just ask the question?

THE COURT: Yeah, ask the question.

MS. GOLDEN: Forget the stipulation.

MR. SOTOS: But why does it have to be in relation to a stipulation that was part of a settlement.

THE COURT: Well, I'm just saying it seven or eight times, if you were listening to me. We're not going to talk about a stipulation, that's part of the settlement. But the factual thing you can't keep out.

MS. GOLDEN: Just ask the question.

THE COURT: Yeah, just ask the question.

(Proceedings resumed in open court).

MR. LOEVY: May I proceed, Your Honor?

THE COURT: You may.

THE COURT REPORTER: Mr. Loevy, just a moment.

MR. LOEVY: Sorry, Blanca. Sure.

(Brief pause).

BY MR. LOEVY:

Q. All right. Sir, it would be accurate, as a factual matter, to say that you have no specific recollection of the Valentin investigation; however, based on your review of the record, you do not believe you were directly involved in the gang book identification, correct?

MS. GOLDEN: Objection. Compound.

THE COURT: Break it down if there's a compound issue.

MR. LOEVY: Can I put it on the screen, Your Honor?

MS. GOLDEN: Objection. That's the basis of the objection.

THE COURT: Why don't you break down the question.

BY MR. LOEVY:

Q. All right. You have no specific recollection of the Valentin investigation, correct?

A. That's correct, sir, yes.

Q. And you do not believe you were involved in the gang book identification because you never met Orlando Lopez, correct?

A. That's correct, sir.

MR. LOEVY: All right. No further questions, Your Honor.

THE COURT: Anything more?

MS. GOLDEN: Just a few questions.

RECROSS EXAMINATION

BY MS. GOLDEN:

Q. Officer Noon, if Gang Crimes officers know as of 7:30 at

night that there's one eyewitness to a gang-related shooting, what are the next steps in the investigation for the officers?

MR. LOEVY: Objection. Scope, Your Honor.

THE COURT: Overruled.

BY THE WITNESS:

A. To basically use whatever information you acquired to go to that location to see if there is, in fact, a person to talk to that would have some knowledge about the case.

BY MS. GOLDEN:

Q. And according to the police report that you looked at before, as of 7:30 at night Gang Crimes knew that Orlando Lopez was an eyewitness, correct?

MR. LOEVY: Objection. Leading, Your Honor.

THE COURT: Sustained.

BY MS. GOLDEN:

Q. I'll direct you back to the police report.

MR. LOEVY: Your Honor, I just would object to scope. This is opening another area.

MS. GOLDEN: I think you already --

THE COURT: Well, it may affect the scope. And, yes, that would open things up. Go ahead.

BY MS. GOLDEN:

Q. So Gang Crimes knew, as of the time you received this report at least, that Macho Lopez was the eyewitness?

A. That's correct.

Q. Or a potential eyewitness, right?

A. That's what the report says, that's correct.

Q. And as of the time you received this report, you also knew that the --

MR. LOEVY: Objection to leading, Your Honor.

THE COURT: Sustained.

MS. GOLDEN: Just trying to go faster.

BY MS. GOLDEN:

Q. What, if anything, did Gang Crimes know about the suspected affiliation of the offender?

A. Lead to the Latin Kings.

Q. And did police at the time you received this report have an address for the single eyewitness?

A. Yes, I believe there was.

Q. And would a next natural step have been to go to that location that night?

MR. LOEVY: Objection. Leading, Your Honor.

THE COURT: Sustained.

BY MS. GOLDEN:

Q. What would the next natural step of the investigation be?

A. Send somebody over to that location to check it out to see if it was verified.

Q. Is there any reason to wait two days to talk to the only eyewitness to a shooting like this?

A. No.

MS. GOLDEN:  That's about it.

FURTHER REDIRECT EXAMINATION

BY MR. LOEVY:

Q.  Ms. Golden showed you a copy with Orlando Lopez's name on it.  Do you see that, Macho Lopez?

A.  Yes, sir.

Q.  All right.  This document have a fax showing it was faxed in 2012.  Probably sometime around the post-conviction proceedings, right, sir?

A.  I have no knowledge of that, sir.

Q.  All right.  Showing you another version of the same report, this is Plaintiff's Exhibit 11.  Now I'm going to show you Plaintiff's Exhibit 19 C.

There was an earlier version of this police report that did not have Orlando Lopez's name on it, correct?

A.  In the document that you just showed me, that's correct.  I have no knowledge of this.

Q.  All right.  But you don't know when Orlando Lopez's name got added to it, and you don't know what you were doing on August 27th, 1988?

A.  I did not prepare this report, so I have no knowledge of that.

MR. LOEVY:  I have further questions, Your Honor.

THE COURT:  Anything further?

(Whereupon, there was a conference had between counsel off the record.)

FURTHER CROSS-EXAMINATION

BY MS. GOLDEN:

Q. Officer Noon, I'm showing you what's part of City's 50 and ask you -- this is the first page, and this is the second page (indicating).

And I'm going to ask you if you see that same fax that Mr. Loevy pointed out on this document.

The document that I showed you, which was Defense Exhibit 1.9, do you see where it has this fax on the left-hand corner?

A. Yes, ma'am.

Q. City 50, which is the original, doesn't have that same fax on the left-hand corner, correct?

A. That's correct.

Q. But -- and counsel can correct me if I'm wrong -- otherwise, it appears to have the very same information on it?

A. It appears to be, without reading it word for word. Glancing it --

MS. GOLDEN: You can point this out if we're wrong.

MR. LOEVY: We did the converse the other day. It wasn't complete, remember?

MS. GOLDEN: There is a different report.

(Whereupon, there was a conference had between counsel, inaudible.)

(Brief pause).

BY MS. GOLDEN:

Q. And so there is, there is as Mr. Loevy showed you in the file, an unfinished copy of the exhibit I just showed you?

MR. LOEVY: Objection. Leading, Your Honor.

MS. GOLDEN: I'm just trying to set up the question so we're not here all day.

THE COURT: Well, I don't think the problem is leading. The problem is it may assume facts that may be in dispute, I don't know.

MR. LOEVY: I'll withdraw the objection, Your Honor.

THE COURT: Okay. Go ahead.

BY MS. GOLDEN:

Q. Was it your custom and practice to wait at the police station for a completed copy of the general case report before you went to make what you called the major incident report?

A. We like to get that report from the beat officer pretty much completed as possible, because there's information hopefully in every report that downtown is going to want to know about in your report. So you'd like to get as much as you could from the beat officer to relay down to downstate headquarters.

Q. And the time that Officer Crawford--and I'm pointing to the

Q. screen in front of you--signed this report is 1930 hours, right?

A. Yes.

Q. So that's 7:30 at night?

A. Civilian time, 7:30, that's correct.

Q. And your shift ends at what time?

A. 1:00 o'clock in the morning.

Q. So at the time you have this report, if you have completed the report from Officer Crawford, you still have quite a few hours left on your shift, correct?

A. That's correct.

    MS. GOLDEN:  That's all.  Thank you.

            FURTHER REDIRECT EXAMINATION

BY MR. LOEVY:

Q. All right.  There is a copy of the report in the investigative file that doesn't have Orlando's name on it, would that surprise you?

A. I wouldn't have any knowledge of the investigative report.

Q. Because the way it works is, there's different carbon of the report, right?

A. I would assume there would be, yes.

Q. All right.  So all this means is, someone ripped off the carbon before the kid's name got added later, right?

A. I would have no knowledge of that, sir.

    MR. LOEVY:  All right.  I have no further questions.

THE COURT: Anything further?

(No response).

THE COURT: Anything further?

MS. GOLDEN: No.

THE COURT: Thank you, sir. You may step down.

THE WITNESS: Thank you, Your Honor.

(Witness excused.)

THE COURT: I think we can press on.

MR. LOEVY: Thank you.

THE WITNESS: Uh-huh.

(Brief pause).

(Witness walked into the courtroom.)

THE COURT: Is this the witness?

MR. SWAMINATHAN: Yes, Your Honor.

THE COURT: Could you step down here, please.

(Brief pause).

THE COURT: Please raise your right hand.

(Witness duly sworn.)

THE COURT: You may be seated.

JOSEPH SPARKS, PLAINTIFF'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. LOEVY:

Q.  Good morning, sir.  If you could state your name, please.

A.  George Sparks, S-p-a-r-k-s.

Q.  And are you a former member of the Chicago Police Department?

A.  Yes, I am.

Q.  How long were you with the CPD?

A.  33 years.

Q.  And drawing your attention to the mid-'80s, were you working in Gang Crimes North?

A.  Yes, I was.

Q.  All right.  There were a lot of crimes to investigate back then, correct?

A.  Correct.

Q.  Were the Gang Crimes people cutting corners or were they doing the right way?

A.  Doing it the right way.

Q.  Just because there's a lot of shootings, doesn't mean you can treat this as, "Hey, we just got to arrest people," right?

A.  Correct.

Q.  You got to make sure you do it right, and you got to make sure you respect people's Constitutional rights, right?

A.  Right.

Q.  All right.  Showing this stipulation.

        MR. LOEVY:  Put it up in the Elmo, please.

        MR. POLICK:  Objection again, Judge.

        MR. SOTOS:  Objection.

        THE COURT:  Is this the same problem?

MR. LOEVY:  No.  This is him and his stipulation.

THE COURT:  Well --

MR. POLICK:  It's the same issue, Judge.

THE COURT:  You know what?  You can use it.  I think it raises different issues.

MR. LOEVY:  All right.

THE COURT:  If the witness was a party to this, you can ask him about it.

MR. POLICK:  That's fine, Judge.

BY MR. LOEVY:

Q.  (Reading:)

"... the parties hereby stipulate that Joe Sparks was not directly involved in the gang book identification."

That is true, you weren't directly involved, right?

A.  Correct.

Q.  All right.  I want to draw your attention to 1988, when the Felix Valentin murder occurred.

Belmont and Western, was that your assignment at the time, sir?

A.  Yes.

Q.  And you knew about the street gang at the time, Latin King street gang?

A.  Pardon?

Q.  Sorry.  You knew about the Latin King street gang at the

Sparks - direct by Loevy

2759

time?

A. Correct.

Q. But you had never heard of Jacques Rivera, correct?

A. Correct.

Q. Now, you're testifying here without any notes that you took back then, right?

A. Correct.

Q. You created no reports?

A. Correct.

Q. But you have read the reports, correct?

A. Correct.

Q. I'm going to show you a copy of Plaintiff's Exhibit 1, which is a report we've been talking about here in court the last couple of weeks.

See where it says "Sparks"?

A. Yes, sir.

Q. It says that the four people here, Noon, Guzman, Sparks, and Zacharias located a witness on the 29th of August; do you see that?

A. Yes.

Q. The witness was brought in the Gang Crimes North, and on that date he identified a picture of Jose Rios who is Jacques Rivera allegedly. Do you see all that?

A. Yes, sir.

Q. All right. That didn't happen, did it?

A.   No, sir.

Q.   It's untrue?

A.   (No response.)

Q.   That's a question.

A.   Yes.

Q.   Now, you participated in a photo identification procedure that took place on the night of the shooting, correct?

A.   Correct.

Q.   And that was at the boy's house, right?

A.   I don't know if it was his house or -- the witness was there.

Q.   But you had a lot of cases back in the '80s, right?

A.   Correct.

Q.   And this one had no reason to stick out in your mind, did it?

A.   No, sir.

Q.   And you don't have a photographic memory of all your cases, do you?

A.   No, sir.

Q.   In fact, if I asked you one of the investigations you were working on that week, would you be able to tell me?

A.   No, sir.

Q.   Would you be able to tell me who's house you went to, who was present, all that kind of stuff?

A.   No, sir.

Sparks - direct by Loevy

2761

Q.  All right.  You have, though, reviewed a report created by McLaughlin about the Valentin homicide, correct?

A.  Correct.

Q.  There's one dated the 27th of August.  And you've looked at it carefully, right?

A.  Yes, sir.

Q.  Your name is on it, right?

A.  Yes, sir.

Q.  And it does not say anything about a photo identification procedure taking place on the 27th, the night of the shooting, correct?

That's accurate, right?

A.  I think so.  I'm not positive.

Q.  Take a look.

MR. LOEVY:  May I approach, Your Honor?

THE COURT:  Sure.

(Document tendered to the witness).

BY MR. LOEVY:

Q.  Your name is on that report?

A.  (No response.)

Q.  You reference as one of the Gang Crime Specialists?

A.  (No response.)

Q.  You see it there on page 2, almost dead center, "J. Sparks"?

This is Plaintiff's Exhibit 19 D, Your Honor.  It's

already in evidence.

THE COURT:  If you can help the witness find what you're asking about.

MR. LOEVY:  I'll put it on the screen, Your Honor.

THE COURT:  All right.

BY MR. LOEVY:

Q.  That's your name, right?

A.  Yes.

Q.  All right.  And there's nothing in this report that says anything about an identification procedure taking place at the boy's house on the 27th, right?

A.  Not on this report.  This is a different report.

Q.  All right.  Let me show you the report that's dated the 29th.

That's the report you're talking about, the one that's dated the 29th, correct?

A.  Yes.

Q.  Let me show you another report from the 27th.  This is dated the 27th, this is Plaintiff's Exhibit 16.  Did you review this one as well?

A.  I don't believe so.

Q.  All right.  This one on the 27th says Lopez has not been interviewed yet, right?

A.  Yes.

Q.  All right.  Now, I found the one, my colleague found the

one on the 29th. This is the one that says that the gang book procedure happened, right?

A. (No response).

Q. It says right here, Lopez viewed the books, made an identification, Jose Rios was the person who shot the victim, right?

A. Yes.

Q. All right. That report is dated the 29th, is it not?

A. Correct.

Q. All right. And so the only paper, you would agree with me, that exists in the investigation is that the gang book identification happened on the 29th, two days after the shooting, correct?

A. No, sir.

Q. The question was just the paper. The only paper that exists.

A. I guess so, yes, sir.

Q. What's that?

A. I think so.

Q. All right. But you have a recollection that's different from the paper, right?

A. Yes, sir.

Q. You have a recollection that something happened at Orlando's house on the night of the shooting, right?

A. Correct.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 590 of 1335 PageID #:105975
Sparks - direct by Loevy
2764

Q. And although you have that recollection, you've not seen any documents that corroborates that, right?

A. Correct.

Q. Should there be documents -- if Orlando was shown photographs at his house on 27th, do the policies and practices of the Chicago Police Department require the detectives or the Gang Crime Specialists to memorialize that in writing?

A. I don't believe so.

Q. What's that understanding based on?

A. Well, I base it if they relayed the information to the detectives, they would include everything in their supplementary.

Q. So your understanding was, you as a Gang Crimes Specialist discharged your obligations under the policies and practices of the police department, if photos were shown, identifications were or weren't made, and all you gotta do is pick up the phone and orally report it to the detectives, that's all you gotta do?

A. I won't say "orally." You can meet them face to face and tell them.

Q. That's orally, too, right?

A. Yes.

Q. But your understanding of the polices and practices of the police department were that you didn't have to actually memorialize that in a document, we agree about that, right?

A.   I believe so.

Q.   How long were you a Gang Crimes specialist?

A.   27 years.

Q.   So you have great familiarity with both the policies and the practices of the Chicago Police Department, right?

A.   Yes, sir.

Q.   That's a lot of un-memorialized information, isn't it?

A.   No, sir.

Q.   All right.  I guess you're saying Gang Crime Specialists would trust that maybe the detectives will write it down, that was the only fail-safe in the system?

        MS. ROSEN:  Objection to the form of the question.

        THE COURT:  Sustained.

        MR. LOEVY:  All right.

BY MR. LOEVY:

Q.   You have a recollection of being in the boy's house on the night of the shooting, right?

A.   Yes, sir.

Q.   And do you remember what room the boy was in?

A.   I believe it was the kitchen.

Q.   All right.  You did not actually see the boy make the identification in the book, right?

A.   That's correct.

Q.   Somebody relayed to you -- you believe you were present, though, right?

A.  Yes.

Q.  All right.  Somebody relayed to you, called out, "Hey, the boy picked out Jacques Rivera," right?

A.  I don't know if it was -- I believe I was told that he picked somebody out.  I don't know if it somebody yelled, Hey, he picked out Jacques Rivera."

Q.  All right.  But you weren't in the room?

A.  Correct.

Q.  So how did you learn he made a pick in the room with the photographs on the 27th?

A.  I believe -- I believe somebody told me.  I don't know who, but I was told.

Q.  All right.  But you did not see how it we want down?

A.  No, sir.

Q.  And you can't say either way whether it was legit or suggestive, right?

        MS. ROSEN:  Objection to the form.

        THE COURT:  Overruled.

BY THE WITNESS:

A.  No.

BY MR. LOEVY:

Q.  You can't say either way, right?

A.  I believe it was legit.

Q.  That's your belief, but let's talk about facts that you saw and observed.  You can't say either way if it was legit, right?

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 593 of 1335 PageID #:105973
Sparks - direct by Loevy
2767

A.   I'm saying I believe it was legit.

Q.   And that's because you had faith in Mr. Guevara?

A.   Yes, sir.

Q.   All right.  Isn't it true, Mr. Guevara was accused of doing suggestive things on many other occasions?

MR. SOTOS:  Judge, objection.  Foundation.

MR. LOEVY:  He brought up his belief, Your Honor.

THE COURT:  Overruled.

BY MR. LOEVY:

Q.   How about if we leave aside your belief, All right.  Let's just talk about facts.  You don't know if it was done suggestively or not, right?

A.   Correct.

Q.   And a photo procedure, especially with a kid, could be done suggestively if you're not careful, right?

A.   It's possible.

Q.   Because you could say to the kid, "You know, how about this guy?  Does he look familiar?"  You know, maybe -- and maybe over time you could have a conversation and the kid could come to believe it was his ID, right?

A.   Possible.

Q.   You got to be careful about that, right?

A.   Correct.

Q.   And if you showed him a photo that wasn't the guy, and the kid was real interested in that photo, you could be like, "You

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 594 of 1335 PageID #:105979
Sparks - direct by Loevy
2768

know what? Let's talk about another photo," right?

A. It's possible.

Q. So kids could be steered inadvertently without their even knowing it, right?

A. It's possible.

Q. And you, as an investigator, I bet you took great care to avoid that, right?

A. Correct.

Q. All right. You have shown books to witnesses before in your career?

A. Yes, sir.

Q. Many times?

A. Yes, sir.

Q. But on this occasion, you're sure it was not you who showed the books?

A. Correct.

Q. Now, in the room with the boy, there had to be a police officer, right?

A. Correct.

Q. And your memory is that that police officer was Rey Guevara, correct?

A. At the time I thought it was.

Q. All right. Do you remember if Daniel Noon was in the room?

A. I believe he was, too.

Q. All right. Would you defer to his recollection if he says

he wasn't?

MR. SOTOS:  Objection.  Mischaracterizes the testimony.

MR. LOEVY:  No, he said he never met Orlando.

THE COURT:  Overruled.

MR. SOTOS:  Judge, that's different from whether he was in the house.

THE COURT:  No, the question was, was he in the room.

MR. LOEVY:  Right.

THE COURT:  Overruled.

BY MR. LOEVY:

Q.  So let me ask it this way, you're not claiming to have a real certain memory about exactly who was in the room, right?

A.  Correct.

Q.  The only thing you remember was Guevara was in the room?

A.  At the time I thought he was.  At the time of my deposition.

Q.  All right.  Has your memory gotten better since your deposition?

A.  Yes.

Q.  What?

A.  Yes.

Q.  It has?

Did Guevara tell you he wasn't in the room?

A.  I haven't talked to Guevara.

Sparks - direct by Loevy

2770

Q.  Why not?

A.  Just haven't talked to him.

Q.  All right.  But now you remember that Guevara wasn't in the room?

A.  I believe he wasn't.

Q.  All right.  But you were sworn under oath at your deposition, weren't you?

A.  Yes, sir.

Q.  And you had reviewed all the reports before your deposition, right?

A.  Yes, sir.

Q.  And you had thought carefully about what you were going to say before your deposition, right?

A.  Yes, sir.

Q.  All right.  Did you have anything to do with the case after that day, sir?

A.  According to the arrest report, Reynaldo Guevara called out for a transport, and me and my partner, Joseph Fallon, transported Jacques Rivera into Area 5.

Q.  All right.  Did that happen?

A.  I believe it did.  I don't remember, but I believe it did.

Q.  Didn't you say that you didn't arrest him?

A.  I didn't arrest him.

Q.  You didn't arrest him.

So showing you this arrest report.  This is your name

here, "Sparks," (indicating) right?

A. Right.

Q. I'm sorry, this is Plaintiff's Exhibit 5.

So after the identification, your memory is that you went and arrested Jacques Rivera or you didn't arrest Jacques Rivera?

A. I went and transported Jacques Rivera.

Q. All right. Was that after whatever happened in the kitchen happened in the kitchen?

A. Yes.

Q. How quickly after this boy said Jacques was the murderer did you go arrest Jacques Rivera?

A. I didn't arrest him.

Q. Well, your name is on the report, isn't it?

A. Correct.

Q. So is that false?

A. (No response.)

Q. The "additional arresting officer," you, right?

A. Correct.

Q. Okay. That's the report created by Mr. Guevara, correct?

A. Correct.

Q. Is that true or false?

A. I did not arrest Jacques Rivera. I transported him.

Q. All right. So when it says "additional arresting officer, Joe Sparks," that's false, right?

A. Yes -- no.

Q. What did you say?

"Yes," "no," or "don't know," which one?

A. It's the process. Everyone who works in the case, they put him down.

Q. All right. So you were an arresting officer?

A. Correct.

Q. So this is false, right?

A. Yes.

MR. LOEVY: Could I have a moment, Your Honor?

THE COURT: Sure.

(Brief pause)

MR. LOEVY: At this time, Your Honor, I would like to approach with Exhibit 154 L.

(Document tendered to the witness).

MR. ART: I.

MR. LOEVY: I.

BY MR. LOEVY:

Q. Have you had a chance to review that document?

A. Yes, I have.

Q. May have it back, please.

A. Sure.

(Document tendered)

BY MR. LOEVY:

Q. Can you identify that document, sir?

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 599 of 1335 PageID #:105984
Sparks - direct by Loevy
2773

A.   Yes, sir.

Q.   All right.  Tell the jury what it is.

A.   This is to prepare for court.

Q.   You've seen those documents before?

A.   Yes, sir.

Q.   They're prepared in the regular course of your job as a police officer?

A.   Correct.

        MR. LOEVY:  All right.  Your Honor, we move this into evidence.

        MS. ROSEN:  Objection.

        THE COURT:  I think the point for which it's relevant has not been established yet.

BY MR. LOEVY:

Q.   All right.  Do you remember your phone number at Gang Crimes North back in the '80s?

A.   No, sir.

Q.   Would it refresh your recollection to take a look at this document?

A.   Yes.

        MR. LOEVY:  May I approach, Your Honor?

        THE COURT:  Yes.

BY MR. LOEVY:

Q.   All right.  Does that refresh your recollection that if someone wanted to get hold of Gang Crimes North, what phone

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 600 of 1335 PageID #:105985
Sparks - direct by Loevy
2774

number would they call?

A. 744-8260-8260.

MR. LOEVY: Your Honor, at this point we move the document into evidence.

THE COURT: I will receive the document, but just for that purpose, because everything else in the document is irrelevant to this case, right?

MR. LOEVY: Yes.

THE COURT: Just for the phone number. It is received for that purport.

(Plaintiff's Exhibit 154 I was received in evidence).

BY MR. LOEVY:

Q. All right. I'm publishing it. The phone number for Gang Crimes North is 744-8260, correct?

A. Correct.

Q. And showing you Plaintiff's Exhibit 19 I.

This is the same document, same kind of document, a felony minute sheet, for the Jacques Rivera shooting, correct?

A. Correct.

Q. And when it says, "prosecuting witnesses" and it lists, Guevara. "Guevara" in call caps, does that mean he's the lead guy because he's the one in all caps?

A. I don't know what it means.

Q. All right. But this is the phone number for all four

Q. people is Gang Crimes North, right?

A. Correct.

Q. Not Area 5 where the detectives are, but Gang Crimes North, correct?

A. No. No, sir.

Q. Correct, you agree with me?

A. It's not -- 5555 Grand is not Gang Crimes North.

Q. No, the phone number, sir.

A. I know.

Q. The phone number is Gang Crimes North phone number for all four witnesses, right?

A. They got it down there, but it's not for Area 5.

Q. Right. But if a prosecutor wanted to call a prosecuting witness and they picked any available phone numbers, the prosecutor prosecuting the case would be preferred to Gang Crimes North, correct?

A. Referred to? Yes, sir.

MR. LOEVY: No further questions, Your Honor.

THE COURT: Okay.

CROSS EXAMINATION

BY MR. POLICK:

Q. Good morning, Mr. Sparks.

A. Good morning.

Q. Going back to August of 1988, can you tell us what -- where you were working at that time?

Sparks - cross by Polick

2776

A. Gang Crimes North.

Q. All right. And where was that located?

A. Belmont and Western.

Q. And you told us on Mr. Loevy's examination that -- well, let me ask you this -- let me strike that.

Were you working the night of the incident on August 27th?

A. Yes, sir.

Q. What do you recall about your role in the case on that date?

A. We received a call. I'm not sure some -- the officers who are at the scene told us to bring the Latin King books over to 3320, I believe, West Cortland.

Q. Okay. Do you recall who called you?

A. No, I don't.

Q. Do you recall where you were when you received the call?

A. I'm not sure if I was on the street or in the office.

Q. All right. You just don't recall one way or the other?

A. Correct.

Q. Okay. And when you received the call to bring the Latin King books, did you know what they were requesting?

A. Yes, sir.

Q. Okay. And what was it that they were looking for?

A. The Latin King photo books.

Q. All right. And where were those kept at?

A. At Belmont and Western.

Q. And did they give you a location where they wanted those books brought?

A. Yes, sir.

Q. Okay. So who were you working with that night, do you recall?

A. I thought it was my partner Joe Fallon, but I guess it was Paul Zacharias according to the report.

Q. All right. So after getting that information, what did you do? How did you get the books?

A. We were there, we took the books, four Latin King books, and brought them over to the address on Cortland.

Q. Okay. And was there any rule or procedure that you were aware of that you could not bring those books out of the Gang Crimes office?

A. No, sir.

Q. Have you done that before, bring the books to a witness to view?

A. Yes, sir.

Q. Okay. So you got the books from the office. What do you recall doing next?

A. Bring them over the address on Cortland. Hand it to whoever called for them or we just put them on the table.

Q. Do you have a recollection of going into the building?

A. Yes, sir.

Q. What kind of building was it?

A. I believe it was a four-flat. We went through the alley up to the second floor.

Q. All right. And you indicated that you brought the books in, correct?

A. Correct.

Q. Were you the person actually showing the books?

A. No, sir.

Q. Okay. When you brought the books in, do you recall what room you were brought in, they were brought into?

A. It was the kitchen.

Q. All right. And who was in the kitchen that you recall?

A. The witness and I believe an older Hispanic woman.

Q. All right. When you say "the witness," who are you referring to?

A. Orlando Lopez.

Q. And the older Hispanic woman, was she a police officer?

A. No, sir.

Q. Who was she?

A. I don't know who she was. I don't know if she was a guardian, or his mother. I don't know who she was.

Q. All right. She was a civilian, though?

A. Correct.

Q. Do you know if she was related to Mr. Lopez?

A. I don't know.

Sparks - cross by Polick

2779

Q. All right. Were there other people in the residence at this point?

A. Yes.

Q. Do you recall how many people were there?

A. Not exactly.

Q. All right. And where were the books being viewed in the kitchen?

A. In the kitchen.

Q. Okay. Where in the kitchen, though?

A. At the kitchen table.

Q. All right. Is that where Mr. Lopez was looking through them?

A. Yes, sir.

Q. Okay. And do you recall how he went through the books?

A. No, sir.

Q. Okay. Did you see him going through the books at all?

A. No, sir.

Q. All right. Where were you after bringing the books to the kitchen?

A. We were in the dining rooming, the living room.

Q. All right. And was that an adjoining to the kitchen?

A. Yes.

Q. All right. Why were you in that room as opposed to the kitchen?

A. Because there was already people around him and he was

looking at the books, so we just went to the other room.

Q. Do you know how many books you brought?

A. Four.

Q. Four. And they were all Latin King books?

A. Correct.

Q. Do you know how many books Mr. Lopez looked through?

A. No.

Q. Do you know how long it took him before an identification was made?

A. No, I don't.

Q. And you told us on Mr. Loevy's examination that you were not present in the room when Mr. Lopez made the identification?

A. Correct.

Q. The information was somehow relayed to you?

A. Yes, sir.

Q. Do you recall how that was done?

A. No.

Q. Do you know who told you?

A. No, sir.

Q. Do you know who you were told -- who was identified?

A. I believe we were told Jacques Rivera.

Q. Now, you mentioned during Mr. Loevy's questioning that it was not always necessary to do a report when a witness made an identification, correct? Do you recall the question?

A. Yes, sir.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 607 of 1335 PageID #:105992
Sparks - cross by Polick
2781

Q. All right. And you said that you could relay that information to the detectives orally or face to face?

A. Correct.

Q. Was that a common practice when detectives were involved in the case?

A. Sometimes, yes.

Q. Okay. And why would you be relaying that information to the detectives?

A. So they would include all the information in their report.

Q. Okay. And when someone makes an identification in a photo book like that, a gang book, can you as a Gang Crimes specialist just based on that identification contact the prosecutor or Felony Review and seek charges?

A. No, sir.

Q. Okay. What -- what's the next step that has to happen before that process even begins?

A. The next step is to try and locate the boy has identified, take him into occurred, bring him in for a physical lineup.

Q. All right. And at the time were Gang Crime Specialists allowed to do physical lineups?

A. No, sir.

Q. Okay. Whose role was it to do the physical lineups?

A. The detectives.

Q. All right. And you were asked about Mr. Rivera's arrest on August 30th, correct?

A.   Right.

Q.   You indicated you transported him?

A.   Yes.

          MR. LOEVY:  Objection.  Leading.

          MR. POLICK:  Going into another area.

          THE COURT:  It's sustained.  But he's going into another area.

BY MR. POLICK:

Q.   Do you know from what location to what location you transported him to?

A.   I believe he was arrested at 3300 Beach, and we transferred him to Area 5 and put him in a room, interview room.

Q.   And would that be unusual for one set of officers to make a physical arrest and another set of officers to do the transport?

A.   No.

Q.   You've done that before?

A.   Yes, sir.

Q.   And the report indicates that you got credit for it even though you were not the arresting officer?

          MR. LOEVY:  Objection.  Leading, Your Honor.

          THE COURT:  Sustained.

BY MR. POLICK:

Q.   Why would your name be on there as an arresting officer?

A.   To get credit for it, the activity, that you were part of

the arrest.

Q. All right.

MR. POLICK: May have a moment, Judge?

THE COURT: Sure.

MR. POLICK: Thank you.

(Brief pause).

MR. POLICK: Judge, I don't have anything further.

THE COURT: Mr. Loevy.

REDIRECT EXAMINATION

BY MR. LOEVY:

Q. When you said that you get credit for it, that report was authored by detective Guevara, correct?

A. Correct.

Q. Why did Detective Guevara get to decide who's going to get credit for this arrest and prosecution?

A. Probably whoever worked in the case.

Q. All right. And it was always your understanding this was his case, wasn't it?

A. Pardon?

Q. It was always your understanding that this was his and Steve Gawrys case, right?

A. No, sir.

Q. All right. Then how about they got to write the reports and make the credit?

A. Because he made the arrest. It's an arrest report.

Q.   All right.  You had some memories about a woman in the kitchen, and four books.  You did that without notes, without reports, right?

A.   Correct.

Q.   None of those details are written in any report, correct?

A.   Correct.

Q.   And, in fact, the report talks about book sixteen D, right?

A.   That's correct.

Q.   So there's a lot of Latin King books, right?

A.   Four.

Q.   Well, this says book sixteen.

A.   I know.

Q.   All right.  You're not claiming the woman was or wasn't in the kitchen when the ID happened, right?  You just say you remember there was a woman, right?

A.   Correct.

Q.   All right.  Do you remember other buildings and other photo ID procedures that year?

A.   No, sir.

Q.   Can you tell me another one where who was present and where else, say, that whole decade?

A.   No, sir.

Q.   All right.  Somebody called out to you that there was an ID, right?

A.   Yes, sir.

Q. Did anybody explain to you why Jose Rios was Jacques Rivera?

A. No.

Q. But it always was Jose Rios, wasn't it?

A. I guess.

Q. Well, showing you the report. Does this refresh your recollection that the person identified was Jose Rios?

A. Yes, sir.

Q. All right. All right. Did anybody explain to you why Jacques was Jose Rios?

A. No.

Q. All right. The Gang Crimes detectives did develop the evidence in this case, correct?

A. I believe so.

Q. Because the only evidence was Orlando Lopez, right?

A. Correct.

Q. And that evidence was developed by Gang Crimes, right?

A. I believe so.

Q. And they referred it to the detectives, right?

A. Correct.

Q. But by the time of the lineups, Orlando had already seen a photo the Gang Crimes suspect, right?

A. Correct.

Q. Now, you said a couple of police reports were inaccurate. Was there a problem with inaccurate police reports back in the

Sparks - redirect by Loevy

2786

'80s?

A.  Not that I'm aware of.

Q.  All right.  So is it unusual to have a report this inaccurate?  That something says something happened that didn't happen, was that unusual?

A.  Yes, sir.

Q.  Excuse me?

A.  Yes, sir.

MR. LOEVY:  No further questions, Your Honor.

THE COURT:  Anything further?

MR. POLICK:  Nothing further, Judge.

THE COURT:  Thank you, sir.  You may step down.

(Witness excused.)

THE COURT:  Let's take our morning break.  10 minutes, ladies and gentlemen.

COURT SECURITY OFFICER:  All rise.

(The following proceedings were had out of the presence of the jury in open court:)

THE COURT:  So where are we?

MR. LOEVY:  We're going to close this morning, Your Honor.

THE COURT:  One, two more witnesses?

MR. LOEVY:  One more witness.

Although, Your Honor, there is a witness who couldn't be here this morning, so we want to leave our case open for

that, but we'll be done before lunch.

THE COURT:  Okay.  10 minutes.

(Recess).

COURT SECURITY OFFICER:  All rise.

THE COURT:  Are we ready?

MR. LOEVY:  We are, Your Honor.

(Whereupon, there was a conference had between counsel off the record.)

MR. LOEVY:  Your Honor, we are going to read an interrogatory, and then call Richard, and then we're going to close subject to Mr. Victorson couldn't be here this morning, so we are going to reopen our case for Mr. Victorson.

THE COURT:  All right.

MS. ROSEN:  Just to be clear on that, that's the only thing that the case will be reopened for is Mr. Victorson, right?

MR. LOEVY:  Yes.

THE COURT:  Right.  I think I'll just say that there's one witness who couldn't be here.

Let me just ask this, when the plaintiff rests, I want to tell them that now it's time for the defense case, but I also want to tell them, if it's correct, that they've already heard a good deal of the defense case in terms of both sides questioning.  And this is many of the police officers witnesses, correct?

MS. ROSEN:  Correct.

THE COURT:  All right.  Just so that I'm clear about that.

MS. ROSEN:  Yes.

THE COURT:  Okay.  Then I think we're ready.

(Brief pause).

THE COURT:  Is the witness going to be a long witness or a short witness that is not here?

MR. LOEVY:  The witness that is not going to be here is medium witness.

THE COURT:  Medium witness.

MR. LOEVY:  The witness now is a short witness.

THE COURT:  I was wondering if I could make a prediction about the one who is not here, but I won't even try. "Medium" probably means, what?  More than a half a day and less than a week?

(Laughter in the courtroom).

(Brief pause).

COURT SECURITY OFFICER:  All rise.

(The following proceedings were had in the presence of the jury in open court:)

THE COURT:  Please be seated, everyone.

MR. SOTOS:  Judge, I'm afraid we're going to need a sidebar before we start.  I apologize to the Court and the jury.  I know they just came back.

(Proceedings heard at sidebar on the record).

MR. SOTOS:  Judge, my understanding is that Mr. Loevy intends to dismiss two of the defendants in front of the jury, which we view to be some kind of like a magnanimous show to suggest, "Well, we believe them, but the other people are still guilty."  We don't think it's supposed to happen that way, that they should be dismissed after the jury is not present.

THE COURT:  Well, let's do this, I will obviously need to tell the jury that they're being dismissed, right?

MR. SOTOS:  Yes.

THE COURT:  So why don't, when they come back from lunch, why don't I just tell them that two defendants have been dismissed?

MR. LOEVY:  Well, that's ambiguous.  We want to voluntarily dismiss them.  If I could give you a little background.

Every defendant who signed that stipulation got out of the case.  For reasons unknown to me, those two defendants decided to stay in the case even though it was true.  They could've gotten out.  So they want to imply that we sued somebody we shouldn't have sued when they made a choice to stay in this case.

THE COURT:  I don't think the jury is going to understand this.  It can look like grandstanding.  And I think it -- it's probably going to be obvious to everybody from the

testimony of those two witnesses that they weren't involved. The jury doesn't need to know who -- they don't even need to know that the stipulation has anything to do with letting people out of the case. They wouldn't know that.

MR. LOEVY: That was more background. These people literally chose to stay in the case. We said, "You don't have to be defendants if you sign this." They said, "it's true."

THE COURT: Look, I think the noninflammatory way to do this is when they came back from lunch or if you want me to do it before lunch. I will be happy to tell them that the plaintiff is dismissing two people. I don't think we have to do more. Now, who are we dismissing?

MR. LOEVY: Noon and Guzman.

MR. SOTOS: And Mr. Guevara (laughing).

THE COURT: Well, as soon as you rest. How about if I do it when you rest, Noon and Guzman.

MR. LOEVY: Thank you.

THE COURT: Okay.

(Proceedings resumed within the hearing of the jury.)

(Witness walking into the courtroom).

THE COURT: This is the witness?

MR. LOEVY: This is the witness.

THE COURT: Can you come down here, sir.

(Brief pause).

THE COURT:  Please raise your right hand.

(Witness duly sworn.)

THE COURT:  You may be seated.

RICHARD RIVERA, PLAINTIFF'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. SWAMINATHAN:

Q.  Good morning, sir.  Please introduce yourself to the jury.

A.  I am Richard Rey Rivera, son of Jacques Rivera.

Q.  Do you have any brothers and sisters?

A.  I do.  I have a brother and a sister.

Q.  What are their names?

A.  Jacques Rivera, Jr., and Jennifer Rivera.

Q.  Where do you fit in the group?  Oldest, youngest, middle?

A.  I am the middle child.

Q.  And then who's older, who's younger?

A.  Jacques, Jr. is the oldest and Jennifer is the youngest.

Q.  And how old are you?

A.  34 years old.

Q.  I'm going to ask you a little bit about yourself.

Did you graduate from high school?

A.  Yes, I did.

Q.  Where did you graduate from high school?

A.  Steinmetz Academic Center.

Q.  Is that here in Chicago?

A.  Yes, sir.

Q. What did you do after high school?

A. I went into the military. To the Marine Corps.

Q. How long did you do that?

A. 3 years.

Q. What did you do when you the finished your service?

A. After I finished my service I just immediately looked for work. My dreams were to become a firefighter, but unfortunately it didn't happen because I had a torn MCL and ACL from the military. So I just went on to look for work and I've been working ever since.

Q. All right. Are you working currently?

A. Yes, sir.

Q. And you've been working consistently since you left the Marines?

A. Yes, sir.

Q. What about volunteer work? Do you do any volunteer work?

A. I actually was a full-time mentor for the YMCA. It was a program for Youth Safety Violence Prevention for 4 years.

Q. I think you may have said this, but what kind of work were you doing?

A. I was -- it's a program called Youth Safety Violence Prevention. So it was just working with youth, at-risk youth.

But before, I was volunteering with this program called Urban Warriors, which dealt with veterans and youth from so-called the hood, you know, that seemed like that same, like

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 619 of 1335 PageID #:106004
R. Rivera - direct by Swaminathan
2793

combat sort of, you know, street life.

Q. What about your dad, does he do any volunteer work?

A. He does. I've actually gone with him to some colleges, like Dominican universities. He's actually come and volunteered his time to come speak at -- you know, in some of the programs that I work with at the YMCA, or even BAM, which is becoming a program that he's actually come and volunteered his time to come talk with the youth, as well.

Q. This is a program where you work with kids and young men?

A. Yes, sir.

Q. Does your dad enjoy working with kids?

A. Yes, he does.

Q. Does he enjoy being with kids?

A. Yes, he does.

Q. Let me ask you just last question on this topic, just about your family.

Do you have a family?

A. I do. I have a 7-month old baby girl and having one on the way.

Q. Sir, are you close with your dad?

A. Very close.

Q. Do you see him regularly?

A. Very regularly.

Q. How often do you see him?

A. I would say almost every weekend we try to see each other.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 620 of 1335 PageID #:106005
R. Rivera - direct by Swaminathan
2794

Q.  Before your dad was wrongfully incarcerated, were you close to him then?

A.  Ah, yes.  We were always close, just --

Q.  And between then and now, I sort of want to move forward, but between then and now, was there a period of time when you didn't see your dad very often?

A.  As we got older the visits got less frequent, yes.

Q.  In particular, was there a period of time when your dad was incarcerated and you didn't see him regularly?

A.  Was there a period?

Q.  A period of time when your dad was in prison and you didn't see him very often.  You saw him only in the prison visiting room?

A.  Oh, yes.

Q.  How long was that period?

A.  23 years.

Q.  When your dad was -- let me ask you just leading into that period when your dad was in prison.

Would you say you have very few memories at that time beforehand, before your dad was locked up?

A.  Yeah.  Not too many.

Q.  Okay.  So let's talk about, then, the period when he was wrongfully imprisoned.

In those early years, I want to start there, when you were a young kid.  About how old were you when your dad was

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 621 of 1335 PageID #:106006
R. Rivera - direct by Swaminathan
2795

locked up?

A.  5 or 6.  5 or 6 years old.

Q.  Would you guys see him in prison in those early years?

A.  Yes.

Q.  How often?

A.  From what I remember, once, twice a month.  We would try to go -- try to go once every 2 weeks.  Yes, once or twice a month.

Q.  Sometimes you wouldn't make it that often, but you would try.

A.  Uh-huh.  Yes.

Q.  Who would take you?

A.  It would be one of my aunts, which is one of my dad's sisters, and my grandmother usually.

Q.  Grandmother being Jacques' mom?

A.  Yes.

Q.  What was that time like when you were with him in those visits?

A.  From what I remember, just always him being joyful and humorous.  And just happy, in a sense.

Q.  Was that sort of his natural personality?

A.  Yes.

Q.  I want to step back for a second.  When you're visiting him in prison, can you give us sort of a little bit of an understanding of what that prison visit visiting room, visiting

R. Rivera - direct by Swaminathan

2796

setting was like?

A.  Well, I mean, the process to go see him was a long process, first off.  Like one room, had to wait some time, go to the next room, wait another hour, maybe two.

And then just first seeing him, just kisses and hugs galore all the time.

Q.  So sort of stepping back.  The process you're describing, that was sort of an all-day process between the time you go there and come back, and all that?

A.  Yes, sir.

MS. ROSEN:  Objection.  Leading.

THE COURT:  Sustained.

BY MR. SWAMINATHAN:

Q.  How long would it take you to get up there?

A.  To the prison, about an hour.  An hour drive.

Q.  And then you said it would take a while to get in and see him?

A.  Yes, sir.

Q.  Okay.  Sort of a processing process?

A.  Yes, sir.

Q.  Overall, how long would that take over the course of the day?  Go see him, spend time with him, and come back?

A.  I would say 5 to 6 hours.

Q.  And I want to go back to those visits, just the setting when you go in to see him.  Where are you?  What is that room

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 623 of 1335 PageID #:10600
R. Rivera - direct by Swaminathan
2797

like when you're meeting with him?

A. It's crowded. It's loud, yeah. It's just very crowded and very loud.

Q. Is there any privacy in the visiting room?

A. No. No.

Q. Are there guards watching over you?

A. Yes.

Q. From your experience, what was it like to be having these visits with your dad when you're sort of being watched over by guards and he's sort of under their control?

MS. GOLDEN: Object to relevance, Your Honor, unless how was it like for his father.

THE COURT: Overruled.

BY THE WITNESS:

A. I mean, it felt like kind of like we were pressured. Or, you know, like limited, I would say. Because, you know, you only get a certain time, and we would always look to see if the guard makes his little signal, to be like, okay, it's time to go, you know. So it was kind of pressure, I would say.

BY MR. SWAMINATHAN:

Q. Let me ask you just sort of the starting point when you come in and see him. What would happen as kids, when you first get to that prison and you'd see your dad? Was there sort of a difficult thing in terms of when you guys would meet?

A. Was it difficult?

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 624 of 1335 PageID #:106009
R. Rivera - direct by Swaminathan
2798

Q.  No, what was the typical sort of way.  When you first came in, what would happen when you first saw him?

A.  Oh, just would greet each other like we've never seen each other.  My dad is the only man that I kiss on the lips, you know.  It would just be that emotional, you know.

Q.  Do you still kiss him on the lips today?

A.  Yeah.

Q.  Is your dad an affectionate person?

A.  Yes, he is.

Q.  Based on your experience knowing your dad, visiting him in prison, do you think it was hard for an affectionate person like him to have these visits in prison?

A.  Of course.

Q.  Tell us what you would do during your visits with your dad.

A.  Ah, we would play different games.  Of course, like a Thumb War game, or this Hot Potato game that I remember.  One of my favorites was like this football game where you make like a little triangle out of a paper and you slide it, you only get like two pushes, or whatever.

Q.  And what was your -- and your dad, what was his demeanor like, his behavior during these visits?

A.  He was always joyful.  He tried to, I guess, put on a brave face, so to say.  You know, but always joyful, trying to -- trying to, you know, I guess distract us from where we were at. But he always tried to stay in high spirits.

Q. When you say a "brave face," what do you mean?

A. Just -- I mean, I wouldn't know what it's like to be in a maximum security prison, but I think everybody would have that face of, you know, kind of depression or just being sad, but he would just try to, you know, put on that face for his kids, so we wouldn't have to, you know -- we knew why we were going there, but I guess he would just put on that brave face to try to help us deal with where he was at, I guess.

Q. How long would these visits be in the prison when you went to see him as a kid?

A. From what I remember, I think they were 2 hours, 2 hours long.

Q. Would you stay as long as they would let you?

A. Definitely.

Q. And when it was time to leave, did you guys have sort of a common routine when it was time to leave?

A. Again, the kisses and the hugs. And then -- so there's like this little flight of stairs that you go up. And he would -- he would -- of course, he wouldn't be allowed to go up the stairs. So he would just stand at the bottom of those stairs.

And at the top of those stairs is a small window, and there's that room where you have to wait to be -- for them to open the gate and to go into the next room over. So it would take a few minutes for them to gather all the visitors.

So we would wait and stay at the end by that window

and just -- we would just look at each other and blow kisses, say, "call me," things like that, until we would have to walk away.

Q. Did you look forward to those visits with your dad?

A. Yes. Always.

Q. And knowing him, did he look forward to those visits?

A. Oh, I'm pretty much.

Q. Would your dad always know when you were coming, when you were going to come and have a visit?

A. Oh, no.

Q. Sometimes it would be a surprise that you were coming or not coming, is that right?

A. Yeah. When we didn't pre-plan it, I would just show up.

Q. Were there times when you were planning to visit -- I'm assuming we'll get to this, but you guys could make phone calls as well, right?

A. Well, we couldn't call, but, you know -- you know, we would receive calls from him. Like I couldn't personally, but whenever we had a chance to talk to him, whether there was a letter or over the phone.

Q. Would there be times when, you know, over the phone when he would call you, you'd say, Hey, we're planning to come this coming weekend or the next weekend, something like that?

A. Yes.

Q. Would there be times when you couldn't make it?

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 627 of 1335 PageID #:10601?

R. Rivera - direct by Swaminathan

2801

A.  Yes.

Q.  Would there be times when he wouldn't know that you weren't able to make it that week, something had come up?

A.  No, he would not know.

Q.  Turning to other topics, other forms of communication with your dad.  Other than the visits, were there other ways in which you all communicated?

A.  Ah, I mean, besides the visits, there was letters.  He just wrote a lot of letters.  A lot of letters.  And whenever I would get the chance to talk with him over the phone, I would.

Q.  Let's start with the letters.  What do you remember about your dad's letters?

A.  They were always lengthy.  He always wrote outside the letter, like on the envelop.  He would always put a scripture from the Bible and his little goofy, smiley face.

Q.  What do you mean by "goofy, smiley face"?

A.  It's the way he draws it with the hair and nose.  Just his -- his smiling face that he puts.

Q.  Do you remember anything about his letters?  What he would say in his letters?

A.  Ah, he would always start out the letter by saying hope that we're in goods health.  All the time, every letter would start off that way.  And just ask about what's going on in life.  You know, depending on what age we were, you know, how's school going, girlfriends, you know, things like that, grades.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 628 of 1335 PageID #:106018
R. Rivera - direct by Swaminathan
2802

Q. Would you guys write him as often as he wrote you?

A. No.

Q. What about cards, would your dad send you cards?

A. Yes.

Q. On what occasions?

A. Mostly for holidays. Of course, our birthdays. And he would -- he would try to send us money as much as he could.

Q. He would send you money for your birthdays?

A. Yes. And Christmas. You know, just like major holidays.

Q. How much would he send?

A. From what I remember, I think it was 10 to 20 dollars.

Q. And was it your understanding he was working in prison and so he was able to collect some money to send you?

A. Yes.

Q. What did it mean for you to get that money from your dad on occasions?

A. Everything. Especially being, you know, younger, like a dollar is a lot to you. But actually just like me, Wow, my dad is in prison, working hard, probably making who knows what, and still sending us money, you know.

Q. What would you do with the money?

A. I'm pretty sure I spent it on junk food and candy, and stuff like that.

Q. What about phone calls, would you talk to your dad on the phone? You just mentioned this.

A.   The only time that I would occasionally talk to my dad was, we would go to my grandmother's house, his mother's house, every weekend.  And, you know, she would receive calls from him, and that's when we would be able to talk.

Q.   Could you call -- could he call whenever he wanted?  How did it work?

A.   Ah, I'm not sure how the schedule was as far as the telephones calls, but I know it would be a certain time that he can call, but I don't even know.

Q.   And then would it cost money to call or was it free?  How did it work?

A.   Oh, no, definitely cost money for the calls.  My grandmother struggled a lot with her phone bill.

Q.   Were there times when your grandmother couldn't afford to accept calls from your dad?

A.   Yes.

Q.   If your family had been more wealthy, you'd have more money, do you think you guys would be able to have more phone calls?  Your dad would call more often?

A.   Oh, yeah, I'm pretty sure.

Q.   How often do you think he would've called if money wasn't an object?

A.   Every day.

Q.   When he would hang up the phone when you spoke to him, did your dad have a way of saying goodbye when he'd hung up the

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 630 of 1335 PageID #:106015
R. Rivera - direct by Swaminathan
2804

phone with you?

A.   Yeah.  Of course, he would hang up the phone saying, "I love you," but he would make us repeat at least 3 or 4 times, he's like, "But who loves you more?"  And we would say, "Jesus Christ."  And he'd say, "Who?" "Jesus Christ." "Who?" "Jesus Christ."  He would say it 3, 4 times and then say, "Amen."

Q.   Had your dad become a religious person in prison?

A.   Yes.

Q.   All right.  Now I want to turn to the period as you got older.  Did you see him as often as you did when you were a kid?

A.   No.

Q.   Why not?

A.   Ah, I mean, just -- just life took its toll, you know.  We got older.  And, you know, becoming a teenager, joining sports, school.  And as we got older and we didn't have -- not had to, but we just didn't go to my grandmother's house every weekend anymore.  So not being around her as often and not being around my aunts, we just wouldn't go visit him as much.

Q.   Would your dad ever say anything like that, that you guys weren't coming out as often?

A.   You know, he would mention it if we were talking over the phone or if I go to see him again, like, "Hey, son, I thought you were supposed to come."  But he wouldn't -- he wouldn't dwell on it.  He wouldn't focus on that.  He wouldn't mention

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 631 of 1335 PageID #:106016
R. Rivera - direct by Swaminathan
2805

it, but he wouldn't -- like I say, he wouldn't dwell on it.

Q. When you say he wouldn't dwell on it, it was just sort of the same that you talked about earlier about putting on a brave face?

A. Yes, sir.

Q. You also talked about some of the logistical challenges, you getting out there was a whole day affair, is that right?

MS. GOLDEN: Objection. Leading.

THE COURT: Sustained.

BY MR. SWAMINATHAN:

Q. As you were becoming a teenager, did your dad have things in common with you as a teenager?

A. Honestly, I wouldn't -- I wouldn't even know because we weren't around each other to figure those kind of things out, I guess, maybe besides our sense of humor.

Q. Did he know what your life was like day in and day out?

A. No.

Q. Did you have shared experiences?

A. No.

Q. Did your dad know your favorite movies, your favorite music, favorite books, those kinds of?

A. Ah, probably not. I mean, whatever he would ask us over the phone, things like that, but no.

Q. And you talked about the idea that as you got older, you saw him less often. Do you have any regrets about that?

A. Of course. Always.

Q. Can you tell us about that?

A. Ah, I mean, from my own personal experience, like when I was in the military, 3 months in boot camp, and it doesn't compare nothing to what the time -- the amount of time that he had to spend in prison, but within those 3 months when you get a piece of mail, that was everything. Like they would have you sit down, read out your name, and you would hope to hear your name called.

And I remember just thinking about my dad, like -- like damn. Excuse me (crying).

I can imagine how he feels, because like me being there for 3 months and he was there for 23 years, like that piece of mail was everything; everything.

Q. In that 3 months, did you get a small sense of what your dad had experienced over 21 years?

A. A very small sense.

Q. Did you make it through boot camp?

A. Yes.

Q. Is that a proud moment for you?

A. A very proud moment.

Q. Did some of your family attend?

A. Yes.

Q. Was your father able to attend?

A. No.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 633 of 1335 PageID #:106013
R. Rivera - direct by Swaminathan
2807

Q. What did you do once you finished boot camp?

A. I made it my business to go visit him.

Q. Why did you do that?

A. Well, first because I, you know, just experienced what he had to go through, I guess I sort of would say. But I was like I had to go visit him because, like, you only get about a week, I only had a week to get home. And I was, like, I just want to go see my dad in my uniform just to show him, you know, what I've accomplished.

Q. And what was his reaction when you went to see him?

A. Ah, he was super proud, man. Like super proud.

Q. Anything you remember? What did he do when you went there? What was his reaction?

A. Well, in a crowded room of, you know, other visitors and prisoners, he's like, "Oh, look at my son. My son." Like he was very loud and proud, and I was like embarrassed. But, you know, I was, like, that's how a father's reaction is supposed to be. But he was just very proud.

Q. Is that how your dad has always been with you? Is he a proud dad about his kids?

A. Yes.

Q. You have talked about having some siblings. We heard about your sister. You also had your older brother, you said Jacques, Jr.?

A. Yes.

Q. And what is Jacques, Jr. doing today?  What does he do?

A. He works in a warehouse, I believe.  Yeah, a warehouse.

Q. And did he graduate high school?

A. Yes.

Q. And then what did he do after high school?

A. He went to the Navy.

Q. And then you a half brother as well, correct?

A. Yes.

Q. And in terms of -- we heard about your daughter, heard about your son a little bit.  Obviously, there are a lot of people who deserve credit for whatever you all accomplished, but does your dad deserve any credit in your mind, as well?

A. Of course.

Q. Why do you say that?

A. You know, he would always make it his business to make sure:  First, that we were taking care of our sister, our mother, and always doing good in school, that was a big thing, and staying away from the gangs.

Q. I want to turn to another period of time, a period around 2011.

    Was there a moment in time when you came to learn that your dad was going to be released from prison?

A. Yes.

Q. What do you remember when you first learned that?

A. I always remember getting a text or a call from my mother

saying that -- that your dad is -- he's in the newspaper.

And I was working, so there as a gas station literally right next door to where I was working at. And they didn't sell the newspaper, but the lady that worked there that knew me, she bought a newspaper earlier. And she came around and she was helping me look for this -- this article in the newspaper. And I found the article and I just started crying, man.

Q. And when your dad was released from prison, were you there?

A. Yes, I was.

Q. Who else was there?

A. My brother, my sister; his mother, my grandmother; my mother was there, a few other close friends.

Q. Tell us what you remember, what that was like at that moment when you first saw your dad after he was released.

A. It was just a breath of fresh air. Especially for him, I'm sure. But it's like unbelievable, man. It's like (crying.) Excuse me. Just very unbelievable.

Q. What did you do when you saw him?

A. Cried, kissed, and cried some more.

Q. And how would you describe your dad's emotions in those first moments?

A. Very emotional. Very emotional, and I'm pretty sure very relieved.

Q. Did you all leave the prison together?

A. Yes, we did.

Q. Where did you go?

A. We went to my grandmother's house. His mother's house. Yeah, we went -- we went to where he was staying with my grandmother, right after that.

Q. You told me the first moments. Tell me about that drive, that first time leaving the prison and then going back to Chicago.

A. I remember he was in the front seat, I was in the back seat. And, of course, he's like, you know, looking at how much Chicago has changed since then. But I remember he was looking for a Christian radio station. And he was looking for a certain song. And I was asking, "Dad, what's the name of the song?" So while I'm asking this, I have an iPad and I was, you know U-tubing whatever artist he was mentioning.

And with him not knowing, I started playing the song. And he's like, "Oh, where does that come from? Where does that come from?" Like with my iPad, he's like, "Wow, what's this?" Just -- just tripping out over the technology of today's modern-day world.

Q. And after those first hours and those first days, tell us about the ensuing days and weeks of his life after release. What was that like for him?

A. I mean, I know we tried to be with him every day. Like trying to do everything. And, you know, wherever we would go,

he would just have a high sense of paranoia. Like just anybody that had their hat shifted to a certain side, or anything like that. Or if they looked like any type of trouble, he would get very, very paranoid.

Q. What do you mean by "paranoid"? Give us a sense of what you mean.

A. He would just be extra careful of his surroundings of where he was at. He didn't want to be around a certain area. Like was just not comfortable with wherever he was at.

Q. Did he have a general sense of discomfort wherever he was going?

A. Yes.

Q. Has that gotten better over time?

A. Ah, yeah. I mean, it's gotten better since he's been released, but, you know, I wouldn't say it's like, you know, better now, like it's great, but it's definitely calmed down, I would say.

Q. Something he still struggles with?

A. Yes.

Q. I want to turn to another topic, which is Jacques and his relationship with his mother.

When Jacques was released, where did he spend most of his time from the time of release to today? I guess in the first few years after his release, where did he spend most of his time?

A. He was living with his mother, my grandmother.

Q. Tell us about the relationship between Jacques and his mother, in your words.

A. It's love. Mother-son love, you know. I just remember my grandmother just always, you know, being there for my dad, never giving up on him. And I'm pretty sure my dad appreciates that a lot.

Q. Did your grandmother ultimately pass away?

A. Yes.

Q. How long did your dad have with your grandmother, if you remember, before she passed away?

A. I'd say about 4, 4 or 5 years.

Q. Was he happy to have had some time with her after he was released?

A. I'm pretty sure, yes.

Q. Was it also hard for him?

A. Of course.

Q. Did he take care of her in the years before she passed away?

A. Yes.

Q. Tell us about life, life now. You say you see your dad pretty often. What kind of things do you guys do together?

A. We eat a lot. We both love food. I love to cook. I love to cook for him. We kind of have this -- we try to keep this day -- we would get together almost every Sunday for breakfast,

but we -- we do everything.  Anything we can.  Whether it's going to a movie, or if it's him coming to a family gathering, we try to do whatever we can together now.

Q.  When he gets a chance to see you, does he take you up on the opportunity?

A.  Of course.

Q.  Does he see your brother regularly as well?

A.  Yes.

Q.  Your brother, does he have kids like you?

A.  Yes.  He has a son and a daughter.

Q.  How old are they?

A.  His youngest son is going to be 3, and then his daughter is 6.

Q.  Does your dad spend time with his grand kids?

A.  Yes.

Q.  How often does he see them between you and your brother's kids?

A.  Ah, every -- almost every week.  Every week.

Q.  Is he good with the grand kids?

A.  Very good with the grand kids.

Q.  What does he like to do with them?

A.  Ah, feed them everything that they're not supposed to eat (laughing).  That's grandpa, man.  You can't say "no" to grandpa.  Just always, you know -- of course, I have a 7-month old, he's always carrying her.  As soon as he sees her, grabs

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 640 of 1335 PageID #:106025
R. Rivera - direct by Swaminathan
2814

her.  Same thing with my brother's son.  Just interacting with them.  Making them laugh like he used to do with us, it's what he does with us.

Q.  Does he have a nickname that the grand kids call him?

A.  Yeah, that's Gampa.

Q.  What is it like to see him with the grand kids?

A.  It's a great feeling.  You know, like for them to at least be, you know, young enough to -- to grow, to grow up to get to know their grandfather, you know.

Q.  Do you all spend holidays together?

A.  Yes.  Always.

Q.  Does he ever miss an opportunity to be with you all on holidays and special occasions?

A.  No.  Never.

Q.  As long as he's alive, do you think he'll ever miss another opportunity to be with you all when he can?

A.  No.

Q.  Why do you that?

A.  I mean, he's lost so much time already, I don't think he wants to lose any more time with us.

MR. SWAMINATHAN:  Nothing else, Your Honor.

THE COURT:  Any cross-examination?

MS. GOLDEN:  Just have a minute.

(Brief pause).

MS. GOLDEN:  Yes, Your Honor.

CROSS EXAMINATION

BY MS. GOLDEN:

Q.  Mr. Rivera, do you remember giving your deposition in this case a while back?

A.  Not the whole thing, but some of it.

Q.  A few years ago, right?

A.  Uh-huh.

Q.  You have a pretty good job at the YMCA.  I think you mentioned it on direct examination.

A.  Yes, I am.

Q.  You were a role model or what was your title?

A.  I was a mentor, outreach worker.

Q.  Okay.  And you did some pretty cool stuff there, didn't you?

A.  Yes, ma'am.

Q.  You helped at Risk-Youth stay away from gang, right?

A.  Yes.

Q.  You helped, encourage them to get good educations?

A.  Yes, ma'am.

Q.  And you helped them cope with violence in their homes?

A.  Yes.

Q.  And a lot of these children that you were helping grew up in a home without a father, correct?

A.  Yes.

Q.  And -- and one of the things you did -- I think you said

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 642 of 1335 PageID #:106027
R. Rivera - cross by Golden
2816

that you were a role model for these kids, weren't you?

A. Yes.

Q. And you yourself grew up in a gang-infested neighborhood?

A. Yes.

Q. And you were able to stay away from that life, correct?

A. Yes.

Q. I'm sure it couldn't have been easy.

A. No.

Q. Okay. I think you also mentioned your dad spending time with his grand kids. Your kids and Jacques' kids, correct?

A. Yes.

Q. Do you guys ever get together with both families?

A. Yes.

Q. And do you guys do anything outside the house?

A. Ah, yes. Something in particular just -- ah, you know, if it's not catching a movie, we're going places like Dave & Buster's, or something like that. Just, I don't know ...

Q. Did you ever go anywhere -- the kids play the games at Dave & Buster's. That's an expensive proposition, isn't it?

A. Ah ....

Q. It is for me. I'm sorry.

(Laughter in the courtroom).

BY MS. GOLDEN:

Q. Do you guys go out to eat anywhere other than Dave & Buster's, anything you can think of?

R. Rivera - cross by Golden

2817

A.  Oh, many places.

Q.  Just name some if you can remember.  If you can't, that's fine.

A.  He loves this place, this Cuban restaurant.  Couple of places.

Q.  Okay.  And your dad lives in Rogers Park?

A.  Yes.

Q.  Does he ever take the kids to the lake?

A.  Yeah, we go the beach.  Now it's summertime, but we have gone to the beach before.

Q.  Do you go to the local parks in the area?

A.  In his area?

Q.  Or any area.

A.  Yeah, we go to the park.

Q.  Okay.  I think you mentioned that -- how old were you when your dad went away?

A.  6.

Q.  Okay.  And I think you mentioned that now you guys eat all the time, right?

A.  Yes.

Q.  And I think in your deposition you mentioned that you have breakfast sometimes with your mom and your dad.  Sophia, right?

Since his release, you have family meals together in the morning?

A.  Ah, yeah.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 644 of 1335 PageID #:106020
R. Rivera - cross by Golden
2818

Q. And do you remember saying in your depositions that those were the kinds of things you didn't remember from before he went away?

A. Family meals?

Q. Breakfast with your mom and dad.

A. Ah, I mean I -- I -- I remember I was having meals together, but I don't know what we had together, but I'm pretty much we sat down for meals.

Q. Okay. Have you ever spoken to your father about what his life was like before he went away?

A. No.

MS. GOLDEN: That's it. Thank you.

THE COURT: Anything further? Redirect.

MR. SWAMINATHAN: No, Your Honor.

THE COURT: Thank you, sir. You may step down. Watch your step.

THE WITNESS: Thank you.

(Witness excused.)

THE COURT: Okay.

MR. LOEVY: Your Honor, subject to what we said, then we ae going to rest.

THE COURT: Okay. Ladies and gentlemen, the plaintiff is resting subject to a witness who couldn't be here today. So at some point in the future the plaintiff will reopen his case for one more witness.

The other thing I'm going to tell you is that the plaintiff has decided to dismiss as defendants Mr. Noon and Mr. Guzman. So they are no longer defendants in this case.

Now, I suppose we'll take our lunch break. We're pretty close. I have a meeting until 1:00. So it's going to be a little longer than usual. So we'll start again at 1:00.

We'll start with the defense case. But just so you know, you've already heard quite a bit of the defense case, because when the police officers witnesses have taken the stand, both sides have done their examination. So we are well into the defense case at this point, but we'll be starting officially this afternoon.

Anything else I need to say that I neglected to say?

MR. LOEVY: Not from the plaintiff, Your Honor.

THE COURT: Okay. 1:00 o'clock, ladies and gentlemen.

COURT SECURITY OFFICER: All rise.

(The following proceedings were had out of the presence of the jury in open court:)

THE COURT: Counsel, I have a meeting at 12:15 to basically 1:15, but I'll come back early. But I will not be able to be back earlier than 1:00. So if there's anything we need to talk about, now would be a good time to do it.

MS. ROSEN: Judge, there's just one issue I'd like to raise about Mr. Hickey who is coming this afternoon.

THE COURT: Okay.

MS. ROSEN: And there was some discussion earlier with Mr. Brasfield about whether or not the Palmer, the Seventh Circuit Palmer decision could come in, the one where the Seventh Circuit decided the fees.

And we didn't raise it with Mr. Brasfield, and I don't intend to raise it with Mr. Hickey, but what I do intend to raise with Mr. Hickey, who is going to be talking about the policies and practices, was that at the conclusion of the litigation, which the jury has already heard about, that the City's policies were in place and there was no further criticism that came out of that particular litigation as it relates to the policies.

And that the City then had those policies in place with knowledge that -- that the only incident that ultimately was affected by the pre-Palmer policy was the Jones case. And that no litigation in Palmer --

THE COURT: All right. You are confusing me to no end.

MS. ROSEN: Sorry, Judge. Let me try to be a little more clearer.

THE COURT: Okay.

MS. ROSEN: So Jones and Palmer came in under a notice theory, that the City of Chicago was on notice.

THE COURT: Correct.

MS. ROSEN: Okay. So Mr. Hickey was involved in

revamping the policies.

THE COURT: Okay.

MS. ROSEN: He's got to speak to the revamping over the policies. He also was involved, you know, through this entire period of time where Palmer ultimately reached its conclusion in '86 or '87.

THE COURT: Okay.

MS. ROSEN: And he's also going to say that the City was aware that the litigation ended.

THE COURT: Okay.

MS. ROSEN: And that there were no other individuals identified who had been adversely affected by the pre-Palmer policies.

Because we heard about Mr. Jones and how, you know, Mr. Brasfield testified about Mr. Jones and he went on trial --

THE COURT: Okay.

MS. ROSEN: And this was -- this was -- you know, he had a bad result as a result of the policies. Nobody else was identified through any of the other litigation to have suffered from any bad results up until through the time of '86, '87 when the Palmer litigation ended. So that would speak to the City's notice about the efficiency --

THE COURT: Well, I'll hear from the plaintiff. I think you may be telling them much more about this than would ever come -- that they could ever imagine, and that's my

concern. I mean, I don't know what --

MR. LOEVY: Here's our concern, it sounds like -- and, by the way, I was okay with most of that, but right to the end she said, "If Hickey is going to imply that the courts told us we're good --" you know, maybe we should talk about it. I bet we could get close.

But the idea was, in the Palmer litigation, as Eileen put it, no further victims were identified, but that wasn't an issue in the Palmer litigation. The case ended. All cases end. So Hickey should not be able to imply that the court said that there were no more -- you know, it's done. The case ended, that's what happened.

THE COURT: Well, that's my concern, where do we go with that. I mean, they're going to -- the case ended. Of course, all cases end.

MS. ROSEN: Sure. It was -- you know, it was described by Mr. Brasfield as two landmark cases that identified a problem that led to wrongful convictions, that's how he described it, okay.

THE COURT: He said that the policy led to wrongful convictions other than Jones?

MS. ROSEN: He did.

THE COURT: Okay.

MR. LOEVY: He was cross-examined on that. And she said, "name any." And the redirect was, it had a parallel file

system which created a risk of wrongful convictions.

THE COURT: That's kind of what I remember, but you're not agreeing on what exactly he said, whether there was a risk or actually caused wrongful convictions.

MR. LOEVY: The jury has only heard of George Jones. I mean, that's it. That's what they heard. And Eileen crossed on that point.

MS. ROSEN: He also said, though, that, you know, his opinion that the written order was -- you know, he talked about institutionalizing a parallel policy system that led to wrongful convictions.

THE COURT: Well, let me ask you this, as a result of all this litigation, Jones and Palmer -- I mean, I'm trying to articulate this. How many cases do we know of where the parallel file system was the subject of a finding of I guess we're talking about lack of exculpatory evidence. Just Jones?

MS. ROSEN: Just Jones.

THE COURT: Because Palmer fizzled out for all kinds of reasons.

MS. ROSEN: Well, in Palmer, the class-action led to the order that told the City -- the court entered an injunction telling the City to keep all of the files that were in existence at that time. 300 or so were turned over to the plaintiff's attorneys and to whatever criminal defense --

THE COURT: So you want to say something -- I mean,

you're going to have to come up with something anodyne, because I don't want this jury to have the idea that there were no other wrongful conjunctions; we don't know.

MS. ROSEN:  No.  No.  Right.

MR. LOEVY:  If we get into a factual dispute about what happened, the people's law office says that they didn't actually searched --

THE COURT:  No, no, I don't want to get into that.  I actually do not want to get into this.  So you're going to have to figure out a way of articulating whatever he's going to say now about -- now, Jones, we know how that ended, correct?

MS. ROSEN:  Correct.  And that's beyond dispute.

THE COURT:  And Palmer ended with -- what was it? Half of it was standing and half of it was nothing found?

MR. LOEVY:  No; attorney's fees.

MS. ROSEN:  The criminal defendants who were part of he class that -- because there were two classes, one with no convictions with pending cases, and one with convictions.  And the pending cases were the ones with no standing because they could pursue anything through their criminal prosecutions.  The conviction cases were, my understanding from reading the opinion, were the ones that the files were turned over to plaintiff's attorneys to review for any exculpatory evidence that could be used, and they found nothing.

MR. LOEVY:  But, Your Honor, they had nothing to

compare it to.

THE COURT: But let me just tell you, you got to come up with some way that he can describe this that doesn't hurt either party and it does not go into what the people's law office found, because that's nothing but trouble. So that needs to happen, okay.

MR. LOEVY: I think we can do that, Your Honor. Thank you.

THE COURT: I just want you to know that I can't be back until 1:00.

MR. SOTOS: Judge, just really quickly. We're going to be filing a Rule 50 motion, but we're going to file it after the plaintiff's officially close.

MR. LOEVY: And, Your Honor, I guess we probably are going to file a Rule 50 motion, as well.

THE COURT: Well, that's fine. If anybody needs to do anything today to preserve the record. The plaintiff hasn't actually rested, so you're okay.

MR. SOTOS: Right.

THE COURT: And the defense hasn't rested so -- well, you would do it at the same time, right?

MR. LOEVY: If it would be permitted to defer it, that would be our preference. We want to file a Rule 50 motion, as well, for judgment in our favor.

THE COURT: At this point?

R. Rivera - cross by Golden

2826

MR. LOEVY: Yeah.

THE COURT: All right. Well --

MR. LOEVY: It's free, so ... My colleague tells me we might have to wait until it's their turn, but I'll do it then, too.

THE COURT: Well, I don't know. I mean, I'm certainly not going to rule on any of this based on an oral -- you know, you're going to have to explain all this to me. And I'm probably going to reserve, anyway.

MR. LOEVY: Could we do it in writing, then, Your Honor?

THE COURT: Yeah. But my question is, does anybody need to do it now to make a record?

MS. ROSEN: No. I think the fact is, their case is not -- the plaintiff's case isn't officially closed --

THE COURT: It's after Victorson that everybody needs to do it.

MS. ROSEN: Certainly the defendants. I don't know what the rule is for the plaintiff.

THE COURT: So the record is clear, that this is not the time. The time is after Victorson.

MR. LOEVY: Thank you, Your Honor.

MR. LEINENWEBER: Just one brief, thing, Judge, though. I would make an oral motion, and I can follow up with a written motion, to strike any of the 404(b) allegations since

I don't believe there's been any evidence that came in during the plaintiff's case.

And as I understand it, the witness that is to come in, Mr. Victorson, is a state's attorney and would not be offering any. So that would be my motion, Judge, and I can follow up with a written one.

MR. LOEVY: It might be the usual case, except that he didn't deny it.

THE COURT: I don't even know what you want me to do, and I certainly can't deal with it orally.

MR. LEINENWEBER: No problem, Judge.

THE COURT: But you stated it for the record and so file something.

MR. LEINENWEBER: Thanks, Your Honor.

(Luncheon recess taken from 11:59 o'clock p.m. to 1:00 o'clock p.m.)

*    *    *    *    *    *    *    *

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER

/s/Blanca I. Lara                    June 20, 2018

2658

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JACQUES RIVERA,                              ) No. 12 CV 4428
                                             )
            Plaintiff,                       )
                                             )
vs.                                          ) Chicago, Illinois
                                             )
REYNALDO GUEVARA, STEVE GAWRYS,              )
DANIEL NOON, JOHN GUZMAN, JOSEPH FALLON,     )
JOSEPH SPARKS, PAUL ZACHARIAS, GILLIAN       )
MCLAUGHLIN, JOHN LEONARD, EDWARD MINGEY,     )
RUSSELL WEINGART, ESTATE OF ROCCO            )
RINALDI, CITY OF CHICAGO,                    ) June 20, 2018
                                             )
            Defendants.                      ) 1:02 o'clock p.m.

VOLUME 12-B
TRANSCRIPT OF PROCEEDINGS - Trial
BEFORE THE HONORABLE JOAN B. GOTTSCHALL
and a jury

APPEARANCES:

For the Plaintiff:     LOEVY & LOEVY
                       BY:  MR. JONATHAN I. LOEVY
                            MR. STEVEN E. ART
                            MR. ANAND SWAMINATHAN
                       311 North Aberdeen Street
                       3rd Floor
                       Chicago, Illinois  60607

                       MacARTHUR JUSTICE CENTER
                       Northwestern University School of Law
                       BY:  LOCKE E. BOWMAN III
                       357 East Chicago Avenue
                       Chicago, Illinois  60611
                       (312) 503-0844

Court reporter:            Blanca I. Lara
                       Official Court Reporter
                       219 South Dearborn Street
                             Room 2504
                       Chicago, Illinois 60604
                         (312) 435-5895
                       blanca_lara@ilnd.uscourts.gov

2659

APPEARANCES: (Continued)

For the Individual        THE SOTOS LAW FIRM
Defendants:               BY:  MR. JEFFREY N. GIVEN
                               MR. JAMES G. SOTOS
                               MS. CAROLINE P. GOLDEN
                               MR. JOSEPH POLICK
                               MR. DAVID A. BRUEGGEN
                          550 East Devon Avenue, Suite 150
                          Itasca, Illinois  60143

For the Defendant         ROCK FUSCO & CONNELLY, LLC
City of Chicago:          BY:  MS. EILEEN E. ROSEN
                               MS. CATHERINE M. BARBER
                               MS. THERESA B. CARNEY
                          321 North Clark Street, Suite 2200
                          Chicago, Illinois  60654

For the Defendant         LEINENWEBER BARONI & DAFFADA, LLC
Guevara:                  BY:  MR. THOMAS E. LEINENWEBER
                               MR. JAMES V. DAFFADA
                          120 North LaSalle Street, Suite 2000
                          Chicago, Illinois  60602

2660

(Jury out.  Proceedings heard in open court:)

THE COURT:  Are we ready?

MR. SOTOS:  We are, Your Honor.  I just want to brief -- one very brief issue.

THE COURT:  Yes.

MR. SOTOS:  Do we need Mr. Loevy for this?

MR. ART:  Yes.  Sorry.

MR. BOWMAN:  I don't know what it is.

MR. SOTOS:  It has to do with Dorsch.

MR. BOWMAN:  Let's wait for Jon.

MR. SOTOS:  Wait?  Okay.

THE COURT:  So we're ready?

MR. BOWMAN:  Mr. Sotos has an issue --

MR. POLICK:  Just waiting for Mr. Loevy --

MR. BOWMAN:  -- and I wanted to defer to Mr. Loevy on all things, if we could.  Or if you'd prefer, we could just deal with it now.

THE COURT:  Well, I like to tell the jury --

MR. BOWMAN:  I understand.

THE COURT:  -- tell the jury 1:00, I like it to be 1:00.  So I don't know how long this will take, but judging from past history, probably forever.

(Mr. Loevy enters the courtroom.)

MR. SOTOS:  I hope not.

MR. BOWMAN:  We just found out.

2661

MR. SOTOS: So we didn't have to do it --

THE COURT: Well, tell me. Tell me. Tell me.

MR. SOTOS: I wanted to alert the Court to the fact that we wanted to examine Mr. Dorsch as an adverse witness and wanted to make sure there was no objection.

MR. LOEVY: There's a big objection. He's a Chicago police officer.

THE COURT: Well, yeah, but he's been working for the Center for Wrongful Convictions for a long time.

MR. SOTOS: He's testified --

MR. LOEVY: He's done work for them. But, you know -- you know, we had the adversity -- adverse examination --

THE COURT: Well, I let you do it finally. I don't know if there was a basis for it.

MR. LOEVY: There was an objection.

THE COURT: I'll let you do it.

MS. ROSEN: Thanks, Judge.

MR. LOEVY: Your Honor, they objected, and you sustained their objection.

MR. SOTOS: Judge --

THE COURT: I know, but I ended up letting you -- letting you do what you were -- I mean, I just, you know, let you do it.

As I say, I don't know. Nobody's briefing this. There's law on this. You know, I would expect lawyers to give

2662

me some case law instead of just hitting me with this unexpectedly.  But, you know, with nothing to go on --

MR. LOEVY:  Your Honor, how about if we did the same thing, which is he has to establish adversity?

(Witness enters courtroom.)

MR. SOTOS:  Your Honor, could I ask him to step out briefly?  He just walked into the courtroom so --

THE COURT:  No, I think we can go ahead.  Let's get the jury.

MR. SOTOS:  Judge, the -- so I can question him adversely then?  I just want to make sure that there's -- you don't need me to say anything else?  I can.

THE COURT:  He worked for the police, and then he -- well, I think the witness is still there but --

MR. SOTOS:  Sir, can you step out?

THE COURT:  Real quickly.  Don't go far.

(Witness left the courtroom.)

THE COURT:  So what's the history?  Tell me the history fast.

MR. SOTOS:  So he worked for the police.  He retired in 1994.  If I could just --

MR. LOEVY:  Thirty years with the police department.

THE COURT REPORTER:  I'm sorry.  One at a time, please.

MR. SOTOS:  He retired in 1994.  Since 2010, 2011,

he's worked with -- as a private investigator with Northwestern on cases. He's testified against Mr. Guevara in three post-conviction proceedings in 2013.

I can't really imagine that --

THE COURT: You know, it's as much -- probably a stronger case for adversity than what we heard yesterday, you know, who was somebody who was a State's Attorney and then was in the EEOC and then was a volunteer with children. I mean --

MR. LOEVY: Well, he's done some work for Northwestern. You know, Northwestern isn't even a party.

THE COURT: You know what, it's --

MR. BOWMAN: It's not as if --

THE COURT: I let you do it.

I'm going to let you do it.

Now, what does that mean? That means both sides get to cross-examine, right?

MR. SOTOS: Except yesterday they were objecting to my leading questions, and Your Honor sustained them through Mr. O'Brien --

THE COURT: Well, you know what, I'm -- because you lawyers who should be better than this are giving me nothing, I'm operating by guesswork.

So I'm going to let both sides do it by cross. Okay?

MR. SOTOS: We would have liked to have done that with Mr. O'Brien --

THE COURT:  Well, I'm sure you would have, but if you don't give me anything and I tell you that I don't know what the relevant law is, there's not much I can do except, you know, like a blind crab.  So there it is.

We did try to do our own research, and we didn't find anything helpful, but -- we're ready.

(Jury in.)

THE COURT:  Please be seated, everyone.

Mr. Sotos.

MR. SOTOS:  Thank you, Your Honor.  Defense would call William Dorsch.

(Brief pause.)

MR. SOTOS:  I thought he stepped right outside the courtroom.

THE COURT:  He was here two seconds ago.

MR. SOTOS:  He changed his mind.

MS. GOLDEN:  I don't know if Anand went to get him. I'll go take a look.

(Brief pause.)

MR. SOTOS:  I think Anand went to get him.

MR. LOEVY:  He went to look for him.

(Witness enters courtroom.)

THE COURT:  Sir, would you step up here, please. Please raise your right hand.

(Witness duly sworn.)

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 661 of 1335 PageID #:106046
Dorsch - direct by Sotos
2665

THE COURT: You may be seated.

WILLIAM DORSCH, DEFENSE WITNESS, SWORN

DIRECT EXAMINATION

BY MR. SOTOS:

Q. Good afternoon, sir.

A. Good afternoon.

Q. You work for the Chicago Police Department from 1964 through '94; is that right?

A. No.

Q. When did you work for the Chicago Police Department?

A. I became a police officer in 1970; June 15th, 1970.

Q. And then you retired in 1994?

A. As soon as I reached 50 years of age, I retired, yes, in '94.

Q. And you currently work as a private investigator?

A. Yes.

Q. Do you do work for criminal defense attorneys?

A. Yes.

Q. One of the things you do is to interview witnesses in criminal cases?

A. Yes.

Q. I want to take you back to 1988 and ask you about an incident that occurred in August of 1988.

Do you -- do you recall the incident that we're here for today?

A.   Only by reports.

Q.   So you've reviewed reports of the incident to refresh your recollection?

A.   Yes.

Q.   So just so we're clear that other than from your review of the reports, do you have any recollection of the incident at all?

A.   No.

Q.   And that's not unusual after 30 years, is it?

A.   No, especially with minimal participation.

Q.   Especially with minimal participation?

A.   In the incident, yeah.

Q.   Well, you did review the reports, right?

A.   I did.

Q.   And after having reviewed the reports, you characterized your involvement as minimal?

A.   Well, if I would have started work at 4:30 in the afternoon, it seems that it was concluded, my involvement in that case, about 7:30.

Q.   That evening?

A.   That evening, three hours.

Q.   All right.  But in terms of what happened, it was fairly significant, right?

A.   Oh, any -- any homicide is significant.

Q.   All right.  So when you say "minimal," you're just talking

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 663 of 1335 PageID #:106043
Dorsch - direct by Sotos
2667

about the number of hours you devoted to the case --

A.  That's correct.

Q.  -- on that day?

All right.  So let's talk about that.  You became a detective in what year?

A.  1987.

Q.  So that was about a year before -- sometime in the year before the incidents that led to this lawsuit?

A.  Yes.

Q.  And prior to being a detective, in what capacity were you working as Chicago police officer?

A.  Beginning after I --

Q.  Just before you were a detective.

A.  Before I was a detective?  I was a tactical officer in the 20th District.

Q.  And at some point you worked as a Gang Crimes officer, correct?

A.  That's correct.

Q.  You never became a Gang Crimes specialist, but you were a Gang Crimes officer?

A.  No, I was still -- I was never a Gang Crimes officer.  I worked with Gang Crimes less, but I was not a Gang Crimes officer.

Q.  All right.  And I want to ask you, as a detective, can you describe how you worked with Gang Crimes specialists?

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 664 of 1335 PageID #:106049
Dorsch - direct by Sotos
2668

A.  Well, it's -- every case might be different, but like tactical officers or patrol officers, you go where you figure you can get assistance.

Q.  I'm talking about Gang Crimes specialists.

They were kind of your eyes and ears on the streets, so to speak, right?

A.  They and also, I would say, tactical officers.  And I say that because I was a tactical officer for most of my career.

Q.  Right.  But I'm not asking you about tactical officers. I'm asking you about Gang Crimes specialists, and specifically I'm asking, is it fair to say that as a detective, you worked with Gang Crimes specialists, and they functioned as your eyes and ears on the street?

A.  They assisted, yes.

Q.  Okay.  You don't disagree with me when I --

A.  No, I mean --

Q.  -- I'm using your words from your deposition, so --

A.  No, I'm not disagreeing at all.

Q.  All right.  So they functioned as your eyes and ears on the street?

MR. LOEVY:  Objection, asked and answered, Your Honor.

MR. SOTOS:  That's fine.

BY MR. SOTOS:

Q.  Mr. Dorsch, you recall giving a deposition in this case back in April of 2015, page 219?

Do you recall being -- line 16.

Do you recall being asked this question, giving this answer:

"Question:  In the course of a murder investigation that you were working on as a detective, how, if at all, would Gang Crime specialists be used as part of that investigation?

"Answer:  Not different than when I was a tactical officer.  They were the eyes and ears sort of of the streets.  So you got information."

MR. BOWMAN:  Objection.  That's not impeaching. That's exactly what he said.

THE COURT:  That's what the witness just said. Sustained.

MR. BOWMAN:  May it be stricken, Judge?

THE COURT:  Yeah, because it's not impeaching.

BY MR. SOTOS:

Q.  And so Gang Crime specialists essentially were able to provide you with information, correct?

A.  Yes.

Q.  All right.  About what was going on with the gangs?

A.  Yes.

Q.  Helped you -- helped you locate witnesses?

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 666 of 1335 PageID #:106051
Dorsch - direct by Sotos
2670

A. Yes.

Q. Okay. But they couldn't charge cases, right?

A. No. They would bring it to the Detective Division for assistance.

Q. All right. But they would have to bring it to the detectives, because you were the ones who were authorized by law to charge a case -- to bring -- to seek criminal charges?

A. Well, in a serious crime like a homicide, but they can make narcotic arrests and charge. And they can make gun arrests and charge. A variety of cases they can charge without detectives.

Q. But not in a homicide case?

A. They would also include the homicide units.

Q. Well, specifically it was the detectives --

A. Sure.

Q. -- that had the authority to seek charges in a homicide case, correct?

A. Yes.

Q. Not the Gang Crimes specialists?

MR. LOEVY: Objection, asked and answered, Your Honor.

MR. SOTOS: I'm just trying to make it clear, Judge. I'm not --

THE COURT: Overruled.

THE WITNESS: Repeat the question, please.

BY MR. SOTOS:

Q. In terms of who at the police department had the authority

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 667 of 1335 PageID #:106052
Dorsch - direct by Sotos
2671

to seek criminal charges in a homicide case, that was something
detectives could do but not Gang Crimes specialists, correct?

A.  Well, they always worked through the detectives for that.

Q.  Again, because only the detectives could seek the criminal
charges, correct?  They had --

MR. BOWMAN:  Objection, asked and answered.

MR. SOTOS:  I don't think -- I don't think he answered
it.

THE COURT:  Overruled.

BY THE WITNESS:

A.  Yeah, I mean, we would call Felony Review and run the case
by them, with the assistance of witnesses and the Gang Crimes
officers or tactical officers and whatever -- whatever police
officers were involved.

BY MR. SOTOS:

Q.  And if there was a lineup to be conducted, only the
detectives could conduct it, correct?

A.  No.  I mean, in a homicide --

Q.  I'm sorry.

A.  -- yes.

Q.  You're right.

In a homicide -- you understand we're talking about a
homicide case here?

A.  Yeah, if you want to stay there, because incorrect.  I've
run lineups when I was a tactical officer.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 668 of 1335 PageID #:106053
Dorsch - direct by Sotos
2672

Q. Right. But in a homicide case, only detectives could run those lineups?

A. Yes, that was part of our responsibility.

Q. And in this case, you did run a lineup, correct?

A. From reviewing the reports, it seems, yes.

Q. And you did seek criminal charges, correct?

A. There was an identification made, so criminal charges would have been asked for.

Q. Okay. And you -- you did that, right?

A. According to the report, criminal charges were granted, yes.

Q. Okay. But I'm not asking whether or not the State's Attorney granted the charge -- granted the charges.

I'm asking whether or not you were the person who actually sought the charges?

A. I can't answer that question, because I have no recall if I did that.

Q. Well, could it have been anybody other than you or your partner, John Boyle?

A. I would suspect it would either have been John or I.

Q. It would have had to have been one of the two of you, right?

A. After a lineup, yes.

Q. Let's -- let's look at the reports that you -- I think these are the reports that you were reviewing.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 669 of 1335 PageID #:106054
Dorsch - direct by Sotos
2673

MR. SOTOS:  Can you put 23-H up?  It's RFC519.

MS. GOLDEN:  Which date?

MR. SOTOS:  September 15th Supp. Report.

BY MR. SOTOS:

Q.  Mr. Dorsch, I've placed in front of you Defendants' Exhibit 23-H.  And I'm going to ask you to look at that and tell me whether you recognize --

MR. SOTOS:  I don't think it should be in front of the jury.  I don't think it's been admitted yet.

MR. LOEVY:  No objection, Your Honor.

MR. SOTOS:  Well, I haven't moved it yet.  I just want to make sure --

THE COURT:  Wait.  It hasn't been moved.

MR. SOTOS:  Right.

BY MR. SOTOS:

Q.  Can you tell me whether you recognize that document?

A.  It is a Supplemental -- Supplemental Report, apparently authored by myself and Detective Boyle.

MR. SOTOS:  And, Your Honor, we would move for the admission of Defendants' 23-H.

THE COURT:  All right.  And there's no objection, right?

MR. BOWMAN:  None.

MR. LOEVY:  No.

THE COURT:  23-H is received.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 670 of 1335 PageID #:106055
Dorsch - direct by Sotos
2674

(Defendants' Exhibit No. 23-H received in evidence.)

BY MR. SOTOS:

Q. So you've -- you've had a opportunity to review this report prior to your testimony here today, correct?

A. Yes.

Q. And so I'd like to take you through it.

At the top -- at the top it says, "Battery/Aggravated Handgun." But this was a homicide case, right?

A. Well, the initial investigation was from a battery. Subsequently, the -- the victim died, so it became a homicide, yes.

Q. But by the time you got it, it was a homicide?

A. Yes.

Q. Okay. So do you know where the "Battery/Aggravated Handgun" came from?

A. No, I don't.

Q. So you --

A. I mean, from the original report, I would assume.

Q. All right. Because you reviewed the other reports in the case prior to completing this report that's in front of you right now, right?

A. I don't recall the review, no.

Q. You don't recall that you reviewed the file on the day that you --

A. Thirty years later, I do not recall.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 671 of 1335 PageID #:106056
Dorsch - direct by Sotos
2675

Q. Well, that's fair. Judging by -- let's ask by your practice.

I mean, when you were assigned to a case, was it your practice to review whatever reports were already in existence?

A. I was only assigned to a lineup -- a lineup.

Q. So -- but could you answer my question?

Was it your practice, when you were assigned to do part of an investigation on a case, would you review whatever reports were in the file?

A. If they were available. I also would have talked to the officers that were involved in making the arrest.

Q. But you would have reviewed the reports, too, right?

A. If they were there.

Q. Okay. And so that aggravated -- "Battery/Aggravated Handgun" reference, is that something you probably got from a prior report that you had reviewed and just put it in there?

A. I can tell you I know I didn't write that report because I never use parentheses, nor do I ever put the year like 1988. I would have wrote "August '88." I wouldn't have wrote 1988.

Q. Did I misunderstand you? You didn't say a little while ago that either you or your partner --

A. I said I or John Boyle wrote the report, yes.

Q. Okay. But didn't -- didn't you just say now that you know you didn't write it?

A. Well, I can tell you I don't believe that I wrote that

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 672 of 1335 PageID #:106057
Dorsch - direct by Sotos
2676

report, because I can see from that it's different than how I would write a report.

Q. Well, I mean, you said a couple minutes ago that either you or John Boyle wrote it, correct?

A. Yeah.

MR. LOEVY: Objection, asked and answered.

MR. BOWMAN: Objection, asked and answered.

THE COURT: I think it's getting argumentive, and I'm going to sustain the objection.

BY MR. SOTOS:

Q. Well, let me ask you just a straight question.

Do you know whether you wrote it or not?

MR. LOEVY: Objection, Your Honor, asked and answered.

THE COURT: Overruled.

BY THE WITNESS:

A. I don't -- I don't believe that I wrote it. I believe John must have wrote it.

BY MR. SOTOS:

Q. All right. So you think Mr. Boyle wrote it?

A. Well, it's either him or I, and I don't believe that I wrote it because it's not my format.

Q. Because you don't use the parentheses?

A. Yeah, and I don't usually put the -- I don't put the full year out after, like, August you see in the upper right portion of the report.

Q.  Up in the right where it says, August of 2000 --

A.  Yes.

Q.  -- "August 1988" --

A.  Yeah.

Q.  -- you don't do that?

A.  I would have put '88.

Q.  Okay.  Is that your signature on the bottom left-hand corner of the report?

A.  Yes, it is.

Q.  Okay.  And you read the report before you signed it, right?

A.  I have no recall, but I would hope that I had.

Q.  Again, going by your practice as a detective, aside from whether you recall it in this case or not, is that the kind of thing that you would have done before you signed the report? Would you have read it?

A.  Well, you might not read all reports, but I -- I have no recall.

Q.  Yeah, but I'm asking you about this -- I'm not asking you about all the reports, sir.

I'm just asking you about this report --

A.  I don't recall.  I don't recall --

Q.  Let me finish, please.

A.  Okay.

Q.  I'm just asking you about this report that you signed -- I'm just asking you if you would have read this -- based on

your practice, is this the kind of thing you would have read it before you put your signature on it?

A.  I have no recall, but I assume that I would have.

Q.  Okay.  And the fact that your name is in the lower left-hand box on this page, is that any indication to you that -- right down here -- does that -- does that indicate to you one way or the other whether you would have actually been the person to author it?

A.  No.

Q.  So there was no practice with whether the name went in the left-hand box or in the middle box in terms of who would have actually written it?

A.  Yes, unknown.

Q.  Do you know if that's John Boyle's signature next to yours or did you --

A.  I don't.

Q.  Do you know his handwriting?

A.  Not any longer, no.

        MR. SOTOS:  Turn to the next page, please.

BY MR. SOTOS:

Q.  In the middle paragraph here where it has "Orlando Lopez," does that mean that was the eyewitness who was in the station that day?

A.  It says "Reinterviewed."  I -- yes.

Q.  So -- yeah, it says "Reinterviewed," right?

Dorsch - direct by Sotos

2679

A.   Yes.

Q.   So does that signify to you that on the day the lineup was held that you would have reinterviewed Orlando Lopez?

A.   I'm sure that he was talked to.  He must have been talked to for a lineup.

Q.   All right.  And that's something that you would have done or Mr. Boyle or combination of the two of you, correct?

A.   Yes.

Q.   And right underneath that in the next paragraph, it states that you were assigned by Sergeant Rinaldi to continue into the investigation related to the case upon learning that the victim had died as a result of the multiple gunshot wounds.

        You don't have any recollection of that occurring, correct?

A.   Correct.

Q.   All right.  But you don't have any reason to doubt that that's what happened, correct?

A.   No, no doubt.

Q.   And in the next paragraph after that, it states that upon reviewing the case file, the R/S's -- and R/S's, is that a typo?

A.   I've looked at that and thought that it possibly could be.

Q.   Because the S is next to the D on the typewriter?

A.   Exactly.  I did -- I did look at that, and I kind of came to that same conclusion, because it didn't make sense

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 676 of 1335 PageID #:106061
Dorsch - direct by Sotos
2680

otherwise.

Q. So that was probably meant to be R/D, correct?

A. I think so.

Q. And that's just a typo, right?

MR. LOEVY: Objection, asked and answered, Your Honor.

THE COURT: Sustained.

BY MR. SOTOS:

Q. All right. It states that you and Mr. Boyle contacted Gang Crimes North to notify them that the victim had died, correct?

Do you see the highlighted portion?

A. Yes, it says that.

Q. Okay. And, again, you don't have any recollection of doing that 30 years ago, correct?

A. Correct.

Q. And you don't have any reason to doubt that that's what you did at the time?

A. If all the events happened that day within three hours, there's an awful lot that was done within three hours that I don't know how all of it would have been done in that time span.

I mean, a phone call is a phone call. That could be done quickly. If a phone call was made, I don't know.

Q. All right.

A. But it says it was.

Q. Sir, I'm not asking you about everything else that was done

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 677 of 1335 PageID #:106062
Dorsch - direct by Sotos
2681

or --

A.   Yeah.

Q.   -- how the notification was made.

I'm just asking if the report --

A.   Yeah.

Q.   -- as far as you know, is accurate in stating that after reviewing the case file that you and/or Mr. Boyle contacted Gang Crimes North to notify them that the victim had passed away?

A.   Yes, it says that.

Q.   Okay.  And, again, you don't have any reason to doubt that that's what you did back 30 years ago?

A.   No.

Q.   Okay.  And that you were requesting their assistance in locating the offenders of the incident, along with known witnesses.

Once, again, not remembering independently, you don't have any reason to doubt that what was written in the report by either you or Mr. Boyle was accurate?

A.   I have no reason to doubt.

Q.   Pardon me?

A.   I have no reason to doubt it.

Q.   Thank you.  Moving on to the next paragraph, it states that Mr. Rivera was -- agreed to come to Area 5, that he was brought in to Area 5 by Mr. Guevara and Mr. Gawrys.  Do you see that?

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 678 of 1335 PageID #:106068
Dorsch - direct by Sotos
2682

A.   Yes.

Q.   And that upon his arrival, he was informed that the victim had died -- that upon, excuse me, the -- Mr. Rivera's arrival, he was informed that the victim had died and that it was necessary to speak with him further and request that he participate in a lineup, correct?

A.   Correct.

Q.   Okay.  And so, again, you're not disputing that you had a conversation with Mr. Rivera; you just don't remember the case at all?

A.   Correct.

Q.   Okay.  You stated that he agreed to cooperate and was allowed to wait in an interview room until the arrival of a witness would arrive to view a lineup, correct?

A.   Correct.

Q.   Okay.  And moving on to the next paragraph, it states that a lineup was conducted and that Mr. Rivera was positively identified as the person who while armed with a handgun and shot the victim numerous times.  You don't recall that happening?

A.   I don't recall it being told to me, but I see the report and have no reason to doubt.

Q.   And that Mr. Rivera was then advised of his *Miranda* rights, to which he replied that he understood, was asked if he wanted to cooperate further, stated that he wanted to speak to a

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 679 of 1335 PageID #:106064
Dorsch - direct by Sotos
2683

lawyer, at which time all questioning ceased, correct?

A. Correct.

MR. LOEVY: Your Honor, this report has already been read to the jury maybe more than once. So we object to cumulativeness.

THE COURT: Overruled.

MR. SOTOS: It was just admitted, Judge.

THE COURT: I overruled the objection.

BY MR. SOTOS:

Q. All right. So moving on to the next page, the report states that Assistant State's Attorney Julie Rosner was notified and responded to Area 5.

You don't have any reason to doubt that, in fact, either yourself or Mr. Boyle contacted Julie Rosner in order to -- in order to bring -- to come to the station in which you were seeking to have felony charges approved, correct?

A. That would be correct.

Q. And that was -- when I say "and/or Mr. Boyle," it's because you don't really remember which of you made notifications or phone calls, correct?

A. Correct.

Q. But whether it was you and/or Mr. Boyle, the two of you had agreed that this was something that you should do, correct?

A. It would have been procedure, yes.

Q. All right. So who actually made the notification isn't

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 680 of 1335 PageID #:106065
Dorsch - direct by Sotos
2684

really significant; is that right?

A.  I don't find it is.

Q.  And then it goes to say that after reviewing the file and interviewing the witness and police officers, the charge of murder was approved against Jacques Rivera, correct?

A.  Yes.

Q.  Okay.  And that was a decision that Ms. Rosner made after, according to the report, reviewing the file and interviewing Orlando Lopez, correct?

MR. LOEVY:  Objection, Your Honor, foundation and relevance.

BY MR. SOTOS:

Q.  According to your report?

A.  Felony Review -- if Julie Rosner was from Felony Review, it would have been her responsibility.

MR. SOTOS:  Can you place 23-G up?

BY MR. SOTOS:

Q.  And, by the way, in 2010 you spoke with a representative of Northwestern about this case, correct?

A.  I'm not sure of the year.

Q.  Is that --

A.  And I'm not sure if you're talking about the first contact I ever had.

Q.  Well, would you take my word for it if I told you it was 2010 or 2011, or do you want me to find some documents?

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 681 of 1335 PageID #:106066
Dorsch - direct by Sotos
2685

A.  Well, if you tell me who I talked to, maybe it would help me.

Q.  Do you recall talking to a Jane Raley in 2010?

A.  Well, I remember talking to Jane Raley.  It would have been the first time I talked to her.

Q.  Okay.  And you talked about your involvement in the case at that point, correct?

A.  That's not why I was there, but eventually we talked about this case.

Q.  Yeah.  You were bringing her a different case, correct?

A.  That's correct.

Q.  All right.  But you talked -- but then you asked her -- she told you that she was looking at cases involving Mr. Guevara, correct?

A.  No.  She said she had a case that I -- my name was also involved in that case.

Q.  Okay.  And then you talked to her about the case at the time, correct?

A.  About that case, yes.

Q.  The Rivera case, this case?

A.  This case.

Q.  Right.  But she told you what she knew of your involvement in it, and it didn't refresh your recollection even back in 2010, correct?

A.  First she asked me if I recalled the case, and she

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 682 of 1335 PageID #:106067
Dorsch - direct by Sotos
2686

mentioned the name, and I had no recall.

And she said -- asked me if I had any objection to looking at the case and talking to her about that case.

Q. And you didn't remember it?

A. I didn't remember the case, but I did tell her I would talk to her. Show me the case and let me see if I can remember it.

Q. She showed you some of the same reports that we've looked at here today, correct?

A. There were reports that I did see, yes.

Q. Like the Supp. Report we just went through, that's one of the reports she showed you, right?

A. Again, I'm sure it probably was, but I don't recall -- have vivid memory of it.

Q. Okay. You said even at that time, it still didn't refresh your recollection about the case?

A. Not at all.

Q. Okay. Shortly after that, you started doing some work for Northwestern, correct?

A. Maybe a year later or so.

Q. Well, you've done quite a -- quite a bit of work for Northwestern, right, private investigative work?

A. Not true. I've done two major cases that ended in exonerations for them, yes.

Q. Okay. But did you --

A. But I had very minimal, very minimal, almost none since my

involvement in the Guevara case.

Q.  Okay.  Would you quarrel with me if I said you were paid $65,000 as of your deposition four years ago in the case?

A.  I was paid how much?

Q.  A total of $65,000 from Northwestern and related entities?

A.  In one year?

Q.  No, all the --

A.  All the cases?

Q.  From 2011 up to 2014.

A.  That's -- from 2011 to '14, I don't -- I wouldn't have a -- I don't know.

I know I did work for the Illinois Appellate Defenders, even the State's Attorney's Office paid me probably a lot of money for working --

Q.  But I'm just asking you about --

A.  I don't recall.  I don't recall.

Q.  So would you quarrel with me if I told you that was the number?

A.  Over three or four years?  I don't know.  I'll take your word for it.  I have no idea.

Q.  All right.  We can move on.

By the way, when you were assigned to this case on September 15th, you indicated that you only had three hours or so of involvement in the case, right?

A.  From looking at the reports, that's what it does seem, from

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 684 of 1335 PageID #:106069
Dorsch - direct by Sotos
2688

the time I started my shift to the end of the lineup.

Q.  Do you -- do you know who the detectives were who were previously on the case?

A.  Only from having reviewed the reports.  I had no knowledge before that.

Q.  And from reviewing the reports, what did that tell you about what detectives were on the case on the day that you were assigned?

A.  Well, there were several, maybe four or five detectives that were involved in the case prior.  But I think the primaries were Jack Leonard and Gillian McLaughlin.

Q.  And do you know why they weren't on the case -- working on the case on September 15th, the day that you were assigned?

A.  No idea.

Q.  If they had been working that day or on duty, is it your assumption that they would have still been on the case that day?

A.  I would think so.

Q.  So you can't think of any reason why Gill McLaughlin or Detective Leonard would have been thrown off of the case?

A.  Thrown off of the case?

Q.  Right.

A.  Specifically those words, I have no knowledge of.

Q.  Because that would be a relatively significant thing, right, if a detective was thrown off of the case because they

wanted to put somebody new on?

A. Well, thrown off, I never heard that before. I mean, I've had other people -- other detectives finish my own cases for a variety of reasons, furlough or I'm in court or I'm not working that day.

Q. Right. So it's not unusual for a detective who is working on a day to take over an investigation for somebody who isn't working that day?

A. It's not unusual, no.

Q. And so from your review of all the reports that you've looked at, do you have any reason to think that Gill McLaughlin or Jack Leonard were at the police station on September 15th, the day that the lineup was conducted of Mr. Rivera and he was charged with the murder?

A. I think --

            MR. BOWMAN: Asked and answered.

            THE COURT: Overruled.

BY THE WITNESS:

A. I think had they been there that they would have taken the case.

BY MR. SOTOS:

Q. So at the time the case came to you, it was still an investigation, correct?

A. The time the case came to me, it was now a homicide.

Q. Right.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 686 of 1335 PageID #:106076
Dorsch - direct by Sotos
2690

A.   And I was assigned to assist Gang Crimes in a lineup and only a lineup.

Q.   Well, it was -- the case was -- it had become a homicide, correct?

A.   Yes.

Q.   And from your review of the reports, Gill McLaughlin and Jack Leonard were two of the detectives who had been previously working the case before it became a homicide?

A.   I assume that I learned that.  How I learned it, whether it be from a report or from verbalizing from somebody else, I don't know.

Q.   Okay.  When you say "verbalizing," you mean during, like, your meetings with plaintiff's counsel to prepare for your testimony --

A.   No.

Q.   -- right?

A.   I mean at that time at that day in my office at Area 5, whatever information was rendered to me, either verbally or from a report that I may have seen.

Q.   Somehow you knew that Gill McLaughlin and Jack Leonard had been working on the case before it became a homicide?

A.   I assume that I did.

Q.   Okay.  And you said that all you were involved in was the lineup.  So let's talk a little bit about that.

      So this is the lineup report, which is in evidence as

Dorsch - direct by Sotos

2691

Defendants' Exhibit No. 23-G, Your Honor.

And on the top of this report, you see where it says, "Homicide/1st Degree"?

A. Yes.

Q. Okay. That's different than the last report where it stated that it was "Battery/Aggravated Handgun," correct?

A. Correct.

Q. And if you go down to where it says, "Persons conducting lineup," it lists yourself and Detective Boyle, correct?

A. Correct.

Q. And you were the two individuals who were conducting that lineup, correct?

A. It says that, yes.

Q. Pardon me?

A. Yes.

Q. Thank you. And there's some faint signatures on the bottom. Can you see those, Detective John Boyle and Detective William Dorsch?

A. Yes.

Q. Okay. Are -- is that signature yours, William Dorsch?

A. It's different than my signature.

Q. Okay. It's different than the signature on the last document, correct?

A. Right. I mean, you can look at the "R" specifically and know that I don't ever sign my name like that.

Q. And is that a common police practice where one detective will allow another detective to sign their name to a document?

A. Yes.

Q. Okay. And going on to the next page, it lists yourself, Detective Boyle -- I was doing better with that on the last one -- Mr. Guevara and Mr. Gawrys as the people who were present during the lineup, correct?

A. Yes.

Q. And below that it lists the people who were there and then describes a positive identification of Mr. Rivera, correct?

A. Yes.

Q. Now, you don't have any recollection of what happened during this, correct?

A. No, I don't have a recollection of it.

Q. But you understand from reading the reports that you and Detective Boyle conducted the lineup with the eyewitness, Orlando Lopez, and with Mr. Rivera being one of the subjects in the -- in the lineup, correct?

A. That's correct.

Q. All right. And so if there had been -- well, before we get to that, what kind of instructions do you give the -- the witness before they actually view the lineup?

A. Well, I would hope that it would be something like: "Just because you're here, we've asked you to come in to look at a photo lineup or a physical lineup. It does not mean that the

Dorsch - direct by Sotos

2693

person involved in the crime is actually here, so don't feel that you have to make an identification."

Q.  So you have a conversation with the witness before they do the lineup?

A.  Instructions to the witness that they don't have to make an identification.

Q.  And if you had seen any kind of effort to influence -- well, strike that.

Before we get to that, can you tell from looking at the reports whether you were in with the witness or whether you were in the room with the -- with Mr. Rivera and the other fillers in the lineup?

A.  No, I can't.

Q.  But that's usually how it's conducted, right?  You would be -- either you or Mr. Boyle would be with the witness, and then the other detective would be with the -- with Mr. Rivera and then the fillers in the lineup, correct?

A.  Well, it could have been a combination of officers involving Gang Crimes, too.  I don't know who would be on the other side of the glass, if both detectives are on one side of the glass or if we're split up or where the Gang Crimes officers are.  I have no recall.

Q.  All right.  Understood.  But typically, if you're doing a lineup, you would have at least one detective with the witness and one detective with the suspect and the fillers in the

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 690 of 1335 PageID #:106075
Dorsch - direct by Sotos
2694

lineup, correct, as a general practice?

A. I mean, I -- there's no general practice, I mean, as that goes.

Q. And if you had seen anything that -- in terms of any kind of efforts to influence the witness in any way, is that something that would have been noted in your report?

A. Well, you know from prior conversation with me that I have done that in the past.

Q. Sir, I'm just asking you whether or not on that night --

A. On that night, there's no indication and I have no reason to believe that there was anybody that led the victim -- led the witness.

Q. Okay. And I've never had a prior conversation with you at any point in our lives, have I?

A. Oh, sorry. I'm thinking of somebody else from your office.

Q. I'm just -- I'm just asking you if I've ever had a conversation with you in our lives?

A. Okay. I'm mixing you up, I think. You're with Sotos Law Firm, right?

Q. This is the first time we've met, right?

A. Okay.

Q. So, again, if you had seen anything inappropriate with regard to the dealing with or handling of the witness, that's something you would have noted in your report, correct?

A. Well, I wouldn't allow it, first off. I wouldn't seek

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 691 of 1335 PageID #:106076
Dorsch - direct by Sotos
2695

charging.

Q. Right. And you did seek a charge in this case?

A. Yes.

Q. So you had no reason to think at the time that anybody in any way improperly tried --

MR. LOEVY: Objection, asked and answered, Your Honor.

BY MR. SOTOS:

Q. -- tried to influence the witness?

THE COURT: Overruled.

BY THE WITNESS:

A. I had no reason to not believe the witness.

BY MR. SOTOS:

Q. And while you were at the police station, you didn't see any indications that the witness was expressing any reluctance in identifying Mr. Rivera on that day, correct?

A. I have no recall.

Q. But if you did, again, that's something that would have been noted?

A. Yes.

Q. If the witness in any way expressed that they were unsure, that's something you would have noted?

A. I would have liked to know, yes.

Q. If the witness had said anything along the lines of "That's the wrong guy," that's something you would have noted?

A. Yes.

Q. Now, having completed the lineup, you satisfied yourself that the case against Mr. Rivera was sufficient to warrant you seeking felony charges against him, correct?

A. Yes, an identification had been made, and the procedure would be to call Felony Review.

Q. Okay. And -- but you understood the significance of asking the State's Attorney to bring a murder charge against a person who had been identified, correct?

A. Yes.

Q. So when we talked before about reading reports, given the fact that you had conducted the lineup and given the fact that you understood the significance of what was about to happen, is it fair to say that you would have reviewed the case file to satisfy yourself that you were comfortable in seeking felony murder charges against Mr. Rivera?

A. As far as reviewing the case file, I would have been only satisfied with the identification and proceeded from there.

Q. You would have satisfied yourself that the case was sufficient --

A. With the identification.

Q. -- was sufficient to seek felony murder charges against Mr. Rivera, correct?

A. From the identification.

        MR. SOTOS:  Can we put up 23-I, please?

BY MR. SOTOS:

Q. So in front of you, Mr. Dorsch, is a document that's been admitted into evidence as Defendants' Exhibit 23-I. This is already in evidence.

And I'm going to ask you, is that one of the documents that you reviewed to prepare for your testimony?

A. Yes.

Q. And can you tell the jury what that document is?

A. This is a complaint charging the defendant with first degree murder.

Q. And is that your signature on that document?

A. No.

Q. Do you know who wrote your signature on the document?

A. I would -- probably my partner. I mean, that would be the --

Q. Mr. Boyle?

A. I would expect, yes.

Q. So, I mean, I guess I understand why when there's reports with both of your names next to each other, why one person might write down for both. But do you know why Mr. Boyle would have written your signature on a complaint for criminal charges when your -- when his name isn't on there?

A. Well, not to be critical of John, but John didn't like to go to court. I did most of the court work.

Q. So was this to give you credit as the lead officer who was actually bringing the criminal charge?

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 694 of 1335 PageID #:106079
Dorsch - direct by Sotos
2698

A. You don't get credit.

Q. You don't get credit for that?

A. There's no -- there's no structure for awarding points or something -- if that's what you're getting to, no.

Q. I'm just asking --

A. No, there's nothing about credit.

Q. Okay. So it was -- your -- is that something that Mr. Boyle would do from time to time with you? He would -- because he didn't like to court that -- didn't like to go to court, he would sign your name on criminal complaints?

A. Well, he -- he had, and I'm sure I had done that in my career, too, with other officers.

Q. All right. So in any event, it was authorized -- you authorized him to sign your name to documents?

A. Yes.

Q. All right. So you understood that you were putting yourself out there as the person seeking the charges in this case?

A. Yes.

Q. And when you say that you're -- you know, a couple times you qualified your answer, I think, when I asked you whether you were comfortable in seeking the federal -- the felony charges. You said, well, on the basis of the lineup.

You were comfortable from reading the file and the lineup that the charges were warranted; is that fair to say?

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 695 of 1335 PageID #:106080
Dorsch - direct by Sotos
2699

MR. LOEVY: Objection, Your Honor. That -- we went over that, like, six times.

THE COURT: Sustained.

MR. SOTOS: One minute, Your Honor?

THE COURT: Sure.

(Counsel conferring.)

BY MR. SOTOS:

Q. Just a couple other questions, sir.

There's been testimony throughout this case about GPRs. And you know what GPRs are, correct?

A. Yes.

Q. Those are handwritten notes that detectives make that -- throughout their investigations, correct?

A. Yes, General Progress Report.

Q. All right. And in the documents that we've looked at for you, we see that you, in fact, conducted a lineup, correct?

A. Yes.

Q. All right. And you didn't prepare a separate GPR memorializing that lineup beyond your Supp. Report, correct?

A. I don't recall.

Q. Is that something you typically would do?

A. I don't -- I don't know how to answer what is typical to something like that.

Q. Well, when you do a lineup, did you typically do a GPR as well as a Supp. Report?

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 696 of 1335 PageID #:106086
Dorsch - direct by Sotos
2700

A.   I may have written down the names of the people that were in the lineup before putting them to type.

Q.   How about the -- the reinterview of Orlando Lopez? According to your Supp. Report, Orlando Lopez was reinterviewed at the police station that day, correct?

Want me to show it to you again or --

A.   Please.

MR. SOTOS:   Okay.   Could you put -- put 23-H up, please?   Okay.

BY MR. SOTOS:

Q.   Do you see in front of you -- this is Defendants' Exhibit 23-H -- where it reflects that Orlando Lopez was reinterviewed?

A.   Yes.

Q.   Okay.   And you don't recall the specifics of that interview 30 years later, correct?

A.   Well, I think if I would have done the actual report, I would have put down "witness" and never had put in "reinterviewed."

Q.   Why is that?

A.   Because he was a witness to the lineup.   I have no knowledge, I don't think, of his prior interviews with the police officers.   If I did, I don't recall.

Q.   Well, didn't we just talk about this a little while ago?   I asked you whether or not he was reinterviewed that day, and you said yes?

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 697 of 1335 PageID #:106082
Dorsch - direct by Sotos
2701

MR. LOEVY:  No.  Objection.  He said he didn't remember at all, Your Honor, and I --

THE COURT:  Sustained.

BY MR. SOTOS:

Q.  I think I asked you whether or not the report reflected that Mr. Lopez had been reinterviewed, and you said yes?

A.  I think you pointed to that portion of it and showed me that it said "reinterviewed."

Q.  Right.

A.  I didn't comment on whether --

Q.  And did it indicate to you that he'd be reinterviewed?  Are you saying it doesn't indicate that to you?

A.  I'm saying I'll say it says that, but I'm saying that if I would have written it, I probably would have put "witness."  I wouldn't have wrote "reinterviewed."

Q.  Even if he was reinterviewed?

A.  I don't recall that I talked to him other than doing the lineup.

Q.  But you don't recall anything about that day, correct?

MR. BOWMAN:  Objection, asked and answered.

THE COURT:  Overruled.

BY THE WITNESS:

A.  Thirty years later, I don't recall.  Usually people I find who recall events, if it's a recent event, it's easier to recall.  If it's an unusual event, it's easier to recall.  But

if it's something that happens repeated -- repetitively in the habit of your work, you may not recall it years later.

BY MR. SOTOS:

Q. Couldn't agree more. That's why I'm asking you, how do you remember whether he was interviewed or not?

A. I don't.

MR. LOEVY: Objection, asked and answered.

THE COURT: Yeah, sustained. I think it's getting argumentative.

BY MR. SOTOS:

Q. Well, the document reflects that he was reinterviewed, correct?

MR. LOEVY: Objection, asked and answered, Your Honor.

THE COURT: You know, I'm going to overrule so we can get beyond this, because I think we're kind of stuck.

BY MR. SOTOS:

Q. The document reflects that he was reinterviewed, correct?

A. It says "reinterviewed."

Q. Do you have any reason, as you sit here today, to doubt that that's correct, that that's accurate?

MR. BOWMAN: Objection.

THE COURT: Overruled.

BY THE WITNESS:

A. I would hope that we talked to him about the crime in some form.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 699 of 1335 PageID #:106084
Dorsch - direct by Sotos
2703

BY MR. SOTOS:

Q. That's all I'm asking you.

So I'm just asking, assuming you did, there wasn't a GPR that was prepared to summarize that discussion?

MR. LOEVY: Objection, foundation. We don't even know if we have all the GPRs, Your Honor.

THE COURT: Sustained.

BY MR. SOTOS:

Q. Do you know whether you prepared a GPR summarizing a --

A. No.

MR. SOTOS: Just one more second, Your Honor.

THE COURT: Sure.

(Counsel conferring.)

BY MR. SOTOS:

Q. And then just the last area, sir, is --

MR. SOTOS: Defendants' Exhibit No. 12, please.

BY MR. SOTOS:

Q. I'm placing --

MR. SOTOS: No. Oh, yeah, it's 1.2. I said 12. I apologize.

Maybe I can get a hard copy, Judge. It doesn't seem to be --

THE COURT: Yeah, a hard copy would be great.

MR. SOTOS: Can we just go to the Elmo? I can't pull this out.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 700 of 1335 PageID #:106085
Dorsch - direct by Sotos
2704

BY MR. SOTOS:

Q. Mr. Dorsch, I'm placing in front of you a document that's been admitted into evidence as Plaintiff's Exhibit 19-A, and I'll ask you whether or not you recognize that document?

A. Well, it's an Investigative File Inventory of Reports that were written.

Q. Okay. And this is one of the reports that you prepared -- that you reviewed when you prepared for your deposition -- I mean, your testimony here today, correct?

A. I don't know that I saw this. Maybe I had.

Q. All right. Well, you do recognize it, though, correct?

A. I know of this type of report, yes.

Q. You do see your handwriting on it, correct?

A. Yes, at the lower portion from 20 down, I believe that is my handwriting.

Q. Which reflects the Lineup Supp., the arrest report, the 101, the murder complaint, the evidence report, and a closing stip, correct -- Closing Supp., correct?

A. Correct.

Q. And then moving on to the next page, it states "Supp. Report" from September 16th, 1988, correct?

A. Correct.

Q. Okay. So you also logged that report into the --

A. I believe that's my handwriting.

Q. -- correct?

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 701 of 1335 PageID #:106086
Dorsch - direct by Sotos
2705

THE COURT REPORTER: I'm sorry. I didn't hear the end of your question.

BY MR. SOTOS:

Q. Into the file inventory, you inventoried that report, the September 16th report?

A. Apparently, yes.

Q. And in looking through the -- through the file, do you recall seeing any prior reports which indicated that Detective McLaughlin had tried to put a person named Mr. Rodriguez in a lineup with Mr. Rivera, but the -- they couldn't find the eyewitness, and then they tried to do a photo array?

Do you recall seeing that in the reports?

A. In the copies that were submitted to me recently, I saw that, yes.

Q. All right. So those were a couple of the documents that you spoke with plaintiff's attorney -- Mr. Rivera's attorneys about in preparing for your trial testimony, correct?

A. Yes.

Q. And you saw those reports back at the time you were assigned to the case as well, correct?

A. I don't recall that.

Q. All right.

MR. SOTOS: Can we get the September 1st Supp. Report up?

MR. LOEVY: Your Honor, we would have an objection --

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 702 of 1335 PageID #:106087
Dorsch - direct by Sotos
2706

BY MR. SOTOS:

Q. This is Defendants' --

MR. LOEVY: -- to this area of inquiry. This is about events two weeks before he was involved, and it's not relevant. We've already done these Supp. Reports with other witnesses.

MR. SOTOS: Well, Judge, I think it is relevant. He said that --

THE COURT: Well, you know, let me hear a question. As I've said many times, without a question, I don't know what anybody's doing.

BY MR. SOTOS:

Q. So, Mr. Dorsch, in front of you is a document that's marked as Defendants' Exhibit 1.13 that's in evidence, and that's a Supp. Report dated September 1st, 1988.

When you were assigned to the case on September 15th, is that the kind of document that you would have reviewed if it was present in your file?

A. If it was presented to me at that -- on that date. If it was presented to me on that date, yes.

Q. Well, if it was in the file?

A. I don't know that I had a file to review.

Q. Well, do you know that you -- are you saying you didn't have a file to review or you just don't --

A. I don't recall.

Q. -- know?

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 703 of 1335 PageID #:106088
Dorsch - direct by Sotos
2707

A. I don't recall.

Q. So hypothetically, if you had -- hypothetically, if a file existed, you would have reviewed it before you sought felony murder charges against Mr. Rivera, correct?

MR. BOWMAN: Objection, asked and answered.

THE COURT: Overruled.

BY THE WITNESS:

A. Yes.

BY MR. SOTOS:

Q. All right. So hypothetically speaking, then, if this report was in the file, you would have reviewed it?

A. If I had the file and it was in there, I would have reviewed it.

Q. Okay. But that's what I'm asking you about when you say, like, "if I had the file."

Before you sought felony murder charges against Mr. Rivera, you would have tried to get the file, right?

MR. BOWMAN: Objection, asked and answered.

THE COURT: Not that question. Overruled.

THE WITNESS: Repeat the question, please.

BY MR. SOTOS:

Q. Before you would have sought felony murder charges against Mr. Rivera, you would have tried to get the file, correct?

A. Yes, I would liked to have gotten some reports about the incident prior, yes.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 704 of 1335 PageID #:106089
Dorsch - direct by Sotos
2708

Q. All right. And where would you get it from?

A. From the office, whoever -- probably the sergeant that said, "Here, run a lineup."

Q. And I understand that you don't have an independent recollection of it now, but if somebody told you back then, "Well, we don't have a file," that would have sounded pretty strange to you, right?

A. Oh, yeah, that definitely would have sounded strange.

Q. Especially when it's a case that was investigated a couple weeks earlier, so you would have assumed that something had been done, right?

A. I would have assumed that something would have been done by the prior detectives involved in the case, yes.

Q. Just from the reports that you wrote, you knew that the shooting had occurred back on August 27th, correct?

A. We had to copy that information from some report.

Q. Okay. So you would have been able to get -- you would have been able to ask for the file from the office, correct?

A. I'm sure we did.

Q. And if you didn't have it, you would have taken steps to make sure you got it before you brought felony murder charges against Mr. Rivera?

MR. LOEVY: I think we've established that, Your Honor.

MR. SOTOS: I don't know if we have, Judge.

THE COURT: I'm not sure.

MR. SOTOS: I'm not either.

THE COURT: Overruled.

BY MR. SOTOS:

Q. Have we? Is that true that you would have taken steps to get the file that was in existence before you sought felony murder charges --

A. Well, I have to --

Q. -- against Mr. Rivera?

A. -- gather significant information that would have to be placed into my report, and that can only come, I believe, from a prior report.

Q. All right. So if -- so you don't have any reason, as you sit here today, to doubt that you had the prior Supp. Reports that had been created?

A. No.

Q. Okay. So understanding you don't recall specifically, in front of you is a Supp. Report from September 1st, 1988.

And do you see where it shows the two people are in custody, Jacques Rivera and Jose Rodriguez?

A. Yes.

Q. Okay. And you remember reviewing that while you were meeting with Mr. Rivera's attorneys to prepare for your testimony, correct?

A. From that inter -- from that, yes.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 706 of 1335 PageID #:106096
Dorsch - direct by Sotos
2710

Q.  Right.  You've done -- you've done investigative work for Mr. Rivera's attorneys on other cases, correct?

A.  No.  I mean, I think I might have done one for Mr. Loevy. And Locke, I know he's at Northwestern, but I don't know that I did any cases for him there.

Q.  Okay.  But you have -- well, that's fine.

So in looking at this document, you would have seen that Mr. Rivera and Mr. Rodriguez were in custody back on August 31st, correct?

A.  Yes.

MR. SOTOS:  Okay.  And can we go to the next page, please?

MR. LOEVY:  Your Honor, just reading him a report that's already been read to the jury is not relevant.  He doesn't remember it.  There's nothing he -- what's the point?

MR. SOTOS:  And I'm not reading, Judge.

THE COURT:  You know what, let's just do it because I -- overruled.

BY MR. SOTOS:

Q.  And do you see this page?

A.  Yes.

Q.  And, you know, we don't have to read from it because you've reviewed this in at least getting ready for your trial testimony, right?

A.  I've looked at it, yes.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 707 of 1335 PageID #:106092
Dorsch - direct by Sotos
2711

Q.  Right.  And you've talked about it with the attorneys.  So you're familiar with it, as you sit here today, so we don't have to read it, right?

A.  I'm familiar with the report.

Q.  Okay.  And you understand that the report states that Mr. Rodriguez and Mr. Rivera were both in custody on August 30th and 31st, correct?

A.  Yes.

Q.  And that Detective McLaughlin and Detective Leonard were trying to do a lineup with both of them in it, correct?

A.  Yes.

Q.  And that they couldn't find the eyewitness, right?

A.  Correct.

Q.  Okay.  And that they then tried to do a photo array with the victim at the hospital to have him look at photographs of Mr. Rodriguez and Mr. Rivera, correct?

MR. BOWMAN:  Objection.  Is Mr. Sotos summarizing the report?  I don't understand.

THE COURT:  I think that -- I think there's a lack of clarity.  You're going over the report, right?

MR. SOTOS:  I'm asking him what he understands it to be as he sits there.

THE COURT:  What the witness understands the report to say?

MR. SOTOS:  Yes, not his independent memory.  If I

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 708 of 1335 PageID #:106098
Dorsch - direct by Sotos
2712

sent that message, I didn't mean to.  Okay?

THE COURT:  Okay.  What the witness understands the report to say.

MR. SOTOS:  Yeah, so I don't have to read it.

BY MR. SOTOS:

Q.  So your understanding of the report, having reviewed it to prepare for your testimony, is that it recited that Detective McLaughlin and Detective Leonard were unable to complete the lineup because they couldn't find the eyewitness, correct?

And go ahead and read it.

A.  Yeah, it says "Reporting Detectives," and I assume this is their report, Leonard and McLaughlin.

Q.  Right.  If you want to check it --

A.  I'm sure on the last page it would say their names.

Q.  Okay.

MR. LOEVY:  Your Honor, if he wasn't part of it, he doesn't remember it, we've already talked about it, why are we doing it again?

THE COURT:  Well, because we are trying to get through some testimony about what the report says.

MR. LOEVY:  Okay.

THE COURT:  And let's just do it.

BY MR. SOTOS:

Q.  And you see that it -- the report recites that Detective McLaughlin and Detective Leonard tried to do a photo array with

the victim where they wanted to show him pictures of Mr. Rodriguez and Mr. Rivera, correct?

A. Yes.

Q. And that that wasn't completed because of the victim's medical condition, correct?

A. I believe it says that.

Q. Okay. So that's information that, if you had a copy of the file, you would have had available to you at the time that you sought charges against Mr. Rivera for murder, correct?

A. I would hope that I would have had it. It's credible police work. I would hoped to have had it.

Q. And as you -- as you sit here today, you don't have any explanation for why you didn't pursue the case against Mr. Rodriguez and try and get him into a lineup, do you?

A. No.

MR. SOTOS: Thank you. Nothing further, Judge.

THE COURT: Okay. Cross-examination.

CROSS-EXAMINATION

BY MR. BOWMAN:

Q. Good afternoon, Mr. Dorsch.

A. Good afternoon.

Q. You've said repeatedly in response to questions that you have no recollection of this particular case?

A. That's correct.

Q. And why is it that you don't recall the case?

A. Thirty years ago, it's something that a task that I -- had been done on other cases, and usually it would take something of unusual occurrence for someone to have recall.

Q. And from your review of the documents, you were able to determine how long was your total involvement in this particular case?

A. Typically, working the afternoon shift, you started at 4:30. You had a roll call which lasted 15 to 20 minutes. And then you set about assigned tasks that were given to you by supervisors or you followed up on existing cases.

And it states that the lineup was completed. Begun, I believe, at 7:15 and completed at 7:30. So you would have then sought Felony Review, and basically it's pretty much over at that 7:30 mark. I mean, really there's nobody else to interview. It's just waiting for Felony Review to come in and be appraised of the identification.

Q. Does the fact that your total expenditure of time, at least according to the reports, was three hours have anything to do with the fact that you don't remember what happened in this particular matter, do you think?

A. That's correct. I mean, Felony Review would have had to respond, too. But then I don't know that if I would have been sent out on another assignment.

Q. Now, you were asked some questions about money that you have received from Northwestern University over the course of

the period from 2011 to about, what was it, 2015, 2016?

A. I believe that's what he mentioned.

Q. And you indicated that you have worked on a couple of major cases for Northwestern lawyers, right?

A. Yes.

Q. A couple of cases that were exoneration cases, right?

A. That's correct.

Q. And you did a lot of work?

A. Yes, on those cases.

Q. Did you earn the money that you received from Northwestern based on the work that you did?

A. I certainly did.

Q. And actually, if you take 65,000 over that number of years, it works out to about $15,000 a year, right?

A. Correct.

Q. That's not your total income for any of those years by any means, right?

A. No, it's not.

Q. So would it be a fair summary that you and your partner ran a lineup on September 15, 1988, at which a witness by the name of Orlando Lopez picked out a suspect by the name of Jacques Rivera?

A. According to the reports I've seen, yes.

Q. And you were asked some questions by Mr. Sotos about whether you were assigned to this case.

Do you remember those questions?

A. Yes.

Q. And you weren't assigned to this case in the -- in the sense that you were given this case to investigate when it started, right?

A. That's correct.

Q. I mean, that's a special term of art in the police department; you're assigned to a case, it becomes your case, right?

A. That's correct.

Q. And your -- your responsibility in this case was to run a lineup, pure and simple, end of story, right?

A. Yes.

Q. You did not do any work on this case before the date of September 15, 1988, right?

A. That's correct.

Q. There's all kinds of stuff that had happened before you were involved, right?

A. I would assume.

Q. Detectives -- this was an assault -- a gun assault that occurred on August the 27th, right?

A. Excuse me. 27 -- yes, 27th of August.

Q. Presumably, I mean, you don't know, but detectives would have been called in; examination of the scene would have occurred, right?

A. Yes.

Q. Evidence would have been collected if there was any, right?

A. Correct.

Q. Witnesses -- canvass would have been done --

A. Yes.

Q. -- should have been done?

Witnesses would have been located, and so forth, right?

A. Correct.

Q. And you had no involvement in any of that, right?

A. That's correct.

Q. Now, you were asked some questions about the circumstance of your being asked to do this lineup.

And would it be a fair summary that you don't know what was in Sergeant Rinaldi's mind when he said, "Dorsch and Boyle, run a lineup for us"? Is that fair to say?

A. In his mind, no.

Q. I mean, whether Gillian McLaughlin and Jack Leonard were or were not on duty that day is not something you know, right?

A. No, I don't.

Q. You made an assumption that they weren't, but it's an assumption, right?

A. Yes.

Q. And you have no personal knowledge about that whatsoever, right?

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 714 of 1335 PageID #:106099
Dorsch - cross by Bowman
2718

A. Correct.

Q. And another possibility is that Gillian McLaughlin and Jack Leonard were asked not to do this lineup for some reason that you don't know about; you have no idea, right?

A. No idea.

MR. SOTOS: Objection, Your Honor. No facts in evidence.

THE COURT: Overruled.

BY MR. BOWMAN:

Q. You have no idea whether Gillian and -- Gillian McLaughlin and Jack Leonard had been -- had decided that they were going to do something else that day and weren't in the building at the particular point in time when this lineup was run, right?

A. Correct.

Q. You don't know where they were in the hours before you were asked to do this; you don't know one way or another whether you saw them or didn't see them that day, right?

A. Correct.

Q. Now, if you were to answer a question about whether or not Gillian McLaughlin and Jack Leonard were or were not on duty on September 15, 1988, you'd be speculating one way or another, right?

A. Yes.

Q. Incidentally, do you have any personal knowledge as to why on September 15, 1988, of all days, that was the day that

Q. was -- that you were requested to run this lineup?

A. No.

Q. Now, you were asked some questions about your Supplementary Report, and I wanted to ask you some of my own about the -- about the report.

This is Plaintiff's Exhibit 19-H, which is in evidence, if the jury could see it.

So if you look at the bottom, you were directed to your signature. Yes?

A. Yes.

Q. And as you look at the signature on this particular document, you can be confident that this is, indeed, your signature, right?

A. That is my signature.

Q. Okay. Now, before we go any further, let me ask you a question.

You've had an opportunity to review this report. Do you have any reason to doubt the truthfulness of the report that you wrote?

A. Of that report? No.

Q. You mentioned a typo when Mr. Sotos was asking you questions. There was an "R/S" as opposed to "R/D."

Do you recall that testimony?

A. Yes.

Q. And that was -- that's a typo that people can make, right?

A.   Yes.

Q.   Are there any other typographical errors in your report, to your knowledge?

A.   Not that I recall seeing.

Q.   Well, we'll look and see if we can find any, but as far as you know, there are none, right?

A.   Right.

Q.   Now, I want you to look with me at a paragraph -- well, first of all, let's do this.

You were asked some questions about this reinterview of Orlando Lopez, right?

A.   Correct.

Q.   And you told us that when you conduct a lineup, one of the things that you do is you have to interact with the witness, right?

A.   Yes.

Q.   You need to have basic understanding -- the witness needs to have a basic understanding of what it is that's supposed to happen, right?

A.   Yes.

Q.   And among other things, you want the process to be fair, right?

A.   Yes.

Q.   So your practice, I believe you said, was that you would tell the witness, among other things, "Look it, the guy that --

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 717 of 1335 PageID #:106107
Dorsch - cross by Bowman
2721

that's suspected of this crime may be in this lineup; he may not be. The guy you saw may not be there at all," right?

A. That's correct.

Q. And that's part of the process that you engage when you do that -- that discrete task of running a lineup, right?

A. That's the way I did it.

Q. And as you talk to the witness?

A. Yes.

Q. Now, you were asked some questions about the location, how the -- how the -- the folks that were key in this lineup came to the police station, right?

And you reported that upon reviewing the file you reached out to Gang Crimes North, right?

A. It says that.

Q. And the reason to reach out to Gang Crimes North is because they're the ones who know what's going on, right?

A. Apparently.

Q. I mean, you needed -- you're supposed to run a lineup. You needed a witness, right?

A. Yes.

Q. And you need a suspect, right?

A. Yes.

Q. And what you did is you asked them to assist in locating offenders in the incident and known witnesses, right?

A. Yes, but I -- I don't say that I did it. I don't know if I

Dorsch - cross by Bowman

2722

did it.  It's possible.  But it's also possible my partner did it, and I don't -- I don't recall.

Q.  Fair enough.  One or the other of you knew that you needed to find offenders, if any, and witnesses, if any, in order to do your job, right?

A.  Yes.

Q.  And the folks you turned to for that assistance was Gang Crimes North, right?

A.  Yes.

Q.  And then you conducted the lineup.  At least by the report, it appears you conducted a lineup, right?

A.  Yes, that's correct.

Q.  Now, I want to be clear with you about -- about one thing.

It's not true, is it, that the detectives are the bosses of the Gang Crimes specialists?  Is that right?

A.  That's correct.

Q.  I mean, the Gang Crimes specialists have their own chain of command; the detectives have their chain of command; and it's separate, right?

A.  Right, there's --

Q.  You don't boss Gang Crimes guys around and tell them what to do as a detective, right?

A.  That's correct.  We're structured sort of like the military.

Q.  And so you may be in a position of asking for their

assistance, right?

A. Correct.

Q. And they may be in a position of asking for your assistance as a detective, too, right?

A. Yes.

Q. For example, you're the guys -- the detectives are the guys who are supposed to run lineups in homicide cases, not the Gang Crimes guys, right?

A. Correct.

Q. So it would be fair to say that the detectives in those circumstances in a particular case might assist Gang Crimes in that regard --

A. Definitely.

Q. -- right?

A. Definitely.

Q. Now, when you ran the lineup, do you have a process that you would follow in order to select the fillers for the case?

A. Well, you want the lineup to be fair. So you need to pay attention to the person who is the subject of the lineup and try to find people of similar age, physical description. And those are primary things that you're looking for.

You certainly don't want to have someone too tall when the subject is smaller or too heavy when he's lighter. You try to get as best you can a group of persons together that are somewhat similar in appearance.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 720 of 1335 PageID #:106105
Dorsch - cross by Bowman
2724

Q. Recognizing that you don't have any recollection of it, do you have any reason to doubt -- to doubt, based on your limited involvement, your three hours of involvement, that the lineup you ran was fair?

A. No.

Q. From your point of view?

A. No.

Q. And at the conclusion of your lineup, you were required to document the lineup that had been conducted, right?

A. Yes.

Q. And I've put on the screen Plaintiff's Trial Exhibit 19-G, which is in evidence. And there's a section of that that I want to focus you on.

It says, "This is a lineup report," right?

A. Yes.

Q. And a lineup report is the report that the police department requires to be prepared in each and every circumstance when a lineup is run, right?

A. Yes.

Q. So if we're to go back to the police file, we'll see a record that you ran a lineup on September 15, right?

A. Correct.

Q. And among the things that you document in the lineup report is you have a list of the people who participated in the lineup, right?

A.  Yes.

Q.  And that includes the suspect?

A.  Yes.

Q.  And it includes fillers, right?

A.  Yes.

Q.  And the police department actually has rules about how many fillers there's supposed to be in a lineup for each suspect, right?

A.  Correct.

Q.  And then you make a note that when you asked this boy if he recognized anybody, he picked Jacques Rivera, right?

A.  By reviewing the report, that's what it says.

Q.  Now, at that point, you have a responsibility as a detective to engage with the State's Attorney's Office, right?

A.  Yes.

Q.  Somebody, whether it's you or Boyle, needs to make a call to Felony Review?  Yes?

A.  Yes.

Q.  And you have no recollection of that?

A.  That's correct.

Q.  And -- but your report clearly indicates that you -- that you made that call, right?

A.  Yes.

Q.  And there is paperwork to be done in addition, right?

A.  Yes.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 722 of 1335 PageID #:106107
Dorsch - cross by Bowman
2726

Q. I'm going to put on the screen what's in evidence as Plaintiff's 19-I.

MR. BOWMAN: It's in evidence, right?

MR. LOEVY: Yes.

BY MR. BOWMAN:

Q. And tell us what that is.

A. This is a felony minute sheet. This is filled out after the subject's been positively -- or identified and charged in the case. It would be sent to the court.

Q. Now, there's some language up here. It says, "For State's Attorney Use Only." We've asked some questions about this.

Is this a document that the State's Attorneys fill out or the police?

A. The police.

Q. Okay. Did you fill out this document, to the best of your recollection?

A. I can't see the full report, but I see my name on it with Detective Boyle.

Q. And down at the -- so what does that suggest to you?

A. Well, it only suggests that my name is on the report.

Q. Okay. Further than that, you don't recall?

A. Correct.

Q. Now, there is a list of complaining witnesses in this -- in this document, right?

A. Yes.

Q. Or prosecuting witnesses.

The first is Orlando Rivera, right?

A. Yes.

Q. And that's the kid who made the ID?

A. Yes.

Q. And then the next is "Gang Specialists GUEVARA," and that's all in caps. Does that mean anything to you?

A. No.

Q. Below him is Gawrys, also a gang specialist, right?

A. Yes.

Q. And then yourself and Mr. Boyle, right?

A. Yes.

Q. Now, the purpose of this document is that it goes with the records over to the State's Attorney's Office, and it's available to the prosecutor who is going to be handling the case in court, right?

A. Yes.

Q. And so among other things, you list contact information for the police officers involved in the investigation, right?

A. Yes.

Q. And do you see here where there is a contact number written there?

A. Yes, I do.

Q. And do you happen to know from memory what that is a number for, 744-8260?

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 724 of 1335 PageID #:106109
Dorsch - cross by Bowman
2728

A.   I don't recall, but I know it's -- if I look by my name and Boyle for being assigned at Grand Avenue, that is not our office number.

Q.   Okay.  Well, let me show you a different -- a different report.

    (Counsel conferring.)

        MR. BOWMAN:  Your Honor, I'm going to refer next to Exhibit 154-H.  There was some discussion about it this morning.  I want to be sure I don't put it on the screen.

        I can put it on the screen so you can see it.

        MR. POLICK:  Your Honor, that was in for a limited purpose.

        THE COURT:  Okay.  Yeah, this was, I think, received for a limited purpose.  Is that -- is my memory right?

        MR. POLICK:  Correct.

        MR. BOWMAN:  I was just going to ask him -- I was going to ask him about the phone numbers on this document.

        THE COURT:  Okay.

        MR. LOEVY:  Do we need to move this one in before we ask him --

        MR. BOWMAN:  Right.  Yeah.  Okay.

BY MR. BOWMAN:

Q.   So let me back up for just a minute.

        I'm going to hand you what's been marked for identification as Plaintiff's Exhibit 154-H.  And can you tell

us what that is, sir?

A.   Again, it's a copy of the felony minute sheet that's prepared to be sent to the State's Attorney's Office.

Q.   And it lists your name on it, does it not?

A.   Yes.

Q.   It indicates a date of arrest of an individual on February 23, 1989, right?

A.   Yes.

Q.   And does it appear that this was prepared -- I'm assuming you have no recollection of this document, either?

A.   No, I have no recollection of it.

Q.   And does it appear that it was prepared either by yourself or by your partner?

A.   Yes.

        MR. BOWMAN:  Your Honor, at this time we move 154-H for the limited purpose that's been discussed.

        THE COURT:  Okay.  That's not the one that was already received for that limited purpose?

        MR. LOEVY:  This is a different one.

        THE COURT:  Okay.  154-H is received for the same limited purpose; that is, the phone number.

    (Plaintiff's Exhibit No. 154-H received in evidence.)

        MR. SOTOS:  Judge, we -- we don't want to spend time. They can use it.  It's fine.

        MR. LOEVY:  It's in evidence.

MR. BOWMAN: Okay. It's in. May the jury see the document, Judge?

THE COURT: Yes.

BY MR. BOWMAN:

Q. So we were talking about the date on this particular document, and this is Felony Minute Sheet Form 101, just like the one relating to the Valentin case that we were talking about a few minutes ago, right?

A. Yes.

Q. And this also -- the format is a little bit different, but it also lists the complaining or prosecuting individuals, prosecuting witnesses, right?

A. Yes.

Q. And there are a couple of civilians listed up at the top, right?

A. Yes.

Q. And then this is also a case that you and Boyle apparently worked with Guevara and Gawrys on, right?

A. Yes.

Q. Once again, Guevara is listed first; Gawrys is second, right?

A. Yes.

Q. And then your name and your partner's name appear below, right?

A. Correct.

Q. And here we have the same phone number for Guevara and Gawrys, right?

A. Yes.

Q. It is 744-8260, right?

A. Yes.

Q. And on this particular document, there is an address, 2452 West Belmont, right?

A. Yes.

Q. And do you recall that that was where Gang Crimes North was located at that time?

A. Yes.

Q. And then if we look on this one, there's actually a different number for yourself and Dorsch, right?

A. For me and Boyle, yes.

Q. I'm so sorry. My apologies, Mr. Dorsch.

There's a separate number for the two of you guys, right?

A. Right, that would be our office number.

Q. All right. So when this document is prepared, it goes to the file in the State's Attorney's Office, right?

A. Yes.

Q. And the State's Attorney who is going to follow the case in court can make a phone call to the police officers who were involved in the investigation for follow-up purposes, right?

A. Yes.

Q. For example, if there is a need for testimony from a police officer, the State's Attorney is going to dial the number on the form, right?

A. Yes.

Q. And on the form that's in evidence as Plaintiff's 19-I, there's only one phone number that can be dialed, right?

A. Yes.

Q. And that's the number for Mr. Guevara and Mr. Gawrys?

A. Yes.

Q. Now, did you testify, to the best of your recollection, at any point in the trial of Jacques Rivera for killing Felix Valentin?

A. No, I did not.

Q. Would it surprise you to learn that Rey Guevara did testify in that trial?

A. Surprise me? No.

Q. Now, did you frame Jacques Rivera, Mr. Dorsch?

A. No, I did not.

    MR. SOTOS: Objection, Judge. Objection, Judge, beyond the scope, relevant. Nobody claimed that.

    THE COURT: Sustained.

BY MR. BOWMAN:

Q. Well, let me ask you this.

    Did you ever hear at any point when you were spending your three hours working on this case that Orlando Lopez had

said that Jacques Rivera was the wrong guy, wrong guy? Did you ever hear that?

A. I never heard that.

Q. Did you -- let me ask you this.

If you had done your reinterview, whatever you want to call it, of Orlando Lopez and you had learned that Orlando Lopez was saying, "Jacques Rivera is the wrong guy, wrong guy," what would you have done, sir?

MR. SOTOS: Objection, asked and answered. I covered that.

THE COURT: Overruled.

BY THE WITNESS:

A. If he said that, that would mean that's a bad identification. It's not the guy.

BY MR. BOWMAN:

Q. Would you have gone ahead with a lineup under those circumstances?

A. No. You're trying to get the actual offender.

Q. Now, if you had -- would you have hidden that fact and not reported it?

A. No, never.

Q. Did you tell Orlando Lopez who to pick out from the lineup that you ran?

MR. SOTOS: Objection, Judge, relevance. Nobody made any claim of that.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 730 of 1335 PageID #:106115
Dorsch - cross by Bowman
2734

THE COURT: I'm sorry. What was the objection?

MR. SOTOS: Relevance, beyond the scope. Nobody made any claim of that.

THE COURT: Overruled.

BY MR. BOWMAN:

Q. Did you tell him?

A. That -- repeat, please.

Q. Did you tell Orlando Lopez who to pick out from the lineup that you ran?

A. No.

Q. If you had learned that Orlando Lopez had been suggested to and persuaded that he should pick out Jacques Rivera from a series -- over the course of a series of identification procedures, including a photograph that was shown to him on August 27, gang books shown to him on August 29 --

MR. SOTOS: Objection, Your Honor.

BY MR. BOWMAN:

Q. -- a lineup that he --

MR. SOTOS: Objection, beyond the scope.

MR. LOEVY: Your Honor, scope objections were waived at this trial.

THE COURT: Well --

MR. SOTOS: No, I don't think that --

THE COURT: -- I'm going to overrule the scope objection. This is so compound, I don't know how anybody can

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 731 of 1335 PageID #:106116
Dorsch - cross by Bowman
2735

possibly answer it.

MR. BOWMAN: Okay. Let me try it again.

BY MR. BOWMAN:

Q. If you had been informed that somebody had, in effect, put a thumb on a picture of Jacques Rivera in Orlando Lopez's presence suggesting who Orlando Lopez should pick, what would you have done?

MR. SOTOS: Objection, Your Honor, assumes facts not in evidence. No evidence of that.

THE COURT: It's a hypothetical. Overruled.

BY THE WITNESS:

A. If somebody put a thumb on a photo, immediately throw that person out of the room, as it was suggestive of who they wanted someone to pick out. I don't want -- I only want the witness to pick out the offender.

BY MR. BOWMAN:

Q. Do you have any information about a circumstance in which Rey Guevara suggested to a witness in the course of a photo identification who he should -- who that witness should pick out?

MR. SOTOS: Objection, Your Honor, beyond the scope.

MR. BOWMAN: Mr. Loevy responded to that. We had a mutual understanding. I thought that scope objections --

THE COURT: I think you're going to have to come to the sidebar, because I don't know what we're doing.

(Proceedings heard at sidebar on the record:)

MR. SOTOS: Judge, these scope objections --

THE COURT: Well, it's way beyond the scope. There's no question about that.

MR. SOTOS: And it's also -- for him to say the scope is waived, this is on redirect. This is on a -- I'm sorry. This is, like, not in their case. They closed their case without putting on any 404(b) evidence and --

THE COURT: I don't know. Were scope objections waived?

MR. LOEVY: Yes, they were. And we had a mutual understanding.

MR. DAFFADA: No, they were not.

MR. LOEVY: We didn't let them -- we didn't have a problem when they broke into our witnesses and it's their exam --

MR. SOTOS: It's not --

MR. LOEVY: -- and it's mutual. We said for this trial --

THE COURT: Yeah, I -- you only have to say it once.

MR. LOEVY: I'm sure on the trial it's waived.

MR. SOTOS: So it's not mutual, because what happened was they didn't call him in their case. So if they called him in their case, the agreement is then we waive scope objections so we don't have to then do it all over again in our case. It

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 733 of 1335 PageID #:106113
Dorsch - cross by Bowman
2737

doesn't go back and forth like that where they can take evidence that they didn't introduce --

THE COURT: Well --

MR. LOEVY: We wouldn't have waived -- we wouldn't have not called him if we didn't have an agreement to waive scope at this trial.

THE COURT: Yeah.

MR. SOTOS: Just so you know, Judge, it's going to lead to a one-hour cross. I'm not exaggerating.

THE COURT: Well, it's already going on and on and on.

MR. SOTOS: Well, but I'm just saying this one is going to lead --

MR. LOEVY: Your Honor --

MR. SOTOS: -- to a one-hour cross.

THE COURT REPORTER: Gentlemen, please.

MR. LOEVY: Your Honor, what's not fair here is he walked him through a very long exam --

THE COURT: Well, I don't need to know about it. I was here.

MR. LOEVY: Well, he said it was a very legit ID; it was a legit lineup. It was a legit lineup, legit lineup.

Now Mr. Bowman wants to ask him --

THE COURT: So what are we doing now?

MR. LOEVY: He wants to do two things. One, well, you -- "Mr. Sotos just asked you about what you knew at that

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 734 of 1335 PageID #:106119
Dorsch - cross by Bowman
2738

lineup. What about what -- the things that you didn't know about?" That's not beyond the scope.

THE COURT: Wait a minute. Wait a minute. Wait a minute.

I think the question was about Guevara.

MR. LOEVY: Right. You don't know either way whether Guevara was suggestive with the witness before that --

THE COURT: We did that. We did that.

MR. LOEVY: Well, he was on his second question, and he objected --

MS. ROSEN: No, no, no.

THE COURT: No, no, no, no. We did it a whole -- we spent a half an hour on it like an hour ago, so --

MR. LOEVY: And the second issue that's going to come up is he's going to testify that he had a reason to believe that Mr. Guevara did suggestive IDs because -- and the reason we didn't call him is because we had an agreement before the trial that's on the record --

THE COURT: Wait. You've told me that six times.

MR. LOEVY: All right. So that's what we -- that's the only other area left.

THE COURT: What is the area? Tell me the area.

MR. LOEVY: Mr. Dorsch is going to say that he did observe Mr. Guevara doing suggestive things.

THE COURT: In this case?

MS. ROSEN:  No, no.

MR. BOWMAN:  No, in another case.

MS. ROSEN:  404(b).

MR. DAFFADA:  It's one of the 404(b)s --

MR. BOWMAN:  This is one of the 404(b)s that you allowed, Judge.

MR. LOEVY:  So we deferred it --

MR. SOTOS:  Which -- which --

MR. LOEVY:  -- because we have a scope waiver.

MR. SOTOS:  Well, they didn't defer it, Judge.

MR. LOEVY:  Yes, we did.

MR. SOTOS:  They didn't ask about it during their case.

THE COURT:  I'm going to have to --

MR. SOTOS:  They said they closed --

THE COURT:  I'm going to have to tell the jury that both sides are calling the witness.  That's what I'm going to have to do.

MS. ROSEN:  Well, then, Judge, if that's -- if that's still an open question, then we need to know that.  We don't have to decide it right now, but we need to know that going forward.

THE COURT:  Well, you better tell me if it's going to be for any other witnesses, because I didn't know this was coming.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 736 of 1335 PageID #:106126
Dorsch - cross by Bowman
2740

MS. ROSEN:  Neither did we.

MR. SOTOS:  We didn't either.  That's why we stayed away from it, Judge; otherwise, I would have brought it up.

MR. LOEVY:  We made our decisions based on a pretrial agreement --

THE COURT:  I'm telling you that if you want to do this again with some other witness, you need to tell me.

MR. LOEVY:  All right.  Got it.

THE COURT:  How much longer is this going to go on?

MR. SOTOS:  Judge, I really will have an hour.  It's very complicated.

THE COURT:  All right.  We'll take -- we're going to take our break then.

MR. SOTOS:  It goes over the course of 20 years.

(End of sidebar proceedings.)

THE COURT:  Ladies and gentlemen --

THE COURT REPORTER:  Judge, I'm sorry.

THE COURT:  -- I think this is as good a time as any for a 10-minute break.

COURT SECURITY OFFICER:  All rise.

(Jury out.)

THE COURT:  So --

MR. SOTOS:  Can we have the witness step out, Judge?  Oh, I thought you were going to address the issue --

THE COURT:  Well, I want to say something, but I don't

think it's going to affect the witness.

Do you want me to tell the jury that as far as this witness is concerned, both sides are calling him for their own purposes?

MR. LOEVY:  We would be agreeable to that.

MR. BOWMAN:  That's fine.

MS. ROSEN:  Well, for the record, we have an objection to this procedure.

THE COURT:  I know you do.  I know you do.

MR. SOTOS:  Well, actually --

THE COURT:  But there's a -- there's a cat fight about what agreements you reached.

MR. SOTOS:  But there's not.  There's not.

THE COURT:  Well, I know you say --

MR. SOTOS:  He just talks really fast.  There's no agreement --

THE COURT:  Yeah, that's --

THE COURT REPORTER:  I'm sorry.

THE COURT:  That's what you say, Mr. Sotos.

MR. SOTOS:  He's not saying there's an agreement, Judge.

MR. LOEVY:  I'm saying what's on the record.  We had -- at the pretrial conference, we said we're going to have -- not have scope objections, and both sides are going to be able to go into each other's witnesses.

I'm saying it's on the record.  I'm not saying me and Mr. Sotos has a secret understanding.

THE COURT:  Well, I don't have the record with me.

MR. SOTOS:  When you see -- when you see the pretrial, you'll see --

THE COURT:  Okay.  So I don't want to hear it again --

MR. SOTOS:  Okay.

THE COURT:  -- because I heard it over there for 15 minutes.

MR. SOTOS:  Okay.

THE COURT:  I asked you what you want me to tell the jury, if anything, and you're not responding to me, so forget about it.  Ten minutes.  I won't say anything.

MR. SOTOS:  We would appreciate it if you would tell the jury, then, that both sides are calling witnesses --

MS. ROSEN:  This witness.

MR. SOTOS:  This witness.

MR. BOWMAN:  This witness.

MR. SOTOS:  Assuming that they won't be able to keep doing it, but for this witness, we'd appreciate if you would say that.

THE COURT:  All right.

(Recess.)

THE COURT: Okay. Are we ready?

So it would be very helpful if I knew what witnesses were coming and which witnesses the plaintiff claims are subject to this kind of examination so I don't get surprised by it again.

MR. BOWMAN: Okay.

MS. GOLDEN: So, Your Honor, I think that we don't agree to waive scope in our case. If they have any other witnesses they want to call, they should call them before they close their case.

THE COURT: What does that mean?

MS. GOLDEN: That means that we have not agreed to waive scope in our defense case. If their case is still open, if they intend to call any witnesses in their case, they have a chance to do that.

THE COURT: Well, are you assuming that I didn't just rule that I am going to allow this with this witness?

MS. GOLDEN: Other than this witness.

THE COURT: Oh, okay. All right. Well, we'll have to deal with -- okay. We're ready.

(Jury in.)

THE COURT: Please be seated, everyone.

Ladies and gentlemen, both sides are calling Mr. Dorsch for their own reasons, as if they were calling Mr. Dorsch in their case. We're doing just what we did with the

police officers throughout.

So with that, Mr. Bowman, why don't you go ahead.

MR. BOWMAN: Thank you, Your Honor.

BY MR. BOWMAN:

Q. Just one question more before we leave the subject.

To be clear, you don't know one way or another whether anybody did or didn't do anything suggestive to indicate to Orlando Lopez who he should pick out before you started dealing with him; is that fair?

A. No, I don't.

Q. Now, do you, sir, have information that Rey Guevara on a different occasion engaged in suggestive practice?

A. Yes.

Q. And can you, to the best of your ability, tell us when it was that this event that you recall happened?

A. It would have been before he was meritoriously promoted to detective. He was still in Gang Crimes. It was an event that happened after this case.

Q. And can you approximate how close in time it was to this case? Just to the best of your ability.

A. Oh. This is in '88. I believe this was in '89. And to the best of my recollection, it would have been around Mother's Day of '89.

Q. All right. When this event that you recall occurred, who was present?

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 741 of 1335 PageID #:106126
Dorsch - cross by Bowman
2745

A. This was a different case totally. It was Detective -- I mean, Gang Crimes Specialist Guevara and Gawrys came into our offices with two witnesses and another man, and they went into our office. And similar to this case, my partner and I were assigned to assist them with a lineup.

Q. And who was your partner at the time?

A. To the best of my recollection, that, again, would have been John Boyle.

Q. Okay. And was there an identification procedure that you were involved in --

A. Yes.

Q. -- at that time prior to the lineup?

A. Yes.

Q. And can you tell us -- just tell us what happened.

A. Arrived at work that evening. There had been a homicide that was probably -- it was unsolved, maybe two, three months old. Not much to go on. Person had been shot in a car with a young girl with him in the car, a relative. That person died. And there was no other information about the offenders. The only clue was that the offenders had shot at him from a large white car.

And -- continue?

Q. And so did it come about that on the particular occasion that you're recalling, Gang Crimes Specialist Guevara appeared in your office with a witness -- or with a couple of witnesses?

A. Yes. Both Gawrys and Guevara arrived at Area 5 with these two young teenage -- I remember they were still teenagers, younger, 15, and an older man who stayed in the lobby, and we were informed by our sergeant to assist with a lineup related to that unsolved homicide.

Q. And prior to the lineup, was there a photo spread that was shown to the witnesses?

A. Yes.

Q. And can you tell us what happened during that procedure?

A. We were able to obtain a photo of a person who owned a large white car. That information came from the two juveniles who said they had witnessed the shooting, but for two or three months had never approached the police, yet they claimed to have written down the license plate number on a piece of paper. And when stopped by Detective Guevara that night, they told him that they had witnessed it and gave him the piece of paper, which they evidently still had on them, and brought them into the office where we did our lineup.

Q. And then --

A. A photo -- excuse me, a photo lineup was conducted.

Q. And what happened during the photo lineup?

A. Well, to do it fairly, brought the two young boys -- and Detectives Guevara and Gawrys came in with me and Boyle -- into a larger meeting room. I placed the photo of the person who owned the white -- large white car amongst the group of maybe

five or six other photos onto a table.

I called only one boy up to the table the first time, gave him the same instructions as I said in the other case, where, "Just because you're here and gonna look at a photo doesn't mean that the offender is in this group of photos. So don't feel you have to pick out somebody."

The photos were on the table. And the second young man stayed in the back so he couldn't see the photos. And Detective Guevara came up with the one young man. And the young man started looking at the photos, and he was looking and looking, and time passed. And I wasn't pushing him to pick out a photo. Like I said, I want him to be certain. I don't want him to guess. I don't want it -- him to make me happy. I only wanted to know if he could make a positive I.D.

And, like I said, he wasn't picking out anybody and then, suddenly, Mr. Guevara reached out, put his finger on a photo and said, "That's him," and the young man immediately said, "Yes, that's him." And I told Detective Guevara, not knowing why he had done that, to get out of the office, and I told the young boy to get out of the office also.

I then mixed up the photos, called the second young man up. He looked at the photos and he could not identify anybody.

So then I went out and talked to Detective Guevara and the young boy.

Q. And as a -- was there a lineup that occurred subsequent?

A. Yes.

Q. What happened in that lineup?

A. Well, it was the next day, because at -- the photo array had been later in the evening, and we had to go out and pick up this young man whose photo we had.

So after Sergeant Mingey, John Boyle and myself went out and found a white car with the license plate number and brought that young man into the station, and informing him that he would have to stand in a lineup, we set about having separate interviews -- I mean, separate lineups for the two boys.

Q. And what was the result of the lineup?

A. Well, the young man who had the assistance of Detective Guevara positively identified the subject in a lineup as the person that he had seen shooting and in that car the night the murder happened.

He left the room. The second lineup happened, and the young man who couldn't identify anybody could not identify anybody in the lineup.

Q. Now, following these events, do you know if charges were brought against the young man whose license plate and white car had resulted in his being brought in?

A. Well, we were -- I'll say not "we." I'll -- I was not happy with the way this happened. It was not an identification

Dorsch - cross by Bowman

2749

that I perceived as fair. I didn't know why Detective Guevara had put his finger on the photo. But I had to run it past Felony Review, and they said, basically, "You had a photo I.D., you had a lineup I.D. Charge him."

So we set about charging him. Sent the kids home. Guevara and Gawrys left, and me and my partner were sitting there thinking about what we have to do now, because we had put the kid in the lockup.

The father of the young man came in, and we had some conversation with him. And he wanted to know what he should do, and I told him merely to go to court the next day. Don't get an attorney. And I told my partner, we're gonna go pick up those two young men again, and we went out and picked them up.

Then the next morning, individually, basically, laid it on them, do you -- we have trouble with the identification. I don't know that it was really you or Detective Guevara for whatever reason picking him out, but I have trouble with the identification. What we don't want is to put an innocent person in jail. Okay?

And each boy independently said that they were approached by Detective Guevara and the older boy -- the older man that was in the lobby and told that they wanted their help in identifying this kid in this homicide. They never saw the murder.

Q. Now, after you obtained this information, what further

step, if any, did you take?

A. We took the kids immediately down to Branch 66, presented them to the state's attorney assigned the case. I informed him about what had happened and that these kids had never seen that homicide, and it would be most important to get this kid released today, because once that kid got into the system, I don't know how long it would take, how long he would stay in jail before he could be released.

Q. Do you have an understanding --

A. So --

Q. -- of what happened?

A. Yes. He was -- well, we left there with the word of the state's attorney that he was going to go to the Felony court and have him released.

We returned the two kids home, and me and my partner then drove back to our office; at which time, we were confronted by the office staff, our supervisors who already had been apprised of the fact that we had gone to court and gotten this kid released.

Q. Now, without going into that conversation, let me ask you this. Did you at any time approach Mr. Guevara's supervisors and inform Guevara's supervisors about what you had witnessed?

A. No.

Q. Why didn't you do that?

A. Two reasons. One, I didn't know why anyone would do what

he did.  I'd never seen it before.  But you didn't have to be a policeman to know that it was the wrong thing to do.

And number two, I would report it only to my supervisors because it's -- like I said, we're like the military.  He was in a different unit, a different location.  It would be more their job to approach his boss than it would be my job to approach his boss.

MR. BOWMAN:  All right, sir.  I have no further questions.  Thank you.

THE COURT:  Okay.  Mr. Sotos.

MR. SOTOS:  Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. SOTOS:

Q.  Mr. Dorsch, I'm going to ask you a few questions about this case and then I'm going to ask you some questions about the case you just talked about.  Okay?

A.  Yes.

Q.  You were asked by Mr. Bowman a couple times on -- when he examined you about Rinaldi, Sergeant Rinaldi, your supervisor, telling you to do a lineup.

Do you recall that?

A.  Are we talking about the other case first or --

Q.  We're talking -- right now, we're talking about this case --

A.  Okay.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 748 of 1335 PageID #:106133
Dorsch - redirect by Sotos
2752

Q. -- the jury's here to decide. Then I'm going to ask you some questions about the other case that you just talked about.

A. On the --

Q. Okay.

A. On --

Q. So do you --

A. Yes. On the Rivera case. So we were -- apparently from the report, we were asked by Sergeant Rinaldi to do a lineup.

MR. SOTOS: Okay. So can you put 23-H on the screen, please? Page 2.

BY MR. SOTOS:

Q. Can you tell me where it says that Sergeant Rinaldi asked you to do a lineup?

A. Well, we're assigned the case.

Q. Right. It says that you were assigned to continue the investigation, correct?

A. Which took us three hours and it only entailed a lineup.

Q. Yeah, but that's different from saying that Sergeant Rinaldi told you -- well, strike that.

It only took three hours because you called the State's Attorney's Office to charge the case after the lineup, correct?

A. Well, it would have been after a positive identification that the State's Attorney's Office would have been called, yes.

Q. But if you weren't -- nobody told you you had to seek

felony murder charges, correct?

MR. LOEVY: Objection, Your Honor. You know, this was covered the first time. Nothing new on that.

THE COURT: Overruled.

BY THE WITNESS:

A. Nobody told me, but it's -- it's part of my job description. It's a format and policy and what we follow. And once you have the identification, we would then contact Felony Review.

BY MR. SOTOS:

Q. So no matter what the circumstances, once you get the identification, you're going to seek murder charges no matter what else you know?

MR. LOEVY: Objection, asked and answered, Your Honor.

MR. SOTOS: Just following up, Judge. Just following up on his answers, Judge.

THE COURT: I don't know where -- whatever else you know, I -- I don't -- I think that that question is really problematic given the answers the witness has already given.

BY MR. SOTOS:

Q. Okay. Well, you knew that there had been prior investigation into the case, correct?

MR. LOEVY: Objection, asked and answered, Your Honor. I mean, this was covered.

MR. SOTOS: This is all --

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 750 of 1335 PageID #:106135
Dorsch - redirect by Sotos
2754

THE COURT: Overruled.

MR. SOTOS: -- follow-up to what Mr. Bowman --

THE COURT: Overruled.

MR. SOTOS: -- covered.

BY MR. SOTOS:

Q. I mean, you knew that there was prior investigation?

A. I would assume -- I would assume that I would have known there was prior investigation.

Q. So you knew that Detective McLaughlin and Detective Leonard left you with an open investigation, correct?

A. Well, I knew it was opened. There -- you're bringing them into it. They had no -- they didn't assign it to me.

Q. You knew from the reports that they were trying to get Mr. Rivera and Mr. Rodriguez into a lineup, correct?

MR. LOEVY: Objection, Your Honor.

THE COURT: Sustained. I think the witness testified that he doesn't remember what reports he saw. So, so --

BY MR. SOTOS:

Q. Hypothetically, if the reports were in the file, if you had the reports, you would have known that Detective McLaughlin and Detective Leonard were trying to get Mr. Rivera and Mr. Rodriguez into a lineup, correct?

MR. LOEVY: Objection, Your Honor. It's not even what the reports say, and it's not relevant.

MR. SOTOS: Well, I can read through the reports

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 751 of 1335 PageID #:106136
Dorsch - redirect by Sotos
2755

again.

THE COURT: I think that would be useful so we know what we're talking about.

MR. SOTOS: Can you put the September 1st report up, please.

MR. LOEVY: Your Honor, the objection is that it's two weeks earlier.

MR. SOTOS: Judge, he's giving testimony.

THE COURT: Wait, wait, wait, wait. The objection is that it was two weeks earlier. That objection is overruled, unless I know what Mr. Sotos is going to be asking.

MR. LOEVY: All right.

BY MR. SOTOS:

Q. Can you look at page 2 of the report and tell me -- well, do you need to read it? Do you know as you sit here today, as you prepared for your testimony, that the reports indicated that Detective McLaughlin and Detective Leonard were trying to get Mr. Rivera and Mr. Rodriguez into a lineup on August 31st?

THE COURT: This we've been well over. There's no question in my mind that we've been talking about this in your examination.

MR. SOTOS: Well, I didn't hear. Objection sustained, then, or --

THE COURT: Well, Mr. --

MR. BOWMAN: I'm sorry. I didn't articulate an

objection.

THE COURT: Mr. Bowman was on his feet.

MR. SOTOS: All right.

MR. BOWMAN: Objection.

BY MR. SOTOS:

Q. Okay. Well, you said that when -- well, all right. Let me ask you this way.

Did you call Detective McLaughlin or Detective Leonard and say, "Should we charge this case?"

A. No.

Q. You could have if you had an issue, right?

A. If there was a question or issue, I'm sure I would've.

Q. You knew you didn't -- you only had the case on the one day for the three hours that you've described, right?

A. Correct.

Q. And so if you had any issues, you could have called Detective McLaughlin and said, "Is there any other issues that should hold us up in charging this case," correct?

A. If I felt a need to, I'm pretty sure I would've.

Q. And you didn't?

A. I guess I didn't feel the need to.

Q. And then you -- you know, you kept -- Mr. Bowman kept asking you about it was just three hours, and you said, "Well, I could have gone off on another investigation. I don't know."

Well, you know that didn't happen, right?

A.  No, I don't know.

Q.  Well, you've looked at the reports.  You submitted -- didn't you have to stick around and talk to the Felony Review assistant after you did the lineup?

A.  I don't know.

Q.  Is that something that, based on your practice, you would do?

A.  Partners, at times, split up.  I mean, I've done more than one homicide investigation in an evening.  I've been taken off of a case and sat out on a -- one that just occurred.

Q.  But you don't have any reason to think that that happened on this day, do you?

A.  No, I don't have any recall.

Q.  So again, going by practice --

MR. LOEVY:  Objection, Your Honor, asked and answered.

THE COURT:  Sustained.

BY MR. SOTOS:

Q.  You submitted the report that you signed.  You submitted that at 11:00 o'clock at night, right?

A.  I have no idea when it was submitted.

Q.  Okay.

MR. SOTOS:  Can we put up Defendants' 23-G, please. No, that's not the one.  23 -- this is Defendants' 1.1.

BY MR. SOTOS:

Q.  Okay.  Do you see the -- this is your supp. report,

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 754 of 1335 PageID #:106139
Dorsch - redirect by Sotos
2758

correct?  The one we talked about before with your signature on it?

A.  Yes.

Q.  11:00 -- do you see the time?  It's 11:00 o'clock at night, right?

A.  Yes.

Q.  All right.  You reviewed those reports getting ready for your testimony, right?

A.  They were sent to me, yes.

Q.  So you know you didn't go off on any other assignment after 7:30, correct?

A.  I don't know that.

Q.  Even after reviewing the report, you don't know that?

A.  No.

Q.  Because you don't remember?

A.  Well, it's -- no, I don't know.

Q.  Does the report suggest to you, based on your practice, that if it was submitted at 11:00 o'clock at night, that you probably didn't go off on some other investigation or some other assignment after seeking felony murder charges against Mr. Rivera?

A.  I don't know.

Q.  Let's talk about this other case.

Did you testify on direct examination that the man in the station, you heard a conversation between him and Mr.

Guevara about wanting help?

A. That I said I heard it?

Q. Yes.

A. From them? You mean them talking about it?

Q. From anybody.

A. It was from the young men that were brought in as witnesses.

Q. So what is it that you heard them say?

A. They said, the next morning when we picked them up, that they had not witnessed that shooting at all; that they were stopped and they were asked to assist Detective Guevara and this man in identifying someone and putting a murder case on him, and that they were offered money to do so.

Q. So you've testified about this case several times, haven't you?

A. I have testified eight times in court and in depositions about this case.

Q. That many times? Eight times?

A. Yes.

Q. I wasn't aware of that.

     And haven't you previously testified that the man who was in the police station, the witnesses said that he bribed them to make -- to identify the witness by giving them money or other things?

A. That's what the two young boys said, yes, and I've --

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 756 of 1335 PageID #:106146
Dorsch - redirect by Sotos
2760

Q. Did you --

A. -- testified to that.

Q. You didn't say that during direct examination this morning.

MR. LOEVY: Objection, Your Honor. He's answering questions and --

THE COURT: Overruled.

BY THE WITNESS:

A. I don't know that it was asked.

BY MR. SOTOS:

Q. Okay. So --

MR. SOTOS: One second.

(Counsel conferring.)

MR. SOTOS: Do we have one for the judge?

MS. GOLDEN: I think so.

BY MR. SOTOS:

Q. Mr. Dorsch, this is a demonstrative, Defendants' Exhibit No. 1 -- Defendant's Demonstrative No. 1.

So this is the chronology about this incident that you've described, did you say, eight times?

A. I believe it's eight times.

Q. It's more than I was aware of, but --

MR. LOEVY: Objection. He said that. It wasn't a question either time.

BY MR. SOTOS:

Q. So you said that this happened in 1989, right? '88 or '89?

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 757 of 1335 PageID #:106142
Dorsch - redirect by Sotos
2761

A.   Eventually, I came to believe it was 1989 because it happened when Guevara was still in Gang Crimes and he was meritoriously promoted a few months after.

Q.   So that's how you were able to place it in time by virtue of the fact that you know he was a Gang Crimes detective at the time and not a -- a Gang Crimes specialist and not a detective at the time the incident occurred?

A.   Yes.  And, as you said, that he would have needed a detective to run the lineup.

Q.   And in the incident that happened in '89 or so -- I mean, are you sure it's '89 or around '89?

A.   I believe it was '89.

Q.   And you didn't report it to your superiors, correct?

A.   I certainly did.

Q.   You did?

A.   Yes.

Q.   Who did you tell?

A.   Just about everybody who wanted to hear it.

Q.   So you -- you've never testified that you didn't report it because it was a career ender?

A.   I didn't --

     MR. LOEVY:  Objection.  That's improper impeachment. You know, what testimony?  What was the question?

     THE COURT:  Wait.  Is this -- you're aware or you have evidence that this witness made the statement?

MR. SOTOS: Yes. I'm asking him if he ever said that.

THE COURT: Overruled.

BY MR. SOTOS:

Q. Did you ever testify that you didn't report it because it was a career ender?

A. I felt -- I didn't know why he had done what he did. It troubled me. And I reported it to my supervisors and anybody else who wanted to hear about it. People knew I was angry.

But I did not go to his unit because I didn't feel like, in my own mind, I knew why he did it, was a stupid thing to do. Was it just a mistake? Was it a random action? I don't know. I didn't know at the time what the purpose was, so I did not think I wanted to destroy a man's police career by making an improper accusation.

Q. So then you didn't report it?

A. I reported it to my office.

Q. Because you did think it was a big deal?

A. Only because I know that their -- it would be their responsibility to pass it on. My responsibility was to keep an innocent man out of jail.

Q. Didn't you just say you didn't report it because you didn't want to interfere with a man's career?

MR. LOEVY: Objection --

BY THE WITNESS:

A. No.

MR. LOEVY:  -- Your Honor.

THE COURT:  I think there's some confusion, maybe.

MR. LOEVY:  It's also asked and answered.

THE COURT:  Well --

MR. SOTOS:  Okay.  Well, let me --

MR. LOEVY:  We covered it.

MR. SOTOS:  -- ask it --

THE COURT:  -- I think it's gotten --

MR. SOTOS:  -- straightforward.

THE COURT:  -- very confusing.

BY MR. SOTOS:

Q.  Did you testify that you didn't report it because you didn't want it to interfere with Mr. Guevara's career?

A.  Well, there's a big action that would've had to have taken place before my accusation, not knowing why he had done it, became an administrative complaint against him, I guess.

Q.  So you did report him or you didn't?

A.  I talked to the people in my office and told them what happened with that, and that's why I went and did what I did.

Q.  So who did you talk to?

MR. LOEVY:  Objection, Your Honor.  This really has been covered.

MR. SOTOS:  It hasn't at all, Judge.

THE COURT:  Overruled.

MR. SOTOS:  It hasn't been at all.

BY MR. SOTOS:

Q. Who'd you talk to?

A. Whomever was present the night of the -- after the young -- well, we wouldn't have talked to him that night because I wasn't sure what action we were gonna take until after the father came in and we decided to go to court with the young boys the next day. We had to take them anyway, but we were gonna pick them up.

But after we returned from court, my office supervisors, including the commander's office and probably the commander -- and this was, again, 1989. Whatever people were working days the next day were waiting --

Q. Who?

A. -- for me and my partner.

Q. Who? Who?

A. Well, it would've been Jim Fruin. Okay? He was a commander at that time in '89. But I don't have a vivid memory of him. But I can tell you what was said to me.

Q. But you're not sure if that's who you talked to?

A. I wasn't -- I didn't come back to talk to anybody about it. They approached me when I returned after dropping off the kids the next day.

Q. You're not sure who they are. You mentioned a person by name --

A. It was the office -- it was sergeants, lieutenants, but I

don't recall anymore.

And the reason I hesitate, it's 30 years ago. And if I make one mistake and name a wrong person, then my credibility will -- they will say is no good. So rather than do that, I will be honest and say I don't remember all that were there.

Q. Thank you. That's all I was asking you.

A. Yeah.

Q. So you don't remember all that were there. Do you remember anybody specifically that you reported this to?

A. Within the group, I can tell you the response in the question.

Q. I'm just asking if you remember any specific person that you reported it to. If you can give me a name, great. If you can't --

THE COURT REPORTER: Mr. Sotos, I'm having a hard time hearing you.

MR. SOTOS: Oh. Because I'm behind this -- I'm sorry.

MR. LOEVY: But, Your Honor, we do object, asked and answered. I mean, he's asked him multiple times.

THE COURT: I don't think there's been an answer to this question.

MR. LOEVY: All right.

BY THE WITNESS:

A. Okay. In all the times that I have talked about this incident, and the many times that I have testified about this

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 762 of 1335 PageID #:106147
Dorsch - redirect by Sotos
2766

incident, for the same reason I just stated, rather than make one mistake and identify the wrong person, I have always said I don't recall, because I really don't recall exactly who was there, but I remember what was said to me.

BY MR. SOTOS:

Q. One of the reasons you don't recall is because it was so very long ago, correct?

A. Yes.

Q. All right. So let's talk about that.

You retired from the police department --

MR. SOTOS: I'm sorry. I keep stepping behind.

BY MR. SOTOS:

Q. You retired from the police department in 1994, correct?

A. That is correct.

Q. Okay. And you didn't bring this up to anybody until late 2010-2011, correct?

A. To anybody within the police department or are you talking about when I --

Q. Anybody.

A. Of course, everybody knew about it.

Q. Everybody who?

A. Well, everybody who cared, every -- I mean, we talked about it.

Q. Who?

A. People I worked with, my partner and others.

Dorsch - redirect by Sotos

2767

Q.  Who was your partner?

A.  John Boyle.

Q.  John Boyle --

A.  Yes.

Q.  -- knew about this?

A.  Yes.  He was with me the whole time.

Q.  All right.  Now, you do agree that you previously testified that it was somebody else who was with you named Bill Johnston, correct?

A.  Yeah.

MR. LOEVY:  Your Honor, if we could get a page and a line for impeachment?  It's not fair to say --

MR. SOTOS:  Just I'm asking what his recollection is about his testimony.

THE COURT:  Well, if you're going to be -- I don't know what you have in your hand, but you have something in your hand, and it's normal to tell the other side what page -- what it is and what page and line.

MR. SOTOS:  But I'm not trying to impeach him, Your Honor.  I'm just asking him --

THE COURT:  All right, all right.

MR. LOEVY:  Well, we had just -- we'd just ask that he not ask about testimony unless he shows us the testimony, because, otherwise, we --

THE COURT:  There's no such rule.  As long as there's

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 764 of 1335 PageID #:106149
Dorsch - redirect by Sotos
2768

not going to be any kind of impeachment.

BY MR. SOTOS:

Q. Have you previously testified that the person who was with you that night was Bill Johnston, a different partner of yours?

A. Like I said, I've talked about this eight times in court and depositions, and I had a hard time in the beginning trying to remember which partner I would have been working with at the time that had occurred, because I did have several partners over the years.

Q. So you thought it was Bill Johnston at one point and then you later decided it was -- you concluded it was John Boyle?

A. That's correct.

Q. And anybody else know?

A. Sergeant Mingey knows. Him and I talked about it very many times in the last couple years when I would meet with him for coffee.

Q. Okay. And you talked to representatives of Northwestern about this, correct?

A. Yes.

Q. And so we talked during your direct examination about your meeting with Jane Raley from Northwestern in 2010-2011, in that time period, correct?

A. I'll accept that.

Q. Okay. And in the 16 years before that meeting, after you retired, had you told anybody about this incident?

A. I was living -- I moved to northern Wisconsin.

Q. Yeah. But I'm just -- that's not my question --

A. And I wasn't --

Q. -- sir.

A. I wasn't --

Q. Sir, my question is, did you tell anybody in the intervening 16 years?

And if you have a reason for it, that's fine. We can go into that. But I'm just asking you now, did you tell anybody?

A. Anybody within family, police department, friends, things like that? A lot of those people know.

Q. Did you report this to anybody in those 16 years?

A. I was long gone from the police department.

Q. So the answer is no?

A. No, I didn't.

Q. Thank you.

In 2010 or 2011, you had a meeting with Jane Raley from Northwestern in which you were trying to bring her another case in which you've added that that person was exonerated, correct?

A. No, he has not been exonerated. I'm still working on it 12 years later.

Q. All right. That's good. But you had a meeting with Jane Raley at Northwestern --

A.   Yes.

Q.   -- because you were trying to bring her a case?

A.   Well, it had already been with Northwestern, but it was with Dave Protest that I first brought it to and then he stepped aside.  It went --

Q.   Were you --

A.   -- to another attorney after that, not from Northwestern. I was not happy with the way the case was being pursued, and I believed in the young man's innocence, so I decided to take it and I met with Jane Raley at Northwestern where I had never been before.

Q.   All right.  And so you weren't happy with the way David Protest was handling the case, and you wanted to see if Jane Raley and Northwestern would do it?

A.   Correct.

Q.   All right.  And so when you met with her, she told you she was working on cases involving Detective Guevara, correct?

A.   After we got done talking about the case I brought, she mentioned that -- she says, "Do you know Detective Guevara?" And I said, "Of course I do."

Q.   And you asked her, in fact, if she was working on any cases that you were involved in, correct?

A.   She told me they had a specific -- first, I believe she said, "We have a case that involves Detective Guevara, and your name is in that" -- "in the reports as being involved, too.

Dorsch - redirect by Sotos

2771

Would you like to talk about it?"  And I -- she may have mentioned the name right off.  I don't remember.  But she said, "Would you" -- "Would you agree to talk about it?"  And I said, "Certainly."

Q.  So then --

A.  And she showed me reports.

Q.  She showed you some of the reports that we looked at --

A.  She --

Q.  -- during your testimony --

A.  Yeah, she showed me --

Q.  -- correct?

A.  -- some reports.

Q.  Okay.  And during that same conversation, you decided to tell her about this other incident involving Mr. Guevara, correct?

A.  Yes.

Q.  Okay.  And that was in late 2010, early 2011?

A.  Correct.

Q.  And then after that meeting, you started doing work for Northwestern, private investigative work, correct?

A.  I was asked to do two cases, maybe three.  The two major cases, like you said, ended in exonerations.

Q.  And you're aware that Ms. Raley prepared notes from your meeting with her in your -- well, you know what?  From a different meeting.  Hold on.  Hold on one second.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 768 of 1335 PageID #:106153
Dorsch - redirect by Sotos
2772

And then are you aware that Mr. Rivera filed suit in this case in June of 2012?

A. Did -- Mr. -- in this case?

Q. In this case.

A. No, I wasn't aware. I wasn't even aware there was a lawsuit when I talked to her the first time.

Q. Well, when you talked to her the first time, there wasn't a lawsuit.

A. Okay. Yes.

Q. The lawsuit --

A. Yes.

Q. -- was filed sometime over a year after that.

A. Okay.

Q. And you talked about conversations with Ed Mingey. You actually talked to Ed Mingey about why it was that you weren't sued in this case, right?

A. It had been one of our many conversations where we met for coffee that came up. He asked me why I was not sued in this case.

Q. All right. And I think you've -- hold on one second, please.

I think you've testified that he rightfully asked you whether -- why --

A. Yes.

Q. -- they were sued and you weren't.

A. Yes.

Q. Because you were expecting that you would be sued --

A. I would --

Q. -- correct?

A. I would not have been surprised.

Q. Okay. But you had already had the meeting with Ms. Raley in which you disclosed the other incident involving Mr. Guevara, correct?

A. Yes.

Q. And then several months after that, the filing of this lawsuit, in January of 2013, you had a meeting with representatives of Northwestern about the allegations that you had brought forward about Mr. Guevara, correct?

A. I don't recall.

Q. You don't remember that? Maybe I can show you something to refresh your recollection.

I'm showing you what's been marked as Defendants' Exhibit No. 76. Ask you to take a look at that briefly and see if it refreshes your recollection.

MR. LOEVY: What exhibit number is it?

MR. SOTOS: 76.

BY THE WITNESS:

A. Oh, Jenner & Block, yes.

BY MR. SOTOS:

Q. Pardon?

Dorsch - redirect by Sotos

2774

A.  Jenner & Block.  I recall that meeting.

Q.  You met at the law firm of Jenner & Block in down -- not too far from here, correct?

A.  I guess it was at their request, yes.

Q.  And the purpose of that meeting was to discuss the allegations that you had brought forward in your meeting with Jane Raley in 2010 and 20 -- or late 2010, early 2011, correct?

A.  What their purpose was, I don't know.  I just know that I was asked to come, and I came.  I don't know what their purpose was.

Q.  You didn't know what their purposes were during the meeting?

MR. LOEVY:  Objection, asked and answered.

THE COURT:  Overruled.

BY THE WITNESS:

A.  That's not -- that's not what I said.  I says I was requested to come to the meeting, but I didn't -- they didn't state to me specifically who was going to be there or what.

BY MR. SOTOS:

Q.  But you had an understanding.  You knew what the meeting was about, right?

A.  They probably told me it was about Guevara, but I didn't know -- I didn't know Jenner & Block was even involved.

Q.  But you knew that the people you were meeting with, in addition to the people from Northwestern, back at that time

Dorsch - redirect by Sotos

2775

were working on cases involving Detective -- excuse me, Mr. Guevara?

A.  Probably by that time, I did.

Q.  Okay.  And so you provided them the information that you remembered about the case back in -- what you thought was 1989 during that meeting, correct?

A.  I don't recall what was discussed.

Q.  And after that meeting, you testified in -- the meeting was in January of 2013.  Is that what the --

A.  Yes.

Q.  -- notes indicate?

A.  That's correct.

Q.  Do you recall testifying in February of 2013 in a post-conviction petition which involved another case involving Mr. Guevara?

        MR. LOEVY:  If we can get the exhibit and the page?

BY MR. SOTOS:

Q.  The *Solache/Reyes* case?

A.  Yeah.  I testified in that case, yes.

        MR. LOEVY:  If we could just get the exhibit and the page?

        MR. SOTOS:  And -- which exhibit is this?

   (Counsel conferring.)

        MR. BRUEGGEN:  Exhibit 69.

        MR. SOTOS:  This is Defendants' Exhibit 69.

Dorsch - redirect by Sotos

2776

BY MR. SOTOS:

Q. Sir, I'm going to show you what's been marked as Defendants' Exhibit No. 69. Ask you to look at it --

A. Thank you.

Q. -- quickly and tell me if it refreshes your recollection as to what it is.

A. It's related to the *Reyes* and *Solache* case, and I do recall that I testified in court.

Q. Thank you. And, again, that was on February 14th, 2013, correct?

A. That's what it says.

Q. Okay. And then --

MR. SOTOS: Your Honor, could I have one second?

THE COURT: Sure.

(Counsel conferring.)

BY MR. SOTOS:

Q. And, sir, I'm now going to show you what's been marked as Defendants' Exhibit No. 68 and tell me if you recognize that.

A. Yes.

Q. What do you recognize that to be?

A. It is the *Serrano* and *Montanez* case that I testified in, also.

Q. So you testified in February of 2013 and May of 2013, two different cases over in the Circuit Court of Cook County about this same incident that you've described here, correct?

Dorsch - redirect by Sotos

2777

A.   Yes.

Q.   And that's the only incident you really testified about in both of those cases, correct?

A.   I don't recall.

Q.   And was it your understanding through your meetings with Northwestern that people were trying to find out, like, which case it was that you were talking about?  They were trying to find the file, right?

A.   As was I.

Q.   Okay.  You couldn't find it either?

A.   My requests went unanswered.

Q.   Your request to the police department?

A.   Yes.

Q.   And then in April of 2015, Northwestern gave you a file which they told you was the file that you had been talking about?  At least that's what they told you?

A.   That's what they told me.

Q.   And so you reviewed the file, correct?

A.   I did.

Q.   And what did you conclude after reviewing the file?

A.   It was total fabrication, mixing some of what I had said that were similar to what I had said, but there were too many things in there that were not correct to be the file in the case that I specifically was talking about.

Q.   So you concluded that the file that Northwestern said --

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 774 of 1335 PageID #:106159
Dorsch - redirect by Sotos
2778

sent you was a different file?

A.   It was not the case that I was talking about in the incident where Guevara put his finger on the photo.  It was not that case 'cause there were too many discrepancies.

Q.   Right.  And --

MR. SOTOS:  Your Honor, could I have a minute, please?

THE COURT:  Yeah.

MR. SOTOS:  Thank you.

(Counsel conferring.)

BY MR. SOTOS:

Q.   So, sir, you concluded after reviewing that file that it couldn't have been the file that you were talking about because there were too many differences, right?

A.   Most definitely.

Q.   So you reviewed that file pretty carefully, correct?

A.   Yes.

Q.   And there were a lot of similarities, too, right?

A.   Yes.

Q.   Okay.  Let's talk about some of the similarities.

Fair to say that in both cases, the Jimenez file and the one that you were describing -- now, wait.  Before we get to that, in reviewing the Jimenez file, did you see that the State's Attorney's Office -- Cook County State's Attorney's Office actually interviewed the witness who you had said Detective Guevara pointed it -- pointed out a suspect to --

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 775 of 1335 PageID #:106160
Dorsch - redirect by Sotos
2779

MR. LOEVY: Objection, foundation, Your Honor. He's just testifying to things that happened.

THE COURT: Hold on a second. The question -- Mr. Sotos, could you just repeat the question, please?

MR. SOTOS: Sure.

BY MR. SOTOS:

Q. In reviewing the file that Northwestern sent you, did you see that the Cook County State's Attorney's Office had interviewed the witness who you had claimed Detective Guevara had pointed a -- pointed out a photo to?

MR. LOEVY: And our objection is, Your Honor, foundation. If they want to prove that, they should prove it, but they can't just start talking about things that are allegedly in a file.

MR. SOTOS: Judge --

THE COURT: Overruled.

BY MR. SOTOS:

Q. You reviewed the file, correct?

A. Yes.

Q. I'm asking you if you recall reviewing the report that showed that the State's Attorney's Office -- you -- let me back up.

You understood that after that file was produced, the Cook County State's Attorney's Office started looking into it to determine whether or not what you were claiming had actually

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 776 of 1335 PageID #:106161
Dorsch - redirect by Sotos
2780

happened?

A. Which they should do.

Q. Right. And you were aware of that when you reviewed the file?

A. No, I wasn't aware what action was taken, but I do know it took them four years to find it.

Q. Took who four years?

A. The police department, whoever found it first. I would assume it would be the police department. They certainly didn't find it per my requests.

Q. And it's your testimony that they found the wrong one?

A. I don't even believe in this one.

Q. You don't believe what?

A. I don't believe in it.

Q. You don't believe that they found --

A. There's too --

Q. -- the right --

A. There's too much coincidence to some of the things that they knew for four years.

In 1992, which this case is (indicating), sir, there were 33 homicides in the 14th District.

Q. This case being the Jimenez case?

A. The '92 case. That's the '92 case, is it not?

Q. It's a 19 -- December 1991.

A. Or '91. Okay. Then there were, I think, 34 homicides in

that year.

Q. You remember that?

A. I have it right in my file.

Q. Okay. So go ahead.

A. Okay. It took them four years before they could find it. I've had instances and requests that I have done of the Chicago Police Department where I filed FOIA requests over a period four times in ten years and told each time they could not find the file. All the time, I had the file.

Q. Okay. Well, let's --

A. All right? And then, if I may bring this up --

Q. Sure.

A. -- Larry Potash himself helped me, from WGN, in the same incident.

MR. SOTOS: Objection, Your Honor. It's getting into a narrative. He's not even responding to the question.

THE COURT: Well --

THE WITNESS: I understand, Your Honor.

THE COURT: I think -- why don't we wait for a question. I know that you asked to go into that, but let's start again.

BY MR. SOTOS:

Q. I want to ask you about the consistencies between the file that Northwestern found, or the Jimenez file, and the case --

MR. LOEVY: Objection, Your Honor.

Dorsch - redirect by Sotos

2782

BY MR. SOTOS:

Q. -- that Northwestern found --

MR. LOEVY: There's no foundation that Northwestern --

THE COURT: Yeah, I --

BY MR. SOTOS:

Q. That Northwestern gave you.

A. Right.

Q. Okay. I want to ask you about the similarities between that and the case that you're describing.

Before doing that, I'm trying to ask you whether or not you were aware, when you reviewed the materials that Northwestern gave you, that the Cook County State's Attorney's Office had talked to the witness who had told them that he was bribed to identify the wrong person, but that Detective Guevara didn't do anything wrong.

You were aware of that, correct?

A. I found that to be in that file, yes.

Q. All right. And so it was your testimony that, well, it had to have been a different case, correct?

A. Guevara was in Gang Crimes. He needed -- he did not need me in '91 because he was a detective.

Q. Understood. It couldn't have been the Jimenez file because of that?

A. That's correct. That's only one of the things.

Q. So in reviewing the file in the Jimenez case, you saw that

that case involved a situation where a victim was with a young girl passenger who was shot in Humboldt Park, correct?

A. Correct.

Q. And that was the same scenario that was in your case, correct --

A. Yes.

Q. -- that you remembered? And that in the Jimenez case, the suspect was allegedly driving a -- the person who was in a -- person who was in a car where the shooting occurred -- the shooter's car?

A. Yes.

Q. Was driving a big white car?

A. Correct.

Q. And that was similar to what was in the file that you described, correct?

A. I believe it was a different color, a little -- maybe --

Q. A yellow?

A. A yellow or green.

Q. But pretty similar, right?

A. I don't -- well, I'm pretty good on colors. I don't find them similar.

Q. White and yellow?

A. No.

Q. All right. And in both cases, correct me if I'm wrong, more than a month after the shooting, two witnesses were

Dorsch - redirect by Sotos

2784

brought to Area 5 by Mr. Guevara, correct?

A.   According to that report.

Q.   Correct.  And that's in both the Jimenez file and in the case that you described, correct?

A.   Yes.

Q.   Okay.  And in both of those cases, the witnesses had allegedly surfaced because they had kept a license plate -- they knew the license plate of the suspect shooter's car, correct?

A.   Well, in my case, they had written it down and still had it in their possession months later.

Q.   That wasn't the case in the Jimenez file?

A.   I don't recall.

Q.   You do recall, though, that the witness -- when the witnesses surfaced, it was because they -- when the witnesses surfaced, they had the license plate of the car, correct?

THE COURT:  Mr. Sotos, for my benefit -- I don't know if anybody else is having trouble, but if you could identify these cases by name, because I'm getting pretty confused.

MR. SOTOS:  We'll call it the Jimenez file and the Dorsch file.  Okay?

BY MR. SOTOS:

Q.   And I'm asking you about in both cases -- so I'm not talking about any differences now.  I'm saying in both of those cases, the teenage -- involved teenage Hispanic witnesses,

correct?

A.  In the Jimenez case, the witnesses were 17.  They were not juvenile.  All right?

Specifically in my case, when I went to Branch 66 with the two juveniles, meaning younger than that -- and I recall they were like 14 or 15.  When I told the state's attorney there what had happened, the state's attorney asked me if I wanted to charge the two juveniles who were lying to me in that case, and I said no.  I only want to set an innocent free.  I don't want to go to juvenile court.

Q.  So a two-year difference -- maybe a two-year difference in age from the Jimenez case and the one you remember as the Dorsch case?

A.  A two-year difference, I think.

Q.  Okay.  And in both cases, the Jimenez case and the Dorsch case, the witnesses were brought into a room where you were present with your partner and with Mr. Guevara, and who else was there?

A.  Are you talking about the Dorsch case or --

Q.  Your case.

A.  It was Guevara, Gawrys, the two young men, and my partner, John Boyle, and myself.

Q.  Right.  And that's the same thing in the Jimenez case, correct?

A.  I don't recall.

Q.  You don't recall that that was the same allegations that were -- the same --

A.  No.

Q.  -- scenario --

A.  No.

Q.  -- in the Jimenez file?  In both cases, the one witness picked out the suspect, correct?

A.  I know in my case, that's what happened.

Q.  And the Jimenez case as well, right?

A.  I don't recall.

Q.  Well, you reviewed the Jimenez file pretty carefully, didn't you?

A.  Well, that was some time ago, sir.

Q.  When's the last time you reviewed it?

A.  Nobody sent that one to me, I mean, recently.

Q.  You didn't review it in preparing for --

A.  No.

Q.  -- your testimony?

A.  No.

Q.  So you don't recall, then, that in the Jimenez case, one witness picked the suspect and the other witness didn't?

A.  I don't recall that.

Q.  Okay.  Do you remember that in both cases, the witnesses said that a third party bribed them to identify the suspect?

A.  I recall that.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 783 of 1335 PageID #:106168
Dorsch - redirect by Sotos
2787

Q. Okay. But you don't recall that in the Jimenez case --

MR. LOEVY: Objection, Your Honor, asked and answered. You can see the pattern here. He's going to ask the same question again.

THE COURT: I have no idea. Sorry.

BY MR. SOTOS:

Q. So you do recall that in both cases, the witnesses said the -- they were bribed to give the false information?

MR. LOEVY: Objection, Your Honor.

THE COURT: That's sustained.

MR. LOEVY: It's the exact same question.

MR. SOTOS: Okay.

BY MR. SOTOS:

Q. It's your testimony that in your case, in addition to the bribe, Detective Guevara pointed somebody out, correct?

A. Definitely.

Q. Okay. And the difference in the Jimenez case is that the witness told the state's attorney that that never happened?

A. I don't recall.

Q. You don't recall that from reading the Jimenez file either?

A. No, I -- today, I don't recall.

Q. You don't dispute it, though?

A. No.

Q. You recall that you spoke to the father -- well, the witnesses -- the witness was -- excuse me.

The suspect who was identified was charged, correct?

A.  He was charged, yes.

Q.  And you were a detective at the time, right?

A.  Yes.

Q.  So you went to Felony Review with the case, to have the guy charged, after you claim 20 years later that Mr. Guevara had pointed him out?

A.  I took it to Felony Review again, apprised them of the fact that I was not happy with the lineup.  I did not tell them, I don't believe, that Guevara put his finger on the picture because I was -- it only had just happened, and I was totally confused myself as to why he would do that.

Q.  You did not tell Felony Review at the time this occurred?

A.  I think for the same reasons I stated before.  I was conflicted --

Q.  Confused?

A.  I was conflicted as to the purpose he did that.

Q.  So how long had you been a detective at that point?

A.  Two years.

Q.  And how long had you been a police officer?

A.  1970.

Q.  And so you testified here on -- about proper procedures, correct?

A.  Right.  And I never saw that before.

Q.  So it's your testimony that you didn't know at the time

Dorsch - redirect by Sotos

2789

that it was wrong for a police officer to point at a photo and say, "That's the guy"?

A. Oh, I knew it was wrong, but I didn't know why he did it.

Q. What's the difference -- what's the difference why he did it if it was wrong?

A. I -- he didn't -- he should've explained it to me why he did it.

Q. I mean, it was another murder case like this one, correct?

A. Now we're talking about the other case?

Q. The other -- the case that you -- the Dorsch case. It was a murder --

A. Yes.

Q. -- case, right?

A. Yes.

Q. Right. And it's your testimony that you had the suspect charged with murder, correct?

A. Felony Review charged him with murder, yes.

Q. Even -- well, you went and sought Felony Review.

A. Right.

Q. You sought murder charges, right?

A. Right. Because we had to ask them. Because we already had one state's attorney come in with the photo I.D., and I told them I wasn't feeling good about the identification. And I don't think I told them about Guevara. Like I said, I didn't know why, so I didn't want to push there.

Q. So --

A. And I knew also that we would need a live lineup, and that would be the next day. All right?

And, again, when I had the same person who reacted to Guevara's touching the photo identify him -- he had already seen the photo, I was not surprised -- and apprised the Felony Review that, again, that I was not happy -- a different person from Felony Review, I believe. That I was not happy with the way the identification went, they said charge him.

Q. I'm sorry. I don't remember what my question was at this point, but -- let me ask you one that I did ask, and I don't -- I didn't hear your answer.

What's the difference why? What does that have to do with anything? If this really happened, why didn't you report it to the State?

A. Well --

Q. Why would you seek murder charges?

A. Because you need the state's attorney to come in and apprise him of the facts. And I didn't tell him about that.

In hindsight, if I had been braver and been able to stand up and accuse another officer, not really knowing why he did something, maybe I should've, maybe I should've. But I find it my personal fault that I was not brave enough, sir, to stand up and say it like it was.

Q. Because you -- according to your testimony, you had two

witnesses, one who didn't identify the suspect and one who only did after he was pointed out, correct?

A. Yes.

Q. And you testified earlier that you told your supervisors, who you couldn't name -- you threw out a Jim Fruin, but you weren't sure --

MR. LOEVY: Objection, asked and answered.

BY MR. SOTOS:

Q. -- correct?

MR. LOEVY: We went through that subject. Let's not --

THE COURT: Sustained.

MR. LOEVY: -- go back.

THE COURT: Sustained.

MR. SOTOS: Judge, this impeaches about his conversations with Felony Review that he had. He said he told other people.

THE COURT: Well, why don't we not ask a question that's already been asked and answered. If you're going to ask about Felony Review, I think that's different.

MR. SOTOS: Okay. But it's only because it relates to that issue, Judge.

THE COURT: Well, I need to hear the question.

MR. SOTOS: Okay. That's fine.

BY MR. SOTOS:

Dorsch - redirect by Sotos

2792

Q. So you said that you sought felony murder charges against the suspect despite what you've testified now had occurred because you weren't brave enough to stand up then, correct?

A. Probably.

Q. And you wish you would have?

A. After all I've gone through, after all these testimonies and all these years, yes, I do.

Q. But while saying all of that, you've also testified that you did tell your superiors in the police department.

A. I told whoever was there, probably not that night. Maybe I did because there's a shift change. I don't know. And that's another conflict. I don't know who was still there at what point in time.

But I know when I came back from the office -- to the office, I know what was said to me, after they were told that I had been to Branch 66 and asked that that kid be relieved -- released. And do you want to know what they told me?

Q. Who?

A. Whoever it was. I can't remember exactly, but I know -- I'll never forget the words.

Q. Tell us the words, please.

A. "Dorsch, what the fuck are you doing? We're never gonna solve this case."

Q. So some unnamed person --

A. And I was told not to write any reports after that.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 789 of 1335 PageID #:106174
Dorsch - redirect by Sotos
2793

Q.   But you were brave enough to go to your superiors and say that, correct?

A.   Yeah.  I was pissed off.

Q.   But you -- you were mad and you -- your testimony is that you were perfectly willing to go tell your super -- your unnamed supervisors about it, correct?

A.   Yes.

Q.   But you didn't tell the state's attorney for whom you were seeking that a person be charged with murder about it?

MR. LOEVY:  Your Honor --

BY MR. SOTOS:

Q.   That's your testimony?

MR. LOEVY:  -- that's argumentative, and he was asked six times.

THE COURT:  Sustained.

BY MR. SOTOS:

Q.   The other aspect of the two cases that were similar is that in both the Jimenez case and the Dorsch case, the witnesses who were saying that they were bribed both said that they were bribed because the person who bribed them was mad at the person he wanted picked out because that person was dating his ex-girlfriend, correct?

A.   Yes.

Q.   All right.  And you're still testifying they're two separate cases?

A.  Let me explain something to you.  The two witnesses in the case I'm talking about could very well be the same two witnesses in the case two years later, who would now be 17 and no longer juveniles.  Okay?  So it could be that they are the same people but now attuned to another case.  All right?

Q.  In the Jimenez case and the Dorsch case, the suspect in both cases was a DePaul student who worked at Walgreens at Irving and Milwaukee streets, correct?

A.  That's correct.

Q.  Are you still saying it's two different -- two different cases?

A.  Yes.

Q.  And you testified in October of 2015 in still another post-conviction case involving Roberto Almadovar and William Nagran.  Do you recall that?

A.  Yes.

Q.  I'm going to show you Defendants' Exhibit --

MR. SOTOS:  What?  228?

BY MR. SOTOS:

Q.  I'm showing you Defendants' Exhibit 228 and ask you to take a look at that and tell me whether you recognize it.

MR. LOEVY:  228?  Oh, we don't have 228, Your Honor.

MR. SOTOS:  Oh.  Is that an additional one?  Oh, I'm sorry.

MR. LOEVY:  Well, if it's not in the pretrial order,

Your Honor, then we object.

MR. SOTOS: It's his prior testimony, Judge. I'm just going to ask him if he recognizes it.

BY THE WITNESS:

A. Yes. Apparently -- excuse me.

THE COURT: Okay. So it's not in the pretrial order, but it's being used for --

MR. SOTOS: Just to refresh his recollection.

THE COURT: All right.

MR. LOEVY: If we could get a copy, then, Your Honor?

THE COURT: Okay. When can I -- can I?

MR. SOTOS: We'll get copies at the end of the day, yes.

BY MR. SOTOS:

Q. Does that refresh your recollection about when you testified in that case?

A. Yes. It's another exoneration that I did testify in.

Q. Okay. And do you recall testifying in that case that the Jimenez file and the case you're talking about are two different cases?

A. Yes.

Q. And to this day, you're still testifying to the same thing, correct?

A. Yes, sir.

Q. You've testified that the person who was your partner and

was actually in the room with you that day when this allegedly happened was your partner in this case, Mr. Boyle; is that right?  Your partner in the case that we're on trial for here?

A.  I believe it was John Boyle.

Q.  Okay.  And so you had previously indicated it was a Bob Johnston, correct?

A.  Early on when we first started talking about it so many years later, I wasn't sure what year it was that the incident happened, as I didn't know when Guevara became a detective.

Q.  Oh, so it was when you learned when Guevara became a detective that you figured out --

A.  It couldn't be Johnston.

Q.  Okay.  So it was just false when you were saying that it was Johnston?

MR. LOEVY:  Objection, Your Honor, argumentative.

THE COURT:  Sustained.

BY MR. SOTOS:

Q.  So how did finding out when Mr. Guevara became a detective help you place the time of this incident?  How did you know it was six months before that?

A.  I didn't say six months on anything.

Q.  Oh, I'm sorry.  Then I misspoke.

How did you -- how did that place the time for you?

A.  Because I knew he got meritoriously promoted about two months after -- maybe it was even a month later -- after that

incident, the Dorsch case, as you're talking about.

Q. So you're able to place this incident in time with when he got promoted?

A. Yes.

Q. You think you might be having a false memory about that?

A. No. He was a Gang Crimes specialist. He didn't need me for a lineup. He did need me for a lineup.

MR. SOTOS: All right. Could I have a minute, Your Honor?

THE COURT: Sure.

(Counsel conferring.)

MR. SOTOS: That's all I have, Your Honor. Thank you.

THE COURT: Okay.

MR. LEINENWEBER: Your Honor, I have about 20 minutes. I can start now, if you'd like.

THE COURT: Okay. Why don't we -- why don't you start.

MR. LEINENWEBER: Thanks, Judge.

THE COURT: I do want to stop at 4:00, though, so when you reach a --

MR. LEINENWEBER: No problem, Your Honor. I will stop.

If you would put that down, I'd appreciate it. Take it down. Thanks.

(Counsel removes exhibit from easel.)

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 794 of 1335 PageID #:106179
Dorsch - redirect by Sotos
2798

THE COURT REPORTER: Mr. Sotos, please take your lavaliere off.

MR. LEINENWEBER: Judge, where should I place it? Because I'm going to draw pictures.

(Counsel holds up easel with paper.)

THE COURT: Oh, a good question that I'm not sure I have the expertise to answer. Make sure the jury can see it and then the lawyers can move, if they need to.

MR. LEINENWEBER: Do you want me to -- can I do it right here?

THE COURT: And I can move if I need to.

MR. LEINENWEBER: Can I do it right here? Do you mind, Jon, if I do it right here?

MR. LOEVY: I don't mind if it's okay for the jury to see it. I don't know if I'm blocking.

MR. LEINENWEBER: Can everybody see that?

(Jurors nodding.)

THE COURT: Are you going to be writing on it or --

MR. LEINENWEBER: Yeah.

THE COURT: Well, you may want to move it a little closer to the jury. I don't know.

MR. LOEVY: This is a good spot for it.

MR. LEINENWEBER: Yeah.

MR. LOEVY: Can I put this over here, Your Honor?

THE COURT: Sure.

Dorsch - redirect by Leinenweber

2799

(Counsel moves easel.)

MR. LEINENWEBER: Thanks, Jon.

Sorry. Thank you. I'll just put it right here.

REDIRECT EXAMINATION

BY MR. LEINENWEBER:

Q. Good afternoon, Mr. Dorsch.

A. Good afternoon.

Q. I think you've said that -- today that the case that you're referring to -- I'm going to call it the umbrella case. Is that a good way --

A. Please.

Q. Okay.

A. It's been referred as that before.

Q. Right. So the umbrella case, the one -- and so we're clear, the umbrella case is the one where you say that -- the one where Mr. Guevara put his -- basically put his thumb on the picture, correct?

A. Yes.

Q. Okay. So there's the umbrella case and then the other case we've been speaking about is the Jimenez case, correct?

A. That you're speaking of, yes.

Q. Okay. And so the umbrella case, to the best of your recollection -- I think you said it occurred around Mother's Day of '89, is that right?

A. It was -- that's -- was to the best of my recollection in

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 796 of 1335 PageID #:106186
Dorsch - redirect by Leinenweber
2800

the many years later that we talked about it, yeah.

Q. Yeah. And I understand that as you look back on things, you try to determine when stuff happens. We all understand it was a long time ago.

So I'm going to write, like, a picture of an umbrella, and I'm going to say "May '89." It's a terrible picture.

So that's when that happened. And we know from the records that you reviewed about that -- well, let me say this.

The Jimenez case, you had some involvement in that investigation, correct?

A. Yes. Those names of the witnesses are familiar to me.

Q. Right. So then the Jimenez case -- so I'm going to put a big J over here -- that was December '91, correct?

A. As -- yes.

Q. Okay. So May of '89 and December '91 is approximately -- would you agree with me it's about 30 months?

A. Okay.

Q. Correct? The umbrella case, as you sit here today, you do not recall what the name of the person that was killed, correct?

A. That's correct. And I didn't recall the name of the person in '91 either.

Q. Understood. But at least the one in '91, the Jimenez case, you've seen reports with your name on it, correct?

A. Yes.

Dorsch - redirect by Leinenweber

2801

Q. Whereas, the umbrella case, you've never seen any reports with your name on it?

A. Correct.

Q. Okay. So you don't know the name of the person that was killed at this -- I'll put D, for decedent, but we know it's Jimenez here.

And I take it you don't remember as you sit here today in the umbrella case the name of the person who was fingered, the person who was identified, correct?

A. That's correct.

Q. Okay. So I'm going to put a question mark here.

But at least for the name of -- excuse me, for the '91 case, the Jimenez case, you know that a Mr. Ramon was arrested, correct?

A. I know that a Mr. Ramon was arrested, but I don't remember the involvement. I don't remember him from the case.

Q. Right. Understood. I'm just asking if you understand the names.

So at least for the umbrella case, we have an approximate date of May of '89. We do not know the --

MR. LOEVY: Your Honor, we're going backwards again.

MR. LEINENWEBER: I'm sorry, Judge. I'll clear it up.

BY MR. LEINENWEBER:

Q. We don't know the decedent, and we don't know -- so two question marks. We don't know the decedent, and we don't know

the suspect, correct?

A. Correct.

Q. Okay. And then I think you said that there were two kids that were brought in by Mr. Guevara in the umbrella case.

A. Correct.

Q. And they are the ones -- one of them, witness No. 1, said, "Oh, yeah, I was gonna pick that guy," after Rey pointed him out, right?

A. Yes.

Q. Okay. And then the second witness, after you ushered that kid out, he couldn't tell you who it was, right?

A. Correct.

Q. Okay. And same thing happened there. They were both brought before a lineup.

No. 1, the kid who had been prodded, he knew who it was, but the second person didn't. Is that fair to say?

A. We're talking about -- as you --

Q. We're talking about the umbrella case.

A. Yes.

Q. And then I think you had found out you talked to, at least in the umbrella case, the defendant, whose name we don't know, that the father came in that night, correct?

A. Yes.

Q. You spoke to the father?

A. Yes.

Dorsch - redirect by Leinenweber

2803

Q.   And the father said the kid had had like a prior felony of some kind, correct?

A.   Yes, he did.

Q.   It was a prior gun felony, right?

A.   Yes, he did.

Q.   And so I take it that when the dad comes in, you're probably a little suspicious of this guy, right?

A.   Suspicious --

Q.   Of the dad.

A.   Of the dad?

Q.   Yeah.  Well, I mean, you've got a guy who a witness has fingered for a murder, and the dad comes in to plead his case. I'm sure that you were like, "Yeah, sure, whatever," correct?

A.   No.  He came in not knowing why his son was there.

Q.   Okay.  So you spoke to him, and he basically explained that this prior gun felony wasn't what it seemed to be, right?

A.   I -- well, first, he said, "My son wouldn't have done something like this.  He's not a bad kid."  And I says, "Well, wait a minute.  He does have a gun arrest."

Q.   Right.  And then the dad explained about the gun arrest. You looked up some paperwork about it, and it turned out the dad was correct, right?

A.   Yes.

Q.   Okay.  So there was a gun arrest here of a suspect that turned out to be -- was it nolle'd or dismissed or it didn't

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 800 of 1335 PageID #:106185
Dorsch - redirect by Leinenweber
2804

seem like --

A.   I don't -- I don't recall.

Q.   Okay.  And then going to the Jimenez case, you know from your review of the reports that Ramon, the suspect, he had a gun case, too, correct?

A.   Totally different.

Q.   But it was a gun case, am I right?

A.   A gun case, but totally different.

Q.   But at least going to write "gun" here and I'm going to write "gun" here, because you'd agree with me that this was a gun case?

A.   Yeah.

Q.   The umbrella case?

A.   Well, I know I --

Q.   Correct?

A.   Yes.

Q.   Correct?  And then Mr. Jimenez has a gun case, correct?

A.   He did have a gun case.

Q.   Thank you.  Then it turns out you go and talk to the two teenage witnesses.  So there's two teenage witnesses in both cases.  So I'm going to run out of room here, but I'm putting two witnesses on both sides.

         THE COURT:  And we're about to run out of time, and you're getting into something complex, so --

         MR. LEINENWEBER:  It's not going to be complex when

I'm done, Judge.

THE COURT:  All right.  Well, I meant complex in terms of time.

MR. LEINENWEBER:  Okay.  I'm almost done.  I'll just --

THE COURT:  Okay.

MR. LEINENWEBER:  Let me just wrap up this part.

THE COURT:  Sure.

BY MR. LEINENWEBER:

Q.  So there's two witnesses to the umbrella case, teenagers --

A.  Uh-huh.

Q.  -- right?  And I think Hispanic teenagers, did you say?

A.  I don't recall.  Oh, wait.  I believe they were both Hispanic in both.

Q.  Okay.  So then we jump to Jimenez, and there were two Hispanic teenage witnesses in that case, too, correct?

A.  There were two named in the Jimenez case and two unnamed that I'm talking about.

Q.  Okay.  And then in both cases, I think Mr. Sotos asked you, both cases, the poor guy that was shot is at a light in a car with a woman or a girl next to him, right?

A.  No.  No.  He's on a side street.

Q.  Oh, a side street.  But he's in a car, correct?

A.  He's in a car.

Q.  And a white car, at least in the umbrella case, a white car

comes up, shoots him, drives off, right?

A. Correct.

Q. And then in the Jimenez case, a car, yellow, white, drives up, shoots him, and drives off, correct?

A. I don't recall specifics.

MR. LEINENWEBER: Okay. Judge, we can break here, if it's good with you.

THE COURT: Okay. All right. 9:30, ladies and gentlemen.

(Jury out.)

THE COURT: Okay. Just to review what you need from me before we start tomorrow.

Now, we're not going to have Wasilewski tomorrow, right? Okay. Good.

Anything that you can anticipate needing me for overnight?

MR. LOEVY: Not from plaintiff.

MR. SOTOS: I don't think so, Judge. We have a little more room than we have now. Thank you, Your Honor.

MS. ROSEN: Yeah.

THE COURT: Okay. Well, just remember that I will be here from 8:00 o'clock. So --

MS. ROSEN: Okay.

THE COURT: -- if you need me, give me some warning so we don't keep the jury waiting. Okay?

2807

MR. SOTOS:  Thank you, Your Honor.

MR. ART:  Thank you, Judge.

MS. ROSEN:  Thank you.

MR. LOEVY:  Thank you, Judge.

(Adjournment at 4:02 p.m. until 9:30 a.m., 6/21/18.)

C E R T I F I C A T E

We, Nancy L. Bistany and Colleen M. Conway, do hereby certify that the foregoing is a complete, true, and accurate transcript of the Trial proceedings, Volume 12-B, had in the above-entitled case before the HONORABLE JOAN B. GOTTSCHALL, one of the Judges of said Court, at Chicago, Illinois, on June 20, 2018.


/s/ Nancy L. Bistany, CSR, RPR, FCRR          06/21/18


/s/ Colleen M. Conway, CSR, RMR, CRR          06/21/18

Official Court Reporters                      Date
United States District Court
Northern District of Illinois
Eastern Division

# EXHIBIT 56

**GENERAL PROGRESS REPORT**
**DETECTIVE DIVISION/CHICAGO POLICE**

| DATE OF ORIG. CASE REPORT | | | DATE OF THIS REPORT | | | |
|---|---|---|---|---|---|---|
| DAY | MONTH | YEAR | DAY | MONTH | YEAR | WATCH |
| 27 | Aug | 88 | 31 | Aug | 88 | 3 |

| OFFENSE CLASSIFICATION—LAST PREVIOUS REPORT | VICTIM'S NAME AS SHOWN ON CASE REPORT | BEAT/UNIT ASSIGNED |
|---|---|---|
| AGG BATTERY | VALENTIN, FELIX | 5537 |

This form is designed for recording handwritten notes and memoranda which are made during the conduct of investigations, including: inter-watch memoranda (handwritten or typewritten), witness and suspect interview notes, on-scene canvas notes, and any handwritten personal notes made by detectives during the field investigation of violent crimes which are used to prepare official Department case reports.

#1 VILLAFANE, ANGEL M/WH/23
21 JULY ■ 1619 N. CALIFORNIA

#2 OLIVERO, CARLOS M/WH/18
14 MAY ■ 2478 N. ALBANY

#3 RIVERA, JACQUES M/WH/23
30 APR ■ 4238 W. DIVISION

#4 RUIZ, GEORGE M/WH/19
28 JAN ■ 2453 N. FRANCISCO

#5 RAMON, LOPEZ, M/WH/20
22 SEPT ■ 1424 N. WASHTENAW

#6 RODRIGUEZ, JOSE M/WH/30 APRIL ■
23 2040 N. SPAULDING

| REPORTING OFFICER'S SIGNATURE—STAR NO. | RECEIVED BY: SUPERVISOR'S SIGNATURE—STAR NO. | DAY—MO.—YR. | TIME |
|---|---|---|---|
| Leonard 5609 | | | |

CPD-23.122 (Rev. 2/83)

R.D. NO. K 371 955

Wron 00064

**PLAINTIFF'S TRIAL EXHIBIT 14**
**PAGE 1 OF 1**

# EXHIBIT 57



1

**RFC  01415**

PLAINTIFF'S TRIAL EXHIBIT 62

1 of 6



**RFC 01416**

PLAINTIFF'S TRIAL EXHIBIT 62

2 of 6



RFC 01417

PLAINTIFF'S TRIAL EXHIBIT 62
3 of 6



**RFC  01418**



**RFC  01419**

PLAINTIFF'S TRIAL EXHIBIT 62

5 of 6



**RFC  01420**

# EXHIBIT 58

951

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JACQUES RIVERA,                              ) No. 12 CV 4428
                                             )
          Plaintiff,                         )
vs.                                          ) Chicago, Illinois
                                             )
REYNALDO GUEVARA, STEVE GAWRYS, DANIEL NOON, )
JOHN GUZMAN, JOSEPH FALLON, JOSEPH SPARKS,   )
PAUL ZACHARIAS, GILLIAN MCLAUGHLIN, JOHN     )
LEONARD, EDWARD MINGEY, RUSSELL WEINGART,    ) June 11, 2018
ESTATE OF ROCCO RINALDI, City OF CHICAGO,    )
                                             )
          Defendants.                        ) 9:20 o'clock a.m.

VOLUME 5 A
TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JOAN B. GOTTSCHALL
and a jury

APPEARANCES:

For the Plaintiff:      LOEVY & LOEVY
                        BY:  MR. JONATHAN I. LOEVY
                             MR. STEVEN E. ART
                             MR. ANAND SWAMINATHAN
                        311 North Aberdeen Street
                        3rd Floor
                        Chicago, Illinois  60607

                        MacArthur Justice Center
                        Northwestern University School of Law
                        BY:  Locke E. Bowman , III
                        357 East Chicago Avenue
                        Chicago, Illinois 60611
                        (312) 503-0844


Court reporter:              Blanca I. Lara
                         Official Court Reporter
                         219 South Dearborn Street
                             Room 2504
                         Chicago, Illinois 60604
                           (312) 435-5895
                        blanca_lara@ilnd.uscourts.gov

Appearances   (continued:)


For the Individual        THE SOTOS LAW FIRM
Defendants:               BY:   MR.  JEFFREY N.  GIVEN
                                MR.  JAMES G.  SOTOS
                                MS.  CAROLINE P.  GOLDEN
                                MR.  JOSEPH M.  POLICK
                                MR.  DAVID A.  BRUEGGEN
                          550 E. Devon Avenue, Suite 150
                          Itasca, Illinois   60143


For the Defendant         ROCK FUSCO & CONNELLY, LLC
City of Chicago:          BY:   MS.  EILEEN E.  ROSEN
                                MS.  CATHERINE M.  BARBER
                                MS.  THERESA B.  CARNEY
                          321 N.  Clark St., Suite 2200
                          Chicago, Illinois   60654


For the Defendant         LEINENWEBER BARONI & DAFFADA, LLC
Guevara:                  BY:   MR.  THOMAS E.  LEINENWEBER
                                MR.  JAMES V.  DAFFADA
                          120 N. LaSalle St., Suite 2000
                          Chicago, Illinois   60602

953

(The following proceedings were had out of the presence of the jury in open court:)

COURT SECURITY OFFICER: All rise.

THE COURT: Very quickly. A juror, Elvia Martinez, approached the courtroom deputy this morning to say that her employer will not pay her for more than one week of jury duty, and she has a trip planned in July. And I guess the connection is, she can't go on the trip if she doesn't have the money. I don't quite understand it. It was not entirely coherent, but at least the way it was communicated to me.

I asked the courtroom deputy to check with the jury department. I have no idea what the law says about this, maybe some of you do. So, anyway, just to inform you of that.

We also have a few minutes. Let's see. On the subject of Mallul, a couple of things.

Please be seated.

One thing is, it's pretty late for a motion in limine, I think too late. But, in any event, I don't think any of the criticisms raised about Mallul would involve barring him in any sense. I think there are a couple of issues that have been raised that probably will be helpful to me in dealing with issues that come up while he's testifying. Let me see where my notes are.

First of all, as was the case with the plaintiff's expert, I really need to have the opinion segregated at some

954

point so I can track what's coming in. And as I think should be obvious, he can testify to the factual assumptions he's making, but they need to be somewhat tied to the opinions he's giving. I'm sure the defense knows that.

He cannot testify as to what was in Mr. Lopez's mind, which he tried to do at one point. He cannot opine on the veracity of any witnesses in the case, I'm sure everybody knows that. And he certainly cannot testify as to whether the prosecutor's office, specifically Ms. Rosner, had good grounds to be satisfied that she could bring this case. And he can't testify to after-acquired evidence regarding Nieves, because that was the subject of a motion. I'm sure that's no surprise to anybody.

So I think with those ground rules, I'm certainly not going to bar his opinions, but I do need to know what his opinions are, and it's not entirely evident at all times from what I've been given.

I made some rulings on the 404(b) issues. I think we can avoid Mr. Perez. I basically looked at all the 404(b) witnesses, and I think that there's -- there's another witness that I excluded because I thought Mr. Perez was slightly less prejudicial. But if Mr. Perez goes out, I think the probative nature probably shifts the balance in favor of another witness. And it seems to me the closest one is Diaz, but we can talk about that at lunch time. That avoids all the issues that the

955

defense has raised about Perez. So we'll talk about that a little bit at lunch time and go into that.

And I think with that, I'm ready.

Now, where do we stand with -- I think there was an issue with Mr. Lopez and whether we needed to do something in terms of when he was going to be available.

MR. LOEVY: Your Honor, it looks like he doesn't want to be testify. I think we're going be doing him by video.

THE COURT: Okay.

MR. LOEVY: We've been working with Mr. Given trying to get the deposition in a place where it needs to be to play tomorrow.

And we apologize. It's going to impose a little bit on the Court, because we're going to be dumping objections on you for you to umpire. Maybe at lunch, maybe at the end of the day, but we'd like to play it tomorrow if we could get that ruling.

THE COURT: Well, the easiest way is as we did the last time, if you give me the transcript and give me some way to indicate what you're putting in and what the objections are, then I can take it home with me and deal with it.

MR. LOEVY: All right. We were hoping to play it tomorrow. So maybe --

MR. GIVEN: We've been working hard on it, Judge. And we're close. We're going to talk at lunch about trying to

resolve a couple of things ourselves.

THE COURT: Right.

MR. GIVEN: And then the hard part, honestly, is putting them all on one document so that it's efficient for everybody to look at one sheet of paper, and not sheets of paper.

THE COURT: Right.

MR. LOEVY: We'll hurry as fast as we can, Your Honor.

THE COURT: I want to just give you the bottom line on the 404(b) at lunch time, but most of it we've gone into it. That'll probably take five minutes and then we'll go to lunch.

MR. GIVEN: Judge, will you be entertaining a discussion of that at lunch time? Because we do have some problems with Ms. Diaz that are separate and apart --

THE COURT: That were not raised before?

MR. GIVEN: Well, that she was -- she was withdrawn. I don't remember all the details right, but Ms. Diaz was withdrawn as a witness a long time ago. So we have not prepared for her at all because they withdrew her.

THE COURT: Look, I've got to get the jury in here; it's time. I can't hear that you haven't prepared on anything. So I'm trying to -- I was trying to respond to the objections you raised with Perez.

MR. GIVEN: Right. My only question was whether we could have a short discussion. We'll have it very concise for

957

you.

THE COURT: Great. Make it concise and we'll talk about it.

MR. GIVEN: Okay.

THE COURT: Okay, we're ready.

(Brief pause)

COURT SECURITY OFFICER: All rise.

(The following proceedings were had in the presence of the jury in open court:)

THE COURT: Please be seated, ladies and gentlemen.

One of the members of the jury raised a question with my courtroom deputy this morning. I understand what the question is and I will get back to you later. I don't know who asked the question, but I will get back to you later in the day with whatever information I can get.

Okay, let's proceed.

MR. POLICK: Thank you, Judge.

GILLIAN MCLAUGHLIN, DEFENDANT HEREIN, PREVIOUSLY SWORN

RECROSS EXAMINATION

BY MR. POLICK:

Q. Ms. McLaughlin, good morning.

A. Good morning.

Q. When we left off on Friday, Mr. Loevy had asked you some questions about your August 27, 1980 report that is Defendants' Exhibit 1.12.

Do you have that in front of you?

A. What's the exhibit number?

Q. 1.12.

A. I have Plaintiff's Exhibit 19 E.

Q. Here you go.

(Document tendered to the witness)

BY MR. POLICK:

Q. All right. And Mr. Loevy asked you some questions about that document. You testified that it was signed by two different sergeants, do you recall that testimony?

A. Yes.

Q. Okay. So the one that you have in front of you, Defendants' 1.12, who is that signed by?

A. I believe it was a Sergeant Sarnacki.

Q. All right. And then if I show you Defendants' 3 B, if you could just take a look at that.

(Document tendered to the witness)

BY THE WITNESS:

A. Yes.

BY MR. POLICK:

Q. And is that a report prepared by you?

A. Yes.

Q. And that's your August 27, 1988, report?

A. Yes.

Q. All right.

MR. POLICK: Judge, I would move to admit Defendants' Exhibit 3 B.

THE COURT: Any objection?

MR. LOEVY: No, Your Honor.

THE COURT: It is received.

(Defendants' Exhibit 3 B admitted into evidence).

MR. POLICK: Thank you.

BY MR. POLICK:

Q. And do you see the sergeant's approval on that particular report?

A. Yes, I do.

Q. And who is the sergeant that approved that report?

A. Sergeant Rinaldi.

Q. And can you explain why it was signed and two different sergeants?

A. Well, I'm not absolutely sure, but when I was reviewing the

reports I noticed that one of the copies that Sergeant Sarnacki had signed, there were black spots that indicated holes.

When we do reports, we put them on -- one of the copies that we make is for information for the office. So that if somebody calls from downtown, they have a reference, because there's a lot of cases and they want to keep track of what's going on.

So I'm thinking that it was on the board, he saw it. He was a brand new detective sergeant and he signed it, that's all I can think of. I don't know why.

Q. And this report you would have submitted it for approval in the basket that you testified to?

A. Yes.

Q. All right. I want to turn now to exhibit -- Defendants' Exhibit 1.23. That's your August 27th report, GPR General Progress Report regarding your interviewer with Mr. Lopez.

Do you have that in front of you? If not, I have a copy here.

A. I'm just looking.

(Brief pause).

BY MR. POLICK:

Q. Were you taking down these notes as you were interviewing Macho Lopez?

A. Yes.

Q. Okay. And then when you -- you note here, "18 years of

age, Kings," have seen that before?

A. Yes.

Q. Can you explain what that information is?

A. It was telling me about the offender that he had seen shooting Felix Valentin.

Q. Okay. And this particular GPR was also submitted into the sergeant's basket that you've testified to for approval?

A. Yes. Yes, it was.

Q. And it was, in fact, approved?

A. Yes, it was.

Q. Who was the sergeant that approved this GPR?

A. Sergeant Rinaldi.

MR. POLICK: Judge, I don't have any further questions.

THE COURT: Okay. Let's see. And --

MR. LEINENWEBER: I just have one question, Judge, thanks.

RECROSS EXAMINATION

BY MR. LEINENWEBER:

Q. You testified on Friday, you were talking about in your experience how lineups were conducted while you were a detective --

A. Yes.

Q. -- do you remember those questions?

And I believe you said that typically it was the

detectives that ran the lineup, is that correct?

A.  Yes.

Q.  So if -- if -- if there were detectives conducting a lineup -- excuse me.  Strike that.  Sorry.

If there were detectives and Gang Crimes both there at the same time, who would conduct the lineup?

A.  I would say the detectives.

MR. LEINENWEBER:  That's all I have.  Thanks, Judge.

MS. ROSEN:  I have no further questions.

THE COURT:  Anything further?

MR. LOEVY:  Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. LOEVY:

Q.  You were asked questions a moment ago about the August -- about lineups, do you remember the question there?

A.  Well, he just said if I remember the questioning.

Q.  And the issue is, on August 31st who would have been in charge of the lineup, yourself or he Gang Crimes people, if the lineup happened?

A.  We would've been in charge of it.

Q.  And you guys got that lineup set up, correct?

A.  We had the people in place, but the lineup never took place.

Q.  And to your knowledge, the August 31st first lineup didn't happen?

A.  Yes, that's correct.

Q.  All right.

MR. LOEVY:  Your Honor, I have no further questions for this witness either.

THE COURT:  Anything further?

MR. POLICK:  No, Your Honor.

THE COURT:  Thank you.  You may step down.  Watch your step.

THE WITNESS:  Just leave the reports here?

THE COURT:  Just leave everything there.

THE WITNESS:  Thank you, ma'am.

(Witness excused.)

MR. LOEVY:  May we have a moment?

THE COURT:  Sure.

(Brief pause)

THE COURT:  Let me know when you're ready.

(Brief pause).

THE COURT:  And could one of the lawyers collect all the documents that are left on the witness stand, please.  Thank you.

MR. POLICK:  Yes, your Honor.  I'm sorry.

MR. ART:  Your Honor, we're going to present a stipulation between the parties to the jury.

THE COURT:  Okay.  Ladies and gentlemen, remember a stipulation is an agreement.

MS. SCOTT: Explicitly for purposes of evaluating the City's policies, practices, and customs between January 1st, 1985, to December 31st, 1991, related to documenting the results of lineups, it is hereby agreed and stipulated that this time period shall be considered a representative sample for purposes of considering the City of Chicago's policies, practices or customs.

The parties reviewed 435 homicide investigative files for that time period. And that set of files is to be considered a representative sample for purposes of assessing the City's policies and practices regarding lineup documentation in this case.

MR. LOEVY: Your Honor, plaintiff calls Dr. Gary Wells.

THE COURT: Okay. Dr. Wells.

(Brief pause).

THE COURT: Please raise your right hand.

(Witness duly sworn.)

THE COURT: You may be seated.

GARY WELLS, PLAINTIFF'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. ART:

Q. Sir, can you state your full name for the record, please.

A. Yes. My name is Gary Wells, G-a-r-y, last name W-e-l-l-s.

Q. Dr. Wells, what's your profession?

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 829 of 1335 PageID #:106219
McLaughlin - redirect by Loevy
965

A. I'm a professor of psychology at Iowa State University.

Q. Do you have a specialty?

A. My specialty is in cognitive and social psychology, but more specifically I study reliability of eyewitnesses.

Q. How long have you been studying eyewitness identification?

A. 42 years now, I believe.

Q. Tell the jury what an eyewitness ID psychologist studies, just in general terms.

A. Well, in general, what we're doing, what we do is we look at the factors that increase and decrease the reliability of eyewitnesses to crime, and we study those using various methods.

Q. Have you studied how police departments conduct eyewitness identifications?

A. Yes, I have.

Q. Have you trained police departments?

A. I have.

Q. And have you developed police policies in these areas as well?

A. Yes, I have.

Q. Please tell the jury what you studied in this case.

A. In this case, I was asked by Jacques Rivera's attorneys to take a look at files, homicide files, that were drawn from Area 4 in the years 1985 to 1991, with a particular interest in whether the results of those -- of lineups in those cases over

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 830 of 1335 PageID #:106215
McLaughlin - redirect by Loevy
966

that period of time resembled, or not, the results that other jurisdictions report from their lineups.

Q. Okay. And by "results" what do you mean?

A. Well, there are three kinds of results you can get from a lineup, three categories, and only three:

One is the witness can identify the suspect in the case.

A second possibility is that a witness can identify no one, and make no identification at all.

But a third important possibility is that the witness will pick a filler. And a filler being a known innocent member of the lineup who is placed there merely to fill it out and help make it fair to the suspect.

Q. And you said you studied data from homicide files in Area 4. Are you sure it was Area 4 and not Area --

A. Oh, Area 5. Did I say 4?

Q. Yes.

How many total homicide files did the data come from?

A. There were 435 homicide files.

Q. And in the those files how many total lineups did you looks at?

A. And there were 980 lineups identified, conducted in those files.

Q. And how many Official Lineup Reports did the Chicago Police Department report that an eyewitness had selected a filler from

a lineup?

A. Zero.

Q. How unusual is that?

A. It's so unusual that we would normally consider that to just basically be impossible.

Q. How often does science tell us a filler should be selected?

A. Well, fillers in lineups are selected about one out of every four times the witnesses observe a lineup.

Q. Have there been studies on how often filler identifications are reported by other police departments?

A. Yes. And that's where we actually get the nearly one out of four. 23.7 percent of the time in cumulatively, as we've looked at these lineups in police departments, 23.7 percent of the time witnesses identify a filler, a known -- mistakenly identify a known innocent filler.

Q. Okay. Do other jurisdictions then report these filler identifications?

A. Yes.

Q. And did they do so in the 1980's?

A. Yes.

Q. Is there a mathematical way that you can reconcile the total absence of filler identifications in the Chicago Police Department with about a quarter of a time filler identification rate in other jurisdictions?

A. Well, that would be very difficult to reconcile. You would

have to -- it's such an extreme difference that you would have to make an assumption that, for example, that it's a combination of things. For instance, sometimes when a witness identifies a filler, it's being called something else. Other times, maybe there's a failure to even do a Lineup Report when a witness identifies a filler as if they're -- you know, "We're missing reports."

Q. Tell the jury why it's important to accurately report a filler identification.

A. Well, filler identification is very important because, first of all, it's a form of evidence. It tells you something about also the credibility of that witness. If a witness identifies a filler, you know instantly that they've made a mistake in identification. That tells you going forward that maybe you don't want to use that witness --

Q. Let me stop you right there and interrupt. Why do you know a filler selection is a mistake in identification?

A. Well, by definition, a filler is a known innocent who's placed in a lineup. I'm mean, you know, back in the early days of like lineups, sometimes they might use police as fillers in a lineup. And so you pick Officer Krupke, no one is going to charge Officer Krupke with a crime. They're there to help protect an innocent suspect against just being picked by chance.

But another -- so another reason is because it's

exculpatory. I mean, it's evidence that the person who was the suspect in the lineup is not, in fact, the perpetrator, because, in effect, what the eyewitness is saying is that this person, who I picked, say number five who turns out to be a filler, looks more like the perpetrator than your suspect does who is standing in position three.

Q. Okay. Let's talk a bit about your background. Please tell the jury about your training and your academic career.

A. Well, starting, I earned my Ph.D. at Ohio State University, so experimental social psychology and cognitive psychology. And I began doing these kinds of experiments, I pioneered this kind of work doing experiments on eye witness identification while I was still in graduate school, and started publishing articles and results of those studies.

Q. Where do you teach today?

A. Today? I'm a professor at Iowa State University.

Q. Okay. How many articles have you published on eyewitness identification?

A. I don't know that number. I would -- I think it's probably a little over 200.

Q. Okay. Have you refereed articles for Journals as well?

A. Yes. You know, I peer-reviewed or refereed, same idea, journal articles. I reviewed those for major journals. I'm on the editorial boards for major journals that publish studies on eyewitness identification.

Q.  Okay.  Let's talk about your research on eyewitness identifications.  You said you've been conducting that research about 40 years?

A.  Yes.

Q.  Who currently funds your research?

A.  The National Science Foundation.

Q.  And describe for the jury, just in general, the major types of studies that are conducted in your field.

A.  Okay.  So there are three types of studies that -- that we do.  The main and first, and still the kind of staple kind of work that we do is, we create events for unsuspecting people.  And because we created the event--for example, a theft or some kind of staged criminal action--we know who the perpetrator was.  And not really a perpetrator, one of our people.

We then follow that up with some kind of lineup.  And then that allows us to examine how often witnesses are able to pick him out, if he's even there.  When he's not there, how often do they reject, or how often do they pick a filler.

And then we go back into those kinds of experiments and we begin to systematically manipulate things:

Like the view they got, whether it was within race or cross-race identification.  Things like how long between the time of the crime of -- of the crime that we staged for them, and the time of the lineup.  The instructions they get prior to viewing the lineup.  See how they respond to, for example,

things like queueing or, you know, leading them toward or away from a particular member of the lineup.

And we can just study those things in terms of how that affects the behavior, and the choosing, and the accuracy of the witness.

Q. What's that kind of study called?

A. Those are experimental studies.

Q. And what's the goal, just in general terms, of an experimental study?

A. Mostly it's to isolate cause and effect relations. So because we manipulate one thing at a time, and when we observe what happens we can infer, when we do it right, that that one thing that we manipulated caused a change in the rate of accurate or mistaken identifications.

Q. Okay. Have you done experimental studies in your career that have absolutely nothing to do with filler identifications?

A. Oh, yes. We have lots of studies that we do that are not necessarily just focused on filler identification. Although, anytime we do an identification study, we always look at what happiness with regard to the identification rates.

Q. Okay. When you do an identification that doesn't have to do with filler identifications in particular, does that mean that filler identifications don't have real-world effect?

A. Oh, no. Filler identifications are always of importance.

Q. Okay. Why are they always of importance?

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 836 of 1335 PageID #:106261
McLaughlin - redirect by Loevy
972

A. Because they're an indication of how reliable the witness is. When a witness makes an identification of a filler, it is a mistaken identification, no matter how you look at it.

Q. Okay. So experimental studies are the first type, what are the other two?

A. So the second type is what we call -- we call generally Field Studies. These are studies of actual lineups conducted by police departments in actual cases. And so, for example, you know, we -- we go into -- there's two types, one is going into the records and look at past cases. You look at every lineup that's been done, and what's the result of that lineup: How often are witnesses picking fillers. How often are they picking the suspect in the case. How often are they making no identification.

Q. And is that what you did in this case, essentially?

A. That's what -- that's the kind of data that we -- that I was provided with in this case with regard to Area 5.

Q. Okay. Please continue.

A. And this has been done in other places, a wide variety of places, ranging from California, to North Carolina, to London, England. There are now 11 of these that are peer-reviewed and published.

Q. Okay. And what's the third type of major study --

A. And the third type is a little different, it's a little more qualitative type as opposed to the quantitative type.

And in this qualitative type, we're looking at cases of wrongful conviction.  People who were innocent.  Mostly we focused on DNA exoneration cases, because it turns out that 72 percent of DNA exonerations are cases that involve a mistaken -- one or multiple mistaken witness identifications that resulted in that conviction of an innocent person.

Q.  Okay.  Let's finish talking about your experience.  Do you serve on committees that consult on eyewitness ID issues?

A.  Yes.

Q.  Tell the jury about that.

A.  Well, there have been a lot of Innocence Commissions and committees around the country.  One of my first was for the State of New Jersey, and then North Carolina, and then the Boston Police Department, Suffolk County, Massachusetts Police Department, and so on.  Where they were looking at this sort of epidemic problem that's been with us forever, really, of mistaken eyewitness identification, and how can you better manage that, how can you lower the risk to innocent suspects, and what kinds of documentation and procedures are best to use.

Q.  Have you worked with the Department of Justice?

A.  Yes; the U.S. Department of Justice in the '90s under the Attorney General.  She appointed me to work with law enforcement and prosecutors from across the country.

We spent about a year and a half meeting and developing.  We came out of it developing a guide on eyewitness

identification for law enforcement that was mailed to every law enforcement agency in the United States, over 17,000 law enforcement agencies on United States.

Q. Do you lecture on eyewitness identification?

A. I do.

Q. Tell us about the lecturing that you've done.

A. Well, the lecturing is to a variety of audiences. In some cases, defense attorneys, but also prosecutors, judges, at the national level, and at state levels, and more local levels as well, and law enforcement.

Often my audiences are mixed. They'll have people from law enforcement, as well as judges, and some prosecutors, and some defense attorneys, and people from various innocence projects.

Q. Let's talk more about your experience working with law enforcement. In how many states have you consulted with law enforcement agencies?

A. Well, I think if by "consulted" you mean that I've interacted with them and shared information with them directly, face to face, that would be about 30 states would be my estimate.

Q. Okay. Describe for the jury the types of work that you do with law enforcement agencies.

A. So what I do is, I usually start off by -- they're usually coming to me, and so I'm not pushing myself on them.

So they ask me for advice about their policies and procedures. First thing I do is find out what are their policies and procedures, how are they doing these things. And then I share with them what we've learned in the science, as well as, because I've worked with so much, so many people across the country in law enforcement, other just good practices that other agencies have brought to bare.

I help them develop procedures. When we developed the procedures out of the Department of Justice, I shared those procedures with them and those guidelines. When I worked with the State of New Jersey to reform their procedures in 2002, it became even more concrete.

So we had these good examples that we would share, sort of protocols, or, you know, methods of implementing eye witness identification procedures and making records for eyewitness identification procedures that we then would give out to other places across the country.

Now they're posted online. There are educational tools online. Even in our Department of Justice Report, we followed up a year later after the initial report was published in '99 and distributed. In 2000 we put online and on DVD in those days --

Q. Okay. Let me stop you there?

A. -- a training manual.

Q. Are you familiar with how police departments were

conducting lineups in the 1980's?

A.  Yes.

Q.  And does that include how they were documenting lineups?

A.  Yes.

Q.  Did you rely on that experience in arriving at your opinions in this case?

A.  I did.

Q.  Have you served as an expert witness in other cases before?

A.  I have.

Q.  How often do you do that?

A.  It's pretty rare.  It's not one of my favorite things to do.  I mainly am interested in working with the legal system to improve procedures, but maybe one case a year I'll get involved in it at some level.

Q.  Okay.  Has our firm paid you in this case?

A.  Yes.

Q.  How much, total?

A.  I think about $12,000 since I first got involved, which is in 2014.

Q.  Okay.  And what's your hourly rate for work on this case?

A.  400 a hour.

Q.  Is that a customary rate for an expert with your experience in your field?

A.  It's pretty typical, yes.

Q.  Okay.  Let's outline some of the basic concepts that apply

McLaughlin - redirect by Loevy

977

to your work in this case, Okay. And you mentioned this already, but what are the possible results of a lineup.

A. Well, there are really only three. The witness can identify the suspect. There should only be one -- a proper lineup should only really have one suspect. And the suspect may or may not be the perpetrator. The suspect doesn't mean peremptory. Suspect means the person who is focused on.

So they can identify that person. They can make no identification. They can say, "I don't know," or "I don't see the guy there," or they can identify one of the fillers.

Q. Okay. Suppose that an eyewitness picks a filler out of a lineup instead of the suspect, okay. Is it okay to report that identification as the identification of a suspect?

A. No.

Q. And is it any better to report that identification as a non-identification?

A. It's not a non-identification. It's an identification of a filler.

Q. Okay. So --

A. An innocent filler.

Q. So let's talk in detail about why you have to accurately report the identification of a filler. You mentioned it's evidence in a criminal case, what do you mean by that?

A. Well, it's -- it's -- it's evidence because the -- in a variety of ways. Really, there's more than one way. I mean,

McLaughlin - redirect by Loevy

978

it's evidence that the jury, or a judge, or a prosecutor should -- should ultimately look at to make an assessment about whether this eyewitness is reliable with regard to who they saw at the crime.  After all, they just made an identification of a known innocent person.

Q.  So because it's evidence, you got to write down what the witness actually says during the identification procedure, correct?

A.  Everything that happens in that identification procedure has to be fully documented.

Q.  Okay.  Showing you City Exhibit 11, which I believe is already in.

(Brief pause).

(Exhibit published to the jury.)

BY MR. ART:

Q.  Are you familiar with this general order?

A.  I am familiar with this general order.  This is -- this appears to be the Chicago Police Department general order on lineup procedures for 1983.

Q.  And in paragraph J here on the second page, how often does it say that a lineup has to be documented?

A.  In every case.  More specifically, it says, "In no case will a lineup be conducted without an Supplementary Report being completed."

Q.  Okay.  Does this written policy say anything about

recording filler identifications as negative identifications or non-identifications?

A.  No.

Q.  All right.  In fact, what does the policy say here in paragraph J 6 about what you have to record in every single identification procedure?

A.  Well, there's -- there's a list of 9 mandatory things, but -- but number 6 is particularly -- particularly important, the name of the person s identified in the lineup.

Q.  Okay.  And why is that important?

A.  Well, because that means that, you know, if it's a filler identification, it has to be -- you have to call it a filler -- you have to call it an identification.  If they named that person, even though they're a filler, doesn't matter whether they're a filler or the suspect, you have to name that person who was identified in the lineup.

Q.  So on its face, does the City's policy require a filler identification to be reported?

A.  In my reading of this, in my view, it's mandatory to report filler identifications as filler identifications.

Q.  Okay.  And based on your study in this case, was that happening?

A.  Well, no.

Q.  Okay.  Let's go back to the reasons it's important to accurately report a filler identification.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 844 of 1335 PageID #:106229
McLaughlin - redirect by Loevy
980

Tell us more about what a filler identification says about the credibility of the eyewitness.

A. Well, it -- it -- there's only one response that an eyewitness, in an actual case as opposed to do one of our experiments, because we know ground-truth in our experiments, but in actual cases there's only one response that an eyewitness can make at the time of a lineup that clearly is evidence of unreliability of a credibility problem, and that's to pick a filler.

I mean, if they say, "I don't see the guy there," well, that doesn't mean they're wrong. I mean, maybe he's not there. If they pick the suspect, that might or might not be, you know, the guilty party. But whenever they pick a filler, you know instantly that's a mistake.

And so it's important in the sense that it affects the credibility of that witness. It's important, as well, which tends to follow from that, that you probably -- I mean, for the most part, it could be argued that you probably shouldn't use that witness; that is --

Q. Why not?

A. Because the witness has shown a willingness, propensity, a capacity to mistakenly identify someone. Now, if you show them a subsequent lineup, then how do you interpret the second identification?

Q. Okay. So suppose you're in a situation where a witness

picks a filler the first time, and then is used again, okay. How does that information become important in the criminal justice system?

A. Well, by carefully documenting the first filler identification, it is then a matter of record. That's exculpatory type of evidence, which we haven't talked about much yet, but it's exculpatory type of evidence. And so it would be mandatory minimum to share it with the defense should anything ever go to trial. Everyone should know if that witness turns around and identifies maybe that same person in a subsequent lineup or somebody else in a subsequent lineup, then the trier of fact, the judge and the jury, everyone should know that that first lineup the witness made a mistake in identification.

Q. What do you mean when you say it's exculpatory evidence?

A. It's exculpatory in the sense that -- you know, it's easier to show this with our -- with our experiments, and that is that when an eyewitness picks a filler, it tends to happen primarily when the suspect in the lineup is not the culprit. If the suspect in the lineup is the culprit, then that person shouldn't look more like him than anybody else in the lineup.

So it's exculpatory in the sense that what the witness is saying is, that person looks more like the perpetrator than this filler, than anybody else's in the lineup, including the suspect in the case.

Q. Okay.

A. So in that sense, it tends to be exculpatory. It's evidence of that -- that points towards innocence of the inspect.

Q. Okay. So when a witness makes no identification from a lineup, is that exculpatory as well?

A. It's -- it's exculpatory, it kind of depends on -- I mean, how exculpatory it is depends on a number of things, including, you know, if a witness just simply says, "I don't know, I can't pick anybody," then that kind of non-identification or no identification is of little exculpatory value.

If the witness really affirmatively says, "Definitely the person I saw is not in this lineup," that's exculpatory as well, you know, in the sense that a filler identification is -- is exculpatory.

Q. So if they're both exculpatory, why is it necessary to record a filler identification for what it is instead of a non-identification?

A. Well, they're both exculpatory. Non-identifications are no identifications, and filler identification. They both point in the exculpatory direction, but that's where the similarity ends. They're distinct because when the witness makes no identification, they're still potentially a credible witness, right. They haven't picked -- they haven't picked an innocent person. They might be right. It may be none of those people.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 847 of 1335 PageID #:106232
McLaughlin - redirect by Loevy
983

So the right thing to do is to make no identification. But when a witness picks a filler, that reflects directly right back on the credibility of that witness. It's always a mistake. And so you should never confuse those two kinds of identification decisions by a witness of no identification versus a mistaken identification of a filler.

Q. Okay. Switching topics. Please explain to the jury why eyewitnesses pick fillers.

A. Well, you know, eyewitness identification is a very difficult task. We -- there are all kinds of things going on at the time they're witnessing; there's fears, there's stress, there's problems with distance, things happen quickly. There might be -- there are lots of distracting things, things that you have to look out for. It all unfolds very quickly.

And so witnesses often have relatively weak memory to start with. Then when they come to a lineup, everyone fits the general description. If it's properly constructed, everyone fits the general description of the person that you said you saw. And so under those kinds of circumstances, people tend to look at the lineup, and it's difficult to make a good, strong identification. They tend to pick who looks most like him, if they're going to pick anybody.

And if it's not -- if the perpetrator is not in the there, then most of the time, because there's more fillers than there is the one perpetrator, it's going to be one of the

fillers who looks most like him.

Q. Okay. So let's get into the data you looked at in this case. You said you compared the rates of suspect no identification and filler identification in Chicago versus other jurisdictions, correct?

A. Yes.

Q. How did you go about doing that?

A. Well, I was provided with a spreadsheet set of results, as well as PDF's. So the underlying case files from these 435 cases that -- that produced 908 lineups. I did a spot-checking of -- and those were all categorized in terms of what were the outcomes, how many suspects there were, how many witnesses there were, what the witnesses did, so on and so forth.

Q. Let me interrupt you, then, and walk you through it more step by step, Okay.

A. Yes.

Q. So you looked at the 435 homicide files, correct?

A. Right.

Q. How many Official Lineup Reports were there in those files?

A. There were 980 -- oh, Official Lineup Reports? There were like 666, I think, Official Lineup Reports.

Q. Okay. And showing just you at this point what has been marked as Plaintiff's Exhibit 154 A.

What sort of report is that?

A.   It is a Lineup Report form.  It's on a supplementary report form, but as you can see if you look most of the way down that page, you can see that it says it's Lineup Report.

Q.   Okay.  And is this what you mean by Official Lineup Reports?

A.   This is it.  That would be an official Lineup Report, yes.

MR. ART:  We move to introduce 154.

THE COURT:  Any objection?

MS. ROSEN:  No objection.

THE COURT:  It is received.

(Plaintiff's Exhibit Lineup Report admitted into evidence).

MR. ART:  May we publish it to the jury?

THE COURT:  You may.

BY MR. ART:

Q.   You mentioned on the front page of these Lineup Reports they're written on a Supplementary Report, correct?

A.   Yes.

Q.   They say Lineup Report?

A.   Yes.

Q.   And then what information do these reports relate, in general?

A.   Well, I mean, they have information about who is conducting the lineup.  In this case, for example, Detectives Curly and Oshay.  Who's viewing the lineup.  And then the persons

participating, these are the lineup members.

So it's not uncommon to have this other information there: Their ages, maybe height, weight, and so on. And so you can see how many that way were in the lineup. And then it comes down to a point where, in this case it says "Identification - none." And so what's being reported here is that--and it's in the narrative right down below it--that the witness that viewed the lineup was unable to make any identification of the members in the lineup.

Q. Did all the Official Lineup Reports that you looked at follow the same general format?

A. They follow the same general format, yes.

Q. What type of identification does this one report?

A. No identification.

Q. Okay. In addition to the Official Lineup Reports, did you look at other police reports that reported the results of identification procedures?

A. Yes. If in the file there was some other kind of report that would somehow make reference back to the idea that there was a lineup conducted, or that there was some kind of outcome information, that was -- that was scored as well.

Q. Okay. Were the files that you reviewed collectively, and the jury just heard the stipulation, but do you understand them to be a representative sample of the Chicago Police Department's homicide files?

McLaughlin - redirect by Loevy

987

A.   I'm aware of the stipulation that these are representative, yes.

Q.   Okay.  In terms of coding the data from those files, who coded the data?

A.   I did not code them.  They were coded by Jacques Rivera's attorneys.

Q.   So our firm?

A.   By the firm.

Q.   Okay.  Is it common in your field to rely on data complied by others?

A.   Yes.

Q.   And you mentioned before, you were given all the underlying files, correct?

A.   I had the underlying files, yes.

Q.   Did you spot-check the data?

A.   I did.

Q.   Tell us how you did that.

A.   Well, I randomly picked 30 to 35.  Began to look at those and go into the coded system, and see if my coding, my reading of those, my scoring of those, agreed with what Jacques Rivera's attorneys' firm had produced.  They did.  I saw, rather quickly, that the process was largely a mechanical process.

Q.   What do you mean by that?

A.   Well, that it -- the results and the ability to code these

McLaughlin - redirect by Loevy

988

kind of just leap out at you. I mean, you just have to look at it, and say, "Okay, there. There's your result, no outcome" or, "There's the number of witnesses, 1 or 4." "There's the number of suspects in the lineup, 1 or 3.

Q. Okay.

A. Which is not to say that there weren't occasional, you know, potentially an occasional ambiguity. Undoubtedly there would be some in there, but, for the most part, it's kind of just a mechanical counting process.

Q. Did your spot-checking satisfy you that the data was accuracy?

A. Yes.

Q. Did the defendants have an opportunity in this case to point out any mistakes in that data?

MS. ROSEN: Objection, Your Honor.

BY THE WITNESS:

A. They did.

THE COURT: I'm, sorry what's the objection?

MS. ROSEN: Foundation.

THE COURT: Oh, does the witness have any basis for knowing?

BY MR. ART:

Q. Did you sit for a deposition in this case?

A. I did.

Q. At that deposition did the Defendants point out errors in

the dataset?

A.  They found a few.  They weren't consequently.  They didn't find any filler ID's that.

Q.  When you say "a few," do you mean 5?

A.  5 may be the number.  I can't remember.  It seems to me it took them a couple of hours to go through them.

Q.  Okay.  Are you familiar with the report of the defense expert John Wixted in this case?

A.  Yes.

MS. ROSEN:  Objection, Your Honor.  Beyond the scope of his disclosure.

THE COURT:  Now I don't have it in front of me.  Did he --

MR. ART:  Not in his report, Your Honor.

THE COURT:  All right.  Well, then it's sustained.

MR. ART:  Okay.

BY MR. ART:

Q.  Do you expect a few errors in a dataset like this one?

A.  Well, I would, because, you know, you have different detectives writing reports, and there are 980 potential lineup outcomes to code from what -- you know, and sometimes occasionally ambiguous and difficulty to find, and especially if a outcome isn't really fully reported in the official report but instead is buried in some other kind of ancillary report.

Q.  Okay.  So there's some errors.  Given that there is zero

documented instances of filler lineup -- filler ID's being reported, how many errors would it have to take to change the opinions that you arrived at in this case?

A. Well --

MS. ROSEN: I'm going to object, Judge. Beyond the scope.

THE COURT: Sustained.

BY MR. ART:

Q. Okay. Let's talk about the data that was coded, okay. I'm going to show you what has been marked as Plaintiff's Exhibit 150.

MR. ART: If we could just have it on his screen for now.

I'm going to bring it to you so you can look at it.

(Document tendered to the witness).

BY MR. ART:

Q. What is Plaintiff's Exhibit 150?

A. This is a hardcopy of the electronic files, Excel file of these lineup outcomes as coded by the Loevy firm.

Q. Okay. This is the result of the coding process that you just described, correct?

A. Yes.

Q. And is this the data that you relied on in reaching all your opinions in this case?

A. Yes.

MR. ART: Your Honor, we move to admit Plaintiff's Exhibit 150.

THE COURT: Any objection?

MS. ROSEN: Yes, Judge. He didn't prepare the data and he didn't prepare the coding. So we object.

THE COURT: But this is a report based on --

MR. ART: It's our position it comes in under 1006, Your Honor.

THE COURT: Can I see it?

MR. ART: Of course, Your Honor.

(Document tendered to the Court.)

THE COURT: Thank you.

(Brief pause).

THE COURT: Did Professor Wells rely on this?

MR. ART: Yes, Your Honor.

THE COURT: All right. Overruled.

MR. ART: So if we could publish the first page of Plaintiff's Exhibit 150 for the jury.

(Exhibit published to the jury.)

BY MR. ART:

Q. Okay. There are a couple of header rows there, correct?

A. Yes.

Q. And then, after that, you have rows and rows of data, right?

A. That's correct.

Q. And what does each row of data represent?

A. Each row represents a -- a lineup. It may have been a lineup that was seen by more than one witness, but it represents a lineup.

Q. Okay. Let's talk about the information that was coded, okay, across the top row.

A. Right.

Q. So tell us what information is recorded, just in general, in the first five columns about the Lineup Report itself.

A. Okay. So the first column there, for example, if we look at the top line, that GO25122, is simply a record number that goes with that particular case.

Q. Okay.

A. So it's a case number.

Q. And then what's the next column?

A. It's within that case how many lineups there were.

Q. Okay. So within this file, how many different lineups there?

A. 2.

Q. Okay. So we have 2 lines for that file, right?

A. Right. So each line is one lineup. And so if that says "2," then there has to be that same case number that repeats it's -- repeats that same case number, there's the second lineup.

Q. Okay. What's the third column?

A.   It's whether or not the results are in an Official Lineup Report.

Q.   It's a little bit messed up, right?  It says, "Are the results not in an official report."  So if it, "Yes," what does it mean?

A.   Right.  So if it says "yes" it means that the results that are extracted and put into this table were not in an Official Lineup Report --

Q.   Okay.  And what --

A.   -- but instead were in some kind of ancillary report.

Q.   Okay.  What's the next column?

A.   Just the date in which the Lineup Report was made.

Q.   And then the next column?

A.   And the time of the report.

Q.   What does the column "unknown information affecting coding" mean?

A.   Well, sometimes there's unknown information.  In some cases, information was redacted or incomplete.  You couldn't really exactly tell what was going on.  For example, if you look at the second line there, the "yes" to "unknown information affecting coding" is because that report never said how many people were in that lineup.

Q.   Okay.  And then the column after that, "live photo lineup" just reports whether it's a live of photo lineup, correct?

A.   Yes.

Q. And then the columns that follow after that, "Witnesses viewing lineup, people in lineup, suspects in lineups," those are recording information from those lineup reports like the one we've looked at, is that correct?

A. Right. So here, for example, in the top line we have three witnesses viewing that lineup. Not together, presumably, but independently of each other. There were five people in the lineup, one of whom was a suspect, the other four being fillers.

Q. And in some lineups you have multiple witnesses, correct?

A. Yes.

Q. And in some lineups you have multiple suspects, correct?

A. Yes.

Q. Is it proper to have multiple suspects in a lineup?

A. No -- well, if you do, the General Order of 1983 for the Chicago Police Department, for example, and this is typical, says that you need at least four fillers for every suspect. So if you have two suspects --

Q. Let me stop you there.

Just explain, in general terms, why you don't want to have multiple suspects in a lineup?

A. Well, let's take it to an extreme, let's say you have a lineup composed only of suspects, which I think happened in one of these cases. What it means is that there's no way to fill

that lineup. I mean, you could throw a dart up there and it's going to land on a suspect, and presumably charges would be laid against that person. There's no sort of safety kind of mechanism.

That's what fillers are, they're a way to protect against witnesses who are just guessing or witnesses who are not credible. You would never know a witness wasn't credible if everybody was a suspect and they could just choose anybody.

So it needs to be -- it makes it a non-failable lineup if everybody is a suspect.

Q. Okay.

A. As you begin to move down from "it's all suspects" to "four out of the five suspects," it still is problematic. It becomes less and less problematic. As the General Order pointed out, that there should be at least four fillers for every suspect.

Q. Okay. Let me stop you there and let's talk about the next column.

A. Okay.

Q. It says, "Total possible positive identifications."

A. Right.

Q. It says the formula is the number of suspects in the lineup times the number of witnesses, correct?

A. Correct.

Q. Okay. What's the theory there?

A. Well, the theory is that, you know -- you know, that with

three witnesses, in this case three witnesses and only one suspect, you can't get more than three identifications of suspect. If there were three witnesses and two suspects, you could get up to six identifications of suspects from that.

Q. Okay. And is that where your total of 980 attempted lineups comes from?

A. Comes from that column. I believe you highlighted it there.

Q. Okay. And then the columns to the right of that just record whether there was a positive ID, a tentative positive ID, no ID, or a filler ID, correct?

A. Right.

Q. And those are the categories that you discussed before, correct?

A. Yes.

Q. All right. The second to the last category here says, "witness viewed, but no reported outcome," what does that mean?

A. Well, I wish I knew.

Q. Please explain.

A. It's just mysteries in some these files where, you know, there were presumably witnesses there. And there's just -- we never learn in the file what those witnesses did when they viewed the lineup. So we just -- it's there -- it's an important column. It's there because, as you'll see not on this page but you can see on some other pages, there are

instances of that, quite a number of instances.

Q. So does that column represent literally the absence of any recorded information?

A. It's the absence of information, yes.

Q. All right. Let's talk about what you saw, what the results you saw in the Chicago data; okay?

A. Okay.

Q. So showing you plaintiff's Demonstrative 25.

(Exhibit published to the jury.)

BY MR. ART:

Q. Explain to the jury what you found.

A. Okay. So in this total number of lineups, that is the number of possible identifications here, out of that 980, the files report, whether it's in an official report or some ancillary report, 554 times a witness identified a suspect. So that's 56.6 percent of the 980.

And then 313 times the file reports that the outcome for a witness was to make no identification. And so that's 31.9 percent of the 980 lineups.

Q. Okay. And if you look at these two columns, they don't add up to 100 percent, correct?

A. That's correct.

Q. And why not?

A. Because of the missing information, the failure to report what an eyewitness did upon viewing the lineup.

Q. And that set of case is the no-reported outcome cases, right?

A. Right. And I think that's, you know, in the 11 percent range or something like that.

Q. Very good. Okay. Switching topics. What did you compare the Chicago data to?

A. So these 11 published Field Studies of varying sizes. I mean, some were kind of smaller-scale studies, others were very large studies that were conducted in these various locations, one of which is a study that I did with my colleagues.

For example, we worked with the police department in San Diego, as well as the police department in Tucson, Arizona; Austin, Texas; and Charlotte North, Carolina, to just simply make records of every lineup that they do, and look at how often a witness picks suspects, how often witnesses pick fillers, how often witnesses make no ID. And we were comparing some different ways of conducting lineups at the time.

So then there are these others, they're published by other people over a period of many years. And so we take all of those data, all of those lineups from these different police departments and we aggregate them. We pull them all together and say, "All right, what's our best estimate, then, on the large sample." And then you're up to like 6700-and-some lineups.

Q. Let me pause right there.

A. Okay.

Q. And let me show you Plaintiff's Demonstrative 26.

Describe for the jury what this chart shows.

(Exhibit published to the jury.

BY THE WITNESS:

A. All right. So this is a table of results from those studies that I pulled together. So 6,734 attempts by eyewitnesses to identify perpetrators from lineups in actual cases across the period of these studies.

So the top line there, you can see, that's a small, relatively small sample by Behrman and Davey from the Sacramento Police Department.

As you move down, you can see some studies at much larger scales conducted at various places. For example, the Horry, Halford & Brewer was conducted in London, England. The Wixted, Mickes, Dunn, Clark & Wells, down there where it has number of possible ID's 348, was conducted with the Houston Police Department.

And you can see, as you move across, you've got some sums --

Q. So let me pause for a second there.

A. Okay.

Q. There are 6700 total lineups conducted in these studies, correct?

A. Yes.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 864 of 1335 PageID #:106249
McLaughlin - redirect by Loevy
1000

Q. Okay. Are all these studies studying the same thing?

A. No, they're looking at different issues. For example, Wright & Skagerburg were looking at the question of what happens to the confidence of the witness once they learn they've picked a filler or picked the suspect in the case.

The Wells, Steblay & Dysart work was looking at what kind of differences do you get when you do a lineup using what we call a sequential one-at-a-time showing of the lineup members versus showing them all at once. So they're asking different questions.

Q. Okay. What do they all have in common?

A. Well, what they have in common is, everyone reports -- you know, everyone -- all these published studies report the number of suspect identifications, the number of filler identifications, and the number of no -- no picks.

Q. And that is what we're seeing in these columns, correct (indicating)?

A. Right.

Q. You mentioned that there are some studies that have a very large scale, right?

A. Right.

Q. If a study has a large scale, what does that mean about the data that it records?

A. Well, it's more stable.

Q. What do you mean "stable"?

A. Well, the law of large numbers is pretty straightforward. If you have a small sample, it might deviate quite a bit from what you would expect by, you know -- but if it's a large sample. It has -- it comes much closer to stabilizing in terms of actually giving you a number that's closer to the real number.

I mean, if, for example, you take a coin and you flip it 10 times. You might get 80 percent hits, that's not unusual. But if you flip it 1,000 times, you'll never get 800 hits. So it's going to approximate 50 percent on 1,000 flips, but it doesn't have to approximate 50 percent on 10 flips. So that's the law of large numbers.

So these larger samples are more stable, more reliable, more what we should, perhaps, base our estimates on.

Q. When you have 11 studies with 11 different size samples, what's the most appropriate way to give each study the appropriate weight?

A. Well, your best guess is the mean, the overall average.

Q. Okay. And is that what you're showing here at the bottom?

A. It is. And so as you move across and you look at this and you see that "suspect percentage" down at the bottom there, that 40.8 percent, that is not the per se. It's close, but it's not per se the average of that column. Instead, it is the 2,746 suspect ID's divided by the 6,734 possible ID's.

Q. Okay. So let's look at the results of the Field Study.

Showing you plaintiff's Demonstrative 27.

(Exhibit published to the jury.)

BY MR. ART:

Q.  Explain to the jury the results that we find in the Field Studies for rates of different identification.

A.  So this is just extracted from the table that you were just showing where the Field Studies is 6,734 lineups.  2,746 times they identified the suspect, call it 41 percent, just kind of rounded.  No identification, 35 1/2 percent.  Filler identifications, 23.7 percent.

Q.  Okay.  And so that's where you get that figure that we should expect to see identification about a quarter of the time, correct?

A.  Right.

Q.  All right.  Now let's compare that data to the Chicago data, Okay.  Showing you plaintiff's Demonstrative 28.

(Exhibit published to the jury.)

BY MR. ART:

Q.  In the Field Studies you said that about 24 percent of the lineups resulted in a filler identification, correct?

A.  Correct.  But no filler identification is reported in the -- in the Chicago files.

Q.  So in 980 total lineup attempts, there's not a single one that as the suspect picked a filler, right?

A.  Right.

Q.  Okay.  And to be clear, that total of zero is below even the lowest rate of filler identification in those Field Studies, right?

A.  Right.

Q.  Okay.  Is the rate of suspect identifications higher in Chicago?

A.  They are.  You know, they're almost 16 percent higher.

Q.  What does that mean to you, if anything?

A.  Well, you know, we don't know.  It is on the high end for rates of identifying the suspect.  It's possible that, you know, there's something about the denominator that there were more than 980 lineups.

Q.  Let me stop you there.

Are the rates of non-identification similar between Chicago and the Field Studies?

A.  The non-identification rates are pretty similar, within, you know, a couple of percent, maybe 3 percent, 3 1/2 percent of each other.

Q.  Okay.  Showing you another demonstrative here, okay.

(Exhibit published to the jury.)

BY MR. ART:

Q.  The lines on these charts represent what you saw in the Field Studies, and the shading represents what you see in Chicago data, okay.

Is there any way to play with these numbers to make

the Chicago data match the field data?

MS. ROSEN: Objection, Judge. Beyond the scope of Rule 26(a) disclosure.

THE COURT: Sustained.

BY MR. LOEVY:

Q. Okay. You did statistical analysis of these results, correct?

A. Yes.

Q. Is there any way with statistical analysis you can explain the difference between the Chicago data rates of identifications and the Field Study data?

MS. ROSEN: Objection. Same objection, Judge.

MR. ART: Your Honor, this is front and center in his report. It's most of what his report is about.

THE COURT: Can you basically direct me to where?

MR. ART: Starts at page 7 and runs through page 10.

THE COURT: It looks to me like he's doing very mathematical things with those results, so I think it's probably within the scope. Overruled.

BY MR. ART:

Q. Please explain.

A. Well, I mean, you have to somehow account for why there's zero there. And so, you know, are they in some other category?

You know, for example -- but, I mean, we wouldn't think that you could pull identification rates from the

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 869 of 1335 PageID #:106254
McLaughlin - redirect by Loevy
1005

suspect, and pull them over and say, "Oh, they were really filler identifications."

You can't take any significant number of the "no identifications" and say those were filler identifications without bringing that "no identification" rate down to where it's too low to be comparable to what you get in the Field Study.

So you could try to force it, but it -- it -- it tends not to work. You almost need to speculate that, in addition, maybe there's some missing files.

Q. Okay. So let's pause there.

MR. ART: Your Honor, is this now a good moment for the mid-morning break?

THE COURT: It is a very good moment for a mid-morning break. Let's take 10 minutes, ladies and gentlemen.

COURT SECURITY OFFICER: All rise.

(The following proceedings were had out of the presence of the jury in open court:)

MR. LOEVY: Your Honor, we have a scheduling issue to raise with the Court. The problem was, we have a witness here named Olivero, who is missing work. This is his second time here. And he says he is going to leave. We had a long -- over the weekend we --

THE COURT: What do you want to do?

MR. LOEVY: We want to break into this witness for a

ten-minute witness, five to ten. He's going to leave. He's not going to come back. It's not fair to him --

THE COURT: You know, this happens all the time.

Is there a problem?

MR. LOEVY: I forgot to ask them if there's a problem.

THE COURT: Well, that would've been helpful, then I'd be on break.

It doesn't appear to be. And I don't think there's a problem.

MR. SOTOS: Fine with us, Judge.

THE COURT: Okay. Ten minutes.

So, Dr. Wells -- is Dr. Wells going to go to the witness room?

MR. ART: Yes.

THE COURT: Okay. Fine.

(Recess.)

(The following proceedings were had out of the presence of the jury in open court:)

THE COURT: Is everybody back?

Yes? No?

I just want to deal with this juror problem.

Okay. Is everybody back so we can deal with this jury issue?

MR. LOEVY: Yes.

THE COURT: It turns out that there's no way to force

the company to pay her. So I'm just going to have to tell her that. There's no sense having her in suspense. So it's Ms. Martinez. My guess is, she's going to be very unhappy. There's nothing I can do about it.

So, okay. Let me have the CSO bring he.

Could you bring Ms. Martinez in. Thank you.

(Brief pause)

THE COURT: I could try to find out who the company is and write to them, but if they have a policy, I don't think it's going to do any good.

MR. SOTOS: Well, worth a try, right?

THE COURT: It's always worth try. Unless somebody doesn't want me to do that.

MR. LOEVY: I think that's a good idea.

MR. SOTOS: Yes, we agree.

(Juror Martinez entered the courtroom)

THE COURT: Hi, Ms. Martinez. Come on in, please.

I've been doing some research this morning, getting some research done on whether there's any way to get the company to pay you beyond the week. There is no way.

You want to tell me who the company is? Maybe if I wrote them a nice letter or --

JUROR MARTINEZ: Can I talk to you in private?

THE COURT: Well, this is private. I'm sorry.

JUROR MARTINEZ: I was trying to make different

arrangements and hopefully I'll see. I'll try to see if on the weekends or something like that.

THE COURT: Okay. And, please, I can't put pressure on them obviously, but if there's any way I can help, I would like to help, okay?

JUROR MARTINEZ: I was investigating to see if we could do other arrangements, adding to my vacation. But I'm actually taking vacation in July. I've already scheduled it. And so it's just one week.

THE COURT: I'm really sorry. I thought that there was a law or something that would require more than this, and I'm disappointed. I may try to work for that in the future.

Thank you. I'm sorry.

(Juror Martinez exited the courtroom.)

MR. LOEVY: Your Honor, by agreement, it's actually going to be two short witnesses, which the defense has agreed to and which we appreciate.

THE COURT: Okay. Are we ready for the jury when they're ready for us?

MR. LOEVY: The witnesses that we're going to break in are here. You want them to come forward?

THE COURT: No, just as long as he's ready.

MR. LOEVY: All right.

THE COURT: Ben, would you tell the CSO that as soon as the jury is ready, we're ready.

COURT'S LAW CLERK:  Sure.

(Brief pause).

THE COURT:  So my assistant did some research. Toshiba Machine Company.  Sounds to me like they're big enough to have a better policy than this.

MR. LOEVY:  That's the employer.

MR. SOTOS:  You would think.  Really?

THE COURT:  Well, maybe she can work it out.  Let's hope.

(Brief pause).

THE COURT:  Defense, until the jury is in, you are saying to me --

COURT SECURITY OFFICER:  All rise.

THE COURT:  Oops.  Sorry.  We'll talk about it at lunch.

(The following proceedings were had in the presence of the jury in open court:)

THE COURT:  Please be seated, everyone.

Ladies and gentlemen, we have two witnesses, the plaintiff has two brief witnesses with scheduling issues.  So we're going to introduce -- I'm sorry, interrupt Dr. Wells and see if we can get these two short witnesses on and off, and then we'll go back to Dr. Wells.

Counsel?

Olivero - direct by Swaminathan

1010

MR. SWAMINATHAN:  Plaintiff calls Carlos Olivero.

THE COURT:  Sir, please raise your right hand.

THE WITNESS:  Good morning.

THE COURT:  Good morning.

(Witness duly sworn.)

THE COURT:  You may be seated.

(Brief pause).

THE COURT:  I think there's a document there.

Is that for this witness or the prior witness?

MR. SWAMINATHAN:  The other witness, Your Honor.
Thank you.

THE COURT:  Thanks.

(Brief pause)

GARY WELLS, PLAINTIFF'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. SWAMINATHAN:

Q.  Sir, please tell the jury your name.

A.  Carlos Olivero.

Q.  Do you live in Chicago?

A.  Yes, sir.

Q.  How long have you livid in Chicago?

A.  About 35 years.

Q.  Are you currently employed?

A.  Yes.

Q.  What kind of work do you do?

A. A handyman Services.

Q. Do you do that for yourself?  Are you self-employed?

A. Self-employed, yes.

Q. Do you have your own business?

A. Yes.

Q. How long have you had your own business?

A. I've been on my own for about 8 years.

Q. We won't go through your whole history.  Have you worked pretty much your entire adult life?

A. Yes, pretty much.  Since 18 and up.

Q. Have you had jobs other than the handyman work that you're doing?

A. Yes.

Q. What kind of jobs?

A. Manufacturing, construction, retail.

Q. Sir, have you ever been convicted of a crime and then sent to jail, or spent time in prison, that kind of thing?

A. No, sir.

Q. Have you ever been a member of a gang?

A. No, sir.

Q. I want to turn to the topic that brings us here.  This is a controversy in this case among the parties about whether there was a first lineup that occurred on August 31st, 1988 --

        MR. SOTOS:  Judge, objection to the testimony.  Just ask questions, in terms of whether there's a controversy or --

THE COURT: Okay.

MR. SWAMINATHAN: I'll move on.

BY MR. SWAMINATHAN:

Q. I want to ask you about what you know about what might have happened on August 31st, 1988.

Were you in lineup at that time?

A. Yes. I participated in a lineup, yes.

Q. What causes you to say you were in a lineup?

A. That was a request by the police officer that asked me -- asked for volunteers and I was one of the volunteers.

Q. And let's talk about that in more detail now. And so we'll start with sort of what happened that day that you believe you were in a lineup.

First, back in 1988, in the summer, how old were you?

A. 18. Probably about 3 1/2 months into 18 years.

Q. Okay. And was there an occasion, in the late summer of 1988, when went to the police station?

A. I remember a police station in Addison. I don't know what the street that is, but yes.

Q. You're not sure about the location?

A. I'm not sure what day that was.

Q. But you wet to a station?

A. Yes.

Q. Okay. And on this day that you went to the police station, tell the jury what you were doing before you interacted with

any police.

A.   Ah, I was hanging out with friends at a friend's house inside they're gate, front yard.  So on that particular day, I was called over by squad car -- by a police officer in an unmarked, you know.  And I walked over and just asked, "Would you like to voluntarily in a lineup?"

Q.   What was your answer to that?

A.   I thought it was kind of funny.  And, you know, being young and not really thinking, I said, "Sure."

Q.   So at that point your understanding was they wanted you to participate in a lineup?

A.   Yes.

Q.   And did they ask you to volunteer?

A.   Yes.

Q.   And you agreed to do that?

A.   Yes.

Q.   Why did you agree to do that?

A.   I don't know (laughing).  Young and adventurous, I guess. I don't know.  Being fresh out of 18, you're not really thinking.  You think everything is okay.  I mean, what's -- it's -- it was a favor by a police officer.

Q.   And so did you then go to a police station?

A.   Yes.

Q.   And who took you to the police station?

A.   I went in the unmarked vehicle.

Olivero - direct by Swaminathan

1014

Q. You ever been in any lineups before in your live?

A. No; this would be the only would.

Q. Never any lineups after this incident?

A. Never.

Q. The officers that picked you up, do you remember anything about them?

A. Ah, I -- not really, other than they're vest, maybe dark hair, perhaps clean shaven.

Q. When you say "vests," what do you mean?

A. The clear -- the clear bullet-proof vest. You can distinguish a vest over clothing.

Q. Were they in plainclothes or were they in regular police uniforms?

A. Plain clothes.

Q. And do you remember what vehicle they came in? Was it a regular police car with sirens?

A. No, it was unmarked.

Q. As you sit here today, many years later, are you able to describe what these officers look like?

A. No. Not in full detail, no.

Q. So officers eventually took you to the station, is that right?

A. Yes.

Q. What happened when you got to the station?

A. Ah, I walked in through the front of the station, the one

on Grand. And just -- walked into like a front desk. I don't remember if I provided my ID at the time. But just kind of walked down a the long hallway, and turned into a room. And I don't remember -- it seemed like we waited there for a while.

Q. So they took you into a room. Is that the only room you went into? Were there other rooms you went into?

A. I only remember one room, yes.

Q. Tell us what you remember about that room?

A. Solid white room with a picture glass window, you know. A glass -- big picture-glass window. Clearly you can tell it's a double -- a double mirror.

Q. Well, when you say you could tell it's a double mirror, what do you mean?

First of all there's a glass. Was it on multiple walls, was it on one wall?

A. On one wall.

Q. Could you see through that glass?

A. No.

Q. And then the other walls basically were regular, you said, white walls?

A. Yes, regular, painted white locks.

Q. When you went into the that room, did other people also go into that room or were you in that room by yourself?

A. No, I was in there with a few other guys that also walked in down the hallway into the room.

Olivero - direct by Swaminathan

Q. Can you say exactly how many people came into the room?

A. I believe it was three or four.

Q. And then what happened next after there's three or four people and you in the room?

A. I pretty much just stood around, quiet. And, you know -- you know -- I really didn't socialize with any of the other guys because I didn't them, so ...

Q. Were they talking a little bit?

A. A little bit. Just on a low tone. So I blocked them out. I really couldn't hear them.

Q. So you're in the room and you're waiting around. What happens next?

A. Ah, I know after waiting a little while, then I believe an officer came in with two guys. They looked like they've been in there a few days or something because they had no shoelaces. Their hair was messed up like they slept there, or something.

I mean, they came in. I believe they were cuffed. I don't know what manner they were handcuffed. And then we just --

Q. Did somebody --

A. Somebody instructed us to face the --

Q. These two guys come into the room. And then once they come into the room, I think you're about to tell us what happens after that.

A. Then they asked us to face the glass. And I can hear

noises in the other room behind the glass.  So clearly, people are walking in or perhaps --

MR. SOTOS:  Objection, Judge, what was happening on the other side of the glass.

THE COURT:  Just what you say or heard.

BY THE WITNESS:

A.  Okay.  What I heard was people on the other side of the glass.

BY MR. SWAMINATHAN:

Q.  Could you make out what they were saying?

A.  No.

Q.  You can just hear sounds of people on the other side of the glass?

A.  Yes.  I could hear foot motion.

Q.  And when you were hearing these sounds, is this while you were waiting around for the guys to come in or was it while once you were in that room facing the glass?

A.  This is -- this was we were all facing the glass now, posing for the lineup.

Q.  Okay.  So once this two gentlemen came into the room, what's the first thing that happened?  Did they line you guys all up in a row?

A.  I was already against the wall and they just said, "Face the glass."

Q.  And so what about the others, were they sort of in random

Olivero - direct by Swaminathan

1018

places in the room or were you all sort of near each other?

A.  I think there was a set motion of against the wall, facing the glass, anticipating what we were there for.

Q.  So you were all then facing the glass?

A.  Yes.

Q.  Okay.  Do you know how long it was, approximately, that you were across from the class?

A.  Perhaps about three to five minutes.

Q.  All right.  When that was done, did you eventually then leave the room?

A.  When that was done, I think there was a brief pause where the other two guys that were brought in last had to be escorted out.  And then perhaps maybe about minute after that, then we were let out.

Q.  And with that, was that pretty much the end of your involvement with this?

A.  Pretty much.  Then I just needed to arrange to get a ride back to where I was picked up.

Q.  Based on what you just told us about today, were you participating in a lineup back in August of 1988?

A.  Yes, that what it was.

Q.  A lineup in which you believe there was somebody behind on the other side of the glass mirror?

MR. SOTOS:  Objection.  Asked and answered; leading.

THE COURT:  Sustained.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 883 of 1335 PageID #:106268
Olivero - direct by Swaminathan
1019

BY MR. SWAMINATHAN:

Q.   And have you ever been in any other lineups in your life?

MR. SOTOS:  Objection, Judge; asked and answered.

BY THE WITNESS:

A.   No.

THE COURT:  Overruled.

BY MR. SWAMINATHAN:

Q.   Now, this lineup that you were in, do you have any idea what the case was about, or who the case involved, or who the victim was, or anything like that?

A.   All I knew it was a lineup for a bad shooting that had occurred.

Q.   And how did you hear that it was a bad shooting?

A.   I heard it from the officers.

Q.   I'm going to show you a document that's marked Plaintiff's Exhibit 62.  It's been admitted.  Ask you if you recognize any of the individuals in these photos.

(Exhibit published to the jury.)

BY MR. SWAMINATHAN:

Q.   And let's start whether you recognize somebody you might see on a regular basis.

A.   He looks familiar.  Number 1, I recognize.

Number 2, that's me.

Q.   Number 2 is you?

A.   Yes.

Q. Okay. And does that look approximately the way you were in August of 1988?

A. I believe so, yes.

Q. Looks like a picture when you were 18 years old?

A. Yes.

Q. Showing you Plaintiff's Exhibit 14, also in evidence.

(Exhibit published to the jury.)

BY MR. SWAMINATHAN:

Q. Is you name listed on this piece of paper?

A. Yes, sir.

Q. It says here, "May 14th." Is that your birthday?

A. That's correct.

Q. Does this appear to be you that's identified in this document from August 31st, 1988?

A. Yes.

Q. Sir, do you know Jacques Rivera at all?

A. No.

Q. Do you know anybody who knows Jacques Rivera?

A. No, I don't.

Q. Have you ever met him before?

A. No.

Q. Do you have any desire to come to court today and say something favorable to Jacques Rivera versus the police --

MR. SOTOS: Objection, Judge.

THE COURT: Sustain.

BY MR. SWAMINATHAN:

Q. Are you missing work to be here today?

A. Yes, I am.

Q. Are you here because you received a trial subpoena?

A. Yes.

Q. Thank you for being here.

THE COURT: Cross-examination.

MR. SOTOS: Thank you, Your Honor.

CROSS EXAMINATION

BY MR. SOTOS:

Q. Good morning, Mr. Olivero.

A. Good morning.

Q. So you're testifying this morning about an incident at a police station that occurred 30 years ago?

A. Yes.

Q. Quite some time ago?

A. Yes, it was.

Q. So is your memory of it relatively vague or is it crystal clear in your mind as you sit here today?

A. There are some sketchy moments, but I definitely know the lineup that I participated once in my life as a teenager.

Q. You know you were there at the police station that day and what you remember happening that day?

A. I remember the lineup details, yes.

Q. What you described to the jury, you remember?

A. Yes.

Q. Okay. And after you were at the police station that day, you said you thought it was in Addison?

A. Yes, that was a different station that I was shown by the attorney where I was arrested with some friends after this incident. So I confused the police station in Addison, yes.

Q. So you were arrested with some friends shortly after this incident?

A. Yes. I didn't remember, because I committed no offense. I was just, you know, sort of dragged in with friends. But I did not know about the incident until Anand showed me my rap sheet.

Q. Anand, you mean the attorney from Mr. Loevy's office who just questioned you?

A. Yes, sir.

Q. So what did do, he showed you a rap sheet?

A. He just showed me what I had to do -- or what I had based on around the date of the lineup.

Q. Okay. So --

A. It happened -- I guess it happened after the lineup. I have no clue of what date that was. That's why I found about that particular station.

Q. Okay. So I'm just trying to make sure I understand. So you're saying that incident, the arrest that occurred shortly after the incident we're talking about here, you were in a police station in Addison for that?

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 887 of 1335 PageID #:106272
Olivero - direct by Swaminathan
1023

A. Yes.

Q. Okay. But this one you were at Grand and Central?

A. Grand and Central, yes.

Q. Okay. I just wanted to clarify that.

Now, you don't remember where you were living in he summer of 1988, right?

A. I remember streets, and so on. It's just that the numbers were kind of fuzzy because living with my single mom, we moved around a lot. So sometimes remembering particular addresses, as a teenager you really didn't focus on the numbers.

Q. Long time ago, hard to remember those kinds of details.

A. Back then, yeah. The address, yeah, I didn't remember it.

Q. And so with respect to this incident at the police department, you hadn't thought about this for -- let's see, this happened in 1988, right?

A. Yes.

Q. So did you ever think about it again for the next, you know, 20 years or so?

A. No.

Q. Okay. And then at some point you were approached by representatives of Mr. Rivera and you were asked questions about it, correct?

A. Yes.

Q. Do you remember when that occurred?

A. The first time I was informed was a lady by the name of

Cynthia from the university.

Q. From Northwestern University?

A. Yes.

Q. And she came to your house?

A. Yes. She informed me about what I was involved in. What happened about the lineup that I was involved in.

Q. Because it was so long ago, she reminded you about the incident?

A. She reminded me of what was happening with the case. But I do know that I participated in the lineup, but I just --

Q. I understand. I'm just trying to get the scenario of events clear.

So, again, it had been -- do you remember what year she showed up at your house?

A. Perhaps 2013, or something like that.

Q. Do you remember giving a deposition in this case in 2013?

A. Yes.

Q. So that was about 5 years ago, right?

A. Yes.

Q. And it was just a couple of years before that, maybe 2010, 2011 when you talked to the investigator from Northwestern?

A. Perhaps, yes.

Q. Do you remember her name?

A. I don't remember her last name, but I know Cynthia was her first name, yes.

Q. You just don't remember her last name?

A. No, sir.

Q. All right. And so if that was 2010, fair to say that was 22 years after you had been to the police station that night?

A. Yes.

Q. Okay. And you were only in that room for about five minutes?

A. Doing the lineup was about five minutes, but we were in the room for much longer than that.

Q. How long about?

A. I would say it felt like an hour.

Q. And you hadn't thought about it, then, from the time it occurred, for the next 22 years of your life, until the woman from Northwestern showed up?

A. That's correct.

Q. Okay. And the woman was -- did you -- she was telling you about what her role was in the case, right?

A. Briefly she told me what she was doing, yes.

Q. She told you she was trying to help Mr. Rivera get released from prison, correct?

A. She just told me that someone was in prison, you know, and that I participated in a lineup that he was wrongfully convicted, I guess.

Q. So she told you that?

A. Yes.

Q. Okay. Did she -- did she tell you anything else about the case? Do you remember?

A. Other than there was only one witness to what had happened.

Q. What did she tell you about that witness?

A. It was a young, I don't know, 12, 13-year old witness.

Q. Anything else?

A. Ah --

Q. About what she said or --

A. Other than she needed my -- for me to verify what I participated in.

Q. Did she tell you that that witness had said he was forced to pick Mr. Rivera?

A. Ah, I don't know if she -- if she used the word "force." I think "pressured," she might have mentioned he was pressured.

Q. And you didn't know if it was true that the witness had actually said that, right?

A. No. I didn't witness that no.

Q. You just knew that she ws telling you that?

A. Yes.

Q. Okay. And you don't remember her specifically using the word "force," as you sit here today?

A. It's possible. I don't remember.

Q. It's possible that she told you that the witness had said that he was forced into picking, Mr. Rivera?

MR. LOEVY: Objection; Asked and answered, Your Honor.

THE COURT: Sustained.

BY MR. SOTOS:

Q. Did you feel she was trying to pull details about the incident that you hadn't thought about in the last 22 years?

A. What kind of details? The only details I knew was what I participated in.

Q. Understood. I'm just asking if it was your perception that she was asking you to pull from your memory an incident that had happened 20 years before.

A. Yes, she wanted me to try to remember what I did that day, how I got to the police station, and, you know, how many people were in the room that I was in.

Q. You really couldn't remember how many people were in the room exactly, right?

A. There was definitely about three or four.

Q. Okay. And let's go back to when you were -- when you were picked up by the police.

You described the police officers as -- well, before we get to that, let me ask you a couple of more questions about Northwestern.

Was the investigator from Northwestern talking to you about details that you felt she thought was important about the case?

A. Ah, my understanding the importance of what I witnessed.

Q. All right. Because you, back in 2010, you signed an

affidavit that the investigator had prepared for you, correct, after you had met with her?

A. Yes.

Q. And she wrote the affidavit, not you, right?

A. Yes. She took notes, yes.

Q. You read it and signed it?

A. Yes.

    MR. SOTOS: If we could put 125 up.

    (Exhibit published to the jury.)

BY MR. SOTOS:

Q. So, Mr. Olivero, do you see on the screen in front of you there, there's a document that says it's an affidavit on the front page?

A. Yes.

Q. Could you look through that really quickly and let us know whether or not that's the affidavit that you signed with the Northwestern investigator in December of 2010.

    (Brief pause)

BY THE WITNESS:

A. It's a little fuzzy. I didn't bring my reading glasses.

BY MR. POLICK:

Q. Could I try to give you a pair? Maybe it'll work?

A. I'll try. Yes. Sure.

    So what do you want me to verify here? That it's my initials? Or is that the paper? Or --

Q. Just that that's the affidavit that you had signed back in 2010.

(Said item tendered.)

BY MR. SOTOS:

Q. Do those help?

A. Yeah, they're a little too strong, but let me see. I can try.

Q. Understood.

(Laughter in the courtroom).

BY THE WITNESS:

A. The further I get, a little better it is.

BY MR. SOTOS:

Q. Okay.

(Brief pause).

BY THE WITNESS:

A. Yes. That is the affidavit, yes. And that's my signature, yes.

BY MR. SOTOS:

Q. Why don't you hold on to them just in case. You'll probably need them.

MR. SOTOS: Your Honor, we would move to admit Defendants' Exhibit 125.

MR. SWAMINATHAN: No objection, Your Honor.

THE COURT: I'm sorry, you said no objection?

MR. SWAMINATHAN: No objection.

THE COURT: Okay. 125, it is received.

(Defendants' Exhibit 125 admitted into evidence).

BY MR. SOTOS:

Q. So, Mr. Olivero, I just want to go through the affidavit with you. And, again, this was prepared by the Northwestern investigator after you had met with her sometime before that, correct?

A. Yes.

Q. And how long was your meeting with that Northwestern investigator?

A. Perhaps about an hour.

Q. All right. And if you go to page -- or excuse me. If you go to paragraph 4, you state that you were at your friend Ricky's house located at 2478 North Albany, correct?

A. No, I don't think that's -- I don't think it was -- that's Ricky's house, no. I believe that was an address where I used to live. So, again, I didn't remember addresses, but I did tell her I was at Ricky's house, I just don't remember if that's the correct address.

Q. Do you know -- are you trying to say you think that might be the address you lived at, not where Ricky's house was?

A. It's possibly, yes.

Q. All right. But you don't think it's the address that Ricky actually loved at?

A.  No.

Q.  Where did Ricky live?

A.  I don't remember the street, but it was near California and Armitage.

Q.  Okay.  So California and Armitage is quite a bit a ways from 2478 Albany, right?

A.  I believe so, yes.

Q.  All right.  And you said the two plainclothes, in the next sentence, you said that sometimes in the late afternoon two plainclothes police officers pulled up in an unmarked car?

A.  Yes.

Q.  Okay.  And you described those officers as clean-cut looking?

A.  Yes.

Q.  Okay.  Did you say "clean shaven," too?

A.  Yeah.  Presentable officers, yes.

Q.  Do you remember the race?

A.  Might've been Latinos.

Q.  You don't remember?

A.  Ah, they might've been Hispanic officers.

Q.  I understand it could be a lot of things, but I'm asking you if you remember the race of the officers as you sit here today 20 years later?

A.  Oh.  No, I guess I can't say that I know -- I knew the race back then or today.  I just know they were police officers.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 896 of 1335 PageID #:106286
Olivero - direct by Swaminathan
1032

Q. That's what I'm asking you, if you remember.

You said the officers, whoever they were, gave you a hard stare?

A. I think that was a youth expression, you know, when the officers, they look at you like if you committed something, or you did something. That was just an expression of a hard stare.

Q. You didn't mean that critically. They weren't looking at you in a way that you thought they were trying to cause you problems?

A. No, I had nothing to fear. So it was just unusual to be looked at as with such a hard stare.

Q. But you couldn't have a problem with the way they were treating you?

A. No.

Q. Whoever they were?

A. No I did not.

Q. Going into paragraph 5 in the second sentence, you said you waited at the station for several hours before the lineup occurred?

A. That's what it felt like, yes. At least more than an hour.

Q. More than an hour?

A. Yes.

Q. And you said in your affidavit that it was just you and one other guy sitting in the waiting room, is that right, or were

there more people?

A.   I believe there was three in that room, maybe including myself, might've been four.  But, again, this was strange to me the way of the setting, so I just kept to myself.

Q.   But you think there was prominently three or four people in the room there instead of just you and one other guy?

A.   Yeah.  There was definitely two more, two or three, and then myself.

Q.   All right.  And you go on to say in the next sentence that you remembered two of men being brought in without laces in their shoes?

A.   Yes, sir.

Q.   And you said you believed they were handcuffed?

A.   Yes.

Q.   Because in your affidavit, it looks like you had scratched -- is that you that put "CO" there and scratched through that line?

A.   Yes, sir.

Q.   So it looks like the sentence originally read that the men in cuffs, and then you scratched out "in cuff," correct?

A.   Yes, sir.

Q.   So were you trying to say at that time when you scratched out the word "in cuffs" that the two men were not in handcuffs?

A.   I remember them -- their handcuffs, I just couldn't remember in what manner they were cuffed, whether it was in

front of them, or behind them, or if they were cuffed together.

Q. And then so you don't remember whether they were cuffed or they weren't?

A. I don't remember what manner. I know they had handcuffs when they were brought in. I just don't remember what manner they were cuffed.

Q. Do you know why you scratched out the words "in cuffs," scratched through it and put your initials next to it in your affidavit back in 2010?

A. Ah, no, I don't remember why I scratched it out.

Q. Was it because at the time you didn't remember that they were actually in handcuffs?

A. Again, they might've been cuffed hand by hand next to one another. So a split second, but I did see handcuffs, that's probably why I wasn't too sure about how they were handcuffed and that's perhaps why I scratched it out.

Q. Okay. But you didn't write anything in place of it, you just scratched out the words "in cuff," correct?

A. Yes. But they were without laces, that's definitely --

Q. They were what?

A. They did not have any laces in their shoes. So that indicated to me they had been there much more before me, much more time.

Q. Right. But I was asking you about the "in cuffs."

A. Yeah.

Q. Okay. So you don't have an explanation for why you scratched that out, then?

A. I do not know why I scratched that out.

Q. Right after that, you say they looked "scruffy"?

A. Yes.

Q. Is that your word is that the word of the investigator from Northwestern who interviewed you?

A. I think that might've been my word, because they looked dirty and messy. But, you know, perhaps -- I don't remember exactly if "scruffy" is my word or her word.

Q. Well, do you remember giving a deposition in this case back in 2013? We talked about it a little while ago.

A. Yes.

Q. All right. And you remember, page 91, being asked this question and giving this answer --

MR. SWAMINATHAN: What line, counsel?

MR. SOTOS: Line 14.

MR. SWAMINATHAN: Thank you.

BY MR. SOTOS:

Q. Do you remember being asked this question and giving tis answer:

"Question: And the word "scruffy," is that your word or is that Cynthia's word?

"Answer: That's Cynthia's word, yeah."

MR. LOEVY: If you would finish the answer, please?

BY MR. SOTOS:

Q.   (Reading:)

     "... now she's the one that crossed everything
     out and I initialed it."

     Did you give that answer back in 2013?

A.   Yes.  I guess I did, yes.

Q.   And going on the next page, in paragraph 6, you stated that there were six men in the lineup, do you see that?

A.   (No response.)

Q.   You were with six men there.  The second line of paragraph six.

A.   I don't have it on here.

Q.   On the next page.

     Oh, it's on there now.  Do you see it now in front of you?

A.   Ah, I'm waiting for the bold letters.  Sorry.

Q.   Do you see the second line, highlighted portion, there were six men in total?

A.   It's still --

Q.   Are you having a hard time seeing it?

A.   Yes.  It's highlighted, but it's not bold.  Sorry.

Q.   The second like.

A.   So the second line, okay.

Q.   There were six men in total?

     Does that help?

A. Yes.

Q. Okay. So this was prepared 22 years after the incident, and you specifically remembered the exact number of people that were in the lineup?

A. Ah, I wouldn't say I remember specifically the amount of people. There was definitely a group. You know, perhaps might've been six in total, I just -- you know, there was a group of guys there.

Q. I was just asking you about how you came up with a number six. Was that something Cynthia told you?

A. No, I believe she might've -- she might've said that it was six total because of the two guys that were brought in. So I was there, three other guys were there, that's four.

Q. So you got that information from Cynthia and just included it in the affidavit, is that fair to say?

A. About the amount of people that were there?

Q. Yes.

A. Yeah. She asked me how many people would I say was there total, and six.

Q. Okay. And then when you said that one of the officers told you that it was a bad shooting, when did the officer tell you that?

A. Before I got in the car.

Q. Before you got in the car?

A. Yes.

Olivero - direct by Swaminathan

1038

Q.  Because in this affidavit, if look at page 8 -- excuse me, paragraph 8, after describing what occurred during the lineup, you then said at some point in the process:

"....I heard an officer state that the crime was

a bad shooting ..."

correct?

A.  That's correct.  I'm sure he mentioned it more than once due to the specify what he needed volunteers for.

Q.  So was the officer that was in the room at the police station with you the same officer who had picked you up on the scene?

A.  I don't remember if it's the same officer, no.

Q.  So you're saying now, though, that an officer told you both when they picked you up and then also in the room that it was a bad shooting?

A.  I remember the word -- the phrase "bad shooting" when I was in the car.  So it's possible he said it before I got in the car, but I also remember being in the car and hearing that.

Q.  But you don't remember him saying it at the police station, correct?

A.  No, I do not remember that.

Q.  So let me ask you about this, if you go to paragraph 9, it says:

"... I do not remember the police ever asking

for or taking my photograph."

Do you see that?

A.   That's correct.

Q.   So was that a detail that you had discussed with Cynthia from Northwestern when you met with her before you filed the affidavit?

A.   I don't understand the question.  A detail how?

Q.   Let's go back to your meeting with Cynthia.  You talked with her about a number of details in the case, correct?

A.   Yes.

Q.   She asked you about things that, from your perception, appeared important to her, correct?

A.   Yes.

Q.   One of the things you talked about with her was photographs that were or were not taken at the police station that night, correct?

A.   Correct.

Q.   And so do you remember what she told you about the photographs?

A.   No.  I don't remember, no.

Q.   You don't remember that?

A.   I think the context of this conversation, she showed me the photograph of myself that we saw here, and I didn't remember ever taking that photograph.  That's --

Q.   So the Northwestern investigator showed you, in 2010, the photograph that you were shown during your direct examination

just a little while ago?

A. When I first met her, yes, she showed me that photograph.

Q. Well, if in paragraph 9, do you see that you said:

"... I do not remember the police ever asking

for or taking my photograph ...."

You see that, right?

A. Yes.

Q. And then the next sentence is:

"... if the police had ever asked for my

photograph, I do not think I would have

consented."

Correct?

A. That's correct.

Q. So it's your testimony that the Northwestern investigator had the photograph at the time and showed it to you? Are you sure about that?

A. She showed me that -- that photograph copy, yes. I just -- as a teenager, I didn't remember if I ever took a photograph.

Q. I don't want to confuse you here, and I know this took place a long time ago. So it's stipulated by everyone in this case that Northwestern did not have the photograph in 2010. So could you have been shown it some time later?

A. (No response.)

Q. You don't remember?

A. Yeah, I don't remember if Cynthia showed me my photograph,

I just know my photograph showed up. So I don't remember ever taking a photograph.

Q. So you don't remember whether you saw that photograph back in 2010 when you were talking to Northwestern or whether it was shortly before your deposition that you gave in this case in 2013?

A. I believe she -- Cynthia might've shown me the photograph, I can't say for certain.

Q. Because it was all so long ago?

A. It was a photograph that I didn't know existed.

Q. Right. Certainly when you met with Cynthia from Northwestern, you didn't know that the photograph existed, correct?

A. That's correct.

Q. You know today that it did exist?

A. Yes.

Q. You know that the police officers did take a picture of you at the police station that night, correct?

A. I don't remember it, but you know, I don't know how that photo -- I don't remember ever posing for a photo.

MR. SOTOS: 93.

Excuse me one moment, Your Honor.

(Brief pause).

(Exhibit published to the jury.)

BY MR. SOTOS:

Q. Mr. Olivero, that's the photograph that you were shown during your direct examination, correct?

A. Yes.

Q. And does it look like there's a white wall behind you there?

A. Yes.

Q. Does that look like it's similar to the wall that was in the room that you were in at the police station the night that we've talked about here for some time today?

A. Yes.

Q. So you don't have any reason to doubt that that photograph was taken while you were in the room?

A. Yes. It's possible, yes.

Q. You just don't remember that, correct?

A. I just don't remember. Being in the environment I was in, perhaps I was nervous, I didn't -- you know, a photo happened so quickly, I guess just going with the motions of being in the room with, you know, guys that I didn't know.

Q. And, realistically, perhaps because it was so very long ago, right?

A. Yeah, that, too. So long ago, I took a photo. Sometimes you don't even remember when you take a selfie.

Q. I understand. But nevertheless it was something that was important enough to the person you were meeting with that it was included in your affidavit, correct?

MR. LOEVY: Your Honor, objection. I think the subject matter has been exhausted.

THE COURT: Well, I don't think that the witness can speculate as to what was in somebody's mind. Sustained.

BY MR. SOTOS:

Q. That paragraph, paragraph 9, that was something that you had talked to Cynthia from Northwestern about, correct?

A. About the photo, yes.

Q. Yes. And that was something she raised with, you didn't raise it with her, correct?

MR. SWAMINATHAN: Objection; Asked and answered.

THE COURT: Sustained.

BY MR. SOTOS:

Q. You were shown several other photographs during your direct examination.

MR. SOTOS: This is number 94.

Can we switch the Elmo?

MR. GIVEN: It's up now, Jim.

(Exhibit published to the jury.)

BY MR. SOTOS:

Q. I'm just going to go through it this way. It's going to be a little bit quicker. Showing you what has been marked as Exhibit Number 95.

Do you recognize that person as having been one of the people who was there with you at the police station that night?

A.   Yes.

Q.   Okay.  And does the wall behind him appear to be the same one that was behind you?

A.   It looks like the same, yes.

Q.   The same thing with Exhibit 96.  Do you recognize that person as one of the people who was in the lineup at the police station with you that night?

A.   I don't remember him too much, no.

Q.   But do you have any reason to doubt that picture was taken in the same room that you were in that night?

A.   It looks like the same wall background.  My picture looks like up close, versus he's got a body frame.

Q.   Looks like the same room, though?

A.   The background looks the same, yes.

Q.   And the same thing with Plaintiff's Exhibit 97, appear to be the same room?

A.   Yes.

Q.   Do you recognize that person?

A.   Yes, he -- he looks familiar.  He was in the room.

Q.   And same thing with Defense Exhibit 92, appears to be in the same room?

A.   The background looks the same.  I vaguely remember him. Not sure.

Q.   And so when this was over at the police station, how did you get home?

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 909 of 1335 PageID #:106294
Olivero - direct by Swaminathan
1045

A.   One of the -- one of the guys who there gave me and some other guy a ride.

Q.   Do you remember -- here, let me show you again really quickly the pictures, see if you can identify that person.

Is that the person you were referring to?

A.   That he gave me a ride, do you mean?

Q.   Yes.

A.   I don't remember if it was him.  He might've been in the car with me, I don't remember.

Q.   If I showed you these pictures, would you be able to tell us who gave you the ride home?

A.   With definite?  No, I probably would not be able to exactly who drove and who gave me he ride home, no.

Q.   And these were people you had never met before?

A.   That's correct.

Q.   And you're certain that one of them gave you a ride home?

A.   Yes.

Q.   And there were others with you in the car?

A.   I believe it was myself and one other person, one of the guys.  At the time, just being a teenager just kind of anxious to just, you know, leave.  So I didn't really focus on who they were or what they said.  So I just wanted a ride back to where I was supposed to go.

Q.   All right.  My question is, are you certain it was these people that you never met before that you were in the police

station with who drove you home that night?

A.  Yes.

Q.  And do you remember how many people were in the car?

A.  I remember me, and some other guy, and the driver.

Q.  All three of you were in the police station together that night?

A.  Yes.

MR. SOTOS:  One second, Your Honor.

(Brief pause).

MR. SOTOS:  Nothing further, Judge.  Thank you.

THE COURT:  Any other defense questions?

All right.  Plaintiff.

REDIRECT EXAMINATION

BY MR. SWAMINATHAN:

Q.  Do you have any family members who are police?

A.  Yes.

MR. SOTOS:  Objection; relevance.  Beyond the scope.

THE COURT:  Sustained.  Sustained.

BY MR. SWAMINATHAN:

Q.  Do you have any bias against the police?

A.  No.

MR. SOTOS:  Judge, objection.

THE COURT:  We're beyond cross at this point.

MR. SWAMINATHAN:  Bias is relevant.

BY MR. SWAMINATHAN:

Q.  If your photograph was taken or not taken that day, would it make any difference to you in term of what you believe happened that day?

MR. SOTOS:  Objection.

BY THE WITNESS:

A.  No.

THE COURT:  What's that objection?

MR. SOTOS:  Relevance.

THE COURT:  Overruled.

BY MR. SWAMINATHAN:

Q.  If your photo was taken or not taken, does that change your opinions about your belief that you were in a lineup that day?

A.  No, it does not.

Q.  You were asked some questions about investigators who came to speak with you, do you recall that?

A.  Yes.

Q.  Fair to say a person basically came to your door many, many years later, is that true?

A.  Yes.

MR. SOTOS:  Objection; leading.

BY MR. SWAMINATHAN:

Q.  Did you have --

THE COURT:  One is leading.  So this is redirect, so don't lead.

BY MR. SWAMINATHAN:

Q.   Did you have questions about why this person was here?
What is this about?

A.   Yes.

Q.   And did she tell you some things about why she was there
and what this was about?

A.   She mentioned about a lineup that I was in, and there was
an incident, kind of briefed me that needed my testimony.

Q.   Did you meet with investigators for the City as well at
some point?

A.   For the City?  I mean, I thought Cynthia was an
investigator for the City until she mentioned she was
Northwestern.

Q.   You understood that Cynthia was an investigator from
Northwestern, correct?

A.   Yes.

Q.   And she was representing Jacques Rivera, correct?

A.   Yes.

Q.   And you also at some point later on met with investigators
for the City, correct?

A.   I'm under the impression that you guys were from the City.

Q.   You also at some point had some people who came to you
other than the folks from our firm, right, who came and met
with you and said, "I came to talk to you about this incident,"
correct?

A.   Cynthia and your firm, yes.

Q. And when you met with Cynthia, did you -- did you tell her about what you remember, about what happened back in 1988?

A. Yes.  I remember volunteering.

Q. Did she tell you what to say?

A. No.  No.

Q. Did she pressure you in any?

A. No; it was just surprising that something so innocent in my part was so important now.

Q. And after meeting with her, did you prepare an affidavit?

A. Yes.

Q. And you did your best to tell the truth in that affidavit, correct?

A. Yes.

Q. We're looking at the affidavit again now.  This is the affidavit we discussed previously.

In portions of this affidavit you made some edits, correct?

A. Yes.

Q. And counsel talked to you a little bit about the sections where you removed some information about handcuffs, for example.  Do you see that?

A. Yes.

Q. And is it fair to say you aren't certain whether or not the people who were brought in the room were handcuffed?

A. I -- I was certain handcuffs.  It happened so quickly, the

officers just took off the handcuffs.  I don't know from which one.  So that was why I wasn't uncertain and I scratched it.  I had her scratch it off.

Q.  Because you weren't certain, is that why you scratched that information off?

MS. ROSEN:  Objection, Judge, to the leading.

THE COURT:  Sustained.

BY MR. SWAMINATHAN:

Q.  When you scratched this off, what was the reaction of the investigators?  Were they okay with it?  Did they something else?  What did they say?

A.  I guess she was okay with it.  I just wanted to reflect whatever I can remember.

Q.  Did they have any problems with any of th changes that you wanted to make to the affidavit?

A.  No.

Q.  Did you have a chance to review the affidavit?

A.  I did.  I scanned through it, yes.

Q.  In the affidavit, did you state that you participated in a lineup at the request of the Chicago police?

A.  Yes.

Q.  Did you indicate to them this was the one and only lineup you had ever been in, is that true?

A.  Yes, sir.

Q.  You talked to them in this affidavit about how you stood in

front of a one-way mirror, is that true?

A.   Yes.

Q.   Now, you were asked a lot of questions about your memory of events that happened 30 years ago.  Was this a memorable event for you?

A.   Yes, it was.

Q.   Why was it a memorable event?

A.   Ah, just never been, you know -- you know, being a teenager, never been in a lineup before and this was it.  And why I did it?  I still don't know.  But I -- it wasn't -- it's not a norm for me, so that's why I remember it well, that I participated in what that was, a lineup.

Q.   Even though it was a memorable event, do you claim to remember every detail about that happened, what was said, and who was there, those kinds of things?

A.   Not every detail.  I remember just one of the guys there made verbal contact with one of the two suspects that were brought in last.

Q.   Fair to say, in general, you remember some things about this event many years ago, but you don't remember everything?

A.   Correct.

Q.   Some details stick out to you more than others, is that true?

       MR. SOTOS:  Judge, objection; leading.

BY THE WITNESS:

Olivero - redirect  by Swaminathan

A.  Correct.

THE COURT:  And that is true.  Sustained.

BY MR. SWAMINATHAN:

Q.  Sir, is that how your memory works?

MR. SOTOS:  Judge; objection.

THE COURT:  Sustained.

BY MR. SWAMINATHAN:

Q.  All right.  Let me ask you this, I asked you about things that you remember, don't remember.  Let's talk about the portions of this that you do remember.

Do you remember being brought to the police station?

A.  Yes.

Q.  Do you remember being asked to participate in a lineup?

A.  Yes.

Q.  Do you remember being taken to a room?

MR. SOTOS:  Judge, objection; Asked and answered.

THE COURT:  I think we're going over some things again I think that we've already gone over.

BY MR. SWAMINATHAN:

Q.  Do you remember facing a one-way glass?

A.  Yes.

MS. ROSEN:  Objection; Asked and answered.

MR. SOTOS:  Objection.

THE COURT:  Sustained.

BY MR. SWAMINATHAN:

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 917 of 1335 PageID #:106302
Olivero - recross by Sotos
1053

Q. Showing you Plaintiff's Exhibit 14.

(Exhibit published to the jury.)

BY MR. SWAMINATHAN:

Q. Sir, you testified today about what happened. Is everything you told the jury about today exactly what you remember?

A. Yes.

Q. Okay. And do you had any reason to repute that back on August 31st, 1988, you were a participant in a lineup?

MS. ROSEN: Objection, Judge. It's asked and answered.

THE COURT: I'm going to overrule this objection, but maybe we ought at sidebar about --

MR. SWAMINATHAN: This is my last question.

THE COURT: Okay. That's it?

MR. SWAMINATHAN: Yeah.

THE COURT: Okay.

BY THE WITNESS:

A. I don't remember the exact date. I remember just the event.

MR. SWAMINATHAN: Thank you. Nothing further.

MR. SOTOS: One other area, Judge.

RECROSS EXAMINATION

BY MR. SOTOS:

Q. Mr. Olivero, you said you remembered, you just testified

you remembered one guy they brought in making contact with a guy who was already in here?

A.   One of the guys that were already in the room made verbal contact with one of the guys, the two individuals that were brought in.

Q.   And --

A.   So him making verbal contact with him is what jogged my memory to remember him particularly.

Q.   What do you remember about that contact?

A.   He referenced, you know, to what gang -- gang affiliation to him, you know.

Q.   So the guy that was already in there said something about a gang affiliation to the guy they brought in?

A.   Yes.

Q.   And how did that cause you to feel?

A.   Ah, nervous.

Q.   I think in your affidavit, if you look at paragraph 7, you stated that:

        "...at this point I thought to myself I'm stuck
        in a room with a bunch of gangbangers and
        there's going to be a fight."

A.   Yes, that's possible how I was feeling back then, yes.

Q.   So that made you uncomfortable?

A.   Yes.

Q.   You never had any involvement with any kind of gang

activity?

A.  No, sir.

Q.  And these are the people that you got into the car with after your time at the police station for a ride home?

A.  That's correct.

MR. SOTOS:  Nothing further.

THE COURT:  Anything further?

FURTHER REDIRECT EXAMINATION

BY MR. SWAMINATHAN:

Q.  Just to ask you about a paragraph where you remember some conversation that was happening in the room.

Was that a memorable event during the course of all this?

A.  Yes.

Q.  And so is that, therefore, a piece of the story that you remembered?

A.  Yes I remember.

Q.  Even if you don't remember all the other pieces of the story?

A.  Correct.

MR. SWAMINATHAN:  Thank you.

THE COURT:  Anything further?

MR. SOTOS:  No, Your Honor.

THE COURT:  Thank you, sir.  You may step down.  Watch your step.

(Witness excused.)

THE COURT:  There's another brief witness.  Well, brief, supposedly.  I'll try to get this witness on before lunch, but I can't -- the way things are going, I can't make any guarantees.

MS. GOLDEN:  Your Honor, can I get my glasses?

THE COURT:  I'm sorry?

MS. GOLDEN:  My glasses, can I get my glasses?

THE COURT:  Sure.

(Brief pause).

MR. SWAMINATHAN:  The witness is coming back from the restroom.

(Brief pause).

THE COURT:  Sir, can you come back here, please.  Down here to the front.

(Brief pause).

MR. SWAMINATHAN:  Plaintiff calls Angel Villphane.

THE COURT:  Raise your right hand.

(Witness duly sworn.)

THE COURT:  You may be seated.

ANGEL VILLAFANE, PLAINTIFF'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. SWAMINATHAN:

Q.  Please tell the jury your name and how to pronounce it.

A.  Angel Villafane, Jr.

Villafane - direct by Swaminathan

1057

Q. Where do you live?

A. Chicago.

Q. Are you currently working, sir?

A. Yes.

Q. Where do you work?

A. I work for Nipanish Press (phonetic).

Q. Are you coming from work today?

A. Right now.

Q. I want to cut right to the issues in this case.  Let me ask you this first, do you know Jacques Rivera?

A. No, I don't.

Q. Is he a person who is connected to you in any way, through family or friends?

A. No.

Q. I want to talk about the summer of 1988.  Were you living in Chicago at that time?

A. Yes.

Q. Where were you living?

A. Around Fairfield and Wabansia, California.

Q. Is that near Humboldt Park?

A. Yeah, Humboldt Park area.

Q. Was there an occasion back in August of 1988 when you were picked up by the police or you had an interaction with the police?

A. Yes.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 922 of 1335 PageID #:106307
Villafane - direct by Swaminathan
1058

Q. Can you tell us about that.

A. We was in the neighborhood right in front of Fairfield Avenue, by Wabansia, right behind the school. We were working in our cars, back it was Toyotas. And all of a sudden we saw a squad car that stopped. And it come by us. Tell us to put the hands in the cars. And they was searching us for something, and they don't find nothing. They say, "You and you going to the station." I said, "what for?"

Q. So officers came and spoke to you and they indicated to you that you're going to the station, is that where you are at?

A. Yes.

Q. What happened once they told you that?

A. So they take -- take to us the station, station police, because supposed to do a lineup.

Q. And did you want to two in a lineup?

A. No, I say "what for?"

Q. And did you end up going to the police station?

A. Mandatory. They take us.

Q. And when you went to the police station, did you participate in a lineup?

A. Yeah, we did.

Q. Tell us what happened when you got to the police station.

A. Well, we get to the police station, they pull us in for like ten minutes or something like that. After that, they take us in the room where it was a class room and back wall. And

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 923 of 1335 PageID #:106308
Villafane - direct by Swaminathan
1059

they told us, "We're going to the a lineup."  I said, "I don't want to do this.  They said, "You don't got no choice."

Q.  So when they took you to the station, they took into a room, is that right?

A.  Yes.

Q.  Okay.  And once you were in the room, were there other people in the room as well?

A.  It was me and my friends.

Q.  Your friend was someone who was brought to the station with you, is that right?

A.  Yes.

Q.  Did your friend also participate in a lineup or not?

A.  Well, he did, but not in the same lineup.

Q.  So he didn't participate -- he didn't come into the same room you did, is that right?

A.  Right.

Q.  In the room that you went into, were there other individuals in that room as well who were brought into that room?

A.  In the lineup.

Q.  You believe it was a lineup?

A.  Yes.

Q.  So that instance in which you believe there was a lineup, were other people brought into that room, as well?

A.  It ws like five of us.

Q. And so for that lineup, what happened once they had those people in the room with you?

A. They told us they going to tell us to look right, look left, stay forward.

Q. And all of this, this happened in this room. Can you tell us a little bit about that room you were in.

A. I don't know what to tell you.

Q. The room that you were in, did it have any walls -- did it have regular walls, was it glass?

A. Yeah, it got the one big glass in front and the back wall.

Q. And when they had you looking left, looking right. When you're facing forward, what were you facing?

A. We were facing the glass.

Q. And why did you do this thing where you were looking left, and looking right, and so on?

A. That's what they told us, to do what they tell us.

Q. You believe that process that you just described was a lineup?

A. I believe. I never been in one.

Q. That process --

A. That's my first time.

Q. That was the first time you'd ever been in a lineup?

A. Yes.

Q. No other lineups before or after that in your life?

A. Neither in my life.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 925 of 1335 PageID #:106315
Villafane - direct by Swaminathan
1061

Q.  When the police picked you up, what was your reaction?
What was your emotion what was happening?

A.  I was scared.

Q.  Did that make this a memorable event for you?

A.  Yeah.

Q.  Showing you Plaintiff's Exhibit 62.

        (Exhibit published to the jury.)

BY MR. SWAMINATHAN:

Q.  I ask you if one of these pictures is a picture of you.

A.  The first one.

Q.  This is your picture (indicating)?

A.  That's me.

Q.  Okay.  And is this how you looked back in August of 1988?

A.  Yeah.

Q.  Do you know anything about what this case was about that
you were there for?

A.  I don't know nothing.

Q.  Do you know a person name Felix Valentin?

A.  No.

Q.  One of the people listed here, is one of these people with
your name?

A.  The first one.

Q.  Next to number 1, that's your name?

A.  Yeah, Villafane, Angel.

Q.  Is that your birthday, July 21?

A. July 21, yeah.

Q. So, sir, you believe that this incident where your name is listed here, that's the name Felix Valentin, that this event occurred on August 31st, 1988?

MS. ROSEN: Objection to the leading.

THE COURT: Sustained.

BY MR. SWAMINATHAN:

Q. Sir, do you have any reason to dispute that the event you described occurred on August 31st, 1988?

THE WITNESS: No.

MS. ROSEN: Objection.

THE COURT: Overruled.

BY MR. SWAMINATHAN:

Q. Go ahead. Do you have any reason to dispute that the event that you described occurred on August 31st, 1988?

A. No.

MR. SWAMINATHAN: Nothing further.

THE COURT: Cross?

MR. SOTOS: Thank you, Judge.

CROSS EXAMINATION

BY MR. SOTOS:

Q. Good morning, Mr. Villafane.

A. Good morning.

Q. How are you, sir?

A. Okay.

Q. So this time when you went to the police station back in 1988, long time ago, huh?

A. Yes.

Q. And after you went that day, when was the next time you ever thought about it?

A. I've be thought all my life.

Q. You think about it all your life?

A. Yeah.

Q. Yeah?

A. It was my first time in life.

Q. Ever in a police station?

A. No, they take me from the street to do a lineup. They make me feel like I wasn't matter.

Q. That wasn't you first time in a police station, was it?

A. No. At that time I think so.

Q. But you've been in police stations since then?

A. I be for -- for tickets.

Q. And so when was the next time you talked to anybody about this incident after August of 1988?

A. When was what?

Q. When was the next time you talked to somebody about it?

A. None.

Q. You don't remember?

A. No.

Q. It's -- do you remember talking with people from

Northwestern University around 2010?

A.  No, I don't remember.

Q.  You don't remember that?

MR. LOEVY:  Objection; Asked and answered, Your Honor.

THE COURT:  Overruled.

BY MR. SOTOS:

Q.  Let me go back to my last question.

A.  Okay.

Q.  Do you remember maybe 5 years ago you gave a deposition in this same case where the lawyers were present, they asked you questions about the case, you gave answers, you took an oath?

A.  I don't remember.  I think so.

Q.  And do you remember in that deposition --

MR. SOTOS:  Page 28, counsel.

MR. SWAMINATHAN:  Lines, counsel?

MR. SOTOS:  Page Line 11.

BY MR. SOTOS:

Q.  (Reading:)

"Question:  So you never really gave this any thought, right?

"Answer:  Yeah.

"Question:  Until many, many years later?

"Answer:  Weird --"

MR. SWAMINATHAN:  What page, counsel?

MR. SOTOS: 28.

BY MR. SOTOS:

Q. (Reading:)

"Question: And when was the next time anybody ever asked you about that lineup?

"Answer: When?

"Question: Yes.

"Answer: Like 2 years ago somebody came to my house, a lady."

Do you remember that?

A. No.

Q. Okay. Is it fair to say that -- so if I told you your deposition took place in 2013, you don't remember somebody from Northwestern, a representative of Mr. Rivera, coming to your house to talk to you about the case a couple of years before that?

A. I do; right.

Q. You do remember?

A. Yes. Yes.

Q. Okay. And she was asking you questions about the case, correct?

A. I believe.

Q. She told you she represented Mr. Rivera?

A. I believe.

Q. Do you remember where the meeting was at?

Villaphane - cross by Sotos

1066

A.  About the meeting?

Q.  Do you remember where the meeting occurred?

A.  Ah, I think it was in front of my house -- I don't remember.

Q.  You're not sure?

A.  No, I'm not sure.

Q.  Because that was like 8 years ago, right?

A.  I guess.

Q.  About.  You don't even know, right?

A.  Right.

Q.  It could've been five , could've been ten?

A.  Right.

Q.  And do you remember telling her that the first time you talked to her, that you weren't there, you don't know anything, you didn't have anything to tell her when you first started talking with her?

A.  I don't remember.

Q.  Do you remember at your deposition being asked this question and giving this answer --

MR. SWAMINATHAN:  Page and line, counsel.

MR. SOTOS:  Page 30, top of the page.

BY MR. SWAMINATHAN:

Q.  (Reading:)

"Question:  How long did the first meeting last?

"Answer:  It was quick, 20 minutes, 15 minutes.

She just asked me question, almost the same. I
say I wasn't there. I don't know nothing. I
can't say. I can't tell you nothing. I don't
know nothing."

Do you remember telling her that?

MR. LOEVY: That's not impeaching, Your Honor. It's
just how long did the meeting last.

MR. SOTOS: The answer is --

THE COURT: The question was how long -- that was the
underlying question is, how long did the meeting last?

MR. LOEVY: Yes.

MR. SOTOS: Yes.

THE COURT: Well, I think, then, we ought to stick to
that. Sustained.

BY MR. SOTOS:

Q. Do you remember telling a representative of Northwestern
first time you talked to her that you didn't -- you didn't know
anything, you weren't there, anything along those lines, do you
remember that?

MR. SWAMINATHAN: Objection, Your Honor. There's No
foundation he was asked about a lineup at the first meeting.

MR. SOTOS: Judge --

THE COURT: Overruled.

BY MR. SOTOS:

Q. Do you remember first saying that to a representative at of

Northwestern when she showed up at your house?

A. I don't remember.

Q. Did she then start talking to you about the case to try and help refresh your recollection about what she was talking to you about?

A. I believe something like that.

Q. She told you she was representing Mr. Rivera, correct?

A. I guess.

Q. And she told you that she wanted to ask you about that night you were at the police station?

A. Okay.

Q. She reminded you that you were in a lineup that day?

A. I believe.

Q. And did she tell you she wanted your help to get Mr. Rivera released from prison?

A. I think so.

Q. And you to want help, right?

A. I got nothing to say.

Q. Okay. You reasonable if she took any notes?

A. Ah, I don't know.

Q. Do you ever remember talking to her on the phone at all?

A. No.

Q. Do you remember talking to the representative from Northwestern about whether there was a photograph taken of you at the police station that night?

A.  I guess.

Q.  Do you remember her telling you that there, in fact, was not a photograph that was taken?

A.  I'm not sure.

Q.  You don't remember if she told you that the police -- that she did not have any copy of a photograph that had been taken of you at the police station that night?

A.  I do not know.

Q.  After you met with her, do you remember her name?

A.  No.

Q.  Was anybody else present when you were meeting with her or was it just the two of you?

A.  Ah, I don't know.  I believe me and her only, I don't know.

Q.  You said the police were a little bit rough with you or they weren't nice to you when they picked you up?

A.  In that time, yes.

Q.  They handcuffed you?

A.  Yes.

Q.  Didn't they tell you they were going to get you a sandwich after it was over?

A.  Yeah.

Q.  Did they get you the sandwich?

A.  I guess.  I'm not sure.

Q.  After you met with the woman from Northwestern, she prepared a paper for you to sign after that, correct?  Do you

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 934 of 1335 PageID #:106319
Villaphane - cross by Sotos
1070

remember that?

A.  No, I don't remember.

Q.  You don't remember that either.

MR. SOTOS:  Defendants' Exhibit 114.

BY MR. SOTOS:

Q.  Can you see on the screen in front of you there, sir, a paper?

A.  Yes.

Q.  Can you see where it says it's an affidavit of Angel Villafane, Jr.?

A.  Yeah.

Q.  And that's signed by you on the second page, correct?

A.  Yeah, that's me.

Q.  All right.  And so you didn't prepare this yourself, right?

A.  No, not me.

Q.  The lady that you had met with prepared it?

A.  I believe.

Q.  And then she came back to your house to have you sign it, is that right?

A.  I guess, yes.

Q.  You're not sure where you signed it?

A.  I believe, yeah, I did sign it.

Q.  You're not sure where you were when you signed it?

A.  Right.

Q.  Too long ago to remember the details?

A. Yeah. It's -- it's not my case, so I don't know.

Q. Right. Understood.

Can you turn to page 11 -- excuse me, page 2 and look at paragraph 11 of the affidavit.

And do you see where it says --

THE COURT: We don't have the right page.

MR. SOTOS: Oh, I'm sorry.

(Brief pause).

MR. SOTOS: Can you turn to the second page.

Your Honor, we move to admit Defendants' Exhibit 114.

THE COURT: Any objection?

MR. SWAMINATHAN: No objection.

THE COURT: 114 is received.

(Defendants' Exhibit 114 admitted into evidence).

BY MR. SOTOS:

Q. Do you see paragraph 11 in front of you there, sir?

A. Yeah.

Q. And it says:

"... the police did not ask to take my photo."

Do you see that?

A. Okay.

Q. Now, was that something that you told the investigator on your own or was that something that she suggested to you when she was talking to you about the case?

Villaphane - cross by Sotos

1072

A. Ah, I think I told the police why they take my picture on me.

Q. I'm sorry, sir. Can you repeat it one more time.

A. I believe I told the police why they take picture of me.

Q. Why they didn't take a picture.

Okay. But what I'm asking you about when you met with the investigator from Northwestern, did she tell you that they didn't have a photograph from your night at the police station or did you bring that up to her?

A. I'm not sure.

Q. And you said that the police did not ask to take your photo that night?

A. I believe.

Q. But you weren't sure about that?

A. I'm not sure, but I think --

Q. Long time ago.

A. They want to take a picture of me for what reason.

Q. So you didn't think they had taken one?

A. I think not.

Q. Or you didn't remember that they had taken one?

A. I don't remember.

Q. Okay. And you said you would not have given the police permission to take your photo, correct?

A. Okay.

Q. Okay. And that if the police have a photo of you, you

would like to see it, correct?

A.   Yes.

Q.   And so the investigator from Northwestern, when she was there that day talking to you about the case, she didn't have a photograph to show you, correct?

A.   I believe.

Q.   Now, since then you have seen the photograph that was taken of you at the police station that night, correct?

A.   Yeah.

Q.   And is that, in fact, how you appeared back in 1988?

A.   Yeah.

Q.   And is that, in fact, how you appeared in 1988?

A.   Yeah.

Q.   You don't have any reason to doubt that the police actually did take that photo of you that night at the police station, correct?

A.   Yeah.

Q.   When did you first see that photograph?

A.   I'm not sure when.

Q.   You're not sure when?

A.   I'm not sure when.

Q.   Could it have been at the deposition that we talked that that took place about 5 years ago?

A.   It could've been.

Q.   And you don't remember how long ago that deposition was

either, right?

A. No.

Q. When you say that the police officer -- who were you with when the police officer picked you up?

A. Who I was?

Q. Yes. Who were you with.

A. I was with my friends from the neighborhood.

Q. Do you remember their names?

A. No, I don't.

Q. Do you remember if they were handcuffed, too?

A. Ah, there was two of us who were handcuffed.

Q. Two of your friends were handcuffed?

A. Two of us, yes.

Q. Are you sure they were handcuffed?

A. Well, two of us. I. Was handcuffed myself.

Q. Do you remember again in your deposition in 2013, page 18, Line 20, being asked:

        "Question: And was your friend also handcuffed?

        "Answer: I believe. I don't believe.

A. I believe.

Q. But you don't remember for sure?

A. Yes.

Q. Too long ago?

A. Yes.

Q. The other people who are in the lineup, do you remember any

of them that were standing with you in the room that night?

A.   No, I don't.

Q.   You don't remember any of them?

A.   No.

Q.   Do you recall their race?

A.   It was Spanish.  It was Spanish.

Q.   They were Hispanic?

A.   Yeah.

Q.   Again, referring to your deposition in 2013, page 27, Line 10, do you recall being asked:

        "Question:  Do you recall anything about the

        other people who were also in this lineup?

        "Answer:  No.

        "Question:  Do you remember if they were

        Hispanic?

        "Answer:  No."

         Do you remember saying that?

A.   Maybe.

Q.   Okay.  So it's possible you don't remember whether they were Hispanic or not?

A.   I know I was Hispanic, my other friends -- we was in the neighborhood, they was Spanish.

Q.   Since you gave your deposition, did you do anything to prepare for your testimony here at trial today?

A.   No.

Q. You didn't talk to the lawyers for Mr. Rivera?

A. Yes.

Q. Did they talk to you about this fact, about whether or not the other people were Hispanic?

A. Yes.

Q. Okay. And you don't remember how any of them were dressed or anything like that?

A. No.

Q. And while you were in the room, the room where the picture was taken, the photograph was taken, you didn't hear any -- you said there was a mirror in the room?

A. Yes, right in front of us.

Q. Right. And you couldn't see on the other side of the mirror, right?

A. No, we cannot see nothing.

Q. You couldn't hear anything that was going on in the other side of the mirror, right?

A. No. No.

Q. And this whole thing, from the time you were picked up to the time you were dropped off, about how long did that take?

A. I'm not sure. I'd say like an hour, 40 minutes. I'm not sure.

Q. And when you went home, did the police drop you back off where they picked you up?

A. In the same place, yes.

Q. You didn't go back -- I didn't go back with the other people who were in the lineup, right?

A. No.

Q. The police dropped you back --

A. Yeah. And my car was there. I just went home.

MR. SOTOS: One second, Your Honor.

(Brief pause).

BY MR. SOTOS:

Q. Just one other question, Mr. Villafane. You testified on direct examination that when you went to the police station, you went with another friend of yours, and he was in another lineup that night?

A. I believe.

Q. And who was your friend?

A. I'm -- I'm not sure which one it was.

Q. Was it Papo or Lalo?

A. I recall those names, Papo and Lalo.

Q. Could it have been one of those two?

A. Yes.

Q. Too long ago to remember for sure?

A. Right.

Q. So but your understanding is that he was placed in a different lineup than the one you were in that night?

A. Yes.

Q. Okay. And was he in the same room with you at the police

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 942 of 1335 PageID #:106327
Villaphane - redirect by Swaminathan
1078

station when you were waiting for a while before you went into the other room?

A.  Yeah.

MR. LOEVY:  Foundation.

THE COURT:  Overruled.

BY THE WITNESS:

A.  I believe we was in the same.

BY MR. SOTOS:

Q.  You were both in the same room together?

A.  Right.  When -- when they bring him in, yeah, I believe.

Q.  And then you went to one place, he went to another?

A.  Right.

Q.  Did you ever talk with him after that, about the lineup that he was in?

A.  No.

MR. SOTOS:  Thank you, Judge.  Nothing further.

THE COURT:  Anything further?

MR. SWAMINATHAN:  Just a few questions and then that's it.

REDIRECT EXAMINATION

BY MR. SWAMINATHAN:

Q.  You were asked some questions about the investigator from Northwestern, about whether you could help her.  Did you do anything to help the investigator from Northwestern other than to tell her the truth?

A.   Nothing but the truth.

Q.   Have you told the jury about what you remember, about what happened that day back in the summer of 1988?

A.   Well, say that again.

Q.   Have you told the jury what you remember about what happened that day back in August of 1988?

A.   Yes.

Q.   And did it happen the way that you described it?

MR. SOTOS:  Objection, Judge, what he testified to on direct?

THE COURT:  Overruled.

MR. SWAMINATHAN:  That is within the scope.

BY MR. SWAMINATHAN:

Q.   Go ahead.

A.   Yes.

Q.   Are you making any of this up?

MR. SOTOS:  Judge, objection.

BY THE WITNESS:

A.   No.

THE COURT:  Sustained.

BY MR. SWAMINATHAN:

Q.   Is this your name on this document (indicating)?

A.   Yeah, that's my name.

Q.   Were you in a lineup on August 31st, 1988?

LEFT SIDE:  Judge, objection.  It's all asked and

answered.

BY THE WITNESS:

A.   Yes.

        THE COURT:  I think we're just going over the ground that's covered.  Sustained.

        MR. SWAMINATHAN:  Nothing further.

        THE COURT:  Anything further?

        MR. SOTOS:  No, Judge.

        THE COURT:  Thank you, sir, you may step down.  Watch your step.

        (Brief pause)

        THE COURT:  Okay, ladies and gentlemen, I think it's time for a lunch break.

        Sir, you are excused.  Thank you very much.

        (Witness excused.)

        THE COURT:  We'll start again at 25 after 1:00.

        COURT SECURITY OFFICER:  All rise.


        (The following proceedings were had out of the

          presence of the jury in open court:)

        THE COURT:  Okay.  Quickly on 404(b).  You know, the magistrate judge did things I don't know anything about, and I don't know which witnesses were subject to full discovery and which witnesses were not.  So before I spend another day like I did yesterday trying to figure things out that had all kinds of

issues that I don't know about, why don't you tell me,
plaintiff, who were the 404(b) witnesses that were disclosed
and as to whom there was complete discovery.

MR. ART: All of the folks who are currently mentioned
in he response were disclosed. I think the only issue is
whether Sam Perez gave fulsome deposition on the particular
404(b) facts that he's going to be allowed --

THE COURT: Well, I think we're past the Perez
problem. I mean, I think so it's full of issues because he
didn't show up.

MR. ART: To be clear, they took a full deposition on
all of the issues that he will testify about that are
admissible under Rule 404(b), and then refused to start
answering questions on other subjects.

MR. LOEVY: And, Your Honor, we offered to make the
deposition available to them this weekend. Remember we talked
about that.

THE COURT: Yes.

MR. LOEVY: And they declined the opportunity to
depose him, undoubtedly so they could argue that they didn't
have his deposition. But we told them on Friday, if you want
us to facilitate a deposition, we will attempt to do that for
you.

THE COURT: So he is available?

MR. ART: Yes.

MR. LOEVY:  They declined the request.

MR. GIVEN:  Judge, we declined the request because we were going to be filing this motion about him.

THE COURT:  Well, you know, nobody is telling me enough.  Basically I'm being whipsawed by half stories from everybody.  You make it really hard for me to cope with this.

So, anyway, I've wasted my time on Sam Perez.  So what's the story on the other witnesses?

MR. LOEVY:  Sam Perez, on Friday where we left it was --

THE COURT:  I know that, but they're saying they can't develop rebuttal because I didn't rule on it when the issue was presented to me.  So let us just go from there to see where we go next, if anywhere.

MR. GIVEN:  Judge, with regard to Ms. Diaz, when I told you I'd be concise and efficient, she was withdrawn, as you know --

THE COURT:  Well, that's why I'm asking the question that I'm asking.

MR. GIVEN:  Correct.  And she was not subject to discovery, as Your Honor held in your ruling --

THE COURT:  So now that I understand that, since you made that point this morning, am I going to get the information that I'm looking for or do I just go have lunch?

MR. ART:  We can make her available, as well.  I mean,

to the extent that there is some issue about whether this person has been put under oath and given testimony on the limited 404(b) stuff that's coming in in the past, which we don't think there's an issue on this side, we can make those witnesses available.

THE COURT: Well, I don't understand what happened with Ms. Diaz, and I don't know why I need to waste my time to find out since I've asked this simple question and I'm not getting an answer.

MS. ROSEN: Judge, what we can do for you, because I heard your simple question is, you want to know which witnesses were available for full discovery.

THE COURT: That's what I'd like to know. That's where we start.

MS. ROSEN: Correct. We can put that together for you at the lunch and give it to you, and give you the identities of the witnesses that plaintiff agreed to withdraw who were then not subject to full discovery, and then you'll know the universe.

THE COURT: Diaz was one that was withdrawn?

MR. GIVEN: Correct. Yes.

MS. ROSEN: She was.

THE COURT: And Judge Roland, I take it, allowed, what? Ten 404(b) witnesses?

MR. LOEVY: On the plaintiff's side. So what Judge

Roland said is, okay, we're not going to have a huge 404 case.

THE COURT: Yeah, I got that.

MR. ART: Ten, pick them.

THE COURT: Fine. I got it. I don't need to have the whole history. I just want to know "ten."

And then what happened? Did the plaintiffs withdraw some of those ten who were first identified?

MR. ART: We sent a letter listing ten to the defendants.

MS. ROSEN: And Ms. Diaz was not -- for example, Ms. Diaz was not on the ten.

THE COURT: So who was the ten?

MS. ROSEN: I don't have. That's the list I'm going to get for you.

THE COURT: All right. I think that's where we should start. I think I need to know this before we get into the afternoon. How long is Dr. Wells going to take?

MR. ART: I have ten or fifteen more minutes on direct.

MS. ROSEN: I have some cross.

THE COURT: Yeah, I'm sure you do. But we might get to another witness. Who is the next?

MR. LOEVY: The next witness will either be Guevara, depending on the timing, or a video that we will play and then Guevara.

THE COURT: All right. So I don't have to reach the 404(b) today.

MR. ART: Correct.

THE COURT: All right. But you're also going to give me a deposition to take home tonight?

MR. LOEVY: Yes, we are, Your Honor.

THE COURT: So let's meet at 20 after, and why don't you tell me the ten people, 404(b) people. I assume there was discovery. Maybe we can get that resolved today.

MR. ART: Thank you, Your Honor.

MS. ROSEN: Thank you.

THE COURT: All right.

(Luncheon recess taken from 12:28 o'clock p.m. to 1:20 o'clock p.m.)

\* \* \* \* \* \* \* \*

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER

/s/Blanca I. Lara                June 11, 2018

1086

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JACQUES RIVERA,                          ) No. 12 CV 4428
                                         )
              Plaintiff,                 )
                                         )
vs.                                      ) Chicago, Illinois
                                         )
REYNALDO GUEVARA, STEVE GAWRYS,          )
DANIEL NOON, JOHN GUZMAN, JOSEPH FALLON, )
JOSEPH SPARKS, PAUL ZACHARIAS, GILLIAN   )
MCLAUGHLIN, JOHN LEONARD, EDWARD MINGEY, )
RUSSELL WEINGART, ESTATE OF ROCCO        )
RINALDI, CITY OF CHICAGO,                ) June 11, 2018
                                         )
              Defendants.                ) 1:20 p.m.

VOLUME 5B
TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JOAN B. GOTTSCHALL
and a jury

APPEARANCES:

For the Plaintiff:     LOEVY & LOEVY
                       BY:  MR. JONATHAN I. LOEVY
                            MR. STEVEN E. ART
                            MR. ANAD SWAMINATHAN
                       311 North Aberdeen Street
                       3rd Floor
                       Chicago, Illinois  60607

                       MacARTHUR JUSTICE CENTER
                       Northwestern University School of Law
                       BY:  LOCKE E. BOWMAN III
                       357 East Chicago Avenue
                       Chicago, Illinois  60611
                       (312) 503-0844

Court reporter:             Blanca I. Lara
                        Official Court Reporter
                       219 South Dearborn Street
                            Room 2504
                       Chicago, Illinois 60604
                         (312) 435-5895
                       blanca_lara@ilnd.uscourts.gov

1087

APPEARANCES:   (Continued)

For the Individual          THE SOTOS LAW FIRM
Defendants:                 BY:   MR. JEFFREY N. GIVEN
                                  MR. JAMES G. SOTOS
                                  MS. CAROLINE P. GOLDEN
                                  MR. JOSEPH POLICK
                                  MR. DAVID A. BRUEGGEN
                            550 East Devon Avenue, Suite 150
                            Itasca, Illinois  60143

For the Defendant           ROCK FUSCO & CONNELLY, LLC
City of Chicago:            BY:   MS. EILEEN E. ROSEN
                                  MS. CATHERINE M. BARBER
                                  MS. THERESA B. CARNEY
                            321 North Clark Street, Suite 2200
                            Chicago, Illinois  60654

For the Defendant           LEINENWEBER BARONI & DAFFADA, LLC
Guevara:                    BY:   MR. THOMAS E. LEINENWEBER
                            120 North LaSalle Street, Suite 2000
                            Chicago, Illinois  60602

1088

(Proceedings in open court.  Jury out.)

THE COURT:  Do we have the list of 10?

MR. BRUEGGEN:  I have got it.  We do, Judge.

THE COURT:  We are still waiting for plaintiff's counsel, I think.

MR. SWAMINATHAN:  Here comes John.

Do you want a copy, Judge?

THE COURT:  Yes.  Thank you.  Thank you very much.

MR. BRUEGGEN:  We haven't seen that list.

Here is our list.

MR. SWAMINATHAN:  January 30th letter.

MR. BRUEGGEN:  Yes.

MS. ROSEN:  Excuse me, your Honor.  There is one other one.

Bill Dorsch is on there as well.  He is not listed, but he is No. 11.

THE COURT:  Right.  Okay.  I know about him.

Now, what exactly does the defense want in terms of rebuttal that you do not have?

MR. GIVEN:  I'm sorry.  We are back to Mr. Perez?

THE COURT:  Correct.

MR. GIVEN:  We want -- well, assuming he was going to be a 404(b) witness, we would want to depose him so that we could then answer your Honor's question, because until his dep is done, we don't know what we need to develop.

1089

THE COURT: But you didn't want to depose him enough to depose him. So --

MR. GIVEN: That's not exactly true.

THE COURT: There's a note from the jury. Oh, somebody whose name I can't read --

THE COURT SECURITY OFFICER: It's Mr. Planter, your Honor.

THE COURT: Mr. Planter needs to take a conference call from 3:00 to 3:30.

THE COURT SECURITY OFFICER: He told me it's a medical issue, your Honor.

MR. LOEVY: At least half of that could coincide with the afternoon break, your Honor.

THE COURT: Yes, but not all of it.

Something with father who had a mild heart attack.

Well, this is what I suggest. I suggest we take our break at 3:00, and that we tell him to -- does he need a place to make the call?

THE COURT SECURITY OFFICER: Judge Norgle's jury room is available.

THE COURT: Okay. And then as soon as he is ready to come back to us -- okay? And we will just wait for him. All right?

So does the rest of the jury know about this?

THE COURT SECURITY OFFICER: Not yet, no.

1090

THE COURT: All right. So I will tell them.

MR. GIVEN: So, Judge, we left off talking about this deposition this week.

And the point is -- our point is, the time to take Mr. Perez's deposition was two years or three years ago when he wouldn't show up for it.

THE COURT: I understand that's your position.

MR. GIVEN: Okay. And we would be prejudiced by having to take his deposition now.

THE COURT: But you don't know how or to what extent.

MR. GIVEN: Because I haven't taken it, and it becomes circular.

THE COURT: Okay. I get it.

So when was the case that he was involved in? Was that a recent case?

MR. LOEVY: It was the *Juan Johnson* case, another Guevara case that went to a full jury trial, your Honor. There was a ton of discovery done on it.

THE COURT: All right.

MR. BRUEGGEN: The question was, how long ago?

MR. ART: It was 2009 was the trial.

THE COURT: 2009.

Okay. Let's -- okay. Oh, it's not time yet. Okay.

MR. GIVEN: Judge, one other thing.

Mr. Perez purports to have other 404(b) information

1091

about Mr. Guevara beyond Juan Johnson. That's part of the problem.

MR. ART: Your Honor, we proffered the *Juan Johnson* case and his testimony about that, and we understand the Court's ruling to be limited to that.

MR. LOEVY: I think that's part of the confusion, why they think they need all these depositions. He is going to only testify on the limited 404(b) --

THE COURT: On Juan Johnson.

MR. LOEVY: -- on Juan Johnson, which he was deposed on.

MR. GIVEN: In fact, Judge, not to make your head spin, but Mr. Perez is knee deep into the Dorsch story.

MR. ART: He is not going to presented for that purpose.

THE COURT: What Dorsch story?

MR. GIVEN: Mr. Dorsch, William Dorsch, who's one of their other 404(b) --

THE COURT: Yes, I know who Mr. Dorsch is.

MR. GIVEN: He has a story that he likes to tell about Mr. Guevara, and we believe that that story in fact implicates Mr. Perez. So we wanted to -- in fact, that's where Perez's deposition stopped. We started asking about the Dorsch story, and he said, "I think I may need a lawyer." And that's where it all broke down.

1092

THE COURT:  And you don't plan to bring that out, or you do?

MR. LOEVY:  No.

MR. GIVEN:  Well, but the point is, they don't want to bring it up --

MR. BRUEGGEN:  But we do.

MR. GIVEN:  -- but we may want to bring it up as impeachment of Dorsch depending on what Perez says.

THE COURT:  I understand.

MR. GIVEN:  The time to do that would have been a long time ago.

THE COURT:  Let me ask one thing.  He indicated to plaintiff's counsel that he would make himself available.

MR. LOEVY:  Your Honor, I said to the defense on Friday -- the Court said, "If you want his deposition, we will try to facilitate it."

Mr. Sotos told us, "We don't want a deposition."

THE COURT:  Oh, so you didn't try?

MR. LOEVY:  So I didn't try because they said they didn't want one.  They said they didn't want one.  I mean, I would have if they said they wanted it.

THE COURT:  Well, I don't know if he has a lawyer.  I mean, he obviously wants a lawyer.  If he didn't have a lawyer --

MR. GIVEN:  To that point, Judge, they got him a

lawyer back in the day.

THE COURT: Okay.

MR. GIVEN: And then the lawyer said -- we called the lawyer several times and said, "When is Mr. Perez going to come for his deposition?"

He said, "I don't know. He won't call me."

MR. SWAMINATHAN: Mr. Perez has testified, as Mr. Given has said, in post-conviction proceedings since this on the Juan Johnson matter, that are the only things we are going to have him testify about. Without counsel, he is prepared to testify on those subjects, as far as we understand, and has been doing so.

MR. LOEVY: Mr. Perez was deposed in Mr. Johnson's trial, gave trial testimony in Mr. Johnson's trial, talked at the post-conviction at Mr. Johnson's trial --

MR. GIVEN: Gave a dep in this case.

MR. LOEVY: -- gave a dep in this case on the Juan Johnson scenario fully exhausted.

And then we said this weekend, "If you guys really are saying you need more dep, we will try to make it available."

They said, "No."

So I think that's pretty disclosed, your Honor.

MR. GIVEN: Not fully exhausted at his deposition, your Honor. I'm trying to work --

THE COURT: You don't need to tell me things twice.

1094

Okay?

So you told me that you want to inquire about the Dorsch matter for which he wanted a lawyer. So I think I get that.

You said you might want that for what? Impeachment here?

MR. GIVEN: For possible rebuttal and impeachment both of Mr. Perez and of Mr. Dorsch.

Perez is a hornet's nest, your Honor. That's part of the reason he should be barred at this late hour.

THE COURT: I think we are ready for the jury.

The juror's name is?

THE COURT SECURITY OFFICER: Mr. Planter.

THE COURT: Mr. Planter needs a conference call concerning father. Okay. The -- something -- needs to -- okay. I think I have got enough.

MR. ART: Is it okay if Dr. Wells takes the stand?

THE COURT: Absolutely.

(Jury in at 1:28 p.m.)

THE COURT: Okay. Please be seated, everyone.

Mr. Planter, would it be okay with you if, without going into any details about this, I explain to the jury what we are going to do?

JUROR PLANTER: Oh, sure.

THE COURT: Okay. So Mr. Planter has told me that he

needs to be on a conference call from 3:00 o'clock to 3:30 concerning a medical issue relating to a family member. And it seems to me that we should accommodate Mr. Planter's need to do that. So let me just say we are going to break at 3:00.

Mr. Planter, do you know that the doctor will be available at 3:00?

JUROR PLANTER: Yes.

THE COURT: Okay. We will find you a confidential place for you to talk to him. And then if you can come back to us before 3:30, I am sure we would all appreciate being able to start as soon as we can.

JUROR PLANTER: All right. Thank you.

THE COURT: All right. So let us proceed. We will go until 3:00, and we will break at 3:00 and hopefully get back to work as soon as we can after that.

MR. ART: Thank you, Judge.

GARY L. WELLS, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

DIRECT EXAMINATION - Resumed

BY MR. ART:

Q. Mr. Wells, back to you.

So when we left off, we were talking about the rate of filler identifications in Chicago being zero and the rate in other jurisdictions being approximately 24 percent. And you said that you had done some statistical analysis.

I would like you to explain the statistical analysis

and to tell us whether it explained the discrepancy between those two rates.

A. Well, a statistical analysis, per se, never explains anything. It just shows whether something is reliably different; in other words, not just due to chance. And that's, in effect, the primary test that I did, was to find out if, using what's called a chi-square analysis -- it's not an -- it's sounds exotic, but it's really not that exotic. It really is a type of statistical test that just estimates the likelihood that some observed numerical difference could be due purely to chance.

So when you do a chi-square on this, for example, comparing the number of filler picks you would expect to get based on 980 lineups to the number that you actually get, it's a very small probability that sort of stops after you get out to about four or five zeros -- or you stop it when it gets out to about four or five zeros after the point sign.

So it's just statistically pretty close to impossible -- I mean, as a scientist, I can never say anything is impossible, but that's pretty close to impossible. Less than -- let's just say less than 1 in 10,000.

Q. And what's impossible is that the zero filler lineup rate is explained by chance?

A. Is explained by chance that Chicago Police Department somehow got lucky 980 lineups in a row.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 961 of 1335 PageID #:106346
Wells - direct by Art
1097

Q. So did you then consider theories that might explain the difference between what happens in Chicago and what happens in other jurisdictions?

A. Yes.

Q. Okay. Tell the jury, just in general terms, what the four theories you proposed were.

A. Well, one theory that you have to look at is the possibility that they weren't using fillers, that everyone in all their lineups were suspects.

You are not going to get filler picks if you treat everybody as a suspect.

Q. Was there any indication in the data that that was happening?

A. No. There were more suspects than there should be. There were lineups in which there were multiple suspects and not enough fillers to really meet their own 1983 general order about how they do lineups. But there were not enough instances of those to explain that discrepancy. So I largely ruled that out. That's just not a strong enough thing to explain the discrepancy.

Q. Okay. So that's one of the four down.

What are the other three?

A. So a second one is that the fillers -- there were fillers, but those fillers were so poorly chosen -- in other words, let's say that the witness described the perpetrator as being a

white male in his mid-20s with short, dark hair, and that description fits their suspect, but then all the fillers are, let's say, in their -- clearly in their 30s or they have blond hair or they have a heavy build and so on, in which case, you know, at the extreme, they might as well be dogs, cats, and refrigerators. No one is going to choose them. But that also did not seem to explain things.

We were able to look -- I was able to look at some of the lineups. Some of the files had photos of their lineups. They looked reasonable, not great necessarily, but it takes a pretty extreme -- extremely poor fillers to never get filler picks like that. So I did not consider that to be something that could explain the result.

Q. Okay. What else did you consider?

A. So a third possibility is that the witnesses are being steered during the procedure -- during the lineup procedures.

Q. Let me stop you there.

When you say "steered," do you mean someone is pointing to someone in a lineup and saying, "Pick that person"?

A. Not necessarily. That would be an example of steering, I suppose.

So there is two kinds of steering. Steering away from fillers. So, for example -- and it can be very subtle kinds of things, like the witness, you know, says, "Well, you know, No. 4," and the person administering this knows that it's a

filler, and so they are kind of, you know, maybe through facial expressions or whatever, getting them to kind of move on; or maybe they speak up and say something like, you know, "Now, Mrs. Jones, take your time. Look at all of them." So that --

Q. When you are talking about this steering, does the eyewitness necessarily know that it is happening?

A. No, it doesn't feel like steering to them. Generally speaking, if you do it right, people don't realize they are being steered or queued toward somebody or away from someone else.

Q. Are some eyewitnesses more or less susceptible to steering than others?

MS. ROSEN: Objection. Relevance, Judge.

THE COURT: Overruled.

BY THE WITNESS:

A. Well, young eyewitness -- children are more --

MS. ROSEN: Objection, your Honor.

THE COURT: Overruled.

MS. ROSEN: Beyond the scope of his 26(a) disclosures.

THE COURT: Was it in the 26(a) disclosures?

MR. ART: Yes, your Honor. It's on page -- his steering hypothesis is on Page 11 of the report in the middle of the page.

THE COURT: I don't see that the witness has talked about age or other demographic factors here, so I'm going to

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 964 of 1335 PageID #:106349
Wells - direct by Art
1100

sustain the objection.

BY MR. ART:

Q.  Okay.  Let me try to -- so ultimately did you eliminate steering as an explanation for the zero filler lineups in the Chicago data?

A.  I think that steering could account for a little bit, but not -- I mean, zero is a qualitatively different number.  I mean, it's so thoroughly not -- filler identifications are so thoroughly not in the files that I don't think that steering could explain how -- I mean, you can -- you can't steer everybody away from a filler.

Q.  Okay.  Is there something about the way steering works that prohibits that from being the explanation for what you are seeing in the data?

A.  Yes.

Q.  And what is that?

A.  That the results are too extreme.

Q.  Okay.  What was your fourth hypothesis?

A.  The fourth is that -- it has to do with reporting.  You know, this reporting, for example, it may be a failure.  So that the filler IDs are happening, but they are not getting reported.  In some cases, maybe no report is being made at all about that witness or about that lineup when they picked a filler.

        Another possibility -- and these are not exclusive,

but this is also a reporting possibility -- is that the --

MS. ROSEN:  Objection, your Honor.  Beyond the scope of his 26(a) disclosure.

MR. ART:  Your Honor, it's in his report at Page 8 and 9, and he was asked in his deposition at 171 to 173 about these subjects.

THE COURT:  8 and 9?

MR. ART:  Yes, your Honor.

(Brief pause.)

THE COURT:  Overruled.

BY MR. ART:

Q.  And let's just try to keep it as concise as possible.

It's your opinion that the zero rate of filler identifications in Chicago is explained by a lack of reporting, correct?

A.  A reporting problem seems to be the reason.

Q.  So when a filler is selected, a report is not made.  Is that one option?

A.  That's one option, a report is not made.  Another is that it's just simply called something else.

MS. ROSEN:  Objection, your Honor.  Beyond the scope of his 26(a) disclosure.

THE COURT:  I think it's implicit.  That much I am pretty confident of.  Overruled.

BY MR. ART:

Q.  Okay.  Showing you --

MR. ART:  May I approach, your Honor?

THE COURT:  Sure.

BY MR. ART:

Q.  Showing you what's been marked as Plaintiff's Exhibit 154-D.

(Document tendered.)

BY MR. ART:

Q.  Is that one of the lineup reports that you considered in your study of this case?

A.  Yes, it appears to be in the set.

I didn't -- I don't have a copy of it, but it certainly looks like it's one of them.  G 159-909, I believe that was in the set, the lineup report -- official lineup report.

Q.  Okay.  Let me take that back from you.

(Document tendered.)

MR. ART:  Your Honor, we would move admission of Plaintiff's Exhibit 154-D.

THE COURT:  Any objection to 154-D.

MS. ROSEN:  No objection, your Honor.

THE COURT:  It is received.

(Said exhibit was received in evidence.)

BY MR. ART:

Q. This is another lineup report, correct?

A. Yes.

Q. Okay. And if we look at Page 2 of this report, what does it tell us about the results of this lineup?

A. It says that no identification is made by either person viewing this lineup.

Q. Okay. So how would that report be coded in the data that you looked at?

A. It would be recorded as no identification. The witness didn't identify anyone.

Q. Okay. And then looking at -- there are other materials attached to this exhibit, correct?

A. Yes.

Q. So showing you the page marked RFC 2867, what does it say about what this witness did in the middle of that page?

A. Well, it says that this witness had indicated, in this case to, I believe, an assistant State's Attorney who's writing this report, that the witness -- this witness had identified a person whose last name is Garcia.

Q. Okay. And was that person a suspect in the lineup that was reported or a filler?

A. I remember this particular file now. That was a filler.

Q. Okay. And, in fact, there is another page of State's Attorney notes; is there not. This page (indicating)?

A.   Yes.

Q.   And, again, that's a separate witness making the same identification, correct?

A.   That witness also, in an interview from the assistant State's Attorney, indicated that he -- he or she; I don't know; Bobby could be a female -- identified Garcia as well.

Q.   Okay.  So you have a lineup report that says no identification and then some evidence in the same file that, in fact, there was a filler identification, correct?

A.   Yes.

Q.   So what does that tell you about one way in which filler identifications might not be reported?

A.   So they may be -- when there are filler identifications, they may be calling them no identification.

Q.   And did you find other examples of that?

A.   I believe there is at least one more example that we saw. I think it had two witnesses as well.

Q.   Okay.  Did you also review testimony of various detectives involved in this case in the preparation of your opinions in this case?

A.   Yes.

Q.   What did they say about the way that filler identifications were recorded?

A.   Well, they said a number of different things.  I mean, some said that they would record a filler identifications as the

witness identified a filler, but others said that it might get scored or written up as no identification.

Q. Okay. Did you have the opportunity to review the testimony of the City's designee James Hickey before testifying today?

A. Yes.

Q. What did he say about the way that filler identifications are recorded?

MS. ROSEN: Objection, your Honor.

Actually, I withdraw the objection.

THE COURT: Thank you.

BY MR. ART:

Q. Go ahead.

A. He said that they were recording filler identifications as no identification.

Q. Okay. So fillers being reported as something that they are not is one explanation of nonreporting, correct?

A. Yes.

Q. Did you find any evidence that, in fact, filler identifications simply weren't being reported at all?

A. Well, the problem is that if filler identifications were recorded as no identifications, then to get that, let's say, 23, 24 percent filler identifications, they all have to come from the "no identification" category, and there aren't enough "no identification" categories -- no identification responses to really leave much of anything left. I think that --

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 970 of 1335 PageID #:106355
Wells - direct by Art
1106

Q.  Let me interrupt you there.

Showing you Plaintiff's Demonstrative 29, are you saying that there is not enough in the "no identification" category to account for what we would expect to see both for filler identifications and nonidentifications?

A.  Right.

Q.  So does that suggest to you that there are simply missing reports from the data set?

A.  So that makes me think that perhaps there are missing reports because I can't make that work.

Q.  What about the "no outcome reported" category?

A.  I mean, that's a possibility.  It's possible that when witnesses identify fillers, sometimes they would just not report any outcome at all.

Q.  So remind the jury what that "no outcome reported" category is.

A.  They say nothing, absolutely nothing about what the witness did.  It's no information whatsoever.

We can't confidently put it in the filler identifications, but we can't confidently put it anywhere.

Q.  But if those are filler identifications, it means that they are literally not being recorded, correct?

A.  It means they are not being reported.

Q.  Okay.  And then what about the rate of suspect identifications in the Chicago data?  What does that tell you

about whether or not there are simply instances where fillers are selected and no report at all is made?

A. Well, it's possible that the denominator is wrong here, that there are more than 980.

Q. How does that tell you that?

A. Well, if there were more than -- if you bring in -- if you say, well, some of these no identifications or filler identifications -- maybe you bring the no reported outcomes into filler identifications. You still don't quite have enough to cover things. You can only get 11 and a half percent of the fillers that way. You can't really take more from no identifications.

But this 56.6 percent would go down if there are some number of additional lineups that are not being reported at all -- there is no record of at all. One would never even find them in the files.

Q. Okay. To get the correct number of filler identifications here, how many missing reports would there have to be?

MS. ROSEN: Objection, Judge. Beyond the scope of his 26(a) disclosure.

THE COURT: I think this is just characterizing it in a different way. Overruled.

BY THE WITNESS:

A. Well, you will never quite fully bounce it off, but you don't have to. But to bring it within the ballpark, you are

going to need another, roughly, 100.  Bring the 113 over and call those filler identifications.  You still need about another 100 from someplace.

BY MR. ART:

Q.  So in a data set this size, that's a large number of missing reports, correct?

A.  It would be 10 percent or so.

Q.  Okay.  Can you say whether it's more common that a filler ID is simply not reported at all or whether it's more common that it's reported as a nonidentification?

A.  Well, we saw some instances in there, I think, where it was reported as -- just the couple that we just talked about --

Q.  Right.

A.  -- reported as no identification.  So I think that happened.  I don't know how often.  But the no identifications are already just down around 32 percent, where we would expect them.  It's not a bloated category.  It doesn't seem to have a bunch of filler identifications thrown into it.

Q.  What does that mean?

A.  It means they are probably -- it doesn't serve as a complete explanation to say that filler identifications were always coded as or reported as no identifications.

Q.  Okay.  Whatever the explanation, is it a problem either way?

A.  It is a problem.  You can't -- you can't -- you should

never report an affirmative mistaken identification made by a witness as no identification.

Q.   And we touched on the reasons why a little bit earlier, but remind the jury why.

A.   Well, I mean, then it goes forward.  No one knows that the witness had already identified an innocent person -- a filler is an innocent person -- as being the culprit in question, which allows that person to then potentially view another lineup.  That lineup might include that person again if it's not reported.  It might include -- it might have a new suspect.

But, again, ultimately the triers of fact, judge and jury, need to know, had this witness made -- has this witness previously made a mistaken identification, because it reflects on their credibility?

It also, as I mentioned before, it's a form of -- a special type of exculpatory evidence.

Q.   Okay.  I want to go back to one thing that you were talking about, which is steering witnesses.  Okay?

How does that process occur, and why can it explain the filler identifications here?

A.   Well, I mean, I think that at the extreme, it could if it was extreme enough.

I mean, if we went with, for example, your idea of, like, "no, you need to identify this person, not that person" kind of steering, that blatant, you know, forced kind of

steering, then maybe you get no filler identification.  Maybe you get a result that's extreme.

Q.  I apologize.

Is that how steering normally works in eyewitness identifications?

A.  No.  It's usually much more subtle.  So some of this could be a result of steering.

Q.  Okay.  How is it usually much more subtle?

A.  Well, it's more subtle in the sense of sort of not accepting the filler ID, like, you know, does anybody else look familiar?

And then you get the witness to start talking about a different lineup member.  And then you start to show interest, and you reinforce it.  And then the witness is sort of, like, talking themselves into, "Oh, yeah, that guy does look more like" -- "oh, yeah, that's the guy."  So you have steered them away -- in that case, away from a filler and toward a suspect, which could explain some of the low filler rate and high suspect identification rate.

Q.  Did you find any evidence in the data that you looked at that there was this subconscious kind of steering going on in the Chicago Police Department?

A.  Well, there is no way to know that from these files, which is why, since the '80s, I have been pushing hard on jurisdictions across the country to use double-blind

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 975 of 1335 PageID #:106360
Wells - cross by Rosen
1111

administration. The person who administers the lineup does not know which person is the suspect and which ones are fillers because then they can't steer them. Lots of jurisdictions have adopted that now. It's probably my greatest accomplishment in life, that approaching probably 50 percent or more of the country is now doing double-blind lineups.

Q. Can you say to a reasonable degree of scientific certainty that this data that you see is a result of nonreporting of filler lineups, particularly identifications?

A. I think it's mostly a result of -- not 100 percent, but mostly a result of the failure to report or report accurately the behavior of the witness in response to a lineup.

Q. Thanks, Dr. Wells.

MR. ART: Nothing further.

THE COURT: Cross-examination.

MS. ROSEN: Yes, your Honor.

CROSS-EXAMINATION

BY MS. ROSEN:

Q. Good afternoon, Dr. Wells.

A. Good afternoon.

Q. How are you?

A. I'm doing fine.

Q. Good.

I want to talk to you a little bit this afternoon about your testimony here today.

Just as an initial matter, in connection with the work that you did with this case, you were required to prepare a report; isn't that correct?

A. Yes.

Q. And that report is dated December 20th, 2016, correct? Do you recall?

A. Yes, that sounds right.

Q. Okay. And in connection with that report, you had to -- there are certain things you have to do. You have to disclose certain materials; isn't that correct?

A. Right.

Q. Okay. And one of the things you have to do in your report is identify the information that you relied upon in arriving at your decisions; isn't that correct?

A. Yes.

Q. Okay. And you indicated -- actually, let me get you a copy of your report.

(Brief pause.)

BY MS. ROSEN:

Q. I am going to hand you what's been marked as City Exhibit No. 1 for identification. You can refer to it --

A. Okay.

Q. -- as we discuss your testimony.

(Document tendered.)

BY MS. ROSEN:

Q. If you look at your report, you will see on the second page, which it's hard to see with the stamp there, but it's Page 40. Do you see that No. 40 there? It's the second page of your report.

A. Yes.

Q. You identified the information that you were provided in advance of rendering your opinions in this case, correct? At the bottom of the page there it says, "I was provided" --

A. Yes.

Q. So as an initial matter, you were provided electronic copies of the lineup data, correct?

A. Yes.

Q. And that's the information that you discussed with Mr. Art earlier. It's the big table with all of the categories that were coded, correct?

A. Yes.

Q. You did not prepare that report, correct, that Excel spreadsheet?

A. That's correct.

Q. And that was provided for you by the lawyers representing Mr. Rivera, correct?

A. Correct.

Q. So the data extraction that's reflected in that report is not data that you extracted, correct?

A. Right.

Q. And it's not data that you had anybody extract for you, anybody in your employ, correct?

A. Correct.

Q. Okay. And at the time that you rendered your opinions, you made very clear that you were not vouching in any way for the reliability of the data that's reflected in the report, correct, in the table?

A. Yes, although I did spot-check, as I say in the report here.

Q. Yes. And you told us on direct, I think, that out of the 435 files, you looked at, like, 30 or something; is that right?

A. That would be about right.

Q. Okay. And then in addition to the data that you were provided that was extracted by Mr. Rivera's lawyers, you also were provided all of those files, right?

A. Yes.

Q. And so had you wanted to review all the files, they were available to you?

A. Yes.

Q. But you did not have the time nor the inclination to do that; is that correct?

A. That's correct.

Q. Okay. You were also provided some depositions; is that correct -- dep transcripts?

A.  Yes.

Q.  And those dep transcripts were of a police officer named Steve Gawrys, correct?

A.  Right.

Q.  Edward Mingey, correct?

A.  Yes.

Q.  Mr. Rinaldi, correct?

A.  Yes.

Q.  And Mr. Zacharias, correct?

A.  Right.

Q.  And you were also provided the deposition testimony of Mr. Hickey, correct?

A.  Right.

Q.  You just testified in front of the ladies and gentlemen of the jury a few minutes ago about Mr. Hickey's deposition testimony, and you highlighted the portion of his deposition testimony where he indicated to you that, back -- or indicated in his testimony that, back in the 1980s, it was the practice of the Chicago Police Department to document filler identification in the category of "no identification," correct? Those were combined?

A.  It was the practice but not the policy.

Q.  Not the written policy, but it was the practice?

A.  That's what he says.

Q.  Correct.

And you understand him to be the City's spokesperson on this issue?

A. Correct.

Q. In terms of interpreting the policies, the written policies?

A. I don't know if he is the spokesperson interpreting the written policy. I think he was the spokesperson. I mean, I think anyone can interpret that policy. It's pretty straightforward.

Q. Okay. Well, but you don't understand what Mr. Hickey's role was in this case. Is that what you are saying?

A. Well, Mr. Hickey described a practice that was --

Q. I'm not asking about what he described.

I'm asking if you understand what Mr. Hickey's role is in this case?

A. I guess to speak for the City on this, yeah.

Q. Okay. And you were deposed in this case; isn't that correct? You sat for a deposition?

A. Yes.

Q. And isn't it true that, at your deposition, you were asked questions about Mr. Hickey's testimony, specifically the testimony that you talked about earlier, and you indicated that his role and his testimony was of no consequence to you or your analysis; isn't that true?

A. I think that, in my report, I talk about the -- I talk

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 981 of 1335 PageID #:106366
Wells - cross by Rosen
1117

about the others, not Mr. Hickey, as having little or no impact on -- little or no consequence to me.

Q. Right. I'm not asking about your report. I'm asking about when you gave a deposition in this case.

A. I mean, I'm not sure. You may be right.

Q. I can hand you --

MR. LOEVY: Can we get the page?

MS. ROSEN: Sure. It's 193. It starts at the bottom of 193.

BY MS. ROSEN:

Q. I can hand you your deposition testimony.

A. Okay.

Q. You can keep this up here.

(Document tendered.)

BY MS. ROSEN:

Q. So you can start at about the middle of the page, 193.

A. Okay.

Q. And then let me know when you have had a chance to review that testimony, and then I will ask you the question I have in mind.

(Brief pause.)

BY THE WITNESS:

A. Okay.

BY MS. ROSEN:

Q. And I'm focused on Mr. Hickey.

A.  I see that.

Q.  Okay.  So isn't it true that it was your testimony that Mr. Hickey's testimony was of no consequence to you and that he was of no relevance to your analysis?

A.  I would still largely maintain that, yes.

Q.  Okay.  But not entirely?

A.  Well, when I was asked these questions, I was unclear about what Hickey's role was, I think.

Q.  And you're still unclear, right?  You just said --

A.  No.  I thought you just agreed with me when I said that he was the spokesperson for the City on this issue.

Q.  Okay.  But you weren't precisely clear on his role, right?

A.  Well, right, because I was reading his testimony.  I didn't necessarily care what his role was.  And in his testimony he was saying something different than what the policy was.  So I would find it very odd for the spokesperson for the City to describe the practice as being different than the policy.

Q.  Okay.

A.  And so that puzzled me.

Q.  Okay.  Let me ask you this question:  At the time of your deposition you were asked about Mr. Hickey's deposition and how it impacted your analysis.

        Isn't it true that at the time of your deposition you didn't even recall Mr. Hickey's testimony?

A.  Yeah, I think that's -- I couldn't remember which person

was Hickey. That's true.

Q. And Hickey is not mentioned anywhere in your report that you prepared on December 20th, 2016, correct?

A. I don't quote him like I quote some of the other detectives or sergeants that were deposed.

Q. Other than on the second page of your report where Mr. Hickey's name is listed as one of the depositions that you reviewed, do you mention Mr. Hickey's name anywhere else in your report?

MR. LOEVY: Your Honor, we object to relevance, and the subject has been exhausted.

THE COURT: I am going to overrule that objection.

BY THE WITNESS:

A. Probably not. I wouldn't be surprised if I didn't mention him.

BY MS. ROSEN:

Q. Okay. And then with respect to the City's written policy, which you were shown earlier as -- well, I don't know what plaintiff's exhibit is, but it's City's Exhibit No. 11, which was the order.

Do you still have that up there?

A. I do not.

Q. Okay. Let me give you a copy.

(Document tendered.)

BY THE WITNESS:

A.   Thank you.

BY MS. ROSEN:

Q.   At the time that you prepared your report, isn't it true -- up until the point in time that you prepared your report, you were not provided that order, were you?

A.   Oh, I had the order, yeah.

Q.   Was it provided to you in this case?

A.   I don't know.  You know, I'm pretty aware of lineup procedures all across the country.  So I knew about the 1983 procedures because I have dealt with Chicago Police Department before.

Q.   So can you identify for me where in your report that you discuss the written policies of the Chicago Police Department from 1983?

A.   I wasn't -- in my report?

Q.   Yeah, in your report.

A.   I probably don't discuss that in my report.

Q.   Do you even, anywhere in your report, identify what the City's express policy is on lineups?

A.   Well, their policy is not their claim of what they did.

Q.   Okay.  That's a different question.  So here is the question --

A.   Well, it seems relevant to --

Q.   You know, I am going to ask you, Dr. Wells, to try and just

answer my questions so that we can just move this along.  Okay?

A.  Okay.

Q.  So my question is, do you, anywhere in your report, even address the City's written policies on lineup procedures?

A.  I don't believe I did, no.

Q.  Okay.  And, in fact, the only things that you identify in your report as having reviewed prior to preparing your report on December 20th, 2016, are the -- is the lineup data that was extracted for you by Mr. Rivera's attorneys, the underlying data that you didn't look at other than to spot-check, the couple depositions that we talked about, and that's it, correct, and the 11 studies?  But in terms of the data from this case that you were provided?

A.  That sounds right.

Q.  Okay.  And isn't it true that at the time of your report, after you did all the work that you did, you concluded that, as a result of the fact that the City's filler rate -- Chicago Police Department's filler rate was zero, you concluded that that couldn't have been by chance, correct?

A.  Correct.

Q.  And you had talked about the four different possibilities for that phenomena, but the fourth one was your opinion that the reason for the zero filler rate was that filler identifications were not reported, correct?

A.  Yes.

Q. In fact, isn't the precise language that you use in your report that, "In other words, by policy or practice, lineup administrators might treat filler identifications as nonevents, something that never happened and for which no report is ever written." Isn't that the words you used?

A. Yes.

Q. Okay.

Now, with respect to the opinions that you are offering in this case, am I correct you did not review any of the information related to Mr. Rivera's criminal prosecution, correct? So you are offering no opinions regarding anything that occurred in that case, the underlying case?

A. I was not asked to offer any such opinions.

Q. Okay. And you did not review any of the police reports that were involved in the Valentin murder investigation for which Mr. Rivera was ultimately prosecuted and convicted?

A. No, I don't believe I reviewed any of those police reports. That wasn't my -- in Rivera's case. That was not my role.

Q. Okay. And you were not asked to opine upon the adequacy of the City's policies, correct?

You were simply asked to evaluate this data and come up with an explanation for why the data might look different if, in fact, it did look different, correct?

A. I don't know if I would agree with that. I mean, I was certainly asked to opine about what these data seemed to

indicate, and that's what I do. I opine in terms of saying that it would be inappropriate to do any of these four things that seem to explain this, and it certainly would contradict the City's own policies.

Q. Can you take a look at, again, the second page of your disclosure, your December 20th, 2016, written opinions, Page 40. And if you look at the paragraph -- actually, I am going to -- maybe we can put this up on the screen just for -- not in front of the jury. It hasn't been admitted.

I will ask you to take a look at this paragraph here. And it specifically lays out what you were asked to do in the case, correct?

A. The middle paragraph there, yes.

Q. Yes, the one that begins, "I was contacted by."

A. Yes.

Q. Okay. And isn't it true that what you were asked to do is to determine whether the rates of identification -- eyewitness identification of suspects, filler identifications, and nonidentifications, based upon what was reported in the case files, were within the numerical ranges that would be expected based on what we know about eyewitness identification from lineup. Correct? That was the first question.

A. Yes.

Q. And the second question was, "If not, in what ways do they differ?" Correct?

A. Yes.

Q. And the second question was, "And if they differ, what are the possible explanations?" Correct?

A. Yes.

Q. Okay. When you were doing the spot-checking that you talked about earlier, you took no notes, correct?

A. That's right.

Q. And there is no way for us to recreate which files you spot-checked and which ones you didn't, correct?

A. No, I don't believe so.

Q. Okay. And you also actually got the assistance of a coworker or a colleague, correct?

A. Yes.

Q. And who was that?

A. Nancy Steblay.

Q. Okay. And she is somebody you work with frequently, correct?

A. Yes.

Q. And she, too, did not do any of the extractions from the data that underlies the database that was provided to you?

A. That's correct.

Q. She also did just some spot-checking?

A. Yes.

Q. And you utilized her simply to help you crunch the numbers or confirm the numbers that you were crunching for accuracy?

Wells - cross by Rosen

A.   Yes.

Q.   Okay.  And neither one of you did any systematic review of the data underlying the database that was provided to you, correct?

A.   That's right.

Q.   Now, in terms of -- you obviously have talked about -- actually, before I move to that topic, before you were asked to give opinions in this case, you were provided some information about the case and plaintiff's view about what they expected the evidence to show, correct?

A.   In broad brushstrokes, yes.

Q.   And what they told you is they had reason to believe that a lineup had occurred and a witness had picked the filler, but there was no report made that the lineup even happened, correct?

A.   That was mentioned as a theory, yes.

Q.   And that was the theory they were asking you to test, correct?

A.   No.  They weren't asking me to test that theory.

Q.   They were asking you to test the numbers to see if --

A.   Because that's a specific case, a specific question about what happened in the Rivera case.  I was never asked to do that.

Q.   That's fair.  I understand what you are saying.

So what they were asking you to do, though, is to test

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 990 of 1335 PageID #:106375
Wells - cross by Rosen
1126

the data to help them to figure out whether or not there was anything in the data that would support the idea that lineups were occurring where no report was made of the lineup, correct?

A. Right, or that there was something suspiciously different from what other jurisdictions get with their lineups.

Q. Okay. Now let's talk a little bit about the work that you did in this case.

As we already discussed -- well, let me back up for a second.

So there is different terminology, right? You talked about it a little bit earlier, but I sort of want to focus it back on the lineups and terminology.

You said, I think, earlier on your direct that there were three possible outcomes to an identification process, right?

A. Yes.

Q. The suspect being picked, a filler being picked, or no identification, correct?

A. Yes.

Q. That's not exactly true, because sometimes there is a phenomenon called tentative identifications, right?

A. Well --

Q. So there is circumstances where an eyewitness says, whether it's about the suspect or a filler, that that person looks like the perpetrator, but I can't be sure, right? That's a

phenomenon that occurs?

A.  Yes.

Q.  So that's another category, right, of outcome for a lineup identification procedure, right?

A.  Well, I wouldn't call it a category.  I would say it could be construed as a low confidence ID, or it could be construed as just simply information about what the person looked like.

I mean, you know, the witness is trying to be informative.

Q.  Okay.  So when we talk about the coding that was done in the data chart that was provided to you, how was that coded?

So when the lineup reports were being reviewed and there was information in there where the witness expressed some thought that the person looked like the suspect or looked like the filler, how was that coded?

A.  Well, there is a tentative ID category in the sheets that they created.

Q.  And that tentative ID category, in terms of the numbers, the 54 percent and the 31 percent that you discussed, where did that tentative ID category fall?

A.  It fell -- I think it fell into just sort of its own column there.

For example, there were two potential filler IDs that were described as tentative, but interestingly in that same report, I think that the idea of the suspect was tentative as

well. And that was counted as a suspect pick.

Q. So I guess what I'm asking you is not specific to any one of the particular lineups, but in terms of the coding for the database that you relied on to come up with the numbers, can you tell me what category tentative positive IDs fell for purposes of the numbers, the totals that you came up with and the rates that you came up with?

A. I'm not sure off the top of my head. They were not very common.

Q. When you say "not very common," what do you mean?

A. I mean rare.

Q. So of the -- can you put a percentage point on how many positive IDs were tentative?

A. I can count them for you.

Page 1, zero.

We could just walk through the pages. I mean, you can see them yourself.

Page 2 there is one. Page 3 there are a couple.

Q. Maybe I can help you out.

Why don't you take a look at Page 45 of your report.

A. Page 45 of my report. Okay.

Q. You see "Outcomes" and "Official Reports"?

A. Yeah. Okay. 29.

Q. So that's 29 out of 335 positive IDs in the "Official Reports," correct?

A.   Right.

Q.   And the official reports, you testified on direct, totaled 666?

A.   Right.

Q.   And so when you calculated that the positive identification rate for the Chicago data was 54.6 percent --

A.   Right.

Q.   -- you included those tentative --

A.   Those tentatives were suspect IDs.  So they were included as suspect IDs.  They were tentative IDs on a suspect.  So they counted as -- in this analysis, which is the one that's reported here, that's how you get from 335 to 364.  You add the 29.

Q.   Correct.  And that's how you get to the 54, right?  You remember you were shown the demonstrative?

A.   Right.

Q.   And we compared the field study data to the Chicago data?

A.   Yes.

Q.   And the field study data had suspect identifications at 40.8 percent, right?

A.   Right.

Q.   And the Chicago data had it at 54.6 percent?

A.   Right.

Q.   And so in that number is the 29 tentative positive IDs, right?

A. Yes.

Q. So those were coded and counted as a positive ID?

A. Those were counted as suspect IDs in this analysis, yes.

Q. Okay. Fine. As a suspect ID.

So in the report here -- you corrected me now a couple times. When I say "positive" you say "suspect," right?

A. Right.

Q. But in your report don't you say "positive IDs"?

A. I don't think so.

Q. Well, take a look right there on the page that we are talking about, 45, "Outcomes" and "Official Reports," "positive IDs"?

A. That's just using the language that some of the reports had used.

Q. Some of the lineup reports?

A. Yes.

Q. It's not language you used, though, right?

A. No, because you can positively identify a filler.

Q. But that's not --

A. "Positive" means affirmative, that guy. It doesn't mean that it's always the suspect. You can positively identify a filler. So I prefer "suspect picks" and "filler picks."

Q. Okay. So back to the discussion we were having about the tentative.

So in this analysis you included in your number to

determine what Chicago's rate was for suspect identifications, tentative identifications, correct?

A. Yes.

Q. Okay. Now, in connection with the work you do in the eyewitness identification field, you participate in studies, correct? You administer them. You develop them, whatever the appropriate word is. Correct?

A. Yes.

Q. And you talked on direct examination about the work you did with police departments. I think you said Houston, and I don't remember what the other two were. Why don't you remind us of what the departments were.

A. Well, San Diego Police Department; the Tucson Police Department; the Austin, Texas Police Department; Charlotte, North Carolina Police Department.

Q. Is that all one study or multiple studies?

A. That all went into our study. We combined all those.

Q. What was the year of that?

A. We published it -- so what year was it done? I would have to look at my curriculum vitae. It would have been probably -- it took probably two years before we published it.

Q. So what year was it published? Do you remember? 2015, 2016, something like that?

A. I think it was earlier than that.

Q. 2014, maybe.

A.  It's in that table of --

Q.  It's the double-blind -- is that it?

A.  2014.  Published 2014.  So I think we were doing that in '11 and '12.

Q.  Okay.  And just so that the ladies and gentlemen of the jury understand what that was, that was real cases, right, live lineups?

A.  Yes.

Q.  Not experimental field studies, right?

A.  Yeah.  But when you say -- no, it was not live lineups.  It was photographic lineups.

Q.  Okay.  So it was still -- but it involved actual crimes was my point?

A.  Yes.

Q.  Okay.  And in terms of designing the study, you came up with detailed questions and a detailed protocol about what needed to be done to get at the information that you were trying to gather, correct?

A.  That's correct.

Q.  Okay.  And was it part of the questionnaires that you were providing to law enforcement agencies to get the information that you wanted -- didn't it include specific information that you wanted from them about the nature of the identification, correct?  Meaning what the witness actually said, things of that nature?

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 997 of 1335 PageID #:106382
Wells - cross by Rosen
1133

A.  We are the only -- this is the only field study in which we actually designed a computer to administer these photo lineups to the witnesses so that we could be sure that everything was run exactly the same way and from one witness to another and one detective to another and that everything got recorded.  So, yes, highly controlled.  No one has ever done that before.

Q.  Okay.  During the course of that study, I imagine that there were eyewitnesses that made tentative identifications of either the suspect or a filler, correct?

A.  Well, you make an identification or you don't.  You are basically using a mouse.  You are answering questions about whether you see the perpetrator.  If you say yes, then you are asked which person.  You have to click on that person.

And then once you have made -- if you have made an affirmative decision like that as opposed to clicking "none of these" other whatever, then you have to state how confident you are in that identification.

Q.  Okay.

A.  So, you know, there are witnesses sometimes who have low confidence in that identification.  We wouldn't call it tentative.  We would call it a low confidence identification.

Q.  So when you were -- there is -- you relied on 11 of these field studies for comparison to the Chicago data, right?

A.  The collective, the 6,700 lineups.

Q.  Correct.  And that came from 11 different studies, correct?

A. It came from 11 different studies, yes.

Q. Okay. And one of those was your study, right?

A. That's correct.

Q. The one you just described?

A. That's right.

Q. Okay. And in your study, when you report and calculated the number of suspect identifications, how did you account for low confidence identifications?

Did you include them in the number, or did you discard them?

A. Yes.

Q. And they counted as suspect identification or a filler identification?

A. Well, if they identified the suspect, that counted as a suspect identification. They clicked and said, "Yes, I see the perpetrator there." So that goes into that category.

Q. Okay. And did you have an option during this study for "I think so," or it looks like --

A. Yes, there was a -- I see what your question is.

A "not sure" response, but they are not clicking on someone.

One of the options is -- instead of saying, "He is not there," or identifying someone, they could say, "Not sure."

Q. Okay. But when they are saying "not sure," are they saying "not sure" -- do they have the option in your field study of

saying "not sure" on a particular individual or just generally?

A.  No, the lineup as a whole.

Q.  Pardon me?

A.  No, just the lineup as a whole

Q.  So you didn't even give the option in your study of a tentative identification, right, because that's not very meaningful, is it?

A.  Well, a "not sure" response is not an identification.

Q.  Right, but that's different than a tentative pick of somebody as opposed to not sure generally, right?  That was an option.  But you didn't even give the option of tentatively this person, correct?  That wasn't even part of --

A.  No, no.  I mean, you can identify the person and say, "But I'm not sure."  "But I'm not confident."  "My confidence is low."

Q.  That was the option you provided?

A.  They could do that, yes.

Q.  In that study?

A.  Yes.

Q.  And those "not sures" were counted as positives?

A.  If they said "not sure," no.  If they made an identification and said, "I'm not positive," then it still is an identification.  We treated the suspect identifications that way, and we treated the filler identifications that way.

Q.  Now, it's true, isn't it, that part of your experience is

teaching research methods at the graduate level, correct?

A. Yes.

Q. And science, you would agree with me, is driven by hypotheses, correct?

A. Yes.

Q. And there is sloppy ways to test hypotheses and clean ways to test hypotheses, correct?

A. Yes.

Q. And at a minimum, in order to have valid research, you have to have accurate, reliable data collection; is that correct?

A. That's right.

Q. Now, I'm going to ask you to take a look at what is Appendix A to your report, which is the data that was extracted by Mr. Rivera's lawyers and provided to you. I'm going to ask you to take a look at the first page there.

And if you look at the --

MS. ROSEN: Actually, we can put this up, actually, on the -- just the appendix.

BY MS. ROSEN:

Q. Take a look at the first page of the appendix.

A. Okay.

Q. And if you look at the RD number G 063126, the lineup that occurred on March 20th, 1985, at 1800 hours. Do you see that there?

A. Yes.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 1001 of 1335 PageID #:106386
Wells - cross by Rosen
1137

Q. And that's a live lineup, according to the data extracted, correct?

A. Yes.

Q. And it indicates there is one witness viewing the lineup, correct?

A. Yes.

Q. And four people in the lineup, correct?

A. Right.

Q. And zero suspects in the lineup, right?

A. Right.

Q. So that has to be an error, right, because there wouldn't be a lineup without a suspect?

A. Unless the file never makes it clear who the suspect is. I would have to look at the file.

Q. Well, that would be no outcome reported, right?

A. Right.

Q. So when you looked at this, you spot-checked, did you notice that that particular entry had zero in there for the suspect and check that?

A. I can't -- you know, I can't recall out of these 980 whether that particular one is one that I looked at to try to figure that out or not. I would have to look at the file again.

Q. And this is on the first page, right?

A. Yes, it's on the first page of this file. That doesn't

mean that -- I mean, when I get a spreadsheet, I can sort on anything. I may sort on things that don't go in the order of the RD number.

Q. Did you do that in this case? Did you resort the data?

A. Sure, and then -- but then this is preserved.

Q. How did you resort the data?

A. Well, if I wanted to, for example, say, well, how many lineups had multiple suspects in that same lineup, then in a separate file -- I'm not mucking with the original file; you have got the original files; you know this is what was provided -- then I would sort on the column, and if hit an "undo," it's right back as it was. But I would sort, and then they are rank ordered in terms of how many had multiple suspects. It's just -- it's the way people work with data.

Q. And you did that in this case?

A. Sure.

Q. And how did you sort -- specifically how did you sort that data?

A. I sorted lots of different ways, to look at the data in different ways.

Q. Can you tell us how you sorted the data? Can you tell us here today in court how you sorted the data?

A. It's just a rearrangement of these rows. Okay? So, like, maybe you want to put the highest number of people in a lineup in there. What's the lowest number of people in a lineup that

they do?

So if you -- in an Excel program, for example, if you sort on that column but it moves everything equally, so it keeps the cases all intact, then you can just go down and count.  Oh, look, here is their largest lineup.  Go to the end of the file.  Look, there is their smallest lineup.

It's the way you look at -- that's the way people look at data.

Q.  I understand that that's the way that people look at data, and I understand how you can look at data in different ways.

My question is a little bit different.

A.  I'm not sure what the question is, so ask it again.

Q.  So my question is, what did you do?  How did you sort the data in this case, so we know how you came up with your opinions?  Because there is nowhere in your report or any of the materials that were provided that we were told that you resorted the data in any way, nor does it explain --

A.  To me, that just makes no sense.  You look at data from lots of different angles.

So, for example, I would look at the data in the way of saying, well, what were their largest lineups?  What were their smallest lineups?  Are they getting more identifications from the large lineups than the small lineups or vice versa --

Q.  Let me interrupt.

A.  -- to see if there is anything in there that might serve as

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 1004 of 1335 PageID #:106389
Wells - cross by Rosen
1140

some kind of explanation or clarification. That's how one looks at data.

Q. And did you do that, the example that you just provided, sort it to put the number of lineups and the most --

A. I did that. I probably did 30 different things.

Q. When you did that, what was the result of that?

A. I saw no pattern.

Q. And you have no notes and you have no reports and you have no indication in your report or even in your deposition testimony that you did that; is that correct?

A. If there would have been anything there, I would have brought it up. I would have said, look, one of the things you see in here is X, but I saw no such patterns.

Q. How many -- since you did that sorting on the number of people in a lineup, how many lineups did you identify where there were six people in a lineup -- six suspects in a lineup?

A. I think there was one such instance.

Q. How about five?

A. I don't remember.

Q. How about four?

A. You know, I looked at it to see if that could potentially be an explanation for not getting filler picks. If you had 100 lineups all with six in it, that explains -- that starts to explain things, but I didn't see things like that.

Q. How many -- when you did that sorting, in terms of the

number of people in the lineup, how many lineups had more than one suspect in the lineup?

A. I don't remember the number. I think -- I don't remember that number. But, I mean, everybody has these data. You have these data, too.

Q. You know, Doctor, I'm not testifying here today. You are. So I know what data I have, and I know what I need to do here today.

A. Well, you are asking me questions that, you know, I don't see what that has to do with sorting. Sorting is a typical way of looking at data.

Q. I understand that you don't understand it.

Okay. Since we are talking about the data and sorting the data, did you know that there are reports that have redactions? Correct?

A. Yes.

Q. So the names of the participants --

A. Yes. Right.

Q. And was it explained to you that the reason for those redactions is that those were criminal investigations involving juveniles?

A. Yes.

Q. And that we were prevented from disclosing the identities?

A. Yes.

Q. When you sorted the data, did you sort to see how many of

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 1006 of 1335 PageID #:106391
Wells - cross by Rosen
1142

those files contained redactions?

A.  I don't recall if I sorted that particular way or not.

Q.  Okay.  And just so that the jury understands what we are talking about, I am going to ask you to take a look at --

MS. ROSEN:  Let's put City 19-E, not for the jury yet.

BY MS. ROSEN:

Q.  If you would take a look at your screen, you see that's a redacted report for a homicide investigation with an RD number of H 375595.  Do you see it there?

A.  Yes.

Q.  And this is one of the reports that underlied the data that you reviewed, correct?

A.  Yes.

MS. ROSEN:  We seek to move into evidence City 19-E.

MR. ART:  No objection, your Honor.

THE COURT:  City 19-E is received.

(Said exhibit was received in evidence.)

BY MS. ROSEN:

Q.  Okay.  So when we talk about the redactions, if you take a look at that, you can see that all of the identifying names, victims, the people viewing the lineup, the people participating in the lineup, all of those are redacted, correct?

A.  Yes, but I can tell that there are two witnesses viewing the lineup.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 1007 of 1335 PageID #:106392
Wells - cross by Rosen
1143

Q. Right, because you see that there is two lines there?

A. Right.

Q. So you can infer from that --

A. Right.

Q. -- that there is two people viewing the lineup.

Can you tell how many suspects are in the lineup from that report?

A. I don't believe so.

Are there more -- is there more in the file? I need to see the whole file.

Q. They are all redacted. The whole file is redacted.

A. I need to see that the rest of the file is redacted.

Q. You don't believe me?

A. I'm just saying I don't know. There may be some way there of determining the answer to your question.

I can't say that I don't -- that I can't determine the answer to your question until I have seen the whole file.

Q. Okay. I will simplify it a little bit.

Looking at this report, can you identify the number of suspects in this lineup?

A. No, but I think -- can you go to the next page.

Q. The first page?

A. There are four people in the lineup.

Q. Are you asking me, or are you telling us there is four people in the lineup?

A.  I believe there is four people in the lineup.

Q.  Okay.

A.  Giving the City the benefit of the doubt, I would say there is only one suspect probably.  That would be my best guess, because there is supposed to be four fillers for every one suspect.  That's the City's policy.

Q.  Okay.  So I want you to focus on the data, right, because we are talking about data extraction.

A.  Yeah.  So --

Q.  Okay.  Can you just let me finish my question for a second?

A.  Okay.

Q.  You didn't do the data extraction, right?  You relied on the fact that the data extraction was reliable?

A.  Right.

Q.  So now I'm going to ask you some questions about the data extraction.

So from this report, can you tell how many suspects were in this lineup?

A.  No, but it would not matter to me necessarily --

Q.  Can you --

A.  -- because the question is, is there a filler pick here?  Clearly not.

Q.  Well, the question -- I understand that that's what you are trying to determine, is the number of filler picks and what the numbers mean in comparison to the 11 studies.

A.  Right.

Q.  But you still have to have reliable data to make that comparison, don't you?

A.  Well, no.

Q.  No?

A.  I mean, you have to know whether there are fillers in here. You have to know whether there were filler picks to make my conclusions.  I don't have to know necessarily how many suspects were in this lineup.  I just have to know, hey, another lineup, two witnesses, no filler picks.

Q.  So if there were two suspects in this lineup, that obviously increases the chances of a suspect being picked and decreases the chances of a filler being picked, correct?

A.  Well, if --

Q.  It's just a "Yes" or "No" question.

A.  It does, yes.

Q.  Okay.  And that's something to take into account when you are trying to crunch the numbers, because at the end of the day what you are doing here, right, is you are comparing the Chicago data to the data that you aggregated from the 11 studies to find a possible explanation for the zero percent filler rate, correct?

A.  Right.

Q.  Okay.  And in the face of the City's admission that the zero percent filler rate is a function of the City's policies

and practices at that time to identify -- to document the lineup identifications where there is no identification and a filler identification as the same, the number that becomes important, isn't it, is the actual suspect picked, right? Isn't that the number that then becomes important in the face of the City's admission on that topic?

A. I don't accept your premise. That was not the City's policy. The City's policy is in writing.

Q. Okay. Well, you are not an expert on the City's policies, correct?

A. I'm not? I read it. I mean, isn't everyone in this room an expert on the City's policy in 1983?

Q. No, I don't think so.

A. No?

Q. I don't think you're an expert.

A. If it says write down the name of everyone identified, isn't that -- I mean --

Q. Dr. Wells, I am going to interrupt you for a second because you have not been designated as an expert on what the City's policies and practices are. You have been designated as an expert on eyewitness identification procedures.

MR. LOEVY: Your Honor, she asked him that question, though.

THE COURT: Well, you did, but where do you want to go?

MS. ROSEN: You know what? I can withdraw it and move on.

BY MS. ROSEN:

Q. Can you take a look at the appendix. And if you look at Page 58 of the appendix, if you look toward the bottom of the page, you will see the RD number of H 375595.

Do you see that there?

A. On Page 58, and the number was what?

Q. H 375 --

A. 375.

Q. -- 595.

A. 595, yes.

Q. Okay. And that matches the RD number of the redacted report we were just looking at, right?

A. Yes.

Q. Okay. And if you go across the report in the column, it says there is two witnesses viewing the lineup, right?

A. Yes.

Q. And then there is five people in the lineup, correct?

A. Right.

Q. And that says one suspect, right?

A. Right.

Q. But we have already determined that we can't tell that from this particular report, right, how many suspects from this report?

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 1012 of 1335 PageID #:106397
Wells - cross by Rosen
1148

A.   That's true.

Q.   Okay.  And then total possible identifications, it says two.  And then positive ID, it says zero.

Do you see that there?

A.   Yes.

Q.   Okay.  So even from the redacted materials, we can tell that that zero is incorrect, right?

A.   Right.

Q.   Because, in fact, there is at least one and maybe two positive IDs, depending on how you interpret the information that is on the second page of City 19-E, right?

A.   Right.  And so there might have been more suspect IDs than --

Q.   Than is --

A.   -- than is in this but still no filler IDs.

Q.   Okay.  But it's just not clear from the report, right?

A.   It's clear there is no filler ID.

Q.   No, but I mean whether it's one positive or two positives is not clear?

A.   It doesn't affect the result, I don't think.

Q.   Okay.  We talked a little earlier about the sorting.  You were explaining to us that you sorted data.  And you didn't remember if you -- well, did you sort the redacted files or didn't you sort the redacted files?

A.   I don't recall.

Q.   If I were to tell you that 18 out of the 167 files were redacted, would that jibe with your knowledge of the data?

A.   What's the 157?

Q.   167 files.

A.   Where are you getting that number?

Q.   The files that are in the data actually, the number of files in the data that have lineups.

A.   Oh, I see.

Q.   Right.  So there were 435 total files, right, but of those 435 total files, there were only 167 files that had lineups. Did you know that?

A.   Yeah.

Q.   So 18 out of 167 files were redacted.  Is that information that you learned while you were sorting, or do you not know that?

A.   Well, I knew that some had redacted data.  You do what you can with the redacted data.

Q.   Okay.  Now, let's talk about a different category of suspect.

         Are you familiar with the term "familiar perpetrator"?

A.   Yes.

Q.   And what is that?

A.   Well, it's kind of a loose term referring to the idea that you have seen a person around on prior occasions.  I mean, maybe someone you went to school with or something along those

lines.

Q.   Somebody you saw in the park, something like that?

A.   Sure.

Q.   Okay.  And in terms of looking in the research identification rates in the familiar perpetrator data, that looks a little bit different, doesn't it, than it does in the stranger data?

A.   Well, there aren't very many that have much familiarity.  I mean, if there is enough familiarity, you would never do a lineup.  I mean, you are not going to do a lineup to identify your uncle.

So these tend to be, you know, lower levels of familiarity.  Otherwise you wouldn't even do a lineup.

Q.   Sure.  But, for example, when you did your study, the one we talked about earlier, you completely excluded from your data familiar perpetrator data and focused only on stranger identifications, correct?

A.   Right.  But we collected familiar data.  We have those data.

Q.   Right.  But in terms of -- in fact, the 11 peer-reviewed studies that you talked about that formed -- that you used to create the aggregate data for comparison to the Chicago data, you included your study, right, that we have been talking about?

A.   Right.

Q. So in the numbers that you provide in your aggregate, I think from your study there were 132 suspect IDs, right?

A. Right.

Q. Those exclude all familiar perpetrator IDs?

A. Those do.

Q. Pardon me?

A. Those do exclude familiars.

Q. And then, looking at the 11 studies that you relied on, there is three other studies where you also were able to exclude and did exclude the familiar perpetrator data; isn't that correct?

A. Right.

Q. And that would be the Klobuchar study?

A. Yes, Klobuchar.

Q. Klobuchar? Is that how you say it?

A. Yes. She is a U.S. Senator now.

Q. Thank you.

And the Memon study and the Valentine study, right? Those are the three that excluded the familiar perpetrator data?

A. Yes.

Q. Okay. And, in fact, what we know from the Klobuchar study, that she did some work and determined that when there was sort of low-level familiarity, like somebody I saw around the neighborhood or somebody I saw in the park playing baseball or

something like that, the suspect identification rate in those circumstances jumps to, like, 91 percent; isn't that right?

A. Right, but it's a small -- very small, yeah.

Q. And then for people that have more familiarity, not as close as it's my brother or my uncle, but somebody that they know by nickname or something like that, it jumps even higher to, like, 96 percent, right?

A. Again, a very small sample, but yes.

Q. Okay. And in this case, the data set that was extracted for you, was the familiar perpetrator data included in that?

A. I don't think there was any way to exclude it. There was not enough -- that information was not in the files.

Q. You couldn't exclude it?

A. I don't think that it was typically in the files.

Q. To know whether or not it was familiar or not?

A. Right. Or, you know -- yeah, I don't think there was usually that kind of information in there.

Q. Okay. Let's take a look at City 19-F.

MS. ROSEN: You can put it up on the screen but not yet for the jury.

BY MS. ROSEN:

Q. Do you see it there? I will ask you to take a look at -- the RD number is P 129569. Do you see that there?

A. Yes.

Q. Is this one of the lineup reports that was -- this is one

of the lineup reports that was in the data that you were provided, correct?

A. Yes.

MS. ROSEN: At this time the City seeks to admit City 19-F.

THE COURT: Any objection?

MR. ART: No objection, your Honor.

THE COURT: Received.

(Said exhibit was received in evidence.)

BY MS. ROSEN:

Q. We can see from the first page this is an Area 5 lineup report, right?

A. Yes.

Q. Then we flip to the second page there, the "History and Investigation" portion of the report.

Do you see where it says that the person viewing the lineup, Mr. McGee, positively identified person No. 2, Timothy Hester, as the offender who he knows as Timmy Shaw, who, while armed with a handgun, pointed it at McGee's head and demanded to know where Cuckoo was? Do you see that there?

A. Yes.

Q. Okay. So that would be fairly characterized, right? He knows the person's name as somebody familiar to the person viewing the lineup, correct?

A. Yes.

Q.  And in the context of Ms. Klobuchar's study, this person would fit in the 96 percent rate as somebody that he knew by name, right?

A.  By name, yes, I would say so.

Q.  Okay.  And so if you were being consistent with the information that you compiled with the aggregate data, this should have been excluded, right?

A.  I would exclude that, but -- so, you know, knock one off of the suspect picks.  It really doesn't affect my conclusions.

Q.  Okay.  Let's take a look at --

THE COURT:  I think we need to break.

MS. ROSEN:  Judge, do you want to take the break?

THE COURT:  Let's take our recess, ladies and gentlemen.

Mr. Planter, if you can get back before 3:30, just let the court security officer know you are ready.  Okay?

JUROR PLANTER:  Will do.

(Jury out at 2:59 p.m.)

THE COURT:  I would say try to be back around 3:15, 3:20, just in case we can begin then.

(A brief recess was taken at 3:00 p.m.)

1155

(Jury out.)

THE COURT: The juror is not back yet, but I thought we could take this time -- we have a few minutes.

I -- so it looks to me like of the 404(b) witnesses that everybody seems to have had notice of, we have Rosario and Ruiz, right? Am I reading this right?

MR. ART: Yes.

MR. SWAMINATHAN: Those are the two that are left.

THE COURT REPORTER: I'm sorry?

MR. SWAMINATHAN: Those are the two.

THE COURT: Rosario and Ruiz.

So why -- defense, tell me what that Dorsch-Perez thing is that you're so concerned about.

MR. GIVEN: So it's hard to make any of these stories short, Your Honor.

Bill Dorsch has this story about Detective Guevara allegedly pointing at a picture of someone in a photo lineup to a witness.

THE COURT: Right.

MR. GIVEN: And as a result of that, Detective Dorsch went out and ultimately arrested the person who was picked by the witness.

THE COURT: Okay.

MR. GIVEN: And then a couple days later, Dorsch says, "You know, something wasn't right about it." Of course, it

1156

wasn't at the pointing. He said, "I just didn't have --
something different feel right."

I'm trying to make a long story short.

He winds up going to talk to the two witnesses, one of
whom had pointed at the picture. And they admitted --

THE COURT: Is one of those Perez?

MR. GIVEN: No, no, no. I'm getting to Perez.

THE COURT: Okay.

MR. GIVEN: The two teenaged witnesses say, "You know
what, we really didn't see the shooting after all. In fact, we
are paid -- we were bribed by this older guy to pick this guy
out" --

THE COURT: Okay.

MR. GIVEN: -- "because he was dating a girlfriend."

THE COURT: Okay.

MR. GIVEN: The briber was Sam Perez.

THE COURT: Oh.

MR. SWAMINATHAN: So let me try to address that.

THE COURT: Yes.

MR. GIVEN: And so we want to -- so we want to address
that with him.

THE COURT: Yes, that's what I understand.

Go ahead.

MR. SWAMINATHAN: There are two pieces to this, right?

THE COURT: Okay.

1157

MR. SWAMINATHAN: So one of them requires taking a step back.

On the Perez talking about the Juan Johnson case, the acceptable 404(b) cross stuff, okay, we've talked about that.

THE COURT: Right.

MR. SWAMINATHAN: He was deposed. He was deposed again for another 100 pages on the subject.

THE COURT: Right.

MR. SWAMINATHAN: On this Dorsch subject --

THE COURT: Yes.

MR. SWAMINATHAN: -- this is a real side-show issue. And I'll put it this way.

We had to identify that list of 10, which -- which you have now seen in that letter --

THE COURT: They're ready? Okay.

MR. SWAMINATHAN: We've identified the 10 in that letter. They then had to disclose whoever they were going to have rebut each of these people. Okay. And they have a disclosed people with --

THE COURT: I'm really sorry. We probably should get the jury back and do this in the morning.

MR. GIVEN: All right.

THE COURT: Twenty after 9:00?

MR. SWAMINATHAN: Sure.

MR. GIVEN: Sure.

THE COURT: Thanks.

Okay. Doctor, you may retake the witness stand.

(Witness resumes the witness stand.)

THE COURT: I want to know if all of this is admissible. If he turns out -- if he testifies about it in a deposition or at trial, whatever, is it admissible, all this other situation?

Does Perez say that he told Dorsch about this?

MR. GIVEN: Well, we don't know what Perez says. We don't know, Judge.

THE COURT: Sorry. Sorry.

COURT SECURITY OFFICER: All rise.

(Jury in.)

THE COURT: Please be seated, everyone.

Ms. Rosen.

MS. ROSEN: Thank you, Your Honor.

BY MS. ROSEN:

Q. Dr. Wells, we left at the break talking about familiar perpetrator --

A. Yes.

Q. -- data?

A. Right.

Q. So I'm going to ask you to take a look at what we've marked as City Exhibit 19-G. And you see there on the report there's RD No. G303248. And that's one of the lineup reports that was

in the data that you were provided, correct?

A. Yes.

MS. ROSEN: At this time, the city seeks to admit 19-G.

THE COURT: Any objection?

MR. ART: No objection, Your Honor.

THE COURT: It is received.

MS. ROSEN: Thank you, Your Honor.

(City Exhibit No. 19-G admitted in evidence.)

BY MS. ROSEN:

Q. If you take a look at the second page of the report, the information about Susan Pagan and Kathy Navarro, and you see there were able to identify participant No. 5, Mr. Rodriguez, as being the person that they know as Mickey as being the shooter in this incident, correct?

Do you see that there?

A. Yes, I do.

Q. So that report indicates that there was some familiarity between the eyewitness and the perpetrator.

And based on the Klobuchar study, that would fit in the 96 percent rate of identifications, right?

A. That would be one suspect ID fewer, perhaps, to count in order to pull out familiar others.

Q. Okay. And then if we take a look at City 19-H, if we could put that up on the screen just for Dr. Wells and counsel for

the moment, you see RD No. K417078.

That's a lineup report from the data that was extracted and provided to you, correct?

A. Yes.

Q. Okay. And then if --

MS. ROSEN: At this time, the city seeks to admit 19-H.

MR. ART: No objection, Your Honor.

THE COURT: Okay. It is received.

(City Exhibit No. 19-H admitted in evidence.)

BY MS. ROSEN:

Q. And then if we take a look at the second page of that report, you see that the witness Eugene viewed that lineup and positively identified Orval Fain. Do you see that there?

A. Yes.

Q. And, of course, from the face of the report, we can't tell whether there was a familiarity between the eyewitness and the perpetrator, correct?

A. Not on this report, no.

Q. Okay. But if we take a look at City Exhibit 19-I -- and we can just put that up on the screen for Dr. Wells initially -- if you take a look at that as soon as we get it up there for you, K417078, so that matches RD number of 19-H, correct?

A. Yes.

MS. ROSEN: At this time, the city seeks to admit

19-I.

MR. ART: No objection, Your Honor.

THE COURT: It is received.

(City Exhibit No. 19-I admitted in evidence.)

BY MS. ROSEN:

Q. And we'll take a look at page 5 of that report. Take a look at the bottom of the page. That's Eugene Medina. That was one of the -- actually, that was the person, right, that viewed the lineup and positively identified Orval Fain?

And if we go to the next page, the top of the page, he further said that he's known the offender for approximately the past two years also. He said he also knew him by the name of Junior.

Do you see that there?

A. Yes.

Q. Okay. So that's another example of the eyewitness being familiar with the perpetrator. And based on the description of the type of familiarity, that would fit within the Klobuchar study of 96 percent that we talked about, correct?

A. Well, I mean, I don't know if it will -- I don't know if phrasing it as fitting in the -- in the 96 percent.

That's a familiar other. If you want to pull it out of the suspect picks, then, you know, that's three -- three suspect picks that probably should be pulled out.

You also mentioned two that probably should be put in.

Q. If we take a look at now City 19-J, taking a look at the RD number, which is K502173, it's another one of the lineup reports that you've reviewed and -- well, one of the lineup reports that make up the data that you reviewed, right?

A. Right.

Q. Is that correct?

A. Correct.

MS. ROSEN: At this time, the city seeks to admit 19-J.

MR. ART: No objection, Your Honor.

THE COURT: Received.

(City Exhibit No. 19-J admitted in evidence.)

BY MS. ROSEN:

Q. If we look at the second page of the lineup report, it indicates that Charles McCarthy was allowed to choose his own position in the lineup.

Mr. McCarthy would have been the -- one of the participants in the lineup? And then -- right? Is that right?

A. Yes.

Q. And then Lina Elkins, Howard Lucas, Michael Brown each positively identified McCarthy as the offender.

Do you see that there?

A. Yes.

Q. From that report, you can't tell the relationship between an eyewitness and the suspect identified, correct?

A. Yes.

Q. Take a look at 19-K. If you can just put that up for Dr. Wells.

Do you see that RD number is K502173?

A. Yes.

Q. And it matches the lineup report that we were just looking at in City 19-J?

A. Yes.

MS. ROSEN: Okay. The city seeks to admit 19-K.

MR. ART: No objection, Your Honor.

THE COURT: Okay. Received.

MS. ROSEN: Thank you.

(City Exhibit No. 19-K admitted in evidence.)

BY MS. ROSEN:

Q. If you take a look at the third page of the report, Howard Lucas is one of the people that reviewed the lineup. Middle of the page -- middle of the paragraph: "During the argument, a male black who Lucas knows only as Insane came walking out of the first-floor hallway," correct?

A. Yes.

Q. "And then Insane then produced a silver colored handgun and fired twice at the victim."

So that's another example of an eyewitness who is familiar with the perpetrator, right?

A. Yes.

Q. And then moving down, Michael Brown, he related essentially the same account as did Lucas.

He further stated that after the victim was shot by Insane, the victim continued to go after him.

And then on the next page, he indicated he'd known Insane for about one year but doesn't know his identity.

So that's another example of an eyewitness who was familiar with the perpetrator, correct?

A. Yes.

Q. And then in the same report, Linda -- Lina Elkins, L-i-n-a, she related that she had seen the offender before in the building but doesn't know anything about him.

So that's another example of a familiar relationship between the eyewitness and the suspect, right?

A. Yes.

Q. Okay. So we've gone through several examples here of lineup reports and the data that you relied on that you could clearly discern from the reports, if you were looking, that there's a familiar relationship between the eyewitness and the perpetrator?

A. Yes.

Q. And when you were doing the sorting that you described earlier, did you look for that?

A. Well, it wasn't coded.

Q. Oh. So that would have been an error in the coding maybe

to have let you know that there were familiar perpetrators so that you could have dealt with that appropriately?

A. Yeah. I mean, that would -- I mean, that wouldn't have changed my conclusions. You're not showing me filler IDs.

Q. Well, correct. But let's say, just hypothetically speaking, if we went through all of this data and identified -- I don't know -- 25 percent or 30 percent were reports that indicated a familiar perpetrator, it would certainly change the numbers, wouldn't it?

It wouldn't change the zero number, but it would change the other numbers, right?

A. Yeah, it would -- it would still fail to explain the absence of filler picks. But I would be very surprised you'd find that kind of number. I mean, that's not -- those are not the rates in which one finds familiar others in these files.

Q. And -- okay.

You don't know, though, anything about the crime that existed in Area 5, which is where this data is extracted from, back in the 1985 to 1991 period, right?

So you don't know the likelihood of familiar relationships between eyewitnesses and suspects; isn't that correct?

A. No, but I would -- I would be surprised if there were very many. I mean, you're going to find -- you're going to find some. You did find some.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 1030 of 1335 PageID #:106415
Wells - cross by Rosen
1166

Q.  And we already talked about the multiple suspects in a lineup phenomenon.  I just want to clarify something about that.

You indicated that the orders of the Chicago Police Department expressly stated that if there were -- there had to be four fillers for every -- for every suspect; is that right?

A.  Yes.

Q.  I'm going to ask you to take a look at this order again --

A.  Okay.

Q.  -- because I think maybe you might have misspoke.

A.  Okay.

Q.  If you look at G, the order states, doesn't it, that when more than one suspect is placed in the lineup, the lineup ideally should consist of at least four nonsuspects in addition to the number of suspects in the lineup?  Not four for each, correct?

A.  Oh, okay.  Well, most -- you're right.  Most police departments, when they put that phrase in there, it's, you know, each -- each filler needs -- each suspect needs some number of fillers.

Q.  Okay.  But we're not talking about other departments.

We're talking about the General Orders related to the Chicago Police Department, right?

A.  Right.

Q.  Okay.  We talked -- you talked on direct about the no

outcome reported and category of data.

You didn't throw that out of the analysis, right?  It remained as part of the analysis.  You counted it different ways, but it remained part of your analysis, correct?

A.  Well, I mean, you know, yeah, it's -- you can treat it in different ways just to see what happens but --

Q.  Okay.  And can you tell from the -- did you discern from the no outcome reporteds how many of those were familiar perpetrator relationships?

A.  No.

Q.  How many were redacted?

A.  No.

Q.  How many included multiple suspects in the lineup?

A.  No, but I still wouldn't have been able to code them, and they would -- no one could code them because they're not reported.

Q.  But -- well, you didn't code them at all, right?

A.  Well, no one could code them because they weren't reported.

Q.  Okay.  And since we're talking about coding, when you -- the field studies that you rely on, there were 11 of them.

Some of them were -- were of the type -- studies of the type that you described that you were involved in where the researchers were actually involved in accumulating the data realtime, right, as the identification procedure was happening, right?

A.  Well, yeah, those are called "prospective studies."

Q.  Okay.  But also included in the 11 field studies that you aggregated for comparison to the Chicago data were something called "archival studies," right?

A.  Yes.

Q.  And that's the circumstance where the researcher is culling data from police reports and coming up with the information from the police reports that they've accumulated, much like what was attempted to be done in the Chicago data, right?

A.  Yes.

Q.  Okay.  And can you tell us from the 11 studies that you identify in Table 1 how many were prospective and how many were archival?

A.  Yes.  I mean, starting at the bottom there, Wright & McDaid was archival.  Wright & Skagerburg was prospective.  Wells, Steblay & Dysart was prospective.  Wixted, et al., was prospective.  Valentine & Pickering was archival.

The Memon studies -- the Memon & Havard and the Horry, Memon & Wright were archival.  Klobuchar & Steblay was prospective.

The Horry, Halford & Brewer was archival.  Behrman & Richards was archival.  Behrman & Davey are archival.  Mostly archival.

Q.  Mostly archival.

And in the context of looking at archival data, it has

been noted, not in necessarily all of these studies but some of them in others, that it's sometimes difficult to extract the type of information that you need in order to identify, for example, filler identifications based on the reporting that was done from the -- by the detectives involved, correct?

A. Only one of these studies said anything about that.

Q. Which study was that?

A. Behrman & Davey.

Q. Okay.

A. The small study, 58.

Q. Behrman & Davey recognized that as a problem, correct?

A. Well, not for the 58.

Q. But for the photo lineups that they --

A. For the photo lineups, yes.

Q. So they had to get rid of the photo lineup data -- they didn't include the photo lineup data because the reporting wasn't clear enough, right?

A. The reporting was not clear enough, so they did not even re -- they did not even attempt to report filler identification rates for their photo lineups, only their live lineups.

Q. Okay. And that's not something that's uncommon, right, when you're looking at archival data like that, right?

A. Well, actually, I think it is.

Q. Well, isn't it true that in your study, the one that we talked about already, in the published article about your

study, you identify that researchers using archival methods have noted the failure of lineup administrator reports to document filler identification?

A. Yeah, Behrman & Davey and --

Q. And I --

A. -- and a study by Tollestrup and Turtle and Yuille.

Q. Okay. So the -- let's talk about the Tollestrup study.

One of the authors of that study was actually a student of yours, right?

A. That's right.

Q. Which one?

A. Turtle.

Q. And the study that was done, that was back in the early 1990s, right?

A. Right.

Q. And you didn't include the Tollestrup study in your 11 field studies --

A. It's --

Q. -- because it wasn't peer reviewed, correct?

A. Because it wasn't peer reviewed, right.

Q. Okay.

A. But there's another reason, and that is, that they didn't have -- they couldn't score filler IDs. It was done in a suburb of Vancouver and -- and just photo lineups. But they weren't doing it with their photo lineups. They weren't making

good records.

Q. So they couldn't score it because they couldn't get definitive language about what exactly was the outcome of the identification procedure, right?

A. Right.

Q. And, in fact, in the Tollestrup article, isn't it true that what they say is it was difficult to distinguish the reliability between false alarms and rejection of photo spreads, right?

A. Well, they were using -- they were using some odd language when -- when they said that, but it's a similar problem to this Chicago problem, yes, in that Vancouver suburb.

Q. Similar problem because the documentation is not good?

A. Right.

Q. So it's hard to code it accurately?

A. Right.

Q. And get an accurate picture of what's going on?

A. For filler identifications.

Q. Right.

A. I mean, other parts of it can be coded.

Q. Okay. And, in fact, in the Tollestrup study, they noted identification outcomes that were entered in the files in a variety of ways, such as negative results, unable to identify police suspect, not in the lineup, pointed out suspect, and one other is looking like perpetrator, positive ID, weak ID. Those

were the types of things that they couldn't code because it was too ambiguous, right?

A. Well, I think they were able to code those things. I think that it's a question of being able to sort them into the three categories.

You know, Chicago's not the only place on the planet that has done that, but I still think it's relatively rare. They're in the archival records most -- most places.

Q. And I'm going to ask you to take a look at --

MS. ROSEN: What's the exhibit number on Tollestrup?

MS. BARBER: 19-M.

BY MS. ROSEN:

Q. I'm going to ask you to take a look at what we've marked as City 19-M. Do you see there RD No. K103034?

A. Yes.

Q. And that's one of the lineup reports that comprises the data that was used for the coding in the Excel spreadsheet that you relied on for your analysis, right?

A. Yes.

MS. ROSEN: The city moves to admit 19-M.

THE COURT: Any objection?

MR. LOEVY: 19-M?

MR. ART: No objection, Your Honor.

THE COURT: Received.

(City Exhibit No. 19-M admitted in evidence.)

BY MS. ROSEN:

Q.   If you take a look at the second page of the lineup report, the detective documented the result as:  The results of the lineup are that the witness was not able at this time to identify the arrested subject, Dugar, positively as the offender in that case.

Do you see that there?

A.   Yes.

Q.   And that's the similar vague language that Tollestrup found in the reports that they were having difficulty with, right?

A.   Yeah, in a Vancouver suburb.

Q.   And then if we take a look at --

MS. ROSEN:  What's the next one?

MS. BARBER:  19-N.

BY MS. ROSEN:

Q.   -- City 19-N, if you could take a look at that.  The RD number is P049272.  Do you see that?

A.   I do.

Q.   And that's also one of the lineup reports that was -- made up the underlying data for the table that you relied on, correct?

A.   Right.

MS. ROSEN:  If we could move to admit City 19-N.

MR. ART:  No objection, Your Honor.

THE COURT:  Received.

(City Exhibit No. 19-N admitted in evidence.)

BY MS. ROSEN:

Q. And if you take a look at the second page, it indicates that the detective wrote that Lionel Ford was located and brought to Area 5, neither -- Area 5 where he was placed in a formal lineup and viewed by the witnesses, neither of whom could identify the subject Ford as being the offender in this case -- in the homicide, right?

A. Yes.

Q. And that's similar vague language that Tollestrup and Turtle referenced in relation to the work they were doing, right?

A. Yes.

Q. Okay. And it's true, isn't it, that since the 1980s to today, lots of research has been done about eyewitness identification procedures, right?

A. Right.

Q. Lots of studies have been done. You've been involved heavily in the process.

And as the data gets done and the research gets done, hypotheses that were held, it turns out, aren't necessarily what we thought they were to begin with, right?

A. Yes, some, yes.

Q. So just as an example, so we talked a little bit earlier about low confidence, right?

There was a time when confidence levels was not something that the researchers thought were a reliable variable, to talk about the reliability of an eyewitness identification, right, that it didn't matter?

A.  It's still not reliable if you don't have pristine procedures.

Q.  Sure.  So all of this was --

A.  So it requires pristine procedures and careful records before you can make any inferences about the confidence of the witness, right.

Q.  Correct.  But even before this recent work that you've been involved in personally, right?

A.  Yes.

Q.  With Dr. Wixted, right?

A.  That's right.

Q.  Confidence levels, if there's pristine conditions, high confidence levels actually does increase the reliability of the identification procedures?

A.  It does.

Q.  Okay.  And that's something new that we've just discovered, right?

A.  Not really.

Q.  Not really?

When is the first time you wrote about that?

A.  Oh, I was writing about it throughout the '90s.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 1040 of 1335 PageID #:106425
Wells - cross by Rosen
1176

The reason, for example, if you look at the Department of Justice report and if you look at what we call the White Paper, which was what we knew in 19, for example, 98, just kind of a summary, but we'd known it for a long time. I was writing about this in '90, '92, '98, '88; and that is, that -- that you have to document the confidence of the witness at the time of the identification and with a double-blind administrator.

And the reason we strongly recommend that is because it has diagnostic value.

Q. Okay.

A. So the proof's in the pudding. We've recommended documenting the confidence of the witness for decades. And --

Q. And now --

A. -- the reason is because it has diagnostic value.

Q. And now the data supports that?

A. Well, now the data support that high-end confidence is surprisingly high levels of accuracy, again, under pristine conditions.

Q. Okay. And then another area that has changed is this idea about sequential versus simultaneous lineups, right?

A. Right.

Q. There was a period of time where the thinking was that sequential was more reliable than simultaneous, right?

A. Right.

Q. And you were a part of the group of researchers who

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 1041 of 1335 PageID #:106426
Wells - cross by Rosen
1177

believed that sequential was more reliable than simultaneous, right?

A. Right.

Q. And there's recent information and data that suggests that there isn't that big of a difference between the two, correct?

A. They're pretty close to being the same, yeah.

Q. Okay. So as we grow and we learn, we learn new things, right, about eyewitness identification procedures and their reliability?

A. Right.

Q. And isn't it true that back in 1988 you prepared a publication a book called The Eyewitness ID: A System Handbook?

A. Yes.

Q. And that was published for police officers to use, correct?

A. Right.

Q. And isn't it true that at that time what you had to say about filler identifications versus no identifications was the following:

Research shows that eyewitness identifications of distractors are somewhat more likely to occur when the lineup suspect is innocent than when the suspect is guilty, but failures to identify anyone in the lineup are even more diagnostic of the suspect's innocence than are identifications of distractors, because failures to identify anyone are much

more likely when the suspect is innocent than when the suspect is guilty, correct?

A.   Right.

Q.   Since that time, there's data that suggests that you were incorrect about that, correct?

A.   Well, it depends on -- I mean, I was incorrect in the sense that I was looking at at that time what we would call rejections, which is where the witness confidently says the person's not there.

But just no identification is different than a rejection.  I mean, if you record things as just no identification, I mean, the frustrating things about looking at these files and looking at these reports is you say no identification.

Well, there's different, you know, degrees of no identification.  I mean, you could say, "The guy I saw is definitely not there."  That's pretty diagnostic.

But a lot of these are just going to be, "Uh, I'm not sure.  You know, I can't make an ID."

So it depends on the -- what I was talking about in 1998 wasn't fully taking into account the confidence of the witness.

Q.   That was 1988, right?

A.   '88, right.

Q.   Yeah.  And what you just said about the documents here is

Wells - cross by Rosen

1179

there's a lot of ambiguity, right?

A. Right. But if you actually read my handbook, you'll see that there's no ambiguity about making record of filler identifications.

Q. Sure. But I'm talking about the police reports that we had to deal with here that were from 1985 to 1991.

What you just described is ambiguity in the way the detectives were reporting what was actually occurring, correct?

A. I don't think there's ambiguity about if a witness picks a filler that you shouldn't say the witness made no ID. I don't think there was ever any ambiguity about that.

Q. But there's ambiguity in the reporting, right?

So it's hard to discern in many places exactly what's going on, right?

A. You'll -- I'll have to ask to repeat it. Go ahead.

Q. Sure. In the reports --

A. Yeah.

Q. Well, in the 30 of the 400-and-whatever reports you reviewed, did you notice ambiguity in the reporting?

Isn't it true you just said that there's -- what -- you said these reports are ambiguous, right?

A. Right.

Q. Okay.

A. I mean, the very statement -- I mean, to add to the ambiguity, normally when you say that witness made no ID,

that's -- that's not very informative because did they say, "The guy's definitely not there"? Did they say, "I can't be, you know, positive enough to make an ID"?

But now it's even more ambiguous because you've thrown in an entire category, filler IDs. Positive mistaken identifications of fillers, if that's thrown in, the category means who knows, right?

I mean, so that's never been ambiguous. You would never -- and it wasn't in my '88. It wasn't in earlier writings either.

Q. It wasn't ambiguous from your perspective, is what you're saying?

A. I don't think it was from anybody's perspective. I don't think it is from the common person.

I don't think that the typical person on the street would -- if upon viewing a lineup asked, "What did the witness do," say "Made no ID because he didn't pick the suspect."

I think they would say, "Hey, he picked somebody. It turns out it was a filler. Wow. Informative."

Q. But you already noted that that was happening, right? You noted it in your -- in your study that --

A. In the --

Q. -- researchers -- can I finish my question?

A. Yeah.

Q. -- researchers using archival methods had noted failure of

lineup administrator -- administrator reports to document filler identifications.

So it was a phenomena that was happening, correct?

A. In two locations that we know of at different points in time --

Q. Okay.

A. -- a suburb of Vancouver and Sacramento, but not Sacramento County, only Sacramento City.

Q. Okay. I'm going to move to one more topic, and I think we're done.

A. Okay.

Q. You would agree with me, wouldn't you --

THE COURT: It's three to 4:00. Are you going to be done -- are you going to be done in three minutes?

MR. ART: I have about -- about five minutes, I think.

THE COURT: Well, I can't really go over. I can go until five after, but we're not going to finish by five after.

MR. ART: I'll be quick.

MR. GIVEN: Judge, I also have, like, three or four very quick questions.

THE COURT: Well, I don't need to know everybody. I need to know whether we can finish in five minutes, and I am gathering we cannot.

MR. ART: It does not sound that way, Your Honor.

THE COURT: I think we're going to have to take our

recess, ladies and gentlemen, and we'll start at 9:30 tomorrow morning.

COURT SECURITY OFFICER: All rise.

(Jury out.)

THE COURT: Okay. I think we better get together about 9:20, at the latest, tomorrow.

MS. ROSEN: Okay, Judge.

MR. LOEVY: Your Honor, we don't want to talk to Dr. Wells, but I do want to apologize to him. I know he wanted to get back to Iowa today, and I'm disappointed. I know the Court's disappointed. It looks like we just almost made it. Sorry.

THE WITNESS: You'll see me in these same clothes tomorrow, by the way.

(Laughter.)

THE COURT: I'm sorry. I just don't have flexibility in the afternoon.

MR. ART: Thank you, Judge.

MR. LOEVY: We understand and appreciate it.

Sorry, Dr. Wells.

THE COURT: If we hadn't had to take that long recess, we would have been --

MR. LOEVY: Yeah, it wasn't anybody's fault. We would have made it easy.

MR. ART: Thanks, Dr. Wells. Sorry, Dr. Wells.

(Adjournment at 3:59 p.m. until 9:20 a.m., 6/12/18.)

C E R T I F I C A T E


We, Frances Ward and Nancy L. Bistany, do hereby certify that the foregoing is a complete, true, and accurate transcript of the Trial proceedings, Volume 5-B, had in the above-entitled case before the HONORABLE JOAN B. GOTTSCHALL, one of the Judges of said Court, at Chicago, Illinois, on June 11, 2018.


/s/ Frances Ward, CSR, RPR, FCRR          06/11/18


/s/ Nancy L. Bistany, CSR, RPR, FCRR      06/11/18

Official Court Reporters                  Date
United States District Court
Northern District of Illinois
Eastern Division

# EXHIBIT 59

3518

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JACQUES RIVERA,                              ) No. 12 CV 4428
                                             )
            Plaintiff,                       )
vs.                                          ) Chicago, Illinois
                                             )
REY GUEVARA, STEVE GAWRYS, DANIEL NOON,      )
JOHN GUZMAN, JOSEPH FALLON, JOSEPH SPARKS,   )
PAUL ZACHARIAS, GILLIAN MCLAUGHLIN, JOHN     )
LEONARD, EDWARD MINGEY, RUSSELL WEINGART,    ) June 25, 2018
ESTATE OF ROCCO RINALDI, CITY OF CHICAGO,    )
                                             )
            Defendants.                      ) 9:23 o'clock a.m.

VOLUME 15 A
TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JOAN B. GOTTSCHALL
and a jury

APPEARANCES:

For the Plaintiff:      LOEVY & LOEVY
                        BY:  MR. JONATHAN I. LOEVY
                             MR. STEVEN E. ART
                             MR. ANAND SWAMINATHAN
                          311 North Aberdeen Street
                          3rd Floor
                          Chicago, Illinois  60607

                        MACARTHUR JUSTICE CENTER
                        Northwestern University School of Law
                        BY:  Locke E. Bowman, III
                        357 East Chicago Avenue
                        Chicago, Illinois 60611
                        (312) 503-0844


Court reporter:             Blanca I. Lara
                        Official Court Reporter
                        219 South Dearborn Street
                             Room 2504
                        Chicago, Illinois 60604
                          (312) 435-5895
                        blanca_lara@ilnd.uscourts.gov

3519

Appearances  (continued:)


For the Individual          THE SOTOS LAW FIRM
Defendants:                 BY:   MR.  JEFFREY N.  GIVEN
                                  MR.  JAMES G.  SOTOS
                                  MS.  CAROLINE P.  GOLDEN
                                  MR.  JOSEPH M.  POLICK
                                  MR.  DAVID A.  BRUEGGEN
                            550 East Devon Avenue
                            Suite 150
                            Itasca, Illinois  60143

For the Defendant           ROCK FUSCO & CONNELLY, LLC
City of Chicago:            BY:   MS.  EILEEN E.  ROSEN
                                  MS.  CATHERINE M.  BARBER
                                  MS.  THERESA B.  CARNEY
                            321 North Clark Street
                            Suite 2200
                            Chicago, Illinois  60654


For the Defendant           LEINENWEBER BARONI & DAFFADA, LLC
Guevara:                   BY:   MR.  THOMAS E.  LEINENWEBER
                                  MR.  JAMES V.  DAFFADA
                            120 North LaSalle Street
                            Suite 2000
                            Chicago, Illinois  60602

3520

(The following proceedings were had out of the presence of the jury in open court:)

COURT SECURITY OFFICER: All rise.

THE COURT: All right. Is everybody here?

MR. LOEVY: Yes.

THE COURT: Wonderful.

All right. The third motion for a mistrial is denied. The motion to bar Wasilewski's opinions is cumulative.

Could I get a quick response from the defense at some point.

MS. ROSEN: Well, yeah, Judge, I mean, he's scheduled for this morning or this afternoon, depending on how quickly we move. Our response is, we are not calling him to repeat testimony. His unique testimony in the case is to discuss the procedures put in place at the State's Attorney's Office it they relates --

THE COURT: Is that what all he's going to testify about?

MS. ROSEN: After Jones and Palmer, that's it. The procedures put in place. There's that SAO memo of April 23rd and --

THE COURT: All right. I don't want to spend a lot of time on this. I just want to know what he's going to testify about.

MR. LOEVY: Well, we had an objection to just that.

3521

It's that memo that they read to the jury twice now. They've read it twice. We don't need another paid which to --

THE COURT: What memo have they read?

MR. LOEVY: The state's attorney's memo laying out the state's attorney's discovery.

THE COURT: How long is it going to take him to do this?

MS. ROSEN: 20 minutes.

THE COURT: I think it's okay.

All right. Then on the recalling of the two officers, I need to be sure that there's not going to be any repetition. So I need you to -- we've got the transcript. I don't know how much time it will take to figure this out, but that's my main thing. I think we're at the end here. I don't want to extend this. I want this to go to the jury.

And I will allow it if there's something that -- you know, the rule was that you were going to cross-examine them or you were going to examine at the same time. So there has to be some good reason to recall them. So I need you to sort of tell me at some point what that is and I'll check the transcript.

MR. SOTOS: Well, Judge, I can tell you not that they will not be cumulative.

THE COURT: Yeah, I know you would tell me, but I need to figure it out for myself; it's my job.

MR. SOTOS: The reason I didn't want to do it advance

3522

is that I didn't want to -- I think that the motion was intended to ferret out what's going to be brought out, and that's what we didn't want to do, but I'm assuring the Court that it won't be cumulative, and it's going to be short, too ---

MR. LOEVY:  Your Honor, they can't just --

MR. SOTOS:  -- that was the whole point.

MR. LOEVY:  Your Honor --

MR. SOTOS:  But that's what we thought the motion was intended to do.

MR. LOEVY:  They can't just call --

MR. SOTOS:  So they ask to bar a defendant in advance of them testifying because they want to make sure it's not accumulate.  I'm advising the Court, it won't be cumulative.

THE COURT:  Well, it's an unusual situation because I'm allowing you to call them in violation of the agreement that everybody reached at the end of trial, and I want to have some assurance about what this is going to be.  I don't need to hear from the plaintiff, because that's what I'm going to do.

MR. LOEVY:  That's why I haven't talked yet.

THE COURT:  I'm going to allow it if there's some good reason to do it at this point.

MR. SOTOS:  Well, Judge, we would request that the witness be allowed.  I don't think it's in violation of any agreement.  We always waive scope objections in trials to

3523

facilitate things and move them along, but we've never had a situation where the defendant was -- that was interpreted as a bar to them being recalled from having to be cumulative --

THE COURT: Oh, that makes no sense.

Let's get the jury.

When are they going to be recalled?

MR. SOTOS: Tomorrow.

THE COURT: All right. Then we'll have plenty of time to work this out. But if it was -- it was clear I thought, and I have told the jury, that everybody was going to examine these officers at the same time.

MR. LOEVY: And they were, they were examined at --

THE COURT: Yeah, I know that.

MR. SOTOS: Judge, it's just rebuttal to what's come up in their case. And I don't really necessarily understand that we each should be required to disclose what that rebuttal is going to be in advance. That's all it's going to be, I'm assuring the Court. But if, you know, the Court is going to insist --

THE COURT: Well, if it's going to be brief, and it's going to be in rebuttal, I guess -- I guess it's okay, but I'm going to stop you if it sounds repetitive.

MR. SOTOS: Understood.

MR. LOEVY: Your Honor, our position is, we can't just call witnesses who have already been called. You know, we'd

3524

like to call witnesses again, too.  It would go on forever.

These witnesses have been called by the defense --

THE COURT:  Well, I made the ruling.  I mean, if there's something that came out, what's -- I mean, I suppose if we're going to avoid a rebuttal case, are we going to avoid a rebuttal case?  Are you going to have a rebuttal case?

MR. LOEVY:  No.  Not this time.  So, I mean, I think you should adhere to the ruling that they have to identify what it is.  I mean, that's what Your Honor said, and I think that's a sound rule.

THE COURT:  Well, everybody ought to have the transcript --

Can we make sure the jury is coming?

(Brief pause).

MR. LOEVY:  And then depending on what it is, we can have a rebuttal case.  He won't tell you what it is.

MR. SOTOS:  Well --

THE COURT:  Could we get the jury, please.

MR. GIVEN:  Judge, I just wanted to remind you, the Nieves motion is pending.

THE COURT:  Yeah.  I don't think anything was opened up.  So that's denied.

COURT SECURITY OFFICER:  All rise.

(The following proceedings were had in the presence of the jury in open court:)

THE COURT: Good morning. Please be seated.

Is the elevation stool needed anymore?

JUROR CICCARELLI: No.

THE COURT: Fabulous. Okay.

MR. SOTOS: Your Honor, the defense will continue with the reading of the deposition of Stephen Machain.

THE COURT: Okay.

THE COURT REPORTER: Could the readers state their name for the record, please.

READER RAHE: Austin Rahe, R-a-h-e.

READER STORTZ: Jake Stortz, S-t-o-r-t-z.

THE COURT REPORTER: Thank you.

AUSTIN RAHE and JAKE STORTZ

called as readers herein, to read all questions by Mr. Shapiro and answers given by Mr. Machain:

DEPOSITION TESTIMONY OF STEPHEN MACHAIN

"EXAMINATION BY MR. SHAPIRO" (read by Mr. Rahe):

Q. So the individuals or entities that were notified, according to your report, were Gang Crimes North, the 14th and 13th District, and an evidence tech, correct?

A. Evidence tech, right.

Q. And after providing those notifications, did you have any further involvement in the investigation of the Valentin shooting?

A. I don't believe so. No.

deposition of Stephen Machain

3526

Q. Okay. So you spoke with the victim as you noted before, right?

A. Yes.

Q. And if you talked to someone, would it be noted here in this report?

A. Yes.

Q. I'm understanding you to say that everyone you spoke with as a witness was memorialized in a report. And I also -- you know, you also have the report in front of you. So I'm asking you, can you tell me based on the report everyone that you've interviewed as a witness in this case?

A. Based on the report, who I talked to?

Q. Yeah, that's it.

A. Well, the report indicates I talked to the victim, I talked to the brother. Of the three names listed on the report, I talked to two of the three.

Q. Okay. So who -- who are the two that you talked to? Are those Felix Valentin?

A. And the brother, Israel Valentin.

Q. And the individual who is listed on the report as Macho Lopez, that's the individual who you did not talk with?

A. Correct.

Q. One of the other witnesses told you about Lopez?

A. I don't recall how I got Lopez's name, but in glancing at the case report I see the proximate age as 13 to 15. So I got

that information from somebody, but I don't recall who.

Q. And you didn't actually speak with or see Mr. Lopez, right?

A. As far as I know, I don't really remember if I saw him or not. Probably not, because if I would have seen him, I would have gotten some more information from him, like his correct age or whatever, his contact -- whatever contact information as far as the address. So there would have been more information in there, but it's not.

Q. Do you have any recollection of the name Jacques Rivera coming up at any point in your role during the investigation?

A. No.

Q. Do you have any recollection of the name Jose Rios coming up at any point in your role in the investigation?

A. No.

Q. Based on the information that you obtained during your work in the Valentin shooting, you didn't have any reason to think that Jacques Rivera should be a suspect, right?

A. I had no idea who anybody's name was. I mean, not at all. I didn't have a nickname. I had no name at all."

READER RAHE: Okay. So I'm going to be showing you a document which has been marked in this case as Defendants' Exhibit 1.25. If you can put that up in the Elmo.

(Brief pause).

READER RAHE: Is it on?

(Brief pause)

MR. LOEVY: Your Honor, it's a rap sheet. We've seen this before.

THE COURT: I'm sorry. The question is, is the Elmo on, right?

MS. ROSEN: Judge, the question is, is the Elmo on?

MR. LOEVY: He should keep reading.

THE COURT: Well, I guess we're having a technical problem.

(Brief pause)

MS. CARNEY: It appears to be on.

MR. LOEVY: We have it on the board, Your Honor.

THE COURT: I don't want to spend a lot of time but --

MS. CARNEY: It seems to be the system won't -- like none of the actual computers are turned on.

THE COURT: I guess we should call systems.

But can't we go on? You have the hard exhibit?

MS. ROSEN: We're going to start grabbing something here and there --

THE COURT: That would be great. Let's call systems and get them to work on this so we don't have a problem again.

MR. LOEVY: Your Honor, should we keep reading, though? It's the rap sheet.

THE COURT: We're going to get the exhibit and then we're going to keep reading.

(Brief pause)

(Exhibit published to the jury.)

"EXAMINATION BY MR. SHAPIRO" (read by Mr. Rahe):

Q.  Sir, have you seen this document before?

A.  No.

Q.  And is that the type of document that you've come across at any point in your work with the Chicago Police Department?

A.  Yes.

Q.  And what is it?

A.  They call it a rap sheet.

Q.  And what is a rap sheet?

A.  It's a list of an arrestee's prior offenses.

Q.  And in order to obtain a rap sheet on a person, would you need -- you would need to know their name, right?

A.  I guess.

Q.  And given that you hadn't come across the Jacques Rivera or Jose Rios in the course of your investigation, is it accurate to say that you would not have been the person who requested this rap sheet?

A.  I would say so.  Correct.

Q.  Who -- who usually asks for rap sheets?  Is it usually detectives, patrol?  Does it vary?

A.  It varies.

Q.  And are you familiar with the stamp that appears on this exhibit toward the bottom that says "issued by inquiry" followed by inquiry, followed by a date and, "by name check

only"?

A.  I'm familiar with the stamp, yes.

Q.  What does that stamp mean?

A.  It means that somebody had requested a rap sheet.

Q.  So based on this document, you know that somebody requested this rap sheet and you know it wasn't you, right?

A.  Correct.

Q.  All right.  Going back to Exhibit 1 --"

READER RAHE:  Which I've been asked to clarify is Defendants' Exhibit 3 C in this case.

"EXAMINATION BY MR. SHAPIRO" (read by Mr. Rahe):

Q.  Forgive me if I asked this already, but the sum total of information about the perpetrators of the Valentin shooting that you had is contained in Exhibit 1, right?

A.  Yes.

Q.  And, Mr. Machain, when you were asked earlier about what Gang Crimes North did after you notified them as reflected on the last page of Defendants' Exhibit 3 C, I just want to be clear, you have no personal knowledge about what any Gang Crime Specialists from Gang Crimes North did after you notified them, is that correct?

A.  Correct."

READER RAHE:  That's all.

(End of the deposition of Stephen Machain.)

THE COURT:  Okay.

MR. SOTOS: Judge, defendants would call John Boyle, but we're going to need the Elmo in order to proceed with his examination.

THE COURT: Can we start or do you need it right at the beginning?

MR. SOTOS: I think it's going to be fairly early. It's going to be report-driven.

THE COURT: Okay.

MR. LOEVY: Your Honor, we have seen all the reports.

THE COURT: Well, you know, I didn't tell you how to you do your examination, so I'm going to tell the defense how to do their examinations.

Let me call and see what's going on.

(Brief pause).

THE COURT: (On the telephone) We're at an impasse because we can't get the Elmo up. Do they know that it's an emergency? They need to come right in because we can't do anything. Thanks. Bye-bye.

(Brief pause).

MR. SOTOS: Judge, we --

MS. GOLDEN: Did they turn anything off?

THE COURT: I have no idea.

(Brief pause).

THE COURT: There's nothing else to do in the meantime.

MR. SOTOS:  We're trying right now to figure it out. But we have a witness whose depositions we might be able to read.

THE COURT:  That would be great.

MR. SOTOS:  One of them has many exhibits.

(Brief pause).

MR. SOTOS:  Apparently none of the displays are working.

THE COURT:  Nothing is working?  Great.  Happy Monday.

(Brief pause)

MS. GOLDEN:  So it can't be the --

THE COURT:  Ben, maybe Marlan can figure it out?

Break SOTOS:  We can take our morning break early.

(Laughter in the courtroom).

MS. GOLDEN:  I think it's coming up.

(Brief pause).

MS. GOLDEN:  It has to be re-set?

(Brief pause).

MS. GOLDEN:  It's coming back.

THE CLERK:  It had to be rebooted.  I'm just hoping --

(Brief pause)

THE CLERK:  Are you up?

THE COURT:  I'm up.

THE CLERK:  You're up, Judge?

THE COURT:  Uh-huh.

THE CLERK: Are you all up now?

(Responses in the affirmative)

THE COURT: Horay. Thank you.

So it needed to be rebooted, basically.

COURT'S LAW CLERK: I guess so.

(Brief pause).

THE COURT: Okay. And I think this is the witness, right?

MS. GOLDEN: Yes.

THE COURT: Perfect. Come down here, please.

MS. GOLDEN: Defense calls Detective Boyle.

THE COURT: Sir, can you come up here, please.

Please raise your right hand.

(Witness duly sworn.)

THE COURT: You may be seated.

There's water there if you need it.

JOHN BOYLE, DEFENDANT CITY'S WITNESS, SWORN

DIRECT EXAMINATION

BY MS. GOLDEN:

Q. Good to go?

A. Yes.

Q. Good morning, Detective Boyle.

Could you please introduce yourself to the ladies and gentlemen of the jury.

A. My name is John Boyle.

Boyle - direct by Golden

3534

Q.  And, sir, where were you employed in 1988?

A.  In 1988 I was employed by the Chicago Police Department.

Q.  And you were a detective at the time?

A.  That's correct.

Q.  And your partner was?

A.  Detective William Dorsch.

Q.  And how long had you been with the police department as of 1988?

A.  I came on as a probation officer on the 23rd of October 1972.

Q.  I'm sorry.  A what?

A.  Probation patrolman.

Q.  Maybe if you could move the microphone a little bit closer to you.

A.  I came on as a patrolman in started in the police academy October 23rd, 1972.

Q.  So about 16 years of experience prior 1988?

A.  Approximately.

Q.  And you remained with the department until the year 2006?

A.  That's correct.

Q.  So that was about 30 -- 30, 35 years of service?

A.  30.

Q.  Okay.

A.  Almost 34.

Q.  And are you currently employed?

Boyle - direct by Golden

3535

A.    No.

Q.    You are retired?

A.    Yes.

Q.    Completely retired?

A.    Completely retired.

Q.    So we've had in this case -- one of the issues in this case is how the case is concluded or resolved.

A.    Uh-huh.

Q.    And so I want to ask you as a homicide detective, generally, what was the process for seeking charges in an investigation you were working on.

A.    You would contact the State's Attorney's Felony Review unit.

Q.    And the Felony Review unit is a unit of Cook County, correct?

A.    Cook County.

Q.    Separate and apart from the police department?

A.    Yes.

Q.    Now, when you say you would call the Felony Review unit of the State's Attorney's Office, who do you mean when you say "you"?

A.    One of the detectives and myself, or Dorsch, or whoever.

Q.    Okay.  Was -- did Gang Crime Specialists have the authority to contact Felony Review at the State's Attorney's Office to request charges in a homicide case?

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 1068 of 1335 PageID #:106453
Boyle - direct by Golden
3536

A.  No.

Q.  And was it the job of the detectives who contacted Felony Review to decide whether or not charges would, in fact, be filed?

A.  No, that's an decision of the State's Attorney's Office.

Q.  All right.  Do you have any recollection of the case we're here about today, the Valentin homicide investigation?

A.  None other than what I read in the reports.

Q.  I have provided you with the reports?

A.  Yes.

Q.  Do they refresh your recollection?

A.  Not really.

Q.  Okay.  From the reports, can you tell that you were working on September 15th?

A.  Yes.

Q.  And you and Detective Dorsch conducted a lineup relative to that case on that date, correct?

A.  Correct.

Q.  Do you specifically remember conducting the lineup?

A.  No, I don't.

Q.  What, if any, practice or policy or procedure did you and Detective Dorsch have with respect to conducting lineups?

A.  Ah --

Q.  In terms of where you would be during the course of the lineup.

Boyle - direct by Golden

3537

A. Well, one -- one detective would usually be in room with the witnesses and a victim, and the other detective would be in the other room with the people who are participating in the lineup.

Q. Do you remember -- do you specifically remember the lineup that was conducted on September 15th by you and Detective Dorsch?

A. No.

Q. Do you know whether you were with witness or whether the were with the lineup participants?

A. No.

Q. But it's fair to say that one of you would've been in one location and the other would've been in the another?

A. Correct.

Q. And I think based on the reports, we saw that Gang Crime Specialists, Gawrys and Guevara, were also identified as being present?

A. Correct.

Q. And what does it mean for a specialist to be present?

A. Well, it could mean -- obviously, they were present in the station or in the area at the time, but I can't say definitely where they were at.

Q. For this particular lineup?

A. For this particular lineup.

Q. Okay. I want to take a look at Defendants' Exhibit 1.10,

which is your closing Supp.

I'm going to bring you a copy.

A.   There's reports up here.

Q.   Those are probably not yours.

I'm going to bring the reports and then as we get to them you'll have them right in front of you.

(Documents tendered to the witness).

BY MS. GOLDEN:

Q.   Do you have -- do you have, sir, Defense Exhibit 1.10 in front of you?

A.   Yes.

Q.   And do you recognize that?

A.   Yes.

Q.   What, is it?

A.   This is a copy of -- of a closing -- or a closing supplementary report or clearing supplementary report.

Q.   And directing your attention to the signature in Box 93 --

A.   Yes.

Q.   -- in the lower left-hand corner, do you recognize that signature?

A.   Yes.

Q.   Whose signature is that?

A.   Detective William Dorsch.

Q.   Can you tell from flipping through the pages of the report, Mr. Boyle, who authored this particular report, the closing

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 1071 of 1335 PageID #:106456
Boyle - direct by Golden
3539

Supp.?

A. I would have say it was Detective William Dorsch.

Q. And what leads you to that conclusion?

A. Typically the name appearing in Box 93 would be the person who authored the report. And on the last page of the report, typically the first name would be the name of the author of the report.

Q. So because his name is listed first on the last, and because his name appears in the first box at the bottom of the report, that leads you to believe that the report was typed and written by him?

A. Yes.

Q. Is there anything else about the report that leads you to the conclusion that you were not the author of this report?

A. Some of the, I guess you call the style that the report was written is -- reminds me of what he would have written and not myself.

Q. And is that your signature in Box 94?

A. That's my name, but I didn't sign it.

Q. Who -- do you know who signed your name here?

A. I think that that was Detective Dorsch.

Q. Did he have your permission to sign your name to this report?

A. Yes.

Q. Was it your custom and practice to read the reports before

Q.   you authorized him to sign your name?

A.   Yes.

Q.   Okay.  I'm going to direct your attention to the second page of the report, and ask you, sir, about your assignment to this case.

Is it your understanding from the report you were assigned on September 15th, 1988?

A.   That's correct.

Q.   And when you and Detective Dorsch were assigned to the case, the investigation was that for a homicide, correct?

A.   Correct.

Q.   The victim had recently passed?

A.   Correct.

Q.   And the prior investigation had been that of an aggravated battery?

A.   Correct.

Q.   Now, do you remember who assigned you to the case?

A.   According to the report, it says Sergeant Rinaldi.

Q.   And what was the first thing, according to the report, that you and Detective Dorsch did after you were assigned to the case?

A.   Would be to review the file.

Q.   And when you say you reviewed the file, are you talking about the investigative file?

A.   That's correct.

Q. All right. Sir, I'm showing you what has been marked as Defendants' Exhibit 1.2.

A. Yes.

Q. And ask you if you recognize this document.

A. Yes.

Q. And what is it?

A. This is what was referred to as an investigative file inventory.

Q. I'm so sorry, I couldn't hear that.

A. This is what was referred to as the investigative file inventory.

Q. This is basically a table of contents, so to say, of the reports that were contained in the file when you were assigned the case?

A. Ah, correct.

Q. And do you recognize any of the handwriting on lines 1 through 19?

A. Ah, I recognize 19 -- 20 through 25.

Q. 20 through 25?

A. Right. 19, I can't say that -- who that is.

Q. And whose handwriting do you recognize to be on lines 20 through 25?

A. It looks like to be Detective Dorsch's.

Q. And the date on the far right corner for these documents is?

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 1074 of 1335 PageID #:106459
Boyle - direct by Golden
3542

A.   15th of September 1988.

Q.   So what does that mean with respect to what Detective Dorsch did with these documents on that date?

A.   That he wrote this in the end of the file and that he added these documents to the original file.

Q.   On September 15th?

A.   Correct.

Q.   But, in any event, in terms of what you had available in the case file when you and Detective Dorsch were assigned to the case, it was the documents listed as Exhibits 1 through 19 on Defendants' Exhibit 1.2?

         MR. LOEVY:  Objection to foundation, Your Honor.

         THE COURT:  Sustained.

         MS. GOLDEN:  Do you have the investigative file?

      (Brief pause)

BY MS. GOLDEN:

Q.   All right.  Mr. Boyle, I'm showing you what is City's 45.

      Do you recognize that document or that file?

A.   Yes.

Q.   What is that?

A.   This is what was called a case file.

Q.   And according to your report, was that the case file that you reviewed when you originally received the assignment?

A.   Yes.

Q.   And according to the table of contents on the inner court

Boyle - direct by Golden

3543

folder, documents listed on what we have as Defense Exhibit 1.2 were in the file when you received the case assignment, at least according to your report?

A. Correct.

Q. And there were four supplementary reports in the case file at the time you received the assignment, correct?

A. Yes, four.

Q. So turning your attention back to the second page of Defendants' Exhibit 1.10, Mr. Boyle.

I was going to ask you, according to the report, what was the next thing that you and Detective Dorsch did after you reviewed the case file?

A. Which? What was that?

Q. I have it on the computer screen in front of you.

A. Oh, okay.

We would've reviewed the original reports in the file and then contacted Gang Crimes North Unit.

Q. And did you -- what according to the report did you advise Gang Crimes North of?

A. That the victim in this incident had succumbed to his injuries.

Q. And that was a communication that came from you or Detective Dorsch to Gang Crimes North?

A. Correct.

Q. And what, if anything, did you, according to the report,

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 1076 of 1335 PageID #:106461
Boyle - direct by Golden
3544

ask them to do?

A. We asked them if they can locate the -- the offender and the witness -- the witnesses.

Q. And according to the report one -- Orlando Lopez was located, as was Mr. Rivera, correct?

A. Correct.

Q. And Orlando Lopez was the eyewitness that viewed the lineup that you and Detective Dorsch conducted?

A. Correct.

Q. On page 2 of your report, it says -- or indicates -- or identifies Orlando Lopez as being re-interviewed. Do you recall interviewing Orlando Lopez?

A. No, I do not.

Q. But certainly he was spoken to that date, correct?

MR. LOEVY: Objection, Your Honor. Foundation.

MS. GOLDEN: According to the report.

THE COURT: The witness has no recollection. Is he just reading from the report?

MS. GOLDEN: I'm asking him to interpret his report.

THE COURT: Did the witness write the report?

MS. GOLDEN: He authorized the report.

THE COURT: All right. The objection is lack of foundation?

MR. LOEVY: Yes, Your Honor. He has no memory of any of these events.

THE COURT: Well, I'm not sure why you're doing it this way, but go ahead.

MS. GOLDEN: Okay. Thank you.

THE COURT: Well, there was a question pending. You want the question read back?

(Record read by the Court from realtime feed.)

"... on page 2 of your report, it identifies Orlando Lopez as being re-interviewed. Do you recall interviewing Orlando Lopez?"

And the answer was, "no."

Okay. I guess there wasn't a question pending.

MS. GOLDEN: I thought he answered.

THE COURT: Why don't we go ahead. We're short of time.

MS. GOLDEN: Sure.

BY MS. GOLDEN:

Q. I'm going to show you, sir, what we've marked as Defendants' Exhibit 1.2.

And this is the lineup report of the lineup that you and Officer Dorsch conducted, correct?

A. Correct.

Q. And is this your signature in the lower left-hand corner (indicating)?

A. Yes.

Q. Okay. And is this Mr. Dorsch's signature in the middle box

Boyle - direct by Golden

3546

(indicating)?

A.  No.

Q.  Whose signature is that?

A.  I signed it for him.

Q.  And did you have his authority to do that?

A.  Yes.  After reviewing the report, he said I could sign it.

Q.  And the time and date of this report is what, sir?

A.  15th September 1988 at 8:30 p.m.

Q.  And according to the inventory, the lineup report was put into the case file September 15th?

A.  Correct.

Q.  And according to the inventory, the supplementary report was also put into the file on that date?

A.  Yes.  That would be on 25 closing Supp.

Q.  Now I want to ask you about --to back to your assignment to the case and ask you how it came to be that you were assigned to this particular case, given that detectives Leonard and McLaughlin had been previously working?

MR. LOEVY:  Objection.  Foundation.  He has no memory.

THE COURT:  If the witness knows, he should answer. If he doesn't know, he should say he doesn't know.

BY MS. GOLDEN:

Q.  Do you have an understanding of why you were assigned to the case?

A.  I can only say that it was probably because of detective --

MR. LOEVY: Your Honor, we object.

THE COURT: Are you just guessing at this point or do you have some basis for knowing?

THE WITNESS: No, I don't know.

BY MS. GOLDEN:

A. All right. Had you ever -- was it unusual for you to work on a case that had been previously assigned to other detectives?

A. Yes.

Q. It was unusual?

A. Yes.

Q. But it did happen?

A. It did happen from time to time.

Q. In what sorts of circumstances?

MR. LOEVY: Objection, Your Honor.

THE COURT: Sustained.

BY MS. GOLDEN:

Q. After the lineup, according to the report, did you have another occasion to speak with Mr. Rivera?

A. According to the report, yes.

Q. I'm sorry. Just a moment.

(Brief pause).

MR. LOEVY: Your Honor, I object. This isn't his report. This is --

THE COURT: There's no question pending.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 1080 of 1335 PageID #:106465
Boyle - direct by Golden
3548

MR. LOEVY: All right. Sorry.

BY MS. GOLDEN:

Q. Did you say "yes"?

THE COURT: Oh, maybe there is. Sorry.

(Brief pause)

THE COURT: Okay. So I guess there is a question pending.

I guess my question is, what can the witness since he says he has no recollection of it other than read the report? If there's some reason for this, fine. But --

MS. GOLDEN: Okay. I'll move on.

THE COURT: The report is --

MS. GOLDEN: I'll move on.

BY MS. GOLDEN:

Q. I want to ask you about the felony 101 sheet, which is marked as Defendants' Exhibit 1.19, and ask you, sir, if you recognize this document?

A. Yes, I do.

Q. And is this a document that was filled out before or after the State's Attorney's Office decided to file charges?

A. After the state's attorney filed charges.

Q. And then I also want to ask you about Defendants' Exhibit 1.18.

A. Yes.

Q. And do you recognize this document?

A.  Yes, this is a felony complaint.

Q.  And whose signature appears on this document?

A.  That's my -- my -- myself signing Detective Dorsch's name.

Q.  And did you have his authority to do that?

A.  Yes.

Q.  And that, too, is also prepared -- forget that.

In -- contained in this investigative file, when you received the case assignment, at least according to your report, was a supplementary report that described an identification by the victim of Jose Rodriguez and Felipe Nieves as possible suspects.  Do you see that in front of you?  It's marked Defense Exhibit 1.15.

A.  Yes.

Q.  Do you have any explanation for why Jose Rodriguez was not included in the lineup that you conducted?

MR. LOEVY:  Objection to foundation, Your Honor.

THE COURT:  Well, again, I just ask if the witness knows.  Overruled.

BY THE WITNESS:

A.  Do I know why?

BY MS. GOLDEN:

Q.  Do you know why he wasn't included in the lineup that you conducted?

A.  I would only think that it's because he wasn't there.

Q.  Not in the police station?

A.  Not in the police station.

Q.  Do you know why he wasn't in the police station?

A.  I can only say that --

THE COURT:  Again, you are speculating.  So if you know.

THE WITNESS:  No.

THE COURT:  Okay.

BY MS. GOLDEN:

Q.  That question would've been easier to answer 30 years ago, I bet?

A.  Yes.

Q.  If -- if either you or Mr. Dorsch had -- didn't believe Orlando Lopez or had any reason to identify -- or to -- let me start over.

If either you or -- if you had any reason to doubt the reliability or the accuracy of Orlando Lopez's identification of Mr. Rivera on September 15th, would that have been included in your report?

MR. LOEVY:  Objection, Your Honor.  There's no foundation that he even spoke to Orlando Lopez.

THE COURT:  Well, overruled.

BY MS. GOLDEN:

Q.  If you had any reason to doubt the reliability or the credibility of Orlando Lopez during the course of the -- during the course of the lineup on September 15th, is that something

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 1083 of 1335 PageID #:106468
Boyle - direct by Golden
3551

you would've included in your report?

A. Yes.

Q. If you had any reason to doubt his reliability or credibility, is that something you would've shared with Mr. Dorsch?

A. Yes.

Q. Is that something that you also would've shared with the state's attorney when she came?

A. Yes.

Q. If Mr. Lopez said to you or to anyone else in your presence that he had identified the wrong guy, is that also something that would be included in your report and shared with the State's Attorney's Office?

A. Yes.

Q. And according to the report, you did witness the identification procedure, correct?

A. I was present, yes.

        MS. GOLDEN: All right. Just need a minute.

     (Brief pause).

        MS. GOLDEN: I don't have any other questions.

        THE COURT: Okay. Mr. Loevy.

        MR. LEINENWEBER: How would you like to handle that --

        THE COURT: Oh, Mr. Leinenweber, if you have questions, go.

        MR. LEINENWEBER: Just a few questions.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 1084 of 1335 PageID #:106469
Boyle - cross by Leinenweber
3552

THE COURT:  Go ahead.

CROSS EXAMINATION

BY MR. LEINENWEBER:

Q.  Good morning, Mr. Boyle.

A.  Good morning.

Q.  Drawing your attention back not as far as this case, which I think we've established was like in September 1988.

A.  Correct.

Q.  Drawing your attention back to approximately springtime of 1989, around Mother's Day in May, were you partners with Mr. Dorsch at that time?

A.  Yes.

Q.  And I may have missed it, and my apologies if I did, how long a time were you partners with Mr. Dorsch?

A.  Detective Dorsch and I became partners in 1987, probably sometime in July.

Q.  Okay.  And when did you stop being partners with him?

A.  Ah, sometime in '89.

Q.  Okay.

A.  I think it was in the fall.

Q.  Okay.  And so drawing your attention back to that time. Did you ever have the occasion to investigate a murder case with Mr. Dorsch where the suspect or the defendant was a students at DePaul and was working at a Walgreens.  Do you recall anything like that?

A.   No.

Q.   And do you recall ever interviewing with Mr. Dorsch two young witnesses who admitted they had been bribed to finger a suspect who worked at Walgreens and went to DePaul?

A.   No.

Q.   Does that ring any bells at all?

A.   Not at all.

Q.   Do you believe that that's something that, in your career, that that's something that would stick with you, that you would remember?

A.   Yes.

Q.   Okay.  And from the frame let's say from 1988 to 1991, did you ever work with a case with Rey Guevara where he pointed out a picture in a photo array to a suspect or pointed to a person in a lineup to a suspect?

        MR. LOEVY:  Objection.  That opens the door, Your Honor.

        THE COURT:  I'm sorry, I couldn't hear the objection.

        MR. LOEVY:  I object to this line of inquiry that Mr. Guevara wouldn't do this.

        MR. LEINENWEBER:  No, no, I didn't --

        THE COURT:  The question is, did the witness ever witness it.  Overruled.

BY MR. LEINENWEBER:

Q.   Did you ever see anything like that?

A.   No, I did not.

MR. LEINENWEBER:  If I could have one moment?

THE COURT:  Sure.

MR. LEINENWEBER:  Mr. Boyle, I've nothing further.
Thank you very much, Judge.

THE COURT:  Okay.  Anything more from the defense
side?

MS. GOLDEN:  No.

THE COURT:  Mr. Loevy.

CROSS EXAMINATION

BY MR. LOEVY:

Q.   All right.  Mr. Boyle, you did a lot of investigations in
your 30-plus years, correct?

A.   Correct.

Q.   And this one just isn't ringing any bells with you
whatsoever, is that also true?

A.   Correct.

Q.   Now, you did get some visits from some Cook County state's
attorney investigators trying to help you see if you remembered
anything a few years, correct?

A.   I think it was just one.

Q.   One visit or one investigator?

A.   One investigator.

Q.   All right.  But you also got some visits a few years ago
from some investigators from Mr. Sotos' office, correct?

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 1087 of 1335 PageID #:106472
Boyle - cross by Loevy
3555

A. They were private investigators.

Q. From Mr. Sotos' office?

A. Mr. Sotos?

Q. Mr. Sotos. The defense attorneys.

A. It was Mr. Given.

Q. All right. And nothing improper about that, right?

A. Not that I know.

Q. They wanted to see if you remembered certain things, right?

A. Correct.

Q. All right. And then you gave a deposition in this case, too?

A. Correct.

Q. And you met with the defense attorneys for a few hours before that as well?

A. The day before.

Q. All right. And there was some conversations about Mr. Dorsch with the attorneys, right?

A. Correct.

Q. Now, if I understand your testimony, you're not exactly sure when you stopped being partners with Mr. Dorsch, is that accurate?

A. I couldn't say exactly what day it was, no.

Q. All right. And you thought -- your best memory was fall of '89?

A. Ah, either -- when I say "fall" I mean like August or

September.

Q. Might've been sooner, might've been later, right?

A. Correct.

Q. All right. And you can't say for sure at any particular point in 1989 you were still his partner, right?

A. I was his partner from -- from January --

Q. At some point?

MR. SOTOS: Objection. If he could finish his answer, please.

THE COURT: Let the witness finish his answer.

BY THE WITNESS:

A. Till sometime the end of December.

BY MR. LOEVY:

Q. All right. And there were obviously days when you and he weren't working together, correct?

A. Yes.

Q. And Mr. Dorsch said he -- at one point he said he didn't want to be your partner. He wanted to work with Billy Johnson, right?

A. He told me several stories.

Q. But he did go ahead and work with Bill Johnson, right?

A. Yes, he did.

Q. All right. And you certainly weren't working with Mr. Dorsch at the time, 1992, when the Jimenez case happened, correct?

A.  I wasn't working.  I have no idea what the Jimenez case is.

Q.  You never knew Mr. Dorsch to lie in court, correct?

A.  I -- when we would go to court, there was always a motion to exclude, so I would be removed and we wouldn't hear each other's testimony.

Q.  Do you remember giving a deposition, being asked these questions at page 189, lines 10 through --

MS. GOLDEN:  If you would give me a second, Jon?

MR. LOEVY:  Sure.  This is 189 of his deposition.

BY MR. LOEVY:

Q.  (Reading:)

"... did it ever come to your attention that Bill Dorsch had lied in court?"

And your answer was "no," right?

A.  I can't see what --

MS. GOLDEN:  Well, can you keep reading?

MR. LOEVY:  I'm about to ask the next question, too, Your Honor.

THE WITNESS:  Am I supposed to be --

THE COURT:  Well, I don't have this in front of me. And I don't know -- is this a rule of completeness problem?

MS. GOLDEN:  Yes.

THE COURT:  But you're going to go on?

MR. LOEVY:  Yes.

THE COURT:  Well, why don't you ask the next question

and we'll see if there's a problem. You need to give me the transcripts.

BY MR. LOEVY:

Q. You're never in court with Bill Dorsch, right?

A. Not during the trial, no.

Q. All right. But it never came to your attention that he had ever said anything untrue, correct?

A. Correct.

Q. And you never knew him to include any false information in police reports?

A. Correct.

MR. SOTOS: Judge, objection. There's no impeachment there.

MR. LOEVY: That was a question.

THE COURT: That was a question. That was not impeachment.

BY MR. LOEVY:

Q. All right. In every police report you ever saw him write was truthful and accurate, accurate?

A. That I saw.

Q. Yeah.

A. That I saw.

Q. And you never saw him to lie about his observations as a Chicago police officer, correct?

A. Ah, officially.

Q.  Do you remember being asked these questions --

MS. GOLDEN:  Jon, can I have --

MR. LOEVY:  This is page 190, lines 11 through 17.

THE WITNESS:  I don't have anything in front of me.

BY MR. LOEVY:

Q.  All right.  I'll read it when Ms. Golden is ready.

(Brief pause)

MS. GOLDEN:  Okay.

BY MR. LOEVY:

Q.  (Reading:)

"Question:  Did you ever have to report to a
supervisor that Bill Dorsch was lying?

"Answer:  No.

"Question:  Did you ever hear Bill Dorsch lie to
another person about his observations as a
Chicago police officer?

"Answer:  No."

Did you give those answers, sir?

A.  Yes, I did.

Q.  All right.  Basically, he was a jokester sometimes, right?

MS. GOLDEN:  Could you --

THE COURT:  You want more?

MS. GOLDEN:  For completeness, I think he needs to
read the next two lines, because the question previous to the
impeachment --

MR. LOEVY: Your Honor, this isn't proper.

THE COURT: Okay. If you want -- if you're making a rule of completeness objection, please direct it to me and tell me what it is that you want Mr. Loevy to read.

MS. GOLDEN: I would like him to read lines 18 to 20.

MR. LOEVY: And, Your Honor, our point is, that's a different point, which I'm about to cover.

MS. GOLDEN: I withdraw the objection.

MR. LOEVY: All right.

THE COURT: Hold on a second.

(Brief pause).

MR. LOEVY: All right. Do you want me to just read the lines here.

THE COURT: Yeah, I think that would make it easier.

MR. LOEVY: All right.

BY MR. LOEVY:

Q. (Reading:)

"... to your attention, did Bill Dorsch ever include false information in any police report?

"Answer: Not that I know of."

And then the next question that Ms. Golden wanted read:

"Question: So every report that he wrote that you reviewed, the information in that report was truthful and accurate?

"Answer: As far as I could tell. Like this report, I don't remember this at all. So I don't -- the incident at all."

Does that help clarify for you?

A. Clarify what?

Q. Does that complete your answer?

A. I'm not sure what you're asking me.

Q. All right. Sir, you and Bill Dorsch signed each other's names?

A. Correct.

Q. And you trusted him --

A. Correct.

Q. -- to write reports that you would sign, right?

A. Correct.

Q. But he was sometimes a jokester, was he not?

A. You could say that.

Q. But he was always -- at your deposition you testified, he was always straight about the cases, right?

MS. GOLDEN: Object to form.

THE COURT: Overruled.

BY THE WITNESS:

A. You are referring to what he said in his reports?

BY MR. LOEVY:

Q. No, I'm saying, when you would interact with Dorsch, you guys spent a lot of times in cars, talking about all kinds of

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 1094 of 1335 PageID #:106479
Boyle - cross by Loevy
3562

things, right?

A.   Uh-huh.

Q.   And sometimes he would he joke.  There's a lot of jokesters at the police department, right?

A.   There are some, I guess you would say.

Q.   Bill actually talked a lot, didn't he?

A.   Excessively.

Q.   All right.  But when he told you something about a case, he was always straight with you about cases, right?

A.   No.

Q.   All right.  Do you remember giving this answer at your deposition page, 195, lines 22, through 196 lines 5 --

A.   Am I supposed to be seeing this in front of me?

Q.   This is your deposition.  I'm going to read it to you and then you --

A.   Oh, I thought you meant I was supposed to see it on here.

Q.   No, I'm going to read it.

A.   Okay.

Q.   (Reading:)

     "... so apart from your conversations you had
      with Bill Dorsch where you understood him to be
      joking about a particular case, did he ever say
      anything to you about a case that you didn't
      believe?

       "Answer:  A case that we were working on?"

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 1095 of 1335 PageID #:106480
Boyle - cross by Loevy
3563

"Yeah."

"No."

Your answer was "no," right?

A. If that's what it says.

Q. All right. That's true, wasn't it?

A. Well, I mean, he didn't -- he wasn't always honest, is what I'm telling you.

Q. All right. At your deposition, did you say he was always honest?

A. If that's what it says. I'm not sure what they were referring to. I'm not exactly sure what you're referring to.

Q. All right. Let's talk about the inventory that Ms. Golden showed you.

This is Plaintiff's Exhibit 1980.

MR. LOEVY: If we could have the Elmo, please.

BY MR. LOEVY:

Q. This is the same exhibit but with the plaintiff's number on. Are you saying you reviewed all of the documents on the inventory?

A. I -- as I said, I don't recall.

Q. Because, for example, there is some missing GPR pages. There is seven pages listed here and we've only found five. Do you remember what the other two GPRs said?

A. No.

Q. Back in the day, when you reviewed the files, you would've

had all seven, right?

A. It should've been there, yes.

Q. All right. Do you know where the other two went?

A. I have no idea. I don't know where mine are.

Q. You had GPRs, sir?

A. I'm sure -- I'm sure I would've written GPRs as to the lineups, as to the names and different addresses of the participants in the lineup.

Q. All right. Let me change topics, sir.

Nobody said to you that day, no witness said, "Look, this is the wrong guy, wrong guy"? That didn't happen to you, right?

A. No.

Q. And even though you don't remember the events, you have a high degree of confidence that the witness did not say to you, "Look, this is the wrong guy," right?

A. Yes.

Q. And if that had come to your attention, we can be sure this lineup wouldn't have gone forward, right?

A. Correct.

Q. Now, you were asked about the felony minute sheet. I'm going to show you 19 I.

This is the document you were referring to with Ms. Golden, right?

A. Yes.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 1097 of 1335 PageID #:106482
Boyle - cross by Loevy
3565

Q. All right. So this document, although it says for state's attorney's use only, it sounds from the testimony we've in court, this was prepared by the police officers, right?

A. Correct.

Q. All right. Do you know why Guevara and Gawrys are listed ahead of door and Boyle?

A. No.

Q. Does it have any significance that "Guevara" is in all caps?

A. No.

MS. GOLDEN: Foundation, Your Honor. Foundation.

THE COURT: Again, if the witness knows, he should answer. We can't have anybody speculating, but I don't know if the witness knows. So overruled.

BY MR. LOEVY:

Q. Was it the practice to put the lead person who is answering the questions in all caps and everybody else in lowercase?

A. No.

Q. All right. Showing you the phone numbers there.

Was it the practice to put the detectives' phone numbers or the Gang Crimes phone numbers?

A. Actually, I don't know what this phone number is.

Q. Well, I'm going to show you 154 H, which is also in evidence.

Looks like 744-8260 is the Gang Crimes phone number,

doesn't it?

A.  Yes, this --

MS. GOLDEN:  Objection.  Foundation.

THE COURT:  You know, when you call a witness who can only reads from documents, I can't keep the other side from reading documents, too.  I don't know why this isn't just the same thing.

MS. GOLDEN:  Well, I thought his objection was sustained.

MR. LOEVY:  No.  Most of the exam --

THE COURT:  If the witness doesn't know, he should tell us he doesn't know.  And he will.  I'm sure he will.

BY MR. LOEVY:

Q.  Was 744-8364 -- this is a different unrelated case, sir, taking place a year later --

A.  Uh-huh.

Q.  -- was that your phone number, 744-8364?

A.  That would've been the phone number for Area 5.

Q.  All right.  So can we conclude from Exhibit 19 I that, in the Jacques Rivera case, the police prepared for the state's attorney that Gang Crimes were the contacts for this case?

A.  I -- I -- I think that this must be their number, because I don't recognize it an Area 5 number.

Q.  All right.  And I think you told counsel that you recognized some handwriting as Mr. Dorsch's, right?

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 1099 of 1335 PageID #:106484
Boyle - cross by Loevy
3567

A.  Yes.

Q.  And whose handwriting was the other handwriting?

MS. GOLDEN:  Objection.

BY THE WITNESS:

A.  Which?

BY MR. LOEVY:

Q.  Any other handwriting on the document, do you remember all the handwriting on the document?  This one --

A.  The one right in front of me?  Yes, kind of the middle, towards the bottom, where it says "case report," and it's dated and then signature under that, that writing is mine.

Q.  Oh.  This is --

A.  Where it says "15 September" and "John D. Boyle," that's mine.

Q.  Do you know whose handwriting this is, sir (indicating)?

A.  No.

Q.  All right.  We've had some testimony with Ms. Golden from the lineup report.  This is Plaintiff's Exhibit 19 G.  I think it might be Defendants' Exhibit 1.12.  But it's plaintiff's 19 G, "persons present during the lineup."

A.  Yes.

Q.  Can we infer from this report authorized by you --

A.  Yes.

Q.  -- that Guevara and Gawrys were present during the lineup?

A.  Yes.

Boyle - cross by Loevy

3568

Q. All right. Because you also said, "Well, this must be when they were in the building." Did you say that to Ms. Golden?

A. I May I have told her that.

Q. All right. But the truth is, this means they were present at the lineup, right?

A. I'm sure you understand how a lineup is conducted. I can't say at this point in time where they were in the building. If they were in the lineup room or they're in the other room where the witness and victim would be.

Q. I got it. But it was one or the other, right?

A. Either that or they were outside. I can only assume.

Q. But this report states, and your understanding because you created is, they were present during the lineup, right?

A. They were present in the building, is all I can say.

Q. Okay. So this shouldn't say present during the lineup, it should just be they were in the building that day?

MS. GOLDEN: Objection to argument.

THE COURT: Sustained.

BY MR. LOEVY:

Q. All right. You said that the state's attorney makes the addition to prosecute, correct?

A. Correct.

Q. And that's always the case for every murder, right?

A. For every murder.

Q. All right. But in this case, the p?

Boyle - cross by Loevy

A. Correct.

Q. Why did you sign Bill Dorsch's name instead of your own?

A. Because -- because -- -- I couldn't tell you that. Typically the complainant, but obviously the complainant was dead. It would've been myself or Bill Dorsch.

Q. He thought maybe you didn't want to go to court, and so you signed your partner's name, is that maybe why you'd do it?

A. We had no control over who would get subpoenaed. That's the State's Attorney's Office.

Q. All right. But you didn't want your name on tis complaint?

A. I -- I can't say why I signed his name.

Q. All right.

A. I might've -- he might've done the 101 and I did this; I don't know.

Q. All right. You were familiar with the Latin King gang back then, correct?

A. Vaguely. I mean, I'm not familiar with it anymore.

Q. All right. But you certainly didn't know who Jacques Rivera was, correct?

A. No.

Q. All right. You were a partner with Rey Guevara on some cases, correct?

A. I was probably with him on different cases, but I don't specifically remember an individual case.

Q. All right. You were asked if you ever saw him do anything

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 1102 of 1335 PageID #:106487
Boyle - cross by Loevy
3570

improper on a photo ID.  My question is, did you ever see him do any photo ID's that were proper?

A.  To tell you the truth, I don't think I ever saw him do a photo spread.

Q.  All right.  Back in 1988, when this investigation happened, you were the detective and Guevara was the Gang Crime Specialist, right?

A.  That's correct.

Q.  Would you have tasked the Gang Crime Specialists to go out and, you know, do this, talk to that witness, you know, that witness, you know, give them assignments?

MR. DAFFADA:  Objection; form, Your Honor.  Ask him to do what?

THE COURT:  Well, why don't you ask a specific question.

MR. LOEVY:  All right.

BY MR. LOEVY:

Q.  We've had some testimony about the roles of the detectives and the Gang Crime Specialists.  My question to you is, you as a detective, would you have tasked Guevara to take investigative steps or would you have left it to him to decide what to do?

A.  I mean, in this particular case, I don't think I was involved in it before the 15th of September.  So what you're asking me if what I told him to do before, I don't know.

Q. Well, how about if it was a regular case during this time period.

A. Uh-huh.

Q. You're a new detective, right?

A. Yes.

Q. All right. Your job is not to give Guevara instructions about --

A. Right. We were equivalent rank.

Q. Equivalent rank, right?

A. Right.

Q. So you're not his supervisor telling him, "I want you to take this witness" or "I don't want you to talk to that witness," right?

A. No.

Q. You're investigating your cases, right?

A. Right.

Q. And the Gang Crime Specialists are sort of doing a parallel investigation of the same cases, is it fair to say?

        MS. GOLDEN: Objection to form.

        THE COURT: Overruled.

BY THE WITNESS:

A. Well, they were Gang Crime Specialists. They specialized in Gang Crimes.

BY MR. LOEVY:

Q. All right. But they were doing their own investigations,

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 1104 of 1335 PageID #:106489
Boyle - cross by Loevy
3572

right?

A.  Yes.

Q.  All right.  Did they ever, the Gang Crime Specialists, in your career then as a detective, did they ever call up and say, "Listen, there's been a development, and I don't want to write it down, so I want to tell you, the detective, I want you to write this up.  I got a development on a witness," did anything like that ever happen?

        MR. DAFFADA:  Objection, Your Honor.  Foundation and form.  No scope at all.

        THE COURT:  Overruled.

BY THE WITNESS:

A.  No, that would be hearsay evidence.

BY MR. LOEVY:

Q.  That never happened in your career, did it?

A.  No.  I mean, they would have to write their own report.

Q.  All right.  So just so we're clear what I'm talking about. You're a detective, you're working on a case, right?

A.  Correct.

Q.  There's Gang Crime Specialists out there in the filed with their finger on the pulse doing their own investigation in the same cases, right?

        MS. GOLDEN:  Objection to form.

        MR. LOEVY:  It's a question, Your Honor.

        THE COURT:  It's a question.  Overruled.

BY THE WITNESS:

A. Yes, they would do investigations of gang incidents.

BY MR. LOEVY:

Q. And sometimes your investigations and their investigations are going on at the same time, right?

A. Correct.

Q. All right. Would they ever call up and say, "Hey, there's been a development, detective. A witness told me something happened. Would you create a Supp. Report," do they have you write their Supp. Reports?

A. No.

Q. Did the Gang Crime Specialists ask the detectives to be the memorializers of the investigation?

MR. DAFFADA: Objection to form.

THE COURT: Overruled.

BY THE WITNESS:

A. No, they wouldn't. They would write their own reports.

BY MR. LOEVY:

Q. If they wrote them, right?

MS. GOLDEN: Objection to the form; foundation.

THE COURT: Overruled.

BY THE WITNESS:

A. I mean, you're asking me if they didn't write reports?

BY MR. LOEVY:

Q. Yeah. You guys wouldn't get a whole lot of police reports

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 1106 of 1335 PageID #:106491
Boyle - cross by Loevy
3574

from Gang Crime Specialists during investigations until the whole thing was over, right?

A. At this particular time I can't recall because I wasn't involved in too many Gang Crime cases. I was a detective.

Q. Now, how about those books, they had these books with the photos and the mug books, right? The gang books?

A. They were photo albums, right.

Q. Right. Those photo albums never left the area, did they?

A. The area?

Q. The office. They never left the office?

A. I couldn't tell you.

Q. Okay. Do you remember giving this answer at your deposition. This page 65, Line 19, through 66, Line 1:

Do you remember giving these answers:

"Question: So did you observe the Gang Crime Specialists showing gang books to witnesses while you were assigned to the tactical group?

"Answer: Yeah. Because typically those books you are referring to, they never really left the area. They would stay in the office at Belmont and Western and they wouldn't leave that office."

Did you give that answer, sir?

A. I probably did say that.

Q. All right. You, in your investigations, know that you

Boyle - cross by Loevy

3575

shouldn't show a photo to a witness before a lineup, we agree on that?

A.  Not at the lineup if the suspect is in custody, no.

Q.  All right.  Because if they see a photo before the lineup, then --

A.  It's tainting the lineup.

Q.  It's tainted the lineup, right?

A.  Correct.

Q.  And then it's easy to pick out the guy in the lineup because you've already seen this photo, right?

A.  Correct.

Q.  Now, you didn't regard these gang book IDs as a reliable investigative tool, is that fair to say, sir?

A.  I'm not sure.  I -- some -- some books I think were kept better than others.  Some were more up to date.  And at the time, we were referring to 1988, the technology that was available then wasn't the same as we have today.

Q.  Right.  Those photos would come in and out and you didn't know who's picture and what time frame --

A.  Oh, we had no control over these books.  They were in a different unit, in a different building.

Q.  Gang crimes.

A.  The other side of the City.

Q.  All right.  But in your cases, you didn't regard mug book identifications as reliable, is that fair to say?

A.  I wouldn't say identifications made from a photo album or mugshot album is as reliable as an eyewitness identification face to face.

Q.  Do you remember giving these answers at your deposition. This is page 72, Line 14, through 73, 24:

"Question:  As a detective, speaking in general terms, did you view the gang books to be one resource that you could draw upon if you needed help in solving a crime?"

And you asked:

"Answer:  Did I?"

"Question:  Yes.

"No."

And your answer was, "No."

A.  Did I ask --

Q.  (Reading:)

"Why not?"

And then you explained why not.

Did you want me to go back?  I'm sorry.

A.  You said did I ask --

Q.  No, I'm probably confusing.

MR. LOEVY:  Could I put it on the screen, Your Honor? Maybe that would help and you can read along.

MS. GOLDEN:  Well, I object to publishing it.

THE COURT:  It's impeachment.  Overruled.

BY MR. LOEVY:

Q.  All right:

"... as a detective, just speaking in general terms, did you view the gang books to be one resource that you could draw upon if you needed help in solving?

You said:

"Did I?" after an objection.

The question was:

"Yes."

And you, "No."

And then you were asked:

"Why not?"

"... well, at the time, the gang -- these books were what they call IR photos which were based on people who had already been arrested.  They would get a photo of when they were originally arrested, they were assigned an IR number.  And every time they were arrested after that, there would be a photo taken at that time, but these photos didn't -- they didn't seem to be that up to date to me.  I mean --"

Then you were asked:

" So you didn't view that an identification from the gang books would be something that carried

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 1110 of 1335 PageID #:106495
Boyle - cross by Loevy
3578

weight with you as an investigating detective,

is that right?"

You said:

"Did I -- did I think so?"

"Yes."

You said:

"I didn't think so, because I thought they were

out-dated and that the whole system -- I mean,

obviously it was later revamped, but, you know,

I don't place -- I don't know.  It's kind of

hard to say.  These photo identifications, I --

you know, I just don't know."

That was your answer, correct, sir?

MR. DAFFADA:  Judge, objection.  That's not
impeachment at all.

THE COURT:  Overruled.

BY MR. LOEVY:

Q.  Is that a truthful and accurate summary of the weight that
you as a detective placed on these gang book IDs?

A.  Well, to clarify, when I said "IR photos," there's a photo
taken each and every time a person is arrested.  Sometimes
newer photos weren't in the books, but --

Q.  All right.  But how about the summary there that you didn't
regard those books to be a reliable way to make an
identification, that's accurate, right?

A. As I said, I don't think it would be as accurate as a face-to-face identification in a lineup.

Q. All right. Let's say you do a lineup and the witness picks the wrong person, picks a filler. How does that get recorded?

A. You write a report similar to this one here, but you say it's a negative lineup.

Q. You don't say the name of the filler that they picked, the volunteer?

A. You know, you write the names of everybody --

Q. Right.

A. -- who is there, and you say this was a negative lineup.

Q. All right. But let's say it wasn't a -- it wasn't a negative, let's say they picked No. 2, Anne (indicating)?

A. Well, that's a positive lineup.

Q. Well, but she was not the suspect.

A. Right.

Q. All right. So let's say the suspect is Steve, and the witness picks Anne. Was the practice at the time to write down the witness picked Anne or just say "no pick"?

A. No pick, because you don't want to impugn the integrity of an innocent person.

Q. Well, wouldn't that be impugning the integrity of the suspect if the witness had been burned and you didn't write that down? Wouldn't that impugn the suspect's integrity?

A. No, I'm talking about a person who is a volunteer in a

Boyle - cross by Loevy

3580

lineup.  Is that what your question is?

Q.  That's what I was --

A.  A wrong person got picked, that person is a volunteer, you don't want to impugn their integrity because if it's not them, it's not them.

Q.  All right.  When you wrote the closing reported, it looks like you and Dorsch each signed one of the reports, right?  You signed Defendants' Exhibit 1.2 D -- I'm sorry, you're in the left box on the lineup report?

A.  Let me --

Q.  It's on the screen, sir.

A.  Oh, okay.

Yes, this is my signature.

Q.  And on the other one -- what you call it -- the closing report, looks like Dorsch is in the left box, right?

A.  It's not a closing.  It's a clearing Supp.

Q.  Clearing Supp.  But the point is, looks like you probably split the paperwork, right?

A.  Correct.

Q.  All right.  He wasn't in charge of you, and you weren't in charge of him, right?

A.  What do you mean?

Q.  I mean, he wasn't your boss, you weren't his boss?

A.  No, we were of equal rank.

Q.  Equal partners, right?

A. Yeah. We were equal rank.

Q. I'm sorry, I'm missing that.

A. Equal rank.

Q. I got it. Okay.

Now, it doesn't really matter who wrote -- whose report this was, does it? You both signed it, right?

A. Right.

Q. And Mr. Dorsch thought that you were probably the one who typed it because you wrote out the word "August." You did have a practice of writing out the whole month, looks like, when you wrote these reports? Was that your practice, sir?

A. Sometimes.

Q. All right. And this other report had it written out, too, right?

A. Correct.

Q. All right. So it doesn't really matter who wrote which report, does it?

A. I'm not sure what you're asking me.

Q. Well --

A. It doesn't matter to who? I don't --

Q. This was not your investigation, you and Dorsch, accurate?

A. Initially, no.

Q. Well, it wasn't your investigation, period, was it?

A. Well, after the 15th of September at -- whatever it was -- at 5:00 o'clock in the evening it was.

Q. You guys were the new guys, right? You and Dorsch?

A. We were the detectives, correct.

Q. And you got -- for some reason unknown to you, somebody said, "Hey, Phil and Mr. Boyle, you guys run a lineup with this kid," right?

A. Correct.

MS. GOLDEN: Objection. Foundation.

MR. LOEVY: I think he answered it, Your Honor.

THE COURT: Overruled.

BY MR. LOEVY:

Q. And although somebody said, "Hey, Mr. Boyle, Mr. Dorsch, run this lineup," it wasn't your case, was it?

A. Initially, no.

Q. Okay. Do you remember being asked this question at your deposition. This is page 179, lines 19 through 21:

"Question: I'm simply wanting to know what you did, if you remember.

And your answer was?

".. well, as I said, it wasn't my case."

That was your answer at the deposition, right?

MS. GOLDEN: Objection, Your Honor. That's out of context and that's not impeaching.

THE COURT: So what do you want me to look at for context?

MS. GOLDEN: Well, the question is not the same

question that he put to Mr. Boyle just now on the stand.  It is not impeaching in the prior statement --

THE COURT:  Well, without making a speech, can you direct me to where in the deposition I should look and I'll look at it to understand what you are telling me.

MS. GOLDEN:  There's no other place in the deposition to look.  The statement he's trying to --

THE COURT:  All right.  Hold on a minute.

(Brief pause).

THE COURT:  If there's no place to look for context --

MS. GOLDEN:  Well, the preliminary question --

MR. LOEVY:  Why don't we back up, Your Honor?  Can I read the whole thing?

BY MR. LOEVY:

Q.  (Reading:)

"... if neither of those people, being
McLaughlin and Leonard, were in --"

No, I'm sorry.  Let me just read it.  This is page 178, lines 24:

"... if neither of those people were in custody,
would you have left it to Rey Guevara and Steve
Gawrys on September 15th, 1988, to show
photographs to Orlando Lopez to see if he could
identify either of those individuals as the
perpetrator of the homicide."

And there's some objections, and you said:

"No. Because, you know, this -- I don't think this was my case. So apparently Jack and Gill were working with these guys independent of me and Dorsch. So whatever they did together, you know, I don't know. As I said, I can't remember this incident at all. So what they did, how they did it, and when they did it, I really have no idea."

And then the question that was objected to:

"... I'm simply wanting to know what you did, if you remember."

And you said:

"Answer: Well, as I said, it wasn't my case."

My question to you, sir, were those your answers?

A. Those were my answers.

Q. And because it wasn't your case, when you wrote the report and -- well, somebody told you to run a lineup, right?

A. That's --

Q. That's your understanding?

MS. GOLDEN: Wait.

BY MR. LOEVY:

Q. Should I ask the question clearer?

Your understanding is, someone told, "Here's a little boy need you to run a lineup," right?

MS. GOLDEN:  Objection.  Foundation.

THE COURT:  Overruled.

BY THE WITNESS:

A.  We were informed by the sergeant to follow up on this investigation.

BY MR. LOEVY:

Q.  All right.  And you had to request Gang Crimes North's assistance in locating the offenders and the witnesses, right?

A.  Right.

Q.  Because you hadn't worked on the case until you showed up for work that day, right?

A.  Right.

Q.  You didn't know who the offenders were, did you?

A.  No, I didn't.

Q.  You didn't know who the witnesses were, did you?

A.  No.

Q.  All right.  So who did you rely on to tell you who the offenders were and who the witnesses were?

A.  Well, a review of the reports and contacting the Gang Crimes unit.

Q.  All right.  Did Gang Crimes tell you who the offenders were?

A.  I think --

Q.  Jacques Rivera, right?

A.  Pardon me?

Q. Jacques Rivera, right?

A. Jacques Rivera?

MR. DAFFADA: Objection.

THE COURT: Sustained. If the witness has no recollection, he should tell us that.

BY MR. LOEVY:

Q. Gang Crimes brought the offender into the station to participate in that lineup, correct?

MR. DAFFADA: Same objection.

THE COURT: If he knows.

BY THE WITNESS:

A. You mean independently of what's in the report?

I can't remember. I don't remember.

BY MR. LOEVY:

Q. All right. You were done with this case after that shift ended, correct?

A. Correct.

Q. And you don't really recall if you reviewed anything, wouldn't that be an accurate statement? Any of the paperwork?

A. When?

Q. When you got assigned to the case, you might've reviewed the paperwork and might have, isn't that what you said at your deposition?

A. That's correct.

Q. Probably would've been -- if somebody was telling you,

"Look, we know who did it.  We know who the witness is," you probably would've relied on that person rather than reading the whole file, fair to say?

A.  Well, I would try to -- myself or Dorsch, either one of us, would've read the reports.

Q.  Maybe, maybe not, right?  That's what you said at your deposition?

A.  Well, you have to get up to speed.  You have to know what you're talking about.

Q.  Maybe Mr. Guevara brought you up to speed, right?

A.  Well, as I said, detective -- or Gang Crimes Specialist Guevara and his partner weren't detectives.  So we relied on the reports of the detectives who were previously assigned to investigate this case.

Q.  All right.  Remember the report Ms. Golden showed you where it looked like the victim had identified a guy named Jose Rodriguez.  Do you remember her showing you that report?

A.  No, I -- when?  This morning?

Q.  Yeah.

A.  Could you tell me which one that is?

Q.  If you don't remember, you don't remember.

A.  I don't remember.

Q.  All right.  Let me ask you this, then:  If the victim had identified a guy named Jose Rodriguez, whose call would it have been not to put Jose Rodriguez in that lineup, yours or the

people who had been working on the case for the last two weeks?

A. If I was aware that there was another person identified, he would also be placed in the lineup if he was in custody.

Q. All right. If you had known that there was another suspect, you would have put him in the lineup, right?

A. Yes.

Q. So the fact that you didn't put Jose Rodriguez in the lineup suggests you didn't even know that, is that fair, sir?

A. Well, it would depend, too. Because you can't put dissimilar people in the same lineup.

Q. But you could do two lineups, right?

A. Yeah, you could do two lineups, correct.

Q. All right. All right. So you can infer, then, that you didn't know there was another suspect or you would've done two lineups, right?

A. Ah, I could only assume.

Q. All right.

MR. LOEVY: May I have a moment, Your Honor?

THE COURT: Sure.

(Brief pause).

MR. LOEVY: No further questions, Your Honor.

THE COURT: Ms. Golden?

(Brief pause)

MS. GOLDEN: Nothing further.

Thank you, Mr. Boyle.

THE COURT: Mr. Leinenweber?

MR. LEINENWEBER: Yes. Thank you, Your Honor.

RECROSS EXAMINATION

BY MR. LEINENWEBER:

Q. I think you said in response to Mr. Loevy's question that you thought that Mr. Dorsch was not always truthful?

A. Yes.

Q. What do you mean by that?

A. He wouldn't always tell the truth. I mean, he -- he would make things up and -- there was a more specific sergeant, he would go out of his way to aggravate this guy and it would just -- one day he came in and gave the sergeant a time-due slip. The time-due slip is that you would work overtime or had worked overtime. He gave it to the sergeant to sign, that the night before attended a seance in following up on a homicide investigation.

Q. Did you say he attended a seance?

A. That's what he wrote on the time-due slip, that he attended a seance to find out the identity of the offender.

Q. So --

A. In an unrelated case.

Q. What do you mean by a seance?

A. I assumed -- I never been to one, but I assume they have a DV where you get ghosts coming in --

Q. Like a fortune teller or something?

A.  Well, that kind of hocus-pocus.

Q.  Okay.

MR. SWAMINATHAN:  Thanks, Judge.  I have nothing further.

Thanks, Mr. Boyle.

FURTHER RECROSS EXAMINATION

BY MR. LOEVY:

Q.  A detective job could be very stressful right?

A.  Yes.

Q.  And, you know, part of the job, unfortunately, means immersing yourself in human misery, right?

A.  Yes.

Q.  And partly how some people cope with it was, they try to be joking, correct?

A.  Correct.

Q.  That seance thing that you were talking about, that was a joke, wasn't it?

A.  I assume he thought it was going to be funny, but this, as you say, you're immersing yourself in the misery of others.

Q.  All right.

A.  The was 8:00 o'clock in the morning.

Q.  This is page 195 of your deposition, lines 4 through 21. Do you remember being asked this questions about that seance thing:

"... so in a joking manner."

Well, I mean, I guess if you want to call it, you can call it whatever you want."

"But I'm asking for how you would characterize it."

I mean, we're talking about serious cases here. I mean, I really didn't think this is something you should be joking about."

"Question: So you didn't think he should be joking around about it."

"Answer: No.

"... but you understood he was joking about it?"

"... eventually, I mean, after a few minutes you would pick up on his game plan there."

"That was a joke, right?

"Anser: Yes."

You gave those answers, right?

Let's start with that, you gave those answers, right?

A. I gave you those answers, yes.

Q. All right. And you were asked at the deposition a lot of questions about whether he ever lied about cases, or reports, or in court. And we talked about those during my exam, right?

A. Yes.

Q. And you were asked, "Can you think of any other time he ever said something that was untruthful," and you came up with a seance example, right?

Boyle - further recross by Loevy

3592

A.   Uh-huh.

Q.   But that was a joke, right?

A.   I didn't think it was funny and the sergeant who he gave the report to didn't think it was very funny either.

Q.   All right.  But he took misconduct very seriously, Bill Dorsch, correct?

A.   I don't know.

Q.   Did you ever report misconduct during your 30-plus years?

A.   By Dorsch?

Q.   No.  By anybody.

A.   No.

Q.   Did you ever witness any misconduct by a single police officer in 30-plus years?

A.   No.

MR. LEINENWEBER:  Objection, Judge.  Beyond the scope, foundation.

THE COURT:  Overruled.

BY MR. LOEVY:

Q.   So if you never saw anybody break a single rule in 30-plus years, then you never reported anybody for breaking a single rule in 30-plus years, is that true?

A.   I mean, it's -- it's not -- I can't remember everything that happened in 30 years.

MR. LOEVY:  No further questions, Your Honor.

THE COURT:  Anything further?

(No response.)

THE COURT:  I'm sorry.  "Yes"?  "No"?

MR. LEINENWEBER:  No.  Thank you, Judge.

MS. GOLDEN:  No. Thank you.

THE COURT:  Thank you.  You may step down.  Watch your step.

THE WITNESS:  Thank you, Your Honor.

THE COURT:

(Witness excused.)

THE COURT:  This is actually a good time for a break.

COURT SECURITY OFFICER:  All rise.

(The following proceedings were had out of the presence of the jury in open court:)

THE COURT:  So why when you're trying to get this case to the jury before the 4th of July, do we hear from a witness who has no recollection of anything?  I mean, tell me what that is about?

I know that Mr. Loevy made some points, but I don't even know why I heard from the witness in the first place. What was he supposed to establish?

MR. SOTOS:  We think he's very important, Judge, but we'll be done with all our evidence tomorrow.  So in terms of the 4th of July, this case is just about over.

THE COURT:  Well, if you think it's very important, I wish you could share with me why you think it was very

important because I'd like to know what's going on.

MR. SOTOS:  Well, we have a theory that Mr. Boyle and Mr. Dorsch were the individuals who ultimately charged this case and that it was incumbent on them to take whatever steps plaintiff is contending needed to be done in terms of --

THE COURT:  Did he establish that for you?  Because I just heard him say, "I don't remember," "I don't remember."

MR. SOTOS:  Right.  But we think the reports that he and Mr. Dorsch did are critical.

THE COURT:  But they're in evidence, right?

MR. SOTOS:  They were in evidence, but we thought that the jury should see the two individuals who were responsible in that regard.

MR. LEINENWEBER:  And part of it, Judge, was, I just had to close that loop.  I basically promised the jury he would testify that when I asked Mr. Dorsch, "John Boyle is your partner when the umbrella case happened, right?"  "Yeah, he was."  I said, "would it surprise you for him to say he never knew that to happen, doesn't remember that, doesn't think it happened?"

THE COURT:  You know, I would like to think that we should've done that in 5 minutes.

MR. SOTOS:  Well, but the problem was, we couldn't very well put him up there to testify about the one thing and then not ask him about the case that he was involved in, which

was our case.  That's our answer.

(Recess.)

(The following proceedings were had out of the presence of the jury in open court:)

THE COURT:  I know everybody is not back, but I asked on Friday if you could try to get the instructions updated. And my question is, where are we?  Because I' to maybe spend some time at lunchtime today so I can figure out how much time I'm going to need this jury for tomorrow.

MS. ROSEN:  Mr. Art, I thought, was working on that.

MR. ART:  Yeah.  I'll have a copy of it for you at lunch.  Resolved and unresolved.

THE COURT:  And how many unresolved?

MR. ART:  I think 6 or7, it looks like.

THE COURT:  Okay.  And there are things we haven't talked about before?

MR. ART:  Yes, there's things we haven't talked about, and then it's just a few issues in the resolved section, so I guess we should call it partially resolved.

THE COURT:  On the issues that are unresolved, are there any cases that you're citing for me or anything, so that I can try to get them solved tonight?

MR. ART:  They are listed in there.

THE COURT:  Okay.  So you're going to give this to me at lunch.  We can get copies.  I can do that tonight.

MR. ART:  Yes.

THE COURT:  Okay.  Because at some point, I have to figure out am I going to give this jury time off or are we going to be able to roll into this, and I have no idea at this point.

Okay.  Are we ready?

(No response)

THE COURT:  Hearing nothing, I'm going to wait a few seconds, and if the silence continues, I will assume we're ready.

(Brief pause).

MS. ROSEN:  We are reading Cynthia Estes.

THE COURT:  The other thing I'd like to know from you, ASAP, maybe lunchtime, maybe later today, is how much time everybody estimates you will need for closings.

Hi.  I'll swear you in as soon as the jury comes in -- oh, you're just the reader.

READER SCHROEDER:  I'm just the reader.

THE COURT:  Oh, sorry.

(Laughter in the courtroom.)

READER SCHROEDER:  I'm just here to only read what's on the paper (laughing).

COURT SECURITY OFFICER:  All rise.

(The following proceedings were had in the presence of the jury in open court:)

THE COURT:  Please be seated, everyone.

And, ladies and gentlemen, we're going to have another deposition reading at this point.

THE COURT REPORTER:  Would the reader please state your name for the record.

MS. SCHROEDER:  Sara Schroeder, S-c-h-r-o-e-d-e-r.

THE COURT REPORTER:  Thank you.

MS. GOLDEN:  And you'll be reading for Ms. Estes?

MS. SCHROEDER:  Yes.

MS. GOLDEN:  Your Honor, can we proceed?

THE COURT:  Yes, you may.

CAROLINE P. GOLDEN and SARA SCHROEDER called as readers herein, to read all questions by Ms. Rosen and answers given by Ms. Estes:

DEPOSITION TESTIMONY OF CYNTHIA ESTES

"EXAMINATION BY MS. ROSEN (read by Ms. Golden):

Q.  Good morning, Ms. Estes.

A.  Good morning.

Q.  I'm Eileen Rosen.  I introduced myself before we started.

A.  Yes.

Q.  But could you state and spell your last name for the record, please.

A.  It's Estes, E-s-t-e-s, Cynthia.

Q. Okay. I'm going to ask you to take a look at what we've marked as Exhibit Number 5, which is 12 pages of documents and ask you to take a quick look at those and tell me if you recognize them.

A. I do.

Q. And what do you recognize those to be?

A. That's my handwriting.

Q. On all 12 pages?

A. Yes.

Q. Ms. Estes, are you employed?

A. Yes.

Q. And what is your current employment?

A. I'm self-employed.

Q. How long have you been self-employed?

A. Probably about 7 years.

Q. And what do you do?

A. I'm an investigator.

Q. And what type of investigations do you do?

A. Criminal defense.

Q. And do you work with any other investigators or have any investigators that work for you or with you?

A. No.

Q. So it's just a solo operation?

A. Yes.

Q. And before becoming self-employed approximately 7 years

ago, where were you unemployed, if you were employed?

A. I was employed for many years at the King County Public Defender.

Q. You said King County?

A. King in Seattle.

Q. What years were you employed by the King County Public Defender's Office in Seattle?

A. 1986 to 2005.

Q. And I take it at that time you lived in Seattle?

A. Yes.

Q. And what did you do when you were employed by the King County Public Defender's Office?

A. I was an investigator.

Q. And you did, I take it, investigations on criminal cases?

A. Yes.

Q. That were being handled by the Public Defender's Office?

A. Yes.

Q. And prior to that, were you employed, if you were employed?

A. That's a long time ago. Prior to that, I was a western saddle maker.

Q. Like horse saddles?

A. Yes.

Q. Wow. And where did you do that?

A. I did that for many years in Portland, Oregon.

Q. And what made you witch from saddle-making to criminal

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 1132 of 1335 PageID #:106517
deposition of Cynthia Estes
3600

investigative work?

A. I have to say that I used my creativity for a lot of years, but I felt like I wasn't using my brain and I was interested in the law.

Q. What's the highest level of education that you have?

A. Second year of college.

Q. Did you complete your second year?

A. No.

Q. And where did you go to college?

A. I'm a drop-ou. Portland Community College and in the University of Northern Colorado.

Q. All right. Where do you currently live?

A. In Engelwood, Colorado.

Q. And how long have you lived in Englewood?

A. I'd say close to a little more than 2 years.

Q. And before that, where did you live?

A. Here in Chicago.

Q. So did you come from Seattle to Chicago?

A. Well, I grew up in Chicago.

Q. I see.

A. I grew up on the south side.

Q. When did you leave Chicago?

A. Gosh.

Q. Approximating?

A. 1970.

Q. Okay. And then when did you return to Chicago?

A. The second time?

Q. Yes. Most recently.

A. 2006.

Q. And in between the time that time that you left in the 1970's and the time that you returned in 2006, did you reside in Chicago during that timeframe?

A. No.

Q. So what prompted you then to move from -- well, did you move directly from Seattle to Chicago in 2006?

A. Yes.

Q. And what prompted you to move from Seattle back to Chicago?

A. Family obligations.

Q. And then how long did you remain living in Chicago before you moved next?

A. Again, I think it was -- so I left Chicago about 2 years ago.

Q. Okay.

A. Yeah.

Q. So when you left Chicago, you went to Englewood, Colorado?

A. Yes.

Q. So 2006 to about 2011, does that sound right?

A. End of 2011, yes.

Q. And just for frame of reference, I believe the post-conviction hearing ended with respect to Jacques Rivera's

case in October of 2011.  Were you still here when that happened?

A.  I was still here.

Q.  And then when did you first come to Chicago in --

MS. GOLDEN:  I'm sorry.

"EXAMINATION BY MS. ROSEN (read by Ms. Golden):

Q.  And then when you first came to Chicago in 2006, then you became self-employed?

A.  Yes.

Q.  And you've done work for the Bluhm Legal Clinic, is that correct?

A.  Yes.

Q.  Have you done work for other entities other than the Bluhm Legal Clinic while you were here in Chicago for that approximately 5-year period of time?

A.  Yes.

Q.  And who else have you done work for?

A.  I'm trying to remember the name of the law firm, and I can't remember.  I did one case for another firm.

Q.  So you did one case for another firm.  Did you do any work for anybody else in that 5-year period of time other than the Bluhm Legal Clinic?

A.  Well, there's -- you know, there's clinics within a clinic.

Q.  That's a fair point.

A.  Is that -- so there was Center on Wrongful Convictions and

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 1135 of 1335 PageID #:106520
deposition of Cynthia Estes
3603

Family and Children or Family and Children Justice Center, and I believe that was it.

Q. Okay. So you raise a good point. There are multiple clinics at Northwestern University law school. So for the 5-year period of time or so that you were here in Chicago and were self-employed as an investigator, other than the one case that you did for another firm whose name I can't recall --

A. I don't recall.

Q. -- have you done any work for anybody other than an entity of Northwestern?

A. I don't believe so.

Q. And how is it that you first were hired by any entity at Northwestern to do investigative work?

A. Okay. I believe Jane Raley was the first person to hire me.

Q. Prior to being hired, did you know Jane Raley?

A. No.

Q. Do you know how it is that she got your name or how that all came about?

A. She had heard about my work, is my understanding.

Q. Heard about the work you done in Seattle?

A. Yes.

Q. The investigations that you did in connection we work -- the investigations that you did in connection with working for the Center on Wrongful Convictions, was that work

investigations in connection with post-conviction proceedings?

A.  Yes.

Q.  And then the work you did with the Family and Children Justice Centers, what type of work was that?

A.  It was some post-conviction work and some pretrial work.

Q.  What types of cases does the Family and Children Justice Center deal with or handle?

A.  Criminal.

Q.  Do they represent children?

A.  Yes.

Q.  Juveniles?  Do they represent juveniles in connection with pending criminal proceedings against them?

A.  Yes.

Q.  Who were the people that you worked for principally at the Center for Wrongful Convictions?

A.  Jane Raley, Karen Daniel, Cathryn Crawford, Tom Geraghty, Steve Drizin.  I believe that's it.

Q.  So during this 5-year period of time, though, you were self-employed.  So you're not an employee of the university, correct?

A.  I'm not an employee.

Q.  And over the course of the 5 years that you were doing investigative work for either the Center on Wrongful Convictions or the Family and Children Justice Center, approximately how much money did you make a year doing

deposition of Cynthia Estes

3605

investigative work?

A.   An average?  About $12,000.

Q.   Per year?

A.   Yes.

Q.   During that timeframe you were doing this investigative work, what sort of part-time -- is that a fair way to describe it, part-time?

A.   Yes.

Q.   And approximately how many cases do you think you worked on in that 5-year period of time, if you can estimate it?

A.   I don't know.

Q.   Is it hundreds?

     So is it, say, more than 50 or less than 50?

A.   Less than 50.

Q.   Can you estimate, was it more than 25 or less than 25?

A.   I really don't know.

Q.   So somewhere between -- somewhere less than 50 cases over this 5-year period of time?

A.   Yes.

Q.   And did you just bill your time hourly, is that how it worked?

A.   Yes.

Q.   And what was your hourly rate?

A.   The first few years was $40 an hour, and I believe the last year was $50 an hour.

deposition of Cynthia Estes

Q. And now, in the last 2 years, you're still doing investigative work, is that correct?

A. A little bit.

Q. Just a little bit?

A. Uh-huh. Very part-time.

Q. More part-time than it was when you were in Chicago?

A. Yes.

Q. What types of entities do you do work for now?

A. Oh, attorneys that contract with the public defender. So they do conflicts cases.

Q. So the PD contracts private attorneys when there's a conflict?

A. Yes.

Q. And these public attorneys contract you to do whatever investigative work they need to do?

A. Exactly.

Q. During the time that you were doing contract work for either the Center on Wrongful Convictions or the Family and Children Justice Center, did you ever hear about a police officer by the name of Rey Guevara?

A. What was his --

Q. Rey Guevara.

A. Yes.

Q. And when did you first hear the name Rey Guevara?

A. I have no idea.

Q. Are you aware that Rey Guevara was involved in the original investigation into the murder of Felix Valentin?

A. Yes.

Q. When you first began doing work on Jacques Rivera's case, did you know that Reynaldo Guevara was a police officer that was involved in the case?

A. Yes.

Q. And did you know Reynaldo Guevara's name prior to getting involved in your investigation in the Jacques Rivera case?

A. I don't know.

Q. So it's possible that that was the first case that you became aware of Rey Guevara?

A. It's possible.

Q. Have you worked on any other cases involving Officer Guevara?

A. I don't know. I may have.

Q. Do you recall who it was that first mentioned the police officer by the name of Rey Guevara to you?

A. No.

Q. Did you, at the time that you were conducting your investigations, ever have photographs of Mr. Guevara?

A. I don't believe so.

Q. Do you currently have any photographs of Mr. Guevara?

A. No.

Q. Do you retain your files from the investigative work that

deposition of Cynthia Estes

3608

you did while you were self-employed?

A.  Yes.

Q.  So you still -- for example, in the Jacques Rivera case, do you still have your files relating to the work you've done?

A.  Yes.

Q.  And what types of information are contained in your files?

A.  My notes, and the reports, time sheet.

Q.  Okay.  And if you had had, let's say, a photograph of Officer Guevara when you were doing the investigative work that you'd obtained from whatever you might it obtained it from, would you have maintained that photograph in your file?

A.  Yes.  I don't believe I've ever seen Officer Guevara.

Q.  Okay.

A.  Yeah.

Q.  Do you know what his -- has anybody physically described him to you?

A.  Not that I recall.

Q.  Do you believe -- as you sit here today, have you ever seen Officer Guevara, to your knowledge?

A.  To my knowledge, I don't recall ever see Officer Guevara.

Q.  In connection with your investigative work, what types of things do you do?

A.  I go to the scene, take photos, create diagrams, interview witnesses, testify.  That's about it.

Q.  In connection with the work that you can for -- for Ms.

Raley in the Jacques Rivera case, did you go to the scene?

A.  I did.

Q.  Did you take any photographs?

A.  I did not.

Q.  Did you create any diagrams?

A.  No.

Q.  Did you interview witnesses?

A.  Yes.

Q.  Which witnesses did you interviewer?

A.  Orlando Lopez, Carlos Olivera, Angel Villafane, the person I can't remember right now, a man named Miguel Rodriguez, and a woman named Lori Amaro.  I think that -- that's all I can remember.

Q.  In connection with your interview with Orlando Lopez -- we've already discussed that -- Exhibit No. 5 are the notes that you prepared in connection with at least one of your interviews with Orlando Lopez, correct?

A.  Yes.

Q.  And do you have any other notes related to conversations you had with Orlando Lopez other than those that are marked as Exhibit No. 5?

A.  No.

Q.  And you also prepared a report in connection with your interview of Orlando Lopez, correct?

A.  Yes.

Q. And we'll get to that report in a minute, but did you just prepare one report?

A. Yes.

Q. How many times did you talk with Orlando Lopez?

A. I talked to him during the initial interview, and I spoke to him the day he came to testify.

Q. Are those the only two times you spoke, personally spoke with Orlando Lopez?

A. Yes.

Q. So the day you did the initial interview, that would've been February 28, 2010, is that correct?

A. Yes.

Q. In Ohio?

A. Yes.

Q. And then when he came to Chicago to testify, you mean for the post-conviction proceeding?

A. Yes.

Q. When you interviewed Mr. Olivera, where did you interview him?

A. At his home.

Q. Do you recall where that was at?

A. No.

Q. How did you locate Mr. Olivero?

A. My memory is that I checked databases and came up with his name.

Q. Did you call him or did you just show up?

A. I just showed up.

Q. And what was your purpose in going to speak with Mr. Olivero?

A. To see if he remembered the Chicago police taking a photo of him.

Q. When you met -- when you went to meet with Mr. Olivero, did you go to meet with him with anybody else or was it just you?

A. I was alone.

Q. When you went to meet with or interview Orlando Lopez the first time, you just showed up, too, right?

A. Absolutely.

Q. And why is it that you would just show up unannounced if you're going to interview a witness?

A. I rarely telephone witnesses ahead of time.

Q. Why is that?

A. I think it's much more effective to interview people in person.

Q. Why not call them and arrange to meet with them in person as opposed to just showing up unannounced?

A. Because they can't see me on the phone. And I prefer someone see me so they know they don't to have be afraid of me.

Q. And why would you be concerned that they'd be afraid of you?

A. It's been my experience that a lot of people are afraid of

deposition of Cynthia Estes

3612

the legal system.

Q. And when you went out to meet with Mr. Ruiz, did you use the same method to locate him, checking databases?

A. Yes.

Q. Where did you talk to him?

A. I don't recall.

Q. And did you show up unannounced?

A. Yes.

Q. Had you show up announced to Mr. Villafane's home as well?

A. Yes.

Q. And what was your purpose in going out to talk to Mr. Ruiz?

A. To talk about the photograph by the Chicago Police Department.

Q. In the course of your investigation involving the Jacques Rivera case, did you review police reports?

A. I did.

Q. Do you recall what police reports you reviewed?

A. No.

Q. Where did you obtain the police reports that you did review?

A. At the Center on Wrongful Conviction.

Q. So somebody provided them to you?

A. Yes.

Q. One of the lawyers, presumably?

A. Yes.

Q. What lawyers worked on Mr. Rivera's case, to your knowledge?

A. Jane Raley and Judy Royal.

Q. And you had worked with Ms. Raley before this investigation, right?

A. Yes.

Q. How about Ms. Royal, you had worked with her before?

A. Yes.

Q. And other lawyers that you are aware of that worked on Mr. Rivera's post-conviction proceeding?

A. No.

Q. Who is Jennifer Linzer?

A. She is the -- let me get this right, the assistant director on the Center on Wrongful Convictions.

Q. Is she a lawyer?

A. No.

Q. What's her role?

A. She's an assistant. She's the assistant director of the whole -- you know, the whole organization.

Q. And do you know what she does on a day-to-day basis?

A. She assists -- she assists the lawyers.

Q. She went to Ohio with you two when you first interviewed Orlando Lopez, right?

A. She did.

Q. Has she accommodated with ever before on a witness

interview?

A. Yes.

Q. How often before your interview of Orlando Lopez had Ms. Linzer accompanied you on a witness interview?

A. Maybe 20 times.

Q. So fairly common for her to do that?

A. Yes.

Q. And what's her role in accompanying you on an interview like that?

A. She's very instrumental on the day-to-day running of the Center and she assists the attorney. She assists the students and she assists the investigators.

Q. What type of assistance was she providing you when she went to Ohio with you to interview Orlando Lopez?

A. I believe that I requested her that she come with me.

Q. Why?

A. Well, it is a long drive. And she knew the case, and I didn't know what to expect when I got there.

Q. When you say "she knew the case," what do you mean?

A. She was familiar with the Jacques Rivera case.

Q. What assistance did she provide to you once you got to Ohio?

A. She assisted in the interview process.

Q. So she actually asked questions, too?

A. Yes.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 1147 of 1335 PageID #:106532
deposition of Cynthia Estes
3615

Q. And in the other times you had Ms. Linzer accompany you on witness interviews, has she participated in the same way, asking questions in the interview process?

A. Yes.

Q. Does she have any investigative training, to your knowledge?

A. Yes.

Q. What type of investigative training does she have, to your knowledge?

A. I don't know.

Q. But she didn't utilize her to interview Mr. Olivero, Mr. Villafane, or Mr. Ruiz, correct?

A. No.

Q. Is there some reason why you wouldn't utilize her for those three individuals but you would for Mr. Lopez?

A. My memory is that Mr. Olivero, Mr. Villafane, and Mr. Ruiz were difficult to find. And they were evening interviews, and I did not ask Ms. Linzer to go with me.

Q. Because they were difficult to find?

A. Well, because they were difficult to find, she's got a family, and I was out spending a lot of time looking for them.

Q. Are you aware that after your interview of Orlando Lopez, he prepared an affidavit?

A. I don't remember that.

Q. Do you recall participating in any way in the preparation

of his affidavit?

A.  I don't remember that.

Q.  Is that something you would do as part of your investigative work, help prepare the affidavits, or was that primarily the responsibility of the attorneys?

A.  Usually the responsibility of the attorneys.

Q.  So, in general, part of your investigative work, you know, you would go out and talk to witnesses on a variety of different topics, and from time to time these witnesses, the information they provided to you was reduced to an affidavit for whatever reason it was necessary for the case you were working on.

Did you have any role in the preparation of these affidavits?  Did you review them?  Did you check them for accuracy?  Any role at all, just generally speaking?

A.  I probably had, but I don't know which ones.

Q.  Okay.

A.  Yeah.

Q.  As you sit here today, you don't recall whether or not Mr. Lopez prepared an affidavit?

A.  I don't recall that.

Q.  And you don't recall whether or not you participated in any way in the preparation of the affidavit?

A.  I don't recall.

Q.  What information did you have before you went out to

interview Mr. Lopez in February of 2010?

A. What information did I have about Mr. Lopez?

Q. Just whatever information did you have about the case, in general.

A. I had read, I believe, some police reports.

Q. Okay.

A. And had spoken to the client.

Q. So in connection with your investigative work, you'd also talked to Mr. Rivera himself?

A. Yes.

Q. How many times did you talk to Mr. Rivera during the course of the work you did?

A. So --"

MS. GOLDEN: I'm sorry, there was an objection.

"EXAMINATION BY MS. ROSEN (read by Ms. Golden):

Q. So the question was, how many times did you speak with Mr. Rivera during the course of the work that you did?

A. I believe twice.

Q. And do you recall when the first time was that you spoke with Mr. Rivera?

A. No.

Q. Do you recall when the second time was that you spoke with Mr. Rivera?

A. No.

Q. Do you know if you spoke with Mr. Rivera before you went

out and interviewed Orlando Lopez?

A. I don't recall.

Q. When you spoke with Mr. Rivera the two times that you spoke with him, was it in person?

A. Yes.

Q. And was he still incarcerated at that point?

A. Yes.

Q. Both times?

A. Yes.

Q. So before you went out and interviewed Mr. Lopez, you had reviewed some police reports. Do you know if you reviewed all of the police reports?

A. I don't believe so.

Q. Who decided which police reports you should review? Was that something you decided or the lawyers decided?

A. My memory is that I got everything through Jane.

Q. And did you review everything you were given?

A. Yes.

Q. Anything that you were given in connection with the work that you did in connection with this case, by whomever, you reviewed, is that correct?

A. Yes.

Q. So if you didn't review the entire set of police reports, it's because they were not provided to you?

A. Yes.

Q.  Did you review the criminal trial testimony?

A.  I believe I read some of it.

Q.  And were you provided all of the criminal trial testimony or only some of it?

A.  I don't recall.

Q.  Do you recall what portions of the criminal trial testimony you reviewed?

A.  I don't.

Q.  Before interviewing Mr. Lopez, did you review his testimony?

A.  I believe I did.

Q.  Is there any other test -- any other witness testimony from the criminal trial that you can recall reviewing other than Mr. Lopez's trial testimony?

A.  No.

Q.  Before going to interview Mr. Lopez in Ohio, other than reviewing whatever police reports you had to review and reviewing perhaps his testimony, did you review anything else in preparation for that meeting?

A.  I don't recall.

Q.  And other than reviewing documents and talking to the client, did you do anything else in preparation for the meeting?

A.  Well, I checked databases.

Q.  To locate Mr. Rivera Lopez?

deposition of Cynthia Estes

3620

A. Yes.

Q. And how difficult was it for you to find Mr. Lopez?

A. I believe that I spent, you know, several days looking through databases.

Q. So would you consider spending several days looking through databases unusual?

A. No.

Q. And, ultimately, after reviewing those databases, you located an individual who you thought was the Lopez, the Orlando Lopez that you were looking for?

A. Correct.

Q. Other than reviewing the police reports, reviewing perhaps Mr. Lopez's testimony, speaking to the client, and checking databases, did you read anything else in preparation for your interview with Mr. Lopez?

A. I spoke to Jennifer Linzer.

Q. And what was your purpose in speaking with Ms. Linzer?

A. To talk about her going to Ohio with me.

Q. To arrange for her to accompany you?

A. Yes.

Q. As you sit here today, do you recall whether or not you ever saw the criminal trial transcripts in its entirety?

A. I don't remember.

Q. Any idea how long the trial transcript was?

A. No.

Q. And you didn't review that yesterday, right?

A. No.

Q. Okay. So let's take a look at what we've previously marked as Exhibit 5. Well, we've said already, these are your notes, right?

A. Yes.

Q. If you can orient me a little bit to the document. It says across the top, February 28, 2018. What is that suppose to denote?

A. The date of the interview.

Q. And then off to the left, it says "August 27th, 1988. What is that?

A. You know, I believe that's his date of birth, but I don't know.

Q. And then these appear to me to questions.

A. Yes.

Q. Are these questions that you wrote out in advance of your interview?

A. Yeah, it looks like I wrote it in the car because they're hard to read.

Q. So you weren't driving, Ms. Linzer was driving?

A. No, Ms. Linzer was driving.

Q. So in the car on the way down, you sort of outline some questions?

A. Yes.

deposition of Cynthia Estes

3622

Q. And can you help me with the question so that I can make sure that I understand what you've written here.

If we go, No. 1, can you read that?

A. What do you recall about the Jacques Rivera case?

Q. Okay. And then No. 2?

A. Have you been contacted in the last few years regarding Jacques Rivera.

Q. Prior to you going to Ohio to interview Mr. Lopez, to your knowledge had anybody else associated with Mr. Rivera's defense made contacted with Mr. Lopez?

A. No.

Q. Nobody had said to you that they talked to him 5 years ago, or 10 years ago, or something like that?

A. No.

Q. Okay. Then No. 3?

A. Recall the names of detectives and prosecutors.

Q. And then No. 4?

A. Talk about Guevara.

Q. And what does that mean in terms of "talk about Guevara"? Like what kind of question were you intending to pose related to Mr. Guevara?

A. You know, I believe I was going to -- it looks like I was going to ask if he recalled Detective Guevara.

Q. Why were you particularly interested in -- did you say Detective Guevara?

A.   Yeah.  I don't know if he was an officer or a detective, I know he wasn't a mister.

Q.   Did you -- why were you focusing on Guevara?

A.   I don't -- I don't know why I wrote this.  I -- it looks like the names of the detectives and prosecutors and then had his name there.

Q.   Do you recall how many detectives and officers were involved in the investigation?

A.   I don't.

Q.   Was it more than Guevara?

A.   Oh, yes.

Q.   Okay.

A.   Yes.

Q.   But you didn't jot down names of the others, just Guevara?

A.   Right.

Q.   Is there some particular reason you were focusing on Guevara?

A.   I don't recall.  Clearly I was.

Q.   No. 5?

A.   How long had you lived in the building before this incident.

Q.   And is that a reference to the building where the shooting took place?

A.   Yes.

Q.   Outside of which the shooting took place?

A. Yes.

Q. And why were you interested in how long he lived there?

A. I just think I wanted to get just general background.

Q. Okay. No. 6?

A. How long did you stay in the building after the incident.

Q. And, again, why were you interested in that?

A. Just background.

Q. Okay. No. 7?

A. How well did you know Felix and Israel Valentin.

Q. And No. 8?

A. Did your sister date one of the Valentins? And then I just put "Israel."

Q. And why were you interested in that information?

A. Just background, you know, like why was he there.

Q. Why was Orlando there?

A. Right.

Q. And then No. 9?

A. Family connection to the Valentins.

Q. And then No. 10?

A. Do you recall how many times you were interviewed by the police?

Q. And why were you interested in the number of times he was interviewed?

A. I always ask that.

Q. And why is that an important question for purposes of your

work?

A.  Just so I know how many times the police have talked to people.

Q.  But I guess, why do you need to know how many times?  What difference does it mean if it's one or five or ten to you in connection with the work that you do?

A.  Well, if the witness told me that they had been interviewed ten times but I only one police report, I would be concerned that I was missing nine.

Q.  Got it.  And then No. 11.

A.  I put "by prosecutors," and I'm assuming I meant how many times you were interviewed by prosecutors.

Q.  Got it.  And then No. 12?

A.  It was a note to show him the original police report.

Q.  And do you know what original police report you were referring to?

A.  I don't.

Q.  Did you have police reports with you when you went to Ohio?

A.  Yes.

Q.  Do you know which police reports you had with you when you went to Ohio?

A.  No.

Q.  Did you note that anywhere?

A.  I'm sorry?

Q.  Is it written down anywhere, I took, you know, these police

reports dated whatever to Ohio with me?

A. I believe Jennifer took them.

Q. You believe Jennifer brought the police reports?

A. Yes.

Q. To Ohio?

A. Yes.

Q. Now, if we go to the next page, which is now the third page, what -- these are clearly not questions. What is this recording at this point?

A. This is Orlando talking. And I'm in the back of the car trying to write while he's talking.

Q. So let's talk about the -- let's say some foundation for the interview.

So you and Jennifer drive to Ohio, is that right?

A. Yes.

Q. How long did it take you to get there?

A. I don't remember.

Q. Is it hours?

A. It's hours. It was -- seemed like half a day.

Q. And did you go right to Mr. Lopez's residence?

A. We did.

Q. And what happened when you got there?

A. His son was there.

Q. How old was his son?

A. You know, my memory is, he's about 12 or 13.

Q. And did you speak with his son?

A. We did.

Q. And what did you say to him?

A. We just asked if his dad was home, and he wasn't. And he said that he -- that they had gone shopping and they would be back in an hour.

Q. And so did you like leave any contact information or what. Did you do?

A. No, we just left. Said we'd be back.

Q. Did you identify yourselves for the 12-year old?

A. We did.

Q. What did you tell him?

A. You know, my memory is that we told him where we were from, and that we needed to speak to his father because he was a witness in the case.

Q. And then did you -- did you know what time it was when you first went to Mr. Lopez's house?

A. It was late afternoon.

Q. And then did you return?

A. We did.

Q. How much later?

A. I think about an hour and a half later, maybe.

Q. And when you returned, what happened?

A. He was there.

Q. So you knocked on door?

A. Yes.

Q. And did he open the door?

A. He did.

Q. And who spoke first, you or him?

A. He did.

Q. What did he say?

A. Who are you, you know, why are you here.

Q. And who responded to him, you or Ms. Linzer, or both?

A. I believe we both did.

Q. And what did you say?

A. I told him who I was. Told him why we were there. And we asked him if he had been a witness in a case many years ago in Chicago.

Q. When you told him who you were, what specifically did you tell him?

A. My memory is that I -- I always give my name, and I say that I work for whatever attorney I'm working for.

Q. The name of the attorney?

A. Yes.

Q. Like, I'm working for Jane Raley?

A. Yes.

Q. Okay.

A. And Jennifer said something, I don't -- I can't speak to what she said. And I told him I was there from the Center on Wrong Convictions, and I may have said the Bluhm Legal Clinic

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 1161 of 1335 PageID #:106546
deposition of Cynthia Estes
3629

at Northwestern, and that we were there regarding a case involving Jacques Rivera.

Q. And then what did he say?

A. He invited us in. He said he recalled the case and we went inside. We did not stay long. And he asked us why we were there again. And we explained to him that he was a witness and that we would like to speak to him.

Q. And what did he say?

A. Let's go take a drive.

Q. And how long were you in the house?

A. Minutes.

Q. Other than him saying why are you here, and you saying, you know, we're here from the Center on Wrongful Convictions and were a witness, was there any other conversation while you were in the house?

A. Well, there is a brief conversation about why we were there, you know, what we wanted.

Q. And what did you tell him you wanted from him?

A. We'd like to interviewer him.

Q. What did he say to say?

A. Let's go take a drive.

Q. Was anybody else in the house?

A. His wife was in another room and his children were there.

Q. Did you meet his wife?

A. We were introduced briefly.

deposition of Cynthia Estes

3630

Q. When were you introduced to her?"

MS. GOLDEN: Go ahead. Read that."

BY READER SCHROEDER:

A. "As we were leaving the house."

"EXAMINATION BY MS. ROSEN (read by Ms. Golden):

Q. So he said, let's go for a drive, and then what happened?

A. And then we got into Jennifer's car, and I asked her to drive, and I asked him to sit in the front seat and I sat in the backseat.

Q. And why did you want seating arrangements that way?

A. I was a little afraid of him.

Q. Why were you afraid of him?

A. He was a little scary-looking.

Q. And so why -- in light of the fact that he was scary-looking, what advantage did you see by sitting in the backseat and having Jennifer drive?

A. So I had a view on him.

Q. So like you could have an eye on him?

A. Yes.

Q. And what about him was scary-looking?

A. He seemed angry to me.

Q. Anything else?

A. The let's go take a drive scared me because it sounded like something out of a movie.

Q. Anything else?

A. An Italian gangster movie.

Q. Anything else?

A. No.

Q. Was there anything about his address or where he lived --

A. No.

Q. --- that added to it?

A. No.

Q. So now you're in the backseat and Jennifer is driving and he's in the front passenger seat, and what happens?

A. He's mumbling.

Q. Could you understand what he was saying when he was mumbling?

A. Not at first. He was mumbling something and I thought, oh; -- you know, I thought he's angry. I heard the word "redemption," and I asked him to repeat it. And he repeated it for me, I look at him and he was crying.

Q. And so like did he turn around in the car to talk to you?

A. Yeah.

Q. When he was mumbling, was he facing forward?

A. He was putting on his seatbelt and mumbling.

Q. And then you heard the word "redemption" and asked him to repeat himself?

A. Yes.

Q. And did he turn at that point?

A. Yes.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 1164 of 1335 PageID #:106549
deposition of Cynthia Estes
3632

Q. And at that point is when he was crying?

A. Yes.

Q. Then what happened?

A. He was upset. He was visibly shaken.

Q. And he said something like, you know, he'd been waiting?

A. He knew -- okay. And he said something like, you know, he'd been waiting. He knew somebody was going to show up at some point, and he wanted to get this off his -- this burden off of him.

Q. And while you were in the backseat, are you taking notes?

A. I wasn't right then, but then as we started driving I got out my note and started taking notes.

Q. So this note that we're looking at, the third page of Exhibit No. 5, is the note you're taking while you're in the backseat?

A. Yes.

Q. And while you weren't immediately taking notes, once you sort of got underway, you started writing things down?

A. Yes.

Q. So this about -- I think across the top it says: This about redemption?

A. Yes.

Q. That's to write down what we just talked about, right?

A. Yes.

Q. What he blurted out?

A.   Yes.

Q.   Can you read the next couple of lines?

A.   Read them out loud?

Q.   Yes, so that I can make sure I understand what you wrote.

A.   I've been waiting a long time for someone to show up.  This is about redemption.

     Do you want me to keep going?

Q.   Yeah.  Go ahead.

A.   Okay.

     I need to do the right thing.  I need to right this. The only person that knows is my wife.  The family doesn't even know.

Q.   Okay.  Let me stop you there.  Is he just saying all this spontaneously or are you asking him some follow-up as he's speaking?

A.   I'm not saying a word.

Q.   Okay.

A.   He is crying and saying this.

Q.   And is Jennifer saying anything?

A.   We were both stunned.

Q.   And why don't you go ahead and continue to read it.

A.   Okay.

     He's not the right guy.  The individual who killed my brother-in-law -- my brother-in-law's brother was not the guy doing time.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 1166 of 1335 PageID #:106551
deposition of Cynthia Estes
3634

And then he starts talking about, Izzy was an Imperial Gangster, and I think the name was Izzy. He had blond hair, not blond but lighter color than black, and there was a fat guy driving, that's all I know regarding the driver. Maybe it was a Chevy Caprice.

They drove up, and I saw the guy with the gun. And it had to have been a silencer. I was hiding and looking. I ran into the corner store and they did not take me seriously.

Q. You can stop there a second.

So now all of this that you just read here, was this just all spontaneously without interruption?

A. Yes.

Q. So he was just blurting out all this information?

A. My memory that -- is that this was the -- in the car, and then at some point I think it was now, I don't remember, we got to Starbucks, but I don't remember exactly when that was.

Q. So while you were in the car driving to Starbucks, are you asking any follow-up questions or are you just letting him talk?

A. My memory is that he was really upset and that I didn't say much. I mean, he's crying. He's a grown man crying, really upset, and I think we were both stunned.

Q. So the answer is that you were not asking any follow-up questions while you were in the car?

A. I don't recall. I don't recall asking anything.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 1167 of 1335 PageID #:106552
deposition of Cynthia Estes
3635

Q.  So he just been moved from, It's the wrong guy, to Izzy, to driving a Chevy Caprice, to the fat guy.  Was this about just him spewing all of this out?

A.  He spewed a lot.

Q.  So is it all of this on his first page from -- so is all of this on his first page him moving on his own from topic to topic, unprompted by you?

A.  That's my memory.

Q.  Okay.  If we go to the next page, starting at the top of the page.

A.  Okay.

     I thought it was a BB gun.

Q.  Yeah.

A.  I ran into the store, they wouldn't call.  They wouldn't call.  They thought I had made it up.  They couldn't hear the shot.  They couldn't hear the shots.  I knew I did wrong.  It's been bothering me all these years.  It's been a heavy burden.  I wanted to tell someone.  I went to Indiana for job -- Job Corps, and I met my wife there.  When I met her, a heavy burden came off.

     And then he starts talking about the Spanish Cobras had killed Israel, and that was Mo Valentin.  I looked up to him.  In 1997 or '98, I moved to Ohio, I moved to Harrisburg.

     And then he said, The shooter got out on the passenger side.

Q. Wait. So now all of this information here, is this while you're still in the car or have we moved into the Starbucks?

A. I can't remember at what point we moved into Starbucks, and that would be in my report.

Q. It would be in your report?

A. In my report, yes.

Q. Okay. All right. And can you tell from looking at these notes whether or not you were asking questioning at this point or not?

A. No.

Q. Why don't we go ahead and -- actually, let's wait a minute. Let's finish reading it.

A. Okay. So now let's go to --

Q. Could you read that for me?

A. Yeah.

Q. Please do.

A. I want to tell you all straight, but this is also a shock to me. I knew some day I would have to do this. I knew and prayed on it that some day I would make this right. And I want to make it right. It's been a burden on my shoulders, but nothing like the burden of what your client has gone through.

Q. Can I just interrupt you there. There's a triangle.

A. Yeah, that's client.

Q. That's your note for client?

A. Yes.

Q.   Okay.

A.   Do you want me to keep going?

Q.   Yeah.  Go ahead.

A.   I knew then he wasn't the right -- I knew then he wasn't the right guy, and I knew it wasn't the right thing, but I really didn't care.  I was already at peewee in the gangs.  I was an MLD.  I don't care about no -- I didn't care about no Latin King.

When I saw him at the trial, I knew he was not the right guy, but I was young, and I had already told my story so many times.  I told them, but they kept saying, don't be afraid, we'll keep you safe, and all that crap.

Q.   And can you tell yet if you're in the Starbucks or if you're still in the car?

A.   My memory is we were in the Starbucks.

Q.   For this part?

A.   Yeah.

Q.   Okay.  Let's go to the next page.

A.   Okay.

I was talking to a pastor in Harrisburg, retired cop. He was counseling me, and I told him about my guilt.  I told him in front of my wife around 1988, but he never got back to me, it was still a burden.  I remember praying to God, take this burden off of me.  I remember thinking, how could I make it right.

Marilyn was Israel's girlfriend. They had three kids, so he was my brother-in-law. Marilyn isn't around here anymore. Leave her out of this. Her kids grew up without their dad. He was like a bit bro to me. I looked up to him. He used to smoke blunts and got all high and say just not sure that guy is the real guy that did it. Even he must have had doubts. Now I know Felix picked out an IG, I'm mad.

Q. Let me stop you there for a second.

A. Yeah.

Q. "Now I know that Felix picked out an IG, I'm mad" part, how does he know now that Felix picked out an IG?

A. I think at that point we had told him.

Q. So at some point through all of this you're interacting with him, meaning that you're asking questions, you're having -- giving information, that kind of thing?

A. Yep. And I think the report will reflect like when we started asking questions.

Q. And then at the sort of top left, there's some stars and an arrow, what is that?

A. Usually if there's a star, it's me wanting to come back to that.

Q. Okay.

A. And I don't know what the arrow is.

Q. All right. The next page?

A. The day of shooting when I came back I saw his face. He

deposition of Cynthia Estes

3639

jumped in the car.  They went right on Spaulding, they went that way to make it seem like Latin Kings.  That's what I think.  The police came to my house.  Jacques Rivera looked a lot like him.  I just got sick of looking at the pictures, and I said it looks like him.

The shooter's hair was lighter brown.  I saw the real killer maybe like a week later at Funston School.  His little brother went there.  I saw the real shooter.  He had a black jacket.  I saw his face, and I knew immediately it was him.

I went to Calvin Park High School.  The guy's name was Gizzy or Izzy.  I'm pretty much he's dead now.  Street justice.

Do you want me to just keep going?

Q.  Yes.  Sure?

A.  Okay:

I told him it's not the guy I picked, but the lady wouldn't listen.  She said it's okay, you're scared, et cetera. I picked his picture in a lineup and I picked him.  They brought me back the third time and I told them it wasn't him.

Q.  And I told them?

A.  I knew it wasn't him.

Q.  Okay.

A.  Only once, pictures on Cortland.

Q.  Do you know what that means?

A.  I believe he's saying they showed him the photo books that's Cortland, the street he lived on.

deposition of Cynthia Estes

3640

Q.  Okay.

A.  A white-haired lady, the cops saying it's okay, it's all right.  I recall exaggerating on the stand.  And then I put down me - Q.  I asked him the specific question, you knew it wasn't him?

And he said, Right.  I knew it wasn't him, but it had already gone so far.  I know they said he had an alibi, so I thought he's not going down on this, but I also didn't care, nor did that lady.

And then go ahead?

Q.  Yeah.  Before we move to the next page, the thing about, "I knew they said he had an alibi," did you follow up with him on that, about what meant?

A.  I don't know.  I don't remember.

Q.  If you had, would it be in your notes or in your report?

A.  Yes.

Q.  Okay.  Now, the next page.

A.  Let him now -- this is me telling the client.

Q.  Okay.

A.  Let him know as a child I did what I had to do.  I'm so sorry.  So, so sorry.  I just want to make this right, and then I wrote in parenthesis "crying."

Q.  Okay.  Now the next page.

A.  Looks like I wrote "Oscar" should be Orlando, read his testimony.  So I believe Jennifer went out to the car and got

his testimony.

Q. Okay.

A. I know I did not. I never left the Starbucks.

Q. Okay.

A. When I saw the shooter, Felix was looking at the shooter trying to protect his head. Felix, for sure, saw the shooter, they asked me if I was sure three times.

And this is the question I asked, baseball field. I asked him about a baseball field saying -- asking if he told someone that he had seen our client in a baseball field. And he says, I can't recall. I probably said it, but I don't recall. And there's his phone number that I wrote down.

Q. Okay.

A. And --

Q. Oh --

A. It's upside down. It's upside down. It was scanned upside down.

Q. And I just printed it. So let's flip it. Sorry.

A. So he's saying, early that evening the car was by the slab, and I was coming out the door. He had -- well -- Jean black jacket. That's what the shooter had on. And black gloves. The weird look for hair, reddish brown hair, not a ponytail. Back then, that strange look, it was not a good 'do. And then I wrote that he was laughing.

Q. When he was describing the hair style?

deposition of Cynthia Estes

3642

A. Yes. As not being a good 'do.

Q. Okay.

A. When the guy turned towards the car, that's when I could see. And it looks like I asked -- or Jennifer asked, Felix's car?

No, the shooter's car. He turned his head and looked around. If he had looked the other way, I would've gotten killed, too. He would've seen me. If they could've gotten Felix and Mo and my sister, it would've been a bonus.

Q. Okay.

A. I'm mad at myself for years now. I'm mad at them because they didn't want to hear any story once they had theirs. It was a lady with blondish, lightish hair with white in it. Older like you, and then he is pointing at me.

I did say, I think it was the third time I was shown the photos that this is not the right guy. I know who the guy is. He was an IG. He used to be in the neighborhood. But I really think he's dead now. I think I heard he's dead.

We asked does Jose Rodriguez ring a bell. He asked us what's his street name. We said we don't know, and we told him about the arrest.

Q. What arrest?

A. I don't know.

Q. Okay. Going up to the point where he's pointing at you --

A. Yes.

Q. -- so like he's comparing you to the lady?

A. Yes.

Q. Do you know was he comparing your age or your hair or both?

A. I assume it was both.

Q. And then?

A. He said older like you, you know, pointing at me.

Q. And then the next it says, I did say I think -- is that word "it"?

A. I did think it was the third time.

Q. Okay.

A. Or I think it was the third time.

Q. That he was shown the photos?

A. Yes.

Q. And that's when he said this is not the right --

A. This is not the right guy.

Q. And that's connecting up to the lady that he was trying to tell, saying, you know, don't be afraid, or whatever she was saying?

A. Right. Right.

Q. Can you take a look at what we've now marked as Exhibit No. 6 and tell me if you recognize what this is.

A. Yes.

Q. And what is that?

A. This is the report I wrote regarding Orlando Lopez.

Q. And can you tell me when you prepared the report in

connection with the date of the interview?

A. I don't recall the exact date. It would've probably been within 4 or 5 days.

Q. And how did you prepare the report? Meaning what's your process when you sit down to draft a report, that -- that report. Did you utilize your notes, did you rely on your memory, a combination?

A. A combination.

Q. Okay. So we talked a little bit earlier about when we were talking about your notes on the interview of Orlando Lopez. At some point you moved from talking to him in the car to the Starbucks. And you thought your report identified at what point in time in the conversation?

A. I think it does.

Q. If you take a look at page 2 of your report. At the bottom there it says, "at this point we arrived at Starbucks."

A. Okay.

Q. "And began a formal interview." Do you see that there?

A. I do.

Q. Okay. All right. So anything above that, any information above that is information he was providing to you as you described earlier, in the car spontaneously without questioning or prompting?

A. Yes.

Q. And then once you get into the Starbucks and you're sort of

digesting the information he's already provided and you're across the table, I assume, from another --

A.  Yes.

Q.  -- is when you start asking questions and following up on his answers, is that correct?

A.  Yes.

Q.  Is there a particular reason, before you went down to Ohio, that you didn't take photographs of the scene or do diagrams, which is something you typically do?

A.  Jennifer Linzer took photos of the scene and I went with her.

Q.  Okay.

A.  And I believe there was a student with us.

Q.  When you went to take the photographs you mean?

A.  Yes.

Q.  Okay.

A.  I have a memory of there being a student with us, but I don't know who that was.

Q.  Okay.  So you and Jennifer and the student went out, took pictures of the building and the street and --

A.  Yes.

Q.  Did you take those pictures with you when you went down to interview Mr. Lopez?

A.  My memory is Jennifer did.

Q.  Did you utilize those photographs in any way in connection

with your interviewer?

A. My memory is that she showed him a picture or pictures of the building.

Q. In the context of your discussion with him about what happened?

A. Yes.

Q. And there were no diagrams?  Nobody did diagrams?

A. No.

Q. Is there a particular reason that you didn't do diagrams?

A. I don't remember.

Q. All right.  And prior to going down to Ohio to interview Mr. Lopez, did you have a purpose in mind?

A. Like to what end?  There was no end to interview Mr. Lopez. There was no, what end.  It was, he was the only witness that testified against our client.  I believe, and that was part of my job, is to talk to the witnesses.

Q. And when you're speaking to a witness who has testified against your client, is there a strategy that you utilized when you are interviewing that type of witness?

Are you there to either test the credibility of their testimony or find out whether or not their testimony was influenced by something, or is there some particular areas that you're particularly interested in probing?

A. I try to ask open-ended questions because but I don't ever know - I don't ever know how a witness is going to answer.

Q. When you went down to Ohio, did you expect Orlando Lopez to completely recant his testimony the way he did?

A. Absolutely not.

Q. In your many years of experience doing investigative work, how many -- on how many occasions have you interviewed a witness who has recanted his prior testimony?

A. Probably five recantations in the whole history of my career, but nothing quite like this.

Q. And what makes you say nothing quite like this?

A. .it was stunning. His demeanor, as I said, he seemed angry at first, and I mistook that. I mistook it for anger and it wasn't anger. He was going through clearly something difficult, because when he got in the car and started crying, most witnesses don't usually cry. Certainly ex-gang, ex-Maniac Latin Disciples don't usually cry when I talk to them. And he was so visibly shaken, it's an interview I won't forget.

Q. In the other recantations that you've been a part of, did you, before interviewing the witnesses that ultimately recant, have any inclination or suspicion that the witness was going to recant?

A. No.

Q. So in those other cases that it happened, it happened spontaneously like it did -- not spontaneously but it was unexpected to you when you went down and interviewed the witness?

A.  I never know what to expect.  I just don't ever know what to expect.  You know, sometimes I think people will be really nice to me, and they're not.  And sometimes I think people are going to be really mean to me, and they're not.  I just never know.

Q.  And in the circumstance, the five or so times that you've had witnesses recant on you, what percentage is that of the witnesses that you've interviewed?

A.  A tiny percentage.

Q.  So it's a rare circumstance?

A.  Oh, yes.

Q.  And so in the cases where witnesses aren't -- don't recant and you're conducting these interviews, is there some goal or strategy in conducting the interviews in terms of the information that you're obtaining?

A.  The way I ask questions is usually open-ended questions.  Again, I never know how somebody is going to answer my questions.  And so I go in wanting to know what happened or wanting to know what they saw or wanting to know what they recall.  And every case is so different, and every witness is so different, you know.

Q.  If you could, turn to page 8 of your report.

Off to the side there, there's some writing that seems to be cut off.  Well, first of all, is this your handwriting?

A.  It's not.

Q. Okay.

A. I have no idea what it says.

Q. Or whose handwriting it is?

A. I don't. Yeah.

Q. And then there's some markings on this page. Are those yours?

A. Not mine.

Q. Okay. Actually, let's go back for one second. On page 2, there's -- "Mr. Lopez said the only other people who knows the truth is his wife" is underlined. Is that your underlying?

A. No.

Q. Okay. And then at page 5, some words are underlined. Is that your underlying?

A. No.

Q. Did Jennifer Linzer assist in any way in this report, Exhibit 6?

A. I don't believe so.

Q. Do you draft a report all in one sitting or were there drafts of it? Like, you know, is that -- do you write a report, and then print it, makes edits or not print it, and make edits, or --

A. I usually just write the report and I'll change it if there's typos.

Q. Okay.

A. But I don't usually make edits.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 1182 of 1335 PageID #:106567
deposition of Cynthia Estes
3650

Q.  Okay.  And then is there just this draft of this report in existence or are there other drafts?

A.  No, I believe this is it.

Q.  I want to direct your attention to page 11 of the report. If you look at the beginning of the first full paragraph there where you write, I asked Mr. Lopez if we could go through the order in which he identified our client.

A.  Yes.

Q.  So that's meaning you, not Linzer, right?  That was you asking you the questions?

A.  That's right.

Q.  And you redirected him back at this point in the interview from, you know, whatever topic you were talking about.  If you look to page 10, he's talking about Izzy or Gizzy and street justice, do you see that?

A.  Yes.  Uh-huh.

Q.  So then is it fair to assume at this point you're saying to him, okay, I want to follow up and go back to this topic of the order in which he identified your client, do you see that there?

A.  Yeah.  It says -- I just asked him if we could go through the order.

Q.  So that's you at that point in the interview, right?  It's fair to assume that this is the progression of the interview?

A.  Yes.

deposition of Cynthia Estes

3651

Q. As it is in this report?

A. Yes.

Q. So he's telling you about is Izzy, Gizzy being dead, street justice took care of him he thinks because he's dead, and then you at this point say, I want to talk, I want to ask you about the order in which you identified our client.

A. Yes.

Q. And then it says here that Mr. Lopez told you that the cops. Was that -- was that his word or your word?

A. "Cops"?

Q. Yes.

A. That would be his. I don't use that word.

Q. Brought the mug book in his house and big the guy?

A. Uh-huh.

Q. Right? Is that correct?

A. Yes.

Q. So that's the first interview, the first identification?

A. Okay. Yes.

Q. Is that correct?

A. Yes.

Q. And then he thinks he may have big him from a lineup a few days later.

A. Okay.

Q. Is that the second, right?

A. Yeah. He said he thinks.

Q. Right.

A. He may have picked him from a lineup a few days later.

Q. Okay.

A. Yes.

Q. And then the third point would be, he thinks a few days after that they showed him more photos, and that's when he told Rivera, he's not the guy, but the lady wouldn't listen right?"

MR. SOTOS: Could we have that question back.

MS. GOLDEN: I'm sorry.

"EXAMINATION BY MS. ROSEN (read by Ms. Golden):

Q. And then the third point would be, he thinks a few days after that they showed him more photos, and that's when he told him, Rivera was not the guy, but the lady wouldn't listen, right?

A. Yes.

Q. So that's -- when you went back to that question, that's the order that he provided to you in terms of the identification of Mr. Rivera, correct?

A. Yes.

Q. And then you asked him follow-up questions about the lady, correct?

A. Yes.

Q. And he told you she was not in uniform, maybe she was a lawyer. Do you see that there?

A. Yes. Uh-huh.

Q. And then he described her as older with blond hair and some white in it, right?

A. Yes.

Q. And then pointed to your hair and said, kind of like yours?

A. That's correct.

Q. Okay. And then he said, He thinks this was the third time when he was brought back that he tried to tell them that he had the wrong guy, correct?

A. Yes. Correct.

Q. Okay. And then if you go back up to the top. The third time would be the time a few days later when he was being shown some more photographs, right?

A. Yeah. I mean, he thought, yeah.

Q. And then if you look at actually page 13 of your report.

A. Okay.

Q. That short middle paragraph. It says, Jennifer rejoined us at that point. We showed Mr. Lopez photos of the building on Cortland.

A. Yes.

Q. Okay. So that's the point she would have gone out to the car that you were talking about earlier, you think?

A. It said at this page 12 --

Q. Uh-huh.

A. I'm sorry, on the bottom of page 12, at this point Jennifer never excused herself to get something out of the car.

Q.  Okay.

A.  So --

Q.  And then the photos would have been the photos we were talking about earlier?

A.  Yes.

Q.  Okay.  If we go to page -- the bottom of page 16, into 17, it says -- are you there yet?

A.  Uh-huh.

Q.  I asked -- "

        MS. GOLDEN:  Oh, wait.

        (Brief pause)

"EXAMINATION BY MS. ROSEN (read by Ms. Golden):

Q.  Okay.  If we go to page, the bottom of page 16 into 17, it says -- are you there yet?

        I asked about the white-haired lady.  He said he can't remember much.  She was older and had blondish hair with white in it.  Mr. Lopez said he is pretty sure it was the third time he was brought in and shown the photos.  He pointed to the guy he picked out and said that is not the right guy.

        Do you see that there?

A.  Yes.

Q.  So that, again, is in reference to the third time when he was trying to tell the white-haired lady that he had gotten it wrong, right?

A.  Yes.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 1187 of 1335 PageID #:106572
deposition of Cynthia Estes
3655

Q. Okay. How long were you in the Starbucks with Mr. Lopez?

A. I would say probably about an hour and 40 minutes, an hour and 45 minutes, maybe.

Q. Okay.

A. You know, a lot of it -- a lot of the time was like comforting him. I think that's the best word I can use, because he was very, very upset and it was awkward and we were in a public place.

Q. Yeah.

A. And he was upset.

Q. And so how did the interview end?

A. It was getting late and he was needing to go home, and it just -- he said, I need to go home, I think.

Q. Okay. And so then you guys, obviously, left the Starbucks and took him home?

A. We took him home.

Q. And then did you go back to Chicago that night or did you spend the night?

A. We spent the night and I don't remember where.

Q. And then when is the next time you had any contact with Mr. Lopez?

A. My contact with him was over until he testified.

Q. So you had no communication with him via telephone, e-mail, anything?

A. I don't recall any at all.

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 1188 of 1335 PageID #:106578
deposition of Cynthia Estes
3656

Q. Okay. And then when he came to Chicago, what interaction did you have with him?

A. My memory is that Jennifer and I spent part of the day with him while he was waiting to testify and I was waiting to testify.

Q. And where did you spend part of the day? At court?

A. At court. A good amount. As you know, a good amount of time was at court, and we took him out to lunch.

Q. During the course of your investigation in connection with Jacques Rivera's case, did you ever talk to a police officer named Craig Letrich?

A. I did not.

Q. Are you aware if anyone did?

A. Yes.

Q. Who talked to Mr. Letrich?

A. Students from Northwestern.

Q. At some point when you were interviewing Orlando Lopez, did you tell him that Felix had identified somebody else while he was in the hospital?

A. Yes.

Q. And what was your purpose in telling him that?

A. I had asked permission to let him know that. That was after his spontaneous outbursts, is how I would describe it. Then he was, I think, upset about how things were handled, and I went ahead and told him that Felix had identified someone

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 1189 of 1335 PageID #:106574
deposition of Cynthia Estes
3657

else.

Q. You asked permission of who?

A. The attorney.

Q. At what point did you ask permission to tell him that?"

MS. GOLDEN: Line 15.

BY READER SCHROEDER:

"A Yes, it was before the interview.

"EXAMINATION BY MS. ROSEN (read by Ms. Golden):

Q. Before you went to Ohio?

A. Yes.

Q. Okay. I'm going to actually mark this. I did them separate, but we can do them as one group exhibit. Why don't we mark this as Exhibit 7. I'll ask you to take a look at those as soon as your attorney has a chance.

These are photographs that were provided to us in this case. And I just want you to take a quick look at them and tell me who's depicted in those photographs and what timeframe they're from.

A. As best I can tell you, these were between January of 2010 and May 2010. They were in a box of mine marked as Pictures 2010.

Q. In all of those photographs have a picture depict you and other, I assume, family members?

A. Yes.

Q. And from that time period?

deposition of Cynthia Estes

3658

A. Yes.

Q. Age that's how you looked during that time period?

A. Yes.

Q. Yes?

A. Yes.

Q. And that would've been the time period around the same time period that you went down to Ohio to meet with then to interview Orlando Lopez, correct?

A. That was in February.

Q. Yeah.

A. So I can tell you this, this one was in May. The top one was in May.

Q. So the top one being marked at the bottom Estes 00001?

A. Yes.

Q. Okay. And now I want to go back just for a second to the interview of Orlando Lopez. At any point in time while you were interviewing him, either in the car or at Starbucks, did you ever call back to Chicago to speak to the attorneys?

A. No.

Q. Okay. You weren't in the courtroom when Orlando testified at the post-conviction proceeding, were you?

A. No.

Q. Any of the notes you would've taken of anybody in connection with the interviews you did in this case, could you have retained all of those?

A. Yes.

Q. You don't ever destroy notes?

A. No.

Q. Did Orlando Lopez tell you anything either at his house, in the car ride, or at the Starbucks when you were doing the formal interviewing of substance related to the case that's not reflected in either your notes or your report?

A. No, I don't believe so.

Q. Okay. So you didn't leave anything out?

A. I hope not."

        MS. GOLDEN: There something else?

        (Brief pause).

"EXAMINATION BY MS. ROSEN (read by Ms. Golden):

Q. Ms. Estes, did Orlando Lopez ever describe to you, give you any physical descriptions of the police officers that he dealt with while he was -- during the Jacques Rivera investigation?

A. The police officers he dealt in?

Q. Uh-huh.

A. I don't recall physical description. There was -- he said there was a man.

Q. Okay.

A. A policeman.

Q. And that policeman, did he describe him in any way? Tall, short, by race, by height, weight?

A. I don't recall that.

Q. Is that something that if he had told you what the officer looks like, you would've taken notes on that?

A. Yes.

Q. All right. How about the white-haired lady, did he describe her in any way other than by her hair?

A. Blondish, whitish hair.

Q. Right.

A. Sometimes blond hair and a little older looking, I think is what he said.

Q. Right. Other than that, in which we've already talked about --

A. Yes.

Q. -- earlier today, did he provide any physical description of the woman in terms of height, weight, race, any other identifiers?

A. Well, he didn't say race. He pointed to me and said, she looked like you, or kind of like you, you know.

Q. Sure. So you assumed that that meant white?

A. I did.

Q. Or Caucasian?

A. Assumed that, yes.

Q. Okay. Any other description of the white-haired lady beyond what we've talked?

A. No.

Q. And if he had provided some physical description, that's

something you would have put in notes, correct?

A.  Yes.

Q.  Did you ask him to describe any of the two police officers?

A.  It doesn't appear that I did.

Q.  Any reason that you can think of why you wouldn't have asked what they looked like?

A.  You know, again, that's such an extraordinary period of time with him.  It wasn't a typical interview.  I didn't know how much time we were going to have, and he's the one who ended the interview.  I would've liked I have gone on for another hour, but we didn't.  We talked a lot about a lot of things and we also listened to him being very upset.

Q.  Is it generally, in your experience, important to get a description of the police officers that are involved with a key witness like Orlando Lopez?

A.  I'd love to get their names, yeah.

Q.  And did you ask him if he remembered their names?

A.  Apparently I didn't.

Q.  As opposed to asking him and he said he didn't remember, you -- your interpretation is you just didn't ask him, is that correct?

A.  I mean, I don't remember if I asked.  Again, I'd have re-read my report and re-read my notes, but if I had asked, I believe I would have written it down.

Q.  And if somebody doesn't remember a name, in your

experience, is it important to try to get their recollection of what the officer looks like, some identifiers of these offers?

A. Yeah. Can be.

Q. Did it -- as you were hearing Mr. Lopez's story as he was describing it to you at Starbucks, did it occur to you that the identification of these officers that he was describing an important factor in the case?

A. You know, in retrospect, I probably should have asked, but there was just so much going on.

Q. And you've already told us that, other than the interview that day, you haven't spoken with Mr. Lopez again other than that day at the courthouse, correct?

A. That's correct.

Q. Okay. Do you know if Mr. Lopez has described these officers in any further way beyond what you've already told us?

A. I have no idea.

Q. So the white-haired lady, blond haired, whatever she is, he never told you that she was a police officer for sure, right?

A. He didn't, no. He said he didn't know."

MS. GOLDEN: I believe that concludes the reading.

THE COURT: Okay. And I think it's time for lunch. 1:15, ladies and gentlemen.

THE COURT SECURITY OFFICER: All rise.

(The following proceedings were had out of the presence of the jury in open court:)

THE COURT: Do you have any instructions material for me at this point?

MR. ART: I do.

THE COURT: Oh, goodie.

MR. LOEVY: And, Your Honor, could we tell the jury after lunch, we forgot to mention that both sides can rely on the testimony, too. We told them all through our case that the defendants were going to rely on our witnesses.

THE COURT: I think there's an instruction to that. So it's probably sufficient.

MR. LOEVY: Although, we did tell them throughout our case that they were relying on our witnesses. We would like you to remind them that we can rely on their witnesses.

MS. ROSEN: But, Judge, I think you did actually tell them once we moved to our case because we had the scope issue come up. So I think you did tell them that it would apply both ways.

THE COURT: I think that's right. I don't want to like gild the lily.

MR. LOEVY: Fair enough.

THE COURT: And I think you are, correct.

MS. ROSEN: Yes.

MR. LOEVY: We tried to do that witness by stipulation. It would've saved about an hour.

MR. SOTOS: He's right, we talked about several of

these depositions.  We did try and do stipulations.  We weren't able to agree.  But we tried.

THE COURT:  You know, I've been do this for a long time, and if you were unable to agree, it's on you.

MR. SOTOS:  We understand that, but it was both of us.

THE COURT:  Okay.  If that's not ready, could you just bring it up?

MR. ART:  I shall, yes.

THE COURT:  As soon as possible?

MR. ART:  Yes.  In two minutes.

THE COURT:  Thank you.

(Luncheon recess taken from 12:20 o'clock p.m. to 1:15 o'clock p.m.)

*    *    *    *    *    *    *    *

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER

/s/Blanca I. Lara                    June 25, 2018

3665

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JACQUES RIVERA,                        ) No. 12 CV 4428
                                       )
              Plaintiff,               )
                                       )
vs.                                    ) Chicago, Illinois
                                       )
REYNALDO GUEVARA, STEVE GAWRYS,        )
DANIEL NOON, JOHN GUZMAN, JOSEPH FALLON,)
JOSEPH SPARKS, PAUL ZACHARIAS, GILLIAN )
MCLAUGHLIN, JOHN LEONARD, EDWARD MINGEY,)
RUSSELL WEINGART, ESTATE OF ROCCO      )
RINALDI, CITY OF CHICAGO,              ) June 25, 2018
                                       )
              Defendants.              ) 1:17 o'clock p.m.

VOLUME 15-B
TRANSCRIPT OF PROCEEDINGS - Trial
BEFORE THE HONORABLE JOAN B. GOTTSCHALL
and a jury

APPEARANCES:

For the Plaintiff:     LOEVY & LOEVY
                       BY:  MR. JONATHAN I. LOEVY
                            MR. STEVEN E. ART
                            MR. ANAND SWAMINATHAN
                       311 North Aberdeen Street
                       3rd Floor
                       Chicago, Illinois  60607

                       MacARTHUR JUSTICE CENTER
                       Northwestern University School of Law
                       BY:  LOCKE E. BOWMAN III
                       357 East Chicago Avenue
                       Chicago, Illinois  60611
                       (312) 503-0844

Court reporter:            Blanca I. Lara
                       Official Court Reporter
                        219 South Dearborn Street
                              Room 2504
                        Chicago, Illinois 60604
                          (312) 435-5895
                       blanca_lara@ilnd.uscourts.gov

3666

APPEARANCES:   (Continued)


For the Individual          THE SOTOS LAW FIRM
Defendants:                 BY:   MR. JEFFREY N. GIVEN
                                  MR. JAMES G. SOTOS
                                  MS. CAROLINE P. GOLDEN
                                  MR. JOSEPH POLICK
                                  MR. DAVID A. BRUEGGEN
                            550 East Devon Avenue, Suite 150
                            Itasca, Illinois  60143


For the Defendant           ROCK FUSCO & CONNELLY, LLC
City of Chicago:            BY:   MS. EILEEN E. ROSEN
                                  MS. CATHERINE M. BARBER
                                  MS. THERESA B. CARNEY
                            321 North Clark Street, Suite 2200
                            Chicago, Illinois  60654


For the Defendant           LEINENWEBER BARONI & DAFFADA, LLC
Guevara:                    BY:   MR. THOMAS E. LEINENWEBER
                                  MR. JAMES V. DAFFADA
                            120 North LaSalle Street, Suite 2000
                            Chicago, Illinois  60602

(Jury out.  Proceedings heard in open court:)

THE COURT:  Ready, everybody?

MR. LEINENWEBER:  Yes, Your Honor.

THE COURT:  Yes, we're ready.

COURT SECURITY OFFICER:  So are they.  They're all here.

THE COURT:  So they are.

MR. LOEVY:  Who do we have next?  What's next?

MS. BARBER:  Wasilewski.

MR. LOEVY:  Wasilewski.  Got it.

Let me switch with you.

THE COURT:  This is no slouch jury, that's for sure.

COURT SECURITY OFFICER:  All rise.

(Jury in.)

THE COURT:  Please be seated, everyone.

MS. BARBER:  Your Honor, the City calls John Wasilewski.

THE COURT:  Okay.  Step up here, please.

THE WITNESS:  Sure.

THE COURT:  Please raise your right hand.

(Witness duly sworn.)

THE COURT:  You may be seated.

JOHN WASILEWSKI, DEFENSE WITNESS, SWORN

DIRECT EXAMINATION

BY MS. BARBER:

Q. Good afternoon, sir. Can you introduce yourself to the jury, please.

A. Sure. My name is John Wasilewski, W-a-s-i-l-e-w-s-k-i.

Q. And I want to start with your professional background.

What is your profession or most recent profession?

A. Well, I'm a retired circuit court judge -- Illinois Cook County Circuit Court judge, and I do part-time consulting and expert witness when requested.

Q. Can you tell us the dates of when you were on the bench?

A. Yes, I was on the bench from 1988 to 2010.

Q. And what were your assignments as a criminal court judge in Cook County?

A. Initially I was assigned out to the Sixth Municipal District in Markham, and I was assigned to the preliminary hearing courtroom, which is the hearing of preliminary hearings, which are -- if somebody's charged with a felony, there's an initial hearing to determine whether there's sufficient evidence for a felony trial to go through.

Shortly after that in -- actually, in February '89, I was assigned to fill in for a felony trial judge for a month. And then shortly thereafter -- well, in April of 1989, I was permanently assigned to the felony trial courts in Markham.

And in 1993 I was made the supervising judge of the Markham felony trial courts. And then shortly thereafter, I was made acting presiding judge, and I would act as the

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 1201 of 1335 PageID #:106586
Wasilewski - direct by Barber
3669

presiding judge when the presiding judge was not available. And I did that under three different presiding judges.

And then in 2001, I asked to be assigned to the criminal division. And the chief judge assigned me to the criminal division, and the criminal division is the -- all the felony trial courts for the City of Chicago. And most of them are at -- located at 26th and California, but there's -- was at that point in time four courtrooms in Bridgeview, and there was some courtrooms out in Skokie as well.

But I was assigned to the Bridgeview, but I was -- had a Chicago felony trial courtroom.

I then in 2009 -- early 2009, I was appointed a circuit court judge by the Illinois Supreme Court. And then in the summer of 2010, after 22 years of service, I retired.

Q. And what did you do before you became a judge?

A. I was a Cook County Assistant State's Attorney.

Q. And what -- what year did you start as an Assistant State's Attorney?

A. I started in June of 1978, and then when I left -- when I left to go to the bench in December of 1988.

Q. Can you take us through a little bit your -- the dates and assignments you had when you were a prosecutor.

A. Well, initially I was assigned to traffic court for just about six months, and then I was assigned to the Fifth Municipal District, which is a suburban courtroom.

And then I was assigned to the criminal division, and I was assigned out initially to Markham, and then eventually I went to 26th and California.

And then I was appointed deputy -- in 1987, I was appointed deputy supervisor of the First Municipal District, which is the entire City of Chicago, misdemeanors courtrooms. And there I supervised 45 Assistant State's Attorneys, and I assisted in the supervision -- I was a supervisor, too.

I also was a -- had to handle domestic violence court, and I think I had a preliminary hearing courtroom for a short period of time.

Q. So as a prosecutor, what were the years that you were handling serious felony cases?

A. Well, from 1980 to 1987, I was a felony trial assistant, basically a line felony trial assistant. I went up the ranks -- you know, in the ranks. You start as third chair, second chair, first chair. I was a first chair.

And Judge Boharik when -- I was then assigned to or made deputy supervisor.

Q. And can you tell us about your educational background.

A. Sure. Well, I -- my degree -- law degree -- my undergrad degree is from DePaul University. I have a bachelor of arts there. And my law degree is Northern Illinois University, College of Law. And I was admitted to the bar in 1978.

Q. And do you belong to any professional organizations?

A.  I belong to quite a few.  I belong to the Illinois State Bar Association, where I'm pretty active.  I was on the Assembly, which is the governing body of the Illinois State Bar Association, for about 16 years.

I was also on the State Bar Criminal Justice Section Council, which is a council made up of judges, defense attorneys, and prosecutors.  And we discuss legislation -- proposed legislation.  We discuss matters that are -- that are happening in the criminal law area, mainly in the state law but also in federal.  And we would take a position on it.

We also did CLEs and we also -- which are continuing legal education, which are courses.  You know, we would have a -- I presented for them as well as did writings -- did papers on various topics of the criminal law.

I also appeared on TV when they asked me to appear on TV to discuss an issue of criminal law, and we also -- it's basically what we did on that.

I'm presently the chair of the Illinois State Bar Standing Committee on Corrections and Sentencing.  And what we do in that -- it's likely made up, too, of judges, prosecutors, defense attorneys.  And it's also made up of some personnel that work with, like, the Department of Corrections.

And we recently published a book on post-conviction remedies, which is distributed throughout the Illinois Department of Corrections to help people realize what remedies

they might have available to them.

Q.  Okay.  And you were asked to be an expert in this case, right?

A.  Yes.

Q.  Okay.  And you were paid for your work?

A.  Yes.

Q.  And as I understand it, the opinions that you're -- that you -- your work went towards, much of those opinions are no longer relevant for court today, right?

A.  That's my understanding, yes.

Q.  Okay.  So what topics are you offering your specialized knowledge here today for?

A.  Well, the trial procedure in the criminal courts -- the criminal division courtrooms in Cook County, Illinois, in the area of 1988 to 1990, around that area.

Q.  Okay.  And did you have an opportunity to review Mr. Brasfield's expert report in this case?

A.  Yes, I did.

Q.  And did you notice in that case that he did several comparisons of certain files that he reviewed, right?

A.  I saw that, yes.

Q.  And you didn't do any of those -- review any of those files or do any of those comparisons?

A.  No, other than this case.

Q.  Okay.  Can you tell us how -- how were the criminal courts

organized in Cook County in the 1980s?

A. Well, as far as -- there's different -- well, there's different divisions, but there's -- the criminal division, as I said earlier, is for the City of Chicago. It's all the felony cases for the City of Chicago. And they handle most of the line -- the general felonies that come into the system, including murders.

And there's 40 courtrooms or there were 40 courtrooms back in 1988. And 31 of them were at 26th and California; 5 of them were at Markham; and 4 of them were at Skokie.

Q. And then within each courtroom, are there different prosecutors assigned to each courtroom?

A. Yes. Well, the regular felony trial -- at that time, there were approximately -- in 1980 there were approximately 108 Assistant State's Attorneys that were assigned to the felony trial division and that were assigned specifically to basically a line criminal division courtroom.

There's other courtrooms, too. There's like special prosecutions, but they don't handle cases on a daily basis. But the ones on a daily basis are in the criminal division. And so there's 108 of them, and they consist of -- each courtroom consists of a -- usually three assistants. And there's a third chair, basically the new or least experienced of all the State's Attorneys. And then there's a second chair, which is -- has more experience. And then there's the first

chair, who is -- the first chair has the most experience. And the first chair is considered to be basically in charge of that courtroom for the State's Attorney's Office.

Q.  Okay.  And the jury has heard lots of questions in this case about documents not making it into criminal defense attorneys' files or not getting into their files.

Can you explain, just in general terms, what criminal discovery is?

A.  Sure.  Under Illinois law the -- well, discovery is basically exchange of information.  The -- you know, the defense wants the information as to the witness.  It's all controlled by Illinois Supreme Court Rule 411 to 415 back in 1988.

And the Supreme Court Rules basically require the prosecutor if you serve -- you're served with written notice, you provide the names and addresses of the witnesses that you intend to call -- the state does -- a memoranda of any statements that they made and with the substance in it.  And it's -- basically they're talking about the police reports.

And then also you have to tender these statements, obviously, of the defendant, also any statements of a co-defendant, any tangible -- you have to list any tangible evidence.  You have any physical evidence.  You have to tender any lab reports that you might have, any reports by experts.

You also have to notify whether there's, you know, a

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 1207 of 1335 PageID #:106592
Wasilewski - direct by Barber
3675

lineup, and you have to tell them whether or not you used an informant.  There's things of that nature.

And there's also -- the defense also has to do the same thing with a little bit lesser requirement.  They do have to list all their witnesses and their addresses.  They also have to say whether they're going to use an affirmative defense.  Or, for example, an alibi, they have to tell the state, and if it's an alibi, they're supposed to tell them where the person was supposedly at during the alibi.

Q.  During your time as a prosecutor, were you familiar or did you become familiar with the *George Jones* case?

A.  I did.

Q.  And what was -- and the litigation surrounding that, right?

A.  Right, right.  It was a -- I mean, it was a -- it was a big story back then.

You know, it was -- it was a case where there was a -- evidently the Chicago Police Department had a street file with the evidence that was favorable to the defendant that was not disclosed.  And it caused the case to be -- it caused a mistrial in the case and the case eventually dismissed.

Q.  So what was your understanding of the -- sort of the problem or the issue that the *Jones* case brought to light?

A.  Well, evidently they had -- the Chicago Police Department had a file that was never turned in to the, you know, like central or that nobody was even aware of as far as the State's

Attorney's Office that this file -- and in there was evidently some information. In that particular case, I think a memo written by another detective that never was disclosed to the State's Attorneys.

Q. So before the *Jones* -- *George Jones* case, when you were working as a prosecutor, did you routinely receive detectives' handwritten notes and memos and things like that --

A. Before -- before *Jones*?

Q. Right.

A. No.

MR. LOEVY: Objection to his -- what he received, Your Honor.

THE COURT: Wait a minute. Wait a minute. Hold on a second.

THE WITNESS: Sure.

MR. LOEVY: It's an undisclosed --

THE COURT: Wait a minute. The question is, before the *Jones* case, did the witness receive detectives' handwritten notes?

That's not asking for an opinion. That's just a matter of fact.

MR. LOEVY: The objection is, Your Honor, he's here for procedures, not about whether they did or didn't comply later or before. He's just a procedures witness.

THE COURT: You know, I'm going to overrule that

objection, though. I think that's context for what's coming later, is what I expect.

BY MS. BARBER:

Q. And without going into the details of any underlying -- the underlying case or the court opinions, were you familiar with the *Palmer* litigation?

A. Yes.

Q. And just in a general sense, what was your understanding of what the *Palmer* litigation was about?

A. Well, what we were aware of is because Judge Shadur had entered an order, and part of the order involved the State's Attorney's Office. And I know it involved partially the *Jones* case. But, you know, that's -- our aspect or what was known back then is basically what Judge Shadur's order to the State's Attorney was.

Q. Okay. Let's go to -- I want to show you City Exhibit 29, which has already been admitted.

A. Okay.

Q. And, Judge Wasilewski, can you tell us what is this?

A. That's an order that was -- within the State's Attorney's Office that was sent to all assistant -- or the felony trial assistants -- all trial ASAs throughout the system, actually.

Q. And what is the date of the memo?

A. The date is June 13th, 1983.

Q. And who is it issued by?

A.   It was issued by Lawrence O'Gara.

Q.   And who was he?

A.   At the time, he was chief of the criminal division -- criminal prosecutions bureau, which is a Deputy State's Attorney.

Q.   So in terms of, like, the rank of the State's Attorney's Office, what level was he at?

A.   I'd say about No. 3 guy in the office.

Q.   And this was -- who was this memo directed towards?

A.   It was, well, to all trial assistants.  So, you know, that's what he's aimed at, any felony trial assistant he's talking about.

Q.   Okay.  And what was your understanding of why this memo was being issued to the trial assistants?

A.   Well, mainly because Judge Shadur indicated in the order that -- he ordered the State's Attorney to comply with these -- his -- his order.

So it was -- it was given to the Cook County State's Attorney, and he also incorporated Judge Shadur's order verbatim.

Q.   Did you have an understanding of why this order was being directed towards the State's Attorney's Office as opposed to just the Chicago Police Department?

A.   Well, because we control the discovery in the matters.  We're ultimately -- under Illinois law, we're ultimately

responsible for discovery in a criminal case.

Q. So I want to go through the details a little bit.

Looking at subsection (a), can you tell us what that portion was directing the felony trial assistants to do?

A. Sure. Basically you have to know the familiarity with the Chicago Police Department and that we're talking about the different sections of the Chicago Police Department. You know, there's many sections, obviously.

There's, for example, fingerprints, latent -- fingerprint examinations. There's labs. There's serology. And they all may have reports. Polygraph, writing -- handwriting. I mean, there's various -- serology.

And they're all -- and then the RD section, which is where the ident -- the reports are maintained, the identification section where they have the -- the criminal histories and also the arrest reports, those are all matters that you have to obtain information from the Chicago Police Department individually, so to speak.

Q. So in the subsection (a), it has "(including any changes from time to time)" in parentheses.

After Judge Shadur's order, did you become aware of any changes in the Chicago Police Department's record keeping?

A. Right. Well, they had to -- the investigative -- they created investigative file in the -- in violent crimes.

The detectives were required -- well, I don't think

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 1212 of 1335 PageID #:106597
Wasilewski - direct by Barber
3680

they were required to maintain them, but if they did, they had to keep the file, and there was a procedure in keeping it.

Q. Did you become aware of any new changes with respect to detectives' handwritten notes?

A. They had to be maintained in that -- in the investigative file.

Q. Do you recall if there was a specific form that they were supposed to memorialize their notes on?

A. We call them GPRs, but they're General Progress Reports. They're supposed to be in those General Progress Reports.

Q. Okay. And after Judge Shadur's order, what was the initial response from defense attorneys in the criminal discovery process?

A. Well, they would issue subpoenas, sometimes almost immediately, for the investigative file. And they would -- yeah, they would file the subpoena. And so would -- I don't know if -- what would happen then is the Chicago Police Department would tender a copy of the investigative file to the State's Attorney's in that courtroom.

MR. LOEVY: Objection to foundation --

THE WITNESS: Okay.

MR. LOEVY: -- whether the CPD would tender investigative files.

MS. BARBER: Well, I think that's where he's getting it from.

THE COURT: Well, I'm going to sustain -- the witness obviously can't testify to what the police did. He can only -- I don't think that -- he can only testify to what the State's Attorney's did, right?

MS. BARBER: Well, I mean, I think if he's receiving documents -- he knows where he's receiving documents from.

THE COURT: Well, let's -- that's right. But that doesn't mean that he knows exactly what's going on in the police department.

I'm going to sustain the objection to the form of the question. Let's just go on, though. You can rephrase it.

MS. BARBER: Okay.

BY MS. BARBER:

Q. When a criminal defense attorney issued a subpoena for the investigative file, did the State's Attorneys have an opportunity to review it?

A. Well, what would happen, an officer would deliver -- I don't know -- I don't know where they came from, but a Chicago police officer would deliver a copy of the investigative file.

MR. LOEVY: Objection, Your Honor. This is undisclosed testimony from the report. It's not -- not what we were told is going to be the testimony.

MS. BARBER: It just goes generally into --

MR. LOEVY: It's not in the report.

THE COURT: Well, this is a hard call. I mean, this

is -- I thought the witness was going to testify about procedures in the State's Attorney's Office.

MS. BARBER: That's correct, and specifically with respect to this memo --

THE COURT: All right.

MS. BARBER: -- and obtaining documents.

THE COURT: Well, I think -- I think that certainly the witness can testify about once this memo was in effect, what the State's Attorney -- what the State's Attorney's role was.

MS. BARBER: Okay.

BY MS. BARBER:

Q. So I guess just to answer my question more directly then, when a criminal defense attorney issued a subpoena for an investigative file -- and this is back during the time after Judge Shadur's order -- did State's Attorneys have an opportunity to review that investigative file?

A. Yes.

Q. And taking you to subsection (b), can you tell us what that section in the memo is directing felony trial assistants?

A. Well, basically, it's something we did -- I mean, you would -- you would gather everything together once the -- a motion for discovery is filed.

So you would -- including that, they wanted -- what Judge Shadur I think wants is to make sure that you have every

file, including the investigative file.

Q.  Okay.  And it mentions discovery motion.  Can you tell us, what is a discovery motion?

A.  Well, again, that's -- a discovery motion is -- again, it's under the Supreme Court Rule 40 -- 412.  And it's a discovery -- it's a motion made by the defense asking the state to provide information about the case.

And it goes through, like I say -- as I said earlier, a series of, you know, the --

THE COURT:  There's some water there.

THE WITNESS:  Is there?  If you don't mind if I take some.

THE COURT:  Sure.

(Brief pause.)

BY THE WITNESS:

A.  We would list -- we were -- we were required by the Supreme Court to list the names, addresses of witnesses, and provide basically -- they don't specifically say police reports, but they say memoranda.  And they're basically referring to police reports.  So those are all tendered to defense.

And there's some matters that it wouldn't matter if there was a discovery motion or not.  We're required under the Constitution to provide whether there's a request for it or not, and that would be evidence favorable to the defendant.

BY MS. BARBER:

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 1216 of 1335 PageID #:106606
Wasilewski - direct by Barber
3684

Q. I'm going to flip to Defendants' 23-C, which I believe has already been admitted as well.

And can you tell us, is that, like, an example of a discovery motion?

A. Yes.

Q. And can you tell us the process of how a discovery motion is filed or who it's served on?

A. Right. It's usually filed in open court by the defense attorney, and it's usually on the very first appearance, either when he files his first appearance or when he first appears in court.

Q. And does a discovery motion get sent to the Chicago Police Department?

A. No.

Q. Subsection (b), flipping back to City 29, states that the State's Attorneys were to obtain all police files and records from the various divisions of the Chicago Police Department.

Can you tell me -- tell us what various divisions of the Chicago Police Department you would obtain documents from?

A. Well, it would depend on the case. But, I mean, you'd look at it -- obviously, if you have fingerprints in the case, you're going to request fingerprint, report from the fingerprint people.

If somebody was talked to by the polygraph section, they have a report. You get that report. You would -- if

there was blood involved, there's a serology division.  You'd ask for that.

If you had handwriting involved, there's a handwriting -- there was back then a handwriting section, you know, the comparison of a handwriting.  You would either request of them form work or see what they had.

There's quite -- firearms, you know, there's different firearms for identification.  Tool marks, you know, they could identify pipe wrenches and things of that nature.

Q.   And then once you obtained those reports from the various divisions, the prosecutors would then disclose those documents to the criminal defense attorneys, right?

A.   Yes.

Q.   And then at the end of subsection (b), it states:  All additional such document -- documentation as is subsequently generated.

Were there circumstances where sometimes after a criminal defendant was charged there was more investigation that was done or needed?

A.   Oh, sure.  Because I -- just a good example of a fingerprint, the fingerprint people might say, "We need a palm print."  And so then you'd go into court and ask to take a palm print, say, from the defendant.  Then you would send it to the fingerprint people.  They would compare it.  They'd generate a report.  We would then give that report to the defense.

Q.  And can you describe the level of difficulty in your day-to-day job of having to get documents from the different departments of the police department -- different divisions?

MR. LOEVY:  Objection, Your Honor, undisclosed opinions.

THE COURT:  Overruled.

BY THE WITNESS:

A.  We -- I -- we never had a problem with -- the Chicago police were generally very compliant.

MR. LOEVY:  Objection, Your Honor.  We did talk about this with counsel.  If they're going to say Chicago police never had a problem, that's going to open up --

THE COURT:  Well, the witness was saying that he never had a problem.

MS. BARBER:  It was -- and it was just the level of --

THE COURT:  Overruled.

MS. BARBER:  -- just the level of difficulty.

THE COURT:  I don't know what you talked about among yourselves.  I wasn't a party to that, but I -- this objection is overruled.

BY MS. BARBER:

Q.  Actually, so if you could just explain just in general terms of you in your experience, just the level of difficulty of having to make those phone calls and things like that to get the documents.

A. Well, we -- I mean, it was pretty -- it was pretty simple. You had to read the report. If you read the report, you knew what you needed.

You would then call that section and ask them to send the reports, and they -- they would always send the report.

Q. Looking at subsection (c), that talks about the investigative file inventory sheet.

Do you -- did you have an understanding of what that was after Judge Shadur's order?

A. Oh, yeah. Yeah, eventually we did, yes. Yeah, it's the -- you know, it's basically -- it's what it says. It's inventory sheet, what's in the investigative file. And it was attached to the -- like the report that's filed -- the permanence report, basically.

Q. And if you received documents from the -- if you received an investigative file from the Chicago Police Department without the investigative file inventory sheet, could you follow up?

A. Sure.

Q. And subsection (d) discusses all police writings.

And I think you've already testified you understood what a General Progress Report was after Judge Shadur's order, correct?

A. Right. Well, that's when they created General Progress Reports. You know, basically from that case, the Chicago

Police Department came up with that order, the Chicago order, so that, you know, we knew we had to provide everything.

Q. And then subsection (e) talks comparing all files or notes.

If you for some reason wanted to look at the original investigative file, like the -- not a copy but the original, would you be able to do that?

A. We could request a detective to come down to the courtroom or to our office with the file.

Q. And if a criminal defense attorney wanted to review the original, would you make it available for them?

A. We could make it available to him, yes.

Q. Now, I want to talk about the actual process of disclosing documents to criminal defense attorneys.

Can you tell us, like, the initial steps when a first -- when a case first came into a courtroom?

A. Well, yeah -- well, initially what happened is some -- excuse me again.

Sometimes what would happen is even at the bond hearing, the process would start. Some -- some attorneys would file protective orders, protective orders for -- either to protect either reports themselves or evidence. They'd file it initially -- sometimes even at the bond hearing.

And then as -- and it was important, because later on if the evidence was for some reason not available, they could then claim -- they don't have to claim -- show prejudice. They

could say it was a violation of the order.

Then what would happen is we would file our -- on the first court date, we'd file our motion for discovery, and then we would in the meantime collect all these reports. And there would be more than just police reports. Especially, like, for example, in a murder, there are generally going to be medical reports. There's going to be a medical examiner. There's going to be, you know, obviously, the photographs of the scene, things of that. You have to get all these things together.

And it does take a little while to get together, and then -- but you sometimes -- while you usually do tender them, sometimes in a piecemeal fashion, you might file -- for example, tender the police reports, but you do this on the -- all the State's Attorneys generally did this on the record. And they would say it on the record. They'd say it in the court, and there was a court reporter there. And the court reporter would be typing it down, so they could show that they, in fact, tendered those reports.

Then they would mark -- we had a thing called a half sheet. We called it a blue back and half sheet. And it was a little file that came when we first got the file in. It was a -- we had a packet, what they call a term counter, which is how many days you have to try a person in, if he demands trial -- speedy trial.

Then there's these lined sheets of paper, and we'd

call that the half sheet, and we'd write on there who the judge was that day, because sometimes another judge would be sitting in. We'd write down what happened in court. You know, it was either a continuance or if there was an offer on the case. We'd offer so much if he wanted to plead guilty.

If there was discovery tendered, we'd mark down what we discover -- what we tendered on that particular date. Then we'd put -- you know, we had the date there, too. And then we'd put down the Assistant State's Attorney that made that note. You know, it would ASA Wasilewski. You know, that's -- we knew that it was tendered on that date.

Q. And why was it important to document either on a half sheet or actually on the record in court what documents were disclosed or tendered?

A. Well, because if during the course of the trial there came a dispute as to whether or not that -- you know, that item was tendered or not, we'd be able to either go back to that court reporter on that date and get a transcript, or we could say on that date, Judge, we tendered, you know, these material to the defense.

Now, there were some State's Attorneys that were even -- where they prepared forms where they'd have the defense sign that they received them. There were -- there was one judge that required the state and the defense to go through everything together, and they had -- he had them initial every

document that was tendered. And so the one person would keep -- you know, the State's Attorney, a copy of the defense attorney's initial, but that took a lot of time.

Q. And in your review of Mr. Brasfield's report, from your review, did it appear that he looked at or examined any of the half sheets in any of the State's Attorney's files to see what, if anything, was disclosed?

MR. LOEVY: Objection. This wasn't disclosed. This isn't a witness commenting on Mr. Brasfield.

THE COURT: Was that part of the report? I don't remember seeing it myself.

MS. BARBER: Those actual words are not in there, but it's -- it's --

THE COURT: Well, the question is, though, was this witness asked to -- did he give an opinion on Mr. Brasfield?

MR. LOEVY: No.

MS. BARBER: He --- his opinions rebut Mr. Brasfield --

THE COURT: Well, I think you better show --

MS. BARBER: -- in terms of what --

THE COURT: -- it to me, because I don't remember seeing it. So maybe it's just the way you're approaching it, but --

MS. BARBER: I can try it a different way.

THE COURT: All right.

BY MS. BARBER:

Q. So is it -- if you wanted to go back in time and look at what -- what the record showed for what documents were disclosed to a criminal defense attorney, you could look at the half sheet or the criminal court transcripts, correct?

A. Yes.

Q. Okay. And you touched on this a little bit already, but were there rules or laws in Illinois governing discovery in criminal cases?

A. Well, yeah, it's the Illinois Supreme Court Rules. Supreme Court Rule 411 through 415, they had various provisions and they had enforcement proceed convictions in that -- in those.

Q. And can you tell us -- so if you -- if the State's Attorneys didn't comply with those discovery rules -- discovery rules, what are the potential consequences?

A. Well, there's a couple things you could do. One, the -- under 412, I believe, (g) -- take a -- yeah, (g), they can go into the Illinois Supreme Court 412(g) --

MR. LOEVY: Objection, Your Honor. I thought this was the part you said you wanted not included.

THE COURT REPORTER: I'm sorry, a little louder, please.

MR. LOEVY: I thought this was the part you said you wanted not included.

THE COURT: What I said was that Mr. Wasilewski did

not disclose that he was commenting on Mr. Brasfield, but I don't think that's what this is.

MR. LOEVY:  I meant on the other part of the -- the other part of your decision about what he was going to testify about, the other discovery procedures.

THE COURT:  Well, right.  But you're asking about the procedures that the State's Attorney followed, right?

MS. BARBER:  Right.  So these were --

THE COURT:  Which I think was okay.  That was clear.

MS. BARBER:  Right, I'm not talking about defense attorneys.

THE COURT:  Go ahead.  Overruled.

BY MS. BARBER:

Q.  Okay.  So can you continue?

A.  Well, first, if -- if he -- if the defense attorney feels that the state has something or that either the state's not aware or is not disclosing it, they can go into court and ask the judge to get involved and either order it with a judicial order.

Now, also there's another provision, 415 -- Illinois Supreme Court Rule 415(g), which provides the sanctions for failure to abide by discovery.

Q.  And can you tell us what are the available -- or what does sanctions mean, and what are the available sanctions?

A.  Sanctions are basically penalties.  You know, if you don't

Wasilewski - direct by Barber

3694

do something, this is going to happen.

And actually, probably the most effective when it's -- when you argue that it's a violation of your order, Judge; you ordered this to be done, and it's not being done.

So it can be contempt of court, you know, either to make the person comply. It can be if it's --

MR. LOEVY: Your Honor, we do object. This is what you barred.

THE COURT: You know what, let me see counsel at the side, because I think we are not in agreement about the ground rules.

(Proceedings heard at sidebar on the record:)

THE COURT: First of all, is this an issue in this case? I mean, is anyone -- are you suggesting that the State's Attorney failed in his obligation to do what he was supposed to do?

MS. BARBER: No, that's not what we're suggesting.

THE COURT: That's what this sounds like this is all about, what happens when a State's Attorney fails.

MS. BARBER: It's the role of the prosecutor in criminal discovery and how that that's important and that Mr. Brasfield didn't look at that.

MR. ART: Your Honor, this is why we moved to bar this, because there is no dispute in this case about whether the prosecutor's office is --

THE COURT: Yeah, I don't think we need to go on and on about what the prosecutor -- what happens when a prosecutor fails since our prosecutor testified. And I -- to me, I mean, I don't see where there's any kind of issue with that.

MR. LOEVY: The only reason --

MS. BARBER: It's a general matter, so you know -- you understand that Mr. Brasfield didn't just opine.

THE COURT: Well, yeah, but that's what you're not supposed to be doing.

MS. BARBER: I'm not talking about the underlying case. I'm talking about the other files that he reviewed and the file comparisons where he just looked at investigative files and criminal defense attorneys' files and didn't consider the State's Attorney's Office or files in the middle.

MR. ART: Your Honor -- I'm sorry. There's no disclosed opinion on what the Brasfield analysis --

MS. BARBER: He did -- he was -- he did disclose the rules and the sanctions. It's right there in his report.

MR. LOEVY: That was what was barred.

MR. ART: It was barred --

MR. LOEVY: I was trying to say something.

THE COURT: Wait a minute. One person at a time.

MR. LOEVY: That was what you barred, Your Honor. Remember you wrote an opinion about this, that sanctions motions and contempt hearings were barred. That's why I was

frustrated.

THE COURT: I don't remember that.

MS. BARBER: I don't remember that either.

THE COURT: I don't know why it's an issue in this case. It seems to be a lark and a frolic.

MS. BARBER: Yeah.

MS. ROSEN: It was just to close out the loop of the end of --

THE COURT: Yeah, but it has nothing to do with this case. I think it's really confusing.

So where are we going now?

MS. BARBER: I should be just about done. I'll have to think of a different last question.

THE COURT: Okay. All right.

(End of sidebar proceedings.)

BY MS. BARBER:

Q. Judge Wasilewski, based on your experience handling -- working as a prosecutor during the 1980s in Cook County and handling criminal cases, what is your opinion about how seriously the prosecutors took their obligation to comply with the discovery rules?

A. Well, they took it very seriously, because if you had a case that was lost because you committed a discovery violation, there's a lot of problems.

There's one, you gave the -- the victim that you have

to explain to.  You have your supervisor who is not going to be too happy about it.  And more -- I mean, and then he's got supervisors above him who if they hear about it, it could be very serious.  And your reputation, too.  I mean, every -- every lawyer has a reputation, and judges know it.

MS. BARBER:  Thank you.  I have no further questions.

THE COURT:  Anything more from the defense side?

MR. LEINENWEBER:  No, Your Honor.

MR. ART:  Just very briefly, Your Honor.

CROSS-EXAMINATION

BY MR. ART:

Q.  Good afternoon, Judge.

A.  Good afternoon.

Q.  So we reviewed the policy you have an obligation to turn over as a prosecutor all files that you had in your possession that were police documents, correct?

A.  Basically, yes.

Q.  And you took that extremely serious on an office-wide basis, correct?

A.  Yes.

Q.  Because it's a matter of constitutional significance.  It is a violation of a person's right not to turn over those police documents; is that right?

A.  Well, it depends what you're talking about.  I mean, we gave them all.  I mean, under the Illinois Supreme Court Rules,

there's -- there's no requirement to turn any police reports over.

Q. Okay. But you said earlier under the rules there's a requirement as a prosecutor to disclose all the police reports, correct?

A. Well, under Judge Shadur's order, yes.

Q. Okay. And so at the time you were in the prosecutor's office, any police reports that you got, you would hand over, right?

A. Yes.

Q. And you wouldn't use any discretion at all; you'd say this is a police report, and you would hand that police report over?

A. Well, there would be exceptions, because if you had a confidential informant in there, yes, you'd say, "No, we're not going to disclose the confidential informant."

Q. Okay. But -- but material information that the defense was entitled to you would definitely hand over, right?

A. Sure.

Q. And you wouldn't make judgment calls about something that was close to the line or not, correct?

A. Not after that *Jones* case.

Q. Okay. And so that was the policy in effect in the time you were in the prosecutor's office, right?

A. Basically.

Q. And you were there at the same time as Mr. Victorson,

correct?

A. Correct.

Q. And, in fact, you worked with him in the years leading up to the prosecution in -- at issue in this case, right?

A. Well, he was in a courtroom near me, yes.

Q. You knew him?

A. Yeah. I didn't -- I didn't -- I know him just to say hi and bye. I mean, we didn't hang around together or anything like that.

Q. Okay. In your opinion, he would not have withheld police documents he had from a criminal defense attorney?

A. That's my opinion, he would not.

Q. Okay. And he testified at this trial that, in fact, he said to Judge Wadas, "Here's all the files -- police files I've got." You have no reason to dispute that, correct?

A. Correct.

Q. Okay. How much were you paid by the City in this case?

A. I was paid up to now 23,600.

Q. Okay. And to be fair, some of that is for work that you're not testifying about today --

A. Right.

Q. -- correct?

And what was your hourly rate?

A. My hourly rate is, you know, to do the reading and writing and things of that nature, $350 an hour.

Q. Okay.

A. And then if I had to appear at a different location, like for another lawyer to talk to me, that would be $400 an hour. And then in court, it's $500 an hour.

Q. All right. So your testimony today is that the Cook County State's Attorney's Office had the ultimate responsibility for making sure that police documents in its custody got over to the criminal defense, correct?

A. Correct.

Q. And you said you did that in response to motions for discovery, correct?

A. Yes.

Q. And -- and Cook County State's Attorneys could send subpoenas, and criminal defense attorneys could send subpoenas. There were multiple ways to get these documents, right?

A. There was, yes. You're correct.

Q. But motions for discovery were a standard way to get those documents in every case, right?

A. Yes.

Q. Okay. In order to ensure that you got all the documents from the Chicago Police Department, you had to have the cooperation of the Chicago Police Department, correct?

A. Yes.

Q. And they had to provide you the documents in order for you to turn them over, correct?

A. Yes.

Q. Okay. So any documents that the Chicago Police Department didn't give to the Cook County State's Attorney's -- Attorney's Office, you obviously couldn't turn over, correct?

A. What I don't know, I don't know.

Q. Right. Okay.

And you testified earlier that you always got everything, correct?

A. I believe so.

Q. Okay. You didn't mean to suggest that the Cook County State's Attorney's Office in every case always got all of the documents from the police department, did you?

A. Well, as far as I can tell, we did.

Q. Okay. So, for example, in this case, do you know why there are 30 pages of documents from the investigative file missing from Judge Wadas' file?

MS. ROSEN: Objection to the foundation.

THE COURT: Sustained.

MR. ART: I'll withdraw it. That's all I have.

THE COURT: Anything further?

MS. BARBER: Nothing further, Your Honor.

THE COURT: Okay. Thank you, sir. You may step down.

THE WITNESS: Thank you. Thank you.

(Witness excused.)

MR. SOTOS: Your Honor, defendants are going to

present the deposition of another unavailable witness,
Mr. Ruiz.

    THE COURT:  Okay.

    MS. GOLDEN:  And the reader's name is Jeffrey Kivetz.
Can you spell Kivetz?

    READER KIVETZ:  K-i-v-e-t-z.

          JEFFREY KIVETZ,

called as a reader herein, to read all answers given by George
Luis Ruiz:

        "DIRECT EXAMINATION

"BY MS. GOLDEN:

Q.  "Could you please state and spell your name for the record.

A.  "George Ruiz.

Q.  "George?  G-e-o-r-g-e?

A.  "G-e-o-r-g-e, R-u-i-z.

Q.  "Do you have a middle name or initial?

A.  "L.

Q.  "Standing for?

A.  "Luis.

Q.  "Do you have a nickname?

A.  "Yes.

Q.  "What's your nickname?

A.  "Froggy.

Q.  "And that was your nickname in -- and was that your
nickname in 1988?

A.  "Yes.

Q.  "How old are you, Mr. Ruiz?

A.  "44.

Q.  "In August 1988 or in 1988, did you live at 2453 North Francisco?

A.  "Yes.

Q.  "And who did you live there with?

A.  "With my mom.

Q.  "What is your mother's name?

A.  "Her name is Blanca, B-l-a-n-c-a.

Q.  "Ruiz?

A.  "No.  Mosquera, M-o-s-q-u-e-r-a.

Q.  "Okay.  Mr. Ruiz, are you currently employed?

A.  "Yes.

Q.  "And where are you employed?

A.  "Aabbitt Adhesives, A-a-b-b-i-t-t.

Q.  "What do you do for them?

A.  "I'm a shipping clerk.

Q.  "What facility do you work at, what address?

A.  "2403 North Oakley.

Q.  "And how long have you held that job?

A.  "In October, it will be seven years.

Q.  "Were you a member of the Maniac Latin Disciples in 1988?

A.  "Yes.

Q.  "And was -- hold on a second.

"Were -- what were the colors of the Maniac Latin Disciples in 1988?

A. "Black and navy blue.

Q. "Was Ramon Lopez a member of the Maniac Latin Disciples in 1988?

A. "No.

Q. "He wasn't?

A. "No.

Q. "Was he a member of any gang in 1988?

A. "Yes.

Q. "What gang was he a member of?

A. "He was a Maniac Campbell Boy.

Q. "And what are the colors of the Maniac Campbell Boys?

A. "Blue and red.

Q. "And how do you know that he was a member of the Maniac Campbell Boys in 1988?

A. "Because we went -- we grew up together. We went to school together.

Q. "Did you in 1988 know anyone by the name of Jacques Rivera?

A. "No, I did not.

Q. "Do you know anyone by the name of Jacques Rivera now?

A. "Yes, I do.

Q. "And who is this person?

A. "He is apparently the person that was released from jail.

Q. "How do you know him?

Deposition of George Luis Ruiz

3705

A. "I don't know him.

Q. "Have you ever met him?

A. "Yes.

Q. "When did you meet him?

A. "I met him while I was incarcerated.

Q. "Where?

A. "At Stateville Correctional Center.

Q. "When?

A. "I believe it was in 1999.

Q. "And what were you in jail for?

A. "I was in jail for an UUW, unlawful use of a weapon.

Q. "And what was he in jail for, the murder or -- or do you know what he was in jail for?

A. "I did not know what he was in jail for.

Q. "Did you talk to him?

A. "Yes.

Q. "Did you guys discuss the murder of Felix Valentin?

A. "No, we did not.

Q. "Have you ever discussed the murder of Felix Valentin with Mr. Rivera?

A. "No, I did not.

Q. "So you met Ace for the first time in prison?

A. "Yes.

Q. "Did you know Felix Valentin in 1988?

A. "Sure did.

Q. "And what was your relationship with him at the time?

A. "My relationship with him?

Q. "Yes.

A. "I was actually a real close friend with his two older brothers.

Q. "And what were his two older brothers' names?

A. "One was Israel Valentin; the other was Harry Valentin.

Q. "Were you ever -- have you ever been in a lineup with Ramon Lopez?

A. "I don't think so.

Q. "Have you ever been in a lineup with Ace?

A. "Not that I recall, no.

Q. "When is the last time you talked to Ace?

A. "1999.

Q. "When you were in jail?

A. "Yeah.

Q. "Do you remember -- how do you know they were detectives that picked you up?

A. "They were the regular detectives that were always around in the neighborhood.

Q. "Were they wearing street clothes or --

A. "Yes, street clothes.

Q. "Were they gang guys?

A. "They were probably Gang Crime, yes.

Q. "Did you have any problem -- did you have any objection to

going with the officers for the lineup?

A. "No.

Q. "What exactly did they say when they pulled up?

A. "They said, 'Hey, guys, we got the guy that shot Felix. Do you guys -- do you guys have any problems to coming down to take a lineup?'

Q. "So they did mention lineup when they stopped you on the street?

A. "Yes.

Q. "And did you have any problem with that?

A. "No.

Q. "And you said you remember the clothes you were wearing?

A. "Yes.

Q. "What were you wearing?

A. "I was wearing a black and yellow Kelvyn Park T-shirt.

Q. "And what is Kelvyn Park?

"Is that a local park in the area?

A. "No. It's a high school.

Q. "And how many of your friends went with?

A. "Two guys, plus me.

Q. "Okay. I'm going to show you a picture that we previously marked as Deposition Exhibit No. 4 and ask you if you recognize the person in that picture.

A. "Yes, I do.

Q. "Who is that?

A.     "That's me.

Q.     "Okay.  And is this how you looked in 1988?

A.     "As far as facial features, yes.

Q.     "Is this a picture of you on the day they picked you up?

A.     "I don't know.

Q.     "Are you wearing the T-shirt you think you were wearing when they picked you up?

A.     "No, I'm not.

Q.     "Have you ever seen this picture before, which we have marked as Deposition Exhibit No. 4?

A.     "No, I haven't.

Q.     "And how would you describe the shirt you are wearing in the picture?

A.     "It looks like it's black and white.  It looks like a sweater.

Q.     "You wouldn't call that your --

A.     "Kelvyn Park T-shirt?

Q.     "Right.

A.     "No.

Q.     "Okay.  I'm now showing you what we've marked as Deposition Exhibit No. 5 with today's date.

       "Do you recognize the person in that picture?

A.     "Yes, I do.

Q.     "And who is that?

A.     "That's Ray Lopez.

Q. "And have you ever been in a lineup with this man?

A. "No.

Q. "The clothes you are wearing in Deposition Exhibit No. 4, are those your clothes?

A. "I'm not sure.

Q. "Do you remember wearing that shirt ever?

A. "No.

Q. "All right. I'm showing you what we have marked as Deposition Exhibit No. 3 and ask you if you recognize the person in that photograph."

        MS. GOLDEN:  Page 34.

"BY THE WITNESS:

A. "Yes.

"BY MS. GOLDEN:

Q. "Who is that?

A. "That's Ace.

Q. "And is that how he looked when you knew him?

A. "No.

Q. "How was his appearance different when you knew him?

A. "He was a lot heavier, and he didn't have all that hair.

Q. "You mean hair in the back?

A. "Just hair, period.

Q. "Okay.

A. "He was like a -- a crew cut hair.

Q. "But the face was the same, except for maybe a little

Deposition of George Luis Ruiz

3710

fuller?

A.  "Yes.

Q.  "So what happened after they asked you to go to the station with them?

A.  "We went to the station.  They put me in a room.

Q.  "What kind of room?

A.  "It was a small room, maybe eight by six.

Q.  "The lineup room?

A.  "Yeah, the lineup room.

Q.  "How long were you at the police station total?

A.  "I'm not quite sure.

      "Must have been maybe about two hours.

Q.  "And how many days after the shooting was it?

A.  "Like three or four days.

Q.  "And how was it -- how is it that you remember that?

A.  "What?

Q.  "That it was only three to four days after the shooting?

A.  "Just vaguely remember stuff, you know.

Q.  "How many lineups have you been in in your life?

A.  "Maybe about 15, 16.

Q.  "How many of them were before the shooting?

A.  "I really can't remember.

      "But I would say maybe about eight.

Q.  "And about eight or so afterwards as well?

A.  "Yeah.

Q. "Is that a yes?

A. "Yes.

Q. "Okay. Did your friends go with you into the lineup room?

A. "No.

Q. "Did you go directly from the front door of the station into the lineup room, or did you hang out somewhere in between?

A. "No. They took us into like an interrogation room.

Q. "All three of you?

A. "Yes.

Q. "And how long were you in the interrogation room?

A. "About 45 minutes.

Q. "What were you guys doing in there?

A. "They just had us sitting in there, sitting.

Q. "Okay. Did anybody from the police station talk to you while you were in there?

A. "No.

Q. "Do you know Rey Guevara?

A. "Excuse me?

Q. "Do you know Rey Guevara?

A. "Is that the officer?

Q. "Well, do you know a man by the name of Rey Guevara -- Officer Guevara?

A. "Officer Guevara, yes. I know Officer Guevara.

Q. "And did you see him when you were at the police station for the lineup?

A. "No.

Q. "Okay. I'm going through -- show you what we have marked as Deposition Exhibit No. 9 and ask you if you saw that woman at the police station when you were there for the lineup."

THE COURT: It's not up yet. Are we having another problem?

MS. GOLDEN: I think we're working on it.

Nope. Do you want me to go somewhere else and come back to it? It's pretty discrete.

THE COURT: Well, if you can.

MS. GOLDEN: I can.

"BY MS. GOLDEN:

Q. "So you were in -- what kind of room did you call it?

A. "An interrogation room.

Q. "Interrogation room?

A. "For --

Q. "For 45 minutes or so, with your two other friends?

A. "Yes.

Q. "And nobody really was talking to you guys at the time?

A. "No.

Q. "What were you talking about?

A. "We were just talking about, you know, all the stuff that guys talk about.

Q. "Were you talking about the shooting?

A. "No.

Q. "Did the two friends of yours that you went to the police station with, did they also know Felix, Moe, and Harry Valentin?

A. "I believe so.

Q. "Were they also friends of his?

A. "I believe so.

Q. "And you don't remember their names still?

A. "No.

Q. "Are you not friends with those people anymore?

A. "No, I -- I haven't been in the neighborhood for quite some time. I got out of the penitentiary in 2001, and I haven't been over there since.

Q. "So is it that you don't remember who was with you, or you don't remember their names?

A. "I don't remember their names.

Q. "But as you sit here today, you have a memory of their faces?

A. "If I can see the pictures, then maybe I can tell you their names, if I know their real names because ...

Q. "So you're in the interrogation room for 45 minutes with your two friends.

"And then what?

A. "Then they came and got me.

Q. "Who is 'they'?

A. "The officers.

Q. "The same two officers that picked you up --

A. "No.

Q. "-- or two different people?

A. "Two different guys.

Q. "What did these guys look like?

A. "Just detectives, you know; I'm not really -- you know.

Q. "Well, do you know either one of their names?

A. "No.

Q. "Can you describe them in any way, their physical appearance?

A. "White guys.

Q. "More white guys?

A. "Yeah, big guys. Same -- you know.

Q. "And what did they tell you?

A. "They said, we're going to go into the lineup now, and they took me into the room.

Q. "Just you, or did they take your friends as well?

A. "No. Just me.

Q. "What did they tell you, other than, come on, let's go, we're going into a lineup?

A. "They just said not to speak out, not to say anything because that -- the guy who shot us -- the guy who shot Felix was going to be standing next to us.

Q. "How did you feel about that?

A. "I was -- I was angry, you know.

"But at the same time, I wanted -- I wanted, you know, the guy who got Felix to go to jail, you know.

Q. "So this officer that you can't describe, or one of the officers, neither of whom you can't describe, other than he was a big white guy, told you that the guy who shot Felix was going to be standing right next to you?

A. "Yeah.

Q. "And did he -- did that officer know that Felix was your friend?

A. "Yes.

Q. "How do you know that?

A. "Because Felix was from the neighborhood, and everybody in the neighborhood knows each other.

Q. "What else did the officers tell you before the lineup?

A. "That he -- that they didn't want -- he didn't want no crazy stuff going on in that room.

Q. "Did anybody join you and your two friends in the interrogation room during the 45 minutes that you were there?

A. "No.

Q. "And you were the only ones selected for the lineup, right?

A. "Yeah.

Q. "So you go into the lineup room now, right?

"And you say this takes about 15 minutes?

A. "The lineup itself?

Q. "Tell me, how long did it take?

A. "The lineup itself took about maybe 25 minutes.

Q. "What took -- what happened during the course of the lineup?

A. "They had six people lined up.

Q. "When you go into the lineup room, who else is there?

"Or are you the first one in the room?

A. "Yeah, I was -- no. It was -- two guys were there already, and they took me in there, and then they brought in three other people.

Q. "So two guys were there when you get there?

A. "Uh-huh.

Q. "And can you describe them at all?

A. "No.

Q. "Hispanic males?

A. "Yes.

Q. "You come in. And I take it you don't know how long the two guys had been in there before you?

A. "No.

Q. "Did you recognize those two guys?

A. "No.

Q. "Could you tell me what gang they were in?

A. "No.

Q. "And then you joined them.

"How long were you there before they bring the other folks in?

A. "Maybe 15 minutes.

Q. "And how many did they have bring in?

A. "They brought in three extra guys.

Q. "Are you sure they brought in three extra guys?

A. "Yes.

Q. "And can you describe -- did you recognize any of them?

A. "Yes.

Q. "And who did you recognize?

A. "I recognized two of them.

Q. "And who is that?

A. "One of them we know as brothers; they're Latin Kings.

"And one of them is named Nicky, and the other one is named Joey.

Q. "When you say they're brothers, what does that mean?

A. "They're blood brothers.

"They're actual brothers.

Q. "Okay. And did they have the same last name?

A. "Oh, I don't know their names. I don't know their last names.

Q. "So those are nicknames?

A. "Yes."

        MS. GOLDEN: I'm sorry. I'm missing a line.
"BY MS. GOLDEN:

Q. "How do you know they were Latin Kings?

A. "Because they're our rival.

Deposition of George Luis Ruiz

3718

Q.  "But you recognize them from the streets?

A.  "Yeah.  Just because they're Latin Kings doesn't mean you don't know them, you know, I mean.

"They're only across the park, you know, so to speak.

Q.  "And are these the scruffy looking guys?

A.  "Yes.

Q.  "And the third person, did you recognize that person?

A.  "No, I did not.

Q.  "When you were in jail with Ace, did he ever tell you he knew you --

A.  "No.

Q.  "-- from the street?

"And this third person, did he appear to you to be a Latin King as well?

A.  "No.

Q.  "But did he seem to be with the brothers?

A.  "They brought them, all three of them -- all three of them were brought in together.  That's all I can say.  I didn't ...

Q.  "And did all three of them look scruffy?

A.  "Yes.

Q.  "And how much time elapsed between the time that you were brought into the lineup room by the officer and the time that the three others were brought into the room?

A.  "About 15 minutes.

Q.  "Did the police tell you anything other than, you know,

where to stand and all that, after they brought you into the room?

A. "Yeah. They ...

Q. "Did they talk about the case anymore?

A. "No. No.

Q. "All right. So what happened?

A. "So they just told us they didn't want no monkey business going on in the room and just follow -- follow directions, basically.

Q. "And what were the directions that you were given?

A. "Just stay looking forward.

"And when your number is called, you walk up to the glass, turn to the right, turn back to the glass, and then walk back to your spot in the line.

Q. "So most of the time you spent in the lineup room was spent waiting for these last three guys to get there?

A. "Yeah.

Q. "Do you remember what number you were?

A. "No, I don't.

Q. "Do you remember if you were first or last?

A. "I know I wasn't first or last. I might -- I know I was in the middle. I might have been number three or something like that.

Q. "All right. I'm going to show you what we've marked as Deposition Exhibits 1, 2, and 6.

"Are any of these guys the brothers --

A.   "No.

Q.   " -- that you just told me about?

A.   "No.

Q.   "Do you recognize any of the people in these photographs?

A.   "No.

Q.   "Were any of these people depicted -- were any of these people depicted in Exhibits 1, 2, and 6 in the lineup that you were in shortly after Felix's murder?

A.   "No.

Q.   "Okay.  So did they call everybody up to the window and turn left and then step back into the line?

A.   "One by one.

Q.   "And then what happened?

A.   "Then after everyone was done, they took me back to the neighborhood.  The officers, they took me back to the neighborhood.

Q.   "Did you go back to the interrogation room first to where your friends were?

A.   "No.

Q.   "Had your friends already left by the time you were --

A.   "Yeah.  They were already gone.

Q.   "How did they get home?

A.   "I have no idea.

Q.   "How did you get back?

A. "The officers took me back.

Q. "The same two officers who picked you up or the two officers who ran the lineup?

A. "Two different officers.

Q. "Are these two -- are these the officers that conducted the lineup?

A. "No.

Q. "This is a third set of officers?

A. "Yes.

Q. "Can you describe either of them?

A. "No. It was -- no, I can't describe them.

Q. "What if anything did they say to you about the results of the lineup?

A. "Nothing.

Q. "Did anyone at the police station tell you anything about the results of the lineup?

A. "No.

Q. "Did anyone take your photograph while you were at the police station for the lineup?

A. "Probably. I'm not sure.

"But I guess standard procedure, they -- they do take pictures.

Q. "Do you remember anybody taking your picture when you were there for the lineup?

A. "No.

Deposition of George Luis Ruiz

3722

Q. "Have" you ever seen a picture of that lineup?

A. "No.

Q. "Did you see Ramon Lopez at the station that day?

A. "No.

Q. "Did you see anyone else you knew at the station that day other than the two guys you came with?

A. "No.

Q. "Now, at some point in time you became aware that Felix had passed, right?

A. "Yes.

Q. "And who told you that?

A. "His brother Harry.

Q. "And how -- when was that?

A. "That was maybe three weeks after the incident.

Q. "After the shooting?

A. "Yeah.

Q. "And how long had Felix been dead when Harry called you?

A. "When Harry told me?

Q. "Right.

A. "Maybe -- I don't know. Four or five days.

Q. "And what did he say to you and what did you say to him?

A. "He told me, my brother passed away.

"And we were saying, you know, I thought he was going to be okay. Well, he was fine, then he got pneumonia, and he didn't come out of it.

Q. "So Harry was surprised he passed away?

A. "Yeah. He was shocked. He was -- he was his little brother.

Q. "When you were in the interrogation room, was the door closed?

A. "Yes.

Q. "Did it have any windows?

A. "No.

Q. "Did you -- was the door closed the whole time?

A. "Yes.

Q. "Do you know whether or not there were any other lineups taking place while you were in the interrogation room?

A. "No.

Q. "How far away from the interrogation room is the lineup room?

A. "I want to say about 20 feet.

Q. "Can you see -- if the door is open to the interrogation room, can you see the door to the lineup room?

A. "I don't think so.

Q. "What station was it?

A. "Grand and Central.

Q. "And how many times had you been there before?

A. "A lot.

Q. "How many, about?

A. "Maybe like 20.

Q. "Okay. Twenty times before the shooting?

A. "Yeah.

Q. "And how many times since?

A. "Another 15 or so.

Q. "So 20 times before the shooting?

A. "Yes, 20.

Q. "And about 15 times afterwards?

A. "Yes.

Q. "So you are familiar with the facility?

A. "Yes.

Q. "How many interrogation rooms are there -- or were there in 1988?

A. "I don't know.

Q. "More than a couple?

A. "Yes.

Q. "How would you describe the lineup room?

A. "Small.

Q. "You said six by eight?

A. "Yeah, eight by six, three room -- three walls and a mirror.

Q. "Any furniture?

A. "No.

Q. "Do you remember anything that was said by the officers on the way home?

A. "No.

Deposition of George Luis Ruiz

3725

Q. "Do you know who viewed the lineup?

A. "No.

Q. "Do you know if anyone -- anybody viewed the lineup?

A. "No.

Q. "Do you know how many people could have viewed the lineup?

A. "No.

Q. "Did you know in 1988 someone by the name of Carlos Olivero?

A. "No.

Q. "Did you know in 1988 someone by the name of Angel Villafane?

A. "No.

Q. "Did you know in 1988 someone by the name of -- I already asked you, did you know Orlando Lopez?

A. "No.

Q. "Did you ever talk to Felix after the shooting before he died?

A. "No.

Q. "Is it possible that you were in a lineup unrelated to Felix Valentin's shooting just because you -- simply by virtue of the fact that you were at the police station that day?

A. "Sure.

Q. "That's happened to you before, hasn't it?

A. "No.

Q. "Have you ever been asked to volunteer for a lineup?

A.   "No.

Q.   "You've never been a filler?

A.   "No."

        MS. GOLDEN:  Do we have deposition Exhibit 9?  Okay.

"BY MS. GOLDEN:

Q.   "Okay.  I'm going to show -- I'm going through -- I'm going to show you what we have marked as Deposition Exhibit No. 9 and ask you if you saw that woman at the police station when you were there for the lineup.

        "Do you remember seeing her?

        READER KIVETZ:  What page --

        MS. GOLDEN:  I'm sorry.  We're back on page 48.

        MR. LOEVY:  At the bottom.

"BY THE WITNESS:

A.   "No, I don't remember seeing her."

        MS. GOLDEN:  And that concludes the reading of the deposition.

        THE COURT:  Thank you.

        MR. SOTOS:  Judge, the defendants have still another unavailable witness --

        THE COURT:  Okay.

        MR. SOTOS:  -- deposition to read, Thomas Bryant.

        THE COURT:  Okay.

        MR. GIVEN:  Appears unavailable in more than one respect, Your Honor.

THE COURT: Okay. This is our reader, correct?

MR. GIVEN: Correct.

You have to state your real name and spell it for the court reporter, please.

READER ENGQUIST: Sure. Josh Engquist, E-n-g-q-u-i-s-t.

JEFFREY N. GIVEN, JOSH ENGQUIST, called as readers herein, to read all questions by Ms. Ekl and answers given by Thomas B. Bryant:

"DIRECT EXAMINATION

"BY MS. EKL" (Read by Mr. Given):

Q. "Could you please state your first and last names and spell your last name for the court reporter.

A. "Thomas, middle initial B. as in boy, Bryant, B-r-y-a-n-t?

Q. "And you are a reverend, correct?

A. "Yes.

Q. "So is it okay if I call you Reverend Bryant throughout the course of this deposition?

A. "You can call me Thomas, that's fine.

Q. "Okay. What is your date of birth?

A. "April 7th, 1949.

Q. "And how old does that make you today?

A. "Sixty-four.

Q. "All right. Reverend Bryant, did you do anything to prepare for your deposition here today?

A. "No.

Q. "Did you meet with anyone?

A. "I met with Steve.

Q. "And that's Steve Art, who is sitting to your left?

A. "Yes.

Q. "When did you meet with Mr. Art?

A. "About an hour ago.

Q. "And I see you're looking over at him.  He can't assist you in answering the questions today.

A. "I understand.

Q. "Is that the first time that you met Mr. Art?

A. "Yes.  Telephonically, we've talked to each other.

Q. "And how many times have you talked to Mr. Art prior to coming here today?

A. "Over the phone?

Q. "Yes.

A. "Approximately five to ten times.

Q. "Okay.

A. "I'm looking, but I'm not ...

Q. "That's fine.  When was it that you first met Mr. Art over the telephone?

A. "I can't remember that.

Q. "Was it within the last year?

A. "Yes.

Q. "What was the nature of the five to ten phone calls that

you've had with him during the course of that year?

A. "Concerning Jacques -- Jacques Rivera.

Q. "And during each of those conversations, was he asking you questions about things that you knew about Jacques Rivera?

A. "What I could remember -- not about Jacques, about what Orlando Lopez and I discussed -- well, not discussed. But I counseled him -- he and his wife. My wife and I counseled those two.

Q. "Okay. I'll get into -- into -- I'll get more into that in a little bit more detail.

"As far as your conversations with Mr. Art, taking aside what you told him that you had knowledge about, did you tell -- did he tell you anything about the pending lawsuit?

A. "No.

Q. "Did he tell you anything about Jacques Rivera in general?

A. "No. That he's out of prison and things like that, things that I already knew.

Q. "Did he talk to you at all about the Chicago Police Department?

A. "Yes.

Q. "And what did he tell you about the Chicago Police Department?

A. "That -- he told me that the Chicago Police Department, some of them are -- how can I put this -- that some of the policemen, they did some things that weren't proper.

Q. "Did he tell you the names of any --

A. "No.

Q. "-- officers that he was referring to?

A. "No, I can't remember any of the names.

Q. "Did he tell you that any Chicago police officers involved in the investigation of the case involving Jacques Rivera did anything improper?

A. "No.

Q. "Does anything that Mr. Art told you about the Chicago Police Department in any way taint or change your testimony here today in terms of the things that you had learned from Mr. -- from Orlando?

A. "No.

Q. "Did you look over any documents in preparation for your deposition here today?

A. "I was going to, but I didn't.

Q. "What documents were you going to look at?

A. "The affidavit I gave Mr. Art.

Q. "Was that the affidavit from this year?

A. "Yes.

Q. "Okay. And what was it that caused you not to look at it?

A. "Because I wanted it to be fresh. I wanted it to be off the top of my head, and I just wanted to -- I didn't want to.

Q. "Okay. Did you look over any transcripts?

A. "No.

Q. "Reverend, where do you currently live?

A. "631 Lincoln Street, Steelton.

Q. "Do you live there with anyone?

A. "My wife.

Q. "Is your wife Nellie Bryant?

A. "That's her.

Q. "She's also a pastor?

A. "Yes, she is.

Q. "Where did you live in 1988?

A. "361 Lincoln Street, Harrisburg.

Q. "That would be 631?

A. "631 Lincoln Street, Harrisburg.

Q. "Are you currently employed?

A. "We are retired, but I'm a pastor in New Birth Christian Fellowship.

Q. "How long have you been a pastor at New Birth Christian Fellowship?

A. "Since its existence, which is six years.

Q. "Prior to that, were you a pastor or an assistant pastor anywhere else?

A. "I've been a pastor in some capacity for almost 40 years.

Q. "Directing you back to 1998, were you acting as a pastor at that time?

A. "Yes.

Q. "Where was that?

A.   "That was Global Outreach Christian Center.

Q.   "How long did you work there?

A.   "Fifteen years.

Q.   "As a pastor at Global Outreach Christian Center, can you just generally describe to me the types of duties and things you did in that capacity?

A.   "Marriage ceremonies, counseling.  I worked with the men's ministry.  I taught -- I caught Bible studies.  I preached.  I traveled to different countries.  That's about it.

Q.   Approximately how much of your time did you spend counseling individuals?

A.   "It depended on the severity of the counseling and -- but we -- my wife and I primarily did all the counseling.  At that particular time, I was married, like, 35 years.  I think I have something to say concerning marriage.

Q.   "In addition to being a pastor, have you held any other types of employment?

A.   "Yes.

Q.   "Where was the last place that you were employed?

A.   "I worked for a private company called Shore -- I think it was Shore to Shore Ship, something like that.  I helped extradite undocumented individuals to Texas, Louisiana, Miami, places like that.

        "And then I was also I -- I did security for Harrisburg High School.  I did drivers education for a private

company. I forgot the name of the company now. And prior to that, I was a criminal investigator for the Pennsylvania Office of the Attorney General.

Q. "And how long did you work as a criminal investigator?

A. "I worked for 19 years. And 11 years, I worked as an inspector for the Pennsylvania Department of Transportation.

Q. "What were your duties or what types of crimes did you investigate when you worked as a criminal investigator for the Attorney General's Office?

A. "It was all -- some white collar. We did everything. Every -- anything that the district attorneys deemed necessary for us to investigate, we would investigate.

"I did -- my last part of my tenure, I was part of the CHRIA, Criminal History Records Information Act, where we went to -- to law enforcement, the police departments, clerks of the courts, DAs, district judges, to see if they were in compliance with the Chapter 91 of the Criminal Code, how they handled, how they disseminated, how they expunged all the criminal history. We followed the -- an inmate from the time he was arrested all the way to final disposition.

Q. "And as far as when you were working as an inspector for the Pennsylvania Department of Transportation, what were your general job duties during that time?

A. "I worked primarily on bridges and roads, making sure the contracts came up to specs.

Deposition of Thomas B. Bryant

3734

Q. "When did you first meet Orlando Lopez?

A. "I met him around 1998, something like that.

Q. "Do you remember how it was that you met him?

A. "I do.

Q. "How was that?

A. "It was a counseling session.  He and his wife, my wife and I, we met in our office at Sycamore Street in Harrisburg.

Q. "So that was the very first time you met Orlando?

A. "No, no.  He was a member of our church.

Q. "Okay.

A. "Yes.  He moved to Harrisburg from Cleveland.

Q. "So how long had you known him as a church member prior to the time that you started counseling him?

A. "I can't remember that.

Q. "Was it over a year, under a year, if you can remember?

A. "I can't remember that.

Q. "Before you began counseling him, did you know anything about his background in terms of any involvement he may have had as a witness in any criminal --

A. "No.

Q. "-- cases in Chicago?

"When you -- when you began counseling him, that was for marriage counseling; is that correct?

A. "Yes.

Q. "And what was the name of his wife --

A. "I can't remember.

Q. " -- at the time?

A. "I can't remember -- Mrs. Orlando -- no, I'm just kidding. I can't remember his wife's name. But I also counseled his daughter -- his sister and her husband also. And I think the husband -- his sister's husband took her last name. Yes. That's very different. That's why I remember that.

Q. "Right.

A. "And I think his mother was here for a while also in the area.

Q. "How did the counseling sessions work in terms of -- were you one on one with Orlando, or was it you and your wife and Orlando and his wife? How did the sessions operate?

A. "It was my wife and I and Orlando and his wife, because we all -- we all came together, that's how we met -- did our counseling session.

Q. "And was that the same -- did you all four meet for each session, or were there ever any individual sessions?

A. "We met all four of us every time, yes.

Q. "Approximately how many times in total did you meet with Orlando and his wife?

A. "I can't remember that. I'm sorry.

Q. "Would you say less than five times or more than five?

A. "I can't really -- I'm sure it was more than five times, around five times or more, because he -- he was -- he was very

Deposition of Thomas B. Bryant

3736

distraught about some things.  And he -- him and his wife weren't getting along, so that took more time, I'm sure.

Q.  "Do you remember about how many sessions it took before he started --

A.  "Opening up?

Q.  "-- opening up about things that were going on with his past life?

A.  "About two or three times.

Q.  "And other than the relationship --

A.  "Can I --

Q.  "Absolutely.  I don't want to cut you off.

A.  "Only because we didn't want to jump right into his past. We were finding out what was going on with him, and then -- and about the second or third one, then we got -- went into his past.  We figured it was in his past.

Q.  "What do you remember as far as that first session when he first opened up about his past, what do you remember in terms of what he told you?

A.  "The first time that he -- we met?

Q.  "No.  The first time that he brought up his past, how did that come about?  Basically, what did he say to you that kind of started that dialogue?

A.  "He was crying.  He was very distraught.  He was very emotional.  We had -- we said something else has to be wrong for you to be like this.  So what is it?  You know, what's --

what's -- that's how it came about.

Q. "And what did he tell you in response to you saying that?

A. "He told us that when he was a teenager that he testified against a person, and that person wasn't the one that actually committed a murder.

Q. "Did he say anything further during that first session where he's opening up about his testimony or what led him to testify falsely or anything else of that sort?

A. "He said -- no. He just said he went -- he testified against this person, and he realized -- I don't know how -- but he said he wasn't the right one, and he recanted his statement to the police department.

Q. "Did he tell you that he had recanted --

A. "Yes.

Q. "During that first session when he's telling you that he had testified falsely, is it during that session that he had said he had recanted to someone?

A. "I believe so, yes.

Q. "And were those the words he used?

A. "No. Those are my words.

Q. "Okay. What did he tell you?

A. "He said he testified against an individual, that -- and that was the wrong individual that was convicted.

Q. "Okay. But when you said that he recanted to somebody --

A. "Those were my words.

Q. "Okay. But what did he say that leads you to say that he recanted?

A. "He was very distraught, and he was crying, and he said he testified against a man that did not commit the murder. Those were his words.

Q. "Okay. And is that all that you can remember him saying from that first session?

A. "I remember him saying that that's why he was in Cleveland and that what -- and that they more or less helped him go to Cleveland and get out of Chicago, the police department or whomever. And he got a job. And I remember this very succinctly. He got a job washing windows and doing aluminum siding, or vinyl siding, and the -- and the job transferred him to Harrisburg. That's how he got to Harrisburg.

Q. "Okay. You said that they -- and you thought the police department -- helped him get out of Chicago?

A. "Yes.

Q. "Is that something that you specifically, as you sit here today, remember him telling you during that session, that the police department helped him get out?

A. "Absolutely.

Q. "Okay. Did he tell you how it was that they helped him get out of Chicago?

A. "No.

Q. "Did he tell you why they helped him get out of Chicago?

A.    "No.  But I -- can I assume?

Q.    "No.  I don't want you to guess.  I'm just asking --

A.    "No, he didn't.

Q.    "-- what he actually told you.

A.    "Absolutely.

Q.    "Did he ever tell you during that first conversation that when he was back in Chicago before he came to Cleveland, that he had ever told anyone back then that his testimony was untrue or --

A.    "Yes.

Q.    "-- was false?

       "He did tell you that?

A.    "Yes.

Q.    "And what did he say about that?

A.    "He said he told the authorities that he -- that what he stated was not true, and he wanted to make it right.

Q.    "Did Orlando tell you that he had testified in front of a judge --

A.    "Yes.

Q.    " -- in a criminal trial?

A.    "Yes.

Q.    "When he told you that he told the authorities that what he had said was not true, was that -- did he tell you that that was before or after he testified in front of the judge?

A.    "I think it was after.

Deposition of Thomas B. Bryant

3740

Q.  "Okay.  And did he give you any more specifics in terms of who it was that he told?

A.  "No.

Q.  "Did he tell you what, if anything, happened after he had testified and after he had told the authorities that this testimony was inaccurate?

A.  "No.

Q.  "Did you ask him?

A.  "I can't remember if I did or not.

Q.  "Is it fair to say that at the time that you're having this conversation with Orlando -- and now I am asking you to give me your perception --

A.  "Okay.

Q.  "-- that he seemed to be having a lot of guilt at that time --

A.  "Yes.

Q.  " -- over what had taken place?

A.  "Yes, absolutely.

Q.  "Did he actually tell you that he was experiencing feelings of guilt?

A.  "Guilt and remorse, yes.

Q.  "And did he tell you specifics in terms of why he was feeling guilt and remorse?

A.  "Because an innocent man was in prison.

Q.  "And did he tell you that that was based on his testimony?

A. "Yes.

Q. "During that initial conversation, did you go into more detail about why it was that he testified falsely or how it was that he came to be involved in those circumstances?

A. "No.

Q. "Okay. Did you have later conversations with him in later sessions that you got into more detail about his involvement?

A. "No.

Q. "At any point in time, did he tell you whether or not he had, in fact, observed a murder?

A. "I can't remember that.

Q. "Do you remember if he ever told you that his testimony about being present for a murder was true or false?

A. "I understand it was false. He said he initially -- he told the authorities that -- that the gentleman -- I don't -- who I know now is Jacques Rivera -- committed the murder. Then he said later that that wasn't the one who actually committed the murder.

Q. "I think my question isn't clear then. My question is whether or not -- did he tell you whether he observed a murder --

A. "Oh.

Q. "-- taking aside whether it was Jacques or not?

A. "He said he observed it, yes.

Q. "And did he tell anything about what he observed?

A.  "No.  I didn't ask him.

Q.  "Did he explain to you at all how it was that he began talking to the police?

A.  "No.

Q.  "Did he tell you anything about what he initially told the police?

A.  "That he testified against Jacques Rivera and later said it wasn't true.

Q.  "And what I'm talking about is specifically, prior to his testimony, did he tell you that he ever had a conversation with police officers about what he saw before he testified?

A.  "I'm not sure.

Q.  "Did he ever tell you why it was that he testified falsely?

A.  "No.

Q.  "Did you talk to him about what he should do to remedy the situation?

A.  "I told him he needed to go to the authorities.  An innocent man was in prison.

Q.  "And when you told him" --

        MR. GIVEN:  Bless you.

"BY MS. EKL" (Read by Mr. Given):

Q.  "And when you told him he should go to the authorities, was this still back in 1998?

A.  "Yes.

Q.  "Do you know whether or not he did that back in 1998?

A.   "No, I didn't -- I didn't know at that particular time, no.

Q.   "Was his wife present for each of the conversations where he was talking about his testimony and the fact that it was false?

A.   "Yes.

Q.   "And not to -- I just want to make sure we have it clear. So Orlando told you that he testified in a criminal trial, correct?

A.   "Uh-huh.

Q.   "I'm sorry.  Is that yes?

A.   "Yes.

Q.   "And he told you that sometime after the criminal trial, he went to authorities and told them that what he testified to was false, correct?

A.   "Correct.

Q.   "But he didn't tell you anything about what took place in terms of his involvement with the investigation and the police officers prior to testifying?

A.   "No.

Q.   "Did Orlando tell you how long after the trial it was that he went to the authorities?

A.   "I can't remember that.

Q.   "Is there anything else that you can remember about what he told you about going to any authorities after the criminal trial?

Deposition of Thomas B. Bryant

3744

A.  "No.

Q.  "At some point, did Orlando and his wife move away from the Harrisburg area?

A.  "Yes, they did.

Q.  "When was that?

A.  "Oh, I'm not -- I'm not absolutely sure of the time, but I know he came back to Harrisburg once or twice to church.  He loved the church, so he came back when he was -- when he was in Cleveland.

Q.  "Do you know when that was?

A.  "No, I don't.

Q.  "Is there anything else that he told you about the circumstances of making a false statement during the course of the criminal trial that you can recall that you haven't already told me about?

A.  "No.

Q.  "Is there anything else about his statement to the authorities afterward that you can think of that you haven't told me already?

A.  "No.

Q.  "Okay.  During those couple of occasions that you said Orlando came back to Harrisburg, did you see him during those occasions?

A.  "Yes, I did.

Q.  "And did you ever talk to him about his testifying falsely

in Chicago?

A.  "No.

Q.  "Did you ever ask him if he had gone to the authorities to try to remedy the situation?

A.  "No.

Q.  "So was the last conversation that you ever had with Orlando about the fact that he falsely testified in Chicago, was that back in 1998?

A.  "Yes.

Q.  "After 1998, when was the next time you had any conversation with anyone about Orlando and his involvement in the murder investigation?

A.  "Actually, it was around 2011.

Q.  "And who was it that you had contact with?

A.  "Orlando called me on the telephone.  My number is on -- on my cell phone.

Q.  "And what did he tell you at that time?

A.  "He told me that the Northwestern -- Northwestern University, that unit there.

Q.  "Would you say the exoneration project or the --

A.  "Yes.  They would be contacting me.  And at that particular time, I told him I didn't want to talk to him anymore.

Q.  "Didn't want to talk to Orlando?

A.  "No.

Q.  "I'm sorry.  Let me make sure my question -- you're

answering -- that you're answering the right question.

"Did you tell Orlando that you did not want to be talking to him?

A. "Orlando, yes.

Q. "Why was that?

A. "Because I knew from my background that that might come up in the future, that I might have to testify. So I didn't want my testimony to be tainted by talking to him.

Q. "So you felt that you may have to testify in a criminal proceeding --

A. "Exactly.

Q. "-- involving Jacques Rivera, correct?

A. "Exactly.

Q. "And you were afraid that if Orlando talked to you, it would taint your testimony in Jacques Rivera's case; is that accurate?

A. "Exactly.

Q. "So was that the full substance of your conversation with Orlando, just --

A. "It was brief.

Q. "-- that you might be contacted?

A. "It was very brief. And he -- yes, that's the extent of the conversation.

Q. "Okay. And just to make sure, did he say anything to you about the fact that he told Northwestern the truth?

A. "I can't remember that. I can't remember that.

Q. "After that 2011 phone call with Orlando, were you contacted by someone from Northwestern?

A. "I was.

Q. "And were you contacted in person or over the phone?

A. "Over the phone.

Q. "When was that?

A. "Right after I got back from California. So a week later. It was in August. Wait a minute, I'm -- I can't remember when it was.

Q. "Okay. Who was it that called you?

A. "Someone from Northwestern University.

Q. "Do you remember the name of the person?

A. "No, I don't. I had all that -- that information, but I -- I didn't even look at that again, because I -- I have all the information at home. I didn't even look at it.

Q. "Okay. So when you say that you have all the information at home, have you kept notes of your conversations with the different individuals?

A. "No.

Q. "Have you ever taken any notes about the things that Orlando told you?

A. "No -- initially, I did. And I think I destroyed my notes, because I have to -- I have to report to my senior pastor. So I did -- we took -- we took -- initially we took notes, and

then I destroyed them.

Q. "Before you destroyed the notes, did you provide copies of those notes to anyone?

A. "No. I just told my pastor what transpired. He was -- he was -- he was my -- I have to -- I have responsible -- he was my senior pastor, so I had to report to him. So that's what -- that's the way it went.

Q. "Going back to the phone call that you initially had with someone from Northwestern, do you remember if that was a female or a male who called you?

A. "Female.

Q. "And if you can, describe as best you can what that person said to you and what you said to them.

A. "Okay. They said they wanted to bring me to Chicago and take an affidavit, do an affidavit. And the next day or so, I was on the phone -- I was on a plane to Chicago.

"And the hearing for Jacques Rivera was the next day. So I had to be there the day before. And when I got there, I was interviewed by two attorneys. I forgot -- State's Attorneys? And my -- my testimony wasn't allowed. But the judge said -- she said that it's hearsay information, so my testimony wasn't -- I went there to testify, but I wasn't -- the testimony wasn't allowed.

Q. "Prior to them saying we want you to do an affidavit, did they talk to you to find out whether or not you knew anything?

A. "Oh, of course. I'm sorry. I sort of the jumped.

Q. "All right. Let's go back to that part.

A. "Okay.

Q. "Let me ask you what they asked you and what you told them in relation to your knowledge about Orlando at that time.

A. "They asked me did I know Orlando, and I said yes. And what was the nature of our involvement; I said I was his pastor. And then they said, what else do I know about Orlando; and then I told them that ten years prior to that, he told me that he testified against an individual, that was not true. And that's what -- that's what I told them.

Q. "When you talked to the people from Northwestern, did they explain to you what their role or what their involvement --

A. "Yes.

Q. "-- was in the case now -- I mean at that time, in 2011?

A. "Basically, yes.

Q. "What did they tell you?

A. "That they were working on the case to get Jacques Rivera exonerated. Unlawful conviction unit.

Q. "Did they tell you anything about any conversations that they had had with Orlando?

A. "No.

Q. "When you were talking to them, did you have any concerns about divulging any type of privileged information or things that were secret in terms of your counseling sessions?

A.  "No.

Q.  "Why was that?

A.  "Because it was ten years ago, and this -- this -- some things -- I'm not a lawyer-client type.  It wasn't that relationship.  So, no.  I was at liberty to divulge whatever transpired there because this was somebody's life at stake.

Q.  "Okay.  In general, your sessions with any of the people that were in the church, your counseling sessions, were those things that you would have -- that you considered confidential in general, or were they all --

A.  "Oh, yes --

Q.  "-- generally --

A.  " -- they were confidential.

Q.  "And what was it about this specific conversation with Orlando that made it no longer confidential?

A.  "Because another individual was involved other than what happened in -- other than what happened in the counseling session.

Q.  "When you were initially counseling Orlando and he started telling you about the fact that he had testified falsely against an individual, did you let him know at that time that whatever he said you would no longer be able to keep it confidential?

A.  "Absolutely, because I have to notify my senior pastor.

Q.  "Okay.

Deposition of Thomas B. Bryant

3751

A.   "That's number one.

Q.   "Other than notifying your senior pastor, was there anyone outside of that counseling session that you told -- that you talked to about what Orlando had told you about his testimony?

A.   "I can remember -- I can't remember calling my -- I can't remember calling my former colleagues.  I can't remember doing that.  I'll just leave it like that.

Q.   "After you talked to Northwestern, did you have any further conversations with Orlando?

A.   "No.

Q.   "So you said the next day after you were having a phone conversation with the person from Northwestern, you were -- you then were on a plane to come to Chicago, correct?

A.   "Yes.

Q.   "And just to be clear, when you were talking on the phone, was that with one person or more than one person?

A.   "I think it was with one person, yes.

Q.   "And even though you can't remember the name of that person, did you meet that person when you came --

A.   "I did --

Q.   "-- to Chicago?

A.   " -- yes.

Q.   "If I throw out a couple of names, can you let me know if maybe it helps refresh your memory?

A.   "I sure will.

Q.  "Do you remember either speaking over the phone or meeting in person with someone by the name of Cynthia Estes, E-s-t-e-s?

A.  "No.

Q.  "What about a woman by the name of Jennifer Linzer, L-i-n-z-e-r?

A.  "That's it, Jennifer Linzer.

Q.  "And at some point when you were in Chicago, did you meet with an attorney from Northwestern by the name of Jane Raley?

A.  "Yes.

Q.  "And after arriving in Chicago, did you then at some point meet with Jennifer Linzer and Jane Raley?

A.  "Yes.

Q.  "When was that in comparison to when you arrived in Chicago?

A.  "It was the next day before the trial -- before the hearing.

Q.  "Where did you meet them?

A.  "In their office.

Q.  "And other than those two individuals, were there any other people present?

A.  "I met the director, but I forgot his name.

Q.  "When you say you met the director, other than introductions, was he present for any conversation that had to do with the Jacques Rivera case?

A.  "I can't -- I don't think so.  No, he wasn't.

Q. "What do you remember about any conversation that took place between you and Cynthia -- I'm sorry -- you and Jennifer Linzer and Jane Raley once you were at Northwestern?

A. "Only I gave my testimony. That was it.

Q. "What do you remember saying to them?

A. "About what Orlando told me as far as he testified about Jacques Rivera and it wasn't true.

Q. "Was it during that meeting that you gave them the information that essentially was put into an affidavit in --

A. "Yes.

Q. " -- 2011?

A. "Yes.

Q. "And was that the affidavit -- I'm sorry.

"And was that affidavit prepared while you were still at their offices?

A. "I believe so, yes.

Q. "If you could take a look at what we marked as Bryant Exhibit No. 1, which I believe is Defendants' Exhibit 62-A."

THE COURT: Mr. Given --

MR. GIVEN: Yes?

THE COURT: -- do you have any sense of how much longer?

MR. GIVEN: We're about halfway through.

THE COURT: Oh, I think we better take our break then.

Ten minutes, ladies and gentlemen.

COURT SECURITY OFFICER: All rise.

(Jury out.)

MR. LOEVY: Your Honor, I would like to address the Court either now or before the break ends.

THE COURT: Go ahead.

MR. LOEVY: It has to do with Mr. Murray. He will be their third expert, who is a lawyer, who is going to talk about the State's -- he is a State's Attorney. That's what Mr. Murray is, a former Cook County State's Attorney.

He is the third lawyer to be called by the defense as an expert and essentially the third State's Attorney expert.

And we barred -- moved to bar Wasilewski as cumulative, and that was denied. But now that Wasilewski has said what he said, there's --

THE COURT: Well, maybe I should find out what he's going to be testifying for.

MS. ROSEN: He's actually going to be testifying to his review of the files as it relates to Mr. Brasfield.

And we're not going to go --

THE COURT: That's different.

MS. ROSEN: -- through the whole procedure thing again.

THE COURT: Okay. Has this deposition been edited at all, or is it just being read beginning to end?

MR. GIVEN: Oh, no, no. There's lots of edits and

additions and subtractions by both sides.

THE COURT:  Okay.  Let me ask you something that we need for our record keeping.

The two defendants who were dismissed, that was with prejudice, I assume?

MR. LOEVY:  Yes, Your Honor.

THE COURT:  Okay.  Thanks.  So try to be at five after.

(Recess.)

(Jury out.)

THE COURT: We're ready except your client isn't here, right?

MR. SWAMINATHAN: Yes.

MR. ART: Thank you, Your Honor.

THE COURT: He's here?

MR. ART: Right inside the door. We'll bring him in.

(Plaintiff reenters.)

THE COURT: Yes, he is. Okay. I think we're ready.

(Pause.)

THE COURT: When does the defense anticipate finishing tomorrow, if you've got any sense of it?

MR. SOTOS: Probably by noon.

MS. ROSEN: By noon.

MR. SOTOS: By noon.

THE COURT: Okay. And will there be -- at this point, should I expect any rebuttal case from anybody?

MR. LOEVY: We want to reserve the right, but if we did, it would be very short, and we have none contemplated right now.

THE COURT: So do you -- have you figured out how long you need for closings?

MR. LOEVY: We were going to talk about how much each side wanted. We haven't talked yet.

THE COURT: Yeah, but I am thinking what we're going

3757

to do at noon tomorrow when we come back from lunch.

MS. ROSEN: We still have to do the jury instructions.

THE COURT: We do, but we're going to try to get as many done tonight as we can.

MR. LOEVY: So you think we may close tomorrow afternoon?

THE COURT: Well, I don't know, because I -- I want to make sure that -- you know, I don't know how long you're going to need for closings. It may be more than a day, anyway. So if it's going to be more than a day, I'd like to get started.

MR. SOTOS: Well, I think what we're thinking is it's probably going to be a day. I don't know about more than a day, but a day.

THE COURT: Well, that makes a big difference. Because if it's not going to be a day --

MR. SOTOS: Well, I mean, it will be a day. I said I don't think --

THE COURT: You're going to divide the day up so that we're done within a day?

MR. SOTOS: That's my sense of it. Right?

MR. LOEVY: I would really hope we could finish.

MR. SOTOS: Yeah.

THE COURT: All right. So then what the -- then I --

MR. SOTOS: Five hours.

THE COURT: -- instruct the jury first thing Thursday

3758

morning?  Is that the idea?

MR. LOEVY:  No.  We're -- I don't think we're contemplating a full day of closings, Your Honor.  We haven't talked about it.  But we were talking -- you know, if each side had two hours, that wouldn't even be -- that'd be a lot, first of all, and it would not be --

THE COURT:  Oh, so maybe we can do it all --

MR. SOTOS:  I mean, I guess we could talk among ourselves, but -- at least two --

THE COURT SECURITY OFFICER:  All rise.

MR. SOTOS:  -- maybe.

(Jury entering.)

THE COURT:  Well, while the jury is sitting down, let me see counsel at the side.  We're in the middle of a conversation.  We'll be done in, like, 30 seconds.

THE COURT REPORTER:  Judge, do you want me there?

THE COURT:  No.

THE COURT REPORTER:  No?  Okay.

MR. ART:  Off the record.

THE COURT:  Off the record.

(Proceedings heard at sidebar off the record.)

THE COURT:  We were trying to figure out, ladies and gentlemen, when we can get this case into your hands at the earliest possible opportunity.  That's what we're trying to figure out.

I don't have an answer yet, but we're getting there.

Okay. All right. Let us proceed.

"BY MS. EKL" (read by Mr. Given):

Q. Pastor Bryant, "if you could take a look at what we marked as Bryant Exhibit No. 1, do you recognize that document?

A. "Yes.

Q. "And what do you recognize that to be?

A. "My testimony, I guess, as it would happen" [sic] "during our conversation with Orlando.

Q. "If you could take a look at the last page of that document, do you recognize the signature above the typed words 'Thomas B. Bryant'?

A. "It's my signature.

Q. "So it says 19th day of August 2011, correct?

A. "Right.

Q. "And does that refresh your memory as to when you signed the document?

A. "Yes.

Q. "Where were you when you signed the document?

A. "I think it was at her house or my house. I can't remember.

Q. "So that would have been in Pennsylvania, correct?

A. "Yes.

Q. Did -- "So did you sign this document before you went to Chicago or after you came --

A. I --

Q. -- "back?

A. "I can't remember.

Q. "How was it that this document was prepared?

A. "I can't remember.

Q. "Do you remember if you typed the document or if someone else did?

A. "No, I didn't type this.

Q. "Do you know who typed it?

A. "No, I don't.

Q. "Can you do me a favor -- and take your time -- but if you can read through the affidavit -- and I'll let you know my question is going to be whether or not there's anything in this affidavit that, to your knowledge, is inaccurate as of 2011.

A. "No.

Q. "Did you tell Linzer and Raley, when you had your conversation with them at Northwestern, all of the things that are contained in this affidavit?

A. "Yes.

Q. "And if I could direct your attention to paragraph 7 where it says: 'While providing marriage counseling to Orlando Lopez and his wife in 1998, Mr. Lopez discussed his past. Mr. Lopez revealed that when he was a child living in Chicago, he witnessed a shooting and then later testified as a witness for the prosecution at the murder trial of a gang member.

Mr. Lopez also revealed that his trial testimony identifying the defendant as the shooter was not true and that he knew his testimony was a lie at the time. While talking about the shooting incident and his false testimony, Mr. Lopez appeared distract.'

"Do you see that paragraph?

A. "Yes.

Q. "Is there anything else you told Northwestern, the ladies from Northwestern, about what Orlando Lopez told you other than what's contained in paragraph No. 7?

"And I'm talking about that he told you about the incident in terms of his testimony.

A. "Not that I can remember.

Q. "Does paragraph 7 contain everything that we've talked about today and everything that you recall him saying about his testimony?

A. "He told me also that they helped him move out of town.

Q. "Okay. And, again, about his statement that they helped him move out of town, did he give you any more specifics about who they were or who it was that helped him?

A. "I can't remember" it -- "remember that.

Q. "Pastor Bryant, if you could take a look at what's been marked as Bryant Exhibit No. 2" --

MR. GIVEN: And, Judge, that's Defendants' Exhibit 62-B, as in boy.

BY MS. EKL (read by Mr. Given):

Q. "Let me know whether or not you recognize that document.

A. "Okay.

Q. "Do you recognize that document?

A. "Uh-huh.

Q. "What do you recognize that to be?

A. "A statement I gave, I guess, to you guys.

Q. "So when you say 'you guys,' who are you referring to?

A. I am sorry, not you guys. This is a statement that I gave -- I don't know who I gave this to, but I" -- "but this is the statement I made when these -- because these two, this one guy, Delorto, he came to my house. And I -- and I -- he gave me his card, so I remember him. I can't remember who gave me" -- "who I gave this to, but, yes, this is a statement I made.

Q. "But it's not your testimony that you gave the statement to Investigator Delorto, correct?

A. "No.

Q. "And is that your signature on the last page of the document?

A. "Yes.

Q. "And it indicates it was executed on September 18th, 2013, correct?

"That date is on the second-to-the-last page.

A. "Yes.

Q. "Okay. Does this refresh your memory that that is, in fact, the date that you signed this document?

A. "Yes.

Q. "Where were you when you signed the document?

A. "I can't remember. I think I was home. Yes, I think I was home.

Q. "Did you type this or did someone else type it for you?

A. "Someone typed it, I guess. I don't -- I don't remember. I just remember signing it -- reading it and signing it.

Q. "Do you remember how it was that you received the document? And what I'm getting --

A. "In the mail.

Q. "Okay. After you signed it, did you send it back somewhere?

A. "Yes.

Q. "Where did you send it to?

A. "To Steve Art and Loevy & Loevy.

Q. "Is it fair to say that your declaration, which is Exhibit No. 2, is substantially the same as your affidavit, which is Exhibit No. 1, with the exception of some updates made in terms of how many years --

A. "Yes.

Q. -- "you had been in different locations?

A. "Yes.

Q. "And specifically, is it fair to say that paragraph 7 is

the same in Exhibit No. 1 as it is in Exhibit No. 2?

"And take your time if you need to look at the two.

A. "Basically the same.

Q. "Was there anything that you see that is different between the two?

A. "No.

Q. "That's okay. Is there anything else that you can remember about your conversation at Northwestern with Linzer and Raley other than what we've discussed here today?

A. "No.

Q. "After your meeting with them, what is the next thing you recall taking place while you were in Chicago?

A. "I went to the courtroom.

Q. "Okay.

A. "And talking to to the U.S. attorneys.

Q. "Did you talk to -- you said you think you talked to two state's attorneys?

A. "Yes. It was two.

Q. "Okay.

A. "And the police officer, she was there.

Q. "A female police officer?

A. "A female police officer was in the room. I didn't know who" -- "I didn't know she was a police officer. She was retired, I believe, at the time.

Q. "Do you remember her name?

A. "No, I don't.

Q. "Do you know who she worked for?

A. "Chicago Police, I believe.

Q. "When you say you believe Chicago Police, are you just assuming because you were in Chicago?

A. "Yes, I'm assuming.

Q. "Is it possible that it could have been some kind of investigator for the State's Attorney's Office?

A. "No. Someone said she was a retired police officer. I can't remember who.

Q. "Where was it physically within the building that you spoke to these individuals?

A. "It was an adjacent room from the courtroom.

Q. "So is it fair to say that the judge wasn't present for that --

A. "No.

Q. -- "conversation? That's fair to say?

A. "That's fair to say. I'm sorry.

Q. "That's okay. How long did the conversation last?

A. "Fifteen, twenty minutes. It wasn't long.

Q. "And what, if anything, do you remember those individuals saying to you and you saying to them during the course of that 15- to 20-minute conversation?

A. "Everything I" -- "that I told Northwestern people, the same thing. It didn't change.

Deposition of Thomas B. Bryant

3766

Q. "Did you ever learn the results of that hearing that you had initially been called to Chicago to testify in?

A. "Actually, it was a couple months later, it came on the news that Jacques Rivera was released from prison here in Harrisburg after 20-something years in prison. I woke my wife up.

Q. "After you saw the news that he'd been released, did you make any phone calls --

A. "No.

Q. -- "at that point?

A. "No. I didn't want to make any -- any waves or anything.

Q. "When was the first time that you learned that Jacques had filed a civil lawsuit against the Chicago Police Department?

A. "When Steve called.

Q. "And that phone call, that was sometime this year?

A. "I believe so, yes.

Q. "What did Steve tell you during that conversation?

A. "That a lawsuit was pending, Jacques against the police department, I believe.

Q. "Did he tell you why the police department was being sued?

A. "I can't remember that. I just --

Q. "Now, because you're telling me you're assuming, I will ask, what did you assume at that time?

A. "I assumed, since he was released, that there was a civil matter concerning Jacques and the police department.

Q. "Did Steve tell you anything about the specific allegations made against any police officers?

A. "No, not specific.

Q. "Did he tell you why it was that he was calling you to let you know?

A. "Yes.

Q. "What did he tell you?

A. "That he wanted my testimony.

Q. "Did he tell you what it was that he believed you'd be testifying about?

A. "No.

Q. "So at any point during any conversation with Steve, have you told him anything more about your interaction with Orlando than anything that you told us here today?

A. "No."

MR. GIVEN: Okay. We're now moved into cross-examination by Mr. Art. Do you want me to keep reading?

MR. LOEVY: That'd be great, Jeff. Thank you.

MR. GIVEN: Okay. So this is cross-examination by Mr. Art.

"CROSS-EXAMINATION"

"BY MR. ART" (read by Mr. Given):

Q. "Okay. I want to direct your attention to Exhibit No. 2, which is your affidavit from 2013.

A. "Okay.

Deposition of Thomas B. Bryant

3768

Q. "And if you could just look through that and see if you can identify the name of the investigator who came to you visit you.

"And to expedite the process, I'll direct your attention to paragraph 10.

A. "Yes, James Delorto. And I forgot the other gentleman's name.

Q. "Where did Mr. Delorto and the other gentleman visit you?

A. "At my home.

Q. "Did they call you prior to visiting you at your home?

A. "They showed up. They just stopped by.

Q. "Do you recall whether they stopped by your home before or after your first conversation with me?

A. "Before.

Q. "Tell us, in as much detail as possible, what they said to you and what you said to them during that conversation at your house.

A. "We were talking about Jacques Rivera, and gangs in general, as far as you" -- "as how gang members would make a pact with each other to get their other" -- "get their guys out of prison. That's what -- my wife -- I shared that with my wife that day, and that's how I remember that.

Q. "Did you bring up gangs or did the investigator?

A. "The investigator brought up the gangs" -- "brought the gangs up.

Deposition of Thomas B. Bryant

3769

Q. "You testified earlier at length about your 1998 conversations with Mr. Lopez and his wife during counseling.

"Do you remember that testimony?

A. "Yes.

Q. "Is it possible that you discussed subjects with Mr. Lopez and his wife during these" -- "those counseling sessions that you haven't testified about here today?

A. "No.

Q. "Do you recall everything that was said in those counseling sessions as you sit here today?

A. "Mostly all of them.

Q. "And have you testified today about everything that you can remember?

A. "Yes.

Q. "Okay. You testified that in 1998, Mr. Lopez told you he had recanted his statement to authorities.

"Do you remember that testimony?

A. "Yes.

Q. "What do you mean by 'authorities' when you use that term?

A. "Police department.

Q. "Did Mr. Lopez use the term 'authorities' or did he use the term 'police department'?

A. "I can't remember.

Q. "So is it fair to say that there are aspects of the conversations that you had with Mr. Lopez in 1998 that you

don't remember verbatim as you sit here today?

A. "Yes.

Q. "When Mr. Lopez was telling you about his" -- "this recantation, is it possible that he said he recanted to the police officer prior to his testimony in court?

A. "I want to say yes.

MR. GIVEN: Okay. Mr. Art says, "No further questions," and then Ms. Ekl says, "I have a few follow-ups."

"REDIRECT EXAMINATION"

"BY MS. EKL" (read by Mr. Given):

Q. "What now makes you believe that he may have said that he recanted his testimony prior to testifying in court?

A. "In retrospect, I remember him -- I believe he said that.

Q. "That he said what?

A. "That he -- prior to the trial, he told them that it wasn't Jacques Rivera who did it.

Q. "And who did he tell you that he told?

A. "The police department.

Q. "Did he tell you who in the police department he told?

A. "No.

Q. "And as you sit here now, after being questioned by Mr. Art, your memory is now refreshed that he told you" -- "that he told someone in the police department prior to testifying in court that his testimony was going to be false?

A. "Not the way I would put it." "Not the way you put it.

Deposition of Thomas B. Bryant

3771

Q. "Okay. Orlando told you that he testified falsely in front of a judge at the trial, correct?

A. "Uh-huh.

Q. "I'm sorry. Is that yes?

A. "Yes.

Q. "And I just want to make clear, when I asked you when it was that he recanted his testimony, you said that it was after he testified. He told some authorities that he had testified falsely, correct?

A. "Right.

Q. "Okay. Is your testimony now changing? Is your memory different now in terms of when Orlando told you that he had recanted?

A. "Yes.

Q. "And it's your testimony that now he told the police that he had testified falsely, but that went and testified" -- "but then went and testified falsely again?

A. "I don't know about that. I have no answer to that question.

Q. "Okay. But do you understand what --

A. "I do, I do.

Q. -- "what I'm getting at? Okay. What makes you believe that he told someone from the police prior to testifying in court?

A. "Because he told me that.

Q. "Okay. Have you ever told anyone, prior to today's sitting here, that Orlando told you that he recanted prior to testifying?

A. "I can't remember that.

Q. "Mr. Art asked you whether or not it was possible.

"Are you saying that it's possible that that took place or is that something that you now have a clear recollection of?

A. "I have a clear recollection of that.

Q. "Of?

A. "He" -- "He telling me that, that prior to the trial, he said that he testified against the wrong person.

Q. "Where was it that he told you he had testified the first time that was false?

A. "Again?

Q. "You said he told you that prior to trial, he testified falsely -- that he told someone that he had testified falsely.

A. "It was on the counseling session.

Q. "Okay. But when was it that Orlando allegedly first made a false statement that he was now telling the police was -- 'I testified falsely'?

A. "When was the first time that he -- repeat that, please.

Q. "Sure. Let me just break this down. So Orlando told you that he testified falsely, correct?

A. "Right.

Q. "Okay. And when he told you he testified falsely, where did that false testimony take place?

"Did he say, 'I testified at a motion,' 'I testified at a trial' --

A. "I don't remember.

Q. -- "'I testified' --

A. "I just don't -- I don't remember that.

Q. "He just told you he testified falsely?

A. "Yes.

Q. "Did he tell you it was in front of a judge?

A. "I don't remember that.

Q. "When he told you that he told authorities that the testimony was false --

A. "Prior to the trial, and they went and tried him anyway, that's what he told me.

Q. "So you said prior to trial, he talked to some authorities, correct?

A. "Right.

Q. "And did he say authorities, or you said he said he talked to some authorities, correct?

A. "Right.

Q. "Okay. When he's talking to the authorities prior to trial, did he tell you where it was he had already testified, where it was that this false testimony had already occurred?

A. "Prior to trial.

Q. "Right.

A. "Prior to trial, that's when he said he -- he recanted what he said prior to trial.

Q. "Okay. Did he tell you anything about the person that he recanted to?

A. "He said he saw that person, and he knew that that was the wrong one that committed the murder.

Q. "When he's recanting, when he's telling some authority what he testified to or what he said was false, did he describe for you the authority? Did he describe for you --

A. "No.

Q. -- "what that person looked like or anything about that person?

A. "No. He said he knew that the -- he knew that was the wrong person that he had testified against.

Q. "Okay. I understand you're saying that's what he's saying to the authority, correct?

A. "No, that's what he told me. He said that he told -- he told me that that was the wrong person that he initially testified that committed the murder.

Q. "Okay. Maybe I'm confused. Sorry.

"Orlando Lopez told you that he was -- I'm just going to go step by step --

A. "Okay.

Q. -- "to make sure it's clear. He told you that he was

involved in a murder investigation, correct?

A. "Uh-huh.

Q. "I'm sorry. Is that yes?

A. "Yes.

Q. "And he told you that he had witnessed a murder, correct?

A. "Yes.

Q. "And then at some point, he had identified Jacques Rivera as the person who committed the murder, correct?

A. "Yes.

Q. "And then at some point, he had testified that Jacques Rivera was the person who committed the murder, correct?

A. "Yes.

Q. "Did Orlando tell you if he ever told anyone, other than you, that his testimony was false?

A. "Yes, he did.

Q. "Did he tell you who the first person was that he told -- or that he said, 'I was' -- 'I testified falsely'?

A. "The police department.

Q. "Okay. And did he tell you when that conversation took place?

A. "Yes, he did.

Q. "When did he say that conversation took place?

A. "Prior to the trial.

Q. "Did he tell you then why he testified falsely at the trial?

Deposition of Thomas B. Bryant

3776

A.  "No.

Q.  "And, again, at the police department, he did not describe who the person was at the police department that he talked to, correct?

A.  "He never told me that.

Q.  "He never told you who it was at the police department that he made the statement, 'I made a false statement'?  Is that --

    "I think that's even more convoluted, but --

A.  "No, he never told me that.

    "Can I say something?

Q.  "You have to wait until there is a question.

    "I asked you several times, when I was initially questioning you, whether or not Orlando told you that the first person he told you" --

    MR. GIVEN:  Sorry.  Let me start that over.

BY MS. EKL (read by Mr. Given):

Q.  "You have to wait until there's a question.

    I asked you several times when I was questioning you whether or not Orlando told you that the first person he told you was after he testified or before, and you said on both occasions that I was first asked" -- "that I first asked you that it was after.

    "What has caused you to change your testimony?

A.  "I recall him saying that they didn't believe him when he recanted that, and that -- that jolted my memory.

Q. "You've used several times the word 'recant,' correct?

A. "Right.

Q. "Was that the word that Orlando was using during your conversation with him?

A. "No.

Q. "Okay. Do you remember, as you sit here, what words he used that you are now characterizing as a recant?

A. "He said he didn't tell the truth as to who murdered the victim.

Q. "And did he tell you what this person told him in response? The person that he was saying that to, what they said in response?

A. "No.

Q. "The fact that Delorto and his associate came out and spoke to you in Harrisburg, is there anything about their conversation with you that's influenced or changed anything about your testimony here today?

A. "No."

MR. GIVEN: Okay. We're now back to Mr. Art on recross.

"RECROSS-EXAMINATION"

"BY MR. ART" (read by Mr. Given):

Q. "You said that when Mr. Lopez told you about recanting to police officers, he said that they didn't believe him.

"Do you recall that testimony?

A.   "Yes.

Q.   "Do you recall precisely what Mr. Lopez said about the police officers not believing him?

A.   "No.

Q.   "Do you recall anything else, as you sit here today, about Mr. Lopez's conversation with you about recanting his identification of Mr. Rivera?

A.   "No."

MR. GIVEN:   "No further questions" by Mr. Art.

"REDIRECT EXAMINATION"

MR. GIVEN:   Ms. Ekl says:

Q.   "Sorry.   I have just one follow-up.

"Counsel keeps referring to the person that Orlando recanted to as being police officers.

"As you sit here today, is it accurate that you don't specifically recall him saying it was a police officer?

A.   "Yes.

Q.   "He told you it was someone, some law enforcement person, correct?

A.   "Yes.

MR. GIVEN:   Okay.   Now I'm back to being Mr. Art.

"RECROSS-EXAMINATION"

"BY MR. ART" (read by Mr. Given):

Q.   "When he was talking about law enforcement officials, did you understand him to be talking about police officers?

A.  "Yes."

MR. GIVEN:  Now I'm back to Ms. Ekl.

"REDIRECT EXAMINATION"

"BY MS. EKL" (read by Mr. Given):

Q.  "Was that an assumption on your part?

A.  "Yes.

"No further questions."

THE COURT:  Okay.

MR. GIVEN:  And, Judge, while I'm up here, could I -- I'm going to do a couple housekeeping matters.

I'd like to move into evidence 62-A and -B, which were the two affidavits that we just referred to.

THE COURT:  Yes.  Is there any objection that was not the subject of a ruling before today?

MR. LOEVY:  No, Your Honor.

THE COURT:  Okay.  So they are received.  It's 62?

MR. GIVEN:  62-A --

THE COURT:  Okay.

MR. GIVEN:  -- and B, as in boy.

THE COURT:  They are both received.

(Said Defense Exhibits 62-A and -B received in evidence.)

MR. GIVEN:  And, Judge, Mr. Brueggen handed me a note that when we were reading two other depositions, there were exhibits that were used but were not moved into evidence.

THE COURT:  Okay.

MR. GIVEN: One was in the Machain deposition. It was Defendants' Exhibit 3-C, as in Charlie.

THE COURT: Any objection?

MR. LOEVY: No, Your Honor.

THE COURT: 3-C is received.

(Said Defense Exhibit 3-C received in evidence.)

MR. GIVEN: And then in the Estes deposition, Defendants' Exhibit 102, which were the handwritten notes, and --

MR. LOEVY: I think that already was in evidence, wasn't it?

MR. SOTOS: Yeah.

MR. LOEVY: Maybe as a plaintiff's number. But we don't object.

THE COURT: Anyway, it's received.

(Said Defense Exhibit 102 received in evidence.)

MR. GIVEN: And Defendants' Exhibit 99, which were the photos of Ms. Estes.

MR. LOEVY: No objection, Your Honor.

THE COURT: They are received.

(Said Defense Exhibit 99 received in evidence.)

MR. GIVEN: Thank you, Your Honor.

THE COURT: Okay. Thank you. You may step down.

(Reader excused.)

MR. LOEVY: Are you guys calling Mr. Murray?

MS. ROSEN:  Pardon?

MR. LOEVY:  Are you calling Mr. Murray?

MS. ROSEN:  Yes, we're calling Mr. Murray.

(Witness enters.)

THE COURT:  Sir, could you come up here, please.
Please raise your right hand.

(Witness duly sworn.)

THE COURT:  You may be seated.

BERNARD MURRAY, DEFENDANT CITY'S WITNESS, SWORN

DIRECT EXAMINATION

BY MS. ROSEN:

Q.  Good afternoon, Mr. Murray.

A.  Good afternoon.

Q.  Could you introduce yourself to the ladies and gentlemen of the jury.

A.  My name is Bernard Murray, M-u-r-r-a-y.

Q.  And could you tell us what your occupation is.

A.  I'm an attorney.

Q.  And when were you first licensed to practice law?

A.  I was licensed in November of 1983.

Q.  And you're licensed here in the State of Illinois?

A.  Yes.

Q.  Could you just give us a little bit of background on your education, starting with college.

A.  Went to the University of Illinois here in Chicago.  After

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 1314 of 1335 PageID #:106699
Murray - direct by Rosen
3782

graduating there, I went to DePaul University, College of Law, and obtained my law degree there. And after that, obtained my license from the bar exam results.

Q. And what was your first job out of law school?

A. I was employed by the Cook County State's Attorney's Office. That was in December of 1983.

Q. Okay. So you first began your law career at the Cook County State's Attorney's Office in what year? What -- I'm sorry. What month?

A. December of 1983.

Q. Okay. And what was your first assignment in the Cook County State's Attorney's Office?

A. My first assignment was to the Appellate Division, which is an area where you are writing -- or responding to a defendant's brief on appeal, after the trial's already been concluded, and now you're writing the State's brief in response.

Q. When you do appellate work in the Appeals Division, do you have an opportunity to review the record that -- from the trial?

A. Right. The transcripts of the trial of all the witnesses that were testifying, that's provided as part of the record on appeal, as well as other legal documents that might have been filed during the course of the pendency of the case.

Q. Okay. And how long were you in the Appeals Division?

A. I was there approximately ten months.

Q. And where was you -- where were you assigned after that?

A. My next assignment in the Cook County State's Attorney's Office was to the Juvenile Division.

Q. And what's the Juvenile Division, just generally?

A. The juvenile court, where the prosecutors are assigned, they're divided into handling cases that involve delinquency matters, where a person under 18 back then, a person under 17 now, is accused of committing a crime.

The other part of juvenile court is the abuse and neglect courtrooms, where maybe a minor has not been -- has been abused or neglected by his parents, and the State, in one aspect or another, is intervening in the situation, trying to provide services to the family or maybe even relocating the child.

Q. And did you work both sides of juvenile court?

A. Yes. I started on the abuse and neglect side first and then I went to the delinquency side.

Q. And how long were you in the juvenile court?

A. Approximately 19 months, maybe -- maybe 20 months.

Q. Okay. And then what was your next assignment?

A. The next assignment -- my next assignment was the Felony Review office, part of the Cook County State's Attorney's Office.

Q. Okay. The jury's heard testimony about what Felony Review is, so I don't think we need to repeat that for them, but what

years were you in Felony Review --

A.  Approximately --

Q.  -- approximately?

A.  -- '85 to '86, I think.  Approximately.

Q.  Okay.  And then after that, where were you assigned?

A.  The Preliminary Hearings Unit.

Q.  And what is the Preliminary Hearings Unit?

A.  When a defendant is first charged with a felony, his case is assigned to one of numerous preliminary hearing courts in the City of Chicago.

In the Preliminary Hearing Unit, the case is only there for 30 days to determine if the prosecutors are going to go ahead with charges, if they're going to obtain an information, a judge -- make a determination of charges going forward or if they're going to refer the case to the grand jury for charges there.  It's a step to the criminal court system.

Q.  Okay.  And how long were you in Preliminary Hearings?

A.  Less than a year.

Q.  And then where did you get assigned?

A.  I was then assigned to a felony trial courtroom.

Q.  And what year were you first assigned to a felony trial courtroom?

A.  I believe that's 1988.

Q.  And for how long did you remain assigned to a felony trial courtroom?

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 1317 of 1335 PageID #:106702
Murray - direct by Rosen
3785

A.   From 1988 through 1990.

Q.   And as an assistant state's attorney assigned to a felony trial courtroom, just generally -- the court -- the jury's heard a lot about the courtrooms, but generally, like, what was your particular duties and responsibilities?

A.   The -- generally, there are three prosecutors assigned to the felony courtrooms at 26th and California, and your responsibilities are for prosecuting all the felony cases that are assigned to the particular judge that you appear in front of.

Q.   And at some point in time while you were in the Felony Trial Division, did you become a first chair?

A.   I did.

Q.   And what is a first chair?

A.   Well, the prosecutors assigned to each felony courtroom -- there's approximately three of them -- the first [sic] one is the one with the least experience.  The second chair, they referred to, has more experience, and the first chair has primary responsibility in the courtroom for all the cases in the courtroom, but also because he's the most experienced.

Q.   And when did you become a first chair, approximately?

A.   1989.

Q.   Okay.  And then you said you were in the Felony Trial Division until 1990.  Then what was your next assignment?

A.   I was assigned to the Gang Crimes Prosecution Unit.

Murray - direct by Rosen

3786

Q. And what is the Gang Crimes Prosecution Unit?

A. It's a specialized unit in the Cook County State's Attorney's Office that has -- primarily prosecutes gang-related crime -- felonies, primarily murders. They can also be attempt murders or other serious felonies, but primarily homicides.

Q. And when were you first assigned to the Gang Prosecutions Unit?

A. Early in 1990.

Q. Okay. And then after that, where were you assigned?

A. Well, I remained with that unit for a number of years, and then at one point, I became a deputy chief, a supervisor in that unit.

So I was in that unit a total of eight years. Eight years? Seven or eight years.

Q. Okay. And then where were you assigned after that?

A. After that point, I became a supervisor -- it's called a lane supervisor, but it's back in the Felony Trial Division.

So I'm now a supervisor of six of those courtrooms where I was once a trial room prosecutor. So I'm supervising 18 prosecutors who are assigned to 6 different felony courtrooms.

Q. And how long did you hold that position?

A. I'm going to say over a year.

Q. And then what was your next assignment?

A. I went back to the Special Prosecutions Bureau where the

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 1319 of 1335 PageID #:106704
Murray - direct by Rosen
3787

Gang Crimes Unit is, and I was the deputy chief of that bureau.

And that bureau has, I think approximately at the time, six different specialized units in it, including the Gang Crimes Unit.

Q. Okay. And how long were you the deputy chief of the Special Prosecutions Bureau?

A. Until 2001.

Q. And then what happened?

A. In 2001, I was -- became the chief of the Criminal Prosecutions Bureau.

Q. And what is it to be the chief of the Criminal Prosecutions Bureau?

A. It's the largest bureau for lawyers in the Cook County State's Attorney's Office. It is -- includes felony trial courtrooms, suburb -- and misdemeanor courtrooms. It includes some specialized units, such as Sex Crimes.

It also has the same supervision over the suburban courthouses -- there's five suburban courthouses -- that also have felony courtrooms and misdemeanor courtrooms and other units, like Domestic Violence and units of that nature.

Q. Okay. And then did you have any additional positions at the Cook County State's Attorney's Office?

A. No. That was my final position.

Q. And when did you leave the Cook County State's Attorney's Office?

A. December of 2008.

Q. Okay. And where have you been employed since you left the Cook County State's Attorney's Office?

A. In 2009, I was employed by the DuPage County State's Attorney's Office.

Q. And what was your position there?

A. I initially had a position with their Community Prosecutions Unit, but I was quickly assigned as -- what DuPage County refers to as a deputy chief. So I was responsible for the felony courtrooms in the DuPage County State's Attorney's Office.

Q. And then after your -- after that?

A. After I left that office, basically retired from being a prosecutor. I have a position teaching at Harper College, one class a semester, and recently I've picked up some contract work as a special prosecutor.

Q. Okay. At very -- for various State's Attorney offices, is that right?

A. Correct, for Kane County and Lake County.

Q. Okay. And then in addition to that, do you do some consulting work?

A. Yes, I do.

Q. And it's in connection with your consulting work that you're here today, is that correct?

A. Yes.

Q.  And the City of Chicago retained you today to provide some opinions related to some work that you did in connection with this case, is that right?

A.  Yes.

Q.  And in this case, the *Rivera* case isn't the first case that the City of Chicago has retained you; is that right?

A.  No, it's not the first.

Q.  And what was the other case that the City of Chicago retained you to provide consulting work?

A.  It was *Fields* case.

Q.  Okay.  And you're here today to address some of Mr. Brasfield's opinions, is that correct?

A.  That's correct.

Q.  And in the *Fields* case, did you similarly address some of Mr. Brasfield's opinions?

A.  Yes, I did.

Q.  Okay.  And we'll get to the specifics of that in a minute, but in connection with the work that you did in this case, have you been paid?

A.  I have.

Q.  And what's your hourly rate?

A.  $200 an hour.

Q.  Okay.  And approximately how much have you been paid to date in this case for the review and consulting work that you've done?

A.   $17,400.

Q.   Okay.  And in the *Fields* case, what was your hourly rate?

A.   Same.

Q.   Okay.  And what was the total amount you were paid, approximately, in the *Fields* case?

A.   $85,000.

Q.   Okay.  And if you compare that the review you did in this case to the review you did in the *Fields* case, which one was a bigger review or more time-consuming?

A.   The *Fields* case was more time-consuming.

Q.   Okay.  And generally speaking, what did we have you do in this case in terms of reviewing documents?

A.   Well, the document review was two files that Mr. Brasfield claimed were missing police reports.  So the -- probably the main focus was seven files where he claimed police reports were missing not only in the defense attorney's file, but also the same reports were missing from the prosecutor's file.

     So that was the primary focus.  But I also examined the type of documents he claimed were missing from all the files.  And there were other prosecutors' files which were claimed to be missing, investigative material as well.  And I did review whether those documents were present there.

Q.   And did you also review Mr. Brasfield's report in this case?

A.   Yes.

Q.   In the *Fields* case, do you know -- other than the six or seven files that you specifically reviewed that you just talked about, do you know approximately how many other files were at play in this case that you reviewed?

A.   In this case?

Q.   Yeah.

A.   There were 26 files where there was a prosecutor's file, and it was a total of -- I think Mr. Brasfield said a total of 38 files that he was relying upon that he was examining.

Q.   And those 38 files, was it your understanding those were the criminal defense files that he was looking at, correct?

A.   Those are criminal defense files that he was looking at.

Q.   Okay.  And you're aware, right, that also in connection with all of this work, there is a set of investigative files and a set of what we've been calling permanent retention or Records Division files, correct?

A.   Yes, I'm aware of that.

Q.   Okay.  In the *Fields* case, what was the universe of files that were at play, if you recall?

A.   The -- there was -- I think eventually it was narrowed down to 61 files.  Some -- there were prosecutor's files, but most of them there were not.

Q.   Okay.  So we're going to focus on the work that you did in this case.  But generally speaking, when you came into this case, did you have some understanding from your work in *Fields*

about what Mr. Brasfield's methodology was for arriving at his conclusions?

A.  I did.  The types of documents that he analyzed as being missing and whether he termed it investigative material or not.

Q.  Okay.  And in connection with the work that you did in this case, did you pay any attention or special attention to Mr. Brasfield's Attachment F?

A.  Yes.

MS. ROSEN:  And that would be City Exhibit 14-D for identification, although I don't believe it was admitted.  Was it?

(Ms. Carney nodding.)

MS. ROSEN:  Okay.

BY MS. ROSEN:

Q.  So let's talk just generally about Attachment F.

What was Attachment F?  And do you have a copy of it up there with you?

A.  Yes, I do.

Q.  Okay.  You can refer to it.

What was Attachment F that Mr. Brasfield prepared in connection with his opinion?

A.  The -- it's a listing of initially 48 files that he was examining, where he examined the investigative files and the permanent retention files, and he -- in this Attachment F, he provided a description of the file, the investigative file,

what was missing from the criminal defense file, and what was missing from the permanent retention file.

Q. And in connection with the work that you did for the City in this case, did you do any kind of analysis of the documents that he identified as being missing from the criminal defense file?

A. Just on the -- initially on the face of this Attachment F, he -- when he says something is missing from the criminal defense attorney file, he would put a brief description of what it was. And I knew from examining the files, and also from my prior work, the description of the files were either material that I -- that was investigative material or material that was not investigative material. I could tell that just from reading the titles of the documents.

Q. And when you call a document investigative material, what do you mean?

A. Well, it could be -- it's reports created by the police officers during the course of the investigation. So it could be the initial case report, a two-page report, or it could be a supplementary report, numerous supplementary reports in which the officers will detail interviews they had with different people and evidence that were collected and leads that they were following.

It could also be a defendant's arrest report, his criminal history or witness' background information. It could

also include general progress reports, which are notes of interviews or notes of -- taken during the course of the investigation.

It could also be forensic reports. A lab does examination on some evidence that was collected, or the collection of evidence done by the forensic investigators who might have photographed the crime scene or collected evidence at the crime scene.

So all those are the type of reports that I would generally term investigative reports.

Q. Okay. And then what are the reports that you would term -- actually, I've forgotten what you call them.

A. Non-investigative?

Q. Non-investigative, a simple term, the non-investigative reports. What's the category -- like what are the titles of the documents or the categories of documents that you're describing as non-investigative?

A. Well, some are documents such as a subpoena issued for the file, or a court attendance report where a police officer went to court, either at trial or at a motion. Or it could also be an investigative file inventory, which is a listing of the documents that are in the file but are -- they're not substantive. They don't include interviews. They're just a listing of documents.

Also, there were documents that it was not the primary

Murray - direct by Rosen

3795

responsibility -- or were not created, I should say, by the Chicago Police Department, such as a medical examiner's postmortem report. That's created by the Cook County Medical Examiner's Office. So I would say though it's important to the investigation, it was not something that was required to be maintained by the Chicago Police Department.

There are also other documents that were just not reports of any type.

Q. And when you're talking about documents that weren't reports of any type, what are you talking about?

A. It might be a Xerox of a blank envelope or a Xerox of the outside of the file which may have the file person's name on it, but no other information.

Or Chicago Police Department, when they would send documents through interoffice mail or send them to the prosecutor's office, they would sometimes just fold the report over and write the detective's name on it. So if later on, we Xeroxed a detective's name, it's essentially an outside of an envelope. It's not really an investigative report at all.

Q. Okay. And in connection with your review on this case, did you arrive at certain opinions regarding whether or not the criminal defense -- whether there was indicia suggesting that the criminal defense attorney files were incomplete in the present day?

MR. LOEVY: Objection, Your Honor, no foundation. He

didn't even look at criminal defense attorney files.

MS. ROSEN: Yes, he did.

MR. LOEVY: No criminal defense attorney files.

THE COURT: Well, how --

MS. ROSEN: That's -

THE COURT: Now, wait a minute. Yes/no, yes/no. What -- how am I --

MR. LOEVY: Maybe I stand corrected. If I do, I apologize. I thought his whole task -- I --

THE COURT: Well, does anyone have the report here? Do I need to look at the report?

MR. LOEVY: I have a copy, Your Honor.

THE COURT: That might help me. Okay.

(Document tendered to Court.)

MS. ROSEN: I -- we can --

THE COURT: And --

MR. LOEVY: We're talking about --

THE COURT: -- can you direct me to the page?

MS. ROSEN: Yeah. Judge, actually, I think you addressed this in a motion.

THE COURT: Well, that may well be, but it was a long time ago, and there were many.

MS. ROSEN: Well, he specifically identifies at page 12 and 13 the specific review of --

THE COURT: Okay.

MS. ROSEN: -- files, but then there's also --

THE COURT: All right. So there are seven specific files that are referred to on page -- defense files that Mr. Murray talked about in his report.

MR. LOEVY: We have no objection to talking about those seven files, Your Honor.

THE COURT: Okay. And is that what you're prepared to do?

MS. ROSEN: Judge, actually, there's more. So if you could just give me a second?

THE COURT: Well, let's see. It looks like I'm up to H. So that's more than seven. Starting on 12, there's *Quinones* --

MS. ROSEN: Yeah. Judge, actually, if I could hand up the ruling --

THE COURT: That would be great.

MS. ROSEN: -- on the motion *in limine*?

THE COURT: If that's going to answer this question.

MS. ROSEN: It is, actually, Judge.

THE COURT: Okay.

MS. ROSEN: It begins here at the paragraph that -- there's a portion of it that's highlighted --

THE COURT: Okay.

MS. ROSEN: -- that it was on.

(Document tendered to Court.)

Case: 1:18-cv-01028 Document #: 827-1 Filed: 11/22/25 Page 1330 of 1335 PageID #:106715
Murray - direct by Rosen
3798

THE COURT: Well, it looks to me like this is covered in the report, because the ruling states that Mr. Murray has disclosed the basis for the opinion about those files.

MR. LOEVY: Yeah. We don't have any objection to talking about the six to eight files he looked at, Your Honor.

MS. ROSEN: It's broader than that, Judge.

THE COURT: Well, I don't -- that's what I don't know. Why don't we go -- why don't we proceed -- we don't have much more time left -- and we'll figure this out later.

MS. ROSEN: Yeah. Sure.

THE COURT: Let's start with what's obvious.

MS. ROSEN: Sure.

BY MS. ROSEN:

Q. With respect to the files that are specifically addressed in your report, did you arrive at any conclusions regarding whether or not there are indicia in the file that the files as they exist today are incomplete?

A. Yes.

Q. And what are those opinions?

A. Well, my opinions are that the file -- the criminal defense attorney files that exist today are missing significant amounts of material. That would indicate that they are not in the condition today, sometimes 30 years later, that they were in at the time of trial.

Q. Okay. And then did we also ask you to review -- let's

limit it to the nine files for now -- the significance of the info or the lack thereof of the documents that Mr. Brasfield was identifying as being, quote-unquote, missing?

A.   Yes.

Q.   And what was your opinions there?

A.   Well, my opinions are -- a couple different levels.  That there's indications in the prosecutor's files that the documents were ordered and provided to the criminal defense attorneys, again, sometimes 30 years ago.

There's also indications that some of the documents he claims were missing from the criminal defense attorney's file, that they were known to the criminal defense attorney both by what the prosecutor's file says, but also the -- some comments and notes in the criminal defense attorney's file.

MS. ROSEN:  Okay.  And maybe this is a good place to break.

THE COURT:  All right.

MS. ROSEN:  And then we can --

THE COURT:  Okay.  Ladies and gentlemen, I am optimistic that the evidence will be completed sometime tomorrow.

Once the evidence is -- and I -- you know, I mean, I've been wrong before, but that's my very best estimate.

Once the evidence is completed, we have a very long day of closing arguments.  Everybody gets to make one.

3800

Plaintiff gets to make an opening and a closing one.  So there are a lot of arguments and then I have to instruct you on the law.  If I can do it all on Wednesday, I am going to do it on Wednesday so that when you come in on Thursday morning, you can begin deliberating.

If it's going to be a lot longer than we have on Wednesday, I won't try to do it, but it would be helpful to me if you can think overnight of whether, if we had to cut lunch to 45 minutes on Wednesday, is that doable?  I mean, you know.

(Jurors nodding.)

THE COURT:  It looks like everybody says yes, but -- and the other thing I want to check is in the event that we could get it all done on Wednesday if we worked a little later in the evening, say till 4:30 rather than 4:00, it would be helpful for me to know if you can manage that.

I don't want to press anybody to do it.  We've been following a pretty strict schedule.  But I'm trying to figure out where I have some flexibility.

So I'll check with you tomorrow and see.  At least, I gather, we can cut -- we can shorten the lunch and get a little bit more time that way.  And think about what it would mean if we went a little later on Wednesday afternoon.  We would not go any later than 4:30.

Okay.  Have a good evening.

(Jury out.)

3801

THE COURT: Okay. Ms. Rosen, I'm going to give you back your copy of this.

(Document tendered back to counsel.)

THE COURT: Yeah, I do not want to start early on Wednesday morning because my guess is that I am going to be very busy on Wednesday morning with the instructions. I need to read them. I need to fix them. So I -- it does not seem to me to be a good time to be cutting time.

Was there supposed to be an update of the conspiracy instruction?

MR. ART: Yes, Your Honor.

THE COURT: And where -- what is the status of that?

MR. ART: I think where the parties are is we have that instruction and a couple additional ones on each side that we'll exchange right after court today and then submit to you at some point this evening, if that's all right.

THE COURT: Well, yeah, but you mean more disputes than I know about already?

MS. ROSEN: Maybe, maybe not.

THE COURT: Well, I would certainly --

MS. ROSEN: Yeah.

THE COURT: You know, there's a limit --

MS. ROSEN: Yeah.

THE COURT: -- to what I can do. So please, you know, make some efforts to try to get these disputes down.

3802

MR. ART:  We shall.

THE COURT:  I am going to take the Murray opinion home tonight so I am more familiar with it.

MS. ROSEN:  And I think, Judge, in that motion *in limine* ruling, that specific argument was made that he should only be confined to the nine.

THE COURT:  Yeah.

MS. ROSEN:  And there's -- and I could find it quickly, but I think there's --

THE COURT:  Well, let me take that home, too.

MS. ROSEN:  Okay.

THE COURT:  That would be helpful.

MS. ROSEN:  Thank you.

THE COURT:  Do you know which one it was, Ms. Rosen? Do you have it right in your hand?

MR. SWAMINATHAN:  It's motion *in limine* -- it's docket 554, ruling on plaintiff's motion *in limine* 4.

THE COURT:  Wait.  Which number is it?

MS. ROSEN:  554.

THE COURT:  554 is the docket entry?

MS. ROSEN:  Yeah.

THE COURT:  Okay.

MS. ROSEN:  Thank you.

   (Adjournment at 4:02 p.m. until 9:30 a.m., 6/26/18.)

C E R T I F I C A T E

We, Nancy L. Bistany and Colleen M. Conway, do hereby certify that the foregoing is a complete, true, and accurate transcript of the Trial proceedings, Volume 15-B, had in the above-entitled case before the HONORABLE JOAN B. GOTTSCHALL, one of the Judges of said Court, at Chicago, Illinois, on June 25, 2018.

/s/ Nancy L. Bistany, CSR, RPR, FCRR          06/26/18

/s/ Colleen M. Conway, CSR, RMR, CRR          06/26/18

Official Court Reporters                      Date
United States District Court
Northern District of Illinois
Eastern Division