# EXHIBIT 60

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JACQUES RIVERA, | ) | |
| | ) | Case No. 12 C 4428 |
| *Plaintiff*, | ) | |
| | ) | Hon. Joan B. Gottschall, |
| *v.* | ) | District Judge |
| | ) | |
| REYNALDO GUEVARA, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |

**<u>PLAINTIFF'S RESPONSE TO DEFENDANTS' POST-TRIAL MOTION</u>**

# EXHIBIT 21

# Part 2 (p. 112-187)

Designated Deposition Testimony of Orlando Lopez

112

well, go ahead and ask your question. I'm thinking there's a form objection here, but go ahead.

Q. My question is, and I'm going to read on Page 93 beginning at Line 3 continuing through Line 18, and my question is going to be whether this helps you remember.

Obj. #9

Improper refreshing/ impeachment, hearsay, duplicated

MS. ADAMS: Well, how about you just let him review it and then you ask him if that refreshes his recollection?

MR. BOWMAN: Because I want to do it this way.

MS. ADAMS: Okay.

MS. ROSEN: Objection. Form.

Q. Question: Now, you testified at trial that you had seen the shooter play baseball at Humboldt Park; correct? And your answer is correct. Question: And you testified here today that that testimony was a lie; correct? Your answer is correct. Then comes the question, why did you testify at the time of trial that you had seen the shooter play baseball at Humboldt Park? You gave this answer, because, you know, what happened was the cops were like, when they pointed him out

Obj #9

113

they were asking me have you seen him playing baseball or have you seen him anywhere else and I said yes. That was the reason why I said that I seen him playing baseball at a park. And then later on it's pointed out that --

MR. GIVEN: Why don't you just read the rest of it?

MR. BOWMAN: Sure.

Q. Then continuing on at Line 19 the Court says just a minute, did you say when they pointed him out? The Witness: That's you, says who me? The court says yes, and then you respond no, they didn't point it out to me when I pointed him out. They were asking have you seen him anywhere else at a park playing, you know, baseball, stuff like that, and I said yes.

Does that help you remember how it came up?

A. I was -- are you done with your question?

Q. Yes.

A. I was referring to what I said back then, my first testimony in court. That's what I remember. That's why I responded that way.

114

Where did you say this, and I said yes, except I remember -- remembering what I said at trial, the first trial for Jacques Rivera, and I did say all that stuff, and then I repeated saying that over here. I didn't say, you know, in the sense of they made me point him out. No, that was not the --

Q. I understand that.

A. -- the concept. I didn't want to make it seem like -- because like I said, there's a lot of people at stake here based on my testimony and recanting my story here, and I don't want it to be taken out of context either.

Q. We're all very clear that you're the one that pointed him out and not the police.

A. Okay, so --

Q. All I'm asking about is how the part about playing baseball at Humboldt Park came up?

A. Like I said, as a kid that came out, and I remember saying that to the cops.

Q. Is what you said in your testimony that I read from June 23, 2011, is it accurate

Δ obj.
#9
(con't)

Δ obj
#9
(con't)

115

except for the business about they pointed him out?

MR. GIVEN: Objection. Form.

Q.   Is the rest of it accurate?

MR. GIVEN: Objection. Form.

A.   Whatever I said here that's what I said. There's no lie about it. I cannot, you know, say, oh, yeah, it's a lie. It is right here in black and white, but there's a lot of question -- you know, you guys are great at your job and you ask questions and you guys are amazing on how you go about asking questions and tripping up people at times instead of getting to the point on what we need to do because, you know, nobody wants to see justice. Everybody wants to see this, that, and the other. That's what I have a problem.

You know, I apologize I'm coming off what I'm here for, but that's the reason why I cannot stand the system in the sense of how you guys operate and how things get twisted up and get hung up on words instead of straight facts and how that was the individual that did it, but we're stuck on you said this, you said that. Well, let's get to the point where I

*withdrawn*

Δ obj. #9 (con't)

P objection #2 unresponsive

*withdrawn*

116

pointed out the wrong guy. I made a mistake. The individual did this, but -- I said it. It was here. There. I apologize for going left, right here, whatever. I apologize.

Q. So what you said is correct; yes?

A. Yeah. It's here. It's correct.

Δ obj #9 (cont)

Q. Let me show you another part of the transcript that I'm going to read out loud. It's on Page 62.

MS. ROSEN: I have a form objection to you reading from the transcript as a method of refreshing a recollection. And actually right now it's not even refreshing a recollection because you haven't even asked him a question to which he said I don't recall. So I have a form objection and actually move to strike all the testimony that's going to be handled this way.

BY MR. BOWMAN:

Q. I'm going to read you the first six lines at the top of Page 62 if you want to follow along. This is about when you told them wrong guy, wrong guy.

Question: When you had this conversation with the white-haired lady, was

Δ obj. #10 narrative, no question, cumulative, irrelevant

117

anybody else present? Answer: Yes, the gentleman, the detective with the fro, and the glasses and the mustache. Then after I walked away they had a conversation. What conversation they had I don't know.

Does that refresh your recollection that it was the detective with the fro who was present when you told them that it was the wrong guy?

MR. GIVEN: Objection. Form.

A.   If I said it here. That's what I said.

Q.   And is that accurate?

A.   Yeah, it's accurate.

Q.   So in other words, it's accurate that the other person present when you said wrong guy, wrong guy was the detective with the fro?

MS. ROSEN: Objection. Form.

A.   It says it here.

Q.   And is that accurate?

A.   Correct.

Q.   Yes, all right.

Where -- back in the day when this happened, what was your father's address?

118

A. 2216 North Avers.

Q. And what was his name?

A. Do I got to give my fathers's name here, too?

Q. Yes, please.

A. Jesus Lopez.

Q. J-E-S-U-S?

A. Jesus.

Q. And did you sometimes stay overnight at your father's house --

A. Yes.

Q. -- back in those days?

Anything difficult about finding your father's house at that time --

MR. GIVEN: Object.

Q. -- if anybody had wanted to find your father's house, would it have been easy to find?

MR. GIVEN: Objection --

MS. ROSEN: Objection. Form.

MR. GIVEN: -- form, incomplete hypothetical, calls for speculation.

MS. ADAMS: If you know, if you know.

A. I knew where my house was at. As

119

far as other people, I don't know. That's,

that's --

Q. How far was it from your mother's house to where your father lived?

A. Well, I could tell you right now. Probably three miles, four miles, I don't know exactly. I couldn't tell you like that.

MR. BOWMAN: Mr. Lopez, I appreciate your cooperation in this process. I'm done with my questioning at this point. I know that the other lawyers will have questions for you as well and that may prompt some additional questions from me after they finish, but for the moment I'm done, and I appreciate your cooperation with the process.

MS. ROSEN: And we think it's a good time to take a lunch break.

MR. GIVEN: Yeah.

MS. ROSEN: And then we can collect our --

THE WITNESS: Do what you guys got to do.

MS. ROSEN: -- notes, and we can hopefully streamline the afternoon so that we can get this done and get you out of here.

120

MS. ADAMS: Okay, so it's 1:35, you guys want to say 40 minutes for lunch?

MS. ROSEN: Fine.

THE VIDEOGRAPHER: Off the record 1:36.

121

(Luncheon recess taken 1:36 p.m.)

- - - - -

122

THE VIDEOGRAPHER: Back on the record. The time is 2:16.

(Deposition resumed 2:16 p.m.)

AFTERNOON SESSION

CONTINUED EXAMINATION OF ORLANDO LOPEZ

BY MS. ROSEN:

Q. Good afternoon, Mr. Lopez. I introduced myself to you earlier today. My name is Eileen Rosen, and I represent the City of Chicago in this lawsuit that has been filed by Mr. Rivera. And I have some questions that I want to ask you. First I'm going to do sort of some follow-up questions to the questions Mr. Bowman asked you earlier today, and then I have some questions of my own that are independent of that, so I'm going to jump around a little bit.

If you're not sure -- I'm going to try and direct you to the testimony you gave earlier, but if you're confused at all, let me know because it's not going to be sort of sequential.

You testified early this morning that you hadn't spoken to any of the lawyers representing Mr. Rivera in the civil case, but

123

you have spoken to the lawyers representing Mr. Rivera in connection with the post-conviction proceeding; correct?

A. Correct.

Q. Okay. And when did you first speak with lawyers representing Mr. Rivera in connection with the post conviction proceeding?

A. The first time as far as like in the room where they were writing stuff like down how you guys --

Q. Sure.

A. The first time I remember that I recall was in Chicago where I met with Jennifer over there -- I met Jennifer here in Cleveland, and the one that was asking the question here in Cleveland was the investigator they hired.

Q. Right.

A. And then when I went to Chicago, that's when I started getting the questions asked over there.

Q. Okay. So when -- as I understand it, Jennifer and Cynthia Estes, the investigator; is that who it was?

A. Correct.

Q. They first came to your home

124

unannounced and knocked on your door; right?

A. Correct.

Q. After that did you go to Chicago to meet with other attorneys that were involved in the case?

A. It took I think a -- I don't know how long. It was awhile back I was able to talk to them again.

Q. Okay. And did you only go to Chicago one time?

A. Yes, to testify at his trial I think it was.

Q. The post conviction proceeding?

A. Yes, post -- correct.

Q. Okay, so -- and that was the only time that you actually sat in a room and met with them?

A. With the --

Q. Lawyers.

A. With that lawyer yes, with her and her team.

Q. And do you remember the lawyer's name?

A. No, she was a -- no, I do not remember her name.

125

Q. Was it Jane Raley?

A. Short-haired old lady with some glasses and --

Q. Okay, and is she the same lawyer that was in court when you actually testified?

A. Correct.

Q. Mr. Bowman showed you a copy of the affidavit that was prepared dated June 12, 2010. It was marked as Exhibit 29.

Do you still have that in front of you?

A. Yes.

Q. Did you prepare that affidavit? Did you type it up?

A. I did not type this up.

Q. How did you get it in this typed form? How was it provided to you?

A. It was provided to me by -- what was her name? She wrote everything down that I said, and then she put it on here.

Q. Okay. And then did she give it to you to take a look at to make sure it was correct?

A. Yes.

Q. And did you make any corrections to

126

it, do you remember?

A. If I correctly -- yeah, I did make some corrections because I wanted to make sure everything was accurate.

Q. And then you sent it back?

A. Correct.

Q. And how did you do this, by email?

A. Email.

Q. And then once you made those corrections, did she send the affidavit back to you for you to review again?

A. Correct.

Q. How many revisions do you think that went through?

A. If I'm correct, I think it was three or -- two or three I think it was.

Q. Did you keep copies of --

A. I sure did.

Q. Do you still have them?

A. Not on me here.

Q. No, but I mean do you still have them somewhere today?

A. Yes, I do.

Q. Because we have not been provided those drafts, so at some point we might get

127

them -- ask your attorney if we could get copies.

MR. GIVEN: And actually, Cynthia, I did -- sorry, not Cynthia.

Stephanie, I did serve a subpoena Duces Tecum for any documents he might have, so if you could find those that would be great.

MS. ROSEN: Yeah, we'll follow up with your attorney, but if you have them, like I said, we've never seen the drafts to see the changes that you made. All right.

Q. And when -- was it Cynthia that asked you, the investigator, that had come out to your house, was she the one that asked you to prepare the affidavit or if you would be willing to prepare the affidavit or was it Jennifer?

A. It was Jennifer.

Q. Okay. And did she tell you what they needed the affidavit for?

A. Yes.

Q. And what did she tell you?

A. She told me it was for Jacques Rivera, for his behalf, where I wanted to recant my story, and I wanted to correct the

128

wrong that I did.

Q. Okay. And then did she tell you that -- what the goal would have been to use the affidavit, what they wanted to accomplish?

A. The mission was to reopen the case.

Q. Okay. And we talked -- you talked a little bit this morning about the gangs that were in and around the area where you lived at the time of this incident and you had mentioned that at some point you felt peer pressure and you ultimately joined a gang, and I thought you said you were an MLD, but then did you also say something about Deuces something, or did I mishear you?

A. You misheard me.

Q. Okay. So the only gang that you ever were a member of was the Maniac Latin Disciples?

A. Correct.

Q. What's the relationship between the -- what was the relationship in say 1988, '89 between the Maniac Latin Disciples and the Campbell Boys?

A. The Maniac Latin Disciples pretty much, the umbrella and the Campbell Boys fall

129

under them. That's why they had the word Maniac in their gang. Anything that was -- you know, Maniac Latin Disciples were the gang -- the Don if you want to say pretty much and everybody had to, you know, follow suit under them.

Q. So the Maniac Campbell Boys, is that like the full name for that?

A. Yeah, that's the name, yeah.

Q. So they were under the umbrella of the Mania Latin Disciples; correct?

A. Correct.

Q. So they were friendly?

A. Correct.

Q. And Imperial Gangsters, how did they fit within that framework in that 1988, '89 timeframe?

A. At the time they were rivals.

Q. And what was the territory of the Imperial Gangsters in this 1988, '89 timeframe in relation to where you lived?

A. Well, from Kimball and Cortland all the way to Fullerton and -- Fullerton and -- what was the street? Yeah, Kimball, Fullerton -- from Fullerton to Armitage, they

130

were big on that sense. From Central Park, you had Central Park, Armitage and then Kimball. Then once you hit Palmer -- towards Central Park and Palmer those were Cobras, and then by Kedzie, that was the borderline between Kings and Gangsters.

Q. Okay. And so then where were the Maniac Latin Disciples in all of this?

A. That was just me saying that was just the gang I joined. That was all it is. The Maniac Latin Disciples were over there on the other side of Humboldt Park. They're -- Humboldt Park area and they're in the northwest side also towards Pulaski and all that area.

Q. Okay, but Israel was a Maniac Campbell Boy; right?

A. Correct.

Q. And he -- and where did he live?

A. He lived in Campbell LeMoyne where did Campbell Boys like originated from.

Q. Got it. Okay. So your neighborhood though was not Campbell Boys?

A. At all.

Q. I got it. Okay.

You said that when you lived on

131

Cortland back in 1988 that it was you, your mother, your stepfather, and your four sisters, and we already talked about Marilyn. Your three other sisters, were they older or younger than you?

A. I had an older one, she was the oldest and the other two were younger. Marilyn was the second oldest.

Q. Marilyn was the second oldest?

A. Correct.

Q. When did Marilyn start dating Israel?

A. That I can't really give you an answer on that, that was between them two.

Q. Up until the time of Felix's death, had they been going out for a long period of time?

A. Yes. She was already living -- you know, living with -- you know, staying over their mother's house over there with her. They were already deeply involved.

Q. Okay. Did they have any kids together --

A. Yeah.

Q. -- at that point?

132

A.   At that point, no.  She was -- she got pregnant --

Q.   Right around that timeframe?

A.   Around that timeframe.

Q.   And how many children did she end up having with Israel?

A.   Three.

Q.   And he's since passed away; correct?

A.   Correct.

Q.   And how did he die?

A.   Murdered.

Q.   How long after Felix's murder was Israel murdered?

A.   I'd say a couple years after.

Q.   And was his murder -- the perpetrator brought to justice?  Was that crime like do you know --

A.   From my brother-in-law who he died, no, it was never brought to justice.

Q.   So nobody knows who killed him?

A.   It was a rival gang.  At the time there was a Spanish Cobra thing, a war going on.

Q.   But nobody was ever arrested?

133

A. That I'm aware of, no.

Q. And you've referred to Israel as your brother-in-law. Did they ever actually get married?

A. No.

Q. Now, on the day that Felix was shot, you had said that -- something about Israel and your sister going to a wedding.

A. Correct.

Q. Before you came out of the house that day, was Israel already in your apartment?

A. Correct.

Q. Had he come there with Felix to pick up your sister?

A. No.

Q. Felix came to get Israel and Marilyn?

A. Correct.

Q. Was Israel staying at your house at that point?

A. He spent the night over.

Q. Was that something he would do from time to time is spend the night at your house?

A. Correct.

Q. Did you know that -- before you

134

went out the door, did you know that Felix was already there?

A. Yes, I heard the -- yes, they beeped the horn and my brother-in-law was like you need to hurry up to my sister pretty much.

Q. And you lived on that first floor apartment. Could you see out the window of the first floor into the alley to see the car?

A. Yes.

Q. There's I think the other photograph.

A. See right here (indicating) there was a window -- the window was here (indicating) and there was a window over here also (indicating). So we saw him through -- that was my bedroom at the time.

Q. The corner was?

A. Yes, this was my bedroom there (indicating), but see these windows here (indicating), they were boarded up back in the day. So this (indicating) was actually considered the basement, and this (indicating) was considered the first floor.

Q. Okay, can we turn that photograph so that the videographer can see that? Can you

135

just point out again --

MR. BOWMAN: Can you turn it so I can see?

A. I can't show it to both of you at the same time.

Q. That's okay. You can hold it -- there you go.

A. Back in the day this was boarded up. There was no nobody living there. There was this first floor back then.

Q. Okay.

A. And this was my bedroom.

Q. Okay.

A. And that's where, you know, they come in and say, hey, I'm on my way. You know, I'm overhearing him say, hey, I'm on my way, just relax. You know, that type of conversation.

Q. Sure. So you knew that Felix was already there in the alley?

A. Uh-huh.

Q. And the car that he was driving, that red car, was that Felix's car?

A. Correct.

Q. At the time that you were out on

136

the street and observing all the things that you already testified to, was there anybody else out on the street?

A. No.

Q. The detective that you described earlier with the fro and the glasses, do you know how old he was? Can you estimate his age?

A. No, I can't tell you that. I really don't know. I don't want to guess his age to be honest with you. I don't know.

Q. Was he tall or short?

A. Well, he was taller than me, of course. Remember I was a child, so everybody was taller than me, so that's the response you're going to get from me.

Q. Was he thin or heavy set?

A. I'd say he was thin I guess, I don't know, or my size, you know, my size probably. I don't know. You know, either or I guess. In between probably.

Q. And you had said that at -- earlier when you were talking about the, I believe it was the first lineup, that Felix's father was there, too?

A. If my memory suits me right, yes.

137

Q. And when you say there, do you mean in the room with you?

A. Yes, he was in the room.

Q. Do you know why Felix's father was there?

A. I couldn't tell you why.

Q. Earlier when you were telling us about Jennifer and Cynthia coming to Ohio and knocking on your door you said something about telling them that you wanted to get a lawyer.

A. Uh-huh.

Q. Did you tell them you wanted a lawyer?

A. Correct.

Q. And what did they say to you?

A. That's fine.

Q. Now, I know that you were given a copy and you reviewed the testimony that you most recently gave, the Exhibit No. 30.

When is the last time that you reviewed your testimony from the criminal trial?

A. The criminal trial I -- when I received the -- when she -- I got mail and then also got it on the email, like a thing I read

138

-- before I went through the first one, I actually read through that one first, the old one, to see -- you know, just to curse at it and, you know, just get out my anger and curse the police, believe me -- you know, just whatever. As far as -- just I reviewed it there. It was last week, there.

Q. So fairly recently?

A. Just recently, yes. I apologize.

Q. That's okay.

A. I'm letting my emotions get the best of me.

Q. I know this is difficult, and it's hard to relive all of this, and we appreciate that you're sitting here and doing that.

When you were reviewing that testimony, did you take note of your testimony where you were asked about the lineup that you saw?

A. I was basically going on the -- for some reason I was just going based on -- I wanted to read the ending of it, and I was looking at that more because of the lawyer how he was asking me how far did you see the distance from, you know, that was really where

△ obj.
#11
improper refresh/
impeachment,
hearsay,
irrelevant

139

I was more -- for some odd reason stuck on that. I was mainly more focused on reading that. I don't know why, but that's what I read more than anything else.

Q. So you don't recall the testimony where they were asking you questions about the lineup?

A. No. No, I didn't really review that part of it.

Q. Do you recall being asked questions about the lineup when you testified back in 1990?

A. There is a lot of -- like I said, you guys are asking details and it's hard for me to tell you yes, no, and I understand it's yes or no questions, but --

Q. No, that's not necessarily a yes or no question, so if you don't remember, you don't remember. I'm just trying to probe, you know, what you remember.

A. No, I just -- like I said, I just remember them asking how far from the shooter. That's what I -- I recant. I do remember that part of the -- you know, vividly in the sense it stuck in my head.

140

Q. Sure. Do you remember at the time of the criminal trial that you were shown a photograph of the lineup and you were asked to put an X over the person you identified in the lineup?

A. I did read that. Now that you bring it up, I did read that part, and I also -- they also -- I remember them telling me to point out the shooter in trial, and I proceeded to point at Jacques Rivera at the time.

Q. Okay. I'm going to ask that we mark this -- what number are we on?

MR. BOWMAN: I think we're at 36.

- - - - -

(Thereupon, Deposition Exhibit 36, Photograph, was marked for purposes of identification.)

- - - - -

Q. I'm going to show you what we've marked for identification as Exhibit No. 36, and it also has one of those Bates stamp numbers at the bottom, which I see is cut off on this version, but it's Bluhm, B-L-U-H-M, 45084, and I'm going to ask you to take a look at that. And do you see the photograph in

141

front of you there, Mr. Lopez?

A. Yes.

Q. Do you recognize that photograph?

A. I really don't remember this photograph.

Q. Do you remember putting the red X on the photograph at the time of the trial?

A. No, I don't recall the -- like I said, trial is any -- I don't remember too much of the trial as far as pictures and stuff like that.

Q. Do you recognize anybody in that photograph?

A. Yes. I recognize Jacques Rivera.

Q. Do you recognize any of the other individuals in that photograph?

A. No, I don't.

Q. Do you remember ever seeing them before?

A. No.

Q. Is that the first lineup that you saw?

A. I can't -- I don't remember the -- you know, it was the first or the second. I can't tell you if it was -- you know.

142

Q. You don't remember?

A. I don't remember.

Q. That's fair enough. After Felix was shot you testified earlier that Israel came down. Did Marilyn come down, too?

A. No, not at the moment. She came after they -- she heard the car. He was yelling, you know, just screaming and then got out the car, peeled the car, and she was like what happened, what happened, and that's when -- and that was pretty much what happened. That's when she came afterwards.

Q. And where did she come from?

A. From the apartment.

Q. Okay. And then where did she go after she came out?

A. She just started crying and just started walking towards east to go towards, you know, the area where they were from.

Q. How far from your house on Cortland was the Valentin house?

A. It was far. You had -- you know, you took -- I'm going to -- I really don't know mileage, you know, how many miles, but it was far. It was a distance.

143

Q. Was it walking distance?

A. No. You can walk there, don't get me wrong, but it was going to take a while to get there.

Q. Okay. When you testified earlier that you were in the hiding place the first time at the -- right next to the door of your building and then you said you ran to the corner store to get help, how did you -- how did you run, like what direction did you take?

MR. BOWMAN: Object to the form of the question.

A. Answer it?

Q. Yeah, you can go ahead and answer.

A. On an angle, straight across.

Q. And then when you ran back from the corner store back to that hiding place again, what direction?

A. Same way. I ran east if you want to call it. I ran northwest, you know, southeast.

Q. So both times you were running diagonally across the street?

A. Correct.

Q. Do you remember when you first

144

spoke with Cynthia and Jennifer when they came out to visit you in Ohio that first time saying something about the real shooter's name being Izzy or Gizzy?

A. It was a gangster, yeah. The words -- the street -- like after that I saw -- I also saw him back in the day, you know, when I was in high school at Kelvyn Park, and I saw him there also, but --

MR. BOWMAN: I'm sorry, which park?

THE WITNESS: High school, Kelvyn Park High School, because his brother was having problems and he went to go, you know, fix a problem and at the time when I saw him, I ran also like a -- scared.

Q. Okay. So let me try and understand this. This time that you're talking about at Kelvyn Park is years later?

A. Years later.

Q. About how old were you at that point?

A. I was a freshman.

Q. In high school?

A. In high school.

Q. And you saw the person that you had

Δ Obj.
#12
relevance,
after-acquired
evidence (MIL)
barred (MIL),
not in affidavit

145

seen at Funston School earlier; right?

A. Correct.

Q. And you said something about he had come up to the park because his brother was having some kind of trouble?

A. Yes.

Q. His younger brother or his older brother?

A. Younger brother.

Q. And how do you know that?

A. I didn't know him, you know, personally, but we know that was his brother because, you know, he was like -- you know, he got -- it was just -- his brother got beat up it looked like and he came and was upset about it. Like I said, we all lived around the area. You know, his brother went to Kelvyn Park, and I knew this for a lot of years, and I was -- like I said, I didn't -- I stayed away.

Q. When did you first become aware that the person that you believed shot Felix's younger brother went to Kelvyn Park?

A. When he went the first year, freshman year. Like I said, they all -- you know like when you're in gangs, people talk

146

about, yo, this is individual's brother and that's why he was having problems at school. He said she -- you know, the type where this is his little brother.

Q. Okay. When did you first become aware that the person who you believed shot Felix's name was Izzy or Gizzy?

A. Because that was around the area where his brother -- when he came to the school, that's what the name they were saying, his name.

Q. Okay. So they said that this individual's brother's name is Izzy or Gizzy?

A. Correct.

Q. And then when you saw him you realized it was the shooter?

A. Correct.

Q. Okay. I got it now. So it wasn't that you knew it before then --

A. Yeah, I didn't know. No, I didn't remember like at all the details of his name. I knew after when he was like, yo, that's the brother and that's Izzy, you know, and then I ran when I saw that. I was like, oh, gosh, here we go again. I got to get out of here.

Δ obj. #13 irrelevant, after-acquired evidence, not in affidavit

Δ obj. #13 (cont)

147

Q. Okay. And did you ever get any more information about this Izzy or Gizzy person after that time?

A. I didn't want no part of knowing nothing about the individual. Like I said, I was scared for my life. I didn't -- the best -- I was hiding fool in other words.

Q. Did you know the little brother's name?

A. No, I did not know him like that. Like I said, I didn't want no part of knowing nobody. I just knew he was his little brother.

Q. Did you go to Kelvyn Park?

A. Yes.

Q. Were you and the little brother the same age, like in the same class?

A. No, no, no, no.

Q. Was he older than you or younger than you?

A. That -- I'm assuming we were around the same age probably because I like said, he was at Kelvyn Park.

Q. Okay. Earlier today you said you didn't see the driver of the getaway car?

A. No, I did not.

Δ Obj. #14 irrelevant, after-acquired evidence barred (MIL), not in affidavit

148

Q. For lack of a better description, do you remember telling Cynthia and Jennifer that he was fat, that the driver was a fat guy?

A. That I don't recall if I said it. I probably did say that. I just remember saying to them that it was, you know, it was not him, and that the guy that did it was a gangster, and that was pretty much the convers- -- you know, like I said, there was a lot of things said and just -- you know how you guys bombard people with questions and you're just answering and answering and you're answering as best as you can. So I apologize if I don't recall a lot of the answering the questions, so --

Q. No, it's not a problem at all. So you don't remember one way or the other whether you used a descriptive --

A. Yeah, I don't -- yeah, I don't.

Q. Now, in the Valentin family, there was Israel and Felix. Were there other brothers other sisters?

A. Harry.

Q. And do you know Harry Valentin?

A. Yeah, I did know him -- remember

149

him.

Q. Is he still alive?

A. I couldn't tell -- I can't answer that. I really don't know.

Q. Were you -- did you consider him family too, at the time back in 1988?

A. That's all family. Once you have kids with a -- you know, you're family pretty much. That's how we roll.

Q. Okay. When is the last time you spoke with Harry?

A. I haven't spoke to those people ever since I left, and it's been since I was 18 years old probably.

Q. Oh, okay.

A. I was done.

Q. Go ahead.

A. I was just done with a lot. You know, like I said, once I had my son at 19 years old, I didn't want to deal with nobody no more.

Q. Were there any sisters in the Valentin family?

A. Denise.

Q. Any other sisters?

150

A. They had a baby sister Vanessa.

Q. And no contact with any of them since you left Chicago; right?

A. No, I'm done with -- like I said, I don't want no part of that. I was done.

Q. When Cynthia and Jennifer first came out to your house in Ohio to talk to you, do you remember them asking you specific questions about the order in which you identified Jacques?

A. The way --

MR. BOWMAN: Object to the form of the question.

A. It was -- like I said, it was -- they were asking me the lineups and I -- just like I was telling him, a lot of that stuff I don't recall how the order went. They were not coaching me in the sense either.

Q. No, no, I don't mean that. I mean do you remember them asking you at some point while they were talking to you that they want to get it straight, and that they asked you to sort of tell them, you know, a sequence to the times that you identified --

A. To my best ability --

151

Q. -- Jacques?

A. -- I did answer some of those questions my best, you know.

Q. And have you ever seen the report that Cynthia Estes prepared about the interview she did with you?

A. All that she showed me was the affidavit.

Q. Okay. So you never saw her -- she -- any typed up report she prepared?

A. Just affidavit.

- - - - -

(Thereupon, Deposition Exhibit 37, Report, was marked for purposes of identification.)

- - - - -

Q. We are on Exhibit 37. I'm going to ask you to just flip through those pages. I don't want you to read the whole thing, but just take a quick look and make sure you've never seen that before, or if you have seen that before, tell me that you've seen it before?

A. All I remember was, like I said, the affidavit.

152

Q. Okay. So you don't ever recall seeing that before. So just give me one second. I'm going to ask you to take a look at Page 11 of that report. If you just read -- you can just read it to yourself starting at where it says, I asked Mr. Lopez if we could go through the order in which he identified our client, and just read that to the bottom of the page.

A. Out loud?

Q. No, to yourself.

A. Oh. All righty.

Q. Okay. Now, if you go to the sort of the beginning few lines of that, that page there, 11 of the Estes report where it says Mr. Lopez said the cops brought the mug book to his house and he picked the guy, then he thinks he may have picked him from a lineup a few days later. Then he thinks a few days after that they showed him more photos and that's when he told them Rivera was not the guy, but the lady wouldn't listen.

Do you see that there?

A. What was the -- okay.

MR. BOWMAN: Yeah, I object to the

153

form of the question, also to the evidentiary basis for the -- I mean the --

A. Well, could I state --

MS. ADAMS: Wait. You don't answer questions that haven't -- let him finish his objection.

MR. BOWMAN: I finished my objection. I object to the form of the question, and I don't think it even states a question.

BY MS. ROSEN:

Q. Okay. The question is do you see those couple sentences there in that report? That's my first question.

A. Yeah, I do see that.

Q. Okay. Do you recall when you were having a conversation with Jennifer and Cynthia, saying that to them, saying that the cops brought the mug book to your house and you picked the guy and then you think you may have picked him from a lineup a few days later and then you think a few days after that they showed you more photographs -- photos and that's when you told them that Rivera was not the guy, but the lady wouldn't listen?

154

Did you say that to Cynthia and Jennifer when you they came to your house?

MR. BOWMAN: Object to the form of the question.

A. What I said -- because like I said, you guys write -- like I said, you guys write however you guys want to write I guess, whatever. What I've been saying here is exactly what I told her also.

Q. Okay.

A. So you guys word things differently and I -- I'm just shocked. Like I said, I told them exactly what I told you and what you've been hearing me come out of my mouth.

Q. Okay.

A. So this is something they wrote. I never saw this. So I couldn't tell you -- like I said, they word things differently. I don't know how they wrote this or whether they -- I just -- I'm just amazed how things get written here. To say I remember exactly how they said this. No, I don't remember saying it like this.

Q. Is it accurate the way she's got it written there?

155

MR. BOWMAN: Objection. Foundation. Asked and answered. It's already been testified to.

Q. Is what she has recounted there accurate of what you told her?

MR. BOWMAN: Same objection. No foundation for that question.

A. Like I said, again --

MR. BOWMAN: Just answer the question. Either it is or it isn't.

A. I don't remember talking to her like this. There.

Q. Okay. In your conversation with Jennifer and Cynthia, did you say something about that you had heard that Mr. Rivera had an alibi so you thought he would be found not guilty?

A. Yeah, I did say that.

Q. Where did you hear that, that he -- where did you hear that he had an alibi?

A. In the court. That was the defense of the lawyer where he was saying, you know, he wasn't there, because like I said, there is certain things I remember vividly and there's certain things I don't remember vividly.

156

Q. Sure.

A. I remember the lawyer saying he didn't do it. He had an alibi, so that was his defense. That I remember saying in those type of words.

Q. So you remember that in the courtroom way back in 1990?

A. Correct.

Q. And that was from Mr. Rivera's lawyer saying arguing or something to the judge?

A. Correct.

Q. After you had become involved in the police investigation into Felix's shooting and murder, did you for some period of time move to your dad's house on Avers because you were afraid of some kind of gang retaliation?

A. Yes, I did move with my father.

*P Objection #3 barred by gang MIL*

Q. And when did you do that?

A. I couldn't tell you the day or the time. I just know I moved with my dad.

Q. And would it have been right around the time of the shooting?

A. No. It didn't happen right away.

Q. A little bit later?

157

A. Because I was still living with my mom.

Q. Was it later?

A. It was later on.

Q. Do you remember if it was before or after you testified?

A. I don't re- -- like I said, I don't remember.

Q. Okay. And you had testified earlier today, and I think I read it in other places where you talk about that your parents didn't want you involved in this way back when; right?

A. Correct.

Q. Why didn't they want you involved?

A. Typical Latinos. We don't want to -- they were afraid for my life and the problems -- you know, retaliation from gangs. You know how that goes over there in Chicago, it's obvious. They were just concerned about me, and they didn't want me to get involved.

Q. Because they were afraid for your safety?

A. And theirs, too.

Q. And theirs, right. The police

P Objection #4 barred by gang MIL, asked + answered

158

officers that came out to your house that first night, the ones that you described earlier as the blue -- how did you say it blue --

A. Blue boys.

Q. Blue boys. Were there any blue girls? Were there any female police officers that came out that night?

A. I didn't notice any female. I just know they were cops. I didn't look at nobody being -- I didn't care -- like I said, as a kid I'm just -- no, there.

Q. Okay. So you just don't remember one way or another whether there was a female?

A. Yeah, correct.

Q. The female that you described, the white or blond-haired lady that you tried to tell that you had gotten it wrong, had you ever seen her before?

A. No.

Q. Have you seen her since?

A. No.

Q. Okay. Now, we talked a little bit -- I asked you a few questions earlier about the affidavit, but I want to go back to that for a second.

159

Do you recall how many times you communicated with Cynthia about the affidavit?

MR. BOWMAN: Object to the form of the question.

A. A couple of times I assume. You know, I don't -- to say five, ten I couldn't tell you that --

MS. ADAMS: Just to be clear, she communicated with me. She didn't communicate directly with him.

MS. ROSEN: Oh, okay. Then let me back up for a second.

A. I'm just, you know -- I was getting stuff through there --

MS. ROSEN: Okay. Let's go back and I'll establish --

MS. ADAMS: Relax.

MS. ROSEN: -- sorry, the foundation.

MS. ADAMS: That's okay.

BY MS. ROSEN:

Q. After you met with Jennifer and Cynthia, did you communicate with them any further after that first time directly or was it all that communication through your

160

attorney?

A. Then after that through Jen --

right with Steph.

Q. With Stephanie?

A. Yeah, it's just --

Q. Okay. So you spoke to Jennifer and Cynthia that first time when they came to your house unannounced?

A. Uh-huh, yes. I apologize.

Q. And then after that time all communication with anybody related to Mr. Rivera was through your attorney, Ms. Adams; correct?

A. Correct.

Q. And the revisions and the things that were made and the communications about the revisions to the affidavit were through your attorney; correct?

A. It was sent through her and then come to my -- to here -- then to me through the computer so I could see and make sure it was the right way.

Q. Sure, but from Stephanie?

A. Correct.

Q. Okay. Did anybody from

161

Mr. Rivera's team contact you directly, not through your attorney after that first time that they came out to your house?

A. Was this -- okay, let me ask a question. What team was it something you're referring to?

Q. That Jennifer or Cynthia --

A. Yeah, the -- yes, they -- that's where I met, in my house.

MS. ADAMS: Okay, now wait. Listen to her question. One more time.

Q. After that first time when Cynthia and Jennifer came out to your house --

A. Okay.

Q. -- any time after that if you had any contact with anybody that was representing Mr. Rivera, was that always through your attorney?

A. Yes.

Q. And when you came to Chicago to -- and before you testified and you met with the attorneys that were representing Mr. Rivera at that time, was your attorney also present with you?

A. No.

162

Q. And when you came to Chicago and met with those attorneys that were representing Mr. Rivera before you testified at the post conviction proceeding, how many times did you meet with them before you testified?

A. That was the only time right there.

Q. The one time?

A. That one time when we went to court.

Q. And how long did you meet with them before you testified?

A. They picked me up from the hotel and we went straight to the Cook County Jail, whatever you want to call it, the courts.

Q. And was Mr. Rivera in court when you were there testifying?

A. Yes.

Q. Did you recognize him?

A. Yes.

Q. And that was the first time you had seen him since the criminal trial; is that right?

A. Correct.

Q. I've seen some emails between your attorney and the attorneys representing

163

Mr. Rivera in the post conviction proceeding where your attorney was expressing some concern about the fact that your -- the fact that you lived in Ohio was printed in the newspaper and that you were concerned about that?

A. Yes, I was.

Q. Can you tell me why you were concerned about that, what you were afraid of?

A. Jesus Christ. I got a family first and foremost as you -- I don't know if ya'll are parents or whatnot and husbands and wives. That's your first and foremost.

I came to this whole situation naive, you know, thinking I'm going to do the right thing, which I did, and nothing was going to come out of it, none of this suing going on. And I thought I was going to testify and game over. My concern was my family, main thing.

Q. Are you still in touch with your sister, Marilyn?

A. Not really -- we're, you know we're -- after all this been going on, you know, like I said, we haven't been not at -- we talk, but not like -- hi, bye and that's it.

Q. Before Jennifer and Cynthia came

164

out to your house and knocked on the door, how was your relationship with your sister, Marilyn, at that point?

A. Okay. Like I said, we live -- she lives over there, I live over here, and there's not really a tight-knit fit because we're a distance.

Q. Because she lives out of state, in a different state; right?

A. Correct.

Q. And do you -- she has three children; is that what you said?

A. Correct.

Q. And what's your relationship with your nieces or nephews?

A. I call them and still, you know, encourage them as an uncle, stuff like that.

Q. Do you guys ever get together for family functions?

A. I have gone over there to see my nephew, you know, them over there, yes, I have done that.

Q. Do your children have a relationship with her children?

A. No, because like I said, we're two

165

different states.

Q. In 1988, did you have a street name?

A. My street name was just Macho.

Q. Macho?

A. Yeah.

Q. That's written a police report --

A. Yeah, Macho.

Q. -- so I just wanted to make sure that that was --

A. Yeah, that's fine.

Q. After Felix was shot, did you visit him in the hospital?

A. No, I did not.

Q. Did -- do you know if Marilyn did?

A. That I couldn't tell you.

Q. Did you continue to communicate with Israel after Felix got shot?

A. Yes.

Q. Did Israel go visit Felix, do you know?

A. I assume he did.

Q. Do you recall him telling you anything about how he was doing or anything like that?

166

A. No, that he never told me. He didn't really say nothing about that.

Q. Do you recall how long Felix stayed alive before he passed away after the shooting?

A. No, I do not.

Q. Do you know how many times Felix was shot?

A. After the report I read I think it was like nine times, I think it was. That's what I read, I don't know.

Q. Do you know what report you read that said that? Was it a police report?

A. No, it was a -- you know, how people -- you know how you and I would be gossiping on the side like, yeah, yeah, I think he got shot nine times, but never read it on a report.

But, you know, after the report -- like I said, I went through this report, there was just certain things that stuck out to me and certain things that -- you guys are into details. My details, I saw the individual who did it. That's all I care about. So that's what I'm focusing on.

Q. Did Felix and Israel look alike?

P Objection
#5
compound question,
nonresponsive

TESTIMONY WITHDRAWN

167

A. No, not to not me. My opinion, no. I don't know.

Q. What was -- back in 1988, what was your relationship with Felix and Israel's parents?

A. That I -- you know, dating my sister, and, you know, I used go to their house, and that was pretty much it. Nothing major. It was still young in the relationship with my sister and, you know, they were so young, but still we knew from, you know, being on Campbell and stuff like that, that's how I knew them.

*TESTIMONY WITHDRAWN*

Q. Do you know an individual by the name of Angel Villafane?

A. It does not ring a bell to me.

Q. How about Carlos Olivero?

A. If you're asking me about these guys' name, I don't know. They got to give me street names. I don't know. We never knew each other really by our first name -- our real names. We just by our nicknames.

Q. How about somebody by the name of George Ruiz?

A. That doesn't ring a bell, no.

168

Q. Ramon Lopez?

A. No.

Q. Jose Rodriguez?

A. No.

Q. Just give me one second.

Do you know where Felix went to school?

A. I couldn't -- he went to school was Roberto Clemente probably.

MS. ROSEN: Okay. Why don't we take a quick break, and I think I'm just about done, and then I think Mr. Given might have some questions for you.

MR. GIVEN: I likely will, and if we take like 10, 15 minutes it could pay off in the long run.

MR. BOWMAN: Understood.

THE COURT: Off the record 3:10.

(Recess taken 3:10 p.m.)

- - - - -

THE VIDEOGRAPHER: On the record. The time is 3:29.

(Deposition resumed 3:29 p.m.)

MS. ROSEN: Mr. Lopez, I don't have any further questions. Thanks.

169

EXAMINATION OF ORLANDO LOPEZ

BY MR. GIVEN:

Q. Hi, Mr. Lopez. My name is Jeff Given. I introduced myself to you at the beginning of the day. I represent the defendant police officers who are being sued by Mr. Rivera in this case.

I have a few questions for you. Some of them may sound like questions that you've been asked earlier, and I apologize, but I have tried to pare them down so we will not be here any longer than I hope we need to be; okay?

A. Okay.

Q. On August 27, 1988 you saw Felix Valentin get shot; correct?

A. Correct.

Q. And later that evening police came to your house; right?

A. Correct.

Q. And you talked with the police and you told them what you had seen?

A. Correct.

Q. You told them you had witnessed the shooting?

170

A. Correct.

Q. And you told them that the shooter was a Latin King because the car turned south into Latin King territory; right?

A. Correct.

Q. And if I understand it right, Cortland Street was sort of a buffer between the Imperial Gangsters and the Latin Kings; correct?

A. Correct.

Q. And, in fact, the car with the shooter, after it took off, turned right onto Spaulding; correct?

A. Correct.

Q. And that was into Latin King territory; right?

A. Correct.

Q. And, in fact, that's where you would expect a Latin King to go after shooting a person by your house; correct?

A. Correct.

Q. In fact, it would be foolish for a member of a rival gang to drive into Latin King territory under those kinds of circumstances; right?

171

A. Correct.

Q. Now, you told the police you didn't know the name of the guy that shot Felix, but that you had seen him a few times playing baseball in Humboldt Park; right?

A. I did say that, correct.

Q. And then the police came back to your house a little while later that same night with some gang books and photographs of Latin Kings; right?

A. Correct.

Q. And you went through those books for about an hour?

A. Just, yeah --

Q. More or less?

A. Yeah, more or less.

Q. And you looked at about 100 photographs?

A. I guess, yes.

Q. These were big thick binders --

A. Correct.

Q. -- that you had described earlier?

A. Correct.

Q. And you went through those books very carefully?

172

A. Correct.

Q. And you wanted to make sure that the person you picked, if any, would be the right guy; right?

A. Correct.

Q. And that's why you were very careful as you went through those books; right?

A. Correct.

MR. GIVEN: Somebody's phone is buzzing.

MS. ROSEN: It's done.

MR. GIVEN: Okay.

Q. Now, after all this time of looking at the books, you ultimately picked a photo of the person you believed shot Felix; right?

A. Correct.

Q. And that person was Jacques Rivera?

A. Correct.

Q. And you told the police you were certain it was him; didn't you?

A. Correct.

Q. And they asked you a couple times, are you sure and you said, yes, I'm sure.

A. Correct.

Q. And at that time you believed the

173

shooter was Jacques Rivera; didn't you?

A. At the time, yes.

Q. Now, the police didn't force you to pick that photos; did they?

A. No.

Q. They didn't trick you into picking that photo; did they?

A. No.

Q. Now, on other occasions besides the night of the shooting, police also showed you other photographs of other gang members at various times; didn't they?

A. No.

MR. BOWMAN: Objection to form.

Q. Well, do you remember testifying in this case at the criminal trial back in April 1990?

A. I remember I was at a trial but to tell you 1990, April, I couldn't tell you that yes or no.

Q. Well, you remember testifying as -- when you were about 13 years old in --

A. At that age, yes, around that age.

Q. And it was in the criminal case of Jacques Rivera?

174

A. Correct.

Q. You just don't remember if it was April of 1990 or what month.

A. No, that I don't remember.

Q. And you were sworn to tell the truth in that trial; correct?

A. Correct.

Q. And would you agree with me that your memory back in that time period when you testified, which was a couple years after the shooting, was better then than it is today with regard to the events of the shooting?

A. Yeah, my memory was -- at 13, yeah, I guess. Yes.

Q. Okay. Let's mark the next exhibit as Exhibit 38.

- - - - -

(Thereupon, Deposition Exhibit 38, Bench Trial, was marked for purposes of identification.)

- - - - -

MR. GIVEN: Stephanie you want to --

Q. And just take a quick look at it. You don't need to read it all right now.

175

On the front page you see that there's a date April 5, 1990; do you see that?

A. Yes.

Q. And it says bench trial; correct?

A. Correct.

Q. And then it says The People of the State of Illinois versus Jacques Rivera. Do you see that?

A. Yes.

Q. Does that help refresh your recollection that the trial that you testified at was in April of 1990?

A. That doesn't help me at all as what day it was.

Q. Okay. You don't have any reason to dispute the date of --

A. Oh, no, no, no. I'm not disputing your dates. I'm just disputing the fact that I couldn't tell you the date.

Q. Sure. I understand.

THE VIDEOGRAPHER: I'm sorry, could you move your microphone up?

MR. GIVEN: Is that better?

THE VIDEOGRAPHER: Yes. Thank you.

Q. Now, do you remember you were asked

Obj. improper refresh/impeachment #16 no answer unnecessary

176

questions at the trial by lawyers; correct?

A. Correct.

Q. And you answered those questions as best you could; correct?

A. Correct.

Q. Were you asked the following questions and did you give the following answers? Question: Were you ever shown a photograph of a man named Rodriguez that was in the Imperial Gangsters? Did police ever show you his photograph? Answer: No. Question: They did not? Answer: They showed me some other pictures of some other gang members.

Were you asked those questions and did you give that answer? I'm sorry, Stephanie this is on --

MS. ADAMS: I got it.

A. If I said I --

MR. BOWMAN: Hang on, hang on. I need to make an objection before you answer, and the objection is that if this was being read for purposes of impeachment, it is not impeaching, and if it's not for impeachment then it's hearsay.

MR. GIVEN: It is for impeachment.

#16

177

BY MR. GIVEN:

Q. And let me ask again, Mr. Lopez, on other occasions besides the night of the shooting police showed you other photographs of other gang members; didn't they?

MR. BOWMAN: Objection.

A. No, they did not.

Q. So during the course of the investigation you don't -- do you remember one way or the other if the police showed you other photographs besides the gang books?

A. Latin Kings, and I repeated Latin Kings. That was it.

Q. You were interviewed quite a few times about this case; weren't you?

A. Presumably, yeah, I -- yes.

Q. And you can't remember all the times that you were interviewed and showed photographs; can you?

A. I was only showed Latin Kings. Those were the only pictures they showed me.

Q. Now, some time after you picked out Jacques Rivera's photograph from the gang book, you viewed a lineup at a police station; correct?

178

A. Yes. I did a lineup.

Q. And you believe you saw two lineups; correct?

A. Yes.

MR. BOWMAN: Objection. That's not his testimony.

Q. And it's true, isn't it, that you picked Jacques Rivera in every live lineup that you saw; correct?

A. Correct.

Q. There's no doubt in your mind; is there?

A. No.

Q. Now, while you were at the police station but before you viewed a lineup, you had a conversation with a white-haired woman; correct?

MR. BOWMAN: Objection. Misstates the testimony.

A. Answer?

MR. BOWMAN: Answer.

MS. ADAMS: You can answer.

A. Yeah, I did say something about a lady with white hair, yes.

Q. Okay. And you told this

179

white-haired woman that you had picked the wrong guy?

A. Correct.

Q. And the white-haired lady told you not to be afraid, nothing was going to happen to you, you would be protected; is that correct?

A. In those lines, yes.

Q. And this conversation was the first time you had ever encountered that white-haired lady; correct?

A. Correct.

Q. And the white-haired lady was the only person you told that the shooter wasn't Rivera; is that correct?

MR. BOWMAN: Objection. That misstates the testimony. He's testified there were two people present at the time.

MR. GIVEN: Stop the speaking objections. If you have an objection, state it cleanly. I'll ask my question again.

MR. BOWMAN: You can't ask a question that misstates the testimony.

MR. GIVEN: I am not and --

misstating the testimony. I am asking a

180

question. I will ask it again.

BY MR. GIVEN:

Q. The white-haired lady was the only person you told that the shooter wasn't Rivera; correct?

MR. BOWMAN: Objection. Same objection. Misstates.

MS. ADAMS: You can answer.

A. There was -- oh, Lord. I said white lady --

Q. Let me ask my question again.

MR. BOWMAN: He hasn't finished answering yet, and you can't interrupt him.

MS. ADAMS: Listen to the question and just answer that.

A. Yeah, I told the lady -- white lady --

MS. ADAMS: Listen to what he asked you. One more time. Listen to his question.

Q. Let me ask my question again. The white-haired lady was the only person you told that the shooter wasn't Rivera; correct?

MR. BOWMAN: Objection. Misstates his testimony.

A. At the time, yes, I told her, only

Δ obj. #17 irrelevant, unnecessary colloquy, wastes time

181

her. I'm assuming I told her because she was the only one that was telling me that things will be fine.

Q. And then a few minutes after you had this conversation with the white-haired lady you went to a lineup and you picked Rivera again; correct?

A. Yeah, I picked him -- I picked him out twice.

Q. Now, the police did not point Rivera out to you in the lineup; did they?

A. No.

Q. And they didn't point him out to you in those gangs books; did they?

A. Nope.

Q. And the police or no one else in authority at the station ever forced you to identify Rivera as the shooter in the lineup; did they?

A. Correct.

Q. In fact, you told Cynthia Estes and Jennifer Linzer in February 2010 that you wanted them to know that the police did not force you into picking anybody out; didn't you?

A. Correct.

182

MR. BOWMAN: Objection to that foundation. Form.

Q. Now, at Mr. Rivera's criminal trial in April of 1990, you testified in court that Jacques Rivera was the person who shot and killed Felix Valentin; didn't you?

A. At the trial, yes.

Q. And that was a lie; wasn't it?

A. Yes, it was.

Q. And you knew it was a lie; right?

A. Yes.

Q. Now, nobody forced you to lie; correct?

A. Correct.

Q. The police didn't pressure you into falsely identifying Jacques at the trial; did they?

A. No.

Q. The police didn't force you to pick Jacques Rivera's photograph from the gang book; did they?

A. No.

Q. Just give me a second.

MR. GIVEN: I don't have any other questions.

183

MR. BOWMAN: We'll take one last break, and I'll have a few questions or possibly not. We're close to the end.

THE VIDEOGRAPHER: Off the record 3:42.

(Recess taken 3:42 p.m.)

- - - - -

THE VIDEOGRAPHER: Back on the record. The time is 3:52.

(Deposition resumed 3:52 p.m.)

MR. BOWMAN: Mr. Lopez, I -- once again I want to thank you for your cooperation in this process. I do not have any further questions for you. So that concludes the questioning and your lawyer will advise you regarding the rights that you have with respect to the transcript that's going to be made of your deposition.

MS. ADAMS: He'll read, of course.

MR. BOWMAN: Very good. So before we go off the record there is one thing that Mr. Given brought to my attention during one of our breaks. Specifically with reference to

184

Exhibit 31, which is the Google Maps page with 3320 West Cortland and the surrounding area in Chicago. As Mr. Lopez testified, there is an A, which is within a bubble, and that is supposed to designate the address 3320 West Cortland.

In fact, that A we can all see is misplaced. The map depicts the alley between Kimball and Spaulding that ran adjacent to 3320 just to the east and the bubble, therefore, should be placed just to the left on our map of that alley, and I'm just going to take my ink pen and make an X at the location where 3320 should be designated on this map, and I think we all stipulate that that's the correct location.

MS. ROSEN: Yes.

MR. GIVEN: I agree.

MR. BOWMAN: And that concludes our record. So we're off the record at this point.

THE VIDEOGRAPHER: Off the record 3:54.

(Whereupon the deposition was concluded at 3:54 p.m.)

185

Whereupon, counsel was requested to give instruction regarding the witness's review of the transcript pursuant to the Civil Rules.

SIGNATURE:

Transcript review was requested pursuant to the applicable Rules of Civil Procedure.

TRANSCRIPT DELIVERY:

Counsel was requested to give instruction regarding delivery date of transcript.

Original - Mr. Bowman

Copy - Mr. Given

186

REPORTER'S CERTIFICATE

The State of Ohio,  )

                  SS:

County of Cuyahoga.  )


        I, Toni DiNardo, RPR, a Notary
Public within and for the State of Ohio, duly
commissioned and qualified, do hereby certify
that the within named witness, ORLANDO LOPEZ,
was by me first duly sworn to testify the
truth, the whole truth and nothing but the
truth in the cause aforesaid; that the
testimony then given by the above-referenced
witness was by me reduced to stenotypy in the
presence of said witness; afterwards
transcribed, and that the foregoing is a true
and correct transcription of the testimony so
given by the above-referenced witness.
        I do further certify that this
deposition was taken at the time and place in
the foregoing caption specified and was
completed without adjournment.

187

I do further certify that I am not a relative, counsel or attorney for either party, or otherwise interested in the event of this action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Cleveland, Ohio, on this _____ day of _____, 2013.


_____
Toni DiNardo, RPR, Notary Public
within and for the State of Ohio

My commission expires January 12, 2015.

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT NO: 1669960
CASE NAME: Rivera, Jacques v. Guevara, Reynaldo, Et Al
DATE OF DEPOSITION: 5/29/2013
WITNESS' NAME: Orlando Lopez
In accordance with the Rules of Civil
Procedure, I have read the entire transcript of
my testimony or it has been read to me.
I have made no changes to the testimony
as transcribed by the court reporter.


_____     _____
Date                     Orlando Lopez
Sworn to and subscribed before me, a
Notary Public in and for the State and County,
the referenced witness did personally appear
and acknowledge that:

They have read the transcript;
They signed the foregoing Sworn
Statement; and
Their execution of this Statement is of
their free act and deed.

I have affixed my name and official seal

this _____ day of_____, 20____.


_____
Notary Public

_____
Commission Expiration Date

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT NO: 1669960
CASE NAME: Rivera, Jacques v. Guevara, Reynaldo, Et Al
DATE OF DEPOSITION: 5/29/2013
WITNESS' NAME: Orlando Lopez

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have listed my changes on the attached Errata Sheet, listing page and line numbers as well as the reason(s) for the change(s).

I request that these changes be entered as part of the record of my testimony.

I have executed the Errata Sheet, as well as this Certificate, and request and authorize that both be appended to the transcript of my testimony and be incorporated therein.

_____    _____
Date                          Orlando Lopez

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They have listed all of their corrections in the appended Errata Sheet;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal

this _____ day of_____, 20____.

_____
Notary Public

_____
Commission Expiration Date

McCorkle Litigation Services, Inc.
Chicago, Illinois   (312) 263-0052

ERRATA SHEET

RENNILLO DEPOSITION & DISCOVERY - A VERITEXT COMPANY

ASSIGNMENT NO: 1669960

PAGE/LINE(S) /     CHANGE     /REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____     _____

Date            Orlando Lopez

SUBSCRIBED AND SWORN TO BEFORE ME THIS _____

DAY OF _____, 20_____ .

_____

Notary Public

_____

Commission Expiration Date

1

**A**

ability
17:9 65:11
150:25

able
41:15 44:23
45:7 47:9
49:5 51:23
52:14 54:15
54:19 69:19
124:7

aboverefere...
186:13,18

absolutely
12:19 57:25

accommodate
13:15

accomplish
128:4

accurate
15:20 17:4
96:1 106:11
106:12,17
114:25 115:4
117:13,14,15
117:21 126:4
154:24 155:5

acknowledge
188:11 189:16

acquainted
29:20

act
188:14 189:20

action
187:4

actions
26:12

actual
26:6

adams
4:4 10:17,17
14:3 16:10
16:13 20:11
20:13 24:13
24:18,24
33:10 35:19
41:22 43:12
82:22 90:22
92:9,16,20
112:8,13
118:23 120:1
153:4 159:8
159:17,20
160:13
161:10
176:17
178:22 180:8
180:14,18
183:21

adamssd
4:8

add
72:24

additional
58:16 119:13

address
19:8 33:22
34:1 88:21
117:25 184:5

addressed
66:23

adjacent
184:9

adjournment
186:22

adult
101:1

advise
183:17

affidavit
6:3 14:25 15:6
15:16 125:8
125:13
126:10
127:15,16,20

128:4 151:8
151:11,25
158:24 159:2
160:17

affiliation
62:24

affixed
187:6 188:15
189:21

aforesaid
186:12

afraid
50:13 80:5
90:20 93:22
94:4 97:4,6
97:7 101:3

afternoon
11:13 37:4,9
45:8 107:13
119:24 122:4
122:7

age
10:21 25:10
30:20 50:9
136:7,10
147:16,21
173:23,23

ago
16:25 65:17
66:10 96:9
110:14

agree
26:14 174:8
184:18

ahead
31:11 85:4
112:1,3
143:14
149:17

al
1:11 188:3
189:3

alibi
155:16,20
156:3

alike
166:25

alive
149:2 166:4

alley
28:21 36:19,22
38:6,11
41:14 42:2,5
42:7 43:4
45:2 46:15
47:13 53:18
57:14 106:1
108:19
109:14 134:8
135:20 184:8
184:12

amazed
154:20

amazing
115:12

anand
2:15,20 10:11

angel
167:15

angels
81:20

anger
138:4

angle
143:15

anniversary
20:14

answer
11:23 12:8
13:3,5 19:18
85:4,9 87:6
109:10

112:18,20,24
117:1 131:14
143:13,14
149:3 151:2
153:4 155:9
176:11,12,15
176:20
178:20,21,22
180:8,15

answered
11:24 65:10
85:10 105:5
108:21
109:18 155:2
176:3

answering
12:14 13:18
24:19 105:6
148:12,12,12
148:14
180:13

answers
11:20 36:19
176:8

antagonized
91:19

anybody
46:25 76:9
109:7 117:1
118:16 136:2
141:12
160:11,25
161:16
181:24

anybodys
19:23

apart
102:21

apartment
28:17,19 32:14
34:1 37:10
37:11 38:14
38:16,19,23
41:12,13
43:16 45:2
47:22 63:17
65:5 133:11
134:7 142:14

apologies
71:12

apologize
34:24 55:19
73:21 79:11
85:21 91:20
103:18
115:18 116:3
116:4 138:9
148:13 160:9
169:10

appear
188:11 189:15

appearance
73:24

appearances
2:1 3:1 4:1
5:3 10:6

appeared
63:9

appended
189:11,18

applicable
185:7

appreciate
44:6 119:9,14
138:14

approximately
21:9 37:13
102:5

april
173:16,19
174:3 175:2
175:12 182:4

area
19:10,15 20:17
22:10,18,19
33:20 80:5

128:8 130:13
130:14
142:19
145:16 146:8
184:2

arguing
156:10

armitage
32:17,20 34:20
42:9 85:13
88:9,10,23
89:3,4,11
93:5,13
129:25 130:2

arrangement
29:10

arrested
132:25

asked
12:25 13:7,17
13:18 34:12
60:20 61:7
64:18 66:16
66:18,19,21
73:5 75:5
83:12,15
84:15 104:2
105:5 108:20
109:17
116:14
122:14
123:20
127:13,14
138:18
139:10 140:3
150:22 152:6
155:2 158:23
169:10
172:22
175:25 176:6
176:14
180:18

asking
12:7 27:11
34:5,7 60:17
65:7 85:17
86:7,10
87:16 92:4,5
92:7 113:1
113:14
114:19
115:12
123:15
138:24 139:6
139:14,22
150:8,15,20
167:18
179:25

assignment
188:2 189:2
190:2

assume
13:6 30:19
54:9 70:4
72:21 98:11
159:5 165:22

assumed
61:18 97:6

assuming
14:2 32:11
56:6,6 61:2
68:24 93:16
147:20 181:1

assumption
61:24 62:2
71:21

assumptions
96:20

assured
95:14

assuring
79:12 94:5
95:21 96:6
97:2,4,13
101:8

attached

189:7

attend
27:20

attended
27:21

attending
27:16,18

attention
183:24

attorney
5:16 127:1,9
160:1,12,18
161:2,18,23
162:25 163:2
187:2

attorneys
124:4 161:22
162:2,25

attracted
24:10

audibly
11:23

august
17:13 18:7
25:20,24
26:16 169:15

authority
181:17

authorize
189:11

avenue
2:7 35:2

avers
27:24 35:13
118:1 156:16

avoid
12:5

aware
133:1 145:20
146:6

awhile
124:7

**B**

baby
150:1

back
19:7 23:2,7,10
23:15 25:18
39:25 40:2,5
40:14 45:19
46:12,19,20
46:24 47:1,8
50:15,19
51:5,14,17
51:19,22
53:22 54:1,2
54:4 59:11
60:16 63:6
67:10,12
69:1 77:19
78:8 83:14
93:1 97:22
98:2,24 99:4
101:5 103:25
103:25
105:18 106:6
107:6,7,8,9
107:23 109:5
110:22
113:23
117:24
118:12 122:1
124:7 126:5
126:10 131:1
134:20 135:8
135:10
139:11
143:16,17
144:7 149:6
156:7 157:12
158:24
159:12,15
167:3 171:7
173:16 174:9

183:10

bad
34:13

ballpark
72:19

bam
49:23,24

base
97:22

baseball
18:11 59:2
111:2,10
112:17,23
113:2,4,16
114:20 171:5

based
73:8 114:11
138:21

basement
134:22

basically
138:20

basis
153:2

bates
40:21 44:11,13
48:8 52:1
140:21

bb
43:22,23 51:3
65:20 108:4

beat
145:14

bedroom
134:16,18
135:12

beeped
134:4

beginning
112:5 152:14
169:5

behalf
2:3,13 3:3,17
4:2 10:15,18
127:24

beige
105:25

belabor
25:13

believe
14:25 31:3
67:4 78:21
83:10 136:22
138:5 178:2

believed
82:18,25 83:6
145:21 146:6
172:15,25

bell
167:16,25

bench
6:12 174:19
175:4

best
12:4,22 17:8
21:4 33:11
37:14 38:3
40:4 41:24
44:5 65:11
66:9,15 69:6
78:10 88:20
94:20 95:1
96:8,11
102:2 138:12
147:6 148:13
150:25 151:3
176:4

better
89:1 148:1
174:11
175:23

big
35:9 101:11
130:1 171:20

binder

69:11,13,17
69:20 70:2,6
71:8 95:12
**binders**
69:9,10,23
70:8,11,14
70:22 71:2
71:16 171:20
**birth**
25:8
**bit**
122:17 128:7
156:25
158:22
**black**
39:25 40:1,1,9
40:10 43:15
45:20 46:9
56:23 58:22
62:21 63:4
89:24 91:23
93:6 115:9
**blew**
46:17
**block**
49:22
**blond**
95:18
**blondhaired**
158:16
**blue**
56:4,9 60:16
64:1,5,22,23
105:25 158:3
158:3,4,5,5
**blues**
60:15
**bluhm**
2:4 44:13,13
48:9 52:2
140:23,23
**bluntly**
103:18
**boarded**
134:20 135:8
**bombard**
148:11
**book**
71:19 72:21
73:2 152:16
153:19
177:23
182:20
**books**
61:1,2 66:24
66:24 67:5,6
67:8,9 69:4
71:8,10,25
72:6 77:13
93:8 171:9
171:12,24
172:7,14
177:11
181:14
**borderline**
130:5
**born**
21:21
**bottom**
35:1,23 140:22
152:8
**bowman**
2:6 5:9,16
10:8,9 11:2
11:10 16:12
24:19 26:1
33:2 42:14
42:18 43:6
45:15 49:16
52:10 53:12
57:19,22,25
59:4 83:2
87:7,13,20
87:23 94:25
110:13
112:11 113:8

116:19 119:8
122:14 125:7
135:2 140:13
143:11
144:10
150:12
152:25 153:7
154:3 155:1
155:6,9
159:3 168:17
173:14
176:19 177:6
178:5,18,21
179:16,22
180:6,12,23
182:1 183:1
183:13,22
184:19
185:12
**box**
22:19
**boy**
30:21 62:14
64:5 130:16
**boyfriend**
31:3 68:17
**boys**
30:15 60:16
61:23 64:1
64:22,23
128:23,25
129:7 130:20
130:22 158:4
158:5
**brain**
55:8
**break**
13:11,13 59:5
92:17 110:15
110:16
119:17
168:11 183:2
**breaks**
183:25
**bring**
55:9 111:12
140:7
**bringing**
60:25
**brother**
31:22 48:3
88:12 107:3
107:4 108:24
110:4 144:12
145:4,7,8,9
145:12,14,17
145:22 146:1
146:4,9,23
147:12,15
**brotherinlaw**
30:4 47:19
61:22 62:10
62:11 108:24
132:19 133:3
134:4
**brotherinlaws**
81:8 88:12
107:4 108:24
110:4
**brothers**
146:13 147:8
148:22
**brought**
69:5 70:11,14
71:7,19
73:14 104:5
132:17,20
152:16
153:19
183:24
**brown**
55:11 56:5,8
**brownish**
55:11
**bubble**
33:23 184:4,10

**bud**
67:2
**buffer**
170:7
**building**
28:17 36:20,23
37:1,5,21
38:5,10 45:4
45:19 47:12
49:21 50:23
53:19 80:17
80:21,22
143:8
**business**
84:12 98:4
115:1
**buzzing**
172:10
**bye**
163:24

---
**c**

**calendar**
26:9
**call**
46:16 63:5
76:7 77:6,7
104:15
143:20
162:14
164:16
**called**
10:21 60:16
69:9
**calls**
118:22
**camera**
41:23 43:7
**campbell**
30:4,9,10
61:23 62:14
68:15,19,22
128:23,25
129:7 130:16
130:19,20,22
167:12
**cant**
21:2 27:7
37:18 45:22
66:12 70:3
72:11 79:8
80:15 98:17
109:25
131:13 135:4
136:8 141:23
141:25 149:3
177:17
179:22
180:13
**caption**
186:21
**car**
37:23,24 38:4
38:9,12,17
38:22,25
39:8 41:16
42:5,8,21
43:2 45:7,12
46:23,24
47:2,5,12
48:4 52:19
53:2,3,16
54:10,12,18
54:19 55:25
56:1,4,11,16
56:21,22,25
57:5,6,8,13
57:13,15,16
58:2,4,6,15
60:21 61:12
61:13 62:14
77:20 105:25
106:4 107:2
107:9,16,23
108:18

109:13 134:8
135:22,23,23
142:7,9,9
147:24 170:3
170:11
**card**
103:24
**care**
158:10 166:23
**careful**
172:7
**carefully**
171:25
**carlos**
167:17
**carry**
95:13
**case**
1:9 14:17 60:5
86:9 87:4
92:6 93:14
94:2,3 97:8
97:25 102:7
102:23 104:4
122:25 124:5
128:5 169:7
173:16,24
177:15 188:3
189:3
**casualty**
21:24
**cat**
40:22
**catch**
30:8 57:21,22
**caucasian**
95:15,16
**cause**
84:24 86:8
186:12
**caused**
73:24 89:21
90:9 100:20
**center**
33:24
**central**
35:12 36:11,12
88:10,23
130:1,2,3
**certain**
155:24,25
166:20,21
172:20
**certificate**
5:13 186:1
189:11
**certification**
188:1 189:1
**certified**
10:24
**certify**
186:8,19 187:1
**chair**
72:4
**chance**
14:2,19 16:19
35:18
**change**
86:9 97:7
189:8 190:3
**changes**
127:11 188:7
189:7,9
**chaotic**
65:3 66:10
**checking**
77:16
**chevy**
56:6,7,10
**chicago**
2:7,8,18 3:18
3:23 10:14
14:7,7 20:23
20:25 21:9
21:12 22:5

22:11 23:2
23:14 24:3
25:16 26:23
30:13 33:19
62:20 75:21
122:10
123:13,18
124:3,10
150:3 157:19
161:20 162:1
184:3
**child**
65:12 72:11
136:13
**children**
19:22 20:4
21:21 103:24
132:5 164:12
164:23,24
**christ**
163:9
**circumstances**
170:24
**city**
3:17 10:14
14:7 21:12
23:6 25:16
33:19 34:21
122:9
**civil**
10:23 122:25
185:3,7
188:5 189:5
**clarify**
16:19
**clark**
3:21
**class**
147:16
**cleaner**
23:25
**cleaning**
24:6,7,11,17
**cleanly**
179:21
**clear**
11:21 12:2,15
12:20,23
13:2 15:22
16:13 17:17
22:2 25:13
26:3 30:25
32:22 33:21
34:14 38:18
64:7 65:13
68:4 72:23
114:15 159:8
**clemente**
168:9
**cleveland**
1:21 10:5
19:11 20:16
24:2,8
123:14,16
187:7
**client**
152:8
**clinic**
2:5
**close**
183:3.
**closest**
42:12,22
**clothes**
90:7
**coaching**
150:18
**coat**
93:6
**cobra**
132:23
**cobras**
130:4
**collect**
119:19

**color**
40:18 54:24,25
56:7 62:18
63:7
**colored**
55:4
**colors**
62:22 63:2,4
**columbus**
4:6
**com**
2:20 3:15,15
3:25 4:8
**come**
13:22 23:7
36:6,10,16
37:3,8 59:14
69:1 80:7
92:13,20
94:10 96:16
101:16
104:17
111:13,13
127:13
133:13
135:15 142:5
142:13 145:4
154:14
160:20
163:16
**comes**
112:21
**coming**
14:22 15:23
47:1 54:2
68:14 102:11
102:14,22
103:18
105:12 106:6
106:13,14
107:3 109:5
115:18 137:8
**commission**
187:17 188:19
189:25
190:25
**commissioned**
186:8
**communicate**
159:9,23
165:17
**communicated**
159:2,9
**communication**
159:25 160:11
**communications**
160:16
**company**
190:1
**completed**
186:22
**completely**
25:14 69:13
**complies**
45:14 52:25
53:4,11,17
**comprehensible**
12:23
**computer**
160:21
**concept**
114:9
**concern**
163:2,18
**concerned**
157:20 163:5,8
**conclude**
62:16 71:14
110:16
**concluded**
184:24
**concludes**
183:16 184:19
**conduct**
84:5

confident
19:4
confirm
34:3
confused
122:20
confusing
34:13
connected
63:1 87:25
connection
78:13 123:2,7
connelly
3:19
consider
32:3 149:5
considered
32:4 134:22,23
consult
13:11
contact
60:7 75:9,10
150:2 161:1
161:16
context
114:13
continue
165:17
continued
122:5
continuing
112:5 113:9
convers
148:8
conversation
67:22 75:7,17
79:16 84:10
86:19 97:17
97:20 98:6
98:20,22
99:2 103:12
116:25 117:4
117:5 135:18
153:17
155:13
178:16 179:9
181:5
conversations
84:13
conveyed
79:18
conviction
16:15 123:7
124:13 162:4
163:1
cook
162:13
cooperation
44:7 119:9,15
183:14
cop
106:9
copies
40:18 126:17
127:2
cops
60:14 67:11
68:1,13 72:1
112:25
114:23
152:16
153:19 158:9
copy
125:7 137:18
185:13
corner
46:13,20 49:12
49:14 52:17
54:5 89:16
105:11,18,19
105:19 107:5
107:8 134:17
143:9,17
correct
11:8 14:4,13

14:18 17:10
19:5 22:25
23:13 24:9
25:4,6,17
28:15,18
29:18 34:7
35:14,25
36:1,21
38:21 39:15
39:18 42:10
42:23 45:5
46:6 51:13
51:15 53:20
57:18 58:7
59:24 63:11
63:23 65:18
69:18 71:22
74:24 76:23
77:4 81:11
89:9 93:11
99:9 101:15
101:22
112:17,18,20
112:20 116:5
116:6 117:22
123:3,4,24
124:2,14
125:6,23
126:6,12,15
127:25
128:19
129:11,12,14
130:17
131:10 132:9
132:10 133:9
133:12,18,24
135:24
137:14
143:24 145:2
146:14,17
156:8,12
157:14
158:14
160:13,14,18
160:24
162:23
164:10,13
169:16,17,20
169:23 170:1
170:5,9,10
170:13,14,17
170:20,21
171:1,6,11
171:21,23
172:1,5,8,16
172:18,21,24
174:1,6,7
175:4,5
176:1,2,4,5
177:25 178:3
178:9,10,17
179:3,7,11
179:12,15
180:5,22
181:7,20,25
182:13,14
184:15
186:17
corrections
125:25 126:3
126:10
189:17
correctly
126:2
cortland
26:22 28:6,16
32:7,8,15,17
33:19,20,23
34:3,5,8,20
36:5,9 38:13
38:13 45:4
105:11
129:22 131:1
142:20 170:7
184:2,6
couldnt
49:25 50:8

56:20 119:7
137:6 149:3
154:17
156:20 159:6
165:16 168:8
173:19
175:19
counsel
10:6 14:8
35:20 48:18
185:1,10
187:2
counsels
42:25
county
162:13 186:4
188:10
189:15
couple
23:18 88:8
105:7 132:15
153:13 159:5
172:22
174:10
course
56:12 104:25
136:13 177:8
183:21
court
1:1 10:19
11:17,18,22
16:2 101:17
101:19 102:3
103:6 104:16
113:10,12,24
125:5 155:21
162:9,15
168:18 182:4
188:7
courtroom
102:24,25
103:1 156:7
courts
162:14
crime
40:25 132:17
criminal
137:21,23
140:2 162:21
173:16,24
182:3
cross
16:11,13 32:16
49:13
cry
21:22
crying
142:17
cure
87:15
current
25:10
currently
19:10
curse
138:3,4
custody
5:15
cut
140:22
cuyahoga
186:4
cv
1:9
cynthia
102:14 103:15
104:22
123:22 127:3
127:4,12
137:8 144:1
148:2 150:6
151:5 153:18
154:1 155:14
159:2,23
160:7 161:7

161:12
163:25
181:21

---
**D**
---

dad
29:11 156:21
dads
156:16
daniel
3:7
dark
55:12 76:25
date
10:2 18:6 21:3
25:7,19,22
26:6,15,17
27:9 175:2
175:16,19
185:11 188:3
188:9,19
189:3,13,25
190:20,25
dated
125:8
dates
175:18
dating
131:11 167:6
day
25:21 26:4,7,9
26:18,21
27:5,14
37:14 60:10
60:11,16
77:14 117:24
133:6,11
134:21 135:8
144:7 156:20
169:5 175:14
187:7 188:16
189:22
190:22
daylight
37:16
days
87:1,18 118:12
152:18,19
153:21,22
deal
149:20
dealing
77:3
death
22:24 131:15
decade
21:5
decided
22:8
deed
188:14 189:20
deeply
131:21
defendant
3:17 10:14,16
169:6
defendants
1:13 3:3 14:8
defense
155:21 156:4
delivery
185:9,11
denise
149:24
department
40:23
depicts
184:8
deposed
10:24
deposition
1:15,19 10:3
11:15 15:5
16:6 19:11
33:13 41:2

44:18 48:14
52:5 59:13
86:22 93:3
110:24 122:3
140:15
151:13
168:23
174:18
183:12,20
184:23
186:20 188:1
188:3 189:1
189:3 190:1
describe
39:22 50:5
56:1 66:15
69:4 74:13
90:17 95:5
described
39:16 136:5
158:2,15
171:22
description
6:2 69:6 89:2
148:1
descriptive
148:18
designate
17:19 184:5
designated
184:14
designation
48:9
destroyed
92:12,12
detail
109:20,25
110:2,10
details
40:3,4,8
106:15
139:14
146:21
166:22,22
detective
75:25 76:1
77:8,8,9,12
77:18 81:2,4
81:6,7,14,17
83:18,19
95:8,8,11,25
99:19,24
117:2,7,17
136:5
detectives
81:18 100:2
deuces
128:13
devon
3:11
diagonally
143:23
diamond
91:9
didnt
21:24 22:16
25:24 27:9
30:8 46:18
46:19 50:9
50:10 68:11
69:12 73:13
78:19,19
83:2 87:10
87:15 93:25
95:11 96:18
97:3,23,24
98:3 105:3
106:23
113:13 114:5
114:9 139:8
145:11,19
146:20,20
147:4,6,11
147:24
149:20 156:3
156:24

157:12,15,21
158:8,9,10
159:9 166:2
171:2 172:20
173:1,3,6,12
177:5 181:13
181:24 182:6
182:15,19
die
25:24 132:11
died
21:22 132:19
difference
65:23 91:15,24
different
82:2,3 85:3
86:5,6 87:21
164:9 165:1
differently
154:11,18
difficult
118:13 138:13
difficulty
44:6
dinardo
1:22 186:6
187:14
direct
16:10,11,12
122:19
direction
32:8 39:1
55:18 60:21
61:13 65:19
66:6 68:20
143:10,18
directions
35:21
directly
89:7 109:6
159:10,24
161:1
disciples
21:20 22:22
128:18,22,24
129:3,11
130:8,11
discovery
1:19 190:1
discussion
35:16
discussions
60:4
dispute
175:16
disputing
175:17,18
disrespect
76:9
distance
138:25 142:25
143:1 164:7
district
1:1,2
divided
22:12
division
1:3
document
44:12
documents
14:20 127:6
doesnt
167:25 175:13
doing
12:15 31:25
43:15 68:2
73:7 90:23
92:10,10
97:23 104:9
138:15
165:24
don
129:4
dont

11:20 12:24
19:23 20:13
25:12 26:10
28:3 30:19
40:17 41:24
42:24 44:3
51:8 53:1
56:8 57:19
64:11,12,12
64:13,14,16
64:19,20
67:7,17 70:3
70:23 71:12
72:21,22,22
72:24,25
75:4,13,14
76:1,9,13
77:14 79:9
80:10,16
81:14,16
83:18 84:9,9
84:12,14,17
85:17 87:21
90:22 91:11
91:17 92:2,7
92:9,15
93:22 94:13
94:16,18
95:17 96:4
97:2,4 99:24
102:8,12,18
102:19 103:2
103:4 104:6
105:1 111:9
111:15,18,19
113:6 114:13
116:15 117:5
119:1,6
124:6 136:9
136:9,10,18
136:19 139:3
139:5,18,19
141:4,8,9,17
141:23 142:1
142:2,23
143:2 148:4
148:13,17,19
148:19 149:4
150:5,17,19
151:19 152:1
153:4,9
154:18,22
155:11,25
157:7,7,16
158:12 159:6
163:10
166:10 167:2
167:19,20
168:10,24
174:2,4,25
175:15 177:9
182:24

**door**
38:20 48:22,24
89:13 124:1
134:1 137:9
143:7 164:1

**double**
57:1,6

**doubt**
18:20,25 84:24
178:11

**drafts**
126:25 127:10

**draw**
33:4

**dressed**
13:24 45:20
46:8 58:22
95:10

**drive**
106:1 108:18
109:13
170:23

**driven**
83:14

**driver**
39:10 147:24
148:3

**drivers**
39:12 42:16,20

**drives**
47:2

**driving**
48:5 56:12,14
56:16 135:22

**drove**
13:25 79:21,23

**duces**
127:6

**due**
21:20

**duly**
10:23 186:7,10

**dye**
63:9

**dyed**
63:6,7

---
### E

**earlier**
51:20 77:25
122:8,14,20
136:6,21
137:7 142:4
143:5 145:1
147:23
157:10 158:2
158:23
169:10
171:22

**early**
122:23

**easier**
53:8

**easiest**
49:9

**east**
1:20 2:7 32:10
32:11,13,15
32:19 34:4
35:4,8,9,23
36:5,25 39:2
55:20 57:8
61:14 68:15
106:2 142:18
143:19
184:10

**eastern**
1:3

**easy**
44:12 118:17

**edu**
2:10

**edward**
3:5

**eileen**
3:20 10:13
122:9

**either**
56:4 70:18
92:4 93:20
95:16 97:3
114:14
136:19
150:18
155:10 187:2

**elementary**
27:22 29:9

**email**
126:7,8 137:25

**emails**
162:24

**emotions**
50:5,11 101:5
138:11

**employed**
24:25

**employment**
23:19

**employs**
25:3

**encounter**
32:16

**encountered**
179:10

**encourage**
164:17

**endeavor**
12:6

**ended**
88:8

**ensure**
79:6

**ensuring**
78:16 80:3

**entered**
189:9

**entire**
16:18 188:5
189:5

**entirety**
16:14

**entitled**
12:19

**entranceway**
48:25

**erieview**
1:20

**erosen**
3:25

**errata**
189:7,10,18
190:1

**erratically**
48:5

**errors**
17:3

**esq**
2:6,15 3:10,20
4:4

**establish**
159:16

**estes**
123:22 151:5
152:15
181:21

**estimate**
57:12 70:1
72:15 88:20
89:10 136:7

**estimation**
21:4

**et**
1:11 188:3
189:3

**eternity**
54:16,20

**evening**
169:18

**event**
70:17 187:3

**events**
46:8 48:12
52:13 174:12

**eventually**
12:12

**everybody**
12:12 85:10
101:7 115:16
129:5 136:13

**evidentiary**
153:1

**exactly**
26:11 38:3,9
43:14 65:18
85:23 106:9
109:21 119:7
154:9,13,21

**examination**
5:8 10:22 11:1
122:5 169:1

**excuse**
89:23

**executed**

189:10

**execution**
188:14 189:19

**exhibit**
5:15 6:3,4,5,6
6:7,8,9,10
6:11,12 15:2
15:5,13,19
15:24 16:4,6
16:14 17:2
33:13,18
35:21 40:16
40:17 41:2,8
44:10,18
45:11 48:10
48:14,18
49:10 52:3,5
52:12 57:17
111:22 125:9
137:19
140:15,20
151:13,17
174:15,16,18
184:1

**exhibits**
5:5,16 6:1

**expect**
170:19

**experience**
12:21

**expiration**
188:19 189:25
190:25

**expires**
187:17

**explain**
92:5

**expressing**
163:2

**extra**
40:18

**extreme**
44:6

**eye**
54:9

---
### F

**face**
46:22 47:9
51:24,25
54:15,20,21
54:23 55:5,7
55:7,8,15
58:10,13,17
90:11,12
110:3

**facial**
76:20

**facilities**
13:12

**facing**
38:6,7,11
39:19,24
42:3 56:25
57:6,7,8
99:22

**fact**
45:3 62:2,8,13
90:7 103:6
106:13 163:3
163:3 170:11
170:18,22
175:18
181:21 184:7

**factory**
23:24 24:1

**facts**
96:21 110:9
115:23

**fair**
13:8,9,19,20
20:14 24:15
44:2,3 50:21
64:24 71:23
77:16 110:12

142:3

**fairly**
138:8

**fall**
128:25

**fallon**
3:4

**falsely**
182:16

**family**
20:2 21:25
22:14,14
23:3,12
28:19 29:21
30:1 31:7,13
31:23 32:4
32:14 68:23
81:1 92:13
148:20 149:6
149:7,8,23
163:9,18
164:19

**far**
14:14 56:7
75:25 83:17
89:10 102:11
106:9 119:1
119:3 123:8
138:6,24
139:22
141:10
142:20,22,25

**fat**
148:3,3

**father**
29:3,5,6 81:8
81:10,19,20
119:4 136:23
137:4 156:18

**fathers**
85:14 86:14
117:25
118:10,14,17

**fatherss**
118:3

**feature**
76:2

**features**
74:4,7

**february**
181:22

**feed**
24:12

**feel**
85:18 91:18

**feeling**
50:6

**feelings**
86:9

**feet**
89:17

**felix**
17:13 18:5,17
21:22 22:7
26:4,18,21
27:6 28:2
29:2,20
31:16,19
37:4,9,24
38:1 39:6,7
39:17 41:14
42:11,16,20
43:17,21
45:20 46:9
46:12 54:6
62:8,9,13
69:23 88:12
101:21
105:10
107:13,14
108:1,6,10
111:1 133:6
133:13,16
134:1 135:19
142:3 148:21
165:12,18,20

166:3,6,25
167:4 168:6
169:15 171:3
172:15 182:6

**felixs**
22:24 25:19
26:15 29:21
38:4,9 41:16
45:7 47:12
47:17 52:19
53:3 60:8
75:22 81:10
106:4 131:15
132:13
135:23
136:23 137:4
145:21 146:7
156:14

**fellow**
93:5

**felt**
22:8,18 29:15
54:16,20
73:8 128:10

**female**
158:6,8,13,15

**fence**
22:15

**field**
103:18

**filed**
122:10

**finally**
54:7 61:3

**find**
103:12 104:14
118:16,18
127:7

**finding**
118:13

**fine**
66:13 79:12
80:4 95:14
96:7 97:5,14
101:8 120:3
137:16
165:11 181:3

**finger**
43:2 53:7 91:6
91:7,8

**finish**
12:7 13:17
83:2 84:21
119:13 153:5

**finished**
54:7 153:7
180:12

**firm**
3:9 24:16 25:3
104:3

**first**
10:23 11:3,22
21:21 28:25
32:15 35:9
36:6,15
37:21 41:25
46:8 47:11
49:20 50:24
50:25 51:23
53:7,8 54:14
58:18 59:22
60:6,7 63:15
64:2 77:12
77:17 78:1,3
78:5,8,13
79:22 80:8
80:12,20
83:9,21,25
84:4 85:7,11
85:24 86:13
86:25 87:1
88:1,9 98:10
103:5,8
105:23
107:12,18,19
107:25

McCorkle Litigation Services, Inc.
Chicago, Illinois   (312) 263-0052

113:24 114:3
116:20
122:12 123:5
123:8,12,25
134:6,8,23
135:10
136:23 138:1
138:2 141:21
141:24 143:6
143:25 144:2
145:20,23
146:5 150:6
153:14 158:1
159:24 160:7
161:2,12
162:20 163:9
163:12
167:21 179:9
186:10
**fit**
129:16 164:6
**five**
159:6
**fix**
144:14
**flip**
69:18 151:18
**floor**
28:24,25
105:23 134:6
134:8,23
135:10
**focused**
139:2
**focusing**
166:24
**folks**
92:3,5
**follow**
116:22 127:8
129:5
**following**
18:17 176:6,7
**follows**
10:25
**followup**
122:13
**fool**
92:8 147:7
**foolish**
170:22
**force**
93:25 97:3
104:23 173:3
181:24
182:19
**forced**
21:16,17,17
181:17
182:12
**foregoing**
186:16,21
188:13
189:18
**foremost**
83:9 163:10,12
**forever**
20:11,12
**forgive**
100:17
**form**
15:15 25:23
31:10,21
42:13,15
66:1 79:2
82:20 83:8
84:8 85:2,3
86:18 87:3,5
87:8,9,14,18
90:14 94:24
100:11,22
106:21
111:14,25
112:2,14
115:3,5
116:10,16

117:10,19
118:20,21
125:17
143:11
150:12 153:1
153:8 154:3
159:3 173:14
182:2
**formal**
11:20
**forth**
96:10
**found**
103:11 155:16
**foundation**
155:2,7 159:19
182:2
**four**
19:22 20:4
28:11,14
119:6 131:2
**framework**
129:16
**frank**
103:19,20
**free**
188:14 189:20
**freshman**
144:22 145:24
**friend**
32:3
**friendly**
129:13
**fro**
76:3,5,14,15
76:16,19
77:6 95:25
99:19 117:2
117:7,18
136:6
**front**
4:5 38:20
48:19 111:21
125:10 141:1
175:1
**full**
69:10 95:12
129:8
**fullerton**
129:23,23,25
129:25
**fulltime**
25:5
**functions**
164:19
**funston**
88:24 145:1
**further**
159:24 168:25
183:15
186:19 187:1
**fusco**
3:19

---

**G**

**game**
163:17
**gang**
17:20 22:4,8
22:17,21
25:15 61:21
62:24 63:1
66:21,22,23
77:13 88:13
89:6 90:15
90:18 91:12
91:16,24
92:11,14
93:6,8
128:11,16
129:2,3
130:10
132:22
156:17
170:23 171:9

173:11
176:13 177:5
177:11,23
182:20
**gangs**
17:21 21:13,19
22:16 66:21
92:11,19
128:7 145:25
157:18
181:14
**gangster**
17:15,16,18
91:25 96:23
144:5 148:8
**gangsters**
17:25 88:14
91:1,3,14,22
129:15,20
130:6 170:8
176:10
**gather**
25:12,14
**gawrys**
3:4
**ged**
23:21,22
**gentleman**
37:24 46:11,21
47:5 51:2
54:4,5 80:17
88:11 95:4,5
95:7,23
96:12 98:18
100:14
106:22 117:2
**geography**
32:6
**george**
167:24
**getaway**
57:13 147:24
**getting**
58:4 85:21
108:25
115:14
123:19
159:13
**gillian**
3:7
**girlfriend**
31:4
**girls**
158:6
**give**
35:17 69:6
72:17,18
89:1 96:8
109:25 118:3
125:21
131:13 152:2
167:19 168:5
176:7,15
182:23 185:1
185:10
**given**
3:10 5:11
10:15,15
11:15 14:21
15:15 30:12
31:10,21
32:22 34:7
66:1 71:3
79:2 82:20
82:23 83:1,4
83:8 84:8,20
85:2 86:17
87:3,5,9,16
90:14 92:18
94:24 96:2
100:23
102:19
106:21
108:20
109:17
111:24 113:6

115:3,5
117:10
118:15,19,21
119:18 127:3
137:17
168:12,14
169:2,4
172:9,12
174:22
175:23
176:25 177:1
179:19,24
180:2 182:24
183:24
184:18
185:13
186:13,18
**gizzy**
144:4 146:7,13
147:2
**glad**
33:5 104:11
**glanced**
46:24
**glass**
82:6
**glasses**
76:3,22 117:3
125:3 136:6
**go**
23:1,10,15
29:16 31:10
31:23 32:13
32:15,19
34:19,25
40:3 46:5,20
50:23 51:1
53:1 60:21
67:6 68:15
68:16,18,21
85:4 88:9
97:22 98:2
100:12,12
101:17 112:1
112:2 115:12
124:3,9
135:7 142:15
142:18
143:14
144:13
146:25
147:13
149:17 152:6
152:13
158:24
159:15
165:20 167:7
170:19
183:23
**goal**
128:3
**god**
103:10 104:13
107:1 108:5
**goes**
14:15 47:2,3
56:7 157:19
**going**
12:13,22 13:1
13:6 14:24
16:1,17 19:7
19:11 21:22
25:1 27:2
29:15 30:19
34:21 35:1
36:5,9 37:17
37:22 38:1
40:15,16,19
44:8,15 48:7
50:8 51:1
52:21 65:2
73:2 77:7,21
78:17 79:6
79:12 80:3,4
84:11,12
85:8,9,14,19

86:13 87:14
90:23 92:3,6
92:16 93:15
93:18,23
94:1,5 95:22
96:6 97:5,13
97:14 100:16
101:8,11
107:2 109:8
110:13,15
111:20,24
112:4,6
116:3,8,17
116:20
122:12,16,18
122:21
131:16
132:23 133:8
136:15
138:20,21
140:11,19,24
142:23 143:3
151:17 152:3
163:14,15,16
163:17,22
179:5 183:19
184:12
**goldbrownish**
40:2
**good**
35:19 39:11
58:11,14
79:14,19
92:18 119:17
122:7 183:22
**google**
6:5 33:7,10,14
33:18,25
184:1
**gosh**
146:24
**gossiping**
166:15
**gotten**
158:17
**grade**
28:1,3
**graduate**
23:20
**grange**
4:3
**grangeinsur...**
4:8
**great**
78:15,22 79:9
115:10 127:7
**grew**
23:15
**grocery**
104:1
**groomed**
13:23
**ground**
11:22
**guess**
35:4 50:12
89:19 98:25
136:9,17,20
154:7 171:19
174:14
**guessing**
92:3
**guevara**
1:11 3:4 10:5
188:3 189:3
**guilty**
155:17
**gun**
43:22,23 51:3
54:17 59:15
59:16,17
60:1 108:3
**guns**
108:4
**guy**

56:12,14 67:4
88:21 89:20
93:7,12,19
93:21,21,24
94:18,22
95:3 96:14
96:14,14,17
96:19,19,22
96:22,25
97:1 98:7,7
101:7,14
104:21 111:1
116:1,23,23
117:9,17,17
148:3,7
152:17,21
153:20,25
171:3 172:4
179:2
**guys**
82:1,5 95:13
115:10,11,21
119:21 120:2
123:10
139:14
148:10 154:6
154:6,7,11
164:18
166:21
167:19
**guzman**
3:8

---

**H**

**hadnt**
58:18 122:24
**hair**
40:1,2,9 55:1
55:11,11,12
62:18,18
63:1,10,12
73:12,15,15
73:16,22
74:4 76:6,20
89:25 90:6
95:16 178:24
**half**
69:21
**hand**
14:24 16:1
40:15,19
44:16 48:7
52:1 59:15
187:6
**handled**
116:18
**hands**
89:5
**handshake**
90:15,17 91:3
**handshakes**
91:14
**hang**
40:7 43:6
73:19 176:19
176:19
**happen**
50:14 78:17
80:4 84:24
85:12 86:8
86:25 97:14
156:24 179:5
**happened**
21:16 26:11,12
64:13 69:25
70:18 75:23
77:18 87:17
88:8 93:13
97:19 104:19
105:21
112:24
117:25
142:10,10,11
**happening**
78:9

| | | | | | |
|---|---|---|---|---|---|
| happy 87:12 | 144:12,23,24 highrise 23:25 24:11 | husbands 163:11 hypothetical 118:22 | 93:16 96:21 99:21 100:16 101:1,2,3 | 134:12,14,15 134:19,20,21 134:22 | ive 12:25 13:7,17 13:18 20:15 |
| hard 48:8 138:14 139:14 | hired 123:16 | hysterical 48:3 68:18 | 103:16,16,18 103:19 | indication 41:21 | 33:2,7,17 52:2 61:11 |
| harrisburg 20:20,21,25 24:5 | hispanic 54:24 55:3 | ___I___ | 104:11 105:6 106:23,24 109:8 111:20 | individual 10:16 18:5,10 56:21 58:21 | 86:3,6 154:8 162:24 izzy |
| harry 148:23,24 149:11 | history 23:19 91:12 hit 130:3 | id 15:2 23:18 32:22 45:10 | 111:24,25 112:1,4 114:19 | 66:25 68:10 68:12 73:4 90:1,2 91:5 | 144:4 146:7,13 146:23 147:2 |
| hasnt 180:12 | hold 41:22 42:25 | 53:7 59:4 94:20 95:1 | 115:18,19 116:8,20 | 104:3 108:9 115:23 116:2 | ___J___ |
| hate 55:10 92:11,19 108:5 | 45:11 49:9 53:6 86:17 135:6 | 132:15 136:17 idea | 119:10,14 122:12,16,18 126:15 133:1 | 147:5 166:22 167:14 individuals | jacket 40:1 55:2 89:24 90:8 |
| haven 22:9 | home 16:22 28:8 | 12:12 92:18 identification | 135:15,16,16 138:11 | 17:22 91:6 141:16 146:1 | jacques 1:5 10:9,12 |
| havent 84:1 116:14 149:12 153:5 163:23 | 34:2 37:9 65:4,6 69:5 70:12,15 80:7 83:14 | 15:1,7 16:4,8 33:15,17,25 40:17 41:4 44:10,20 | 139:19 140:11,19,24 142:23 144:10 | 146:13 information 147:2 initials | 11:10 14:16 18:1 61:4 72:14 73:4,9 73:11,23 |
| head 12:1 62:1 99:3 108:7,23 139:25 | 84:12 86:2 93:8 94:10 123:25 | 48:10,16 52:3,7 84:25 111:22 140:17,20 | 147:20 150:4 151:17 152:3 154:12,20 | 52:23 53:10 ink 184:12 | 74:15 80:19 82:9,10,13 82:17,18,25 |
| heading 36:5,8 | honest 136:10 | 151:15 174:20 | 158:11 159:13 | inside 56:21 63:21,22 | 83:6 84:11 84:19,23 |
| hear 92:6 105:1 110:8,8 155:19,20 | honestly 67:7 hope 169:12 | identified 101:20 140:4 150:10,24 152:7 | 163:14 166:24 168:11 172:23 | 63:23 80:14 80:17,18,18 99:18 104:5 instant | 85:11 90:3,4 94:7 98:13 99:2,6 100:6 100:20 |
| heard 22:3 43:22,25 44:1 51:3 98:19 134:3 142:7 155:15 | hopefully 119:24 horn 134:4 hospital 165:13 | identify 181:18 identifying 40:21 182:16 ill | 175:17,18,21 176:15 181:1 184:12 immediately 89:21 90:9 | 58:13 instruction 185:2,10 insurance | 101:20 104:20 109:23 110:7 110:9 114:3 127:23 |
| hearing 13:25 16:2,16 108:3 154:14 | hotdog 88:22 hotel | 16:3 26:1 33:5 44:16 48:9 52:11 53:5 | 91:2 impeaching 176:23 | 4:3 interaction 75:21 77:11 | 140:10 141:14 150:10 151:1 |
| hearsay 176:24 | 162:12 hour | 84:8,21 87:12 94:25 | impeachment 176:22,23,25 | interactions 78:12 | 172:17 173:1 173:25 175:7 |
| heartbeat 110:5 | 72:12 171:13 house | 100:18 101:11 105:8 | imperial 17:16,18,25 | interested 20:1 187:3 | 177:23 178:8 182:5,16,20 |
| heavy 136:16 | 31:24 52:16 60:14 68:14 | 109:11 110:4 110:16 | 88:14 91:1,3 91:22 96:23 | interrupt 12:6 180:13 | 188:3 189:3 jail |
| height 76:19 | 85:14 86:14 103:22 104:5 | 159:16 179:21 183:2 | 129:15,20 170:8 176:10 | interrupted 39:13 | 162:13 jane |
| held 10:5 35:16 | 105:22 106:2 107:12,19,20 | illinois 1:2 2:8,18 | impossible 109:21 | intertwined 31:13 | 125:1 january |
| hell 183:21 | 108:19 109:14 | 3:13,23 20:23,25 | imprinted 55:7 | interview 84:5 151:5 | 187:17 jeff |
| help 42:25 68:2 109:22 113:18 143:9 175:10,13 | 118:10,14,17 118:25 119:4 127:14 131:20 133:10,19,23 | 26:23 30:10 175:7 im 10:17 12:12,22 13:5 14:1,2 | improper 86:21 inches 69:22 incident 128:9 | interviewed 177:14,18 introduced 122:8 169:4 investigating | 4:10 10:15 43:7 45:15 49:16 53:12 57:19 169:3 jeffrey |
| helps 112:7 | 142:20,21 150:7 152:17 | 14:24 15:1 16:1,17 20:1 | incomplete 118:21 | 102:7 investigation | 3:10 jen |
| hereinafter 10:24 | 153:19 154:2 156:16 158:1 | 20:3 21:22 22:2 25:1,4 | incorporated 189:12 | 40:25 156:14 177:9 | 160:2 jennifer |
| heres 70:24 | 160:8 161:3 161:9,13 | 26:8 30:8,13 30:19 32:11 | incorrect 32:24,25 | investigator 123:16,23 | 102:14 103:13 104:22 |
| hereunto 187:5 | 164:1 167:8 169:19 | 32:25 34:10 35:19 37:17 | indentation 45:25 46:2,10 | 127:13 involved | 123:13,14,22 127:17,18 |
| hes 24:19 34:7 42:21 132:8 179:17 | 170:20 171:8 huh 24:13 humboldt | 39:5,11 40:15,16,19 42:18 44:4,4 44:8,9,15 | 46:13 50:22 51:7 independent 122:16 | 124:4 131:21 156:13 157:12,15,21 isnt | 137:8 144:1 148:2 150:6 153:17 154:2 155:14 |
| hey 31:24 135:15 135:16 | 18:11 59:2 111:2 112:17 112:23 | 48:7 50:16 52:21 56:6,6 57:2 61:2 | index 5:1,5 6:1 7:1 91:6,7 | 155:10 178:7 israel 30:23 31:1,6 | 159:22 160:6 161:7,13 163:25 |
| hi 163:24 169:3 | 114:20 130:12,13 171:5 | 64:8,11,12 64:16,20 65:2 66:21 | indicate 41:19 43:1 53:7 | 47:19,21 48:2 62:11 81:21,22 | 181:22 jesus 118:6,7,8 |
| hid 49:3 51:9,19 51:22 52:17 105:18 | humbolt 22:11 hung 115:22 | 68:23 71:6 76:14 77:7 79:5,11,14 | indicated 47:13 57:16 69:20 | 130:15 131:12 132:6 132:14 133:2 | 163:9 jgiven 3:15 jo |
| hiding 52:24 53:10,23 54:1 107:5 108:4 143:6 143:17 147:7 | hurry 134:5 hurt 50:14 husband | 79:15,23 81:23 84:20 85:9,13,21 86:3,7,10,15 86:16 89:15 | indicating 24:18 32:18,19 43:4 46:1 49:12 51:5 57:7,9 69:8 | 133:8,11,16 133:19 142:4 148:21 165:18,20 166:25 | 78:15 job 25:5 79:4,14 79:19 109:24 115:11 |
| high 23:20 144:8,11 | 68:16 | 90:20,23 91:19 92:2,4 92:5,7,10 | 69:11 89:15 89:17 90:25 107:22 | israels 81:19 167:4 itasca 3:13 | jobs 23:23 john |

McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

3:6,8
join
21:19 22:8
joined
22:3,16,21
128:11
130:10
joining
21:19
jose
168:3
joseph
3:4,5
jsotoslaw
3:15
judge
11:21 156:11
jump
12:13 122:16
june
15:17 16:3
17:8 114:25
125:8
jury
92:3
justice
115:15 132:17
132:20

——— K ———
kedzie
35:9 130:5
keep
13:1 126:17
kelvyn
144:8,11,18
145:17,22
147:13,22
kept
93:24
kid
97:21 98:1,3
100:25 101:2
101:5,9
114:22
158:10
kids
20:5 131:22
149:8
killed
110:3 132:21
182:6
kimball
35:12 36:13,14
49:15 105:12
129:22,24
130:2 184:9
kind
145:5 156:17
kinds
170:24
king
62:17 67:4
71:18,19
170:3,4,15
170:19,23
kings
17:20 22:11
60:22,23
61:1,18 62:7
62:20 66:4,5
70:25 71:2,6
71:7,9,10,15
71:20 73:2
130:5 170:8
171:10
177:12,13,20
kinky
76:6,7
knew
27:8 29:22
31:23 43:20
65:21 67:8
68:9 80:2
83:10 88:15

90:1 104:3
118:25
135:19
145:18
146:19,22
147:12
167:11,13,20
182:10
knocked
124:1 164:1
knocking
137:9
know
11:9 13:13
17:22 19:23
21:15 22:9
22:12 26:7
27:9 30:20
31:14,16,24
43:8 44:3
45:16 46:17
46:17 47:12
47:16 48:5,6
50:9,20 51:1
51:3,4,8
54:25 55:10
55:11,12
56:18 57:6
57:19 60:15
60:19 61:5
61:22,23
62:21 63:24
64:5,10,13
64:15 65:20
67:11 68:6,6
68:11,12
76:2,14,17
76:18,19
77:23 78:5
78:15,15,16
79:1,3,4,5
79:10,13,25
80:4 82:10
82:13 83:20
85:8,16,17
85:20 88:7
88:18 89:4
89:14 90:22
91:13,15,23
92:1,2,2,4
92:15 93:18
93:24 94:3
96:4,9,20
97:3,5,9,10
97:22,23,24
97:24,25
98:1,4 99:24
100:5,9,20
101:2,3,5,19
103:13
104:10,11,25
105:1,22
106:25
108:12
109:22,23
110:11,11,14
111:7,8,9,15
112:24
113:16 114:5
115:8,10,15
115:18 117:5
118:23,24
119:1,6,11
122:21 124:6
129:3,5
131:19,19
132:18
133:25 134:1
135:14,15,17
136:7,9,10
136:18,18,19
136:19 137:4
137:17 138:3
138:4,5,13
138:25 139:3
139:20,24
141:24,25

142:8,19,22
142:23,24
143:20 144:7
144:13
145:10,11,11
145:12,13,13
145:17,25
146:3,20,23
147:8,10
148:6,9,10
148:24,25
149:4,8,19
150:23 151:3
154:19
155:22
156:21
157:18,19
158:9 159:6
159:13
163:10,14,21
163:22
164:16,21
165:15,21
166:6,10,11
166:13,14,18
167:2,6,7,10
167:11,14,19
167:20 168:6
171:3 181:23
knowing
20:1 93:19
101:25 102:1
147:4,11
knows
132:21
koisher
4:10

——— L ———
lack
148:1
ladies
103:21
lady
89:13 93:20
95:4,9,10,15
96:5,12
98:19 116:25
125:2 152:21
153:25
158:16
178:24 179:4
179:11,13
180:3,10,16
180:17,21
181:6
language
89:23
late
21:6
latin
17:20 60:22,23
61:1,18 62:6
62:17,20
66:4,5 67:4
70:24 71:2,5
71:7,8,10,15
71:18,19,20
73:2 128:17
128:22,24
129:3,11
130:8,11
116:21
170:3,4,8,15
170:19,23
171:9 177:12
177:12,20
latinos
157:16
law
2:4,10 3:9
lawful
10:21
lawsuit
14:15 122:10
lawyer

13:11 104:7
124:20 125:4
137:10,13
138:23
155:22 156:2
156:10
183:17
lawyers
14:6,16 40:20
44:15 119:11
122:24 123:1
123:6 124:19
124:22 176:1
lbowman
2:10
leaf
69:16
leave
21:12 35:17
leaving
22:5
led
68:13
left
21:6,8 25:15
25:15 35:24
37:5 39:3,4
39:5 54:12
75:17 103:17
103:24
107:10 116:3
149:13 150:3
184:11
legal
2:4
lemoyne
30:5,9,11,12
68:16,22
130:19
lengths
57:13
leonard
3:7
letting
138:11
levels
85:3
lie
101:23,25
102:1,3
112:20 115:7
115:8 182:8
182:10,12
lied
103:6
life
21:18 25:15
88:16 92:12
92:13 94:4
101:12 147:6
157:17
light
76:24 77:1
line
78:1 79:15
80:18 82:1
112:5,6
113:9 189:7
190:3
lines
78:25 79:10
116:21
152:14 179:8
lineup
18:18,22 19:1
77:21,24
78:8,13
79:22 80:12
80:25 81:5
81:25 83:22
83:25 84:4
87:2 88:1,2
88:7 93:16
93:17,17
94:11,15
98:10,13,23

98:25 99:8
99:10,16,20
100:3,7
136:23
138:18 139:7
139:11 140:3
140:5 141:21
152:18
153:21
177:24 178:1
178:8,15
181:6,11,18
lineups
80:1,8 150:15
178:3
linzer
181:22
listed
35:22 189:7,17
listen
101:6,10
152:22
153:25
161:10
180:14,18,19
listing
189:7
literally
32:23
little
11:20 28:10
33:23 97:21
122:17 128:7
146:4 147:8
147:12,15
156:25
158:22 171:8
live
19:17 20:2,17
20:22 28:8
29:6 41:13
130:18 164:4
164:5 178:8
lived
19:14 28:6
30:4,7 32:14
41:12 52:16
119:4 128:8
129:21
130:19,25
134:6 145:16
163:4
lives
164:5,8
living
19:10 20:16,21
24:5 26:21
26:22 131:18
131:19 135:9
157:1
llc
3:19
located
43:3 45:8
53:16
location
41:16 45:12
53:3 57:6
80:15 90:3
184:13,16
locke
2:6 10:8 11:10
86:19
loevy
2:14,14,20
long
19:14 20:9
21:1 25:2
49:19 66:10
72:9 76:15
83:20 96:9
124:7 131:16
132:13
162:10 166:3
168:16
longer

169:12
look
14:19 19:1
34:17 38:25
39:1 40:20
50:15 54:15
58:14 59:21
65:2 70:8
72:8,9 80:8
84:4 92:8
94:11 95:11
98:23 125:22
140:24
151:20 152:3
158:9 166:25
174:24
looked
14:23 39:23
40:8,13 51:7
54:8,16,17
54:18,19,25
55:15 58:13
58:21 69:5
69:23 70:15
72:16 74:1,9
74:10 81:25
99:16,20
145:15
171:17
looking
71:25 72:6,13
74:23 75:1
77:13 79:11
80:25 81:5
100:2 107:9
109:5,6,6
138:23
172:13
looks
69:14
loose
69:16
lopez
1:16 4:2 5:8
10:4,18,21
11:1,5,5,7,9
17:12 18:4
18:15 19:6
25:19 33:21
44:2 48:19
52:11 59:14
67:21 92:1
118:6 119:8
122:5,7
141:1 152:6
152:16 168:1
168:24 169:1
169:3 177:2
183:13 184:3
186:9 188:4
188:9 189:4
189:13
190:20
lopezs
16:15
lord
180:9
lot
65:4 70:7
92:12 109:19
114:11 115:9
139:13
145:18 148:9
148:14
149:18
150:16
loud
116:8 152:10
love
82:23
lunch
119:17 120:2
luncheon
121:1

——— M ———

8

macho
165:4,5,8
magnitude
97:24
mail
137:24
main
163:18
major
167:9
man
20:3 21:22
39:14,16,19
39:22 45:19
46:8 56:15
56:18,22
58:2 77:20
89:25 90:19
92:14 93:20
108:22 176:9
mania
129:11
maniac
21:20 22:22
61:23 128:17
128:22,24
129:2,3,7
130:8,11,15
map
6:5 33:14,18
33:25 34:17
184:8,11,14
maps
33:7 184:1
marilyn
28:11 30:16,17
30:17,21
31:1,6 67:21
67:23 68:5
131:3,7,9,11
133:17 142:5
163:20 164:3
165:15
mark
16:3 40:16
48:10 140:12
174:15
marked
6:2 15:6 16:7
33:14,17
35:21 41:3
44:19 48:15
52:2,6
111:21 125:9
140:16,20
151:14
174:19
marking
15:1 44:9
married
20:3,10,15
68:17 133:4
matter
10:4
mclaughlin
3:7
mean
17:18 19:21
21:14 29:8
30:3 68:9
76:5,6 79:25
80:22 91:14
91:15 95:18
99:23 104:18
111:25
126:21 137:1
150:19,19
153:2
means
42:21
meant
42:11
meet
124:4 162:5,10
member

17:24 32:4
81:1 88:13
89:6 90:16
91:16 128:17
170:23
members
22:14 92:13
173:11
176:13 177:5
memory
26:25 33:5
37:15 70:17
75:16 77:24
108:8 136:25
174:9,13
mentally
13:24
mentioned
36:18 81:6
128:9
merry
101:11
met
14:11 123:13
123:14
124:16
159:22 161:9
161:21 162:2
method
116:11
microphone
175:22
mileage
142:24
miles
119:6,6 142:24
mind
18:20,25 32:10
32:11,19
56:3 70:20
178:11
minding
51:1
mingey
3:6
minute
110:14 113:10
minutes
15:3 65:16
120:2 168:15
181:4
mirror
82:7 99:22
mischaracte...
71:13
mischaracte...
71:4 82:21
96:3
mishear
128:14
misheard
81:23 128:15
misplaced
184:8
mission
128:5
misspoke
42:19
misstates
178:18 179:17
179:23 180:7
180:23
misstating
179:25
mistake
26:2 88:15
101:11 116:1
mld
128:12
moe
47:19 68:17
mom
28:9,13 29:12
157:2
moment

19:7 27:9
43:15,19
61:8 66:3
94:6 103:23
104:2 105:23
119:14 142:6
money
105:3
month
174:3
morning
11:11 14:12
65:24 122:23
128:7
mother
28:7 67:15
75:18 131:2
mothers
119:3 131:20
mouth
85:18 154:14
move
109:11 116:16
156:16,18
175:22
moved
20:24 156:21
mozart
27:21 29:8,9
mug
152:16 153:19
mullet
63:6
murder
25:20 98:1
132:13,16
156:15
murdered
132:12,14
mustache
76:21 117:3

---
**N**
---

naive
163:14
name
10:8 11:4,4,9
17:22 22:20
68:9 76:1
103:13,14
118:2,3
122:9 124:23
124:25
125:19 129:8
129:9 144:3
146:7,10,11
146:13,21
147:9 165:3
165:4 167:15
167:19,21,23
169:3 171:3
188:3,4,15
189:3,4,21
named
102:13,14
176:9 186:9
names
19:24 102:19
102:19,21
167:20,22
nature
30:25 31:19
nay
104:18
near
28:21 33:24
86:25
necessarily
139:17
need
11:23,25 13:10
13:14 15:13
19:23 34:23
41:20 64:7
66:11,13

105:7 115:14
134:5 169:12
174:25
176:20
needed
127:20
neighborhood
23:15 68:21
130:22
nephew
164:21
nephews
164:15
never
18:8 50:18
56:22 68:17
71:5,10 94:2
96:22,23
97:11 105:2
105:20
127:10
132:20 151:9
151:21
154:17 166:1
166:16
167:20
newspaper
163:4
nice
70:6 76:17,19
nicknames
167:22
nieces
164:15
night
63:15 64:2
65:25 67:2
68:2 69:23
75:8 77:12
83:13,21
84:3 133:21
133:23 158:2
158:7 171:8
173:10 177:3
nightmare
109:2
nights
93:9
nighttime
60:9
nine
25:4 166:9,16
nipped
67:1
noise
51:3
nonuniform
64:18
noon
3:7
nope
181:15
normally
50:17
north
2:16 3:21
34:19,19,21
35:2,3 36:24
38:6,7,11
42:3,9 55:19
89:2 106:1
108:18
109:14 118:1
northern
1:2
northwest
130:13 143:20
northwestern
2:4,10
notary
186:6 187:14
188:10,18
189:15,23
190:23
note

138:17
notes
119:23
notice
158:8
noticed
58:18 63:13
number
6:2 40:21,21
40:23 44:11
44:13 52:2
72:18,18
74:22 140:12
numbers
140:22 189:7

---
O
---

oath
11:18 17:11
18:3,14
object
7:2,4,14,15,17
8:6,13,16,17
8:18,19,22
25:23 84:8
84:20 86:17
111:24
118:15
143:11
150:12
152:25 153:8
154:3 159:3
objection
7:1,3,5,6,7,8
7:9,10,11,12
7:13,16,18
7:19,20,21
7:22,23,24
7:25 8:1,2,3
8:4,5,7,8,9
8:10,11,12
8:14,15,20
8:21,23,24
8:25 9:1,2,3
9:4,5,6
15:15 31:10
31:21 42:13
66:1 71:3
79:2 82:20
83:1,8 85:2
85:3 87:3,5
87:9,14,19
90:14 94:24
96:2 100:11
100:22,23
106:21
108:20
109:17
111:14 112:2
112:14 115:3
115:5 116:10
116:16
117:10,19
118:19,20
153:6,8
155:1,6
173:14
176:20,21
177:6 178:5
178:18
179:16,20
180:6,7,23
182:1
objectionable
87:18
objections
87:11 179:20
observing
136:1
obtaining
23:22
obvious
157:20
obviously
50:15 69:12

occasion
23:1 75:20
85:6
occasions
18:16 173:9
177:3
occurred
22:7 106:16
odd
139:1
office
187:6
officer
64:25 72:6
74:13,18
75:1,21,25
77:3,6 79:21
80:24
officers
60:8 63:16,19
63:25 64:1,6
64:19 65:6
65:25 74:20
74:22 75:5
77:15 158:1
158:6 169:6
official
188:15 189:21
oh
34:24 36:14
42:18 90:4
103:9 107:1
108:5,22
115:8 146:24
149:15
152:12
159:11
175:17 180:9
ohio
1:21 4:6 10:5
10:22 19:11
103:11 137:8
144:2 150:7
163:4 186:2
186:7 187:7
187:15
okay
12:2,3,17,18
13:3,4,15,20
19:25 24:15
26:18,19
27:10,12
28:5 33:8
34:3,11,16
35:3,19 40:5
40:9 43:11
43:12 45:17
45:18 49:17
50:10 53:12
61:24 64:8
76:10,15
77:6 79:6
83:4 85:8,15
85:16 86:24
87:20 88:5
91:17 93:23
94:1,6 101:9
103:10,16
112:13
114:18 120:1
123:5,21
124:9,15
125:4,21
127:19 128:2
128:6,16
130:7,15,21
130:24
131:22
134:24 135:6
135:11,13
138:10
140:11
142:15 143:5
144:16 146:5
146:12,18
147:1,23

149:10,15
151:9 152:1
152:13,24
153:12,16
154:10,15
155:13 157:9
158:12,22
159:11,15,20
160:6,25
161:4,10,14
164:4 168:10
169:13,14
172:12
174:15
175:15
178:25
**old**
20:5,7 21:8
23:15 26:24
30:17 34:1
50:16 101:11
125:2 136:7
138:2 144:20
149:14,20
173:22
**older**
131:4,6 145:7
147:18
**oldest**
103:24 131:7,8
131:9
**olive**
54:24,25 55:4
74:8,9
**olivero**
167:17
**once**
22:17 23:11
31:13 53:6
66:22 73:3
126:9 130:3
149:7,19
183:13
**ones**
61:24 158:2
**open**
89:12
**operate**
115:21
**opinion**
167:1
**opportunity**
14:5 15:23
**opposed**
12:1
**order**
150:9,17 152:7
**ordinary**
78:14,20
**original**
40:24 185:12
**originated**
130:20
**orlando**
1:16 4:2 5:8
10:4,18,21
11:1,5,6,7
122:5 169:1
186:9 188:4
188:9 189:4
189:13
190:20
**outside**
63:16 102:24
103:1
**overhearing**
135:16
**overnight**
118:10
**owner**
46:14

---
**P**
---

**page**
7:2 32:24

33:18,22,24
34:18 35:1,8
35:23,23
111:23 112:5
116:9,21
152:4,9,14
175:1 184:1
189:7 190:3
**pages**
69:18 70:1
151:18
**palmer**
27:25 34:21
130:3,4
**paper**
33:5
**papers**
95:13
**pare**
169:11
**parents**
157:11 163:11
167:5
**park**
18:11 22:12
29:8 35:12
36:11,12
59:2 88:10
88:23 111:2
112:17,23
113:4,15
114:20 130:1
130:2,4,12
130:13 144:8
144:10,12,18
145:4,17,22
147:13,22
171:5
**parked**
38:4 42:2,3
45:12 52:19
57:1,8
**part**
28:23 68:2
105:1 114:20
116:7 139:9
139:24 140:7
147:4,11
150:5 189:9
**partially**
42:5
**particular**
14:14,16,20
22:4 24:16
25:3 33:21
64:25 90:7
100:10
**parties**
31:14
**party**
187:3
**passed**
132:8 166:4
**passenger**
42:12,17 56:13
**paul**
3:5
**pay**
168:15
**peeled**
142:9
**peer**
21:18 22:4
128:10
**pen**
53:1,8 184:13
**pennsylvania**
20:18,19,22
**people**
65:4 104:25
105:2 114:11
115:13 119:1
145:25
148:11
149:12

166:14 175:6
179:18
**period**
29:1 131:16
156:15 174:9
**perpetrator**
132:17
**person**
17:12,14,15,24
17:25 18:4
43:14 75:24
82:18,24
83:5,15
84:19,22
96:13 100:21
101:20
107:14
108:25
117:16 140:4
144:25
145:21 146:6
147:3 170:20
172:3,15,17
179:14 180:4
180:21 182:5
**personally**
29:22 111:8,9
145:12
188:11
189:15
**phone**
172:9
**photo**
57:23 172:14
173:7
**photograph**
6:6,7,8,9,10
40:19 41:3,7
41:15 43:1
44:9,14,19
44:24 45:6
48:8,11,15
49:5 52:1,6
52:12,15,18
52:22,23
53:6 57:10
73:24 134:11
134:24 140:3
140:16,25
141:3,5,7,13
141:16 176:9
176:11
177:23
182:20
**photographs**
153:23 171:9
171:18
173:11 177:4
177:11,19
**photos**
40:25 152:20
153:23 173:4
**pick**
133:14 173:4
182:19
**picked**
82:9,10,14,17
82:24 83:5
84:18,22
93:8 100:6
100:14,24
101:13,14
152:17,18
153:20,21
162:12 172:3
172:14
177:22 178:8
179:1 181:6
181:8,8
**picking**
47:18 72:14
75:14 83:11
84:11 91:23
100:21 101:3
173:6 181:24
**picture**

42:1 45:13,23
48:21 56:24
57:24 73:10
73:12,25
74:9,15 75:3
82:15 108:23
**pictures**
60:25 65:8,9
66:4 69:10
70:6,7 71:15
71:25 72:8,9
72:15 73:2
74:23 75:2
141:10
176:13
177:21
**place**
16:3,16 52:19
52:23 53:9
53:16,23
54:2 80:13
98:6 143:6
143:17
186:20
**placed**
41:8 48:18
184:11
**places**
157:11
**plainclothes**
64:3
**plaintiff**
1:7 2:3,13
10:9,12
**play**
112:16,23
**playing**
18:11 59:2
97:22 98:2
111:2,10
113:1,4,15
114:20 171:4
**plays**
32:12
**pleasant**
12:21
**please**
10:6,20 11:3
15:11 25:7
38:8 57:10
88:6 95:6
96:8 107:17
118:5
**plus**
48:12
**point**
13:10 20:6
25:13 27:3
37:3,8 40:13
44:3,9 45:11
46:9 47:6,9
47:13 49:10
49:21 50:6
50:23 51:11
51:22 53:9
53:15 59:5
59:14,16,18
61:4 74:2,3
91:23 93:4,7
99:8 100:10
101:6,16
106:3 110:4
113:13 114:6
115:14,25
119:10
126:25
128:10
131:25 132:1
133:20 135:1
140:9,10
144:21
150:20 164:3
181:10,13
184:20
**pointed**
42:8,9 61:4

66:4,22,23
66:24 73:4
74:15 75:15
80:18,19
82:12 85:11
94:8 98:12
98:13 99:1,5
99:6,23
100:8 112:25
113:5,11,14
114:16 115:1
116:1
**pointing**
57:3 99:1
**police**
14:7 18:16,21
19:1 40:22
46:16 60:4,8
63:16,19
64:18 68:3
69:1 72:5
75:8,21
80:23,24
83:6,21 84:5
93:14 94:15
94:22 99:16
105:9,14,24
106:5 108:17
109:12,16
110:25
114:17 138:5
156:14
157:25 158:6
165:7 166:12
169:6,18,21
171:2,7
172:19 173:3
173:10
176:10 177:4
177:10,24
178:14
181:10,16,23
182:15,19
**ponytail**
63:5
**possibly**
183:3
**post**
16:15 123:7
124:13,14
162:3 163:1
**postconviction**
123:3
**prayed**
104:13
**pregnant**
132:2
**prepare**
125:13 127:15
127:16
**prepared**
13:24 125:8
151:5,10
**presence**
96:12 186:15
**present**
4:10 94:21
98:19 99:20
104:7 117:1
117:8,16
161:23
179:18
**presented**
66:3
**press**
91:5
**pressing**
100:17
**pressure**
22:5 104:23,24
128:10
182:15
**pressured**
73:7
**pressures**
21:18

**presumably**
177:16
**pretty**
17:5,16 28:22
30:6 38:1
40:10 48:6
49:24 50:7
51:9 54:7
55:12 58:19
61:6 63:3
64:20 66:6
67:1 68:24
68:25 78:6
78:18,19
79:7 96:14
109:2 128:24
129:4 134:5
142:11 148:8
149:8 167:8
**prevent**
12:14
**pride**
62:22
**printed**
163:4
**prior**
14:20 18:8,11
20:21 22:5
36:19 47:6
58:25 77:22
105:20
107:15
**probably**
21:2 40:10
46:21 49:8
51:8 57:15
61:3,25
72:20 75:17
110:16 119:6
136:19,20
147:21 148:5
149:14 168:9
**probe**
139:19
**problem**
101:10 110:5
115:17
144:14
148:16
**problems**
144:13 146:2
157:18
**procedure**
10:23 11:15
185:7 188:5
189:5
**proceeded**
140:9
**proceeding**
123:3,7 124:13
162:4 163:1
**process**
119:9,15
183:15
**prompt**
119:12
**prompted**
21:12
**properly**
11:24
**protected**
179:6
**proudly**
62:22
**provided**
10:22 125:17
125:18
126:24
**provides**
24:17
**public**
186:7 187:14
188:10,18
189:15,23
190:23

puerto
55:1
pulaski
130:14
purpose
13:12 34:16
purposes
15:6 16:7
33:14 41:3
44:19 48:15
52:6 140:16
151:14
174:19
176:22
pursuant
185:3,6
put
28:12 43:11
52:22 53:14
54:17,21
59:21 79:9
80:17 85:18
91:13 100:13
125:20 140:4
putting
141:6

**Q**

qualified
186:8
question
11:24 12:8,9
12:14,20,24
13:2,5,8,17
13:18 16:14
20:14 24:20
25:24 26:2
31:12 34:12
34:13 37:7
38:8 48:19
49:4 53:25
64:17 73:20
83:3 85:9,16
86:18,19,23
86:24 87:21
91:19 100:18
107:16 109:9
109:10 112:1
112:4,6,15
112:18,21
113:21
115:10
116:15,24
123:15
139:18
143:12
150:13 153:1
153:9,10,12
153:14 154:4
155:7,10
159:4 161:5
161:11 176:8
176:11
179:21,23
180:1,11,14
180:19,20
questioning
86:22 103:17
110:17 111:6
119:10
183:17
questions
11:11,19 12:23
23:19 26:17
32:6 60:17
65:7,10 84:6
84:16 102:23
105:5,8
115:11,12
119:11,13
122:11,13,13
122:15
123:19 139:6
139:10,16
148:11,14
150:9 151:3

153:5 158:23
168:13,25
169:8,9
176:1,3,7,14
182:25 183:2
183:16
quick
49:23 50:2,3,3
58:12 151:20
168:11
174:24
quite
177:14

**R**

raise
21:25
raley
125:1
ramon
168:1
ran
40:6 45:22
46:1,4,12,13
46:19,23,23
48:1,22 49:1
49:2,6,11
50:18 51:6
54:4,10,17
55:17,19
68:14 88:16
88:17 105:16
105:19 107:6
107:7,9,22
143:8,16,19
143:20
144:15
146:24 184:9
raucous
60:14
reacting
50:11,12,17
read
15:3,9,13,24
16:17,20,22
17:1 27:8
44:12 48:8
111:20 112:5
113:6 114:25
116:8,20
137:25 138:2
138:22 139:3
140:6,7
151:19 152:4
152:5,8
157:10 166:8
166:10,11,16
174:25
176:22
183:21 188:5
188:6,12
189:5,6,17
reading
116:11 139:2
ready
13:22,25 108:3
real
58:14 144:3
167:21
realize
12:21 74:2
93:7 96:17
realized
146:16
really
12:11 19:18
20:7 21:3
30:20 50:9
72:12 90:18
93:25 131:13
136:9 138:25
139:8 141:4
142:23 149:4
163:21 164:6
166:2 167:21

reason
21:20 22:15
34:9 61:17
62:1 92:7
113:3 115:19
138:21 139:1
175:15 189:8
190:3
reasonable
13:14
recall
56:8,8 60:25
64:4 67:7,12
77:14,15,20
78:10,24
80:9,10 84:9
84:10,14
95:17 99:17
102:5,20
103:22
106:19
111:10
116:15
123:13 139:5
139:10 141:8
148:4,14
150:17 152:1
153:16 159:1
165:23 166:3
recalling
79:17
recant
127:25 139:23
recanting
100:25 101:1
114:12
received
102:6 137:24
recess
59:8 92:24
110:20 121:1
168:19 183:7
recognize
41:6,7 44:23
52:14 58:23
59:1 89:21
90:10 91:2
141:3,12,14
141:15
162:18
recognized
90:11
recognizing
44:22 52:14
recollection
44:5 96:9,11
102:17 103:3
112:10
116:12,14
117:6 175:11
recollections
94:21 95:2
record
10:2,7 12:16
32:23 35:15
35:16,17,20
59:6,12
92:22 93:2
110:18,23
120:4 122:2
168:18,21
183:5,11,23
184:20,20,21
189:9
records
26:15
recounted
65:16 155:4
red
37:23,23 38:4
135:23 141:6
reduced
186:14
refer
26:17 60:20
62:9 77:8

reference
183:25
referenced
188:11 189:15
referred
63:25 133:2
referring
67:20 113:23
161:6
refresh
117:6 175:10
refreshes
112:10
refreshing
116:12,13
regard
174:12
regarding
183:18 185:2
185:11
regular
76:17
related
160:11
relation
36:23 58:1
129:21
relationship
30:1,2,15,22
31:1,5,7,19
128:20,21
164:2,14,24
167:4,9
relationships
31:14
relative
187:2
relax
135:17 159:17
relive
138:14
remember
25:21 26:4,6,9
26:10,11
28:3 40:11
46:18 50:1,9
56:10 60:12
60:13 64:5
64:11,12,13
64:15,17,19
64:20,22
65:3,5 66:9
67:9 68:20
69:3 70:23
70:25 72:11
72:13 73:1,1
74:17,25
75:4,14 76:1
76:2 77:22
78:7,8,9,18
79:23,24,25
80:11,12,14
80:16,16
81:7,12,14
81:16,17,19
81:19 83:11
83:18,23,25
84:2,10,13
84:17 85:23
87:24 88:17
93:14,15
94:12,13,14
94:17,18,19
97:16 98:15
99:1,3,17,22
100:1 102:8
102:10,12,13
102:16,18,22
103:2,4,21
105:15,16
106:24 107:1
107:2,10,24
108:2 109:1
109:3 111:3
111:16,18,19
112:7 113:18

113:25 114:2
114:23
123:12
124:22,25
126:1 136:13
139:18,19,20
139:22,23
140:1,8
141:4,6,9,18
141:23 142:1
142:2 143:25
146:21 148:2
148:5,17,25
150:8,20
151:24
154:21,22
155:11,24,25
156:2,4,6
157:5,8
158:12
173:15,18,21
174:2,4
175:25 177:9
177:17
remembered
50:12
remembering
114:2
rennillo
1:19 190:1
reopen
128:5
repeat
25:22 37:7
38:7 53:25
repeated
114:4 177:12
rephrase
26:1 94:25
rephrasing
13:2
report
6:11 74:11
151:4,10,14
152:4,15
153:13 165:7
166:8,11,12
166:17,18,19
reporter
10:20 11:19
188:7
reporters
5:13 186:1
represent
10:9 11:10
52:11 122:9
169:5
represented
14:8 104:2
representing
14:16 122:25
123:1,6
161:16,22
162:2,25
request
189:9,11
requested
185:1,6,10
requestion
18:23
resemblance
73:9
resemble
69:13
resembled
61:5 73:18
resource
33:11
respect
183:18
respond
113:13
responded
113:25
responding

13:7
response
16:13 73:6
136:14
responsibility
13:1
rest
101:12 113:7
115:4
result
22:4
resumed
59:13 93:3
110:24 122:3
168:23
183:12
retained
5:16
retaliation
156:17 157:18
return
23:14
returned
47:7
review
112:9 126:11
139:8 185:2
185:6 188:1
189:1
reviewed
137:18,21
138:6
reviewing
138:16
revisions
126:13 160:15
160:17
reynaldo
1:11 3:3 188:3
189:3
rican
55:1
right
14:12 19:6
26:25 32:5
32:10,12,20
33:6 34:4,19
34:21 35:7,9
35:24 36:18
36:25 38:7
39:3 42:3
43:4 45:25
46:1 51:6,21
51:25 53:14
54:13 56:3
57:2,8 58:5
64:24 65:2
67:2 70:17
70:20 75:19
77:24 81:13
88:14,22
89:15 91:17
93:23 95:15
95:22 107:2
107:11,22,25
108:6 110:6
115:8 116:4
116:13
117:23 119:5
123:17 124:1
127:11
130:16 132:3
134:12
136:25 143:7
145:1 150:3
156:22,24
157:13,25
160:3,22
162:6,22
163:15 164:9
169:19 170:4
170:6,12,16
170:25 171:5
171:10 172:4
172:4,7,15
174:25

McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

11

182:10
rights
183:18
righty
152:12
rinaldi
3:8
ring
167:16,25
rival
17:20 132:22
170:23
rivals
129:18
rivera
1:5 10:4,10,12
11:10 18:1
61:4 72:14
73:4,9,11
80:19 82:10
82:11,14,18
82:19,25
83:6 84:11
84:19,23
85:12 90:3,5
94:7 98:14
99:2,6 100:6
100:20
101:20
104:20
109:23 110:7
110:9 114:3
122:11,25
123:2,6
127:24
140:10
141:14
152:21
153:24
155:15
160:12
161:17,22
162:3,15
163:1 169:7
172:17 173:1
173:25 175:7
178:8 179:15
180:4,22
181:6,11,18
182:5 188:3
189:3
riveras
73:23 74:15
75:2 156:9
161:1 177:23
182:3,20
roberto
168:9
rocco
3:8
rock
3:19
rockfuscoco...
3:25
rodriguez
168:3 176:9
roll
149:9
room
82:1,2,3 83:17
99:10 100:13
100:13 123:9
124:16 137:2
137:3
rosen
3:20 5:10
10:13,13
24:21 25:23
42:13,16
52:9 57:23
81:22 100:11
100:22
111:14
112:14
116:10
117:19

118:20
119:16,19,23
120:3 122:6
122:9 127:8
153:11
159:11,15,18
159:21
168:10,24
172:11
184:17
roughly
102:9
rpr
1:22 186:6
187:14
ruiz
167:24
rules
10:22 11:22
185:3,7
188:5 189:5
run
11:12 34:4
35:8,12
55:18 143:10
168:16
running
35:17 48:3
55:24 56:2
56:23 88:17
107:5 108:1
109:4 143:22
runs
32:9 36:23
russell
3:6

—————
S
—————
safe
22:9,9,18
safety
157:23
sat
65:1 124:16
saturday
27:8,17
saw
18:8 21:22
45:19 46:2,8
46:11 47:4
48:3 49:3
51:2,4 53:24
54:3 56:21
58:17 59:15
59:25 60:18
61:2 65:22
70:5,5,18
73:3,8,13,14
73:14 75:14
78:9 80:9
82:16 86:15
88:10,12,21
89:5 90:2
93:4 100:13
105:13,17,17
107:20,21
108:1,11,18
109:13 111:7
134:15
138:19
141:22 144:6
144:7,8,14
144:25
146:15,24
151:9 154:17
166:22
169:15 178:2
178:9
saying
46:19 64:11
76:14 78:24
79:3,9,14,15
79:24 86:4,6
93:24 96:21
105:15,16

106:24 111:3
111:16 114:4
114:23 130:9
144:2 146:10
148:6 153:18
153:18 154:8
154:22
155:22 156:2
156:4,10
says
34:5 113:10,12
113:12
117:20 152:6
152:15 175:4
175:6
scared
50:17 88:16,18
144:15 147:6
scene
40:25
school
23:20 27:2,14
27:16,17,18
27:20,21
29:9 85:7
86:14 87:1
88:10,24
144:8,11,12
144:23,24
145:1 146:2
146:10 168:7
168:8
scorned
104:15
screaming
48:4 142:8
seal
187:6 188:15
189:21
seat
42:20
seated
39:9
second
40:7 43:6
53:23 54:2
58:3,9,17
78:2,3,5
93:16,16,17
94:11,15
100:7 131:8
131:9 141:24
152:3 158:25
159:12 168:5
182:23
seconds
54:14 58:9
see
17:2 18:22
33:23 34:18
37:22 39:6
41:16 43:18
45:7,22
46:18,19,22
46:24 47:9
49:5 51:24
51:25 52:18
54:8,19,21
56:15,25
57:2,10,23
57:24 58:9
58:13 59:17
66:19 69:19
77:5,19
90:13 102:15
102:22
107:13,19
108:15 109:7
111:7 115:15
115:16
127:10 134:7
134:8,12,19
134:25 135:3
138:3,24
140:22,25
147:24

152:23
153:12,15
160:21
164:20 175:1
175:2,8
184:7
seeing
61:1 87:24
93:12 108:8
141:18 152:2
seen
18:6,10 58:24
59:2 65:14
65:15 84:7
97:12 105:25
106:5 111:2
111:10
112:16,22
113:1,2,4,15
127:10 145:1
151:4,21,21
151:22
158:18,20
162:21,24
169:22 171:4
select
73:25
send
126:10
sense
23:6 36:2 56:4
79:4 114:6
115:20 130:1
139:24
150:18
sent
126:5 160:19
sentence
84:21
sentences
153:13
sequence
46:7 150:23
sequential
122:22
serious
97:25
seriousness
97:25
serve
127:5
serves
26:25 32:10,20
33:6 56:3
70:17,20
77:24
service
24:17
session
122:4
set
136:16 187:6
setup
81:25
shake
88:13
shaking
12:1 89:5
sheet
189:7,10,18
190:1
shes
154:24
shocked
50:7 154:12
shoot
46:3 77:22
shooter
46:2 61:5,9,12
62:16 66:17
66:19 74:1
89:22 90:10
93:10 105:17
106:1,3
108:1 109:13

110:11
112:16,22
139:22 140:9
146:16 170:2
170:12 173:1
179:14 180:4
180:22
181:18
shooters
47:9 59:15
62:25 108:18
144:3
shooting
18:7,9,12,17
26:16 37:25
37:25 39:17
41:17 43:17
43:21 45:20
46:9,11,15
47:23 51:2
54:6 58:25
60:8,18
61:19 71:18
75:22 77:23
87:25 105:13
105:21,21
106:16 107:3
107:14,15,23
108:3,4,6,10
109:3,4,5
156:14,23
166:4 169:25
170:19
173:10
174:11,12
177:4
shopping
103:23 104:1
short
59:5 110:15
136:11
shorthaired
125:2
shot
17:13,14,15
18:5 26:5,18
26:21 27:6
28:2 29:2,20
37:5,9 41:14
46:21 48:2,3
60:18 69:24
88:11 101:21
105:10
107:13
108:25,25
111:1 133:7
142:4 145:21
146:6 165:12
165:18 166:7
166:16
169:16 171:3
172:15 182:5
shots
43:24 44:1
show
44:8,15 45:1,3
45:23 57:1
59:16,17
73:13 110:3
116:7 135:4
140:19
176:10
showed
67:5 70:24
73:13 77:18
125:7 151:7
152:20
153:23
173:10
176:12 177:4
177:10,18,20
177:21
showing
33:18 62:23
65:7,8
shown

41:7 48:20
52:15 57:17
140:2 176:8
shut
67:16
side
22:15 35:7,24
35:25 36:25
38:12,13,15
39:12 42:12
42:17,21
56:13 88:25
89:2,3,5
93:5 130:12
130:14
166:15
sidewalk
42:4
sign
93:6
signature
185:5
signed
15:1,17 188:13
189:18
significance
61:15
significant
62:4
signs
90:19 91:12
92:11,14
similar
11:17 63:3
69:22 73:15
simple
91:24 100:14
simply
109:10
sir
53:19 88:3
90:21 107:18
sister
28:11 30:3,14
31:6 47:18
67:10,13,19
67:20 133:8
133:14 134:5
150:1 163:20
164:2 167:7
167:10
sisterinlaw
30:3
sisters
28:11,12,14
131:2,4
148:22
149:22,25
sit
14:5 17:11
18:3,14
37:17 71:24
72:2 77:19
sitting
89:13 138:15
situation
163:13
six
116:20
size
136:18,18
skin
74:8
skinned
74:9 76:24,25
77:1
skipped
61:11
slid
51:6
slow
12:11
solution
33:3
solved

12

| | | | | | |
|---|---|---|---|---|---|
| 101:10 | 51:19 | 13:19 50:22 | suite | 163:23 | telling |
| somebody | ss | 100:18 106:3 | 1:20 2:17 3:12 | talked | 64:12 67:10,16 |
| 46:15 58:23 | 186:3 | 179:19 | 3:22 | 63:19,24 64:25 | 79:5 83:11 |
| 59:1 71:24 | stairs | stopped | suits | 95:20 128:6 | 86:20 93:20 |
| 87:24 101:4 | 50:25 | 78:23 | 136:25 | 128:6 131:3 | 94:17 97:9 |
| 104:14 111:1 | stake | store | summary | 158:22 | 97:10 137:7 |
| 167:23 | 114:11 | 46:5,14,14,14 | 101:13 | 169:21 | 137:10 140:8 |
| somebodys | stamp | 47:7,8 48:2 | supposed | talking | 148:2 150:16 |
| 172:9 | 140:21 | 49:5,11,22 | 184:5 | 12:5,9,17 | 165:23 181:2 |
| someplace | stand | 50:22,24 | sure | 26:18 37:4 | ten |
| 67:6 | 88:23 115:20 | 51:2,12,16 | 12:7 21:23,25 | 64:18,23 | 19:16 159:6 |
| somewhat | standing | 51:18 54:3 | 22:3 45:24 | 72:5 76:4 | terms |
| 69:14,15 | 58:2,5 108:9 | 105:11,12,16 | 61:7,8,9 | 78:5 93:17 | 64:17 88:19 |
| son | 108:13 | 105:19,20 | 64:16,20 | 93:18 101:1 | 95:23 |
| 21:21,23 24:12 | starbucks | 107:7,7 | 66:19 73:5,6 | 103:9,10 | territorial |
| 89:23 103:25 | 104:8 | 143:9,17 | 74:14,14 | 104:8 106:22 | 22:13 |
| 149:19 | start | story | 75:6,6 83:12 | 136:22 | territory |
| sorry | 12:8,13 131:11 | 86:2 94:2,7,9 | 83:16 113:8 | 144:17 | 22:10 62:6 |
| 24:24 30:8 | started | 97:7,11 | 122:18 | 150:21 | 129:19 170:4 |
| 35:19 39:11 | 48:5 60:17,24 | 101:2 102:4 | 123:11 | 155:11 | 170:16,24 |
| 42:18 81:23 | 61:1 78:21 | 109:2,2 | 125:22 126:3 | tall | test |
| 84:20 127:4 | 93:20 104:8 | 114:12 | 126:18 | 136:11 | 44:4 |
| 144:10 | 123:19 | 127:25 | 135:19 140:1 | taller | testified |
| 159:18 | 142:17,18 | straight | 151:20 156:1 | 136:12,14 | 65:24 77:25 |
| 175:21 | starting | 50:23 86:2 | 160:21,23 | team | 84:19,23 |
| 176:15 | 152:5 | 115:22 | 165:9 172:2 | 124:21 161:1,5 | 96:1 112:15 |
| sort | state | 143:15 | 172:23,23 | tecum | 112:19 |
| 122:12,21 | 10:6 153:3 | 150:22 | 175:20 | 127:6 | 122:23 125:5 |
| 150:23 | 164:8,9 | 162:13 | surrounding | toll | 136:2 139:11 |
| 152:13 170:7 | 175:7 179:20 | streamline | 184:2 | 11:3 12:25 | 142:4 143:5 |
| sotos | 186:2,7 | 119:24 | surroundings | 13:21 16:23 | 155:3 157:6 |
| 3:9 | 187:15 | street | 11:16 | 17:12 18:4 | 157:9 161:21 |
| sound | 188:10 | 1:20 2:16 3:21 | suspect | 18:15 19:9 | 162:3,5,11 |
| 43:23 51:3 | 189:15 | 4:5 29:9 | 71:17 111:7 | 20:24 21:3 | 174:10 |
| 169:9 | stated | 32:9,16 | swaminathan | 21:11 22:20 | 175:11 |
| sounded | 106:25 | 33:19,23 | 2:15 10:11,11 | 23:9,23 25:7 | 179:17 182:4 |
| 43:23 65:20 | statement | 35:9 36:5,6 | swear | 26:20 28:5 | 184:3 |
| south | 106:12 188:13 | 36:9,10 37:6 | 10:20 | 28:22 29:25 | testify |
| 35:1,3 36:24 | 188:14 | 37:11 42:6 | sweetest | 30:7,25 | 13:22 14:22 |
| 47:3 61:14 | 189:19,19 | 49:14 57:13 | 104:25 105:2 | 31:18 36:22 | 15:23 16:21 |
| 62:3,15 89:3 | statements | 88:20,24,25 | sworn | 37:13,17,18 | 101:17 |
| 170:3 | 14:21 15:19 | 89:7 129:24 | 10:23 14:21 | 38:3,9 40:3 | 112:21 |
| southeast | states | 136:1,3 | 174:5 186:10 | 40:12 41:11 | 124:11 |
| 143:21 | 1:1 153:9 | 143:23 144:6 | 188:10,13 | 41:20,24 | 163:17 |
| spanish | 165:1 | 165:2,4 | 189:14,18 | 43:24 46:7 | 186:10 |
| 132:23 | station | 167:20 170:7 | 190:21 | 48:20 49:13 | testifying |
| sparks | 18:16,21 19:2 | streets | system | 49:24,25 | 162:16 173:15 |
| 3:5 | 80:23,23 | 89:14 | 115:20 | 50:1 51:16 | 173:21 |
| spaulding | 83:21 94:15 | strike | | 53:23 54:3 | testimony |
| 32:18 34:6,10 | 98:8,9,16 | 108:16 116:17 | T | 54:22 55:5 | 14:21 16:2,15 |
| 36:7,8 47:3 | 177:24 | stuck | | 55:13 56:20 | 16:20 17:3,7 |
| 47:3,4 62:3 | 178:15 | 22:17 94:7 | table | 59:18 60:6 | 22:1 25:14 |
| 62:15 106:2 | 181:17 | 108:7 115:24 | 69:12,21 72:3 | 60:12 61:20 | 44:7 71:4 |
| 109:15 | stay | 139:1,25 | tail | 62:19 65:2 | 81:13 82:21 |
| 170:13 184:9 | 118:9 | 166:20 | 89:25 | 65:15,21 | 104:10 |
| speak | stayed | stuff | take | 66:16 70:3 | 112:19 |
| 55:9 123:5 | 145:19 166:3 | 21:15,18 26:13 | 12:16 13:10,13 | 70:16 72:12 | 113:24 |
| speaking | staying | 27:8 31:15 | 15:2 25:18 | 72:12 74:16 | 114:12,24 |
| 87:11 179:19 | 131:19 133:19 | 55:9 80:2,6 | 49:19 59:4 | 78:10 79:8 | 116:17 |
| specific | stenotypy | 84:14 96:24 | 61:13 72:8 | 80:15 81:24 | 122:19 |
| 150:8 | 186:14 | 105:4 111:8 | 72:24 77:23 | 82:4 88:5,19 | 137:18,21 |
| specifically | step | 113:16 114:4 | 92:16 110:13 | 92:14 96:16 | 138:17,17 |
| 183:25 | 19:6 | 123:9 141:10 | 110:15 | 96:18 98:5 | 139:5 178:6 |
| specified | stepdad | 150:16 | 119:17 | 98:17 99:15 | 178:19 |
| 186:21 | 28:13 | 159:14 | 125:22 | 100:19 102:2 | 179:17,23,25 |
| speculation | stepfather | 164:17 | 138:17 | 103:5,7,8 | 180:24 |
| 118:22 | 28:10 131:2 | 167:12 | 140:24 143:3 | 105:3,9,14 | 186:13,17 |
| speech | steph | style | 143:10 | 105:24 106:5 | 188:6,7 |
| 12:11 | 160:3 | 73:15 89:25 | 151:20 152:3 | 106:10,18 | 189:6,9,12 |
| spell | stephanie | 90:6 | 168:11,15 | 108:17 | thank |
| 11:4 | 4:4 10:17 | subpoena | 174:24 183:1 | 109:12,15,20 | 20:9 22:1 26:2 |
| spend | 35:17 127:5 | 127:5 | 184:12 | 110:2,6,25 | 44:7 53:21 |
| 29:3,4,11 32:1 | 160:4,23 | subscribed | taken | 111:4,17 | 175:24 |
| 133:23 | 174:22 | 188:10 189:14 | 1:19 15:12 | 119:5,7 | 183:14 |
| spent | 176:15 | 190:21 | 44:14 48:11 | 127:19,22 | thanks |
| 83:20 133:21 | steve | substance | 52:13 59:8 | 128:2 136:8 | 42:19 168:25 |
| spoke | 3:4 | 79:18 | 92:24 110:20 | 137:6,12 | thats |
| 104:19 144:1 | stick | sued | 114:13 121:1 | 139:15 | 17:2 20:14 |
| 149:11,12 | 72:25 85:19,22 | 169:6 | 168:19 183:7 | 141:25 149:3 | 23:12 27:10 |
| 160:6 | 94:1 97:11 | suggest | 186:20 | 150:23 | 28:21,22 |
| spoken | sticking | 64:9 86:4 | talk | 151:22 | 29:16 32:24 |
| 14:15 122:24 | 102:4 | 103:14 | 14:3,6 34:15 | 154:17 | 33:25 34:9 |
| 123:1 | stipulate | suing | 55:10 63:16 | 156:20 | 34:10,16,19 |
| spot | 184:15 | 163:16 | 64:1 106:13 | 158:17 159:7 | 35:3 37:16 |
| 45:7 50:19 | stop | suit | 124:8 145:25 | 163:7 165:16 | 38:1 40:10 |
| | | 129:5 | 150:7 157:11 | 173:19,19 | 41:13 44:3 |
| | | | | 174:5 175:19 | |

13

46:3 47:4
49:15,24
50:4,19 51:5
51:9 53:8,18
55:9 58:20
60:24 61:17
61:25 62:21
64:22 65:12
67:11,12,13
67:17,25
68:1,19,23
68:24 69:12
70:25 71:18
73:1 74:10
76:12,14
77:21 81:11
85:18 86:10
86:15 89:13
89:25 92:4,6
92:18 95:20
95:20 96:13
97:15 98:24
98:25 99:2
104:18 106:6
107:23 108:6
109:1 110:7
111:16,21
113:11,24,25
115:6,17,19
116:17
117:11 119:1
119:2 123:19
129:1,9
135:6,14
136:14
137:16
138:10 139:3
139:17,23
142:3,10,12
146:2,10,22
146:23 149:7
149:9 152:20
153:14,24
159:20 161:8
163:12,24
165:7,11
166:9,23,23
167:12
170:18 172:6
178:5 183:19
184:15
**theirs**
157:24,25
**theres**
91:22 112:2
114:11 115:7
115:9 134:10
155:24 164:5
175:2 178:11
**theyre**
46:15 91:14
97:9,10
130:12,13
**thick**
69:22 70:6
171:20
**thin**
136:16,17
**thing**
13:16 15:10
22:2 49:9
58:19 61:12
62:16 64:8,9
66:2 75:22
77:21 93:13
107:19,25
132:23
137:25
151:19
163:15,18
183:23
**things**
88:8 109:19
115:21 136:1
148:10
154:11,18,20
155:24,25

160:15
166:20,21
181:2
**think**
26:14 33:2
49:8 70:18
81:1 87:15
95:7,8,17,19
96:5 98:3
119:16 124:6
124:12
126:13,15,16
134:10
140:13 153:9
153:20,22
157:10 166:8
166:9,15
168:11,12
184:14
**thinking**
50:19 101:5,9
112:2 163:14
**thinks**
152:17,19
**third**
91:8
**thought**
87:16 94:4
128:11
155:16
163:17
**three**
69:22 98:21
119:6 126:16
126:16 131:4
132:7 164:11
**threw**
34:9
**throw**
31:14 82:22
90:18 92:14
**throwing**
91:9 92:11
93:5
**thumb**
91:7
**tightknit**
164:6
**time**
10:2 12:17
13:14 15:12
17:15 21:10
23:5 25:19
26:24 27:17
29:1,3,4,7
29:11,19
30:18 31:2
32:1 37:14
39:24 41:17
46:5,20 47:4
47:22 49:20
50:6,10
51:23 53:23
54:2,14 58:3
58:9,11,17
58:18 59:7
59:22,25
60:2 61:6,9
61:16,17
64:14 65:11
65:11,21
66:3,10,11
67:3,15 72:8
74:8 75:20
77:17,20
80:6,20 84:4
85:15,24
86:13 88:17
89:11 93:2
95:19 96:9
96:10 99:18
100:16 101:2
105:10
107:12
108:11 109:9
109:25 111:7

112:22
118:14
119:17 122:2
123:8,12
124:10,16
128:9 129:18
131:15,17
132:22
133:23,23
134:16 135:5
135:25
137:20 140:1
140:10 141:7
143:7 144:2
144:14,17
147:3 149:6
149:10
156:15,21,23
159:24 160:7
160:10 161:2
161:11,12,15
161:23 162:6
162:7,8,20
168:22
172:13,25
173:2 174:9
177:22
179:10,18
180:19,25
183:11
186:20
**timeframe**
129:17,20
132:3,4
**times**
18:25 19:3
23:9 58:23
115:13
143:22
150:24 159:1
159:5 162:4
166:6,9,16
171:4 172:22
173:12
177:15,18
**today**
13:22 14:9
15:23,25
16:21 17:11
18:3,14 19:8
77:25 112:19
122:8,14
126:22
147:23
157:10
174:11
**told**
46:14 55:14
65:13,18,19
65:24 66:5
67:24 68:4
70:24 71:1,5
71:9 78:22
84:1 94:21
95:2,3 96:22
96:23 97:11
97:12 101:4
102:3 104:9
105:19
116:22 117:8
127:23
152:21
153:24 154:9
154:12,13
155:5 166:1
169:22,24
170:2 171:2
172:19
178:25 179:4
179:14 180:4
180:16,21,25
181:1,21
**toni**
1:22 12:16
14:24 186:6
187:14
**top**

34:18 35:22
116:21
**tops**
70:19
**totally**
25:15
**touch**
163:19
**tower**
1:20
**transcribed**
186:16 188:7
**transcript**
5:1 6:4 16:2,7
16:18,20
17:1 111:21
116:8,11
183:19 185:3
185:6,9,11
188:5,12
189:5,11,17
**transcription**
186:17
**travel**
61:13
**trial**
6:12 22:7,23
112:16,22
114:2,3
124:11
137:22,23
140:2,9
141:7,9,10
162:21
173:16,18
174:6,19
175:4,11
176:1 182:3
182:7,16
**trick**
173:6
**tried**
158:16 169:11
**trimmed**
76:18,18
**tripping**
115:13
**trouble**
145:5
**true**
15:20 178:7
186:16
**truth**
174:6 186:11
186:11,12
**truthful**
17:8
**try**
12:7,14 26:3
36:4 87:14
87:21 100:16
122:19
144:16
**trying**
26:8 44:5 64:8
85:17 86:3
86:15,16
109:22
139:19
**turn**
60:3 106:2
109:14
111:22
134:24 135:2
**turned**
40:5,14 46:12
46:21 54:6,8
54:11,13
58:2,8,22
59:20,23
61:14 105:18
107:6 170:3
170:12
**turning**
51:4 107:1,2,8

**twice**
18:19,21 19:3
46:21 181:9
**twisted**
115:21
**two**
18:25 19:3
28:10 58:22
61:2 69:21
70:19,19
72:12 78:1
80:8 98:20
102:6,11,22
103:9,11,21
126:16 131:7
131:14
164:25 178:2
179:18
**twoway**
82:7
**type**
33:22 125:14
125:15
135:17 146:3
156:4
**typed**
125:16 151:10
**typical**
157:16

───── U ─────

**uhhuh**
12:1 34:22
135:21
137:11 160:9
**uhoh**
82:22
**ultimately**
128:11 172:14
**umbrella**
128:25 129:10
**unannounced**
124:1 160:8
**uncertainty**
18:24
**uncle**
164:17
**understand**
12:20,24 25:20
34:15 64:10
66:9 69:13
91:18 114:8
123:21
139:15
144:16 170:6
175:20
**understanding**
40:24 99:21
**understood**
13:6 95:24
168:17
**uniform**
64:2,5 74:18
**uniformed**
63:25 65:25
**united**
1:1
**unusual**
37:22 86:25
87:17
**ups**
78:1
**upset**
67:16 85:21
145:15
**upstairs**
47:21,25
**use**
13:11 41:25
76:13 128:3

───── V ─────

**valentin**
17:13 18:5,17

30:15,21,23
47:19 62:12
142:21
148:20,24
149:23
169:16 182:6
**valentins**
29:21 31:8
**vanessa**
150:1
**varied**
29:17
**various**
173:12
**veritext**
190:1
**version**
140:23
**versus**
10:4 29:11
175:7
**vicinity**
36:20 85:7
**video**
7:1
**videographer**
4:10 10:1,19
43:10 45:17
49:18 53:13
59:6,11
92:22 93:1
110:18,22
120:4 122:1
134:25
168:21
175:21,24
183:5,10
184:21
**videotaped**
1:15 10:3
**view**
18:18
**viewed**
177:24 178:15
**villafane**
167:15
**visible**
38:17,22
**vision**
108:2
**visit**
23:2,10,12
102:6 144:2
165:12,20
**visited**
23:3,5 30:5
**visiting**
102:11
**vivid**
75:15
**vividly**
26:11 46:18
56:9 58:14
90:12 99:3
108:25
139:24
155:24,25
**vs**
1:9

───── W ─────

**wabanasia**
35:2
**wait**
153:4 161:10
**waiting**
104:16
**walk**
38:19 143:2
**walked**
37:6,10,20,21
38:18,22
68:15,18
117:3

walking
39:5 68:20,21
85:13 88:8
142:18 143:1
want
12:13,25 15:9
21:24 22:17
25:12 32:5
33:4 34:14
40:3 41:22
57:1 60:3
64:9 70:4
71:13 72:17
72:21,22,23
72:23,24,25
72:25 76:7,9
76:13 79:9
85:19,22
87:11,21
91:12,13
92:7 97:22
104:6 105:1
110:1,7,8
112:11 114:9
114:13
116:21 120:2
122:12 129:4
136:9 143:19
147:4,11
149:20 150:5
150:21
151:19 154:7
157:12,15,16
157:21
158:24
162:14
174:22
183:14
wanted
16:18 21:23
22:2 97:6
98:2 118:16
126:3 127:24
127:25 128:4
137:10,12
138:22 165:9
172:2 181:23
wants
57:24 101:6,9
115:15,16
war
132:23
wasnt
86:18 103:22
106:22 110:7
146:18
155:23
179:14 180:4
180:22 182:8
watched
46:3
watching
61:25
way
28:12 34:15
50:18,21
54:21 55:15
57:2,7 60:22
62:23 68:19
70:19 74:4,6
85:10,19
86:12,14,21
86:21 88:9
97:3 101:11
103:17,18
110:10,10
112:12
113:25
116:18
129:23
135:15,16
143:19
148:17
150:11
154:24 156:7
157:12

158:13
160:22
177:10
ways
98:2
weapon
43:18
wear
62:20,22
wearing
40:1 55:2
56:23 64:3
65:20 89:24
90:8 93:6
wedding
47:20 133:8
week
16:25 27:5
138:7
weekend
27:13
weeks
18:17
weingart
3:6
went
18:16,21 19:1
26:12 51:6
51:11,17
59:21 61:2
61:10,14
62:3,14
65:19 66:6
67:3,14,18
72:20 73:8
84:3 86:1
97:21 98:4
98:13,24,24
99:4 104:8
104:20 107:1
110:10
123:18
126:14 134:1
138:1 144:13
145:17,22,23
150:17 162:8
162:13
166:19 168:6
168:8 171:12
171:24 172:7
181:6
west
26:22 28:6,16
32:7,11,11
32:14 33:1
33:22 34:4
35:3,11,13
35:24 36:9
45:4 56:25
184:2,5
weve
26:15 35:22
127:10
140:19
whatnot
163:11
whats
36:5,9 41:7
42:14 44:23
48:20 52:15
75:22 79:10
87:7 103:13
108:23
128:20
164:14
whereof
187:5
white
56:25 57:5,16
95:15,16,17
95:19 115:9
158:16
178:24
180:10,16
whitehaired
116:25 178:16

179:1,4,10
179:13 180:3
180:21 181:5
wide
89:14
wife
19:21 104:1
willing
127:16
window
23:25 24:6,7
24:11 99:23
134:7,13,13
134:14
windows
134:19
witness
10:20 24:14
43:13 45:14
52:25 53:4
53:11,17
54:9,9
113:11
119:21
144:11 186:9
186:14,15,18
187:5 188:1
188:4,11
189:1,4,15
witnessed
169:24
witnesss
185:2
wives
163:11
woman
56:19 102:13
102:14
178:16 179:1
women
102:6,10,11,22
103:9,11
word
53:2 76:12
79:11 129:1
154:11,18
words
22:10,19 41:25
79:9,13,17
85:18 87:10
115:22
117:15 144:5
147:7 156:5
wore
76:22
work
13:23 24:4,16
25:2 95:13
worked
23:23 24:1
25:2
worlds
33:10
worries
73:22
wouldnt
152:22 153:25
write
53:2 154:6,6,7
writing
123:9
written
53:9 154:20,25
165:7
wrong
32:21 42:14
87:7 93:19
93:21,21,24
94:18,22
95:3 96:13
96:14,14,17
96:19,19,22
96:22,25
97:1 98:6,7
101:7 104:11

104:20 116:1
116:23,23
117:9,17,17
128:1 143:3
158:17 179:2
wrote
44:11 125:19
154:16,19

_____ X _____

_____ Y _____

yall
163:10
yeah
29:4 31:9,12
43:13 57:4
57:11 71:9
74:20 76:7
76:21 81:2
81:16 104:9
106:7,17
108:14 115:8
116:6 117:14
119:18 126:2
127:8 129:9
129:9,24
131:24
143:14 144:5
146:20
148:19,19,25
152:25
153:15
155:18
158:14 160:5
161:8 165:6
165:8,11
166:15,15
171:14,16
174:13,13
177:16
178:23
180:16 181:8
year
20:24 23:10,11
145:23,24
years
19:16 20:7,15
21:2 25:4
44:14 48:12
50:16 52:13
132:15
144:18,19
145:18
149:14,20
173:22
174:10
yelling
142:8
yellow
40:10 62:21
63:4,7,7,9
91:23 95:16
95:18
yesterday
47:1
yo
146:1,22
youll
33:23 34:18
young
65:12 66:11
96:10 167:9
167:11
younger
131:4,7 145:7
145:9,22
147:18
youre
11:18 13:7
19:4 22:17
22:17 35:1
36:4,8 39:11
69:11 85:8
85:17,17,19

86:4,6,19
90:22 91:9
94:1 97:13
101:9 103:10
103:17,17
109:22
114:15
122:18,20
136:15
138:15
144:17
145:25
148:11,12
149:8 161:5
167:18
youve
13:6 14:15,21
23:23 36:18
53:9 66:13
69:20 73:19
77:25 84:19
133:2 151:20
151:22
154:13
169:10

_____ Z _____

zacharias
3:5

_____ 0 _____

00
93:2,3
0093
40:23
01
59:7,8
03
1:18 10:2
045062
52:2
045067
48:9
045069
44:13

_____ 1 _____

1
37:18 93:2,3
110:19,20,23
110:24 120:1
120:5 121:1
10
20:8 37:18
49:25 168:15
168:18,19
100
1:20 2:17 7:24
7:25 8:1
171:17
106
8:2
108
8:3
109
8:4
11
1:18 5:9 10:2
27:1 152:4
152:15
111
8:5,6
112
8:7
115
8:8,9
116
8:10
117
8:11,12
118
8:13,14,15
12
1:9 15:17 27:1

37:18 59:7,8
59:12,13
92:23,24
125:8 187:17
122
5:10
13
20:7 173:22
174:13
1301
1:20
14
20:7
140
6:10
143
8:16
15
6:3 7:3 20:15
21:2 49:25
168:15
150
3:12 8:17
151
6:11
152
8:18
154
8:19
155
8:20,21
159
8:22
16
6:4 122:2,3
1669960
188:2 189:2
190:2
169
5:11
17
20:7 25:9
173
8:23
174
6:12
176
8:24
177
8:25
178
9:1,2
179
9:3
18
30:19 59:12,13
112:6 149:13
180
9:4,5
182
9:6
186
5:13
19
21:10 113:9
149:19
1988
17:13 18:7
25:21 26:16
128:21
129:16,20
131:1 149:6
165:2 167:3
169:15
1990
139:12 156:7
173:17,19
174:3 175:2
175:12 182:4
1990s
21:5

_____ 2 _____

2

5:3 122:2,3
20
21:10 44:14
48:11 52:13
188:16
189:22
190:22
2010
15:17 125:9
181:22
2011
16:3,16 17:8
114:25
2013
1:17 10:3
187:8 188:3
189:3
2015
187:17
21
110:19,20
2200
3:22
2216
118:1
23
16:3 17:8
114:25
25
7:4
27
17:13 18:7
25:20,25
26:16 110:23
110:24
169:15
29
1:17 6:3 10:3
15:2,5,13,19
15:24 125:9
168:22,23
188:3 189:3

--- 3 ---
3
37:18 112:5
168:18,19,22
168:23 183:6
183:7,11,12
184:22,24
30
6:4 16:4,6,14
17:2 89:17
111:22
137:19
31
6:5 7:5,6
33:13,18
35:21 184:1
312
2:16
3122435900
2:19
3124941000
3:24
3125030844
2:9
32
6:6 40:17 41:2
41:8
321
3:21
33
6:5,7 44:10,18
45:11
3320
26:22 28:6,16
32:6,14
33:22 37:6
45:4 184:2,5
184:9,13
34
6:8 48:10,14
48:19 49:10
35

6:9 52:3,5,12
57:17 120:1
36
6:10 120:5
121:1 140:13
140:15,20
37
6:11 25:11
50:16 151:13
151:17
375
2:7
38
6:12 174:16,18

--- 4 ---
40
120:2
41
6:6
42
7:7 183:6,7
43215
4:6
44
6:7
4428
1:9
45084
140:24
48
6:8

--- 5 ---
5
25:9 175:2
188:3 189:3
52
6:9 183:11,12
53
92:23,24
54
184:22,24
550
3:11

--- 6 ---
6
5:5
60143
3:13
60607
2:18
60611
2:8
60654
3:23
610
4:5
6144495993
4:7
62
52:9 116:9,21
6307353300
3:14
66
7:8

--- 7 ---
71
7:9
76
25:9
79
7:10

--- 8 ---
82
7:11
83
7:12,13
84

7:14,15
85
7:16
86
7:17
87
7:18,19,20
89
128:21 129:17
129:20

--- 9 ---
90
7:21
90s
21:6,7
93
111:23 112:5
94
7:22
96
7:23
9th
1:20

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JACQUES RIVERA, | ) | |
| | ) | No. 12 CV 004428 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | The Honorable Joan B. Gottschall |
| | ) | |
| REYNALDO GUEVARA, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' OBJECTIONS TO PLAINTIFF'S DEPOSITION DESIGNATIONS FOR ORLANDO LOPEZ

Defendants Reynaldo Guevara, Steve Gawrys, Daniel Noon, Joseph Fallon, Joseph Sparks, Paul Zacharias, John Guzman, Gillian McLaughlin, the Estate of John Leonard, Edward Mingey, Russell Weingart, Rocco Rinaldi ("Defendant Officers") and the City of Chicago, by their respective attorneys, pursuant to this Court's Standing Order, list the following objections to Plaintiff's deposition designations for Orlando Lopez:

Page 17, lines 14-16, 22-25 (except for the words "is that person" in line 25)
Objection: Relevance in light of Court's ruling provisionally barring after-acquired Nieves evidence, Dkt. 526

Page 88, lines 12 (from "… and saw him…") through 14 (to "Gangsters")
Objection: Relevance in light of Court's ruling provisionally barring after-acquired Nieves evidence, Dkt. 526

Page 96, lines 22 (beginning "I never told…") through 24
Objection: Relevance in light of Court's ruling provisionally barring after-acquired Nieves evidence, Dkt. 526

Page 109, lines 22-25
Page 110, lines 1-11
Objection: calls for a narrative, no question pending, cumulative, irrelevant commentary.

Page 116, lines 20-25
Page 117, lines 1-22
Objection: calls for a narrative, no question pending, cumulative, irrelevant commentary.

# EXHIBIT 61

36

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JACQUES RIVERA,                              ) No. 12 CV 4428
                                             )
            Plaintiff,                       )
vs.                                          ) Chicago, Illinois
                                             )
REYNALDO GUEVARA, STEVE GAWRYS, DANIEL NOON, )
JOHN GUZMAN, JOSEPH FALLON, JOSEPH SPARKS,   )
PAUL ZACHARIAS, GILLIAN MCLAUGHLIN, JOHN     )
LEONARD, EDWARD MINGEY, RUSSELL WEINGART,    ) June 6, 2018
ESTATE OF ROCCO RINALDI, CITY OF CHICAGO,    )
                                             )
            Defendants.                      ) 9:16 o'clock a.m.

VOLUME 2 - A
TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JOAN B. GOTTSCHALL
and a jury

APPEARANCES:

For the Plaintiff:     LOEVY & LOEVY
                       BY:  MR. JONATHAN I. LOEVY
                            MR. STEVEN E. ART
                            MR. ANAND SWAMINATHAN
                       311 North Aberdeen Street
                       3rd Floor
                       Chicago, Illinois  60607

                       MacArthur Justice Center
                       Northwestern University School of Law
                       BY:  Locke E. Bowman , III
                       357 East Chicago Avenue
                       Chicago, Illinois 60611
                       (312) 503-0844


Court reporter:             Blanca I. Lara
                       Official Court Reporter
                       219 South Dearborn Street
                            Room 2504
                       Chicago, Illinois 60604
                          (312) 435-5895
                       blanca_lara@ilnd.uscourts.gov

Appearances (continued:)

For the Individual      THE SOTOS LAW FIRM
Defendants:      BY:   MR. JEFFREY N. GIVEN
            MR. JAMES G. SOTOS
            MS. CAROLINE P. GOLDEN
            MR. JOSEPH M. POLICK
            MR. DAVID A. BRUEGGEN
        550 E. Devon Avenue, Suite 150
        Itasca, Illinois 60143

For the Defendant      ROCK FUSCO & CONNELLY, LLC
City of Chicago:      BY:   MS. EILEEN E. ROSEN
            MS. CATHERINE M. BARBER
            MS. THERESA B. CARNEY
        321 N. Clark St., Suite 2200
        Chicago, Illinois 60654

For the Defendant      LEINENWEBER BARONI & DAFFADA, LLC
Guevara:      BY:   MR. THOMAS E. LEINENWEBER
            MR. JAMES V. DAFFADA
        120 N. LaSalle St., Suite 2000
        Chicago, Illinois 60602

38

(The following proceedings were had out of the presence of the jury in open court:)

THE COURT: I'm not coming out for good, but I wanted to alert you of three things. We have issues with two jurors. Mr. Flores, at the close of the day yesterday, said that he can't serve for four weeks because his job, and he's a plumber, he'll lose too much income. He said he wasn't going to be paid. It turns out he is going to be paid, but not enough. So that is as of Mr. Flores. And he wants to talk to me this morning about that.

Ms. Thayer, Marlan's impression is that she doesn't want to be excused, but she wasn't asked or didn't say during jury selection --

That who was it?

THE CLERK: Grandfather.

THE COURT: That her grandfather was murdered in Yugoslavia, or something, and she feels that we need to know about that. So I'll call both of them in.

I don't know what you want to do about Mr. Flores. I mean, I'm not going to make the decision. He was quiet as a mouse all day yesterday.

MR. LOEVY: And, Your Honor, we're not going to go four weeks. We're just not.

THE COURT: But that's the other thing, you know. He doesn't want to be here. So you just have to tell me. I'm not

39

going to do anything that's not agreed at this point.

MR. SOTOS: Just thinking off the top of my head. What if the Court indicates that we don't think it's going to go four weeks and that it's going to go three, but if we're not done maybe we can have some kind of agreement with respect to him.

MR. LOEVY: I think we can work it out along the lines Mr. Sotos was talking about. If we could talk him into staying --

THE COURT: Well, you know, why don't I tell him that we're trying to figure out what to do and we'll talk to him at the end of the day, or at lunch time, or something. And we'll get Ms. Thayer in here for a few minutes.

Now, on the issue that Mr. Sotos raised yesterday, it's complicated. It's complicated, and it's all governed by Rule 613(b). And nobody really gave me briefs on Rule 613(b). So I'm going to just say as far as opening statement is concerned, I don't want to go into this. And I want you to inform me ASAP, maybe tonight or by tomorrow morning, what your position is on Rule 613(b).

Because it turns out that as it's basically a collateral attack on the credibility of somebody who you think is going to be testifying by deposition, right?

MR. LOEVY: Well, he may not, Your Honor. We would like to address it if you give us the opportunity on the

40

record.

THE COURT: Well, I would like to, but I don't want to do it now because I've got things I've got to do for the next ten minutes.

MR. LOEVY: It's not fair to us on opening. They raised it at an untimely way --

THE COURT: Well, you know what, it's 613 and it attaches problems.

MR. LOEVY: Your Honor, the factual premise in their argument was wrong. Their argument was he never told the police at the time. They've now acknowledged that that was wrong. He did say in the affidavit that the information they're trying to keep out, he did tell the police at the time. Once that factual --

THE COURT: Wait. That's true?

MR. LOEVY: That is true, Your Honor.

MR. SOTOS: Yes.

MR. LOEVY: He says, I did tell the police.

THE COURT: Where did he say that?

MR. LOEVY: He said it in his post-conviction affidavit. So he will be impeached with he did say --

THE COURT: You know, I don't even have these documents.

MR. SOTOS: Judge, I can tell you exactly what it is. First of all, I do want to apologize for saying yesterday that

41

Mr. Loevy was making stuff --

THE COURT: You know, I got five minutes. To got to go back to chambers.

MR. SOTOS: So he said it according to the Northwestern investigators, he told her, and then it was in the affidavit that she prepared after that. He did not say it post-conviction testimony --

THE COURT: Well, you got to sit down and tell me -- well, I can't read all this stuff.

MR. LOEVY: The only issue is, did he tell the police. He says he did. At various times he said he didn't tell the police, on other times he said he did tell the police.

THE COURT: Well, you got to tell me the dates and when he said he told the police.

MR. LOEVY: In the post-conviction affidavit in 2010.

THE COURT: Well, I don't know what that is.

MR. LOEVY: In 2010 he said --

THE COURT: Was before that before his deposition?

MR. LOEVY: Yes.

THE COURT: And what did he say?

MR. LOEVY: He said back when I was -- I recant, back when I said it was Jacques Rivera, I really said it wasn't him, and I told the police it wasn't him and I told the police it was an IG. And then at his deposition, he didn't say it, and he will be impeached by --

42

THE COURT: Let me ask you this, you're saying that he filed an affidavit. Did the defendants have the affidavit?

MR. LOEVY: Yes, they did.

THE COURT: And what was in 210?

MR. LOEVY: Right.

THE COURT: And he said he told the police that it was an IG?

MR. LOEVY: Right.

THE COURT: And then in his deposition he said, because I read that, he said he didn't tell the police that.

MR. LOEVY: Right.

MR. SOTOS: And he wasn't confronted with it, and that's what the rule requires. Rule 613 requires --

THE COURT: It requires an opportunity, that's why I'm asking the questions that I'm asking.

MR. SOTOS: Correct.

MR. LOEVY: Well, we hope to call him live, in which case we're going to confront him with the affidavit. But there's no -- I mean, he did make the statement that at the time he told the police that. And that's what the ground rules have been, what the police knew, they knew.

THE COURT: All right. So I'll see what I can figure out.

(Recess.)

43

(The following proceedings were had out of the presence of the jury in open court:)

THE COURT: Okay, people, be seated.

The day when Estes was deposed as given when Lopez was deposed.

MR. POLICK: I believe it was right afterwards.

THE COURT: Who was after whom?

MR. POLICK: Estes was after Lopez.

THE COURT: So let me ask you this, I think it's a much easier issue, I think, why can't -- why doesn't plaintiff impeach with the affidavit that everybody had notice of way ahead of time?

MR. LOEVY: We hope to. Intend to.

THE COURT: Why do you need to get into Estes today?

MR. LOEVY: We're not going to get into Estes. All we're going to say is, we believe we're going to prove at this trial that Lopez at the time told this information to police and they didn't act on it.

THE COURT: That the person wasn't --

MR. LOEVY: Right.

THE COURT: Okay. That doesn't raise the problem, because you had notice of that, right?

MR. SOTOS: We think it raises a huge problem, because we don't think the issue has anything to do with notice. We think the issue is --

44

THE COURT: No, 613 makes it about notice and opportunity.

MR. SOTOS: Right. But it's the witness that has to have the opportunity to be confronted --

THE COURT: No, no, no, no. You have to have the opportunity; 613(b). It's not the witness, right? You're allowed to collaterally impeach witnesses in federal Court. I'd be shocked if --

MR. SOTOS: No, I'm pretty sure, Judge. I've got it in front of me.

THE COURT: 613(b):

"... extrinsic evidence of a prior inconsistent.
Extrinsic evidence of a witness's prior
inconsistent statement is admissible only if the
witness is given an opportunity to -- "

Well, he was given an opportunity, because at his deposition he went on and on about how he didn't tell the police it was --

MR. SOTOS: No, but, Judge, it says if he has an opportunity to explain and deny the statement. So that's how that works, he has to be asked, Did you, in fact, give a statement to another person. So that he can either say, "No, I didn't say that" or "This is why I said that" or "this is actually what I said."

THE COURT: Well, I don't have the whole deposition,

45

and so --

MR. SOTOS: Because what happened was, when he described what happened, when he said, I never told the police anything about the IGs, nobody confronted him with the affidavit or the statement of Estes. Nobody said, "Well, did you, in fact, give an affidavit" or "Did you, in fact, talk to Ms. Estes," and that's what the rule requires.

So that's why they can't impeach him until he's had an opportunity to address that. And, in fact, without getting into much into the weeds, the notes on which Ms. Estes' statements were based, don't really -- aren't really the same as what she put in the report. And so that's one of the reasons why a witness has an opportunity to say either, "Well, yeah, I said that but then I remember this" or "I didn't say it that way --"

THE COURT: He was not asked about his --

MR. SOTOS: Your Honor --

THE COURT: Can I ask a question and then you can talk.

MR. SOTOS: Sure. Sorry.

THE COURT: He wasn't asked about his post-conviction affidavit at his deposition?

MR. SOTOS: Correct.

THE COURT: Go ahead.

MR. LOEVY: Yeah, at the beginning.

46

MR. BOWMAN: He was asked what he had said --

THE COURT: Yeah, I know that. But that's not what the rule requires.

All right. I think I've to stick with my prior sense that we don't go into this in opening statement.

MR. LOEVY: Okay.

THE COURT: You can brief it.

MR. LOEVY: Your Honor, we have some dismissals, too. Mr. Sotos and I have reached a stipulation on some of the defendants. We should put on the record that Mr. Rinaldi, the Estate of Leonard, Mr. Zacharias, Sparks, Weingart, and Fallon are being dismissed from the lawsuit.

THE COURT: Okay. I will have time to spend with you today at lunch time to the extent we need it. So all I want to do right now is I think calling the two jurors, and tell Mr. Flores that we don't think it's going to be four weeks, but we're working on his issue, okay, and I'll get back to him later. And on Ms. Thayer, just ask her what it is she wanted to tell us.

MR. LOEVY: We'd be willing to waive that if the defense was inclined to do that, too.

THE COURT: Waive?

MR. LOEVY: Just deal with it at lunch and just get going.

THE COURT: You mean not to deal with the jurors?

MR. LOEVY: Yeah.

THE COURT: Yeah, but they want to deal with that. I think it's their problem. I don't want a whole bunch of people there thinking that they're not being responded to.

MR. LOEVY: Fair enough.

THE COURT: All right. Let's have Mr. Flores.

I just want to tell everybody that I've made a decision that, at least for now, members of the press, with credentials, can use computers to type and record things; otherwise, electronics are prohibited among all spectators. And photographing and recording is prohibited both by local rule and by the rules of the Judicial Conference. Okay. We will have an order posted eventually.

(Whereupon Mr. Flores entered the courtroom.)

THE COURT: Mr. Flores, I know that you raised a problem, okay.

JUROR FLORES: Yes.

THE COURT: Let me just tell you that everybody is aware of it. Number one, we've managed to pair some issues down this morning. So I don't think we're going to be four weeks, number one.

But we're all working on your issue. And I can't give you a commitment now. I'll try to get back to you before the end of the day, okay. That's really the best I can do.

JUROR FLORES: Yes.

48

THE COURT: Because once we swear in a jury, it's very difficult to undo that. So that's why we're -- I understand your concern, everybody understands your concern, but we can't like snap our fingers and figure out what to do about it right now.

JUROR FLORES: When you said if I had concerns, I tried to tell you right away.

THE COURT: Well, that's why I appreciate it. Unfortunately, you don't know this, but the time was yesterday. It's not today.

JUROR FLORES: Well, I tried doing it yesterday right after we finished, and they kept sending me downstairs and upstairs --

THE COURT: Yeah, but, you see, once I swear in the jury, basically I'm stuck, okay. Now it becomes a problem. But we're working on your problem, okay.

How much do you lose a day?

JUROR FLORES: Like almost $300.

THE COURT: Okay. You get paid something, but it's not enough.

JUROR FLORES: Not even close --

THE COURT: Okay.

JUROR FLORES: -- to what I'm getting here. I have a whole family to provide for.

THE COURT: Give us today. And, you know, we're doing

49

our best, that's all I can tell you, okay.

JUROR FLORES: Okay.

THE COURT: So, you know, I know about it. I'm worried about it. Everybody knows about it. Everybody is worried about it. But we've got all kinds of legal things to worry about, and I can't just make a solution.

JUROR FLORES: Yeah. Yeah.

THE COURT: I know you raised it probably when you thought the best opportunity was, but you don't have any way of knowing this, but the fact is that once the jury is sworn in, then we're into all this legal difficulty. Okay.

So bare with me today, and we'll try to deal with this by the end of the day today. Okay?

JUROR FLORES: Okay. Sounds fair.

THE COURT: Thank you.

JUROR FLORES: Thank you.

(Juror stepped out of the courtroom).

THE COURT: I think we got to seriously consider this. He's basically working independently.

Ms. Thayer, please.

You can all sit down, people.

(Brief pause).

THE COURT: Running a 20-ring circus, it's difficult to remember what's going on out there all the time.

(Brief pause).

(Juror Thayer entered the courtroom)

THE COURT: Hi, Ms. Thayer.

JUROR THAYER: Hi.

THE COURT: You raised with my courtroom deputy that there was something that you felt you needed to talk about.

JUROR THAYER: Yes.

THE COURT: Why don't you just tell us what you want to talk to us.

JUROR THAYER: Ten years ago my father was diagnosed with glioblastoma. That is the same cancer that John McCain currently has.

Last night I went on Fox news and they had an article saying that the aide who made a comment about John McCain was fired. So I read that, and that triggered what happened with my dad.

The last week's of my dad's life, his memory, short-term memory was pretty much gone. So he didn't really remember like any of my children, didn't remember anything. So within the last week that he was conscious, he would talk about his childhood growing up in Europe. My dad never spoke really about Europe, his time in Europe at all.

When he was 12 years old his father was a German soldier. They lived, I'm not even sure. Like I said, he didn't really speak about it, either Hungary or Yugoslavia, I'm not sure where.

One time he had like a weekend pass, or something I'm guessing, and he went home to his family. When he came home, I guess some German soldiers were attacking, I'm not sure if it was rape, what was going on, a woman. My grandfather supposedly stopped the attack.

When the woman was speaking to her husband, they were asking her what happened. She was in shock, I guess, and just kept repeating my father's name. My grandfather was then taken by I don't know who, and was burned alive.

After the woman recovered from her shock, it was to realize that, no, Joe saved me, he didn't -- or Jacob, rather, "he saved me, not attack me."

The memory that my dad had of that was because we were looking at old pictures from the time in Europe and someone had sent him a picture of a -- in like a village square. I don't even think I looked at the picture. And it was remembrance of my grandfather who had died in error or was accused in error.

I don't know the details. My dad never spoke of it. I had just assumed that he died during the war before that time. So until I was 43 years old, I never knew the circumstances of his death. Like I said, when I saw John McCain, that he had glioblastoma, I remembered my grandfather, and I'm like, holy crap, maybe I should have said something, but I didn't realize it until that triggered.

THE COURT: First of all, you didn't do anything

52

wrong, because we didn't ask you the question, okay.

JUROR THAYER: Right.

THE COURT: Are you okay with bearing with us?

JUROR THAYER: Yes.

THE COURT: All right.

JUROR THAYER: Like I said, I have no idea the circumstances around it. I mean, we didn't stress that. We went on to happier times. It might have been like a ten-minute conversation, and that was the first time I ever heard about it. I spoke to my husband and told him about it after it happened, you know, because he wasn't there. I never spoke about it with my aunts, or my mother, or anything after that.

THE COURT: Well, there are questions that we could have asked you that would have called for that --

JUROR THAYER: Okay. Like I said, I don't think it would've triggered it --

THE COURT: It's not your fault.

JUROR THAYER: Right. Until I heard glioblastoma.

THE COURT: Okay. Let me just ask if the lawyers have any questions.

MR. LOEVY: No, Your Honor.

MR. SOTOS: No, judge.

THE COURT: Okay. Thank you for bringing that up.

JUROR THAYER: You're welcome. I just couldn't sleep last night. I'm like, should I say something, should I not say

something. I'm like, you know, if you can't sleep at night, that means you need to say something.

THE COURT: Yeah. Basically that's two of us, but my reasons were different.

(Laughter in the courtroom).

THE COURT: But do not stress out.

JUROR THAYER: Right. Like I said, I don't know really any of the details of what happened.

THE COURT: No, you did nothing wrong. Everything is fine.

JUROR THAYER: Okay.

THE COURT: And I appreciate you're bringing this up. I think it's important that you brought it to my attention, but it's definitely nothing happened that you are responsible for; okay?

JUROR THAYER: Okay. All right. Thank you.

THE COURT: All right. I hope you sleep tonight.

THE WITNESS: Thanks.

(Juror Thayer exited the courtroom)

THE COURT: All right. Are we ready, everybody?

MR. LOEVY: Yes, Your Honor.

THE COURT: Okay. Hey, Ben, could you tell the CSO that we're ready? Thank you.

(Brief pause).

THE COURT: Okay. So we know about opening statement,

Opening statement on behalf of Plaintiff

we're not going into this in opening statement, right?

MR. LOEVY: Correct, your Honor.

THE COURT: Good enough. And then you're going to give me whatever you can on 613.

(Brief pause).

THE MARSHAL: All rise.

(The following proceedings were had in the presence of the jury in open court:)

THE COURT: Please be seated, everyone.

Members of the jury, good morning. The reason I let you sit wherever you want to sit is to try to help, make sure everybody can see and hear.

If at any time during the proceedings you are having difficulty seeing and hearing, please raise your hand and let me know and we'll try to scramble things around to make sure that you can. You need to tell me, though, if you're having some problems.

Okay. I think we can begin with the plaintiff's ope ing statement.

OPENING STATEMENT ON BEHALF OF PLAINTIFF

MR. LOEVY: Thank you, Your Honor, counsel.

Ladies and gentlemen of the jury, before I start I want to thank you again, because all of you have agreed to make a tremendous sacrifice to give up your lives. You got things going on, you got other things you could be doing, and all of

you have agreed to take time to serve.

And some people say that serving on a jury, aside from military service, is one of the most important things you can do to serve your country.  And Judge Gottschall spoke yesterday about how important the jury system is to our country.

And it really is especially important in a case like this, where the allegation here is an abuse by a government official of an American citizen.  An abuse of someone's Constitutional rights.

In our country, the government doesn't get to decide who's right.  Not even Judge Gottschall is going to get to decide what justice is.  You, the community, a cross-section of Mr. Rivera's community, you're going to decide what's justice.  It's a beautiful system and it works really well because it's hard to get BS past 12 members of the community.

You're going to have the opportunity to correct an injustice.  And it only works when people show up when they get that card in the mail and agree to participate, and we thank you, because it is a big sacrifice.

Let me introduce everybody.  I'm Jon Loevy.  This is Locke Bowman, Steve Art, Aand Swaminathan, (indicating).  And together we represent our client, Jacques Rivera.  Jacques is 53.  He's got some kids.  He lives in Chicago.  He works at the Northwestern Feinberg School of Medicine.  He helps keep the lab going.  He works there 8:00 to 5:00, five days a week.

He's been working there for about five years ago.

The most defining feature of Jacques, though, is that he is a wrongfully convicted person. He spent 21 years in maximum security prison for a crime he didn't commit. He lost his 20's, his 30's, part of his 40's in a terrible, terrible, dangerous, dangerous place, maximum security prison with murderers, and rapists, and child molesters. A very violent place. And he's here seeking justice in this lawsuit.

I'm going to start at the end of his story, because it has something of a happy ending. He was exonerated. After 21 years of writing letters to innocence projects and trying to get people to listen to him, finally he got the attention of the Northwestern Innocence Project. They took his case. They did a re-investigation. They talked to the witness who accused him. And his conviction was overturned. And he was freed, and he was granted a Certificate of Innocence. The courts acknowledged his innocence. And he now stands before you an innocent man falsely accused of a crime which he did all that time.

Now, this is not the criminal case. The criminal case is over. This is the civil case now. This is Jacques' attempt to get justice and accountability for what happened to him. Because what happened to him was not an accident. He didn't accidentally get wrongfully convicted. He got wrongfully convicted because of misconduct by a group of Chicago police

officers, most primarily a detective named Rey Guevara. Manipulated the evidence, manipulated the witnesses, and withheld evidence causing his wrongful conviction.

Now, there's something extraordinary about this case. We're going to ask Mr. Guevara, Isn't it true you framed the heck out of Jacques Rivera? Isn't it true you cheated and manipulated the witnesses? And you know what he's going to say?

That's a dramatic pause for silence because he's not going to deny it. He's not going to say anything. We're going to say, Did you frame Jacques Rivera? He's going to say, I'm not going to answer that question.

And, by the way, you don't get to just choose not to answer questions. Judge Gottschall is going to explain to you, there's only one reason you can refuse to answer questions, and that is this, you can only refuse to answer a question if you gave a fruitful answer, it would incriminate you. He's going to say, Did I frame Jacques Rivera? My answer to that is, I take the Fifth. I refuse to answer that question on the grounds that if I answered it truthfully, I would be implicating myself in a crime.

MR. LEINENWEBER: Judge, I'm sorry to interrupt. I object. I believe that is a mischaracterization.

THE COURT: You're going to have -- you want a sidebar?

MR. LEINENWEBER:  No, Judge.

THE COURT:  Go ahead.

MR. LOEVY:  He's going to say, I assert my constitutional privilege not to answer that question.  And this is not criminal case.  In a criminal case, Judge Gottschall is going to tell you the law, you can't draw an adverse inference from somebody's silence.  In a civil case like this one, you can.  You can infer that if he told the truth, that it would be bad for him, and that's why he doesn't want to answer.  So that makes it an extraordinary case, ladies and gentlemen.  He is not going to deny the allegations in the case.

Let's back up.  Let me tell you a little bit of Jacques Rivera.  In the late '80s, 1988, Jacques was living with his girlfriend and his three very young children.  He ws living in Humboldt Park.  Humboldt Park was a different place than it is today.  You know, today there's a lot of yuppies, back then it was a very gang-infested neighborhood, and that's where he grew up.

His job in his mid 20's, he worked at the Humboldt Park Institute.  He worked there for a couple of years.  They would help get gang members out of gangs and get then into school.  When Jacques was at that form of his life, he was in a gang.  A lot of people in Humboldt Park were in a gang.  You heard yesterday he was in a gang.  And he was.  And so were many of the people he grew up with.

He was working at the Humboldt Park Institute, he was living with his girlfriend, and he was living his life thinking about the future.

Now, on August 27, 1988, Rey Guevara pulls up to Jacques, says, I want to talk to you. They knew each other. Mr. Guevara was a gang detective and he would sometimes come into the Humboldt Park Institute where Jacques was. And for reasons we don't know, Rey Guevara decided Jacques was guilty of a crime.

The reason we don't know is, he wouldn't tell us. We're going to ask him, Why do you think Jacques had something to do with this murder? And he's going to look at you from that witness stand and say, I'm not going to answer that question. So we don't know why he suspected Jacques, all we know is that he was wrong.

So he says, Jacques, I need you to stand in a lineup. Jacques goes, says, I have nothing to hide, I'll come stand in a lineup. He goes in a lineup, the witness doesn't pick him. Couple of weeks go by, he goes on with his life, Guevara picks him up again: Hey, we got to talk to you, come stand on a lineup, you're under arrest. He says, like, All right, I didn't do anything wrong. He goes stands in a lineup. This time they say: Bad news, Jacques, the witness picked you, you're under arrest for murder. He's like, murder? What are you talking about? Who did I supposedly kill?

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 123 of 663 PageID #:106843
Opening statement on behalf of Plaintiff

60

He gets a lawyer. He goes to a bond hearing. And they're trying to say he murdered someone named Felix Valentin. A boy he's never heard of. Had nothing to do with. Doesn't know him. Doesn't know anybody who knows him. Had absolutely nothing to do with Felix Valentin.

And the only evidence is evidence of a false identification procured by Detective Guevara. And you're going to hear in this case, evidence that we lawyers call 404(b) evidence, that when he manipulated the identification, Mr. Guevara, it wasn't an accident. It wasn't a mistake. He had knowledge and he had intent, because he had done that on other occasions in the same way, manipulating a photo lineup.

So Jacques is put on trial. Well, first he has to understand what he's being accused of. Let me tell you about this murder: On August 27, 1988, a kid named Felix Valentin -- I know people are taking notes. It's like watching a TV show, at the beginning it's a little confusing, but then over the course of the week, you start getting it. So this kind, Felix Valentin, he's 16 years old. He's in a gang called the Campbell Boys. Him and his brother are going to a wedding that day. They drive to his brother's girlfriend's house. So they're going to pick up his girlfriend and go to the wedding.

Poor Felix, 16 years old, sitting in the car. And now they've driven into Imperial Gangster territory. This is a gang that's got nothing to do with Jacques. Jacques was

affiliated with the Latin Kings.  These are totally different gangs.

So you got a Campbell Boy who drives into the Imperial Gangster territory, and a kid comes up to him and shoots him 11 times.  Basically trying to execute him.  So shoots him 11 times.

Now, Valentin must have been a tough 16-year old, because he survive.  And he gives the police a description, a contemporaneous description.  He didn't have a whole lot of details, but he said it was a 16 or 18-year old, so basically a teenager.  This is one high school kid saying another high school kid shot me.  At the time Jacques is 23.  He didn't go to college, but that's like out-of-college age.  So he's not someone who would be mistaken for a high school kid.

So Valentin says, I got shot by a high school kid with a Toyota Hatchback two-door.  Nothing to do with Jacques.

I told you that Valentin didn't die.  So they took him to the hospital.  And you're going to hear from a Detective Letrich who spoke to Valentin in the hospital before Valentin passed away.

Detective Letrich is going to say:  I went to talk to Valentin.  I said, can you make the identification.  He said, yes, Valentin told me -- this is not Orlando Lopez.  This is, Valentin told me he's an Imperial Gangster, so I went and got the Imperial Gangster photographs, and Valentin told me, this

Opening statement on behalf of Plaintiff

is the guy who shot me, a guy named Jose Rodriguez, an Imperial Gangster named Jose Rodriguez. This is the victim shortly after getting shot 11 times saying, this guy, Jose Rodriguez, shot me.

Now, we're not here to retry Jose Rodriguez's guilt or innocence. That's not what the case is about. We're just talking about the police investigation. And you're not detectives, I'm not a detective, but that probably strikes you as a clue, a clue, a good clue, the victim saying, I got shot by this kid, Jose Rodriguez.

Now, Detective McLaughlin, from the Chicago Police Department, inherits the investigation. She's in charge of it. Somehow during this entire investigation there's no police report showing that anybody talked to Jose Rodriguez. Nobody said, Hey, Jose, where were you on Saturday? Nobody said, Hey, Jose, do you drive a Toyota Hatchback? Nobody said, Hey, Jose, did you shoot Felix Valentin?

There's no evidence they even asked Jose Rodriguez any questions at all. What is going on with that? I mean, like I said, that's a pretty good clue, the victim saying it's Jose Rodriguez. There's no paperwork anywhere that they even talked to Jose Rodriguez.

Instead Detective Guevara says, we're going to take this in a different direction, Jacques Rivera is the killer. And we still don't know why he thought it was Jacques Rivera.

And he's going to get an identification from an 11 year old boy -- no, actually, he had just turned 12. He was 11 in May, he turned 12. Some of you have no 12 year olds, they're -- you know, that's still Lego's and Superheros. That's not a mature, you know, even a teenager. That's someone who just turned 12.

And somehow Guevara was able to get him alone without his parents on multiple occasions. And here's what the 12-year old said: Valentin's brother's girlfriend had a younger brother, so Valentin's brother's girlfriend tells the police, Yeah, my younger brother Orlando might've seen something. This is the kind, Orlando.

So Orlando gives a contemporaneous description. McLaughlin talks to him and he says, I was standing by the store. And showing you this demonstrative.

MR. LOEVY: Ann, we do have the demonstrative?

(Brief pause).

MR. LOEVY: He's standing by the store. This is where the store is (indicating).

MR. LOEVY: And, Ann, if you could point to the store.

(Brief pause).

MR. LOEVY: And if you could, Anna, if you could point to the store.

(Brief pause).

MR. LOEVY: Right there (indicating).

He says, he tells Detective McLaughlin, I was standing

by the store and I saw a shooting over here (indicating). This is where the kid got shot, in an alley over here (indicating). His car was here in the alley (indicating).

Now, that's almost 200 feet. It's 190 feet. It's basically easily four times this courtroom. That is a good distance.

And he says, Yeah, I got a glimpse of the killer, this 12-year old. I didn't get a good look, but I got a glimpse of him.

So that's 190 feet, ladies and gentlemen. That is not a good view of someone committing a murder basically a full city block away.

So Orlando Lopez, according to Guevara, picks out Guevara's suspect. And this is one of the first issues in the case that you're going to hear a lot about. They're going to try to tell you that this was random. That Orlando Lopez is looking through six books, and he's like, there's the guy, it's Jacques Rivera, that's their, story.

That's not happened and we can prove it. You're going to hear about two dates. It turns out the police report says that the witness identification was August 29th, August 29th, August 29th, that's when they claim that little Orlando Lopez supposedly randomly picked out Jacques Rivera's photograph. The problem is, that's how it went down. We're going to prove to you that even before they say that Lopez supposedly picked

photo out of a book, they had already pulled Jacques' photograph. And you don't have to understand it all in opening, but the date is August 27th.

So they're going to try to say that Guevara's report here is a fraud, that this is typo, and a mistake, and it can't be on the 29th, it was actually on the 27th. So it's a little confusing, but basically the bottom line is, the documents disprove the story. Jacques was their suspect before the kid supposedly picked him out. So what they did was they showed him Jacques' photo and they try to get him to say it was Jacques. That's very different than the story they're going to try to tell you, that he just randomly picked out Jacques' photo.

Now, after he supposedly picked out the photo -- and, by the way, there's something super shady going around about the picked out photo from the gang book, because nobody, nobody the courtroom, nobody on that table, nobody is going to admit to being the police officer who supposedly got Jacques -- I'm sorry, who supposedly got little Orlando Lopez to pick the photo.

You know, you'd think that they would've written that down, who the police officer was. They can't seem to remember or find. Everybody is, I don't know. Nobody admits to being that police officer who supposedly put Jacques' photo in the case. What we do know is this, after little Orlando Lopez

supposedly picked out Jacques, they arrest Jacques, they put him in that lineup. Remember I told you, Jacques was in a lineup.

Now, what exactly is a lineup? This is the lineup (indicating). They put five guys, you know, against the wall, and Jacques is the guy in the middle (indicating). And they say -- and what they do is, they get four guys that are not guilty. They're called fillers.

So, in other words, if you want to see if the kid can pick out your suspect, which is, by the way, if you've already shown him your photograph, it's a lot easier, but you put innocent guys around him and then you see if you can pick out the guy from among independent guys, right. Like this guy is the guy that just got on the street, in the lockup, he's not guilty (indicating). Same with this guy, this guy, and this guy. And they're saying, See if you can pick out Jacques.

Well, little Orlando goes to that lineup and he picks the wrong guy, he picks the filler. He picks one of the guys that's not Jacques.

Now, Orlando Lopez eventually became the entire case again Jacques Rivera. There's something funny about the way the Chicago Police Department would document lineups back in the '80's and the early '90s, and that is this, they didn't write it down when people picked fillers.

And, you know, is that just the lawyer talking to you?

Let me tell you what the evidence shows. We hired Dr. Gary Wells, one of the country's if not the leading expert, one of the leading eyewitness memory lineup experts in the country, from the University of Iowa. And we asked the police department for hundreds of files of murder investigations. And there's an stipulation that is a statistically significant sample of files. And we looked at those files and tried to draw conclusions.

Now, there are studies on this.

MR. LOEVY: Anna, if you could show the first one.

(Brief pause).

MR. LOEVY: Dr. Wells is going to explain to you that there's been about 12 field studies of lineups. And if you add them all up, that's about 6,000 lineups. And the baseline of these studies shows that about 40 percent of the time the witness will pick the suspect.

Now, that doesn't mean the suspect is guilty, because sometimes police officers can intentionally or unintentionally, consciously or unconsciously, suggest who the suspect is, because they're not blind lineups. But about 40 percent of the time, they pick the suspect.

And, by the way, 15 percent of the time by pure luck you get the right guy, too, because it's one in six chance. So 40 percent of the time they get the suspect and over the course of the United States and all these different cities. About a

third of the time, 35 percent of the time in studies all over the country, they say, I can't make an ID.  I didn't get a good enough view, I'm not going to make an ID.  And then most importantly of all, about you a quarter of the time, 23 percent of the time when they do lineups in law enforcement, when they do lineups, somebody picks the wrong guy; it happens.  You know, about a quarter of the time when you put a suspect who says they've seen something, they picked the wrong guy.  That's because eyewitness identifications are fallible.  They don't work good.  People think that that's good evidence, yeah, I saw that person.  It turns out that's not reliable.

You're going to hear that the DNA evidence has now proved some people innocent, and it turns out a lot of people were wrongfully convicted based on false identifications. People aren't as good as recalling faces as they think they are, so they make a lot of mistakes.  You'll hear this evidence.

Now, let's look at the Chicago data that Gary Wells found for the lineups that they reported in the mid to '80s and the early '90s.  In Chicago there were 980 lineups.  And I already told you, it was stipulated that this is a statistically significant amount of lineups.  And in Chicago, apparently suspects are better -- I mean, witnesses are better at identifying suspects, 15 percent better.  The national average, you only get them 40 percent of the time, in Chicago

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 132 of 663 PageID #:106852
Opening statement on behalf of Plaintiff

69

they get them 56 percent of the time. We have better vision here in Chicago.

But the more interesting piece of data is, guess how many times in those 1,000 lineups witnesses picked the wrong guy, fillers. I already told you you expect 25 percent of the time, so you'd expect about 250 times the witnesses picked the fillers, right? Because it's 25 percent, almost 1,000 lineups.

MR. LOEVY: Anna, if you could show how many times in the lineups they picked fillers.

(Brief pause).

MR. LOEVY: The answer is zero (indicating). A thousand times in a row, no witness ever picked the wrong guy. That's not possible. You know, Gary Wells is going to put the statistics out there. It is not possible that the Chicago police showed 1,000 lineups and nobody picked the wrong guy. It's statistically impossible.

What it really means is, in Chicago they had a policy that if picked the filler, you don't write it down. If the witness looks at a guy and picks the wrong guy, we write down, No identification made.

And you know what, they're not going to deny that, because they can't deny it because the number is zero. They're going to say, Well, we didn't really think it was important if you picked the filler. Well, it is important. Look at what happened to Jacques Rivera. Little Orlando Lopez goes in the

lineup and he says, That's the guy. They show him a picture of Jacques, and he gets the wrong guy. And he to this day is something, I picked the guy and I believe it was Jacques Rivera, and police are saying, no, that didn't happen, Orlando is mistaken, we didn't do a lineup that day. He didn't pick anybody, we couldn't find Orlando Lopez, that lineup didn't happen. And Orlando is saying, what do you mean it didn't happen, I was there, I picked the guy, I believe it was Jacques Rivera. I picked somebody.

And, in fact, Jacques was arrested. And he stood in the lineup. And there were fillers. These five, six guys, this is Plaintiff's Exhibit 62, after the first lineup, these guys were photographed (indicating). One by one. Polarized were taken of this lineup. And the police are going to say, nope, there was no lineup, this is a mistake. You know, we set up the lineup, but then we couldn't find little Orlando Lopez, so we didn't do the lineup that day.

What do you mean you couldn't find him? He's 12 years old. Where is he going to be? He lives with his parents. You know, he's 12. He goes to school. They said, no, we couldn't find him, so we didn't do the lineup that day. Well, some of the fillers are going to come to court. They're going to say, I remember that day. One of them is going to say, I was never arrested in my life. I remember being in this lineup. We stood in a lineup. That lineup happened. It did happen,

ladies and gentlemen, and he picked the kid. He picked the suspect other than Jacques Rivera.

What we do know is that they let Jacques go. And, by the way, if little Orlando Lopez had truly picked Jacques Rivera, they would've arrested him and charged him with murder. They let him go, and they've got nothing because the kid picked the wrong guy.

Now, they're still trying to make the case, they go visit the victim in the hospital, Valentin. This is Detective McLaughlin goes visits the victim. Remember, I told you the victim already told them who did it, a guy named Jose Rodriguez. And the victim said, it was Jose Rodriguez, a Imperial Gangster.

So they go talk to the victim and they show the victim pictures of Jacques Rivera. Because, remember, they're still trying to say it's Jacques Rivera. By the way, there's no reason to think it's Jacques Rivera. There's no fingerprints, no DN, no statements. Nobody is saying it's Jacques Rivera. There's absolutely no connection between Jacques and this case. They're not going to have any connection at all except this 12-year old kid, who, by the way, you know, spoiler, the 12 yearly, I'll jump ahead, says, it wasn't Jacques Rivera. When he grew up, he said, I told the police it wasn't Jacques Rivera and they don't want to hear it. So there's really no evidence it was Jacques Rivera.

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 135 of 663 PageID #:106855
Opening statement on behalf of Plaintiff

72

But what we do know is, Ms. McLaughlin went to the hospital and showed the victim. And the victim now was getting worse. He was shot on the 27th, by early September he caught an infection and his condition started to tail off. So he actually died not of his wounds, he caught an infection, a bacterial infection that wouldn't respond to drugs, caught pneumonia, and he died September 14th.

So when McLaughlin sees him in early September, his condition is starting to go down a little bit. He's wearing a ventilator, but he can nod. And she asks him, Can you participate in a photo ID. And he says, yes. She asked the doctors, can he participate. They say yes. She shows him a pick of Jacques. He doesn't identify Jacques.

So now you got both witnesses saying it's not Jacques. The case should've been over. Jacques goes, lives his life. Something changed, though. Two weeks later, on September 14th, the victim dies.

So now they've got -- and now it's not just the shooting, now it's a murder. Unsolved murder is not good. If you're a police officer, you know, you don't want to have unsolved murders on the book. They want to close this case.

So they haven't done anything on the case since October. And I'll show you the chronology -- since August, sorry. This is when the shooting happened. There's the dispute about when they Jacques' ID. The first lineup happens

August 31st. And then nothing happens on the case until the 14th of September when Valentin dies, and then they pick up the investigation again.

So of all the crazy things, Guevara is going to solve the case on September 14th. He writes a report. Him and his partner, Gawrys. Two out of three people who signed this report, including the supervisor Mingey, are going to take the Fifth, and say, I'm not answering any questions about that report. The third, if he testifies, Mr. Gawrys, is going to say, I don't remember, I don't remember, and I don't remember.

What the report says is, Jacques Rivera is guilty of murder. Jacques Rivera did it. Well, where's the evidence? What have you got? And what that report says is -- remember, the report is created here on the 16th, it says, We forgot to write it down, but back here on the 10th of September, we went to see the victim in the hospital, and the victim picked out Jacques' photo.

Now, that's pretty sketchy. There's a few problems with that. First of all, if that really happened on September 10th in here, then why didn't anybody write that down? Why didn't they write down the victim picked out Jacques? There's no report, there's no notes. That doesn't get written down till the 16th, after the victim has died, when he can't deny it anymore.

So you're going to hear a lot about how police

officers do their job.  They take notes, they take reports, they write things down.  It would not happen that the victim identified Jacques on the 10th and nobody made any notes or reports and they didn't write it down until after the victim died.

There's a second problem with this bogus identification, and that is the victim already said it wasn't Jacques, and the victim already said it was Jose Rodriguez.

So after he dies, Gawrys and Guevara come up with a police report saying, oh, no, on September 10th he told us it was Jacques by looking at his photo.

Now, there's an even deeper problem to this identification.  It turns out that on September 10th, when they supposedly got Jacques' identification from this victim, Felix Valentin, he was basically in a coma.

We have the notes from his doctor.  And what it turned out was by September 3rd, September 2nd, he could still talk, he could still interact and nod, but by the 4th or 5th his condition started dropping off.  By the 9th and 10th, he was nonresponsive.

So you're going to hear from Dr. Sharkey who said, I worked in Cook County Hospital back then, now I live in Florida, I got no horse in this race.  He's going to say, actually, I'm sort of pro-police.  And were not pro or anti-police here.  Let's be real clear.  Nobody is saying that

all police are bad or that we don't respect police. They have a hard job, they do it well. All we're saying is, people should be accountable for their mistakes.

But Dr. Sharkey says, I was a doctor back in Cook County and this was my patient and here are my notes. And on September 10th, the day that Guevara supposedly got an ID from this kid, Felix Valentin, Valentin was nonresponsive. He had been shot 11 times. He was fully paralyzed. He's being kept alive by a machine, a ventilator. So he had a big mask on his face that was breathing for him. He was completely paralyzed. Not only did the bullets paralyze him, but because he was at risk because this machine was keeping him alive. If he had any involuntary movements and the machine got knocked, he would die. So they gave him a drug called Parval that made him completely paralyzed, like down to the eyeballs. Just paralyzed him so he wouldn't be at risk. This is the day that he supposedly made the ID to Guevara.

But it's actually worse for them, because what the doctor's notes say is, he's nonresponsive. What does that mean? When I go to his hospital bed, I try to wake him, I shake him, I check on him. The light is on but nobody is home, that's how the doctor puts it, nonresponsive. He says we would pain stimuli to make sure he's still alive. Take your knuckles, rub it on someone sternum. Don't try it, it's very painful, but when they would rub it on someone and they didn't

get any response at all, that's nonresponsive.  They shine a line in his eyes, Dr. Sharkey says, the pupils don't even dilate.  He is just completely comatose.

Too bad for them when they wrote that report saying, We got an identification from the victim on September 10th. This guy was in no condition to identify anybody.  And that's how you know this isn't a legitimate investigation.

So they say -- they write this report on the 16th saying, Yeah, we got the identification.  They arrest Jacques, they put him in a lineup, and they go get the kid again. Remember the kid had missed Jacques the first time.  Somehow they got him away from his parents again and they him the lineup.

Now, the kid is not a kid anymore.  He's 37 years old. And he has felt great guilt about is role in this.  You know, it's not his fault.  They're going to try to blame him, like he's a liar.  He didn't lie.  He was manipulated.  He was in over his head.  This was an 11, 12-year old who couldn't control the situation.

But he is going to say this, he's going to say, I'm 37 years old and it was not Jacques Rivera.  It was not Jacques Rivera.  And he's going to say, I told the police.  When they came to get me for that lineup, I said to a woman and a Latino, he had an Afro then and glasses, he's going to describe Guevara, "I said it's not Jacques."  And eh's going to say,

they weren't trying to hear it. They just didn't want to hear it. They told me, you'll be okay, you'll be okay, and they just wouldn't let me explain it wasn't Jacques.

And we don't know who that woman was, but Detective McLaughlin, to her credit, was something of a pioneer back then. She was one of the first women in the Detective Division. There were no other women on the case. She was the lead investigator. She was, in fact, the woman that little Orlando told that to. And there's going to be little dispute that it was Detective Guevara, because he did, in fact, have na Afro and glasses. We have pictures. And Detective Guevara was the one making the case.

So the kid said, it wasn't me, but he couldn't control the situation. And eventually he gave up, and he was manipulated, and he testified against Jacques. Jacques goes on trial two years later. Now the kid is 13. There is no evidence at all presented at this trial but this little kid pointing a finger. I mean, I could point a finger at Anna and say, Anna did it, you killed Felix Valentin. That is literally the equivalent of what they had. They had one kid pointing the finger at Jacques.

Now, his story changed, ladies and gentlemen. This poor kid, they had him testify to this. Remember I told you, his contemporaneous story was, I was at the store 200 feet away from the shooting. Well, that's not going to work at a trial.

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 141 of 663 PageID #:106861
Opening statement on behalf of Plaintiff

78

So he changes his story. He says, no, no, no, I just remembered, I was coming out my door over here (indicating), and I saw the back of the shooter. This is his criminal trial testimony. We're diagnose go over it slowly: I saw the shooter from behind doing the shooting here in the alley. I saw him shoot him three times. So then what I did is I ran to the store. So I still haven't seen the shooter. I saw him from behind. Three shots, I ran to the store. I told the store clerk, call the police, call the police, there's been a shooting. And the clerk said, I don't want anything to do with it. So I ran to back and hid here in this nook, and then I saw the final 8 shots. And then the shooter turned, and I got a glimpse of him, and I saw him, and that's Jacques Rivera.

That is his story. That is a ridiculous story. Remember I told you, juries are BS meters. That doesn't make any sense at all. That literally was his story.

And I saw glimpse of him, and I'm here to tell you two years later, it wasn't -- remember I showed you the photos. You know, how could he be sure it wasn't this guy, it wasn't this guy, it wasn't this guy, it was that guy. Human beings can't even perform that exercise for people that looked alike even if you did see him and got a good look at him. And he certainly didn't see him to get a good look at him if he saw anything.

So how did Jacques get convicted? Because of this:

Opening statement on behalf of Plaintiff

The kid says, You know what, I knew Jacques. I'd seen him in the park. Didn't know him, I'd see him in the park. And, by the way, he admits, as an adult, that's not true. I'm 16 -- no, actually he's 12. I don't know Jacques Rivera, he's 23. I don't know him, that's the truth. But back then he said, I'd see him in the park, he had a gold ponytail, a gold dyed ponytail in the back. And you can see it, back then Jacques had bushy hair in the back. There's no gold in his hair, and there's no photograph of gold in his hair.

In fact, contemporaneously, all the paperwork created in 1988, didn't say anything about gold hair, gold ponytail, no photograph. So Jacques is on trial saying, What do you mean I had a gold ponytail? I didn't have a gold ponytail. He even calls witnesses. He calls witnesses, some of whom you'll hear to say, he never had a gold ponytail.

But to seal his fate with the judge. It wasn't a jury trial, it was a bench trial. Remember Judge Gottschall said you shouldn't accumulate all the power in one person Judge Close. Guevara got on the witness stand and said, I know Jacques Rivera, the guy had a gold ponytail, he had a dyed gold ponytail. Just a bald-faced lie. And Judge Close said, you know what, you're a Chicago police officer, I'll give you credibility, if the kid said gold ponytail and you're saying it, guilty, guilty.

And now Jacques' got to be sentenced. And if he

accepts responsibility, he can get less. But he says, No, way, you know, I'm innocent, I had nothing to do with this crime. The judge says 80 years, max. He can't even say goodbye to his family and he's sent off to maximum security prison.

I told you, the kid is now grown up. He says, I don't want any trouble with either side. You know, I'm not saying the police did anything bad, but I tell you what, I feel guilt, Jacques didn't do it. He told his pastor. Hopefully you'll hear from his pastor if he comes to town. So, in other words, when the young kid grew up, he unburdened himself to his pastor and said, I was part of something that wasn't right.

You know it wasn't his fault. He was just 12. But he told his pastor. And then when the Northwestern law students and lawyers came to see him, he told the truth. So he, too, will testify. He doesn't want to come back to court. He's not going to come back to Chicago. He's left town. He may testify by a video link, he may testify by video deposition. He doesn't want anything to do with it, but his takeaway is simple, it wasn't Jacques Rivera.

Let's talk about the claims in the case. I already told you that this is not a criminal case. Nobody is going to prison or jail. It's just a civil case. So that means the burden of proof is different.

In a civil case -- you've heard in a criminal you got to prove things beyond a reasonable doubt. Some of you were

even on criminal juries. This is a preponderance test, more likely than not. So as you listen to the evidence over the next couple of weeks, what you have to decide is which side is more likely than not true, which side am I finding is making sense to me. That tie goes to the defense because we have the burden of proof. But the way it's usually expressed is, you put all the evidence saying that the plaintiff should win on one side, all the evidence of the defendants' on one side, which one tips it a little bit. That's not a high burden to meet. It's not going to be hard here because we're going to tip the scale pretty good, most especially because Detective Guevara is not denying it. He's not denying it.

We're going to say, hey, everything I said in opening statement, do you disagree? He's going to say, I'm not going to answer that. Not going to answer that because if I told the truth, I'd be incriminating myself. Again, you cannot refuse to answer questions just because you don't feel like it. You can only answer them if the truth would incriminate you.

The claims in the case are malicious prosecution and due process. Let me just talk a little bit about both. Malicious prosecution basically is that he got framed. He got prosecuted without probable cause. The bigger claim is the Brady claim, the due process claim.

So let me explain. We're alleging that the criminal trial that I told you about wasn't fair. That his rights were

violated at that criminal trial. You're going to hear a lot over the next couple of weeks about Brady, Brady and exculpatory evidence. What does that mean? What that means is this, if they put a guy on trial, any of you or any of us, the police and the prosecutors have to turn over all the evidence, not just the evidence that you're guilty. The Supreme Court decided a long time ago, you have to turn over everything that is bad for you and everything that is good for you.

So if the police develop evidence that would help Jacques prove his innocence, they are constitutionally obligated to turn that over. And that's what didn't happen here.

So the police have to write reports. They have to take notes. They have to turn over the stuff. Whatever Rodriguez said, they have to turn that over. If the kid admitted that it wasn't Jacques, they have to turn that over.

And there was quite a bit of evidence that didn't get turned over in this case, including -- starting with the kid saying it wasn't Jacques, and the kid not picking out Jacques from the first lineup. That was withheld from Jacques.

You know, when you go on trial and somebody points a finger at you and says that's you. You know, it's hard to beat that. Your Constitutional rights require that they turn over the exculpatory stuff, the stuff that's good for you. And that's what didn't happen here. They didn't turn over the

gangs files. It turns out there's a whole parallel set of files that Guevara's colleagues would keep. They got shredded, they got lost, they're gone. We don't know where those files are. But most importantly of all, there was an investigative street file that didn't get turned over.

And let me tell you about that. In the 1980's the Chicago Police Department had a different policy than it has now. And it was an constitutional policy. They kept two sets of files. They would keep the official file where they would put the police reports, everything that says you're guilty, and then they kept an Investigative file or a street file where they stashed everything else.

So while the investigation was ongoing, they'd keep their notes in there, they'd keep their memos in there. They keep the stuff pointing in different directions, to different suspects. They keep that in the Investigative file. And then when they close the case, they only put into the official file the stuff that made you seem guilty, and they left the other stuff in this parallel street file.

Now, again, this is not just the lawyer talking, this happened. A guy named Frank Laverty, a very courageous detective at the Chicago Police Department back in the early '80s --

MR. POLICK: Your Honor, I'm going to object to this line of colloquy; irrelevant.

THE COURT:  You want to tell me again?  I'm sorry.

MR. POLICK:  Irrelevant.

MR. LOEVY:  This was ruled on it, Your Honor.

THE COURT:  As I said, if it was a subject of a motion, you're going to have to present me with a motion.  I don't know -- I mean, I can't remember everything that was ruled on.

MR. LOEVY:  The Jones/Palmer evidence, Your Honor.

MS. ROSEN:  Judge, that --

THE COURT:  All right.  Let's go to the side.

(Proceedings heard at sidebar on the record).

THE COURT:  You're saying this was in the Jones/Palmer ruling?

MR. LOEVY:  Yes, Your Honor.  What we're saying is --

THE COURT:  Well, let me hear the objection.

MR. LOEVY:  Sure.

MS. ROSEN:  So the objection is you did allow reference to Jones and Palmer.  You are going to allow the expert to talk about Jones and Palmer.

THE COURT:  Right.

MS. ROSEN:  But you limited the amount of evidence they can go into.

THE COURT:  What is this Laverty?  I mean, what is the ruling on that?

MR. LOEVY:  There's no ruling.  This is what triggered

Jones and Palmer.  It wasn't moved to be barred.  Laverty blew the whistle, disclosed the existence, then the Palmer case got litigated.

THE COURT:  Okay.  So say what you were going to say.  You know, I'd --

MR. LOEVY:  Judge --

THE COURT:  No, I want to hear from the defense.

MS. ROSEN:  So the point, Judge, is that the evidence of all the intricate detail of the Jones and Palmer litigation is not going to be put before this jury.  The point that the Court will allow was that for purposes of that the City was on notice that they had a problem with the recordkeeping policies, but to go into the -- to follow the intricate details of Jones and Palmer --

MR. LOEVY:  It is not --

THE COURT:  You know what, I don't think there's any ground to keep this up.  Let's go forward.

(Proceedings resumed in open court).

MR. LOEVY:  May I continue?

THE COURT:  Yes.  Go right ahead.

MR. LOEVY:  So what I was saying, in the Jones case, a very courageous whistleblower named Frank Laverty, who worked at the Chicago Police Department, blew the whistle.  He thought that George Jones was not having his rights respected.  And he said, you know what, we got parallel sets of files, we got the

official file that we give to the criminal defense, and we got these investigative files that we keep back at the Area that don't get turned over with all the stuff in them, all the investigative stuff. And that was a big deal when that whistle got blown.

And there was hearings in a cause called Palmer, actually in this building. And the policymakers at the Chicago Police Department were put on notice that this was a problem, that there were parallel files. They had hearings. And they said the Chicago Police Department resolved, we're going to change the system, we're going to do better. Because they were told, the policymakers were told by the courts, you can't do that. You can't have the official file and the Investigative file being separate files, and you don't put the exculpatory stuff in the official file, you gotta stop.

So the police department, in 1983, made a new rule. Saying, all right, we're going to stop doing that, we're going to stop doing that. The problem is, they didn't stop doing it. You know, that was the rule on the books said, we won't keep parallel street files, but they kept right on doing it. And we know they kept right on doing it because it happened in this case and it happened in others.

In another litigation in this building also, the Chicago Police Department disclosed, and this is the data that Brasfield looked at, they disclosed, you know, guess what, we

just found 6 file cabinets, or 3 or 4 or 5 file cabinets in the basement at a police department. And we looked in these file cabinets, and what do you know, there are hundreds of investigative files that we forgot to turn over.

So the police department had to disclose this. This was about 3 years ago that they had all these file cabinets in the basement where all these investigative files were that didn't get turned over. So apparently, despite the notice, they didn't fix the problem.

So all these hundreds of files, an expert named Mike Brasfield, has looked at it in several other wrongful conviction cases and he's done a comprehensive analysis. And you're going to meet him. And he's going to say, I looked through these hundreds of street files, investigative files, that the police department found in the file cabinet in the basement, so we're talking 2015 they found, or '14, or '16. And I looked at all these files and I did an analysis, and there's a whole lot of documents in these files that didn't get turned over to the criminal defendant, that didn't get turned over to the prosecutors. So when they say they fixed the problem and changed the problem, they didn't fix and change the problem.

Now, how does that interplay with this case? Well, there was a street file in Jacques' case, an Investigative file. And that file turned up in 2010. Maybe 21 years too

late for Jacques Rivera. He's been in prison for 20 years. In 2010, Ms. McLaughlin finds the street file for Jacques' case, and it's got a whole lot more documents than were in the official file. And we're able to do the comparison between this new file that they found and the official file, because Jacques' lawyer kept his file all these years.

Jacques' lawyer is a guy named Ken Wadas. He's now a judge, but at the time he was Jacques' criminal defense attorney. He said, you know, this case always bothered me. I always knew there was a problem, so I kept my file for 20 years. He doesn't keep all files, but he says, I kept this file because this case always bothered me. And he was able to produce his file in this case because he kept it.

And it turns out that this visual shows you, what this shows, the x's, are all the documents that didn't get turned over (indicating). So all the documents that were in the street file, the Investigative file that didn't make it to Ken Wadas, were the x's. And what was not turned over to Jacques Rivera back in the '80s when was on trial were som every important exculpatory documents. Documents showing that the first lineup happened.

Remember I told you, Jacques went to trial and said, Look, the kid didn't pick me at the first lineup. And they said, no, no, no, we didn't do the first lineup. Well, this was what was in the street file (indicating), photos of the

guys from the first lineup. That first lineup did happen, and the kid did pick a filler.

Another document they found in the street file was this one (indicating). This is Plaintiff's Exhibit 9. This is Jose Rodriguez, apparently. Who's Jose Rodriguez? He's the guy that the victim -- remember, the victim gets shot. They say to the victim, Who shot you? He says an Imperial Gangsters named Jose Rodriguez. So Jose Rodriguez gets arrested. And this document says the victim, Felix Valentin, is expected -- no, I'm sorry. The investigation is recorded, the victim is Felix Valentin. It is expected that the prisoner, Jose Rodriguez, will be charged with aggravated battery, that's the shooting, when the investigation is completed at 1:00 o'clock on September 2nd, 1988. This document didn't make it to Jacques Rivera.

So that was a problem. You've now heard that there are police officers who are going to have to be accountable in this case. Detective Guevara; Detective McLaughlin; Guevara's partner, Mr. Gawrys; and Mr. Mingey, who is now taking the Fifth. But the police officers are not the only ones who have to be accountable. The City of City also has to be accountable, because they had this parallel system of file keeping and it led to a systemic violation of people's Constitutional rights.

So that brings me to the last thing I'll talk about,

and that is damages.  And I appreciate your patience.  One of the things you're going to have to decide in this case is how to make Jacques whole.  If you could give him back the 20-some years he lost, you would, but nobody could.  So you have to decide what's fair to compensate him.  That's why he's filing this lawsuit, he wants justice.

And he's going to tell you how devastating this wrongful conviction was to him.  How for 21 years he was in maximum security prison, constantly surrounded by danger, by violence, by anger, by sociopathic people that were, you know -- this is not where you what to spend five minutes, much less an hour, much less a day, much less a month, much less the rest of your life.

And, you know, Jacques didn't know he was going to get out in 21 years.  You know, he didn't know then.  He was looking at the rest of his life, you know, a lot of his life in prison.  He didn't know he was going to be exonerated.  He's going to tell you in his own words about what it meant to lose his liberty.  To live in a cage.  You know, to be shackled.  You know, these cages are tiny.  They're not much bigger than the jury box.  He had to live in there with two men.  He's going to tell you about the indignities.  You know, just the chronic, the lack of privacy, the fact that you are so separated from what's going on in your life.

You know, he's going to tell you that his girlfriend

at the time, Sophia, tried to stick with him a little bit. She said, let's see how the appeal goes. But after about a year, you know, it's hard to be with somebody who's going away for the rest of their lives, and she moved on, and he accepts that.

So as his life went on in maximum security, he's losing the ties to his life. His mother stayed there with him, but the pain it had on her and his children. His children were very young when he was arrested and when he was convicted. And he did not have necessarily a strong of a base with them as he had hoped to have.

He will tell you, he's not a saint. You know, the first thing he's going to tell you is, you know, he's not claiming he was leading this perfect life, he was the perfect father. He is going to be very honest about he made bad choices too, he wasn't perfect. But he loved his kids, and he lost 20 years with them. And when he got out, their childhood was over. And he doesn't have that foundation.

And he's going to tell you, he's proud of them. They've all gone on to be respectable. Two of them joined the Service, and they have jobs. And one of them is his daughter, works here in Chicago, and you'll hear about them. And he's proud of what they became. But he's doing his best to connect with them, but he's lost 20 years of connection.

And, really, that 20 years is, when you're in your 20's, and your 30's, and your 40's, that's when you build the

base of your life. That's when you build your connections, your foundations. That is the heart of your life, and that's what was taken Jacques Rivera.

And the other thing I will tell you is that, it's one thing if you're guilty. If you do the crime, you do the time, that's what they say. You know, the world makes sense, at least. You shoot somebody, hey, I got to be punished. But when you're innocent and the whole thing feels unfair, it just messes with your mind. Because it's like, Why am I being punished? What did I do? I didn't do anything, why is this happening to me? And you can never get comfortable with that. You just fight against it, fight against it, and fight against it. And weaker men, weaker people, it could break them. Jacques Rivera, you're going to see, has a lot of reserve. He's a very resilient man. And he just kept writing letters. And when he wanted to give up, he just kept writing letters. And, finally, somebody heard his cry, his conviction was reversed. Now, here we are, the final chapter, Jacques is looking for accountability, he's looking for justice, and I thank you again for your willingness to participate in that. Thank you.

THE COURT: I think we're going to need a mid-morning break, and I think this is probably a good time to take it. So let's try to keep it as close as ten minutes as possible.

THE MARSHAL: All rise.

(The following proceedings were had out of the presence of the jury in open court:)

THE COURT: Ten minutes, everybody.

(Recess.)

THE COURT: I'm going to need the help of counsel to tell me when everybody is back. I don't know if we're waiting for people or -- is everybody here?

MR. LOEVY: Plaintiff's side is good.

THE COURT: Is defense side ready?

MR. SOTOS: Yes.

THE COURT: As soon as the jurors are ready. If they're not ready, we'll wait for them.

And who is going to argue first?

MR. POLICK: I will, Judge.

THE COURT: For the individual defendants?

MR. POLICK: Yes, other than Guevara and Mingey. So Noon, Guzman --

THE COURT: Okay. You know, I'm just going to say we're going to start with the defense opening statement.

MR. POLICK: That's clear.

THE COURT: And then when the City gets up --

MS. ROSEN: Well, we're also going to have a separate opening by Mr. Leinenweber for Mr. Guevara and Mr. Mingey.

THE COURT: All right. Well, you can tell them that.

MR. POLICK: Yes, I will.

THE COURT: We're going to have an overflow courtroom, but it's not set up yet.

MR. POLICK: Judge, is it okay if I turn the podium?

THE COURT: Absolutely.

MR. POLICK: Thank you.

THE COURT: I would really ask lawyers to think about the possibility of excusing the juror who doesn't want to be here. We'll talk about it at lunch time.

MR. LOEVY: Your Honor, it's a hardship on everybody, and we need a cross-section of the community --

THE COURT: Well, I know that, but you've got somebody who's basically not able to support his family.

MR. LOEVY: He didn't say that.

THE COURT: Yeah, he did. That's the information I'm getting. He's gone from $200 a day to $40 a day. I think that's what they get paid and he's got a family to support.

MR. LOEVY: We are extremely sensitive to that but --

THE COURT: I just want you to think about it and let me know. I don't see why anybody wants somebody here who doesn't want to be here. I don't think we're going to lose other people or be surprised.

MR. SOTOS: For what it's worth, our view is that if he could be available for a shorter time, then it makes sense, but if that's not going to do it --

THE COURT: Well, I don't know what short a time to tell him. If he can't support his family for four weeks, can he support his family for three weeks.

MR. SOTOS: That's kind of what I was wondering.

MR. LOEVY: Well, maybe he can, you know.

THE COURT: Well, normally people who make money only when they work, end up getting excused.

MR. LOEVY: Our only concern is, Your Honor, a cross-section --

THE COURT: I know what your concern is, and I'm not creating -- just think about it.

MR. LOEVY: Yes.

THE MARSHAL: All rise.

(The following proceedings were had in the presence of the jury in open court:)

THE COURT: Please be seated, everyone.

Okay, ladies and gentlemen, we're going to start with the opening statements for the defense.

MR. POLICK: Thank you, Your Honor.

OPENING STATEMENT ON BEHALF OF INDIVIDUAL DEFENDANTS

MR. DAFFADA: Your Honor, counsel, Mr. Rivera.

Ladies and gentlemen of the jury, we, too, want to thank you for your service and taking time out of your busy lives to hear this case. This case is not only important to Mr. Rivera, it's also important to the officers who have been

accused and are defendants in this case. The clients I represent are Gilliam McLaughlin, Daniel Noon, John Guzman, and Steven Gawrys. They are appreciative of your service in taking the time out of your lives to hear this case.

So let's talk a little bit about the facts, and I'll try to give you some guide posts about the evidence that you're going to hear over the next couple of weeks.

This case is about an eyewitness who made a mistake and turned that mistake into a lie. That eyewitness was Orlando Lopez. This mistake was identifying Juan Rivera -- I'm sorry, Jacques Rivera as the man he saw shoot Felix Valentin on August 27th of 1988. His lie was sticking to that mistake in identification for over 20 years.

My opponent, Mr. Loevy, has told you this was the result of police misconduct. Mr. Orlando Lopez himself doesn't say that. What the evidence in this case is going to show is that his mistake and his lie were his and his alone.

Lopez will tell you that the police did not force or pressure him to make his identification. They did not point out Jacques Rivera to him. Nor did they suggest or force him to stick to his identification.

When Felix Valentin was shot, Orlando Lopez was 12 years old. He lived with his family in the Humboldt Park neighborhood of Chicago. And on face value, 12 years old, may seem very young. But you're going to hear evidence that he

traveled between homes of his mother and his father. They were divorced. And he knew those neighborhoods. And he knew the gangs in those neighborhoods. Knew their territories, their boundaries. He knew the rivalries, he knew their alliances.

You will hear that he recognized the shooter from the neighborhood. And you will hear how he looked at photo albums of suspects in his home, not at the police station. And he went through all those notebooks or photo albums, page by page. Took him a while. And after doing that process, he picked Jacques Rivera as the shooter. And no one told him who to pick. And the police asked him: Mr. Lopez, are you sure? And he said, Yes, I'm sure.

You will hear that two years after that, Orlando Lopez identified Mr. Rivera again as the shooter when he testified in court before a judge at Mr. Rivera's trial. Picked him out, pointed him out right in open court. And he identified Mr. Rivera as the person who had shot Felix Valentin.

As Mr. Lopez grew older, became a young man, he moved out of state, and he still hung on to that lie. Over 20 years went by. Lopez was now in his early 30's and still maintaining his lie until one day, in February of 2010, when he was approached by two women working for Mr. Rivera's legal team.

And when these women began to question him about the incident, Mr. Lopez admitted that he had lied, and he recanted his identification of Mr. Rivera as the person who shot Felix

Opening statement on behalf of individual defendants

Valentin.

You're going to hear evidence that Mr. Rivera's legal team presented Mr. Lopez with affidavits to sign saying that he had lied about his identification. And ultimately Mr. Lopez did finalize and sign an affidavit in June 2010. And that process led to Mr. Rivera's release from prison.

Mr. Lopez, once again, testified in court. And this time he admitted his mistake. He admitted his lie. And he also testified that the police did not force or pressure him to do any of that.

Ladies and gentlemen, our criminal justice system works until the witness lies, and then it doesn't work. In this case, the witness that lied was Lopez and the system broke down, because everyone in the system, the police, the prosecutors, even the judge, believed Mr. Lopez. And the system wasn't corrected until Mr. Lopez admitted his mistake and his lie.

Now, the incident you're going to hear about took place almost 30 years ago. We weren't all walking around with cell phones or iPads. There was no Internet. No flat screen TV's like we have here in the courtroom. Computers and word processors were not commonplace in our homes or in our offices. You're going to hear that the police reports in this case were typed up on typewriters. And I'll tell you right now, they're not perfect.

Memories have faded over time as well. Some of the officers testifying do not remember this incident. And those that do remember have limited memories, and that's what you would expect after that passage of time.

Now, in August 27th of 1988, Orlando Lopez was living with his family in the first floor apartment in a multiunit building at 3320 North Cortland. And Mr. Loevy showed you a picture of that building. His older sister, Marilyn, who he lived with, was dating a young man by the name of Israel Valentin. And the Lopez and Valentin families were fairly close. August 27th was a Saturday, and Israel and Marilyn were going to go to a wedding that day.

But at about 3:45 in the afternoon, Israel was either already at the house to pick up Marilyn or he drove there with his brother, Felix, to go to the wedding. And Mr. Lopez, he considered the Valentin brothers family.

Felix parked the car in an alley next to the building, and he waited in the driver's seat for Israel and Marilyn to come out of the building. At that point, Mr. Lopez left the building and he went outside. And he saw a man walk up to Felix's car and begin shooting at him.

Lopez will tell you, he ran across the street to a store to try to get help; they refused. He ran back across the street to his building, hide along the wall and watching. And he saw the shooter go to a car driven by another person, and

turn towards Mr. Lopez as he got into the car, he entered the car, and then Mr. Lopez saw the car leave the scene, turning right on to Spalding Avenue and heading to an area which he knew to be the territory of the Latin Kings.

There is no dispute in this case, ladies and gentlemen, that Lopez was at the scene, and there's no dispute he saw the shooter.

Israel came out of the building, and he saw his brother slumped over in the car. He pushed Felix over. He got in the car. He tried to get his brother to the hospital. He's driving the car, he ran in and hit a couple of other cars. And, thankfully, an unknown driver, a good samaritan, stopped and helped Israel get his brother, Felix, over to Norwegian American Hospital. And doctors there determined that Felix had 10 gunshot wounds.

When the police responded to the hospital, Felix was able to somewhat communicate that the offenders were Latin Kings. And they also learned from Israel that his girlfriend's brother, Orlando Lopez, who went by the nickname Macho, saw the incident.

Now, in this case you're going to hear about two different units or groups of officers involved in this investigation. The first group is the detectives. And they worked out of the unit that will be referred to as Area 5 or the Detective Division. The detectives conduct the

investigation. And the assigned detectives in this case were Gillian McLaughlin and her partner John Leonard. Mr. Leonard is now deceased.

The other group of officers that you're going to hear about are the Gang Crimes Specialists. And they worked in a different building, in a different unit. And they're function was to interact with the gangs and gather information from them on the streets. Their role was to assist the detectives in their investigation, and they didn't prepare a lot of reports. And the Gang Crimes Specialists in this case are Defendant Noon, Gawrys, and Guzman.

And both of these detectives and the Gang Crime specialists, both of these groups learned that there was this young man, Macho Lopez, who saw the incident.

The evidence is going to show that during the evening hours of August 27th, following the shooting, Detective McLaughlin interviewed Lopez. He described to her what he saw happen. And he gave her a description of the shooter, a Latin King he had seen before from the neighborhood, but he didn't know his name.

The detectives asked the Gang Crimes Specialist to show photo books of Latin King gang members to Mr. Lopez.

And these books, ladies and gentlemen, they're huge binders filled with photographs, four to a page. But what the Gang Crimes Specialists did, they brought these photo books

over to Mr. Lopez's residence on Cortland, and they allowed him to look through them. Go through them, page by page. He sat down and he went through them.

The evidence is going to show that after viewing these photo books, Mr. Lopez identified Mr. Rivera as the shooter. And he did so without the police telling him or pointing out who to pick.

So when you hear about the evidence on August 27th, listen carefully. Mr. Loevy showed you some of the reports. You're going to get a chance to look at the reports and certainly hear testimony about that, including the criminal history or the rap sheet that he just showed you of Mr. Rivera that was dated August 27th.

Listen to Mr. Lopez's testimony, and the officers' testimony, and also don't leave out your common sense, because what we believe the evidence is going to show is that Lopez picked out Mr. Rivera out of the photo books, just like he said he did. And this theory that the police set out the frame Mr. Rivera before they had even interviewed the witness, Lopez, and before they even knew whether Felix Valentin was going to survive or die, really doesn't make a lot of common sense.

After the events of August 27th, I expect you're going to be hearing a lot of contested and confusing evidence about identification procedures involving lineups and photos. Part of that evidence is going to be reports that could've been

clearer or made more complete. Part of the evidence Mr. Loevy referred to concerns two officers in this case who elected not to testify. They're represented by Mr. Leinenweber and he will speak to you about that. But you're going to have to look at all the evidence, not just part of the evidence. You're job is to look at all of it. That's what we're asking you to do. And that evidence will show, ladies and gentlemen, that in every identification procedure that Mr. Lopez was involved in, he picked Mr. Rivera as the shooter.

For example, Mr. Lopez believed he viewed the first lineup and picked Mr. Rivera out of that lineup. What the evidence is going to show is that during the late evening hours of August 30th and going into the morning hours of August 31st, detectives Leonard and McLaughlin attempted to conduct a lineup containing Mr. Rivera and the other suspect that Mr. Loevy alerted you to, Jose Rodriguez. And they wanted Mr. Lopez to view a lineup with both Mr. Rivera and Mr. Rodriguez, but because the hour was late, Lopez's parents wouldn't allow him to go out to the police station. They wanted him to do it in the day.

So both Mr. Rivera and Mr. Rodriguez were held overnight with the intention of doing that lineup late in the day on the 31st. However, that next day they couldn't find Lopez. They looked for him. They couldn't locate him. Not surprising. It ws was a gang-related shooting and his parents

really didn't want him to be involved.

So what detectives Leonard and McLaughlin did is, they went over to Cook County Hospital where Felix Valentin had been transferred for further treatment to see if he could view photographs. Norwegian American Hospital was not a trauma center. Mr. Valentin needed to be at a trauma center, and that's why he was transferred to Cook County Hospital.

And what they learned from the hospital staff was that Felix could view photos depending on his medication, and that he was expected to survive. So detectives Leonard and McLaughlin returned to their police station and they created what's known as an array of photos. And they took photographs of Mr. Rivera, Mr. Rodriguez, and four other individuals who are referred to as fillers.

When the detectives returned to Cook County Hospital with the photographs for Mr. Valentin to view, Mr. Valentin had been medicated and he was not in good shape. You're going to hear evidence that they tried to show him the photographs, but because of his condition, they decided this is not going to be a good identification, he can't do it, and they decided to stop.

And upon the return to the police station, they preserved or inventoried those photographs with the idea that when Mr. Valentin gets better, when his condition improves, we'll go back and try to show him the photographs again. And

they documented it.  They documented what they did that day in the reports.  And as a result, Mr. Rivera and Mr. Rodriguez were released.

In the weeks following, there was no activity on this aggravated battery case, because the detectives involved there was a priority to homicide cases, and it was expected that Mr. Valentin was going to survive.  Tragically, Felix Valentin died on September 14th of 1988, and the aggravated battery now became a homicide, and the only other witness was Orlando Lopez.

The evidence is going to show that on September 15, a lineup containing Mr. Rivera was conducted for Mr. Lopez to view.  Now, on that day, you'll hear evidence that detectives Leonard and McLaughlin were not working.  So the lineup was conducted by two different defendants, Detective Dorsch and Detective Boyle, they are not defendants in this case.  And Dorsch and Boyle reviewed the file, and they knew about Mr. Rodriguez, the other suspect.  They went ahead with the lineup anyway, and the lineup only had Mr. Rivera in it.

And when Mr. Lopez viewed that lineup, he picked out Mr. Rivera as the person that had shot Felix Valentin on August 27th of 1988.  And as a result of that lineup identification, Mr. Lopez was -- I'm sorry, Mr. Rivera was charged with murder, and that is the case that Dorsch and Boyle presented to the prosecutors.

You're going to hear evidence from Lopez that before this lineup took place, he told the woman that may have been a lawyer, he's not exactly sure, with either blond other white hair, something the effect of, wrong guy, wrong guy, but he didn't give much detail about that, because according to Mr. Lopez, sometime after he had identified Mr. Rivera in those photo books on he day of the shooting, he had a chance encounter on the street with the person who he believed it was the shooter and he realized, I made a mistake.

Lopez says that this female assured him everything would be okay. She did not pressure him or force him to stick to his identification of Rivera. And, nonetheless, Mr. Lopez went to view the lineup that Dorsch and Boyle had set up, and he picked out Mr. Rivera out of that lineup.

Now, while my client Gillian McLaughlin has lovely white hair hear today, 30 years ago she did not. The evidence is going to show she was a brunette. And the other evidence is going to show that she was not working that day. She's not the woman Mr. Lopez spoke to. And she knows she wasn't, because if she were working that day, it would've been her conducting that lineup and not Detectives Dorsch and Boyle, because she was the assigned detective to that case.

I expect you're also going to hear evidence from others who played a role in Mr. Rivera's prosecution as part of criminal justice system, because there was a conviction. And

Mr. Loevy told you about that, there was necessarily a prosecution. And you're going to hear from a former Cook County Prosecutor, her name is Julie Rosner. And she will explain that she was the prosecutor, and that she was not affiliated with the police, and that her role was to conduct this process that you'll hear that's called Felony Review, because it's only the prosecutors that have the discretion to approve murder charges.

And Ms. Rosner will explain to you that her practice and procedures as part of this Felony Review process is, first of all, to interview the eyewitness, Mr. Lopez. And she would've done that after his identification of Mr. Rivera in the lineup. She would've done that alone, with no police involved. She had experience working with juveniles, because she had previously worked in Juvenile Court. And she gathered information about what Lopez saw that day, and she would've confirmed his ID of Mr. Rivera as the shooter.

We expect the evidence is going to show that Lopez made no claim to her that he had picked the wrong guy. That Rosner spoke to detectives Dorsch and Doyle about the progress in the investigation, and not Gang Crimes Specialists, and that Rosner and her supervisor approved the charges against Mr. Rivera.

I also expect you're going to hear from the prosecutor who tried the case against Mr. Rivera, his name is Mr.

Victorson. And we expect the evidence to show that Mr. Victorson went ahead with this case knowing that his sole eyewitness, this whole case was this 12-year old man who saw Mr. Rivera shoot Felix Valentin, that was his case. And we expect he's also going to tell you that he was not influenced by the police in any way in proceeding with that prosecution.

And you're also going to hear evidence that Mr. Rivera himself had an attorney. He didn't elect to have a public defender. He went out and he retained a private attorney to defend him at his trial. And Mr. Loevy alluded to him that that attorney's name is Mr. Wadas, and I'm sure you're going to hear evidence from him as well in this case.

Now, Mr. Rivera claims that the defendant officers violated his right to a fair trial by fabricating evidence, suppressing evidence that was favorable to him, and conspiring to do those things. The evidence, ladies and gentlemen, will show that did not happen.

This case begins and ends with Orlando Lopez. Lopez ID'd Rivera from those photo books on August 27th. He later learned he was mistaken, but he lied about it to the police, he lied about it to the prosecutors, and he lied about it to the judge. And the system was broken by that lie. And it was not corrected until Mr. Lopez recanted over 20 years later.

The evidence is also going to show that the police did not force or pressure Mr. Lopez to make his identification or

to stick to his lie. And at the end of the case after you've heard all the evidence, ladies and gentlemen, we will ask you to return a verdict in favor of the defendant officers. Thank you.

MR. LEINENWEBER: Thank you, Your Honor.

OPENING STATEMENT ON BEHALF OF DEFENDANTS MINGEY AND GUEVARA

MR. LEINENWEBER: Good morning. My name is Tom Leinenweber. And I represent Ed Mingey.

Ed, if you would stand up, please.

And I represent Rey Reynaldo.

Rey, would you stand up, please.

Reynaldo Guevara was born in Puerto Rico. Did most of his schooling there. Came over here, did some high school. Went back to Puerto Rico, went to college a couple of years. Came back to the United States and joined the United States Airforce --

MR. LOEVY: Your Honor, I object. There's going to be no testimony on any of this. If he's not going to testify, his attorney shouldn't testify.

THE COURT: I think that unless we're going to hear testimony about this, I'm going to sustain the objection.

MR. LEINENWEBER: Very well, Judge. Thank you.

As Mr. Loevy has said in his opening statement, this is a bit of an unusual case. He's correct, Mr. Mingey and Mr. Guevara are going to rely on their Fifth Amendment rights. The

Fifth Amendment right is not to be called on and compel to give testimony against themselves. This is a Constitutional right that you have, that you have, that you have, that you have, and that everyone in this courtroom has, because the framers of our constitution gave it to us.

The Supreme Court of the United States has said that the Fifth Amendment protects the guilty, as well as the innocent --

MR. LOEVY: Your Honor, I object. This is an argument, at the minimum.

THE COURT: Maybe we need to talk about this at sidebar. I'm going to be instructing on the jury on the meaning of the Fifth Amendment in a case like this.

MR. LEINENWEBER: I'll move on.

THE COURT: Okay.

MR. LEINENWEBER: In any event, I expect the Judge will also instruct you about the Fifth Amendment. As Mr. Loevy said is that you may hold that against them for refusing to answer questions. You may not hold that against them, that will be up to you as the jurors. But I suspect Her Honor will also instruct you that that, in and of itself, a refusal to answer a question is not evidence. And you can't find against him just based on the refusal to answer a question.

As my colleague has said, this case started on August 27th, 1988. I know that case well because it was my last day

of freedom. I started law school on Monday. 30 years ago. And you heard about the tragedy that occurred that day. And it was a tragedy both for Juan Rivera -- or Jacques Rivera, pardon me, and also for the Valentin family, and Orlando Lopez, and now it's tragedy for my clients.

And it's a tragedy based on a horrible crime which Mr. Lopez saw. As you understand from what counsel has said, and we expect the testimony will be, he walked out of his house and he sees this horrible murder of a family member. It's a family member. Not officially a family member, but I expect him to testify that his brother was dating -- excuse me, his daughter, pardon me, his sister was living with the brother of the person that was killed. He said that we were like family. So it's seared in his memory, this horrible event that he viewed when he was 12 years old.

And you'll hear about the testimony about that. You'll hear about what he saw and what happened. As my co-counsel has said, that day he tells his sister, I know who did it. His sister says, are you sure, Orlando? Yes, I'm sure it was a Latin King. Are you sure? Yes I'm sure.

That gets to the police. He says to this police, I know who did it. Who was it? It was a Latin King. Are you sure, Orlando? Yes, I am sure.

So they bring him gang books. Again, this is 1988, 30 years ago, and no pictures, no cell phones, no laptops, nothing

like that.  Open up the book, give him the book.  Give him some time, in his home, with his family, no pressure, see if you can find a picture of someone who looks like the person who did this.  He goes through and he finds a picture.  That's him, this looks like the guy.  Are you sure, Orlando?  Yes, I am sure.

So eventually a lineup is done.  Mr. Lopez has now, 30 years later, says there were two lineups, but out of two lineups I picked Jacques Rivera.  I picked him at every lineup, I picked him at every picture.  So there's a lineup.  He goes, the first lineup he says, this is what he says now 30 years later:  I go in, I look at the people, I pick him out, yeah, that's it, Jacques Rivera, he's the one I saw.  Are you sure, Orlando?  Yes, I'm sure.

As we know, Jacques Rivera didn't commit this murder.  Mr. Lopez, some time later, crossed the street from a hotdog stand in his neighborhood near his school, sees the guy:  My god, a bolt of lightning hit Orlando Lopez, that's the guy, not him, that's the guy.

So what happens?  Eventually Orlando is brought in to view another lineup.  And at this lineup he says, in his first statement in 2010 to the Northwestern people working for Mr. Rivera, he says, I told the white-haired lady, it was an older lady, I told the white-haired lady and a cop, wrong guy, wrong guy, and she said to me, don't worry about it, you're safe, no

one is going to hurt you.  He says, they don't know what I'm talking about, they do not understanding what I'm trying to say.

So what does Orlando do?  He changes his mistake to a lie.  He says, okay, that's him, Jacques Rivera did it.  And, again, as my colleague says, the system then gets screwed up, because someone has inserted a lie into the system.

So then Orlando goes back to business of being a 7th grader, it's the beginning of the year, but he can't walk away from this.  Eventually, about two years later, he's in 8th grade, he gets called to testify in a courtroom similar to this.  Takes an oath, same oath the people in the witness stand will take in this case, and he swears to the judge that that's the man who did it.  He lies.

He lies to the prosecutor.  He lies to the defense attorney.  He lies to the judge.  He lies to the police.  He lies to his family.  He lies to Felix's family.  He lied.  And as a result, Mr. Rivera was convicted.

Now little Orlando Lopez is no longer little.  As 30 years go by and he's 41 years old now.  What will little Orlando Lopez testify to?  Little Orlando Lopez would testify, as my colleague said, that no one ever told me who to pick.  No one pointed out someone.  I picked him out.  I lied.  The lies are mine, and mine alone.

That's what this case is about.  The lies of Orlando

Lopez. The lies of a young child who became a man and said now he wants to make peace, he wants to make it up. As Mr. Loevy said, he doesn't have a dog in this fight. All he wants to do is tell the truth, but the truth is that they are Orlando's lies, and his alone. And that's why, at the end of the case, we would expect you to find our clients not guilty. Thank you.

THE COURT: Before we start with the next argument, I just want to tell the people in the back that courtroom 2230 has audio and visual and it's just been set up if you want a place to sit; 2230.

MS. ROSEN: May I proceed?

THE COURT: Yes.

MS. ROSEN: Thank you.

OPENING STATEMENT ON BEHALF OF THE DEFENDANT CITY OF CHICAGO

MS. ROSEN: Your Honor, ladies and gentlemen of the jury, counsel, Mr. Rivera, colleagues:

My name is Eileen Rosen. And I along with my co-counsel, Katherine Barber and Theresa Carney represent the City of Chicago.

As Mr. Loevy told you, Mr. Rivera has brought a claim against the City of Chicago, as well as the claims that he's brought against the police officers.

Now, with respect to the claims against the City of Chicago, Judge Gottschall at the end of the case will instruct you on how to navigate and determine whether or not the facts

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 178 of 663 PageID #:10689
Opening statement on behalf of defendant City of Chicago
115

that you hear in this courtroom and the evidence that you hear from the witness stand support a claim against the City of Chicago.

But essentially the core of it is, in order for you to find the City liable in this case, you have to determine that it was one of the City's policies that was the moving force behind the constitutional violation that occurred against Mr. Rivera. So the first thing you have to do is determine that there was a constitutional violation.

Now, I'm not going repeat the arguments that were made by Mr. Polick or Mr. Leinenweber regarding whether or not we believe the evidence will prove that there was no constitutional violation in this case, but before you even get to the City you have to determine that there was a constitutional violation.

I am confident, as my colleagues are, that you will find that there was no constitutional violation and that everything that happened with Mr. Rivera happened as a result of Orlando Lopez's mistake and then his lie.

If we're wrong and you determine that there is a constitutional violation, then you will have an occasion to determine whether or not that constitutional violation was caused, the moving force was the City's policy.

So the City of Chicago has policies, written policies as it relates to the Chicago Police Department and how it

operates. And that's one of the ways that plaintiff could prove that it was the policies that caused the constitutional violation.

The City of Chicago also has policies that aren't all written down. They're practices. They're things that happen on a regular basis. And if the evidence supports it, that's another way that the plaintiff can establish that it was the policy of the City of Chicago that caused the constitutional violation.

You can also find liability against the City if you determine that the training that the City of Chicago does as it relates to the complaints that Mr. Rivera is making. If there's a training deficiency, that's another way that you might find that the City is liable.

Now, in this case, the primary claims that Mr. Rivera is making is that his due process rights were violated. And as everybody has already talked about, both Mr. Loevy, Mr. Polick, Mr. Leinenweber, the core of it is the due process right to a fair trial. And Mr. Rivera is claiming primarily, Mr. Loevy talked about it, a Brady violation. And what that means is that evidence that was exculpatory, or evidence that might have led the factfinder to determine that he wasn't guilty of the crime, was not provided to him through the criminal justice system.

And Mr. Loevy talked to you a little bit about the

Opening statement on behalf of defendant City of Chicago

files in a case called Jones and Palmer. He talked to you about Mr. Laverty and the file in this case. And he talked to you about the file that he claims was found in 2010. That -- that file and those, how the recordkeeping of the Chicago Police Department is evidence you're going to hear in incredible detail in this case.

And I just want to talk to you a little about the City's recording keeping policy, the Chicago Police Department's recordkeeping policy. Mr. Loevy is correct that back in early 1980's there was an occasion where information was revealed to a criminal defendant that had not previously been revealed. And as a result of that, there was litigation. There was litigation in this building. And what that litigation told us was that back in the early 1980's and before, so you're talking about the practices in the 1970's, the City's recordkeeping policies provided that police reports that were typewritten, and you'll see lots and lots of police reports in this case, were prepared and originals of all of those police reports were sent to the Records Division section of the Chicago Police Department for keeping.

In this case, I have this is the actual Records Division file for Mr. Rivera's case (indicating). And you can see that there is handwritten reports, there's typewritten reports. You can see the signatures. You can see all of these reports. All of the originals which gets sent to the Records

Division downtown for keeping.

And when a criminal defendant is on trial, the prosecution either directly or the criminal defendant directly can retrieve this information.

Now, back in the early 1980's before the case, the Jones and Palmer case that Mr. Loevy talked about, the detectives also, during the course of their criminal investigation, obviously took notes of their investigation. They memorialized witness interviews, or locations they went to. All that information, the notes, were kept on pieces of paper and they were kept in files. And these files were kept at the different Detective Division areas. So the way that the Chicago Police Department divides up the detective divisions is by area throughout the City. So those areas are where the detectives work. They maintain those files in the areas. And those files were not routinely produced to criminal defendants before this litigation that happened in the early 1980's.

As a result, though, of that litigation, the City of Chicago dramatically changed its policies. Written orders were enacted. The judge that was overseeing the litigation was heavily involved in the orders that were written. Training was done. Mr. Loevy is correct, policymakers from the City of Chicago were aware and were heavily involved. The Superintendent of Police at that point in time was heavily involved in recreating the policies.

And the end result of that is, today the same.  What we have today is, we still have this RD file.  It's the Records Records Division file, which is what the police department calls it.  It's also sometimes referred to as the Permanent Retention file, because it gets stamped.  And those are the same typed reports that end up downtown, originals.

But there's also a different file.  Today what we have is something called an Investigative file.  And you'll see the orders that lay out the file and what's supposed to be in them. And this is the actual original Investigative file related to Mr. Rivera's criminal prosecution and the murder investigation into Felix Valentin's death.

And what you will see, and you'll have an opportunity throughout the trial to review pages of this file, is that it's a manila folder.  There's a binder at the top, there's two holes punched in the top.  All of the information that the detectives accumulate is put into this folder.  All the information that is put into this folder is recorded on this log (indicating).

And what you will see is -- and, you know, not all the files look the same.  Some are bigger, some are smaller.  It depends on the case.  Not all the evidence is the same, so it's not all memorialized the same.  But what it shows you is there's copies.  So these typed reports, the originals of which are in this Records Division file (indicating), copies of these

reports are maintained in this file by the detective so they have the information available to them, because these files that are typed and sent downtown are typed and sent downtown as they're happening.

And sometimes, like in this case, the investigation lasted for two weeks. The originals are being sent downtown. They're not held at the Area. So the copies of the investigative files are contained in -- the copies of the reports are contained in the Investigative file.

You'll also see, as you flip through here, this pink slip of paper, this is an inventory (indicating). So when evidence is recovered, the Chicago Police Department inventories the evidence. That evidence is sent to the evidence and recovery property section where it's kept for safekeeping and it stays there.

And you'll also see, and this is the most dramatic change since the new orders were implemented, a form which is called the General Progress Report, and you'll hear all kinds testimony. You'll actually hear from a City witness who was around back in the 1980's when all this was happening, when the new policies were developed. He'll tell you he personally audited all of the areas or oversaw the audits of all of the areas, and will explain to you what those files looked like back then, the ones that were issue in the litigation and what the files look like now, and why they're different, and why

they are significantly different, and why it will matter by the time you get to the end of this case.

The quintessential feature of the Investigative file that distinguishes it from the files that happened pre-litigation are these General Progress Reports. And detectives were trained that every note they took were supposed to be memorialized on one of these General Progress Reports, and then all of the information from the General Progress Report was to be utilized to prepare their sub-reports, and that's what these look like (indicating).

And you will hear evidence from people that trained the detectives or have knowledge of the training of the detectives, you'll hear evidence from the City representatives that were involved in implementing these policies, that it was driven home to every single detective in the Detective Division that every single note had to be memorialized. And that even if, for some reason, you didn't have that General Progress Report handy when you were taking your notes and you wrote it down on piece of paper, you still had to put that piece of paper in that file, because those files had to be maintained. It was pursuant to a court order. It was pursuant to the rules of the Chicago Police Department. And that training was drilled into every detective's head.

Now, Mr. Loevy talked to you a little bit about the fact that this file, the Investigative file in this case, was

Opening statement on behalf of defendant City of Chicago

122

withheld from Mr. Rivera and his criminal defense attorney, and it didn't come to light until Ms. McLaughlin, Detective McLaughlin, found it in 2010. You will hear evidence in this case, and I am sure you will determine that what, in fact, happened was that when Mrs. McLaughlin retrieved the file, she was asked by the prosecutor that was handling Mr. Rivera's post-conviction proceeding -- so Mr. Rivera, after his team found Mr. Lopez and secured the affidavit from him, there was a process to undo a conviction, they have to file, and you'll hear all the evidence about this, a post-conviction petition. And there was a judge that was assigned to the case. And there were lawyers representing Mr. Rivera, and there were lawyers representing the state. And what you will hear is that at the time of the post-conviction proceeding, the State's Attorney's Office could not find its file, its file from back in the 1980's and '90s when this case was prosecuted. And so at the post-conviction the State's Attorney asked Detective McLaughlin for the police reports. And she went and retrieved the police reports from where they were and where they had been stored for all these many years. So she didn't find missing records, she simply provided copies to the State's Attorney because the copies no longer existed in the State's Attorney's Office.

And you're going to hear as it relates to the claim against the City, Mr. Loevy talked about Mr. Brasfield, you'll hear from the City's experts, you'll hear a lot about the

different types of files. And I just want to have you attune to be listening to the files. We've already talked about two of them. We've talked about what the police department calls the Records Division file or the Permanent Retention file, and we have what's called the Investigative file. Those are all police department records.

There's also, you'll hear evidence, and you'll see examples of criminal defense attorney files. Mr. Loevy alluded to the fact that Mr. Wadas kept his file. So other attorneys also keep their files, primarily the Public Defender's Office. So we've accumulated a lot of those files. You'll see examples of them in the courtroom.

The other type of file is the State's Attorney's file. So, of course, when the State's Attorney prosecutes a case, they create a file. It contains court pleadings and things like that, but it also contains police reports and whatever other evidence they need to utilize in the course of their prosecution. You'll see examples of those files, as well.

You'll hear about the criminal court process, you'll hear about how the prosecutor obtains records from the Chicago Police Department in other cases -- in other places. You'll hear testimony about how the criminal defense attorney obtains records and evidence. And you'll be able to understand how it all works. And we're confident that at the conclusion of all the evidence, that you will see that the City did, in fact,

change its policies from back in 1982 and '83. And that whatever happened to Mr. Rivera had nothing to do with the City's policies as it relates to recordkeeping.

There's one other, before I move to the lineup issue, which is another part of the claim against the City, I want to talk to you about the photographs that Mr. Loevy told you were found in 2010 and the file that supposedly Detective McLaughlin found. These photographs of the lineup that he says occurred in the first lineup, the so-called first lineup, and how these photographs, and he showed you photocopies of them, how these photographs were found in this file.

Here's the envelope that the photographs are in (indicating). And you can see, there's an inventory number on them, and it's an envelope. This envelope is stored, and has been stored since 1988 in the Evidence Recovery Property Section of the Chicago Police Department. As we get into the evidence in this case, you're going to see supplementary reports that Detective McLaughlin prepared and others. You will see a reference in that supplementary report to this very inventory number. And you will hear from Mr. Wadas, I expect, that he knew what the reference was to this inventory number. And that if, in fact, he had wanted these photographs, he could have found them.

So these photographs were never in this file. To this day, they're not in this file. They're stored in the Evidence

Recovery Property Section. And here's the photographs (indicating). They're polarized. So you will hear evidence from the detectives, from Detective McLaughlin, that on the day that they wanted to do the lineup with Mr. Rivera, pictured right there (indicating), that Mr. Rivera was in custody. So that's him (indicating). That Mr. Rodriguez, the person that was identified by Mr. Valentin was in the photos, and then the fillers that were talked about.

And the idea is, and Mr. Polick touched on it, and the evidence will show that on that date the intention was to run a lineup, to have Mr. Lopez look at the lineup. But it was late, they couldn't do the lineup, they were going to do it the next day. They couldn't find Mr. Lopez the next day. So the detectives decided to take the polarized, go to the hospital, and see if Mr. Valentin can make the identification, but he wasn't well enough to do it at that time.

So these photographs were never in the file. They've never been in the file. They have been inventoried as they were supposed to be, and that's where they remain.

Now, Mr. Loevy pointed out to you that there was paper for Mr. Rodriguez as evidence that wasn't disclosed to Mr. Wadas. I am confident that you will hear testimony this morning, because the first witness you're going to hear from is Officer Letrich. And Mr. Loevy made reference to him. Officer Letrich is the individual that went to the hospital and got the

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 189 of 663 PageID #:106909
Opening statement on behalf of defendant City of Chicago
126

identification of Mr. Rodriguez from Mr. Valentin. Officer Letrich is not a detective. He was not assigned to work on this case. He was a 14th District tactical officer. And I expect the evidence will show that he's going to testify that part of their responsibilities of 14th District tactical officers is to work shootings. This was a shooting that happened in his district. He will explain to you how he became aware of it. And he will explain to you that he went out to Mr. Valentin and showed him the Imperial Gangsters gang book, and that he identified Mr. Rodriguez. And he also identified another person who he claimed was the -- who Mr. Valentin thought was the driver.

You will also hear that Mr. Letrich testified in Mr. Rivera's case. Mr. Wadas, his criminal defense attorney, subpoenaed Mr. Letrich. Mr. Letrich testified in the case and told the factfinder, who in that case was the judge, that, in fact, he went to the hospital, he showed gang books of Imperial Gangsters, and that Mr. Valentin identified a photograph. And that he went out and he arrested Mr. Rodriguez and brought him into custody. And then he left the lineup to the detectives, because it's the detectives' job to conduct the lineups.

So whether or not that particular piece of paper was produced or not to Mr. Wadas, which we dispute that Mr. Wadas didn't have all of the paperwork that he needed, but even if that's true, the evidence was that somebody else was identified

in the case, and Mr. Rivera knew about it and utilized it in the course of his criminal defense.

I want to talk to you just a little bit about the lineups. Mr. Loevy showed you that little piece of an exhibit that showed the percentages of fillers that are picked across the studies that were done by Dr. Wells. The City also hired a witness, Dr. Wixted. Dr. Wixted and Dr. Wells know each other. They've worked together. They've written papers together. And you'll hear from Dr. Wixted about his views about what the statistics show as it relates to the Chicago Police Department's data, and how it compares to the data that is done in the studies. You will hear about the studies. You will hear about Dr. Wells' methodology in terms of how he counted the lineups, what he relied on to count the numbers of identification, fillers, and no identification. You will hear testimony from City witnesses about the practices back in 1988 when it came to lineups. You will hear definitely that the rules in the Chicago Police Department are that for every lineup that is conducted, that lineup has to be documented, irrespective of the outcome of the lineup. There's written orders on it. The detectives are trained on it. And every person that conducts lineups knows that that is the rule, that every lineup, irrespective of the outcome, has to be memorialized.

You will also, though, hear testimony, there's three

potential outcomes to a lineup procedure. You'll have what is called a positive identification, which means that the person viewing a lineup, the witness, picked the suspect. There's also a no identification, which is the person wasn't able, he viewed the lineup but said I can't make an identification.

And then Mr. Loevy talked about the identification of fillers. In the 1980's the police department, the way they memorialized a no ID outcome and a filler outcome was call it a negative outcome, or words to that effect. So for the Chicago Police Department back in the 1980's, The Way it was memorialized is positive, or negative, or words to that effect.

So they didn't, at that time, specifically identify filler identification. And you're going to hear from people at the City, about the training that was done, and how it was expected.

And certainly you have to keep in mind when we are talking about these issues, that this is from the perspective from the 1980's. We know things differently now, about the equality of eyewitness identifications, and what we need to do to guard against misidentifications. But in terms of what was going on in the 1980's, you will hear the evidence of what the City did. And you will hear that what the City did was not different than pretty much what anybody else did.

So at the conclusion of the case, I expect that you will determine that there is no evidence that any of the City's

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 192 of 663 PageID #:10691
Opening statement on behalf of defendant City of Chicago
129

lineup procedures were the moving force behind any constitutional violation as it relates to Mr. Rivera's conviction.

And then, finally, as it relates to training, you're going to hear from trainers from the Chicago Police Department. They're going to talk to you about how detectives are trained on lineup procedures, on recordkeeping precedes, on the need and requirement to disclose exculpatory information. On how they are supposed to conduct themselves in investigations. And I am confident that at the conclusion of the case, that you will determine that the City's training policies were also not the moving force behind a constitutional violation in this case.

As everybody has said in this courtroom, we appreciate your time. This is going to be a lot of information. We know you're taking time out of your busy schedule to listen to us. It's an important case. It's an important case for the plaintiff, no doubt, but it's also an important case for the police officers that being accused here, it's also an important case for the City of Chicago.

So we want to thank you. And we're confident from the defendants' side of the case that, at the conclusion of the evidence, you will find no liability for any of the defendants.

THE COURT: Can we press on a bit?

MR. LOEVY: Yeah. We have a short witness.

THE COURT:  Okay.

MR. LOEVY:  At this time we call Mr. Letrich.

(Brief pause).

THE COURT:  Sir, would you come down here, please.

Please raise your right hand.

(Witness sworn).

THE COURT:  You may be seated much.

CRAIG LETRICH, PLAINTIFF'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. LOEVY:

Q.  State your name for the record, please.

A.  Craig Letrich.

Q.  You are a former member of the Chicago Police Department?

A.  Correct.

Q.  What years did you work there, sir?

A.  I worked from '86 till last year, 2017.

Q.  And did you retire last year?

A.  Yes.

Q.  What have you been doing since?

A.  Retired.

Q.  You are enjoying it?

A.  Not bad.

Q.  Let's turn your attention back to the mid '80s.  Tell the police -- tell the jury what your job was with the police department then.

Letrich - direct by Loevy

A.   I started in '86 and then in '87 I went to the 14th District.  And sometime near the end of '87 to beginning of '88 I was put on a Tac Team.

Q.   And the Tac Team would respond to crimes and conduct investigation?

A.   Yes.

Q.   All right.  And sometimes that concluded shootings, correct?

A.   Correct.

Q.   Did you, over the course of your career, work on a lot of shooting cases?

A.   Enough; yes.

Q.   Were you good at what you did, sir?

A.   I felt so.

Q.   All right.  I want to turn your attention to this case, the shooting of Felix Valentin on August 27th, 1988.

A.   Yes.

Q.   Have you had a chance to review the paperwork before your testimony today?

A.   Yes.

Q.   And tell the jury what you reviewed.

A.   I reviewed the case report, previous testimony, and my Sup.

Q.   Your Sup. is the report you created?

A.   Yes.

Q.   All right.  And having refreshed your recollection there,

Letrich - direct by Loevy

do you understand that Felix Valentin was shot a number of times. Do you remember how many times?

A. I think more than 10.

Q. Somewhere around there?

A. Yeah.

Q. All right. Tell the jury how the crime went down as it was reported by the people at the scene.

A. Ah --

Q. He was in a car?

A. He was in a car. There was a shooter, and a car, I believe that the shooter got out of. He shot him several times and they left.

Q. And then this happened all around 3300-block of West Cortland?

A. Yes.

Q. Right in the middle of the afternoon, right?

A. I believe so.

Q. And no problems with viewing, or lighting, or anything like that?

A. I have no idea. I wasn't there.

Q. All right. But the middle of the afternoon on an August day, correct?

A. Correct.

Q. And the victim was taken where?

A. Originally to Norwegian American.

Q. And did he die right away?

A. No.

Q. How long did he live, do you remember?

A. I think 10 days or more.

Q. All right. You got involved early on in the investigation, correct?

A. Correct.

Q. What was the date you interviewed the victim?

A. I interviewed the victim on the 30th of August.

Q. And you know that because you created a report to memorialize that, correct?

A. Correct.

Q. Did you memorialize your action in your report, all the actions you recall taking?

A. Just a summarization of what I did.

Q. All right. It looks like you had a conversation with Valentin, correct?

A. Correct.

Q. And so at that time, when you spoke to him, Valentin could talk, right?

A. Well, he verbalized. I don't believe he talked talk. I believe with his eyes and nod.

Q. You said, "victim related that the person who shot him and the driver were members of the Imperial Gangsters street gang," that's what you wrote in the report, correct?

A. Right.

Q. Did he relate that to you?

A. By communication of other than talking, yes.

Q. Do you have a memory of that, sir, or are you just guessing?

A. I have -- I have a memory that he didn't talk to me.

Q. All right. Do you remember giving testimony at Jacques' trial?

A. Yes.

Q. And you remember being asked these questions --

MR. LOEVY: This page 53, Your Honor, at Line 15.

BY MR. LOEVY:

Q. (Reading:)

"Question: What doctor gave you permission to talk to that person, the victim, before you went and talked to him?

"Answer: I believe it was a nurse in charge of that unit.

"Question: What did you ask her about his medical condition?

"Answer: All I asked is that if I would be able to talk with the victim.

"Question: After you talked with him, you left. ..."

And then you came back with the books, right?

A.  Right.

Q.  So you did testify that you talked with Valentin, he told you it was Imperial Gangsters, and then you went back, right?

MR. POLICK:  Objection.  Not impeaching.

MR. LOEVY:  That was the question, Your Honor.

THE COURT:  Overruled.

BY THE WITNESS:

A.  I talked in spoken words, I did.

BY MR. LOEVY:

Q.  All right.  Do you remember at the same testimony being acted these questions, this is page 48, lines 10 through 16, your testimony back in 1990:

"Question:  Without saying what the conversation was, did you have a conversation with Felix Valentin?

And your answer was:

"Answer:  Yes, sir.

And then were asked again:

"Question:  Now, after you had that conversation with Felix Valentin, what did you do next?

"Answer:  I brought in a photograph album of the Imperial Gangsters book gang."

Right?

A.  Correct.

Q.  That was the testimony you gave, right?

A.  Correct.

Q.  And that was true, right?

A.  Yes.

Q.  And your memory was fresher then correct?

A.  Correct.

Q.  Do you remember being in the hospital that day?  Do you remember Felix Valentin?

A.  Yeah, I remember he was in a big thing going from side to side.

Q.  All right.  He did relate to you that the shooter was an Imperial Gangster, correct?

A.  Correct.

Q.  And Imperial Gangsters, that was a completely different gang than Latin Kings with which Mr. Rivera was affiliated, correct?

A.  Yes.

Q.  Two very different gangs, right?

A.  Correct.

Q.  And you did not indicate any uncertainty in your report on Mr. Valentin's part, correct?

A.  Correct.

Q.  You felt confident you were getting liable information, correct?

A.  Correct.

Q.  How sure was Valentin that he got shot by an Imperial

Gangster?

A. I didn't put a certainty on it. He said that it was an Imperial Gangster. He motioned, whatever, it was Imperial Gangster. When I was going through the synopsis of what happened, that it was an Imperial Gangster and not a Latin King. That's why I came back only with an Imperial Gangsters books.

Q. Did you believe Valentin when he told you he got shot by an Imperial Gangster?

A. Yes.

Q. All right. It sounds like he knew the gang of the person, did he know the person?

A. He said -- when I say said, he can identify the person that shot him.

Q. He must have known him, correct?

A. I don't know by know, but he --

MR. POLICK: Objection to what someone else knew, Your Honor.

THE COURT: I'm sorry, I did not hear that.

MR. POLICK: Objection to what someone else knew.

MR. LOEVY: May I withdraw the question and ask it better?

THE COURT: Yes. Yes.

BY MR. LOEVY:

Q. You got the sense of talking with Felix Valentin that he

knew who shot him, correct?

A. Correct.

Q. All right. When you got the sense that he knew who shot him, you went back to get the books, correct?

A. Yes.

Q. And then what happened next?

A. I went back to the ward and showed him the books, the 14th District Imperial Gangsters books.

Q. You went back, got the books, back to hospital?

A. Yes.

Q. All right. You probably dealt with a lot of witnesses in your career, right?

A. Yes.

Q. And you have a lot of experience with these things?

A. Yes.

Q. Did you find in your experience Mr. Valentin to be a reliable witness?

A. Yes.

Q. Do you have any reason to doubt his credibility or veracity or ability to identify the person who shot him?

A. No.

Q. And, in fact, you've expressed a high level of certainty that Mr. Valentin's identification was correct, right?

A. It was tentative, yeah.

Q. Well --

A.  I put down in the report that it was tentative on the arrest report.

Q.  Well, did you talk to Katherine Pelich (phonetic) in 2010 --

MS. ROSEN:  Objection.

MR. LOEVY:  I'm impeaching him.

THE COURT:  I'm sorry, what's the objection?

MS. ROSEN:  This witness isn't even on the witness list.

MR. LOEVY:  It's an impeachment witness, Your Honor.

THE COURT:  Well, is there a question about whether the person is on the witness list?

MR. LOEVY:  Is she on the witness list?

No, but it's an impeachment witness, which obviously the rules don't require.  He signed an affidavit with her.

MS. ROSEN:  Objection, Your Honor.  That's not true.

THE COURT:  Well, I'm not sure.

MR. LOEVY:  How about if I show the copy of the affidavit and see if that refreshes his recollection.

THE COURT:  Why don't you do it that way.  Let's start that way.

MS. ROSEN:  Your Honor, that's not an affidavit.

THE COURT:  It decedent matter.

BY MR. LOEVY:

Q.  Take a look at paragraph 8, if you would, sir.  And just to

orient you, this is not a document you created. This is a document that was created by someone else after a conversation with you.

(Document tendered to the witness.)

BY THE WITNESS:

A. Okay.

BY MR. LOEVY:

Q. Did you tell Ms. Pelich that Valentin was a reliable witness and that you are certain that Valentin's identification was correct?

MS. ROSEN: Objection, Your Honor.

THE COURT: I think Mr. Loevy can ask the witness if he said that or he didn't say that. Overruled.

BY THE WITNESS:

A. I don't recall saying certain.

BY MR. LOEVY:

Q. Who did Felix Valentin identify?

A. He identified the -- Jose Rodriguez to me.

Q. All right. After the victim identified Jose Rodriguez as the boy who shot him, what did you do with that information?

A. Went back to the office, and formed a couple of other officers, and we went out looking for the subjects that were identified.

Q. All right.

MR. LOEVY: Your Honor, at this time we would like to

Letrich - direct by Loevy

141

move his report into evidence.  It's Plaintiff's Exhibit 19,
page 39.  We'll label it 19B.

        May I approach and give the witness a copy of the
exhibit, Your Honor?

        THE COURT:  Is there any objection to the exhibit?

        MR. GIVEN:  No, your Honor.

        THE COURT:  Okay.  You may.

        (Plaintiff's Exhibit No. 19 was received in

         evidence.)

        (Document tendered to the witness.)

BY MR. LOEVY:

Q.  This is your report.

A.  Uh-huh.

Q.  All right.  You did say when you returned with a photo
album, Valentin picked out number one, that's Rodriguez, right?

A.  Right.

Q.  As the person who was shot, right?

A.  Right.

Q.  You didn't say it was tentative, did you?

A.  If you read my arrest report, I believe it's in my arrest
report.

Q.  All right.  But the report --

A.  Not -- not on this report, no.

Q.  All right.

        All right.  Did you go arrest Mr. Rodriguez?

A.   Yes.

Q.   Where did you find him?

A.   At his residence.

Q.   And that was at 2440 North Spaulding, correct?

A.   I'd have to look at the arrest report, but I believe that was on Spaulding.

        MR. LOEVY:  Approaching with Plaintiff's Exhibit 8.

        (Document tendered to the witness.)

BY THE WITNESS:

A.   Yes, 2040 North Spaulding.

BY MR. LOEVY:

Q.   All right.  And that is really close, right down Kimball, basically, to where the shooting happened, correct?

A.   It's about a little over a block.  Two blocks, maybe.

Q.   All right.  So you arrested him right near the shooting?

A.   Not far, yes.

Q.   All right.  Where did you take Mr. Rodriguez?

A.   To the 14th District.

Q.   All right.  Was it your intention at that time to have him arrested?

A.   Yes.

Q.   And was it your intention to put him in a lineup?

A.   At some point.  I wouldn't have done it, a detective would've done it.

Q.   All right.  But you handed him off at that point?

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 206 of 663 PageID #:106926
Letrich - direct by Loevy
143

A.   I brought him back, we put him in the lockup, and we had notified the detectives, and they put hold papers on him.

Q.   All right.  And the hold papers are the papers suggesting that he has to be held until there's a lineup, right?

A.   Yeah.

Q.   All right.  And for purposes of terminology, we're saying that there's allegations, there's two lineups, the first lineup and a second lineup.  This would've been the lineup in August, right?

A.   It would've been the -- probably on the 31st.

Q.   Of August?

A.   For him to be in any other lineup than the photographic lineup I did on the 30th, yes.

Q.   All right.  So was it your understanding that there was going to be a lineup in late August?

A.   Yes.

Q.   All right.  In your experience with the police department, if a witness participated in a lineup and picked a filler, how was that supposed to get recorded?

A.   If he -- originally -- originally --

          MS. ROSEN:  Objection; foundation, Judge.

          THE COURT:  Hold on a second.

     (Brief pause).

          THE COURT:  Well, I guess the witness can tell us if he has any experience with that.

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 207 of 663 PageID #:106927
Letrich - direct by Loevy
144

BY THE WITNESS:

A. Could you restate that, please?

BY MR. LOEVY:

Q. Do you ever have any experience in these lineups what happened if the filler got picked instead of the suspect?

A. Well, it's changed over the years. I can't recall when it changed. Originally they would do a Sup., and then I believe it changed only to only when there was a positive ID or vice versa, I can't recall which was which.

Q. But if they got a guy they'd say positive, right?

A. Right.

Q. And then if he missed, and picked somebody who was innocent, they would just say, no identification made. They wouldn't specify that he picked a filler, right?

A. They wouldn't tell the witness.

Q. All right. How quickly after you finished interviewing Mr. Valentin did you create your police report?

A. Later on in the evening.

Q. Is it important to finish reports by the end of duty?

A. Yes.

Q. Why is that?

A. Well, so I can memorialize most of what I did or at least did during that tour.

Q. So it's your understanding of the policies and practices of the police department that you're supposed to create the police

report on the day the events happened, right?

MS. ROSEN: Objection, Judge; foundation.

THE COURT: Overruled.

BY THE WITNESS:

A. I don't -- I don't know that's a rule. However, I did it as a rule myself.

BY MR. LOEVY:

Q. All right. And you were good at what you did, right?

A. Pardon?

Q. You were good at what you did?

A. I believe I was.

Q. Now, you had no further involvement with this investigation after you arrested Jose Rodriguez?

A. No.

Q. All right. So you handed him off to the detectives, correct?

A. Right.

Q. Did you communicate to the detectives that the victim has identified this guy, Jose Rodriguez, as the one who shot Felix Valentin?

A. Whoever called the Area. I can't even say if it was me or one of the other officers say that we have someone in custody for this crime that he was identified, yeah.

Q. But you passed it off to the detectives, right?

A. Yes.

Q. And it was their job to do the investigation, right?

A. Correct.

Q. Not yours, right?

A. Not mine, no.

Q. You were done at that point?

A. Right.

MR. LOEVY: All right. I have no questions, Your Honor.

THE COURT: Okay. Are we going to combined both sides direct or how have we decided to deal with this?

MR. POLICK: Yes. We're going to go ahead with the direct.

THE COURT: Okay. So go ahead.

So, ladies and gentlemen, this is what I kind of told you about yesterday. In a normal case, you have a direct examination by one party to call the witness, and then you'd have cross-examination by the other side, but to try to expedite the case, everybody who has direct questions of this witness is going to go ahead and inquire.

MR. POLICK: Thank you, Your Honor.

THE COURT: So what that basically means is that both sides are calling the same witness.

MR. POLICK: May I proceed?

THE COURT: You may.

MR. POLICK: Thank you.

Letrich - direct by Loevy

CROSS EXAMINATION

BY MR. POLICK:

Q. Good morning, Mr. Letrich.

A. Hello.

Q. All right. So you told us you were assigned to the 14th District Tac Team in August of 1988, correct?

A. Yes, sir.

Q. That's a unit that's different from the gang crimes unit, correct?

A. Correct.

Q. You were not a Gang Crimes Specialist?

A. No.

Q. And on that -- that same period of time, 14th District Tactical Unit, that separate and apart from the Detective Division that was known as Area 5, correct?

A. Correct.

Q. And you were not a detective at the time, right?

A. Correct.

Q. Now, you told us on Mr. Loevy's examination that you were not there at the scene of Mr. Valentin's shooting on the 27th, right?

A. Yes.

Q. All right. And you did not interview Mr. Valentin at Norwegian American Hospital on that day, did you?

A. Correct.

Q. You interviewed him at Cook County Hospital three days later, right?

A. Correct.

Q. That would be --

A. The 30th.

Q. August 30th, that's when you said you interviewed him?

A. Yes.

Q. All right. Now, your report that you spoke of, that's called a supplemental report?

A. Yes.

Q. You have that in front of you, right?

A. Yes.

Q. And it's dated August 31st?

A. Correct.

Q. All right. And the report itself doesn't say the date that you went to see Mr. Valentin at Cook County Hospital, does it?

A. No.

Q. You said it was the 30th. Do you recall what time of day on the 30th you went to the hospital to see Mr. Valentin?

A. It wasn't long after we got on. I believe we started at 5:00 at that time, so we probably got there 6:00, 7:00 at the latest.

Q. All right. So you had dinner before you went over?

A. I don't recall.

Q. Were you alone when you went to see Mr. Valentin or were

you with somebody else?

A. With my partner at the time.

Q. And who was your partner at the time, sir?

A. James Moriarty.

Q. Now, before you went to interview Mr. Valentin at Cook County Hospital, did you obtain permission to interview him from the hospital staff?

A. Yes.

Q. Now, your report, your supplemental report that's dated August 31st, doesn't document Mr. Valentin's physical condition, does it?

A. No.

Q. All right. You told us, when Mr. Loevy was examining you, that you recalled him being in the hospital bed, right?

A. Yes.

Q. And you made some reference about the bed moving. Can you tell us what you meant?

A. It was a bed that swung from side to side to keep his lungs from filling up with water to get pneumonia, which was stopped while we were talking to him.

Q. And other than the bed moving, do you recall anything else about his physical condition?

A. He had some tubes in his arms and the oxygen in his nose, I believe.

Q. Was he hooked up to monitors?

A. There were monitors there, yes.

Q. Do you know if he was under any medication at the time that you interviewed him?

A. I don't know.

Q. And if you don't know, then you don't know even what kind of medication he may have been on, correct?

A. Correct.

Q. Do you know what unit of Cook County Hospital he was in when you interviewed him?

A. Intensive care, that's all I know.

Q. Now, Mr. Loevy asked you some questions about how you were communicating with Mr. Valentin, do you recall those questions?

A. Correct.

Q. All right. Now, you indicated that it was nonverbal, did I understand that correctly?

A. It was verbal on my end, but I don't believe it was verbal on the victim's end.

Q. So when you are describing this nonverbal communication, can you explain to the ladies and gentlemen of the jury how you're doing this with him?

A. Well, I asked him questions. He's in the incident bed like this (indicating). And I asked him questions, and he could move his head from side to head, up and down, and he blink his eyes.

Q. Okay. So the nonverbal communication we're doing here is

head nodding, that's one?

A. Uh-huh.

Q. And the other is eye blinking?

A. Yes.

Q. And how did you ask him the questions so that you could understand or interpret his head nodding or eye blinking?

A. I can only speculate at this time as 30 years later, but if -- if it's a positive --

MR. LOEVY: Objection, Your Honor. There's no foundation.

MR. POLICK: If he knows, Judge.

THE COURT: Okay. So you're saying you don't have any recollection?

THE WITNESS: No, I can only speculate what happened then, right.

THE COURT: Did you --

THE WITNESS: I know that's -- I know he couldn't move.

THE COURT: Did you have a practice that you followed in many cases or are you just sort of guessing at what you may have done?

THE WITNESS: No, this would be just speculation on my part.

THE COURT: I have to sustain the objection.

MR. POLICK: All right. I'll move on, Judge.

BY MR. POLICK:

Q. How did you know he understood your questions?

MR. LOEVY: Objection, Your Honor.

THE COURT: Well, if the witness knows, he can answer. If you're just guessing, then you shouldn't.

BY THE WITNESS:

A. I'm not guessing, because I wouldn't have done a supplemental report, and I know he -- he was understanding what I was telling him and talking to him about.

BY MR. POLICK:

Q. And if Mr. Valentin needed clarification, how would you do that?

MR. LOEVY: Same objection, Your Honor.

THE COURT: Again, if the witness has any recollection, he can testify. If he doesn't, he should not testify.

THE WITNESS: I don't recall any clarification that he needed.

BY MR. POLICK:

Q. All right. So how did he express to you that the gang affiliation of the person that shot him was an Imperial Gangster?

MR. LOEVY: Same objection, Your Honor.

THE COURT: And the same ruling. If the witness remembers, he can answer.

Letrich - direct by Loevy

BY THE WITNESS:

A.  I know I asked him if he knew who shot him.  And his -- his response be it by head or eye movement was that he knew and it was an Imperial Gangster.

BY MR. POLICK:

Q.  Xx so did you go through a list of gangs so he could nod his head or blink his eyes to get a response to that?

A.  Two gangs.

Q.  Two?

A.  Which were the two gangs which were congruent, attached to that address.

Q.  All right.  And what were the two gangs that were --

A.  The Imperial Gangsters and the Latin Kings.

Q.  All right.  If you could please allow me to finish my question before you answer.

A.  Oh, I'm sorry.

Q.  Just for the court reporter here.  It's difficult to take down two people if they're talking at the same time, okay?

A.  Uh-huh.

Q.  All right.  Thank you.

So you asked him about those two gangs?

A.  Uh-huh.

Q.  Is that a yes?  You have to say out loud.

A.  Yes, sir.

Q.  She has to take that down, too.

Letrich - direct by Loevy

A.  Yes.

Q.  And he said Imperial Gangsters?

A.  Correct.

Q.  So with that information, you returned to your unit, your office?

A.  Yes.

Q.  Was that still the same day?

A.  Yes.

Q.  All right.  And how far was the 14th District from Cook County Hospital?

A.  Probably no more than 20 to 30 minutes away.

Q.  All right.  And then you got the photo albums that contained the Imperial Gangsters?

A.  Yes, sir.

Q.  Was it one book, two books?  How many?

A.  Two books.

Q.  Two books.

        And then you returned to Cook County Hospital?

A.  Yes, sir.

Q.  Based on your timeline, that took you about an hour to do that, correct?

A.  About.

Q.  About 30 minutes back to your office, pick up the books --

A.  Give or take a couple of minutes.

Q.  Did you stop anywhere going back?

A.   No.

Q.   And were you still with your partner, Officer Moriarty?

A.   Yes.

Q.   So when you returned to Cook County Hospital, did you get permission from the hospital staff to show him the books?

A.   Well, the same nurse was there.  So, yes.

Q.   All right.  And when you returned, had Mr. Valentin's condition changed in any way?

A.   Not that I was aware of.

Q.   All right.  Do you know if he was on any medication at that time?

A.   No, I don't.

Q.   These two photo books that you are referring to, can you describe for us what they look like?

A.   They're large rectangular books, probably 16 inches by maybe 10 inches, and there's four photos per page, and it says "Chicago Police Department" in blue in the front.

Q.   So are you describing something more like a binder that's very thick?

A.   It's a binder, which was called the book.

Q.   It's not like a traditional photo album that we may have with family pictures in it, right?

A.   No.

Q.   It's large?

A.   Yes.

Q. Okay. And you said there were four photographs to each page?

A. Yes.

Q. And were the pages encased in something?

A. Encased in plastic.

Q. In plastic. With four to a page?

A. Yes.

Q. All right. Do you know offhand how many photographs each book contained?

A. I couldn't say, no.

Q. More than 100?

A. It could've been. I couldn't say how many were in the Imperial Gangsters book. Some gangs are bigger than others. At least 50 or more in the first book.

Q. Okay. And how about in the second book, about the same?

A. Could be. Could be.

Q. All right. Now, was Mr. Valentin able to hold these binders and look through them?

A. No.

Q. So who held them?

A. I did.

Q. And did you turn the pages for him?

A. Yes, I did.

Q. And you we want through it page by page?

A. Yes.

Q. And at some point he picked out who you described in your report as Mr. Rodriguez and a Mr. Nieves, correct?

A. Correct.

Q. Who did he pick out first?

A. I don't recall which one was first.

Q. Okay. But he identified one as the shooter?

A. Yes.

Q. And one as the driver, correct?

A. Correct.

Q. Who did he identify as the shooter?

A. Rodriguez, which his nickname was Chequin (phonetic).

Q. Okay. Do you know how to spell that?

A. I'd have to look at the report.

Q. And how long did it take him for you to hold the book and go through the pages before he actually picked somebody out of the book?

A. 10 to 15 minutes, total. I would say total time he made both identifications.

Q. So both identifications were made within 10 to 15 minutes?

A. Yeah. And they were both out of the first book, I believe.

Q. Did you end up showing him the second book?

A. No.

Q. Now, you said there were four photographs to a page, correct?

A. Correct.

Q. And so when you say in your report that he picked out, how did he select from -- from the four on the page?

A. As I was holding it open, I would go one picture at a time until he signified something to me.

Q. All right. And he did that with the head nodding or the eye blinking?

A. Correct.

Q. Now, you mentioned that one of the reports that you reviewed for your testimony here today was a case report, correct?

A. Yes.

Q. And that's also referred to as a General Offense case report?

A. Yes.

Q. And that is the report that's done by the patrol officers at the scene?

A. Correct.

Q. And you had access to that report describing Mr. Valentin's shooting, correct?

A. Yes.

Q. And you had that at the time you went to Cook County Hospital to see Mr. Valentin?

A. I believe so.

Q. Do you know how got access to that report?

A. In the Tac Team there's reports were put in the bin,

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 222 of 663 PageID #:106942
Letrich - direct by Loevy
159

sometimes people would talk about their reports. I don't know how I came in contact with the specific report, but that's generally there were stuff, things written on the chalkboard as well.

Q. All right. And that report was prepared by 14th District officers?

A. Yes.

Q. All right. Did you know Officer Machain?

A. Yes.

Q. Do you know Officer Crawford?

A. Yes.

Q. They were the ones that prepared that report, correct?

A. Yes.

Q. Now, you knew from looking at that report that on August 27th Mr. Valentin described the shooter and driver as Latin Kings, right?

A. Correct.

Q. That's documented in the case report, right?

A. Yes.

Q. And so after Mr. Valentin told you that it was Imperial Gangsters, how did you attempt to clear that up?

A. All -- all I did was go in the -- go back and get two -- two people to find -- try to find Mr. Rodriguez.

Q. Okay. But I'm asking you how you cleared up the fact that in the case report it said Latin Kings and he's telling you

Letrich - direct by Loevy

160

it's Imperial Gangsters.

A. I asked, that are you -- are you sure it was an Imperial Gangster. I asked him that before I even got the books, and he said, yes. He signified yes.

Q. But you knew there was a difference from what you read in the report, right?

A. Yes.

Q. All right. Now, in addition to these Imperial Gangsters books at your unit, did you also have Latin King photo books?

A. Correct.

Q. Did you put any Latin King photo books over to Cook County Hospital for Mr. Valentin to look at?

A. No.

Q. So after Mr. Valentin picked out Mr. Nieves and Mr. Rodriguez, what did you do next?

A. Went back to the district and I got officer and we went to look for him.

Q. All right. And you told us during Mr. Loevy's questioning that you located Mr. Rodriguez and placed him under arrest?

A. Correct.

Q. Did you find Mr. Nieves?

A. No.

Q. And when you arrested Mr. Rodriguez, you indicated that you arrested him at his home?

A. Correct.

Q. All right. And you prepared an arrest report for him, correct?

A. Yes.

Q. And that report was prepared at or near the time of his arrest, correct?

A. Yes.

Q. And it's your regular practice to prepare an arrest report?

A. Yes.

Q. And that report would then be kept by the Chicago Police Department and inspectors, correct?

A. Correct.

MR. POLICK: Your Honor, at this time I would like to admit to Defendants' Exhibit 1.28, which the arrest report.

MR. LOEVY: No objection, your.

THE COURT: You may.

MR. POLICK: Thank you.

(Defendants' Exhibit 1.28 was received in evidence.)

BY MR. POLICK:

Q. You have the report with you?

A. Yes.

Q. Okay. I would like to just ask you a few questions about this report.

You have already told us where you arrested Mr. Rodriguez. When did you arrest Mr. Rodriguez?

A.   31st August at 1:00 in the morning.

Q.   All right.  And how old was Mr. Rodriguez when you arrested him?

A.   22, according to the report.

Q.   Okay.  And that's information you're getting from Mr. Rodriguez in the top portion of that report, right?

A.   Yes.

Q.   Okay.  And you told us he had a nickname right, Chequin?

A.   Yes.

Q.   You noted that in your report, right?

A.   Yes, sir.

Q.   And you also noted in that report, which you told Mr. Loevy on direct, that Mr. Valentin tentatively identified Mr. Rodriguez, correct?

A.   Correct.

Q.   What did you mean by tentatively identify?

A.   That he identified out of the gang book we had, which pictures are all similar as in IR photos, and such, that you can also do.  So someone else -- he would have to review in a lineup or somehow another viewing.

Q.   All right.

A.   Before each charges, I'm sure, would be approved.

Q.   All right.  So when you are talking about a lineup, you are talking about a physical lineup where five people stand and a person views them, correct?

Letrich - direct by Loevy

163

A.   Yes.

Q.   Okay.  Now, certainly Mr. Valentin in his condition wasn't going to be able to go to a police station and view a live lineup, correct?

A.   Correct.

Q.   So what kind of lineup could be done?

A.   At that time they could've done IR photos, several IR photos.

Q.   You could do a photocopy lineup, correct?

A.   Right.

Q.   I lieu of --

A.   In lieu of out of a gang book which aren't all the same. Not all the same pictures.

Q.   All right.  And in a photo lineup would be a photo of the suspect, correct?

A.   Right.

Q.   And then four other individuals who are called fillers, right?

A.   Correct.

Q.   And instead of having Mr. Valentin, because he couldn't come to the police station, you would take those photographs to him and show him that, right?

A.   Correct.

     THE COURT:  Counsel, we're getting pretty close to the lunch hour.  Do you have any sense of how much longer you have?

MR. POLICK: Maybe another ten minutes, Judge. You want me to stop now and take a break? I'm happy to do that.

THE COURT: And there would be more questioning from --

MR. LOEVY: I have about two minutes, Your Honor.

MR. POLICK: And Ms. Rosen may have some.

THE COURT: All right. I think we ought to take a lunch break, in that case.

All right. Ladies and gentlemen, we'll start again at 1:15.

THE MARSHAL: All rise.

(The following proceedings were had out of the presence of the jury in open court:)

MS. ROSEN: You could leave the exhibits up there.

THE WITNESS: All right.

MS. ROSEN: And we can't talk to you since you are on the stand.

THE COURT: All right. 1:15 everybody.

MR. SOTOS: Judge, can I just raise one question? It doesn't have to be -- at some point before the plaintiff takes the stand I wanted to just address a couple of issues. I know it's going to be this afternoon. So maybe during a break, but --

THE COURT: Why don't tell me what they are?

MR. SOTOS: Yeah, I think this might be the best time.

Letrich - direct by Loevy

165

So we're just concerned about a couple of areas of his testimony based on his deposition.

You know what, Judge, Mr. Loevy is right, I'm going to talk to him first.  I apologize.

THE COURT:  I'll come back five minutes early.

MR. SOTOS:  That would be fine.

THE COURT:  Okay.  So we're trying to figure out if there's any basis to excuse the juror.  He is not looking good, I would say that, okay.

MR. SOTOS:  Judge, that's fine.

THE COURT:  You know, I don't like people on my juries who don't want to be on my juries, but I also don't want to create reversible error.  So that's my situation.

Okay.  I'll see you at ten after.

(Luncheon recess taken from 12:15 o'clock p.m. to 1:10 o'clock p.m.)

              *    *    *    *    *    *    *    *

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE
      RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER


          /s/Blanca I. Lara              June 6, 2018

166

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JACQUES RIVERA,                          ) No. 12 CV 4428
                                         )
            Plaintiff,                   )
                                         )
vs.                                      ) Chicago, Illinois
                                         )
REYNALDO GUEVARA, STEVE GAWRYS,          )
DANIEL NOON, JOHN GUZMAN, JOSEPH FALLON, )
JOSEPH SPARKS, PAUL ZACHARIAS, GILLIAN   )
MCLAUGHLIN, JOHN LEONARD, EDWARD MINGEY, )
RUSSELL WEINGART, ESTATE OF ROCCO        )
RINALDI, CITY OF CHICAGO,                ) June 6, 2018
                                         )
            Defendants.                  ) 1:10 o'clock p.m.

VOLUME 2 B
TRANSCRIPT OF PROCEEDINGS - Trial
BEFORE THE HONORABLE JOAN B. GOTTSCHALL
and a Jury

APPEARANCES:

For the Plaintiff:      LOEVY & LOEVY
                        BY:  MR. JONATHAN I. LOEVY
                             MR. STEVEN E. ART
                             MR. ANAND SWAMINATHAN
                        311 North Aberdeen Street
                        3rd Floor
                        Chicago, Illinois  60607

                        MacARTHUR JUSTICE CENTER
                        Northwestern University School of Law
                        BY:  LOCKE E. BOWMAN III
                        357 East Chicago Avenue
                        Chicago, Illinois  60611
                        (312) 503-0844

Court reporter:              Blanca I. Lara
                          Official Court Reporter
                        219 South Dearborn Street
                             Room 2504
                        Chicago, Illinois 60604
                          (312) 435-5895
                     blanca_lara@ilnd.uscourts.gov

167

APPEARANCES:   (Continued)


For the Individual          THE SOTOS LAW FIRM
Defendants:                 BY:   MR. JEFFREY N. GIVEN
                                  MR. JAMES G. SOTOS
                                  MS. CAROLINE P. GOLDEN
                                  MR. JOSEPH M. POLICK
                                  MR. DAVID A. BRUEGGEN
                            550 East Devon Avenue, Suite 150
                            Itasca, Illinois  60143


For the Defendant           ROCK FUSCO & CONNELLY, LLC
City of Chicago:            BY:   MS. EILEEN E. ROSEN
                                  MS. CATHERINE M. BARBER
                                  MS. THERESA B. CARNEY
                            321 North Clark Street, Suite 2200
                            Chicago, Illinois  60654


For the Defendant           LEINENWEBER BARONI & DAFFADA, LLC
Guevara:                    BY:   MR. THOMAS E. LEINENWEBER
                                  MR. JAMES V. DAFFADA
                            120 North LaSalle Street, Suite 2000
                            Chicago, Illinois  60602

168

(Jury out. Proceedings heard in open court:)

THE COURT: Mr. Sotos, where are we with what you brought up before lunch?

MR. SOTOS: So, Judge, we addressed a couple of issues. We had a couple of them resolved. There are still several that are -- we need to address. Try and do that really quickly.

One of them is just based on what Mr. Rivera testified to in his deposition. So we talked about things that we thought we disputed. One of them had to do with his testimony during the deposition about his reaction to our ability to subpoena his physical -- or his therapy records, that that was very trying for him, and it's our view that while that may be the case, that's not part of his damages in this case and it could be unfairly prejudicial.

THE COURT: Okay. And I am --

MR. SOTOS: And not just to defendants.

THE COURT: -- supposed to decide this now, not as a discovery dispute?

MR. SOTOS: Well, he's going to testify this afternoon.

THE COURT: Yeah, I know, but --

MR. SOTOS: We don't want him to bring it up in his testimony. That's what was the concern.

THE COURT: Oh, you tried to get discovery of his

therapy records and you couldn't?

MR. SOTOS: We did get them, but he had an emotional reaction to our having gotten them because he thought that it was going to be a private counseling.

THE COURT: Okay. I know. It is going to be relevant or not relevant.

MR. LOEVY: Your Honor, well, the issue is he saw a therapist. The defendants have now seen his records.

THE COURT: Right.

MR. LOEVY: It is relevant that when he was talking to the therapist, he thought it was private, he believed it was private in this litigation.

THE COURT: Well, look, I mean, we weren't born yesterday. If he's going to seek to get damages based on that, it's fair game in this litigation. We all know that.

MR. LOEVY: I think we're agreed on that. I'm not sure, then, what Mr. Sotos is trying to keep out.

THE COURT: I don't either.

MR. SOTOS: To him testifying about his reaction to when we got them. Because we had another case with him last year in state court --

THE COURT: Wait a minute, wait a minute.

MR. SOTOS: -- where the --

THE COURT: You're going to bring out that he was not happy that the defense got his records?

170

MR. LOEVY: What we're going to bring out is when they cross-examined him and -- or they suggest in any way that he's, you know, just trying to be a litigator, that he did not anticipate that these were going to be public. These are authentic. He believed it was his private thoughts with his therapist. That's -- you know, you don't have the specific questions, but when they start cross-examination --

THE COURT: Well, I am going to have -- I -- you know what? This is just -- we're in an alternative universe. I am going to have to rule on the objections as they come in. This is goofball.

MR. LOEVY: Well, I will keep it out of the direct and then Mr. Sotos and I can handle it --

THE COURT: Okay.

MR. LOEVY: -- at a better time.

THE COURT: I mean, I think --

MR. SOTOS: That's not going to be the focus of my cross.

MR. LOEVY: And it was not part of our direct anyways. It wasn't. It was --

THE COURT: Well, good.

MR. LOEVY: -- a cross question.

THE COURT: Then let's go on to another issue.

MR. SOTOS: Okay. Another one is that related to that, testimony regarding distress of the litigation process

being another element of his damages. Again, it's our view that he voluntarily encountered this by filing the lawsuit.

THE COURT: Well, that's proper cross-examination. Okay?

MR. SOTOS: Okay. We have another issue with respect to his testimony that he gave in his deposition about his religious conversion in prison. There's a federal rule that states that evidence of a witness' religious beliefs or opinions is not admissible to attack or support the witness' credibility. So we'd like to ask that that not become a --

THE COURT: I don't think that's what that rule is talking about.

MR. LOEVY: Yeah.

THE COURT: Okay? That's talking about, like, religious tests for offices in the United States. I mean, you don't put somebody on the stand and say, "Well, you know, you're a Buddhist, and you should not be believed."

What -- he's going to testify that this is, what, something --

MR. LOEVY: He's going to testify that one of the things that helped him get through this ordeal was he became --

THE COURT: I think that's fine.

MR. SOTOS: All right.

MR. LOEVY: All right.

MR. SOTOS: And then the last thing is with respect to

172

the Certificate of Innocence, we wanted to bring out on cross-examination the fact that there was monetary payment that went along with that.

MR. LOEVY:  And we have case law that you can't. That's like saying you've already been paid by an insurance company.  It's a collateral source payment.

THE COURT:  It sounds -- you know, I am guessing it sounds like collateral source.  I think we take it away -- if he gets a verdict, I -- I assume we --

MR. LOEVY:  It might set it off.

THE COURT:  -- set off the --

MR. LOEVY:  Or you might, you might not, but we don't want to concede that.  But it's not an issue for the jury. It's like if an insurance company pays --

THE COURT:  You know, I believe you, but I think there may be a setoff.  He's not allowed to recover twice for the same thing.  But I don't think we need to go into it.

MR. LOEVY:  Well, we have cases, Your Honor, that collateral source payments are not admissible.  The jury shouldn't hear that he got --

THE COURT:  Yeah.

MR. LOEVY:  -- payment.

THE COURT:  Collateral source --

MR. SOTOS:  I was --

THE COURT:  -- payments are not admissible.  Let's go

on to the next issue.

MR. SOTOS: Those are the four.

THE COURT: Okay.

MR. LOEVY: Your Honor, there's an issue, too.

We -- Mr. Sotos said yesterday that the gangs in prison was a concern. What we want to elicit on direct is he -- in prison, he did associate with gangs. Most people did. And, you know, he associated with gangs until the late '90s when he said, "I'm done with the gangs." We just want to keep it simple and be true to the facts that that was reality.

THE COURT: Okay. And Mr. --

MR. LOEVY: And I think --

THE COURT: -- Sotos --

MR. LOEVY: -- Mr. Sotos objected. Wasn't sure.

THE COURT: -- what do you want? You don't --

MR. SOTOS: No.

THE COURT: -- object?

MR. SOTOS: Not on that.

THE COURT: Okay. Fine.

Okay. Anything further?

MS. ROSEN: Just one thing, Your Honor.

THE COURT: Yes.

MS. ROSEN: There are in the courtroom, have been in the courtroom earlier today, and were in the cafeteria, other plaintiffs who have lawsuits against Mr. Guevara.

THE COURT: Okay.

MS. ROSEN: And they are in the cafeteria intermingling, not deliberately intermingling. But the jurors are around. And if they could just be cautioned not to be discussing Mr. Guevara or their lawsuits or their experiences --

THE COURT: Yes. So there are people in the courtroom now?

MS. ROSEN: Yes.

THE COURT: Well, let me --

MS. ROSEN: At least one of their counsel.

THE COURT: All right. Let me just say that while you are in any of the common areas of this building where there might be a juror in this case around, you may not talk about your own issues with these defendants because -- keep it closed -- because the effect if some juror were to hear that is that all our work would be crashed and we'd have to start all over again.

So I am ordering everybody -- in fact, I would say while you're in the building -- I can't keep you from talking if you're in any kind of a confidential place, but anywhere in this building where there might possibly be a juror in this case, please do not discuss your own issues. Thank you.

Anything further?

MR. LOEVY: Not from the plaintiff, Your Honor.

175

MR. SOTOS: Not from the defense, Judge.

THE COURT: All right. My research indicates that I cannot excuse this juror based on his work -- his financial strain because of his work. Obviously, I could have done it before we excused all these people yesterday, but once the jury is impaneled and we have them, I can only do it if the parties agree to it.

So I am going to, I think, call him in at the break and tell him that I'm really sorry, but the rules say I cannot do it, and I'm just -- you know, I'm sorry I can't. But I probably could say that --

(Courtroom door opens.)

THE COURT: Yes? Yes?

THE CLERK: Bring them in?

THE COURT: No.

THE CLERK: Okay.

THE COURT: Probably say that the rules provide that I can hear certain kinds of issues before we excuse all of the other people, but after I do that, I can't excuse him for this reason anymore.

If at any point -- I know the defense is okay with excusing him. I would love to excuse him. If at any point the plaintiff changes your mind about him, please let me know.

MR. LOEVY: Very good.

THE COURT: Because, you know, a man who can't support

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 239 of 663 PageID #:106959
Letrich - cross by Polick
176

his family is not going to be paying a whole lot of attention or be very -- I would think not very open to this case, but I may be wrong.

Okay. We're ready. But I'll do it at the break. As soon as the jury goes out, I'll ask him to stay.

(Witness reenters.)

MS. ROSEN: Do you want him to wait?

THE COURT: Oh, you can retake the witness stand.

MS. ROSEN: Okay.

THE COURT: Yes.

(Pause. Jury in.)

THE COURT: Please be seated, everyone.

Mr. Daffada?

MR. POLICK: Thank you, Judge.

CRAIG LETRICH, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

CROSS-EXAMINATION (Resumed)

BY MR. POLICK:

Q. Mr. Letrich, I think when we left off, you were describing the photo array or photo lineup to the jury.

You did not do such a photo array or photo lineup with Mr. Valentin at the hospital, did you?

A. No.

Q. Now, going back to Mr. Rodriguez.

When you were processing his arrest at the 14th District, did you speak with Mr. Rodriguez at all?

A.  Through an interpreter.

Q.  Okay.  What was Mr. Rodriguez's primary language?

A.  Spanish.

Q.  Okay.  And who was the interpreter that you used?

A.  Officer Vergara.

Q.  And Officer Vergara, was he a member of the your unit, the 14th District tac team?

A.  Yes.

Q.  All right.  And through Officer Vergara, did you ask Mr. Rodriguez if he knew anything about the shooting of Felix Valentin on August 27th of 1988?

A.  Yes.

Q.  Okay.

A.  And --

Q.  And do you know what he said?

A.  He -- well, he broke -- spoke in English, but, like I said, it was through Vergara, and he didn't admit shooting the victim --

Q.  All right.

A.  -- Valentin.

Q.  You specifically asked him if he was involved?

A.  In the shooting of -- yes.

Q.  And he denied that?

A.  Yes.

Q.  Okay.  And if, in fact, he had known anything or admitted

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 241 of 663 PageID #:106961
Letrich - cross by Polick
178

it, that would have been included in your supplementary report?

A. If he would have made any admission, I would have put it in, yes.

Q. All right. Now, you told us during Mr. Loevy's questioning that after your arrest of Mr. Rodriguez, you did contact the detectives at the Area 5 Detective Division?

A. Yes.

Q. You let them know that he was in custody, correct?

A. Yeah, yes.

Q. All right. Did you yourself bring Mr. Rodriguez over from the 14th District to the Detective Division?

A. I don't believe so.

Q. All right.

A. I don't recall that.

Q. Someone else in your unit did?

A. Yeah, it could have been a wagon, transport wagon.

Q. All right. But that was the end of your involvement?

A. Yes.

Q. Okay. And then going forward in time, do you recall being subpoenaed to testify at Mr. Rivera's criminal trial?

A. Yes.

Q. Okay. You received a subpoena to appear personally and to bring the gang book albums that you showed Mr. Valentin by Mr. Rivera's attorney, Mr. Wadas?

A. Yes.

Q. Okay. And you did appear to testify?

A. Yes.

Q. Did you bring the books?

A. I don't recall, but if it was -- I would imagine I would have if it was in the subpoena.

Q. You would have honored the subpoena?

A. Yes.

Q. All right. And you testified in court, correct?

A. Correct.

Q. And you testified about Mr. Valentin's I.D. -- or identification of Mr. Rodriguez, correct?

A. Yes.

Q. From the books that you showed him, right?

A. Yes.

Q. And you testified about his identification of Mr. Nieves from the books that you showed him, right?

A. I believe so. I'd have to look at my transcript, but I believe so.

Q. Okay. You have that in front of you, right? Take a quick look at it just to be sure.

A. You know, I don't have the transcript.

MR. POLICK: All right. Let me -- may I approach, Judge?

THE COURT: You may.

MR. POLICK: Thank you.

THE WITNESS: Thank you.

BY MR. POLICK:

Q. Just let us know when your recollection is refreshed, sir.

A. Uh-huh.

Yeah, the only thing regarding Mr. Nieves is it says if we attempted to arrest him, and -- yes, I recall that, but we didn't find him.

Q. Okay. And you testified about your arrest of Mr. Rodriguez?

A. Yes.

Q. And that it was communicated to the Detective Division?

A. I believe so. Let me double-check.

Q. I can direct you. I think it's page 54.

A. 54?

Yes, yes.

Q. Thank you.

MR. POLICK: I don't have any further questions, Judge.

THE COURT: Okay. Ms. Rosen, do you --

MS. ROSEN: I have no questions.

THE COURT: Oh, okay. Mr. Loevy?

REDIRECT EXAMINATION

BY MR. LOEVY:

Q. Sir, just to make sure I understand you, you did arrest Rodriguez because the victim said Rodriguez was the one who

shot him, correct?

A. Correct.

Q. And you just testified that you remember interviewing Rodriguez about whether he was involved, and he denied involvement.

Do you remember just telling that to Mr. Polick?

A. Correct.

Q. Okay. There's -- that doesn't say that anywhere in any police report, right?

A. Correct.

Q. I mean, take a look at your police report, sir.

A. No, I know. I would've -- only would have put it in there if he admitted to me that --

Q. Okay. So we agree, then, that the contemporaneous documents at the time -- and this is Plaintiff's Exhibit 19-B. All it says is: Offender #1 taken into custody, advised of rights and processed, right?

A. Correct.

Q. It doesn't say, "We asked him, 'Do you have any involvement,' and he denied it," right?

A. It's part of the processing. I mean --

Q. No. But it doesn't say that. That was --

A. It doesn't say it in that report --

Q. Right.

A. -- or --

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 245 of 663 PageID #:106965
Letrich - redirect by Loevy
182

Q.   And you don't remember this 20 years later, right?

A.   It was 30 years, but I -- I know that I would have put it in had he admitted it.

Q.   All right.  If you had asked him questions bearing on the investigation, such as, "Mr. Murder Suspect, did you kill the victim," that's something you would have written down, right?

A.   Right.

Q.   So can we infer that since you didn't write down that, "I interrogated the murder suspect about whether he committed the murder," that that wasn't your job; that was the detectives' job?

A.   It would've eventually have gone to them, yes, which it did.

Q.   All right.  You're not saying you remember to this day that you interrogated the murder suspect and forgot to write it down?

A.   It wasn't at length.  And if he denied that he did it, I would -- you know, I wouldn't have.

Q.   You're just guessing, right?

A.   Well, I didn't -- he didn't admit it to me.  That I know.

Q.   All right.  Your report -- you mentioned to Mr. Polick that your arrest report used the phrase "tentative I.D."

     Do you remember that?

A.   Yes.

Q.   Now, what -- I think you explained that when you've used

the word "tentative," you meant it was an I.D., but it had to be confirmed in a lineup, right?

A. Correct.

Q. So when you used the word "tentative," you didn't mean to suggest it was equivocal or not sure. You meant, "A tentative I.D. is made. Now we got to confirm it," right?

A. Right.

Q. All right. And whose job is it, then, to follow through and do the lineup and see if Rodriguez was the killer?

A. The Detective Division.

Q. All right. And then the last couple of areas here.

You told Mr. Polick that you believed that there was two possible gangs that could have been involved in the shooting, the Imperial Gangsters and the Latin Kings, right?

A. That would have been -- yes, more than likely would have been one of the two, because it was right on the border, yes.

Q. And you also told Mr. Polick that you had some reason to think maybe it was a Latin King, right?

Apparently, the first police report, maybe it was a Latin King?

A. Not me. It was listed on the --

Q. Right.

A. -- report.

Q. All right. So you made it your job to make sure you were getting clarity from the victim, "Is this an Imperial Gangster

who shot you or is it a Latin King?"  You needed that clarity, right?

A.  That's -- that's why I went, yes, and asked.

Q.  And he gave you clarity that it was an Imperial Gangster, correct?

A.  He -- he inferred to me that -- or told me -- or directed me by his motions that it was an Imperial Gangster.

Q.  And you told Mr. Polick that he was sure, correct?

A.  Yeah, at that -- sure.  At that time, he was sure it was.

Q.  And he was sure it was an Imperial Gangster who he knew, correct?

A.  Yes.

Q.  And he told you who killed him?  In words, nods, or otherwise, he told you the killer was Jose Rodriguez, correct?

MR. POLICK:  Objection, Judge, asked and answered.

THE COURT:  Overruled.

BY THE WITNESS:

A.  He -- by pointing out the picture, yes, yes.

MR. LOEVY:  All right.  I have no further questions, Your Honor.

THE COURT:  Anything further?

MR. POLICK:  Just a few on that.

THE COURT:  Yes.

RECROSS-EXAMINATION

BY MR. POLICK:

Q. First of all, I think Mr. Loevy misspoke.

This wasn't a murder investigation you were involved in, right?

A. It was aggravated battery at the time.

Q. All right. Mr. Valentin was very much alive when you spoke to him, correct?

A. Correct.

Q. Okay. Bad condition, but he was alive, right?

A. Yes.

Q. Okay. And with regard to speaking to Mr. Rodriguez at the 14th District station, you testified to that at Mr. Rivera's criminal trial, didn't you?

A. Yes.

MR. POLICK: Okay. Nothing further, Judge.

MR. LOEVY: Nothing for the plaintiff, Your Honor.

THE COURT: Okay. No further questions. Thank you, sir.

THE WITNESS: Thank you.

THE COURT: You may step down. Watch your step.

(Witness excused.)

MR. LOEVY: At this time, Your Honor, plaintiff calls the plaintiff, Jacques Rivera.

THE COURT: Okay. Mr. Rivera, please step up here. Please raise your right hand.

(Witness duly sworn.)

THE COURT:  You may be seated.

THE WITNESS:  Thank you.

(Witness brushes up against microphone.)

THE WITNESS:  Sorry about that.

MR. LOEVY:  No problem.

JACQUES RIVERA, PLAINTIFF HEREIN, SWORN

DIRECT EXAMINATION

BY MR. LOEVY:

Q.  Why don't you state your name and introduce yourself.

A.  My name is Jacques Rivera.

Q.  And how old are you, Mr. Rivera?

A.  I'm 53 years old.

Q.  Where do you live?

A.  I live in Rogers Park.

Q.  Sir, where did you spend ages 23 through 44 of your life?

A.  In a maximum-security prison for a crime I did not commit.

Q.  And when were you released, sir?

A.  October the 4th, 2011.

Q.  All right.  Let's -- tell me a little bit about what you do.

What do you do for a living?

A.  I work at Northwestern University, the Feinberg School of Medicine.  I deliver medical supplies to the labs that are doing research on Alzheimer's, cancer, and other diseases.

Q.  And what are your jobs on the -- the duties on the job?

Rivera - direct by Loevy

187

A. To deliver those medical supplies, to pick up non-working medical supplies. It could be from minus-86-degree freezers, to shakers, to incubators.

Q. How long have you worked at Northwestern?

A. It's going on, I believe, six years.

Q. And what are your hours?

A. 8:00 to 5:00.

Q. Do you like working there?

A. I love it.

Q. What do you like about the place?

A. People are acceptable. You know, my co-workers are great. It's a physical job. It keeps me in shape at 53. Yeah.

Q. Does it tire you out at the end of the day?

A. Oh, I'm out, yeah. Yes, it does.

Q. All right. What do you do with your -- when you come home?

A. I basically, you know, take my dog out, feed him, walk him. Take a shower. Sit back, watch TV.

Q. All right. Are you married?

A. No, I'm not.

Q. Do you presently have a girlfriend?

A. Yes, I do.

Q. And what is her name?

A. Maria.

Q. How long have you been with Maria?

A. A little over two years.

Rivera - direct by Loevy

Q. What does she do?

A. She works at Northwestern University as well.

Q. How did you meet her?

A. At Northwestern University.

Q. Who do you hang out with in your time now, in your life now?

A. Me, Maria, and Brownie.

Q. Brownie is who?

A. My doggie, my puppy.

Q. All right. You also have some kids and some grandkids, correct?

A. Yeah, yes, sir.

Q. Tell the jury about that.

A. My oldest son has a son, two years old, Jacques, Jr. He has a daughter that's five years old, Janiya. And we from time to time get together and, you know, have breakfast, dinners.

Q. How about your other son and your daughter? What are their names?

A. My youngest son is Richard Ray. He has a daughter. She's a little over six months old. He has another one on the way. She's adorable.

And my daughter, Jennifer, she works at the W, I believe it's called, on inner Lake Shore Drive.

Q. All right. And where does Jacques and Richard work?

A. Jacques works at -- I believe it's Midland Fabrications, a

Rivera - direct by Loevy

189

sheet metal company, and Richard does -- he does -- he's at a collection agency for a car loan. And on the weekends, he does -- he does a move -- he works for a moving company.

Q. All right. Let's back up, sir.

When -- where were you born?

A. Here in the States. Chicago, Illinois.

Q. All right. In what city?

A. Chicago.

Q. What neighborhood were you growing up in?

A. Humboldt Park.

Q. Who did you live with growing up?

A. My mom, dad, four sisters and a brother.

Q. And what did your parents do when you were younger?

A. My dad was an alley mechanic. My mom worked at retail stores, Zayre's, if anybody remembers that.

Q. Did you have some siblings growing up?

A. Yes, sir.

Q. Who were they?

A. My sister Linda. She's -- would be the oldest. My sister Janette, my sister Rose, and my youngest sister Candida.

Q. Were you all close growing up?

A. Oh, yeah, yeah.

Q. And what do they do now?

A. My oldest sister's in IT. She's in computer software. My second-oldest sister Janette works for the Chicago Public

Schools. My sister Rose, she's a -- into the dog-grooming business. And my sister Candida, she was working at a hotel chain. She lives in California. And that's what I remember about Candida.

Q. All right. How about -- let's talk about the neighborhood.

Humboldt Park neighborhood, when you were growing up, what was the neighborhood like then?

A. Gang infested, a lot of shootings.

Q. All right. In your neighborhood, did some of the kids join gangs?

A. Yeah. You had to.

Q. Well, not -- you didn't have to, but some people did?

A. Oh, yeah, yeah.

Q. And what gang was in the neighborhood?

A. The Latin Kings.

Q. All right. Did you get involved?

A. Yes, I did.

Q. At what age did you get involved?

A. Roughly -- after the age of 15.

Q. What was that -- what was going on in your life at that time?

A. Well, my dad had passed away.

Q. How old were you when that happened?

A. I believe I was 15 -- either 15 or 16.

Q. All right. And was this a good decision?

A. Oh, definitely not.

Q. Are you someone who's claiming every decision you made in your life is a good decision?

A. Oh, no.

Q. All right. How did you slip into this lifestyle?

A. Well, my mom had other kids to raise, and she didn't have the money, what -- you know, even when my dad was around, they didn't have the money to move, so -- and, you know, it becomes a part of you.

Q. All right. Did -- were you -- were other kids you had grown up with, gone to school, were they in the gang as well?

A. Yes, sir.

Q. All right. What was the geographic range we're talking about? You know, Latin Kings is a -- we've heard that term.

A. Sure.

Q. It's a big term. What was your crowd there?

A. On -- it was on Beach and Spaulding.

Q. All right. That's a corner?

A. Yes, sir.

Q. All right. How about -- leaving aside that part of your life, did you have other good friends growing up?

A. Sure.

Q. And then when you were younger, what kinds of things did you do before your wrongful arrest?

A. We would go on bike rides. We would -- you know, we would

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 255 of 663 PageID #:106975
Rivera - direct by Loevy
192

appoint somebody, this guy will hold the radio, this guy will hold the bike patches for the tires, this guy will hold the lunches, and we would go on bike rides to Lincoln Park Zoo, down to Kiddieland in Maywood.

Q. And then as you guys got a little older, in your teen years, what kinds of things would you do as teenagers?

A. Hung out. Just basically just hung out.

Q. All right. Movies and --

A. Oh, movies, go after girls, you know.

Q. All right. And speaking of girls, did you have a serious girlfriend during that phase of your life?

A. Yes, I did.

Q. What was her name?

A. Sofia Matarazzo.

Q. How did you meet Sofia?

A. She knew another family that lived in the neighborhood, and I -- and I ran into her at the store, and we hit it off.

Q. All right. Is she older than you or younger?

A. She's a -- I think she's a year older than me.

Q. All right. What kinds of things did you like to do with Sofia?

A. We went to dances, whenever they had dances. You know, we went for walks, went to the movies.

Q. All right. Skipping ahead, did there come a time when she got pregnant?

A. Yes, sir.

Q. Was that a planned pregnancy?

A. No, that wasn't planned.

Q. All right. Did you and she start living together?

A. Yes, we did.

Q. Did you like each other?

A. Yeah, yeah. I'll say yeah.

Q. All right. Were you the perfect boyfriend and the perfect anything?

A. No. No, not at all.

Q. All right. Was it a happy time when your child was born?

A. Most definitely, yeah.

Q. Tell us a little bit about that.

A. My son, Jacques, Jr. -- you know, I -- being a -- never being -- you know, being at a young age and having a kid, I mean, you start learning the responsibilities of it. And my mom was not having it. Like some grandmothers do, they take -- you know, they watch the kids, she's like, "No. You" -- you know, "You had the kid. You take care of him."

So I remember early in the mornings, I will walk him around in his carriage to put him back to sleep when he gets up to feed him a bottle and stuff like that.

Q. Did you move in with Sofia?

A. Eventually, yes, we did.

Q. And where did you stay?

A.   We stayed -- we lived with my mom on Beach and then we lived with her ma for a while.

And being, I would say, that my dad died at a young age, I really didn't know what it was to be a man.

Q.   And who was some of the role models for you, showing you how to be a man?

A.   Oh, Sofia Matarazzo's mother.

Q.   Tell us a little bit about that.

A.   A great Italian woman, older Italian woman.  And, you know, she always -- she called me a macaroon, whatever that may mean, but -- she called me a macaroon, and, you know, she -- I would give her the credit for trying to help me to become a man.

Q.   All right.  Were there other positive role models in your neighborhood?

A.   In my neighborhood?

Q.   Yeah.

A.   Oh, no.  No, no, no.

Q.   All right.  Did you and Sofia eventually get a place of your own?

A.   Yes, we did.

Q.   By the way, did you stay with your mother also during some of that time period?

A.   Yes, sir, yes, sir.

Q.   And where did you guys, you and Sofia, get a place of your own?

A.   We wound up moving out of that neighborhood down -- maybe a half hour to an hour away, down by Division and Pulaski.

Q.   All right.  You said you -- you know, you were not always the most mature person before this, correct?

A.   Most definitely.

Q.   Or after becoming a father?

A.   Yeah, yeah.

Q.   All right.  Did becoming a father help you become more mature?

A.   It was -- I was going in that direction, yes, sir.

Q.   All right.  Did you become more serious about working?

A.   Most definitely.

Q.   Where were you working?  What were some of the jobs --

A.   I was to --

Q.   -- before your wrongful arrest?

A.   Working at Stanley's Food Market, bringing up produce from the freezers into the -- to the floor.

Q.   All right.  Did you come to a more serious job and a more steady job?

A.   With the Humboldt Park Institute.

Q.   Tell us about that.

A.   It was a government grant.  It was a -- it was a center. It was -- we had teachers from Malcolm X College there.  We were trying to get students who dropped out of high school to get them their GED.

Rivera - direct by Loevy

196

Sofia was actually the director of the place. And -- yeah, we had teachers from Malcolm X College. It was computer classes, GED classes, and, you know --

Q. How long did you work there, sir?

A. A few years.

Q. And were you working there at the time of your wrongful arrest in this case?

A. Yes, sir.

Q. Did you like working there?

A. Yeah, I did. It was -- the money wasn't good all the time. Being the government grant, it -- you know, we'd have to fill out proposals to get money, and sometimes it wasn't always there. But yeah, yeah, I liked working there.

Q. Now, you were -- the idea was to get kids off the streets, it sounds like, but you were sometimes someone who, you know, spent time in the streets, too.

A. Oh, yeah.

Q. So why did that work? Why were you qualified to do it if you're --

A. Well, I guess the best teacher's the one who's been through it, you know. I've come from the streets, so I knew what it was like.

Q. All right. Did you guys move over to Division and Pulaski, you and Sofia?

A. Yes, yes, sir.

Q. Do you remember about how old you were at that point?

A. 18, 19, maybe.

Q. How long did you live over there?

A. Well, we lived in that general area for a few years.

Q. All right. Were you -- did you do your best to be a father?

A. Well, what I knew, yes.

Q. All right. Was it fun to have kids?

A. Oh, that -- yeah, definitely.

Q. And as far as Sofia, was this a perfect relationship?

A. Nah, it wasn't the perfect relationship, but --

Q. Were there good times and bad times?

A. Most definitely.

Q. Was part of that your fault?

A. Most definitely.

Q. All right. How many children did you and Sofia go on to have?

A. We had three kids.

Q. And those are the children you described?

A. Two boys and a girl.

Q. All right. Were you able to be with your children for their whole childhood, starting when you got -- starting at about age 23?

A. No.

Q. Why is that?

Rivera - direct by Loevy

A. Again, I was wrongfully convicted of a crime I did not commit.

Q. All right. What sorts of things would you do with your kids before you got arrested?

A. You know, when I walked them to school, I remember there was a snowstorm, and I was tossing them into the snow until my youngest son, Richard, said, "Dad," you know, "stop," you know.

Q. Those are just memories and --

A. He got scared, so -- yeah. And go to the park. We went to the park. Yeah.

Q. All right. Would you take them to school on a regular basis?

A. I was the -- yeah, the primary one that took them to school, yeah.

Q. All right. Where were they? And how would you get there?

A. The school was like a block away from where we lived. It was Brian Piccolo.

Q. And would you drive them or walk them?

A. I would walk them. It was a block away, so I would walk them.

Q. All right. Was there a time where you and Sofia broke up, by the way?

A. Oh, yeah. We had, yeah, a separation there.

Q. And did you have another girlfriend during that time?

A. Yes, I did.

Q. How long were you guys apart?

A. Several months, I would say.

Q. All right. Whose fault was that? Yours or hers?

A. That was definitely mine's.

Q. All right. And when you were apart, were you with another girl?

A. Yes, I was.

Q. And who was that?

A. Lori Amaro.

Q. And how old were you at that time?

A. 21, 22, if I can remember.

Q. All right. And did you and Lori have a child?

A. Yes, we did.

Q. And what is his name?

A. Joshua Amaro.

Q. And is he a part of your life and someone that you love?

A. Oh, yes, yes. Yes, he is. And I do love him.

Q. All right. After you had this other thing that had -- how did it all work out? Who'd you end up with? And what happened?

A. Well, Ms. Amaro basically gave me an ultimatum, and by then, I finally realized that, you know, I made a mistake and I wanted to be united back with my -- the mother of my kids, my three kids.

Q. And is that what you did?

A. Yes, sir.

Q. All right. When you and Sofia wanted to go out, did you guys have babysitters? Who would be in charge of the kids if you wanted to go out?

A. My mom would watch them at times. Her mom's would watch them.

Q. Did you spend time at both houses there?

A. Yes, I did.

Q. All right. So this is the life you've described. Let's fast-forward to 1988.

Were you interested in continuing the life that you were living?

A. The straight and narrow path, yes, sir.

Q. All right. But you're not implying that you were always on the straight and narrow path?

A. Oh, no, no.

Q. You sometimes got in trouble?

A. I was heading in that direction.

Q. All right. How far in your life had you gotten out of Humboldt Park at this point in your life?

A. I would say a couple of years, if I remember correctly. It was --

Q. I mean, had you seen the world? Had you gone other places?

A. Oh, no, no. I have never been outside of Humboldt Park.

Q. All right. One day in 1988, did you have an encounter with

Detective Guevara that changed your life?

A.  Yes, I did.

Q.  Where were you when you interacted with Detective Guevara that day?

A.  On the corner of Beach and Spaulding.

Q.  And had you known Guevara?

A.  I seen him around.

Q.  What do you mean?

A.  Well, he was a Gang Crimes detective, and he was in and out around that area.

Q.  And did you know him by name?

A.  I -- well, I knew him, yeah.  Yeah, I guess I knew him by name.

Q.  All right.  Did he know you by name?

A.  He never addressed me, so -- I would assume he did.

Q.  All right.  And would you see him sometimes at the Humboldt Park Institute?

A.  Yeah.  Well, actually, the Humboldt Park Institute was doing so well that they gave us more money to open up a recreational center right across the street from it, which was called Mind & Body, which I ran.  We had weights in there, a foosball table there, hockey tables for the after-school kids and --

Q.  Would Guevara come there sometimes?

A.  He would -- he always came in there.

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 265 of 663 PageID #:106985
Rivera - direct by Loevy
202

Q. All right. This time in 1988, what do you remember, the first time that Guevara approached you about this situation?

A. I mean, I was standing there. He drove up with his partner, and they spoke from the window and said, "We need to talk to you." And --

Q. What'd you say?

A. -- I was -- it was just strange. Like, he just drove up and said, "I need to talk to you." I said, "About what?" He said, "I need to talk to you." And I just found it strange.

He was on the driver -- the passenger side of the car. He stepped out the car, came around to the back end of the car.

And if I may, Your Honor, step up to display what he did?

THE COURT: Sure.

BY THE WITNESS:

A. He moved his coat to reveal his revolver (demonstrating). I took it as, you know, you could come willfully or forcefully.

BY MR. LOEVY:

Q. All right.

A. I knew I had done nothing wrong.

Q. What did he ask you to do?

A. Went up to the vehicle. He asked me to be a filler in a lineup.

Q. All right. What was your understanding of being a filler?

A. Somebody they just needed to stand in the lineup, other

Rivera - direct by Loevy

203

participants, you know, not meaning that you were guilty of anything. They just needed participants to stand in a lineup.

Q. And what did you do? What'd you say?

A. I complied with him. I had no problem. I didn't do nothing wrong, and I knew this, and -- I had no problem with it.

Q. All right. Did he tell you what the lineup was all about?

A. No, sir.

Q. All right. Do you remember the car ride at all?

A. Oh, yeah.

Q. Were you nervous or, you know, concerned?

A. I was -- had some concerns. You know, I was wondering what it was all about, because, you know, it's been a while since I was picked for a filler in a lineup, so --

Q. All right. What do you remember happening at the police station?

A. Well, he -- at first, I was driven to Belmont and Western police station, and I sat there till late hours of the night, and another police vehicle came and transferred me over to Grand and Central.

Q. And did you understand what you were doing there, what the delay was or what was going on?

A. You know, I started asking questions. I was -- you know, I was supposed to be a filler in a lineup, and it turned out to be, you know, I'm sitting there, you know, and I -- you know, I

asked the lockup officer. He said Guevara had left, Detective Guevara had left for the evening. He said he'll be returning in the morning. And when the shift changed with the officers, I asked them again. I said, where's Detective Guevara?

MR. SOTOS: Judge, could I just ask, could we just get some foundation for who's -- if he remembers who he talked to at the time?

THE COURT: Okay.

BY MR. LOEVY:

Q. Do you have any idea who these officers were?

A. Guevara -- oh, no, not the lockup officers, no.

Q. Yeah. Just random people you were interacting with?

A. Yeah, yeah. Just officers.

MR. LOEVY: All right. He may continue?

THE COURT: Sure.

MR. LOEVY: All right.

BY THE WITNESS:

A. So -- and I kept asking them. I was like, you know, I was supposed to be a filler. Where's -- they said, "Well, Detective Guevara's out in the field right now. When" -- "We'll let him know when he returns." And that was it.

BY MR. LOEVY:

Q. All right. Did the situation finally come to a head there or something happened?

A. Well, they told me that I was supposed to be put in a

lineup at -- I think it was like 2:00 o'clock, if I remember correctly, and that never took place.

And the shift changed again, and I was like -- I told the officers of the shift change, I said, "Man, I was supposed to be a filler in a lineup."

Q. And when did it all resolve?

A. At 7:00 o'clock the next day.

Q. 7:00 o'clock. What happened at 7:00 o'clock the next day?

A. I was -- was it the next day? I think -- it's been some time now, so I'm not -- quite remember the, you know -- but at 7:00 o'clock, I was put in a lineup.

Q. All right. How many lineups total were you in in your case?

A. I was -- I went to two lineups.

Q. And are you certain of that?

A. Yes, sir.

Q. Approximately how many apart were they? How many -- how long in time?

A. You know, three to four weeks, if I had to guess at it.

Q. All right. How about the first lineup here, the one that we've been talking about when Guevara picked you up? Did you know the other guys in the lineup?

A. No, sir.

Q. All right. What do you remember about the lineup?

A. Walking into there and -- into the lineup room and --

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 269 of 663 PageID #:106989
Rivera - direct by Loevy
206

obviously, they were gang members. They were flagging gang signs, and I was just like, you know, I'm a filler. I don't want no problems. And I'm just there to be a filler.

Q. Did the lineup happen?

A. Yes, it did.

Q. Describe for the jury what you remember.

A. Standing in the lineup behind the two-way mirror. Them going by the number, you know, which you lined up in, and they would indicate, you know, "No. 1, step out, turn to your left, turn to your right, step back."

Q. All right. Are you sure that this lineup happened?

A. Yes, sir.

Q. And did you, in fact, complain to your lawyer about the fact that there was no documentation of it?

A. Yes, sir.

Q. And you did that back in the 1980s?

A. Yes, sir.

Q. Did you try to make an issue of it at the trial back in the 19 -- in 1990?

A. Well, I didn't, but my attorney tried to, yes.

Q. All right. Were you identified at this first lineup?

A. No, sir. I was --

Q. What happened --

A. -- released.

Q. -- after that?

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 270 of 663 PageID #:106950
Rivera - direct by Loevy
207

A.  I was released.

Q.  All right.  Were you charged with murder after the first lineup?

A.  No, sir.

Q.  All right.  When you say you were released, did you have to deal with a traffic situation?

A.  I don't understand the question.

Q.  Was there a Maywood situation with a traffic ticket?

A.  Oh, oh, the traffic -- I thought you were talking about the traffic in general.

Yeah, I had a traffic violation out in Maywood which held me, and they sent me down to 11th and State for the traffic violation.

Q.  And that was for a warrant for the traffic violation?

A.  Yeah, a warrant for -- yeah.

Q.  All right.  And was that resolved?

A.  Yes, sir.

Q.  And then what happened?

A.  Went home.

Q.  And then did you go on with your life?

A.  Yes, sir.

Q.  And that was back at the Humboldt Park Institute and your children?

A.  Yes, sir.

Q.  And then -- yeah, I think you said, but how long you

estimate went by before you bumped into Guevara again?

A. Three to four weeks.

Q. That's your memory. Are you saying it wasn't -- it was -- could have been two? Could have been five?

A. Could have been two weeks. Yeah, could have been five weeks, yeah.

Q. All right. What was your next interaction with Guevara?

A. I had just picked up my kids from school, my two boys. Drove to the Humboldt Park Institute.

Q. Why did you do that? Why'd you take the kids to the Humboldt Park Institute?

A. Because my wife -- well, my girlfriend was there and -- we went back to pick her up.

Q. All right. Was that your routine?

A. Yeah.

Q. What happened when you got the kids back from Piccolo and went back to Humboldt Park?

A. I instructed them to go inside to their mother. I noticed my -- the pastor from Victim Outreach, Fernando Rivas, and another individual standing out in front of the church, and I went to approach to talk to them and --

Q. Then what happened? Then what happened? Sorry.

A. So the --

Q. I was just trying to insert questions so it's question/answer.

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 272 of 663 PageID #:106992
Rivera - direct by Loevy
209

A.   Yeah.   I want to answer the question.

I approached them to talk to them, and I hear a screeching sound.  Detective Guevara and Gawrys, I believe it was, jumped out the car.  Detective Guevara grabbed me, handcuffed me, you know, put me on the parked car that was standing there, on my chest.  His partner helped me down.  And I told them, "Man, what is this all about, Man?"  I said, "You know, you all just picked me up not too long ago.  I participated in a lineup.  I was released."  And he just -- he didn't say nothing.  He just, you know -- Detective Guevara asked me what kind of car was I driving and where was I parked.

Q.   What'd you tell him?

A.   I told him I drive a four-door white Chevy Caprice Classic that was around the corner on Kedzie.

Q.   Then what happened next?

A.   I can only assume he went over there to shake the car down, to look through it, and he came back with nothing.

Q.   All right.  You don't know what happened at the car, though, right?

A.   Oh.  No, I don't know what happened at the car, no.

Q.   You know he left and came back?

A.   Yeah, yeah.

Q.   And then what happened?

A.   They placed me inside their vehicle.

Q.   And then?

A.  We drove off and -- you know, I'm trying to tell both of them, you know, "What is going on here?"  You know, "I got my kids.  I," you know -- and Guevara slammed on the brakes real hard.  I -- of course, being handcuffed behind my back, I flew forward.

Q.  Let me interrupt you with that.

The seatbelts weren't as often used in the '80s as they are today, correct?

A.  No.

Q.  What happens if you're in a police car and you're handcuffed and the brakes get slammed on?

A.  You're gonna fly -- you're gonna fly -- go flying forward.

Q.  And then what happened?

A.  He grabbed me by my shirt, and he said, "Well, you being charged with murder, M-F."

Q.  Did he -- all right.

A.  Yeah.  And he just --

Q.  Did he --

A.  He shoved me back.  And I said, "That's all I wanted to know."  All I wanted to know what was going on.  I wasn't being told nothing.

Q.  All right.  Did he tell you who you supposedly murdered?

A.  No, sir.

Q.  Did you have any idea what he was talking about?

A.  No, sir.

Rivera - direct by Loevy

211

Q. All right. What were you thinking?

A. What was this all about? It had to have been a mistake.

Q. All right. What happened when you get to the police station?

A. I was put in an interview room. Was held there for a couple hours, if I remember correctly, and then eventually put in a lineup. Yeah.

Q. All right. Was there any discussion or was that before or after the lineup with the officers? Was there discussion with Guevara before or after a lineup?

A. After the lineup.

Q. All right. Tell us about the second lineup.

And this would be the second lineup, right?

A. Yes, sir.

Q. Okay. Tell us about this second lineup.

A. Same procedures. You standing there with the individuals. They ask -- they literal -- they told me that I could stand wherever I wanted to stand, and I stood dead center, the lineup, 'cause I wanted to make sure that whoever is looking at these lineups, you know, I want them to see me. I want to make sure they get the person right.

And again, they step out. Turn to your left, turn to your right. Went through the procedures. Another detective came into the room making the sounds like, "Ding, ding, ding, ding, ding, ding." He said, "You're a winner." And -- yeah.

Q. What do you mean, "You're a winner"? What did he say?

MR. SOTOS: Judge, you know, I'm going to object. I just didn't hear who he said said that, if he said anybody. I --

THE COURT: Yeah.

THE WITNESS: It was a detective, sir. I don't know who he was.

BY MR. LOEVY:

Q. All right. It's been 30 years. Do you remember anything about it?

A. He just -- I don't know who he was. He just came in the room and said, "Ding, ding, ding. You're a winner."

Q. All right. And you weren't a winner, were you?

A. Oh, no, no, not at all.

Q. What was he telling you?

A. That I was identified.

Q. For the crime of?

A. Murder.

Q. All right. After that, what happened?

A. I was sat at a table. Detective Guevara came up to me and -- he wanted me to admit it. He wanted me to admit to it and to implicate somebody else in it. He said he would help me out if I told him I was the driver of the car and who the shooter was.

I told him how -- you know, "How can I admit to

something that I didn't do? And you want me to implicate somebody else?" I told him, "Uh-Uh." I said, "You not gonna put me down for the shooter or driver. I'm not admitting to nothing."

Q. We didn't understand. What'd you say? What'd you tell him?

A. I told Detective Guevara that I did not do the shooting. And I told him he had -- he offered to help me out by telling -- if I would tell him who the shooter was, and he was gonna put me down for the driver. I said, "I don't see how you can help me if you want me to admit to something that I didn't do." And he, in turn, told me, he said, "Well, you ain't got to tell us nothing. You going down for this anyways." And I left it at that. I said nothing else to him.

Q. How long did the questioning last?

A. That was it. It stopped right there.

Q. Was there anybody else in the room besides you and Guevara?

A. It was in the detectives' -- in the office, so there was -- there was other detectives there.

Q. All right. But who was interacting with you?

A. Just Detective Guevara.

Q. Where were you taken next, sir?

A. Excuse me?

Q. Where were you taken next?

A. To the bullpen downstairs, to holding.

Rivera - direct by Loevy

214

Q. How long did you spend there?

A. Maybe late that night.

Q. And then you were taken where?

A. The Cook County Jail.

Q. All right. What were you thinking at that time? Did you understand what was happening to you?

A. I'm gonna have to get an attorney.

Q. Did you have any idea what was happening to you?

A. None whatsoever.

Q. Is the Cook County Jail a safe place to be?

A. No, sir.

Q. What can happen to you in the Cook County Jail?

A. Dangerous. Anything. Anything can happen to you. You could get raped, you'd get stabbed, you'd get beat up.

Q. All right. Was there a bond hearing?

A. Yes, sir.

Q. And did you get a lawyer?

A. Yes, I -- well, Sofia did, yeah.

Q. Who was the name of the lawyer?

A. Kenneth Wadas.

Q. How did you get Kenneth Wadas?

A. Kenneth Wadas was the attorney for a friend of Sofia's family.

Q. Had you ever met him before?

A. No, sir.

Q. All right. Did you pay him?

A. Yes, we did, yeah.

Q. All right. Did Wadas make any arguments to the court about the bond?

A. Yes, he did.

Q. What was the argument that he made on the record there?

A. Wadas was -- made this -- you know, the State was arguing about a no bond, and what I remember Wadas was saying was -- he said, "Your Honor, the State has an eyewitness that said he can identify the shooter." He said, "My client was put in a lineup and was released that," you know -- that the eyewitness identified -- you know, saw, looked at that lineup, and he was released. Now they're coming back again and was put in a lineup, and now they're saying he was identified.

Q. All right.

A. And, you know, if I remember correctly, the judge was -- he found that to be -- you know, because he made -- he didn't make no -- he made sounds. He went, "Oh."

Q. All right. In other words, did he lower your bond?

A. Yes, he did.

Q. All right.

A. Well, he didn't even lower it. That's the bond he gave me.

Q. What was the bond set at?

A. It was a hundred thousand dollars, ten thousand to walk.

Q. All right. And who helped you to raise the money?

A. Sofia and friends.

Q. How did they raise the money? They just hit up friends, family?

A. Yep. You know, yeah, asking friends and family members.

Q. Did that cause you distress that people were contributing to your bond there in their money?

A. Of course, because I had nothing to do with this case.

Q. All right. How long did it take to get the money to bond you out?

A. I know I had a court date, so -- I believe it -- the court dates could go on from 30 days to 60 days, a continuance, so -- I remember getting out the day before my court date.

Q. All right. So at least about a month, you think?

A. About a month, yeah.

Q. All right. At the court date, did you find out who you had supposedly murdered?

A. When I went to that court date, there was -- they -- because I bonded out, they -- I -- although I went the very next day to that court hearing, knowing that there was a court date that I was given, and I wanted to make it, definitely wanted to make it, and it didn't -- it didn't go through.

Q. All right. At some point, did you find out who you were supposed to be murdered?

A. No, not at that point.

Q. At some point going forward, somebody must have told you

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 280 of 663 PageID #:107005
Rivera - direct by Loevy
217

who you supposedly murdered.

A.  I believe it was Wadas.

Q.  All right.  And this is Felix Valentin, we now know, right?

A.  Yeah, yeah.

Q.  Is that a name that you knew?

A.  No, no.

Q.  Did you know Felix Valentin?

A.  Not at all.

Q.  Did you know anybody who knew Felix Valentin?

A.  No, sir.

Q.  All right.  You're 23.  Did you have any reason to be -- you know, were you -- in your life, were you interacting with this boy, this 16-year-old?

A.  None, none whatsoever.

Q.  Do you know anyone who murdered him?

A.  No, sir.

Q.  When you were out on the street, was there any talk that you could -- you know, who murdered him that you could use to assist you?

A.  There was talk from the Campbell Boys.

MR. SOTOS:  Judge, I'm going to object to this random talking on the street.

MR. LOEVY:  All right.  It's a fair --

THE COURT:  Sustained.

MR. LOEVY:  -- objection, so --

THE COURT: Sustained.

BY MR. LOEVY:

Q. All right. You didn't know who did it, right?

A. I didn't know who did it, no.

Q. And you weren't able to provide any concrete information at all?

A. None whatsoever.

Q. All right. Were -- and I think you said shootings weren't uncommon in the neighborhood, correct?

A. They are not, yeah.

Q. All right. You found out that Felix Valentin was in the Campbell Boy gang. It sounds like you would have learned that, right?

A. Yes, sir.

Q. Did you have anything to do with the Campbell Boys?

A. No, sir.

Q. Did you ever have any beef with the Campbell Boys?

A. No, sir.

Q. All right. You also found out the shooting was in an Imperial Gangster neighborhood?

A. Yes, sir, Kimball and Cortland.

Q. Did you spend time in the Imperial Gangster neighborhood there?

A. Oh, no.

Q. Did you have any business there?

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 282 of 663 PageID #:107002
Rivera - direct by Loevy
219

A.   No, none.

Q.   All right.  How long a period of time went by until your trial started?

A.   Almost two years.

Q.   And would you have to show up for hearings during that time period?

A.   Every court date.

Q.   And so what would you have to do?

A.   Just appear.

Q.   All right.  You were out on bond.  What would happen if -- were you always on time and did you always appear?

A.   I was, except for one incident, I showed up late.

Q.   All right.  What happened on that time?

A.   The babysitter changed her mind at the last minute or became ill.  We had to redirect somewhere else to take my son.

I got to court late.  They done forfeited my bond.  They gave me a no bond and put out a warrant for my arrest.

Q.   All right.  Were you able to get that sorted out when you got there?

A.   Yes, I did.  I talked to the clerk of the court, and she goes, "Man, they called your case," and I was like, "I know.  I'm sorry I was late."  And she says, "Well, I'll try," and they called it back and --

Q.   Got it resolved?

A.   Yeah.

Q. All right. On the other occasions, were you always in court and always on time?

A. Yeah, all -- that was the only time.

Q. All right. Why did you show up for court on every court hearing?

A. I didn't have nothing to do with this case, and I wanted to prove my innocence.

Q. All right. What were those two years like while you're waiting for the trial? Was it hanging over your head or were you able to put it aside?

A. Oh, no, I was -- definitely it affected me a lot, wondering what was gonna be the outcome. I mean, I could draw my own conclusion, but -- I mean, you know, I -- and I was -- and, you know, I didn't know what was the outcome gonna be. I thought I was gonna be set free. I didn't think I was gonna go to jail for this, but --

Q. All right. During that two-year period, where were you working?

A. Well, a little bit at the Humboldt Park Institute until it -- I believe it shut down and the rec center across the street shut down. And I got a job at Three Star Security.

Q. All right. And who were you living with at that time during that two-year period?

A. Sofia.

Q. And the children?

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 284 of 663 PageID #:107004
Rivera - direct by Loevy
221

A.  Yes, sir.

Q.  All right.  What did you do to get ready for your criminal trial?  Who did you meet with to get ready?

A.  Ken Wadas.

Q.  How would you get ready?  Or what did you do to get ready?

A.  Go to his office.  We would, you know -- I think I'd been to his office twice, maybe, you know, in the two years.

Q.  All right.  The trial -- the shooting happened in August '88.  When did the trial finally happen?

A.  If I'm not mistaken, April/May of 1990.

Q.  So about almost two years later?

A.  Almost two years later.

Q.  So when you're getting ready for that trial in April or May 1990, was there talk about what your testimony was going to be?

A.  Yes, before we was going to trial.

Q.  All right.  Did you decide if you were going to testify?

A.  Yes, I did.

Q.  Why?

A.  'Cause I didn't have nothing to do with it.

Q.  All right.  Was there talk about whether you could prove an alibi?

A.  Yes, there was.

Q.  And is it hard to prove your whereabouts from two years earlier on a given day?

A.  Well, it was -- it was -- it became difficult.

Rivera - direct by Loevy

MR. SOTOS: Judge, objection.

THE COURT: I'm sorry?

MR. SOTOS: Objection to the opinion, unless he's asking about his situation.

THE COURT: You're asking about --

MR. LOEVY: I'll tell you what. I was just fronting it. If we want to stay away from that, that's fine with me.

THE COURT: No. The question was, were you asking for an opinion or were you asking the witness what happened to him?

MR. LOEVY: Him.

THE COURT: Okay. With that clarification --

MR. SOTOS: And that's fine.

THE COURT: -- it's fine.

BY THE WITNESS:

A. So what was the question?

BY MR. LOEVY:

Q. About were there issues with proving an alibi at trial two years later?

A. Oh, yeah. I mean --

Q. For you.

A. Yeah. It was -- I mean, the problem became that -- usually on the weekends, we do our family chores. So I had stood out the night before with some friends. I got home late. Sofia was mad. She's like, "You know, we do the family chores," because we both worked, whether it'd been laundry, grocery

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 286 of 663 PageID #:107006
Rivera - direct by Loevy
223

shopping.  So she was upset, and I said, "Let me get a few hours' sleep and we can resume back to what we do."

So the problem became that she didn't know -- well, we didn't know what time she left the apartment.

Q.  Is it easy to prove -- you know, did you have e-mails or calendars or any way to prove --

A.  No.

Q.  -- anything?

A.  Nothing.

Q.  All right.  Would that have been a day that had any importance to you at the time to remember what time people were leaving?

Before you got arrested, would it have been any reason to stick in your mind or anything like that?

A.  Not that I can remember.

Q.  All right.  As far as the murder itself, were you able to provide Mr. Wadas any help at all about why Felix Valentin was killed or who might want to kill him?

A.  Like, how was I gonna provide him any help?  I didn't know nothing about it other than I didn't do it.

Q.  All right.  When the trial happens in April 1990, how old are you at that time?

A.  25, I believe.

Q.  And who came to the trial?

A.  My mom, Sofia, two friends, and my kids.

Rivera - direct by Loevy

224

Q. Did you have some faith at that point that you would get justice?

A. Oh, most definitely. I -- yeah, me and Ken thought, you know, we was gonna beat this.

Q. All right. Did you have any understanding what the evidence was against you?

A. Not until the day we went to trial.

Q. All right. What was the nature of the evidence?

A. That they had an eyewitness.

Q. All right. And who was that?

A. Orlando Lopez.

Q. All right. Did you have to decide if you were going to take a jury or a bench?

A. Ken had asked me, he said, "Next month, we got to come, you know, for jury" -- I mean, "We have to come for trial, so you have to decide whether to take a bench or a jury."

Never being through this process before, of being wrongfully convicted or convicted, you know, for a murder, I asked some people about it. They said, "I'd rather have 12 people decide my fate."

We came back, I told Ken. He said, "Have you made a decision?" I told him, "Yeah. I want to take a jury." And Ken advised me that, you know, out here in Skokie, people are not -- you know, they're not well-adjust to gang-related murders. And I was like, gang-related murders? When did this

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 288 of 663 PageID #:107008
Rivera - direct by Loevy
225

become a gang-related murder? I didn't even know about that. And he's like, "I think we stand a good chance with the judge."

Q. All right. And who made the decision?

A. Ken did.

Q. Well, Ken made a recommendation.

A. Recommended, but --

MR. SOTOS: Judge, Judge --

BY THE WITNESS:

A. -- I mean, on his advice, I --

THE COURT: Okay. What's the objection?

MR. SOTOS: Objection, objection to the leading after the answer, the answer and -- he said Ken didn't and then the question was, well, he just made recommendations. Leading.

MR. LOEVY: Judge --

THE COURT: Okay. Sustained.

MR. LOEVY: All right.

THE COURT: Sustained.

BY MR. LOEVY:

Q. Whose responsibility, ultimately, is that decision to take a bench or a jury, yours or the lawyer's?

A. It would have been mine's.

Q. All right. Did Ken give you a recommendation?

A. Yes, he did.

Q. And when did the trial start?

You don't remember the exact date, I take it?

Rivera - direct by Loevy

226

A.  No, not the exact date.

Q.  All right.  How -- when did the trial start?  How long did it last?  You know, what's your best memory?

A.  My best memory, it was like -- it was like a day.

Q.  All right.  Was there a lot of evidence or anything like that?

A.  Detective Guevara and Orlando Lopez.

Q.  And when it came time for your defense, do you remember what witnesses you called?

A.  Detective Letrich and myself.

Q.  All right.  Let's back up, then.

    What did Guevara testify to at the trial?

A.  In particular, that I really remember, was the color of my hair on the back.

Q.  What did he say?

A.  He testified that the day he arrested me, he noticed my hair to be in a pigtail and that it was dyed a gold or a blond color.

Q.  And was that true?

A.  No, sir.

Q.  All right.  And did that match what the witness was trying to say at the trial, too?

A.  Yes, it did.

Q.  All right.  Let's back up.

    The kid -- the kid was how old at the time, Orlando?

Rivera - direct by Loevy

A.  12, 13.

Q.  Is this someone you knew or had ever seen in your life there?

A.  Nah, nope.

Q.  All right.  What was his demeanor as a witness?  And did, you know --

A.  He looked jittery.  He looked like he, you know -- he -- he was inconsistent with his statements.  That -- from what I seen.

Q.  All right.  When it came time to the money part of the trial, they said, "Orlando, do you see the killer," and he pointed at you, right?

A.  He pointed towards me.

Q.  All right.  Did you know at that time that he had previously told the police it wasn't him?

A.  Wasn't me?

Q.  Yes.  In other words --

A.  No, no.  I didn't know that.

Q.  And, in fact, did you learn that at any time before --

MR. SOTOS:  Objection.  It assumes facts not in evidence.

MR. LOEVY:  Those facts are going to be in evidence, Your Honor.

THE COURT:  They're not -- I think that those facts are going to come into evidence, so I am going to --

MR. LOEVY: Right.

THE COURT: -- overrule the objection.

MR. LOEVY: All right.

BY MR. LOEVY:

Q. And the facts in -- later, many years later, you came to learn that Orlando says he told the police it wasn't you? You learned that many years after the fact, right?

A. Yes, I did.

Q. Okay. Did you know it at the time of your trial?

A. No, I did not.

Q. All right. How did you -- did the State present any murder weapon?

A. No, sir.

Q. Any DNA?

A. No, sir.

Q. Any fingerprints?

A. Nope.

Q. Any gun powder on your hands or anything?

A. No, sir.

Q. Any evidence from your car or anything -- any shell casing proof? Anything?

A. Nothing.

Q. Any confession? Any statement?

A. Nothing.

Q. Any evidence at all other than this 12-year-old kid?

A.   Other than the gold/blond hair in the back.  That's what they introduced, so -- I mean, that was it.

Q.   Now, the gold/blond hair -- before Guevara said that the -- that you had blond hair, did the kid say anything about a gold/blond ponytail?

A.   He was said he was sure that the shooter had his hair dyed a gold or blond color 'cause he was always looking at the back of the shooter's head.

Q.   All right.  And when you heard the witness say that, were you able to prove that you didn't have a ponytail?

A.   They went back to the line of photos.  And I tried to stress to Ken that if this is a big identification of the shooter, why didn't he take the -- Guevara take a picture of the back of my hair?

Q.   All right.  I'm going to show you Plaintiff's Trial Exhibit 58, page 7.  This is the lineup photo.

          MR. LOEVY:  I don't believe there's an objection, Your Honor.

          MR. SOTOS:  No objection, Judge.

          THE COURT:  Okay.

BY MR. LOEVY:

Q.   All right.  Is there any ponytail or gold on your hair there?

A.   No, sir.

Q.   All right.  Is there any picture -- and showing you the

side view.  This is --

MR. LOEVY:  Which page is this?

BY MR. LOEVY:

Q.  I'll call this 58-B.  The first one was 58, page 7.  This is 58-B.

MR. LOEVY:  Same -- you guys cool with that?

MR. SOTOS:  Yes.

BY MR. LOEVY:

Q.  All right.  You're the guy in the middle, aren't you?

A.  Yes, sir.

Q.  Is there any gold ponytail shown?

A.  No, sir.

Q.  Now, at the time you were arrested, did anybody tell you that the shooter supposedly had a gold ponytail or anything like that?

A.  None whatsoever.

Q.  When's the first time you learned that supposedly that's what I.D.'d you, was having a gold ponytail?

A.  When I went to trial.

Q.  And that's two years later?

A.  Yes, sir.

Q.  If anybody had written down or given you a report saying, "Hey, the shooter had a gold ponytail," would you have taken a picture of the back of your hair?

MR. SOTOS:  Objection, leading, Judge.

THE COURT: Overruled.

BY THE WITNESS:

A. I'm sorry?

BY MR. LOEVY:

Q. Okay. If you had known at the time, back in 1988, that there was an issue about whether the shooter had a ponytail in the back, would there have been a way for you to prove that you didn't have a ponytail?

A. Yeah. Sure, I could have.

Q. Could you have taken a picture?

A. Yes, certain -- yes, I could have.

Q. All right. Did the police have any pictures at all showing you had gold in the back of your hair?

A. No, sir.

Q. All right. You testified you didn't have a gold ponytail two years later, right?

A. Yes, sir.

Q. And did you call witnesses who could corroborate that?

A. Yes, sir.

Q. Who were those witnesses?

A. Osorio, Guillermo Osorio, who's a guy that I worked hand in hand with at the Humboldt Park Institute. His wife was a beautician. So I used to go -- they lived right there on Beach. I used to just go to their house, and she used to cut my hair.

Q.  All right.  And these witnesses testified on this question?

A.  Guillermo did.  Guillermo --

Q.  What did he say?

A.  -- Osorio did.  His wife -- I don't know what happened with that.

Q.  All right.  What was the gist of the testimony?

A.  That he never known me to have my hair in that kind of style.

Q.  Did you ever have a gold ponytail?

A.  Never, never.

Q.  All right.  When the kid said you had a gold ponytail and you said you didn't, did anybody else testify on that question?

A.  Not that I remember.

Q.  Do you remember if the State called anybody in rebuttal? Any police officers?

A.  Oh.  Detective Guevara.

Q.  And what did he say?

A.  He said the day he arrested me, he noticed that my hair was in a pigtail, dyed a gold or a blond color.

Q.  All right.  How did you make -- how did that make you feel to hear that the witness was being corroborated by Detective Guevara?

A.  I -- you know, I mean, you have opportunity.  You could have took a picture of the back of my hair.  You could have went a little step further and got a court order and could have

Rivera - direct by Loevy

233

took a lock of my hair, got a DNA. All day long, I could have never refuted it. He -- or nobody else never took that -- went to that extent.

MR. SOTOS: Objection. It's non-responsive, narrative.

MR. LOEVY: It was a little non-responsive, Your Honor. All right.

THE WITNESS: I'm sorry.

BY MR. LOEVY:

Q. All right. Did your attorney do a good job at the trial?

A. He did the best he could with what he had.

THE COURT: What -- I'm sorry?

MR. SOTOS: Objection. He asked him if his attorney did a good job at the trial.

THE COURT: Well, did you think you -- I think if the witness --

MR. LOEVY: All right.

BY MR. LOEVY:

Q. From your perspective, did he fight hard on your behalf?

A. I believe he did.

Q. All right. Was there closing arguments at your trial?

A. Yes, there was.

Q. And what happened?

A. Well, the closing arguments was that Ken tried to bring into was, you know, the color of my hair. You know, if that

Rivera - direct by Loevy

234

was true that Detective Guevara said my hair was dyed gold or blond in the back, why didn't they take a picture of it?

And then he tried to introduce the photo lineup, and the State objected, stating that you can't see the full back of Rivera's hair.

Q. And how -- what were you thinking?

A. Well, that's why you should have took a picture of it.

Q. Yeah. All right. So at the end of the closing argument, what happened?

A. Came back with a guilty verdict.

Q. And how long was the whole proceeding?

A. Ten minutes. 10, 15, 20 minutes.

Q. Well, it might -- it must have been longer than that if Orlando testified, Guevara testified --

A. Well, the --

Q. -- and you testified.

A. I'm talking about --

MR. SOTOS: Objection, Judge.

BY THE WITNESS:

A. -- the judge's decision.

THE COURT: I think there's some confusion.

MR. LOEVY: That's fine. Yeah.

THE WITNESS: Yeah.

THE COURT: So why don't you ask a clearer question.

BY MR. LOEVY:

Rivera - direct by Loevy

Q. How long was the whole trial?

A. Day, maybe two that I remember.

Q. All right. Could it -- it took place -- could it have taken place on two days, two half-days?

A. Yeah, it could've.

Q. All right. You don't remember either way?

A. No.

Q. All right. And at the closing argument, how long between when the lawyer stopped talking and the judge gave his verdict?

A. 15 minutes.

Q. All right. And what happened?

A. That he was -- he summoned. He came back with a -- (witness crying). He said I was guilty.

Q. What were your emotions at that time?

A. What I'm doing now.

Q. All right. What happens next?

A. You're hauled away like a criminal. I felt like a monster. You know, and I didn't do it. He knew I didn't do it.

Q. Were you put in handcuffs?

A. Yes, I was.

Q. Were your mother and girlfriend there?

A. Yes, they was.

Q. Were you able to say good-bye to them?

A. No.

Q. What did -- did Wadas ask permission -- do you remember if

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 299 of 663 PageID #:107010
Rivera - direct by Loevy
236

he asked permission for you to say good-bye?

A.  I don't -- I know he did at one point.  I don't know if it was then or at my bond hearing.

Q.  All right.  Where were you taken next?

A.  To county jail.

Q.  And how'd you get there?

A.  A Cook County bus, transportation bus.

Q.  Were you emotional at that time?

A.  You know, my kids, what's gonna happen to my kids?

Q.  How long did you stay at the county jail?

A.  A few months, maybe, if I remember.

MR. LOEVY:  You need some water or something?  Are you good or are you --

(Witness takes tissue.)

MR. LOEVY:  You got any water?  Do you want to give him water?

THE COURT:  There's water in that pitcher, and there's -- yeah.

THE WITNESS:  Thank you.

(Witness pours cup of water.)

BY MR. LOEVY:

Q.  All right.  Then there -- after the trial, there comes a sentencing procedure, correct?

A.  Yes, sir.

Q.  And you had to decide if you were going to address the

judge, right?

A. Ken asked me that -- that I had that right, to address the judge.

Q. And what was your thought process at the time? Did -- was it -- were you -- let me ask this question.

Were you advised that if you, you know, expressed sorrow or, you know, responsibility that your sentence would be less than, you know, just being advised?

MR. SOTOS: Objection, Judge, foundation. Advised by who? I don't know what he's referring to.

THE COURT: I don't -- overruled.

MR. LOEVY: And I'll withdraw the question, Your Honor. I apologize.

BY MR. LOEVY:

Q. But what was your thought process at the time?

A. I wanted to address the court. I wanted to tell him that I was innocent.

Q. All right. Is it a good idea or a bad idea, after you've been convicted by a judge, to tell him he made a mistake for sentencing purposes?

A. I -- it's my first experience, so Ken Wadas advised me not to say nothing.

Q. All right. If you had -- were you going to say you were sorry or anything like that to --

A. Sorry for what?

Rivera - direct by Loevy

Q. Would you have -- if the judge would have given you far less time if you said sorry, would you have said sorry?

A. No, no. Why? I mean, you know, it didn't make sense. I wasn't gonna apologize for something I didn't do.

Q. And what was the range you were looking at? Do you remember?

A. I'd never been through this before, so I don't --

Q. And, by the way, you said you've never been through this before. You've never been through a murder charge?

A. A murder trial.

Q. You have a conviction for --

A. Joyriding in a car.

Q. And other things. But what I'm saying is, have you -- when you've been guilty, have you pled guilty?

A. No.

Q. I'm saying if you committed the crime, did you plead guilty?

A. If I did a crime?

Q. Yes.

A. I would, yes.

Q. All right.

A. If I was wrong.

Q. All right. 'Cause when you -- you said you hadn't been through it. You didn't mean to imply you hadn't been arrested and hadn't gotten in trouble?

A. I'm implying I've never been through a murder trial.

Q. All right. What did you do -- what did the judge do?

A. He sentenced me to 60 years for the murder, 20 for a brutal and heinous, and 5 for the UUW. He gave me 85 years.

Q. Five was for the gun that you supposedly used to --

A. That they didn't have, but --

Q. All right. 85 years?

A. 85 years.

Q. And you can get credit for -- you know, for half of it, correct, if you --

A. You get a day for day.

Q. All right. Where were you sent next?

A. To Joliet Receiving Center.

Q. How long did you spend there?

A. Maybe a few months; if not, a month.

Q. And where did you ultimately get assigned to? What facility?

A. You know, you're in there with nothing. You know, you're lucky to get a shower. You're lucky to get hygiene products.

Q. This is while you're waiting, just so --

A. Yeah, to wait to where they're gonna send you. It's like a lottery. You know, they come with a speaker where you're gonna go to. You know, they call out your name and the number they assign to you. Yeah.

Q. And what facility did you get assigned?

Rivera - direct by Loevy

A. They sent me to Stateville Correctional Center.

Q. How did you get to Stateville?

A. I guess that's where they wanted to send me.

Q. No. I mean, how did you physically get there?

A. Oh, I'm -- they have transportation buses.

Q. And were you shackled at that time?

A. Shackled from hands to feet.

Q. Can you describe that for the jury?

A. And to the bus.

Well, they -- they put you like this (demonstrating) so you can't reach the handcuffs. One arm's going down, one is going up, and it's a box that goes in between it (demonstrating). And then they put shackles on your legs. And then there's a chain that goes from your arm to your legs. So it's one, two, three.

Q. As a man, as a human being, how did it feel to be put in that situation?

A. Knowing you didn't do something, it's humiliating, Man. It's, you know -- I mean, I felt, you know -- it didn't -- it's just, you know -- you felt like a monster. I'm not a killer.

Q. All right. At Stateville, you pull up. Describe what the Stateville facility is. Is it an old facility or new facility?

A. It's a very old facility with two new buildings that they build in there.

Q. Is it full or empty? Or, you know, how is it doing on

capacity there?

A.   It's overcapacity.

MR. LOEVY:  Your Honor, before we talk about prison, I don't know if you intended to take an afternoon break.

THE COURT:  Yes, I do, and I think we're getting to about that time.

MR. LOEVY:  Okay.

THE COURT:  So why don't we take ten minutes, ladies and gentlemen, and then we'll go till 4:00 o'clock.

(Jury out.)

THE COURT:  Counsel, I think this is probably as good a time as any to speak to Mr. Flores, so that's what I plan to do, unless somebody has --

MR. LOEVY:  No objection from the plaintiff, Your Honor.

MR. ART:  Do you want him off the stand?

THE COURT:  No.  It's probably good --

MR. ART:  That's fine.

THE COURT:  Okay.  Would you tell the CSO to bring Mr. Flores in?  Thank you.

Mr. Rivera, if you want to step down for a minute, that's fine.  It's up to you.

THE WITNESS:  I think I can wait.

THE COURT:  Okay.

(Juror enters.)

Rivera - direct by Loevy

THE COURT: Hi, Mr. Flores. Come in.

I wanted to get back to you. I am very sorry, but it turns out that the rules do not allow me to excuse anybody for anything like this kind of reason.

Once I excuse all of the extra people, which I did yesterday, and swore the jury in, I would be violating the rules that govern this case, and it would be -- I can't really do that. And I'm really, really, really sorry.

JUROR FLORES: What do I do with my bills? What do I do to feed my family? I mean, honestly, I feel like now I'm being taken away from my family, being is that I take care of my household. I mean, how is that --

THE COURT: You know, if there were anything I could do, I would do it, but I'm governed by rules. That's the problem. I don't get to do what I want to do.

JUROR FLORES: Yeah.

THE COURT: It gives me the right to do -- I have a certain amount of what they call discretion to do things like this, but once I send the extra people home and swear in the jury, then I am stuck with rules that tell me when I can do this, and it's just not permissible.

We've been -- my law clerks and I have been looking at the cases all morning. We did that over lunch. I've just been trying -- because I would like to do it for you. I mean, I really would if I could, but I can't. I'm so sorry.

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 306 of 663 PageID #:107026
Rivera - direct by Loevy
243

All I can tell you is that we're going to move as quickly as we possibly can and --

JUROR FLORES: What do I tell my bank who gave me a loan for my house? Even my loan for my cars? How do I tell my daughter I can't feed her?

THE COURT: You know, I just -- I don't know. All I can tell you is I wish there were a solution, but I just don't -- I am not able to find a solution.

JUROR FLORES: When I described myself, I specifically said my wife is a stay-at-home mom so that could be a consideration if I get picked or not.

THE COURT: See, it didn't -- I have had lots of people with wives who are stay-at-home moms and who have a job, and I've never -- you know, normally, I will tell you, in my past history, if somebody raises their hand and says, "I got to talk to you, I got to talk to you," and then we can deal with it.

I understand that you didn't know that that was what you should do, but not having happened, I am stuck, I am stuck. I'll really sorry.

JUROR FLORES: So I'm stuck being homeless now? If I lose my house, I lose my cars -- how am I supposed to go to work? And I'm not -- I understand the severity of the case and I'd have to respect to the Court, you know.

THE COURT: Yeah. I mean, if there were anything I

Rivera - direct by Loevy

244

could do or I could figure out how to do it, I would do it. That's all I can tell you. I know that doesn't do you any good, but that's the truth from my heart.

JUROR FLORES: Yeah, but I mean (gesturing) --

THE COURT: I'm sorry. I'm really sorry.

JUROR FLORES: That makes me feel, like, biased to the court, you know, already, you know, 'cause I feel like I'm not getting my -- I didn't do anything wrong, and now I'm the one in my own family got to be screwed, you know. I'm trying to be honest. I tried to be --

THE COURT: I've done everything I can.

JUROR FLORES: But --

THE COURT: I'm really sorry. I mean, all I can do is read the rules, read the cases, have people work on it. That's been happening all day. So I -- there's nothing I can do. I am just really sorry. I am really sorry.

All right. Let's -- there's nothing -- you know, if I think of anything, believe me, I'll let you know. But we've done a lot of work trying to figure this out. Okay? I am sorry.

(Juror exits.)

MR. LOEVY: That was more than we thought, you know.

THE COURT: It was?

MR. LOEVY: Yeah. I didn't know it was that bad. So we will --

Rivera - direct by Loevy

THE COURT: Well --

MR. LOEVY: We'll consider it on our end, Your Honor.

THE COURT: Well, if you're going to consider it -- now I've told him -- I mean, basically, you've lost him.

Now, I don't know whose ox is going to get gored. You know, probably mine, but -- you know, I am really sorry that you didn't understand it. But when I hear somebody who's a plumber who's making $200 a day and then he's not working, I -- and he's getting $40 -- or $47 a day, I mean -- I don't know.

If you change your mind, please let me know, because it's not comfortable -- it's not comfortable for me to sit here with somebody feeling like that.

MR. SOTOS: Judge, my -- I was -- you know, my only concern is he said he becomes biased to the court. When he said that, I got -- then I got concerned.

THE COURT: Well, I am concerned. Okay? You read the rules. We've been doing research the whole frigging morning.

MR. SOTOS: No, and I understood the premise of -- yeah.

THE COURT: If you research and find a case, bless you.

MR. SOTOS: No, I understand, Judge. It's just --

THE COURT: The cases say good cause and they talk about medical emergencies or people who are acting out in the courtroom is what they talk about. Okay?

MR. SOTOS: Thank you, Judge.

THE COURT: They don't talk about -- this -- I have excused people my whole life during jury selection for exactly this reason. I did not have a clue that this was coming.

MR. LOEVY: All right. Your Honor, from the plaintiff's side, we -- in the interests of justice, we would be agreeable, if the defense is agreeable.

THE COURT: The defense is more than happy. They're thrilled.

MR. SOTOS: Well, Judge, it's not -- okay. We are in agreement.

THE COURT: Okay. I can call him in and I can tell him that after hearing him, there's been agreement by everybody that he should be excused.

Could you get Mr. -- thank you. I appreciate it. I don't think you want that juror.

MR. LOEVY: I do.

THE COURT: Not that juror.

THE WITNESS: Yeah, I do.

(Pause. Juror reenters.)

THE COURT: Mr. Flores?

JUROR FLORES: Yes.

THE COURT: You're an awfully good lawyer. After listening to you talk about your situation, okay, there was an agreement among everybody that it would be too much to ask you

to stay. If everybody is in agreement, then nobody is going to complain about me to the people who make me keep the rules. Okay?

So you have persuaded us that you have a real problem here. You persuaded me earlier today. But you are excused.

Now, do you want to stay for the rest of the day or do you want to go now?

JUROR FLORES: I can stay for the rest of the day, so I could do my part today.

THE COURT: Okay.

JUROR FLORES: That's fine.

THE COURT: Would you do me a favor and not talk to the other jurors about it? I will explain your absence to them tomorrow. Okay?

JUROR FLORES: Awesome.

THE COURT: Okay. Because once somebody gets an idea --

JUROR FLORES: Yeah.

THE COURT: -- you never know.

JUROR FLORES: No, no.

THE COURT: All right. You are excused. You do not have to come back after today.

JUROR FLORES: Thank you.

THE COURT: Okay.

(Juror exits.)

THE COURT: All right. Let's take a short break.

MR. SOTOS: Thank you, Judge.

(Recess at 2:30 p.m.)

THE COURT: Is there anything that we need to take up between tonight and -- well, I guess I'm going to get some kind of a memo from the plaintiff on Rule 13, whatever.

MR. ART: 613.

THE COURT: Yeah, what, by tomorrow morning you think?

MR. ART: We'll file it this evening if that's okay.

THE COURT: This is perfect. And then -- okay.

COURT SECURITY OFFICER: All rise.

(Jury in.)

THE COURT: Please be seated, everyone.

Mr. Loevy, whenever you're ready.

MR. LOEVY: Thank you, Your Honor.

BY MR. LOEVY:

Q. All right. You were telling us about Stateville.

You ended up spending how long at Stateville?

A. I spent 21 years at Stateville.

Q. All right. Is that a violent place, Stateville prison?

A. Very violent place.

Q. Can you explain?

A. It's a maximum security prison.

Q. What kinds of -- what kind of prisoners are in there?

A. Murderers, rapists. I have even walked -- on the way to

Rivera - direct by Loevy

249

the gym one day, I passed up Richard Speck. He was a -- in the tunnels there doing some painting. And I was, like, wow, look at Richard Speck.

Q. All right. So how about weapons? Did people have weapons that you had to worry about in prison?

A. Knives.

Q. What other kinds of weapons would people come up with in prison?

A. Anything from the motor from a fan to batteries in a sock, to soap in a sock, swords. I seen guys with literally a sword.

Q. How would fights break out? Give us an example of how -- how fights would break out.

A. Any -- bump into somebody, saying the wrong thing to somebody over on the basketball court, over on the weight pile. Yeah, it's little simple things like that.

Q. When you say just bumping into somebody, is that different than it is, say, out here, not in prison?

A. You know, I mean, you don't know what the next guy is dealing with. So he might have -- his girlfriend might have just left him. His wife might have just left him. He might have just lost his appeal. He's angry. You bump into him; he's going to turn around and take action.

Q. All right. How about, like, on the yard? Did you spend time in the yard?

A. As -- as an in -- I mean, I am an inmate, but I'm saying I

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 313 of 663 PageID #:107033
Rivera - direct by Loevy
250

also worked the ground crew.

Q. All right. Was the yard a dangerous place?

A. Oh, yes.

Q. Tell us a little bit about that.

A. Guys get hit with the weights all the time. It could be dangerous to the tower man. If there's a fight pursuing and they ask you -- they got a sign that tells you -- well, it just tells you to -- to sit down if a helicopter should be coming in, but it doesn't tell you to sit down or lay down if the tower is shooting.

So if there's a -- if there's a fight pursuing on the yard, you could get accidentally shot with a mini 14.

Q. All right. Do people get hurt that way sometimes?

A. There was a -- a couple of individuals in the roundhouse that got shot like that.

Q. All right. How about the chow hall? Is the chow hall a dangerous place?

A. The chow hall is a -- you know, again, the tower's in the center. It's a round piece, and you're locked in -- into a room. It's gated. They could see through it, but, you know, the time they open up the gate and get there to you, you could, you know, be beat up, stabbed up already.

Q. Would fights break out easily?

A. They mainly -- not so much in the chow hall, but on the yard where the blind spots are at, inside the cell houses in

the blind shots.  But, yes, there was definitely a lot of fights.

Q.  If there were guys that weren't going to get out ever no matter what happened, did they act differently?  Were they more dangerous?

A.  Oh, they didn't -- they didn't care about nobody.

Q.  What do you mean?

A.  If they felt like they wanted to have sex with you, they're going to come after you.

Q.  Was there -- were they looking at any --

MR. SOTOS:  Objection, unless it's talking about himself.  If he's just talking generally, I object to foundation.

MR. LOEVY:  Should I clarify, Your Honor?

THE COURT:  All right.  Well, if you can clarify and lay a foundation, fine.  But I think it's okay for the witness to talk about the environment that he was aware of.

MR. LOEVY:  That's what we were getting at, Your Honor.

MR. SOTOS:  That's fine.

BY MR. LOEVY:

Q.  All right.  This is the environment you lived in for 21 years, correct?

A.  Yes, sir.

Q.  All right.  If somebody attacked you in this world, how

were you supposed to react if somebody decides to try to fight with you?

A. You better fight back. You better --

Q. Why is that?

A. You better show some signs of -- you can't show no signs of weakness, or you'll have a, you know, a roll of guys, you know, waiting to come after you.

Q. All right. Is it dangerous to report things to authorities if people attack you?

A. It's most definite -- definitely.

Q. Why is that?

A. You'd be labeled a stool pigeon, as a trick. They think you're working with the administration. And, yeah, that is very dangerous.

Q. How about witnessing violent acts? Did you see people badly hurt in prison?

A. There was a few incidents I saw.

Q. Tell us about one.

A. It was with a gentleman whose nephew got killed by another gang member. And I was coming in through the side tunnel, and I seen the gentleman that they attack coming down the tunnel with a -- with a broom. He was sweeping.

And about six to seven other guys just jumped up and just started stabbing him.

Q. All right. And what did you do?

Rivera - direct by Loevy

253

A.  I froze.  I just, you know, like, oh.

Q.  Are you supposed to get involved, not get involved in that situation?

A.  Oh, no, no.  You can't get involved, no.

Q.  What happens if you get involved?

A.  You'll be the next one being stabbed.

Q.  All right.  What happened to that guy?

A.  I don't -- you know, he -- I thought he -- I mean, to make an assessment of the -- he fell to the ground, and I was wondering why he fall to the ground.  Maybe because of the stabbings.  But I think he was -- he fell to the ground because it's harder to stab somebody when you're laying on the floor because they have to come down at you.

Q.  All right.  Other examples of violence where people were killed or stabbed?

A.  My first day at Stateville Correctional Center, I was walking on the gallery with my property.  I looked down to the lower gallery, and I saw an inmate hit an officer with a baseball bat.

Q.  Then what happened?

A.  We went on a 90-day lockdown.

Q.  For the rest of the prisoners.  What happened to the prisoner who started the fight there?

A.  Excuse me?

Q.  What happened to the prisoner with the bat?

A. Oh, nothing. He was probably sent to hit that officer.

Q. All right. Would some of the officers use violence against inmates sometimes?

A. I've -- I've seen some beatings --

Q. Tell us about that.

A. -- two officers.

I worked in the segregation unit for, if I'm correct, 13 years. And the segregation unit is -- it's you're segregated from the rest of the population.

So if you're brought into the segregation unit, you're most likely to be handcuffed. So that's when they would attack. You know, if an inmate -- let's say, for instance, the gentleman that hit the officer with the baseball bat, when they eventually got him cuffed up and took him over to the segregation unit, they would jump on him.

Q. All right. How about a guy named Sprawls (phonetic), would you -- did you witness violence against him?

A. Yes, Sprawls was a gentleman that was on -- I was 7 gallery; he was on 9 gallery. He worked -- they had a -- a room where the visiting passes came through, and he would grab the visiting passes and bring them back to the cell houses. So he had that movement.

Eventually the people that he was running with, I guess, found out that he was working with the administration. And I was on my way to work in the dining room, and they

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 318 of 663 PageID #:107038
Rivera - direct by Loevy
255

stabbed him. They stabbed him up, and he bled to death on the gallery.

Q. Is it tough to live in a place with that kind of violence all around you?

A. You know, you got to worry about what's going to happen to you next, if anything is going to happen to you next.

Q. All right. You -- do you remember an incident with a Lieutenant Davis or a Henderson?

A. My cell -- again, all the top floors are -- are inmates who don't have jobs. They try to keep all the inmates who have jobs on the lower floors, so the officers don't have to go up to the higher galleries because, you know, it's dangerous, so they -- to let the inmates out for the shower that have jobs.

My cell was in front of the bullpen. Everybody and anybody or -- that came in that unit or left that unit, I would -- I could see them, because my cell was right there.

There was a young man in there that I knew that was up on the top galleries. And he was saying something to the effects of Lieutenant Davis, some nonsense, Lieutenant Davis.

I saw Lieutenant Davis coming into the bullpen. And as he was approaching the bullpen, he started putting on some leather gloves, which is an intimidation --

Q. Then what happened?

A. -- to any inmate.

When he came into the bullpen, the inmate thought he

Rivera - direct by Loevy

was going to attack him, so the inmate struck first.  He -- he hit the lieutenant first.  And him and the lieutenant wrestled. Another officer came in, and they, you know, beat him up.

Q.  Was it common for the prisoners to carry knives?

A.  Than not, yeah.

Q.  What's that?

A.  Than not, yeah.

Q.  Did you ever have to use a knife to protect yourself?

A.  I never had to use a knife to protect myself.

Q.  And, obviously, did you ever use a knife offensively to hurt somebody or --

A.  No.

Q.  All right.  Why was -- why would people in the prison have to carry knives?

A.  To protect yourself.

Q.  Can you explain?

A.  If somebody wanted to attack you with your line of defense, they're going to come at you with a knife.  So you would do your best to defend yourself, to protect yourself.

Q.  What was going through your mind when you're making these decisions in prison?

A.  How did I wind up here, man?  I just -- you know, I know wrongfully -- I knew in my mind I was wrongfully convicted, but it's just -- you know, maximum security prison, it's -- it's not what they show on TV.

Q. What were your strategies for avoiding the trouble if you wanted to, you know, try to stay away from violence?

A. Well, one of the issues were the bottom bunk. There's two men to a cell, and the majority of the inmates want the bottom bunk. That's, I believe, also because to get into the top bunk, there's no ladders. These are not what -- these bunk beds are not what you buy your kids.

You literally have to put one foot on the toilet, hold on to the bunk, put another foot on top of the sink, and then jump onto the bunk. And that's the same way of getting down. You have to jump down and jump back up there.

So, you know, I had a bottom bunk. A guy came in. You know, if there was an issue with it, I would give it to him with no hesitations, because I just didn't want no problems.

I mean, not just like that gave it to him, because that's also a sign of weakness, too.

Q. Is that dangerous, too, if you give in too fast?

A. Oh, yeah. Oh, yeah. But, you know, I just -- you know, some of the guys I felt bad for. You know, they had maybe medical problems, you know, and I would just -- you know, a week or two, maybe a month or depending on the individual, I would just say, "Hey, man, why don't you just take the bottom bunk."

Q. All right. And as far as avoiding trouble, would you try to de-escalate or escalate when you were in there -- in the

prison?

A. Well, I didn't try to de -- I mean, as far as with me, I tried to not escalate it. As far as with other individuals, I -- you know, you have to stay out of it. Yeah.

Q. All right. How about your cells? You were -- you lived in these cells for 21 years.

Describe physically what it -- size it was. Can you do it vis-a-vis where you're sitting?

A. It's --

MR. LOEVY: Can he stand, Your Honor, to --

THE COURT: Sure.

MR. LOEVY: All right.

(Witness left the witness stand.)

BY THE WITNESS:

A. Say this wall to here, if not smaller.

BY MR. LOEVY:

Q. Could you touch it with both arms, both walls?

A. Oh, yeah. Go like that, you touch both the walls.

Q. All right. And then the other dimension?

A. It's -- it's about this long.

Q. All right. Is that roughly the size of the jury box that --

A. It can be. It's a little -- a little bit longer.

Q. Longer that way? All right.

A. Yeah.

(Witness resumed the witness stand.)

BY MR. LOEVY:

Q. All right. How many men would live in a cell that size?

A. Two men to a cell.

Q. And how were they laid out in terms of the galleries and the catwalks and the cells?

A. It was just one big cell house. Odds were 1 -- you know, like I was 1, 3, 5, 7, and 9. On the opposite side would be 2, 4, 6, 8, 10.

Q. And would there be a catwalk with guards?

A. The catwalk's in the middle of the gallery where he could see the upper two and lower three. And the catwalk, mainly it goes all the way around the cell house. And the cell house is -- I mean, it's long.

So he would walk around any time an officer was on the gallery with a shotgun to protect that officer. They supposed to do 15-, 20-minute rounds, and you'll see them every other two hours.

Q. Are there walls on the cells or bars like in the movies?

A. There's a bar. There's bars.

Q. All right. And how many -- how big were -- how many men were the cells built for?

A. Maximum security is supposed to be one.

Q. All right. And how -- the whole time you were living there, did you have one in your cell or was it always two?

A. I was by myself a few times.

Q. But most of the time was what?

A. Living with another individual.

Q. Is there any privacy when you're living in a cell like that?

A. None whatsoever.

Q. Is that tough to go that long without any privacy at all?

A. Well, it is, especially when you want to use the washroom.

Q. That's an example, for example?

A. Yeah.

Q. How would you use the bathroom?

A. Yeah, you'd have to use the washroom. But they -- we had put up a sheet, you know, to use the washroom. Then the administration said we couldn't have -- because they didn't know what was going beyond the sheet, so you couldn't put up nothing.

So you would -- hopefully that your cellmate's in the mood when you ask him, "Hey, can you get up and go to the bars, 'cause I got to use the washroom?"

If he doesn't get up and doesn't feel like he wants to get up, you're not going to use that bathroom.

Q. How close is the toilet to where the beds are?

A. He's right there. You look like over, and he'll be sitting right there by the toilet.

Q. All right. Were there problems with flushing in the

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 324 of 663 PageID #:107044
Rivera - direct by Loevy
261

toilets there?

A.   Eventually they put in 15-minute flushes.  So the toilet wouldn't flush until every 15 minutes.

Q.   And that created problems, too?

A.   Well, you know, if you're sitting there and if, you know -- you could flush it, but then you have to wait for another 15 minutes to flush it again.

So if you give him -- your cellmate that's they call a courtesy flush and then you use some more, you have to wait 15 more minutes.

He might, you know, say, "Man, you know, I mean, it ain't your fault.  It's a natural movement, bowel movement."

You have no control over that, but he might get upset.

Q.   All right.  Did you get to pick who you were going to be living with under these conditions?

A.   Oh, no.

Q.   Is it difficult to live with another human being that tight for that long?

A.   Most definitely, yes.

Q.   Could -- could people -- could both of you stand up at the same time in the cell on the size you just described?

A.   You could face each other, but you couldn't pass each other.  You would both have to turn to the side to get through.

Q.   All right.  Were some of the cells missing some of the essential things, like water or something like that?

Rivera - direct by Loevy

262

A.   The water -- well, the water -- some of the cells, they would run good.  Some of them would just trickle out.

I remember one day I was going to wash up, and I stuck my -- it's a white washcloth.  I stuck it underneath the water, and upon going to put the washcloth to my face, I noticed that a bunch of rust was coming out from the water.

So it was brown.  The -- the towel actually turned brown.

Q.   How about pests, like --

A.   Can you have pets?

Q.   Yeah.  Or was that a problem in prison where you were living, you know, with bugs or mice?

A.   Oh, with bugs, yeah.  Bugs and mice, yeah, they would -- they'd get into your box.  They give you a box where you store your belongings in.

You know, you hear the mice in the middle of the night chewing through your noodles or your potato chips.

Q.   Did the bugs or the mice get on you sometimes or get up near you?

A.   Yeah, yeah.  You're laying in the bed, and you -- there's roaches and --

Q.   How about temperature issues?  Were there temperature issues in these cells?

A.   You know, on the upper galleries, it's good in the wintertime because the heat rises.  It's bad if you're on the

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 326 of 663 PageID #:107046
Rivera - direct by Loevy
263

lower galleries because it gets very cold on the lower galleries.

But in the summertime, it's bad for everybody because the heat is just unbearable in there.

Q. All right. Let's start with the cold.

Would it get seriously difficultly cold?

A. Again, my cell is right there by the bullpen by the door, so -- and not that I wasn't allowed. They didn't give me permission. But they never -- I had always had extra blankets.

All the inmates that were in that -- in that area right there, they had extra blankets. And the staff wouldn't -- they wouldn't mind, because they know the coldness of it because the doors open constantly, inmates coming in and out from visits to doctors' appointments.

Q. All right. But is it -- is it -- I guess maybe I'm a cold person. But what's it like to be really cold? Can you get any relief from it?

A. You get up underneath the covers. You put it all over you and just -- and sometimes you wear sweat pants. You know, you wear your sweatshirt, extra pair of socks.

Q. How about the heat? When it got real hot, what was that like?

A. They only gave you one small fan. You was only allowed one small fan.

Q. So, I mean, describe how hot -- in the hottest summer, is

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 327 of 663 PageID #:107047
Rivera - direct by Loevy
264

it hotter inside or outside?

A.  Oh, it's hotter inside than it is outside.

Q.  And then you if had a cell that was having problems, how hot -- you know, how hot did it feel, and what would the inmates do?

A.  Oh, well, the only way to cool off is if you have a fan. For those who didn't have a fan, they would fan themself with something.

And if you got your water working in your sink, you would, you know, wipe off with a rag, keep a rag on you. That's the only thing you can do.

Q.  Was there air conditioning or ventilation or anything like that?

A.  None whatsoever.

Q.  All right.  When you said before you felt like the facility was crowded, did the crowding create more stress among the inmates if there was too many people for what it was?

A.  Yeah, yeah, it caused a problem.

Q.  How about cellmates with hygiene issues?  Over the course of your 21 years, did you have issues where you're living that tight with another guy who had problems with that?

A.  I got -- I had an individual that was in the cell with me that was a problem.

Q.  And was that the kind of problem that happens in prison sometimes?

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 328 of 663 PageID #:107048
Rivera - direct by Loevy
265

A. Oh, yeah.

Q. Tell the jury what that's like.

A. Well, I mean, you know, he gets up, and he wants to wash his feet in the sink. Your feet? Okay. You know, you got to give him that. He's living there with you. But he doesn't clean the sink out afterwards.

Q. All right. So that's the kind of indignity you had to live with?

A. Yeah. I mean, they didn't always give you cleaning material to clean yourselves with. They did -- and when they did do, it was watered down, so it basically didn't do no good. But he wouldn't even clean the sink out.

Q. How about people that wouldn't shower and stuff like that, did that create problems?

A. As everybody knows, a person who doesn't wear deodorant, the kind of smell that you get from that. So, yeah, that caused a problem, fights.

Q. All right. And when I -- when you say don't use deodorant, is it different if you're on the outside here, somebody's not wearing deodorant, than if you're in a cell as small as you described, and the temperatures are up high?

A. Oh, you're going to -- you're going to have to deal with it. I mean, out here you can walk away or either go buy the individual a roll of some deodorant if you need to.

A lot of these guys didn't have money. They didn't

have families, so they didn't -- couldn't afford deodorant.

Q. Were there some guys with mental health issues that interfered with showering?

A. They during -- Menard Correctional Center had a mental institution -- a place down there, and I think they closed that down. And they just spreaded out the inmates throughout the Department of Corrections. And, yeah, they definitely -- a lot of mental illness.

Q. Did that affect -- were there people who wouldn't shower?

A. Oh, yeah, definitely.

Q. What was -- what was the reasons people didn't want to shower?

A. Afraid to go to the shower, afraid of getting raped, stabbed or -- so they would just wash up in the cell.

Q. All right. Did you see fights and stuff in the shower?

A. Yeah, I saw some fights in the shower.

Q. How many guys would go in the shower at the same time?

A. Depending on the officer, if he wants to get the showers done, he would put anywhere from 15 to 20 inmates in the shower.

Q. Did you get to pick who you went in there with?

A. No, they go by galleries -- by cells.

Q. Would it sometimes create danger?

A. Yes, sir.

Q. All right. Did people sometimes get hurt by their

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 330 of 663 PageID #:107050
Rivera - direct by Loevy
267

cellmates?

A. Oh, yeah.

Q. Did people sometimes get killed by their cellmates?

A. Most definitely.

Q. All right. Did you ever have trouble with a cellmate?

A. I had one, one issue with a cellmate.

Q. Tell us what happened.

A. Kind of a young kid. He wasn't -- you know, just wasn't listening. You know, certain things you just don't do while you're living in the cell with another man.

And I told him, I said, "Man, you know, you need to slow down."

And he said, "Nah, you ain't got to tell me nothing."

I said, "You need to slow down."

And I pushed him. You know, he was coming towards me, and I pushed him. I didn't think he was going to swing on me, because I didn't -- I didn't guard up or nothing. And I just pushed him away.

And he walked -- he didn't walk at me in an aggressive manner. I guess that's the full tactic of it. And he hit me right in my eye here, and my eye just swelled up right away. Blood was running out.

And when he did that, it surprised me, but I grabbed him. I wasn't going to try to fight him. I just grabbed him, and I pushed him up against the bars, and I grabbed the bar,

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 331 of 663 PageID #:107051
Rivera - direct by Loevy
268

you know, so use the bars for leverage to hold him up against it.

And eventually, an officer came by and saw it, and we both went to segregation.

Q. All right. Is it -- I mean, at any time any cellmate can create problems, it sounds like?

A. Any time, you know.

Q. Did people sometimes get killed?

A. Oh, yeah.

Q. Did you personally know of people that got killed by their cellmates?

A. I can't say I personally know anybody that's gotten killed, but, you know, you hear the stories.

Q. All right. You have to close your eyes at some point?

A. Oh, yeah.

Q. Is that dangerous?

A. It can be, depending on who you living with. But, you know, guys in there, you try to pick somebody -- well, not pick somebody, but you can always -- like if he was -- if he was, like, two doors down from me and we're cool, I would try to get the officer to get this guy moved out and get him moved in.

So that was always an option, too. It didn't happen often, but if you could get somebody -- and especially if you get a job, if you get a job in the penitentiary, your -- they cell you with another work inmate. So that's less of a stress,

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 332 of 663 PageID #:107052
Rivera - direct by Loevy
269

too, because he don't want to lose his job, so he ain't going to try to create nothing with you, but -- but it can happen, though.

Q. All right. How about the guards? Were there some good guards?

A. Oh, yeah, yeah, yeah.

Q. Were there some not-so-good guards?

A. Yes, yes.

Q. Can you explain?

A. Just officers, I believe, that were -- I don't -- you know, if I could speculate, you know, I don't know what they were going through, but I felt like some of them officers were bullied as a kid.

Q. All right. It felt like they were bullying to the inmates?

A. So they -- they would do it to the inmates, because I didn't understand why they would do the things that they did.

I had a lieutenant that really didn't care for me. I never done nothing to him. He got mad because of -- I was working the grounds, and it was -- it was really cold outside. So they don't provide you no skull cap or nothing like that. No head coverings, you can't wear them. But if you're working the grounds, they understand it.

So what the inmates would do in the summertime, because they don't provide you shorts either, so if you buy a pair of sweat pants -- they won't allow you to do this, but

Rivera - direct by Loevy

they didn't complain about it -- but the inmates would cut the sweat pants to make shorts out of them. So the lower part of the pants -- the sweat pants, they would use that as a -- as a hat, which that's what I had.

Q. And then what happened that day?

A. You know, the lieutenant came up to me, and he says, "Man I've got to have that hat."

I was, like, "Man, lieu. I mean," I said, "I'm working the grounds," you know, shoveling. It was the wintertime.

He's, like, "Man, I got to have that hat." I took it off. I gave it to him.

As I was walking out -- you know, it was in the chow -- the dining room. As I was walking out, I went to the other movement lieutenants -- there's two other -- there's one lieutenant in the chow hall, and there's two lieutenants in the tunnels, the movement lieutenants.

I went up there to tell them that I'm going back into the cell house to get something to cover my ears, because he took -- and he thought I was complaining about it.

Q. Are you allowed to complain about the guards?

A. Oh, no, you better not complain about no guards.

Q. All right. Well, did you have some good relationships with guards, too?

A. Yeah, there was -- there was some officers I -- you know,

I -- you know, you try to make the best of a bad situation.

Q.  All right.  And what was going through your head in terms of interacting with the guards?

A.  You can't display that too much, because other individuals think you're working with the administration.

Q.  All right.  Some of them were nice, though?

A.  Yeah, yeah, yeah.

Q.  Did some of them treat you disrespectfully and -- you know, and less than you wanted to be treated?

A.  I mean, they did.  As I said, the Lieutenant Lohizer (phonetic).

I had another lieutenant.  I was going to a Bible study one day.  I had my Bible in my hand.  It was kind of big, and I guess he thought I had something in it.  He wanted to look through it.  I gave it to him.  He looked through it. When he got through, he threw it to the floor and walked off.

And I just laughed at -- you know, I mean, what can you do?

Q.  All right.  When you first got to prison, were most of the inmates in gangs?

A.  Practically all of them were in gangs.

Q.  Did -- who ran the prisons, the gangs or the guards?

A.  The gangs did.

Q.  And was it you -- you were affiliated with a gang on the outside for some part of your life, correct?

A. Yes, sir.

Q. And did you affiliate with that gang in the prison?

A. You -- I mean, you have to or go to PC, protective custody, and it's just as bad as there.

Q. So basically, did everybody affiliate with gangs in the prison?

A. If they weren't a gang member --

MR. SOTOS: Objection, Judge --

THE COURT: I'm sorry.

MR. SOTOS: Objection, Judge, foundation. The question was everybody.

THE COURT: I think that's -- unless there's a foundation, everybody is a little broad.

BY MR. LOEVY:

Q. All right. What -- what made it safer for you to be in a gang in prison?

A. Not to get raped, stabbed, tooken advantage of.

Q. All right. Did there come a time -- you said if you didn't be in a gang, you could be in protective custody. Why was protective custody not safe?

A. Because all the white gangs were back in protective custody. They were not out in population.

Q. And when you say white gangs, you're really talking about --

A. Skin heads.

Q.  So that was not a safe place either?

A.  No.

Q.  All right.  Did there come a time when you decided you didn't want to be in gangs anymore?

A.  Oh, yeah, yeah.

Q.  And when was that?  About what year?

A.  If I remember correctly -- and I got a diary that I was keeping stuff in -- I believe it was May 9th, 1999.

Q.  All right.  And that's an important day in your life, is it not?

A.  Yes, sir.

Q.  All right.  We'll put that to the side for a minute and come back to that.  But let me talk to you more about the 21 years and the conditions you lived under.

How was the food?

A.  Horrible.

Q.  Can you explain?

A.  Well, it was bad at first.  And then they -- I guess the Department of Corrections got a deal with a -- a food manufacturer which was served soy.  So they would give us soy seven days a week, three times a day.

And just like anything else, too much of anything is bad for you.  So having soy three times a day, seven days a week wasn't good for a person.

Q.  Was it good for your health?

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 337 of 663 PageID #:107057
Rivera - direct by Loevy
274

A.   Not my health, it wasn't.

Q.   Didn't agree with your health?

A.   No.  Eventually I contracted H. pylori, which is the good and bad bacteria in your system.  And the bad bacteria rised.

According to the doctor that I seen, the H. pylori -- the bad bacteria in your system is supposed to be at 0.05.  Mine's was 0.15.

Q.   And what did that mean for your health?

A.   I broke out in a rash.  I had really bad stomach pains, couldn't really eat nothing.  So they put me on 2000 milligrams of antibiotics a day.

Q.   All right.  When you're in prison, you mentioned the soy problem, but are you able to eat healthy?  Is there healthy choices?

A.   No, not the commissary.  The commissary, everything is -- got preservatives in it, you know.  It's high salt.

Q.   How about portion size and the meals that they're serving, what are the portions like?

A.   Oh, you know, you got a minute -- you got less than a minute to eat your food.

Q.   And is there enough food?

A.   No, no.

Q.   What do you mean?

A.   Small portions of it.

Q.   Was there enough calories in the diet that they served the

prisoners?

A. Well, the trays that they had and how they put the food constituted enough food to give -- to feed an inmate. So that's how they got around that.

Q. Do you know if there was enough calories in there or --

A. Oh, no. You don't -- as long as you filled that spot, this -- you give them the vegetables, the carbohydrates, and the dessert.

Q. Were people hungry?

A. Starving.

Q. Did that create unpleasant and uncomfortableness?

A. Definitely.

Q. How about the holidays?

Backing up, when you were a kid, did you enjoy the holidays with your family?

A. Yep.

Q. And how about during the 20-years-plus you spent in prison, what were the holidays like in prison?

A. It was rough. It was rough -- I think after the first five, ten years, it was rough, but I done it -- adapted to the lifestyle. Christmas, Thanksgiving was just another day.

Q. In prison, did they try to make it special or anything like that?

A. They -- they -- they did their best. They try to give us turkey and stuffing, but -- and there was no sitting down. It

Rivera - direct by Loevy

276

was a line.  You go through; you get your tray; you go back to the cell house.  Go through, go back to the line, go to the cell house.

So anywhere between the kitchen and the cell house, for those guys who doesn't actually eat right or maybe they lug, they can catch you in between there.

They're going to take your tray.  What's going to happen next, you going to be fighting with this individual, or you're going to give him your tray.

Q.  All right.  Did you get lonely during the holidays?

A.  Most definitely.

Q.  How about the fact of your guilty or innocence, did that play in at all?  And can you explain?

A.  Oh, yeah.  I was innocent of a crime, and I can't enjoy the -- you know, Christmas with my kids.

Q.  Were there births while you were in there, nieces or nephews?

A.  Oh, I had two nieces.  My nephew was born already.  But, yeah, my two nieces.

Q.  How about the subject of sex?  Did the prison permit conjugal visits, you know, with a girlfriend?

A.  No.

Q.  So, you know, for 20 years, how long did you go without having sex?

A.  For 21 years.

Q. All right. Is it good for a person to repress sexual urges for 21 years when you're in your 20s and your 30s?

A. If I could speak on my own behalf, yes, it does.

Q. It does -- not so good?

A. No, it's not good.

Q. All right. Did that make people act out?

A. Oh, yeah.

Q. What would people do? Would they act inappropriately around women or, you know --

A. Well, with the female guards, definitely that.

With other men, try to, you know, rape you or, you know.

Q. So how about acting toward you? Were people inappropriate toward you or try to be or --

A. Oh, no.

Q. You were able to stay clear?

A. Yeah.

Q. Did you -- but were you able to ever be alone during that 21 years with a woman?

A. Oh, no. No, no.

Q. How about, switching topics, you said that the Menard had emptied out, and there was sometimes people who had mental problems.

Was there unpredictability or irrationality that created danger there where people were unpredictable if they

had mental illness?

A. They were unpredictable.

Q. What would that be like?

A. They could lash out at any minute. I mean, you sitting in the chow line talking to somebody, and next minute this guy is trying to smack you upside your head with a soap sock or with a rock, because there were rocks on the yard, so you could pick the rocks up.

They don't shake you down, you know, search you when you go back into the cell house. So you could pick up rocks and take them with you back into the cell house.

Q. Were --

MR. SOTOS: Judge, I'm going to object. I just -- I'm not able to distinguish whether he's describing something that happened with him or just generally what he observed in person.

MR. LOEVY: Objection. That's an argumentative objection, Your Honor.

MR. SOTOS: It wasn't intended to be.

THE COURT: I think if you could just be more specific with the question, it would solve the problem.

BY MR. LOEVY:

Q. For 21 years, you had to deal with all kinds of indignities and dangers, it sounds like, right?

A. Yes, sir.

Q. Was the danger that people would take a rock, put it in a

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 342 of 663 PageID #:107062
Rivera - direct by Loevy
279

sock, and hit you in the head, was that something that was on your mind?

A. That, and a lot of other things.

MR. SOTOS: Judge --

BY MR. LOEVY:

Q. How often was that on your mind?

MR. SOTOS: -- I'm objecting because I can't tell if he's saying that this actually happened to him or if it was -- he was concerned about that.

THE COURT: He's saying -- all the witness said that I heard was that it was something that concerned him.

MR. SOTOS: Okay. That's fine. I just wanted to be clear.

BY MR. LOEVY:

Q. Why were you concerned about that, sir?

A. Because you could get hit.

Q. Did that happen to inmates?

A. It happened to me.

Q. When did it happen to you, sir?

A. In the segregation unit. Upon passing -- I was a feeder --

Q. By the way, that wasn't with a rock. That was with soap, right?

A. It was with a soap, yeah.

Q. All right. Tell us what happened to you.

A. Passing out a tray. You know, I try to -- you know, like

it was stated earlier, individuals are hungry, and especially, especially in the segregation unit, because they're not allowed to go to the commissary.

You know, those in the general population are able to go to the commissary if you have money. But -- and, you know, individuals are asking, "Man, can I get an extra tray, man?"

And I try -- you know, I had a few extra trays, so I would try to give this guy one one day, this guy one. And this individual wanted -- he wanted another one. I had just gave him a tray the day before.

And I told him, "Man, I gave you one yesterday. I can't help you out."

So when I turned my back, he reached out the chuckhole and swung and hit me right here (indicating). And I was like -- I turned around and said, "What the?"

He goes, "Yeah, yeah, yeah." And I --

Q. Did you turn your back again?

A. I turned my back again, like a dummy --

Q. And then what happened?

A. He hit me again.

Q. All right. Tell them what he hit you with.

A. With a soap sock.

Q. Well, the jury might not know what a soap sock is, so --

A. Oh, you put your soap -- they give you -- you could buy soap off the commissary, but the prison, they got two kinds of

soap they give you. It's a big bar. It's a green bar. And then they give you a little bitty white bar.

So you can put those green -- they're pretty hard. You put them in a sock, tie the sock up, and use it is as a weapon.

Q. Did you ever have to use one of those as a weapon?

A. Oh, me? No, no, no.

Q. But you had one used on you?

A. I had one used on me, yeah.

Q. All right. And did it ever leave your mind that if you turned your back on somebody, they might hit you with a soap sock or a shank or something else?

A. It did after that incident.

Q. All right. How about problems with feces, including in segregation and elsewhere, what would people do with that?

A. You know, if the guys didn't get their way, they would -- they would throw the feces on you.

If you didn't give them something that they were asking for, they would threaten to throw it on you, feces and urine. So, again, it's unpredictable situation. You don't know if they'll do it. You don't know if they're bluffing, if they're doing it to get what they want. But you certainly don't want to find out after being drenched with feces and urine, so --

Q. All right. How about diseases in prison? Were there

Rivera - direct by Loevy

282

diseases in prison?

A. They had their AIDS wing, hepatitis, tuberculosis, yeah.

Q. And you mentioned the bacteria problem. Did you have a skin problem as well with the psoriasis?

A. Oh, psoriasis, yeah.

Q. What was that like?

A. From head to toe, just eaten up with psoriasis.

Q. All right. How was the medical care in prison?

A. Awful.

Q. All right. Did you have an injury that required medical attention?

A. My lower back, my L4, I believe it was.

Q. All right. Tell the jury what happened.

A. We were -- I worked in the segregation unit. I prepared the food for the inmates in the building.

And what we did was we would get hot boxes that a truck would bring from the general kitchen to the segregation unit.

We would remove this hot box. There was pans of food in it. We would put them in hot -- a steam table and make trays. You know, put the trays on the food, put them in bread racks, and send them upstairs with the workers to feed the inmates in the segregation unit.

One day I was by myself. I tried to roll the cart off with the pans of food in it, and it started to tilt. So as I

bent over to try to grab it from falling, I herniated a disc in my back.

Q. Now, this is something that could have happened to you on the outside of prison, too, right?

A. Yes, sir.

Q. All right. Was it worse for you in prison after you got hurt?

A. Yeah, because they didn't do nothing about it.

Q. Tell the jury about that.

A. The two EMTs that were there, I went up to the hospital. The doctor said -- you know, he examined me. And he said, "Can you walk?"

And, of course, I don't want to misdiagnose me, but I took very little steps. I believe there was two steps.

He said, "You're fine. Send him back to the cell house."

So I had the two EMTs on my arm like this, and I had to tell them, "Don't let me go." I said, "Don't let me go because I'm going to fall."

So they put me back on the stretcher, and officer took me back to the segregation unit where I laid in my bed for the next two months, urinating in a half of a bottle because I couldn't get up. I really didn't eat much because I couldn't get up to use the washroom. That went on for the next six years.

Q. Six years?

A. Six years.

Q. What were you trying to do to get medical attention?

A. I write grievances, writing to the medical director. And they basically base their decision on what their doctors tell them.

Q. All right. After six years, did you eventually -- of complaining, did you eventually get help?

A. When a new medical director came in, I addressed the issue with him. He examined -- he himself examined me, sent me out. And I had an MRI, and it showed that my L4 was herniated.

Q. All right. Did they give you attention and care at that point?

A. They sent me to physical therapy where the physical therapist said, "If you would've got here sooner, we would have probably been able to get this disc back into that slot."

        But since it stood out there so long, it done and -- tissue done and grew around it, so there was nothing they could do.

Q. And what was physiologically causing you the pain? What was causing the pain?

A. The disc was pinching on my sciatic nerve.

Q. All right. Did they -- did you get an epidural or how did it work? How did they solve it?

A. Oh, well, I get epidurals now. But in the prison, they

sent me to a neurosurgeon. And the surgery he performed was he shaved the disc off my sciatic nerve.

He didn't actually want to pull the whole disc out. He just wanted to shave it to get it off of the sciatic nerve.

Q. All right. How about -- changing topics, how about lockdowns? Tell the jury what lockdowns are.

A. Goodness. I guess stated earlier, when I first got there, I saw an inmate hit an officer with a baseball bat.

You walk in there with nothing, you're going to sit in a cell with nothing. I think it was July I got there, 1990. The middle of summer, it's scorching hot. I have no fan.

You know, so you're sitting in the cell for 90 days with no fan, nothing, just a yellow jumpsuit that they give you --

Q. You say sitting in the cell. You got to be clear.

Were you allowed out of your cell at all?

A. Oh, not at a -- not on a lockdown. No, there's no movements during lockdowns.

Q. How long could a lockdown last?

A. 90 days.

Q. And when you say no movement, once a week would you get out of the cell?

A. They would let you out for a shower.

Q. How often?

A. Once a week.

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 349 of 663 PageID #:107060
Rivera - direct by Loevy
286

Q. Other than that, what are you doing?

A. Sitting in your cell.

Q. All right. How about -- was that difficult, sir?

A. Yeah, not having nothing, I mean, you know, majority of the inmates have fans. They got TVs. They got reading material.

And, of course, eventually, you know, other inmates know what we're going through, so they'll send out reading material. But you can only read, you know, so many books over and over again.

Q. All right. And over time, did you -- how often did you have to experience these lockdowns?

A. Whenever -- whenever it went down, whenever --

Q. Was it common, uncommon? Give us some idea.

A. It happened frequently but, you know --

Q. How about shakedowns, what were those?

A. Oh, man. Well, that's another reason why being good with the officers, if an officer doesn't like you, for whatever reasons, he'll throw your food on the floor. He'll open it up.

I remember they came in with a dog to sniff for drugs, and they would put the dog along your bed on your linen, so you could see the dog's footprints on your bed. And there's nothing you can do about it. You just have to accept it.

Q. Were they respectful of your property?

A. Most definitely, throwing everything out your box, they throw it all -- and in the Department of Corrections, their

rules and regulations states that whatever they take out your box, they have to put back as much as possible the way it was.

That's not happening.

Q. How about strip searches? Are there strip searches in prisons?

A. Oh, yeah.

Q. Describe how those, you know, were and how they made you feel.

A. They -- if it's a -- if it's a major lockdown -- because they categorize the lockdowns. You got your major; you got your simple lockdowns that went on for a few weeks.

But if they even suspect you had drugs or anything other than what supposed to have and up on visits -- when you go up on a visit, you would have to take off all your clothes. They tell you turn around, grab the wall, then they have you bend over at the waist and spread your cheeks.

Q. All right. Was that humiliating or --

A. Most definitely.

Q. How about feeling innocent and not feeling like you deserved it, how did that --

A. It's, you know -- you know you're innocent, and you have to be subjected to all this humiliation.

You know, nobody wants to bend over, you know, and do that type of -- but you got to follow the rules.

Q. How about the ability to control the affairs of your life?

Liberty, you know, people talk about liberty. You've lost your liberty. You can't make choices for yourself. Can you put it in words how that affected you?

A. That I lost my liberty?

Q. Yeah.

A. Well, I had an incident when I got out, and I don't know if this is what you're referring to. I think everybody can relate to this.

That you got -- they send you a letter in the mail to purchase your sticker for your plate. And I was getting them when I first got out when I got -- when I got a car. And I guess the City of Chicago decided to stop notifying people, so I never got the notification. I didn't get the sticker for my plate, so I got a ticket.

I said I'm going to contest this ticket. I went to the court, and I told the judge. I said, "Your Honor, I was wrongfully convicted in 1988, went to prison in 1990, 21 years of my life in a maximum security prison being told what to do, when to do it, and how to do it."

I said, "If you don't tell me I have to get my plate sticker, I'm not going to get it."

Q. You said 21 years of being told how to do, what to do and --

A. How to do it, what to do, and, you know, what not to do.

Q. You got used to that, huh?

Rivera - direct by Loevy

289

A. It became a part of me.

Q. Are you trying to adjust to that, sir?

A. Oh, every day. Every day it's an adjustment.

Q. All right. The macho culture you were describing before about you have to be tough, can't show weakness, do you remember that?

Does that get tiring in maximum security prison?

A. If that's not who you are, yes, it does. But eventually some inmates, they be -- that's who they become.

Q. How about crying? Did you -- well, are you a crying person, sir?

A. Very much so. I'm very in tune with my emotions.

Q. All right. Did you cry in prison?

A. Several times.

Q. How would you do that?

A. Underneath the blanket. You can't make no sudden -- you know, you can't make no loud noises. You can't let nobody else know that you're crying.

Q. What happens if you show weakness like that?

A. They're going to come for you.

Q. All right. Did you -- did you get depressed to the point where somebody in the prison staff got worried about it and thought that maybe you needed psychology or --

A. Well, I -- they -- they were concerned, but I went to them. They didn't come to me.

I think it was several months before I got my new trial. I don't know what it was. I just started crying uncontrollably. I felt depressed. I felt lonely. And I went to Officer Sullivan, who was the officer on the walk. And the only one I could think of was Ms. Tara. She was the head of internal affairs.

And I told him, "Man" -- he goes, "What's wrong with you, Rivera?"

I said, "I don't know, Sullivan." I said, "I just -- I don't know."

So he -- I said, "You know, can you see if Ms. Tara is up there so I can talk to Ms. Tara?"

And he said, "Yeah, yeah." So he called her on the radio. And she responded, "Well, I'm not at the office." She goes, "I'm somewhere in the prison." She goes, "I'll let you know when I'm back at the office, and you can send him up there."

So I went up there to Ms. Tara and, you know, just crying uncontrollably. And she was like, "What's the matter?"

And I was like, "I don't know."

I didn't know what was going on. I just felt depressed. I felt lonely.

And she said, "Why don't you see the prison psychologist or psych therapist?"

And I said, "Well, okay."

And therapist wanted to put me on medication, and I couldn't -- I couldn't do it. I couldn't --

Q. Why were you not willing to take the prison medication there?

A. I seen too many individuals on it that -- I seen an individual, he was fine one day. The next minute I see him, he's sitting there crying, shriveled up. And I was like, "What is wrong with you?"

He did the psychrotrophic medication. And I told him, "Man, you need to get off that stuff, man. That stuff's going to mess you up."

I seen him a couple weeks later. He got off of it. He was fine.

So that was just -- you know, to see that, I knew that was -- that would take the same effect as to me, so I didn't want to get on psychrotrophic medication.

Q. All right. Did you ever get to the point where you considered suicide or considered ending it or anything like that?

A. I thought about it.

Q. What was your thought process?

A. I'm never going to get out. I had hope. I gave up hope.

Q. Did you ever seriously consider it?

A. Not seriously, but it crossed my mind.

Q. Did you know people that hung themselves or killed

Rivera - direct by Loevy

themselves?

A. Yeah, yeah, I knew a friend named Grady.

Q. Tell us what -- what happened there.

A. In the segregation unit, he -- on the count, there's -- every 3:00, 11:00, and 7:00 in the morning, there's a count of inmates in the prison. You cannot mess up that count and especially if you got a job.

Q. And you had a job?

A. I had a job, so --

Q. By the way, let's break in there.

What was your job at that time?

A. I was working the segregation unit.

Q. And what was your responsibilities?

A. For the food service.

Q. All right.

A. And the counselor was going out the door. It was like -- it was like 2:50.

And she was like, "Rivera, can you run this up to this inmate Sanchez up on 3A?"

And I was like, "Sure, I'll run it up there to him."

So I ran up some paperwork for her. And Mr. Grady was a couple of cells down from him. And he's like, "Man, bro, Jacob, can I holler at you, man? Can I talk to you?"

And I was like, "Grady, they're going -- the count is going on. I can't mess the count up." I said, "After the

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 356 of 663 PageID #:107076
Rivera - direct by Loevy
293

count, I'll be back up."

So as we're waiting downstairs for the count, any time something happens in the prison, they automatically start closing doors. They'll tell you to step into the dayroom and start closing doors. So you know something happened, you know.

So Officer Perry that I knew, Officer Perry came back down. I was like, "Man, Perry, what's going on?"

He's like, "Man, that guy Grady up there." And I was like, "Yeah." He goes, "He just hung himself."

Q. How did that make you feel?

A. If I had just stopped.

Q. All right. Did you change the way you did things after that?

A. I had to see the priest in the prison. You know, he told me not to blame -- I was blaming myself. It was just, if I would have just stopped, would that have made a difference? Now I'll never know that. But I did. I changed that.

Q. What do you mean?

A. Every time somebody called me, if it wasn't for the count, I stopped to hear what they had to say.

Q. Guys in segregation aren't getting a lot of human contact?

A. No, not at all.

Q. Did you try to do your best?

A. Oh, I had it down. I did the food service, and I had it where the officers were opening up doors for me.

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 357 of 663 PageID #:107077
Rivera - direct by Loevy
294

And the inmate would be in the cell with feces on his mattress or urine or blood. They weren't going to give him another mattress. So I would go to the officer in the booth, and I would tell him, "Man, I got this mattress. This guy's got a bad mattress. Can you" -- well, you got two doors.

The galleries consist of -- it's a four pod. There's two galleries here, and there's two galleries here. The officer sits in the middle in the booth. He controls all four of the wings. So you can close the dayroom doors, and you can close the gallery doors.

So he said, "Rivera, I'm going to let you give him that mattress." He said, "Tell that inmate not to come out that cell."

And I said, "I just want to give him a mattress, man. That's all."

And the inmate understood that. I told him, "Don't come out the cell, man."

So he would give me the old mattress, and I would give him the -- it wasn't new, but there was no feces or urine or blood on it. So I would give him another mattress.

Q. All right. And I want to change topics to your marriage -- or actually, not marriage.

After you were convicted and sent to prison -- so let's back up -- did you and your girlfriend try to stay a couple?

Rivera - direct by Loevy

A. We tried.

Q. Tell us a little bit about that first year.

A. Well, being since the 85 years, I mean, I was distraught already. I know I didn't commit this crime. Where do I go? What do I do? Who can help me? You know, I don't know nothing. I haven't experienced this.

I told her to go on with her life.

Q. What's that?

A. I told her to go on with her life.

Q. What was your thinking there?

A. Thinking about her and the kids.

Q. All right. What did you and her decide to do that first year?

A. She said let's wait until after the appeal was over.

Q. How long were you estimating that was going to be?

A. That could be anywhere from two years.

Q. All right. And did she stick around for that?

A. She did, but she left.

Q. What do you mean?

A. She -- she left. I have no control over -- I mean, I could call her. And if she doesn't answer, she doesn't answer. But I can't leave the prison.

Q. How did you know that she was abandoning this relationship?

A. She never came back.

Q. Were you getting letters or anything like that?

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 359 of 663 PageID #:107079
Rivera - direct by Loevy
296

A.   No.

Q.   Did you blame her?

A.   Oh, no, not at all.  I mean, I wish she would have did it when I first told her, because I probably could have dealt with it better.  But I loved her; she loved me.  And we had kids. We tried to make it work.

Q.   Now, this was not a perfect relationship?

A.   Oh, no, not at all.

Q.   All right.  How did it make you feel when she stopped returning your calls and letters?

A.   I know she's gone.  So, you know, there's not -- you don't have too much room or time to, you know, do anything.  You know, you got to react to it and get the crying over it and get back on your case.

Q.   Did there come a time when Sofia reappeared in your life?

A.   She did.

Q.   When was that?

A.   I believe it was '95, if I'm not mistaken.

Q.   So a few years down the road there?

A.   Yeah.

Q.   And did you talk?  And tell us what happened.

A.   We decided to get married in the prison.

Q.   Tell us how she reacquainted and how she got back and how that went down.

A.   She just came back.  She just came back and said she was

having a hard time taking care of her and the three kids, and -- but she said she -- you know, she wanted to get back together.

And I was like, you know, fine. And I felt, you know, she was sincere about it and wouldn't take off again. And plus, you know, you got 85 years in a maximum security prison. If you don't have nobody in your corner, you're pretty much screwed, because you don't want to borrow nothing from nobody in the prison.

Q. So you proposed?

A. I did.

Q. And what did she say?

A. She accepted.

Q. And tell us about the wedding.

A. It's in the side room in the visiting room. Chaplain Cohen that I knew from the chaplaincy department, he was the one that married us.

And afterwards, I called her when she left. I think my kids were there.

Q. Let me slow you down.

Who was there at the wedding?

A. Yeah, my kids and my mom.

Q. All right. Did you get a chance to kiss the bride there?

A. You get one kiss, and that's it.

Q. Any chance for you and your wife to be alone at that time?

A. None whatsoever.

Q. All right. At the end of that ceremony, what happened next?

A. We sat at the tables in the visiting room. We had whatever food that they sell you in the vending machines, and it was over with. She went home, and I went back to the cell.

Q. Is that how you had pictured a wedding being?

A. Oh, no.

Q. And was there -- I'm sorry to ask again.

There was no chance for intimacy either that day or any other time?

A. Excuse me?

Q. There was no opportunity for intimacy with --

A. Oh, no. No, it's not allowed.

Q. What happened after that wedding?

A. You know, she -- I mean, I called her.

And she's like, "You know, I know that you think in the eyes of God that we were brought together, you know." She goes, "But it didn't even feel -- emotionally it didn't feel like a marriage."

And she was absolutely right. It didn't feel like a marriage. I felt the same way.

Q. Did she come back?

A. I had to file an annulment for the marriage.

Q. Did she come back after the wedding at all, even a single

time?

A.   Nah.  No.

Q.   What happened after a certain amount of period of time went by?  You said you filed something?

A.   Almost nine months went past, and I filed an annulment with the clerk of Will County.  They writted me out to the courthouse.

And the judge asked me, "Mr. Rivera, why should I annul this marriage?"

I said, "She never came back.  She's gone."

She said, "Well, that's good reasons."  She said that was good reasons, so, you know.

Q.   All right.  Did you -- you know, you're in prison, and your wife's not.  And there might be other men involved.

You know, did you have jealousy or issues like that?

A.   I've been wrongfully convicted, sitting in a maximum security prison.  I cannot -- I don't have time to think about jealousy.  I'm trying to fight my case.

Q.   How about your mother?  Going back to when it first happened and then your relationship with her, did it affect your mother, in your perception?

A.   The wrongful conviction?

Q.   Yeah.

A.   Definitely.

Q.   Did that hurt you?

A. It did hurt me.

Q. Did your mother make sacrifices that you felt --

A. My mom made big sacrifices for me.

Q. Can you explain?

A. She knew her son wasn't a killer. That's not who she raised. She took care of my kids. She didn't have custody of them, but she did spend as much time as she could as possible.

She was there. Sofia was gone. Again, you don't want to borrow nothing from nobody in prison. I needed soap. I needed toothpaste. And I had a job in the prison that provided me that. But, you know, my mom, you know, she would send me money. And I really didn't want her to send me money, because I wanted her to -- you know, she was taking care of my kids already. So, you know, I think it was a financial burden on her that I felt it was.

Q. How about the children? They were younger when you first went away, correct? They were young kids?

A. Yes.

Q. Would your mother sometimes bring them down to visit when they were kids?

A. Whenever she could, she did.

Q. Was it easy for her? Did she drive? Was it hard?

A. My older sister brought them down with her.

Q. What were the visits like?

A. Weekdays, you get a two-hour visit. On the weekends, you

get an hour visit, and that's if it's not crowded.  If it's crowded, you're going to get 30 minutes, you know, if that.

And they could only come on the weekends.  My sister had to work Monday through Friday, and that was the only time she could get off.

Q.  Were the visits -- you know, over time when the kids got bigger, did they get less frequent?

A.  Oh, yeah.

Q.  How about when the kids got out of grade school into high school, what happened?

A.  I -- what I remember is they came a couple of times.  You know, I didn't hold nothing against them.  I know they were teenage boys; and, you know, they wanted to mingle with the girls and -- but both of my boys -- well, my oldest son was in the Navy; my younger son was in the Marines.

So they had a -- they had their lives that they were trying to, you know, put in -- put together.

Q.  Did you have as much of a foundation and a backbone to rely on there?

A.  Rely on from whom?

Q.  In other words, they weren't teenagers when you went in, right?

A.  No.

Q.  How old was your youngest, for example?

A.  I believe he was four.

Q. And then Jennifer?

A. Jennifer, seven, eight months old, if that, if I remember correctly.

Q. So your entire relationship with Jennifer was behind bars?

A. Oh, yeah.

Q. Was that difficult to make a foundation and bond?

A. Yeah, my little girl, yeah.

Q. How about besides your mother and your children, did prison interfere with your other relationships on the outside, like with your friends or, you know, colleagues?

A. Well, it's a term that they use, out of sight, out of mind. If you're not seen by nobody, you're not going to be seen by nobody. So ain't nobody going to come. You know, you're out of sight, out of mind.

And a lot of people knew that I -- the time I got sentenced to. And, you know, you lose everything, literally lose everything, friends, family, loved ones.

Q. All right. Changing topics again, did you find any solace from the suffering in religion?

A. Yes, I did.

Q. And did you -- were you a religious person growing up?

A. No, sir.

Q. Did you become more religious in prison?

A. Use that term, I would say, yeah, but I don't say religion. I --

Rivera - direct by Loevy

303

Q. All right. Tell a shorter summary, without telling the whole story, about how it affected you in prison and your faith.

A. I lost my federal habe. Everybody in the prison knows that -- or believes that that's where you're going to get your rhythm at. I lost my federal habe.

Q. That's your chance to get out of prison?

A. At least somebody to hear it.

I found myself at a Christian service. I don't know how I got there. I was, you know, so distraught. And I was listening to the minister, but I knew from that point on, I had to -- I done entrusted in man. I done entrusted in jailhouse lawyers to try to help me get to court -- back to court. And I had to turn to a higher power.

Q. And did you -- did you decide to -- tell us a little more.

A. You know, believe it or not, God started speaking to me, and he put things in perspective. He put things in the orders that needed to get out of my life. And the gangs were number one.

Q. All right. Did you stop affiliating with the gangs at that point?

A. Not at that point, but a time -- a period that came that I did.

Q. What point did you stop affiliating with the gang in prison?

A. May 9th, 1999.

Q. What was that day?

A. That was the day that I gave my life to Christ.

Q. All right. Did you have to explain to the gang that you were -- you're going to run with a different team?

A. Yes, definitely.

Q. How did that go?

A. Surprisingly, it went well. A lot of people didn't expect it. A lot of people thought, especially officers, lieutenants, they said, "Well, how much did you pay if they didn't beat you to get out?"

I said, "All I did was put my faith in God."

And I went to the guy, the chief of the gang that was in there, and I told him, "Man," I said, "You know, I want out, man. I went to give my life to the Lord."

Q. Is it safe in prison to not be affiliated with a gang?

A. Oh, man, you just don't know the things. I was -- you know, I mean, it wasn't -- it wasn't a concern of mine's. It was, and it wasn't.

I just wanted to get away. I knew I had to get away, so I just wanted to establish that first. But then what went through my mind was, who is going to protect me?

Q. You'd been in prison now almost 10 years, right? I guess 1990 to 1999.

Were you a little more comfortable than when you first

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 368 of 663 PageID #:107088
Rivera - direct by Loevy
305

got there?

A. Sure.

Q. And did you know your way around a little bit better?

A. Oh, yeah.

Q. Were you able to navigate it without being associated with a gang?

A. Oh, yeah.

Q. All right. This -- the faith that you found, did that help give you comfort when you had distress about your wrongful conviction?

A. Definitely gave me comfort.

Q. All right. Were you angry at God? You know, had -- God obviously had a role in what happened.

A. Well, no, it wasn't God that had no role in it.

Q. All right. Sorry I put words in your mouth. You tell me.

A. Um, um, I -- that was my last appeal. As far as the State of Illinois was concerned, I was going to serve 42-1/2 years out of that 85-year sentence.

I had to turn to God. And he told me, "If you want me to help you, these are the things you have to do." And like I said, one of them was the gangs.

I -- I went out there three times to talk to the gang leader, and twice I turned back around because I was afraid. I don't know what was going to happen to me.

So the third time I went back out there, I just -- I

got the courage. And when that came over me, I just felt a sense of peace. I mean, so much so that I told the gang, "If you want to stab me, beat me, pipe me," which what they do if you want to get out, I said, "you know, do it, because I want out. That's how bad I want out, and I want away from y'all."

And he told me, "You got that coming." And I didn't understand what he meant by that, I got that coming. Why do I have that coming?

Q. All right. But you did separate yourself?

A. I definitely separated myself from the gang.

Q. But the question I asked you was, what peace did you make with God? You're experiencing this injustice. How could you make sense of the fact that where was God?

A. He was there now.

Q. Did -- did your life change a little bit in prison after that?

A. It did. It changed.

Q. Did you -- you said you were pursuing appeals.

Did you -- tell us a little bit about your appeals.

A. Well, everybody --

Q. Let's back all the way back.

You get convicted. What's the next move?

A. Direct appeal.

Q. All right. Did you -- were you able to do that?

A. No, I wasn't, but I was afraid of waivering [sic] that --

that appeal, so I filed it myself in the county jail.

Q. Were you trained in the law?

A. No.

Q. Were you particularly good at books or stuff like that?

A. Not in the law, no.

Q. How did you file it yourself?

A. Another inmate helped me.

Q. All right. And this is the notice of appeal.

And did you get a lawyer at some point?

A. Public defender.

Q. And then what happened after that?

A. He told me his name. He told me that he's going to order the documents, the trial transcripts, and that he would be working on the case.

Q. All right. And did you get a new lawyer after that?

A. Several months after that, I get a -- a letter from Ken Wadas, my trial attorney.

And I guess Sofia -- you know, he talked to -- Sofia talked to him, and if I'm not mistaken, he might have even said something, you know, that this was such a bad case that he would take it for free.

Q. Well, did you end up paying him?

A. No, sir.

Q. All right. Did he end up appeal -- taking the appeal?

A. Yeah, yeah. I got a letter from the public defender's

office saying they're withdrawing from the case. I didn't know why.

And then I get a letter from Ken saying that he's, you know.

Q. All right. Did you get your hopes up for the appeal?

A. You know, you always -- you know -- you know, I didn't know what hope really was, but I thought maybe I have another shot at this.

Q. What year would this have been about?

A. '92, '93, somewhere in there.

Q. What happened to your appeal, sir?

A. They denied my appeal.

Q. How did you get told that?

A. Through Ken Wadas sent me a letter.

Q. All right. Did you give up?

A. No, I couldn't give up.

Q. So what did do you?

A. Jailhouse lawyers.

Q. And did you start writing letters?

A. I wrote letters to everybody, everybody that I could. Every address I had, I wrote.

Q. Tell the jury.

A. Innocence Projects, New York, Barry Scheck, and other countries. I was writing everybody.

And you have a list of it. So you start at the top,

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 372 of 663 PageID #:107092
Rivera - direct by Loevy
309

you go down through it. Hopefully by the time you get down to the bottom, you'll hear from somebody else. But if you don't hear from nobody, you don't get no answer, you start back at the top and go right back through it again.

Q. And that's what you did?

A. I had to.

Q. Did you go to the law library yourself?

A. Whenever I was allowed to, yeah.

Q. All right. Were you able to do research?

A. You can, but the majority of the time, inmates would tear the pages out the books because they wanted that case. If you had the money, you had to pay for a copy of that -- you know, if you wanted this case, you had to pay for the copy.

And if they didn't have the money, they would tear the case out of the book. So if that was a case that could help me or -- it was -- it was gone.

Q. But there was some cases?

A. There was some cases, yeah.

Q. So what would you try to do?

A. Read up on this case to see how it applied to mine's.

Q. All right. Were you making progress with your appeals?

A. No.

Q. Did there come a time in prison when you met a guy named Juan Rivera that had influence on this?

A. Yes, I did.

Q. How did you meet Juan?

A. Working in the segregation unit, they would sometimes on the lower floors -- we lived in the segregation unit. So one part of the -- you know, the top two floors were segregation. That side was segregation. This side was -- they had -- it was called sick bay. So if you was in a wheelchair, or whatever, they didn't have you in general population, there was no room in the hospital, they would put you back here.

They would also put inmates who were coming in on the new, if it was too late to process them, they would put them -- they would stick them on this wing.

Q. All right. And then one day, there was Juan Rivera?

A. Got up the next day, was serving lunch. And if I'm not mistaken, he says something to "Hey, man, can I get an extra tray? I'm hungry."

And I was like, "Yeah, sure."

I gave him an extra tray, and we just started talking from there.

Q. Now, you were quite a bit older than him or a little bit older at least?

A. Yeah, I'm about -- about five, six years older than him.

Q. How old was he at that time?

A. Early 30s, maybe.

Q. All right. Did you become friends?

A. Yes, we did.

Q. And was he able to help your quest for justice?

A. Yeah, but -- but it was ironic that, you know, that his name is Juan Rivera, and I'm Jacques Rivera.

Q. Any relation there?

A. No, but he -- but we call each other brothers. We do call each other brothers.

He was also wrongfully convicted of a crime. We started sharing our stories, and I asked him if he could help me.

Q. Did he have a lawyer?

A. Yes, he did.

Q. And did he introduce you?

A. Not right away.

Q. Eventually did you hook up with the Northwestern people that represented Juan?

A. On the Center of Wrongful Conviction, yes, sir.

Q. And you said what?

A. On the Center of Wrongful Convictions at Northwestern.

Q. And that's the clinic? Do you want to tell the jury what the --

A. That's the one that was on -- Juan was with. Well, he was -- they were with him, and prior -- several years prior to that, I had wrote Northwestern, was one of the people I wrote to.

And Cathryn Crawford was an attorney at Northwestern.

She had sent me a letter saying -- you know, introducing herself. And she said that -- that there was an investigation against Detective Reynaldo Guevara. She said she seen my intake form and that Detective Guevara was one of the arresting detectives --

Q. Leaving out -- leaving out aside who the detective was --

A. Oh, I'm sorry.

Q. -- did she say she could help you a little bit?

A. Oh, yeah, yeah. And she came out, and we talked.

She said, "Now, mind you that we're not taking your case." And I said, "Okay."

And then eventually, they didn't take my case.

Q. And then when Juan got involved?

A. It sat on the back burner for about nine years. In between that time, I met Juan. He couldn't -- well, what he told them about me, they said, "Okay, well, let's deal with you first and then, you know, and" --

Q. Did there come a time when they dealt with you and decided to help you?

A. Well, they -- Juan Rivera went back to court. He lost a third appeal.

MR. SOTOS: Objection, Judge, relevance to what happened in the Juan Rivera case.

MR. LOEVY: I am trying to get it back to him, Your Honor.

THE COURT:  No, I think that this is okay.  Overruled. I think I've ruled on this.

BY THE WITNESS:

A.  Juan Rivera was denied his third new trial.  Being frustrated, he just told Northwestern, "Get off my case and get on Jacques Rivera's case."

And, of course, the people at Northwestern, they're like, "No, no, no, we're not going to get off your case.  We're going to appeal it, but we will definitely look into it."

Q.  And they did look into your case?

A.  Jennifer Linzer did.

Q.  Jennifer Linzer is who?  She works at the Northwestern --

A.  She was the assistance director of the law school.

Q.  All right.  Was there -- and do you know if they conducted an investigation?

A.  They said they would.

Q.  All right.  What was their breakthrough?  Was there a breakthrough at some point?

A.  Well, when Cathryn Crawford was on the case, she said they was trying to locate the eyewitness in the case and --

Q.  Who was who?  Orlando --

A.  Orlando Lopez.

Q.  Right.

A.  They couldn't locate him.  So being that there was no physical or no other type of evidence in my case, what

convicted me was a single identification of a 12-year-old boy. There was nothing for them to go on. It's hard to investigate a case when there's no other physical evidence.

So she said they tried to locate Orlando Lopez. They couldn't locate him. That was Cathryn Crawford.

Jennifer Linzer nine years later, they thought they had located Orlando Lopez.

Q. All right. And did that have implications for your case? Did something good happen?

A. Well, it was positive.

Q. Well, what happened?

A. An investigator, Cynthia Estes and Jennifer Linzer believed that this was Orlando Lopez that they were looking for living in another state. They went out there, and it was him.

Q. All right. And did anything good happen to your case after that?

A. Orlando Lopez said he knew what they were there for --

MR. SOTOS: Objection, Judge.

THE COURT: I'm sorry.

MR. SOTOS: Objection to this witness describing what Orlando Lopez said to somebody else.

MR. LOEVY: It's not offered for the truth, and it is coming in independently later, too. It's not offered for the truth.

MR. SOTOS: I think that's hearsay. It is offered for

the truth.

THE COURT:  What is it being offered for?

MR. LOEVY:  Well, for how his case broke open.

MR. SOTOS:  Well, he doesn't need to describe --

THE COURT:  Why doesn't -- rather than going into what Orlando Lopez said to these people --

MR. LOEVY:  Okay.

THE COURT:  -- why don't we just get to the conclusion?

MR. LOEVY:  Got it.

BY MR. LOEVY:

Q.  After Orlando Lopez met with your attorneys, did something good happen in your case?

A.  Yes, it did.

Q.  What happened?

A.  They stated that Orlando Lopez said that I was --

Q.  Now, without saying who said what, so --

MR. SOTOS:  Objection.

BY MR. LOEVY:

Q.  We're just saying, did something good happen in your case?

A.  Yeah, he said I wasn't the guy who did it.

MR. SOTOS:  Objection, Judge.

MR. LOEVY:  I don't think he understands the issue.

THE COURT:  You know that -- overruled.  There's no way to describe it otherwise.

MR. SOTOS:  Well, the exception is --

THE COURT:  Just that.  Just that.  Let's not go into any details.  Just the conclusion.

MR. LOEVY:  Okay.

THE WITNESS:  I don't even know how to answer now.

THE COURT:  Go ahead.  Just --

BY THE WITNESS:

A.  He said that I wasn't the guy who shot and killed Felix Valentin.

BY MR. LOEVY:

Q.  All right.  And then in court, did something good happen after that?  Did you guys file a petition?  You know, did you move your case forward?

A.  Yeah, eventually, yeah.

Q.  And --

A.  We filed an excessive post-conviction on newly discovered evidence.

Q.  All right.  You said that real fast.  Explain to the jury what you mean.

A.  We filed -- in a post-conviction petition, you're only allowed in the State of Illinois, I believe -- it's only -- you only can file one post-conviction unless you can prove otherwise.

We filed another post-conviction on newly discovered evidence, which was evidence that we discovered that was newly

that wasn't presented to my attorney at trial.

Q. All right.

A. We had --

Q. Had you or anybody in your family previously looked for Orlando Lopez, to your knowledge?

A. Oh, no, no.

Q. Why not?

A. Nobody know where to begin. We didn't -- you know, this is the first time my family's experienced any of this with me. Nobody knows what to do anything.

Q. All right. Would it have been a good idea to go try to talk to Orlando Lopez?

A. I didn't think it would have been.

Q. Why?

A. Because they could say you tampered with that witness.

Q. All right. So there was no contact between you and him?

A. None whatsoever.

Q. All right.

THE COURT: Mr. Loevy, let me just -- it's -- we're getting on closing time, so if you reach a convenient stopping point --

MR. LOEVY: Yep.

THE COURT: -- in the next couple of minutes.

MR. LOEVY: I am aiming for the stopping point, Your Honor.

Rivera - direct by Loevy

THE COURT: Okay.

BY MR. LOEVY:

Q. The state did a reinvestigation, correct?

A. Yes, sir.

Q. Did you agree to talk to the state?

A. Yes, sir.

Q. And did you -- did you have to talk to the state?

A. No, I didn't have to talk them.

Q. Okay. Did the state make you an offer, sir?

A. Yes, they did.

Q. Tell us what it was.

MR. SOTOS: Objection, Judge, foundation as to who did and who he's talking about.

MR. LOEVY: The state's lawyer.

THE COURT: I'm sorry?

MR. LOEVY: The state's lawyer. Remember the name --

MR. SOTOS: That's a different --

THE COURT REPORTER: I'm sorry.

MR. LOEVY: I'm sorry.

THE COURT: You know, just wait a minute.

What is the objection?

MR. SOTOS: I just wanted foundation. I want to know who he talked to.

THE COURT: Okay. That's fair.

BY THE WITNESS:

A.   Darren O'Brien.

BY MR. LOEVY:

Q.   What was the offer, sir?

A.   The offer was that if I pleaded guilty to it, I could go home Friday.

Q.   And where were you at the time?

A.   At Stateville Correctional Center.

Q.   How long had you been in there?

A.   I'd been in there already close to 17, 18 years, if I'm not mistaken.

Q.   And they offered you, if you just say "I did it," you can go home?

A.   I would have been home that -- it was on a Wednesday.  They said that Friday, I could be home with my family.

Q.   How much more time were you looking at if you turned --

A.   I had 19 more years left.

Q.   -- down that deal?

     All right.  What did you decide to do?

A.   I couldn't accept that offer.

Q.   Why not?

A.   Because I didn't kill Felix Valentin.

Q.   So what did you tell the state?

A.   I can't accept that offer.  I said, you know, the State's Attorney's job is to serve and protect our -- the citizens of the City of Chicago and bring justice for them.

I thought it was appalling that they would want me to plead guilty to something that they knew I didn't do, to a crime that I didn't commit, and to -- just for the sake of my freedom?  What about the victim's family?  Did anybody think about them?

Q.  Why didn't you just plead guilty and go home, sir?

A.  I didn't kill Felix Valentin, and I wasn't going to -- and not only because of the victim's family, my family.

You know, I told my kids I did not commit this crime. "Well, wait a minute, dad, you said you didn't do it.  Now you're pleading guilty to get your freedom?"

At no cost I wasn't pleading guilty to nothing.  I said, "I'll go back and do my 19 years, but I'm not pleading guilty."

Q.  All right.  And we'll talk about it tomorrow.

But then there was a process where they could have tried you again, and the state dropped the charges, right?

A.  Yes, an evidentiary hearing.

Q.  And was that a happy day?

A.  Judge Neera Walsh, I love her.

MR. LOEVY:  All right.  We'll talk about that tomorrow if this is an okay time to break.

THE COURT:  Okay.  Ladies and gentlemen, we'll take our evening recess.  We'll start at 9:30, tomorrow.

COURT SECURITY OFFICER:  All rise.

(Jury out.)

THE COURT:  I think we probably ought to assemble lawyers at about 20 after 9:00 so we can deal with -- I'm going to get your brief tonight at some time.

MR. ART:  You will, Your Honor.

THE COURT:  Okay.  That will give us a little time to go through it.  Okay.  9:20.

MR. ART:  Thank you.

MR. SOTOS:  Thank you, Judge.

(Adjournment at 3:57 p.m. until 9:20 a.m., 6/7/18.)

C E R T I F I C A T E

We, Colleen M. Conway and Nancy L. Bistany, do hereby certify that the foregoing is a complete, true, and accurate transcript of the Trial proceedings, Volume 2-B, had in the above-entitled case before the HONORABLE JOAN B. GOTTSCHALL, one of the Judges of said Court, at Chicago, Illinois, on June 6, 2018.

/s/ Colleen M. Conway, CSR, RMR, CRR          06/06/18

/s/ Nancy L. Bistany, CSR, RPR, FCRR          06/06/18

Official Court Reporters          Date
United States District Court
Northern District of Illinois
Eastern Division

# EXHIBIT 62

2978

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JACQUES RIVERA,                                    ) No. 12 CV 4428
                                                   )
            Plaintiff,                             )
vs.                                                ) Chicago, Illinois
                                                   )
REY GUEVARA, STEVE GAWRYS, DANIEL NOON,            )
JOHN GUZMAN, JOSEPH FALLON, JOSEPH SPARKS,         )
PAUL ZACHARIAS, GILLIAN MCLAUGHLIN, JOHN           )
LEONARD, EDWARD MINGEY, RUSSELL WEINGART,          ) June 21, 2018
ESTATE OF ROCCO RINALDI, CITY OF CHICAGO,          )
                                                   )
            Defendants.                            ) 9:25 o'clock a.m.

                        VOLUME 13 A
                 TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE JOAN B. GOTTSCHALL
                      and a jury

APPEARANCES:

For the Plaintiff:     LOEVY & LOEVY
                       BY:  MR. JONATHAN I. LOEVY
                            MR. STEVEN E. ART
                            MR. ANAND SWAMINATHAN
                         311 North Aberdeen Street
                         3rd Floor
                         Chicago, Illinois  60607

                       MACARTHUR JUSTICE CENTER
                       Northwestern University School of Law
                       BY:  Locke E. Bowman, III
                       357 East Chicago Avenue
                       Chicago, Illinois 60611
                       (312) 503-0844


Court reporter:           Blanca I. Lara
                       Official Court Reporter
                        219 South Dearborn Street
                             Room 2504
                       Chicago, Illinois 60604
                          (312) 435-5895
                       blanca_lara@ilnd.uscourts.gov

2979

Appearances  (continued:)


For the Individual       THE SOTOS LAW FIRM
Defendants:              BY:  MR. JEFFREY N. GIVEN
                              MR. JAMES G. SOTOS
                              MS. CAROLINE P. GOLDEN
                              MR. JOSEPH M. POLICK
                              MR. DAVID A. BRUEGGEN
                         550 East Devon Avenue
                         Suite 150
                         Itasca, Illinois  60143

For the Defendant        ROCK FUSCO & CONNELLY, LLC
City of Chicago:         BY:  MS. EILEEN E. ROSEN
                              MS. CATHERINE M. BARBER
                              MS. THERESA B. CARNEY
                         321 North Clark Street
                         Suite 2200
                         Chicago, Illinois  60654


For the Defendant        LEINENWEBER BARONI & DAFFADA, LLC
Guevara:                 BY:  MR. THOMAS E. LEINENWEBER
                              MR. JAMES V. DAFFADA
                         120 North LaSalle Street
                         Suite 2000
                         Chicago, Illinois  60602

2980

COURT SECURITY OFFICER: All rise.

(The following proceedings were had out of the presence of the jury in open court:)

THE COURT: Is everybody here so I can just do two short things that I have?

MS. ROSEN: Actually, no, Judge. I think there's some issue with plaintiff's counsel getting here on time.

MR. SOTOS: Mr. Loevy is here, but --

MS. ROSEN: I guess it's Mr. Bowman who is not here.

THE COURT: I think it's enough if Mr. Loevy is here.

MS. ROSEN: Yeah. Okay. I think he's out in the hallway.

THE COURT: This is of great consequence what I'm going to say, so ....

MS. ROSEN: I'm sure.

(Laughter in the courtroom)

THE COURT: Nobody knows where he is?

MS. ROSEN: Mr. Art went to get him, Your Honor.

THE COURT: Thank you.

(Brief pause)

MR. SOTOS: You can just tell us. We'll tell him.

THE COURT: Right.

(Brief pause)

THE COURT: Actually --

MR. SOTOS: I was kidding, for the record.

2981

THE COURT: No, actually this is just for you. It's a just note.

MR. SOTOS: All right.

THE COURT: It's actually for Mr. Leinenweber.

MR. SOTOS: Oh. Nobody wants to hear that.

THE COURT: No, but it's not bad news. Just a minor thing.

This is really minor, everybody.

Mr. Art is here. So that's good.

Okay. I just want to tell you, No. 1, the CSO got a jury note this morning:

"... Judge, the jury cannot see the easel. Can
it be moved."

MR. LEINENWEBER: I'm abandoning the easel, Judge. I'd be happy to accommodate.

THE COURT: All right. That's No. 1.

No. 2 is, we did look at the pretrial conference transcript to see what was said about scope. And Mr. Polick is speaking, and he says:

"Judge, just to circle back for clarification."

And we couldn't find what we were circling back to, so --

MR. LOEVY: We did, Your Honor. We're going to get those pages.

THE COURT: All right. Well, let me go on. I don't

2982

we need to because I say:

"Yes."

And Mr. Polick says:

"In terms of the order of the examination. So once the witness is up there, just to move this along, we are going to -- each side is going to do their examination and we are going to waive scope objections?"

And I just said, "yes." And Mr. Loevy said:

"We will waive scope."

And then I said:

"And waive scope. Thank you. Thank you. Because I cannot keep track of scope when we are doing that."

And then we talk about our little jury instructions, so they knew we weren't following the usual rules.

So apparently there were no limitations put on that. There was just an agreement. So to that extent, I think what the plaintiffs told me yesterday was correct.

I also just want to say that there's been kind of madness in terms of this hostile witness business, because nobody is giving me what I need to make any kind of a finding.

So after deciding what I can decide, I listened to the witness and it's really unclear. With Ms. Rosner, I don't think there is any basis for treating her as a hostile witness

2983

by any side. We're going back decades, and she's been like with the EEOC. So I think that was a little goofy.

And then with our current witness, I don't know if the manner of the defense questioning created the hostility, but I certainly don't see any basis for the plaintiff finding that -- or arguing that this witness is adverse.

So, you know, I can't fix this, though, after the fact very easily. I mean, I can't fix it at all. So I'm just going to say, if anybody anticipates wanting to examine a witness as adverse when that is not otherwise acceptable, otherwise not something that's clear, let's put it that way, I need something from you in advance, otherwise I'm just not going to let anybody do that.

MR. LOEVY: Your Honor, but for this witness, can we stay with the same grounds we have been doing with this witness?

THE COURT: Well, I don't know -- what's the rule when one side calls an adverse witness, okay, which you've done.

MR. SOTOS: Correct.

THE COURT: And then the other side cross examines, but then also does their own examination. I mean, I'm not quite sure what the rules provide for this.

MR. SOTOS: It seems to me, Judge, that if we're proceeding under a scenario in which then the other side is going into an area that's not cross-examination --

2984

THE COURT: That's not within the scope.

MR. SOTOS: Right. Then they can't lead unless it's an adverse witness.

THE COURT: That makes sense. And until I find something -- and that's what you've been doing, right?

MR. LOEVY: Well we were leading. And you gave us permission to lead. And we'd ask that you don't reverse your decision on that.

THE COURT: Well, I don't think it's right. I mean, I've seen this witness and he seems to be largely in your corner.

MR. LOEVY: Yes and no. I mean, he is the guy who participated in the criminal investigation that led to our conviction.

THE COURT: Well --

MR. LOEVY: He's telling the truth about --

THE COURT: -- I'm not going to reverse myself on what you can do when you're within the scope.

MR. LOEVY: All right.

THE COURT: But when you're using him as your witness, I think you better directly examine him.

MR. LOEVY: All right. Well, Mr. Sotos brought up this issue.

THE COURT: But, as I'm saying, you know, there's law out there, and I don't know it by heart. And if anybody wants

2985

to give me anything, just show me that this ought to be done differently, fine. But I think we should get the jury.

MR. LOEVY: Well, one other thing, Your Honor, is that we have said that there wasn't going to be attacking in cross-examination, and that has been respected in this trial, but Mr. Leinenweber is going over the same subject that Mr. Sotos went over comprehensively and aggressively. I didn't get a chance to ask Tom if he intends to keep talking about the Jimenez case, but Mr. Sotos exhausted everything that was to exhaust on the Jimenez case, and then Mr. Leinenweber just started it all over.

THE COURT: Quick.

MR. LEINENWEBER: Judge, I don't believe that's correct.

THE COURT: You're not going to be with him for a long time, anyway.

MR. LEINENWEBER: Honestly, Judge. You know me, I probably won't be more than 20 minutes or half hour; promise you.

MR. LOEVY: Well, if it's 20 minutes to half hour on what Mr. Sotos just spent 45 minutes on, there's nothing new to talk about there.

THE COURT: I don't know. This gets very complicated when there are two lawyers with different interests representing clients with different interests. I'm not sure

2986

that this is where I want to jump in and start setting rules, especially when Mr. Leinenweber promises me --

And actually you're more reliable than anybody else on this --

(Laughter in the courtroom)

THE COURT:  -- if you're going to be short.

MR. LOEVY:  But Your, Honor, they are aligned on this. Mr. Soto -- it wasn't even Mr. Sotos' issue.  I mean, Mr. Dorsch is making allegation against Mr. Guevara --

THE COURT:  You know, I'm not -- let's get the jury.

MS. ROSEN:  Judge, can I just ask a scheduling question?

THE COURT:  Yeah.  But let's get a jury.

MS. ROSEN:  So you still intend to have another jury instruction conference?

THE COURT:  We probably will have to.

MS. ROSEN:  Yes.  So what we're looking at right now is that we should be done with evidence on Monday.  So I don't know where you want to put that in.

THE COURT:  Is that all of you?

MS. ROSEN:  That's the defense.

THE COURT:  And when on Monday do you anticipate --

MS. ROSEN:  Well, it depends on how quickly we move along.  Hopefully Monday noon'ish is the best guess right now.

THE COURT:  All right.  So I need to know from you a

2987

little in advance how many issues we have to resolve so that I can figure out how much time I should allow.

I mean, I can send the jury home early Monday, I can have them come in late on Tuesday. I can do any of those things.

MS. ROSEN: So you're going to want to do it -- I guess that's the point, you're going to want to do it at the conclusion of the evidence, is what you're envisioning?

THE COURT: Well, I don't want to have to do it twice. If we're ready to do it --

MR. LOEVY: We made a lot of progress, as you recall, at the pretrial conference. I mean, there wasn't that many unresolved issues.

THE COURT: Yeah, I know that. I don't know -- I mean, it seems to me, you can tell me if you think I'm wrong, but that it's more efficient to do it at the close of all the evidence but before the arguments. And to give the jury an amount of time off based on what you tell me about how many issues we have to resolve. There's no point in the jury sitting, waiting.

MR. LOEVY: Well, it sounds like it's going to break naturally. On Monday, if we're going to run out of witnesses on Monday --

THE COURT: We're ready.

MR. LOEVY: If we're going to run out of witnesses on

2988

Monday, that's when we ought to do it.

COURT SECURITY OFFICER:  All rise.

(The following proceedings were had in the presence of the jury in open court:)

THE COURT:  Good morning, ladies and gentlemen.

(Jurors responded.)

THE COURT:  You look dryer than I am.  I don't know if it's just the way you appear, right?  Did not bring an umbrella.  Big mistake.

Please be seated.  The lawyers have been informed that the easel needs to be turned around so that you can see it.  And I think it is turned around so you can see it.  But I appreciate that.  Anytime you are having trouble seeing anything, just let me know.

Mr. Leinenweber, I think we just need the witness.

MR. LEINENWEBER:  Correct, Judge.

(Brief pause)

THE COURT:  And, ladies and gentlemen, I have on pretty good authority, based on what I understand, which is never completely certain, that you'll have the case sometime -- I can't say it's at the beginning of next week, but early next week.  I'm hoping -- we have to go through closing arguments of which there will be a number, and instructions, and that takes kind of day.  My guess is is that the evidence is probably going take us well into Monday, and then we'll be able to do

those other things on Tuesday.

(The witness enters the courtroom)

THE COURT:  It's my hope that you will have the case on Wednesday.  That is not a complete promise.  And when on Wednesday, I'm not sure, but we're making progress and we're getting there.

Counsel, do we have a witness?

Ah, Mr. Dorsch.

THE WITNESS:  Good morning, Your Honor.

THE COURT:  Good morning.

WILLIAM DORSCH, DEFENSE WITNESS, PREVIOUSLY SWORN

REDIRECT EXAMINATION (resumed)

BY MR. LEINENWEBER:

Q.  Good morning, Mr. Dorsch.

A.  Good morning.

Q.  To make things easier, you'll be happy to know that I'm abandoning the easel since I'm going to use the Elmo.

MR. LEINENWEBER:  So, Judge, I'll try not to reinvent the wheel, but I just like to establish a couple of things that we talked about yesterday.

BY MR. LEINENWEBER:

Q.  We talked about two cases.  We talked about the umbrella case.  And by that, you know, I'm referring to the case where you state that Mr. Guevara basically put the finger on the picture of the witness, correct?

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 399 of 663 PageID #:107119
Dorsch - redirect by Leinenweber
2990

A.   Yes.

Q.   When I say "umbrella," that's what I mean.

A.   Understood.  And Mingey referred to that case always as the umbrella case.

Q.   Correct.  So, but you know what I'm talking about when I saw umbrella, right?

A.   Yes, I do.

Q.   Okay.  And then second case I believe you were talking about was the Jimenez case.

MR. LEINENWEBER:  And if I could approach the witness?

THE COURT:  Yes.

(Document tendered to the Court and the witness.)

BY MR. LEINENWEBER:

Q.   Sir, I'm going to show you what's been marked as Defendants' Exhibit 70.  If you could just take a look at that, please.

(Brief pause)

THE COURT:  I do not have realtime.  Should I --

THE COURT REPORTER:  I'll fix it, Judge.

THE COURT:  Hold on one second.  A little technical glitch.

(Brief pause)

THE COURT:  That's fine.  Thank you.

Don't wait for me, I'm just plugging things in.

BY MR. LEINENWEBER:

Q. That exhibit, that appears to be the part of the criminal file of the Jimenez case, is that fair to say?

A. Yes.

Q. And if you look -- I put a little sticker on it to make it easier. If you look at that page where the sticker is on, you're listed there as the detective and the arresting officer, is that correct?

A. No, it's for a lineup report.

Q. But at least your name, your signature is on that document?

A. Well, my -- it's not my signature.

Q. But your name is on it?

A. My name is on it, yes.

Q. And also your partner at the time, Bill Johnson, is that correct?

A. Well, apparently we were working that day on that case.

Q. Okay. And I understand you've worked on a lot of cases, and it's been a long time since you've been on the police department. And no one here expects you to remember every detail, but seeing your name and your partner's name on that pretty much indicates to you that you were working on that case, correct?

A. Yes.

Q. Okay. And you were one of arresting officers, correct?

A. Apparently.

Q. Okay. And we can tell by that date, that says the date of the murder. I think we established yesterday was December 19th of 1991, correct?

A. Right.

Q. Okay. And then going back to the umbrella case. You had said yesterday, on further thought, that you believe that that happened around Mother's Day of 1989, correct?

A. Yes.

Q. Now, again, because memory is memory, you said different dates on different occasions, is that fair to say?

A. Oh, sure.

Q. Yeah. At your deposition you said it may have been '88, may have been '89, may have '90, is that correct?

A. Correct.

Q. Okay. And at one point you actually had a blurb about this case on your website for your private business, correct?

A. On this case?

Q. No. No. On the umbrella case.

A. I don't know that -- I don't know.

Q. Okay. So I believe you had that on your website and you stated the date of that was 1992. Does that sound, correct?

MR. BOWMAN: Objection. Foundation.

THE COURT REPORTER: I'm sorry, who's objecting?

MR. LOEVY: Mr. Bowman.

THE COURT: Overruled.

BY THE WITNESS:

A. I don't recall that case being on my website.

BY MR. LEINENWEBER:

Q. Okay. Do you remember you gave a deposition on this matter?

A. Yes. I've given, I think, with court testimony, about 8 times.

Q. Right. But at least in terms of this case, you gave a deposition a couple of years ago, is that right?

A. Well, I think the first people that came out to me were from the Sotos law firm. They came to my home.

Q. Understood. Understood. But you sat down, you were sworn in, you answered --

A. Right.

Q. -- questions, correct?

A. Sure.

Q. Okay. Same type of oath you took today, to tell the truth --

A. Yes.

Q. - - correct?

And you told the truth to the best of your ability, is that correct?

A. Yes.

MR. LEINENWEBER: Counsel, I'm referring to page 350, Lines 1 to 6.

MR. BOWMAN:  Thank you.

BY MR. LEINENWEBER:

Q.  Were you asked this question and did you give this answer -- excuse me.  That's the wrong page.

MR. BOWMAN:  Page number?

MR. LEINENWEBER:  I'm sorry, it's 321, lines 16 to 24.

MR. LOEVY:  321?

MR. LEINENWEBER:  321, 16-24.

BY MR. LEINENWEBER:

Q.  And the next paragraph -- at Line 16, 321, this is question:

"Question:  The next paragraph starts in 1992 while working as a detective in Area 5."

And then you went on to describe the case in which you were uncomfortable with identification:

"... the witnesses agreed that they've been paid by a third-party to finger the person who was arrested."

Am I right in believing that the case you were describing in your MLIS frequently asked questions is the same murder investigation you were talking about in the post-conviction proceedings?

"Answer:  Yes."

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 404 of 663 PageID #:107124
Dorsch - redirect by Leinenweber
2995

And now I'm on Line 5, on page 322:

"Question: Okay. So when you created your website page, you knew that or you wrote that the case occurred in 1992, correct?

"Answer: From --"

"I asked if --"

"Answer: I wrote that, yes.

"Question: Okay. Why did you believe when you wrote that that it was in 1992, but in the post-conviction proceedings you said it was the best recollection, '88 or '89.

"Answer: Because I didn't know when Guevara became a detective.

"Question: Okay. So you were guessing?

"Answer: I was guessing at that time and at that time also."

Was that what --

A.   That's correct.

MR. LOEVY:  Objection.  Not impeaching, Your Honor.

THE COURT:  That is true, but -- -

MR. LEINENWEBER:  I'm sorry, judge.  I'll keep going.

BY MR. LEINENWEBER:

Q.   (Reading:)

"So when you wrote the web page, you were guessing?

"Answer: Yeah.

"... it was 1992?

"Answer: Yeah."

Was that the question and those answers?

A. If you're repeating from that, but I don't -- I'm having difficulty with the web page because that was created so many years ago and I haven't seen it probably since this was created.

Q. Understood. But you have no reason to doubt that when you have that answer, that you had it on your web page and you wrote it in 1992, correct?

A. I don't recall it on the web page, but I don't disagree with the dates.

Q. Fair enough. I'll move on.

So at least if we go here (indicating). So I'm not using the paper anymore. It says date of incident for Jimenez, December 19th, 1991. The umbrella case 1988, 1989 and 1990, and I forgot to put 1992.

And we also know from the questions yesterday that the victim's name in the Jimenez case was, obviously, Jose Jimenez, is that correct?

A. In that case, yes.

Q. But in the umbrella case, we don't know who the name is, correct?

A. I do not recall.

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 406 of 663 PageID #:107126
Dorsch - redirect by Leinenweber
2997

Q. Okay. So I had put down "I don't remember," but "I don't recall" is kind of the same thing.

And the location of the incident for the Jimenez case was at, I think, Sawyer and Wabansia. And so that location would be 3231 West Wabansia, correct, for the Jimenez case?

And you can check that report, if you'd like. I think actually it says 1700 North Sawyer.

A. Yes.

Q. Sawyer and Wabansia.

A. Well, wait. I think it says 1200 here.

Q. I'll take a look.

A. The Jimenez case -- oh, 1700? Where did I see 1200?

This says 1700. Yes; consistent.

Q. So I'm going to actually change this because I was wrong. I have Wabansia here.

But 1700 North Sawyer.

And for the umbrella case, it's fair to say, you don't remember where it happened, correct?

A. No, it happened right near the viaduct on Bloomingdale, but I don't remember the exact north/south street, but it was in the area of Kedzie.

Q. Okay. So Kedzie and Bloomingdale. I'll put that down.

A. Right.

Q. And the nature of the incident in both cases was, I believe we established yesterday, a drive-by shooting, correct?

A. It was common.

Q. Okay. And then I believe you said in the umbrella case, you believed it was a white car in which the shooter was in, correct?

A. I know it was a white car.

Q. Okay. But in the Jimenez case, it's a yellow car, correct?

A. Correct.

Q. Okay. So that's a little difference of yellow and white, correct?

A. (No response.)

Q. And there was a passenger in the car in the Jimenez case, a girl named Maureen Clausen. Does that name sound familiar?

A. Yes.

Q. And she was a 17-year-old girlfriend of Mr. Jimenez, correct?

A. And her name is familiar to me from reviewing the reports, as are the two witnesses.

Q. But in the umbrella case, you don't recall what the girl's name is, correct?

A. Only that she was about 13 years old and she was a cousin of the person driving the car. And that she was from Puerto Rico. And after the shooting, the family immediately sent her back to Puerto Rico. So we were not able to find her and interview her.

Q. Okay. But Maureen Clausen is the one in Jimenez, unknown

person in umbrella, right?

MR. LOEVY: Objection "unknown," Your Honor. He described the person.

BY MR. LEINENWEBER:

Q. You don't know her name, right?

A. I don't know her name.

Q. So it's unknown, correct?

A. It would've been in the report.

Q. Correct. But you don't know her name, right?

A. Yes.

Q. And I think you said that you believed that the girl in the umbrella case was 13, is that right?

A. She was young. She was 13, 14 years old.

Q. But Maureen in the Jimenez case, she's 17, correct?

A. That's correct.

Q. Okay. And I think you just said that after the incident, she moved away to Puerto Rico, the girl in the umbrella case?

A. Well, she didn't move away to Puerto Rico. She was sent back to Puerto Rico.

Q. She was gone. She went to Puerto Rico, right?

A. Right. I never talked to her. I only remember that from the report.

Q. But in the Jimenez case, Maureen -- Maureen moved to Philadelphia, correct?

A. That's correct.

Dorsch - redirect by Leinenweber

3000

Q.   Okay.  And in both cases, there were two young teenage witnesses, correct?

A.   Yes.

Q.   And I think yesterday you agreed with me, you said in both of those cases the two young witnesses were of Hispanic origin, correct?

A.   That's correct.

Q.   And the witnesses' names, at least in the Jimenez case, were a Mr. Vargas and a Mr. Nelson, correct?

A.   In the Jimenez case?

Q.   Can you take a look.

        (Brief pause)

BY THE WITNESS:

A.   That's correct.

BY MR. LEINENWEBER:

Q.   And in Jimenez, witness one, Mr. Vargas, picked the suspect out of a photo array and picked a suspect out of a lineup, correct?

A.   That's what it says, yes.

Q.   And Mr. Nelson, the second witness, he didn't make an ID either from a lineup or from the -- excuse me, from a photo array or a lineup, correct?

A.   I would have to review it.

Q.   Take a look.

        (Brief pause)

BY THE WITNESS:

A. You have to forgive me. Maybe you can help me find it, because -- I apologize, but --

BY MR. LEINENWEBER:

Q. I know it's a lot. Take my word, it's in there.

A. Okay.

Q. And in the umbrella case, Witness No. 1 picked out a photo array, ID'd the defendant -- I mean, the suspect out of the lineup, but Witness No. 2 made neither, is that correct?

A. I'm going on your word, sir. I told you, I couldn't find it.

Q. That's what you testified to previously, correct? You said that -- I think actually Mr. Bowman asked you. You had said that Rey Guevara brings in two witnesses, hustles one over to you, you're doing a photo array, the kid's taking his time, and Rey is like, "Yeah, that's the guy, right there," right? And then that guy later, witness one, later made up an ID of the lineup, isn't that what you said yesterday?

A. In the umbrella case?

Q. Yes.

A. Yes.

Q. Okay. So similarly in Jimenez and umbrella, you have one Witness No. 1 does both, picks out of the ID and picks out of a lineup. Witnesses No. 2, "Nah, can't do it either," right? They're exactly the same?

Dorsch - redirect by Leinenweber

3002

A. The same.

Q. And it came to be that you found out, at least in the umbrella case, that these kids had been bribed, right?

A. Yes.

Q. And you know in the Jimenez case that Vargas and Nelson had admitted to being bribed, too, correct?

A. No, I never knew that, sir.

Q. Okay. Well, let me show you what I've marked as Defendants' Exhibit No. 71.

MR. LEINENWEBER: If I might approach, Judge.

BY MR. LEINENWEBER:

Q. You were shown this document from your deposition, correct?

(Document tendered to the witness)

BY THE WITNESS:

A. Okay.

BY MR. LEINENWEBER:

Q. You answered questions about that in your deposition?

A. I don't recall. I would have to read it to --

Q. Go ahead. Read it.

But while you're reading it, I'll tell you what it says. It says:

"Witness Nelson and Vargas --"

MR. LOEVY: Your Honor, I object to foundation.

MR. LEINENWEBER: Judge, if you want, we can sit here and wait --

THE COURT: Wait a minute. Wait. What's the objection?

MR. LOEVY: It's a foundation objection. This is a document created by somebody else for a witness interview with somebody else.

THE COURT: And what are you using it for?

MR. LEINENWEBER: Impeachment.

MR. LOEVY: Well, it's for the truth of what's in it, Your Honor.

MR. LEINENWEBER: No, it's an impeachment, Judge.

THE COURT: Well, is it possible for me to see it so I know what you're talking about?

MR. LEINENWEBER: Sure.

This is a terrible copy. If I can approach, Judge.

THE COURT: I don't care, as long as I can read it.

MR. LEINENWEBER: You can sort of read it.

(Document tendered to the Court.)

THE COURT: Yeah, that does look pretty bad.

MR. LEINENWEBER: Yeah.

THE COURT: All right. Hold on a second.

(Brief pause)

THE COURT: So is there any basis for -- I guess I'm kind of figuring out, if the witness didn't write this report, what can be the basis for impeaching him on this report?

MR. LEINENWEBER: That he's answered questions about

this report.  He's read this report before.  And I believe he knows, having read that report, what these witnesses did.

MR. LOEVY:  Your Honor, but they can't impeach him with somebody else's report.

THE COURT:  You know, if he testified at his deposition about this report and is saying anything different about the report, I don't see what's wrong with that.

But what is the pending question?

MR. LEINENWEBER:  The pending question is, did the witnesses, Nelson and Vargas, admit to being bribed.

MR. LOEVY:  See, that's the truth.  I mean, if --

THE COURT:  Hold on.  Hold on.

MR. LOEVY:  Sorry.

THE COURT:  So in a deposition, was the witness just testifying to what was in the report?

MR. LEINENWEBER:  He was shown the report to refresh his recollection.

THE COURT:  So you are asking him whether it refreshes his recollection now?

MR. LEINENWEBER:  Correct.

THE COURT:  All right.  So you're using it to refresh recollection.

So does it refresh your recollection?

THE WITNESS:  I've never seen this report.  It's not mine.

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 414 of 663 PageID #:107134
Dorsch - redirect by Leinenweber
3005

BY MR. LEINENWEBER:

Q. You were shown that report at your deposition, correct?

A. Which deposition?

Q. At the deposition in this case, sir.

A. Which time?

Q. There was only one, sir.

A. I've only had one deposition?

Q. You only had one deposition --

THE COUR REPORTER: I'm sorry.

BY THE WITNESS:

A. I've given depositions numerous times.

THE COURT: You know, you can't both talk at once. I mean --

THE WITNESS: I've been in numerous depositions, Your Honor.

MR. LEINENWEBER:

Q. You were deposed in this case, correct? I just asked you some --

A. Yes.

Q. -- questions --

A. Yes, in the Rivera case.

Q. And at that deposition you understood that these witnesses had been bribed, correct?

MR. LOEVY: Objection, Your Honor. He just --

THE WITNESS: In the Rivera case? No.

THE COURT: Sustained.

MR. LEINENWEBER:

Q. No, in the umbrella case, sir.

In the umbrella case, you said that they were bribed, correct?

A. Yes.

Q. Okay. And in the Jimenez case, they were bribed, too, correct?

MR. LOEVY: Objection, Your Honor.

THE COURT: Sustained.

THE WITNESS: That is what that report says.

THE COURT: Sustained.

THE WITNESS: Sorry.

MR. LEINENWEBER: If I could have just one moment, Judge.

THE COURT: Sure.

(Brief pause)

BY MR. LEINENWEBER:

Q. And you understood in the umbrella case, that -- you understood in the umbrella case that the witnesses admitted to you that they had been bribed because the ex-boyfriend wanted to set up the kid, correct?

A. Yes.

Q. Okay. And, similarly, that's what happened here, too, correct, in the Jimenez case?

Dorsch - redirect by Leinenweber

3007

A.   That's what it says.

Q.   All right.   And we know from the paperwork on the Jimenez case --

MR. LOEVY:   Objection, Your Honor.   Same objection. He's still working off the Jimenez paperwork.

MR. LEINENWEBER:   That's the one that he was the arresting --

THE COURT:   Let me hear the witness.

BY MR. LEINENWEBER:

Q.   We know from Exhibit 70 in which you said you were the arresting officer in the Jimenez case, right?   That the suspect who was arrested in that case was a man named Robert Ramos, correct?

A.   Yes.   From reviewing the reports I see that, yes.   And I recall the names.

Q.   Right.   However, in the umbrella case, you do not recall the name of the defendant or suspect, correct?

A.   Well, I only recall these names because they were handed to me.   If I would gladly have the other report, it probably would enhance my memory.

Q.   Of course.   And if that other report existed, sir, I would give it to you.   You'd be sure of that.   And if I didn't, you'd be sure Mr. Bowman would, correct?

A.   At that time --

Q.   That's correct?

Dorsch - redirect by Leinenweber

A.   Repeat, please.

Q.   Sure.  Of course.

        If that report existed, you would have a copy of it either from us or Mr. Bowman, correct?

        MR. LOEVY:  Objection.

        MR. BOWMAN:  Objection.

        THE COURT:  What is the question?

        MR. LOEVY:  He should be able to answer.

        MR. LEINENWEBER:  It's a "yes" or "No" question.

        THE COURT:  Well, you're not giving him an opportunity, then.

        MR. LEINENWEBER:  Of course.

BY THE WITNESS:

A.   Repeat, please.

BY MR. LEINENWEBER:

Q.   Of course.

        If that report existed, you would have been given it, correct?

A.   It doesn't always happen that way, sir.

Q.   Okay.  But you've never seen this report, right?

A.   Reports have disappeared numerous times within the Chicago Police Department.

Q.   So -- Okay.  But you haven't seen it, correct?

A.   I -- '70?

Q.   '70 you've seen.  That's the one you were the arresting

officer on.  The umbrella case, you've never seen a report on that, right?

A.  Although I've asking for it.

Q.  You've never seen that report, right?

A.  No.  Reports were typewritten --

Q.  My question, sir, is, you've never seen the report, right?

A.  I would've loved to, yes.

Q.  My question --

A.  I have not seen it.

Q.  Correct.  Thank you.

So we know Robert Ramos is a suspect.  In Jimenez, umbrella man, we don't know who that suspect is, correct?

A.  Correct.

Q.  And I think you said you spoke -- yesterday we talked a little bit about it.  You spoke to Mr. Ramos' father, "Good kid.  Wouldn't do this."  He had a previous gun charge, right?

A.  I never said I talked to Mr. Ramos' father.

Q.  Sorry.  You're correct.

A.  We were talking about the umbrella case, sir.

Q.  You talked to unknown umbrella guy person, right?

A.  That's correct.

Q.  We don't know his name either, right?

A.  It would've been senior.

Q.  All right.  So senior.

A.  Father.

Q. Father. He comes in, says, "This is a good kid. He would've done something." Basically convinces you, correct?

A. Convinced me to take a look at it. I already had doubts, so I was willing to go that route.

Q. Understood. Understood.

And you found out that umbrella suspect had a gun charge, but the dad explained it, right?

A. And the report explained it, too.

Q. Correct. And in the Jimenez case, as you answered my question yesterday, you knew that Mr. Ramos had a gun charge that had been dismissed, too, correct?

A. No.

Q. Let's take a look.

Excuse me. Yesterday you said you had, do you remember that question?

A. Oh, if we're talking about Ramos, you brought out the fact that he had a defaced firearm.

Q. Correct. And it was a gun charge, right?

A. But I wasn't shown any paper.

Q. I didn't show you any paper, correct.

A. Right.

Q. But there was a gun charge, right? And you admitted it?

A. As you said.

Q. Correct. So in both umbrella man and Ramos, there's a prior gun charge, right?

A. According to what you described for Mr. Ramos, they both would've had gun charges.

Q. And when you investigated umbrella man, you found out he worked at Walgreens, correct?

A. Yes.

Q. And if you look at your report there in Jimenez, Mr. Ramos worked at Walgreens, too, correct?

A. In this report, but I wouldn't have known that at the time.

Q. Right. But in your report, it says he worked at Walgreens, correct?

A. Yes.

Q. And it also says, umbrella man and Mr. Ramos were both DePaul students, correct?

A. I want to change something. I would not say "in my report," sir. I'm going to say, "in this report it says that."

Q. Fair enough. We obviously know that lots of officers, Gang Crime Specialists, police officers, detectives, they all work on these reports; fair enough?

A. Correct.

Q. Okay. But those reports indicated that both umbrella man and Mr. Ramos worked at Walgreens and went to DePaul, correct?

A. I believe so.

Q. And in the umbrella case, as you indicated, it was Rey Guevara that brought the witnesses in, correct?

A. Mr. Guevara and Mr. Gawrys.

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 421 of 663 PageID #:107141
Dorsch - redirect by Leinenweber
3012

Q.  But in the Ramos case, the Jimenez case, those witnesses came in on their own, correct?

A.  I don't know.

Q.  Let's see Exhibit 70 just to make sure you got the right page there.  Just take a look at that, please.

(Said item tendered.)

BY MR. LEINENWEBER:

Q.  I'm going to ask you to look at page 46 -- excuse me.

MR. LEINENWEBER:  This is Exhibit 70, Judge, the page is listed as RFCO24682.

If I can approach the witness?

THE COURT:  Sure.

(Document tendered to the witness)

BY MR. LEINENWEBER:

Q.  Just take a look at that and see if that refreshes your recollection.

(Brief pause)

MR. LOEVY:  Your Honor, we object to foundation.

BY MR. LEINENWEBER:

Q.  This is your report, is it not, sir?

This is in evidence.

A.  This is a report that bares my name, yes.

Q.  Correct.

MR. LOEVY:  All right.  Then we withdraw the objection, Your Honor.

Dorsch - redirect by Leinenweber

3013

BY MR. LEINENWEBER:

Q.  And in that report where I put in yellow it says:

"Vargas heard in the neighborhood that police needed the witness to the offense, and he presented himself along with Nelson to the police station to help."

Does that refresh your recollection?

A.  No.

Q.  It doesn't?

A.  No.

Q.  Is that what the report says?

A.  That's what the report says.

Q.  You have no reason to doubt that report?

A.  Oh, I have many reasons to doubt the report, sir.

Q.  Okay.  Well, at least that's what the report says, though, correct?

A.  That's what the report says.

Q.  Okay.  So at least according to this report, which you signed, it says:

"Witnesses Vargas and Nelson presented themselves to help."

Correct?  Isn't that what it says?

A.  That's what this report says.

Q.  Thank you.

So the difference here between umbrella man and

Jimenez Ramos is, in umbrella man, Rey and Steve Gawrys bring the witnesses in. In Jimenez, the witnesses volunteer and come in, right? That's the difference between them two, as you sit there today, correct?

A. That is one of the differences, yes.

Q. At least that's the difference of how the witnesses came to your attention, right?

A. According to the report, yes, that would be the difference.

Q. And I believe you said yesterday, in the umbrella case you eventually went to Branch 66, and you told the state's attorney there to get rid of the case, correct?

A. Yes.

Q. Okay. And that report indicates that you went to Branch 66 for Mr. Ramos, correct?

A. No.

Q. Take a look.

A. Well, we would've gone to Branch 66 for Mr. Ramos several years later on a similar shooting, yes.

Q. But I'm just talking about this shooting.

A. Okay. This shooting?

Q. Right.

A. Yeah.

Q. You went to Branch 66 on both cases?

A. That's what we would do, yes.

Q. And the assistant state's attorney that's listed in your

Dorsch - redirect by Leinenweber

3015

Robert is Donna Nelson, correct?

A.   If he's listed, it's in the report.

Q.   I think it's a she.

A.   Or she.

Q.   She's listed in the report as the state's attorney.

However, in the umbrella case, as you sit here, you don't know the name of the assistant, correct?

A.   There were two, because it was two nights, one for the photo ID's and the second one for a lineup.

Q.   But you don't know the names of those state's attorneys, correct?

A.   Unfortunately, I do not recall.

Q.   So we have Donna Nelson and I don't remember the state's attorney.

And then finally, you've seen the Jimenez case file, we've gone through this, but you haven't seen an umbrella man case file, correct?

A.   That's correct.

Q.   So it appears from my little cheat sheet here, that if we take your date of Mother's Day and we go -- Mother's Day 1989, and we go to a little before Christmas of 1991, that's a span, I think you agreed with me yesterday, that's 30 months, correct?

A.   Yes.

Q.   So in the span of 30 months while working as a Chicago

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 425 of 663 PageID #:107145
Dorsch - redirect by Leinenweber
3016

police detective, you had not one, but two cases involving a DePaul student, working at Walgreens --

MR. LOEVY:  Objection.  Argumentative, Your Honor.

THE COURT:  I think so.  I think it's been established.

MR. LEINENWEBER:  Yes.

BY MR. LEINENWEBER:

Q.  Two very, very, very similar cases, right?

A.  At the time that I was a detective --

Q.  No, I'm just asking if they're very similar cases.

A.  As they appear today, there are similarities and many discrepancies.

Q.  Right.  And the biggest discrepancy, I suppose, as you sit there would be, there's a Jimenez file, but there isn't an umbrella file, right?  That's the biggest difference.

A.  To me the biggest difference?

Q.  Well, let's say --

A.  Is that your question?

Q.  I'll take that back.

That's a big difference, right?

A.  That's a big difference.

Q.  Yes.

MR. LEINENWEBER:  And I'm running against my time, Judge.  I'm almost done, I promise.

(Brief pause)

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 426 of 663 PageID #:107146
Dorsch - redirect by Leinenweber
3017

BY MR. LEINENWEBER:

Q. And I think you stated yesterday -- or I know you stated yesterday, that at one point you thought Bill Johnston was your partner on the umbrella case, but on further reflection you said it was John Boyle, correct?

A. In the early conversations about my recall of the events, trying to pinpoint when Guevara was a Gang Crimes specialist, that was the unknown to me. That's why there was some conflict for me to determine who my partner was at the time.

Q. Sure. But now after you thought about it, and as you testified yesterday truthfully, it was John Boyle, correct?

A. In '89? Yes.

Q. In the umbrella case.

A. Yes.

Q. He was your partner?

A. Yes.

Q. And would it surprise you to learn that John Boyle denies this ever happened?

MR. LOEVY: Objection, Your Honor. Is Mr. Boyle going to come to court?

MR. LEINENWEBER: He is going to come to court.

MR. LOEVY: All right. We'll hear from Mr Boyle, then.

BY MR. LEINENWEBER:

Q. Would it surprise you, sir?

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 427 of 663 PageID #:10714
Dorsch - redirect by Leinenweber
3018

A. No, it wouldn't surprise me.

Q. Okay. And I believe you stated that --

MR. LEINENWEBER: If I could have one moment, Judge, if I could?

THE COURT: Sure.

(Brief pause)

MR. LEINENWEBER: Judge, a few more questions. I promise.

BY MR. LEINENWEBER:

Q. So, sir, I think you stated your role, at least in Mr. Rivera's case, you don't recall it. But apparently from like 4:30 to 7:30 on the day of September 1988, you did a lineup, correct?

A. Apparently, yes.

Q. Okay. And the way you do a lineup, we're not going to go through the whole song and dance, but most likely you're in a room with a witness and they're looking at a two-way mirror or two-way glass, right?

A. Correct.

Q. Okay. So you're in there with the witness, Orlando Lopez, correct?

A. I don't recall which side of the class I would've been on.

Q. Okay. But it's possible you spoke with Mr. Lopez that day?

A. I'm sure I did.

Q. Okay. And at the time, I take it, was your hair color a

different color than it is now?

A. I was 30 years younger, sir.

Q. So was it dark?

A. Yes.

Q. Did you have a mustache at that time?

A. Yes.

Q. And were you wearing glasses at that time?

A. Yes.

MR. LEINENWEBER: Has this been marked (indicating)?

(Counsel conferring.)

MR. LEINENWEBER: Judge, if I can approach?

THE COURT: You may.

MR. LOEVY: Is this on the pretrial order?

MR. LEINENWEBER: It's not.

MR. LOEVY: All right. Then, Your Honor, we object. They're showing an exhibit that is not on the pretrial order.

THE COURT: Okay. I haven't seen the exhibit. I don't know what it's being used for.

What are you using it for?

MR. LEINENWEBER: It's a picture of this witness from the Chicago police file.

THE COURT: Overruled.

MR. LEINENWEBER: If I can approach, Judge.

. I've marked this as exhibit --

What number?

Dorsch - redirect by Leinenweber

3020

MR. SOTOS: 229.

MR. LEINENWEBER: 290?

MR. SOTOS: 2-2-9.

BY MR. LEINENWEBER:

Q. 229. If you can take a look at that, sir.

(Document tendered to the witness:)

BY MR. LEINENWEBER:

Q. That's your picture, isn't it?

A. Yes, it is.

Q. That picture was taken, do you recall when?

Sometime in the '80s?

A. Pardon?

Q. Sometime in the '80s?

A. I think it was in an award ceremony.

Q. But it was sometime in the '80s?

A. Yes.

MR. LEINENWEBER: Judge, I would move that as an exhibit into evidence.

MR. LOEVY: No objection, Your Honor.

THE COURT: It's received.

(Defense Exhibit 229 was received in evidence)

BY MR. LEINENWEBER:

Q. So is it fair to say--I know it's 30 years ago--that you looked approximately like that?

A. Yes.

Q. We all get old, but that's what you probably looked like?

A. Yes.

Q. And I think yesterday you had said that you met with Jane Raley from Northwestern. You asked her about whether you were involved in cases. She told you about Rey. And then you offered -- she talked this case that you were involved in, correct?

A. That's not how it went, sir. And I didn't testify to that.

Q. You met with Jane Raley --

A. Yes.

Q. -- sometime, correct?

A. Yes.

Q. Okay. And you were meeting her about the -- and I'm going to mispronounce his name, and forgive me, Echeveria (phonetic).

A. Echeveria (phonetic.)

Q. That was a case that you believe the person was innocent from Wisconsin, I think?

A. From where?

Q. Wisconsin?

A. No, it's a Chicago case. And I'm still working on it, sir.

Q. And that was the reason for your meeting with Ms. Raley was to see if Northwestern would be interested in taking up this person's cause, fair to say?

A. That's right.

Q. And during the conversation, it came up that you asked are

there any cases that Northwestern was working on that you might be involved in, is that correct?

A. No, I believe she said to me, "Do you know Rey Guevara?" And I said, "Yes, I do."

Q. And you talked about the Guevara case, this case, correct?

A. Yes. She said she had a case that was his case, and my name was also on that case, and would I have any objection to talking to her at that moment about the case --

Q. And you did --

A. -- and I told her I have no problem.

Q. Okay. And you did. Let me ask --

THE COURT: One person at a time.

BY MR. LEINENWEBER:

Q. Yeah, let me ask the question, sir.

And you did, you told her. And you said, "Hey, by the way, I got some information on Rey Guevara," correct? And you told her about the umbrella story, right?

A. We did talk about the umbrella story and --

Q. You talked about the umbrella story --

A. -- we talked about other events.

Q. Okay. But the umbrella story was a big part of it, right?

A. It was a part of the conversation, sir.

Q. That was the trade, right?

A. That was the what?

Q. That was the trade. You traded that story, you traded the

umbrella story so you weren't sitting over there (indicating), isn't that fair to say?

A.   There was no lawsuit, as I understood.

Q.   Fair enough.

MR. LEINENWEBER:   Judge, I have no further questions. Thank you, sir.

THE COURT:   Let's see.   That's all the defense questioning, right?

Who was examining for the plaintiff?

MR. LOEVY:   Mr. Bowman, Your Honor.

THE COURT:   Okay.   Mr. Bowman, do you have anything else?

MR. BOWMAN:   I do.   Thank you.

RECROSS EXAMINATION

BY MR. BOWMAN:

Q.   Good morning, Mr. Dorsch.

A.   Good morning.

Q.   You've been asked this morning and yesterday a number of questions about whether the case you recall is the Jimenez case or some other case.

MR. BOWMAN:   I'm just setting the stage, Judge.

BY MR. BOWMAN:

Q.   Just putting aside which case it was.   Just leave that issue aside.

Whatever case it was, did what you say Rey Guevara

did, did it happen?

A.   Yes.

Q.   You talked yesterday about how the memory works.  And you said some things stick in a person's mind, some things don't.  Is your memory of Rey Guevara putting a finger on a photograph something that falls in the category of "sticks in the mind" or something that falls in the other category of what one tends to forget?

A.   It's vivid in my memory.

Q.   You were asked some questions about whether you had seen this old file.  Have you undertaken efforts to look for it?

A.   Years of trying to find it.  Asking for it.

Q.   Can you tell the jury the steps that you've taken to attempt to find the file that you remember.

A.   Well, because I'm not a police officer at the time of my interest in finding the file, I have to take the general steps that normal people take and file FOIA requests, Freedom of Information Act, requesting that not because I didn't know the name of the file, requesting all homicide files by name from the area.

Q.   And have those efforts bore fruit?  Were you able to obtain the file from the Chicago Police Department using those channels?

A.   No.

        (Counsel conferring.)

BY MR. BOWMAN:

Q. Did they give you any files in response to your request?

A. No, but they did send me a chronological event of homicides.

Q. And was that helpful to you in locating the file?

A. It wasn't helpful to me in locating the file, but in 1989, and I have it in my file here, it shows that they had 130 named homicide victims. And they were all named, location and dates, but yet the total for the Area 5 was 129. So that meant there was one homicide reported but not credited by the police department as one of theirs.

Q. Okay.

A. So there's one missing in my review.

Q. Mr. Dorsch, what is it like for you as a former police officer to step forward and accuse a fellow veteran of the Chicago Police Department of wrongdoing?

          MR. LEINENWEBER: Objection, Judge. Relevance, scope.

          THE COURT: Overruled.

BY THE WITNESS:

A. It's huge. I've given testimony on this case, and every case I do no longer as a police officer. In this case, I've never had an attorney present at depositions that represent me, at a deposition or in a courtroom --

          MS. ROSEN: Objection. Violates a motion in limine. If we could have a sidebar?

THE COURT:  All right.

(Proceedings heard at sidebar on the record)

MS. ROSEN:  There was a motion in limine on code of silence.  On code of silence, Your Honor.

THE COURT:  You mean whether he had an attorney present is a code of silence question?

MR. LOEVY:  It was a generalized ruling on code of silence.  You said you were going to see how the evidence goes and see if it becomes relevant.  This code of silence has become injected into the case.  He is a whistleblower.

THE COURT:  No, no, no, no.  I think it was the terminology.

MR. LOEVY:  Yes.  Not the concept.

THE COURT:  So he shouldn't use the terminology --

MR. BOWMAN:  I haven't spoken with him about it.  I don't know that -- I don't know what he's going to say, but I don't intend to use it in a question.  My point is just to have him clarify --

THE COURT:  Do you have the ruling?  Because normally I don't keep witnesses from saying what they want to say.

MR. LOEVY:  It becomes very relevant.

THE COURT:  I want to proceed my way, and I've asked for the ruling.

MS. ROSEN:  These are the motions and that's the order.

(Document tendered to the Court)

THE COURT: There was no ruling. It's granted until I reconsider it. You know, I'm not going to prevent him from saying what he wants to say. But you better not ask him about that.

MR. LOEVY: Don't use that word.

MR. BOWMAN: I'm not going to use that word.

THE COURT: All right.

(Proceedings resumed in open court)

BY MR. BOWMAN:

Q. Could you tell the jury, Mr. Dorsch, whether or not it's easy to provide evidence of wrongdoing against a fellow cop?

A. No, it's not.

Q. Can you say why, please?

A. When you're working, it's like a family. You go to breakfast, you go to lunch, you go to dinner. You spend endless also hours in courtrooms or waiting to testify at a court hearing. You work 24, 30 hours straight sometimes with partners. You trust each other greatly. You depend on each other greatly. And basically pretty much all your friends are policemen.

Q. When you came forward with the information that Rey Guevara had committed misconduct, did it affect your relationships within the Chicago Police Department?

A. Well, I wasn't really expecting when I met with Jane Raley

Dorsch - recross by Bowman

3028

what the conversation was going to be about, but later when it became known that I had talked about the incident, it greatly affected me. I mean, I've had threats.

Q. Have you -- have there been affects for you on your personal relationships?

A. Oh, I no longer associate with very many people in the Chicago Police Department, even partners. I give them space. I don't want them to have to answer. But mostly when I would run into people, they would want to know what was going on.

Q. Have you been subjected to scorn, Mr. Dorsch, as a result of coming forward with your information against Rey Guevara?

A. Oh, yes --

MR. SOTOS: Objection. Relevance, Judge.

THE COURT: Overruled.

BY THE WITNESS:

A. I even had a ranking officer telling me, "Why aren't you dead yet."

BY MR. BOWMAN:

Q. Have you been subjected to ridicule, Mr. Dorsch, because you came forward with information against Rey Guevara?

A. Yeah. People are misunderstanding. A lot of people think that I work for Northwestern Law School. And I never have. I've never been an employee. Everything I've done has been independent.

And I still get cases from Cook County Public

Defender's Office. I get cases from the Illinois Appellate Public Defender's Office. The federal government has retained me on investigations. But because of that kind of work, now being seen as being on the other side, I'm the bad guy.

Q. Is it easy for you, Mr. Dorsch, to come into this courtroom and be subjected to cross-examination by Mr. Sotos and Mr. Leinenweber the way it was yesterday afternoon and this morning?

MR. LEINENWEBER: Objection, Your Honor.

MR. SOTOS: Objection, your Honor.

THE COURT: Overruled.

BY THE WITNESS:

A. I understand their position. I know what their job is, and I understood from previous court appearances in my career that their job is to -- is on behalf of their client. I'm the bad guy.

BY MR. BOWMAN:

Q. Is that a position you'd prefer to be in, Mr. Dorsch?

A. Well, there was a time when I was considered their guy, when I'm talking about when I was a policeman. I was trusted to testify. They considered you an expert witness every time you went up there and gave testimony. Now they question your qualifications.

Q. Mr. Dorsch, you brought up in one of your answers yesterday afternoon the subject of bravery. Is there any bravery

involved in making an accusation against Rey Guevara?

MR. SOTOS: Objection, Your Honor. Leading, relevance.

THE COURT: Overruled.

BY THE WITNESS:

A. When you're a detective, the sole purpose of your job is to get to the truth. Anything short of that is a failure.

BY MR. BOWMAN:

Q. Does it go against the grain, Mr. Dorsch, for one cop, such as yourself, to make an allegation of wrongdoing against another cop?

MR. LEINENWEBER: Objection. Leading, repetition.

MR. SOTOS: Objection. Leading.

THE COURT: Overruled.

BY THE WITNESS:

A. Against another cop? People sitting in this courtroom were my friends. I am responsible for what I know and what I say. I have no control of what they will say if they were sitting in this seat.

BY MR. BOWMAN:

Q. You were asked some questions about who you told about this and when you told folks. Did I hear you say you told Sergeant Mingey.

A. Well, certainly. Sergeant Mingey went to the house to pick up the umbrella boy, which is a name he gave to that case, the

Dorsch - recross by Bowman

3031

one where we don't know the name, and we don't recall where it was, and he no longer recalls. He gave it that name.

Q. Did it -- would it surprise you, Mr. Dorsch, to learn that when Ed Mingey was asked in this courtroom about whether you had, in fact, informed him of this incident, that Ed Mingey Fifth Amendment and didn't answer the question?

A. Does it surprise me? No.

Q. And would it surprise you to learn that before Mr. Mingey started Fifth Amendment, when he was asked in his deposition that he acknowledged that, indeed, you had told him about Rey Guevara's wrongdoing?

A. Ah --

Q. Would that surprise you to learn that?

A. That he told the truth? No.

Q. Now, you were asked about John Boyle. And you testified that it wouldn't surprise you either to learn that Mr. Boyle is expected to deny that he was involved in this or that you told him, and that doesn't surprise you?

A. No.

Q. Can you tell the jury why that doesn't surprise you.

A. Well, we're individuals, we all stand-alone. And for whatever reason, you do what you do, it's your choice. I can't control his choice.

Q. There were a number of years between the incident and your conversation in 2010 with Jane Raley. And in those years, can

you tell us what you were doing.  Were you a Chicago police officer?

A.   With Jane Raley?

Q.   No.  When did you retire from the Chicago Police Department?

A.   I retired in August of 1994.  As soon as I turned 50 years of age I left.

Q.   And between 1994 and 2010, where were you?

A.   Well, I retired to northern Wisconsin where I built a new home.  And worked part-time for the Sawyer County Sheriff's Department.  Was given a job where I was training police officers for the State of Wisconsin for 2 years.

Obtained my private investigator license up there and was working cases in Wisconsin.  And then I eventually returned to Chicago, and got my private investigator license here and began picking up cases from many attorneys that had one time been state's attorneys who were now doing defense work.

Q.   Is it fair to say that in that period of time you were moving on, leaving the Chicago Police Department behind?

A.   Oh, yes.

Q.   Now, you were asked about a conversation that you had with Jane Raley.  Can you tell us what Jane Raley said to you about the interest in Guevara that prompted her to -- that prompted you to provide her this information?

MR. GIVEN:  Objection, Your Honor.  Hearsay.

MR. BOWMAN: It's for the effect on the witness, Judge.

THE COURT: Just hold on one second.

(Brief pause)

THE COURT: Okay. So why is that not hearsay?

MR. BOWMAN: Because the issue, that has been the subject to a great deal of cross-examination, has been why this witness didn't tell other people earlier about the circumstance.

THE COURT: And what Jane Raley said to him is going to -- I think I'm going to sustain the objection.

BY MR. BOWMAN:

Q. Well, the work that Jane Raley was doing was looking at wrongful convictions, right?

A. Yes.

UNIDENTIFIED SPEAKER: Leading. No foundation.

THE COURT: Overruled.

MS. ROSEN: Who is objecting? I'm sorry.

MR. BOWMAN: Mr. Daffada.

BY MR. BOWMAN:

Q. And did Jane Raley's focus on wrongful convictions influence your decision to inform her about your information on Rey Guevara?

MR. SOTOS: Objection, Your Honor. Leading.

THE COURT: Overruled.

BY THE WITNESS:

A. Well, that wasn't the purpose of why I went there. I had no idea she was going to bring up Rey Guevara to me.

BY MR. BOWMAN:

Q. But she brought it up to you?

A. Yes.

Q. Now, you were asked a number of the questions about testimony that you provided in the years since 2010 yesterday afternoon when Mr. Sotos was asking you questions. Do you remember that?

A. Yes.

Q. How many times did you say you've testified under oath about this?

A. At trials and in depositions, at least 8 times.

Q. Have you been asked to provide this testimony?

A. Well, I've been subpoenaed to courts and depositions, yes.

Q. And one of the cases that Mr. Sotos asked you about was your testimony in a case called People of the State of Illinois against Armando Serrano and Jose Montanez.

A. Yes.

Q. That was a post-conviction hearing?

A. Yes.

Q. And did you testify in that case on May 15, 2013?

A. Well, I don't recall the date, but I did testify in that case.

Q.   And do you recall that the subject of that case was whether Mr. Guevara had physically abused a witness?

MS. ROSEN:   Objection.  Foundation.

MR. LEINENWEBER:   Objection.

THE COURT:   Okay.  Tell what is the objection.  I think I heard two at the same time.

MS. ROSEN:   Foundation as to the content of the question.  How would he know.

MR. LEINENWEBER:   Objection also on relevance, Judge.

THE COURT:   On what?

MR. DAFFADA:   Relevance and scope.

THE COURT:   Hold on a second.

(Brief pause)

MR. DAFFADA:   Relevance, scope, compound.  Violates Rule 404(b).

THE COURT:   The question is, did the witness know, right?

MR. BOWMAN:   Right.

THE COURT:   So the foundation objection is overruled.

MR. DAFFADA:   404(b) objection, Your Honor.

THE COURT:   I'm sorry what?

MR. DAFFADA:   404(b) objection, Your Honor.

MR. BOWMAN:   Mr. Sotos brought it up, Judge.

THE COURT:   I think it was brought up yesterday.  I don't remember the exact context, but I think counsel can go

into anything that was opened up.

BY MR. BOWMAN:

Q. So to be clear, Mr. Dorsch, do you know that the Serrano and the Montanez case was a case in which the allegation against Mr. Guevara was that he had physically abused a witness?

THE COURT: Well, this is going to be leading. I don't think you can even ask the question this way.

MR. BOWMAN: Okay.

BY MR. BOWMAN:

Q. Do you know what the allegations were against Mr. Guevara in that case?

MR. DAFFADA: Same objection, Judge, 404(b).

THE COURT: Overruled.

BY THE WITNESS:

A. I remember being asked in a case, if it was that one, if I ever witnessed or knew of Guevara using physical force against someone.

BY MR. BOWMAN:

Q. And do you know what the outcome of that case was?

THE COURT: Let me talk to you at the sidebar.

Do you have the question you asked about this yesterday?

MR. SOTOS: I know exactly what it was, Judge.

(Proceedings heard at sidebar on the record).

Dorsch - recross by Bowman

3037

MR. SOTOS:  I asked him whether he's testified in prior proceedings about this story he's telling.  And --

THE COURT:  What story he's telling?

MR. SOTOS:  The story about Rey Guevara.

THE COURT:  About this incident?

MR. SOTOS:  Yes.

THE COURT:  Yeah.  Okay.

MR. SOTOS:  And I asked him whether he testified in three specific cases involving six specific individuals.

THE COURT:  Right.

MR. SOTOS:  Whether he did that.  And that's all we talked about.  Now he's asking about the allegations.

THE COURT:  Okay.  Correct.  I don't think that opens 404(b) up.

MR. LOEVY:  All right.  Then what we would like to establish is, and we can leave out the 404(b) at this point --

THE COURT:  That would be good.

MR. LOEVY:  He brought up the Serrano case, he brought up the Montanez case --

And the third case?

MR. ART:  Selache (Phonetic.)

MR. LOEVY:  Selache (Phonetic).  And he's implying that Mr. Dorsch did this for personal gain to try to get Northwestern to pay him money, you know, that kind of thing. He should just be able to establish what those cases were.

Those were exoneration cases.

THE COURT: No, I think that's beyond the pale.

MR. LOEVY: Your Honor, while we're at sidebar before we go back, since we're here, there's been a lot of hearsay about the Jimenez case. You know, what other people are saying happened in Jimenez.

THE COURT: Right.

MR. LOEVY: So, you know, I think we're done with the Jimenez subject, but if not, I don't want argue in front of the jury, no more hearsay about Jimenez is our objection. I don't know if they're intending to do it on redirect, but --

MR. SOTOS: I'm going to ask him about what he knew about the Jimenez case on redirect after that. I'm definitely going to do that.

MR. LOEVY: You already did that all that, and then he did all that --

THE COURT: Well, it's actually been done twice.

MR. LOEVY: And he asked the questions --

MR. SOTOS: No, Judge. He just asked him all sorts of questions about what he remembers testifying to. I want to ask him whether he -- about what my job is on cross-examination to paint him out to be a bad guy, and how what he said as to Jimenez about the umbrella case was the truth, and about how the City appears to be hiding a file, and I want to ask him whether he testified about those things before --

Dorsch - recross by Bowman

3039

THE COURT: Well, the objection was to going into a lot of hearsay about Jimenez.

MR. SOTOS: I'm not going to go into the back and forth.

THE COURT: All right.

MR. SOTOS: I'm not going to ask any hearsay questions, Judge. I won't ask a single hearsay objection.

THE COURT: All right. So make an objection.

(Proceedings resumed in open court)

BY MR. BOWMAN:

Q. In any event, Mr. Dorsch, you have had -- you have been called upon under subpoena to testify on multiple occasions about what you know about Rey Guevara, right?

A. Yes.

Q. Has your testimony been truthful?

A. Yes.

Q. Has it been easy for you to be repeatedly placed under subpoena and called upon to provide testimony --

MR. DAFFADA: Objection. Asked and Answered, cumulative.

THE COURT: It's a little different question, but it's pretty cumulative.

BY MR. BOWMAN:

Q. Let me move on to one other subject. You were shown a photograph of yourself from the late '80s, which you appeared

to be a much younger man with some different looking glasses and some darker hair and darker mustache. Do you remember seeing that?

A. Yes, I remember the photo.

Q. So let me put it to you, Mr. Dorsch, are you the guy to whom Orlando Lopez said, "Wrong guy. Wrong guy. This isn't the guy"? Did Orlando Lopez say that to you?

A. Never.

Q. What would you have if he had, sir?

A. Certainly would not have charged anyone.

MR. BOWMAN: That's all I have.

THE COURT: Okay. Mr. Sotos.

MR. SOTOS: Thank you, Judge.

FURTHER REDIRECT EXAMINATION

BY MR. SOTOS:

Q. Good morning, sir.

You testified just now that it's our job to make you the bad guy, correct?

A. From experience in the courtroom, yes.

Q. Do you understand that it's our job to probe the truth of the testimony that you give to the jury?

A. Yes.

Q. You understand that it's for the jury to decide whether or not what you're saying is truthful or not. Regardless of whether you testified repeatedly that it's truthful, it's

ultimately for the jury to decide whether, in fact, it's true, correct?

A. Most definitely, it is theirs.

Q. So do you understand that the reasons we ask you about the Jimenez file, which was disclosed, is to probe whether or not that was, in fact, the file that you were talking about rather than the umbrella file?

A. I understand why you did the that, yes.

Q. Okay. And you're certainly aware of many incredible similarities between the two cases, is that true?

A. Oh, yes.

Q. So many similarities that would you agree with me that unless you were sitting in your shoes, it would be very difficult to believe that there was another case that was so similar but still different?

A. I stated that, the first time I read that report.

Q. You were shocked at the similarities?

A. I was astounded.

Q. Still knowing that there was some other case out there --

A. Oh, I knew there were other cases similar.

Q. Right. But you were shocked when you --

MR. LOEVY: Asked and answered, Your Honor.

THE COURT: Sustained.

MR. SOTOS:

Q. You just testified that something about a chronology of

130 cases that you tried to look at -- before we do that, you testified that you've been trying to find this other file for 4 years?

A. Well, over a period of time, yeah. Yeah. Various ways.

Q. And you're aware, from your discussions with attorneys, that a lot of people have been looking for this file, correct?

A. That was why it was astounding that it was found 4 years later.

Q. And when Northwestern gave you the file, the Jimenez file, they told you that they had --

MR. LOEVY: Objection. Hearsay, Your Honor. "They told you," hearsay.

THE COURT: Well, I have no idea if it's hearsay.

Why are you asking it for?

MR. SOTOS: I want to know about his knowledge at the time. Not about whether or not -- whether it was actually a file. It's about what he was told about it and what he thought.

MR. LOEVY: Your Honor, hearsay. Objection.

MR. SOTOS: Not for the truth, Judge.

THE COURT: Let me hear the question.

Don't answer the question.

BY MR. SOTOS:

Q. When you were -- you were provided the Jimenez file by Northwestern, correct?

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 452 of 663 PageID #:107172
Dorsch - further redirect by Sotos

3043

A.  Yes.

Q.  And they told you that they had found the file you've been talking about?

MR. LOEVY:  Same objection, Your Honor.

THE COURT:  I don't see why that would be relevant except for the truth.  I'm going to sustain the objection.

MR. SOTOS:

Q.  In any event, they provided you with the Jimenez file?

A.  Yes.

Q.  Okay.  And then you looked at it and you were astounded at the similarities?

MR. LOEVY:  Objection.  Asked and Answered, Your Honor.

THE COURT:  Sustained.

BY MR. SOTOS:

Q.  You knew at the time you looked at the Jimenez file that the State's Attorney's Office --

MR. LOEVY:  Objection to Hearsay.  He's going to start saying the State's Attorney's Office --

THE COURT:  I have to hear the question.

MR. SOTOS:  He testified --

THE COURT:  No, just ask the question.

BY MR. SOTOS:

Q.  You knew at the time that you reviewed the Northwestern file that the Cook County State's Attorney's Office had

interviewed the witness in the Jimenez case, correct?

MR. LOEVY:  Objection, Your Honor.

THE COURT:  So at the time -- the question is, when the witness was provided the Jimenez file, did he know of his own knowledge?

MR. SOTOS:  Yes.

THE COURT:  Okay.  Overruled.

MR. SOTOS:  That was it.

BY MR. SOTOS:

Q.  So at the time you reviewed the Jimenez file when Northwestern provided it to you, you knew that the Cook County State's Attorney's Office had interviewed the witness who you were claiming Mr. Guevara -- no, that's not a fair question, because he says it's a different case.

You knew at the time you were provided the file that the Cook County State's Attorney's Office had interviewed the witness in the Jimenez case, correct?

A.  No, I didn't know.

Q.  Do you recall giving a deposition in this case?

A.  I recall depositions in this case.

Q.  Well, let me ask you this, do you remember when you were provided the Jimenez file?

A.  (No response)

Q.  Do you remember when you were provided the Jimenez file? If I told you it was April 25, 2015, does that make sense to

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 454 of 663 PageID #:107174
Dorsch - further redirect by Sotos
3045

you?

A.  I have no recollection at all when I got it.

MR. LOEVY:  Objection.  Foundation, Your Honor.

THE COURT:  The question --

BY THE WITNESS:

A.  I don't remember.

BY MR. SOTOS:

Q.  You don't remember?

A.  I don't remember, no.

BY MR. SOTOS:

Q.  You remember giving a deposition in the Rivera lawsuit in 2015?

A.  I'm sure I did.

Q.  April 14, 2015?

A.  I don't remember the dates.

Q.  You take my word for it?

A.  Yes.

Q.  Do you recall -- page 398, Line 6 -- do you recall being asked in April 2015:

"Question:  Have you seen, are you aware that --"

MR. LOEVY:  Objection, Your Honor.  This is the hearsay he just wants to read.  There's no foundation for it.

MR. SOTOS:  It's not hearsay.  It's about what he was aware of.

THE COURT: You know, again, you have this, I don't. I don't know what's coming. You seem to know. If you want to give me that so I can look at it, maybe I'll have a better idea.

MR. LOEVY: All right. There's no time frame on the question at all.

THE COURT: There's what?

MR. LOEVY: No timeframe on the question at all.

MR. SOTOS: Your Honor, I said it was a different --

MR. LOEVY: Your Honor --

MR. SOTOS: Can we show the witness --

THE COURT: You know, just stop arguing.

So the objection is that there needs to be a timeframe?

MR. LOEVY: No, the objection is, he's just trying to do what he said he wouldn't do at sidebar.

THE COURT: And what I just told you was, I don't know. So let me see it.

MR. SOTOS: I got it right here.

(Mr. Sotos brushing against microphone, loud noise)

(Document tendered to the Court.)

THE COURT: Come on, people. Let's just try to get some kind of professionalism in here.

(Brief pause)

THE COURT: Okay. So this is in a deposition, and the witness read something?

MR. SOTOS: He had received a Northwestern file.

THE COURT: It doesn't say that.

MR. SOTOS: Well, there's a lot of --

THE COURT: Hold on.

(Brief pause)

THE COURT: Look, I'm going to sustain the objection. You're talking about documents from Northwestern, documents from the State's Attorney's Office. I don't know what you're talking about, and I don't know why it isn't hearsay, but --

MR. SOTOS: Can I answer?

THE COURT: Sure. Sure.

MR. LOEVY: Could we go to sidebar?

THE COURT: All right. We'll go to sidebar.

(Proceedings heard at sidebar on the record.)

MR. SOTOS: May I?

THE COURT: Yeah.

MR. SOTOS: Because this goes specifically to why he is continuing to -- it goes specifically to why he is trying to claim that the umbrella file is not the Jimenez file because he knew the witness had been interviewed by the Cook County State's Attorney's Office and that he had told the State's Attorney's Office that he was bribed by another person and he was not -- and that Rey Guevara did not do anything --

THE COURT: This is the witness in the Jimenez case?

MR. SOTOS: Judge, this is -- yes.

MR. LOEVY: Yes.

MR. SOTOS: That the witness in the Jimenez case had been interviewed by the Cook County State's Attorney's Office and had told him that he was bribed by another person and that Rey Guevara did not do anything to him. And it was because --

THE COURT: And what is the basis for -- I'm getting confused. He was in the Jimenez case?

MR. SOTOS: Judge, let me explain it to you again. Northwestern gave him the Jimenez file. I tried to ask him, they told him they thought that was the case.

THE COURT: Right.

MR. SOTOS: He looked at it, and learned that this witness had been interviewed by the State's Attorney's Office in the Jimenez case.

THE COURT: Yeah, but I'm trying to figure out why we're building this whole structure on Jimenez.

MR. SOTOS: Because -- because it explains --

MR. LOEVY: Well, if I can --

THE COURT: Shh.

Go ahead.

MR. SOTOS: Because it explains why he is lying about his, his umbrella case not being the Jimenez case.

MS. ROSEN: He did work on it.

MR. SOTOS: If I could finish!

MR. LOEVY: But he did --

THE COURT: One person at a time.

MR. SOTOS: He now just blamed the Chicago Police Department for hiding one file in the chronology when there is no other file --

THE COURT: Let me.

MR. SOTOS: -- it's the Jimenez file.

THE COURT: Well, let me ask a question --

MR. DAFFADA: To answer your last question, Mr. Dorsch was involved in the Jimenez case.

THE COURT: Yeah, I got that. I was already told that.

Did he make an accusation in the Jimenez case about bribery by Guevara?

MR. SOTOS: No.

MR. LOEVY: That's the point --

MR. SOTOS: The witnesses in the Jimenez case said they were bribed by an individual --

THE COURT: Yeah, I know, but why is this on his doorstep?

MR. LOEVY: It's not, Your Honor.

THE COURT: Could I hear this? Because I'm doing fine on my own at this point.

MR. LOEVY: All right..

MR. SOTOS:  What's the question?

THE COURT:  My question is, this whole thing is about the fact that there's similar allegations in the Jimenez case. Did he make an accusation in the Jimenez case against Guevara?

MR. SOTOS:  No, because he made an accusation about an unknown unidentified file which everybody knows is the Jimenez case.  And he's saying it isn't because of the fact that the witness was interviewed by the State's Attorney's Office and said it never happened, that's why he's lying.

THE COURT:  But he never said it happened.

MR. SOTOS:  He did.

MR. LOEVY:  Your Honor, when am I going to get a turn?

THE COURT:  When did he say it happened?

MR. SOTOS:  What did he say?

THE COURT:  When did he say that Guevara bribed somebody in the Jimenez case?

MR. SOTOS:  He said --

MR. LOEVY:  He didn't.

MR. SOTOS:  No, Judge, he said --

MR. LOEVY:  Your Honor, I think you're going to -- you know --

MR. SOTOS:  Judge, this is the most serious of error after what he just said about this case and about the Chicago Police Department hiding files.

THE COURT:  All right.  Let me hear you.

MR. LOEVY: What they're trying to do is, Jim wants to tell the jury, "isn't it true that witnesses said things, isn't it true the state's attorney said things." Bring the witnesses in. They said they were going to do their rebuttal case. They want to short-circuit the rebuttal case and just do hearsay. They just want to tell this witness, didn't the state's attorney say this, didn't the witnesses say that.

Now I'm yelling. I'm sorry.

THE COURT: Yeah, you are.

MS. ROSEN: And, Your Honor, if I can --

THE COURT REPORTER: Ms. Rosen, I'm sorry, you're rubbing up against my machine and I can't write.

MS. ROSEN: Sorry!

THE COURT REPORTER: That's Okay.

MS. ROSEN: The chronology is is that he comes forward with this event that he says happened and gives all the descriptives. So then the City and Northwestern start looking through files to look for the case that matches that.

THE COURT: Yeah. I got that.

MS. ROSEN: We identified the Jimenez file. Northwestern believes it's the file, the City believes it's the file.

THE COURT: Right.

MS. ROSEN: He is told while this is happening that the State's Attorney's Office has interviewed the witnesses who

were bribed.

THE COURT: Right.

MS. ROSEN: And those witnesses say, "Yes, we were, but Rey Guevara had nothing to do with that."

THE COURT: Okay.

MS. ROSEN: So then the point is that once he learns that, all of a sudden the Jimenez file is not the file that he's talking about. It's some other unknown file with no descriptives. That's the point that we are trying to make, is that once he's confronted with --

THE COURT: Okay. Let me ask you this, I don't believe I'm hearing this for the first time, I mean the fact that there was an allegation of bribery in the Jimenez case.

MR. SOTOS: There was, Judge.

THE COURT: That didn't involve him.

MR. SOTOS: It did not involve him.

MR. LEINENWEBER: And, Judge, if I may. On my cross-examination he admitted that he knew that. He knew it in both cases.

THE COURT: That's what I thought. That's what I thought. I think we've beat this horse to death.

MR. LOEVY: So let's move on.

THE COURT: What are you trying to do now?

MR. LOEVY: Except for hearsay.

MR. SOTOS: I'm trying to demonstrate that this idea

that the -- he just testified for the first time that --

THE COURT: You know, all you're allowed to do in examination of a witness is get what you need for closing argument.

MR. SOTOS: Correct.

THE COURT: What more do you want to get than you already have?

MR. SOTOS: I'm trying to impeach his credibility on his testimony that the City of Chicago withheld or buried a file when everybody knows it's not true.

MR. LOEVY: Then ask him about --

MR. SOTOS: That was the file. So he doesn't have any foundation for saying that.

THE COURT: So if Mr. Leinenweber already established that there was an allegation of bribery in the Jimenez case that -- did you bring out what the state's attorney's position was?

MR. LOEVY: No, Mr. Sotos did. Mr. Sotos did yesterday. He did yesterday.

MR. SOTOS: He denied it today, Judge.

THE COURT: Well, if you go over it like 20 times, who knows. We've spent enough time on this.

MR. SOTOS: Wait. No, no, no. No, no. Judge, he denied it today. The deposition impeaches what he just said, that he didn't know the state's attorney had interviewed the

Dorsch - further redirect by Sotos

witness.

MR. LOEVY: But there's no timeframe on when he knew it.

THE COURT: Wait. Wait. Wait. Wait.

Okay. So if we know that by April of 2015 he had seen the Jimenez file and he knew that the witnesses said what they said.

MR. SOTOS: Yes. And that's the time we're talking about, the time of the dep.

THE COURT: You know, you can make your point with the date, you can't argue it. I've heard enough on this subject, make your point --

MR. SOTOS: That's all I want to do.

MR. LOEVY: He already asked him what the date of the deposition was.

THE COURT: Well, I just said what you can do, but I want the question that has the date in it --

MR. SOTOS: Well, can I just ask that question?

MR. LOEVY: And then we move on?

THE COURT: Yeah. Yeah. If you make the date clear.

MR. LOEVY: But then, Your Honor, we're not going to hear hearsay about what the investigators --

THE COURT: I don't know what we're going to hear.

MR. LOEVY: Well, Your Honor, we object to opening this can of worms. I was trying to --

THE COURT: Well, it's been opened for the whole darn examination. So we're not opening anything.

(Proceedings resumed in open court)

BY MR. SOTOS:

Q. Sir, you testified this morning that you were not aware that the State's Attorney's Office had interviewed the witness in the Jimenez?

MR. LOEVY: Objection to timeframe, Your Honor.

THE COURT: Sustained.

BY MR. SOTOS:

Q. As you sit here today, are you aware that the Cook County State's Attorney's Office interviewed the witness in the Jimenez case?

A. Am I aware?

Q. Yes.

A. Now I am.

Q. Were you aware of that at the time you reviewed the documents you received from Northwestern?

A. No.

Q. When did you become aware of that?

A. If I did become aware of it, I probably learned it while being at trials or depositions.

Q. Okay. So were you aware --

MR. LOEVY: Objection, Your Honor. That's what you allowed us to do.

THE COURT: Let me hear the question.

MR. LOEVY: It's hearsay, Your Honor.

BY MR. SOTOS:

Q. Were you aware on April 14th, 2015, that the Cook County State's Attorney's Office had interviewed the witness, Mr. Vargas, in the Jimenez case?

A. If somebody told me, then I would be aware. I don't know that somebody told me. I don't know --

Q. You --

A. The State's Attorney's Office never came to me and told me they interviewed anybody.

Q. Different question, sir. I'm not asking if the State's Attorney's Office told you. I'm asking you whether at the time you gave this deposition in this lawsuit in April 2015, whether you were aware that the Cook County State's Attorney's Office had interviewed the witness in the Jimenez case?

A. I do not recall which deposition.

Q. If I showed you something from the deposition, would it refresh your recollection?

A. Yes.

MR. SOTOS: What exhibit is this?

MS. GOLDEN: 67.

(Document tendered to the witness)

BY MR. SOTOS:

Q. Sir, I'm showing you what has been marked Defendants'

Exhibit 67, page 398.  Can you to review the highlighted portion, please.

(Document tendered)

BY THE WITNESS:

A.  Yes.

BY MR. SOTOS:

Q.  Does that refresh your recollection as to whether you knew at the time of the deposition that the Cook County State's Attorney's Office had interviewed the witness in the Jimenez case?

A.  Well, I think it's even unclear to me reading what is my answer.  It says, "I think that was part of what I saw."  "I think."  So do I really know?  "I think."

Q.  So you believe, at least at the time you gave your deposition, that the -- that you knew that the Cook County State's Attorney's Office had interviewed the witness --

MR. LOEVY:  Objection.  Asked and Answered.

THE COURT:  Sustained.

BY MR. SOTOS:

Q.  Did you know that the witness had told --

MR. LOEVY:  Objection, Your Honor.  Now he is testifying.

MR. SOTOS:  I'm going to ask him what he knew.  If he knew about this, I'm going to ask him what he knew about it.

THE COURT:  He says he thinks.  Okay.  "Knew," there's

no basis for that.  The witness just said that's what he thought.

BY MR. SOTOS:

Q.  Do you think he knew --

MR. LOEVY:  Objection, Your Honor.  He just wants to testify --

THE COURT:  Da-da-da.  This is the question that I thought you were going to ask, and I thought it's just been answered.  So I don't know what else you're going to do.

MR. SOTOS:  I want to probe what he actually knew at the time before he started saying that there was another file other that the Jimenez case.  I want to ask him what he knew when he knew.

MR. LOEVY:  That's what we talked at sidebar, Your Honor.

THE COURT:  So you're going to ask what he knew from other sources at the time of the deposition about this other case?

MR. SOTOS:  Right.  To probe why he is saying that the Jimenez file is not --

THE COURT:  You know, I think you're going to need to do this some other way.  I'm going to sustain the objection.  I said you could do what you said you wanted to do.  Now I don't know what you're doing.  I'm not going to do another sidebar.

MR. SOTOS:  I was just going to ask him about his

Dorsch - further redirect by Sotos

3059

knowledge, Judge.

THE COURT: Yeah, I can't even imagine, but the question has been asked and answered.

BY MR. SOTOS:

Q. Well, sir, you testified on direct examination that there was a chronology of -- that you were trying to find the other file that's like the Jimenez case, you were trying to get that from the Chicago Police Department?

A. No, I wasn't trying to find a case that was similar. I was trying to find the case that I was talking about, sir.

Q. Right. Right. Which is different from the Jimenez case?

A. I had no knowledge of the Jimenez case when I was requesting the file to the case I'm talking about.

Q. But you were on Jimenez case, right?

A. Yes.

Q. Right. So, I mean, you worked that case, too?

MR. LOEVY: Objection. Asked and Answered, Your Honor.

THE COURT: Overruled.

BY THE WITNESS:

A. Yes.

BY MR. SOTOS:

Q. All right. And so you were trying to find the other file, the umbrella file from the Chicago Police Department?

MR. LOEVY: Objection. Asked and Answered, Your

Honor. That subject has been covered.

THE COURT: Yeah. We covered this for a long time. Let's get on to something new.

MR. SOTOS: No, this was actually just brought up by Mr. Bowman on direct. And he suggested that the file is missing. It was a chronology. He hasn't been crossed on it at all, Judge.

THE COURT: Well, I'm pretty sure I heard it before.

MR. SOTOS: No, it just came up for the first time.

THE COURT: Go ahead.

MR. SOTOS: In fact, let me ask him that.

BY MR. SOTOS:

Q. You testified in response to Mr. Bowman's question that there was 129 files listed in the chronology you received from the Chicago Police Department, correct?

A. Yes.

Q. And you said that there were 130 murders committed in that same period, did I get that right?

A. I think we have it backwards, but I have it, if you want to see it.

Q. You have the chronology?

A. What I received.

Q. Okay. Yeah. Can you show that? Can you hand that to me, please?

A. Yes.

Q. You have other documents that you brought with you today?

A. No. Personal documents.

Well, actually I have 2 years, '89 and '88, because those were the years I was looking at because Guevara was a Gang Crimes specialist at that time.

In '89 with the Chicago Police --

Q. Wait a minute. Before you start reading it, maybe you better hand it to me so we can figure out what it is.

A. Sure.

(Said item tendered)

BY MR. SOTOS:

A. Thank you, sir.

MR. SOTOS: Judge, I'll mark this as Defendants' Exhibit 230.

THE COURT: How much do you have, Mr. Sotos?

MR. SOTOS: Well, I'm going to have to explore this area.

THE COURT: I know that, but I'm trying to figure out when to take a break.

MR. SOTOS: We should probably take a break.

THE COURT: All right. Let's take 10 minutes.

COURT SECURITY OFFICER: All rise.

(Recess.)

COURT SECURITY OFFICER: All rise.

Dorsch - further redirect by Sotos

(The following proceedings were had out of the presence of the jury in open court:)

MR. LOEVY: Your Honor --

THE COURT: Yes.

MR. LOEVY: -- if we could have permission to complain. Mr. Bowman's exam was maybe 10 minutes and we've already like tripled that on the re-redirect.

THE COURT: Well, I don't know what to do.

MR. SOTOS: Judge, I've got two things to bring up. First of all, I didn't anticipate all that new stuff coming in about the City. We just asked that this document that he relied on --

THE COURT: You know, I don't know what he meant to state.

MR. SOTOS: And the other thing is, you know, when I knocked over the microphone, you made a comment about the lawyers being unprofessional. And the people who were sitting back there thought it was directed at me. I don't know that it was, but it was right on the heels --

THE COURT: So you want me to say that I didn't mean that knocking over the microphone was unprofessional?

MR. SOTOS: No, I'm just --

THE COURT: I mean, the court reporter can't even figure out who's objecting. And I can't keep it all straight. You're talking over each other.

MR. SOTOS:  I just felt the need to bring it up because that was the context in which it occurred.

THE COURT:  Well, you don't bring it up unless you want me to do something.  Because I'll be happy to do something, but I don't know what it is you want me to do.

MR. LOEVY:  Well, hopefully we can get going --

THE COURT:  I'd be happy to do something, but I don't think anybody looking at this could possibly think it was anything other than lawyers yelling over each other.  So the court reporter and I can't figure out what's going on.

MR. SOTOS:  Maybe if you said something along the lines, you think the attorneys are all being professional and you weren't trying to imply otherwise because of the back and forth that was occurring.

THE COURT:  I don't think the lawyers are being professional.  I think everybody is -- it's chaos in here.  But I need to get the court reporter -- I mean, get the CSO because I don't know where he is.

(Brief pause)

MR. LOEVY:  Judge, here he is.

THE COURT:  Oh, here you are.

MR. SOTOS:  Judge, we're waiting for your --

MR. GIVEN:  I asked your clerk to make some extra copies of he documents.

THE COURT:  And he's doing it.

MR. SOTOS:  That's what we need.

THE COURT:  Well, I think it takes a little while for the jury to get in here.  We won't start until we have copies.

(Brief pause)

THE COURT:  And, you know, if everybody just calms down, you'll be making objections that the court reporter can hear, that I can understand, and people won't be tripping over things, because that's all part of the chaos that this has erupted into.

MR. SOTOS:  Just when I handed you the paper, Your Honor, and I caught --

THE COURT:  Well, everybody just needs to slow down.

(Brief pause)

THE COURT:  Here he comes.  Everybody is getting their copies.

No more speaking objections, but objections ought to have a basis.  I mean, you can't just say "object."  I'm going to ignore that; okay?

MR. LOEVY:  We understand.

THE COURT:  But I don't need speaking objections, and I don't want them.

MR. LOEVY:  While the jury is out, can we make a standing objection that they've already gone twice what Mr. Bowman has redirected and we think it's all been covered during the last exams.

THE COURT: Okay. It's not common in this courthouse to want anybody to be bloodied at the end of cross-examination, and I suppose other people have different experiences.

MR. SOTOS: Judge, you know, we have a view on that based on what we believe occurred as part of our motion with respect to Mr. Guevara and Mr. Mingey. This witness is giving very important testimony, and we think we ought to be able to probe and --

THE COURT: I'm not stopping you.

We're ready. We're ready. Where is the CSO?

(Brief pause)

THE COURT REPORTER: I'll get him, Your Honor.

(Brief pause)

COURT SECURITY OFFICER: All rise.

(The following proceedings were had in the presence of the jury in open court:)

THE COURT: Please be seated, everyone.

Mr. Sotos.

MR. SOTOS: Thank you, Your Honor.

BY MR. SOTOS:

Q. Mr. Dorsch, before we talk about the document that you just handed to me, I just wanted to make one thing clear. After you talked to Ms. Raley in 2010 or 2011, sometime after that Mr. Rivera filed a post-conviction petition. Are you aware of that?

A.  Nobody kept me informed about Mr. Rivera's case.

Q.  So you never testified about this story in connection with any proceedings involving Mr. Rivera until yesterday when Mr. Bowman asked you some questions about it, correct?

A.  Correct.

Q.  All right.  So now I want to ask you some questions about the document that you just gave me.  And it's been marked as Defendants' Exhibit 230.

And before I ask you about the substance of it, I want to ask you, have you shared this with the attorneys for Mr. Rivera?

A.  No.

Q.  Because you've been trying to find this file for several years now, right?

A.  Yes.

Q.  And you knew that a lot of people have been trying to find this file, right?

A.  No.

Q.  You knew that at the time that you were provided the Northwestern file -- I'm sorry, the Jimenez file by Northwestern in 2015, that people had thought they had found the file, right?

A.  I had hoped people were looking for the file.  I wanted it found.

Q.  But you knew when people gave it to you that people had

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 476 of 663 PageID #:107196
Dorsch - further redirect by Sotos
3067

been looking for it?

MR. LOEVY: Objection. Asked and Answered, Your Honor.

THE COURT: I mean, I don't even -- you can ask the question, but let's make it clearer.

BY MR. SOTOS:

Q. When Northwestern gave you the file in 2015, the Jimenez file, you knew that they had been looking for it?

A. I hoped they had.

Q. Right. And you knew lawyers for the City had been looking for it?

A. I hoped they had.

Q. Because you had given the story about what happened with Mr. Rivera?

A. Well, I was looking for the file myself, yes. I wanted verification.

Q. And you said you testified about this story on several occasions, as many as 8.

MR. LOEVY: Objection, your Honor.

THE COURT: Sustained.

BY MR. SOTOS:

Q. Well, in all the occasions when you did testify about it, some of the attorneys from Mr. Loevy's firm were the lawyers in those case, right?

A. Yes.

Q.  And there were other lawyers from Northwestern who were lawyers, at times, in those cases too, is that correct?

A.  Yes.

Q.  So were you talking to them during that time about this other file and where it might be?

A.  No.

Q.  Were they telling you that they were trying to find the file, too?

A.  I had asked for help from anyone that could find it, Chicago Police Department or anybody who could help me find the file.

Q.  Including the attorneys --

A.  Through my own efforts.

Q.  Including the attorneys in those other cases that were discussed.

A.  No.  No.

Q.  You didn't talk to them about --

MR. LOEVY:  Objection, Your Honor.  Asked and answered.

THE COURT:  Sustained.

BY MR. SOTOS:

Q.  When you asked people for help, like who did you ask?

MR. LOEVY:  Objection.  Asked and Answered, Your Honor.

MR. SOTOS:  I didn't ask that.

THE COURT: Overruled.

BY MR. SOTOS:

Q. Who were you asking for help?

A. Well, I asked, personally, maybe Jane Raley, Karen Daniel. Anybody who can find a file and my own records with FOIA.

Q. And did any of them -- did anybody ever tell you, the people that you asked --

MR. LOEVY: Objection. Hearsay.

MR. SOTOS: Just in terms --

THE COURT: I didn't hear the question.

BY MR. SOTOS:

Q. Did the people that you were talking to tell you that they were continuing to look for a different file after they had given you the Northwestern file --

MR. LOEVY: Your Honor --

MR. SOTOS: -- the Jimenez file?

THE COURT: And the objection?

MR. LOEVY: Hearsay, Your Honor.

THE COURT: Your Honor, I don't think it's really for the truth. Overruled.

MR. LOEVY: And relevance, Your Honor.

THE COURT: Overruled.

BY THE WITNESS:

A. No, nobody told me.

BY MR. SOTOS:

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 479 of 663 PageID #:107199
Dorsch - further redirect by Sotos
3070

Q. That they were still looking for another file?

A. No.

Q. All right. But you continued to look?

A. No.

Q. You stopped looking, too?

A. I only had 2 years that I looked at, '88 and '89.

Q. Okay. So because that's the years you think that this other incident occurred?

A. Those are the years that I knew occurred -- should've occurred.

Q. And so this is what I want to get to, so you testified earlier that you got this chronology. So you handed me a document that's been marked as Defendants' Exhibit number 230. And that's a document that you, in fact, have written all over, correct?

A. Yes.

Q. Okay.

MR. SOTOS: Your Honor, we would move to admit Defendants' Exhibit 230 at this time.

MR. LOEVY: We would object to relevance, Your Honor.

THE COURT: Overruled. I will receive it.

(Defendants' Exhibit 230 was received in evidence)

MR. SOTOS: Okay. May I publish, Judge?

THE COURT: Yes.

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 480 of 663 PageID #:107205
Dorsch - further redirect by Sotos
3071

BY MR. SOTOS:

Q. So I'm going to show you the first page of the document. This is a document that you received from the Chicago Police Department, is that correct?

A. No, you can get that off the website by just going for the Chicago Police Annual Report which will give you a summary.

Q. Okay. And you got a "42" up the upper left-hand corner. What is that?

A. I believe for that year there were 42 homicides in the 14th District.

Q. Okay. So to try to move through this quickly. At the bottom you write, "Report 130 homicide listed 129," correct?

A. Right.

Q. All right. And that's what you testified to in response to Mr. Bowman, that there was one missing file, right?

A. That's always been a question in my mind, why would there be 130 names but the police department only said there were 129 total homicides in Area 5. And maybe it's not important, but I just never, in my own mind, could understand why there was a difference of one.

Q. So what is the report that says there were 130 homicides?

A. If you go further on, you'll find the names of homicide victims that were returned to me from one of my FOIA requests. One of the only things I got back from Chicago.

Q. Okay. And that actually was attached to the same exhibit,

and that is this page (indicating). This is the first page, those, right? These are homicide victims from 1989?

A. Correct.

Q. Correct?

A. Yes. Reported by the police department.

Q. And then some other ones, correct?

A. Right.

Q. And then there's another one. So you counted up a total of 129, is that right?

A. No, from those pages there's 130 names.

Q. 130 on these pages. And so where does the 129 number come from?

A. If you go back to the police summary for districts, you'll find it's broken down in areas. In the 14th, 15th, 16th, 17th, and 25th districts total 129 homicides.

Q. Okay. That's this document that was part of the --

A. Right. You'll see 14th, 15th, 16th, and so on, lists the number of homicides, as the police report for that year coming out to only 129, where there's 130 names. Maybe it's not important, I don't know. Maybe I'm misreading it.

Q. By the way, you've never shared this document with anybody prior to you giving it to me this morning?

A. No.

Q. Okay. So correct me if I'm missing something, and I just read it, but you said there's 130 names, 130 names that are

listed in these three pages?

A. That's the police listing them, it comes out to 130.

Q. But this report says there's 129.

A. Right. And that's a summary for the same year.

Q. So there's more names listed than --

A. No, which is --

Q. -- than the index? It's the opposite?

A. Yeah. That's why I don't understand it.

Q. But you -- so if had this list, you could go through all 130 cases and then find out whether one of these is the case that's just like the Jimenez case?

A. I tried to do that.

Q. You went through them all?

A. Well, from looking at it.

Q. Were any of them the case --

A. Only by location.

I don't know. I would have to get the individual files.

Q. You never --

A. Unless I have success getting returns of anything from the Chicago Police Department from my FOIA's.

Q. All right. And then, just so we're clear, were you attempting to testify on direct examination that because there was a difference between 129 and 130 of the people listed and the index here, that somebody in the City of Chicago police

department or City itself was trying to hide the other file that the umbrella file that you said that you were involved in?

A. Was that what I was trying to say? I was trying to understand the difference. I didn't know what to say.

Q. But you don't think that what you just handed me in any way suggests that anybody who was trying to -- trying to withhold a file from you, right?

A. As I'm not the author of either of those totals, I don't know what it is.

MR. LOEVY: Your Honor, we object. This topic has been covered scanned.

MR. SOTOS: I'm just about done, Judge.

THE COURT: Overruled.

BY MR. SOTOS:

Q. But you would agree with me that you don't have any reason to think that the list of all the people is complete?

A. I don't know what to think.

Q. You don't have any reason to doubt it?

A. No. No. I don't know what it means, the difference. I don't.

Q. You're not trying to say it's incomplete?

A. No.

Q. All right. So if you wanted to --

A. I'm saying that's what was returned to me per my request for information, because you asked me what attempts did I make

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 484 of 663 PageID #:107204
Dorsch - further redirect by Sotos
3075

no find it, that's all.

Q. And you never discussed your list with any of the attorneys here or any other attorneys anywhere --

THE COURT: Definitely asked and answered.

MR. SOTOS: If I could have one minute, Judge.

(Brief pause)

MR. SOTOS: I'm done, Judge. Thank you.

THE COURT: Okay. Mr. Leinenweber.

MR. LEINENWEBER: One, I promise.

THE COURT: Go ahead.

CROSS EXAMINATION

BY MR. LEINENWEBER:

Q. Thanks for your patience, Mr. Dorsch.

Just to bring you back to the case we're here for. I think you said, and you've already said it, you don't really have any memory of the Juan Rivera, your work on the Juan Rivera case, correct?

A. Correct.

Q. And so you have no memory or knowledge of any mistakes or errors made by any of the Chicago police officers in the case, would that be fair to say?

A. Correct.

Q. And I think you were asked by Mr. Bowman, you know, if -- if a witness did say to you, "Hey, wrong guy. Wrong guy," you would remember that and you would have done something about it,

right?

A. You bet.

Q. Okay. And it wouldn't have been unusual at that time in your work as a police officer, as a detective, for a witness to express fear, correct?

MR. LOEVY: Objection to scope and relevance, Your Honor.

MR. LEINENWEBER: Judge, I think it goes directly to --

THE COURT: You know what? I can rule on it without help.

I'm going to overrule the objection. It is beyond the scope but we have an issue about that. Go ahead.

MR. LEINENWEBER: Thanks, Judge.

BY MR. LEINENWEBER:

Q. It would've been unusual in your position as a detective when you're dealing to a witness for a witness to express fear, correct?

A. Sure.

Q. And that would be something, I'm assuming, the Chicago police would say, "Don't worry about it, we're going to protect you," is that fair to say?

A. Protect would be -- I would be lying to them if I said we were going to protect them.

Q. You would comfort them, is that fair to say?

A. Right. Well, I would try to express the importance of their doing the right thing.

Q. Okay. And that wouldn't be something you would even note in a report. I take it witnesses would express trepidation, fear, whatever word, constantly to you right, when you're dealing with them?

A. Well, you would explain that the procedure for a lineup that they were protected by a one-way glass.

Q. Right. But my question was, if someone did express some anxiety or fear, that's a common occurrence, right? It happens all right?

MR. BOWMAN: Objection. Asked and Answered.

THE COURT: Overruled.

BY THE WITNESS:

A. Well, it doesn't happen all the time, sir, but it happens on occasion.

BY MR. LEINENWEBER:

Q. On occasion. Okay.

And it would happen enough, though, that it's not something you would ever note in a report, correct?

A. I don't think I ever have.

Q. Okay. And the one last question. Do you understand that with regard to the umbrella case and the Jimenez case, it's Mr. Mingey's contention that they're the same one; do you understand that?

Dorsch - further redirect by Sotos

3078

A. No, I don't.

Q. Okay. You very much, sir. Appreciate your patience.

MR. LEINENWEBER: Thank you, Your Honor.

MR. BOWMAN: Nothing further, Your Honor.

THE COURT: Okay. Thank you, sir. You may step down. Watch your step.

THE WITNESS: Thank you, Your Honor.

(Witness excused)

MR. LOEVY: At this time, Your Honor, we would call Mr. Victorson.

THE COURT: This is the witness who was not able to come before the plaintiff closed. So we're reopening the plaintiff's case for this one witness.

MR. LOEVY: Thank you, Your Honor.

THE WITNESS DORSCH: Just want to get my umbrella. Sorry, Your Honor.

THE COURT: No, that's fine.

(Brief pause)

(Witness enters the courtroom.)

THE COURT: Is this the witness?

MR. LOEVY: I believe that is.

Okay. Is this the witness?

THE COURT: Is this the witness?

MR. ART: Yes, Your Honor.

THE COURT: Okay. Sir, could you step down here,

Victorson - direct by Loevy

3079

please.

(Brief pause)

THE COURT: Please raise your right hand.

(Witness duly sworn.)

THE COURT: You may be seated.

LARRY VICTORSON, PLAINTIFF'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. LOEVY:

Q. All right. Sir, if you would state your name, please.

A. Larry Victorson.

Q. And what do you do for a living, sir?

A. I'm retired. I'm in New York City.

Q. All right. You have kids there?

A. Yes, I do.

Q. What did you do before you retired?

A. I was in private practice here in Chicago. I was a state's attorney here in Chicago. I was in private practice in El Paso, Texas. I was a prosecutor in El Paso, Texas. And for 6 months I was with the federal Justice Department in Washington, D.C., Strike Force.

Q. All right. And how long were you with the Cook County State's Attorney's Office?

A. 25 1/2 years.

Q. And one of cases you prosecuted there was the People of Illinois versus Jacques Rivera, correct?

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 489 of 663 PageID #:107209
Victorson - direct by Loevy
3080

A.   Yes.

Q.   All right.  And you haven't probably seen Mr. Rivera in more than 30 years?

A.   No.

Q.   Do you have any recollection at all about the case?

A.   Zero.

Q.   To prepare for the deposition, I saw you've been given a transcript?

A.   Yes.

Q.   Do you remember who gave it to you?

A.   The -- whoever that is.  Jim Sotos.

Q.   And nothing wrong with that.  He was trying to help you remember, which is perfectly normal, right?

A.   Yes.

Q.   All right.  In reviewing that transcript, does that bring back any memory of the case?

A.   No.

Q.   All right.  Having reviewed the transcripts, would you agree that as prosecutions go and murder cases go, this was not a particularly strong case for the state?

A.   Absolutely not.

Q.   You would agree with me?

A.   Yeah.

Q.   Because it was single-fingered child?

A.   It was.  And I'm sure I tried to get rid of it.  I'm sure I

tried to plea bargain the case, but I don't know -- I don't remember exactly what happened. But I would not voluntarily wanted to try a case like this.

Q. Well, let me understand your answer. You're saying when you looked at this file, you would've said to yourself, "Boy, I really wish I could make a deal and not have to go through with this," right?

A. Sure.

Q. All right. Was Ken Wadas a person that you knew and were friends with?

A. He was.

Q. All right. Was Mr. Wadas willing to take any deal whatsoever to plead guilty?

A. I don't know.

Q. Well, you do know, don't you?

A. No.

Q. You went to trial.

A. Listen, I'd have to see my file. The file has disappeared, right?

Q. I see.

A. All right.

Q. But the case did go to trial, right?

A. Yes, it did.

Q. So Mr. Wadas accepted no deals, we know that.

A. We know that for sure.

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 491 of 663 PageID #:107216
Victorson - direct by Loevy
3082

Q. All right. You were put on a case. You put on a witness and Israel Valentin to say that his brother had been shot, right?

A. Yes.

Q. Just to establish death. He wasn't claiming to be an eyewitness. He just said, "this is my brother. He's dead"?

A. I don't think I put him on. I think Mike Christ put him on.

Q. All right. Usually there's one witness to prove that the victim is dead, right?

MR. SOTOS: Objection. Leading.

THE WITNESS: Yeah.

MR. SOTOS: Objection. We talked about the leading.

THE COURT: I think this is an adverse witness. So I will overrule that objection.

BY MR. LOEVY:

Q. All right. Then came Orlando Lopez, the boy who did point his finger at Jacques, correct?

A. I put him on. I didn't put the first guy on, I don't believe.

Q. Oh, you had a partner, right? So maybe that was --

A. Mike Christ.

Q. And he is no longer with us? He's deceased, I think or --

A. No, he's not.

Q. All right. My mistake. I apologize to Mr. Christ. I got

Victorson - direct by Loevy

3083

confused.  I'm glad to hear he's doing well.

But he was -- who was the lead, you or Mr. Christ?

A.  I was.

Q.  All right.  And then basically you put on -- somebody put you on the kid, there was a stipulation, and then you rested, right?

A.  Yeah, I put on the kid.

Q.  All right.  Then Jacques' lawyer, Ken Wadas, put in a defense, right?

A.  Uh-huh.

Q.  He put on Mr. Letrich, who was trying to establish that the victim had identified somebody else, right?

A.  Yes, he did.

Q.  And you know that because you reviewed the transcript, today, right?

A.  Right.

Q.  And then you put on Jacques who denied the shooting?

A.  Yes.

Q.  And Jacques actually testified that he had alibi, didn't he?

A.  He did.

Q.  All right.  And at the end of your case, you had a choice, whether to end it right there or call a rebuttal, right?

A.  Right.

Q.  And, by the way, just to be clear about alibi.  He put

himself on, and said, "I wasn't there.  I was home with my family," right?

A.  Yes.  And he put in his alibi that he was with these people.  And I figured if he was really with them, he would've called them as witnesses.

Q.  And, of course, Mr. Wadas said he had so much respect for you that if he put a witness up there to say, "I remember at 3:00 o'clock on a random Saturday where I was," you would've shredded that witness, is that accurate?

A.  I don't know.

Q.  Well, were you good at what you did?

A.  Very.

Q.  If someone came in here and claimed to remember on a benign day that they remembered exactly what time it was, even though it was an uneventful day to them, you had a field day with that, right?

A.  I don't know.  I would've tried.

Q.  All right.  You had a choice when the case ended to put on a rebuttal case, right?

A.  Yeah.

Q.  And what witness did you put on in rebuttal?

A.  I have to -- you can -- who did I put on?  I put on Guevara the cop, right?

Q.  Right.

A.  Okay.

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 494 of 663 PageID #:107219
Victorson - direct by Loevy
3085

(Counsel conferring.)

THE COURT: The witness answered. You heard the answer from the witness.

MR. LOEVY: Yeah.

THE COURT: Okay.

BY MR. LOEVY:

Q. All right. What was Guevara called as a witness for?

A. Rebuttal.

Q. Do you remember that he was going to corroborate that the victim saw from behind a gold ponytail, right?

A. In the park, yes.

Q. And I said "victim," I meant witness.

A. He knew him from the park, right.

Q. I'm not asking about he knew him. I'll get to that.

A. Okay.

Q. The guy claimed to see a gold ponytail, right?

A. Yes -- well, I don't know about a ponytail. Part of his hair was dyed gold.

Q. All right. Let's take a look at Mr. Guevara's testimony. This is page 4 of Plaintiff's Exhibit 35. If we could have the Elmo.

A. Elmo? Boy oh boy.

Q. This is Mr. Guevara's testimony in rebuttal. He did put on like a little pigtail dyed in gold, right?

A. Right.

Q. All right. And that corroborated the kid who also at the trial described that the shooter supposedly had this gold ponytail, right?

A. I think so.

Q. That's good for you as the prosecutor, right? Now you got some corroboration.

A. Exactly.

Q. Now, there was no police report from back in 1988, 2 years before the trial, that talked about a gold ponytail, correct?

A. I don't know.

Q. All right. Let me ask you hypothetically, since your memory is, you know -- it's been a long time.

Would you have caused some concern if both the kid and Guevara were saying, "Yeah, the shooter had a gold ponytail," and none of the police reports, none of the notes, nothing that you had said anything about a gold ponytail, would you have inquired about that?

A. Absolutely.

Q. All right. Would you have asked Mr. Guevara about that?

A. Did I?

Q. You don't remember if you did, but would you have?

A. Whatever I did, I would've done. I did what I would've done.

Q. And you obviously had to learn from Guevara somehow that he was claiming to remember that Jacques had a gold ponytail

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 496 of 663 PageID #:107216
Victorson - direct by Loevy
3087

right?

A. If it wasn't in the police reports, I guess I did learn it that way.

Q. All right. So you would've been discussing this with Guevara before you put him on the witness stand, right?

A. Yes.

Q. Now, did you coach the kid to say that he had a gold ponytail?

A. I didn't coach anybody. I told him to tell the truth. I didn't coach anybody.

Q. And I didn't mean to --

A. I'm sure you didn't.

Q. What I'm saying is, when that kid got to you --

A. Uh-huh.

Q. -- was he already saying "gold ponytail"?

A. I'm sure he was.

Q. That's what I'm asking. So you were not the one who helped him remember gold ponytail?

A. No, I didn't.

Q. Do you know how the kid got to court that day?

A. No idea.

Q. It was not uncommon to have members of the Chicago Police Department to participate in preparing witnesses, correct?

A. Yes, it was. I never -- I didn't have a cop in with me when I prepare a witness, I don't believe.

Victorson - direct by Loevy

3088

Q. All right. You were present for the interview, right?

A. Right.

Q. So, in other words, when the trial is getting ready, you'd speak with the witness without the cops around, right?

A. I believe so. Normally, yes.

Q. All right. But have no personal knowledge either way about what was said before the witnesses were brought to you, right?

A. Of course I don't.

Q. All right. And sometimes the witnesses would get brought to you by Chicago police officers, right?

A. I don't know. We had our own investigators who would go out and bring them in, Cook County Sheriff's investigators.

Q. So there really would have been no reason for Chicago police officers to be driving the witnesses if you had your own investigators, right?

A. I don't know who brought them and why. I don't know.

Q. All right. Well, you're saying that -- but my question was, there would've been no reason for Chicago police officers to have to transport witnesses if you guys had your own transport, right?

A. Right.

Q. All right. And if Mr. Guevara testified that he did it routinely--he testified on an earlier proceeding, at a deposition--that they would bring witnesses, would you say you didn't know that, or that's not true, or which way --

A. I don't know.

Q. All right. You said it was a weak case because it was a kid pointing his finger, right?

MR. SOTOS: Objection, Judge. Asked and answered.

THE COURT: Sustained.

BY MR. LOEVY:

Q. You had more than just the kid, though, you also had a Chicago police officer, right?

A. Guevara?

Q. Right.

A. Yes.

Q. And were you intending to vouch for the credibility of the case by putting a Chicago police officer on the stand?

A. I used them in rebuttal, right?

Q. Yes.

A. All right.

Q. Okay. You said that you also called Guevara -- you also called Guevara to say something about a park, right?

A. The hair.

Q. No; remember you said about the park, too? Baseball in the park?

A. Yeah. He saw him play baseball in the park and he knew him because of the hair.

Q. And do you remember that you called Guevara -- this is the same page I showed you before.

MR. LOEVY: And if I could get the next page. I'm sorry about that, Anne.

BY MR. LOEVY:

Q. But you asked Guevara about summer in the park playing baseball, too, right?

A. Right.

Q. And Guevara confirmed that he had seen Jacques in the park, right?

A. Yes.

Q. So that also helped your case, right?

A. Yeah. I guess, yes.

Q. Because the idea was, the kid wouldn't have been believable unless he said, "Maybe I've seen this guy armed," right?

A. I'm not going to say that.

Q. All right. Showing you the next page, page 5. What Guevara said was:

"... did you ever see the defendant in the park?

And Guevara said:

" Numerous times."

Right?

A. Yes.

Q. All right. So that also helped corroborate the kid that when the kid was asked, "Hey, you're 13, how do you know this 23 year old? Did you see him in the park?" And maybe he said, "yeah, yeah, I've seen him in the park," then Guevara

Victorson - direct by Loevy

3091

corroborates that?

A.  Exactly.

Q.  All right.  Did you give the closing argument when it was time to give the closing argument?

A.  I'm sure I did.

Q.  Well, you waived it, sir.  Isn't that a little unusual?

A.  No.  It's a bench trial?

Q.  Yes.

A.  Is that unusual?  No.

Q.  But you did waive closing argument?

A.  I didn't speak in closing argument?

Q.  That's what I'm telling you.  I'll show you.  This is page 15 of the criminal trial.

A.  Didn't I say just:  Just briefly, this, that, and the other?

Q.  Here's how it ended here:

        "... at this time we would rest our

        surrebuttal."

         And then the court asked for an identification, and you said:

         "We waive opening argument."

A.  Exactly.  I made a closing argument.

        Wait a minute.  Did I make closing argument?

Q.  You did.

A.  Okay.

Victorson - direct by Loevy

3092

Q. And it was about from page 21 to 22, it was about 12 lines here.

A. Maybe -- maybe less.

Q. This is your closing argument here. It starts about -- let's see if I can find where it is.

Oh, here. I apologize, it was longer. It starts at the top of page 21. You said, We got the Humboldt Park, he got impeached, and then continue on the next page. A little more than a page of closing, right?

A. Right.

MR. DAFFADA: Objection, Judge. There's no question asked.

MR. LOEVY: A little more than closing, a page of closing.

THE COURT: Wait. Wait. I can't hear you. Say again.

MR. DAFFADA: He is not asking a question. He's testifying.

THE COURT: Well, he's allowed to lead and I don't think that is improper.

MR. DAFFADA: There is no question.

MR. LOEVY: A little more than a page of closing argument, was the question, Your Honor.

THE COURT: Well, you know, maybe part of the problem is you're going so fast.

MR. LOEVY: All right. I am trying to be respectful of the time. I will slow down.

THE COURT: Well, that's great, but we need to hear and understand.

MR. LOEVY: Very good. I will slow down.

BY MR. LOEVY:

Q. Mr. Wadas fought vigorously, did he not?

A. Fought vigorously.

Q. In other words, you and him were friends and courtroom adversaries, right?

A. Right.

Q. And you were in the same office together for at least some period of time?

A. Absolutely.

Q. "Absolutely"? Yes, right?

A. Yes.

Q. All right. And you knew him to be a good attorney, I take it?

A. Yes.

Q. He was a diligent attorney, was he not?

MR. SOTOS: Objection, Your Honor. Relevance.

MR. LOEVY: They've asked --

THE COURT: Overruled.

BY THE WITNESS:

A. From what I know, sure. Yes.

BY MR. LOEVY:

Q. And he was very passionate in his Defense of Jacques Rivera, wasn't he?

A. Yes.

Q. In fact, he put on more witnesses than you did, didn't he?

A. I guess he did.

Q. And he actually put on a surrebuttal case, didn't he?

Do you remember from the transcript?

A. If you say he did, he did.

Q. Do you remember from reading the transcript this morning that he put on --

A. No, no. Tell me who the witness is and what he said and I'll tell you.

Q. He brought in after the gold ponytail thing came up, he went out and found Rivera's a pastor named --

A. Yes. Yes. Yes. After reading the transcript, I do remember this.

Q. And he called another guy, and they both said, "What are you talking about? There's no gold ponytail on this guy"?

A. Yeah.

Q. All right. And, in fact, there was no pictures or photographs or reports about a gold ponytail.

A. I think there was a picture.

Q. Do you remember a picture of a gold ponytail?

A. I don't know. It would be in the transcript. If there

was, I would've showed it to somebody.  Did I?

Q.  Exactly.  If you had such a photo, you would've used it at trial?

A.  Right.

Q.  All right.  And if you didn't use it at trial, then you didn't have such a photo?

A.  Exactly.

Q.  All right.  Mr. Rivera was found guilty, correct?

A.  He was.

Q.  And the judge gave him 80 years?

A.  I don't remember that.

Q.  All right.  Take a look at page 8 of the sentencing transcript, and page 13.

And the part I've highlighted there with a pen, does that refresh your recollection that the judge said he was sentencing him to, "like a caged animal at the Illinois Department of Corrections"?

A.  That's what it says.

Q.  And it also looks like, the next page, that Mr. Wadas asked, "Can he see his family and say goodbye?"  And the judge wasn't having that either, right?

A.  It says there wasn't enough security in the building, I think.  Right.

Q.  All right.  Let's back up a little bit.  You reviewed the kid's testimony for what he said, right?

Victorson - direct by Loevy

3096

A.  Yes.

Q.  And he told a story about having come out of his house. Saw three shots.  Saw the back of a guy.  Ran to the store a half block away.  Talked to the clerk.  The clerk wasn't going to call the police, so he ran back and hid, and saw the next eight shots.  That was the story you put on at trial, right?

A.  If that's what it says, yes.

Q.  And you had a chance to review that this morning?

A.  Yes.  Yes.

Q.  All right.  Were you concerned that that story wasn't reflected in the original police reports?

A.  If it wasn't reflected in the original police reports, I would've been concerned, so ....

Q.  All right.

A.  Well, wait a minute.  Did he change -- I don't know.  Yeah, I would've been concerned if I saw in the police reports.  I didn't see it.

Q.  All right.  When the kid came to you, and you said you have a protocol where you go in the room and you talk to the kid without anybody else present, right?

A.  Uh-huh.

Q.  Right?

A.  Yes.

Q.  Okay.  Was the kid saying he was by the store or was he saying the story he told at trial?

A.   I don't know.

Q.   Did you coach him to say --

A.   I did not coach him.

Q.   All right.  So let me ask it very clearly then.  The story he told at trial, was that the same story he told you when you first talked to him?

        MS. ROSEN:  Objection, Judge.  Foundation.  He says he doesn't remember.

        THE COURT:  I think we have to hear that from the witness.

BY THE WITNESS:

A.   I don't remember.

BY MR. LOEVY:

Q.   All right.  Would you have helped him to change his story?

A.   No, I wouldn't.

Q.   All right.  Can you infer, then, that the story he told you the first time you met him is the story he told?

A.   Yeah.

Q.   Did you coach this kid to say --

A.   I did not coach him.

Q.   All right.  And you don't know either way whether somebody coached him before he met you?

A.   I sure don't.

Q.   And when you say you would not coach him, is this something you did not do as a prosecutor?

Victorson - direct by Loevy

3098

A. Yeah. I tell them to tell the truth, you know.

Q. And you have no recollection of your conversation with Mr. Lopez?

A. No.

Q. All right. In deciding to whether to put the kid on -- you know, he was 13 by the time at trial, but he just turned 12 at the time of the incident, right?

A. Right.

Q. Did you put some faith in the Chicago Police Department that they were bringing you a case that was legit?

MR. SOTOS: Objection, Judge.

THE COURT: The basis?

MR. SOTOS: Argumentative.

THE COURT: Overruled.

MR. SOTOS: Bringing a legit case.

THE COURT: Overruled.

BY THE WITNESS:

A. I didn't think either way about it. I mean, the case was approved by Felony Review. I got it for trial. I took it as it was. I had no reason to think the kid was lying to me. The state's attorney in Felony Review apparently didn't think so either.

BY MR. LOEVY:

Q. All right. But it's a very serious thing to prosecute a guy for murder, right?

A.   Exactly.

Q.   And obviously if you had been told about problems in the case, you would've taken those very seriously, right?

A.   Sure.

Q.   So, for example, if Mr. Guevara had told you, "You know what?  I gotta be straight with you.  There was a point in time where the kid was saying, the wrong guy.  It's not that guy.  It's the wrong guy," how would you have reacted to that?

MR. SOTOS:  Objection, Your Honor.

THE WITNESS:  I would've made --

THE COURT:  What's the objection?

MR. SOTOS:  No foundation for any conversation between him and Mr. Guevara about that.

MR. LOEVY:  We're saying this conversation didn't happen.

THE COURT:  Overruled.  Overruled.

BY THE WITNESS:

A.   It did not happen.  If that conversation would have happened, yes, I would've done something.

BY MR. LOEVY:

Q.   All right.  But you can infer that you would've had conversations with Guevara, right?

A.   Maybe not about that.  He was a rebuttal witness.

Q.   All I'm establishing is, you and Guevara would have been talking about the case at some point in time, right?

A.   Absolutely.

Q.   And you are 100 percent sure in your mind that he never told you that the kid ever expressed doubts about Jacques Rivera?

A.   Without a doubt, I'm sure.

Q.   And if you had learned anything about that, you would have had to disclosed that to the defense, correct?

A.   I would have done more.  Yes, I would've.

Q.   What do you mean?  Not only would you have disclosed it to the defense, what more would you have done?

A.   It probably would've been over.

Q.   What do you mean?

A.   I would have dismissed it, probably.

Q.   If Mr. Guevara had shared with you that there had been a first lineup -- you had an understanding that the kid picked out Jacques at a lineup, right, at some point?

A.   Yes.

Q.   If he had shared with you that there had been a first lineup, where the kid had pointed his finger at a filler and picked the wrong guy, picked a filler before he picked out Jacques in a different lineup, that would've changed your view of the case, too, would've it have?

A.   Yes.

Q.   In fact, you would had to disclose that immediately to Ken Wadas?

A.   Absolutely.

Q.   And regardless of -- it sounds like you're not sure if you would've prosecuted.  You might've?  You might not have?

MR. SOTOS:  Objection.  He's testifying for him.

THE COURT:  I'm sorry, I can't hear you.

MR. SOTOS:  He's testifying for him.  He can ask him questions.

MR. LOEVY:  It's a leading question, Your Honor.

THE COURT:  It's a leading question.  Overruled.

BY MR. LOEVY:

Q.   You want me to ask it again?

A.   Sure.

Q.   I thought I was reading your body language that -- well, you tell us.  Mr. Sotos is right.  If you had learned that he had picked out a kid -- that the kid had picked out a filler at a first lineup, he pointed his finger and got the wrong person, and before he picked out Jacques, would you have gone forward with the prosecution maybe?

MR. DAFFADA:  Objection.  Asked and answered.

THE COURT:  Overruled.

BY THE WITNESS:

A.   I don't think so.

BY MR. LOEVY:

Q.   All right.  But at a minimum, you would've disclosed that to Mr. Wadas, right?

A. Yes.

Q. And why is that?

A. I think it's the rules.

Q. What's that?

A. I think it's under the rules you do that. It's called Brady.

Q. All right. And you're being facetious. That's an important rule, right? That's an important rule?

A. Yes, it is.

Q. All right. Do you remember that contemporaneously, even as far back as September 16th, 1988, Mr. Wadas was complaining that there was a first lineup where he wasn't picked, do you remember that?

A. No.

Q. All right. Showing you the transcript. This is page 35 -- I'm sorry. Plaintiff's Exhibit 35, page 4. There was a bond hearing, right?

A. Right.

MR. SOTOS: Judge, objection. Foundation, whether he was there at a bond hearing. He wasn't involved a that point.

THE COURT: Well, do we know if Mr. Victorson was there?

MR. LOEVY: I don't know if he was there. This is in evidence, Your Honor.

BY THE WITNESS:

A.  But I don't know who this is.  He must have been the state's attorney, but I was not there at a bond hearing.

MR. LOEVY:  All right.  Well, it is in evidence and I'd like to show him the relevant parts, Your Honor.

THE COURT:  Well, if he wasn't there, I don't know what he can tell us.

BY MR. LOEVY:

Q.  Was it your understanding that Mr. Wadas was making contemporaneous complaints that, "Hey, there was an earlier lineup and my guy got to let go after that"?

A.  I never heard that.

Q.  All right.  If Mr. Wadas was asking you, "Where are the reports where my client was not picked," you would've taken that seriously, right?

A.  Absolutely.

Q.  And what would you have done?

A.  I would've given him the reports.

Q.  Well, you didn't have the reports, right?

A.  Exactly.

Q.  So how would you have gone about getting them?

A.  I didn't know they existed.

Q.  All right.  Did you take steps as the prosecutor --

MR. LOEVY:  Can I get Plaintiff's Exhibit 1.

BY MR. LOEVY:

Q.  Did you take steps as a prosecutor to make sure that you

got the stuff that existed?

A.  As far as I know I did.

Q.  What was your protocol and procedure to do that?

A.  Subpoena all reports, all police reports of the case, this, that, and the other.

Q.  But you subpoenaed them?

A.  Me and my partner.  Someone did.

Q.  All right.  So is it 100 percent clear that the Chicago Police Department was under a subpoena obligation to produce all their records in the case?

MS. ROSEN:  Objection.  Foundation.

BY THE WITNESS:

A.  I'm sure they were.

THE COURT:  Overruled.

BY MR. LOEVY:

Q.  And even without a subpoena, just a request should've been enough, right?

A.  I don't know.

Q.  I'm trying to understand your answer.  If you said --

A.  We always did it by subpoenaed.  We didn't call them and say, "Please send us police reports."  We said, "You're ordered to bring us police reports."

Q.  All right.  Well, let me show you a motion for discovery. This is Plaintiff's Exhibit 39.  These were -- this is the motion that Mr. Wadas filed in Mr. Rivera's case.  It's already

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 514 of 663 PageID #:107234
Victorson - direct by Loevy
3105

in evidence.

A. Okay.

Q. All right. These were filed rather typically, right?

A. Absolutely.

Q. And this is the criminal defense attorney saying to the state, "Hey, give us everything that exists," right?

A. Absolutely.

Q. And you took these motions seriously, right?

A. I do.

Q. Now, you didn't physically walk over to the police department and empty out their files, did you?

MR. SOTOS: Objection, Judge, to the nature of the question. You didn't walk over to the police department and empty out their files?

THE COURT: Overruled. But let's try to be more efficient.

BY MR. LOEVY:

Q. So what did you do?

A. I issued a subpoena to the police to send us the files.

Q. All right. Was it typical for you to make requests to the police department?

A. It was.

Q. Some cases you probably didn't send subpoenas, correct?

A. I don't know of any.

Q. All right. Now I'm going to show you a police report that

was -- you would've reviewed the police reports before you put on the criminal case, right?

A.  Yes.

Q.  All right.  I'm going to show you page 2 of Plaintiff's Exhibit 1.

And can you see it on your screen, sir?

A.  Yeah.

Q.  This is a report signed by Mr. Guevara and Mr. Gawrys.  And it says in here that the victim picked out your guy, Jose Rios, who is supposedly a/k/a Jacques Rivera; do you see that?

A.  Yes.

Q.  All right.  Did Mr. Guevara ever tell you, or Mr. Gawrys, or anybody else, that this was inaccurate?

A.  No.

Q.  If Mr. Guevara had told you, "You know what?  I gotta be frank with you, Mr. Prosecutor, when we told you that the victim picked out the guy you're prosecuting, actually we meant he didn't pick out the guy you're prosecuting," you would've had a Giglio or a Brady obligation to disclose if that was a false report, correct?

A.  Yes.

Q.  And explain what that means.

A.  I would say, "The cop just told me the report is not accurate."

Q.  And Mr. Wadas would've been entitled to that information,

right?

A. Absolutely.

Q. And then when Mr. Guevara took the stand, Mr. Wadas would've been able to impeach him with, "Mr. Guevara, you just said that, but isn't it true you also wrote a false report," right?

A. Right.

Q. Right?

A. Yes.

Q. And in a case like that, that's important and material impeachment evidence, would you agree?

A. Sure.

Q. And that never happened. He never told you that report was false?

A. He never told me that report was false.

Q. And even though you have no memory, how do you know that?

A. Because if he would've, I would've done something about it. I would've told the defense lawyer.

Q. All right. Do you have any memory about the scenario that Jacques supposedly got picked out by the victim from looking at photo books?

A. I read it in the transcript.

Q. All right. If you had been told that prior to the gang book identification on August 29th -- do you see that?

A. Yeah.

Victorson - direct by Loevy

3108

Q. If you had been told that Guevara had showed photos of Jacques before the kid randomly went through the book and stopped on Jacques' photos, that would've changed your view of the case, right?

A. Yeah.

Q. Because the theory you put on at trial was, "Hey, you should believe Jacques is guilty because this kid was just looking through books and stopped on Jacques' photo," right?

MR. SOTOS: Objection to the leading, Judge.

THE COURT: The leading is fine. Overruled.

BY MR. LOEVY:

Q. So that would've been material if the kid had seen photos of Jacques before the gang book identification, correct?

A. Yes.

Q. And that would've been something you would've disclosed to Mr. Wadas?

A. Yeah.

Q. And Mr. Wadas is a fine attorney. He could've made good use of that, wouldn't he have?

A. Yes, he's a fine attorney.

Q. He might've impeached Guevara, impeached the child?

A. He would have.

MR. SOTOS: Judge, objection to this witness testifying what Mr. Wadas might have done with anything. There's no foundation for that.

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 518 of 663 PageID #:107238
Victorson - direct by Loevy
3109

THE COURT: Well, it's already been answered. When you make the objection when the question is pending, I will be responsive.

BY MR. LOEVY:

Q. All right. Do you recall that Mr. Wadas was asking you, "Mr. Victorson --"

He didn't call you "Mr. Victorson." What did he call you?

A. Mr. Victorson.

Q. All right. Did Mr. Wadas ask you, "I'm not getting any GPRs. Where are all the GPRs? Where are all the reports"?

A. I absolutely don't remember that.

Q. All right. Mr. Wadas says you told him, "Look, you've got everything that I have"?

A. I did.

Q. And is that something that you would've said if it wasn't true?

A. No.

Q. Would you explain.

A. What?

Q. Can you explain?

A. You want me to explain that?

Q. Yes.

A. I don't lie. I don't withhold evidence. That's my explanation.

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 519 of 663 PageID #:107239
Victorson - direct by Loevy
3110

Q.   So you have every degree of confidence that whatever you had, you gave to Ken Wadas?

A.   100 percent.

Q.   And whatever you didn't have, you couldn't give to Ken Wadas?

A.   Well, let me think.  That's right.  That's right (laughing).

Q.   And Mr. Wadas kept his file all these years, and he says there are missing reports.  Are you the one who didn't give it to him?

A.   No.

Q.   Was there a phone number for records at the Chicago Police Department that you would call and talk to the clerk?

A.   Absolutely.

Q.   And what was the clerk's name?

A.   I don't know the clerk's name, but it was a 744 number.

Q.   All right.  So every trial you would call up the clerk and say, "I need the records for my case," right?

A.   Yeah.  And we'd also issue a subpoena, too.  Do it by phone and issue --

Q.   There were times when you felt like you weren't getting all the investigative materials, right?

A.   Never.

Q.   All right.  This is your deposition.  Remember giving a deposition in this case?

A. Sure.

Q. This is page 65, lines 15, through 66, lines 2:

"Question: If you had called Ms. Hudson to ask for an investigative file regarding a homicide in 1988, and that file that you received did not contain any GPRs, you would have called Ms. Hudson and asked for them, is that correct?

"Answer: No. Call the area, call the detective area.

"Question: I see. And can you tell us how that process would work?

"Answer: I would call the detective who is involved in the case and say, I need your GPRs in the case, do you have them?"

Did you give those answers?.

MR. SOTOS: Objection, Judge. There's nothing impeaching about that.

THE COURT: Overruled.

BY MR. LOEVY:

Q. Did you give those answers?

A. Does it say I did?

Q. Yes, it does.

A. Then I did.

Q. But you know that I have to ask that because you're an attorney. You impeach people, too, right?

A.   Just like you.

MR. SOTOS:   Objection, Judge.   He wasn't impeached in any way.

MR. LOEVY:   That objection was ruled on, Your Honor.

THE COURT:   I can go back and figure this out, but --

MR. LOEVY:   Let me ask another question.

THE COURT:   Yeah.   Go ahead.   I don't think it's a good use of our time.

BY MR. LOEVY:

Q.   There were times when you'd get the file and you say, "You know what?   There's some GPRs, I don't think I got all the GPRs."   You'd call the detectives and say, "Hey, I want all the GPR's," right?

A.   If I knew there were GPRs, absolutely, yes.

Q.   All right.   So that would happen from time to time?

A.   I'm sure it did.

Q.   All right.   In this case, if Mr. Wadas was telling you, "I got zero GPRs, I got no GPRs," you're sure you would've called up and made inquiries, right?

A.   If he said, "Hey, there's GPR's here ..."

Q.   No, I said there's no GPRs.   Sorry to interrupt you.   He said, "got no GPRs."

A.   If he would have said to me, "I have no GPRs, but there are GPRs, call the area," I would've called the area.

Q.   What if he was saying, "I got no GPRs, I have no idea if

there's GPRs because I wasn't part of the investigation, all I know is, I got no GPRs."

A.  I would've called the area.

Q.  All right.  And would you have satisfied yourself that you had exhausted the efforts?

A.  Yeah.  If they'd told me there are no GPRs, I wouldn't go there and search myself.

Q.  All right.  But it was your job, not Mr. Wadas's job, to make sure the police department was on adequate notice that you needed their records, right?

A.  Absolutely.

Q.  Did Mr. Wadas have a right to rely on you to do that job?

A.  Sure did.

Q.  Did you take that responsibility seriously?

A.  Yes.

Q.  Would it have been diligent of Mr. Wadas to take your word for it that you had exhausted the efforts to get the GPRs?

A.  Absolutely.

MR. SOTOS:  Objection, Judge, this witness commenting on another's diligence.  Not disclosed for that purpose.

THE COURT:  Sustained.

BY MR. LOEVY:

Q.  From the context of your interactions with Mr. Wadas -- and you had experience with the criminal justice system, correct?

A.  I did, yes.

Q. And with a criminal defense attorney, too?

A. Yes.

Q. All right. Was it diligent for a criminal defense attorney to rely on what a prosecutor is telling them or does the criminal defense attorney have to assume --

MR. SOTOS: Objection.

MR. LOEVY: -- that the prosecutor is lying?

THE COURT: I think that this ultimate issue is for the jury. So you can get the facts you need, but let's not do legal conclusions.

MR. LOEVY: All right.

BY MR. LOEVY:

Q. You would not have proceeded with this prosecution unless you believed that the police department had given you all the documents, right?

A. Yes.

Q. And that required a measure of trust on your part, right?

MR. DAFFADA: Objection. Asked and Answered.

THE WITNESS: On my part?

THE COURT: Sustained. I think we've been over this.

MR. LOEVY: All right.

BY MR. LOEVY:

Q. Was it the practice in the courts for Mr. Wadas, if you told him there's no more documents, to file a motion to hold the police department in the contempt?

A.   I don't know.

Q.   All right.  That wasn't something that you routinely encountered, right?

MR. SOTOS:  Judge, objection.  Asked and answered.

BY THE WITNESS:

A.   No, it's not.

THE COURT:  Overruled.

BY MR. LOEVY:

Q.   And how about filing a motion.  You know, if Mr. Wadas filed a motion for discovery, you told Mr. Wadas, "Ken, you got everything there is," would it be routine practice that Mr. Wadas would accept your word?

MR. DAFFADA:  Objection.  Asked and Answered.

THE COURT:  Sustained.

BY MR. LOEVY:

Q.   You have since learned that this was a wrongful prosecution, correct?

MR. SOTOS:  Objection, Judge.  Objection --

THE COURT:  Overruled.

MR. SOTOS:  -- to the phrase --

BY THE WITNESS:

A.   I know about this lawsuit, right here (indicating).

THE COURT:  Okay, wrongful conviction.

MR. SOTOS:  If his point is that he was released and he didn't commit the crime, that's one thing, but asking him

whether he learned it's a wrongful prosecution --

THE COURT: Well, that's why i said --

MR. LOEVY: All right. Maybe I can clarify.

THE COURT: Rephrase it, yes.

BY MR. LOEVY:

Q. Your job as a prosecutor is not just to get convictions, right?

A. Yes.

Q. You want to convict the guilty people and not the not guilty people, right?

A. Yes.

Q. And you have some regret that apparently something went wrong in this process?

A. No, I don't have any regret. I had nothing to do with it if something did. I have no regrets. I did the right thing, period.

Q. You did the right thing with the information you had, right?

A. Yes.

Q. And this was not your fault, was it?

MR. SOTOS: Objection, Judge.

THE COURT: Overruled.

BY THE WITNESS:

A. No -- or what's not fault?

Q. All right.

A.   But what's not my fault?

Q.   It was or wasn't?

A.   What -- what are you talking about is not my fault?

THE COURT:  Are you withdrawing the question?

MR. LOEVY:  Yes, Your Honor.

THE COURT:  Okay.  The question is withdrawn.

THE WITNESS:  Good idea.

THE COURT:  Cross-examination.

MR. SOTOS:  Judge, I have quite a bit.  I don't know if you want to break, but --

THE COURT:  Okay.  Five after 1:00, ladies and gentlemen.

COURT SECURITY OFFICER:  All rise.

(The following proceedings were had out of the presence of the jury in open court:)

MR. GIVEN:  Judge, I do have a copy, a courtesy copy of the motion that was filed.

THE COURT:  Excellent.  Thank very much.

(Luncheon recess taken from 12:06 o'clock p.m. to 1:05 o'clock p.m.)

Victorson - direct by Loevy

\* \* \* \* \* \* \* \*


I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER


/s/Blanca I. Lara                    June 20, 2018

3118

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JACQUES RIVERA,                              ) No. 12 CV 4428
                                             )
          Plaintiff,                         )
                                             )
vs.                                          ) Chicago, Illinois
                                             )
REYNALDO GUEVARA, STEVE GAWRYS,              )
DANIEL NOON, JOHN GUZMAN, JOSEPH FALLON,     )
JOSEPH SPARKS, PAUL ZACHARIAS, GILLIAN       )
MCLAUGHLIN, JOHN LEONARD, EDWARD MINGEY,     )
RUSSELL WEINGART, ESTATE OF ROCCO            )
RINALDI, CITY OF CHICAGO,                    ) June 21, 2018
                                             )
          Defendants.                        ) 1:06 o'clock p.m.

VOLUME 13-B
TRANSCRIPT OF PROCEEDINGS - Trial
BEFORE THE HONORABLE JOAN B. GOTTSCHALL
and a jury

APPEARANCES:

For the Plaintiff:     LOEVY & LOEVY
                       BY:  MR. JONATHAN I. LOEVY
                            MR. STEVEN E. ART
                            MR. ANAND SWAMINATHAN
                       311 North Aberdeen Street
                       3rd Floor
                       Chicago, Illinois  60607

                       MacARTHUR JUSTICE CENTER
                       Northwestern University School of Law
                       BY:  LOCKE E. BOWMAN III
                       357 East Chicago Avenue
                       Chicago, Illinois  60611
                       (312) 503-0844

Court reporter:              Blanca I. Lara
                        Official Court Reporter
                        219 South Dearborn Street
                            Room 2504
                        Chicago, Illinois 60604
                         (312) 435-5895
                       blanca_lara@ilnd.uscourts.gov

3119

APPEARANCES:   (Continued)

For the Individual          THE SOTOS LAW FIRM
Defendants:                 BY:   MR. JEFFREY N. GIVEN
                                  MR. JAMES G. SOTOS
                                  MS. CAROLINE P. GOLDEN
                                  MR. JOSEPH POLICK
                                  MR. DAVID A. BRUEGGEN
                            550 East Devon Avenue, Suite 150
                            Itasca, Illinois  60143

For the Defendant           ROCK FUSCO & CONNELLY, LLC
City of Chicago:            BY:   MS. EILEEN E. ROSEN
                                  MS. CATHERINE M. BARBER
                                  MS. THERESA B. CARNEY
                            321 North Clark Street, Suite 2200
                            Chicago, Illinois  60654

For the Defendant           LEINENWEBER BARONI & DAFFADA, LLC
Guevara:                   BY:   MR. THOMAS E. LEINENWEBER
                                  MR. JAMES V. DAFFADA
                            120 North LaSalle Street, Suite 2000
                            Chicago, Illinois  60602

3120

(Jury out.  Proceedings heard in open court:)

COURT SECURITY OFFICER:  All rise.

THE COURT:  Ready?

MS. ROSEN:  Judge, just one thing before we put Mr. Hickey on.

We discussed the issue about the -- how to deal with the Palmer -- the conclusion of the Palmer litigation.

THE COURT:  Yes.

MS. ROSEN:  We have reached an agreement.  But for purposes of the record, it's the city's position that they should be allowed to go into the conclusion as we argued in our motions *in limine*.  But for purposes of dealing with it today, we have --

THE COURT:  You reached an agreement?

MS. ROSEN:  -- crafted the question, and we'll go forward without waiving the city's original --

THE COURT:  Okay.

MR. SOTOS:  And -- oh, I'm sorry.

MS. ROSEN:  -- without waiving the city's original position.

THE COURT:  Okay.  That's helpful.

Yes?

MR. SOTOS:  Judge, normally we would be moving for directed verdict under Rule 50 -- judgment as a matter of law under Rule 50 after the -- Mr. Victorson testified, because we

3121

had thought that they were going to close their case after that.

But in light of the Court's rulings on scope, I'm not sure that that's still something -- I don't know that their case is ever really closed until all the evidence is in if the Court --

THE COURT: Well, that's an interesting question. But there aren't going to be any other witnesses called for the plaintiff.

MR. LOEVY: Not --

THE COURT: So unless you're calling witnesses --

MR. SOTOS: We should --

THE COURT: -- because I assume the plaintiffs want to -- is going to want to post some substantive evidence, I think we're done.

MS. ROSEN: Right.

MR. SOTOS: All right. Then we'll be moving after Mr. Victorson under Rule 50.

THE COURT: Okay. All right. We're going to continue with Mr. Victorson, right?

MR. SOTOS: Yes.

THE COURT: And is he here? Okay.

MR. LOEVY: Mr. Sotos said we're done. We don't know who their other witnesses are, just so we're clear.

MR. SOTOS: No, no. We're -- not -- the case isn't

3122

done.  But, I mean, usually, you know, we want to move --

THE COURT:  Mr. Victorson, you can retake the witness stand.

(Witness resumes the stand.)

MR. SOTOS:  We want to make a Rule 50 motion, and I'm just --

THE COURT:  I understand, but I'm saying that I left the case open for Mr. Victorson.

MR. SOTOS:  Right.

THE COURT:  It would be nice for us to know who these witnesses are, okay, so we can call this, and you'll know.

MR. SOTOS:  We've given them -- given them our witnesses.  Now we're going to add --

THE COURT:  Oh, okay.

MR. LOEVY:  Oh, I didn't know that was a final list.

MS. ROSEN:  No, no, it's not a final --

MR. SOTOS:  It's not a final list.  We have to add a couple now as a result of what happened with Mr. Dorsch, but --

THE COURT:  Well, I can't -- I can't advise you on what to do with the Rule 50, because I don't know what -- who these witnesses are or what kind of issues they're going to raise or anything.

MR. SOTOS:  All right.

THE COURT:  But you probably want to make your record, because the Court of Appeals is not as generous with these

3123

things as I am, as I'm sure you know.

MR. SOTOS:  Understood, Judge.  Thank you.

THE COURT:  I don't care when you make the motion. It's mostly because I don't know the rules.

(Discussion off the record.)

THE COURT:  And do we know who is going to examine Mr. Victorson?  Will it just be you?

MR. SOTOS:  Yes.

THE COURT:  Just you?

MR. SOTOS:  Yes, Judge.

THE COURT:  Okay.

MR. LEINENWEBER:  Judge, I just have, like, two questions.

THE COURT:  Okay.  Two of you.  Thank you.

MR. SOTOS:  Do you have any questions of Mr. Victorson?

MS. ROSEN:  Oh, I'm sorry.  I do not.

THE COURT:  Okay.

MS. ROSEN:  Not -- well, not at this time.  I suppose something could come up that would change that, but --

COURT SECURITY OFFICER:  All rise.

(Jury in.)

THE COURT:  Please be seated, everyone.

Mr. Sotos.

MR. SOTOS:  Thank you, Your Honor.

LARRY VICTORSON, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

CROSS-EXAMINATION

BY MR. SOTOS:

Q.  Good afternoon, Mr. Victorson.

A.  Good afternoon.

Q.  I know -- we know you have to be someplace.  We'll do our best to get you out of here as quickly as possible.

A.  I canceled that appointment.

Q.  Oh, I'm sorry you had to --

THE COURT:  Sorry about that.

BY MR. SOTOS:

Q.  All right.  Let's get to it, then.

So during the direct examination, Mr. Loevy asked you whether or not the police brought you a weak case.  And you said something about Felony Review, correct?

A.  Right.

Q.  Could you explain to the jury what that Felony Review process is?

A.  Before this case was approved for -- to be sent to the trial courts -- to the State's Attorney's Office for trial, there's something called Felony Review.  And it's an assistant who is on call and especially for murders, armed robberies, rapes, that type of stuff.

Before they charge a case, before it's approved for trial, the felony assistant goes out, talks to the police

Victorson - cross by Sotos

3125

officers, talks to the witness, talks to the defendant, if the defendant is willing to talk, then makes a decision and, I guess, whether to approve the case or not, and probably calls the supervisor of Felony Review to run that decision by the supervisor.

Q.  So it's your --

MR. LOEVY:  Your Honor, we move to strike that.  We already heard from Ms. Rosner about Felony Review.

THE COURT:  Well, I think unless we're going to do something different from what Ms. Rosner's done --

MR. SOTOS:  I was just following up on what he elicited from him on direct.  That's it.  We're not going to go anymore into Felony Review.

THE COURT:  Okay.  Because -- because it is repetitive.

MR. SOTOS:  Of course.  We're moving right -- right beyond that.

BY MR. SOTOS:

Q.  So the point here is that when you got the case, it had already been approved by the Felony Review Division?

A.  Correct.

Q.  Okay.  And so once you get the case, in terms of whether it's a weak case or a strong case or somewhere in the middle, the decision about whether to go forward with that case is a decision that's made by the State's Attorney's Office, correct?

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 536 of 663 PageID #:107256
Victorson - cross by Sotos
3126

MR. LOEVY: Your Honor, leading. Objection, leading.

THE COURT: Sustained.

BY MR. SOTOS:

Q. So who -- who makes the decision whether or not to go forward with a prosecution?

A. The State's Attorney's Office.

Q. Okay. And does that apply whether the case is weak, strong, or somewhere in the middle?

A. Yes.

MR. SOTOS: And -- and, Your Honor, I thought that the rule on leading was that --

THE COURT: The rule on leading --

MR. SOTOS: -- if they called the witness that --

THE COURT: No. Let me make it clear, because I think I did, but if I didn't, the rule on leading is that I'm not going to find anybody adverse to one side or the other unless I have a foundation in advance before we get into this process.

MR. SOTOS: Understood, Judge.

THE COURT: So this is your witness, and so you wouldn't lead but --

MR. SOTOS: Okay.

THE COURT: No, no, I'm sorry. Plaintiff called this witness.

MR. SOTOS: Plaintiff called the witness, Judge. I thought --

Victorson - cross by Sotos

3127

THE COURT:  I'm sorry.  My mistake.

No, you may lead.

MR. SOTOS:  Okay.  Thank you.

THE COURT:  I'm sorry about that.

MR. SOTOS:  That's fine.  Thank you.  I appreciate that, Your Honor.

THE COURT:  Forgot where we were.

MR. SOTOS:  We've got a lot going on in here.

THE COURT:  Yeah, we do.

BY MR. SOTOS:

Q.  So the -- so then that's a decision that's made by your office -- regardless of the strength of the case, you have to decide whether it's strong enough that your office decides to prosecute?

A.  Correct.

Q.  And so once you get the case, there's a process that occurs that's called the discovery process, right?

A.  Yes.

Q.  And in this case, you served on -- typically, there's a motion for discovery that the defendant will file in the case?

A.  Yes.

Q.  And then you'll file a response to that?

A.  Yes.

Q.  All right.  And I'm going to put up on the screen for you a document that's in evidence as Defendants' Exhibit 23-L.

And I'm going to represent to you that this is an answer to discovery that was filed in Mr. Rivera's case during -- during the pretrial phase of the case. It's kind of small. I don't know if we can get that -- I don't think we really need to.

Just to move it along, do you see all of the names that are under No. 2?

A. Yes.

Q. Can you see them?

A. Yes.

Q. All right. There's a number of individuals, including the witness, Orlando Lopez, correct?

A. Yes.

Q. Several hospital personnel?

A. Yes.

MR. LOEVY: Your Honor, we object. It's been shown to Mr. Wadas and read to -- by the defense to Mr. Wadas, too. This is cumulative. We should go to new areas.

THE COURT: Overruled. I don't know where we're going with this.

BY MR. SOTOS:

Q. And several police officers, correct?

A. Correct.

Q. All right. Mr. Loevy asked you a number of questions during direct examination about what Mr. Wadas did during the

case.

Do you know whether he interviewed the people on that list or any of the people on the list?

A.  No, I don't.

MR. LOEVY:  Objection, foundation, Your Honor.

THE COURT:  Overruled.

BY MR. SOTOS:

Q.  You don't know one way or the other?

A.  I do not know.

Q.  And if he didn't, you don't know why that would be, right?

MR. LOEVY:  Same objection, Your Honor.

BY THE WITNESS:

A.  No.

THE COURT:  Overruled.

BY MR. SOTOS:

Q.  And the purpose of providing this information to the defense is so that the defendants have information -- that the defendant's lawyer has information that he can follow up on if he feels that any of its worth following up on, correct?

A.  Yes.

Q.  And the discovery process doesn't just involve the answer that you filed to the motion for discovery, correct?

A.  No, it's a continuing duty.

Q.  It's an ongoing process?

A.  Yes.

Q. A lot of back and forth between the prosecution and the defense lawyer?

A. A lot.

Q. Okay. Is it uncommon for there to be situations in which it takes more than one attempt or two attempts to get all the information that's needed?

A. It's common.

Q. Okay. So you're trying to get information from police departments?

A. Anywhere we can get it.

Q. Hospitals?

A. Ab -- yes.

Q. Especially in a murder case, right?

A. Yes.

Q. So you're going to be getting medical reports from hospitals and things of that nature?

A. Yes.

Q. Okay. And aside from the answer to discovery that's filed, there's a number of police reports that are provided to the defendants as well, correct?

A. Yes.

Q. All right. I'm going to direct your attention to a couple of those.

Have you had a chance to look at any -- I know I gave you the -- I gave you the criminal trial transcript this

morning when I first met you outside of court, correct?

A. That's right.

Q. All right. And have you had a chance to review any police reports beyond that transcript?

A. No.

Q. All right. So I'm going to show you a couple of documents that were used in the criminal case and ask you a few questions about those.

So do you recall Mr. Loevy asking you some questions about if you had known that there was a lineup in which a filler had been identified, would you then have, like, done something different with the case, correct?

A. I'd have told Mr. Wadas for sure.

Q. You would have told him -- pardon me?

A. Mr. Wadas, I would have told the defense --

Q. You would have made sure you let him know if somebody had said that --

A. Yes.

Q. -- Mr. Rivera identified a filler?

A. Yes.

Q. So I'm placing in front of you on the screen Defendants' 23-F and ask to turn to the second page.

So this is a Supp. Report that the parties agree was in Mr. Wadas' file. And so if it was in Mr. Wadas' file, you would have had it, too, correct?

A.  I better of.

Q.  All right.  I'm going to try to move through this quickly so I don't take up too much time with it, but counsel will correct me if -- what it essentially details is a situation two weeks before Mr. Rivera was charged when he was placed into custody along with another individual named Rodriguez, and police attempted to do a lineup and were unable to find a witness.  Do you see --

A.  Yes.

Q.  Do you see that from your quick review of it?

A.  I do.

THE COURT REPORTER:  I'm sorry.  I can't hear you.

BY THE WITNESS:

A.  Yes, I do.  They couldn't find the eyewitness, Lopez.

BY MR. SOTOS:

Q.  And then after they couldn't find the eyewitness, they decided to try a photo array with the victim who was still -- who was still alive in the Cook County Hospital?

A.  Right.

Q.  And do you see at the bottom of that page where it says, the R/Ds -- and R/Ds stands for reporting detectives, right?

A.  Yes.

Q.  It says, R/Ds returned to Cook County Hospital with six photos, and then there's an inv. number next to that?

A.  Yes.

Q. Do you know what that inv. number stands for?

A. Inventoried those photos under that number.

Q. Okay. And what does that mean when it says that the photos were inventoried?

A. They put them in an envelope and marked them as the -- the photos that were used for the photo lineup, and they kept them.

Q. All right. And then if you turn to the next page -- you don't have to turn. We have to wait for it to get turned here.

So do you see where it lists those six individuals? And it says above that that the following is the numerical order and names of the subjects in the photos?

A. I do.

Q. All right. And with the addresses there, too?

A. Uh-huh, yes.

Q. All right. So if -- if Mr. Wadas thought it was important enough to follow up on the information in that report, in light of his client having told him that he was in a lineup, he could have interviewed the police officers who were listed on the report, correct?

A. Yes.

Q. And by the way -- well, he also could have interviewed the eyewitness, Mr. Lopez, right?

MR. LOEVY: Your Honor, the only objection we make is that this is a Wasilewski issue, you know, the exact issues.

THE COURT: Overruled.

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 544 of 663 PageID #:107264
Victorson - cross by Sotos
3134

MR. LOEVY: Okay.

BY MR. SOTOS:

Q. He could have interviewed the eyewitness, too, if he wanted to ask about a prior lineup, correct?

A. He could have, yes.

Q. Or had an investigator interview him, either way?

A. Yes.

Q. And by the way, he had said something about if he would have tried to interview the witness, that you would have blocked him in some way. Is that --

A. I don't --

Q. Is there any truth to that?

A. I don't -- explain that. I don't know what you're talking about. Let me hear that.

Q. So if a defense attorney told you that they wanted to interview an eyewitness in a case that you were prosecuting, is that something that you would try and keep from happening?

A. No, no.

Q. Would you facilitate it if they asked you to?

A. No.

Q. So what would be your position on that?

A. Go out and talk to him. If he wants to talk to you, he'll talk to you. If he doesn't -- if he doesn't want to talk to you, he doesn't have to.

Q. Basically his call?

A. Yes.

Q. Okay. And you see those six people who were listed on that report. Is there anything, as far as you know, that would have prevented Mr. Wadas from interviewing any of those individuals and asking them whether they were in a lineup?

A. Nothing I would know of.

MR. SOTOS: Can you put Plaintiff's 1 up?

BY MR. SOTOS:

Q. So we're going to put in front of you in a second an exhibit that's been entered into evidence as Plaintiff's Exhibit 1.

It's a document that Mr. Loevy asked you about during the -- his direct examination?

A. Yes.

Q. And he asked you about the statement on the bottom of that page -- excuse me -- on the second page at the top where it says, "Numerous attempts were made to interview the victim at Cook County Hospital. R/i's were able to have the victim view the gang photo book where then an identification was made of Jose Rios as the person that shot the victim."

Do you see that?

A. I do.

Q. Okay. Now, you've looked at the trial transcript in the case, correct?

A. I have.

Victorson - cross by Sotos

Q.   And you've testified on direct that this case was a single-witness identification case, correct?

A.   Yes.

Q.   So you didn't present any evidence in the criminal prosecution that the victim had ever made an identification?

A.   Sure, I did.  I mean, didn't -- didn't the victim say -- or didn't -- wasn't there testimony someone made an identification of this guy?

Q.   Yeah.  Maybe we're talking past each other.

So the eyewitness made an identification of Mr. Rivera, correct?

A.   Right.

Q.   And that was basically what the case was that was presented?

A.   Absolutely.

Q.   That witness, and then I think the -- the victim's father, Israel Valentin, testified very briefly, right?

A.   Life and death, right.

Q.   That's what you saw from reviewing the transcripts?

A.   Right.

Q.   All right.  So you didn't present any evidence that there was any other identification of Mr. Rivera that was made by the victim or anybody else?

A.   No.  Whatever --

Q.   So --

A. No.

Q. So the information that's in this report, that didn't in any way impact on Mr. Rivera's conviction?

A. How do I know that?

Q. Well, because you didn't present the evidence of it, right?

MR. LOEVY: Objection, argumentative, Your Honor.

THE COURT: Overruled.

BY THE WITNESS:

A. Repeat the question.

BY MR. SOTOS:

Q. Okay. Let me just ask it more simply.

Other than the identification that Mr. -- that the eyewitness, Mr. Lopez, made of Mr. Rivera and the brief testimony of the victim's father who described his life and death, you didn't present any other evidence in the case at trial, correct?

A. No. Right. Correct.

Q. All right. Thank you.

And when I met you this morning, I gave you a copy of the transcript of the criminal trial, correct?

A. Correct.

Q. And so were you able to review that during the time you were waiting this morning?

A. I did.

Q. Okay. It was a very short transcript, correct?

A.  It was.

Q.  And the whole thing is about 80 pages or so?

A.  What -- yes.

Q.  You didn't count them?

A.  No, I didn't.

Q.  Okay.  And -- so I'm going to ask you about that trial in a few minutes.

Before we get to that, I want to ask you a couple other questions following up about Mr. Loevy's questions about what Mr. Wadas did and your impression of him as an attorney. Okay?

A.  Yes.

Q.  I'm not asking you for an opinion.  I just want to ask you about some of the things that occurred in the case.

A.  Okay.

Q.  We've talked about whether he could have interviewed the witness or the police officers or the people in those pictures.

Oh, by the way, when the report disclosed that there were photos that had been inventoried of the people in that photo array, that was also something that Mr. Wadas could have gotten rather easily, correct?

A.  Yes.

Q.  He could have asked you to get them?

A.  Yes.

Q.  Or could he have just gotten them himself directly?

A. We'd have gotten them and given them to him.

Q. You would have gotten them for him if he thought they were important and wanted them?

A. Yes, or he could have subpoenaed them, but we get them. We give them.

Q. Okay. And Mr. Loevy asked you about a motion to -- a motion to hold somebody in contempt.

Short -- short of that, if -- if Mr. Wadas had a belief that there was a lineup that occurred before the lineup at which Mr. Rivera was identified and arrested and that -- as Mr. Loevy said, that in that lineup a filler was picked out, would that have been something that would have allowed him to file a motion to suppress his -- his actual identification on the grounds that it was unreliable?

MR. LOEVY: Objection, Your Honor.

THE COURT: What's the objection?

MR. LOEVY: All right. We'll withdraw it, Your Honor.

THE COURT: Okay.

THE WITNESS: Repeat it.

BY MR. SOTOS:

Q. Is that something Mr. Wadas could have done if he thought that there was --

THE COURT: The witness asked you to repeat the question.

MR. SOTOS: Oh, that's going to be tough. I'd have to

Victorson - cross by Sotos

3140

remember it.

(Laughter.)

THE COURT: I think the court reporter can find it for us.

Can you find it for us?

THE COURT REPORTER: Yes, Judge.

MR. SOTOS: Thank you for your help.

(The record was read.)

MR. LOEVY: Your Honor, I remember my objection. Vague and confusing.

MR. SOTOS: Completely. I hated hearing it back.

(Laughter.)

MR. SOTOS: Let me ask another question.

BY MR. SOTOS:

Q. A motion to suppress an identification is something that a criminal defense lawyer can file during a case, correct?

A. Correct.

Q. So if he believes that an identification that has been made was unreliable, then he can file the motion to suppress and ask the court to suppress the identification?

A. That's right.

Q. One reason to do that would be to say that in a prior lineup, the eyewitness identified somebody other than my client, correct?

A. Yes, sir.

Q. All right. And there's nothing that would have prevented Mr. Wadas from filing such a motion if he felt that was worth pursuing, correct?

A. Nothing I know of.

Q. Again, focusing on the fact that this was a single-eyewitness case, do you know whether or not Mr. Wadas interviewed the Felony Review assistant who was present at the police station on the night the charges were approved?

A. I have no idea.

Q. And when that process occurs, the Felony Review process we talked about before, is it -- was it your experience that the Felony Review --

MR. LOEVY: Your Honor, I do object. He doesn't remember, and we already heard from Felony Review.

THE COURT: Again, I need to hear the question.

BY MR. SOTOS:

Q. Was it your experience that when a Felony Review Assistant State's Attorney would interview a witness, they would create what are called Felony Review notes of that interaction?

A. Yes.

THE COURT: Overruled.

BY MR. SOTOS:

Q. And to the extent that those notes provide a summary of that conversation, that's something that you commonly disclose to criminal defendants' attorneys during criminal prosecutions,

Victorson - cross by Sotos

3142

correct?

A. Yes.

Q. So those -- we don't have those notes today 30 days later -- 30 years later, but if at the time that your case was ongoing, if Mr. Wadas wanted to review those notes, is that something he could have asked you for?

A. He'd have had -- he'd have had his own copy of them. We'd have given him a copy of those notes.

Q. Without any hesitation?

A. Without any hesitation.

Q. And if after reviewing those notes he wanted to talk to the Felony Review assistant who was there that night, would your answer for that be the same as for the witnesses? That's up to him?

A. Let him go out there and talk.

Q. You wouldn't try and interfere with something like that?

A. No, no.

Q. When you reviewed the transcript this morning, did you see that Orlando Lopez was describing a situation in which he saw a shooter, and then he ran to a store, talked to a store owner, and then ran back and still saw the shooter shooting?

A. Yes.

Q. And it looked like a little corner store, right?

A. I didn't see it.

Q. Okay. You don't whether or not Mr. Wadas went and talked

to the store owner and asked him whether any of those things occurred, right?

A. I do not know.

Q. But nothing would have prevented him from doing that, correct?

A. Nothing.

Q. And let me ask you about that.

You did have a chance to review Orlando -- excuse me -- Orlando Lopez's testimony this morning?

A. I did.

Q. All right. Is it too much to ask you to kind of just briefly review it for the jury or --

A. You want me to read it to the jury?

Q. Well, you don't have to read it. Let me know if I'm summarizing it correctly.

Did he essentially say that he came out of his apartment and then saw someone shooting at the victim; and then he ran down to a store, talked to a store owner, asked him to call the police; and the store owner blew him off, and then he came back out, went into, like, an area where there's an indentation and then saw the final shot or shots?

A. That's correct.

Q. Okay. And Mr. Loevy asked you questions during direct examination as to -- about whether or not there was information to -- to impeach that story, whether that would have been

something that would have been useful for Mr. Wadas to have, correct?

A.   Absolutely.

Q.   Okay.  I'm going to direct your attention to page --

MR. SOTOS:  And, you know, before I do that, Judge, we would move for the admission of Defendants' Exhibit No. 5, which is the entire transcript of the criminal trial.

THE COURT:  Any objection?

MR. LOEVY:  Just subject to any motions *in limine*, Your Honor.  No objections.

THE COURT:  Subject to any --

MR. LOEVY:  Any motions *in limine*.  No objections, though.

THE COURT:  Five is received.

(Defendants' Exhibit No. 5 received in evidence.)

BY MR. SOTOS:

Q.   So I'm going to direct you to page -- it says JR1038.

You know what, maybe I should just give you a copy so you can do it that way, and then we can put it up on the screen as well.

So I'm handing you Defendants' Exhibit 5 and ask you to turn to page 1038.

MR. LOEVY:  I guess our pages are numbered differently.  Which exhibit are you using, Jim?

MR. SOTOS:  What?

Victorson - cross by Sotos

3145

MR. LOEVY: Which exhibit number so we can --

THE WITNESS: I don't see any page numbers like that.

MR. LOEVY: Mine don't have page numbers either.

MR. SOTOS: I think we have two different --

THE WITNESS: Up on top, Robert, right?

BY MR. SOTOS:

Q. Yes, it's up on top.

A. The little numbers.

MR. LOEVY: Yeah, the same as him.

BY THE WITNESS:

A. 1038?

BY MR. SOTOS:

Q. 1038. So do you see there that Mr. Wadas states that before he calls his next witness, "I believe we will proceed by stipulation and that if Detective Jack Lerner" -- do you know that that's -- name "Lerner" is not typed correctly there?

A. Probably Jack Leonard.

Q. You knew Jack Leonard?

A. Absolutely.

Q. Okay. So let's say if detective Jack Leonard were called to testify, he would testified that he was one of the investigating officers, that he had occasion to interview Orlando Lopez, and that he prepared a report that he had with Lopez and that his report reads as follows:

"After talking to Lopez, Lopez stated to him, not

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 556 of 663 PageID #:107276
Victorson - cross by Sotos
3146

verbatim but in essence, that Lopez was coming from the store at the corner of Kimball and Cortland. Lopez observed the copper colored car coming out of the alley. The vehicle turned eastbound. Lopez stated that the vehicle contained two male whites. The male white began to run. Lopez noticed a gun."

And it goes on to the next page to say that he heard -- believes he heard three shots, but they were not very loud and that Lopez indicated that Lopez saw the victim lean forward into the right in the vehicle which victim had been seated. He said he could not -- he could identify the shooter because he recognized him as someone who played baseball at Humboldt Park and observed him there on a few occasions.

Do you see that?

A. I do.

Q. So I'm going to ask you to take a look at Defendants' Exhibit --

MR. BRUEGGEN: 23-J.

BY MR. SOTOS:

Q. -- Defendants' Exhibit 23-J.

MR. SOTOS: Can we have a -- can you put it up or give me a clean copy?

MR. BRUEGGEN: I'll put it up.

MR. SOTOS: Okay. And -- okay. Can we turn to the next page, please?

BY MR. SOTOS:

Victorson - cross by Sotos

Q. So I've placed in front of you Defendants' Exhibit -- what?

MR. BRUEGGEN: 23-J.

BY MR. SOTOS:

Q. -- 23-J, which is already in evidence.

And I'll just represent to you that this is the document that -- to save time, that Detective Leonard was -- that was being read into court during the criminal trial.

And that's a Chicago Police Department Supplementary Report, correct?

A. Correct.

Q. And so based on what we've read and what this report says, the story that Mr. Lopez was coming from the store at the moment that he heard the shooting, according to this report that was read into evidence at the criminal trial, that's quite a bit different from what Mr. Lopez actually testified to at the criminal trial, correct?

A. How? I'm not --

Q. Well, I guess what I'm saying is in the criminal trial he said that he first saw the shooting when he came out of the building, right?

A. Right.

Q. And then he ran all the way down to the store, presumably while the shooting's still going on, goes to the store, talks to the store owner, and then comes back, and he's still seeing the shooting, correct?

A.  Yes.

Q.  So that's -- that's a bit different from what's in the report that I just showed you where it says Lopez was coming from the store when he first saw things, correct?

A.  Yeah, I guess so.

Q.  And that was information that Mr. Wadas had available to him in the criminal trial, correct?

A.  Yes.

Q.  And he was able to use it to impeach Mr. Lopez's testimony by basically saying, "Well, this is what he said today at trial, but the story that he told the police was different" --

A.  Correct.

Q.  -- correct?

A.  That's what we stipulated to, right?

Q.  That was -- it was actually stipulated by you --

A.  Right.

Q.  -- because you had the police report that said that?

A.  Yes.

Q.  So you were asked a number of questions about GPRs.

    MR. SOTOS:  You can leave that up there.  Yeah, maybe you can find it.

BY MR. SOTOS:

Q.  And you were asked questions about whether there were or weren't GPRs in the handwritten documents, correct?

A.  Yes.

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 559 of 663 PageID #:107279
Victorson - cross by Sotos
3149

Q. Okay. Whether they were in the file.

And while they're looking for it, if I told you that there was a GPR that said that the witness was by the store as opposed to coming from the store, in your estimation, does that make any substantial additional difference that could have impeached Mr. Lopez any more than he already was?

A. For what it's worth.

Q. For --

A. For what it's worth. I mean, he says he saw the shooting. Whether he's coming from the store, going to the store, whatever. It could -- for what it's worth, it could impeach him a little bit, right?

Q. All right. So you can -- in terms of impeaching him, is it uncommon in a criminal prosecution where you have witnesses and whether they're prosecution witnesses or defense witnesses, telling stories that vary from stories that they've previously told?

A. Depending on what degree they vary.

Q. But not that unusual, correct?

A. No, little minor things, absolutely not.

Q. And in this case, the judge was able to hear the difference between Lopez's trial story, which is that he saw the shooter, ran to the store, talked to the guy in the store, the store owner blew him off, turned around, came back, ran out, and went and hid in an indentation and then saw the last shots -- the

Victorson - cross by Sotos

3150

judge was able to hear that story, correct?

A. If he could hear, yes.

Q. And then they were able to hear that he had told Detective Leonard that he was coming back from the store at the first time that he saw any shooting, correct?

A. If -- yeah, if that's what the stipulation said, yes.

Q. And the difference in those two stories, though significant, wasn't enough to convince the court to not convict Mr. Rivera, correct?

A. I wasn't the court, but apparently not.

Q. All right. But from your perspective as a prosecutor, you put on the story, and he's told another story and he gets impeached with the prior report, you let the evidence go where it goes, and the judge makes the decision?

A. That's right.

Q. You're not going to dismiss the case because a witness who gets on the stand and describes seeing a shooting has previously said something that's different than what he said on the stand?

A. Well, if he said -- if he previously said "I didn't really see the shooting," that would be big.

Q. That -- that would be enough of a difference where you would say, "Oh, wait a minute here. If this guy is saying he didn't see the shooting, then this is something I have to do something about," correct?

Victorson - cross by Sotos

3151

A.   Yes.  Yes.

Q.   Okay.  But in a case like this where you have a witness who describes something one way at trial, but there's a police report that says he described it differently before, that's a matter you leave to the trier of fact, correct?

A.   Exactly, yes.

Q.   And when I say "the trier of fact," I use that phrase because there can be two different trier of facts in a case, right?

A.   Yes.

Q.   Sometimes it's the jury who is the trier of fact, correct?

A.   Correct.

Q.   And sometimes it's the judge?

A.   That's right.

Q.   And when a jury is present like in this case, the judge has a different function in terms of the overall progress of the trial, correct?

A.   Correct, yes.

Q.   But in a bench trial, the judge is the sole person who's actually making the decision about what he believes, doesn't believe, and what he's deciding should happen?

A.   Correct.

Q.   Okay.  And in this case, the reason that you were proceeding before a judge was because Mr. Wadas had opted for -- to proceed before a judge rather than a jury, correct?

A.  Mr. Wadas, in conjunction with his client, yes, they decide.

Q.  Okay.  And did you view that to be a somewhat unusual decision in a case like this?

A.  No.

Q.  No?

A.  No.

Q.  Do you remember the sentencing process in this case?

A.  I -- just from what I read.

Q.  Because after a -- a defendant is convicted, then there's a separate proceeding at which the judge has to set the sentence, correct?

A.  Correct, yes.

Q.  So whether it's a bench or a jury trial, the judge is the one who sets the sentence?

A.  In Illinois, yes.

Q.  It's not like that in other places?

A.  Not when I was in Texas.  You had a choice.  Jury could do sentencing, a bifurcated trial.

Q.  I wasn't aware of that.

        MR. SOTOS:  Give me one second.

BY THE WITNESS:

A.  Maybe no longer.

        MR. SOTOS:  Give me one second.

BY MR. SOTOS:

Q. Sir, I'm going to place in front you -- I'm going to hand you a document that's been marked as Defendants' Exhibit 23-M. It's a 15-page -- 17-page document, ask you to take a look at it and let me know when --

A. All right.

Q. Let me know when you're done reading. And tell us what it is.

A. (Examining document.)

Well, the first thing is about a motion to revoke bail, and there's another transcript here.

Q. Well, do you see -- do you see the portion of the exhibit that's related to the sentencing? You want me to direct you --

A. I'm here. I'm here. I haven't read it, but it starts on page 2, right?

Q. Well, maybe I can take you through it more quickly.

A. All right.

Q. Do you see that it's a sentencing transcript from the case that -- in which Mr. Rivera was convicted?

A. I see a Report of Proceedings. I don't know if it's the sentencing transcript, but it's the sentencing -- it was when he was sentenced, I think.

Q. I did give you the right transcript, didn't I?

A. I hope. Let's see.

Q. I did?

A. I think you did.

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 564 of 663 PageID #:107284
Victorson - cross by Sotos
3154

Q. Okay. So that is the sentencing transcript?

A. Yes.

Q. Okay.

A. But it -- it doesn't say it on there, sentencing transcript, right?

Q. I don't know if it actually says that.

A. All right. It doesn't.

Q. It's a pretty short document, isn't it?

A. It is.

Q. Okay. Did you see in looking through that -- and the sentencing transcript is the time when the defendant's lawyer -- lawyer can present evidence in relation to how long of a sentence he's going to get for the crime that he's been convicted of, correct?

A. Yep. Yes, sir.

Q. All right. And is that a proceeding that typically a defendant will present witnesses on his behalf?

A. Sometimes, yes; sometimes, no.

Q. Do you see that in this case that Mr. Wadas didn't call any family members of Mr. Rivera to testify at the sentencing?

MR. LOEVY: Objection to relevance, Your Honor.

THE COURT: Overruled.

BY THE WITNESS:

A. Well, I'll take your word for it. I mean --

BY MR. SOTOS:

Q. You don't -- you don't see in the transcript that there's any witnesses that were called?

A. I don't.

Q. And that he made a brief argument of about a page?

A. He made an argument.

Q. And then the judge imposed sentence?

A. Yes.

Q. Okay. Thank you.

MR. SOTOS: One moment.

(Counsel conferring.)

MR. SOTOS: Nothing further. Thank you, Judge.

THE COURT: Mr. Leinenweber?

MR. LEINENWEBER: Very briefly, Judge. Thank you.

CROSS-EXAMINATION

BY MR. LEINENWEBER:

Q. Good afternoon, Mr. Victorson.

A. Good afternoon.

Q. There were, like, some crime scene photos and some pictures from the lineup taken in this case?

A. I guess --

Q. Would those -- would those documents have been given over to Mr. Wadas?

A. Absolutely.

Q. And similarly, if there were Felony Review notes from a Felony Review prosecutor, you would have turned those over to

Victorson - cross by Leinenweber

Mr. Wadas, too, correct?

A. Absolutely.

MR. LOEVY: Objection, asked and answered, Your Honor.

THE COURT: Overruled.

BY MR. LEINENWEBER:

Q. And finally, you had indicated, I think, that by reviewing the transcript that you had called Officer Rey Guevara in rebuttal in the case; is that correct?

A. Correct.

Q. And I think it's been established that Mr. Lopez, the witness, had testified at the trial that he had seen the defendant, Mr. Rivera, playing baseball in Humboldt Park, correct?

A. That's right.

Q. And then in rebuttal, you had -- you had questioned Mr. Guevara, and he said he spent a lot of time himself in Humboldt Park for work, and Mr. Guevara said he also played softball himself in Humboldt Park. Do you recall that?

A. I do.

Q. And then on cross-examination, Mr. Wadas asked Mr. Guevara and said, "Had you ever seen Mr. Rivera playing softball?"

Do you remember that question?

A. I do.

Q. And Officer Guevara said, no, he'd never, ever seen Jacques Rivera playing baseball. Do you remember that testimony?

A. He said he had seen him in the park but didn't remember seeing him play baseball, yes.

MR. LEINENWEBER: Thank you very much, sir. I have no further questions.

Thank you, Judge.

THE COURT: Plaintiffs.

REDIRECT EXAMINATION

BY MR. LOEVY:

Q. Sir, Mr. Sotos asked you, it was your decision to proceed, right?

A. Yes.

Q. All right. But you also said you tried not to proceed, right?

A. I did not.

Q. You did not --

A. I did not say that.

Q. All right. What steps were you -- available to you to not proceed?

A. If I thought there was -- if I thought the guy wasn't guilty or we couldn't prove the case, I would have dismissed it or I would -- I would have dismissed it.

Q. Or you would have tried to get a plea, right?

A. Yeah.

Q. All right. And that's what you tried to do, right?

A. I don't know. I don't have the file. I don't know. I

don't remember.

Q. All right. Did you say this morning that you're quite confident you would have tried to plead this case out?

A. Absolutely.

Q. All right. You were shown a police report by Mr. Sotos about representing that we tried to have the lineup, but we couldn't find the kid.

Do you remember those questions he asked you?

A. I do.

Q. Okay. That's what the police reports represented to you, right?

A. Right.

Q. Did you rely on those police reports as truthful?

A. Yes.

Q. Was it reasonable of you to take the Chicago police reports as true?

A. Yes.

Q. Was it reasonable of Mr. Wadas to rely on the Chicago police police reports?

MR. SOTOS: Objection, Your Honor, asked and answered.

THE COURT: Overruled.

BY THE WITNESS:

A. Yes.

BY MR. LOEVY:

Q. All right. People didn't in your -- in your time in that

building, people didn't come into the courtroom assuming that police officers were fabricating and writing untrue things, right?

A.   Correct.

Q.   Did attorneys all the time rely on what was written in police reports?

A.   I'm sure they did.

Q.   All right.  Did you interview all the people in the lineup to see if this was true or false?

A.   No.

Q.   Why not?

A.   I don't know.

Q.   All right.  Did you rely on -- let me ask you this.

    Was it unreasonable of you not to interview all the lineup people?

A.   No.

Q.   All right.  Was it unreasonable of Mr. Wadas not to interview all the lineup people?

    MR. SOTOS:  Objection, Your Honor.

    THE COURT:  Overruled.

BY THE WITNESS:

A.   I don't think so.  If you're talking about the mis -- the lineup where the misidentification was?  Which lineup are you talking about?

BY MR. LOEVY:

Q. Well, was it -- did you interview anybody on any lineup?

A. No, I did not.

Q. And the one where the -- supposedly they couldn't find the victim, you didn't interview the people on that lineup either?

A. Not a one of them.

Q. And it was -- it was reasonable for you not to do that?

A. Yes, it was.

Q. And it was reasonable for Mr. Wadas not to do that?

A. Yes, it was.

Q. All right. This "by the store business," my team has me on a very short leash on this, but I just want to establish a couple quick points.

At trial he was coming from the store, right? That was --

A. I --

Q. -- at least for part of it?

In the report, it says "coming from the store." That's what Mr. Sotos read you?

A. Yes.

Q. Now, if you had a contemporaneous note that put him 191 feet away at the store, I think you acknowledged to Mr. Sotos, that's some impeachment, right?

A. Yeah, some impeachment.

Q. All right. Now, in a case where the entire case -- there's no evidence at all except a little boy pointing his finger,

then that impeachment becomes very important, right?

A.  It becomes important.

Q.  I mean --

A.  I don't know very important.

Q.  What's that?

A.  It becomes important.

Q.  All right.  And the reason it's actually very important is because there's literally nothing to convict Jacques Rivera but this kid claiming he wasn't by the store when he saw the shooting, right?

A.  What's "by the store" mean?  How many feet?

Q.  Well, coming from the -- all right.  I'm past my time.  I'm done.  We're not going to argue about the store anymore.

   (Laughter.)

BY MR. LOEVY:

Q.  All right.  At the sentencing, you were -- you were asked about what Mr. Wadas did, right?

A.  Yes.

Q.  And then showing you page 2 of the same transcript --

        MR. LOEVY:  If I could have the Elmo, please.

BY MR. LOEVY:

Q.  -- you -- you didn't do anything at the sentencing saying -- but say, "I'm not going to go over the facts.  You've heard it.  I would just remind the court that this was a shooting, and I believe the nature of the offense, we should

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 572 of 663 PageID #:107292
Victorson - redirect by Loevy
3162

give him an extended term"?  That's all you said, right?

A.  Well, I also said he was shot 10 or 11 times at point --
nearly point-blank range while the victim sat in the car.

Q.  Right.  I didn't mean to -- I was paraphrasing.

But this -- everything you said is between lines 1 and
9, right?

A.  It is.

Q.  All right.  So Mr. Wadas and you obviously had some kind of
either implicit or express understanding that you were both
going to stand down, right?

A.  You're kidding, right?

Q.  Sir, you sometimes at sentencing go a lot harder than
saying, "Oh, you know, this is a bad shooting.  You know, give
him -- give him some years"?  You sometimes go harder than
that, right?

A.  This is a bench trial.  The judge heard it.

Q.  All right.

A.  He knows what happened.

Q.  All right.  You sometimes go harder than that, right?
Never?  Okay.

A.  Not --

Q.  In any event, if Mr. Wadas would have started calling
witnesses, you might have started calling witnesses, right?

A.  It would depend on what his witnesses said.

Q.  All right.  You don't fault Mr. Wadas for the decisions he

made in this case, do you?

MR. SOTOS: Objection, Judge.

THE COURT: Overruled.

BY THE WITNESS:

A. Listen, I wasn't there when he made whatever decisions he made. So, no, I don't.

BY MR. LOEVY:

Q. All right. Let's talk about his diligence.

Mr. Sotos showed you a list of a whole bunch of people on the list that -- the state discovery, right?

A. Yes.

Q. All right. Did you interview all those people?

A. Probably not.

Q. All right. That's a long list, right?

A. Yes, but that's not why -- yes, it's a long list.

Q. All right. And you had the burden of proof, not Mr. Wadas, right?

A. That's -- yes, yeah.

Q. But you tried to focus on what mattered, right?

A. Right.

Q. All right. So the stuff that the police report said wasn't as relevant, you didn't focus on that, right?

A. The police report didn't say anything's not relevant.

Q. Well, when you're determining which of the names to look at on Plaintiff's Exhibit 40, where did you decide what was

relevant?  You either talked to Guevara or you looked at the reports, right?

A.  That's right.

Q.  The boy didn't know, right?

A.  The reports -- I decided who to call because of the reports.

Q.  All right.  So you -- you and Mr. Wadas both relied on the police reports to focus on what mattered, right?

A.  I did.

Q.  All right.

A.  I don't know what he did.

Q.  Was it unreasonable for him if he did the same thing you did?

A.  No.

MR. SOTOS:  Objection, Judge, not disclosed for that purpose.

THE COURT:  I didn't even hear the answer.

MR. SOTOS:  Well --

THE COURT:  I just heard an objection.

MR. SOTOS:  -- that's why I objected.

MR. LOEVY:  Your Honor, the objection was Mr. Sotos did the exact converse.  He kept --

THE COURT:  Wait, wait, wait.  Overruled.

BY MR. LOEVY:

Q.  Okay.  Now, Mr. Sotos asked you, "Hey, all Mr. Wadas had to

do was interview the eyewitness," right?  Remember those questions he was asking you?

MR. SOTOS:  Objection, Your Honor.  I don't think I said it that way.

THE COURT:  Overruled.

BY MR. LOEVY:

Q.  Do you remember that line of questioning?

A.  No.

Q.  All right.  You don't -- Mr. Wadas was in the prosecutor's office for a long time, right?

A.  Yes, sir.

Q.  All right.  He said that -- and tell me if you agree or disagree -- that, you know what, the prosecutors would try to guard their witnesses, and if at all possible, they preferred that the defense attorneys didn't talk to them.

MR. SOTOS:  You know --

BY MR. LOEVY:

Q.  Was there such a practice?

MR. SOTOS:  Objection.  He just made up the testimony. That's not what Mr. Wadas said.

MR. LOEVY:  We were all in court, Your Honor.

MR. SOTOS:  He said he would have blocked it.

THE COURT:  No, no, no.  I don't want any more speaking objections from anybody.

And the objection is overruled.

THE WITNESS: Repeat the question.

BY MR. LOEVY:

Q. All right. Were the prosecutors at the time -- if they had a witness who was an important witness, would they sort of do what they could do to keep the defense attorneys away from that witness?

A. Absolutely not. We would --

Q. Do you know why -- excuse me.

A. We would tell the witness "You can talk to him if you want to. You don't have to."

Q. All right. Maybe I'm focusing on that part.

So you made it very clear to the witnesses that they had no obligation to speak to the defense attorney?

A. I have no idea if that came up in this case.

Q. I'm not asking you about this case, because you don't remember this case.

I'm saying, isn't it true there was a practice in the State's Attorney's Office at the time, if not today, to strongly encourage prosecution witnesses that, "Hey, you don't -- if Mr. Wadas comes and knocks on your door, you have no obligation to talk to him. If you slam that door in his face, you're perfectly allowed to do that"? You tell them that, right?

A. Absolutely not. I say, "You don't have to talk to him if you don't want to. Don't slam your door."

Victorson - redirect by Loevy

(Laughter.)

BY MR. LOEVY:

Q. All right. The corner store guy, you didn't go interview the guy at the corner store, did you?

A. No.

Q. Was that incompetent of you?

A. I hope not.

Q. All right. Was it incompetent of Mr. Wadas?

A. I don't know.

Q. You don't think so, do you?

MR. SOTOS: Objection, Judge, asked and answered.

THE COURT: Sustained.

BY MR. LOEVY:

Q. All right. How about filing a motion to suppress, the other question he asked you about, or a motion -- some kind of motion, he could have filed a motion about Orlando Lopez, was the questions he asked you?

A. He could have filed any motion he wanted to.

Q. All right. What question was Mr. Sotos suggesting -- asking you about, do you remember?

A. No.

Q. All right. Whatever motion it was, was Mr. Wadas incompetent for not filing it?

MR. SOTOS: Objection, Judge, to the opinion. It's not a --

THE COURT: Sustained.

BY MR. LOEVY:

Q. All right. You -- you thought Mr. Wadas fought valiantly and vigorously and passionately for his client, right?

A. I thought he tried to represent his client. I don't know if it was valiant, vicious, whatever you said.

What's the other word?

Q. I'll ask another one.

This isn't Mr. Wadas' fault, is it, sir?

MR. SOTOS: Objection, Judge.

THE COURT: Sustained.

MR. LOEVY: The -- all right. I have no further questions.

THE COURT: Anything further?

MR. SOTOS: Judge, I have -- actually, I have one other area that I neglected to go into. It's only going to take three, four minutes, at the most.

THE COURT: Go ahead.

MR. SOTOS: Okay.

MR. LOEVY: And we would object if it's outside the scope, Your Honor.

THE COURT: I haven't heard it, but I'm inclined to overrule it if it's going to be brief.

RECROSS-EXAMINATION

BY MR. SOTOS:

Victorson - redirect by Loevy

3169

Q. When you reviewed the transcript this morning, did you see that an Officer Craig Letrich had also testified for Mr. Rivera?

A. Yes.

Q. Okay. In relation to a police report that he had prepared that indicated that a man named Rodriguez and a man named Nieves had both been identified by the victim as -- as the shooter or the shooter and the driver?

A. If that's what it says, yes.

Q. Okay. And so did -- reading the transcript didn't refresh your recollection about that, correct?

A. Oh, no, no.

Q. But you saw that Letrich testified generally to something involving a Mr. Rodriguez?

A. Right.

Q. All right. And that wasn't something that caused you to say, "Well, we're not going to go forward with this case"?

A. It was not.

Q. Okay. And it wasn't something to change the outcome of the trial either, correct?

A. I don't -- no.

            MR. SOTOS: That's all I have, Judge. Thank you.

            THE COURT: Okay. Anything further?

                        REDIRECT EXAMINATION

BY MR. LOEVY:

Victorson - redirect by Loevy

3170

Q. You didn't investigate that, right?

A. Investigate what?

Q. What Letrich had seen on the street?

A. Did I investigate it?

Q. You didn't do any investigation, right?

A. You mean, did I go out on the street and stuff?

Q. Yeah.

A. No, I didn't.

Q. You relied on the police department to do that, correct?

A. Correct.

MR. LOEVY:  I have no further questions, Your Honor.

THE COURT:  Anything further?

MR. SOTOS:  No, Judge.

THE COURT:  Thank you, sir.  You may step down.

THE WITNESS:  Thanks.

Am I excused?

THE COURT:  You are excused.

(Witness excused.)

MS. ROSEN:  Judge, could we do a quick sidebar?

THE COURT:  Okay.

(Proceedings heard at sidebar on the record:)

MS. ROSEN:  Judge, we just for the record want to move under Rule 50 orally for judgment as a matter of law.  We have written pleadings to file later, but --

THE COURT:  Okay.

3171

MS. ROSEN: -- since we're not clear about exactly what the timing is, we just wanted to make sure we're doing it --

MR. SOTOS: All defendants want to preserve the record.

THE COURT: Okay. That's fine. And I'm reserving ruling and --

MR. LOEVY: Plaintiff makes the same motion.

THE COURT: Okay. Also reserving ruling.

Why don't we just make an agreement that since there's some ambiguity about this, if you make it at the end of the day, you have a continuing -- I mean, I'd like to have to avoid taking these sidebars after every witness.

MR. SOTOS: Yeah, and we don't want to take up the time arguing it.

THE COURT: Right.

MR. SOTOS: So --

THE COURT: But as I think about it, I don't know what the 27th floor will think, so I don't know.

MR. SOTOS: Me neither, Judge.

THE COURT: Well, why don't --

MR. LEINENWEBER: Judge, I just have a continuing objection -- continuing motion.

THE COURT: Why don't you just say, like, "Same motion," and we don't have to have a sidebar.

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 582 of 663 PageID #:107302
R. Lopez - direct by Golden
3172

MS. ROSEN: Okay. Thanks, Judge.

(End of sidebar proceedings.)

(Witness enters courtroom.)

THE COURT: Sir, you must be the witness? Yes.

THE WITNESS: Yes.

THE COURT: Could you come up here, please?

Please raise your right hand.

(Witness duly sworn.)

THE COURT: You may be seated.

RAMON LOPEZ, DEFENSE WITNESS, SWORN

DIRECT EXAMINATION

BY MS. GOLDEN:

Q. All right. Could you please state your name and introduce yourself to the ladies and gentlemen of the jury.

A. Hi. My name is Ramon Lopez.

Q. And, Mr. Lopez, where do you live?

A. I live in Elgin.

Q. Okay. And are you employed?

A. Yes.

Q. You're missing work to be here today?

A. Yes.

Q. Thank you, sir. You're not alone.

I'm going to cut to the chase -- I'm hoping we get an award for the quickest witness today -- and show you on your -- on the screen in front of you, we're going to pop up something

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 583 of 663 PageID #:107308
R. Lopez - direct by Golden
3173

that we're calling Defendants' Exhibit 1.13.

And going back to August of 1988 --

THE COURT: Wait a minute. I don't have anything on my screen.

MS. GOLDEN: I'm going to ask him a few questions until it gets up.

THE COURT: Oh, sorry.

MS. GOLDEN: Defense table 1.

BY MS. GOLDEN:

Q. I'm going to take you back to about 30 years, then, to 1988.

You lived in the Humboldt Park area?

A. Yes.

Q. And what was your address, sir?

A. 1424 North Washtenaw.

Q. And you lived there with whom?

A. My father, my mom, and my brothers and sisters.

Q. Okay. And in this case we've heard -- the jury has heard a lot of testimony about a person by the name of Felix Valentin.

Did you know Felix?

A. Yes.

Q. And how did you know him?

A. I went to school with his brothers -- older brothers, and his older brother was my best friend.

Q. Okay. His brothers' name were?

A. Israel Valentin, Jr.

Q. And his other brother --

A. And Harry -- Harry Valentin.

Q. And the name that you knew Felix's brother by was?

A. Mo.

Q. Okay. The two of you were best friends?

A. Yes.

Q. You and Mo?

A. Yes.

Q. And do you remember the day that Felix was shot?

A. Not really. I'm sorry.

Q. Okay. Do you remember getting a call from one of the brothers about it?

A. Yes.

Q. Okay. And did I ask you what your birthday was?

A. No.

Q. Okay. What's your birthday?

A. 9/22/68.

Q. So that's September 22nd?

A. Yes, ma'am.

Q. Okay. All right. So now if you can look at the screen, and I'm going to point you, sir, to -- do you see your name on that page -- this is a police report, Supplement -- Chicago Police Department Supp. Report, dated September 1st that the jury has seen before, and ask you, sir, if you see your name on

the document?

A.  Yes, ma'am.

Q.  And that's the way you spell your name, Ramon Lopez?

A.  Yes.

Q.  And you were -- in September of 1988, give or take, you were 19 years old, but it says 20 here, right?

A.  I can't understand.  I'm sorry, ma'am.

Q.  So how old were you in September of 1988?

A.  Oh, I was 20.

Q.  Okay.  And your birthday here is September 22nd, 1968?

A.  Yes, ma'am.

Q.  And this was the address that you were living at in August and September of 1988?

A.  Yes.

Q.  Okay.

MS. GOLDEN:  And can you do a side by side with this?

BY MS. GOLDEN:

Q.  I'm going to show you what we've marked as Defendants' Exhibit No. 96.  And do you recognize that?

A.  Yes.

Q.  And what is that?

A.  That's a picture of me.

Q.  And how old do you look in the picture?

A.  Wow.  Probably like 18, 19.  I don't know.

Q.  Do you remember when the picture was taken?

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 586 of 663 PageID #:107306
R. Lopez - direct by Golden
3176

A.   Not really, sorry.

Q.   Do you remember where it was taken?

A.   That was 14th District.

Q.   Okay.  And how do you know that?

A.   I think.  That was the only place I've been arrested years back.

Q.   Okay.  How many times have you been arrested back in the day?

A.   Maybe like four or five.

Q.   Okay.  All right.

        MS. GOLDEN:  Can we see Defendants' Exhibit 96 -- I'm sorry -- Defendants' Exhibit 95.

BY MS. GOLDEN:

Q.   And do you recognize -- showing you what we've marked as Defendants' Exhibit 95 and ask you, Mr. Lopez, if you recognize the person that's shown in this picture?

A.   Yes.

Q.   And who is that?

A.   That's George.

Q.   And how -- did you know George back in September and August of 1988?

A.   Yes, ma'am.

Q.   And how did you know George?

A.   We went to school together from grammar to high school, and we grew up in the neighborhood.

R. Lopez - direct by Golden

3177

Q. Did you play sports together?

A. Yes, we did.

Q. Okay. Were you also both gang members?

A. Yes.

Q. Were either of you a member of the Latin Kings?

A. No. No, ma'am.

Q. And do you remember being present when this picture of George was taken?

A. No.

Q. Let me ask you, sir, are -- so at the time back -- taking you back to the time when Felix was shot, do you remember ever standing in a physical lineup?

You know what a physical lineup is, right?

A. Yes.

Q. And that's where you -- well, what is it?

A. A lineup is when they put, like, four or five people in a room, and somebody's behind the window -- I'm sorry -- saying whoever did it. You know, they point them out like that.

Q. You step forward --

A. Right.

Q. -- sometimes they turn to the side?

A. Right. They tell you No. 1, No. 2, No. 3, No. 4, come forward.

Q. Have you ever been in a physical lineup with your friend, George Ruiz?

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 588 of 663 PageID #:107308
R. Lopez - direct by Golden
3178

A. No, never, ma'am.

Q. And George has a nickname?

A. Froggie, yes.

Q. And back in September of 1988, how long had you known Froggie?

A. Oh, since we were, like, maybe eight, nine, ten. We were kids.

Q. Do you think that you would remember being in a lineup with him?

A. Yes, yes, I would.

Q. Have you ever been in a lineup?

A. Yes.

Q. And how many times?

A. One time in my life.

Q. And what happened after that lineup?

A. They accused me for the -- for the case they were charging me for.

Q. You were arrested after the one lineup you --

A. Yes, I was only 15 years old when that happened.

Q. And so you were arrested after the only one lineup you've ever been in?

A. Yes, that's the only time, yes.

        MS. GOLDEN: I don't have any other questions.

        THE COURT: Okay. Anybody else on the defense side have questions?

MR. LEINENWEBER:  No.  Thank you, Judge.

THE COURT:  Plaintiff.

CROSS-EXAMINATION

BY MR. LOEVY:

Q.  Okay.  All right, sir.  You do not know Jacques Rivera, right?

A.  Excuse me?

Q.  You don't know -- the name Jacques Rivera doesn't mean anything --

A.  No, no.

Q.  You don't know anything really about what this lawsuit is like?

A.  No.

Q.  You got a subpoena from the defense, and here you are to testify?

A.  I believe so.  I'm here.

Q.  All right.  You are not sure how many times in the mid-'80s you were at the police station; is that fair to say?

A.  Under -- when I was 20, at least twice -- three times. Three times.

Q.  Well, didn't you say four or five?

A.  But from 15 years old.  So that's about four or five.

Q.  All right.  So -- but in the -- then focusing on the late '80s, it would have been three arrests?

A.  Around there, yes.  It's a long -- I mean --

Q. You mentioned the murder thing. You had some drugs, some drug stuff, but, yeah, it's been so long you can't remember --

MS. ROSEN: Objection, Judge. He didn't say anything about a murder.

MR. SOTOS: Objection.

MR. LOEVY: Attempted murder.

THE COURT: Not -- not in this proceeding.

BY MR. LOEVY:

Q. No, I thought you said -- I thought you told her that was the lineup.

THE COURT: No, I think you --

MR. SOTOS: Objection.

THE COURT: Sustained.

BY MR. LOEVY:

Q. All right. You were here for a murder --

MR. SOTOS: He's talking about offenses.

THE COURT: Now, wait a minute. I don't need piling on.

MR. SOTOS: All right. All right.

BY MR. LOEVY:

Q. All right. What were you in the lineup for?

If you didn't answer that question, don't answer that question.

Did you tell Mr. Rosen -- Ms. Golden what you were in the lineup for?

R. Lopez - cross by Loevy

3181

MS. GOLDEN: Well, this is way longer than 10 years.

THE COURT: Wait, wait. The witness said he wasn't in the lineup.

MR. LOEVY: No, I think he said he was in a lineup.

THE COURT: Oh, on another occasion?

MR. LOEVY: Yes, yes. And if I missed -- if I missed --

THE COURT: No, no, no, if that's what you're going into, but the question is --

MR. LOEVY: All right. I'm going to move on, Your Honor.

THE COURT: No, I don't -- all right. Fine. I think we're just a little confused.

BY MR. LOEVY:

Q. All right. Fair to say that you're not exactly sure how many times you would have been at the police station in the late '80s, right?

A. Yes.

Q. All right. Now, I'm going to show you Plaintiff's Exhibit 14.

MR. LOEVY: If I could have the Elmo, please.

BY MR. LOEVY:

Q. This is the Felix Valentin shooting, this document here. You didn't create this. Have you seen it?

A. No.

R. Lopez - cross by Loevy

Q. All right.  You're not Angel Villafane, right?

A. No.

Q. You're not Carlos Olivero?

A. No.

Q. You're not Jacques Rivera?

A. No.

Q. Are you George Ruiz?

A. No.

Q. But you are Ramon Lopez?

A. Yes.

Q. All right.  Do you dispute that you were at the police station on the 31st of August, 1988?

A. Say that again.  I'm sorry?

Q. Do you dispute that you were at the police station that day?

A. That I wasn't in the police station?

Q. You tell us.

A. I wasn't.  Not that day.

Q. You're saying -- in fact, you're here because your claim is you were not taken to a police station, right?

A. Not that day on the lineup with those persons.  I was not there that day.

Q. And you would remember, you say, because Felix was your friend --

A. No, no.  I'm telling the truth because George had told me

when he got arrested --

Q. Who was saying what? Okay. We don't a hearsay.

A. Okay. I'm sorry.

MS. GOLDEN: Objection.

THE COURT: No, wait.

BY MR. LOEVY:

Q. We don't want a hearsay.

THE COURT: Wait a minute.

MS. GOLDEN: Well --

THE COURT: Let's let the witness answer the question, and then you can go back and clarify.

BY MR. LOEVY:

Q. All right. Here's the question.

MS. GOLDEN: Could you ask -- Your Honor, could you --

THE COURT: What?

MS. GOLDEN: -- could you ask Mr. Sloevy -- Mr. Sloevy -- (phonetic) -- Mr. Loevy to slow down just a bit?

THE COURT: That would be helpful.

BY MR. LOEVY:

Q. All right, sir. After Felix was died -- died --

A. Okay.

Q. -- within that week, did you ever get taken to the police station?

A. No. No, sir.

Q. In two weeks of Felix's death, were you ever in the police

R. Lopez - cross by Loevy

3184

station?

A. No.

Q. All right. I'm going to show you some pictures that were allegedly taken on the 31st of August.

Do you know this person?

MS. GOLDEN: Object to foundation.

THE COURT: Yeah, is there any --

MR. LOEVY: This is Plaintiffs' Exhibit 62, Your Honor. This is --

THE COURT: But what is the basis for believing the date that you --

MR. LOEVY: Because Ms. McLaughlin and probably Mr. Gawrys say these are the pictures of the lineup that they tried to take and then couldn't find the victim, and then he was at the hospital.

MR. GIVEN: Objection to --

MS. GOLDEN: There's been other testimony from other witnesses that there were other sources of photo array photographs.

MR. LOEVY: No, this exhibit --

THE COURT: Well, you know, I don't know.

This is obviously going to be a big fight unless somebody's got transcripts --

MS. GOLDEN: If he just asked him about the picture, I have no problem with it. But if he inserts into his question

R. Lopez - cross by Loevy

3185

the date that --

THE COURT: Yeah, I'm trying to say that. That's what I was trying to say.

MS. GOLDEN: Correct.

THE COURT: Excuse me.

BY MR. LOEVY:

Q. All right. The police report -- well, all right. I'm just going to ask the questions.

Is this you here with this wall?

A. No, that's not me.

Q. Is that you?

A. Nope.

Q. Is that you?

A. No.

Q. Is that you?

A. No.

Q. Is that you?

A. Yes.

Q. All right. And you're saying you were not present with these six people being photographed against this same wall on that day?

A. Right.

Q. Is it possible that you just don't remember?

A. No, because I would have remembered. Trust me, I would have remembered. If I was in a lineup with those persons, I

would have remembered.

Q. Well, it sounds like if you were even in the police station at all you would have remembered, you're saying, right?

A. No, not that day. I'm telling you I wasn't there that day.

Q. Okay. And I think you told Ms. Golden you think it was the 14th District where that picture was taken of you?

A. It should be. That's the only police station I've been in.

Q. All right. Do you recognize the wall as this being the 14th District wall, or are you just --

A. I cannot remember. I cannot tell you that. I don't --

Q. All right. But you believe that was taken in the 14th District, not where this investigation happened?

A. I guess. I believe.

Q. All right. You said that -- that you actually knew another boy in the lineup. That's this guy? Was it this guy or this guy?

A. That one, George.

Q. All right. Did you -- you knew Little Orlando Lopez, right?

A. Excuse me?

Q. Did you know Orlando Lopez?

A. No.

Q. Wasn't he the brother of Felix?

A. Oh, the little kid? Yes.

Q. So he knew you?

A.   Yes.

           MS. ROSEN:   Objection.   He's not the brother of Felix.

           THE COURT:   I think you misspoke.

BY MR. LOEVY:

Q.   All right.   Orlando Lopez -- oh, all right.   I did misspeak, and I got confused, and I'm on a wrong track.

           THE COURT:   Well, we all -- I think we're all in that position.

BY MR. LOEVY:

Q.   All right.   But you knew the victim, right?

A.   Which victim?

Q.   And this person knew --

           THE COURT:   Mr. Loevy, you've got to slow down and just make clear to the witness what you're asking him, please.

BY MR. LOEVY:

Q.   All right.   This person, did he know the victim?

A.   Yes.

           MS. GOLDEN:   Your Honor --

BY MR. LOEVY:

Q.   And this person, that's you.   You also knew the victim?

A.   Yes.

Q.   And you -- you're saying you were not in any lineup that day?

A.   That's right.

           MR. SOTOS:   Objection, Judge, asked and answered

several times.

THE COURT:  Sustained.

MR. LOEVY:  All right.  I have no further questions.

THE COURT:  All right.  Anything further?

MS. GOLDEN:  No, Your Honor.  Thank you, Mr. Lopez.

THE COURT:  Thank you very much.

THE WITNESS:  Thank you.

(Witness excused.)

MR. LOEVY:  Thank you, sir.

MS. CARNEY:  Your Honor, at this time the defense calls Cathryn Crawford.

(Witness enters courtroom.)

THE COURT:  Is this the witness?

MS. CARNEY:  I believe so.

THE COURT:  Could you step down here, please?

Please raise your right hand.

(Witness duly sworn.)

THE COURT:  You may be seated.

CATHRYN CRAWFORD, DEFENSE WITNESS, SWORN

DIRECT EXAMINATION

BY MS. CARNEY:

Q.  Good afternoon, Ms. Crawford.

Could you please introduce yourself to the jury and spell your first name for the court reporter.

A.  Sure.  My name is Cathryn, C-a-t-h-r-y-n, Crawford.

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 599 of 663 PageID #:107310
Crawford - direct by Carney
3189

Q. And are -- where do you currently live?

A. I live in Chicago.

Q. So you moved back from Texas, was it?

A. Yes, ma'am.

Q. Okay. And where are you currently employed?

A. I work for the Lawndale Christian Legal Center.

Q. And how long have you been an attorney?

A. Since -- for 20 -- close to 22 years.

Q. So you got your license around 1996?

A. Yes, ma'am.

Q. And at some point after you became an attorney, did you begin to work for the Northwestern School of Law?

A. Yes, ma'am.

Q. Okay. And when was that?

A. In 1998.

Q. Can you explain briefly for the jury what some of your job duties were while you were working at Northwestern?

A. So as -- at Northwestern, I was essentially a clinical professor. I had various titles, depending on what stage of my career I was at, but I basically supervised clinical students in helping represent people in juvenile and criminal court.

Q. At some point were you also -- did you also hold the position of a senior lecturer, or was that all within the global --

A. So I started as a senior lecturer, and I was doing research

on an abuse and neglect -- on the abuse and neglect court. And then I moved into -- I think I was an assistant clinical professor and then an associate clinical professor.

Q. In any of those roles, did you teach any classes?

A. I taught the clinical class, and then I had some -- a seminar every once in a while I'd also teach.

Q. Can you explain to the jury a little bit about what a clinical class is.

A. So a clinical class, usually I had eight students who would assist me in representing juveniles in juvenile court, juveniles in adult court, adults in adult court.

We would accept representation, and the students acted as sort of associates in a law firm. So they would assist me in client counseling, witness interviewing, legal research.

The third-year law students had what I liked to call their learner's permit, and so they could go into court with me and perform functions that lawyers would perform under my supervision.

Q. And approximately when did you leave your job at the Northwestern School of Law?

A. So I left permanently in 2011.

Q. Did you leave for a period of time before that?

A. I did. I had a leave from 2008 to 2010 when I worked at the John D. and Catherine T. MacArthur Foundation.

Q. And that is a separate entity from the Northwestern School

of Law, correct?

A. Yes, ma'am.

Q. Okay. I'm going to jump ahead a little bit.

During your tenure as an associate professor and senior lecturer, did you have an occasion to speak with Mr. Jacques Rivera?

A. Yes, ma'am.

Q. Okay. And how would you describe your relationship with Mr. Rivera while you were working at Northwestern?

A. I am not quite sure I understand that question.

Q. Okay. Well, let me ask you this.

When did you first speak to Mr. Rivera during your tenure at Northwestern?

A. I'm -- I believe it was in 2001 or 2.

Q. And how frequently would you speak with Mr. Rivera while you were working at Northwestern?

A. Well, Mr. Rivera, when I spoke with him, was in prison. So I know that I went to see him on one occasion. I don't recall more than one. And I may have spoken to him on the telephone.

Q. Did you correspond with him at all with letters?

A. Yes, ma'am.

Q. At the time you were working at Northwestern School of Law, would you consider yourself as representing Mr. Rivera?

A. No, ma'am.

Q. Okay. Then let me try then my first question again.

Crawford - direct by Carney

3192

So how would you have described your working relationship with Mr. Rivera while you were at Northwestern School of Law?

A.   So I was -- I would describe it as I was conducting an investigation into his case.

Q.   And when you're conducting an investigation into a case such as Mr. Rivera's, what does that entail, just the basics?

A.   As Mr. Rivera's or what I did in Mr. Rivera's case?

Q.   If you're comfortable talking about Mr. Rivera's case --

A.   I mean, from -- actually, you're right, because it was a really long time ago.

So essentially in conducting an investigation of the type that I was conducting in Mr. Rivera's case, it generally involved trying to obtain the records relating to the case, looking at the court opinions that were issued on appeal, trying to get copies of transcripts, any police reports, the file of the defense lawyer, any press or clippings that related -- just anything that existed in the universe that related to his criminal case.

Q.   So you had mentioned that you would have tried to get the file of his criminal defense attorney?

A.   Yes.

Q.   Typically you would have attempted to get the file of the criminal defense attorney.

Did you attempt to get the file from Mr. Rivera's

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 603 of 663 PageID #:107328
Crawford - direct by Carney
3193

criminal defense attorney?

A.  Yes, ma'am.

Q.  Okay.  And do you know when you first reached out to Mr. Rivera's criminal defense attorney?

A.  I believe it was in February of 2002.

MS. CARNEY:  If I could have one moment, Your Honor.

THE COURT:  Yes.

(Brief interruption.)

MS. CARNEY:  May I approach, Your Honor?

THE COURT:  Sure.

MS. CARNEY:  DX 26.

MR. LOEVY:  Defendants' 26?

MS. CARNEY:  26.

MR. LOEVY:  Thank you.

BY MS. CARNEY:

Q.  Ms. Crawford, I've handed you what has been previously marked as Defendants' Exhibit 26.

Do you recognize this document?

A.  Yes, ma'am.

Q.  Okay.  And is that your signature on the bottom?

A.  I am not sure if it's my signature or if my secretary signed it.  I had recently gotten married, so I was trying out all sorts of signatures, so -- and her initials are underneath it, but it's one or the other.

Q.  I can tell you, I understand that pain.

The date on this letter is February 6th of 2002. So when you said it was early February of 2002, you would have reached out to Mr. Wadas who was Mr. Rivera's criminal defense attorney, correct?

A. Yes, ma'am.

Q. Okay.

MS. CARNEY: Your Honor, I'd ask that we admit Defense Exhibit 26.

THE COURT: Any objection?

MR. BOWMAN: No, no objection.

THE COURT: It is received.

(Defendants' Exhibit No. 26 received in evidence.)

THE WITNESS: Your Honor, may I have a tissue?

THE COURT: Yes, yes, absolutely. They're there for you, actually, as is the water.

THE WITNESS: Thank you.

BY MS. CARNEY:

Q. So just really quickly in regards to this letter, the first sentence is: "Per our telephone conversation on Friday, February 1st, 2002, enclosed please find a signed authorization."

So would you have first -- was February 1st of 2002, would that have been the first time you reached out to Mr. Wadas?

A. Based on this letter, yes, ma'am.

Q. And then your letter says that you've included a signed authorization form. Can you explain what that is?

A. So on the second page of this exhibit is an authorization for release of information. And this is essentially Mr. Rivera giving me permission to obtain his file from his prior counsel.

We would -- any time you want to get records from a lawyer or a hospital or any place that requires consent from the person whose file it is, you would get one of these signed.

Q. And did you ultimately receive Mr. Wadas' file?

A. Yes, ma'am.

Q. Okay. And you have no independent recollection of how you went about obtaining the file; is that correct?

A. No, ma'am.

Q. Okay. So you could have gone -- sent somebody to his office to pick up the original and copied it and returned it to him?

A. Yes, ma'am.

Q. And you also could have gone to his office, picked up a copy, and brought it back?

A. I personally don't think that I would have gone to his office to pick it up, but I think that somebody from my office would -- would have -- that would -- the normal procedure would be our clerk would have gone and picked it up.

Q. Understood. So you would have sent -- somebody would have gone on your behalf to pick up either the original or some copy

of the file?

A.  Yes.

Q.  Okay.  And you have no memory of how that actually occurred, though, do you?

A.  No, ma'am.

Q.  Okay.

MS. CARNEY:  DX 27.  May I approach, Your Honor?

THE COURT:  You may.

BY MS. CARNEY:

Q.  Ms. Crawford, I'm handing you a copy of what has been marked as DX 27.

MS. CARNEY:  And I believe this has been previously admitted, Your Honor.

MR. BOWMAN:  I believe it has.  There's no objection in any event.

THE COURT:  Okay.  So if it has not been, it will be received.

(Defendants' Exhibit No. 27 received in evidence.)

BY MS. CARNEY:

Q.  Ms. Crawford, do you recognize this document?

A.  I recognize it because -- yes, I do.

Q.  Okay.  And why do you recognize it?

A.  This was shown to me in my deposition.

Q.  Okay.  And then we have talked about working on your signature back around 2002, but does that look like what you

Crawford - direct by Carney

3197

were attempting to have your signature look like in 2002?

A. Yes, ma'am.

Q. Okay. And can you explain to the jury a little bit about what this document is?

A. It's called a "Receipt for documents contained in Jacques Rivera's file."

Q. And do you recall -- have any recollection who created this document?

A. I do not.

Q. Would somebody working on your behalf have created this document?

A. It's quite likely.

Q. And would that have been in conjunction with the copying of the file that Mr. Wadas had provided for you?

A. Either if we -- I don't know if we actually copied the file or if we received a copy of the file, so -- but it would have been prepared -- presumably it's a catalog of the different categories of the files' contents.

Q. Okay. If you were provided a copy of the file, what would the purpose be to have created a receipt after the fact?

A. I -- I could only guess at this point. I don't actually have an independent recollection of this.

There are a whole host of different reasons that you might create an index for -- of a file, which I could -- I could guess some of them, but I don't recall specifically why

one was created in this case.

Q. But it's also a possibility that you had Mr. Wadas' original file, and as you -- you or someone on your behalf was copying it, you were counting pages and indexing what was in there so that you can ensure it was all returned to Mr. Wadas, correct? Is that a possibility?

A. I think it --

MR. LOEVY: Objection, Your Honor.

THE COURT: Sustained. I think anything is possible.

MS. CARNEY: Understood, Your Honor.

BY MS. CARNEY:

Q. Did you provide a copy of this receipt back to Mr. Wadas?

A. I don't have an independent recollection of it, but I would presume that I did.

Q. Okay. Did you maintain a -- when you were investigating the facts of Mr. Rivera's case back in 2001, 2002 -- do you think it went into 2003 that you were working on Mr. Rivera's case?

A. It might have.

Q. Okay. What about 2004?

A. I don't think so, but I don't recall. This was so long ago.

Q. Okay. Would you have created your own file for Mr. Rivera's case?

A. Yes.

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 609 of 663 PageID #:107329
Crawford - direct by Carney
3199

Q. And what kind of things, generally speaking, would you have put in such a file?

A. Well, I mean, let me just say it depends on what you mean by a file. Like everything relating to Mr. Rivera's case would be in a single file --

Q. All right.

A. -- that's correct.

Q. So you would have created one master file.

Would it have included things like your correspondence with Mr. Rivera?

A. Yes, it would have correspondence, memos from students on -- about legal issues. Sometimes the students and I would come up with action items.

So anything that either dealt with what we -- action we were going to take on the case, things that we had done on the case, or the results of our investigation.

Q. Okay. And do you still have a copy of that file?

A. No, ma'am.

Q. When was the last time that you saw your -- what you had put together as your master file for Mr. Rivera's case?

A. I don't remember.

Q. When you -- and I believe you had testified that you kind of moved around Northwestern School of Law in various capacities. Did that file move with you?

A. Well, I wasn't physically moving.

Q.  Okay.

A.  I mean, when we moved into our new building, I moved, but in general -- and I think we were already in the new building. But I --  the file was always -- belonged to me while I was there.

Q.  What happened to the file when you left Northwestern in 2011?

A.  So all of my files were -- with one exception of a case that I was still working on, all of my files were boxed up and indexed and placed into storage or, you know, somewhere on-site or off-site.

Q.  Do you have an index of those files anywhere?

A.  I don't have an index of those files.

Q.  Did Northwestern ever provide you with an index of what was boxed up and sent to storage?

A.  I'm -- I don't know if -- I don't know if -- I don't know if I kept a copy or if they kept the copy there, because from my recollection, my secretary or, you know, people were helping me box things up and then writing on the outside, and -- but I just don't remember.  I'm sorry.

Q.  So when do you think the last time that you saw your physical file from Mr. Rivera's case was?

A.  I cannot tell you specifically with respect to Mr. Rivera's case.  I can tell you that when I was leaving for Texas, I made sure that everything was boxed up.

Q. Okay. When was the last time that you took any action investigate -- looking into the facts of Mr. Rivera's case?

A. It was in the early 2000s.

Q. So, again, 2003, maybe 2004?

A. Yeah, I don't -- I don't remember specifically.

Q. Okay.

MS. CARNEY: Can I have one moment, Your Honor?

THE COURT: Sure.

(Counsel conferring.)

BY MS. CARNEY:

Q. And, Ms. Crawford, just if I asked you this already, I apologize.

When did you move to Texas?

A. So I moved to Texas in 2012.

Q. 2012?

A. Yes, ma'am.

Q. And so when you left Northwestern in 2011, did you have another job in between, or did you take some time off?

A. So I was basically sticking around Chicago for this single case that I was working on involving a juvenile in adult court. And so I was working on that case and literally moved the day after it came -- a hearing came to a conclusion.

Q. And you didn't take any of your files with you to Texas, right?

A. Just that one that I just referred to.

MS. CARNEY: I have no further questions.

THE COURT: Anything further from the defense side?

MR. LEINENWEBER: No, Judge. Thank you.

THE COURT: Plaintiff.

CROSS-EXAMINATION

BY MR. BOWMAN:

Q. Good afternoon, Ms. Crawford.

You were describing where you currently work. It was Christian Legal Services, did you say?

A. Lawndale Christian Legal Center.

Q. And what is Lawndale Christian Legal Center?

A. Lawndale Christian Legal Center is a community-based holistic law firm. We represent people from the Lawndale community, which is on the Chicago's West Side, and we provide what we call holistic defense.

So anybody from the neighborhood 24 and under will -- who gets in conflict with the law, either in juvenile court or adult criminal court, we -- they get a lawyer and then also a case manager. So the lawyer addresses their legal needs, and the case manager addresses their social needs.

Q. Thank you.

I want to ask you some questions about the obtaining of Mr. Wadas' file. Okay?

A. Yes.

Q. You're not saying here, are you, that Mr. Wadas gave you

his original file, right?

A. No. No, sir.

Q. What you're saying is because of the passage of time, you have no idea what version he gave you? Was it his original file or -- or a copy of the file, you wouldn't be in a position to say, correct?

A. That's correct.

Q. And, Ms. Crawford, would you defer to Mr. Wadas' recollection that his original file never left his possession?

A. Absolutely.

MS. ROSEN: Objection, Judge.

THE COURT: It's really too late, because it's been answered.

BY MR. BOWMAN:

Q. Ms. Crawford, would you ever destroy a document?

A. No.

Q. Would you ever secret a document?

A. No.

MR. SOTOS: Objection. Objection. Nobody is making any such accusations.

MR. LOEVY: All right. Then we're done.

MR. BOWMAN: Then we're done. I have no further questions.

THE COURT: All right. Anything further?

MS. CARNEY: Yeah, I have just a couple short

follow-ups.

### REDIRECT EXAMINATION

BY MS. CARNEY:

Q.  Ms. Crawford, just to follow up on -- in regards to your file and what I believe -- sorry.

You would have put a copy of the Wadas file that you received into your file, correct?

A.  Yes, ma'am.

Q.  Okay.  Are you aware that -- of any searches that have been conducted to find the copy of your file?

A.  Yes, ma'am.

Q.  Okay.  And those searches have borne no fruit, correct?

A.  Yes, ma'am.

MS. CARNEY:  Okay.  Thank you.

THE COURT:  Anything further?

MR. BOWMAN:  No.  Thank you, Judge.

THE COURT:  Thank you, Ms. Crawford.  You may step down.

(Witness excused.)

THE COURT:  And I think it's break time, ladies and gentlemen.

(Jury out.)

THE COURT:  Ten minutes.

Dan, I forgot to tell the jury.  Could you just mention to them that my call at 9:30 is going to take 10

3205

minutes tomorrow, so we can start at 9:40.  I'll try to remind them, too.

9:40 tomorrow, everybody.  My call is very short.

MS. ROSEN:  Judge, I just have one quick question.

THE COURT:  Yes.

MS. ROSEN:  On Judge -- the Wasilewski motion to reconsider --

THE COURT:  Yes.

MS. ROSEN:  -- are -- do we -- are we going to expect a ruling?  He's on the list for tomorrow, so --

THE COURT:  Oh, okay.  We'll try to have one to you -- I don't think -- I don't know that I can promise it tonight, but it's in progress.

MR. LOEVY:  And, Your Honor, we would supplement our argument with, a lot of topics he was going to say Mr. Sotos elicited, if we're talking about Wasilewski.

THE COURT:  I don't think that's a reason for anything.  I'm ruling on the motion.

MS. ROSEN:  Okay.

THE COURT:  He's not the first witness?

MS. ROSEN:  We can arrange -- we can move it.

THE COURT:  Yeah, I think -- I think the best I can do is promise that you'll have it before we start tomorrow morning.

MS. ROSEN:  Okay.  Great.  Thanks, Judge.

3206

MR. LOEVY:  Thank you.

MR. ART:  Thank you, Judge.

MR. LOEVY:  Would you call him if that happens or --

MS. ROSEN:  Yes.

MR. LOEVY:  So we should get ready for him not knowing?  You'll call him if he's in, right?

MS. ROSEN:  We're calling him either way.

(Recess.)

3207

(Witness enters.  Jury out.)

THE COURT:  Okay.  Are we ready?  Are we ready?

MR. LOEVY:  Yes, Your Honor.

MS. ROSEN:  I believe we are.

MR. LOEVY:  Although, we need Mr. Bowman.

MS. ROSEN:  Oh.  I guess we don't have Mr. Bowman.
Sorry.

THE COURT:  Okay.

(Messrs. Bowman and Art reenter.)

THE COURT:  Okay.  We're ready?

MR. BOWMAN:  We are, Judge.

(Pause.)

THE COURT:  Who's next?

MS. ROSEN:  Mr. Hickey.  Do you want him to take the
stand or --

THE COURT:  Sure, if he's here.

MS. ROSEN:  Yeah.  If you want to come up?  Save the
extra 30 seconds.

THE COURT:  Yeah.  I'll swear you in as soon as the
jury is in the box.

We're ready.

(Jury in.)

THE COURT:  Please be seated, everyone.

And I asked Dan to tell you, but I'll repeat it, since
I am remembering, that I have just one brief matter in court

Hickey - direct by Rosen

3208

tomorrow at 9:30, so we'll be able to start by 9:40 at the latest.

Okay, sir. Would you please raise your right hand.

(Witness duly sworn.)

THE COURT: You may be seated.

MS. ROSEN: Do we need to clean up up there a little bit --

THE WITNESS: Yes.

MS. ROSEN: -- for you? Sorry.

THE WITNESS: Thank you.

JAMES K. HICKEY, DEFENDANT CITY'S WITNESS, SWORN

DIRECT EXAMINATION

BY MS. ROSEN:

Q. Good afternoon, Mr. Hickey.

Could you please introduce yourself to the ladies and gentlemen of the jury.

A. My name is James K. Hickey.

Q. And what is your current occupation?

A. Retired.

Q. What was your former occupation?

A. I was a member of the Chicago Police Department.

Q. Okay. And, sir, you've been designated, have you not, as a spokesperson for the City of Chicago on certain issues related to this case; is that correct?

A. That is correct.

Q. And so you're able to provide testimony on behalf of the City of Chicago, is that correct?

A. Yes, ma'am.

Q. Okay. Why don't we talk about -- just a little bit about your background.

When did you start with the Chicago Police Department?

A. June 1971.

Q. And just briefly, tell us a little bit about your career through the 1990s.

A. For the first 29 years, I was a sworn member of the Chicago Police Department. I was a police officer. I worked in a district. Subsequently worked in the Youth Division. Then I made detective. Then I went to Area 1 Homicide and Sex Investigations Unit.

I worked in detective administration for the chief of detectives and then I worked in the crime laboratory of the police department.

And I made sergeant and lieutenant along the way, and I worked in -- returned to patrol in the Englewood district. And from there, I went to work for the chief of patrol.

And subsequent to that, I started a new unit for the airports. We consolidated the airport units into one unified command.

After that, Superintendent Martin selected me for the brand-new Random Drug Testing Unit. After that, I went to

Research & Development where I ended my sworn career.

And I -- upon finishing my sworn career, I started working for the police department again as a civilian. I was assigned to -- over 16 years as a civilian. I was assigned to three separate divisions, once twice, Research & Development, the Records Division, the Information Services Division, and back to Research & Development, all as the assistant director.

Q. Thank you.

Now I want to focus your attention to your job responsibilities in the early 1980s. At that point in time, say, in 1980-1981, where were you assigned?

A. 1980, I was finishing up Area 1 Homicide and then I was assigned to detective headquarters.

Q. Okay. And is that when you were -- you described earlier being in the administrative branch of the Detective Division?

A. Correct.

Q. Okay. While you were in the detective administration, did you come to learn about an event that occurred with an individual by the name of George Jones?

A. Yes, I did.

Q. Okay. And you -- the jury has heard some testimony about Mr. Jones and a class-action lawsuit that was filed called *Palmer*.

Do you have firsthand knowledge about some of the events that transpired during that time?

A.  I did.

Q.  Okay.  And can you briefly tell us -- well, let me back up for a second.

Now, Mr. Jones was an individual who was being criminally prosecuted, correct, for a murder?

A.  Correct.

Q.  And the jury's already heard it, but just so we can get a frame of reference, shortly before he was to start his trial, information came to light from a detective, actually, Frank Laverty, about a memo and a potential alternative suspect, correct?

A.  That's correct.

Q.  And you're aware, Mr. Hickey, that shortly right after that came to light, a class-action lawsuit was filed called *Palmer*, correct?

A.  Yes, ma'am.

Q.  Okay.  Can you tell us what happened nearly immediately upon the filing of the class-action lawsuit?

A.  I was working for the chief of detectives, and there was an internal meeting, and we strived to do some fact-finding as to how the various six Areas in the Detective Division were maintaining their files, especially their notes and inter-watch memorandum.

Q.  Okay.  You said there were six Areas.  Back in 1981 and '82, the Chicago Police Department had six detective Areas; is

Hickey - direct by Rosen

3212

that correct?

A.   That's correct.

Q.   And their responsibility was to oversee the criminal investigations, felony prosecutions over the City of Chicago?

A.   Felony and misdemeanor.

Q.   Okay.  And the -- it was geographically broken down.  Is that what the Area denotation is?

A.   Correct.

Q.   Okay.  So once this meeting was held about the fact-finding, what, if anything, did you personally do?

A.   I visited -- I conducted a site survey of each of the six different detective Areas, focusing on how files were maintained for violent crime field investigations.

Q.   And prior to that point in time, did the City of Chicago have any policies regarding files that contained notes or inter-watch memorandum or to/from memoranda?

A.   It did not.

Q.   And what did you find during your fact-finding?

A.   I found, first of all, there was a lack of uniform terminology to describe what we all thought was basic note-taking and communication between watches.  There was a variety.

     I also took the opportunity to look at specific files, samplings of different files and observed that some were better written than others.

Q. Okay. And the files that you were reviewing, were they -- well, first of all, going from Area to Area, was there uniformity?

A. There was not.

Q. Okay. And did any of the Areas have a central location within the Area for storing or maintaining these files?

A. All the Areas maintained an office file. There was differences in how they managed, they didn't manage various notes and working files, as I refer to them.

Q. Okay. And the notes and the inter-watch memorandum and the to/from memoranda, the ones that you observed during your fact-finding, did any of those documents have affixed to them the Records Division number for any particular investigation?

A. Mostly, they did not.

Q. Okay. And the jury's heard some testimony, but the -- can you describe what the Records Division number means in the Chicago Police Department.

A. The Records Division number is the key filing number. It dates back to 1961.

1961, all the incidents reported to the Chicago Police Department began with a letter A, 62, boy, and so on and so forth. And when they ran out of the alphabet, they started over again.

Q. Okay. And is -- how does the -- how did the Chicago -- how does the Chicago Police Department use the Records Division

Hickey - direct by Rosen

number?

A.   It was and continues to be the key bureaucratic filing of all reports submitted under a particular incident.

Q.   Okay.  And does each individual Records Division number tie to a particular criminal -- a particular crime?

A.   It does.  It can be non-criminal as well.  It could be a lost-and-found case report.

Q.   Okay.  So even in that circumstance, there's an RD number?

A.   Correct.

Q.   Okay.  Now, during the point in time that you were doing your fact-finding, did you have responsibilities in terms of reporting what you found?

A.   I reported to the chief of detectives, and I did prepare some memos on that topic.

Q.   Okay.  And did you have an understanding of what the purpose of the fact-finding was with -- based on the meetings that you were having and the discussions that you were having about what was going on as a result of the *Palmer* litigation?

A.   The Detective Division simply wanted to get a handle on the practices and to establish a more uniform methodology to organize these files.

Q.   And while you were doing this fact-finding, was the *Palmer* litigation going on?

A.   It was.

Q.   Okay.  Do you know whether or not the super -- the then

Hickey - direct by Rosen

3215

superintendent of police actually testified in connection with the *Palmer* litigation?

A.   In this building, yes.

Q.   Okay.  And who was that?

A.   Richard Brzeczek.

Q.   And did he have some opinions about how the policies should change or not change going forward?

A.   He testified that the notes of detectives, including everything, and even if it was on the back of a matchbook, should be preserved.

Q.   Okay.  And at that time, did you have an understanding of what other law enforcement agencies' policies and practices were as it related to note-taking?

A.   I attempted to find out what the practice was.

Q.   Okay.  And this was during this period of time when you're doing your fact-finding and trying to develop a new policy, right?

A.   Correct.

Q.   And were you hands-on involved in the development of new policies as it related to Detective Division records?

A.   I was the drafter of all the drafts on the topic.

Q.   Okay.  Up until what period of time?

A.   Well, until the final issuance of 83-1, I think is the number.

Q.   Okay.  And so up until --

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 626 of 663 PageID #:107346
Hickey - direct by Rosen
3216

A.  82.

Q.  -- Special Order 83-1, were there other versions that went into effect?

A.  There was one earlier, a few months earlier than that.

Q.  Okay.  So tell us about what you tried -- what you found out when you were trying to find out what other law enforcement agencies did as it relates to notes.

A.  From the FBI, I did a site visit in the Chicago office here.  I learned that the FBI agents, when preparing their standard report called a 302, took their notes and put them into a sealed envelope and filed the envelope at the time of submission of their report.

I also learned that they had a suffix system.  Each and every report had a unique suffix at the end of their numerical identifier, again, whatever the, you know, suffix was.  I can't remember if it was alpha or numeric.

Q.  Okay.  With respect to the notes that they put in the envelope, did you find out whether or not those notes were regularly produced in response to requests either in a criminal case or a civil case?

A.  I did, and they were not produced.

Q.  Okay.  All right.  Did you -- were you able to find out anything about other law enforcement agency practices at that time regarding notes?

A.  I telephoned, cold-called a few police departments.  I

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 627 of 663 PageID #:107347
Hickey - direct by Rosen
3217

really didn't learn much.  I learned that you don't learn much by cold-calling people on the phone and asking how they do their filing on homicide cases.

But I can't even remember the cities that I called at that time.

Q.  Okay.  And in any event, you then endeavored to write a new policy, correct?

A.  Correct.

Q.  And did you have input from other members of the police department regarding what the goal was of the policy?

A.  I certainly did.  This was not done in a vacuum.  I had supervision.  I had attorneys from the police department, attorneys from the plaintiffs.  Everyone had a crack at it.

Q.  Okay.  And when you say attorneys for the plaintiffs, who are you referring to?

A.  At that time, there was a group of attorneys representing --

Q.  Yeah, go -- I'm sorry.  I didn't mean to interrupt you.

A.  By name or --

Q.  No, no, no.

A.  Oh.

Q.  Just what were they -- plaintiffs in what case?

A.  Oh.  Well, the *Palmer* case, if you --

Q.  Okay.  So when the policies were being drafted, you had input from the Chicago Police Department higher-ups and things

like that?

A.   Yes, ma'am.

Q.   Okay.  And the plaintiffs' attorneys?

A.   Yes.

Q.   And was the City of Chicago's Legal Department involved?

A.   It was.

Q.   Okay.  And so it -- without speaking too -- you know, with specific detail as to the initial policy that was drafted, generally what was required once that first policy was drafted as it relates to files and notes?

A.   We strived to implement the policy statement of the superintendent of police, how to preserve the notes that had been generated and anything else pertinent to the case.

Q.   Okay.  And then you said eventually, there were drafts of it -- of the policy and then we finally landed on -- I think you said 83.2 was the final version, right?

A.   I was wrong.  I said 83-1.  It's -- I'll go with you.

Q.   Okay.  I think 83-1 was a predecessor version.

A.   Okay.

Q.   Can you tell us why the draft of the order kept changing over this, sort of, short period of time?

A.   Well, it only changed once, but it's a relatively short period of time, within a year.

       For organizational speed, that's --

Q.   Pretty good?

A.  -- fast-track.

Q.  Okay.  So let's talk a little bit about 83-2, which is actually Plaintiff's Exhibit 165.

MS. ROSEN:  Do you -- defense table 2, please.

BY MS. ROSEN:

Q.  And taking a look at --

MS. ROSEN:  Which, I think, is already in evidence. You guys moved it in.

MR. BOWMAN:  I think it is, yes.  No objection, in any event.

BY MS. ROSEN:

Q.  Taking a look at Detective Division Special Order 83-2, is that the final 1983 version of the Special Order dealing with investigative files?

A.  Yes, it is.

Q.  Okay.  And just generally, with respect to the Chicago Police Department, they issue all kinds of directives, whether it's a General Order or a Special Order, and those get updated, right, from time to time?

A.  They do.

Q.  And this particular order, 83-2, was in effect until about 1986; is that right?

A.  Correct.

Q.  Okay.

A.  The only distinction I would make is that this is a

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 630 of 663 PageID #:107350
Hickey - direct by Rosen
3220

Detective Division order.  You had asked if the -- you know, about the Chicago Police Department, which is a larger entity.

Q.  Got it.  And we'll talk about that, too.

So when we're talking about Special Orders, who do they apply to?

A.  Detective Division Special Orders -- okay.  No.

Q.  Yeah, no.  You're right.  You corrected me.  I was being too --

A.  I'm sorry.

Q.  I was being too general.  So you tell me what a Detective Division Special Order is.

A.  A Detective Division Special Order applies to everyone within the organizational command of the chief of detectives.

Q.  Okay.  And why was it that this order was drafted as a Detective Division Special Order?

A.  The responsibility for investigating violent crime field investigations is clearly that of the Detective Division.  They alone have the authority and responsibility to close a case, to maintain its status.  It's their report, which is the final word in the criminal investigation.

Q.  Okay.  And, of course, there are other units of the Chicago Police Department that get involved in criminal investigations, right?

A.  Correct.

Q.  And what are some of those other units?

Hickey - direct by Rosen

3221

A. Almost a hundred percent of them start in the Patrol Division. The men and women in blue are the ones who start writing the reports.

Q. And that first report, what is it called?

A. It's a case report. It's generally called a case report.

Q. Okay.

A. It's specifically called a general offense case report.

Q. Okay. And that would be a document that's prepared typically by somebody in the Patrol Division, the beat cop?

A. Correct.

Q. Okay. And then there are other units, right, within the Chicago Police Department that participate in criminal investigations, right?

A. Correct.

Q. So, for example, in this case, we've heard about Gang Crimes specialists. They obviously have a role in conducting criminal investigations, correct?

A. Correct.

Q. And this order does not apply to those other types of units, correct?

A. No. This order was issued by the Detective Division chief.

Q. Okay. And why --

A. He doesn't have the authority to issue it to another bureau or division outside of his organizational responsibility.

Q. Okay. And do -- why was -- why is it that only -- this

Hickey - direct by Rosen

3222

type of order regarding investigative files applied only to the Detective Division?

A.   Well, that was the issue at hand, trying to get a more uniform approach to maintaining our files.

And again, it's the Detective Division responsibility. The issue of homicide investigation is the final responsibility of the Detective Division.

Q.   Okay.  So, now, let's take a look a little bit at the order.  If we take a look at the Purpose, which is section II.

And does that detail -- that section detail the purpose of the order?

A.   It does.

Q.   And if we take a look at subparagraph A., can you tell us what that says?

A.   "Guidelines for the proper retention of official Department reports, notes, memoranda, and miscellaneous documents of potential evidentiary value, accumulated during the course of a particular violent crime field investigation."

Q.   And so -- and you actually are the one that wrote this, right?

A.   I am.

Q.   Okay.  And your intention when writing this was what precisely to convey to the individuals within the Detective Division that this order apply to?

A.   That the notes of detectives is not their personal

property.  It's the work product of the Chicago Police Department and, therefore, should be preserved.

Q.  And prior to this period of time, was there a different view by detectives working in the Detective Division regarding who had proprietary rights over the notes, for lack of a better way to describe it?

A.  Notes, the handwritten notes -- there's a couple of variety of notes.

Q.  Okay.

A.  The handwritten notes were always thought to be that of the detective.  Upon preparation of a supplementary report, they were routinely destroyed.

Q.  Okay.  And then as far as typewritten notes, before 83-2 went into effect, what was the thinking there?

A.  The typewritten notes most often were inter-watch requests for someone else working a different shift to do something, and these notes, if they didn't make the supplemental report, did not make the official RD number file.

Q.  Okay.  And in terms of how detectives then -- and even after the promulgation of 83-2 utilized their notes, what was the expectation regarding what they were supposed to -- like, they take the notes and then what were they supposed to use the notes for?

A.  I didn't understand the question.

Q.  I'm sorry.  It was a bad question.

With respect to note-taking that detectives did, what was the -- even before promulgation of 83-2, what was the expectation regarding what the detectives were using those notes for in connection with preparing their supplementary reports?

A.   It was their -- to remind them, to refresh their memory as they prepared the official supplementary report.

Q.   Okay.  Now, if we take a look at subparagraph G. regarding "instructions for use of the Investigative File Folder," can you describe what the investigative file folder is.

A.   First of all, this is brand new.  It really is being introduced.

Q.   Okay.

A.   It's nothing more than a classic file folder that -- a manila folder, 8 and a half by 11.  It had a two-hole punch in the top of it, and reports and notes that were generated could literally be placed on this clip, this two-hole clip, and then it was organized according to the RD number.

Q.   So prior to 83-2 being in effect, that type of folder was not being utilized by anyone in any of the Areas with respect to maintaining notes or memoranda or anything like that?

A.   It was not.

Q.   Okay.  And the documents that were included in the investigative file folder, was it the expectation that each of those documents would have the RD number on it?

Hickey - direct by Rosen

3225

A.  No.

Q.  Okay.  Was the investigative file folder organized by RD number?

A.  Yes, it was.

Q.  Okay.  And if we take a -- well, let me just show you what's been marked City Exhibit --

        MS. CARNEY:  45.

BY MS. ROSEN:

Q.  -- 45, which is the original investigative file in this case.  Is this the type of folder (holding up document) that you envisioned when you were creating this policy?

A.  Yes.

Q.  May I take that back?

        So it's got the two-hole punch at the top and the metal binder that you were describing, right?

A.  Correct.

Q.  Okay.  Let's talk about subparagraph I., "instructions for the use of the General Progress Report."

        What is a general progress report?

A.  The general progress report is essentially a notepad, but it was filled with a few boxes on the top and then literally 85% of the form, if not more, was simply blank lines.  It was designed to facilitate and organize note-taking by detectives.

        There was the hope, there was the direction that these things would be used by the detectives in the course of their

investigation, whether they are out in the field, in a squad car, or in their office interviewing suspects --

Q.  Okay.

A.  -- and witnesses.

Q.  And that was -- was that a brand-new report that was created with this policy?

A.  It was.

Q.  And how was it -- is it -- was it single sheets of paper? Was it a pad of paper?  How did that work?

A.  It is one single page, but it was printed on a pad of paper, again, with the two-hole punches to facilitate subsequent filing.

Q.  Okay.  And you said that the hope was that the detectives would utilize that for all of their note-taking, correct?

A.  Yes, ma'am.

Q.  And since 83-2 was created, is there a hundred percent compliance with taking all notes on the general progress report?

A.  I don't think there's a hundred percent compliance with almost anything.

Q.  Okay.  And with respect to the purpose and intent of 83-2, if, for some reason, a detective were to take a note not on the GPR report, what is the expectation with respect to that particular note, whether it's handwritten or typed?

A.  The organization would frown but, most importantly,

preserve it. The important thing is to preserve the information, even though it wasn't submitted in the proper format.

Q. Okay. And why is the most important thing to preserve it?

A. We really are about the business of truth, and we're -- we don't want to throw away something that may be important.

Q. Okay. And in the first, say, 18 months or so of this new General Order going into effect, do you have any understanding on whether or not there was use of the general progress report?

A. Yes, I do.

Q. And what do you base that knowledge on?

A. I worked in Research & Development. Research & Development not only drafts orders for the superintendent, we also are in charge of all the printed documents that are used by the Chicago Police Department.

On the bottom of the report -- all the reports of the Chicago Police Department -- there's a little number, you know, that -- it includes the date and the month that it was created. And because -- I will get to the answer to your question. Because I was in Research & Development, we also keep track of the printing orders. All the requests to reprint or print new documents come through Research & Development.

And I went out of my way to find out how often the general progress reports were used in the first 15 months, and there was an order -- multiple orders for printing and

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 638 of 663 PageID #:107358
Hickey - direct by Rosen
3228

reprinting, totaling 140,000 of these general progress reports.

Q. Okay. And when the *Palmer* class action was first filed and these changes began being made, was there some institutional resistance to the change in the beginning?

A. I don't think there was true organizational -- institutional resistance. I think there was confusion.

Q. And explain.

A. Take, for instance, the superintendent's message about notes, there was actually two on his part. One was a teletype that he had issued, and subsequent to that was a -- his testimony in federal court.

In the teletype he issued, he said, you know, preserve everything, including notes. I mean, there was genuine confusion about the topic of notes. Well, I'm pretty sure he means notes that are written on a typewriter or handwritten between watches. I'm pretty sure he doesn't mean my personal notes.

Q. That was the thinking?

A. I -- by some.

Q. By some?

A. By some.

Q. Okay.

A. So, therefore, I wouldn't say it was resistance. I would say it was confusion.

Q. Okay. And there was -- some of the litigation that went on

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 639 of 663 PageID #:107359
Hickey - direct by Rosen
3229

addressed those kinds of issues, right?

A.  It did.

Q.  Okay.  And by the time 83-2 was promulgated, that was after input by the people you had talked about, right?  The lawyers from the City's Law Department, the plaintiffs' attorneys in the *Palmer* case, after these hearings had happened, after the superintendent had testified, right?

A.  Correct.

Q.  Okay.  So by the time we get to 1983 when this Special Order is issued, from the police department's perspective, it's clear that when we say notes, we mean all notes, right?

A.  Yes, Ms. Rosen.

Q.  Okay.  Now, let's talk about the investigative file inventory sheet, which is subparagraph J.

What is that document?

A.  This is a document that I designed, I drafted.  I wanted to memorialize the fact that certain items were placed into the care and custody of the investigative file, and I could think of nothing other than actually trying to describe it and, as they are put in chronological order, it would be a living, breathing document, you know, as of what date was something submitted.

And it's also kind of an integrity check on the file. If something says it's there, and later on it's not, well, there's legitimate reason to ask why it's not.

Hickey - direct by Rosen

3230

Q. Okay. And when we look at what we -- I showed you before, City 45, on the front page of it is an example, right, of this log, the investigative file inventory?

A. It's a multi-lined inventory control sheet.

Q. Okay. And then if we just take a look quickly at section III, the Policy, if you could just read that.

A. "It is the policy of the Chicago Police Department to conduct all criminal investigations in an impartial and objective manner and to maintain the integrity of its investigative files to ensure that the due process rights of the accused are not only" -- or, excuse me, "are not compromised during the subject investigation, initial court hearing or any subsequent review. Additionally, it is the policy of the Chicago Police Department to record" --

Q. If we could go to the next page.

A. -- "and preserve any relevant information obtained by any detective during the course of a violent crime field investigation.

"When assigned to violent crime field investigations, detectives will preserve and record information and materials obtained in the course of the investigation to assure not only that information and materials indicating the possible guilt of the accused are preserved, but also that any information and materials that may tend to show his possible innocence or aid in his defense are preserved.

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 641 of 663 PageID #:107361
Hickey - direct by Rosen
3231

"Deviation from this policy adversely impacts on the goals and objectives of the Chicago Police Department and may result in disciplinary action against that Department member."

Q.  Okay.  And what was the purpose of putting that policy statement in the order?

A.  To establish and send a message that we are the gatherers of information, whether it proves or disproves the guilt or innocence of an individual.

Q.  And then the remainder part of the order then specifically provides definitions for the various topics that we've talked about, correct?

A.  Correct.

Q.  Okay.  And then by the time we get to 1986, that order is revised.

You didn't rewrite the order, right?

A.  I did not.  I had moved on from the Detective Division.

Q.  Okay.  But it was substantially the same with some minor changes, correct?

A.  Correct.

Q.  Do you know what the change was?

A.  I think there were two changes.  I think they dropped the purpose.  And second of all, there was a section added about auditing and assigning that responsibility to the exempt commanders.

Q.  And what's an exempt commander?

Hickey - direct by Rosen

3232

A. Exempt commander is a person who's in charge of a specific subunit of the Chicago Police Department; in this case, the Detective Division. They are appointed by the superintendent of police.

Q. Okay. And at the conclusion of the *Palmer* case, the *Palmer* litigation was resolved without any findings either way regarding any specific wrongful convictions; is that correct?

A. That is correct.

Q. Okay. Now, let's switch topics and talk about the Subpoena Service Unit.

What is the Subpoena Service Unit of the Chicago Police Department?

A. The Subpoena Service Unit is that one place in the Chicago Police Department that all requests for subpoenas or -- all requests for information, documents, reports, physical evidence, whatever it may be, lands in the same place within our large organization.

Q. Okay.

A. And that is within the Records Division.

Q. And what is the Records Division?

A. The Records Division is the place, the organizational subunit of the Chicago Police Department which stores all official reports, whether they be written or they be mugshots or the arrest reports, the traffic reports, and things like that.

Hickey - direct by Rosen

3233

Q. Okay. And how -- back in the 1980s, early '90s, who staffed the Subpoena Service Unit?

A. The Subpoena Service Unit, from the time I was there, was staffed by both sworn members and civilian, kind of a hodgepodge of, you know, sworn versus civilian members.

Q. Okay. And do you know what type of training the individuals that worked within the Subpoena Service Unit received?

A. On-the-job training.

Q. And can you describe what that means?

A. Well, by virtue of the fact it's a relatively small group of people, four or five, it's kind of difficult to have formal class settings and the fact that there's very little turnover in a unit like that. The newest person simply gets trained by those who have been there and also their supervisor who, most of the time, was a sergeant of police.

Q. Okay. And can you describe the process by which a subpoena comes into the Subpoena Service Unit from, let's say, either a prosecutor or a criminal defendant. What happens?

A. It lands in the Subpoena Services Unit. Whether it originally started in the superintendent's office or was dropped off somewhere in a large organization, it's sent to the Records Division, Subpoena Services Unit, which looks at it and tries to determine what is it they're asking for.

Q. Okay. And how do they make that determination?

A.   The nice part is the RD number.  Usually, there's an RD number associated with it, or at least an arrest report number in which they could find the RD number.

And it's interesting that the Subpoena Unit is actually the middleman.  The Chicago Police Department does not keep all of its records in one place.  The Polygraph Unit is part of the Crime Lab.  If there was a request for a polygraph report, they would circle the Crime Lab and send it to the Polygraph Unit.  If it was a DUI, they would send it to the Traffic Records section.  Different units.  So it's not one-stop shopping.  If they wanted investigative files, they would send it to the particular Area of an investigative authority.

So they would take this subpoena, literally circle the receiving unit, make -- and make as many copies as they need.  One subpoena may need information from three different subunits, and they send it out to those units and say, "Respond by" -- it's very date-specific because this information is needed by the prosecutor or the defense attorney by a certain date.  So the date is very important in the processing of these subpoenas.

Q.   Okay.  And do the people in the subpoena survey -- Subpoena Service Unit, when they send out these subpoenas, do they then get a response from each of these different units?

A.   They do.  And then they take the responses -- and I've seen

Hickey - direct by Rosen

3235

them rubber band and collate these -- the package of responding reports and then put them into their date file as to when they will be delivered to the requester.

Q. Do the individuals that work in the Subpoena Service Unit have any responsibilities to review the documents, to cull it for information that they don't deem relevant, or do they simply take what's been provided by the responding unit, put it in their date file, and then produce it?

A. They process the reports. I don't think very many of them read the reports from cover to cover.

Q. Okay. All right. We are going to switch gears one more time and talk about lineup procedures.

So taking you back to the 1980s. The Chicago Police Department had written directives relating to lineup procedures, is that correct?

A. It is.

Q. Okay. And let me ask you to take a look at what's been marked CX-11, which has already been admitted.

And this is General Order as distinct from the Detective Division Special Order that we were talking about before, correct?

A. Correct.

Q. And so what does it mean when it's a General Order?

A. A department General Order is issued by the superintendent of police for all members of the Chicago Police Department.

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 646 of 663 PageID #:107366
Hickey - direct by Rosen
3236

Q. Okay. And this particular order is 83-5 that went into effect on March 17th, 1983. And this is the order that remained in effect until September 24th, 1988; is that correct?

A. Correct.

Q. Okay. So now let's take a look at just a couple of the provisions of the order.

MS. ROSEN: If we could go to the second page -- actually -- I'm sorry. Could we go back to the first page just for a second?

BY MS. ROSEN:

Q. If we look at the first page of the order, at the bottom, section II-G., is that where it instructs the persons that are conducting the lineup about the number of fillers that are required to be in the lineup per suspect?

A. It does.

Q. And does it indicate that if there's one suspect in the lineup, there has to be at least five people total in the lineup?

A. It does.

Q. And does it say if there's more than one suspect in the lineup, the lineup should ideally consist of four non-suspects in a lineup?

A. Correct.

Q. Okay.

MS. ROSEN: Now, if we could switch to the second

page, subsection H. That -- can we blow that up? Yeah.

BY MS. ROSEN:

Q. So that paragraph describes what's to happen regarding photographing a lineup, correct?

A. Correct.

Q. And is this related to live lineups, this order?

A. Yes, it is.

Q. Okay. And can you tell us what the instruction is in this order regarding when, at this time, it was required to photograph a live lineup?

A. You want me to read it or just --

Q. If you can just -- you don't have to read the whole thing.

A. Whenever there is an identification of the suspect, an evidence technician, the ones with the camera back in the day, would be requested and directed to respond to the detective area to take a photograph of the positive lineup.

Q. Okay. And if there were no identification, would there be a photograph taken?

A. There would not.

Q. If there were a filler identification, would there be a photograph taken --

A. No, there would not.

Q. -- back in 19 -- in the 1980s?

A. No, there would not.

Q. Okay. And let's take a look at now paragraph J.

Hickey - direct by Rosen

3238

Can you tell us who, pursuant to this order, has responsibility for conducting live lineups?

A. The responsibility is given to the Detective Division and only to the members of the Detective Division.

Q. Okay. And can you read for us the underlined language in the order.

A. "In no case will a lineup be conducted without a Supplementary Report being completed."

Q. Okay. And so this order instructed that regardless of the outcome of a lineup, a lineup report had to be created; is that correct?

A. Yes, Ms. Rosen.

Q. A live lineup?

A. Yes, ma'am.

Q. Okay. Now, with respect to a circumstance where there was no identification made in a lineup, what was the expectation of the Chicago Police Department back in the 1980s?

A. Prepare a report, describe those who were in the lineup, and submit it to your supervisor.

Q. With respect to a live lineup that was conducted in the 1980s, if there was a filler identified in the lineup, what was the expectation of the Chicago Police Department back in the 1980s?

A. It's the same as a non-identification. A report is required to be prepared.

Q. So at that time, back in the 1980s, the department did not expect police officers to distinguish a non-identification from a filler identification?

A. Did not require.

Q. Okay.

MS. ROSEN: If I could have just a moment?

BY MS. ROSEN:

Q. With respect to the lineup procedures that we were just talking about, today is that different in terms of memorializing a filler identification versus a non-identification?

A. Yes.

Q. And do you know why it's different?

A. Best practices have changed, evolved over the decades.

Q. Okay. And, now, the best practices are to make that distinguish -- to distinguish that clearly in the reports that are being prepared?

A. Correct.

MS. ROSEN: Thank you. I have no further questions.

THE COURT: I assume no other defense questions?

MR. LEINENWEBER: No, Your Honor.

MR. GIVEN: None, Your Honor.

THE COURT: Mr. Bowman.

MR. BOWMAN: Thank you, Your Honor.

CROSS-EXAMINATION

Hickey - cross by Bowman

3240

BY MR. BOWMAN:

Q. Good afternoon, Mr. Hickey.

A. Hello, Mr. Bowman.

Q. Just briefly, the George Jones case was an eyewitness identification case, right?

A. You know, I don't know. I mean, I'm sorry, but I -- I don't know the particulars.

Q. Well, for purposes of refreshing your recollection, you remember a witness by the name of Pervy Pointer and an identification of a fellow by the name of George Jones and some information about Pervy Pointer's inability to identify Mr. Jones that was not provided to the criminal justice system, right? Does not ring a bell?

A. I'm sorry. It wasn't my case, so -- yeah.

Q. Understood. In any event, you were aware, along with many others in the Chicago Police Department, generally of the contours of the George Jones matter, right?

A. Absolutely.

Q. This was a case, without knowing the details, in which it was very clear that there was important information that detectives had developed tending to show that George Jones didn't commit the crime that the criminal justice system did not receive, right?

A. It did not receive it at the time of discovery, but it was turned -- or made known to the judge prior -- during the trial

or prior to the trial or -- at some point.

Q. And, in fact, there was a detective by the name of Frank Laverty who came forward in the middle of Mr. Jones' trial and made the information from a street file known to the participants in that case, the judge, the defense lawyers, the prosecutors. Nobody had been aware of it prior to Mr. Laverty coming forward?

A. Correct.

Q. And the case caused quite a storm in the criminal justice system here in Chicago.

MS. ROSEN: Objection, Judge, relevance to the "storm."

BY MR. BOWMAN:

Q. It caused a storm within the Chicago Police Department.

MS. ROSEN: Object to the form.

MR. BOWMAN: Maybe I should ask --

THE COURT: Yes.

MR. BOWMAN: -- a better question.

THE COURT: Yeah.

BY MR. BOWMAN:

Q. It was a -- it was a matter of deep concern institutionally to the police department that these events had transpired as they had, right?

A. Correct.

Q. And that's where you come in tasked with getting your arms

Hickey - cross by Bowman

3242

around the scope of the issue.

A.   Yes, sir.

Q.   Yes?  And that's the reason why you did the work that you described when Ms. Rosen was asking questions, going out and finding exactly how detectives were recording information about cases and whether they were preserving the information, right?

A.   Correct.

Q.   And you learned that there were -- you said this earlier this afternoon.

There were various practices and policies and procedures going on in various locations around the police department.  I mean, there was no uniformity.  That's all I'm trying to --

A.   There was a lack of uniformity.

Q.   And generally speaking, many detectives in the police department had the impression that their notes were their own personal property.

A.   That is correct.

Q.   And that they were free to destroy them at the end of a case if they chose to do so.

A.   I was a detective, and I destroyed mine.

Q.   They were free to keep them in their own possession, in a locker, in the trunk of a car, in their basement, and not make them part of the official documentation of the police department.

A.   Those notes were never addressed by the Chicago Police Department, so, therefore, the detectives rightfully thought they could do almost anything with them.

Q.   That was the culture that was engrained in the department at the time?

A.   It was the practice.  I'd like to draw a distinction between culture.

Q.   Fair -- fair enough.

A.   Okay.

Q.   Would you agree with me that it was an engrained, entrenched practice?

A.   Yes.

Q.   And obviously, this was a problem for the supervisors within the Chicago Police Department that this was occurring, and you set about to correct this process to the best of your ability.  Did I --

A.   Yes.

Q.   -- load too much into that question?

A.   No.  I mean, it -- we were concerned.  I was assigned fact-finding and also came up with, I thought, a procedure that would address the problem.

Q.   And to be clear -- and just to back up for a minute, talk just generally about notes.

        Taking notes, that's part of what detectives do, right?  It's a -- if you're going to be a detective, you're

going to take notes?

A. I don't know how you can do it without taking notes.

Q. Nobody's got a photographic memory. You talk to somebody. You need to make a record of what they say.

A. Correct.

Q. So the notes are fundamental, right?

A. For most human beings, yes.

Q. And so we all agree -- and you've said this -- that everyone in the criminal justice system is entitled to see notes that detectives make along the course of an investigation.

A. Yes. That is the policy established by Superintendent Brzeczek.

Q. And indeed, the notes will reflect the progress that an investigation takes over time as detectives go about their work, right?

A. I don't know if it's always progress. Sometimes it's kind of a plateau, the same story over and over or -- but yes, it certainly records different aspects of different interviews, what we've learned.

Q. Indeed, an investigation may plateau, right, at some point?

A. Correct.

Q. An investigation may start down one direction and then that becomes a dead end, right?

A. Yes, sir.

Q. Or something that seemed innocuous and unimportant at the beginning of an investigation may turn out to be a critical piece of an investigation, right?

A. It may.

Q. And so all of these are reasons why it's important, if you're to have a full picture of an investigation, that everybody gets to see the notes, right?

A. Everything that's been preserved, yes.

Q. That way, you see the tracks of the investigation, right?

A. You see the results of multi -- a multitude of interviews.

Q. And you see the -- a process that might occur of investigating a suspect, eliminating that individual, for example?

A. Yes, sir.

Q. And the problem that *Jones* crystallized was that these tracks, this process of progress was too often not being included in the official record that was produced, and *George Jones* exemplified that; is that fair?

A. It occurred. We were concerned about it. You know, "too often" is kind of a wide term. But yes, it did occur.

Q. And to be clear -- I'm not trying to commit you to how often it occurred.

We all agree that it should never occur, right?

A. Yes, sir.

Q. And so at the end of your investigation, you authored a

Case: 1:18-cv-01028 Document #: 827-2 Filed: 11/22/25 Page 656 of 663 PageID #:107376
Hickey - cross by Bowman
3246

policy that Ms. Rosen asked you a few questions about just a few minutes ago, Detective Division Special Order 83-2.

A.   I drafted it.  The chief of detectives issued it.

Q.   And that is a very proper clarification.

A.   Yes.

Q.   Thank you.  But to be clear, you were the author of this.  And we've had a lot of testimony about general progress reports in this case.  You are the father of the general progress report, among other things, right?

A.   Yes, sir.

Q.   So I want to ask you a few questions about the policy that you drafted that was issued by the chief of the Detective Division.

      The fundamental thrust of 83-2 was that notes that detectives take are no longer personal property of the detectives, right?

A.   We are to preserve everything, and we made perfectly clear that those notes previously thought to be personal property are now the work product of the Chicago Police Department.

Q.   And they were to be preserved and they were to be placed in a file known as an investigative file, right?

A.   Yes, sir.

      MR. BOWMAN:  And if I could have the Elmo back again?

BY MR. BOWMAN:

Q.   Your policy contained detailed explanation and requirements

Hickey - cross by Bowman

3247

with respect to the investigative file, right?

A.  Yes, sir.

Q.  You talked about the clips at the top of the file to hold everything in place.

A.  Awfully detailed.

Q.  And there was a folder that everything was supposed to be in.  Yes?

A.  Yes, sir.

Q.  And a -- even a document repository so that if a detective collected something that was off-size and didn't fit within the clips, there was a way to make sure that it was preserved and kept, right?

A.  Yes, sir.

Q.  And then there was an inventory form, which you've talked about, so that everybody would have a record of exactly what was contained in the file.

A.  Yes, sir.

Q.  Now, in 83-2, is there any provision as to the procedures and the mechanisms for taking the investigative file and producing it to the persons in the criminal justice system who have need of the information, the defense lawyer, the prosecutor, and the judge?

A.  I can only think of one thing that might fit what you're asking, and that is the investigative inventory.

When an arrest has been made in a violent crime field

investigation, a copy of that inventory of the investigative file is supposed to be sent to the official downtown keeper of records in the RD file, and so that that might provide notice to those who come in the future asking for information to inform them that such a thing exists.

Q. All right. So what the policy does is it provides in subsection D., as you've just testified, that the investigative file inventory sheet, which we just talked about a few minutes ago, that whenever charges are placed against a person, to ensure notice of existing documents, the investigative file or the inventory form is to be placed in the downtown file, right?

A. Yes, sir.

Q. And another name for the downtown file that we've heard in this case is the permanent retention file, right?

A. For homicides, it's permanent retention.

Q. Right. And here, of course, we're involved in talking about a homicide case. So with respect to the case that's in issue in this courtroom, the downtown file would be known as the permanent retention file, right?

A. Yes, sir.

Q. And, of course, it's important that the inventory sheet go into that file for the very reasons you just described, in order to give everyone in the system notice of the contents of the investigative file, yes?

A. Yes, sir.

Q.  And if the inventory sheet, for some reason, were not to be placed in the permanent retention file, that would be a -- first of all, a deviation from policy, yes?

A.  Yes, sir.

Q.  And it would also result in the problem that nobody would know what's in the investigative file, right?

A.  If it was -- I don't know if it was a deviation of policy. Yes, it's certainly a deviation of procedure.

Q.  And just to be --

A.  But, but in homicides, there are investigative files.  So in the absence of an inventory sheet in the permanent downtown file, one would have to think there was an investigative file in the detective area.

Q.  Right.  And my question is, apart from the inventory sheet, which is mentioned in the provision that we just talked about, is there any procedure or mechanism in the Chicago Police Department's policies as to how the investigative file at the Area is to be produced to the participants in the criminal justice system?

A.  Not to my knowledge.

Q.  The -- let me just show you, while we're thinking about it, a copy of Plaintiff's Exhibit 20.

    (Counsel conferring.)

BY MR. BOWMAN:

Q.  So let me turn to something that you also talked about with

Ms. Rosen.

This policy that I've been asking you about is a Detective Division Special Order, right?

A. Yes, sir.

Q. And you said in response to Ms. Rosen that a Detective Division Special Order relates to the Detective Division, right?

A. Yes, sir.

Q. It is not a policy that concerns the entire police department?

A. Correct.

Q. It is, instead, rules and requirements that pertain to the Detective Division alone, right?

A. Yes, sir.

Q. The Detective Division does not encompass Gang Crimes, right?

A. Correct.

Q. And Gang Crimes is, if we were to have a policy relating to Gang Crimes, we would have a Special Order that related to the Gang Crimes, yes?

A. That would be the way, yes.

Q. Now, what that means is that all of these rules as to the preservation of notes, the treatment of notes as the property of the Chicago Police Department that are contained in Special Order -- Detective Division Special Order 83-2, those don't

Hickey - cross by Bowman

3251

apply to a Gang Crimes specialist, right?

A.  Correct.

Q.  So if, for example, there were to be notes that were created by a Gang Crimes specialist who was investigating a crime, those notes would not be governed by 83-2, right?

A.  The notes would not, but certainly there's an obligation by all department members, whether they're in Gang Crimes or Narcotics or anywhere else, if they have information, you know, they either prepare a supplementary report with the information they have or pick up the phone, call the local detective area, "This is what I learned."

Q.  Right.  And, of course, we all have -- everybody working in the police department has the obligation to abide by constitutional requirements, right?

A.  Yes, sir.

Q.  But we're talking about your policy, the 83-2, and those restrictions don't apply to Gang Crimes, right?

A.  They do not.

        MR. BOWMAN:  Your Honor, this might be a good place to stop.

        THE COURT:  Okay.  And it's time.

        Ladies and gentlemen, again, ten minutes late tomorrow, 9:40.  Have a good evening.  Hopefully, it's not going to keep raining all evening.

    (Jury out.)

3252

THE COURT: Okay. Again, let me know. I'm going to try to get that ruling to you before we start tomorrow.

MS. ROSEN: It will just dictate the length of the testimony, obviously, and so we have to get witnesses lined up.

THE COURT: Right. But it's --

MS. ROSEN: Yeah, no, I got it. I --

THE COURT: Yeah.

MS. ROSEN: Yeah, I appreciate it. Thanks.

THE COURT: It may be brief. I mean, that may just be the way we have to deal with it without --

MS. ROSEN: The order may be brief?

THE COURT: The order may be brief.

MS. ROSEN: Yeah, yeah. Appreciate it.

THE COURT: We'll see.

(Adjournment at 4:01 p.m. until 9:40 a.m., 6/22/18.)

C E R T I F I C A T E


We, Nancy L. Bistany and Colleen M. Conway, do hereby certify that the foregoing is a complete, true, and accurate transcript of the Trial proceedings, Volume 13-B, had in the above-entitled case before the HONORABLE JOAN B. GOTTSCHALL, one of the Judges of said Court, at Chicago, Illinois, on June 21, 2018.


/s/ Nancy L. Bistany, CSR, RPR, FCRR       06/22/18


/s/ Colleen M. Conway, CSR, RMR, CRR       06/22/18

Official Court Reporters                   Date
United States District Court
Northern District of Illinois
Eastern Division