# EXHIBIT 64

**INVESTIGATIVE FILE INVENTORY**
CHICAGO POLICE DEPARTMENT

R.D. NO.
K371-955

| EXHIBIT | DESCRIPTION OF DOCUMENT | MDR* | ENTERING MEMBER | DATE OF ENTRY |
|---------|------------------------|------|-----------------|---------------|
| 1. | SUPP REPORT | | DORSUN/BOYLE | 16 SEPT 88 |
| 2. | | | | |
| 3. | | | | |
| 4. | | | | |
| 5. | | | | |
| 6. | | | | |
| 7. | | | | |
| 8. | | | | |
| 9. | | | | |
| 10. | | | | |
| 11. | | | | |
| 12. | | | | |
| 13. | | | | |
| 14. | | | | |
| 15. | | | | |
| 16. | | | | |
| 17. | | | | |
| 18. | | | | |
| 19. | | | | |
| 20. | | | | |
| 21. | | | | |
| 22. | | | | |
| 23. | | | | |
| 24. | | | | |
| 25. | | | | |

*MDR: denotes Miscellaneous Document Repository. A check (✓) will be placed in this box if a document has been placed in the MDR.

DISTRIBUTION: The original of this document is to remain attached to the Investigative File Case Folder. One copy of this document will be forwarded to the Records Division whenever a Violent Crimes field investigation results in a person(s) being charged with a felony.

CPD-23.121 (1/83)

R.D. NO. K371-955

Wron 00002

PLAINTIFF'S TRIAL EXHIBIT 269
1 of 30

**INVESTIGATIVE FILE INVENTORY**
CHICAGO POLICE DEPARTMENT

R.D. NO. K 371 955

| EXHIBIT | DESCRIPTION OF DOCUMENT | MDR* | ENTERING MEMBER | DATE OF ENTRY |
|---|---|---|---|---|
| 1. | Original Case Report | | Leonard & McLaughlin | 27 Aug 1988 |
| 2. | GPR's (three pages) | | Leonard & McLaughlin | 27 Aug 1988 |
| 3. | Supplementary Report | | Leonard & McLaughlin | 27 Aug 1988 |
| 4. | GPR's (three Pages) | | Leonard & McLaughlin | 28 Aug 1988 |
| 5. | Arrest Record | | Leonard & McLaughlin | 28 Aug 1988 |
| 6. | Supplementary Report | | Leonard & McLaughlin | 28 Aug 1988 |
| 7. | ARREST REPORT | | LEONARD Y McLAUGALIN | 31 Aug 88 |
| 8. | HOLD OVER | | " | " | " |
| 9. | ARREST REPORT | | " | " | " |
| 10. | HOLD OVER | | " | " | " |
| 11. | SUPPLEMENTARY | | " | " | " |
| 12. | PROPERTY INV | | " | " | " |
| 13. | EVIDENCE REPORT | | " | " | " |
| 14. | FIRE ARM EVID REPORT | | " | " | " |
| 15. | GPR (1 PAGE) | | " | " | " |
| 16. | PROPERTY INV | | " | " | " |
| 17. | PRISONER RELEASE | | " | " | " |
| 18. | PRISONER RELEASE | | " | " | " |
| 19. | SUPPLEMENTARY | | " | " | " |
| 20. | LINE UP SUPP | | DORSCH /BOYLE | 15 SEPT 88 |
| 21. | ARREST REPORT | | COPY SENT TO/ | " |
| 22. | 101 | | CASE REPORT UNIT (164) RECORDS PROCESSING | " |
| 23. | MURDER COMPLAINT | | DATE: 5 September " | " |
| 24. | EVIDENCE REPORT | | BY: " | " |
| 25. | CLOSING SUPP | | AREA 5 VIOLENT CRIMES " | " |

R.D. NO. 371 955

*MDR: denotes Miscellaneous Document Repository. A check (✓) will be placed in this box if a document has been placed in the MDR.

DISTRIBUTION: The original of this document is to remain attached to the Investigative File Case Folder. One copy of this document will be forwarded to the Records Division whenever a Violent Crimes field investigation results in a person(s) being charged with a felony.

CPD-23.121 (1/83)

Wron 00003

## SUPPLEMENTARY REPORT
CHICAGO POLICE – FOR USE BY B.I.S. PERSONNEL ONLY

All descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

4. DATE OF ORIG. OCCURRENCE–TIME
DAY / MO. / YR. — 15 Sept 88 — 1905

| OFFENSE CLASSIFICATION LAST PREVIOUS REPORT | UCR OFF. CODE | ADDRESS OF ORIG. INCIDENT-OFFENSE | BEAT OF OCCUR. |
|---|---|---|---|
| Death Investigation | 5084 | 1835 W. Harrison — CORRECT XX YES ☐ NO | 1224 |

VICTIM'S NAME AS SHOWN ON CASE REPORT: VALENTINE, Felix

IF NO, CORRECT ALL VICTIM INFORMATION IN BOXES 20 THROUGH 27. — FIRE RELATED ☐ YES XX NO — BEAT ASSIGNED 5537

TYPE OF LOCATION OR PREMISE WHERE INCIDENT/OFFENSE OCCURRED: Cook County Hospital — LOCATION CODE 233 — NO. OF VICTIMS 1 — NO. OF OFFENDERS Dna

VERIFIED — UPDATE TO: Dna

(Property section values: Dna)

NARRATIVE:

This is part of homicide investigation listed under RD# K-371 955. This RD number is unfounded.

| EXTRA COPIES REQUIRED | DATE THIS REPORT SUBMITTED DAY MO. YR. | TIME | SUPERVISOR APPROVING (PRINT NAME) STAR NO. |
|---|---|---|---|
| normal | 29 Sept 88 | 2330 | |

REPORTING OFFICER (PRINT NAME): Det John Leonard — STAR NO. 5629

SIGNATURE: John J. Leonard

CPD(11.411-B (Rev. 8/85) — *MUST BE COMPLETED IN ALL CASES

K 404 356

Wron 00011

**HOSPITALIZATION CASE REPORT / CHICAGO POLICE**

1. CLASSIFICATION (Check One): ☒ DEATH ☐ SUICIDE ☐ ATTEMPTED SUICIDE ☐ INJURY TO CITIZEN ON PUBLIC PROP. ☐ ... ☐ EMPLOYEES INJURY ☐ ACCIDENTAL

2. BEAT/UNIT ASSIGN.: 1277
3. BEAT OCCUR.: 1724

6. ADDRESS OF OCCURRENCE: 1835 W HARRISON
7. DATE OCCURRED / TIME: 14 SEPT 88 / 1166
8. DATE REPORTING OFFICER ARRIVED / TIME: 15 SEPT 88 / 1905

9. VICTIM'S NAME: VALENTINE FELIX — SEX: M — RACE: 4 — AGE: 16
10. HOME ADDRESS: 1458 N CAMPBELL
11. HOME PHONE: 235-1828
12. BUSINESS PHONE: D N/A

13. PERSON REPORTING INCIDENT TO POLICE: INVESTIGATOR COLLINS — SEX: M — RACE: 4
14. HOME ADDRESS: 2121 W HARRISON
15. HOME PHONE: 666-0500
16. BUSINESS PHONE: 666-0500

17. PERSON DISCOVERING VICTIM: N
18. HOME ADDRESS:
19. HOME PHONE:
20. BUSINESS PHONE:

21. NAMES OF WITNESSES: N
22. HOME ADDRESS:
23. HOME PHONE:
24. BUSINESS PHONE:

25. TYPE PREMISES WHERE OCCURRED/VICTIM FOUND: Cook County Hosp
LOCATION CODE: 733
26. CAUSE OF INJURY (INSTRUMENT OR MEANS): Gun Shot Victim
27. REASON (ACCIDENT, ILL HEALTH, ETC): UNK

28. REMOVED BY: BT 1277
29. REMOVED TO: Cook County ME
30. NAME OF PERSON AUTHORIZING REMOVAL: Investigator Collins

31. SOBRIETY OF VICTIM (CHECK ONE): ☐ SOBER ☐ OTHER ☒ INTOX.
32. EXTENT OF INJURIES (CHECK ONE): ☐ 1 MINOR ☐ 2 SERIOUS ☒ 3 FATAL
33. FIRST AID GIVEN BY POLICE: ☐ 1 YES ☐ 2 NO
34. MEDICAL AID REFUSED BY VICTIM: ☐ UNK

35. NAME AND ADDRESS OF ATTENDING PHYSICIAN: N
36. INVENTORY NO.:

37. NARRATIVE (THE INDICATED SOBRIETY OF VICTIM OR WITNESSES IS THE APPARENT CONDITION, WHEN REPORTED.)

IN SUMMARY: ABOVE SUBJECT WAS BROUGHT INTO COOK COUNTY HOSP. BY RELIABLE AMB FROM NORWEGIAN AMERICAN HOSP. ABOVE SUBJECT WAS A VICTIM OF A GUN SHOT WOUND UNDER R.D. OF K371-955 FROM ADDRESS OF 3324 W CORTLAND. WHILE SUBJECT WAS IN COOK COUNTY HOSP TRAUMA UNIT HE CONTRACTED A GERM KNOWN AS ARUNETOBACTER WHICH CLOSED DOWN THE TRAUMA UNIT FOR 24 HRS FROM 13 SEPT 88 TO 14 SEPT 88 BETWEEN 1800 HRS TO 1800 HRS. R/O's TALKED TO COOK COUNTY HOSP ASST ADMIN STER ANDREA MUNOZ. ABOVE IS COOK COUNTY ME CASE 300. ABOVE PRONOUNCED AT 1156 14 SEPT 88 AT COOK COUNTY HOSP BY DR SARKEY

NO PERSONAL PROPERTY INVENTORY

NOTIFIED DET WEINGART 865 AREA 5 V/C

☐ I HAVE READ THIS REPORT AND BY MY SIGNATURE INDICATE THAT IT IS ACCEPTABLE
☐ CONTINUED ON REVERSE SIDE

38. EXTRA COPIES REQUIRED (NO. & RECIPIENT): Area 5 V/C
39. DATE INVESTIGATION COMPLETED / TIME: DAY 15 / MONTH SEPT / YEAR 88 / TIME 2010
42. SUPERVISOR APPROVING: Sgt. Martinez

40. REPORTING OFFICER (Print or Type): G LETTON — STAR NO. 2598
41. REPORTING OFFICER (Print or Type): A ELLIOTT — STAR NO. 12312
SIGNATURE / DATE: DAY 15 / MONTH SEPT / YEAR 88 / TIME 2020

SIGNATURE: (signed)
SIGNATURE: W. Elliott

CPD-11.408 (Rev. 9/83) RACE CODES: 1-BLACK, 2-WHITE, 3-BLACK-HISP., 4-WHITE-HISP., 5-AMER. INDIAN/ALASK. NAT., 6-ASIAN/PACIFIC ISL.

K404356

Wron 00012

PRELIMINARY FIRED EVIDENCE REPORT
CRIME LABORATORY DIVISION/CHICAGO POLI

R.D. NO. K 37195

**OFFENSE OR INCIDENT** | T U C R | AREA-DIST | AT | DATE OF THIS REPORT

**LOCATION OF OFFENSE/INCIDENT** | LOC. CODE | INVESTIGATOR | STAR NO. | UNIT

**VICTIM(S) NAME** | **OFFENDER(S) NAME**

1.

2.

| INVENTORY DISTRICT/AREA | DESCRIPTION | | CLASS CHARACTERISTICS | S / NS |
|---|---|---|---|---|
| | SUBMITTED BY—NAME | STAR NO. DATE | | |
| | NO. REC'D. | EXHIBIT(S) | | |
| | 6 FIRED BULLETS | | | |
| | DISCHARGED CART. CASES | | | |
| EXHIBIT NO. | SHOTGUN SHELLS | | | |
| DATE REC'D. | WADDING | | | |
| | | | | |
| | SUBMITTED BY—NAME | STAR NO. DATE | | |
| | NO. REC'D. | EXHIBIT(S) | | |
| | FIRED BULLETS | | | |
| | DISCHARGED CART. CASES | | | |
| EXHIBIT NO. | SHOTGUN SHELLS | | | |
| DATE REC'D. | WADDING | | | |
| | | | | |
| | SUBMITTED BY—NAME | STAR NO. DATE | | |
| | NO. REC'D. | EXHIBIT(S) | | |
| | FIRED BULLETS | | | |
| | DISCHARGED CART. CASES | | | |
| EXHIBIT NO. | SHOTGUN SHELLS | | | |
| DATE REC'D. | WADDING | | | |

CONCLUSIONS—IN THE OPINION OF THE EXAMINER

R.D. NO.

**FIREARMS EXAMINER (PRINT)** | **FIREARMS EXAMINER (SIGNATURE)**

CPD-33.405 (Rev. 3/86)

PAGE

Wron 00013

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 7 of 758 PageID #:107460



**PROPERTY INVENTORY - NO.**
CHICAGO POLICE
CPD-34.523 (Rev. 5/87)

**524882**

LIST OTHER INVENTORY NOS. RELATED TO THIS RECOVERY — ☐ NONE

UNIT

**INVENTORY NO.** **524882**

| DATE RECOVERED | DAY | MONTH | YEAR | R.D. NO. | CRIME LABORATORY NO. | CROSS REFERENCE |
| --- | --- | --- | --- | --- | --- | --- |
| | 16 | SEP | 88 | K 371-955 | | ✓ |

| LINE NO. | QUANTITY | DESCRIPTION OF PROPERTY | U.S.C. ONLY | |
| --- | --- | --- | --- | --- |
| 1 | 1 | SEALED BULLET ENVELOPE | $ | CENTS |
| 2 | | | | |
| 3 | | | | |
| 4 | | | | |
| 5 | | | | |
| 6 | | VALENTINE, FELIX M/WH/16 | | |
| 7 | | ME# 300 SEP 88 | | |

ATTACH THIS COPY
TO COURT PAPERS

DIRECTIONS

Wron 00018

EVIDENCE & RECOVERED PROPERTY SECTION USE ONLY — TOTAL CASH U.S.C.

SEIZURE WITHOUT SEARCH WARRANT

COMPLETE FIRST STATEMENT ON REVERSE SIDE OF THIS COPY.

ATTACH THIS COPY TO PINK COPY OF ARREST REPORT.

GIVE COPY NO. 4 TO ARRESTEE. IF NOT ACCEPTED ATTACH TO THIS COPY.

CHECK ALL BOXES APPLICABLE
☐ U.S. CURRENCY TO BE DEPOSITED
☐ U.S. CURRENCY TO BE HELD IN ORIGINAL FORM — DO NOT DEPOSIT —
☐ C.P.O. CONTINGENCY FUND MONEY
☐ GAMBLING RAID SEIZURE
☐ MEDICAL EXAMINER'S PROPERTY

☐ MISDEMEANOR   STATE CHARGE (S)   ☐ JUVENILE   ☒ HOMICIDE   ☐ ARSON
☒ FELONY   ☐ MANSLAUGHTER   ☐ NARCOTICS & RELATED

RECOVERED/SEIZED FROM — NAME   ☐ DECEASED   ☐ ARRESTED
DR CHOI - CCM   AT
ADDRESS

OWNER'S NAME   TELEPHONE NO.

SEIZURE WITH SEARCH WARRANT

FOUND BY — NAME   ☐ CHECK IF C.P.O.
ADDRESS   TELEPHONE NO.

COMPLETE SECOND STATEMENT ON REVERSE SIDE OF THIS COPY.

☒ HOLD FOR INVESTIGATION AND/OR EVIDENCE — RECOVERING OFFICER — STAR NO. — UNIT
RICKHER # 15550 652

1st OFFICER'S NAME   STAR NO.

ATTACH THIS COPY TO SEARCH WARRANT

☐ PROPERTY OWNER NOTIFIED   ON   DAY MONTH YEAR   HOW NOTIFIED
☐ TO PICK UP PROPERTY WITHIN 30 DAYS OR PROPERTY WILL BE DISPOSED OF   ☐ IN PERSON ☐ PHONE ☐ MAIL

SIGNATURE   UNIT

☐ TO BE DISPOSED OF BY CUSTODIAN (NOT TO BE RETURNED)

2nd OFFICER'S NAME   STAR NO.
THOMAS, F   16935

ATTACH COPY NO. 4 TO THIS COPY.

INITIAL DESTINATION OF PROPERTY   ☐ MEDICAL EXAMINER
☐ EVIDENCE & RECOVERED PROPERTY SECTION   ☒ CRIME LABORATORY   ☐ AUTO POUND NO.

SIGNATURE   UNIT
F Thomas   177

VIA   ☐ POLICE MAIL   ☐ RECOVERING UNIT PERSONNEL
☐ E. & R.P.S. PICKUP   ☒ EVID/LAB. TECHNICIAN

APPROVING DESK SERGEANT   STAR NO. DATE   TIME
W Ellis   6647   16 SEP 88   1520

COPY 3 - COURT COPY - ATTACH TO COURT PAPERS



Wron 00019



Wron 00037

PLAINTIFF'S TRIAL EXHIBIT 269
8 of 30



Wron 00038

**EVIDENCE REPORT**
CRIME LABORATORY DIVISION/CHICAGO POLICE

| | | |
|---|---|---|
| OTHER NO. | RD NO. | K 371 9554 |

| OFFENSE OR INCIDENT | IUCR | AREA-DIST.-BEAT | | DATE RECEIVED | TIME |
|---|---|---|---|---|---|
| HOMICIDE/ 1st DEGREE | 0110 | 5th | 025 | 5548 | 15 Sep 88 | 1710 |

| ASSIGNMENT TYPE | UNIT ASSIGNED | RECEIVED BY | DATE ARRIVED | TIME |
|---|---|---|---|---|
| LINE UP PHOTOS | 652 | MILLER | 15 Sep 88 | 1915 |

| LOCATION OF SERVICE | REQUESTED BY | DATE COMPLETED | TIME |
|---|---|---|---|
| AREA FIVE VIOLENT CRIMES | BOYLE | 15 Sep 88 | 1920 |

| VICTIM'S NAME | SEX—RACE—AGE | ADDRESS | PHONE NO. |
|---|---|---|---|
| VALENTIN, FELIX | M WH 16 | 1458 N Campbell | NONE |

COMP. PRINTS: ☐ DNA ☐ NO   IN CUSTODY ☒ YES ☐ NO   NAME

**PHOTOS TAKEN**

| A E.I. BOARD | E DIRECT | I RIGHT PROFILE |
|---|---|---|
| B EII. BOARD | F LEFT PROFILE | J RIGHT PROFILE |
| C DIRECT | G LEFT PROFILE | K |
| D | H | L |

**DETAILS OF CASE**

| POSITION | NAME | C.B.# |
|---|---|---|
| 1 | SANCHEZ, SANTIAGO | NONE |
| 2 | CRUZ, EFRAM | NONE |
| 3 | RIVERA, JACQUES | |
| 4. | TORRES FELIX | NONE |
| 5. | DELGADO, ISRAEL | NONE |

| INVESTIGATING OFFICER'S NAME | STAR NO. | UNIT | BEAT OFFICER'S NAME | STAR NO. | UNIT |
|---|---|---|---|---|---|
| Det. John Boyle | 6945 | 652 | DNA | | |

| REPORTING TECHNICIAN'S NAME | STAR NO. | APPROVING SUPERVISOR'S NAME | STAR NO. |
|---|---|---|---|
| P.O. John Miller | 5482 | Sgt. A. Wamgit | 865 |

CPD-11.103 (Rev. 11/85)

Wron 00045

**DETECTIVE DIVISION AREA COPY**

PLAINTIFF'S TRIAL EXHIBIT 269
10 of 30



CONTINUATION OF NARRATIVE

Wron 00046

PLAINTIFF'S TRIAL EXHIBIT 269
11 of 30

66 -2                    16 Se  amber 1988
_____         _____
(Court Branch)            (Court Date)

FELONY                                                            (1-82) CCMC1-216

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

The People of the State of Illinois               COMPLAINT FOR PRELIMINARY EXAMINATION
              Plaintiff

         v.                              NO. ...............................

JACQUES RIVERA
.......................................
              Defendant

Felix Valentin ............................................ complainant, now appears before
              (Complainant's Name Printed or Typed)

The Circuit Court of Cook County and states that

JACQUES RIVERA ......................................................... has, on or about
                        (defendant)

27 August 1988        at   3320 W Cortland
.................................... ...............................................
        (date)                        (place of offense)

committed the offense of  HOMICIDE/ 1st Degree Murder .......................... in that he

Killed  Felix Valentin without legal justification by shooting him  Felix

Valentin 10 times with a hand gun with the intent to kill  Felix Valentin

..................................................................................

..................................................................................

..................................................................................

                    38                                          9-1(a)(1)
in violation of Chapter.......................................... Section..............

ILLINOIS REVISED STATUTES

                                         William P. Dorsch
                                      ..............................
                                         (Complainant's Signature)
                                      5555W Grand        744-8364
                                      ..............................
STATE OF ILLINOIS      )              (Complainant's Address)    (Telephone No.)
                       ) SS.
COUNTY OF COOK         )              Det. William Dorsch
                                      ..............................
                                         (Complainant's Name Printed or Typed)

being first duly sworn, on ........... his ........................, oath, deposes and says that he has read the foregoing
complaint by him subscribed and that the same is true.

                                         William P. Dorsch
                                      ..............................
                                         (Complainant's Signature)

Subscribed and sworn to before me  ............................................. 15 September, 19 88

                                      ..............................
                                         (Judge or Clerk)

I have examined the above complaint and the person presenting the same and have heard evidence thereon, and am satisfied that
there is probable cause for filing same. Leave is given to file said complaint.

Summons issued,       Judge ............................................................
        or
Warrant Issued,       Bail set at ......................................................
        or
Bail set at ......................................... Judge .................................

                                                                    Judge's No.

MORGAN M. FINLEY, CLERK OF THE CIRCUIT COURT OF COOK COUNTY

Wron 00047

FELONY MINUTE SHEET - FORM 101
======================================================================
ASSISTANT STATE'S ATTORNEY:          (For State's Attorney Use Only)
Enter each continuance here. In cases of multiple defendants indicate which
defendants, if any, did not join in the continuance. Also indicate dates of
all demands for trial, and by whom demands were made.

**************************************************************************

COURT BRANCH: ___66___                         R.D.# __K 371 955__

| IR NUMBER | DEFENDANTS | AGE | DATE OF ARREST | CHARGE |
|-----------|------------|-----|----------------|--------|
| 614 010 | Jacques Rivera | 23 | 15 Sept 1988 | 38-9-(1)(a) |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

DATE OF OFFENSE: _27 Aug 1988_ TIME: _03:45_ ( )am oxopm PLACE: _3320 W Cortland Ave_
                                                Chicago/Cook County, Illinois
The facts briefly stated are as follows: __The victim while seated in his__
_vehicle at 3320 W Cortland was attacked by the arrestee Jacques Rivera who_
_shot him ten times. The victim died of his wounds on 14 September 1988._
_The arrestee was identified by photos by the witness Orlando Lopez. On_
_15 September Jacques Rivera accompanied the arresting officers into Area Five_
_where a line up was conducted. RIVERA was positively identified by the_
_witness as the subject who shot the victim._

WITNESSES: Spell out first & last name; First name first. Also furnish
           address & phone number of each witness.

| PROSECUTING WITNESS | ADDRESS | HOME PHONE | BUS. PHONE |
|---------------------|---------|------------|------------|
| Orlando Rivera | | | |
| GCSP R. GUEVARA | 2452 W Belmont | 744-8260 | |
| GCSP S. Gawrys | 2452 W Belmont | 744-8260 | |
| Det. W. Dorsch | 5555 W Grand | 744-8260 | |
| Det. J. Boyle | 5555 W Grand | 744-8260 | |
| | | | |
| | | | |

A.S.A. Rosner _____ APPROVED FELONY CHARGE(S)

BOND, $_____ _____ ASST. STATE'S ATTY. _____ DATE

Wron 00048

RELEASE OF PERSON IN CUSTODY   CHICAGO POLICE

INSTRUCTIONS:   Prepare in duplicate.
Original to Watch Commander of Detention Facility
Duplicate to Area Headquarters

| | | TODAY'S DATE 31 Aug 1933 | C.B. NO. 3901 323 |
| NAME OF ARRESTEE MIYSKA, Jacques | AGE 23 | ADDRESS 4231 W. Division | DISTRICT OF DETENTION 025 |
| DATE OF ARREST 31 Aug 1933 | TIME OF ARREST 2300 HRS | ARRESTED BY Guevara | STAR NO. 16345 | ASSIGNMENT Gang Crimes North |

**REASON FOR ARREST**

Identified in a photo by witness as the person that shot Felix

Valentin.

**REASON FOR RELEASE**

the undersigned were unable to locate the witness for a line-up.

**CHECK ACCOMPLISHED PROCEDURES**

☒ PRINTS TAKEN    ☐ VIEWED BY VICTIM    ☐ WEAPONS TESTED    ☐ OTHER (SPECIFY)
☒ PHOTO TAKEN    ☐ VIEWED BY COMPLAINANT    ☐ TOOLS TESTED
☐ LINE-UP    ☐ ALIBI CHECKED    ☐ VEHICLE TESTED

**PERSONS WHO VIEWED SUBJECT**

| 1. NAME | ADDRESS | PHONE NO. |
| 2. | | |
| 3. | | |

My investigation has revealed that there is not sufficient cause to further detain the above named subject, and it is requested that the subject be released IMMEDIATELY.

| SIGNATURE OF DETECTIVE | STAR NO. 9629 | ASSIGNMENT Area 5 Violent Crimes |
| APPROVING SIGNATURE DETECTIVE DIVISION WATCH COMMANDER | RANK Sgt. | STAR NO. 2056 | ASSIGNMENT 3rd Watch Comm. |
| ADDITIONAL COMMENTS | | |

| This form was presented to the desk sergeant at the 25th district on: | DATE 31 Aug 1933 | TIME 2230 HRS. |
| SIGNATURE OF DESK SERGEANT | STAR NO. | DATE RELEASED | TIME RELEASED HRS. |

CPD-11.519 (Rev. 11/82)

Wron 00052

**GENERAL PROGRESS REPORT**
**DETECTIVE DIVISION/CHICAGO POLICE**

DATE OF ORIG. CASE REPORT: 28 | AUG | 88

DATE OF THIS REPORT: 27 AUG 88 | 3

OFFENSE CLASSIFICATION—LAST PREVIOUS REPORT: AGG BATT

VICTIM'S NAME AS SHOWN ON CASE REPORT: VALENTIN, folix

BEAT/UNIT ASSIGNED: 5637

This form is designed for recording handwritten notes and memoranda which are made during the conduct of investigations, including: inter-watch memoranda (handwritten or typewritten), witness and suspect interview notes, on-scene canvas notes, and any handwritten personal notes made by detectives during the field investigation of violent crimes which are used to prepare official Department case reports.

LOPEZ, ORLANDO
12 - 🔲 MAY 7 - ▮
Mozart
STANDING 3324
Shooting - 3322.
18 yoa - KINGS - HASSEAN BEFORE
235-3373 - Neighbor

#1 BLACK Jacket -
Dark PANTS
gym shoes

#2 By STORE - CAR came through
Alley - Turned EAST AND STOPPED Shooter
GOT OUT STARTED to walk THEN
RAN - VICTIM BENT OVER IN CAR to pick
up something
AND WAS shot. Possible
Silencer - E on CORT - South on Spaulding
Brown color med size CAR - Chev.
Copper

PRINTED CP
581 S IP - 7355106
5'8 - 145 -

REPORTING OFFICER'S SIGNATURE—STAR NO.

RECEIVED BY: SUPERVISOR'S SIGNATURE—STAR NO.

DAY MONTH: 29 AUG 1988

John J. Leonard #8679

CPD-22.122 (Rev. 2003)

Wron 00053

PLAINTIFF'S TRIAL EXHIBIT 269
15 of 30

**GENERAL PROGRESS REPORT**
**DETECTIVE DIVISION/CHICAGO POLICE**

| DATE OF ORIG. CASE REPORT | DATE OF THIS REPORT |
|---|---|
| 18 Aug 88 | 27 Aug 88 3 |

| OFFENSE CLASSIFICATION—LAST PREVIOUS REPORT | VICTIM'S NAME AS SHOWN ON CASE REPORT | BEAT/UNIT ASSIGNED |
|---|---|---|
| AGG BATTERY | VALENTIN, FELIX | 5537 |

This form is designed for recording handwritten notes and memoranda which are made during the conduct of investigations, including: inter-watch memoranda (handwritten or typewritten), witness and suspect interview notes, on-scene canvas notes, and any handwritten personal notes made by detectives during the field investigation of violent crimes which are used to prepare official Department case reports.

9601
D. KEATING #8788
J. McDONALD #6989

3300 - 3318 - ABANDON BUILDING
3322 - 1, 2, 3, HEARD OR SEEN
NOTHING
3301 - 3319 - VACANT LOT

3321 - SEEN NOTHING -

5 RECOVERED 22 CAL
STEEL CASINGS
MOUTH OF ALLEY

PHOTO'S OF SCENE
PHOTO'S OF VICTIMS CAR

REPORTING OFFICER SIGNATURE—STAR NO. John Leonard 3629   RECEIVED BY SUPERVISOR'S SIGNATURE—STAR NO.   DAY-MO-YR 29 AUG 1988

CPD-23.122 (Rev. 2/83)

R.D. NO. K 371 955

Wron 00054

CITY OF CHICAGO, DEPARTMENT OF POLICE / 1121 South State Street
IDENTIFICATION SECTION      Chicago, Illinois   60605

CRIMINAL HISTORY OF **RIOS, Jose**      M/WH

DATE      29 July 1981

DATE OF BIRTH      30 April 1964

I.R. NO.   614010      FBI NO. 970150 AA5      I.S.B. NO. 3423829

| NAME & ADDRESS | C.B. NO. | DATE OF ARREST, ARRESTING OFFICER & DIST. | CHARGE | DISPOSITION |
|---|---|---|---|---|
| Jose RIOS<br>3449 W. North<br>30 April ▓ | 6187986 | -28 Jul 81. Off. Rogers, 14th Dist, Disorderly Conduct. | | |
| Jacques RIVERA<br>3335 W. Beach<br>30 Apr ▓ | 6776065 | - 27 Feb 83 Off Chavez 14 dist ▓<br>28 Feb 83, ▓<br>FPC, TRANSFER TO CHIEF JUDGE, Judge Sodini<br>14 Mar. 83, INFO#83-2690, ▓ | | (95½-4-103a) |
| Jack RIVERA<br>3335 W Beach<br>30 Apr ▓ | 6851273 | - 02 Jun 83 Off Gruber Summer Mobile Force '14)▓<br>24 June 83, ▓ Fail Exib Reg. (MCC) Fail<br>Poss. I.D. (38-83-2a) LFW, Judge Laurie (Docket No.<br>83235069) | | |
| | SEE CB<br>6776065 | 28 June 83. ▓ Nolle Prosse, ▓<br>▓ 2yrs PROBATION, Judge Hall. | | |
| | SEE CB<br>6857273 | -29 Aug 83, ▓ Fail to Exhibit Reg. (MCC) Fail<br>Poss ID Card (38-83-2a) JOI, Judge Macellaio (Docket No. 8323<br>5069) | | |
| Jaques RIVERA<br>1032 W. Division<br>30 Apr ▓ | 7355806 | -20 May 85, Off. Fnuelly GCU-North (014th) ▓<br>17 Jul 85, ▓ (56½-1402), ▓ (38-83-2),<br>SOL, Judge Kowalski, (Dk#85-1172594) | | |
| Jacques RIVERA<br>132 W. Division<br>30 Apr ▓ | 7849197 | -23 Jul 87, Off. Clark, 14th Dist., ▓<br>10 Aug 87, ▓ SOL Judge Chrones<br>(Doc# 8718 1956) | | |
| Jacques RIVERS<br>4448 W. Cortez<br>30 Apr. ▓ | 8034413 | -24 May 88, Off. RRamirez, 14th dist. Poss. Cann. | | |

ISSUED ON INQUIRY
AUG 27 1988
BY NAME CHECK ONLY

CONFIDENTIAL — Further dessimination of information contained in this record is forbidden. When this record has served the purpose for which it is issued must be destroyed. (U.S. Dept. of Justice Rules & Regulations

Wron 00055

PRESS HARD — — This is a 6-part formset.

P... I CLEARLY — — This is the official Department rec... 1

**CHICAGO POLICE**
**ARREST REPORT**
PD-11.420 (Rev. 11/87)

| MISDEM. ORDIN. COURT KEY | 1. NAME (LAST) | (FIRST) | (MIDDLE) | 2. SEX | 3. RACE | 4. DATE OF BIRTH |
|---|---|---|---|---|---|---|
| | RIVERA | Jacques | | M | WH | DAY 30 MONTH Apr. YEAR |

| ADDRESS OF ARREST | APT. NO. | 6. AGE |
|---|---|---|
| 3300 BEACH | | 23 |

| ENTER LOCATION CODE FOR NATURE OF PREMISES | 11. DIST./RES. | 12. RESIDENCE ADDRESS |
|---|---|---|
| 304 | 025 | 4238 W. Division |

| 13. TIME PHOTO | 14. F.B. NO. |
|---|---|
| | K-371-955 |

| 18. STATE/PLACE OF BIRTH | DRIVERS LICENSE NO. | STATE | 20. I.R. NO. |
|---|---|---|---|
| Chicago | Unk | | 614 010 |

| 1. RESISTED ARREST | 16. ASSAULTED OFFICER | 17. OFFICER INJURED | 18. SOBRIETY | HBD | INTOX |
|---|---|---|---|---|---|
| YES ☒ | YES ☒ | YES ☒ | ☒ | | |

| 1. WEAPON | RIFLE | SHOT-GUN | | KNIFE |
|---|---|---|---|---|
| PISTOL/REVOLVER ☐ | | | Bna | |

| 22. HEIGHT | 23. WEIGHT | 24. EYES | 25. HAIR | 26. COMPLEXION |
|---|---|---|---|---|
| 5'10 | 180 | Brn | Brn | Med. |

| 27. FINGERPRINT CLASSIFICATION |
|---|

| 3. GLASSES | MEDIUM | HEAVY | 20. MARKS, SCARS, DEFORMITIES, HANDICAPS, ETC. |
|---|---|---|---|
| ☒ | ☒ | | Goatee |

| 21. BEAT OF | 22. DATE OF ARREST | 33. FINAL CL. DATE & BRANCH |
|---|---|---|
| 1422 | Aug. 88 '00 |  |

Ch. 38 Sec. 12-4

Agg. Battery

| 4. WHERE EMPLOYED | OFFENSES | DISPOSITIONS |
|---|---|---|
| Imblt. Park Inst | | |
| 5. OCCUPATION | | |
| Maintenance | | |

| 6. NO. ARRESTED | 37. TIME FINGERPRINTED |
|---|---|
| 1 | |

| 38. REFERENCES (CHAPTER ARTICLE SECTION) | 39. OFFENSES | 40. DISPOSITIONS |
|---|---|---|

| 1. PERSON IN INVESTIGATIVE UNIT NOTIFIED | UNIT NOTIFIED | 42. INITIAL APPROVAL OF PROBABLE CAUSE | 43. DATE CHARGED | TIME | 44. APPROVAL OF CHARGES |
|---|---|---|---|---|---|
| Sgt. Czarnecki | A/5 V.C. '00 | Capt. | DAY MONTH YEAR | | |

| 5. VEHICLE OF ARRESTEE | YEAR | MAKE | STATE LICENSE NO. | DISPOSITION OF VEHICLE |
|---|---|---|---|---|
| | Does | | | Not |

Apply

| 6. | NAME | SEX | RACE | HOME ADDRESS | PHONE NO. |
|---|---|---|---|---|---|
| VICTIM/COMPLAINANT | Felix VALENTIN | M | WH | 1458 N. Campbell | |

| 7. ARRESTEE TRANSPORTED TO BY | STAR NO. | HOW TRANSPORTED | TIME | PROPERTY INVENTORY NO(S) |
|---|---|---|---|---|
| A/5 V.C. | Sparks & Fallon | Bt. 4626 | 2255 | DNA |

8. NARRATIVE (The facts for probable cause to arrest include, but are not limited to, the following)

| DOES ARRESTEE HAVE DEPENDENT CHILDREN AT HOME | F. YES—NAME OF YOUTH DIV. MEMBER NOTIFIED |
|---|---|
| ☐ YES ☒ NO | |

Above subject arrested after being identified by a witness as the person who shot the victim, Felix VALENTIN, on 27 Aug. 88 at 3320 W. Cortland.

Additional Arresting Officers: G.C.Sps.Paul Zacharias # 15994, Joseph Sparks # 14879, Joseph D. Fallon # 5351
Dets. John Leonard # 5629, Gillian McLaughlin #8086

Hold papers submitted to Capt. Duggan due to the fact that the witness is not available to view a physical line-up which will be held on 31 Aug. 88.

I do solemnly, sincerely, and truly declare and affirm that the facts stated herein are accurate to the best of my knowledge.

| ARRESTING/APPEARING OFFICER'S SIGNATURE | DEPUTY CLERK | |
|---|---|---|
| | Sgt. T. Czarnecki | 2056 |

| OR NARCOTIC ARREST | APPROX. WEIGHT NO. PKG | EST. STREET VALUE = CALL ORG CRIME | NO. CALLED | TIME OF CALL | FOR COURT USE — COURT DOCKET NO. |
|---|---|---|---|---|---|
| ☐ SUSPECT CANNABIS ☐ SUSPECT CONTROLLED SUBSTANCE | DNA | $ | | | |

| 8. VEHICLE ASSIGNED | ONE MAN ☐ TWO MAN ☒ | OTHER | 50. DESIRED COURT DATE | BRANCH | 51. COURT SGT. TO HANDLE | 52. DATE RECEIVED LOCKUP | TIME | 52. FINAL JUDGE'S NAME |
|---|---|---|---|---|---|---|---|---|
| | | | | | YES ☐ NO ☒ | | | |

| 5. ARRESTING OFFICER - PRINT | STAR NO. | UNIT NO. | BEAT NO. | DO. GRP. | ARRESTING OFFICER'S SIGNATURE | STAR NO. | UNIT NO. | BEAT NO. |
|---|---|---|---|---|---|---|---|---|
| Reynaldo Guevara | 16345 | 760 | 4627 | 7 | R. Guevara | 16345 | 760 | 4627 |

| 4. BOOKING OFFICER | STAR NO. | UNIT | 57. PROPERTY RECEIPT NO. | 58. INITIAL COURT DATE | BRANCH |
|---|---|---|---|---|---|
| | | | | | |

| 9. ARRESTEE SEARCHED BY | STAR NO. | UNIT | 60. BONDED DATE | TIME | |
|---|---|---|---|---|---|
| | | | | | Wron 00056 |

| | 61. YO. NO. | 62. RELIGION | 63. | TEMP. | 64. NO. ADULTS | 65. DATE OF OFFENSE | TIME | 73. COMM. | 74. JUVENILE CODE |
|---|---|---|---|---|---|---|---|---|---|

PLAINTIFF'S TRIAL EXHIBIT 269

18 of 30

Detective Division                                    Date
Area Five Violent Crimes                                    30 Aug 88

To:              Watch Commander,     1st   Watch,     025   District.

From:            Det.    J. Leonard #5629              , Area Five Violent Crimes

Subject:         Request to hold prisoner(s) past regular court call.

1. The undersigned respectfully requests that:

Jacques Rivera                                    CB#

                                                  CB#

                                                  CB#

be held in the lock-up of the     025     District past the regularly
scheduled court call.

2. The reason for this request is:  the witness to this case will not be
available until tomorrows date, and Felony review will not approve
charges until they can interview the witness.

3. This investigation is recorded under RD#  X 371 955  and the victim
is    Felix Valentin    . It is expected that the prisoner will be
charged with  Aggravated Battery  upon completion of the investigation
at  1900 s  hours on   31 Aug 88

4. Presented to the    025    District Watch Commander at    2 8 4.
on   3 A  18                                                  hours

                                             Det.

APPROVED:

Wron 00057

**CHICAGO POLICE ARREST REPORT**
CPD-11.420 (Rev. 11/87)

| MISDEM./ORDIN. COURT KEY | 1. NAME (LAST) | (FIRST) | (MIDDLE) | 4. DATE OF BIRTH |
|---|---|---|---|---|
| .lony | RODRIGUEZ | Jos | Antonio | DAY 4 / MONTH 30 / APR / YEAR ██ |

| 5. ADDRESS OF ARREST | APT NO. | 6. AGE | 7. ALIAS (LAST) | (FIRST) | (MIDDLE) | 8. C.B. NO. | 1. NO. OF CHARGES |
|---|---|---|---|---|---|---|---|
| 2040 N Spaulding | 1st South | 22 | "Chequin" | | | 6110114405 | 1 |

| 10. ENTER LOCATION CODE FOR NATURE OF PREMISE | 11. DIST./RES. | 12. RESIDENCE ADDRESS | 13. TIME PHOTO | 14. R.D. NO. |
|---|---|---|---|---|
| 290 | 014 | 2040 N Spaulding 1st South | | K-371-955 |

| 15. REGISTERED ARREST | 16. ASSAULTED OFFICER | 17. OFFICER INJURED | 18. SOBRIETY | 19. STATE/PLACE OF BIRTH | DRIVERS LICENSE NO. | SEX | 20. I.R. NO. |
|---|---|---|---|---|---|---|---|
| YES / NO [x] | YES / NO [x] | YES [x] | SOBER HBD INTOX [x] | P.R. | | | 861-858 |

| 21. WEAPON | 22. HEIGHT | 23. WEIGHT | 24. EYES | 25. HAIR | 26. COMPLEXION | 27. FINGERPRINT CLASSIFICATION |
|---|---|---|---|---|---|---|
| PISTOL / REVOLVER / RIFLE / SHOT GUN / KNIFE / OTHER DNA | 5-10 | 120 | Brn | Blk | Lt | |

| 28. GLASSES YES/NO [x] | 29. BUILD SLENDER [x] / MEDIUM / HEAVY | 30. MARKS, SCARS, DEFORMITIES, HANDICAPS, ETC. | 31. SEAT OF ARREST 1413 | 32. DATE OF ARREST DAY 31 / MONTH AUG / YEAR 88 | TIME 0100 | 33. FINAL CT. DATE & BRANCH |
|---|---|---|---|---|---|---|

| 34. WHERE EMPLOYED | 1. Ch. 38:12-4a | Agg. Battery | DISPOSITIONS |
|---|---|---|---|
| Great America | 2. | 2. | |
| 35. OCCUPATION Laborer | 3. | 3. | |
| | 4. | 4. | |
| 36. NO. ARRESTED one | 37. TIME FINGERPRINTED | 5. | 5. |
| | 38. REFERENCES (CHAPTER ARTICLE SECTION) 39. OFFENSES | 40. | DISPOSITIONS |

| 41. PERSON IN INVESTIGATIVE UNIT NOTIFIED | UNIT NOTIFIED | TIME | 42. INITIAL APPROVAL OF PROBABLE CAUSE | 43. DATE CHANGED | TIME | 44. APPROVAL OF CHARGES |
|---|---|---|---|---|---|---|
| LAWLER | A/5 VC | 0115 | Lt. J.S.Villanueva #372 | DAY / MONTH / YEAR | | |

| 45. VEHICLE YEAR | MAKE | STATE LICENSE NO. | DISPOSITION OF VEHICLE |
|---|---|---|---|
| N-----O-----N-----E | | | |

| 46. VICTIM COMPLAINANT NAME | SEX | RACE | HOME ADDRESS | PHONE |
|---|---|---|---|---|
| VALENTIN, Felix | M | 4 | 1458 N Campbell | 235-182' |

| 47. ARRESTEE TRANSPORTED TO: BY | STAR NO. | HOW TRANSPORTED | TIME | PROPERTY INVENTORY NO(S). |
|---|---|---|---|---|
| 014 LETRICH | 6198 | 1464 B | 0105 | |

48. NARRATIVE (The facts for probable cause to arrest include, but are not limited to, the following:)  DOES ARRESTEE HAVE DEPENDENT CHILDREN AT HOME 30 YES [ ] NO [x]  IF YES—NAME OF YOUTH DIV. MEMBER NOTIFIED

This is an arrest / investigation by Bts. 1464 30
Of the 014th District Tactical Unit.

Above taken into custody after he was tentatively identified by the victim/compla:
ant as the individual who shot the victim (5) times. This occured on 27 AUG 88
under above RD#. Identification made from photos in the "Imperial Gangster" photo-
book.

Arresting Officers:     MORIARITY 16633, VERGARA 14416, WOJCIK 4408

I do solemnly, sincerely, and truly declare and affirm that the facts stated herein are accurate to the best of my knowledge.

ARRESTING/APPEARING OFFICER'S SIGNATURE    DEPUTY CLERK
WOJCIK LETRICH

| FOR NARCOTIC ARREST [ ] SUSPECT CANNABIS [ ] SUSPECT CONTROLLED SUBSTANCE | APPROX. WEIGHT AND PILLS DNA | EST. STREET VALUE CALL DRG. CRIME FAX 0-662 $ | TEL. NO. CALLED | TIME OF CALL | FOR COURT USE – COURT DOCKET NO. |
|---|---|---|---|---|---|

| 49. VEHICLE ASSIGNED 1 ONE 2 TWO MAN/MAN CAR/CAR [x] OTHER | 50. DESIRED COURT DATE | BRANCH | 51. COURT SGT. TO HANDLE [ ] YES [ ] NO | 52. DATE RECEIVED LOCKUP | TIME | 53. FINAL JUDGE'S NAME |
|---|---|---|---|---|---|---|

| 55. ARRESTING/APPEARING OFFICER – PRINT | STAR NO. | UNIT NO. | BEAT NO. | D.O. GRP | ARRESTING OFFICER'S SIGNATURE | STAR NO. | UNIT NO. | BEAT NO. |
|---|---|---|---|---|---|---|---|---|
| LETRICH | 6198 | 14 | 64B | S/M | | 6198 | 14 | 64B |

| 56. BOOKING OFFICER | STAR NO. | UNIT | 57. PROPERTY RECEIPT NO. | 58. INITIAL COURT DATE | BRANCH |
|---|---|---|---|---|---|

| 59. ARRESTEE SEARCHED BY | STAR NO. | UNIT | 60. BONDED-DATE | TIME |
|---|---|---|---|---|

| JUVENILE DATA | 61. Y.D. NO. | 62. RELIGION | 63. DETAINED 1 / RELEASE 2 | TEMP. | 64. NO. ADULTS ARRESTED | 65. DATE OF OFFENSE DAY / MO. / YEAR | TIME | 73. COMM. AREA NO. | 74. JUVENILE CODE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Wron 00058 | |

COURT-SERGEANT – PERMANENT RECORD COPY

PLAINTIFF'S TRIAL EXHIBIT 269
20 of 30

Detective Division
Area Five Violent Crimes

Date: 31 Aug 88

To:  Watch Commander, 1st Watch, 14 District

From: Detective  P. Boyle 14633  R. Tapkowski 15665
Area Five Violent Crimes

Subject: Request To Hold Prisoner(s) Past Regular Court Call

1. It is requested that the below listed prisoner(s) be held past the regularly scheduled court call.

RODRIGUEZ, Jose _____, CB Number 8101 405

_____, CB Number _____

_____, CB Number _____

2. The reason for this request is: A line-up must be viewed by the witness in this case.

3. This investigation is recorded under RD Number K 371 955, and the victim is VALENTI, Felix. It is expected that the prisoner will be charged with Agg. Battery when the investigation is completed at 0100 hours on 2 Sep 88 (date).

Detective [signature] 14633 [signature] 1566

Wron 00059

Approved: _____

PROPERTY INVENTORY - NO.
CHICAGO POLICE
CPD-34.523 (Rev. 8/87)

**524226**

LIST OTHER INVENTORY NOS. RELATED TO THIS RECOVERY — ☐ NONE

UNIT

INVEN-TORY NO. **524226**

| DATE RECOVERED | DAY | MONTH | YEAR | R.D. NO. | CRIME LABORATORY NO. | CROSS REFERENCE |
|---|---|---|---|---|---|---|
| | 26 | Apr | 86 | R-3119 | | |

NOTICE TO PROPERTY OWNER OR CLAIMANT

| LINE NO. | QUANTITY | DESCRIPTION OF PROPERTY | U.S.C. ONLY |
|---|---|---|---|
| 1 | 1 | Sealed Evidence Envelope | |
| 2 | | Containing: (5) Spent II | |
| 3 | | Brass Cartridge Cases | |
| 4 | | | |
| 5 | | | |
| 6 | | Acc Battery | |
| 7 | | Victim: Felix Valentine | |

☐ PROPERTY RELEASE ORDER (CPD-34.554) REQUIRED

RETURN TO THE POLICE STATION WHERE YOUR PROPERTY WAS TAKEN FROM YOU. GIVE THIS COPY TO THE DESK OFFICER IN CHARGE OF FORMS AND INSTRUCTIONS NECESSARY FOR THE RETURN OF YOUR PROPERTY.

UPON OFFICIAL NOTIFICATION THAT INVENTORIED PROPERTY IS AVAILABLE FOR RELEASE, THE SUBJECT OWNER OR CLAIMANT MUST PICK UP THE PROPERTY WITHIN 30 DAYS OF NOTIFICATION OR THE PROPERTY WILL BE LEGALLY DISPOSED OF ACCORDING TO THE DIRECTION OF THE LAW.

EVIDENCE & RECOVERED PROPERTY SECTION USE ONLY

TOTAL CASH U.S.C.

NOTICE TO FINDER
(GIVE OR MAIL THIS COPY TO FINDER)

OBTAIN UNCLAIMED PROPERTY AFTER 30 DAYS AND BEFORE 45 DAYS FROM THE DATE OF INVENTORY.

YOU MUST OBTAIN A PROPERTY RELEASE ORDER FROM THE RECOVERING UNIT. PRESENT THIS FORM TO THE EVIDENCE & RECOVERED PROPERTY SECTION:

2650 SOUTH CALIFORNIA, ROOM B804 8:00 A.M. TO 4:00 P.M., MONDAY THROUGH FRIDAY (CLOSED HOLIDAYS)

CALL 744-6224 OR 744-6225 TO ARRANGE TO PICK UP BULKY ITEMS.

CHECK ALL BOXES APPLICABLE
☐ U.S. CURRENCY TO BE DEPOSITED
☐ U.S. CURRENCY TO BE HELD IN ORIGINAL FORM — DO NOT DEPOSIT —
☐ C.P.D. CONTINGENCY FUND MONEY
☐ GAMBLING RAID SEIZURE
☐ MEDICAL EXAMINER'S PROPERTY

☐ MISDEMEANOR    STATE CHARGE(S)    ☐ JUVENILE
☒ FELONY

☐ HOMICIDE    ☐ ARSON
☐ MANSLAUGHTER    ☐ NARCOTICS & RELATED

RECOVERED/SEIZED FROM — NAME
☐ DECEASED    ☐ ARRESTED

AT Alley @ Approx. 3350 W. Cortland

OWNER'S NAME UNKNOWN    ADDRESS    TELEPHONE NO.

FOUND BY — NAME ☐ CHECK IF C.P.D.
Keefe + McDonald    ADDRESS Crime Lab    TELEPHONE NO.

ARRESTEE INFORMATION

☒ HOLD FOR INVESTIGATION AND/OR EVIDENCE (If not needed for investigation)
INVESTIGATING OFFICER — STAR NO. — UNIT Det. Leonard 5629 6??    1st OFFICER'S NAME Leonard    STAR NO. 5629

SEIZURE WITHOUT SEARCH WARRANT — (Ill. Rev. Stat. Chap. 38, Sec. 108-2):

PROPERTY OWNER NOTIFIED    ON    DAY MONTH YEAR    HOW NOTIFIED
☐ TO PICK UP PROPERTY WITHIN 30 DAYS OR PROPERTY WILL BE DISPOSED OF    ☐ IN PERSON ☐ PHONE ☐ MAIL
SIGNATURE    A15 VC    UNIT 652

GIVE THIS COPY TO ARRESTEE. IF NOT ACCEPTED, ATTACH TO COPY 5.

☐ TO BE DISPOSED OF BY CUSTODIAN (NOT TO BE RETURNED) (This applies if property is not evidence, not returnable and/or owner is unknown)    2nd OFFICER'S NAME    STAR NO.

FINAL DESTINATION OF PROPERTY    ☐ MEDICAL EXAMINER    SIGNATURE    UNIT 17-
☐ EVIDENCE & RECOVERED PROPERTY SECTION    ☒ CRIME LABORATORY    ☐ AUTO POUND NO.

SEIZURE WITH SEARCH WARRANT — (Ill. Rev. Stat. Chap. 38, Sec. 108-10):

VIA ☐ POLICE MAIL    ☐ RECOVERING UNIT PERSONNEL    APPROVING DESK SERGEANT    STAR NO.    DATE    TIME
☐ E. & R.P.S. PICKUP    ☒ EVID./LAB. TECHNICIAN

ATTACH THIS COPY TO SEARCH WARRANT

**COPY 4 — GIVE OR SEND TO FINDER, ARRESTEE OR OWNER**

Wron 00060

**EVIDENCE REPORT**
CRIME LABORATORY DIVISION/CHICAGO POLICE

| | | OTHER N. | RD NO. K 371 955 |
|---|---|---|---|

| OFFENSE OR INCIDENT | IUCR | AREA-DIST.-BEAT | DATE RECEIVED | TIME |
|---|---|---|---|---|
| Aggravated Battery | 0 4 4 0 | 5 014 1422 | 28 | 1932 |

| ASSIGNMENT TYPE | UNIT ASSIGNED | RECEIVED BY | DATE ARRIVED | TIME |
|---|---|---|---|---|
| CS | 9601 | McDonald | Aug | 1955 |

| LOCATION OF SERVICE | REQUESTED BY | DATE COMPLETED | TIME |
|---|---|---|---|
| 3320 W. Cortland & 2732 W. Wabansia | 5537 | 88 | 2200 |

| VICTIM'S NAME | SEX—RACE—AGE | ADDRESS | PHONE NO. |
|---|---|---|---|
| VALENTINE, Felix | M/WH/16 | 1458 N. Campbell | |

| ELIM. PRINTS | IN CUSTODY | NAME | D.O.B. | CB NO. | IR NO. |
|---|---|---|---|---|---|
| ☐YES ☐NO | ☐YES ☐NO | | | | |

**FINGERPRINTS**

| MED NEG LIFT | LOCATION FOUND | F.N. | MED NEG LIFT | LOCATION FOUND | F.N. |
|---|---|---|---|---|---|
| | | | | | |

| POSSIBLE SUSPECT INFORMATION | ☐MALE ☐FEMALE | RACE | ☐ADULT ☐JUVENILE | IDENT. SECTION | ☐SUITABLE ☐NOT SUITABLE | INITIAL | DATE |
|---|---|---|---|---|---|---|---|

**PHOTOS TAKEN**

A   O/A exterior of auto (5) E

B   O/A interior of auto (2) F

C   north alley at O/A 3320 W. Cortland (5)   G

D   O/A cartridge cases (4)   H

I

J

K

L

**VEHICLE(S)**

| YEAR | MAKE & MODEL | COLOR | STATE LICENSE NO. | V.I.N. |
|---|---|---|---|---|
| 73 | Mazda RX3 | Red | None | S124A162930 |
| YEAR | MAKE & MODEL | COLOR | STATE LICENSE NO. | V.I.N. |
| | | | | |

**PHYSICAL EVIDENCE**

| PROP. INVENT. NO.–UNIT | DESCRIPTION & LOCATION | INITIAL DEST. |
|---|---|---|
| 524 226    177 | (1) sealed evidence envelope containing (5) cartridge cases recovered from the northwest corner of the mouth of the alley at 3320 W. Cortland. All cases are marked with the letter "U". | FA |

DETAILS OF CASE  Reporting Technicians were requested to process the above listed vehicle, in which the victim was allegedly sitting when shot. The auto was processed for all pertinent physical evidence as was the scene of the shooting with the above listed results.

| INVESTIGATING OFFICER'S NAME | STAR NO. | UNIT | BEAT OFFICER'S NAME | STAR NO. | UNIT |
|---|---|---|---|---|---|
| Leonard | 5629 | A/5/VC | | | |

| REPORTING TECHNICIAN'S NAME | STAR NO. | APPROVING SUPERVISOR'S NAME | STAR NO. |
|---|---|---|---|
| J. McDonald | 6989 | | |
| D. Keating | 8788 | | |

CPD-33.103 (Rev. 11/85)

Wron 00061

PROPERTY INVENTORY - NO.
CHICAGO POLICE
CPD-34.523 (Rev. 2/87)

**544008**

LIST OTHER INVENTORY NOS. RELATED TO THIS RECOVERY ☐ NONE

UNIT

INVEN-
TORY
NO. **544008**

| DATE RECOVERED | DAY | MONTH | YEAR | R.D. NO. | CRIME LABORATORY NO. | CROSS REFERENCE |
|---|---|---|---|---|---|---|

NOTICE TO PROPERTY OWNER
OR CLAIMANT

| LINE NO. | QUANTITY | DESCRIPTION OF PROPERTY | U.S.C. ONLY |
|---|---|---|---|
| 1 | | | |
| 2 | | | |
| 3 | | | |
| 4 | | | |
| 5 | | | |
| 6 | | | |
| 7 | | | |

☐ PROPERTY RELEASE ORDER (CPD-34.554) REQUIRED

RETURN TO THE POLICE STATION WHERE YOUR PROPERTY WAS TAKEN FROM YOU. GIVE THIS COPY TO THE DESK OFFICER IN CHARGE OF FORMS AND INSTRUCTIONS NECESSARY FOR THE RETURN OF YOUR PROPERTY.

UPON OFFICIAL NOTIFICATION THAT INVENTORIED PROPERTY IS AVAILABLE FOR RELEASE, THE SUBJECT OWNER OR CLAIMANT MUST PICK UP THE PROPERTY WITHIN 30 DAYS OF NOTIFICATION OR THE PROPERTY WILL BE LEGALLY DISPOSED OF ACCORDING TO THE DIRECTION OF THE LAW.

EVIDENCE & RECOVERED PROPERTY SECTION USE ONLY

TOTAL CASH U.S.C.

NOTICE TO FINDER
(GIVE OR MAIL THIS COPY TO FINDER)

OBTAIN UNCLAIMED PROPERTY AFTER 30 DAYS AND BEFORE 45 DAYS FROM THE DATE OF INVENTORY.

YOU MUST OBTAIN A PROPERTY RELEASE ORDER FROM THE RECOVERING UNIT. PRESENT THIS FORM TO THE EVIDENCE & RECOVERED PROPERTY SECTION.

CHECK ALL BOXES APPLICABLE
☐ U.S. CURRENCY TO BE DEPOSITED
☐ U.S. CURRENCY TO BE HELD IN ORIGINAL FORM — DO NOT DEPOSIT —
☐ C.P.D. CONTINGENCY FUND MONEY
☐ GAMBLING RAID SEIZURE
☐ MEDICAL EXAMINER'S PROPERTY

☐ MISDEMEANOR  STATE CHARGE(S)
☐ FELONY
☐ JUVENILE
☐ HOMICIDE
☐ MANSLAUGHTER
☐ ARSON
☐ NARCOTICS & RELATED

2650 SOUTH CALIFORNIA, ROOM 8804 8:00 A.M. TO 4:00 P.M., MONDAY THROUGH FRIDAY (CLOSED HOLIDAYS)

RECOVERED/SEIZED FROM — NAME ............................... AT
☐ DECEASED  ☐ ARRESTED

CALL 744-6224 OR 744-6225 TO ARRANGE TO PICK UP BULKY ITEMS.

OWNER'S NAME ............... ADDRESS ............... TELEPHONE NO.

FOUND BY — NAME ............... ADDRESS ............... TELEPHONE NO.
☐ CHECK IF C.P.D.

SEE COPY 4 FOR NOTICE TO FINDER

ARRESTEE INFORMATION

☐ HOLD FOR INVESTIGATION AND/OR EVIDENCE
(IF NOT NEEDED FOR INVESTIGATION/EVIDENCE, LEAVE BLANK)

INVESTIGATING OFFICER — STAR NO. — UNIT

1st OFFICER'S NAME ............... STAR NO.

SEIZURE WITHOUT SEARCH WARRANT — (Ill. Rev. Stat. Chap. 38, Sec. 108-2)

☐ PROPERTY OWNER NOTIFIED  ON  DAY  MONTH  YEAR  HOW NOTIFIED
TO PICK UP PROPERTY WITHIN 30 DAYS OR PROPERTY WILL BE DISPOSED OF
☐ IN PERSON  ☐ PHONE  ☐ MAIL

SIGNATURE ............... UNIT

GIVE THIS COPY TO ARRESTEE. IF NOT ACCEPTED, ATTACH TO COPY 5.

☐ TO BE DISPOSED OF BY CUSTODIAN (NOT TO BE RETURNED)
(THIS APPLIES IF PROPERTY IS NOT EVIDENCE, NOT RETURNABLE AND/OR OWNER IS UNKNOWN)

2nd OFFICER'S NAME ............... STAR NO.

SEIZURE WITH SEARCH WARRANT — (Ill. Rev. Stat. Chap. 38, Sec. 108-10)

INITIAL DESTINATION OF PROPERTY
☑ EVIDENCE & RECOVERED PROPERTY SECTION
☐ MEDICAL EXAMINER
☐ CRIME LABORATORY
☐ AUTO FOUND NO.

SIGNATURE ............... UNIT

ATTACH THIS COPY TO SEARCH WARRANT

VIA ☒ POLICE MAIL  ☐ RECOVERING UNIT PERSONNEL
☐ E. & R.P.S. PICKUP  ☐ EVID/LAB. TECHNICIAN

APPROVING DESK SERGEANT ............... STAR NO. ............... DATE ............... TIME

**COPY 4 - GIVE OR SEND TO FINDER, ARRESTEE OR OWNER**

Wron 00062

**RELEASE OF PERSON IN CUSTOL**   CHICAGO POLICE

INSTRUCTIONS:  Prepare in duplicate.
Original to Watch Commander of Detention Facility
Duplicate to Area Headquarters

| | | | |
|---|---|---|---|
| TODAY'S DATE | 31 Aug 1933 | C.B. NO. | 3101 405 |

| NAME OF ARRESTEE | AGE | ADDRESS | DISTRICT OF DETENTION |
|---|---|---|---|
| ROORIGUEZ  Jose  Antonio | 22 | 2040 J. Spaulding | 014 |

| DATE OF ARREST | TIME OF ARREST | ARRESTED BY | STAR NO. | ASSIGNMENT |
|---|---|---|---|---|
| 31 Aug 1933 | 0100 HRS | Letrich | 6193 | 14a District |

**REASON FOR ARREST**

Identified in a photo by the victim, from his hospital bed.

**REASON FOR RELEASE**

victim was unable to identify the defendant, due to being heavily
sedated for pain.

**CHECK ACCOMPLISHED PROCEDURES**

| | | | |
|---|---|---|---|
| ☑ PRINTS TAKEN | ☐ VIEWED BY VICTIM | ☐ WEAPONS TESTED | ☐ OTHER (SPECIFY) |
| ☑ PHOTO TAKEN | ☐ VIEWED BY COMPLAINANT | ☐ TOOLS TESTED | |
| ☐ LINE-UP | ☐ ALIBI CHECKED | ☐ VEHICLE TESTED | |

**PERSONS WHO VIEWED SUBJECT**

| NAME | ADDRESS | PHONE NO. |
|---|---|---|
| 1. | | |
| 2. | | |
| 3. | | |

My investigation has revealed that there is not sufficient cause to further detain the above named subject, and it is requested
that the subject be released IMMEDIATELY.

| SIGNATURE OF DETECTIVE | STAR NO. | ASSIGNMENT |
|---|---|---|
| John J. Leonard | 5629 | Area 5 Violent Crimes. |

| APPROVAL SIGNATURE DETECTIVE DIVISION WATCH COMMANDER | RANK | STAR NO. | ASSIGNMENT |
|---|---|---|---|
| | Sgt. | 2056 | 3RD WATCH COMM. |

ADDITIONAL COMMENTS:

| | | DATE | TIME |
|---|---|---|---|
| This form was presented to the desk sergeant at the 014 district on: | | 31 Aug 1933 | HRS. |
| SIGNATURE OF DESK SERGEANT | STAR NO. | DATE RELEASED | TIME RELEASED HRS. |

CPD-11.519 (Rev. 11/82)

Wron 00063

**GENERAL PROGRESS REPORT**
**DETECTIVE DIVISION/CHICAGO POLICE**

DATE OF ORIG. CASE REPORT: 27 Aug 88
DATE OF THIS REPORT: 31 Aug 88 | 3

OFFENSE CLASSIFICATION—LAST PREVIOUS REPORT: 466 BATTERY
VICTIM'S NAME AS SHOWN ON CASE REPORT: VALENTIN, FELIX
BEAT/UNIT ASSIGNED: 5537

This form is designed for recording handwritten notes and memoranda which are made during the conduct of investigations, including: inter-watch memoranda (handwritten or typewritten), witness and suspect interview notes, on-scene canvas notes, and any handwritten personal notes made by detectives during the field investigation of violent crimes which are used to prepare official Department case reports.

#1  VILLAFANE, ANGEL   M/WH/23
21 JULY ■ · 1619 N. CALIFORNIA

#2  OLIVERO, CARLOS   M/WH/18
14 MAY ■   2478 N. ALBANY

#3  RIVERA, JACQUES   M/WH/23
30 APR ■   4238 W. DIVISION

#4  RUIZ, GEORGE   M/WH/19
28 JAN ■   2453 N. FRANCISCO

#5  RAMON, LOPEZ,   M/WH/20
22 SEPT ■   1424 N. WASHTENAW

#6  RODRIGUEZ, JOSE   M/WH/30 APRIL ■
28   2040 N. SPAULDING

R.D. NO. K 371 955

REPORTING OFFICER'S SIGNATURE—STAR NO. [signature] 5609
RECEIVED BY: SUPERVISOR'S SIGNATURE—STAR NO. | DAY—MO.—YR. | TIME

CPD-23.122 (Rev. 2/83)

Wron 00064

PRELIMINARY FIRED EVIDENCE REPORT
CRIME LABORATORY DIVISION/CHICAGO P.

R.D. NO. _K 371953_

OFFENSE OR INCIDENT _agg Battery_  UCR _____ AREA-DIV-BEAT _5-014 14_  DATE OF THIS REPORT _____

LOCATION OF OFFENSE/INCIDENT _3320 W Portland_  LOC. CODE _____ INVESTIGATOR _Leonard_  STAR NO. _5639_  UNIT _A58C_

VICTIM(S) NAME
1. _Felix Valentine_

OFFENDER(S) NAME

2.

| INVENTORY DISTRICT/AREA | DESCRIPTION | CLASS CHARACTERISTICS | S/NS |
|---|---|---|---|
| 54 524/226 | SUBMITTED BY—NAME _____ STAR NO. ___ DATE ___ | | |
| | NO. REC'D. — — — EXHIBIT(S) | _22 44? 4/4_ | _N/S_ |
| 88 965 | _____ FIRED BULLETS | | |
| EXHIBIT NO. | 5 DISCHARGED CART. CASES _2 44 4? 6_ | | |
| 30 aug 88 | _____ SHOTGUN SHELLS | | |
| DATE REC'D. | _____ WADDING | | |
| | SUBMITTED BY—NAME _____ STAR NO. ___ DATE ___ | | |
| | NO. REC'D. — — — EXHIBIT(S) | | |
| | _____ FIRED BULLETS | | |
| | _____ DISCHARGED CART. CASES | | |
| EXHIBIT NO. | _____ SHOTGUN SHELLS | | |
| DATE REC'D. | _____ WADDING | | |
| | SUBMITTED BY—NAME _____ STAR NO. ___ DATE ___ | | |
| | NO. REC'D. — — — EXHIBIT(S) | | |
| | _____ FIRED BULLETS | | |
| | _____ DISCHARGED CART. CASES | | |
| EXHIBIT NO. | _____ SHOTGUN SHELLS | | |
| DATE REC'D. | _____ WADDING | | |

CONCLUSIONS—IN THE OPINION OF THE EXAMINER

_MNFU Not Suitable_

R.D. NO. _K 371953_

FIREARMS EXAMINER (PRINT) _Comoro 1168_  FIREARMS EXAMINER (SIGNATURE)

_mc Laughlin_

CPD-33.405 (Rev. 3/86)

PAGE _Wron 00065_

CITY OF CHICAGO / DEPARTMENT OF POLICE / 1121 South State Street
IDENTIFICATION SECTION          Chicago, Illinois  60605

CRIMINAL HISTORY OF **RIOS, Jose**      M/WH

DATE          29 July 1981

DATE OF BIRTH      30 April ▉

I.R. NO.     614010          FBI NO. **970150 AAS**    I.S.B. NO. **24/23829**

| NAME & ADDRESS | C.B. NO. | DATE OF ARREST | ARRESTING OFFICER & DIST, CHARGE | DISPOSITION |
|---|---|---|---|---|
| Jose RIOS<br>3449 W. North<br>30 April ▉ | 6187985 | —28 Jul 81. Off. Rogers, 14th Dist, Disorderly Conduct. | | |
| Jacques RIVERA<br>3335 W. Beach<br>30 Apr ▉ | 6776065 | — 27 Feb 83 Off Chavez 14 dist Robbery<br>28 Feb 83, S/A Robb., (38-18-1a), Poss Stl Veh., (95½-4-103a),<br>FPC TRANSFER TO CHIEF JUDGE, Judge Sodini<br>14 Mar. 83, INFO#83-2690, Robbery, Theft, Poss Stolen Veh. | |
| Jack RIVERA<br>3335 W Beach<br>30 Apr ▉ | 6851273 | — 02 Jun 83 Off Gruber Summer Mobile Force '14) UUW<br>24 June 83, UUW Gun (38-24-1a4) Fail Exib Reg. (MCC) Fail<br>Poss. I.D. (38-83-2a) BFW, Judge Laurie (Docket No. ░░░<br>83235069)<br>28 June 83. Robbery(83-2690) Nolle Prosse, Theft, Poss Stln | |
| | SEE CB<br>6776065 | Mtr Veh, PG/FG, 2yrs PROBATION, Judge Hall. | | |
| | SEE CB#<br>6857273 | —29 Aug 83, UUW (38-24-1a10) Fail to Exhibit Reg (MCC) Fail<br>Poss ID Card (38-83-2a) SOL, Judge Macollaio (Docket No. 8383<br>5089) | |
| Jaques RIVERA<br>4032 W. Division<br>30 Apr ▉ | 7355806 | —20 May 85, Off. Fnuelly GCU-North (014th) Poss. Cocaine<br>17 Jul 85, Poss Cocaine, (56½-1402), No POID Card,, (38-83-2)<br>SOL, Judge Kowalski, (D##85-1172594) | |
| Jacques RIVERA<br>4032 W. Division<br>30 Apr ▉ | 7849197 | —23 Jul 87, Off. Clark, 14th Dist., Batt.<br>10 Aug 87, Battery(38-12-3) SOL Judge Chrones<br>(Doc# 8718 1956) | vmd |
| Jacques RIVERS<br>4448 W. Cortez<br>30 Apr. ▉, | 8034413 | —24 May 88, Off. RRamirez, 14th dist. Poss. Cann. | |
| Jacques RIVERA<br>4238 W. Divison<br>30 Apr. ▉. | 8101323 | —30 Aug. 88, Off. Guevarra, GCU-N (25th) Dist. Agg. Batt. (c | |

CONFIDENTIAL —Further dessemination of information contained in this record is forbidden. When this record
has served the purpose for which it was issued, it must be destroyed. (U.S. Dept. of Justice Rules & Regulation
S.S. 20.33).          Wron 00067

**PLAINTIFF'S TRIAL EXHIBIT 269**
28 of 30

**GENERAL PROGRESS REPORT**
**DETECTIVE DIVISION/CHICAGO POLICE**

DATE OF ORIG. CASE REPORT: 27 Aug 88

DATE OF THIS REPORT: 27 Aug 88 3

OFFENSE CLASSIFICATION—LAST PREVIOUS REPORT: AGG BATTERY

VICTIM'S NAME AS SHOWN ON CASE REPORT: VALENTIN, FELIX

BEAT/UNIT ASSIGNED: 5537

This form is designed for recording handwritten notes and memoranda which are made during the conduct of investigations, including: inter-watch memoranda (handwritten or typewritten), witness and suspect interview notes, on-scene canvas notes, and any handwritten personal notes made by detectives during the field investigation of violent crimes which are used to prepare official Department case reports.

Felix Valentin

DR Perez

6 in chest    2 in Left Arm

5 in chest
shots
6 bullets

10 holes in back    only 2 holes
in front —    6 bullets in chest

R.D. NO. K 371 955

REPORTING OFFICER'S SIGNATURE-STAR NO. 6056

John T. Leonard 5629

RECEIVED BY SUPERVISOR'S SIGNATURE-STAR NO.

DAY 29 AUG 1988

Wron 00068

**GENERAL PROGRESS REPORT**
**DETECTIVE DIVISION/CHICAGO POLICE**

| DATE OF ORIG. CASE REPORT | DATE OF THIS REPORT |
|---|---|
| 27 Aug 88 | 27 Aug 88  3 |

| OFFENSE CLASSIFICATION—LAST PREVIOUS REPORT | VICTIM'S NAME AS SHOWN ON CASE REPORT | BEAT/UNIT ASSIGNED |
|---|---|---|
| AGG BATTERY | VALENTIN, FELIX | 5537 |

This form is designed for recording handwritten notes and memoranda which are made during the conduct of investigations, including: inter-watch memoranda (handwritten or typewritten), witness and suspect interview notes, on-scene canvas notes, and any handwritten personal notes made by detectives during the field investigation of violent crimes which are used to prepare official Department case reports.

Felix 16   5537
DOB 14380 Campbell
Diego School
Campbell Boy

VALENTIN, ISRAEL
1458 N. Campbell
235-1821
DOB June 1 - ███
SS#

1545 DROVE-UP TO 3324 W. CORTLAND - ISRAEL (moe) WENT TO GET DATE - TO GO TO WEDDING - GONE FOR APPROX 5 MIN - CAME DOWN WITHOUT GIRLFRIEND DIDN'T SEE BROTHER WALKED TO CAR SAW FELIX SLUMPED OVER IN PASSENGER SIDE - (F-HAD BEEN DRIVING) - PUSHED FELIX OVER - TOLD GIRLFRIEND TO GO UP AND CALL MRS VALENTIN - MOE TOOK OFF FOR HOSPITAL HAD ACCIDENT K875233 +TRAFFIC - UNKNOWN MOTORISTS BROUGHT VICTIM - MOE TO NORWEGIAN -

GIRLFRIEND'S BROTHER - Macho Lopez - 13 yoa SAW INCIDENT - HAS NOT BEEN INTERVIEWED -
KINDOS -

Campbell Boy -
BROTHER - ALSO -

R.D. NO. K371 055

| REPORTING OFFICER'S SIGNATURE—STAR NO. | RECEIVED BY: SUPERVISOR'S SIGNATURE—STAR NO. | DAY 29 AUG 1988 |
|---|---|---|

CPD-23.122 (Rev. 2/83)

John F. Fernard 5609

Wren 00069

# EXHIBIT 65

Inventory numbers. If property taken was scored for Operation Identification, indicate I.D. number at end of Narrative. Offender's approximate description, if possible, should include name if known, nickname, sex, race code, age, height, weight, color eyes & hair, complexion, scars, marks, etc. If suspect is arrested, give name, sex, race code, age, C.B. or I.R. number, if known, and state "In Custody."

## SUPPLEMENTARY REPORT
CHICAGO POLICE – FOR USE BY B.I.S. PERSONNEL ONLY

All descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

| 4. DATE OF ORIG. OCCURRENCE–TIME | | |
|---|---|---|
| DAY | MO. | YR. |
| 27 | Aug | 1988 | 1545 |

| 1. OFFENSE CLASSIFICATION LAST PREVIOUS REPORT | I.UCR OFF. CODE | 2. ADDRESS OF ORIG. INCIDENT/OFFENSE ☒ 1 VERIFIED ☐ 2 CORRECTED | 3. BEAT OF OCCUR. |
|---|---|---|---|
| BATTERY/Aggravated   Handgun | 041 A | 3320 W. Cortland | 1422 |

| 5. VICTIM'S NAME AS SHOWN ON CASE REPORT | I CORRECT ☒ 1 YES ☐ 2 NO | IF NO. CORRECT ALL VICTIM INFOR- MATION IN BOXES 20 THROUGH 27. | 6. FIRE RELATED ☐ 1 YES ☒ 2 NO | 7. BEAT ASSIGNED |
|---|---|---|---|---|
| VALENTIN, Felix | | | | 5537 |

| 8. TYPE OF LOCATION OR PREMISE WHERE INCIDENT/OFFENSE OCCURRED | I LOCATION CODE | 9. NO. OF VICTIMS | 10. NO. OF OFFENDERS |
|---|---|---|---|
| Alley | 092 | 1 | 2 |

| | 11. VER: ☒ FIXED ☐ UPDATE TO | 12. OBJECT/WEAPON | 13. FIREARM FEATURES | 14. POINT/ENTRY | 15. POINT/EXIT | 16. BURGLAR ALARM | 17. SAFE BURGLARY METHOD | 18. IF RESIDENCE WHERE WERE OCCUP. |
|---|---|---|---|---|---|---|---|---|
| CIRCUM-STANCES | | CODE NOS. | CODE NO. | CODE NO. | CODE NO. | CODE NO. | CODE NO. | CODE NO. |
| 19 dna | DESCRIBE PROPERTY IN NARRATIVE. F = TAKEN.    R = RECOVERED | | | | FILL IN THE FULL AMOUNT OF ONLY THOSE VALUES WHICH EITHER DIFFER FROM OR WERE NOT REPORTED ON THE ORIGINAL CASE REPORT OR THE LAST PREVIOUS SUPPLEMENTARY REPORT. | | | |

| PROPERTY | ☐ VERIFIED ☐ UPDATE TO | 1 MONEY ☐ T $ ☐ R | 2 JEWELRY ☐ T $ ☐ R | 3 FURS ☐ T $ ☐ A | 4 CLOTHING ☐ T $ ☐ R | 7 OFFICE EQUIPMENT ☐ T $ ☐ R | 8 TV, RADIO, STEREO ☐ T $ ☐ R |
|---|---|---|---|---|---|---|---|
| | | 9 HOUSEHOLD GOODS ☐ T $ ☐ R | 9 CONSUM. GOODS ☐ T $ ☐ R | 11 FIREARMS ☐ T $ ☐ R | 8 NARC./DANGEROUS DRUGS ☐ T $ ☐ R | 5 OTHER ☐ T $ ☐ R | 6 NONE ☐ T ☐ R |

| | 20. NAME (LAST–FIRST–M.I.) | 21. I-UCR OFFENSE CODE | 22. HOME ADDRESS (NO., DIR., STREET, APT. NO.) | 23. SEX–RACE–AGE CODE | 24. HOME PHONE | 25. BUSINESS PHONE | 26. IN CUST. YES NO | 27. VICTIM REL. CODE |
|---|---|---|---|---|---|---|---|---|
| VICTIMS UPDATE ONLY | 1. | | | | | | | |
| | 2. | | | | | | | |
| | 3. | | | | | | | |

| | 28. OFFENDER'S NAME (OR DESCRIBE CLOTHING, ETC.) | | 29. HOME ADDRESS | 30. SEX–RACE–AGE CODE | HEIGHT | WEIGHT | EYES | HAIR | COMPL. |
|---|---|---|---|---|---|---|---|---|---|
| OFFENDERS UPDATE ONLY | 1. | | | | | | | | |
| | 2. | | | | | | | | |

| | 31. C.B. NO. | I.R. NO., Y.D. NO. OR J.D.A. NO. | I OFFENDER REL. CODE | C.B. NO. | I.R. NO., Y.D. NO. OR J.D.A. NO. | I OFFENDER REL. CODE | 32. NO. ARREST/ ARRESTING UNIT NO. |
|---|---|---|---|---|---|---|---|
| OFF. 1 | | | OFF. 2 | | | | |

| 33. OFF'S VEHICLE ☐ USED ☐ STOLEN | YEAR | MAKE | BODY STYLE | COLOR | V.I.N. | | STATE LICENSE NO. | STATE |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

| 34. SERIAL NOS. OR IDENTIFICATION NOS. ☒ 1 DNA ☐ 2 VERIFIED ☐ 3 CORRECTED | | LIST ALL CORRECTIONS & NEW OR ADDITIONAL NOS. OBTAINED IN NARRATIVE |
|---|---|---|
| DNA | | |

| 50. OFFENSE/CLASS. THIS DATE (IF SAME ENTER DNA) | REV. CODE | 51. METHOD CODE | 52. METHOD ASSIGNED ☒ 1 FIELD ☐ 3 SUMMARY | UNIT NO. | 53. STATUS |
|---|---|---|---|---|---|
| DNA | | DNA | | 652 ** | ☒ 2 PROGRESS ☐ 1 SUSPENDED ☐ 3 UNFOUNDED |

| STATUS CONT'D. ☐ 3 CLRD. CLOSED | ☐ 4 CLRD. OPEN | 5 EXC. ☐ CLRD. CLOSED | 6 EXC. ☐ CLRD. OPEN | 7 CLSD. ☐ NON- CRIM. | 54. IF CASE CLEARED, HOW CLEARED ☐ 1 ARREST & PROSEC. | ☐ 2 DIRECTED TO JUV. CRT. | ☐ 3 COMPL. REFUSD. TO PROSECUTE | ☐ 4 COMMUNITY ADJUSTMENT | ☐ 5 OTHER EXCEPT. | ☐ ADULT ☐ JUV. |

55. ☐ FOR SUMMARY CASES ONLY – THE ORIGINAL CASE REPORT IS SUBSTANTIALLY CORRECT, AND CONTACT WITH THE VICTIM HAS DISCLOSED NO ADDITIONAL PERTINENT INFORMATION.

60. NARRATIVE

In Custody:

RIVERA, Jacques/M-WH-30Apr█/AKA-ACE/4238 W.
Division/5'10/180/brn/brn/med/Employeed:
Humboldt Park Inst-Maintenance   IR#614 010
CB# 8101-323

RODRIGUEZ, Jose Antonio/AKA-Chequin/2040 N.
Spaulding 1st South/5'10/120/brn/blk/light
IR# 861-858   CB# 8101-405

Arresting Officers:

RIVERA:   Det. John Leonard    5629
          Det. G. McLaughlin   8086
          GCSP R. Guevara      16345
          GCSP J. Fallon       5351
          GCSP J. Sparks       14879
          GCSP P. Zacharias    15994

| 90. EXTRA COPIES REQUIRED (NO. & RECIPIENT) | 91. DATE THIS REPORT SUBMITTED – DAY MO. YR. | TIME | 92. SUPERVISOR APPROVING (PRINT NAME) | STAR NO. |
|---|---|---|---|---|
| Normal | 1 Sept 1988 | 0100 | | 273 |

| 93. REPORTING OFFICER (PRINT NAME) | STAR NO. | 94. REPORTING OFFICER (PRINT NAME) | STAR NO. | SIGNATURE |
|---|---|---|---|---|
| Gillian McLaughlin | 8086 | John Leonard | 5629 | |
| SIGNATURE | | SIGNATURE | | DATE APPROVED (DAY–MO.–YR.) |
| Jill McLll 8086 | | John Leonard | | 02 SEP 1988 |

K 371 955

Wron 00034

PLAINTIFF'S TRIAL EXHIBIT 19F

1 of 3

Detective Division      Page 2        1 Sept, 1988
Area 5 Violent Crimes             K 371 955

AGGRAVATED BATTERY/Handgun
VALENTIN, Felix

Arresting Officers:      RODRIGUEZ: P.O. LETRICH 6198 014
                   P.O. MORIARITY 16633 014
                   P.O. VERGARA  14416 014
                   P.O. WOJCIK   4408 014

Date, Time & Location of Arrest:  RIVERA:  30 Aug, 1988/2300/3300 N. Beach

              RODRIGUEZ: 31 Aug, 1988/0100/2040 N. Spaulding

Evidence:          544008 (652) Photos

Investigation:       The undersigned detectives were assigned to
              the continuing investigation of the above cap-
              tioned incident. Efforts to locate suspect
RIVERA, Jose were successful and subject was taken into custody, advised of his Miranda
Warnings and transported to Area 5. Due to the lateness of the hour, the parents of the
witness indicated that the daytime hours would be better for viewing of a line-up.
In light of this fact, a hold was placed on RIVERA for line-up purposes.

              The undersigned had been informed that another
              suspect was in custody (014) and hold papers
              had been placed on that subject, RODRIGUEZ, by
1st watch personnel in order to have witness view RODRIGUEZ in line-up. The lateness
of the hour also prevented an interview with victim who is in surgicial intensive care.

              On today's date, attempts were made to locate
              the eye witness, LOPEZ, Orlondo, in order to
              have subject view a line-up. Numerous visits
to witnesses residence proved negative and family indicated that they were unaware of
his whereabouts but that subject may have been visiting his father, address unknown.
R/D's went to Cook County Hospital and attempted to converse with victim; Verbal com-
munication was next to impossible due to ventilator hook up through mouth and throat.
Victim appeared to understand questions of a yes and no nature. R/D's inquired of the
physcians staff if photos could be shown to victim and staff indicated yes but that the
victim is regularly medicated, and response would be dependent of that medication. R/D's
returned to Area Five and requested 014 personnel to locate persons fitting description
of both in-custody suspects.to produce a photo spread for purposes of victim identification
if possible at this time.

              R/D's returned to Cook County Hospital with six
              photos (Inv. #544-008 652). It should be noted
              that the photos were numbered from one to six
but the were not shown numerically to the victim. The victim does not have use of his
limbs and is basically paralyzed from the neck down. Therefore photos were individually
held for victim to view (random order). As photo's were being shown to victim it appeared

Wron 00035

Detective Division               Page 3                         1 Sept., 1988
Area 5 Violent Crimes                                        K 371 955

AGGRAVATED BATTERY/Handgun
VALENTIN, Felix

Investigation Cont.:               that the victim was having a difficult time
focusing of the photos. Victims eyes were con-
stantly tearing and R/D's inquired of the staff
of victim's medication at the time. R/D's learned that victim had been placed on a
morphine drip for the pain. It should also be noted that the victim was in constant
motion (side to side) as the whole bed moved to help keep lungs from filling with fluid
staff indicated that victim presently in danger of contracting pneumonia. It was then
decided to cease the photo identification until later in the week; when the physcian
indicated that the tubes would be removed from victim's throat.

The following is the numerical order and names
of subjects in photos.

#1   VILLAFANE, Angel/M-WH/23   21July█ / 1619 N. California

#2   OLIVERO, Carlos/M-WH/18   14May█ / 2478 N. Albany

#3   RIVERA, Jacques/M/WH/23   30Apr█ / 4238 W. Division

#4   RUIZ, George/M-WH/19   28Jan█ / 2453 N. Francisco

#5   RAMON, Lopez/M-WH/20   22Sep█ / 1424 N. Washtenaw

#6   RODRIGUEZ, Jose/M-WH/23   30Apr█ / 2040 N. Spaulding

Due to the above facts and circumstances both
subjects were released. This investigation con-
tinues........

Wron 00036

PLAINTIFF'S TRIAL EXHIBIT 19F
3 of 3

# EXHIBIT 66

STATE OF ILLINOIS)
               )SS.
COUNTY OF C O O K)

FILED
OCT 31 1988
MORGAN M. FINLEY
CLERK OF THE CIRCUIT COURT
CRIMINAL DIVISION

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT - CRIMINAL DIVISION

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS | ) | |
| | ) | |
| vs. | ) | No.  88 CR 15436 |
| | ) | |
| JACQUES RIVERA | ) | |

### MOTION FOR DISCOVERY

NOW COMES the Defendant, JACQUES RIVERA, by his Attorneys, NICHOLAS A. De JOHN & ASSOCIATES, LTD., and moves this Honorable Court for an order to be entered upon the State's Attorney of Cook County to disclose and produce certain evidence which is essential and material to the preparation of the defense.

The Defendant requests that such disclosure and production include, but not be limited to, the following:

1.  A Bill of Particulars containing:

    A.  The exact time and date of the occurrence;

    B.  The exact street address and physical description of the location of the occurrence.

        (Chapter 38, S111-6, Illinois Revised Statutes.)

**RFC 00489**

PLAINTIFF'S TRIAL EXHIBIT 39
PAGE 1 OF 6

2.    A List of Witnesses or Persons the prosecution may or may not call as witnesses and their addresses, including production of the following:

      A.    Any written or recorded statements by these witnesses including those written or recorded statements of police officers;

      B.    Any memoranda reporting or summarizing statements of police officers;

      C.    Any memoranda reporting or summarizing oral statements by such witnesses.

3.    Any written or recorded statement or statements and the substance of any oral statements made by the accused or alleged Co-Conspirators indicted or unindicted, named or unnamed in the indictment, to include:

      A.    A List of Witnesses to the making and acknowledgment of such statements;

      B.    The time, place, and date of the making of such statements;

      C.    Any written or recorded memoranda containing the substance of any oral statements.

4.    Any transcript of the Grand Jury Minutes containing the testimony of the accused and testimony before the Grand Jury of those witnesses who may be called to testify before trial.  This is to include any transcription made of witness testimony that may be favorable to the defense.

**RFC  00490**

**PLAINTIFF'S TRIAL EXHIBIT 39**
**PAGE 2 OF 6**

5.   A list of all physical property that the State intends to use at the time of trial, including:

    A.   A list of all physical property in the possession of law enforcement officials;

    B.   Date and time the property was acquired;

    C.   Location from which the property was acquired;

    D.   What person or persons first took the property into their possession;

    E.   Reports made by law enforcement authorities pertaining to this property, including scientific reports, etc.;

    F.   That such property be made available to the defense for inspection before trial.

6.   Any reports or statements of experts made in connection with the particular case, including the results of physical or medical examination and of scientific tests, experiments or comparisons.

7.   Any books, papers, documents, photographs, or tangible objects which the prosecution intends to use in the hearing or trial or which were obtained from or belong to the accused.

8.   Prior criminal records of State's witnesses to be used for impeachment.

9.   Whether the prosecution intends to use certified copies of convictions of the accused for purposes of impeachment during trial and time and jurisdiction of such convictions.

**RFC  00491**

**PLAINTIFF'S TRIAL EXHIBIT 39**
**PAGE 3 OF 6**

10. That the prosecution disclose any evidence in its possession as to whether it will rely on prior acts or convictions of a similar nature for proof of knowledge, intent, or motive.

11. The names and addresses of the witnesses the State intends to call at the time of trial for identification of the Defendant as the perpetrator of the crime, including:

    A. Time, date, and place of identification confrontations;

    B. If photographic identification is used, production of any photos used, whether of Defendant or of the other persons;

    C. All persons present at such viewing;

    D. Any pictures taken of lineup, etc.;

    E. Names of any individuals who confronted the accused and made no identification or identified him for other crimes.

12. That the prosecution shall inform defense counsel of any electronic surveillance, including wiretapping, of conversations to which the accused was a party on his premises or that the prosecution intends to use on prosecution of a conspiracy.

13. That the prosecution inform defense counsel whether any evidence was acquired as a result of the execution of any legal process. If so, a copy of this to be supplied to the defense for purposes of inspection.

**RFC 00492**

**PLAINTIFF'S TRIAL EXHIBIT 39**
**PAGE 4 OF 6**

    A.   That the prosecution make available reports of any mental, physical, or psychological examinations administered to the Defendant.

    B.   That the prosecution make available any medical and hospital reports pertaining to the Defendant.

14.   That the prosecution disclose to the defense the names and addresses of any witness or witnesses that may bear with or be favorable to the defense. These witnesses to be clearly and separately identified on the List of Witnesses. The same disclosure is requested for any physical evidence or scientific evidence that might be or would be favorable to the defense.

15.   That the prosecution be ordered to compel any informants whom the State intends to keep the identity of a secret, to be brought to the Court any time, date, or place out of the presence of the Defendant and defense counsel to assert whether or not this informant does in fact exist.

16.   That the State make available relevant witnesses for the purpose of preserving testimony that may hereafter be made unavailable to include production of certain books, papers, documents, or tangible objects that may be under the control and possession of these witnesses.

WHEREFORE, the Defendant, JACQUES RIVERA, respectfully requests this Honorable Court to enter an order requiring the prosecution to respond to the aforesaid Motion For Discovery.

**RFC 00493**

**PLAINTIFF'S TRIAL EXHIBIT 39**
**PAGE 5 OF 6**

Respectfully submitted,

NICHOLAS A. De JOHN & ASSOCIATES, LTD.
Attorneys for Defendant

NICHOLAS A. De JOHN & ASSOCIATES, LTD.
Attorneys for Defendant Rivera
218 North Jefferson Street
Suite 200
Chicago, Illinois 60606
(312) 649-9500

**RFC 00494**

PLAINTIFF'S TRIAL EXHIBIT 39
PAGE 6 OF 6

# EXHIBIT 67

JR1377

STATE OF ILLINOIS)
                 )SS
COUNTY OF C O O K)

IN THE CIRCUIT COURT OF COOK COUNTY

COUNTY DEPARTMENT - CRIMINAL DIVISION

PEOPLE OF THE STATE OF ILLINOIS)
                VS.             )
                               )    NO. 88-15436
      Jacques Rivera           )
                               )
                               )
                               )
                               )
                               )
                               )

ANSWER TO DISCOVERY

TO. ATTORNEY OF RECORDS

    Now come the People of the State of Illinois, by their Attorney,
RICHARD M. DALEY, State's Attorney of Cook County, through his Assistant,
    Joy Peigen                    and answer the defendant's motion for pre-
trial discovery as follows:

1.    (a) BILL OF PARTICULARS:

            DATE: on or about   8/27/88

            TIME: approximately:  1545 hours

            LOCATION: at or near:  3324 W. Cortland

        (b) The physical description of the location of the occurrence
            is contained in the police reports tendered to the defense
            in open court.

2.      The people may or may not call the following persons as witnesses
        at the trial of this cause.

        Family of Felix Valentin      CPD
        Israel valentin               J. Fallon #5251        J. Boyle 6945
        1458 N. Campbell              R. Guevara 16345       T. Lazar 5355
        Orlando Lopez                 E. Crawford 15602
        3320 W. Cortland              S. Machain 7963
        Norwegian American            G. McLaughlin 8086
        Hospital Personnel            J. Leonard 5629
        Cook County                   D. Noon 5410
        Hospital Personnel            J. Guzman 8728
        Chicago Crime Lab             J. Sparks 14879
        Personnel                     P. Zachorias 15994
        D. Choi                       C. Letrich
                                      J. Moriarty 16633
        A.S.A. Rosner                 Wojcik 4408
        M. E. Swartz                  Vergara 14416
                                      S. Gawry 16899
                                      W. Borsch 4057
        Any and all other persons mentioned in the police reports.

PLAINTIFF'S TRIAL EXHIBIT 40
PAGE 1 OF 3

(2)

(2)     The following witnesses made written statements:

Written statements of witnesses, if any, have been tendered to the defense.

(b)     All memoranda reporting or summarizing oral statements made by witnesses are contained in the police reports tendered to the defense in court.

3.     The People may or may not call any and all persons listed in 2(a) as occurrence witnesses at the scene of the offense or at the time of arrest.

4.     (a)     Written or recorded statements of the defendant or co-defendant(s), if any, have been tendered to the defense in open court, under which it was made and the witnesses to the making or acknowledgment of the statement(s), are contained in the police reports, or felony review notes, tendered to the defense in open court.

(b)     Summaries of oral statements (a) of the defendant or co-defendant(s), if any, the date, time and place of such statement(s), and circumstances under which the statement(s) were made, and the witnesses present are contained in the police reports tendered to the defense in open court.

5.     The transcript of the Grand Jury minutes, if any, will be made available to the defense for inspection and copying upon being received by the People.

6.     (a)     The following articles; if any, may or may not be offered into evidence by the People at the time of the trial of this court.

        Photos, shell casings, hospital report, certified copies of conviction, protocol, bullets.

Any and all property mentioned in the police reports.

(b)     The date, time, and place of acquisition, the persons involved in the acquisition of the articles, and the circumstances are contained in the police reports tendered to the defense in open court.

(c)     The People will comply with all reasonable requests for inspection by the defense.

7.     Reports of experts, if any, made in connection with this particular case, including the results of physical or mental examinations, scientific tests, examinations and comparisons will be tendered to the defense upon being received by the People.

8.     Please see 6 (a) for any books, documents, photographs and tangible objects obtained from or which belonged to the defendant which the People may or may not use at the trial of this cause.

9.     The People have no knowledge at this time that any of its potential witnesses have any criminal convictions.

JR-L 010433

(3)

10. The People have no knowledge at this time that any personnel/witnesses have any criminal or civil actions involving the People of the State of Illinois pending now or at any time during the prosecution of the accused.

11. The People intend to use certified copies of all convictions of the defendant, if any exist, for purposes of impeachment during the trial of this cause. The nature of these convictions is available for inspection.

12. The People may or may not rely on the following prior acts or convictions of the defendant of a similar nature for proof of knowledge, intent, scheme, or design.

13. The dates, times, places, circumstances, results and persons present at any identification confrontations involved in this cause are contained in the police reports tendered to the defense in open court.

Any photographs available to the People which were used in connection with any photographic identification will be made available for inspection.

Any lineup photographs available to the People will be made available for inspection.

14. The People have no knowledge, at this time, that any other person was identified in this matter except as mentioned in the police reports.

15. The People have no knowledge, at this time, that any other person was identified in this matter except as mentioned in the police reports.

16. Please see paragraph 7 above.

17. No electronic surveillance was employed in connection with this cause.

18. Any evidence which was acquired by the execution of any legal process, whether a search warrant, arrest warrant or other process or court order, is listed in 6 (a) and in the police reports and other documents tendered to the defense in open court, if such process was used.

A copy of any legal process executed in connection with this cause will be available for inspection and copying if a copy is not in the court file.

19. The People are unaware of any evidence or witnesses which may be favorable to the defense in this cause.

20. No informant that the People intend to call as a witness in the trial of this cause exists.

21. The People will comply with lawful orders of court in this cause and will provide the defense with further evidence as investigation discloses.

RICHARD M. DALEY
State's Attorney of Cook County

BY: _____
Assistant State's Attorney

JR-L 010318

PLAINTIFF'S TRIAL EXHIBIT 40
PAGE 3 OF 3

# EXHIBIT 68

Identify and describe all property or positive evidence recovered at the end of the narrative in column form. Show exactly where found, when found, who found it and its description (include Property Inventory numbers). If property taken was verified for Operation Identification, indicate I.D. number at end of Narrative. Offender's approximate description, if possible, should include name if known, nickname, sex, race code, age, height, weight, color eyes & hair, complexion, scars, marks, etc. If suspect is arrested, give name, sex, race code, age, C.B. or I.R. number, if known, and state "In Custody."

## SUPPLEMENTARY REPORT
CHICAGO POLICE – FOR USE BY B.I.S. PERSONNEL ONLY

All descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

**DATE OF ORIG. OCCURRENCE-TIME**: DAY 27 MO. Aug YR. 1988 — 1565

| 1. OFFENSE/CLASSIFICATION LAST PREVIOUS REPORT | 14/UCR OFF. CODE | 2. ADDRESS OF ORIG. INCIDENT/OFFENSE | 3. BEAT OF OCCUR. |
|---|---|---|---|
| BATTERY/Aggravated Handgun | 041 A | (3320) W. Cortland | 1422 |

| 5. VICTIM'S NAME AS SHOWN ON CASE REPORT | | 6. FIRE RELATED | 7. BEAT ASSIGNED |
|---|---|---|---|
| VALENTIN, Felix | | | 5537 |

| 8. TYPE OF LOCATION OR PREMISE WHERE INCIDENT/OFFENSE OCCURRED | LOCATION CODE | 9. NO. OF VICTIMS | 10. NO. OF OFFENDERS |
|---|---|---|---|
| (ALLEY) | (092) | 1 | 2 |

Property: dna verified / T = TAKEN; R = RECOVERED

NARRATIVE

| | |
|---|---|
| Victim: | VALENTIN, Felix/16-05Jan■■/1458 N. Campbell 235-1821/ Student Diego School/CAMPBELL BOY |
| Wanted: | #1-M/WH/18-22/brn eyes/dk hair/black jean type jacket/dark pants/gym shoes |
| | #2-M/WH/18-22-no further description at this time (driver) |
| Injuries: | 10 GSW in back/2 exit wounds front chest 6 pellets lodged in chest cavity Critical Condition |
| Taken To: | Norwegian American Hospital where victim |

DNA ... DNA ... FIELD ... 652

| DATE THIS REPORT SUBMITTED | |
|---|---|
| Normal | 27 August 1988 2155 |

| REPORTING OFFICER (PRINT NAME) | STAR NO. | REPORTING OFFICER (PRINT NAME) | CC STAR NO. |
|---|---|---|---|
| Gillian McLaughlin | 8086 | John A. Leonard | 5629 |

28 AUG 1988

RFC 00507

PLAINTIFF'S TRIAL EXHIBIT 43A
1 of 29

Detective Division　　　　　　　　　Page 2　　　　　　　　27 August, 1988
Area 5 Violent Crimes　　　　　　　　　　　　　　　　　　　K 371 955

AGGRAVATED BATTERY/Handgun
VALENTIN, Felix

Taken To: cont.　　　　　　　　was stabilized and then transfered to Cook
　　　　　　　　　　　　　　　　County Hospital. Victim taken to Hospital
　　　　　　　　　　　　　　　　by brother, Israel. Dr. Perez treated victim
　　　　　　　　　　　　　　　　at Norwegian American Hospital.

Weapon:　　　　　　　　　　　　Unknown type handgun

Location:　　　　　　　　　　　ALLEY adjoining 3320-22 N. Cortland

Date & Time:　　　　　　　　　27 August, 1988/1545 hours

Weather & Lighting:　　　　　Overcast-Raining/Natural

Manner/Motive:　　　　　　　　Multiple Gun Shot Wounds/Gang Retaliation

Vehicle Used:　　　　　　　　　Older Model GM type car (medium-full size)
　　　　　　　　　　　　　　　　copper color

Evidence:　　　　　　　　　　　None at this time　(victim's car not processed)

Personnel Assigned:　　　　　M.B. 1413　P.O. E. Crawford　15602
　　　　　　　　　　　　　　　　　　　　　　P.O. S. Machain　　7963
　　　　　　　　　　　　　　　　M.B. 4629　GCSP D. Noon　　　　5410
　　　　　　　　　　　　　　　　　　　　　　GCSP J. Guzman　　　8728
　　　　　　　　　　　　　　　　M.B. 4626　GCSP J. Sparks　　14879
　　　　　　　　　　　　　　　　　　　　　　GCSP P. Zacharias 15994

Interviewed:　　　　　　　　　VALENTIN, Israel/1458 N. Campbell/235-1821
　　　　　　　　　　　　　　　　DOB 1 June ■/CAMPBELL BOYS

Investigation:　　　　　　　　On today's date at approximately 1715hrs, R/D's
　　　　　　　　　　　　　　　　received a radio assignment to go to Norwegian
　　　　　　　　　　　　　　　　American Hospital on a man shot. The undersigned
responded accordingly and upon arrival located beat personnel who informed R/D's that
they had been called to the hospital and had not been to the original scene. It should
be noted that an Evidence Tech was not called to the scene because the victim's car is
missing; Family members may have relocated car but this cannot be confirmed. The beat
personnel also indicated that the victim was in critical condition and unable to verba-
lize but was motioning yes and no to questions.

　　　　　　　　　　　　　　　　R/D's went into the emergency room and spoke with
　　　　　　　　　　　　　　　　Dr. Perez who informed R/D's that in his opinion,
　　　　　　　　　　　　　　　　the victim had ten (10) GSW in back; two (2)
exit wounds in chest (front left) and six (6) pellets remained in chest cavity. Dr.
Perez showed R/D's the X-Ray of victim and the pellets appeared in upper center chest
cavity. Dr. Perez further indicated that the victim had to be relocated to another
facility for further treatment due to the not-trauma status of Norwegian American Hospital.

RFC 00508

Detective Division                    Page 3                        27 August 1988
Area 5 Violent Crimes                                               K 371-955

AGGRAVATED BATTERY/Handgun
VALENTIN, Felix


Investigation:                        Dr. Perez further indicated that if the victim
                                      survived his injures he would most likely be
                                      paralyzed from the waist down.  The victim was
spoken to briefly concerning identification and number of offenders.  Victim indicated
by nodding  to simple questions.  Victim was transfered to Cook County Hospital where
he is presently undergoing surgery.

                                      R/D's then interviewed the brother of the victim
VALENTIN, Israel                      who stated in essance but not verbatim that on
                                      date and time of incident ISRAEL and victim had
driven to ISRAEL's girlfriends home (3320 N. Cortland) to pick her up in order to at-
tend a friend's wedding.  ISRAEL indicated that the victim was driving.  Upon arrival
at 3320 N. Cortland; ISRAEL exited the vehicle and went inside of same address.  A few
minutes later; not more than five (5), ISRAEL came back outside to the car.  As he ap-
proached the vehicle, ISRAEL noted that the victim was not visible.  ISRAEL then ascer-
tained that his brother had been shot.  ISRAEL indicated that ISRAEL did not hear any
gun shots and ISRAEL was on first floor apartment.  ISRAEL told his girlfriend to call
the police and ISRAEL pushed his way into the car and attempted to drive his brother:
to the hospital.  At approximately 1200-1300 N. Kedzie ISRAEL encountered a few parked
cars and was unable to transport his brother to the hospital (RD K875 233).  ISRAEL
abandoned the vehicle and an unknown citizen took ISRAEL and his brother to the hospital.
It should be noted that as of this time the victim's car has not been located to be
processed.


Investigation Continues..........


**RFC  00509**

Identify and describe all property or persons otherwise recovered at the end of the narrative in column form. Show exactly where found, when found, who found it and its description (include Property Inventory numbers). If property taken was scribed for Operation Identification, indicate I.D. number at end of Narrative. Offender's approximate description, if possible, should include name if known, nickname, sex, race code, age, height, weight, color eyes & hair, complexion, scars, marks, etc. If suspect is arrested, give name, sex, race code, age, C.B. or I.R. number, if known, and state "In Custody."

## SUPPLEMENTARY REPORT
### CHICAGO POLICE — FOR USE BY B.I.S. PERSONNEL ONLY

All descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

**4. DATE OF ORIG. OCCURRENCE-TIME** — DAY: 27  MO: Aug  YR: 1988  1545

| OFFENSE/CLASSIFICATION LAST PREVIOUS REPORT | I-UCR OFF. CODE | ADDRESS OF ORIG. INCIDENT/OFFENSE ☒1 VERIFIED ☐3 CORRECTED | BEAT OF OCCUR. |
|---|---|---|---|
| BATTERY/Aggravated  Handgun | 041 A | 3320 W. Cortland | 1422 |

VICTIM'S NAME AS SHOWN ON CASE REPORT: VALENTIN, Felix — CORRECT ☒1 YES ☐2 NO — IF NO, CORRECT ALL VICTIM INFORMATION IN BOXES 20 THROUGH 21 — FIRE RELATED ☐1 YES ☒2 NO — BEAT ASSIGNED 5537

TYPE OF LOCATION OR PREMISE WHERE INCIDENT/OFFENSE OCCURRED: Alley — LOCATION CODE 092 — NO. OF VICTIMS 1 — NO. OF OFFENDERS 2

| | OBJECT/WEAPON | FIREARM FEATURES | POINT ENTRY | POINT EXIT | BURGLAR ALARM | SAFE BURGLARY METHOD | IF RESIDENCE WHERE WERE OCCUP. |
|---|---|---|---|---|---|---|---|
| dna | | | | | | | |

PROPERTY (DESCRIBE PROPERTY IN NARRATIVE. T - TAKEN; R - RECOVERED) — FILL IN THE FULL AMOUNT OF ONLY THOSE VALUES WHICH EITHER DIFFER FROM OR WERE NOT REPORTED ON THE ORIGINAL CASE REPORT OR THE LAST PREVIOUS SUPPLEMENTARY REPORT.

| 1 MONEY | 2 JEWELRY | 3 FURS | 4 CLOTHING | 5 OFFICE EQUIPMENT | 6 TV, RADIO, STEREO |
|---|---|---|---|---|---|
| ☐T ☐R | ☐T ☐R | ☐T ☐R | ☐T ☐R | ☐T ☐R | ☐T ☐R |
| 7 HOUSEHOLD GOODS | 8 CONSUM. GOODS | 9 FIREARMS | 10 NARC./DANGEROUS DRUGS | 11 OTHER | 12 NONE |
| ☐T ☐R | ☐T ☐R | ☐T ☐R | ☐T ☐R | ☐T ☐R | ☐T ☐R |

| 20. NAME (LAST-FIRST-M.I.) | 21. I-UCR OFFENSE CODE | 22. HOME ADDRESS (NO., DIR., STREET, APT. NO.) | 23. SEX-RACE-AGE CODE | 24. HOME PHONE | 25. BUSINESS PHONE | 26. WILL/WON'T | 27. VICTIM REL. CODE |
|---|---|---|---|---|---|---|---|
| 1. | | | | | | | |
| 2. | | | | | | | |
| 3. | | | | | | | |

| 28. OFFENDER'S NAME (OR DESCRIBE CLOTHING, ETC.) | 29. HOME ADDRESS | 30. SEX-RACE-AGE CODE | HEIGHT | WEIGHT | EYES | HAIR | COMPL. |
|---|---|---|---|---|---|---|---|
| 1. | | | | | | | |
| 2. | | | | | | | |

| 31. C.B. NO. | I.R. NO., Y.D. NO. OR J.D.A. NO. | OFFENDER REL. CODE | C.B. NO. | I.R. NO., Y.D. NO. OR J.D.A. NO. | OFFENDER REL. CODE | ARREST UNIT NO. |
|---|---|---|---|---|---|---|
| OFF. 1 | | | OFF. 2 | | | |

| 32. OFF'S VEHICLE | YEAR | MAKE | BODY STYLE | COLOR | V.I.N. | STATE LICENSE NO. | STATE |
|---|---|---|---|---|---|---|---|
| ☐USED ☐STOLEN | | | | | | | |

33. SERIAL NOS. OR IDENTIFICATION NOS. ☒1 DNA ☐2 VERIFIED ☐3 CORRECTED — LIST ALL CORRECTIONS & NEW OR ADDITIONAL NOS. OBTAINED IN NARRATIVE

| 50. OFFENSE/CLASS. THIS DATE (IF SAME ENTER DNA) | REV. CODE | 51. METHOD CODE | 52. METHOD ASSIGNED | UNIT NO. | 53. STATUS |
|---|---|---|---|---|---|
| DNA | | DNA | ☒1 FIELD ☐3 SUMMARY | 652 | ☒2 PROGRESS ☐1 SUSPENDED ☐3 UNFOUNDED |

STATUS CONT'D. ☐3 CLRD. CLOSED  ☐4 CLRD. OPEN  5 EXC. CLRD. CLOSED  6 EXC. CLRD. OPEN  7 CLD. NON-CRIM. — 54. IF CASE CLEARED, HOW CLEARED ☐1 ARREST & PROSEC. ☐2 DIRECTED TO JUV. CRT. ☐3 COMPL. REFUSED TO PROSECUTE ☐4 COMMUNITY ADJUSTMENT ☐5 OTHER EXCEPT. ☐ADULT ☐JUV.

55. ☐ FOR SUMMARY CASES ONLY — THE ORIGINAL CASE REPORT IS SUBSTANTIALLY CORRECT, AND CONTACT WITH THE VICTIM HAS DISCLOSED NO ADDITIONAL PERTINENT INFORMATION.

**80. NARRATIVE**

In Custody: RIVERA, Jacques/M-WH-30Apr█/AKA-ACE/4238 W.
Division/5'10/180/brn/brn/med/Employed:
Humboldt Park Inst-Maintenance  IR#614 010
CB# 8101-323

RODRIGUEZ, Jose Antonio/AKA-Chequin/2040 N.
Spaulding 1st South/5'10/120/brn/blk/light
IR# 861-858  CB# 8101-405

Arresting Officers:  RIVERA:  Det. John Leonard  5629
Det. G. McLaughlin  8086
GCSP R. Guevara  16345
GCSP J. Fallon  5351
GCSP J. Sparks  14879
GCSP P. Zacharias  15994

| 90. EXTRA COPIES REQUIRED (NO. & RECIPIENT) | 91. DATE THIS REPORT SUBMITTED — DAY / MO. / YR. | TIME | 92. SUPERVISOR APPROVING (PRINT NAME) | STAR NO. |
|---|---|---|---|---|
| Normal | 1 Sept 1988 | 0100 | | 2073 |

93. REPORTING OFFICER (PRINT NAME): Gillian McLaughlin  STAR NO. 8086 — 94. REPORTING OFFICER (PRINT NAME): John Leonard  STAR NO. 5629

Approved 02 SEP 1988  1700

RFC 00510

PLAINTIFF'S TRIAL EXHIBIT 43A
4 of 29

Detective Division               Page 2                                 1 Sept, 1988
Area 5 Violent Crimes                                               K 371 955

AGGRAVATED BATTERY/Handgun
VALENTIN, Felix

Arresting Officers:                    RODRIGUEZ:  P.O. LETRICH 6198  014
                                                P.O. MORIARITY 16633 014
                                                P.O. VERGARA  14416 014
                                              P.O. WOJCIK    4408 014

Date, Time & Location of Arrest:      RIVERA:     30 Aug, 1988/2300/3300 N. Beach

                                      RODRIGUEZ:  31 Aug, 1988/0100/2040 N. Spaulding

Evidence:                             544008 (652)  Photos

Investigation:                     The undersigned detectives were assigned to the continuing investigation of the above captioned incident. Efforts to locate suspect RIVERA, Jose were successful and subject was taken into custody, advised of his Miranda Warnings and transported to Area 5. Due to the lateness of the hour, the parents of the witness indicated that the daytime hours would be better for viewing of a line-up. In light of this fact, a hold was placed on RIVERA for line-up purposes.

The undersigned had been informed that another suspect was in custody (014) and hold papers had been placed on that subject, RODRIGUEZ, by 1st watch personnel in order to have witness view RODRIGUEZ in line-up. The lateness of the hour also prevented an interview with victim who is in surgicial intensive care.

On today's date, attempts were made to locate the eye witness, LOPEZ, Orlondo, in order to have subject view a line-np. Numerous visits to witnesses residence proved negative and family indicated that they were unaware of his whereabouts but that subject may have been visiting his father, address unknown. R/D's went to Cook County Hospital and attempted to converse with victim; Verbal communication was next to impossible due to ventilator hook up through mouth and throat. Victim appeared to understand questions of a yes and no nature. R/D's inquired of the physcians staff if photos could be shown to victim and staff indicated yes but that the victim is regularly medicated, and response would be dependent of that medication. R/D's returned to Area Five and requested 014 personnel to locate persons fitting description of both in-custody suspects to produce a photo spread for purposes of victim identification if possible at this time.

R/D's rerurned to Cook County Hospital with six photos (Inv. #544-008 652). It should be noted that the photos were numbered from one to six but the were not shown numerically to the victim. The victim does not have use of his limbs and is basically paralyzed from the neck down. Therefore photos were individually held for victim to view (random order). As photo's were being shown to victim it appeared

-3 SEP 1988  11 26



**RFC 00511**

PLAINTIFF'S TRIAL EXHIBIT 43A
5 of 29

Detective Division          Page 3          1 Sept., 1988
Area 5 Violent Crimes          K 371 955

AGGRAVATED BATTERY/Handgun
VALENTIN, Felix

Investigation Cont.:          that the victim was having a difficult time focusing of the photos. Victims eyes were constantly tearing and R/D's inquired of the staff of victim's medication at the time. R/D's learned that victim had been placed on a morphine drip for the pain. It should also be noted that the victim was in constant motion (side to side) as the whole bed moved to help keep lungs from filling with fluid staff indicated that victim presently in danger of contracting pneumonia. It was then decided to cease the photo identification until later in the week; when the physcian indicated that the tubes would be removed from victim's throat.

The following is the numerical order and names of subjects in photos.

#1   VILLAFANE, Angel/M-WH/23   21July█ / 1619 N. California

#2   OLIVERO, Carlos/M-WH/18   14Ma█ / 2478 N. Albany

#3   RIVERA, Jacques/M/WH/23   30Apr█ / 4238 W. Division

#4   RUIZ, George/M-WH/19   28Jar█ / 2453 N. Francisco

#5   RAMON, Lopez/M-WH/20   22Sep█ / 1424 N. Washtenaw

#6   RODRIGUEZ, Jose/M-WH/23   30Apr█ / 2040 N. Spaulding

Due to the above facts and circumstances both subjects were released. This investigation continues........



RFC 00512

PLAINTIFF'S TRIAL EXHIBIT 43A
6 of 29

Identify and describe all property or passive evidence recovered at the end of the Narrative in column forth. Show exactly where found, what found, who found it and its description (include Property Inventory any numbers). If property taken was scribed for Operation Identification, indicate I.D. number at end of Narrative. Offender's approximate description, if possible, should include name if known, nickname, sex, race code, age, height, weight, color eyes & hair, complexion, scars, marks, etc. If suspect is arrested, give name, sex, race code, age, C.S. or I.R. number, if known, and state "In Custody."

## SUPPLEMENTARY REPORT
### CHICAGO POLICE — FOR USE BY B.I.S. PERSONNEL ONLY

All descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

4. DATE OF ORIG. OCCURRENCE–TIME: DAY 27 MO. Aug YR. 1988  1565

| 1. OFFENSE/CLASSIFICATION LAST PREVIOUS REPORT | I UCR OFF. CODE | 7. ADDRESS OF ORIG. INCIDENT/OFFENSE XX VERIFIED ☐ 2 CORRECTED | 3. BEAT OF OCCUR. |
|---|---|---|---|
| BATTERY/Aggravated Handgun | 041 A | 3320 W. Cortland | 1422 |

| 5. VICTIM'S NAME AS SHOWN ON CASE REPORT | CORRECT ☒1 YES ☐2 NO | IF NO, CORRECT ALL VICTIM INFORMATION IN BOXES 20 THROUGH 27. | 6. RRE RELATED ☐1 YES ☒2 NO | 7. BEAT ASSIGNED 5537 |
|---|---|---|---|---|
| VALENTIN, Felix | | | | |

| 8. TYPE OF LOCATION OR PREMISE WHERE INCIDENT/OFFENSE OCCURRED | LOCATION CODE | 9. NO. OF VICTIMS | 10. NO. OF OFFENDERS |
|---|---|---|---|
| ALLEY | 092 | 1 | 2 |

NARRATIVE:

| | | |
|---|---|---|
| Wanted for Questioning: | RIOS, Jose/M-WH/24-30Apr█/IR 614 010 LKA 4448 W. Cortez,Nickname "Ace". AKA RIVERA, Jaques. | |
| Evidence: | 5 Recovered .22 cal shell casings at mouth of alley (524 226 CL) Photos of Scene Photos of Victim's Vehicle | |
| Personnel Assigned: | M.B. 9601 Tech D. Keating #8788 Tech J. McDonald #6989 M.B. 5537 Det. J. Leonard #5629 Det. G. McLaughlin #8086 | |
| Interviewed: | LOPEZ, Orlondo/M-WH-3320 W. Cortland N/P-12-17May█/Student Mozart School | |

| 95. EXTRA COPIES REQUIRED (NO. & RECIPIENT) | 96. DATE THIS REPORT SUBMITTED | TIME | 93. SUPERVISOR APPROVING (PRINT NAME) | STAR NO. |
|---|---|---|---|---|
| Normal | DAY 29 MO. Aug YR. 1988 | 2355 | | 73 |

| 91. REPORTING OFFICER (PRINT NAME) | STAR NO. | 94. REPORTING OFFICER (PRINT NAME) | STAR NO. |
|---|---|---|---|
| Gillian McLaughlin 8086 | | John Leonard | 5629 |

SIGNATURE: John Leonard

29 AUG 1988  1532

K 371 955

RFC 00513

PLAINTIFF'S TRIAL EXHIBIT 43A
7 of 29

Detective Division              Page 2                          29 August, 1988
Area 5 Violent Crimes                                         K 371 955

BATTERY/Aggravated handgun
VALENTIN, Felix

Victim's Vehicle:                 1973 MAZDA 2 Door Sedan Red in Color Ser #
S124A162930 Bearing No License/Relocated after
accident via towtruck to vacant lot at Wabansia
Washtenaw.

Investigation:                   The undersigned detectives, in continuation of
the investigation of the above captioned incident;
interviewed an eye-witness who stated in essance

LOPEZ, Orlondo                but not verbatim that on date and time of this
incident; LOPEZ was coming from the store at corner
of Kimball and Cortland. LOPEZ observed a copper colored GM-type car coming out of the
alley, traveling northbound at approximately 3319 W. Cortland. The vehicle turned east-
bound on Cortland and stopped at approximately 3311 W. Cortland. LOPEZ indicated that
said vehicle contained 2 M/WH's one of whom exited from the passenger's side of the
vehicle and began to walk toward 3320 W. Cortland where the victim was seated behind
the wheel of his vehicle. Suddenly, the M/WH began to run toward vehicle and LOPEZ
noticed a gun in M/WH's hand. LOPEZ believed he heard three (3) shots but indicated
that they were not very loud. LOPEZ indicated that LOPEZ saw the victim lean forward
and to the right in the vehicle which victim had been seated.

LOPEZ informed R/D's that LOPEZ could identify
the shooter because LOPEZ recognized the shooter
as a M/WH who played baseball at Humboldt Park
and LOPEZ had observed him there on a few occassions. LOPEZ did not know shooters
name but was aware that shooter was affiliated with the Latin Kings. LOPEZ then viewed
books and made an identification of one RIOS, Jose (16-D LATIN KING Page 40-D) as the
M/WH who exited the copper car and shot the victim. At this time there is no identifi-
cation of the driver.

The scene was processed by 9601 and five (5)
.22 cal shell casings were found and photographs
were taken. The victim's car was photographed
at Wabansia and Washtenaw where it had been relocated after the accident. A canvass
of the 3322 W. Cortland occupants on 1st, 2nd and 3rd floors revealed negative results.
3300-3318 W. Cortland is an abandoned building. 3301-3319 W. Cortland is a vacant lot.
The residents at 3321 W. Cortland heard and saw nothing.

An active search of the suspect shooter is being
undertaken by R/D's and GCSP. This investigation
continues.......

RFC 00514

PLAINTIFF'S TRIAL EXHIBIT 43A
8 of 29

## SUPPLEMENTARY REPORT

**CHICAGO POLICE**

| | |
|---|---|
| | 27 Aug 88  1545 |

| INC/SENT OFFENSE CLASSIFICATION LAST PREVIOUS REPORT | IUCR OFF. CODE | ADDRESS OF ORIG. INCIDENT/OFFENSE | VERIFIED | CORRECTED | BEAT OF OCCUR. |
|---|---|---|---|---|---|
| BATTERY:Aggravated,Handgun | 041A | 3324 W. Cortland | | | 1422 |

| VICTIM'S/SUBJECT'S NAME AS SHOWN ON LAST PREVIOUS REPORT | | CORRECT | FIRE RELATED | BEAT ASSIGNED |
|---|---|---|---|---|
| VALENTIN, Felix | | YES ☒ NO ☐ | YES ☐ NO ☒ | 1464B |

| VICTIM'S/SUBJECT'S ADDRESS | TYPE OF LOCATION OR PREMISE WHERE INCIDENT/OFFENSE OCCURRED | LOCATION CODE |
|---|---|---|
| 1458 N. Campbell | Street | 304 |

**PROPERTY** — DESCRIBE PROPERTY IN NARRATIVE (T=TAKEN; R=RECOVERED)

| 1. MONEY | 2. JEWELRY | 3. FURS | 4. CLOTHING | 7. OFFICE EQUIPMENT | 8. TV, RADIO, STEREO | PROPERTY INVENTORY NO(S). |
|---|---|---|---|---|---|---|
| ☐T | ☐T | ☐T | ☐T | ☐T | ☐T | |
| ☐R | ☐R | ☐R | ☐R | ☐R | ☐R | |
| 5. HOUSEHOLD GOODS | 6. CONSUM. GOODS | 14. FIREARMS | 6. NARC./DANGEROUS DRUGS | 5. OTHER | 6. NONE | |
| ☐T | ☐T | ☐T | ☐T | ☐T | ☐T | |
| ☐R | ☐R | ☐R | ☐R | ☐R | ☐R | |

**OFFENDERS**

| 11. OFFENDER'S NAME (OR DESCRIBE CLOTHING, ETC.) | 12. HOME ADDRESS | | 13. SEX-RACE-AGE CODE | HEIGHT | WEIGHT | EYES | HAIR | COMPL. |
|---|---|---|---|---|---|---|---|---|
| 1. RODRIGUEZ,Jose | 2040 N. Spaulding | 1st | M/4/22 | 5-10 | 120 | Brn | Blk | Lt |
| 2. NIEVES,Felipe | Unk | | M/4/24 | 5-06 | 150 | Brn | Brn | Lt |

| 14. C.B. NO. | I.R. NO. V.D. NO. OR I.D.A. NO. | OFFENDER REL. CODE | C.B. NO. | I.R. NO. V.D. NO. OR I.D.A. NO. | OFFENDER REL. CODE 15. NO. | ARREST. UNIT NO. |
|---|---|---|---|---|---|---|
| OFF. 1 8101-405 | | 024 OFF. 2 | | | 1 | 1464B |

| 16. OFF'S VEHICLE | YEAR | MAKE | BODY STYLE | COLOR | V.I.N. | STATE LICENSE NO. | STATE |
|---|---|---|---|---|---|---|---|
| ☐USED ☐STOLEN Unk | | Toyota | 2dr | Brn | UNK | UNK | |

**NARRATIVE**

IN SUMMARY: R/O's had occassion to interview above victim regarding above RD#. Victim related that the person who shot him and the driver were members of the Imperial Gangster street gang. R/O's returned to show the victim the Imperial Gangster photo album. Above victim picked out offender#1 as the person who shot him and offender#2 as the driver of the vehicle used. Offender#1 taken into custody,advised rights per Miranda in Spanish and English and processed in 014. Victim interviewed at Cook County Hospital.

Additional Arresting Ofcrs:WOJCIK#4408,VERGARA#14416

| | | TIME | |
|---|---|---|---|
| 91. DATE THIS REPORT SUBMITTED 31 Aug 88 | | 0230 | 92. SUPERVISOR APPROVING (PRINT NAME) 1622 |
| 90. REPORTING OFFICER (PRINT NAME) C.LEIRICH  STAR NO. 6198 | 94. REPORTING OFFICER (PRINT NAME) J.MORIARTY  STAR NO. 16633 | | |
| SIGNATURE | SIGNATURE | | DATE APPROVED DAY-MO-YRA 31 AUG 88  TIME 1730 |

FPD 11.411-A (REV. 8/85)  *MUST BE COMPLETED IN ALL CASES

RFC 00515

PLAINTIFF'S TRIAL EXHIBIT 43A
9 of 29

**SUPPLEMENTARY REPORT**

27 Aug 88  1545

| | | | |
|---|---|---|---|
| 1 INCIDENT/OFFENSE CLASSIFICATION LAST PREVIOUS REPORT | IUCR OFF. CODE | ADDRESS OF ORIG. INCIDENT/OFFENSE | SEAT OF OCCUR. |
| Murder/Homicide | 0110 | 3320 W. Cortland | 1422 |

VICTIM/SUBJECT'S NAME AS SHOWN ON LAST PREVIOUS REPORT: VALENTIN, Felix   CORRECT X yes □ no   FIRE RELATED □ yes X no   SEAT ASSIGNED 4627

VICTIM/SUBJECT'S ADDRESS: 1458 N. Campbell   TYPE OF LOCATION: Alley   LOCATION CODE 092

| 11. OFFENDER'S NAME (OR DESCRIBE CLOTHING, ETC.) | 12. HOME ADDRESS | SEX-RACE-AGE CODE | HEIGHT | WEIGHT | EYES | HAIR | COMPL. |
|---|---|---|---|---|---|---|---|
| RIVERA, Jacquez | 4231 W. Division | M 4 23 | 5-9 | 160 | Br | Br | Med |

| 14. C.B. NO. | I.R. NO. Y.D. NO. OR J.D.A. NO. | OFFENDER FBI. CODE | C.B. NO. |
|---|---|---|---|
| 8112-639 | 614010 | 24 | |

**NARRATIVE**

VICTIM: VALENTIN, Felix; M/WH/16; 1458 N. Campbell 3 rd. flr.

Deceased, former member of the Campbell Boys/014

DATE, TIME, LOC. OF INC: 27 Aug 88; 1545 hrs.; 3320 W. Cortland, Alley

DATE, TIME, LOC. OF ARREST: 15 Sep 88; 1930 hrs.; 5555 W. Grand, A/5 VC

OFFENDER: RIVERA, Jacquez; M/WH/23; 30 Apr ■; 5-9, 160;

AKA. RIOS, Jose; 4231 W. Division 3rd. flr.

nickname, ACE; member of Latin Kings/014

CHARGES: Murder 1st. Degree; 38-9-1a

COURT DATE & BRANCH: 16 Sep 88; 66-2

INVESTIGATION: Reporting officers along with other Gang Crime

Specialists were investigating an Aggravated

Battery in which the victim was shot ten times. GCSp. Noon, Guzman, Sparks,

and Zacharias located a witness on 29 Aug 88. This witness was brought

into Gang Crimes North to view gang photo books. On that date witness

positively identified the photo of Jose RIOS from book 16-D, page 40

DATE THIS REPORT SUBMITTED: 16 Sep 88   TIME 0030   Sgt. Mingey 1731

REPORTING OFFICER: GCSp. S. Gawrys 16899   REPORTING OFFICER: GCSp. R. Guevara 16345   16 Sep 88   0030

K-371955

RFC 00516

PLAINTIFF'S TRIAL EXHIBIT 43A
10 of 29

CONTINUATION OF NARRATIVE

INVESTIGATION CON'T: photo D, Latin King gang book. Numerous attempts were made to interview the victim at Cook County Hospital, on 10 Sep 88 r/i's were able to have victim view gang photo book were then an idetification was made of Jose RIOS as the person that shot victim.

On 15 Sep 88, reporting officers located Jose RIOS, AKA. RIVERA, Jaqcuez on the street and he was asked to accompany r/o's to A/5 VC to stand in a line-up for Murder. Subject agreed and he was read his Miranda warnings.

Once in A/5 VC Jose RIOS was placed in a line-up and he was positively identified as the person that shot the victim Felix VALENTIN on 27 Aug 88. Review by A.S.A. Rosner with witness, charges of 1st. Degree Murder were approved.

Orlando LOPEZ, witness, was shown photos of Jose RODRIQUEZ and Felipe NIEVES and he stated to r/i's that these two individuals were not involved in this incident.

6S    51 0C51 d3S 91

R.D. NO. K-371955

I HAVE REVIEWED THIS REPORT AND BY MY SIGNATURE INDICATE THAT IT IS ACCEPTABLE    SIGNATURE    STAR NO.    DATE (DAY, MO, YEAR)

RFC 00517

PLAINTIFF'S TRIAL EXHIBIT 43A
11 of 29

Identify and describe all property or persons reasonably recovered at the end of the narrative in column form, show exactly where found, when found, who found it and its disposition (include Property inventory numbers). If property taken was scribed for Operation Identification, indicate I.D. number at end of Narrative. Offender's approximate description, if possible, should include name if known, nickname, streetname code, age, height, weight, color eyes & hair, complexion, scars, marks, etc. If suspect is arrested, give name, sex, race code, age, C.B. or I.R. number, if known, and state "In Custody."

## SUPPLEMENTARY REPORT
### CHICAGO POLICE - FOR USE BY B.I.S. PERSONNEL ONLY

All descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

4. DATE OF ORIG. OCCURRENCE-TIME
DAY NO. YR.
27 AUGUST 1988 1545

| 1. OFFENSE/CLASSIFICATION LAST PREVIOUS REPORT | 1 MJOR OFF. CODE | 3. ADDRESS OF ORIG. INCIDENT/OFFENSE □ VERIFIED □ 2 CORRECTED | 5. BEAT OF OCCUR. |
|---|---|---|---|
| (BATTERY/AGGRAVATED HAND GUN) | (041 A ) | 3320 W Cortland | 1422 |

| 5. VICTIM'S NAME AS SHOWN ON CASE REPORT | I CORRECT ☒ YES □ 2 NO | IF NO, CORRECT ALL VICTIM INFOR- MATION IN BOXES 20 THROUGH 21. | 6. FIRE RELATED □ 1 YES ☒ NO | 7. BEAT ASSIGNED |
|---|---|---|---|---|
| VALENTIN, Felix | | | | 5548 |

| 8. TYPE OF LOCATION OR PREMISE WHERE INCIDENT/OFFENSE OCCURRED | I LOCATION CODE | 9. NO. OF VICTIMS | 10. NO. OF OFFENDERS |
|---|---|---|---|
| ALLEY | 092 | 1 | 2 |

| | 12. OBJECT/WEAPON | 13. FIREARM FEATURES | 14. POINT/ENTRY | 15. POINT/EXIT | 16. BURGLAR ALARM | 17. SAFE BURGLARY METHOD | 18. IF RESIDENCE WHERE WAS OCCUR. |
|---|---|---|---|---|---|---|---|
| □ UPDATE | CODE NO. | CODE NO. | CODE NO. | CODE NO. | CODE NO. | CODE | CODE NO. |

DESCRIBE PROPERTY IN NARRATIVE. T = TAKEN R = RECOVERED

FILL IN THE FULL AMOUNT OF ONLY THOSE VALUES WHICH EITHER DIFFER FROM OR WERE NOT REPORTED ON THE ORIGINAL CASE REPORT OR THE LAST PREVIOUS SUPPLEMENTARY REPORT.

| | 1 MONEY | 3 JEWELRY | 5 FURS | 6 CLOTHING | 7 OFFICE EQUIPMENT | 8 TV, RADIO, STEREO |
|---|---|---|---|---|---|---|
| VERIFIED DNA | □ T $ □ R | □ T $ □ R | □ T $ □ R | □ T $ □ R | □ T $ □ R | □ T $ □ R |
| UPDATE TO | 9 HOUSEHOLD GOODS □ T $ □ R | 10 CONSUM. GOODS □ T $ □ R | 11 FIREARMS □ T $ □ R | 12 NARC./DANGEROUS DRUGS □ T $ □ R | 13 OTHER □ T $ □ R | 14 NONE □ T □ R |

| 20. NAME (LAST-FIRST-M.I.) | 21. JUER OFFENSE CODE | 22. HOME ADDRESS (NO., DIR., STREET, APT. NO.) | 23. SEX-RACE-AGE CODE | 24. HOME PHONE | 25. BUSINESS PHONE | 26. IN CUST. YES NO | 27. VICTIM PREV. CODE |
|---|---|---|---|---|---|---|---|
| 1. | | | | | | | |
| 2. | | | | | | | |
| 3. | | | | | | | |

| 28 OFFENDER'S NAME (OR DESCRIBE CLOTHING, ETC.) | 29. HOME ADDRESS | 30. SEX-RACE-AGE CODE | HEIGHT | WEIGHT | EYES | HAIR | COMPL. |
|---|---|---|---|---|---|---|---|
| 1. RIVERA, JACQUES | 4231 W Division | M WH 23 | 5'10 | 175 | brn | brn | olive |
| 2. | | | | | | | |

| 31. C.B. NO. | 13. NO., Y.D. NO. OR J.D.A. NO. | I OFFENDER IREL CODE | C.B. NO. | 13. NO., Y.D. NO. OR J.D.A. NO. | I OFFENDER REL. CODE | 33. NO. ARREST/UNIT NO. |
|---|---|---|---|---|---|---|
| OFF. 1 8112-639 | 614010 | 24 | OFF. 2 | | | |

| 33. OFF'S. VEHICLE | YEAR | MAKE | I BODY STYLE | COLOR | V.I.N. | STATE LICENSE NO. | STATE |
|---|---|---|---|---|---|---|---|
| □ USED □ STOLEN | | | | | | | |

| 34. SERIAL NOS. OR IDENTIFICATION NOS. □ 1 DNA □ 2 VERIFIED □ 3 CORRECTED | LIST ALL CORRECTIONS & NEW OR ADDITIONAL NOS. OBTAINED IN NARRATIVE |
|---|---|

| 50. OFFENSE/CLASS. THIS DATE OF SAME ENTER DNAJ | I REV. CODE | 51. METHOD CODE | 52. METHOD ASSIGNED | + UNIT NO. | 53. STATUS |
|---|---|---|---|---|---|
| HOMICIDE/1st Degree | 0110 | DNA | ☒ FIELD □ 3 SUMMARY | 652 | □ 0 PROGRESS □ 1 SUSPENDED □ 2 UNFOUNDED |

STATUS CONT'D.

| □ 3 CLRD. CLOSED | ☒ 4 CLRD. OPEN | □ CLRD. CLOSED | □ CLRD. OPEN | □ NON-CRIM. | 54. IF CASE CLEARED, HOW CLEARED □ 1 ARREST & PROSEC. □ 2 DIRECTED TO JUV. CRT. □ 3 COMPL. RFUSD. TO PROSECUTE □ 4 COMMUNITY ADJUSTMENT □ 5 OTHER EXCEPT. □ ADULT □ JUV. |

55. □ FOR SUMMARY CASES ONLY - THE ORIGINAL CASE REPORT IS SUBSTANTIALLY CORRECT, AND CONTACT WITH THE VICTIM HAS DISCLOSED NO ADDITIONAL PERTINENT INFORMATION.

60. NARRATIVE

FIELD INVESTIGATION/ CLEARED by ARREST, OPEN

IN CUSTODY: RIVERA, Jacquez nm1 M/WH/age 23, dob: 30 Ap▮▮

4231 W. Division, 5'9, 160 lbs, brown eyes,

brown hair, IR# 614010   CB# 8112-639.

ARRESTING OFFICERS: Det. William Dorsch #4257   Area Five Violent Crimes

Det. John Boyle #6945                       "

GCSp. R. Guevara #16345    Gang Crimes North

GCSp. S. Gawrys #16899                       "

| 90. EXTRA COPIES REQUIRED (NO. & RECIPIENT) | 91. DATE THIS REPORT SUBMITTED DAY MO. YR. | TIME | 92. SUPERVISOR APPROVING (PRINT NAME) | STAR NO. |
|---|---|---|---|---|
| nomeal | 151 Sept 88 | 2300 | SGT. R. WEINGART | #865 |

| 93. REPORTING OFFICER (PRINT NAME) | STAR NO. | 94. REPORTING OFFICER (PRINT NAME) | STAR NO. | SIGNATURE |
|---|---|---|---|---|
| Det. W. Dorsch | 4257 | Det. J. Boyle | 6945 | |

| 95. DATE APPROVED (DAY-MO.-YR.) | TIME |
|---|---|
| 16 SEP 1988 | 2100 |

K 371-955

CRC □ 228

RFC 00518

PLAINTIFF'S TRIAL EXHIBIT 43A
12 of 29

Detective Division
Area Five Violent Crimes

15 September 1988
RD# K 371-955

page two

Date, Time & Location of Arrest:    15 Sept 88 at 1930 hrs, 5555 W. Grand.

Charges, Ct. Branch & Date:    Murder, Chapter 38-9-1a to appear in
Branch 66 on 16 Sept 88.

Injuries:    Multiple gun shot wounds to upper body.
(see attached supplementary report)
Cook County Hospital notified this office
on 14 Sept 88 that the victim in this
incident had been pronounced dead at
1156 hrs by Dr. SHARKEY from multiple
gun shot wounds.

Notifications:    Medical Examiner Swartz ME# Sept 300
ASA Rosner
Sgt. Christian , Area Five Youth

Re-Interviewed:    LOPEZ, Orlando M/WH/age 12, dob 17 May ▮
3320 W. Cortland, ph# 235-8434
student at Mozart School.

Investigation:    The undersigned reporting detectives
were assigned by Sgt. RINALDI #2073
of Area Five Violent Crimes to continue into the investigation related to RD#K 371-955
upon learning that the victim in this incident had died as a result of the multiple
gun shot wounds that he received on 27 August 1988.

Upon reviewing the case file the R/S's
contacted Gang Crimes North to notify them of the death of the victim and request
there assistance in locating the offenders in this incident along with known witnesses.

On 15 Sept 88 the subject known as
Jacques RIVERA was located and requested that he accompany us into Area Five to
continue this investigation. He agreed to do so and was brought into Area Five by
GCSp Guevara and Gawrys. Upon his arrival he was informed that the victim in this
incident had died of his wounds and that it was necessary to speak with him further
and request that he participate in a line up. He agreed to cooperate and was allowed
to wait in an interview room until the arrival of a witness to this incident could
arrive to view a line up.

At app 1915 hrs a line up was conducted
and the subject Jacques RIVERA was positively identified as the person who while armed
with a handgun had shot the victim numerous times. At this time he was notified of
the charges against him and advised of his rights per Miranda to which he replied
that he understood. He was asked if he wanted to cooperate further in  this
investigation at which time he stated that he wanted to speak to his lawyer. At this
time all questioning ceased.

RFC 00519

PLAINTIFF'S TRIAL EXHIBIT 43A
13 of 29

Detective Division                                    15 September 1988
Area Five Violent Crimes                              RD# K 371-955

                              page three

Investigation Con't:        ASA Julie ROSNER was notified and responded to
                            Area Five. Upon reviewing the file and interviewing
                            the witness and police officers the charge of
                            MURDER was approved against the subject, Jacques
                            RIVERA.

                            Do to the fact that charges for Murder have been
approved the undersigned requests that this case be classified as CLEARED, OPEN.


Det. William Dorsch #4257

Det. John Boyle #6945


RFC 00520

PLAINTIFF'S TRIAL EXHIBIT 43A
14 of 29

**SUPPLEMENTARY REPORT**
CHICAGO POLICE – FOR USE BY B.I.S. PERSONNEL ONLY

4. DATE OF ORIG. OCCURRENCE–TIME
27 AUGUST 1988 1545

1. OFFENSE/CLASSIFICATION LAST PREVIOUS REPORT: HOMICIDE/ 1st DEGREE

IUCR OFF. CODE: 0110

2. ADDRESS OF ORIG. INCIDENT/OFFENSE: 3320 W Cortland

5. BEAT OF OCCUR: 1422

5. VICTIM'S NAME AS SHOWN ON CASE REPORT: VALENTIN, FELIX

8. TYPE OF LOCATION OR PREMISE WHERE INCIDENT/OFFENSE OCCURRED: ALLEY

LOCATION CODE: 092

9. NO. OF VICTIMS: 1

10. NO. OF OFFENDERS: 2

---

60. NARRATIVE

THIS IS A LINE UP REPORT

DATE TIME & LOCATION OF LINE UP:   15 September 1988, 1915 hours, Area Five Violent Crimes Office

PHOTOGRAPHER:   P.O. John Miller # 5482  UNIT # 650

R.D. #:   K 371 955

PERSONS CONDUCTING LINE UP   Det William Dorsch #4257

Det John Boyle #6945

CONTINUED ON PAGE TWO

60. EXTRA COPIES REQUIRED IND. & RECIPIENT: NORMAL

61. DATE THIS REPORT SUBMITTED: 15 SEPTEMBER 1988   TIME 2030

62. SUPERVISOR APPROVING (PRINT NAME): SGT. R. WEINGART   STAR NO. #865

63. REPORTING OFFICER (PRINT NAME): Det. John Boyle   STAR NO. 6945

64. REPORTING OFFICER (PRINT NAME): Det. William Dorsch   STAR NO. 4257

65. DATE APPROVED: 16 SEP 1988   TIME 2/00

RFC 00521

PLAINTIFF'S TRIAL EXHIBIT 43A
15 of 29

```
DETECTIVE DIVISION                          RD #  K 371   955
AREA FIVE VIOLENT CRIMES                     15 SEPTEMBER  1988

HOMICIDE/1st DEGREE MURDER
VALENTIN, FELIX
```

PAGE TWO

PERSONS PRESENT DURING LINE UP:
1. Det. William Dorsch #4257 Area Five Violent Crimes
2. Det. John Boyle #6945 Area Five Violent Crimes

3. GCSP. Ray Guevara #16345 Gang Crimes North
4. GCSP. Steve.Gawrys # 16899 Gang Crimes North

PERSONS VIEWING LINE UP:
1. Orlando LOPEZ  RD# K 371 955

PERSONS PARTICIPATING IN LINE UP:
1. SANCHEZ, Santiago M/WH/19 12 May ▮ Volunteer.

2. CRUZ, Efram M/WH/20 26 March ▮ Volunteer

3. RIVERA, Jacques M/WH/23 5'9" ▮ CB#

4. TORRES, Felix M/WH/22 29 October ▮ Volunteer

5. DELGADO, Israel M/WH/21 25 June ▮ Volunteer

PERSONS IDENTIFIED IN LINE UP:
Position # 3 RIVERA, Jacques

INVESTIGATION:
The Reporting Detectives conducted a line-up in the offices of Area Five Violent Crimes pursuant to this investigation. Subject #3 Jacques RIVERA was positively identifed by the witness. RIVERA was allowed to select his position in the line-up. RIVERA was not requested to repeat any statements nor did he make any statement.

Det. John Boyle #6945
Det. William Dorsch #4257
DDA FIVE VIOLENT CRIMES.

RFC 00522

Inventory numbers). If property taken was scribed for Operation Identification, indicate I.D. number at end of Narrative. Offender's approximate description, if possible, should include name if known, victim name, sex, race code, age, height, weight, color eyes & hair, complexion, scars, marks, etc. If suspect is arrested, give name, sex, race code, age, C.B. or I.R. number, if known, and state "in Custody."

## SUPPLEMENTARY REPORT

CHICAGO POLICE — FOR USE BY B.I.S. PERSONNEL ONLY

All descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

**4. DATE OF ORIG. OCCURRENCE-TIME** DAY 27 MO. Aug YR. 88 — 1545

| 1. OFFENSE/CLASSIFICATION LAST PREVIOUS REPORT | I-UCR OFF. CODE | 2. ADDRESS OF ORIG. INCIDENT/OFFENSE ☐1 VERIFIED ☐2 CORRECTED | 3. BEAT OF OCCUR. |
|---|---|---|---|
| HOMICIDE/MURDER | 0110 | 3324 W. Cortland Ave. | 1422 |

5. VICTIM'S NAME AS SHOWN ON CASE REPORT — VALENTINE, Felix
CORRECT ☒ YES ☐ NO — IF NO, CORRECT ALL VICTIM INFORMATION IN BOXES 20 THROUGH 27.
6. FIRE RELATED ☐ YES ☒ NO
7. BEAT ASSIGNED 5055

| 8. TYPE OF LOCATION OR PREMISE WHERE INCIDENT/OFFENSE OCCURRED | 8. LOCATION CODE | 9. NO. OF VICTIMS | 10. NO. OF OFFENDERS |
|---|---|---|---|
| In Auto/Street | 304 | 1 | DNA |

THIS IS A CAUSE OF DEATH REPORT:

MEDICAL EXAMINERS CASE NUMBER:     300 Sept 1988

DATE OF AUTOPSY:     16 Sept 1988

PATHOLOGIST:     DR. CHOI

CAUSE & MANNER OF DEATH:     MULTIPLE GUN SHOT WOUNDS/HOMICIDE

INVESTIGATION:     On todays date Dr. CHOI performed an

autopsy on the body of Felix VALENTINE.

(Cond't Page Two)

90. EXTRA COPIES REQUIRED (NO. & RECIPIENT) — D.N.A.
91. DATE THIS REPORT SUBMITTED — DAY 16 Sept MO. 88 YR.
92. REPORTING OFFICER (PRINT NAME) — Det. T. LAZAR   STAR NO. 5355

20 SEP 1988

RFC 00523

PLAINTIFF'S TRIAL EXHIBIT 43A
17 of 29

HOMICIDE/Murder (0110)                    PAGE TWO                    K-371-955

VALENTINE, Felix M/WH                                                16 Sept 88

INVESTIGATION CONT'T:          External and internal examination has revealed
                               the presence of Eleven (11) gun shot wounds;
                               #1, gun shot wound entrance to the back of the
                               head 7" below the top and at the midline, lodged.
                               #2, gun shot wound entrance to the upper left
                               back 4" to the left of midline.
                               #3, gun shot wound entrance to the upper left
                               back 2" to the left of midline.
                               #4, gun shot wound entrance left back 4" to the
                               left of midline.
                               #5, gun shot wound entrance left back 2" to the
                               left of midline.
                               #6, gun shot wound entrance left back 1½" to the
                               left of midline.
                               #7, gun shot wound entrance left back 1" to the
                               left of midline.
                               #8, gun shot wound entrance left back 1" to the
                               left of midline.
                               #9, gun shot wound entrance back at the midline.
                               #10, gun shot wound entrance back at the midline.
                               #11, graze wound upper right upper back.

                               Internal examination also revealed the presence
                               of Six (6) small caliber lead bullets which were
                               recovered by Dr. CHOI and then inventoried by
                               Crime Lab Personnel.

                               Upon completion of the autopsy Dr. CHOI has
                               determined that the cause of death was due to
                               MULTIPLE GUN SHOT WOUNDS and the manner of death
                               is HOMICIDE.

                               This is a progress report.....

Report of Det. T. LAZAR # 5355, FID

K-371955

RFC 00524

PLAINTIFF'S TRIAL EXHIBIT 43A
18 of 29

CASE # 300 Sept 1988
VALENTINE, Felix  M/WH
RD# K-884-369





E. CASE #: 300 Sept 1988

THOLOGIST:     DR. CHOI

USE & MANNER OF DEATH:   MULTIPLE GUN SHOT WOUNDS/HOMICIDE

JURIES: Eleven (11) gun shot wounds(see format)

EVIDENCE:  Six (6) small caliber (.22 Cal) lead bullets revesed and inventoried.

1

RFC 00525

PLAINTIFF'S TRIAL EXHIBIT 43A
19 of 29



CRIMINAL HISTORY OF RIOS, Jose   M/WH

DATE   29 July 1981

DATE OF BIRTH   30 April 1964

| I.R. NO. 614010 | | FBI NO. 970150 AA5 | | I.S.B. NO. 24 23829 |

| NAME & ADDRESS | C.B. NO. | DATE OF ARREST | ARRESTING OFFICER & DIST. | CHARGE | DISPOSITION |
|---|---|---|---|---|---|
| se RIOS<br>49 W. North<br>April ▉ | 6187986 | —28 Jul 81, Off. Rogers, 14th Dist, Disorderly Conduct. | | | |
| acques RIVERA<br>335 W. Beach<br>0 Apr ▉ | 6776065 | — 27 Feb 83 Off Chavez 14 dist ▉<br>28 Feb 83, ▉<br>FPC, TRANSFER TO CHIEF JUDGE. Judge Sodini<br>14 Mar. 83, INFO#83-2690, ▉ | | | |
| ck RIVERA<br>35 W Beach<br>30 Apr ▉ | 6851273 | — 02 Jun 83 Off Gruber Summer Mobile Force (14) UUW<br>24 June 83, ▉  Fail Exib Reg. (MCC) Fail<br>Poss. I.D. (38-83-2a) BFW, Judge Laurie (Docket No. ▉<br>83235060) | | | |
|  | SEE CB<br>6776065 | 28 June 83, ▉  Nolle Prosse,<br>▉  2yrs PROBATION, Judge Hall. | | | |
|  | SEE CB<br>6857273 | —29 Aug 83 ▉  Fail to Exhibit Reg (MCC) Fail<br>Poss ID Card (38-83-2a) SOL, Judge Macellaio (Docket No. 8323<br>5089) | | | |
| ques RIVERA<br>32 W. Division<br>Apr ▉ | 7355806 | —20 May 85, Off. Fnuelly GCU-North (014th) ▉<br>17 Jul 85, ▉  (56½-1402), ▉, (38-83-2),<br>SOL, Judge Kowalski, (Dk#85-1172594) | | | |
| ques RIVERA<br>2 W. Division<br>Apr ▉ | 7849197 | —23 Jul 87, Off. Clark, 14th Dist., ▉  ▉<br>10 Aug 87, ▉  SOL Judge Chrones<br>(Doc# 8718 1956) | | | |
| Jacques RIVERS<br>4448 W. Cortez<br>30 Apr. ▉ | 8034413 | —24 May 88, Off. RRamirez, 14th dist. Poss. Cann. | | | |
| acques RIVERA<br>238 W. Divison<br>0 Apr. ▉ | 8101323 | —30 Aug. 88, Off. Guevarra, GCU-N (25th) Dist. Agg. Batt. (ed | | | |
| acquez RIVERA<br>231 W. Division<br>0 Apr ▉ | 8112639 | 15 Sep 88, Off. Guevara,GCU-N(025), Murder. | | | |

CONFIDENTIAL —Further dessemination of information contained in this record is forbidden. When this record has served the purpose for which it was issued, it must be destroyed. (U.S. Dept. of Justice Rules & Regulations

ES

PLAINTIFF'S TRIAL EXHIBIT 43A

RFC 00526

# ARREST REPORT

RIVERA    Jacquez    (III)  M  WH  30  Apr

1 ADDRESS OF ARREST: 5555 W. Grand    APT NO. 8 AGE: 23    7 ALIAS: RIOS Jese

292    025    12 RESIDENCE ADDRESS: 4231 W Division    K-371-955

19 STATE/PLACE OF BIRTH: IL.    DRIVERS LICENSE NO: R160-4206-5123    614010

HEIGHT: 5'9    WEIGHT: 160    EYES: Brn    HAIR: Brn    COMPLEXION: Med

WEAPON: PISTOL/REVOLVER

30 MARKS, SCARS, DEFORMITIES, HANDICAPS, ETC.: Ace/on left arm

31 BEAT OF: 2522    DATE OF ARREST: 15 Sept. 88  1930

MURDER First Degree

36 REFERENCES

SGT. Weingart    A/5VC 1630  t. A. Wymchi' *400

44 APPROVAL OF CHARGES

VICTIM/COMPLAINANT: VALETIN, Felix  ( DECEDANT)

ARRESTEE TRANSPORTED TO: A/5VC    BY: GUEVARA & GAWRYS  16345    HOW TRANSPORTED: 4627    TIME: 1500    PROPERTY INVENTORY NO(S): DNA

NARRATIVE (The facts for probable cause to arrest include, but are not limited to, the following:)

This is a gang crimes north arrest by 4627 and 5548 A/5VC. for Murder. Above subject arrested for Murder after being placed in a line-up and pick out by the witness as the shooter in this Homicide.

CHARGES APPROVED PER ASA ROSNER

ADDITIONAL ARRESTING OFFICERS: DET. B. DORSCH 4257 & Det. J. BOYLE 6945 Beat 5548 and GCSP. S. GAWRYS # 16899 Beat 4627

I do solemnly, sincerely, and truly declare and affirm that the facts stated herein are accurate to the best of my knowledge.

FIRST ARRESTING/APPEARING OFFICERS SIGNATURE:  Gcsp. R. Guevara

DESIRED COURT DATE: 16 Sept. 88    BRANCH: 66-2

GCSP. R. GUEVARA    16345    760    4627    7    Hcp R Guevara 1634 760 4627

JUVENILE DATA

PLAINTIFF'S TRIAL EXHIBIT 43A
21 of 29

**ILLINOIS STATE POLICE**
**CRIMINAL HISTORY RECORD INFORMATION**
**SUBJECT IDENTIFICATION INFORMATION**

SID: IL24238290

FBI: 970150AA5                                              CHICAGO: IR614010
----------------------------------------------------------------------------
NCIC FINGERPRINT CLASSIFICATION: DO18PMPMPODIPI13PIPI
HENRY FINGERPRINT CLASSIFICATION:    18) O 14 U OMM O
                                         I 32    IOI I
----------------------------------------------------------------------------
NAME:                                                      DOB:
RIVERA, JACK                                               04/30/██████
RIVERA, JACQUES
RIVERA, JAQUES
----------------------------------------------------------------------------
    SEX: MALE
   RACE: WHITE
   EYES: BROWN          BROWN
   HAIR: BROWN
   SKIN: MEDIUM
 HEIGHT: 505   DATE REPORTED:
 WEIGHT: 145   DATE REPORTED:
----------------------------------------------------------------------------
PLACE OF BIRTH

ILLINOIS
----------------------------------------------------------------------------
            ( END OF SUBJECT IDENTIFICATION )

IL 493-0828              S T A T E   U S E   O N L Y              DSP6-488(1/87)

   DATE: 102688   ORI: IL016033A   RO: 9996   PCN: 00072825D   PAGE:   1

**RFC 00528**

PLAINTIFF'S TRIAL EXHIBIT 43A
22 of 29

## ILLINOIS STATE POLICE
## CRIMINAL HISTORY RECORD INFORMATION
### SUBJECT TRANSACTION INFORMATION

SID: IL24238290

FBI: 970150AA5                                          CHICAGO: IR614010

| AGENCY INFORMATION | SUBJECT INFORMATION | DATE | CHARGE INFORMATION |
|---|---|---|---|
| ARREST<br>ILCPD0000<br>CHICAGO PD<br>DCN<br>C88101323 | RIVERA,<br>JACQUES<br>04/30, ███ | 08/30/88 | 38-12-4<br>AGGRAVATED BATTERY |
| ARREST<br>ILCPD0000<br>CHICAGO PD<br>DCN<br>CB7355806 | RIVERA,<br>JAQUES | 05/20/85 | 56.5-1402<br>POSSESSION CONTROLLED SUB |
| ARREST<br>ILCPD0000<br>CHICAGO PD<br>DCN<br>CB6851273 | RIVERA,<br>JACK | 06/02/83 | 38-24-1-A-4<br>UNLAWFUL USE OF WEAPON |
|  |  | 06/02/83 | 38-83-2-A<br>FOID I D CARDS |
| S.A. DISPOSITION<br>IL016013A<br>COOK COUNTY SA<br>DCN<br>CB6851273 |  | 08/29/83 | CHARGE FILED<br>38-83-2-A<br>FOID I D CARDS |
| COURT DISPOSITION<br>IL016025J<br>COOK CO CIR CRT<br>DCN<br>CB6851273<br>COURT CASE#<br>83123506901 |  | 08/29/83 | STRICKEN ON LEAVE<br>38-83-2-A<br>FOID I D CARDS |

( CONTINUED ON NEXT PAGE )

IL 493-0829            S T A T E   U S E   O N L Y            DSP6-488(1/87)

DATE: 102688    ORI: IL016033A    RO: 9996    PCN: 00072825D    PAGE:    1

**RFC 00529**

PLAINTIFF'S TRIAL EXHIBIT 43A
23 of 29

## ILLINOIS STATE POLICE
## CRIMINAL HISTORY RECORD INFORMATION
### SUBJECT TRANSACTION INFORMATION

SID: IL24238290

FBI: 970150AA5                                    CHICAGO: IR614010

| AGENCY INFORMATION | SUBJECT INFORMATION | DATE | CHARGE INFORMATION |
|---|---|---|---|
| ARREST<br>ILCP00000<br>CHICAGO PD<br>DCN<br>CB6776065 | | 02/26/83 | 38-18-1<br>ROBBERY |
| S.A. DISPOSITION<br>IL016013A<br>COOK COUNTY SA<br>DCN<br>CB6776065 | | 02/26/83 | CHARGE FILED<br>38-18-1<br>ROBBERY |
| COURT DISPOSITION<br>IL016025J<br>COOK CO CIR CRT<br>DCN<br>CB6776065<br>COURT CASE#<br>83-2690 | | 10/31/84 | GUILTY<br>38-16-1-A<br>THEFT |
| | SENTENCED | 10/31/84 | SENTENCED TO<br>PER IMPRISON/PROB<br>2 YEARS |

WARNING:    RELEASE OF THIS INFORMATION TO UNAUTHORIZED INDIVIDUALS OR
            AGENCIES OR MISUSE IS PROHIBITED BY FEDERAL LAW TITLE 42 USC
            3771B PERTAINING TO CRIMINAL HISTORY INFORMATION.

( END OF TRANSCRIPT )

IL 493-0829           S T A T E   U S E   O N L Y           DSP6-488(1/87)

DATE: 102688    ORI: IL016033A    RO: 9996    PCN: 00072825D    PAGE:    2

**RFC 00530**

PLAINTIFF'S TRIAL EXHIBIT 43A
24 of 29

M/PIPER          REQ/JAMES PIPER
4L01JASL2PIPER
IL016033A
ATN/JAMES PIPER
THIS RECORD IS BASED ONLY ON THE FBI NUMBER IN YOUR REQUEST-970150AA5.
BECAUSE ADDITIONS OR DELETIONS MAY BE MADE AT ANY TIME, A NEW COPY
SHOULD BE REQUESTED WHEN NEEDED FOR SUBSEQUENT USE.

- FBI IDENTIFICATION RECORD -

WHEN EXPLANATION OF A CHARGE OR DISPOSITION IS NEEDED, COMMUNICATE
DIRECTLY WITH THE AGENCY THAT FURNISHED THE DATA TO THE FBI.

NAME                          FBI NO.      DATE REQUESTED
RIVERA,JACK                   970150AA5    10/26/88

SEX  RACE  BIRTH DATE  HEIGHT   WEIGHT  EYES  HAIR  BIRTH PLACE
M    W     04/30/█     506      140     BRO   BLK   ILLINOIS

FINGERPRINT CLASS
DO 17 PM PI PO
DI PM 14 PI PI


1-ARRESTED OR RECEIVED    06/02/83
  AGENCY-POLICE DEPARTMENT  CHICAGO  IL (ILCPD0000)
    AGENCY CASE-614010
    CHARGE 1-UNLAWFUL USE OF WEAPON

2-ARRESTED OR RECEIVED    04/20/85
  AGENCY-POLICE DEPARTMENT  CHICAGO  IL (ILCPD0000)



M/PIPER          REQ/JAMES PIPER
NCIC.
    AGENCY CASE-614010         NAME USED-RIVERA,JAQUES
    CHARGE 1-POSSESSION COCAINE

  COURT-
    07/17/85  DISPOSITION-
    CHARGE-POSSESSION COCAINE
    SOL
    07/17/85  DISPOSITION-
    CHARGE-NO FOID CARD
    SOL

3-ARRESTED OR RECEIVED    08/30/88
  AGENCY-POLICE DEPARTMENT  CHICAGO  IL (ILCPD0000)
    AGENCY CASE-1323614010     NAME USED-RIVERA,JACQUE
    CHARGE 1-AGGRAVATED BATTERY


THE USE OF THIS RECORD IS REGULATED BY LAW.  IT IS PROVIDED FOR
OFFICIAL USE ONLY AND MAY BE USED ONLY FOR THE PURPOSE REQUESTED.
END OF RECORD

RFC 00531

PLAINTIFF'S TRIAL EXHIBIT 43A
25 of 29

GENERAL OFFENSE CASE REPORT — CHICAGO POLICE

1. OFFENSE/INCIDENT - PRIMARY CLASSIFICATION: BATTERY
UCR OFF. CODE: 041A  2. SECONDARY CLASSIFICATION: AGGRAVATED: HANDGUN
3. R.D. NO.: K-371.95

4. ADDRESS OF OCCURRENCE: 3324 W CORTLAND STREET
5. FIRE RELATED: ☐ YES ☒ NO
6. DATE OF OCCURRENCE - TIME: 27 AUG 88 1545
7. BEAT OF OCCUR: 1422  8. BEAT/UNIT AS: 1413

TYPE OF LOCATION OR PREMISE WHERE OFFENSE OCCURRED: STREET
LOCATION CODE: 804  DATE R.O. ARRIVED - TIME: 27 AUG 88 1638
ASSIGNED BY: ☐ ON VIEW ☒ COS ☐ SUPERVISED

VICTIM 1: VALENTIN, FELIX  HOME ADDRESS: 1458 N CAMPBELL
SEX-RACE-AGE: M 4 16  235 1821  HOME PHONE: NONE  TIME AVAIL: ANY
VIC REL: 24

CONT. 1 of 2

WITNESS/REPORTED OFFENSE:
VALENTIN, ISRAEL  1458 N CAMPBELL  M 4 22  235 1821  NONE
LOPEZ, MACHO  3324 W Cortland 1st  M 4 ?5  N — N — K

OFFENDER: DRIVER N.F.D.  U — N — K  M 4 16  24
PASSENGER yellow Baseball hat  U — N — K  M 4 16  SIGNS  24

55. UNUSUAL CHARACTERISTICS OF OFFENSE: SEE NARRATIVE
GANG REL: ☒ VICTIM ☒ OFFENDER  LATIN KINGS

VEHICLE: ☐ STOLEN ☐ OFFENDERS  MAKE: TOYOTA  2DN  COLOR: U — N — K

NARRATIVE: IN SUMMARY: VICTIM AND WITNESS #1, VALENTIN, ISRAEL, went to above address to pick up, witness VALENTIN's Girlfriend, as they were going to a wedding. Witness VALENTIN went upstairs to pick up his Girlfriend, victim was to be in car behind steering wheel, in Drivers seat. Witness (VALENTIN) went downstairs, and could not see his Brother.

SOBER: ☒ YES
COPY: ☒
FLASH MESSAGE: ☒ YES ☐ NO

REPORTING OFFICER: E.M. CRAWFORD  STAR NO. 15602
REPORTING OFFICER: S. MACHAIN  STAR NO. 7963
DATE/TIME COMPLETED: 27 AUG 88 1930
SUPERVISOR APPROVING: Sgt. Gulstersen  STAR NO. 2111

RFC 00532

PLAINTIFF'S TRIAL EXHIBIT 43A
26 of 29

CONTINUATION OF NARRATIVE

R.D. NO. K 371-955

...in the car, approached and observed his brother slumped across seat, bleeding. Victim was sprawled across seat, stating "they shot me, they shot me," and began screaming. Witness Valentin, pushed his brother across seat and drove him to Norwegian Hospital. While enroute, witness Valentin struck 3 parked M.V.'s in the 1200-1300 blks of N. Kenzie. A passer-by in another M.V. came by, and drove victim and witness Valentin to Norwegian. Victim treated at Norwegian, to be transferred to Northwestern Hospital. R/O's were able to somewhat communicate with victim & learned the following:

Suspect auto: older model, Ban 2 dr, possibly hatch back, Toyota, clean windows, Puerto Rican flag hanging from rear view mirror.

Suspect offenders (1) M/wht, Latin King Gang affiliation, driver of car, N.F.D. at this time. (2) M/wht, Latin King Gang affiliation, passenger in above auto, LSW yellow baseball hat, light to med. complexion, 16-18 yrs, armed with an unk type handgun this time. NFO PT

I have reviewed this report and by my signature indicate that it is acceptable.

SUPERVISOR SIGNATURE

DATE (DAY MO YR)

FOR USE BY BUREAU OF INVESTIGATIVE SERVICES ONLY

RFC 00533

PLAINTIFF'S TRIAL EXHIBIT 43A
27 of 29

**GENERAL OFFENSE CASE REPORT**
CHICAGO POLICE

| | |
|---|---|
| 1. OFFENSE/INCIDENT - PRIMARY CLASSIFICATION | Battery |
| IUCR OFF. CODE | 041A |
| SECONDARY CLASSIFICATION | AGGRAVATED - HANDGUN |
| R.D. NO. | K-371 955 |
| 4. ADDRESS OF OCCURRENCE | 3324 W. Cortland Street |
| 6. DATE OF OCCURRENCE - TIME | 27 AUG 88 1545 |
| BEAT OF OCCUR | 1422 |
| BEAT/UNIT ASSIGN | 1413 |
| LOCATION CODE | 3.0.4 |
| 11. DATE R.O. ARRIVED - TIME | 27 AUG 88 1638 |

Victim info: **CONT. 2 of 2**

31. OBJECT/WEAPON: (01 HAND GUN)

NARRATIVE: PASSENGER, OFFENDER EXITED AUTO, WALKED UP TO VICTIM AS HE SAT IN AUTO AND BEGAN FIRING. VICTIM STRUCK 5 TIMES IN NECK AND CHEST. VICTIM SAT IN A RED 2 DR 76 MAZDA, IL PLATE. FS 8461 IL 3/89 VIN # LA23S147846, THAT WAS DECORATED WITH PINK CARNATION TYPE PAPER, IN PREPARATION FOR WEDDING.

SOBRIETY OF VICTIM: SOBER

REPORTING OFFICER: S. MACHAN STAR NO. 7963
REPORTING OFFICER: MAGUIRE STAR NO. 15612
DATE INVEST. COMPLETED: 27 AUG 88 1930
SUPERVISOR: Sgt. G. Petersen STAR NO. 2111
DATE APPROVED: 27 AUG 88 2100

RFC 00534

PLAINTIFF'S TRIAL EXHIBIT 43A
28 of 29

RFC 00535

# EXHIBIT 69

2229

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JACQUES RIVERA,                                  ) No. 12 CV 4428
                                                 )
                Plaintiff,                       )
vs.                                              ) Chicago, Illinois
                                                 )
Rey GUEVARA, STEVE GAWRYS, DANIEL NOON,)
JOHN GUZMAN, JOSEPH FALLON, JOSEPH SPARKS,       )
PAUL ZACHARIAS, GILLIAN MCLAUGHLIN, JOHN         )
LEONARD, EDWARD MINGEY, RUSSELL WEINGART,        ) June 18, 2018
ESTATE OF ROCCO RINALDI, City OF CHICAGO,        )
                                                 )
                Defendants.                      ) 9:25 o'clock a.m.

VOLUME 10 A
TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JOAN B. GOTTSCHALL
and a jury

APPEARANCES:

For the Plaintiff:      LOEVY & LOEVY
                        BY:  MR. JONATHAN I. LOEVY
                             MR. STEVEN E. ART
                             MR. ANAND SWAMINATHAN
                          311 North Aberdeen Street
                          3rd Floor
                          Chicago, Illinois  60607

                        MACARTHUR JUSTICE CENTER
                        Northwestern University School of Law
                        BY:  Locke E. Bowman, III
                        357 East Chicago Avenue
                        Chicago, Illinois 60611
                        (312) 503-0844


Court reporter:            Blanca I. Lara
                        Official Court Reporter
                        219 South Dearborn Street
                           Room 2504
                        Chicago, Illinois 60604
                          (312) 435-5895
                        blanca_lara@ilnd.uscourts.gov

2230

Appearances  (continued:)


For the Individual          THE SOTOS LAW FIRM
Defendants:                 BY:   MR.  JEFFREY N.  GIVEN
                                  MR.  JAMES G.  SOTOS
                                  MS.  CAROLINE P.  GOLDEN
                                  MR.  JOSEPH M.  POLICK
                                  MR.  DAVID A.  BRUEGGEN
                            550 East Devon Avenue
                            Suite 150
                            Itasca, Illinois  60143

For the Defendant           ROCK FUSCO & CONNELLY, LLC
City of Chicago:            BY:   MS.  EILEEN E.  ROSEN
                                  MS.  CATHERINE M.  BARBER
                                  MS.  THERESA B.  CARNEY
                            321 North Clark Street
                            Suite 2200
                            Chicago, Illinois  60654


For the Defendant           LEINENWEBER BARONI & DAFFADA, LLC
Guevara:                   BY:   MR.  THOMAS E.  LEINENWEBER
                                  MR.  JAMES V.  DAFFADA
                            120 North LaSalle Street
                             Suite 2000
                             Chicago, Illinois  60602

2231

(The following proceedings were had out of the presence of the jury in open court:)

THE COURT: On the record?

THE COURT REPORTER: Yes.

THE COURT: Starting over.

Let me just say quickly because we don't have a lot of time, but I put on the record that juror Ciccarelli, C-i-c-c-a-r-e-l-l-i, told the courtroom deputy that she saw a headline about the case in the Tribune over the weekend. Just closed it up without reading it.

Mr. Sotos is just going on about how inflammatory it was. And Mr. Loevy added that it's exactly what happened in court. And let's not spend a lifetime on it, but is there something you want to say?

MR. SOTOS: I said it.

THE COURT: Okay.

MR. SOTOS: You know, in terms of it being exactly what occurred in court, it was an inflammatory headline.

THE COURT: All right. And the other thing is, one of our jurors got a sprained ankle over the weekend and is here, but will be slow coming in and going out. Okay?

Anything anyone needs to pick up with me in the next five minutes?

MR. LOEVY: Not for the first witness, Your Honor.

MR. SOTOS: Not for the first witness either.

2232

THE COURT: Well, we got nothing over the weekend. So when you say "not for the first witness" what does that mean?

MR. LOEVY: Well, Your Honor, we have a short motion that we're going to file. We haven't given to the other side. We haven't given it to them, so ....

THE COURT: So is this something I'm going to decide in a hurry at some point today?

MR. LOEVY: Well, before tomorrow.

THE COURT: Oh. Okay.

MR. SOTOS: We have one of those, too.

THE COURT: All right. So I'm going to have it at tonight?

MR. SOTOS: Yes. For sure.

THE COURT: Okay.

MR. SOTOS: It's just practically done.

THE COURT: Okay. As long as, you know, I don't have to do it in five minutes over the break.

Okay. So let me leave you alone. I'll just wait. I'm not going to go back there.

MR. SOTOS: Oh, Judge, there is one other issue. Maybe I can bring it up now since we have a few minutes.

I would just ask the Court to caution plaintiff. When he had damages witness on the stand, there was a bit of like an embrace afterwards between him and his daughter. And we would just ask that that be reserved for outside the presence of the

2233

jury, those kind of public displays of affection during trial.

THE COURT: Right. I think that would be a good idea.

MR. LOEVY: Okay, Your Honor.

MR. SOTOS: Thank you.

(Brief pause).

COURT SECURITY OFFICER: Everybody is here.

THE COURT: Everybody is here. Tell me when you want to get started.

MR. LOEVY: We're ready.

Is Mr. Brasfield here?

MR. SWAMINATHAN: Yes. He's outside. I'll go get him.

MR. LOEVY: Anand, why don't you finish what you're doing and someone else can ....

(Brief pause).

THE WITNESS: Your Honor. Good morning.

THE COURT: Shall we start or do you want to break?

MR. LOEVY: Thirty seconds?

THE COURT: Sure. Sure.

(Brief pause).

COURT SECURITY OFFICER: Ready, Your Honor?

THE COURT: Not quite. Very soon.

(Brief pause).

THE COURT: Now is it time?

MR. LOEVY: We're ready.

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 83 of 758 PageID #:107536
Brasfield - direct by Loevy
2234

THE COURT: Okay. Yes.

COURT SECURITY OFFICER: All rise.

(The following proceedings were had in the presence of the jury in open court:)

THE COURT: Would you be more comfortable not climbing into that jury box?

JUROR CICCARELLI: Actually, I'm okay.

THE COURT: Okay.

JUROR CICCARELLI: I just realized how short I am.

(Brief pause).

THE COURT: Good morning, ladies and gentlemen. Please be seated.

Mr. Loevy, whenever you're ready.

MR. LOEVY: Thank you, Your Honor.

MICHAEL BRASFIELD, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

DIRECT EXAMINATION (resumed)

BY MR. LOEVY:

Q. Mr. Brasfield, good morning.

A. Good morning.

Q. One of the subjects that you mentioned last week was detectives taking notes when they talked to witnesses like eyewitnesses. And I think you gave us some perspective on whether those notes are supposed to be in the file or not supposed to be in the file. Which is the answer?

A. The notes are supposed to be transcribed into the GPRs.

Brasfield - direct by Loevy

2235

Q.  Give the jury a little more context for what kind of notes homicide detectives are supposed to take when they talk to eyewitnesses and get their accounts.

A.  They should include the date, time, location, individuals present, the identity of the individual being interviewed, and the synopsis, if you ill, a Reader's Digest version of what was discussed.

In the case of a witness that was of significant importance to an investigation, such as an eyewitness, victim, whatever.  For an, assault, obviously, not homicide, but you would expect a written signed statement.

Q.  And what kinds of details would that include?

A.  That would include everything from the position of, in a case of a witness, their location relative to what they observed, any description of clothing, the time of day or night, lighting conditions, whether they knew or had been acquainted or had seen in the past the individual that they were -- had said to be observed.

Q.  How about their level of certainty if it's an eyewitness situation?

A.  That would also be an important factor to include.  You would want to know, "Now you say that this is the person you saw, you've given me the description, do you feel quite confident that you'd be able to identify this person in the future if you were to see them again?"  Or if not confident,

what their level of confidence was.

You would probably -- not "probably," you should also take note of any indication that the detective observed that might affect the reliability of the witness, that could include whether they wore eyeglasses, their age, how well they're able to articulate what they observed, that type of thing.

Q. Now, each time an eyewitness is re-interviewed or speaks to the police again, do you need to make notes again or is it sufficient to rely on the first notes?

A. No -- (coughing). Pardon me. I'm sorry.

No, it's important to continue taking notes. There may be -- and, again, I think I testified to it on Friday -- you never know during the course of an investigation what will be important later.

So if you're re-interviewing a witness, you want to make sure that if there is any change, or alteration, or addition, or subtraction to what you had learned earlier from that witness, you want to make notes of that.

And if they add something that they may have seen the suspect subsequent to the last time they were interviewed, whether they remembered something else about the individual or whatever it was that was different than the first time.

Q. And all that should be memorialized?

A. Yes, it should.

Q. How about if there is an identification procedure, either

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 86 of 758 PageID #:107539
Brasfield - direct by Loevy
2237

photographs or otherwise, and the person makes an identification, are those details supposed to be materialized?

A. Yes, they are. Whether it is a photographic lineup, a montage, gang book, whatever, or a more formalized physical lineup in person, the information should be memorialized as to who was there, who conducted it, who was with the witness that was observing the lineup, or picking photos out of a photo array, whatever.

Q. All right. And leaving aside this case but talking systemically on all the files that you looked at, did the City of Chicago's investigators do a good job of complying with the standard for the kinds of memorialization you've been talking about?

A. I would have to characterize, based on the files that I have reviewed over a number of cases, including this one, that they were very lackadaisical.

There would be sometimes some information about who was present, but the nuts and bolts of what you would expect to be in that were not there.

Q. Did that deviate from the standard that you observed in other departments and all the work you described yesterday on a national level?

MS. ROSEN: Objection, Judge. This is beyond the scope of the 26(a) disclosures.

THE COURT: Is this subject -- I would like the report

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 87 of 758 PageID #:107540
Brasfield - direct by Loevy
2238

if I need to.

MR. LOEVY:  I mean, it's really the whole gist of his whole report of how Chicago didn't meet up to the national standards.

THE COURT:  Well, this is the subject about taking notes and keeping notes?

MR. LOEVY:  Yes.

THE COURT:  Does somebody have the disclosure that you can hand to me or do I need to get it?

MR. LOEVY:  I can hand one to you, Your Honor.

(Document tendered to the Court.)

MR. LOEVY:  Your Honor, I guess it's like maybe 58 referred to --

THE COURT:  Well, let me see.  Where is the disclosed according to the plaintiff?

MR. LOEVY:  I gave it to you.

THE COURT:  Oh, I'm sorry.

MR. LOEVY:  No, it's our fault, Your Honor.  It's all the cases, which is basically the second half of it.

MS. ROSEN:  Well --

THE COURT:  Hold on.  Hold on.

Hand this back to counsel so he can direct me to the page so we can move this along.

THE LAW CLERK:  Yes.

MR. SWAMINATHAN:  Let me do it this way.  We'll give

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 88 of 758 PageID #:107541
Brasfield - direct by Loevy
2239

you this which lists all the cases they aren't turning over notes.

MS. ROSEN: Well, Judge, this is a different issue, all the cases they're talking about right now about not turning over notes. What he's talking about just right now is the quality of the notes --

THE COURT: Let me see it and then we'll talk about it.

(Document tendered to the Court.)

THE COURT: Thank you. That's perfect. Give me a second.

(Brief pause).

THE COURT: Okay. Let me see counsel at the side.

(Proceedings heard at sidebar on the record).

THE COURT: This is all about the files?

MR. SWAMINATHAN: Are you looking at page 58?

THE COURT: Yeah.

THE COURT REPORTER: Mr. Swaminathan, if you're going to be on the record, I'm not hearing you.

MR. SWAMINATHAN: Yes. Sorry.

So starting on page 59.

THE COURT: Oh, 59?

MR. SWAMINATHAN: Yes. It starts talking about --

THE COURT: Okay. I thought it was 58 and 59. Hold on.

Brasfield - direct by Loevy

2240

MR. SWAMINATHAN: Yes.

THE COURT: Hold on.

(Brief pause).

THE COURT: So what this is about is information that was not put in the official files.

MR. LOEVY: Uh-huh.

THE COURT: He seems to be testifying that what he is looking for was in note files.

MS. ROSEN: Right. The way I heard it, Judge, was that even the notes that were taken were insufficient by standards. He's not saying -- he's not making the comparison between what notes were in one file, or the ones in another file, or the ones in the criminal defense attorney files, which is the whole thrust of it. What he is now saying is they should've put this detail in the note, they put that detail in the note, they should put that detail in the note, and that's not -- he didn't make that comparison.

THE COURT: I get it. I get it.

MR. SWAMINATHAN: There's a section in the report where he specifically discloses opinions about a comparison of these notes versus what's in --

THE COURT: Show it to me.

MR. SWAMINATHAN: That's the file, which is exactly what he's talking about now.

MR. LOEVY: That was the blue column on the chart.

Brasfield - direct by Loevy

2241

THE COURT:  Just show me.

MR. SWAMINATHAN:  All of the pertinent information --

THE COURT:  Yes, it's got to be disclosed.  So telling me does not do me any good.

MR. SWAMINATHAN:  Just to explain to you what this is, he's saying information on the notes is not in the permanent retention files.  It's not going into the reports, it's not going into the permanent retention files --

THE COURT:  Well, it seems to me that if what he is saying is that -- well, he just saw the permanent retention files and it wasn't in there, is that what he's saying?

MR. LOEVY:  He saw both.  He saw the permanent retention and the investigative files.

THE COURT:  So where is a critique of what's kept in the investigative files?

MR. SWAMINATHAN:  That's what he's saying here, the handwritten notes and so on, found in the investigative files and they're not put into the retention files.

THE COURT:  That's not what he said.  That's not what he said.  He said that the detectives were not recording all kinds of things.

MR. LOEVY:  You know what it is?  It's that the murder book chapters are missing -- remember yesterday he was talking about the blue column?  He's saying that Chicago investigations read like there's only one chapter, and the murder book is

supposed to have all chapters that goes in all difference directions. So it's limited -- he's what they memorialized is not what he would expect to see. It's less than they expect to see. One reason it's hard to show a specific thing is because he's like saying he went through case by case, by case, and he's like saying in this case they --

THE COURT: Show me just one example where he's critiquing the failure to record like witness interviews, that's what he's talking about.

MR. SWAMINATHAN: I'll find it.

(Brief pause)

MR. LOEVY: I tell you what. We've lost a lot of time. I'm ready to move on. I appreciate that.

THE COURT: Okay.

(Proceedings resumed within the hearing of the jury.)

MR. LOEVY: Ready, Your Honor?

THE COURT: Yes.

BY MR. LOEVY:

Q. Sir, you had a chance to review Mr. Wadas' file in this case, correct?

A. The criminal defense attorney's file during the --

MR. LOEVY: Your Honor, we did not yet moved Exhibit 43 into evidence, Mr. Wadas' file. We'd like to do so now.

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 92 of 758 PageID #:107545
Brasfield - direct by Loevy
2243

THE COURT:  Any objection?

MS. ROSEN:  No, Judge.

THE COURT:  It is received.

(Plaintiff's Exhibit No. 43 was received in

evidence.)

BY MR. LOEVY:

Q.  And you also had the copy of what we've been calling the investigative file.  This is Plaintiff's Exhibit 19, which is also in evidence, correct?

A.  That's the one referred to as Wronkowski 1 to 69?

Q.  Exactly.

A.  Yes.

Q.  And what's your understanding of where the investigative file turned up and how?

A.  That it was eventually discovered or provided after, long after the criminal prosecution and conviction and during the course of civil litigation, as I recall.

Q.  And is it your understanding that in both the Jacques Rivera case and in others, that there were documents in the investigative file that were not in the criminal defense file?

A.  That's my experience with the material I've reviewed over the years.

Q.  In fact, you've reviewed a lot of cases and found similar results, correct?

A.  That's correct.

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 93 of 758 PageID #:107546
Brasfield - direct by Loevy
2244

Q. All right. I'd like to show you a copy of Plaintiff's Exhibit 269.

And your exercise in this case was to do a comparison between what was in the criminal defense file and what was available at the police department either because they found it in the basement, or on the pallet, or in the file cabinets, right?

A. That's correct.

Q. So what is Plaintiff's Exhibit 269?

A. This would be the investigative file as I recall -- or excuse me, what I'm referring to as --

Q. And I want to focus your attention on the subset of pages that are missing from --

MS. ROSEN: Can he identify that? He didn't identify what Plaintiff's Exhibit 269 is.

MR. LOEVY: He might not know what Plaintiff's Exhibit 269 is.

MS. ROSEN: Would you identify it?

MR. LOEVY: Yeah.

BY MR. LOEVY:

Q. Plaintiffs 269 were the pages that were in the investigative file that were not in Mr. Wadas' file or the permanent retention file?

A. Yes, I understand. This is the -- normally I've seen it as a whole complete set.

Q. Right. So this is a subset that was created that you were not part of creating?

A. That's correct.

Q. All right. Now, you were not -- in this case and others, is every page that didn't make it into Mr. Wadas' file important or the kind of thing that would've been a constitutional problem?

A. Not necessarily --

MS. ROSEN: Objection.

THE COURT: What's the objection?

MS. ROSEN: Judge, I think this is going to what you barred --

THE COURT: Overruled.

MS. ROSEN: -- if I heard the question correctly.

THE COURT: Overruled. Overruled.

BY THE WITNESS:

A. Not necessarily. Although, it is still my position in investigations that everything should be turned over.

BY MR. LOEVY:

Q. All right. But in this case and others, some of the documents that didn't get turned over are relatively benign, correct?

A. That's correct.

Q. I'm going to show you Plaintiff's Exhibit 268, which is a subset of the subset. All right.

Brasfield - direct by Loevy

2246

These are documents that were not turned over to Mr. Wadas, didn't make it into his file that may or may not have had significance.  And this is page 2.

MR. LOEVY:  If we could have the Elmo, please.

BY THE WITNESS:

A.  I'm sorry?

BY MR. LOEVY:

Q.  I'm going to just put these in the Elmo and just ask you to identify them.  I'm not going to ask you to comment on them or give an opinion about whether or not they're exculpatory, but I just want to identify them.

A.  Okay.  I hope they're a little dryer than this set.

Q.  Yes.  Sorry about that.  I spilled on them.

MS. ROSEN:  Do you have a copy for me?

MR. LOEVY:  Yes.

(Said item tendered.)

BY MR. LOEVY:

Q.  All right.  Can you identify page 2 of 268?

A.  Yes, this is a Chicago Police Department investigative file inventory form.  It was the first of two pages, I believe.

Q.  All right.  And were inventory forms the kinds of documents that you found missing in all the other files you reviewed, too?

A.  In most of my files.

Q.  Do you remember the number?

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 96 of 758 PageID #:107549
Brasfield - direct by Loevy
2247

A.   I don't have it right here in front of me, but I think I testified to it Friday.  50% of the permanent retention files didn't have inventories.

Q.   All right.  And then --

MS. ROSEN:  Mr. Loevy, I'm sorry to interrupt, but is this 268 that you're showing him or 269?

MR. LOEVY:  268.

MS. ROSEN:  You gave me 269.

MR. LOEVY:  Sorry.

(Said item tendered.)

BY MR. LOEVY:

Q.   Why are inventories important to get turned over to criminal defense attorneys?

A.   Well, in Chicago's system since there isn't this central single investigative discovery file that contains everything, since they chose to have a permanent retention folder, their initial effort was to allude to, for lack of a better word, by use of an inventory form what could be found in the parallel investigative file.

And so it became critically -- or it becomes critically important that everything that could be found in an investigative file is inventoried and put into the permanent retention file.  So that as the criminal defense attorney or the assistant state's attorney gets the permanent retention file also has this file inventory and can see, "oh, here's

Brasfield - direct by Loevy

2248

something that's mentioned that's in an investigative file, I'll ask for that, too."

Q. And that was an important part of the policy changes that the City enacted after Jones and Palmer, right?

A. That was an attempt to do that, yes.

Q. And what proportion of the criminal defense attorney files did they actually get the inventories?

A. Again, I don't have it right in front of me.

Q. Do you have that cheat sheet that you made?

A. Yes.

Q. At the bottom.

Looks like 3 out of 38 cases, according to your report, the criminal defense attorney didn't get the inventory?

A. 6 out of 38 was to-from memos.

Q. Not the to-from memos, the inventory. The last two lines. Only 8 percent of cases did criminal defense attorneys even receive --

A. Yes. I'm sorry to have to work my way down so slowly, but my last bullet point at only 8% did the criminal defense attorney even received the inventory.

Q. That's on page 43 --

A. 92% of the time they didn't, yeah.

Q. All right. You did not memorize all the statistics?

A. No. I'm sorry to fumble there, but ....

Q. All right. Showing you a copy of page 4, another document that was not in Mr. Wadas' file but was in the investigative file.

Can you identify for the jury what kind of document that is?

A. This is a general progress report. It is an official police form designed by the Chicago Police Department but is not required to be included in the permanent retention file. And in this case, it is a general progress report from the --

Q. Without commenting on the significance for it in this case, was this the kind of document that you saw missing from the criminal defense attorney files in the review that you performed?

A. Yes.

Q. Showing you page 5, a rap sheet of a Jose Rios, which also has Jacques's name on it, issued on inquiry.

This is another document that was in the investigative file but not in Mr. Wadas' file. Was this typical of the kind of document that criminal defense attorneys were not receiving?

A. That's correct.

Q. And showing you page 6 and page 8, two arrest reports with Mr. Guevara's name on it of arrest of Jacques Rivera.

Those also were documents that Mr. Wadas did not receive?

A. That's correct.

Brasfield - direct by Loevy

2250

Q.   And showing you page 11, 268.

This document we've been talking about here in the last couple of weeks with Mr. Villafane, Mr. Olivero, Mr. Rivera.  Was this the kind of document that also was not turned over to criminal defense attorneys?

A.   That's correct.

Q.   Showing you page 12.

Macho Lopez has not been interviewed as of the 27. This also is the kind of GPR we've been discussing, correct?

A.   That is correct.

Q.   Now, showing you this page 9, would it be fair to call this an administrative document?

A.   This would be, in normal police parlance, would be considered, intended to be an administrative-type document.

Q.   All right.  And was this typical of the kind of documents that you found in the investigative files but not making it to the criminal defense attorneys?

A.   That's correct.

Q.   And it says here:

"... It's expected the prisoner will be charged
    with aggravated battery when the investigation
    is completed on September 2nd ..."
    talking about someone other than the suspect.

Even though this is an administrative document, not talking generally but -- not talking specifically but

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 100 of 758 PageID #:107553
Brasfield - direct by Loevy
2251

generally, can administrative documents be important to criminal defense attorneys?

A. Right. Again, I mentioned that I think on Friday, that since you never know what could be important, either for prosecution or defense, it may -- this type of document, in general circumstances, could be used to either discount or disprove something that was a companion issue.

Q. All right. Let's talk about some of the cases.

You looked at a number of cases, right?

A. Yes.

Q. And not just in Jacques Rivera, but in prior cases as well, right?

A. That's correct.

Q. And you were paid for your time to do that review, correct?

A. I was.

Q. Do you know how many total hours you spent on this project over the course of the 3, 4, 5 cases you've done?

A. I honestly don't -- I've been deposed and I provided those hours in each of the cases. They run into the hundreds.

Q. And how about in the Jacques Rivera case, how many hours did you bill for?

A. Up until the deposition by the City, I believe somewhere in the neighborhood of close to 100 hours.

Q. All right. And do you know approximately how much you

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 101 of 758 PageID #:107554
Brasfield - direct by Loevy
2252

billed in this case?

A.  No.  In excess of 100 hours.

Q.  All right.  So somewhere between 30- and 40,000 dollars?

A.  That sounds about right.

Q.  And did you do a lot of work for that?

A.  I did.

Q.  And do you have any other -- in your entire professional career as a consultant, have you ever done a project that was this time-consuming and this resource-intensive?

A.  As an aggregate of all the three cases?

Q.  Yes.

A.  No.  Never.

Q.  All right.  I'm going to show you not all of the files you reviewed, but some of them.

I want to start with the Samuel Robinson case, and show you an example of a document.  This is Bates stamped 13648 in the Robinson file?

MR. LOEVY:  Anand, do you know the exhibit number?

MR. SWAMINATHAN:  Plaintiff's Exhibit 154.

BY MR. LOEVY:

Q.  This is Plaintiff's Exhibit 154.

Can you tell the jury the kind of document we're looking at here.

A.  This is a document not on --

MR. LOEVY:  Oh, the jury screen is not up, Your Honor.

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 102 of 758 PageID #:107555
Brasfield - direct by Loevy
2253

And, Your Honor, we move this into evidence.

THE COURT: Any objection?

MS. ROSEN: Can you identify what that document is? Bates number?

MR. LOEVY: It is 13648. It is a memo that was in the investigative file but not the permanent retention or criminal defense attorneys file.

MS. ROSEN: Well, you know? I'm going to object to you testifying.

MR. LOEVY: You asked me to identify it.

THE COURT: You asked. Can the witness identify the document?

MR. LOEVY: I believe so.

THE COURT: All right. Do it that way.

BY MR. LOEVY:

Q. Mr. Brasfield?

A. I cannot give you the specific case file that it came from, but I've had occasion to look at this from the original material that I reviewed and I have relied on it, in part, in forming my opinions.

MR. LOEVY: All right. We would move this into evidence, Your Honor.

THE COURT: All right. Is there an objection to this?

MS. ROSEN: There's an objection until I know what the

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 103 of 758 PageID #:107556
Brasfield - direct by Loevy
2254

RD number is.

MR. LOEVY:  The RD number is 581836.  581836.

MS. ROSEN:  All right.

THE COURT:  It's received.

(Plaintiff's Exhibit No. 154 was received in evidence.)

MR. LOEVY:  Your Honor, we would ask permission to publish this memo.

THE COURT:  You may.

BY MR. LOEVY:

Q.  Can you tell us what we're looking at here?

A.  This is what I would refer to as a to-from memo.  Sometimes the to-from memos are somewhat antiquated printed to-from memos, but this one is obviously a typewritten note from one detective or one police employee to another regarding what's self-evident on the face of it, that a citizen called, an anonymous citizen, and provided information about a possible alternative suspect.

Q.  All right.  Is this the kind of information that should've been turned over to the criminal defense attorney?

A.  Yes.

Q.  And it wasn't?

A.  No.

Q.  All right.  Is that -- that is an example of a systemic problem?

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 104 of 758 PageID #:107557
Brasfield - direct by Loevy
2255

A.   This is the type of thing, this would be an example that's indicative of the types of things that I would find in reviewing investigative files that would be generally missing from the permanent retention file.

Q.   All right.   Let's talk about another case, the Fields case.  This is Plaintiff's Exhibit 146, page 950.

        MR. LOEVY:   Your Honor, permission to show this to the witness before we show it to the jury.

        MS. ROSEN:   Judge, I have a standing objection to all of the documents as to the Fields case for the reasons that we've expressed.   And, quite frankly, I think the Court sustained the objection to the documents from the Fields case in the ruling.

        MR. LOEVY:   Your Honor, these are the files he reviewed to form his opinions.

        THE COURT:   If you want to make it more specific to me, it would be great, but I don't know that I made any categorical ruling about --

        MS. ROSEN:   Judge, the City objected to the entry of the documents from Fields because Mr. Brasfield did not rely on the documents from Fields in rendering the opinions in this case.   He simply relied on the Fields report.

        THE COURT:   Well, let me ask you this, were these documents given to Mr. Brasfield?

        MR. LOEVY:   Absolutely.

THE COURT: And did they lead to a conclusion?

RIGHT SIDE: Absolutely.

MS. ROSEN: But, Judge, they were given to him in the Fields case. He expressly said he wasn't relying on the underlying --

THE COURT: You know what? If you want to show me the ruling, show it to me, because I'm not following.

Is it a motion in limine?

MS. ROSEN: It is, Judge.

THE COURT: And which motion in limine is it, because maybe we can find it.

MR. SWAMINATHAN: City's motion in limine number 6, I believe. Your ruling is docket 552, and the ruling is on page 15.

THE COURT: All right. Let me just take a look at this.

(Brief pause).

THE COURT: We've got it. So let me get it printed out.

(Brief pause).

THE COURT: I want to just remind the lawyers that I said that I need to see the motions if you're going to rely on some ruling. And it wastes our time if you don't have them and we got to find them and print them out.

(Brief pause).

THE COURT:  Is it coming?

COURT'S LAW CLERK:  Yes.

MR. LOEVY:  Your Honor, can I back up and lay a better foundation?

THE COURT:  I have no idea, because I don't know what the ruling says.  I don't have them all committed to memory.

(Brief pause).

THE COURT:  How many pages do I need?

MS. ROSEN:  Judge, page 14 of the ruling, docket 552.

THE COURT:  I've got 552, but I don't have 14.

MS. ROSEN:  I'll hand it up to you --

THE COURT:  Wait.  I have it now.

MS. ROSEN:  Okay.

(Said item tendered.)

THE COURT:  Can you stop the printing, if you can.

COURT'S LAW CLERK:  Yes.

(Brief pause).

MS. ROSEN:  It's the middle paragraph.

THE COURT:  Yeah, I'm reading it.

MS. ROSEN:  Okay.

(Brief pause)

THE COURT:  Well, let me ask you this, there was no categorical bar.  It was just a request of counsel to alert everyone to anything that he intended to use.  And I think we now know it's being used, and it's being used the way other

documents were used. I don't know if you gave notice or not. It would've been helpful.

MR. LOEVY: Well, it's page 67 and 68 of his report, that he relied on this, you know, heavily.

MS. ROSEN: Judge, and these documents were not produced in discovery in the case. The Fields documents were not produced in discovery in this --

THE COURT: Well, if he refers to it in this report, I think that's adequate.

MS. ROSEN: But if he expressly says that he's not relying on the underlying source document and he's simply relying on his whole opinion --

THE COURT: This ruling does not give any kind of prohibitive bar. It simply says there needs to be notice because there's been a lack of specificity in terms of how much he's going to use from these cases.

MR. LOEVY: And it's not much, Your Honor.

THE COURT: I'm going to overrule the objection.

MR. LOEVY: All right. We would ask permission to show Plaintiff's Exhibit 146, page 950.

THE COURT: Okay.

MR. LOEVY: And we can call this 146 A.

THE COURT: And there's an objection to 146 A, I assume, but I'm overruling it and it will be received.

Brasfield - direct by Loevy

2259

(Plaintiff's Exhibit No. 146 A was received in evidence.)

MR. LOEVY: All right. And if we could publish this then to the witness, please.

BY MR. LOEVY:

Q. Can you provide some context for the kind of document we're talking about -- first of all, is this a document that was in the criminal defense attorney file or not in the criminal defense attorney file?

A. This would've been not in the criminal defense attorney's file.

Q. All right. Can you give us some context for why this is the kind of document that's important?

A. This is a general progress report produced on a City of Chicago Police Department form. And as I've mentioned, other than the requirement that GPRs be inventoried, they're not included in the permanent retention for discovery.

This is an example of one that was not produced. And it describes receiving a phone call who the caller indicated that a Rodell Banks was the person who had shot the people on 39th Street. This would be the type of information, however eventually it turned out to be true or not true, would be the type of thing that a criminal defense attorney would need, the defendant would need to mount an effective defense.

Q. And to be clear, the criminal defendant in this case was

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 109 of 758 PageID #:107562
Brasfield - direct by Loevy
2260

not Rodell Banks, it was a man named Nate Fields, correct?

A.   That's correct.

Q.   All right.  Showing you Plaintiff's Exhibit 146 B, which is page 921 of the same exhibit.

Can you identify the kind of document we're talking about here?

A.   This is what's been referred to obviously as a handwritten memo.  And it refers to --

MS. ROSEN:  Judge, I have an objection.

This is a different exhibit, correct?

MR. LOEVY:  Yes.  146 B.

MS. ROSEN:  Okay.  So it's on the screen.  I have an objection to it.

THE COURT:  So this is for the same reason?

MS. ROSEN:  For the same reason.

THE COURT:  Okay.  That objection is overruled.  You may publish it.

BY THE WITNESS:

A.   And it indicates that about 0900 hours in a stairwell, he said that he was going to get a gun and that he would put on masks.  And Lawrence also said he would -- wouldn't live through the night, and Marshall said he would be jumping -- "won't be jumping on you anymore."  This, again, is referring to someone other than Mr. Fields.

Q.   Is this the kind of information that Mr. Fields should've

had in the criminal defense trial?

A. Yes, I would expect that to be.

MS. ROSEN: Judge, just for purposes of the record, this document I've never seen it before. It's never been produced.

MR. LOEVY: It's a plaintiff's exhibit, Your Honor.

MS. ROSEN: It's never been --

THE COURT: Hold on.

It's never been produced?

MS. ROSEN: Never produced in discovery in this case at all.

MR. LOEVY: Your Honor, it's a plaintiff's trial exhibit. They have all our trial exhibits.

MS. ROSEN: But --

THE COURT: Okay. Let's not have a fight about it. You're telling me that it was made available with other exhibits?

MR. LOEVY: We gave them all our trial exhibits, Your Honor.

MS. ROSEN: Before trial. Just before trial.

THE COURT: Overruled.

BY MR. LOEVY:

Q. All right. This one is not on a GPR, correct?

A. That's correct.

Q. Does that show evidence of compliance with the rules?

A.  No, it is clear, noncompliance with the rules.

Q.  All right.  Showing you 146 C.

MR. LOEVY:  And same type of document, Your Honor. Last one from the Fields case.  We'd ask permission to move 146 C into evidence.

MS. ROSEN:  Same objection.

THE COURT:  And I will also overrule that objection. It will be received.

(Plaintiff's Exhibit No. 146 C was received in evidence.)

BY MR. LOEVY:

Q.  All right.  This is another document that did not make it to the criminal defense attorney's file, correct?

A.  Yes.

THE COURT:  How are you marking this?

MR. LOEVY:  C.  It says "A" but it should be "C."

THE COURT:  Okay.  All right.

BY MR. LOEVY:

Q.  Can you explain what this document is?

A.  In police parlance, it's a rap sheet.  It's the identification section listing of an arrest of an individual. In my review of these hundreds of cases, that when it's produced by the ID or record section to whoever it's asked for, it's date stamped.  This one is April 27, '84.  What this refers to is Earl Hawkins.

Brasfield - direct by Loevy

2263

Q. Now, without getting into too much detail about the Fields case, could it be exculpatory if this guy, Hawkins, was a suspect on April 27th, that might play into the chronology of the case, correct?

A. That's correct.

Q. Now, can you know from looking at all these files whether this date turned out to be important in the Fields case as being before he was supposed to be a suspect?

A. I can't --

MS. ROSEN: Objection.

THE COURT: Wait a minute. Wait a minute.

What's the objection?

MS. ROSEN: He's making an analysis of whether or not it's important in the Fields case.

MR. LOEVY: I'm asking if he can.

Could I ask a better question, Your Honor?

THE COURT: Well, I thought we weren't going to do that.

MR. LOEVY: This is the Fields cases. May I ask a different question?

THE COURT: Sure.

BY MR. LOEVY:

Q. When you review these files, is it hard to know if a particular document like this one had significance on the Fields fact pattern?

Brasfield - direct by Loevy

2264

A.   It's very difficult to, but it would require considerable time to cross-check.

Q.   All right.  So this might be a benign document or it might be a smoking-gun document, it's hard for you to know, correct?

A.   That's correct.

Q.   All right.  Let's talk about the Kluppelberg case.

This is another example of a file that turned up after the criminal trial and included documents that didn't make it to the criminal defense attorney, correct?

A.   That's correct.

MR. LOEVY:  All right.  I'd like to introduce at this time Plaintiff's Exhibit 145 A, which is a handwritten note from the investigative file that was found on the pallet.

MS. ROSEN:  Judge, I have the same objection to the Kluppelberg documents.

THE COURT:  Was this also a trial exhibit?

MR. LOEVY:  Yes, Your Honor, Plaintiff's Exhibit 145.

THE COURT:  I will receive it.

(Plaintiff's Exhibit No. 145 A was received in evidence.)

BY MR. LOEVY:

Q.   All right.  Can you give us some context for what we're looking at here.

A.   Again, this would be a handwritten memo that would've been in the investigative file that did not make it into the

Brasfield - direct by Loevy

2265

permanent retention file for discovery.

Q.   And just to be clear for the context, Mr. Kluppelberg was accused of an arson murder, correct?

A.   That's correct.

Q.   So why is this kind of information important?

A.   Well, Mr. Kluppelberg was accused and eventually convicted of a fire that occurred in 1984 that killed six people.  It was originally investigated and determined by both bomb and arson and Violent Crimes as unknown origin or accidental and laid dormant for a number of years.

And then -- but in the original investigation, there were several things that were -- that came to light that were included in the investigative file.

Q.   Such as this document?

A.   Such as this that alludes to the fact that a Minerva Herst (phonetic) had indicated to the investigators that there were extension cords all over the basement floor and that it was a hazardous condition.

Q.   All right.  Showing you 145 B.

This is another handwritten note.  It looks like an interview of some kind of with a name and a date?

A.   Yes.

Q.   Was this a document that was in the investigative file but not in the official file?

A.   That's correct.

Q.   Is this problematic that this kind of information didn't get turned over?

A.   Yes, because, on its face, that there was an individual who had had an argument with the victim of the fire, and would lead an individual to whether it was a criminal defense attorney or investigator, that there may be -- if it was, in fact, a malicious crime, that it might have a different suspect.

Q.   All right.  Do you remember -- this is a case you worked on, the Kluppelberg case, correct?

A.   Yes.

Q.   Do you remember another suspect named Isabela Ramos and a reason the police had to suspect she may have been involved?

A.   There was information came during the original 1984 investigation and contained in the investigative file that there was a lady that had set fires in that immediate vicinity, had a drug alcohol problem, as I recall, and could possibly have set the fires and couldn't quite remember whether she might have or not.

Q.   All right.  Was that the kind of information that should've been turned over?

A.   Yes.

Q.   And when you reviewed the files, did you see other information like that that should've been turned over and wasn't?

A.   Yes, that's correct.

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 116 of 758 PageID #:107569
Brasfield - direct by Loevy
2267

Q. All right. And showing you -- I'm not going to go through all the files. Obviously, some of the files contained information that was more important than others that wasn't turned over, correct?

A. That's correct.

Q. And some of them were sort of cryptic some of the information that didn't get turned over, names, phone numbers, license plates, that kind of thing?

A. Yes. There were several examples of just a one-line note that could've been important, might not have been important, but evidently the person that wrote it down, who did not identify themselves in each occasion, thought it was important enough to include in the investigative file.

Q. All right. I want to show you only one more file, the Demetrius Johnson file, which is part of Plaintiff's Exhibit 154.

And showing you a copy of a report from the permanent retention file --

MR. LOEVY: And, Your Honor, we'd move 154 J into evidence.

THE COURT: Any objection?

MS. ROSEN: No objection.

THE COURT: It is received.

(Plaintiff's Exhibit No. 154 J was received in evidence.)

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 117 of 758 PageID #:107570
Brasfield - direct by Loevy
2268

BY MR. LOEVY:

Q.  It looks like this is a lineup report that was in the permanent retention files, Guevara report, dated 12th of June, 2300 hours, conducted by a Mr. Guevara.  And it looks like the person viewing the lineup was Aby Gonzalez.  You've seen this document, right?

A.  Yes, I have.

Q.  And the important thing here is that it was 11:00 o'clock at night on June 12th, 1991, correct?

A.  That's correct.

Q.  Now, it looks like, based on this police report, that was in the permanent retention file.  Does that mean this police report was turned over?

A.  Yes.

Q.  It looks like the suspect here -- I just want to -- it looks like it's a negative lineup.  And it says:

        "... after four witnesses viewing this lineup,
        the results were negative.  Because the results
        of the lineup was negative, the subject was
        released without charging."

    It looks like Brian Jones is the guy they were interested in, do you see that?

A.  Brian Jones, yes.

Q.  And showing you a copy of a report that was in the investigative file that was not turned over.

MR. LOEVY:  This is Plaintiff's Exhibit 154 K, Your Honor.

BY MR. LOEVY:

Q.  And this one was created looks like a day later on the 13th of June of 1991 at 1700 hours.  Do you see that?

A.  Yes.

MS. ROSEN:  Judge, I'm going to object to the term "created."  There's no foundation for that.

THE COURT:  Sustained.

BY MR. LOEVY:

Q.  Well, it's dated 13th of June at 1700 hours, correct?

A.  Yes; referring to an event on June 12th.

Q.  All right.  Referring to an event that happened on June 12th at what time?

A.  2230 hours.  10:30 p.m.

Q.  All right.  So that would be about a half hour before this lineup that we just talked about, correct?

A.  That's correct.

Q.  And in this report, it looks like Aby Gonzalez, same person doing the lineup, right?

A.  It's the same name, yes.

Q.  And, again, we have Brian Jones as one of the volunteers in the lineup, right?

A.  Brian Jones, yes.

Q.  All right.  This report that was in the investigative file

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 119 of 758 PageID #:107572
Brasfield - direct by Loevy
2270

contains different information than the one in the permanent retention file, does it not?

A.   The highlighted section indicates that he did, in fact, identify the participant as the offender.

Q.   All right.  As a professional in your field, why is it important that the document that says he did identify this alternate offender, why does that have to get turned over, too, in addition to the one where he said he didn't?  Same person.

A.   Ah, I don't know how to explain why -- why you wouldn't.  I mean, it is -- it is some conflicting information that it needs to be.  It just calls out for further investigation and explanation.

Q.   In other words, if the permanent retention file contained a lineup report saying that 11:00 o'clock at night Aby Gonzalez failed to identify the alternate suspect, and then there was another report --

        MS. ROSEN:  Objection to the phrase "alternate suspect," Your Honor.

        THE COURT:  Sustained to the form.

BY MR. LOEVY:

Q.   Brian Jones was not the person on trial in People of Illinois versus Demetrius Johnson, correct?

A.   Correct.

Q.   All right.  So if there was another report half hour earlier that said that the same witness, Aby Gonzalez, had

Brasfield - direct by Loevy

2271

identified the alternate suspect, Brian Jones, as the offender, that's the kind of thing that should've been turned over, right?

A.   Absolutely.

Q.   Even if the first lineup was created by -- the first report was created by Detective Guevara and the second report was created by Detective Erickson, does that reduce the requirement to turn this kind of information over?

A.   Absolutely not.

Q.   All right.  Were there other examples in the file you reviewed, without going through file by file, by file, by file?

A.   Yes.  Of similar instances, yes.

Q.   All right.  And if Ms. Rosen was to show you file by file, by file, by file, there would be a lot of examples of documents that weren't necessarily important, would you agree with that, too?

A.   I would.

Q.   So why did you list the documents also that weren't as important along with documents that were as important when you were describing what was missing?

A.   I'm sorry, would you --

Q.   Sure.

A.   -- state that again.

Q.   Did you make any editorial decision about only list the important missing stuff or did you list all the missing stuff

when you compiled your statistics?

A. With the spread sheet that we demonstrated on Friday, that was everything objectively, whether it was valuable or not valuable, or potentially important or not potentially important.

Q. Why was it important in your analysis not to make a value judgment about whether it was important or it wasn't important?

A. I was trying to illustrate the theme or the pattern of noncompliance with the orders for discovery, and to emphasize the fact that there was a systemic pattern of parallel files.

Q. All right. Were you -- like if you saw a note with a license plate or a phone number or a name in a given investigation, were you necessarily in a position to know how much significance it always had?

A. No, I was not.

Q. All right. You also included in your analysis administrative documents. Can you list the kinds of administrative documents we're talking about?

A. There were court attendance, there were -- there's a form that is required that's kind of like a library check-out card for when a file has been taken out of a particular location. While you can call it an administrative file, the inventory was certainly there as an administrative effort as opposed to an investigative effort.

Q. Could those kinds of, quote, administrative documents, also turn out to be exculpatory?

A. Yes.

Q. For example, a court record or an attendance record, you never know when it might become important in a case whether a person was on duty or off duty, correct?

A. That's correct.

Q. And were those the kinds of documents that were or weren't making into the file that got turned over?

A. They were not making it into the files.

Q. All right. Approximately -- based on your numbers and your report, and I think it's on page 43 of your report, bullet point 4 of your cheat sheet, approximately what percent of the time were the files you reviewed missing investigative materials of the 38 cases?

A. Well, of the -- I'm sorry, if you can speed the process up here. If you'll direct me to it.

Q. It's --

A. Page what?

Q. Page 43 of your report or it's the first bullet point under 4 A in the bottom third of your summary.

A. Well, on page -- I'm sorry to interrupt, but on page 43 of my report the handwritten notes and general progress report, 74% were missing on official handwritten notes. 10% -- I'd go down the stats here if you want but --

Brasfield - direct by Loevy

2274

Q. Well, the sort of summary stat, how many out of 38 we missing at least some investigative materials?

A. I believe that was 100%.

Q. All right. So in wrapping it up, you talked yesterday about the policies of the police department and whether you thought they were sufficient and insufficient. And I believe you said that you thought that it was an insufficient solution, right?

A. Yes.

Q. But based on the fact on the file-by-file document review that you did and gave some examples for, do you believe that the police department had a problem in practice as far as implementing these supposed rules that were supposed to fix things?

A. Yes, the material that I reviewed in hundreds and hundreds of cases, that the actual practice was such that it was not -- that it indicated there were parallel files and that the material was not -- significant material was not being turned over to discovery.

        MR. LOEVY:  I have no further questions, Your Honor, thank you.

        THE COURT:  Okay.  Cross-examination.

        MS. ROSEN:  Your Honor, if I understood correctly, Mr. Brasfield is using some kind of summary or bullet points assistance in his testimony.  So if I heard that correctly, I

don't have --

MR. LOEVY:  I have a copy here.

THE COURT:  Okay.  Thank you.

(Said item tendered.)

MS. ROSEN:  Judge, are we going to take a break soon or are you --

THE COURT:  Well, yeah, we haven't been going for an hour.  I've been trying to push to an hour and a quarter.

MS. ROSEN:  Yeah.  So there's some stuff we need to set up, but I can wait and then do that at the break.

THE COURT:  Let's try to push on for at least 10 minutes, 15 minutes.

MS. ROSEN:  Yes.  Thank you.

CROSS EXAMINATION

BY MS. ROSEN:

Q.  Good morning, Mr. Brasfield.  How are you?

A.  Very good, Ms. Rosen.  Thank you.

Q.  I want to start with your global opinions.  And if I understood your testimony on Friday and this morning, you hold an opinion that the Chicago Police Department's policies and practices, both written policies as well as how they played out in practice, were deficient because they didn't provide the criminal defense attorneys or criminal defendant with the discovery that they're entitled to, do I have that generally correct?

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 125 of 758 PageID #:107578
Brasfield - cross by Rosen
2276

A.   Generally correct, yes.

Q.   Okay.  And in an effort to evaluate the City's policies and procedures, if I understand your testimony correctly, you looked four sets of files, correct?

A.   The investigative files, the permanent retention files, the criminal defense attorney files, and, to a lesser extent, a few of the assistant state's attorney files.

Q.   Okay.  And for purposes of your opinions in this case, you looked at 138 investigative files, is that correct?

A.   Actually there were 52 Area North files, there were 138 in the central area, or Area 5, that would total 190.  As I said, I think in my testimony on Friday, there were some that had multiple defendants and there were some that were redacted.  So the base universe, as I referred to it, was around 190.

Q.   So the total number of investigative files that you had at your disposal in this case was 190, right?

A.   That's correct.

Q.   And 52 of those files, it was your understanding, came from the police facility called Area North, correct?

A.   That is my understanding, yes.

Q.   And those 52 Area North investigative files, you had no companion permanent retention or records division files, correct?

A.   There were eventually files that produced to correspond with the 180 or so that I looked at.

Q.   Well --

A.   But some were not available.

Q.   Okay.  So let me just -- listen to my question.  Okay?

So with respect to the total 190, the 52 Area North files did not have the companion permanent retention or records division files, is that correct?

A.   That may be my recollection.  I'm not sure.

Q.   And we can take a look at your attachments --

A.   Okay.

Q.   -- in a minute, if that would help you.

But regardless, with respect to the total number of investigative files, 52 were from Area North and 138 were from records division storage facility, correct?

A.   Where they would normally be, yes.

Q.   Okay.  And then you also received what you're calling permanent retention files.  And that's because in homicide cases, when you're looking at those files years later, they have that permanent retention stamp on it, correct?

A.   They eventually receive that stamp, yes.

Q.   Okay.  And that stamp, your understanding is based on your review of the depositions in this case and everything else, doesn't go on those documents immediately, correct?

A.   No, it does not.

Q.   And, in fact, I think it goes on.  I think the testimony is, some 6 or 7 years after the case is closed, correct?

A.  I don't recall reading specifically the time.  It's when the cases close, if you will.

Q.  Okay.  And so that's why you're calling those documents in homicide cases permanent retention files, right?

A.  That's the terminology that I've seen the City's designated experts refer to it as.

Q.  Sure.  And they're also referred to by those same people as records division files, correct?  You've seen that?

A.  I've seen that, yes.

Q.  All right.  And in the process, you've talked about your criticism of the Chicago Police Department as it relates to its use of centralized files, and we'll get to that more particularly in a minute.

But you understand that pursuant to the City of Chicago's processes probably going back all the back to the early 1960's, the records division is where original general offense case reports and supplementary reports are funneled for any investigation regardless of whether it's a homicide or not, correct?

A.  That's my understanding.

Q.  Okay.  And the records division is the unit of the Chicago Police Department that's required to maintain all of those original documents, correct?

A.  All of the documents the Chicago Police Department deems to go there.

Brasfield - cross by Rosen

Q. Sure.

A. But not all of the records.

Q. Correct. But my question was specific to general offense case reports and supplementary reports; correct?

A. That's correct.

Q. And you have an understanding, don't you, based on your review in this case and other cases where you've testified against the City of Chicago, that the initial document that's created at the inception of any crime is a document called the general offense case report, correct?

A. That's correct.

Q. Okay. And it's at that point that the investigation is given a particularized identification number and that's the thing we've all been calling the RD number, correct?

A. The records division number, that's correct.

Q. Correct. And there's a letter and there's some numbers after it, like N12345, correct?

A. Correct. Alphanumeric system, yes.

Q. Okay. And then you are also aware through the work that you've done in connection with your opinions related to the Chicago Police Department, that once a general offense case report is prepared, if there's any follow-up investigation, any document that's created should have that special records division number, correct?

A. That's correct.

Brasfield - cross by Rosen

2280

Q.   And you also know that the typewritten reports that either patrol division officers do, or tactical officers do, or Gang Crimes Specialists do, or even detectives, those typewritten reports go on something called a supplementary report, correct?

A.   They're supposed to, yes.

Q.   Okay.  But there's also, as you pointed out, post-events that transpired as it relates to Mr. Jones and the Palmer class-action litigation.  The Chicago Police Department created new documents and new forms, correct?

A.   That's correct.

Q.   And one of the premiere forms, the identifying feature of the new forms is a document called the general progress report, correct?

A.   That is a form that was put into existence.  I don't know the exact date.

Q.   Sure.  And that began, I think initially, with special order 3-1, if I have that, correct, right?

A.   That's my recollection.

Q.   Okay.  And the general progress report was the Chicago Police Department's attempt to, for purposes of the Detective Division, standardize note-taking in the course of any criminal investigation, correct?

A.   Limited to the Detective Division, yes.

Q.   Correct.  And you've seen through your review of all of these files examples of general progress reports where notes

have been taken on them, is that correct?

A.  Yes, I have.

Q.  Okay.  And with respect to the review that you conducted in this case, you looked at the -- we talked about the 52 Area North files, the 138 files that came out of the records division warehouse, and that's the set of investigative files in this case, right?

A.  That's correct.

Q.  And contained within those investigative files are lots of documents related to the investigation.  The sort of the characteristic document that let's anybody know that it's an investigative file, it's the general progress report, correct?

A.  I'm sorry, would you restate that?

Q.  Sure.  And you've reviewed lots and lots and lots of investigative files not only in this case but in other cases, correct?

A.  Yes.

Q.  And the sort of signature feature of the investigative file is that it contains general progress reports, correct?

A.  Not necessarily.

Q.  They don't all contain --

A.  They do not all contain general progress reports.  I would expect them to, but they do not.

Q.  Okay.  So the majority contained general progress reports?

A.  There are -- there are a number that contain general

progress reports, as to be expected.

Q. Okay. But in your review of all of the records division files or permanent retention files, isn't it true that you found zero general progress reports?

A. In which?

Q. The permanent retention file or the records division file, isn't it true that there are zero general progress reports in those files?

A. In the permanent retention file, correct.

Q. Correct. Okay. And that's by design, correct?

A. They're supposed to be included on the inventory that goes with the permanent retention file.

Q. There's supposed -- there's supposed to be a reference to them in the inventory log that would list out GPRs on that log that we've seen and that you've already discussed, correct?

A. There should be, yes.

Q. Okay. But, in fact, there are no actual hard copies of the general progress reports in the permanent retention or RD file, correct?

A. That's the way it was designed, yes.

Q. That's expressly by design and the City has never said otherwise, correct?

A. That would be correct.

Q. Okay. Also in your review you talked about the documents to-from memos and then the handwritten notes that didn't appear

on the general progress report. Do you recall that testimony?

A. That they did end up on general progress reports?

Q. No. Let me slow that down a little bit and get to my point.

A. Please.

Q. You've testified that in addition to finding general progress reports in investigative files, you've also found what we call to-from memoranda, correct?

A. That's correct.

Q. And the characteristic feature of a to-from memorandum is that at the top of the document it says "to" and it's addressed to somebody, and then it says "from" and it's from the person who's typing up the memorandum and then it has information, correct?

A. If it's on a Chicago to-from memo, but, yeah, in general, that's one of the examples that were shown a little earlier this morning. The essence of the to-from memo was "George," "Bob," "Jim" subject matter, and the end.

Q. Well, actually in a to-from memorandum there is no Chicago Police Department to-from memorandum form, right?

A. In my review of the files over the last several years, there have been where it says "to:" "from:" "subject:" That's what I would refer to as a to-from memo.

Q. Okay. But it's not on a preprinted form. It's somebody saying "to" and the addressee "from" and the -- I mean, you've

seen no evidence to suggest that it's some official form from the Chicago Police Department, right?

A. Not that I recall.

Q. Okay. And so your criticism of the continued use of the to-from memorandum after the changes that were made, after Jones and Palmer, is that, in your opinion, because the Chicago Police Department created the standardized general progress report form, any information that was being prepared on a to-from memo should've actually been prepared on a general progress report, correct?

A. That's correct, because it has to be available. And if it's not -- if it's a reference to a general progress report, it's on the inventory sheet. And you'd have a handwritten memo, or a handwritten to-from, or typewritten, and it's not on a general progress report, you may or may not have on the inventory sheet a reference to this informal document.

Q. Okay. But you did those to-from memorandum in those investigative files, right?

A. I did, yes.

Q. Okay. And then the other criticism that you have with respect to the contents of the investigative file is that there are notes that are handwritten out that are not on the general progress report form.

And it's your opinion that those notes should've been transferred over to the general progress report form because

Brasfield - cross by Rosen

2285

that's the standardized form for note-taking, correct?

A.   That's correct.

Q.   Okay.  And so what should the police officer do with the original handwritten note?  If they do what you think they should be doing, if they take the information that's on a blank piece of paper that's not on the form, they transfer that information over to the general progress report, what should they do with that note that was taken on a non-GPR form?

A.   Well, as I testified to on Friday, since there is no clear guidance from the Chicago Police Department as to what they should do with it, the importance of a handwritten note is going to be represented in the -- in the reference in the general progress report.

        And if -- if everything contained on the handwritten note, and in a case of a license plate number --  many, many, times I'd see a piece of paper that just had a license plate number or a name.  And if that information, for instance a license plate number, was on the general progress report explaining what it represented, who acquired it, and when, then if that piece of scratch paper was destroyed, shredded, whatever, I would find no problem with that.

Q.   Okay.  Well, I'm talking about the circumstance of so police officers, detectives, out on the field, for whatever reason they don't have their general progress report forms, they're interviewing a witness, they take a bunch of notes on a

piece of paper, it's your view in that scenario that that information should be transferred from that slip of paper over into a general progress report, right?

A.   That was also as I understand in reading the material in Jones and Palmer, that was not only something that they were supposed to do, it was required to do, and they didn't do.

Q.   Okay.  So in that scenario, it's your opinion that the Chicago Police Department, post-Jones and Palmer, required Chicago police officers to transfer the information that's on a note on to a general progress report, correct?

A.   That information should be placed in a general progress report that can be put on an inventory sheet that will go into the permanent retention file and lead to discovery.

Q.   Okay.  What should happen, in your opinion, should the police officer do with that note after they've transferred that information over to the general progress report?

A.   I would -- I would even be able to -- to feel the minimum requirement was met if that information was -- was placed on a general progress report and a copy of that entire general progress report, with the note, was inventoried on the inventory sheet and went to the file, but you have this separate piece of paper floating around there.

        But if, in fact, everything that was on that handwritten note, depending on what it contained, was on a general progress report, that would meet the criteria.

Brasfield - cross by Rosen

2287

Q. Okay. But, in fact, what you found, actually, is that those notes were retained in the investigative file, correct? That's how you located --

A. They were -- for lack of a better word, they were hidden in there. No one knew they were there based on the permanent retention file.

Q. When you say "they were hidden in there," that presupposes, doesn't it, that criminal defense attorneys did not get investigative files, right? That's the premise for that conclusion?

A. Based on the number of cases I reviewed, that's my conclusion, generally speaking. I'm not saying that each and every criminal defense attorney failed to get an investigative file.

Q. Okay. In the course of your review in this case, you compared investigative files to criminal defense attorney files, correct?

A. That's correct.

Q. Okay. And you compared 44 investigative files to 48 criminal defense attorney files, correct?

A. That's what I was provided, yes.

Q. And that's what the number -- I think you told us on Friday that the criminal defense attorney files that we obtained in this case were the only ones that were available that were related to the number of -- the RD numbers that we had for

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 137 of 758 PageID #:107595
Brasfield - cross by Rosen
2288

investigative files. So the total universe that we had, the parties could only locate 48 criminal defense attorney files,, correct?

A. That's correct.

Q. Okay. And it's 48 criminal defense files against 44 investigative files because some of those cases involved multiple defendants, right?

A. Right.

Q. Okay. So in your Attachment F to your report, isn't it true that in every single criminal defense attorney file you identified documents from the investigative file?

A. That there were -- there were some documents from the investigative file.

Q. Well, let's talk about Mr. Sherman Addison.

Isn't it true that there were 69 pages of documents from the investigative file in the criminal defense attorney's file?

A. Given the sheer volume of material that I've looked at, I would have to have it here in front of me.

Q. Okay. So would you like to have your Attachment F?

A. No, I have Attachment F.

Q. Okay. Well, take a look at page 4 of Attachment F.

A. Okay. I'm sorry.

Q. And it says "Sherman Addison," right?

A. Yes.

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 138 of 758 PageID #:107591
Brasfield - cross by Rosen
2289

Q. RD number GO63126, right?

A. Right. With the corresponding Bates numbers.

Q. Okay. And in your comparison you list investigative files 69 pages, right?

A. That's correct.

Q. And the only thing that you note missing from the Sherman Addison file is that ME body chart, right?

A. Medical examiner's body chart, yes.

Q. Okay. And you know that the Medical Examiner body chart is a document that's created not by the Chicago Police Department, but by the Medical Examiner's Office, correct?

A. And provided to the police department to be put in their investigative file.

Q. And provided to do the state's attorney, correct, in the course of a criminal prosecution?

A. The state's attorney would get that information from the police department.

Q. What's your basis for saying that?

A. Well, in my experience and in the testimony and the depositions I've reviewed, that the state's attorney would request and get information from the police department pertaining to their criminal homicide investigation.

Q. And that's the sole place that the prosecutors went to for their information?

A. No. I am sure, depending on the prosecutor, they might

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 139 of 758 PageID #:107592
Brasfield - cross by Rosen
2290

seek it from other places.

Q. Are you suggesting that there are criminal prosecutions that happened in Cook County in 1985 to 1991 on homicide cases where the medical examiner's report was not provided in the criminal case to either the state's attorney or the criminal defense attorney?

A. That's not what I'm suggesting at all.

Q. Okay. Now, let's take a look at the next one on your list, Joaquin Gonzalez.

You list there investigative file, 52 pages, right?

A. Yes, that's correct.

Q. And the only thing you note missing from the criminal defense attorney file that was in the investigative file is the MD body charts, correct?

A. That's correct.

Q. And you know, before we proceed, isn't it also true that in your review of all of these documents, particularly the criminal defense attorney files, that you do not know and cannot represent that the criminal defense attorney files that we got in connection with the discovery in this case are actually complete files, right?

A. It was put to me that the criminal defense Public Defender's Office provided everything that they had in their files.

Q. But you have seen no evidence in any of the records that

Brasfield - cross by Rosen

2291

the files, as they existed in 2015 or 2016 when we received them in this case, were in the same condition that they were in back in the 1980's or '90s when the criminal prosecutions were going forward, correct?

A.   I have no independent knowledge of that, no.

Q.   Okay.  So as we sit here today when we're looking at files that are 30 years old, none of us can say that they're in the same condition that they were in when the criminal prosecution was going forward, correct?

A.   I can only say that they should be, but I don't know whether they were or not.

Q.   And you have no idea what -- and let me back up for a second.  These criminal defense files all came from the Cook County Public Defender's Office, right?

A.   That's my understanding, yes.

Q.   Okay.  And you have seen no testimony from anybody from the Cook County Public Defender's Office that indicates that these files were in the same condition that they were in back at the time of the criminal prosecution, correct?

A.   I recall maybe one or two depositions or one or two source documents where a criminal defense attorney at the time represented that the file contained what they had, but I don't recall independently.

Q.   Okay.  Well, I'm going to focus your attention actually on these files that we're talking about.  They're listed in your

Brasfield - cross by Rosen

2292

Attachment F.

And with respect to the criminal defense attorney files that are listed in Attachment F, isn't it true that there is zero testimony from any criminal defense attorney related to these particular criminal defense files?

A.   These specific ones I don't recall, no.

Q.   Okay.  So now taking a look at the next name on the list at page 4, Jesus Hernandez and Jipolito Torres.  It's investigative file, 63 pages, correct?

A.   That's correct.

Q.   And then the documents that you list as being missing from the criminal defense file is the investigative file inventory that we've talked about, correct?

A.   Yes.

Q.   Okay.  The felony case computer printout, that's a document that's created and prepared by the Cook County State's Attorney's Office, right?

A.   That's my understanding, yes.

Q.   And subpoenas that were issued by the criminal defense attorney to the police department, right?

A.   Correct.

Q.   So certainly the criminal defense attorney should've had copies of his own subpoenas in his file, right?  If it were in the same condition it had been in back in the 1980 and '90s?

A.   I was comparing them what was in the investigative file and

what wasn't in the criminal defense attorney files, so ...

Q. I appreciate that. But in the context of evaluating whether or not these files are in the same condition that they were in back in the 1980s, isn't it true that you would expect a criminal defense attorney to keep a copy of a subpoena that that criminal defense attorney issued in his file or her file?

A. They may or may not. But, again, I'm not evaluating what should or should have been practice. I was looking objectively at what was in the file and what wasn't.

Q. Right. But if -- you would expect, wouldn't you, and if you're looking at a criminal defense attorney's files, that that criminal defense attorney would maintain copies of subpoenas that that criminal defense attorney issued?

MR. LOEVY: Objection, asked and answered, Your Honor.

THE COURT: Overruled.

BY THE WITNESS:

A. I have no way of knowing.

MS. ROSEN:

Q. And so when you noticed that there were subpoenas missing -- subpoenas that were prepared by criminal defense attorneys and that there were no copies of those subpoenas in those criminal defense attorney files, that did not inform your opinions in any way regarding whether or not these files were in the same condition they had been in during the time of the criminal prosecution, right?

A.   That's correct.

THE COURT:  Ms. Rosen, it's 10 to.  Is this a good time?

MS. ROSEN:  Sure.

THE COURT:  Let's take our mid-morning break, ladies and gentlemen.

COURT SECURITY OFFICER:  All rise.

(The following proceedings were had out of the presence of the jury in open court:)

THE COURT:  Okay.  10 minutes, everybody.

THE WITNESS:  Your Honor, may I just stay here?  Is that all right?

THE COURT:  Sure.  Sure.

(Recess.)

THE COURT:  Ready, everybody?

(Brief pause).

THE COURT:  Got to say, at least the air-conditioning is working here.  It's not working in chambers.

COURT SECURITY OFFICER:  All rise.

(The following proceedings were had in the presence of the jury in open court:)

THE COURT:  Please be seated, everyone.

Ms. Rosen, as soon as you're ready.

MS. ROSEN:

Q.   Okay.  Mr. Brasfield, so we were talking about your

Attachment F to your report. And we had talked about the first three criminal defense files that you have listed here.

And you would agree with me, wouldn't you, that with respect to every single case, every single criminal defense file that you reviewed in connection with this comparison, contained information that was exclusively found in the investigative file, correct?

A. I'm sorry, I have to ask you to repeat that.

Q. Sure. We were talking about your Attachment G -- I mean, Attachment F, which is your comparison of 44 investigative files to 48 criminal defense files. And in every single one of the 48 criminal defense files that you reviewed in this case you found materials that are contained solely in the Chicago Police Department's investigative files, correct?

A. That there -- there are documents contained within the investigative files, some, that are not in either the permanent retention or the criminal -- I'm sorry, but --

Q. Maybe I'm not being clear in my question.

So we're looking at your Attachment F, which is your comparison between investigative files and criminal defense files, in part, correct?

A. Well, in the first page on page 1 of Attachment F, I attempt to lay out exactly what that was.

Q. Okay. But I'm just asking you the question. The jury doesn't have it in front of them at this time, and the jury is

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 145 of 758 PageID #:107593
Brasfield - cross by Rosen
2296

not reading it.  So it is true, is it not, that Attachment F is your comparison of 44 investigative files to 48 criminal defense files?

A.   And 43 corresponding permanent retention files.

Q.   Correct.  And I'm going to put that analysis to the side for a moment.

A.   All right.

Q.   I just want to talk about your comparison between the 44 investigative files and the 48 criminal defense files.  Okay?

A.   As a portion of all of the comparisons I did, yes, that's true.

Q.   Okay.  And when you compared the 44 investigative files to the 48 criminal defense files, isn't it true that in every single one of the 48 criminal defense files you found documents that are solely contained in the investigative files?

A.   Yes.

Q.   Okay.  And so that is at least some indication that documents from the investigative files are actually making their way into the criminal defense attorney files?

A.   Some, yes.

Q.   Okay.  And your criticism is that there are pages from the investigative file that don't appear in the criminal defense files as they existed, correct?

A.   Yes; but taking it as a total group that there's a pattern of certain types of documents not appearing in the criminal

Brasfield - cross by Rosen

2297

defense file.

Q. Okay. So the pattern, if we're looking at your Attachment F, if we're calling it a pattern, you identify the document from the investigative file that's missing from the criminal defense attorney file, right?

A. Yes. And each and every one will not be identical, but, generally speaking, you will find handwritten notes, property inventory sheets that are consistently, not entirely, but consistently as a pattern missing.

Q. And when you're talking about handwritten notes -- what was the other thing? Handwritten notes and what?

A. Inventory sheets.

Q. The inventory -- you mean the inventory, not property inventory, right?

A. No.

Q. You're talking about evidence?

A. I'm talking about the investigative file inventory sheets as an example.

Q. That log that we've been talking about?

A. Yes.

Q. So those -- so it's handwritten notes and the log that are the things that you see that are -- have some pattern of being missing from the criminal defense files?

A. And the to-from memos, yes.

Q. And the to-from memos.

Okay. Take a look the Sherman Addison, the first one there. Is the to-from memo, or handwritten notes, or the inventory log missing from that one?

A. No. As I said, it's not consistent with each and every one, but taken as a group, as often as not, they're missing.

Q. Okay. Well, take a look at number 2, Joaquin Gonzalez. You don't identify that there's notes, or to-from memorandum, or the inventory log missing there, right?

A. That's correct.

Q. Okay. And number 3, Mr. Hernandez's file. That one you do note the inventory log, so that's one?

A. And handwritten notes.

Q. And handwritten notes --

A. And a number of other things.

Q. And handwritten notes that are missing from the permanent retention file?

A. From the permanent retention file.

Q. Okay. Well, I'm not focusing on the permanent retention file.

Q. All right.

Q. I'm looking at the criminal defense attorney file.

A. I apologize. Yes.

Q. So the criminal defense attorney file, right, because that's where this stuff needs to go, right?

A. I'm sorry?

Brasfield - cross by Rosen

Q. This information, the information that's contained in the permanent retention file and the information that's contained in the investigative file needs to go to the criminal defense attorney file, right?

A. Yes.

Q. Okay. And the City has consistently said that, by design, the documents that are in the investigative file and the documents that are contained in the permanent retention file are distinct, usually, correct?

A. That's correct.

Q. Okay. So if both of those files get produced, then there isn't a problem, right?

A. If, if, -- that's a big if -- if both were produced, if everything that was available that was produced during the course of an investigation were discovered, produced to the criminal defense, that would be fine.

Q. Okay. So now if we go down the list some more. If we look at the fourth one, the document that you identified missing from the criminal defense attorney file is the Enmy report (phonetic), right?

A. That's correct.

Q. Okay. And then with respect to Mr. Marino on the next page, that one you couldn't compare it to the criminal defense file because it looked like the case was transferred to a different attorney, so you couldn't make the comparison because

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 149 of 758 PageID #:107602
Brasfield - cross by Rosen
2300

the file appeared, on its face, incomplete, correct?

A. It was unavailable, yes.

Q. Okay. And then if you look at the next one, the document that you say of the 34 pages of documents contained within the investigative file, the document that you say is missing is the arrest supplementary report, correct?

A. That's correct.

Q. Okay. And if we go down the line, Mr. Devalle, no page is missing from the criminal defense file, right?

A. That's correct.

Q. Okay. The next one, Mr. Boyd, that one you couldn't review the criminal defense file because the case was transferred. So in it's face, it was an incomplete file, correct?

A. That's correct.

Q. Okay. And then when we get to Michael Green, which is on page 6, that's 389 pages from the investigative file that are found in Mr. -- in the criminal defense attorney's file from Mr. Green's case. You have a list of information there that you say isn't found in the criminal defense attorney's file, correct?

A. That's correct.

Q. Okay. And in that one there's handwritten notes, there's a supplementary report, there's request for photo identifications, there's form 101's, there's a request to hold prisoners, there's an arrest report and an arrest warrant. All

those kinds of documents you have listed that are missing from the 389 pages?

A. That's correct.

Q. Okay. And then if we go to the next one, Mr. Slack. Missing from the criminal defense file, you have identified here a subpoena, a latent fingerprint examination report, an arrest report, and one page of handwritten notes, right?

A. And photographs, yes.

Q. And photographs.

And the photographs you understand as it relates to the Chicago Police Department back in the 1980's. You're aware, aren't you, that Mr. Wadas testified that typically they weren't provided copies by the State of photographs? They were simply brought to court and the criminal defense attorney was allowed to just review the photographs. So they didn't actually get copies back then because it was difficult and costly to photograph the copies?

A. I've seen the deposition information that there was some material that was provided to the defense counsel in court.

Q. Okay. And photographs specifically, right? I mean, that's what Mr. Wadas testified to in connection with this case, right? You reviewed --

A. Generally speaking, as I recall the testimony, it had to do with crime scene or autopsy photographs, not necessarily photographs pertaining to lineups or suspects or gang material.

Brasfield - cross by Rosen

2302

There are a lot of other types of photographs.

Q. Sure. And you don't identify here what type of photograph, right, in this list?

A. No, I did not.

Q. Okay. And I'm not going to spend the time to go all the way through each of these, but, generally speaking, your review indicated to you that at least some documents that are contained solely in an investigative file appeared in criminal defense attorney files, right?

A. That's correct.

Q. Okay. And you also had available for your review in connection with this case Cook County state's attorney files, right?

A. I believe there were 6 of those, yes.

Q. Well, you looked at 6, right?

A. That's correct.

Q. There were more available for your review, weren't here?

A. That's my understanding, there may have been. I reviewed 6.

Q. But you also had more at your disposal, right?

A. I did not have them, no.

Q. They weren't -- they weren't provided to you?

A. No.

Q. But you knew they were available?

A. Ah, they may have been. I don't know.

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 152 of 758 PageID #:107605
Brasfield - cross by Rosen
2303

Q. You can't recall?

A. I don't recall. I do know that the state's attorney files, the 6, when compared to the criminal defense files, were missing the same information.

Q. In the 6 that you reviewed, right?

A. That's correct.

Q. Okay. But as I indicated, you knew there were more? You don't remember as you sit here today how many more state's attorney files were available?

A. I was not provided that information.

Q. Were you told there were 26 state's attorney files available that matched 26 of the criminal defense attorney files, 26 of the permanent retention files, and 26 of the investigative files?

A. I don't recall that, no.

Q. Okay. How did you choose to look at only 6?

A. Those wee the 6 that were provided to me.

Q. By plaintiff's counsel?

A. Yes.

Q. All right. You testified earlier about the work that you did in connection with two other cases that relate to this particular issue regarding the Chicago Police Department's record-keeping policies in the 1980's, that was Kluppelberg case and Fields case, correct?

A. That's correct.

Q. And in connection with the work that you did in Fields, you looked at zero state's attorney files, right?

A. That's correct.

Q. And you looked at 28 criminal defense files that compared to 89 total files that were found or located, stored in the basement at Area 1 from 1983 to 1989, is that right?

A. I don't have it in front of me, but that's what you have there, yes.

Q. You don't have your Fields report in front of you?

A. It was contained in my -- in my submitted report. I don't have it in the folder in front of me.

Q. Okay. But you'll take my word for it that in connection with the work that you did in Fields, for the time period 1983 to 1989, there were a total of 89 investigative files, right?

A. I will take your word for it.

Q. Okay. And you did not have any state's attorney files for those 89 files, right?

A. That's correct.

Q. And you had 28 criminal defense attorney files for those 89 files, right?

A. I'll take your word for that.

Q. Okay. And you had 27 permanent retention or records division files for those 89 files, right?

A. I'll take your word for that, too.

Q. Okay. And then the other set of materials that you looked

at in Fields were for files that were from 1999 to 2006, right?

A. I believe that was the date range.

Q. Okay. And that particular date range was of interest to you because it had to do with the facts of the Fields case. And it's 10 years later than any of the issues that we're dealing with in this case, right?

A. I believe I -- you're asking if I thought they were relevant, is that the short version or --

Q. No, I'm just asking you if I have the facts correct.

So 1999 to 2006 was another database that you looked at in Fields, and that database was relevant to the facts in the Fields case, right?

A. Yes.

Q. Okay. And in this case you know that Mr. Rivera was arrested in 1988 and he was prosecuted in 1990. So the files that are available from 1999 to 2006 is a whole another decade later, right?

A. That's correct. In the specific case here with Rivera, I looked at 3 years before and 3 years after.

Q. Right. So it was 1985 to 1991, that was the dataset?

A. That's correct.

Q. Okay. And in Fields, that 1999 to 2006 timeframe, there were 340 investigative files that were a part of that dataset, right?

A. As I recall that number.

Brasfield - cross by Rosen

2306

Q. And, again, zero SAO files, Cook County state's attorney files available in that review, right?

A. That's correct.

Q. And only 23 criminal defense attorney files and no permanent retention files, right?

A. Again, I'll take your word for it.

Q. Okay. And then in the Kluppelberg case, you also reviewed files from 1983 without an end date, right?

A. The event occurred, I believe, in 1984. So that would've been the time period.

Q. Okay. And the documents that were available for your review comprised, I think, 619 or so files, RD files, right? Permanent retention files?

A. Again, since I don't have the report right in front of me, but that's --

Q. Actually, I misspoke. 619 investigative files.

A. Yes.

Q. Okay. And you only reviewed, in connection with the work in Kluppelberg, 25 percent of those files?

A. That sounds right.

Q. Okay. And, again, in Kluppelberg there were zero state's attorney files, right?

A. That's correct.

Q. And zero criminal defense attorney files, right?

A. That's my recollection.

Q. And only 15 permanent retention files?

A. Again, without the report.

Q. So you looked at -- you'll take my word for it, that was 15?

A. Yes.

Q. And so you looked at, in Kluppelberg, 164 investigative files, which represents the 25 percent of the total versus 15 permanent retention files, correct?

A. Again, I would be much more comfortable if I had the spreadsheet here in front of me. But you're an officer of the court, if that's what's in the report, I'll take your word for it.

Q. Well, I never had your spreadsheet from Kluppelberg, but I had your report.

A. All right.

Q. So I gleaned it from your report.

A. Okay.

Q. Okay. So you testified on Friday that you had physically examined, I think the number you said was 2,000 homicide cases in connection with your review of these 3 -- in connection with the review you done in these 3 civil cases, is that right?

A. I added them up and I think they were 2,216-or-something. I think I testified on Friday that there were probably 2200.

Q. Okay. And does that represent investigative files, RD files, criminal defense attorney files, and SAO files, or is

that just 220-something homicides?

A. It's 2,200-some homicide investigations. There may have been more than one victim, but those are distinct homicide investigations.

Q. So you looked at 2,200, and whatever the number is, investigative files?

A. Homicide -- you asked if they were distinct homicides.

Q. Okay. So that number is distinct homicides, right? That's what you're saying?

A. Yes.

Q. So you had available for your review 2,200 homicide investigations?

A. Electronic format, yes.

Q. How many did you have available for your review in this case?

A. As I mentioned, in the neighborhood of 190.

Q. So the rest, the other 2,000 came from Kluppelberg and Fields?

A. That's correct.

Q. Where you had zero state's attorney files available for your review, right?

A. That's correct.

Q. And a total of 51 criminal defense files, right, that came from the Fields case because you had zero in Kluppelberg?

A. Right.

Q. Right?

A. There were a total of 48 criminal defense files in Rivera.

Q. Yeah, I'm not asking about Rivera. So of the 2,200 and whatever, 190 came out of this case, right?

A. Yes.

Q. So that leaves 2,000 homicides that you reviewed in connection with your work in Kluppelberg and Fields, right?

A. That's correct.

Q. Okay. And in Kluppelberg and Fields you reviewed zero state's attorney files?

MR. LOEVY: Objection, asked and answered, Your Honor.

THE COURT: Overruled.

BY THE WITNESS:

A. That's right.

MS. ROSEN:

Q. And in Kluppelberg and Fields combined, you reviewed of those 2,000 homicide files, 51 criminal defense attorney files?

A. I believe that's correct.

Q. And those 51 criminal defense attorney files were only available to you in the Fields cases because you reviewed zero criminal defense attorney files since Kluppelberg, right?

A. That's my recollection.

Q. Okay. Now, let's talk a little bit about your background and your expertise.

Q. You've never been a homicide detective, correct?

A. That's correct.

Q. In fact, what you did do, what you did work in as a detective, you worked something that you called, I think, traffic homicides. Is that what you called it?

A. Traffic homicide, yes. One of the assignments.

Q. One of the what? I'm sorry.

A. One of the assignments.

Q. As a detective?

A. Yes.

Q. Okay. And traffic homicides is obviously some kind of car accident that leads to a death, right?

A. Right. A car striking a pedestrian, hit-and-run, fleeing, whatever.

Q. Okay. And that is the extent of the work you did related to homicide investigations, right?

A. As far as a hands-on detective in the deaths, yes.

Q. Okay. And in the course of your work as a traffic homicide investigator, you had occasion to interview suspects, right?

A. That's correct.

Q. And when you interviewed suspects, you would jot down the interview on notes, right?

A. It would depend on where the interview was held. If it was held in the office, quite often I would type it as I went or take a handwritten statement.

Q.   And that would be handwritten notes, right?

A.   It would be either a handwritten statement, or if I was in the field it could be, depending on the individual, jotted notes.

Q.   When you say "handwritten statement," that's not you taking notes, if I'm understanding the distinction you are making. That's a formal handwritten statement of the suspect, right?

A.   It's either a formal handwritten statement written by the witness, or suspect, or victim, or it is a verbatim handwritten statement by the investigative detective, in this case me.

Q.   Okay.  So you're aware, though, aren't you, that in Cook County in the 1980's, those types of handwritten statements are taken by assistant state's attorney, right?

A.   I've seen in the material that I've reviewed in the cases that in a formal setting within the police facility, that was the case.  In the field, no.

Q.   Okay.  But did you ever -- well, let me back up for a second.

     So it's your understanding that during the time period and actually even to today, Cook County state's attorneys would come out to the police facility and they were the ones that memorialized either witness or suspect statements either in handwritten form or court reported form, or sometimes just orally, right?

A.   I've seen it done by the detectives, I've seen it by the

Brasfield - cross by Rosen

2312

state's attorney, I've seen it transcribed by a court stenographer, I've seen it handwritten by the suspect, I've seen it handwritten by a detective, I've seen it -- I've seen it in multiple ways.

Q.   In Cook County?

A.   In Cook County.

Q.   So you're claiming that you have, through your review of the documents, seen handwritten statements written in the hand of the suspect?

A.   Yes.

Q.   What cases were those?

A.   I can't identify them with that volume, but I have seen because it was -- well, anyway, I can't point you to the specific case, but I have seen it.

Q.   And what's the foundation for your belief that the statement was written by the suspect as opposed to the state's attorney?

A.   The handwritten statement would be signed by the suspect.

Q.   By all --

A.   Or the witnesses, or whatever.

Q.   Aren't they all -- isn't it true that in Cook County in handwritten statements every single page of the handwritten statement is signed at the bottom by the suspect?

A.   That may be the policy.  In the material that I've reviewed, it is not consistently applied.

Q. How do you know -- you're just reviewing the record, right?

A. I'm reviewing copies of the physical documents in the file.

Q. Okay. So how have you drawn your conclusion simply from your review of the documents that a certain handwritten statement was written in the hand of the suspect?

A. In the vernacular, in many times that is used where it says, "I went," "I saw," "I did this," "I did that," in some instances, for lack of a better word, the dialect or the language would indicate that it was being put down on paper by the individual that was giving the statement.

Q. Well, isn't it true that the practice of Cook County state's attorneys doing Felony Review in Cook County were the ones that actually talked to the suspects and handwrote their statements?

A. I think I answered that question, but in the police facility I have seen many instances where the assistant Cook County attorney or a stenographer was conducting the interview and taking the statement. I have seen other statements that have been taken in the field by either the primary investigator, or an investigator, or some other police employee that was not taken by the State's Attorney's Office.

Q. And you're distinguishing between notes of interviews and formalized handwritten statements, right?

A. I am.

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 163 of 758 PageID #:107616
Brasfield - cross by Rosen
2314

Q. Okay. And --

A. But the ones -- I'm sorry, maybe I misunderstood your last question. I have seen in the material that I have reviewed handwritten statements acquired by Chicago police officers that were taken in the field, not notes.

Q. Okay. And it's on that formalized form that the Cook County State's Attorney's Office --

A. Not necessarily. They're generally all over the board. They can be on blank pieces of paper, they can be on general progress reports. There's a lack of consistency.

Q. And are you distinguishing whatever it is you claim to be seeing in these files from simply notes of an interview?

A. Yes.

Q. And how are you making that distinction?

A. If I understand your question correctly, is that I have seen what are ascribed and understood by police officers to be statements from a witness or a suspect that has been handwritten, and sometimes an indication of where or some reference in another document that said the statement was taken by me at such and such a place, but, generally, just a handwritten statement.

Q. And as you sit here today, you can't identify a single one of those files for us to take a look at?

A. I would not have any difficulty spending a few hours and finding the samples, I'm confident of that. But as I sit here

right this moment, I can't give you a page number or a Bates number.

Q.   Okay.  So going back to your note-taking practices when you were a traffic homicide investigator.  It is true, isn't it, that you would sometimes jot down notes of an interview so that when you later prepared your typewritten report it would jog your memory, right?

A.   In the sense of just a short note or two, yes.

Q.   Okay.  And most investigators that you were familiar with back at the time that you were a traffic homicide investigator did the same thing, right?

A.   It was -- it was a practice that was common, yes.

Q.   Okay.  And the notes that you took when you were -- when were you a traffic homicide investigator, by the way?

A.   I was promoted to the Detective Division in 1971, '72.

Q.   And how long did you remain a traffic homicide investigator?

A.   I was there for, I think, a little over a year, then I went to vice narcotics, and then I went to burglary theft.

Q.   Okay.  So in this time period, you took notes sometimes of interviews.  And in that time period the Seattle Police Department had no standardized form for taking notes, right?

A.   That's correct.  We had standardized formats, such as Chicago's general progress reports, for transcribing any notes on to.

Brasfield - cross by Rosen

Q. Okay. And so the notes that you didn't take on those forms were on a note pad or a legal pad, right?

A. That's correct.

Q. And sometimes detectives that you worked with had really good memories and took no notes at all, right?

A. They were considered poor detectives, but ....

Q. I'm sorry, what?

A. Poor detectives.

Q. With great memories?

A. (Laughing.)

Q. Well, those are your words, right?

A. I have attested to the fact that detectives have claimed to have excellent photographic memories.

Q. Well --

A. But have never claimed that they were supposed to wait more at the end of shift to transcribe that memory on to an official police report.

Q. Okay. We're not talking about when they're transcribing from memory. My point is that sometimes you're aware of detectives with great memories who would conduct an interview without taking any notes at all, and then eventually, whatever the time period is, prepared their typewritten report, right?

A. I'm aware of detectives that did that. They were not classified, in my professional opinion, as great detectives.

Q. Okay. But other detectives like yourself took notes,

right?

A. That's correct.

Q. And that legal pad or note pad that you took the notes on was not an official Seattle Police Department record, right?

A. That's correct.

Q. And, in fact, you referred to that procedure as sloppy procedure, right?

A. I'm sorry?

Q. I said you have described that procedure of taking photos on a legal pad as a sloppy procedure, right?

A. I may have. I don't recall that.

Q. Okay. And then after you used the information from the notes and typed it into your reports, you would destroy those notes, right?

A. Depending upon the format and the context of the investigation. If it was, as I've testified to in other depositions or in trial, if it was just a memory jog that someone had approached me on the street corner and I wrote down "John Smith," then transcribed that into an official form that said on such-and-such a date on such-and-such location I was with my partner and we were approaching someplace, and then the name that was on the piece of paper contacted me, I would not keep the scratched paper that said "John Jones" or "Bill Smith," or however.

If, however, it was an extensive note having to do

with things that I saw and observed, I would introduce that into the case as a piece of evidence.

Q. Okay.

A. And it would get an evidence number.

Q. But there was no universal prohibition against shredding notes, right?

A. Against what?

Q. Shredding notes.

A. Within the parameters and the context of what I testified to, no.

Q. Well, if you're shredding the notes, then we don't know, right? Exactly what you wrote on the note, right?

A. Yes, I do, because contemporaneous with the taking of the note I detail on an official police form the date, time, all the relevant material that I've just previously testified to, that would've been fully encompassing everything well beyond what was on the note.

Q. But we have to take your word for it, right? Because you destroyed the note?

A. (Laughing). You'd have to take the detective's word for what was on the official police document. And I think you're holding the detective far more accountable having them detail the date, time, place, location, who, what, when, why, where and how, than on a piece of paper that just ends up in an investigative file.

Q.   Well, I'm not sure if you answered my question, but we can move on.

With respect to the note-taking generally, there is no requirement, right, no national generally accepted police practices requirement that investigators, detectives, take notes, right?

A.   I believe that in my report is a supplemental that indicates a long list of bibliography of police textbooks and publications contemporaneous to the time period of the cases that I reviewed that indicated that that was what would be the advisable practice.

I cannot, as we sit here, point you to a specific page on a particular document, but as early as when I started college in 1962 or '63 and I was taking criminal justice courses, from V. A. Leonard who published a text even before that, it's just the things that you learn in the police academy, and it's in the published literature about taking notes, what you do with them, that type of thing.

Q.   And the materials that you are citing are your Attachment E, right, to your report?

A.   Yes.

Q.   And you list a bunch of reference materials, right?

A.   That's correct.

Q.   And these reference materials, you don't identify within the reference material any particular citation to support the

proposition that the taking of notes is required or in what form or fashion the taking of notes should be recorded, correct?

A.   No.   And in a two-paragraph preface to that, it describes generally accepted policing practices during the relevant time period, that it's not exhaustive and it's supplemental to my experience with police practices, et cetera.   It's just -- it's the way things were done, should be done.

Q.   Well, my question is more specific.   I'm not focusing on your experience or what you believe should be done.   My question is specific to the source materials that you listed in your report for us to look at.

And isn't it true that there is not a single citation in your source materials to a particular page or chapter of any of these source materials to support the proposition that notes have to be taken, and if they do have to be taken, in what format, is that right?

A.   That's correct.   I did not give you page and line, or in my report did I give you page and line, but I gave you an ample bibliography to put in context my opinion.

Q.   And some of the books that you identified are homicide investigations, right, by Mr. Franco?

A.   There are some that go back into the 19th Century.   My attempt there was to show that this was not a new invention. That for well over 100 years police detectives, police

investigators have been expected to document, take notes, and provide a single source for information. And some of them were even tongue-in-cheek because they were from military manuals and French publications, the point being that there's a great body of literature.

Q. So the Franco that I have in my hand is published, copyrighted in 1931, right?

A. I don't have it in front of me, but I'll take your word for it.

Q. Okay. It's listed in your Attachment E on the third page. So you don't need to take my word for it.

(Brief pause).

BY MS. ROSEN:

Q. Do you see it there?

A. I'm sorry, which one is it?

Q. It's the Franco publication.

A. Harold A. Franco?

Q. Yes.

A. 1931?

Q. Yes.

A. Yes.

Q. Correct. And there's no citation. It's a reference to this homicide investigation, but there's no citation in this book about the requirements regarding notes, right?

A. That's correct. On all of the documents.

Brasfield - cross by Rosen

2322

Q.   There's not a single reference from any of these materials that you list to a particular page or policy, model policy or anything as it's relates to notes, right?

A.   No.  As I said, this is to provide a universe of what kind of literature and information that a confidant homicide investigator, or in this case a police department, should be aware of, and to point out that it wasn't a narrow body of information.  But I did not, in my additional information or bibliography, give you a page and line number.

Q.   Okay.  And the body of literature you alluded to it before -- I think you said it's sort of tongue-in-cheek -- included publications that are completely in French, right?

A.   I gave an example of a 1938 publication on scientific police homicide investigations.  I gave one from the Judge Advocate General's Office of the law on Belligerent Occupation in 1945.  That is not to takeaway from the more relevant documents that are cited here for the time period in question. My attempt, again, was to point out that this was a historical knowledge base.

Q.   And yet not a single specific citation to support the proposition --

        MR. LOEVY:  Your Honor, asked and answered.

        THE COURT:  Sustained.

BY THE WITNESS:

A.   I've given you my answer on that.

THE COURT:  Sustained.

BY MS. ROSEN:

Q.  Okay.  And included in all these materials that we've been talking about, there is also no specific citation to the requirement that files need to be centralized or centrally located, right?

A.  And I've acknowledged that there can be other systems besides just a single centralized one.  But if you don't have a centralized one, then you need to have safeguards and specific guidelines to affect the same outcome.

Q.  Okay.  Now, let's talk about the guidelines and the directives.  So if we could look at what's been marked as City Exhibit No. 34, which I believe is already in evidence.

So we can go ahead and publish it to the jury.

BY MS. ROSEN:

Q.  You can look at it up on your screen.

That's special Order 86-3, right?  So that's the version of the investigative file special order that was in place at the time of Mr. Rivera's arrest and prosecution, correct?

A.  Yes, this is a copy of Special Order 863, May 29th, 1986.

Q.  Okay.  And your understanding is -- I think you testified a little bit about it on Friday -- is that after the Jones and Palmer cases came to light, that the Chicago Police Department created new procedures as they related to recordkeeping and

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 173 of 758 PageID #:107626
Brasfield - cross by Rosen
2324

file maintenance, retention, and production, right?

A.   This was the latest in a series of attempts by the police department, yes.

Q.   Okay.  And in your view, the written policy, in and of itself, is insufficient, right?

A.   That's correct.

Q.   And can you identify for us an example of a written policy that would be sufficient from a law enforcement agency from the time period of the mid 1980's?

A.   I'm sorry, would you repeat that?

Q.   Sure.  Are you able to identify for us any written policy that is sufficient, in your view, from any law enforcement agency from the 1980's?

A.   I did not provide one within my report, no.  I was asked to examine the Chicago Police Department's.

Q.   And in connection with your review of the Chicago Police Department, you're critical of the -- separate and apart from the criticisms that you have about how it played out in practice, you are critical of the written policy, correct?

A.   In the context of the outcome of the George Jones case and the Palmer case, and the criticisms that the respective courts had with the deficiencies in these, coupled with the criticisms of that particular order and the earlier orders that are contained in my report on page 55, yes, I'm still critical of it.

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 174 of 758 PageID #:107627
Brasfield - cross by Rosen
2325

Q. So you're only critical of it because of the context, is that what I'm understanding you to say?

A. I'm critical of it because it does not accomplish what the courts put the Chicago Police Department on notice that they needed to do as the result of specifically the Jones and Palmer cases.

And I outlined in detail over several pages what some of those criticisms were. And they were concurrent or consistent, I should say, with the self-assessment of depositions that I found from employees of the Chicago Police Department, as well as excerpts from the decisions in the Jones and Palmer cases.

Q. Okay. So if I understood what you just said correctly, the reason that you believe that Special Order 86-3 is insufficient is because of what occurred in Jones and Palmer, is that correct?

A. No. What I'm trying to convey is that the Chicago Police Department was put on notice that their practices and their policies were leading to events, up to and including wrongful convictions, and that their policies and their practices needed to change. That their attempts to create that change in the culture of the Chicago Police Department were, on their face, just looking at the policy itself, failing to address the underlying issues.

Q. Okay. So let's de-construct that a little bit. So you

said because the City's policies before the cases of Jones and Palmer came to light, it led to wrongful convictions, right? Is that what you said?

A. The material I reviewed indicated, historically, that was the case, yes.

Q. And isn't it true, actually, that factually what happened was, Mr. Jones never was convicted because the information came to light during the course of his criminal case, right?

A. That's correct. He was, through no effort of either the Chicago Police Department or the state's attorney, he was narrowly spared a wrongful conviction.

Q. Okay. And then, in fact, in Palmer, that was a class action lawsuit, right?

A. That's correct.

Q. And zero plaintiffs in the class action lawsuit were wrongfully convicted, right?

A. In the context of my response, that's correct.

Q. Okay. So in terms of the City's policies before Jones and Palmer, it's your understanding, isn't it, that the City's record-keeping policies at that time were that there was the records division file that we've been talking about in pretty much the same condition and with the same materials contained in it as we've been talking about, right?

A. Yes.

Q. And then --

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 176 of 758 PageID #:107629
Brasfield - cross by Rosen
2327

A.   That's a long question.

Q.   And there was not pre-Jones and Palmer any direction to the Detective Division about how to maintain, how to record, how to produce investigative files, or materials like that, right?

A.   That's correct.

Q.   And that's the issue that created the problem in Jones and the issue that created potential problems in Palmer, right?

A.   Within the confines of what I was asked to do, that's correct.

Q.   Okay.  And after the Palmer class-action litigation was filed and the Chicago Police Department was put on notice that there were these records that were being maintained in the Detective Division, they drastically changed their policy, right?

A.   They wrote some policies.

Q.   Which was a drastic change, right?  It now detailed and required these files to be maintained and produced in discovery, right?

A.   Ah, on the face, if you pay attention to the policy language, that was what was an attempt to accomplish.  As far as an actual, viable policy with specific steps and the scope, or limited scope, and other criticisms within my report, it did not have the desired effect.

Q.   But going back to my question.  The changes that were made from the pre-Jones-Palmer policies to the post-Jones/Palmer

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 177 of 758 PageID #:107630
Brasfield - cross by Rosen
2328

policies were drastic. They were now acknowledging and requiring that these files be maintained in a certain fashion so that they could be available for criminal cases, right?

A. They -- I might quibble with the term "drastic." I think the policies were an attempt to bring the Chicago Police Department into compliance with general accepted police practices around the country at the time.

Q. And you cannot identify for us a single policy from around that time that matches or exceeds the policy that was written by the Chicago Police Department in 1983, correct?

A. I have not provided that, that's correct.

Q. Okay. Now, taking a look at Special Order 83-3.

If you take a look at the second page where it discusses the general progress report:

"... the general progress report is a department form that's 8 1/2 by 11 in size, which would be utilized by all division members."

Do you see that there?

A. Yes.

Q. And it says:

"... this document is designed to standardize the recording of handwritten notes and memorandum."

Do you see that?

A. Yes.

Q. So that's the general progress report that we've seen in court and that you've been discussing, right?

A. Yes.

Q. Okay. And if you go down to the bottom of that page, 4C, where it says?

"... detectives are required to ... "

take a look at paragraph 3. Do you see that it says:

"... detectives are required to submit all

handwritten notes and investigative documents

generated or received by unit supervisor for

review and inclusion in the investigative file

case folder."

Do you see that there?

A. Yes.

Q. So that is not a prohibition from including notes in the investigative file, right?

A. No, I don't believe I testified that it was a prohibition.

Q. Okay. All right. Now, let's take a look at some of the files that you looked at in this case.

So first let's put up the demonstrative. You saw on Friday the chart that was here --

A. I'm sorry. Yes, I did.

Q. That was your Attachment G?

A. G.

Q. Yeah.

MS. ROSEN: This is our demonstrative. You don't have an objection to it?

MR. LOEVY: No.

BY MS. ROSEN:

Q. So we're going to look at City Demonstrative Number 1.

Do you see that there on your screen?

A. I see it labeled Brasfield Attachment G.

Q. Okay.

A. It's illegible but --

Q. Well, there's a lot of data there, right?

A. Yes, there is.

Q. And there's lots of colors, right?

A. Yes.

Q. Okay. And this reflects each of the pages, right, that compromise Attachment G, right?

A. I would assume that's the case, yes. Since it is illegible --

Q. Okay. And if you look at two pages all the way to the far right, do you see that there? Where it's just in blue?

A. Yes.

Q. Those are the Area North files, right?

A. I'm sorry, your question again?

Q. The two pages that are all the way to the right on the screen --

A. And whoever is running the Elmo or device, I actually have,

even though they're a lot smaller, I actually have those pages in front of me, if you can give me --

Q. I think it's probably the last -- in your attachment, is take what you mean?

A. My exhibit G. The far left-hand corner of those two pages in the light gray column you'll see a series of sequential numbers. If you can tell me what those numbers are, I can turn to the correct page.

MS. ROSEN: Can you tell me the first number on that?

MS. CARNEY: G340106.

BY THE WITNESS:

A. No, I mean in the very far left-hand column under "in identifying information," it runs 1 to 90.

BY MS. ROSEN:

Q. Oh, that number you mean?

A. Yeah.

MS. CARNEY: 145.

BY MS. ROSEN:

Q. 145.

A. All right. That's the upper left-hand column, first number.

Q. Right. So the pages --

A. Okay.

Q. Those two sheets there, right?

A. We're on the same page.

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 181 of 758 PageID #:107634
Brasfield - cross by Rosen
2332

Q.   Okay.  Great.  So those are the Area North files, right?

A.   Yes.

Q.   And so the only information that you have is information related to the investigative files that were found at Area North?

A.   This is a compilation of all 190 files.

Q.   The entirety of your attachment, right?

A.   Yes.

Q.   But focusing on the last two pages, which begin at 145 and go down, those two pages.

A.   That includes on the two pages a column, the blue column for investigative files, the purple column for permanent retention, and the next page, which is the green, is the criminal defense attorney files.

Q.   Correct.  But when you're looking at that attachment and you're looking at those last two pages, all that you have written in the blue -- actually, let me back up for a second.

     Did you prepare this attachment?

A.   I did not specifically make the Excel spreadsheet, but I'm familiar with its contents and I've looked at it and compared.

Q.   Okay.  So you did not actually go through the files yourself, extract the information, and put it on to the Excel spreadsheet, correct?

A.   No, I believe I testified to on Friday that the sheer volume here that either contract or permanent employees with

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 182 of 758 PageID #:10763
Brasfield - cross by Rosen
2333

the retaining law firm did the initial screening and made notes when things were either contained or not contained within a category or contained or not contained cross-reference between investigative versus permanent retention, and then using what was developed I would go through and see if, in fact, that was an accurate reflection.

Q. Okay. So going back to my question. You weren't the one that reviewed the files and then took the information from whatever comparisons were being made and included it in the attachment. That was done for you and you utilized that then for your purposes, right?

MR. LOEVY: Objection, that's exactly what he's been talking about.

THE COURT: Sustained.

BY THE WITNESS:

A. Yeah, that is correct. However, I had an electronic format, an exact copy of the investigative file, the permanent retention file, and the criminal defense file available to me.

BY MS. ROSEN:

Q. But not the state's attorney files, right?

A. Other than the 6.

Q. Okay. So going back to my original question. So the ones that begin at 145, that if you look at the screen that we have an arrow in, so there's two pages. Those are files that relate to the investigative files that were found at Area North for

which you made no comparison to any other file, right?

A. That's -- if I understand your question correctly, yes.

Q. Okay. So for purposes of evaluating just the one simple question of whether or not these documents are contained in a criminal defense attorney file, they don't help us, right?

A. Say that again.

Q. Since you compared the investigative files from Area North to no other files, and you simply looked at them on their face for whatever information it was that would be helpful to you in your global opinions --

A. That's correct. I was limited to looking in that group at just what was contained and what wasn't contained within the investigative file.

Q. Okay. So it gives us, those files give us zero information about whether or not any of this information or all of this information was in the companion criminal defense attorney files it, right?

A. As I understand your question, that's correct.

Q. Okay. So now if we take a look at City Demonstrative Number -- I think I have mine out of order.

Actually, wait. We're not done with this yet.

I think you told us on Friday that the blue columns reflected information from the investigative files, right?

A. That's correct.

Q. And the purple reflected information that you -- that was

found and that you compared to the permanent retention file, right?

A. That's correct.

Q. And so looking at that simply on its own, that does not help us or inform whether or not these materials actually are contained in any particular in criminal defense attorney file? That's your evaluation about whether or not the policies were being followed as they were written, right?

A. Within the context of its limitation, yes.

Q. Okay. And then across the top of the attachment there is color-coding that just lines up with green for criminal defense attorney file, blue for investigative file, and purpose for permanent retention file, right?

A. Yes.

Q. Okay. So now if we move to City exhibit -- Demonstrative Exhibit Number 2.

MS. ROSEN: I assume no objection?

MR. LOEVY: No objection, Your Honor.

BY MS. ROSEN:

Q. So now the next page you'll see we sort of grayed out the purple color, and we grayed out the blue color. So we can focus our attention now on the green, which represents information that you found that's contained within the criminal defense attorney file, right?

A. Again, the corresponding number in the upper left hand --

Q. Just generally. So you can look at any one of your pages that you have there, and you can compare it to the demonstrative that's on your screen. And you'll see that what's been done is that the blue column and the gray -- the blue column and the purple column has been grayed out. And so that way we can see the green, which is what represents -- which represents what's contained or not contained in the criminal defense files, right?

A. I think I understand what you're saying. It's not what I had. It's something that you produced, but if what you're saying is the green represents criminal defense files, then I would agree with that.

Q. Yeah. I mean, it's your green. We didn't change the green.

A. I realize that, but the darkened-out portions which have some relevance, they're not there, so ....

Q. Okay. And the green represents the cases, the files where you found and determined that there were pages missing from the criminal defense file that appeared in the investigative files, right?

A. I'm not trying to be obtuse, but the spreadsheet I have is the spreadsheet that I included with my report. This is something that you have done. I can't read it, and I don't understand what you're trying to ask me.

Q. Okay. So let me see if I can be a little more clear. In

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 186 of 758 PageID #:107639
Brasfield - cross by Rosen
2337

the demonstrative what we've done is we've eliminated the blue color and we've eliminated the purple color and made it all gray like the rest of your background.

And so then what's there, so that we can focus in on the criminal defense files is the green cells as they appeared in your attachment.

So all those green cells represent, if I understand your attachment correctly, criminal defense files that purport to have missing documents, right? Isn't that what the green cells represent?

A. The green cells in the original report referred to the criminal defense files. And I'm not -- I'm not arguing that or denying that. It's just still unclear to me because what I have on the screen in front of me could be anything. I can't tell what it is.

Q. Okay. So if you'll take my word for it, hypothetically speaking --

A. Certainly. If that's the preface.

Q. -- that the green cells match your green cells, and that I haven't changed any green cells --

A. Okay.

Q. -- and all we've done is make all the other colors gray.

A. Okay.

Q. Are you with me?

A. Yes, ma'am.

Q.   Okay.  So now we've got the green cells, and the green cells represent documents that are missing from the criminal defense attorney files, right?

A.   Okay.

Q.   Okay.  So now each of those lines --

MS. ROSEN:  And if we can give him an example.

(Brief pause).

MS. ROSEN:

Q.   If we look at your Attachment G in your form, if you take a look at Line 3.

A.   And since Line 3 corresponds to three different sections, the green, the purple, and the blue, and they're found on different pages, just the green.

Q.   Just the green.

A.   All right.

Q.   Okay.  So now we're on the same page.

A.   Yes.

Q.   So Line 3, just the green.  The first column or cell, what's written at the top of that?

A.   In the green part?

Q.   The green, at the very top, what is that?

A.   (Reading:)

     "... has a criminal defense attorney file been
     produced?"

Q.   Okay.  And that's a "yes" or a "no," right?

A. That's "yes" or a "no."

Q. Okay. And in this particular case, Line 3, the answer is "yes," right?

A. And I'm sorry. It's a little small.

(Brief pause.

BY THE WITNESS:

A. "Yes." It is a "yes."

BY MS. ROSEN:

Q. And if we go next to the cell right next to it, same line, at the top.

A. It says:

"Is there any investigative material missing

from the defense attorney file."

Q. And the answer is "yes" or "no," right?

A. Yes, that's correct. The answer in this specific column is "yes."

Q. And then if we move further to the right, what's the question asked at the top of that cell?

A. Referring to the just mentioned column is:

"If, in fact, there is material missing, what is

the Bates number for the missing material?"

Q. Okay.

A. And in this case there was a single Bates number.

Q. So a single page was missing from that particular file?

A. That's correct.

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 189 of 758 PageID #:107642
Brasfield - cross by Rosen
2340

Q.   Okay.  And then if we move further to the right, what's there?

A.   (Reading:)

"Does the defense attorney file contain an inventory sheet?"

"Yes" or "no."

In this case "yes."

Q.   Okay.  And then if we move further to the right, what's that column?

A.   (Reading:)

"If "yes," i.e., the inventory in the defense attorney file, does it match the inventory in the investigative file?"

Q.   And then in this case?

A.   It was not applicable because there was no inventory in the investigative file.

Q.   Okay.  And then the next cell over, what is that one?

A.   (Reading:)

"Are GPRs from the investigative file --"

(Laughing.)  I'm really sorry, but it would help if I had a bigger one.

MR. SWAMINATHAN:  I have a bigger one.  Can I give that to him?

MS. ROSEN:  Sure.

THE WITNESS:  Thank you, sir.

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 190 of 758 PageID #:107643
Brasfield - cross by Rosen
2341

MR. SWAMINATHAN: Would it help you if you have a bigger copy, Judge?

THE COURT: Is this a bigger copy (indicating)?

MR. SWAMINATHAN: We have a bigger one. Do you want that?

THE COURT: Well, this wasn't big enough.

MR. SWAMINATHAN: Judge, you have two options, actually.

THE COURT: Oh, that's nice and big.

(Document tendered to the Court.)

BY MR. LOEVY:

Q. Okay.

A. It is a little bit better:

"... are GPRs from the investigative file missing from the attorney file?"

And that be "yes" or "no." And in this particular case of row three:

"Not applicable because no GPRs in the investigative file."

Q. And then moving further to the right?

A. (Reading:)

"If, in fact, there are GPRs missing, what are the Bates numbers?"

And since that's not the case here, it's marked "NA," not applicable.

Q.   Okay.  And then further to the right?

A.   (Reading:)

     "Are handwritten notes from the investigative

     file missing from the attorney file?"

     And then in this, not applicable, no handwritten

notes in the investigative file.

Q.   Okay.  And then one more?

A.   (Reading:)

     "Bates numbers from missing handwritten notes."

     Not applicable since there were none.

Q.   And then finally one more.

A.   (Reading:)

     "Are to-from memos from the investigative file

     missing from the attorney file?"

     This is "NA," "no, there are no to-from in

     investigative file."

Q.   Okay.  So now if we're interested in simply isolating from this giant chart here that's too small to read, just the information that's missing from the criminal investigative file, it would be appropriate to look at this third cell, right, where it says "missing documents"?

A.   Right.

Q.   So if we could move then to City Demonstrative Number 3?

     MR. LOEVY:  Judge, these aren't the same read from his chart, right?

MS. ROSEN:  Same.

MR. LOEVY:  No objection.

BY MS. ROSEN:

Q.  So if we move to City Exhibit 3.  If you'll take a look there.  Take a look just on the screen.

So the green that's there on your cell, I'm going to represent to you represents each cell that identifies the list of missing documents in the criminal defense attorney files that were available for your review.  Okay?

A.  Just limited to the criminal defense files, yes.

Q.  Correct.  Okay.

MS. ROSEN:  Judge, if we're going to take a lunch break, now might be a good time.

THE COURT:  Yes.  Very good.

Let's take an hour, ladies and gentlemen.  We'll start at ten after 1:00.

COURT SECURITY OFFICER:  All rise.

(The following proceedings were had out of the presence of the jury in open court:)

THE COURT:  Can anyone give me any sense of how we're doing?

MS. ROSEN:  Yes.  I mean, I think I have about half an hour, and then I think Mr. Loevy is estimating at this moment about half an hour, and then I think we're moving through the remaining witnesses today and tomorrow.

MR. LOEVY: I think so, Your Honor. We have some hope that we're going to close our case tomorrow, subject to one witness who is not available tomorrow.

THE COURT: It's longer than anticipated. But, okay. And then what?

MS. ROSEN: And then we're anticipating three or 4 days, depending.

THE COURT: Okay. All right. Very good. That's not terrible news.

(Laughter in the courtroom).

MS. ROSEN: We'll go with that.

(Luncheon recess taken from 12:13 o'clock p.m. to 1:10 o'clock p.m.)

*    *    *    *    *    *    *    *

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER

/s/Blanca I. Lara                    June 18, 2018

2345

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JACQUES RIVERA,                                ) No. 12 CV 4428
                                               )
           Plaintiff,                          )
                                               )
vs.                                            ) Chicago, Illinois
                                               )
REYNALDO GUEVARA, STEVE GAWRYS,                )
DANIEL NOON, JOHN GUZMAN, JOSEPH FALLON,       )
JOSEPH SPARKS, PAUL ZACHARIAS, GILLIAN         )
MCLAUGHLIN, JOHN LEONARD, EDWARD MINGEY,       )
RUSSELL WEINGART, ESTATE OF ROCCO              )
RINALDI, CITY OF CHICAGO,                      ) June 18, 2018
                                               )
           Defendants.                         ) 1:12 o'clock p.m.

VOLUME 10-B
TRANSCRIPT OF PROCEEDINGS - Trial
BEFORE THE HONORABLE JOAN B. GOTTSCHALL
and a Jury

APPEARANCES:

For the Plaintiff:     LOEVY & LOEVY
                       BY:  MR. JONATHAN I. LOEVY
                            MR. STEVEN E. ART
                            MR. ANAND SWAMINATHAN
                       311 North Aberdeen Street
                       3rd Floor
                       Chicago, Illinois  60607

                       MacARTHUR JUSTICE CENTER
                       Northwestern University School of Law
                       BY:  LOCKE E. BOWMAN III
                       357 East Chicago Avenue
                       Chicago, Illinois  60611
                       (312) 503-0844

Court reporter:            Blanca I. Lara
                        Official Court Reporter
                       219 South Dearborn Street
                             Room 2504
                       Chicago, Illinois 60604
                         (312) 435-5895
                  blanca_lara@ilnd.uscourts.gov

2346

APPEARANCES:  (Continued)

For the Individual          THE SOTOS LAW FIRM
Defendants:                 BY:  MR. JEFFREY N. GIVEN
                                 MR. JAMES G. SOTOS
                                 MS. CAROLINE P. GOLDEN
                                 MR. JOSEPH M. POLICK
                                 MR. DAVID A. BRUEGGEN
                            550 East Devon Avenue, Suite 150
                            Itasca, Illinois  60143


For the Defendant           ROCK FUSCO & CONNELLY, LLC
City of Chicago:            BY:  MS. EILEEN E. ROSEN
                                 MS. CATHERINE M. BARBER
                                 MS. THERESA B. CARNEY
                            321 North Clark Street, Suite 2200
                            Chicago, Illinois  60654


For the Defendant           LEINENWEBER BARONI & DAFFADA, LLC
Guevara:                    BY:  MR. THOMAS E. LEINENWEBER
                                 MR. JAMES V. DAFFADA
                            120 North LaSalle Street, Suite 2000
                            Chicago, Illinois  60602

(Jury out.  Witness in.  Proceedings heard in open court:)

MR. SOTOS:  Judge, we have an issue we have to address before the jury comes in.

THE COURT:  Well, the jury is on its way in, so quick.

MR. SOTOS:  Okay.  Well, we've been just told that they're planning on calling two of the defendants.

MR. LOEVY:  Just one.  Actually, not Mr. Noon.  He told me he has some health issues in the afternoon.

MR. SOTOS:  Well, Mr. Guzman isn't even here, and didn't have notice that he's going to testify today.

THE COURT:  All right.

MR. SOTOS:  And there's --

THE COURT:  Well, what can I do about that?  You have to figure that out.

MR. LOEVY:  Well, I thought we had it figured out this afternoon.

MR. SOTOS:  No.  I mean, I think you have to figure something out, because we have an agreement that you give 24 hours' notice.  We didn't get it.  He's just --

THE COURT:  Well --

MR. SOTOS:  -- coming back.

THE COURT:  Well, wait.

MR. SOTOS:  Here's the problem.  I'm just saying there's a problem.

THE COURT:  Right.  Calm yourself.  Yes.

MR. LOEVY: Ms. Rosner was supposed to testify today. She's had a family emergency.

We don't want to have a gap. We had a conversation this morning. They explained to me Mr. Noon doesn't do as good in the afternoon. Fine. Mr. Guzman has no memory of these events, none. He's been listening to the --

THE COURT: But he's not here.

MR. LOEVY: -- entire trial. Well, he will be here. I assume he --

MR. SOTOS: He's coming at some point. He's out of -- he lives in Albuquerque. He's flying in today.

MR. LOEVY: Has he been here today?

MR. SOTOS: No.

MR. LOEVY: Oh. Then I apologize, then. And I --

THE COURT: Okay. All right.

MR. LOEVY: -- misunderstood the situation.

THE COURT: So I don't have to deal with something before the jury comes in. Thank you.

MR. SOTOS: Appears we don't. Thank you, Judge.

THE COURT: If you talk to each other --

MR. LOEVY: I thought we had an understanding.

THE COURT: -- you know, you'd save me a lot of aggravation.

So are we going to have a gap?

MR. LOEVY: I don't think so, Your Honor. We're

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 199 of 758 PageID #:107652
Brasfield - cross by Rosen
2349

getting a witness.

THE COURT: Okay.

(Jury in.)

THE COURT: Please be seated, everyone.

Ms. Rosen, whenever you are ready.

MS. ROSEN: Thank you, Judge.

MICHAEL BRASFIELD, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

CROSS-EXAMINATION (Resumed)

BY MS. ROSEN:

Q. Okay, Mr. Brasfield. Let's take a look at your Attachment G again. And what we've done now for this portion is we've actually blown up portions of your file. See where I am?

MS. ROSEN: I'll mark this one City's Demonstrative Exhibit No. 4. This is a blow-up/highlight of -- you have no objection to this, right?

MR. LOEVY: Right.

MS. ROSEN: Of an entry at line 27 of your Attachment G.

MS. ROSEN: Your Honor, may I approach?

THE COURT: Yes.

BY MS. ROSEN:

Q. This is an RD file, H167635. And I have a folder here for you, if you need it, which contains the public defender's file and the state's attorney file. And you can see we've tabbed for you the Bates numbers, if that comes up, of the questions

that we may have for you, so we can speed it along.

If you take a look at what is at line 27 of your chart, you have the Records Division, No. H167635, and that is the homicide investigation related to the homicide of an individual named Mr. Whims which occurred in April of 1986.

And you note on your exhibit that Bates number where the missing material is is RFC4150.

Do you see that there?

A. Yes.

MS. ROSEN: We can actually put --

BY THE WITNESS:

A. I'm sorry. Yes.

MS. ROSEN: -- that up on the screen. And then -- actually not for the jury yet, though.

BY MS. ROSEN:

Q. If you can take a look at what's up on your screen. That's a supplementary report. The first page is RFC4149 and then the next page is RFC4150.

Do you see that there?

A. Yes, I do.

Q. And that 4150 is the Bates number on your spreadsheet, right? RFC4150 is the document that's missing from the criminal defense attorney file, right?

A. Yes. What I have on the spreadsheet, yes.

Q. Okay.

MS. ROSEN: At this time, we seek to admit -- what number is the investigative file?

MS. BARBER: What number are you on?

MR. LOEVY: We need a letter, too.

MS. ROSEN: Yeah, I know. So we'll make it --

MS. BARBER: 19.

MS. ROSEN: -- 19-Q, yeah.

THE COURT: Any objection?

MR. LOEVY: No, Your Honor. Well, same objection they were making, but -- so -- no objection.

THE COURT: It's received.

(Said City Exhibit 19-Q received in evidence.)

BY MS. ROSEN:

Q. Okay. So taking a look at that second page, that's a second page of a supp. report, right?

A. Yes.

Q. And according to your chart, that page is missing.

A. That's --

Q. But if we -- actually, if we take a look at the criminal defense attorney file that I have for you -- so it's the PD file and you can see the pages there are tabbed JRL24061 --

A. Yes.

Q. -- and 062. Do you see those there?

A. Yes.

Q. And, in fact, JRL204062 is contained within the PD file,

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 202 of 758 PageID #:107655
Brasfield - cross by Rosen
2352

and that's the same page as the document that you've identified as missing, RFC4150.  Let me know when you're there.

A.  Right.  It's in the folder that you handed me.  It's printed on the back of that.

Q.  Yeah.  And let me just say, we photocopied all of these files double-sided to save on volume.

A.  Okay.

Q.  So I am not -- I'm not making any representation that they're originally kept double-sided or single-sided.  It's just how we photocopied them.

A.  Very good.

Q.  So we don't have as much paper.

Okay.  So you're with me, right, that, in fact, the report that's identified on your chart -- the second page of the report that's identified on your chart as missing is also on -- in the PD file, which is Bates-stamped JRL204062?  Do you see that?

A.  Yes.  It's in this folder that you handed me.

Q.  Okay.  So that is just an error in the chart, right?

A.  Well, it is in this folder that you handed me.  I made a notation on the spreadsheet that it wasn't there.

Q.  Okay.  But the folder I handed you is a photocopy of the public defender's file in this case in the same RD number.

A.  Oh, I'll take your word for it.

Q.  If you take a look at it -- look at the -- I gave you the

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 203 of 758 PageID #:107656
Brasfield - cross by Rosen
2353

whole file.

A.  Right.

Q.  Do you recognize it from --

A.  Yes.

Q.  -- your review?

A.  Well, from my electronic review, yes.  I don't -- I'm not disputing it at all.

Q.  Okay.  All right.  Now I'm going to ask you to take a look at N262285 and hand you that.

And the same application here.  There's a PD file and an SAO file in there.

A.  And is there a line number?

Q.  Yeah, just one second.

A.  Oh, I'm sorry.

Q.  I'm going to get it for you.

A.  I'm sorry.

Q.  That's okay.  And now we're going to take a look at line No. 110 on your chart, which is Records Division No. N262285, right?  Do you have that matched up there with the file I gave you?

A.  Let me find the 110 first.

MS. ROSEN:  Okay.  And this -- the board that we have up now is City Exhibit No. 5.

BY THE WITNESS:

A.  262285, okay.

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 204 of 758 PageID #:107657
Brasfield - cross by Rosen
2354

BY MS. ROSEN:

Q. Right. So we're looking at line 110, right?

A. Yes.

Q. Of Attachment G. And it says on your -- on the spreadsheet that there are several pages missing, right, from the criminal defense attorney's file?

A. Right. In the second column, is there any investigative material missing from the defense attorney file? Answer is -- on my spreadsheet is yes and then a series of one, two, three, four, five, six, seven.

MS. ROSEN: Okay. So if we could put RFC12640 and 41, which we're going to mark as City 19-R. Just for Mr. Brasfield and counsel and the Court.

BY MS. ROSEN:

Q. If you take a look at RFC12640, that's a two-page document, right?

A. Yes. It's labeled 12640, 12641.

Q. And those are the two pages that you identified as being missing from the criminal defense file --

A. That's correct.

Q. -- right? Okay.

MS. ROSEN: The City seeks to admit RFC12640 and 41 as City 19-R.

THE COURT: Any objection?

MR. LOEVY: No objection, Your Honor.

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 205 of 758 PageID #:107658
Brasfield - cross by Rosen
2355

THE COURT:  It is received.

(Said City Exhibit 19-R received in evidence.)

BY MS. ROSEN:

Q.  And then if you take a look at now the state's attorney's file --

A.  This is the state's attorney's file?

Q.  You have both in there, both the public defender's file and the state's attorney's file.

So you can -- you see which one is the state's attorney's file?

A.  I -- the one that's rubberbanded together.

Q.  Of SAO?

A.  SAO, yes.

Q.  Okay.  If you take a look at the SAO file and look at the page that's Bates-stamped 18941.  Do you see that there?

A.  Yeah, I see the tab, yes.

Q.  Oh, I'm sorry.  18996.  Oh.  No, no, no.  18969, 18970.  I'm sorry.

A.  I'm sorry.  So which one it is you want me --

Q.  So -- yeah, my mistake.  So take a look at the SAO file and look at 18969 --

A.  All right.

Q.  -- to 18970.  So if you look at the backside, which would normally -- of 69.

A.  I'm sorry.  This is a little awkward.

Q. I know.

A. Okay. I have the 18969, which is the stick-em tab on it, and then I have 18970 here.

Q. Okay. And is that the same rap sheet that you've identified as missing from the criminal defense attorney's file? Can you tell --

A. This is from the public -- this is from the state's attorney file.

Q. Correct.

A. Yeah. So I had no reference to this at all.

Q. Okay. But my question is if you look at the documents, are they the same?

MS. ROSEN: And maybe we can make it easy for you. Why don't you put that up on the screen, SAO18969 and 18970.

MS. CARNEY: And the jury hasn't seen it?

MS. ROSEN: The jury hasn't seen it yet, but I would like Mr. Brasfield to look at it first.

BY MS. ROSEN:

Q. You can take a look at the screen. Does that look like the same rap sheet?

A. It is the same rap sheet that's in the state's attorney's file.

Q. Okay.

A. Which I have not seen.

Q. Right. So if you can --

MS. ROSEN: If we -- the City seeks to admit these two pages from the SAO file, City Exhibit 21-A.

MR. LOEVY: No objection, Your Honor.

THE COURT: It is received.

(Said City Exhibit 21-A received in evidence.)

BY MS. ROSEN:

Q. And then if we put them side by side, you can see that 12640 is identical to SAO18969, right?

A. I have -- they keep changing on the screen here. I currently have 12641 and state's attorney subpoena 18970.

Q. Okay. So you take a look at both of those documents and those are the same, correct?

A. Superficially, they appear to be the same, yes.

MS. ROSEN: Okay. And then if we can flip back to the first two pages.

BY MS. ROSEN:

Q. And if you could take a look at that, those look like copies of the same document, right?

A. They appear to be, yes.

Q. Okay. So you have said that you did not see this state's attorney file, right?

A. That's correct.

Q. Okay.

A. Unless this was one of the six, which I don't believe it was.

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 208 of 758 PageID #:107661
Brasfield - cross by Rosen
2358

Q. It is not one of the six.

A. Right.

Q. But it was -- you knew that they were -- that other state's attorney files were available, right?

A. I would have assumed they would have been.

Q. Well, available to us in this case, like that we had received them.

A. I -- I would believe that to be the case, yes.

Q. Okay. And despite the fact that you looked at a couple SAO files, you didn't ask to review all the SAO files?

A. That's correct.

Q. Okay. And in this particular case, that rap sheet that you identified as missing from the criminal defense attorney file actually exists in the SAO file?

MR. LOEVY: Your Honor, I think we've established that point. Asked and answered.

THE COURT: Well, overruled if you don't think you've gotten that answer.

MS. ROSEN: Yeah, I don't think I have.

BY THE WITNESS:

A. I -- ask your question again. I'm sorry.

BY MS. ROSEN:

Q. Sure. And isn't it true, based on what we've just done here in court, that the criminal -- that the rap sheet that you said was missing from the criminal defense attorney's file, the

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 209 of 758 PageID #:107662
Brasfield - cross by Rosen
2359

exact copy of it exists in the SAO file?

A. That's -- that's correct. Based on the material you've shown me today, there is this rap sheet that was contained in the state's attorney's file. On my spreadsheet, I've made a note that it does not -- they are not contained within the criminal defense file.

Q. Okay. And then let's take a look at -- in the same file, you identify RFC12644 as missing.

MS. ROSEN: If we can put that up on the screen just for Mr. Brasfield.

BY THE WITNESS:

A. This is in the set of three sequential, 12742 through 12745, and you're referring to 744.

BY MS. ROSEN:

Q. No. What I'm saying -- what I'm asking you to take a look at on the computer screen here --

A. I'm sorry.

Q. -- is RFC12644.

A. Yes.

Q. Which is a document that you have identified as being missing in your attachment at line 110, right?

A. Yes.

Q. Okay. And it's missing from, in your review, the criminal defense attorney's file?

A. That's correct.

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 210 of 758 PageID #:107663
Brasfield - cross by Rosen
2360

Q.  Okay.  So now I'm going to ask you to take a look at that same SAO file that you have there at page 18941.

A.  It appears to be the same one that's on the screen here.

Q.  Okay.  And so the document that you identified as missing from the criminal defense attorney's file, the -- another document from the same file is actually an SAO file, right?

A.  That's correct.  Apples and oranges, but yes.

Q.  Okay.  Now, let's move to --

(Counsel conferring.)

MS. ROSEN:  Actually, the City would like to admit -- I didn't do that.  So let's put up SAO18941, which we'll mark as City 21-B, and seek to admit that for identification.

THE COURT:  Any objection?

MR. LOEVY:  No, Your Honor.

THE COURT:  It is received.

(Said City Exhibit 21-B received in evidence.)

MS. ROSEN:  Okay.  If we could just put those up side by side --

MS. CARNEY:  Sure.

MS. ROSEN:  -- since we didn't do that.

BY MS. ROSEN:

Q.  Those are the documents we were just talking about, right? The two lineup reports?

A.  That's correct.

Q.  And there's a copy in the criminal defense -- there's a

copy missing from the criminal defense attorney file in the City's investigative file, also in the City -- in the state's attorney's file, right?

A.  I have -- what you're showing me is -- I'll just say yes.

Q.  Okay.  All right.  Now, if we can take a look at, also from this same file, RFC12646.

And this is a document that you've identified on line 110 as being missing from the criminal defense attorney's file, right?

A.  Yes.

Q.  And it's a bunch of handwritten notes that we've been talking about, right?

A.  That's correct.

MS. ROSEN:  City seeks to -- moves to admit City 19-S.

THE COURT:  Any objection?

MR. LOEVY:  No, I don't think so, Your Honor.

THE COURT:  19-S is received.

(Said City Exhibit 19-S received in evidence.)

BY MS. ROSEN:

Q.  And so these -- this is an example, right, of handwritten notes not on a GPR that you had such concern about in your testimony, right?

A.  Generally speaking.  Because I don't have the whole file in front of me.  I'm -- if you're saying that these handwritten notes weren't on a GPR, I'll take your word for it.

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 212 of 758 PageID #:107665
Brasfield - cross by Rosen
2362

Q. Well, do they appear to be on a GPR?

A. Well, this is not, no.

Q. Oh, okay. So, yeah, just that document is not on a GPR, right?

A. That's correct.

Q. And you --

A. That's correct.

Q. -- identified that particular page as missing on your chart?

A. Missing from the criminal defense file, yes.

Q. Okay. So now I would like you to take a look at SAO18946.

A. A quick scan would indicate that it is the same document.

Q. Okay.

MS. ROSEN: The City seeks to move SAO18946 as City's 21-C.

THE COURT: Any objection?

MR. LOEVY: No, Your Honor.

THE COURT: It is received.

(Said City Exhibit 21-C received in evidence.)

MS. ROSEN: If we could put those up side by side. Oh, wrong one.

MS. CARNEY: Sorry.

BY MS. ROSEN:

Q. Okay. So the same document that you identify as missing from the criminal defense attorney file is in the SAO file,

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 213 of 758 PageID #:107666
Brasfield - cross by Rosen
2363

right?

A. That's correct. Again, having not examined it.

Q. The SAO file?

A. Right.

Q. Okay. Now, if we can take a look at the same case. You identify RFC12647, which is a general progress report as missing from the criminal defense attorney's file.

MS. ROSEN: If we could put that up on the screen just for Mr. Brasfield.

BY MS. ROSEN:

Q. See that there?

A. Yes.

Q. Okay.

MS. ROSEN: City seeks to -- moves to admit RFC12647 as City T.

MR. LOEVY: No objection, Your Honor.

THE COURT: T?

MS. ROSEN: T, as in Tom.

THE COURT: Okay. It is received.

(Said City Exhibit T received in evidence.)

MS. ROSEN: Okay. Thank you. If we could publish that to the jury.

BY MS. ROSEN:

Q. So, now, this is a general progress report that you've identified in your chart as missing from the criminal defense

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 214 of 758 PageID #:107667
Brasfield - cross by Rosen
2364

attorney's file, right?

A. That's correct.

Q. And it's just a single page, right, of the general progress -- of a progress report? It's not a whole cache of them. It is just one general --

A. Right. It's not numbered as page 1 of 2 or 1 of 3.

Q. Okay.

A. It's just a standalone.

Q. And then if you can take a look at SAO file 18867. And do you see that same GPR in the state's attorney file?

A. Appears to be the same.

MS. ROSEN: Okay. And the City seeks to admit SAO189 -- no, 18867 as City 21-Z.

THE COURT: Any objection?

MR. LOEVY: No, Your Honor.

THE COURT: It is received.

(Said City Exhibit 21-B received in evidence.)

BY MS. ROSEN:

Q. And they're the same other than the redaction that should have happened on the other one as well?

A. Right. There is a redaction on the one on the left.

Q. Yeah. I'll represent to you that we redacted it because it should have been redacted.

A. Because we don't want to share Social Security numbers.

Q. Correct. And we should --

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 215 of 758 PageID #:107668
Brasfield - cross by Rosen
2365

A. Correct. Okay.

Q. -- have redacted the other one. So we can take those down. But those are the same documents --

A. Yes.

Q. -- right? Okay.

A. Appear to be.

Q. And so if we do one more from this file, the last one on your list that's identified in the -- in line 110 is RFC12724 and 12725.

MS. ROSEN: Get that up on the screen for Mr. Brasfield.

BY MS. ROSEN:

Q. That's a GPR, RFC12724 and then RFC12725.

Do you see that there?

A. I'm -- unless I'm looking in the wrong place on the spreadsheet, I don't see 1272 -- what was it?

Q. 127 -- well, it's 12725 that's missing, right? That's what's there?

A. That's correct.

Q. Okay. So 12725 has got two words on it, right, "of offender"?

A. Yes.

Q. Okay. And then if we go back to 12724, that's a GPR, right?

A. That's correct.

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 216 of 758 PageID #:107660
Brasfield - cross by Rosen
2366

Q. And if you read the line at the bottom there, does it make sense that the two words on the other page follow from that sentence? Can you tell?

A. I don't have the second page in front of me now.

Q. Okay. There it is.

A. Thank you. And "made possible I.D." and then that would flow "of offender."

MS. ROSEN: Okay. City seeks to move RFC12724 and 12725 as City Exhibit U.

THE COURT: Any objection?

MR. LOEVY: No, Your Honor.

THE COURT: It is received.

(Said City Exhibit U received in evidence.)

MS. ROSEN: Okay. And then if we take a look at -- if we could put those up side by side.

BY MS. ROSEN:

Q. And have you in your review of the files noticed that sometimes people write on the back of a GPR, that detectives write on the back of a GPR?

A. I have seen that occur, yes.

Q. Okay. So is it likely, based on that, that this "of offender" is on the backside of that GPR?

A. I would have -- entirely possible, but it's not the way to independently tell from that.

Q. Unless you were to look at the original file or something,

right?

A. If you had that original piece of paper, yes.

Q. Okay. And now if we take a look at -- if you look at the SAO file that you have and take a look at pages SA018873 and 18874.

A. 18873?

Q. 18873, yeah. And 74.

A. All right. They appear to be the same two pages that you showed me.

MS. ROSEN: Okay. And the City would seek to admit SA018873 and 74 as City 21-E.

MR. LOEVY: No objection, Your Honor.

THE COURT: It is received.

(Said City Exhibit 21-E received in evidence.)

BY MS. ROSEN:

Q. So the first pages of the document are the same, same copies, same document, and then the second pages are the same, same copies, same document, right?

A. That's correct.

Q. Okay. So each of the documents that you've identified at line 110 of your attachment as being missing all exist in the copy that we've obtained in the state's attorney's file, right?

A. In the material that you've just given me, assuming that the source is correct, that's -- that is correct.

Q. Okay. So that's some indication, don't you think, that

perhaps the criminal defense attorney's files are not in the same condition as they were back at the time of the criminal prosecution?

MR. LOEVY: It's one file, Your Honor.

THE COURT: Excuse me?

MR. LOEVY: Objection to the foundation for that question. One file.

THE COURT: I think the witness can answer if he has any idea.

BY THE WITNESS:

A. I'm sorry. Would you --

BY MS. ROSEN:

Q. Sure. Based on this exercise that we've just gone through, isn't it true that the fact that all of the documents that you've identified as missing from the criminal defense attorney's file at line 110, since they're all in the SAO file, isn't that some indication to you that perhaps the criminal defense attorney files that we've obtained in this case are not in the same condition as they were in the criminal prosecution?

A. I would have to make a guess without foundation. I would say unequivocally that the documents are contained in the state's attorney's file.

Q. Okay.

A. I can say unequivocally that they were not in the criminal defense file. Whether they were or they were not was not what

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 219 of 758 PageID #:107672
Brasfield - cross by Rosen
2369

I was asked to do, and I can't form a speculation as to it.

Q. Do you have an understanding, based on the work that you've done in this case and your experience, about whether or not prosecutors have an obligation to turn over the police reports that they have in their file?

A. It's my understanding that that is the expectation, yes.

Q. Okay. All right. Now --

A. Ms. Rosen, are we done with this --

Q. We are done --

A. Thank you.

Q. -- with this one. We'll take a look at now N133637.

A. Thank you.

Q. Uh-huh. And this is line 103 on your attachment. Let me know when you're there.

A. Referring to N133637?

Q. Right.

A. Okay.

Q. And you have listed there a series of six or seven pages of documents that are missing, right?

A. Right. The first column indicates that it's yes, but with an investigative file incomplete.

Q. Meaning that the investigative file that you received from the police department is missing?

A. That's correct.

Q. And how do you know that?

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 220 of 758 PageID #:107678
Brasfield - cross by Rosen
2370

A.   That there are -- it varies from case to case.  I'd have to see the whole file.

Q.   And you don't know why it said that?

A.   I don't recall independently right now why.

Q.   In any event, from the file that you have, you've identified the pages that are listed at line 103 as missing, right?

A.   Right.

Q.   If you'd take a look at RFC11884.  That's the first page of a supplemental report that you identified as missing from the criminal defense attorney's file, right?

A.   That's correct.

Q.   And then the second page is also missing, according to your report, 18 -- 11885.  Do you see that there?

A.   That's correct.

          MS. ROSEN:  City seeks to move City V.

          THE COURT:  Any objection?

          MR. LOEVY:  No objection, Your Honor.

          THE COURT:  It is received.

   (Said City Exhibit V received in evidence.)

BY MS. ROSEN:

Q.   Okay.  And then if you take a look at the SAO file that we have for you, take a look at 103839.

          MS. ROSEN:  If we could put that on the screen just for Mr. Brasfield.

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 221 of 758 PageID #:107674
Brasfield - cross by Rosen
2371

BY MS. ROSEN:

Q. And that's the same two-page supplemental report, right?

A. It appears to be.

MS. ROSEN: Okay. And City seeks to move 21-F into evidence.

THE COURT: Any objection?

MR. LOEVY: No, Your Honor.

THE COURT: It is received.

(Said City Exhibit 21-F received in evidence.)

MS. ROSEN: And if we can put them up side by side for the jury.

BY MS. ROSEN:

Q. Other than the redaction problem again, they're the same document, right?

A. That's correct.

Q. Now, let's take a look at another document that you've identified as being missing, 11890.

MS. ROSEN: Did I skip one?

MS. CARNEY: You skipped 11886.

MS. ROSEN: Okay. Let's do -- I'm sorry.

BY MS. ROSEN:

Q. Take a look at 11886. Do you have that up?

A. Now, what number was it?

Q. 11 --

A. 18 --

Q. -- 886 --

A. -- 86.

Q. -- is on the screen for you. It's a two-page supplemental report.

A. Yes.

Q. So according to your chart, you have 11886 and 11887 as missing, right?

A. Actually, 84 through 87, yes.

Q. Okay. So that would encompass --

A. This 86 --

Q. -- 886?

A. -- yes.

MS. ROSEN: Okay. City seeks to move 11886 and 11887 as City W.

MR. LOEVY: No objection, Your Honor.

THE COURT: It is received.

(Said City Exhibit W received in evidence.)

BY MS. ROSEN:

Q. And, like I said, that's a two-page supplementary report, right?

A. That's correct.

Q. And, now, if I can ask you to take a look at the SAO file, exact page 1036 to 1037.

Do you see that same supplementary report in the SAO file?

A. Appears to be the same.

MS. ROSEN: Okay. The City seeks to admit 1036 to 1037 as 21-G.

MR. LOEVY: No objection, Your Honor.

THE COURT: It is received.

(Said City Exhibit 21-G received in evidence.

BY MS. ROSEN:

Q. And, once again, those are the same documents, so one -- the one that you say is missing or identified as missing from the criminal defense attorney file can be found in the SAO file?

A. Again, without having seen the state's attorney file, it's contained within the state's attorney file.

Q. Okay. And you never saw the state -- you didn't review the state's attorney's file in the analysis you did?

A. I don't believe this was one that I did, no.

Q. Okay. Now let's take a look at RFC11890, which is another document that you say was missing from the criminal defense attorney file. And this is a one-page supplementary report dated March 26th, 1990.

Do you see that there? Yes.

A. Yes. 11890 is here on the screen.

MS. ROSEN: Okay. And City seeks to admit City X.

THE COURT: Any objection?

MR. LOEVY: No, Your Honor.

THE COURT:  X is received.

(Said City Exhibit X received in evidence.)

BY MS. ROSEN:

Q.  And then if you take a look at your SAO file and look at page 1057.

A.  It appears to be the same one.

MS. ROSEN:  Okay.  City seeks to admit SAO1057 as 21-H.

THE COURT:  Any objection?

MR. LOEVY:  No, Your Honor.

THE COURT:  It is received.

(Said City Exhibit 21-H received in evidence.)

MS. ROSEN:  If you could put those side by side.

BY MS. ROSEN:

Q.  So the document that's in the criminal defense attorney file, this particular supplementary report, is contained in the SAO file that we've provided for you, correct?

A.  That's correct.

Q.  And then if we look at 11904 to 11905, that's an example of a general offense case report, correct?

A.  That's correct.

Q.  Okay.  And that's the first page of the document.  Look at the second page of the document.

And you have identified both of those pages as missing from the criminal defense attorney file, right?

A.   That's correct.

Q.   And the criminal -- the general offense case report is a document that you would expect to find in the permanent retention file as well, the original of that document, right?

A.   I would expect it to be in the permanent retention file.

Q.   Okay.  And then if we take -- if you can take a look at SA01030 to 1031, can you tell me if that's the same exact report in the state's attorney's file that you've identified as being missing from the criminal defense attorney's file?

A.   I'm sorry.  It's upside down.

Q.   Oh, sorry.

A.   Just a second.  And I'm not trying to prolong the agony here.  I just --

Q.   No.

A.   -- want to make sure that that's what it appears to be.

          MS. ROSEN:  And the City seeks to admit SA01030 to 1031 as City I -- 21-I.

          THE COURT:  21-I.  Any objection?

          MR. LOEVY:  No objection, Your Honor.

          THE COURT:  It is received.

   (Said City Exhibit 21-I received in evidence.)

          MS. ROSEN:  If we could put those up side by side.

          MS. CARNEY:  Are they in?

          MS. ROSEN:  Yeah, they're both in.  And that's the first page of the report and then the second page of the

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 226 of 758 PageID #:107679
Brasfield - cross by Rosen
2376

report.

BY MS. ROSEN:

Q. So each of the documents that you've identified at line 103 as being missing from the criminal defense attorney file are in this SAO file as well, correct?

A. That's correct.

And I should have mentioned, whether it's relevant or not, but I have no idea when these documents came into possession of the state's attorney, so --

Q. Okay.

A. And they're not stamped "permanent retention," so --

Q. And presumably, though, your understanding of how that works with respect to permanent retention is that "permanent retention" stamp comes later, right?

A. Later in the process.

Q. Right. So presumably, most of the time, that stamp's not going to be on documents contemporaneously with a criminal prosecution, assuming the criminal prosecution is not going for years and years and years and years, right?

A. That's -- yes.

Q. Okay.

A. Kind of a mixed bag, but generally speaking.

Q. Okay. And then I am going to ask you to take a look at one more document in the SAO file that is -- I mean -- yeah. No. In the PD's file, actually.

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 227 of 758 PageID #:107680
Brasfield - cross by Rosen
2377

So take a look at -- you also have the PD file there. And if you take a look at what's flagged as JRL208557, 558, and 559. There should be a tab on it for you. Let me know if --

A. Just to make it a little easier, this is the state's attorney's file. This is what the police have.

Q. That's the public defender's file, right?

A. This?

Q. That big one is the public defender's file.

A. Okay. I thought you indicated it was the police file.

Q. No, no, no. It's --

A. I'm sorry.

Q. -- the public defender's file.

A. All right.

Q. So the smaller one --

A. So we have -- I'm sorry.

Q. Yeah. The smaller one is the SAO file. The bigger one is the public defender's file.

So take a look at JRL208557.

A. All right.

MS. ROSEN: Put that up on the screen.

BY MS. ROSEN:

Q. And do you see there that it is a to/from memorandum to the director of the Records Section from James Fruin, the commander at Area 5?

A. Yes.

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 228 of 758 PageID #:107681
Brasfield - cross by Rosen
2378

Q. Okay. This -- and then let's look at the next page, 58 and 59. Do you see those there? Those are subpoenas, correct?

A. That's correct.

Q. Okay. Now, if we can --

MS. ROSEN: The City seeks to admit JRL208557 to 559 as City 22-A.

THE COURT: Any objection?

MR. LOEVY: No, Your Honor.

THE COURT: 22-A is received.

(Said City Exhibit 22-A received in evidence.)

MS. ROSEN: All right. If we could get that up on -- the first page of the memo up there.

BY MS. ROSEN:

Q. So let's take a look at this to/from memorandum, which everybody can see now on the screen.

So it's dated April 16, 1990, correct?

A. Yeah, April 16th, 1990.

Q. Yeah.

A. Yes.

Q. And it's a to/from memorandum that we've talked about. It's to the director of the Records Section from the commander at Area 5 of the Detective Division.

And you understand that in 1990, there were multiple police Areas, right?

A. Yes.

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 229 of 758 PageID #:107682
Brasfield - cross by Rosen
2379

Q. And its subject is "Subpoena for 'street files,'" right?

A. Yes, correct.

Q. And your understanding -- you have an understanding, don't you, based on the work you did in this case and the other cases, that the files that were being maintained at the Area police stations that caused the issues in Jones and Palmer were commonly referred to as street files, among other names, right?

A. Among other things, yes.

Q. Okay. And based on your review of all of these materials and your review of numerous subpoenas in many of these files, you noticed, didn't you, that both the State's Attorney's Office and the PD's Office and other criminal defense attorneys, when they were issuing subpoenas to the state's -- to the Chicago Police Department and asking for all of the documents, would include a request for the RD file and then a whole list of names, street file, running file, working file, all of that, right?

A. The more experienced -- in just looking at it from a police practices perspective, some would and some would not.

          MR. LOEVY: What's the Bates number, Eileen, on that?

          MS. ROSEN: It is JRL208557 --

          MR. LOEVY: Thank you.

          MS. ROSEN: -- to 559.

          MR. LOEVY: Thank you.

          MS. ROSEN: Uh-huh.

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 230 of 758 PageID #:107683
Brasfield - cross by Rosen
2380

BY MS. ROSEN:

Q. Okay. So -- and you can tell from the subpoena that this is the commander directing in this memorandum to the director of the Records Section, and then the next two pages, which we showed -- we'll show in a minute again -- are the subpoenas, right, that were issued in the criminal case?

And it's an indication that the commander is responding to the subpoena. They searched their current files at Area 5, and they're sending the documents to the Records Division. Do you see that there?

A. Yes.

Q. And your understanding of how the Subpoena Unit operated back in the 1980s and the 1990s was that a subpoena would come into the Subpoena Unit at the Chicago Police Department and there would be a clerk or a police officer, depending on who was handling it, that would be charged with the responsibility of responding to the subpoena, correct?

A. That's correct.

Q. And it's your understanding from reading the depositions and the records in this case that what would happen is that the person that was handling that particular subpoena would make photocopies of the subpoena and then they would write on each of those photocopies the unit that they were going to send the subpoena to, the unit within the Chicago Police Department that they were going to send the subpoena to for a response,

correct?

A.   It was a mixed bag.

Q.   Well, you understood that was how the process was supposed to work at a minimum, right?

A.   There was no training and there were no guidelines and there were no policies for the Subpoena Unit, which I think the court recognize -- not this court, but the court in other matters recognized.

MS. ROSEN:  Your Honor, I'm going to move to strike the what courts in other matters recognized.

MR. LOEVY:  I think he meant Jones and Palmer, Your Honor.

MS. ROSEN:  Well --

THE COURT:  Well, the witness may need to do that to answer -- to talk about that to answer the question.  I just don't know.

BY MS. ROSEN:

Q.   All right.  Let me focus your attention on my question. Okay?

THE COURT:  Okay.

BY MS. ROSEN:

Q.   So it's your understanding that, according to the Chicago Police Department and their expectation of how it worked with the Subpoena Unit, the subpoena would go to the Subpoena Unit, correct?

Brasfield - cross by Rosen

2382

A.  As I've said, I've read depositions from Mr. Hickey and from others that indicated that there was, at times, some confusion, that they had received no training.  Depending on the experience of the clerk, it would handled -- be handled different ways, and there was no printed guideline.

Q.  Okay.  So that's -- you're answering not my question, respectfully.

A.  Well --

Q.  But let me address that for a second.

A.  All right.

Q.  You're saying that information that you just testified to comes from Mr. Hickey?

A.  It comes from dep -- within depositions that I have read, whether it was specifically to Mr. Hickey in all regards or only in portions.  But based on all of the depositions and statements that I have seen, I think that's a fair reflection of the practice.

Q.  Okay.  So let's take a look at the second page of this document.

        This is the subpoena, right?

A.  Yes.

Q.  A copy of the subpoena.  And you see at the top there, it says A/5?  Do you see that --

A.  A copy of what?

Q.  -- handwriting at the top of the subpoena?  It's

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 233 of 758 PageID #:107686
Brasfield - cross by Rosen
2383

highlighted.

A.  Oh, up at the top, A/5.  Area 5, yes.

Q.  Area 5.  And so that conforms with the idea that somebody sent that subpoena to Area 5, right?  Because the memo -- the attached memo is from the commander at Area 5, right?

A.  I'm not arguing that that was the intent or what the case was, but I can't independently tell because there's nothing that I can gauge it as a baseline as to what that's supposed to mean.  But I must -- I would say that could be a safe assumption.

Q.  Okay.  Let's look at the next page, and that indicates there that the person that issued the subpoena was the assistant public defender in the case.

        Do you see --

A.  Yes.

Q.  -- that there?

A.  Assistant Public Defender Sorensen.

Q.  Okay.  And so that is at least one example of a subpoena being sent to the Area to be fulfilled by the appropriate people at the Area for the documents that they might have that are related to the case, right?

A.  Following that process, if it went to Area 5, it was limited to Area 5.  Did not include Gang squad members or anyone else.  But yes.

Q.  There's no indication in this file that you're aware of

that the Gang Crimes squad is involved in this criminal prosecution, right?

A.   The Subpoena Unit would have no way of knowing it.

Q.   I'm not asking you about whether or not the Subpoena Unit would know or would not know.  I'm asking you from the file that's in front of you and the file that you've reviewed in connection with the work in this case, can you say that the Gang Crimes squad or Gang Crimes specialists or any gang unit was involved in this particular criminal investigation?

A.   Not as I sit here, no.

Q.   Okay.

     MS. ROSEN:  If we could take that down.

BY MS. ROSEN:

Q.   Now I'm going to ask you to take a look at RD number K575912.

A.   Thank you.

Q.   Here you go.

     MR. LOEVY:  What's the RD number?

     MS. ROSEN:  K575912.

BY MS. ROSEN:

Q.   That matches with line 74 of your attachment, right?  Oh, give you a chance to get there.

A.   I have it.

Q.   Okay.  So K575912 is the same as -- is the RD file that's referenced at line 74 of your attachment, right?

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 235 of 758 PageID #:107688
Brasfield - cross by Rosen
2385

A.   That's correct.

Q.   And you list a series of documents there that are missing from the criminal defense attorney's file, right?

A.   That's correct.

Q.   Okay.  So if we look at 8844 through 8852 --

MS. ROSEN:  If we could just put those individually on the screen for Mr. Brasfield.

BY MS. ROSEN:

Q.   -- those are a series of --

MS. ROSEN:  You can just flip through them.

BY MS. ROSEN:

Q.   -- court attendance reports, right?

A.   So far.

Q.   We'll go all the way through to 8852.

A.   Yes.

Q.   Okay.  And then if we take a look at 8862, 63, and 64, those are also court attendance reports, correct?

A.   That's correct.

Q.   Okay.  And those were the -- they're -- you agree with me that those are administrative documents, right?

A.   In the context of my previous testimony, they were designed to be, yes, but could be investigatory.

Q.   Right.  And you're -- I think, if I understood your testimony --

MS. ROSEN:  And we can -- the City seeks to admit this

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 236 of 758 PageID #:107689
Brasfield - cross by Rosen
2386

as a group exhibit, City Y, City -- which one is it?  19-Y.

THE COURT:  Any objection?

MR. LOEVY:  No, Your Honor.

THE COURT:  19-Y is received.

(Said City Exhibit 19-Y received in evidence.)

BY MS. ROSEN:

Q.  So if I understood your testimony earlier, the reason a court attendance report might be relevant to a criminal investigation was because the police officer might have been in court when he said he was doing something else?  Do I have that right?

A.  That was just an example.  Or in this particular 8864, it's referenced a "further line up is necessary."

And I've -- I think I've made it fairly clear that oftentimes these forms are -- can be innocuous, but that they may contain information that would be useful to follow up on. That's not what they were designed for.

But part of that comes from my two years as an investigative sergeant within Internal Affairs and two years as the captain in Internal Affairs.  You can glean all sorts of things.  Maybe 9 times out of 10, you can't.  But they're produced for a purpose, and they have value.

Q.  Okay.  So taking a look at this one, RFC8864, it's your understanding, isn't it, that the way that the Chicago Police Department uses these forms is after a case gets charged,

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 237 of 758 PageID #:107695
Brasfield - cross by Rosen
2387

whenever a police officer is notified to go to court on that particular case, they're required to prepare this report, right? That's your understanding?

A. That would be my understanding.

Q. Okay. So in this particular one that you've identify -- that you've pointed out this idea about "further line up necessary" -- do you see that language there?

A. Yes.

Q. Okay. Isn't that further -- that the continuance was granted by the court because a further lineup was necessary, correct?

A. That could be.

Q. Well, it says Reason for Continuance: "Further line up necessary."

A. Right.

Q. Okay. So the fact that the court continued the case and the police officer had to put that on his report doesn't impact the police officer's activity, right?

A. No, I -- you may be reading too much into my answer. All I'm indicating is that other than the design of the form to document court attendance, there may be other information that may or may not be of assistance in pursuing a defense. This may have absolutely no relevance at all.

Q. Okay. And you agree with me, don't you, that these court attendance reports that you've seen in these files that you've

Brasfield - cross by Rosen

2388

reviewed are prepared after the investigation is complete by the Chicago Police Department?

A. I have not been privy to the policy and procedures that pertains to the utilization of court attendance reports. It would be my assumption that the court attendance report, as all reports, would be filled out contemporaneous to the event.

Q. Right. And unnecessarily, a police officer isn't called to court on a case until the criminal prosecution is underway and the crim -- and the Chicago Police Department's role in the investigation is complete?

A. I understand your question better now. Yes.

Q. Okay. And can you identify any other files that you've reviewed for any other law enforcement agency where court attendance reports of this nature are required to be produced to the criminal defendant absent a request?

A. My experience in general terms is that anything that has been written up involving a homicide case or any felony case would be discoverable and disclosed, regardless of later on someone deciding it's relevant or not relevant. Makes it easier for everyone.

Q. So my question's a little bit different. I'm asking you to identify any law enforcement agency that you're familiar with that would require the police department to produce court attendance reports of the type that we're discussing here right now absent a specific request for court attendance reports.

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 239 of 758 PageID #:107692
Brasfield - cross by Rosen
2389

A.   If it was contained in the centralized file, it would be auto -- the expectation and the fulfilment would be that it would be automatically disclosed.

Q.   Well, let me try it one more time.

Can you identify for us a specific agency in the United States of America that requires these court attendance reports to be produced in criminal discovery absent a specific request for criminal attendance reports?

A.   I am not aware of any specific agency right now that uses court attendance reports in the manner that the Chicago Police Department does.  But since they are in the Chicago Police Department file, I would expect it to be disclosed.

But no, I cannot point you to another agency that does it like Chicago does it.

Q.   Okay.  Requires police officers to prepare a report when they go to court?  Is that what you're saying?

A.   They fill out --

Q.   That's --

A.   They fill out overtime reports or an overtime slip if they're off-duty that a supervisor would sign, and it would go to Payroll.

Q.   So should that also be produced in discovery?

A.   It would not be included in the file.

Q.   Okay.  So let's take a look at 8880 to 8882, which is another document you've identified on line 74 as being missing.

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 240 of 758 PageID #:107693
Brasfield - cross by Rosen
2390

And that's a two -- three-page supplementary report detailing a canvass that was conducted in this case, right?

A. Yes.

Q. Okay. I'm going to ask you to take a look at the state's attorney file, 26557 to 26559.

Those are the same reports, right?

A. They appear to be, yes.

MS. ROSEN: Okay. The City seeks to admit RFC8880 to 8882 as City Y -- City 19-Y.

THE COURT: I think 19-Y was already used.

MS. ROSEN: Okay. Then City 19-Z. You're right. I lost track of my list.

THE COURT: Any objection?

MR. LOEVY: No, Your Honor.

THE COURT: It is received.

(Said City Exhibit 19-Z received in evidence.)

MS. ROSEN: And then we seek to admit SA026557 to 26559 as SA021 -- as City 21-J.

THE COURT: Any objection?

MR. LOEVY: No, Your Honor.

THE COURT: It is received.

(Said City Exhibit 21-J received in evidence.)

BY MS. ROSEN:

Q. So both of those reports are -- both of those documents are copies of the same report, correct?

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 241 of 758 PageID #:107694
Brasfield - cross by Rosen
2391

A. They appear to be, yes.

Q. And the one that's missing in the criminal defense attorney's file is in the state's attorney's file?

A. That's correct.

Q. And this is another one of the state's attorney files that you did not review in connection with your analysis?

A. That's correct. Again, with the caveat I don't know when it got into the state's attorney's file.

Q. Okay. If we can take a look at the next one. We're almost done. I promise. It's K417078, which is line 67 of your attachment.

A. Thank you very much. You got it?

Q. Yes. Here's one for you.

A. Okay. And you indicated row 67?

Q. Yes, K417070.

A. I have it.

Q. You have it?

A. Yes.

Q. Okay. So I am going to ask you to first take a look at RFC8153. And that's one of the documents you identified as being missing, right, from the criminal defense attorney's file?

A. Yes.

Q. And do you recognize that to be a screenshot of a criminal court docket? Do you see that? Got the court number on it.

A.  It is a -- I'm sorry to interrupt.

Q.  Yeah, no.  It's got, like, the court number on it and the name of the case and the disposition.  Do you see that there?

A.  Yeah.  And it includes a heading on the computer software for the screen that -- defendant's name, other information, software commands.  But, yeah, appears to be a screenshot.

MS. ROSEN:  Okay.  So the City would seek to admit RFC8153 as City 19-AA.

THE COURT:  Any objection?

MR. LOEVY:  No, Your Honor.

THE COURT:  It is received.

(Said City Exhibit 19-AA received in evidence.)

BY MS. ROSEN:

Q.  And that's a document of a public record, right?  I mean, it's a computer that has the criminal court information on it, right?

A.  I would hesitate.  I don't have sufficient information to tell you what system it's from, whether it's a law enforcement system or a court system or from the State's Attorney's Office, but it's some type of a criminal-justice-related, it would appear.

Q.  Okay.  And then if we look at the other documents that you have identified -- we have 8154, 55, 56, and 57.

MS. ROSEN:  If we could put those up sequentially.

BY MS. ROSEN:

Q. Those are all -- some more court attendance reports. And ask you to take a look at those. Is that correct?

A. Yes.

MS. ROSEN: And the City seeks to admit the series RFC8154 through 57 as City 19-BB.

THE COURT: Any objection?

MR. LOEVY: No, Your Honor.

THE COURT: It is received.

(Said City Exhibit 19-BB received in evidence.)

BY MS. ROSEN:

Q. Okay. So these are some more of those court attendance reports that we've already talked about, right?

A. Yes, that is correct.

Q. Okay. And then if we take a look at RFC8158 to 8161, that's a report of a postmortem examination from the Office of Medical Examiner?

A. That's.

Q. Do you see that there?

A. Yes.

MS. ROSEN: If we could -- City seeks to admit that as City 19-CC.

THE COURT: Any objection?

MR. LOEVY: No, Your Honor.

THE COURT: It is received.

(Said City Exhibit 19-CC received in evidence.)

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 244 of 758 PageID #:10769
Brasfield - cross by Rosen
2394

BY MS. ROSEN:

Q. And then you can see from the top of that document that the document is actually created by the -- it's on the letterhead of the Office of the Medical Examiner for Cook County, right?

A. Right. Handwritten above that is "Area 5."

Q. Right. And so doesn't that indicate to you that a copy was made from -- of the document by the Cook County Medical Examiner's Office and sent to Area 5?

A. That would be the assumption.

Q. Okay. And do you have any idea how that process works in Cook County when a -- when the medical examiner prepares their postmortem report, in the process, when it is that they send a copy of that postmortem report to the detectives?

A. In my experience and in looking at the material in other cases, that's done in a very timely manner, within a short period of time, depending on the workload at the Medical Examiner's Office, after the autopsy was conducted.

Q. That's based on your experience in Cook County?

A. No, no, of course not.

Q. Oh, okay. So you don't know in Cook County how long the process is or at what point in time the copy gets sent to the detectives?

A. Based on my review of the files and entries, on occasion, where received, a notation will have been made in the -- in a general progress report or a supplemental report that a medical

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 245 of 758 PageID #:107698
Brasfield - cross by Rosen
2395

examiner's report was received, it was generally within a short period of time from the death.

Q. Okay. And if we can take a look at now 8162. That's another document from the Medical Examiner's Office, right?

A. Yeah. Commonly referred to as a tox screen, yes.

Q. And then if we move to 8174, that's a supplementary report, correct?

A. Yes.

Q. And if you take a look at SAO29730, a copy of that report is also in the SAO file, right?

A. Yes. It appears to be the same one.

Q. Okay.

MS. ROSEN: The City would seek to admit RFC8174 as City 19-DD.

THE COURT: Any objection?

MR. LOEVY: No, Your Honor.

THE COURT: It is received.

(Said City Exhibit 19-DD received in evidence.)

MS. ROSEN: And City SAO29730 as City 21-H. No. K.

THE WITNESS: The only -- I might point out, the only difference here is the absence of the signature in the state's attorney's subpoena one.

THE COURT: Any objection to 21-K?

MR. LOEVY: No, Your Honor.

THE COURT: It is received.

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 246 of 758 PageID #:107699
Brasfield - cross by Rosen
2396

(Said City Exhibit 21-K received in evidence.)

BY MS. ROSEN:

Q. So the state's attorney version does not have the signature on the bottom, right?

A. Right. There's a Sergeant Gralak signature.

And I only commented on it that they're not totally identical, but they're --

Q. Okay.

A. -- the same document.

Q. Okay. And then if we take a look at the other document that you have noted as missing as RFC8178 and 8179, and that's another -- that's a copy of one of the investigative file inventories that we've been talking about, right?

A. That's correct.

MS. ROSEN: The City would seek to admit 8178 -- RFC8178 to 79 as City 19-EE.

THE COURT: Any objection?

MR. LOEVY: No, Your Honor.

THE COURT: 19-EE is received.

(Said City Exhibit 19-EE received in evidence.)

BY MS. ROSEN:

Q. And in this particular case, you see that there's a stamp on it that says that a copy of the inventory file -- the investigative file inventory is to be sent to Records, right, for processing on September 30th, 1988, right?

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 247 of 758 PageID #:107706
Brasfield - cross by Rosen
2397

A.  That's correct.

Q.  And that's what you would expect pursuant to the written policies, right?

A.  Yes.

Q.  Supposed to happen?  And, in fact, in the permanent retention file in this case, that document is there; is that correct?

A.  I have to look at the other chart.

Q.  Okay.  There's something -- you have the chart there, right?

A.  Yeah.  8178.

And does the Bates file -- or does the investigative file contain an inventory?  Yes.

Q.  Okay.  And then if we take a look at RFC8180, RFC8180.  I think this is probably one of the first times the jury has seen this.

This is one of those investigative file control cards, right?

A.  Yes.

MS. ROSEN:  The City seeks to admit RFC8180 as City 19-FF.

THE COURT:  Any objection?

MR. LOEVY:  No, Your Honor.

THE COURT:  It is received.

(Said City Exhibit 19-FF received in evidence.)

BY MS. ROSEN:

Q. And this is the thing that you described earlier as sort of like a library card?

A. Yes.

Q. Where the document is supposed to -- your understanding, right, is that the way that this is -- this document is supposed to work is that where the file is kept at the Area or if it's kept at Records Storage, if the file is removed, whoever's removing the file is supposed to fill it out so if somebody later goes looking for the file, they know where it is, right?

A. That was the intent, yes.

Q. Okay. If we take a look at RFC8183, this is a document you've identified as being missing from the criminal defense attorney's file, right?

A. You're directing my attention where?

Q. On the screen. So RFC8183 and then, if you look at your report, it -- I mean, your attachment, it's one of the documents that are missing.

A. That's correct.

Q. And if you take a look at now the PD file, there's three documents I'd like you to take a look at, JRL206808 and JRL206810 and JRL206812.

A. Okay. I have 808 and 812. What was the other one?

Q. 808, 810, 812.

A.  I am not finding them by --

THE COURT:  Can you explain --

BY THE WITNESS:

A.  -- Bates numbers.

THE COURT:  -- please?

MS. ROSEN:  Yeah, sure.

BY MS. ROSEN:

Q.  This one is 812 and 808.  Oops.

(Counsel drops paper, witness retrieves it.)

MS. ROSEN:  Thank you.  I don't know why it's not tabbed.  Let's do it on the screen to save time.

THE WITNESS:  Okay.

BY MS. ROSEN:

Q.  So if you take a look at your screen, JRL206808 --

MS. ROSEN:  Is that what's up there now?

MS. CARNEY:  Yes.

BY MS. ROSEN:

Q.  -- and then take a look at -- and then just take a look at that.  The inventory number there, do you see it as 524768?

A.  Yes.

Q.  And it matches the inventory number 524768 on the evidence report, right?

A.  That's correct.

Q.  Okay.  So that inventory that's in the PD's file that you have is -- matches the inventory number that's on this report,

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 250 of 758 PageID #:107708
Brasfield - cross by Rosen
2400

right?

A. The --

Q. So the --

A. The inventory file number as opposed to the Bates files, which I've referred to?

Q. Yes, so -- yes. So what I'm saying is take a look at -- if you look at the inventory number -- right? You understand that when the Chicago Police Department inventories evidence, there's an inventory sheet that's prepared, if that --

A. Yes.

Q. -- that number?

A. That's my understanding.

Q. Okay. And so if you look at the document on your right, which is JRL206808 from the PD's file, it indicates that the inventory number for that particular piece of evidence is 524768, right?

A. Yeah, I would agree completely. There is a -- two documents, a preliminary evidence report and a property inventory form, two different types of form. They both make reference to an inventory number.

Q. And the same --

A. They match.

Q. So it's the same inventory number, right?

A. Yes.

Q. They match?

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 251 of 758 PageID #:107704
Brasfield - cross by Rosen
2401

A.   That's correct.

Q.   Okay.  And then if we can go to 206810.  That one is 524766, and that matches the next item on the Preliminary Fired Evidence Report, right?

A.   That's correct.

Q.   Okay.  And then if we go to 206812, 553001 is the inventory number, and that also matches the final number on that report, the fired -- the evidence report?

A.   That's correct.

Q.   Okay.  So each of the -- so the document that you say is missing is the preliminary report, but the evidence that's being discussed in that report, that evidence is in the PD's file via the inventory forms, right?

A.   Right.

Q.   Or reference to them?

A.   But what I indicated in the spreadsheet was missing is missing.

Q.   Right.  But the information that it's referencing appears in a different form in the report?

A.   That's correct.

Q.   I mean, in the file, in the PD's file.

     Okay.  If we take a look at RFC8213, these are some handwritten notes.  And that's one of the items that you say is missing from the PD's file, right?

A.   Yeah.  If I could ask you to give me the line number again.

I've shuffled enough papers here that I lost --

Q. Oh, sorry.

A. -- track of --

Q. The line number --

A. -- which row.

Q. -- on your attachment?

A. No.  The row.

Q. Yes.

A. The case.

Q. 67.

A. All right.  Thank you.

Q. Sure.  Do you see that?  Are you with me yet?

A. Yes.  I have it.  I'm sorry.

Q. Okay.  No problem.

So that handwritten note, you say, is missing, right?

A. Right.

Q. And if we take a look -- have you take a look at the SAO file, page 29800.

MS. ROSEN:  And we can put it up side by side on the screen, if that's easier.

BY MS. ROSEN:

Q. This is an example, isn't it, of information that was in the note that also is contained in the GPR?

A. And your question is what?

Q. So if you compare the handwritten note to the GPR, the

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 253 of 758 PageID #:107706
Brasfield - cross by Rosen
2403

information is the -- is information that appears in both documents, right?

A. Without taking the court's time to read through the whole thing, this appears to be an example of what was intended to transcribe notes into the general progress report.

Q. Okay. And then if you take a look at SA029974 --

MS. ROSEN: And we can just do that on the screen, 29974.

BY MS. ROSEN:

Q. Again, the information about the Susan Sweat person is in that report as well, right? If you look at the middle -- the body of the report.

A. Again, I -- the screen is filled -- entirely full of the reference to Susan Sweat. The one on the other was --

MS. ROSEN: You can flip back to the first -- the GPR.

BY MS. ROSEN:

Q. Susan Sweat, right?

A. That -- now you have corresponding documents.

Q. Okay. All right. And then the last one, which we're not going to take the time to go through, because I think we've done enough of this, is if you just take a look at your chart line 85, it is M381429.

And maybe we can quickly flip through those on the screen for you, if you want, but I can tell you that each and every one of the documents that you identify as missing are all

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 254 of 758 PageID #:10770
Brasfield - cross by Rosen
2404

court attendance reports.

Do you want me to flip them for you or --

A.  No, no.  I'm -- I'll accept your representations.

Q.  Okay.

A.  That's correct.

Q.  Okay.  All right.  So just a couple more things.

Were you aware that after -- shortly after the court entered its order in the *Palmer* litigation regarding the City's policies and practices that a memo was issued in the State's Attorney's Office detailing the State's Attorney's Office's responsibility as it related to obtaining documents, obtaining materials, making sure that documents were turned over to criminal defense attorneys?

A.  I have no independent recollection of seeing that.  I may have.  I don't recall.

Q.  Okay.  And do you -- maybe if I ask you this question -- do you recall that specifically in that memo that was dated June 13th, 1983, the chief of the Criminal Prosecutions Bureau instructed all of their trial assistants to not only familiarize themselves with all of the documents that are available from the Chicago Police Department, but specifically instructed them to provide to the defendant a copy of the investigative file inventory sheet where it existed?  Do you have any recollection of that?

A.  I have no independent recollection, but I -- it still would

not fulfill the issue or address the problem.

Excuse me while I get my report, but --

Q. You don't recall that that happened?

A. I don't recall that. But since many of the times, there were no -- there was no inventory in the permanent retention file, that would make it problematic.

Q. But if it were in the investigative file, it wouldn't be problematic, right? Because the state's attorney could just get it from the investigative file.

A. It's possible.

Q. Because the state's attorneys were aware of investigative files, right?

A. They should have been, yes.

Q. And certainly, if they're prosecuting a criminal prosecution for a murder, and they were charged with this responsibility of making sure that they knew all the documents that the Chicago Police Department had in connection with such an investigation, they would -- you would expect them to go get those documents for the criminal defendant?

A. I was not asked to evaluate the State's Attorney's Office.

Q. Okay. In connection with the work that you did for this case, information I have is that through -- up until, I guess, yesterday and -- or Friday and today, your invoices total $58,900? Is that --

A. I'm sorry. How much?

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 256 of 758 PageID #:107704
Brasfield - cross by Rosen
2406

Q. $58,900.

A. On this case?

Q. Yeah.

A. The last ones that I have looked at were up until the deposition by the City, and because that includes cross-country travel, hotel, so on and so forth.

But the last one that I've documented was, I think, in the neighborhood of 30,000. But I won't -- it's objective. Whatever it is, it is.

Q. Okay. I'm just totaling up the invoices --

A. Okay.

Q. -- that I was provided. Okay. And then in connection with the work that you did in *Fields* where you looked at files there, do you recall what the total was for that review?

A. No, I -- I have no idea right now in any of my cases what the totals were.

Q. Do you think it was less or more than the 58,000 or so that you charged here?

A. It probably was more.

Q. Okay. And then in connection with the work that you did in *Kluppelberg*, how much did you charge there?

A. Again, I'm -- I have no -- no idea.

Q. Do you think it was less or more than what you charged in this case?

A. It was rather intensive. I -- it could very well have been

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 257 of 758 PageID #:107715
Brasfield - redirect by Loevy
2407

more.

Q. Okay. And those are the three cases, right, *Kluppelberg*, *Fields*, and this case, *Rivera*, those are the three cases that you examined the City's policies as it related to file creation, maintenance, storage, and production?

A. As they pertain to a *Monell* issue, yes.

Q. Okay. And you have -- I think you told us about it on Friday that you have been hired in other cases by other plaintiffs against the City, but they're not these *Monell* issues, as you described them?

A. Generally speaking, that's correct.

Q. And can you tell us how much, approximately, you've made for those other cases in opining against the City?

A. No, I -- in the context of -- I think I testified to probably 150 cases over the last ten years or so. I -- that's not something I've kept track of.

MS. ROSEN: Okay. I don't have any further questions.

THE COURT: Any further defense questions?

MR. GIVEN: None, Your Honor.

THE COURT: Okay. Mr. Loevy.

MR. LOEVY: Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. LOEVY:

Q. You were asked about your compensation. Is your compensation commensurate with the experts in your field, sir?

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 258 of 758 PageID #:107716
Brasfield - redirect by Loevy
2408

A.   It's -- I've seen it as high as 450 to 500 dollars as down to about 2, 250.  So it's probably in the mid range.

Q.   In fact, the defendants in this case hired two experts to rebut you, correct?

A.   That's my understanding.

Q.   And do you know their names?

A.   I blank them out right at the moment.  I'm sorry.  Murray, I think --

Q.   It's Murray and --

A.   -- Nolan.  Or not Nolan.

Q.   And Noble.

A.   Noble.

Q.   And Mr. Murray, in fact, would it surprise you, made more than a hundred thousand dollars in --

        MS. ROSEN:  Judge, that's a little --

        MR. LOEVY:  It's commensurate with the --

        THE COURT:  You know, I -- go ahead.

BY MR. LOEVY:

Q.   Is that reasonable, if Mr. Murray, just in the *Fields* and the *Kluppelberg*, billed more than a hundred thousand dollars before he even got to this case?  Do you quibble with that for the kind of -- amount of work done?

A.   No.

        MS. ROSEN:  Objection, foundation for whether he knows how much Mr. Murray charged in the other cases.

THE COURT: I think that's -- sustained.

MR. LOEVY: All right.

BY MR. LOEVY:

Q. You were asked quite a bit about some documents and were they in this file. Do you remember the stuff on the board and all that?

A. Yes.

Q. As far as actual mistakes that you made, as distinct for were there documents in the state's attorney's file -- do you understand what I'm asking now? Just whether there were mistakes in your spreadsheet. How many mistakes did you count Ms. Rosen identified?

A. I don't think I recall --

Q. She identified the rap sheet and the supp. report, right?

A. Yes.

Q. Two mistakes out of how many documents would you say you looked at?

A. Out of 190 files, thousands of pages.

Q. All right. And to be clear, she identified a lot of other documents that were not in the criminal defense files but were in the state's attorney's files.

That is not a mistake that you made in any way, is it?

A. No.

Q. Did you even purport to make the comparison she was making?

A. No. I'm -- my report makes that very clear.

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 260 of 758 PageID #:107718
Brasfield - redirect by Loevy
2410

Q. All right. So let's just focus on the errors that she identified, that rap sheet and the supp. report.

That was a coding mistake, I guess?

A. Yes. That would be my recollection.

Q. All right. Do you -- what do you have to say for yourself for making those two mistakes, sir?

A. Shame on me.

Q. All right. Do you feel confident that the global set of data is, in fact, reliable?

A. Yes.

Q. And do you feel confident that if Ms. Rosen could have found three mistakes, she would have identified a third one?

MS. ROSEN: Objection, leading, Judge.

BY MR. LOEVY:

Q. Do you have confidence in the adversarial process to ferret out mistakes in the data?

A. I do. I think if I had erred beyond the two, I would have been cross-examined on it quite a bit.

Q. All right. And you had some expectation that your work would be cross-checked not only by the defense counsel, but by their experts as well, correct?

A. That's correct.

Q. Now, in the *Kluppelberg* and the *Fields* data, there was not a hundred percent without mistakes either, was it?

A. No, it was not.

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 261 of 758 PageID #:107719
Brasfield - redirect by Loevy
2411

Q. All right. But was the numbers roughly comparable in terms of there was a few mistakes, but for the most part, the data was reliable?

A. That's correct.

Q. All right. Let's talk about what she did talk about for most of that time, which was documents that were not in the criminal defense files, but some of the documents or the information was in the state's attorney's files.

That's what she asked you about, right?

A. Generally, yes.

Q. Do you remember approximately how many files she was talking about?

A. Half a dozen, maybe.

Q. About a half dozen. And maybe she identified how many documents? 20? Somewhere around there?

MS. ROSEN: Objection to the leading, Judge.

MR. LOEVY: All right.

THE COURT: Sustained.

BY MR. LOEVY:

Q. I don't know how many documents. Do you know how many documents?

A. No, I don't.

Q. All right. Now, you do not dispute that for at least some of the documents missing from the public -- from the criminal defense attorney files, there were copies in the state's

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 262 of 758 PageID #:107715
Brasfield - redirect by Loevy
2412

attorney's files, right?

A. Absolutely.

Q. Now, the first question I have for you on that is, do you know when those documents got into the state's attorney file? And how does that affect your analysis?

A. No. And I think I -- I mentioned once or twice during my responses to Ms. Rosen that I have -- the state's attorney's files can grow through the civil litigation, totally independent of preparation for a criminal defense file.

MS. ROSEN: Objection, Judge, foundation for that.

MR. LOEVY: No. He has foundation, Your Honor.

THE COURT: Overruled.

BY MR. LOEVY:

Q. So, in other words, some of the state's attorneys' files might have -- are -- was there post-conviction proceedings for some of the files, for example?

A. That -- that's correct. And that an effort may have been made years after the criminal file -- or criminal file was put together to gather files that may have not been located at the time, may have been moved from one area to another, and they may show up in those state's attorney files years after the fact.

MS. ROSEN: Objection, Judge. This is pure speculation.

THE COURT: You know, this whole area on both sides is

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 263 of 758 PageID #:107716
Brasfield - redirect by Loevy
2413

speculation. Okay? So it seems to me that it was opened up.

BY MR. LOEVY:

Q. So all the documents Ms. Rosen showed you, there's no way to know if those got into the file later or if they were truly in the file at the time of the criminal proceeding? Would you agree with that?

A. I would agree with that. That's correct.

Q. All right. Let's say some of the documents she showed you were in the state's attorney's file at the time of the criminal proceeding.

Does that mean that the criminal defense attorney files are invalid?

A. No. They -- the criminal defense files were -- are what they are.

Q. And maybe the state's attorneys gave them the documents; maybe they didn't, correct?

MS. ROSEN: Objection, Judge.

THE COURT: That's leading.

MR. LOEVY: All right.

BY MR. LOEVY:

Q. Do you have any way to know whether the state's attorneys withheld documents from the criminal defense attorneys?

A. No, I do not.

Q. What did you compare?

A. I compared what was objectively physically able to be

examined as being contained in the criminal defense attorneys' files and that those criminal defendants' attorneys were from the Public Defender Office.

Q. All right. And as far as files for which there was a state's attorney's file, did you see plenty of material that was in neither the criminal defense file nor the public -- the state's attorney's file?

A. That's correct. I -- that I found cases like that, yes.

Q. All right. So does anything about the fact that some of the material that is listed in your report was or was not found in the state's attorney's file, does that change anything about any of your opinions, sir?

A. No, it does not.

Q. All right. Ms. Rosen asked you about things that were missing, and she brought you to Attention F -- your Attachment F before lunch.

Do you have Attachment F up there?

A. Yes, I do.

Q. All right. I think she stopped at Mr. Green on page 6, correct?

A. Yes.

Q. All right. And there's quite --

MR. LOEVY: If I could just publish this, Your Honor? Permission to publish Attachment F.

THE COURT: It's in evidence?

Brasfield - redirect by Loevy

2415

MR. LOEVY:  We move it into evidence if it's not.

THE COURT:  Okay.  As what?  Sorry.

MR. LOEVY:  This is Plaintiff's Exhibit 253-F is how it's labeled.

THE COURT:  Any objection?

MS. ROSEN:  No, Judge.

THE COURT:  It is received.

(Said Plaintiff's Exhibit 253-F received in evidence.)

BY MR. LOEVY:

Q.  All right.  There was quite a bit of material in the *Green* case -- let's see if I can focus it -- that was missing from the criminal defense file, correct?

A.  That's correct.

Q.  Handwritten notes, investigator business statements, supplementary reports, et cetera.

Showing you another file here on the next page, the *Quinones* case.  Also a lot of stuff missing, correct?

A.  That's correct.

Q.  Showing you the next page.  This *Pitchfork* case, quite a bit of stuff missing, correct?

A.  Quite a bit.

Q.  And same with the *Rodriguez* case?

A.  Yes.

Q.  And, you know, she did show you four where there wasn't that much missing.  Do you remember those questions?

A.  I do.

Q.  All right.  Does that mean that there wasn't other files where there was quite a bit missing?

A.  No.  There were -- there were -- had we gone through all of the pages, there would have been some very substantive examples.

Q.  All right.  I want to show you the sorting that Ms. Rosen did.  I don't remember what exhibit she labeled this one.

MR. LOEVY:  Do you remember, Eileen?  This is your graphic here with the green.

BY MR. LOEVY:

Q.  Do you remember Ms. Rosen asking you about that?

A.  Yes.

Q.  Now, it looks like there's not a lot of green on this page, correct?

A.  Visually, that's the impression you get.

Q.  Now, all this gap here (indicating), does that imply that there were criminal defense files that didn't have stuff missing?

A.  No.

Q.  Can you explain why?

A.  Because if you look at the actual source document that was prepared, there will be indications where -- that the original column would be "No" so that when you have -- there's no way to show that the other material that was missing would be.

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 267 of 758 PageID #:107720
Brasfield - redirect by Loevy
2417

Q.  All right.  So, in other words --

MR. LOEVY:  And we've re-sorted -- we'll call this demonstrative -- give me a number that we're on.

MR. ART:  20, Plaintiff's 20.

MR. LOEVY:  Plaintiff's 20 is probably another corresponding.

MR. SWAMINATHAN:  Demonstrative?  Are you saying a demonstrative exhibit?

MR. ART:  Demonstrative 20.

BY MR. LOEVY:

Q.  Demonstrative 20.  Showing you the same data but sorted in a different way.  Let me get some white paper.

If we compiled just the cases for which you were able to do criminal defense comparisons -- so, in other words, this is the files -- all the files, including ones for which you were not able to do the comparison.  That's what Eileen -- Ms. Rosen showed you, right?

A.  Yes.

Q.  But if we were to show you just the cases where you were able to do comparisons -- showing you the first page of Plaintiff's Exhibit 20 -- Demonstrative 20, showing you the second page of Plaintiff's Demonstrative Exhibit 20, and showing you the third page of Plaintiff's Demonstrative Exhibit 20.  There'd be a whole lot more green on there, would there not?

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 268 of 758 PageID #:10772
Brasfield - redirect by Loevy
2418

A.   Yes.  The presentation, I would -- the original one that was given to me by Ms. Rosen I would consider as not a true representation and skewed.  But if you looked at it just from the green standpoint, you get a different impression.

Q.   And, in fact --

A.   And --

Q.   -- without characterizing it, if all the -- only the criminal-defense-file-available comparisons were used, would the column be entirely green or was it -- there might have been one exception?

A.   There might have been one or possibly two exceptions, but it would be entirely green.  I think that points out the importance of taking the report in total.

Q.   All right.  Talking about the charts.

     Now, you did not put the numbers into the boxes, correct, sir?

A.   That's correct.

Q.   But what did you do to make sure -- Ms. Rosen was asking you about how the boxes got created.  What did you do to make sure the boxes were accurate?  And how did -- and who analyzed the data?

A.   Well, as I -- I believe I testified to either yesterday or earlier today, the spreadsheet came to me and I would look at an example on row 9 where it indicated there was a criminal defense attorney file and then X number of these things were

Brasfield - redirect by Loevy

2419

missing.

I would then go into electronically that particular homicide file and see if, in fact, the ones that had been put on the spreadsheet were missing, and that's how I'd verify it.

And if anything -- that made it an absolute, it wasn't there. I looked at it, and it wasn't there. It gave the benefit of the doubt to the City in the fact that had I myself gone and looked at each and every page, I may or may not -- I don't think I would have, but it's conceivable that I could have found other omissions. But I did verify, in fact, that the omissions were true.

Q. So you verified that there were omissions and you didn't even look for more omissions?

A. That's correct.

Q. All right. Now, we've been talking a lot about whether there was information in the criminal defense file that was or wasn't in the investigative file.

And this is going to be a hard question to ask, but do you have any way to know either way for any part of your analysis if there was information that didn't even make it into the investigative file at all?

A. By inference, there will be things that in the various cases that I looked at where there will be reference to someone having talked to an individual or that be sure that something happens.

I'm saying this badly, but there is -- you can infer from some of the information that was contained in the file that something else happened, but there is nothing in the file to show what it was. You know, did they go talk to somebody that they said they were going to go talk to? That type of thing.

Q. All right. So you were limited to what actually got reduced to paper --

A. Yes.

Q. -- in the investigative file? You're not saying that the police department, based on what you observed, didn't have other information that didn't get reduced to paper?

MS. ROSEN: Objection, Judge, calls for speculation.

THE COURT: As I said, this whole area is speculative on both sides. Overruled.

BY THE WITNESS:

A. I think it -- I think an individual with experience in examining police investigative files could draw strong inferences that material did not make it in there.

And in particular, for example, the whole area of gang squad members where they have forms that are supposed to be filled out on a daily activity as to what they did and who they talked to and so forth, and, as I've testified before, those are routinely just never there.

BY MR. LOEVY:

Brasfield - redirect by Loevy

2421

Q. All right. Ms. Rosen asked you most of the exam about the comparison between the green column, which is the criminal defense files, and the blue column, which was the investigative file, correct?

A. That's correct.

Q. Does that -- anything that she talked about affect the opinions you gave about the blue column as a standalone?

A. No. And that's where I feel the strongest. I'm very comfortable, objectively, what was in the criminal defense file was either or wasn't.

Now, when it was or when it wasn't, I can't say. But when I'm comparing investigative files as standalone items, just doing a straightforward audit and looking at it, very comfortable about the deficiencies in that.

And the same with the permanent retention file.

Q. That was my next question.

A. I'm sorry.

Q. Did anything that she asked you about affect any of your opinions at all about the purple column?

A. No, it did not.

Q. Can you explain?

A. The -- without even comparing the investigative files vis-a-vis the permanent retention files, if a permanent retention file is supposed to have an inventory sheet, absolute requirement, and it didn't have an inventory sheet, which was a

basis for legitimate discovery, that's a standalone issue.  But when it also is supposed to contain certain other things, supplementary reports that the City very clearly says are supposed to be in there, and they're in the investigative file, but they're not in the permanent retention file, you can look at that as a standalone deficiency.

Q.  All right.

A.  It's a very objective issue.

Q.  Then sort of summary, then you had a number of opinions that you didn't talk about with Ms. Rosen.  But as far as the opinion that she did ask you about, blue versus green, notwithstanding having been shown that at least some documents were in the state's attorney's file, does that change your opinion about whether the criminal defense attorneys were getting the investigative materials?

A.  No, it does not change my opinion.

MR. LOEVY:  All right.  Your Honor, we've been going a long time without a break.  I don't know what your plan is.  I can keep going.

THE COURT:  Well, my plan was -- I was promised about how long this was going to take on both sides, and we weren't even going to get close to the break.

MR. LOEVY:  Yeah.

THE COURT:  But now that we're at ten to 3:00, unless we're very close, I'd like --

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 273 of 758 PageID #:107726
Brasfield - redirect by Loevy
2423

MR. LOEVY: We're not.

THE COURT: -- to take a break. Okay. Ten minutes, ladies and gentlemen.

(Jury out.)

THE COURT: Okay. So I was promised 30 minutes by Ms. Rosen, and I think it took an hour and a quarter, and we're already close to a half -- I don't know where we are, Mr. Loevy, with you, but --

MR. LOEVY: Well, my estimate was based on, you know, on the estimate. But I probably only have 15 minutes.

THE COURT: You're only 20 minutes in, actually.

MR. LOEVY: All right.

THE COURT: All right. Ten minutes.

(Recess 2:51 p.m. until 3:01 p.m.)

THE COURT: Am I getting briefs at any point?

MR. LOEVY: Yes.

Steve, do we have the O'Brien brief to give the Judge?

MR. ART: Anand has it.

MR. LOEVY: All right. Well, give the O'Brien brief to the Judge.

We've already given it to the defense, Your Honor.

THE COURT: And when will I get it?

MR. LOEVY: As soon as Anand brings it in the courtroom.

THE COURT: Okay.

(Jury in.)

THE COURT: Are you going to file it electronically?

MR. LOEVY: Yes, Your Honor.

Have we filed it yet?

MR. ART: We'll do it now.

MR. LOEVY: Now.

THE COURT: Thank you.

Please be seated, ladies and gentlemen.

BY MR. LOEVY:

Q. All right. Sir, this morning, which I know seems like a long time ago, but this morning you were asked by Ms. Rosen about the Sherwin -- Sherman Addison file that -- where you had listed something -- only one thing missing or two things missing.

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 275 of 758 PageID #:107728
Brasfield - redirect by Loevy
2425

Do you remember her asking you about that?

A. Vaguely.

Q. All right. I'd like to show you Plaintiff's Exhibit 157-N. This is a document from that file.

MR. LOEVY: Your Honor, we'd move that into evidence.

THE COURT: Any objection?

MS. ROSEN: Can I see which one it is?

MR. LOEVY: It is a -- here's a copy for you.

It's a document from the file, Your Honor.

THE COURT: 157-E, did you say?

MR. LOEVY: N.

THE COURT: N.

MR. LOEVY: Or maybe it's Z. I think I'm out of letters.

In any event, Your Honor, we move it into evidence.

THE COURT: Any objection?

MS. ROSEN: No, Judge.

THE COURT: It is received.

(Said exhibit received in evidence.)

BY MR. LOEVY:

Q. Showing you a transcript from the Sherwin Addison file, it looks like the defense attorney is saying, "The only thing that I can see that is still outstanding now is apparently there is or I don't know if there is, but usually there's an investigative file. We never had that, never had it for the

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 276 of 758 PageID #:107729
Brasfield - redirect by Loevy
2426

first trial."

And then he says a little bit later: "As far as talking to Detective Jedlowski, she only talked to him for about five minutes and had him bring any reports that he had. All he had is the typed police report, which is the normal police report that is always issued in the cases, the noninvestigative type of police report. No notes, no GPRs, and that is what she was shown by him. She noted she didn't have a copy of the street file or the investigator file, so that is why she subpoenaed the investigative file. But she was not tendered anything by the detective, and, in fact, the detective happened to be in the building yesterday, so I spoke with him, and he verified that all he had was they typewritten reports."

Do you see that, sir?

A. Yes, I do.

Q. So this was cited by Ms. Rosen as an example of where you couldn't find anything missing from the file or you found one document that wasn't missing. Do you remember that?

A. Yes.

Q. All right. Were there indications like this throughout these files that the investigative materials were missing?

A. Yes.

Q. All right. You were shown by Ms. Rosen before we broke this document, and I don't remember what exhibit number she labeled it, but it is on -- it's the Susan Sweat thing.

And I asked you during the break to take a look at this, by agreement of Ms. Rosen.

Did you have a chance to take a look at it?

A. Yes.

Q. All right. Showing you the GPR that she showed you -- remember she put it on the screen, and she said, "Isn't it true this information's in here, and isn't it true it's in here?"

Do you remember those questions?

A. Yes.

Q. Now that you've had a chance to review at little more carefully, is the information in this note -- did it make it into the GPR or the report?

A. No, there is information that is missing and -- the car, the address, and a name and a phone number --

Q. So the --

A. -- another address.

Q. So the example she gave you where the state's attorney file has a GPR but the state's attorney nor the criminal defense attorney has the notes, is that an acceptable situation?

A. No, it is not.

Q. Now, you were shown some court attendance sheets as being missing from the criminal defense files, and Ms. Rosen asked you a number of questions about those, correct?

A. Yes.

Q. I'm going to show you -- what number are we on --

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 278 of 758 PageID #:107761
Brasfield - redirect by Loevy
2428

MR. LOEVY: 154, I'll call it, AA, Your Honor.

154-AA, we move that into evidence.

THE COURT: Any objection?

MS. ROSEN: No, Judge.

THE COURT: It is --

(Plaintiff's Exhibit No. 154-AA received in evidence.)

BY MR. LOEVY:

Q. This is from one of the files you were shown, a court attendance record in the Borotto case showing that Detective Guevara -- R. Guevara was present in court with his overtime book.

That could on certain fact patterns be exculpatory, could it not?

A. Yes, very definitely.

MS. ROSEN: Objection, calls for speculation.

THE COURT: All right. That was implicit in the question. Overruled.

BY MR. LOEVY:

Q. All right. Let me give you a hypothetical.

Let's say there's a question about whether Officer Guevara brought Orlando Lopez to court for the first proceeding, and then Orlando Lopez started saying there was something different about the hair than he had previously said before.

This is the kind of document that a criminal defense

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 279 of 758 PageID #:107732
Brasfield - redirect by Loevy
2429

attorney could use to cross-examine; would you agree?

MR. SOTOS: Objection --

MS. ROSEN: Objection --

MR. SOTOS: -- Objection, Your Honor. That's rampant speculation, and it's speculation in regard to this actual case.

THE COURT: I think you're basically asking a hypothetical, right?

MR. LOEVY: Right.

THE COURT: Overruled.

BY THE WITNESS:

A. Absolutely. And that was what I was trying to convey in one of my earlier responses.

It purports to say a factual thing occurred that an officer was in such and such a place at such and such a time.

And it may be generally not important, but if you need to either verify or impeach the veracity, you have a document here that might show, hypothetically, that a detective was claiming to be in one place when he could not have been because he was in another.

BY MR. LOEVY:

Q. And Ms. Rosen asked you about, are there other departments that create these documents? And I understood it's not a document you were too familiar with?

A. That's correct.

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 280 of 758 PageID #:107733
Brasfield - redirect by Loevy
2430

Q. You're used to seeing it in the -- in the payroll and overtime context, is what you said?

A. Yes, that's my -- that's -- that's the way that you usually see it and not only in my -- one of my previous agencies but others that I'm familiar with.

I'm not saying that this isn't -- that this could not be found in another jurisdiction, but it's normally something that's a -- that's a fiscal.

Q. All right. So that brings me to my question.

If the City of Chicago has this document and it is in the investigative file, should it be withheld or turned over?

A. It should be turned over, because it is an -- it is an official document. It's part of the file.

And if it's not a part of a file in San Francisco or New York, that's San Francisco and New York. But if it's a part of a file in Chicago, it should be disclosed.

Q. All right. You were asked some questions about To/Froms and whether those were, you know, administrative or investigative.

Do you remember those questions?

A. Yes.

Q. I'm going to show you another document from the *Fields* case. And then this is 146-E. This is a To/From.

MR. LOEVY: We move this into evidence, Your Honor.

THE COURT: Any objection?

MS. ROSEN:  Same objection that I have to all the *Fields* documents.

THE COURT:  Okay.  Overruled.  It will be received.

(Plaintiff's Exhibit 146-E received in evidence.)

BY MR. LOEVY:

Q.  All right.  Is this an example of an informal To/From?

A.  Yeah, and this is where I was making the comment on the typed form.  It's not an official form, but it's "To:  From:  Subject:"  It's a To/From memo.

Q.  All right.  Can a To/From memo be relevant and discoverable and exculpatory?

A.  Yes.

Q.  Does this one give an example?

A.  Yes.  And this is a situation where a witness is describing that the offenders were wearing skull caps, had them pulled over their faces to conceal their identity, and it goes on to talk about a vehicle and other information.

But that's -- that could impugn or support, but whether the witness was actually able to identify someone.

Q.  And, in fact, if James Langston went ahead and testified that Nate Fields committed the murder, this could have been very exculpatory, could it not have?

A.  Absolutely.  If -- if the -- Langston was saying that he'd seen their face or saw his face and knew who it was when they actually had their faces covered.

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 282 of 758 PageID #:107735
Brasfield - redirect by Loevy
2432

Q. All right. Ms. Rosen asked you some questions about your work in the *Fields* case and the *Kluppelberg* case. And you were asked whether in the *Fields* case you reviewed the criminal defense files or the state's attorney files.

Do you remember those questions?

A. Yes.

Q. Okay. Which did you review or which did Mr. Murray review in that case?

A. I reviewed the criminal defense files and the investigative files and the permanent retention files.

Q. Do you remember which -- if Mr. Murray reviewed the state's attorney files, or you don't remember either way?

A. I don't remember either way. My recollection, which I'm uncomfortable with winging it, is that he did not.

Q. All right. You seem to be someone who prefers to be precise and not guess?

A. As much as possible, yes.

Q. All right. The permanent retention file, I just want to establish quickly.

Showing you a copy of Plaintiff's Exhibit 20, this is part of Plaintiff's Exhibit 20, which I believe is already in evidence, right? That's the permanent retention file from the Rivera case.

We know it's the permanent retention file because it's got a big stamp on it, correct?

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 283 of 758 PageID #:107736
Brasfield - redirect by Loevy
2433

A. Yes, we call that a clue in the trade.

Q. And -- if you're a detective.

And it has a stamp reflecting Records Division?

A. Yes, it's --

Q. Can you explain --

A. -- a date and timestamp.

Q. All right. Now, showing you the same document from Mr. Wadas' criminal defense file, this is Plaintiff's Exhibit 43.

MS. ROSEN: Judge, objection, scope. Scope. I didn't talk about the Valentin file at all.

THE COURT: How is this within the scope?

MR. LOEVY: She talked about whether the criminal defense attorney's has got the permanent retention file or some other file. And so this is just tying up that point.

THE COURT: Overruled.

BY MR. LOEVY:

Q. And showing you Mr. Wadas' copy of the same report, it has the same stamp, does it not?

A. Yes, it's the same location, the same angle, the same date, and the same time.

Q. All right. Did you form opinions about whether criminal defense attorneys got the investigative file or the permanent retention file?

A. I'm -- the conclusion I'm drawing from that objective piece

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 284 of 758 PageID #:107737
Brasfield - redirect by Loevy
2434

of evidence in the document is that they got a copy of the permanent retention file and not the investigative file.

Q. All right. The stamp itself, do you know how many years down the process that the documents get stamped in Records Division when they -- when they get stored?

A. It -- it can be quite a -- quite some time after the closure of the case.

Q. All right. You were asked about -- by Ms. Rosen about the inventory, and you've already testified that in many, many cases the inventory was not reflected in the criminal defendant's files, correct?

A. That's correct.

Q. And -- actually, I already asked that. I'm going to move on to notes.

You were asked a number of questions about whether homicide detectives should take notes. Do you remember that?

A. Yes.

Q. And whether they could wing it.

And you were asked for your support about why you believe detectives have to take notes?

A. Yes.

Q. Is that an open question in your field, sir?

A. No, it's not.

Q. Can you put that into context for us?

        MR. LOEVY: Eileen, can I have the book?

BY THE WITNESS:

A.   In the context of taking notes?

BY MR. LOEVY:

Q.   Yeah.  I mean, what -- like is there any disagreement in -- even in the 1980s that you could conduct a homicide investigation and keep it all in your head?  Or is this something reasonable minds could disagree about or not?

A.   No, that is not something that was accepted practice among your peers as an investigator.  It certainly was not an accepted practice from a supervisory standpoint.

These forms, which we all have -- most all have a space for supervision, sergeant, or lieutenant or a captain to sign, and that's part of the process to ensure that the case is complete and conducted appropriately.

Q.   All right.  Some things are just your opinion, you know, and you feel strongly.

I mean, if we had other people in your field, would anybody disagree with you that you have to take notes if you learn information from eyewitnesses and -- during a homicide investigation?

MS. ROSEN:  Objection, Judge.  Would anybody disagree with that?

THE COURT:  Sustained.

BY MR. LOEVY:

Q.   All right.  How much of a consensus is there in your field

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 286 of 758 PageID #:107739
Brasfield - redirect by Loevy
2436

that you have to take notes?

A. I would say there's a very strong consensus and expectation that that's what you need to do and that's what's required.

Q. And when you say "required," does that have anything to do with respecting the constitutional rights of someone accused? And can you explain?

MS. ROSEN: Objection, Your Honor.

THE COURT: Well, if the witness knows. Overruled.

BY THE WITNESS:

A. I'm sorry. Would you ask the question again?

BY MR. LOEVY:

Q. When you said you have to take notes, does that have anything -- the requirement, does that have anything to do with protecting constitutional rights? And can you explain?

A. Partially. It is to ensure that the prosecution and the defense and the jury and the judge, that the process is as fair as can be and that that's an expectation --

Q. All right.

A. -- for that.

Q. And the people accused of crimes have a right to all of the notes and all of the information about the witnesses against them?

A. Yes.

Q. All right. You were asked -- a couple more areas.

You were asked about the wrongful convictions of

Mr. Jones, and she pointed out that he wasn't actually convicted, right?

A.   That's correct.

Q.   But what was discovered during the *Jones* prosecution, the existence of what practice?

A.   Parallel files, separate files, investigative street area, whatever you want to call them, but that there were parallel files.

Q.   And that parallel set of files, not in the *Jones* case but in other cases, does that create the risk of wrongful convictions?

A.   Yes, it does.

Q.   And they -- the city made a policy, and Ms. Rosen tried to get you to sign on that it was a drastic change.

Were you -- were you pushing back on whether it was a drastic change?

A.   I was.

Q.   Can you explain?

A.   The policy as written still failed to address some of the key issues that were found to be causing the underlying problems.  And that pertained to -- and, in fact, one of the iterations of the policies, it actually institutionalized separate files and investigative files.

It also was restricted -- those various attempts at the policies restricted only to the Detective Division, so that

if you work anywhere else in the police department and had any involvement with the investigation, you were not bound, at least under the policy as written, to adhere to the policies.

Those are a couple of examples.

Q. How about discretion? Did the policies cover discretion?

A. It created two other issues. One, it allowed the individual detectives -- literally hundreds of detectives in their own independent discretion as to what was relevant to be put into the file, so that if you had someone who was very, very effective and very efficient, they would feel that everything that was generated need to go in the file.

Others might say, well, this doesn't support who we've got our tunnel vision or our focus on, so it's not relevant. We're not going to put it into the file.

And the policy needs to be very specific with guidelines telling you this goes in, this may be optional. But that failed to do that.

Q. And did you see from reviewing the Hickey testimony that Ms. Rosen was asking you about and a Commander Stibich that there actually were recommendations to make better changes that didn't get implemented?

A. Yes, there was a recognition at the line level with the people that were -- that were working on these policies that those deficiencies existed and that they should consider -- that the command staff should consider making it

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 289 of 758 PageID #:107742
Brasfield - redirect by Loevy
2439

department-wide for everyone and to provide guidelines --

specific guidelines as to what type of thing went in there and

some other recommendations about the need of additional

training for change of cultural patterns and so forth.

Q.  And did those recommendations get implemented?

A.  No, they did not.

Q.  All right.  Showing you Defendants' Exhibit 34, which is

the policy, and I'm -- I don't mean -- I'm not being silly

about it, but it is sort of hard to read; the print's so small,

right?

A.  That's -- that is a difficulty even at my age.

Q.  All right.  So what I'm asking you, sir, is, is it

sufficient for a police department to write up a policy, put it

in the books, and just hope it's just going to get implemented?

A.  No.  And I've -- I've said facetiously in depositions that

they spend some amount of time describing that it's supposed to

be an 8-1/2-by-11-inch folder, and it's supposed to have 2-hole

metal punch designed to do such and such and such and such,

which completely ignores the substantive issue of do this

specifically, make it department-wide, eliminate discretion,

that type of thing.

Q.  And the "do this specifically" -- I'm not sure this is

clear yet -- but does this policy actually say that you have to

turn over the investigative files?

A.  No, that is another glaring deficiency.

Q. And I can't believe we've had you all day and haven't gotten to that yet, but it provides for the creation of investigative files, right?

A. Yes.

Q. Is there anything in here that says once you create investigative files, you're supposed to give them to criminal defendants?

A. No.

Q. All right. I apologize for taking so long to getting to the point, but just a few more questions.

You were asked about this document. I don't remember Ms. Rosen's exhibit, but it was the one that's Bates 208557, and it's dated April 1990, correct?

A. Yes.

Q. And she asked you, isn't it true that savvy people knew to subpoena street files, right, subpoena for street files?

A. Yes.

MS. ROSEN: Objection to the form of the question, savvy.

BY MR. LOEVY:

Q. All right. Some people subpoenaed street files, right?

A. In the material I've reviewed, there were -- there were indicators that -- and I don't know whether they were more experienced or they just were more thoughtful or whatever, but some specifically recognized the existence of a parallel file

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 291 of 758 PageID #:107744
Brasfield - redirect by Loevy
2441

system and would ask for street files.

Q. All right. If the policy on the books was working, should it have taken until April -- I mean, by April of 1990, how many years after that was the policy -- was it that the policy --

A. The last one 86-3 -- not the last one, but the last one we talked about would have been four years earlier.

Q. And then actually, the first change was seven years earlier, right?

A. That's correct.

Q. All right. Does this suggest that somebody wasn't getting the message?

A. It appears to be --

MS. ROSEN: Objection, calls for speculation --

THE COURT REPORTER: I'm sorry, one more time, please.

MS. ROSEN: Calls for speculation, form of the question.

THE COURT: Could you ask it in a way that doesn't call for speculation?

MR. LOEVY: I'll just -- I'll move on, Your Honor.

BY MR. LOEVY:

Q. Ms. Rosen asked you if -- isn't it true that the GPRs and the investigative material was not supposed to go into the permanent retention file by design, that it was supposed to be in the separate file by design.

Do you remember those questions?

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 292 of 758 PageID #:107745
Brasfield - recross by Rosen
2442

A.  Yes.

Q.  Okay.  Is that a good design?

A.  No, that's -- that's further institutionalizing what was supposed to be a cultural change.

Q.  And you were asked -- the final area.  You were asked about your work in the *Fields* case.

Do you remember the time period was -- involved 1983 to '89 and then again '99 to 2006, correct?

A.  Yes.

Q.  And in this case -- what was the time period that you looked at in this case?

A.  From -- this was 1988.  So it was three years earlier, three years after, '85 to '91, I think.

Q.  And then *Kluppelberg* was '83 to '91?

A.  I believe so, yes.

Q.  All right.  In all of those years in all of those files, do you see any evidence that the City of Chicago fixed the problem identified in the *Palmer* and *Jones* litigation?

A.  I saw no indication of that.

MR. LOEVY:  All right.  I have no further questions, Your Honor.

THE COURT:  Ms. Rosen.

MS. ROSEN:  Yeah, I have a couple.  Just a couple more questions.

RECROSS-EXAMINATION

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 293 of 758 PageID #:107746
Brasfield - recross by Rosen
2443

BY MS. ROSEN:

Q. Just so that I'm clear, is it your opinion that the investigative files, as a general matter, do not get produced to the criminal defendants?

A. I'd say it's very erratic and sporadic.

Q. Okay. So if we could take a look at your Attachment F.

A. When I -- as a caveat, in their totality.

Q. Well, that's a different issue, right?

A. Well, when I say do they get produced, I'm talking about the whole animal.

Now, do -- do portions of them get produced in certain cases? Absolutely.

Q. Okay. So let's take a look at your Attachment F.

And isn't it true -- I think we went over this -- that you've looked at 44 investigative files, compared it to 48 criminal defense files, and in each and every criminal defense file, you found documents that solely were contained in the investigative file?

And you can flip through each of the pages if you want.

MR. LOEVY: Object to asked and answered, Your Honor. This is what her exam was.

MS. ROSEN: I'm rebut -- he just went back to it, Judge.

THE COURT: Well, you know, we're going to be here for

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 294 of 758 PageID #:10774
Brasfield - recross by Rosen
2444

weeks.

MS. ROSEN: I've got five questions on this.

THE COURT: Okay.

BY MS. ROSEN:

Q. Right? You compared a total of 48 criminal defense files to 44 career spending -- investigative files, and if you page through -- do you have the attachment up there with you?

A. Yes, I do.

Q. Okay. If you look through every page of that -- page 4, page 5, page 6, page 7, page 8, page 9, page 10, page 11, page 12, page 13, page 14, page 15, page 16, page 17, and page 18 -- every single one of those files contained documents that existed only in the investigative file, correct?

A. And I've -- I have answered and testified to earlier that 90 percent of the time there were investigative materials missing.

The reverse of that is is that there may very well be some material from the investigative files, and I've never disputed that. But what I am saying, that the totality of what was in the investigative files in 90 percent of the time, 37 out of 38 of them were not there.

Q. Okay. And let's take a look at the prefatory language that you have in Attachment F on page 1.

And if we could highlight the line that says, "I did not make any inferences about what documents were turned over

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 295 of 758 PageID #:107748
Brasfield - recross by Rosen
2445

to criminal defendants."  Is that correct?

A.  That's what I've tried to emphasize, yes.

Q.  Okay.  So all of your opinions today, based on the criminal defense attorney files that you've reviewed and the 2,200 files that you've reviewed in all the cases, you are not making a single inference about what documents were turned over to the criminal defendant, correct?

A.  I've drawn a number of inferences in the 72-page report and footnoted and highlighted why I formed that opinion and that there is material consistently indicating that there is a parallel set of files and that material that should be discoverable is not getting turned over to the defense bar.

Q.  But you're not making any inferences about what documents were turned over to criminal defendants?

MR. LOEVY:  Your Honor, it's only half the sentence. It's not fair --

BY THE WITNESS:

A.  I would --

THE COURT:  Sustained.

BY THE WITNESS:

A.  I would read that in its entirety.  And I can either read it for you or you can highlight the whole thing.

BY MR. ROSEN:

Q.  You want the whole paragraph highlighted for you?

A.  Yes.

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 296 of 758 PageID #:107740
Brasfield - recross by Rosen
2446

Q. Okay. And we can read it.

"The following listing provides a case-by-case account of what documents are included in the investigative files but are missing from criminal defense files," right?

A. Yes.

Q. And when you say "missing," all you're saying is the copy that you had in front of you -- you're not vouching for the fact that the file is in the same condition as it was during the criminal prosecution?

A. And that's where the second sentence: "I did not make any inferences about what documents were turned over to criminal defendants. I based my conclusions on observations about actual differences between files. For each homicide investigation, each set of files, whether the investigative file, the criminal defense file, or the permanent retention file, is labeled with the CPD Records Division (RD) number and the criminal defendant's name."

Now, that is a preface to an attachment to my report.

Q. Right.

A. But the report has to take -- be taken in its entirety.

Q. And the entirety is what you've been testifying to --

A. Yes.

Q. -- over the last couple days?

Okay. And now you have an opinion that the policies as set forth in 86.3 are not a good design, right?

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 297 of 758 PageID #:107750
Brasfield - recross by Rosen
2447

A.   That's correct.

Q.   Because they institutionalize this notion of a parallel file, which is now officially entitled an investigative file, correct?

A.   In part.

Q.   And the reason for that is you believe that a centralized file is a better system?

MR. LOEVY:  Objection, asked and answered.  I didn't --

THE COURT:  You know, I think if we're ever going to end this, we're going to have to not go over what we've already gone over.  So I'm going to sustain the objection.

BY MS. ROSEN:

Q.   Okay.  Your opinion that it's not a good design that you just testified to with Mr. Loevy -- that opinion that 86-3 is not a good design, is that because it institutionalizes the use of parallel files?

A.   No, not entirely.  I gave four or five other -- testified just a few minutes ago to four or five other things that -- that were flawed.

Q.   And part of it is this idea about giving police officers discretion, correct?

A.   That's -- that's one thing.

Q.   I said part of it is --

A.   Part of it.

Q.  -- this idea of giving police officers and detectives discretion, correct?

A.  Right.

Q.  And isn't it true that as a police officer you're always utilizing discretion in your work?

A.  I believe I testified to that very thing in -- on Friday but in different circumstances when we're -- when we're composing and putting together something that someone's life depends on, it's an entirely different matter.

Q.  And so can you point to us an example of how it is that you removed discretion from writing a report, any policy --

MR. LOEVY:  Objection to writing a report.  He wasn't talking about writing a report.

THE COURT:  Yes, sustained.

BY MS. ROSEN:

Q.  Can you point us to any written policy that describes eliminating the discretion that you're concerned about based on 86-3?

A.  Other than I have testified repeatedly that the general practice in my field of expertise is that if you want specificity, you need to have detailed examples, a checklist training to that, and then auditing, and if failure to pass the audit, some sort of discipline in the process.

That's a glaring inadequacy of the Chicago Police Department's policies.

Q. And you can't identify a model policy for us to review?

A. I don't -- as I've said -- and I'll have to rely on my previous answers. I've done the best I can to answer that.

MS. ROSEN: Okay. Thank you.

MR. LOEVY: No questions, Your Honor.

THE COURT: Okay. Thank you, sir. You may step down.

THE WITNESS: Thank you, Your Honor. It's a pleasure.

THE COURT: Watch your step.

THE WITNESS: Okay. In all matters.

(Witness excused.)

THE COURT: I think we have a little time.

MR. LOEVY: Your Honor, at this time, we'd like to start the video testimony of Orlando Lopez. We won't finish it up, but we should use it.

Thanks for coming.

THE COURT: Okay.

THE WITNESS: Thank you very much. Appreciate it.

(Said audio-video recording played in open court.)

THE COURT: Counsel, when we get to a place to stop.

(Said audio-video recording played in open court.)

MR. LOEVY: Keep going just a little bit.

(Said audio-video recording played in open court.)

THE COURT: Okay. 9:30, ladies and gentlemen.

COURT SECURITY OFFICER: All rise.

(Jury out.)

THE COURT: Okay. So I suspect we ought to get together by about 20 after, I would think, in the morning and try to resolve --

MR. SOTOS: Judge, can I give you some reading material? That's a motion we filed about 45 minutes ago, just a courtesy copy.

THE COURT: Yes, that would be very helpful.

MR. SOTOS: Okay. The motion itself is short. It's the exhibits.

THE COURT: This is also being filed electronically?

MR. SOTOS: It already was. I just wanted you to have the copy.

THE COURT: Thank you.

(Adjournment at 4:01 p.m. until 9:20 a.m., 6-19-18.)

CERTIFICATE

We, Colleen M. Conway and Nancy L. Bistany, do hereby certify that the foregoing is a complete, true, and accurate transcript of the Trial proceedings, Volume 10-B, had in the above-entitled case before the HONORABLE JOAN B. GOTTSCHALL, one of the Judges of said Court, at Chicago, Illinois, on June 18, 2018.

/s/ Colleen M. Conway, CSR, RMR, CRR          06/18/18

/s/ Nancy L. Bistany, CSR, RPR, FCRR          06/18/18

Official Court Reporters                        Date
United States District Court
Northern District of Illinois
Eastern Division

# EXHIBIT 70

© Cook County Hospital
1835 West Harrison Street Chicago, Illinois 60612

# Certification of Death

**Section A** To be completed by Ward Clerk before sending chart to receiving.

1. Who is the nearest living relative? Name ___Rosa Valentine (mother)___

2. Is this the same person listed in the chart? ☑Yes ☐No   Relationship ___Mother___

   If "No" explain ___

**Section B** To be completed in full by Physician pronouncing death

1. Date of Death ___09-14-88___   Time of Death 24 hr. clock ___1158___

2. Clinical Diagnosis clinical cause of death ___Cardio Pulmonary Arrest___

3. Date of Operation if any ___08-28-88 (1) Neck Exploration ; 8-27-88 Pretracheal Window ;___
   ___8-27-88 Exploratory Laparotomy___

   Coroners Case? ☑Yes ☐No

   If "Yes" why? ___Trauma Victim___

5. Did you undertake the notification of death? ☑Yes ☐No

   If "Yes" whom ___Rosa Valentine___

   How notified? ___By Phone___   Time A.M./☑PM ___12:15___ ___09-14-88___

   Was permission for an autopsy requested? ☑Yes ☐No
   Status of autopsy permit: ☐Signed ☐Telegram ☐Refused ☐Awaiting Signatures ☐Unable to Contact

Notes ___

Physician print ___Shabely___   signature ___

| Priority in Legal Status of Relatives | Cases to be Reviewed by Coroner | |
|---|---|---|
| 1 Husband/Wife (common law husband or wife has no legal status) | 1 Traumatic Injury (head or internal injury, fracture, stab or gunshot wounds, etc.) | 8 Death in Operating Room or During Operative Procedure |
| 2 Father/Mother (preferably both signatures) | 2 Poisoning (barbituate, aspirin, narcotics, etc.) | 9 D.O.A. (Dead on Arrival) |
| 3 Children over 21 Years of Age (legally adopted—same status) | 3 Criminal Abortion | 10 Unknown Identity |
| 4 Brothers and Sisters | 4 Tetanus | 11 Burns |
| 5 Uncles/Aunts | 5 Frostbite | 12 Suspect for Subdural Hematoma |
| 6 Nephews/Nieces | 6 Accidental Injury | 13 Sustained an Injury (Fracture) (within one year prior to death) |
| 7 Cousins | 7 Suicide | 14 Rape |

Imprint Plate

```
  1583444
VALENTINE, FELIX
1458 N CAMPBELL
01/05/72      M
08/27/88   2195119  TRA   32
```

CPD 0259

PLAINTIFF'S TRIAL EXHIBIT 31A
1 of 23

| DATE — HOUR | CHICAGO, ILLINOIS |
|---|---|
| 08-29-88 | S- Pt Responds Appropriately to Commands & upper extr |
| | O- T~97 |

OTHER VSS

HEENT: Neck wound clean + dry Pervious suture & minimal drainage

CHEST: Sensation ↓ to absent below nipple line

Shallow Respirations

Clear A→P

CARDIAC: RRR Neml S₁, +S₂ (S₃?), S₄?

ABD: wound staples intact minimal sanguinous drainage
Soft Flat, non-tender, BS ⊕

SACRUM: Initiation of breakdown

Ext: ⊕ Edema calves soft

LABS: 12.6 / 3.5 | 148      Het 29

ABG 750 / 30 / +4 / +5      7.46 / 35 / 115 / 25.1 / 99 %

A/P ① S/P Multiple gun shot wounds & resultant paraplegia
Pod # 3 bilateral chest tubes
Pod # 2 S/P neck exploration
Wean ventilator as tolerated
Bronchoscopy during extubation
CT Scan lecture - C spine + vertebral body injury &
bullet fragment in close proximity
D/C peripheral central line
Water mattress & log roll side to side q 2°

DATA BASE
HISTORY
PHYSICAL EXAMINATION

(IMPRINT PLATE)      (DATE & SIGN ALL NOTATIONS)

M 213) (5-1-84)

CPD 0272

**COOK COUNTY HOSPITAL**
**CHICAGO, ILLINOIS**

DATE — HOUR

30 Aug 8    CT SURGERY

See Bronchoscopy Report

Endotracheal tube removed over bronchoscope

Trachea 3 lesions, Ø inflammation

M Brylan MD
4157

4/31/88
7:55 A.M.    CT SURGERY:

S: PT. AWAKE, RESPONSIVE, INTUBATED

O: T=99 P=133 R=9 BP=130/70

CHEST TUBE OUTPUT /24 HRS: (R) = 400mL /(L) 75mL

CHEST: CHANGE REMOVED BILATERALLY

CTMONI: 5.9, NO S&S Ⓐ

ABG (TV=700 FiO₂ =100% IMV=5 PEEP=5 ) 7.44/39.4/266.4

A: 16 YR OLD HISP. MALE S/P MULTIPLE GSW TO CHEST, S/P FAILED EXTUBATION
   8/30 PER C POOR OXYGENATION, ADEQUATE VENTILATION. PT. ON FiO₂ 100%
   ONLY UNREMARKABLE NITROGEN WASH-OUT AND ALVEOLAR COLLAPSE.
   RECOMMENDATIONS: PLACE BODY CHEST TUBES TO WATER SEAL. VIGOROUS PULM. TOILET.

M Kelly MD
# 3093

8-31-88    TRAUMA NOTE

S: A: AWAKE + ORIENTED    RESPONDS APPROPRIATELY TO VERBAL EYE COMMANDS

O: Temp 101⁵ P 130 R 30 BP 130/90 H/O 150 cc 15 HRS

V/O > 1 cc/K/HR CHEST TUBES (R) 100 cc 15 HR FT (L) 100 cc/15 HR FT

GCW: A + O × 3

NECK SUPPLE STATUS INTACT, CLEAR + DRY

CHEST: LL BS (R) LUNG C RHONCHI THROUGHOUT

CARDIAC: RRR MEM S₁S₂ G₃S₄ S, √

ABD: STATUS INTACT CLEAR + DRY

SCAPHOID, SOFT, NON-TENDER, BS Ⓐ HYPOACTIVE

RECTAL: TONE PRESENT √ VAULT Ⓐ HEME

EXT: Ⓐ CCC

(IMPRINT PLATE)      (DATE & SIGN ALL NOTATIONS)

# DATA BASE
## HISTORY
## PHYSICAL EXAMINATION

D 0275

PLAINTIFF'S TRIAL EXHIBIT 31A
3 of 23

**COOK COUNTY HOSPITAL**
**CHICAGO, ILLINOIS**

DATE — HOUR

LABS

$\frac{131}{3.9}$ | | ( 110  HCT 25

AO6  ± MV8 TV 700  MAP 77  50% FIO2   7.44 / 37 + / 248 / 26 / 1.7  | 85%

A/P  ① T₂-T₄  PARAPALEGIA  2°  MULTIPLE GSW
  BOTH CHEST TUBES TO H₂O SEAL
    Nb AIR LEAKS  Ⓛ CHEST TUBE ↓↓ OUTPUT
      ① CHEST TUBE REMAINS — 100 cc /s HIFT
  HYPOXIA — ETIOLOGY UNKNOWN   Ē FEBRILE EPISODE
    V/Q SCAN  LOW — INT  PE.
    CXR   DIFFUSE. ① CORR  PATZIDE INFIL
    BRONCHOSCOPY   Ē WASHINGS  FOR
      START AB  E₂ CLIN STAT, C+S, ENDOS
      VENT SUPPORT  AS NEEDED
  PNEUMATIC  STOCKINGS  AFEL  NON-INVASIVE VENOUS
    STUDIES
    NEURO — POTO REST BED
      REST AS  PAST MANAGEMENT
      REHAB + CONSORM
      DIGITAL EXAM  HYSTENDIGITAL
  TRANSFUSE  2U PLBG  ⒸⒽⒶⒸⒽⒺ PRECTAL ⒼTEL BLOOD

---

9/11/91

CT SURGERY :
S: P1- ALIVES, INTUBATED
O: Tmax = 104.7 / 100°,  P=110, R=24, BP 156/90
  24 HR CHEST TUBE OUTPUT : (R) = 325 mL /(L) = 100 mL
  PHYS EXAM :  BILAT. CLARSE KGNGUI
  ABG (FIO₁ = 40%, MV=8 PEEP = +5  TV= 700) 7.41 / 42·3 / 93·4
A: 16 YR. OLD HISP. MALE s/P MULTIPLE GSW Ē (R) SIDED PULM CONTUSION Ē
  CLINICAL PICTURE CONSISTENT Ē PNEUMONIA. CULTURES PENDING
  REC : CONTINUE BILAT. CHEST TUBE DRAINAGE .

(IMPRINT PLATE)     M Stella, MD     (DATE & SIGN ALL NOTATIONS)
                    # 30945

# DATA BASE
## HISTORY
## PHYSICAL EXAMINATION

(FORM 213) (5-1-84)

CPD 0278

**COOK COUNTY HOSPITAL**
**CHICAGO, ILLINOIS**

DATE — HOUR

7/2/8  12:00 n.  Psychiatry consult

Pt is 16 y/o HM, high school student, was brought to CCH on 8/27/88 c̄ multiple GSW to chest. Pt is now a paraplegic — is unaware of his condition. Pt unable to talk — could form words with his mouth. Oriented to time + place. Pt appeared to be in pain and his mood was sad. Denies suicidal or homicidal thoughts today. Feels bad about his situation, and did not want to talk about what happened. He does remember what happened. Pt stated he is married, and his wife would care for him. He stated he has one son. Denies admission to hospital for any previous medical or psychiatric problem. Recent memory intact. Pt. ~~brother~~ patients home was called and the following info was obtained from his brother, Israel Valentine: Pt is single and has his own apartment on the 1st floor beneath his mother. He is 10th grade, fixes cakes — he likes necessary — and does day labor for a construction company. He has a girlfriend 17 or 18 who pays rent for their apt. States the shooting was definately gang related but he was mistaken for another brother due to close family resemblance. Pt was taken via his own car by his brother to Norwegian after being shot on the corner of Kimball + Courtland.

Plan: Follow and give supportive care
    or will refer to appropriate facility for care when necessary

                              Alice Daniels n_s

(IMPRINT PLATE)                    (DATE & SIGN ALL NOTATIONS)

**DATA BASE**
**HISTORY**
**PHYSICAL EXAMINATION**

CPD 0280

PLAINTIFF'S TRIAL EXHIBIT 31A
5 of 23

**COOK COUNTY HOSPITAL**
**CHICAGO, ILLINOIS**

DATE — HOUR

A/P ① MGSW T̄ RESULTANT T₉-T₁₂ PARAPLEGIA

NEURO - UNCHANGED CRM

CHEST- SERO SANGUINOUS CHEST TUBE CXAMPL 50-100-200 SENSLYM

SCANS- STAPH AUREUS / STREP PNEUMONIA 4⁺ , SPUTUM

SENS TO ANCEF / GENT - CXR SHOWS IMPROVEMENT

ABD - STOOLS RESPONDING TO GLYCERIN SUPP

CONT NG CO₂ / NPO / HYPERAL

EXT- COMPRESSION STOCKINGS

9/4/88   CT SURGERY

S: PT. INTUBATED, ALERT, RESPONSIVE

O: T = 103° P = 142 BP = 162/90

CHEST TUBE OUTPUT /24HRS: ⓡ =150 ML / ⓛ =130 ML

CHEST: GOOD AIR MOVEMENT BILATERALLY.

CXR: ⓡ LL PNEUMONIA (PULMONEL INFO / PaO₂ 5.10 > 100)

7.44 36.5 / 10.5

A: 16 YR-OLD HISP MALE S/P MULTIPLE GSW C̄ T4 PARAPLEGIA , ⓟ LL PNEUMONIA.

P: CONT. ANTIBIOTICS, NUTRITIONAL SUPPORT. MAY PULL ⓛ CT TODAY.

09/03/88   S: PT BECOMES MORE ANXIOUS AS STAY ON TCU LENGTHENS

O: Tₑ 101 Tₘₐₓ 103 ° BP 140/80 P 132 R 30

CW? 8   %/o ~15 U/B/HC 2.2. 1.020

GEN: PT AGITATED BUT ALERT + ORIENTED X3 AND FOLLOWING COMMANDS

HEENT: ① NECK STAPLES INTACT WOUND CLEAN + DRY ① HEMATOMA

NECK SIMPLE NON-TENDER

CHEST: GOOD BREATH SOUNDS BILATERALLY

RALES THROUGHOUT ① SIDE 3 RALES ① BASE

ⓛ CHEST TUBE IN PLACE NO AIR LEAK

(IMPRINT PLATE)   (DATE & SIGN ALL NOTATIONS)

**DATA BASE**

**HISTORY**

**PHYSICAL EXAMINATION**

**COOK COUNTY HOSPITAL**
**CHICAGO, ILLINOIS**

DATE — HOUR

| | |
|---|---|
| 9/8/44 | CT SURGERY: |
| | S: PT. INTUBATED |
| | O: Tmax = 102² T=102 P=129 BP = 161/76 (MONTOR) R= 40    CHEST TUBE (R) 50 ML /24 HRS ;(L) ONLY/24 HRS |
| | CHEST: BILAT. RHONCHI |
| | ABG (IMV=12 FiO₂ = 40% TV= 700 PEEP=5)  7.50/41.5/74    O₂ SAT = 97.8 % |
| | A: 16 YR OLD HISP. MALE S/P MULTIPLE GSW   T4 PARAPLEGIC c BILAT. PNEUMONIA. |
| | P: CONSIDER OVERKIDING PT's. VENTILATORY DRIVE BY ↑IMV AND INCREASING |
| | MINUTE VENTILATION · WILL FOLLOW · RECOMMEND PUTTING (L) CHEST TUBE |
| | TO WATER SEAL.    M Spratt, MD |
| | # 30715 |

| | |
|---|---|
| 09-08-89 | S: PT c RESPIRATORY DISTRESS |
| | O: BP 170/90 P 140    R: 50    T 102.3 Tmax 103.² |
| | U/O 600 w/shift   NG 500-600 w/shift TUBE  @ 30 w/ @ 0 |
| | GEN:   PT on VECED DEEP DROWSY BUT RESPONSIVE |
| | IN RESPIRATORY DISTRESS |
| | HEENT:  O NECK WOUND: STABLE INTACT  WOUND CLEAN +DRY |
| | NECK:  SUPPLE  NON-TENDER |
| | CHEST:  BREATH SOUNDS BILAT |
| | COARSE RALES BILAT |
| | CARDIAC:  REG TACHY  NORM S₁ +S₂ @S₃, S₄ |
| | ABD:  SCAPHOID, FLAT. SOFT, NON TENDER, BS⊕ |
| | ⊖ HSM ⊖ MASSES |
| | WOUND CLEAN+DRY |
| | EXT:  ⊖ CCE |
| | LABS: |
| | NOT AVAILABLE PER COMPUTER |
| | 197 \ / 145    H 0 25 |
| | 3.7 /    750/12/40/5    7.19/ /79/18/86 |
| | A/P   PARAPLEGIA  T4   S/P MULTIPLE GSW SHOT WOUNDS |
| | NEURO- STABLE FU |
| | % BRAIN ABSCESS - CT SCAN HERE |
| | DISCUSS MOTION /re S/T UP c NEURO SURG |

(IMPRINT PLATE)                          (DATE & SIGN ALL NOTATIONS)

**DATA BASE**
**HISTORY**
**PHYSICAL EXAMINATION**

R 41914 Valentine, C. Tier 1
99788 CHART RECORD

**(C) COOK COUNTY HOSPITAL**
**CHICAGO, ILLINOIS**

| DATE-HOUR | PROB NO | |
|---|---|---|
| 09-11-88 | | S: Pt less conscious today |
| | | O: BP 119/56 P 116 R 38 T 100° |
| | | CVP LT PAP 50/30 PE 40 Pcwp 26 |
| | | GW1 Ty paraplegic requires extensive ventilatory parameters |
| | | Heart: Ncc heard well |
| | | Carotid: Rcc they near S, rs |
| | | Lungs: coarse diffuse rales throughout — worsening |
| | | Abd: Wound well healed |
| | | Flat, soft, non tender, BS⊕ hyperactive |
| | | ⊕ Ø UQ fullness |
| | | Rectal: brown trace⊕ |
| | | Ext: ⊖ cc |
| | | A/P ① Ty paraplegia c̄ diffuse bilateral pneumonia |
| | | c̄ acute bacterial |
| | | Switched to Imipenem / ciprofloxacin |
| | | CXR worsening at all unit parameters |
| | | Need to R/o 2° source fevers gall bladder us been ordered |
| | | Plan arrange CT scan head tags |
| | | [signature] |
| 09-11-88 | | S: Pt condition worsening |
| | | O: T 102 AP 126/74 R 38 P 142 CVP 26 PA 59/30 PE 42 PCWP |
| | | U/o —30 cc/hr Nb —180 cc/shift |
| | | GW at requiring ↑ pt ↑ in vent parameters |
| | | Heart— tachy nrm- S, rs, |
| | | Lungs— worsening diffuse rales |
| | | Abd — flat, firm n Ø UQ ↑ fullness, non tender, BS⊕ hyperactive |
| | | Ext — ⊖ cc |
| | | A/P ① Ty paraplegia c̄ diffuse bilateral pneumonia (acute bacterial) |
| | | CXR; vent settings worsening daily |
| | | Ab ciprofloxacin / ciprofloxacin |
| | | Pt too unstable for trip to CT → Ø/↓ ⊕ UQ |
| | | Pt unstable today |
| 09-12-88 | | Nutrition BEE ~1600 2.5P ALTPN c̄ 20% intralipids |
| | | Source requirements calories due to sepsis |

(IMPRINT PLATE)

[left margin stamp: Valentine, Edward R 41960 1583444 CHART RECORD]

(DATE & SIGN ALL NOTATIONS)
[signatures]

**PROGRESS NOTES**
S = Subjective
O = Objective
A = Assessment
P = Plan

PLAINTIFF'S TRIAL EXHIBIT 31A
8 of 23

## COOK COUNTY HOSPITAL
### CHICAGO, ILLINOIS

| DATE-HOUR | PROB. NO. | |
|---|---|---|
| 04-14-88 | | ARREST NOTE |

Pt. HYPOTENSIVE THROUGH THE NIGHT REQUIRING ↑ LEVOPHED AND ↑ EPINEPHRINE. Pt ALSO WORSENING HYPOXIA REQUIRING INCREASING VENTILATORY SETTINGS AND ACIDOTIC REQUIRING BICARBONATE AND THAM. THIS AM Pt HAD 4 ARREST SEQUENCES. THE LAST FROM WHICH HE WAS DEEMED UNRESUSCITATABLE AFTER BICARBONATE AND MANUAL CHEST COMPRESSIONS. Pt DECLARED DEAD AT 12:58 A TODAY. ROSA VALENTINE MOTHER OF Baby NOTIFIED BY ME PER PHONE

± 4007

**PROGRESS NOTES**

(IMPRINT PLATE)

(DATE & SIGN ALL NOTATIONS)

S - Subjective
O - Objective
A - Assessment
P - Plan

(FORM 247)

PLAINTIFF'S TRIAL EXHIBIT 31A
9 of 23

**COOK COUNTY HOSPITAL**
DIVISION OF RESPIRATORY CARE

| DATE-HOUR | |
|---|---|
| 9/10/88 | *pt is unresponsive nor alert has no spontaneous breathing on SIMV of 35. Tuele* |

*BS report by Tuele or*
*Opti us responsive — gud answer*
*gud chest movement 2 each cycle*
*of vel*
*BS repid or B*

*Patient lies more alert un responsive. Good chest expansion with ventilator cycle on testing spont mv spontaneously un Suction Patient has a 200-300cc leak E.T. tube change url removal Stat*

*Bedside report given B Tuele*

(Date and sign all notations)

**Bear Adult Ventilator Flow Sheet**
Date: 9-10-88
LTAV Start Date: 8-27-88
Ventilator #: 7

VALENTINE, FELIX
3444

CPD 0489

PLAINTIFF'S TRIAL EXHIBIT 31A
10 of 23

COOK COUNTY HOSPITAL

DEPARTMENT OF NURSING SERVICES

7/7/88 8:00am Rec'd sleeping supine on flexicare bed on max inflation for rigidity due to spinal cord injury. hypothermia unit on 85° F. temp at present 101.6. Cardiac monitor attached, normal sinus rhythm rate of 112. bp 140/80. (R) nostril nasal intubated c size 7.5 soft pressure cuff. suction minimal return. Ventilator setting is tidal volume 650 IMV 12 peep 5 FiO2 40% pO2 at 6am 78.0. bilateral congested breath sound. [illegible] scant to high amount c goldish liquid secretion. lavage c 30cc normal saline. pupil are 4mm and reactive to light. Bilateral crepitation heard c [illegible] sound. Midline suture (staple) dry and intact no signs of infection. IV infusing per (R) subclavian #14 0.9NS c 100cc hour. Ka 131 [illegible] hung at 7am. IV# 85 ACTPN total Na 150meq/liter potassium total K 10mg total Cl 100meq per liter c 100cc hour. Versed drip at 5mg/5cc hour #79, #81 100cc 0.9NS 100 Unit reg insulin at 5unit 5cc per hour. movement of arm intact unable to move below nipple line. cooling blanket on. — Gloria Hall RN

9:30am IV#88 100cc 0.9NS 100cc Versed c 5cc 5mg per hour. responsive to verbal stimuli. open eyes attempt to talk. — Glor. Hall RN

9:30am Cardiac monitor on rhythm strip on chart Glor Hall RN

9:35am Cipro finely crush c 10cc NS via NG tube. Appears tolerate well. — Glor Hall RN

10:30am suction minimal return. Vital RR 38-40 pulse 118-126 bp 144/88. — Gloria G. Hall RN

12:30pm IV#90 ACTPN c 100cc hour hung. — Glor Hall RN

IMPRINT PLATE

...3444
VALENTINE, FELIX
1458 N CAMPBELL
01/05/72 M 2
08/27/88 2335119 TRA 22

NURSING

Record DATE ON TOP LINE & THEREAFTER each time date changes
PRIOR to each entry, record time.
SIGNATURE & CLASSIFICATION MUST APPEAR AFTER EACH ENTRY
DO NOT SKIP A LINE OR SPACE
ALL ENTRIES MUST BE PROBLEM ORIENTED

No. 244

CPD 0595



COOK COUNTY HOSPITAL
DEPARTMENT OF NURSING SERVICES

IMPRINT PLATE

VALENTINE, FELIX
1658 N CAMPBELL
01/05/77
08/27/88   2395119   TRA   32

NURSING

842 8

Record DATE ON TOP LINE & THEREAFTER
each time date changes
PRIOR to each entry, record time.
SIGNATURE & CLASSIFICATION MUST APPEAR
AFTER EACH ENTRY
DO NOT SKIP A LINE OR SPACE
ALL ENTRIES MUST BE PROBLEM ORIENTED

No. 244

CPD 0602

PLAINTIFF'S TRIAL EXHIBIT 31A
12 of 23

COOK COUNTY HOSPITAL

DEPARTMENT OF NURSING SERVICES

7/27/ 5:30p Suction ē TAT done — [illegible signature]
5:3?p 4th unit of PRBC transfusion progress 160/90 – 3?5
123 – 30 — [illegible signature]
5:4?p chest x-ray taken — [illegible signature]
6:05p Increase pavulon drip 4 mg / 4 ml/hr
pt – 32 — [illegible signature]
6:15p Increase pavulon drip 5 mg / 5 ml/hr · RR – 22
— [illegible signature]
6:30p Increase pavulon 6 mg / 6 ml/hr · RR – 32 – [illegible signature]
6:35p st cath done 250 ml sp gr 1.02?
— [illegible signature]
6:45p TV 600 IMV 28 — [illegible signature]
7p Rec'd on pleasure [illegible] NET ē setting of TV 650, IMV 30 FiO2 50% PEEP +5. Resp rapid [illegible]. ET secure and no airleakage noted. Lungs ē coarse rales throughout & some scattered exp. wheezes on (L) lower & upper lobe. Equal chest movement ē bilateral breath sounds (+) ↓ breath sounds on (R) lower lobe. Bilateral chest tube in place. (L) $H_2O$ seal [illegible] output ē serosanguinous secretions & bloody streaks. (R) chest tube 15cm of $H_2O$ ē serosanguinous purulent in color secretions, drsg are dry + intact. No air leak noted. N/G to [illegible] placement. Have lge amt of [illegible] secretion being collected. ABD slightly round ē BS (–) Midline ABD incision ē steri strips in place. No drainage noted. Incisions intact. All pulses are palpable & equal. Have Bunny boot & alternating air compression on lower extremities. [illegible] ē good circulation. Skin hot & dry. No cyanosis noted. (R) A-line & CVP ē 100 .9NS 250cc Heparin 250 u. (L) triple lumen [illegible] port #1 Regular 100 u/.9 NS 100cc; [illegible] Distal port #0 Versed 100mg / .9NS 100cc @ 15mg/15cc/hr. Middle port: #6 ACTPN @ 104cc/hr, 20% lipid #3 @ 21cc/hr. (R) PIV .9NS #7 @ 10cc/hr, MSO4 100mg / 100 D5W @ 5mg/5cc/hr, Pavulon 5mg/5cc/hr [illegible signature]

IMPRINT PLATE

URSING

Record DATE ON TOP LINE & THEREAFTER each time date changes
PRIOR to each entry, record time.

SIGNATURE & CLASSIFICATION MUST APPEAR AFTER EACH ENTRY

DO NOT SKIP A LINE OR SPACE

ALL ENTRIES MUST BE PROBLEM ORIENTED

No. 244

CPD 0608



COOK COUNTY HOSPITAL

DEPARTMENT OF NURSING SERVICES

9-9-88 9PM Urine output scanty. Dr. Tom notified. Panto pands nn
7¹⁰PM [illegible] draining good output 250 cc
Dr. Tom aware of [illegible] Panto pand
7¹⁵P Received pt on a pediair low air loss therapy bed
unresponsive to both deep painful & verbal stimuli
Both pupils remain dilated & non reactive to light. NTT
@ (R) nare intact connected to bear 2 respirator c̄ TV 550
FiO2 50% IMV 35/min peep + 10 bilateral breath sounds present
lungs c̄ rales @ both lung fields. NGT @ (L) nare
intact connected to T Gomco suction draining very minimal
amt of light greenish drainage. Triple lumen @ (L)
subclavian intact to the yellow port is IV # 15 1L ACTP
infusing well @ 104 cc/h on a travenol pump. piggyback
to it is IV # 14 20% 250 cc Intralipid infusing well @ 21 cc/h
on a travenol pump. to the white port is Pavulon
drip @ 6 cc/h or 6 mg/h on a travenol pump. to the
blue port is a pressurized bag IV # 13 250 cc 0.9% NS
+ 250 u Heparin flushes good. piggyback to it is IV # 8
100 cc 0.9% NS + 100 u Regular Insulin infusing well @ 5 u/h
on a travenol pump. drsg dry & intact. Mid abdominal
incision c̄ steri strips intact no drainage noted so far.
Abdomen round & firm bowel sounds very hypoactive
both lower extremities c̄ bilateral [illegible] compression
on & functional. both feet slightly edematous. Both pedal
pulses present. c̄ good capillary refill. (R) chest tube
intact to water seal no air leak noted @ present. Occlu-
sive drsg dry & intact. (L) chest tube intact connected
to 15 cm suction draining serous drainage but very minimal
amount c̄ slight air leak noted. occlusive drsg dry & intact.
Arterial line @ (R) wrist intact connected to pressurized
bag double to CVP flushed drsg dry & intact waveform
[signature]

IMPRINT PLATE

[illegible]3444
[illegible], FELIX
[illegible]
017057[redacted] 2
08/27/88 2395119 TRA 32

NURSING

Record DATE ON TOP LINE & THEREAFTER each time date changes
PRIOR to each entry, record time.
SIGNATURE & CLASSIFICATION MUST APPEAR AFTER EACH ENTRY
DO NOT SKIP A LINE OR SPACE
ALL ENTRIES MUST BE PROBLEM ORIENTED

No. 244

84 2 8

CPD 0611



COOK COUNTY HOSPITAL

DEPARTMENT OF NURSING SERVICES

| Date | Time | Entry |
|---|---|---|
| | 10P | C.O. ~11.2. Dr. [illegible] at bedside – aware of VS, U/O, PWP. [illegible] |
| 9-12-98 | 12A | ↑ #46 100U Reg Insulin / 100cc 0.9% NaCl at 6cc/°. Assessment essentially unchanged from 7P. Remains [illegible] & [illegible] SiO2 .55 // TV 550 / IMV 38 / peep +25. Dr. [illegible] aware of 10P ABGs – ® chest tube drsg Δ'd. CBurgh RN |
| | 130A | ↑ #47 100mg Versed / 100cc 0.9% NaCl at 15cc/°. Tubing Δ. CBurgh |
| | 2A | ↑ #48 20% intralipids at 31cc/°. CBurgh. [illegible] notified CBurgh |
| | 230A | ↑ #49 250cc 0.9% NaCl at 10cc/°. Tubing Δ. CBurgh |
| | 430A | ↑ #50 100mg MSO4 / 100cc NS at 5mg (5cc)/°. Tubing Δ. VS, PWP, U/O stable – see graphic sheet. CBurgh. Hypothermia mattress removed. TSI'd for scant clear secretions – breath sounds remain coarse throughout. CBurgh |
| | 530A | CVP ē poor waveform / sluggish bld return / flushes ē difficulty – Dr. [illegible] aware. CBurgh RN |
| | 6A | ↑ #51 Special sol. ACTPN – Minimum [illegible], AA 10%, Dextrose 25%, Acc 37, K 30, Na 125, Cl 152, Mg 5, Ca 4.6, Gluc 4.6, P 15mM at 84cc/°. CBurgh |
| | 630A | pCXR taken. CBurgh. Saline irrigated q4° for patency. Remains unresponsive. VSS. ABGs / [illegible] / [illegible] Labs sent. (10P 9/11) PT 12.4 / PTT 31.4 CBurgh RN |
| | 7A | Hypothermia mattress in use – Dr. [illegible] aware of temp, VS. CBurgh |
| | 715A | Dr. Shakey notified of U/O, PWP, VS. CBurgh |
| 9/12/98 | 730a | Received pt in Flexicair bed. Unresponsive to verbal or pain stimuli on pavulon @ 6mg/hr via infusion pump into blue port of © subclavian triple lumen cath. PERL. No spontaneous movement x 4 extrem noted. NGT into L → ↑ gomco. NGT irrigated ē 30cc of NS. Light brownish colored drainage returned. Oral ETT secured by ET guard. Balloon inflated. ETT → ventilator. Vent settings TV 550. FiO2 55. IMV 38. peep +25. Suctioned ET per closed system for small amt of whitish secretions. Suctioned mouth for thin, white secretions → continue. [signature] |

IMPRINT PLATE

NURSING

Record DATE ON TOP LINE & THEREAFTER each time date changes
PRIOR to each entry, record time.
SIGNATURE & CLASSIFICATION MUST APPEAR AFTER EACH ENTRY
DO NOT SKIP A LINE OR SPACE
ALL ENTRIES MUST BE PROBLEM ORIENTED

CPD 0619

**COOK COUNTY HOSPITAL**

**DEPARTMENT OF NURSING SERVICES**

1-14-88 7³⁰ Received pt laying flat in bed Flexicair II air bed in WFTU bed #5 applied. Pt is unresponsive to verbal & tactite & painful stimuli. Pt is on Pavulon drip @ 6mg/6cc/hr via Hogard 8000 pump into proximal lumen of triple lumen. D subclavian triple lumen distal port c̄ IV#62 D₅W 250cc @ 10cc/hr via flow control IVPB to #64 Levophed drip 4mg in 250cc D₅W @ 3.7cc (2mcg/kg) hr via Hogard 8500 pump IVPB to #69 Dopamine drip 800mg in 250cc D₅W @ 3cc/3mcg/kg/hr via Hogard 8000 pump and middle port has #76 ACTPN c̄ 70meq Na⁺ & no K⁺ infusing @ 84cc/hr IVPB to #76 is #77 Intra lipids 250cc 20% infusing @ 21cc/hr both via Hogard 8000 pump. R subclavian Swan Ganz c̄ #75 Versed 100mg + 100cc D₅W @ 15mg/15cc/hr IVPB to #78 MSO₄ drip 100mg in 100cc D₅W infusing @ 5cc/hr via introducer port per Hogard 8000 pump. Infusing into Swan Ganz PA dis valve (yellow) proximal injectate port are #66 Heparin flush 250cc in 250cc D₅W @ 3cc/hr via pressure bag. To VIR (white) (blue) is reg insulin 100u in 100cc D₅W @ 6cc/6 u/hr, IVPB to Swan CVP port D₅ Amphotericin B 50mg + Hydrocortisone 50mg @ 125cc PIV c̄ #73 Lasix drip 250mg in 250cc @ 3mg/3m @ 3cc/hr. Swan Ganz. Intubated via mouth c̄ ETT to ERROL BEAR 5 ventilator c̄ IMV 50 TV 650 FO₂ 70% PEEP +25. ETT held in place by external fixation device. NGT to high Gomco draining greenish drainage. Breath sounds present bilat. No bowel sound. R chest tubes x2 c̄ & 2 c̄ dk red drainage & lighter red drainage noted in collection bottle. L chest tube #6 also to drainage bottle to 25 cm water seal suction R & L chest tube dsgs, Swan Ganz dsg A line dsg triple lumen & PIV dsgs are all dry & intact. ——————

IMPRINT PLATE

. . . 1444
...TINE, FELIX
1458 N CAMPBELL
17057 ▮
08/27/88 2375119 TRA 32

NURSING

Record DATE ON TOP LINE & THEREAFTER each time date changes PRIOR to each entry, record time.

SIGNATURE & CLASSIFICATION MUST APPEAR AFTER EACH ENTRY

DO NOT SKIP A LINE OR SPACE
ALL ENTRIES MUST BE PROBLEM ORIENTED

No. 244

CPD 0629

PLAINTIFF'S TRIAL EXHIBIT 31A
16 of 23



COOK COUNTY HOSPITAL, 1825 West Harrison Street, Chicago, Illinois 60612
NURSING ACTIVITY FLOW SHEET

PLAINTIFF'S TRIAL EXHIBIT 31A
17 of 23

Nursing Activity Flow Sheet
CPD 0641



COOK COUNTY HOSPITAL, 1825 West Harrison Street, Chicago, Illinois 60612
NURSING ACTIVITY FLOW SHEET

STAMP ADDRESSOGRAPH HERE

VALENTINE, FELIX
1458 N CAMPBELL

Nursing Activity Flow Sheet
Revised 8/11/75 GYC    No. 246

CPD 0042

PLAINTIFF'S TRIAL EXHIBIT 31A
18 of 23

COOK COUNTY HOSPITAL
DIVISION OF RESPIRATORY CARE

| DATE-HOUR | |
|---|---|
| 9/6/88 | Pt is alert with spont. respirations. Good chest expansion with each cycle of ventilator. Color is good. Skin is dry & warm ——— [illegible signature] |
| 5:31 | [illegible] ——— [illegible signature] |
| 16/7 | Bedside report given by [illegible] to [illegible] |
| | Pt is alert good [illegible] good chest movement c each cycle of vent. Pt not [illegible] weaning parameter done ——— [illegible signature] |
| | BS report [illegible] ——— [illegible] |
| 1620 | Pt had a good air entry. Pt Color is good pt is alert. |
| | A ( 127) [illegible] |
| | Bed side report [illegible] [illegible signature] |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

(Date and sign all notations)

Bear Adult Ventilator Flow Sheet

Date: 9-6-88

LTAV Start Date: 8-27-88

Ventilator #: 7

1583444
VALENTINE, FELIX
1458 N CAMPBELL
01/05/72 M 2
08/27/88 2395119 TRA 32

CPD 0713



**COOK COUNTY HOSPITAL**

**DEPARTMENT OF NURSING SERVICES**

IMPRINT PLATE

Record DATE ON TOP LINE & THEREAFTER
each time date changes
PRIOR to each entry, record time.
SIGNATURE & CLASSIFICATION MUST APPEAR
AFTER EACH ENTRY
DO NOT SKIP A LINE OR SPACE
ALL ENTRIES MUST BE PROBLEM ORIENTED

No. 244

CPD 0730

PLAINTIFF'S TRIAL EXHIBIT 31A
20 of 23

COOK COUNTY HOSPITAL

DEPARTMENT OF NURSING SERVICES

*[Handwritten nursing notes — largely illegible cursive. Partial transcription follows.]*

1/10/88 — ABG results in PH 7.39 PCo₂ 46.4 Po₂ 62.5 O₂ sat 88.1% ...
Hct 33% Na 133 K 4.7 Glucose 181 mg ...

*[Remaining handwritten entries illegible]*

IMPRINT PLATE

IC. 3444
VALENTINE, FELIX
1458 N CAMPBELL
01/05████
NURSING 08/27/88   2335119   TRA    32

Record DATE ON TOP LINE & THEREAFTER
each time date changes
PRIOR to each entry, record time.

SIGNATURE & CLASSIFICATION MUST APPEAR
AFTER EACH ENTRY

DO NOT SKIP A LINE OR SPACE
ALL ENTRIES MUST BE PROBLEM ORIENTED

No. 244

CPD 0731

PLAINTIFF'S TRIAL EXHIBIT 31A
21 of 23

COOK COUNTY HOSPITAL

DEPARTMENT OF NURSING SERVICES

| | |
|---|---|
| 9/18 7A | (R) PIV BLO [illegible]. Rest per pump except BLO. Site clean |
| | s redness swelling. A-line & CVP balance & recalibrat |
| | A-line c times accurate to cuff pressure. CVP off |
| | d/t bicarb infusing through line. Is on cardiac |
| | monitor showing ST s ectopy. All alarms on @ bedside |
| | & central station. Pupils are pinpoint but react to light |
| | Remains paralysis d/t drugs. — [signature] RN |
| 10:30 | K+ level ↓ starting on K+ 10meq per IV [illegible] Ht 160 |
| 11:30 | Second set of K+ rules started. No ectopy noted [signature] |
| 12:30 | Temp 106.8 placed on cooling blanket c cool moist |
| | cloth over forehead. — [signature] RN |
| 2P | Temp remains ↑ & on cooling blanket. — [signature] |
| late entry 9:15 A | Completion of BLO transfusion No reaction this gave. |
| | [signature] RN |
| 1:45 | Foley cath placed @ this time. — [signature] RN |
| 2:30 | Packed c ice under arms & groin area to help reduce |
| | temp sustained several times via monitor & ET. [signature] |
| 3:40 PM | Received patient in bed unresponsive with |
| | nasotracheal tube to ventilator setting of |
| | TV 550 F100 50%. IMV 35 Peep +10. With |
| | soft restraints on both arms. With sequential |
| | compression on both lower extremities. NG to |
| | ↗ [illegible] with [illegible] drainage noted |
| | (R) chest tube to water seal. (L) CT to 15 cm |
| | suction, no air leak noted so far. |
| | midline abdominal wound [illegible] to air |
| | with steri strip in place. Ice bags on |
| | [illegible] for ↗ temp. With |
| | cooling blanket on. Bilateral lung |
| | sounds [illegible]. Cardiac monitor on (alarm |
| | on) → [illegible] tachycardia. With bunny boots |
| | on both feet. — [signature] |

IMPRINT PLATE

[illegible]
[redacted]
[illegible]

NURSING

Record DATE ON TOP LINE & THEREAFTER each time date changes
PRIOR to each entry, record time.
SIGNATURE & CLASSIFICATION MUST APPEAR AFTER EACH ENTRY
DO NOT SKIP A LINE OR SPACE
ALL ENTRIES MUST BE PROBLEM ORIENTED

No. 244

2 8



**COOK COUNTY HOSPITAL**

1835 W. HARRISON ST. CHICAGO, ILLINOIS 60612

---

Cook County Hospital
Thu Sep 15, 1988 03:22 am
Cumulative Trend Report from 08/27/88 0715 to 09/14/88 1049

Med Rec Number:   001583444                    All Sections-Page 30
Patient Name:     VALENTINE, FELIX             Adm: 08/27/88
Location:         DIS
Phys-Service:     BARRETT, JOHN-TRAUMA
Acct #:           C2395119

Out at: 09/06/88 1245        Gram Stain [165597]          Techs: T5088*,2346

Many WBC's
Rare Gram negative bacilli

Out at: 09/10/88 1023        Final [165597]               Techs: T5424*,9827

ACINETOBACTER ANITRATUS
  3+
  SEE # 163485

In at: 09/06/88 1217                             Spec. Type: BRONCHIAL WASH
Coll. Time: 09/06/88 1216    MYCOLOGY/CULTURE              Techs: VUKN

Ordering Phys: SHARKEY                            [C2395119/165597]

Out at: 09/07/88 1425    Myco. Fungal Smear [165597]      Techs: TT208*,2346

No Fungal elements seen
Negative for Histoplasma

In:  09/06/88 1217                                Spec: BRONCHIAL WASH
Out: 09/07/88 0919           GRAM STAIN           Techs: VUKN T6326,2346
Coll Time: 09/06/88 1216
Order Phys: SHARKEY                               [C2395119/165597]

                             *STAT*STAT*STAT*
Result Name                  Result

Gram Stain Smear:            Many WBC's, Rare Gram
                             negative bacilli

                                        VALENTINE, FELIX
                                        001583444
                                        DIS09/14/88
                                        (M-01/05/█
Cumulative Trend Report                 Dr. BARRETT, JOHN



PLAINTIFF'S TRIAL EXHIBIT 31A
23 of 23

# EXHIBIT 71

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION


NO.:  12 C 4428

JACQUES RIVERA,

     Plaintiff,

vs.

REYNALDO GUEVARA, et al,

     Defendants.
                   /


| | |
|---|---|
| VIDEOTAPED DEPOSITION OF: | ARTHUR SHARKEY, M.D. |
| DATE: | January 15, 2016 |
| TIME: | 4:19 p.m. - 6:14 p.m. |
| PLACE: | The Orthopaedic Institute 4500 Newberry Road Gainesville, Florida |
| REPORTED BY: | Leah Underwood Notary Public |
| VIDEOGRAPHER: | Kevin Hamill |

A P P E A R A N C E S:

        Loevy & Loevy
        BY:  Steven Art, Esquire
        312 N. May Street, Suite 100
        Chicago, Illinois 60607
        (312) 243-5900

                Appearing on behalf of the Plaintiff

        The Sotos Law Firm, P.C.
        BY:  Jeffrey N. Given, Esquire
        550 E. Devon Avenue, Suite 150
        Itasca, Illinois 60143
        (630) 735-3300

        Rock, Fusco & Connelly, LLC
        BY:  Eileen E. Rosen, Esquire
        321 N. Clark Street, Suite 2200
        Chicago, Illinois 60654
        (312) 494-1000

                Appearing on behalf of the Defendants

Page 3

I N D E X

Page

TESTIMONY OF ARTHUR SHARKEY, M.D.:

DIRECT EXAMINATION - By Mr. Art                     5

CROSS-EXAMINATION - By Mr. Given                   67

REDIRECT EXAMINATION - By Mr. Art                 166

RECROSS-EXAMINATION - By Mr. Given                181

CERTIFICATE OF REPORTER                           185

EXHIBITS MARKED FOR IDENTIFICATION:

Exhibit No. 1                                        5
(Excerpts of Medical Records)

Exhibit No. 2                                       62
(CPD 641 and CPD 642)

Exhibit No. 3                                       75
(Correspondence)

Exhibit No. 4                                       96
(Excerpts of Medical Records)

Exhibit No. 5                                      149
(Police Report)

Exhibit No. 6                                      149
(Police Report)

Exhibit No. 7                                      149
(Police Report)

Exhibit No. 8                                      149
(Police Report)

Exhibit No. 9                                      180
(CV)

THE VIDEOGRAPHER:  Okay.  This is the video deposition of Dr. Arthur Sharkey taken by the plaintiff's attorney in the matter or Rivera versus Guevara in the North District of Illinois, East Division -- Eastern Division, Case 12 C 4428.  Today's date is January 15th, 2016.  We are going on the record at 4:19.

Counsel will state their appearance for the record, please.

MR. ART:  Steve Art for the plaintiff Jacques Rivera.

MR. GIVEN:  Oh, I'm sorry.  Jeff Given on behalf of the individual officers, none of whom's names -- all of whom's names I cannot remember, but we'll all trust that they will be included.  And by the way, I have 2:19, not 4:19.

THE VIDEOGRAPHER:  Or 2:19.  I'm sorry.

MR. GIVEN:  That's what threw me off.

MS. ROSEN:  Eileen Rosen on behalf of the City of Chicago.

COURT REPORTER:  And if you'll please raise your right hand.

THE WITNESS:  (Complies.)

COURT REPORTER:  Do you swear that the testimony you are about to give will be the truth, the whole truth and nothing but the truth?

THE WITNESS:  So help me God.

COURT REPORTER:  Thank you.

THEREUPON:

ARTHUR SHARKEY, M.D.,

was called as a witness and, after having been duly sworn,

was examined and testified as follows:

DIRECT EXAMINATION

BY MR. ART:

Q.  Doctor, thanks for taking the time out today.  Let me start off with a couple, just logistical points.  In front of you, you have a document that we've marked Group Exhibit 1.  That is a selection of documents from the larger medical record of the treatment of Felix Valentin at the Cook County Hospital in September 19 -- August and September 1988.

(Thereupon, Exhibit Number 1 was marked for identification)

BY MR. ART:

Q.  This is gonna be boring, but I'm gonna have to read every page into the record, but we're doing this to save time in the long run so that I can just call out a page number --

A.  Fine.

Q.  -- and you can review the record.  Just for the record, some of the pages contain highlighting.  The highlighting is not part of the original medical record.  The highlighting is highlighting that I have put on the documents

Page 6

to more quickly direct Dr. Sharkey to information that relates to the questions I'll be asking.

So for the record, Group Exhibit 1 is documents Bates stamped CPD 276, 282, 287, 291, 292, 293, 296, 489, 549, 561, 597, 605, 606, 608, 611, 633, 686, 687, 730, 731, 732 and 787. I apologize to the court reporter.

So, Doctor, have you given a deposition before?

A. Yes.

Q. About how many, just approximately?

A. A couple hundred.

Q. So you know the rules very well. Because this is a video deposition that may at some time in the future be used for a trial, let's all try to speak one at a time. Mr. Given may make objections. Ms. Rosen may make objections. Because there's no judge here to rule, I would ask that you answer after their objection.

Okay?

A. Yes.

Q. If you need a break, just let me know. All right.

MR. GIVEN: And you have to say yes or no. You just nodded your head.

THE WITNESS: Oh, sorry.

MR. GIVEN: And after a hundred depositions, you probably know that you have to speak --

THE WITNESS: Yes. But I thought I was on video.

Page 7

Do I have to do --

MR. GIVEN: You are on video. You are, but she is also taking you down.

MR. ART: Can you tap out three taps for yes?

Thank you, Jeff.

BY MR. ART:

Q. Okay. As I said, my name is Steve Art, and I represent Jacques Rivera in this case.

Can you please state and spell your full name for the record, Doctor?

A. Arthur Michael Sharkey, S-h-a-r-k-e-y.

Q. And please tell us your profession.

A. I am a practicing surgeon.

Q. And in general terms, what do you do in your practice as a surgeon?

A. Right now, my practice is plastic surgery and orthopedic hand surgery.

Q. Okay. In August and September of 1988, were you a resident at Cook County Hospital in Chicago?

A. Yes, I was.

Q. Did you have the opportunity during that period of time to treat a man named Felix Valentin?

A. Yes, I did.

Q. Excuse me.

We're gonna talk a bit today about Felix Valentin,

Page 8

but first, I want to ask you some questions about your background.

Okay?

A.   Yes.

Q.   You testified that you're an orthopedic hand surgeon and a plastic surgeon.

Correct?

A.   I just -- most of the surgery I do is just orthopedic in nature, but I'm a plastic hand surgeon.

Q.   Where do you practice?

A.   I practice in Gainesville, Florida.

Q.   And how long have you been a plastic hand surgeon?

A.   20 years, 21 years.

Q.   How many surgeries do you perform annually, approximately?

A.   Over 500.

Q.   And tell us the types of surgeries that you do.

A.   I do lower extremity reconstructions from automobile accidents; upper extremity reconstructions for traumatic injuries and reconstructive surgeries for arthritis and nerve entrapments.

Q.   Do you interact with patients on a daily basis?

A.   Yes.

Q.   Tell us what an orthopedic hand surgeon does on a typical day when you're not actually doing surgery.

Page 9

A.   We -- I see patients in the office two-and-a-half days-a-week and I operate two-and-a-half days-a-week.  I see 65 to 75 people in the office every day.

Q.   Where are you licensed to practice medicine today?

A.   The State of Florida.

Q.   Are you affiliated with any hospitals?

A.   No.

Q.   Are you a member of any professional associations?

A.   Yeah; the American Society of Plastic Surgeons.

Q.   Okay.  Thank you, Doctor.

Can you describe the training that you need to become a plastic hand surgeon?

A.   So I did four years of medical school at the University of Illinois in Chicago.  I did five years of general surgery training at the Cook County Hospital and the University of Illinois.  I got my board certification a year or two after that.  I then did two years of plastic surgery at Saint Louis University Hospital in St. Louis, and a year or two after that, got my board certification in that.  And then I did a little over one year of hand surgery at Kutz & Kleinert at the University of Louisville in Kentucky, and got my certificate of added qualifications a year or two after that.

Q.   How long did you train at Cook County Hospital in general surgery?

A. I did most of my rotations in surgery that I could as a medical student there as well. So five years formally and five to seven years in total.

Q. So you had -- you had -- how many years of medical school did you have there?

A. I -- I did four years of medical school. That's mostly concentrated at the University of Illinois, but we did clinical clerkships at the county hospital.

Q. Got you. And you did an additional five to seven years --

A. Five years of general surgery.

Q. -- at Cook County as a resident?

A. Cook County the whole time.

Q. Okay. And then you had --

A. Majority.

Q. Did you have a second residency at Saint Louis?

A. Yes.

Q. All right. And that was a more specialized residency in hand surgery?

A. It's plastic surgery.

Q. Plastic surgery?

A. And then a third residency in hand surgery.

Q. Okay. Let's talk generally about a residency at Cook County Hospital in the 1980s and early '90s. Okay? Well, first of all, do you remember what years you were there

Page 11

as a resident, precisely?

A.    Would have been, I think '87 to '92.

Q.    Okay.  What sort of tasks did you perform as a resident in Cook County in the late 1980s?

A.    Everything that needed to occur inside the hospital.

Q.    Did you see patients in a clinical setting?

A.    We transported the patients, we took them to x-ray, we put their IVs in, we got them their gowns, we put them on the bed, we prepped them for surgery, we did their surgery.  Pretty much start to finish.  We saw people in clinic and in the emergency room too.

Q.    Was a residency then a little bit different than it is today?

A.    It's a lot different than it is now.

Q.    In what ways?

A.    We -- we were in the county hospital, not jokingly, between a hundred and 120 hours a week.

Q.    Okay.

A.    That was our standard work week.

Q.    How many patients would you see in a day, if you had to estimate?

A.    Probably 50, on average.

Q.    And they are presenting all kinds of physical aliments?

A.    That's correct.

Q.    Did you do rotations as a resident at Cook County in the late 1980s?

A.    Yes.

Q.    What types of rotations?

A.    We would have done colorectal surgery, general surgery, trauma surgery, many different kinds of surgical specialties as well.  We did plastics and things like that.

Q.    Okay.  And so you were focusing on many different kinds of surgical rotations?

A.    That's correct.

Q.    And you had a rotation in the trauma surgery service there?

A.    Yes, I did.

Q.    And tell us what -- what happens in a trauma surgery ICU.

A.    So at -- at that time, the Cook County Hospital was a premier trauma surgery unit, along with Baltimore, in the country.  We had a bay where we would accept the people that would be brought in by fire and rescue.  There were five or six beds in that area, and there would be two to four residents in that area with some highly-skilled nurses in the region that did the triage of the patient, to determine what specialist needed to to see the patients.  We followed strict protocols on regards to who should be called and who

shouldn't be called. Back then, John Barrett was in charge of the the unit. And I think he was the one, like, airplane pilot checking off things. So when you got young people taking care of people, you want to make sure no steps are missed. And then the specialists would be asked to come see the patients. They would examine them in that docking bay, and then a determination of whether the patient would be prepared for surgery or sent back to the floor or the ICU. Literally never discharged from that area. They had to be pretty sick to get there.

Q. Right. How -- how long would a rotation in the trauma surgery service last at that time?

A. My -- my recollection is two months.

Q. Okay. And -- and so you were there at some period around the beginning of September 1988?

A. That's correct.

Q. And is that the capacity in which you would have seen Felix Valentin?

A. Yes.

Q. Okay.

A. I would have been a second-year general surgery resident at that time.

Q. Okay. As a second-year general surgery resident, do you supervise people?

A. So because of the county trauma unit's reputation,

Page 14

there was medical students that worked in a specialty rotation. People that wanted to be surgeons in the future would like that to be on their applications, so they would be there. To be quite frank, as I'm older now and experienced, it was the nurses that did most of the running and teaching of the residents in that front bay. They knew all of the protocols. They all had intense experience and would, you know, instruct most of what happened. And one trauma physician at that time -- Rocky Roberts is the one I remember now. She was in The Fugitive. If you watch the movie, she's the doctor that's in The Fugitive. She would, you know, give instructions. There were multiple people in the bay, and she'd be following to make sure all the protocols were followed and taken care. And then there was generally two residents in the back that were taking care of the people that were in the ICU. So there may be all of us there at one time, but the team in the front was in charge of the unit during the day.

Q. Okay. So you interacted with nurses a lot; correct?

A. Correct.

Q. And in your capacity as a resident, would you review medical records and medical records from cases a lot?

A. Yes.

Q. And do you make treatment decisions as a resident

Page 15

based on your review of medical records?

A.    In the county hospital, yes.

Q.    Okay.    And have you -- switching topics, Doctor, have you ever given expert testimony in a civil case before?

A.    A couple, yes.

Q.    A couple times?

A.    Uh-huh.

Q.    On whose behalf?    Do you recall?

A.    Either one.    It could be --

Q.    Either plaintiff or a defendant?

A.    Yes.

Q.    Okay.    Is it split pretty evenly as far as you can recall?

A.    Yeah.    It wouldn't be -- I'm not a hired gun, if that's what you're asking.

Q.    So you've testified in your capacity as a treating physician?

A.    It's usually as a treating physician.    There's been a few cases; three or five in my lifetime, I've done expert cases.

Q.    Okay.    And what sort of opinions are you giving in those cases in general?

MR. GIVEN:    I'm sorry.    Object.    Which cases are you talking about?    The three to five or the --

MR. ART:    Any one in which you're giving testimony

Page 16

as a treating physician.

MR. GIVEN: As a treating? That's what I meant.

BY THE WITNESS:

A. Workers' compensation in Florida -- and the laws have changed somewhat -- it was favorable in the past for the lawyers to litigate the cases. So that's why I've done 200 depositions. We used to do four or five depositions a week. Now we rarely do them. But they are coming more frequently. And now the videocamera is now coming back into vogue.

Q. Right.

A. So most of those opinions are in workers' compensation cases where I'm the treating physician, and a fair number of liability, auto accident or slip and falls that somebody's involved with product liability.

Q. Got you. And in the three to five cases where you have provided expert testimony as a retained expert, what sort of opinions have you given?

A. Such as -- you mean, what type?

Q. Like, what --

A. It's usually hand surgery now. And plas -- I do -- for many years when I worked in the hospital, because of my county training -- and the University of Louisville is a trauma center too -- I did all the bad traumas. So I was involved in all the bad traumas. So it was a lot of plastic surgery originally for salvaging limbs. And then

Page 17

subsequently, I do a lot of really complex hand surgery.  So it's regarding those bad injury cases.

Q.  Okay.  Thanks, Doc.

Let's talk about Felix Valentin's course of treatment at Cook County Hospital.  Okay?  First I want to ask if you have an independent recollection of treating Mr. Valentin?

A.  It's -- it's a memorable place to be in.  I have a vague recollection of his injuries and, like, the location he was in the unit, but I don't independently recall the case. When I'm reviewing it, it's -- it's not forefront in my mind.

Q.  Okay.  So is it fair to say that you can't recall his course of treatment without reference to the records, but you do recall generally Felix Valentin being at the ICU?

A.  That's correct.  After I reviewed the records, I remembered the case pretty specifically, but it's only on reliance of the records.

Q.  Okay.  And -- and this is a case that, just so we're clear, happened about 30 years ago.

Correct?

A.  That's correct.

Q.  In -- in preparation for your testimony here, did you have the opportunity to look at the Cook County Hospital's patient file for Felix Valentin?

A.  Yes.

Page 18

Q.   And those files were sent to you by me.

Correct?

A.   That's correct.

Q.   And they have stamps in the lower right-hand corner that read CPD 229 to 816.

Is that correct?

A.   To me, they didn't always follow logical order, but yes, they were numbered.

Q.   Got it.  So we had put a number in the lower right-hand corner?

MR. GIVEN:  Let me just say, the numbers were in chronological -- the documents may not have been in -- in rational order, but that was how they were provided to us.

MR. ART:  We will blame the county.

THE WITNESS:  It was a lot better than the county charts I used to have when I was there.  I was surprised how complete it was.

MR. GIVEN:  I was surprised they had it at all, but we're all glad they did.

MR. ART:  Yes.

Ready?

MR. GIVEN:  Ready.

BY MR. ART:

Q.   Okay.  So before your testimony here today, you had

Page 19

the opportunity to review approximately 500 pages of medical records replated to Valentin.

Correct?

A.   Yes.

Q.   Did you recognize those documents to be the type of files that would have been kept at Cook County in the late 1980s?

A.   Yes.   I see my old friends' signatures.

Q.   And some of those documents bear your handwriting as well.

Correct?

A.   That is correct.

Q.   And some of them bear doctors that -- that you worked with back then.

Correct?

A.   Uh-huh.

Q.   And then --

MR. GIVEN:   That would be a yes?

THE WITNESS:   Yes, sir.

BY MR. ART:

Q.   And then are there also notes from nurses in the documents?

A.   Yes.

Q.   Okay.   By reviewing these medical records, can you tell us about Mr. Valentin's course of treatment at Cook

Page 20

County Hospital in late August, early September 1988?

A.    I don't have the summary in front of me, but I can describe his injuries.  Is that what you're interested in?

Q.    No.  I'm -- just as a general proposition, does reviewing the documents help to refresh your recollection and let you describe treatment that he was given?

A.    Absolutely.

Q.    Okay.  And you treated Mr. Valentin in the course of your regular day-to-day job as a resident there.  Correct?

A.    So when a patient would come into the unit, you would be the head second -- the second-year residents run the unit.  There's a fourth year and I think a fifth-year resident at the time that's there.  They do the surgeries.  You're the worker bee who prepares everything and makes sure everything runs smoothly for your fourth or fifth year or suffer the consequences.  And so I -- I was, best as I review this case and as I remember, I was his second-year resident, which would have been his key physician on the case.

Q.    Okay.

A.    So there would be notes from other residents who'd cover me on the days that we're going 24 on, 24 off, but most of the time, I write most of his notes.

Q.    Is it fair to say that you were the physician sort of at the center of the treatment of Mr. Valentin?

A.    That's correct.  That's correct.

Q.    Okay.  All right.  Let's talk generally about his health while he was at Cook County Hospital.  Okay?  Are you aware as you sit here what injury he came into the hospital with in late August 1988?

A.    My recollection of him -- and it's been a busy week.  I didn't get a chance to review the records this week.  But my recollection was he was a transfer; some hospital down south.  It wasn't uncommon that they would try to stabilize a patient in one of the smaller trauma centers in town, and then if they thought they were overwhelmed by him, to transfer him to the county hospital.  And as I remember it, we took him into the trauma bay, into the regular rooms for an evaluation when he came in from a transfer -- I don't remember.  It was maybe even a couple days afterwards -- for multiple gunshot wounds.

Q.    Okay.  So he came to you from another hospital with multiple gunshot wounds?

A.    That's correct.

Q.    And where was he put when he got to you?

A.    Initially, I think we did evaluate him in the regular triage center, but he went back into the ICU region we had just behind the area of the triage center.

Q.    And in general, what sort of injuries do folks in the ICU, what sort of -- strike that, please.

In general, what -- what degree of injury are these folks that are in the ICU suffering from?

MR. GIVEN: Objection to form.

You can answer.

BY THE WITNESS:

A. So unfortunately, this is the time when you read about the gun violence in Chicago now, they'll refer to this period of time; the late, '70s, the early '80s, as the other time of heavy gun violence in Chicago. So we would take in probably 14 to 20 people a day. Probably 10 of them would have some sort of a penetrating trauma; either a knife or a gunshot wound. Most of those were single or two gunshot wounds. I used to shoot with -- one of the guys that we did the trauma unit with was an FBI agent, and I used to see the guys that we would treat in the county hospital or similar to those, and they were tremendous shots on the range and I'd wonder why do they keep hitting everybody in the leg. Because that was the vast majority. But apparently, that's the penalty for stealing some of the drug money or taking some of the drugs, would be if you were considered a runner, you would be shot in the leg. So most of what we would do in the day was clear people for leg gun or knife wounds to the extremities or areas. And then there would be a group of people who would come in with either gunshot wounds to the chest or the abdomen or head and neck regions. And those

Page 23

people obviously have a much higher risk to life and limb; and therefore, they were treated in the ICU area in the back part of the bay after they were operated on.

Q. Okay. So when Mr. Valentin came in, he was suffering from more serious injuries that put him in a part of the ICU where people with more severe injuries are treated.

Is that correct?

A. So he has a T5, is it or T4 paraplegia, which is just the very high chest wound. He had a transmediastinal injury. That's the reason I somewhat vaguely remember him. He's how I learned how to workup transmediastinal injuries and take care of them, which is a danger to your esophagus, your aorta; your heart and lungs. So there's a specific workup for that. And so we would have taken him through that workup. But those are -- the devastation of the injury that I remember to him was he -- he had limited, but present function somewhat to his arms. But he was completely paraplegic. And at his young age, not a good injury.

Q. Okay. So -- so in layman's terms, describe what made him paraplegic when he arrived at your ICU.

A. So he -- he was paraplegic when he was at the unit. And he had a gunshot wound that would have crossed or traversed across his chest through the area of one of his lung cavities. He has chest tubes in this area, because as

Page 24

the bullet passes through the area of the chest, it will puncture the lung. And in order for the lung to expand itself, that was probably the most common thing we did with people, is put chest tubes in in that trauma bay, other than resuscitate them. And then he had a bullet fragment go into his spine, and either put a hematoma or blood clot on his spine or transacted his spine. My recollection is that he transected a part of his spine. That prevented any type -- there's no correction of that problem.

Q. So the bullets that struck him caused a serious spinal cord injury and also serious damage to the lungs?

A. That's correct.

Q. And just to state the obvious, what's the consequence of the spinal injury for him long-term?

A. Yeah. So I mean, he would have --

MR. GIVEN: I'm sorry. I'm gonna object to the form of that question.

MR. ART: Just because of the obvious part?

MR. GIVEN: If you understand it --

No, no. If you read it to me again, I could tell you what it --

MR. ART: Okay. Let me -- I'll just ask a different question so we don't have a form objection.

BY MR. ART:

Q. What would the long-term consequences to Mr.

Valentin have been from the injury to his spinal cord?

A.    So his T4 paraplegia would not have given him a normal lifespan, due to pressure ulcerations, other lower extremity difficulties that he would have had.  So I mean, it was -- it was a -- a devastating injury.

Q.    Okay.  And -- and then what were the consequences while he was in the ICU of having this -- this hole through his lung?

A.    Yeah.  So I mean, it's just a monitoring the chest tubes.  It's actually a relatively straightforward treatment of these pneumothoraces.  They generally heal pretty well over time.  The fact that you're in a severe injury and you have hypothermia, hypovolemia, anemia, makes you more prone to sepsis -- which is what ends up killing him, is the sepsis.  An infection, I guess I should say that.  But in him, he had a lung infection, I believe along with his blood infection that he develops, and a question of whether he had some sort of a neurological infection as well from his spinal cord injury.

Q.    Okay.  During the time that he was there, was his health on a general downward trajectory?

A.    Yes.

Q.    And eventually, he succumbed to complications from the gunshot wounds.

Correct?

Page 26

A.   That's correct.

Q.   And more specifically, he succumbed to a -- to infection, essentially?

A.   He had a very bad organism and it was a very difficult to treat.  We tried, I think Ciprofloxacin, which we treat very commonly now with my patients.  It was an experimental medication at that time that we utilized on him, is my recollection.

Q.   Okay.  And on September 14th, did you pronounce him dead?

A.   Yes.

Q.   Okay.

A.   I could look at the notes specifically, but I know I pronounced him dead, if that's the day.

Q.   Yeah.

MR. GIVEN:  He may not have the note in there.

MR. ART:  Yeah.  Why don't you -- let's just do this, so the record is clear --

MR. GIVEN:  You know what?  I can promise you I will ask him about pronouncing him dead in my documents.

MR. ART:  Okay.  Let me just ask --

THE WITNESS:  When I reviewed the chart, I remember seeing a note from me that I called his mom about it.

BY MR. ART:

Q.   Okay.  Let's talk about a few of the particular

Page 27

medical issues that you've already touched on sort of generally, okay, that Mr. Valentin suffered between the time he came in in late August 1998 -- strike that.

Let's talk about a few of the specific medical issues that Mr. Valentin suffered between the time he came in in late August 1988 and the time that he died on September 14th, 1988.

Okay?

A. Uh-huh.

Q. And for these questions, I -- I want to focus your attention on September 10th, 1988, in particular.

A. Uh-huh.

Q. I first want to talk about his responsiveness just -- and the general indications in the medical record that appear about his responsiveness.

A. Okay.

Q. So let's look first at the document in front of you in Group Exhibit 1 that is Bates stamped CPD 611. Okay? So if you look in the lower right-hand corner and turn to 611, they are all in -- they are all in numerical order.

A. Yes.

Q. And once everyone's there --

MR. GIVEN: I'm here.

BY MR. ART:

Q. So I'm showing you a record from September --

MR. GIVEN: Eileen, are you -- are you at 611?

MS. ROSEN: Yes.

MR. GIVEN: Okay.

BY MR. ART:

Q. Okay. I'm showing you a record that is from September 9th, 1988.

Do you see that?

A. Yes.

Q. Okay. Do you see where it says that he's unresponsive to both painful and verbal stimuli?

A. Yes.

Q. Explain to us what that means.

A. So in the back of the trauma bay, when -- we would try to get a mental status assessment of everybody every morning. A lot of people are on sedations or medications to try to allow them to have a more comfortable night, or pain control or assistance with their ventilator problems. And usually in the ICU, that's the reason they are in the ICU, is to have a ventilator, at the county hospital. So we would do an assessment of their ability to respond to get an idea of, you know, their overall general sense of mental capabilities. Unresponsive to deep and verbal pain, the classic thing that we would do would be to ask them -- to try to stimulate them quietly. You know, if that didn't work, then we'd shout at them. And then if that didn't work, we would either use a

sternal rub, where we take our knuckles and rub it as hard as we can on their sternum, to see if they'd have a response or we'd do a nipple test, where we'd pinch their nipple and see if they responded to that.

Q. So on September 9th, Felix Valentin isn't responding to any of those things.

Is that correct?

A. That's what this note says. Yes.

Q. Okay. Do you see where that same note says, pupils remain dilated and nonreactive to light?

A. Yes.

Q. Tell us what that means.

A. Well, normally that would indicate a neurological injury to the patient, but I don't think he had a -- a brain neurological injury at that time. I think it's just an indication of the level of his sedation or responsiveness due to the medications that we had him on. Just -- he was probably very sluggish; not nonreactive, which means he was heavily medicated.

Q. And what does it mean for his pupils to be dilated and nonreactive to light?

A. Generally, that's indicative of nobody's home.

Q. Okay. And -- and what do you do as the resident to test that? You shine a light in his eyes?

A. I wouldn't generally do that test normally on

Page 30

somebody in the daytime, you know, when I'm making rounds on somebody.

Q.    Yeah.

A.    Just -- it must be -- I don't know.  It's a nursing protocol; something they do.

Q.    Okay.  Let's look at a medical record from the next day; September 10th, 1988.

Okay.

A.    Uh-huh.

Q.    So please turn to the document Bates stamped CPD 489.

A.    Yes.

Q.    So in this document from September 10th, 1988, do you see where it says, patient is unresponsive, not alert, has no spontaneous breathing?

A.    Yes.

Q.    What does it mean; that he has no spontaneous breathing?

A.    So during the course of his treatment -- again, I'm going by recollection.  And I can see the med sheet of that day, if we need to go to it.  He had difficulty with a pneumonia, which is not unusual in people that were in the trauma bay.  And it's an un -- or very common problem to get ARDS; respiratory distress syndrome, where people -- some people called it shock lung back then, where people who had

lost a large amount of blood or had large traumas and required aggressive resuscitations developed essentially I call it fluid-filled lungs that were prone to pneumonia. So when they are being ventilated, attempts to keep them responsive so that you can clean their lungs out, we used to routinely do something called TBT; just break, basically -- either the respiratory therapists or us as residents would try to clear out their lungs by forcing their cough reflex. So if we could keep them so they could get rid of their own secretions, that would be favorable. But if they would fight the ventilator or buck the ventilator, we would increase their medications to where they are less responsive so that they don't buck the ventilator or fight the ventilator. And then if that failed, then in his case, we put him on a medication to paralyze him.

Q. Okay. So when you -- when it says he has no spontaneous breathing, does that mean that he is at the point where he would have been bucking the ventilator and so --

A. No. It generally would mean that we've arrested his breathing by giving him the paralytic medication or sedating him to the point that he no longer breathes for himself.

Q. Okay. In general, the note that says that he's unresponsive, not alert and has no spontaneous breathing, does that suggest to you that his situation had not improved

Page 32

from September 9th to September 10th?

A. Yes.

Q. Let's look at another record from September 10th. Okay? If I could turn your attention to the document stamped CPD 730.

A. Yes.

Q. So up at the top of this record for September 10th, 1988, again, we see language, pupils dilated and nonreactive.

Do you see that?

A. Yes.

Q. Does that mean that he was in the same state with respect to his response to light stimulus on September 10th as he was on September 9th?

A. That would be my impression. Yes.

Q. And earlier, you testified that when folks aren't having a reaction to that light stimulus, it means no one's home.

Explain what you mean by that.

A. Generally, if -- if we're gonna do an evaluation of somebody having a severe neurological injury, one of the things we do is just see how reactive their pupils are to light. But when they are narcotized, their eyes are normally constricted; their pupils are constricted, not dilated. And again, it's a little bit misleading, because normally, they would have some response to their -- reaction. It just would

mean that they were either heavily sedated or had some problem that kept them from functioning their pupils. That generally means a very deep, deep neurological issue.

Q. Okay. So based on this note, can we say on September 10th, that you think likely because of medication, Mr. Valentin's neurological functioning had been suppressed very substantially?

A. That's my impression from his records. Yes.

Q. Okay. Let's look at another record from September 10th. Turn to the next page, please, which is CPD 731.

Everyone there?

A. Yes.

Q. Okay. So we're looking at another record from September 10th, 1988. And again, it says, unresponsive to both verbal and painful stimuli.

Do you see that?

A. Yes.

Q. Do you know who made this note here that we're looking at?

A. This looks like it's a nursing note. I can't recollect who that signature is.

Q. Is a nursing note the kind of thing that you would rely on as a resident in your treatment of patients at the ICU?

Page 34

A.   We interacted -- particularly on the trauma unit, we interacted very closely with the nurses.

Q.   Okay.  So based on all of these records that we've just reviewed, is it fair to say that on both September 9th and September 10th, Valentin was not responding to verbal stimuli?

A.   Well, the nurse's note here as I read it says unresponsive to both verbal and painful stimuli.  That would be, like, again, probably a sternal rub for the nurse.

Q.   Okay.

A.   And is on a Pavulon drip, which would mean he's paralyzed.

Q.   Okay.  And during that same period of time, his eyes on a neurological level aren't reacting or reacting very sluggishly to light.

Correct?

A.   That's correct.

Q.   Did you see any indication in the medical records that you reviewed that Mr. Valentin regained responsiveness at any time between September 9th, '88 and the day he died, September 14th?

A.   I don't see any indication from the records that I reviewed that he was responsive during that period of time.

Q.   Okay.  I want to talk with you about something that you just mentioned, which is Pavulon.  Okay?  Explain to us

Page 35

what Pavulon is.

A.    I don't -- we used to have to be pretty facile with all those ICU-type medications.  Fortunately for me, I'm not doing that anymore.  But I would liken Pavulon to Curare, the -- what they put on the tip of their dart when they paralyze people.  I think it's Pancuronium, which causes the muscles to be unable to receive the neurological stimuli to function.  And so that medication would have been utilized to keep him from fighting against his ventilator so we could better ventilate him, to try to oxygenate him over concerns that he could have a critical problem with his ability to oxygenate his brain, if we didn't.

Q.    Does if -- so it suppresses both voluntary and involuntary muscle movement?

A.    Yes.

Q.    Okay.  Going back to the record Bates stamped CPD 731 that we were just looking at, this is a record from September 10th, 1988.

Correct?

A.    I'm sorry.  Where are you?

Q.    Sorry.  Going back to the record Bates stamped CPD 731.  Just let me know when you get back there.

A.    Okay.

Q.    Okay.  So we're looking again at a nursing note from September 10th, 1988.

Correct?

A.    I read this as September 10th, 1988, at 7:45.  I think that's a p.m., but I'm not sure.

Q.    Okay.  And it says, patient on Pavulon drip.

Correct?

A.    Correct.

Q.    So what does it mean, that he was on a drip of Pavulon?

A.    So again, that would have been -- and as I recall from looking at the records when I reviewed them before, he -- he was struggling against the ventilator.  And we -- we were using two different medications in order to try to get him to not fight the ventilator and keep him comfortable at the same time.  My recollection is those were Versed, which is an anti-anxiolytic, and a Morphine drip, which would be a pain drip.  And we were unable to control him on that and so we had to add a paralytic agent, in order to allow him to let the air to come in to breathe for his lungs to oxygenate him.

Q.    Okay.  Let me turn your attention to the very next page that's marked CPD 732.

A.    Uh-huh.

Q.    Okay.  And then towards -- excuse me.  So we're looking at CPD 732.  And towards the top of that page, there is an entry for the date September 9th, 1988.  Do you see that?  It's right in the very upper left-hand corner of the

document. You see it?

A.    There it is.   I see September 9th.

Q.    Yep.

A.    Yes.

Q.    Okay.   And there's an entry for 7:00 a.m.?

A.    That's correct.

Q.    And I've highlighted a bit for you at the end of that.

Will you read what that says?

A.    Pupils are reactive, but react to light -- that can't be right.   Pupils are pinpoint, but react to light.

So that's a much more logical examination that he's heavily narcotized at that time.

Q.    Okay.

A.    Narcotic being the Morphine that he's on to try to keep him calm.   Remains paralysis.   I have no idea what the D means.   Increasing drugs.

Q.    Okay.   Where it says he remains paralyzed, is that because of the Pavulon that you were just talking about?

A.    Again, there's an offshoot that, you know, she's talking about his neurological status, but that wouldn't likely be in that area.   That would likely be his ability to function other than his normal paralysis from the gunshot wound at that point.

Q.    Okay.   So this is likely paralysis because of drugs

Page 38

and not paralysis --

A.     That's why she's -- that's why she's -- I think the night of the 9th is when we really struggled with him and we had to increase his medication.  So I think that's what she's detailing.

Q.     Okay.  So let's go to the page Bates stamped CPD 608.

Okay?

MS. ROSEN:  Did you say 608?

MR. ART:  Yes.

BY MR. ART:

Q.     So does this note in the lower right-hand corner of this record from September 9th show that he's --

MR. GIVEN:  Well, can you establish the date for me a little bit better?

MR. ART:  Do you see that this record -- strike that.

BY MR. ART:

Q.     Do you see that we're currently looking at a record from September 9th, 1988?

A.     My copy's a little unclear, but it looks like a 9 in the left -- or right upper-hand corner.

Q.     Okay.  And then in the lower right-hand corner, there's a note about Pavulon.

Do you see that?

Page 39

A.   Yes.

Q.   Does this show he's put on an increasing Pavulon drip?

A.   If you look at the top there, is when they initiate the Pavulon.  It looks like about 5 or -- looks like they continued to try go up on it as time goes on.  They go to 4 and 5 and 6.  And then it looks like they either come down to 5 or stay at 6, meaning they got an appropriate response. This is the medications that she had him on at -- at that point.  You see the Morphine Sulfate that he's on there? That's -- that's a drip he's on for pain.  And then the Versed is the first medication.  That's the anti-anxiolytic. It looks like that's a 15 -- that may just be concentrations of the medication.  I would hesitate to say that's an amount that was going into him from this.  But it does look like the Pavulon is probably on 5 or 6 at that time.

Q.   What -- what physical affect would the Morphine alone have on Mr. Valentin?

A.   So if I --

MR. GIVEN:  Let me just get an objection in. Objection; incomplete hypothetical, calls for speculation.

To the extent you can answer, you can.

THE WITNESS:  Thank you.

BY THE WITNESS:

Page 40

A. So again, I prefer to have his medical record, to make a definitive statement on it. My recollection is we had him somewhere between 5 and 10 milligrams of morphine. For somebody who hasn't taken that, it puts you out pretty good, but if you've been on it for a few days, your body will become more concentrated on it. But the amounts of Versed and Morphine that he were on were relatively significant of themselves.

BY MR. ART:

Q. Okay. So tell us what Versed is.

A. So Versed, I think most people in the jury would liken Versed to a medication Valium, would be probably -- it's a shorter-acting -- Midazolam would be another one we used that was an anti-anxiolytic that would sedate you pretty heavily at the dosages that we were giving it to him.

Q. Okay. And so he's got a combo of Morphine, Versed and then the Pavulon is added.

Is that correct?

A. That's correct.

Q. And what affect would the Pavulon have had?

A. In my notes at some point, I put that we tried to just put on a partial Pavulon, where he wasn't completely paralyzed. I don't think that was successful. I think we ended up completely paralyzing him. But he would have been unable to move or serve any functions for himself, including

Page 41

breathing at that time.

Q.   So let's look at that note that you just mentioned. If I could turn your attention to the document Bates stamped CPD 291, which is towards the front.

A.   Yes.

Q.   On the bottom of that page, do you see a note written for September 9th, 1988?

A.   Yes.

Q.   And what does it say in that note about Pavulon?

A.   It says, patient Pavulonized, which would just mean he's currently under the influence of it.  It says that he's intubated next to that, meaning that there's a tube that's probably going through his mouth down into his lungs past his vocal cords.  And it says partially, which means we're initiating it, trying to keep him to have some function on his own.  Up at the top of there, if you don't mind me going off script --

Q.   Please, please.

A.   Patient is tachypneic on an IMV of 12.  So the rate of oxygenation we're giving him, we used to use sometimes in the really bad cases; a jet ventilator that could go up to 40 times.  And I think we eventually get there on him.  But we're sedating him with Versed, is the second thing I say there, in order to try to get him not to fight the ventilator, and that he's on assist-control ventilation.

Page 42

It's been a long time since I ran a ventilator.  I think that means at this point, he's still trying to initiate some of the inspiration, but the ventilator has to kick in and blow in the full amount of the medicine that he's using.

Q.  And this is all stuff that's happening before September 10th, 1988.

Correct?

A.  That's correct.  It would -- that note is either from the 7th or the 8th.

Q.  And then going back to the Pavulon that you used to paralyze him, if you go down to the bottom of this page back to your note on September 9th --

A.  Yes.

Q.  -- what does it say about a recommendation?

A.  The -- the chest surgeon at that time recommended that we completely paralyze the patient; in other words, that we completely take over for the patient so the patient didn't breathe on their own.

Q.  Okay.  And would that have been something that was then done?

A.  Yeah.  The -- the -- so this would have been a consultant that we had regarding the lung injuries.  And this is related to -- I see in my note -- we didn't finish reading that note above, but it says the sputum has got Acinetobacter in it at that time.  So he has the active pneumonia.  So we

Page 43

would generally always follow the chest service recommendations, because they would have been considered a higher level than we would have been.

Q. Okay. So let's look at the next page, which is CPD 292.

MR. ART: We all there?

BY MR. ART:

Q. Okay. So we're looking at a record -- another record here from Mr. Valentin's hospital file Bates stamped CPD 292. And at the top of the page, there's a note from ophthalmology on September 9th, 1988.

Do you see that note?

A. Yes. 9/9/88.

Q. Okay. And there it says, unable to obtain patient on Pavulon.

Do you see that?

A. That's correct.

Q. What does that mean to you, if anything?

A. I believe the VA stands for visual acuity. So something simple like holding up an eye chart to read for him like you take at the driver's license area. And I think he is saying that he's unable to obtain an evaluation because of the Pavulon. But this probably explains why the patient's pupils were dilated and not reactive. The ophthalmologist may have come in and given him medication to prevent him from

Page 44

pupiling down his eyes. He could have dilated his eyes to look for the candida. Sometimes they did that in the unit. I'm sorry I didn't see that before.

Q. No, no. That's okay. And then -- and then is it the combination of the Morphine, the Versed and the Pavulon that is suppressing his neurological function?

A. That's correct.

Q. And so it's suppressing it on September 9th, 1988. Correct?

MR. GIVEN: Hold on just a second. Because of the likelihood possibility that Dr. Sharkey will not be making it up to trial, I'm gonna object to form. You're -- you're starting to lead. This is your witness on direct.

MR. ART: That's fine. That's fine.

MR. GIVEN: So --

MR. ART: Let me ask it in a non-leading way. That's totally fair.

MR. GIVEN: Okay.

MR. ART: Let me try to remember the question I was gonna ask. Strike that, please.

BY MR. ART:

Q. In your review of the record --

MR. GIVEN: Don't strike that.

MR. ART: Strike that, please.

Page 45

BY MR. ART:

Q. In your review --

MR. GIVEN: Sorry. Go ahead.

BY MR. ART:

Q. In your -- in your review of the record, was it the combination of the drugs Morphine, Versed and Pavulon that he was on or something else that explains the suppression of his neurological function?

A. My impression is is that it's a combination of all the medications he was on; the Morphine and the Versed and the Pavulon, that made him unresponsive.

Q. Okay. Was there any decrease in those medications that you saw in the record at any time between September 9th and the time that he passed away?

A. I -- I -- unless I see the medical -- you know, the medication profile, my recollection was that he never was taken off of those three medications at the same time, but we may have after he was on the Pavulon, decreased some of those medications. I -- I don't recollect completely.

Q. And if you did decrease some of those medications once he was on the Pavulon, what was the reason for that?

A. It's unnecessary anymore.

Q. And why?

A. You may be able to take away the -- you might not take away the Morphine because of the pain component, but the

Page 46

Versed may become unnecessary for an anti-anxiolytic, if he's paralyzed.

Q. Okay. You said that he was on a ventilator while he was at Cook County.

Correct?

A. That's correct.

Q. Why was he on a ventilator?

A. Due to his lung injury and his pneumonia.

Q. What would the ventilator do to help him?

A. The ventilator basically has a mask on it, like you would bag somebody when you were putting them to sleep for anesthesia. And it runs that bag with a certain concentration of oxygen at a certain pressure across their lungs in order to oxygenate and take away the carbon dioxide from their lungs.

Q. And so that machine assists in breathing.

Correct?

A. It either assists or controls his breathing.

Q. Okay. Does -- does being on a ventilator require you to have a tube running down your throat?

A. Yeah. There's -- there would be three ways that we typically had the people on the ventilator. One's a tube through your nose that goes through your vocal cords into your lungs. One's through your mouth. It goes through your vocal cords and into your lungs. And then a tracheostomy,

Page 47

that would go just below your vocal cords down into your lungs, that if you plug it, you could speak through it. But that would generally be not plugged during a time when you were doing any ventilatory assistance.

Q. Okay. And based on the records that you've reviewed in Mr. Valentin's case, where is the most likely place that the tube was placed in his case?

A. I believe from what I read, that he was probably orally intubated, where the tube went through his mouth, down through his vocal cords, into his lung.

Q. Okay. And that would prevent you from speaking. Correct?

A. Yes.

Q. I mean -- and let -- let's be clear: Apart from all of the drugs that he was on, that would prevent you from speaking?

A. Yes.

MS. ROSEN: Objection; leading.

BY MR. ART:

Q. That's right. So let me re-ask the question. Apart from all of the drugs that he was on, would that tube going down his throat have prevented him from breathing?

A. Not from breathing.

Q. Strike that, please.

Page 48

Apart from all of the drugs that he was on, would that tube going down his throat have prevented him from speaking?

A.    Yes.

Q.    You also said that he developed a pneumonia during his stay.

Is that correct?

A.    Yes.

Q.    Let's look at the hospital record marked CPD 282. Okay? And let me know when you're there.

A.    I am there.

Q.    In the middle of this page, there is a physician's note dated September 4th, 1988.

Do you see that?

A.    Yes.  That's a chest -- a resident or fellow's note.

Q.    Okay.  And what does it say about his pneumonia in that note?

A.    It says, chest x-ray, right lower lobe pneumonia.

Q.    And what does that mean?

A.    That means the patient actually has an infiltrated process or a consolidation in a region of the lung where the bacteria can be concentrated and noted on the x-ray.

Q.    Okay.  And now let's -- so strike that, please.

Based on this note, we can say he was starting to

Page 49

suffer from pneumonia at least as early as September 4th, '88.

Correct?

A. That's correct.

Q. And let's turn to the record stamped 287, which I believe is the next page.

A. Uh-huh.

Q. So we're looking at another record from Felix Valentin's treatment at Cook County Hospital that's dated September 6th, 1988.

Do you see that date in the upper left all the way?

A. 9/6/88.

Q. Okay. And then all the way down towards the bottom, there's a note about the pneumonia.

Do you see that note?

A. Yes.

Q. What does that note say?

A. Chest X-ray. Pneumonia progressed to bilateral.

Q. What does that mean?

A. So it is possible for the pneumonia -- we talked about trying to clear their secretions for the bacteria to become more diffusely located, but always in the trauma unit, the concern is once you've progressed to the bilateral pneumonia, that you're having that shock lung or that ARDS associated with their lungs, which is -- significantly

Page 50

declines their pulmonary status.

Q. Okay.

A. I -- I will note you can actually read my notes back then.

Q. This is your handwriting here on this one?

A. That's significantly changed till now 25, 30 years later.

Q. Now are they more readable or less readable?

A. Much less.

Q. Okay. All right. Switching subjects here, let's look at the record marked CPD 276; front page.

A. Yes.

Q. In the middle of this record, it says neuro-roto rest bed.

Do you see that?

A. Yes.

Q. What is a roto rest bed?

A. My recollection of that is is that was a bed that we were trying to use to prevent people with neurological injuries or paralysis to develop pressure ulcerations. It's something I did a whole lot more of when I became a plastic surgeon. I treated pressure sores pretty extensively for a period of time in my practice as well as my residency. And the idea is to prevent the person from laying right on their sacrum where they develop pressure sores. So the bed

Page 51

constantly had a move and a shift to it to try to keep the pressure off of one area.

Q. Okay. So while he's in the ICU, he's on a bed that's constantly moving.

Correct?

A. Correct.

Q. And then you said that he got an infection while he was at the ICU.

Is that correct?

A. That's correct.

Q. Let me turn your attention in the record stamped CPD 787, which is the last page.

A. Uh-huh.

Q. What is this record that we're looking at?

A. So this is a Gram stain from 9/8 -- I believe 9/6 or 9/8/88, 12:45. The first thing is a Gram stain. Many WBCs. That indicates an active inflammatory process. Rare Gram-negative bacilli, that's just the coloring of the organism when they do the Gram stain. And then the culture is read out later starting on 9/10/88 and it says, Acinetobacter Anitratus.

Q. So on September 10th, 1988, he has this Acinetobacter bacteria.

Is that correct?

A. Yes.

Page 52

Q. And that is his -- the infection that he was suffering.

Is that correct?

A. Yes.

Q. Tell -- tell us what that is, to the best of your knowledge.

A. Yeah. That's a very difficult organism to clear. I don't know if it was antibiotic susceptibilities or not, but it's my recollection that we had a problem with the Acinetobacter in the unit. A lot of the patients ended up having infections with it. But it was a difficult bacteria to eradicate.

Q. And what do you treat it with?

A. I believe that's why we started -- I think Cipro was a used medication orally. I don't think it had been used IV. Or there was another drug Imipenem that I think he was started on at some point. One of those two, I think was relatively experimental at that time, because we were having trouble finding any antibiotic that would treat them once they got the severe infection; their problem with the Acinetobacter.

Q. Okay. So in addition to the Morphine and the Versed and the Pavulon, he was also on antibiotics to clear an infection.

Is that correct?

Page 53

A.    That's correct.

Q.    Okay.   So just a couple more questions from me, Doctor.

Given what we've just discussed, I want to ask you about what Valentin reasonably could have done on September 10th, 1988.

Okay.   Having reviewed the records on the 9th and the 10th, he's unresponsive to verbal stimuli.

Correct?

A.    Yes.

Q.    And he's unresponsive to --

MR. GIVEN:   It's leading.   Objection; form, leading.

BY MR. ART:

Q.    Having reviewed the records on September 9th and September 10th, can we say that he was unresponsive to verbal stimuli on those days?

A.    That's the reports from the record.   Yes.

Q.    Can we also say he was unresponsive to pain stimuli?

MR. GIVEN:   It's also -- I'm sorry.   That question that you asked the last time, plus this one, I don't think has cured the leading.   So I'll object as to form.

THE WITNESS:   That's --

MR. ART:   Let me ask the question again, since he

Page 54

-- since he interrupted it.

BY MR. ART:

Q.    Can we also say based on your review of those records, that he was not responsive to pain stimuli?

MR. GIVEN:  Objection; form.

BY THE WITNESS:

A.    That's my impression from the record.

BY MR. ART:

Q.    And he was -- strike that, please.

And on both September 9th and September 10th, 1988, was he on a ventilator?

A.    Yes.

Q.    And that ventilator most likely was fed via tube in his mouth.

Correct?

A.    Yes.

MS. ROSEN:  Form, leading.

MR. ART:  Okay.

BY MR. ART:

Q.    And on those dates that ventilator was -- how was -- strike that, please.

And on those dates, how was that ventilator most likely hooked up?

A.    It would have been hooked up through an endotracheal tube either through his nose or his mouth; most

Page 55

likely, through his mouth.

Q.   And then on both of those days, was he also on Versed?

A.   At some point during both of those days, from my recollection of the medication record, he was on Versed.

Q.   And then during both of those days, based on your review of the record, was he also on Pavulon?

A.   Yes.

Q.   And by the time that you got the order on September 9th to fully paralyze him, he would have been on -- would he have been on a dose sufficient to fully paralyze him?

A.   So at one point, I believe we get to full paralysis.  I would have to see the medication record to know exactly when that was instituted.  But again, it is an ICU setting, so it's likely not long after that notation.

Q.   Okay.  And we reviewed records that said that certain information could not be obtained for his medical treatment on September 10th, because he was paralyzed.

Correct?

A.   That is correct.

Q.   All right.  So given all of that together, on September -- strike that, please.

Given all of the records that you have reviewed and the aspects of Mr. Valentin's treatment, on September 10th,

Page 56

could Valentin have reliably spoken with another person?

MR. GIVEN: Objection; form.

THE WITNESS: Can I answer?

MR. GIVEN: Yes.

BY THE WITNESS:

A. My impression is he could not have.

BY MR. ART:

Q. Given all of that on September 10th, could Mr. Valentin have reliably looked through a photo album?

MR. GIVEN: Objection; form, incomplete hypothetical, calls for speculation.

You can answer.

BY THE WITNESS:

A. My impression is he could not.

BY MR. ART:

Q. And given all of that on September 10th, could Mr. Val -- strike that, please.

And given all of that on September 10th, could Mr. Valentin have reliably communicated with his eyes?

MR. GIVEN: Objection; form, foundation, incomplete hypothetical, calls for speculation.

BY THE WITNESS:

A. Based on the notations, it would seem unlikely.

BY MR. ART:

Q. Okay. Do you hold all of those views to a

Page 57

reasonable degree of medical certainty?

A.    From my review of the record, yes.

MR. ART:  All right.  Let's go off for one moment. I need to see if I have anymore.

MR. GIVEN:  Sure.

THE VIDEOGRAPHER:  Going off the record at 3:22.

(Off the record.)

THE VIDEOGRAPHER:  We're going back on the record at 3:24.

BY MR. ART:

Q.    In -- in the files that you reviewed, did you see any note that police officers had been at the hospital?

A.    Actually, I think at the beginning of the intake assessment of the beginning of the large stack that you gave me, there was an indication very early in the course of his treatment, there were police officers there, but I did not see any accounting for police officers in the area during the time you had specified on the 9th and the 10th.

Q.    Okay.  Apart from that note early in the intake -- and when you say intake, do you mean the time that he would have arrived at the hospital?

A.    When he was transferred there.

MR. ART:  Okay.  Let's go off for a minute.

(Off the record.)

MR. ART:  Let 's go back on.

THE VIDEOGRAPHER: We're on.

MR. ART: Good? Good? Okay.

BY MR. ART:

Q. Let me back up a little bit. Apart from -- strike that, please.

When you say that you saw a note about police officers being there in relation to his intake, what do you mean by intake?

A. So it unfortunately wasn't uncommon when the fire rescue people would bring the patient, that the police would soon follow afterwards. So it was not an uncommon problem for the police to be on the trauma unit ward; unfortunately, sometimes as my patients. So it's not uncommon at all for police officers to be around the area. And I knew there was some question about whether the police had interacted with him. So I do remember at some point informed, but it was not then; it was, like, one of the first days that he was in the unit, that I think somebody was there to evaluate the situation.

Q. Okay. And as you sit here right now having reviewed those records, you don't recall any similar note for anytime after that.

Is that correct?

A. That's correct.

Q. Switching subjects, I want to turn your attention

Page 59

to one of the physician's notes that you made. Okay? So let's turn to the page Bates stamped CPD 293. Let me know when you're there.

A.    I'm there.

MR. GIVEN:  Hold on, Steve.

MR. ART:  Yeah.  Take your time.

MR. GIVEN:  Okay.

BY MR. ART:

Q.    On this page, does your handwriting appear?

A.    Yes.

Q.    And are there two entries on this page for the date September 11th, 1988?

A.    Yes.

Q.    And what are -- what is in each of those two entries?

MR. GIVEN:  Objection; form.  You can answer that, if you understand it.

THE WITNESS:  Can I just read them?  Is --

MR. ART:  No, no, no.  Don't read them.  And I guess that was a poor question, so let me ask you a question that hopefully will not be as poor.  But let me not destroy the court reporter's microphone.

THE WITNESS:  Is this gonna be on the blooper sequence?

MR. ART:  I think I'm off camera.  Here we go.

Page 60

Strike that, please.

BY MR. ART:

Q. On each of those dates, did you write a SOAP note?

A. Yes.

Q. What's a SOAP note?

A. Subjective objective assessment plan.

Q. Would it have been unusual for you to write two SOAP notes on the same day like this?

A. Occasionally on a day where a patient was critical, I would write two notes on the same day. That would usually follow -- I usually don't time my notes. There's really no purpose for us to time our notes, other than to make lawyer's lives easier. That was never really something I strove for in my life.

Sorry today, gentlemen.

MR. GIVEN: Well, no wonder you're so unsuccessful.

BY THE WITNESS:

A. So normally if I was gonna add another entry, I probably would have timed one of them.

BY MR. ART:

Q. And why would you have timed one of them?

A. It would indicate that there was a significant change in the patient's status that was a reason I was entering a second time.

Q. Does this suggest to you that one of the two notes

from 9/11 is actually misdated?

A.    That's my impression.

Q.    If you look closely at the very upper left-hand corner of this --

A.    Yes.

Q.    -- sheet where the date is --

A.    Correct.

MR. GIVEN:  Where it's been highlighted by you?

MR. ART:  Yes; where the date has been highlighted by me.

BY MR. ART:

Q.    Can you tell with certainty whether that says September 10th or September 11th, 1988?

A.    I tried to evaluate that a couple times.  My read is I wrote 9/11, but --

Q.    Okay.  But you think that might be misdated.

Is that correct?

A.    That's my impression.

MS. ROSEN:  Form; leading.

MR. ART:  Fair.  I'm going to -- I'm going to direct your attention to a document that is not in the group exhibit, but is Bates stamped -- two documents; CPD 641 and 642, which we can mark as Exhibit 2.

MR. GIVEN:  And I'm sorry, Steve.  What were the numbers?

Page 62

MR. ART: CPD 641 and 642.

(Thereupon, Exhibit Number

2 was marked for identification)

BY MR. ART:

Q. Thank you. I'm gonna give this to you, Doctor. And here's my question: In both of these SOAP notes, you have recorded objective information.

Correct?

A. That's correct.

Q. And what objective information do you record in each note?

MS. ROSEN: I'm sorry. What page are you guys on?

MR. ART: So -- so in both of the notes that you have on the page stamped CPD 293, you record --

MS. ROSEN: Okay. Because I thought you directed him to 641.

MR. ART: I did. I did. And because you're not here, you can't see that we're gonna compare some documents here. But I'll try to be clearer on the record.

MS. ROSEN: What am I comparing? Sorry.

MR. ART: So just so it's totally clear, you're gonna be comparing CPD 293 to CPD 641 and 642.

Okay?

MS. ROSEN: Got it. Thank you.

Page 63

MR. ART: So the Doctor is looking at both documents.

MS. ROSEN: Okay.

BY MR. ART:

Q. And I'm gonna go back to my question, which was in both of the SOAP notes on CPD 293, you record objective information.

Correct?

A. That's correct.

Q. And what objective information do you record?

A. So the recordings are of -- BP is blood pressure. P is pulse. R is respiration. T is temperature. CVP is a line that is placed in order to register how much fluid your overall venous capacity has. That's probably pulmonary artery pressure; PAP, which shows how much restriction there is inside the lung arterials and veins. And then I'm not sure what that next one is there.

Q. That's fine. Can you look at that data that is on CPD 293 and compare it to the chart that you have on CPD 641 and 42?

A. Yeah.

Q. It's possible to do that, first, is the general question?

A. Yeah. So we're taking care of, I don't know, 20 patients on the trauma unit. We're trying to get through

Page 64

rounds. Our job isn't to write notes; our job is to take care of people. So we're not individually taking blood pressure, pulses or respirations on patients, so we rely on the nurse's notations who are actually doing that information. And then we record it in our note to serve as a source of documentation for where the patient's status is at the time that we're making the notation.

Q. Okay. And then -- so -- so this information that is recorded on CPD 293, would it have been taken directly from the chart that you're looking at which is marked as Exhibit 2?

A. It would have been taken from a chart like this.

Q. Okay.

A. Yes.

Q. Can you comparing the two entries on CPD 293 say whether the top one from September 11th is actually from September 10th, 1988?

MR. GIVEN: Objection; form.

BY THE WITNESS:

A. So I have to review it. If you can -- if you know where it is, tell me where it is, because it takes me a while to do this.

BY MR. ART:

Q. Let's look at the temperature first, okay, and let's look at the -- what's the only time on the chart marked

Page 65

as Exhibit 2 that his temperature drops to a hundred degrees?

A.    It -- it's in the region between, looks like 12:00.

Q.    On September 10th; correct?

A.    You're gonna have to help me out with this.  I know I've been through this note before, but --

Q.    No.  It's totally fine.  So if we go to -- if we start on CPD 642, you see a date entry there for 9/12; correct, at 12:00 a.m.?

A.    That's correct.

Q.    And then moving backwards in time --

A.    Correct.

Q.    -- along the chart, you can get to where the dividing line between September 10th and September 11th is?

A.    Right.

Q.    So if we move backwards in time --

A.    That's correct.

Q.    -- then if you're looking at the document stamped CPD 641, and you're approximately one, two, three, four, five, six, seven, eight, nine, 10 -- 11 boxes, columns over --

A.    Correct.

Q.    Do you see that?

A.    Uh-huh.

Q.    You are in -- that is midnight of September 10th to September 11th, 1988.

Correct?

MR. GIVEN: Hold on. Hold on before you answer. I'm gonna object to not just verbally leading, but literally leading him through the chart with your fingers. So I object to the form.

BY THE WITNESS:

A. Okay.

BY MR. ART:

Q. Okay. Do you see there where there's a dividing line between --

A. That's correct.

Q. -- September 10th and September 11th?

A. Yes.

Q. 1988? And is the only time that Felix Valentin's temperature drops to a hundred degrees on September 10th or September 11th?

A. September 10th.

Q. Okay. And does that support your suspicion that the note on CPD 293 at the top of the page is actually for September 10th, 1988, and not September 11th as it appears to read on the page?

A. So my situation was that I was disturbed enough that I had two 11th notes that I didn't understand, that I at one time went back there and tried to reconstruct that myself. And my impression was that I could find data that

Page 67

made it more consistent with it being from September 10th.

MR. ART: Thank you, Doc. That's all the questions that I have for you. I appreciate your time.

CROSS-EXAMINATION

BY MR. GIVEN:

Q. Doctor, I'm gonna have a lot of questions for you, but let me start by -- before I --

A. Can I shift a little bit so I'm looking at him? Thank you.

Q. Hi. How are you?

A. Fine.

Q. Nice to meet you. Before I turn -- let me just go through a couple of things in regard to Group Exhibit 1 and then we can put it away.

A. Yes. Okay.

Q. On the second page; 282 towards the bottom --

A. Yes.

Q. -- when it says on the date 9/3/88 --

A. Yes.

Q. -- it says one, two, three, four -- about five lines up, patient agitated, but alert and oriented times three and following commands.

Did I read that correctly?

A. Can -- can you tell me again where we're at?

Q. Sure. If you start at the bottom, see the very

Page 68

last thing that's written says chest tube something or another?  See that at the bottom of --

A.    I want to make sure I'm on the same page.  What number are you on?

Q.    I'm sorry.  282.

A.    Okay.  Chest tube.  Got it.  One, two, three --

Q.    Okay.  So go up one, two, three, four, five -- six.

A.    Six.  General:  Patient agitated, but alert and oriented times three and follows commands.

Q.    Okay.  What does alert and oriented times three mean?

A.    To person, place and time.

Q.    And following commands means what?

A.    I would ask him a simple command, and he would have probably at that time squeezed my hand or something like that.

Q.    Okay.  So that would require him to understand your command and respond appropriately to it.

Right?

A.    He was competent at that time.  Yes, sir.

Q.    Okay.  If you go to CPD 489 a few pages further in --

A.    Yes, sir.

Q.    -- these are not your notes.

Correct?

Page 69

A.   No.   Those are the respiratory therapist's notes.

Q.   His name was Tucker?

A.   That's correct.

Q.   Do you have any idea who Tucker is?

A.   No.

Q.   Any idea how experienced Tucker was?

A.   No, sir.

Q.   Any idea how long he had been there?

A.   No, sir.

Q.   How long he had his job?

A.   No.

Q.   Okay.   CPD 611?

A.   Yes, sir.

Q.   Mr. Art asked you some questions.   This is in the upper left-hand corner dated 9/9/88.

     Right?

A.   Yes, sir.

Q.   And under -- he pointed out there's some highlighted words there --

A.   Correct.

Q.   -- towards the top.   And to the left of that, it says 7:15 p?

A.   That would be 7:15 p.m.   Yes, sir.

Q.   Okay.   That means that the note is made at or around 7:15 p.m.

Right?

A.   That's correct.

Q.   And it reflects Mr. Valentin's status at that point in time.

Right?

A.   That's correct.

Q.   Not the rest of the time before or after?  That's marking what time it's noted.

Right?

A.   All the notes would be point in time.

Q.   Right.  And that's not your signature at the bottom of the page.

Right?

A.   No.  This is one of the nurse's.  This is a nursing note.

Q.   Okay.  Go to 731.

A.   Yes, sir.

Q.   At the top, it's got a note from September 10th at 6:45 a.m.

Correct?

A.   Correct.

Q.   And then the next date and time notation is 7:45.  And can you tell if that's a.m. or p.m.?

A.   I -- I struggled with that.  My impression is it's p.m., but I'm not sure.

Page 71

Q. Okay. I thought it was p.m. too. So am I right that on this particular page, there are no notes from 6:45 a.m. to 7:35 p.m. regarding Mr. Valentin's responsiveness?

MR. ART: I object -- sorry. I object to the form of the question, to the extent that that doesn't say 7:45 p.m.

THE WITNESS: Okay. So --

MR. GIVEN: Well, he just said he thinks it does, so --

THE WITNESS: Well, I can answer; right?

MR. GIVEN: You may.

BY THE WITNESS:

A. That was -- my impression was that that was the case when I reviewed the record. Yes.

BY MR. GIVEN:

Q. Okay. Is that -- is that entry in your handwriting? I couldn't tell if that was your signature or not.

A. No. This is again a nurse.

Q. Okay.

A. These are the nursing records. They would be generally at the bedside with the patient throughout the day, so their notes are gonna be more extensive and more detailed.

Q. Okay. And then I skipped one. On page CPD 561 --

Page 72

A.   Yes, sir.

Q.   At the top of the page, the word Morphine is written and highlighted.

You see that?

A.   Yes.

Q.   Is that your handwriting?

A.   No.

Q.   Do you know whose handwriting it is?

A.   No.

Q.   Do you know when that word was added?

A.   I have no idea.

Q.   Do you know why it's highlighted?

MR. ART:  Just to be totally clear, that's my handwriting and I highlighted it, but I don't think I asked any questions about this page.

MR. GIVEN:  Okay.  And to save one question later, you'd agree with me, Mr. Art that that's -- Morphine is not on the original document.

Correct?

MR. ART:  I do agree.  Yes.

MR. GIVEN:  Okay.  Then we can leave that page alone.

MR. ART:  Sorry.  I didn't even -- I didn't even notice I had written that.

MR. GIVEN:  Before I start asking my next

questions, why don't we go off the record very quickly just to do some housekeeping.

MR. ART: Okay.

THE VIDEOGRAPHER: We're going off the record at 3:42.

(Off the record.)

THE VIDEOGRAPHER: We're going back on the record at 3:51.

BY MR. GIVEN:

Q. Doctor, let me reintroduce myself. Again, my name is Jeff Given. I represent the officer defendants in this case. Today's not the first day you and I have spoken.

Correctly --

A. That's correct.

Q. Correct? We've talked before one time. Correct?

A. That's correct.

Q. That was, by my records, May 26th of 2015?

A. That's correct.

Q. And in order to talk with you that day, you asked that I prepay your expenses?

A. That is correct.

Q. And I did that. Correct?

A. That is correct.

Page 74

Q.   I sent you a check for $500.

Correct?

A.   That's correct.

Q.   And we talked about your review of records in that case?

A.   That's correct.

Q.   And the records that we talked about were records that you would have been sent by Mr. Art.

Right?

A.   That's correct.

Q.   And since that conversation, we've had no other phone calls.

Right?

A.   That's correct.

Q.   We've had no e-mails?

A.   That's correct.

Q.   Before or since?

A.   That's correct.

Q.   And I've sent you no documents, except the check.

Right?

A.   Not that I'm aware of.

Q.   Okay.  Let me hand you what's been marked as Exhibit 3.  Take a quick look at it.  And you don't -- it's just to refresh your recollection.  I'm gonna ask you some documents -- or some questions that might refer to some of

the documents in Exhibit 3.

(Thereupon, Exhibit Number

3 was marked for identification

BY MR. GIVEN:

Q.    When did you first hear from somebody in Mr. Art's office?

A.    I -- a lot of this information, I'm not gonna know, because it's -- the people that work for me dealt with him on all the stuff.

Q.    Okay.

A.    I assume that that means that we received information sometime in January or February about the fact that they were hoping somebody could help them with the case.

Q.    Okay.  Sometime in January or February of 2015; right?

A.    That's correct.

Q.    And then was that -- did you personally speak with someone from Mr. Art's office at that time?

A.    No.

Q.    What's your understanding of what the call was about?

A.    My understanding was that they had a case that they needed somebody that was on the record to evaluate the record and document to what the record states.

Q.    And what was communicated to Mr. Art's office;

Page 76

about your willingness to do that?

A. It wasn't very great at the beginning, but --

Q. What do you mean?

A. I mean, I'm a loyal county man, so -- I had a feeling that he was trying to get money out of the county and had a client that was -- maybe negatively impacted in the county. So --

Q. And just so you know, you -- the county is not a defendant in this case. Right? You know that now; right?

A. Well, I'm not sure who is, but yeah.

Q. Well, I'll represent to you, and I'm sure Mr. Art would agree, that nobody connected with the county is a defendant in this case. And whether they were or weren't, you would -- you know you're under oath; right?

A. That is correct.

Q. And you would tell the truth, regardless of whether it hurt the county or helped the county.

Right?

A. That's right. But I didn't have to review the records on the case.

Q. But you agreed to do so; right?

A. Yeah.

Q. And -- and so if you look at Page 2 of Exhibit 3, it notes a telephone conference on February 12th, 2015.

You see that?

Page 77

A.   That is correct.

Q.   Is that the first time you actually spoke with somebody from Mr. Art's office?

A.   That's my understanding.

Q.   Okay.  And prior to that, have there been any written communication other than you receiving documents?

A.   My understanding is I think I got the letters with all the documents.  It was the very first thing that was requested of me, is my understanding.

Q.   Do you still have the letters that came with the documents?

A.   I bet she does.  I don't, but it wouldn't surprise me if she did.

Q.   All right.  So if I after the deposition send you a letter asking for any documents --

A.   If she's got them, you can have them.

Q.   Okay.  Great.  Thank you.

And so you received at some point after this initial communication -- by the way, what was it that convinced you to agree to do it?

A.   I looked through records and I thought it was a reasonable request.

Q.   So you hadn't agreed until you saw the records?

A.   Yeah.

Q.   Okay.  And you got a stack of records about this

Page 78

thick that I'm showing you?

A.    That is correct.

MR. GIVEN:  Put it on the video.

THE VIDEOGRAPHER:  Yep.  Got it.

BY MR. GIVEN:

Q.    And then after you got that stack of documents, you agreed to do the review.  And is that when you had the telephone conference; on February 12th?

A.    Again, I'm not a hundred percent sure, but it seems logical.

Q.    Okay.  Do you remember who you talked to on February 12th?

THE WITNESS:  Was it -- I talked to a woman first, didn't I or did I talk to you?

MR. ART:  You talked to my paralegal, then you talked to me.

THE WITNESS:  Okay.  Yes.

BY MR. GIVEN:

Q.    So just so I could have it come out of your mouth instead of Mr. Art, can you tell me who you talked to?

A.    I apparently talked to Mr. Art.

Q.    And how long did that conference --

A.    It wasn't a long conversation.

Q.    Do you remember what he said to you or you said to him?

A.   No, I don't.

Q.   Did Mr. Art tell you anything about this lawsuit?

A.   It -- either the head letter or the previous letter gave me the indication it was about a possible wrongful conviction.

Q.   Okay.  Did he tell you any of the facts of the case?

A.   Not that I recall.

Q.   And when I -- at this point, I'm asking whether in writing or in your conversation with him.

A.   No.  My understanding is it was really -- he had a question about the patient's capability of responding at a certain period of time.  My recollection is that I hesitantly agreed to review the records; that once I reviewed the records, I don't want to say it was a moral obligation; I guess I felt like it was reasonable that there could have been a problem, so I agreed to go ahead and look through the whole record for him.

Q.   Okay.  When you and I spoke, you told me that somebody had indicated to you; whether it was Mr. Art or somebody else, that the case involved what my notes indicate or my recollection indicates was a problem cop.

Did they tell you something about a problem cop?

MR. ART:  Are you testifying?

MR. GIVEN:  I am not.  I'm asking if you were told

about a problem cop.

MR. ART:  Okay.  So don't talk about your notes.

MR. GIVEN:  I'm -- I withdrew that and said my recollection.  And I can ask him whether --

BY THE WITNESS:

A.  I'm okay.  I kind of recollect what you're talking about.  So my understanding was -- I am a huge supporter of the police.  The -- the Cook County officers came to us.  I believe I buried the first female officer that died in the line of service while I was on the trauma service.  I believe the conversation went as I reviewed the record, it seems like it's unlikely they got the information that they say they got.  And I told him I don't really believe police officers act that way.  And he told me that their understanding was that there was somebody that maybe wasn't a straight-up police officer that was involved in the case.

Q.  What did they tell you about that officer?

A.  My understanding was it wasn't the first time that there was a problem regarding his recordkeeping.

Q.  What did they -- what did they tell you besides that?

A.  That was just it.

Q.  Okay.  Did you have any other conversations about that officer or any other officer with him?

A.  No.

Page 81

Q.   Okay.   It looks like you agreed to review the initial batch of records that they sent you.

A.   Uh-huh.

Q.   And you charged a total of $6,000 for your record review.

Is that correct?

A.   That's correct.

Q.   And in addition to the records that they sent you initially, this page also indicates that there were some new records recently received on February 20th.

Correct?   February 20th of 2015?

THE WITNESS:   Did you send a second group of records?

MR. ART:   I don't think so.

THE WITNESS:   I don't know.

MR. ART:   I think we just sent the whole stack.

BY THE WITNESS:

A.   I just did it -- I did it in several series.  So I don't remember him getting me -- I didn't ask you for anymore records.  I don't remember him sending me a second group of records.

BY MR. GIVEN:

Q.   So if --

A.   But I reviewed them in blocks.  I mean, at first, to be honest with you, I mean, the question he asked me

regarding the 10th or the 11th, when I went through it, I went through it first to see if I was gonna allow him to go forward with me. And then once I thought that it was reasonable, I wanted to really understand exactly what happened. So every one of those pieces of paper, I went through, including going back and trying to retroactively find out if I really did that 10th or the 11th note and what day it occurred on. So I came to the office on a couple weekends and just did nothing but that.

Q. Okay. So you don't recall sitting -- as you sit here today, whether you got a new set of records after the initial batch?

A. My understanding is when you and I spoke, it was all -- the records were already there.

Q. Well, we didn't speak until May; correctly -- correct?

A. So I don't remember two groups of records coming in. All the records would have been there that I reviewed with you that day.

Q. Okay. Okay. And if you got a new set of records, that might be reflected in whatever documents your secretary would have in the -- in her file.

Right?

A. Correct, yeah.

Q. Okay. And then it looks like you sent a bill out;

Page 83

your office sent a bill on February 23, 2015.

Correct?

A.   That's correct.

Q.   For a total of $6,250?

A.   That's correct.

Q.   Has that been paid?

A.   That's my understanding.

Q.   Okay.  Do you know when it was paid?

A.   I have no idea.

Q.   Okay.  And then if you go in a few pages more, at the bottom, it says, JRL 202870.

You see that?

A.   Yes, uh-huh.

Q.   It looks like another invoice.  And it references a phone call -- sorry -- phone conference on May 21st, 2015, for a thousand dollars.

You see that?

A.   Is it -- spans two pages or something?  Yeah.

Q.   No.  It's just a one page.

A.   Oh.  It's one more in?  I see that.  Yes.

Q.   And what -- I assume that means you had a phone conference on May 21st?

A.   I assume -- I assume they asked me to review something further in the records and then we had a phone conference about it.

Q. Okay. Given the fact that it was a thousand dollar invoice, did that phone conference last about an hour?

A. I assume. Maybe I gave you a discount. You're not supposed to put me out in front of him after I gave you a break from being from the government.

Q. No. I just want to know how long the conversation took.

A. It probably was an hour.

Q. Okay. And who was on that call?

A. Mr. Art.

Q. Anybody else with Mr. Art?

A. No. I don't think there's nobody else. No; not my recollection.

Q. Okay. And fair to say that what you talked about in that conference was your review of the records, and Mr. Art asked you questions similar to what he asked you today and you gave answers --

A. It was very similar to what you and I did.

Q. Sure. Did he mention anything else in that lawsuit about the -- I'm sorry. In that conversation -- let me start over.

In that conversation, did he say anything else about the lawsuit?

A. Regarding?

Q. Anything.

Page 85

A.   It was pretty much a standard review of the chart, is what I remember.

Q.   Okay.  And then the invoice for that conference was on September -- sent on September 9th, 2015 by your office.  Correct?

A.   I'm sorry.  Where are you at again?

Q.   Same page.  The date of the invoice we were just looking at is September 9th?

A.   Yes.  Yes.

Q.   And flipping the page to -- there's some copies of checks there.

A.   Uh-huh.

Q.   One is for a thousand dollars, dated January 5th.  Is that your understanding that that was the payment for the September 9th invoice?

A.   That's my understanding.

Q.   And then there's another check for $3,500.  What's your understanding of what that check is for?

A.   That's for the two hours that's expiring right now.

Q.   Okay.  And that's -- Mr. Art told you that the deposition would last two hours?

A.   About two hours.

Q.   Okay.

MR. ART:  Wishful thinking, I guess, huh?

MR. GIVEN:  Well, you didn't ask me.  If you want

Page 86

to go on the record and say you never asked me if I would ask any questions. I would have told you it would go longer than two hours probably, but you didn't ask me.

BY MR. GIVEN:

Q. Prior to the deposition and your last conversation with Mr. Art back in May of 2015, any other conversations with the Loevy office?

A. No.

Q. Okay. And to prepare for your deposition today, what did you do?

A. Unfortunately, it's been a wild week. I didn't do anything.

Q. Okay.

A. Which never happens. I always prep myself before I go on camera, but I didn't even get a haircut.

Q. You look fabulous today.

A. I used to look pretty good when I was in Chicago. These days are pretty rough.

Q. Plastic surgeons are supposed to look good; right?

A. I don't do that kind of plastic surgery.

Q. The $6,000 for the record review we've talked a little bit about, did you review those records with anyone else?

A. No.

Page 87

Q.   Did you consult with anyone else?

A.   No.

Q.   When's the last time you did a record review of charts that were not related to your specialty?

MR. ART:  Objection to form.

Go ahead.

MR. GIVEN:  Well, let me make it clear.

BY MR. GIVEN:

Q.   When's the last time that you have reviewed charts that didn't have to do with plastic surgery or reconstructive surgery?

A.   When is the last time I did a general surgery chart review?

Q.   Sure.

A.   20 years ago.

Q.   And when's the last time you did a record chart review relating to your work at Cook County Hospital?

A.   Never.

Q.   Okay.  Were you ever sued when you were -- during your time or related to your time at Cook County Hospital?

A.   Yes.

Q.   How many?

A.   Once.

Q.   And what was the result of that lawsuit?

A.   It was -- I think the county settled for $5,000.

Page 88

Q.    What were the -- what were the -- what was the essence of the allegations?

A.    I think it was a delayed diagnoses of an appendix.

Q.    Did you testify in that case -- or let me rephrase it.  Did you give a deposition in that case?

A.    I gave a deposition.

Q.    And do you know why the county settled?

A.    Excuse me?

Q.    Do you know why the county settled?

A.    I think it was a nuisance, so they -- for $5,000, they thought it was cheaper than going to trial.

Q.    And other than that, that's the only lawsuit that you had in connection with your time with Cook County?

A.    I've never been sued ever again.

Q.    You anticipated my next question.  Congratulations on that.

A.    It's a little different environment than Chicago.

Q.    Let's see.  You answered that.

In August of -- and September of 1988, when you dealt with Felix Valentin, were your hours the hundred to 150 hours-a-week that you mentioned earlier?

A.    As long as they could get.  Yeah.

Q.    And what was your schedule?  Was it -- in theory, was it one day on, two days off or how -- how was your schedule set up back then?

A. So we were on 24 hours on, 24 hours off, but we typically worked 24 hours on and then 12 hours that next day. And then we'd go home for 12 hours and then we'd come back for 36. The -- one of the reasons I didn't want to take the case was -- I mean, it's, like, very similar to being in the military. It's like a SEAL team. You protect each other's backs and you take care of the patients that you have. And if you're sacrificed in that, that's the way it goes. So we didn't really have much of a life. It was what we felt was the right thing to do.

Q. Well, we thank -- as we say, we thank you for your service. And I'm told or I should say, my understanding is that's one reason why working at Cook County hospital was considered a fantastic opportunity for anybody who wanted to be a resident.

A. All -- all the people written in that note are pretty famous doctors somewhere. Yeah.

Q. Including yourself?

A. No. I do all right.

Q. When's the last time you've dealt with gunshot wounds and the kinds of injuries Mr. Valentin had?

A. So I've been away from the hospital. I just operate at my surgery center now. So I don't do any heavy trauma for the last five or six years. But I still was probably the best trained trauma guy in town here, so I dealt

Page 90

with all of the difficult problems up until about that time. But most of the time here in Gainesville, you don't have people shot with guns, but mostly motor vehicle or ATV accidents and stuff like that.

Q. Have you ever been disciplined professionally?

A. No. You talking about my wife? She's a professional. No. No, I have not been disciplined professionally.

Q. Prior to hearing from Mr. Art's office in approximately January or February of 2015, did you ever talk about this case once Mr. Valentin died 27 or 28 years ago?

A. There would have been a morbidity/mortality conference surrounding it. Yes. Absolutely.

Q. Then that takes place shortly after his death; right?

A. Within the first couple months afterwards. Yes.

Q. Since that time, have you had occasion to ever talk about this case?

A. No.

Q. Did -- at the time, do you recall ever talking to the police?

A. I don't.

Q. Do you recall ever talking to lawyers for Mr. Rivera? And let me explain. Mr. Rivera is the plaintiff in this case who was charged and convicted of shooting Mr.

Valentin, whose conviction was later reversed.

A.   Correct.

Q.   With all that said --

MR. ART:   And he was granted a certificate of innocence.  But go ahead.

MR. GIVEN:   Which we'll be happy to talk about that.

BY MR. GIVEN:

Q.   But with that understanding of who Mr. Rivera is, do you recall ever talking to any lawyers for Mr. Rivera back in 1988?

A.   No.

Q.   The only lawyers you've talked to for Mr. Rivera would be from Mr. Art's office --

A.   That's correct.

Q.   -- in 2015?

A.   That's correct.

Q.   Okay.  Do you remember talking to any assistant states attorneys back in 1988?

MR. ART:   In general?

MR. GIVEN:   I'm sorry.  Let me ask that over.

BY MR. GIVEN:

Q.   Do you remember talking to any assistant states attorneys with regards to Mr. Valentine's death or his -- the prosecution for his death?

Page 92

A.   I do not.

Q.   Okay.  Do you recall talking to anyone else in the legal profession, the law enforcement field or anywhere else about Mr. Valentin after the mortality review?

A.   No.

Q.   Okay.  And I think what you said earlier, if I understood you right, is prior to the call from Mr. Art's office, you didn't really have any memories of this case.  Correct?

A.   I -- I told him several times -- I mean, some of this stuff is pretty memorable to you.  I vaguely remember who he was, where he was in the unit.  But that's all.  Everything else is by the records.

Q.   When you say, have some recollection of who he was, what do you -- what do you recall?

A.   I remember his injury.  Once I see his records, I remember taking care of him.  I remember where his bed was in the unit.  But that's all I remember.

Q.   Do you recall what he looked like?

A.   No.

Q.   Do you recall if you talked to him at all during your course of treatment?

A.   I'm positive I talked to him during the course of his treatment.

Q.   And when you talked to him, did he communicate back

with you?

A. Only like I told you. My recollection, again is very vague when you asked me about, you know, he was alert and oriented. So I would have been at his bedside with him.

Q. Did -- do you recall ever communicating with him about the incident in which he was shot?

A. No.

Q. Do you remember -- no, you don't remember or no, you didn't?

A. No. I don't think I did.

Q. Okay. You don't recall whether you ever asked him what happened or who shot you or anything like that?

A. The only recollection I think I have from him is telling him I didn't think it was good for him. If I have any recollection of it, is I told him that he should make peace with whoever he wanted to make peace with; that I didn't think he was probably coming out.

Q. And at what point -- he was in -- let me start that over.

He was in Cook County Hospital from August 27th of 1988 until he died on September 14th.

Correct?

A. It was about -- it was about the time you asked me about him being alert and oriented.

Q. Earlier today when I asked you about --

Page 94

A. He was getting sick right then. Yeah.

MR. ART: A note from September 3rd?

MR. GIVEN: I was trying to remember what date it was.

THE WITNESS: Yeah. It was right about that time, if I would have talked to him about it. That's some vague recollection that I have.

BY MR. GIVEN:

Q. Do you remember telling that to members of his family as well?

A. May have. I do -- I did see in the records that I talked to his mother. I somehow think I talked to his mother during the time he was there as well. That wouldn't be unusual for us to do that.

Q. And other than what you've told us about today, do you have any independent memories other than what's reflected in the documents?

A. No.

Q. Do you remember as you went through the documents, that there are various notations for the family visit -- the family visiting Mr. Valentin? Do you remember seeing those?

A. There was some visits from the family. Yes, sir.

Q. Do you remember other than his mother, do you remember who else from his family was there?

A. The only person I remembered from the situation was

Page 95

his mother.  I assume that's who it was when they were mentioning that.

Q.  Okay.  Well, now I'm gonna ask you some questions that's gonna take us to my big, thick stack of things here.  All of mine have notations on them.  Mr. Art told me he had a copy that reflects this same thick stack.

MR. ART:  Do you want him to have the copy?

MR. GIVEN:  Yeah.  Do you mind?

MR. ART:  Yeah.  As long as, you know, when --

MR. GIVEN:  I mean, here's -- let's -- let's go off the record.

THE WITNESS:  You don't have, like, answer this way in them, do you?

MR. ART:  Not -- not in this set.

We're off?

MR. GIVEN:  Let's go off the record just for a second.

THE VIDEOGRAPHER:  We're going off the record at 4:16.

(Off the record.)

MR. GIVEN:  Okay.  Let's go back on the record.

THE VIDEOGRAPHER:  We're going back on at 4:18.

BY MR. GIVEN:

Q.  You told us earlier today that in reviewing the documents that Mr. Art sent you, you went very carefully

Page 96

through them; took about -- probably about six hours, I'm guessing?

A.   It might have been 12.  I don't know.  It was between six and 12.  Yes.

Q.   Okay.  And in front of you while we were off camera, you now have in front of you a document which I neglected to have Leah mark as exhibit -- deposition Exhibit 4, but which we will mark as Exhibit 4.  And I'll note for the record, Mr. Art is gonna point out that it's missing two pages, which are now back in the stack which were previously used as Exhibit 2.

(Thereupon, Exhibit Number

4 was marked for identification)

BY MR. GIVEN:

Q.   So I think you told us that you had seen a page which was in Exhibit 1, actually, where you noticed that you had written the wrong date.

Remember that?

A.   That's correct.

MR. ART:   293.

BY MR. GIVEN:

Q.   That would be CPD 293?

A.   Uh-huh.

Q.   And at the top of the page, it's written 9/11/88.  And you've told us that based on your study of the documents,

in all likelihood, that's a mistake and it should have been 9/10/88.

Right?

A.    That is correct.

Q.    Okay.    When -- when would you generally write your notes in the course of your residency in August and September of 1988?

A.    My recollection is that we -- we came to work, we evaluated each one of our individual patients; so had the person on the other nights that I wasn't working -- my wife was one of those people.    And we would take over from them to evaluate the patients that we were assigned while they did the same to their patients.    And then they would review through the chart, examine the patient, catch up on what had happened while we were there or were not there, and then we would present to the attendings on the morning rounds probably around 6:30, 7:00.    That would probably take till 8:00 or 9:00 and then we would write our records, is my general recollection of what's going on in between gunshot wounds coming in.    But that's pretty rare in the morning.

Q.    So fair to say based on that description, that written record entries could take place many hours after the event that you're describing?

A.    So I think that's a fair question.    Generally in the county hospital, we were writing as we went, particularly

Page 98

in the trauma unit and ICU. But yeah. I -- I can write a note five hours after I finished with what I was doing. Yeah.

Q. Sure. And could it be more than five hours sometimes?

A. Usually not a whole lot longer than that, but yeah, sure, could be occasionally.

Q. Okay. And does -- there are different kinds of notes that are reflected in this big stick -- stack.

Right?

A. Absolutely. Uh-huh.

Q. And would what you just told us about your practice of writing notes apply to all the kinds of notes that you would write or were some notes written more contemporaneously or less contemporaneously than what you've told us about?

A. The least reliable dating and timing of notes would be the physician notes. The much more reliable would be the nursing notes and the -- and the respiratory therapists' notes.

Q. Okay. In your review of the documents, did you find any other dates that were wrong?

A. No.

Q. Okay. Well, let's look at towards the beginning of the stack.

A. Uh-huh.

Page 99

Q.   Mr. Art earlier asked you, and I said on the record we'd talk a little bit about when --

A.   Excuse me one second.  Okay.  Thank you.  Sorry.

Q.   I told you we would talk a little bit about when Mr. Valentin died.

A.   Yes.

Q.   If you look at CPD 254 near the very front --

A.   Uh-huh.

Q.   You see that?

A.   I'm sorry.  I am just not very good with this record.

Q.   2 -- 254?

MR. ART:  It's double sided.  Sorry.

BY THE WITNESS:

A.   Yeah.  Sorry.  Yes.

BY MR. GIVEN:

Q.   It says, he became finally un-resuscitable on 9/14/88 at 11:59 a.m.

Correct?

A.   That's correct.  And that sounds like my English, if that's not a word.

Q.   I think it's a word.

A.   I could knock a math problem out of the block, but English and language --

Q.   Sure.  And in fact, at the bottom of that page, it

Page 100

says, completed by Sharkey.

A.    That's correct.

Q.    That's you; right?

A.    Yeah.

Q.    So does that mean you wrote this -- the information that's on here, you put it in?

A.    I do believe un-resuscitable would be my verbiage. Yes.

Q.    And the date and time is your's as well?

A.    Yeah.  This is a little bit different than the standard notes that we write.  This is a county three-page form that has writing in it that you tear different forms off.  It's a discharge summary or death summary thing.

Q.    Sure.

A.    This -- this would not be uncommon to be done a day later or something like that.  It was just final paperwork that --

Q.    Okay.

A.    -- would be the last thing we would do.

Q.    Okay.  And you know, going back to the September 10th, September 11th mistake that we talked about earlier, mistakes happen; right?  I mean, you didn't intend to write the wrong date, did you?

A.    That's correct.

MR. ART:  Objection to form.

Page 101

Sorry. Go ahead.

BY THE WITNESS:

A. That's correct. And yes. Mistakes do happen, yes.

BY MR. GIVEN:

Q. Right. And you'd agree with me it's important in hospital records that dates and times be as accurate as possible.

Right?

A. That's correct.

Q. But that sometimes, mistakes happen for a variety of reasons.

Right?

A. Correct.

Q. Okay. So looking at -- back to the big stack here, 258, it's a report of death to the coroner of Cook County.

You see that?

A. Yes. On the left page?

Q. Yes.

A. Yes.

Q. And that notes that Mr. Valentin died on September 14th at 11:56 a.m.

Right?

A. Correct.

Q. Couple minute's difference either way; right? It's not a big deal?

Page 102

A. Correct.

Q. Okay. If you go to 259 --

A. Uh-huh.

Q. -- which is the certificate of death, you see that?

A. Yes, uh-huh.

Q. That's your signature?

A. Correct.

Q. And there, the date of death is noted at -- as 9/14/88 and the time of death: 11:58. Right?

A. That's correct.

Q. Okay. Now, would you go to Page 299 for me, please?

A. I have these -- they are highlighted at the bottom or something --

Q. They are very hard. The Bates stamping was --

A. It's the arrest note; correct?

Q. On the arrest note.

A. Uh-huh.

Q. And this is -- that's your signature there; right?

A. That is me.

Q. If you go a third line up from where the writing stops, it says, dead at 12:58 a.m. today?

A. Correct.

Q. Correct? And that's dated -- the date of the

Page 103

arrest note is 9/14/88.

Right?

A.    That's correct.

Q.    Mr. Valentin didn't die at 12:58 a.m. -- is that an A or a P, by the way?

A.    I would have guessed it was an A, but --

Q.    Okay.  I would have too.  But whether it's 12:58 a.m. or p.m., that's not correct, is it?  Or is it? What -- what time did Mr. Valentin die?  The certificate of innocence says it was 11:58.  This says 12:58.

MR. ART:  I doubt it's the certificate of innocence.

MR. GIVEN:  I doubt it is too.

BY MR. GIVEN:

Q.    Let me start that question over.

The document we just looked at; the certificate of death, said that the time of death was 11:58.  Right?  That's 258.  Sorry --

MR. ART:  At this point, I'm gonna object to the relevance of detailed line of questioning about which minute he died.

THE WITNESS:  I'm okay with it.  It kind of amuses me, so -- I don't feel -- I don't feel offended.  I see what you're saying.  Yes.  Uh-huh.

BY MR. GIVEN:

Page 104

Q. So 12:58 is not correct?

A. That would be -- I believe you're accurate. Correct.

Q. Okay. And --

A. And considering I notified his mother by phone on that record at 12:15 on 9/14, it -- that's very unlikely the case.

Q. Right. So chances are, you -- I assume you'd agree with me this is one of those notes you wrote hours later and you just miswrote the time.

Is that correct?

A. I -- I probably wrote it -- this is much more likely written exactly at the time and I misread the clock.

Q. And you misread the clock?

A. Yeah.

Q. Or you misremembered; right?

A. I -- I was always a Midwestern boy, so I'm not gonna tell you I was on eastern time or anything.

Q. Fair enough. You certainly weren't lying about the time; right?

A. No.

Q. Of course.

Let's go to 629.

A. Okay.

Q. That's a Department of Nursing Services note;

Page 105

correct?

A. That it is.

Q. It's dated 9/14/88; correct?

A. That's my impression.

Q. And that's your -- is that your signature down at the bottom?

A. No.

Q. Oh. That's a nurse?

A. That's correct.

Q. Okay. And that nurse has written at the top there, 9/14/88. At what time -- I'll just ask you. What time does it look like her note?

A. I read it as 7:30 p.m.

Q. And we know that can't be right. Correct?

MR. ART: Objection.

BY MR. GIVEN:

Q. He was dead at 11:58 a.m.?

A. I understand. Yes. I see your point. That is correct.

Q. People make mistakes when they write notes sometimes, don't they?

MR. ART: Objection to the relevance. Asked and answered.

MR. GIVEN: You can answer yet again.

BY MR. GIVEN:

Q. People make mistakes, don't they?

A. I'd like to see how you work.

Go ahead.

Q. I make mistakes too. Mr. Art will tell you that.

So was there -- I want to talk a little bit about Mr. Art asked you some questions about whether you had any notes about police officers' presence being noted in -- in the records.

A. Correct.

Q. Remember those questions?

A. Yes.

Q. And I think you said that it was not uncommon to see a lot of police in the trauma unit.

Right?

A. That's correct.

Q. And was there a policy or a practice in August of -- and September of 1988 that whenever police were on the trauma unit, there had to be a written record of that?

A. No. In fact, I was curious about what the policy was, to be honest with you, taking care of patients now because of the confidentiality of information. I don't remember us ever escorting them in or out. And I am not sure they didn't just get a badge and then they had free range. I -- I don't remember that.

Q.   You just don't remember one way or the other?

A.   Correct.

Q.   So it could well have been in August and September of 1988, that police officers could have gone in to Felix Valentin's room and the fact that that happened wouldn't necessarily be in a note.

Right?

MR. ART:  Object to form, foundation.

Go ahead.

BY THE WITNESS:

A.   He wouldn't have been in a room.  He would have been in the trauma bay.  But yes, it's very possible.

BY MR. GIVEN:

Q.   Okay.  And you'd agree with me, I assume that the only way that you -- that a nurse or a doctor could make a note of a police officer's visit to Mr. Valentin is if the nurse or the doctor was present or otherwise knew that the visit had occurred.

Right?

A.   Right.  The -- the reason my record review was a little more extensive than I thought it was, I went through all of those nurse's notes, to my recollection and the respiratory therapist's notes to see if there was a documentation of whether a police officer was adjacent to the bed.  And I did not find any.

Q.   Okay.  Well, let's go through a couple of those documents.  If you could look at 567.

A.   I have it.

Q.   Okay.  About maybe a third of a way down the page at 7:15 p.m., do you see that?  The sentence starts received patient on roto rest bed --

A.   Yes.

Q.   -- and then it goes on.  It says -- as best as I can make it out, received patient on roto rest bed from above day shift nurse.  Vital signs are stable.  And then it says, visitors at bedside.

Correct?

A.   Correct.

Q.   And there's no -- it doesn't tell us who the visitors are.

Correct?

A.   That's correct.

Q.   And you have no idea who those visitors are?

A.   I would not be able to tell you that.

Q.   That was -- and by the way, the day of that is August 31, 1988?

A.   That's correct.

Q.   At 7:15 p.m.; right?

A.   Correct.

Q.   So for all you know, those visitors could be

Page 109

police.

Right?

MR. ART: Objection to form, foundation.

Go ahead.

BY THE WITNESS:

A. I would not know. Correct.

BY MR. GIVEN:

Q. Okay. Look at 587. You there?

A. I'm there.

Q. Okay. That's a nursing note from September 4th of 1988.

Correct?

A. Uh-huh, correct.

Q. And towards the bottom, second line up says, 4:00 p., visitors at bedside.

Correct?

A. That is correct.

Q. And once again, you don't know who those visitors are.

Right?

A. No. I don't know who they are.

Q. Okay. And when you were reviewing -- I think we talked about this very briefly. When you were reviewing the stack of notes, you saw notes; several notes, I think from -- noting that family members were visiting.

Page 110

Right?

A.   They -- I -- I noticed a note somewhere in there where I think I talked to the mom during the time that she was there.  But that would have been my notation.  So I don't -- I don't think I saw any nurse's notes where it said specifically who was there.

Q.   Okay.  Well, let's look at 593.  Okay.  You there?

A.   Yes.

Q.   You see 2:00 p.m. in the middle of the page there?

A.   Yes.

Q.   Says, family members at bedside?

A.   There it is.  Uh-huh.

Q.   Doesn't say visitors.  Says family; right?

A.   No.  It does say family members.  Uh-huh.

Q.   Let's look at 596.

A.   Okay.  Go ahead.

Q.   At 6:00 p.m. towards the top, says patient -- I'm gonna try to read it.  Patient's eyes open.  Does not respond to commands or family visits this afternoon.

Right?  Is that what it --

A.   I'm sorry I'm missing you.  But that sounds like her note.  But I need to see exactly where it is.

MR. ART:  Hold on.

BY MR. GIVEN:

Q.   596.

Page 111

A.   I'm on 96.  How many lines down are you?

Q.   Do you see the first entry's for 4:00 p.m. and then the next entry is dated 6:00 p.m?

A.   Yes.

Q.   I'm at the 6:00 p.m.

A.   Yes.

Q.   And it says, patient's eyes open.  Does not respond.

A.   Yes, yes.

Q.   And then --

A.   To commands.

Q.   To commands or family visits this afternoon.

So there's a note that the family had visited that afternoon.

Right?

A.   Yes, that is.

Q.   And again, it says family visits.  Doesn't say visitors or it's not anonymous.

Right?  I'm gonna come back to that page later.

MS. ROSEN:  Was there an answer to that question?

THE WITNESS:  The answer was yes, I see it and it was accurate.

MS. ROSEN:  Thanks.  Sorry.

THE WITNESS:  No problem.

BY MR. GIVEN:

Q.    607?

A.    Yes.

Q.    At the entry for 7:40 or maybe --

A.    7:40, it looks like to me.

Q.    It says, family at bedside?

A.    Correct.

Q.    Doesn't say visitors; right?

A.    Uh-huh.

Q.    623 at 4:00 p.m.?

A.    Yes.

Q.    Family at bedside?

A.    Correct.

Q.    And 627, the very bottom, his family came to visit him.

      See that?

A.    9/13.  Correct.

Q.    Right.  On 9/13.

      So would you agree with me that there could have been other times when either visitors or the family were present with Mr. Valentin and went uncharted?

      MR. ART:  Objection; compound, foundation, relevance and form.

      Go ahead.

      MR. GIVEN:  I'll break up -- I'll break up the compound.

Page 113

BY MR. GIVEN:

Q.    Would you agree with me that there could have been other times when visitors were present with Mr. Valentin and went uncharted?

MR. ART:   Same objections.

Go ahead.

BY THE WITNESS:

A.    Yes.

MR. ART:   Let's go off for a minute.

THE VIDEOGRAPHER:   Going off the record at 4:38.

(Off the record.)

THE VIDEOGRAPHER:   We're going back on at 4:39.

BY MR. GIVEN:

Q.    Earlier in the deposition, you described for Mr. Art what -- when you wrote unresponsive, what unresponsive means to you.

Remember that?

A.    Correct.

Q.    Would you agree with me that the term unresponsive can mean different things to different people, even within the medical community at Cook County Hospital in August and September of 1988?

A.    I'm sure it does, yes.

Q.    As you mean responsive -- because obviously, that's all you can talk about -- are there different degrees of

Page 114

being unresponsive? Can one be -- well, let me just ask the question.

Are there different degrees of unresponsiveness?

A. So you actually kind of go through a thing, like when I come into your room in the morning, if you're awake and you're talking to me, then I don't have to do anything. If you're not awake, the first thing I'll do is give you a verbal cue to ask you to wake up. If you don't do that, then I might put my arm on your shoulder. I might give you a little shake after that, if you're not waking up. And then if I'm concerned about you, then I might do some of the maneuvers I talked about before, like a sternal rub. I would not do a nipple twist test outside of the county hospital. Those days are over.

Q. I'm sure your children are traumatized for life.

Would you agree with me that depending on circumstances, a patient can go in and out of responsiveness?

A. Yes.

Q. And it's possible that a nonresponsive patient can become responsive when there's no doctor or nurse there to chart it.

Correct?

A. Right. And I want to answer you as simply as possible. Yes, that is possible. But obviously, there's mitigating factors for whether they are being medicated or

Page 115

not.

Q. Sure. And would you agree that on September 10th of 1988, even in light of all the circumstances that you discussed with Mr. Art earlier, it was not impossible for Felix Valentin to make an identification to police officers as was reported?

MR. ART: Objection; form.

BY THE WITNESS:

A. Okay. Just -- the only thing I'll give you a possibility of that bothers me in any way about what I told him is the thing where I said the patient less responsive today on -- on the note we've dated to the 10th. I mean, my feeling is that means I was indicating he's having a lot of mental problems; you know, that he's significantly declining, that he has significantly declined. But that's not, you know, as strongly stated as it could be to indicate what the rest of the nursing notes and other people reflect.

Q. In your discussions with Mr. Art, did he tell you anything about why he was focussing on September 10th?

A. I just thought there was documentation of something said that day. Yeah.

Q. Okay. And it was your understanding that with that -- what was being discussed in the lawsuit was that on September 10th, Mr. Valentin was alleged to have said something.

Page 116

Right?

A. My understanding was that he gave an identification at that time, yes; that that was the concern.

Q. Did you have an understanding of how that identification was communicated?

A. No.

Q. And you'd agree with me that there are several ways one can communicate an identification.

Right?

A. Absolutely.

Q. And I go back to my question: Would you agree with me that it was not impossible for Felix Valentin to make an identification to police officers on September 10th?

MR. ART: Objection; form, foundation, relevance, asked and answered.

Go ahead.

BY THE WITNESS:

A. Right. So you know, when I'm reviewing this chart -- and I had this conversation with you before. I mean, I'm trying to be as fair as I can with everything. I mean, in my note, it says that he's declining in his responsivity. That's why I really went over the record really hard. I mean, is it impossible? No. Is it likely? I think it's extremely unlikely. So yes. It's not impossible, but I think it's extremely unlikely.

Page 117

Q. Okay. And you'd agree with me, I assume that if the date of September 10th in the police report is wrong and the identification was made earlier than September 10th, that the earlier that identification was made, the more likely it would be that Mr. Valentin could make it?

MR. ART: Objection to form, foundation, and misstates the record manifestly.

Go ahead.

BY THE WITNESS:

A. So I don't know. If before he was shot, they'd had asked him, had been perfect? No. I mean, are there days in the hospital when he was conscious and awake and been able to communicate that information? Absolutely.

BY MR. GIVEN:

Q. And the more days you go back from September 10th --

A. That's correct.

Q. -- the more able he would have been to communicate that information?

A. That's correct.

Q. Okay. So what I want to do now is just go through this stack of documents. And I've got a number of them I just want to ask you about his status. Okay? And bear with me. Not every of these Post-It notes is something I want to ask you about. We're actually making good time here.

Page 118

A.   But you're adding more papers to his side where I think now, we're gonna last longer.

MR. ART:  No.  I'm gonna be so quick.

THE WITNESS:  I just want you to know that there's a really nice restaurant about 250 yards from here.  And you take me to 6:00, and you're buying me a couple drinks and dinner.

MR. GIVEN:  I've got no problem with that.

THE WITNESS:  I'm kidding.

MR. ART:  I've got no problem with that, because that means I'm missing my flight.

BY MR. GIVEN:

Q.   Okay.  And I am gonna go through chronologically, so -- so our days of skipping through back and forth, I think are done.

A.   Okay.

Q.   270; CPD 270 is a note from August 27, 1988, at 8:00 p.m.

You see that?

A.   August 27th, '88.  Neurosurgery or --

Q.   And then a little way's down, it says, awake, alert and intubated.

Right?

A.   You do understand you guys read a little better than me.

Right?

Q.   We had a head start on you.

About eight lines down.

A.   Awake, alert, intubated, but follows commands.

Q.   Okay.  And alert, what does alert mean in your world in August and September of 1988?

A.   Yeah.  That's one of the neurosurgeons; Arnold.  Boy, he was a smart guy.  It -- it means that was able to communicate with me.

Q.   Okay.  And follows commands means that he understands what somebody is telling him to do and responds appropriately.

Right?

A.   Right.

MR. ART:  Objection to form.  Sorry.  Objection; form, relevance.

BY MR. GIVEN:

Q.   Your answer was right?

A.   Correct.  Yes, sir.

Q.   Thank you.

Okay.  Next page:  271 dated 8/29/88.  Second line down from the top, patient -- can you read that?  Something and responsive.  Right?  I don't know what the first word there is.

MR. ART:  Objection to form.

Page 120

Go ahead.

BY THE WITNESS:

A.   Are you looking at the CT note?

BY MR. GIVEN:

Q.   I am looking at the page -- I'm not smart enough to answer that question.  I'm looking at the page that's Bates stamped CPD 271.

A.   And I am too.

Q.   Okay.  At the very top.  It says 9 --

A.   Patient intubated, responsive.  Yeah.  Uh-huh.

Q.   Now, that's not your note; right?

A.   No.  That's a pediatric surgeon there.

Q.   So you don't know what they meant by responsive; right?

A.   I assume pretty similar to what the other man meant.

Q.   Sure.  Next page:  272?

A.   Uh-huh.

Q.   8/29/88 at the top, it says, patient responds appropriately to commands?

A.   With upper extremities, yeah.

Q.   Okay.

A.   And that's what my recollection, is the way I communicated with him was with his upper extremities.  That's my note.

Page 121

Q. Okay. And that's your -- that's your note there; right?

A. Yeah.

Q. Okay. 274?

A. Uh-huh.

Q. August 30th of 1988, this is your note as well. Correct?

A. Right. Same.

Q. One, two, three, four -- about eight lines down, it says, general alert and oriented times three?

A. Uh-huh.

Q. And we talked about what that means earlier. Correct?

A. Correct.

Q. Okay. Next page: 275. Middle there, it says, 8/31/88 at 7:55 a.m. See it says, patient alert, responsive, intubated?

A. Correct.

Q. And then below that, 8/31/88 trauma note, it starts and goes to the next page where it looks like it's your note?

A. It's mine.

Q. Okay. The very first thing after trauma note, patient alert. You just want to read that for me, please?

A. Patient alert and oriented. Responds appropriately to upper extremity commands.

Q.   Okay.  And that means what you just told us it means.

Right?

A.   Uh-huh.

Q.   Next page, 276 towards the bottom, it says, 9/1/88, patient alert and intubated.

Right?

A.   Correct.

Q.   On the next page, 277, second entry, 9/1/88 trauma unit.  I think this is your note or --

A.   That's mine.

Q.   Okay.  It says, patient without complaints.  You see that right under trauma unit?

A.   That's correct.  Uh-huh.

Q.   How would you know he was without complaints?

A.   It's a hell of a question.  I was wondering that myself.

Q.   Would I be fair in assuming that given what you've told us about the way you communicated with him, that you in one way, shape or form asked him if he had complaints, and he in one, way shape or form communicated to you that he did not?

A.   That would be my -- that would be my understanding of the note.  Yes.

Q.   Okay.  Next page, 278; 9/2/88, in the middle there.

Page 123

A. Uh-huh.

Q. Third line down: Follows commands appropriately, and upper extremity -- I'm sorry. Maybe you can read that.

A. Upper extremity, grabs my fingers. Grabs fingers.

Q. Okay.

MR. ART: I object to the form of you just reading the medical records. They speak for themselves.

MR. GIVEN: Should I do the Judge Schaefer (phonetic) thing and hold it to my ear and say, I don't hear it saying anything?

BY MR. GIVEN:

Q. That's your handwriting? That's your note that we just read?

A. That's my note. And unfortunately, he's getting sick. His temperature is really up.

Q. Still communicating, though; right?

A. Yep.

MR. ART: I didn't have the record before me. What was the date on that?

MR. GIVEN: That was --

THE WITNESS: 9/2.

MR. ART: Thanks.

BY MR. GIVEN:

Q. 9/2. Okay. Speaking of 9/2, CPD 280 is a note dated 9/2/88 at 11:20 a.m. and it says, psychiatry consult.

Do you see that?

A.    Uh-huh.

Q.    And it's signed by Alice Daniels?

A.    Okay.

Q.    Do you remember Alice Daniels?

A.    No, I don't.

Q.    Okay.  Do you know who she was?

A.    No, I don't.

Q.    Okay.  Is this one of the documents you've read when you reviewed these --

A.    That was -- my understanding -- her handwriting looks familiar to me.  And I thought this is where -- I thought there was a note earlier in the chart than this that explained the police had come and that he did not want to give them information.  That's my recollection of reviewing the records.  I don't know if there's a record like that or not.

Q.    Okay.

A.    And I think it was this person that wrote that, if that was the case.

Q.    Okay.  Looking at this note, this says this note was in the file or the records back in 1988; correct, once she wrote it?

A.    Yes, uh-huh.

Q.    And is this the kind of thing you would have seen

Page 125

at the time as you were going through and checking on Mr. Valentin?

A.   Yeah.   I probably would have seen this.

Q.   And you'd agree with me that this note reflects a detailed set of communications to and from -- well, let me start over.   That in part, this record reflects a detailed communication to and from Ms. Daniels and Mr. Valentin in which he -- she writes down that he among other things denies suicidal or homicidal thoughts, feels bad about his situation did not want to talk about what happened.   You'd agree with me that's what this reflects.

Correct?

A.   Correct.

MR. ART:   Objection to form.   Sorry.   I apologize.

MR. GIVEN:   Sorry.   I apologize too.

BY MR. GIVEN:

Q.   So this record reflects that there was some detailed communication between Mr. Valentin and Ms. Daniels.

Right?

A.   That's my impression.   And some from the family as well.

Q.   Okay.

MR. ART:   What's the date on that?

MR. GIVEN:   September 2.

BY MR. GIVEN:

Page 126

Q.    And you don't know how this communication was made between Ms. Daniel and Mr. Valentin; correct?  Via was it -- for instance, you don't know if any of it was verbalized or not.

Correct?

A.    Well, yeah.  I don't know.  But if -- yeah.  I have to just leave it at that.

Q.    Okay.  And you'd agree with me these are -- however the communication was made, it was a pretty -- for lack of a medical terminology, pretty high level of detail with regard to what was being communicated?

A.    Yes.

Q.    Okay.  Next page:  281.  This was actually one of the pages in Mr. Art's Exhibit 1.

A.    I -- I just want you to know that when it said denies suicidal, I didn't say he was in this deposition.

MR. GIVEN:  This is not -- this is homicide in some ways.

MR. ART:  That's right.

BY MR. GIVEN:

Q.    Okay.  Next page:  281, dated 9/3/88?

A.    Yes.

Q.    Your note where it says, patient alert and oriented, that's your note.

Right?

Page 127

A.   Yeah.

Q.   And then it also says following --

A.   No.  Where are we at?

Q.   I'm sorry.  Let me start over.

A.   Are you on 9/3 or --

Q.   I'm on 9/3/88.  It says, trauma resident note.
That note is your's; correct?

A.   I'm sorry.  I got -- you and I must be on a
different page.  I don't have trauma -- I have a 9/3 note
that says patient becomes more anxious.

Q.   No.  Let's -- let's stop.  I'm looking at CPD 281.

A.   I got you.  I'm a page ahead of you.

Q.   Okay.  Going a page ahead of me is not gonna get
you there faster.

A.   That's correct.

Q.   So about a third of the way down; 9/3/88, you see
that?

A.   Yeah.

Q.   Trauma resident note, that's your note.
Correct?

A.   Uh-huh.

Q.   Can you read what it says after S?

A.   Patient alert and oriented.  Following commands
with upper extremity appropriately.

Q.   That means what you've told us previously.

Page 128

Right?

A.   Correct.

Q.   Next page:  282 at the bottom.

A.   Yeah.  This is where it doesn't get good.

Q.   Okay.  Let me just ask you a question.

A.   Uh-huh.

Q.   Okay.  At the bottom there -- actually, in the middle, it says, 9/4/88.  And it says -- am I correct in that it says, patient was intubated, alert and responsive?

A.   Correct.

Q.   And then a little below that, 9/5/88?

A.   Yeah.

Q.   This is your handwriting; correct?

A.   Correct.

Q.   Among other things -- and all I'm interested in right now is one, two, three, four, five -- six lines up from the bottom of Page 282, where it says, patient agitated, but alert and oriented times three and following commands.

A.   Correct.

Q.   That's what it says?

A.   That is correct.

Q.   That's what you wrote; right?

A.   Correct.

Q.   And you meant by that the same thing you've previously told us?

A.    Uh-huh.

Q.    If you could go to 2-9-0, 290?

A.    Uh-huh.

Q.    At the bottom, these are notes from 9/8; correct?

A.    I'm sorry.  I got -- I'm missing --

Q.    290?

A.    I go -- somehow, I go from 288 to 291.

Q.    Oh.  Well, for purposes of -- let me just --

A.    You want me to read mine?

Q.    I will just show you and I'll show Steve.  I've got some words circled that I'm gonna ask you what it means.  So I'll hand you a copy of Page 290.  It's got some highlights and it's got a handwritten note from me that says, what mean.

A.    Okay.

MR. GIVEN:  Steve, you want to take a look?  I guess that means no.

BY THE WITNESS:

A.    Okay.

BY MR. GIVEN:

Q.    And at the bottom there where I've circled something and I think it says neuro stable --

A.    Oh, no.  It's stable fracture.

Q.    Oh, okay.  That's --

A.    That's it.

Q.    That's it.  What does that mean?

Page 130

A.     The spine stable -- the spine fracture doesn't need to be stabilized with hardware.

Q.     Okay.  Okay.  We've already talked about 293 at length.  I think you'll all be happy.  Actually, let me just go back to it.  Page 293 --

A.     Uh-huh.

Q.     -- this is the page that's got the two entries for 9 --

A.     Yes.

Q.     Dated 9/11?

A.     Yes, yes.

Q.     So what's dated 9/11, you believe should be 9/10.  Correct?

A.     That's correct.

Q.     For all the reasons that we talked about earlier?

       MR. ART:  I'll object to the form of that question.  That's fairly unclear.

       The top one?

       MR. GIVEN:  The top one.  Let me start over, because I don't want it to be unclear.

BY MR. GIVEN:

Q.     At the very top, the first of the two dates that say 9/11 --

A.     Correct.

Q.     -- for all the reasons that we discussed earlier in

Page 131

the day, you believe that that date should read 9/10?

A.    That's correct.

Q.    And what that would mean, then at the very first line there, patient less responsive today, that would mean less responsive than he was on 9/9? Is that the -- the import of that?

A.    So now I'm trying to figure out if I have 9/11 and 9/12 or 9 -- I wish I had taken that down. I'm sorry. It's -- one of these sets of vitals matches exactly with one of the days; either 9/11 or 9/12. But yeah. Let's just stay with that. To me, it means like he -- I'm either -- had a little bit out of him the day before and I got nothing now or something. It indicates to me that I had something at some point on him.

Okay.

Q.    Okay. And then the -- the next notation dated 9/11 on that same page where it says patient condition worsening, you see that.

Right?

A.    Yeah.

Q.    That means it was worse than the day before.

Right?

A.    Yeah. You know, always up -- I've had a standard form up until this period of time when we get in this area where I'm having him squeeze my hands and making sure he's

Page 132

alert. And I've lost that.

Q. Okay.

A. It's a little -- I'm sorry. I know -- it's kind of hard to watch one of my patients die. I'm sorry. It's a little difficult.

Q. I bet. I bet. You want to take a break?

A. No. I'm okay.

Q. We're gonna skip quite a few pages. As I'm going through, your wife's name is LAM.

Correct?

A. Uh-huh.

Q. Okay. We're gonna make a big jump here to 551. Let me know when you get there.

A. Okay.

Q. At the top, it's dated 8/28/88 at 2:40 a.m., it looks like. And it says, received from OR in bed. Unresponsive to verbal painful stimuli, et cetera.

Correct?

A. Correct.

Q. Now, when it says unresponsive there, that doesn't mean unresponsive for all time.

Right?

A. Correct.

MR. ART: Objection -- sorry. Objection to form, foundation, relevance.

Go ahead.

BY MR. GIVEN:

Q.   And in fact --

MR. ART:  Get an answer on the record.

MR. GIVEN:  I'm sorry.  I thought he answered that.

BY THE WITNESS:

A.   That's my understanding.  Yes.

BY MR. GIVEN:

Q.   And in fact, your understanding from the review is that he was responsive for many days after 8/28.

Correct?

A.   Well, it -- it said they got him back from the OR. It just means he's still anesthetized.  So in the trauma unit, they wouldn't take the patient likely to the recovery room.  We'd just bring him right from the OR back down.  So it's basically, he's still anesthetized.

Q.   Right.  So it's just, this note is calling him unresponsive at the time that the note's being made.

Correct?

A.   That's correct.

Q.   And that condition of being unresponsive can change, as we know it did from other notes in this stack.

Correct?

A.   Correct.

MR. ART:  I'll object to the form.

Page 134

BY MR. GIVEN:

Q. In fact, if you look at the next page; 552 --

A. Uh-huh.

Q. -- also dated 8/28, at the top, it says that he opens his eyes spontaneously, responds to verbal stimuli, able to move fingers on command.

Correct?

A. Correct.

Q. So he's now responsive, isn't he?

A. Well, that's because he was anesthetized, though. But okay. Yes. If you're making that point, yes, you're correct.

Q. Yes. And then you go a little ways further down on the page, maybe just over half. It says, hand grip -- hand grips are weak, but patient follows commands to squeeze hands.

Do you see that? It's right above --

A. Yes, yes.

Q. -- 8:00 a.m., I believe.

A. Yes, sir.

Q. And then can you just read for me what the next line says?

A. States he feels cool to touch with -- I'm not sure -- level of neck line, nipple line. Nipple line. Yeah. He's describing his -- his paraplegia.

Q.    Okay.   Was he intubated at this point?

A.    I don't think he's intubated at this point.

Q.    Okay.

A.    Hold on just a minute.   He -- he should be intubated at this point with an oral endotracheal tube. Bilateral press sounds -- so hold on.

Q.    So when it says that he states he feels cool to touch, it indicates that at least to the note taker, he was able to -- she used the word state as in talk.

Correct?

A.    Let me just see if the next note has him intubated. So I -- I agree with you that the note is not clear.   And there would be an order, so if it needs further clarification, that he be extubated.   But yeah.   It should be difficult for him to speak.   So he may have been extubated, if this is in his post-op period.   But yeah.   It's certainly confusing, at least.   If not, he's intubated.

Q.    Okay.

MR. ART:   Object.   Just because I don't have the records, what date are you on?

MR. GIVEN:   Sorry, Steve.   28.

MR. ART:   Of August?

MR. GIVEN:   Of August.   What else would it be?

BY MR. GIVEN:

Q.    Go to Page 565, please.

A. Okay.

Q. At the top there, it looks like it's a note from August 30th at midnight.

Is that your handwriting?

A. No.

Q. Am I correct that it says patient is alert and responsive to verbal stimuli, follows commands well?

A. Correct.

Q. Let's -- we already talked about 567 and the visitors at bedside, so let's --

MR. ART: I object to the commentary.

BY MR. GIVEN:

Q. Go to 578, please, which is dated 9/1/88 at 8:00 p.m.

A. Uh-huh.

Q. Starts by saying, patient received on roto kinetic bed on rotation.

You see that?

A. Yes.

Q. Can you tell me when he -- he being Felix Valentin was first put on that roto bed or is that something you would have to spend inordinate amounts of time --

A. It would be pretty inordinate.

Q. Okay.

A. The -- the roto bed would not have been in the

Page 137

county hospital. They would have had to order that and get it shipped in once they knew he was paraplegic. It would have taken them a couple days to get it.

Q. Okay. Page 580, this is dated 9/3/88?

A. Uh-huh.

Q. It's not your handwriting; correct?

A. No.

Q. It says, initial assessment: Plaintiff is alert and oriented times three.

Correct?

A. That's correct.

Q. And a little ways further down, it also says that he follows verbal commands compliantly.

Correct?

A. Sorry. I noticed that he was nasally intubated at that time.

Follows verbal commands compliantly. Moves upper extremity. Has sensation above nipples area of chest.

Q. Thank you. 586 --

A. Uh-huh.

Q. -- from September 4th way down at the bottom, in roto bed in motion; alert, oriented times three.

Correct?

A. That's correct.

Q. Is that your note?

Page 138

A.   No.

Q.   The next page:  587, 9/4/88 at 4:00 p.m., that's the one that says visitors at bedside.

Correct?

MR. ART:  Objection.

BY THE WITNESS:

A.   Correct.  4:00 p.m.

MR. ART:  I'm just gonna object.  This is asked and answered.

MR. GIVEN:  Okay.  Fair enough.

BY MR. GIVEN:

Q.   Page 594, dated 9/6/88 --

A.   Dated when?

Q.   It says, 9/6/88.

A.   Okay.

Q.   At the 10:00 p.m. entry, could you read that for me, please?

A.   Temperature continues to be elevated.  Remains in cooling blanket.  Poor results so far.  Opens eyes to command and respond to verbal stimuli.

Q.   Okay.  Thank you.  Next page:  595, dated 9/7/88.

A.   That's another one I'm missing.  No.  It's flipped around.  Okay.  Go.

Q.   Okay.  Dated 9/7/88; correct?

A.   Yes.

Page 139

Q.   And towards the bottom at the 9:30 a.m. entry --

A.   Yes.

Q.   -- am I correct that it says, responsive to verbal stimuli, opens eyes, attempt to talk?

A.   Correct.  Which would be much more indicative of what somebody's like on a ventilator.  They can try to talk.

Q.   Right.

A.   They just won't get anything around it, if it's in right.

Q.   Okay.  On 596 --

A.   Uh-huh.

Q.   -- at the top, it's dated 9/6/88.

Correct?

A.   Yes.

Q.   And at 6:00 p.m., it's noted that plaintiff's eyes are open.  Does not respond and -- to commands or family visits this afternoon.

Correct?

A.   Correct.

MR. ART:  Objection to form.

BY MR. GIVEN:

Q.   And then if you go to the next page -- I'm sorry. If you go to Page 598, which is not the next page; it's the page after, on 9/6/88, says -- third line down:  Patient is alert, oriented to place and person, follows simple verbal

commands.

Correct?

A.   I'm sorry.   I'm missing where you're at there.
Time?

Q.   At the top, one, two -- three lines from the top.
Starts, patient is alert.

A.   My page was flipped again.

Q.   Sorry.

A.   Patient alert and oriented to place and person,
follows simple verbal commands.   Fingers --

Q.   That -- that's all I'm interested in.

A.   Okay.

Q.   And that's also on September 6th; correct?

A.   Correct.

Q.   602?

A.   Uh-huh.

Q.   9/7 at 3:30 p.m., it says, patient is awakened to
name called, is alert when awakened, and is able to move
upper extremities and follow simple command.

Correct?

A.   Patient is awakened to name called, is alert when
awakened and is able to move upper extremities and follows
simple, I assume commands.   Yes.

Q.   Okay.   And then -- okay.   Let's move on.
If you go to 619, please.

Page 141

A.   Uh-huh.

Q.   At the very top, it says -- this is an entry, Steve, I'm sorry, for I think it's 9/11 at 10:00 p.m.; just the entry right before we go over to 9/12.  And the very first entry says something at bedside.  I think -- is it doctor at bedside?

A.   Yeah.  That would be doc -- I'm pretty sure that would be doctor, unless it's specifically mentioning.  But this is a nurse, so it would be indicating that there was somebody above her at the bedside.

Q.   I see.

A.   Because she's making them aware of the vital signs. He's getting really sick right in here.

Q.   Right.  And the next line says, aware of us.
     Correct?

A.   No.  Aware of vital signs.

Q.   Oh.  The doctor is aware of vital signs?

     MR. ART:  And I just object in general to you reading your version of these medical records.  If you have questions for him about what it says, say what does it say.

     MR. GIVEN:  Fair enough.  That's what I've been doing, Steve.

     Why don't we move on.

     MR. ART:  Okay.  Well, note my standing objection

Page 142

to you reading medical records into the record.

MR. GIVEN:  I'll -- and then I ask him did I read that correctly.  You'd prefer that I have him read it?  I'll be happy to do that.

Want me to start over?

MR. ART:  Yes.  Start over.

MR. GIVEN:  Okay.  We're gonna start over, because Mr. Art doesn't like --

MR. ART:  Jeff, give me a break.  All right?  Try to move it along a little faster without just reading your version of the testimony into the record.  That's all I'm saying.

MR. GIVEN:  I'll ask him to read his version into the record and then you'll be happy.

MR. ART:  I would be happy.  Yes.

THE WITNESS:  Should we go back to that homicidal or suicidal thing with the psychologist or we're okay?

MR. GIVEN:  No.  We're good.

MR. ART:  It's not me.

BY MR. GIVEN:

Q.   Let's go to Page 672.  And the next few pages, just look very quickly at the next few pages that follow from 672 through 676.

A.   Okay.

Q.   These appear to me to be documents from Norwegian

American Hospital.

A. That is correct.

Q. Is that what they appear to you?

A. Yes.

Q. Would you have reviewed these notes back in 1988 to familiarize yourself with Mr. Valentine's condition?

A. Uh-huh.

Q. And at 672, in the middle of the page, it's described -- well, I can learn.

Can you read for us the line that starts in the middle of the page? It looks like it starts with carried by.

A. I'm sorry. Okay. Carried by ER staff from car. Pale and unresponsive.

Q. That's all I need you to read. And then further down on the page above -- you see where -- at the bottom where it says Northwestern University trauma?

A. Yes.

Q. And then there's a line above that. And then the line above that, could you read what it says for me, please?

A. Unable to move --

Q. No.

A. -- lower extremities --

Q. Right.

A. -- alert and oriented.

Q. Thank you.

Alert and oriented; right?

A.    Uh-huh.

Q.    So he came in to Norwegian unresponsive, and then later became alert and oriented.

Right?

A.    Yeah.   He was hypovolemic.

Q.    Sure.   And then if you look at 676, it's another Norwegian American Hospital record.

Correct?

A.    Yes.

Q.    And would you agree with me in the middle of the page there, that the patient was awake -- noted to be awake and alert on a couple different occasions?

A.    I certainly see one occasion.   Yes.

Q.    Do you see right below it?

A.    Oh.   There's another one.   Awake.   Uh-huh.

Q.    Okay.  Page 9 -- sorry.   It's 711.   It's a Division of Respiratory Care note?

A.    Yes.

Q.    See that?   Dated 9/8; correct?   See that first date entry there along the left-hand side?   Am I correct that that's 9/8?

A.    I am not certain.   I need -- is there a corresponding date before and after?

Q.    Look at the bottom of the page.

A.   I know.  But it's not clearly an 8 to me, is why I'm asking.  So is there a corresponding before and after that make -- makes that logical sense?

Q.   I don't know.

A.   You don't know?

Q.   We can --

A.   I see a 6 and I see a 9.  And I don't see an 8.  So I guess that would be the most likely.  Yes.

Q.   And one, two, three -- four lines down from the top, 9 slash, what's that number appear to you to be?

A.   945.

Q.   No.

A.   I'm sorry.

Q.   I don't know that we're looking at the right -- are you on 711?

A.   Yeah.  I -- I'm saying that I see somebody who has written a 9/6 on one page and somebody that's written a 9/9 on the other page.  So I don't think it's a 7.  So I think it's most likely an 8.  I think you're correct.

Q.   Can I just look at the page you're looking on? That one right there; right?

A.   Oh, I'm sorry.  I thought that was a time.  I see where you're saying.  Yes.  It says 9/8.  I was looking at the bottom of the page.  I'm sorry.

Q.   So on 9/8, one, two, three, four, five, six, seven

Page 146

-- eight lines from the top, could you --

MR. ART: Can I see it before you ask a question?

MR. GIVEN: Yeah, yeah, yeah. Sure.

MR. ART: This is getting totally ridiculous.

MS. ROSEN: I'm sorry. What was that, Steve?

MR. ART: I said, it's getting totally ridiculous.

MS. ROSEN: Is that a commentary on the questioning?

MR. ART: No.

MR. GIVEN: Only Steve is allowed to make comments; not us.

MR. ART: It's a comment on the fact that I -- Jeff hasn't provided any of these documents to the other side. He didn't bring copies with him, so he's reading documents into the record while I don't have copies to see what he's reading. So that's what I'm saying is ridiculous.

MS. ROSEN: Isn't he just using the Cook County records?

MR. ART: Yeah. But he's made me give my copy to the witness, because he didn't bring another one.

MS. ROSEN: I see.

MR. GIVEN: Okay.

BY THE WITNESS:

A. It says, patient received -- wait. Received

Page 147

patient alert.  Response to verbal commands.  Nasally intubated.

BY MR. GIVEN:

Q.   Okay.  And then further down on the page, also on 9/8 at 1550, third line from there, could you read that for me, please?

A.   Yeah.  Patient has large amount of --

Q.   No, no.  That's not what I want.

A.   Okay.  Patient semi alert and responsive.

Q.   That's it.  Thank you.

Page 713?

A.   Uh-huh.

Q.   9 -- I believe -- well, why don't you tell me what date you think that is; the one, two, three -- fourth line down where it has a date.

A.   9/6, is what I can see.

Q.   Okay.  And one, two, three, four, five, six -- seven lines from the top, could you read that for me, please?

A.   Patient -- patient is alert.

Q.   Correct.  The next two words?

A.   Could -- I am sorry.  I can't tell what that is.

Q.   I couldn't either.  I was hoping you could.

Okay.  If you could go to -- we're almost at the end of this stack, and then I will only have maybe 10 minutes more of questions and we'll take a quick break.

If you start on Page 787. And I want to look at 787 through 793 -- and I'm sorry -- 794. And I'm gonna ask -- Mr. Art asked you some questions about the acino -- Acinetobacter --

A.   Acinetobacter.

Q.   Thank you.

Would you agree with me that on the pages I just told you about, they -- all those pages are -- the word that you just said; Acinetobacter Anitratus appears.

Correct?

A.   Yeah. It's even hard for me to say the second word, but --

Q.   So what -- if you could just look collectively at those pages that I told you; 787 through 793, can you tell me -- I'm sorry -- 794, what is -- what are these pages telling us with regard to the Acinetobacter story?

A.   So what it's trying to express on -- particularly on 789, is whether a certain antibiotic can treat this bug or not. And it's a sense of resistant to everything except Azlocillin, which I've never heard of, and Tobramycin, which I assume we had available back then, but I don't know.

Q.   Okay.

A.   Piperacillin.

Q.   Okay. You can put that stack down. I'm gonna state for the record that had Mr. Art told me he was not

Page 149

bringing the full set of documents, which our communication led me to believe he was, I would have brought a second set for you.

MR. GIVEN: That's all I can tell you, Steve. I thought you were bringing them all; otherwise, I would have done it. So let's take a short break. I'm gonna have the court reporter mark a few exhibits and we're in the home stretch here.

THE VIDEOGRAPHER: We're going off the record at 5:27.

(Off the record.)

THE VIDEOGRAPHER: We're going back on the record at 5:35.

(Thereupon, Exhibits Nos. 5 through 8 were marked for identification)

BY MR. GIVEN:

Q. Doctor, we're in the home stretch here. Won't be much longer.

A. Let's bring home the six horse.

Q. I'm going to ask the court reporter to hand you what we just marked as Exhibit Number 6, please. And I will state for the record, that it is a document Bates stamped previously as CPD 0003 through 0005. It's what's called a supplementary report dated at the bottom 27 August 1988.

MR. ART: Can I have a standing objection to you

using this report? It's hearsay. The witness has no foundation to answer questions about what's in the report.

MR. GIVEN: Well, he might, actually. So let me -- you can have the standing objection, obviously.

MR. ART: Yeah. But I mean, to the extent that you're planning to reading portions of the report into the record, I'm gonna have an objection that that's hearsay, that there's no foundation been laid for it. This witness can't --

MR. GIVEN: Well, I am gonna ask him a question -- I am gonna read him, if you don't mind, because I think it will make it go faster --

MR. ART: I'm just asking you to recognize the standing objection.

MR. GIVEN: It's recognized.

MR. ART: Thank you.

MR. GIVEN: And let me ask you, would you allow me, to make things go faster, that I can just read to him portions of this and then ask him my question based on what I read him? As opposed to having him read it, I will read it into the record.

MR. ART: I will object to your questions as you go. But I have a standing objection to any use of this document on hearsay and foundation grounds.

Page 151

MR. GIVEN: Fair enough. Okay. So --

MS. ROSEN: I'm sorry, Steve. What's the foundation objection?

MR. ART: That this witness doesn't have the capacity to lay any kind of foundation for any information in a police report written by the Chicago Police Department.

THE WITNESS: I unfortunately don't have very much experience with these.

MR. GIVEN: No need to.

BY MR. GIVEN:

Q. Let me -- let me -- let get my question out and then --

A. Go ahead.

Q. So this is a police report as we've now fairly well established. And I am going to read to you portions of this report, but not all of it. And I'm not purporting to read all of it. But when I'm done reading what I read to you, I'm then gonna ask you a question.

Okay.

A. Go ahead.

Q. At the bottom of the page CPD 3, it says, taken to -- this is a police report about Felix Valentin being the victim of a shooting.

A. Okay.

Page 152

Q.   It says at the bottom, he was taken to Norwegian American Hospital, where victim was stabilized and then transferred to Cook County Hospital.  Per Dr. Perez, treated victim at Norwegian American Hospital.  Further down on Page CPD 004, it says on today's date at approximately 1715 hours, reporting detectives received a radio assignment to go to Norwegian American Hospital on a man shot.  I'm skipping a little bit.  At the bottom of that paragraph, it says, the beat personnel also indicated that the victim was in critical condition and unable to verbalize, but was motioning yes and not to answers.  I think that's a typo.  But it says, yes and not to questions.

Next paragraph, it begins by saying reporting detectives went into the emergency room, spoke with Dr. Perez.  Further down, it says, Dr. Perez further indicated that the victim had to be relocated to another facility for further treatment, due to the not trauma status of Norwegian American Hospital.  Next page at the top, it says in part, the victim was spoken to briefly concerning identification and number of offenders.  Victim indicated by nodding to simple questions.  And that's all I want to read to you.

My question based on what I read to you, Dr. Sharkey, is this:  Based on your review of the medical records that were provided to you and based on your review of them both in 2015 as well as contemporaneously in 2000 -- I'm

Page 153

sorry -- in August and September of 1988, is there any medical reason to doubt Felix Valentin's ability to communicate as reflected in the police report I just read you?

MR. ART: So I have an objection to you reading it into the record, and I have a hearsay objection, and an objection to foundation and an objection to relevance.

MR. GIVEN: Okay. You can answer my question.

MR. ART: And the form.

Go ahead.

BY THE WITNESS:

A. So -- and I'm willing to answer it. What -- state to me exactly what your question is, if you will.

Q. Sure. Is there any medical reason to -- based on your review of the documents that you've looked at relating to Felix Valentin, is there any medical reason to doubt that the victim was unable to verbalize, but was motioning yes and not to questions?

MR. ART: On this date?

MR. GIVEN: On August 27th.

MR. ART: Same objections.

Go ahead, Doctor.

BY THE WITNESS:

A. Okay. If you want to go back to each one, I'll have to go back to each one. But if I can give you a general

Page 154

recollection, that that would be reasonable.  Yes.

BY MR. GIVEN:

Q.  Okay.

MR. ART:  And I think this is an inappropriate line of questioning; to read him massive amounts of police report and then ask him if there's anything about them that contradicts anything in the 500-page medical record.

BY THE WITNESS:

A.  So I mean, I have to -- to be honest, to give you a formal answer, I gotta go back and look at all the records from the 27th.  But I've got a decent memory.  I think we had already surmised that the 22nd, that was -- yeah.  He was -- had some awareness.

BY MR. GIVEN:

Q.  Okay.  And I think I may have misstated.  When I -- when I handed you -- what I just handed you, did I call it exhibit --

A.  It says 6 on it.

Q.  6?  Okay.  I should have given you 5.  I just went out of order.  So now I'm gonna hand you what's marked as Exhibit 5, which I should have done earlier.  Apologize.

And on -- this is a -- for the record, a police report Bates stamped CPD 57, 58, 59 and 60 dated 27 August of 1988.  It is -- I will state for the record and tell you that

Page 155

this is a report written by a beat officer Nuchain (phonetic). And on the second page in particular, starting at the bottom, I am going to -- and there's a standing objection to this. I understand. But I'm doing this in order to make things go faster, rather than have you read it into the record. It says, reporting officers were able to somewhat communicate with victim and learn the following: Suspect: Auto, older model. It goes on to describe the older model. And it says, suspect offenders: One: Male, white, Latin King gang affiliation. Driver of car: No further details at this time. Two: Male white Latin King gang affiliation. Passenger in above auto last seen with yellow baseball hat; light to medium complexion. It goes on from there.

My same question to you is based on your review of the hospital records, is there any medical reason to doubt that Felix Valentin had the ability to communicate in the manner that is shown on this report?

MR. ART: I have an objection, again to you reading the police report into the record. I have a hearsay objection, a foundation objection, a relevance objection. The question's compound. I have an objection to the form. I have an objection that it would require him to go back through the medical records and read them all.

Page 156

But with those objections, please answer.

BY THE WITNESS:

A.   That would seem reasonable, yes.

BY MR. GIVEN:

Q.   Okay.  Now I'm going to ask the court reporter to hand you Exhibit 7.  For the record, Exhibit 7 is a Chicago police report; copy of a supplementary report Bates stamped CPD 0019 through 21, dated September 1st of 1988.

You have that; right?

A.   Correct.

Q.   Doctor?  Okay.  So on -- I'm going to start on Page 2.  And I'm just gonna read you a couple sentences, and I'll stop after each sentence or two and ask you questions.

So if you go to the second from the bottom paragraph, it says, on today's date.  And then about halfway through there, it says -- there's a sentence that starts, verbal communication was next to impossible.  Do you see that?  One, two, three, four, five, six --

A.   Yes.

MR. ART:  That's your question?  I have all of the same objections, if that's your question.

MR. GIVEN:  My question was, do you see that.

MR. ART:  Right.  So I have all of the same objections as I just previously made.

MR. GIVEN:  Okay, Steve.

Page 157

BY MR. GIVEN:

Q.   So now that you see the sentence, let me read it to you.

A.   Okay.

Q.   Verbal communication was next to impossible, due to ventilator hookup through mouth and throat.

Is that sentence consistent with your review of the medical records?

MR. ART:   Same objections.

BY THE WITNESS:

A.   So what date are we on?

BY MR. GIVEN:

Q.   This report is dated 1 September?

MR. ART:   Is it reporting events on 1 September? Do you want to purport that for the record?

MR. GIVEN:   Would you?

MR. ART:   No.   I -- I think the entire project of having some witness who has no firsthand knowledge of these documents answer questions about them with you making representations about what they are is inappropriate.

MR. GIVEN:   Done?

MR. ART:   Yes.

BY MR. GIVEN:

Q.   My question, Doctor, is this:   Would you agree that

Page 158

on September 1st, verbal communication was next to impossible -- let me start over.

Would you agree that on September 1st, 1988, with regard to Felix Valentin, that verbal communication was next to impossible, due to ventilator hookup through mouth and throat?

MR. ART: I object to the form of the question. I object to you reading the police report. It's hearsay. I have a foundation objection. I have an objection to the relevance. The question is compound. I have an objection to form. I have an objection to you asking him to compare police reports to 500 pages of medical records.

But go ahead.

BY THE WITNESS:

A. So again, to be a hundred percent certain, I have to go back to the 1st of September. But I remember the problems beginning around the 4th of September, so I would assume that that was acceptable. Yes. And I don't know if this is when he went to surgery that one time, is why he was on the ventilator when we had the questions of his responsiveness. But I don't see anything there that would make me uncomfortable for the 1st of September.

BY MR. GIVEN:

Q. Okay. Let's go to the bottom paragraph on Page 20.

Begins RD's return to Cook County hospital.

You see that?

A.   Yes.

Q.   One, two, three -- four lines down, the sentence reads, the victim does not have use of his limbs and is basically paralyzed from the neck down.

Do you see that?

A.   Uh-huh.

Q.   Do you need to go through the 500 pages of documents to tell me whether that is accurate or not?

MR. ART:  I have the same objections.

Go ahead.

BY THE WITNESS:

A.   The paralyzed, no.

BY MR. GIVEN:

Q.   He was paralyzed, just not from the neck down.

Is that correct?

MR. ART:  Same objections.

Go ahead.

BY THE WITNESS:

A.   Well, he pretty much paralyzed -- I mean, at the shoulder level.  Yes.

BY MR. GIVEN:

Q.   Okay.  And then the next page, one, two, three, four -- starting five lines from the top, it says, it should

Page 160

also be noted that the victim was in constant motion side to side, in parenthesis, as the whole bed moved to help keep lungs from filling with fluid.  Staff indicated that victim presently in danger of contracting pneumonia.

See that sentence?

MR. ART:  Same objection.

BY THE WITNESS:

A.  Yes.

BY MR. GIVEN:

Q.  Is that sentence consistent with your understanding of the medical records?

MR. ART:  Same objections.

Go ahead.

BY THE WITNESS:

A.  It's really for pressure sore purposes.  But yeah. That's fine.  It was -- sounds like a nurse's understanding of what was going on.  Yes.

BY MR. GIVEN:

Q.  And then the last sentence says, it was then decided to cease the photo identification until later in the week, semicolon, when the physician indicated that the tubes would be removed from victim's throat.

You see that?

MR. ART:  Same objections.

BY THE WITNESS:

Page 161

A.    Yeah.

BY MR. GIVEN:

Q.    Do you recall being the physician that the police talked to?

MR. ART:    Same objections.

BY THE WITNESS:

A.    I unfortunately don't remember.  I wish I did.

BY MR. GIVEN:

Q.    Okay.  That's all the questions I have on that one. Last I'll have the court reporter hand you what's been marked Exhibit 8.

Exhibit 8 is a police record titled Hospitalization Case Report.  I will represent to you that it was Bates stamped CPD 55.  It's just -- was Bates stamped in that bottom area where it's all black, so you can't see it.  It's dated 15 September 1988.  It's written by a Chicago police officer; the reporting officer Letrin (phonetic), I believe.

A.    Uh-huh.

Q.    Mr. Art doesn't like it when I read to you, so could you read for me in the section that says narrative in the middle of the page where it says -- begins in summary?

A.    Uh-huh.

MR. ART:    Jeff, you've read all the other ones, so go ahead and read this one.  I think whether you read it or he reads it, the objections are the same.

MR. GIVEN: Fair enough.

THE WITNESS: I used to read in church sometimes.

MR. GIVEN: He just doesn't like hearing my voice, that's all.

BY MR. GIVEN:

Q. In summary, above subject was brought -- and by the way, the above subject is Felix Valentin, misspelled Valentine.

In summary, above subject was brought into Cook County Hospital by Reliable Ambulance from Norwegian American Hospital.

Is that statement consistent with your understanding of the records?

A. Correct.

MR. ART: Same objections.

BY MR. GIVEN:

Q. Above subject was a victim of a gunshot wound under RD -- it has a police number RD of K 371-955.

Putting aside the RD number, is that sentence consistent with your understanding from the medical records that he was the victim of a gunshot wound?

MR. ART: Same objections.

BY THE WITNESS:

A. Yes.

BY MR. GIVEN:

Page 163

Q.   Continues -- I'll put aside it has a sentence about the address.  While subject was in Cook County Hospital trauma unit, he contracted a germ known as a -- and he has that word.

A.   He tried pretty good.  That's pretty darn good.

Q.   He tried pretty well.

A.   Yeah.

Q.   He spells it A-n-i-n-c-t-o-b-a-c-t-e-r.  That's the thing we were talking about earlier; right?

A.   I told you I thought they closed the trauma unit down.

MR. ART:  Same objections.

BY MR. GIVEN:

Q.   That's consistent with what the medical records tell us.

Right?

MR. ART:  Same objections.

BY MR. GIVEN:

Q.   And then it says, which closed down the trauma unit for 24 hours from 13 September '88 to 14 September of '88 between 1800 hours to 1800 hours.

You see that?

MR. ART:  Same objections.

BY THE WITNESS:

A.   Yes.

Page 164

BY MR. GIVEN:

Q.   Does that refresh your recollection of what you had mentioned earlier about the trauma unit having a problem with the Acinetobacter?

A.   That's correct.

MR. ART:   Same objections.

BY MR. GIVEN:

Q.   In fact, was the trauma unit closed down for 24 hours from 13 September to 14 September?

A.   That's my understanding.   That -- that was my recollection.

Q.   Is that reflected anywhere in those 500 pages that you reviewed?

A.   I don't think you'd make a celebration out of it in the medical record.   But the patients would have stayed.   The patients that were already admitted there, I believe were moved to different intensive care facilities and we cared for them there.   And then they took the whole unit on a scrub-down cleaning.   So I think we still cared for the patients during that period of time; just, they didn't accept any intake patients.   And we moved patients in order to clean areas.   Yes.   That's what I remember.

Q.   But there's nothing in the documents that reflect what you just told us.

Right?

Page 165

A.    That is correct.

Q.    It says, RO's talked to Cook County Hospital assistant administrator Andrea Manor.  Do you remember somebody named Andrea Manor or Minor, perhaps?  Maybe Munoz.  Let's try that over.

A.    Munoz might have been right.  That sounds relatively familiar.

        MR. ART:  Same objections.

BY MR. GIVEN:

Q.    And then above, pronounced at 11:56 14 September '88 at Cook County Hospital by doctor -- they misspell your name.

A.    That's better than most people.  Shaky is the one I don't like for a surgeon.  That's -- the Filipino nurses would announce to all the 16-year-old hernia patients -- I'm sorry if there's a Filipino on the jury -- but Dr. Shaky your doctor.  And they would get up and leave the cart.

Q.    Is that last sentence that I read accurate, based on your examination of the medical records?

        MR. ART:  Same objections.

BY THE WITNESS:

A.    Yes.

        THE VIDEOGRAPHER:  We have seven minutes till tape change.

BY MR. GIVEN:

Page 166

Q.   Is there anything else that you recall about Felix Valentin and your treatment of him during his stay at the Cook County Hospital in August and September of 1988 that we haven't talked about today?

A.   No.

MR. GIVEN:  I have no other questions.

MR. ART:  Did you say seven minutes?

(Off the record.)

REDIRECT EXAMINATION

BY MR. ART:

Q.   All right.  Back on the record.  Let's go back on the record.  Okay.

Doctor, the police exhibits -- the police report exhibits that you just looked at; Exhibits 5 through 7 -- or 5 through 8, have you ever seen them before in your life?

A.   No.

Q.   Do you have any knowledge of the underlying facts reported in those reports or how they reported or anything about those reports?

A.   Have I ever referenced them before; any police reports?  No.

Q.   Do you have any personal knowledge of the things that the police wrote in those reports or why they wrote them in those reports?

MR. GIVEN:  Objection; form.

Page 167

BY THE WITNESS:

A.   No.

BY MR. ART:

Q.   Did Mr. Given show you a report from September 10th, 1988?

A.   No.

Q.   Okay.  I want to talk to you about questions he asked you about bias and our conversations.  Okay?  Do you recall the questions he asked you?

A.   Go ahead and ask me.

Q.   Okay.  Your testimony here today is based on your medical understanding of the medical records.

Correct?

A.   That's correct.

Q.   And to some very limited extent, a slight memory of Felix Valentin that you have.

Correct?

A.   That's correct.

Q.   You had a conversation with me prior to this deposition.

Correct?

A.   Correct.

Q.   And you had a conversation with counsel for the defendants prior to this deposition.

Correct?

Page 168

A.   Correct.

Q.   Did anything about either of those conversations influence your testimony here today?

A.   No.

Q.   Was your testimony truthful to a reasonable degree of medical certainty?

A.   Yes.

Q.   Did anyone -- and you testified about this earlier, but did anything about the parties that I or Mr. Given represent influence the manner in which you testified here today?

A.   The only thing that I would say was that I -- I had a bias against, you know, giving testimony in favor of you or your client.

Q.   In favor of me or my client?

A.   Yeah.

Q.   And as you have testified about already, you overcame that bias; correct, and provided fair and accurate testimony?

A.   That's my impression, yes.

Q.   I want to talk to you about the hourly rates that you charge for consulting and this deposition.

A.   Yes.

Q.   You are a plastic surgeon; correct?

A.   Yes.

Q. Is -- is it true that the rate that you have charged for this deposition and your previous consults with us is a reasonable rate for a professional in your situation, if not a discounted rate?

A. I'm losing money.

MS. ROSEN: Objection; form, foundation.

BY THE WITNESS:

A. As we speak, I'm losing money.

BY MR. ART:

Q. Okay.

A. If that's what's important, I don't know. I make a good living. Yes.

Q. Yes. If you weren't here with us today, you could be working on other medical projects.

Correct?

A. Yes.

Q. Mr. Given asked you a series of questions about whether the visits with family or visitors or police officers were recorded in the medical record.

Do you recall those questions?

A. Yes.

Q. You -- you testified earlier that there is a record of a visit with the police at the beginning of Mr. Valentin's stay at the Cook County Hospital.

Correct?

Page 170

A.   I haven't reviewed the record this week, so it's just, that's a recollection I have from when I first -- you two would know that better than I would right now.

Q.   Right.  But you have a recollection that there is such a note?

A.   That's correct.

Q.   And you did not find any such notes later; correct?

A.   That's correct.

Q.   There are notes later talking about visits from family.

Correct?

A.   Correct.

Q.   And visits from unidentified individuals.

Correct?

A.   Visitors, correct.

Q.   But nothing about a visit with police specifically.

Correct?

A.   Correct.

Q.   You testified earlier that Mr. Valentin was on a constant decline --

A.   That's correct.

Q.   -- the entire time he was at Cook County Hospital.

Correct?

MR. GIVEN:  Objection; form, misstates his testimony.

Page 171

You can answer.

BY THE WITNESS:

A.    Yeah.  I do think that's a little bit -- I apologize.  I kind of surprised myself I got a little emotional about that part.

BY MR. ART:

Q.    No, no.  That's fine.

A.    But yeah.  Around September 4th or 5th.  It's strange to see his record, and you realize I'm sitting there trying to fix him and I -- I know I'm not gonna be able to. Yeah.

Q.    Fair enough.  And I did not mean to misstate what you were saying.  So let me -- let me ask you the question this way:  Is there a point in time during his stay where you can mark a -- a real decline in his health?

A.    I -- I don't have -- when I was looking at the full record again and going through it, I think around the 4th or the 5th, he had a temperature of around 104 or 105.  That -- that's him showing his fulminant pneumonia.  And then it just takes the body two days for where he can't -- he can't compensate anymore for it.  And that's when he gets intubated, and the bug is not treatable and he succumbs to his illness.  Yeah.

Q.    Thanks, Doc.

So Mr. Given asked you a series of questions about

Page 172

whether Mr. Valentin was alert and oriented at Norwegian Hospital prior to Cook County.

Do you recall those questions?

A.   Yes.

Q.   And he asked you a number of questions about whether he was alert and oriented based on the medical records between August 27, 1988, when he comes into Cook and, you know, the large portion of the medical record between then and September 3rd.

Do you recall those questions?

MR. GIVEN:   Objection to the characterization of my questions.   It was not limited to September 3rd.

With that objection, you can answer.

BY THE WITNESS:

A.   Yeah.   So I think he started getting sick around the 3rd or the 4th.   I think he's fair to, you know, object to that.   I think he gets pretty sick around -- he's declining that whole time, but he still had some notes that said he was responsive.   The 6th, I think is where he seems like he's really starting to fall apart.

BY MR. ART:

Q.   Okay.   And we -- I asked you a number of questions about what the records reflect about September 9th and September 10 in my initial questions to you.

Do you recall my questions?

Page 173

A.   Correct.

Q.   So this discussion about his state on September 6th or 4th or 3rd, whatever you want to call it and earlier really doesn't impact your review -- or your conclusions about the medical record on September 9th and September 10th. Correct?

A.   That's correct.

MR. GIVEN:  Objection to form.

Your answer can stand.

BY MR. ART:

Q.   Mr. Given asked you some questions about what unresponsive means to different people.  Do you recall those questions?

A.   Uh-huh.

Q.   And you testified that as far as you're concerned, you'll go through a series of steps with the patient to figure out response?

A.   Uh-huh.

Q.   Verbal cues; correct?

A.   Yes.

Q.   Touch; correct?

MR. GIVEN:  I'm gonna object.  These are all extremely leading.  This is your witness.

MR. ART:  Yeah.  But it's on redirect on questions you asked.

MR. GIVEN:  I don't care.  You can't -- you can't use leading questions.  That's my objection.  If you don't want to change them, that's fine.

BY MR. ART:

Q.   Can you please describe to us again the things you just told Mr. Given about?

MS. ROSEN:  Objection; asked and answered.

MR. ART:  You guys, stop it.  Really.  Like --

MS. ROSEN:  Did you just tell me to stop objecting?

MR. ART:  No.  I just -- Jeff Given is telling me not to ask an open -- or a question about something he asked on cross.  And then when I --

MR. GIVEN:  My objection was leading.

MR. ART:  And when I asked it in a non-leading way, you tell me it's asked and answered.  You guys are --

MS. ROSEN:  It was asked and answered when you were leading it too, but he objected first.  It's still all asked and answered.  He's already -- your question is premised on didn't Jeff Given already ask you these questions.  So asked and answered.

MR. ART:  Okay.  I'm just trying to get the witness to a place where he can answer my follow-up questions to Jeff's questions.  So I will lead him and I will suffer the consequences.

Mr. Given asked you -- so strike my former

Page 175

question, if I had one pending.

BY MR. ART:

Q. Mr. Given asked you a series of questions about what unresponsive means to different people.

Do you recall those questions?

A. That's correct.

Q. And do you recall telling him things that you do to try to get a response out of people?

A. Yes.

Q. As of September 10th or September 9th, 1988, Mr. Valentin was failing to respond to all of those things.

Correct?

MR. GIVEN: Objection; form, misstates.

You can answer.

BY THE WITNESS:

A. So I have to give him the --

MR. GIVEN: And leading.

BY THE WITNESS:

A. I have to give the fact that I said he's less responsive today on a note I think -- and I can review that again, if it's important -- reflect the possibility of the 10th. But from reviewing the entire record, looking at the medications and the other notes, it's my impression that he would not have been able to answer any questions on the 10th or the 11th.

Page 176

BY MR. ART:

Q.   And if that note that you're talking about is misdated the 11th and you're talking about the way he was on the 9th, then we really we have a clear record of what was going on on the 10th.

Correct?

MS. ROSEN:  Objection; form.

THE VIDEOGRAPHER:  We're out of time.

MR. ART:  Okay.

THE VIDEOGRAPHER:  We're going off the record at 6:05.

(Off the record.)

THE VIDEOGRAPHER:  We're going back on the record at 6:07.

MR. ART:  Can you read back the last complete question and answer?

COURT REPORTER:  Yes.

MR. ART:  Thank you.

COURT REPORTER:  Well, there wasn't an answer.

MR. ART:  Right.  So what was the question?

(Record read back by court reporter as requested.)

MR. GIVEN:  Objection; form.

MR. ART:  And then he said I don't understand your question.

MR. GIVEN:  Right.

Page 177

MR. ART: So I'm gonna strike the question.

BY MR. ART:

Q. And let me ask you this: Mr. Given asked you if it was -- sorry. Strike that.

Mr. Given asked you if -- strike that.

Mr. Given asked if it was not impossible that Valentin would have been able to make an ID on September 10th?

A. Correct.

Q. You testified, I believe in response, that it would be extremely unlikely.

Correct?

A. Correct.

Q. Do you stand by your earlier testimony that on that date, given your review of the whole medical record, he could not reliably have spoken with another person?

MR. GIVEN: Objection; form, asked and answered.

BY THE WITNESS:

A. Communicating or speaking?

BY MR. ART:

Q. Spoken.

A. I -- I believe he did not speak to anybody on that day.

Q. Okay. And then on that day, based on your review of the record, do you still believe that he could not have

Page 178

reliably looked through a photo album?

A. Yes.

MR. GIVEN: Objection; form, foundation, incomplete hypothetical, calls for speculation.

BY MR. ART:

Q. And now answer.

A. Yes.

Q. During that period of time, his eyes were not responding to light stimulus on a neurological level.

Correct?

MR. GIVEN: Objection; asked and answered.

Steve, you asked that. We spent five, 10 minutes on that.

MR. ART: Jeff, it's redirect.

MR. GIVEN: So. Redirect doesn't mean you get to ask the same questions over. What redirect means is you get to ask new questions.

MR. ART: Jeff, calm --

MR. GIVEN: Steve, Steve, Steve, I am calm, my friend. But you take great lengths of time to correct me and tell me how smart all of your objections are, so I thought I would just take a few seconds to explain what my objection was. Asked and answered.

You can go ahead.

THE WITNESS: You guys get paid more than the

lawyers in Gainesville.

Sorry. Could you tell me your question again?

MR. ART: I wish I could.

BY MR. ART:

Q. Here's my question: On September 9th and 10th, Mr. Valentin was not responding on a neurological level to -- or he was responding sluggishly to light shined in his eyes?

MR. GIVEN: Objection; leading.

BY THE WITNESS:

A. So yes. That is the case. But again, when we further reviewed the chart, some of that may have been related to ophthalmological medications. I'm not sure of that. But there were several notations that his eyes were not appropriately responsive. Yes.

BY MR. ART:

Q. He was on a paralytic drug.

Correct?

A. It could have --

MR. GIVEN: Objection. Hold on, Doctor. Sorry. I don't want to speak over you. And it's harder for her to take all it all down, if only one of us talks at a time.

Objection; leading. Objection; asked and answered.

BY THE WITNESS:

A. Go ahead and give me the question.

BY MR. ART:

Q. It was he was on a paralytic drug; correct?

MR. GIVEN: Same objection.

BY THE WITNESS:

A. He was on a paralytic drug that would have had an affect on his eye blinking. Is that what you're asking? Yes.

MR. ART: That's all the questions I have.

MR. GIVEN: Wait, wait, wait. Do you want to do his CV?

MR. ART: Thank you. Thank you, Jeff. I do.

MR. GIVEN: This one's got my handwriting.

THE WITNESS: It reminds me who I am.

MR. ART: Let me mark that as Exhibit 9.

(Thereupon, Exhibit Number 9 was marked for identification)

THE WITNESS: I promise you that's been updated in the last 30 years, but not very close.

BY MR. ART:

Q. I'm showing you what's marked as Exhibit 9. Is this an accurate copy of your current CV?

A. I am not possible affiliated with North Florida presently.

Q. That's Page 2?

A. That's Page 2. If -- if that's in -- I may still

Page 181

be a member of the general surgery boards through my hand, but I relinquished my general surgery boards, because I didn't want to take the test for general surgery a couple years ago. The rest is fine.

MR. ART: Thank you, doctor.

RECROSS-EXAMINATION

BY MR. GIVEN:

Q. Just to follow up, when you were talking about the general surgery, can you point to me what you were just talking about?

A. I think it's probably my plastics or my hand certificate. I'm -- I'm triple boarded general surgery, but I had to take a test four years ago, and I saw how much I'd have to restudy general surgery and I said no. So I'm plastic surgery board certified and hand surgery board certified. And I may keep my general surgery boards through my hand surgery. I can't remember if that's the way it worked. But --

Q. So let me ask this: Everything we're talking about today regarding Felix Valentin is about general surgery. Right?

A. Correct.

Q. Which you may or may not be board certified in as we sit here today?

A. Correct. But I have been beforehand.

Page 182

Q.   Sure.   Am I correct that on those police reports that we talked about in Exhibits 5 through 8 -- let me start the question over.

In the police reports that we talked about in Exhibits 5 through 8, am I correct that those reports contain in part references to certain medical information that is also reflected in the medical records you reviewed?

MR. ART:  And I object to hearsay, foundation, relevance.

Go ahead.

BY THE WITNESS:

A.   I think the answer to your question is yes.

MR. GIVEN:  Okay.  I have no other questions.

Eileen?

MS. ROSEN:  I have, like, two hours.

MR. ART:  That was actually a good one.

THE WITNESS:  Eileen, I can tell you have got the sense of humor.

MS. ROSEN:  No.  I have nothing.  Thank you.

MR. ART:  Do you want to review this?

THE WITNESS:  I don't want to review this.

MR. ART:  Okay.  Just so the record's clear, you have an option to review or trust the reporting and waive signature.

THE WITNESS:  To waive.  That's correct.

MR. ART:  So you're waiving?

THE WITNESS:  I'm waiving.

MR. ART:  Thank you very much, Doctor.

MR. GIVEN:  Thank you, Doctor.

Thank you very much.

(Deposition concluded.)

Page 184

CERTIFICATE OF OATH

STATE OF FLORIDA:

COUNTY OF ALACHUA:

          I, the undersigned authority, certify that ARTHUR SHARKEY, M.D. personally appeared before me and was duly sworn.

          WITNESS my hand and official seal this 29th day of January 2016.

                                        LEAH UNDERWOOD
                                        Notary Public - State of Florida

Page 185

REPORTER'S DEPOSITION CERTIFICATE

STATE OF FLORIDA:

COUNTY OF ALACHUA:

           I, LEAH UNDERWOOD, Court Reporter, certify that I was authorized to and did stenographically report the deposition of ARTHUR SHARKEY, M.D.; that a review of the transcript was not requested; and that the transcript is a true and complete record of my stenographic notes.

           I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

           DATED this 29th day of January 2016.

                         LEAH UNDERWOOD
                         Court Reporter

# EXHIBIT 72

**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| GERALDO IGLESIAS, | ) | |
| | ) | No. 19 C 6508 |
| *Plaintiff,* | ) | |
| | ) | Hon. Franklin U. Valderrama, |
| *v.* | ) | District Judge |
| | ) | |
| REYNALDO GUEVARA, *et al.,* | ) | |
| | ) | JURY TRIAL DEMANDED |
| *Defendants.* | ) | |

**PLAINTIFF GERALDO IGLESIAS'S CONSOLIDATED RESPONSE
IN OPPOSITION TO DEFENDANTS' SUMMARY JUDGMENT MOTIONS**

Jon Loevy
Anand Swaminathan
Steve Art
Rachel Brady
Sean Starr
Meg Gould
**LOEVY + LOEVY**
311 N. Aberdeen St.
Chicago, IL 60607
(312) 243-5900
steve@loevy.com

**TABLE OF CONTENTS**

**Page**

I.    IGLESIAS IS INNOCENT OF THE ROMAN MURDER ..........................................3

II.    ROMAN IS SHOT IN A CAR ON THE STREET IN LOGAN SQUARE.................................................................................................................3

III.    DEFENDANTS HAD NO LEADS ..............................................................................3

IV.    OCHOA AND RODRIGUEZ DID NOT SEE AND COULD NOT IDENTIFY THE PERPETRATOR ...........................................................................4

V.    DEFENDANTS DECIDE ON IGLESIAS AS THEIR SUSPECT WITHOUT EVIDENCE AND FABRICATE A TIP FROM A CONFIDENTIAL INFORMANT .........................................................................5

VI.    DEFENDANTS FRAME IGLESIAS IN TWO DAYS IN JUNE 1993.......................6

VII.    THE DEFENDANTS FABRICATE AN INCRIMINATING STATEMENT FROM VICENTE USING FORCE, THREATS, AND PROMISES, AND THEN SUPPRESS WHAT THEY HAVE DONE........................8

VIII.    THE DEFENDANTS SUPPRESS KEY EVIDENCE THROUGHOUT THE PROSECUTION OF IGLESIAS ..........................................................................9

IX.    IGLESIAS IS CONVICTED AT TRIAL.................................................................11

X.    THE CITY OF CHICAGO'S OFFICIAL POLICIES CAUSED IGLESIAS'S WRONGFUL CONVICTION.............................................................12

XI.    IGLESIAS FIGHTS TO PROVE HIS INNOCENCE AND IS EXONERATED.........................................................................................................13

XII.    DEFENDANTS REFUSE TO TESTIFY IN THIS CIVIL CASE ............................13

XIII.    VICENTE COMES CLEAN ......................................................................................14

I.    DEFENDANTS CONCEDE AND DO NOT CHALLENGE THAT MANY OF IGLESIAS'S CLAIMS REQUIRE A TRIAL.........................................15

II.    SEVENTH CIRCUIT LAW DICTATES THAT THIS COURT SHOULD NOT PARSE SUB-THEORIES OF LIABILITY AT SUMMARY JUDGMENT IN A FAIR TRIAL CASE .................................................18

III.    SUMMARY JUDGMENT IS UNAVAILABLE TO GUEVARA AND HALVORSEN IN LIGHT OF THEIR INVOCATION OF THE FIFTH AMENDMENT.............................................................................................................20

    A.  Guevara and Halvorsen Cannot Meet Their Initial Burden of Production At Summary Judgment.........................................................................21

    B.  Guevara and Halvorsen Cannot Meet Their Burden of Persuasion At Summary Judgment .................................................................23

ii

C.  Requiring More Evidence In Addition to the Assertion of Fifth Amendment Rights Before Denying Summary Judgment Is Contrary to Law ................................................................................24

D.  Guevara and Halvorsen Cannot Assert Their Fifth Amendment Rights and Then Obtain Summary Judgment Given Other Evidence in the Record ...........................................................26

IV.  SUMMARY JUDGMENT IS UNAVAILABLE TO THE DEFENDANT OFFICERS ...................................................................27

A.  A Reasonable Jury Could Conclude That Defendants Fabricated False Evidence ...............................................................................29

1.  Riccio, Gawrys, and Biebel Fabricated Evidence ...........................................32

2.  Ochoa's and Rodriguez's Identifications Were Fabricated ............................36

3.  Defendants' Fabrication of the Confidential Informant Tip Was Used to Deprive Iglesias of His Liberty ......................................................39

B.  Independently, A Reasonable Jury Could Conclude That Defendants Suppressed Material Exculpatory and Impeachment Evidence ................................................................................................43

1.  Defendants Suppressed Their Own Fabrications .............................................45

(a)  Defendants' Position That Suppressions of Fabricated Evidence Cannot Violate Due Process Is Wrong .....................................46

(b)  *Gauger*'s Rule Regarding Suppressions Relating to False Confessions Cannot Apply To This Case........................................47

(c)  Defendants' Suppressions of Their Fabrications Were Material to Iglesias's Criminal Prosecution................................................50

2.  Defendants Suppressed Exculpatory and Impeachment Evidence Independent of Their Fabrications .....................................................51

(a)  Defendants Suppressed That Both Eyewitnesses Told Police that They Did Not See and Could Not Identify the Shooter ...............................................................................................51

(b)  Defendants Suppressed That Iglesias Was Their Suspect Before There Was Any Evidence Implicating Him, and They Suppressed A Document Showing They Had Picked Him As A Suspect First ..................................................52

(c)  Defendants Suppressed Their Interactions with Vicente ..........................53

(d)  Defendants Suppressed Their Interactions with Ochoa ............................55

(e)  Defendants Suppressed Their Own Pattern of Misconduct..................................................................................................56

3.  Defendants' Arguments About Other Suppressed Exculpatory and Impeachment Evidence Lack Merit....................................57

(a) Defendants Suppressed A Note Documenting That A Witness Knew the Shooter ....................................................................58

(b) Defendants Suppressed Documentary Evidence That They Believed Spanish Cobras Had Committed the Crime ........................................................................................................62

(c) Defendants Suppressed Arnell Moore's Non-Identification of Iglesias ...............................................................63

(d) Defendants Suppressed Their Interactions with Rodriguez .............................................................................................65

(a) Defendants Suppressed Exculpatory Police Documents ...........................68

C. Independently, A Reasonable Jury Could Conclude That Defendants Utilized Unduly Suggestive Lineup Procedures That Tainted Iglesias's Criminal Trial .................................................................70

  1. Unduly Suggestive Identification Procedures That Taint A Criminal Case Violate Due Process and Are Actionable Under § 1983 ...............................................................................................70

     (a) The Seventh Circuit Recognizes This Type of § 1983 Claim ...................................................................................................70

     (b) *Vega* Does Not Affect This Type of § 1983 Claim .................................71

  2. Defendants Used Unduly Suggestive Identification Procedures That Tainted Iglesias's Criminal Case and Violated His Right to Due Process ...................................................................74

     (a) The Identification Procedures Were Unduly Suggestive ..........................74

     (a) Ochoa's and Rodriguez's Identifications Were Not Reliable ................................................................................................78

     (b) The Identifications Tainted Iglesias's Criminal Proceedings ..........................................................................................81

  3. Whether or Not Iglesias's Attorneys Objected to the Admission of the Identifications At the Criminal Trial Has Zero Bearing on This Theory ........................................................................84

  4. Defendants Are Not Entitled To Summary Judgment Merely Because They Disclaim Intent .........................................................87

  5. Defendants Are Not Entitled To Qualified Immunity on This Theory ............................................................................................89

D. A Jury Must Decide Iglesias's Fourth Amendment Illegal Seizure and State Law Malicious Prosecution Claims .........................................91

E. A Jury Must Decide the Failure-To-Intervene Claims .........................................95

F. A Jury Must Decide Iglesias's State-Law Claim of Intentional Infliction of Emotional Distress .........................................................................97

iv

G.  A Jury Must Decide the Section 1983 Conspiracy Claims ...................................97

H.  A Jury Must Decide the State Law Negligence Claim .......................................101

V.  SUMMARY JUDGMENT IS UNAVAILABLE TO THE CITY OF
CHICAGO ..........................................................................................................103

A.  The City Misstates the Legal Framework Governing *Monell*
Claims ...............................................................................................................106

B.  The City Does Not Move for Summary Judgment On A Number
of Iglesias's *Monell* Theories, and So A *Monell* Trial Will Occur
No Matter What ................................................................................................107

C.  The City Is Precluded from Relitigating Its Official Policy of
Evidence Suppression ......................................................................................110

D.  The City Does Not and Cannot Challenge Iglesias's *Monell*
Theory That City Policymakers Promulgated Policies That Were
Deficient to Stop Evidence Suppression..........................................................111

E.  A Jury Must Decide the *Monell* Theory Regarding the City's
Widespread Practice of Evidence Suppression.................................................112

1.  The City's False Premise Regarding Expert Evidence .................................112

2.  The City Invokes the Wrong Legal Standard for Widespread
Practice Claims ............................................................................................112

3.  The City Has Already Lost the Widespread Practice of
Evidence Suppression Theory Multiple Times, Which
Makes Its Argument for Summary Judgment Frivolous ..............................114

4.  Non-Expert Evidence Establishing the City's Evidence
Suppression Practice ....................................................................................115

5.  Expert Evidence Demonstrating the City's Evidence
Suppression Practice ....................................................................................120

6.  The City's Arguments for Summary Judgment on the File
Suppression *Monell* Theory Lack Merit .....................................................122

   (a)  The City's Causation-Related Arguments Lack Merit ...........................122

   (b)  The City's Arguments Challenging Mr. Tiderington
        Lack Merit............................................................................................124

F.  A Jury Must Decide the *Monell* Theory Regarding the City's
Failure to Train, Supervise, and Discipline Its Police Officers .........................128

1.  Non-Expert and Expert Evidence Supports the Failure to
Train, Supervise, and Discipline Theory ......................................................129

2.  The City's Arguments for Summary Judgment on the Failure
to Train, Supervise, and Discipline *Monell* Theory Lack
Merit.............................................................................................................143

(a) The City's Reiterated Arguments Regarding Mr. Finnell and Ms. Meza Lack Merit and Do Not Justify Summary Judgment ....................................................................143

(b) The City's Argument About Burge Evidence Lacks Merit.................................................................................145

(c) The City's Argument About Lawsuits Against Officers Lacks Merit.................................................................146

(d) The City's Argument About Complaint Register Files Lacks Merit.................................................................147

G. A Jury Must Decide the *Monell* Theory Regarding the City's Widespread Practice of Fabricating Witness Identifications Using Suggestive Identification Procedures ...........................................149

1. Non-Expert Evidence Supporting the Widespread Practice of Fabricating Identifications.........................................150

2. Expert Evidence Supporting the Widespread Practice of Fabricating Identifications ...............................................153

3. The City's Arguments for Summary Judgment on the Fabricated Identification *Monell* Theory Lack Merit ....................................158

H. The City's Remaining Arguments for Summary Judgment on the *Monell* Claims Lack Merit..................................................161

1. The City's Liability Does Not Necessarily Depend on Individual Liability ...................................................161

2. The City's Causation Argument Is Meritless.................................163

I. The *Respondeat Superior* and Indemnification Claims Survive Summary Judgment ...........................................164

**TABLE OF AUTHORITIES**

**Cases**                                                                                               **Page(s)**

*Adickes v. S.H. Kress & Co.,*
  398 U.S. 144 (1970) ................................................................................................*18*

*Alexander v. City of South Bend,*
  433 F.3d 550 (2006) ...................................................................................... *passim*

*Alexander v. United States,*
  721 F.3d 418 (7th Cir. 2013) ...................................................................................92

*Anderson v. City of Rockford,*
  932 F.3d 494 (7th Cir. 2019) ............................................................................41, 55

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ................................................................................................15

*Armstrong v. Daily,*
  786 F.3d 529 (7th Cir. 2015) ............................................................................65, 101

*Avery v. City of Milwaukee,*
  847 F.3d 433 (7th Cir. 2017) ...................................................................... *passim*

*Banks v. Dretke,*
  540 U.S. 668 (2004) ............................................................................................59, 69

*Baxter v. Palmigiano,*
  425 U.S. 308 (1976) ............................................................................................23, 24

*Beam v. IPCO Corp.,*
  838 F.2d 242 (7th Cir. 1988) ...................................................................................115

*Beaman v. Freesmeyer,*
  183 N.E.3d 767 (Ill. 2021) ........................................................................................92

*Belangen v. Schreiber,*
  407 F.3d 34 (2d Cir. 2005) .......................................................................................23

*Bell v. City of Milwaukee,*
  746 F.2d 1205 (7th Cir. 1984) ............................................................................98, 100

*Blackmon v. City of Chicago,*
  No. 19 CV 767, 2023 WL 7160639 (N.D. Ill. Oct. 31, 2023) ....................................71, 73, 75

## TABLE OF AUTHORITIES (cont.)

**Cases**                                                                          **Page(s)**

*Blasius v. Angel Auto., Inc.,*
839 F.3d 639 (7th Cir. 2016) ................................................................................124

*Bolden v. Pesavento,*
623 F. Supp. 3d 897 (N.D. Ill. 2022) .....................................................................71

*Bonds v. City of Chicago,*
No. 16-CV-5112, 2018 WL 1316720 (N.D. Ill. Mar. 14, 2018)...........................162

*Boss v. Pierce,*
263 F.3d 734 (7th Cir. 2001) ...........................................................................60, 61

*Briscoe v. LaHue*,
460 U.S. 325 (1983)...............................................................................................90

*Brown v. Mississippi,*
297 U.S. 278 (1936)...............................................................................................72

*Bryant v. Whalen,*
759 F.Supp. 410 (N.D. Ill. 1991) ..........................................................................93

*Buckley v. Fitzsimmons,*
509 U.S. 259 (1993)...............................................................................................41

*Byrd v. Brishke,*
466 F.2d 6 (7th Cir. 1972) .....................................................................................96

*Cage v. City of Chicago,*
No. 9 C 3078, 2010 WL 3613981 (N.D. Ill. Sept. 8, 2010)..................................162

*Calhoun v. Ramsey,*
408 F.3d 375 (7th Cir. 2005) ...............................................................................107

*Camm v. Faith,*
937 F.3d 1096 (7th Cir. 2019) ..........................................................................19, 49

*Canton v. Harris,*
489 U.S. 378 (1989).......................................................................................108, 128

*Carmichael v. Village of Palatine,*
605 F.3d 451 (7th Cir. 2010) .................................................................................17

**TABLE OF AUTHORITIES (cont.)**

**Cases** **Page(s)**

*Cartwright v. City of Chicago*,
    450 Fed. App'x 539 (7th Cir. 2011) ...................................................................95

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)...........................................................................................17

*Chavez v. Martinez,*
    538 U.S. 760 (2003)......................................................................................72, 73

*Chelios v. Heavener*,
    520 F.3d 678 (7th Cir. 2008) ...........................................................................95

*City of Chicago v. Reliable Truck Parts Co., Inc.,*
    822 F.Supp. 1288 (N.D. Ill. 1993) ...................................................................24

*City of Los Angeles v. Heller,*
    475 U.S. 706 (1986).........................................................................................162

*Coleman v. City of Peoria,*
    925 F.3d 336 (7th Cir. 2019) ......................................................................70, 86

*Collier v. City of Chicago,*
    2015 WL 50814408, (N.D. Ill. Aug. 26, 2015) ................................................93

*Costello v. Grundon,*
    651 F.3d 614 (7th Cir. 2011) ..........................................................17, 39, 109

*Crivens v. Roth,*
    172 F.3d 991 (7th Cir. 1999) ...........................................................................61

*Currie v. Chhabra*,
    728 F.3d 626 (7th Cir. 2013) ...........................................................................95

*Daniel v. Cook County,*
    833 F.3d 728 (7th Cir. 2016) ..................................................................113, 123

*Davis v. Carter,*
    452 F.3d 686 (7th Cir. 2006) ...........................................................106, 109, 114

*Dixon v. Cook County,*
    819 F.3d 343 (7th Cir. 2016) .........................................................................113

**TABLE OF AUTHORITIES (cont.)**

**Cases**                                                         **Page(s)**

*Doe-2 v. McLean Cnty. Unit Dist. No. 5 Bd. of Directors,*
593 F.3d 507 (7th Cir. 2010) ..................................................................................102

*Dominguez v. Hendley,*
545 F.3d 585 (7th Cir. 2008) ....................................................................................43

*Donald v. Outlaw,*
No. 2:17-CV-32-TLS, 2023 WL 2346270 (N.D. Ind. Mar. 3, 2023) ......................71

*Dura Auto. Sys. of Ind., Inc. v. CTS Corp.,*
285 F.3d 609 (7th Cir. 2002) ..................................................................................144

*Engel v. Buchan,*
710 F.3d 698, 699 (7th Cir. 2013)............................................................................46

*Escobedo v. Ram Shirdi,*
No. 10 C 6598, 2013 WL 1787819 (N.D. Ill. Apr. 25, 2013)................................164

*Estate of Moreland v. Dieter,*
395 F.3d 747 (7th Cir. 2005) ..................................................................................114

*Evans v. City of Chicago,*
2010 WL 3075651 (N.D. Ill. Aug. 5, 2010) ...........................................................162

*Evans v. City of Chicago,*
2006 WL 463041 (N.D. Ill. Jan. 6, 2006)...............................................................109

*Evans v. Katalinic,*
445 F.3d 953 (7th Cir.2006) .....................................................................................84

*Ezell v. City of Chicago,*
No. 18 C 1049, 2024 WL 278829 (N.D. Ill. Jan. 24, 2024) ............................49, 71

*Fields v. Chicago,*
981 F.3d 534 (7th Cir. 2020) ..................................................................................114

*Fields v. Chicago,*
No. 10 C 1168, 2017 WL 4553411 (N.D. Ill. Oct. 12, 2017)
*affirmed*, 981 F.3d 534 (7th Cir. 2020)............................................103, 110, 113, 114

x

## TABLE OF AUTHORITIES (cont.)

**Cases**                                                                                              **Page(s)**

*Fields v. City of Chicago,*
  2014 WL 477394 (N.D. Ill. Feb. 6, 2014) .................................................................................68

*Fields v. Wharrie,*
  672 F.3d 505 (7th Cir. 2012) .......................................................................................44, 45

*Fields v. Wharrie,*
  740 F.3d 1107 (7th Cir. 2014) ...........................................................................................30

*Fox v. Hayes,*
  600 F.3d 819 (7th Cir. 2010) .......................................................................................94, 97

*Fox v. Peters,*
  2011 WL 6378826 (N.D. Ill. 2011) ...................................................................................109

*Franks v. Delaware,*
  438 U.S. 154 (1978).............................................................................................................92

*Garcia v. City of Chicago,*
  No. 01 C 8945, 2003 WL 1715621 (N.D. Ill. Mar. 20, 2003) .............................................142

*Gauger v. Hendle,*
  349 F.3d 354 (7th Cir. 2003) ...............................................................................48, 49, 50

*Geinosky v. City of Chicago,*
  675 F.3d 743 (7th Cir. 2012) ............................................................................................100

*Gerstein v. Pugh,*
  420 U.S. 103 (1975).............................................................................................................91

*Giglio v. United States,*
  405 U.S. 150 (1972).......................................................................................43, 44, 45, 67

*Glisson v. Ind. Dep't of Corrections,*
  849 F.3d 372 (2017)..................................................................................106, 107, 108, 113

*Godinez v. City of Chicago,*
  No. 16-CV-07344, 2019 WL 5597190 (N.D. Ill. Oct. 30, 2019) .................................163, 164

*Goudy v. Cummings,*
  922 F.3d 834 (7th Cir. 2019) ........................................................................................18, 19

## TABLE OF AUTHORITIES (cont.)

**Cases**                                                                                    **Page(s)**

*Gray v. City of Chicago,*
   No. 18 C 2624, 2022 WL 910601 (N.D. Ill. Mar. 29, 2022) ....................................................75

*Graystone Nash, Inc.,*
   25 F.3d 187 (3d Cir. 1994)...........................................................................................................24

*Hampton v. City of Chicago,*
   2017 WL 2985743 (N.D. Ill. July 13, 2017).................................................60, 61, 73, 74, 75

*Hampton v. Hanrahan,*
   600 F.2d 600 (7th Cir. 1979) ......................................................................................................98

*Harris v. City of Chicago,*
   No. 20-CV-4521, 2020 WL 7059445 (N.D. Ill. Dec. 2, 2020)..............................................101

*Henry v. Ramos,*
   1997 WL 610781 (N.D. Ill. Sept. 28, 1997) ...............................................................................97

*Hensley v. Carey,*
   818 F.2d 646 (7th Cir. 1987) .........................................................................................72, 73, 90

*Hill v. City of Chicago,*
   No. 06 C 6772, 2009 WL 174994 (N.D. Ill. Jan. 26, 2009) .....................................................84

*Holland v. City of Chicago,*
   643 F.3d 248 (7th Cir. 2011) ......................................................................................................43

*Hollins v. City of Milwaukee,*
   574 F.3d 822 (7th Cir. 2009) ....................................................................................................128

*Holloway v. City of Milwaukee,*
   43 F.4th 760 (7th Cir. 2022) ...........................................................................................70, 71, 80

*Hope v. Pelzer,*
   536 U.S. 730 (2002)....................................................................................................................95

*Hudson v. City of Chicago,*
   No. 16-CV-4452, 2019 WL 1112260 (N.D. Ill. Mar. 11, 2019)............................................164

**TABLE OF AUTHORITIES (cont.)**

**Cases**                                                                **Page(s)**

*Hurt v. Wise,*
  880 F.3d 831 (7th Cir. 2018) ......................................................................41

*J&J Sports Productions, Inc. v. Resendiz,*
  2009 WL 1953154 (N.D. Ill. July 2, 2009).................................................89

*J.K.J. v. Polk County,*
  960 F.3d 367 (7th Cir. 2020)  ....................................... 106, 158, 160, 161

*Jackson v. Marion County,*
  66 F.3d 151 (7th Cir. 1995) ......................................................................102

*Jane Doe-3 v. McLean Cnty. Unit Dist. No. 5 Bd. of Directors,*
  973 N.E.2d 880 (Ill. 2012)........................................................................102

*Jenkins v. Bartlett,*
  487 F.3d 482 (7th Cir. 2007) ....................................................106, 108, 128

*Jimenez v. City of Chicago,*
  830 F. Supp. 2d 432 (N.D. Ill. 2011) .............................................59, 60, 67, 69, 70

*Johnson v. City of Chicago,*
  No. 05 C 6545, 2009 WL 1657547 (N.D. Ill. June 9, 2009) ...............................142

*Jones v. City of Chicago,*
  856 F.2d 985 (7th Cir. 1988) ...................................................... *passim*

*Kailin v. Gurnee,*
  77 F.4th 476 (7th Cir. 2023) ......................................................................91

*Kindle v. City of Harvey,*
  No. 00 C 6886, 2002 WL 230779 (N.D. Ill. Feb. 15, 2002)................................143

*King v. Kramer,*
680 F.3d 1013 (7th Cir. 2012) ...................................................................107

*Kluppelberg v. Burge, No. 13 C 3963,*
  Dkt. 635 at 3 (N.D. Ill. Aug. 4, 2017)........................................................67, 121

*Kyles v. Whitley,*
  514 U.S. 419 (1995)..................................................................................43

**TABLE OF AUTHORITIES (cont.)**

**Cases**                                                               **Page(s)**

*Lac du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse*,
991 F.2d 1249 (7th Cir. 1993) ...................................................................................88

*LaPorta v. City of Chicago*,
277 F. Supp. 3d 969 (N.D. Ill. 2017) ...........................................................124, 163

*LaSalle Bank Lake View v. Seguban*,
54 F.3d 387 (7th Cir. 1995) ......................................................................................23

*Lawson v. Veruchi*,
637 F.3d 699 (7th Cir. 2011) ....................................................................................92

*Lewis v. City of Chicago*,
914 F.3d 472 (7th Cir. 2019) ....................................................................................46

*LiButti v. United States*,
178 F.3d 114 (2d Cir. 1999)......................................................................................23

*Liggins v. City of Chicago*,
2021 WL 2894167 (N.D. Ill. July 9, 2021)..............................................................101

*Logan v. Caterpillar*,
246 F.3d 912 (7th Cir. 2011) ....................................................................................91

*Logan v. City of Chicago*,
891 F. Supp. 2d 897 (N.D. Ill. 2012) ........................................................................24

*Lopez v. City of Chicago*,
464 F.3d 711 (7th Cir. 2006) ....................................................................................97

*Lyons v. Johnson*,
415 F.2d 540 (9th Cir. 1969) ....................................................................................25

*Malley v. Briggs*
475 U.S. 335 (1986)..................................................................................................94

*Manson v. Brathwaite*,
432 U.S. 98 (1977).............................................................................................72, 90

*Manuel v. Joliet*,
580 U.S. 357 (2017)..................................................................................................91

**TABLE OF AUTHORITIES (cont.)**

**Cases**                                                                                          **Page(s)**

*Marcinczyk v. Plewa,*
  No. 09 C 1997, 2012 WL 1429448 (N.D. Ill. Apr. 25, 2012)........................................142, 144

*Martinez v. Cook County,*
  No. 11 C 1794, 2011 WL 4686438 (N.D. Ill. Oct. 4, 2011) .................................................162

*Maxwell v. City of Indianapolis,*
  998 F.2d 431 (7th Cir. 1993) .......................................................................................93, 94

*Maxwell v. Gilmore*,
  37 F. Supp. 2d 1078 (N.D. Ill. 1999) ..................................................................................145

*McCottrell v. White*,
  933 F.3d 651 (7th Cir. 2019) .................................................................................................89

*McDonough v. Smith,*
  139 S. Ct. 2149 (2019).............................................................................................................41

*Monell v. Department of Social Services*,
  436 U.S. 658 (1978)....................................................................................................... *passim*

*Moore v. City of Chicago,*
  2011 WL 1231318 (N.D. Ill. 2011) .......................................................................................97

*Moore v. Pennsylvania Dep't of Corrections,*
  457 F. App'x 170 (3d Cir. 2012) ...........................................................................................

Mwangangi v. Nielsen,
  48 F.4th 816 (7th Cir. 2022) .................................................................................................96

*Nanda v. Bd. of Trustees of Univ. of Illinois,*
  219 F. Supp. 2d 911 (N.D. Ill. 2001) ..................................................................................71

*Napue v. Illinois,*
  360 U.S. 264 (1959)................................................................................................................43

*National Acceptance v. Bathalter,*
  705 F.2d 924 (7th Cir. 1983) ...............................................................................................25

*Neil v. Biggers,*
  409 U.S. 188 (1972)..........................................................................................................78, 90

**TABLE OF AUTHORITIES (cont.)**

**Cases**                                                                                       **Page(s)**

*Nelson v. LaCrosse Cty,*
    301 F.3d 820 (7th Cir. 2002) ............................................................................................109

*Newsome v. McCabe,*
    256 F.3d 747 (7th Cir. 2001) ..............................................................................................43

*Newsome v. McCabe,*
    319 F.3d 301 (7th Cir. 2003) ................................................................................44, 45, 55

*Obrycka v. City of Chicago,*
    2012 WL 601810 (N.D. Ill. Feb. 23, 2012) .....................................................................142

*Ocean Tomo, LLC v. Barney,*
    133 F. Supp. 3d 1107 (N.D. Ill. 2015) ..............................................................................59

*Olson v. Tyler,*
    771 F.2d 277 (7th Cir. 1985) ..............................................................................................92

*Otto v. Variable Annuity Life Ins. Co.,*
    134 F.3d 841 (7th Cir. 1998) ................................................................................91, 92, 96

*Padilla v. City of Chicago,*
    2009 WL 4891943(N.D. Ill. Dec. 14, 2009).....................................................................147

*Padilla v. City of Chicago,*
    2013 WL 1208567 (N.D. Ill. Mar. 26, 2013)......................................................................92

*Palmer v. City of Chicago,*
    82 C 2349 (N.D. Ill.)................................................................................................ *passim*

*Patrick v. City of Chicago,*
    974 F.3d 824 (7th Cir. 2020) ..............................................................................................40

*Pembaur v. City of Cincinnati,*
    475 U.S. 469 (1986)...........................................................................................................106

*Pennington v. Flora Cmty. Unit Sch. Dist. No. 35,*
    2023 WL 348320 (S.D. Ill. Jan. 20, 2023).......................................................................102

*Petty v. City of Chicago,*
    754 F.3d 416 (7th Cir. 2014) ......................................................................................29, 30

**TABLE OF AUTHORITIES (cont.)**

**Cases**                                                               **Page(s)**

*P.H. Glatfelter Co. v. Voith*,
   784 F.2d 770 (7th Cir. 1986) ....................................................................................88

*Pickett v. Dart,*
   2014 WL919673 (N.D. Ill. Mar. 10, 2014).................................................................162

*Proffitt v. Ridgway,*
   279 F.3d 503 (7th Cir. 2002) ....................................................................................98

*Purghoraishi v. Flying J, Inc.,*
   449 F.3d 751 (7th Cir. 2006) ....................................................................................38

*Reeves v. Jewel Food Stores,*
   759 F.3d 698 (7th Cir. 2014) ..................................................................................102

*Rehberg v. Paulk,*
   566 U.S. 356 (2012)..................................................................................................42

*Reyes v. Nurse,*
   38 F.4th 636 (7th Cir. 2022) ....................................................................................70

*Rivera v. Guevara,*
   319 F. Supp. 3d 1004 (N.D. Ill. 2018) ..........................................................103, 154

*Rivera v. Guevara,*
   No. 12 C 4428, 2019 WL 13249674 (N.D. Ill. Sept. 20, 2019)..............................103

*Robinson v. City of Harvey,*
   No. 99 C 3696, 2001 WL 138901 (N.D. Ill. Feb. 16, 2001)...................................143

*Roe-Midgett v. CC Services*,
   512 F.3d 865 (7th Cir. 2008) ..................................................................................145

*S.E.C. v. Colello,*
   139 F.3d 674 (9th Cir. 1998) ....................................................................................22

*Sanders v. City of Chicago Heights,*
   No. 13 C 0221, 2016 WL 2866097 (N.D. Ill. May 17, 2016) ...........................80, 90

*Saunders-El v. Rohde,*
   778 F.3d 556 (7th Cir. 2015) ....................................................................................47

**TABLE OF AUTHORITIES (cont.)**

**Cases**                                                              **Page(s)**

*Savory v. Cannon*,
947 F.3d 409 (7th Cir. 2020) ........................................................................71

*Serrano v. Guevara,*
No. 17 CV 2869, 2020 WL 3000284 (N.D. Ill. June 4, 2020)................................................42

*Sherrod v. Berry,*
827 F.2d 195 (7th Cir 1987) ........................................................................ 147

*Simmons v. United States,*
390 U.S. 377, 382-83 (1968) ........................................................................75, 89

*Smith v. Burge,*
222 F. Supp. 3d 669 (N.D. Ill. 2016) ........................................................................49

*Smith v. Cain,*
132 S. Ct. 627 (2012)........................................................................43

*Smith v. City of Chicago*,
143 F. Supp. 3d 741 (N.D. Ill. 2015) ........................................................................146

*Smith v. Ne. Illinois Univ.*,
388 F.3d 559 (7th Cir. 2004) ........................................................................32

*Sornberger v. City of Knoxville,*
434 F.3d 1006 (7th Cir. 2006) ........................................................................84

*Standard Ins. Co. v. VanLanduit*,
551 F. Supp. 3d 854 (N.D. Ill. 2021) ........................................................................88

*Steidl v. Fermon,*
494 F.3d 623 (7th Cir. 2007) ........................................................................34

*Steidl v. Gramley,*
151 F.3d 739 (7th Cir. 1998) ........................................................................108

*Sterk v. Redbox Automated Retail, LLC*,
770 F.3d 6187 (7th Cir. 2014) ........................................................................21

*Stevenson v. City of Chicago*,
No. 17 CV 4839, 2018 WL 1784142 (N.D. Ill. Apr. 13, 2018)...................................102, 103

**TABLE OF AUTHORITIES (cont.)**

**Cases**                                                                                    **Page(s)**

*Stinson v. Gauger,*
868 F.3d 516 (7th Cir. 2017) *(en banc)* ............................................................ 41, 46

*Stovall v. Denno,*
388 U.S. 293 (1967) .............................................................................................72

*Streckenbach v. Vandensen,*
868 F.3d 594 (7th Cir. 2017) ...............................................................................110

*Strickler v. Greene,*
527 U.S. 263 (1999) ..........................................................................................66, 67

*Sublett v. John Wiley & Sons, Inc.,*
463 F.3d 731 (7th Cir. 2006) ....................................................................17, 38, 109

*Swanigan v. Chicago,*
775 F.3d 953 (7th Cir. 2015) ................................................................................162

*Swanigan v. City of Chicago,*
881 F.3d 577 (7th Cir. 2018) ................................................................................ 73

*Taylor v. City of Chicago,*
2021 WL 4401528 (N.D. Ill. Sept. 27, 2021) .........................................................42

*Thomas v. Cook County,*
604 F.3d 293 (7th Cir. 2010) ...............................................................................114

*Thompson v. Boggs,*
33 F.3d 847 (7th Cir. 1994) .................................................................................109

*Thompson v. City of Chicago,*
472 F.3d 444 (7th Cir. 2006) ...............................................................................126

*Thompson v. City of Chicago,*
722 F.3d 963 (7th Cir. 2013) .................................................................................57

*Thompson v. City of Chicago,*
2009 WL 674353 (N.D. Ill. Mar. 12, 2009) ...........................................................24

*Thompson v. Clark,*
596 U.S. 36 (2022) ...............................................................................................91

**TABLE OF AUTHORITIES (cont.)**

**Cases**                                                                 **Page(s)**

*Titran v. Ackman*,
    893 F.2d 145 (7th Cir. 1990) ........................................................................17, 109

*Tolan v. Cotton,*
     572 U.S. 650 (2014) ................................................................................ *passim*

*United States v. $39,000.00 in U.S. Currency*,
    951 F.3d 740 (6th Cir. 2020) ...............................................................................25

*United States v. 4003-4005 5th Ave.*,
    55 F.3d 78 (2d Cir. 1995) ....................................................................................24

*United States v. Agurs,*
    427 U.S. 97 (1976) ...............................................................................................44

*United States v. Bagley,*
    473 U.S. 667 (1985) ................................................................................45, 55, 56

*United States v. Certain Real Prop. & Premises*,
    55 F.3d 78 (2d Cir. 1995) ....................................................................................22

*United States v. Holm,*
    326 F.3d 872 (7th Cir. 2003) ...............................................................................18

*United States v. Jackson,*
    546 F.3d 801 (7th Cir. 2008) ...............................................................................99

*United States v. Morris,*
    80 F.3d 1151 (7th Cir. 1996) ...............................................................................61

*United States v. Rylander,*
    460 U.S. 752 (1983) .............................................................................................22

*United States v. Taylor,*
    975 F.2d 402 (7th Cir. 1992) ...............................................................................22

*United States v. Wade*,
    388 U.S. 218 (1967) ...........................................................................................150

*Vega v. Tekoh,*
    597 U.S. 134 (2022) ................................................................70, 71, 72, 73, 74

xx

**TABLE OF AUTHORITIES (cont.)**

**Cases**                                                                                      **Page(s)**

*Velez v. City of Chicago,*
    No. 1:18-CV-08144, 2023 WL 6388231 (N.D. Ill. Sept. 30, 2023) ......................103, 104, 142

*Vodak v. City of Chicago,*
    639 F.3d 738 (7th Cir. 2011) ................................................................................107, 108

*Washington v. Boudreau,*
    No. 16-CV-01893, 2022 WL 4599708, (N.D. Ill. Sept. 30, 2022) ................................ *passim*

*Wearry v. Cain,*
    577 U.S. 385 (2016) ...................................................................................43, 44, 54, 56

*Wehrs v. Wells,*
    688 F.3d 886 (7th Cir.2012) ......................................................................................59

*Wells v. Coker,*
    2014 WL 716518 (C.D. Ill. Feb. 25, 2014) ...............................................................162

*Whren v. United States*,
    517 U.S. 806 (1996) ..................................................................................................95

*Whitlock v. Brueggemann,*
    682 F.3d 567 (7th Cir. 2012) ...............................................................................29, 40

*Williams v. City of Chicago,*
    733 F.3d 749 (7th Cir. 2013) .....................................................................................92

*Williams v. Florida,*
    399 U.S. 78 (1970) ....................................................................................................22

*Wilson v. City of Chicago*,
    707 F. Supp. 379 (N.D. Ill. 1989) .............................................................................99

*Woodward v. Corr. Med. Servs,*
    368 F.3d 917 (7th Cir. 2004) ...................................................................................163

*Yang v. Hardin,*
    37 F.3d 282 (7th Cir. 1994) .......................................................................................96

*Ziglar v. Abbasi,*
    137 S. Ct. 1843 (2017) .............................................................................................100

xxii

**TABLE OF AUTHORITIES (cont.)**

**Cases**                                                                                                    **Page(s)**

**Other Authorities**

10A Wright & Miller, Federal Practice & Procedure §2727 ...........................................18, 21, 112

**INTRODUCTION**

Geraldo Iglesias was wrongly convicted of the 1993 shooting murder of Monica Roman based on a fabricated tip from a confidential informant that Defendants invented, two false identifications Defendants fabricated from two supposed eyewitnesses to the crime, who said from the start they could not identify the shooter, and manufactured statements from a jailhouse informant, who has since testified that Defendants used physical abuse to force him to implicate Iglesias. No real evidence of any kind ever implicated Iglesias. To ensure his conviction, throughout Iglesias's criminal proceedings, Defendants suppressed evidence that would have shown Iglesias was innocent and that Defendants had framed him.

Starting at age 24, Iglesias served nearly two decades in prison for a crime he did not commit. Throughout, he maintained his innocence and fought to clear his name. In 2019, based on the revelation that false evidence had been used to obtain his conviction, the Cook County State's Attorney's Office moved to vacate Iglesias's conviction, a state court vacated the conviction, and state prosecutors dropped all charges against him. In 2022, the State of Illinois granted Iglesias a Certificate of Innocence. There is no dispute that Iglesias is innocent, and Defendants do not contest that fact at summary judgment.

In 2019, Iglesias brought this § 1983 lawsuit to hold the Defendants accountable for violating his constitutional rights and causing his wrongful conviction. Iglesias's conviction is one of more than 44 obtained by notorious Chicago Police detective Reynaldo Guevara, his partner Ernest Halvorsen, and their colleagues at the Chicago Police Department's Area Five Detective Division, whose misconduct has spawned dozens of civil rights cases in this District. But these Defendant Officers are not solely to blame. Iglesias's ordeal was also caused by the City of Chicago's official policies, which caused the suppression of evidence in homicide investigations,

permitted the fabrication of identifications using suggestive identification procedures, and encouraged untrained police officers to engage in misconduct with impunity.

None of the Defendants is entitled to summary judgment on any of Iglesias's claims. The motions filed by Guevara and Halvorsen are frivolous, considering both have asserted their Fifth Amendment right not to incriminate themselves in response to all questions about their misconduct at issue in this case. For its part, the City moves for summary judgment on *Monell* theories that it has already lost repeatedly at trial and is therefore precluded from re-litigating here, and it cannot create a genuine dispute of fact on others, as Iglesias has explained in his cross-motion for partial summary judgment. Dkts. 244, 248. The Defendants' remaining arguments lack merit and are made in the face of overwhelming evidence that the Defendant Officers and the City violated Iglesias's rights protected by the U.S. Constitution and Illinois law, and so summary judgment is inappropriate on those claims. This Court should deny Defendants' motions.

## SUMMARY OF DISPUTED MATERIAL FACTS

Defendants' motions depend on a factual account that impermissibly construes the evidence for the moving Defendants and improperly draws inferences for them. *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014). Iglesias has prepared an extensive account of the facts relevant to summary judgment in his Local Rule 56.1 statements.[1] Given space constraints, the number of Defendants' arguments, and the vast record, Iglesias summarizes the material disputes here, rather than repeating all of the facts. Additional facts are discussed below within the argument sections. Properly viewing the record in Iglesias's favor, the following facts cannot be disputed.

---

[1] Iglesias's affirmative statement of facts in support of this response is cited as "PSOF ¶" (Dkt. 277), his response to the City's statement of facts as "RSOF-City ¶" (Dkt. 275), and his response to the Officer Defendants' statement of facts as "RSOF-Officers ¶" (Dkt. 276). The Defendant Officers' brief (Dkt. 247) is cited "OB," the City's (Dkt. 253) "CB," and Guevara's (Dkt. 264) "GB."

## I. IGLESIAS IS INNOCENT OF THE ROMAN MURDER

Iglesias is innocent of the Roman shooting. PSOF ¶¶1-3, 6-12. He had nothing to do with the crime. No evidence connects him to the crime. He has always maintained his innocence. The State of Illinois has certified that he is innocent. PSOF ¶¶1-12.

## II. ROMAN IS SHOT IN A CAR ON THE STREET IN LOGAN SQUARE

On June 7, 1993, Monica Roman was sitting in the front passenger seat in a car driving northbound on Sawyer toward Palmer, in the Logan Square neighborhood of Chicago, along with a driver and three rear passengers. PSOF ¶¶13-15, 17-18. As they were nearing the stop sign at Palmer, a gunman was standing on the sidewalk on the west side of the street, wearing all black with a hood up over his head, south of the intersection and near the entrance to the apartment building at 2148 N. Sawyer. PSOF ¶¶19-20, 48, 120, 121, 236. He began firing at the vehicle. PSOF ¶¶21. The shooter was behind the car to the south. PSOF ¶¶18-21. The bullets entered the vehicle on the rear driver's side next to the rear window, and they traveled through the vehicle hitting Monica Roman in the front passenger seat. PSOF ¶¶21, 25.

When the vehicle's driver heard the shots, he sped away going north on Sawyer across Palmer. PSOF ¶¶20, 22, 24. The shooter fled in the opposite direction, running south to an alley just south of the building at 2148 N. Sawyer, and then turning right (westbound) in the alley to escape. PSOF ¶¶23, 44, 50, 74-76, 130-31.

## III. DEFENDANTS HAD NO LEADS

The responding detectives interviewed all of the witnesses who had been in the car with Roman—Jesus Gonzalez, Daniel Sanchez, Jose Coronell, and Hugo Rodriguez—and all of the witnesses at the scene. All of the individuals in the car either did not see the shooter at all, or only saw the shooter from behind as he was running away in the opposite direction. PSOF ¶¶26-33, 70-

3

87. All of the other witnesses at the scene who were anywhere near the shooter—even those who were on the street as the shooter ran by them or near them—did not get a good look at the shooter and could not make an identification. PSOF ¶¶29-37, 39, 41-51, 117-32.

## IV.    OCHOA AND RODRIGUEZ DID NOT SEE AND COULD NOT IDENTIFY THE PERPETRATOR

Rosendo Ochoa and Hugo Rodriguez, who were also at the scene of the crime, did not get a good look at the shooter and could not make an identification either. PSOF ¶¶26-27, 29-33, 70-81-117-32, 164-71. Many circumstances of the shooting made it impossible for Ochoa and Rodriguez to be able to see the shooter, let alone make an identification. Among them: (a) the shooter was wearing a hood over his head, (b) the shooting lasted only a few seconds before the shooter fled through an alley, (c) the shooter was not someone they were familiar with but rather a stranger, and (d) more than two weeks passed from the time of the shooting to the time either of them was asked to make an identification. PSOF ¶¶23, 33, 44, 50, 75-77, 89, 120, 130-32, 135, 147, 166, 168, 170, 236.

In addition, both Ochoa and Rodriguez were not in a position to be able to see the shooter's face, and they had extremely obstructed views of the shooter. In Rodriguez's case:

- He was in the car with Roman traveling north, while the shooter was behind him to the south, PSOF ¶¶33, 70-71;
- He immediately ducked when the shooting started, PSOF ¶¶72;
- By the time he looked up and out of the rear window, the car he was in was at the intersection of Sawyer and Palmer, while the shooter was almost to the alley to the south, a considerable distance away, running in the opposite direction so only his back was visible, PSOF ¶¶74-76; and
- There were blinds in the rear window of the car that obstructed any view out that window, PSOF ¶¶80.

In Ochoa's case:

- He was in the window at 2135 N. Sawyer, more than 150 feet away from the shooter, PSOF ¶¶117-19, 127, 166.
- The shooter was hiding behind a tree, PSOF ¶¶19, 21, 121, 123-25;

4

- There were numerous obstructions to Ochoa's view, including a tree near his window and the tree the shooter was hiding behind that slanted out into street, PSOF ¶¶19, 21, 121, 123-25, 166;
- He was looking out his window up the street, at an angle, PSOF ¶¶118-19, 126, 166; and
- He never got a direct view of the shooter, who was never facing toward him. PSOF ¶¶123-25, 129-30.

At the scene right after the shooting, and in the interview of Rodriguez by detectives at the station just a couple hours later, he could not provide any description of the shooter to responding officers who interviewed him thoroughly. All he could say was that the shooter was wearing all black, without any physical description of the shooter at all. PSOF ¶¶27-33, 82-86.

Ochoa could only provide a vague physical description of the shooter. PSOF ¶¶34, 133-38. He said the shooter was a male white Hispanic, with light complexion, 17-19 years old, 5'5" to 5'7", 135-140 pounds. Ochoa could not provide a description of any distinguishing features. PSOF ¶135.

Iglesias did not fit Ochoa's description at all. At the time of the shooting, he was 24 years old, 5'10", with medium complexion. At the time, he also had two distinct features: large hoop earrings and shaved eyebrows, neither of which Ochoa mentioned at all. PSOF ¶¶38-39, 137.

Critically, unbeknownst to Iglesias, Ochoa and Rodriguez each told Detective Santopadre, the responding detective who interviewed them on the day of the shooting, that they could not identify the perpetrator. PSOF ¶¶85-86, 96, 137-38. That information was hidden until this civil case. PSOF ¶¶ 85-86, 96, 106, 137-138, 210-211.

## V. DEFENDANTS DECIDE ON IGLESIAS AS THEIR SUSPECT WITHOUT EVIDENCE AND FABRICATE A TIP FROM A CONFIDENTIAL INFORMANT

Without any leads, the investigation went dead. No witnesses could identify the perpetrator. Defendants had no avenues to pursue. Between June 8 and June 23, other than a cause-of-death

report, there were no police reports submitted in the case—for a period of more than two weeks. PSOF ¶¶29-33, 52, 57, 89, 179, 288.

Then, Guevara, Halvorsen, Riccio, and Gawrys got involved in the case. Defendants decided that Iglesias was their suspect without any evidence. They pulled Iglesias's rap sheet on June 22, 1993, as shown by the "issued on inquiry" date stamp appearing on it, before there was any evidence implicating him in the crime. PSOF ¶¶63-64. That rap sheet was never turned over to prosecutors or to Iglesias and his attorneys, until this civil case. PSOF ¶65.

Then, to make their suspicion of Iglesias appear legitimate, Halvorsen, Guevara, Gawrys, and Riccio made up a tip from a confidential informant, writing a report saying that a confidential informant had told them that Iglesias was the perpetrator. PSOF ¶184. But there is no contemporaneous documentation of that tip, and none of the Defendants will swear under oath that they received that tip or know who the informant was. PSOF ¶¶57-60. Rather, Defendants Guevara and Halvorsen pleaded the Fifth when asked if they simply made it up. PSOF ¶¶61-62.

## VI.    DEFENDANTS FRAME IGLESIAS IN TWO DAYS IN JUNE 1993

On June 23 and June 24, 1993, Defendants fabricated all of the evidence implicating Iglesias in the murder, closed the case, and had him charged with murder. PSOF ¶¶53-60, 115-116, 139-143, 179-190, 212, 279. Over the course of those two days, (a) they fabricated a claim that Ochoa had identified Iglesias from a photo array at his home on June 22, 1993, to justify arresting Iglesias, when no such identification procedure had occurred; (b) then, they showed Ochoa and Rodriguez photo arrays at Area Five on June 23, in which they had them to identify Iglesias, even though they had each said they could not make an identification; and (c) they used those identifications of Iglesias's photos to get Ochoa and Rodriguez to identify Iglesias in a live lineup that same night. PSOF ¶¶67-108; 114-158.

6

The fact that Iglesias was not involved in and has been certified innocent of the Roman murder, PSOF ¶¶ ¶¶1-12; that the Defendants decided Iglesias was their suspect first, without any evidence to implicate him, PSOF ¶¶57-60, 184; that none of the witnesses interviewed by the responding officers and detectives could provide any details about the shooter or indicated that they could make an identification, PSOF ¶¶ 82-96, 133-138; that Ochoa and Rodriguez could not describe the shooter and on the day of the shooting both told Detective Santopadre that they could not identify the perpetrator, PSOF ¶¶70-96, 117-138; and that Guevara and Halvorsen have asserted the Fifth Amendment when asked if they fabricated the identifications, PSOF ¶¶109-113, 157-162, has an important consequence at the summary-judgment stage of this case: This Court must draw the inference from these facts alone that any identifications that Ochoa or Rodriguez made of Iglesias were false and fabricated by Defendants. Put differently, with the facts construed for Iglesias, Defendants identified an innocent person as their suspect, and then got two witnesses who had not seen the perpetrator to both identify that same innocent person. Construing the evidence for Iglesias and drawing inferences in his favor, there is no explanation at summary judgment other than that Defendants fabricated these identifications.

The identifications of Iglesias obtained from Ochoa and Rodriguez were false. PSOF ¶¶70-96, 117-138, 181-186, 188-190. They were the result of improperly suggestive identification procedures. PSOF ¶¶99-105, 108, 176-178; see Argument IV(C) *infra* (discussing the suggestive identification procedures in detail). Defendants did not document the true circumstances of these identification procedures, reporting instead that the two witnesses independently selected Iglesias without suggestion. PSOF ¶¶89, 106, 114-116, 140, 149-151, 154-156, 181-190.

To wrap the case up, Defendants Guevara, Halvorsen, Riccio, Gawrys, and Biebel fabricated a closing report that included an entirely false account of how they "solved" the crime.

7

PSOF ¶¶54, 67-68, 114-115, 183-190, 279, 289, 292, 297. That report included the false story about a confidential informant who implicated Iglesias, and the false claim—contrary to what was reported to the responding detectives—that Ochoa and Rodriguez now claimed two weeks after the crime that they could identify the shooter. PSOF ¶¶184-186, 188-190. The Defendants then included in the closing report and two lineup reports the false claim that Ochoa and Rodriguez identified Iglesias from photo arrays and live lineups. PSOF ¶¶181-182, 185-186, 189-190.

## VII.  THE DEFENDANTS FABRICATE AN INCRIMINATING STATEMENT FROM VICENTE USING FORCE, THREATS, AND PROMISES, AND THEN SUPPRESS WHAT THEY HAVE DONE

Based on only their fabricated evidence, Iglesias was charged, detained, and prosecuted for Roman's murder. PSOF ¶¶267-278. Given the weak case against Iglesias, Defendants needed more evidence. So, they invented that evidence.

About a month after Iglesias had been charged, Guevara and Halvorsen forced a jailhouse informant named Francisco Vicente to adopt a story that Guevara and Halvorsen had fabricated. The false story was that, while Vicente had been in Cook County Jail, he ran into Iglesias, who confessed to shooting Monica Roman. This story was made up by Guevara and Halvorsen. Vicente had no such interaction with Iglesias. Guevara and Halvorsen forced Vicente to provide the statement by physically abusing him, threatening him, and making him promises, none of which were disclosed. PSOF ¶¶192-198.

This was not the first case in which Guevara and Halvorsen cemented their case against an innocent suspect by forcing Vicente to tell a false story that the suspect had confessed to Vicente. In other cases, using the same physical abuse, threats, and promises, Guevara and Halvorsen forced Vicente to falsely claim that four other innocent men—Jose Montanez, Armando Serrano, Angel Pacheco, and Robert Bouto—had each confessed to him about other crimes in which Guevara and

8

Halvorsen were the investigating detectives. PSOF ¶99. As in Iglesias's case, this information was concealed during the prosecutions of Montanez, Serrano, Pacheco, and Bouto, and all were wrongfully convicted. PSOF ¶¶199, 202, 204, 207, 208.

When Defendants Guevara and Halvorsen were asked under oath if they fabricated Vicente's statements implicating all of these men, they invoked their Fifth Amendment right against self-incrimination. PSOF ¶¶201-204. The City of Chicago conducted an investigation into allegations of misconduct against Defendant Guevara, and concluded as part of that investigation that Vicente's statements implicating Iglesias and all four other men were false and fabricated. PSOF ¶¶207-209.

## VIII. THE DEFENDANTS SUPPRESS KEY EVIDENCE THROUGHOUT THE PROSECUTION OF IGLESIAS

Throughout the criminal proceedings, Defendants suppressed that they had fabricated the evidence just discussed, including a false confidential informant tip, the photo array from June 22, that Ochoa's and Rodriguez's identifications were fabricated, and that Vicente's statement was made up by Guevara and Halvorsen. PSOF ¶¶251-277. In addition, they suppressed many other items of exculpatory and impeachment information they had uncovered during their investigation.

Defendants suppressed that they had decided on Iglesias as a suspect first, before there was any evidence at all. They concealed in their file a rap sheet with a date stamp, showing that they had selected Iglesias as their suspect first, and then fabricated evidence to implicate him second. PSOF ¶¶63-65.

In addition, Defendants suppressed that eyewitnesses Ochoa and Rodriguez each told responding detectives that they could not identify the perpetrator. PSOF ¶¶70-86, 117-138. They suppressed that Ochoa and Rodriguez said that Iglesias looked different than the person who had committed the shooting. PSOF ¶¶104-106, 150-151. They suppressed the circumstances of the

9

identification procedures that they conducted with Ochoa and Rodriguez. PSOF ¶¶67-69, 104, 106, 114-116, 151, 154-156, 181-183, 185-186, 188-190.

Moreover, Defendants suppressed that they conducted multiple photo identification procedures with Rodriguez before his purported identifications of Iglesias on June 23. Rodriguez was shown photos multiple times over the first few days after the June 7 crime, including a book of photos of members of the Imperial Gangsters, in which Iglesias would have appeared, but Rodriguez did not identify anyone. PSOF ¶¶89-91, 96, 173, 210, 229-233.

The Defendants also suppressed a report reflecting that, early on in the Roman investigation, witnesses at the scene had told them that the perpetrator was a member of the Spanish Cobras, a gang with which Iglesias had no affiliation. PSOF ¶¶94, 214-221. Defendants buried this information in the file for another homicide investigation, but they omitted the report entirely from the Roman homicide investigation file. PSOF ¶¶218-221.

Defendants suppressed that Efrain Torres, a witness who lived at 2148 N. Sawyer (where the shooter was standing), had come from the Boy's Club at the nearby corner close in time to the shooting and knew the shooter. PSOF ¶¶222-225. This information, contained in handwritten notes in the Roman homicide file, but not disclosed to the prosecution or defense, was critical because Torres later viewed a lineup during the investigation, in which Iglesias was the suspect, and Torres did not select him. PSOF ¶¶226-228.

Defendants suppressed that they conducted numerous identification procedures with other scene witnesses, all of whom had far better viewing opportunities than Ochoa or Rodriguez. Scene witnesses Arnell Moore, David Chmieleski, Efrain Torres and Daniel Sanchez were all shown books of photos to see if they could make an identification, but none of them could. In the case of Arnell Moore, one of the times he was brought to Area Five view photos was on June 23, by which

10

time Iglesias was the suspect. PSOF ¶¶234-245. He had the best viewing opportunity of anyone—he was standing at 2148 N. Sawyer, same as the shooter, who walked past him twice—but did not identify Iglesias. PSOF ¶¶43-45.

Finally, Defendants suppressed that they had obtained a story about an incriminating jailhouse confession from Vicente by using force, threats, and promises, all of which were undisclosed. PSOF ¶¶192-198, 213.

Much of this exculpatory and impeachment evidence was documented in reports and notes, which Defendants included in their investigative file, but which they did not turn over to prosecutors or to Iglesias and his criminal defense lawyers. PSOF ¶¶210-266. All of the Defendants shared information about the investigation with the small team in which they worked. PSOF ¶¶279-283. All of the Defendants had access to and reviewed the investigative file. PSOF ¶¶279-284. None of them ensured that the exculpatory information was disclosed. PSOF ¶¶210-213, 226, 245, 247, 250, 259, 262, 264.

## IX.    IGLESIAS IS CONVICTED AT TRIAL

At Iglesias's criminal trial, the fabricated evidence discussed above was introduced against Iglesias and was the sole basis for his conviction. PSOF ¶¶269-278. Guevara testified about the fabricated confidential informant tip that he said made Iglesias the suspect. PSOF ¶275. Guevara falsely testified that Iglesias told him he was near Palmer and Sawyer when the shooting occurred. PSOF ¶276. And Guevara, Rodriguez, and Ochoa all testified about the fabricated identifications Defendants procured from them. PSOF ¶¶269-274. In addition, Vicente testified about the fabricated confession that Iglesias purportedly made to him in Cook County Jail. PSOF ¶277. Based on these fabrications, Iglesias was convicted of murder. PSOF ¶278.

11

## X.    THE CITY OF CHICAGO'S OFFICIAL POLICIES CAUSED IGLESIAS'S WRONGFUL CONVICTION

The suppression of evidence during Iglesias's case was the result of the official policies of the City of Chicago, which caused the widespread suppression of evidence in homicide cases, including Iglesias's. PSOF ¶¶301-355, 358, 361-371, 376-377, 379-389, 513-526, 546-550. Moreover, the City's official policies let officers fabricate witness identifications using unduly suggestive identification techniques, which caused unreliable identifications to be used and to taint criminal proceedings like Iglesias's criminal case. PSOF ¶¶392-415, 424, 431, 441, 457-461, 462-471, 510-512, 527-545, 546-550.

Finally, the City's official policies permitted police to conduct investigations untrained and without any oversight or discipline. PSOF ¶¶457-461, 474-511, 513-545. The City's policy of failing to train, supervise, and discipline its police officers led to historic corruption and police misconduct across the Chicago Police Department in the years leading up to the Roman investigation, including at the Area Five Detective Division on the northwest side of Chicago. PSOF ¶¶451-461, 474-511, 513-545, 546-550. Because of this environment of lawlessness, officers like Guevara and Halvorsen were free to fabricate evidence, manipulate witnesses, suppress investigative information, and to frame innocent individuals for crimes they had not committed with complete impunity. PSOF ¶¶498-512, 513-526, 534-545, 546-550. A code of silence in the Chicago Police Department prevented anyone from blowing the whistle on their misconduct. PSOF ¶¶465, 501.

As a result, Guevara framed at least 44 innocent individuals for murder. In the past 15 years, at least 44 murder convictions engineered by Guevara have been overturned by Illinois courts, and Guevara has been widely recognized as a blight on the criminal legal system. PSOF ¶¶ 344-355, 503-512, 546-550. Guevara was able to use his police powers to dismantle families and

12

an entire community because the City did nothing to ensure its police officers conducted themselves according to law.

## XI.   IGLESIAS FIGHTS TO PROVE HIS INNOCENCE AND IS EXONERATED

Defendants' misconduct caused Iglesias to be wrongfully convicted in the prime of his life. He spent nearly two decades incarcerated for something he had not done. During his decades of wrongful incarceration, Iglesias always maintained his innocence as he fought for his freedom. PSOF ¶¶1-6.

In 2018, based on proof that Defendants had introduced false evidence in his criminal case, Iglesias's post-conviction petition was granted and his conviction was set aside. PSOF ¶¶7-8. The Cook County State's Attorney dropped all charges against him. PSOF ¶9. In 2022, following a full hearing, a state court granted Iglesias a Certificate of Innocence. PSOF ¶¶10-12.

## XII.   DEFENDANTS REFUSE TO TESTIFY IN THIS CIVIL CASE

The only evidence that implicated Iglesias in Roman's murder and that caused his wrongful prosecution and conviction was fabricated by Defendants. PSOF ¶¶53-60, 63-64, 67-69, 88-108, 114-116, 139-143, 147-156, 176-177, 181-190, 192-198, 200, 210-213, 279. At Iglesias's criminal trial, Guevara testified consistent with that false story, helping to put Iglesias behind bars. PSOF ¶¶266, 271-276.

But today, Guevara and his partner Halvorsen do not stand by their story. PSOF ¶¶61-62, 109-113, 157-162, 191, 201-20. They both have asserted their Fifth Amendment right against self-incrimination in response to every question about every material disputed fact discussed above. PSOF ¶¶61-62, 109-113, 157-162, 191, 201-204.

13

## XIII.  VICENTE COMES CLEAN

Vicente has now come forward to reveal the truth about his fabricated statements used against Iglesias, as well as those used against the other four men who he claimed had confessed to him to crimes. Vicente has testified that the statements were all false, they were all manufactured by Guevara and Halvorsen, and that he was forced to give those statements because of physical abuse, threats, and promises from Guevara and Halvorsen. Vicente has testified to this misconduct consistently, across multiple depositions and sworn statements in recent years. PSOF ¶¶196-200.

### ARGUMENT

This is not a summary judgment case. The record properly construed unambiguously supports the conclusion that Defendants fabricated all of the evidence used to arrest, charge, prosecute, and to convict Iglesias of Roman's murder, that Defendants hid from prosecutors and from Iglesias and his attorneys a large volume of exculpatory and impeachment evidence that would have halted Iglesias's prosecution and shown his innocence, and that Defendants conducted suggestive identification procedures and fabricated identifications that fatally tainted Iglesias's criminal case. A similar volume of evidence supports Iglesias's claim that this misconduct occurred because of the official policies of the City of Chicago. All material facts are disputed, and Defendants' legal arguments lack merit. This Court should deny Defendants' motions.

Though Defendants ignore the legal standard throughout their motions, this Court must examine the evidence in the light most favorable to Iglesias and draw all inferences in his favor. *Tolan*, 572 U.S. at 656-57. Summary judgment is warranted only if Defendants show that there is no genuine issue of fact on any of Iglesias's claims such that they are entitled to judgment as a matter of law. *Id.* "Credibility determinations, the weighing of the evidence, and the drawing of

14

legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

This brief proceeds in five parts. First, it outlines those claims and theories not challenged by Defendants, on which there will be a trial. Second, it explains that Seventh Circuit law holds that this Court need not parse sub-theories of liability and items of evidence at summary judgment in a case like this one, where it is clear the case will proceed to trial on a fair trial claim against the Defendants. Third, it describes the reasons summary judgment is categorically unavailable to Guevara and Halvorsen, given their assertion of their Fifth Amendment rights. Fourth, it sets out why the Defendant Officers' legal arguments must be rejected and outlines the hotly disputed facts that preclude summary judgment for the Defendant Officers. And fifth, it explains why the City is precluded from re-litigating *Monell* claims the City has lost in recent trials, why Iglesias is entitled to summary judgment on the theory that the City's express policies were deficient to stop the suppression of evidence in homicide cases, and why genuine disputes of fact preclude summary judgment on the remainder of Iglesias's *Monell* claims.

## I. DEFENDANTS CONCEDE AND DO NOT CHALLENGE THAT MANY OF IGLESIAS'S CLAIMS REQUIRE A TRIAL

It is first important to note that Defendants concede a trial is necessary on certain theories of liability, and they do not move for summary judgment on other theories. In particular, Defendant Officers expressly concede the following:

- Guevara and Halvorsen both concede they cannot obtain summary judgment on Iglesias's theory that they knowingly fabricated Vicente's statement incriminating Iglesias, OB-8; GB-2;
- Because they concede they are not entitled to summary judgment on the Vicente theory, Guevara and Halvorsen also necessarily concede that they are not entitled to summary judgment on Iglesias's theories that they suppressed material exculpatory and impeachment evidence regarding their interactions with Vicente, see Argument IV(B)(2)(c) *infra*;

15

- Moreover, this concession also means that Guevara and Halvorsen also necessarily concede that they are not entitled to summary judgment on Iglesias's theories that they failed to intervene to prevent the violation of Iglesias's rights, see Argument IV(E) *infra*, that they conspired to violate his rights, see Argument IV(G) *infra*, and that they intentionally inflicted emotional distress, see Argument IV(F) *infra*, and Guevara and Halvorsen do not make any argument for summary judgment on those claims and theories in their briefs.

In addition, Defendant Officers do not include any argument in their motions regarding the following material disputes of fact:

- No Defendant challenges that a jury must decide whether Defendants fabricated a false statement attributed to Iglesias stating that he hung out in the area of the crime, PSOF ¶187;
- No Defendant challenges that a jury must decide whether Defendants fabricated entirely that Ochoa identified Iglesias from a photo array at his house on June 22, 1993, when in fact no photo array occurred on that date, PSOF ¶¶139-146;
- No Defendant challenges that a jury must decide whether Defendants fabricated a false closing report, which summarized the evidence they had fabricated to implicate Iglesias a photo identification procedure had taken place on June 22 and June 23, 1993, PSOF ¶¶183-191;
- No Defendant challenges that a jury must decide whether Defendants suppressed exculpatory and impeachment evidence that Ochoa and Rodriguez each informed Defendant Officers that they had not seen the shooter and could not identify him, PSOF ¶¶133-138 (Ochoa); ¶¶83-87 (Rodriguez);
- No Defendant challenges that a jury must decide whether Defendants suppressed exculpatory and impeachment evidence that Iglesias was their suspect before there was any evidence implicating him, and that they suppressed a rap sheet in their file establishing that was the case, PSOF ¶¶63-66;
- No Defendant challenges that a jury must decide whether Defendants suppressed exculpatory and impeachment evidence regarding Guevara and Halvorsen's suppression of their interactions with Vicente, PSOF ¶¶192-209;
- No Defendant challenges that a jury must decide whether Defendants suppressed exculpatory and impeachment evidence relating to their interactions with Ochoa, PSOF ¶¶114-116, 133-138, 147-162, 211;
- No Defendant challenges that a jury must decide whether Defendants suppressed exculpatory and impeachment evidence that Rodriguez told Defendants during the identification procedures that Iglesias looked different in various ways from the perpetrator, PSOF ¶104; and
- No Defendant challenges that a jury must decide whether Defendants suppressed exculpatory and impeachment evidence relating to their own pattern of misconduct, PSOF ¶¶503-512, 546-549.

In addition, the City of Chicago does not move for summary judgment on multiple of Iglesias's *Monell* theories, as outlined at the start of Argument V(B) *infra*.

16

Because Defendants do not move for summary judgment on a number of Iglesias's theories that they violated his right to a fair trial, they are not entitled to summary judgment. Defendants *each* bear the burden of showing that there is no evidence on which a reasonable jury could find for Iglesias on *any* of his claims against *each* of them. *Celotex Corp. v. Catrett*, 477 U.S. 317, 331-32 (1986). The fact that Defendants have not moved for summary judgment on many theories supporting Iglesias's claims, means that those uncontested theories must be tried, and that Defendants are not entitled to judgment on any claim. *Id.* at 332 ("Plainly, a conclusory assertion that the nonmoving party has no evidence in insufficient….[A] part who moves from summary judgment . . . must affirmatively show the absence of evidence in the record."); *Titran v. Ackman*, 893 F.2d 145, 148 (7th Cir. 1990) ("When a party moves for summary judgment on ground A, the opposing party need not address grounds B, C, and so on; the number of potential grounds for (and arguments against) summary judgment may be large, and litigation is costly enough without requiring parties to respond to issues that have not been raised[.]"); see also *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 736 (7th Cir. 2006). Any arguments Defendants might have made for summary judgment on the above theories are now forfeited, and it will be too late for Defendants to raise them in reply. *Costello v. Grundon*, 651 F.3d 614, 635 (7th Cir. 2011) (reversing summary judgment granted on issue raised in a reply).

Independent of these concessions and forfeitures, Guevara does not develop an argument that *he* is entitled to summary judgment at all. Instead, Guevara has filed a boilerplate motion to "join" the other Defendants' motions for summary judgment, which is devoid of substance or record citations. Dkt. 264. The problem for Guevara, among other things, is that the other Defendants do not make *any* argument that he is entitled to summary judgment. See Dkt. 247.

17

Guevara has failed to satisfy his burden of production at summary judgment, and his motion should be denied without the need for a response. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)); 10A WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE §2727. In addition, his argument is too cursory to justify relief. *United States v. Holm*, 326 F.3d 872 (7th Cir. 2003) ("It is not the obligation of this court to research and construct the legal arguments open to parties," and "perfunctory and undeveloped arguments" are waived).

Moreover, by conceding that a trial is needed on several fabrication theories discussed above, and then "joining" a motion filed by other Defendants without additional discussion, Guevara necessarily concedes that a trial is necessary on all other claims that arise from those he concedes must be tried. For example, Guevara concedes he cannot obtain summary judgment on the fabrication theory that he fabricated Vicente's statement incriminating Iglesias. That also means he cannot obtain summary judgment on the related suppression theory that he hid the evidence that he used physical abuse to force Vicente to adopt the fabricated statement, which could have been used to impeach Vicente and Guevara, among other witnesses. The same logic applies regarding Guevara's liability on nearly every theory at issue. This Court should deny Guevara's motion summarily.

## II. SEVENTH CIRCUIT LAW DICTATES THAT THIS COURT SHOULD NOT PARSE SUB-THEORIES OF LIABILITY AT SUMMARY JUDGMENT IN A FAIR TRIAL CASE

Defendants' decision to concede and not to contest Iglesias's theories set out above has an additional consequence. The Seventh Circuit has directed that courts at summary judgment should not weed through sub-theories and parse items of evidence giving rise to a fair trial due process claim, so long as it has been established that there is a material dispute of fact about whether a Defendant contributed to violating a plaintiff's right to a fair trial. See *Goudy v. Cummings*, 922

18

F.3d 834, 844 (7th Cir. 2019) (holding that once it is established at summary judgment that a trial is required on due process theories, the court "need not and do[es] not address [the plaintiff's] allegation that the alleged [additional theory of liability] independently constituted a basis for liability"); see also *Camm v. Faith*, 937 F.3d 1096, 1108–09 (7th Cir. 2019) ("It's worth noting that while the parties sometimes refer to three '*Brady* claims,' it's more accurate to say that [the plaintiff] has a single *Brady* claim alleging the suppression of three baskets of evidence."); *Goudy*, 922 F.3d at 838 (stating that "[i]t is important to clarify that although the parties occasionally refer to [the plaintiff's] '*Brady* claims' or 'identification procedure claim,' his allegations do not give rise to separate *claims* under section 1983. [The plaintiff] has presented a single claim: that the defendants are liable for causing him to receive an unfair trial in violation of his due process rights"); *id.* (holding that "all defendants who can be shown to have 'suppressed' evidence in violation of *Brady* . . . should be liable for the aggregate impact on the outcome of the trial [the plaintiff] ultimately received.").

As a result, once this Court decides Iglesias has shown a genuine dispute of fact on any of his due process theories, it can move forward with a trial on Iglesias's fair trial claim without exploring every argument made by Defendants in their motion, and it can deny summary judgment on that basis. Most prominently, while there is plainly no reason for the Court to labor over whether Guevara or Halvorsen is entitled to summary judgment relating to any particular sub-theory or item of evidence, given their concessions and forfeitures, the same is true of all of the Defendants. This Court need not parse every due process theory addressed in Defendants' motion and below to conclude that a trial against each Defendant is necessary and to deny summary judgment. This Court should simply deny the motions and proceed to trial.

19

### III. SUMMARY JUDGMENT IS UNAVAILABLE TO GUEVARA AND HALVORSEN IN LIGHT OF THEIR INVOCATION OF THE FIFTH AMENDMENT

Guevara's and Halvorsen's motions are frivolous for another reason. They cannot obtain summary judgment given their assertion of their Fifth Amendment right to remain silent in response to questions about the material facts at issue. This Court should independently deny their summary judgment motions based solely on their assertion of this privilege.

Guevara asserted his Fifth Amendment right not to incriminate himself in response to hundreds of questions about his specific misconduct during the Roman investigation and Iglesias's arrest, prosecution, and conviction, including every one of the specific disputed material facts at issue in this case (*e.g.*, the confidential informant tip, the Ochoa and Rodriguez identifications, the Vicente statement, etc.). PSOF ¶¶ 61, 109-113, 157-160, 191, 201-202. For his part, Halvorsen also asserted his Fifth Amendment right not to incriminate himself in response to dozens of deposition questions about his misconduct in the Roman investigation and Iglesias's wrongful prosecution. PSOF ¶¶ 62, 112-113, 161-162, 191, 203-204 .[2] The two pleaded the Fifth in response to questions about making Iglesias a suspect, fabricating a confidential informant tip, fabricating identification procedures and identifications, concealing their knowledge that Ochoa and Rodriguez had not seen the perpetrator of the crime, fabricating a false statement they forced Vicente to provide, fabricating police reports about this false evidence, suppressing their misconduct, and testifying falsely at trial. ¶¶61-62, 109-113, 157-162, 191, 201-204.

Because Guevara and Halvorsen exercised their right to remain silent in response to every question regarding disputed material facts, they cannot seek summary judgment. They cannot meet their initial burden of production, and they cannot meet their ultimate burden of persuasion, at this

---

[2] In a civil deposition in another matter, he did not deny his misconduct in this case. PSOF ¶203. Instead, he confirmed that Vicente's story about Iglesias's confession was made up. PSOF ¶¶205-206.

20

stage of the case. It is critical that this Court send a clear message that police officers cannot assert their Fifth Amendment right to avoid self-incrimination in civil cases, refuse to participate in discovery, and then ask the Court to take the issue of their liability away from a jury before trial.

### A. Guevara and Halvorsen Cannot Meet Their Initial Burden of Production At Summary Judgment

At summary judgment, the moving party bears the initial burden of establishing the absence of genuine disputes of material fact for trial. *Adickes*, 398 U.S. at 157; 10A WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE §2727, at 455-56 (3d ed. 1998) ("The movant is held to a stringent standard."). That initial burden is satisfied either when the moving party affirmatively produces evidence negating an essential element of the non-moving party's claim, or when the movant establishes that the record demonstrates the non-moving party will be unable to meet its burden at trial. *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). The movant "cannot sustain its burden merely by denying the allegations in the opponent's pleadings, or merely by asserting that the nonmovant lacks evidence to support its claim." 10A WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE §2727.1, at 455-56 (4th ed. 2016). If the moving party neither offers evidence to negate an element of the nonmovant's claim, nor points to evidence establishing that the nonmovant cannot satisfy its trial burden, then the moving party fails to satisfy its initial burden, the burden does not shift to the non-moving party, and summary judgment must be denied, even without a responsive brief. *Adickes*, 398 U.S. at 160 ("Because respondent did not meet its initial burden of establishing the absence of a policeman in the store, petitioner here was not required to come forward with suitable opposing affidavits."); *Sterk*, 770 F.3d at 627.

A moving party who asserts their Fifth Amendment right to remain silent in response to questions about every material fact cannot satisfy the initial burden of production at summary judgment, because that party can neither point to evidence negating an essential element of the

21

claim nor establish that proof will be lacking on material facts at trial. The Seventh Circuit has emphasized that an assertion of the Fifth Amendment does not "relieve a litigant in civil litigation of the need to establish elements on which he bears a burden of production or persuasion." *United States v. Taylor*, 975 F.2d 402, 404 (7th Cir. 1992); see also *United States v. Rylander*, 460 U.S. 752, 758 (1983) ("But while the assertion of the Fifth Amendment privilege against compulsory self-incrimination may be a valid ground upon which a witness . . . declines to answer questions, it has never been thought to be in itself a substitute for evidence that would assist in meeting a burden of production."). "A party who asserts the privilege against self-incrimination must bear the consequence of lack of evidence. . . . If this be seen as a 'price' on the assertion of the privilege, so be it." *Taylor*, 975 F.2d at 404; see also *Williams v. Florida*, 399 U.S. 78, 83-84, (1970) (explaining that forcing a litigant to choose "between complete silence and presenting a defense has never been thought an invasion of the privilege against compelled self-incrimination"). And "the claim of privilege will not prevent an adverse finding even at summary judgment if the litigant does not present sufficient evidence to satisfy the usual evidentiary burdens in the litigation." *United States v. Certain Real Prop. & Premises*, 55 F.3d 78, 83 (2d Cir. 1995).

While there may be cases in which a party asserts the Fifth Amendment on a peripheral issue unimportant to the material facts at summary judgment, here Guevara and Halvorsen, the two principal Defendants, asserted the privilege as to all material aspects of their illegal conduct in this case. "[A] district court has discretion in its response to a party's invocation of the Fifth," *S.E.C. v. Colello*, 139 F.3d 674, 677 (9th Cir. 1998), and it is a sound exercise of that discretion in this situation to hold that the party invoking the Fifth Amendment cannot satisfy its burden of production at summary judgment.

22

**B.      Guevara and Halvorsen Cannot Meet Their Burden of Persuasion at Summary Judgment**

Even assuming Guevara and Halvorsen could meet their burden of production, they certainly cannot satisfy their burden of persuasion at this stage: They must show that no material fact is disputed. *Celotex*, 477 U.S. at 323. The Supreme Court holds that jurors must be expressly instructed that they can draw adverse inferences against a party asserting the Fifth Amendment in civil litigation. *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976); *LaSalle Bank Lake View v. Seguban*, 54 F.3d 387 (7th Cir. 1995); see also *LiButti v. United States*, 178 F.3d 114, 120 (2d Cir. 1999) (An "adverse inference may be given significant weight because silence when one would be expected to speak is a powerful persuader"). As Rule 56 requires, a court at summary judgment must draw an inference like this one in favor of the non-moving party, here Iglesias, and against the movants, Guevara and Halvorsen. *Tolan*, 572 U.S. at 656-57.

Accordingly, where a Defendant asserts his Fifth Amendment rights to avoid answering questions about material facts, then moves for summary judgment, the Court must draw an inference against that Defendant on those material facts. *Belangen v. Schreiber*, 407 F.3d 34, 55 (2d Cir. 2005) (noting that while a jury may decide whether to draw an inference from the assertion of privilege, the court is "required at summary judgment to draw all reasonable inferences in favor of the non-moving party"); see also *Seguban*, 54 F.3d at 390 (holding that this inference based on an assertion of the privilege may be drawn against even the *non*-moving party at summary judgment). Applied to this case, this Court must draw the adverse inference at summary judgment against Guevara and Halvorsen on those material facts where they have asserted their Fifth Amendment rights, and so Guevara and Halvorsen cannot satisfy their burden of showing there are no disputes of material fact at this stage.

The prospect of losing a claim on the merits in the future because of an assertion of the Fifth Amendment is certainly not the type of cost of invoking the privilege that is prohibited—in fact, this prospect of losing on the merits is considered a wholly permissible consequence of asserting the privilege in non-criminal cases. *E.g.*, *Kimm v. Rosenberg*, 363 U.S. 405, 408 (1960) (*per curiam*) (imposing adverse immigration consequences where burden could not be met under a federal statute because of an assertion of the privilege); *Baxter*, 425 U.S. at 318-20 (declining to extend the *Griffin* rule to civil cases and expressly permitting inferences against the asserting party in a civil action); *Graystone Nash, Inc.*, 25 F.3d 187, 191 (3d Cir. 1994) ("The principle that the invocation of the privilege may be too 'costly' does not mean that it must be 'costless.'"). A party who invokes the privilege deprives the opponent of an essential source of information, obstructs discovery and proceedings, and hinders the search for truth. *Seguban*, 54 F.3d at 390 n.4; *United States v. 4003-4005 5th Ave.*, 55 F.3d 78, 84 (2d Cir. 1995). Moreover, a party cannot use the privilege as a shield to avoid self-incrimination and then as a sword to obtain a litigation advantage. *City of Chicago v. Reliable Truck Parts Co., Inc.*, 822 F. Supp. 1288, 1293 (N.D. Ill. 1993). Iglesias is not asking at this stage for entry of judgment in his favor based on Guevara's and Halvorsen's assertion of privilege. On the contrary, he contends only that those Defendants cannot themselves ask for judgment before trial after asserting their Fifth Amendment rights. This Court should deny Guevara's and Halvorsen's motions because of their assertions of the Fifth Amendment.

C. **Requiring More Evidence In Addition to the Assertion of Fifth Amendment Rights Before Denying Summary Judgment Is Contrary to Law**

Based on a misunderstanding of the law, some district courts have required an examination of additional evidence before denying summary judgment to a moving party who has asserted the Fifth Amendment privilege. See *Rivera*, 319 F. Supp. 3d at 1039-40; *Logan v. City of Chicago*, 891 F. Supp. 2d 897, 901 (N.D. Ill. 2012); *Thompson v. City of Chicago*, 2009 WL 674353, at *3

24

(N.D. Ill. Mar. 12, 2009). These courts have held that there must be "some evidence" in the record apart from the moving party's assertion of the Fifth Amendment to deny the motion for summary judgment. These cases are incorrectly decided and depart from established law.

In some situations, courts have said that judgment should not be entered on the pleadings against a party merely because that party asserts the Fifth Amendment privilege. *National Acceptance v. Bathalter*, 705 F.2d 924, 932 (7th Cir. 1983). In other cases, courts have refused to grant summary judgment to a *moving* party merely because the *non-moving party* asserted the Fifth Amendment. *Seguban*, 54 F.3d at 391. Unfortunately, District courts have read these cases incorrectly to say that summary judgment cannot be *denied* based on the *moving* party's assertion of the Fifth Amendment. *Rivera*, 319 F. Supp. 3d at 1039-40. But the cases cited do not support such a proposition, and there is nothing in the law that would justify such a logical leap.

Consider the question this way: Suppose there were a blanket rule that judgment cannot be entered against a party merely because that party has asserted the Fifth Amendment privilege.[3] That rule would not justify the conclusion that a summary judgment motion filed by a party asserting the privilege cannot be denied on that basis. Entering a judgment *against a party* who asserts the Fifth is much different than denying a motion for summary judgment *filed by a party* who asserts the Fifth. The former situation imposes a high cost for asserting the Fifth Amendment and ends the litigation; the latter merely requires the party asserting the Fifth to face a trial.

District courts have cited *Seguban*, 54 F.3d at 391, in support of the incorrect "more evidence" rule. But that case undermines rather than supports this rule. There, a motion for

---

[3] And the rule is not so simple in the case law. In some circumstances parties *are* granted judgment merely because the opposing party has asserted their Fifth Amendment rights. *Lyons v. Johnson*, 415 F.2d 540, 541 (9th Cir. 1969) (holding that a plaintiff who asserted the Fifth could not sustain a burden of proof and that judgment for the defendants was appropriate); see also *United States v. $39,000.00 in U.S. Currency*, 951 F.3d 740, 742 (6th Cir. 2020).

summary judgment was denied on the logic that the *non-moving party's* assertion of privilege could not justify a grant of judgment to the moving party, without consideration of other evidence. That situation is doubly different than this case: First, here the *moving* party is asking for summary judgment *and* asserting the Fifth. Second, the consequence for the moving party here of asserting the privilege is not a judgment in the nonmovant's favor, but instead is the mere denial of the moving party's motion. Courts who have held that summary judgment cannot be denied based on an assertion of the Fifth Amendment privilege alone get the law wrong.

> **D.** **Guevara and Halvorsen Cannot Assert Their Fifth Amendment Rights and Then Obtain Summary Judgment Given Other Evidence in the Record**

Regardless, even if the erroneous "some evidence" standard were applied here, requiring Iglesias to point to evidence beyond Guevara's and Halvorsen's assertion of the Fifth to defeat summary judgment, their motion for summary judgment remains frivolous. There is ample additional evidence. Indeed, when one considers the record evidence below in the light most favorable to Iglesias and the misconduct it establishes, along with Guevara and Halvorsen's assertion of their Fifth Amendment rights when asked about that same misconduct, plainly Guevara and Halvorsen are not entitled to summary judgment.

\* \* \*

The discussion above illustrates many independent reasons that it makes little sense for Defendants to have filed summary judgment motions in this case. Parties do not have an absolute right to move for summary judgment in every case, and the Federal Rules establish a preference for speedy resolution of claims. It is a waste of this Court's and the parties' time and resources to litigate hundreds of pages of summary judgment motions in a case where summary judgment is plainly not warranted and a trial is sure to occur.

26

## IV.    SUMMARY JUDGMENT IS UNAVAILABLE TO THE DEFENDANT OFFICERS

Examining the record in the light most favorable to Iglesias and drawing inferences in his favor, this Court should deny summary judgment on all claims and theories on which Defendants have moved. No material factual issues are undisputed. Instead, the facts are hotly contested and must be resolved by a jury. Moreover, Defendants' purely legal arguments lack merit and contradict deeply established Supreme Court and Seventh Circuit cases.

Defendants move for summary judgment on portions of Iglesias's due process fair trial claim. But the evidence in the record supports Iglesias's due process claim on each of three, independent theories of liability—fabrication of evidence, suppression of evidence, and fabricated identifications using suggestive identification procedures.

On fabrication, Defendants do not discuss much of the fabricated evidence they used to implicate Iglesias and none of Defendants makes a complete argument that he is entitled to summary judgment. Instead, their arguments are limited: Riccio, Gawrys, and Biebel argue they did not fabricate the confidential informant tip, Ochoa's and Rodriguez's identifications, or Vicente's statements; all Defendants contend Ochoa's and Rodriguez's identifications were not fabricated; and all assert they are not liable for fabricating the confidential informant tip because the tip was not admitted as evidence at Iglesias's criminal trial. This Court could accept each of Defendants' arguments (which it should not do, for the reasons discussed below), and still no Defendant would be entitled to summary judgment on this due process theory. Nonetheless, Defendants' limited arguments fail in the face of disputed facts and they get the law completely wrong.

On suppression, Defendants do not address many items of key evidence they suppressed, including that Ochoa and Rodriguez each said they could not identify the shooter; that Iglesias was

27

a suspect before there was evidence and the rap sheet that proved as much; Guevara's and Halvorsen's interactions with Vicente; and their interactions with Ochoa. By forfeiting any challenge on those issues, Defendants cannot obtain summary judgment on Iglesias's suppression theory. Moreover, when Defendants do discuss the evidence they suppressed, they ignore disputed facts. In addition, they assert the law permitted them to suppress their fabrications of evidence with impunity, a position contrary to Supreme Court and Seventh Circuit precedents. They argue that various items of evidence they suppressed were not suppressed, which is disputed. And they argue Iglesias's attorney should have discovered the evidence they were hiding by exercising more diligence, a view that is disputed and is incompatible with controlling law.

With respect to Iglesias's unduly suggestive identification theory, Defendants incorrectly argue—contrary to Seventh Circuit precedents—that such a claim is not cognizable under § 1983. In addition, they contend there is no evidence they used suggestive identification procedures with Ochoa or Rodriguez. But even accepting some of the *Defendants'* own version of the facts, they are liable for intentionally using improper identification techniques, resulting in false identifications of Iglesias, which tainted Iglesias's criminal trial. The law prohibiting Defendants' illegal tactics was clearly established long before 1993.

Finally, Defendants' other arguments on Iglesias's Fourth Amendment legal seizure claim, Illinois malicious prosecution claim, federal failure-to-intervene claim, federal and state conspiracy claims, and Illinois negligence claims lack merit and depend on reviewing the factual record in the light most favorable to Defendants, which this Court cannot do at this stage. So, too, for the interspersed arguments from Riccio, Gawrys, and Biebel that they were not involved in the misconduct at issue (which begs the question why the other Defendant Officers have moved for

28

summary judgment as all). Iglesias's claims must go to trial against the Defendant Officers on all theories.

**A.    A Reasonable Jury Could Conclude That Defendants Fabricated False Evidence**

The Supreme Court and Seventh Circuit "'have consistently held that a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of [his] liberty in some way.'" *Avery v. City of Milwaukee*, 847 F.3d 433, 439 (7th Cir. 2017) (citing *Mooney v. Hollohan*, 294 U.S. 103, 112 (1935); *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012)). This due process theory is entirely distinct from the due process theory based on suppression of evidence, which is discussed below. *Petty v. City of Chicago*, 754 F.3d 416, 421-24 (7th Cir. 2014).

There are multiple fabrication theories, each of which would independently justify denying summary judgment:

1. Defendants Guevara, Halvorsen, Riccio, Gawrys and Biebel fabricated a tip from a confidential informant to provide the reason that Iglesias was a suspect in the crime, knowing that no such tip had ever occurred, PSOF ¶¶56-60;

2. Defendants Guevara, Halvorsen, Riccio, Gawrys and Biebel fabricated a statement attributed to Iglesias that he "hangs out" in the area of Sawyer and Palmer with members of the Imperial Gangsters, which Iglesias never provided to these Defendants, PSOF ¶187;

3. Defendants Guevara, Halvorsen, Riccio, Gawrys and Biebel fabricated entirely that a photo identification procedure had taken place on Ochoa identified Iglesias in a photo array at Ochoa's house on June 22, 1993, when no photo array occurred on that date, PSOF ¶¶114, 139-146;

4. Defendants Guevara, Halvorsen, Riccio, Gawrys and Biebel fabricated Ochoa's identification of Iglesias in photo array and a live lineup procedure on June 23, 1993, when Ochoa told them he could not identify the shooter, PSOF ¶¶114, 139-146, 147-151, 154-156;

5. Defendants Guevara, Halvorsen, Riccio, Gawrys and Biebel fabricated entirely that Rodriguez identified Iglesias in a photo array and then a live lineup procedure on June 23,

29

1993, when Rodriguez told them he could not identify the shooter, PSOF ¶¶67-69, 70-108, 182, 229-233, 294;

6. Defendants Guevara and Halvorsen, in conspiracy with the other Defendants, fabricated a false story that the forced Vicente to adopt, using physical force, in which Vicente said that Iglesias had made incriminating statements to him, when Defendants had knowingly manufactured that false story, PSOF ¶¶192-198;

7. Defendants Guevara, Halvorsen, Riccio, Gawrys, and Biebel fabricated a closing report for their investigation, which included a summary of the evidence that they had fabricated implicating Iglesias, PSOF ¶¶183-190, 279-280, 289-294, 297

8. Defendants Guevara, Halvorsen, Riccio, and Biebel, in conspiracy with Gawrys, fabricated two lineup reports claiming that Ochoa and Rodriguez both positively identified Iglesias from lineups independently and without police manipulation, PSOF ¶¶67-69, 106, 114-116, 181-182, 289-291; and

9. Defendants Guevara, Halvorsen, Riccio, Gawrys, and Biebel fabricated a claim that more than two weeks after the crime Ochoa and Rodriguez told them that they got a good look at the shooter and could make an identification, PSOF ¶¶114, 185.

Where a due process violation concerns witness statements, the Seventh Circuit has been careful to distinguish between coerced evidence and fabricated evidence. Police coercion of witnesses that produces truthful testimony does not by itself violate due process, absent a violation of the *Brady* duty to disclose facts about the police coercion that was used to obtain the testimony. *Avery*, 847 F.3d at 439 (citing *Fields v. Wharrie*, 740 F.3d 1107, 1123 (7th Cir. 2014) (*Fields II*)). Police fabrication of witness testimony that the officers know to be false, however, violates due process without need for further analysis. *Id.* at 439-40 (citing *Petty*, 754 F.3d at 423).

Contrary to Defendants' suggestion, OB-10-11, all of the fabrication theories in the case concern the creation of evidence that Defendants knew was false, and not an assertion that Defendants coerced truthful testimony. The facts construed in the light most favorable to Iglesias demonstrate that the Defendants Officers created a fake confidential informant tip in order to implicate Iglesias before there was evidence; fabricated identifications that they knew were false from witnesses who had not seen the perpetrators and had made clear that they had not seen the

30

perpetrators; and manufactured a statement for a jailhouse informant to incriminate Iglesias, which was invented out of whole cloth and which the informant was forced to adopt because of Guevara and Halvorsen's physical abuse of him. Any conclusion that these were coercions of truthful evidence necessarily would require construing facts for the Defendants, at minimum, which is inappropriate at this stage.

Importantly, Defendants do not challenge much of Iglesias's due process fabrication theory. Defendant Officers other than Guevara and Halvorsen argue that they were not involved in the fabrications of the confidential informant tip, Ochoa's and Rodriguez's identifications, or Vicente's incriminating statement (items 1, 4, 5, and 6, above). OB-8-10. All Defendants Officers argue that Ochoa's and Rodriguez's identifications were not fabricated (items 4 and 5, above). OB-10-11. All assert that they cannot be liable for fabricating a fake tip from a confidential informant first implicating Iglesias because, in their view, it was not used to deprive Iglesias of his liberty (item 1, above). OB-11-12. Guevara and Halvorsen both concede that they cannot move for summary judgment on the theory that they fabricated Vicente's statement (item 6, above). OB-8; GB-2.[4]

Apart from arguing that Ochoa's and Rodriguez's identifications were not fabricated and that the confidential informant tip was not used, none of Defendant Officers contest that the other items of evidence above were fabricated or deny that they were used to deprive Iglesias of his

---

[4] This concession necessarily concedes that Guevara and Halvorsen are not entitled to summary judgment on other claims and theories as well, including Iglesias's theories that Guevara and Halvorsen suppressed material exculpatory and impeachment evidence regarding their interactions with Vicente, see Argument IV(B)(2)(c) *infra*, that they failed to intervene to prevent the violation of Iglesias's rights, see Argument IV(E) *infra*, that they conspired to violate his rights, see Argument IV(G) *infra*, and that they intentionally inflicted emotional distress, see Argument IV(F) *infra*. Because Guevara and Halvorsen concede the Vicente fabrication theory, they necessarily concede these claims and theories as well.

31

liberty (items 2, 3, 7, 8, and 0, above). See OB-8-12. Any such argument is now forfeited. *Smith v. Ne. Illinois Univ.*, 388 F.3d 559, 569 (7th Cir. 2004).

The end result is that Guevara and Halvorsen concede they are not entitled to summary judgment on this theory, and no Defendant makes a complete argument for summary judgment. As discussed, Seventh Circuit precedents dictate that this Court need not address fabrication sub-theories in a situation where the due process claim will be tried. See Argument II *supra*.

### 1. Riccio, Gawrys, and Biebel Fabricated Evidence

Riccio, Gawrys, and Biebel argue that they did not fabricate the confidential informant tip, Ochoa's and Rodriguez's identifications, or Vicente's statements, because they were not present for any interactions with any of those individuals. OB-7-10. Iglesias agrees that they were not involved in fabricating Vicente's statements. But these Defendants are not entitled to summary judgment on Iglesias's fabrication theory.

Riccio, Gawrys, and Biebel argue that they were not involved in fabricating the confidential informant tip or the Ochoa and Rodriguez identifications, but their arguments interspersed throughout their brief are broader than that—they contend that they had minimal involvement in the Roman investigation, such that they are entitled to summary judgment on many different claims. See OB-12, 18, 32 (suggestive identification theory); OB-36, 39-40 (evidence suppression theories); OB-43 (malicious prosecution and detention without probable cause); OB-46 (failure to intervene); OB-49 (conspiracy); OB-40 (intentional infliction of emotional distress). Those arguments go well beyond construing the facts in their own favor. In making them, Defendants ask the Court to disbelieve facts in the record and instead to accept their self-serving statements to the contrary. These Defendants were each intimately involved in the misconduct at issue, and none of them is entitled to summary judgment.

32

Defendants argue that Biebel was simply a supervisor who signed reports and did not conduct the investigation. *E.g.*, OB-36. There are a number of problems with this argument. First, supervisors who approve police reports are not passive rubber stampers who sign whatever crosses their desks—they are in fact leaders of the team, responsible for oversight of investigative tasks and verification of results. PSOF ¶¶283, 286-287 They are kept fully abreast of the homicide investigation as it proceeds, including the results of any positive or negative lineup identification procedures, witness interviews and other developments. PSOF ¶283. Indeed, tracking the day-to-day progress of the investigation was one of their integral roles. PSOF ¶283; see generally PSOF ¶¶285-291. The record supports the conclusion at summary judgment that Biebel was involved in misconduct that occurred in the investigation he oversaw.

Biebel oversaw the Defendants' investigation throughout as their direct supervisor. PSOF ¶¶285-291. He approved the initial reports on June 7 and June 8, the day of the crime and day after, which included the interviews in which Ochoa and Rodriguez had told the reporting detectives they could not make an identification, and which omitted the unsuccessful photo identification procedures conducted with Hugo Rodriguez and others. PSOF ¶288. He approved the false June 24, 1993 closing report of Halvorsen, Guevara, Riccio, and Gawrys, which documented the panoply of fabricated evidence used to implicate Iglesias, including the entirely made-up confidential informant and June 22 photo array, as well as the fabricated photo array and lineup identifications of Ochoa and Rodriguez, and a fabricated statement from Iglesias in which he purportedly admitting to hanging out near the scene. PSOF ¶¶289-291.

Biebel acknowledged that as a supervisor, he remained involved and informed of what was going on during the investigation, and he took steps to understand what had occurred during the investigation to ensure reports were accurate. PSOF ¶¶283, 285-287. Accordingly, Plaintiff is

33

entitled to the inference that Biebel learned about the fabrication and suppression that had occurred during the course of the investigation, and nevertheless approved reports that he knew were fabricated, and that concealed exculpatory and impeaching evidence.[5]

Finally, the arguments of Riccio, Gawrys, and Biebel ignore substantial disputes of fact. For example, they argue they were not present for or involved in identification procedures with Ochoa and Rodriguez. OB-8-10, 18-19. That is an unsustainable view of the record. Consider that Riccio and Gawrys are listed as reporting detectives on the closing report, and Biebel is listed as the supervising and approving officer, on the closing report and lineup reports that document so much of the fabricated evidence. PSOF ¶¶279-280, 289-294, 297. Riccio and Gawrys were involved in preparing that report, and thus the numerous fabrications contained within it. PSOF ¶¶292, 297. Riccio and Gawrys are also listed as arresting detectives on the arrest report for Iglesias and were involved in arresting him and bringing him to Area 5 on June 23 without any probable cause for his arrest. PSOF ¶¶295, 298. For these Defendants to claim in the face of this evidence that they are entitled to a view of the facts where they were uninvolved in the very things that they themselves reported being involved in does not pass the straight face test.

But there is even more evidence they were involved in the fabrications in this case. With respect to the confidential informant tip, the closing report on which they are both identified as

---

[5] Defendants contend that Biebel cannot be liable merely for his supervisory role. OB-46. Supervisors are liable under § 1983 "for their subordinates' violation of others' constitutional rights when they 'know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Steidl v. Fermon*, 494 F.3d 623, 631-32 (7th Cir. 2007). As discussed above, the summary judgment record supports the conclusion that Biebel directly participated in violating Iglesias's rights, and so reference to supervisory liability is not necessary. Nonetheless, the record would also permit a reasonable jury to conclude that the constitutional violations Iglesias suffered were caused by the deliberate indifference of Biebel. He was the direct supervisor of the other Defendant Officers, had direct knowledge of their investigation, made assignments, and approved reports, thereby ratifying the misconduct contained in those reports. PSOF ¶¶283, 285-291; RSOF-Officers ¶¶44, 101. His participation as a supervisor was essential to the scheme. *Id.* He is liable on that basis as well. To the extent Defendants wish to contest these facts, they must do so at trial.

reporting detectives states that the "Reporting Detectives were contacted by a confidential informant" who implicated Iglesias. PSOF ¶¶56, 184, 292, 297.

The same is true of the Ochoa and Rodriguez identifications. Riccio admits that he is the one who wrote the fabricated lineup reports falsely claiming that Ochoa and Rodriguez had positively identified Iglesias, and he signed Guevara and Halvorsen's names to the report. Biebel then reviewed it and approved it. PSOF ¶¶293-294, 289-291.

These actions—working with Guevara and Halvorsen to fabricate the initial lead against Iglesias, working with them to draft the closing report full of fabrications, signing their names to fabricated lineup reports, and in Biebel's case overseeing and signing off on all of these fabrications—are all evidence that Riccio, Gawrys, and Biebel conspired with Guevara and Halvorsen to file charges and prosecute Iglesias for a crime he had not committed.

Of course, in addition to this evidence, under oath Guevara and Halvorsen did not deny that they were involved in the fabrication of the confidential informant tip, the Ochoa and Rodriguez identifications, and Vicente's statement. Instead, they pleaded the Fifth about their involvement in those fabrications. PSOF ¶¶61-62, 109-113, 157-162, 201-204.

In light of this record evidence, Riccio, Gawrys, and Biebel cannot assert at summary judgment that they were uninvolved as a factual matter in fabricating the confidential informant tip and Ochoa's and Rodriguez's identifications. They had knowledge of this false evidence. They reported it. They reached an agreement to prosecute Iglesias based on it—the identifications were a central part of their conspiracy to frame Iglesias. A trial is required against Riccio, Gawrys, and Biebel on the fabrication of these items of evidence. And again, once the Court makes the determination that these Defendants will proceed to trial on the due process claim, it need not address every other sub-theory and item of evidence. See Argument II *supra*.

35

### 2. Ochoa's and Rodriguez's Identifications Were Fabricated

Defendants next contend that there is no evidence that Ochoa's and Rodriguez's identifications of Iglesias were fabricated. OB-10-11. In this argument, Defendants do not argue that they were uninvolved in the identifications, but they instead contend that Ochoa's and Rodriguez's identifications of Iglesias were accurate. *Id.*

Defendants do not faithfully apply Rule 56. Defendants' arguments simply cherry pick one a piece of evidence they think supports them and draw inferences from that evidence in their own favor, disregarding ample record evidence that creates genuine disputes of fact. Properly construing the record for Iglesias and drawing inferences for him, as this Court must, neither Ochoa nor Rodriguez could have made an identification given the circumstances of the shooting: he shooter had his hood up over his head; the incident lasted just seconds; the perpetrator was a stranger to both witnesses; the shooter was hiding behind a tree; Ochoa was more than 150 feet away, looking out a second floor window, at an angle up the street, with an obstructed view; Rodriguez ducked right away when the shooting began and then looked back through the rear window of a car with blinds on it, for a considerable distance, only able to see the back of the shooter as he was running away in the opposite direction of the speeding car. PSOF ¶¶19, 21, 23, 26-27, 29-33, 44, 50, 70-81, 89, 117-132, 135, 164-171, 236. As a result, neither Ochoa nor Rodriguez could provide a description of the perpetrator. Rodriguez could only tell the reporting detectives that the shooter was wearing all black. Ochoa could provide only a limited description, consistent with the long distance from which he saw the shooter, which did not include any distinguishing features. PSOF ¶¶82-86, 133-38. The limited description he could provide—age, height and complexion—did not match Iglesias at all. PSOF ¶137. Importantly, each of the two witnesses independently told responding detectives that they would not be able to identify the

36

perpetrator. PSOF ¶¶27, 84-86, 138. Throughout the criminal proceedings, Defendants suppressed that the eyewitnesses had told them they could not make an identification. PSOF ¶¶271-274. And they suppressed evidence that Rodriguez had been shown multiple, earlier identification procedures in which he did not make an identification, including at least one of Imperial Gangsters in which Iglesias would have been included. PSOF ¶¶90-96, 210, 229-233.

Meanwhile, Iglesias is innocent, as this Court must infer at summary judgment based on the evidence. PSOF ¶¶2-12. That means, as a factual matter, that he was not the perpetrator who was present at the scene. PSOF ¶¶2-12. Nonetheless, Defendants somehow got two different witnesses independently to identify their chosen suspect Iglesias. PSOF ¶¶67-69, 114-116, 269-270. In other words, both witnesses picked the same innocent person who Defendants had decided in advance to frame for the Roman murder. PSOF ¶¶55-66.

Moreover, when asked if they fabricated identifications from Ochoa and Rodriguez that they knew were false, Guevara and Halvorsen took the Fifth. PSOF ¶¶109-113, 157-162. Based on these facts alone, Iglesias is entitled to the inference at summary judgment that Defendants fabricated Ochoa's and Rodriguez's identification of Iglesias to frame him and knew that those identifications were false.

But there is much more. There is record evidence that Defendant Officers fabricated a statement attributed to Iglesias that he claimed to hang out near the area of the shooting. PSOF ¶187. They fabricated that Ochoa had identified Iglesias during a photo identification procedure at Ochoa's house on June 22, even though no such event occurred. PSOF ¶¶139-146. They fabricated false police reports documenting their false evidence. PSOF ¶¶181-191. And they manufactured witness testimony for trial. PSOF ¶¶269-270, 274, 277. This unchallenged evidence that Defendants knowingly fabricated evidence separate from Ochoa's and Rodriguez's identifications

37

firmly supports the inference at this stage that they did the same thing with Ochoa's and Rodriguez's identifications.

Moreover, it is undisputed—and unchallenged at summary judgment—that Defendants fabricated a jailhouse confession incriminating Iglesias and forced Vicente to adopt that story. PSOF ¶¶192-209. The blatant fabrication of a jailhouse confession to the crime amply supports the proper view of the evidence at this stage that Defendants fabricated Ochoa's and Rodriguez's identifications of Iglesias. Put differently, if Defendants had obtained legitimate identifications of Iglesias, they would have had no need to make up a confession; and the fact that they were willing to invent a confession supports the inference that they fabricated other incriminating evidence.

Moreover, Defendants do not address as a factual matter anywhere in their motion Iglesias's contention that they selected him as a suspect and pulled his rap sheet before any evidence existed (facts that they suppressed), and then made up a story about a confidential informant tip in order to have a false reason to suspect Iglesias. PSOF ¶¶ 63-65, 211, 55-62, 210. (The Defendants simply argue that this fabricated tip did not violate Iglesias's due process rights, which is addressed below. See Argument IV(A)(3) *infra*.) This false story about how Iglesias became a suspect and Defendants' subsequent fabrication of Ochoa's and Rodriguez's identifications are intimately related—the latter fabrication is the execution of a plan that began with the former fabrication. PSOF ¶¶55-62, 67-113, 114-162. Defendants cannot hope for summary judgment on Iglesias's fabrication claims having failed to even address the fabricated origin of their scheme. *Sublett*, 463 F.3d at 736 ("[I]f the moving party does not raise an issue in support of its motion for summary judgment, the nonmoving party is not required to present evidence on that point, and the district court should not rely on that ground in its decision."); *Purghoraishi v. Flying J*, 449 F.3d 751, 765 (7th Cir. 2006) (same). It will obviously be too late

for Defendants to raise these arguments in their reply. *Costello v. Grundon*, 651 F.3d 614, 635 (7th Cir. 2011) (reversing summary judgment granted on issue first raised in a reply).

Again, Guevara took the Fifth when asked if Ochoa's and Rodriguez's identifications were fabricated, PSOF ¶¶109-111, 157-160, Halvorsen did the same, PSOF ¶¶112-113, 161-162, and Ochoa and Rodriguez themselves admit that they identified differences between the shooter and Iglesias, PSOF ¶¶106, 150. Drawing the necessary inferences for Iglesias from this testimony and Defendants' refusals to testify, combined with the other evidence above, Defendants cannot win the argument at summary judgment that Ochoa's and Rodriguez's identifications were legitimate and that they had no knowledge that they were unreliable. Such a view requires turning the summary judgment standard on its head. This Court should reject Defendants' argument that they are entitled to a judgment as a matter of law that Ochoa's and Rodriguez's identifications were not fabricated.

### 3. Defendants' Fabrication of the Confidential Informant Tip Was Used to Deprive Iglesias of His Liberty

Defendant Officers' final argument for summary judgment on Iglesias's fabrication due process theory is that they cannot be held liable because one item of evidence they fabricated— the fake confidential informant tip—was not admitted as evidence as Iglesias's criminal trial. OB-11-12. The two-paragraph argument is too cursory to justify summary judgment, *Smith*, 388 F.3d at 569, and it is wrong on the law and the facts. However, before turning to that argument, it is important to observe that Defendants do not argue that the other items fabricated evidence above had no impact on Iglesias's criminal trial. OB-11-12. Those fabrications were used in Iglesias's criminal case to deprive him of his liberty, and they are alone enough for each of the Defendant Officers to be held liable on Iglesias's fabrication due process theory, without the need to resolve the question of whether the confidential informant tip alone violated Iglesias's due process rights.

39

Again, the Court should not address sub-theories and items of evidence one by one once it is already clear there will be a trial on due process claims. See Argument II *supra*.

On the law, Defendants' position that they cannot be liable for fabrication of evidence unless the particular item of evidence fabricated is admitted as evidence at the criminal trial, OB-11-12, fundamentally misunderstands Seventh Circuit law governing fabrication due process claims. An officer who fabricates evidence violates due process if their fabrication causes *any* deprivation of liberty. This is true whatever form the initial fabricated evidence takes (*e.g.*, a false report, a manufactured statement, a fabricated identification, invented physical evidence, or planned testimony, etc.), regardless of the stage of the criminal case at which the fabrication causes a liberty deprivation (*e.g.*, issuance of a warrant, filing of charges, an indictment, a conviction, etc.), and however the evidence comes to impact the criminal proceedings (*e.g.*, introduced as an exhibit, offered as testimony, or used to preclude other evidence from being used in the criminal case).

The question is simply whether the fabrication caused a deprivation of liberty. As the Seventh Circuit put it in *Whitlock v. Brueggemann*, "We have consistently held that a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of her liberty *in some way*." *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012) (emphasis added). The cases unanimously hold that due process is violated when fabricated evidence causes a liberty deprivation at any stage of the criminal proceedings, even when the initial fabrication is not admitted in its original form in those proceedings. See, *e.g.*, *Patrick v. City of Chicago*, 974 F.3d 824, 835-36 (7th Cir. 2020) (affirming a due process fabrication verdict against multiple defendants where a plaintiff's coerced confession and a fabricated lineup report were introduced at the criminal trial in the form of oral testimony);

40

*Anderson v. City of Rockford*, 932 F.3d 494 (7th Cir. 2019) (holding that summary judgment not available where police officer fabricated witness statements before trial and then instructed witnesses to testify consistent with those fabricated statements at trial); *Avery v. City of Milwaukee*, 847 F.3d 433, 441-42 (7th Cir. 2017) (due process violated when fabricated confession of the plaintiff was introduced at trial through police testimony); *Stinson v. Gauger*, 868 F.3d 516, 528 (7th Cir. 2017) (*en banc*) (due process violated when police collude with a witness to fabricate expert testimony before a criminal trial and the fabrication is later introduced as trial testimony); *Whitlock*, 682 F.3d at 582-84 (due process violated when witness testimony fabricated by police before trial is introduced at trial by an immune prosecutor).[6]

Fabricated evidence violates due process when it is admitted as evidence, when it comes in at trial through the testimony of police or witnesses, where it used to affect the outcome of the criminal case, or where it "furthered the prosecution" in any other way. *Hurt v. Wise*, 880 F.3d 831, 844 (7th Cir. 2018).[7] Accordingly, there is no support for Defendants' position that they can be liable only if a particular item of fabricated evidence was actually introduced at trial in its original form.

On the facts, there are material disputes of fact about whether the confidential informant tip was used to deprive Iglesias of his liberty during the criminal proceedings. A trial is required

---

[6] In addition, the Supreme Court implicitly rejected Defendants' myopic view of a fabricated evidence claim in both *Buckley v. Fitzsimmons*, which approved a fabrication claim where physical evidence of a boot print was fabricated before trial and then introduced through the testimony of a witness at trial. 509 U.S. 259, 262-64 (1993), and more recently in *McDonough v. Smith*, where the Court recognized that a claim that falsified affidavits, witness coaching, and a bogus DNA analysis fabricated before trial violated the Constitution when that evidence was later introduced though witness testimony. 139 S. Ct. 2149, 2154 (2019).

[7] Defendants cite *Avery*, OB-11-12, but that case supports Iglesias's position: the Seventh Circuit there recognized that evidence often comes in at trial through oral testimony, and it rejected the proposition that witness testimonial immunity renders a state actor not liable for a pre-trial act of fabrication. 847 F.3d at 441. In so holding, *Avery* recognizes that the pre-trial act of fabrication still may violate due process rights if the fabricated evidence affects the criminal proceedings later in some other form.

41

to resolve these disputes. *Washington v. Boudreau*, No. 16-CV-01893, 2022 WL 4599708, at *21 (N.D. Ill. Sept. 30, 2022) (where arguments about the use of fabricated evidence involve disputes of fact about the effect of evidence on a criminal case, a trial is necessary). Defendants contend that the tip was not used in the criminal case, but that is plainly false: Defendant Guevara testified at the criminal trial about having received the tip from a confidential informant, based on which he then included Iglesias's photo in the photo array shown to Ochoa and Rodriguez. PSOF ¶275. This is enough to demonstrate that the tip violated Iglesias's due process rights. *Taylor v. City of Chicago*, 2021 WL 4401528, at *7 (N.D. Ill. Sept. 27, 2021) ("Although the report itself was not admitted into evidence, as the Court has previously noted, the contents of the fabricated report certainly were.").[8]

Moreover, the Defendants' false confidential informant tip led to an arrest and detention without any probable cause, and it was used to get murder charges approved. PSOF ¶¶55-62, 268. A jury must consider the claim that Defendants' pre-trial fabrication of a fake confidential informant tip violated Iglesias's due process rights when that fabrication was used against Iglesias during his criminal proceedings.[9]

---

[8] Defendants rightly do not raise any argument for testimonial immunity in their summary judgment briefs. Testimonial immunity does not extend to pre-trial acts of fabrication that are then presented by way of testimony at trial. *Rehberg*, 566 U.S. at 370 n.1; *Avery*, 847 F.3d at 441-42 (an officer cannot immunize himself simply by testifying about his false evidence at trial and noting that "[i]f an officer who fabricates evidence can immunize himself from liability by authenticating falsified documentary or physical evidence and then repeating the false 'facts' in his trial testimony, wrongful-conviction claims premised on evidence fabrication would be a dead letter."). Accordingly, Defendants may not be found liable simply for testifying, but they are liable for fabricating evidence before criminal proceedings that was later introduced through his testimony during criminal proceedings.

[9] Defendants cite *Serrano v. Guevara*, No. 17 CV 2869, 2020 WL 3000284, at *17 (N.D. Ill. June 4, 2020), claiming that it supports the view that reference to a non-testifying witness due not violate due process. OB-12. *Serrano* says nothing of the sort. In that case, the court found that a false witness statement was *not* used substantively at trial, and so the plaintiff could not show that it had an effect on his prosecution. *Serrano*, 2020 WL 3000284, at *17. Here, the fake tip was used in the criminal case as the entire explanation of why Iglesias became a suspect in the Roman murder, PSOF ¶¶55-56, and any dispute about causation must be reserved for the jury, *Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir. 1988).

\* \* \*

All of Defendants' fabricated evidence outlined above was used to deprive Iglesias of his liberty. Indeed, all of the evidence that ever implicated Iglesias in the Roman shooting was created by the Defendants. To the extent that the Defendants disagree, it is because there are genuine disputes of fact. Summary judgment on Iglesias's fabrication theories should be denied.

### B. Independently, A Reasonable Jury Could Conclude That Defendants Suppressed Material Exculpatory and Impeachment Evidence

This Court should also deny summary judgment on Iglesias's evidence suppression due process theories. *Brady* requires that exculpatory and impeachment evidence material to the criminal case be disclosed to the prosecution and defense, "[a]nd police officers can be held liable under *Brady* and its progeny when they withhold exculpatory evidence from prosecutors[.]" *Holland v. City of Chicago*, 643 F.3d 248, 255 (7th Cir. 2011); see also *Kyles v. Whitley*, 514 U.S. 419, 438 (1995). The Seventh Circuit has long recognized that section 1983 due process claims may be brought against police who withhold evidence, causing wrongful convictions. *Whitlock*, 682 F.3d at 572; *Dominguez v. Hendley*, 545 F.3d 585 (7th Cir. 2008); *Newsome v. McCabe*, 256 F.3d 747, 752 (7th Cir. 2001); *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988).

The Supreme Court holds that "[e]vidence qualifies as material when there is 'any reasonable likelihood' it could have 'affected the judgment of the jury.'" *Wearry v. Cain*, 577 U.S. 385, 392 (2016) (quoting *Giglio v. United States*, 405 U.S. 150, 154 (1972); *Napue v. Illinois*, 360 U.S. 264, 271 (1959)). A litigant "need not show that he 'more likely than not' would have been acquitted had the new evidence been admitted. . . . He must show only that the new evidence is sufficient to 'undermine confidence' in the verdict." *Id.* (citing *Smith v. Cain*, 132 S. Ct. 627, 629-31 (2012)); see also *Kyles*, 514 U.S. at 434.

The question whether suppressed evidence was material must be answered considering all of the suppressed evidence together in the aggregate, and not by assessing evidence piece by piece. *Wearry*, 577 U.S. at 394. Whether evidence is material also depends on the strength of other evidence used in the criminal proceedings—it might take only a little evidence to disturb an already-weak conviction. *United States v. Agurs*, 427 U.S. 97, 113 (1976).

A group of Defendants who each suppress different items of evidence that are collectively material are each liable for the resulting due process violation, even if one may have an argument that the item of evidence they suppressed was not alone material. *Goudy*, 922 F.3d at 843 ("[A]ll defendants who can be shown to have suppressed evidence in violation of *Brady* . . . should be liable for the aggregate impact on the outcome of the trial [the plaintiff] ultimately received.") (internal quotations and citations omitted).

Importantly, it is firmly established that evidence that would impeach a key witness is material. *Giglio*, 405 U.S. at 153-54; *see also Smith*, 565 U.S. at 75 (impeachment evidence regarding eyewitness material when eyewitness was the only evidence connecting defendant to the crime); *Fields v. Wharrie*, 672 F.3d 505, 517 (7th Cir. 2012) (*Fields I*) ("The constitutional violation occurs when the means by which the testimony was acquired are not disclosed at trial— or when other information that impeach the testimony's reliability are not shared with the defense."); *Newsome v. McCabe*, 319 F.3d 301, 302-05 (7th Cir. 2003) (holding that "the details about how [the police] induced the witnesses to finger Newsome" was "information vital to probe whether manipulation occurred").

The case against Iglesias could not have been thinner. There was no evidence implicating him other than the fabricated evidence discussed above. Any one of the pieces of exculpatory evidence suppressed by Defendants would have undermined confidence in his prosecution and

44

conviction. Any piece of it would have impeached key witnesses at trial—the eyewitnesses and the Defendant Officers. When the suppressed evidence is considered collectively, there is no chance any Defendant is entitled to summary judgment on the suppression claim.

### 1. Defendants Suppressed Their Own Fabrications

The Defendant Officers suppressed that they had fabricated the false evidence discussed in the previous section. Specifically, Defendants did not disclose to state prosecutors, to Iglesias, or to his criminal defense attorneys that they had fabricated a confidential informant tip to first implicate Iglesias in the crime, a purported statement from Iglesias that he hung out by the crime scene, the June 22 photo array supposedly at Ochoa's house, Ochoa's and Rodriguez's photo array and live lineup identifications of Iglesias, a jailhouse confession from Iglesias attributed to Vicente, and police reports falsely documenting the investigation. See Argument IV(A) *supra*.

Had the Defendants disclosed that they had fabricated this evidence incriminating Iglesias, it would have immediately halted the criminal prosecution and conclusively shown Iglesias's innocence. The suppression of the fact that items of incriminating evidence were invented by police is precisely the sort of impeachment evidence that is material as a matter of law, within the meaning of *United States v. Bagley*, 473 U.S. 667, 676 (1985), and *Giglio*, 405 U.S. at 154-55. It could have been used to cross-examine literally every state's witness at trial, including Rodriguez, Ochoa, and Guevara, in a manner that would have left the state without any evidence to prosecute or convict. *Smith*, 565 U.S. at 75; *Fields I*, 672 F.3d at 517; *Newsome*, 319 F.3d at 302-05. Defendants' suppression of their own fabrications is enough for Iglesias's suppression claims to survive summary judgment, without the need for the Court to consider other suppression theories. See Argument II *supra*.

**(a) Defendants' Position That Suppressions of Fabricated Evidence Cannot Violate Due Process Is Wrong**

Defendants incorrectly assert that facts giving rise to a due process fabrication claim cannot also give rise to a due process suppression claim. OB-41-43. This made-up legal rule has no support in the law and Defendants cite none. Contrary to Defendants' position, the Seventh Circuit has recognized in many cases that the same facts may give rise to both a fabrication claim and a suppression claim. The *en banc* Seventh Circuit in *Stinson* endorsed due process claims brought against defendants who violated due process by "(1) fabricating the principal evidence of [the plaintiff]'s guilt (the opinions that his detention matched the bite marks on [the victim]), and (2) failing to disclose, as required by *Brady*, the defendants' agreement to fabricate this evidence." 868 F.3d at 524-25. Similarly, *Avery* explained that a claim regarding fabricated informant statements used in a criminal case gave rise not only to a fabrication due process theory but also a *Brady* theory because, although the plaintiff "knew that the informants' statements were false, . . . he did *not* know about the pressure tactics and inducements the detectives used to obtain them. . . . In other words, he did not have the evidence that could help him *prove* that the informants' statements were false." 847 F.3d at 443-44. In *Engel v. Buchan*, the Court recognized a *Bivens* claim where "[the plaintiff] claim[ed] that [the defendant] framed him by fabricating evidence and manipulating witnesses, then suppressed this evidence in violation of *Brady*." 710 F.3d 698, 699 (7th Cir. 2013). And in *Lewis v. City of Chicago*, the court said expressly that when fabricated evidence causes a conviction, it gives rise to liability for a due process violation for fabrication of evidence, and that "misconduct of this type that results in a conviction might also violate the accused's right to due process under the rubric of *Brady* . . . , if government officials suppressed evidence of the fabrication." 914 F.3d 472, 480 (7th Cir. 2019).

46

Consider how illogical Defendants' proposed rule would be. According to Defendants, a police officer could beat a witness until he agreed to provide a false manufactured statement implicating a criminal defendant, as Defendants did with Vicente here, PSOF ¶¶192-209, and though the fabricated statement might violate the criminal defendant's due process rights, the police officer is under no *Brady* obligation to disclose that he beat the witness. Or an officer could plant a criminal defendant's blood on an item of physical evidence found at the scene to connect the defendant falsely to a crime, violating due process, but the state would face no obligation under *Brady* to disclose that the item of evidence contained no blood at the time it was collected from the scene. Or an officer could even fabricate that he himself was a witness to a crime and saw the defendant do it, and provide that testimony on the stand at trial, without any due process obligation to disclose that he was off of work and out of the country on the day of the crime. The suggestion that such suppressions do not violate the Constitution is patently absurd. The *Brady* case line is not a hyper-technical system of disclosure rules. Instead, the Supreme Court has for decades made clear that *Brady* imposes an affirmative duty on the government "to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police," and then to disclose all of that exculpatory and impeachment evidence, even if it has not been requested, if the evidence considered collectively had a reasonable probability of impacting the criminal case. *Kyles*, 514 U.S. at 432-38. This Court should reject Defendants' novel new legal rule.

### (b) *Gauger*'s Rule Regarding Suppressions Relating to False Confessions Cannot Apply To This Case

Because the argument Defendants make has sown some confusion in cases decided by courts in this Circuit, it is worth explaining a bit more why the cases Defendants rely upon do not apply in the context presented by Iglesias's case. In support of their argument, Defendants cite to *Saunders-El v. Rohde*, 778 F.3d 556, 562 (7th Cir. 2015), part of the line of Seventh Circuit cases

that started with *Gauger v. Hendle*, 349 F.3d 354, 360 (7th Cir. 2003), which hold that police are not required under *Brady* to disclose the true circumstances of an interrogation of a criminal defendant that results in a false confession because, according to these cases, the criminal defendant was present for and knows the true circumstances of the interrogation and false confession. The logic of these decisions is that police are not required to turn over evidence already known to the criminal defendant because that evidence has not been "suppressed" within the meaning of *Brady*.

This is not a false confession case, and the Seventh Circuit has emphasized that *Gauger*'s logic does not extend to the type of evidence suppression claims presented here. In *Avery*, the Court held that *Gauger*'s rule does not apply where police are aware of exculpatory or impeachment evidence that the criminal defendant/civil plaintiff does not possess. 847 F.3d at 443-44. There, the Court confronted the situation where police fabricated witness statements to implicate a plaintiff at his criminal trial, causing his wrongful conviction. *Id.* Though the plaintiff all along knew those statements were false, given their very nature, the Court held that *Gauger* did not apply, and that the police had an obligation to disclose and could not remain silent about how they had manufactured the false witness statements and the tactics they had used to get the witnesses to adopt them. *Avery*, 847 F.3d at 443-44. Put simply, where the police know of evidence that the criminal defendant does not, including evidence that might impeach a third-party witness or police officer who testifies falsely, that evidence must be turned over and *Gauger* does not apply, even though the criminal well knows that the evidence used against him is false. *Avery*, 847 F.3d at 443-44.

Applying this rule, courts have limited *Gauger* to the context of cases where police interrogate and coerce a confession from a criminal defendant, and the criminal defendant then

48

contends that the police should have disclosed the circumstances of the interrogation and false confession, *Ezell v. City of Chicago*, No. 18 C 1049, 2024 WL 278829, at \*22 (N.D. Ill. Jan. 24, 2024), and they have not applied the same rule in cases, like this one, where police have suppressed the true circumstances of their own conduct and their interactions with third-party witnesses who inculpate the suspect, *Smith v. Burge*, 222 F. Supp. 3d 669, 680 (N.D. Ill. 2016) ("Courts in this district have concluded that similar allegations state a *Brady* claim based on events that transpired outside of the interrogation room.").

The *Gauger* rule has no application to any of the claims or theories in this case. Consider Vicente's false statement. Iglesias obviously knew that statement was false because he had never confessed to Vicente. But he did not have what he needed to impeach the Defendants' false story attributed to Vicente because Defendants suppressed that evidence. This is precisely what happened in *Avery*, where the criminal defendant knew that the witnesses' statements were false, and the police suppressed information about how they had obtained those false statements, which the defendant could have used to impeach the witnesses at trial. 847 F.3d at 443-44. Moreover, the Seventh Circuit held recently in *Camm* that a police officer's lie about evidence in an investigation is itself actionable under *Brady*, regardless of the exculpatory value of the evidence being lied about, because "exposing the lie . . . would have eroded the jury's trust in both the prosecutor and the lead case investigator," and "it would have set up an argument that they were hiding crucial evidence because they thought it might undermine their case," both of which "can help create reasonable doubt." 937 F.3d at 1110.

Given these cases, there is no argument that Defendants can escape liability on *Brady* claim merely because Iglesias knew the evidence they had fabricated was false. The *Gauger* rule should

not be overread in a way that eliminates the meritorious *Brady* claims in this case in advance of trial. This Court should reject the application of the *Gauger* rule in this case, as *Avery* instructs.

### (c) Defendants' Suppressions of Their Fabrications Were Material to Iglesias's Criminal Prosecution

A jury must decide whether Defendants are liable for suppressing the material exculpatory and impeachment information relating to their fabrications of false evidence. The record construed for Iglesias would permit a reasonable person to decide that Defendants are liable for suppressing that no confidential informant tip was ever received, which would have impeached Defendants' entire account of the reason that Iglesias was suspected. PSOF ¶¶55-62. Or that Iglesias never said he hung out near the crime scene, which would have exonerated Iglesias and impeached the police account. PSOF ¶187. Or that no photo identification procedure took place on June 22, when according to Defendants' account of the investigation, Ochoa made his first identification of Iglesias, which would have impeached Ochoa's and Rodriguez's identifications and Defendants' own testimony in the criminal case. PSOF ¶¶139-146. Or that Ochoa's and Rodriguez's identifications of Iglesias were fabricated, which would have halted the criminal case. PSOF ¶¶67-113, 114-162. Or that the Vicente statement was manufactured using physical above, threats, and promises, which would have impeached one of the central state's witnesses against Iglesias, and which would have fatally undermined Guevara's credibility in all aspects of his testimony. PSOF ¶¶192-209. The list of ways that disclosing Defendants' fabrications would have been exculpatory and impeaching goes on and on.

The disclosure of any one piece of this evidence would have been material to Iglesias's criminal case, within the meaning of *Brady*, and collectively this evidence was certainly material. *Goudy*, 922 F.3d at 843. Just as none of Defendants is entitled to summary judgment on Iglesias's

50

fabrication theories, none is entitled to summary judgment on his suppression theories, without the need for further analysis.

### 2. Defendants Suppressed Exculpatory and Impeachment Evidence Independent of Their Fabrications

But Iglesias's suppression of evidence theory is not based solely on the suppression of Defendants' fabrications, because Defendants suppressed other material exculpatory and impeachment evidence as well. Notably, unlike the fabrication claims, the Defendants do not argue that they were uninvolved in particular suppressions of evidence. Nor could they, given that Iglesias is entitled to the inference at this stage, based on the short time frame in which the evidence against Iglesias was developed (two days) and the small investigating team (four detectives and one sergeant), that Defendants each knew of the exculpatory and impeachment evidence that the team had uncovered. PSOF ¶¶53-54, 282. In fact, Defendants do not even discuss the evidence suppression theories outlined in this section.

### (a) Defendants Suppressed That Both Eyewitnesses Told Police that They Did Not See and Could Not Identify the Shooter

Defendants suppressed that both Ochoa and Rodriguez independently informed them that they had not seen the shooter and could not identify him. Defendants do not discuss this *Brady* theory at all in their summary judgment motion, OB-34-41, and thus have forfeited any argument on it, *Smith*, 388 F.3d at 569.

Documentary evidence and testimony from the initially assigned detectives themselves proves that both Ochoa and Rodriguez got little to no view of the shooter and each independently told detectives that they could not make an identification. PSOF ¶¶70-87, 117-138. That information was not provided to prosecutors, to Iglesias, or to his attorneys. PSOF ¶¶210-212

Defendants have no evidence in the record that would allow them to respond to this suppression of critical evidence.

A reasonable jury could conclude based on this evidence that Defendants knew that both Ochoa and Rodriguez could not identify the perpetrator. It is hard to conceive of more powerful impeachment evidence in a case that turned on identifications from two eyewitnesses than testimony that both told the police they could not identify the perpetrator. Defendants cannot dispute these facts at this stage. This suppressed evidence was, without question, material. *Jones*, 856 F.2d 985 (affirming a due process verdict in a case with nearly the same fact pattern); *Whitlock*, 682 F.3d at 574 (affirming denial of summary judgment in similar circumstances).

### (b) Defendants Suppressed That Iglesias Was Their Suspect Before There Was Any Evidence Implicating Him, and They Suppressed a Document Showing They Had Picked Him As A Suspect First

Defendants also suppressed the fact that Iglesias was their suspect before any witness identified him or any evidence implicated him. This is another profound suppression in this case. Again, Defendants do not discuss this *Brady* theory at all in their summary judgment motion, OB-34-41, and thus have forfeited the issue, *Smith*, 388 F.3d at 569.

Defendants had no evidence at all implicating Iglesias at any point following the crime or initial investigation. PSOF ¶55. In fact, the case went cold for weeks. PSOF ¶55. On June 22, Defendants decided that Iglesias was their suspect, they pulled his rap sheet, and they fabricated a confidential informant tip to provide a false basis to suspect him of the crime. PSOF ¶¶54-65. Only after this did Defendants obtain any other evidence purportedly implicating Iglesias. PSOF ¶¶52, 64, 139-146.

The rap sheet was produced by another division of the Chicago Police Department with an "Issued on Inquiry" date stamp of June 22, and the Defendants put the rap sheet in their file. PSOF

¶¶63-65. Meanwhile, Defendants fabricated a June 22 photo array at Ochoa's home, when in fact Ochoa only viewed a photo array at Area Five on June 23. PSOF ¶¶139-146. In other words, the rap sheet was produced one day before Ochoa and Rodriguez made their supposed identifications of Iglesias. PSOF ¶¶67-69, 114-116, 181-182. Iglesias is fully entitled to the inference at this stage of the case that this sequence of events demonstrates that Defendants decided he was a suspect first and created evidence to implicate him second. That inference is strengthened by the fact that the rap sheet itself was hidden in the investigation and was never turned over to prosecutors, Iglesias, or his defense attorneys. PSOF ¶¶63-65.

This is not the only Guevara case in which Guevara and others decided on a suspect first, pulled that suspect's rap sheet, and then suppressed the rap sheet showing what they had done. In fact, it is quite a common and disturbing pattern for these Defendants. PSOF ¶¶63-66. In the cases of Jacques Rivera and Jose Montanez, both resulting in exonerations, Defendant Guevara and other Area 5 detectives requested their rap sheets before any witness had provided evidence making them a suspect. PSOF ¶66.

If Iglesias could have told the criminal court that Defendants had chosen him as their suspect before any evidence existed, it would have exonerated him immediately, and it would have impeached the state's entire case. Particularly so if Defendants had disclosed that they had done this in multiple cases.

**(c) Defendants Suppressed Their Interactions with Vicente**

A jury could also find Guevara and Halvorsen independently liable on the theory that they suppressed their abuse of and interactions with Vicente in connection with their fabrication of his false statement implicating Iglesias. As discussed, these Defendants have conceded that they are

53

not entitled to summary judgment on this theory, see Argument I *supra*, and there is no discussion of the theory in their motion, OB-34-41, which would forfeit the issue, *Smith*, 388 F.3d at 569.

Guevara and Halvorsen physically abused Vicente until he adopted a false statement that Iglesias had confessed to him in jail. PSOF ¶¶192-197. They decided to use Vicente to fabricate a confession from Iglesias, just as they had done in two other cases in which they wrongfully convicted four other men. PSOF ¶¶199, 549(j). So, they orchestrated an interaction in the Cook County Jail between Vicente and Iglesias, having already decided that Vicente would falsely claim that Iglesias confessed to him in that conversation. PSOF ¶¶192-198. In fact, Iglesias told Vicente he was being charged with something he did not do. PSOF ¶195. But Vicente went along with the confession story fabricated by Guevara and Halvorsen, because Guevara and Halvorsen physically abused him, threatened to continue abusing him, and promised him leniency and benefits if he told their false story. PSOF ¶¶192-198.

The evidence Defendants possessed about their interactions with Vicente was both exculpatory because it exonerated Iglesias, and it could have been used to impeach Vicente, as well as Guevara, and all of the evidence and testimony about Iglesias's guilt in the criminal case. See *Wearry*, 577 U.S. at 392-96 (holding that suppression of police and other records that could have been used to impeach a state's witness were material in a case that depended on the jury crediting "[the witness]'s account rather than [the defendant]'s alibi"); *Smith*, 565 U.S. at 74-75 (police records of statements by eyewitness that he could not see a perpetrator's face that contradicted that eyewitness's later identification of the defendant at trial were material); *Kyles*, 514 U.S. at 441-42 (contemporaneous eyewitness statement, in which he described the shooter as someone who was "about 5'4" or 5'5", 140 to 150 pounds, medium build" was material and exculpatory, where defendant was 6 feet tall and thin because "[i]f cross-examined on this

54

description, [the witness] would have had trouble explaining how he could have described [the defendant] . . . as a man more than half a foot shorter with a medium build"); *Bagley*, 473 U.S. at 683-84 (evidence that could have been used to impeach the testimony of state law enforcement officers at trial is material).

Moreover, if Defendants had disclosed this information, Iglesias would have been exonerated without a trial—he could have called on Vicente to testify that he had never confessed to the Roman killing, that the Defendants' story of Iglesias confessing was made up, and that Vicente only said otherwise because Defendants had forced him through illegal physical abuse and coercion to accept their false statement. *Anderson v. City of Rockford*, 932 F.3d 494, 507 (7th Cir. 2019) ("Due process entitled the plaintiffs to learn before their trial" that witness's statement "was the product of police coercion or fabrication"); *Avery*, 847 F.3d at 439 (due process rights are implicated by "a violation of the *Brady* duty to disclose facts about the coercive tactics used to obtain" witness testimony); *Newsome v. McCabe*, 319 F.3d 301, 304 (7th Cir. 2003) (affirming judgment where police officers were held liable "under the due process clause because they concealed exculpatory evidence—the details of how they induced the witnesses to finger [plaintiff]").

### (d) Defendants Suppressed Their Interactions with Ochoa

Defendants also suppressed all of their interactions with Ochoa leading to his supposed identification of Iglesias. In addition to suppressing that he told them that he could not identify the shooter and the fact that there was no June 22 photo array, Defendant Officers suppressed that Ochoa informed them during the identification procedures on June 23 that there were a number of differences between what Iglesias looked like and what the shooter looked like. PSOF ¶¶150-151. A jury could find Defendants liable on this suppression theory as well.

55

The evidence Defendants possessed about their interactions with Ochoa (and Rodriguez, discussed below) was both exculpatory because it exonerated Iglesias, and it could have been used to impeach both Ochoa and Rodriguez, as well as Guevara, and evidence and testimony about Iglesias's guilt in the criminal case. See *Wearry*, 577 U.S. at 392-96 (holding that suppression of police and other records that could have been used to impeach a state's witness were material in a case that depended on the jury crediting "[the witness]'s account rather than [the defendant]'s alibi"); *Smith*, 565 U.S. at 74-75 (police records of statements by eyewitness that he could not see a perpetrator's face that contradicted that eyewitness's later identification of the defendant at trial were material); *Kyles*, 514 U.S. at 441-42 (contemporaneous eyewitness statement, in which he described the shooter as someone who was "about 5'4" or 5'5", 140 to 150 pounds, medium build" was material and exculpatory, where defendant was 6 feet tall and thin because "[i]f cross-examined on this description, [the witness] would have had trouble explaining how he could have described [the defendant] . . . as a man more than half a foot shorter with a medium build"); *Bagley*, 473 U.S. at 683-84 (evidence that could have been used to impeach the testimony of state law enforcement officers at trial is material).

Though Defendants discuss the suppression of information relating to Rodriguez in their motion, OB-39-41, which is discussed below, see Argument IV(B)(3)(d) *infra*, they do not make an argument about the suppression of their interactions with Ochoa, see OB-39-41, and they forfeit that issue as well, *Smith*, 388 F.3d at 569.

**(e) Defendants Suppressed Their Own Pattern of Misconduct**

Last but not least, as described below in great detail, by the time of Iglesias's criminal trial Guevara had been involved in a number of cases where they fabricated and suppressed evidence, coerced false statements from witnesses and suspects, obtained false identifications using

56

suggestive procedures, and wrote false police reports. See Argument V(F) *infra*. Defendants did not disclose any of this pattern of extreme police misconduct by the officers who investigated Iglesias to prosecutors or defense attorneys. The suppression of this other misconduct, which could have been used to impeach Guevara and others on the stand, is also violation of *Brady*. *Thompson v. City of Chicago*, 722 F.3d 963, 972 (7th Cir. 2013). As with all of the suppression theories just discussed, Defendants do not address this theory in their motion, OB-34-41, forfeiting the issue, *Smith*, 388 F.3d at 569.

<p style="text-align:center">* * *</p>

Each of the suppression theories above are not addressed by Defendants Officers in their motions for summary judgment. Accordingly, Defendant Officers have not met their burden of production or persuasion to show that summary judgment is warranted on these theories. Once the Court has concluded that these theories will go to trial, it can deny summary judgment and move on, without addressing Defendants arguments about particular items of evidence they suppressed.

### 3. Defendants' Arguments About Other Suppressed Exculpatory and Impeachment Evidence Lack Merit

With respect to the suppressed items of evidence Defendants discuss in their motion, see OB-34-35 (listing seven items), Defendants' arguments for summary judgment depend on a version of the facts skewed in their own favor and legal arguments that are contrary to law, OB-34-41. This Court should reject Defendants' arguments.[10]

---

[10] On page 37 of their motion, Defendant Officers make arguments about the suppression of "the handwritten note of Iglesias's own school schedule" and "the tow report." OB-37. Iglesias is not pursuing a *Brady* theory based on these two items, and the Court need not address them.

<p style="text-align:center">57</p>

**(a) Defendants Suppressed a Note Documenting That a Witness Knew the Shooter**

Defendants suppressed a handwritten note in their investigative files that documented that an individual named Sarah Torres, who lived in the apartment building in front of which the shooter stood when he committed the crime, told investigators that her son, Efrain Torres, "came from boys club" and "knows shooter." PSOF ¶224. The note was never disclosed to prosecutors, Iglesias, or his attorneys. PSOF ¶¶227-228. Defendant Officers later showed Efrain Torres a live lineup that included Iglesias, and they reported that Torres had not made any identification. PSOF ¶182. Defendants contended that Torres's non-identification of Iglesias was inconsequential because, in their view, he had not seen the shooter's face. PSOF ¶182. But all the while Defendants suppressed a note that documented that Torres knew who the shooter was. And knowing who the shooter was, Torres did not identify Iglesias. PSOF ¶¶182, 224. This suppressed item of evidence would have allowed Iglesias to call Torres to demonstrate that Iglesias was not the shooter, and it would have worked in tandem with the reported non-identification to exculpate Iglesias, and it would have impeached the Defendants' account of their investigation.

In their motion, Defendants assert that the note does not clearly say that the Torres "knows shooter," and they contend that it instead says that he "knows shorti," OB-35, an implausible reading of the note (the note has two o's following the h), which impermissibly construes the facts against Iglesias. In addition, they contend that there is "no material difference" between the suppressed note, which says Torres "knows shooter," and a disclosed police report that says Torres "saw the offender." OB-35-36. This is an untenable position—there is a world of difference between a witness who knows who the perpetrator is and one who reports having seen the perpetrator. In the former circumstance the witness has personal knowledge of the identity of the perpetrator, and in the latter he does not. Particularly so when the witness viewed Iglesias and did

58

not identify him, and the fact that the witness knows the shooter means the non-identification of Iglesias means Iglesias did not do it.

Next, Defendants assert that Iglesias and his attorneys could have learned themselves what Efrain Torres knew. As a preliminary matter, Defendants' arguments are fatally undeveloped, and this Court should be strict in not even entertaining these undeveloped arguments. *Wehrs v. Wells*, 688 F.3d 886, 891 n. 2 (7th Cir.2012).[11] In addition, Defendants' contention would be a *defense* at trial, and Defendants in their cursory arguments are far from meeting the heavy burden of establishing that all elements of the defenses are established by unrebutted evidence. *Ocean Tomo, LLC v. Barney*, 133 F. Supp. 3d 1107, 1114 (N.D. Ill. 2015). On the merits, Defendants did the opposite of disclose the exculpatory Torres note—they wrote false reports to ensure that it did not come to light that Torres knew the shooter—and a Defendant who actively suppresses evidence cannot later claim it was discoverable through the exercise of reasonable diligence. *Banks v. Dretke*, 540 U.S. 668, 695 (2004) (holding that there is no requirement that a Defendant find materials that state actors are deliberately hiding: "A rule thus declaring 'prosecutor may hide, defendant must seek' is not tenable in a system of constitutionally bound to accord defendants due process").

Even if that were not the case, disputes of fact would preclude summary judgment. As in *Jimenez*, "[w]hat was available through reasonable diligence . . . is very much in dispute." 830 F. Supp. 2d at 446. Iglesias's attorney, John DeLeon, took ample steps to learn everything he could about the information detectives had developed during their investigation, including any

---

[11] It is an extreme burden responding to a summary judgment motion where moving parties make hundreds of assertions in single sentences, without any analysis, and the nonmoving party has to expend multiple paragraphs responding to each. Iglesias has done his best in this response to address all of Defendants contentions as efficiently as possible. But Defendants should not be permitted to create this amount of work for the Court and parties with bald assertions.

exculpatory or impeachment evidence. PSOF ¶¶259, 261-262. He filed discovery requests and issued multiple subpoenas to get all of the investigative information available in the police files related to the Roman investigation, and he expected and trusted that all such information was being disclosed to him. PSOF ¶¶259-262. He issued additional supplemental discovery, and he made attempts to talk to a number of witnesses, some of which were successful and some of which were not. PSOF ¶¶259-263. But the idea that he should have divined that Efrain Torres may have actually known the shooter, even though that information is assiduously omitted from the police reports regarding Efrain Torres and his mother, and even though the handwritten note stating that information was not disclosed, is simply wrong both factually and legally. PSOF ¶¶222-228.

Fundamentally, Defendants' "argument rests on far too expansive an understanding of what sort of evidence should be considered available to a defendant through the exercise of reasonable diligence." *Boss v. Pierce*, 263 F.3d 734, 740 (7th Cir. 2001). Reasonable diligence does not require defense attorneys to seek evidence they "had no reason to believe existed," and the Seventh Circuit regards "as untenable a broad rule that any information possessed by *a defense witness* must be considered available to the defense for *Brady* purposes." *Id.* at 740, 743 (emphasis added). The Court observed that such defense witnesses "may be uncooperative or reluctant," it can be difficult to "extract all the favorable evidence a defense witness possesses," and "the defense may have forgotten or inadvertently omitted some important piece of evidence[.]" *Id.* Importantly, this is the view of the Seventh Circuit in the case of a witness *controlled by the defense*. "These concerns have even more weight in a case, like this one, involving information possessed by a *prosecution* witness." *Hampton v. Chicago*, 2017 WL 2985743, at *22 (N.D. Ill. July 13, 2017). As Judge Kennelly observed in *Jimenez*, reasonable diligence would not be a

60

tenable legal rule if courts determined that stories in the minds of prosecution witnesses were discoverable through the exercise of reasonable diligence:

> Defendants' argument seems to assume the existence of a Perry Mason-like world in which prosecution witnesses readily give up impeaching information when interviewed or questioned by defense counsel. Real life does not work that way, or at least the governing legal rule cannot realistically be premised on the assumption that it always works that way. Witnesses coerced or persuaded to testify in a particular way often tend to identify with, and to ally themselves with, their persuaders. A legal rule that assumes that such a witness will readily describe the circumstances of the coercion or persuasion simply because the other side's lawyer asks the witness the right question would defy common sense.

830 F. Supp. 2d at 444-45. And as Judge Dow observed in *Hampton*, in cases where "the evidence that was allegedly withheld was in the minds of the prosecution witnesses, . . . and there is some evidence that the prosecution witnesses provided misleading information about the detectives' use of suggestive identifications with them," summary judgment should not be granted on reasonable diligence grounds. 2017 WL 2985743, at *22.

More generally, the Seventh Circuit has said that the reasonable-diligence doctrine does not extend to information *in the heads of witnesses* the same way that it does to information in accessible documents. *Boss* observes that "[i]n the typical reasonable diligence case, the question is whether defense counsel had access to the documents containing the *Brady* material, through an open file policy," and not "whether defense counsel had access to *Brady* material contained in a witness's head." 263 F.3d at 741. The Court continued: "In cases like the present one, the question is whether defense counsel had access to *Brady* material contained in a witness's head. . . . Because mind-reading is beyond the abilities of even the most diligent attorney, such material simply cannot be considered available in the same way as a document." *Id.* (citation omitted).

At the same time, the Court has concluded that information may be deemed unavailable if the defense has less of an opportunity to obtain it, *e.g.*, *United States v. Morris*, 80 F.3d 1151, 1168 (7th Cir. 1996) (focusing on whether "defendants had been given the same opportunity as the

61

government to discover the identified documents"); or where there is evidence that a witness would have lied about it, *e.g.*, *Crivens v. Roth*, 172 F.3d 991, 996-97 (7th Cir. 1999) (holding that evidence in a prosecution witness's head not discoverable through the exercise of reasonable diligence where there was evidence that the witness would have lied about that evidence). Here there is no support in the record for a conclusion that Iglesias's attorney could have discovered from Efrain Torres that he knew the shooter, particularly given Defendants' active efforts to suppress that fact.

Finally, all Defendant Officers except Guevara contend that there is no evidence they saw or knew about this note. OB-36. To the extent Riccio, Gawrys, and Biebel rehash their arguments that they were uninvolved in the case, Iglesias incorporates his response above. See Argument IV(A)(1) *supra.* Moreover, this self-serving view of the facts cannot be sustained at summary judgment. The note was in these Defendants' investigative file for the Roman homicide—the same file containing all of the reports that Defendants wrote, signed, and approved. PSOF ¶¶183, 222, 279-283. Case updates were shared on a daily basis with the supervising sergeant Biebel. PSOF ¶¶282-283, 286. Iglesias is entitled to the inference that the investigating officers knew the evidence in their own file.

### (b) Defendants Suppressed Documentary Evidence That They Believed Spanish Cobras Had Committed the Crime

Defendant Officers also suppressed that, in the separate Vargas homicide investigation, which occurred around the same time, they had received information indicating that in the days immediately after the Roman homicide they had learned information indicating that the perpetrator was a member of the Spanish Cobras, and they found the lead credible enough to follow up about with a witness in the Vargas investigation. PSOF ¶¶214-217. Guevara and Halvorsen wrote a report documenting this information, but they placed it in the Vargas homicide file, and they

excluded it from the Roman homicide file. PSOF ¶218. It was never turned over to the prosecutors or the defense. PSOF ¶¶220-221.

This information was material to the Roman investigation because Defendant Officers claimed all along that the shooting had been committed by an Imperial Gangster, and they used that information to tie Iglesias to the crime, contending that he was affiliated with the Imperial Gangsters. PSOF ¶¶56, 90, 94, 184. If Iglesias could have shown that there had been evidence developed in the days immediately after the shooting that witnesses had indicated the shooter was a Spanish Cobra, and that the Defendants themselves believed that the crime may have been committed by Spanish Cobras, a gang with which Iglesias was not affiliated, it would have impeached the police theory of the investigation and it would have exculpated Iglesias.

Defendants do not provide any argument about why they are entitled to summary judgment on this theory, except to say that Iglesias cannot demonstrate that he did not possess the report. OB-38. But it is Defendants' burden to point to record evidence that establishes that there is no dispute of fact about whether this Vargas report was disclosed. In this context, that would mean evidence that Defendants had disclosed the document. They point to nothing of the sort, and they cannot obtain summary judgment by mere assertion. Regardless, as discussed below, the document was not disclosed. See Argument IV(B)(3)(d) *infra*.

### (c) Defendants Suppressed Arnell Moore's Non-Identification of Iglesias

Defendants also suppressed witness Arnell Moore's non-identification of Iglesias shortly after the crime. Moore is the witness who got the best look at the shooter, seeing him twice in the course of the crime, and providing a detailed description. PSOF ¶¶43-44, 236. Shortly after the crime, investigating officers showed Moore photobooks to see if he could identify the shooter. PSOF ¶¶236-238. Iglesias is entitled to the inference that he was in the photobooks shown to

63

Moore, given that Moore viewed the photobooks at Area Five, and he is only documented to have been at Area Five on June 23; on that day, the only suspect, and the only person's photo being used in photo identification procedures as a suspect, was Iglesias. PSOF ¶¶236-238. But Moore did not select Iglesias's photograph from the book. That the best eyewitness failed to select Iglesias's photo is exculpatory evidence that should have been disclosed. Instead, Defendants deliberately suppressed it, omitting from their closing report that this identification procedure had occurred, and instead falsely stating the opposite: that Moore had told them he did not get a good look at the shooter and could not make an identification, and indicating that as a result he was not shown any photo array or lineup. PSOF ¶¶188, 240, 244.

Defendants contend that they were not involved in the photobook procedures. OB-40. Again, to the extent this restates arguments Iglesias has disposed of already, he incorporates that response. See Argument V(A)(1) *supra*. Moreover, Guevara, Halvorsen, Riccio, and Gawrys were all involved in arresting Iglesias on June 23, and were at Area Five participating in various aspects of the many other fabrications discussed above, and all participated in writing the closing report that deliberately concealed that Moore had been shown photos that day at Area Five. PSOF ¶¶143, 183-190, 236-238. Again, the investigative team was small, police officers testified that they would have readily shared information about the investigation with one another, and Sergeant Biebel had them share case updates at their daily roll calls. PSOF ¶¶279-286.

Defendants also assert that because the results of the photobook procedures "may not" have been documented, Iglesias has no way to show that the information withheld was exculpatory. OB-40-41. This cynical and self-serving argument should be rejected. At this stage of the case Defendants are not entitled to the inference in their favor that notes and reports they made during the course of their investigation that no longer exist had no exculpatory or impeachment value.

Moreover, Iglesias need not demonstrate that Defendant Officers recorded the results of the photobook procedures at all—he just needs to show that they suppressed exculpatory investigative information that they learned about, written or not. Defendants position that they can avoid a trial on whether they suppressed exculpatory evidence because there is no documentation of the evidence they suppressed "strains *Brady* to the point of absurdity." *Armstrong v. Daily*, 786 F.3d 529, 550 (7th Cir. 2015) ("*Brady* would mean nothing if, . . . a prosecutor could comply with its command by deliberately destroying exculpatory evidence and then disclosing the fact of destruction to the defense."). Defendants' arguments regarding Moore's photobook non-identification should be rejected.

### (d) Defendants Suppressed Their Interactions with Rodriguez

Last but not least, Defendants suppressed their interactions with Hugo Rodriguez. When Rodriguez supposedly identified Iglesias, he told Defendants that Iglesias looked different from the shooter in important ways, but this information was suppressed and omitted from the closing report. PSOF ¶¶104, 106, 210, 212.

Also suppressed was the fact that Guevara showed Rodriguez a photo to remind him what Iglesias looked like in advance of his trial testimony. PSOF ¶¶230-233. So was the fact that Guevara practiced Rodriguez's testimony with him in advance of trial. PSOF ¶¶230-233. So was the fact that Rodriguez had viewed photobooks on multiple occasions before his purported identification of Iglesias on June 23. PSOF ¶229.

Defendants contend again that no documents were created from those meetings with Rodriguez, and so there is no evidence of what exculpatory or impeaching evidence was suppressed, OB-39, an argument this Court should reject for the same reasons discussed in the last subsection above, see Argument IV(B)(3)(c) *supra*.

Defendants also contend that this information was not necessarily material exculpatory or impeachment evidence, because all Defendants were doing is preparing Rodriguez to testify truthfully. OB-39. This argument again impermissibly draws inferences for the moving party. This argument ignores most of the suppressions related to their interactions with Rodriguez. On the suppression of the meetings before trial again, the Defendants again impermissibly draw inferences for themselves. Rodriguez made an in-court identification of Iglesias, but what was not known to Iglesias and his counsel was that Guevara had shown Rodriguez Iglesias's photo and was meeting with Rodriguez repeatedly to help him rehearse his story and make that identification. This raises serious questions about why, if Rodriguez had actually seen the shooter at all, he would have needed such coaching. In other words, all of this evidence would have buttressed Iglesias's defense, and impeached Rodriguez's identifications.

Last, Defendants again argument that Iglesias and his lawyers could have discovered all of the information that Rodriguez knew. OB-41. As discussed above, this position misunderstands the reasonable diligence doctrine, and for the same reason that Iglesias and his lawyers could not have discovered the documents Defendants were suppressing or the exculpatory evidence regarding Moore, they could not have discovered the suppressed Rodriguez. Iglesias incorporates those arguments again here. See Argument IV(B)(3)(c) *supra*. Where "the evidence that was allegedly withheld was in the minds of the prosecution witnesses, . . . and there is some evidence that the prosecution witnesses provided misleading information about the detectives' use of suggestive identifications with them," summary judgment should not be granted on reasonable diligence grounds. 2017 WL 2985743, at *22

Moreover, Defendants' position the chance to learn what Rodriguez knew is also inconsistent with the Supreme Court's *Brady* line of cases. The Court in *Strickler v. Greene*, 527

66

U.S. 263 (1999), imposed a duty on the state to disclose material exculpatory or impeachment evidence, even when there has been no request for that evidence by the accused. Included in that is evidence that would impeach witnesses known by the state. *Giglio*, 405 U.S. 150. For these constitutional rules to have effect, any understanding of reasonable diligence along the lines of the one that Defendants advance in this case must be rejected. Defendants had an obligation under *Brady*, *Giglio*, and *Strickler* to disclose evidence about Rodriguez even without an effort on the part of Iglesias and his attorneys to obtain that evidence. That constitutional obligation is in irreconcilable tension with Defendants' proposed legal rule that they were not required to turn over suppressed evidence about their interactions with a witness because there was some remote chance that Iglesias and his attorneys could have discovered it. As Judge Kennelly put it in *Jimenez*, adopting Defendants' position "would effectively render *Brady* and its progeny, including *Giglio* . . . , a dead letter: if the governing rule is predicated on the assumption that a prosecution witness will, if interviewed by the defense, disclose impeaching information, then the prosecution effectively is relieved of the legal responsibility under *Brady* and *Giglio* to disclose that information." *Jimenez*, 830 F. Supp. 2d at 445; *accord Kluppelberg v. Burge*, No. 13 C 3963, Dkt. 635 at 3 (N.D. Ill. Aug. 4, 2017) (rejecting reasonable diligence defense and concluding that "defense counsel's diligence is irrelevant if the suppressed information was material").

Finally, there is a heated dispute of fact about whether Iglesias and his attorneys could have learned what Rodriguez knew. Iglesias's attorney issued numerous subpoenas and discovery requests to learn exactly this type of information, but it was not disclosed. PSOF ¶¶259-266. While Defendants' reasonable diligence argument for summary judgment is contradicted by law, it is also precluded by factual disputes. Given the blatant *Brady* violations outlined above, Defendants'

67

only possible defense is to deny they occurred. That defense must be mounted at trial and not in a motion at this stage.

### (a) Defendants Suppressed Exculpatory Police Documents

The summary judgment record also supports Iglesias's claim that Defendants violated his right to due process by suppressing investigative documents generated during the course of the Roman investigation. *Jones*, 856 F.2d 985 (noting that suppression of exculpatory evidence in clandestine police files violates due process); see also *Fields v. City of Chicago*, 2014 WL 477394, at *6-7 (N.D. Ill. Feb. 6, 2014) (denying summary judgment on a similar claims). As discussed, they suppressed documents showing they picked Iglesias first, that the eyewitnesses could not make an identification, that Efrain Torres knew the shooter, and that their leads pointed to the Spanish Cobras. PSOF ¶¶63-65, 214-221, 222-228.

Defendant Officers mildly suggest Iglesias cannot succeed on a document suppression claim because he cannot show that documents ever existed, he cannot show he did not receive them, and he cannot show that his criminal defense attorney could not have discovered the documents. OB-38-39. But Defendants are not entitled at this stage to these inferences in their favor that notes and reports they made during the course of their investigation were not suppressed.

The opposite is true. Construing the record for Iglesias, it is obvious that notes and documents that Defendants created during the investigation were not turned over. PSOF ¶¶210-245. The Vargas report was not even maintained in the Roman investigative files, and it was discovered during the litigation of this case in other police files. PSOF ¶¶214-221. With respect to the documents that were included in Roman investigative files obtained during discovery in this case, those documents were not in the Cook County State's Attorney's file (to whom the police would have disclosed the documents had they been disclosed); the documents and the information

in them were not referenced at the criminal trial at all (which they would have been if they had been turned over); Iglesias's lawyer said he had no knowledge of the exculpatory information contained in the document; police officers took the Fifth when asked if they turned over documents to the prosecutor and criminal defense; and Defendant Officers took affirmative steps of fabricate evidence that contradicted the suppressed documents. PSOF ¶¶53-54, 67-162, 179-191, 210-213, 246-257, 265-266. Drawing inferences for Iglesias, the documents in question were not disclosed.

Defendants assert that perhaps the documents were turned over to Iglesias's criminal defense attorney and were part of a defense case file that has not been discovered in this civil case, or that Iglesias's defense attorney might have obtained some of the document by subpoena. OB-38-39. Those arguments depend on untenable inferences or raw assumptions drawn for the Defendants, which is inappropriate at this stage. *Tolan*, 572 U.S. at 656. Moreover, to the extent that Defendants are suggesting that Iglesias's attorneys should have discovered this information by working, that, too, is in dispute. Iglesias's attorney made efforts to discover all of the evidence in the case, and he was rebuffed. PSOF ¶¶258-266. As a result, Iglesias's attorney's effort cannot be the basis for summary judgment, *Jimenez*, 830 F. Supp. 2d at 446 ("What was available through reasonable diligence . . . is very much in dispute.").

Again, where police officers take steps, as here, to actively suppress evidence by fabricating a false account, they cannot later contend that the evidence was disclosed or should have been discovered. *Banks v. Dretke*, 540 U.S. 668, 695 (2004) ("A rule thus declaring 'prosecutor may hide, defendant must seek' is not tenable in a system of constitutionally bound to accord defendants due process"). Police officers who lie to perpetuate the suppression of evidence are liable under *Brady* solely on that basis as well. *Camm*, 937 F.3d at 1110 (holding that a *Brady* claim may be based on "exposing the lie" of a police officer, which would have "eroded the jury's

69

trust in both the prosecutor and the lead case investigator"). These disputes of fact preclude summary judgment on Defendants' theory that they did not suppress exculpatory documents. *Jimenez*, 830 F. Supp. 2d at 443-44.

### C. Independently, A Reasonable Jury Could Conclude That Defendants Utilized Unduly Suggestive Lineup Procedures That Tainted Iglesias's Criminal Trial

#### 1. Unduly Suggestive Identification Procedures That Taint A Criminal Case Violate Due Process and Are Actionable Under § 1983

Defendants argue that, following the Supreme Court's decision in *Vega v. Tekoh*, 597 U.S. 134, 141 (2022), § 1983 does not render a state actor liable for using unduly suggestive identification procedures to obtain a false identification that taints a criminal case. OB-13-18. Defendants are wrong on the merits, but this Court should reject the argument before even reaching the merits, because it is not within this Court's prerogative to overrule Seventh Circuit precedents.

#### (a) The Seventh Circuit Recognizes This Type of § 1983 Claim

The Seventh Circuit held in *Alexander v. City of South Bend* that while "[t]he Constitution does not require that police lineups, photo arrays, and witness interviews meet a particular standard of quality," it does "guarantee the right to a fair trial . . . and that right is violated if unduly suggestive identification techniques are allowed to taint the trial," and so state actors are liable under § 1983 if they use identification techniques that make a criminal trial unfair. 433 F.3d 550, 555. Since then, the Seventh Circuit has recognized that this theory of § 1983 lability is viable repeatedly and recently. *Holloway v. City of Milwaukee*, 43 F.4th 760, 766 (7th Cir. 2022); *Coleman v. City of Peoria*, 925 F.3d 336, 347 (7th Cir. 2019); see also *Reyes v. Nurse*, 38 F.4th 636, 644 (7th Cir. 2022) (recognizing the same in the federal habeas context). In *Holloway*, the Seventh Circuit considered whether and what effect *Vega* might have on this line of cases, but it "conclude[d] that [the question] need not be resolved" and went on to address the suggestive

70

identification § 1983 claim on the merits. 43 F.4th at 766-67. Accordingly, the Seventh Circuit currently recognizes this theory of § 1983 liability, having applied it in a recent case, and it will consider whether *Vega* affects it at an appropriate time.

Since *Holloway*, five district courts in this Circuit have considered Defendants' argument that *Vega* eliminated § 1983 suggestive identification claims, and all but one have followed Seventh Circuit precedent and have rejected the argument.[12] This Court is bound to follow existing precedent of the Seventh Circuit and cannot overrule it. *E.g.*, *Savory v. Cannon*, 947 F.3d 409, 421 (7th Cir. 2020) (en banc); *Nanda v. Bd. of Trustees of Univ. of Illinois*, 219 F. Supp. 2d 911, 914 (N.D. Ill. 2001). Defendants have preserved an argument, which they can present to the court of appeals at an appropriate time, and this Court should reject Defendants invitation to overrule Circuit precedents, without reaching the merits of Defendants' argument.

### (b) *Vega* Does Not Affect This Type of § 1983 Claim

On the merits, Defendants are wrong that *Vega* changes anything. In fact, quite contrary to Defendants' argument, the logic of *Vega* is *already applied* to § 1983 due process claims asserting that a police officer's improper identification techniques resulted in an unreliable identification

---

[12] In *Bolden v. Pesavento*, 623 F. Supp. 3d 897, 908-09 (N.D. Ill. 2022), Judge Seeger rejected a Rule 50 challenge to a $25 million verdict on the theory. In *Donald v. Outlaw*, No. 2:17-CV-32-TLS, 2023 WL 2346270, at *11-12 (N.D. Ind. Mar. 3, 2023), Judge Springman rejected the argument and denied summary judgment. In *Blackmon v. City of Chicago*, No. 19 CV 767, 2023 WL 7160639, at *14 & n.19 (N.D. Ill. Oct. 31, 2023), Judge Jenkins also recognized consistent with Seventh Circuit precedent that a § 1983 claim for improper identification procedures is viable when those procedures affected the criminal trial. Similarly, the court in *Washington v. Boudreau*, No. 16-CV-01893, 2022 WL 4599708, at *22-23 (N.D. Ill. Sept. 30, 2022), denied summary judgment on this theory (except as to two defendants, who were granted qualified immunity).

Only *Ezell v. City of Chicago*, No. 18 C 1049, 2024 WL 278829, at *23-24 (N.D. Ill. Jan. 24, 2024) (Ellis, J.), concluded that such an unduly suggestive identification claim is not viable under § 1983, without much legal analysis at all, and without considering whether it was within that court's power to overrule Seventh Circuit precedents. Indeed, in that case, the parties hardly briefed the issue: the defendants presented the argument that the district court should rely on *Vega* to overrule Seventh Circuit precedents in four sentences of their motion, 18 C 1049, Dkt. 462 at 33; the issue was not discussed in response, except to say that multiple courts recognize the claim as viable, 18 C 1049, Dkt. 475 at 29; and there was a limited discussion in reply, 18 C 1049, Dkt. 505 at 29-30.

71

that is used in and taints a criminal case. In both instances, a police officer's violation of a prophylactic rule does not by itself violate the Constitution and is not actionable under § 1983, but where illegally obtained evidence is actually used in and taints a criminal case, there is a violation of core Constitution rights, and a corresponding claim under § 1983.

*Vega* holds that there is no § 1983 claim for a mere violation of *Miranda*'s prophylactic rules. 597 U.S. at 150. The Court reasoned that *Miranda* prophylactic rules exist to guard against Fifth Amendment violations in criminal cases. *Id.* at 149. But a police officer's violation of those rules does not automatically violate the Fifth Amendment. *Id.* at 149-50. As a result, the violation of *Miranda*'s prophylactic rules is not necessarily a violation of the Fifth Amendment actionable under § 1983. *Id.* However, the Court was careful to say that "[i]f a *Miranda* violation were tantamount to a violation of the Fifth Amendment, our answer would of course be different," *id.* at 141, and it said that because a long line of Supreme Court cases recognizes that statements that are illegally compelled by police interrogations and then are used in a criminal case violate the Fifth Amendment, *Brown v. Mississippi*, 297 U.S. 278 (1936), and are actionable under § 1983, *Chavez v. Martinez*, 538 U.S. 760, 766-67 (2003). As the Court emphasized throughout its opinion in *Vega*, it was not breaking any new ground. 597 U.S. at 142. Just as the Court has long held that compulsive questioning without *use of the resulting confession in the criminal case* does not violate the Fifth Amendment and is not actionable under § 1983, *Chavez*, 538 U.S. at 767, a mere violation of *Miranda*'s prophylactic rules without more does not violate the Fifth Amendment and is not actionable under § 1983, *Vega*, 597 U.S. at 149-50.

Precisely the same framework already applies to unduly suggestive identification claims. As the Seventh Circuit explained in *Hensley v. Carey*, "The rule [from *Stovall v. Denno*, 388 U.S. 293 (1967), and *Manson v. Brathwaite*, 432 U.S. 98 (1977)] against admission of evidence from

72

unnecessarily suggestive lineups is a prophylactic rule designed to protect a core right, that is the right to a fair trial, and it is only the violation of the core right and not the prophylactic rule that should be actionable under § 1983." *Hensley v. Carey*, 818 F.2d 646, 649 (7th Cir. 1987). As was the case in *Vega* for violations of *Miranda*'s prophylactic rules, a violation of the prophylactic rules prohibiting unnecessarily suggestive identification procedures does not by itself violate due process, and is not by itself actionable under § 1983. *Alexander*, 433 F.3d at 555. Instead, the plaintiff must show "how the flaws [in the defendants'] identification techniques made his trial unfair." *Id.*; see also *Swanigan v. City of Chicago*, 881 F.3d 577, 583 (7th Cir. 2018) (holding that there is no § 1983 claim regarding suggestive identification procedures if the identifications are never used in the criminal case). If the plaintiff can show that improper identification procedures resulted in an unreliable identification that tainted the criminal proceedings, then a violation of due process is established, and that violation is actionable under § 1983. *Blackmon*, No. 19 CV 767, 2023 WL 7160639, at *14; *Hampton*, 2017 WL 2985743, at *23.

*Vega*'s logic governing Fifth Amendment § 1983 claims is identical to the law that governs due process suggestive identification § 1983 claims. In *Vega* and *Chavez*, a violation of a prophylactic rule or the use of coercive interrogation techniques alone is not actionable under § 1983, but the use of an illegally obtained confession in the criminal case, in violation of the core Fifth Amendment right against self-incrimination, is actionable under § 1983. In the context of suggestive identification procedures, the use of improper identification procedures is not alone actionable under § 1983, but an unreliable identification obtained from such procedures that is used in and taints the criminal case, in violation of the core due process right to a fair trial, is actionable under § 1983. Because the law governing § 1983 suggestive identification claims is

73

already in harmony with *Vega*, this Court should reject Defendants argument that *Vega* eliminates this type of § 1983 claim.[13]

### 2. Defendants Used Unduly Suggestive Identification Procedures That Tainted Iglesias's Criminal Case and Violated His Right to Due Process

Disputed facts preclude summary judgment on Iglesias's claim that Defendants used improper identification techniques to obtain false identifications that were introduced in and tainted Iglesias's criminal case. "A plaintiff with this kind of [section 1983] claim must demonstrate, by reference to the *Brathwaite* standard, that unduly suggestive identification procedures led to an unreliable identification that undermined the fairness of his trial." *Alexander*, 433 F.3d at 555-56. The assessment of whether identification procedures were so unduly suggestive that they gave rise to a misidentification turns on two questions, assessed considering the totality of circumstances: (1) whether the procedures were unnecessarily suggestive; and (2) whether there is evidence that the identifications were nonetheless reliable. *Hampton*, 2017 WL 2985743, at *23 (citing *Lee v. Foster*, 750 F.3d 687, 691 (7th Cir. 2014)). If the identification techniques were unduly suggestive, the question is whether they rendered the criminal proceeding unfair. *Id.* (citing *Alexander*, 433 F.3d at 555). Each of these questions must be resolved in Iglesias's favor at summary judgment.

### (a) The Identification Procedures Were Unduly Suggestive

As discussed above, the identifications of Ochoa and Rodriguez were fabricated: Neither Ochoa nor Rodriguez could have possibly seen the perpetrator's face well enough to make an

---

[13] Interestingly, although Defendants go on for seven pages discussing *Vega* and Seventh Circuit law, they do not actually say anything different than what Iglesias has said above. OB-13-18. Instead, they contend that violations of prophylactic rules alone do not give rise to § 1983 claims, which is apparent from the case law, but then they make no argument whatsoever about whether the introduction of a tainted identification in the criminal case is actionable as a due process claim. See OB-16-18. Instead, they fudge the end of the argument, note that Judge Ellis deemed these § 1983 not viable, and skip right to an argument about what Iglesias can show factually. OB-17-18.

identification. They told responding detectives they could not make an identification in their initial interviews on the night of the shooting. Iglesias is an innocent man and was not present at the scene. Defendants selected Iglesias as their suspect before there was any evidence, and they suppressed that they had done so. Then they fabricated a June 22 photo array identification at Ochoa's home that never happened. Both Ochoa and Rodriguez told Defendants that Iglesias looked different than the perpetrator. Yet despite all of this, Defendants got both Ochoa and Rodriguez each to identify the same innocent person who Defendants had selected as their suspect. See Argument IV(A)(2) *supra*. The only way this could have happened is if Defendants fabricated the identifications, telling Ochoa and Rodriguez who to pick. When Guevara and Halvorsen were asked if they did exactly that, they pleaded their Fifth Amendment right not to incriminate themselves. *Id.*

This extreme misconduct is far more than enough at summary judgment to establish that the identification procedures were improperly suggestive. *Gray v. City of Chicago*, No. 18 C 2624, 2022 WL 910601, at *12 (N.D. Ill. Mar. 29, 2022) (denying summary judgment where the police defendants convinced a witness to select a particular photo); see also *Blackmon v. City of Chicago*, No. 19 CV 767, 2023 WL 7160639, at *17 (N.D. Ill. Oct. 31, 2023) (holding that evidence that Defendants intended to obtain an identification of a suspect relevant to dispute of fact about whether the identification procedures were unduly suggestive); *Hampton*, 2017 WL 2985743, at *23 (denying summary judgment where the officer suggested who the witness should pick). Indeed, on this view of the facts, Defendants did all the things (and more) that the Supreme Court said in 1968 would make an identification procedure unduly suggestive in *Simmons v. United States*, 390 U.S. 377, 382-83 (1968).

Even pretending that this misconduct was not in the record—so, construing some of the facts in *Defendants' favor*, just for purposes of this argument—there would still be sufficient evidence to show that the identification procedures Defendants used were unduly suggestive.

For one, Defendants do not challenge any of the opinions of Iglesias's expert in eyewitness identifications, Dr. Dysart, who points to nearly a dozen factors suggesting Ochoa and Rodriguez's identifications were unreliable at best, and fabricated at worst. PSOF ¶¶163-178. Ultimately Dr. Dysart opined that it would have been "extremely unlikely that [either Rodriguez or Ochoa] could have formed a strong enough memory to be able to reliably recognize the face of a stranger," and that the "combination of a weak memory for the shooter based on a limited opportunity to view coupled with suggestive identification procedures easily accounts for the selections of Mr. Iglesias in this case." PSOF ¶178.

For instance, analyzing these identifications and applying eyewitness expert science, Dr. Dysart opined that the conditions under which Ochoa and Rodriguez viewed the shooting—including the obstructions like trees and window blinds, short duration, and huge distance—combined with their virtually nonexistent descriptions of the shooter (that, incidentally, did not match Iglesias), severely limited their abilities to make an accurate identification. PSOF ¶¶163-171. How then did both of these people both pick Iglesias out of the photo array? Dr. Dysart and another expert in eyewitness identification and memory, Dr. Nancy Frankly, both opine that the photo array was biased against Iglesias, because Iglesias stood out from the fillers, some of whom were "completely implausible alternatives." PSOF ¶¶174-175. The fact that neither Rodriguez nor Ochoa were told that the perpetrator may or may not be in the photo array was suggestive, and the fact that the lineup administrators knew who the suspect was also suggestive. PSOF ¶172. Dr. Dysart further opines that if Rodriguez viewed Iglesias's photo in a photo book and rejected

76

Iglesias, as the record suggests he did, "any subsequent viewing of Mr. Iglesias would be contaminated by the mug book procedure." PSOF ¶¶90, 172.

After being pointed out in an unduly suggestive photo array, the results from any subsequent procedure are relatively meaningless. PSOF ¶176, 264. That is, the bias from the first suggestive procedure renders the outcomes of the subsequent lineup procedures' irrelevant for the purposes of determining witness accuracy. PSOF ¶176. After these identification procedures, the risk of unconscious transference and commitment—the phenomena where witnesses believe that the suspect's face is familiar from the crime, but it has merely been encoded as the result of repeated identification procedures—was high, explaining Rodriguez's and Ochoa's view that they had selected the right person. PSOF ¶¶176-177. Accordingly, the totality of circumstances reveals a robust dispute about whether the identification procedures used with Ochoa and Rodriguez were unduly suggestive, even setting aside the evidence that Defendants fabricated the identifications out of whole cloth. PSOF ¶¶97-110, 147-162, 172-178.

Defendants argue that Ochoa and Rodriguez each viewed separate, legitimate photo arrays that were not suggestive, and that they did not do anything to elicit a selection of Iglesias from those photo arrays. OB-24. That is an account that impermissibly takes the facts in Defendants' own favor and draws untenable inferences. *Tolan*, 572 U.S. at 656. For the reasons just discussed, Defendants are not entitled to the inference that their identification procedures were legitimate; instead, Iglesias is entitled to the inference that the identifications were fabricated. And again, even ignoring the circumstantial evidence of direct fabrication, the remains a hot factual dispute about whether the photo identification procedures were unduly suggestive, given Iglesias's unrebutted expert evidence that that Ochoa and Rodriguez did not get a good enough look at the shooter to make an identification; that their initial descriptions were thin and did not match Iglesias; that at

77

least Rodriguez had seen Iglesias in a photo book before the photo lineup; that they were not given neutral pre-identification instructions; that the photo array itself was biased against Iglesias; and that the witness's expression of confidence were meaningless. PSOF ¶¶163-175.[14]

### (a) Ochoa's and Rodriguez's Identifications Were Not Reliable

Defendants argue that Ochoa's and Rodriguez's identifications were sufficiently reliable that they could not have tainted Iglesias's criminal proceedings. OB-24-29. This argument depends on a self-serving and slanted view of the facts, and it should be rejected.

Ochoa's and Rodriguez's identifications were undeniably unreliable. Most importantly, the record viewed in Iglesias's favor shows that Ochoa and Rodriguez identified Iglesias as the shooter even though Iglesias had nothing to do with the crime and was not at the scene, and even though neither Ochoa nor Rodriguez saw the shooter. PSOF ¶¶2-12, 70-81, 117-132. Ochoa and Rodriguez picked an innocent person, and so of course the identification of Iglesias cannot be said to be reliable. PSOF ¶¶2-12. This factor of the suggestive identification analysis is meant to assess whether the suggestiveness of the identification procedure created a substantial likelihood of *misidentification*. *Neil v. Biggers*, 409 U.S. 188, 198-201 (1972). In a case where the record reflects an *actual misidentification* of an innocent person, it is established that the identification was not reliable.

Nonetheless, even applying the *Biggers* factors—the opportunity of the witness to view the criminal during the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation,

---

[14] With respect to the live lineup, Defendants argue that there was no established police procedure prohibiting a photo array being used directly before a live lineup. OB-22. For purposes of this analysis, that is beside the point. The question is whether showing Iglesias to both witnesses in a photo array directly prior to a live lineup rendered the latter lineup meaningless as an identification procedure, and construing the record for Iglesias at this stage, the answer must be "yes."

and the length of time between the crime and the confrontation, 409 U.S. at 199-200—there is ample evidence to support the view that the identifications were not reliable. The reported initial description from Rodriguez was that the shooter was wearing all black, running into an alley (in the opposite direction), and so he could provide no description of the person at all. PSOF ¶¶33, 82-84. Ochoa's description of the perpetrator, also without any reference to any distinguishing features—and omitting Iglesias's unique eyebrows and earrings—was not only vague, but in addition the limited details he could provide such as complexion, age and height did not match Iglesias. PSOF ¶¶33. The initial descriptions are strong evidence that Ochoa and Rodriguez could not identify the perpetrator at all, let alone accurately identify Iglesias. PSOF ¶¶171, 173. Indeed, the witnesses told the police they could not identify the shooter. PSOF ¶¶82-86, 133-138.

In addition to the poor descriptions environmental circumstances confirm the identifications were unreliable, all of which are discussed at length above—*e.g.*, the shooter wore a hood up, the witnesses had views obstructed by blinds or trees, the incident lasted seconds and there was a limited viewing opportunity, both witnesses viewed from a great distance, the shooter ran, Rodriguez drove away and ducked). See Argument IV(A)(2) *supra*; see also Statement IV *supra*.

Moreover, Iglesias's expert, Dr. Dysart, explains how these variables reduce the risk of accurate identifications, according to established, peer-reviewed eyewitness science. She opines that Ochoa and Rodriguez viewed the perpetrator for such little time that the risk of false identification of an innocent person in identification procedures increased to 90%. PSOF ¶165. That already high risk of inaccurate identification was increased by the well documented reduction in eyewitness accuracy caused by distance, obstructed viewing caused by the perpetrator's hood, weapon focus, and stress and arousal. PSOF ¶¶163-171. Dr. Dysart opines that "[t]ogether, these

estimator variables [environmental circumstances] likely created a scenario where it would have been difficult for either witness to have a strong memory for the perpetrator. . . . [T]here are significant concerns regarding eyewitness reliability in stranger identification cases where the witness has a weak memory for the perpetrator and suggestive identification procedures are employed." PSOF ¶171.

No evidence in the record suggests Ochoa's or Rodriguez's identifications of Iglesias were reliable. *Washington*, 2022 WL 4599708, at *23 (holding that a witness's identifications of the plaintiffs at night from a distance was enough to create a genuine dispute of fact about whether the identification was reliable and procedures were suggestive); *Bolden*, 623 F. Supp. 3d at 915-19 (affirming jury verdict as supported by sufficient evidence when unreliability of the identification was supported by nearly the same factors present here). *Sanders v. City of Chicago Heights*, No. 13 C 0221, 2016 WL 2866097, at *9 (N.D. Ill. May 17, 2016) (noting that limited opportunity to view the crime, a lack of detail, and misidentification of the wrong person created a dispute of fact for trial).

In response to these arguments, Defendants argue at some length that the witnesses had a great opportunity to view the perpetrator, gave good descriptions to the police that were similar to Iglesias, and made identifications in which they were confident. OB-24-26. That is a factual account they will have to present to a jury—there is no part of it that is not disputed and directly contradicted by the facts set out above—it is not a determination that the Court can credit at this stage, consistent with Rule 56. *Tolan*, 572 U.S. at 656. There are many examples of how Defendants' account is slanted drastically in their favor, but consider that they argue that the descriptions of the witnesses were "sufficiently similar to Iglesias's physical appearance." OB-26. Not only did the witnesses provide no distinguishing details in their description, but the one generic

80

description that was provided was dissimilar to Iglesias, as the witnesses later told police. See Argument IV(A)(2) supra. Or consider that Defendants stress that "there were two identifications—by witnesses who did not know each other or speak to each other and witnessed from different locations . . . ." OB-26. At this stage, the fact that two unrelated witnesses identified the same innocent person that Defendants had chosen as their suspect is a fact that supports Iglesias's account that the identifications were fabricated. See Argument IV(A) supra.

Moreover, Defendants' contention about witness certainty is one the Seventh Circuit has discounted at summary judgment, saying it is "too much of a leap at the summary-judgment stage" to decide as a matter of law that a witness identification was reliable where the witness confidently identified a suspect and testified that the identification was not influenced, given the problems of unconscious transference. *Holloway*, 43 F.4th at 766-67; *see also* PSOF ¶¶266-267. Even accepting Defendants' view of witness confidence, it would not entitle Defendants to summary judgment.

### (b) The Identifications Tainted Iglesias's Criminal Proceedings

The final factor necessary to support this due process theory is whether the unduly suggestive and inaccurate identifications rendered Iglesias's criminal case unfair. Based on this record, the question must be answered in the affirmative.

Under Seventh Circuit case law, whether unduly suggestive identifications made criminal proceedings unfair is answered by reference to the following questions: "What identification evidence was actually admitted at trial? What did the victims, eyewitnesses, and police officers say? Were they cross-examined? Were the circumstances surrounding the identification and the police procedures put before the jury? What exhibits were admitted on this issue? Was any

objection or motion to suppress the identification evidence made? What other evidence tended to link the defendant to the crime?" *Alexander*, 433 F.3d at 555.

At trial, Ochoa, Rodriguez, and Guevara implicated Iglesias as the perpetrator from the stand, explaining in detail the identifications of Iglesias that were obtained by Defendants' suggestive identification procedures before trial. PSOF ¶¶269-276. Rodriguez and Ochoa both testified about photo identifications of Iglesias and subsequent live lineup identifications. PSOF ¶¶269-270. Guevara testified about the photo identifications and live lineup identifications of Ochoa and Rodriguez. PSOF ¶¶271-273. The photo array used with both was introduced as evidence, as was a photograph of the live lineup. PSOF ¶274. Ochoa, Rodriguez and Guevara all placed markings on the trial exhibits of the photo array and live lineups in front of the jury. PSOF ¶274.

Though DeLeon attempted to cross examine these witnesses, Defendants' suppression of the true circumstances of these identification procedures—of the fact that Ochoa and Rodriguez had previously admitted to detectives that they could not identify the shooter, that some of the procedures did not happen at all, that Iglesias was a suspect before any identification, that the confidential informant tip was made up, and that Defendants told Ochoa and Rodriguez who to pick from the photo array, and then fabricated police reports as to all of this (at the same time suppressing the truth)—rendered cross examination effectively impossible. *See, e.g.*, PSOF ¶¶179-191, 258-266.

The identifications were used to convict Iglesias at trial. Indeed, no other evidence—apart from Defendants' own fabricated evidence—even implied Iglesias was guilty. The record shows conclusively that the unduly suggestive false identifications made Iglesias's trial unfair. *Donald*,

2023 WL 2346270, at *11 (deciding in nearly identical circumstances that material disputes of fact required a jury to determine whether identifications tainted a criminal trial).

The Defendants devote much of their argument to contention that the criminal jury "had ample information to determine for itself whether the identifications were suggestive." OB-27-29. This is an outlandish argument at summary judgment in this case, considering the strong evidence of fabricated and suppressed evidence discussed above. See Arguments IV(A) and IV(B) *supra*. Defendants seem to be arguing that they fabricated and suppressed evidence to frame an innocent person, bilked the criminal justice system by not revealing anything that they had done, but now should escape liability because the criminal jury had everything it needed to consider whether the identifications were reliable. This argument should be rejected summarily.

But even if this Court entertains the argument and evaluates the identifications in a vacuum, there are ample disputes of fact about whether the jury in Iglesias's criminal case had the information it needed about the suggestive identification procedure to decide whether the identifications were accurate. Iglesias and his attorney were unaware of the circumstances of Defendants' interactions with Rodriguez that cast doubt on Rodriguez's purported identification of Iglesias, including, critically, the fact that Rodriguez had told the detectives who initially interviewed him that he could not make an identification. They were also unaware that Rodriguez was shown multiple photo and lineup procedures in the first few days after the shooting—including those that would have contained Iglesias's photo—and did not make an identification; that Rodriguez told them Iglesias looked different from the shooter; and that Roriguez was told during the lineup to select the person he had identified from the photo array he saw less than an hour earlier. PSOF ¶¶82-87, 90-96, 101-106, 150-151, 210. Nor were they aware of Defendants' interactions with Ochoa that undermined Ochoa's purported identification of Iglesias, including,

83

again critically, the fact that Ochoa had told the detectives who initially interviewed him that he could not make an identification. But also, they were unaware that Ochoa did not in fact view a photo array at home on June 22; that he was shown a photo array only after Defendants had already pulled Iglesias's rap sheet and made him a suspect; that he told detectives the shooter looked different from Iglesias, and that he told detectives that Iglesias looked different than the shooter. PSOF 133-138, 139-146, 147-162, 211. This is ample evidence upon which a jury in this case could find that the jury in Iglesias's case was not properly informed.

### 3. Whether or Not Iglesias's Attorneys Objected to the Admission of the Identifications at the Criminal Trial Has Zero Bearing on This Theory

Defendants next argue that Iglesias cannot pursue this § 1983 theory because his attorneys did not file a motion to suppress the identifications during the criminal proceedings. OB-30-31. This argument suffers a number of flaws, each of which is an independent reason to reject it. First, Defendants do not point to any case that supports their proposed legal rule that a motion to suppress in the criminal case is a prerequisite to a § 1983 claim challenging a tainted identification. They do not because no such case exists.

Second, it makes sense that such a case does not exist. Even where a motion to suppress is filed and *denied* in the criminal case, that denial has no impact on whether a § 1983 claim can proceed. The Seventh Circuit in *Sornberger* held that a decision denying a suppression motion in a criminal case has zero effect in later § 1983 litigation after the criminal conviction has been set aside. *Sornberger v. Knoxville*, 434 F.3d 1006, 1021-23 (7th Cir. 2006); see also *Evans v. Katalinic*, 445 F.3d 953, 955–56 (7th Cir.2006) (estoppel argument based on state-court decision "absurd" when there is no extant criminal judgment against the plaintiff); *Hill v. City of Chicago*, No. 06 C 6772, 2009 WL 174994 (N.D. Ill. Jan. 26, 2009) (collecting cases and concluding that state court denial of motion to suppress did not prevent civil rights plaintiff from re-litigating the

84

legality of his confession). If a state court decision *denying* a motion to suppress as without basis has no effect on a later § 1983 case, then the *absence* of any litigation on such a motion to suppress obviously cannot bar a § 1983 action.

Third, Defendants' argument ignores the practical realities of litigating criminal cases. An attorney's decision not to file a motion to suppress in a criminal case can be influenced by a wide array of strategic considerations—*e.g.*, a bad trial judge, the chances that a motion to suppress will adversely impact other litigation on evidentiary issues prior to trial, or the view that an eyewitness will be more effectively cross-examined at trial without testifying first in a preliminary hearing. There are many reasons not to file a pre-trial motion to suppress that have nothing to do with the veracity of an identification.

Fourth, another strategic reason not to file a motion to suppress in the criminal case is the fact that, at the time of the criminal case, the criminal defendant might lack the evidence to effectively challenge the identification. That, of course, is the case here. Had Iglesias known that the eyewitnesses had not seen the shooter and told police they could not make an identification, for example, he could have filed quite a successful motion to suppress. But Defendants hid that evidence. In effect, Defendants are arguing that because they hid the evidence that they had framed Iglesias and manufactured identifications, he could not file a motion to suppress in the criminal case, and because he could not do that, they cannot be liable for manufacturing the identifications. That circular argument is nothing more than an attempt to contest Iglesias's facts at summary judgment.

Fifth, Iglesias's counsel De Leon did try to undermine and challenge Ochoa and Rodriguez's identifications of Iglesias during the criminal trial. He vigorously cross-examined both Ochoa and Rodriguez, over dozens of pages of transcripts, trying to demonstrate that they

could not have possibly seen the shooter well enough to make an identification, that their identifications were mistaken because Iglesias did not fit the initial descriptions, and that they were not telling the truth about what they saw and about their interactions with police. PSOF ¶266. He pressed on these arguments in his lengthy closing argument. *Id*. But he was ultimately unsuccessful, because what he lacked was the investigative information that would have allowed him to effectively confront the witnesses and prove his points, because Defendants had concealed it all. PSOF ¶¶258-266.

Finally, Defendants cite passages from *Alexander*, 433 F.3d at 556 and *Coleman v. City of Peoria*, 925 F.3d 336, 347-48 (7th Cir. 2019), to suggest that their invented motion-to-suppress rule is grounded in case law. OB-30-31. But neither of those cases even suggests that a motion-to-suppress in the criminal case is a prerequisite to a § 1983 claim.

*Coleman* is nothing like this case. There, the Seventh Circuit found that police officers used no improper identification procedures at all. *Id.* at 347-48. The witness had seen the suspect's fact for three minutes during the incident in question, and the witness recognized the suspect because they had lived in the same place for years. *Id.* During the happenstance meeting at the police station, the witness recognized the suspect, who was in a hallway, and pointed him out as the perpetrator. *Id.* Based on those facts, the Court determined that the witness's identifications did not clearly taint the suspect's trial. *Id.* at 349. The witness knew the perpetrator and had an independent basis to make an accurate identification, and that was what undermined the plaintiff's claim. Discussing the criminal trial court's denial of a motion to suppress the identification, the Seventh Circuit said that the denial of such a motion did not alone give rise to § 1983 liability. *Id.* at 347. That is nearly the opposite of a holding that a motion to suppress is required to assert a § 1983 claim.

86

In *Alexander*, the plaintiff lost the claim because he did not put any evidence in the record relating to his criminal case or the manner in which the identification affected that case. 433 F.3d at 556 ("[The plaintiff] has not made any effort to describe how the police identification procedures tainted his trial."). the Seventh Circuit said, "Without the trial record we cannot determine whether such a motion, had it been made, would or should have been granted. . . . Alexander's is a sympathetic case, but we cannot connect the dots for him. That he must do on his own." 433 F.3d at 556. The absence of a record doomed the claim, and the Seventh Circuit recognized that a properly assembled record, like the one here, might demonstrate that a hypothetical motion to suppress would have been granted had it been filed in the criminal case. *Id.* The core of Iglesias's claim is that he lacked information during the criminal case that he needed to effectively defend himself. Unlike Alexander, Iglesias has put together a record in this case that establishes that if he had possessed the evidence earlier and had filed a motion to suppress, it would have been granted. This Court should reject Defendants' argument regarding the lack of a motion to suppress.

### 4. Defendants Are Not Entitled to Summary Judgment Merely Because They Disclaim Intent

Defendants' next assert incorrectly that there is no dispute of fact about whether they possessed the requisite mental state to be held liable for conducting the suggestive identification procedures that resulted in their tainted identifications being used at Iglesias's criminal trial. OB-31-32. In this argument, Defendants merely reiterate their view that Riccio, Gawrys, and Biebel were not involved in procuring the identifications, and they assert in a single sentence that there is no evidence Halvorsen knew the identification procedures were suggestive. OB-32. Guevara does not make any independent argument.

Iglesias had already explained how Riccio, Gawrys, and Biebel participated in obtaining Ochoa's and Rodriguez's fabricated identifications. See Argument IV(A)(1) *supra*. Moreover,

87

Halvorsen's argument is so perfunctory that it is forfeited. *Smith*, 388 F.3d at 569. Even if it were not, Halvorsen cannot possibly take the Fifth about whether he knowingly obtained false identifications of Iglesias, and then argue that he is entitled to summary judgment because he has established that there is no genuine dispute of fact about whether he had the necessary intent. It is highly problematic for a party's lawyers to argue for judgment by disclaiming that the party acted with intent when the party has exercised his right to remain silent. See Argument III *supra*.

Moreover, the Seventh Circuit long has reminded that "[d]ue to the difficulty of proving a subjective state of mind, cases involving motivation and intent are usually not appropriate for summary judgment." *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse*, 991 F.2d 1249, 1258 (7th Cir. 1993); see also *P.H. Glatfelter Co. v. Voith*, 784 F.2d 770, 774 (7th Cir. 1986) (noting that, "as a general principle, questions of motive and intent are particularly inappropriate for summary adjudication and that resolution by summary judgment of the issues raised by an allegation of fraud is often difficult or impossible") (internal quotation marks and citations omitted). "There is especially good reason to follow the general rule where, as here, evaluating whether a party had an actual intent to deceive requires credibility determinations." *Standard Ins. Co. v. VanLanduit*, 551 F. Supp. 3d 854, 868 (N.D. Ill. 2021) (internal quotation marks omitted).

In this case, the record is replete with evidence from which a reasonable jury could draw the inference that Defendant Officers had the intent to obtain a fabricated identification using unduly suggestive procedures. Officers involve in those procedures have taken the Fifth. Defendants decided on Iglesias as their suspect without evidence. Multiple pieces of evidence independent of the identifications were fabricated. Defendants suppressed information undermining their eyewitnesses, including statements from those witnesses that they could not

88

make an identification, throughout the case, and still more exculpatory and impeachment evidence was suppressed on other subjects. Some Defendants testified falsely at trial. Police reports were falsified. The list of circumstantial evidence of intent goes on and on. Based on much less evidence the Seventh Circuit decided that "[a] jury would not be compelled to find that the officers acted with that intent, but it could so find." *McCottrell v. White*, 933 F.3d 651, 670–71 (7th Cir. 2019). This Court should reject Defendants' intent argument.

### 5. Defendants Are Not Entitled to Qualified Immunity on This Theory

Finally, Defendants contend they are entitled to qualified immunity on this theory. OB-32-33.[15] Defendants argue only that the law was not clearly established in 1993 that they could not use a photo array prior to a live lineup or that they could not use poor quality fillers. OB-33. That qualified immunity argument depends on a view of the facts where Defendants did not violate Iglesias's rights at all, but as discussed already material disputes of fact foreclose such an argument.[16]

To the extent Defendants are actually arguing that the law governing Iglesias's identification theory was not clearly established in 1993 and 1994, that is plainly incorrect. The illegality of the Defendants' conduct was established long before the events at issue in this case. In 1968, the Supreme Court announced that identification procedures that highlight who the suspect is are unduly suggestive. *Simmons v. U.S.*, 390 U.S. 377, 383 (1968). Moreover, it has

---

[15] Defendants do not argue they are entitled to qualified immunity on any of Iglesias's other due process theories, and so they have now forfeited any argument for immunity on those claims. *J&J Sports Productions, Inc. v. Resendiz*, 2009 WL 1953154 (N.D. Ill. July 2, 2009).

[16] In fact, this whole section of Defendants' brief really repeats factual arguments addressed above about whether Defendants violated Iglesias rights, OB-33, but now Defendants have dressed them up as arguments about the contours of clearly established law.

For example, Defendants argue that the law was not clearly established that they could not say "the probably got the guy" before an identification procedure, OB-49, which is not an argument about the state of clearly established law, but instead is an argument that they did not engage in suggestive identification procedures in the first place.

been the law since at least 1977 that subjecting a criminal defendant to unduly suggestive identification procedures that taint the criminal proceedings violates due process. *Manson v. Brathwaite*, 432 U.S. 98 (1977); *see also Neil v. Biggers*, 409 U.S. 188 (1972). It was clear in the Seventh Circuit that police officers could be held liable for this misconduct at latest in 1987, nearly a decade before Iglesias's prosecution. *Hensley*, 818 F.2d at 648-50; see also *Sanders v. City of Chicago Heights*, No. 13 C 0221, 2016 WL 2866097, at *10 (N.D. Ill. May 17, 2016) (holding that it was clearly established in 1993 that police officers violated a criminal defendant's due process rights by conducting impermissibly suggestive identification procedures). Defendants are not entitled to qualified immunity on Iglesias's due process identification theory.[17]

### 6. Defendants' Remaining Arguments for Summary Judgment on the Unduly Suggestive Lineup Theory Lack Merit

Defendants' remaining arguments for summary judgment on this due process theory have been addressed already. First, Defendants argue that Riccio, Gawrys, and Biebel were uninvolved in the identification procedures. OB-18-19. Iglesias has addressed already how that is an untenable reading of the record, particularly so if the record is construed for Iglesias, and Iglesias incorporates that argument here. Argument IV(A)(1) supra. The evidence that these Defendants were involved is substantial. PSOF ¶279-299.

Second, to the extent that Defendants incorporate an argument in their discussion of the identification procedures about their lack of intent, see OB-20, that argument is addressed directly above, see Argument IV(C)(4) supra.

---

[17] Iglesias preserves the argument that qualified immunity does not apply to § 1983 claims. The Supreme Court's qualified-immunity precedent derives from the premise that there is "no evidence that Congress intended to abrogate the traditional common law" immunities in §1983 actions. *Briscoe v. LaHue*, 460 U.S. 325, 337 (1983). But that premise is wrong. Section 1983 as originally enacted in 1871 contained express language abrogating state common-law immunities. That text was mistakenly omitted during codification, and the Supreme Court has never addressed it.

90

At the end of the day, the Defendants' account of their identification procedures is based on Defendants' own view of the facts, depends on piles of inferences in their favor, and the resolution of credibility issues. "Where the material facts specifically averred by one party contradict the facts averred by a party moving for summary judgment, the motion must be denied . . . . A court's job on summary judgment is not to resolve swearing contests or decide which party's facts are more likely true. . . . These credibility disputes are for fact finders to resolve." *Kailin v. Gurnee*, 77 F.4th 476, 483 (7th Cir. 2023).

### D. A Jury Must Decide Iglesias's Fourth Amendment Illegal Seizure and State Law Malicious Prosecution Claims

Iglesias also brings a § 1983 claim for illegal detention without probable cause, as well as a state-law claim for malicious prosecution. Defendant Officers treat these as though they were a single claim, OB-43-45, but they are not. The Supreme Court held in *Manuel v. Joliet*, 580 U.S. 357, 363-64 (2017), and *Thompson v. Clark*, 596 U.S. 36, 42 (2022), that it has long recognized a Fourth Amendment claim for illegal seizure pursuant to legal process where the detention is without probable cause. That claim, like all other Fourth Amendment claims, requires proof of a (1) a seizure, (2) without probable cause. *Gerstein v. Pugh*, 420 U.S. 103, 114-16 (1975). By contrast, an Illinois malicious prosecution claim requires proof of (1) initiation or continuation of criminal proceedings, (2) without probable cause, (3) with malice, (4) terminating in the plaintiff's favor. *Logan v. Caterpillar*, 246 F.3d 912, 921-22 (7th Cir. 2011).

Defendants Riccio, Gawrys, and Biebel repeat the argument that they were not involved in the identification procedures. OB-43. This argument should be rejected for the reasons discussed above. See Argument IV(A)(1) *supra*.[18]

---

[18] There is a hint of an argument in this section that these Defendants did not cause Iglesias's wrongful prosecution and conviction. The argument is too cursory to be preserved, *Otto v. Variable Annuity*

91

On both claims, Defendants contend that there is no genuine dispute about whether there was probable cause to suspect that Iglesias killed Roman. OB-44-45. Defendants assert that they believed at the time that Ochoa and Rodriguez accurately identified Iglesias, and they cite cases that say that probable cause can be based on eyewitness identifications. *Id.* Again, Defendants' argument is founded on utterly disputed facts and inapplicable case law.

"In a malicious prosecution case, probable cause is defined as a state of facts that would lead a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion that the accused committed the offense charged." *Williams v. City of Chicago*, 733 F.3d 749, 759 (7th Cir. 2013). It is firmly established that knowingly fabricated evidence and false statements never support probable cause. *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978); *Alexander*, 721 F.3d at 423; *Lawson v. Veruchi*, 637 F.3d 699 (7th Cir. 2011) (reversing grant of summary judgment where false statements precluded finding probable cause); *Olson v. Tyler*, 771 F.2d 277, 281 & n.5 (7th Cir. 1985) (holding that when officer includes false facts or omits facts in the

---

*Life Ins. Co.*, 134 F.3d 841, 854 (7th Cir. 1998) (refusing to consider unsupported or cursory arguments), but it is also wrong on the law and facts. The Seventh Circuit holds, "[A] prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial—none of these decisions will shield a police officer who deliberately supplied misleading information that influenced the decision," as Defendants did here. *Jones*, 856 F.2d at 994. As a matter of Illinois law, liability extends to all persons who played a significant role in causing the prosecution of plaintiff. *Beaman v. Freesmeyer*, 183 N.E.3d 767, 782 (Ill. 2021). Police who engage together in misconduct to deceive other actors in the criminal justice system are routinely found to have commenced and continued criminal prosecutions. *E.g.*, *Padilla v. City of Chicago*, 2013 WL 1208567, at *16 (N.D. Ill. Mar. 26, 2013) (police who engage in misconduct cannot blame others involved in the prosecution).

Defendants' contention that they did not cause Iglesias's criminal proceedings and their implication that a prosecutor exercised independent judgment in bringing the case cannot be reconciled with the record either. As discussed at length, the Defendant Officers fabricated false evidence and hid evidence from prosecutors. PSOF ¶¶55–62, 67-162, 192-209, 214-257. They manufactured identifications and false witness accounts to be used in Iglesias's criminal case. PSOF ¶¶67-162, 192-209. They concealed from both the felony review prosecutor (Latz) and trial prosecutor (Studenroth) the fabrications they had used to build a case against Iglesias, because those prosecutors would have disclosed all of that information if they had learned about it. PSOF ¶¶246-257. Guevara testified consistent with their false statements at trial. PSOF ¶¶271-274. The record construed in Iglesias's favor shows direct influence by Defendants over the decision to prosecute.

92

probable cause analysis, "he cannot be said to have acted in an objectively reasonable manner"). Along the same lines, police cannot manufacture their own probable cause. *Collier v. City of Chicago*, 2015 WL 50814408, *4 (N.D. Ill. Aug. 26, 2015).

Moreover, probable cause is a quintessential question of fact. The Seventh Circuit holds that a court cannot decide the probable cause question "if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them." *Maxwell v. City of Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1993); *see also Bryant v. Whalen*, 759 F. Supp. 410, 417 (N.D. Ill. 1991). "Accordingly, a conclusion that probable cause existed as a matter of law is appropriate only when no reasonable jury could find that the officers did not have probable cause[.]" *Maxwell*, 998 F.2d at 434.

As discussed at length already, there is a huge difference of opinion about whether Defendants had any evidence whatsoever to entertain an "honest and sound" suspicion that Iglesias had killed Roman. Viewed in Iglesias's favor, the record demonstrates that Defendants wholly fabricated all the evidence against Iglesias, including the made-up tip that supposedly implicated him, each of Ochoa's and Rodriguez's identifications, and statements they attributed to Vicente. See Argument IV(A) *supra*. There is similarly strong evidence that Defendants hid evidence demonstrating that Iglesias was innocent and that they had no reason to suspect him. See *id.* In other words, there is nothing that the Defendants can point to that establishes probable cause independent of their own misconduct.

Putting a finer point on it, Defendants state that probable cause for Iglesias's should be measured at the time of the filing of charges. OB-44. Assuming that is true, Defendants submitted a sworn arrest report at the time that legal process was initiated in Iglesias's criminal case, which had a field in which they were to record the evidence establishing probable cause of the murder

93

charge. PSOF ¶146, 267. That field states: "Geraldo IGELESIAS was identified in a line-up, as the person who on 7 June 93, at 2148 N. Sawyer, shot Monica ROMAN in the head with a handgun, killing Monica ROMAN." PSOF ¶146. The identified evidence was fabricated, viewing the facts in Iglesias's favor. See Argument IV(A) *supra*. No other evidence was identified. Indeed, when Iglesias was arrested on the afternoon of June 23, the only two items of evidence that even arguably existed were the confidential informant tip and the purported June 22 photo array at Ochoa's home, but both were entirely made up. PSOF ¶¶55-62, 139-146. A jury must decide whether there was probable cause to suspect Iglesias of the Roman murder.

Finally, Defendants argue that they are entitled to qualified immunity on Iglesias's federal claim, asserting that they had so-called "arguable probable cause" to charge Iglesias based on Ochoa's and Rodriguez's identifications. OB-45. Arguable probable cause does not add any protection for Defendant Officers at this stage of the case. The Seventh Circuit holds that, in evaluating at summary judgment whether an officer is entitled to immunity from a Fourth Amendment claim, there is "substantial, if not complete, overlap of the issue of immunity and the principal issue on the merits." *Maxwell v. City of Indianapolis*, 998 F.2d 431, 435-36 (7th Cir. 1993); *see also id.* ("The . . . officers attempt to draw a distinction by contending that the relevant inquiry is into 'arguable probable cause,' which is another way of asking whether they had probable cause to think they had probable cause."). Indeed, the Supreme Court held unambiguously in *Malley v. Briggs* that an officer is not entitled to qualified immunity when a reasonable official in his position would have known that the facts did not establish probable cause. 475 U.S. 335, 345 (1986). The probable cause and arguable probable cause standards are objective, based on the facts known to the officer. *Fox v. Hayes*, 600 F.3d 819, 833 (7th Cir. 2010). The

officer's subjective state of mind is irrelevant to this analysis. *Whren v. United States*, 517 U.S. 806, 812-13 (1996).

Just as a jury must decide whether Defendant Officers had probable cause to suspect Iglesias, it must decide whether a reasonable officer would have believed that there was probable cause, to the extent there is any difference. *Chelios v. Heavener*, 520 F.3d 678, 686 (7th Cir. 2008) (jury must make probable cause determination "if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them"). The Seventh Circuit has reversed grants of summary judgment where defendants did not establish conclusively that there was no fact issue on probable cause. *Cartwright v. City of Chicago*, 450 Fed. App'x 539, 540-42 (7th Cir. 2011). Moreover, a claim of qualified immunity can be defeated even if the precise conduct in question had not previously been held unlawful. *Hope v. Pelzer*, 536 U.S. 730, 739-741 (2002) ("[O]fficials can still be on notice that their conduct violates established law . . . in novel factual circumstances."); see also *Currie v. Chhabra*, 728 F.3d 626, 632 (7th Cir. 2013) (Fourth Amendment rights are well established "even in the absence of earlier cases involving fundamentally similar or materially similar facts"). Finally, qualified immunity does not protect officers "who knowingly violate the law." *Hunter v. Bryant,* 502 U.S. 224, 229 (1991) (citation omitted). Defendant Officers are not entitled to qualified immunity on this claim.

## E.    A Jury Must Decide the Failure-To-Intervene Claims

Riccio, Gawrys and Biebel argue for summary judgment on Iglesias's failure-to-intervene claim. OB-46-48. First, they argue again that they were not involved in the misconduct at issue. OB-47. To the extent that argument incorporates the arguments they have made above, Iglesias incorporates his response. See Argument IV(A)(1) *supra*. To the extent they take the position that they had no opportunity to intervene to prevent the violation of Iglesias's rights, their one-

95

paragraph argument is not developed in a way that permits a response and is therefore forfeited. *Smith*, 388 F.3d at 569; see also *Otto*, 134 F.3d at 854. It also lacks merit. "Whether a bystander officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact[.]" *Mwangangi*, 48 F.4th at 832. The discussion of Iglesias's due process claims above demonstrates that a reasonable jury could find that each of these Defendants had the opportunity to intervene to prevent the fabrication and suppression of evidence that caused Iglesias's decades-long wrongful incarceration. See Argument IV *supra*. Indeed, Defendants had decades to so intervene while Iglesias was languishing in prison and did not. These Defendants' arguments otherwise are plainly dependent on the Court drawing inferences—and many untenable inferences—in their favor, an approach the Court cannot take at this stage.

Second, these Defendants argue that Iglesias's failure-to-intervene claims fail because they are entitled to summary judgment on all of Iglesias's other constitutional claims. OB-48. This Court should reject this argument because Defendants do not move for summary judgment on all of Iglesias's other constitutional claims, and regardless material disputes of fact require a trial on those claims. Argument I *supra*.

Finally, they argue that such a claim is not viable under § 1983, a position they admit is incompatible with Seventh Circuit law. OB-48. As the Seventh Circuit reaffirmed in the very case Defendants cite for the proposition that a failure-to-intervene claim is not viable, defendant who has a realistic opportunity to step forward and prevent a fellow officer from violating the constitutional rights of another but who fails to do so is liable. *Mwangangi v. Nielsen*, 48 F.4th 816, 832 (7th Cir. 2022); *Byrd v. Brishke*, 466 F.2d 6, 11 (7th Cir. 1972); *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). Summary judgment is not appropriate on this claim.

**F.      A Jury Must Decide Iglesias's State-Law Claim of Intentional Infliction of Emotional Distress**

In a single paragraph, Riccio, Gawrys, and Biebel assert that Iglesias's state-law claim of intentional infliction of emotional distress fails because they were not involved in the misconduct at issue. OB-50-51. For the reasons discussed already, these Defendants committed misconduct in the course of the Roman investigation. See Argument IV(A)(1) *supra*. As a result, Iglesias spent decades in prison. "For conduct to be extreme and outrageous it must go 'beyond all bounds of decency' and be 'considered intolerable in a civilized community.'" *Fox v. Hayes*, 600 F.3d 819, 842 (7th Cir. 2010) (quoting *Lopez v. City of Chicago*, 464 F.3d 711, 721 (7th Cir. 2006)). An important factor in deciding whether conduct is "extreme and outrageous" is whether "a defendant abused a position of authority." *Fox*, 600 F.3d at 842. Iglesias's allegations fit this tort perfectly, and disputes of fact prevent summary judgment for these Defendants on this claim. *See Henry v. Ramos*, 1997 WL 610781, at \*2 (N.D. Ill. Sept. 28, 1997) ("An average member in the community would consider it outrageous for police officers to falsely frame, arrest and imprison an innocent citizen."); *Moore v. City of Chicago*, 2011 WL 1231318, at \*4 (N.D. Ill. 2011).

**G.      A Jury Must Decide the Section 1983 Conspiracy Claims**

Riccio, Gawrys, and Biebel argue for summary judgment on Iglesias's federal and state conspiracy claims in a single section. OB-49-50. First, on both federal and state claims, these Defendants assert that Iglesias's conspiracy claims are derivative of his due process claims and unsupported by evidence. OB-49. To the extent that argument is based on a purported deficiency in Iglesias's due process claims, that argument is rebutted by the discussion above of the reasons that the due process claims survive. See Argument IV(A)-(C) *supra*. Moreover, Defendants' bald assertion that there is no evidence of conspiracy is insufficient to shift the summary judgment burden. *Carmichael*, 605 F.3d at 460 ("The defendants, the moving party on the summary

97

judgment motion, never fulfilled the obligation of setting forth the basic facts and law which, in their view, warranted summary judgment on this claim."). Regardless, there is ample evidence supporting Iglesias's conspiracy claims.

To prove a section 1983 or civil conspiracy, Iglesias must point to evidence from which a jury could infer an agreement among two or more people acting in concert to commit an unlawful act, or a lawful act by unlawful means. *Hampton v. Hanrahan*, 600 F.2d 600 (7th Cir. 1979), *rev'd in part*, 446 U.S. 754. "To be liable as a conspirator you must be a voluntary participant in a common venture," the Seventh Circuit has explained, "although you need not have agreed on the details of the conspiratorial scheme or even know who the other conspirators are. It is enough if you understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do your part to further them." *Jones*, 856 F.2d at 992. Conspirators are liable "for the wrongful acts of the other conspirators committed within the scope of the conspiracy." *Proffitt v. Ridgway*, 279 F.3d 503, 507 (7th Cir. 2002). "Rarely in a conspiracy case will there be direct evidence of an express agreement among all the conspirators to conspire," and so "circumstantial evidence may provide adequate proof of conspiracy." *Bell v. City of Milwaukee*, 746 F.2d 1205, 1256 (7th Cir. 1984).

There is ample evidence on which a jury could infer an agreement between the Defendant Officers, and Iglesias's conspiracy claims against each of them should proceed to trial. The facts viewed in Iglesias's favor show Defendants all worked together on the Roman homicide investigation, deciding that Iglesias was a suspect before he was ever identified, and working from there to fabricate evidence implicating him in the crime, even though there was no evidence to speak of otherwise. PSOF ¶¶63-66, 279-299. Where evidence contradicted Defendants' official version, it was hidden from sight. PSOF ¶¶214-245. As discussed, Defendant Biebel had the

98

Defendants provide updates on the investigation at each roll call, all of the Defendant were involved in preparing the closing report full of fabrications, they all participated in Iglesias's arrest without probable cause, and they worked together signing each other's names to police reports. PSOF ¶¶ 63-66, 279-299; RSOF-Officers ¶¶ 26, 30, 44, 100. By the end of June 23, 1993, each of the Defendant Officers had engaged in a scheme to fabricate evidence to frame Iglesias for a crime they had no evidence he committed. *Id.*; *see Jones*, 856 F.2d at 992 ("We cannot say that the jury acted unreasonably in finding that all of the individual defendants were voluntary participants in a common venture to railroad [the plaintiff].").

The conspiracy continued after Iglesias was charged, with the Vicente fabrications and the efforts to prepare Rodriguez to identify Iglesias at trial, but its object and scope remained the same. *See United States v. Jackson*, 546 F.3d 801, 815-16 (7th Cir. 2008) ("[C]o-schemers are jointly responsible for one another's acts in furtherance in the scheme," and a "participant in conspiracy is liable for foreseeable acts of his co-conspirators in furtherance of the conspiracy[.]"). Throughout, Defendants conspired with Vicente, Ochoa, and Rodriguez to provide false statements and evidence in Iglesias's criminal case. PSOF ¶¶ 67-113, 114-162, 192-200, 277.

The Seventh Circuit has warned that "[t]he question whether an agreement exists should not be taken from the jury in a civil conspiracy case so long as there is a possibility that the jury can infer from the circumstances (that the alleged conspirators) had a meeting of the minds and thus reached an understanding to achieve the conspiracy's objectives." *Hampton*, 600 F.2d at 621; *Wilson v. City of Chicago*, 707 F. Supp. 379, 386 (N.D. Ill. 1989) ("Who actually was in the conspiracy, if one existed, its aims, and its extent are for the jury to decide."); *Washington*, 2022 WL 4599708, at *23 (denying officers summary judgment on conspiracy claim there was a material dispute of fact as to whether they fabricated or withheld evidence). The summary

judgment record reveals a genuine dispute of fact about whether each of the Defendants reached an agreement with the others, and a reasonable jury could find for Iglesias on his conspiracy claims.

Second, Defendant Officers argue they are entitled to qualified immunity on Iglesias's § 1983 conspiracy claims because, in their view, it is unclear in 1993 whether officers working for the same police department could be liable for participating in a conspiracy. This argument follows from the incorrect contention that the law is unclear about whether the so-called intra-corporate conspiracy doctrine bars Iglesias's conspiracy claims against the Defendant Officers. OB-50. The argument is wrong on a number of levels. For starters, the Supreme Court and Seventh Circuit long before the Roman case held that § 1983 conspiracy claims can be pursued against members of a single law enforcement agency. See *Adickes*, 398 U.S. at 152; *Geinosky v. City of Chicago*, 675 F.3d 743, 749 (7th Cir. 2012) (reinstating conspiracy claim against "several members of the same police unit [who] allegedly acted in the same inexplicable way against a plaintiff on many different occasions"); *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988) (conspiracy among supervisory officers within the Chicago Police Department); *Bell v. City of Milwaukee*, 746 F.2d 1205, 1253-61 (7th Cir. 1984) (upholding punitive damages for conspiracy among members of the Milwaukee Police Department).

In addition, neither the Supreme Court nor the Seventh Circuit has ever applied the intra-corporate conspiracy doctrine to §1983 claims, and cases applying that doctrine in other contexts but not to §1983 claims do not unsettle established law. Moreover, the intra-corporate conspiracy doctrine has no place in § 1983 cases. The doctrine arose in the antitrust context and provides that "an agreement between or among agents of the same legal entity, when the agents act in their official capacities, is not an unlawful conspiracy." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017). It arose because the presumption for a conspiracy among agents of a single corporate entity is that

100

the actions of employees are attributed to the corporate principal. But for § 1983 claims that presumption cannot apply because *Monell* holds that actions of municipal employees can never be imputed to their municipal employer. So, applying the doctrine to §1983 claims does not make sense. This is why "district courts have overwhelmingly declined to dismiss conspiracy claims against police officers pursuant to the intracorporate conspiracy doctrine." *Liggins v. City of Chicago*, 2021 WL 2894167, at *5-*6 (N.D. Ill. July 9, 2021).

Moreover, qualified immunity considers whether state actors were on notice that their *conduct* was unlawful according to established law, which it was, not whether prior cases gave notice of a *defense* to a civil claim. *Armstrong v. Daily*, 786 F.3d 529, 556 (7th Cir. 2015) ("The issue is not whether issues concerning the availability of a *remedy* are settled. The qualified immunity defense focuses instead on whether the official defendant's *conduct* violated a clearly established constitutional right."). Accordingly, "[r]ecent uncertainty over the intra-corporate conspiracy doctrine's application to § 1983 cases does not create an opening for qualified immunity on behalf of defendant officers." *Harris v. City of Chicago*, No. 20-CV-4521, 2020 WL 7059445, at *5 (N.D. Ill. Dec. 2, 2020).

Lastly, the intra-corporate conspiracy doctrine applies to conspiracy wholly among members of a single entity, and here Iglesias's conspiracy claims include an agreement between Defendants and private individuals, including Vicente, and so the intra-corporate conspiracy doctrine would not apply in this case, even if there were some argument for its application more generally.

### H.    A Jury Must Decide the State Law Negligence Claim

In their final argument, Defendant Officers assert in a paragraph that Iglesias's Illinois negligence claim that they breached a duty to him and acted willfully and wantonly in so doing

101

must be dismissed because, Defendants say, there is no separate tort of willful and wanton misconduct in Illinois. OB-51. "This argument is a non-starter," courts in this Circuit have recognized, "While there is no independent tort of willful and wanton conduct in Illinois, it is regarded as an aggravated form of negligence and can be pleaded as such by alleging the basic elements of a negligence claim—duty, breach, and causation—as well as 'either a deliberate intention to harm or a conscious disregard for the plaintiff's welfare.'" *Pennington v. Flora Cmty. Unit Sch. Dist. No. 35*, 2023 WL 348320, at *4 (S.D. Ill. Jan. 20, 2023) (quoting *Jane Doe-3 v. McLean Cnty. Unit Dist. No. 5 Bd. of Directors*, 973 N.E.2d 880, 887 (Ill. 2012)); see also *Stevenson v. City of Chicago*, No. 17 CV 4839, 2018 WL 1784142, at *10 (N.D. Ill. Apr. 13, 2018). Similarly, the Seventh Circuit has held: "Under Illinois law, a plaintiff pleading willful and wanton misconduct must establish the same basic elements of a negligence claim, which are the existence of a duty, breach of that duty, and an injury proximately resulting from the breach. A willful and wanton claim has the additional requirement that the breach be not merely negligent, but with conscious disregard for the welfare of the plaintiff." *Doe-2 v. McLean Cnty. Unit Dist. No. 5 Bd. of Directors*, 593 F.3d 507, 514 (7th Cir. 2010) (internal quotations and citations omitted). Iglesias's claim has been recognized by the Illinois Supreme Court and the Seventh Circuit, and Defendant Officers' argument to the contrary should be rejected. Particularly so given that federal pleading rules only require Iglesias to plead facts in his complaint, not legal theories. *Reeves v. Jewel Food Stores*, 759 F.3d 698, 701 (7th Cir. 2014).[19]

Defendants do not argue that Iglesias has failed to create a genuine dispute of fact on any element of this claim. Nonetheless, to succeed on this claim at trial, Iglesias must show that the

---

[19] Iglesias pleaded the claim this way initially because Illinois law might provide a defense to public employees who act with negligence, requiring a heightened showing of "willful and wanton conduct." 745 ILCS 10/2-202.

Officer Defendants owed him duty of care, breached this duty, that this breach caused Iglesias's injuries, and that Defendants either deliberately intended to harm Iglesias or consciously disregarded his welfare. *Stevenson v. City of Chicago*, No. 17 CV 4839, 2018 WL 1784142, at *10 (N.D. Ill. Apr. 13, 2018). For all of the reasons set out above, there are genuine disputes of fact on all of these elements as to each Defendant. See Argument IV(A)-(C) *supra*.

**V.     SUMMARY JUDGMENT IS UNAVAILABLE TO THE CITY OF CHICAGO**

Though the City purports to move for summary judgment on all claims, it does not come close to making a showing that justifies that relief. The City moves for summary judgment on *Monell* claims whose theories are supported by evidence that multiple courts in this District have already determined survive summary judgment, on which federal juries have already found the City liable, after which multiple judges have denied the City's post-trial motions, and the Seventh Circuit in one case has affirmed. *Fields v. Chicago*, No. 10 C 1168, 2017 WL 4553411 (N.D. Ill. Oct. 12, 2017), *affirmed*, 981 F.3d 534 (7th Cir. 2020), *Rivera v. Guevara*, No. 12 C 4428, 2019 WL 13249674 (N.D. Ill. Sept. 20, 2019); *Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1067 (N.D. Ill. 2018); *Washington*, 2022 WL 4599708, at *17. Like in those cases, the City fails to establish its entitlement to summary judgment on those same claims here.

Moreover, although Iglesias's *Monell* claims are supported by extensive evidence separate from and alongside expert reports and testimony, the City's arguments for summary judgment depend nearly entirely on challenges to the experts that Iglesias has disclosed. Not only do those arguments ignore the separate supporting Iglesias's *Monell* claims, but the same types of challenges have already been rejected already by other courts in this District, which have held that juries may consider nearly the exact expert opinions the City seeks to exclude here. *E.g.*, *Fields v. Chicago*, 2017 WL 4553411, at *5; *Rivera*, 2019 WL 13249674, at *3; *Velez v. City of Chicago,*

No. 1:18-CV-08144, 2023 WL 6388231, at \*24 (N.D. Ill. Sept. 30, 2023); *Washington*, 2022 WL 4599708, at \*11.

Indeed, Iglesias's experts do better than what has been deemed admissible in past cases, and their examinations of the City's policies and practices are among the most comprehensive and careful analyses ever produced regarding the Chicago Police Department. The City asks this Court to depart from these sound past court opinions and robust evidence and instead grant the City judgment in advance of trial. This Court should decline that invitation.

The Court should deny the City's motion for summary judgment for at least seven reasons. First, the City does not move for summary judgment on all *Monell* theories against it. Second, as discussed in Iglesias's partial motion for summary judgment, Dkt. 248 at 3-18, the City is precluded from re-litigating Iglesias's *Monell* claim that the City had an official policy of evidence suppression. Third, also discussed in Iglesias's motion, Dkt. 248 at 18-25, the City has no evidence to contest that City policymakers, who were on notice of the need for policies governing the recording and disclosure of investigative materials in homicide cases, promulgated facially deficient written policies, leading to the suppression of evidence.

Fourth, there is ample evidence, even ignoring expert opinions entirely, that would permit a reasonable jury to conclude that the City knew of and was indifferent to a widespread practice of suppressing evidence, which risked *Brady* violations in criminal cases. The central premise of the City's entire motion is that Iglesias's *Monell* claims are based entirely on the reports of Iglesias's retained experts, which is not true. Because the City raises challenges in its brief solely to Iglesias's experts (and only partial challenges to those experts' opinions), it effectively does not challenge the large record of evidence supporting Iglesias's *Monell* claims.

104

Fifth, the parties hotly dispute whether the City failed to train, supervise, and discipline its officers, and promoted a code of silence in the Chicago Police Department, risking violations of citizens' constitutional rights, including in the City's failure to training, supervise, and discipline Guevara, who is responsible for the wrongful convictions of at least 44 individuals.

Sixth, material disputes of fact preclude summary judgment on the City's widespread practice of fabricating witness identifications using unnecessarily suggestive and improperly documented identification procedures in homicide cases, which risked that unreliable identifications would be used in criminal cases.

Seventh, the City's arguments regarding the admissibility of the expert opinions are without merit and do not entitle the City to summary judgment on any theory. Iglesias responds to the City's *Daubert* motions separately, see Dkt. 268 (Mr. Tiderington); Dkt. 269 (Mr. Finnell); Dkt. 271 (Dr. Steblay), and he incorporates those responses here. Many of the City's arguments in its summary judgment motion are copied from its *Daubert* motions.

Throughout its summary judgment motion, the City impermissibly ignores evidence, construes the record in the light favorable to the City, and draws inferences in its favor. When the record is properly construed for Iglesias and inferences are drawn in his favor, it is obvious the City's official policies and customs caused innocent civilians to be framed in homicide investigations where evidence was manufactured and suppressed, witness identifications were fabricated using suggestive identification procedures, and police officers worked untrained and never disciplined, leaving them to violate the rights of countless individuals. The City is responsible for violating Iglesias's rights, and it should not be permitted to sit on the sidelines at trial.

105

### A.     The City Misstates the Legal Framework Governing *Monell* Claims

The City ignores recent Seventh Circuit cases discussing *Monell* liability and provides an incomplete outline of the legal standard governing § 1983 claims against municipalities. CB-3-4 (stating incorrectly that there are three potential avenues to municipal liability).

The *en banc* Seventh Circuit has held recently that municipalities are liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), if the violation of a plaintiff's constitutional rights was caused by: (1) application of an express policy, including a deficient policy that reflects a municipal decision not to adopt or to omit needed policies, *J.K.J. v. Polk County*, 960 F.3d 367, 377-84 (7th Cir. 2020) (*en banc*) (holding a jury correctly found a municipality liable for gaps in a jail sexual assault policy when decisionmakers knew of the risk of sexual assault of detainees); *Glisson v. Ind. Dep't of Corrections*, 849 F.3d 372, 379-81 (2017) ("[I]n situations that call for procedures, rules or regulations, the failure to make policy itself may be actionable."); (2) a widespread custom or practice that pervades to an extent where acquiescence on the part of policymakers is apparent, *id.* at 379 (citing *Monell*, 436 U.S. 690-91); *Davis v. Carter*, 452 F.3d 686, 691-92 (7th Cir. 2006); (3) an action taken by an official who exercises final policymaking authority for the municipality, *Board of Comm'rs v. Brown*, 520 U.S. 397, 403-04 (1997); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986); or (4) a failure to train, supervise, or discipline officers that amounts to deliberate indifference to the rights of individuals with whom they come into contact, *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007); *Sornberger*, 434 F.3d at 1029-30.

"The central question is always whether an official policy, however expressed (and we have no reason to think that the list in *Monell* is exclusive), caused the constitutional deprivation," the Seventh Circuit has explained. *Glisson*, 849 F.3d at 379. "It does not matter if the policy was

duly enacted or written down, nor does it matter if the policy counsels aggressive intervention into a particular matter or a hands-off approach." *Id.*

### B. The City Does Not Move for Summary Judgment On A Number of Iglesias's *Monell* Theories, and So A *Monell* Trial Will Occur No Matter What

The City's motion inexplicably asserts that Iglesias is only pursuing three *Monell* theories, and the City goes on to address only three widespread practice theories regarding evidence suppression, identification procedures, and failure to discipline police officers. CB-1-5 (describing theories); CB-8 (Part II, addressing widespread practice regarding eyewitness identifications); CB-17 (Part III, addressing widespread practice of evidence suppression); CB-37 (Part IV, addressing widespread failure to discipline). The City makes no argument about any other *Monell* theory.

The City thus ignores *Monell* theories at issue in the case. In addition to the theories discussed by the City, Iglesias pursues the following theories, which the City has not addressed:

- The Chicago Police Department's express written policies governing the creation, maintenance, and production of investigative information were deficient (or non-existent) and caused the suppression of exculpatory investigative materials in homicide cases, including in this case. PSOF ¶¶300-355, 358, 361-365, 367-371, 373-391, 408;[20] *see Glisson*, 849 F.3d at 379-80 (holding that a conscious municipal decision not to adopt or to omit needed policies creates liability under the express policy framework of *Monell*); *Calhoun v. Ramsey*, 408 F.3d 375, 379-80 (7th Cir. 2005) (holding that a single application of a deficient express policy resulting in a constitutional violation is enough to establish liability). Iglesias has moved for summary judgment on this theory. Dkt. 248 at 18-25.
- The City's final policymakers, who were on notice of the problem of systemic suppression of investigative materials, chose not to adopt needed policies to ensure transmission of police investigative information in homicide cases, and in so doing made a decision that caused suppression of exculpatory materials in Iglesias's case. PSOF ¶¶300-339, 341-355; *see Vodak v. City of Chicago*, 639 F.3d 738, 747-48 (7th Cir. 2011) (policymakers' decision about how to implement policy gives rise to liability when it violates constitutional rights); *King v. Kramer*, 680 F.3d 1013, 1021 (7th Cir. 2012) (where municipality has "actual or

---

[20] Among other things, the City's express policies authorized individual police investigators to subjectively determine what investigative materials to maintain and turn over; they mandated a system of parallel investigative files in homicide investigations; they were devoid of any requirements governing the CPD's transmission of investigative files to prosecutors and others in the criminal justice system; they did not cover gang crimes officers or other non-detective investigators; and they included no rules binding the CPD's subpoena service unit, which was charged with responding to requests for documents and subpoenas. PSOF ¶¶300, 315-16, 322, 325-330, 334, 336, 339-340.

constructive knowledge that its agents will probably violate constitutional rights, it may not adopt a policy of inaction"); *Steidl v. Gramley*, 151 F.3d 739, 741 (7th Cir. 1998) (final policymaker who is aware of a systematic lapse in policy and who fails to correct it renders municipality liable). Iglesias has moved for summary judgment on this theory as well. Dkt. 248 at 18-25.

- The City failed to adequately train, supervise, and discipline its police officers regarding documentation of investigative information, maintenance of investigative files, production of investigative materials to the criminal justice system, and the documentation of their investigations, PSOF ¶¶300, 355, 387, 514-527;[21] *e.g.*, *Canton v. Harris*, 489 U.S. 378, 390 (1989) (deliberate indifference exists if the "need for more or different training" was "obvious"); *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007) (municipality liable "when the inadequacy in training amounts to deliberate indifference to the rights of the individuals with whom the officers come into contact").[22]

- The Chicago Police Department's express written policies governing the conduct and documentation of identification procedures were deficient (or non-existent) and caused the fabrication of false identifications, suggestive identification procedures, and inaccurate or non-documentation of eyewitness identification procedures. PSOF ¶¶300, 398-415, 528-547, 550; *e.g.*, *Glisson*, 849 F.3d at 379-80; *Calhoun*, 408 F.3d at 379-80.[23]

- The City's final policymakers, who were on notice of the problem of false identifications, suggestive identification procedures, and inaccurate documentation of eyewitness identification procedures, chose not to adopt needed policies to ensure that accurate identification procedures were conducted and fairly reported at the time of the Roman investigation. PSOF ¶¶300, 392-415, 431, 441, 444-45; *see also e.g.*, *Vodak*, 639 F.3d at 747-48; *King*, 680 F.3d at 1021; *Steidl*, 151 F.3d at 741.

- The City is liable for its failure to adequately train, supervise, and discipline its officers to properly conduct identification procedures and to accurately record the results of those identification procedures, PSOF ¶¶300, 355, 402–415, 528-546, 547; *see also, e.g.*, *Canton*, 489 U.S. at 390; *Jenkins*, 487 F.3d at 492.

- The City had notice of and was deliberately indifferent to a widespread practice among its police officers of fabricating false evidence used in criminal cases, and the City failed to train, supervise, and discipline officers who fabricated evidence, which resulted in violations of due process and numerous wrongful convictions. PSOF ¶¶300, 350-53, 431-432, 441, 444, 451-461, 462-471, 474-483, 485-513, 536-546, 547-551; *e.g.*, *Jackson v.*

---

[21] The City had no policies governing supervision of investigative file production; it did not audit its written policies governing the production of investigative materials, which were promulgated after *Jones* and *Palmer*; and it did not provide training on those policies, PSOF ¶¶300, 316, 321, 322, 325-330, 355, 387, 515-527; *Sornberger*, 434 F.3d 1006, 1029-30 (7th Cir. 2006) (holding that municipalities are liable if they knew more supervision was needed).

[22] The City moves for summary judgment on Iglesias's *Monell* theory that the City failed to discipline police officers accused of misconduct generally, but it does not address the separate theories that the City did not provide adequate training, supervision, or discipline on particular subjects relating to homicide investigations.

[23] With respect to its official policies governing eyewitness identification procedures, the City moves on Iglesias's widespread practice theory, CB-8-17, but it does not address his express policy/gap in policy theory, his theory regarding actions of final policymakers, or his theory that the City failed to train, supervise, or discipline on this subject.

108

> *Marion County*, 66 F.3d 151, 156 (7th Cir. 1995); *Davis v. Carter*, 452 F.3d 686, 694 (7th Cir. 2006); *Evans v. City of Chicago*, 2006 WL 463041, at \*13 (N.D. Ill. Jan. 6, 2006).

The fact that the City has not moved for summary judgment on these *Monell* theories means they must be tried. *Carmichael*, 605 F.3d at 460 ("The burden of defeating summary judgment did not shift to the plaintiffs on this issue simply because, without citation to relevant facts or authority . . . defendants sought summary judgment on all claims against all parties."); *Sublett*, 463 F.3d at 736 ("As a general matter, if the moving party does not raise an issue in support of its motion for summary judgment, the nonmoving party is not required to present evidence on that point, and the district court should not rely on that ground in its decision."); *Titran*, 893 F.2d at 148 ("When a party moves for summary judgment on ground A, the opposing party need not address grounds B, C, and so on; the number of potential grounds for (and arguments against) summary judgment may be large, and litigation is costly enough without requiring parties to respond to issues that have not been raised[.]"). Any argument the City might have made regarding these theories are now forfeited, *Thompson v. Boggs*, 33 F.3d 847, 854 (7th Cir. 1994); *Fox v. Peters*, 2011 WL 6378826, at \*8 (N.D. Ill. 2011), and it will be too late for the City to raise arguments for the first time in reply, *Costello*, 651 F.3d at 635; *Nelson v. LaCrosse Cty*, 301 F.3d 820, 836 (7th Cir. 2002).

To the extent the City states at the start of its motion that Iglesias is not pursuing the above *Monell* theories, *e.g.*, CB-4 ("Plaintiff does not identify any express unconstitutional policy and is not claiming that he was directly injured by a person with final policymaking authority."), or implies that the City was not on notice of these theories, CB-1-2 (discussing allegations in Iglesias's complaint), those contentions are without merit. First, these theories have been litigated exhaustively in this case, and Iglesias has explained them in detail in response to discovery

requests. PSOF ¶300.[24] Second, they are discussed at length in the parties' expert reports. PSOF ¶¶356-371, 416-445, 472-512.

Third, the City recently has faced multiple trials and cases involving these *Monell* claims, including in Guevara cases, in which it has briefed the theories and evidence just discussed, including *Fields*, No. 10 C 1168, Dkt. 1184 (response to post-trial motion) at 12-25 (explaining each of these theories); *Rivera*, No. 12 C 4428, Dkt. 735 (response to post-trial motion) at 78-118 (explaining each of these theories); *Rivera*, No. 12 C 4428, Dkt. 321 (response to summary judgment) at 50-53 (explaining each of these theories). The City cannot attempt to obtain summary judgment without addressing *Monell* theories that Iglesias pursues merely by mischaracterizing the nature of Iglesias's claims, and this Court should reject the City's attempt to do so. As the court decided in *Rivera*, 319 F. Supp. 3d at 1056-59, a trial is necessary on these *Monell* theories that the City does not challenge.[25] Given the City's forfeiture, Iglesias does not address these theories further in this response.

### C. The City Is Precluded from Relitigating Its Official Policy of Evidence Suppression

As Iglesias explains in detail in his cross-motion for partial summary judgment, this Court should grant summary judgment to Iglesias because the City is precluded from relitigating Iglesias's *Monell* theory that the City had an official policy of suppressing exculpatory evidence.

---

[24] To the extent that the City cites Iglesias's complaint in its motion, CB-1-2, the Court should disregard those citations. Not only were the claims explored in richer detail in discovery, as discussed, but the Seventh Circuit has repeatedly reminded that legal theories need not be spelled out in a complaint, and the limitation of theories in a complaint is not relevant at summary judgment. *Streckenbach v. Vandensen*, 868 F.3d 594, 596 (7th Cir. 2017) ("Complaints need not plead law or spell out theories of liability.").

[25] Remarkably, in its summary judgment brief in *Rivera*, filed seven years ago, the City made the same argument that Rivera there had not pursued the *Monell* theories that Iglesias sets out above, and Iglesias there responded, as Iglesias does here, that he had pursued those theories in discovery. No. 12 C 4428, Dkt. 321 at 50-53. The Court then ruled that those theories were in play at trial in *Rivera*. 319 F. Supp. 3d at 1056-59. For the City to suggest seven years later that it is still not on notice of these theories in these closely related cases is incredible.

Dkt. 248 at 3-18. Because Iglesias's argument for summary judgment is fully developed in Iglesias's cross-motion, he does not repeat the argument here, but he expressly incorporates the argument. *Id.* Iglesias's statement of facts filed in response to the City's motion for summary judgment includes the same relevant material facts that are included in his statement of facts in support of Iglesias's cross-motion for summary judgment, to comply with Local Rule 56.1(b). PSOF ¶¶300-391.

**D.      The City Does Not and Cannot Challenge Iglesias's *Monell* Theory That City Policymakers Promulgated Policies That Were Deficient to Stop Evidence Suppression**

In addition, as Iglesias also discusses in his cross-motion, the City cannot raise any material dispute of fact that its final policymakers put in place express policies that were facially deficient to stop the suppression of evidence in homicide investigations. Dkt. 248 at 18-25. Again, Iglesias does not repeat the argument justifying the grant of summary judgment to Iglesias on that theory here, but he expressly incorporates the argument. *Id.* Iglesias's statement of facts filed in response to the City's motion for summary judgment includes the same relevant material facts. PSOF ¶¶300-391.

Moreover, as discussed above, the City does not move for summary judgment on Iglesias's express policy and final policymaker *Monell* theories, because it has no evidence permitting it to do so, and thus the City has forfeited any argument for summary judgment on those theories. *See* Argument V(B) *supra*. Accordingly, when this Court disposes of the City's summary judgment motion, there is no need for this Court to address the theory that the City's final policymakers put in place express policies that were facially deficient to stop the suppression of exculpatory evidence in homicide investigations.

**E.**     **A Jury Must Decide the *Monell* Theory Regarding the City's Widespread Practice of Evidence Suppression**

Turning to the arguments the City has preserved, the City contends it is entitled to summary judgment on Iglesias's theory that the Chicago Police Department had a widespread practice of suppressing evidence in homicide investigations. CB-17-37. The City has no hope of summary judgment on this theory.

### 1. The City's False Premise Regarding Expert Evidence

A few preliminary points are important. First, the City's entire summary judgment motion starts from the premise that Iglesias's *Monell* claims depend "entirely upon his expert witness disclosures." CB-1; CB-24-26. As a result, the City discusses only Iglesias's experts' opinions relating to the *Monell* theories that the City addresses.[26] In so doing, the City simply ignores the huge volume of evidence supporting Iglesias's *Monell* theories that are unrelated to expert testimony. The City's litigation decision to ignore evidence means it cannot meet its burden to show that there are no genuine disputes of material fact in the record. *Adickes*, 398 U.S. at 157; 10A WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE §2727. A party cannot assert that a claim is based entirely on a single item of evidence, ignore all other record evidence, and ask a court to grant it summary judgment by attacking the single item of evidence it has identified.

### 2. The City Invokes the Wrong Legal Standard for Widespread Practice Claims

Second, it is important to clarify what sort of pattern must be shown in order to succeed on a *Monell* widespread practice theory. The City wrongly suggests in various places throughout its motion and in its *Daubert* briefing that Iglesias must present evidence of a pattern of repeating

---

[26] As discussed below, the City challenges only a small portion of Iglesias's experts' opinions in its motion, and so even if its false premise were correct, the City would not be entitled to summary judgment.

*constitutional violations* to succeed on this *Monell* theory. The Seventh Circuit rejected exactly this argument when it affirmed the verdict against the City on the evidence-suppression widespread practice theory in *Fields* saying, "We have rejected that narrow interpretation of *Monell* liability." 981 F.3d at 562. The *en banc* court of appeals in *Glisson* reiterated the long-standing rule that a *Monell* plaintiff need only show a repeated pattern of *behavior* that provides notice of a *risk of harm*, and not a repeated pattern of *actual harms* to others, to establish a widespread practice. 849 F.3d at 381-82.

Accordingly, to proceed with a widespread practice theory, Iglesias need only establish a repeated pattern of behavior that provided notice of a risk of harm to which the City did not respond, and not a pattern of constitutional violations. *Daniel v. Cook County*, 833 F.3d 728, 734 (7th Cir. 2016) (custom and notice shown by "evidence tending to show a general pattern of repeated behavior," without "evidence that . . . systemic failings affected other[s]"). So, for example, Iglesias can show a repeating pattern of evidence suppression in homicide cases that provided notice of the risk that exculpatory or impeachment evidence would be suppressed in criminal cases, and he need not show a repeating pattern of *Brady* due process violations. Or he may show a repeating pattern of fabricating identifications using suggestive identification procedures in homicide cases, which provided notice of the risk that unreliable identifications would taint criminal proceedings. Or he may show a repeating pattern of failing to train, supervise, and discipline police officers, which gave notice of the risk that officers would violate the rights of civilians. Ample Seventh Circuit precedent confirms that a plaintiff meets the burden of establishing a widespread practice "by offering competent evidence tending to show a general pattern of repeated *behavior* (*i.e.*, something greater than a mere isolated event)." *Daniel*, 833 F.3d at 734 (7th Cir. 2016) (emphasis added); *see also Dixon v. Cook County*, 819 F.3d 343, 348-49

113

(7th Cir. 2016) (notice of a systemic deficiency and inaction establishes liability); *Thomas v. Cook County*, 604 F.3d 293, 303 (7th Cir. 2010) (policymakers "must have been aware of the risk created by the custom" of delayed responses to medical requests); *Davis*, 452 F.3d at 694-95 (rejecting the same argument the City makes here); *Estate of Moreland v. Dieter*, 395 F.3d 747, 760-61 (7th Cir. 2005) ("[T]he plaintiff need not show that the policy, practice, or custom resulted in past deprivations of rights."). Iglesias proffers record evidence to establish each of these widespread practices.

In addition, the summary judgment record *also* includes evidence of repeating constitutional violations caused by the City's widespread practices of evidence suppression, fabricating identifications with suggestive procedures, and failing to train, supervise, and discipline officers. PSOF ¶¶344-354, 371, 373-391, 451-461, 474, 547-550. So, even applying the City's incorrect legal standard, summary judgment would be inappropriate.

### 3. The City Has Already Lost the Widespread Practice of Evidence Suppression Theory Multiple Times, Which Makes Its Argument for Summary Judgment Frivolous

Third, before diving into the record evidence that precludes summary judgment, it is worth reiterating that the City lost the *Monell* theory regarding its widespread practice of evidence suppression at trial in *Fields* and *Rivera*; the City's post-trial motions were denied; and the Seventh Circuit expressly found in affirming the *Fields* verdict that (1) the City's widespread practice of evidence suppression was well established, (2) City policymakers were on notice of the practice, and (3) there was sufficient evidence to support a verdict against the City on this theory. *Fields*, 981 F.3d at 563. For the City to argue after such rulings that there is insufficient evidence for a trial on the same theory is meritless. Worse yet, the City does not even reference the Seventh Circuit's *Fields* decision in its motion for summary judgment, which is at odds with the City's

114

duty of candor to this Court. *Beam v. IPCO Corp.*, 838 F.2d 242, 249 (7th Cir. 1988). Even if the City were not precluded from relitigating its policy of evidence suppression, *see* Argument V(C) *supra*, these past verdicts affirmed by the Seventh Circuit make its argument for summary judgment frivolous.

### 4. Non-Expert Evidence Establishing the City's Evidence Suppression Practice

Setting aside Iglesias's expert opinions for the moment, there is a huge volume of evidence in the record supporting Iglesias's claim that the City had a widespread practice of evidence suppression, including:

- Starting in at least 1982, City policymakers, including the Chicago Police Superintendent, received notice in the lawsuits *Jones v. Chicago*, 87 C 2536 (N.D. Ill.) (see also *Jones*, 856 F.3d at 996), and *Palmer v. City of Chicago*, 82 C 2349 (N.D. Ill.), that the City had a citywide problem creating, maintaining, and producing investigative information in homicide investigations, which resulted in the suppression of investigative materials and violations of due process, PSOF ¶¶301-304, 307-309, 312; *see also Fields*, 981 F.3d at 563 (concluding that *Palmer* and *Jones* establish the City was aware that the failure to ensure production of evidence in police investigations "presented a constitutional problem");[27]
- James Hickey, the City's designated Rule 30(b)(6) witness on this topic, testified, among other things, that (a) in light of *Palmer* and *Jones*, City policymakers knew that they had an evidence suppression problem, (b) he reviewed evidence disclosure practices across the department prior to 1983 and determined that the problem was citywide, (c) the problem

---

[27] The City engages in a long, largely revisionist history regarding the *Jones* and *Palmer* litigation and the policies it promulgated in response. CB-18-23. This discussion is largely irrelevant to the fact disputes at summary judgment. Particularly so given that the Seventh Circuit has already concluded in *Fields* that *Jones* and *Palmer* provided the City notice of a widespread practice that risked constitutional harm, and that its practice of evidence suppression continued after that time. 981 F.3d at 563. Moreover, the City's discussion plainly does not construe the facts in the light most favorable to Iglesias, which is required at this stage.

To the extent, however, that the City is suggesting that the *Jones* and *Palmer* cases are themselves ultimately not evidence of a widespread practice of evidence suppression, that is not correct. *Jones* involved the suppression of critical exculpatory information and resulted in a large damages verdict approved by the Seventh Circuit. 856 F.2d 985. *Palmer* caused numerous City policymakers to take notice of a widespread problem of evidence suppression, *according to the testimony of those City policymakers themselves*, PSOF ¶¶301, 307-312, and the City's pronouncement that none of the *Palmer* files revealed exculpatory information is undermined by the fact that those files were never analyzed in a systematic fashion, PSOF ¶304. As the Seventh Circuit noted in *Jones*, the *Palmer* litigation was resolved "without a formal ruling on the lawfulness of the practice," thought the Court in *Jones* concluded that the record supported that the practice was in place and that "[t]he City sensibly does not attempt to defend such behavior in this court." *Jones*, 856 F.3d at 995-96.

115

stemmed from a citywide practice of using a "decentralized" file system for homicide investigations, whereby investigative steps were being documented in informal notes and internal to-from memoranda between investigators, all of which were treated as the personal property of the investigators and were stored in parallel files; and (d) entire branches of an investigation, including investigation into alternate suspects, were not getting documented in official reports, and were instead written in memos and notes that were not disclosed and were eventually destroyed, PSOF ¶¶305-309;

- City officials were aware of substantial resistance within the Police Department to any change in policies requiring disclosure of information or the practice of keeping parallel, "personal" files not available to the criminal justice system, and they were aware of the risk of wrongful prosecutions and convictions if the evidence suppression problem was not solved, PSOF ¶¶310-312;

- Detective Division Special Orders 83-1 (effective February 3, 1983), 83-2 (effective May 2, 1983), and 86-3 (effective May 29, 1986) were put in place in response to the problem and required that detectives keep notes and memoranda on a new official form called a "General Progress Report" and preserve them in a new "Investigative File" kept in the Detective Area. PSOF ¶¶319-320, 323-324, 326-27. But the written policies had facial deficiencies, including: (1) they left to the discretion of detectives what information to record in the Chicago Police Department's official files, based on detectives' own subjective determinations, PSOF ¶¶322, 325, 328-330, 338; (2) the policies did not include any instruction to disclose to prosecutors and criminal defendants investigative information, and they did not require the disclosure of the newly created "investigative files," PSOF ¶¶322, 325, 328-330, 334, 336, 339; (3) they allowed for the continued use of a decentralized, parallel file system in which investigative information was kept in different places, perpetuating the risk that material would not be gathered from all of those locations, PSOF ¶¶322, 325, 328-329, 335-336; (4) they failed to cover gang crimes officers and other non-detective investigators participating in homicide investigations, meaning there was no change in rules when it came to investigative information gathered by these individuals, PSOF ¶¶ 322, 325, 328-329, 337, 525; (5) they did nothing to ensure that the Chicago Police Department subpoena service unit (charged with responding to subpoenas from the criminal justice system for investigative information), the Detective Divisions, or anyone else in the Chicago Police Department actually produced to the criminal justice system all of the different investigative information created by the Chicago Police Department during an investigation, PSOF ¶¶322, 325, 328-330, 334-336, 339;

- Judge Shadur in *Palmer* identified many of these specific problems in the paragraph above as problems in need of a solution, PSOF ¶¶318, 322, and despite those findings, City policymakers decided to leave these particular gaps in Chicago Police Department written policies, PSOF ¶¶331-341;

- City policymakers and designees in charge of this policy-making concede that the Special Orders the City implemented did not address Judge Shadur's concerns, including the continued use of parallel files, the lack of any guidance as to what constituted relevant information that needed to be documented, the lack of any guidance to the subpoena service unit about what to gather in response to document requests from prosecutors and criminal defendants, and most fundamentally the lack of any directive to produce all investigative information contained in police investigative files, and they conceded that the policies they

116

promulgated were insufficient to overcome a problem as entrenched as the Chicago Police Department's evidence suppression policy. PSOF ¶¶335-341, 519-525;

- The City did not audit the effect of the new policies or take any steps to monitor compliance with the new policies. PSOF ¶331-333, 387, 514-515, 518-520, 523-526;
- The City acknowledges that its continued system of having multiple parallel files instead of a centralized file, coupled with the lack of instruction or directive ordering or ensuring that the entire contents of the investigative files be produced, left detectives and subpoena personnel confused about their disclosure obligations, PSOF ¶336;
- The Defendant officers in this case testified almost uniformly that they had no knowledge of the requirements of the post-*Palmer* Special Orders, received no training on the Special Orders or on the obligation to preserve notes or disclose exculpatory information, and continued to keep unofficial, personal notes that they destroyed, PSOF ¶355;
- The Chicago Police Department suppressed evidence in the case of Nathson Fields, who was convicted of the 1984 double murder and eventually re-tried and acquitted in 2009, a case in which civil discovery revealed a street file—sitting among hundreds of other files in a file cabinet at Area Central—of over a hundred pages of handwritten notes, memos, and other documents identifying multiple alternate suspects and potential leads demonstrating that Fields was innocent, PSOF ¶344-348;
- Ample evidence from the 2016 *Fields* trial, in which a jury found that the failure to disclose evidence to Fields was the result of a pattern and practice of the Chicago Police Department and awarded Mr. Fields compensatory damages of $22 million, including (a) dozens of other street files in the Area Central basement, including the cases of Jon Fulton, Timothy Malone, and James Crockett, (b) the testimony of Defendant officers in that case about the continued use of informal notes and memoranda and a lack of training on the new Special Orders, and (c) the testimony of the City's defense experts, supporting the conclusion that the street files practice continued, PSOF ¶¶348, 374-377;
- The Chicago Police Department suppressed evidence in the case of James Kluppelberg, who was convicted for a 1984 fire that killed six people and later exonerated, a case in which civil discovery in 2014 revealed a newly-discovered file from the original investigation that contained numerous handwritten notes and memoranda, including a memo between detectives about an alternate suspect who was intoxicated at the time and had started a fire in a building nearby just hours before the fire for which Kluppelberg was convicted, PSOF ¶349;
- The Chicago Police Department suppressed evidence in the case of Jacques Rivera, another Guevara case, including an August 27 GPR containing the critical first memorialization of the sole eyewitness's account that put the witness further away from the scene of the crime than police reports documented; an August 27 GPR regarding the same witness that contradicted Defendants' story about an identification procedure that happened on that date; Guevara falsely claimed that the shooting victim had identified Rivera as the shooter before he died, but suppressed that the victim was in a medically induced coma at the supposed time of the identification. PSOF ¶¶350-353. The City's Rule 30(b)(6) designee Hickey admitted that all of these documents should have been disclosed. PSOF ¶350.
- Ample evidence from the 2018 *Rivera* trial, in which a jury found that the failure to disclose evidence to Mr. Rivera was the result of a pattern and practice of the Chicago Police Department and awarded Mr. Rivera compensatory damages of $17 million, supported that the City had a pattern and practice of evidence suppression. For instance:

117

o Rivera's expert, Michael Brasfield, testified that the City's written policies were plainly deficient because they retained the decentralized record-keeping system that perpetuated the system of multiple, unofficial parallel files that were at the heart of the *Jones* and *Palmer* litigation, did not cover gang crimes units and other investigators involved in homicide investigations, did not define what investigative information had to be documented in reports, and did not contain instructions to ensure that the investigative file and each of the various other parallel sources of police documents were searched for and produced in response to criminal court subpoenas. PSOF ¶352, 381-382;

o Brasfield conducted an analysis of 435 CPD Area Five homicide files for the years 1985 to 1991, and his analysis of the data revealed that, in 61% of the cases, the requirement to create GPRs was not being complied with, in 37% of the cases the rule requiring inventories was disregarded, and in 92% of the cases documents contained in the unofficial investigative files were not making it to the criminal justice system. A full 100% of the files contained evidence of failures to follow the post-Palmer policies. PSOF ¶383;

o Defendants' expert, Bernard Murray, chose not to conduct his own corresponding review to see if the practices changed after the new policies were enacted, and so Brasfield's testimony on these issues was unrebutted. PSOF ¶383;

o Brasfield also testified that his review of the City's permanent retention files revealed that the problems identified in *Jones* and *Palmer* persisted, as the CPD permanent retention files he reviewed only told the single branch of the story that let from crime to charged suspect, in effect excluding alternate suspects, different witnesses, and other types of materials a criminal defendant would need to build a defense. Defendants' expert, Bernard Murray, failed to rebut this testimony. PSOF ¶384;

o Brasfield also compared investigative files to their corresponding criminal defense files and determined that materials from the investigative file were missing from more than 90% of the defense files, and 74% were missing police notes, the sort of crucial material that had been the subject of *Jones* and *Palmer*. Only 8% included the inventories that were supposed to be disclosed to defense attorneys under the new policies. Brasfield and Murray testified about multiple cases—*e.g.*, Nathson Fields, James Kluppelberg, Samuel Robinson, Demetrius Johnson, David Quinones, Miguel Borrotto, and Curtis Kirkland—in which the withheld materials were the type of important investigative material that by all accounts should have been turned over, and that a jury could deem material. Murray conceded that material missing from criminal defense attorney files was also missing from the prosecutor files, including many of the specific examples above of highly exculpatory material missing from criminal defense files. PSOF ¶385;

o Brasfield's testimony also revealed that Gang Crimes officers were fully involved in homicide investigations, as they were in the Valentin investigation. Gang Crimes officers should have been subject to the rules governing detectives with regard to documenting investigative steps and ensuring that such material was produced to the criminal justice system. But Gang Crimes officers were

118

> permitted to keep their own personal notes in their own set of parallel files. They were exempt from these rules despite the City designee Hickey's recommendation in the early 1980s that gang crimes be included in the new Special Orders. PSOF ¶386;
>
> - o The City's own witness, James Hickey, confirmed in his trial testimony that the CPD was fully aware of its evidence suppression problem, yet did not implement any policy or formal training to ensure disclosure. He confirmed that there was no auditing of detectives following Special Orders, either. PSOF ¶387; and
>
> - o Finally, there was testimony that, as a result of the practice of evidence suppression, Rivera and his criminal attorney never received a number of important documents from the investigative file during the criminal proceedings, although the police department was responsible for ensuring their production. PSOF ¶388.

- After Special Order 86-3 there was no further change in City policy of evidence suppression before the time that Iglesias was wrongly convicted of the Roman murder in 1994. PSOF ¶329, 331, 340-342.
- The City has admitted that its relevant policies were the same from 1983 all the way into the 2000s, PSOF ¶341.
- Consistent with the above, the City of Chicago's own Inspector General issued a report in 2020 finding that the Chicago Police Department's policies related to the documentation, storage/preservation, and disclosure of information learned during homicide investigations remained inadequate, stating, "CPD's records management and production processes are inadequate to meet its constitutional and legal obligations." PSOF ¶ 340.
- The Inspector General issued a follow-up report in 2021, following an inquiry into the status of corrective actions taken by the City of Chicago in response to its 2020 recommendations. In that report, the Inspector General concluded that "CPD has yet to implement most of the improvements to which it committed. Specifically, CPD has yet to conduct a comprehensive staffing and resource analysis, develop and implement standard operating procedures for the management and production of records, or develop necessary trainings." In particular, it found that the CPD "cannot ensure that it identifies and produces all relevant records in its possession as required." Without making these improvements, the Inspector General's follow-up report concluded that "Not having made these improvements, CPD is now—just as it was when OIG published its 2020 report—unable to ensure that it can meet legal and constitutional *obligations* which are at the core of its function as a law enforcement agency. This is an area of very serious risk for CPD and for the City." PSOF ¶340.

Accordingly, even if this Court ignores the evidence relating to Iglesias's retained experts, the summary judgment record establishes disputes of material fact that preclude summary judgment for the City on Iglesias's *Monell* theory that the City had a widespread practice of

119

evidence suppression. As a result, the Court need not even address the City's arguments or the

City's *Daubert* motions on this theory to deny the City's summary judgment motion.

### 5. Expert Evidence Demonstrating the City's Evidence Suppression Practice

Expert opinion evidence also supports Iglesias's widespread evidence suppression theory.

At trial, Iglesias will present Mr. Tiderington's expert testimony in support of this *Monell* theory,[28]

including but not limited to opinions that:

- The City's written policies did not solve the evidence suppression problem because they: (a) allowed for the continued use of a decentralized, parallel file system in which investigative material was kept in different places, creating the risk that material would not be gathered from all of those locations; (b) failed to cover gang crimes officers, despite their significant role as investigators in homicide cases, like this one; (c) left too much discretion to detectives about what to document in police files; and (d) did nothing ensure that the subpoena service unit, detective division, or anyone else produced all of the parallel files created for an investigation, PSOF ¶358;
- The Chicago Police Department's efforts to implement the new Special Orders were woefully inadequate, including a failure to provide proper training and oversight to ensure compliance with the Special Orders, PSOF ¶358, 359-371;
- Mr. Tiderington's analysis and findings from the review of 475 homicide files from Area Five for the period 1991-1995 (the five-year period leading up to and through Iglesias's wrongful prosecution), and 344 Area Five investigative files from 1995-1998 revealed that approximately 50% (1991-1995) and approximately 46% (1995-1998) of investigative files he reviewed contained handwritten notes not taken on general progress reports. Tiderington's analysis found many examples where the information on handwritten notes not transferred to official reports was "potentially exculpatory," including handwritten notes containing cryptic notations on a page without any context: a name, phone number, address, etc., where the relevance of the information and its potential inculpatory or exculpatory value is lost without being transcribed into an official report. Relatedly, Tiderington found no handwritten notes or GPRs in the entire investigative file from Guevara or Halvorsen, the lead detectives in this case. In his decades of experience, he was "not aware of a single homicide investigation in which the lead detectives took no notes." PSOF ¶361;

---

[28] As discussed in Iglesias's response to the City's motion to exclude Mr. Tiderington's opinions, Mr. Tiderington is a police practices expert with more than 40 years of experience in law enforcement, including experience as a Police Chief for more than 20 years. Mr. Tiderington has trained more than 10,000 federal, state, and local law enforcement officers on police practices and criminal investigations. Further, in two decades of experience as Police Chief, Tiderington reviewed and approved policy and procedures relating to every aspect of police operations, including criminal investigations, case development, report writing, maintenance and retention of police records, complaints against police officers, training, supervision, and employee discipline. PSOF ¶¶356-357.

- Mr. Tiderington's review of these investigative files revealed that approximately 10% (1991-1995) and approximately 28% (1995-1998) of the files he reviewed contained to-from memos not on official police forms, despite the Special Order's requirements and the City's knowledge of this deficiency, PSOF ¶¶362;
- Mr. Tiderington's review of these investigative files revealed that 24% (1991-1995) and 17% (1995-1998) of total investigative files contained no inventory sheet, which the Special Orders required as a means to ensure disclosure, PSOF ¶¶363;
- Mr. Tiderington's subsequent review of corresponding permanent retention files during both of these time periods routinely lacked an inventory sheet as required by policy, and his comparison of the investigative files and corresponding criminal defense files for the years 1995-1998 demonstrated that important investigative materials were regularly withheld from criminal defendants, as nearly all of the criminal defense files were missing documents contained in the corresponding Chicago Police Department homicide files, PSOF ¶¶364-368;
- Mr. Tiderington's review of opinions regarding police practices expert Michael Brasfield's analysis in *Fields* of 429 Chicago Police Department homicide files, summaries of which were introduced as substantive evidence, which was almost entirely unrebutted, and which showed that the policy of evidence suppression continued, at minimum, from 1983 to 1989, and from 1999 to 2009, across the City of Chicago, in Chicago Police Department Detective Areas One, Two, Three, and Four. PSOF ¶¶360, 369, 346-47;
- Mr. Tiderington's review of opinions regarding Mr. Brasfield's findings in *Fields* that comparison of the Chicago Police Department homicide files to permanent retention files and criminal defense files demonstrated systematic underproduction of key categories of investigative information—approximately 80% of the criminal defense files were missing handwritten notes from the CPD files, 46% were missing general progress reports (on which detectives were to take notes), and 36% were missing inventories. PSOF ¶¶347, 369;
- Mr. Tiderington's review of opinions regarding Mr. Brasfield's unrebutted analysis in *Rivera* of 435 Chicago Police Department homicide files from Area Five, for the years 1985 to 1991, which revealed that, in more than 90% of cases, information in Chicago Police Department files was not produced to prosecutors and criminal defense attorneys in the criminal justice system, and in 100% of cases the written policies promulgated by the City after *Palmer* were not followed. PSOF ¶¶360, 359, 382-383;
- Mr. Tiderington's review of the police homicide files from *Kluppelberg,* as well as the report of Mr. Brasfield in *Kluppelberg* appended to Mr. Tiderington's report, in which Brasfield found that, of the investigative files produced to him (from 1983-1991), there were (1) repeated instances of not using official forms to ensure file integrity, including that there was a widespread practice of disregarding the use of Major Crime Worksheets, Investigative Case File Controls, Supervisory (Chain of Command) Reviews, Detective Division Personnel Forms, and Case Assignment Slips; (2) Material information was repeatedly omitted from official police reports, including 100% of the case files reviewed being replete with examples of handwritten pages and informal memos between detectives containing potentially exculpatory information regarding leads for other avenues of investigation, as well as names or descriptions of possible alternative suspects, additional witnesses, and possible alibi witnesses; (3) incomplete investigative files; (4) permanent retention files containing limited information; and (5) incomplete inventories or no indication that inventories were sent to Records Divisions. PSOF ¶360, 370;

121

- These assessments of the City's homicide files demonstrate that the evidence suppression practice as it existed prior to the 1980s Special Orders continued unabated. PSOF ¶¶358-371; and
- Mr. Tiderington also identified specific examples of files where investigative materials contained in the City's homicide files were missing from the criminal defense files, were potentially exculpatory information of significant investigative value, and should have been disclosed under standard police procedures, including:; (1) RD # 687989 (Defendant Kim Mathis); (2) RD #Z475236 (Defendant Ardell Clemons); (3) RD #B442532 (Defendant Oscar Soto); (4) RD #A403252 (Defendant Guy Rainey); and (5) RD #P272087 (Defendant Demetrius Johnson). For each of the eight cases, Tiderington reviewed corresponding State's Attorney's Office files. In each, the police documents were withheld, were of potential exculpatory value, and were not given to prosecutors, PSOF ¶ 367.

All of the record evidence above amply supports Iglesias's *Monell* theory that the City was indifferent to a widespread practice of suppressing evidence in the relevant time frame, and summary judgment should be denied.

### 6. The City's Arguments for Summary Judgment on the File Suppression *Monell* Theory Lack Merit

The City's arguments for summary judgment on this theory lack merit. First, the City argues that Iglesias cannot show that its widespread practice of evidence suppression caused the suppression of evidence that occurred in Iglesias's criminal case. CB-24-26. Second, the City contends that Iglesias's *Monell* theory is based entirely on Mr. Tiderington's expert opinions, and that those opinions do not establish a practice of suppressing exculpatory evidence, largely repeating the arguments the City makes in its *Daubert* motion. CB-25-37. Neither argument has merit.

### (a) The City's Causation-Related Arguments Lack Merit

The City's first argument is difficult to follow. To the extent the City is suggesting Iglesias has not shown a genuine dispute that material exculpatory or impeachment evidence was suppressed in Iglesias's criminal case, that argument fails for the same reasons the Defendant

122

Officers' arguments for summary judgment on the evidence suppression theories failed. *See* Argument IV(B) *supra*.

To the extent the City is arguing it did not have a widespread practice of suppressing the *particular kinds* of evidence in the *particular way* they were suppressed in Iglesias's criminal case, that argument depends on construing facts and inferences for the City, which is not permissible. Moreover, the argument understands Seventh Circuit case law governing widespread practice claims too narrowly, and it also construes Iglesias's theory too narrowly.

Iglesias's theory is that the Chicago Police Department had a widespread practice of suppressing evidence. Naturally, in any given homicide case, the types of evidence suppressed, and the mechanisms of evidence suppression, may vary.[29] Regardless of how any one suppression of evidence occurred, that evidence was suppressed across homicide cases establishes an actionable widespread practice. In other words, *Monell* liability does not require Iglesias to show a widespread practice of suppressing the particular types of evidence that were ultimately suppressed in his case in the precise way they were suppressed in his case. Instead, the Seventh Circuit has been clear that a plaintiff meets the burden of establishing a widespread practice "by offering competent evidence tending to show a general pattern of repeated behavior (*i.e.*, something greater than a mere isolated event)." *Daniel*, 833 F.3d at 734; *see also King*, 680 F.3d

---

[29] A variety of overlapping mechanisms caused the suppression of investigative information in Chicago homicide cases including: detectives were permitted to decide subjectively what evidence was documented in reports and in official files; there were no policies requiring the disclosure of evidence, governing what had to be kept in official files, or dictating how to respond to requests for investigative files; there were no policies governing non-detectives; there was a decentralized file system, which allowed for parallel files; the written policies that did exist were not followed; notes were not retained or included in files; and officers intentionally did not turn over to the criminal justice system material evidence they learned during their investigations. Different combinations of these mechanisms caused the suppression of different items of evidence in different homicide investigations during the relevant time period. The fact that there were different mechanisms of suppression does not dilute that the City had a widespread practice of suppressing evidence in homicide investigations.

at 1020-21 (widespread practice of delaying medical care through different mechanisms sufficient to proceed on *Monell* claim where plaintiff was denied needed medication). Iglesias has made such a showing.

To the extent the City is arguing that Iglesias cannot show that its widespread practice of evidence suppression caused the suppression of evidence in his particular case, that causation question must be resolved by a jury. "As long as the causal link is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury." *LaPorta v. City of Chicago*, 277 F. Supp. 3d 969, 991 (N.D. Ill. 2017); *see also Blasius v. Angel Auto., Inc.*, 839 F.3d 639, 648 (7th Cir. 2016) (holding that at summary judgment "a plaintiff need only produce evidence sufficient to *potentially* persuade *any* reasonable jury"). If the jury believes that the evidence above establishes that the City had a widespread practice of evidence suppression in homicide cases, it could easily decide that the practice caused the suppression of evidence in Iglesias's case.

### (b) The City's Arguments Challenging Mr. Tiderington Lack Merit

The City next argues that Iglesias's widespread practice evidence suppression theory depends entirely on Mr. Tiderington's expert opinions, and that those opinions do not establish a widespread practice. CB-26-37. The argument suffers a number of flaws, each of which represents an independently sufficient reason to reject it.

First, the City is simply wrong that the only thing supporting this *Monell* theory is expert opinion evidence. The City ignores the volume of evidence, outlined above, that has nothing to do with Mr. Tiderington and that by itself is sufficient to create genuine disputes of material fact for trial. *See* Argument V(E)(4) *supra*. Iglesias has pointed to hundreds of pages of documents, policies, testimony from Rule 30(b)(6) witnesses, prior litigation of the same theory in federal

124

cases, testimony from Defendant Officers, suppressions of exculpatory evidence in other homicide cases (including Guevara cases), and more. This evidence alone justifies denying summary judgment, without any need for the Court to adjudicate Iglesias's reliance on expert testimony. This Court should so find, which will eliminate the need for the Court to weigh in on Defendants' *Daubert* motion regarding Mr. Tiderington at this stage.

Second, even supposing Mr. Tiderington's report was the only evidence supporting this theory, the City's challenges to his opinions and methodology lack merit. CB-26-37. In its summary judgment motion, the City repeats arguments it makes in its *Daubert* motion. *Compare* CB-26-37, *with* Dkt. 252 at 9-12, 16-24. For the same reasons this Court should reject the City's motion to limit Mr. Tiderington's testimony, set forth in Iglesias's response to that motion, Dkt. 268, this Court should reject the City's repeated arguments regarding Mr. Tiderington in its summary judgment motions. As set forth in Iglesias's response to the City's *Daubert* motion, Mr. Tiderington's *Monell* opinions are laid out in detail over 38 pages of his report. They are amply supported by his review of thousands of pages of police files, policies, deposition testimony, and other records. The City does not challenge Mr. Tiderington's qualifications. Nor does it provide any meaningful methodological attack on his opinions. In particular, as discussed in detail in Igleisas's *Daubert* response, Mr. Tiderington analyzes the deficiencies in the CPD's policies, Dkt. 268 at 3-6, 13-17, 21-22; he appropriately relied on data provided by Iglesias's counsel, which was mechanically coded based on objective criteria and properly spot-checked; and he conducted a robust analysis based on that data that consumed many hours, *id.* at 19-30, 34-36; his analysis is not statistical in nature but instead applies police expertise to observable data, *id.* at 22-27; his analysis does not require intimate familiarity with each different homicide file, *id.* at 27-31; and

125

he has amply supported his opinions that the Chicago Police Department had a practice of failing to document information learned during homicide investigations, *id.* at 13-19, 36-39.[30]

Moreover, the City argues in its motion for summary judgment, as it did in its *Daubert* motion, that Mr. Tiderington's opinions are not reliable because he compared what was in Area Five homicide files to the materials contained in criminal defense files for the same cases, rather than to materials contained in the Cook County State's Attorney's files. CB-32-35. Iglesias has provided a response to that argument in his response to the *Daubert* motion. Dkt. 268 at 31-34. There are several problems with the City's argument. First, the City is simply raising a fact dispute about whether investigative information in the Area Five files was disclosed to prosecutors and criminal defendants, which is inappropriate at this stage of the case. To the extent the City believes that it has evidence that investigative information was disclosed to prosecutors, it can present that evidence, and it may defeat the theory at trial on that basis. But that does not mean that the absence of investigative information in the files of criminal defendants is irrelevant, such that Mr. Tiderington's opinions based on the file comparison can be disregarded. If the Area Five files contained investigative information that the criminal defendants did not receive, that is certainly probative of the City's widespread practice of evidence suppression. The parties' factual dispute is for a jury to resolve.

Second, the City's argument is entirely hypothetical. The City has not developed any evidence—and it points the Court to no evidence—that supports the conclusion that the State's

---

[30] The City also cites cases that generally stand for the proposition that an officer's violation of police policy is not always relevant to showing that the officer committed a constitutional violation in a particular case. CB-30 (citing *Thompson v. City of Chicago*, 472 F.3d 444, 454 (7th Cir. 2006)). Those cases have no application here. Iglesias is not arguing that an officer's violation of policy shows that his constitutional rights were violated. Instead, he will prove at trial that the Chicago Police Department's failure to implement its own policies in a way that would have stopped a widespread practice of evidence suppression, and the continued persistence of that widespread practice, caused the violation of Iglesias's constitutional rights. That is the proof that *Monell* requires.

126

Attorney's files contained any of the investigative information that Mr. Tiderington found in Area Five files but not in criminal defense files. The City cannot hypothesize that perhaps information was turned over without proof, and the City has not developed any of that proof. In other words, the City's factual dispute, which is already inappropriate, is based on raw supposition without evidence, which is doubly inappropriate. Moreover, the City's expert examined a small number of State's Attorney's files and conceded that documents identified as missing from criminal defense files were also missing from those prosecutor files, *see* PSOF ¶385, corroborating Iglesias's evidence.

Third, nowhere in its brief or *Daubert* motion does the City address the fact that the same opinions, based on the same analysis, of the same types of documents (only for a slightly later time period), were admitted in two prior wrongful conviction cases against the City, *Fields* and *Rivera.* In those two cases, Judge Kennelly and Judge Gottschall, respectively, rejected the same arguments the City makes here and permitted police practices experts to offer these same opinions, juries returned verdicts against the City based on this evidence, and in *Fields* the Seventh Circuit affirmed. In those cases, the City's arguments about file comparisons and every other challenge raised to Mr. Tiderington were left for the juries to consider. The City offers no reason why this Court should not follow suit.

Finally, it is important to note that the City does not even challenge all of Mr. Tiderington's opinions. Many of his opinions would survive even if this Court granted the City's *Daubert* motion entirely. Dkt. 252 at 4, 9-11, 16-19, 20-21, 23-24 (identifying limited portions of Tiderington's opinions implicated by City's arguments)*; see also* Dkt. 268 at 3, 19-22. Accordingly, this Court need not resolve all of the City's challenges to Mr. Tiderington's opinions to deny summary judgment.

**F.**    **A Jury Must Decide the *Monell* Theory Regarding the City's Failure to Train, Supervise, and Discipline Its Police Officers**

A jury must also decide Iglesias's *Monell* theory that the City is liable for failing to train, supervise, and discipline its police officers. CB-37-50. The City asserts again that this opinion is based "entirely on his disclosed disciplinary practices experts, Anthony Finnell, Timothy Knight, and Miroslava" CB-38, which again is not correct. As explained below, there is ample record evidence that would permit a reasonable jury to decide that the City failed to train, supervise, and discipline its officers on a City-wide basis, condoned a code of silence that prevented police misconduct from coming to light, and failed to supervise or discipline bad actors, resulting in repeated police misconduct on the part of officers like Guevara, who violated the rights of countless individuals and caused dozens of wrongful convictions for murder.

A failure to train, supervise, or discipline officers provides a basis for municipal liability when the failure amounts to deliberate indifference to the citizens whom the officers encounter. *Harris*, 489 U.S. at 388 (1989); *Hollins v. City of Milwaukee*, 574 F.3d 822, 827 (7th Cir. 2009); *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007). Deliberate indifference exists if the "need for more or different" training, supervision, or discipline was "obvious." *Harris*, 489 U.S. at 390. Proof "can take the form of [](1) failure to provide adequate training in light of foreseeable consequences; or (2) failure to act in response to repeated complaints of constitutional violations by its officers." *Sornberger*, 434 F.3d at 1029-30.

Taking a step back, it is stunning that the City would allow officers like Guevara, Burge, and others to commit brutal misconduct in the Chicago Police Department for decades, without taking any corrective action, and then years later claim an entitlement to summary judgment on the theory that it adequately trained, supervised, and disciplined officers during the time period in which these—and other officers—operated with impunity. The City should not be able to escape

128

accountability for some of the worst police misconduct in U.S. history, which was perpetuated because City policymakers turned a blind eye to its officers, causing the violation of Iglesias's constitutional rights. A jury must resolve this claim.

### 1. Non-Expert and Expert Evidence Supports the Failure to Train, Supervise, and Discipline Theory

Ample evidence supports denying summary judgment on this theory. Iglesias sets out all of that evidence below, but this Court could easily deny summary judgment based on just a few of these items of evidence. Indeed, Judge Kness recently took that approach when denying summary judgment to the City on this theory in a similar case. *Washington*, 2022 WL 4599708, at *16-17 (listing eight items of evidence).

The theory that the City failed to train, supervise, and discipline its police officers is supported by the following record evidence:

- Defendants' misconduct in this case, including their fabrication of witness statements and false evidence, and their failure to disclose evidence to prosecutors, Iglesias, or his attorneys, PSOF ¶¶24-40, 42, 43, 54-72, 86-133, 135-156, 159-70, 195, 199-227, 248.
- The City has a long history of failing to discipline police officers in response to notice of serious misconduct, starting at latest in the Burge era, which predates Iglesias's wrongful conviction:
    - o Starting in 1972 and continuing until 1991, Jon Burge and others who worked for him tortured individuals and fabricated evidence in police investigations, PSOF ¶451;
    - o Superintendent Brzeczek admitted during the Special Prosecutor's investigation that he was aware of that misconduct as early as 1982, PSOF ¶452;
    - o In 1990, the Goldston Report found that command-level Chicago police employees were aware of Burge's and others' sustained police misconduct, identifying 26 OPS and IAD investigations and 50 victims of police misconduct, PSOF ¶¶456-457;
    - o It is undisputed that the City did not discipline officers involved in the beatings and torture outlined in this report, PSOF ¶¶457, 459, 460;
    - o The City did not even fire Burge until 1993, long after the City was aware of his misconduct, and more than a decade after Burge tortured Andrew Wilson, PSOF ¶459;
    - o No other officers were fired for the dozens of cases of alleged torture during the Burge era, and only two others received any form of discipline, PSOF ¶¶460;

129

- o The City no longer disputes that Burge and others committed egregious acts of misconduct between 1972 and 1991, PSOF ¶¶453, 454;
- Unsurprisingly, given the lack of accountability, police misconduct continued without pause in homicide cases following the Burge era:
    - o In 1987, the Illinois Appellate Court reversed the conviction of Melvin Jones for murder based on evidence that officers had fabricated an eyewitness identification against him. PSOF ¶462;
    - o In 1988, the Seventh Circuit upheld a jury verdict in favor of George Jones, who was convicted after CPD detectives suppressed the victim's initial failure to identify him as the suspect and conducted a repeat photo identification procedure which was disclosed without indication that it had been performed before; CPD subsequently disciplined the police whistleblower who brought the misconduct to light, but declined to discipline any of the detectives involved in the investigation,  PSOF ¶463;
    - o In 1989, James Newsome, who had been wrongly convicted of murder, obtained a court order requiring the CPD to run unidentified fingerprints from the murder scene through its fingerprint identification system, and CPD officers hid the results for five years—until in 1994, they revealed that the fingerprints matched another man convicted of murder. This led to the overturning of Newsome's conviction in 1994, and Newsome was subsequently granted a pardon based on innocence in 1995, PSOF ¶464;
    - o In 1993, CPD's head of Internal Affairs Richard Risley learned of serious allegations of criminal misconduct (including hiding evidence related to a homicide) and, instead of pursuing discipline, directly communicated with Miedzianowski about the allegations against him and provided him copies of witness statements and other reports that Miedzianowski was not authorized to have, PSOF ¶465;
    - o In 1993 and 1994, Chicago police officers obtained several purported identifications of Vincent Goldstein as the robber of four grocery stores and arrested him; those identifications were proven false after Mr. Goldstein's alibi was established by his employer and another man confessed, PSOF ¶466;
    - o CPD sergeants, lieutenants, and commanders of detectives widely understood that false identifications could result if photo identification procedures weren't conducted properly, and understood that photo identification procedures could be abused if they were not done correctly, PSOF ¶¶392, 398;
    - o From 1986-1998, the Chicago Police Department conducted no audits into the City's witness identification procedures or practices or patterns of misconduct involving such procedures, PSOF ¶470; and
    - o The City's police officers engaged in a pattern of fabricating evidence starting at minimum in the early 1980s and continuing through the time of Iglesias's conviction, PSOF ¶471.
- The evidence that the City failed to train, supervise and discipline its officers is also evidence in the City's complaint register files (CR files):
    - o Iglesias's experts Finnell and Meza analyzed all of the allegations made in 323 CR files produced by the City, which are all of the CR files relating to detectives

130

assigned to Area Five in the time period between 1989 and 1993, PSOF ¶¶472-475, 478;

o Those CR files contained 2,020 instances of allegations of police misconduct, PSOF ¶¶478;

o They found that 56% of allegations (1,129 out of 2,020) concerned misconduct similar to that in this case—i.e., fabricated statements or evidence, false arrest, improper inventory procedures, planted evidence, threats, verbal abuse, coerced confessions, and excessive force, PSOF ¶¶478;

o The sustained rate for citizen complaints in Chicago was well below the national average, compared to other departments, and reflected a "deeply flawed system of investigation and disciplining serious police misconduct, particularly forms of police misconduct that cause wrongful convictions," PSOF ¶¶488;

o The sustained rate for complaints of fabrication was 6.5% after investigation; 0% for false arrest; and 2.1% for excessive force, PSOF ¶¶479;

o Only 1.1% of the total allegations originating from outside of the Chicago Police Department (21 out of 1,867 allegations) were sustained, much less than other large American municipalities, PSOF ¶¶476, 487;

o The small number of complaints that were sustained in the entire dataset of 2,020 allegations (only 1.6%) disproportionally reflected misconduct relating to procedural misconduct (e.g., inattention to duty, rule violations, improper inventory procedure) or domestic violence, as opposed to abuses against community members while on duty (e.g., fabricated statements, threats, excessive force, false arrest, warrantless search, verbal abuse), PSOF ¶¶486;

o Of the 1,129 allegations concerning the types of misconduct at issue in this case (*e.g.*, fabricated statements, false arrest, coerced confessions, threats, excessive force, improper inventory, and other misconduct), the Chicago Police Department sustained just 23 after investigation and 10 after final review, PSOF ¶¶480; and

o Even where allegations were sustained, officers did not face meaningful discipline, PSOF ¶¶474, 477, 481, 505, 508, 509, 510.

- Based on this evidence, Mr. Finnell and Ms. Meza reached various conclusions, including:

    o Mr. Finnell opines that the City's police officers engaged in a pattern of fabricating evidence starting at minimum in the early 1980s and continuing through the time of Iglesias's conviction, PSOF ¶¶471;

    o He opines that the City had a de facto policy of failing to investigate officers accused of misconduct, and to supervise or discipline officers found to have committed misconduct, PSOF ¶¶474;

    o He opines that the City's mechanisms and rules for investigating misconduct were not consistent with accepted practices as of 1993, PSOF ¶¶474, 487, 490-93, including for the following reasons:

        ▪ General order 93-1 did not permit the investigation of anonymous complaints that were not criminal in nature, PSOF ¶¶490;

        ▪ Officers were not interviewed during investigations, PSOF ¶¶491;

- ▪ There was no mechanism to respond to officers with a high number of complaints (10.7% of officers were responsible for 41.4% of allegations of misconduct), PSOF ¶¶493-494; and
      - ▪ The Chicago Police Department's process for reviewing discipline delayed accountability, PSOF ¶¶492.
    - o He opines that the City of Chicago condoned a code of silence in its police department, where officers were permitted to lie without repercussion, PSOF ¶¶501, 465; and
    - o He opines that the City of Chicago encouraged abuses of power by failing to supervise and discipline officers, PSOF ¶¶502.
- Iglesias has also identified CR files from the Defendants Officers' own disciplinary history in which it was alleged that misconduct similar to this case occurred, and to which the City did not respond:
    - o Guevara, Halvorsen, Gawrys, Riccio, and Biebel were alleged to have engaged in numerous acts of misconduct that mirror those alleged by Iglesias and that demonstrated a risk that they would violated constitutional rights and cause wrongful convictions, PSOF ¶¶498-500, 503-512;
    - o Guevara and Riccio were outliers among their colleagues at Area Five. Defendant Guevara received 30 CRs over his career, Defendant Halvorsen received 9 CRs over his career, Defendant Gawrys received 3 CRs over his career, Defendant Riccio received 16 CRs over his career, and Defendant Biebel received 6 CRs over his career, for a total of 64 CRs across all five officers, PSOF ¶¶494, 495, 503;
    - o The 30 citizen complaints against Defendant Guevara involved misconduct including false reports, false arrest, warrantless searches, verbal and physical abuse/excessive force, and fabrication of evidence. In response to those 30 complaints, Guevara was disciplined just three times. Many of the complaints did not result in meaningful investigation. And in two of the three instances where the CRs resulted in a sustained finding, Guevara only received one-day and two-day suspensions. In the third occasion, his discipline was a 20-day suspension, which was imposed only because the complaint was made by a supervisor in the CPD. Further, in all three of the sustained findings, Guevara investigators concluded based on their investigations that Guevara had lied to them. However, Guevara received only (1) modest discipline for one sustained Rule 14 violation against him (CR # 152902) and (2) no Rule 14 violations at all in the other disciplinary investigations where it was found that he demonstrably lied. (e.g. CR #s 223928, 251502), PSOF ¶¶503-506, 510, 547-48;
    - o Out of 9 CRs against Defendant Halvorsen, none were ever sustained against him, PSOF ¶¶503, 507;
    - o Out of 3 CRs against Defendant Gawrys, none were sustained,, PSOF ¶¶503, 508;
    - o Out of 16 CRs against Defendant Riccio, only one CR contained two sustained allegations against him, which resulted in a three-day suspension, PSOF ¶¶503, 509

132

- o Defendants Guevara and Halvorsen received multiple CRs containing similarly themed allegations and patterns throughout their careers, and Guevara and Halvorsen were sued many times based on similarly themed allegations and patterns, including many allegations of fabricating evidence and abusing people, yet none of their supervisors acted as if they noticed a pattern or showed concern for such behavior, PSOF ¶510;
  - o Mr. Finnell and Ms. Meza opine that Guevara took advantage of the broken disciplinary system at the Chicago Police Department, PSOF ¶504;
  - o Mr. Finnell and Ms. Meza further opine that the City's delayed disciplinary practices meant that the Defendants had no reason to fear that they would ever be disciplined for misconduct, PSOF ¶511.
- Mr. Finnell and Ms. Meza opine that the City's promulgation of a culture of impunity is reflected also in civil lawsuits filed against the Defendants for misconduct like that at issue here. At the time of their report, at least 17 civil rights cases had been filed against Defendants Guevara, Halvorsen, Gawrys, Riccio, and Biebel. At least nine had resulted in verdicts and settlements.. PSOF ¶¶512 Since then, at least eleven other lawsuits have been filed against Defendants Guevara, Halvorsen, Gawrys, Riccio, and Biebel. PSOF ¶¶512.
- The City also disregarded Guevara's own pattern of staggering misconduct, which demonstrates that Guevara is the single worst perpetrator of police misconduct in the history of the Chicago Police Department in terms of framing innocent people, even when compared to Jon Burge.
  - Between 1982 and 1998, the City had notice of the pattern of illegal misconduct of Guevara, who physically assaulted, threatened, and/or coerced witnesses, suspects, victims, and defendants, primarily in the process of obtaining false statements. Between 1982 and 1998, Guevara physically assaulted, threatened, and/or coerced individuals, primarily in the process of obtaining false statements, including Annie Turner, Almarie Lloyd, Leshurn Hunt, Graciela Flores, Daniel Pena, Victor Vera, Virgilio Muniz, Virgilio Calderon Muniz (unrelated to the Virgilio Muniz previously referenced), Wilfredo Rosario, David Rivera, Daniel Rodriguez, David Velazquez, Efrain and Ulio Sanchez, Jacqueline Montanez, Eliezar Cruzado, Adolfo Frias-Munoz, Adrian Duta, Santos Flores, Evelyn Diaz, Luis Figueroa, Gloria Ortiz Bordoy, Rodolfo Zaragoza, Maria Rivera, Robert Ruiz, Voytek Dembski, Rosauro Mejia, Adriana Mejia, and Francisco Vicente, and in every case there is no evidence that he received *any* discipline for his misconduct. PSOF ¶¶546, 547, 549.
- In the few instances where allegations of misconduct were sustained, Guevara received disproportionately little—and clearly not meaningful—discipline for his misconduct:
  - o In 1986, Guevara beat Rafael Garcia by grabbing him by the shirt and throwing him against a bar; handcuffing him and striking him in the face several times; throwing him to the floor and kicking him; and throwing him against the wall and hitting him in the head. After the incident was reported, Guevara then denied striking Garcia and throwing him onto the floor, into the wall, and handcuffing him to the wall. The City's disciplinary body found that Guevara had indeed lied about the incident and had given false information to investigators. For that behavior, Guevara was only suspended for two days, PSOF ¶¶546(f);

133

- o Also in 1986, Guevara called Melvin Warren a "n***** dog" and beat him, and the City's disciplinary body initially sustained Warren's allegations and recommended five-day suspension, only to later overturn the suspension and impose a reduced punishment of a reprimand for calling a citizen "n*****." PSOF ¶¶546(h);
- o In 1996, Defendant Guevara was accused of physically striking his stepdaughter in the face. Defendant Guevara again denied all allegations. Although the Command Channel Review and IAD concurred in a sustained finding and recommended three-day discipline in February 1996, Defendant Guevara only served a one-day suspension, and no Rule 14 violation was added despite finding that Guevara provided false information. PSOF ¶¶548(a);
- o Further, in 1999, Defendant Guevara stated "fuck you" to Sergeant David Oravetz; engaged Sergeant Oravetz in an unjustified verbal altercation when Guevara threatened to kick Sergeant Oravetz's ass and pushed and poked Sergeant Oravetz in the chest; and failed to comply with a direct order to leave the district station—all when observed by several on-duty members of CPD. Throughout the OPS investigation, Guevara still denied all allegations against him despite the presence of others and the statements supporting the allegations. The allegations were sustained. Yet, even after the disciplinary history described above and the allegations at hand, a Police Commander still recommended reducing his recommended 30-day suspension by ten days, "considering the circumstances and his complementary and disciplinary history." In 2000, Guevara's discipline was reduced to 20 days, and he was compensated for 10 days of back pay for the suspension he had already served. No Rule 14 violation was added or sustained, despite Guevara making false statements during the investigation. PSOF ¶¶548(b).
- In spite of these sustained incidents of flagrant misconduct, the City made no effort to meaningfully discipline or terminate Guevara in light of this repeated misconduct, despite notice of it. PSOF ¶¶546-549.
- In yet other instances involving subsequent litigation and ultimately resulting in wrongful convictions, there is still no evidence that Guevara was disciplined for his egregious misconduct towards wrongfully convicted individuals, witnesses, and suspects:
  - o In 1988, Defendant Guevara caused 12-year-old Orlando Lopez to falsely identify Jacques Rivera as the person who shot Felix Valentin, and falsely claimed that the victim, Valentin, identified Jacques Rivera as his shooter before he died. Defendant Guevara reported to have obtained this identification at a time when the victim was in a medically induced coma, unresponsive to any stimuli, and laying in a bed that was in constant motion to prevent his lungs from filling with fluid and killing him. As a result of this misconduct, Rivera was convicted. In 2011, Rivera filed a post-conviction petition based on actual innocence and received an evidentiary hearing. In 2011, Lopez testified at an evidentiary hearing that he knew Rivera was the "wrong guy" when he made the identification. As a result, Rivera received a new trial. Ultimately, the State's Attorney dropped all charges and Rivera was granted a certificate of innocence. After Jacques Rivera's exoneration, he brought suit against Defendant Guevara. A federal jury found that Guevara had violated Rivera's

134

civil rights and awarded Rivera $17 million in damages, as well as $175,000 in punitive damages against Defendant Guevara, his partner Steve Gawrys, and his supervisor Ed Mingey. PSOF ¶¶549(a).

o In 1989, Guevara framed Juan Johnson for murder by showing Sam Perez a photo of Johnson before an identification procedure and by telling Perez that he wanted Johnson to take the blame for the murder. . Johnson filed his post-conviction petition in 1996, and appealed its denial in 2001—and in May 2002, the appellate court reversed the denial, vacated his convictions, and remanded for a new trial. At his new trial, Johnson was acquitted by a jury. He sued Guevara in *Johnson v. Guevara*, 05-C-1042, eventually obtaining a verdict against him for $21 million. (See Ex. 81, Jury Verdict in Johnson v. Guevara, 05 C 1042). Guevara took the Fifth in regard to all allegations regarding Juan Johnson. PSOF ¶549(b);

o Johnny Flores was wrongfully convicted of a 1989 murder that he did not commit, a conviction attributable to the misconduct of Defendant Guevara, who fabricated an identification to inculpate Mr. Flores. In 2022, the State asked the Court to vacate his convictions and subsequently dismissed all charges against him. Flores now seeks justice for the harm that Defendant Guevara and other officers caused him in a federal lawsuit. PSOF ¶549(c);

o In 1989, Jaime Rios was wrongfully arrested, charged, and convicted for a murder that he did not commit—a conviction that was ultimately dismissed after evidence was presented showing that a witness had been threatened by Defendant Guevara into implicating Rios. In 2022, the Cook County State's Attorney's Office agreed to dismiss his conviction; within days, he had obtained a certificate of innocence; and he has now filed a federal lawsuit against Guevara and the City of Chicago. PSOF ¶549(d);

o In approximately 1990, former Chicago police detective Bill Dorsch was present when Detective Guevara brought two juveniles to the police station who purported to have witnessed a shooting and recorded the license plate of the shooter's car. While the first juvenile was viewing a photo array, and before he identified any of the photographs, Guevara pointed to the suspect's photo and told the juvenile "that's him." The juvenile then agreed with Guevara, saying that was the person who committed the shooting. (See Ex. 82, Testimony of William Dorsch, *People v. Serrano & Montanez*, 93 CR 1873 at JR-L 076819, JR-L 076824-48). Mr. Dorsch then directed Guevara to leave the room and had the other juvenile view the same photo array—that juvenile was unable to make any identification. (Id.) Subsequently, Dorsch spoke to the two juveniles without Guevara present. The juveniles admitted that they had been paid to falsely claim that the suspect was the shooter. (Id.) Dorsch's supervisors in the CPD knew about Guevara's misconduct in that case, but instead of disciplining Guevara, instead Guevara was promoted. (*Id.* at JR-L 076888-90, JR-L 076906-09, JR-L 076928-32). Guevara has taken the Fifth in regard to all allegations regarding Bill Dorsch's accusations. PSOF ¶546(m);

o In 1990, Defendant Guevara repeatedly beat Jose Maysonet until he confessed to a double homicide that rested solely on that coerced confession. In 2016, Maysonet's double murder conviction was vacated and he was granted a new

135

trial. Over a year later, the Cook County State's Attorney dropped charges against Jose after five retired Chicago police officers, including Defendants Guevara, Halvorsen, and Mingey, invoked their fifth amendment right and refused to testify. Another victim of this same string of misconduct as Maysonet, Alfredo Gonzalez's conviction for the same homicide was vacated in 2022, and both Maysonet and Gonzalez have filed lawsuits against the City of Chicago and Guevara seeking justice for their wrongful convictions. PSOF ¶549(e);

o  In 1991, Defendant Guevara framed Demetrius Johnson for killing Edwin Fred. Guevara suppressed a lineup report documenting that a key eyewitness had identified a different person as the perpetrator in a lineup, and he fabricated a false police report to make it appear as if that identification had never occurred. In addition, to support his case against Johnson, Guevara manipulated and fabricated eyewitness identifications of Johnson as the shooter from witnesses Rosa Burgos, Ricardo Burgos, and Elba Burgos. Johnson was granted a certificate of innocence and has filed a lawsuit against Guevara and other officers for their misconduct. PSOF ¶549(f);

o  In 1991, David Lugo was just 20 years old when he was framed for murder by Defendant Guevara and his fellow officers. In 2022, his conviction was vacated. He has since filed a lawsuit against Guevara and other officers for their misconduct. PSOF ¶549(g);

o  Marilyn Mulero was wrongfully convicted of a 1992 double murder based on evidence fabricated by notoriously corrupt Chicago Police Defendants Guevara and Halvorsen. Marilyn was pressured to enter a guilty plea without a trial and was sentenced to death. In 2022, all charges against her were dropped. She has also filed suit against Defendants Guevara and Halvorsen. PSOF ¶549(h);

o  Madeline Mendoza was arrested in 1992, and convicted in 1993, for a crime she did not commit, based on false statements obtained by Defendants Guevara and Halvorsen. In 2023, the prosecution agreed to vacate Mendoza's conviction and the case was dismissed. PSOF ¶549(i);

o  In 1993, Detective Guevara used physical violence and inducements to coerce Francisco Vicente into falsely testifying against Armando Serrano and Jose Montanez. In that same investigation, Detective Guevara beat Timothy Rankins with a flashlight, threw him out of his chair, and placed him in a chokehold to induce a statement implicating Serrano and Montanez, causing Rankins to testify falsely against the men in the Grand Jury. In 2004, Jose Montanez filed a post-conviction petition based on the recantation affidavit of the State's key witness Vicente, who provided a detailed statement describing how his false testimony was given as a result of threats, intimidation and physical abuse by Det. Reynaldo Guevara. Likewise, in 2005, Armando Serrano filed a post-conviction petition alleging actual innocence based on Vicente's affidavit and multitudes of other affidavits, transcripts, OPS complaints, and other supporting documentation, revealing that Guevara had engaged in a pattern and practice of coercing evidence through the use of threats, intimidation, lies, and physical abuse. The City of Chicago then determined that Montanez and Serrano were wrongfully convicted. In 2016, both men were exonerated and received

136

certificates of innocence. Guevara has taken the Fifth in regard to all allegations regarding Vicente, Rankins, Montanez, and Serrano. Montanez and Serrano's lawsuit against, *inter alia*, Defendants Guevara, Halvorsen, and the City of Chicago was settled for $20.5 million after Defendants' motion for summary judgment was denied as to the plaintiffs' claims of fabricated evidence, pretrial detention, malicious prosecution, federal and state-law conspiracy, Brady claims, IIED, and failure to intervene. PSOF ¶549(j);

o In 1993, Detective Guevara manipulated the results of the line-up in which Mr. Bouto was identified. Specifically, Detective Guevara allowed witnesses to see Mr. Bouto in the police station prior to the line-up, allowed them to view photographs Mr. Bouto and confer with one another before the line-up, and threatened a witness that Guevara would "put a case" on him if he did not cooperate. Ultimately, the City of Chicago investigated Mr. Bouto's claims and concluded that Mr. Bouto is more likely than not innocent. Guevara has taken the Fifth in regard to all allegations regarding Bouto's case. PSOF ¶549(k);

o In 1993, Jose Cruz was arrested and ultimately wrongly convicted of a murder, based on fabricated and coerced statements caused by Defendant Guevara and other officers. In 2022, the prosecution agreed to vacate and dismiss his conviction. In 2023, he obtained a certificate of innocence, and filed a lawsuit against the City of Chicago, Defendant Guevara, and others for his wrongful conviction. PSOF ¶549(m);

o In 1994, Guevara framed Roberto Almodovar and William Negron. In that case, Guevara framed Almodovar for a murder he did not commit by surreptitiously showing his photograph to witnesses before they viewed a lineup and then falsifying reports to make it seem as if the witnesses had picked Almodovar out of a lineup without any influence by Guevara. Almodovar, and his co-defendant Negron, have both since been exonerated. Guevara has taken the Fifth in regard to all allegations regarding the case against Almodovar and Negron, PSOF ¶549(n);

o Nelson Gonzalez was framed with a 1994 murder, resulting from a fabricated identification conducted by Defendant Guevara. In 2022, Gonzalez's convictions were vacated and the case dismissed, and in 2023, he was granted a certificate of innocence. He has also filed suit against Defendant Guevara, among others involved in his wrongful conviction. PSOF ¶549(o);

o In 1994, Defendants Guevara and Halvorsen, among other officers, manufactured false identifications that resulted in the wrongful arrest and conviction of Carlos Andino. In 2021, Andino filed for post-conviction relief, and in 2022, the Cook County State's attorney's office agreed to vacate Andino's conviction. In 2023, he was awarded a certificate of innocence, and filed suit against Guevara and other officers to seek compensation for his wrongful conviction. PSOF ¶549(p);

o In 1995, Defendant Guevara told Jose Melendez to falsely identify Thomas Sierra as the shooter of Noel Andujar, even though Melendez had not seen the shooter and told Defendant Guevara as much. In addition, Defendant Guevara wrote fabricated reports falsely saying that Jose Melendez and Alberto Rodriguez had identified a car as the one used in the Andujar shooting. The

137

state finally dismissed charges against Mr. Sierra in 2019, and Mr. Sierra was granted a Certificate of Innocence in 2022. He spent over 22 years in prison due to Guevara's misconduct and is suing the City of Chicago and defendant officers, including Defendant Guevara, due to that misconduct. PSOF ¶549(l);

o In 1995, Defendant Guevara arrested Edwin Davila and, in an attempt to coerce a confession, chained Davila to the wall of an interrogation room and told him that he was going to frame him for murder. After Davila maintained that he was uninvolved, Guevara forced Davila to participate in a lineup in which two witnesses identified Davila as the perpetrator, despite that each of those witnesses previously told the police that they had not been able to see the shooter. PSOF ¶549(q);

o In 1996, Gamalier Rivera was wrongfully arrested and convicted for murder resulting from fabricated confessions caused by Defendant Guevara and other officers. After years of seeking post-conviction relief, the state dismissed charges against him, and he was granted a certificate of innocence in 2022. As the Court stated, "No amount of money can make up for the lost time, the trauma of being wrongfully imprisoned, and the egregious experience of being wrongfully accused" as a victim of Defendant Guevara's misconduct. Rivera has filed a lawsuit against Guevara and other officers for their misconduct. PSOF ¶549(r);

o Louis Robinson was wrongfully convicted of a 1996 drive-by shooting that killed Kelly Velez, based on coercive identification and fabricated evidence caused by Defendant Guevara. In 2023, his post-conviction petition was granted following an evidentiary hearing, and the State dismissed all charges. PSOF ¶549(s);

o Juan and Rosendo Hernandez were wrongfully convicted of the 1997 shooting of Jorge Gonzalez and collectively spent decades for a crime they did not commit due to the misconduct of Defendant Guevara and other officers, including the disgraced Joseph Miedzianowski, and Halvorsen. In 2022, their convictions were vacated, and they received certificates of innocence in 2023. They have filed a lawsuit against Guevara and other officers for their misconduct. PSOF ¶549(t);

o In 1997, Guevara falsely reported that witness Ruth Antonetty implicated Ariel Gomez in a murder, when she had not done so, PSOF ¶546(bb);

o In 1998, Guevara repeatedly beat Gabriel Solache into giving a false confession, causing Solache to sustain permanent hearing loss. In the same investigation, Guevara repeatedly threatened and beat Arturo Reyes to coerce Reyes into falsely implicating himself. The City subsequently determined that Solache and Reyes were abused during their interrogations and that their convictions should not stand. Guevara has taken the Fifth in regard to all allegations regarding Solache and Reyes, PSOF ¶354;

o John Martinez was wrongfully convicted of a 1998 homicide due to falsified evidence, including fabricated identifications and coercive interrogations, caused by Defendant Guevara and other officers. In 2023, Martinez's conviction was vacated, and less than a month later, his case was dismissed. In 2024, two others involved in this case – Thomas Kelly and Jose Tinajero – also

138

had their wrongful convictions resulting from the same homicide dismissed based on Guevara's misconduct. Martinez has filed a lawsuit against the City of Chicago and Defendant Guevara, seeking justice for his wrongful conviction. PSOF ¶549(u);

o   In 1999, David Gecht and Richard Kwil were both wrongfully convicted of a murder due to Defendants Guevara and Halvorsen's misconduct. During a single night, Defendants Guevara, Halvorsen, and other officers subjected both Gecht and Kwil to torturous investigations, breaking their wills and coercing them into signing false confessions. They also obtained a false confession from Ruben Hernandez, falsely implicating all three in the crime. In 2022, Gecht and Kwil's charges were dismissed, and both were granted certificates of innocence. The charges against Hernandez were also dismissed, and all three have pending lawsuits against Defendants Guevara and Halvorsen, among other officers, and the City of Chicago.  PSOF ¶549(v);

o   Eruby Abrego and Jeremiah Cain were wrongly convicted of the 1999 murder of Jose Garcia and aggravated battery of Julio Lugo, despite having nothing to do with the murder, due to the false identifications, falsified confessions obtained through torture, and other evidence manufactured by Defendants Guevara, Halvorsen, and others. In 2022, their wrongful convictions were vacated and the charges were dismissed. Both now seek justice for the harm that Defendant Guevara and other officers caused him in a federal lawsuit. PSOF ¶549(w);

o   On February 29, 2024, seven men – Jayson Aguiar, who served 20 years, David Kruger, who served 14 years, Juan Molina, who served 12.5 years, Edwin Ortiz, who served 25 years, Oscar Soto, who served 3 years, Victor Vera, who served 19 years, and Tyrece Williams, who served 20 years–filed petitions seeking to reverse their decades-old convictions tied to disgraced former Chicago Police Detective Reynaldo Guevara. The men—who have completed their sentences and are out of custody—all claim their innocence. PSOF ¶549(x);

o   Plaintiff's retained expert Jennifer Dysart opined on the similarities between the cases she has reviewed involving Detective Guevara, which include Rivera, Montanez v. Guevara, et al., Case No. 17-cv-4560, Armando Serrano v. Guevara, et al., Case No. 17-cv-2869, Sierra, Bouto, and Iglesias. She stated that "It seems that a common theme in the Guevara cases I have reviewed  is [for Guevara to] manipulate witnesses who had poor opportunities to view the perpetrator. Most of the cases had several estimator variables factors: a limited opportunity to see the perpetrator, the presence of stress and arousal, the presence of a weapon, and issues with perpetrator descriptions. In summary, the witnesses in these cases were likely vulnerable to suggestion and influence due to the presence of multiple estimator variables that can lead to a weak memory for a perpetrator." PSOF ¶549(y).

●   Finally, in 2001, the FBI authored a 302 report detailing the criminal activity of CPD Officer Joseph Miedzianowski and Guevara in the 1980s and 1990s. The report explains that Guevara would apprehend drug and gun dealers and then allow them to "buy their way out of trouble," and he would take bribes to alter the results of lineups. The FBI report also states that Guevara would receive cash in exchange for the dismissal of murder cases he

investigated. The report contained no indication that Guevara was questioned or that the IAD tried to find the people mentioned as having cases that were fixed by Guevara. Guevara has taken the Fifth in regard to all allegations regarding the topics covered in the 302 report. PSOF ¶¶548(c).

- That same year, in 2001, a perjury investigation was initiated by State Representative William Delgado in response to complaints received from his constituents. Mr. Delgado alleged that Defendants Guevara and Halvorsen gave false testimony in 17 homicide cases ranging from 1984 to 1997, and requested that the State's Attorney's office also investigate the matter to determine possible misconduct on the part of the detectives. The CPD Internal Affairs Division interviewed Delgado, who related that the 17 defendants convicted primarily on the false testimonies of Guevara and Halvorsen stated that "we're tired of busting you on petty crime and we're gonna get you. We'll bust you for murder." Delgado stated that in at least one case it was impossible for Guevara to obtain a detailed statement from the defendant due to Guevara's poor Spanish. Yet the State's Attorney's office closed its separate investigation without providing a report on the complaint, and without reviewing 3 of the 17 cases. However, based on the closure of the case by the State's Attorney's office (without actually seeing that report) and the alleged "fruitless" attempts to contact witnesses regarding the complaint, the CPD closed the case with a finding of "Not Sustained" in 2002. PSOF ¶548(d).

- Indeed, over the two decades the City was continually on notice of Guevara's misconduct as a result of citizen complaints, the perjury investigation, and the FBI's 302 report, the City did nothing to address Guevara's misconduct, even given the City's knowledge that individuals were still wrongfully incarcerated because of Guevara's misconduct, as was obvious from the steady stream of post-conviction innocence petitions filed and granted by victims of Guevara's misconduct. PSOF ¶546-549.

- It was not until 2013 that the City first investigated Guevara, hiring Sidley Austin to conduct a review of a portion of his cases, which found that Guevara had engaged in investigative misconduct including through improper identification procedures, falsifying reports, and physical abuse during interrogations. PSOF ¶550.

- Guevara's invocation of the Fifth Amendment in response to all questions about the City's failure to discipline him after he repeatedly violated individuals' constitutional rights provides additional support for the conclusion that City policymakers were on notice of and indifferent to Guevara's pattern of framing innocent individuals. Indeed, Detective Guevara has refused to testify about his interactions with many individuals, including Anna Flores, Graciela Flores, David Velazquez, Efrain Sanchez, Julio Sanchez, Adolfo Frias Munoz, Jose Melendez, Gabriel Solache, Arturo Reyes, Virgilio Muniz, Luis Figueroa, Angel Diaz, Wilfredo Rosario, Xavier Arcos, Gloria Ortiz Bordoy, Robert Ruiz, Leshurn Hunt, Adrian Duta, Voytek Dembski, Daniel Pena, Annie Turner, Juan Johnson, Francisco Vicente, Timothy Rankins, Jose Montanez, Armando Serrano, Robert Bouto, Roberto Almodovar, William Negron, Jacques Rivera, Orlando Lopez, Armando Serrano, Timothy Rankins, Robert Almodovar, William Negron, Jose Maysonet, Angel Rodriguez, Santos Flores, Henry Johnson, Arturo Reyes, Gabriel Solache, Ariel Gomez, Xavier Arcos, Ricardo Rodriguez, Robert Bouto, Carl Richmond, Rey Lozada, Rosendo Ochoa, Hugo Rodriguez, Jacqueline Grande, Angel Diaz, Luis Figueroa, Sam Perez, Salvador Ortiz, David Colon, Luis Serrano, Evelyn Diaz, Freddy and Concepcion, Aurelio Martinez, Gamalier Rivera, Antonio Diaz, Richardini Lopez, Maria Diaz, Antonio McDowell,

140

Marilyn Mulero, David Gecht, Richard Kwil, Colleen Miller, Ruben Hernandez, Eruby Abrego, Ramon Torrez, Isidro Quinonez, Julio Lugo, Bernard Turner, Melvin Warren, Rafael Garcia, Jossie Martinez, Semara Johnson, Juan and Rosendo Hernandez, Edgar Perez, Johnny Flores, Edwin Davila, Alfredo Gonzalez, Jorge Pacheco, Alberto Rodriguez, Carl Richmond, Demetrius Johnson, Thomas Sierra, and Iglesias. PSOF ¶547, 549.

- Moreover, there is ample record evidence that the City failed to train, supervise and discipline its officers on a wide variety of particular topics important to investigations, including:
    - o Iglesias's expert testimony that the City's homicide files reflect a widespread practice of evidence suppression, fabricated and false identifications, and other departure from policies, showing a lack of training, PSOF ¶¶358-371, 424, 431-441, 444-45, 470-71, 474-502, 517, 526-545;
    - o The City's 30(b)(6) representatives testified that there was no punishment for non-compliance with Special Orders; no auditing or surveying of the implementation of the policies, including no auditing to ensure that documents were produced in response to subpoenas; and that he had no personal knowledge of any training provided to commanders or supervisors to conduct such audits, PSOF ¶¶513, 514, 519-525;
    - o The City's 30(b)(6) representative Winstrom testified that only a three-hour training took place after the initial S.O. 83-1, and that no other training like that occurred throughout the development of the Special Orders; PSOF ¶516, 518;
    - o The City's 30(b)(6) representative Foster testified that detectives were not trained that there were any prohibitions on what they could say to a witness before a lineup procedure or a gang book showing, PSOF ¶532;
    - o Foster testified that no training on identifications or their assistance in homicide investigations was provided to gang crime specialists, despite their involvement in the investigations and identification procedures; PSOF ¶527, 532;
    - o Foster stated that the only training provided to detectives only trained on documenting positive identifications. PSOF ¶533;
    - o Foster agreed that a gang specialist could interview a witness and learn information pertinent to the homicide investigation outside the presence of any detective, and there was no requirement that the specialist had to document that interview. Even if the gang specialist did document pertinent information the specialist acquired, there was no policy requiring that information to get to the Detective Division, or training on the issue. PSOF ¶414.

This evidence is far more than sufficient for a jury to conclude that the City failed to train, supervise, and discipline its officers, condoned a code of silence, and in so doing was deliberately indifferent to the risk that its officers would commit the types of misconduct at issue in this case. The City had notice of rampant misconduct starting with Burge, was indifferent to that misconduct in its non-response, and then continued to permit police officers to commit misconduct with

141

impunity, as shown in the analysis of Chicago's disciplinary files and the repeated misconduct identified above, including Guevara specifically, through and long past the time of Iglesias's wrongful conviction. This failure on the City's part created an environment of lawlessness where repeat bad actors in the Chicago Police Department could violate the rights of citizens, fabricate evidence, coerce witnesses, testify falsely, suppress evidence, and frame innocent individuals for crimes. A reasonable jury could find that the City's broken system encouraged Defendants to repeatedly commit misconduct, and in the case of Guevara and Halvorsen to manufacture the wrongful convictions of dozens of individuals. Despite this misconduct, the City had no meaningful response.

The evidence set out above dramatically exceeds what many courts have decided requires a trial on this particular *Monell* theory. See, *e.g.*, *Sornberger*, 434 F.3d at 1030 (reversing grant of summary judgment to municipality based on evidence that municipality "had a policy of coercing confessions out of female suspects by threatening to have DCFS take away their children," which included experts' report that reviewed other complaints that it had been deliberately indifferent to coercive threats); *Washington*, 2022 WL 4599708, at *16-17.[31]

---

[31] See also, *e.g.*, *Velez v. City of Chicago*, No. 1:18-CV-08144, 2023 WL 6388231, at *25 (N.D. Ill. Sept. 30, 2023) ("A reasonable jury could find a widespread failure to investigate and to discipline caused the Chicago Officers to believe that their alleged misconduct would not be discovered and that, even if discovered, they would not face any effective disciplinary action resulting from such misconduct.") (cleaned up); *Obrycka v. City of Chicago*, 2012 WL 601810, at *8 (N.D. Ill. Feb. 23, 2012) (denying summary judgment on "code of silence" claim where plaintiff submitted police practices expert that opined a "code of silence" existed and a statistical expert report "showing that the Chicago Police Department has statistically significantly lower rates than the national average of sustained rates for police misconduct complaints"); *Marcinczyk v. Plewa*, No. 09 C 1997, 2012 WL 1429448, at *3 (N.D. Ill. Apr. 25, 2012) (denying summary judgment where plaintiff's evidence of City's failure to investigate and discipline officers accused of misconduct included "documentary evidence indicating that only a minuscule percentage of civil rights complaints are found to be meritorious after investigations and that officers who have complaints lodged successfully against them are subject to only minimal discipline"); *Johnson v. City of Chicago*, No. 05 C 6545, 2009 WL 1657547, at *10 (N.D. Ill. June 9, 2009) (denying summary judgment where plaintiff had evidence that City only paid lip service to known problem of failing to investigate and discipline rogue officers); *Garcia v. City of Chicago*, No. 01 C 8945, 2003 WL 1715621, at *6-7 (N.D. Ill.

142

**2. The City's Arguments for Summary Judgment on the Failure to Train, Supervise, and Discipline *Monell* Theory Lack Merit**

**(a) The City's Reiterated Arguments Regarding Mr. Finnell and Ms. Meza Lack Merit and Do Not Justify Summary Judgment**

The City contends that summary judgment should be granted on this theory because of a smattering of challenges that the City mounts to Iglesias's expert, Mr. Finnell and Ms. Meza. CB-38-50. Again, the City's argument starts from the false premise that the failure to train, supervise, and discipline *Monell* theory is based solely on expert opinions, which is not the case, as demonstrated by the record evidence above unrelated to Mr. Finnell's opinions. The City's criticisms of Mr. Finnell are meritless, and they are also not an argument for summary judgment.

Next, the City also uses its summary judgment motion to regurgitate arguments to exclude Mr. Finnell and Ms. Meza that the City has made in its *Daubert* motion. Dkt. 250. The City's criticisms of Mr. Finnell's methodology and opinions on pages 38-41 (arguments regarding methodology of review of CR files), and pages 41-44 (discussing opinions based on CR files) of its motion, CB-38-44, are addressed fully in Iglesias's response to the City's motion to exclude

Mar. 20, 2003) (denying summary judgment to City given evidence of indifference to a pattern of abuse by its officers where plaintiff had expert testimony on the City's investigations of officers accused of misconduct, testimony from IAD investigator, as well as statistics on the sustain rates of investigations of misconduct from 1999 through 2001, concluding that "[a] reasonable jury could infer that the City knew about and acquiesced in a widespread custom tolerating the tacit use of excessive force by its police officers over a substantial period of time."); *Kindle v. City of Harvey*, No. 00 C 6886, 2002 WL 230779, at *4 (N.D. Ill. Feb. 15, 2002) (denying summary judgment on failure to discipline claim were "[p]laintiff's evidence consists of approximately thirty-five City of Harvey files where private citizens filed excessive force complaints and no corrective action was ever taken on any of them. No formal hearings were ever held on these complaints nor is there evidence of any type of independent investigation on the part of the City of Harvey. Some of the complaints lodged against the Harvey police officers involve similar types of brutality, and no evidence of notes being put in officer's personnel files is present."); *Robinson v. City of Harvey*, No. 99 C 3696, 2001 WL 138901, at *7 (N.D. Ill. Feb. 16, 2001) (denying summary judgment where evidence included complaints of officers' use of excessive force were frequently unreviewed and undocumented as well as an expert report that found that the municipality had systemic deficiencies in its administrative investigations of use of force and citizen complaints).

Mr. Finnell and Ms. Meza.[32] Dkt. 269 at 10-11, 13-32, 33-35. As discussed there, courts in this District have found Mr. Finnell's exact opinions criticized by the City here and similar expert opinions to be helpful to juries in cases concerning widespread practices of failing to discipline Chicago police officers. *Velez*, 2023 WL 6388231, at \*24 (finding Mr. Finnell's opinions helpful to the jury and relevant to the claim based on failing to investigate and discipline police misconduct); *Washington*, 2022 WL 4599708 at \*11 (concluding Plaintiff presented sufficient evidence for *Monell* claim based on expert opinion on deficiencies of investigations and discipline); *Marcinczyk*, 2012 WL 1429448, at \*3-4 (concluding plaintiff presented sufficient evidence for Monell claim, including evidence indicating that "minuscule percentage of civil rights complaints are found to be meritorious after investigations and that officers who have complaints lodged successfully against them are subject to only minimal discipline"). Likewise, as discussed in Iglesias's response to the City's motion to exclude these experts, Mr. Finnell's reliance on Ms. Meza's statistical analysis is not grounds to bar Mr. Finnell's opinions; it is expected and appropriate for experts in technical fields to rely on other experts' conclusions, *see Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir. 2002), and *Washington*, 2022 WL 4599708, at \*11 ("[T]here is nothing objectionable about an expert relying on the work of a colleague."), and Defendants cite no case law to support their unsubstantiated position that Ms. Meza is not qualified, particularly in the face of Ms. Meza's substantial experience in both statistics and police accountability that proves the City wrong.

Moreover, the City's arguments that Mr. Finnell's opinions do not establish a widespread practice depend entirely on disputing the correctness of Mr. Finnell's opinions and ignoring all of

---

[32] As discussed in Iglesias's Response to the City's *Daubert* Motion to exclude Mr. Finnell, Dr. Knight, and Ms. Meza, Iglesias has withdrawn Dr. Knight as an expert. *See* Dkt. 269 at 11-12.

the other record evidence set out above. Whether Mr. Finnell's opinions add evidence supporting a widespread practice, like any other dispute of fact, must be saved for trial.

### (b) The City's Argument About Burge Evidence Lacks Merit

The City asserts in a single paragraph that the evidence discussed above relating to Burge and his colleagues' pattern of misconduct and the City's lack of any response to that pattern is irrelevant to this *Monell* theory, suggesting that those things happened too early in time to be relevant. CB-44-45. A paragraph without factual or legal analysis is insufficient to wish away the Burge scandal. *Roe-Midgett v. CC Services*, 512 F.3d 865, 876 (7th Cir. 2008) (undeveloped arguments are forfeited).

Much like *Jones* and *Palmer* in the context of evidence suppression, the Burge evidence demonstrates that City policymakers had direct notice of the problem of systemic abuses of constitutional rights occurring at the hands of officers in the Chicago Police Department, investigated that problem, and received notice in the 1990 Goldston Report that the problem was widespread, that command-level officers knew of it, and that specific corrective action was essential. *Maxwell v. Gilmore*, 37 F. Supp. 2d 1078, 1094 (N.D. Ill. 1999) (noting in 1999 that by then Burge's misconduct was an established pattern and practice); *Fields*, 981 F.3d at 562 (notice can be established in various ways, such as through proof of a prior pattern of similar constitutional violations).

In addition to being relevant to notice, the Burge evidence demonstrates the City's indifference to police misconduct. In response to the notice of Burge's misconduct, the City did nothing. It did not meaningfully investigate any of the cases of misconduct, including those identified in the 1990 Goldstone Report, or discipline the officers involved, and it took no steps to implement new policies or remedial measures. In fact, it was not until 1993—more than a decade

145

after Burge's torture of suspects began, three years after the Goldston report, and two years before Iglesias's ordeal, that Burge was finally fired. In the preceding decade, at a time when Chicago Police Department command staff knew of Burge's misconduct, Burge was *promoted* to Commander. The ultimate firing of Burge was inconsequential, given that it was untimely and came after his promotion and celebration within the department, and it was the only step the City took. The City did not conduct any other investigation, implement policy changes, or impose discipline. The City's utter indifference to the most extremely abusive police misconduct in the ranks of the Chicago Police Department is highly probative of the City's indifference here. *Smith v. City of Chicago*, 143 F. Supp. 3d 741, 753 (N.D. Ill. 2015) ("Proof of deliberate indifference in the context of a failure to train case 'can take the form of either (1) failure to provide adequate training in light of foreseeable consequences; or (2) failure to act in response to repeated complaints of constitutional violations by its officers.'"); PSOF ¶¶451-461.

The City's indifference toward Burge helped to establish the widespread practice of lax or non-existent discipline that continued in full force through the time of Iglesias's wrongful prosecution and conviction. Indeed, had the City responded to Burge, perhaps there would have been no Guevara. It is understandable that the City wishes to ignore the Burge scandal. However, it is highly relevant to Iglesias's claim that the City's failure to train, supervise, and discipline officers spawned egregious patterns of police misconduct, like Guevara's, which caused the violations of Iglesias's rights. PSOF ¶¶451-461, 474-512, 546-549.

### (c) The City's Argument About Lawsuits Against Officers Lacks Merit

The City also asserts that evidence of lawsuits against Chicago police officers is not relevant to Iglesias's *Monell* claims because some lawsuits were filed after Iglesias's wrongful conviction. CB-49-50. To the extent the City is making the narrow argument that lawsuits filed

146

after Iglesias's wrongful conviction did not provide the City *notice* of the misconduct at issue in those lawsuits before Iglesias's wrongful conviction, Iglesias agrees. But even excluding those lawsuits post-dating 1994, there is a tremendous amount of evidence that the City had notice of the problems created by failing to train, supervise, and discipline officers prior to Iglesias's ordeal.

Regardless, putting notice to one side, all of the lawsuits discussed above concerning police misconduct and the City's response to them are highly relevant to the City's practices and its indifference. The Seventh Circuit has held that incidents postdating a particular case are probative of the policies and practices that were in place at the time of the case, and they are evidence of City policymakers' deliberate indifference. *Sherrod v. Berry*, 827 F.2d 195, 205 (7th Cir 1987) ("[S]ubsequent conduct by a municipal policymaker may be used to prove preexisting disposition and policy[.]"); *see also Padilla v. City of Chicago*, 2009 WL 4891943 at *7 (N.D. Ill. Dec. 14, 2009).[33]

### (d) The City's Argument About Complaint Register Files Lacks Merit

Finally, the City argues that the Defendants' CR files themselves, and Mr. Finnell's and Ms. Meza's opinions about them, are not evidence supporting a widespread practice of failure to train, supervise, discipline. CB-46-50. First, the City's argument that Mr. Finnell did not appropriately analyze which CR files should have resulted in sustained findings, CB-29-30, is

---

[33] Similarly, the City argues that a U.S. Department of Justice report documenting the Chicago Police Department's failure to investigate, supervise, and discipline officers who use excessive force is irrelevant to the *Monell* issues in this case because it post-dates the events at issue here. CB-45-46. Again, Iglesias agrees that the report post-dates the events at issue, but as discussed, this post-incident evidence is probative of the lack of disciplinary policies and indifference on the part of the City when it comes to training, supervising, and disciplining its police officers. The fact that the City's indifference, which was deeply entrenched at absolute latest at the start of the 1990s (being generous to the City), continues well into the 21st Century highlights the probative value of this evidence: The City has never cared about proper discipline of police officers, and its indifference continues today. Regardless, the Court need not resolve a question about the admissibility of a single Department of Justice Report at this stage, because the denial of summary judgment to the City in no way turns on that report.

addressed fully in Iglesias's response to the City's motion to exclude Mr. Finnell, Dkt. 269 at 18-20, 23-30, 32-35 (Parts II(B), III(A), III(C), and IV).[34] The same is true of the City's argument challenging the fact that Guevara and Riccio were outliers. See CB-13, 31-32; Dkt. 269 at 30-32, 33-35 (Parts III(C) and IV).

Second, the City arbitrarily limits the Defendants' CR files (saying that Guevara had only five, for example, when he had 30 in total) in an attempt to suggest that those CR files do not support Iglesias's claim that the City failed to discipline officers. CB-47-48. The City's limitation and skewed view of the evidence is again inappropriate at summary judgment. The City will have to make arguments about what the Defendants' citizen complaints and the City's investigation of them show or do not show at trial.

Moreover, the City is wrong about what Defendants' CRs show. Guevara and Riccio received many more complaints than the average officer—Guevara had 30 CRs during his career, and Riccio had 16. PSOF ¶503. All Defendants were accused of fabricating evidence and abusing citizens multiple times. PSOF ¶503, 498-500, 503-510. They were never meaningfully disciplined for these accusations. PSOF ¶¶504-510. Critically, a small proportion (10.7%) of all accused officers in the Chicago Police Department were responsible for 41.4% of the allegations of misconduct in the files reviewed by Finnell, and Defendants Guevara and Riccio—due to the high number of allegations against them—fell into the category of statistical outliers. PSOF ¶494, 495.

Finally, the City makes the nonsensical assertion that focusing too much on a particular officer's pattern of misconduct transforms the City's liability into *respondeat superior* liability.

---

[34] The City cites to *Rivera* in support of this argument, CB-47, but in *Rivera* summary judgment was granted on this theory precisely because there was no expert like Mr. Finnell or Ms. Meza to opine about the City's failure to investigate and respond to complaints across the Chicago Police Department. 319 F. Supp. 3d at 1069-70.

CB-49-50. It does no such thing. *Respondeat superior* would make the City vicariously liable for a particular tort that Guevara, for example, had committed. The argument here is different: Guevara engaged in a pattern of misconduct because the City had no functional disciplinary system and he could act with impunity. That is not *respondeat superior* liability.

In conjunction with all of the record evidence above, a showing that a particular Defendant repeatedly committed misconduct and received complaints without investigation by the City or consequences "*does* present sufficient evidence of *Monell* liability based on a failure to investigate and a failure to discipline specific officers." *Velez*, 2023 WL 6388231, at *24. Again, the Defendants' CR file evidence is just part of the evidence in support of Iglesias's failure to train, supervise, and discipline theory.

### G. A Jury Must Decide the *Monell* Theory Regarding the City's Widespread Practice of Fabricating Witness Identifications Using Suggestive Identification Procedures

Material disputes of fact also preclude summary judgment on Iglesias's theory that the City was indifferent to a widespread practice of Chicago police officers fabricating witness identifications using suggestive identification procedures. In the nine-year period before and after the Roman investigation, an examination of 2,786 identification procedures performed at Area Five between 1989 to 1998 demonstrates that Chicago police officers obtained identifications of their suspects in a staggering and unprecedented 75% of identification procedures that they performed, and identifications of innocent fillers essentially never. These rates represent a dramatic and statistically significant departure from other jurisdictions, and they can only be explained by Chicago police suggestion during identification procedures. In addition, Iglesias has amassed evidence of dozens of individual cases in which Chicago police fabricated identifications for use in criminal proceedings using suggestive tactics. Moreover, City policymakers

149

promulgated deficient written policies, provided no training on proper identification procedures, took no steps to assess whether police identification procedures resulted in false identifications, and never disciplined officers who fabricated identifications. The City was indifferent to this widespread practice of fabricating identifications and the risk it presented that false identifications would taint criminal proceedings, in violation of due process.

### 1. Non-Expert Evidence Supporting the Widespread Practice of Fabricating Identifications

Again, contrary to the City's suggestion, this theory is not based solely on expert testimony. Iglesias offers evidence that long before the 1993 Roman investigation it was common knowledge in law enforcement that a large portion of wrongful convictions were caused by improper eyewitness identification procedures. PSOF ¶¶392-398.[35] The City's Rule 30(b)(6) witness confirmed that the City had notice of model policies that cautioned law enforcement of the risk posed by suggestive identification procedures. PSOF ¶398.

---

[35] Since 1967, the International Association of Chiefs of Police Law Enforcement Policy Center (IACP) has provided training material for law enforcement about the failures in eyewitness identification, writing that "[e]ye-witness identification and description is regarded as a most unreliable form of evidence and causes more miscarriages of justice than any other method of proof. This weakness has long been recognized by the courts" – including the Supreme Court that same year in *United States v. Wade*, 388 U.S. 218 (1967). PSOF ¶¶ 392, 397. By at least 1992, the IACP was releasing papers and model policies that were premised on the inherent unreliability of eyewitness identification procedures. PSOF ¶¶393-97. As the IACP papers in 1993 noted, "Police frequently rely on eyewitness identifications. Unfortunately, civilian eyewitnesses frequently prove to be unreliable observers, and erroneous identifications are often the result. Misidentifications by eyewitnesses are normally the result of a combination of factors." PSOF ¶393. The papers explained the primary reasons that eyewitness identifications were frequently unreliable: frailties of human memory and perception, especially under stress; and the ease with which eyewitnesses could be influenced by suggestion. PSOF ¶394. The 1993 White Paper accompanying the 1992 Model Policy quoted from the Supreme Court's 1967 decision in *United States v. Wade*, stating that "The influence of improper suggestions upon identifying witnesses probably accounts for more miscarriages of justice than any other single factor. Perhaps it is responsible for more such errors than all other factors combined." PSOF ¶397. Thus, long before 1993, police departments have known about the problems with eyewitness identification procedures, and the need for rigorous safeguards to ensure such procedures were being conducted in appropriate cases, and in the appropriate ways. PSOF ¶¶393-397.

Despite this notice, in 1993 and 1994 the City had no written policies whatsoever governing photo identification procedures. PSOF ¶¶402. With respect to live lineups, the City's written policy in effect required a report to be written for live lineups documenting the date, time, location of the lineup, police conducting, persons viewing, persons present, persons participating in lineup, all persons identified, the person photographing lineup, all comments of counsel for arrestee, and any additional information or unusual circumstance occurring during the lineup. PSOF ¶¶399, 403. The policy does not on its face explain what record must be made when suspects are *not* identified in a lineup. PSOF ¶¶405-06.[36] Nor does the policy on its face require reporting of what police conducting lineups said to witnesses or vice versa, or any other circumstances of the identification (other than what an officer considers relevant or unusual in their own discretion). PSOF ¶¶403, 408, 529, 532. Documentation of exculpatory or impeachment information arising from identification procedures was not required by the policy. PSOF ¶408. The policies did not explain what was required before a supervisor approved a lineup report. PSOF ¶407. There was no training to fill these gaps in policy. PSOF ¶¶528-531.

In 1993 and 1994, there was no policy at all governing photo identification procedures. PSOF ¶402. No written policy required a report of photo identification procedures or required specific documentation about such a procedure. PSOF ¶402. No policy or training provided instruction on identifications made as part of gang book procedures—although both detectives and gang specialists used gang books during homicide investigations—and gang specialists were not provided any training relative to their participation in homicide investigations in general. PSOF ¶¶531, 532. No policy prohibited showing a single photo of a suspect or suggesting to a witness

---

[36] The City's Rule 30(b)(6) witnesses have variously testified that filler identifications were not documented, and that filler identifications were documented as negative identifications. PSOF ¶406.

151

who the suspect was during a photo array, or showing the witness a photo of the suspect prior to a live lineup, or repeating identification procedures with the same witnesses and suspects, or providing confirming statements about a suspect before or after an identification procedure. PSOF ¶¶408-410. The only training manuals the City has produced on identification procedures come from 1996, three years after the Roman investigation. PSOF ¶528.

Moreover, the City had the ability to audit the conduct and accuracy of identification procedures, but it did not actually conduct any audits of these identification procedures from at least 1986 to 1998, including the year of Mr. Iglesias's wrongful conviction. It did not track misconduct during identification procedures in any way. It did not ensure that it received notice or took steps to learn of situations where motions to suppress identifications generated by the Chicago Police Department were granted. PSOF ¶¶534-543.

In this absence of policy, training, supervision, and review, Chicago police officers fabricated identifications using suggestive identification procedures that were not properly documented. There is ample evidence in the record that the practice of fabricating identifications using suggestive techniques persisted citywide at the relevant time period.

Iglesias has identified multiple instances in which Guevara or his colleagues procured wrongful convictions and false charges using fabricated identifications, including but not limited to cases involving Robert Brown, Vincent Goldstein, James Newsome, Donald Reynolds, Billy Wardel, Reynaldo Munoz, Virgilio Calderon Muniz, Victor Vera, Xavier Arcos, Wilfredo Rosario, Daniel Rodriguez, David Velazquez, David Lugo (Colon), Santos Flores, Gloria Ortiz Bordoy, Edwin Davila, Luis Serrano, Evlyn Diaz, Angel Diaz, Luis Figueroa, Ricardo Rodriguez, Rodolfo Zaragoza, Angel Gaya, Maria Rivera, Freddy and Concepcion Santiago, Robert Ruiz, Ariel Gomez, Ruth Antonetty, Jaime Rios, Demetrius Johnson, Robert Bouto, Roberto Almodovar,

Thomas Sierra, Jose Melendez, William Negron, Nelson Gonzalez, Carlos Anindo, Gamalier Rivera, Louis Robinson, John Martinez, Eruby Abrego, Jeremiah Cain, Jacques Rivera, Orlando Lopez, Felix Valentin, Juan Johnson, Samuel Perez, Johnny Flores, Marilyn Mulero, Francisco Vicente, Armando Serrano, Jorge Pacheco, Jose Montanez, Juan and Rosendo Hernandez, and Iglesias. PSOF ¶¶546, 548, 549.

### 2. Expert Evidence Supporting the Widespread Practice of Fabricating Identifications

Iglesias also presents compelling expert evidence in support of this widespread practice theory. First, Iglesias's expert Mr. Finnell provides evidence of cases in which identifications were fabricated, including those of James Newsome, George Jones, Melvin Jones, John Willis, Donald Reynolds, Billy Wardell, Robert Brown, Vincent Goldstein, and the murder of Ruben Gonzalez (which, as Finnell notes, is directly intertwined with the investigation that led to Plaintiff's wrongful conviction). PSOF ¶¶462-468, 471. Moreover, the City never introduced accountability systems that would identify and correct incorrect or improper eyewitness identifications and manipulation of witnesses. PSOF ¶¶470, 527-545. In fact, the City's total failure to identify and correct such misconduct in the 1989-1993 complaints of Area Five police misconduct reviewed by Mr. Finnell "indicates that the City's disciplinary system did not provide any meaningful deterrent against misconduct by police officers who sought to fabricate and manipulate live lineup or photo array identifications." PSOF ¶544.

Second, Iglesias's expert Dr. Nancy Steblay provides extremely strong evidence of the City's widespread practice of fabricating identifications using suggestive identification procedures. Dr. Steblay is a leading expert on eyewitness identification.[37] In this case (and other

---

[37] Dr. Nancy Steblay is an expert on topics of social influence, memory, decision-making, and jury decision processes, with specific expertise in eyewitness identification evidence collection procedures. She

153

Guevara cases), Dr. Steblay conducted an exhaustive analysis of data obtained from 2,786 identification procedures (including live lineups and photo arrays) reported in Area Five homicide files produced by the City from the period of 1989 to 1998. PSOF ¶¶418-419; Dkt. 271 at 6. Each lineup was coded using objective criteria to reflect information about each lineup including: the number of witnesses participating, the number of suspects, whether multiple suspects were included, the number of fillers, the total number of individuals in the lineup or array, whether the witnesses were previously familiar with the perpetrator, the total number of possible positive identifications (the number of witnesses viewing the lineup multiplied by the number of suspects), and the number of reported positive, negative, and filler identifications in each procedure.[38] PSOF ¶¶ 419-420.

The data were assembled in a spreadsheet, which contains many tens of thousands of coded variables, across nearly 2,800 lineup procedures. PSOF ¶419. Dr. Steblay participated in the design of the data summary, ensured that the variables were objective and clearly defined, and verified the data.[39] The data was shared with all parties, and Defendants have not identified any

---

has authored over 45 publications, which involve a quantitative method called meta-analysis as well as the analysis of empirical data from the lab and from real witnesses to crime in the field. She has served on the editorial boards of four major scientific journals that publish research on eyewitness identification. PSOF ¶¶416-417.

[38] The task of coding these data based on police reports "borders on the mechanical." *Rivera v. Guevara*, 319 F. Supp. 3d at 1067. Reading a police report and transferring to a spreadsheet what the report says about the criteria just mentioned does not call for any subjective decision making, as Dr. Steblay explains. PSOF ¶421.

[39] Dr. Steblay ensured that the coding team "was using objective and clear definitions for the coding variable." The coding was undertaken by at least two independent coders, who compared their work to catch discrepancies. The coding process did not call for any subject decision making. Dr. Steblay also conducted a robust reliability check, verifying approximately 200 lineups, randomly selected from the court-ordered homicide files produced in this case. She agreed with the coders in 98% of the instances, "strong interrater agreement" that gave her confidence in the quality of the underlying data. PSOF ¶¶420, 421.

154

error in any of the data coded.[40] PSOF ¶423. Indeed, Defendants' expert responding to Dr. Steblay concedes that he does not challenge the data on which Dr. Steblay relies and has not identified any error in that data. PSOF ¶423.

Dr. Steblay observed that between 1989 and 1998, witnesses participating in Chicago procedures picked the police officer's suspect a whopping 75% of the time, made no identification 25% of the time, and selected a filler less than 1% of the time (in only nine instances in the entire dataset). PSOF ¶424. Moreover, 23% of identification procedures included multiple suspects, and 20% concerned a repeat identification procedure with the same suspect and witness. PSOF ¶424. In 74% of identification procedures, the witness did not know the perpetrator prior to the crime, and in 26% the perpetrator was familiar to the witness. PSOF ¶424.

In addition to making these observations, Dr. Steblay compared the results of Chicago identification procedures to 11 major peer-reviewed field studies which report lineup outcome data for live and photo identification procedures conducted by police in actual cases across varied jurisdictions, including Northern California, San Diego, Houston, Tucson, Austin, Charlotte, and London, England. PSOF ¶425. The 11 field studies report the frequencies of lineup outcomes—suspect/positive identifications, filler identifications, and non-identifications—for a total of 6,734 field lineups. PSOF ¶427. The aggregated field studies revealed that witnesses selected a suspect 40.8% of the time, a known-innocent filler 23.7% of the time, and no one 35.5% of the time. [41] PSOF ¶428.

---

[40] In Defendants' *Daubert* motion, Defendants make much of what they assert are errors in the coded data. Dkt. 251. As Iglesias explains in his response, the asserted errors reflect the ongoing quality control measures between Dr. Steblay's analysis in the earlier *Sierra* case—another Guevara case—and her analysis in this case, and regardless are so few in number compared with the total set of coded data that they would have no effect on Dr. Steblay's analysis. Dkt. 271.

[41] The outcomes of each study are collected in Table 1 of Dr. Steblay's report. PSOF ¶425.

Dr. Steblay then compared the Chicago comparison subset of data to the field studies.[42] PSOF ¶¶429-431. She observed that while in the field studies revealed witnesses selected suspects 40.8% of the time, in the Chicago comparison subset, suspects were identified in 70% of lineups. PSOF ¶431. In field studies, witnesses identified no one 35.5% of the time, while in Chicago there was no identification in 30% of cases. PSOF ¶431. And in the field studies, witnesses picked a filler 23.7% of the time, while in Chicago that occurred not even *once*. PSOF ¶431. Dr. Steblay opined that the difference between the field studies and Chicago's high suspect identification rate and low filler identification rate was statistically significant, and that there was less than a 1 in 100,000 chance that the difference could be explained by chance.[43] PSOF ¶432.

Dr. Steblay then analyzed why Chicago has a dramatically higher suspect identification rate and lower filler identification rate than other jurisdictions. Her analysis shows that the only explanation is that suspect identifications are fabricated using suggestive identification procedures. PSOF ¶¶434-441. Dr. Steblay identified all possible explanations for the elevated suspect identification rate in Chicago: (a) familiar perpetrator identifications (where the witness knows the

---

[42] To compare the Chicago data to the field data, Dr. Steblay had to make the two datasets as similar as possible. She determined the field data did not have lineups in which witnesses were already familiar with the perpetrator, multiple-suspect lineups, or lineups with repeated procedures. This determination was "favorable to the defense case" as the presence of unreported multiple-suspect lineups, familiar-suspect identifications, or repeated identifications would potentially inflate suspect ID rates. PSOF ¶427. Therefore, for the comparison, Dr. Steblay screened out from the Chicago data lineups in which witnesses were already familiar with the perpetrator, multiple-suspect lineups, and lineups that were repeated procedures with the same witness viewing the same suspect. In addition, removing these lineups from the Chicago data eliminated lineups more likely to obtain a suspect identification, reducing the suspect identification rate, and therefore giving the City the benefit of the doubt. Dr. Steblay thus limited her comparison analysis to Chicago lineups from unfamiliar-perpetrator, first viewing, single-suspect lineups. PSOF ¶¶427, 429, 430.

[43] These conclusions are consistent with Steblay's findings in other cases, as the *Iglesias* report includes the data provided and used in those other cases and analyzes all lineups conducted at Area Five between 1989 and 1998. She notes in her *Iglesias* report that the Chicago suspect identification rate was consistent across all of the cases for which she had datasets. Indeed, she concluded that the Chicago suspect identification rate as found in *all* of those cases is statistically significantly higher than the aggregate field studies. PSOF ¶¶ 444, 445.

suspect); (b) multiple suspect lineups, including those with too few fillers; (c) repeated identification procedures with the same suspect and witness, and instances in which police show the witness the suspect, in a photo or show-up, prior to the line-up; (d) steering and suggestion where police direct the witness toward the suspect, whether overtly or covertly; (e) a failure to report filler identifications; and (f) biased lineup constructions where the suspect stands out. PSOF ¶434.

Dr. Steblay eliminated explanations (a), (b) and (c) from the Chicago data that she compared to the field studies, as discussed above, *supra* at 158 n.42, and so those could not be the explanation for Chicago's significantly higher suspect identification rate. PSOF ¶435. Explanation (e)—that the City does not report filler identifications—is denied by the City and would violate its policies, and so that explanation can be eliminated.[44] That leaves fabrication of identifications using the improper techniques identified in explanations (d) and (f)—steering and suggestion to witnesses and presenting lineups where the suspect stands out—as the only explanation for Chicago's radically high suspect identification rate. PSOF ¶436.

In sum, the Chicago Police Department's identification procedures between 1989 and 1998 resulted in suspect identifications approximately 75% of the time overall, and 70% of the time in Dr. Steblay's comparison dataset (and almost never filler identifications). PSOF ¶424, 431. This is a remarkably significant departure from the results of identification procedures everywhere else. PSOF ¶¶ 428, 431-433, 441. The only possible explanation for the rate is that Chicago police

---

[44] The theory here is that a total failure to record filler identifications *might* elevate the suspect identification rate because the set of filler identifications that one would expect to exist based on field studies is simply absent from the Chicago data. However, the City has contended that its police officers recorded filler identifications as non-identifications. PSOF ¶406. That fact is disputed, both by the City's own Rule 30(b)(6) witness and by Dr. Steblay. PSOF ¶406, Dkt. 271 at 38 n.6. Moreover, recording filler identifications as non-identifications would itself present a risk of constitutional violations. *Rivera*, 319 F. Supp. 3d at 1067. Regardless, accepting the City's position for purposes of summary judgment only, not recording filler identifications is not the explanation for Chicago's elevated suspect identification rate.

157

systematically fabricated identifications using overtly and covertly suggestive procedures. This comprehensive analysis of all of the lineups conducted in all homicide investigations at Area Five in the relevant time period is confirmed by Iglesias's evidence of dozens of cases in which Guevara and others fabricated identifications for use in criminal proceedings. PSOF ¶¶546, 548, 549. Moreover, these fabricated identifications using suggestive techniques all occurred against the backdrop of City policymakers having notice of a serious risk of false identifications in identification procedures, but responding with deficient policies, training, and supervision on the subject of identification procedures. PSOF ¶¶398, 400, 404-415, 527-545. The jury in this case should hear that a careful analysis of Chicago's homicide files reveals that eyewitnesses in Chicago nearly always pick the police officer's suspect and never select an innocent filler, contrary to eyewitness science and eyewitness behavior everywhere else.

Iglesias has offered far more than enough evidence to establish the City's widespread practice of fabricating identifications using suggestive identification procedures. That widespread practice presented the acute risk that fabricated identifications would be used in and would taint criminal proceedings, in violation of due process. "A city's policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution." *J.K.J.*, 960 F.3d at 378 (cleaned up). And Iglesias presents evidence that, in fact, that risk came to pass, not only in his case, but also in many other homicide cases that were prosecuted based on fabricated identifications.

### 3. The City's Arguments for Summary Judgment on the Fabricated Identification *Monell* Theory Lack Merit

The City's remaining arguments for summary judgment on this theory lack merit. First, the City incorporates the Defendant Officers' argument that § 1983 claims regarding suggestive

158

identification procedures are not cognizable, CB-9-10, which the Court should reject for the reasons discussed already, *see* Argument IV(C)(1)(b) *supra*.

Second, the City contends that its policies and training governing identification procedures were sufficient to stop fabricated identifications. CB-10-11. But that is a theory that depends on rejecting the evidence set out above in favor of a reading of the City's limited policies and training materials that draws unreasonable inferences for the City, which the Court cannot do. *Tolan*, 572 U.S. at 656. Moreover, the City's argument that its policies were sufficient to stop fabricated identifications obtained in suggestive identification procedures runs headfirst into the evidence that those fabricated identifications occurred routinely across all cases, a finding that the City does not meaningfully challenge in this case.

Third, the City again deploys the argument that only expert opinions support this theory, CB-11, which again ignores the other record evidence discussed above. Then, the City goes on to attack Dr. Steblay's expert opinions in summary terms, contending that they do not establish a widespread practice, rely on data prepared by Iglesias's attorneys, and do not identify particular cases in which identifications were fabricated. CB-11-12. These arguments are addressed in rich detail in Iglesias's response to the City's *Daubert* motion to exclude Dr. Steblay, which Iglesias incorporates here. Dkt. 271 at 11-23, 23-31, 33-44.

Fourth, in a long passage the City takes issue with Dr. Steblay's discussion of the possible mechanisms that could cause the City's remarkably high suspect identification rate and absence of filler identifications. CB-13-16. To the extent that the City is challenging the reliability of Dr. Steblay's opinions, Iglesias has responded to these arguments in his *Daubert* response. Dkt. 271 at 11-23. Otherwise, the City is merely disagreeing in its summary judgment motion with conclusions that Dr. Steblay has reached, which is nothing more than an effort to contest the facts

159

at summary judgment, which the City cannot do as the moving party.[45] The City's assertions about the relevance of Dr. Steblay's opinions sets out what appears to be a weak cross-examination of Dr. Steblay for trial. Indeed, the whole section highlights disputes of fact, and there is no argument that the City has thereby established an *absence* of genuine disputes of material fact about whether Dr. Steblay's opinions support Iglesias's widespread practice theory.

Fifth, the City asserts in two paragraphs that Iglesias cannot proceed on this *Monell* theory because his evidence does not create a genuine dispute of material fact about whether the City was on notice and indifferent. CB-16. Not so. A persistent widespread pattern of behavior risking constitutional harm *is itself* notice to the municipality, *e.g.*, *J.K.J.*, 960 F.3d at 383, and the City's Rule 30(b)(6) witness admitted the City was on notice that if proper policies were not followed, it could result in false identifications or misidentifications, and that unduly suggestive identification procedures presented a risk of unreliability and the "abuse" of these processes. PSOF ¶¶398, 400. Yet the City did nothing to institute policies for photographic lineups, gang books, or photo books before Iglesias's prosecution, and did nothing at all to account for situations where identification

---

[45] The City's discussion misstates and mischaracterizes Dr. Steblay's opinions in every respect: The City complains that an expert presenting "possible explanations" for a phenomenon does not create a dispute of fact, CB-13, which is both an inaccurate statement of what experts do and a misapprehension of Dr. Steblay's analysis, which identifies *all* possible explanations for the City's high suspect identification rate, and then explains why some of them cannot explain the high rate. The City also asserts that Iglesias cannot contend that factors such as familiar perpetrators, multiple suspect identifications, and repeated identification procedures with the same suspect and witness caused the City's high identification rate because Dr. Steblay excluded those factors from the lineup dataset. CB-13-14. But Iglesias *agrees* that they were excluded, and the City does not seem to recognize that the exclusion of all of those lineups from the dataset reduced the City's suspect identification rate by only a couple of percentage points, and also eliminated the more benign explanations that the City might have offered to explain the data. In addition, the City says that Dr. Steblay cannot account for whether Chicago lineups were conducted by non-blind administrators, CB-14, leaving out that its policies never called for blind administration of lineups, PSOF ¶404, and leaving out that this factual dispute has no bearing on Dr. Steblay's testimony or conclusions. Finally, the City asserts that some of Dr. Steblay's proffered explanations for the high suspect identification rate are irrelevant to the case—for example the contention that Chicago did not record filler identifications. CB-15-16. As discussed above, Iglesias accepts for purposes of summary judgment that this is not the explanation for the City's high suspect identification rate, but that has no effect on his widespread practice theory.

procedures went wrong, or to address its high rate of suspect identifications, at any time, from long before Iglesias's prosecution to long after his conviction. PSOF ¶¶402-415, 527-545. That is enough to create a dispute of fact about the City's indifference. *J.K.J.*, 960 F.3d at 383.

Finally, the City asserts that Iglesias cannot proceed with a failure to train argument relating to this theory. CB-17. But the City's earliest training manuals produced in this case on the subject of identification procedures are from 1996, PSOF ¶528, which is three years *after* the investigation at issue in this case. The City may contend that it trained its officers before that, but the proof presents a dispute of fact for trial.

At the end of the day, all of the evidence in the record firmly supports Iglesias's *Monell* theory that the City had a widespread practice of fabricating identifications using suggestive identification techniques. Disputes of fact preclude summary judgment for the City.

### H. The City's Remaining Arguments for Summary Judgment on the *Monell* Claims Lack Merit

None of the City's more general arguments for summary judgment have merit, and so Iglesias addresses them only briefly. The City argues that it cannot be liable under *Monell* if summary judgment is granted to the Defendant Officers on Iglesias's constitutional claims. CB-6-8. It also argues that there is no dispute of fact about whether the City's official policies caused the violations of Iglesias's constitutional rights. OB-50-52. Both arguments fail.

#### 1. The City's Liability Does Not Necessarily Depend on Individual Liability

The Court can disregard the argument that the City is not liable if no Defendant Officer is liable because the Defendant Officers do not move for summary judgment on all of Iglesias's constitutional claims, and they are not entitled to summary judgment on any claim, for the reasons explained above. See Argument IV *supra*. Accordingly, this Court need not decide at this stage whether the City's liability depends on a finding of Defendant Officer liability.

161

Still, the City is incorrect that it cannot be liable unless a Defendant Officer is found liable. The Seventh Circuit's rule, set forth in *Thomas*, is that "a municipality can be held liable under *Monell*, even when its officers are not, unless such a finding would create an *inconsistent* verdict." 604 F.3d at 305 (emphases in original); see also *Swanigan v. Chicago*, 775 F.3d 953, 962 (7th Cir. 2015) ("In some civil-rights cases, . . . a verdict in favor of individual defendants would not necessarily be inconsistent with a plaintiff's verdict on a factually distinct *Monell* claim."). Numerous judges in this district have applied this rule that a municipal policy can cause a constitutional deprivation even if a jury finds the individual officers not liable. See *Bonds v. City of Chicago*, 16-cv-5112, 2018 WL 1316720, at *4-5 (N.D. Ill. Mar. 14, 2018); *Pickett v. Dart*, 2014 WL919673 (N.D. Ill. Mar. 10, 2014); *Wells v. Coker*, 2014 WL 716518 (C.D. Ill. Feb. 25, 2014); *Martinez v. Cook County*, No. 11 C 1794, 2011 WL 4686438, at *1; *Cage v. City of Chicago*, 9 C 3078, 2010 WL 3613981, at *1; *Evans v. Chicago*, 2010 WL 3075651 (N.D. Ill. Aug. 5, 2010).

In the case of a theory of municipal liability that depends entirely on a particular officer's act of misconduct—e.g., a municipal policy of using excessive force where there was no excessive force used by any officer, as in *City of Los Angeles v. Heller*, 475 U.S. 706 (1986)—a *Monell* claim will fail if an individual defendant did not violate the Constitution. But that is not the case here. For example, a jury might find that the City's official policy of evidence suppression caused investigative information not to reach prosecutors, Iglesias, and his attorneys—particularly given the game of hot potato that the Defendant Officers play about who fabricated and suppressed what evidence. In that case, a verdict against the City but for the Defendant Officers would not be inconsistent as a matter of law. The City argues that this theory depends on a finding of individual

162

liability, CB-8, but that argument assumes facts in the Defendants' favor, which is not permissible. This Court should reject the City's argument that its liability depends on the Defendant Officers.

### 2. The City's Causation Argument Is Meritless

The City's causation argument also fails. A municipality's official policy "must be the direct cause or moving force behind the constitutional violation." *Woodward v. Corr. Med. Servs*, 368 F.3d 917, 927 (7th Cir. 2004) (cleaned up). In a case like this, where a plaintiff has put forth evidence of municipal action (or inaction) and deliberate indifference—here in the form of express policies and gaps in policies, widespread practices, actions of final policymakers, and failures to train, supervise, and discipline—the question whether municipal policies and practices caused the plaintiff's constitutional injuries must be resolved by a jury, like most other causation questions. See, *e.g.*, *Thomas*, 604 F.3d at 303 (holding that the jury must make a factual determination about whether the evidence establishes that a widespread practice caused the alleged constitutional harm); *LaPorta v. City of Chicago*, 277 F. Supp. 3d 969, 991 (N.D. Ill. 2017) ("As long as the causal link is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury.").

In this case, there is no distance between the risks of harm presented by the City's official policies and practices—evidence suppression, fabricated identifications, and untrained and unsupervised police officers—and the particular constitutional injuries that Iglesias suffered. A reasonable jury could conclude that the City's policies caused the violations of Iglesias's constitutional rights, as many other courts have concluded in analogous circumstances. See, *e.g.*, *Godinez v. City of Chicago*, No. 16-CV-07344, 2019 WL 5597190, at *6 (N.D. Ill. Oct. 30, 2019) ("Plaintiff has pointed to a variety of evidence, in the form of the DOJ and PATF Reports, public officials' statements, expert testimony, other lawsuits, and evidence about CPD training and

163

accountability that create a genuine issue of fact about the causal link between Godinez's death and CPD practices and the City's *Monell* liability. That is enough to survive summary judgment."); see also *Washington*, 2022 WL 4599708, at *18; *Hudson v. City of Chicago*, No. 16-CV-4452, 2019 WL 1112260, at *7 (N.D. Ill. Mar. 11, 2019); *Thomas*, 604 F.3d at 303; *Woodward*, 368 F.3d at 927; *LaPorta*, 277 F. Supp. 3d at 991.The City's arguments to the contrary, like the Defendant Officers arguments throughout their motion, "reflect[] a kind of self-hypnosis that no lawyer can afforded to practice in the summary judgment context— a view of the evidence through the lens of the Rule 56 movant rather than, as the Rule expressly mandates, that of the nonmovant[.]" *Escobedo v. Ram Shirdi*, No. 10 C 6598, 2013 WL 1787819, at *4 (N.D. Ill. Apr. 25, 2013). This Court should reject the City's arguments that depend on viewing the facts in the City's own favor.

I. **The *Respondeat Superior* and Indemnification Claims Survive Summary Judgment**

Finally, the City asserts that it is entitled to judgment on Iglesias's *respondeat superior* and indemnification claims, arguing these claims are derivative of others. Iglesias's underlying claims survive, and so, too, should these derivative claims.

## CONCLUSION

Construing the record in the light most favorable to Iglesias and drawing inferences in his favor, none of Defendants is entitled to summary judgment on any of the theories on which they have moved for summary judgment. Iglesias is entitled to a trial against the City and the Defendant Officers on all of his claims, except on those against the City on which Iglesias is entitled to summary judgment. For all of these reasons, Defendants' motions for summary judgment should be denied.

RESPECTFULLY SUBMITTED,

**GERALDO IGLESIAS**

By: /s/ Steve Art
*One of Plaintiff's Attorneys*

Jon Loevy
Anand Swaminathan
Steve Art
Rachel Brady
Sean Starr
Wallace Hilke
Meg Gould
**LOEVY + LOEVY**
311 N. Aberdeen St.
Chicago, IL 60607
(312) 243-5900
steve@loevy.com

## CERTIFICATE OF SERVICE

I, Steve Art, an attorney, hereby certify that, on March 26, 2024, I filed the foregoing

PLAINTIFF'S GERALDO IGLESIAS'S CONSOLIDATED RESPONSE IN OPPOSITION TO

DEFENDANTS' SUMMARY JUDGMENT MOTIONS using the Court's CM/ECF system,

which effected service on all counsel of record.

 /s/ Steve Art
*One of Plaintiff's Attorneys*

Jon Loevy
Anand Swaminathan
Steve Art
Rachel Brady
Sean Starr
Meg Gould
Wallace Hilke
**LOEVY + LOEVY**
311 N. Aberdeen St.
Chicago, IL 60607
(312) 243-5900
steve@loevy.com

# EXHIBIT 73

Identify and describe all property or premises entered at the time of the narrative in narrative form. Show exactly where found, when found, who found it and its description (include Property inventory number). If property taken was coded for Operation Identification, indicate I.D. number at end of Narrative. Offender's approximate description, if possible, should include name if known. nickname, sex, race code, age, height, weight, color eyes & hair, complexion, scars, marks, etc. If suspect is arrested, give name, sex, race code, age, C.B. or I.R. number, if known, and state "In Custody."

## SUPPLEMENTARY REPORT
### CHICAGO POLICE — FOR USE BY B.I.S. PERSONNEL ONLY

All descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

**4. DATE OF ORIG. OCCURRENCE—TIME**
DAY 7 — MO. June — YR. 93 — 1556

| 1. OFFENSE/CLASSIFICATION LAST PREVIOUS REPORT | 1.UCR OFF. CODE | 2. ADDRESS OF ORIG. INCIDENT/OFFENSE | 1 VERIFIED / CORRECTED | 3. BEAT OF OCCUR. |
|---|---|---|---|---|
| BATTERY, Aggravated | 041A | (2149 N. Sawyer) | ☒ CORRECTED | 1414 |

| 5. VICTIM'S NAME AS SHOWN ON CASE REPORT | CORRECT ☒ YES ☐ NO | IF NO, CORRECT ALL VICTIM INFORMATION IN BOXES 20 THROUGH 27. | 6. RRE RELATED ☐ YES ☒ NO | 7. BEAT ASSIGNED |
|---|---|---|---|---|
| ROMAN, Monica | | | | 5532 |

| 8. TYPE OF LOCATION OR PREMISE WHERE INCIDENT/OFFENSE OCCURRED | LOCATION CODE | 9. NO. OF VICTIMS | 10. NO. OF OFFENDERS |
|---|---|---|---|
| Street | 304 | 1 | 1 |

| 34. SERIAL NOS. OR IDENTIFICATION NOS. | ☒ 1 DNA | ☐ 2 VERIFIED | ☐ 3 CORRECTED | LIST ALL CORRECTIONS & NEW OR ADDITIONAL NOS. OBTAINED IN NARRATIVE |
|---|---|---|---|---|

| 50. OFFENSE/CLASS. THIS DATE (IF SAME ENTER DNA) | REV. CODE | 51. METHOD CODE | 52. METHOD ASSIGNED | UNIT NO. | 53. STATUS |
|---|---|---|---|---|---|
| Dna | Dna | Dna | ☒ 1 FIELD ☐ 3 SUMMARY | 652 | ☒ 9 PROGRESS ☐ 1 SUSPENDED ☐ 2 UNFOUNDED |

STATUS CONT'D.

60. NARRATIVE

### FIELD INVESTIGATION/PROGRESS REPORT

Continued on page 2

# DATA ENTERED
## D AREA 5

| 90. EXTRA COPIES REQUIRED (NO. & RECIPIENT) | 91. DATE THIS REPORT SUBMITTED | TIME | 92. SUPERVISOR APPROVING (PRINT NAME) | STAR NO. |
|---|---|---|---|---|
| normal | DAY 7 MO. June YR. 93 | 2355 | BIEBEL | 1545 |

| 93. REPORTING OFFICER (PRINT NAME) | STAR NO. | 94. REPORTING OFFICER (PRINT NAME) | STAR NO. | SIGNATURE |
|---|---|---|---|---|
| Det. J. Sanfopadre | 20716 | Det. J. Bogucki | 20668 | Biebel |
| | | Det. R. Schalk | 20718 | |

95. DATE APPROVED (DAY-MO.-YR.) 8 JUN 1993 — TIME OP20

CPD-11.xxx-8 (Rev. 8/85) — MUST BE COMPLETED IN ALL CASES

R-L056674

**DETECTIVE DIVISION**
**AREA 5 VIOLENT CRIMES UNIT**

RD# X-250303
7 June 93

**HOMICIDE/Murder 1st Degree**
**ROMAN, Monica**

| | |
|---|---|
| **VICTIM:** | ROMAN, Monica F/WH/16, DOB: 22 Sep 76, 1230 W. Winnona 1st floor, PH: 784-4879, student Senn H.S. |
| | Father: ROMAN, Sixto M/WH/ 1230 W. Winnona PH: 784-4879 |
| | Mother: ROMAN, Hildea F/WH/ 1230 W. Winnona PH: 784-4879 |
| **WANTED:** | *FROM OCHUA* 1- M/WH/17-19yrs. 5'5"-5'7", 135-140 lbs, clean shaven, wearing: Blk hooded sweatshirt, blk pants. |
| **INJURIES:** | Victim incurred 1 GSW to the forehead above left eye. Lodged. Currently on life support, not expected to survive. |
| **TAKEN TO:** | Victim transported to the Ill Masonic hospital by CFD Amb #3 treated and admitted to SICU. |
| **WEAPON:** | Unk type and caliber handgun. |
| **LOCATION:** | Incident occurred at 2148 N. Sawyer on the street. The victim was riding in an auto at this location. After the shooting the driver of the vehicle drove to 2338 N. Sacramento a Phillips 66 Gas station to contact the police and Ambulance. This location has a Fullerton address of 3009 W. |
| **DATE & TIME:** | Incident occurred on 7 Jun 93, 1556 hrs. |
| **WEATHER & LIGHTING:** | Temp in upper 60's, previous heavy rain during the day, daylight. |
| **MANNER/MOTIVE:** | Offender stood at 2148 N. Sawyer on the parkway, behind tree. Offender fired shots into moving auto striking victim. Offender possibly believed the persons in the auto |

2

JR-L 056675

DETECTIVE DIVISION
AREA 5 VIOLENT CRIMES UNIT

RD# X-250303
7 June 93

HOMICIDE/Murder 1st Degree
ROMAN, Monica

were rival gang members.

VEHICLE USED:

Victim was riding in a 1982 Olds, 4dr. Blue vinyl top, gray body with the right front fender black. Ill License VLF 831. TOWED VIN:1G3AX69Y5CM256966 REGISTERS TO: Francisco CORONELL 5916 N. Paulina 2nd fl.(Boyfriend of victim) DRIVEN BY: GONZALEZ, Jesus (see witness section)

EVIDENCE:

Photos of scene
Photos of above auto
Recovered fired bullet from vinyl top of auto INV # 1135801 CB

PERSONNEL ASSIGNED:

Bt. 1411 P.O. Zuniga, 6871
        (Original report)
Bt. 1417 P.O. Hallinan, 4709
        (Tow Officer/scene)
Bt. 9604 Tech Ginnelly, 12134
        Tech Gurtowski, 13319
        (Crime lab)
Bt. 5532 Det J. Bogucki, 20668
        Det R. Schalk, 20718
        (Investigation)
Bt. 5541 Det J. Santopadre
        (Investigation)

WITNESSES:

*disconnected*

OCHOA, Rosendo M/WH/23 DOB:1 Mar 70 2135 N. Sawyer, 2nd floor, PH: 772-0991, Unemployed, claims no gang affiliation.(Uncle of CORDRO)

GONZALEZ, Jesus M/WH/18, DOB:9Jun74 5916 N. Paulina, 2nd floor, No phone employed: Fireside Restaurant, 5739 N. Ravenswood WPH: 278-5942 Claims no gang affiliation (Driver of vehicle victim was riding in)

*1 or 2 fingers cut off*

SANCHEZ, Daniel M/WH/17, DOB:9Jan76 5916 N. Paulina 2nd floor, student Senn H.S. employed: Hat Dance Restaurant, 325 W. Huron, WPH: 649-0066 Claims no gang affiliation (Passenger in auto)

*6456 N
Ashland
1-Nile
(W)-Chile
yol work
cook real
70+ 205
0818
(H) 262
6817*

3

JR-L 056676

DETECTIVE DIVISION
AREA 5 VIOLENT CRIMES UNIT

RD# X-250303
7 June 93

HOMICIDE/Murder 1st Degree
ROMAN, Monica

WITNESSES CONT.

CORONELL, Jose M/WH/21, DOB:25Nov71
5916 N. Paulina, 2nd floor No Phone
SSN: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 employed: Food Life
Restaurant, 835 N. Michigan (Water
tower Place) WPH: 335-3663 Claims no
gang affiliation (Passenger in auto)

RODRIGUEZ, Hugo M/WH/16 DOB:27Apr77
5916 N. Paulina, No phone, Student
Senn H.S.    unemployed, Claims no
gang affiliation (Passenger in auto)

*4903 N TROY (W)588-6817*

CORDRO, Mercy F/WH/16, DOB:26Mar77
2135 N. Sawyer, 2nd flr. PH: 772-
0991 Student Senn H.S. (Girlfriend
of    Victim)    claims    no    gang
affiliation.

*(w)973-5715 8021 N. LINCOLN*

INTERVIEWED:

*sp1 moved who did it / nip scared but scared / knows will*

TORRES, Sarah F/WH/44, DOB: 28Jun49
2148 N. Sawyer, 3rd flr. South
PH: 252-6103

TORRES, Efrain M/WH/18, DOB:30Nov74
2148 N. Sawyer, 3rd Flr South
HPH: 252-6103, SSN: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

CRUZ, Rosie F/WH/21, DOB:10Feb72
3231 W. Palmer, 3rd flr. No phone

NIEVES, Maria  F/WH/21, DOB:8Jan72
3231 W. Palmer, 3rd flr. No phone.

VAZQUEZ, Frank  M/WH/27,
3241 W. Palmer, 1st flr.
PH: 235-8542, Unemployed.

TO BE INTERVIEWED:

Arnell  M/B/35-37 Bus driver for the
Mavis Bus company PH: 378-3156 NFI

BULLOCKS, Bernice F/B/41,
2148 N. Sawyer, 1st flr South
PH: 342-8727

INVESTIGATION:

The R/Dets  were  assigned  to  the
above captioned investigation by Lt.
Farrell of Area 5 Violent Crimes

The R/Dets learned that the victim had been shot at 2148 N. Sawyer while  riding  in  an  auto.   This  auto  was  driven  to  2338  N. Sacramento to the Phillips 66 gas station where other occupants

4

JR-L 056677

DETECTIVE DIVISION
AREA 5 VIOLENT CRIMES UNIT

RD# X-250303
7 June 93

HOMICIDE/Murder 1st Degree
ROMAN, Monica

contacted the police and an ambulance. The R/Dets responded to 2338 N. Sacramento and found a 1982 Olds 4dr. with Ill license plate number VLF 831. The mobile crime lab arrived on the scene at which time photos were taken of the auto. The R/Dets noted a bullet lodged under the vinyl top of the auto which was recovered and inventoried by the Crime lab personnel. This vehicle was then towed to Pond #1 for further investigation. The R/Dets learned that the victim had been transported to the Ill Masonic Hospital by CFD Amb #3 and was in critical condition with a GSW to the forehead and that witnesses and the passengers from the auto had been taken into the 14th Dist station. Dets Schalk and Bogucki proceeded to the location where the shots had been fired and then to the hospital. Det Santopadre proceeded into the 14th Dist and interviewed the witnesses.

The R/Dets learned shooting occurred on the street at 2148 N. Sawyer which is a residential area with a large apartment building at that address on the West side of the street. Sawyer is a one way Northbound street. The vehicle the victim was in had just dropped off Mercy CORDRO at 2135 N. Sawyer, who is a friend of the victim. The people in the vehicle had been parked in the East/West alley a few doors down from CORDRO's house. The people from the vehicle, including the victim, had been talking with CORDRO and her small niece for a short time. After re-entering the vehicle, with the victim in the front passenger seat and SANCHES, CORONELL and RODRIGUEZ in the rear seat and GONZALEZ driving, they proceeded North on Sawyer and when approaching Palmer shots were fired by the wanted offender at the auto striking the victim. GONZALEZ then drove to the gas station for a phone to call the police and an ambulance.

The R/Dets interviewed the following witnesses.

AKA Geraldo Najero

OCHOA, Rosendo stated that he is the cousin of Mercy CORDRO and was in his 2nd floor apartment at the time of the incident. OCHOA related that CORDRO was dropped off by friends at approx 1610 hrs. and came into the apartment. At that time CORDRO took her 1 1/2 yr old niece down to show her friends who were waiting in the auto in the alley North of the residence. OCHOA stated that he was looking out the window for CORDRO and observed a Male wearing a black hooded sweatshirt with the hood up, across the street in front of the large apartment building. (OCHOA gave the description in the "Wanted" section of this report). As CORDRO began to walk back to his apartment building the friends of CORDRO re-entered their auto and pulled out of the alley and proceeded

5

JR-L 056678

DETECTIVE DIVISION
AREA 5 VIOLENT CRIMES UNIT

RD# X-250303
7 June 93

HOMICIDE/Murder 1st Degree
ROMAN, Monica

North bound on Sawyer. As the vehicle pulled up to the stop sign at Palmer, the Unk male in the black hooded sweatshirt walked up near a tree pulled a handgun and began firing at the auto. OCHOA stated that he heard 5 shots and observed the auto drive away. After firing at the car, the offender ran Southbound on Sawyer to the alley then turned west into the alley and then again turned South in the North/South alley. OCHOA stated that shortly after the man entered the alley he heard the screeching of tires in the alley but did not see an auto. OCHOA stated that he had never seen the offender before in the neighborhood.

GONZALEZ, Jesus

stated that he was driving the auto in which the victim was riding at the time she was shot. The auto is owned by GONZALEZ's roommate who is the boyfriend of the victim and was not present at the time of the incident as he was at work in Deerfield. GONZALEZ stated that he, CORDRO, SANCHEZ, CORONELL, RODRIGUEZ and the victim had left the apartment the males share at 5916 N. Paulina at approx 1430 hrs. All went for a ride in the area of Senn H.S. and then went to Addision and California to pay an electric bill. GONZALEZ then drove CORDRO home to 2135 N. Sawyer where they stopped for a short time in the alley and talked while CORDRO showed her niece to the victim. As they were leaving, GONZALEZ stated that he was on his way to drop off the victim at her house. Someone began to fire at the auto. GONZALEZ stated that he ducked and then sped away from the area before he knew that the victim had been shot. Upon realizing the victim had been shot he drove to a gas station and called for the police and an ambulance. GONZALEZ stated that he nor any of the other males are gang members and that they had never been in the neighborhood where the incident occurred before. At no time was there a problem with anyone while in the area or while on the way to drop CORDRO off. GONZALEZ stated that he nor any of the other have ever been in trouble with the police and all either go to school or work. GONZALEZ stated that he never saw the offender and has no idea why the auto he was driving was shot at.

HUGO RODRIGUEZ

The R/Dets interviewed the other passengers of the auto SANCHEZ, CORONELL, and RODRIGUEZ who gave the account of the incident as related by GONZALEZ. CORONELL and RODRIGUEZ did observed the offender run into the alley after the shooting.

CORDRO, Mercy:

stated that she is a friend of the victim, and goes to Senn H.S. with her. On the day of the shooting,

6

JR-L 056679

DETECTIVE DIVISION
AREA 5 VIOLENT CRIMES UNIT

RD# X-250303
7 June 93

HOMICIDE/Murder 1st Degree
ROMAN, Monica

the victim, and some of her friends, were giving her a ride to her home at 2135 N. Sawyer Ave. They dropped her off in the alley by her house. She got out of the car and went inside to get her young nephew. She came back outside and briefly spoke with the victim and her friends, who were still in the alley. She believed that they were still there because a couple of the guys had to urinate. She then walked southbound on Sawyer, along with her nephew. When she got about 1/2 block away, she heard gunshots. She turned and saw the car with the victim, drive northbound on Sawyer at a high rate of speed. She saw a subject, dressed all in black, turn westbound into the south alley of Palmer. She only saw the back of that subject, and could not see if he had a gun. She further stated that there was no trouble prior to the shooting.

TORRES, Sara: stated that just prior to the shooting, someone rang her front doorbell. She looked out the front window of her 3rd floor apartment, and saw a school bus driver at the door. The bus driver was bringing home the mentally handicapped boy who lives on the 1st floor. The driver apologized for ringing her doorbell, and she stepped away from the window. Shortly thereafter, she heard gunshots and again looked out her window. She then observed a subject, who was in front of her building, run southbound from that location. She described that subject as being about 5-9, skinny, wearing all black clothing including a black hood. She did not see the face of that subject, nor did she see if he had a gun. She did not recall seeing anyone else on the street, other than some cars that drove past.

TORRES, Efrain: TORRES stated that he lives on the third floor at 2148 N. Sawyer with his mother. He stated that at the time of the shooting he was in his apartment. He heard about four shots and then-someone laughing. TORRES stated that he then looked out of the front window but saw nothing. TORRES stated that his mother looked out of the window in time to see a male with a black hooded sweatshirt run S/B from the scene. TORRES stated that about ten minutes earlier, he noticed about five "I.G." gang members standing in front of the Boys Club at the N/E corner of Sawyer and Palmer. He stated that he remembered two of the five subjects were wearing black "hoodies". One of the subjects was a M/WH that he has seen in the neighborhood previously. He wore a 3/4 length black starter coat and pink baggy pants along with his black "hoody". The other subject that was wearing a black "hoody" was a M/B and wore a short black jacket and black pants. TORRES could add nothing further at this time.

7

DETECTIVE DIVISION                                    RD# X-250303
AREA 5 VIOLENT CRIMES UNIT                            7 June 93

HOMICIDE/Murder 1st Degree
ROMAN, Monica

CRUZ, Rosie:                 These girls stated that they were
NIEVES, Maria:               standing on the S/E corner of Palmer
                             and Sawyer. They stated that a male
                             wearing a black "hoody" and black
                             pants walked from the west on Palmer
                             and then turned the corner S/B on
Sawyer. They stated that the male in the black "hoody" stood in
front of the building at 2148 N. Sawyer. A short time later a
silver color slowed down driving N/B approaching the corner. The
male with the "hoody" then approached the car and fired four shots
at the silver color car. The shooter then ran S/B and the two
girls then ran E/B. Both CRUZ and NEIVES stated that they did not
see the face of the shooter.

VAZQUEZ, Frank               stated that he was not at home at
                             the time of the incident and could
                             add nothing further.

                             The bus driver " Arnell" to be
                             interviewed was dropping off the son
                             of Bernice BULLOCKS who is
retarded. Offender was possibly standing in front of the building
at the time he was dropping the child off and Arnell would have had
to walk by the offender prior to the shooting. Bernice BULLOCKS
was looking out the window waiting for the bus to bring home her
son. BULLOCKS was not available at the time of this investigation.

                             This   investigation   remains   in
                             progress.....

                                   Det J. Santopadre
                                   Det R. Schalk
                                   Det J. Bogucki
                                   Area 5 Violent Crimes
                                   Detective Division

8

JR-L 056681

# EXHIBIT 74

Identify and describe all property or possible evidence recovered at the end of the Narrative in column form. Show exactly where found, when found, who found it and its description (include Property Inventory numbers). If property taken was scribed for Operation Identification, indicate I.D. number at end of Narrative. Offender's approximate description, if possible, should include name if known, nickname, sex, race code, age, height, weight, color eyes & hair, complexion, scars, marks, etc. If suspect is arrested, give name, sex, race code, age, C.B. or I.R. number, if known, and state "In Custody."

## SUPPLEMENTARY REPORT
### CHICAGO POLICE – FOR USE BY B.I.S. PERSONNEL ONLY

All descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

4. DATE OF ORIG. OCCURRENCE- TIME
DAY / MO. / YR.
7 June 1993 | 1556

| 1. OFFENSE/CLASSIFICATION LAST PREVIOUS REPORT | 1-UCR OFF. CODE | 2. ADDRESS OF ORIG. INCIDENT/OFFENSE ☒ VERIFIED ☐ 2 CORRECTED | 3. BEAT OF OCCUR. |
|---|---|---|---|
| Homicide/First Degree Murder | 0110 | 2148 N. Sawyer | 1414 |

| 5. VICTIM'S NAME AS SHOWN ON CASE REPORT | CORRECT | IF NO, CORRECT ALL VICTIM INFORMATION IN BOXES 20 THROUGH 27. | 6. FIRE RELATED | 7. BEAT ASSIGNED |
|---|---|---|---|---|
| ROMAN, Monica | ☒1 YES ☐2 NO | | ☐1 YES ☒ NO | 5535 |

| 8. TYPE OF LOCATION OR PREMISE WHERE INCIDENT/OFFENSE OCCURRED | LOCATION CODE | 9. NO. OF VICTIMS | 10. NO. OF OFFENDERS |
|---|---|---|---|
| (Vehicle/Non Commerical) | (259) | 1 | 1 |

CIRCUMSTANCES

11. ☒ VERIFIED ☐ UPDATE TO

| 12. OBJECT/WEAPON | 13. FIREARM FEATURES | 14. POINT/ENTRY | 15. POINT/EXIT | 16. BURGLAR ALARM | 17. SAFE BURGLARY METHOD | 18. IF RESIDENCE WHERE WERE OCCUP. |
|---|---|---|---|---|---|---|
| CODE NOS. | CODE NO. | CODE NO. | CODE NO. | CODE NOS. | CODE NO. | CODE NO. |

19. DESCRIBE PROPERTY IN NARRATIVE. T - TAKEN; R - RECOVERED

PROPERTY ☐ VERIFIED ☐ UPDATE TO

FILL IN THE FULL AMOUNT OF ONLY THOSE VALUES WHICH EITHER DIFFER FROM OR WERE NOT REPORTED ON THE ORIGINAL CASE REPORT OR THE LAST PREVIOUS SUPPLEMENTARY REPORT.

| 1 MONEY ☐T $ ☐R | 2 JEWELRY ☐T $ ☐R | 3 FURS ☐T $ ☐R | 4 CLOTHING ☐T $ ☐R | 7 OFFICE EQUIPMENT ☐T $ ☐R | 8 TV, RADIO, STEREO ☐T $ ☐R |
|---|---|---|---|---|---|
| 9 HOUSEHOLD GOODS ☐T $ ☐R | 10 CONSUM. GOODS ☐T $ ☐R | 11 FIREARMS ☐T $ ☐R | 8 NARC./DANGEROUS DRUGS ☐T $ ☐R | 5 OTHER ☐T $ ☐R | 6 NONE ☐T ☐R |

VICTIMS UPDATE ONLY

| 20. NAME (LAST–FIRST–M.I.) | 21. 1-UCR OFFENSE CODE | 22. HOME ADDRESS (NO., DIR., STREET, APT. NO.) | 23. SEX–RACE–AGE CODE | 24. HOME PHONE | 25. BUSINESS PHONE | 26. INJURED YES NO | 27. VICTIM REL. CODE |
|---|---|---|---|---|---|---|---|
| 1. | | | | | | | |
| 2. | | | | | | | |
| 3. | | | | | | | |

OFFENDERS UPDATE ONLY

| 28. OFFENDER'S NAME (OR DESCRIBE CLOTHING, ETC.) | 29. HOME ADDRESS | 30. SEX–RACE–AGE CODE | HEIGHT | WEIGHT | EYES | HAIR | COMPL. |
|---|---|---|---|---|---|---|---|
| 1. IGLESIAS, Geraldo | 3715 W. Belden | M/4/24 | 5-10 | 150 | Brn | Blk | Med. |
| 2. | | | | | | | |

| 31. C.B. NO. | I.R. NO., Y.D. NO. OR J.D.A. NO. | OFFENDER REL. CODE | C.B. NO. | I.R. NO., Y.D. NO. OR J.D.A. NO. | OFFENDER REL. CODE | 32. NO. ARRESTED | ARREST. UNIT NO. |
|---|---|---|---|---|---|---|---|
| OFF 1: 9422-967 | 764637 | 24 | OFF. 2: | | | 1 | 652 |

| 33. OFF'S. VEHICLE ☐USED ☐STOLEN | YEAR | MAKE | BODY STYLE | COLOR | V.I.N. | STATE LICENSE NO. | STATE |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

34. SERIAL NOS. OR IDENTIFICATION NOS. ☒1 DNA ☐2 VERIFIED ☐3 CORRECTED       LIST ALL CORRECTIONS & NEW OR ADDITIONAL NOS. OBTAINED IN NARRATIVE

| 50. OFFENSE/CLASS. THIS DATE (IF SAME ENTER DNA) | REV. CODE | 51. METHOD CODE | 52. METHOD ASSIGNED | UNIT NO. | 53. STATUS |
|---|---|---|---|---|---|
| DNA | | | ☒1 FIELD ☐3 SUMMARY | 652 | ☐0 PROGRESS ☐1 SUSPENDED ☐2 UNFOUNDED |

STATUS CONT'D
☒3 CLRD. CLOSED ☐4 CLRD. OPEN ☐5 EXC. CLRD. CLOSED ☐6 EXC. CLRD. OPEN ☐7 CLSD. NON-CRIM.

54. IF CASE CLEARED, HOW CLEARED
☒1 ARREST & PROSEC. ☐2 DIRECTED TO JUV. CRT. ☐3 COMPL. RFUSD. TO PROSECUTE ☐4 COMMUNITY ADJUSTMENT ☐5 OTHER EXCEPT.   ☒ADULT ☐JUV.

55. ☐ FOR SUMMARY CASES ONLY – THE ORIGINAL CASE REPORT IS SUBSTANTIALLY CORRECT, AND CONTACT WITH THE VICTIM HAS DISCLOSED NO ADDITIONAL PERTINENT INFORMATION.

80. NARRATIVE

IN CUSTODY:

IGLESIAS, Geraldo  M/WH/Age 24, DOB 24 July 68,

3715 W. Belden,  Single, Unemployed, Admitted member

of the Imperial Gangsters Street Gang, Nickname of

"SNAKE",  IR# 764637

Continued On Page (2)

| 90. EXTRA COPIES REQUIRED (NO. & RECIPIENT) | 91. DATE THIS REPORT SUBMITTED – DAY MO. YR. | TIME | 92. SUPERVISOR APPROVING (PRINT NAME) | STAR NO. |
|---|---|---|---|---|
| | 24 June 93 | 2100 | BIEBEL | 1545 |

| 93. REPORTING OFFICER (PRINT NAME) | STAR NO. | 94. REPORTING OFFICER (PRINT NAME) | STAR NO. | SIGNATURE |
|---|---|---|---|---|
| Det. E. HALVORSEN | #20692 | Det. R. GUEVARA | #20861 | Biebel |
| SIGNATURE | | SIGNATURE | | 95. DATE APPROVED (DAY-MO.-YR.) TIME |
| Det. A. RICCIO | #20870 | Det. S. GAWRYS | #20689 | 25 JUN 1993 | 0920 |

CPD-11.411-B (Rev. 8/85)   *MUST BE COMPLETED IN ALL CASES

R.D. NO. X-250303

EP Montanez Sub. Resp. 010254

DETECTIVE DIVISION                    2              24 JUNE 1993
AREA FIVE VIOLENT CRIMES                             RD# X-250303

HOMICIDE/FIRST DEGREE MURDER
VICTIM: ROMAN, Monica

ARRESTING DETECTIVES:     Det. E. HALVORSEN #20692, Area Five VC
                          Det. R. GUEVARA    #20861,      "
                          Det. A. RICCIO     #20870,      "
                          Det. S. GAWRYS     #20689,      "

DATE, TIME, LOCATION      Wed. 23 Jun. 93, 1800 hrs. 2135 N.
OF ARREST:                Spualding, on the street

CHARGES, COURT BRANCH     First Degree Murder, Chp. 720/5-9-1a2,
AND DATE:                 Branch 66, 25 Jun. 93, Charge approved by
                          A.S.A. M. LATZ, Felony Review

EVIDENCE:                 Inv.# 1178456, Area Five VC
                          (8) Polaroid Color Photos

                          Line-Ups Photos

NOTIFICATIONS:            A.S.A. Mike LATZ, Felony Review

INVESTIGATION:            On 21 June 93, the R/Dets. were contacted
                          by a confidential informant, who is a
member of the Imperial Gangsters Street Gang. This informant
stated that many members of the gang were talking about "SNAKE"
killing a girl in a car on Sawyer and Palmer. The informant could
not elaborate any further.

                          The R/Dets. had previous contact with a
                          member of the Imperial Gangster Street
Gang, with the nickname of "SNAKE". The R/Dets. knew that "SNAKE"
was in fact Geraldo IGLESIAS, IR# 764637. The R/Dets. had a
polaroid photo of IGLESIAS.

                          On 22 June 93, Dets. E. HALVORSEN and R.
                          GUEVARA, interviewed eye-witness, Rosendo
OCHOA. Rosendo OCHOA stated that he got a good look at the
shooters face, and would be able to identify him if he saw him
again. Rosendo OCHOA was shown a photo spread consisting of (8)
Polaroid Color Photos. After viewing this photo array, Rosendo
OCHOA identified the picture of Geraldo IGLESIAS, as being the
person he saw shoot and kill Monica ROMAN.

                          On 23 June 93, the R/Dets. observed
                          Geraldo IGLESIAS on the street at 2135 N.
Spualding. He was placed in custody and transported to Area Five
Violent Crimes. He was informed of the allegation against him, and
that he would be required to stand in a line-up.

EP Montanez Sub. Resp. 010255

DETECTIVE DIVISION                        3                    24 JUNE 1993
AREA FIVE VIOLENT CRIMES                                       RD# X-250303

HOMICIDE/FIRST DEGREE MURDER
VICTIM: ROMAN, Monica

On 23 June 93, at 2000 hrs. a line-up was conducted at Area Five VC, (See Line-Up Supp.). After viewing this line-up Rosendo OCHOA identified Geraldo IGLESIAS as the person he saw shoot and kill, Monica ROMAN.

On 23 June 93, at 2020 hrs. an interview was conducted with Geraldo IGLESIAS in the Line-Up Room, at Area Five VC. Present for this interview were Det. E. HALVORSEN #20692, and Det. R. GUEVARA #20861.

IGLESIAS, Geraldo    in summary he acknowledged understanding his Miranda Rights as they were read to him by Det. E. HALVORSEN, from a pre-printed card. He agreed to talk with detectives. He admitted that he was a member of the Imperial Gangsters Street Gang. He admitted that he hangs out in the area of the Boys Club, at the corner of Sawyer and Palmer. He stated that he gets home from school at 1400 hrs. After he gets home, his daily activity consist of hanging out on the street with his friends who are members of the Imperial Gangsters. He stated that he has been in Chicago during the entire month of June 93. He does not recall what he did on 7 June 93, and has no alibi for his whereabouts on that date at 1556 hrs.

The R/Dets. contacted Felony Review and A.S.A. Mike LATZ arrived at Area Five VC. A.S.A. LATZ reviewed the investigative file, and interviewed Rosendo OCHOA. A second eye-witness, Arnell MOORE was brought into Area Five VC. Arnell MOORE was interviewed by A.S.A. LATZ, and provided the same information that he previously had told detectives. Arnell MOORE stated that he did not get that good a look at the face of the shooter, and would not be able to make an identification.

The R/Dets. located three of the persons who were in the car with the victim when she was shot. Those persons are, Hugo RODRIGUEZ, Jose CORONELL, and Daniel SANCHEZ. The driver of the car, Jesus GONZALEZ was in Mexico but was expected to return to Chicago. RODRIGUEZ, CORONELL, and SANCHEZ all came into Area Five. RODRIGUEZ, CORONELL and SANCHEZ spoke very limited English and were interviewed by A.S.A. LATZ, with Det. R. GUEVARA, as interpreter. During this interview Hugo RODRIGUEZ stated that he would be able to identify the person who shot Monica ROMAN.

EP Montanez Sub. Resp. 010256

```
DETECTIVE DIVISION                    4                    24 JUNE 1993
AREA FIVE VIOLENT CRIMES                                   RD# X-250303
```

HOMICIDE/FIRST DEGREE MURDER
VICTIM: ROMAN, Monica

On 24 June 93, at 0030 hrs. Det. R. GUEVARA and A.S.A. M. LATZ showed Hugo RODRIGUEZ, the same photo array previously viewed by Rosendo OCHOA. After viewing this photo array, Hugo RODRIGUEZ identified the photo of Geraldo IGLESIAS, as the person he saw shoot and kill Monica ROMAN. This photo array was inventoried for evidence.

A.S.A. LATZ requested that two other persons listed in the police reports as potential witness, Efrian TORRES, and David CHMIELESKI be allowed to view Geraldo IGLESIAS in a line-up.

On 24 Jun. 93, at 0125 hrs. a second line-up was conducted at Area Five VC, (See Line-Up Supp.) After viewing this line-up Hugo RODRIGUEZ identified Geraldo IGLESIAS, as the person he saw shoot and kill Monica ROMAN. Efrain TORRES did not witness this incident occur, and made no identifications. David CHMIELESKI informed A.S.A. LATZ that he never saw the face of the offender, and did not identify anyone at the line-up.

On 24 Jun. 92 at 0140 hrs. a second interviewed was conducted with Geraldo IGLESIAS, in the line-up room at Area Five VC. Present for this interview were Det. E. HALVORSEN, Det. R. GUEVARA, and A.S.A. M. LATZ. Geraldo IGLESIAS repeated his previous statement.

A.S.A. LATZ, after having reviewed all of the facts and circumstances of this investigation, approved charging Geraldo IGLESIAS, with First Degree Murder. With the arrest and charging of the sole offender in this incident, it is requested that this case be filed, CLEARED BY ARREST/CLOSED.

```
Det. E. HALVORSEN  #20692
Det. R. GUEVARA    #20861
```

EP Montanez Sub. Resp. 010257

# EXHIBIT 75

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 716 of 758 PageID #:108169

Identify and describe property
memory number
nicknames, sex, race etc., by age, weight, color eyes & hair, complexion, scars, marks, etc. If suspect is arrested, give name, sex, race code, age, C.B. or I.R. number, if known, and state "In Custody."

# SUPPLEMENTARY REPORT
CHICAGO POLICE — FOR USE BY B.I.S. PERSONNEL ONLY

All descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

| 4. DATE OF ORIG. OCCURRENCE—TIME | | |
|---|---|---|
| DAY | MO. | YR. |
| 07 | Jun | 93 | 1556 |

| 1. OFFENSE/CLASSIFICATION LAST PREVIOUS REPORT | IUCR OFF. CODE | 2. ADDRESS OF ORIG. INCIDENT/OFFENSE [X] VERIFIED [ ] 2 CORRECTED | 5. BEAT OF OCCUR. |
|---|---|---|---|
| HOMICIDE/Murder 1st Degree | 0110 | 2148 N. Sawyer | 1414 |

| 6. VICTIM'S NAME AS SHOWN ON CASE REPORT | CORRECT [X] YES [ ] 2 NO | IF NO, CORRECT ALL VICTIM INFORMATION IN BOXES 20 THROUGH 27. | 6. FIRE RELATED [ ] YES [X] NO | 7. BEAT ASSIGNED |
|---|---|---|---|---|
| ROMAN, Monica | | | | 5535 |

| 8. TYPE OF LOCATION OR PREMISE WHERE INCIDENT/OFFENSE OCCURRED | LOCATION CODE | 9. NO. OF VICTIMS | 10. NO. OF OFFENDERS |
|---|---|---|---|
| street | 304 | 1 | 1 |

Narrative section:

## This is an Area Five Violent Crimes Unit Report.

DATA ENTERED AD AREA 5

Continued on page two.

| 34. SERIAL NOS. OR IDENTIFICATION NOS. [X] 1 DNA [ ] 2 VERIFIED [ ] 3 CORRECTED | LIST ALL CORRECTIONS & NEW OR ADDITIONAL NOS. OBTAINED IN NARRATIVE |
|---|---|

| 50. OFFENSE/CLASS. THIS DATE (IF SAME ENTER DNA) | REV. CODE | 51. METHOD CODE | 52. METHOD ASSIGNED | UNIT NO. | 53. STATUS |
|---|---|---|---|---|---|
| dna | | DNA [X] FIELD [ ] SUMMARY | 652 [X] PROGRESS | [ ] 1 SUSPENDED | [ ] 2 UNFOUNDED |

| 80. EXTRA COPIES REQUIRED (NO. & RECIPIENT) | 91. DATE THIS REPORT SUBMITTED | TIME | 92. SUPERVISOR APPROVING (PRINT NAME) | STAR NO. |
|---|---|---|---|---|
| NORMAL | 23 Jun 93 | 2100 | BIEBEL | 1545 |

| 93. REPORTING OFFICER (PRINT NAME) | STAR NO. | 94. REPORTING OFFICER (PRINT NAME) | STAR NO. | SIGNATURE |
|---|---|---|---|---|
| DET. A. RICCIO 20870 | | DET. E. Halvorsen #20692 | | Biebel |
| | | DET. R. Guevera #20316 | | 95. DATE APPROVED (DAY-MO.-YR.) 25 JUN 1993 | TIME 0935 |

R.D. NO. X 2 5 0 3 0 3

AR-L 54596/

THIS IS A LINE-UP SUPPLEMENTARY REPORT:

LINE-UP CONDUCTED UNDER RD#    X-250 303

LOCATION, DATE AND TIME:    Area Five Viewing Room, 23 Jun 93, at 2000 hours.

PERSONS CONDUCTING LINE-UP:  Det. A. Riccio #20870 A5/VC
              Det. E. Halvorsen #20692 A5/VC
              Det. A. Guevera #20861 A5/VC

PERSONS PARTICIPATING IN LINE-UP: 1. VICENS, Jose   M/WH/19
                 1714 N. Monticello 23 Mar 74

                 2. SANTOS, Edgardo M/WH/25
                 2916 W. Cortland 07 Nov 67

                 3. MONTALVO, Charlie M/WH/17
                 5122 W. Dickens 12 Sep 57

                 4. VEGA, Kenneth M/WH/17
                 4759 W. Drummond 06 May 76

                 5. IGLESIAS, Geraldo M/WH/24
                 3715 W. Belden 24 Jul 68

PERSONS VIEWING LINE-UP:    1. OCHOA, Rosendo

PERSONS IDENTIFIED IN LINE-UP:  #5 IGLESIAS, Geraldo was positively identified by witness OCHOA as the person whom he observed shoot the victim, Monica ROMAN.

PHOTOGRAPHS TAKEN BY:    Det. E. Halvorsen #20692 A5/VC

INVESTIGATION:       In furtherance of the investigation into the homicide of Monica ROMAN, R/d's conducted the above line-up. The suspect of the line-up, Geraldo IGLESIAS, was permitted to pick his position in the line-up. All participants were required to stand, face the viewing window, and make facing movements. OCHOA positively identified IGLESIAS as the subject he observed fire a gun at the vehicle in which the victim was a passenger.

Det. E. Halvorsen #20692, Area Five Violent Crimes.
Det. R. Guevera #20861, Area Five Violent Crimes.
Det. Anthony Riccio #20870, Area Five Violent Crimes.

# EXHIBIT 76

Identify and de [...] Inventory numbers). If property taken was scribed for Opera: 'entification, indicate I.D. number at end of Narrative. Offender's ap: 'mate description, if possible, should include name if known, nickname, sex, race code, age, height, weight, color eyes & hai [...] plexion, scars, marks, etc. If suspect is arrested, give name, sex, race [...] age, C.B. or I.R. number, if known, and state "In Custody."

## SUPPLEMENTARY REPORT
### CHICAGO POLICE — FOR USE BY B.I.S. PERSONNEL ONLY

All descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

**4. DATE OF ORIG. OCCURRENCE—TIME**
DAY 07 — MO Jun — YR. 93 — 1556

| 1. OFFENSE/CLASSIFICATION LAST PREVIOUS REPORT | 1-UCR OFF. CODE | 2. ADDRESS OF ORIG. INCIDENT/OFFENSE ☒VERIFIED ☐2 CORRECTED | 3. BEAT OF OCCUR. |
|---|---|---|---|
| HOMICIDE/Murder 1st Degree | 0110 | 2148 N. Sawyer | 1414 |

| 5. VICTIM'S NAME AS SHOWN ON CASE REPORT | CORRECT ☒YES ☐2 NO | IF NO, CORRECT ALL VICTIM INFORMATION IN BOXES 20 THROUGH 27 | 6. FIRE RELATED ☐1 YES ☒2 NO | 7. BEAT ASSIGNED |
|---|---|---|---|---|
| ROMAN, Monica | | | | 5535 |

| 8. TYPE OF LOCATION OR PREMISE WHERE INCIDENT/OFFENSE OCCURRED | LOCATION CODE | 9. NO. OF VICTIMS | 10. NO. OF OFFENDERS |
|---|---|---|---|
| street | 304 | 1 | 1 |

Circumstances: 11. ☐ VERIFIED / ☐ UPDATE TO
12. OBJECT/WEAPON CODE NOS. | 13. FIREARM FEATURES CODE NO. | 14. POINT/ENTRY CODE NO. | 15. POINT/EXIT CODE NO. | 16. BURGLAR ALARM CODE NOS. | 17. SAFE BURGLARY METHOD CODE NO. | 18. IF RESIDENCE "WHERE WERE OCCUP. CODE NO.

19. Property: ☐ VERIFIED / ☐ UPDATE TO
DESCRIBE PROPERTY IN NARRATIVE. T = TAKEN: R = RECOVERED
FILL IN THE FULL AMOUNT OF ONLY THOSE VALUES WHICH EITHER DIFFER FROM OR WERE NOT REPORTED ON THE ORIGINAL CASE REPORT OR THE LAST PREVIOUS SUPPLEMENTARY REPORT.

| 1 MONEY ☐T $ ☐R | 2 JEWELRY ☐T $ ☐R | 3 FURS ☐T $ ☐R | 4 CLOTHING ☐T $ ☐R | 7 OFFICE EQUIPMENT ☐T $ ☐R | 8 TV, RADIO, STEREO ☐T $ ☐R |
|---|---|---|---|---|---|
| 9 HOUSEHOLD GOODS ☐T $ ☐R | 0 CONSUM. GOODS ☐T $ ☐R | 11 FIREARMS ☐T $ ☐R | & NARC./DANGEROUS DRUGS ☐T $ ☐R | 5 OTHER ☐T $ ☐R | 6 NONE ☐T ☐R |

**VICTIMS UPDATE ONLY**

| | 20 NAME (LAST–FIRST–M.I.) | 21 1-UCR OFFENSE CODE | 22 HOME ADDRESS (NO., DIR., STREET, APT. NO) | 23. SEX–RACE–AGE CODE | 24 HOME PHONE | 25. BUSINESS PHONE | 26. INJURED YES NO | 27. VICTIM REL. CODE |
|---|---|---|---|---|---|---|---|---|
| 1. | | | | | | | | |
| 2. | | | | | | | | |
| 3. | | | | | | | | |

**OFFENDERS UPDATE ONLY**

| | 28. OFFENDER'S NAME (OR DESCRIBE CLOTHING, ETC) | 29 HOME ADDRESS | 30 SEX–RACE–AGE CODE | HEIGHT | WEIGHT | EYES | HAIR | COMPL. |
|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | |
| 2. | | | | | | | | |

| | 31. C B. NO | I.R. NO., Y.D. NO OR J.D.A. NO | OFFENDER IREL CODE | C.B. NO. | I.R. NO., Y.D NO. OR J.D.A. NO. | OFFENDER REL. CODE | 32 NO ARRESTED ARREST UNIT NO |
|---|---|---|---|---|---|---|---|
| OFF 1 | | | OFF. 2 | | | | |

| 33. OFF'S. VEHICLE ☐USED ☐STOLEN | YEAR | MAKE | BODY STYLE | COLOR | V.I.N. | STATE LICENSE NO | STATE |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

| 34 SERIAL NOS. OR IDENTIFICATION NOS. ☒DNA ☐2 VERIFIED ☐3 CORRECTED | LIST ALL CORRECTIONS & NEW OR ADDITIONAL NOS OBTAINED IN NARRATIVE |
|---|---|

| 50. OFFENSE/CLASS. THIS DATE (IF SAME ENTER DNA) | REV. CODE | 51. METHOD CODE | 52. METHOD ASSIGNED | UNIT NO. 652 | 53 STATUS |
|---|---|---|---|---|---|
| dna | | DNA | ☒FIELD ☐3 SUMMARY | | ☒PROGRESS ☐1 SUSPENDED ☐2 UNFOUNDED |

STATUS CONT'D.
☐3 CLRD. CLOSED | ☐4 CLRD. OPEN | 5 EXC. ☐CLRD. CLOSED | 6 EXC. ☐CLRD. OPEN | 7 CLSD. ☐NON-CRIM.

54. IF CASE CLEARED, HOW CLEARED
☐1 ARREST & PROSEC. | ☐2 DIRECTED TO JUV. CRT. | ☐3 COMPL. RFUSD. TO PROSECUTE | ☐4 COMMUNITY ADJUSTMENT | ☐5 OTHER EXCEPT. | ☐ADULT ☐JUV.

55. ☐ FOR SUMMARY CASES ONLY — THE ORIGINAL CASE REPORT IS SUBSTANTIALLY CORRECT, AND CONTACT WITH THE VICTIM HAS DISCLOSED NO ADDITIONAL PERTINENT INFORMATION.

**80. NARRATIVE**

This is an Area Five Violent Crimes Unit Report.

Continued on page two.

| 90. EXTRA COPIES REQUIRED (NO. & RECIPIENT) | 91. DATE THIS REPORT SUBMITTED — DAY MO. YR. | TIME | 92. SUPERVISOR APPROVING (PRINT NAME) | STAR NO. |
|---|---|---|---|---|
| NORMAL | 23 Jun 93 | 2100 | | |

| 93. REPORTING OFFICER (PRINT NAME) | STAR NO. | 94. REPORTING OFFICER (PRINT NAME) | STAR NO. | SIGNATURE |
|---|---|---|---|---|
| DET. A. RICCIO 20870 | | DET. E. Halvorsen #20692 | | |

| 95. DATE APPROVED (DAY–MO.–YR.) | TIME |
|---|---|
| | |

CPD-11.411-B (Rev. 8/85)
*MUST BE COMPLETED IN ALL CASES

X 2 5 0 3 0 3

CCSAO-Serr-Mont_00005801

**THIS IS A LINE-UP SUPPLEMENTARY REPORT:**

LINE-UP CONDUCTED UNDER RD#           X-250 303

LOCATION, DATE AND TIME:              Area Five Viewing Room, 24 Jun
                                      93, at 0125 hours.

PERSONS CONDUCTING LINE-UP:           Det. A. Riccio    #20870  A5/VC
                                      Det. E. Halvorsen#20692   A5/VC
                                      Det. A. Guevera   #20861  A5/VC

PERSONS PARTICIPATING IN LINE-UP:   1. DeJesus, Juan  M/WH/18
                                       CB# 9423-098

                                    2. MUNOZ, Ernesto M/WH/22
                                       CB# 9423-030

                                    3. QUIROZ, Miquel M/WH/18
                                       4906 N. Wolcott

                                    4. LOPEZ, Juan  M/WH/18
                                       1041 N. Ridgeway

                                    5. PULOS, Ruben  M/WH/23
                                       CB# 9423-108

                                    6. IGLESIAS, Geraldo  M/WH/24
                                       CB# 9422-967

PERSONS VIEWING LINE-UP:            1. RODRIQUEZ, Hugo
                                    2. TORRES, Efrian
                                    3. CHMIELESKI, David

PERSONS IDENTIFIED IN LINE-UP:      #5 IGLESIAS, Geraldo was
positively identified by witness Hugo RODRIQUEZ as the person whom
he observed shoot the victim, Monica ROMAN.

PHOTOGRAPHS TAKEN BY:                Det. E. Halvorsen #20692  A5/VC

INVESTIGATION:                       In furtherance of the invest-
                                     igation into the homicide of
Monica ROMAN, R/d's conducted the above line-up.  The suspect of
the line-up, Geraldo IGLESIAS, was permitted to pick his position
in the line-up.  All participants were required to stand, face the
viewing window, and make facing movements.  RODRIQUEZ positively
identified IGLESIAS as the subject he observed fire a gun at the
vehicle in which the victim was a passenger.  Witnesses TORRES and
CHMIELESKI viewed the line-up but were unable to make an
identification because they never saw the face of the offender.

CCSAO-Serr-Mont_00005802

Detective Division
Area 5 Violent Crimes

22 February 1993
RD# X-079 312

## Page 3

Det. E. Halvorsen #20692, Area Five Violent Crimes.
Det. R. Guevera #20861, Area Five Violent Crimes.
Det. Anthony Riccio #20870, Area Five Violent Crimes.

CCSAO-Serr-Mont_00005803

# EXHIBIT 77

LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA





schedule@kentuckianareporters.com

877.808.5856 | 502.589.2273

www.kentuckianareporters.com

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

HON. FRANKLIN U. VALDERRAMA, DISTRICT JUDGE

HON. MARIA VALDEZ, MAGISTRATE JUDGE

CASE NO. 1:19-CV-6508


GERALDO IGLESIAS,

Plaintiff


V.


REYNALDO GUEVERA, ET AL.,

Defendants


DEPONENT: STEPHEN GAWRYS

DATE: OCTOBER 27, 2021

REPORTER: AALAYAH PURNELL



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2275 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 2

APPEARANCES

ON BEHALF OF THE PLAINTIFF, GERALDO IGELSIAS:

John Hazinski

Loevy & Loevy

311 North Aberdeen Street

Third Floor

Chicago, Illinois 60607

Telephone No.: (312) 243-5900

E-mail: hazinski@loevy.com

(Appeared via videoconference)

ON BEHALF OF THE DEFENDANT, CITY OF CHICAGO:

Austin Rahe

Rock Fusco & Connelly, LLC

321 North Clark Street

Chicago, Illinois 60654

Telephone No.: (312) 494-1000

Facsimile No.: (312) 494-1001

E-mail: arahe@rfclaw.com

(Appeared via videoconference)

Page 4

INDEX

Page

PROCEEDINGS                                          6

DIRECT EXAMINATION BY MR. HAZINSKI                   7


EXHIBITS

Exhibit                                             Page

1 - Supplementary Report (RFC 10-13)                66

2 - Arrest Report (RFC 14)                          72

3 - Supplementary Report

(RFC IGLESIAS 48-55)                                74

Page 3

APPEARANCES (CONTINUED)

ON BEHALF OF THE DEFENDANT, REYNALDO GUEVERA:

Kevin E. Zibolski

Leinenweber Baroni & Daffada, LLC

1150 Wilmette Avenue

Suite E

Wilmette, Illinois 60091

Telephone No.: (866) 786-3705

Facsimile No.: (800) 896-2193

E-mail: kevin@ilesq.com

(Appeared via teleconference)

ON BEHALF OF THE DEFENDANTS, STEPHEN GAWRYS, ROBERT

BIEBEL, ANTHONY RICCIO, AND ERNEST HALVORSEN:

Josh Engquist

The Sotos Law Firm, P.C.

141 West Jackson Boulevard

Suite 1240A

Chicago, Illinois 60604

Telephone No.: (630) 735-3300

Facsimile No.: (630) 773-0980

E-mail: jengquist@jsotoslaw.com

(Appeared via videoconference)

Page 5

STIPULATION

The VIDEO deposition of STEPHEN GAWRYS was taken at
KENTUCKIANA COURT REPORTERS, 30 SOUTH WACKER DRIVE, 22ND
FLOOR, CHICAGO, ILLINOIS 60606, via videoconference in
which all participants attended remotely, on WEDNESDAY,
the 27th day of OCTOBER 2021, at approximately 11:02
a.m. EST; said deposition was taken pursuant to the
FEDERAL Rules of Civil Procedure.  The oath in this
matter was sworn remotely pursuant to FRCP 30.

It is agreed that AALAYAH PURNELL, being a Notary Public
and Court Reporter, may swear the witness and that the
reading and signing of the completed transcript by the
witness is not waived.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 6

PROCEEDINGS

COURT REPORTER: We are on record. My name is Aalayah Purnell. I'm the video technician and court reporter today. Today is the 27th day of October 2021. The time is 11:03 a.m. Eastern Standard Time. We are convened by videoconference to take the deposition of Stephen Gawrys in the matter of Geraldo Iglesias versus Reynaldo Guevara, et al., pending in the United States District Court for the Northern District of Illinois, Eastern Division, case number 1:19-CV-6508. Will counsel please state your appearance, how you are attending, and the location you are attending from, starting with Plaintiff's counsel?

MR. HAZINSKI: This is John Hazinski representing the plaintiff, Geraldo Iglesias, appearing remotely from Chicago.

MR. RAHE: This is Austin Rahe appearing for the defendant, City of Chicago, via Zoom from the Chicagoland area.

MR. ENGQUIST: You don't need to put it on me. Josh Engquist, also taking it via Zoom in the Chicagoland area. I'm with my client, Mr. Gawrys. I represent the other individual defendants, with

Page 7

the exception of Mr. Guevara.

MR. ZIBOLSKI: Good morning. This is Kevin Zibolski for Defendant Guevara. I'm attending by telephone from the City of Chicago.

COURT REPORTER: Thank you, Mr. Gawrys, will you please state your full name for the record?

THE WITNESS: Sure. First name is Stephen, S-T-E-P-H-E-N. Last name is Gawrys, G-A-W-R-Y-S.

COURT REPORTER: Thank you. And do all parties agree that the witness is, in fact, Mr. Gawrys?

MR. HAZINSKI: Yes.

MR. RAHE: Yes.

COURT REPORTER: Thank you. Sir, will you please raise your right hand? Do you solemnly swear or affirm that the testimony you are about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

COURT REPORTER: Thank you. Counsel, you may begin.

MR. HAZINSKI: Thank you.

DIRECT EXAMINATION

BY MR. HAZINSKI:

Q   So sir, your name is pronounced Gawrys; is

Page 8

that right?

A   Correct.

Q   Thank you. Have you ever given a deposition before?

A   Hear me?

Q   Yes. I'm sorry, did you answer? It didn't come through.

A   Yeah, I did. I said yes. I'll speak louder.

Q   Thank you. I appreciate that. How many times?

A   Two or three times.

Q   Well, you have some familiarity with this process, but just to make sure things go smoothly, I'm going to go over some ground rules in the beginning. The first of which we've already run into a little bit, which is, especially in these remote contexts, it's important that we try not to speak over one another, because, as you can tell, the court reporter here is taking down everything we say. So I'll do my best to let you finish answering a question before I start asking a new one and I'd ask that you try to let me finish asking before you answer; is that fair?

A   Fair.

Q   Thank you. If you don't understand a question that I ask whether because it's a confusing question or

Page 9

because there's some problem with the technology, please ask me to clarify or restate or rephrase the question. And if you answer it, I'll assume that you understood me; is that fair?

A   Fair.

Q   You're welcome to take a break at any time you'd like to.

A   Okay.

Q   So the only thing I'd ask is that you not take a break while I still have a question pending to you, okay? Mr. Gawrys, do you have any medical issues or are you taking any medications that affect your memory?

A   Yes. Both.

Q   And what are the medical issues that affect your memory?

A   I have bad back, bad hip. It's from a cancer surgery.

MR. ENGQUIST: He's asking if it affects your memory though, Steve.

THE WITNESS: Pardon me?

MR. ENGQUIST: If it affects your memory.

A   Oh, no, it doesn't affect my memory. And I took Tylenol, that's all.

BY MR. HAZINSKI:

Q   Well, I'm sorry to hear about that. And you



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 10

know, if, for example, I know we're going to be sitting for a long time today, so if you need to take a break or readjust.

A   Yeah, I'll let you know.

Q   Please feel free, because we don't want you to have to be in pain during this process.

A   Thank you.

Q   Other than Tylenol, are you taking any medications that, and I'm asking only because if there are any medications you might be taking that would affect your memory?

A   No.

Q   You're in the room with your attorney, Mr. Engquist, correct?

A   Correct.

Q   Is anybody else in there with you?

A   No.  Just my dog.

Q   Did you review any documents to prepare for this deposition?

A   Yes.

Q   What documents did you review?

A   Supplementary, just the investigative file.  I looked through that.

Q   About how many pages long was the investigative file that you looked through?

Page 11

A   I don't know.

Q   Did you read the entire investigative file carefully?

A   Most of it.  I tried to.  Yeah, most of it.

Q   Did you review any transcripts in preparation for your deposition?

A   Yes.

Q   What transcripts did you review?

A   I believe it was from Guevara.

Q   It was the testimony of Mr. Guevara?

A   Yes.

Q   Was the testimony from a criminal case or from a civil case?

A   From this case.

Q   Okay.  When you say "from this case," do you mean from the criminal trial in this case?

A   Yes.

Q   Other than Mr. Guevara's testimony, did you review any other transcripts?

A   No.

Q   Did you look at any photographs?

A   Any further what?

Q   Any photographs?

A   No.

Q   In the investigative file you looked through,

Page 12

I think you mentioned seeing supplementary reports. What other kinds of documents did you review in the investigative file?

A   Maybe the original sub, some of the other subs, investigative subs, went through  -- went through that, and then the sub with Guevara, Halvorsen, and then Riccio, and my name on it.

Q   Did you review any handwritten police reports?

A   No.

Q   Did you meet with one or more of your attorneys to prepare for this deposition?

A   Yes.

Q   How many times?

A   One time.

Q   When was that?

A   That would be during my  -- after my last deposition.  What was it last week?  Week before?

Q   What case was it in which you gave that last deposition?

A   That was Maisonette.

Q   Did you have the same attorneys representing you in that case?

A   Yes.

Q   Are you a defendant in the Maisonette case or were you just a witness?

Page 13

A   I was just a witness.

Q   How long was your meeting with your attorney to prepare for this deposition?

A   I'm not sure.  I don't know.  Maybe a couple hours.

Q   Other than your attorney, have you talked to anybody else about your deposition in this case?

A   No.

Q   Mr. Gawrys, are you currently employed?

A   Yes.

Q   Where do you work?

A   I work at Cook County Assessor's Office.

Q   And what do you do at the Cook County Assessor's Office?

A   I'm Chief of Investigations.

Q   What are your responsibilities in that role?

A   I have a team of investigators and we investigate erroneous exemptions on properties.

Q   Do you supervise that team?

A   Yes.

Q   And how long have you had that job?

A   Since 2014.

Q   I want to go back in time.  When were you first hired by the Chicago Police Department?

A   November 1st, 1977.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 14

Q    And what was your first assignment within the police department?

A    Patrol division.

Q    How long did you remain in the patrol division?

A    Well, I went from the district to a specialized unit in -- I don't know what year it was. I'm not sure. '84, '85, somewhere in there.

Q    What was the name of the specialized unit you went to?

A    Special Operations Group. We were the south unit.

Q    And what were the responsibilities of the Special Operations Group?

A    Responsibilities were to -- We were a mobile unit that we can go into any area on the south side and help assist the district personnel if they were having unusual crime patterns or things that were going on that they needed help on they couldn't handle.

Q    Did your rank change when you joined the Special Operations Group?

A    No.

Q    Who was your supervisor, or who was in charge of supervising you in that role?

A    I have no idea. I don't remember.

Page 15

Q    Was it a sergeant?

A    Yes.

Q    And how long did you remain with Special Operations?

A    I really don't remember. Maybe two, three years.

Q    Where'd you go after that?

A    I got promoted to gang specialist.

Q    What year was that promotion?

A    Maybe 1985, '86. I'm not sure.

Q    How long in total were you a gang specialist, approximately?

A    Until 1990.

Q    Was Rey Guevara one of your partners when you were a gang specialist?

A    Yes.

Q    Do you recall what period of time he was your partner?

A    No, I did not.

Q    Do you know if it was for more or less than a year?

A    I have no idea.

Q    Did you have multiple partners while you were a gang crime specialist?

A    Yes.

Page 16

Q    Do you recall the names of any of your other partners while you were a gang crime specialist?

A    Maybe Joe Sparks was one. I don't know. I don't remember. I couldn't be sure.

Q    What did it mean to be partnered with another officer when you were a gang crime specialist?

A    You just worked with that other person.

Q    If you were partnered with a particular officer, did that mean that you worked on all of your cases together?

A    Yeah, for the most part.

Q    Can you estimate about how many cases you worked on in gang crimes with then gang crimes Officer Guevara?

A    No, I have no idea.

Q    What were the responsibilities of a gang crime specialist?

A    Gang crime specialist, we were assigned, most of us, two gangs to monitor, and what you did is you collected information, intelligence, whatever you want to say, which consisted of cars and how many members in the section, who went to jail, who's coming out of prison. Those types of things.

Q    When you said you were assigned two gangs, two as in T-W-O gangs?

Page 17

A    Yeah, two.

Q    The number.

A    One, two. Right.

Q    Which two gang did you specialize in?

A    I had the Latin Kings at Leavitt and Schuler and the Insane Unknowns, they were around, I think it was Damen and Armitage.

Q    As a gang crime specialist, were you ever in charge of monitoring any other gangs?

A    No, that was my only two responsibilities.

Q    Okay. From what you remember during your partnership, what gangs did Officer Guevara specialize in?

A    One of them he had was the Latin Lovers. I don't remember the second one.

Q    Was there a particular -- so you mentioned two intersections associated with each of the gangs that you were in charge of monitoring. What geographic area of the city was that in?

A    I don't know what you want. What do you mean area?

Q    What part of the city is it in --

A    It's the North side.

Q    Okay. Particular neighborhood?

A    One was Wicker Park. The other was Bucktown,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 18

I'm guessing. I don't know. I don't remember.

Q So would it be fair to say that for the two gangs that you specialized in, that it was your job to know who the members of those gangs were?

A Yes.

Q Did you frequently make arrests of gang members?

A Yes.

Q Did you know the nicknames of the people that were in those gangs?

A For the most part, yes.

Q As a gang crimes officer, did you ever have to investigate serious crimes or violent crimes?

A Yes.

Q Okay. As part of those investigations, did you interview witnesses, for example?

A Yes.

Q Now on some occasions, gang crimes officers would work with violent crimes detectives, correct?

A That's correct. Did you hear me?

Q I'm sorry, my connection froze and I couldn't hear your answer. Could you say the answer one more time?

Page 19

A What's the question again? You said we work together?

Q Yeah. Sometimes gang crime specialists work with violent crimes detectives, right?

A Yes.

Q If a violent crime occurred and there was suspected gang involvement, were there always violent crimes detectives that worked on that case, or was it sometimes that gang crimes specialists would investigate it without working with detectives?

MR. ENGQUIST: Objection. Calls for speculation. Also lack of foundation. But go ahead.

A If it was a violent crime, it was investigated by the detectives.

Q When you worked as a gang crimes specialist, can you describe how you would be assigned to work on a particular investigation?

A It would be by a sergeant.

Q And was the sergeant who did the assignments a gang crime sergeant or someone from the detective division?

A No, it'd be a gang crimes sergeant.

Q As a gang crimes officer, did you ever show photographs to eyewitnesses?

Page 20

A Yes.

MR. ENGQUIST: Objection. Vague. Go ahead.

Q I think we got the answer. So did gang crimes officers, when you were a gang crime specialist, keep books with photographs of known gang members in them?

A Did we keep them? What do you mean?

Q Like -- let me --

A We had books --

Q Let me ask it a different way. As a gang crimes specialist, did you have access to books of photographs of known gang members?

A Yes.

Q Okay, Was there a name for those books?

A I don't know about a specific name. There were just gang books.

Q Gang books. Okay. As a gang crimes specialist, were you responsible for putting together those books?

A No.

Q As a specialist in particular gangs, were you ever responsible for adding or removing photographs from a gang book?

A No, you couldn't remove photos from there. Well, you shouldn't, let's put it that way. You shouldn't move.

Page 21

Q Where were those books stored?

A Gang crimes office.

Q At the time you were a gang crimes specialist where was the gang crimes office?

A Belmont and Western.

Q Was that office shared with any other police details or divisions?

A Yes.

Q Which ones?

A It was an area building, so I think it was area three at the time. I'm not sure, the numbers keep changing. But we had the 19th District was in there, patrol division. And then you had the detective division on the second floor. Youth division was there.

Q And you said the -- and so, at that space at Belmont and Western, was the gang crimes office -- did it have its own dedicated space within that building?

A Yes.

Q Okay. Is -- and it was -- and the gang books were stored in that dedicated space, correct?

A Administrative office, yes.

Q What were those gang books used for?

A Identifications.

Q Can you explain how you would use one of those gang books for identifications?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 22

A    If you had witnesses, you would bring them to the office.  Depending on the information you had, you would pull those books.

Q    Did you ever take a gang book out?  Take it out with you into the field?

A    I don't remember doing it, but I may have.  I don't know.

Q    Okay.  From your experience, do you know who was responsible within the police department for adding photos to gang books or taking photos out of gang books?

A    No.

MR. ENGQUIST:  Objection to foundation.

Q    And as a gang crimes officer, did you personally ever have occasion to show gang books to witnesses during criminal investigations?

A    Yes.

Q    Do you recall approximately how many times you did that?

A    No.

Q    As a gang crimes specialist, did you take notes during investigations?

A    Yes.

Q    At the time, were you required to take notes on any particular form or type of report?

A    Say that again.  On a certain report?  Could

Page 23

you repeat that, please?

Q    Let me -- I'll just ask it in a more direct over.  Were you required to make handwritten notes on GPRs as a gang crime specialist?

A    No.

Q    Did you take notes during witness interviews?

MR. ENGQUIST:  Objection.  Vague.  And objection to foundation.

A    I guess I can answer.  What was it?  What are you asking again?  Say that again.

Q    When you were working as a gang crimes specialist, you said you took notes during investigation sometimes.  Did you take notes during witness interviews?

A    Yes.

Q    Were there other circumstances during investigations that you conducted as a gang crimes specialist where you took notes?

A    Could have been.  Depends on the circumstances.

Q    Could you give me an example?

A    Photo ID out of one of the gang books.

Q    So if there was a positive photo ID out of one of the gang books, how would you document that information?

Page 24

A    We would put that on a -- well, we could put it on a department patrol division supplementary, or we would call the detectives on the case to let them know that we do have an ID.  That was for sure.

Q    Other than putting the information on a patrol division supplementary or calling the detectives, are there any other ways that you would document a positive ID from a gang book?

A    No.  I can't think of any.

Q    As a gang crimes specialist, did you ever write memos or notes to detectives that you were working with on a case?

A    I don't remember doing it.

Q    If you took notes, handwritten notes, during an investigation as a gang crime specialist, what would you do with those notes after you made them?

A    Depends on what the notes were.

Q    Can you explain what you mean?

A    I don't know what you're looking for.  What you mean by "notes."

Q    To take one example, let's say you made handwritten notes of a witness interview.  After you made those handwritten notes, what would you use them for?

A    Use them for?  We would notify detective

Page 25

division, if need be, then reduce those notes to a supplementary report.

Q    And when you say "if need be, reduce them to a supplementary report," what do you mean?

A    Well, it depends what the notes were.  I mean, I don't know how to explain it.  If you're there with a witness or something and you're talking to somebody and detectives come in, sometimes detectives would come to our office and bring a witness in to show our books, so we would assist them and show them the books because outsiders weren't really allowed to most of the time, unless they're really well-known detectives, to go through our books.

Q    When you say "outsiders," do you mean folks who aren't in gang crimes?

A    Yeah.  Outside units.

Q    Got it.  So if you had handwritten notes from a witness interview that you took as a gang crime specialist, you said you might notify the detective division and, if need be, you might reduce those notes to a supplementary report; is that correct?

A    We would tell the detective division.

Q    In every case?

A    Well, if it's a violent crime case.  I don't know what the case is you're talking -- you know, you

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 26

have in mind. So if it's a violent crime case, of course we're going to tell the detectives. But you have to -- that's their responsibility for the case, not ours. So we're just there to assist them.

Q And when you say "tell the detectives," do you mean that you would tell the detectives everything that had happened with the witness?

A As far as the interview?

Q Yeah.

A Yes.

Q And in some circumstances, you might also make a supplementary report based on your handwritten notes, right?

A If need be, yes.

Q How did you decide whether to make a supplementary report or not?

A Depends on the information you have.

Q Okay. Can you explain a little more what you mean by that?

A No. I mean, I don't know what you're looking for, but if they had the responsibility of clearing the case, detective division, then we're just there to assist them with information if it's a gang-related case.

Q I'll try to ask the question in a more

Page 27

specific way and maybe it'll be clearer. If you had, let's say, made handwritten notes of a witness interview during an investigation of a violent crime as a gang crimes specialist, you had to make a decision about whether or not to document that information in a supplementary report and I'm wondering if you could tell me what are the factors that you would consider in deciding whether to prepare a supplementary report?

A It would depend on the witness. What the witnesses is telling you. If we take a witness, just for an example, I don't know what you're going at, but we take a witness and they're in our office, our gang office, and we start showing them photos, if there's an ID, or there is no ID, we're going to mark down what we did as far as what books we showed.

Q And when you say "mark down what we did," do you mean putting it in a sup report?

A Yeah. What book, what photo, if there was an ID. And then you notify detective division. But as far as --

Q And --

A -- never mind.

Q I'm sorry. I didn't mean to interrupt you.

A No, that's all right. I don't want to start babbling here.

Page 28

Q Fair enough. And just to be clear, you would put it in a sup if there was an ID or if there was no ID, correct?

A Yes.

Q Besides documenting positive identifications from a photo book, are there other circumstances as a gang crimes specialist that you would prepare supplementary reports?

A Sure.

Q Can you give me some examples?

A Robberies, auto thefts, sexual assaults, narcotics.

Q After you prepared a supplementary report -- well, let me back up.

A Hold on. Okay. We're good.

Q Is it fair to say that you would -- when you had to prepare a supplementary report, you would rely on the handwritten notes that you had made to, sort of, reduce that information into the typed report?

A Yes.

Q Okay. And after you did that, what would you do with the handwritten notes?

A Run.

Q Sorry, could you say that again?

A Run the report, destroy the notes.

Page 29

Q Okay. As a gang crime specialist, did any supervisor ever tell you that you were required to hold onto those notes?

A I don't think so.

Q Okay. When you prepared a sup report documenting some investigative step, what would you do with that completed report?

A Hand it in to a supervisor.

Q Okay. Was it your responsibility to make sure that copies of any report you wrote made it to detectives?

A No, it was not. But I would make a copy of it and either drop off a copy or put it in the mail.

Q As a gang crime specialist, did you ever maintain written lists of known gang members?

A You mean, as far as what I was responsible for or just in general?

Q Did you ever maintain -- so one of your responsibilities, I think you said, was to know who was in the gangs that you specialized in.

A Yes.

Q And so to that end, did you ever maintain written lists of the names of the people in each of the gangs?

A Yes, I believe so.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 30

Q   Do you know if that list also had nicknames of those people?

A   It probably did.

Q   Do you know where you kept that list?

A   Where I kept that, oh, probably in my locker.

Q   Okay.  Was that your locker at the gang crimes office?

A   Yes.

Q   Did you ever keep any other work-related documents in your locker at gang crimes?

A   I can't remember.

Q   As a gang crime specialist, did you work with confidential informants?

A   I don't know if they would call them confidential informants in the formal way.  It depends on what you mean.

Q   I imagine that as a gang crime specialist, you probably had to be gathering a lot of information from people on the street about gang activities; is that fair?

A   That's fair.  Yeah.  You could say it in that way, yes.

Q   Okay.  And later on, as a detective, there's a sort of a formal term called confidential informant, right?

Page 31

MR. ENGQUIST:  Objection.  Foundation.  And I think you're mischaracterizing the evidence but go ahead.

A   I don't know of any.  There's no formal system for confidential informants.  I mean, there are people that you use, you call confidential informants, but people on the street give you information.  But as far as anything structured, no.

BY MR HAZINSKI:

Q   Okay.  Did you ever obtain information -- when you were working as a gang crime specialist, did you ever obtain information that was relevant to your investigation from a witness or somebody on the street and -- but kept their eye identity confidential from the other officers working on the case?

MR. ENGQUIST:  Objection to form.  Go ahead.

A   I don't understand what you mean really.

Q   Okay.  I'm not trying to be tricky.  I think I'm just doing a poor job explaining.  So for example, was there ever a situation where you got some piece of information from somebody and you shared that information with your other officers, but you said, for instance, this is from someone -- this is a confidential who gave this to me.

A   I would share information with other officers

Page 32

on the case.  I mean, everybody's got to know what's going on here.  It would be a little dangerous withholding stuff from somebody that's working on the case.

Q   And why is that?

A   Well, things can happen, you know.  I don't know.  You just want to let them know.  I mean, if you're working on a case, you can't have secrets on it between other officers.

Q   As a gang crime specialist, did you work with particular detective areas more than others?

A   Yes.

Q   And which ones did you mainly work with?

A   Area 5.

Q   Okay.  Were there particular detectives within Area 5 that you worked with most frequently as a gang crime specialist?

A   Sometimes it turned out that way.

Q   Do you recall who those detectives were?

A   We pretty much worked with everybody, but it was Ernie Halvorsen, Jack Leonard, Gillie McLaughlin. We worked with Santa Padre, Mohan.  It was around a lot of detectives, but mainly ones that were assigned to do gang cases, I guess, back then.  I don't know how they were doing it when we were gang specialists, but those

Page 33

are kind of the people we went to.

Q   Okay.  As a gang crime specialist -- so let me actually do this a little out of order.  So after gang crimes, you were promoted to detective, right?

A   Pardon?  What was that?

Q   After you worked in gang crimes, you were promoted to detective?

A   Yes.

Q   And I believe you said that was 1990, you got that promotion, right?

A   Correct.

Q   And how long were you a detective?

A   Six years.

Q   So '96?

A   Correct.

Q   Who were your partners when you were a detective?

A   All of them?

Q   Yeah.

A   It's quite a list.  Well, Guevera, Ray Guevera, Ernie Halvorsen.  I worked with Jack Leonard. Is this as a gang specialist or when I made detective? I'm sorry.

Q   When you made detective, that six-year period.

A   Oh, okay.  Yeah, you work with a lot of

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 34

different detectives. Let's see. Who else? What did I say? Jack Leonard, Ernie. There were quite a few. I mean, there was some on midnights when you had to do your midnight turn. I don't remember their names. Tony Riccio. That's all I can remember right now.

Q   Okay. When you were promoted from gang crime specialists to detective, did you have to go through any additional training?

A   Yes.

Q   And what did that involve?

A   I don't remember.

Q   Do you recall whether it was classroom training?

A   Yes, it was.

Q   Okay. Do you remember about how long that training lasted?

A   No, I don't remember.

Q   Okay. Do you remember who provided the training?

A   Who provided the training? No. No, it was from the academy.

Q   Okay. When you transitioned from being a gang crime specialist to a detective, did your practices around notetaking during criminal investigations change?

A   Yes.

Page 35

Q   Okay. How so?

A   Detective division is required to use GPRs, general progress reports, they're called, for their notetaking.

Q   When you were a detective, did you have an understanding of why the detectives were required to use GPRs?

A   Understanding? No, I think it was just a formal way of keeping things in order.

Q   So when you became a detective, from that point on did you always make handwritten notes on GPRs?

A   For the most part, yes.

Q   But not always?

A   I would say 95% of the time.

Q   So in that other 5% of cases, what were the circumstances where you wouldn't use a GPR?

A   I don't know what circumstances. Sometimes you would just write it on a piece of paper and then include it in the file.

Q   As a detective at Area 5, did you conduct lineup and photo array, eyewitness identification procedures?

MR. ENGQUIST: Sorry. Did you say as a detective?

MR. HAZINSKI: Yeah.

Page 36

MR. ENGQUIST: Okay.

A   Yes.

BY MR. HAZINSKI:

Q   Was that a routine part of your work as a detective?

A   Yes.

Q   As an Area 5 detective, did you ever suggest to a witness who they should pick from a photo array or from a live lineup?

A   Never.

Q   Okay. Would that have been improper?

A   Yes.

Q   Why?

A   You're telling a witness who to pick.

Q   Did you ever see any other detectives tell a witness who to pick?

A   No.

Q   As an Area 5 detective, did you ever write a false report about what happened during an eyewitness identification procedure?

A   No.

Q   Earlier, we were talking about confidential informants. And correct me if I'm wrong, but it sounds like there was no formal designation of categorizing someone as a confidential informant within Area 5; is

Page 37

that right?

A   I don't understand what you're asking. Are you asking -- go ahead. I don't know what you're asking.

Q   Do you have an understanding of what the term confidential informant refers to?

A   Yes.

Q   Okay. And what does that refer to?

A   It refers to someone that's given you information in confidence.

Q   As an Area 5 detective, were there policies or training that you received on working with confidential informants?

MR. ENGQUIST: Objection to foundation, form, compound.

A   I don't remember anything formal.

Q   Did you ever receive any informal training on working with confidential informants?

MR. ENGQUIST: Objection to form. Informal.

A   No.

Q   Is it fair to say that if you got information from a confidential informant, and now we're talking about your work as a detective, that you would not put that informant's name in a typed report documenting the information?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 38

A    Correct.

Q    And that was in order to keep their identity a secret, right?

A    Yes.

Q    So separate from the report, did you ever make records of, or notes of, who the confidential informant was or write it down in any way?

A    I usually knew them, so, no.

Q    Okay.  So it was sort of on you to remember who the informant was that provided that piece of information, right?

A    I'm trying to think of an instant, but it might have been.  You know, I'm not sure, but I wouldn't make it known to anyone.

Q    Would you keep the identity of a confidential informant confidential from the other officers you were working with on an investigation?

A    It depends who the officers were if they didn't need to know.  My partner, maybe on that day, I would tell.  I talked to so-and-so and this is whatever happened.  Other than that, I don't think I ever went beyond that.

Q    During your time as a detective, did an assistant state's attorney ever ask you to reveal the identity of a confidential informant?

Page 39

A    Not that I remember.

Q    When you investigated cases as an Area 5 detective, did you ever obtain information or statements from jailhouse informants?

A    No.  Let me ask you something.  Are you asking within the jail, or people that came out of the jail, or how do you mean that?

Q    Yeah, let me make it a little more specific.  Let's back up.  So did you ever, when investigating a case as an Area 5 detective, get information from someone in exchange for leniency with respect to pending criminal charges against that person?

A    No.

Q    When you were an Area 5 detective, were you aware that sometimes individuals would receive leniency in exchange for providing information?

A    No.

Q    Was there a policy that prohibited Area 5 detectives from doing that?

A    I think it was a department policy.  You couldn't make promises to anyone.

Q    So in other words, if a detective offered someone something, someone who was locked up, they made them an offer in exchange for providing information, that would go against the rules of the department?

Page 40

A    Yes.

MR. ENGQUIST:  Objection to foundation to that question.

Q    Who was responsible for  -- what was the rank of the person responsible for assigning detectives to homicide investigations while you were a detective?

MR. ENGQUIST:  Objection.  Calls for Speculation.  Foundation.  (Inaudible).  Go ahead.

COURT REPORTER:  I'm sorry.  I didn't hear the objection.

MR. ENGQUIST:  Objection, foundation.  Also calls for speculation.  It's also an incomplete hypothetical.

A    To answer your question, the on-duty sergeant for the violent crimes unit, one of the sergeants, would assign you to the case.

BY MR. HAZINSKI:

Q    Okay.  Did you ever, as a detective, did you ever help out on cases that you weren't officially assigned to?

A    Yes.

Q    Okay.  And how would it come to be that you would work on a case that you weren't assigned to?

A    Maybe they were just asking for an assistance.

Q    When you say "they" were asking, who was

Page 41

asking?

A    I mean -- the other detectives would ask to go arrest somebody or whatever, you would go with them, provide assistance, backup.

Q    Okay.  The notes and reports that you created during investigations when you were an Area 5 detectives, were those  -- did you store all of those in a single file?

A    Yes.

Q    Was there a name for that file?

A    Investigative file.

Q    Did that file go by any other names that you're aware of?

A    Probably had nicknames for them.  We had a nickname.  I think officially, it was called the investigative file.  We might call it street file, whatever.  Mostly, it was investigative file.

Q    Okay.  You said that as a detective, about 95% of the time approximately, you would make handwritten notes on GPRs, correct?

A    Correct.

Q    Okay.  After you wrote out a GPR, what would you do with it?

A    It would be included in the investigative file.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 42

Q   Okay.  For you as the detective who wrote the GPR, were you responsible putting it in the investigative file?

A   I don't know about responsibility, but I did it.

Q   What do you mean by that?

A   Well, I mean, nobody else had the responsibility to do something like that.  I mean, it wasn't like we talked about gang pictures and things like that, that the front office, while we were gang specialists, they would take care of it, the administrative staff.  Here, there was no staff, it was just, you did it, you punched holes in it, then you put it in the file, and you marked it in the front of the contents.

Q   Got it.  So there was no, you know, system for staff to --

A   No, you just included it in the file.  So whoever or picked up that file would read that and then it would be up to date.

Q   Okay.  Did you have to submit GPRs for supervisor approval?

A   I don't think so.  I mean, they would look at it, I guess.  I'm not sure how that worked.  I don't remember.

Page 43

Q   Did you have to submit typed reports for supervisor approval?

A   Yes.

Q   Okay.  So I'm curious, once you hand in a typed report to a supervisor to approve it, did you get to see that report again?

A   Only a copy of it in the file.  The original report that you typed out, went on.  It just, wherever it went.

Q   Okay.  So earlier, when we were talking about GPRs, I believe you said you were the one who would put your own GPRs in the file.  Is that true for sup reports that you made as well, that you were the one who put them in the file?

A   Yes.

Q   Okay.  So I just want to understand the kind of steps of the process.  So would you give the original, for example, to the supervisor to review and then make a copy to put in the file?

A   Yes.

Q   Okay.  So there would be a copy that didn't have a supervisor's signature on it, and then the supervisor would have the original to sign off on; is that fair?

A   It could be, yes.

Page 44

Q   Okay.  And was the supervisor who reviewed the files a sergeant in Area 5?

A   Say that again.

Q   was the supervisor who signed off on typed reports a sergeant within Area 5?

A   Yeah, it might.  Yeah, usually, it was.

Q   Okay.  Was it ever somebody else?

A   It could be.

Q   Who else could it be?

A   It could be your lieutenant.

Q   Okay.  So I was just asking you about investigative files when you were a detective.  I want to kind of go back to the period when you worked in gang crimes.  Was there any file that was similar to or operated like the investigative file for gang crimes off officers to use?

A   No, I don't know of any.

Q   Okay.  So from what you remember, is it fair to say there was no separate file with reports or notes maintained by gang crimes officers that was from an investigative file maintained by the detectives?

A   No.

Q   Why did you stop working as a detective?

A   I got promoted to sergeant.

Q   Okay.  And that was in '96?

Page 45

A   Correct.

Q   And you left Area 5 at that point?

A   Yes, I did.

Q   And where'd you go?

A   Back to the patrol division, 22nd District.

Q   Was there an option for you at that point to continue as a sergeant at Area 5?

A   No.

Q   Did you apply to become a sergeant?

A   Yes, I did.

Q   Okay.  And at that point, did you want to stop working as a detective?

A   I didn't want to; I just took the promotion exam.

Q   Okay.  Did you choose to go back to patrol?

A   No, you don't really have a choice.

Q   Okay.  So what years were you a sergeant in patrol?

A   Well, '96 I got made sergeant.  I went to the 22nd district.  I stayed there.  I don't know how long, a couple years.  And then I moved on to the training division.

Q   Do you remember what year you started working at the training division?

A   Yeah, I couldn't tell you for sure.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 46

Q Okay. Was your rank still sergeant when you went to training?

A Yes.

Q Okay. So what were your responsibilities as a sergeant in the training division?

A I, myself, along with another sergeant were responsible, the unit was called Instructional Design and Quality Control, and there, we recently search lesson plans that were taught to recruit, and to suburban police who we also taught, and that was according to the Illinois Standards Board from the State of Illinois.

Q Okay. And so, just so I understand, were you responsible for developing training curricula for police officers?

A Yes.

Q Okay. Do you remember the subject of -- well, actually, let me back up. Did the training materials that you worked on encompass all different kinds of policing responsibilities or were they focused on specific areas?

A No, it was covering a lot of areas.

Q Okay. Did it cover report writing, for example?

A Yes.

Page 47

Q Okay. Did it cover witness interviews?

A Yes.

Q About how long were you in the training division?

A Maybe six years.

Q Do you remember what year you left training?

A Well, I mean, you figure '96. I don't know when I got in there. Made sergeant in '93. I don't know. I don't remember.

Q Where did you go after you were in the training division?

A I went to Internal Affairs.

Q Okay. What were your responsibilities in Internal Affairs?

A I was sergeant. I was head of a team of investigators.

Q And what did the team of investigators do?

A Investigated allegations against police officers.

Q As the sergeant in charge of the team of investigators, were you responsible for actually doing any investigation, or were you in a more supervisory capacity?

A Both.

Q Okay.

Page 48

A Oh, what?

Q How big was that team?

A Oh, gosh. Oh, man, I don't know. Maybe six investigators? I'm not sure. Four? Or about six. I'm not sure.

Q Were you the only investigation team within Internal Affairs? Or were there other teams operating alongside you?

A There were other teams.

Q Okay. Did your team have a specific focus or did it cover allegations citywide?

A It was citywide allegations, all types.

Q Okay. So would it be fair to say that you investigated and were responsible for overseeing investigations into patrol officers and detectives and any other officer potentially?

A Yes.

Q In general, could you please describe the steps that were involved in investigating allegations of misconduct?

MR. ENGQUIST: I object. That's vague. So the form. And it also calls for speculation because there's no parameters at all. But go ahead.

A Of misconduct? It depends what it was. Things

Page 49

were -- we were assigned by a lieutenant, I was, for the team to investigate. We'd be given assignments. Ours were not real major investigations, I mean as far as major, major, like investigating corrupt policemen taking money, things like that. That was given to -- There was another unit within Internal Affairs. I think it was called the Confidential Unit or something. And they handle a lot of those cases.

BY MR. HAZINSKI:

Q As a sergeant working on these investigations, were you responsible for making findings or recommendations about -- in connection with these complaints?

A Yes.

Q Okay. So who did you issue those findings or recommendations to?

A My lieutenant.

Q Okay. Were you personally responsible for the decision about whether to impose discipline?

A Well, I would recommend discipline.

Q Okay. After you made that recommendation, was it somebody else's job to determine whether that discipline should be imposed?

A Yes. It was reviewed by the lieutenant.

Q Okay. So about how many years were you in

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 50

Internal Affairs?

A    I think it came out to like three-and-a-half.

Q    Okay.  And approximately what time period, if you could estimate, were you in Internal Affairs?

A    All right.  Well, I retired in 2008 of January.  So if we went back three years, do the math, that would leave you at what?  2005, you asked when I got there.  So around that time.

Q    Okay.

A    So --

Q    During your time at Internal Affairs, could you estimate approximately what percentage of the cases you investigated, you recommended a discipline be imposed?

A    I couldn't tell you.  I have no idea.

Q    Would it be fair to say it was more than half the time?

A    No idea.

Q    Okay.  Did you keep track of that information about how many instances you were recommending discipline?

A    No.

Q    Okay.  During your time in Internal Affairs, did you ever come to the conclusion that a police officer that you were investigating had falsified a

Page 51

police report?

A    I can't remember if we ever did any of those cases.

Q    Okay.  Were those cases handled by the confidential unit that you mentioned?

A    I'm not sure.  Might have been someone else.

Q    Okay.  So could you give me a sense of what types of complaints you did investigate most often?

A    Rule violations, policy violations of the department, some criminal activity, thefts.  That's about it.  I can't really remember anymore.

Q    Were you yourself ever, at any point in your career at the CPD, the subject of a complaint?

A    Yes.

Q    Okay.  Do you remember how many complaints there were?

A    I think total -- I don't remember.  I had some minor ones.

Q    Do you recall what the allegations were for those complaints?

A    I remember one was a city sticker.  Being off my beat when I first came on the job.  I can't remember any more than that.

MR. HAZINSKI:  Okay.  Could we, if it's okay with you, Mr. Gawrys, could we maybe take a five-

Page 52

minute break and come back?

THE WITNESS:  Sure.  Yeah, that'd be good.  Now is a good time.  All right.

COURT REPORTER:  Okay.  We are going off record.  The time is 12:13 p.m. Eastern Standard Time.

(OFF THE RECORD)

COURT REPORTER:  We are back on record.  The time is 12:27 p.m. Eastern Standard Time.

BY MR. HAZINSKI:

Q    All right, Mr. Gawrys, I had a couple follow-up questions regarding the files, and I want to focus on the investigative files from the time that you were working as a detective at Area 5, okay?

A    Okay.

Q    So were those investigative files stored at Area 5?

MR. ENGQUIST:  Foundation.

A    Yes.

Q    They were, sorry?

A    Yes, they were.

Q    Okay.  And you had to access those sometimes, for instance, to put GPRs in them, right?

A    Yes.

Q    When you were working as a detective, was

Page 53

there a particular room or particular office where they were kept?

A    Yes.

Q    And where was that?

A    It was in an office, mainly for sergeants, and a lieutenant was in there.

Q    Okay.  So I imagine, because there were a lot of investigations going on at the same time, that there were, like, a pretty large volume of investigative files being kept in that office.  Right?

A    Correct.

Q    Okay.  Were they kept in boxes on shelves?

A    No.  They were in file cabinets.

Q    After a case was closed, would the investigative file stay in those file cabinets?

MR. ENGQUIST:  Object to the foundation.  Go ahead.

A    No.  Part of that, well, not part, a lot of that would go, would be -- I guess it would be transferred downtown where a real permanent file was kept.

Q    Is there a name for the permanent file?

A    I don't know one.

Q    Okay.  And the investigative files, sometimes they would have an inventory sheet on the top that



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 54

listed the contents of the file; is that correct?

A   Correct.

Q   Okay.  And your understanding from when you were a detective, what was the purpose of that inventory sheet?

A   Just to track what was inside the file.

Q   Okay.  So when you, as a detective, put something in the file yourself, like you punched it, you put it in, were you responsible for noting that on the inventory sheet?

A   Yes.

Q   Okay.  And did you make that note on the inventory sheet at the same time that you put the thing in the file?

A   Yes.

Q   Okay.  Were you able to take -- during the course of an investigation, were you permitted to take the investigative file with you out of the office where it was stored?

A   Yes, we could.

Q   Okay.  Were you able to take it out in the field with you?

A   Sometimes we did.

Q   Okay.  Were you required to note anywhere that you had removed the file from the office?

Page 55

A   Right.  You had to -- I believe we had to let the sergeant know.  I'm not sure about it, but I know somewhere it was written down or something, from what I remember.

Q   And at some point after a case was closed, your understanding was that it would get sent somewhere else and the information would be kept in some more permanent file.  Right?

MR. ENGQUIST:  Objection.  Calls for speculation.  Go ahead.

A   Yeah, I believe so.  I think there was a copy of the file kept in the office.  I'm not sure.

Q   After a case was closed, did you ever go back through the investigative file and take out documents that weren't necessary?

A   No.

Q   Okay.  So you testified that you reviewed some documents in preparation for this deposition.  Before looking at those documents, did you have any recollection of the Roman homicide investigation?

A   No.

Q   So I'm going to ask you now about what you can independently remember, and I want to define that so that it's clear.  When I ask you about an independent recollection, what I mean to ask is what you remember

Page 56

separate or apart from what's actually written on the paper.  It's something you have an independent memory of, separate from anything you reviewed in preparation for the deposition.  Does that make sense?

A   Sort of.  You asked me if I had any recollection before I looked at the reports.  Is that your question?

Q   I did ask that question.

A   Yeah.  No, I didn't remember the case at all. None of it.

Q   Okay.  But now, having looked at some reports, you know some things about the case that you just gleaned from looking at the paper.  Right?

A   Right.

Q   Okay.  Did the process of looking at those police reports and other documents, did that bring back any independent memories of the investigation beyond what you just saw written down?

A   No.  The only thing is the victim's name.  I kind of remembered.

Q   Okay.  For example, reviewing the reports didn't jog any independent memories of any work you performed on the case?

A   No.

Q   And it didn't jog your memory about any

Page 57

communications you had with other officers during the investigation?

A   No.

Q   About how long in total did you spend reviewing documents before your deposition?

A   Maybe an hour, hour-and-a-half?  Maybe not even.  Somewhere in there.

Q   Okay.  So we're going to talk a little bit about this Roman homicide investigation.  Would it be fair to say that the only details of that investigation that you can testify to are details that you've saw in your recent review of the reports?

A   Yes.

Q   Okay.

A   Just what I read in there.

Q   Okay.  I want to ask you now about your knowledge of some of the people involved in this case, the first being Rey Guevara.  So you were partnered with Rey Guevara as a gang crime specialist, right?

A   Correct.

Q   Okay.  But at some point, he was promoted to Area 5 detectives, right?

A   Promoted to detective.

Q   Right.

A   And assigned to Area 5.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 58

Q   Thank you for that clarification.  Were you and he promoted and assigned to Area 5 at the same time?

A   Yes.

Q   Okay.  At the time that you were both promoted to detective and assigned to Area 5, were you partners in gang crimes?

A   Yes.

Q   And when you were promoted to detective and assigned to Area 5, did you partner up as detectives?

A   Sometimes.

Q   Sorry, could you repeat that?

A   Sometimes, sometimes.

Q   Sometimes.  Okay.  Did you work the same shift as Detective Guevara at Area 5?

A   Sometimes.

Q   Okay.  Did your shifts change over the years?

A   Yes.

Q   Okay.  Do you recall what shift you worked in 1993?

A   No.

Q   Okay.  When was the last time you spoke with Rey Guevara?

A   Someone else asked me that.  That was before May of this year.

Q   And did you speak with him in person or over

Page 59

the phone?

A   Over the phone.  He doesn't live here anymore. So I think I said before that I was going down to Texas to see my sister, and he's kind of close to the area I was going, maybe two, three hours away.  And I wanted to see if I had time to maybe just stop in and visit him, which I never did.

Q   Okay.  Is Rey Guevara still a friend of yours?

A   I consider him a friend.  Yes.

Q   About how often do you talk with him?

A   Not often.  Maybe holidays.

Q   When was the last time you saw him in person?

A   That would be the Rivera case.

Q   Okay.  And it was when that Rivera case went to trial?

A   Yes.

Q   Okay.  Were you friends with Rey Guevara outside of work when the two of you were working together in gang crimes?

A   We didn't associate a lot together.

Q   Okay.  What about when you were detectives? Were you friends outside of work?

A   No, we didn't socialize much there either.

Page 60

Q   Okay.  When would you say that you became friends with Rey Guevara?

A   I have no idea.

Q   Would you say it was after you left Area 5?

A   No, it was probably in gangs.

Q   Okay.  Is it a fair summary to say you were friends with him at work, but didn't socialize with him much outside of work in gang crimes?

A   Yes.

Q   Okay.  When you last talked with Rey Guevara in May, did your conversation touch on any of the ongoing lawsuits against him?

A   No.

Q   Okay.  Have you ever talked to Rey Guevara about the fact that he's invoked the Fifth Amendment right to remain silent in response to questioning about his work as a police officer?

A   I don't remember it if we did.

Q   Did you ever have a conversation with him where it was the two of you talking and you said, for instance, "Hey, Rey, why are you doing that?"

MR. ENGQUIST:  Objection.  Asked and answered. He already answered the question.  You can answer it one more time.  Go ahead.

A   Not sure.  But I think, "Why are you doing

Page 61

it?" "Man, it was just on the advice of his attorneys." And we left it at that.

BY MR. HAZINSKI:

Q   Were you present during his testimony?  Were you present in the courtroom during his testimony at the Rivera trial?

A   Yes.

Q   Okay.  You knew Ernie Halvorsen from your work at Area 5, right?

A   Yes.

Q   Okay.  Was Ernie Halvorsen a friend of yours?

A   Not a friend.  We were acquaintances, work acquaintances.

Q   Did you ever socialize with Ernie Halvorsen outside of work?

A   Not that I remember.

Q   From your own observations, do you know if Guevara and Halvorsen ever socialized outside of work?

A   I don't know.

Q   When was the last time you talked to Ernie Halvorsen?

A   Probably couldn't tell you.  I have no idea.

Q   Okay.  Did you stay in touch with him after you left Area 5?

A   No.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 62

Q    Okay.  For a period of time you were partnered with Tony Riccio; is that right?

A    Yes.

Q    Okay.  For the record, that's R-I-C-C-I-O.  Did you consider Tony Riccio a friend outside of work?

A    No, we didn't socialize together.

Q    Okay.  When was the last time you talked to Tony Riccio?

A    Couldn't tell you.  A long time ago.

Q    Did you keep in touch with Mr. Riccio after you left Area 5?

A    No.

Q    Okay.  Did you know Robert Biebel?

A    Yes.

Q    Okay.  And what was his position at Area 5?

A    He was the sergeant.

Q    Was Biebel one of the people who would sometimes be responsible for approving your reports?

A    I'm not sure.  Could have been.

Q    Were you friends with Robert Biebel while you worked at Area 5?

A    Yes, we were friendly together.

Q    Did you socialize with him outside of the office?

A    No.  The only time we ever met as a group of

Page 63

guys, it was like Christmastime.  That was many years ago.  We would see each other and it was just a get-together, but that stopped.  So --

Q    Okay.  And that was after you left Area 5, right?

A    Yes.

Q    Okay.  Can you estimate approximately what year was the last time you had one of those get-togethers?

A    No idea.  It was a long time ago.  When these cases started, it was just we didn't get together anymore.

Q    After there were more lawsuits?

A    Yes.

Q    Okay.  Do you recall the last time you talked to Mr. Biebel?

A    I saw him at the attorneys' offices walking out the door, or he was sitting in there.  I'm not sure.

Q    Did you have a conversation with him at that point?

A    Well, talk, "Hi, how are you?  Haven't seen you in a while." That's about it.

Q    Did you talk to him at all about any of the lawsuits that either of you was involved in?

A    No.

Page 64

Q    Do you recall ever having any conversations with a man named Geraldo Iglesias?

A    No.

Q    Okay.  Do you recall ever having any conversations with somebody who went by the nickname Snake?

A    No.

Q    Okay.  Now, you as a gang crime specialist, did you have any specialized knowledge of or familiarity with a gang called the Imperial Gangsters?

A    Yeah, I know who they were.

Q    Okay.  Do you know what territory they occupied?

A    I can't remember right now.

Q    But the IGs, the Imperial Gangsters, were not one of the gangs that you were responsible for, right?

A    What's that again?  Say that over?

Q    I'll rephrase the question.  You weren't a specialist in the Imperial Gangsters, right?

A    No.

Q    Okay.  During the time that you were at gang crimes, do you recall which gang crimes specialists did specialize in the Imperial Gangsters?

A    No, I do not.

Q    Okay.  Do you know an individual by the name

Page 65

of Rosendo Ochoa?

A    No.

Q    Do you know a person that goes by either Rosendo Ochoa or any of the following aliases: Geraldo Negaera (phonetic), Victor Lopez, or Ricardo Mahia?

A    No.

Q    Just for the record, going forward, if I say Rosendo Ochoa, I'm going to be referring to those alias as well: Negaera or Lopez or Mahia, okay?

A    Okay.

Q    Do you know an individual named Hugo Rodriguez?

A    No.

Q    Okay.

A    I mean, it's a name, but there's a lot of them.

MR. HAZINSKI:  Yeah.  So I want to show you a document now, and just -- Counsel, so this will be the report produced at RFC 10 through 13.  And Mr. Gawrys, what I'm going to do is --

MR. ENGQUIST:  Just give me one second.  Let me just -- I'm going to have a hard copy of it, so I don't have to look over his shoulder.  Go ahead.

MR. HAZINSKI:  All right.  So what I'm going



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 66

to do is show my screen with you so that we can be looking at it together. So --

MR. ENGQUIST: Is this going to be Exhibit 1?

MR. HAZINSKI: Yeah.

MR. ENGQUIST: Exhibit 1 is RFC 10 through 13?

MR. HAZINSKI: Yep.

MR. ENGQUIST: Okay.

BY MR. HAZINSKI:

Q   So Mr. Gawrys, are you able to see the document that I just shared with you here?

(EXHIBIT 1 MARKED FOR IDENTIFICATION)

A   Yes, I do.

Q   Okay. And if you need me to scroll or zoom to see any part of it, please just let me know, okay?

A   Okay.

Q   So Mr. Gawrys, is this one of the documents that you reviewed in preparation for your deposition today?

A   Yes, it is.

Q   Do you recognize what kind of report this is?

A   It's a supplementary report.

Q   Okay. Is this type of supplementary report, would it be accurate to call it a cleared closed report?

A   I don't think so.

Q   Okay. In general, do you know what a cleared

Page 67

closed report is?

A   Yes. It's arrests were made and there is no other subjects wanted in the case.

Q   Okay. So I'm going to zoom in now to a part on the first page here. And do you see on the left that the box next to "cleared closed" has an X in it?

A   Yes.

Q   Does that indicate to you that this is a cleared closed report?

A   Yes, I would take it that way.

Q   Fair enough. So what is the purpose of a cleared closed report in a homicide investigation?

A   It's just what I said, that the case is now closed because all the subjects are either in custody or been in accounted for to finish the investigation.

Q   What type of information would normally be documented in a cleared closed report in terms of the course of the investigation?

A   I don't understand what you're trying to ask. I mean, a lot of information's in there, so I -- it's different kinds of information. Can you be more specific?

Q   Is one purpose of a cleared closed report to summarize the course of the criminal investigation?

A   Yes.

Page 68

Q   Okay. Is it also -- is another purpose of a cleared closed report to identify the evidence implicating the arrestee?

A   Yes.

Q   Now, your name appears on this report, correct?

A   Correct.

Q   Okay. And it's at the bottom, and there's a number written next to your name, which is 20689. Was that your star number?

A   Correct.

Q   Okay. And your name appears next to detective

A.   Riccio. Do you see that?

A   Yes.

Q   At this period of time in 1993, was Mr. Riccio your partner?

A   On that day, probably.

Q   Does the fact that your name appears in the bottom of this report mean that you were involved in the preparation of this report in some way?

A   Yes.

Q   Okay. Now I want to go to the next page, which is RFC 11, and it says arresting detective, and then it lists the names Halvorsen, Guevara, Riccio, and Gawrys, correct?

Page 69

A   Right.

Q   So does that mean that you were one of the detectives responsible for arresting the defendant?

A   Yes.

Q   Okay. Now I want to ask you about the investigation section on this page. We're still looking at RFC 11. Do you see the first sentence of the investigation section where it says, "On 21-June-93, the reporting detectives were contacted by a confidential informant?" And then it goes on to note information that the informant provided. Do you see that part of the report?

A   Yes, in the first paragraph.

Q   Yes. So you reviewed this report in preparation for your deposition. Do you remember whether you were the one who typed this up?

A   No, I did not type this.

Q   Okay. Do you remember being contacted by a confidential informant at any point during the Roman homicide investigation?

A   It had nothing to do with this case.

Q   Okay.

A   Other than assist the arrest.

Q   So sometimes -- I want to ask a hypothetical question now, sir, stepping away from the details of

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 70

this investigation.  So sometimes as a detective, you would take over or pick up working on a case that some other detectives had previously been investigating, right?

A    Right.

Q    Okay.  Now let's say that you did that and you were -- and as part of taking over the case, would it be your usual practice to review the police reports that had been prepared up to that point?

A    Yes.

Q    Okay.  Suppose that you did that and you were taking over a case and reviewing the reports, and the reports referred to a confidential informant, and you wanted to find out who that individual was.  Was there any way for you to get that information?

A    Only by talking to the detectives that wrote the report about that confidential informant.

Q    Other than talking to those detectives, was there any other way to get that information?

A    I don't know of any.  I can't think of any.

Q    Okay.  So now I want to scroll down to RFC 13, and this is the final page of this report.  And the names at the bottom, it just says Detective E. Halvorsen, Detective R. Guevara.  Do you see that?

A    Yes.

Page 71

Q    Okay.  Do you know why your name and detective Riccio's name aren't listed at the end of this report, even though they appear on the first page?

A    No, I don't know.  I had nothing else to do with the case.

Q    Okay.  So you testified that you believe that you were involved in making the arrest of Geraldo Iglesias and that was it, right?

A    Yes.  I assisted in the arrest, from what I'm reading.

Q    Okay.  So how do you know that that was the extent of your involvement in this case?

A    Because my name doesn't appear anywhere else as doing anything.

Q    Okay.  Is it fair to say that you believe that if you had had any other involvement in the investigation, that your involvement would be documented in some of the other reports in the investigative file?

A    Yes.

Q    For instance, if you had interviewed witnesses, that information would be documented?

A    Yes.

Q    If you had conducted a photo array, or a live lineup procedure, there would be documentation of that as well?

A    Yes.

Page 72

A    Yes.

Q    Do you know whether you communicated with either Guevara, Halvorsen, or Riccio about the Roman homicide investigation while it was ongoing?

A    No.

Q    All right.  I'm going to show you another report now.  And so this will be Exhibit 2, and it's RFC 14 for the record.  Are you able to see this report?

(EXHIBIT 2 MARKED FOR IDENTIFICATION)

A    Okay.  I see it.

Q    And is this one of the reports you reviewed in preparation for your deposition today?

A    Yes, I looked at it.

Q    Okay.  And this is an arrest report documenting the arrest of Geraldo Iglesias on June 23, 1993, correct?

A    Yes.

Q    Okay.  So the report is authored by Halvorsen and Guevara.  And it lists as arresting detectives T. Riccio and S. Gawrys, right?

A    Right.

Q    Okay.  Do you recall how you came to be involved in Geraldo Iglesias' arrest?

A    I don't remember specifically.

Q    Do you have any memory of arresting Geraldo

Page 73

Iglesias?

A    No.

Q    Do you have any memory of anybody asking you to assist with this part of the case?

A    No.

Q    Do you have any memory of what anyone told you about why Iglesias was being arrested?

A    No.

Q    Do you have any memory of reviewing any reports or other police documents after being asked to assist with this arrest?

A    No.

Q    So earlier, you said that one way that a person could be pulled into a case that they weren't formally assigned to is because another detective might ask them for help executing an arrest; is that right?

A    Correct.

Q    Okay.  Is it your belief that that's what happened in this case?

A    I would say so, yes.

Q    Okay.  Now, in the cases -- Just as a matter of your normal practice and procedure, when you were asked to assist other detectives in making an arrest, would it have been typical for you to review the reports and other police documents in the investigative file at

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 74

that point?

A    Before you assisted them in the arrest?

Q    Yes.

A    No.

Q    Okay.

A    I wouldn't.

Q    So if you were assisting other detectives in making an arrest, was it your responsibility to make an independent determination about whether the evidence supported the arrest?

A    No.

Q    In other words, were you just assisting the other detectives and trusting their investigative work?

A    Yes.

Q    Do you have any reason to dispute that any of the information documented in this arrest report is accurate?

A    Say that again, what was that?  You broke up a little.

Q    Sure.  Do you have any reason to believe that any of the information documented in this arrest report is inaccurate?

A    No.

Q    I want to ask you, show you now another document.  Let me see if I can find the right one.  So

Page 75

this is -- we'll make this Exhibit 3, and this is a police report that's been date stamped as RFC Iglesias, 48 through 55.  Mr. Gawrys, are you able to see the first page of this report on your screen?

          (EXHIBIT 3 MARKED FOR IDENTIFICATION)

A    Can you make it --

MR. ENGQUIST:  One second.  You got -- you got to give me time to go flipping through, what is it again?

MR. HAZINSKI:  It's 48 through 55.

THE WITNESS:  Could you make it a little bigger?

MR. HAZINSKI:  Yeah.  And Josh, I'll give you as much time as you need to get there.

MR. ENGQUIST:  Yeah, I'm there now.

THE WITNESS:  That's good.  Okay.

MR. ENGQUIST:  I'm not sure what page you're on, but I'm at the fourth page.

THE WITNESS:  48.

MR. ENGQUIST:  Okay.

MR. HAZINSKI:  Thank you.

THE WITNESS:  Sure.  Shockton (phonetic).

MR. ENGQUIST:  Yeah, I got it.

THE WITNESS:  Okay.

BY MR. HAZINSKI:

Page 76

Q    Mr. Gawrys, was this one of the reports that you reviewed in preparation for your deposition?

A    No.

Q    Okay.

A    Might have gone -- passed by it.  But no, I didn't actually read it.

Q    Okay.  So I want to just ask you about some things about this report.  So understanding that you didn't author this, do you see near the top where it -- Box number two says, "Address of original incident/ offense."  Do you see that box?

A    Yes.

Q    Okay.  You see there's two words next to that with boxes corresponding that say "verified" and "corrected?"

A    Yes.

Q    Okay.  And in this case, one of those is -- says corrected, and it has an X through it.  From your understanding and your familiarity with these types of supplementary reports, what do those words "verified" and "corrected" refer to?

A    Rest of the incident.

Q    Okay.  And so, what are the circumstances where an officer would mark "verified" on a supplementary report?

Page 77

A    I don't know.  I think it's just -- I never marked those.  It looks like they -- from here, you had the wrong address somewhere and they corrected it.

Q    Okay.  I want to scroll down now and ask you about some information that's written on this report. So looking now at RFC 50, do you see that there are some handwritten notes on this page?

A    Yes.

Q    Is that your handwriting?

A    No.

Q    Do you recognize whose handwriting that is?

A    No, I do not.

Q    Okay.  Continuing onto the following page, and now this is RFC 51.  Is the handwritten note on this page your handwriting?

A    No.

Q    Okay.  As you were looking through the investigative file in preparation for your deposition, did you see any handwritten notes that you recognized to be your handwriting?

A    No.

Q    Okay.

A    I wouldn't have any.

Q    What do you mean by that?

A    I wouldn't have any notes in there.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 78

Q   And why is that?

A   Because I didn't work on the file, work on the case.

Q   Okay.  If you didn't work on the case apart from the arrest, why is your name written on the clear, closed report?

A   Because it was at the end, making the arrest. I was included in that narrative.

Q   Okay.  So I've stopped sharing my screen now. So you testified earlier it's your belief that you were partnered with detective Riccio on the day of Geraldo Iglesias' arrest, correct?

A   Correct.

Q   Okay.  Now, do you know from your review of documents, whether Detective Riccio was involved in any aspect of the Roman homicide investigation beyond the arrest?

A   I have no idea.

Q   If you were partnered with Detective Riccio, was it fair to say that you were working with him during your entire shift that day?

A   It could be.

Q   Do you remember one way or the other on --

A   No.

Q   -- June 23rd, 1993?

Page 79

A   No, I do not.

Q   In your review of the investigative file, did you see any police reports or notes reflecting that Detective Riccio helped conduct eyewitness identification procedures on June 23rd, 1993?

A   No, I do not.

Q   Okay.  If reports show that he was present during those procedures, do you have any reason to dispute the truth of that?

A   No.

Q   If it's true that Detective Riccio was helping to conduct eyewitness identification procedures following Geraldo Iglesias' arrest on June 23rd, 1993. As you sit here today, are you able to say that you were or were not present also during those procedures?

A   I was not present.

Q   How do you know?

A   My name doesn't appear on the reports.

Q   As you sit here today, can you say what you were doing at the time of those identification procedures?

A   No idea.  Any number of things.

Q   Can you explain why it would be that Detective -- both you and Detective Riccio participated in Geraldo Iglesias' arrest, but then only Detective Riccio

Page 80

remained involved in the investigation?

A   I would be guessing, but I would say that either I left work, I was called to do another job, maybe called to assist someone else.

Q   Is there any doubt in your mind that your entire involvement in the Roman homicide investigation was limited to executing the arrest of Geraldo Iglesias?

A   Yes.  That was it.

Q   Okay.  In other words, no doubt in your mind?

A   No doubt.

Q   Okay.  Do you know who Francisco Vicente is?

A   No.

Q   Have you ever heard that name before?

A   I think I've heard the name.

Q   What, if anything, do you know about Francisco Vicente?

MR. ENGQUIST:  I'm going to object and instruct him not to answer if his only information came from discussions with his attorneys.  So to the extent that the information only came from your attorneys, acknowledge and answer the question.  So you can answer anything beyond that, go ahead.  But if not, you're not answering.  Go ahead.

A   I don't know.  What was the question?  Do I know that guy, or --

Page 81

BY MR. HAZINSKI:

Q   Yes.

A   I'm sorry.

Q   Apart -- So I'm not interested in information that your lawyers gave to you in any confidential communications you had with them.  So setting those aside.  What, if anything, do you know about Francisco Vicente?

A   I don't remember anything, nothing.

Q   Okay.  Do you remember ever interacting with Francisco Vicente during any homicide investigation?

A   No.

Q   Okay.  Do you have any information about how Francisco Vicente came to be involved in the Roman homicide investigation?

A   No.

Q   During your review of documents in preparation for this deposition, do you remember seeing any documents pertaining to Francisco Vicente?

A   No.

Q   Did you testify at any criminal proceedings against Geraldo Iglesias?

A   No.

Q   As you sit here today, do you have any personal knowledge about whether there was probable

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 82

cause to prosecute Geraldo Iglesias for murder?

A    I have no idea.

Q    Do you have an opinion, one way or the other, about whether Iglesias is guilty of the Roman homicide?

A    No idea.

Q    Does the fact that Reynaldo Guevara has pled the Fifth Amendment in response to questioning about his conduct during the Roman homicide investigation affect your opinion of Geraldo Iglesias' guilt or innocence?

A    No.

Q    Okay.  Now I only have a couple more questions that I -- before I wrap up I just would like to, if you don't mind, if we could take another short break.

A    Sure.  Okay.  Five, 10 minutes?  What do you want?

MR. ENGQUIST:  Let's take a good five, 10 minutes.  Maybe stretch your legs too.

MR. HAZINSKI:  Yeah.  That sounds great, all right.

COURT REPORTER:  We're going off record.  The time is 1:09 p.m. Eastern Standard Time.

(OFF THE RECORD)

COURT REPORTER:  We are back on record.  The time is 1:21 p.m. Eastern Standard Time.

BY MR. HAZINSKI:

Page 83

Q    All right.  Mr. Gawrys, I just have a few follow up questions before we finish, before I finish my questioning.  So at various times when you were an Area 5 detective, you said you had a lot of different partners over the time that you were there, right?

A    Correct.

Q    Now, did your partners change day to day or week to week?  Or did you -- were you assigned a single partner for a longer period of time?

MR. ENGQUIST:  I'm sorry, just for clarification, you're talking about the -- or the five or so, five to six years that he was there?  Or you more in the beginning, or we just talking in general?  I just want to make sure.

BY MR. HAZINSKI:

Q    Just in general.  Over the time that you were at Area 5.  Because you said you had different partners at different times, and I'm curious if you would have one partner for a period -- for a lengthy period and then another, or if it would change back and forth routinely?

A    Well, I mean, obviously things would change. If you went to midnights, everybody had to do their time on the midnight shift.  So I mean, obviously you didn't go as partners.  You just -- there were permanent

Page 84

detectives on that shift that liked working midnights. So you worked with them.  On day watch, I don't know.  I mean, it's -- you team up with people that were available.  And that was also on a third watch, but you did work sometimes steady with people.  For how long?  I don't know.  I have no idea.  I don't remember.

Q    Okay.  On any given day shift, did you have the ability to choose who your partner was going to be or was that told to you by a supervisor?

A    We'd kind of choose between ourselves to work. It just depended what we were doing.

Q    Okay.  Was there a period of time after which you stopped partnering up with Guevara?

A    Yeah, I left the watch.  I went either midnight -- Midnights or second watch, which is day shift.

Q    And when was that approximately?

A    I have no idea.

Q    Are you able to estimate approximately how many investigations you worked on as partners with Detective Guevara, as a detective?

A    No, I don't know.

Q    Would it be fair to say it was more than 10?

A    I would say so.

Q    Okay.  In your experience working as a

Page 85

detective alongside Guevara, did you observe whether he ever took notes during homicide investigations?

A    Yes.  I believe he took notes.

Q    Okay.  And you yourself took notes during homicide investigations as a detective, right?

A    Yes.

Q    Okay.  For example, if you -- when you were working as a violent crimes detective, if you were interviewing a witness, was it your ordinary practice to make contemporaneous handwritten notes during the witness interview?

MR. ENGQUIST:  Objection, call for speculation and vague.  Go ahead.

COURT REPORTER:  I'm sorry, I didn't get your objection.

MR. ENGQUIST:  Objection, calls for speculation and vague.

A    Yes, I would make notes.

BY MR. HAZINSKI:

Q    And as we discussed before, you would make those notes on general progress reports, right?

A    Right.

Q    Okay.  From your own observations, was it also detective Guevara's practice to make handwritten notes during witness interviews during homicide

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 86

investigations?

A    I have no idea a lot of times what he did, so. I wasn't working with him all the time.

Q    Okay.  On the occasions that you were working with him, did you ever observe that he was failing to take notes in a circumstance in which you would've taken notes?

A    No.

Q    And I guess I want to ask the same thing with respect to Tony Riccio.  So when you worked alongside Detective Riccio in Area 5, did he also make handwritten notes during homicide investigations?

A    I'm sure he did.  Yes.

Q    Okay.  That was sort of the standard practice for all Area 5 detectives on your understanding, right?

MR. ENGQUIST:  Objection, calls for speculation, vague.  Go ahead.  And foundation.

A    I would say that's for all detectives.

Q    Yeah.  Earlier I asked you some questions about photo books, gang books, but I asked those questions in the context of your work as a gang crime specialist.  So but now I want to talk about when you were a detective at Area 5.  As an Area 5 detective, did you have access to those same gang books?

A    For the gang unit?  Is that what you were

Page 87

asking?

Q    Yeah.

A    Yes.

Q    This, the gang books we were talking about earlier?

A    Yes.

Q    You did?  Okay.  Now I believe you said that access to those books would sometimes be limited to outsiders; is that right?

A    Yes, they would ask to use the books.

Q    Okay.  Now were there any gang books, and I apologize if there's a siren on my end of the call --

A    It's your call.

Q    Were there gang books that were stored at -- In the same building as Area 5?

A    Gang books?  I don't know.  They had some photos there, but I'm not sure what they were.

Q    Did you personally, in the course of any investigations as an Area 5 detective, did you ever ask to use one of those gang books to show photographs?

A    Which ones?  Area 5?  I don't know what Area 5 had.  I don't remember if they had gang books.  They just had people they arrested.

Q    All right.  Any gang books.  Did you -- do you remember as a detective ever using those?

Page 88

A    I don't know where you're -- are you saying that Area 5 had gang books?

Q    No, I just mean in general, not even gang books specifically stored at Area 5, but gang books stored anywhere.  Do you remember as a detective ever using such a gang book?

A    Yeah, I used gang books.

Q    Okay.  Do you remember where you would go get them?

A    I went to the gang office, it'd be at Belmont and Western.

Q    Okay.  And at that time, was that still Area 3?

A    Yes, I believe what the building was called, that area.

Q    Okay.  Now were the gang books organized with members of all different gangs mixed together, or were they separated out were each book just had one gang?

A    They were separated.

Q    Okay.  So for example, there might be a gang book that corresponded to the Latin Lovers that had photographs of just known Latin Lovers members in it, right?

A    Right.

Q    Okay.  Do you know one way or another whether

Page 89

-- Well, let me ask it this way.  Did the department maintain gang books for all the major Chicago street gangs?

MR. ENGQUIST:  Object to the foundation.

A    Not that I know of.

Q    Okay.  Now you specialized in Latin Kings and the Insane Unknowns, right?

A    Right.

Q    Were there gang books for those two gangs?

A    Yes.

Q    Okay.  Do you know, as you sit today, whether there was a gang book for the Imperial Gangsters?

A    There were.

Q    Okay.  In your review of the police reports and other documents in the investigative file, as you were preparing for your deposition today, did you come to be familiar with what the evidence was implicating Geraldo Iglesias in the Roman homicide?

A    I read that.  I think it was a photo ID? Somebody gave information, and then they did a photo spread.  I am not too sure.  I didn't concentrate on that too much.

Q    Okay.  Fair to say that when you were reviewing the documents, you were mainly looking out to see whether you were involved?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 90

A    Correct.

Q    Okay.  Do you know, for any of the eye witnesses in this case, whether they had a good or bad opportunity to view the perpetrator?

A    No idea.

MR. ENGQUIST:  I'm sorry.  Could you repeat the que -- did you say good or bad opportunity to be the perpetrator, or did you say --

MR. HAZINSKI:  Sorry, to view.  To view.

MR. ENGQUIST:  To view, okay.  Okay.  I'm sorry.  That's why I was confused.  Okay, sorry.

BY MR. HAZINSKI:

Q    No worries.  Do you know one way or the other, whether any identifications that were made in -- during the Roman homicide investigation were reliable?

A    No, I wasn't there.

Q    Okay.  Since this lawsuit was filed, have you had any communications with any of the other defendants in this case, including Guevara, Mr. Halvorsen, or Mr. Riccio about this lawsuit?

A    No.

Q    Okay.  And this process of answering questions about this case and reviewing the documents here today, did that process bring back any independent memories of the Roman homicide investigation that you didn't have

Page 91

before we started this deposition?

A    No.

MR. HAZINSKI:  Okay.  All right, Mr. Gawrys, I don't have any further questions for you at this time.  Thank you.

THE WITNESS:  Okay.  Thank you.  Anything?  No?

MR. ENGQUIST:  We're waiting for Justin.  Who else is on that?  I'm sorry.  Austin, or I think Kevin's on.  Anything from either of you?  Or do you admitted or whatever?

MR. RAHE:  The City doesn't have any questions.

MR. ZIBOLSKI:  This is Kevin.  No questions for Guevara.

MR. ENGQUIST:  None for me.  We'll reserve.

COURT REPORTER:  Okay.  We are going off record.  The time is 1:33 p.m. Eastern Standard Time. Will all parties please continue to remain on the line?

(DEPOSITION CONCLUDED AT 1:33 P.M.)

Page 92

CERTIFICATE OF REPORTER

I do hereby certify that the witness in the foregoing transcript was taken on the date, and at the time and place set out on the Title page here of by me after first being duly sworn to testify the truth, the whole truth, and nothing but the truth; and that the said matter was recorded stenographically and mechanically by me and then reduced to typwritten form under my direction, and constitutes a true record of the transcript as taken, all to the best of my skill and ability.  I certify that I am not a relative or employee of either counsel, and that I am in no way interested financially, directly or indirectly, in this action.

*ayu Rll*

AALAYAH PURNELL,

COURT REPORTER/NOTARY

COMMISSION EXPIRES:  03/22/2025

SUBMITTED ON: 12/06/2021

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2275 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.580.2275 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 751 of 758 PageID #:108204

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 752 of 758 PageID #:108205

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 753 of 758 PageID #:10820

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-01028 Document #: 827-4 Filed: 11/22/25 Page 756 of 758 PageID #:108209

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com