# EXHIBIT 78

LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA



KENTUCKIANA
COURT REPORTERS


a courtroom
powerhouse

schedule@kentuckianareporters.com

877.808.5856 | 502.589.2273

www.kentuckianareporters.com

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

CASE NO 1:19-CV-6508

GERALDO IGLESIAS,

Plaintiff

V.

REYNALDO GUEVARA, ET AL.,

Defendants

DEPONENT: MICHAEL LATZ

DATE:     JANUARY 18, 2022

REPORTER: AMANDA DEMENT



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.580.2275 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

APPEARANCES


ON BEHALF OF THE PLAINTIFF, GERALDO IGLESIAS:

Rachel Brady, Esquire

Loevy & Loevy

311 North Aberdeen Street

Third Floor

Chicago, Illinois 60607

Telephone No.: (312) 243-5900

E-mail: brady@loevy.com

(Appeared via videoconference)


ON BEHALF OF THE DEFENDANTS, STEPHEN GAWRYS, ROBERT

BIEBEL, ANTHONY RICCIO, AND ERNEST HALVORSEN:

Kyle Christie, Esquire

The Sotos Law Firm, P.C.

141 West Jackson Boulevard

Suite 1240A

Chicago, Illinois 60604

Telephone No.: (630) 735-3308

E-mail: kchristie@jsotoslaw.com

(Appeared via videoconference)

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

APPEARANCES (CONTINUED)


ON BEHALF OF DEFENDANT, REYNALDO GUEVARA:

Megan McGrath, Esquire

Leinenweber Baroni & Daffada, LLC

1150 Wilmette Avenue

Suite E

Wilmette, Illinois 60091

Telephone No.: (866) 786-3705

E-mail: mkm@ilesq.com

(Appeared via videoconference)


ON BEHALF OF DEFENDANT, CITY OF CHICAGO:

Austin Rahe, Esquire

Rock Fusco & Connelly, LLC

321 North Clark Street

Chicago, Illinois 60654

Telephone No.: (312) 494-1000

E-mail: arahe@rfclaw.com

(Appeared via videoconference)

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

APPEARANCES (CONTINUED)


ON BEHALF OF DEPONENT, MICHAEL LATZ:

John C. Coyne, Esquire

Law Offices of John C. Coyne

53 West Jackson Blvd.

Chicago, Illinois 60604

Telephone No.: (312) 929-4308

E-mail: jjc@johnccoynelaw.com

(Appeared via videoconference)



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

                             INDEX

                                                    Page

PROCEEDINGS                                           7

DIRECT EXAMINATION BY MS. BRADY                       8

CROSS EXAMINATION BY MR. CHRISTIE                   115

EXAMINATION BY MR. RAHE                             120

REDIRECT EXAMINATION BY MS. BRADY                   122

RE-EXAMINATION BY MR. RAHE                          125


                            EXHIBITS

Exhibit                                             Page

1 - CCSAO Iglesias 470-478, Felony Review            43

    Jacket

2 - RFC-Iglesias 9, Felony Minute Sheet Form         52

    101

3 - CCSAO Iglesias 157-159, Case Fact Sheet          52

4 - RFC-Iglesias 90-93, Clear Closed                 62

    Supplementary Report



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

STIPULATION

The deposition of MICHAEL LATZ was taken at KENTUCKIANA COURT REPORTERS, 30 SOUTH WACKER DRIVE, 22ND FLOOR, CHICAGO, ILLINOIS 60606, via videoconference in which all participants attended remotely, MONDAY. the 18TH day of JANUARY 2022. at approximately 10:31 a.m.; said deposition was taken pursuant to the FEDERAL Rules of Civil Procedure. The oath in this matter was sworn remotely pursuant to FRCP 30.

It is agreed that AMANDA DEMENT, being a Notary Public and Court Reporter for the State of ILLINOIS, may swear the witness and that the reading and signing of the completed transcript by the witness is not waived.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PROCEEDINGS

COURT REPORTER: Okay. We are now on the record. Will all parties, except for the witness, please state your appearance, how you're attending, and your location?

MS. BRADY: Yes. Good morning. This is Rachel Brady, attending on behalf of the plaintiff. I'm participating remotely via Zoom from Chicago.

MR. CHRISTIE: Bob Christie on behalf of the defendant officers, attending remotely in Chicago.

MS. MCGRATH: Megan McGrath on behalf of Defendant Guevara, attending remotely from Chicago.

MR. RAHE: This is Austin Rahe, R-A-H-E, attending remotely from the Chicagoland area. I'm here on behalf of the City of Chicago.

MR. COYNE: And on behalf of the witness, Michael Latz, John Coyne, C-O-Y-N-E, attending remotely from Chicago.

COURT REPORTER: Okay. Thank you. Mr. Latz, will you please state your full name for the record?

THE WITNESS: Michael Latz, L-A-T-Z.

COURT REPORTER: Thank you. Do all parties stipulate that the witness is, in fact, Michael Latz?

MS. BRADY: Yes.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

MR. RAHE: Yes.

MS. MCGRATH: Yes.

MR. CHRISTIE: Yep.

COURT REPORTER: Okay. Mr. Latz, will you please raise your right hand? Do you solely swear or affirm that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

COURT REPORTER: Okay. You may begin.

DIRECT EXAMINATION

BY MS. BRADY:

Q Good morning, Mr. Latz. My name is Rachel Brady and I represent Geraldo Iglesias, who's the plaintiff in this case. Have you ever been deposed before?

A No.

Q So I'll go over some of the ground rules, just so we're on the same page for today. I'm going to ask you questions, and your answers are going to be under oath so, just as if you were testifying in a courtroom. If you don't understand one of my questions, please ask me to rephrase or clarify. If you answer my question, I'm going to assume you understood it. So, just be sure to ask me to clarify if you have any questions. So, the



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

court reporter can get a clean record, please try your very best to let me finish my complete question before you start your answer, and I'll do my best to let you finish your complete answer before I start my next question. I understand that things can get a little tricky just because of the Zoom format, but I'm going to do my very best, and I would ask that you do, as well. And because the court reporter is taking a transcript, it's important that you keep your answers verbal. So saying yes or no, as opposed to nodding your head, or saying uh-huh, or uh-uh. And from time to time, your lawyer or one of the other lawyers here might object to one of my questions. Unless your lawyer instructs you not to answer the question, you can let everybody finish their objections, and then, you can go ahead and answer the question that's pending. Okay?

A Yes.

Q All right. And we can take a break whenever you need one. The only thing I would ask is that if there is a question pending, that you answer the question, and then, we can go on a break. Okay?

A I understand.

Q Okay. Is there any reason that you cannot provide complete and accurate answers to my questions today?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A    No.

Q    Do you have any conditions that affect your memory?

A    No.

Q    Do you take any medication that affects your memory?

A    No.

Q    Are you familiar with the allegations in this civil lawsuit?

A    No.

Q    You understand that you are not a defendant, right?

A    Yes.

Q    And that you have not been accused of any misconduct, right?

A    Yes.

Q    Okay.  Did you review any documentary material to prepare for this deposition, such as police reports or transcripts?

A    Yes.

Q    What did you review to prepare for this deposition?

A    I reviewed the felony review folder, which was completed in this case, which, I believe, that I completed.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q    Okay.  And did you have a chance to look at the exhibits that were sent around, just about 20 or 30 minutes ago?

MR. COYNE:  Yeah.  Let me interject, counsel, really quickly.  Just for the record, we did, my office did make requests for documents and exhibits from plaintiff's office to be forwarded in preparation for the deposition.  We did not receive any from plaintiff's counsel, nor have I received any as of this moment regarding this deposition, just for the record.

MS. BRADY:  Oh, okay.  So, I sent them this morning.  We can go off the record and I can send them to you again.  John, I want to make sure you have them.

MR. COYNE:  Okay.

MS. BRADY:  Okay, so let's take a quick break and go off the record, and I'll send everything.

(OFF THE RECORD)

COURT REPORTER:  Okay, we're back on the record.

MR. COYNE:  All right.  Just for the record, did receive from plaintiff's counsel, four documents as attachments to an e-mail regarding the deposition this morning.  One is a supplementary report

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

regarding victim, Monica Roman, Chicago Police Department, dated 7 June, 1993. Secondly, there's a felony review folder -- or strike that. There's a felony minute sheet form 101, that's one page. Thirdly, there is a felony review folder with a case file document. And lastly, there is a case fact sheet for Geraldo Iglesias, dated June 24 of '93, which appears to be case information. I'm going to be forwarding -- I have not had a chance to review them in detail, and nonetheless to move this along, I will be forwarding all four of these documents to the witness so that he can view them as needed for the deposition. Thank you.

BY MS. BRADY:

**Q So Mr. Latz, your counsel just sent you the documents that I might use as exhibits today. But apart from those documents that are coming to you now, have you reviewed any documentary material or transcripts, or anything like that to prepare for this deposition?**

A Only what I said earlier. I did review the felony review folder, which was completed in conjunction with this case.

**Q Okay. And where did you find the felony review folder?**

MR. COYNE: Objection. Form.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A    A copy of the felony review folder was sent to me by e-mail.

Q    And from whom was the felony review folder sent to you?

A    My attorney.

Q    Okay.  And have you -- strike that.  When you looked at the felony review folder, did you independently recall your participation in this case?

A    I did not.  I did not independently recall.

Q    Okay.  Did it refresh your recollection in any way?

A    Only vaguely.

Q    Okay.  And did you remember filling out any of the information on the felony review folder?

A    I did not.

Q    And when you say it refreshed your recollection vaguely about the case, can you tell me what you recalled about the case after you looked at the felony review folder?

A    I meant vaguely, in the sense that I recalled I was assigned a felony review that summer.  I recalled who the felony review trial supervisors were, my felony trial supervisors.  I recall that I did -- I was called to Area Five for, you know, several murders that summer. But I did not recall any specific incidents regarding

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

this case.

Q    Okay.  And was that felony review folder the only document you reviewed in connection with this case, as you prepared for your deposition?

A    I reviewed, but did not, you know, study the detective supplementary report.

Q    Okay.  And how did you get the supplementary report?

A    It was sent to me by e-mail.

Q    Okay.  From whom?

A    My attorney.

Q    All right.  Are there any other documents, or transcripts, or anything to that effect, that you reviewed to prepare for this deposition?

A    No.

Q    Did you read about Mr. Iglesias's case online, or in the news, or anything like that?

A    I did not.

Q    Okay.  Have you spoken about this deposition with attorneys representing any of the defendants in this civil case?  And that would be attorneys for the individual defendants, Reynaldo Guevara, or the City of Chicago?

A    About two years ago, I received a telephone call from attorneys for defendants, and I forget which

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

one, and I can't remember the name. But I did speak to an attorney for the defense.

Q    And can you tell me what you discussed?

A    The attorney asked me if I recalled this case, being the felony review assistant on this case, and I told him I did not recall it at all.

Q    Did you discuss anything else with that attorney?

A    No.

Q    Have you spoken about this deposition, or about the Iglesias case since its conclusion, with anyone else, apart from your attorney and the attorney that you just told me about?

A    I did -- no. I didn't talk about the substance of the case. I did tell people that I was being deposed.

Q    And for any of the people that you told you were being deposed, did anybody discuss the substance of the case, or their participation, or their recollection of this case at all?

A    No.

Q    Okay. Are you currently employed?

A    Yes.

Q    Who's your employer?

A    I'm self-employed.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q    And what's the name of your law firm, I assume?

A    Michael Latz, Attorney at Law.

Q    Okay.  And for how long have you had your own firm?

A    Since last March -- March 1st.

Q    And when did you leave the Cook County State's Attorney's office?

A    I left the Cook County State's Attorney's office in 1995, I believe.

Q    Do you remember when in 1995?

A    I do not.

Q    And why did you leave the Cook County State's Attorney's office?

A    I left the Cook County State's Attorney's office to take a job with a law firm in Chicago.

Q    And what kind of law firm did you leave the State's Attorney's office for?

A    It was a law firm that did insurance defense.

Q    And for how long were you -- well, strike that.  What was the name of the law firm?

A    O'Connor, Schiff and Meyer.

Q    And for how long were you at O'Connor, Schiff and Meyer?

A    Approximately three years.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q    And where did you go after that?

A    After that, I went to a firm by the name of Potter and Schaffner.

Q    What kind of law does Potter and Schaffner do?

A    Employment law, wage and hour.  Both -- mostly on the plaintiff side.

Q    How long were you at Potter and Schaffner?

A    Approximately three years.

Q    So that takes us up through about 2001; is that right?

A    I would say probably 2000 so.

Q    All right.  And then, where did you go after Potter and Schaffner?

A    Went to a firm named Bollinger Ruberry and Garvey.

Q    And for how long were you there?

A    Approximately seven years.

Q    And what kind of work did you do there?

A    It was insurance defense.

Q    So after you left in around 2007, where did you go?

A    A firm called Ancel Glink.

Q    And for how long were you at Ancel Glink?

A    Approximately three years -- three and a half years.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q    What kind of work did you do there?

A    Ancel Glink does a lot of representation of municipalities and government agencies, and I represented municipalities when they were sued.

Q    Did you do any work representing municipalities in Section 1983 civil rights suits?

A    In my -- yes.

Q    All right.  So, I think, we're up through about 2010.  Where did you go after you left Ancel Glink?

A    I was appointed as a Commissioner of Illinois Workers' Compensation, and I served as both Commissioner and Chairman of Illinois Workers' Compensation Commission.

Q    Until when?

A    That was four years.

Q    So around through 2014?

A    Yes.

Q    Okay.  And then, what did you do after you left the Illinois Workers' Compensation Commission?

A    I went to a firm called McAndrews Norgle.

Q    What kind of work does McAndrews and Norgle do?

A    80 percent is workers' compensation defense.

Q    All right.  And did you do workers' comp

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

defense while you were there?

A    Yes.

Q    And then, when did you leave McAndrews and Norgle?

A    About three years later, I went to a firm called Litchfield Cavo.

Q    And for how long were you at Litchfield Cavo?

A    Approximately -- just less than four years.

Q    What kind of work did you do at Litchfield Cavo?

A    Workers' compensation defense and insurance defense.

Q    And is that when -- when you left Litchfield Cavo, is that when you went out on your own?

A    That's correct.

Q    Okay.  All right.  So now I want to talk about your time at the Cook County State's Attorney's office. And you said you left in 1995, what was your job title in 1995?

A    I was an Assistant State's Attorney, in the Criminal Prosecutions Bureau.

Q    And how long were you an ASA in the Criminal Prosecutions Bureau?

A    The entire time I was an Assistant State's Attorney, I was in the Criminal Prosecutions Bureau.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q    When did you start at the Cook County State's Attorney's office?

A    February 1, 1990.

Q    So you were there for about five, six years?

A    That's correct.

Q    Okay.  And once you left the Cook County State's Attorney's office, did you have any more involvement in the cases that you worked on while you were there?

A    Could you restate or rephrase that question?

Q    Sure.  So after you left the Cook County State's Attorney's office, did you continue to work on any of the criminal prosecutions, that you had been assigned to while you were at the State's Attorney's office?

A    No.

Q    Did you have any direct involvement in the prosecution of cases that you were working on, while you were at the State's Attorney's office?

A    No.

MR. COYNE:  Objection. Form.  Sorry.  Go ahead.

Q    Why did you leave the State's Attorney's office?

A    Excuse me, could you restate that question?

Q    Sure.  Why did you leave the State's

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Attorney's office?

A   To take a job in a law firm.  Make more money.

Q   Did you have any employment in the legal profession before you started at the Cook County State's Attorney's office?

A   Yes.

Q   And what was it?

A   When I was a law student, I was employed at the St. Joseph County Prosecutor's office in Indiana, as an intern.  And after I was sworn in, I worked for three months at my brother's law firm.

Q   All right.  When did you graduate law school?

A   1989.

Q   And do you speak Spanish?

A   I am not fluent.  I understand Spanish, but I'm not -- I don't speak it fluently.

Q   Do you understand Spanish fluently?

A   No.

Q   Did you understand Spanish back in 1993?

A   No.

Q   When did you start to learn Spanish?

A   I started to learn in high school.  I took high school Spanish.

Q   And in 1993, was the extent of your Spanish education high school Spanish?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A     Yes.

Q     How many years of Spanish did you take in high school?

A     Four.

Q     And did you take Spanish in college at all?

A     Yes.

Q     How many years?

A     One or two.

Q     Did you study abroad in a Spanish speaking country?

A     I did not.

Q     So four years of high school Spanish, two years of college Spanish.  Did you have any other Spanish education up through 1993?

MR. COYNE:  Objection.  Form.

A     No.

Q     Did you study in high school, a particular dialect of Spanish, and by that, I mean Mexican Spanish, Puerto Rican Spanish, Spain Spanish?

MR. COYNE:  Objection.  Form.

A     The Spanish we were taught was Castiliano, which was basically Spanish, Spanish.

Q     And did the same go for your Spanish education in college?

MR. COYNE:  Objection.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A     No.

Q     What dialect, or origin of Spanish, did you study in college?

MR. COYNE:  I'm sorry, Rachel, did we get an answer to the last question?  I didn't catch it.

MS. BRADY:  Oh, I'm sorry.

MR. COYNE:  Was there an answer?

THE WITNESS:  What was the question, please?

BY MS. BRADY:

Q     It was whether you studied the same Castiliano Spanish in college, as you did in high school?

A     I don't recall.

Q     All right.  So, I have some questions now about the State's Attorney's office, and specifically, the felony review process, and I'm limiting my questions to the 1993 timeframe.  So I know you weren't there for a terribly long time, but if I don't give you a timeframe, I'm asking you about 1993.  Okay?

A     Yes.

Q     All right.  So can you tell me what the responsibilities of a felony review prosecutor were in the Cook County State's Attorney's office in the 1993 timeframe?

MR. COYNE:  Objection.  Foundation.  Go ahead.

A     I cannot tell you what the responsibilities



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

were, in terms of any sort of policy or job description. I could tell you what I did in 1993.

Q Yeah. Please do.

A Well, as a felony review assistant, we were responsible for assessing charges which were submitted by detectives and other Chicago police officers and determine whether they would receive approval for filing felony charges. That's it.

Q Okay. And when you say charges that were submitted by detectives, what does that mean?

A Detectives would submit the evidence, which they prepared in the form of reports and statements, and request approval for felony charges.

Q Okay. And how were you, as a felony review prosecutor, notified that a detective wanted approval for charges?

A We were, at that time in 1993, we had pagers issued by the State's Attorney's office, and when the pager would page you, you'd know to call into the State's Attorney's office, and you'd be given an assignment.

Q Okay. So your assignments came from, like a dispatch at the State's Attorney's office, and not from the police department directly; is that accurate?

A That's correct.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q Right. And during your five or six years at the State's Attorney's office, did you have a specific assignment in felony review, or did people kind of rotate through those positions?

MR. COYNE: Objection. Form.

A I did not have a specific assignment felony review. I was a member of a felony review team, and just received assignments, kind of a rotating order.

Q And you said you were at felony review in the summer of 1993?

A Yes.

Q Did you do any other rotations in felony review?

A I just had one rotation in felony review, if you could call it a rotation, which lasted approximately a year.

Q And then, when you were a felony review prosecutor, after you made the decision whether to approve or deny charges, did your involvement in the prosecution typically end, or did you stay on and continue working on the case?

MR. COYNE: Objection. Form and foundation. Go ahead.

A If I could just clarify. Depending upon what the charge is, it wasn't always my call whether to

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

approve or deny charges. But once the charges were approved or denied, my participation in the case ended.

Q   And when you say it wasn't always your call whether to approve or deny charges, can you explain what you meant by that?

A   Yeah. Certain, very serious crimes, we needed -- I needed approval of the felony trial supervisor, or maybe someone even higher up in felony review, in order to have the charges approved.

Q   And in those situations, if you were the one who got called out to the station to review evidence, would you make a recommendation to the felony trial supervisor or up?

MR. COYNE: Objection. Form.

A   It depends upon the case, and the particular facts of the case.

Q   Who was the felony trial supervisor in 1993?

A   There were -- there was more than one. Each felony review team had at least one, maybe two felony trial supervisors.

Q   And do you remember who the felony trial supervisors were in 1993?

A   Are you saying the team that I was on?

Q   Yes.

A   Frank Difranco, and David Studenroth.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q   All right.  And when you looked at the felony review folder for the Monica Roman/Geraldo Iglesias case that you mentioned earlier, were you able to tell whether you were the one who approved charges, or whether you submitted them up the chain for review?

A   I was not.

Q   You were not able to tell?

A   That's correct.  I was not able to tell.

Q   Where would I look to be able to figure out if you were the one who approved charges versus someone else up the chain?

MR. COYNE:  Objection.  Foundation.

A   I don't know.

Q   All right.  Oh, you said that there were multiple felony review teams, and that Frank Difranco and David Studenroth were the supervisors of you were team.  How many other teams were there in 1993?

A   I do not recall.

Q   Okay.  And how did the teams work?  Were they assigned to specific areas, or specific stations, or specific categories of crimes, or something else?

A   I don't recall.

Q   And do you recall how many times you were called out to a station to approve charges, during your tenure on the felony review team?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A    I do not recall.

Q    Was it more along the lines of once a day, or once a week, or once a month?

MR. COYNE:  Objection.  Foundation.

A    There was no regular schedule.  That could have been random.  It could have been several times a day, or not at all during the shift.  There was no --

Q    Okay.  And I'm not trying to pin you down on a specific number, but just so that I can have an understanding of your involvement, and kind of what it just looked like on your end, can you give me an estimate of the number of times you went out to review felony charges during your year on felony review?

MR. COYNE:  Sorry.  Same objection.

A    I'm sorry.  I couldn't give you an estimate. This was 30 years ago, and I just -- it would just be a pure guess.

Q    Okay.  Was it more than 10?

A    Yes.

MR. COYNE:  Same objection.

Q    Was it more than 50?

MR. COYNE:  Same objection.

A    Was what more than 50?

Q    The number of times that you went out to a station to approve felony charges, or to evaluate felony

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

charges?

A    Yes.

Q    Okay.  And do you recall how many of the felony charges that you were called out to approve were homicides?

A    I do not recall.

Q    Do you have an estimate of the percentage of the work that you did that -- on felony review that involved homicides?

MR. COYNE:  Objection.  Foundation.

A    It would just be pure guess.

Q    Okay.  What other felonies were you called out to review other than homicides?  What other categories of felonies?

A    Armed robberies would be an example.
Aggravated batteries would be another example.

Q    All right.  So I want to discuss with you now the obligations of state prosecutors, under Brady versus Maryland.  So do you have an understanding of the state prosecutor's obligation under Brady?

MR. COYNE:  Objection.  Foundation and form.

A    I am familiar with what's called the Brady Rule.

Q    And what is that?

A    The obligation of prosecutors to disclose

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

exculpatory evidence to the defense.

Q    And in 1993, did you understand that the state prosecutor's obligation under Brady required them to disclose all exculpatory evidence to the defense?

MR. COYNE:  Objection.  Foundation.

MR. RAHE:  Objection to form, as well.

A    I don't recall what I knew in 1993.

Q    Do you have any reason to think that you were not aware of your obligation under Brady versus Maryland in 1993?

MR. COYNE:  Same objection.

MR. RAHE:  Objection to form.

A    I don't understand the question.

Q    So as you sit here today, you understand the prosecutor's obligation under the Brady Rule, right?

A    Yes.

Q    And do you understand that obligation to include a requirement that prosecutors need to turn over all exculpatory evidence or potentially exculpatory evidence to the defense?

A    I wouldn't say --

MR. COYNE:  Objection to form.

MR. RAHE:  Objection to form.

Q    Can you repeat your answer?  I think it got covered up by objections.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A   I wouldn't say that's exactly my understanding of it, but I would say that's one description of the Brady Rule.

Q   Okay.  What about the description I just gave doesn't square exactly with your understanding of the Brady Rule?

MR. COYNE:  Objection.  Form.

MR. RAHE:  Objection.

A   It's not all Brady versus Maryland says.

Q   Okay.  Do you understand that at least one component of the Brady Rule is that state prosecutors need to disclose all potentially exculpatory evidence to the defense?

A   Yes.

MR. COYNE:  Same objection.  Go ahead.

MR. RAHE:  Objection to form.

Q   And do you have any reason to think that you did not know that, or did not have that understanding about the Brady Rule, back when you were at the state's attorney's office?

MR. RAHE:  Objection.  Form.  Foundation.

A   Could you rephrase the question, please?

Q   Yeah.  So let me give a little context.  So I asked if you had that understanding of the Brady Rule that we just discussed back in 1993.  And you say you

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

don't know.  You don't remember what you knew in 1993.

So my question is:  Do you think that you probably knew that in 1993?

MR. RAHE:  Same objection.  Form and foundation.

MR. COYNE:  Objection.

A    It is likely that, 1993, that I was aware of Brady.  Yes.

BY MS. BRADY:

Q    Okay.  And given all of your training in law school, and your internship in the prosecutor's office in St. Joseph County, and the training, if any, that you had to go through at the state's attorney's office, do you think you have a reason to suspect that you did not know about the Brady obligation back in 1993?

MR. RAHE:  Objection.  Form.  Foundation.

MR. COYNE:  Objection. Form.

A    No.

Q    Are you familiar with the prosecutor's duty to seek justice and not merely convict?

MR. COYNE:  Objection.  Form.

MR. RAHE:  Objection.  Form.

A    Yes.

Q    And did you follow the Brady Rule during your time in the prosecutor's office?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

MR. RAHE: Objection to form.

MR. COYNE: Objection to form, foundation.

A     What do you mean by follow?

Q     Did you disclose all potentially exculpatory evidence of which you were aware, or otherwise ensure that it was disclosed to criminal defendants?

MR. RAHE: Objection. Form. Foundation.

A     When I was a prosecutor and had the obligation to make disclosures, I always did so to the best of my ability and knowledge.

Q     Okay. Do you have any reason to think that, at any point, you were aware of potentially exculpatory information that you did not produce to a criminal defendant?

MR. RAHE: Same objection.

MR. COYNE: Objection to form.

A     Could you restate the question?

Q     Yeah. Do you have any reason to think that, if you were aware of exculpatory information -- oh, strike that. Can we assume that, if you as a prosecutor, were aware of potentially exculpatory information, that you made sure that it was turned over to the defense?

MR. RAHE: Same objections.

MR. COYNE: Objection. Also calls for

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

speculation.

A    I can't answer that question the way it's stated.  There's over a thousand assistant state attorneys in the Cook County State's Attorney's office.

BY MS. BRADY:

Q    So my question is about you and your practice. So can you think of any instances, while you were at the state's attorney's office, in which you were aware of potentially exculpatory information, and you did not follow the protocol to disclose it to the defendants?

MR. RAHE:  Same objections.

A    No.

Q    Did the Cook County State's Attorney's office have a procedure or a standard protocol in the 1993 timeframe to ensure that all potentially exculpatory information got turned over to the defense?

MR. RAHE:  Same objections.

MR. COYNE:  Objection.  Form.  Foundation.

A    I don't know.

Q    Did you ever respond to discovery requests while you were at the state's attorney's office?

A    Yes.

Q    And what are discovery requests?

A    Well, discovery is a mechanism by which the party asked the other party for documents and other

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

evidence to be disclosed.

Q    And did you ever have the responsibility of responding to discovery requests while you were at the state's attorney's office?

A    I believe so.

Q    And would it be fair to say that it was -- strike that.  Were you given any training on how to respond to discovery requests at the state's attorney's office?

A    I don't recall specifically any training.

Q    So how did you learn what to do when you got a discovery request from the defense?

MR. COYNE:  Objection.  Form.

A    I don't -- is your question -- is how did you learn how to do it?  Is that what your question is?

Q    Yeah.  Yes.

A    I don't recall.

Q    Do you have any reason to think that you were not given some sort of instruction, either formal, or on the job training, about how to respond to discovery requests at the prosecutor's office?

MR. RAHE:  Objection.  Foundation.

A    It's kind of a compound question, but you are -- I do know that I learned, during the course when I was an assistant state attorney, of how to respond to

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

discovery requests.

Q    And when you were in felony review, were you responsible for responding to discovery requests?

A    No.

Q    Can you think of any instances, while you were in felony review, where you learned about exculpatory or potentially exculpatory material that had not been disclosed to the defense attorneys?

MR. COYNE:  Objection.  Form.  Foundation.

MR. RAHE:  Form.  Foundation.

A    Did you hear my answer?

Q    I didn't.

A    Oh, could you repeat the question?

Q    Oh, yeah.  Can you think of a time, when you were in felony review, where you learned about exculpatory or potentially exculpatory evidence that had not been disclosed to the defense?

MR. COYNE:  I apologize, Rachel.  Same objections.

A    No.  Never.

Q    All right.  These next questions are, I assume I know the answers, but I just have to ask them.  Did you ever personally withhold exculpatory evidence from defense?

A    No.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q    Are you aware of any instance in which any prosecutor at the CCSAO withheld exculpatory evidence from the defense?

MR. COYNE:  Objection.  Form.  Foundation.

A    No.

Q    Back in the mid-90s, did the Cook County State's Attorney's office have a file-keeping system that allowed defense attorneys to come review the prosecutor's file?

MR. COYNE:  Objection.  Form.  Foundation.

MR. RAHE:  Form.  Foundation.

A    I don't know.

Q    In the mid-90s, are you aware whether the Cook County State's Attorney's office prosecutors were able to go inspect Chicago Police Department files?

MR. COYNE:  Same objection.

MR. RAHE:  Followed.

A    I don't know.

Q    Did you ever personally inspect a file at the Chicago Police Department or its records division?

A    I did not.

Q    Okay.  So now, I'm going to ask you about your practices in general, as a felony review prosecutor. And so, I'm not asking about a specific case, but just kind of your approach to doing things.  So when you were a

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**felony review prosecutor in 1993, what was your process for determining whether to approve charges against a suspect?**

MR. COYNE:  Rachel, so I don't have to keep interrupting you.  Can I just get a continuing line of objection on form and foundation, based on his testimony that he doesn't recall what he knew in 1993?  That way I don't have to keep interrupting.  Thank you.

A    I think that's too general of a question to answer.  I wonder if you could be more specific.

BY MS. BRADY:

**Q    Yeah.  So in the instances in which you were called down to a station, to decide whether to approve charges against someone, how did you decide what was sufficient evidence to approve charges versus not approve charges?**

A    I don't know if I could answer that without the specific context of what the charge was, what the evidence was, and it was different in every case.  You know, and I would just be speculating if I was to give you an example, as I sit here today.  I could answer questions, but they'd have to be more specific questions.

**Q    Okay.  Was the felony-reviewed decision to**



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

approve charges in any way different from the actual decision to charge a criminal defendant, or was it all one and the same?

MR. RAHE: Objection. Form.

A    I don't know. I don't know, as I sit here today, whether there was any difference, and I don't know what you're referring to. What do you mean the decision to charge.

Q    Okay. Did you ever make a decision to approve charges that was overruled by one of your supervisors?

A    I don't recall.

Q    Do you recall if you were ever -- or strike that. Do you recall ever making a decision not to approve charges, that was overruled by a supervisor?

A    I don't recall.

Q    And am I correct in understanding the process as you described it, which is that the police would contact the state's attorney's office when they believed they had enough evidence to charge someone, and then, a felony review prosecutor would go to the station, and review the evidence available, and then, determine whether the evidence established probable cause to charge?

MR. RAHE: Objection. Form. Misstates the prior testimony.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

MR. COYNE: And foundation.

A    I don't -- I can't agree that that's exactly the way it worked.

BY MS. BRADY:

Q    **Was that typically the way that it worked in your experience?**

A    No.

MR. COYNE: Objection to form.

Q    **Okay. Can you tell me --**

MR. COYNE: Sorry.

MS. BRADY: I didn't hear your objection.

MR. RAHE: Oh, objection. Just the same objection.

BY MS. BRADY:

Q    **Can you tell me what about your practice differed from the explanation for the question I just asked?**

A    Well, not my practice, just the way it was worded wasn't exactly the way it went, in my recollection.

Q    **Okay. So can you tell me, in your recollection, how it did go?**

A    The police, generally a detective, would call state attorney's felony review, and ask for a review of felony charges -- a request for felony charges, and



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

dependent upon the type of charge it was, it could be handled either over the phone, or a felony review assistant would be sent out to the area to review the charges.

Q    And did the police tell the felony review prosecutor what charges they were seeking?

MR. COYNE:  Objection.  Form and foundation.

A    Generally, yes.

Q    And would it be fair to say that, in deciding whether to approve charges, you relied on information provided to you by the detectives that asked you to come review the case?

MR. RAHE:  Objection.  Form.

A    Yes.

Q    Did you rely on the information or evidence provided by detectives to be complete and accurate?

MR. COYNE:  Objection.  Form.

A    Yes.

Q    Can you think of an instance in which you ever went to a station to evaluate charges, and you thought that there was evidence that had been fabricated?

A    No.

Q    Can you think of an instance in which you ever went to a station to evaluate charges, where you thought that the officers giving you the information were being

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

untruthful?

MR. COYNE: Objection. Form.

A No.

Q And in the mid-90s, if you thought there was insufficient evidence to approve charges, how did you communicate that to the detectives?

A I would state one of two things. Either felony charges are not approved, or make it a continuing investigation and ask for, you know, other witnesses to be interviewed or something like that.

Q Okay. And can you explain the difference between felony charges are not approved and make it a continuing investigation?

A No. I can't explain that any more than I just did.

Q Okay. Are there instances that you can think of in which you went to review charges, and you just denied them outright, and it ended the investigation?

MR. COYNE: Objection. Form.

A As I sit here --

MR. RAHE: Object to foundation. I'm sorry.

A As I sit here today, I can't remember any specific situations, but I know that I did not approve felony charges on many occasions.

Q And as you sit here today, can you think of



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

any specific instances in which you went to review charges, and you told the detectives to keep investigating?

A    Not specific cases, but I know that it happened.

Q    If you -- oh, strike that.  Did you have a practice of memorializing your thought process or decision making process that you undertook in order to decide whether to approve charges or deny them?

MR. COYNE:  Objection.  Form.

A    I didn't keep any notes other than what was memorialized in the felony review folder.

Q    All right.  I'm going to put up an exhibit.  We'll call this Exhibit 1.  Give me a second to get it at my screen.  Okay.  Can you see this?

(EXHIBIT 1 MARKED FOR IDENTIFICATION)

A    I can.

MR. RAHE:  So you can, Mike, or can't.

THE WITNESS:  I can.  I can.

MR. RAHE:  So the felony review case filing.

BY MS. BRADY:

Q    Yeah.  My computer says it stopped sharing.  Let me put it up again.  Okay.  Can you see this document on your screen?

A    I can see that.  Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q    Okay.  So for the record, this is a nine page PDF, beginning at Bates label, CCSAO Iglesias, 470. Are you familiar with this layout?

MR. RAHE:  Objection to form and foundation.

Q    And I'm not asking questions about this document, specifically, but just about this kind of category of document, and I can flip through the pages if you'd like me to.

MR. RAHE:  (Inaudible).

A    I am familiar with this form, if that's what you're asking.

Q    Yeah.  So I'll flip through so you can see the rest of the pages, just so we're on the same page.

MR. RAHE:  Rachel, just to clarify, this exhibit includes the top sheet, which is a criminal file case document, which, I believe, is a separate document from felony review, but just for purposes of the questions, I wanted to clarify whether the questions are going to pertain to the entire exhibit, or just a felony review folder.

BY MS. BRADY:

Q    Yes.  I included that in error.  So the first page of this document is not part of the felony review folder; is that right?

A    This first page looks like it's a felony file

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

jacket.  I've never seen this before.

Q    Okay.

A    Looks like it's the file jacket that's capped with the felony trial.

Q    Okay.  So flipping now to the second page of this PDF, which is CCSAO, Iglesias, 471.  When you talk about the felony review folder, is this the document that you're talking about?

A    Yes.

Q    Okay.  So this folder, which is Exhibit 1, is this the place where you would memorialize your thoughts about whether to approve charges?

MR. COYNE:  Objection to form.

A    This is where I would record the information which I gleaned, when I came to the area, and recorded what evidence, summarized what evidence was told to me by the detectives in order to, you know, prove, or deny felony charges.

Q    Okay.  And not asking about this document specifically, but just about this category of felony review jackets.  When you were recording the information about various witnesses, where did you get it?

MR. RAHE:  Objection to form.

A    Where did I get what, the felony review folders?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q    Oh, I'm sorry.  Yeah.  Where did you get the information about what the various witnesses had to say?

MR. RAHE:  Same objection.

A    It depends.  As often as possible, I would interview the witnesses myself.

Q    Okay.  Did you also get it from available police reports?

A    Yeah.  I did review police reports when I went to the area, to begin the analysis of doing a felony review.

Q    Okay.  And did you also obtain information about witnesses or other evidence in the investigations orally from detectives?

A    I don't recall specifically, but likely.

Q    And would it be fair to say that you, as a felony review prosecutor, did not independently investigate cases before deciding whether to approve or decline charges against a defendant?

MR. COYNE:  Objection to form.

A    Yes.

Q    Would it be fair to say that your decisions were based on evidence brought to you by local law enforcement agencies?

MR. COYNE:  Objection to form.

A    Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q    Did you rely on detectives to give you their general progress reports when you were determining whether to approve charges?

MR. RAHE:  Objection to form and foundation.

A    I don't know what you mean progress reports.

Q    So by way of background, there are a couple of categories of reports.  So there's the supplementary reports, which I think you mentioned earlier, as having been a document that you reviewed to prepare for this deposition.  And then, there were also general progress reports, and sometimes, they were just handwritten notes, and sometimes, they actually said general progress report in the upper left-hand corner.  Do you remember there being a difference between the types of reports that I'm describing?

MR. CHRISTIE:  Object to form.  Go ahead.

A    I would just like to correct this.  I didn't review a supplementary report before I came here.  I saw one but I didn't review it.

Q    Okay.  That was -- yeah -- my bad.

A    I don't recall the specific names of the reports that I reviewed when I was called out to do a felon review.

Q    Did you typically review any handwritten notes?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A    I don't recall reviewing any handwritten notes.

Q    And do you recall any instances in which you based your decision, whether to approve charges, on information provided by a confidential informant?

A    No.  (Coughs) Excuse me.

Q    And you said that sometimes you would interview witnesses, and sometimes, you would rely on police reports or police providing you with information in some capacity?

A    I don't think that's what I said.  I said it depends upon the case, that we try to interview eyewitnesses as often as possible.

Q    Okay.  And what would determine whether you were able to interview an eyewitness before deciding whether to approve charges?

A    I don't know.  It would depend upon the case. It would certainly, of course, depend upon whether they were cooperative, and depend upon whether they were available.

Q    Was your decision to approve charges based upon a determination of whether there was probable cause?

A    As I sit here today, I honestly cannot remember the standard that we were giving for assessing

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

whether to approve or deny felony charges.

Q    Do you have any reason to believe that this standard that you used to determine whether to approve felony charges was anything other than probable cause?

MR. CHRISTIE:  Objection.  Form.

A    Yes.

Q    And why do you think that it could have been something other than probable cause?

A    Well -- I don't have this specific, but probable cause is pretty low standard.  And we had, I would say, a little bit of a higher standard, and it's more than probable cause.  It's more likely that we would have reasonable probable-hood of success at trial.

Q    Can you think of any instances while you were in felony review where you approved charges, and then, detectives continued to investigate the case?

A    I don't know of any.

Q    Are you aware of whether the Chicago Police Department had any sort of database in the early '90s to track reliability of confidential informants?

A    No.

MR. CHRISTIE:  Foundation.

MR. COYNE:  Form and foundation to that question.

BY MS. BRADY:

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Q    All right.  So you've told me about information in police reports, witness interviews, and information provided to you orally by detectives that you would consider in deciding whether to approve charges.  What other kinds of materials did you review while you were in felony review in order to determine whether to approve charges?

A    Could you name the ones that you said already?

Q    Yep.  Written police reports, witness interviews, and information conveyed orally by police.

A    Statements of the defendant, if any.

Q    Okay.  Anything else?

A    As I sit here, I can't think of anything else.

Q    And, I think, you may have answered this already, but if you spoke with a witness or a suspect in deciding whether to approve charges, would you memorialize that conversation somewhere?

A    Could you just restate that question?

Q    Yeah.  If you spoke with a witness or a suspect, while you were in the process of deciding whether to approve charges, would you memorialize that conversation somewhere?

A    Yes.

Q    And where would you memorialize it?

A    In the felony review folder.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q    What is a felony minute sheet?

A    I don't know.

Q    Are you familiar with the term, felony 101?

A    No.

Q    Apart from the felony review folder that we just discussed, were you, as a felony review prosecutor, responsible for writing up any other paperwork, or reports, or documents, or anything like that to memorialize your decision to approve or deny charges?

A    The felony review folder is the only way I recall that we documented our felony review calls.

Q    Okay.  I'm going to put up now what we'll call Exhibit 2.  For the record, this is a one-page document at Bates label, RFC Iglesias 9.  Can you see this document on your screen?

       (EXHIBIT 2 MARKED FOR IDENTIFICATION)

A    I do.

Q    Do you need me to zoom in?

A    Please.  Yes, please.

Q    Okay.  So here at the top is this felony minute sheet form 101.  Do you see that?

A    I do.

Q    Okay.  Do you recall ever using or writing one of these felony minute sheet form 101?

A    What do you mean by using?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q    Using the form to memorialize your thoughts or actions or decisions?

A    I never created a form 101.

Q    Okay.  Do you know as a matter practice who was responsible for writing the felony 101 form?

A    I do not.

Q    All right.

MR. COYNE:  Sorry.  Did you mark that as 2, Rachel, or no?

MS. BRADY:  I did.

MR. COYNE:  Exhibit 2.  Thank you.

BY MS. BRADY:

Q    What is the state's attorney case fact sheet?

A    I do not know.

Q    I'm going to put up a document.  We'll call it Exhibit 3.  For the record, this is a three-page document, beginning at Bates CCSAO Iglesias 157.  Can you see this document on your screen?

(EXHIBIT 3 MARKED FOR IDENTIFICATION)

A    Can you enlarge it a little bit?

Q    Sure.

A    That -- thank you.  I can see it.  Yes.

Q    Okay.  And I'm going to scroll down so you can take a look at each page.  And you can ignore the highlighting for now.  Okay.  Have you had a chance to

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

take a look at this case fact sheet?

A    Could you scroll back to the top, please? Yes. I see it.

Q    All right.  Did you, as a felony review prosecutor, prepare this case fact sheet, or were you -- strike that.  Were you as a federal -- strike that. Were you, as a felony review prosecutor, responsible for preparing case fact sheets like this?

A    No.

Q    Did you rely on these kinds of case fact sheets during your duties in felony review?

A    No.

Q    Did you as a felony review prosecutor, ever make promises to witnesses in exchange for testimony, or statements, or other information?

MR. CHRISTIE:  Objection.  Form.

A    Never.

Q    Are you aware of any instance in which anyone from the Cook County State's Attorney's office made a promise to a witness in exchange for testimony or other information?

MR. CHRISTIE:  Objection.  Form, foundation.

A    I think that's a -- do you mean ever -- in any kind of promise ever?

Q    Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A    I -- could you repeat or restate the question?

Q    Sure.  Are you aware of any instances in which anyone from the Cook County State's Attorney's office made a promise to a witness in exchange for testimony or other information?

MR. CHRISTIE:  Same objection.

A    I don't have a specific recollection in mind. I do know that -- well, have a general recollection of promising witnesses that they be protected and that they -- but other than that, nothing.

Q    Okay.  Are you aware of instances in which a criminal defendant in one case, or a suspect in one case, would be offered a deal in exchange for testimony in another case?

A    No.

MR. CHRISTIE:  Objection.  Form, foundation to previous question.

Q    And in the instance you described where witnesses were promised protection in exchange for information, would that deal be memorialized somewhere?

MR. CHRISTIE:  Objection.  Same.

A    I don't recall.

Q    Were you ever responsible for working out the plea agreements with criminal defendants while you were at the state's attorney's office?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A    In what context?

Q    **Any context.**

A    Yes.

Q    **And if you worked out a plea deal with a suspect or a defendant, would you be sure to memorialize that somewhere?**

MR. COYNE:  Objection.  Incomplete hypothetical.

Q    **Strike that.  In the instances in which you worked out plea deals with defendants while you were at the state's attorney's office, would you memorialize the terms of the deal somewhere?**

A    Yes.

MR. COYNE:  Objection to form.

Q    **To the best of your understanding, was it the practice at the state's attorney's office to memorialize the terms of any deals reached with defendants?**

MR. CHRISTIE:  Objection.  Form.

A    I can't speak to policies or what other people did.  Only to what I recollect that I did.

Q    **Do you have reason to think that there were prosecutors at the state's attorney's office in the early '90s who were not memorializing the terms of plea deals that they had reached with criminal defendants?**

MR. CHRISTIE:  Objection to form.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A    Well, all plea deals are memorialized.

MR. CHRISTIE:  Objection to form and speculation.  Sorry.  Go ahead.

A    All-plea deals are memorialized by the court when the plea is taken.

BY MS. BRADY:

Q    And to the best of your understanding, those plea deals include all of the terms of the deal, right?

A    I don't know.

Q    Do you have reason to think that anyone at the state's attorney's office in the early '90s was making deals with criminal defendants whose terms were not memorialized somewhere or otherwise disclosed?

MR. CHRISTIE:  Objection.  Form, foundation, calls for speculation.

A    No.

Q    All right.  So now I'm going to ask you some questions about the Iglesias, Roman case, specifically.  So if now would be a good time to take a break, we can do that.  Otherwise, we can plow through.  It's up to you.

MR. COYNE:  Why don't we take five?

MS. BRADY:  Sure.

MR. COYNE:  Let's take five minutes.  Okay, thanks.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

COURT REPORTER: We'll go off the record.

(OFF THE RECORD)

COURT REPORTER: Okay. We're back on the record.

BY MS. BRADY:

Q    Okay. Mr. Latz, you told me earlier that even after looking at the felony review folder, you had no independent recollection of the specifics of the Iglesias' case; is that right?

A    That's correct.

Q    Do you have any independent recollection of the contents of the prosecution file?

A    I do not.

Q    I will represent to you that we have a file that was provided to us by the Cook County State's Attorney's office. Do you have any way of knowing or is -- strike that. Is there any way that we can look at that file and determine when documents were placed in it?

MR. COYNE: Objection. Foundation.

A    Not that I know of.

Q    Do you recall a witness by the name of Fransico Vicente?

A    I have no independent recollection at all.

Q    What about a witness named Frankie Vicente?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A No.

Q What about a witness named Chino (phonetic)?

A No.

Q Do you recall a man by the name of Rosendo Ochoa?

A I do not.

Q Do you recall a man by the name of Hugo Rodriguez?

A No.

Q David Chmieleski?

A No.

Q Efrain Torres?

A No.

Q Do you have any independent recollection of Geraldo Iglesias?

A I do not.

Q Do you remember speaking about the Iglesias' case with David Studenrach?

A No.

Q Do you remember talking about the Iglesias' prosecution with Pridy Peroysing (phonetic)?

A No.

Q Do you remember speaking with the -- any of the defense attorneys about the Iglesias' prosecution so that would be John DeLeon or Donna MaKowski?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

MR. COYNE: You mean criminal -- I'm sorry. You mean criminal defense attorneys, correct?

MS. BRADY: Yes.

MR. COYNE: Thank you.

A No. If you're asking me, do I recollect ever speaking to them? No.

BY MS. BRADY:

Q Okay. And do you recall speaking with any CPD employees about this case?

A I do not recall speaking to any of the Chicago police that was assigned to this case.

Q Do you recall any conversations you've ever had with Reynaldo Guevara?

A I do not.

Q Do you remember Reynaldo Guevara at all?

A Vaguely.

Q What do you remember about him?

A I was sent to Area Five pretty frequently that summer. I knew that he was a detective in Area Five.

Q Do you remember anything else about him?

A No.

Q Do you remember any cases that he presented to you?

A Well, other than this one, just because my recollection has been refreshed. I don't remember any

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

others.

Q   Do you remember Detective Halvorsen -- Ernie Halvorsen?

A   Vaguely.

Q   What do you remember about Detective Halvorsen?

A   I remember that he was a detective in Area Five.

Q   Okay.  Do you remember anything else about him or any other cases?

A   No.

Q   Do you remember were a Detective Steve Gawrys?

A   I do not.

Q   Do you remember Sergeant Biebel over at Area Five?

A   Only vaguely.

Q   What do you remember about Sergeant Biebel?

A   Just that he was a sergeant of detectives. That's it.

Q   When you were reviewing cases at Area Five, was he as a sergeant typically involved in your interviews or decision-making process?

A   Typically, no.

Q   And can you think of any instances in which he was?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A    I cannot.

Q    Okay.  And do you remember a CP Detective Ritchio (phonetic) or Riccio?

A    I do.  Yes.

Q    What do you remember about him?

A    I worked with detective Riccio on a few cases. He knew me by name.  He was a friendly guy.  And of course, I watched him as he -- from afar as he progressed in the ranks at the Chicago Police Department.

Q    And what do you mean you watched as he progressed through the ranks?

A    I believe, he reached a pretty high rank in the Chicago police Department.

Q    And when you say you watched from afar, what do you mean?

A    I mean that I've seen him on TV.  I've seen him at press conferences.  That's what I mean.

Q    Okay.  Did you have any personal or friendly relationship with him?

A    I would call us friendly, but just within that confines of the police.  We didn't meet outside socially anywhere.

Q    Do you remember any cases that you worked on with then Detective Riccio while you were at the state

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

attorney's office?

A   No.

Q   And do you recall making any of the decisions to approve or not approve charges in the Iglesias' case?

A   I do not.

Q   And do you know, as you sit here today, independent of any documents, how you decided whether to approve or not approve charges against Geraldo Iglesias?

MR. COYNE:  Let me note an objection.  And to the extent that a question, actually calls into question application of the attorney work product doctrine. Before I go any further, let me just ask Mr. Latz, do you know the answer to that question? Without answering it, just tell me whether you know the answer to the question or not.

THE WITNESS:  No.

MR. COYNE:  All right.  Then I'll -- won't be in need to insert the instruction.  Go ahead.

BY MS. BRADY:

Q   Okay.  So I'm going to put up now a document that we will call Exhibit 4.  And for the record, this is a four-page document, beginning at Bates RFC Iglesias 90.  Can you see this supplementary report on your screen?

(EXHIBIT 4 MARKED FOR IDENTIFICATION)

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A    I can, Ms. Brady.  I wonder if you could enlarge it for me.

Q    Yes.  And I'll flip through all the pages, so you can familiarize yourself with it.  Can you see this?

A    I can.

Q    Okay.  Just let me know when you're ready for me to scroll.

A    Scroll down.  Okay.  Okay.  Okay.  Okay. Okay. Okay.

Q    That's it.  And I'll just add for the record that the highlighting on here is mine, just for ease of communication during this Zoom deposition.  It wasn't in the original document.

A    Good.

Q    All right.  Have you had an opportunity to review this whole report?

A    You just showed it to me.  I've taken a few minutes to just briefly review it.

Q    Sure.  Are there any places on this document that you want to go back and look at, or read more carefully?

A    Well, depends upon the question, I guess. I'll tell you if I need to.

MR. COYNE:  Yeah.  Let me just object to foundation as to that question, since he hasn't read

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

it yet, but go ahead.

BY MS. BRADY:

Q    If I ask you about specific portions, I'll give you a chance to read them more thoroughly.  But just for now, do you feel like you're familiar with the report in terms of its layout and the places where your name appears?

MR. COYNE:  Objection.  Foundation.

A    I see that my name appears.  I did not create this document, and it was obviously created after the felony review process was over by someone else.

Q    All right.  And during your time in felony review, was that your practice to review documents written by detectives that detailed your participation in a case?

A    No.

Q    Okay.  So would it be fair to say that you did not review this report after it was written?

MR. COYNE:  Objection.  Foundation.

A    I have no recollection of reviewing this report after it was created.

Q    Okay.  And it would not have been your practice to do so, right?

A    No.  Would not.

Q    All right.  So having, kind of looked at just

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

the general contents of this report, does this refresh your recollection at all about the Geraldo Iglesias' prosecution or the Monica Roman murder?

A    Really, it does not.

Q    All right.  So take a look here, kind of in the middle spot of the second page of this document, it says "Notifications ASA Mike Latz felony review."

A    Yes.

Q    That -- was that you?

A    I didn't create this document, but I assume it was me.

Q    Okay.  And it appears from this document, and we can take a look at the felony review folder, if you want confirmation.  And here, it says on the third page of this document, "The R/DETS contacted felony review and ASA Latz reviewed the investigative file and interviewed Rosendo Ochoa.  A second witness, Arnell Moore, was brought into Area Five VC," which, I believe, stands for violent crimes.  "Arnell Moore was interviewed by ASA Latz and provided the same information that he previously had told detectives. Arnell Moore stated that he did not get a good look at the face of the shooter and would not be able to make an identification." Do you see that?

A    I do.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q    Does this refresh your recollection at all about interviewing this person named Rosendo Ochoa?

A    It does not.

Q    All right.  The next paragraph says, "The reporting detectives located three of the persons who were in the car with the victim when she was shot. Those persons are Hugo Rodriguez, Jose Cornell, and Daniel Sanchez.  The driver of the car, Jesus Gonzalez, was in Mexico, but was expected to return to Chicago. Rodriguez, Cornell, Sanchez spoke very limited English and were interviewed by ASA Latz, but Detective R. Guevara as interpreter.  During this interview, Hugo Rodriguez stated that he would be able to identify the person who shot Monica Roman.  Do you see that?

A    I do.

Q    Okay.  Does this refresh your recollection at all about interviewing any of the witnesses to this case, or anything else about your participation?

A    I don't remember those interviews at all.

Q    Okay.  Do you recall other instances in which you interviewed folks at Area Five and Reynaldo Guevara translated?

A    I do not.  I'm sorry.

MR. CHRISTIE:  Objection to form.

Q    All right.  So we can see here at the top of

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

this page, it appears, like Mr. Ochoa had viewed a lineup and identified Geraldo Iglesias as the person who shot and killed Monica Roman. Do you see that?

A    I do.

Q    I'm going to flip to the first page and direct your attention to this paragraph where it says, "On 21 June, 1993, the reporting detectives were contacted by a confidential informant who's a member of the Imperial Gangsters Street Gang. This informant stated that many members of the gang were talking about snake killing a girl in a car on Sawyer and Palmer. The informant could not elaborate any further." Do you see that?

A    I do.

MR. COYNE: Rachel, I think you're referring to page 2, not page 1, just from what I'm looking at.

MS. BRADY: Oh, I'm sorry. Did I say page 1?

MR. COYNE: Correct.

BY MS. BRADY:

Q    Okay. Yeah, that was my bad. Page 2 of this document. All right. So would you agree that based on this report, the evidence that detectives had at the time they come contacted you was a lineup identification from Rosendo Ochoa and that information provided by the confidential informant?

MR. CHRISTIE: Objection. Form.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

MR. COYNE: Objection. Form. Yeah. Let me -- let me -- objection. Form, foundation. Argumentative and requires speculation based upon his testimony thus far. Go ahead.

A This document which we're looking at was not created until after I did my felony review evaluation. I did not rely up upon this document in any way in making that decision. And I don't have any other recollection of anything that was presented to me when I came to Area Five on that day in June, 1993.

BY MS. BRADY:

Q Do you have a reason to believe that this report is inaccurate?

MR. COYNE: Same objection.

A I have no basis that's called accurate nor inaccurate.

Q All right. So here, this highlighted paragraph on page 3 of the report, which is RFC Iglesias 92, it lists that you were interviewed -- or you interviewed people? The final paragraph notes that, as well. Do you see that?

A I do see the paragraph. Yes.

Q Okay. Would it -- strike that. Could we look at the felony review folder then to determine the contents of those interviews?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

MR. COYNE: Objection. Form.

A   Yes.

Q   Okay. All right. I'm flipping back to Exhibit 1, which is the felony review jacket. I'm going to flip through and find the names of the people who we just discussed. One of them was Rosendo Ochoa. I'm sorry, one of them was Arnell Moore. I see him as witness number 3 on page 476 of this document. Do you see that?

A   I do.

MR. COYNE: Rachel, which exhibit number is this again?

MS. BRADY: This is Exhibit 1.

MR. COYNE: One. Okay.

MS. BRADY: Yeah. I'm going to go back and forth between exhibits 4 and 1 a couple of times.

MR. COYNE: Okay.

BY MS. BRADY:

A   Do you have a question?

Q   Oh yeah. I'm sorry. I thought you were looking. Would this be the place where you would have memorialized your conversation with Arnell Moore?

A   Yes.

Q   Okay. Do you have any reason to think that there's anything incomplete about this writeup of what



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

he said to you?

MR. COYNE: Objection -- sorry. Object to foundation.

MR. CHRISTIE: Objection to form.

A    As I sit here today, I have no reason to believe that there's anything incomplete about this summary.

Q    All right.  So it looks like after you interviewed Arnell Moore, you and Guevara talked to Hugo Rodriguez, Jose Cornell, and Daniel Sanchez, and I see that by looking at page 3 of the supplementary report we've been looking at.

MR. COYNE: Let me just catch up with you Rachel before.

MS. BRADY: -- sure.  The final paragraph on page 3.

MR. COYNE: Okay.

MR. CHRISTIE: And we're back on Exhibit 4?

MS. BRADY: Yes.

MR. CHRISTIE: Okay.

MR. COYNE: Got it.  Thank you.

A    Based upon my review of what appears to be a felony review folder in my handwriting, that I did interview Sanchez, Rodriguez, and Cornell.

BY MS. BRADY:

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q    Okay.  I'm flipping back now to Exhibit 1 and we can see the interview with Sanchez is here on page 476 at the bottom; is that right?

A    I'm sorry, what's the question?

Q    Your interview with Daniel Sanchez is memorialized here on page 476?

A    I would say that my interview with Sanchez is summarized in the three lines of that box called "Victim Witness number 4."

Q    Okay.  And as far as you know, this is an accurate summary of what he told you?

MR. COYNE:  Object to foundation.

A    As I sit here today, 30 years later, that's an accurate summary of what he told me.

Q    Okay.  You talked to Daniel Sanchez, Jose Cornell, and Hugo Rodriguez.  So Jose Cornell looks like he appears on page 474 of your felony review file. Would you agree with that?

A    Yes.  A summary of that interview appears on 474.

Q    Okay.  And as you sit here today, do you believe that this is an accurate writeup, or an accurate summary, of what he told you?

MR. COYNE:  Objection.  Foundation.

A    Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q    Here we have, above that on page 474, witness number 5, Hugo Rodriguez.  Do you see that?

A    I do.

Q    Does this, as far as you know, seem like an accurate summary of what Mr. Rodriguez told you?

MR. COYNE:  Same objection.

A    I don't have any independent recollection so I really can't say.  But, I have no reason to believe it's not an accurate summary.

Q    Okay. All right.  Guevara says that he was -- or this report says Guevara was translating these interviews?

A    That's what the report says.

Q    It says here?  Were you able to understand what Guevara and the witnesses were saying to each other?

MR. COYNE:  Objection to form.

A    I have no recollection of that.

Q    Do you have any reason to think that he was not translating accurately?

MR. COYNE:  Objection.  Foundation.

A    I have no reason.

MR. CHRISTIE:  Objection.  Speculation, too. Go ahead, sir.

A    I have no independent recollection, so

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

therefore, I have no reason to believe he was not translating that correctly.

BY MS. BRADY:

Q   Okay.  I think I also missed one.  It says here, Mike Latz, in this paragraph on page 3, Mike Latz interviewed Rosendo Ochoa, and I just want to find that on your felony review folder.  Where --

MR. CHRISTIE:  Rachel, it could be at the last page.

Q   Oh, thank you.  This is page 478 of this folder, the very bottom box.  It says "Eyewitness Rosendo Ochoa."  Do you see that?

A   I do.

Q   Do you have any reason to think that there's something inaccurate about your summary of what Rosendo Ochoa told you through Detective Guevara who interpreted?

MR. COYNE:  Objection.  Foundation.

A   I have no independent recollection. Therefore, I have no reason to believe it's not an accurate summary.

Q   Okay.  All right.  Going back to this police report.  I'm now flipping to page 4 of the report.  Do you see that?

A   Yes.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q    Okay.  At the very top, it says, "On 24 June, '93 at 0030 hours, Detective R. Guevara and A.S.A. M. Latz showed Hugo Rodriguez the same photo array previously viewed by Rosendo Ochoa.  After viewing this photo array, Hugo Rodriguez identified the photo of Geraldo Iglesias as the person he saw shooting Monica Roman.  This photo array was inventoried for evidence."  Do you see that?

A    I do.

Q    Okay.  Up to this point, according to this report, it looks like you had a photo array identification from Hugo Rodriguez.  Information provided by a confidential informant.  And a lineup identification from Rosendo Ochoa.  At that point, it says, "A.S.A. Latz requested that two other persons listed in the police reports as potential witnesses, Efrain Torres, and David Chmieleski, be allowed to review Geraldo Iglesias in a lineup." Do you see that?

A    I do.

Q    Okay.  Does this paragraph give you any insight now, 30 years later, about the value of the evidence that detectives Guevara and Halvorson had presented to you up until that point?

MR. COYNE:  Objection.  Form, foundation.

A    No.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

MR. CHRISTIE: Objection.

Q Would I be correct in interpreting this as one of those situations where you said you need to do more investigation before I can approve charges?

MR. COYNE: Same objection.

MR. CHRISTIE: Objection also causes speculation.

A I don't have any independent recollection of this at all, so I don't know what the proper inference is.

Q Okay. A while back, you told me that there were three things that you would do when called to a station to review charges. You would approve them. You would deny them, or you would say conduct some more investigation. Am I remembering that correctly?

A Yes.

Q Okay. If you would have approved charges at this point, 0030 hours, would you have requested that police go interview more witnesses?

MR. COYNE: Objection. Foundation.

A I guess, I don't understand the question. Please restate the question.

Q Sure. The second paragraph of this report says that you requested, if it's true -- you requested two other people look at a lineup. Does that seem like

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

an accurate summary based on this report?

MR. COYNE: Same objection.

A    I have no independent recollection.

Q    Sure.  I understand that.  Would you agree that based on this report, what happened was, you interviewed all of the people who appear in these witness slots on your felony review folder that we've discussed so far, and requested that Detectives go view -- pick up some more witnesses to view a lineup?

MR. COYNE: Objection.  Form, foundation.

A    I really don't have any recollection of that. That's what this supplementary report says.

Q    Do you have a reason to think that this report is inaccurate?

MR. COYNE: Same objection.

MR. CHRISTIE: Objection.  Calls for speculation.

A    No.

BY MS. BRADY:

Q    Okay.  Let's just assume that this is what happened.  That this report is accurate so far.  And you interviewed Rodriguez, Ochoa, Arnell Moore, Jose Cornell, and Daniel Sanchez.  I think that's it.  And then you said, "Please go have two other witnesses look at Geraldo Iglesias in a lineup." As you sit here today,



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

does that provide you with any information about what the value of the evidence or the interviews you had done already was?

A    No.

MR. COYNE:  Objection to form.  Foundation. Go ahead.  Rachel, can I, just to make it easier on you and given the Zoom delays, can I get a continuing line of objections?  Will you accept based on form and foundation as to any questions from this witness pertaining to this case sub-report in light of his testimony, that he has no independent recollection of it?  That way, I won't have to keep interrupting you.

MS. BRADY:  Yes.

MR. COYNE:  That'll make it easier. Thank you.

MR. CHRISTIE:  We'll just join just to make it easier.

MR. COYNE:  I think, it will.  Yeah.  That way we won't be stepping on the witness's answer or your question.  Thank you.

MS. BRADY:  Well, it's been the policy throughout that one objection for our defendant is for all of the defendants.  So, I think, we're still doing that.

MR. COYNE:  This is my first deposition in this



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

case so I wasn't aware of that.

MS. BRADY: No. I wasn't talking to you, John.

MR. COYNE: Okay.

MS. BRADY: Just clarifying for the record.

MR. COYNE: Oh, I got you. Okay. I understand.

MS. BRADY: Okay. I think there's a question pending.

MR. COYNE: There is. I objected to it. You want to hear it again, Mike?

THE WITNESS: Yes, please.

BY MS. BRADY:

Q    Okay. I'm going to do my best to ask the question again. I don't remember it exactly. So, I'll just ask a new question. Assuming that the information in this report is accurate, which is that you were presented with the investigative file. You knew that Rosendo Ochoa had viewed a lineup and picked out Geraldo Iglesias, and you spoke with witnesses, Arnell Moore, Ochoa, Hugo Rodriguez, Jose Cornell, and Daniel Sanchez, and you knew that Hugo Rodriguez had picked Geraldo Iglesias out of a photo array. Why would you have requested that detectives go out and get two more witnesses to look at a lineup?

MR. COYNE: Separately from my earlier

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

objection, clearly that calls for attorney work product. I'm just going to ask you before we further investigate and engage in any analysis in that regard Mike, do you know the answer to the question she just asked you? Without answering it, do you know the answer?

THE WITNESS: No.

MR. COYNE: Okay.

BY MS. BRADY:

Q **Based on your practice, reviewing charges as a felony review prosecutor, would it be safe to assume that at this point, when you requested additional witnesses come in and view lineups, you did not believe there was sufficient evidence to approve charges?**

MR. COYNE: And again, my question based upon the fact that the question you just asked. First of all, for the record, we have a continuing line of objections as to form and foundations as to any question to this witness, based on this document. Separately from that line of objections, the issue is now the application of the attorney work product privilege under Rule 26, et seq. to this question. So Mike, once again, without answering the question, in order to assess whether to instruct you on that privilege, do know the answer to the question she

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

just asked you?

THE WITNESS: Could you repeat the question?

MR. COYNE: Yeah. Can the court reporter read it back, Rachel, or if you prefer, you can just rephrase it or whatever you want to do. I'm just --

MS. BRADY: We can have the court reporter read it back.

MR. COYNE: -- great.

COURT REPORTER: Give me one moment.

MR. COYNE: Can you turn the volume up, please?

COURT REPORTER: Yeah. One second.

(REPORTER PLAYS BACK REQUESTED TESTIMONY)

MR. COYNE: Amanda, I'm just going to ask -- I'm sorry. I'm going to ask that the entire question, including the beginning, which qualifies the rest of the question. If you please replay the entire question. Thank you.

COURT REPORTER: Yes.

(REPORTER PLAYS BACK REQUESTED TESTIMONY)

MR. COYNE: And again, Mike, the issue is, because this is a why question. This is asking you why you did something, which clearly invokes the attorney work product privilege under Rule 26. The question I have for you, without your answering that question that she just asked you, do you know the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

answer?

THE WITNESS: Yes. I do know.

MR. COYNE: All right then. All right. Well, I would instruct you not to answer the question then based on attorney work product privilege.

BY MS. BRADY:

Q **Mr. Latz, are you going to take your attorney's advice and assert work product protection over the response to my question?**

A Yes.

MR. COYNE: And for the record, I'm not asking him to invoke it. I'm instructing him not to answer. So the proper question would be, is he going to follow his attorney's advice? Just for the record, but, I think, he's answered.

MS. BRADY: Yeah. I need his testimony on whether he's invoking the work product protection.

MR. COYNE: Well, he's not. His attorney is. He's following my instruction not to answer. I'm the one that's invoking the work product privilege.

MS. BRADY: Sure. So you can't invoke the privilege on his behalf.

MR. COYNE: I can instruct him not to answer. I'm sorry. Go ahead, Rachel. I didn't mean to interrupt you.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

MS. BRADY: Yeah. He needs to be the one to invoke it because it's his protection.

THE WITNESS: I will take my attorney's advice.

MS. BRADY: Okay.

MR. COYNE: Yeah. That's what he's doing. He's following his attorney's instruction.

MS. BRADY: Okay. Are you also asserting work product protection over the information I'm looking for?

MR. COYNE: Objection. Foundation. I don't even know if he knows what it is. What the privilege is. But go ahead. Objection. Foundation. You can answer if you can.

A Yes.

MS. BRADY: Okay. We are going to reserve the right to reopen this deposition after we have a chance to raise this issue with the court, if necessary.

MR. COYNE: Sure. And just to clarify, you believe that the question you asked him, which involves his answering why he did something or did not do something with respect to his approving charges, it's your position that that question, why he did something with respect to his approving or not approving charges, that that does not invoke the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

attorney work product privilege?

MS. BRADY: That's correct. Because I'm asking about his practice.

MR. COYNE: Well, no, the practice you predicated the question was the practice. But then, you applied the practice, which has been undefined and untestified to, to the question of what he did in this case. So, I think, we have an obligation under Rule 37.2, before you file a motion to compel, or I file a motion for protective order, to suss that issue out. So if you're asking him about his practices, I think, that's fair game. If you're asking him, "But what were your practices in 1993 as a felony review assistant," then, I think, that's fair game. Although I have a continuing line of objections based on foundation, since he doesn't recall what he knew in 1993. But holding that aside, I believe, it's fair game to ask him about his practices. If you're asking him why he did or did not pursue a particular line of inquiry or action regarding charges, then it's my position that that does clearly invoke the attorney work product privilege, but I'd be happy to hear you out before I elect further.

MS. BRADY: Sure. We can continue the Rule

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

37.2 discussions at a later time after I've had a chance to compile some case law. I'll just say for the record right now that, it's our position that courts will find that the work product protection in the case of prosecutors is -- we've litigated in several of these cases against the city, does not apply when there's an overwhelming need for the information and whether or not it was -- depending on which privileges you're invoking. So, I will just say that, I believe, that we have a good faith argument the work product protection might not apply here, and that we can continue these conversations at a later time.

MR. COYNE: Well, let me respond to that. If you're talking about the potential of inconveniencing this witness by bringing him back, then, I think, we do have to have the conversation. Because what I initially heard you say was you were referring to practices, and therefore, the attorney work product privilege did not apply. Now, what you just said is, it does apply, and therefore, you're referring to something other than practices. But the judge is going to hold that you have an overwhelming need. So, let me just make sure I understand. Are you saying the attorney work



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

product privilege does apply in this case, but there's an overwhelming need for the information, and therefore, it should be overruled?  Or are you saying that you're asking about practices, and therefore you're not invoking the attorney work product privilege?

MS. BRADY:  As to my questions about practice, I'm saying, work product protection doesn't apply. As for my question about how his practices -- what we can infer based on information that he doesn't remember, documentary information presented in this report, and what he knows about his practices, I'm saying that the work product protection doesn't apply because we're not asking about specific decisions that he made in this case.  He doesn't remember them.  He's already testified about that. So any questions about practice as applied to a hypothetical set of facts are not covered.  I'm also saying that even if they are covered, we would have a right to the information anyway.

MR. COYNE:  Sure.  Well, in that case, in order to avoid -- first of all, I asked him if he knew the answer to the question and he said yes, first of all.  So when you say he didn't know the answer to the question, I disagree.  Number two, I'm going to

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

suggest, because my goal, I represent this witness, I don't want him to be inconvenienced. I'm going to invite you to call the judge. We can agree to disagree, and then we can have the judge make the call right now, in order to avoid the possibility even of this witness having to be inconvenienced and take further time off work to come back.

THE WITNESS: I'm sorry, John?

MR. COYNE: Go ahead, Mike.

THE WITNESS: If I have an opportunity, can I have an opportunity to speak to you and maybe --

MR. COYNE: Yeah, let's do this. Yeah. Rachel, we might be able to solve this problem. Give us five minutes. We'll address it. And we might be able to head off this dispute after a brief conference with the client.

MS. BRADY: Sounds good. Let's go off the record.

MR. COYNE: Okay. Five minutes.

(OFF THE RECORD)

COURT REPORTER: We're on the record.

MR. COYNE: With regard to the issue of attorney work product privilege, we went off the record briefly to allow me as counsel for the witness to look into that matter. And having looked

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

into it further, I think we're okay. I asked that the witness be permitted to hear the question again, and then, we can proceed from there.

COURT REPORTER: Okay. Just give me one minute to find the question, because there's a lot of talking before. Okay.

(REPORTER PLAYS BACK REQUESTED TESTIMONY)

A    No.

MR. COYNE: Sorry? What was the last word?

COURT REPORTER: Have done already.

MR. COYNE: No. I thought I heard another word there. Anyway, I would renew earlier objections. I'll let the witness answer the question.

A    The answer is no.

BY MS. BRADY:

Q    Okay.

A    The fact that I asked to speak to two more witnesses doesn't give me any inference from the value of the evidence, which I had already reviewed.

Q    As a matter of practice, if you would have thought that the evidence presented at the time you requested that the two additional witnesses come in was sufficient to approve charges, would you have approved them at that time?

A    I can't answer that because the two witnesses

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

did come in and I did interview them as a matter of my personal practice.

Q    Sure.  My question isn't whether you ultimately approved charges after hearing the additional evidence.  My question is:  As a matter of your own practice in deciding whether to approve charges, if the evidence available up until the point at which you requested additional evidence was sufficient, would you have approved charges at that time?

A    I cannot answer.  I don't have any specific recollection about this case, what my thinking was, and why I did what I did, but I can say this.  It is my practice in every single case, is to interview all of the witnesses that were identified, if that was possible.  Sometimes, it wasn't possible.  But the extent that it was possible, it was my personal practice to interview every witness which was identified in police reports.

Q    Okay.  So speaking now about your practices, and we talked about this a little bit earlier, I'll take this down for now.  You said that your decision to approve charges or ask investigators to do more investigating or deny charges that right, kind of depend on the, of that was available; is that right?

A    Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q     And it was case specific; is that right?

A     Yes.

Q     Was it your practice to approve charges if you felt that the evidence that was presented to you was sufficient to charge?

A     In murder cases, I had to have the approval of the felony trial supervisor, at least. And maybe even higher than that, but yes, of course, I always look for sufficient evidence in order to approve charges.

Q     And -- okay. So I have a couple questions about that. Was it the case when you were in felony review that you needed approval to approve charges for all homicides?

A     My recollection is yes.

Q     Okay. Putting Exhibit 4 back up, can you see this on your screen?

A     I can.

Q     This bottom paragraph says A.S.A. Latz after having reviewed all the facts and circumstances of this investigation approved charging Geraldo Iglesias with first degree murder. Do you see that?

A     I do.

Q     Okay. Does this give you any information about whether you needed approval from your supervisor to decide on approving charges?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A    It does not.

Q    So the fact that it says you approved the charging decision, maybe doesn't mean that you were the one who approved it?

A    I probably needed approval to do the approval.

Q    Okay.  So how would you have gone about getting the approval to do the approval?

A    In this case or during that time?

Q    During that time, generally.

A    There was a -- I would page -- have my felony trial supervisor paged.  This is a time before cell phones and I'd have them paged with a request to call me at Area Five.  And over the phone, I would summarize the evidence, summarize what we've done so far, and I would get oral approval in order for the approval for the approval or instructions to deny the felony approval or instructions to do a continuing investigation.

Q    All right.  And would those discussions be memorialized anywhere?

A    Not by me.

Q    Okay.  So here where it says A.S.A. Latz requested that the two other persons come in and view lineups, do we have any way of knowing whether your supervisor told you to do that, or you just decided on your own?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A     I do not.

Q     Was it your practice to contact -- oh, strike that.  It was your practice or a job requirement, maybe for you to get approval for approving all homicide charges; is that right?

A     That's my recollection.  Yes.

Q     Okay.  And so if you thought there was sufficient evidence to charge, you would contact your supervisor, and they would give you approval or reject your determination, and say you needed more information; is that right?

A     That's my recollection.

Q     And you don't remember who that supervisor was in this case, right?

A     I have no independent recollection of that.

Q     You said your supervisors in '93 were David Studenroth and --

MR. COYNE:  Frank Difranco.

Q     Yes.  Frank Difranco; is that right?

A     That's what I said.  Yes.

Q     Okay.  So you would've called one of those two people to discuss approving charges at least once, but possibly twice.

A     That's correct.  Let me just clarify.  I would've called felony review and had the felony review

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

paged, then both of them and have one of them call probably back in Area Five. That's the way that would've worked.

Q Okay. And there's no way we can tell from looking at your felony review notes, who you called or what they said; is that right?

A Give me a minute just to look. I didn't see any name memorialized on here. So no, it doesn't state who gave me approval for the approval.

Q Okay. So it's possible, looking at this report, assuming the information in the report is accurate about what information was presented to you and what you knew. That, at this point, before you requested that Torres and Chmieleski come in and view lineups, either you had concluded that there was not sufficient evidence to charge yet, or you thought there was sufficient evidence to charge, but your supervisor said you needed more information before you could approve charges; is that right?

A I can't make -- I can't make those assumptions. I don't -- I don't have any recollection of that, and it could have happened a number of different ways.

Q Okay. So what are the other ways that it could have happened beyond the two options that I just

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

described?

A    I think that -- what are the two options you described?

Q    So at this point here in between, when you spoke with the five people, and when you requested that two more people come in and get view lineups, either you concluded that there wasn't sufficient evidence to charge and wanted more information, or you thought there was sufficient evidence to charge and you called your supervisor and your supervisor said, no, you can't approve charges yet.  The cops need more information.

A    I just can't swear that it happened that way. I don't have any independent recollection.  You know, I, I don't know whether this is a chronology.  I don't think it is a chronology.  So say at this point, you know, I may have asked if -- to speak to the witnesses before, you know, before this -- this other thing happened.  I -- I just can't trust this chronology.  I do know that I would've had to have called my felony trial supervisor for approval.  That's as much as I could say.

Q    Okay.  So assuming this is a chronology, because here we have June 24th said, 0030 hours, and then, June 24th at 0125 hours, and then, June 24th at 0140 hours, assuming this is a chronology and that this

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

is the point at which you said, "Go out and get these two more witnesses to look at a lineup." Can you think of any other way that it might have happened, that you decided that the cops needed more information other than you decided there wasn't sufficient evidence to charge, or your supervisor told you there wasn't sufficient evidence to charge?

A    Yes.  The -- the personal practice was to speak to every witness who was identified.  And so that's -- that's something that, you know, I would've done in every, every case where I could get the witnesses in.

Q    Okay.  Are there any other ways that this might have gone down other than the three options that we've discussed, which is, you said there wasn't enough information to charge, your supervisor said there wasn't enough information to charge, or you decided independently that you just wanted to speak with everyone before deciding whether to charge.

A    I don't -- I don't agree with that characterization at all.  I can't agree with that.

Q    What was wrong about it?

A    Well, I don't know.  Let me just add --

MR. COYNE:  Aside from my continuing line of objectives, let me just add that Mr. Latz's earlier

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

testimony, but go ahead Mike.  Sorry To interrupt.

A    I don't have an independent recollection of the chronology, and how things occurred, and in what order.  Okay.  But I do know that in every case I go into -- every case I went into at that time, I wanted to speak to every witness who's identified.  Okay.  And if there were multiple eyewitnesses identified, you know, the -- that -- I wanted to see what they, you know, had to say regarding the -- a line up.  It was just -- it was just customary for me to find out what every witness had to say.  Okay.  So I don't think the fact that I did that, I don't think it is any reflection on what I was thinking at the time or what the -- what our thinking was with regard to the quality of the evidence at the time.  Because that was something that we did in every case tried to speak to every witness.

BY MS. BRADY:

Q    Okay.  So you wanted to speak to every witness who was available no matter what?

A    Well, not no matter what.  Every witness that I could was reasonable and practical to do.  So some witnesses don't cooperate.

Q    Okay.  So if it was reasonable and practical for you to speak to all of the witnesses in this case, you would have wanted to speak to them?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A    Yes.

Q    Before making a decision about approving charges.

A    Yes.

Q    And that was your practice, regardless of what you thought about the value of the evidence that had been amassed at any point before you were done speaking with everyone; is that right?

A    Well, I - I -- that's not exactly how I would say it.  Okay.  So if I was going to deny a case right off the bat, you know, I wouldn't have to speak to every witness.

Q    Why is that?

A    Because the case wasn't being approved, it was being denied.

Q    Why would you not want to speak to everyone to get all the information before deciding whether to deny?

A    Well, I can't think of a specific case when I did.

Q    Okay.  So you wanted to speak to every witness no matter what when it was practical to do so, regardless of what your opinions were about the evidence that had been generated up to the point where you had spoken with everyone?

MR. COYNE:  Objection.  Mischaracterizes his

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

earlier testimony. Go ahead. Can answer if you can, Mike.

A    Oh, what's the question again, please.

BY MS. BRADY:

Q    **You wanted to speak to every witness who was available and willing to speak to you, regardless of what your opinions were about the evidence that was available until the point when you decided to approve charges?**

MR. COYNE:  Same objection.

A    Rachel. And my recollection, in every case, as much as practical, I wanted to interview every witness who was identified.

Q    **All right. Taking a look at this police report again, I'm on page 4 of the report, which is RFC Iglesias 93. Can you see this?**

A    I can.

Q    **Okay. It says here that this person Hugo Rodriguez came in and viewed a lineup. Do you have any way of telling whether you watched this lineup occur?**

A    I do not.

MR. COYNE:  What page is that Rachel?  I'm sorry.  I just want to get on that page.

MS. BRADY:  This is the fourth page of this subpage 93, RFC Iglesias 93.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

MR. COYNE:   Thank you.

BY MS. BRADY:

Q     Was it your practice to watch lineup procedures as they were taking in place?

A     It -- it was not my practice, too.  I don't know whether I viewed this lineup or not.  I know there were times when I did.  I did view lineups, but I don't know whether I viewed this lineup or not.

Q     Was there anything that dictated, whether you would want to watch a live lineup as a matter of practice?

A     As a matter of practice, no.

Q     Was it your practice to watch detectives perform photo array procedures, or other photo identification procedures?

A     It was not my practice.  I know there were occasions when I was present when a photo array was -- was viewed but it was not my practice to participate in that.

Q     And do you have any reason to think that the Iglesias' case that we're talking about today was one of those instances in which you watched the lineup occur?

A     I have no way to know one way or the other.

Q     Do you have any reason to think that the Iglesias' case was one in which you watched a photo

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

identification person?

A   No.

Q   Am I correct in understanding that it would not have been your practice to watch the live lineups that were performed while you were at Area Five in the Iglesias' case?

MR. COYNE:  Objection.  Mischaracterizes his prior testimony.  Go ahead.

A   It was not my practice, too, although there may have been some occasions when I did.

Q   And if you would have made any promises or offers to any of the witnesses that you interviewed here at the station on June 24, 1993, would you have memorialized that information somewhere?  Actually strike that.  Do you recall making any offers or promises to any of the witnesses that we've discussed here in exchange for information?

A   I do not.

Q   Would it have been your practice to do so?

A   No.  Absolutely not.

Q   Okay.  Can you say with confidence that you did not make any promises or offers to any of these witnesses in exchange for information?

A   Yes.

Q   All right.  And you told me earlier that it

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

was -- strike that. You told me earlier that in felony review -- oh, do you need to take a break?

THE WITNESS: Can I take a break? Someone just come to my back door. Just for a second.

MS. BRADY: Yeah. Sure. Yep. Let's go off the record.

(OFF THE RECORD)

BY MS. BRADY:

Q You told me earlier that when you were in felony review, your participation in a particular case ended as soon as charges were approved or not approved; is that correct?

A That is correct.

Q Do you have any reason to think that you continue to participate in the Iglesias' investigation after you approved charges on June 24, 1993?

A I have no recollection of ever hearing about the case again or participating in any way after June 24, 1993.

Q Do you have a reason to think that you did continue to participate in the case after June 24, 1993?

A No.

Q I have some questions now about your awareness of particular misconduct in the Iglesias' case that Mr. Iglesias alleges occurred. It's going to be a bit of a



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

slog, but I got to ask those so please just bear with me. Were you aware at any point during the prosecution of Geraldo Iglesias, that any member of the Chicago Police Department engaged in misconduct involving witness coercion?

A No.

Q Suggestive identification procedures?

A No.

Q Promises made to witnesses?

A No.

Q Threats made against witnesses?

A No.

Q Deals on criminal cases offered to witnesses?

A No.

Q Whether witnesses were fed facts, that would cause them to implicate Geraldo Iglesias?

A No.

Q Police reports that were not disclosed?

A No.

Q False facts that were included in police reports?

A No.

Q Fabrication of any evidence?

A No.

Q Concealing of any exculpatory evidence?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A    No.

Q    If you had been aware of any of those types of misconduct that we just discussed, would you have turned that information over to a supervisor or to Mr. Iglesias' defense attorneys?

A    I would've reported it.

Q    Where would you have reported it?

A    Up my chain of command.

Q    Would that have been one of the supervisors that we've discussed earlier?

A    It would've been through -- through felony review.

Q    And would you also have been memorialized it somewhere?

A    It depends.

Q    What does it depend on?

A    I don't know.  Depends on the situation.

Q    So you think there's a situation in which you would've learned about unconstitutional conduct committed by police officers and you would not have documented it somewhere?

A    No.  That's not what I said.  That's not what I said at all.

Q    So it -- oh, go ahead.

A    You're asking me to speculate because I never



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

saw any such conduct. Okay. You're asking me to speculate what I would've done if I had seen such conduct, but I don't recall ever seeing such conduct.

Q    Okay. As you sit here today, do you have any independent recollection of the evidence that formed the basis on which you approved charges in the Iglesias' case?

A    Independent recollection, no.

Q    Can you figure out the answer to that question based on a review of your felony review jacket?

MR. COYNE: Objection. Form, calls for speculation.

A    Are you asking me if I could draw some inferences from the material on the review folder?

Q    Yes.

A    I could draw some inferences.

Q    Okay. Let's take a look. Do you have a hard copy of this?

A    No.

Q    Okay. So I will flip through and just let me know when you're ready for me to change pages. And to clarify, my question is whether you can infer based on -- or what you can infer based on the information in this felony review folder about the evidence that caused you to approve charges?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

MR. COYNE: Rachel, just let me ask you just so we can head off the obvious dispute or potential dispute. You intend on asking him why as an attorney, working as a prosecutor in the felony review division, why he approved charges? Are you -- do you intend to go beyond what is written on the felony review folder?

MS. BRADY: Only if he has an independent recollection of something that's not on the folder.

MR. COYNE: Okay. We can take it as needed.

BY MS. BRADY:

Q   Okay. All right. So do you see thing on page 471 that allows you to infer about the evidence that gave you reason to approve charges?

A   No.

Q   What about page 472?

A   Do I see -- your question, do I see anything that that supports my approval of charges? Is that's what your question is?

Q   Sort of. So I asked you if you knew what evidence supported charges, and you said you might be able to infer from your felony review folder. So I'm asking you to take a look at your felony review folder and draw that inference.

A   I don't have any independent recollection.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

It's just from the felony review folder.

Q    Okay.

A    The answer would be two eyewitnesses identified the defendant.

Q    Anything else?

A    Not that I could see.

Q    So the two eyewitnesses were Rosendo Ochoa and Hugo Rodriguez.  I'll just represent that to you.  If you would have known that either of those witness did not actually have an opportunity to see the shooter, would that have undermined your decision to approve charges?

MR. COYNE:  Objection to form.  Let me object. Let me -- Rachel, just so we can -- we don't have to get into the same discourse.  Let me have a quick conversation off the record with the witness, please.

MS. BRADY:  Sure.  Can I tell you about this line of questions?

MR. COYNE:  Sure.  You can go ahead.

MS. BRADY:  So that you will have all of the information.  So I'm going to ask seven, maybe eight questions and they're all to the effect of, if you would've known that X was true, would that have impacted your decision to approve charges?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

MR. COYNE: Sure. So yeah. You intend on asking him if X were the case?

MS. BRADY: Yes.

MR. COYNE: Would you have approved or not approved?

MS. BRADY: Yes.

MR. COYNE: And your position is that, I assume, you agree that that's at least seems pretty clearly the work product, but it's your position. The 7th Circuit case law dictates in this case. Your belief is that your compelling need as plaintiff's counsel for the answer to that question will override the work product privilege.

MS. BRADY: Our position is -- oh yeah. My position is also that it's not necessarily work product because these are hypotheticals given that he doesn't remember what we're asking.

MR. COYNE: I got you.

MS. BRADY: Yep.

MR. COYNE: I got you. Okay. Fair enough. I understand. Give me one minute. We'll be right back on. Mike, I'm going to call you.

(OFF THE RECORD)

COURT REPORTER: Okay. We're back on the record.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

MR. COYNE: All right. Just for the record, we had the colloquy about questions, which may invoke the attorney work product privilege, which obviously, the goal is to allow the deposition to go continue seamlessly, and at the same time, protect the witness's interest in any privileges which may apply. Off the record, I had a chance to discuss this issue with the witness and application of the privilege, and we'll go ahead and allow him to proceed. Thank you. Of course, renewing the attorney, the continuing line of objections we have as to form and foundation for the reasons previously stated. Thank you.

BY MS. BRADY:

Q I think there's a question pending. Can the court reporter please read it back?

COURT REPORTER: Yes.

Q Or play it back?

(REPORTER PLAYS BACK REQUESTED TESTIMONY)

COURT REPORTER: Did you guys hear that?

MR. RAHE: I didn't hear the end. I heard, "undermined" was the last word.

COURT REPORTER: Okay. My computer froze during that, so I'll play it again.

(REPORTER PLAYS BACK REQUESTED TESTIMONY)

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

BY MS. BRADY:

Q    Did you hear the question, Mr. Latz?

A    I did.  It's a hypothetical question and it's one I can't answer without all the context.  You know, why is it they couldn't view the shooter.  It just calls for speculation.

Q    Does it matter why the witnesses couldn't see the shooter if they couldn't see the shooter, but made identifications of the shooter anyway?

A    Is that a question?

Q    Yeah.

A    Oh, what's the question?

Q    Does it matter why the witnesses couldn't see the shooter if they said they couldn't see the shooter and yet made an identification anyway?

A    I don't know.  It could.

Q    Why would it matter why a witness couldn't see a shooter?

A    I don't know.  It's just a -- it's a game of hypothesis and speculation.

Q    Are you saying that there are instances in which a witness could have not seen a person commit a crime-

A    I'm not saying that.

Q    -- and you would have relied on that witness'



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

eyewitness identification anyway?

A    I'm not saying that.

Q    Okay.  If you would have known that Guevara and Halvorsen suggested to either Ochoa or Rodriguez who to pick out of the lineup, would that have undermined your decision to approve charges?

MR. COYNE:  Before you answer, Mike, let me just interpose a separate and distinct line of objection in addition to the earlier.  He's answered that he cannot answer a hypothetical question.  He didn't say that he wouldn't.  He said he can't answer a hypothetical question.  So in light of that, Rachel, will you accept that additional basis for objection as continuing in order to avoid interruption?

MS. BRADY:  Sure.

MR. COYNE:  Thank you.  Okay.  Go ahead, Mike.

A    I can't answer hypothetical.  If then, what -- I can't, with all honesty.

BY MS. BRADY:

Q    Okay.  So if you would have known that one of the detectives in this case suggested to a witness who the witness should identify, are you saying that that would not have undermined your decision to approve charges, that you might have approved charges anyway,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

knowing that the detectives had performed suggestive identification procedures?

A    If I believed that, it's called for hypothetical, but if I believed that, I'm sure it would've affected my decision.

Q    If you would have known that there was an undisclosed witness who knew who the shooter was and detectives withheld information about that witness, would you have wanted to interview that witness, as well, pursuant to your practice of wanting to interview all witnesses?

A    Again, you're asking a hypothetical, which isn't complete, but as I said earlier, I would want to interview every witness they identified.

Q    And if you learned that Guevara was translating, for you, conversations with witnesses incorrectly, would that have undermined your decision to approve charges?

A    If I learned that, it would.

Q    And if you'd known that either of the two eyewitnesses, Ochoa, or Rodriguez, were made promises by detectives in exchange for their identifications, would that have undermined your decision to approve charges?

A    It depends on the exact promises -- the exact things said.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q     Okay.

MR. COYNE:  I'm sorry.  I didn't hear his answer to the previous question.  Rachel, maybe you did, or somebody did.  I think, it got cut off.  If you had known about a witness, not the translation one, the one before that.  An undisclosed witness who actually knew who the shooter was.  I didn't hear his answer to that question.

MS. BRADY:  Can the court reporter read back the answer?

MR. COYNE:  Yeah, please.

COURT REPORTER:  I actually didn't get an answer to that question.  I think he coughed over it.

BY MS. BRADY:

Q     Oh, okay.  So I'll ask it again.  Mr. Latz, if you'd known that there was a witness who knew who the shooter was and detectives withheld information about that witness, would you have wanted to speak with that witness, pursuant to your policy of wanting to speak with all witnesses?

A     As I stated before, it was my policy to speak to all witnesses who are identified, so yes.

Q     And then, I asked a question about, if you had known that the two eyewitnesses or either of the two



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

eyewitnesses were made undisclosed promises by detectives in exchange for their identifications.

A  I think, I answered that one already, didn't I?

Q  Yeah, and you said it depends on the promise.

A  Yes.

Q  What does it depend on?

A  It depends on the promises, the things actually said.

Q  What kinds of promises would be acceptable promises that wouldn't cause you to question their identifications?

A  I don't know.  I'd have to see what the actual promises were.

Q  What if you'd known that either of the two eyewitnesses were promised leniency in criminal cases in exchange for their identifications of Mr. Iglesias, would that have undermined your decision to approve charges?

A  Possibly.  It would depend upon the actual words and circumstances.

Q  So are you saying that there are circumstances under which detectives could have made promises to witnesses that they would be, or secure leniency in sentencing that they did not disclose to anyone?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A    I don't know.  I'd have to know the actual terms, words, and circumstances.

Q    Are you aware of allegations of misconduct lodged against Reynaldo Guevara by dozens of people who are claiming that their convictions were wrongful?

A    I'm only generally aware of that, where that this case exists, but I'm not aware of any specific instances.

Q    Are you aware that Geraldo Iglesias is one of 19 men who've been exonerated after being convicted on murder charges resulting from misconduct committed by Guevara?

A    No.

MR. COYNE:  And by the way, Mike, you can answer these questions in so far as they do not require you to disclose information you received from your attorney pursuant to confidential communications to the extent that you can answer those questions without disclosing those.  Go ahead.

MS. MCGRATH:  Object to the form of the previous question.

BY MS. BRADY:

Q    You can answer.

A    No.

Q    You said you were generally aware of

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

allegations of misconduct against Reynaldo Guevara?

A    Yes.

Q    Do any of those or the sum total of those allegations cause you to question the integrity of Reynaldo Guevara's work at the Chicago Police Department?

A    I haven't made any conclusion.

Q    Did you have any knowledge of or involvement in her Geraldo Iglesias' post-conviction proceedings?

A    I did not.

Q    Were you involved in any way in the decision not to recharge Geraldo Iglesias with the Roman murder?

A    No.

Q    I have a couple more questions that I have to ask.  So sorry, I got to ask them.  Did you conspire with any police officer in this case to deprive Geraldo Iglesias of his constitutional rights?

A    No.

Q    Did you withhold any exculpatory evidence from Geraldo Iglesias?

A    No.

Q    Did anyone from the Chicago Police Department present to you any exculpatory evidence which you then withheld?

A    I was not involved in the prosecution of this

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

case, so no.

Q    Did you hear of any Chicago Police Department employee receiving exculpatory evidence and not disclosing it?

A    No.

Q    Has our discussion today or our review of documents refreshed your recollection about this case whatsoever?

A    No.

MS. BRADY:  Okay.  I do not have any more of questions, so I will thank you for your time and turn it over to the other attorneys who might have some follow- ups for you.

MR. COYNE:  Can we just take a quick five-minute break at this point, and then, come back?

MS. BRADY:  Sure.

MR. RAHE:  Sure.

COURT REPORTER:  Okay.  We're going off the record.

(OFF THE RECORD)

COURT REPORTER:  We are back on the record.

CROSS EXAMINATION

BY MR. CHRISTIE:

Q    All right.  Good afternoon, Mr. Latz, my name's Todd Christie.  I represent several of the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

defendant officers in this case. I just have a few questions for you. I just want to circle back. When did you start on felony review for the Cook County State's Attorney's office?

A  It was probably late '92 or early '93.

Q  And you said you stayed on there for about a year?

A  Yes.

Q  So from '92 to about the end of '93?

A  Approximately.

Q  Okay. So you were there for about a year. Okay. When you were determining to approve charges on felony review was your main goal to assess whether there was enough evidence to bring a conviction?

MS. BRADY:  Objection. Leading.

A  I don't know if that was the standard. The standard was, I think, a reasonably likelihood of a conviction, but make sure all the elements of a crime -- there was evidence to support all the elements of the charge.

Q  But you're looking for something more than just probable cause?

A  Yes.

Q  And in your general practice, when you were brought into the police station to look over charges,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

would you review the investigative file or police reports?

A    I would review everything that which was given to me by the detectives, which generally included an arrest report, supplementary reports.

Q    Photographs?

A    Sometimes.

Q    Medical examiners reports, if available?

A    If available.

Q    So you'd review as much evidence that was brought to you as possible?

A    Exactly.

Q    And then, you'd also as you said earlier, you like to interview witnesses.

A    Yes.

Q    And you'd interview as many witnesses as you possibly could that were reasonable and practical to bring in?

A    Yes.

Q    And as you brought up the felony review folder, you reviewed -- or you interviewed several witnesses in this case?

A    Yes.

Q    Okay.

        MS. BRADY:  Objection.  Form.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q   And when you interview witnesses on felony review, do you independently vet their credibility?

MR. RAHE:  Objection.  Form.

MS. BRADY:  Objection.  Form.

A   You know, it's been 30 years.  I think we naturally make an assessment credibility.

Q   You have reviewed the testimony --

MR. RAHE:  I'm sorry, I didn't catch that. I'm sorry, he cut out there.  I didn't catch your -- the answer because it cut out on my end.  It's been 30 years, what?

A   It's been 30 years and I have no specific recollection.  Although, I think, it's natural to make an assessment of credibility.

MR. RAHE:  Okay.  Gotcha.

BY MR. CHRISTIE:

Q   And when you're vetting those witnesses, do you determine if police had ever coerced them to say anything to you?

MS. BRADY:  Objection. Form.  Also, foundation.

MR. RAHE:  Join.

A   No.  I do not.

BY MR. CHRISTIE:

Q   In this case, you don't recall observing any

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

police officers coerce a witness to say something to you?

A    I do not recall that.

Q    And if you did observe police officers coercing a witness to say something, you would've reported that?

A    Yes.

Q    If you observed any police officers making suggestive identifications to a witness to identify a suspect, you would report that?

A    Yes.

Q    And you don't recall doing that in this case?

A    I don't recall seeing any instance of suggestive identification.

Q    When you were determined whether to approve charges, did police officers have any influence over your decision making process?

     MS. BRADY:  Objection.  Form, foundation.

A    What do you mean by "any influence"?

Q    Did you independently analyze and assess the facts?

A    That determination is made independently of what the police department wants.

Q    And when you approve charges, you have a good faith belief that there's enough evidence to bring



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

forward charges?

A    Yes.

Q    And in this case, there were charges approved by you?

A    I have no independent recollection, but according to the felony review folder, yes.

MR. RITCHIE:  Okay.  I have no further questions.  Thank you, Mr. Latz.

THE WITNESS:  Thank you.

MR. COYNE:  Anyone else?

MS. MCGRATH:  I don't have any questions. Thank you, Mr. Latz.

THE WITNESS:  Thank you.

MR. RAHE:  One second.  We can stay on the record.  I just have a couple questions for you, Mr. Latz.

EXAMINATION

BY MR. RAHE:

Q    My name's Austin Rahe.  I represent the defendant, City of Chicago.  Do you remember you talked a little about -- a bit earlier about these two witnesses, Efrain Torres and David Chmieleski?

A    I do.

Q    And those were the witnesses that you wanted to come back in to view to do an identification



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

procedure, a lineup, I think?

A    According to the felony review folder, that's what it says.

Q    Okay.  And did you - well, did you see in any of those reports that David Chmieleski and Efrain Torres had previously said they were not able to see the shooter's face?

A    I don't recall what the reports say.

Q    Okay.  So let's assume that previously, when Efrain Torres and David Chmieleski were interviewed by the police, they said that they were unable to identify, or unable to see the shooter's face, so, I guess, my question is:  If they had previously said that and you knew about it, what would be the purpose of bringing them back into view a lineup?

MR. CHRISTIE:  Objection.  Form, foundation.

MS. BRADY:  Join.

A    If you're asking me to take an -- I don't have any independent recollection of why I did anything in this case.  But if you're asking for an inference from the felony review folders, because -- my practice was to talk to every witness myself and not just rely upon what was in police reports.

Q    Okay.  So it would make sense for them to come in so you could talk to them just to ensure that they



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

didn't have any change of mind, or maybe they would remember something differently when they came in and talked to you?

MR. CHRISTIE: Same objection.

MS. BRADY: Objection. Same objection.

A Yeah. Just to establish whether they -- what they actually saw for myself.

Q Okay. And let's say they came in to talk to you and they told you, "We didn't see the shooter's face." They told you specifically, then, what would be the purpose of showing them a lineup?

MR. CHRISTIE: Same objections.

MS. BRADY: Join.

A To see whether they could make an identification of the suspect.

Q Even if they didn't see his face?

MR. CHRISTIE: Same objections.

MS. BRADY: Also, argumentative.

A Yes.

MR. RAHE: Okay. Thank you. That's all the questions I have. Anyone else?

REDIRECT EXAMINATION

BY MS. BRADY:

Q I have a brief follow-up. Mr. Latz, you mentioned that sometimes, when you interviewed witnesses

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

as a felony review prosecutor, you vetted them for credibility. Do you remember saying that just a couple minutes ago?

A No. I don't think I said that. I said --

MR. RAHE: I don't -- that wasn't his testimony, actually, but go ahead.

Q Okay. So can you tell me what you did while interviewing witnesses when you wanted to evaluate their credibility?

A I think, you misconstrued what I said. I said, naturally, you make a credibility assessment and just naturally, when you talk to anyone, you make a credibility assessment. And I can't tell you what I did because I have no specific recollection. I just know that whenever I speak to a witness in the capacity as a lawyer, I just have to make a subconscious assessment of credibility.

Q Okay. And did you memorialize witness statements in your felony review folder even though you were making credibility assessments about them?

MR. RAHE: Objection. Form.

A Please, I don't understand the question. Could you --

Q Sure.

A -- rephrase the question?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q Yeah. You said it's natural to evaluate people's credibility just as an attorney, when you're talking to witnesses. Did you memorialize what witnesses told you irrespective of any determinations you made about their credibility?

A I -- in the felony review file folder that I have, you could see that there's three lines. We're giving the summary of what witnesses said. And in those three lines, I would summarize what they said. I don't think I made any judgment of credibility on any of the witnesses. I don't think I memorialized any assessment of credibility on any of those witnesses, but I don't have any independent knowledge or independent recollection.

Q Okay. And if you would have made any determinations that the witnesses were less than credible, you would have recorded their statements on those three lines anyway, right?

MR. RAHE: Form, foundation. Go ahead. Yeah.

A What? I'm sorry. What's the question again? Could you rephrase it because I would summarize their statement. In the three lines, I'm given to do that, okay? Are you asking me if I would make any credibility assessment?

Q No. I'm just asking you that, even if you did



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

make a credibility determination, would you have still summarized what the witness said anyway?

A    I would probably summarize what the witness said.  Yes.

MS. BRADY:  Okay.  I do not have any more questions, so I believe we're done.

MR. RAHE:    I'm sorry.  I just have one more.

MR. COYNE:    Go ahead.

MR. RAHE:    Sorry, John.

MR. COYNE:  It's all right.

RE-EXAMINATION

BY MR. RAHE:

Q    I'm going back to what I was just talking about a few minutes ago.  Is the purpose of having witnesses that didn't see the shooter's face view a lineup to be thorough in the investigation of the facts before you potentially approve serious felony charges against a suspect?

MS. BRADY:  I'm going to object to these questions on the ground that they're beyond the scope of my redirect, and also to that one on form and foundation.

MR. COYNE:  Join on form and foundation.  Go ahead, Mike, you can answer if you know.

A    In this specific case, I don't have a



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

recollection of why we called those witnesses in other than I know it was a practice to speak to every witness that was identified in police reports, if possible.

BY MR. RAHE:

Q    Right.  I'm saying more generally, if you're -- I'm just trying to figure out what the purpose would be of having witnesses review a lineup when they said they didn't see the shooter's face, and I'm wondering if that purpose is to be as thorough as possible in your investigation before you approve the felony charges.

A    I would agree with that.  It's an effort to be thorough.

MR. RAHE:    Great.  Thank you.  That's all the questions I have.

MR. COYNE:  Okay, Mike, you have, unless Rachel, you have anything further based on that?

MS. BRADY:  No.  I'm done.  Thank you, everyone.

MR. COYNE:  Okay.

THE WITNESS:  Thank you.

MR. COYNE:  Mike, you have the right to review. As you know, in light of your practice, you have the right to review your transcript and you can't make any substantive changes, but to review the transcript prior to its being completed, you can

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

reserve that right or you can waive it, which do you so choose?

THE WITNESS: Reserve.

MR. COYNE: Okay. Reserve signature. Thank you, all.

COURT REPORTER: Okay. Thank you. We're going off the record.

(DEPOSITION CONCLUDED AT 2:04 P.M.)



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

CERTIFICATE OF REPORTER

STATE OF ILLINOIS

I do hereby certify that the witness in the foregoing transcript was taken on the date, and at the time and place set out on the Title page here of by me after first being duly sworn to testify the truth, the whole truth, and nothing but the truth; and that the said matter was recorded stenographically and mechanically by me and then reduced to typwritten form under my direction, and constitutes a true record of the transcript as taken, all to the best of my skill and ability.  I certify that I am not a relative or employee of either counsel, and that I am in no way interested financially, directly or indirectly, in this action.

AMANDA DEMENT
Official Seal
Notary Public - State of Illinois
My Commission Expires Nov 24, 2022

AMANDA DEMENT,

COURT REPORTER/NOTARY

COMMISSION EXPIRES:  11/24/2022

SUBMITTED ON: 01/25/2022

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.580.2275 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

# EXHIBIT 79

SUPREME COURT OF THE STATE OF ILLINOIS
COOK COUNTY, CRIMINAL TERM
-----------------------------------------------------------------------------x

THE PEOPLE OF THE STATE OF ILLINOIS

-against-

GERALDO IGLESIAS,

Case No. 93 CR 15199

Defendant.
-----------------------------------------------------------------------------X

## EXPERT REPORT OF NANCY FRANKLIN PHD

Nancy Franklin, being duly sworn, deposes and says:

1. I am over 18 years of age, of sound mind and otherwise competent to make this Affidavit. The evidence set out in this Affidavit is based on my personal knowledge.

2. I am an Associate Professor in the Psychology Department at Stony Brook University, Stony Brook, NY.

3. I have a Ph.D. in Psychology from Stanford University (1989), and my areas of specialization are cognition and memory (which includes, among other subjects, eyewitness identification and false memory). I have taught both graduate and undergraduate courses in cognition and human memory and have conducted research at Stony Brook University since 1989. My research has been funded by the National Science Foundation and the National Patient Safety Foundation.

4. I am an active member of the American Psychology-Law Society, the Association for Psychological Science, the Society for Applied Research in Memory and Cognition, and the Psychonomic Society, and I present my work regularly to the research community. I am well-

acquainted with current findings in the field of human memory generally and the fields of eyewitness memory and identification specifically. My CV is attached as Exhibit A.

5. I have consulted as a memory and identification expert in more than 400 criminal cases in New York, Massachusetts, Pennsylvania, Connecticut, Ohio, Washington, D.C., Maryland, South Carolina, Missouri, Arkansas, Oklahoma, Michigan, Illinois, Texas, and California, since 2008. I have testified in more than 60 of these cases.

6. I have been asked to write an affidavit concerning eyewitness evidence provided by Rosendo Ochoa and Hugo Rodriguez, who both made identifications of Geraldo Iglesias following the murder of Monica Roman. In forming my opinions, I reviewed documents totaling approximately 360 pages, including original police reports; photos of the crime scene, of Mr. Iglesias, of a five-person lineup and of a six-person lineup; testimony of eyewitnesses Rosendo Ochoa, Hugo Rodriguez, and Daniel Sanchez; testimony of responding officer Jose Zuniga; and testimony of Detective Reynaldo Guevara.

**Overview of Affidavit**

7. Geraldo Iglesias was convicted in 1994 following identifications and trial testimony by two eyewitnesses, Rosendo Ochoa and Hugo Rodriguez, both of whom had viewed the shooter under nonoptimal perceptual conditions and both of whom had provided descriptions of the shooter that substantially mismatched the physical characteristics of Iglesias. According to Detective Reynaldo Guevara, Geraldo Iglesias became a suspect when a confidential informant told Det. Guevara that Iglesias had committed the murder.

8. A large body of psychological research has identified several factors that impair eyewitness memory and increase the risk of both false memories and incorrect identifications. This affidavit describes factors of the *Iglesias* case that are known to affect memory in these ways, as follows:

a. Inherent incompleteness and unreliability of memory
b. Inherent difficulty in identifying strangers
c. Exposure duration
d. Bias to overestimate event duration
e. Viewing distance
f. Stress
g. Weapon focus effect
h. Delay from incident to identification
i. Characteristics of the description
j. Post-event suggestion
k. ID administrator's knowledge of who the suspect is (*non-blind procedures*)
l. Impact of positive feedback on memory and confidence
m. Multiple exposures to suspect (*Mugshot exposure effect*)
n. Commitment effect
o. Probative value of non-identifications
p. In-court identifications as unreliable and prejudicial
q. Relationship between confidence and accuracy

9. In discussing the above topics, I am relying on peer-reviewed research and am articulating the general consensus among experts in the field regarding these findings. Much of the research demonstrating these effects have emerged from controlled laboratory experiments. Where data from real-world crimes have also been examined, the patterns of findings parallel those found in the laboratory. Indeed, several researchers have argued that error rates observed in the laboratory underestimate those associated with real-world crimes (e.g., Deffenbacher, Bornstein, Penrod, & McGorty, 2004; Ihlebaek, Love, Eilertsen, & Magnussen, 2003; Lindsay & Harvie, 1988; Murray & Wells, 1982) because, for example, the level of stress that can be achieved in the lab is likely much lower than that experienced by many witnesses to crimes.

**Human Memory Is Inherently Vulnerable and Follows Sharp Losses With Time**

10. More than 100 years of research shows that human memory does not behave like an electronic recording device. Instead, it is generally incomplete and subject to error (Bartlett, 1932; Carmichael, Hogan, & Walter, 1932; Loftus & Palmer, 1974). Forgetting begins to set in immediately, with the sharpest losses occurring in the period just after exposure (Ebbinghaus, 1885/1913). When people later remember events, they retrieve whatever details were originally encoded and remain in storage, along with additional details encountered through their own inferences and additional experiences, or from other people. From this, they reconstruct a memory that they typically experience to be a complete and accurate accounting (Payne, Toglia, & Anastasi, 1994). This method of *reconstruction* is a fundamental characteristic of human memory, and it creates opportunities for memory errors. Several contributors to these errors will be discussed in this affidavit.

11. **Inherent Difficulty In Identifying Strangers.** Memory has been studied for a large variety of content types (objects, scenes, language, etc.), and recognition for unfamiliar faces is among the poorest, as detailed below. Consistent with this, approximately three-quarters of exonerations to date had stranger eyewitness identification as a basis for the original conviction (National Research Council, 2014). Eyewitness misidentification appears to be the single greatest contributor to wrongful convictions (e.g., West & Meterko, 2016).

12. Under optimal circumstances (e.g., with good lighting, no threat, extended viewing, and short delay to test), correct identifications in laboratory experiments are typically between 50% and 70%, with false identifications typically 20%-25% (e.g., Shapiro & Penrod, 1986). Similar rates of Hits and False IDs have been demonstrated in real-world criminal identification procedures as well, with IDs of the police suspect treated for these purposes as Hits (Wright & McDaid, 1996). Several researchers have extended this work to perceptual matching tasks that do not require memory, and they have found that false identifications are quite persistent and involve flawed perceptual as well as flawed memory processes (Bruce, Henderson, Greenwood, Hancock, Burton, & Miller, 1999; Bruce, Henderson, Newman, & Burton, 2001; Burton, Miller, Bruce, Hancock, & Henderson, 2001; Henderson, Bruce, & Burton, 2001; Megreya & Burton, 2006, 2007).

13. For example, participants in Megreya, White, and Burton (2011) viewed a face at the top of a computer screen and a set of faces below it. An example from their study is presented here:



14. Participants were instructed that a different photo of the person at the top of the screen, taken the same day, may be presented among the 10 options below him. Their task was to either indicate which was the matching face or indicate that no match was present. In fact, there is no match present in the example above. About one-third of responses to target-absent trials such as the one shown here led to mistaken IDs, demonstrating that poor stranger identification arises from fundamental shortcomings in perception even before any additional complications of memory and distortion are introduced.

15. The increased risk of false identifications appears to arise in part from a bias to choose rather than to indicate that no match is present, both in the laboratory (Wells, 1984) and in real-world criminal ID procedures (Behrman & Davey, 2001). Witnesses tend to make relative comparisons and identify the candidate who they judge to be the best match to whatever they remember about the perpetrator (Leippe, Eisenstadt, & Rauch, 2008).

16. These findings are counterintuitive for the average juror (Schmechel, O'Toole, Easterly, & Loftus, 2006), but are consistent with what we know about adaptive pressures in the evolution of face recognition (Dunbar, 1992). Until quite recently, humans lived in small kin-based groups and had rare contact with members of other groups. When they did see strangers, there likely was little need to later remember specific individuals. Creating a detailed, stable representation of another person's face is particularly costly in cognitive resources. In the absence of adaptive pressures toward committing the nuances of new faces to memory, these functions have remained slow and unreliable.

17. These findings demonstrating the unreliability of stranger identification are relevant to the *Iglesias* case because neither Rosendo Ochoa (trial pp. R-51-R52) nor Hugo Rodriguez (trial p. U-18) recognized the shooter as familiar.

### Encoding Conditions

18. *Encoding* refers to the initial stage of introducing information into memory. Several factors associated with crimes can increase the risk of poor encoding, and thus they increase the risks of incomplete memory and of susceptibility to later systematic distortion.

19. **Exposure Duration**. Stranger identification is poor under a broad range of circumstances, including the straightforward perceptual matching task demonstrated above. Beyond this, performance is further impaired if initial exposure to the face had been brief (Bornstein, Deffenbacher, Penrod, & McGorty, 2012; Shapiro & Penrod, 1986). Mistaken identification rates as high as 80-90% have been observed with exposures of about 10 seconds, and they remain high (mistaken IDs of 25-50%) with exposures of 45 seconds (Memon, Hope, & Bull, 2003; Shapiro & Penrod, 1986). That is, brief exposure creates the risk not just of failing to identify the culprit accurately when he is included in the lineup; it also substantially increases the risk of incorrect identification of an innocent suspect. According to Bornstein et al.'s (2012) meta-analysis[1] of the research to date, much larger increases in exposure time beyond the 30-second range are typically necessary in order to produce clear benefits to identification accuracy.

20. **Bias To Overestimate Event Duration**. People tend to overestimate duration of an event, by as much as a factor of 2 or 3 (e.g., Cutler, Penrod, & Martens, 1987). The risk of this error increases when the event is stressful, unexpected, and/or uncontrollable (see also Buckhout, Fox, & Rabinowitz, 1989; Campbell & Bryant, 2006; Cutler et al., 1987; Loftus, Schooler, Boone, & Kline, 1987; Morewedge, Kassam, Hsee, Caruso, 2009), and is particularly high if the event had lasted less than 2 minutes (Roy & Christenfeld, 2008).

21. With regard to the *Iglesias* case, both eyewitnesses' opportunities to view the perpetrator's face were substantially limited. Hugo Rodriguez did not witness the shooting itself (trial p. U-33), and he ducked down in the car when he heard shots. He then looked up and glimpsed the shooter out of the rear passenger window (trial p. U-10). He ducked down again and then looked up again at the shooter's face as the car he was in accelerated and fled the scene (p. U-12). Rodriguez estimated his exposure to the shooter as "not even ten seconds." This was from a moving car and included time when the shooter was running away with his back turned.

22. Rosendo Ochoa, who testified that he viewed the shooter from an elevated window about 40 yards away, testified at trial (p. R-39) that "Almost immediately he took out a gun and started shooting towards the car where Monica was." Ochoa testified that after shooting five times (p. R-40, R-66), the perpetrator "stood there for about 15-20 seconds, staring at the car." After that, the perpetrator turned and ran with his back to Ochoa (p. R-96). So at best,

---

[1] In a meta-analysis, the data from multiple experiments are aggregated and subjected to a sophisticated statistical analysis in order to assess the existence and strength of the factor of interest. For example, Bornstein et al.'s (2012) meta-analysis included 33 studies published between 1970 and 2006.

Ochoa's view of the shooter appears to have lasted only a matter of seconds, under other poor perceptual conditions, and with some uncertainty about whether or for what proportion of these seconds the perpetrator's full face was available for viewing.

23. These witnesses' duration estimates by themselves indicate that both had only a brief exposure to the perpetrator's face, which is known to produce poor encoding and a high risk of subsequent incorrect identification. Given that the research demonstrates a significant likelihood that both these estimates may also have been inflated, the risk of false identification increases still further.

24. **Viewing Distance.** The quality of optical information reaching the visual system declines sharply as a function of viewing distance (Loftus, 2010; Loftus & Harley, 2005). Given the level of detail necessary to make an accurate identification, initial viewing distances that substantially exceed the ideal position of about 6 ft. away can be detrimental to identification performance (Lampinen, Erickson, Moore, & Hittson, 2014).

25. Rosendo Ochoa estimated that the incident occurred up to 40 yards from his position (trial pp. 38-39), a distance associated with correct ID rates of only about 53% and is associated with false ID rates of about 34% under daytime lighting conditions and 10 seconds of unobstructed free viewing outdoors on a sidewalk (Lampinen et al., 2014). Performance under conditions such as these demonstrate poor perception of fine-grained detail, particularly for internal facial features (e.g., eyes, mouth, nose), which are necessary to form a stable, detailed memory representation of a unique face.

26. **Stress.** Faces viewed under stressful circumstances produce a predictable pattern of errors: increased false identifications as well as reduced correct identifications (e.g., Deffenbacher et al., 2004). In a meta-analysis combining data from 27 different studies conducted in multiple laboratories, using a variety of stress-induction techniques and a variety of methods for testing face memory, Deffenbacher et al. found stressed witnesses to later make misidentifications in target-absent lineups 34% of the time on average and correct identifications in target-present lineups 39% of the time on average. Thus, memory for strangers' faces that had been viewed while under stress is significantly poorer than the already modest performance under ideal circumstances, and an identification made for a face that had been encountered under stress is essentially as likely to be incorrect as correct.

27. Stress inductions in laboratory settings are limited, both by ethical restrictions and by practical limitations, in their ability to produce believable threats in the lab. Methodologies have included anticipated inoculations (Peters, 1988), staged crimes in the witness' presence (Ihlebaek et al., 2003), and depictions of violent crime on video (Ihlebaek et al., 2003), all demonstrating that stressful events impair memory. It is remarkable that performance suffers even under these limitations. But data from highly stressful military training exercises demonstrate that such patterns of impairment remain and are even exacerbated under higher levels of stress. Military personnel who had undergone an intense 40-minute interrogation training exercise in a well-lit room are about twice as likely one day after their release to make a false identification of their interrogator and/or a guard as they are to make a correct ID (Morgan, Hazlett, Doran, Garrett, Hoyt, Thomas, Baranoski, & Southwick, 2004).

Similarly, Kuehn (1974) found that for a randomly selected set of cases in Seattle, WA, victims of relatively less violent crimes (e.g., robbery) produced more detailed descriptions of their attackers than did victims of more violent, and arguably more stressful, crimes (e.g., rape and assault).

28. Hugo Rodriguez witnessed the murder of a friend in the front seat of a car in which he was a passenger, and his view of the shooter occurred largely while he was ducked down to protect himself as his car fled the scene. Rosendo Ochoa observed a man with a gun and heard multiple shots. Such circumstances would be expected to induce stress and to thus increase the risk of incorrect identifications.

29. **Weapon Focus Effect.** Two meta-analyses have shown that the presence of a weapon impairs memory for a stranger's face, both with regard to descriptions and identifications (Fawcett, Russell, Peace, & Christie, 2011; Steblay, 1992). Weapons capture attention, drawing cognitive processing away from the perpetrator's face, even if the witness' eyes are not directly pointed at the weapon. This is consistent with the argument that humans are adapted to monitoring specific threats when confronted with a dangerous situation, since that will optimize the likelihood of survival. Deployment of cognitive resources toward the specific threat and away from face processing would be expected to impair memory for the face, and indeed it does (Fawcett et al., 2011). One outcome of this redirection of cognitive resources is increased risk of subsequent false identifications (Carlson & Carlson, 2012).

30. Weapon focus effects have been demonstrated under a variety of situations and with a variety of threatening objects, including guns (see Fawcett et al., 2011, for a review). The effect holds for real-world criminal cases as well as for lab-based ones (Fawcett et al., 2011).

31. A typical outcome in weapon-present incidents is that victims tend to focus on the weapon and can therefore provide descriptions involving the weapon (Hinkle & Malawista, 1987), as seems to be the case for both witnesses in the *Iglesias* case. Rosendo Ochoa testified that he saw the gun come out of the shooter's clothes and that he saw the shooter hold it with a straight arm (trial p. R-39). Hugo Rodriguez did not notice the perpetrator before the shooting, but he testified that during at least one of his two brief glimpses, he noticed the shooter putting something into his waistband (trial p. U-12).

## Post-Event Factors

32. **Delay.** Memory decays with time, and losses are sharpest immediately following the event (Ebbinghaus, 1885/1913). For example, Deffenbacher, Bornstein, McGorty, & Penrod's (2008) meta-analysis of data from 53 studies found memory to degrade by 15-20% within just the first two hours following an event. Although the rate of loss is steepest immediately after an event, memory continues to fade with time.

33. Detective Guevara was not involved in the *Iglesias* case until June 21, 1993, two weeks after the shooting, and Geraldo Iglesias was not a suspect until after Guevara became involved (trial p. U-85). The eyewitnesses' first identification procedure involving Iglesias was 15

days after the shooting for Rosendo Ochoa and 17 days after the shooting for Hugo Rodriguez.

34. **Characteristics of the Description.** It is important to obtain a witness' description of a perpetrator as soon as possible after an incident, both to preserve as much information as possible before details are forgotten and to protect against post-event influences on memory (Jack, Zydervelt, Zajac, 2014). Details that were absent from the initial description but that emerged in later witness reports, as well as details reported later that directly contradict early descriptions by the same witness, carry the risk of having been intruded, for example, through suggestion or leading questions presented by another person. Indeed, vulnerability to post-event influences increases with the passage of time (Schwartz & Wright, 2012).

35. Hugo Rodriguez and Rosendo Ochoa each gave a description of the perpetrator to police who had arrived on the scene shortly after the shooting (e.g., trial pp. U-102-103, R-45, R-51, R-79). According to the research, we would expect these initial descriptions to be more reliable than those provided by the same witnesses later. Both Rodriguez's and Ochoa's initial descriptions were in substantial agreement with each other and substantially *mismatched* Geraldo Iglesias with regard to several details, including the unalterable features of age, height, and skin tone.

36. For example, according to Officer Zuniga, Hugo Rodriguez provided him at the scene with the following description of the shooter (trial p. U-66): 145 lbs, 5'7", light-complected, about 18 years old. Zuniga confirmed Rodriguez's report of the perpetrator's light complexion later in his testimony (p. U-68), indicating that Rodriguez told him "several times" that the shooter had a light complexion (p. U-71).

37. During his own testimony, Rodriguez characterized the shooter's skin as follows:
- "more or less white" (trial p. U-17)
- "white complected" (p. U-48)
- "light complected" (p. U-54)
- "I said that he looked white." (p. U-57)

Rodriguez further acknowledged at trial that the defendant, Geraldo Iglesias, was not white complected (p. U-49).

38. Ochoa's original description of the shooter to police similarly referred to a White Hispanic (e.g., trial U-102), who was light-complected (trial p. R-56).

39. Based upon Ochoa's and Rodriguez's descriptions, police initially sought a suspect who was light-skinned, 17-19 years old, 5'5"-5'7" in height, and weighing 135-140 pounds (e.g., Wanted profile developed on June 7, 1993, p. 2).

40. Geraldo Iglesias, in contrast, was 24 years old (substantially older than the wanted suspect) and 5'11" (substantially taller) (trial p. U-100). Further, according to the eyewitness

testimony cited above, as well as Detective Guevara's testimony and original police paperwork (trial p. U-104), Iglesias' skin tone was "medium" or darker.

44.     If an eyewitness identifies someone who possesses features contradicting that witness' original description, the witness is by definition unreliable. Notably, both Ochoa and Rodriguez identified a suspect possessing features contrary to their descriptions. Particularly given that some of these features (e.g., age and height) cannot be readily altered or disguised, this contradiction is a clear indicator of the unreliability of both identifications.

45.     With regard to inconsistencies involving features that could in principle be disguised or changed, including hair length, facial hair, notching in eyebrows, and jewelry, witness reliability is again called into question. For example, in the *Iglesias* case, both Ochoa and Rodriguez testified in court that Iglesias's appearance during the lineup procedure differed with regard to several features from that of the shooter. Namely, the shooter and defendant differed with regard to hair length and with regard to presence of a moustache, a beard, eyebrow notching, and earrings (trial pp. U-31-32, U-46, R-49-51).

46.     It would be highly unlikely that witnesses would be able to correctly identify a stranger they had viewed briefly and who had undergone such extensive changes to his appearance. Indeed, the research shows that stranger identification suffers substantially with as minor a change as adding or removing glasses (Kramer & Ritchie, 2016). Similarly, identification suffers when witnesses attempt to match two photos of the same face that had been taken just a few months apart, with the normal variations in appearance that accompany the passage of this rather brief length of time. Thus, if the original eyewitness descriptions in the Iglesias case were accurate, the research findings cast serious doubt on the witnesses' ability to identify a perpetrator who had undergone the sorts of physical changes that would have been involved in this case. If, on the other hand, the witnesses' original descriptions were incorrect with regard to the above details, then the witnesses are again, by definition, unreliable.

47.     **Post-Event Suggestion.** It is typical for witnesses to unwittingly incorporate post-event information to which they are exposed into their memory of the original incident (Payne et al., 1994; Wright, Memon, Skagerberg, & Gabbert, 2009). Memory contamination can stem from a wide range of sources, including investigators (Loftus & Palmer, 1974; Payne et al., 1994). Even information embedded in questions can lead to distortion or incorporation of new detail. For example, witnesses to a traffic accident who are asked about the speed of the two cars in a question that describes them as having "smashed" (as opposed to "bumped") into each other report higher speed estimates and are more inclined to report memory for broken glass that had not been present (Loftus & Palmer, 1974). Leading questions such as these can substantially distort memory through the inclusion of a single suggestive word ("smashed" vs. "bumped"), without the witness' awareness (Greathouse & Kovera, 2009).

No deliberate attempt to influence is necessary on the interviewer's part. On the contrary, these effects can be extremely difficult to avoid or detect.

48. Vulnerability to post-event misinformation increases for memories that had not been well encoded at the time of the incident, leaving more gaps to be filled by details that are encountered after the fact. For example, military personnel who had experienced an event under high stress (which impairs encoding of details) show greater vulnerability to post-event suggestion about event details than do those who had experienced the event under lower stress (Morgan, Southwick, Steffian, Hazlett, & Loftus, 2013).

49. With each retrieval of a memory, new interpretations and embellishments may be incorporated into and reconsolidated with it (Dudai, 2006). Any ability to later differentiate original from subsequently added detail can thus be lost.

50. The eyewitnesses in *Iglesias* may have been influenced by various types of post-event suggestion. For example, following his exposure to the suspect during the investigation, Ochoa's report of the shooter's skin tone changed in the direction of Iglesias':
- "I said that the person was about my color or a little bit darker." (trial p. R-69).
- "Dark" (trial p. R-71)
- Q: Didn't you say, "He looked white, but he was Latino, not as dark as me?"
  A: No. (trial p. R-93)

51. That is, once he had been exposed to the police suspect, Geraldo Iglesias, Ochoa's description of the shooter's skin tone systematically shifted away from the light complexion that Ochoa (and independently, Rodriguez) had originally provided. Instead, Ochoa settled on a description that better matched Iglesias' darker color. Consistent with post-event memory distortion phenomena, Ochoa would neither be expected to doubt this revised memory nor to recognize any such change to his original report.

52. Other elements of Ochoa's testimony raise concerns that his memory may have been vulnerable to embellishment based on post-event suggestion. Although he had claimed to both hear the shooter say something about a gang (trial p. R-39) and to see him throw gang signs (trial p. R-39), Ochoa conceded during his testimony that he actually did not perceive either. If he had come to believe that the shooter was affiliated with a gang, he may have incorporated details into memory that were consistent with those beliefs. Similarly, had he been aware that gang affiliation and prior criminal history were associated with personal adornments like eyebrow notching, he may have been biased to select a photo array member or lineup member who possessed such a feature, which Ochoa testified he had observed during the identification procedure (trial p. R-50).

53. Best practices can be put into place to minimize such suggestive influences. Researchers recommend that distinctive features, and particularly those that could strongly bias an

eyewitness toward the suspect, be either replicated across all lineup members or be masked (e.g., by putting a covering over all lineup members' eyebrows) (Carlson, 2011; Colloff, Wade, & Strange, 2016; Zarkadi, Wade, & Stewart, 2009). Such measures were not taken in Iglesias' ID procedures.

54. **ID Administrator's Knowledge Of Who The Suspect Is (*Non-Blind Procedures*).** Experimenter effects have been long known in medicine. Best practices thus dictate that where possible, a test administrator be "blind" to the hypothesis or experimental condition, in order to avoid unintended forms of influence (Rosenthal, 1976). In his analysis of 161 DNA-based exonerations, Brandon Garrett (2011) found 78% of these cases to involve police contamination of eyewitness identifications. In the lab, several studies have demonstrated a remarkable number of ways that people playing the role of ID administrators can verbally and/or non-verbally steer witnesses toward the suspect (Clark, Brower, Rosenthal, Hicks, & Moreland, 2013), even if they have been instructed to avoid doing so and even without being aware of doing so (e.g., Greathouse & Kovera, 2009). Under these circumstances, non-blind administrators produce two to three times the number of innocent suspect IDs by eyewitnesses as occur spontaneously (Alberts, Duncan, Wallace, & Penrod, 2008; Greathouse & Kovera, 2009). Without adherence to best practices and a double-blind identification procedure, an ID of the suspect carries the risk of having been produced through deliberate or inadvertent witness steering.

55. None of the identification procedures involving Geraldo Iglesias were administered blind. Detective Guevara administered all such procedures, and he as the investigating detective had already developed Iglesias as the suspect in Monica Roman's murder.

56. **Impact Of Positive Feedback On Memory And Confidence.** Both verbal indications ("Good, you identified the suspect") and nonverbal indications (e.g., head nods) that the witness has selected the police suspect produce a broad and powerful set of effects (Wells & Bradfield, 1998; Gurney, Vekaria, & Howlett, 2014). In particular, positive feedback increases the likelihood that the witnesses will identify the suspect in later ID procedures (Leippe et al., 2008; Wells & Bradfield, 1998). It also increases the witness' confidence in their identification (e.g., Garrioch & Brimacombe, 2004; Semmler, Brewer, & Wells, 2004; Wells & Bradfield, 1998), as well as producing robust effects on witness' ratings of the quality of the observation conditions, the degree to which they they had paid attention to the perpetrator, and the speed with which they have identified the suspect (Douglass & Steblay, 2006; Wells & Bradfield, 1998; Wells & Quinlivan, 2009). Feedback effects have been demonstrated with witnesses to real crimes (Wright & Skagerberg, 2007), and they arise with even relatively subtle comments such as, "Thank you. You have been a really great witness" (Dysart, Lawson, & Rainey, 2012).

57. This can present particular risk downstream, in the courtroom, as jurors' perception of eyewitness confidence is one of the strongest predictors of their decisions regarding guilt or innocence (Wells, Lindsay, & Ferguson, 1979). Observers' ratings of credibility of witnesses who had actually made incorrect identifications increase if those witnesses had received positive feedback about their ID (Douglass, Neuschatz, Imrich, & Wilkinson, 2010). That is, not only does positive feedback increase witness confidence, but that confidence is

perceptible to observers, who then find the witness to be more reliable regardless of actual accuracy.

58. I am not aware of any recordings of interviews with Ochoa or Rodriguez, or of any recordings of their identification procedures. Certainly, positive feedback during those events could have profoundly impacted both witnesses' memory.

59. I am, however, aware of at least one instance of positive feedback provided by the prosecutor to Rosendo Ochoa prior to trial, and this feedback would be expected to have produced damaging effects of the type described above (p. R-88):

Q: And when we talked to you, you were in fact very descriptive as to the actual events of the shooting, is that correct?

A: Yes.

Q: And in fact, myself in front of Mr. DeLeon commented to you as to how well you could remember the shooting, is that correct?

A: Yes.

60. The body of research cited above consistently demonstrates that positive feedback of this sort is one of the most distorting influences on memory, with eyewitness evidence being consistently altered, not randomly, but toward the apparent reliability of the witness. Such methods are laden with risk.

61. **Multiple Exposures to the Suspect (*Mugshot Exposure Effect*).** Research has demonstrated that memory can often be based simply on a feeling of familiarity with no further access to specific details about prior exposures (Deffenbacher, Bornstein, & Penrod, 2006; Johnson, Hashtroudi, & Lindsay, 1993; Mandler, 1980). Face recognition is frequently based on such a sense of familiarity, and innocent suspects can be falsely identified as perpetrators because of it. A witness may view someone whose face "rings a bell" and may, misattributing the source of that familiarity, positively but mistakenly identify that person as the perpetrator. This error occurs because prior exposure leads to greater ease of processing on later viewings than would be expected if the face were entirely new. Thus, the witness may be correctly detecting some degree of familiarity but may be misplacing the basis of that familiarity.

62. When the familiarity stems from exposure to the suspect's likeness during the course of the investigation (e.g., through photos), we refer to it as *mugshot exposure effect*. A meta-analysis of 19 independent tests of mugshot exposure effects found that prior exposure to an innocent suspect more than doubles the risk of later mistaking him as the perpetrator (Deffenbacher et al., 2006), and it increases confidence in those false IDs (Steblay, Tix, & Benson, 2013). The degree of risk associated with repeated exposure increases with the number of exposures (Deffenbacher et al., 2006; Longmore, Liu, & Young., 2008).

63. Furthermore, exposure effects interact with other factors, exacerbating impairments. For example, when these identification conditions follow a particularly stressful incident, the false identification rate is nearly 6 times as high as it is when no interpolated identification task had occurred (Morgan et al., 2013).

64. If the witness had identified the innocent target on first viewing him, additional *commitment effects* increase the likelihood of a subsequent identification of that innocent suspect still further (Deffenbacher, Bornstein, & Penrod, 2006; Gorenstein & Ellsworth, 1980).

65. In-court identifications are subject to these same principles of exposure and commitment, in addition to other factors that seriously challenge the reliability of an in-court ID (e.g., substantial delay; highly suggestive showup procedure (discussed below).

66. The above findings with regard to both exposure effects and commitment effects apply to the *Iglesias* case. Hugo Rodriguez identified Iglesias from a photo array on June 24 1993 (trial pp. U-18-19). About an hour and a half later on the same day (trial p. U-52). Detective Guevara presented Rodriguez with 6-person lineup, where Rodriguez again identified Iglesias (p. U-93). He was subsequently asked to make four in-court identifications of Iglesias at trial, discussed below.

67. Rosendo Ochoa identified Iglesias in an 8-photo array administered by Det. Guevera at Ochoa's home on June 22. 1993 (trial p. U-86; R-46). Guevara presented Ochoa with a 5-person lineup the next day, and Ochoa again selected Iglesias (p. U-91). Finally, Ochoa was asked to make an in-court identification at trial.

68. **In-Court Identifications As Unreliable And Prejudicial.** An identification procedure itself can be suggestive. For example, eyewitness identification researchers (e.g., Steblay, Dysart, Fulero, & Lindsay, 2003; Wetmore, Neuschatz, Gronlund, Wooten, Goodsell, & Carlson, 2015), the Supreme Court (Stovall v. Denno, 1967; United States v. Wade, 1967), and state courts (Bradley v. State, 1980, Commonwealth v. Carter, 1979) have concluded that showup ID procedures are inherently suggestive. Consistent with this, showups have been repeatedly found to increase the risk of false identifications of innocent suspects (see meta-analysis by Steblay et al., 2003). An in-court identification procedure, during which the witness is invited to point out the perpetrator from among those present in the courtroom, constitutes a particularly suggestive version of a showup. Eyewitness memory researchers commonly consider such a procedure to be highly theatrical but of very low diagnostic value, given the suggestive nature of the procedure and often the history of prior exposures to the defendant's likeness during the course of the investigation and trial preparation. Nevertheless, a confident identification made in court an eyewitness is high compelling to jurors.

69. Rosendo Ochoa identified Geraldo Iglesias at trial (trial p. R-38). Similarly, Hugo Rodriguez was asked by the prosecutor to make in-court identifications of Monica Roman's shooter on four separate occasions (p. U-11, U-19, U-27, and U-30).

70. **Confidence-Accuracy Relationship and Confidence Malleability.** The relationship between witness confidence and identification accuracy is poor under a broad range of circumstances that are typical of crimes and the investigations that follow (Bothwell, Deffenbacher, & Brigham, 1987). Despite the fact that forgetting increases with time, so does witness confidence for memory of specific details. This happens for understandable reasons. Repeatedly thinking about or answering questions about an event not only can alter the content of a memory, but it also tends to increase memory strength and vividness, leading to

strong subjective experience of authenticity even for incorrect details (Arkes, Hackett, & Boehm, 1989; Begg, Anas, & Farinacci, 1992; Hastie, Landsman, & Loftus, 1978; Pezdek, Sperry, & Owens, 2007; Shaw, 1996; Wells, Ferguson, & Lindsay, 1981). The divergence of memory accuracy and witness confidence serves to lower the correlation between the two over time, thereby reducing the value of witness confidence for assessing witness reliability. Certainty for details that have been altered or incorporated into memory after the incident tends to be as high as is certainty for details stemming from the original incident (e.g., Payne et al., 1994).

71. Members of the research community have recently noted that very high confidence can reflect a high likelihood of identification accuracy under a very narrow set of circumstances in which suggestive influences are absent (Wixted & Wells, 2017). Such circumstances do not characterize the *Iglesias* case.

72. On the contrary, several elements associated with the *Iglesias* case are known to artificially inflate witness confidence. These include the brevity of both witnesses' exposure to the shooter during the incident (Bothwell et al., 1987), stress experienced by both eyewitnesses during the crime (Morgan et al., 2004; Steblay, Dysart, Fulero, & Lindsay, 2001), and multiple instances of exposure to Geraldo Iglesias during the investigation (Steblay et al., 2013).

73. To the extent that witnesses Ochoa and Rodriguez expressed confidence in their testimony (e.g., trial p. U-30), any or all of the above may have served to inflate their certainty, which would then increase their perceived credibility in the eyes of the finders of fact. This poses particular risk, as jurors' perception of eyewitness confidence is one of the strongest predictors of their decisions regarding guilt or innocence (Wells et al. 1979). That is, not only do the above factors tend to increase witness confidence, but that confidence is perceptible to observers, who then find the witness more reliable regardless of his or her actual accuracy.

74. It is not unusual for memory of the circumstances of viewing to similarly undergo distortion toward more favorable viewing circumstances (Wells & Bradfield, 1998). There is evidence for this in the *Iglesias* case. For example, Hugo Rodriguez stated at trial (p. U-19), "I would never forget his face". Such a subjective experience is actually highly predictable by the time an eyewitness testifies in court, following exposures to the suspect and to various instances of positive feedback. In his analysis of police records and court transcripts associated with the first 250 DNA based exoneration cases, Garrett (2011) found that well over half of eyewitnesses who identified innocent suspects in court expressed certainty while doing so. When pressed, these witnesses may concede that they did not remember prominent features of the perpetrator. (In Iglesias, for example, after expressing certainty in court and claiming that he would never forget the shooter's face, Hugo Rodriguez was unable to say whether the shooter had had kinky hair. p. U-46).

75. **Probative Value of Non-Identifications.** Far from being of no value to the judicial process, non-identifications by eyewitnesses carry probative value. Wixted & Wells (2017) demonstrated in their landmark paper that the likelihood of innocence given a non-identification is substantial.

76. On June 24, 1993, Detective Guevara and Assistant State's Attorney Latz administered identification procedures for eyewitnesses David Chmieleski and Efrain Torres, which indicates that they had reason to believe that both eyewitnesses had had a sufficient opportunity to view the shooter's face and were in a position to identify him if he were present in the lineup. Both of these witnesses made non-identifications in lineups that included Geraldo Iglesias (Chicago Police Supplementary Form, dated 6/24/93, 21:00, p. 4). Each of these non-identifications independently constitutes evidence in favor of Iglesias' innocence.

## Conclusion

77. Given the number of factors associated with *Iglesias* that are known to reduce the reliability of eyewitness identification and memory, this case presents high risk that identifications of Geraldo Iglesias by eyewitnesses Rosendo Ochoa and Hugo Rodriguez were unreliable.


_____

Nancy Franklin, Ph.D.

STATE OF NEW YORK               )
COUNTY OF SUFFOLK         ss.
                                   )

Sworn to me and subscribed in my presence this 24 day of July , 2018 by Nancy Franklin.

Notary Public

Suzanne Cheung
Notary Public, State of New York
No: 01CH6014858
Qualified in Suffolk County
Commission Expires 10/19/20 18

Commission Expires: 10/19/2018

# References

Alberts, W., Penrod, S., Wallace, B. & Duncan, J. (July, 2008). Steering witnesses in an identification procedure. Paper presented at the Annual Meeting of the European Association of Psychology and Law, Maastrict, the Netherlands.

Bartlett, F. C. (1932). *Remembering.* Cambridge: Cambridge University Press.

Behrman, B. W., & Davey, S. L. (2001). Eyewitness identification in actual criminal cases: An archival analysis. *Law and Human Behavior, 25*(5), 475-491.

Bornstein, B. H., Deffenbacher, K. A., Penrod, S. D., & McGorty, E. K. (2012). Effects of exposure time and cognitive operations on facial identification accuracy: A meta-analysis of two variables associated with initial memory strength. *Psychology, Crime, and Law, 18*(5), 473-490.

Bothwell, R. K., Deffenbacher, K. A., & Brigham, J. C. (1987). Correlation of eyewitness accuracy and confidence: Optimality hypothesis revisited. *Journal of Applied Psychology, 72(4),* 691-695.

*Bradley v. State,* 152 Ga. App. 902 (1980).

Bruce, V. (1988). *Recognising faces.* London: Lawrence Erlbaum Associates.

Bruce, V., Henderson, Z., Greenwood, K., Hancock, P. J. B., & Burton, A. M., & Miller, P. (1999). Verification of face identities from images captured on video. *Journal of Experimental Psychology: Applied, 5,* 339-360.

Bruce, V., Henderson, Z., Newman, C., & Burton, A. M. (2001). Matching identities of familiar and unfamiliar faces caught on CCTV images. Journal of Experimental Psychology: Applied, 7, 207-218.

Burton, A. M., Miller, P., Bruce, V., Hancock, P. J. B., & Henderson, Z. (2001). Human and automatic face recognition: A comparison across image format. *Vision Research. 41,* 3185-3195.

Buckhout, R., Fox, P., & Rabinowitz, M. (1989). Estimating the duration of an earthquake: Some shaky field observations. *Bulletin of the Psychonomic Society, 27(4),* 375-378.

Campbell, L. A., & Bryant, R. A. (2007). How time flies: A study of novice skydivers. *Behaviour Research and Therapy. 45*(6), 1389-1392.

Carlson, C. A. (2011). Influence of a perpetrator's distinctive facial feature on eyewitness identification from simultaneous versus sequential lineups. *Applied Psychology in Criminal Justice, 7(2),* 77-92.

Carlson, C. A., & Carlson, M. A. (2012). A distinctiveness-driven reversal of the weapon focus effect. *Applied Psychology in Criminal Justice, 8(1),* 36-53.

Carmichael, L., Hogan, H. P., & Walter, A. A. (1932). An experimental study of the effect of language on the reproductions of visually perceived forms. *Journal of Experimental Psychology, 15,* 73-86.

Clark, S. E., Brower, G. L., Rosenthal, R., Hicks, J. M., & Moreland, M. B. (2013). Lineup administrator influences on eyewitness identification and eyewitness confidence. *Journal of Applied Research in Memory and Cognition, 2,* 158-165.

Colloff, M. F., Wade, K. A., & Strange, D. (2016). Unfair lineups make witnesses more likely to confuse innocent and guilty suspects. *Psychological Science, 27(9),* 1227-129.

*Commonwealth v. Carter,* 271 Pa. Super. 508 (1979).

Cutler, B. L., Penrod, S. D., & Martens, T. K. (1987). Reliability of eyewitness identification:

The role of system and estimator variables. *Law and Human Behavior, 11(3),* 233-258.

Deffenbacher, K. A., Bornstein, B. H., McGorty, E. K., & Penrod, S. D. (2008). Forgetting the once-seen face: estimating the strength of an eyewitness's memory representation. *Journal of Experimental Psychology: Applied, 14(2),* 139-150.

Deffenbacher, K. A., Bornstein, B. H., & Penrod, S. D. (2006). Mugshot exposure effects: Retroactive interference, mugshot commitment, source confusion, and unconscious transference. *Law and Human Behavior, 30,* 287-307.

Deffenbacher, K. A., Bornstein, B. H., Penrod, S. D., & McGorty, E. K. (2004). A meta-analytic review of the effects of high stress on eyewitness memory. *Law and Human behavior, 28(6),* 687-706.

Doss, M. K., Picart, J. K., & Gallo, D. A. (2018). The dark side of context: Context reinstatement can distort memory. *Psychological Science, 29(4),* 1-12.

Douglass, A. B., Neuschatz, J. S., Imrich, J. F., & Wilkinson, M. (2010). Does post-identification feedback affect evaluations of eyewitness testimony and identification procedures? *Law and Human Behavior, 34(4),* 282-294.

Douglass, A. B., & Steblay, N. (2006). Memory distortion in eyewitnesses: A meta-analysis of the post-identification feedback effect. *Applied Cognitive Psychology, 20,* 859-869.

Dudai, Y. (2006). Reconsolidation: The advantage of being refocused. *Current Opinion in Neurobiology.* 16(2), 174-178.

Dunbar, R. I. M. (1992). Neocortex size as a constraint on group size in primates". *Journal of Human Evolution* 22(6), 469-984

Dysart, J. E., Lawson, V. Z., & Rainey, A. (2012). Blind lineup administration as a prophylactic against the postidentification feedback effect. *Law and Human Behavior, 36(4),* 312-319.

Ebbinghaus, H. (1885/1913). *Forgetting: A contribution to experimental psychology.* New York: Teachers College, Columbia University.

Eisen, M., Cedré, G. C., Williams, T. Q., & Jones, J. M. (In Press). Does anyone else look familiar? Influencing identification decisions by asking witnesses to reexamine the lineup. *Law and Human Behavior.*

Fawcett, J., Russell, E. J., Peace, K. A., & Christie, J. (2013). Of guns and geese: A meta-analytic review of the 'weapon focus' literature. *Psychology, Crime, and Law, 19(1),* 35-66.

Garrett, B. (2011). *Convicting the Innocent: Where criminal prosecutions go wrong.* Cambridge: Harvard.

Garrioch, L., & Brimacombe, C. A. E. (2001). Lineup administrators' expectations: Their impact on eyewitness confidence. *Law and Human Behavior, 25(3),* 299-315.

Greathouse, S. M., & Kovera, M. B. (2009). Instruction bias and lineup presentation moderate the effects of administrator knowledge on eyewitness identification. *Law and Human Behavior, 33,* 70-82.

Gurney, D. J., Vekaria, K. N., & Howlett, N. (2013). A nod in the wrong direction: Does non verbal feedback affect eyewitness confidence in interviews? *Psychiatry, Psychology, and the Law, 21(2),* 241-250.

Henderson, Z., Bruce, V., & Burton, A. M. (2001). Matching the faces of robbers captured on video. *Applied Cognitive Psychology, 15,* 445-464.

Hinkle, D. P. & Malawista, D. (July, 1987). Sudden fear and witness reliability. *Law and Order,* 52-56.

Ihlebaek, C., Love, T., Eilertsen, D. E., & Magnussen, S. (2003). Memory for a staged criminal event witnessed live and on video. *Memory, 11,* 319-327.

Jack, F., Zydervelt, S., & Zajac, R. (2014). Are co-witnesses special? Comparing the influence of co-witness and interviewer misinformation on eyewitness reports. *Memory, 22(3)*, 243-255.

Johnson, M. K., Hashtroudi, H., & Lindsay, D. S. (1993). Source monitoring. *Psychological Bulletin, 114(1)*, 3-28.

Kuehn, L. L. (1974). Looking down a gun barrel: Person perception and violent crime. *Perceptual and Motor Skills, 39*, 1159-1164.

Lampinen, J. M., Erickson, W. B., Moore, K. N., & Hittson, A. (2014). Effects of distance on face recognition: Implications for eyewitness identification. *Psychonomic Bulletin & Review, 21*, 1489-1494.

Lampinen, J. M., Roush, A., Erickson, W. B., Moore, K. N., & Race, B. (2015). The effects of simulated distance on recognition of same race and other race faces. *Visual Cognition, 23(6)*, 678-698.

Leippe, M. R., Eisenstadt, D., & Rauch, S. M. (2008). Cueing confidence in eyewitness identifications: Influence of biased lineup instructions and pre-identification memory feedback under varying lineup conditions. *Law and Human Behavior, 33*, 194-212.

Lindsay, R. C. L., & Harvie, V. L. (1988). Hits, false alarms, correct and mistaken identifications: The effects of method of data collection on facial memory. (1988). *Practical Aspects of Memory: Current Research and Issues, 1*, 47-52.

Loftus, E. F., & Palmer, J. C. (1974). Reconstruction of automobile destruction: An example of the interaction between language and memory. *Journal of Verbal Learning and Verbal Behavior, 13*, 585-589.

Loftus, E. F., Schooler, J. W. Boone, S. M., & Kline, D. (1987). Time went by so slowly: Overestimation of event duration by males and females. *Applied Cognitive Psychology, 1*, 3-13.

Loftus, G. R. (2010). What can a perception-memory expert tell a jury? *Psychonomic Bulletin & Review, 17*, 143-148.

Loftus, G. R., & Harley, E. R. (2005). Why is it easier to identify someone close than far away? *Psychonomic Bulletin & Review, 12*, 43-65.

Longmore, C. A., Liu, C. H., & Young, A. W. (2008). Learning faces from photographs. *Journal of Experimental Psychology: Human Perception and Performance, 34*, 77-100.

Mandler, G. (1980). Recognizing: The judgment of previous occurrence. *Psychological Review, 87(3)*, 252-271.

Megreya, A. M., & Burton, M. (2006). Recognising faces seen alone or with others: When two heads are worse than one. *Applied Cognitive Psychology, 20*, 957-972.

Megreya, A. M., & Burton, M. (2007). Hits and false positives in face matching: A familiarity based dissociation. *Perception & Psychophysics, 69*, 1175-1184.

Megreya, A. M., White, D., & Burton, M. (2011). The other-race effect does not rely on memory: Evidence from a matching task. *Quarterly Journal of Experimental Psychology, 64(8)*, 1473-1483.

Memon, A., Hope, L., & Bull, R. (2003). Exposure duration: Effects on eyewitness accuracy and confidence. *British Journal of Psychology, 94*, 339-354.

Morewedge, C. K., Kassam, K. S., Hsee, C. K., & Caruso, E. M. (2009). Duration sensitivity depends on stimulus familiarity, 138, 177-186.

Morgan, C. A., III, Hazlett, G., Doran, A., Garrett, S., Hoyt, G., Thomas, P., Baranoski, M., & Southwick, S. M. (2004). Accuracy of eyewitness memory for persons encountered during exposure to highly intense stress. *International Journal of Law and Psychiatry, 27*, 265-279.

Morgan, C. A., III, Southwick, S., Steffian, G., Hazlett, G. A., & Loftus, E. F. (2013). Misinformation can influence memory for recently experienced, highly stressful events. *International Journal of Law and Psychiatry, 36,* 11-17.

Murray, D., M., & Wells, G. L. (1982). Does knowledge that a crime was staged affect eyewitness performance? *Journal of Applied Social Psychology, 12(1),* 42-53.

Narby, D. J., Cutler, B. L., & Penrod, S. (1996). The effects of witness, target, and situational factors on eyewitness identifications. In S. Sporer, R. Malpass, and G. Köhnken (Eds)., *Psychological issues in eyewitness identification.* Hillsdale, New Jersey: Erlbaum. pp. 23 52.

National Research Council of the National Academies. (2014). *Identifying the culprit: Assessing eyewitness identification.* Washington, D.C.: National Academies Press.

O'Donnell, C., & Bruce, V. (2001). Familiarisation with faces selectivity enhances sensitivity to changes made to the eyes. *Perception, 30,* 755-764.

Patterson, K. E., & Baddeley, A. D. (1977). When face recognition fails. *Journal of Experimental Psychology: Learning, Memory, & Cognition, 3(4),* 406-417.

Payne, D. G., Toglia, M. P., & Anastasia, J. S. (1994). Recognition performance level and the magnitude of the misinformation effect in eyewitness memory. *Psychonomic Bulletin & Review, 1,* 376 382.

Peters, D. P. (1988). Eyewitness memory in a natural setting. In M. M. Gruneberg, P. E. Morris, & R. N. Sykes (Eds.), *Practical aspects of memory: Current research and issues: Vol. 1. Memory in everyday life* (pp. 89-94). Chichester, UK: Wiley.

Rosenthal, R. (1976). *Experimenter effects in behavioral research.* New York: John Wiley.

Roy, M. M., & Christenfeld, N. J. S. (2008). Effect of task length on remembered and predicted duration. *Psychonomic Bulletin & Review, 15(1),* 202-207.

Schmechel, R. S., O'Toole, T. P., Easterly, C., & Loftus, E. F. (2006). Beyond the ken? Testing jurors' understanding of eyewitness reliability evidence. *Jurimetrics, 46,* 177-214.

Schwartz, S. L., & Wright, D. B. (2012). Memory conformity for new and old items with immediate and delayed testing. *Applied Cognitive Psychology, 26,* 508-515.

Semmler, C., Brewer, N., & Wells, G. L. (2004). Effects of postidentification feedback on eyewitness identification and nonidentification confidence. *Journal of Applied Psychology, 89(2),* 334-236.

Shapiro, P. N., & Penrod, S. D. (1986). Meta-analysis of face identification studies. Psychological Bulletin, 100, 139-156.

Steblay, N. M. (1992). A meta-analytic review of the weapon focus effect. *Law and Human Behavior, 16,* 413-424.

Steblay, N. M., Dysart, J., Fulero, S., & Lindsay, R. C. L. (2003). Eyewitness accuracy rates in police showup and lineup presentations: A meta-analytic comparison. *Law and Human Behavior, 27(5),* 523–540.

Steblay, N. K., Tix, R. W., & Benson, S. L. (2013). Double-exposure: The effects of repeated identification lineups on eyewitness accuracy. *Applied Cognitive Psychology, 27,* 644-654.

*Stovall v. Denno,* (1967). 388 U.S. 293.

*United States v. Wade,* 388 U.S. 218 (1967).

Weber, N., Brewer, N., Wells, G. L., Semmler, C., & Keast, A. (2004). Eyewitness identification accuracy and response latency: The unruly 10-12-second rule. *Journal of Experimental Psychology: Applied, 10,* 139-147.

Wells, G. L. (1984). The psychology of lineup identifications. *Journal of Applied Social*

*Psychology, 14*, 89-103.

Wells, G. L., & Bradfield, A. L. (1998). "Good, you identified the suspect": Feedback to eyewitnesses distorts their reports of the witnessing experience. *Journal of Applied Psychology, 83*, 360-376.

Wells., G. L., & Lindsay, R. C. L., & Ferguson, T. J. (1979). Accuracy, confidence, and juror perceptions in eyewitness identification. *Journal of Applied Psychology, 64*(4), 440-448.

Wells, G. L., & Quinlivan, D. S. (2009). Suggestive eyewitness identification procedures and the Supreme Court's reliability test in light of eyewitness science: 30 years later. *Law and Human Behavior, 33*, 1-24.

West, E., & Meterko, V. (2016). Innocence project: DNA exoneration, 1989-2014: Review of data and findings from the first 25 years. *Albany Law Review, 79*(3), 717-795.

Wetmore, S. A., Neuschatz, J. S., Gronlund , S. D., Wooten, A., Goodsell, C. A., & Carlson, C. A. (2015). Effect of retention interval on showup and lineup performance. *Journal of Applied Research in Memory and Cognition, 4*, 8-14.

Wixted, J. T., & Wells, G. L. (2017). The relationship between eyewitness confidence and identification accuracy: A new synthesis. *Psychological Science In The Public Interest, 18*(1), 10-65.

Wright, D. B., & McDaid, A. T. (1996). Comparing system and estimator variables using data from real line-ups. *Applied Cognitive Psychology, 10*, 75-84.

Wright, D. B., Memon, A., Skagerberg, E. M., & Gabbert, F. (2009). When witnesses talk. *Current Directions in Psychological Science, 18*(3), 174-178.

Wright, D. B., & Skagerberg, E. M. (2007). Postidentification feedback affects real eyewitnesses. *Psychological Science, 18*, 172-178.

Wright, D. B., & Sladden, B. (2003). An own gender bias and the importance of hair in face recognition. *Acta Psychologica, 114*, 101-114.

Zarkadi, T., Wade, K. A., & Stewart, N. (2009). Creating fair lineups for suspects with distinctive features. *Psychological Science, 20*(12), 1448-1453.

# EXHIBIT 80

STATE OF ILLINOIS   )
                    ) SS:
COUNTY OF C O O K   )

     IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
         COUNTY DEPARTMENT - CRIMINAL DIVISION

THE PEOPLE OF THE       )
STATE OF ILLINOIS,      )
     Plaintiff,         )
                        ) Case No. 93-CR-15199-01
          vs.           )
                        )
GERALDO IGLESIAS,       )
     Defendant.         )


     REPORT OF PROCEEDINGS at the hearing in the

above-entitled cause, before the Honorable ERICA L.

REDDICK, one of the judges of said Division, on the

10th day of March, 2022.

APPEARANCES:

     HON. KIMBERLY M. FOXX,
     State's Attorney of Cook County, by:
     MS. CHRISTA BOWDEN and
     MR. PAUL HOOPER,
     Assistant State's Attorneys,
     appeared for the People;

     MR. JOSH TEPFER and
     MR. ANAND SWAMINATHAN,
     Attorneys at Law,
     appeared for the Defendant.


REPORTED BY:
Rosemarie LaMantia
Official Court Reporter
2650 South California, Room 4C02
Chicago, Illinois  60608
Illinois CSR License No. 084-002661

1

EP Subpoena Response 011918

INDEX

People v Geraldo Iglesias
Case Number 93-CR-15199-01
Date Taken:  March 10, 2022
Pages 1 - 213

OPENING STATEMENTS

By Mr. Swaminathan...................................8
By Ms. Bowden.....................................33

THE WITNESS
GERALDO IGLESIAS

Direct Examination by Mr. Tepfer..............38, 74
Cross-Examination by Ms. Bowden....................70

THE WITNESS:
DR. NANCY FRANKLIN

Direct Examination by Ms. Brady...................85
Cross-Examination by Mr. Hooper..................127

OPENING CLOSE ARGUMENT
By Mr. Swaminathan...............................163

CLOSING ARGUMENT
By Ms. Bowden....................................202

EXHIBITS
Exhibit Number 1 was admitted....................156
Exhibit Number 2 was admitted....................157
Exhibit Number 3 was admitted....................158
Exhibit Number 4 was admitted....................158
Exhibit Number 5 was admitted....................158
Exhibit Number 7 was admitted....................160

2

EP Subpoena Response 011919

THE COURT: All right. Thank you. Court is back in session.

I'm going to end the Zoom feed we have. I don't believe we have participants -- in person proceeding.

So we are calling your case. So People -- I'm sorry? The petition of Geraldo Iglesias. We'll start by having Petitioner's counsel identify followed by the State.

MR. TEPFER: Sure.

Good morning, your Honor. Josh Tepfer for Geraldo Iglesias, who is present in court. To my immediate left is Anand Swaminathan and then Rachel Brady.

THE COURT: And all of -- Ms. Brady, Mr. Swaminathan, you're both attorneys?

MR. TEPFER: Yes.

THE COURT: All right. Thank you.

State?

MS. BOWDEN: Assistant State's Attorney Christa Bowden and Paul Hooper for the People.

THE COURT: And then the Petitioner is present, Mr. Iglesias. So he is present as well in person.

And if everyone is ready to proceed or are

3

there any preliminary matters?

MR. TEPFER: I think there are just a couple. I just want to orient the court briefly.

We have premarked exhibits. The postconviction exhibits are part of our postconviction pleadings and the certificate of innocence pleadings. We have provided the People a copy of those. I believe that is 1 through 71, if I'm not mistaken, or somewhere in that neighborhood. It's all premarked. And we have -- or they're marked. And then we have premarked other exhibits that we intend to rely on, 72 to 86. Binders were given to the State. I have them for your Honor there. If I can approach, I can give them to you.

THE COURT: Well, let me ask initially whether the State is objecting to any of the exhibits that the Petitioner will seek to introduce?

MS. BOWDEN: Judge, I had previously done a motion to strike the Guevara evidence and the evidence from other cases with regard to this case and the court said it was reserving its ruling in the course of the hearing. So I will be renewing my motion to exclude that evidence as we proceed.

THE COURT: All right. Well, seeing as again I have seen much of it before I will permit the exhibits

**4**

to be tendered into court, and then we'll deal specifically when you raise the motion as to any comments as it becomes ripe to do so. At this moment not having heard anything I'm not in a position to render that ruling but I certainly have the ability to disregard anything that I indicate I will not consider.

So with that proviso I will receive the tendered documents.

MR. TEPFER: Thank you, your Honor. And to clarify Exhibit 78, wrong number, photographs of Mr. Iglesias.

THE COURT: Don't show them to me if they're not admitted. Okay.

MR. TEPFER: Sorry, I'm sorry. They're proposed photographs, there is black and white versions in the binder. I do have a color copy. I just wanted to give that as well.

THE COURT: All right.

MR. TEPFER: The final binder up there it's a white binder, we do intend -- as you may recall from a couple months ago at a different hearing we played designated portions of deposition testimony, those in the same way we did previously are the highlighted or designated portions that we are going to play that we --

5

EP Subpoena Response 011922

that are demonstrative so to speak.

THE COURT: All right. So with those representations other than the Guevara evidence, is there any other objection to the exhibits?

MS. BOWDEN: No. We have discussed the evidence before we started the hearing.

(Brief pause.)

MR. TEPFER: The only other matter I wanted to direct your Honor's attention to is that we are presenting one witness via Zoom feed. She is not logged in. I am assuming there is a motion to exclude. She is going to be our second live witness. So we can just text her. She is on call whenever she is needed.

THE COURT: All right. Then I'll reactivate the Zoom feed with that. Okay. Thank you.

MR. TEPFER: Thank you, your Honor.

THE COURT: Any other preliminary matters by the State?

MS. BOWDEN: No, Judge.

THE COURT: Okay.

MS. BOWDEN: Thank you.

THE COURT: We'll be on our way with the opening statement.

MS. BOWDEN: We're ready to proceed.

**6**

EP Subpoena Response 011923

THE COURT: State is ready as well.

Please proceed.

MR. SWAMINATHAN: Thank you, your Honor.

OPENING STATEMENT

BY MR. SWAMINATHAN:

May it please the court, counsel. I'm one of the counsel for Geraldo Iglesias along with Josh Tepfer. We're lucky to have as our colleague join us for this round. And we're here of course with Geraldo Iglesias.

This case starts with the senseless shooting of Monica Roman back in June of 1993. It was yet another senseless killing, you know, in the City of Chicago sadly, and it was a tragedy. No question about it. And by any measure, you know, this young woman was -- she was not affiliated with a gang as far as anybody knows. She was in the wrong place at the wrong time. It was a tragedy.

But what the evidence will show is that there was a second tragedy in the ensuing few weeks because Reynaldo Guevara, the notorious Chicago Police Officer responsible for 20 exonerations and counting, over the ensuing 3 weeks he gets involved in this case and ultimately Geraldo Iglesias gets

**7**

convicted of a crime, of the murder of Monica Roman, ultimately that conviction was vacated and he is here before you today asking a certificate of innocence. And the reason he is seeking that certificate of innocence is because Mr. Iglesias will take the stand today and he will tell you that he is absolutely innocent of that crime. He had nothing to do with it and he has no idea who did it.

And what the evidence will show is that Mr. Iglesias has been asserting his innocence since the day he was arrested on this crime in June, approximately June 23, 1993. He testified at his own criminal trial, asserted his innocence. He testified in allocation. When it was against his interest, he asserted his innocence and again asserted his innocence and he has been fighting to prove his innocence ever since. So that is Geraldo Iglesias.

And your Honor is going to hear from him. I think you Honor will not only hear him talk about his innocence but I think your Honor will hear evidence of his character and the kind of person that he was before he was arrested. He was a young man who was working on his GED, raising his young

8

EP Subpoena Response 011925

son, working in a gang intervention program at the YMCA. This is a man who you will hear has come home from prison despite living through a nightmare for 18 years, who went right to work, right to work and he has been working ever since. He is a man who despite losing all of those years with his son came home and raised his son.

Your Honor will hear of the character of Geraldo Iglesias.

And the next place I want to turn is to Reynaldo Guevara because the juxtaposition in our view is -- (inaudible).

Your Honor will hear from Geraldo Iglesias and hear about this man. And then your Honor is going to hear testimony today not from Reynaldo Guevara in this courtroom, he is obviously not testifying, but you will hear his deposition testimony in which he is asked about his conduct with regard to Geraldo Iglesias and you will hear Reynaldo Guevara take the Fifth with regard to every aspect of his conduct and the treatment of Geraldo Iglesias and the witnesses in this case. When he is asked whether he framed Geraldo Iglesias, whether he manipulated eyewitnesses, whether he abused and

9

EP Subpoena Response 011926

threatened witnesses in order to get them to implicate Geraldo Iglesias he will plead the Fifth.

And your Honor is also going to hear remarkably from Reynaldo Guevara's partner Ernest Halvorsen who will plead the Fifth with regard to every aspect of his conduct in this investigation and ultimately your Honor will hear that Ernest Halvorsen came off of the Fifth -- (inaudible) after taking the Fifth and gave some testimony about his work as a police officer and the evidence will show that when he did come off the Fifth he never denied the misconduct in this case after having pled the Fifth with regard to -- (inaudible).  Instead what your Honor will hear is that he actually admits in part some of his conduct in this case.

So that Reynaldo Guevara and Ernest Halvorsen -- (unintelligible) juxtaposition of what you will hear about Geraldo Iglesias and what you're going to hear about Reynaldo Guevara and Ernest Halvorsen is stark and extremely important.

Then of course there is pattern evidence. Your Honor is going to hear pattern evidence in this case.  I know your Honor has heard substantial pattern evidence in the past, our team has worked

**10**

EP Subpoena Response 011927

very had to make sure we are not presenting you the same evidence over and over and find a way to really streamline what we're presenting to your Honor. Our intent today is to limit what we are showing you substantially in terms of evidence you've seen before with regard to the manipulation of eyewitnesses, that you will see that information in recent -- in recent hearings but this case is frankly a one stop shop for Guevara's misconduct.

You know, there is the Martinez decision from the 1st Appellate court that talks about Reynaldo Guevara. I know your Honor is familiar with it. In that case the court described, and I am paraphrasing, that Reynaldo Guevara had a toolkit of misconduct that he used. Well, he used almost all of the tools in that toolkit in this case. So your Honor is going to hear counter evidence of what these various tools that he used, not only how he used them against Geraldo Iglesias but also how he used these exact same tools against a number of other people. And ultimately that pattern evidence will be unrebutted. The State will not call individuals to come here and rebut that Guevara engaged in these patterns of misconduct and that is

11

EP Subpoena Response 011928

to their credit.

I want to say this, I mean, you know, the idea that we should -- we have to find a way to present these kind of -- this kind of evidence here in a streamline fashion and the State is supporting our ability to do that, that is to their credit. And ultimately appellate courts and Judge Obbish and others in this courthouse have offered opinions about Detective Guevara and his misconduct and the State is not coming here to tell you something to the contrary -- (unintelligible) or any of these positions -- (unintelligible) got it wrong, that is to their credit.

So that evidence will be unrebutted.

The next piece of evidence that will be unrebutted is evidence regarding an individual named Francisco Vicente. Now, Francisco Vicente is a criminal in this case and in many cases because one of the pillars on which Geraldo Iglesias was wrongfully convicted we believe was a statement from Francisco Vicente that Geraldo Iglesias confessed to committing this crime to him in the Cook County Jail.

Francisco Vicente is a classic, notorious

**12**

jailhouse snitch. He claims that Geraldo Iglesias confessed to him.

Now, your Honor is going to hear the deposition testimony of Francisco Vicente in which he says, my claims that Geraldo Iglesias confessed to me are absolutely false. And I did it based on threats and abuse from Reynaldo Guevara and Ernest Halvorsen, his partner. And that testimony -- he said that multiple times. Your Honor will have the sworn testimony in which he said that, not only in his deposition but in other instances. He has been consistent about that and remarkably the Francisco Vicente story is an important one because as it turns out Guevara used Francisco Vicente to convict at least five different men on these claims that these -- all these different men all confessed to Francisco Vicente over the course of 4 weeks in and around June of 1993.

THE COURT: Is this part of the pattern evidence that you hope to introduce as well?

MR. SWAMINATHAN: It is part of -- yes and no. So some of it will be non-pattern evidence. Francisco Vicente will testify about what he did in this case and the threat and abuse that caused him to falsely

**13**

implicate Geraldo Iglesias, that is obviously not pattern evidence -- (unintelligible) relevant here and his statements about his implicating his other individuals in other cases in the exact same 3 to 4 week time frame is obviously relevant pattern evidence -- (unintelligible).

And ultimately that testimony from Francisco Vicente will be unrebutted. The pattern evidence regarding Francisco Vicente will be unrebutted, and the court will hear that the city's own investigator Scott Lassar, whose name you have now heard multiple times. When the city conducted it's investigation into allegations of abuse by Mr. Guevara, the city investigator themselves concluded that Mr. Vicente's claims of Geraldo Iglesias confessing were fabricated and that those claims with regard to other individuals including a man named Robert Bouto were fabricated and in fact Mr. Bouto was innocent.

The court will hear that evidence regarding Mr. Vicente. It will be unrebutted.

The court will also hear evidence today of additional unrebutted evidence that Reynaldo Guevara lied in this proceeding and in particular at the criminal trial.

14

EP Subpoena Response 011931

The court will hear evidence that he created a false alibi evidence against Geraldo Iglesias. Geraldo Iglesias was arrested for this crime.

Just to give you a brief background so you have context. Approximately about 2 weeks after the crime had the occurred, when he was questioned by police, he denied any involvement in the crimes. He always has, never implicated himself. When he is asked where he was at the exact time of the shooting what the evidence will show is he says I don't know exactly where I was 2 weeks ago. I don't keep a calendar. And that's honest testimony. And the police officers wrote down in their police report at that time that he indicated he didn't know where he was at the time of the shooting.

Reynaldo Guevara came to trial and he testified in rebuttal and he claims that for the first time ever that actually when he interviewed Geraldo Iglesias, Geraldo Iglesias had told him I've been hanging out on that very street corner where the shooting occurred at the time of the shooting.

Well, I was standing right there at the corner when the shooting happened, he never made that claim before. It's contradicted by the police reports. It was a complete lie, and that was the statement from

**15**

Mr. Reynaldo Guevara that caused Mr. DeLeon, Mr. Iglesias' criminal attorney, to get extremely upset because it was just so blatant a lie.

So there will be unrebutted evidence that Reynaldo Guevara lied in this case.

There will be unrebutted evidence that he abused Francisco Vicente to try to get him to implicate Geraldo Iglesias.

And ultimately -- (unintelligible) critical in this proceeding, your Honor, because what that tells us is that Reynaldo Guevara had decided to frame Geraldo Iglesias for this crime.

MS. BOWDEN: Objection.

MR. SWAMINATHAN: And we believe --

THE COURT: Basis of the objection?

MS. BOWDEN: Argument.

THE COURT: Response to the objection?

MR. SWAMINATHAN: Merely identifying what we believe the evidence will show and what conclusions your Honor will be able to reach.

THE COURT: Excuse me. The objection is overruled. Continue.

MR. SWAMINATHAN: And so we believe that this proceeding, one of the questions your Honor is going to

**16**

EP Subpoena Response 011933

be thinking about is in a case where Reynaldo Guevara is clearly trying to frame Geraldo Iglesias is there any legitimate, untainted evidence incriminating Mr. Iglesias that this court can rely on, and we believe the answer to that question will be no.

So what is even in dispute? What is the evidence that the State may try to present to your Honor on this question about whether there was untainted evidence that could justify Geraldo Iglesias' conviction?

Well, first, there really is one piece. The State will point to the two eyewitnesses, two witnesses who they will say made identifications of Geraldo Iglesias and that those two individuals have never recanted those identifications, standby those identifications, and on that basis Geraldo Iglesias' conviction should stand. Those two men's names are Hugo Rodriguez and Rosendo Ochoa.

We believe what the evidence will show overwhelmingly is that those identifications were in fact orchestrated and manipulated by Reynaldo Guevara.

And to explain why that is the case I think I want to briefly orient the court to consider crime scene so that your Honor has a sense of the evidence that

17

EP Subpoena Response 011934

you're going to be seeing.

Okay. Let's start with that one. I'm just going to stand -- maybe I will stand on this side to not block anybody's view.

This image shows you the crime scene.

THE COURT: Wait, let the State get situated so they can see it too.

MR. SWAMINATHAN: So this is obviously an overhead map and what it is showing you is this crime took place near the intersection of Sawyer and Palmer. Okay.

So your Honor, this north/south street is Sawyer. And just above this picture to the north of this is Palmer, the cross street. So you see as Sawyer is starting to open up into an intersection that is Palmer. So this street that is crossing Sawyer here is not a street. That is an alley. That is the alley just south of Palmer.

And so in this case what happens is the victim is Roman is in a car basically with 4 gentlemen. Okay. And they're parked here in the alley, and the testimony that your Honor will hear is that they were parked here and one of the people who had been with them recently had a baby, lived in this house down here to the far south, and that she had stopped the car to allow

**18**

her friends to meet the baby or see the baby.

So after that has happened the car pulls out of the alley and turns north on Sawyer. Okay. And it is as the car is traveling north on Sawyer, Ms. Roman is in the front passenger seat, the victim, and there are these 4 other men in the car with her. As the car is traveling north on Sawyer, the car gets shot at. And the testimony that you will hear in this case, the evidence that we will present will show that the shooter was right around this area, entering 2148 North Sawyer, this is the entrance, a little walkway here, and back in the time of the shooting there was a tree that is just off of this walkway to the south of it. Your Honor will see some of that evidence later on, but this is approximately where the shooter was when he fired the shots. And the vehicle had been -- was traveling north and was moving towards this intersection when the shots were fired and they entered from the rear left of the vehicle. Okay. The bullet holes will show that in fact they entered on the left side and to the rear of the vehicle.

And the shooter after firing the shots, what happens, the vehicle of course takes off. The driver -- everybody in the car ducks down. The driver speeds up,

**19**

EP Subpoena Response 011936

accelerates and gets out of here and takes a turn at this intersection of Sawyer and Palmer. The shooter turns around, runs down to this alley and turns to the west, runs down in the alleyway.

So that is the crime scene.

Next slide. So just to give you a basic timeline. The shooting occurs on June 7, 1993. At that time Reynaldo Guevara is not assigned to the shooting. We will submit to your Honor that we believe that is going to be important evidence for your Honor to consider during the course of this case.

The initial investigation for the first 2 weeks was conducted by detectives other than Reynaldo Guevara, primarily a detective named Detective Santopadre. You're going to hear his testimony. And in that 2 weeks there are no leads that are developed.

Your Honor will hear that after they speak to all of the witnesses, including the 2 gentlemen who -- (unintelligible) eyewitnesses, Mr. Rodriguez and Mr. Ochoa. They speak to those witnesses. They're not able to make any identifications. They're not shown any photos and what the detective -- the evidence will show that the detectives who spoke to them did not believe those men got the kind of view that would allow them to

20

make any kind of identification. Only when Reynaldo Guevara later gets involved on June 21st that the case suddenly closes just like that.

MS. BOWDEN: Objection.

THE COURT: Basis?

MS. BOWDEN: Argument.

THE COURT: Overruled. I do believe he is indicating he expects the evidence to show this, so I will overrule that objection and continue.

MR. SWAMINATHAN: And I will just move to withdraw that.

What the evidence will show is that on June 21st -- what Ray Guevara will claim is that -- this will be after he got charges approved against Mr. Iglesias. He will say -- the evidence will show he says on June 21st, a few days earlier, a confidential informant called me and told me a man named -- with the nickname Snake, that is Geraldo Iglesias, committed the crime. Reynaldo Guevara will create a photo array based on that confidential informant. Within 48 hours the same witnesses who couldn't make any identifications when they spoke with Detective Santopadre suddenly are able to make identifications and are able to identify Reynaldo Guevara's suspect. Those identifications, the

**21**

EP Subpoena Response 011938

photo array and lineup, the evidence will show were conducted by Reynaldo Guevara, not by any other detective. This case became a Guevara special on June 21st when he got involved and claimed that he had a confidential informant.

What the evidence will show is that nobody is going to be able to identify who that confidential informant is. They were never identified back in 1993. They were never identified at the time of trial and until this day there is not one officer who will come in and say that that confidential informant actually exists. And your Honor will hear evidence that when asked whether that confidential informant was made up and was used to frame Geraldo Iglesias, Reynaldo Guevara took the 5th and Ernest Halvorsen took the 5th.

Just a couple more here.

So going back to that same overhead view that you saw. Of course these two critical individuals we're talking about are Hugo Rodriguez and Rosendo Ochoa. So where are they?

Hugo Rodriguez is in the car with Ms. Roman. He is in the rear middle seat in the vehicle. So where does he think that he -- that the car is when he looked when the shooting happened, when he looked back to see

**22**

EP Subpoena Response 011939

the shooter, he says we traveled north almost to this intersection and we ducked down after the shots were fired and I looked back and see the shooter and we're near the intersection.  So the car is up here approaching the stop sign at the intersection of Sawyer and Palmer.  And he looked from the rear vehicle back through the rear window and the shooter that he places right here.

Mr. Ochoa is in the house and that young woman who had brought her baby out she lived in the same house as this gentleman Mr. Ochoa.  Mr. Ochoa the evidence will show was looking out of his front window. You will see the trial exhibit where he circled the window he was looking out of.  And in a window looking out facing the street he claims that he looked from there at the shooter again in this location.

So these are the viewing angles that we're talking about when we talk about Mr. Ochoa and Mr. Rodriguez.

Again, your Honor will see this evidence but I will just go through it quickly but this is a trial exhibit, the crime scene photo taken by the police on the day of the shooting.  This was used as a trial exhibit and Mr. Ochoa put an X to mark where it was that

**23**

EP Subpoena Response 011940

the shooter was when he was able to see him and make this identification, and again you see him again right next to that walkway where the door is to 2148 North Sawyer. So that is generally orienting you to those locations.

Now, one thing that you don't see in that overhead shot and that we will talk more about and your Honor will see during the course of evidence as it is presented there is this tree that juts out into the street that used to be there, not there today, and that tree is a tree that Mr. Ochoa is going to have to look past and through to be able to see the shooter.

Again, this is another piece of -- this is another trial exhibit that your Honor will be presented. It shows Mr. Ochoa circling the window that he is in facing out to the street, the alley and where the car was.

Next slide. And again so these are the kinds of trial exhibits and testimony that will orient us to the exact locations of these individuals.

Next slide. And ultimately what your Honor is going to hear during the course of the case is that these identifications we believe will ultimately be -- we'll be able to show you that they were impossible, the

**24**

EP Subpoena Response 011941

kinds of identification these gentlemen are claiming to make just simply could not be done.

Mr. Ochoa's identification from this window all the way up to a shooter near that walkway is at least 160 feet. He is actually out at this front window, so it's a little bit further, but it is greater than 160 feet.

Next slide. This was simply a photo taken with a nose zoom camera from the front steps of that house, not even up stairs through the window, looking out to that exact location, you couldn't make out that individual. That is my colleague Steve Artis. I share an office with him. I wouldn't have been able to identify him if he was who shot that shot and I was standing here.

You can keep going.

All right. So ultimately -- you can close out that slide.

Ultimately your Honor we believe that the evidence you will hear with regard to Mr. Ochoa looking through that window at somebody at about 160 feet away approximately was simply -- (unintelligible) I D wouldn't have been impossible. We believe the circumstances in which he had to view this individual,

**25**

EP Subpoena Response 011942

the amount of time he had to view this individual. You're never going to hear any evidence to indicate that the shooter actually looked at him -- (unintelligible) direct view of the shooter. You're not going to hear that evidence.

You're going to hear evidence that this guy sees somebody fired shots at a car that is not facing him and it's at that moment that he is claiming he is able to identify somebody so far away, he is going to acknowledge that it is somebody who is a stranger who he has never seen before and ultimately 2 weeks later he is being asked to make this identification.

We believe the evidence will show that mister -- the only way Mr. Ochoa could make an identification was based on manipulation by Mr. Guevara.

Same is true of Mr. Rodriguez. Ultimately Mr. Rodriguez is in the same position. He is making an identification of a stranger. He is doing so multiple weeks, 2 weeks later. He is doing so say from the middle back seat of the car. Importantly the evidence will show not a single other person in that car was able to make an identification or suggested that they could make an identification or got any kind of a view to be able to look at a photo and make an identification.

**26**

We think your Honor -- your Honor will see evidence that in fact when Mr. Rodriguez was initially questioned he was very clear about what he could see. He saw a guy who was running away after the shots were fired.

Turn to the next slide.

But what the evidence will show is that Mr. Rodriguez when he is questioned says, yeah, we ducked down.

Okay. So this is when Mr. Rodriguez is initially questioned by the police officer, that Detective Santopadre.

And your Honor is going to be provided with a copy of this general progress report. It's the handwritten notes taken as the officer is talking to Mr. Rodriguez. And Mr. Rodriguez says I was in the middle rear seat. After the shooting I saw the offender. What did he see? A person in all black run into the alley. That is the only description he is able to provide. And that's because we believe the evidence will show, of course that's the evidence -- the description he could provide. So he saw somebody running away because he ducked down like he said, and he looked back after the shots were fired. And what is the shooter doing after

27

EP Subpoena Response 011944

the shots were fired, running the opposite direction to the alley. He saw him from the back.

And so the evidence will show he gives a description entirely consisting with that fact pattern. I can see his clothing. It was black. That's pretty much all I could see.

So that's what Hugo Rodriguez was able to do before Reynaldo Guevara got involved a few weeks later.

So I talked a little about this. We'll talk about it more in closing.

Because in addition to all of the other problems with Hugo Rodriguez' ability to make an identification, this is the victim's car. This is the car that they were in. The bullet holes were over on that far side over there. This is the rear window of the car that he says he looked through to make the identification. I've never seen this before in my entire life, but there are blinds in the rear window of that vehicle.

Mr. Rodriguez you will hear evidence admits that there were blinds in the rear window of that vehicle.

So in addition to speeding away in a car going north, looking at somebody running south, having

**28**

if anything a split second to see that person, et cetera, et cetera, he has to look through the blinds in this rear window to see a shooter. Again, the point is Hugo Rodriguez could not make that identification when he spoke to the original detectives. He couldn't make an identification. That we believe the evidence will show. It was only when Reynaldo Guevara got involved that suddenly this is a man who had a better memory and a better view. We don't believe that that is possible.

So the last thing I want to talk about is just why do these men stand by their story? The State will correctly point out that they have not recanted their testimony.

Your Honor is going to hear from Nancy Franklin, the plaintiff's eyewitness identification expert. Dr. Franklin is going to do several things that are very important we believe.

Your Honor is going to hear from Dr. Franklin about what I just described, these same set of circumstances involving this crime and this crime scene and what we believe the evidence will show is these set of circumstances involving stranger identification weeks later with very limited -- (unintelligible), it will be scientifically almost impossible --

**29**

EP Subpoena Response 011946

MS. BOWDEN: Objection

MR. SWAMINATHAN: -- to make an identification.

Go ahead.

THE COURT: Basis?

MS. BOWDEN: Judge, that will not be admissible, the evidence -- Ms. Franklin will -- should not be permitted to make such -- (inaudible). That is for the trier of fact to determine.

THE COURT: Thank you.

Response?

MR. SWAMINATHAN: I think it's fair enough, but ultimately I'll just strike that comment because ultimately what I believe your Honor will hear is Ms. Franklin will talk about the reliability of the identifications under these type of circumstances and I think your Honor will be able to review that evidence and reach conclusions as lay people would speak of them based on what she is able to tell you, the science under these circumstances.

THE COURT: Okay.

MR. SWAMINATHAN: The second thing that you will hear from Ms. Franklin, it's important, is that she will tell you that individuals can be steered and manipulated into making identifications without even realizing it's

30

happening. And that's important because that is -- that is important to understand, why these men stand by these identifications?

There is another important thing she does. Not only can people be steered, but you're going to hear evidence that in fact there was steering that took place in this case.

The photo array itself was unfair. It was a photo array that was designed specifically to target Mr. Iglesias and the witnesses would have been led specifically to Mr. Iglesias, she'll explain how that works. She will explain the fairness test that she conducted and explain why the evidence will show that this was a photo array that was steered to Mr. Iglesias.

And the last important thing that you will hear from Ms. Franklin about is the idea that statements of confidence -- go ahead.

THE COURT: Go ahead, counsel.

MR. SWAMINATHAN: Statements of confidence in an identification are meaningless. A contemporaneous statement made at the time of these very identification procedures may be of some value but what you will hear is that statements of confidence made later or occurred later are meaningless because people -- (unintelligible)

31

memories in their mind and they -- (unintelligible). So these are important pieces that your Honor will hear about. I think they're also for consideration as you consider this evidence involving these two gentlemen.

So in conclusion we believe the overwhelmingly preponderance of the evidence in this case will show that Mr. Iglesias is innocent.

THE COURT: Thank you, counsel.

State.

OPENING STATEMENT

BY MS. BOWDEN:

Judge, this is a -- the petitioner's request --

THE COURT: Hang on one second.

MS. BOWDEN: -- request that the court grant him a certificate of innocence. The petitioner has the burden here to prove by a preponderance of evidence that he is innocent and I'm going to ask that as typical as it is even for myself to keep that as the focus that we keep reminding ourselves that that is in fact the focus of this hearing.

The State at this time is not seeking to have any conviction upheld. Okay. The conviction has been vacated. The charges have been dismissed.

32

EP Subpoena Response 011949

This is about whether or not the petitioner can prove he is innocent, which is a completely different question than whether or not he is guilty beyond a reasonable doubt.

So with that being said there is going to be an overwhelming amount of evidence that you're going to hear about this pattern evidence about Reynaldo Guevara and that the State will be making motions to exclude that evidence with regard to the witnesses that their identifications have not been challenged.

Mr. Ochoa and Mr. Rodriguez testified in the original trial.

Mr. Rodriguez has been deposed in the civil suit related to this case and that was recently -- it might have been just last year, 2021. September of 2021, he was deposed and you're going to get to see it. I'm going to play a large portion of that deposition and I'm also going to ask the court to review in its entirety at the court's leisure to be able to see what Mr. Rodriguez has to say about the cases own worth because Mr. Rodriguez has English as a second language. Okay. So the deposition in -- with the use of an interpreter, and it's -- I think it's important to be able to see him describing the events that occurred as

33

EP Subpoena Response 011950

he describes them and then how they're interpreted by the interpreter and the questions that are asked.

So we'll be showing a large portion of that. And Mr. Rodriguez at the time of the trial, the time of the deposition, states emphatically that no one told him who to select in the photo array. No one told him who to select in the lineup.

The purpose of this hearing is not going to be to re-litigate the charge of first-degree murder against Mr. Iglesias.

The purpose again is can he prove that he is innocent by a preponderance of the evidence and he cannot do that in light of the un-recanted, vigorously as they called it -- strike that -- vigorously cross-examined identifications of both Mr. Rodriguez and Mr. Ochoa. The appellate court in the Rule 23 opinion, which has been submitted I believe in the volumes that you have there, they describe that the identifications were so vigorously cross-examined at the time by defense counsel that there is no reason, they're unimpeached.

Okay. All the issues that you're going to hear about from Ms. Franklin were brought up by defense counsel one way or another. Those issues were addressed during the cross-examination, responded to by the

**34**

EP Subpoena Response 011951

witnesses and accepted by the jury. Then accepted by the appellate court.

Now, admittedly the Guevara factor and the Vicente testimony in this case is what led to the charges on this case being dismissed. There was a problem because they were involved in this case. The conviction was vacated. It was set down for new trial and the charges were dismissed because of that taint but just because there was that taint does not mean that Mr. Rodriguez and Mr. Ochoa were lying. It does not mean that they did not identify the petitioner as the shooter, and it doesn't mean that the petitioner wasn't the shooter.

The motivating factor for Guevara for the things that he did or did not do in this case we don't know what it is. Was it because he knew and he wanted to make sure that the case was solid? Who knows. But the remaining fact is that he did not interfere with the identifications that were made by the two eyewitnesses.

On the topic of Vicente who, yes, was the jailhouse informant, you will hear his deposition in the Montanez, Serrano depositions where he talks about -- he recants the testimony that he made in this case and said that he was forced by Guevara to give that testimony.

**35**

EP Subpoena Response 011952

You will also see a Montanez, Serrano Third Stage P C Hearing where he took the Fifth Amendment and refused to answer anybody's questions about whether or not there was in fact a jailhouse confession by Geraldo Iglesias or whether or not Guevara forced him to say things that were not true.

When you view all of that, the Vicente testimony becomes a zero and can't be trusted to mean anything one way or the other.

So that leaves the case with the two unchallenged -- or rather unimpeached, vigorously cross-examined identifications by the two witnesses.

So, Judge, again, this is a petition for a certificate of innocence. This is not a P C. This is not a trial to determine guilt. This is not a civil rights action. It is the petitioner's burden to prove himself innocent by a preponderance of the evidence and the evidence in this case bars him from reaching that burden and we'd ask that you deny the petition.

THE COURT: Thank you.

State, if you are ready -- or petitioners, we'll begin with the evidence.

MR. TEPFER: Thank you, your Honor. We would call Geraldo Iglesias.

**36**

EP Subpoena Response 011953

GERALDO IGLESIAS,

called as a witness on behalf of the Petitioner,

being first duly sworn, was examined and testified

as follows:

DIRECT EXAMINATION

BY MR. TEPFER:

Q. Mr. Iglesias, can you please go ahead and state and spell your name?

A. My first name is Geraldo Iglesias. First name is G-E-R-A-L-D-O. Last name is I-G-L-E-S-I-A-S.

Q. And, Mr. Iglesias, you see the court reporter here, she is typing. You see her hands are moving very, very quickly, right there. So if you can please try to speak a little more slowly. She wants to take down everything you say.

So how old are you?

A. I'm 53 years.

Q. And without giving any specific address where do you live?

A. Melrose Park.

Q. Is that a house or an apartment?

A. House.

Q. And how long have you had that house?

A. It's been nine months.

EP Subpoena Response 011954

Q. Is that the first house you have owned?

A. Yes.

Q. And who do you live with?

A. My son.

Q. And what is your son's name?

A. Gabriel Iglesias.

Q. How old is he?

A. Thirty years old.

Q. Anyone else live with you?

A. No, sir.

Q. Do you have any other children?

A. No, I don't.

Q. Any grandchildren?

A. Yes, I got a 5 year old grandson.

Q. What is his name?

A. Ginia.

Q. Spell that.

A. Ginia, G-I-N-I-A.

Q. And we heard during opening Mr. Swaminathan referred to you with a nickname. What is your nickname?

A. They call me Snake.

Q. Why do they call you Snake?

A. Because the shape of my body.

38

EP Subpoena Response 011955

Q. Do you remember who gave you that nickname?

A. No.

Q. You're going to have to give audible responses.

A. No, I don't.

Q. I want to ask you some questions about your life prior to the June 1993 arrest in the murder of Monica Roman. Okay. But just to orient you you were arrested and convicted of the June 7, 1993, murder of Monica Roman?

A. Yes, I was.

Q. And how long, if can you recall, after the June 1993 murder were you actually arrested?

A. Can you repeat the question again?

Q. How much time passed, if you're thinking about the murder, which occurred on June 7, 1993, when was your actual arrest relative to that crime?

A. It was mid-June, June 23.

Q. June 23, 1993, sound right?

A. 1993.

Q. And when you were arrested, you're -- you said I think 54 today -- 53. When you were arrested, how old were you?

A. I was in my mid 20s, 24.

Q. And at that time in June of 1993, 24 years old,

**39**

were you working?

A. Yes.

Q. Where were you working?

A. At that time I was working at the YMCA.

Q. What were you doing at the YMCA?

A. Gang prevention program.

Q. Did you say gang information program?

A. Gang prevention.

Q. Gang probation program?

THE COURT: Mr. Tepfer, can I just have you place the glasses on the bench in front of him. No worries.

Okay. He said working at the Y in a gang prevention program.

Continue.

THE WITNESS: Yes.

BY MR. TEPFER:

Q. I don't want to beat a dead horse. It's up to you, but there is a partition, if you are comfortable it might be a little bit easier to hear you but it is entirely up to you.

A. Yes.

Q. Okay. Are you okay?

A. Yes.

Q. So tell me, tell the court, I'm sorry, a little

**40**

EP Subpoena Response 011957

bit about your duties in this gang prevention program at the YMCA.

A. The gang prevention program consists of removing the -- (unintelligible) on gangs and other neighborhoods and just try to talking to young teenagers, get them away from gangs and, you know, try to give them a safe path.

Q. And was this a paid position?

A. Yes.

Q. And was it a full-time position?

A. Yes.

Q. And were you in school while you were working this full-time paid position as a --

A. Yes. At the same time I was taking my GED class.

Q. You were taking your GED classes. Okay.

And who did you live with at the time when you were 24 years old?

A. I was living with my baby and my -- the mother of my kid.

Q. When you say your baby, is that your son Gabriele?

A. My son Gabriele.

Q. And that's the same son Gabriele you live with

**41**

EP Subpoena Response 011958

til this day?

A. Yes, sir.

Q. And how old was Gabriele? You called him a baby. How old was he at that time?

A. He was 1 year old.

Q. One year old.

And prior to your arrest and subsequent conviction for the Roman murder, at the time of your arrest did you have any felony convictions on your record during the first 24 years of your life?

A. No, sir.

Q. Okay. Now, you've already testified you were convicted of that 1993 murder. Did you serve prison time?

A. Yes, sir.

Q. Okay. And after your prison time were you -- when were you released from prison?

A. I was released September 11, 2010.

Q. 2010.

And after -- and when you were released were you on some sort of parole?

A. Yes, on parole and house monitor.

Q. Okay. At the time you were released, were you able to find work?

**42**

EP Subpoena Response 011959

A. Yes.

Q. Tell the court what you did upon your release work-wise?

A. Well, when I first got out, I started working with CeaseFire, it's another gang prevention program, and pretty much the same thing. We just go out on the streets and talk to kids, take them to the movies, get them off the streets basically, try to keep them busy.

Q. So was this the same employer that you worked at prior to your arrest in 1993 or --

A. Different.

Q. It was a different employer --

A. Pretty much it was the same, same thing.

Q. You had similar responsibilities?

A. Yes.

Q. And how long did you work at CeaseFire, in the gang prevention program?

A. I worked there for about four years before our Governor Rahn came in play and he took all the funds away.

Q. And was this full-time work?

A. Yes.

Q. And paid work?

A. Yes.

**43**

EP Subpoena Response 011960

Q. Now, there was a period of time where you -- let me strike that.

Were you working entirely that 4 to 5 year period after your release from parole in 2010 at this gang intervention program?

A. Yes.

Q. Was there any point where you were re-incarcerated?

A. Yes. Twenty months -- 20 months -- 20 months after being released they cut my band off and I caught a DUI.

Q. And we'll talk about that a little bit later. What happened after you caught the DUI? You were arrested?

A. I was arrested and pretty much since I was on parole, parole was violated and then I was sent back to the penitentiary.

Q. Okay. How much time did you serve in the penitentiary during that parole period?

A. One year.

Q. And then after you were released from that one year on parole, did you return to work at CeaseFire?

A. Yes.

Q. Okay. You mentioned, I think what you said the

**44**

EP Subpoena Response 011961

governor cutoff some fundings for CeaseFire?

A. Yes.

Q. Did you find employment after that?

A. Yes, I did.

Q. Tell the court what that was.

A. Well, I had tooken some course in construction when I was incarcerated. So I used that to my advantage and I started working doing construction.

Q. Okay. And do you still work construction til this day?

A. Til this day.

Q. Okay. So roughly what year did you get into the construction business?

A. I want to say it was around 2014, 2015.

Q. So you've been doing it about six, seven years?

A. Yes.

Q. Do you like it?

A. Love it.

Q. Tell the court why.

A. Well, because you work with your hands. I like to tear up things and put them back together so.

Q. You do a little bit of that work around your own house now, right?

A. Yes, sir.

**45**

EP Subpoena Response 011962

Q. And what kind of construction generally?

A. Commercial, restaurants, clubs, that type of stuff.

Q. And I'm going to give you another warning. You're doing a great job slowing down but also let me try to finish the question, so if the State asks you any questions, it makes it easier for this young woman as well.

What kind of hours do you work?

A. I work from 6 A M to 2:30 P M, Monday through Friday.

Q. Full-time work, paid?

A. Yes.

Q. All right. So is it fair to characterize with the exception of the year for the parole violation since you've been out of prison in September 2010 you have been working full-time, paid work for rough -- with that exception 12 years?

A. Yes, sir.

Q. What do you like to do in your free time?

A. Right now I just like to go home and stay at home. I fixed my house, spend, you know, time with my son. We're both working in the morning so most of the time we're both home in the afternoons.

**46**

EP Subpoena Response 011963

Q. Spend time with your grandson?

A. Yes.

Q. What do you like to do with your grandson?

A. We like go to the park, you know, ice cream, take him to get an ice cream, stuff like that, things that kids like to do.

Q. And were you able to maintain a relationship with your son Gabriele during the 17 years of your incarceration?

A. Yes.

Q. How were you able to do that?

A. Well, my mom used to -- she had a phone line especially for me where I just call him and keep contact with him.

Q. So it was mostly during via phone?

A. Via phone.

Q. Were there in-person visits?

A. Yes, there were but it was kind of hard because him at such a young age once it was time to leave he didn't want to leave. So it was hard for me trying to push him away, trying to make him go with his mom. It was hurting me.

Q. So there came a point where you asked --

MS. BOWDEN: Objection, Judge, the relevance to

**47**

the topic at hand, which is is he innocent by a preponderance of the evidence, is not advanced by what occurred while he was incarcerated.

THE COURT: Response to the objection.

MR. TEPFER: My response is I will move on.

THE COURT: Sustained. Move on.

BY MR. TEPFER:

Q. All right. I want to now turn back to the arrest for the murder of Monica Roman in June 1993. Okay.

A. Okay.

Q. Now, Mr. Iglesias, did you commit the murder of Monica Roman?

A. No, I didn't.

Q. Are you innocent of that crime?

A. Yes, sir, I'm innocent.

Q. Were you present --

A. No, I was not.

Q. Let me finish.

Were you present when that crime occurred?

A. No, I was not.

Q. Did you have any knowledge prior to the commission of that crime that it was going to occur?

A. No, sir.

**48**

EP Subpoena Response 011965

Q. Did you have any knowledge after the commission of the crime who committed the crime?

A. No, sir.

Q. Did you aid or help anyone in the commission of the crime?

A. No, sir.

Q. Did you have anything to do with the murder and shooting of Monica Roman whatsoever?

A. No, sir, I don't.

Q. Do you have any idea who committed that crime?

A. I have no idea, sir.

Q. At the time of your arrest on June 21st, 1993, had you ever heard of Monica Roman?

A. No, I have not.

Q. I want to talk -- you had a trial in this case, correct?

A. Yes, sir.

Q. Jury trial?

A. Jury trial.

Q. I want to talk a little bit about that. That was in December of 1994?

A. Yes.

Q. Did you testify at that trial?

A. Yes, I did.

**49**

EP Subpoena Response 011966

Q. Do you recall the subject of that testimony?

A. Not clearly but -- I'm sorry, your Honor.

Q. Would you like some water or anything?

A. Yes, please.

(Brief pause.)

THE WITNESS: Thank you, your Honor.

THE COURT: Take the time you need.

BY MR. TEPFER:

Q. Ready to proceed?

A. Yes.

Q. I asked you if you recalled the subject of your testimony?

A. Yes.

Q. Can you tell the court what you recall?

A. I recall telling the jury that I was sorry for the murder of Monica Roman but I had nothing to do with it, I was innocent of the charges they were bringing against me.

Q. Okay. And we had a court reporter, there was a court reporter at that trial as well, correct?

A. Yes.

Q. And did you in fact say -- and this is PV87 of the record, quote, I'm sorry for the death of the girl but I had nothing to do with it?

50

EP Subpoena Response 011967

A. Yes, sir.

Q. Now, were you nevertheless -- you already testified you were nevertheless convicted of the crime against Monica Roman?

A. Yes, sir.

Q. And after that happened was there a sentencing hearing?

A. Yes, sir.

Q. And you were present at that sentencing hearing?

A. I was.

Q. There was a court reporter there as well, correct?

A. Correct.

Q. Okay. And do you remember -- well, let me start here.

Do you remember giving a statement, I'm not asking what that statement is but do you remember giving a statement at that sentencing hearing?

A. Yes.

Q. Now, prior to you giving that statement, do you remember the attorneys, the prosecutors and the defense got to say a few things?

A. Yes.

51

EP Subpoena Response 011968

Q. Do you recall the prosecutor prior to you giving your statement asking this court to sentence you to between 60 and 100 years in prison?

A. Yes, I do.

Q. Okay. And then the judge shortly after that asked if you wanted to say anything?

A. Yes.

Q. And did you say something?

A. Yes, I did.

Q. Can you recall as you sit here today what you said?

A. I said that I'm -- my condolences to Monica Roman and I know and the Lord knows that I had nothing to do with this crime.

Q. And there was again, and I'm going to quote it because there was a court reporter there and you tell me if this is accurate what you said, this is TAA22 of the record, quote, I would like to say that I apologize and I'm sorry for what happened to the young lady and I send my condolences to the family but I would like to say I had nothing to do with it and the Lord knows I had nothing to do with it. That's all I got to say. Did you say that?

A. Yes, sir.

**52**

Q. And why did you say that?

A. Because I'm innocent. I was innocent of the crime they were trying to charge me with.

Q. You were sentenced to prison for this conviction?

A. Yes, I was.

Q. Testified to that, what -- do you recall what your sentence was?

A. Thirty-six years.

Q. Now, if the mittimus says it was 35 years, do you have any reason to dispute that?

A. No.

Q. Okay. And did you complete the entirety of your sentence?

A. Yes, I did, sir.

Q. And you testified you were released on September 11, 2010. So how long -- and then the other year -- well, let's start there.

How long were you in prison from the time of -- the time you first went into incarceration through your release on parole?

A. It was 17 years 9 months.

Q. Okay. And then you said roughly another year?

A. Another year, parole violation.

EP Subpoena Response 011970

Q. Let me ask you this. At the time of your arrest, prior to your conviction, was there any period of time where you were out of custody?

A. No.

Q. Now, we alluded to this previously or we just did, while you were out on parole you did get arrested, correct?

A. Yes.

Q. I think you said it was a DUI, is that right?

A. Correct.

Q. Can you tell the court a little bit about the circumstances of that DUI, which I think you said was 20 months after you were released?

A. Twenty months after I was released. Like I said I was incarcerated for so long, then I went home and they put me on a band for 20 -- it was supposed to be 3 years parole and 3 years on house arrest. So after 22 months they took -- they cut the band off, and I got overwhelmed. I went out and I caught the DUI.

Q. And I think everyone in here knows what we mean by band, but when you say band do you mean some sort of monitor for electronic monitoring?

A. Yes. A leg monitor, yes.

Q. Did you in fact plead guilty to that DUI?

**54**

EP Subpoena Response 011971

A. Yes, I did.

Q. You took responsibility for it?

A. Yes, I did.

Q. And subsequent to that, have you had any other conflicts with the law?

A. Well, five years after that I caught a reckless driving.

Q. Can you tell the court a little bit about the circumstances of that reckless driving?

A. Yeah. Well, my mom had just passed away and I didn't know how to take it. I didn't know how to take that and it was hard on me because my mom was my everything, you know, and it was just like -- I was lost without her. She waited for me for 18 years.

Q. Okay. So the record is clear it was not a felony, this was a misdemeanor, reckless driving?

A. Yes, sir.

Q. You in fact pled guilty to that and took responsibility?

A. Yes, sir.

Q. And since that misdemeanor, which I believe was -- is it correct that was in 2015?

A. Yes, sir.

Q. Have you had any other conflicts with the law

55

EP Subpoena Response 011972

in the seven years since then?

A. No, I have not.

Q. No arrests?

A. No arrests.

Q. Okay. Now, you talked about losing your mother when you were out. When you were in prison, did you lose any other loved ones?

MS. BOWDEN: Objection.

THE COURT: Basis?

MS. BOWDEN: Judge, the basis again is --

THE COURT: Relevance?

MS. BOWDEN: -- relevance.

THE COURT: Thank you.

Response.

MR. TEPFER: My response is this is going to get into that he has not voluntarily brought about his conviction by making any statements and it's a preliminary question, then we'll get to the subsequent question.

THE COURT: Okay. Repeat the question again.

MR. TEPFER: The question is did you lose any loved ones while you were in prison.

THE COURT: How does that go to whether or not he voluntarily brought about his own conviction?

**56**

EP Subpoena Response 011973

MR. TEPFER: Well, if I could proffer, the subsequent question would be, I believe his answer is going to relate to the loss of his father and I know that was very difficult for him and that he did not take any steps to falsely admit to the crime or any other steps to attempt to be released through clemency or anything along those lines by making any additions. So it is a preliminary question to address that part of the statute.

THE COURT: Sustained.

BY MR. TEPFER:

Q. At any time when you were in prison for this crime, did you ever admit responsibility for the crime?

A. No, I did not.

Q. At any time while you were on parole or even after your parole, have you ever admitted responsibility for this crime?

A. No, I haven't.

Q. Now, I want to refer again back to the arrest in 1993. Okay.

A. Yes, sir.

Q. You were arrested in June of 1993, roughly 2 weeks after the murder?

A. Yes, sir.

57

EP Subpoena Response 011974

Q. When you were arrested do you -- what happened when you were arrested? Were you taken anywhere?

A. Yes, I was taken to a police station.

Q. And were you questioned by any officers at the police station?

A. Yes, I was.

Q. Were you questioned about the Roman shooting?

A. Yes.

Q. Okay. Do you recall any particular officers who questioned you?

A. Yes, Officer Guevara and Halvorsen.

Q. Did you say Officer Guevara and Halvorsen?

A. Yes.

Q. And based on your conversations with these detectives, did it appear to you that they were the lead investigators in this case?

A. Yes.

Q. All right. And, Mr. Iglesias, had you ever met Reynaldo Guevara or Detective Guevara prior to your arrest?

A. No, I had not.

Q. Mr. Iglesias, had you ever met Detective Ernest Halvorsen prior to your arrest?

A. No, I haven't.

**58**

EP Subpoena Response 011975

Q. Now, did either of these detectives -- let me strike that.

Did Detective Guevara ask you where you were on June 7, 1993, when you were arrested two weeks later?

A. Yes, he did.

Q. What did you tell him?

A. That I didn't remember.

Q. Say that again?

A. That I didn't remember where I was at.

Q. And why couldn't you remember or why did you tell him that? How about that?

A. Why did I tell him that I didn't remember?

Q. Uh-huh.

A. I didn't remember where I was at.

Q. Did you keep a calendar or a diary of your whereabouts in June of 1993?

A. No, I don't.

Q. Did you ever tell Detective Guevara when you were arrested and being questioned by him that at 4:00 p.m. on that day you were out on the street near the boy's club at Sawyer and Palmer with your friends or right by the crime scene?

A. No, I did not.

EP Subpoena Response 011976

Q. Now, if Guevara testified at your criminal trial that you told him that at the police station during your questioning, was that truthful testimony from Detective Guevara?

A. No, it was not.

Q. Now, at your trial did you present any testimony that we call an alibi?

A. No, I did not.

Q. And why not?

A. Because I was innocent. I got -- I was an innocent man, why should I try to prove my innocence?

Q. Did you know when -- by -- did you know where you were, by the time you testified at your criminal trial in December of 1994, did you at that point know where you were on June 7, 1993, at around 4 P M?

A. No, I don't, sir.

Q. Now, the period after your arrest before trial you already testified that you were in custody, correct?

A. Yes, sir.

Q. And that was in Cook County Jail?

A. Yes.

Q. During that time period in custody did you encounter or meet anyone named Francisco Vicente?

60

EP Subpoena Response 011977

A. Yes, I did.

Q. Do you recall when that was?

A. I don't recall exactly the date but I know it was a day that I was going to court.

Q. So where is it that you encountered him? Was it in this building?

A. Yes.

Q. Okay. Do you recall where in this building?

A. Division 10.

Q. Oh, so it was in -- you said Division 10?

A. Division 10.

Q. So it was in the jail?

A. Yes.

Q. I see.

All right. And how is it that you encountered Francisco Vicente in Division 10?

A. We was going to court, and I got introduced to him by my cellmate.

Q. Okay. Do you remember your cellmate's name?

A. Jesus Velasquez.

Q. Do you know where Jesus Velasquez is today?

A. He passed.

Q. He passed away?

A. Yes.

**61**

EP Subpoena Response 011978

Q. Prior to getting introduced by Jesus Velasquez to Francisco Vicente, had you ever met Francisco Vicente before?

A. No, I have not.

Q. Never spoken to him before?

A. Never.

Q. When you were introduced to him at that point at Division 10, did you speak to Francisco Vicente?

A. Yes.

Q. Did you admit the crime to him when you were speaking to him at Division 10 that time you met him?

A. No.

Q. What did you guys talk about?

A. Well, like I said we had court. So he asked me what was I locked up for and I told him I was being accused of murder of Monica Roman, that I had nothing to do with it.

Q. Sir, did you say you told Francisco Vicente that -- the name of the woman that you were accused of murdering and told him that you had nothing to do with it?

A. Yes.

Q. So if Francisco Vicente -- you remember Francisco Vicente testifying at your trial?

**62**

EP Subpoena Response 011979

A. Yes, sir.

Q. And generally speaking he testified that you admitted the Monica Roman murder to him, correct?

A. That's what he said, yes.

Q. Was that truthful testimony?

A. It was not.

Q. Okay. Now, I want to bring up trial Exhibit 9, this was the State's trial Exhibit 9 for the record.

Do you see that up on the big screen there?

A. Yes.

Q. Do you want to -- if I can approach, your Honor, with a print out copy, if you'd like.

THE COURT: Is there a number?

MR. TEPFER: It's not because it's a trial exhibit.

THE COURT: Okay.

BY MR. TEPFER:

Q. Now, do you recognize this picture?

A. Yes.

Q. What is it?

A. It's a picture of myself.

Q. Do you know when it was taken?

A. Sometime in June 1993.

Q. Does that photo fairly and accurately portray

**63**

EP Subpoena Response 011980

what you looked like in June of 1993?

A. Yes.

Q. It was taken at the police station, right?

A. Yes.

Q. And I want to show you what looks like in those photos that you have two earrings in both ears, is that correct?

A. Yes, sir.

Q. Do you recall when you -- I call them double piercings, double piercings in both ears, right?

A. Yes.

Q. Do you recall -- and they're loops, is that fairly accurate, fairly large?

A. Right.

Q. Are they similar to what you're wearing today?

A. Very similar.

Q. Very similar.

Okay. Now, do you recall how old were you when you got those -- your ears pierced like that?

A. I was in my teens.

Q. You were a teenager?

A. Yes.

Q. And when you were arrested you were about 24 in this photo, right?

**64**

EP Subpoena Response 011981

A. Yes.

Q. Now, after you got those and when you got your ears pierced, double pierced, did you do them all together at the same time?

A. Yes.

Q. So all four of those holes so-to-speak?

A. Yes, sir.

Q. Now, after you got those double pierces, how often prior to your incarceration -- so prior to your arrest, prior to this day, did you wear those earrings?

A. Every day.

Q. Every day?

A. Every day.

Q. You never took out those earrings that you got as a teenager?

A. Never.

Q. Okay. Why?

A. It's my style. I just like to wear earrings.

Q. It's your thing?

A. Yes.

Q. Now, did you wear them while you were incarcerated?

A. Well, while incarcerated, the cones, you break little pieces of cones, a piece of cone and you stick

**65**

EP Subpoena Response 011982

them in your earlobes so they can stay open.

Q. But did you wear those actual hoop earrings?

A. While incarcerated?

Q. Yes.

A. No, you can't wear those.

Q. Can't wear those.

Okay. But when you were released from custody in 2010, you're wearing them today, did you start wearing them again?

A. Yes.

Q. How often do you wear them from the time of your release excluding the time that you were placed back in custody until today?

A. Every day.

Q. Same ones you're wearing today every day?

A. Yes, sir.

Q. Why?

A. Like I said I like my earrings.

Q. Now, I'm going to go back to your conviction real quick, and I'm tying this up, we're close to the end.

After your conviction in or around December 1994, did you file what we call a direct appeal?

A. Yes.

**66**

EP Subpoena Response 011983

Q. And you had an attorney for that?

A. Yes.

Q. And was that successful?

A. That was not.

Q. And when you were incarcerated, did you file a postconviction petition shortly after your direct appeal was unsuccessful?

A. Yes.

Q. And did anyone help you with that?

A. Yes, a paralegal, one of the inmates, paralegal.

Q. And when you say paralegal, an inmate in the department of corrections who has experience with legal filings?

A. Yes, sir.

Q. And then was that successful?

A. No, it was not.

Q. And then in 2005 did you file what we call here a successive postconviction petition?

A. Yes.

Q. Okay. And that petition remained pending for quite some time, right?

A. Yes, it did.

Q. Was that petition resolved by the time you were

**67**

EP Subpoena Response 011984

released in 2010?

A. No.

Q. Okay. Was that petition resolved by the time you were released on parole entirely?

A. No.

Q. Okay. So in 2013 roughly it was still pending?

A. It was still pending.

Q. And then in or around 2017 to 2018, did you contact our office and ask for representation on your postconviction petition?

A. Yes, I did.

Q. So that was 25 years or so after your arrest, 8 years after you had gotten out of prison, done with parole, why did you contact our office for help with that postconviction petition?

A. Because I still wanted to prove my innocence.

Q. Why did you -- okay. Sorry. Okay.

Now, you were ultimately successful in that postconviction petition?

A. Yes.

Q. And in January 2019 your conviction was vacated and all charges were dropped?

A. Yes, sir.

Q. Okay. What did that moment in January of 2019

**68**

EP Subpoena Response 011985

mean to you?

A. Man, it was a relief, like pressure was released off your shoulders. It was just something that I've been waiting for for what, almost 30 years.

Q. And here you are back in court asking again -- again voluntarily in court seeking a petition for -- seeking a certificate of innocence, why?

A. Once again so I could prove my innocence and show my kid, my son that all along his dad has been innocent, you know, and just for self-fulfillment, just to, you know --

Q. All right. Thank you, Mr. Iglesias.

MR. TEPFER: I have no further questions.

THE COURT: Cross-examination?

CROSS-EXAMINATION

BY MS. BOWDEN

Q. Back in June of 1993 you were a member of the Imperial Gangsters street gang, is that correct?

A. Yes, ma'am.

Q. And while were you working in the gang interruption or intervention program, you were a member of the Imperial Gangsters street gang?

A. Yes, ma'am.

Q. Also at that time you regularly went to the

69

EP Subpoena Response 011986

Boys and Girls Club that was located on the northeast corner of the intersection of Sawyer and Palmer?

A. I used to go to the boys and girls club to go play basketball, yes, ma'am.

Q. And that was on a daily basis?

A. No, we only go play basketball whenever they give us the opportunity to go play basketball.

Q. How often would you go?

A. We would go maybe once, twice a week. It really depends -- like I said, it would depend, whenever they had open rooms they'd let us go play.

Q. I want to talk about your trial -- your testimony here on the trial. You testified on Friday December 16 of 1994 during the trial, your trial, on these charges, is that correct?

A. Yes, ma'am.

Q. And when you were testifying you testified under oath?

A. Yes, ma'am.

Q. Now, were you asked these questions and did you give these answers:

Question. And as matter of fact you used to hang out in the area of Sawyer and Palmer, is that correct?

**70**

EP Subpoena Response 011987

Answer. I used to hang out in the area of Sawyer and Palmer.

Question. Yes.

Answer. I used to go to the Boys Club in the area of Sawyer and Palmer.

Question. Isn't it a fact that you used to hang out in that area?

Answer. I used to hang out in the area, yes, I did.

Question. And your daily activities consisted of hanging out in that area, is that correct?

Answer. Yes.

Were you asked that series of questions and did you give those answers?

MR. TEPFER: Objection.

MS. BOWDEN: Page V97 and 98 of the trial.

THE COURT: Okay. What was the objection?

MR. TEPFER: It's not impeaching.

THE COURT: Response.

MS. BOWDEN: Question, and did your daily activities consists of hanging out in that area, is that correct? Answer. Yes. I asked whether or not he went there on a daily basis and he said no.

THE COURT: Hanging out versus whether he went

71

EP Subpoena Response 011988

there every day.  One second.

You know, I don't find this to be impeaching. He already said he hung out in that area.  And so the initial question as to -- I think where I was looking for the impeachment was whether he actually played basketball every day with the Boys and Girls Club but the other factor --

MS. BOWDEN:  That's fine, Judge.

THE COURT:  -- understood him to --

MS. BOWDEN:  -- I'll change --

THE COURT:  Excuse me.

-- I understood him to be admitting that he did hang in that area.  I mean he acknowledged that, so I also do not find that impeaching.

BY MS. BOWDEN:

Q.  Were you in the area of Palmer and Sawyer on a daily basis?

A.  On a daily basis, no.

Q.  Were you asked the question:

Question.  And your daily activities consisted of hanging out in that area, is that correct?

And did you give this answer?

Answer.  Yes.

A.  Well, my daily activities consists of -- see,

**72**

EP Subpoena Response 011989

if I was working at --

THE COURT: Hang on. Hang on.

This calls for a yes or no answer and then your lawyer will be able to give you an opportunity to explain if that is part of, you know, your case. So answer that question.

THE WITNESS: Can you repeat the question?

BY MS. BOWDEN:

Q. Were you asked this question and did you give this answer:

And your daily activities consisted of hanging out in that area, is that correct?

Answer. Yes.

A. Yes.

Q. Okay.

MS. BOWDEN: Nothing further.

THE COURT: Redirect?

REDIRECT EXAMINATION

BY MR. TEPFER:

Q. Mr. Iglesias, it sounded like you wanted to say something regarding your testimony on the daily activities, so if you'd like, please, go ahead.

MS. BOWDEN: Objection.

THE COURT: Sustained.

73

EP Subpoena Response 011990

BY MR. TEPFER:

Q. Mr. Iglesias, did you hang out in the area of -- at the Boys Club on a daily basis in 1993?

A. No.

Q. Why did you answer the question at your trial that your daily activities consisted of hanging out in that area?

A. If I was working for the gang prevention program, I got to be around this area in order for me to talk to kids or whoever. This is my area where I was assigned to work at by from the Imperial Gangsters at the time, this is the area that I was working with.

Q. So if I'm understanding your daily activities did include being in that area?

A. Yes.

Q. But your daily activities did not include hanging out in that area?

A. Exactly.

Q. And how do you define hanging out?

A. How do I define hanging out?

Q. Sure.

A. Just hanging out, being careless in the streets.

Q. Something different than working in the area?

**74**

EP Subpoena Response 011991

A. Yes, sir.

Q. All right. I understand now. Thank you.

MR. TEPFER: I have no further questions.

THE COURT: Okay. Thank you.

And then you may step down.

THE WITNESS: Thank you, ma'am.

MR. TEPFER: We're going to proceed via a short video now I believe unless you think you want to take a break. I don't know.

THE COURT: How long is the video?

MR. TEPFER: Should be less than 10 minutes.

THE COURT: Let's see the video.

MR. TEPFER: Thank you. If we can have just one moment.

(Whereupon, a video was played.)

MR. TEPFER: Perhaps if we can take a break and we can try to work this out.

THE COURT: All right. When you say take our break, you mean like a lunch break now?

MR. TEPFER: That would be my suggestion for the court reporter although we're fine. We can take whatever time is appropriate for all parties in the courtroom.

THE COURT: Okay. I understand. Give you one

**75**

hour break.  Let's resume at 1:30.

MR. TEPFER:  Thank you.

(Lunch break.)

THE COURT:  Continue with the case.  This is a petition for certificate of innocence.  Both parties, counsel are present in open court, in person as previously, and if all parties are ready, we'll continue.

MR. TEPFER:  Thank you, your Honor.

One housekeeping matter.  We referred to some trial exhibits earlier and save for the photo array that was used in this case we have printed out copies, colored copies and tendered to the State all the trial exhibits, I will -- I think at a later -- prior ruling, printed out copy of the photo arrays as well.

May I approach and give this to you?

THE COURT:  You certainly may.

State, is there any objection or concern at this point?

MS. BOWDEN:  No.

THE COURT:  All right.

MR. TEPFER:  And the only other housekeeping matter, at the Cierra(phonetic) hearing when I said -- with the designated portions in that binder I gave you,

**76**

EP Subpoena Response 011993

it's just marked as an exhibit.  Again, it's just demonstrative.  So if we can mark that as Exhibit 83, which I previously tendered to your Honor, I have a little sticker for you.

THE COURT:  -- trial Exhibit 9 is it?

MR. TEPFER:  No, I'm sorry.  The Trial Exhibit 9 is going to be encompassed in what I just gave you.  It's the binder that has the designated portions of the videos we're going to play.

THE COURT:  Exhibit 83.

MR. TEPFER:  And with that our next witness will proceed via deposition testimony.  We're going to play a portion of it.  It's Detective Santopadre, who you heard during opening was originally assigned as the detective in this case for a couple of weeks.

May I proceed?

THE COURT:  State, ready?

MS. BOWDEN:  Yes.

THE COURT:  Please, proceed.

(Whereupon, a video was played of the testimony of Detective Santopadre.)

MR. TEPFER:  Next witness is a Zoom witness, Dr. Nancy Franklin.

MS. BOWDEN:  Judge, before we get to this witness,

**77**

EP Subpoena Response 011994

I'm going to object to a portion of what I anticipate is her testimony based upon what has been submitted and tendered to me as part of discovery. I did receive a report entitled Polaroid Fairness Assessment, where it appears that this witness conducted some type of experiment with the evidence in this case in a public forum on the Internet without the permission of the court and intends to use this experiment for which there is no scientific basis that has been tendered to render an opinion regarding the photo identification procedure that was used in this case.

And I'm objecting to any -- to the use of this -- any testimony concerning this experiment that was conducted based upon, Number 1, there is no scientific basis. There has been no Frye hearing or establishment of the foundation for this experiment.

And, secondly, that this experiment was conducted with evidence in this case in a public forum without the permission of the court.

THE COURT: Okay. Counsel?

MR. TEPFER: Well, I'll take the second one first.

She only used publicly available documents, impounded evidence, trial exhibits, that were in this case. So I'm uncertain of the objection on that point.

EP Subpoena Response 011995

And as far as the former, she is going to testify that this is an experiment that's regularly practiced in her field and they can voir dire on that issue.

THE COURT: What is the relevance?

MR. TEPFER: The relevance is she is going to testify that this was -- based on this experiment, which is regularly used in her field, that it was a biased photo array, even if unintentionally, but it is a -- as Mr. Swaminathan put it in opening, a photo array that's steered towards one individual and that individual was Geraldo Iglesias.

THE COURT: And, okay, let me just ask some preliminary questions.

This is for this court then to reach that conclusion, the purpose is to introduce this testimony of your witness to persuade the court that this photo array is unduly suggestive?

MR. TEPFER: Essentially, yes, your Honor. That is correct. And it's not a -- we're not saying it's -- we're not moving to suppress the photo array. We're long past that. But we're saying it goes to the weight that should be given to the photo identification of these witnesses from that array and subsequently lineup

**79**

identifications and in-court identifications.

THE COURT: Is this the sole purpose of the expert today?

MR. TEPFER: I'm not entirely sure I understand your question. This fairness assessment is not the sole purpose of the expert, no.

THE COURT: And it's just a proffer. What else you anticipate to provide evidence as to which aspect of the claim?

MR. TEPFER: Sure. Can I ask Ms. Brady to present that since she is presenting the witness?

THE COURT: Absolutely.

MR. TEPFER: Thank you very much.

MS. BRADY: Good afternoon, your Honor.

THE COURT: Good afternoon.

MS. BRADY: So Dr. Nancy Franklin has written a report that was attached to the petition for a certificate of innocence outlining all of the factors that can lead to false and inaccurate eyewitness identification, which is what we're asserting happened in this case. She is an expert in the field of eyewitness identification, false memory, false -- inaccurate eyewitness identification. So she is going to talk about how memories are formed, the adverse

**80**

conditions that can lead to a likelihood of inaccurate identification and the factors as applied in this case which showed -- or at least she will offer opinions on the factors that could have led to inaccurate identifications, suggestive identifications that we're asserting here.

THE COURT: And this is with respect to witnesses Ochoa and -- was it -- Rodriguez?

MS. BRADY: Yes.

THE COURT: So certainly that is information that would be relevant to the issues before the court. The experiment on the -- I'm a little less convinced that that offer is something that would be helpful to this court's decision to determine as to whether the lineup was unduly suggestive.

MS. BRADY: Sure. So Dr. Franklin can testify about how she performed -- it's called a fairness study. They're standard in her field. It's a way of determining whether identification procedures are suggestive on accident. So if -- as is very obvious if you had an eyewitness identify a white person and then there was a photo array that had only people who weren't white -- one white person, that would be unduly suggestive. It would steer the witness towards picking

81

EP Subpoena Response 011998

the only white person in the lineup.

And what we're asserting is that that was exactly what happened with Mr. Ochoa and Mr. Rodriguez and how this particular photo array had the effect of steering them to pick Mr. Iglesias.

THE COURT: Okay. Well, why don't we proceed with the witness' testimony. I don't know the -- I continue to question the significance or really the helpfulness of that particular area. I think there has been a lot of research developed and laws changed as a consequence of issues of suggestiveness during the identification process particularly with photo lineups and how they're presented and who the witnesses are viewing and the race of those individuals versus the race of the individual they're attempting to identify, you know, the impact of the circumstances, the opportunity, et cetera. There has been quite a bit of development in the area and so I do remain uncertain as to how helpful this specific portion of the testimony you would seek to introduce would be to me, the trier of fact, in this case, in this circumstance. So I would really want the focus of the testimony to be more toward that which impacts the witness identifications if that would provide you some guidance but I think -- and it's not an issue of, you

**82**

know, you know, the second concern about the use of these photos and these random experiments, it's just -- I don't know that it would -- I'm saying I doubt it's helpfulness to this court's determination.

MS. BRADY: I will keep the questioning on that topic very brief, just a couple of questions.

THE COURT: Well, my ruling is I don't find it would be helpful to the court.

Okay. So let me get the --

MS. BRADY: And, your Honor, before -- off the record.

(Off the record.)

THE COURT: Good afternoon.

THE WITNESS: Good afternoon.

THE COURT: The attorneys are going to consult with you briefly before we resume. I'm going to take like a 2 minute recess and vacate the room so that you -- let's give her about 5 minutes, and then, State, I don't mean to give you a hassle about it either but if we can let her consult privately with her witness before we get underway, that would help us.

MR. TEPFER: I mean, we don't have any objection if we just tell her right now.

THE COURT: Oh, you don't?

**83**

EP Subpoena Response 012000

MR. TEPFER: No.

THE COURT: Okay. Fine. Great. Go ahead.

Off the record.

(Off the record.)

DR. NANCY FRANKLIN,

called as a witness on behalf of the Petitioner,

being first duly sworn, was examined and testified

as follows:

DIRECT EXAMINATION

BY MS. BRADY:

Q. Good afternoon, Dr. Franklin. State your full name and spell it for the record.

A. Yes. I'm happy to.

And, I'm so sorry to give you the feedback still that I'm having trouble hearing you but I did hear that question.

My name is Nancy Franklin.

Q. And, Dr. Franklin, what is your profession?

A. I'm currently an emeritus faculty member at Stoney Brook University in New York. I was on faculty in the psychology department for 30 years, and I retired in the summer of 2019 and have since served as an eyewitness identification and memory expert full-time.

**84**

EP Subpoena Response 012001

Q. And can you, please, tell us what an eyewitness identification and memory expert does in laymen's terms?

A. I didn't hear the very end of that question. What an eyewitness identification and memory expert does?

Q. In laymen's terms.

A. In laymen's terms. Thank you.

I am typically consulted on facts of a criminal case that involves eyewitness evidence and I assess the facts of the case for the presence of factors that had been studied that are known to impact eyewitness reliability.

Q. And does your area of study also include false memory?

A. It does, yes.

Q. Can you tell the court what false memory is?

A. Yeah.

So false memory involves errors within memories, in addition to memories that are false, sort of whole cloth. Memories consists of multiple details, many of which were encoded into memory incorrectly in the first place or were sort of woven in after the fact either because of postevent information that is wrong

85

but got incorporated anyways or because, for example, self-suggestion or inference led to additional details being woven in and false memory refers to any of those details being in error.

Q. And how long have you been studying eyewitness identification and memory -- and false memory?

A. Well, I can -- my field is memory and has always been since the mid 1980s, and eyewitness identification and eyewitness memory are simply a subset of that area of specialization that I've specialized in it since my undergraduate years and then that was the focus of my specialization as a Ph.D. student and then, you know, my focus of research after --

Q. And what steps do you take to make certain that in addition to your 30 years of experience you keep yourself current in the field?

A. There is several ways I keep myself current. I still communicate regularly with colleagues. I still regularly read scholarly journals in this field where colleagues publish their research. So that is sort of the cutting edge, you know, current developments within the field. I regularly attend conferences although in the last couple of years during the pandemic that has

86

EP Subpoena Response 012003

been a little bit funky, but that is -- you know, this is still very much my field and those are the primary ways that any member of the field would keep current.

Q. Have you published any of your own studies?

A. Yes.

Q. On what topic?

A. That was a primary responsibility during my years as a faculty member because Stoney Brook University is a research one university, that is actually the most important obligation of faculty members is to be a principal investigator of a lab, to train Ph.D. students as well as master's students, honor students and conduct published research.

Q. And on what topics have you published your own studies?

A. Again, my primary area is memory and so it has been memory and memory areas including eyewitness memory and eyewitness identification but not exclusive to that.

Q. Have you also published any of your own studies on inflated confidence?

A. I missed that again.

Q. Sure.

Have you ever published any of your own

**87**

EP Subpoena Response 012004

studies on inflated confidence?

A. I'm sorry. I'm having -- really having trouble hearing.

Q. Have you published any of your own studies on inflated confidence?

A. Inflated confidence, yes, I have. Confidence with eyewitnesses -- inflated confidence over time is actually the rule in that field that witnesses tend to become more confident simply over time thinking about rehearsing their memory of the event, answering questions about the event, but also very typically eyewitnesses are exposed to additional factors that systematically tend to influence confidence as well.

And I'm so sorry you had such a hard time asking that question.

Q. I will do my best to speak loudly.

And have you ever testified in court before?

A. Have I ever testified before?

Q. In court, yes.

A. In court, yes. -- times.

THE COURT: I'm sorry. That will need to be repeated. How many times?

THE WITNESS: Close to 75 times in court.

THE COURT: Thank you.

88

EP Subpoena Response 012005

BY MS. BRADY:

Q. And you're here today because we as counsel for the criminal defendant invited you to consult on this case, is that right?

A. That's right.

Q. And you prepared a written report?

A. I did.

Q. And have you ever been invited by the prosecution to testify?

A. I haven't, no.

Q. Would you testify for the prosecution if asked?

MS. BOWDEN: Objection.

THE WITNESS: Yeah, of course.

THE COURT: Hang on.

Basis?

MS. BOWDEN: Speculation.

THE COURT: Response to the objection.

MS. BRADY: I think it is entirely relevant to her qualifications and bias.

THE COURT: Okay. I will allow the testimony that she would be willing to testify for the prosecution. Overruled.

BY MS. BRADY:

Q. And, Dr. Franklin, did you review any materials

**89**

as you prepared your report and to prepare for your testimony?

A. Yes, I did.

Q. What materials did you review?

A. I reviewed the police handwritten notes and reports, photos associated with the crime scene, 7 of the 8 photos used in the arrays presented to Mr. Ochoa and Mr. Rodriguez.

I was also provided with photographs of Mr. Iglesias by you that -- that I was told had been taken within a year of the case. I saw photos of the 5 person and 6 person live lineups that the two identified eyewitnesses were presented with and I reviewed trial testimony from Detective Guevara, the two identifying eyewitnesses, Mr. Ochoa, Mr. Rodriguez, also Daniel Sanchez, who was one of the victims in the back seat of the car next to Mr. Rodriguez, Jose Zuniga(phonetic), who was a responding officer. I think that may have been all of the trial testimony.

And in addition a deposition taken in May of last year of John Santopadre, who was involved in investigating the case.

Q. Now, I'm going to ask you some questions about how people form memories generally speaking.

90

Some people believe that memory works like a video camera, is that an accurate belief?

A. No, not at all. So a video camera records everything. It records accurately and then it stores that information in its totality without loss. And all of those things are very much not how human memory works.

Human memory has some very severe bottlenecks from the very beginning with attention and perception and so very little of a situation actually is attended through and perceived for any chance to be put into memory. The subset of information that is perceived may be perceived with some inaccuracies. Things that are perceived may not make it into memory, you know, they may be lost before any sort of memory is encoded, and whatever fraction of information gets put into memory is subject to forgetting, which sets in immediately with the sharpest rates of loss in the minutes and hours after the event and continue to decay over time.

THE COURT: And if I can object here just briefly. On behalf of the petitioner, counsel, were there other questions that you wanted to ask and then tender the witness to the State for voir dire or are you moving or

91

EP Subpoena Response 012008

asking the court to find that she is an expert in the area without --

MS. BRADY: I think we would move the court to find the expert qualified.

THE COURT: To find that she is an expert in what specifically?

MS. BRADY: The field of eyewitness identification and memory.

THE COURT: State?

MR. HOOPER: Judge, we have no questions and we accept her as an expert in that field.

THE COURT: Okay. Thank you.

We'll now proceed.

BY MS. BRADY:

Q. So Dr. Franklin --

A. Just one last thing to add to that list of ways that people --

MR. HOOPER: Objection, Judge --

THE WITNESS: -- is that --

THE COURT: Wait one second.

And are you known as Dr. Franklin or do you just go by Ms. Franklin?

THE WITNESS: Doctor or Professor Franklin.

THE COURT: All right. Thank you.

**92**

EP Subpoena Response 012009

So wait one second. You can't just volunteer information. You have to be asked a specific question. So I did pause the proceedings just to insure that there were no objections to your being qualified as an expert in the field of eyewitness identification and memory, and the State has indicated there is no such objection. I will make the determination, the information that has been submitted beforehand and what the court has heard today that you are qualified as such, and I do realize that some of your answers may be a little longer but I'm going to ask you to try as best you can to more succinctly state the point so that counsel can direct you, that's what we call direct examination, to direct you to the key points needed to support their claim.

So with that I believe she wanted to provide some additional information. Would you ask a question so that she may?

MS. BRADY: Yes.

BY MS. BRADY:

Q. So I had asked you earlier if witness memory behaves like a video camera and you had explained some of the reasons why it doesn't.

Are there any additional reasons why memory does not act like a video camera?

93

EP Subpoena Response 012010

A. Yes. So in addition to the loss of information over time, that sort of leaves holes in their brain that are available to be filled in by postevent information. Video cameras doesn't have that characteristic. Human memory does. It sort of begs to be embellished and altered over time.

Q. You used the word encoding. What does the word encoding mean in your line of work?

A. Thank you.

Yes. So encoding means forming a memory.

Q. And have you and other researchers in your field identified specific factors that effect an eyewitnesses ability to encode a face?

A. Yes. And I'm happy to continue. I just don't want to runoff without appropriate questions. So should I -- should I say more about how memory is affected for faces?

Q. Yes, please.

Can you tell us some of the factors that affect a witness' ability to encode a face?

A. Yes.

Well, so the first -- sorry, the most important foundational piece of evidence here is the finding in a broad range of studies that people can

**94**

EP Subpoena Response 012011

treat truly familiar faces quite differently from how they treat stranger's faces. So while we're very good at identifying, for example, our mother or our best friend even with a brief glimpse, under the very best of circumstances we're actually quite poor at processing stranger's faces so that we can make an identification of them. These are categorically different styles of cognitive processing that we devote to truly familiar versus not yet familiar faces.

So, for example, some of this research has involved a lot of exposure to someone, a long conversation in close proximity, no stress, you know, no obstruction of any of your features, and the person -- (unintelligently) and immediately there is an identification -- (unintelligible).

So a lot of things here quite optimized and under those circumstances people are typically about 50 percent accurate at making a correct identification and about 25 percent likely to make a false identification. And with the other 25 percent rejecting the photo array.

So already we have pretty unremarkable performance.

Q. Even under ideal conditions, right?

**95**

EP Subpoena Response 012012

A. Well, those are as ideal as you can get. We can get more ideal by taking the memory component out of it entirely so that you have, for example, a face staying at the top of a computer screen, and that becomes the face you're trying to identify.

THE COURT: Hang on one second.

There is an objection as to narrative, which is, you know, continuing to speak and provide information beyond that required to answer the crux of the question.

So I do want to encourage you again, counsel, to be more direct and I think we all understand that sometimes a response from an expert won't lend itself to a tidy, you know, 1 or 2 sentence response, however, I do want to interject to avoid the continuing sustaining of a narrative and I think it is a fascinating subject and there is not someone here who wouldn't be fascinated by a lot of the intricate details. The point is we are in proceedings. It does need to be focused and addressed to what is really, you know, the point of what you're being asked.

So I'd ask you not necessarily to volunteer an example of what you're saying unless you're prompted to do so by the attorney questioning, okay, if that

96

EP Subpoena Response 012013

helps.

THE WITNESS: I'm so sorry to keep making you tell me that.

THE COURT: Well, as I said, it is a -- I think it is understood the nature of the work lends itself to more of a discussion framework than it would be one to respond to direct questioning but as nearly as best you can I do want to direct you to try to think about all of those concepts that you may want to bring forth to support the answer, pull them together in your head and give as concise a response as possible, and allow the lawyer to direct you to expound as needed.

THE WITNESS: Yes. Thank you.

THE COURT: All right. So the narrative objection is sustained. They will stop at that point and proceed. Go ahead.

BY MS. BRADY:

Q. Dr. Franklin, can you tell us how the amount of time that a witness looks at a face impacts his or her ability to remember and identify that face?

A. Yes. Duration of exposure has been found to not only impact the likelihood of a correct identification, when the actual perpetrator is present, but it also impacts the rate of false identifications

**97**

EP Subpoena Response 012014

when the perpetrator is not --

Q. And are you -- I didn't catch the last thing that you said.

A. Well, I'll wait for the next question about that.

Q. Okay. Are you aware of any studies regarding simulated robberies that would shed light on a witness' ability to remember a face after viewing someone for 12 seconds?

A. Yes. So you're referring to Memon, Hope and Bull. Yes, the participant saw a video of a simulated robbery with 12 seconds exposure in close range of the perpetrator and they were given an identification task afterward.

Q. And what were the results of the identification task?

A. When the perpetrator wasn't present people still chose to make an identification. This is very typical in this field, where witnesses are prone to choices, and in not having had a sufficient opportunity to form a memory for the face in those 12 seconds choosing can also lead to false identification. In this case it was 90 percent false identification.

Q. And can you tell us how the viewing distance

**98**

EP Subpoena Response 012015

impacts a witness' ability to remember a face?

A. Yes. So similar sort of story. This is another perceptual factor that impacts quality of view and with long distances could be the information that reaches the individual -- excuse me -- visual system is reducing quality, reducing information such that at, for example, 20 yards false identifications are reaching levels that approach or exceed correct identifications, depending on the -- the article that you cite. The range of correct and false identifications are approaching each other at about that range.

Q. And is there an ideal viewing distance?

A. An ideal viewing distance has been found to be about 6 feet.

Q. And can you tell us how stress impacts an eyewitness' ability to remember a face?

A. Yeah. So stress puts the cognitive system in a different mood where cognitive resources are now directed toward survival oriented information. So, you know, how do I defend myself? How do I get out of here, looking directly at the actual threat to monitor it, again, you know, increasing one's ability to survive the situation. What that means is that

**99**

EP Subpoena Response 012016

intention is directed away from the face and the perpetrator. And what we find is that a face seen under a high level of stress is less likely to be correctly identified and, you know, same theme I mentioned a couple of times already, false identifications are increased under extreme levels of stress. For example, where the person is actually fearing for their safety, false identifications have been found to be about twice the level of correct IDs.

Q. And whether the perpetrator of a crime has a weapon does that impact a eyewitness' ability to remember their face?

A. It does for two possible reasons. One is that a weapon might increase stress levels. We just talked about stress. And the other is that weapons capture attention. That is actually something I mentioned a moment ago as well. That is the thing that is most appropriate to monitor if you're going to survive the situation. And when weapons draw attention then attention is less able to be directed toward the face of the perpetrator, and once again lower rates of correct I Ds, higher rates of false I Ds.

Q. And you touched on that a little bit earlier but can you explain how the time between an event and

100

the identification procedure impacts the accuracy of the identification?

A. Yes. So again reiterating actually the sharpest declines are immediately after the event, but that decay continues over time. With longer delays from the point of seeing the perpetrator's face to being presented with an identification procedure we see higher rates of false identifications.

That's associated with the two facts that I've mentioned already. One, that whatever it was that was put into memory in the first place is degrading even further and the other being that witnesses still have a tendency to choose and so with less information to go by it becomes more likely that a false I D will be made.

Q. And are you aware of any studies that have identified how often false identifications occur when there are several weeks between an event and an identification procedure?

A. Yes. Most studies are delayed, have not involved weeks or months, but some have, and, for example, Egan(phonetic) has found that at a 21 day delay false identifications reached 62 percent. In that same study false identifications reached

101

EP Subpoena Response 012018

48 percent by 2 days. So we're seeing continued losses but most of that loss that takes place well before the 3 weeks have elapsed.

Q. And does the research give us any insight on whether eyewitnesses tend to overestimate their ability to identify a perpetrator?

A. Yes. Very often witnesses will report that they will be able to identify and then -- when we do this in the lab and we know who the real perpetrator is we can easily test whether they're accurate in their assessment, and they're very often overconfident in their ability to do that, and they're overconfident in the conditions over which they had seen a perpetrator's face during the initial event. They will intend to overestimate duration of exposure and underestimate distance so that contributes to this confidence.

Q. And you said a little bit earlier that if a person is identifying someone they know very well that they're better at it. What does the reverse tell us about an eyewitness' ability to identify people they've never seen before?

A. Well, most of the research that I've talked about so far involves stranger identification, where under the very best of circumstances people are making

102

EP Subpoena Response 012019

high rates of false I Ds and then we start weaving in these additional challenges. For example, poor perception, weapon focused. When I say poor perception, I mean poor perceptional conditions, stress and weapon focus, we are adding further to the likelihood of false identification.

Q. And when are eyewitness' memories of a perpetrator most accurate?

A. They're most accurate to the extent that they are accurate they're most accurate immediately after an event ends.

Q. So under the best circumstances, ideal viewing conditions, good length of time, ideal conditions, how good are eyewitnesses at making accurate identifications?

MS. BOWDEN: Objection.

MR. HOOPER: Objection.

THE COURT: Basis?

MR. HOOPER: Judge, it really calls for speculation. It doesn't appear to be tied to any study or narrative.

THE COURT: Could you speak up?

MR. HOOPER: Sorry. This is really -- sounds like it's based on speculation rather than opinion based on

**103**

EP Subpoena Response 012020

the studies that she is referring to.

THE COURT: All right. So it sounds that way.

Response.

MS. BRADY: Sure, I can ask a more specific question about a particular study. That might help.

THE COURT: Or it may help to after she answers to ask the basis of the answer, then if it does not pass mustard it can be stricken and disregarded. So, we had qualified her as an expert. I don't know that she would just be randomly offering opinions without a basis but at this point I'm going to overrule the objection, but it is subject to renewal and with the testimony being stricken if it is not supported.

Okay. All right. Proceed.

BY MS. BRADY:

Q. Dr. Franklin, are you aware of any studies that help us figure out how good witnesses are at identifying people that they're actually looking at?

A. Yes.

Q. And can you tell us about that study?

A. Yes. So this would involve rather than asking people to remember a stranger's face they're asking to making a perceptual match involving a stranger's face. And this is work by Megreya and his colleagues where

**104**

the target face remains, you know, large and visible at the top of the computer screen with a 10 photo array beneath that face and the job of the participant in the study is to say whether another photo of the same person taken on the same day is among the ten or to say that he is not there and obviously if they're saying that he is there to name which photo it is. So this allows people to look up and down and up and down as much as they want, take as much time as they want. There is no memory involved. And that is another form of examining how well people can process stranger's faces this time even before memory, you know, comes into play.

Q. And in the conditions that you've described how often are people picking the wrong person?

A. One-third of the time. When the actual second photo taken the same day is not present. This is another instance of people having a strong tendency to choose and they choose the face that they think is the best match to the face at the top of the screen believing that that actually is the same person.

Q. So that's when -- and I just want to make sure I'm understanding. When subject participants are actually looking at a photo and trying to match that

105

EP Subpoena Response 012022

photo to 10 other photos and they're still wrong a third of the time, is that right?

A. Yeah. They're specifically wrong making a false identification a third of the time.

Q. So generally speaking then what happens to the accuracy of eyewitness identifications when you add in adverse viewing factors and length of time between seeing the perpetrator and doing the identification process?

A. Yeah. All of -- all of the factors that we've discussed add to the risk of a false identification beyond the best of circumstances that we just discussed.

Q. Is there a compounding affect between adverse viewing factors?

A. Yes.

Q. And law enforcement use identification procedures like photo arrays and live lineups to have eyewitnesses make identifications.

Are there any factors during an actual identification procedure that can cause an eyewitness to misidentify the perpetrator?

A. Yes. To misidentify an innocent suspect?

Q. Yes.

**106**

EP Subpoena Response 012023

A. Yes.

Q. What are those factors?

A. Well, there are several. For example, starting with non-blind administration of an I D procedure. Shall I explain what that is?

Q. Yes, please.

A. We know from, you know, research -- (unintelligible) real broad than eyewitness identification that the administrator of the test can inadvertently influence the subject of a test, either towards an answer, away from a particular answer, and someone who is motivated as the administrator of a test is at particular risk of again inadvertently steering, and they can do that in very subtle ways.

So, for example, with eyewitness identification, looking at the police suspect or seeing that the witness is looking at the suspect and looking expectedly towards the witness, or in some other way emphasizing the particular person who they know to be the suspect. If a witness is considering someone who is not a suspect, a pregnant pause will often influence that person to reconsider and change their mind. You know, it's the reason why professional poker players might wear sunglasses because this is so easy to do

107

EP Subpoena Response 012024

without meaning to.  It so easily influences the other person and this can all happen under the radar with neither recognizing that this is taking place and so research has demonstrated that non-blind administration of I D procedures actually creates substantial risk of not just a false identification but specifically of a police suspect.

Q.  And what about the -- the quality of the fillers or the similarities of the fillers in the lineup?

A.  The purpose of fillers in a photo array or lineup is to protect an innocent suspect from spurious guesses that might lead a witness to identify them simply because they are the clear best choice and so for those fillers to fulfil that role they need to sufficiently match the witness' description or sufficiently in other ways prevent the suspect from unduly standing out.  And when fillers deviate in even a single characteristic they allow witnesses to rule them out and to be pointed toward the police suspect not because of a memory that they have that matches the suspect but basically by process of elimination.

Q.  And what if a witness sees a photo array and then sits -- or participates in a live lineup

108

EP Subpoena Response 012025

procedure, can that impact the identification as well?

A. Yeah, in a number of ways.

Q. Can you explain how?

A. Sure.

Well, so, first, if the witness had been in one way or another led to make an identification during an initial procedure, then the presence of that same person in the later procedure even if that second procedure is conducted more pristinely with great fillers and is conducted with blind administrators, you know, the damage has been done, and it's very likely that the witness will continue to identify the same person.

So there is a, you know, contamination of memory that is at very high risk as a result of prior experience with I D procedures.

There is also the fact that there is just that one guy who is appearing again and simply having seen that person's face before will increase a sense of familiarity that would lead that person to stand out, which we call exposure affects. The witness doesn't need to recognize that that same person is appearing again, you know, that sense of familiarity again came from something that happens under the radar but if they

109

EP Subpoena Response 012026

do notice that it's the same person being shown to them again that invites an inference that that must be the guy, and I will stop there.

Q. And you said that people have a tendency to choose. You've said that a couple of times. Can you explain what that means?

A. In an identification procedure whether or not the actual perpetrator or target is present in the procedure, people tend to make relative comparisons among the faces that are in front of them, and basically look for the guy who looks most like the guy, whatever they can remember, they're looking for whomever is a best match and if that best match that they settle upon is, you know, deemed good enough they will tend to go ahead and choose that person. So great risk with eyewitness identification tends to be false I Ds rather than the opposite error of failing to identify the correct person.

Q. And in a situation where a witness was perhaps making a false identification due to some combination of factors that you just discussed, would the eyewitness necessarily know that they've been led to identify the wrong person?

A. No. Again, this is can all happen entirely

110

EP Subpoena Response 012027

under the radar.  You know, people are very easily influenced by social cues and by prior experiences. Judgment can be impacted and memory can be impacted.

So you see a face in a photo array, you see that face again in a live lineup, you know, with exposure to that face it will come to be the face that a witness is likely to very clearly remember and to be able to sort of close their eyes and imagine that person as the perpetrator of the crime.  It gets --

Q.  Go ahead.

Okay.  Could an eyewitness really believe that he has identified the correct person out of a lineup even though he had picked the wrong person?

A.  Absolutely, yes.

Q.  What would happened in your experience, based on your research, to that conviction over time?

A.  Well, certainty as mentioned before tends to inflate over time and certainty can actually, you know, particularly in a procedure that has bias built into it, and different sources of bias again are, you know, a non-blind administrator's potentially bias comment, unfair fillers, these things can lead to very high certainty from that moment from, you know, the initial identification potentially of an innocent suspect.  So

**111**

EP Subpoena Response 012028

it is not that confidence must start low and then increase over time. It can actually artificially be produced to be very high early on in the investigation and then we can typically count on that very high confidence to be sustained over time.

Q. And can that happen even to well-meaning witnesses who want to do the right thing?

A. Absolutely. Yeah. This is -- these are memory phenomena. This is, you know, what -- how memory can be contaminated.

Q. All right. So let's talk about the two eyewitnesses in this particular case that we're here about.

So can you tell me about the conditions under which Hugo Rodriguez was able to view the shooter's face?

A. Yes. Mr. Rodriguez was sitting in the middle of the back seat of the car that was shot at. The shooter started in front of the car on the left side, on the driver's side, and Mr. Rodriguez did not see the shooting itself. He immediately ducked down after the initial shot. At one point he popped up and saw the shooter through the rear left side window, passenger -- the rear left side window. He ducked down again and at

112

some point he looked behind the car through a rear window of the car and saw the perpetrator leaving the scene. So he was looking at that point at the back of the shooter. So this was moments and with increasing distance as the car was moving forward and the perpetrator was going in the other direction with potentially lots of visual obstructions. The roof of the car, if you're in the back looking, you know, at someone who is standing near the front of the car, it's not clear how much of a perpetrator you'd be able to see.

There is also, you know, multiple people in the front seat. When he was looking out the side window, Daniel Sanchez was between him and the shooter. When he looked out the back of the car, it's not clear whether he was able to see the perpetrator's face at all at that point but if the perpetrator was visible the view out the back window had a blind obstructing it. So that would have been yet another challenge.

Q. And do we know for the record anywhere how long Hugo Rodriguez said he had the opportunity to view the shooter's face?

A. We know something about what he estimated. I believe he estimated about 10 seconds. It's not clear

113

what exactly was 10 seconds, and it's research -- (unintelligible) out on whether that estimate is accurate but I believe he estimated at one point that something less than about 10 seconds.

Q. And did you read Mr. Rodriguez' deposition that he gave just last year?

A. I don't believe I read that.

Q. And do we know if Mr. Rodriguez saw the shooter's weapon?

MS. BOWDEN: Objection.

THE WITNESS: Can you ask that again?

BY MS. BRADY:

Q. Sure.

Do we know if Mr. Rodriguez saw the shooter's weapon?

THE COURT: There is an objection. Go ahead, State.

MS. BOWDEN: Judge, what would be the basis of that knowledge?

THE COURT: Are you asking me something or are you objecting?

MS. BOWDEN: I am objecting to foundation.

MS. BRADY: Dr. Franklin testified at the beginning of her discussion today that she reviewed

**114**

EP Subpoena Response 012031

trial testimony from both Mr. Rodriguez and Mr. Ochoa where he explains what he looked at when he had the opportunity to view the shooting.

THE COURT: Okay. So that is proffered as the foundation upon which she will provide the testimony.

State, any further argument?

MS. BOWDEN: No.

THE COURT: Overruled. The witness may answer.

THE WITNESS: Yes. Mr. Rodriguez testified that he saw the shooter put something into his waistband.

BY MS. BRADY:

Q. And can you relay to the court what happens to an eyewitness' gaze when they're watching a crime take place and there is a threat or a stressful situation or a weapon?

A. Yes. Weapons tend to attract attention and because Mr. Rodriguez mentioned that he saw something being tucked into the waistband, clearly he gave attention to that action by the perpetrator. Waistband is, you know, a couple feet below the face. It's likely that watching that event take place drew attention away from being able to process the perpetrator's face as effectively as he might have had he not seen that weapon.

**115**

EP Subpoena Response 012032

MR. HOOPER: Objection.

THE COURT: Okay. There is another objection.

State the basis.

MR. HOOPER: The expert has opined that a witness likely observed something that is a specific finding that the finder of fact must make.

THE COURT: Response to that objection.

MS. BRADY: I can ask Dr. Franklin to provide the basis for her opinion.

THE COURT: Okay. And certainly the expert's testimony is here being proffered to aid but the court makes the determinations that the court has to make so you may inquire further.

BY MS. BRADY:

Q. Dr. Franklin, you said that eyewitnesses are likely to look at weapons instead of faces.

Do you have any studies or data that support that?

A. Sure. Yes.

Q. Can you provide them?

A. Yeah. This is a field of study. If I were to point you towards one paper in particular, it would be the meta-analysis that was conducted in 2013 by Jonathan Fawcett. What a meta-analysis is is a

**116**

EP Subpoena Response 012033

specific -- set of statistical analyses on all of the studies to date on a particular topic. So it's sort of a gold standard in any scientific field. And Fawcett conducted a meta-analysis on weapon focus and found it to being a highly reliable phenomenon that generalizes to several different kinds of weapons. I think probably the most commonly studied one has been guns. Fawcett found that this affect holds both for events involving weapons in the lab and also in real world crimes. So to the extent that you can compare, for example, robberies with a weapon versus robberies without a weapon that are otherwise, you know, very similar to each other except for that one factor. Error rates, false identification increase if there is a weapon present.

Q. And did Mr. Rodriguez testify about whether he recognized the shooter?

A. He did testify that he did not recognize the shooter.

Q. And how did Mr. Rodriguez initially describe the shooter?

A. He initially described him as a white Hispanic, light skinned, according to Officer Zuniga, he emphasized light complexion several times. He

117

EP Subpoena Response 012034

described the shooter as a teenager, 17, 18 years old. 5'7" I believe. He also characterized that height as short in his trial testimony.

Q. And does that match Mr. Iglesias' description?

A. No, it does not fit Mr. Iglesias' actually in any of those characteristics.

MR. HOOPER: Objection to that, Judge.

THE COURT: I'm going to sustain that.

BY MS. BRADY:

Q. So to summarize then Hugo Rodriguez ducked down behind a seat, looked at the shooter through a set of blinds, saw a weapon, had just seen his friend get shot and looked for a handful of seconds as the shooter was turning to turn away; how would you characterize Hugo Rodriguez' opportunity to encode the shooter's face?

A. Quite poor.

Q. And how would you characterize Hugo Rodriguez' likely to making an accurate identification?

A. Quite low.

Q. And would it be possible for him to really believe he got a good look at the shooter even though he didn't?

A. You're asking would it be possible for him to believe he got a good look at the shooter?

118

EP Subpoena Response 012035

Q. Yes.

A. Absolutely right.

Q. Let's talk about Rosendo Ochoa and his opportunity to encode the shooter's face.

So under what conditions did Mr. Ochoa view the shooter?

A. Mr. Ochoa was on a second floor level of a nearby building but he saw the shooter initially behind a tree and according to his own estimate the distance from him to the shooter who was across the street was up to 40 yards. He actually had been -- Mr. Ochoa had been looking out the window for several minutes but at something else. There was a person showing a baby to the group down at the street level and his ability to see the shooter appeared to have been actually quite short as well during this incident. So he saw the shooter emerge from behind a tree, by his testimony the gun immediately came out and immediately the shooting began. He characterized the shooter as standing and looking at the car for several seconds to -- I can't remember -- something like 20 seconds, in contrast to how other witnesses describe the event unfolding. And then he described the shooter running with his back toward Mr. Ochoa.

**119**

EP Subpoena Response 012036

Q. And based on the research about how witnesses overestimate the amount of time that they actual view, do you think that Mr. Ochoa's estimate of how long he had to view the shooting was too high?

A. We do know something about accuracy that witnesses -- that -- the accuracy of a witness' estimate of viewing conditions. Broadly they tend to basically make themselves better witnesses that they actually had been by substantially overestimating duration of exposure and substantially underestimating distance of exposure.

So, for example, several researchers, and this includes Boekhout, also Loftus, also Cutler, these are all different studies, have found that with an event that is surprising, stressful and not under the witness' control there is a tendency to estimate duration as being 2 to 3 times what it actually had been.

In terms of distance, witnesses tend to underestimate distance, the findings vary but, for example, Wiest found that the underestimates are about 15 percent.

Q. And did Mr. Ochoa say whether he recognized the shooter?

**120**

EP Subpoena Response 012037

A. He said he did not.

Q. Okay. How would you describe Mr. Ochoa's opportunity to encode the shooter's face?

A. It was also quite poor.

Q. And are you aware of any research that shows the likelihood of a false identifications from this distance under optimal conditions?

A. Yes. So, again, the optimal distance is about 6 feet. Beyond about 40 feet errors in particular false identifications start increasing percipitiously and so by the time you reach this estimated 40 yards correct identifications and false identifications are approaching each other. Some research, for example, by Lindsay has found that false identifications are -- (unintelligible) correct I D at that distance.

Q. So given that both of these witnesses has as you say a very poor opportunity to encode the shooter's face, I'm going to ask you some questions about how did they end up picking Mr. Iglesias out of the lineup.

So can you tell us what kind of identification procedures were used with these witnesses?

A. Yeah. Both witnesses were given first a photo array. I understand that it included 8 photos. I was

**121**

only shown 7 of what I was told were 8 photos.  Both of them saw the photo array first and both of them then were given a live lineup.

Q.  And do you recall about how far after the shooting the identification procedures took place?

A.  I might be in error on this but my best memory is that Mr. Ochoa got a photo array after 15 days and a live lineup after 16 days.  And Mr. Rodriguez got both of them within about an hour and a half of each other 17 days after the event.

Q.  And were there any factors during the photo lineup shown to Mr. Ochoa that could have led him to falsely identify Mr. Iglesias?

A.  Yes.

Q.  And what were they?

A.  Well, so we have non-blind administration for all of the I D procedures for both witnesses.  And my understanding is that, you know, some of these I D procedures it wasn't just a single non-blind State actor who was present.  When you have multiple State actors present, any one of them if they know who the suspect is might convey, you know, guiding cues to a witness.  So we have compounding risks with the presence of multiple non-blind State actors present.

122

So that is one issue.

The second issue is the issue of filler fairness, and whether to what degree the presence of these other array members actually protected Mr. Iglesias from spurious guesses. You know, an 8 pack is larger than a typical photo array in other jurisdictions, and so you might think that would be even more protective but it's quite the opposite when you have very poor fillers next to those fillers someone who might be thought of as good enough looks even better as a candidate and in the presence of them witnesses are more inclined to choose whoever it is that they think is the best match.

Q. And I believe Mr. Ochoa testified that their perpetrator was in the photos, in the set of photos, would that increase the likelihood of him falsely identifying someone?

A. Sorry. Can you say that again?

Q. Mr. Ochoa testified that he was told that the perpetrator was in the photos that he viewed. Would that impact whether he falsely identified someone?

A. Absolutely, yes. So with biassing instructions when people already have a tendency to choose but certainly comments made in the context of an I D

123

EP Subpoena Response 012040

procedure can increase a witness' inclination still further to go ahead and make a pick, and that also has been well established in research.

Q. And I believe Mr. Ochoa said that the prosecutor told him he was going a good job. Would that potentially make them more likely to feel confident in his identification?

A. Yes. So you're pointing to yet another factor, which is positive feedback, and even after a witness has made an identification and is, you know, continuing toward participating in the prosecution of the case at any point along the way gets positive feedback about how well they're doing or that they did a good job or, you know, picked the right person, is a profound influence on their confidence. Again this is very well established that something as simple as a smile or good, you identified the perpetrator, both of these haven't been actually studied, both of them tend to spike eyewitness confidence in -- (unintelligible).

Q. Then both of these eyewitnesses wanted to pick Mr. Iglesias out of a live lineup? Yes?

A. Yes.

Q. Do you consider that reliable evidence that Mr. Iglesias was the shooter?

**124**

EP Subpoena Response 012041

A. I'm sorry, you said more of a question. I'm now hearing my echo so I can't tell whether it's the beginning of my answer or actually the continuing of a question.

Q. No. I'll ask it again.

Both Mr. Ochoa and Mr. Rodriguez identified Mr. Iglesias in a live lineup. Do you consider that to be reliable evidence?

A. Thank you.

The live lineup following the photo array that they both participated in does not add diagnostic evidence in favor of Mr. Iglesias' guilt. Them picking him out of the live lineup was basically a done deal after their exposure to him and their selection of him in the photo array. And, you know, one step further when they're asked to identify him in court these same principles apply.

Q. And are you surprised at all that these witnesses today are still confident in their identification?

A. No, I'm not surprised at all, and I absolutely don't doubt their sincerity.

Q. And does the fact that they're standing by their identification today mean that their

125

EP Subpoena Response 012042

identifications were accurate or reliable?

A. No.

MS. BRADY: I have no further questions.

THE COURT: Thank you, counsel.

Cross-examination by the State.

CROSS-EXAMINATION

BY MR. HOOPER:

Q. Doctor, can you hear me?

A. Say something more.

Q. Can you hear me okay?

A. I can hear you and I know that's the question you're asking me but it's the same issue we started with on direct unfortunately.

Q. All right. Well, let me ask you some questions then.

You can't say today that Rosendo Ochoa got his identification wrong, can you?

A. I can't say today that Mr. Rosendo Ochoa -- and then I lost you.

Q. You cannot say he got the identification wrong, correct?

A. I cannot say he got the identification wrong, in principal, the person could have been right.

Q. And you cannot say that Hugo Rodriguez got his

**126**

EP Subpoena Response 012043

identification wrong, correct?

A. I cannot say that, no.

Q. In fact, you can never say that a witness got an identification correct?

A. I can't say that. I can't speak to reliability. I can speak to how a description and a subsequent identification might be considered in the context of each other but I can't be a finder of fact.

Q. You received police reports to review in this case, is that correct?

A. I'm so sorry. I received?

Q. Police reports.

A. Police reports, yes, sir.

Q. And you reviewed them, correct?

A. I did.

Q. And you received photographs, is that right?

A. I did.

Q. And you reviewed those?

A. I did.

Q. And you reviewed witness statements?

A. Yes.

Q. And you reviewed transcripts from the trial, is that right?

A. I did, yes. And just to clarify witness

**127**

EP Subpoena Response 012044

statements I reviewed --

Q. Ma'am, I have another question for you.

You had knowledge of the facts of this case when you made your opinion, is that right?

A. Yes.

Q. Okay. And in fact you wrote a report in this case, is that correct?

A. That's correct.

Q. And it was 15 pages, is that right?

A. I couldn't tell you.

Q. All right. Isn't it true that you put a summary of the events in your report, do you recall that?

A. I probably did, yes.

Q. But you don't recall?

A. I have the report in front of me, so I can review how I characterize the event itself.

Q. Well, let's move on.

Do you recall putting anything about lighting in your report?

A. I don't believe I did. No. My understanding is that it was daylight.

Q. You consider lighting a relevant factor in an identification?

128

EP Subpoena Response 012045

A. Yes, it's one of several perceptual conditions that would characterize the quality of view, yes, sir.

Q. And in fact that is an important factor, is that right?

A. Yes.

Q. Okay. And what was the lighting during the murder?

A. It was daylight.

Q. Okay. And do you know what affects the building had on the lighting?

A. What affect the building had on the lighting, I'm not sure I understand you.

Q. Okay. Well, let me ask you this. You did not go to the scene of the murder, correct? You did not view it yourself?

A. I missed the last question. I didn't go to the scene of the murder.

Q. And you did not view it yourself, is that correct?

A. I'm sorry. One more time.

Q. I'm sorry. This is -- this is very difficult with the Zoom. I appreciate your patience.

You did not view the scene yourself, is that correct?

**129**

EP Subpoena Response 012046

A. I did not view the scene, no.

Q. Okay. You did in fact never interview the witnesses in this case, is that right?

A. That's right.

Q. You relied the past documentation to form your opinion, is that correct?

A. That's right.

Q. You did no independent analysis of the facts, is that right?

A. You're asking me if I did an independent analysis, yes, I did. You saying --

Q. -- I'm sorry, doctor.

An analysis, an independent analysis of the facts in this case?

A. I did, yes, using the record.

Q. Okay. Regarding a witness' -- you do not know how good or bad their memories are, correct?

A. I don't know what you're asking but I did not conduct any sort of memory tests on either of the witnesses. They would not have been informative.

Q. Would you agree that different people have better memories than other people?

A. Sure.

Q. Okay. But in this case you do not know how

130

EP Subpoena Response 012047

good Rosendo Ochoa's memory is compared to other people, is that correct?

A. Again, that's a very broad question, and, no, I have not conducted any analysis, any testing of Mr. Ochoa's memory.

Q. You don't consider whether Mr. Ochoa or Mr. Rodriguez had a good memory, you do not consider that a factor in an identification?

A. Well, what is at issue here is whether --

Q. My question is do you consider that a factor in the identification?

A. How they would do on a test of memory of something else, no, I don't consider that a factor in assessing the reliability of this identification.

Q. And you don't know how either witness would have handled stress, correct?

A. I don't.

Q. And you would agree that generally people handle stress differently, is that right?

A. Generally brains respond to stress similarly, you know, the same way that everybody's brain has, you know, general principles that that organ, you know, behaves according to.

If you're asking me whether some people find

131

EP Subpoena Response 012048

events -- a sole event to be more stressful than somebody else might find it, I will agree with that.

Q. You don't, from your analysis of the records, you don't know what factors or what things these witnesses were focusing on as the scene unfolded, is that correct?

A. That's correct.

Q. Now, I'm going to talk about some of the experiments you talked about and in general your opinion is -- as it relates to those experiments they were based on experiments that are primarily simulations or research experiments, is that correct?

A. I'm just going to make sure I heard you right, and, your Honor, I'm realizing that when you're moving papers, I think your microphone might be on and it might obscure what the attorney is asking. I think that happened just now.

THE COURT: He'll just repeat it. If ever you can't hear anything, you let us know, like you've been doing and then it will be repeated.

Go ahead.

THE WITNESS: Can you repeat that?

BY MR. HOOPER:

Q. Sure. I'll try to make it more concise.

**132**

EP Subpoena Response 012049

Your opinion is -- primarily based on an experiment that consisted of simulations or research experiments, is that correct?

A. Yeah, most of the research in this field uses well controlled experiments like any scientific field does so that we can know the level of particular factors we're interested in. We can know ground truth. We know who the actual person is who people's memory are tested for.

So, yes, that is the bulk of the research although there is also a subset of this field that investigates real world crimes and generally we found the same patterns.

For example, with weapon focus that I mentioned before, or duration of exposure, these same factors produce the same patterns of error in real world crimes as they do in the labs.

Q. Did you just say that the subjects in those experiments you tested their memory upon them in those experiments? You've tested their memories?

A. Memory for the perpetrator's face, yeah, I mean, so when we're looking to see how does stress or how does distance of viewing impact identifications and reliability we need to test identification.

**133**

EP Subpoena Response 012050

Q. And the subjects in those experiments, those are primarily college students, is that correct?

A. They are, yeah.

Q. And those were paid students, is that right?

A. Those are --

Q. Paid, they were given money to participate in the experiments?

A. Oh, paid, no, typically not.

Q. Some of them were, correct?

A. Rarely, yeah. I mean, typically students who are taking, for example, a psychology course are required as part of the course to participate in some number of experiments so then they can sign up for experiments -- (unintelligible).

Q. So typically they --

A. -- overall --

Q. I'm sorry.

Typically they receive college credit?

A. They receive course credit. So in order to, for example, learn about cognitive psychology or, you know, psychology more broadly if you're taking introductory psych, it's instructive to participate in research to find out what, you know, that looks like, how these studies are conducted and so it's actually

**134**

EP Subpoena Response 012051

got a useful educational value to it in having people participate.

Q. And so those students are typically psychology students, is that what you're saying?

A. Often, yes.

Q. So you're --

A. And when I say psychology that includes, you know, engineering students or premed students or, you know, any major taking introductory psychology as part of their general educational requirement.

Q. Were any of the witnesses in this case college students taking psychology courses?

A. In the Iglesias case I couldn't answer that question.

Q. You would agree that experiments are not like real crimes, correct?

A. I don't know how you mean that so you'd have to be more specific.

Q. Well, the stressors would certainly be different, would you agree with that?

A. Yeah. So the stress in the lab, you know, would not come close to the stress people feel when they see a friend of theirs being shot to death.

Q. And are you aware of any experiment in your

**135**

literature where the witnesses believed they were going to die or could die?

A. The last part, they were going to die or --

Q. Or could die?

A. Or could die, yes.

Q. But they were not threatened with guns in the experiment, is that correct?

A. I couldn't tell you if the people in the research that I am thinking of were ever threatened with guns. I'm very happy to talk about that research if you'd like.

Q. Are you aware of any studies that studied gang members as subjects?

A. Not that I know of, no.

Q. You made a reference to the Megreva, M-E-G-R-E-V-A, study, is that correct?

A. To what? I'm sorry.

Q. Megreva and the rest of -- it's called Megreva, White and Burton, you've made reference to that study, correct?

A. Megreya, yes, that's a paper from 2011.

Q. I'm sorry. So it's M-E-G-R-E-Y-A, is that right?

A. Y-A, yes.

**136**

EP Subpoena Response 012053

Q. And that was a study where people were sat down in front of a computer and asked to identify photographs or computer generated photographs, is that correct?

A. Well, computer -- I mean, they were photographs of real people. This is the study with the face at the top of the screen and the 10 pack below it, and they're looking to answer the question of is there another photo of that same person taken the same day in the 10 pack.

Q. And obviously that was in a controlled environment, is that correct?

A. That's right.

Q. And there was no crime occurring?

A. No crime, everything optimized in terms of quality of view and lack of stress.

Q. And those were college students who took part in that?

A. Those are college students, yes.

Q. I want to reference -- or you referenced another study I want to talk about it. I believe it's Nemon, Hope and Boll, correct me if I'm wrong in the spelling, N-E-M-O-N H-O-P-E and B-O-L-L?

A. That's right, yes.

**137**

EP Subpoena Response 012054

Q.  And you stated that the participants in that study watched a video, is that correct?

A.  That's right.

Q.  But they were not actually threatened during the course of the experiment, were they?

A.  That's right.

Q.  You talked during your direct testimony about the weapon focus affect, correct?

A.  Yes.

Q.  And weapon focus has to do with when a person sees a weapon, in this case it would be a gun, correct?

A.  In this case there was a gun, correct.

Q.  And the weapon focus would be that a person would tend to look at a gun rather than anything else, is that right?  Do I have that right?

A.  That's an oversimplification.

Q.  Okay.  And the reason for that is because a person would feel in danger when they saw a weapon, is that correct?

A.  Well, the weapon tends to capture attention, and that -- there are two reasons that have been found for why it captures attention.  One is because it's threatening.  The other is because it's unusual. People don't normally, you know, see people holding

138

EP Subpoena Response 012055

guns in their daily lives and things that are unusual tend to capture attention as well.

Q. So it's fair to say that the participants in that study were not gang members, correct?

A. I can't speak to that.

Q. Okay. And I believe that study --

A. And there are multiple studies --

Q. Ma'am, can I ask my question, please?

A. -- about that studies --

Q. Okay.

A. -- it is not something I could --

THE COURT: Let me interject to say this, please, wait until the witness finishes the response and I realize there is a slight delay between the ending of the word being carried across the wires, if we can say it like that. So for both of you there does need to be a little bit of a pause in between the, you know, question finishing and then the, you know, the response being given and then after the response is given and the next question. I do understand that it's not traditional to the cross-examination sort of tone but we have to adapt to the equipment we're working with.

MR. HOOPER: Yes, Judge.

THE COURT: Thank you everyone.

**139**

EP Subpoena Response 012056

BY MR. HOOPER:

Q. Doctor, you talked about postevent suggestions, is that correct, during your direct testimony?

A. I'm sorry. I talked about -- and I heard the word suggestion.

Q. Postevent suggestions.

A. Postevent. I did -- I don't know that we used that term but yes, absolutely.

Q. That's the term that you used in your report, is that right?

A. I probably did.

Q. Okay. And you don't know if there were postevent suggestions in this case, correct?

A. There was testimony that reflected postevent suggestions, yes.

Q. What was that testimony?

A. That was testimony by Mr. Ochoa and it was on page R48. He said that day I went to the police station and the detective that called me, that took me over there showed me a lineup, a lineup of 5 persons and he told me that in between those 5 people I could recognize the person that had shot at Monica Roman.

Q. And you did not take that to mean that that was a question?

140

EP Subpoena Response 012057

A. I took that to be -- took it literally.

Q. Let me ask you this question. During these experiments that were conducted, these were all English speakers who were the participants, correct?

A. I'm sorry. They were all English speakers in all research on eyewitness identification?

Q. The ones that -- the research that you're using in your opinion?

A. No.

Q. Okay. And do you know of any experiments that you relied on that involved interpreters or multiple languages?

A. I know of some research involving nonnative speakers and their vulnerability to postevent influences. There is not, as far as I know, a large body of research on the impact of -- did you ask interpreters or did I --

Q. I did say interpreters, yes.

A. I'm sorry. So, I don't know the large body of research on non-English speakers and their interaction with the criminal justice other than their increased vulnerability.

Q. What was Mr. Ochoa's fluency with English?

A. I can't answer that.

141

EP Subpoena Response 012058

Q. And how about Mr. Rodriguez, do you know that?

A. I can't answer that. I do remember a responding officer may have been Zuniga who described broken English. I can't remember which witness he was discussing at that point in his testimony and, you know, in his efforts to interview that witness in the context of those language constraints.

MR. HOOPER: May I have one moment?

THE WITNESS: -- evaluation of their -- of their fluency, I can't do that.

BY MR. HOOPER:

Q. Excuse me. You said earlier that you testified approaching 75 -- approximately 75 trials or approaching 75 trials, is that right?

A. No. What I said was about 75 times, many of these were, for example, postconviction hearings and there were other kinds of proceedings.

Q. Okay. How many of those were for the person originally accused of a crime?

A. I'm sorry. Ask that again.

Q. When you testified were -- how many of those approximately 75 times did you testify for the person originally accused of the crime?

A. (Unintelligible).

142

EP Subpoena Response 012059

Q. Yes.

A. So you're asking how many times I testified for the defense?

Q. Yes.

A. All of them were for the defense.

MR. HOOPER: Judge, one more moment.

(Brief pause.)

BY MR. HOOPER:

Q. Ma'am, in this case are you being paid for your services?

A. No, I'm not.

Q. You're volunteering?

A. I am volunteering. I'm doing --

Q. And in the 75 times that you've testified, did you volunteer in each of those times?

A. Not each of those times, but I tend to volunteer about a thousand hours of my time per year.

Q. How many times have you testified for attorneys for the Exoneration Project?

A. This might be the first. I might be wrong about that but this might be the first time I'm testifying in a case.

Q. How many times have you consulted on cases for the Exoneration Project?

**143**

EP Subpoena Response 012060

A.   There is at least one other that I can think of offhand, and, again, there may be -- I may be underestimating here but it's certainly more than this.

MR. HOOPER:  Okay.  No further questions, Judge.

THE COURT:  Any redirect examination?

MS. BRADY:  No, your Honor.

THE COURT:  All right.  Thank you very much, Professor Franklin.

THE WITNESS:  My pleasure.

THE COURT:  That concludes your testimony.  So thank you very much.

THE WITNESS:  Thank you.  Thank you to everyone for your patience.  I appreciate it.

THE COURT:  All right.  That concludes the Zoom feed.  Do we need like a 5 minute break?

(Off the record.)

THE COURT:  We are back in session.  Please be seated.

Counsel?

MR. TEPFER:  Your Honor, the remainder of our evidence is going to be video deposition testimony.  The next one is Francisco Vicente.  It's about 37 minutes long.  May I proceed?

**144**

EP Subpoena Response 012061

THE COURT:  Please.

(Whereupon, an excerpt of a video was played of the deposition of Francisco Vicente.)

MR. TEPFER:  Next two videos are deposition testimony from Ernest Halvorsen.  You may recall him from the hearing.  He asserted his Fifth Amendment and he did testify in this case briefly about the Iglesias case in the second deposition so we're going to play both portions that relate to Iglesias.

THE COURT:  Approximately how long is each?

MR. TEPFER:  Short, I can double check but the second one I know is 2 minutes long and I think the first one is about that.

THE COURT:  Okay.

(Whereupon, an excerpt segment of a video was played of the deposition of Ernest Halvorsen.)

MR. TEPFER:  That was April 20, 2018, testimony you just heard.

Now, we're going to play about 2 minutes of February 6, 2019, testimony of the same witness.

**145**

EP Subpoena Response 012062

(Whereupon, an excerpt segment of a video
was played of the deposition of
Ernest Halvorsen.)

MR. TEPFER:  And our final -- I'm sorry.  This is testimony from Detective Guevara, former Detective Reynaldo Guevara and this is our last video.

(Whereupon, an excerpt segment of a video
was played of the deposition of
Reynaldo Guevara.)

MR. TEPFER:  Thank you.  With that, subject to discussion of our exhibits, we have no other live or video testimony.

THE COURT:  Okay.  Now, are we seeking to move your exhibits into evidence at this time?

MR. TEPFER:  We are, your Honor.  Let me, if I can, talk about that briefly.

Exhibit 73 is the photo array fairness assessment with Dr. Franklin, given your ruling we're not seeking to admit that.  We're proffering it.  We did seek but we understand your ruling.

THE COURT:  It can stay in.  It's a proffer for if this needs to be appealed but I'm not concerned --

MR. TEPFER:  Perfect.  Thank you, your Honor.

And then Exhibit 83 as I mentioned is a

**146**

demonstrative -- (unintelligible) designation, we're not seeking admissions of fact because we are seeking admissions of the entire depositions that we -- not just the snippets that we played.  That of course includes some exhibits that were thus discussed throughout those depositions.  You saw some snippets.  We did not do a good job of including those exhibits in the designated portions, so we can those to you but we'll be seeking to move the entire depositions into evidence including all of the exhibits that were used and I might just have to supplement that to you, those exhibits from those depositions tomorrow, if that's okay.

THE COURT:  State's position?

MS. BOWDEN:  Judge, at this time I would be moving to strike any of the proffered exhibits regarding events that occurred in other cases regarding Guevara's pressuring or somehow interfering or coercing witnesses to make false identifications.  There has been no evidence presented in the petitioner's case that the witnesses in this case were coerced into making identifications that were against their will, that they weren't making freely and voluntarily because that was their identification.  The caselaw is pretty clear on this, that evidence specifically of Guevara's wrongdoing

147

EP Subpoena Response 012064

in other cases and in these patterns is not admissible in a case unless there is some indication that something to that affect has happened in the instant case and we don't have that here.

THE COURT: You mean with respect to all of the witnesses or Rodriguez --

MS. BOWDEN: Rodriguez and Mr. Ochoa, the eyewitness identifications, speaking specifically of eyewitness identifications as opposed to perhaps a confession or something that is something completely separate. With regard to eyewitness identification there has been no -- there has been no evidence, not even no credible evidence, there has been no evidence presented that Guevara in any way influenced those identifications.

THE COURT: Those two witnesses?

MS. BOWDEN: For those two witnesses, so I would be asking that evidence that has been submitted for that purpose be refused.

THE COURT: Okay. Petitioner?

MR. TEPFER: Sure.

My position is two fold. You did just hear the evidence. Detective Guevara and Detective Halvorsen were asked specific questions about their conduct with

**148**

those two witnesses and they asserted the Fifth Amendment. They are very, very much aware that you may permissibly draw an adverse inference that they did precisely what they refused to answer, so that is the actual evidence of those two witnesses that we have presented and that is what our pattern evidence reflects and these -- on the eyewitness statements.

Now, taking you back several years or a year and a half ago or so, we did have litigation on this question precisely and your ruling was pattern evidence can come in in these certificate of innocence proceedings, which says I'm going to monitor it. I'm going to monitor it and kind of admonish us, counsel, make sure you keep it streamlined, you keep it right and that's exactly what we did. We didn't get up here and present a bunch of other witnesses to talk about how they gave false eyewitness identification statements or how Guevara and Halvorsen forced them to. We don't intend to linger on any of it in closing arguments or in the statements but we have exhibits on it that were filed as part of the previous postconviction filings. You can take them for what they're worth. We'll be spending lots of time in closing arguments and on the other exhibits about what my colleague calls the other

**149**

tools that Guevara used in this case, which you heard directly through Francisco Vicente, or you heard directly through Geraldo Iglesias, in falsifying alibi testimony. So that would be our focus and we are very much guided by your Honor's previous ruling in this case, and if you wanted to add anything --

MR. SWAMINATHAN: I'll only add that, you know, when we had this argument before your Honor on this issue of motion to strike, the conversation at that time was about extraneous forms of pattern evidence outside of the central issues in this case were the eyewitness identification and the abuse of suspects. And so here we're hearing actually a little bit of a different position. On one of the central issues in this case, the eyewitness identifications, the State is now saying we shouldn't be able to present pattern on that central issue. That is a major shift and it's a shift that we don't think is appropriate for very simple reasons. The entire crux of the State's argument that the innocence claim should not be granted is the claim that these are legitimate identifications by these two gentlemen. The eyewitness ID is -- (unintelligible) and it is petitioner's position that those identifications were the product in fact of manipulation and coercion and

150

EP Subpoena Response 012067

that, yes, it is possible that those witnesses do not realize and do not remember the form that manipulation took but in fact it took place. It took place because the identifications were impossible and so on. I won't repeat all of that to your Honor, but of course the centrality of the question is whether or not these officers steered these witnesses and manipulated these witnesses in their identification is a central issue and we do not need to have the witness come in and say, yes, I said I was manipulated for us to be able to present evidence from which your Honor can infer that indeed that is exactly what happened.

So ultimately what I would say is the pattern evidence on whether Guevara and Halvorsen steered and manipulated eyewitness identification is central to the question of whether or not they steered and manipulated eyewitnesses in this case. Pure and simple. And to the extent the argument is it may have taken a slightly different form in this case than other forms to me that is no different than the argument that's failed repeatedly which is, you know, in an abuse case, physical abuse case, if you say, well, the pattern is he punched him with a closed fist but in this case he punched him with an open fist, well, that wouldn't be

151

EP Subpoena Response 012068

relevant pattern evidence. That would be rejected I think by virtually everybody, and to me that is the same kind of analogy that we're making here on the State's and I think it should be rejected.

THE COURT: Thank you.

Any additional argument by the State?

MS. BOWDEN: Judge, the only evidence on this topic cannot come from outside of the case. There are no witnesses that we have heard, have no -- or no allegations that someone felt pressure and refused to go along with it, that anybody did anything untoward. There is nothing in this case that indicates that the influence was had upon these witnesses to make the identifications that they did. There is nothing. And the only evidence that this occurred cannot come from outside of the case. I think that it would be inappropriate to say that these particular witnesses were influenced to falsely identify the petitioner because of something that happened in another case and that is the only thing.

THE COURT: All right. The court has heard arguments presented by both sides, and the court's review and recollection of the evidence that has come forth thus far there actually has been evidence

**152**

presented even with respect to one of the two witnesses, Ochoa and Rodriguez, as to the claim that there was influence or at least the professor, your expert witness talked about the statement that a particular witness and I believe it was Rodriguez made after about what happened in his encounter with the detectives and that was used really to analyze or to provide some support for the claim that it is influenced or it can have an impact on the claim of what a witness remembers as well as the identification process. So there is that, however scant, this isn't, you know, quite the jury instruction analogy when you're certainly determining whether the evidence can be admitted but certainly the court considers whether there is sufficient -- there is a sufficient basis in the record for the arguments, the additional evidence to support claims that are made in the petition and I do find viewing all that I've heard as a whole at this point that there is sufficient evidence or a sufficient basis for this evidence to come in in support of the claim.

Now, the weight it will be given certainly that's for the court to determine but at this point given all that I have heard and the theory under which they are seeking to introduce it I do find that it has

**153**

EP Subpoena Response 012070

been sufficiently supported for its admission. And so I will allow it, and that's not even addressing the -- you know, I think it's kind of more clear with respect to the Vicente testimony but it seemed less so with respect to Ochoa and Rodriguez but understanding the specific theory under which the petitioner seeks to introduce that I do find that this has been supported so I will allow it.

MR. TEPFER: Thank you, your Honor.

With that, with the introduction of -- with the exception of -- argument in Exhibit 73 and 83 we seek admission of the remaining exhibits in front of you.

THE COURT: Okay. At this point over the State's objection because I have heard and considered the objection made and the argument in support, are there any other objections to any of these other exhibits other than the ones we've just discussed?

MS. BOWDEN: No.

THE COURT: So these will be admitted with the exception of 73 and, you know, 83.

MR. TEPFER: With that petitioner rests.

THE COURT: Petitioner has rested.

At this point I am prepared to proceed with

154

EP Subpoena Response 012071

the State's -- the respondent's case, if you are ready.

MS. BOWDEN: We are ready. Judge, I have about an hour and 15 minutes of video from Mr. Rodriguez.

THE COURT: Okay.

MS. BOWDEN: Which would be the substance of my presentation. I then will have -- I think also -- I have the entirety which -- that's only a portion of his actual deposition testimony. I have the entirety as well as some other depositions and documents that I would like the court to review appear on these disks that we'll be submitting.

THE COURT: And what are those of? Also of Rodriguez?

MS. BOWDEN: Okay. So I will be submitting Exhibit Number 1, deposition from September 9, 2021, of Hugo Rodriguez. This includes the video of testimony, the transcripts of the testimony as well as the exhibits shown during the course of that deposition.

THE COURT: State -- I'm sorry. Petitioners, do you have any objection to the Exhibit 1?

MR. TEPFER: No, your Honor.

THE COURT: All right. That will be admitted.

(Exhibit Number 1 was admitted into evidence.)

**155**

EP Subpoena Response 012072

MS. BOWDEN: Exhibit Number 2 is the record on appeal through the trial and sentencing.

THE COURT: You have that on a disk?

MS. BOWDEN: It's on this disk, yes.

THE COURT: Okay. I'm sure there is no objection to that.

MR. TEPFER: There isn't. The only caveat is I would like the entire postconviction record to be put into --

MS. BOWDEN: I don't have that --

MR. TEPFER: -- I think you can take judicial notice that his conviction was vacated, and he also testified to it. All right. No objection.

THE COURT: 2 is admitted by the respondent.

(Exhibit Number 2 was admitted into evidence.)

MS. BOWDEN: Exhibit Number 3 is a deposition from April 27 of 2021 in this case of a person by the name of David Chmieleski, that includes a transcript and the exhibits discussed during the course of the deposition.

THE COURT: All right.

MR. TEPFER: No objection.

THE COURT: 3 will be admitted.

**156**

EP Subpoena Response 012073

(Exhibit Number 3 was admitted into evidence.)

MS. BOWDEN: Exhibit Number 4 is a deposition from April 28 of 2021, of a person named Efrain Moranda, this was a deposition in this matter, Iglesias versus Guevara, City of Chicago, the civil lawsuit that is associated with this.

THE COURT: All right.

MS. BOWDEN: That is the transcript and the exhibits of the deposition.

THE COURT: -- deposition.

MR. TEPFER: No objection.

THE COURT: So Exhibit 4 will be admitted.

(Exhibit Number 4 was admitted into evidence.)

MS. BOWDEN: Exhibit 5, and I believe that the petitioner has also put this in, is the entirety of the Francisco Vicente testimony in Montanez and Serrano versus Guevara, dated November 19, 2018, which I believe you heard a portion of here in court.

THE COURT: All right. Petitioners have no objection, that you agree that can be admitted.

(Exhibit Number 5 was admitted into evidence.)

**157**

EP Subpoena Response 012074

MS. BOWDEN: Also part of Exhibit Number 5 is Francisco Vicente' testimony in that Montanez and Serrano case, it's the third stage P C testimony of Mr. Vicente taken June 17 of 2013.

THE COURT: Okay.

MS. BOWDEN: Just for the court's convenience also on this disk is the People's written objection to petition as well as the associated exhibits, so that is previously been --

THE COURT: All right. And so --

MS. BOWDEN: I also am -- I'm asking that this trial Exhibit Number 7, which was not in the packet that was submitted, I'm going to submit this also for the convenience of the court.

MR. TEPFER: Yes, that is what I promised to get.

MS. BOWDEN: And also for the court's convenience as far as the Hugo Rodriguez' deposition I have correlated the pages of the transcript to the videos that are on the disks so if the court --

THE COURT: Okay.

MS. BOWDEN: -- and then decide they want to watch, you know, you know where to go.

MR. TEPFER: No objection.

THE COURT: All right.

EP Subpoena Response 012075

MS. BOWDEN: Just correlates the page numbers with the video.

THE COURT: Any additional exhibits or items you wish to tender to the court in the respondent's case?

MS. BOWDEN: No.

THE COURT: All of the above admitted without objection. Two disks, single sheet, sorry, one sheet of paper with the page number directives and then trial Exhibit Number 7, a color photo displaying 7 Polaroid shots.

(Exhibit Number 7 was admitted into evidence.)

THE COURT: Okay. And then other than the court's review of all of this is your additional evidence you wish to display the hour and so long video of testimony today?

MS. BOWDEN: A section, yes.

THE COURT: Yes.

MS. BOWDEN: A segment of -- it's like eight hours on the disk. I just want an hour and 15 minutes.

THE COURT: Okay. And then after which -- so today for planning purposes then am I correct that you would want all of this reviewed you all wish before we proceed with the closing arguments in this case?

159

EP Subpoena Response 012076

MS. BOWDEN: That probably would be helpful. I don't know if it would --

THE COURT: One at a time.

MR. TEPFER: Oh, I'm sorry. From our perspective we don't think that is necessary. In the previous hearing we provided all of the information and we closed the same day so we're prepared to close. I know it is very late but tomorrow or later, tonight if you want to.

THE COURT: What is your position, State?

MS. BOWDEN: I believe that it would be helpful for the court to be familiar with the material prior to hearing the arguments. I don't know if you feel that you're familiar enough with the material at this point.

THE COURT: I think I have a strong sense of the -- you know, based on your opening statements as well as what has come forth so far.

MS. BOWDEN: Yes, I would be able to close, Judge.

THE COURT: All right. So then shall we -- shall I observe the video and then we'll take a short break after the video and then you all can close and then I'm going to take some time to make sure that I go through everything exhaustively before I actually rule.

MS. BOWDEN: Okay. For the record, at this time we're starting the video at the timestamp on the video

**160**

EP Subpoena Response 012077

of 1127 -- 11 hour 27 minutes and 2 seconds, I think that is 11 A M, 11:27 A M, on September 9.

THE COURT: Petitioner, do you need to resituate to watch this?

MR. SWAMINATHAN: No, I don't think we need to.

THE COURT: Any objection to it being broadcasts now?

MR. TEPFER: No.

THE COURT: All right. Let's go.

(Whereupon, an excerpt segment of a video was played of the deposition of Hugo Rodriguez.)

MS. BOWDEN: I'm going to stop it here, 12:47 and 14 seconds. As indicated to the court the entire video and the accompanying transcription have been submitted on disk.

THE COURT: Okay. So with the admission of each of the items you've identified and the publishing of this portion of the deposition of Mr. Rodriguez does that conclude the State's evidence?

MS. BOWDEN: It does.

THE COURT: All right. So the State is resting. Is there rebuttal evidence?

MR. TEPFER: No, your Honor, only that we'll be BY

**161**

EP Subpoena Response 012078

referring to other portions of the -- what you saw but we'll highlight those but we're not...

THE COURT: All right. So the petitioners rests in rebuttal.

All right. Do you all need any -- like 5 minutes before we start the arguments or -- I'm going to say this and it might be a little bit of a cramp to your style, we're not going to do hour long arguments both, okay. I want you to confine them to 45 minutes or less and that includes opening and closing and rebuttal rather. Okay. 5 minute recess.

(Short recess.)

THE COURT: Be seated everyone. Thank you.

If you are ready to proceed.

MR. SWAMINATHAN: Thank you.

CLOSING ARGUMENT

BY MR. SWAMINATHAN:

Geraldo Iglesias, you heard him today testify. He testified powerfully of his innocence. He testified not only about his innocence as he has stated it today, he talked about those many moments when he had an opportunity earlier on to plead guilty, to accept some offer, to make some statement incriminating himself to somebody that he committed

**162**

EP Subpoena Response 012079

this crime, and every time he had one of those opportunities he stood up and he reasserted his innocence.  He did it at the criminal trial.  He did it in his allocution.  That is Geraldo Iglesias.

You also heard from Geraldo Iglesias about the man that he was.  This man who was snatched off the streets by Reynaldo Guevara was -- he never fit the profile.  He was -- he had one misdemeanor on his record.  A 24 year old growing up in Humboldt Park.  He was a guy who was working and getting his GED.  He was raising his son.  He was doing the right things.  And you know he -- (unintelligible) say something not only about his innocence but about his character.

Geraldo Iglesias told us something about his character on the stand as well.  He talked about two other instances since he came home from this nightmare, and he told us, yeah, I made some mistakes.  I had some problems with alcohol, trying to deal with the things that happened in my life, and he did something that I felt was really important.  He said I made those mistakes.  I owned up to them.  I pled guilty in those instances.

Geraldo Iglesias never pled guilty in

**163**

EP Subpoena Response 012080

this case. He did the exact opposite. And the reason he did that he made no mistake, he had nothing to own up to. I thought that was a statement about Geraldo Iglesias, his character that I think is important when he talks about who he is, a man who came home, he committed himself to work and to raising his son.

So let's go back. So the question is why, why did Reynaldo Guevara target Geraldo Iglesias of all people? The answer to that question is really simple. We have no idea why. Reynaldo Guevara has asserted the Fifth. Just like Thomas Cierra, Demetrius Johnson and many other of these Guevara witnesses, they have no idea why Guevara chose them. (Unintelligible) -- never fit the profile for whom there was no physical evidence or anything else connecting him to these crimes. So we don't know why he choose these men but what we do know is these men like Geraldo Iglesias, like Thomas Sierra, Demetrius Johnson and others, they fought to prove their innocence for years and years and years.

How, how did Reynaldo Guevara frame Geraldo Iglesias? That's a question we can answer because Guevara's pattern of misconduct is well

**164**

EP Subpoena Response 012081

established, pattern of misconduct that he used in this case is a pattern that -- (unintelligible) all the tools in his toolkit of misconduct he used them in this case.

I cited Johnson, People versus Martinez, the quote is, Guevara's toolbox of coercion is well stocked with a wide variety of tools.

Let's talk about those tools.

When Guevara entered this case -- we're going to talk more about that in a moment, but when he entered the case, what happened? A serendipitous call from a confidential informant that magically cracked the case within 48 hours, boom. That's a classic Guevara pattern. He enters a case that he had nothing to do with and boom, he solves the case just like that because of a serendipitous anonymous call, a confidential informant, whatever it is.

Physical abuse is in order to get somebody -- to get a suspect or a witness to implicate themselves in a crime, that's a classic Guevara pattern. You're going to hear about it. It's in the exhibits that you have. He used it in this case.

Another classic Guevara tool, fabricating

**165**

EP Subpoena Response 012082

eyewitness identifications from witnesses who had not previously been able to make an identification. He did that in this case. He has done that in many other cases.

The fourth tool in the toolbox that he used in this case false alibi statements in order to implicate suspects. In other words, creating false testimony either from those witnesses or himself in order to implicate that person who is a suspect and intentionally -- (unintelligible ) get the outcome he wants at trial.

Those are the tools that Guevara had in his toolkit that he used on Geraldo Iglesias.

So let's talk about in a little more detail in terms of how he used those tools in this case. All right. We're looking again at the crime scene.

I'm going to just really quickly note again the basic locations and when I showed this in the openings, nothing has really changed even if you heard the testimony of Mr. Rodriguez, you saw various exhibits, ultimately what you have is -- it will be discussed and I'll talk a little bit more about some of the testimony about Mr. Rodriguez but

**166**

EP Subpoena Response 012083

ultimately you heard exactly the same thing. Mr. Ochoa is here. Mr. Rodriguez is in this area. He actually changes -- he changes that in his deposition and puts himself back down by this alley and this garage, that wasn't his testimony at the criminal trial but that is a change, but this is ultimately what we're looking at in terms of trying to understand the identifications that were made in this case.

All right. So what I want to talk about now is something I -- (unintelligible) in my opening argument. How did this case evolve? How did it develop? Because one of the critical aspects of this and so many of these Guevara cases is that the case starts out as an investigation by somebody not Guevara and you see what kind of an investigation you get at that stage. This case was led by Detective Santopadre and the other assigned detectives.

Detective Santopadre, you heard his deposition testimony. He talked about the fact that he was the one who interviewed these eyewitnesses. He spoke to Mr. Rodriguez and Mr. Ochoa, and he talked about what his practices were. He talked

167

EP Subpoena Response 012084

about the kind of information he would obtain and did obtain from these witnesses. He talked about the fact that he is a conscientious detective. These are the eyewitnesses. If they got information, of course I want to know what information they have, of course I asked him those questions and of course I write it down. And so he tells us all of that and he says he collects that information and he does exactly what he says, he puts it all into his reports.

So let's look at what happens when Mr. Santopadre talks to these witnesses. He gets two things. He gets either really vague descriptions from the eyewitnesses because they didn't really see much of anything or to the extent he gets any details at all it's details that are inconsistent with Mr. Iglesias.

So let me talk about that. We're looking first at -- this is Exhibit 11, Exhibit 11 is the deposition of Hugo Rodriguez submitted to you by the state's attorney.

So this is the general progress report that was written out by Detective Santopadre when he interviewed Hugo Rodriguez, as you saw it in the

168

EP Subpoena Response 012085

opening, but again this witness, Hugo Rodriguez compared to what you're hearing in deposition 30 years later, when he first talked to the detectives on the day of the crime, who said I am a detective who asks questions, tries to find out what this witness knows, give me your full description of what you saw. This is the description that he gets. After the shooting he saw the offender all black run into the alley. Okay. That's it.

What are the other initial reports in this case? The general investigative case report from when those first beat cops show up at the scene and talk to the witnesses, that first picture you see there is a snippet from the general investigative case report, that is Exhibit 8 to the Hugo Rodriguez deposition. And what do those witnesses state? They describe a shooter who has with black hood overhead. Add that to this matrix of issues.

Franklin talked about these factors that you have to take into consideration. You got somebody with a black hood over his head that is going to obviously have an impact on your ability to view a shooter. And what do they describe? To the

**169**

EP Subpoena Response 012086

extent -- (unintelligible) describe, it's somebody who is 18, 5 foot 7, and light complected.

The next one is the initial report of Rosendo Ochoa. This is the general progress report that Detective Santopadre writes when he is trying to gather all of the information he can from Mr. Ochoa. This is Exhibit 70 in the exhibits that were provided. Rosendo Ochoa was looking out the window and saw somebody who was 17 to 19, 5 foot 5, 135 pounds wearing again same, black hooded sweatshirt.

Okay. Well, so if you take those descriptions that are initially provided to Detective Santopadre and the beat officers, it's either, like I said, extremely vague in the case of Hugo Rodriguez, and in the case of Mr. Ochoa it turns out to be somebody who is light complected, 5 5 to 5 7, 17 to 19, that does not match the description of Geraldo Iglesias. Geraldo Iglesias is 24 years old. He is 5 foot 10, I think it is straight from the arrest report, I'm not making up my own -- this is straight out of the police reports that are in the file that you have. 24 years old, 5 foot 10 and medium to dark complected.

170

EP Subpoena Response 012087

Geraldo Iglesias has never been a man with light complexion.

So I'm going to go through these slides really quickly just on Detective Santopadre's testimony but Exhibit 70 is Detective Santopadre's deposition testimony.

Question. Did you ask the witness if they could make an identification?

Answer. Probably during the interview I would ask that question all the time and what else did he say, I would normally do that.

Next question. When you asked this witness if he could make an identification, if he had said yes, your testimony is that you would have written that down, correct?

Answer. That is right.

Question. Your report, would you agree with me it doesn't say that he indicated that he could make an identification?

Answer. Because the report doesn't say yes, so I -- he did not say that he could make an identification.

And yet on the next page when you completed your interview of Mr. Ochoa based on what

171

he told you about where he was viewing this incident you -- did you have an understanding about whether this was somebody who was going to be able to make an identification or not?

Answer. Well, if I thought he could make an identification, I would have wrote that in the -- in the original report.

Question. So in this case you didn't? Based on what he told you didn't it seem to you that he was going to be able to make an identification, fair?

Answer. Sure.

So Mr. Santopadre says I am making -- (unintelligible) trying to get an identification from somebody if they can make an identification. I talked to this guy. This was not somebody in a position to make an identification. He says this -- that about Mr. Ochoa.

And what does he say about Rodriguez?

Question. Would you agree with me in your interview with him you asked him if he would be able to make -- provide any description of shooter, correct?

Answer. Correct.

**172**

EP Subpoena Response 012089

And all he could tell you is that the shooter was wearing all black, is that correct?

Answer.  That's correct.

And if he had been able to provide any additional information, you would have written that down in your notes, correct?

Answer.  Correct.

So again when Detective Santopadre, a seasoned detective sits down and interviews these two people in person, contemporaneous documents, what they tell them, he has concluded based on what he has learned from these witnesses these are not people in a position to make an identification and that is why the case basically goes cold for 2 weeks because there aren't any meaningful leads.

So of course what happens.  Next thing in the timeline is -- we talked about this -- Guevara enters the picture.  He gets a C I and he writes in a report, he says you know what, I went and talked to Ochoa.  I went back and re-interviewed Mr. Ochoa, because I'm super cop Guevara so maybe I'll learn something different than Detective Santopadre, and super cop Guevara writes in his report now when I talked to Mr. Ochoa he stated, quote, he got a good

**173**

look at the shooter and would be able to identify him if he saw him again. Totally contradicts Santopadre's earlier notes, his earlier reports and Santopadre's testimony.

Who are you going to believe, Detective Guevara or Detective Santopadre? One person has pled the Fifth. One person has answered your questions in a deposition. And of course now that he has got this -- super cop Guevara has now got this new information from Mr. Ochoa whose memory has suddenly improved after meeting with Reynaldo Guevara, that's great because it turns out Guevara, I just happen to actually bring along some photos with me now that you have a much better memory and were able to see the shooter. So here are the photos, he happened to brought with him, and sure enough Ochoa is able to make an identification of Guevara's very suspect and that's it.

Now, we arrest Geraldo Iglesias. He gets his lineup identification. He does the same thing with Hugo Rodriguez. Case closed.

So let's talk about Vicente. The day after the case is purportedly closed Geraldo Iglesias purportedly confesses to Francisco Vicente.

**174**

EP Subpoena Response 012091

Now, there is two sort of interesting timeline pieces to talk about. One is the timeline piece involving all of the other cases involving Vicente. I won't belabor that point. We talked about it in opening. You've heard from Mr. Vicente himself. In a matter of four weeks all of these different people are purportedly confessing to him about different crimes in different cases. Okay. And that on its face doesn't make sense. A guy in the Cook County Jail walking up and just opening up and not only telling you they committed a crime, walking you through the details of these crimes. Silly. If anybody had known that this guy was claiming to have taken confessions from all of these different people in different cases I Ds would have never happened but that is one timeline piece, that's just silly but the other interesting timeline piece is the way this goes down is purportedly Geraldo Iglesias says to Francisco Vicente on June 25th that here is the crime I committed, let me walk you through all of the bad things, he had this conversation in the bullpen.

And then on July 1st you heard Halvorsen when he came off the Fifth, he -- Vicente supposedly

175

tells Halvorsen, Guevara all about this on a day that they're taking him to the grand jury. Tell us about how Geraldo Iglesias confessed about this crime, and then there is nothing about that purported confession from Geraldo Iglesias to Francisco Vicente until Vicente's handwritten statement on July 14, 2 weeks later.

What did Halvorsen tell you? If this guy had -- if Vicente ever told me that some guy Geraldo Iglesias confessed to him I would have documented it and I would have written it in the report. There is no document and there is no report anywhere in this case.

So turn to the next slide. So just to highlight Vicente's sworn statement. He is clear as day about what happened. Everything that is written in it other than my signatures was coerced to me by Guevara and Halvorsen at the Grand and Central station. None of it was true. It was all coerced on all three cases and importantly in an affidavit just to highlight one of the many places where he talks about it, this is Exhibit 61, Geraldo Iglesias never made any admissions to me in Cook County Jail in 1993, and he says at the bottom, I falsely

**176**

EP Subpoena Response 012093

testified because Guevara and Halvorsen physically harmed me and threatened to continue to beat me if I did not cooperate with them. That's Vicente's testimony.

By the way, Vicente's testimony that you heard earlier today is exactly consistent with the testimony you heard from Geraldo Iglesias when he took the stand today.

What did he tell you? He didn't deny that he had some run ins with Francisco Vicente and he told you it happened in the same place, in the bullpen. And they told you the same thing. They had a very brief conversation, but I never said to this guy that I committed this crime and I certainly didn't say to this guy I'll walk you through all of the details of the crime and Vicente says the exact same thing. So that is Vicente's testimony.

As far as the city's investigation, Lassar, to the investigator, what did they conclude? I mentioned this in openings. Let's look at what they actually said. This is Exhibit 7, your Honor. Regarding the Iglesias case Lassar writes, we did for several reasons determine that the confession of Vicente in that matter purportedly occurring in the

177

EP Subpoena Response 012094

bullpen waiting room at Cook County Jail while the two were surrounded by several other people was fabricated.

Regarding the Bouto case, one of the sort of hyper relevant pattern cases, more likely than not that Bouto is innocent, and what else did they conclude, Vicente fabricated the event of Bouto's confession to the crime. All of those other men who supposedly confessed to Vicente were exonerated. Mr. Bouto, Mr. Montanez, Mr. Serrano, Mr. Pacheco, all been exonerated, like Mr. Guevara Iglesias. Every single one of those men received a certificate of innocence. Geraldo Iglesias is the only victim that Guevara used of Francisco Vicente who has not been granted a C O I.

So let me summarize the timeline here. What are the key points I want to make?

This case is all about Guevara. This was a case where this was not going to be solved because these witnesses just didn't see the shooter.

Guevara gets involved and suddenly Guevara conducts a lineup -- a photo array. Guevara gets the C I. Guevara conducts lineups and Guevara gets this Vicente confession.

178

EP Subpoena Response 012095

This is all Guevara and that is important and we're going to come back to that because I think there is a case where Guevara can be involved and there may not be misconduct or there can be a case where Guevara is involved and there may not be a legitimate case for innocence, but the best example of that case that would be -- that case is where you come in and say, sure, Guevara did some things on this case and maybe even the State -- (unintelligible) misconduct in certain aspects of the case but here are these other aspects of the case where other officers, untainted officers came in and conducted meaningful investigation of that incriminating a particular suspect and justifies the conviction. This case is nothing like that.

This is a what I called in my opening a Guevara special, it's all Guevara.

And, again, I'll just say it really quickly -- let's move on here. Skip that.

So let's talk about Mr. Ochoa and Mr. Rodriguez because that is really the central issue that is left here because no one is really -- the State has not presented anything to rebut Francisco Vicente and his testimony. They didn't present any

179

EP Subpoena Response 012096

evidence to impeach Vicente.

So Ochoa and Rodriguez, what are the critical points? They could not make any identifications on the day of the crime when interviewed by Detective Santopadre. They are -- and because nobody believed that they can make any identifications they're not shown any photos or otherwise, which is further indication, these are not men who are going to be able to make identifications from where they were and they have nearly impossible viewing opportunities we'll talk about, and ultimately as Professor Franklin explained, what did she call it, their viewing opportunities -- opportunities to meaningful encode a face were extremely poor, and that context becomes especially important in the context of this timeline, men who had an extremely poor -- (unintelligible) opportunity -- (unintelligible) in fact had an extremely --

THE COURT REPORTER: Your Honor, could he slow down?

THE COURT: Thank you. Yes, will you. I do understand you're trying to get it all in but you can't wear out the court reporter.

**180**

EP Subpoena Response 012097

MR. SWAMINATHAN: The science here says this was extremely poor encoding opportunity. Detective Santopadre put aside the science, experience says this is an extremely poor viewing opportunity. And then only when Guevara gets involved does it suddenly become an opportunity for identifications. We'll come back to that.

So looking at Mr. Ochoa and Mr. Rodriguez, let's just quickly go through the circumstances of their purported identifications.

Starting with Mr. Ochoa, again, this shows the trial exhibit that he marked indicating the location of the shooter and the window where he is when the shooting occurs. Of course you can't really see the windows where he is, it's in that house on the second floor blocked by trees and leaves and of course that is a relevant factor if you're thinking about his opportunity to see through the trees and particularly this slanted tree here and as indicated the shooter is by that walkway leading up to 2148 North Sawyer. And again he marks where he is exactly, where exactly the shooter is when he is able to make his purported identification right next to that slanted tree in that pathway.

**181**

EP Subpoena Response 012098

Keep going.

He identifies the exact window that he is looking out of. Again, importantly the window facing out to the street, not up north as it's going to need to be for him to be able to get a good view. We'll come back to that but he is looking out the window at that point straight out to the street.

So when you look again ultimately what that means he is looking out a window that is facing here. This is the window he circles, and from there he has got to look at a severe angle and more than 160 feet. You heard Professor Franklin talk about distances. She talked about the idea that even at 40 feet there is significant distortion of the view. In fact let's see what she says is, at 20 yards, 60 feet away, false identifications occur 50 percent of the time, 60 feet away. This is 160 feet. She says the ideal viewing opportunity is 6 feet.

THE COURT: Okay. Who testified or provided evidence that this is 160 feet away?

MR. SWAMINATHAN: What we are showing you, your Honor, what we're asking you to rely on here, take judicial notice, is the Google map image, which actually allows you to literally mark the distance. So you will

182

EP Subpoena Response 012099

see in this image that you have it marks from an exact location to an exact location the distance. So this is in fact exactly 160 feet, and it is shown on this Google map image itself.

Next slide, again, I showed this in opening, that's just to give you even a sense of why it is that it is so difficult to make an identification from such a distance because the ability to make out any details of the human face is so limited from that distance.

Let's skip the next slide.

So ultimately I just want to summarize some of the issues with the Ochoa identification. Stranger identification made 2 weeks later. What did Nancy Franklin tell us? She told us stranger identifications are of course much, much harder. Detective Santopadre said stranger identification, much, much harder. Maybe 2 weeks later, she talked about the ideal amount of time that you would have before making an identification and she talked about the idea that even within 2 days there is a 48 percent drop off -- I'm sorry -- even after 2 days 48 percent of the time you will have false identification. At 3 weeks that goes up to 62 percent of the time. So here we have 2 weeks, a little more than 2 weeks later, you have these identifications being

**183**

EP Subpoena Response 012100

made.  You have initial descriptions that don't match Mr. Iglesias.  Mr. Ochoa says it's somebody 5 5.  In the GPR of Mr. Swaminathan 17 to 19 years old.  He misses distinct characteristics of Mr. Iglesias.  If he was really able to get a view of Mr. Iglesias so well from 160 feet away he would have noticed Mr. Guevara Iglesias' earrings.  Mr. Geraldo Iglesias talked to you and gave some very credible testimony about those earrings, that he has always worn them and if somebody was making an identification, the first thing you would have noticed was those earrings.  Mr. Ochoa not only misses the earrings, in his trial testimony, this is in the record at page 51, R 51, he specifically says, oh, the shooter didn't have earrings, didn't have any earrings but now when I identified Mr. Iglesias he now has these new earrings in his ear, that is the difference, he changed something.  That was dead wrong. If they had really been able to see Geraldo Iglesias' face he would have noticed those earrings.  It's a distinct characteristic that someone would notice.

Sure he was wearing a sweatshirt with the hood up, again making it extremely difficult to make an identification and, your Honor, when you get a chance to review the trial record, you're going to see some

**184**

EP Subpoena Response 012101

important changes, classic Guevara changes in the testimony, where Rosendo Ochoa in the initial general progress report, in the initial supplementary report, type report, this is just a person with their hood up and described by all of the other witnesses and described by Mr. Ochoa. By trial Mr. Ochoa's story is actually he had his hood down and then after the shooting he puts his hood up and then he runs away. He changes his testimony after he has had a chance to interact with Detective Guevara. So now he has got to come up with a way to justify how he is making an identification. You got trees blocking and you got a severe angle and I'm going to -- and your Honor has the testimony of Mr. Ochoa. I would suggest you -- this is a person who has credibility issues. Mr. Ochoa was -- at the time he makes the identification he was facing charges for felonies. At the time that he gave his testimony at the trial, he was in custody for felonies. He admits at the trial the lie, several times, he admits in his testimony that he lied about being a member of a gang. In fact he was a member of Latin Kings. He denied that initially to the police officers. He admits that he lied and used different things.

So Mr. Ochoa has some credibility issues but

185

fundamentally the important issue is I don't think he lied when he spoke to Detective Santopadre at all. I think he told the truth. It was down the road once Reynaldo Guevara got involved that something happened with Mr. Ochoa.

Let's talk about Hugo Rodriguez. This is a photo that -- the same crime scene photo you've seen before. This one is Trial Exhibit 14 because this is the one that is marked by Mr. Rodriguez. It was shown during his exam but he identifies where exactly the car was when he first looked up to look back at the shooter, and he identifies what the location of the shooter was as well. So he identifies -- here, because you can't really see it that well, but I put a blue square around it so you can see where he marked the location of the shooter and a C is where he puts the location of the car. So what does that look like? You noticed the C is near the stop sign. This -- actually this is fine. So this -- actually what he does is that was in his original trial testimony. At his deposition the deposition that you just watched today, he created a map for us, and he described what the locations were. What he says is here is the stop sign up at the corner of Sawyer and Palmer. And he puts the car -- and we asked

**186**

EP Subpoena Response 012103

him specifically, location of car when Hugo looked back to see the shooter. This is the moment when he is going to make the identification. Where is the car, all the way up here, almost to the stop sign, and where is the shooter, he puts the shooter all the way back here at the alley.

Okay. Now, that is just plain wrong. It wasn't his testimony at trial, either Mr. Ochoa's testimony or anybody else's testimony. So he just flat out got it wrong but regardless what he is making abundantly clear is he has got a shooter who is way behind him, and he acknowledged in his deposition the shooter was shooting at me from behind.

What does that mean if you have a shooter who is shooting at you from behind your vehicle as you're driving away and the testimony is that the shooter fires the shots and then turns around and runs away into an alley in the opposite description? The obvious implication is when you look up to see him you're going to see a guy running away, you're going to see the back of him, and we show the general progress reports already, that is what his description is of being able to see the back of somebody, he was wearing all black.

So Hugo Rodriguez, same issues, same type of

187

EP Subpoena Response 012104

issues that Nancy Franklin raised, a stranger identification, made 2 weeks later, he can't say anything more than this is a person wearing all black, in a moving vehicle speeding away. He is ducking down while he is being shot at and then looks up right afterward. You've got all of the stress factors that Dr. Franklin talked about, the shooter behind him running away, and of course you have those blinds. I'm going to come back to that in a second. But he also misses the distinct characteristics. And he does the same thing at trial, this is U 31 of the trial, of his trial testimony, where he says, yeah, same thing as Ochoa, they knew what to say, yeah, I -- he -- it's the same guy, he changed -- he got -- he put these earrings in now, but the shooter back when he was committing the shooting he didn't have any earrings in his ears. Same thing, he misses another critical distinct characteristic. If you actually saw this shooter's face, you would have noticed this distinct feature.

The hoodie, he actually is the one person who sticks with the hoodie being on the whole way. He doesn't change his story to the hoodie being down for half of his story. He keeps it where he always kept it, the hood was up. So he has got that as well --

**188**

EP Subpoena Response 012105

(unintelligible). And ultimately he is sitting in the middle rear seat. The shooter is behind him and off on the sidewalk. If anybody in that car was in a position to make the identification, it would have been the person on the driver's side, but those people -- that person couldn't make an identification nor could any of the other individuals in that car. He is the only one who claims to later on of course to have been able to make an identification.

Let's go to the next slide. This is the photo you've seen before but this is now Hugo Rodriguez' deposition exhibit. So we asked him clear as day, where were you looking out of when you claimed to have been able to identify the shooter, he doesn't -- he -- he -- (unintelligible) he is looking out that center rear window, the one that had blinds in it. And I'm going to point out his deposition testimony. He admits in his deposition these are blinds in that window. I am claiming that I did look through these blinds and see the shooter so well that I could identify him 2 weeks later.

By the way, the other point I want to make about Mr. Ochoa that I didn't mention, nowhere in Mr. Ochoa's testimony, in the criminal trial, in any

189

EP Subpoena Response 012106

statement he gave to the police or anywhere does Mr. Ochoa say that the shooter ever looked at him, that the shooter ever actually looked at him so he could get a clear view of the shooter's face. The shooter -- let's go back to the photo that just shows the tree, the overhead view. When is the shooter purportedly looking at Rosendo Ochoa? You got the car in the alley. You got the car pulling up. You got the car coming north. The shooter is shooting here. The shooter is looking at a car that is coming here. When is he ever looking down here to give this guy a direct view of his face? He only got a profile view at best, a profile view from 160 feet away and he is claiming to make an identification, a reliable identification.

So here is something really interesting. Go to the next one. You have two witnesses who were actually in a position to be able to make -- anybody who is going to make an identification in this case it's two people whose names you haven't heard, you have their affidavits and their depositions have been submitted to you by the State, their names are David Chmieleski and Arnold Moore and here is what they say.

David Chmieleski says on June 7th I lived at 2148 North Sawyer. That is the building that the

190

EP Subpoena Response 012107

shooter was standing in front of. That day I was talking to someone outside when I heard gunshots. Seconds later I saw someone in a block hoodie run past me. I only saw the side of the shooter as he was running past so I did not see the shooter's face.

Mr. Moore, I was standing nearby on June 7 when someone in a car on North Sawyer was shot and killed. The shooter walked past me and then fired into a car of people, he then ran back past me and through an alley. I saw the shooter but I did not see the shooter's face.

Those two -- let's go back to the overhead for a second. So those two men are right here, right next to the shooter. If anybody was going to be able to make an identification it should have been those two people but of course they say they didn't get a good view of the shooter but somehow somebody over here got a good view of the shooter even though the shooter runs right past these two gentlemen. Somebody in a car driving away purportedly is the person who is able to get a good view but the two guys standing right next to the shooter couldn't get a view.

Those were Exhibits 77 and Exhibit 75, your Honor.

191

EP Subpoena Response 012108

So Nancy Franklin. I'm not -- won't spend -- (unintelligible). She talked at length about all of the various factors that reduce the reliability of an identification under the circumstances in this case.

Stranger identification, check. Very brief opportunity to view a shooter, check. Distance, delay, multiple weeks before they're able to engage in a photo identification. The stress of being shot at, weapon focus.

So stress is particularly relevant to Mr. Rodriguez. He is literally being shot at.

For Mr. Ochoa, the weapon focus. You have a weapon that he is viewing from that window, that is going to draw his attention. And of course you have the fact that he -- (unintelligible) very limited descriptions initially and the idea that their descriptions grow after multiple conversations and in particular after a conversation with Mr. Guevara is particularly relevant.

And she says something really important because you heard the deposition testimony of Mr. Rodriguez, I am certain that I have the right guy. Again I can't even say that the man is lying. He may truly believe that but his statement of confidence today

192

EP Subpoena Response 012109

as she explained is meaningless because people have this overconfidence about the strength of their ability to make an identification, and that only grows is what she explained, as they get cues, subtle or expressed, as they get cues that they made the right selection and certainly these witnesses got multiple cues that they made the correct selection and I'm going to actually point out to you some of the deposition testimony of Mr. Hugo Rodriguez that you didn't hear but even before I talk about what was specifically said to him, the fact is if you make a photo identification and then you're immediately shown a lineup, the same day or the next day in these two cases, in which the only person who is the same is the person who you identified, that is confirmation, and then when you're shown that person again at trial, there is only one person sitting on the stand and you're told to identify him in court, that's further confirmation, right. And so you get these -- this confirmation such that when Hugo Rodriguez is sitting here 30 years later, the act of overconfidence of his identification, as Professor Franklin explained, doesn't mean anything.

Let's turn to the next slide. I'm going to skip the comments I have there about fairness

193

EP Subpoena Response 012110

assessment. Let's turn to slide after that. This is the photo array that was shown to Mr. Ochoa and Mr. Rodriguez, and you don't need a fairness assessment to understand why there were problems with this photo array, why these witnesses could have been steered to a single individual who had gotten to be the police suspect because the description that had been provided was a male white Hispanic approximately 145 pounds, 5 7, that's being generous, 5 5 to 5 7, light complected, around 18 years old and clean shaven. So you have a lineup where everybody has that facial hair except for two guys and only -- and they got one guy with really dark skin and one guy with really light skin, your Honor has the fairness assessment as a proffer, but what it shows is really just kind of common sense. This was not a photo array procedure that was actually fair that wouldn't steer you to the suspect.

And by the way, just so your Honor is aware, the reason there were 8 photos that are described in trial testimony and there are 7 photos here, nobody knows what happened to the 8th photo and I think it probably existed at some point, at some time we went to go to see the impounded evidence, it's gone, I don't -- there is nothing nefarious about that. I think it's

**194**

EP Subpoena Response 012111

just -- it's just been lost.

All right. I want to turn then to the Guevara related pattern evidence.

I'm going to have to do it this way. Let me turn to a couple of key points about Hugo Rodriguez. I think that is particularly important.

Frankly, if we had known that they were going to play Hugo Rodriguez' deposition, we just found out yesterday, we would have counter designated significant portions of that deposition and I would ask your Honor to really consider the other half essentially of that deposition that wasn't played because there is a lot of very important information in that deposition, some very important issues.

I'm going to highlight just a few of the key ones in here because what he ultimately does is when he testifies he reveals just how impossible this identification would have been, probably in some ways that are even more crystal clear than there ever was.

Page 70 of his deposition.

Question. And so the first time you saw the shooter was when you turned around after hearing shots, is that right?

Answer. Yes. Correct.

**195**

EP Subpoena Response 012112

You were asked where you saw the shooter from and you said out the back window, correct?

Answer.  Correct.

So he is clear he is looking out of that very back window that we pointed out, page 74.

Question.  At that point that the car is speeding away north after the shots are fired that you turned and looked at the shooter, is that right?

Answer.  Yes.  Correct.

So he acknowledges the circumstances while this car is speeding away.

And here is the critical one, page 76, line 5.

Question.  And so you would agree the amount of time you had to see the shooter was a second or less?

Answer.  Yes.  Correct.

He had a second or less to see the shooter.

He says the same thing on page 83, reiterates again, only time you saw the shooter's face was in that one second after the shooter had fired shots, correct?

Answer.  Yes.

On page 106 he acknowledges that in fact there were blinds in that window.

On page 117 and 118, he acknowledges that the

196

EP Subpoena Response 012113

shooter had a hood over his head.

On page 78 he acknowledges that it was someone he had not ever seen before, it was a stranger.

So that tells you what the circumstances of his viewing opportunity. He acknowledges he is the only person in the car who claims to have been able to see the shooter, and he says something really important in his deposition. He acknowledges the importance to the same timeline I talked about before.

This is page 122. Right after the shooting they pull over to this gas station and they call for help, right, this poor guy has been shot and he is with all the other guys in the car. He doesn't say to a single one of them that he saw the shooter or that he could make an identification. Okay. That is page 122 of his deposition.

Page 123, on the way home after they had gone to the police station, did you see -- did you tell anybody that you saw the shooter, could make an identification, no.

Even once you got home, page 124, did you tell anybody that you saw the shooter and can make an identification, answer is no.

When is the first time he tells anybody that

**197**

EP Subpoena Response 012114

he saw the shooter and can make an identification, after he makes the identification in the lineup with Reynaldo Guevara, that's page 140 of his deposition.

He says something important on page 135 and 136 when we talk about Guevara related conduct, and as I'm flipping to that page, I want to point out something else that he said in the testimony that was played for your Honor. He says initially, oh, yeah, he didn't tell me which photo to pick, he just put some photos out in front of me, but he also says in the testimony that was played for you, yeah, I think it was the second photo that he showed me. Okay. That was that he didn't show those photos in one set of photos. He showed them sequentially, one by one, okay, but this is important, page 135, 36, right after you picked the photo with the Latino detective you then went into a lineup, right? Yes. Correct. And when you went into view the lineup, you saw the same person that you had just seen in the photos, correct? Answer. Correct. Once you were there to view the lineup what did the detectives say to you before you made the identification? Answer. If I was able to identify someone from that lineup that I had seen in the picture and I said, yes.

So Guevara is telling him right away after

198

you make the photo identification, right into a lineup, I want to see if you can find the person whose photo -- who I just got you to pick.

Again, with Hugo Rodriguez, there were a lot of credibility issues. He flat out lies in that deposition.

On page 71 he says: I was not in a gang. He says it multiple times. I invited him to correct himself many times in deposition. He says I was not a gang member.

In the record on page U32, at criminal trial, he admitted he was a gang member.

Question. Are you a member of a gang?

Answer. Yes.

What gang are you a member of?

Answer. Latin Kings.

That was what he said in the criminal trial, admitted it, in his deposition he repeatedly lied and said he was not a member of Latin Kings.

I'm not -- I don't have time to read all of it to you.

Pages 171 to 191 of his deposition are a remarkable collection of lies. He lies about whether he had been -- and I don't even want to say he lied. He

**199**

EP Subpoena Response 012116

may have a terrible memory of it but here is what he said. I asked him multiple times.

Okay. Sir, had you been in custody at the time that you gave your testimony in this case?

He says no.

Are you certain?

I'm certain.

Flat out false. You will see that in the testimony.

Sir, had you refused to show -- were you called into come and testify in this case and you refused to show up and testify?

No. No. No, I always came.

Are you certain?

Yes, I'm certain, as certain as I am about my identification.

Also you will see in his testimony, no, he -- he had in fact failed to appear and they had to issue a warrant for him. So you will see that testimony on pages 171 to 190.

I've used up my time. I'll stop there, your Honor. We believe Mr. Iglesias has met his burden to establish the finding of the evidence of his innocence.

THE COURT: Thank you.

**200**

CLOSING ARGUMENT

BY MS. BOWDEN:

The one person who was impeached, Vicente, was in fact Geraldo Iglesias from the stand here today when he told you, Judge, that he actually did have a conversation with Vicente about the fact that he was charged with the murder.  Okay.  Now, here today Mr. Iglesias told you that he told Vicente that he did not do it.  That he was innocent of the crime, that he did not commit the murder he was accused of, however he did tell you that he did have a conversation with Vicente, which Vicente on that deposition adamantly denied ever having any kind of conversation about him being charged with a murder.  In fact he said it over and over and over again, that he never had a conversation with Iglesias about the murder.

We have here a photograph taken before he was arrested on this case of Mr. Iglesias where he is not wearing earrings.

THE COURT:  That he -- where he was arrested?

MS. BOWDEN:  He was not arrested -- on this case this photograph in the photo array was shown to Mr. Ochoa prior to Mr. Iglesias being arrested.  So

**201**

EP Subpoena Response 012118

presumably sometime between the age of -- I believe he said 14 years old when he got his ears pierced and the time he was arrested or today where he has worn earrings every single day except for when he was in prison he is not wearing them in this photograph.

Dr. Franklin talked a lot about how people can be impressed upon to be led in certain ways, sort of like when a lawyer in a deposition asks a leading question, how the implicit bias is there sort of like the expert witness who volunteers her time with the Exoneration Project and her professional services in the need of cause, sort of like experiments and research that is done with subjects who are students who are invested in the outcome of the research or the experiment, that are aware that they're actually involved in experiments. Apparently the implicit bias only goes one way to the advantage of Mr. Iglesias.

We heard about an experiment where the subjects, the participants in the experiment had a photograph of a -- we'll call them a suspect, and then below that were ten other photographs in an array, and that the participants in this experiment were to look at the photograph at the top and then look at the photographs in the array and try to match and even

202

EP Subpoena Response 012119

though they had both photographs at the same time, the top photograph and the ten, one-third of the people failed to make the match. And yet we're supposed to believe that looking at a photo array prior to looking at a live lineup with real live people in it is enough to make people go right ahead and pick out the right person. It doesn't make any sense. There is a flaw there, but the flaws always seem to go to the benefit of Mr. Iglesias.

We saw those overhead pictures with the 160 feet. Now, there are some photographs in the packet that you have there and I kind of put them together so I can make one big picture instead of two. Okay. I just did this here at the desk.

THE COURT: I can see it.

MS. BOWDEN: So we have Mr. Ochoa is up here in this window and he is looking right over here. It really all depends on whose perspective you're looking at this evidence. It all needs to be considered together, not in individual little snippets, not in small pieces. It all needs to be looked at as a whole.

Could Mr. Rodriguez look through the blinds and see a person. Well, let's see what the situation is. Mr. Rodriguez is sitting in the middle of the back

203

seat of the car. There are three people in the front, there are two people in the back with him, and Mercedes, Mercy went up to where Mr. Ochoa lives because while Mercy was gone Mr. Ochoa was watching the baby, Mercy's niece, and when the car full of people pulled up Mercy left the car and went up to where Mr. Ochoa was and she took the baby to go introduce the baby to the people who were in the car, Mr. Rodriguez, Monica, the deceased, these are the people that she was bringing the baby to see.

So Mercedes comes backs down and when Mercedes comes back down Mr. Ochoa goes to the window to watch and he is watching -- he testified he is watching Mercedes and she goes over to the car, okay, which is parked directly across the street from where the shooter ends up shooting from and he is watching what is going on and he sees, sees Mercedes bring the baby up to the car. He sees that Monica is in the car. He sees that there is a couple of guys in the car too but he can't tell who they are because they're in the car. And as this is unfolding Monica's still out -- Mercedes is still out there on the sidewalk when the shots ultimately ring out.

Okay. Mr. Ochoa has been watching these

**204**

EP Subpoena Response 012121

events.  He even talks about how he went from one window, the side window to the front window and yes, when he sees the shooter he is at the front windows but he is paying attention to what is going on out there on the street at the time all this goes down.  It's not that he is moping around in his apartment and he hears gunshots and he runs to the window and he sees a flash and it's over.  He has been standing at the window watching Mercedes bring that baby over to the car where the people end up getting shot.  He is paying attention. This is important.

So who else is paying attention?  Well, Hugo Rodriguez is paying attention.  He is in the car and as soon as the shots went out he ducks down and the way he describes it when you read all of his testimony is he ducks down, he pops up and he looks out the side window of the car, and then he ducks down again and then he -- the car is now moving and he is looking out the back. So he knows where he is going to be looking.  He knows what he is looking at when he comes up the second time and he sees the face of the shooter the way he describes it.

The first time he pops up he looks out and he sees the shooter on the sidewalk and the shooter is

**205**

EP Subpoena Response 012122

putting the gun into his waistband and he describes what the action is and he stands up in court during the trial and he describes what he sees the person doing and then he ducks back down and then he gets back up and he looks again and he goes back and he looks at that same person.

So, again, he is paying attention. He knows where he is going to be looking. He knows who he is looking for and he looked through those blinds and I don't know why we think that this is such a difficult thing to see through if you're this far away from something and you look through. Yeah, I can see that whole medallion up there on the wall. I can see you. I mean, if I know where I'm looking and I'm looking through a keyhole or I'm looking through something it doesn't make this impossible. If he was just looking at a flash, perhaps it might be difficult but it doesn't make it impossible.

The appellate court in the Rule 23 opinion, shockingly lengthy for a Rule 23, they talk about the evidence in this case and they discuss about how if Vicente's testimony is removed from the equation that there is more than sufficient evidence in this case to have proved Mr. Iglesias guilty beyond a reasonable doubt, which as I've already discussed is not what we're

206

EP Subpoena Response 012123

here for and is not even close to what the burden is here or the burden for Mr. Iglesias to prove his innocence by a preponderance of the evidence, but the appellate court does discuss that the level of evidence that exists even without Vicente in the equation and it's the State's position that he just can't be trusted for anything.

And when you read through the entirety of that deposition you read about all of the inducements that were made to him that he denies even having knowledge of but are documented to get him to change his mind about the testimony that he gave in a variety of cases, the inducements that were made to him. There is a transcript where he takes the Fifth Amendment on every single question asked of him about these cases. He is just -- he can't be trusted. His testimony on any topic has little value than prudent would require him being removed from the equation as the appellate court discussed in leaving this case without his testimony.

And when we look at that what we have left are the two eyewitnesses. The two eyewitnesses who had both identified Iglesias as the shooter. The two witnesses that the appellate court discusses the vigorous and thorough cross-examination regarding the

207

identifications that were made.

There were other witnesses who testified namely Sanchez. Mr. Sanchez who is in the vehicle with Rodriguez. He doesn't identify anyone but he does say what happens before the shooting and what occurs after the shooting and it corroborates what Mr. Rodriguez says and what Mr. Ochoa says that he sees.

As far as whether or not Guevara somehow coerced witnesses to identify Iglesias, there is no evidence of this.

There is evidence that as described there were a multitude of people out there that perhaps you would think could have seen the shooter that didn't that went to the police station, that looked at lineups, that looked at photos, that looked at photo arrays, and their failure to identify was documented and they were not pressured in any way to make any identifications, yet the chosen ones were a person upstairs in an apartment some distance away and a person sitting in the back seat of the car with the blinds. Those are the people who made identifications because those are the people who actually were paying attention and saw the shooter's face.

Other people regardless of what anybody

**208**

EP Subpoena Response 012125

else's opinion is about what they should have been able to see is not really relevant. What is relevant is what the witnesses themselves say they saw. And in this case it's Ochoa and it's Rodriguez saying that they saw Iglesias shoot at the car.

Throughout the transcript, during the trial transcript, as I said, we had discussions, U 19, Rodriguez talks about how he was sure that the person that he identified in the photo array and the lineup was the right person because he says I'd say that I would never forget his face. When Mr. Rodriguez uses his own words to describe his own experiences, his meaning comes through a lot more clearly than wherein he is asked a question requiring just a yes or a no answer. Maybe it's the second language, he is using an interpreter, and things are much clear when he is expressing himself rather than having himself expressed for him.

On page R 68 Mr. Ochoa discusses how he actually had a view that he could see the shooter and how the trees were not in his way and he describes what his view is and where he is exactly in the apartment.

Detective Santopadre. Detective Santopadre was not the primary detective initially assigned to the case. When you read his deposition, you will see that

**209**

EP Subpoena Response 012126

he says he was the sole detective working that night. When the case came in, he got assigned as the third guy on the case with -- (unintelligible) and he never worked on the case again. He wasn't involved in the case at all in the investigation, that he just went out there right away.

So now we have a detective who goes out and speaks to a witness right away on the scene after he has just seen this girl and he describes several times in the video her brains are leaking out and everything, and oh, did Detective Santopadre asks the right questions? Did Detective Santopadre when you read this deposition have an independent recollection of the events that occurred or is he just looking at the paper because he says several times, well, it says in the report?

Are there questions about some of the evidence in this case? Absolutely. Vicente, Guevara, there is a taint there that caused Mr. Iglesias' conviction to be vacated.

Again, being not guilty beyond a reasonable doubt is not the equivalent of being innocent by the preponderance of the evidence, and that in fact is the standard here and that is the burden that has to be borne by Mr. Geraldo Iglesias.

**210**

EP Subpoena Response 012127

Judge, with Mr. Ochoa and Mr. Rodriguez, with their un-recanted identifications given in their own words and substantiated by their own observations, Judge, Iglesias has not met that burden.

THE COURT: Thank you, State.

I want to set a time for ruling that does give me sufficient time to read the wealth of documents and information. So let's see. Today is the 10th. If we stay much longer it will be the 11th. I'm thinking by -- I think the last week of April would give me, given my other myriad obligations, the greatest opportunity to have this reviewed and ready to rule on.

So if you'll let me know if there is a particular date that last week of April that might work in your schedules.

MR. TEPFER: Your Honor, we would prefer the 25th or the 26th. I'm in Skokie on the 28th, 29th for hearings.

THE COURT: State?

MS. BOWDEN: If it will be in the morning any day is fine. I had something on the 26th in the afternoon, a sentencing, but --

THE COURT: This would be in the morning.

MS. BOWDEN: That's fine.

211

EP Subpoena Response 012128

THE COURT:  Then why don't we settle on 4/26?

MR. TEPFER:  Thank you.

THE COURT:  So that will be 9:30, you can come in in person or Zoom, whatever is your preference.  I will mark it in person, if it changes, just let me know.

(The above-entitled cause was

continued to April 26, 2022.)

**212**

EP Subpoena Response 012129

STATE OF ILLINOIS )
                   ) SS.
COUNTY OF C O O K  )

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT - CRIMINAL DIVISION

I, ROSEMARIE LAMANTIA, an Official Court Reporter for the Circuit Court of Cook County, Illinois, County Department, Criminal Division, do hereby certify that I reported in shorthand the proceedings had on the hearing in the above-entitled cause; that I, therefore, caused the foregoing to be transcribed into typewriting, which I hereby certify to be a true and accurate transcript of the Report of Proceedings had before the Honorable ERICA L. REDDICK, Judge of said court, on the 10th day of March, A.D., 2022, and contains all of the evidence had and testimony taken on said date.

*Rosemarie LaMantia*
_____

Rosemarie LaMantia

Official Court Reporter

Dated this 5th day

of April, 2022.

213

EP Subpoena Response 012130

# EXHIBIT 81

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ROBERT BOUTO,                          )
                                       )
          Plaintiff,                   )
                                       )
       vs.                             )   No. 19 CV 2441
                                       )
REYNALDO GUEVARA, ET AL.,              )
                                       )
          Defendants.                  )

-------------------------------------------
GERALDO IGLESIAS,                      )
                                       )
          Plaintiff,                   )
                                       )
       vs.                             )   No. 19 CV 6508
                                       )
REYNALDO GUEVARA, ET AL.,              )
                                       )
          Defendants.                  )

          The VIDEOTAPED VIDEOCONFERENCE

deposition of FRANCISCO VICENTE, taken under

oath on Tuesday, March 1, 2022, conducted

via Zoom pursuant to the Federal Rules of

Civil Procedure, before Maribeth Reilly,

State of Illinois Notary Public, and

Certified Shorthand Reporter,

No. 084-002306, commencing at 11:03 a.m.

APPEARANCES:   (REMOTELY)


　　　LOEVY & LOEVY, by
　　　MS. RACHEL BRADY
　　　MR. RUSSELL AINSWORTH
　　　311 North Aberdeen Street, 3rd Floor
　　　Chicago, Illinois  60607
　　　(312) 243-5900
　　　brady@loevy.com
　　　russell@loevy.com

　　　　　Appeared on behalf of Plaintiffs,
　　　　　Bouto and Iglesias;

　　　LEINENWEBER BARONI & DAFFADA, LLC, by
　　　MS. MEGAN McGRATH
　　　120 North LaSalle Street, Suite 2000
　　　Chicago, Illinois  60603
　　　(866) 786-3705
　　　mkm@ilesq.com

　　　　　Appeared on behalf of Defendant
　　　　　Reynaldo Guevara;

　　　O'MARA & O'CALLAGHAN, LLC
　　　MR. SEAN O'CALLAGHAN
　　　230 West Monroe Street, Suite 2620
　　　Chicago, Illinois  60606
　　　(312) 600-5588
　　　sean.ocallaghan@o2lawyer.com

　　　　　Appeared on behalf of Defendants
　　　　　Cook County and Kevin Hughes;

　　　THE SOTOS LAW FIRM, P.C.  by
　　　MR. JOSH ENGQUIST
　　　141 West Jackson Boulevard
　　　Suite 1240A
　　　Chicago, Illinois  60604
　　　(630) 735-3300
　　　jengquist@jsotoslaw.com

　　　　　Appeared on behalf of
　　　　　the individual defendant police
　　　　　officers;

APPEARANCES:  (REMOTELY)

 ROCK FUSCO & CONNELLY, LLC, by
 MS. EILEEN ROSEN
 MS. CATHERINE BARBER
 MS. THERESA CARNEY
 321 North Clark Street
 Suite 2200
 Chicago, Illinois  60654
 (312) 494-1000
 erosen@rfclaw.com
 cbarber@rfclaw.com
 tcarney@rfclaw.com

  Appeared on behalf of Defendant
  City of Chicago.

 MR. DANIEL J. STOHR
 311 North Aberdeen Street, 3rd Floor
 Chicago, Illinois  60607
 (312) 726-1180

  Appeared on behalf of the
  Deponent.


ALSO PRESENT:

 MS. RACHEL WELLING,
  Legal Videographer;

 MS. CINDY SOBOLEWSKI,
 MS. ROBYN FALASZ,
  Exhibit Technicians;

 MS. MARIBETH REILLY,
  Certified Shorthand Reporter.

   * * * * * *

I N D E X

Witness:                                              Page

        FRANCISCO VICENTE

            Examination by:
            Ms. Rosen....................5
            Ms. Brady....................272
            Mr. O'Callaghan..............288


            E X H I B I T S


VICENTE DEPOSITION                        Referenced

        Exhibit No. 12.....................124
        Exhibit No. 14.....................137
        Exhibit No. 17.....................162
        Exhibit No. 18.....................175
        Exhibit No. 19.....................185
        Exhibit No. 20.....................188
        Exhibit No. 21.....................192
        Exhibit No. 22.....................193
        Exhibit No. 27.....................199
        Exhibit No. 26.....................205
        Exhibit No. 28.....................210
        Exhibit No. 32.....................214
        Exhibit No. 41.....................222
        Exhibit No. 38.....................231
        Exhibit No. 39.....................239
        Exhibit No. 42.....................242
        Exhibit No. 44.....................244
        Exhibit No. 45.....................246
        Exhibit No. 46.....................250
        Exhibit No. 48.....................252
        Exhibit No. 49.....................255
        Exhibit No. 55.....................256
        Exhibit No. 60.....................266
        Exhibit No. 61.....................268
        AR-L 513660........................274
        RFC-Iglesias 57....................277

            * * * * * * *

THE VIDEOGRAPHER: This is the beginning of Media Unit 1, and we are now on the video record at 11:03 a.m. This is the videotaped videoconference deposition of Francisco Vicente being taken on March 1, 2022.

This deposition is being taken on behalf of the Defendant in the matter of Robert Bouto versus Reynaldo Guevara, et al. The case number is 19 CV 2441 filed in the United States District Court for the Northern District of Illinois, Eastern Division.

My name is Rachel Welling, legal videographer, representing Urlaub, Bowen & Associates, with offices at 20 North Clark Street, Suite 600, Chicago, Illinois. The court reporter today is Maribeth Reilly, also of Urlaub, Bowen & Associates.

Counsel, please identify yourselves for the video record and the parties which you represent.

MR. AINSWORTH: This is Russell Ainsworth appearing on behalf of Robert

Bouto.

MS. BRADY: Good morning. This is Rachel Brady appearing on behalf of Geraldo Iglesias.

MS. ENGQUIST: Josh Engquist -- go ahead.

MR. STOHR: Daniel Stohr on behalf of the witness.

MR. ENGQUIST: Josh Engquist on behalf of the individual defendant police officers with the exception of Reynaldo Guevara.

MS. McGRATH: Megan McGrath on behalf of defendant Guevara.

MS. ROSEN: Eileen Rosen on behalf of defendant City of Chicago.

And this deposition, just for the record, is being taken in the Iglesias case as well. It's I-g-l-e-s-i-a-s versus Guevara, et al.

We will get you guys the caption for the case so that you have it. I'll have Kara send it.

MR. O'CALLAGHAN: And this is Sean

O'Callaghan representing former Cook County State's Attorney Kenneth Hughes in the Bouto matter.

MS. ROSEN:  That's everybody.

THE VIDEOGRAPHER:  Will the court reporter please swear in the witness.

(Witness sworn.)

FRANCISCO VICENTE, called as a witness herein, was examined and testified as follows:

EXAMINATION

BY MS. ROSEN:

Q.  Good morning, Mr. Vicente.  As I previously indicated, my name is Eileen Rosen, and I represent the City of Chicago in both the Bouto case and the Iglesias case.

Can you please tell us where you are giving this deposition from today?

A.  Here in Waukegan.

Q.  Where exactly in Waukegan are you?

A.  What's your address?

MR. STOHR:  I can't give you the address, 325 --

THE WITNESS:  325 Washington Street, Waukegan, Illinois 60085.

BY MS. ROSEN:

Q.  Are you at somebody's law office?

A.  Yes.

Q.  Do you know the name of the law office that you are located?

MR. STOHR:  Jed Stone, S-t-o-n-e.

MS. ROSEN:  For the record, that's not Mr. Vicente answering the question. That's his lawyer, Mr. Stohr.

BY MS. ROSEN:

Q.  Is there anybody in the room with you right now, Mr. Vicente?

A.  Just me and my attorney.

Q.  What is your attorney's name?

A.  Daniel.

Q.  Daniel what?

MR. STOHR:  S-t-o-h-r.

MS. ROSEN:  Mr. Stohr, I am going to ask you to allow the witness to answer the questions, please.

MR. STOHR:  I was just spelling my name, S-t --

MS. ROSEN: So he can say your name, and then you can spell it, but I would like the witness to answer the questions, please. Thank you.

THE WITNESS: S-t-o-h-n.

MR. STOHR: R.

THE WITNESS: R.

BY MS. ROSEN:

Q. Mr. Vicente, when did you hire Mr. Stohr?

And, Mr. Vicente, if you could look into the camera when you are answering the questions, I would appreciate it.

When did you hire Mr. Stohr?

A. Last month sometime I hired him. Don't remember the exact day, looking for an attorney to represent me on this matter.

Q. How did you locate Mr. Stohr to represent you?

A. Referenced through a friend in Chicago because I am from Chicago. I live out here.

Q. What friend referred you to Mr. Stohr?

A.   That's irrelevant.  I am not going to put nobody's name out there, so please.

Q.   Are you refusing to answer my question of where you got the referral to Mr. Stohr as a lawyer?

MR. STOHR:  I am going to object that it's a question that's not designed to lead you to relevant evidence.

MS. ROSEN:  Can you answer my question, please, Mr. Vicente.

THE WITNESS:  Like I said, I don't think I need to reveal anybody's name in this matter.  This is my matter.  No one else's.

I have an attorney present because the last attorney wasn't working out for me.  The State or no one is paying for my attorney.  I have to pay for this out of my own pocket, okay?  Every time you guys call me to court, I have to dig in my own pocket, take a day off, come to see you guys, and bring back old memories that I have been trying to dig in my head, okay, to forget.  Okay?

So if you guys want me here today, please be patient with me. I have an attorney. It's irrelevant who told me or gave me his name, okay? No one wants to represent me, okay? So, it is what it is. I'm here today to answer any questions you got, okay?

BY MS. ROSEN:

Q. So, Mr. Vicente --

A. If I feel uncomfortable -- if I feel uncomfortable, that's why he's here. He's my attorney, okay?

Q. So, Mr. Vicente, so we need to have a record here of what is going on, and it makes it a little difficult because we are on Zoom, and so it operates a little bit differently. So I am going to ask you my questions, and then I am going to ask you to answer my questions.

A. Okay.

Q. The question that I posed to you was: Are you refusing to answer the question about who referred you to Mr. Stohr?

A.   Yes, because that's irrelevant to this case.  Talk to me about Bouto, talk to me about Armando Serrano, talk to me about Jose Montanez, talk to me about Guevara, okay?  Talk to me about anything concerning this case.  My family or no one close to me deserves to be put through this circus. Okay?

Next question, please.

Q.   How much are you paying Mr. Stohr to represent you?

MR. STOHR:  I am objecting, and I'm instructing him not to answer on the basis of attorney-client privilege.

THE WITNESS:  You guys here for my attorney or for me?

MR. STOHR:  Please, please, I am objecting.  Don't answer the question.

BY MS. ROSEN:

Q.   Have you met with your attorney to prepare for the deposition?

A.   We have talked, and we have met.

Q.   How many times have you met with Mr. Stohr to prepare for your deposition?

A.   Once.

Q.   When was that?

A.   Today.

Q.   How much time did you spend with Mr. Stohr today preparing for your deposition?

A.   Well, we've been talking over the phone, and we've been preparing since we met today.

Q.   So I am going to ask you to try and listen to my question and just answer the question that I am asking you, okay?

How much time did you spend with Mr. Stohr today to prepare for your deposition?

A.   Since 9:15, 9:00 o'clock.

Q.   Before today, did you spend any time with Mr. Stohr to prepare for your deposition?

A.   Oh, we've been talking over the phone, conferences.

Q.   How many conferences have you had with Mr. Stohr?

A.   Many.

Q.   Can you give me an estimate of how many conferences you have had with Mr. Stohr?

A.   About 20, 25.

Q.   Can you tell us how many hours you have spent talking with Mr. Stohr preparing for your deposition?

A.   Many hours.

Q.   Can you estimate it any better than many hours?

A.   I been talking to him since I contacted him weeks ahead.  Many times I have talked to him.  I can't tell you.  Do you want me to look on my phone?  I don't know what to tell you.  I have talked to him.  You want to ask him, you can.  I am trying to cooperate as best as possible.

Q.   I am just asking questions.

A.   Okay.

Q.   Have you reviewed any documents in preparation for your deposition.

A.   Yes, I got them all here.  I'm ready.

Q.   Where did you get those documents?

A.   I've had them.

Q.   You've had them from where?  From when?

A.   From the last deposition, last attorney.

Q.   Who was the last attorney?

A.   My last attorney was -- I forgot his fucking name.  He's right down the street on Washington.  You guys should have him on your record.  He was the one that did the deposition with me the last time.

Q.   Mr. Grimes?

A.   Yes, Grimes.

Q.   He gave you all these records that are in that envelope?

A.   Yes.  I been at -- I've got paperwork since 1993, okay?

Q.   In addition to what's in the envelope?

A.   Everything I've had.  Those are my paperwork.

Q.   So I am going to ask you one more time.  Do you have other paperwork related to the cases of Serrano, Montanez, Bouto and

Iglesias other than the packet that you have with you today?

A. I've got statements. I got the packet.

Q. Mr. Vicente, I am going to ask you to listen very carefully to my question. Other than the documents that you have with you today in that envelope, do you have any other records or documents related to either the Serrano and Montanez and Pacheco cases, the Bouto case or the Iglesias case?

A. I just have statements, okay, and paperwork that I have in that file.

Q. In addition to what you brought with you today, right?

A. That's all I have, lady.

Q. I am just trying to understand what you are telling us, Mr. Vicente. So do you have -- did you just --

A. Okay. You guys -- let me ask you a question. Let me ask you a question. What's so hard -- what's so hard to understand with this language that's coming out of my mouth?

Q. Mr. Vicente, Mr. Vicente, I am going to ask you -- I am going to ask you to just pay attention to my question, okay?

A. Okay.

Q. You have an envelope there that has documents in it, correct?

A. Yes, yes.

Q. Are those all the materials that you have related to these cases, or do you have --

A. Yes, ma'am.

Q. -- more at home?

A. No. Do you understand that?

Q. I do. Thank you.

A. Okay. Can you move on to the next question, or could anybody ask me a question besides you?

Q. No, nobody can ask you a question right now, but me. It's my turn. Maybe other people have questions.

A. I need a break.

MR. STOHR: Let's take a break for about three to five minutes here.

THE VIDEOGRAPHER: We are off the

record at 11:15 a.m.

(Whereupon, a break was taken at 11:15 a.m. to 11:21 a.m.)

THE VIDEOGRAPHER: We are back on the record at 11:21.

BY MS. ROSEN:

Q. Mr. Vicente, can you tell us what materials you have in the envelope that you brought with you today at this deposition?

A. Statements that I made in 1993.

MR. STOHR: Take your time in going over them.

THE WITNESS: Statements that from way back.

BY MS. ROSEN:

Q. Sir, can you tell us the date of that statement that you just held up?

A. The date on here says June 7, 1993. Do the math, okay? I'm allowed to have these, ain't I?

Q. Of course you are allowed to have them, but we are allowed to ask you what you have.

So you have one statement that

you gave June 7th, is that what you said, of 1993?

A. Yep.

Q. Okay. What else do you have?

A. May 14, 1993, February 5, 1993, the statement I made in 2004, 5/26/2004 where I recanted, my affidavit.

Q. Okay. What else do you have?

A. Do you want to know about this?

Q. No, I don't. I am going to ask you questions when I am ready to ask you questions, Mr. Vicente. Thank you, though, for your help.

Any other documents that you have other than the June 7, '93, statement, the May 14, '93, statement and the February 5, '93, statement and your May 2, 2004, affidavit?

Well, I can't read that, so can you tell me the date on that document?

A. October 2018, the 18th of October, an affidavit.

Q. That's the affidavit -- that's the affidavit that you prepared with your other

attorney, Mr. Grimes; is that correct?

A. Yes.

Q. And that's the affidavit that you prepared with Mr. Ainsworth; is that correct?

A. Yes.

Q. And Mr. Tepfer was also there; is that correct.

A. I guess. I don't remember names.

Q. And was Ms. Bonjean there for that affidavit?

A. Yes.

Q. All right. Any other documents that you have other than the ones that you have just told us about?

A. Four transcripts on the Serrano case.

Q. Anything else?

A. No, that's it.

Q. Thank you.

Did Mr. Stohr show you any documents other than the ones that you have with you in your envelope?

A. (Witness indicating.)

Q. And what -- I can't see what that was. Can you tell me what that document was?

A. Basically, that's the one that -- I am looking at here, Iglesias, today's date, January 21st's date.

Q. Does it say deposition notice on it?

A. Videotaped, yeah, deposition, yes.

Q. Any other documents that Mr. Stohr --

A. The ones I am looking through now refreshing my memory.

Q. I'm sorry. You interrupted me so didn't hear your answer.

Are there any other documents that you -- that Mr. Stohr showed you in preparation for your deposition today?

A. I've been looking through my own documents.

Q. Other than the dep notice that you just showed us, did Mr. Stohr provide you any documents?

A. No, I got all the documents I

need.

Q. So I am going to ask you a question about the June 7, 1993, affidavit. I mean statement. That's a statement, right? It's a handwritten statement?

A. Yes, it is.

Q. And it's your handwritten statement; is that correct? Your name is at the top?

A. No, no, no. Get it right, none of these statements I wrote out.

Q. Understood. At the top of the document where it says, statement of, does it say your name underneath it?

A. This says the statement of Francisco Vicente that was written by Mary Roberts, Ed Doyle.

Q. I'm sorry?

A. And Ed Doyle.

Q. Where it says, this statement taken regarding the shooting death -- well, let me start over.

Does it say what case the statement was being taken in?

A.   First degree murder of Monica Roman, which occurred June 7, 1993, at 2148 North Sawyer.

Q.   And then the 8/14/93 statement, can you take a look at that one for me?

A.   Yes, ma'am.

Q.   Does your name appear at the top of the document?

A.   Yes.

Q.   And does it say who was present for that statement?

A.   Kevin Hughes, Detective Ernie Halvorsen, right behind Hughes.

Q.   Does it say what the offense was that you were being talked to about?

A.   Shooting death.

Q.   Does it identify the individual who was shot and killed?

A.   Sandoval, 3415 West Sunnyside.

Q.   And then you said -- did you say February 5, '93?

A.   Yes.  Shooting death of Rodrigo Vargas.

Q.   Does your name appear at the top

of that document?

A. Yes, ma'am. Yes, ma'am, and I didn't write none of these.

Q. Who else was present for that statement?

A. Detective Halvorsen and Pandek.

Q. Do you know who Mr. Bouto is, Roberto Bouto?

A. No, I don't know who Bouto is. I never met Bouto. I was put in a cell with Bouto, next to him, so I don't know Bouto.

Q. But you were put in a cell next to him?

A. Yes.

Q. When was that?

A. Sometime back in 1993.

Q. Why were you being put in a cell at all?

MR. AINSWORTH: Objection. Foundation.

BY MS. ROSEN:

Q. You said you were put in a cell, correct?

A. Yeah.

Q. Where was that cell located?

A. 5555 Grand, Grand and Central.

Q. That's a police station, right?

A. Yes, ma'am.

Q. Why were you put in a cell at the police station at 5555 West Grand?

A. I was booked.

Q. What were you booked for?

A. Armed robberies.

Q. Do you remember the date that you were arrested and booked for the armed robberies?

A. I'm not -- this is 30-something years ago. To dig in my head for an exact date, I don't know what to tell you.

Q. So you don't recall the date is what you are saying, right?

A. No.

Q. Do you recall who arrested you for those armed robberies?

A. Yes.

Q. Who was that?

A. Officer Pena, Detective Pena.

Q. Was Officer Pena a detective at

the time he arrested you for the armed robberies?

A. Yes.

Q. Did you know a Detective Pena before you were arrested for the armed robberies?

A. How would I know him? He's a cop.

Q. I am just asking a question.

A. No.

Q. How is it that you remember that it was Detective Pena that arrested you for the armed robberies?

A. I'll never forget that arresting officer.

Q. Why is that?

A. Because I jumped out of a car on him when I got arrested, and they had to chase me for four and a half blocks until they found me.

Q. What car did you jump out of it?

A. Police car.

Q. So they had arrested you, and then you jumped out of the police car?

A. Yes.

Q.   Why did you jump out of the police car?

A.   Why wouldn't I?

Q.   What do you mean?

A.   Why wouldn't I?  Who wants to go to jail?

Q.   So you jumped out of the police car because you didn't want to go to jail?

A.   Of course.

Q.   Then you said they chased you, and they caught you?

A.   Yes.

Q.   Were there other officers with Detective Pena when they chased you?

A.   About 40 of them.

Q.   Did you say 40?

A.   There was at least 40 of them that were looking for me.

Q.   How long did it take the 40 police officers to find you?

A.   I don't know.  Maybe you should call one of the 40 and ask them because I don't know.  I was running.  I was hiding. I wasn't keeping time.

Q. Where were you when you jumped out of the police car?

A. Fullerton and Long headed towards the police station, which is on Grand and Central in Chicago.

Q. Were you handcuffed?

A. Yes.

Q. Were you handcuffed behind you or in front of you?

A. Behind me.

Q. And so you were running down the street with your hands handcuffed behind your back?

A. I slid one off and took off, opened the door, jumped out in moving traffic, and gone.

Q. Describe for me how you slid the handcuff off.

A. I think that's irrelevant. It has nothing to do with the case.

MR. STOHR: Go ahead and answer the question.

THE WITNESS: I slid it off, lady. How else would you slide it off?

BY MS. ROSEN:

Q. You slid it off while it was behind your back?

A. Yes, ma'am.

Q. So you opened the back seat door and jumped out of the car while it was moving?

A. Yes.

Q. Where is it that the 40 police officers found you?

A. Hiding.

Q. Where?

A. Under a porch. Don't ask me for the address because I don't have it.

Q. Do you know what cross streets you were near?

A. I just told you that. Fullerton and Long.

Q. So you didn't get very far?

A. I got like three blocks away.

Q. What happened when the 40 police officers found you?

A. Well, obviously, they took me to the police station.

Q. Anything else happen to you while -- when the police officers found you?

A. They tossed me over a fence, hooked me to their car, got me to the police station.

Q. How did they toss you over the fence? Describe it for me.

A. Handcuffed. It was police brutality, and Pena was there.

Q. Did you suffer any injuries?

A. At the time, I was more scared than anything, okay? If I had a scrape or a bruise around my arm, it was -- I was just fine.

Q. So you don't think you had any scrapes, or you had them and they were minor?

A. I don't think I had any scrapes.

Q. You said it was police brutality. What do you mean? Because they threw you over the fence, or did they do something else?

A. Because they threw me over the fence.

Q. Would you say you were handcuffed before they threw you over the fence?

A. Yes, I was.

Q. From behind or in front of you?

A. Behind.

Q. How high was the fence?

A. I didn't bring a measuring tape with me, lady.

Q. Do you know which police officer threw you over the fence?

A. Lady, this was 30 years ago.

Q. Did it take more than one officer to lift you and throw you over the fence?

A. Yes.

Q. Do you know why they threw you over the fence?

A. Maybe because I jumped out of the car and ran.

Q. Then they -- you said they put you back in the police car and took you to the police station, right?

A. Yes.

Q. Was there any discussion with those -- Whose police car did they put you

in?  Was it Detective Pena's?

A.  Same guy, yep.

Q.  And when they took you to the police station -- well, was there any other police officer in the car with you and Detective Pena?

A.  His partner.  Don't remember his name.  Ask him.

Q.  When they took you to the police station, where did they take you?

A.  To lock me in a room, a holding room.

Q.  Was that on the first floor or the second floor of the police station?

A.  First floor.

Q.  Had you ever been to 5555 West Grand before that day?

A.  Yes.

Q.  On how many occasions?

A.  Many occasions.

Q.  Had you been arrested many times before that day?

A.  Yes.

Q.  How long were you in the holding

room?

A. I didn't count the hours.

Q. Were you handcuffed?

A. You are asking me something I can't answer. I didn't count the hours or what room I was in, what holding. You are locked up, you are locked up. You forget about the time, okay?

Q. Were you handcuffed?

A. Yes, to a wall.

Q. Were you by yourself?

A. Yes.

Q. I know you don't remember how long you were in that room, but what's the next thing you remember happening?

A. Being in jail.

Q. When you say "being in jail," what are you referring to? The cell at the station or Cook County Jail?

A. The jail, the cell at the jail that I was in.

Q. The police station?

A. Yes.

Q. Did you know what you were being

charged with?

A. Supposedly armed robberies at the time.

Q. Did you do those armed robberies?

A. That's what I was convicted of.

Q. Did you actually do those crimes?

A. Not all of them.

Q. How many armed robberies did you get convicted of?

A. I don't know.

Q. Too many to count?

A. Too many to count, yes. You should know that, though. You should have something in front of you that tells you how much or my background. Come on now.

Q. The armed robberies that brought you to the police station that particular day, the day that you first were put in the cell next to Mr. Bouto, those particular robberies, do you recall which robberies those were?

A. No.

Q. Do you recall whether or not you actually did those robberies, the ones that

brought you to the police station that day?

A.  No.

Q.  Did you give handwritten statements in connection with those robberies?

A.  No.

Q.  Are you sure of that?

A.  Don't remember.  It's been so long.

Q.  When you were put in a cell, that was the cell right at 5555 West Grand?

A.  Yes.

Q.  You said you were put in a cell next to Mr. Bouto, right?

A.  Not next to him, same area.  If there's ten cells back there, I was in one of them.

Q.  Was there anybody else in the cells other than you and Mr. Bouto?

MR. AINSWORTH:  Objection. Foundation.

THE WITNESS:  Come on now.  This lady.

MS. BRADY:  I am also going to

join that objection and for ease of going forward, I will just join in all of the Bouto objections.

MS. ROSEN:  Okay.  Thank you.

BY MS. ROSEN:

Q.  Well, you knew you were in the cell, right?

A.  Uh-huh.

Q.  Yes?

A.  Yes, I do.

Q.  And you knew Mr. Bouto was in the cell at some point while you were there, right?

A.  Yes.

Q.  Do you know that other people were down there at the same time?

A.  Yes.

Q.  Did you know any of the other people that were down there at the same time?

A.  Yes.

Q.  Who did you know?

A.  Lobo.

Q.  Who is Lobo?

A. Maldonado.

Q. How did you know Mr. Maldonado?

A. Well, let me say this nicely. Maldonado was supposed to be a second witness on the Bouto case that they dragged into confession, which was Guevara and Halvorsen, okay? When they did me, dragging me into this big circus, what you got going on today, many years back, Maldonado was present, okay, in the holding cell in the back. Okay?

I hope that answers your question, lady.

Q. Did you know Mr. Maldonado before you saw him in the cell in the lockup?

A. Yes, I did.

Q. How did you know Mr. Maldonado?

A. How did I know Mr. Maldonado?

Q. Yes.

A. We were in the same gang.

Q. How long had you known Mr. Maldonado before you saw him in the cell that day?

A. About three, four years.

Q.   What gang were you both in?

A.   Almighty Imperial Gangsters.

Q.   The time that you were arrested on this particular day that we are talking about, how long had you been a member of the Almighty Imperial Gangsters?

A.   About seven years.

Q.   And are the Almighty Imperial Gangsters Folks or People?

A.   Oh, they're Folks.

Q.   Did you hold any rank in the gang at that time?

A.   No.

Q.   Did you ever hold rank in the gang?

A.   Nope.

Q.   Did you have any conversations with Mr. Bouto while you were in the lockup area?

A.   Yes.

Q.   And what were those conversations about?

A.   Well, basically I asked him what he knew of his existence back then on

his-self.  He started talking.  He introduced himself as a PR Stone because I asked him what gang he was affiliated with, which was, what you be around?  What gang you associated with?  He said he was a member of the PR Stone.

Q.  And are the PR Stones Folks or People?

A.  They are People.

Q.  When you asked Mr. Bouto what he be about, did you ask him what you be about?

A.  Yes.

Q.  What did you tell him?

A.  I told him, we were neutrons.

Q.  What's a neutron?

A.  You're not in a gang.  I didn't tell him I was an Imperial Gangster.

Q.  When you said we told him, "we were neutrons," who were you referring to when you said "we"?

A.  Maldonaldo, Lobo, Lobo G.

Q.  Did you say Lobo G?

A.  Yes.

Q.  Is that his nickname?

A.   Yes.

Q.   When is the last time you saw Mr. Maldonado?

A.   Since this all started, I haven't seen that guy.  I don't even think he's alive.

Q.   So why did you tell Mr. Bouto that you were a neutron?

A.   Because we're oppositions.

Q.   When you say "we're oppositions," what do you mean?

A.   He's an enemy to us, basically.

Q.   You didn't want him to know that you were a part of the Folks Nation, right?

A.   Of course not.

Q.   When you say "of course not," why do you say that?

A.   Well, when I was gangbanging, I didn't run around telling everybody what I was.  You could tell me what you are, but I am not going to show you my hand, lady.

Q.   Why is that?

A.   Because that's the way I wanted it.  It was better like that.

Q. Better for you, right?

A. Oh, of course.

Q. What else did you and Mr. Bouto discuss other than his gang affiliation and you responding that you had no gang affiliation?

A. Basically nothing, just talking shit back there, joking, talking, killing time.

Q. Did you have any conversation with him about why he was in the lockup?

A. No.

Q. He said not a word to you about why he was there?

A. No.

Q. Did you say anything to him about why you were there?

A. No.

Q. Do you know why Mr. Maldonado was there?

A. He was there for armed robberies.

Q. With you?

A. Yes.

Q. Were you two both arrested

together?

A. No. They had picked him up before me.

Q. Did you and Mr. Maldonado commit armed robberies together?

A. That's what they allegedly said, and they convicted us for.

Q. Are you saying you didn't do it?

A. Some of them, I didn't.

Q. Well, I am just talking about the ones with Mr. Maldonado.

A. None with Maldonado.

Q. So Mr. Bouto never said anything to you about why he was there, and you said nothing to him about why you were there; is that correct?

A. Nothing.

Q. How long were you in the lockup with Mr. Maldonado?

A. Not long, not long.

Q. What happened?

A. After about 50, 40 minutes, they pulled me out of the holding cell.

Q. The lockup, you are talking about,

right?

A. Yes, yes.

Q. And that's a different room than the room you were in initially, right, when you first got there?

A. Yes.

Q. Who pulled you out?

A. The holding guard back there.

Q. Was it just you that got pulled out at that time?

A. Yes.

Q. Where did they -- where were you taken?

A. I was taken to an office and put in a room.

Q. Do you recall what floor the office was on?

A. No.

Q. When you were put in the room in the office, were you by yourself?

A. Yes.

Q. Were you handcuffed?

A. Cuffed to a wall.

Q. You said it's an office. How did

you know it was an office?  Did it have a desk or something like that?

A.  Big office where all the detectives and officers hang out.

Q.  A big office, you're talking about?

A.  Yes.

Q.  Were there multiple desks in this office?

A.  Yes, yes.

Q.  It was like an open area of the police station?

A.  Yes.

Q.  And you were handcuffed to the wall or something?

A.  Yes, in a room with a door.

Q.  Was the room off to the side of the office area that you are describing?

A.  Yes, they called themselves holding rooms for detainees.  They cuff you to the wall.

Q.  There's like a bench for you to sit on?

A.  Yes, and toilet.

Q. And how long were you in that cell before something happened?

A. I don't know.

Q. Eventually, did somebody come in to talk to you?

A. Yes.

Q. Who was that?

A. I got to see Officer Pena.

Q. Anybody else?

A. For a brief second, and then some time after that, I met -- unfortunately, I met Guevara and Halvorsen.

Q. When you met Mr. Pena, Detective Pena for a brief second, did you and he have a conversation?

A. Oh, he was just telling me to relax, calm down. I had a good run trying to jump out of the car. And after some time, I met the two, Guevara and Halvorsen.

Q. When Detective Pena told you to relax and calm down, were you agitated or aggravated?

A. No. I wanted to know what was going on, why I was being booked, and what

was going to happen.

Q. And then did Detective Pena answer your questions?

A. No. He took off.

Q. Then you said Detectives Guevara and Halvorsen came in the room?

A. Yes.

Q. Together?

A. Yes.

Q. Were they alone?

A. Yes.

Q. What happened when Detectives Guevara and Halvorsen came into the room?

A. Well, that's when the nightmare started. That's when the nightmare started 30 years ago for me.

What else you want to know?

Q. Tell me specifically what happened.

A. Well, he asked me if I was back there talking to an inmate, and I told him I was talking to two. From asking me them questions, he started trying to get me to coerce a story on Robert Bouto, which at the

time I didn't know him, which at the time I didn't even know his name. I didn't even know what the guy looked like.

Q. What story did Detective -- well, who asked you to coerce the story out of Mr. Bouto?

MR. AINSWORTH: Object to the form of the question.

Go ahead and answer.

BY MS. ROSEN:

Q. Who asked you? Yeah. Who asked you to coerce the story?

A. Guevara and Halvorsen.

Q. So both of them were asking you to coerce the story out of Mr. Bouto?

A. Yes.

Q. What story exactly did they want you to coerce out of Mr. Bouto?

A. That while in lockup, he confessed to me that he shot the bitch and that some guy pointed him out, two or three guys. He was picking his girlfriend up, he shot somebody, and that he admitted this to me in lockup, which was all a lie. The guy never

confessed anything to me.

Q. All right. So they wanted you -- they wanted you to get Mr. Bouto to confess, or they wanted you to say that Mr. Bouto confessed?

A. Lady, let me get this right. You are asking me a question that I already answered. I am not trying to be mean. They coerced me into saying, okay, that he confessed to me.

At no time did I want to do this, okay? They had the story. They never heard me and him talking back there. All they did was pull me out. Once I was in front of them, they both started asking me questions on what were we talking about, and I told them there was no conversation, and they asked me if he admitted anything to me back there about his crimes.

I said, no. That's when they started trying to get me and coercing me, and the story was -- this's going back to like nothing happened. We'll see you again.

I didn't want to see these

assholes again, okay? Because I am from the street. When I was 22 years old, I was from the streets. The streets, you don't run around snitching, okay? You get killed, okay?

These guys literally forced me into a confession by picking at my head numerous times that they got me in into this room because they kept putting me back into the lockup, and they kept wanting more conversation, but I wasn't on that. Having a fellow gang member with me from the same gang, I couldn't do what they wanted me to do, even if they wanted me to by force, but they got their way, okay?

Not only was I hit by Guevara and threatened by both of them, okay? This story of Bouto came from them, too. I never had any intention to go to the police. Bouto told me this, because I didn't know Bouto, never seen him. They were the ones that told me what he looked like, what to say.

So if there is anything else

you want to know, I will tell you what they made me do, okay?

Today, 30 years later, I'm known in the media as the Pope of Humboldt Park, the rat, the rodent, everything and anything. But they still haven't said -- not the State, not the judge, no one has said Francisco Vicente is a victim, too. When is anybody going to acknowledge that I am a victim of Guevara? When is anybody going to acknowledge that just like everybody else who was a victim of Guevara, I was, too? Did I get any help from the State? No.

Lady, before you even ask me, State Attorney Jack O'Malley's office put me in witness protection. They ruined my life. My own mother thought I did this. And all I told my mother over the phone over 14 years of serving my life in prison, because I served some time with this whole circus, mom, I never did this. It's all a lie. Everything is a lie. I don't even know these guys like they say. We were never in

the same room.  And if we were, we never talked about anything.  It was all a fabrication of Guevara and Halvorsen.  And because of them, many of us paid.

I don't get to share with a shrink.  The State ain't paying for a shrink for me.  The State ain't giving me shit. All they did was trick me into witness protection, knowing that Guevara and Halvorsen were fabricating this whole thing.

Even the State's Attorney Hughes, the other one over here, they knew this was all a game to them.  They were fabricating everything in front of the State.  They was taking notes, the ones that wrote this.

If you read one of the statements -- and if you want to stop me and ask me another question, go ahead, lady. Many years ago I couldn't talk like this because I'd choke up, okay?  It's the trauma.  None of you's have ever felt about asking me in court.  No one has asked me what I been there.  I wake up in shakes

because of Guevara, okay?  I sweat at night because I fear that these guys might die in prison.

Okay, now I can talk about it. You can ask me anything, but don't be coming at me like, I know, it's your job but, lady, I tell you my story, okay?  Not only did they put me in the witness protection program that I didn't want to be in.  I couldn't see a defense attorney.  Even if I wanted to, I couldn't see one.  I had a visiting list that was looked through.

You guys think that I was getting joggers.  I was sitting in a federal penitentiary getting some way, and I was getting special privileges like conjugal visits.  Yeah, if I got away with it, yes, I did because of the place I was in, State's Attorney camp and Illinois River.  Yeah, I got conjugal visits, which is illegal due to the State.  Yeah, I had jogging pants.  I had a Walkman.  I didn't want none of that. I didn't want to be there.  Because this all was a fabrication of Halvorsen and Guevara

and everybody that ran along with them, in cohorts, in trying to get a case in front of the judge and get a conviction, okay?

Many years I woke up in prison wondering why me, the snitch, maybe it could have been me for 25 years after they realized that we didn't do shit, and we didn't know each other. If I knew Armando Serrano from being in the same neighborhood or Jose Montanez that wiped my wounds when I was shot and left for dead in Cook County Hospital while the man was mopping a floor. This man literally took the time to care for me and take care of me in the hospital. Jose Montanez, years later why would I go and make up a story on him?

Q. But you did, right? You did make up a story on him?

A. Wait, wait, wait, wait. No, lady, get it right. Guevara made these stories up and Halvorsen. And like I said, anybody that tagged along to sign that statement. In none of these statements do you see my writing. You see a signature. Lady, in one

of these statements if you read it, it says I had a 9th grade education, and I know how to read and write. I went to high school. I'm not stupid. I could have wrote my own confession if I wanted to.

Q. You testified about them, didn't you, Mr. Vicente? You testified about all of them?

A. Yes. Why? Because I had Judge Coghlan, there was a State Attorney every time I made my presence in court threatening me losing me in the system. I will never see daylight. Not only that, Guevara had easy access to the court system where he would just be in the same room with me, knowing that I was going to tell them everything that he wants me to tell him, okay?

I was pressured even if I was to turn to Judge Suria, nobody threatened me? No, nobody threatened me. Nobody gave me, nobody promised me. Yeah, I had to do that in front of the judge, call that perjury, but it was under force. You ain't

been in the same room with Guevara when he slapping people, punching people, trying to get his way.

Q.   So, Mr. Vicente, I am going to interrupt you here because I have more questions, and I realize that you have a lot to say so --

A.   I got a lot to say.

Q.   -- I gave you some space.  I gave you some space so that you could speak, but I do have questions that I want to ask you. So I am going to go ahead and ask the questions, okay?

When you were talking to Detective Halvorsen and Detective Guevara about Mr. Bouto, did they ask you to simply say that he confessed to you; or did they want you to go down there and talk to Mr. Bouto to try and get him to confess?

A.   They asked me -- they asked me to try to get a confession out of him, and I wouldn't comply with it.  I told them flat-out I wasn't.

Q.   And then -- but did they give you

some kind of a story that he should be confessing to?

A. No. They were trying to give me a story for me to say that he told me back then.

Q. And the story that they wanted you to say that he told you was that he shot that bitch and that two or three guys ID'd him, right? Is that what you said before?

A. Yes.

Q. And, eventually, did you agree and that you would go along with it and say that Mr. Bouto gave you that confession?

A. Yeah, obviously, I did, under threat and under --

Q. Understood.

A. Oh, you don't want to hear the rest of that, huh?

Q. Well, you've already told us. You can go ahead and tell us again if you feel -- I don't want you to feel like I am cutting you off, so if you want to say more, go ahead.

A. I want to answer it. If this

concerns Guevara, yes, under threat and under his story line and his fabrication with Guevara, alongside of him, like his little puppy, that was the story I was supposed to sign and put on paper in front of the State Attorney.

Q. And then eventually, you have testified, right, about that story in front of a grand jury?

A. Yes, I did.

Q. Did you after your -- this meeting with Detective Guevara and Detective Halvorsen go back into the lockup?

A. Yes, obviously, I went back to the lockup.

Q. Did you have further conversations with Mr. Bouto and Mr. Maldonado?

A. Yes.

Q. What were those conversations about?

A. Laughing and joking, talking shit, telling stories back there, killing time.

Q. And then did you stay in lockup, or did you get pulled out again?

A. I got pulled out like six, seven times.

Q. Okay. And when you were pulled out these six or seven times, did you always go to see Detective Guevara and Detective Halvorsen?

A. Yes.

Q. What were they saying to you as they kept pulling you out over and over and over again?

A. Trying to get me to fabricate the story, memorize what they were trying to tell me to say because I was going to see someone, make a statement and so forth.

Q. I see. And, eventually, you did that, right? You met with somebody, and you gave a statement?

A. Yes.

Q. Do you recall who it was you gave the statement to?

A. No.

Q. Did you tell the -- was it a State's Attorney that you met with that you gave the statement to?

A.   Yes.

Q.   Did you tell that State's Attorney that what you were telling him was a lie and was coerced by Detective Halvorsen and Detective Guevara?

A.   I never had a chance to tell that State Attorney anything like that.

Q.   Why is that?

A.   Because I had Guevara and Halvorsen in the room.

Q.   Did you ever ask to speak with that State's Attorney by himself or herself?

A.   No.

Q.   Do you recall if that State's Attorney was a man or a woman?

A.   Don't recall.

Q.   At any point in time while you were in the lockup with Mr. Bouto, did you sell him any candy?

A.   No.

Q.   Did you have any candy bars on you while you were in the lockup at any time that day?

A.   Guevara and Halvorsen knew I was

going through withdrawals.  They fed me candy bars, and they fed me pop, if that's where you're going.

Q.  Did you take any of those candy bars into the lockup?

A.  No.

Q.  How did Detective Halverson and Guevara know you were going through withdrawals?

A.  You could tell I was.

Q.  What were you withdrawing from? What drug?

A.  Heroin.

Q.  At that time, were you using heroin regularly?

A.  Not regularly, but I was.  I had just started using heroin.  I was 22 years old.

Q.  And you were using enough heroin that when you stopped using it, you would go through withdrawals, right?

A.  Yes.

Q.  After you gave the statement against Mr. Bouto, after you signed the

statement that was prepared for you by the
State's Attorney, what happened?

A. Well, he sent us to Cook County
Jail. They made sure, and they told me,
Halvorsen and Guevara, that they would --
they were going to make sure that we were on
the same bus ride together. That way it
could look like he had enough time to tell
me and confess whatever they wanted me to
supposedly hear from him and tell them,
which would never happen.

Q. So they put you on the same bus
with Mr. Bouto so that you could keep
talking to him; is that what you are saying?

A. Yes.

Q. And that way, you were given more
opportunity for him to confess to you,
right?

A. Yes.

Q. That was the point?

A. But there was never any confession
from him.

Q. Understood. And when you got to
Cook County Jail, did you see Mr. Bouto

again?

A. Yes.

Q. When did you see Mr. Bouto again after you got to Cook County Jail?

A. Well, they separated us after holding us and putting us through their -- and then they split us up. That was the last time I seen him.

Q. So after you got --

A. 26th and California intake, receiving, that was it.

Q. And you never saw him again?

A. Nope. Saw him about three, four years ago on the news.

Q. Did you testify in Mr. Bouto's criminal case?

A. I don't believe so.

Q. Before that day when you were taken out of lockup the first time, and you were brought to the room where eventually you saw Detectives Guevara and Halvorsen, had you ever met Detective Guevara before?

A. No. I've seen him but never ran into him.

Q. What about Detective Halvorsen, had you ever seen -- had you ever met him before?

A. No, never met neither one of them.

Q. You say you had seen Detective Guevara before, where had you seen him?

A. Patrolling in the neighborhood that I'm from, driving around with Halvorsen.

Q. You had never been arrested by either of them before, correct?

A. Never even spoke to them.

Q. Any idea why they pulled you out of the lockup to try to get you to go on with their plan as it related to Mr. Bouto?

A. Well, the question that you are asking me, I don't know how to answer that because there was someone else back there. They even got his confession, too, okay?

I do recall that they tried to get Maldonado to sign a statement. I'm not sure if Maldonado filed a statement, but they were trying to get Maldonaldo to go along with it.

Q.   How do you know that?

A.   How do I know that?

Q.   How do you know that, what they were trying to do with Mr. Maldonado?

A.   They tried to do it with both of us.

Q.   I understand that.  But I am saying, how do you know -- you, obviously, know what they did with you.  How do you know what they tried to do with Mr. Maldonado?

A.   Well, obviously it came out.  I found this out later.

Q.   From who?

A.   Court, he's a witness.  There's other witnesses, too.

Q.   I thought you didn't go to court and testify against Mr. Bouto?

A.   But he made a statement, didn't he?

Q.   Well, how do you know that?

A.   Lady, I'm attached to this case. It's been 30 years, okay?  He was in lockup with me, okay?  I don't know what they asked

him.  I don't know what he said.  I don't know what he signed.  But I'm pretty sure they tried it with him, too.  Why don't you ask him.

Q.  How do you know that?  Did you talk to Mr. Maldonado about it?

A.  No.

Q.  Did you talk to anybody about what Mr. Maldonado did or said?

A.  Let me show you something, lady. I am going to tell you like this.  I never talked to Maldonado about him giving a statement because I never seen Maldonado after that either, okay?  But I am pretty sure they tried using him, too, okay?  I'm not the only one that they tried to drag into this as a witness, okay?

There is another guy, too, that they called Loco.  Let see, what was his name?  Timothy Rankins.  That was another witness.

Q.  Against Mr. Bouto?

A.  No, on another case.

Q.  On what case?

A. Involving Guevara.

Q. What case?

A. Serrano case.

Q. How do you know that?

A. Because I am a part of the case, lady, like I just told you. I am a part of the Bouto case. I am a part of this case. I ain't slow now. Come on now. This is 30 years later. A bunch of this has come out. I am not stupid now, and I am not being disrespectful either. But 30 years later, who doesn't know this?

Q. Did you know at the time that you gave your statement with respect to Mr. Bouto that Detective Guevara and Detective Halvorsen were speaking with Mr. Maldonado also?

A. No, I didn't know.

Q. When did you first learn that?

A. Well, I learned afterwards since we was split up that he had court, and I had court. We seen each other, and he told me -- I basically remember him telling me that they were still trying to get him to

confess to somebody that never happened.

Q.   Maldonado told you that?

A.   Yes, yes.  I ignored it only because I didn't want to give myself up in lockup, knowing that everybody was going to hear our conversation, okay?

Now, you are talking about something 30 years back, and you keep digging for this and digging for that, and I know that's your job, but let me tell you something, ask me, okay, about Guevara.  Ask me about why didn't I speak up earlier. Don't ask me about Maldonado because I don't know what to tell you.  I could tell you I am pretty sure they got him, too.  That's how crooked your cops are, Guevara and Halvorsen, okay?

Q.   Mr. Vicente, so let me just back up for a second.  I thought you told me that you never had a conversation with Mr. Maldonaldo, and now it sounds like you did have a conversation.

A.   Wait, wait, wait.

Q.   Wait, let me finish my question,

please.

A.  Okay.

Q.  You earlier indicated that you never had a conversation with Mr. Maldonado, and now it sounds like you did have a conversation with Mr. Maldonado.

So which is it?  Did you or didn't you have a conversation with Mr. Maldonado?

A.  Lady, I just told you that.  I was trying to explain to you.  You can't talk in a bullpen because there's other criminals, so I brushed it off, okay?  I didn't want everybody in that bullpen to know that we were trying to snitch on somebody, okay?  So we never got into that conversation.

But like I said, and it's videotaped, I'm pretty sure he got to him, too.  Because by all means, that's how dirty those cops were.  They would have done anything to get a conviction.

Q.  Has anybody ever told you that Mr. Maldonado also gave a statement against Mr. Bouto?

A.   No, but I'm pretty sure that they probably trying getting one.  Like I said, they are that corrupt, and they are that dirty.

Q.   Once you got to the lockup -- I mean, once you got to Cook County Jail, where were you being housed?

A.   In the jail.

Q.   Okay.

A.   In the jail in a jail cell.

Q.   All right.  And then did you have to go to court on your case at any point in time?

A.   Yeah.

Q.   Then how is it that you got involved in either Mr. Iglesias' case or Mr. Serrano, Mr. Montanez, and Mr. Pacheco's cases?

A.   Guevara and Halvorsen.

Q.   And how -- explain to me how that happened.

A.   Well, they would pop up in Cook County Jail.  If I was going to a Courtroom 402, they would be in 402 lockup waiting for

me to be taken up into an elevator. As soon as I got out of that elevator, escorted by the Division 5 officer or courtroom officer, you see them. Yours truly in their suits looking at me, hey, let us talk to you. I'm going to pull you over here into the jury room or behind the courtroom, there is a little room, we need to talk to you.

From there, they would call me up to the State's Attorney's Office and send me passes, which have been documented, too, in the past. Any pass I got from Cook County Jail was either to court. Even if I didn't have court, I would have court just to see them in the back in the courtroom with court going on in this courtroom, people moving back and forth, just to see me.

State's Attorney's Office, they would call me upstairs to the 13th floor, Jack O'Malley was running the show as State Attorney. They would call me up there and keep me up there for hours where I got visits from my ex-wife where I was proposed

these deals for testifying where I was coerced some more, and where I was basically in the lion's den.

Q. Which case did they talk to you about first? In the case involving Mr. Iglesias or the case involving Mr. Serrano, Mr. Montanez, and Mr. Pacheco?

A. I believe it was Iglesias, and they were already talking to me about the Serrano case, too.

Q. At the same time? At the same time?

A. Yes, that's how they tied me to three cases. That's where the mess.

Q. So it's your testimony they were talking to you about Mr. Iglesias' case and Serrano, Montanez, and Pacheco's case at the same time, right?

A. Yes.

Q. And do you recall how much time had passed between the time that you were first arrested and the time that they started talking to you about Mr. Serrano, Mr. Montanez, Mr. Pacheco, and Mr. Iglesias'

cases?  Was that weeks or months or years?

A.  No.  Within five, six months, all three cases were -- I was wrapped up in them.

MR. STOHR:  I would like to take a five-minute break.

THE WITNESS:  It's up to you.

MS. ROSEN:  Sure.

MR. STOHR:  And we also should give some thought as to whether there is going to be a lunch break.  I don't know how long you are planning on going.

MS. ROSEN:  Oh, I imagine we are going to need a lunch break, so.

MR. STOHR:  Is this a good time?

MS. ROSEN:  Well, I mean, we have only really been going -- it's up to the witness.  If the witness needs to eat, then the witness -- then that's fine.  We have only been going for basically an hour.  So and, you know, we probably have six more hours to go, so.

MR. STOHR:  We have been here since 10:00, and I have been here since

9:30.  I know I need to take a lunch break at some point.

MS. ROSEN:  If you want to take a lunch break now, that's fine.  I am just saying.

MR. STOHR:  What time --

MS. ROSEN:  We are going to have a long afternoon, but I am fine with that, too.  It's up to you and the witness.

MR. STOHR:  What time do you propose to take a lunch break?

THE VIDEOGRAPHER:  Ms. Rosen, do you want to go off the record?

MS. ROSEN:  Yes, please.

THE VIDEOGRAPHER:  We are off the record at 12:21.

(Whereupon, a break was taken at 12:21 p.m. to 12:34 p.m.)

THE VIDEOGRAPHER:  We are back on the record at 12:34 at the beginning of Media Unit 2.

BY MS. ROSEN,

Q.  Mr. Vicente, are you all set?

A.  Yes.

Q.   So you told us that within five or six months of your arrest for the armed robberies that led to your encounter with Mr. Bouto, you were being pulled out of Cook County Jail and talked to about Iglesias, Serrano, Montanez, and Pacheco, correct?

A.   Yes, ma'am.

Q.   Who specifically had those discussions with you?

A.   Halvorsen and Guevara.

Q.   And where did the first discussion with you about those four individuals, Mr. Serrano, Mr. Montanez, Mr. Pacheco, and Mr. Iglesias happen?

A.   I don't recall the date.  I don't recall where.  I know it happened 30 something years ago.  Okay, these are things that I've been trying to not think about for the last 30 years because it's been a nightmare.  So it's not easy for me to come up with dates or exact specific places.

Q.   So you have no recollection -- you have no recollection of where you were --

A.   No.

Q. -- when Detective -- you are going to have to just let me get the question out for the court reporter, please.

You have no recollection of where specifically you were when Detective Guevara and Detective Halvorsen first talked to you about Serrano, Montanez, Pacheco, and Iglesias, correct?

A. Right.

Q. But they talked to you about all four of those individuals at the same time, right?

A. Yes.

Q. What did they say to you about Mr. Serrano, Mr. Montanez, and Mr. Pacheco?

A. Well, basically what the story line was basically that I was getting compensated with reduction on my time, that I was getting sent to witness protection, that they were going to make sure that I was secure. A bunch of things happened in those conversations that weren't supposed to happen numerous times.

Q. So they were -- Detective

Halvorsen and Detective Guevara were offering to compensate you with a reduction of your time, witness protection, and your security in exchange for what?

A. For testimonies.

Q. Testimony against Mr. Serrano, Mr. Montanez, Mr. Pacheco, and Mr. Iglesias, right?

A. And Bouto. Don't forget him.

Q. Well, did they offer you a reduction in time, witness protection, and security when they first talked to you about Mr. Bouto?

A. Yes.

Q. Tell me specifically when they were talking to you about Mr. Bouto only that very first day that you encountered Detectives Guevara and Halverson and what they said about compensating you.

A. They sold me a dream of witness protection, my safety, reduction in time, sending me to a place they knew, which was called SMU, from the beginning.

Q. When you said they sold you a

dream, what do you mean?

A. Well, a nightmare basically. Because all it is is a nightmare for me, okay?

Q. But you said at the time that they sold you a dream. And so I am just trying to understand what was your perception of what they were selling you at that time? What did you think was going to happen?

A. Basically for me snitching and for me signing the statements and for me working with the State, that's what I was getting, okay, which was a nightmare not a dream. Let me correct myself.

Q. When they were talking to you only about the Bouto case, did they talk to you about specifics in terms of reducing the amount of time that you would have to serve for your armed robberies?

A. There was talk but no specifics.

Q. And did they say they were going to immediately put you into witness protection?

A. Yes. They tried hard.

Q.  Did they get you into witness protection immediately when you got to the jail?

A.  No, it took them five months.  And the five months, they tied me up to three cases.  That's what it took them to get me to witness protection.

Q.  When they started to talk to you about Mr. Serrano, Mr. Montanez, Mr. Pacheco, and Mr. Iglesias, did you know any of those individuals before Detective Guevara and Detective Halvorsen brought them up?

A.  I knew Armando Serrano, and I didn't know him personally, but we had an encounter together, which was a fight.  We got into a fight one day running into each other.  There was some physical altercation between both of us.

And Jose Montanez, I knew him from when I got shot in 1988, gunshot wound to the abdomen.  When I was laying in Cook County Hospital, he was a worker at the hospital and he recognized me while I was

laying in bed.  I knew Jose Montanez from being in the same gang I was in.

I didn't know Serrano from being in the same gang.  I didn't know Snake from being in the same gang.

Q.  Who is Snake?

A.  Snake is Iglesias.

Q.  How about Mr. Pacheco?

A.  Mr. Pacheco I grew up with.  He is the only one that I grew up with.  I ran around with him for many years as a young adult in my teens.  I knew his mother.  I knew his brothers.  I knew where they lived because I ate and I hung out at his home, just like he did at mine.

Q.  And did Mr. Serrano have a nickname at that time?

A.  I don't know.

Q.  Did you refer to Mr. Serrano ever as Mando?

A.  Yes, due to the cops' story, lying or fabrication, that's what I was told to say.

Q.  So that was made up by the police?

A. All of it was from start to finish. From Bouto to everything that was put on the statement, yours truly, Halvorsen and Guevara.

Q. Before you spoke with Detective Guevara and Detective Halvorsen about Mr. Serrano's case, you did not know that his name -- his nickname was Mando?

A. No.

Q. How about Mr. Montanez, did he have a nickname?

A. I knew him as Pistol Pete, but there was two on the streets that I knew. He was just one of the two, and I knew them both.

Q. How about Mr. Pacheco, did he have a nickname?

A. They called him Jordan because he loved basketball, and he had the best shot on the court.

Q. So like after Michael Jordan, right?

A. Yes.

Q. And then you said Iglesias was

Snake, right, and you knew that?

A. No, I didn't know that.

Q. You didn't know that before?

A. I never knew Snake before. Never knew his name, never knew his nickname, never ran into him until I met him in the bullpen.

Q. When did you meet him in the bullpen?

A. I don't know the exact date. The day they set up to put me and him in the same bullpen. That was Guevara's and Halvorsen's plan to put us in the same bullpen so we could strike a conversation, so then I could then say that he confessed to me, where there was never a confession.

Q. So you knew about it in advance?

MR. AINSWORTH: Object to the form of the question. Lacks foundation as well.

MS. ROSEN: You can answer.

BY MS. ROSEN:

Q. Did you understand my question?

A. Could you repeat it?

Q.  Sure.  Did you know before you went into the bullpen where Mr. Iglesias was that Detective Halvorsen and Detective Guevara expected you to strike up a conversation with Mr. Iglesias to secure a confession from him?

A.  That was the plan.

Q.  That's why they have -- so they arranged it so that you would be in the bullpen at the same time as Mr. Iglesias so that you could attempt to get him to confess to you, right?

MR. AINSWORTH:  Object to the foundation.

MS. ROSEN:  You can answer.

THE WITNESS:  I never got a confession out of him.

MS. ROSEN:  I understand that.

BY MS. ROSEN:

Q.  I am saying before you were put into the bullpen with Mr. Iglesias, you understood that Detective Guevara and Detective Halvorsen wanted you to strike up a conversation with Mr. Iglesias to try and

get him to confess to you, right?

A. Yes, they wanted me to strike up a conversation.

Q. All right. But you did not know Mr. Iglesias before you were in the bullpen with him that day, right?

A. Never met him a day in my life.

Q. Did you know that he was an IG?

A. No, never knew that.

Q. You'd never seen him on the street?

A. Never, not once. Didn't know who he was, never heard his name.

Q. And, Mr. Serrano, he was an IG, too, right?

A. Supposedly.

Q. You say supposedly?

A. Because I didn't know that. I know that now that he was.

Q. So you have come to learn that he was an IG?

A. Yes.

Q. And how did you come to learn that, find that out?

A. In prison.

Q. Was Mr. Pacheco also an IG?

A. Yes.

Q. When was the last time that you had any interaction with Mr. Serrano?

A. I never had no interactions with Serrano.

Q. Ever?

A. Just a fight.

Q. What was that fight about?

A. Just two of us fighting, and he kicked my ass.

Q. Well, why were you fighting, though?

MR. AINSWORTH: Objection. Asked and answered.

THE WITNESS: I don't recall.

BY MS. ROSEN:

Q. You don't remember?

A. I don't recall.

Q. Do you remember where the fight occurred?

A. Somewhere in Humboldt Park.

Q. When is the last time that you had

any contact with Mr. Montanez?

A. Never -- I haven't had any contact with him since 1988 before all this happened in Cook County Hospital when he was trying to be caring, and he recognized me laying in a bed, and I was dying.

Q. How about Mr. Pacheco, when was the last time you had in any contact with Mr. Pacheco?

A. I haven't had any contact with Mr. Pacheco even after I filled -- wrote a statement out for the officers, and everything started, I didn't have any contact with Jose Pacheco for like maybe six, seven years because we grew apart as friends.

Q. You mean before you gave the statement, you had grown apart?

A. Yes, yes, we had grew apart already.

Q. And you -- since all of this happened, you haven't had any contact with him?

A. No, none. Even now none.

Q. And you have testified previously on behalf of Mr. Serrano and Mr. Montanez, correct?

A. What do you mean? I have testified against them?

Q. No, for them. In deposition, did you testify --

A. Yes.

Q. -- for them?

A. Yes.

MR. AINSWORTH: Object to the form of the question. That's not testifying for somebody.

THE WITNESS: No. I am testifying for myself, first off, and I am telling the truth, my truth, okay?

BY MS. ROSEN:

Q. You gave a deposition in the civil case of Mr. Montanez and Mr. Serrano, correct?

A. Yes, that's correct.

Q. And were Mr. Serrano and Mr. Montanez present when you gave your testimony?

A. No.

Q. And after you gave your deposition testimony in Mr. Serrano and Mr. Montanez's case, did you have any contact with either one of them?

A. No.

Q. Did you have any contact with Mr. Ainsworth since the time you gave the deposition at his office in Mr. Serrano and Mr. Montanez's case?

A. Ainsworth?

Q. Yes.

A. Don't recall the name.

Q. He is right -- he is in this -- he is raising his hand right now.

A. Oh, this guy?

Q. Yes, with the glasses.

MR. AINSWORTH: Can you repeat the question?

MS. ROSEN: Sure.

BY MS. ROSEN:

Q. Since you gave the deposition in Mr. Serrano and Mr. Montanez's case at Mr. Ainsworth's office, have you had any

contact with him?

A. With this guy or Serrano, no. I think I seen this guy in my lawyer's office.

Q. Which lawyer?

A. I don't know. This one here.

Q. No, no, no. The lawyer you are saying, Mr. Ainsworth?

A. Yeah.

Q. And you said in your lawyer's office. Which lawyer?

A. Grimes.

Q. He was there when you signed that affidavit in 2018, right?

A. I believe so.

Q. With Ms. Bonjean, right?

A. Yes.

Q. Have you had any contact with Ms. Bonjean since you gave the deposition in Mr. Serrano and Mr. Montanez's civil cases?

A. No. They are not my lawyers.

Q. I am just asking if you have had any contact with them?

A. No.

Q. Are you aware that Mr. Serrano and

Mr. Montanez have settled their lawsuit with the City of Chicago and the City Defendants?

A. Yeah, that's all over the news.

Q. And when did you first learn that Mr. Serrano and Mr. Montanez settled their lawsuit?

A. I seen it on the news. Channel 7 news, Telemundo.

Q. How long ago was that?

A. When the settlement hit the news.

Q. Do you recall how long ago that was?

A. No. It wasn't long ago.

Q. And since the settlement, have you had any -- heard anything from Mr. Serrano or Mr. Montanez or anybody on their behalf?

A. No, no.

Q. Now, going back to the conversations that you had with Detective Guevara and Detective Halvorsen about Serrano, Montanez, Pacheco, and Iglesias, if we could focus on just Serrano, Montanez and Pacheco first, what exactly did Detective Guevara and Detective Halvorsen want from

you with respect to those three individuals?

A. Well, they wanted me to say that I got a confession from them. Standing out on the corner when they drove by, they stopped, allegedly, they started talking of Mando screwing up, fucking up, and that they had just shot somebody, which none of it was true. There was never any meeting or any situation where we met on the street corner. The whole story was fabricated by Halvorsen and Guevara to me to tie me into a statement against these guys.

Q. Did Detective Guevara or Detective Halvorsen tell you why they wanted you to say that those three confessed to you?

A. No.

Q. And when Detective Guevara and Detective Halvorsen first approached you and asked you to say that Mr. Serrano and Mr. Montanez and Mr. Pacheco confessed to you, what did you say to them?

A. Listen, every time I refused to work with them or any time they didn't get -- hear what they wanted out of me, since I

would be pulled into a room, and now I believe that it was premeditated because they knew what they were doing. Putting me in a room to aside, where no one can hear me or see me, they would be able to threaten me, to hit me upside the head if they had to, and get their way with me, okay? So there was a lot of that. This is something that I never wanted to do, not even with the first, second, third case.

Q. Did they express to you why they wanted you to tell this story about Mr. Serrano, Mr. Montanez, and Mr. Pacheco having confessed to you?

A. No, they never ever explained anything to me like that. I wish they would have.

Q. All right. And eventually, you agreed to say, right, that? Exactly that, that Mr. Serrano, Mr. Montanez, and Mr. Pacheco confessed to you, right?

A. I didn't agree. I was forced into this, okay? It's not like I walked out of my house with a statement in my pocket

knowing that today, I'm going to get stopped. I am going to jump out of a car, and then I am going to go tell the police, hey, I know about this. I know about that. No, no.

Q. But eventually, you signed a statement saying that Mr. Serrano, Mr. Montanez, and Mr. Pacheco --

A. That's all paper.

Q. That's all you did?

A. Yes.

Q. Did you go to the grand jury in that case?

A. I'm not sure. I know I went to the grand jury. There's three cases involved. If you ask me, I might be tied up and tell you something that didn't happen or it did because there's three cases 30 years ago.

Q. Did you testify at trial, Mr. Serrano, Mr. Montanez, and Mr. Pacheco's trial?

A. Yes.

Q. And did you testify that they --

and you testified that they confessed to you, right?

A. Yes. But before confessing to that on trial, I had Guevara and I had Halvorsen in the back with the witness' wife, a Wilda, or whatever her name was, crying back there telling me what to do.

MR. AINSWORTH: Sorry, could I just interject. Eileen, I am giving you a lot of latitude but, you know, there's been a lot of -- this testimony was elicited from Mr. Vicente's prior deposition. And so I just want to know if it's your intention to retread all of the ground that was covered in the prior deposition, or are you intending to -- you know, under new ground?

MS. ROSEN: Well, first of all, I am not sure that I am bound to Mr. Vicente's prior deposition in any way. Second of all, certainly, Mr. O'Callaghan wasn't a part of that, nor was his client.

So I don't intend to ask the questions you asked Mr. Vicente, but I am going to go over the basics, and then I am

going to do what I feel like I need to do.

And as far as you saying you are giving me latitude, I don't understand, are we -- is that the game now that once a witness has been deposed that we don't get to ask questions in a different case?

MR. AINSWORTH: Well, I think that --

MS. ROSEN: You know what, wait, we are going to -- if we are going to have this discussion then, if you are going to have a lengthy discussion on this topic, then I don't think it's appropriate to have the witness here for it because that's, I think, a speaking objection. And you are eating up time on the record.

So if you have just a couple more things to say about it, fine. Otherwise, then we need to ask Mr. Vicente to step out of the room and deal with it that way.

MR. AINSWORTH: I can briefly state that I think where the City and Halvorsen and Guevara have all questioned

this witness about a case, I don't think Mr. Hughes' counsel is intending to ask Mr. Vicente any questions about, you know, cases other than that pertain to his client, given his objections on the record when I asked any questions about the Montanez case and with other witnesses. But, you know, if he has questions, then we will take it on -- you know, we will see what they are. But I just think that we are all best served if we focus on the two cases which we are here for this deposition, given that this witness has given a seven-hour deposition about the Montanez case previously, as well as about, you know, the other two cases. But go ahead.

MS. ROSEN: Thank you.

I'm sorry, can you remind me what my last question was?

(Whereupon, the record was

read as requested.)

THE WITNESS: Yes.

BY MS. ROSEN:

Q. And at any point in time up until

the point that you testified against --
testified in the criminal cases against
Mr. Serrano, Mr. Montanez, and Mr. Pacheco,
did you tell anyone that you were being
forced into that testimony?

A.   Yes, I told my family.  Nobody
believed me, though.

Q.   When you say you told your family,
who specifically in your family did you
tell?

A.   Well, I told my mom.  I told my
four brothers, and no one believed me.

Q.   Do you know why they didn't
believe you?

A.   Well, lady, I had a case that was
involving murder.  My family basically told
me over the phone even when I called home,
they didn't believe me.  My own mother told
me she didn't believe me.  Now they believe
me.

Q.   They didn't believe what?

A.   That I was involved in all this
and that I was being harassed by two cops.
I was being told what to say.  They didn't

believe none of it.

Q. Do you have an understanding of why they didn't believe you?

A. I don't know. Maybe you should ask them. There goes one of them questions, and you are going to tell me you had to ask that. Maybe you should ask them that. I can't answer something for somebody.

Q. And then with respect to the criminal cases against Mr. Serrano, Mr. Montanez, and Mr. Pacheco, do you know what ended up happening with those cases?

A. They got convicted.

Q. Did they get convicted?

A. They got convicted.

Q. And then with respect to Mr. Iglesias' case, did you testify in his criminal case?

A. I'm not sure if I did. I don't think I did.

Q. After you were put in the bullpen with Mr. Iglesias to strike up a conversation with him to try and get a confession out of him, did you -- well, let

me strike that.

When you were in the bullpen with Mr. Iglesias, and you were instructed to strike up a conversation with him so that -- to see if he would confess to you, I think you said earlier that he did not; is that right?

A. Right.

Q. But you provided a statement to the State's Attorneys that he did; is that correct?

A. Yes, that was the fabrication statement that I was provided with and the story line by Halvorsen and Guevara.

Q. And you don't recall if you ended up testifying to that in the criminal case, correct?

A. Right.

Q. And then did you as a result of your various statements that you gave and the involvement that you had in the three different cases get a reduction in your sentence for your armed robberies?

A. Yes.

Q. How big of a reduction did you get?

A. Well, for my strong arm robberies and armed robberies, I got six years for each one, and I believe there was numerous of armed robberies that they put on me. Simple robberies, I got three years. There was numerous simple robberies that they put on me. I had from the judge three years to run together with the six, okay?

Q. How much time did you end up serving?

A. I ended up serving maybe three years.

Q. So what year did you get out of prison?

A. I'm not sure. The first time I got out, it was '98, something like that.

Q. Then did you go back in for something?

A. Yes.

Q. Why were you back in prison?

A. Well, people don't know this, but I was out for 15, 16 days, and the 16 days

or 17, maybe 19 days that I was out, I was picked up by some police officers that ended up going to my mom's house. When I ended up getting there, they asked me for my ID, gave them my ID, and they asked me to come to the police station, to follow them in my own car.

And upon going to the police station, 5555 Grand, I was exploited with my mother and my younger brother, Luis Vicente, into a holding cell, once again. And for about four hours, we were locked in a room, and then they let my mom out. They let my brother out. And before you knew it, I was charged with armed robberies again, and I was in front of a judge.

But with them letting my brother and my mother out of the room, Halvorsen stuck his head in the door, and literally said, hi, Chino, how you doing? Good to see you. Locked the door back up and disappeared.

So to me, that was them telling me, we got you off the street. We

got you to keep your mouth shut. You ran around for 16 days. You're lucky you did. I took the time they gave me, and I went and sat at SMU peace-free until I got kicked out of SMU.

Q. So you went into SMU after this second --

A. Yes.

Q. -- arrest?

A. Both times. They put me in the special management units for the State's Attorney's Office.

Q. Do you have an understanding of why you were put in SMU the second time?

A. Yes. I was put in there the second time so no defense attorneys could get ahold of me, so no one can talk to me about the crimes that I was involved in with these other guys that I testified on.

SMU, no lawyer can come and see you. It's the State's Attorney's camp to keep the state witnesses in their holding, in their little place. You guys should know the rest.

Q. How long -- how much time did you spend in the SMU the second time?

A. The second time I spent ten years, almost ten years, nine years and a half in there.

Q. In the SMU?

A. Yes, because I got 20 years the second time. I took it on a cop-out just to go down state. Upon taking that, I ended up not choosing, not wanting, because I didn't want to go to SMU. It was in my docket. That's where they send me to for my protection.

Q. So where or what prison did you go to where you were in the SMU the second time?

A. The first time and the second time, I was at SMU, Illinois River in Canton, Illinois. They have one segregated side for all the state witnesses that are being housed there.

Q. So you went to Illinois River after the first arrest, the one that you -- where you first encountered Mr. Bouto?

A. Yes.

Q. And then you went back to Illinois River after the second arrest after the 15, 16 days that you were talking about?

A. Yes, back to the same place.

Q. Back to the same place?

A. Yes, back to the same place, SMU, special management unit.

Q. Did you stay at Illinois River for the entire ten years?

A. No. I tried to get kicked out of there because I didn't want to be there willingly. I tried smuggling drugs into the place. I tried getting caught having contact visits, sexual visits with my pants around my waist, around my ankles. I tried everything to get kicked out of there.

Q. Did it work?

A. Yes, I did. An officer after so many years kept laughing at me and told me, all you had to do all this time, Frank, was hit one of the state witnesses because then you are a threat to them.

As soon as he said that, I

walked up to the first inmate I seen that was a state witness, and I started cracking him over the head. I ended up in segregation. And within a week, I was tossed out of the penitentiary and tossed out of the program. I was no longer a state witness in their holding and in their clench.

Q. So then where did you get transferred to?

A. I got sent to another penitentiary, which was population. I had to fend for myself. I had to explain to everybody that knew me or that knew of me what I was doing and where I was.

Q. What prison was that?

A. I've been to many prisons after that. I don't recall what prison it was after that that I got out of management because I been to a few of them. Probably Danville, Big Muddy, Logan. So there's a few penitentiaries I went to where I was safe in population.

Q. So just so that I have it clear,

when you were at Illinois River the second time, you were in SMU?

A. Yes.

Q. And you hit this prisoner, eventually, this other prisoner, and that got you kicked out and that put you into general population?

A. Right.

Q. But you don't recall which prison you first went to, right?

A. No, no. I didn't care. They could have sent me to Stateville. I would have been just right. I didn't want to be in the special management unit. That's how they kept --

Q. Sorry, go ahead.

A. No, go ahead.

Q. Do you recall how many years you spent in SMU the second time?

A. Nine years and a half of the 20. I got six months' good time.

Q. But that's the entire -- your entire time in the IDOC the second time, right?

A. In SMU, when I got caught the second time -- well, when I went to the police station really, and they put these cases on me on the second time, and I ended up in SMU, it was within -- getting locked up at the police station, within months I was already given my time, and I was shipped right off to there the following Friday.

Q. How long did you spend in SMU before you hit the prisoner and got moved into the general population?

A. I probably sat there a good six, seven years.

Q. Do you recall what year it was the second time you got arrested? Was it about 1997, 1998?

A. Something like that.

Q. Do you recall students from Northwestern coming to visit you while you were in prison?

A. Yes.

Q. Do you recall what prison you were in when the students came to visit you?

A. Danville.

Q. Do you know somebody by the name of Sergio Serritella?

A. Yes.

Q. How do you know Mr. Serritella?

A. I think he came down with the students.

Q. Do you know what his job or occupation was when he came down with the students?

A. No, no.

Q. How many times do you think you met with Mr. Serritella or saw Mr. Serritella?

A. Once, twice with students.

Q. Were the students involved in drafting the affidavit that you signed in 2004?

A. What do you mean drafting?

Q. Writing.

A. Yeah.

Q. Do you recall how often the students would visit you before you signed the affidavit in 2004?

A. No. They only came out once or twice, if I recall.

Q. Do you recall the names of any of the students that came to visit you?

A. No.

Q. With respect to the affidavit that you signed in 2004, did you have an understanding of why you were being asked to sign the affidavit?

A. Yes.

Q. What was your understanding?

A. To tell my truth.

Q. After you got -- after you completed your sentence for these -- this crime or these crimes, you were released, right, from prison?

A. Yes.

Q. And were you ever -- since you were released from prison, have you ever been arrested again?

A. No.

Q. Currently working?

A. Yes, I am currently working.

Q. What do you do?

A. I sell automotive parts.

Q. How long have you had the job that you currently have?

A. Six years.

Q. Are you currently married?

A. No.

Q. Were you ever married?

A. I was married at the time this happened in the '90s.

Q. What was the name of your wife that you were married to?

A. Delores Alejandra Medina.

Q. When did you and Ms. Medina get divorced?

A. A little after my incarceration with involvement in these cases, she divorced me.

Q. The first incarceration?

A. Yes. She didn't believe me. She left me. I lost my wife, too.

Q. Did you have any children with Ms. Medina?

A. No.

Q. Do you have any children at all?

A.   Yes, I do.

Q.   How many children do you have?

A.   I have two.  Only two I was able to give or have.

Q.   What are their names?

A.   One is Juan Vicente and the other one is Frankie Vicente.

Q.   Delores is not their mother, or she is?

A.   No.

Q.   Do they share the same mother or different mothers?

A.   Different mothers.

Q.   And did you have them before you married Delores?

A.   Yes, one I did, and one I just had.  He's nine years old.

Q.   Who is -- which one is nine years old, sorry?  Frank?

A.   Frank.

Q.   And who is his mother?

A.   I won't share that with you.  That's irrelevant.

Q.   Okay.

A. Nothing to do with this case.

Q. Have you only been married one time?

A. No, I've been married two times.

Q. When did you get married the second time?

A. I got married the second time right after Delores. I was married.

Q. What's the name of your second wife?

A. Do I really have to give you the names?

Q. Is it Michele?

A. Yes.

Q. Okay. And Michele and -- you and Michele were in a relationship while you were in the penitentiary the second time, correct?

A. Yes.

Q. And are you aware of any interactions she had with either the Medill students or Mr. Serritella?

A. No. I was incarcerated.

Q. Do you have any understanding of

what interactions she had with them to assist you while you were incarcerated?

A. I don't understand your question.

Q. Did either Mr. Serritella or the students or Michele ever communicate to you that Michele was trying to help your circumstances while you were in prison through Mr. Serritella or the students?

A. I don't think so. You'd have to ask her that. I don't think so. I can't answer.

Q. You are no longer married to Michele, correct?

A. No. I haven't been married to Michele in a long time.

Q. Did you ever communicate with David Protess?

A. I believe I talked to him a few times over the phone.

Q. Did you ever meet with him?

A. I met with him once.

Q. When was that?

A. When I was out like 15, 16 days.

Q. When did you meet with him during

that period of time?

A. We ate at a restaurant.

Q. This was in between the two times that you were incarcerated; is that right?

A. Yes.

Q. And what was that meeting about?

A. About the case.

Q. Which case?

A. Serrano case, I believe.

Q. How is it that you came to meet Mr. Protess at a restaurant? Did he reach out to you, like how did that happen?

A. I don't recall.

Q. Did you reach out to Mr. Protess?

A. I don't recall.

Q. Did you know who Mr. Protess was --

A. No.

Q. -- during that timeframe?

A. No.

Q. Do you know who he is now?

A. Oh, of course.

Q. And who is he, like what's your understanding of his occupation?

A.   Well, he was lawyers for cases and exonerations.  I don't know.  He's a lawyer.

Q.   And he was talking to you about the Serrano case, right, Serrano, Montanez?

A.   Yes.

Q.   Was there anybody else at the restaurant with you when you met Mr. Protess during that 15, 16 days in between your two incarceration periods at the Illinois Department of Corrections?

A.   There was woman with him.  I don't know who she was.

Q.   You said another woman?  Sorry, did you say woman?

A.   Lady, woman, somebody with him.  I don't know.

Q.   You don't remember her name?

A.   I wasn't there to see her.  I was there to see him.

Q.   Do you recall what you and Mr. Protess talked about during that conversation in that 15, 16 days while you were out?

A.   I can't tell you the whole

conversation, like if I know this in my back of my mind 30 years ago. Would you remember a conversation you had with somebody 30 years ago?

Q. I guess it depends on the conversation.

A. Well, if you've been put through prison and you've been victimized like I have, you will try to forget it.

Q. Did you tell Mr. Protess that you had been victimized?

A. Yes.

Q. Did he introduce himself as a lawyer to you?

A. No. David Protess, simple.

Q. You just knew him to be a lawyer?

MR. AINSWORTH: I object to the form of the question.

THE WITNESS: I don't know what he is. Lawyer, teacher, professor. I don't --

BY MS. ROSEN:

Q. You don't know?

A. I don't know.

Q. What did you tell him about your

victimization?

A. Well, obviously, how I was beaten into a confession that I never came up with.

Q. And this would have been 1997, 1998 timeframe, right?

A. Yeah, I guess.

Q. Did you ever speak with Mr. Protess again?

A. No.

Q. Did you ever meet with Mr. Protess again?

A. No.

Q. Did Mr. Protess have any involvement in the affidavit that you ended up signing in 2004?

A. No, he wasn't there. The students were.

Q. Did you understand that the students were his students?

A. Yes, Northwestern students from the same.

Q. Did you understand that Mr. Protess was associated with Northwestern, right?

A. Well, he came from that.

Q. Correct?

A. Yeah.

Q. All right. And when you explained to Mr. Protess that you had been victimized by Detective Guevara, do you recall what he said to you?

A. No, no.

Q. Did he ask you to sign an affidavit?

A. No. I think I did that on my own, and I wanted to.

Q. The affidavit?

A. Yes. I wanted everybody to know the lie that was created by Halvorsen and Guevara, which I didn't understand at the time.

Q. So how is it that you conveyed to the students that you were willing to sign the affidavit?

A. That's because of the position I was in. In special management unit, you can't just make a call to an attorney and tell them, hey, I am being held, or I am

being -- no.  All your calls go through them.  Your visits do, too, okay?  So ...

Q.  So your recollection is they came to visit you while you were still in SMU?

A.  Yes.  I gave the permission.  They reached out to me.  I was able to get a -- visiting them there and where I met them or whatever, and that's how it started.

Q.  Well, when you were in Danville, you were out of SMU, right?

A.  Yes, yes.  But I started recanting, and I wanted to recant way before the students, way before the students.

Q.  What do you mean by that?

A.  If you were to came instead of the students and would have asked me questions, I would have told you everything then, okay?

Q.  So it just happened to be the students?

A.  Yes, the students popped up, and I was able to start telling my truth, and people started listening.  If not, I would have never been heard.

Q.  Did you say that your recollection

is that you first met with the students while you were still in SMU?  Is that what you said?

A.  No, not in SMU.  You can't.  SMU they wouldn't even let me see the clergy. They wouldn't even let me see my mama if I wanted to.  She had to be put on a visiting list, and it had to be approved, and it had to be, for security reasons, looked over 20 times.

Q.  Did your mother ever come to visit you while you were in SMU?

A.  No.

Q.  So do you recall which prison you were in when the students first came to visit you?

A.  It might be Danville.

Q.  You are not sure?

A.  Not sure.

Q.  And do you recall what prison you were in when you signed the affidavit?

A.  Not sure.

MS. ROSEN:  So this is probably a good place to take the lunch break that

Mr. Stohr wants to take at 1:30.

How much time do you need?

MR. STOHR: I would say -- we've got to walk to somewhere here. So I don't know, 45 minutes, an hour.

MS. ROSEN: You tell us.

THE WITNESS: 45 minutes.

MR. STOHR: 45 minutes.

MS. ROSEN: We will be back at 2:15.

MR. STOHR: Okay, thank you.

THE VIDEOGRAPHER: We are off the record at 1:27 at the end of Media Unit 2.

(Whereupon, a break was taken at 1:27 p.m. to 2:26 p.m.)

(Whereupon, Ms. Barber and Ms. Carney entered the deposition proceedings.)

THE VIDEOGRAPHER: We are back on the record at 2:26 at the beginning of Media Unit 3.

BY MS. ROSEN,

Q. Mr. Vicente, I am going to ask you some questions about Mr. Montanez. Do you

recall seeing Mr. Montanez at all after you were in Cook County Jail?

A. I don't recall.

Q. Do you know who Timothy Rankins is?

A. Yes.

Q. And how do you know Timothy Rankins?

A. Timothy Rankins was put in the special management unit at Cook County Jail where I was being housed at while I was an inmate awaiting trial.

Q. Did you know Mr. Rankins before you were arrested?

A. Never met him in my life.

Q. Did you and Mr. Rankins have any contact with one another once you were at Cook County Jail?

A. When we met, I didn't even know his involvement or who he was. We were in the same unit as witnesses.

Q. Did you eventually discover who he was?

A. Yes.

Q. How did you discover who he was?

A. Well, Timothy Rankins had seen a letter I had sent out and passed to the officer, and he went and wrote down the address and wrote my girlfriend at the time. And in doing that, I called home, found out that he wrote a letter. When I confirmed it, I got off the phone and confronted him, and we got into a big fight involving brooms and involving violence. We hit each other and we fought.

Q. That was while you both were in Cook County Jail, right?

A. Yes, in the witness protection program at Cook County Jail.

Q. You said he saw you send a letter out. Are you saying that he like took -- observed the address and then --

A. Yes, ma'am.

Q. -- sent the letter to the address?

A. Yes.

Q. Do you have any idea why he did that?

A. You can ask him.

Q. And before that event, had you and Mr. Rankins spoken with one another?

A. I didn't even know who he was, even when we fought.

Q. And how did you come to find out that he was involved in these cases?

A. Matt Coughlan and John Dillon after the altercation at the witness protection program in Cook County Jail had moved me to Cook County Jail because I was kicked out of the witness protection program, and they put me in protective custody in the jail. That's when I found out who he was through the State's Attorney's that he was another witness on the case.

Q. And that would be the Serrano, Montanez, and Pacheco, right?

A. That's all I was told.

Q. And you are saying that Coughlan and Dillon told you that?

A. Yes.

Q. Have you ever used the name Carlos Morales?

A.   Yes, that was an alias I used when I was younger.

Q.   And is that the alias you were using while you were at Cook County Jail after your arrest in 1993?

A.   Yes.

Q.   Why were you using that name during that time frame?

A.   That's the alias I used on one arrest, and I kept it -- they kept using it on other arrests because it kept popping up in the computer as an alias.

Q.   Did you have a nickname back then?

A.   Yes.

Q.   What was your nickname?

A.   Chino.

Q.   Do you still use that nickname?

A.   No.

Q.   Did you know any members of Mr. Montanez's family?

A.   No.

(Whereupon, Deposition Exhibit No. 12 was screen-shared/referenced.)

BY MS. ROSEN:

Q. If we could put up on the screen share Exhibit No. 12.

Mr. Vicente, can you see the exhibit that we have put on the screen?

A. Yeah, I can see it.

Q. Can you read the letters, or do you need it made bigger?

A. Yeah. Could you make it bigger?

Q. Yes. How's that?

A. Yes, I see it.

Q. So if we go -- scroll to the bottom of the page. You can see that this is an email -- just so you see the whole page since we blew it up -- that we obtained, I will represent to you, via a subpoena to Northwestern.

And if we go to the top of the page, you will see that there is a couple of dates on there, May 20, 2003, and May 21, 2003. Do you see that?

A. Yes.

Q. And then if you -- if we scroll down to the May 20th email, it says, "This

email is in reference to one of your law students by the name of Alina Machado.  My husband, Francisco Vicente, who is currently incarcerated received a letter from Ms. Machado.  It was a very vague letter, asking him to sign some release to come and view him on some case."

Do you see that there?

A.  Yeah.

Q.  First of all, do you recognize the name Alina Machado?

A.  No.

Q.  And then it goes on to say, "Anyhow, I personally spoke to Ms. Machado because of my concern for my husband.  When I asked what this was about, she stated this was for a grade, and that she was not an attorney.  She stated she hates attorneys. I thought she investigates things for the wrongfully accused, not just a grade.  These are people's lives we are talking about."

"I would like to speak to you about how this was handled.  I could get into better detail if I speak with you.  I

appreciate any time you can give me. Thank you, Michele Vicente."

Do you see that there?

A. Yes.

Q. Do you have any idea -- well, let me step back. Do you recall receiving a letter from Alina Machado in 2003 requesting that you sign a release so that she can come and visit you?

A. Yeah, that was probably -- I am not familiar with the name, but that was probably one of the students reaching out to me to come and see me when they first came out to visit.

Q. Did you have a conversation with Michele about that?

A. No. But Michele was my wife at the time.

Q. Do you know how it is that Michele found out that Ms. Machado had sent you some correspondence?

A. I don't know.

Q. Okay.

A. I didn't even know of this letter

until you showed it to me now.

Q. And you don't recall ever having a conversation with Michele about being concerned that you were getting letters from students or somebody from Northwestern asking to come see you?

A. No.

Q. Do you recall having any phone conversations with Ms. Machado or any other students in and around this time frame?

A. No. You are talking about 20 years ago.

I can't see anybody either.

Q. You can't see anybody, what do you mean?

A. I can't see nothing. Just a screen. Okay.

Q. Yeah, I'm sorry about that. We are not done with the exhibit. That's why.

A. Okay.

Q. But that's okay. We can put it back up in a minute.

Do you know somebody by the name of Tomato?

A.   Tomato?

Q.   Or Tomato, yes.

A.   Yes, I know.  That's funny, but that's his name.  Tomato, yes, I know him.

Q.   Who is Tomato?

A.   Tomato I met a few months before coming out the second time.  When I was out for the 15 days I had met Tomato.

Q.   You were out?

A.   Yes.

Q.   And where did you meet Tomato?

A.   I met Tomato, Humboldt Park neighborhood.

Q.   Did you have any conversations with Tomato about your involvement in Mr. Serrano, Mr. Montanez, and Mr. Pacheco's cases?

A.   No.

MS. ROSEN:  We can put the exhibit back up, please, and go to the third page of the exhibit.

BY MS. ROSEN:

Q.   This is another email, and you can see at the top, it's dated, May 21st, and

it's to David Protess from someone named Loren, and I won't even try to say her last name?

But as you can see, Mr. Protess wrote on May 21, 2003, at 7:00 a.m., "Loren, I spoke with Alina and here is what you can truthfully say to Mrs. Vicente. Alina is working on a class project with three other journalism students. Among other things, the students are looking into criminal cases in the Humboldt Park neighborhood that some people claim were mishandled by the police, including possible wrongful convictions. In the course of their reporting, they contacted a prisoner whose street name is Tomato, a man whom they'd learned is very familiar with such problems in that neighborhood. Tomato wrote back agreeing to meet with the students, and also suggested they speak with a friend of his, Francisco Vicente, who is incarcerated at a different prison."

Do you see that there?

A.   Yes.

Q. Do you have any idea how it was that Tomato knew that you were incarcerated in 2003? Were you communicating with him?

A. Excuse me?

Q. Were you communicating with him in this time frame?

A. I just told you that at the time, the second incarceration, the 15 days I was out, me and Tomato were hanging out, and I had just met him.

Q. But this is now 2003, and you're back in, right?

A. Yes.

Q. And the email --

A. The last time I seen Tomato was the time of the 15 days. Never seen Tomato -- haven't seen Tomato.

Q. Did you have any contact with Tomato wherein you told him that you were now incarcerated again?

A. Lady, I am sorry to say it like this, but Tomato could never be where I was. I was in witness protection. Unless he was telling or a State witness, he couldn't come

around me.  So that's how you know Tomato wasn't around me because I was in State custody, State witness.

Q.  So this is 2002, so this is five years into your second incarceration.  Do you think you were still in SMU?

A.  Yes, and Tomato would never have any conversations with me or be around me because we weren't in the same prison, and I was incarcerated, and I was segregated from population and from everybody in the outside world.  Because to see me, you needed a visiting list and needed to be put through Springfield and a phone list.  You couldn't get ahold of me if you wanted to.

Q.  Okay.  The next paragraph of the email reads, "At this point, Alina wrote to Vicente requesting an interview.  In the letter and subsequent phone conversation with Mrs. Vicente, Alina made it clear that she was a journalism student, not a law student.  The proof of this is that Mrs. Vicente called you, not David Van Zandt.  She also reassured Mrs. Vicente that

they were not asking her husband to become a witness in a criminal case by testifying or signing an affidavit, a concern expressed by the couple.  The piece of paper that Mrs. Vicente referred to in her message was not a legal document or a release, rather it was a form that simply said Vicente would agree to be interviewed by the students.  The students needed him to sign the form in order for IDOC to approve the interview and to arrange for a private conference room away from the visiting area of the prison."

Do you see that?

A.   Yes.

Q.   Do you recall having any conversation with your wife, Michele, in May of 2003 about a conversation she had with Alina about why the journalism student sent you a letter asking to meet with you?

A.   Well, her being my wife and coming to see me on visits, which is documented, I probably told her that some students were coming to see me.  During my incarceration, and being with Michele, Michele was a very

jealous girlfriend and a jealous wife for a man that was incarcerated. I couldn't touch women, see women, and she would still fight me, so that's why we are not together today.

So I don't know where this letter came from, or where she came up with writing these letters. You would have to ask her. All I can tell you is that I met some students. I do know Tomato, and I am here to tell you the truth.

Q. If we go down to the last paragraph that begins, "Now, for your background purposes only, Francisco Vicente is a jailhouse snitch who provided the sole testimony that wrongfully convicted three men in 1995, one of the Humboldt Park cases we are investigating. In Tomato's letter to the students, he claimed that Vicente admitted to falsely testifying against the men. The students would, obviously, like to interview Vicente to find out if Tomato is telling the truth, but we'd rather not mention this yet because we are concerned that Vicente might refuse to speak with

them.  The State gave him only a nine-year sentence for multiple armed robberies in exchange for testifying that these three men confessed to him.  Our hope, however slim, is that Vicente will fess up when confronted in person with an array of evidence indicating that the three men are innocent and couldn't have confessed to him."

Do you see that paragraph there?

A.  Yeah.

Q.  Do you have any understanding or knowledge of why Tomato wrote a letter to the students and said that you admitted to him that you falsely testified against Serrano, Montanez, and Pacheco?

A.  Well, I do remember that Tomato was in Grand and Central holding when I got locked up.  I am remembering that now since you are asking questions and talking to me about Tomato.

Q.  Which time was Tomato at Grand and Central?

A.  And if I'm wrong, maybe it's my

head from hiding stuff. But I do believe that me, Daniel Vicente, Tomato, and Bouto were all in the same jail in Grand and Central. So that's where Tomato would know some of this. I don't know. You have to ask him. I can't explain it to you.

Q. So your recollection now that we are reading these emails is that you remember Tomato being at Grand and Central with your brother, Daniel; is that what you said?

A. Yes. Because while I was out for the 15 days, they locked my brother up, too, the same day they locked me up, and Tomato was with him.

Q. You also said Bouto was there? Was Bouto there?

A. Bouto was when we got to lockup.

Q. Yes, okay. In the jail cell when you got to lockup, Bouto was there, too? Is that what you said? I am just confirming.

A. Yes.

Q. Thank you. Did you ever see or have any conversations with a State senator

by the name of Del Valle?

A.   Who?

Q.   Senator Del Valle?

A.   No.

(Whereupon, Deposition

Exhibit No. 14 was

screen-shared/referenced.)

BY MS. ROSEN:

Q.   If we can look at Exhibit No. 14, please.

Mr. Vicente, Exhibit No. 14 is another one of these emails that we received pursuant to a subpoena to Northwestern.  And as you can see, it's an email, dated June 19, 2003, and the subject line says Francisco Vicente interview summary.  Do you see that there?

A.   Yeah.

Q.   And I will -- we will go through this a little more carefully, but as you will see as we get to the bottom of the email, this is an email from the students to Mr. Protess summarizing an interview that they had with you in June of 2003.

If the students met with you in prison in June of 2003, you would have had to have been moved out of the SMU by that point, correct?

A. Yes.

Q. So based on this email, is it safe to assume that by June of 2003 when you were meeting with the students, you had been moved out of the SMU?

A. Yes.

Q. But you don't recall which prison you were in at that point, right?

A. No.

Q. So now if we scroll down --

A. Big Muddy was the first joint I went to.

Q. After you left SMU?

A. Yes.

Q. Okay.

A. It's coming to me.

Q. So if you look at the bottom of this email where it starts, "The following is a summary of Team Serrano's interview with Francisco." And it says, "Francisco

asked us from the start which case we were investigating.  We told him the name of the defendants, and he immediately said he couldn't help us."

Do you recall having a conversation with the students at your initial conversation with the students wherein you said initially that you couldn't help them?

A.  Don't recall.

Q.  "We then asked him to give us a chance.  We proceeded to introduce ourselves to him and explain how we got there.  We basically told him that Illinois State Senator Miguel Del Valle, a very powerful man, has a legislative aide named Sergio Serritella, who informed our professor of a possible miscarriage of justice."

Do you see where I read that there?

A.  Yes.

Q.  Does that ring any bells with you?  Do you recall having any conversation with students where they told you this?

A.   No.   I can't remember the conversation word for word, lady.

Q.   Do you remember it generally?

A.   No.   It's been so long.

Q.   The email goes on to say, "Sergio told our professor that Tomato might have some information on the case, so our professor assigned us the case and told us to write Tomato first, asking to meet with him and for any information.   That's how we got Francisco's name and why we decided to write him.   He then asked us what Tomato had to do with all of this.   We proceeded to play the tape of Tomato's interview."

Do you see that there?

A.   Uh-huh, yes.

Q.   Do you recall the students playing you an audiotape of the interview they did with Tomato?

A.   No, I don't recall.   It could have happened, I just don't remember.

Q.   And the email goes on to say, "Where he was telling us how Francisco had told them that his testimony against

Serrano, Montanez, and Pacheco was a lie. Francisco told us that while there was some basis to what Tomato had told us, there were a lot of details in Tomato's story, such as the name of the defendants, that he had never told them."

Do you see that there?

A. Yes.

Q. Do you recall having this conversation at all with the students?

A. I'm listening.

Q. Do you recall this conversation that you had with the students about Tomato?

A. No. I remember meeting the students. I just don't remember the conversation.

Q. Do you remember talking about Tomato with the students?

A. No. You bringing his name up, it just came to me.

Q. Okay.

A. You know, I really want you to understand, I am not just saying that I have been hiding this shit for the last 30 years

in my head.  I am trying to put it behind me, okay?  And every time I look up, it pops back up.

Q.  All right.  Reading further, it says, "After having heard Tomato's tape, we asked him whether what Tomato said was true.  Francisco admitted off the record that the alleged conversation he had with the three defendants had never occurred.  He told us that our work was noble since both Jose Montanez and Armando Serrano are innocent."

"We asked Francisco what led him to lie under oath.  He said he was coerced by Detective Guevara and Halvorsen into testifying against all three defendants.  They allegedly beat him until he agreed to cooperate with them."

Do you see that there?

A.  Yep.

Q.  Did you --

A.  It's true.

Q.  Do you recall having that conversation with the students?

A.  I probably did.  I can't tell you

word for word, but they were there.  We had
a meeting.  Obviously, we talked about
something.  I can't tell you word for word,
lady.  Even if you try to get me and you
twist my finger, I can't.  You know, some
things I don't want to remember.

Q.  I am not trying to twist anything.
I am just trying to figure out what you
remember.

A.  I want to answer your question,
and I don't want to be rude to you.  I just
don't remember.

Q.  This says that you told the
students that Guevara and Halvorsen beat you
until you agreed to cooperate with them.

Do you see that there where I
just read it?

A.  Yes.

Q.  Is that true that they beat you
until you agreed to cooperate on Serrano,
Montanez, and Pacheco's case?

A.  I was beat into a confession.  I
was coerced.  I was threatened.  I was
everything under the book.  I was told even

that they would throw me in population and tell everybody I was a State witness, everything under the sun.

Q. I am going to focus on just a second -- I just want to focus on for a second the beating that you say was inflicted upon you to get you to cooperate in the case of Serrano, Montanez, and Pacheco.

Where did that beating take place?

A. It could have been the State's Attorney's Office. Any time I ran into Guevara and Halvorsen and they popped up, even if I was going to court or if I didn't have a court date, they made one. And they shot me up to the State's Attorney's Office.

Any time I'd see Halvorsen and Guevara, I'd got the good cop and the bad cop. Bad cop always puts his hands on me, and the good cop always persuades me, and always does the sweet-talking.

So every and any time, even during trial when I was getting on the

stand, like I said before, with the victim's wife in the jury room, they were still on me like sharks, like flies on shit. I was very uncomfortable with Guevara or Halvorsen in the room, not even with a State Attorney, not even with cops.

Q. So are you saying that they beat you before you took the stand in Serrano, Montanez, and Pacheco's criminal trial?

A. Well, when I was back there, when the wife was back there, she was too busy crying, they over there under their breaths telling me what I had to do and what I had to say, and they were right there.

Q. I am not asking you if they were there. I am asking you if they beat you?

A. No, not that day. But every time the State's Attorney's Office, any time I had court, and they can -- and they can get their way for me to say what I wanted to say and, obviously, I did because of their police brutality.

Q. What injuries did they inflict upon you?

A.   Well, I got --

MR. AINSWORTH:  Objection. Foundation.

THE WITNESS:  -- a lot of head shots.  I got a lot of rib shots.

BY MS. ROSEN:

Q.   Did you have bruising?

A.   Well, if I did then, that was 30 years ago.  What was I going to do, tell the judge?

Q.   I am simply asking you a question. If you have a statement that is --

I am sorry, what?  Did you say no?

A.   What was the question again?

Q.   The question is:  When you were beat by Detectives Guevara and Halvorsen, did they inflict injuries on you?  Were you cut?  Were you bruised?  Did you have swelling?

MR. AINSWORTH:  Objection.  Form. Compound.

THE WITNESS:  No, no.  He knew how to hit me.  He knew how to get away with it.

BY MS. ROSEN:

Q. Who is that?

A. He's a pro at this.

Q. What does that mean?

A. This ain't the only case that he's got. Let's keep it real.

Q. Are you saying that he can hit you without leaving a mark?

A. Yeah.

Q. What was he hitting you with?

A. He hit me with his fist. He pushed my head so many times. He grabbed me by my head. He grabbed me by my neck. He had me handcuffed. He hit me in my ribs.

You know, lady, I can't tell you how many times he hit me. I can't tell you how many fucking times he did this to me, but I can tell you that he did it, okay?

Q. And he did that without leaving a mark?

A. Yes.

Q. It then goes on to say, "Francisco mentioned at least two other cases." It says, "Bourdos and Iglesias." And then it

says, "I'm not sure whether that's how they're spelled, in which both detectives forced him to falsely implicate the defendants."

Do you recall discussing with the students the Bouto case and the Iglesias case?

A. It's possible. They are all the same cop. They are students looking into a case, which is Guevara. It's possible, lady. Like I told you before, I can't tell you word for word what happened in the visit because it was 30 years ago. I could tell you they came to see me.

Q. And then it says, "Additionally, Francisco spoke extensively of the State's Attorney's involvement in this entire controversy. He said he was known as one of Jack O'Malley's boys since he snitched on multiple cases."

Do you see that there?

A. Yeah.

Q. And is that -- do you recall having conversation with the students about

you being known as Jack O'Malley's -- one of Jack O'Malley's boys?

A. Lady, probably because I was stuck in the State's Attorney's Office so much. Instead of going to court on my regular court days, I'd end up in the State's Attorney's Office where I had to hide my pass that said where I was going. Nobody wants to see your pass with State Attorney on there because then they know you're a snitch.

Q. What does it mean to be one of Jack O'Malley's boys?

A. Jack O'Malley was head State Attorney. Jack O'Malley's boys meaning you're a snitch, you're a rat, you're Sammy the Bull.

Q. Sammy the Bull?

A. Do you know who Sammy the Bull is, lady?

Q. No. Sorry, I don't.

A. Next question. He was the turncoat on John Gotti.

Q. I see. Thank you.

Did you ever meet Jack O'Malley?

A. I seen him. He knew who I was.

Q. How do you know he knew who you were? How do you know that he knew who you were?

A. Lady, I used to go up to the State's Attorney's Office so much instead of going to my own court date or their court date that the only pass I would get was to the State's Attorney's Office to meet Halvorsen and Guevara with State's Attorney's there. Every State Attorney knew that I was involved in three cases. Everyone knew that I was a rat. If you're at the State's Attorney's Office, that means you are up there telling something.

It's common sense. I know you are asking the question, but that's all I can tell you.

Q. How do you know that Jack O'Malley knew who you were?

A. State Attorney's Office is very small. He got to see me, and I got to see

him.  He knew by them telling him, obviously, that's Francisco Vicente, he's tied to three cases.  Come on now.

Q.  How often did you see Jack O'Malley there when you were on the 13th floor?

A.  Maybe once or twice.  Did I shake his hand?  No.  Did I talk to him?  No.

I am answering these questions because you are asking questions that don't make no sense to me, lady.

Q.  If we read a little further down in the email, there is a sentence that says, "However, because he ended up modifying his story to help Pacheco get free, instead of receiving the six years he was promised for three armed robberies, he got nine years."

Do you see that there?

A.  Yes.

Q.  Did you have a conversation with the students about modifying your testimony regarding Pacheco?

A.  Could possibly be.

Q.  Is it true that you modified your

story to help Pacheco?

A. Yes, I tried to.

Q. Why did you do that?

A. Because I was lying on the stand for two cops and some corrupt State Attorneys.

Q. Why were you trying to help Pacheco?

A. Lady, they had me up there like a puppet trying to tell a lie that was never true.

Q. But why Pacheco and not the other two?

A. Well, I was trying to go ahead on with the State Attorney why he was questioning me. That's when that happened, okay?

I was under threats. I was under threats from the police, Halvorsen and Guevara, and the State Attorney, which was Coughlan, I believe, and Dillon, which was another State Attorney, and up there on the stand, I did what I did.

Q. Why Pacheco and not Montanez since

Montanez was the one that saved your life?

A. Lady, I just told you because that's the question they had given me at the time, and that was the way I was able to slip it and everybody caught it. They let him out. They dropped his case. Then the other two remaining. I don't know what else to tell you.

When I did that in the courtroom, it should have been an indication for everyone to stop and realize that something was wrong there, but no one did.

Q. Then if we read further down in the email, it says, "Francisco confirmed that he hated Armando Serrano."

You see that there?

A. That I what?

Q. Hated Armando Serrano.

A. I never said that. And if I did --

Q. You did what?

A. And if I did tell her that, what's the problem?

Q. I am just asking you if you said

it?

A. I don't recall the conversation word for word. I've told you this before, so I could have probably said that.

Q. Did you hate Armando Serrano?

A. No. We had a fight and that was it. I know how to take an ass whooping, lady.

Q. Would you say to somebody that you hated him if you didn't?

A. No.

Q. Let me read on. "He also confirmed what Montanez told us about how they had fought at Illinois River, as well as that Montanez had cared for him when he was hospitalized for a gunshot wound."

Do you see that there?

A. Yes.

Q. Do you recall speaking with the students about a conversation you had with Mr. Montanez while you were both at Illinois River?

A. Again, I don't remember the conversation. I know I met with the

students.  Ask them.  I don't recall the conversation because it's been 30 something years.

If you would have asked me ten years later, maybe I would have had an answer for you fresh off my mind.  But 30 years later, when I been trying to erase every fingerprint Guevara and Halvorsen and the State's Attorney's Office put on me, believe me, you will want to forget, too, if you were in my shoes.

Q.  Did you and Mr. Montanez have a conversation while you were both incarcerated at Illinois River?

A.  No, I don't recall a conversation.

And if he was in Illinois River, I will say this, there is no way he could have a conversation with me if I am in Illinois River.  We're segregated.  I'm special management.  He can never get to me.

So I don't know where you are coming from with these questions or who wrote what.  If it was talked about, if I gave a different response, it wouldn't

matter now because what your letter says is what you are reading.

So I am going to tell you again, I don't have no recollection of word for word, and I don't remember ever running into Jose Montanez at Illinois River when I am supposed to be in a special management unit where no inmates in population can come around me. So I don't think that conversation ever took place. Because then I would be in population, and he was never in the penitentiary with me. So there goes your answer.

Q. The email goes on to say, "Francisco said he had several concerns about coming forward with the truth. He's primarily concerned about his safety. He says if he were to testify, he does not want to be in any of the county jails, Cook County in particular, because he fears his life will be in danger."

Do you see that there?

A. Yes, I see that.

Q. Do you recall having a

conversation with the students about that?

A. No, but that would probably be something I would say. Even now I will tell you that, okay?

Q. And what do you mean even now you would tell us that?

A. Even now I fear for my life. Even now I walk looking from side to side, okay?

Q. What are you afraid of?

A. I'm afraid of the State. I'm afraid of the police.

Q. Is that why you -- what you would have been afraid of if you were put in Cook County Jail, the State and the police?

A. Of course.

Q. What were you afraid they could do to you?

A. They can do a lot of things. They can do as much as pulling you out of your dorm, getting you into a room in a courthouse, and doing what the "F" they want, and it's been done to me.

Q. The next sentence reads, "He continually stressed how the IGs or the mob

wanted to kill him."

Do you see that there?

A.  Yes.

Q.  Do you recall telling the students that you were worried that the IGs or, quote, the mob, wanted to kill you?

A.  I'll still tell you that.

Q.  So you are still afraid that the IGs want to kill you?

A.  Of course.

Q.  Why do you think that?

A.  Lady, you don't get the reputation of being a snitch, and nobody lives to tell about it.

Q.  But you made it right?

A.  Nothing is forgiven, lady --

MR. AINSWORTH:  Objection to the form of the question.

THE WITNESS:  -- when it comes down to gangs.

BY MS. ROSEN:

Q.  Say it again.  I'm sorry.  I didn't hear your answer.

A.  I said nothing is forgiven when it

comes down to gangs.

Q. The last two sentences of this same paragraph say, "He told us he would prefer if we could arrange for him to be taken to the courtroom to testify and be promptly returned to Big Muddy afterward."

Do you see that there?

A. Yes.

Q. Do you recall having that conversation with the students?

A. No, I don't.

Q. But this confirms, right, that you were at Big Muddy in June 2003, right?

A. Ina, Illinois.

Q. Pardon me? I didn't hear what you said.

A. Illinois River in Ina, Illinois.

Q. That's different than Big Muddy, isn't it?

A. Big Muddy is in Ina, Illinois.

Q. So in June of 2003, you were in Big Muddy?

A. Yes.

Q. Then if we go a couple paragraphs

down, it says, "Because of the possible consequences, Francisco was also concerned about the media.  He continually stressed that he wanted to remain anonymous if he were to clarify all of this.  He says, he is afraid of jeopardizing his wife's career."

Do you see that there?

A.  Yep.

Q.  Do you recall this conversation with the students?

A.  Again, I am telling you, I don't recall the conversation with the students. It happened so long ago.

Q.  Did you have a concern in June of 2003 about the media?

A.  I still have a concern about the media.

Q.  What is your concern today about the media?

A.  Because the media has never heard my truth and has never heard my side of the story.  When you hear stories about these cases, all you hear is about the rat, about the pope, about the snitch, and they make me

out to be the bad guy. But you never hear that I'm a victim. You never hear that I am the guy that they pushed and they punched and they made and they forced and they threatened. They just make me out to be a rat.

So the media is not my friend, lady. Unless they really want to hear the story, and I'm willing to go public any time.

Q. And then --

A. Now I'm ready. Before I couldn't talk about this, but now I can.

Q. And then, what was your wife's career in June of 2003?

A. I -- she was into banking, bank teller.

Q. This was Michele at this time, right?

A. Yes.

Q. And then it says, "He also said that because of these concerns, he really has to think things over and make sure this is what he really wants to do now. He

didn't make any promises, but said he would consider coming forth with the truth depending on what we tell him about his concerns."

Do you see that there?

A. Yeah.

Q. Do you recall having that conversation with the students?

A. Again, I can't confirm the conversation word for word. But I can confirm that the students came down to me. I can confirm that I stress about a lot of things since I've been stuck to this case since the very beginning.

(Whereupon, Deposition Exhibit No. 17 was screen-shared/referenced.)

BY MS. ROSEN:

Q. If we could take a look at Exhibit No. 17, please. This is a letter that we also got in response to a subpoena. It's dated October 31, 2003, and it's addressed to Chino, right? That was your nickname back then, right?

A. Yes, ma'am.

Q. And if we go to the last page of the exhibit just so you can see who it was signed by. You see it says, respectfully, Pete. Do you see that?

A. Yeah.

Q. That would mean Pistol Pete, right?

Let's go to the first page of the exhibit. First of all, do you recall getting correspondence from Mr. Montanez in October or November of 2003?

A. No.

Q. I want to go through this letter and see if that helps refresh your recollection in any way.

A. Please do.

Q. It says, "How are you doing? Fine I hope. But under the circumstances, I believe you are not doing too good, like me right now. Physically, we are okay but mentally, we are fucked up because of our current situations and our current residence at this time. But we are strong and our

upbringing has taught us well in survival."

Do you see that?

Do you recall getting a letter from Mr. Montanez that says that, said those things to you?

Mr. Vicente?

A. Yes.

Q. Do you recall getting this letter?

A. I don't remember it.

Q. Okay. Let's read a little further. "Chino, this letter isn't easy to write. You pretty much know my situation. It's been ten years, going on eleven. You are the whole key to my situation, the only chance I have to be with my family again. G, I need your help."

Do you know what that -- just the letter "G" is referencing?

A. Gangster.

Q. Gangster. Because you are a fellow Imperial Gangster, right?

A. Yes, I was.

Q. Yes. But in June of 2003, were you still a member of the Imperial

Gangsters?

A. I stopped being an Imperial Gangster the day I met Guevara.

Q. How did you manage that?

A. What do you mean how did I manage? You can't be a gangster if you are a snitch. The day he turned me into snitch, that was the day I was last -- the last day of me being a gangster.

Q. "G, I need your help."

Well, it appears in October of 2003, Mr. Montanez still views you as an Imperial Gangster, right?

MR. AINSWORTH: Object to the form of the question.

MS. ROSEN: You can answer.

MR. AINSWORTH: And lacks foundation.

MS. ROSEN: You can answer.

THE WITNESS: Maybe you should ask him why he called me G, or why he wrote the letter?

BY MS. ROSEN:

Q. "Need your help. You once told me

when you were with Goofy C in the county, remember when I was working passing out trays? Well, you said you would help me but only after you got your deal. Well, it's been ten years since, and you did not -- and you did your time and completed your deal."

Do you see that there?

A. Yeah.

Q. Who is Goofy C?

A. I don't know.

Q. Do you know what Mr. Montanez is referring to when he is referring to an incident while you were in Cook County Jail together, and he was passing out trays?

A. No, I don't have no recollection of running into him after I signed statements or after he was incarcerated in Cook County Jail.

Now, for one, he could have wrote the letter. That doesn't mean it got to me. Two, I am just going to say this -- hold on. Two, you could never write me a letter and send it to me. I was in State custody.

Q. Well, at this point in time, we have established you were at Big Muddy.

A. Okay. Even if I was.

Q. In 2003?

A. Even if I was at Big Muddy, I have never received no note, mail from anyone concerning these cases asking me to help them. That's one, okay?

I don't remember this letter, okay? Not even in Big Muddy, okay? Like I said, even if he wrote it, that doesn't mean I got it, okay?

Q. Are you done?

A. I have never ran into him in Cook County Jail either.

Q. If we read the last -- okay, if we read the last paragraph. "Now I come to you desperate and begging for your mercy. You know I had no part in this situation."

A. He never lied.

Q. [As read]: "Chino, I know deep down in your heart, you want to help, and I spoke to Tomato C about it. He told me everything. Chino, to be real honest with

you, I know you are afraid to do the right thing for two reasons.  One, the guys, and believe me that's nothing.  Them studs don't give a shit about you, what you did or said. They don't give a shit about me either since all this, not a dime, not a letter, nothing from them for either of us, you, myself or Mando.  No one cares.  You were out there. You think what" -- I lost my -- "no one cares.  You were out there.  You think whatever you're afraid of could have happened them.  But like I said, nothing because they don't give a fuck about us."

Do you see that paragraph that I read to you?

A.  Yeah, yes.

Q.  Does that refresh your recollection in any way about receiving this correspondence from Mr. Montanez.

A.  No. I've never seen this letter. If I would have, I would have remembered it.

Q.  Go to the next paragraph.  "You don't have to worry about that.  I got you. Two, you are probably afraid of Guevara and

your deal.  Well, let me enlighten you on that.  The people you dealt with to make up all that was said can't hurt you no more because you did your time.  You can't get retried again.  Nothing.  It's over.  They can't ever press perjury charges on you because if you do the right thing and tell the truth, you can't get charged for perjury because you were coerced by 5-0.  You were forced and threatened to be against us by Guevara, so therefore, it is not perjury anyways.  You need not to be afraid.  The students can tell you themselves that nothing can happen to you."

Do you see these couple of paragraphs that I read to you?

A.  Yes.

Q.  Is that refreshing your recollection in any way about this correspondence?

A.  No.

Q.  "Besides, can't you see that once this is over, the truth is told, we won't have to work again, G.  There's a lot of

ching-ching for us when we sue everyone and their mama for this.  Have you ever been on the Oprah show or 20/20?  Well, shit, that's what's next for us.  No one can hurt us. Only ones that can hurt us is ourselves. Chino, it's true when they say the truth will set you free, but they forget to say you can get paid, too."

Do you see that there, that part of the letter I just read?

A.  Well, lady, that's a lie because I ain't getting a penny from the State.  I ain't getting a penny from no one, okay?

Now, what you are reading to me is a lie because I ain't getting paid, okay?  I don't even get a therapist or a psychiatrist from the State, and I'm all fucked up in the head.

Go ahead, you can go.

Q.  "Chino, we all have messed up once or twice in our lives.  But that's what's good about life.  You can always make up for it, but you need life, and I need you to give me my life back so I can move on with

my life and family.  I'm getting old, nigga, free me fool."

So nothing ringing any bells for you about having received this correspondence, right?

A.  No, not in my prison time. There's no way I would have ever got this letter if he wrote it to me.  Even when I was in population, I had an enemy list, and they were on it.  That means no contact with them.  I can't be put in the penitentiary with them.  If they are there, I'll never get there.  I can't have no correspondence from them.  You can look at my enemy list in the penitentiary.  It's on file, lady, okay?

Q.  What's a kite?

A.  IDOC will tell you, if he's got an enemy list, their mail won't get to them.

Q.  What's a kite?

A.  A kite?  A kite is a letter that in-house jail, another inmate passes you a note.

Q.  From somebody else, right?

A.  Yes.

Q.   Certainly, other people can send you -- could send you correspondence when you were at Big Muddy, right?

A.   Yes.

Q.   So if it didn't say Mr. Montanez's name on the envelope, then nobody would know, right?

A.   Yes.

MR. AINSWORTH:   Object to the form of the question.

BY MS. ROSEN:

Q.   And, of course, the letter is just signed P, right?  It doesn't say Montanez or Jose Montanez or his ID number or anything on there, right, his prisoner ID number?

A.   I guess.  I don't know what's on the paper.  You got it, not me.

Q.   Well, we are going to go through the whole thing, and you will see it just says Pete.

A.   Thank you for reading the letter I never got.

Q.   If we go to the last paragraph on this page, "Chino, please, I never deserve

what I am going through now.  I never in my whole life done anything to anyone to deserve 55 years in prison, so please listen to these young ladies.  They can help us both and our families.  Your kids need you, and my family needs me."

Do you see that there?

A.   Uh-huh.

Q.   Yes?

A.   Yes, I see it.

Q.   So you don't recall any communication from Mr. Montanez begging you to talk to the students at Northwestern and help them to help him, right?

A.   No, I don't remember no letter.  I don't remember seeing him passing out trays, no.

Q.   If we go to the next-to-the-last page, it says, "I don't know if we will ever get the chance to talk again, but if you want to holler, write, give it to the girls like I did.  Well, take care, nigga, and God bless you.  Respectfully, Pete."

Do you see that?

A. Yes.

Q. Do you recall the students handing you this letter from Mr. Montanez during one of their visits?

A. I don't remember. If I don't even remember our conversation, why would I remember this letter?

Q. I'm done with that exhibit. Thank you.

Do you recall any conversations with the students or Mr. Serritella about what they could do for you if you signed the affidavit -- an affidavit saying that you lied?

A. I am going to answer it this way: When I signed the recantation, the students or Serritella, whatever his name is, never promised me anything. They couldn't give me anything, okay? I had an out thing already, okay? There was nothing that they could have done for me, other than to waste their time coming to see me, and I'm glad they did.

Q. Do you recall any conversations

with the students or Mr. Serritella about getting you transferred from Big Muddy to Danville?

A. No.

Q. Do you recall any conversations with the students about compensating you in any way for an affidavit recanting?

A. No. If you are trying to say that they gave me any special favors, they didn't.

(Whereupon, Deposition Exhibit No. 18 was screen-shared/referenced.)

BY MS. ROSEN:

Q. If we can look at Exhibit No, 18, please. This is another email we got from Northwestern in response to our subpoena. It's dated November 6, 2003, and it's from Mr. Protess to the students and Mr. Serritella, and the subject line, it says, Vicente, and then it says, "Hey, Sergio and Team Serrano." It goes on to say, "In anticipation of our teleconference tomorrow, Sergio, I thought I'd raise a few

potential hurdles we need to consider in order to take our investigation to the next level. I see these as strategic concerns rather than insurmountable obstacles, though clearly these are difficulties we should address, especially regarding Vicente, the focus of this message."

"It's indisputable that Vicente is key to this case. If he formally recants, there's a solid basis for obtaining post-conviction relief. We may need more than Vicente to ensure the outcome, including evidence against the actual perps and a current affidavit from Rankins. Hopefully, our investigation will obtain that. But without a sworn statement from Vicente, it's doubtful that the courts will take the petition seriously unless we actually solve the crime."

"While our team has made enormous strides with Vicente, it's obvious that he is going to want something tangible in return before agreeing to sign an affidavit. After all, he's both a con and a

snitch, and I can't see him recanting as a matter of conscience. Therein lies the rub. If any promises to obtain his recantation aren't handled artfully, there is a risk that his statement will be legally meaningless."

Do you see the portion of the email that I just read to you?

A. Yeah.

Q. Do you recall having any conversations with the students before November 6th of 2003 where you made it clear to them that you needed something tangible in exchange for signing the affidavit?

A. No, I don't.

Q. The email goes on to say, "I have three concerns in particular: Vicente could sign an affidavit admitting he lied, and then after he gets what he wants, or that takes heat from the authorities, recant his recantation. That's happened several times before, including Paula Gray in the Ford Heights Four case and Deborah Reinboldt in Randy Steidl's case. We need to take

precautions to be sure it doesn't happen here.

"Two, prosecutors could find out about any deal offered to Vicente, and even if he holds firm in his recantation, use the information to impeach his credibility. I appreciate how ironic this would be since prosecutors didn't hesitate to offer a deal to him at least twice in the past, but that won't stop them from attacking his statement in order to maintain the original convictions."

Prior to November 6, 2003, do you recall having any discussions with the students about any deals in order for you to sign the recantation affidavit?

A.  I don't recall.

Q.  "Number 3, journalists can't be party to any monetary offer. That's viewed as paying for information, and it undermines the credibility of both the reporter and the source. This principle applies to my students as well, who are functioning as journalists in this case. Also, as a

practical matter, it likely would affect how journalists reports our story when the time comes to break it.

"There are no easy answers here, especially since we have already headed down this road with both Michele and Vicente. Just to be clear, I'm not at all second guessing our strategy to date. Without using our approach, we never would have gotten this far. The lives and freedom of two men are at stake, and I think we pursued the only course possible to achieve our goals. However, I am saying that we need to consider measures that will allow us to carefully navigate the slippery slope we are on, while still embracing a just cause."

Do you see that there?

A. Uh-huh, uh-huh.

Q. Do you have any idea what Mr. Protess is referencing here when he says that we have already headed down this road with both Michele and Vicente, the road of offering something in exchange for the affidavit?

MR. AINSWORTH:  Object to the form of the question.  That mischaracterizes what the document says.

BY MS. ROSEN:

Q.  You can answer.

A.  I don't recall.  Ask Michele or ask somebody else.  I don't recall.

Q.  "Here are a few suggestions for maintaining our balance at this point:  One, the truth must come first.  Any promises made to Vicente (e.g., about protective custody or relocation) should follow him telling us what actually happened.  This could be accomplished by saying, 'We're here to discuss your concerns and to address them, just as we have done with your wife.  But before we do that, we need to hear what really came down" with the cops -- "what really came down when the cops questioned you about Montanez, Serrano, and Pacheco.  You've pretty much already told the story to Alina and the other students, but we need to hear it ourselves.'  Ideally, you'd want to tape-record his statement at this point

while promising him, only if he insists, that it won't be played outside the team without his consent.

"By the way, 'the truth must come first approach' would allow him to say on tape that he was promised nothing in exchange for his statement."

Do you see what I just read from this email?

A. Yes.

Q. Do you recall any discussions with the students wherein you demand to be moved into protective custody or to be relocated in exchange for the recantation memo -- recantation affidavit?

A. No. I can't recall.

(Reporter clarification.)

Q. "Number 2, the offer" is to help -- "the offer to help him should be discussed in terms that are as general as possible. One way to put it is: 'Here are the kinds of things we can do for prisoners who are in situations like yours. We can arrange protective custody, transfer them to

a better prison that's closer to home, et cetera.  The bottom line is that we can protect their safety and ensure their comfort.'  If he insists on knowing whether you specifically can do that for him, you can say, 'as long as you cooperate with us and tell the truth, we will address your needs and concerns like we would anyone else in your situation.'"

Do you see that there?

A.  Yep.

Q.  Any conversations that you can recall that you had with the students before November of 2003 where you discussed any of the topics that are addressed in this paragraph, protective custody, transfer to a better prison closer to home, or other comforts?

A.  No, I don't recall.

Q.  Paragraph number 3, "No financial promises should be made.  If he demands money for himself or his wife, give him a reality check instead.  It would completely defeat the purpose of him cooperating and

helping him.  However, you can suggest that the Montanez and Serrano families would likely be very generous with him in the civil rights suits that definitely would follow their release.  That also would give him an incentive to help set them free."

Do you see that paragraph I just read?

A.  Yep.

Q.  Do you recall any conversation with the students where the students -- with the students and/or Mr. Serritella where the students or Mr. Serritella told you that the Montanez and Serrano families would likely be very generous with you in the civil rights suits that they definitely would file following their release?

A.  No, I don't recall a conversation like that, but that would be nice.

Q.  And then four, "Reassure him about timing.  You can truthfully say that for now, you are only asking for a tape-recorded statement to get the ball rolling.  Down the road, it would be great if he'd be willing

to sign a statement based on what he told you, but even that wouldn't become public until after a petition is filed in court, which would be months or longer away.  In most cases, the person signing such a statement wouldn't be called to testify in court.  And if they did, it wouldn't be for an even longer period of time.  You'll be with him every step of the way, and he's in control of how far he is willing to go. Building that ongoing relationship of trust should help prevent him from recanting his recantation."

Do you see that paragraph I just read?

A.  Yes.  I have no recollection.

Q.  Do you recall any conversations with the students about tape-recording a statement from you?

A.  Nope.

Q.  Did you ever -- did students ever tape-record a statement from you?

A.  I'm not sure.

Q.  It's possible?

A.  I don't know.  I was in prison so I don't know how they would -- well, they are not attorneys.  I don't know if they would be allowed to bring a device inside the prison, and I don't recall recordings.

(Whereupon, Deposition

Exhibit No. 19 was

screen-shared/referenced.)

BY MS. ROSEN:

Q.  We can move on to the next exhibit, Exhibit No. 19, please.

All right, Mr. Vicente, this is another email that we received in response to our subpoena to Northwestern. And this one is dated November 7, 2003, and if you look at the bottom of what's on your screen, you will see that it's a response to the email that we were just going through, the November 6th email that began, "Hey, Sergio, and Team Serrano."

And if we go to the top, this is from a Student Steinberger.  Do you remember one of the students, her name was Julie Steinberger?

A.   I don't remember none of their names.

Q.   And then this email says, "David, after reading your letter, one major concern comes to mind.  Sergio has already come forward to Michele regarding a federal job in return for her cooperation."

Do you see that there?

A.   Yeah.

Q.   Do you recall Mr. Serritella or the students offering to secure a federal job for your wife Michele in 2003?

A.   She never had a federal job.  No. Don't recall.  But, no, she ain't never had a federal job.

Q.   Then the email goes on to say "because this job to me doesn't seem like any kind of logical course of action in terms of a recantation (whereas, for example, protective custody or a change of facilities seem like reasonable requests for someone whose words could put their physical safety in danger).  I worry about our already having set this deal in motion.  I

know that Sergio knows his work better than I do, and I also know that he hasn't made any sort of promises to her other than he's looking into it, but I'm just confused on this point, and I wanted to put my concern out there since we all seem to be addressing concerns around here these days, and because I don't want to feel like I've misunderstood things the whole time."

Q. Do you recall any conversation with Michele where she explained to you that either Sergio Serritella, the students, or Professor Protess were trying to help her to get a federal job in return for a recantation affidavit from you?

A. You would have to ask her that because I couldn't answer for her. I don't recall anything like that. I was incarcerated on the other side of the wall, so.

Q. How much contact did you have with Michele while you were at Big Muddy?

A. Excuse me?

Q. How much contact did you have with

Michele while you were at Big Muddy?

A. Well, Michele did ten years with me on and off. Sometimes she was there. Sometimes she wasn't. Being with somebody incarcerated for ten years, you are not going to be there the whole ten years, so. Are you going to ask me how much time I had with Michele? I couldn't even tell you. She was there when she wanted to be.

Q. So with that as background, how often would she visit -- did she visit you while you were at Big Muddy?

A. Yes, she did.

Q. Do you know how many times?

A. I didn't count. No one counts visits.

Q. Do you know how long you were at Big Muddy before you got moved?

A. I'm not sure.

(Whereupon, Deposition Exhibit No. 20 was screen-shared/referenced.)

BY MS. ROSEN:

Q. All right, if we can take a look

at Exhibit No. 20. This is another email that we got in response to our subpoena. It's dated November 21, 2003. It's from David Protess to another student, Molly Browne.

Do you recall Molly Browne at all? Do you recall a student by the name of Molly Browne?

A. I don't remember names. I don't remember her.

Q. If we go to the fourth paragraph of this particular email, it says, "The only noteworthy disagreement I have over strategy is with you seeing Vicente alone, at this point, at least. Right now he sees Sergio as, quote, the man. The best way to overcome this is by showing that both you and Sergio are in charge, which can only happen by going together and implementing the lessons you learned from your first experience. Once he sees that you're players to be reckoned with, you'll be in a position to fly solo."

Do you see that paragraph I

just read?

A. Uh-uh.

Q. Is that a yes?

A. Yes.

Q. And with respect to the reference that you -- Mr. Protess' interpretation of the circumstances that you viewed Sergio as the man, would you agree with that characterization?

A. I don't know where he got that from, that he was never there with me and the students and Sergio. I don't know. You'd have to ask him that.

Q. And I might have asked you this earlier, and if I did, I apologize. How many times do you think you met with Sergio?

A. About twice, two times, no more than two times with the students.

Q. Just with the students? You never met with him alone?

A. No.

Q. The next paragraph says, "Finally, I share your concern about waiting to reinterview Vicente until after the break.

Trouble is, first we need to wait for his transfer, which hopefully will occur soon. Then we can go back to him and demand that he fulfill his part of the deal."

Do you see that there?

A. Yes.

Q. So do you recall having conversations with the students wherein you demanded to be transferred out of Big Muddy into a facility closer to your family before you would consider signing the recantation memo -- or recantation affidavit?

A. Well, I don't recall the conversation because it's 30-something-plus years or a long time ago, but it could have happened.

Are you still there?

Q. Yes, I am still here. I am just reading.

A. Okay.

MS. ROSEN: We can take that exhibit down.

(Whereupon, Deposition Exhibit No. 21 was screen-shared/referenced.)

BY MS. ROSEN:

Q. If we can take a look at Exhibit No. 21. This is another email we got in response to our subpoena. This one is dated December 3, 2003, from Sergio Serritella to David Protess, and the subject is Michele's wish list. And it says, "I hope you enjoyed the holiday and that quarter is ending on a high note. Michele Vicente just called me. I want to talk her wish list over with you before sharing it with the team. You can reach me on my cell phone at your convenience."

Do you see that there?

A. Yes.

Q. Do you have any idea what Mr. Serritella is referring to when he is informing Mr. Protess of a phone call with Michele about her wish list?

A. No. But what's funny is that everybody sending everybody letters, and

even my wife is -- my ex-wife is being named in this, and I'm incarcerated. I don't know what's going on, so I don't know what to tell you about these letters, who wrote who, talking about me, my wife, or what was going on, I don't recall.

(Whereupon, Deposition Exhibit No. 22 was screen-shared/referenced.)

BY MS. ROSEN:

Q. We can take this exhibit down and put up Exhibit No. 22. This is another email that we got in response to our subpoena. This one is dated December 5, 2003, from Sergio Serritella to Mr. Protess and some of the students.

Subject line reads, Danville, and the first paragraph reads, "First things first, Vicente is currently housed at Danville CC. He is very comfortable there and Michele was on cloud nine after a two-hour commute."

Do you see that there?

A. Uh-huh.

Q. Yes?

A. Yes, I see it.

Q. And do you recall being moved in or around the first part of December of 2003 to Danville?

A. Yeah. I don't remember being moved. If it happened, I don't remember.

Q. You know you ended up -- you ended up going to Danville, right?

A. Yeah, I was in Danville. I just don't remember when.

Q. Yeah. And Danville is closer to Chicago, right, than Big Muddy?

A. Oh, hell, yeah. Yes.

Q. What's the difference, do you think?

A. Big Muddy is like 7 1/2 hours away. It's in Ina, Illinois, I-n-a. Danville, it's like 2 1/2 hours, 3 hours away from the City of Chicago.

Q. And then the email goes on to say, "There is one problem: Michele called to advise that an inmate at Danville that knows him from back in the day is spreading the

word that Vicente is a trick. David and I have discussed the situation and think we should run with the following game plan. That is in line with Francisco and Michele's feelings on the matter."

Do you recall when you got to Danville running into an inmate who knew you from back in the day and that was spreading the word that you were a trick?

A. I don't remember none of that.

Q. The next paragraph reads, paragraph 1, "Vicente would like letters written to his cellee, an IG by the name of Freddy Ramos, AKA Flintstone, inmate number B-70550 by both Armando and Jose, indicating that he is cool and trying to help them with their cases."

Do you see that sentence I just read?

A. Yes.

Q. Was Freddy Ramos your cellee when you were in Danville?

A. He could have been.

Q. Do you know who Freddy Ramos is?

A.   I don't remember the name, but I could have been with an IG.   There was a lot of them around me.

Q.   An IG with the nickname of Flintstone?

A.   Flintstone, yes.

Q.   Was Flintstone your cellee at some point in time while you were first at Danville?

A.   No.   We were in the same housing unit.

Q.   I see.   "The cellee can then put the word throughout the joint that he is cool with the nation."

What would it mean to be cool with the nation?

A.   What would it mean to be cool with the nation?

Q.   Yes.   What does that mean?

A.   Basically that I'm not a snitch.

Q.   Do you recall asking Michele to ask Serritella and the students to have Jose Montanez and Armando Serrano send letters saying that you were cool with the nation?

A.   I am going to be honest with you, I don't know where this story line came from.  But the Fred Flintstone was on a gallery with me.  Most of the time he was on psych meds, so he would be sleeping all day, and he didn't interact with anybody.  So I don't know where they getting this from, or I don't recall none of it.  Maybe because it's been so long.

Q.   Are you saying it's just not possible that happened or that you just don't recall it?

A.   I don't recall it, and I can't see something like that happening.

Q.   Why not?

A.   Nah.

Q.   Why can't you see it happening?

A.   Uh-uh.  I was in PC when I went to population.  Flintstone was in PC so that means he is running from the mob, too.  So why would they send him a letter, saying or he interacting with somebody on the street saying, oh, I want everybody to know that Chino is cool, and he is going to be all

right? Someone fabricated that to put that on that memo because honestly, that doesn't even sound right.

Q. So it doesn't sound right to you that you would have asked Michele to ask Serritella and the students to have Mr. Serrano and Mr. Montanez write a letter to individuals in the prison to tell them that you were cool with the nation in an effort to keep you safe? That doesn't make sense to you?

A. That doesn't make sense. Plus when I got to Danville, I was quiet as a cat trying to stay off the radar. I don't know what Michele was doing outside or behind the wall. She talked to certain -- I can't explain it.

But I will tell you this, out of all the things that you read me so far today, this is one of the worst ones, okay, the Freddy Ramos, Flintstone.

Q. Okay.

A. Having guys write letters and all that, that -- that doesn't happen like that,

not even in a movie, lady.

(Whereupon, Deposition Exhibit No. 27 was screen-shared/referenced.)

BY MS. ROSEN:

Q. Okay. If we can mark Exhibit No. 27, please.

Showing you another piece of correspondence that was produced in these cases. This one is dated December 12, 2003. You see it's addressed to Freddy, and it starts, "How are you, Fat Boy?" And if we go to the second page of the exhibit, you will see it's signed by Pistol Pete.

That's Mr. Montanez, right?

A. Uh-huh.

Q. Is that a yes?

A. Yes. I don't know who signed it. It says Pistol Pete, though.

Q. If Mr. Montanez says that was his signature, you would have no reason to disagree with that, right?

A. I ain't never seen Montanez's fucking signature, lady. So why would I

know if it's his?

Q. I am saying you wouldn't disagree with it if Mr. Montanez -- you said it's signed Pistol Pete, but if Mr. Montanez has already testified that that's his signature, you have no reason to disagree with that, right?

A. No. If it's on public record that that's his, then it's his. I don't know if it's his. You could be telling me that.

Q. Okay. Let's go to the first page of the letter.

[As read]: It reads, "Freddy, how are you, Fat Boy? I hope this letter finds you in good health and in high spirits. The last time we spoke or seen one another, you weren't doing so good. I hope that's changed. I hope you finally got in touch with your family again. Listen, I'm doing just fine. Everything here is very smooth. Me and Mando are doing well, just trying to stay positive.

"Freddy, a friend of mine told me you wanted to hear from me. Sorry I took

so long to write.  But as you know already, I am just trying to get by every day. Listen, my friend told me you are there with Chino.  Tell him I said, 'what's up?'  Also tell him I said everything is all good, not to worry.  Fat Boy, you already everything that's happen to me.  You know who's helping me and Mando.  Listen, Chino's all good. He's straight with me and Mando, so he's straight with you.  Tell him just to keep in mind what I wrote him in my letter to him. The girls from the school are down with us. They are all good.  All I need is the truth. Freddy, you make sure you stay focused and stay out of trouble.  You need to come home, Fat Boy.  Freddy, let all your family know. I'm all good with Chino.  You two stay on the right path.  Chino, the girls will come to holler again.  I don't need to go into details.  We need to get this over.  Don't worry about anything.  Well, Freddy, I'm going to let you go now.  Take of yourself and Chino.  Be safe, be smooth.  God bless you, Fat Boy.  Respectfully, Pistol Pete."

With respect to this correspondence that Mr. Montanez sent to Freddy, did Mr. Ramos have any conversation with you about receiving a letter from Mr. Montanez regarding you?

A.  No.

Q.  Let's go to the first page of the letter in the second paragraph, the line that says, "Listen, my friend, told you're there with Chino.  Tell him I said, what's up?"

What does that mean to say "What's up?"

A.  Well, obviously, he is trying to -- exactly what you read, if you're there with Chino, tell him I said, what's up.

But I don't recall Freddy Ramos or Flintstone ever showing me a letter like that.  And if I would have known he got a letter like that, there would have been something different because I would have got away from him, okay?

Q.  You would have got away from who?

A.  From anybody that showed me a

letter like this from Jose Montanez or anybody.

Q.  Why is that?

A.  Because my safety is in jeopardy. I don't care what you think the letter says, lady.  You are in prison.  This ain't no show.  This ain't no Fox TV show called Prison.  This is prison where you are actually there.  And if you don't watch your butt, they will get you.

I don't care what this letter says.  I don't care who they sent it to. Whoever they sent it to never told me anything about this letter.  But I'm glad that now knowing that this letter popped up, maybe it did pop up in Freddy's hand while I was in Danville.  Now I know why I never got stabbed up and thrown over the balcony. Thank God there was a letter written.  Now I know why there was angels flying over me, and I never got stabbed and beat up.

Q.  You didn't make that demand of the students that Jose Montanez and Armando Serrano send letters like this to protect

you?

A. No. But if they did, God bless them. Because everywhere I went in population, I went through a lot, okay? You don't know what it's like to be spit on. You don't know what it's like to be mistreated. You don't know what it's like to be hit with an apple, an orange upside your head five, six apples, five, six oranges because you're that guy. So if they wrote letters for my safety, thank God they did.

Q. You have no idea why they did?

A. I don't know why they did. And like I said, if anybody would have showed me this letter coming from them, I would have ran straight to the police and told them this guy is a threat to me. Because every day of my sentence on both sentences, that's all I did was try to live another day. I didn't testify on one guy. I testified on three, four guys forcefully, unwillingly.

Q. Do you know somebody by the name of Thomas Sierra?

A. No.

Q. Nickname is June Bug?

A. No.

(Whereupon, Deposition Exhibit No. 26 was screen-shared/referenced.)

BY MS. ROSEN:

Q. Let's take a look at Exhibit No. 26. This is a letter that's addressed to somebody named Thomas. It's dated December 11, 2003. So that's one day before the letter that Pistol Pete wrote to Freddy. If we go to the last page of the document, it's signed Armando S, which is Armando Serrano. And there is a P.S. that says I think Chino lives a couple of buildings away from you.

Do you see that there?

A. Yes.

Q. Do you recall anybody in -- at the time you were in Danville who lived on -- with the name of Thomas?

A. No.

Q. Let's go to the first page of the

letter.  It says, "How are you doing?  I hope this letter finds you and your beautiful daughter both in the very best of physical, mental, and spiritual health.  I know I haven't write you in a while, and I probably should have but, you know, I ain't too crazy about writing.  I have been doing pretty good on my" -- I can't read that word "and I hope you have been doing good, too." It's been real -- "I have been real busy struggling with life and trying to make it to the promise land.  How have you been holding up?  How is your daughter doing? Have you heard from your old" -- I don't know what that word is.  "What's up with Hector?"

Do you know somebody named Hector, an IG named Hector?

A.  No.

Q.  "It's 1:30 a.m. and I am at work right now on a break.  Fat ass Pete is right here, too."

And then the letter goes on, "I know the holidays won't be what we'd

probably like things to be, but make the best of it and always keep hope alive.  I know there has been -- there has to be a brighter tomorrow in store for us.  Shit happens to the best of us and being placed in certain predicaments makes all of us even more" -- and then I can't read the rest of it.

If we go to the next page, it says, "Angel told me to tell you what's up."

Do you know somebody from the neighborhood named Angel?

A.  No.  Obviously, they do.

Q.  "I am pretty sure by now you already know that his brother Jordan was murdered, right?"

Do you see that?

A.  Wait, wait, wait, wait, wait, hold on.  Angel, Jordans' brother, I know him.  I know him.

Q.  That's Pacheco, right?

A.  Yes, Angel Pacheco.  You said Jordan, that's Angel.  Angel is his brother. I grew up with both of them.

Q. And then this says, "By now you already know that his brother Jordan was murdered, right?"

You see that there?

A. Yes.

Q. Did you know that Jordan was murdered?

A. Yes, I knew Jordan was murdered.

Q. When did you find out that Jordan was murdered?

A. I was incarcerated.

Q. Did you hear how he was murdered?

A. No.

Q. "It's a sad thing, bro. You get so many blessings and you just have them," I think. "I feel for him because he wasn't a bad man. He just had his dope fiend ways like a lot of us did. Look, I need to ask you for a very important favor. I'm sure you are aware who Chino is, right? Well, anyway, bro. I need you to look out for him and make sure that nothing happens to him. I know the man has done a lot of dirt in the past, but please also know that he is

repenting and he's also helping me, and his help is of paramount importance.  I believe he is living with little Flintstone right now or somewhere in that area.  I confide in you and trust that you will look out for this man.  I would appreciate it dearly. You know some people are ignorant and don't know how to have compassion for a man when they are trying to change their ways of being."  You can't let -- wait, "Please don't let anything happen to him."

And it goes on to have some more conversation about their Merry Christmas and things like that.

Were you aware that Mr. Serrano sent a letter to Danville asking that people leave you alone and that you be protected?

A.  No, I wasn't aware of that.

Q.  Again, you didn't request Mr. Serritella or the students to ask Mr. Montanez or Mr. Serrano to write these letters, is that what you are saying?

A.  No.

MS. ROSEN:  This is probably a good place to take a break.

THE WITNESS:  Did you say break?

MS. ROSEN:  Yes, let's take a short break, like ten minutes.  You can go stretch your legs and go to the restroom.

THE VIDEOGRAPHER:  We are off the record at 4:08.

(Whereupon, a break was taken at 4:08 p.m. to 4:29 p.m.)

THE VIDEOGRAPHER:  We are back on the record at 4:29.

BY MS. ROSEN:

Q.  Can you guys hear us okay?

A.  Yeah, we can hear you.

(Whereupon, Deposition Exhibit No. 28 was screen-shared/referenced.)

BY MS. ROSEN:

Q.  Great.  All right.  Let's take a look at Exhibit No. 28.

Is the screen frozen?

A.  Yes.  There you go.

MS. ROSEN:  Is there an issue with

the exhibit?

EXHIBIT TECHNICIAN:  I didn't think so because it told me I was sharing it, but I will do it again.

Do you see it to now?

MS. ROSEN:  Now we do, great.

EXHIBIT TECHNICIAN:  Sorry about that.

MS. ROSEN:  No worries.

BY MS. ROSEN:

Q.  Taking a look at what we have marked as Exhibit No. 28, this is another email that we received in response to our subpoena.  It's dated January 8, 2004.  And you can see at the top of the email, it is from David Protess to Rob Warden, and there is a copy to somebody named Daniel, which we know to be Karen Daniel, who is an attorney at Northwestern.

First of all, Mr. Vicente, do you know who Rob Warden is?

A.  No.

Q.  Do you know who Karen Daniel is?

A.  No.

Q. Okay, great. If we go to the bottom of the email, there we go -- no. Sorry, I meant the bottom of this page. My bad.

The last two paragraphs read, "After Vicente served roughly four years, he was released and committed another armed robbery, which led to his reincarceration. My students have conducted two prison interviews with him, both times he admitted to fabricating the entire story against the defendants. The second time going on the record partly on audio tape. However, he is fearful about, quote, going public, end quote, with his admission because of what might happen to him if he becomes known in prison as a snitch. Still, he indicated in the last interview that he might be willing to sign an affidavit recanting his testimony if he were moved to a, quote, safer, unquote, prison."

It goes on to say, "The private investigator who worked with us on this case is Sergio Serritella, a young PI

who is also employed by State Senator Miguel Del Valle.  With the help of the senator, Vicente recently was transferred to Danville and now seems to be willing to cooperate fully with us.  Sergio, by the way, was present for both interviews with Vicente and has a good relationship with him, as do the students."

Do you see those two paragraphs that I just read?

A.  Yes.

Q.  And did -- were you aware that State Senator Miguel Del Valle assisted in getting you transferred to Danville?

A.  No, never had any knowledge knowing that he was involved or he had anything to do with it.  I never spoke to him.  I never wrote to him, don't know him.

Q.  Did you have any conversation with the students or Mr. Serritella wherein you indicated that now that they had successfully transferred you to Danville, you would be more willing to cooperate with them in providing a recantation affidavit?

A.   That could possibly have happened.
I don't recall the conversation, but it
could have happened.

Q.   Okay.

THE REPORTER:  I'm sorry, I didn't
hear your answer.

MS. ROSEN:  I think he said safety
was everything to me.

THE WITNESS:  Yes, that's what I
said.

BY MS. ROSEN:

Q.   And there is a reference in the
first paragraph about partially audio-taping
your statement.  Does that refresh your
recollection at all about whether or not you
were audio-taped at all?

A.   No, it still doesn't.

(Whereupon, Deposition
Exhibit No. 32 was
screen-shared/referenced.)

BY MS. ROSEN:

Q.   Let's take a look at Exhibit
No. 32.  This is another email that we
received in response to our subpoena.  This

one is now dated April 30, 2004. It is from Ms. Steinberger to Mr. Urdangen and some of the other students.

Do you know who Mr. Urdangen is?

A. No.

Q. The email reads, "Jeff, I hope you received the affidavit notes. David met the rest of the team and me for a lunch meeting this afternoon to discuss further plans regarding Vicente, and I wanted to bring you up to speed. I am copying the rest of them in on this note as well.

"We hope to return to Danville in the next few weeks to present Vicente with the affidavit. Alina Machado, a previous student of David's who worked on the case and formed a good relationship with Francisco, will accompany us as a, quote, treat, end quote, for him since he has requested to see her again. Ideally, we would have you present as well. There are a few other wrinkles that need to be ironed out."

Do you recall having a conversation with the students about wanting a particular student, Alina Machado, present when you next visited with the students about your affidavit?

A. No.

Q. Did you have a particularly good relationship with Ms. Machado that made you request that they bring her on their next visit?

A. I don't remember her. There was many women students that came up with the investigator. Other than that, I didn't catch names out of the two visits or upon meeting them.

Q. The first paragraph below that, Item Number 1 says, "Vicente adamantly requested that another lawyer be present to consult with him before he signs anything. He said that this would be helpful for the case because his having a lawyer present would enhance the legitimacy of his statement, especially since he received no counsel before signing the statements

advised by Guevara and Halvorsen. He said that this lawyer would not need to have any further responsibility to him beyond the affidavit. He wants to simply have someone stand by, we think, to make him feel more secure."

Do you see that paragraph I just read?

A. Yes.

Q. Did you tell the students that you wanted your own lawyer there to sign the affidavit?

A. It could possibly be. It could have happened.

Q. Okay.

A. I don't recall the conversation, but it could have happened.

Q. If we read the next paragraph, "David brought up two potential problems. The first is that we do not want to offer him further considerations that could be called into question as having enticed his signature. If we offer him free legal assistance, would this be an issue that

would threaten the legitimacy of the affidavit, even if the legal assistance in question was directly related to the signature itself?  The second problem is that David noted that any lawyer would be obligated by duty to tell Vicente prior to signing that he was perjuring himself with his signature.  We hoped that the lawyer could also tell him that this was an unlikely event and an easy one to contest, given that his original perjured statement was directed by government officials, but we wanted to hear your opinion.  In light of this, David did not feel comfortable asking one of his own friends to do the favor, and so a lawyer for Vicente would have to be one of your recommendation."

Do you see that paragraph that I just read?

A.  Yes.

Q.  Did anybody offer the assistance of a lawyer to you in advance of you signing the affidavit?

A.  I don't recall.

Q. Was there a lawyer that was representing you present when you signed the affidavit?

A. No, I don't believe so. No, I don't believe there was a lawyer present.

Q. Okay, thank you.

Next paragraph reads, "We all felt that the lawyer idea was one worth looking into for various reasons. First, it's a relatively simple way to appease Francisco and make him feel comfortable with our concern for his legal security and personal safety and our ability to come through in important matters, especially since we will deny other requests that he makes."

Do you see that there?

A. Yeah.

Q. Do you know what other requests they are referring to that they -- that you made that they intended to deny?

A. No.

MR. AINSWORTH: Objection. Foundation.

THE WITNESS: No. Nope.

BY MS. ROSEN:

Q. Yeah, I heard you.

A. Okay.

Q. Thank you.

Let's go on to the line Item Number 2, "Also there is the issue of Sergio's role in our interview. Vicente made it clear that he understood that we were in no position to offer him any special favors or deals of any sort. He does, however, continue to look to Sergio for these things. David suggested, and the team agreed, that it may be best to separate the signing of the affidavit from Vicente's contact with Sergio so that the two can be as isolated from one another as possible. The current plan was to go into the meeting with Vicente as a team with you, and perhaps the other lawyer present, and have him go over the affidavit and sign, with the understanding that Sergio had made the trip down with us and would speak to him in private when we were finished. That way, we

could hopefully obtain the signature without making -- without his making any requests or placing any conditions on it beforehand, and Sergio could deal with the requests in a private conference afterward."

Do you see that there?

A. Yes.

Q. Do you recall any conversations that you had with Sergio about requests that you wanted -- let me strike that.

Do you recall any conversations with Sergio or the students about favors or deals that you wanted of any sort in exchange for signing the affidavit?

A. Nope.

Q. Did you make any demands or offer any deals in exchange for signing the affidavit?

A. No.

MS. ROSEN: We are done with that exhibit.

BY MS. ROSEN:

Q. Do you recall any conversations with Sergio Serritella or the students about

obtaining work release in exchange for the affidavit?

A. No.

Q. Do you recall any conversations with Mr. Serritella or the students about signing the affidavit in exchange for getting your photograph off the Internet?

A. No.

Q. Do you recall any attempts made to get work release for you?

A. No. Work release, seriously. Sorry to bother you with this, but no one can get work release for me. I was a violent offender. We don't get work release. So I don't know where they got that from, this work release and this and that, sending each other letters and emails. Their theories on he wants this, he wants that, maybe he wants that, can't give a felon work release. It's the truth.

(Whereupon, Deposition Exhibit No. 41 was screen-shared/referenced.)

BY MS. ROSEN:

Q. Let's go ahead and mark Exhibit No. 41. This is a letter that we received in response to a subpoena to the -- I think the Cook County Assistant State's Attorney's Office. This is a letter dated July 29, 2004, and it's addressed to Sergio Serritella and it references Francisco Vicente, B-79591, Danville Correctional Center, Subject: Exception to criteria for placement in work release program.

And then if we scroll to the bottom, the letter is signed Francisco Vicente. Do you see that there?

A. Yes.

Q. Is that your signature?

A. Yep.

Q. Let's scroll back up so we can read the letter.

"Dear Sergio: Please be advised that I am addressing this letter to you to clarify the situation regarding my placement in the work release program. Due to an institutional policy at the Danville

Correctional Center, approval for this placement will require a two-step procedure."

You see what I read there, that first paragraph?

A. Yeah.

Q. Do you recall writing this letter to Mr. Serritella about work release?

A. No.

Q. The Subparagraph (a) says, "It is necessary for you to speak with the warden at this facility so that he may intercede on my behalf with the clinical services department. Policy at this facility dictates that the full six months of good conduct credit is not awarded until an inmate is approximately 18 months from release. If granted at 18 months, the prisoner then has only 12 months until his calculated release.

"In my current situation, I would be immediately eligible for placement on work release (within 24 months of release) if this good time were granted at

this time.  I am eligible for two separate awards of good time.  90 days award of meritorious good time and 90 days award of supplemental good time.

"Subparagraph (b), after the award of this good time, it would be necessary for you to recommend that the warden of this facility, Mr. Liebach, submit me for approval for work release based on an exception to established criteria for such placement.

"These two separate, but distinct elements, will assure my placement in the work release program in a timely manner.  This letter is a follow-up to the telephone call from my wife to assure that we are all following the same procedural format.  I will thank you for your every consideration in this matter, and I will be awaiting an early response to this communication."

Having read the full letter, does that refresh your recollection in any way about seeking Mr. Serritella's

assistance in July of 2004 to get your entry into the work release program?

A. Again, I don't recall. And again, I never got work release. I was paroled out both times.

Q. The question is not whether you got work release. The question is whether you asked Mr. Serritella to help you to get work release?

A. Again, I will tell you, I don't recall.

Q. That's possible?

MR. AINSWORTH: Object to the form of the question.

THE WITNESS: No, it's not possible.

MS. ROSEN: You can answer.

BY MS. ROSEN:

Q. It's not possible that you made that request?

A. Well, for one, I see my signature on there. Two, I don't recall writing this. And, three, I didn't get no work release. Never did.

Q. How would your signature get on there if you didn't put it there?

A. I don't know. Maybe it's paper I signed for the students when they were there. I don't know. Ask them. But I didn't get no work release, lady. That's in my prison file. You can look it up yourself.

Q. Let's go to the second page of the exhibit. This is also dated July 29, 2004. It's addressed to the warden, Mr. Blair Liebach, at Danville Correctional Center. Again, the subject matter is Francisco Vicente, and the subject is good time awards and work release program. If we scroll to the bottom of the page, you see a signature. Is that your signature?

A. Yes.

Q. Inmate, was that your inmate number, B-79592?

A. Yes, but that bottom -- yes, but that bottom signature is not mine either.

Q. What bottom signature?

A. I can write my name out and print,

and that's not my writing, lady.

Q. What are you talking about that's not your writing?

A. The signature is but that writing on the bottom isn't.

Q. Well, when you say "writing on the bottom," tell me the letters that you are referencing.

A. That signature by me might be my name, but all this writing isn't mine. I know it's typewriter or something, but I didn't write this.

Q. Right. I am not saying you handwrote the whole letter. I think it's some kind of word processing or a typewriter or something.

A. Yeah, looked like a typewriter, but I didn't type this up.

Q. Okay, let's read the letter. It says, "Dear Warden Liebach: Pursuant to our conversation the evening of July 27th, please be advised that I have considered every aspect of my placement in the work release program as an exception to the

criteria. As you are aware, I am working on this through Mr. Sergio Serritella."

Do you see that there?

A. Yes, I see it.

Q. But you don't recall writing this?

A. No, I don't, lady.

Q. Okay. "I am enclosing a letter that I wrote to Mr. Serritella this date asking that he contact you. It is my hope that in all of our contact on this subject that everything will be open and above board. I am working through Mr. Serritella because I do not know what is proper for me to request and what should be requested through Mr. Serritella's office.

"Sir, as your records would indicate, I have maintained an excellent adjustment and institutional record. I try to establish and maintain good working relations with all of your staff. My one focus is to legally return to the support of my family as quickly as possible. Work release will facilitate this desire.

"Sir, I am asking that you

intercede on my behalf and ask clinical services to review my record and award the full six months of good time (90-day meritorious and 90-day supplemental) so that we may begin work on consideration for the exception to the criteria. I and my family will thank you for every effort on my behalf, and I remain sincerely yours, Francisco Vicente."

Having read the entire letter, does that refresh your recollection that, in fact, you did write this letter to the warden in an effort to secure a work release?

A. Okay. Again, if you want to read the letter again, you can answer. You can read it ten times. I am going to tell you I don't recall writing this letter, and I didn't get no work release. That's in my prison file.

Q. Do you recall having --

A. You understand that now?

Q. Do you recall having a conversation on July 27, 2004, with the

warden about getting work release?

A. Again, okay, for the record, I will simply state that I don't recall a letter to IDOC. I don't recall a letter to Sergio. I don't recall, and I never got no work release.

So where did you guys get work release? Obviously, from this letter. But I don't recall this letter. There's a lot of things I don't recall on this case because they happened so long ago.

You are trying to make me say something or remember something that I can't remember and that you won't get out of me.

So again, the IDOC, Sergio, I don't recall. There's a lot of things I don't recall because I hid it in my mind, okay?

So next question.

(Whereupon, Deposition Exhibit No. 38 was screen-shared/referenced.)

BY MS. ROSEN:

Q. We can take that exhibit down.

If we can look at Exhibit No. 38, please. This is another email dated May 27, 2004. It's from Julie Lissner to David Protess.

Do you recall Julie Lissner?

A. No.

Q. Do you recall one of the students named Julie Lissner?

A. Yeah, I see it.

Q. Do you recall a student named Julie Lissner?

A. No. I told you once before, I don't remember any of the students' names. It happened so long ago. I know you need to answer these questions -- ask these questions, but I don't remember.

Q. You just tell us when you don't remember. That's fine.

A. Yeah.

Q. The subject line on this is Frankie phone call, and it says, "Okey-Doke, I just got off the phone with an interesting Vicente. He started the conversation out a friendly greeting, but then said, 'Why are

you girls lying to me?  Why did you say you didn't come with Sergio if he was waiting outside the whole time?'  I explained that we didn't come with Sergio and that he may have been waiting in the waiting area if he got there during our meeting, but that we didn't arrive with him.  He then asked, 'Well, you drove with him so you must be lying.'  I explained that we did not drive with him.  We could not have all fit in the same car and that we had ventured to Danville the night before, while Sergio had driven the day of.  That answer seemed to appease him."

Do you recall any conversation with any of the students where you confronted by them and asked them about why they were lying to you?

A.   No.

Q.   The email goes on to say "But why was he calling?  With demands, of course. Number one, he wants Armando and Pete to sign a notarized statement that says that they will not reveal his name to the media."

Do you recall making that demand?

A. No. But that's a funny one.

Q. Why is that funny?

A. Because I would have jumped at the media. Somebody would have heard the truth then.

Q. I see.

"He explained that Randy Steidl is getting out tomorrow and that CNN and everyone else is camped outside the prison. He says he knows the media will be involved in his case, but he wants Armando and Pete to make a signed promise and send it to him. He said that he helped them out, and now he wants them to help him. If he does not get the statement, he will get up on the stand and plead the Fifth."

Do you recall saying that to any of the students?

A. No.

Q. "He said that our group could go up and give hearsay testimony. Smart guy. He seemed to come up with that himself. But

regardless, he is pleading the Fifth if he doesn't get the statement. I had totally played dumb and said I have to talk to the lawyers and my professor, and I don't really understand what kind of statement that is. But he wants an answer. He said he may be sending us a letter about this that we can pass along to our professor. I said that when he receives our professor's phone number to add to his list, that our professor can better address media questions because I don't know how it works. Regardless, he wants notarized statements from Armando and Pete saying that they will not reveal his name to the media, yet I did not clue him in that his name is totally plastered all over the public records of this case."

Do you remember any conversation at all like that about taking the Fifth if Mr. Montanez and Mr. Serrano didn't sign statements promising that they would not put your name out in the media?

A. No.

Q. Do you recall testifying in connection with a post-conviction proceeding for Mr. Serrano and Mr. Montanez's case where, in fact, you did take the Fifth?

A. Yes, and I'll tell you why. You want to know why I took the Fifth?

Q. Sure.

A. I took the Fifth because that was my right as a U.S. citizen, okay, as an American. I took the Fifth because I was also being abused by the judge. What was that judge's name on the case? Boyle, Maureen Boyle, that's why I pleaded the Fifth. I had to walk on eggshells in that courtroom. That woman threatened me, where even an attorney heard it, okay? An attorney on this case.

Q. Who? Which attorney on this case heard a threat by a judge?

A. Jennifer Bonjean. She was there in the courtroom. She abused me.

Q. What was the threat?

A. She made her threat so loud that

everybody in the courtroom heard it, okay? And on top of that, Ms. Jennifer Bonjean jumped up and said, she can't do that. That's why I pleaded the Fifth. That's why I kept pleading the Fifth.

Q. Can you tell me what the threat was?

A. Perjury. She was going to charge me with perjury at the end. I was going to go back to jail. Regardless if I told the truth or if I didn't, I was going to jail. Maureen Boyle did that, and I couldn't do nothing about it. Nothing, just sit and shut up.

Q. If we move on to point 2 in this email, it says, "He asked which girl I was, and I said I was the one sitting next to him. He said something that I didn't understand about how he loves his wife but he thought I was cool or something. Maybe to infer he wasn't hitting on me. Who knows?"

Do you recall having this conversation with one of the students?

A. No, but I see that they were talking about themselves, and they were sending each other emails, even though my name was attached to it. And I know this is a civil suit and you have the right to ask me anything, but isn't this irrelevant to this?

Why can't you ask them these questions if they wrote this stuff? Because I don't recall any of this. I am talking back and forth, and I am not in the conversations or in the typing or the computer.

Q. Well, I am asking you about conversations they said they had with you, so I am seeing what your recollection is.

A. I don't recall the conversations, though.

Q. Okay, well, then you can tell us.

A. I want you to hear this. And if they did happen, I don't remember them. This is something I have been trying to forget for the last 30 years since the day it happened since the day I met Guevara and

Halvorsen, and they became the worst thing that I've ever walked in front of.  I would have taken on the devil instead of them.

You got another question?

Q.  I do.

"He then said he only wants to see Alina, Sergio and me from now on.  He said he felt really overwhelmed and overpowered with the five girls on one situation.  He basically is conforming to the interview roles we were playing."

Do you recall having the conversation with the student, this student, about only wanting to see Alina, Sergio, and Julie going forward?

A.  No.  Next question.

MS. ROSEN:  Let's go to Exhibit No. 39, please.

(Whereupon, Deposition Exhibit No. 39 was screen-shared/referenced.)

BY MS. ROSEN:

Q.  This is another email that we received in response to our subpoena.  It's

from Julie Lissner again.  This one is dated June 1, 2004, and the subject line is letter from Vicente, and Ms. Lissner says that she has now typed a letter that she received from you.  And what she has typed is what appears -- what she claims is a letter dated May 27, 2004, from you that starts,

[As read]:  "Greetings, may this letter find you and the rest of the class in the best. I am doing just fine, yet with many concerns due to our last visit on May 26, 2004.  My concerns are those of having an attorney represent me in this matter concerning the Montanez case and the others.  I really don't believe that any one of you understands my means.  I do see that each of you are just looking for an "A" in the class just to graduate this summer, other than Alina Machado and Julie.  Just as in our last visit, I put my concerns of wanting and needing an attorney and my safety before anything.  I understand that I would have one provided for me if need be in the future, yet all this talk about Professor

David Protess representing me or getting me one if I needed one.  I hope that this is the case and nothing other, and that I am not being lied to in any way like I was on May 26, 2004, when the truth was standing before me?

"I will not see anyone other than Alina Machado, Sergio Serritella, and Julie Lissner, only because I can see the games and role playing from this class.  I am not lying.  I would like to speak to Professor David Protess, my own attorney provided, and to discuss my concerns with someone other than a student just looking for an "A" to graduate?

"Also, I would like for any one of the classmates to pass along to Montanez and the others than before anything, I want an affidavit stating that if and when they regain their freedom, they will keep my name out of the press and the media, notarize.  I will close this letter for now hoping that it was well-received and welcomed.  F.  Vicente, B-79592?"

Do you recall sending a letter like that to Ms. Lissner or any of the other students?

A. Nope.

(Whereupon, Deposition Exhibit No. 42 was screen-shared/referenced.)

BY MS. ROSEN:

Q. All right. Let's take a look at Exhibit No. 42. This is another email we received in response to our subpoena. It's dated August 30, 2005. It's from Mr. Protess.

It says, "Conversation with Vicente. Hi, everyone. Vicente called this evening to discuss the possibility of cooperating with the lawyers for Iglesias and Bouto. After weighing the pros and cons, so to speak, he made the following decisions: He is willing to sign an affidavit swearing that he lied in both cases, but not yet. First, he wants to see the results of our continuing investigation into those cases, and in particular, our

ultimate determination of their guilt or innocence. If we conclude that Iglesias and Bouto were wrongfully convicted, he will then sign an affidavit for both men and testify on their behalf at any judicial proceeding. His reasoning is that he is willing to stick his neck out only if he can help exonerate innocent prisoners whom he helped convict, which is exactly what he did for Serrano and Montanez."

Q. Do you recall any conversation with Mr. Protess about your willingness to sign an affidavit for Mr. Iglesias and Mr. Bouto contingent on the results of the investigation being conducted by Mr. Protess and his students?

A. No.

Q. Do you know what the evidence against Mr. Bouto was?

A. Excuse me?

Q. Do you know what the evidence against Mr. Bouto was other than your testimony?

A. I don't know.

Q. Do you know what the evidence against Mr. Iglesias was other than your testimony?

A. Probably my testimony.

Q. Anything else?

A. No.

Q. You don't know if there were other witnesses that came in and testified that they saw him commit the murder?

A. No. That, I don't know.

MS. ROSEN: Let's take a look at Exhibit No. 44.

(Whereupon, Deposition Exhibit No. 44 was screen-shared/referenced.)

BY MS. ROSEN:

Q. This is another email we received in response to our subpoena. It's dated October 22, 2005, and it is from one of the students to Mr. Protess. And then if we scroll to the bottom, it's an email from Mr. Protess to the student, and I want to focus on that email.

It says -- actually, it may

not be to a student.  I take that back, a Ms. Trossman.

It says, "Hi, Mindy," and then it goes on to say, "On a completely different subject, the new Team Serrano has made significant progress on the case and we're close to convincing Vicente to admit publicly that he lied in all three murder cases.  Before he does, he wants to read his testimony and that of the other two state's witnesses in the Gerald Iglesias case."

Do you see that there?

A.   Yes.

Q.   Do you recall a conversation with Mr. Protess where you requested your testimony from the Iglesias case, as well as the testimony of the two other state witnesses?

A.   No.

Q.   Do you recall Mr. Protess providing you with your testimony in the Iglesias matter?

A.   No.

Q.   Do you recall Mr. Protess

providing you with the testimony of the other two state's witnesses in the Iglesias matter?

A. No, I don't recall.

Q. If you were provided those transcripts in prison, what would have happened to them upon your release?

A. Say that again.

Q. Sure. If Mr. Protess had provided you with these transcripts of your testimony and the other two witnesses, upon your release from prison, would you have taken them with you?

A. Of course.

Q. Do you have those? Do you have those transcripts?

A. No.

(Whereupon, Deposition Exhibit No. 45 was screen-shared/referenced.)

MS. ROSEN: Let's take a look at Exhibit No. 45. This is another email we received in response to our subpoena. It's dated June 28, 2006. It's from Mr. Protess

to Sergio Serritella at the top, and then at the bottom, if we can scroll down, we can see that the communication was initiated by Mr. Serritella to Mr. Protess.

And it says, up at the top, David -- sorry, you went too far. Oh, actually, let's scroll all the way to the bottom.

This is -- if you go to above that line, you will see, it says, "Sergio, thanks for speaking with me yesterday. I tried to phone you this morning but was unable to leave a message. Any help with regard to my financial situation would be greatly appreciated. Please contact me at (773) 682-6122, and then the home number (773) 788-1876."

If we scroll up a little bit, it's from Michele to Sergio on June 28, 2006.

Do you know what financial situation she is referring to?

A. No. But I'll tell you this, that date on there, June 28, 2006, that was two

months after I got out -- no, two months before I got out. And when I got out and went home to Michele and I was released and got home because she picked me up, Michele, I left her within two weeks because she was on cocaine. She had a bad cocaine habit. I admitted her, being her husband, into a rehab. And after that, I divorced her. I didn't want to be around the cocaine and everything that she was involved in. She had a real bad habit at the time.

So these letters of her asking for money, that would make sense. When I came home, she had a real bad habit, where she sold everything in the house.

Q. If we scroll up a little bit, now we have the email from Mr Serritella to Mr. Protess, and it says, "The drama continues. She now says she is" --

Wait, hold it right where you are. Thank you.

"She now says she is out of work and looking at a 400-plus phone bill due to Frankie's calls. Of course, he won't

be paroled home unless there is a land-line because violent offenders start parole on electronic detention.  Should we help?  I won't return her call until I hear from you."

Do you recall a problem with the land-line at your home just prior to your release?

A.  No, I don't recall.

Q.  Okey-Doke.

A.  Sounds to me like one of Michele's schemes to get money or get high.  That's what I think.

THE VIDEOGRAPHER:  Can we go off the record for just one minute.  We need to switch exhibit technicians.  It will literally just take a minute.

We are going off the record at 5:13.

(Whereupon, a break was taken at 5:13 p.m. to 5:14 p.m.)

THE VIDEOGRAPHER:  We are back on the record at 5:14.

(Whereupon, Deposition

Exhibit No. 46 was

screen-shared/referenced.)

BY MS. ROSEN:

Q. Let's take a look at Exhibit No. 46, please. This is another email, dated August 29, 2006, from Mr. Protess to Mr. Serritella.

Can you tell us, before we talk about this exhibit, Mr. Vicente, when it was exactly that you were released from prison?

A. When was I released?

Q. Yes.

A. I was released the second time August 26, 2006.

Q. So at the time of this email, August 29, 2006, you are already released; is that correct?

A. Yes.

Q. If we go to the bottom of the page, you will see, "Frankie articulated his disappointment after your conversation in a voicemail he left me afterwards, which I

saved for you. I haven't called him back yet and don't intend to until I hear from you on how best to handle him." And that's from Mr. Serritella to Mr. Protess.

Do you recall leaving a message for Mr. Serritella where you articulated your disappointment in something immediately upon your release from prison?

A. No. It happened so long ago, I don't.

Q. And if we go to the top of the page, the email reads, "As for Frankie, he definitely sounded disappointed, but please remind him that I didn't say anything to him that I haven't said in the past. Namely, no journalist can give money to a source, especially a witness."

Does that refresh your recollection at all about the message you left and whether or not it had to do with requesting money from Mr. Protess?

A. For the record, I never asked nobody for money. That's not my letter. I didn't write it. That's between them. I

don't recall.  I'm in jail.  And when I got out, I sat back.  I couldn't even come out of my own house because I was so fucked up in the head.  It took me two years to come out of my own house.

Q.  You didn't leave your house for two years?

A.  Basically, I didn't work or do anything for two years after my release.  I was -- I couldn't go outside.

Q.  Do you remember being paid $500 by Northwestern to speak to the students?

A.  Yes.

Q.  When did that happen?

A.  After I got out.

Q.  What did you speak to the students about that you got paid $500 for?

A.  Well, basically, I talked to them about my life, what happened to me.

                (Whereupon, Deposition
                 Exhibit No. 48 was
                 screen-shared/referenced.)

BY MS. ROSEN:

Q.  Let's take a look at Exhibit No.

48.  This is an email dated November 6, 2007, from Mr. Protess to Mr. Urdangen.

"Jeff, I want to give you a heads-up that Frankie Vicente is fairly ticked off about a couple of recent developments.  One is the aborted meeting at the law school, in which he said that he wasn't picked up until after he had to leave for work.  He's also confused about why the meeting wasn't rescheduled since he wants to help."

Do you recall being angry about some canceled meeting at the law school?

A.  No.  Don't recall.

Q.  Okay.  "The other resulted from a call he recently received on his cell phone from someone who said they were a lawyer for Iglesias.  He wouldn't say much to the caller because he couldn't establish who he was and because he didn't authorize his private number to be given out.  He expressed concern that someone at the center had done so without first asking his

permission."

Do you recall having a conversation with Mr. Protess about being annoyed that his number -- sorry, let me start over.

Do you recall a conversation with Mr. Protess about being annoyed that your phone number was being given out?

A.  No, I don't recall.

Q.  Is that something that would have annoyed you, that your phone number was being given out without your permission?

MR. AINSWORTH:  Object to the form of the question.

MS. ROSEN:  You can answer.

THE WITNESS:  Lady, I don't recall.

BY MS. ROSEN:

Q.  In November of 2007, if students were giving out your phone number to people, your personal cell phone number, would that have made you angry?

A.  Well, I wouldn't know because nobody has called me.  You're asking if I

would be -- if I would be angry?  Lady, I am going to answer it like this, I've been angry since I stepped before Guevara and Halvorsen and got tied into this.

I can't even have a relationship.  I've been with the woman -- one woman six years, and we can't even live together because I am not a happy guy anymore, okay?

(Whereupon, Deposition Exhibit No. 49 was screen-shared/referenced.)

BY MS. ROSEN:

Q.  Let's take a look at Exhibit No. 49.  This is another email from Mr. Protess to Mr. Serritella, dated November 6, 2007. And it says, "Frankie.  Sergio, Damn, he disconnected his cell phone over this? That's not good.  Under the circumstances, it might be best to set up the meeting in person to restore his comfort.  If necessary, I'd be happy to join the two of you for another lunch to get things back on track.  There is no case more personally

important to me than Armando's, and I am not going to let the Center screw it up. But let's first see how Jeff responds to this latest development. I'll keep you posted."

Do you recall disconnecting your cell phone in November of 2007 because the students had handed out your phone number?

A. No.

Did you hear me? I said no.

Q. Yes, I heard you. Thank you.

(Whereupon, Deposition Exhibit No. 55 was screen-shared/referenced.)

BY MS. ROSEN:

Q. Let's take a look at Exhibit No. 55. This is a memo, an exhibit that we got -- a document we got from Cook County, and it's dated September 22, 1996.

A. I still got that.

Q. You still have this letter?

A. I still have that.

Q. Where do you have it?

A. Doesn't matter.

Q. Do you have it at your home?

A. I had it.

Q. You had it. You don't have it any longer?

A. No, lady. You can't have it, and so I can't give it to you.

Q. So when you just said, I still have it, you weren't --

A. I still had it. I had this at one time in my own files. I know what this is.

Now, go ahead and ask me your question.

Q. So now you are claiming you don't have it?

A. I don't have it.

MR. AINSWORTH: Object to the form of the question. Argumentative.

THE WITNESS: I won't give you something I don't have.

BY MS. ROSEN:

Q. So what is this about since you're so familiar with it?

A. They took the statement in the Department of Corrections of Cook County.

Obviously, I seen his name, and it's refreshing my memory.  Now if you want to go on ahead and read the little letters like you have been doing and refreshing my memory, that will help.

Q.  Well, you said you -- you said you recognize that, and you remember what it's about.

A.  Yes.  Wait, wait, I didn't say I knew what it said.  I said I recognized it. Now let's get it right, lady.

MR. AINSWORTH:  Eileen, please don't argue with him.

THE WITNESS:  That's what she's doing.

MS. ROSEN:  Russell, please don't interject like that.

MR. AINSWORTH:  I'm sorry, but like --

THE WITNESS:  Thank God he did.

MS. ROSEN:  I'm sorry.  I'm sorry, but you are escalating, you know.

MR. AINSWORTH:  No.

MS. ROSEN:  Yes.  But we can move

on.

MR. AINSWORTH:  Thank you.

THE WITNESS:  Please.

BY MS. ROSEN:

Q.  What do you recall about this memorandum before I read it?

A.  No.  You read it.  I want you to. I am not going to answer nothing until you read it.

Q.  Do you remember anything about the circumstances of why Lieutenant Tucker wrote this memorandum?

A.  It's on paper.  I want you to read it to me.

Q.  I am asking what you remember.

(Nonreportable cross-talk.)

Q.  I am simply asking -- I am simply asking -- I am asking you what you remember?

A.  I don't remember what it says on there.  I recall the paperwork and the name. Now if you want to keep going, you keep going.

Q.  What do you remember about the name?

A. Tucker?

Q. Yes.

A. He is a lieutenant in the division.

Q. Did you know him?

A. He is a lieutenant in the division I was in, lady.

Q. Did you know him personally?

A. No one knows a correctional officer personally. Come on, lady. Seriously? You think I knew this guy personally. I just told you I don't.

Q. How often would you see Lieutenant Tucker while you were at Cook County Jail?

A. Excuse me?

Q. How often would you see Lieutenant Tucker while you were at Cook County Jail?

A. Any time he came on his shift. He is a lieutenant, lady.

Q. So you would see him all the time every time he came on the shift? He was somebody that would circulate in the population all of the time?

MR. AINSWORTH: Object to the form

of the question.

THE WITNESS: Correct. He's a lieutenant.

BY MS. ROSEN:

Q. Let's take a look at the letter. It says, "Sir, I am writing in regards to the above-mentioned inmate because of the help he gave us in removing an officer who was bringing contraband into the division. At no small risk to his life and his family, he supplied us with unreputable evidence against the C/O who was bringing in contraband which was detrimental to this facility."

Do you recall providing information about a C/O who was bringing contraband into the facility?

A. Yes.

Q. What kind of contraband was the C/O bringing into the facility?

A. He brought in a disposable camera and drugs.

Q. How did you become aware that he was bringing in a disposable camera and

drugs?

A. He brought it to me and my cellmate, lady.

Q. Why did he bring it to you and your cellmate?

A. Yes.

Q. I said, why did he bring it to you and your cellmate?

MR. AINSWORTH: Objection. Foundation.

THE WITNESS: Ask him, lady.

BY MS. ROSEN:

Q. Did you ask him for it?

A. Obviously.

Q. You asked him for drugs?

A. Lady, we asked him to bring us a camera, and we asked him to bring us the contraband, and he brought it. Don't ask me how much, don't ask me the date. Don't ask me how many times he did it. He did it.

Q. So then why did you report him?

A. Well, I didn't report shit. So let's get it right. Michele got caught coming to visit me with a picture from the

disposable camera because we had the disposable camera brought in through him with the drugs and the contraband. We sent pictures home after they were developed.

She was too good enough to put a picture in her wallet when she came to visit me at the division, and an officer at the visiting room see the picture of me in IDOC pants and shirt in a cell.

Upon seeing that photo, they confiscated her wallet. They secluded her into the room, and they interrogated her, locked me up. And at the end of the day, they came to find out where the drugs came from.

Q. I see. So Michele got caught, and then you were confronted with it, and you provided the information about how you got the drugs and the camera?

A. Yes.

Q. If you read a little further, it says, "To give you a little background on this situation, we had heard rumors of correctional officers being photographed in

cells with inmates and displaying U.S. currency along with bringing in drugs. Inmate Morales, Carlos was approached by Lieutenant Howell and myself about cooperating with investigations. He said he would help."

Is that accurate?

A. Something like that happened.

Q. Did you agree to help?

A. Well, yeah, I was in jail already so ...

Q. "We informed him at that time that we could not make any promises. He still said okay."

Is that accurate?

A. Yes.

Q. Then it says, "Subsequently, he came up with the photos of the officer in question standing in the cell with his arm around several inmates and money over the bed."

Is that accurate?

A. Yes, the photos.

Q. "This officer has now been removed

from the department."  And then it says, "He has also given us numerous tips on drugs coming into the jail, which we have confiscated and made arrest."

Is that true?

A.  I don't know about all that, but they did find the drugs we had.

Q.  Did you also provide numerous tips to Lieutenant Tucker and others about other drugs that were coming into the jail other than the drugs that this particular correctional officer brought in?

A.  I don't recall.  It was all about me.  It was all about me, the officer, and my cellmate and Michele.  All this other stuff that they wrote on there that you are telling me and reading, I don't remember.  I don't recall.

Q.  Next line reads, "He also supplied us with a picture of a female who is bringing drugs into the jail for a known drug dealer, which is still under investigation as far as I know."

Is that accurate?

A.  I don't remember that.

Q.  Then it says, it has been brought to my attention that his life, along with his families has been threatened after he gets out."

Is that accurate?

A.  That's what he wrote, and that's what's on there.  I didn't tell him that.

Q.  You never had a conversation?

Was it true that there were threats on your life and your family during September of 1996?

A.  Yeah, because of what I was involved in with the Guevara case.  If you are asking me with this police stuff that you are talking about now, no, I didn't -- I was already locked up.  And there's always concern about my family, even to today.

So does that answer your question?

Q.  Yes, thank you.

(Whereupon, Deposition Exhibit No. 60 was screen-shared/referenced.)

BY MS. ROSEN:

Q. All right. Let's take a look at Exhibit No. 60. Exhibit No. 60 is a letter that appears to be addressed to you on the letterhead of the Law Offices of Richard Garvin.

Do you recall ever receiving this letter back in May of 1993?

A. No.

Q. Do you know who Richard Garvin is?

A. No, I don't.

Q. Do you recall an incident where you and Mr. Garvin got into trouble because Mr. Garvin gave you money while you were --

MR. AINSWORTH: Object to the form of the question.

BY MS. ROSEN:

Q. -- while you were at Cook County Jail?

A. No.

Q. I'll read the substance of the letter to see if that refreshes your recollection in any way. "Dear, Francisco: Your friend, Robert Bouto, told me that you

recently caught an armed robbery case and were in need of an attorney to represent you.  Enclosed please find several of my business cards.  If you do not have an attorney to represent you at this time, please feel free to call me.  I understand that you must call me collect.  That is not a problem.  Please call in the late afternoon or early evening hours.  My telephone number is listed above.  I look forward to representing you on this matter should you choose to retain me."

Does that refresh your recollection at all about who Mr. Garvin was?

A.  No.

(Whereupon, Deposition
Exhibit No. 61 was
screen-shared/referenced.)

BY MS. ROSEN:

Q.  Let's take a look at Exhibit No. 61.  If we could go to the third page. Do you recognize this type of document, this form?  It's called a disciplinary report and

findings of fact, Mr. Vicente.

Do you remember seeing this type of form while you were at Cook County Jail?

A. Yes.

Q. Do you know what it is?

A. And?

Q. I am going to read you the description of the incident. "On May 31, 1993, at approximately 1420 hours, Reporting Officer Slaughter searched Inmate Morales, Carlos upon completion of his attorney visit and found $17 U.S. currency in his shirt pocket."

Do you see that there?

A. Yeah.

Q. Do you recall that incident?

A. Yeah, I remember something like that. I don't remember the date, but I -- it does sound fresh in my head like, yeah, I remember something like that.

Q. Why did the attorney that you met with give you money?

A. No, he didn't give me money.

MR. AINSWORTH: Objection. Foundation.

BY MS. ROSEN:

Q. How did you end up with $17 in your pocket after your meeting with the attorney?

MR. AINSWORTH: Objection. Assumes facts not in evidence. Form of the question.

MS. ROSEN: You can answer.

THE WITNESS: I don't know. He didn't give it to me.

BY MS. ROSEN:

Q. Was there $17 in your shirt pocket when you were searched?

A. And?

Q. I am asking you a question. Was there $17 in your shirt pocket when you were searched?

A. I don't recall. And if there was, and?

Q. Where did you get it?

MR. AINSWORTH: Objection. Foundation.

THE WITNESS:  Lady, I am going to be honest with you, when you are in prison, nobody gives a fuck where you get the money from.  If you got money, you're golden. It's like a platinum card, okay?  I had $17 and I got caught with it.

So you want me to tell you where I got it from?  I don't recall.  And if I did know, I wouldn't tell you.  Believe me, I wouldn't.

MS. ROSEN:  We can take a break, and I will take a look at my notes, and we can figure out where we are.

MR. AINSWORTH:  Thank you.

THE VIDEOGRAPHER:  We are off the record at 5:36 at the end of Media Unit 4.

(Whereupon, a break was taken at 5:36 p.m. to 5:46 p.m.)

THE VIDEOGRAPHER:  We are back on the record at 5:46 at the beginning of Media Unit 5.

MS. ROSEN:  Mr. Vicente, I don't have any more questions of you at this time.

THE WITNESS:  Excuse me?

MS. ROSEN:  I don't have any more questions for you at this time.  Thank you.

THE WITNESS:  Thank God.

MR. AINSWORTH:  Does anyone else have questions?

MR. ENGQUIST:  I don't have anything at this time either.

MR. O'CALLAGHAN:  No, I don't have any questions on behalf of Kevin Hughes.

MS. McGRATH:  I don't have any questions at this time.  Thank you.

MR. AINSWORTH:  Are you ready, Rachel?

MS. BRADY:  Yes, I can go.

EXAMINATION

BY MS. BRADY:

Q.  I have just a couple of questions, Mr. Vicente.  My name is Rachel Brady, and I represent Geraldo Iglesias, who is one of the plaintiffs in this matter.  Can you hear me okay?

A.  Yeah, I can hear you.

Q.  Give me just one second.  So I just want to clarify something you said

earlier about what you told defendants Guevara and Halvorsen when you first met with them about the Montanez and Serrano case.

So I am going to put up an exhibit. Give me a second to get it up on my screen.

Actually, I just got kicked out of my Adobe. So can we go off the record for two minutes while I figure out how to log back in. My PDF isn't working. I'm sorry. It will be just a second.

MR. STOHR: I am going to put us on mute so you don't have to hear us.

THE VIDEOGRAPHER: We are off the record at 5:48.

(Whereupon, a break was had at 5:48 p.m. to 5:53 p.m.)

THE VIDEOGRAPHER: We are back on the record at 5:53.

BY MS. BRADY:

Q. Mr. Vicente, can you see this document on your screen?

A. Yes.

(Whereupon, AR-L 513660 was screen-shared/referenced.)

BY MS. BRADY:

Q. So I will represent, for the record, this is a three-page document. It's a supp. report that's out of order, but this is the beginning of AR-L 513660. This is a report from the Montanez case.

So I will show you the first page just so you can take a look. I'm sorry, this is a report from the Bouto case.

Does this document look familiar to you at all?

A. No.

Q. So I am just going to scroll up here, and it says here -- I am going to read this paragraph. "On 2 June '93, the reporting detectives," and that's Guevara and Halvorsen, "arranged to have Francisco Vicente brought from the Cook County Jail to the State's Attorney's gang prosecution unit. He was interviewed at that time by Detective E. Halvorsen and A.S.A. John Dillon."

Do you see that?

A.   Yes.

Q.   So does this -- or strike that.

This report says that you spoke with Halvorsen and Dillon on June 2nd about the Montanez and Serrano cases.

Do you have any reason to doubt that date?

MS. ROSEN:  Objection.  Form. Foundation.  You are not accurately reporting what the report says.  This is a Bouto supp. report.  You just said it.

MR. AINSWORTH:  Excuse me. Eileen, please, no speaking objections.  And that's -- that's not a mischaracterization of the document.

MS. ROSEN:  It 100 percent is.  I am maintaining my objection.  Foundation. Mischaracterizes the document.

BY MS. BRADY:

Q.   Let me back up and ask a foundational question.

Mr. Vicente, do you remember on which case you spoke with State's

Attorney John Dillon?

A. Let me think for a minute. Bouto.

Q. Do you remember if you also spoke with John Dillon on the Montanez and Serrano case?

MS. ROSEN: Objection. Leading.

THE WITNESS: It could possibly be.

BY MS. BRADY:

Q. Let me back up one more step. If I told you that on June 2, 1993, Guevara and Halvorsen coerced you into agreeing to give a statement against Montanez and Serrano, would you have any reason to dispute that?

MS. ROSEN: Objection. Form. Foundation.

We could swear you in, Rachel.

MS. BRADY: I would request that counsel respectfully refrain from editorializing and making rude, disrespectful comments. We have all been in this room together for way too long already, and it would be great if you could just not give me the attitude that's disrespectful,

and it's not professional.  Thank you.

Can the court reporter please read back the question.

Is there a court reporter there who can please read back my most recent question?

THE REPORTER:  I am so sorry.  I was on mute.

MS. BRADY:  That's okay.

THE REPORTER:  My lips were moving, but you guys didn't hear me.

(Whereupon, record read, as requested.)

THE WITNESS:  No.

MS. ROSEN:  Objection.  Form. Foundation.  Leading.

BY MS. BRADY:

Q.  Okay.  And I want to show you now another exhibit.  Can you see this document on your screen?

A.  Yes.

(Whereupon, RFC-Iglesias 57 was screen-shared/referenced.)

BY MS. BRADY:

Q. For the record, this is a two-page document Bates-labeled RFC-Iglesias 56 and 57. I will represent to you this is a general offense case report generated in connection with the Monica Ramon shooting, which is the one that Gerald Iglesias was convicted of.

Can you see this on your screen?

A. Yes, ma'am.

Q. Do you see here at the top where it says, date of occurrence, 7 June '93?

A. Yes.

Q. Do you have any reason to doubt that Ms. Roman was shot on June 7, 1993?

MS. ROSEN: Objection. Form. Foundation.

THE WITNESS: I wouldn't know.

BY MS. BRADY:

Q. So if Guevara and Halvorsen talked to you about the Montanez-Serrano case on June 2nd, and Ms. Roman was not shot until June 7th, does this help refresh your

recollection about whether you would have talked to Guevara and Halvorsen about the Roman shooting and the Montanez-Serrano shootings at the same time?

MS. ROSEN: Objection. Form. Foundation. Leading.

THE WITNESS: It could be.

BY MS. BRADY:

Q. What do you mean?

A. They could have talked to me about both of them at the same time.

Q. So if you spoke to them about the Montanez-Serrano cases on June 2nd and Ms. Roman was not shot until June 7th, does that help you remember whether you spoke to them on June 2nd about the Roman shooting if she hadn't been shot yet?

MS. ROSEN: Objection. Form. Foundation. Leading.

THE WITNESS: No, it doesn't help me. It doesn't help me.

BY MS. BRADY:

Q. Is it possible that Guevara and Halvorsen talked to you about the

Montanez-Serrano case first, and then talked to you about the Iglesias case on a later date?

MR. ENGQUIST: Objection. Leading. Form.

MS. ROSEN: Objection. Form. Foundation.

THE WITNESS: Yes, that's possible.

MS. ROSEN: Leading.

THE WITNESS: Because after the Bouto case, them meeting me in various places and courtrooms, and my courtroom, which is Suria, Judge Suria, in the back, and the State's Attorney's Office where they would call me over. All they wanted was more cases, to attach me to more cases. So once they got me up there, the State's Attorney's Office, they were swamping me. I was all over the place with these two guys.

BY MS. BRADY:

Q. And Geraldo Iglesias never told you he'd ever committed a shooting, did he?

A. No.

Q. He never told you anything about a murder at Palmer and Spaulding, did he?

MS. ROSEN: Objection. Form. Foundation. Leading.

THE WITNESS: Look, I am going to answer this clearly. None of these guys have ever confessed a crime to me. None of these guys have ever been with me to commit a crime. None of these guys ever committed these crimes.

These crimes were fabricated by Guevara and Halvorsen, okay? I'd write that on paper a thousand times because I know that's my truth. Okay? You guys were never in my shoes to know what happened to me. You guys will never know what really happened here or there, what really specifically happened because you guys were weren't there. I was.

Some things I blocked out because I never want to remember. Every time I come to court, it starts popping up little by little. Coming to court was the hardest thing. Leaving here, I won't sleep

for another two, three weeks.  This ruins my life.

But I assure you, these crimes were fabricated by Guevara and Halvorsen. No one other than them.

BY MS. BRADY:

Q.  And Guevara and Halvorsen threatened you in order to get you to implicate Geraldo Iglesias, didn't they?

MR. ENGQUIST:  Objection. Leading.  Form.

MS. ROSEN:  Objection.  Form. Foundation.  Leading.

THE WITNESS:  Listen, they had beat me.  They had coerced me.  They had threatened me.  They even gave me cigarettes, from money to conjugal visits, in the State's Attorney's Office with State's Attorneys outside.  Ask my ex-wife who was bent over the table.  She'll tell you.

BY MS. BRADY:

Q.  And Guevara and Halvorsen --

A.  I can tell you a lot more things.

Just ask.

Q. Guevara and Halvorsen fed you the facts that you then put in your statement implicating Geraldo Iglesias, didn't they?

MR. ENGQUIST: Objection. Leading.

MS. ROSEN: Objection. Form. Foundation. Leading.

THE WITNESS: Since the beginning of meeting Guevara and Halvorsen, I have been their tool, their victim, their way of getting all these guys convicted.

BY MS. BRADY:

Q. And the way they did that was by feeding you information and then threatening you and intimidating you?

A. As soon as I got --

MS. ROSEN: Objection. Form. Foundation. I'm sorry, I have to get my objections in. Form. Foundation. Leading.

And I am putting you on notice right now that if Mr. Vicente does not come to trial and you attempt to use this testimony, I am moving to strike it as

leading.

Do you need a break, Mr. Stohr?

MR. STOHR: No, I do not. That's why I didn't want to go to your office.

BY MS. BRADY:

Q. Mr. Vicente, you can give the answer you were about to give before the objection.

A. What was the answer again?

MS. BRADY: Can the court reporter please read back the question.

(Whereupon, record read, as requested.)

THE WITNESS: Besides getting slapped, besides getting threatened, besides them threatening me, my family, my safety, besides them drilling in my head, besides punching me, poking at me, hitting me in my ribs, and telling me they were going to send me to population and tell everybody that was a stool pigeon and that I had talked to them, pretty much they roughed me up and did everything that they did to lead me to

today.

BY MS. BRADY:

Q. And then in this statement that you eventually gave implicating Geraldo Iglesias, where did you get the details to put in that statement?

A. Every and any case that I have been involved with in Cook County since 1993 is fabricated by Guevara and Halvorsen. Not me; them. They were the ones that pulled me out of the lockup and that's how it started with the Bouto case.

Q. And then am I correct that they told you what to say?

MS. ROSEN: Objection. Form. Foundation. Leading.

THE WITNESS: Well, let me say it like this, their stories would vary from this story line, or let's change this every time they wanted to add until I seen the State Attorney sign that statement. Because they wrote the statement, and I signed it under threat, under the harassment, police brutality, under being dope sick, being

pulled off the streets, using narcotics, yes.

BY MS. BRADY:

Q. When was the last time you talked to Geraldo Iglesias?

A. Last time I talked to Geraldo Iglesias was when we seen each other in a cell, the same cell that Guevara and Halvorsen planted me in and for us to talk, and supposedly, I get a confession. There was never a confession. Yes, we met. That was the first time me and him faced each other. Someone else introduced us that was gang affiliated. Hey, this is so-and-so and so-and-so, and from there we went to court. No confession. No "oh, I did this," none of it.

Q. You haven't talked to him or heard from him since 1993?

A. None of them.

Q. And do you know who any of Geraldo Iglesias' attorneys are?

A. Well, over the years, I have had many attorneys pop up in court decisions. I

don't take names.  I'm sorry.

Q.  Have you, to the best of your knowledge, spoken with any of the attorneys who represent Geraldo Iglesias in this lawsuit, myself included?

A.  No, I've never talked to you, no.

Q.  And have you ever been offered anything in exchange for your testimony about Mr. Iglesias?

A.  No.

Listen, for the record, I am not getting any money from the State.  I'm not getting no therapy.  I haven't got no money from no lawyers.  I haven't got no money from no one.  I work hard, 40, 50 hours a week to take care of a nine-year-old.  It's the only money I get. I don't get handouts.

MS. BRADY:  Okay.  So I will thank you for your time.  I don't have any more questions.

THE WITNESS:  Thank you.

MS. BRADY:  I don't know if Russell has any questions, but thank you for

speaking with me today.

THE WITNESS: You're the last batter, buddy.

MR. AINSWORTH: I don't have any questions, Mr. Vicente.

THE WITNESS: Thank God.

MR. AINSWORTH: Thank you for your time.

Eileen, do you want to do signature?

MS. ROSEN: Well, I mean, I think people might have follow-up.

MR. AINSWORTH: Go ahead.

MS. ROSEN: I do not have any follow-up but ...

THE WITNESS: Thank God.

MS. ROSEN: Josh or Sean or Megan?

THE WITNESS: Am I excused?

MR. AINSWORTH: One second.

EXAMINATION

BY MR. O'CALLAGHAN:

Q. Mr. Vicente, I've just got one clarifying question. Did you say the only two children you have are the two boys?

A.  And who are you --

Q.  I am an attorney.

A.  -- if you don't mind me asking?

Q.  I don't mind you asking me at all.

Mr. Vicente, my name is Sean O'Callaghan.  I represent former Assistant State's Attorney Kevin Hughes, and I am just following up on that question.

You said you just had the two kids, the two boys?

A.  Yeah, I got two boys.

Q.  No other kids, right?

A.  Excuse me?

Q.  No other children, Mr. Vicente, just those two boys?

A.  Not that I know of.  You got any lined up that want me to be their daddy, I'm going to tell them they ain't mine.

MR. O'CALLAGHAN:  Okay, that's all I want to know.  Thank you.

THE WITNESS:  Yes.  Thank you.

MR. ENGQUIST:  I have nothing based off of that.

MS. McGRATH:  Nothing based off of

that.

MS. ROSEN: Mr. Vicente, thank you for your time. When this transcript gets written up, you have an opportunity to review it if you want to make sure that all of the testimony was taken down correctly. That's called reserving signature. Or you can trust that the court reporter took it all down right, and there is a videographer, and you can just say you waive signature. It's totally up to you what you want to do.

You can consult with your lawyer if you'd like.

MR. STOHR: You can waive your signature.

THE WITNESS: I will waive the signature. That's fine.

MS. ROSEN: Okey-doke. Thanks, everyone.

THE VIDEOGRAPHER: We are off the record at 6:10 at the end of Media Unit 5.

(Deposition proceedings

concluded at 6:10 p.m.)

* * * * * *

STATE OF ILLINOIS )

) SS:

COUNTY OF DU PAGE )

I, MARIBETH REILLY, a notary public within and for the County of DuPage and State of Illinois, do hereby certify that heretofore, to-wit, on March 1, 2022, remotely appeared before me, FRANCISCO VICENTE, in a cause now pending and undetermined in the United States District Court, Northern District of Illinois, Eastern Division, wherein ROBERTO BOUTO and GERALDO IGLESIAS are the Plaintiffs, and REYNALDO GUEVARA, ET AL. are the Defendants.

I further certify that the said witness was first duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by said witness was reported stenographically by me in the remote presence of the said witness, and afterwards reduced to typewriting by Computer-Aided Transcription, and the foregoing is a true and correct transcript

of the testimony so given by said witness as aforesaid.

I further certify that the signature to the foregoing deposition was waived by counsel for the respective parties.

I further certify that the taking of this deposition was pursuant to notice, and that there were present at the deposition the attorneys hereinbefore mentioned.

I further certify that I am not counsel for nor in any way related to the parties to this suit, nor am I in any way interested in the outcome thereof.

IN TESTIMONY WHEREOF:  I have hereunto set my hand and affixed my notarial seal this 21st day of March, 2022.

NOTARY PUBLIC, DUPAGE COUNTY, ILLINOIS

























































