# EXHIBIT

STATE OF ILLINOIS )
                  ) SS:
COUNTY OF C O O K )

            IN THE CIRCUIT COURT OF COOK COUNTY
            COUNTY DEPARTMENT-CRIMINAL DIVISION

THE PEOPLE OF THE      )
STATE OF ILLINOIS,     )
                       )      Criminal
        Plaintiff,     )
                       )      No. 93-15199
    vs.                )
                       )      Charge:  Murder, etc.
GERALDO IGLESIAS,      )
                       )
        Defendant.     )

            REPORT OF PROCEEDINGS had of the hearing

in the above entitled cause, before the Honorable

MARY MAXWELL THOMAS, Judge of said court, on the 14th

day of December, 1994.

        APPEARANCES:

            HONORABLE JACK O'MALLEY,
                State's Attorney of Cook County, by:
            MR. DAVID STUDENROTH,
            MR. PRADEEP ROY-SINGH,
                Assistant State's Attorneys,
                for the People of the State of Illinois;

            MR. JOHN DeLEON,
                for the defendant.

J. D. Williams, CSR
Official Court Reporter
2650 S. California Ave.-4C02
Chicago, Illinois  60608

FILED

SEP 19 1995

AURELIA PUCINSKI
CLERK OF CIRCUIT COURT

S-1

EP IGLESIAS Sub Resp 000169

I N D E X

Date of Hearing:   12-14-94

Page Numbers:   S-1 through S-4


PROCEEDINGS


Lunch recess

EP IGLESIAS Sub Resp 000170

I N D E X

Date of Hearing:  December 16, 1994

Pages:  V-1 to V-140

JURY TRIAL

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Francisco Vincente | V-5 | V-22 | V-56 V-61 | V-60 V-62 |
| Eupil Choi | V-65 | | | |
| People rest V-77 | | | | |
| Motion for Directed Finding of Acquittal V-79 | | | | |
| Stipulation V-80 | | | | |
| Geraldo Iglesias | V-82 | V-97 | V-109 | V-110 |
| Julio Matias | V-111 | V-117 | | |
| James Fisher | V-122 | V-126 | V-128 | V-129 |
| Defense rests V-130 | | | | |
| Renaldo Guevera | V-130 | V-133 | V-136 | V-137 |
| People rest V-137 | | | | |

EP IGLESIAS Sub Resp 000171

THE COURT: Bring the jury out.

(The following proceedings were had in the presence of the jury.)

THE COURT: You can just come right up here. You don't have to go into the chairs right now.

Okay, good morning -- I should say good afternoon, ladies and gentlemen. We are engaged in a bench trial right now so what we're going to do we're going to send you to lunch on the county and we'll see you back here in about an hour and hopefully at that point we'll be ready to roll. So you can follow the sheriff and have a nice lunch.

Remember, don't discuss anything about the case.

(The noon recess was taken.)

S-3    EP IGLESIAS Sub Resp 000172

STATE OF ILLINOIS  )
                   )  SS:
COUNTY OF C O O K  )

I, Jewel Williams, an Official Court Reporter for the Circuit Court of Cook County, County Department-Criminal Division, do hereby certify that I reported in shorthand the proceedings had in the above entitled cause, that I thereafter caused the foregoing to be transcribed into typewriting, which I hereby certify to be a true and accurate transcript of the proceedings had before the Honorable MARY MAXWELL THOMAS, Judge of said court.

_____
Official Court Reporter

S-4    EP IGLESIAS Sub Resp 000173

STATE OF ILLINOIS    )
                      )   SS:
COUNTY OF C O O K    )

         IN THE CIRCUIT COURT OF COOK COUNTY
         COUNTY DEPARTMENT-CRIMINAL DIVISION

THE PEOPLE OF THE     )
STATE OF ILLINOIS     )
                      )   No. 93 CR 15199
    vs.              )
                      )   Charge:  Murder
GERALDO IGLESIAS     )

                        REPORT OF PROCEEDINGS had in the trial of the above-entitled cause, before the Honorable MARY MAXWELL THOMAS, Judge of said Court, on Friday, the 16th day of December, A.D. 1994.

           PRESENT:

                HON. JACK O'MALLEY,
                State's Attorney of Cook County, by
                MESSRS. DAVID STUDENROTH and
                PRADEEP ROY-SINGH,
                Assistant State's Attorneys,
                      appeared for the People;

                MR. JOHN DE LEON,
                Attorney-at-law,
                      appeared for the Defendant.

LINDA K. MADISON, CSR
OFFICIAL COURT REPORTER
2650 South California
Chicago, Illinois 60608

                        V-1

EP IGLESIAS Sub Resp 000174

MR. STUDENROTH: We have a preliminary matter before the jury comes out. The next witness that is going to testify is named Francisco Vincente. He has three armed robberies pending, a robbery pending. He is testifying for the State on two additional murder cases. He is in protective custody. We have a recommendation to sentence him to nine years Illinois Department of Corrections on those three charges based upon his cooperation with the State's Attorney's Office. He does have a felony conviction for manufacture and delivery of a controlled substance.

Judge, the issue that I am bringing up to the court is a Motion in Limine to preclude Mr. DeLeon from cross examining the witness regarding an incident that occurred in January of 1992. The arrest report and case report states that it is a charge of soliciting a prostitute. The rap sheet indicates that he received three months supervision on a charge of prostitution and possession of marijuana; and the facts of that charge, Judge, as indicated in the case report, are that he solicited a male police officer for $40 to commit oral sex on the officer.

Judge, my point is this, is that it is three months supervision. It is not a conviction. It would be impeachment on a collateral issue. I think there is more

V-2

EP IGLESIAS Sub Resp 000175

than enough impeachment on this witness and I think that Mr. DeLeon should be precluded from cross examining him regarding that issue.

THE COURT: Mr. DeLeon.

MR. DE LEON: If I can address the court. Your Honor, I am reading from Illinois Criminal Trial Evidence by Mr. Rubner concerning bad acts or immoral conduct. It indicates that an exception to the rule -- it first states a party may impeach a witness by showing that on a prior occasion the witness had committed a bad act or engaged in immoral conduct, which is what I believe soliciting for prostitution would be considered, immoral conduct.

And we are not talking about him soliciting the police officer. We are talking about him indicating that he would perform a sexual act upon the policeman for $40. That is what the case report indicates, and that is what he pled guilty to and received three months supervision for.

Now, it goes on to say as an exception to the rule the party may impeach a witness through cross examination by showing the witness is or was engaged in an unlawful or disreputable activity or occupation, which again is what I am saying this prostitution charge is, disreputable activity or occupation.

It goes on to cite two -- three cases -- two

V-3

EP IGLESIAS Sub Resp 000176

associated with the charge of prostitution. People vs. Winchester, 185 NE 2d 580, and it indicates a witness in that case was associated with a house of prostitution and People vs. Bond, 118 NE 2d 14, witness kept a house of ill fame.

So I would indicate to the court that there is Illinois case law that indicates that this prior bad act because it is disreputable activity or occupation would be allowed to be brought out as prior bad act or immoral conduct.

THE COURT: I could see it if perhaps the witness didn't have substantial other matters which I assume you are going to go into at great length. I really think that this is overkill and I don't see what -- I understand this is a murder trial and a serious matter, but he has extremely serious matters with which you can impeach him and I do not simply see this will add really much to the already damaging material that I assume is going to be elicited from him. I am going to grant the motion.

MR. STUDENROTH: Thank you, Judge.

MR. DE LEON: We understand, your Honor. Again over our objection.

THE COURT: All right.

All right. Bring in the jury.

V-4

EP IGLESIAS Sub Resp 000177

(Jury entered.)

Good morning, ladies and gentlemen. Once again we have cleared the decks and we are ready for action.

State, you may proceed and call your next witness.

MR. STUDENROTH: Thank you, your Honor. At this time the State would call Francisco Vincente.

(Witness sworn.)

FRANCISCO VINCENTE, a witness herein, called to testify on behalf of the People of the State of Illinois, after having been first duly sworn, was examined and testified as follows:

DIRECT EXAMIANTION

By Mr. Studenroth:

Q    Could you please state your name and spell your last name?

A    Francisco Vincente.

Q    Would you please spell your last name for the court reporter?

A    V-i-n-c-e-n-t-e.

Q    How old are you?

A    23.

Q    Are you currently in custody at this time?

A    Yes, sir.

V-5

EP IGLESIAS Sub Resp 000170

Q     And do you go by any other names besides Francisco Vincente?

A     Yes.

Q     What other names do you go by?

A     Carlos Morales.

Q     And did you use that name on two prior occasions?

A     Yes, sir.

Q     How long or when was it that you went into custody?

A     I went into custody May 16, 1993.

Q     So since May 16th of 1993 you have been in custody?

A     Yes.

Q     And you are in a special kind of custody, is that correct?

A     Yes.

Q     In fact you are in protective custody?

A     Yes, sir.

Q     And the reason you are in protective custody is because you are testifying for the State's Attorney's Office in addition to this case on two other murder cases, is that correct?

A     Yes, sir.

Q     And in regarding that testimony on this case and

V-6

EP IGLESIAS Sub Resp 000179

those two cases is it your understanding that the State's Attorney's Office would recommend a period of incarceration of nine years for your cases?

A    Yes, sir.

Q    And the cases that you have pending at this time are three armed robberies and one robbery case, is that correct?

A    Yes, sir.

Q    Is it also true that you have a felony conviction for manufacturing and delivery of controlled substance which occurred in March of 1990?

A    Yes, sir.

Q    Were you a member of a gang?

A    Yes.

Q    What gang were you a member of?

A    Imperial Gangsters.

Q    How long have you been an Imperial Gangster?

A    For about nine years.

Q    Are you currently an Imperial Gangster?

A    As of now, no.

Q    Why not?

A    Because I got a hit out on me.

THE COURT:  I am sorry?

THE WITNESS:  Because supposedly on the streets they

V-7

EP IGLESIAS Sub Resp 000100

have a hit out on me.

MR. STUDENROTH: Q And why do they have a hit out on you?

A Because I broke the silence of secretcy.

Q And when you say you "broke the silence of secretcy," what do you mean?

A Well, by me doing what I am doing now.

Q You mean testifying against fellow members of your gang?

A Yes.

Q What area of the city did your section of the Imperial Gangsters hang out or control?

A Armitage and Drake.

Q I notice --

You have a nickname, is that correct?

A Yes.

Q What is your nickname?

A Chino.

Q Chino, I notice you have some cuts on your eyebrows, is that correct?

A Yes, sir.

Q What does that mean?

A Six slashes for a six point star.

Q Is that also a sign of the Imperial Gangsters?

V-8

A     Yes.

Q     Well, why do you have the cuts in your eyebrows if you are no longer a member of the Imperial Gangsters?

A     Well, I got to keep my image where I am at, you know, protective custody.

Q     Even though you are no longer in that gang?

A     Yes.

Q     Because there are other gang members not in your gang that you are in protective custody with, is that right?

A     Yes, sir.

Q     You talked about this code of silence.  What are some of the things that the gangs do if you break that code of silence and testify against another gang member?

MR. DE LEON:  Your Honor, I am going to object to this.

THE COURT:  Are you asking for a sidebar?

MR. DE LEON:  Sure, your Honor.

(The following proceedings were had at sidebar, outside the hearing and presence of the jurors:)

Your Honor, he's already testified that he's -- there is supposedly a hit out on him.  If he is now going to go on to describe some unnamed people or general things of further why he is under some threat, I think he is just

V-9

EP IGLESIAS Sub Resp 000102

further prejudicing this jury to believe that my client is somehow threatening him. Unless he has something specific to say, I don't think the State should be allowed to ramble on about all the ramifications of him cooperating.

MR. STUDENROTH: Judge, I think this witness's credibility is at issue. I think part of his credibility is going to be attacked because he is a member of the same gang. I think the reason why he is here is relevant and what consequences he could possibly face, what he knows within his own gang what they do to people that break the code of silence and there are only two other things that they do, Judge. One is called a head to toe, and these are all under violations, and they beat him anywhere in the body from his head to his toe or an SOS which is something like a smash hit.

MR. DE LEON: Again I think it is highly prejudicial. He has already said there is a hit.

THE COURT: Well, a hit means get killed.

MR. DE LEON: That's it. I mean how much more severe can it be?

MR. STUDENROTH: Can I expand on that?

THE COURT: Obviously I think it is clear -- You are right, his credibility is at issue and you need to show that. Counsel has an opportunity to cross examine but --

V-10

EP IGLESIAS Sub Resp 000183

He said there is a hit.  Go into that.  There doesn't seem to be any need to go into the issue.

MR. DE LEON:  I mean hit is the worse it can be.

MR. STUDENROTH:  It also goes to bolster his credibility based upon what he is about to testify to, a statement from the defendant as to why this defendant would tell him because then this defendant would know that if someone violates that code of silence they get this violation, this SOS, this hit.

THE COURT:  Well he's already said there is a hit.

MR. STUDENROTH:  As long as I can go into what a hit is.

THE COURT:  Yes.

(The following proceedings were had in open court:)

MR. STUDENROTH:  Q  Chino, you indicated regarding this code of silence if someone breaks that code of silence it is a violation, is that correct?

A    Yes.

Q    And you indicated there is a hit out on you, is that correct?

A    Yes.

Q    Within your dealings with the Imperial Gangsters what is a hit if someone breaks the code of silence?

V-11

EP IGLESIA3 Sub Resp 000184

A    Well, they either put out an SOS on you or a death hit.

Q    And -- You mean they try to kill you?

A    Yes.  An SOS means smash on sight.  Death hit means whenever they catch up to you that you will be taken care of.

Q    Do you know any other members of the Imperial Gangsters that are in this courtroom today?

A    Yes.

Q    Would you please identify that person by pointing out an article of clothing he is wearing?

A    White shirt with the gray tie.

MR. STUDENROTH:  Indicating an in-court identification of the defendant, your Honor, Geraldo Iglesias.

THE COURT:  The record will so reflect.

MR. STUDENROTH:  Q  What name do you know him by?

A    Snake.

Q    How long did you know Snake?

A    For about three years.

Q    And during that time did you know him as an Imperial Gangster?

A    Yes, sir.

Q    Do you know what People and Folks are?

A    Of course.

V-12

EP IGLESIAS Sub Resp 000185

Q    And do you know what Latin Kings are?

A    Yes, sir.

Q    What nation are Latin Kings under?

A    People.

Q    And what nation are Imperial Gangsters under?

A    Folks.

Q    What is the relationship between the Latin Kings and the Imperial Gangsters?

A    There is no relation.  We are opposition.

Q    Well, what would it mean to you if an Imperial Gangster said King Love to a Latin King?

A    Well, he is false flagging.

Q    What does that mean?

A    That is to see if the other rival gang will represent showing him love, to see what they are about.

Q    Did you know what part of the city the Imperial Gangster section was that Snake hung out in or the defendant?

A    Yes.

Q    And what part of the city was that?

A    Spaulding and Palmer.

Q    And how far is Spaulding and Palmer from Sawyer and Palmer?

A    A block away.

V-13

EP IGLESIAS Sub Resp 000186

Q    While you were in custody at Cook County Jail, did you have an opportunity to see Snake?

A    Yes.

Q    And where in Cook County Jail were you when you saw him?

A    Division X, maximum security.

Q    And could you please tell us the number of times that you saw Snake in Division X?

A    A bunch of times.

Q    And what were the circumstances of you seeing him there?

A    Well, I was on one deck, he was on another right nextdoor to me.

Q    And how far away was he from you when you would see him?

A    Like from here to back by the door.

MR. STUDENROTH:  Indicating for the record 40 yards?

THE COURT:  Do you accept that, Counsel?

MR. DE LEON:  Yes, your Honor.

THE COURT:  All right.

MR. STUDENROTH:  Q  And when you would see Snake, what would you do?

A    We used to write on paper, you know, to one another, through the window.

V-14

EP IGLESIAS Sub Resp 000187

Q    And would you flash any gang signs to him?

A    Yes.

Q    What type of gang signs would you flash to the defendant?

A    Our organization, putting up the six point star.

MR. STUDENROTH:   Indicating for the record, your Honor, his hands configurated into a six pointed star.

THE COURT:   The record will reflect that.

MR. STUDENROTH:   Q   Do you recall what dates you would see him or communicate with him in that manner?

A    Every time I would look out my window I would.

Q    Were there also times --  Was there also a time in Cook County Jail when you had an opportunity to talk to him in person?

A    Yes, when I went down to court.

Q    And before you went to court where within Division X would you be?

A    In the bullpen.

Q    And then after in the bullpen would you then go to court?

A    Yes.

Q    And when was the time that you met Snake in Division X bullpen?

A    About a court date I had for about June 25th.

V-15

EP IGLESIAS Sub Resp 000188

Q    Well, did you also have a court date on July 1st?

A    Yes, sir.

Q    Was the date that you met Snake in Division X June 25th or July 1st?

A    I am not sure.

Q    It was one of those two days?

A    Yes, it was.

Q    When you met Snake in the bullpen, did you have an opportunity to talk to him?

A    Yes, sir.

Q    And was there anyone else around when you and he were talking or were you in a separate part of the bullpen?

A    Well, there was other inmates around us but we stepped to the side and sat down on the bench.

Q    And what did you talk to him about?

A    We started talking about some murders that happened in the neighborhood.

THE COURT:    Excuse me, sir.  If you could maybe just sit up in your chair a bit.  Your voice kind of drops. There is a microphone there and if you lean forward.

THE WITNESS:    All right.

MR. DE LEON:    Your Honor, it might help if he gets rid of his gum, too.

THE COURT:    Right.

V-16

EP IGLESIAS Sub Resp 000189

(Brief pause.)

All right.   Let's proceed.

MR. STUDENROTH:   Q   What was the first murder that you talked about?

A   Well, we talked about a murder on Fullerton and Central Park.

Q   After you talked about that murder, did you talk about any other murders?

A   Yes.   I was talking to him about a murder that happened on Spaulding and Palmer.

Q   And what did you say about that murder?

A   That my mom had told me about that murder over the phone.

Q   And what did Snake say, the defendant, when you talked about the murder that occurred on Spaulding and Palmer?

A   Well, he told me that he was incarcerated for that murder, he was being charged with that murder.

Q   Did you and he then have a conversation about the murder that he was incarcerated on?

A   Yes, sir.

Q   And what did he tell you, what is the first thing he told you about that?

A   He said he was standing on the corner with a few

V-17

EP IGLESIAS Sub Resp 000190

of the brothers on Spaulding and Palmer and as they were standing on the corner that a car drove by.

Q    Did he say if he saw the people in that car?

A    Yes, sir.

Q    And what did he say about the people that were in that car?

A    They looked nervous and they looked like Kings.

Q    Latin Kings?

A    Latin Kings, yes, sir.

Q    Did he say where that car went after he saw them?

A    He said it turned the corner and after it turned the corner that they parked in the alley.

Q    Did he say anything about what he was doing when he saw that car?

A    Yes, he started representing to them.

Q    And did he say what gang he was representing to the people in that car?

A    Yes, sir.

Q    What gang was he representing?

A    Imperial Gangsters.

Q    And was he representing any other gangs?

A    Yes, he was -- he was disrespecting them by throwing down the crown.

Q    And could you please indicate to the court what

V-18

EP IGLESIAS Sub Resp 000191

throwing down the crown is?

A     Down like that.

MR. STUDENROTH:  Your Honor, having his thumb first and little finger extended with his two other fingers up toward his palm in a downward direction.

Q     And what does that mean to you?

A     That means King killer.

Q     In other words, disrespecting the Latin Kings?

A     Yes, sir.

Q     Did the defendant indicate to you whether or not the people in the car responded by flashing any gang signs?

A     He said they didn't represent back.

Q     Did he say what the next thing that happened was once he saw that car parked in that alley?

A     He told me that he told one of the shorties to run and get a gap.

Q     Did he say he saw --

THE COURT:  I am sorry.  Could you read that answer back?

                    (Whereupon, the Court Reporter
                    read the record.)

MR. STUDENROTH:  Q  What is a shortie?

A     One of the younger members of the gang, the organization.

V-19

EP IGLESIAS Sub Resp 000192

Q    I think you indicated he told one of them to go get a gat, g-a-t, is that correct?

A    Yes.

Q    What is a gat?

A    A gap --

Q    Is it a gat or a gap?

A    Gap.

Q    How do you spell it?

A    G-a-p, gap.

Q    What is a gap?

A    A gun.

Q    Did he say what he saw when that car was parked in the alley?

A    Yes.  He said he seen a female jump out of the car and run into a building.

Q    Did he say that he got that gun from one of his fellow Imperial Gangsters?

A    Yes, he did.

Q    And after he got the gun, did he say whether he saw what happened back at the car?

A    Yes.

Q    What did he say happened at the car?

A    He said that the female had ran out of the building with a litte baby girl and --

V-20

EP IGLESIAS Sub Resp 000193

Q    And what did he do at that time?

A    He started shooting.  He started shooting at the car.  They started approaching the car and he started shooting at the car.

Q    Did he say what happened when he started shooting at the car?

A    Yes.

Q    What did he tell you when he said he was shooting at the car?

A    He said he shot the bitch in the head.

Q    Then what did he say?

A    He said he ran.

Q    Did he say they ran or he ran?

A    He ran.

Q    Showing you what's been marked as People's Exhibit No. 5, for Identification, do you recognize what's contained in that photograph?

A    Yes.

Q    What is that a photograph of?

A    Sawyer and Palmer.

THE COURT:  Sir, you are going to have to keep your voice up.

THE WITNESS:  Sawyer and Palmer.

MR. STUDENROTH:  Q  And this is a view looking

V-21

EP IGLESIAS Sub Resp 000194

northbound on Sawyer?

A   Yes.

Q   And the street that intersects at the stop sign is what street?

A   That is Palmer.

Q   Does this photograph truly and accurately depict Sawyer and Palmer on the west side of Chicago?

A   Yes, sir.

Q   When the defendant talked to you, he talked to you about a murder that occurred on Spaulding and Palmer, is that right?

A   Yes, sir.

Q   How far is Spaulding and Palmer from Sawyer and Palmer?

A   A block away.

Q   One block to the east or one block to the west?

A   To the west.

MR. STUDENROTH:  Nothing further.

THE COURT:  Cross examination.

                    CROSS EXAMINATION

                      By Mr. DeLeon:

Q   Francisco, you know who I am, don't you?

A   Yes, sir.

Q   Not too long ago I tried to talk to you about

V-22

EP IGLESIAS Sub Resp 000195

this case, is that right?

A    Yes, sir.

Q    In the back room behind the courtroom, is that right?

A    Yes, sir.

Q    You wouldn't talk to me, would you?

A    I refused to.

Q    You refused to talk to me because you are trying to hide something?

A    No, sir.

Q    You just didn't feel like talking, is that it?

A    I didn't want to talk to you, that's it.

Q    Did they tell you not to talk to me?

A    No, they did not tell me that.

Q    You say that you knew Geraldo for three years, is that right?

A    Yes.

Q    Where did he live?

A    I always caught up to him in the neighborhood.

Q    Where did he live; did you know where he lived?

A    No, not exactly.

Q    But you knew him for three years?

A    Yes.

Q    How many brothers and sisters did he have?

V-23

EP IGLESIAS Sub Resp 000196

A    I don't know that.  I don't get into his family history.

Q    Do you know his mother?

A    No, I don't.  I know him.

Q    This lady right here.  Do you know his mother?

A    No, I don't.  I know him.

Q    But you know him for three years?

MR. STUDENROTH:  Objection.  Asked and answered.

THE WITNESS:  We have been in the same --

THE COURT:  Just a moment.  There is an objection.
Sustained.

MR. DE LEON:  Q  Do you know if he has any children?

A    No, I don't.

Q    Do you know if he has a wife?

A    No, I don't.

Q    So Geraldo, who you claim to know for three years, you don't know much about him, do you?

A    We belong to the same organization.

Q    So what you know about him is that --
You were an Imperial Gangster for how many years?

A    For about nine years.

Q    Nine years.  And that he was a member of the Imperial Gangsters, that is what you know?

A    Yes.  And I knew him off the street.

V-24

EP IGLESIAS Sub Resp 000197

Q     But you were never close to him, isn't that right?

A     No.

Q     In other words, you were not close friends, isn't that right?

A     No.  I know him from being in the same gang.

Q     Other than being in the same gang that was it, right?

A     And coming to meetings too, nationwide meetings that the Imperial Gangsters threw.

Q     Now, when you became a witness in the witness quarters you got special privileges, didn't you?

A     Yes, sir.

Q     And you like those privileges, don't you?

A     Yes, sir.

Q     And some of those special privileges are getting your family to visit you, isn't that right?

A     Yes, sir.

Q     In a room rather than through a piece of glass?

A     I got those, too, through a piece of glass.

Q     And you also get them in the room too, don't you?

A     Yes, sir.

Q     That is what is called at the jail a contact visit?

V-25

EP IGLESIAS Sub Resp 000198

A    Yes.

Q    So you get to visit with your wife --

Do you have a wife?

A    Fiance.

Q    Children?

A    Yes, I do.

Q    Mother?

A    Yes.

Q    You get to visit them under privileged visiting, isn't that right?

A    Yes.

Q    And that is part of the benefits of becoming a witness, isn't that right?

A    Well, not really.  It is up to them if they want to give me a contact visit.

Q    Well, when you are in the regular County and you are not a witness, you don't get those contact visits, do you?

A    No.

Q    Do you get any other privileges insofar as -- or have you received any other privileges insofar as having radio, tv rights, things like that?

A    Well, yes.

Q    Would you describe yourself to us or where you

V-26

EP IGLESIAS Sub Resp 000199

are housed?

A    Regular cell.  Same thing they sleep in.

Q    It is a different building?

A    Different building, same cells.

Q    But it is a nicer area, isn't it?

A    Well, there are less people.

Q    Less people, lesss crowded, right?

A    Yes.

Q    Better conditions overall, isn't that right?

A    Well, the place where we were being held at was falling apart.

Q    So where you were held at was falling apart.  Now you are in a nicer place?

A    No.  I am in the jail, I am in protective custody.

Q    I know.  Where you are at in protective custody is a nicer place, isn't it?

A    It is fair.  Nothing to brag about.

Q    It is better than where you were, isn't it?

A    I am not sayiang that.  I am saying that I did have privileges and where I am at now that is where I am being held.

Q    And it is a nicer place than the County Jail where you were held before, isn't that right?

V-27

EP IGLESIAS Sub Resp 000200

A    Yes, it is.

Q    Now, you said that you are cooperating on three cases, right?

A    Yes.

Q    And you said that in this case you are cooperating against a member of your own gang, is that right?

A    Yes.

Q    But you are also cooperating against a member of other gangs also, aren't you?

MR. STUDENROTH:  Objection.

THE WITNESS:  Same gang.

THE COURT:  Just a moment.

Basis?

MR. STUDENROTH:  May I please have a sidebar?

THE COURT:  Yes.

(Whereupon, the following proceedings were had at sidebar, outside the hearing and presence of the jury:)

MR. STUDENROTH:  Judge, I think we reached that point in the proceeding where counsel made a Motion in Limine to exclude talking about the circumstances where the outcome of one of the cases that he had already testified, that the

V-28

EP IGLESIAS Sub Resp 000201

three people were found guilty.  Now, I think that Counsel if he wants to -- wants us to be limited on saying that case was a guilty should be refrained from going into the facts of those cases.  He should be allowed to touch briefly on the fact that he is testifying and cooperating and testifying against other people but to get into the specific circumstances and then to preclude us from getting into one of them was a guilty, I don't think he can have it both ways, Judge.

MR. DE LEON:  That is absolutely ridiculous with all due respect to David.  The outcome of a case is absolutely not admissible under any circumstances.  Me asking him whether or not he is cooperating against the Puerto Rican Stone, which is one of the other individuals he is cooperating against, has nothing to do with the outcome of the case and that is all I am asking him.  He is cooperating against gang members from other gangs.  How does that jump to the level of saying they now can get in --

THE COURT:  I don't know.  You guys know more than I know.

MR. DE LEON:  Your Honor, there is no way I could ever open a door unless I ask the question what happened to that case or the jury didn't believe you or something like that. This is not opening the door.

V-29

EP IGLESIAS Sub Resp 000202

THE COURT: So all you are asking is whether he is testifying --

MR. DE LEON: I am going to ask him if he testified against a Puerto Rican Stone.

MR. STUDENROTH: I would like to know how much further is he going to go.

MR. DE LEON: I don't know.

MR. STUDENROTH: I think there should be some clarification.

MR. DE LEON: I don't plan to go as far as the State thinks I am planning to go.

THE COURT: At this point I am going to overrule the objection.

(The following proceedings were had in open court:)

MR. DE LEON: Q One of the other persons you are cooperating against is a Puerto Rican Stone, is he not?

A Yes.

Q That is different from Imperial Gangsters, a different gang, right?

A Yes.

Q So you are cooperating against other gangs also, right?

A Yes.

V-30

EP IGLESIAS Sub Resp 000203

Q    Now, there is a total of three parties or three cases that you say you got statements on, is that right; that is what you told the State?

A    Yes.

Q    Three murder cases.

Do you consider yourself a good talker?

A    No.

Q    These three guys just -- on these three cases these individuals just like Geraldo just confessed to you; is that what you are telling us?

A    Yes.

Q    You don't hold any rank in the gang as the gang priest or therapist or something, do you?

A    No.

Q    When you talked to these individuals, did you have to con their statement out of them?

A    No.

Q    They just said it just like that?

A    Yes.

Q    So you talked about three murders and in all three murders people gave you confessions?

A    Yes.

Q    I see.  And you are using those confessions that you say you got to help yourself, isn't that right?

V-31

EP IGLESIAS Sub Resp 000204

A    Well, if it helps me, you know.  They haven't promised me anything.

Q    Well, you just told us, didn't you, they promised to offer you nine years, right?

MR. STUDENROTH:  Objection, Judge.  That is a misstatement of the evidence.

MR. DE LEON:  Q  Well, isn't your deal --

THE COURT:  Wait a minute.

Sustained.

MR. DE LEON:  Q  Isn't your deal with the State that the State is going to recommend that you do nine years?

A    Yes.  That is what they told me.

Q    And to get that deal you have to testify?

A    Yes.

Q    So you are getting the deal, right?

A    Supposedly.

Q    That is what you expect, right?

A    That is what I am expecting, yes.

Q    And how long have you been in custody so far months-wise?

A    Well, I have been in custody since May 16, 1993.

Q    So you have been in custody seven months, right?

A    Of 1993.

Q    Oh, from 1993, I am sorry.  A year and a half

V-32

approximately?

A   Uh-huh.

Q   On a nine-year term how much time do you expect to do?

MR. STUDENROTH:  Objection, Judge.

THE COURT:  It is sustained.

MR. DE LEON:  I would ask for a sidebar, your Honor.

(The following proceedings were had at sidebar, outside the hear- and presence of the jury:)

MR. STUDENROTH:  Judge, he is going to get sentenced to nine years.  How much time he expects to do or how much good time they give him, that is up to them.  He doesn't have any promises he is only going to do half his time if he is sentenced to nine years.  He should be precluded from going into what he expects to do.

MR. DE LEON:  What he expects, absolutely cross examable.  What he expects out of the deal.  That is the whole issue here, what does he expect to get.  What is he giving and what does he expect to get, and I should be allowed to go into what he expects to get out of this deal.

MR. STUDENROTH:  He expects to get sentenced to nine years.

MR. DE LEON:  That is not what he expects to do.  I

V-33

EP IGLESIAS Sub Resp 000206

should be allowed to ask him that.

THE COURT: Well, let me indicate that the reason why I sustained it was because, a, the indication is that the State is going to make a recommendation, not that any judge has promised that he or she is going to sentence him to that. That is the first thing that popped into my mind.

MR. STUDENROTH: That is another point, Judge. Judge Suria doesn't have to follow the recommendation.

MR. DE LEON: I would ask that your Honor inquire if the State's Attorney knows whether or not there has been a conference in the case at all and that that was the offer made in a conference or if that is just an offer. I don't know, I am inquiring, because I think that is an important point that you are making.

THE COURT: Well, it is an important point but I would have thought that would have been ascertained by now.

MR. DE LEON: Was there a conference?

MR. STUDENROTH: I would have to check the file, Judge. I don't know. I mean if he is planning to get into this I think he is the one that should have looked into that before. He didn't ask me once.

MR. DE LEON: I asked you what the deal was.

MR. STUDENROTH: You knew the recommendation was nine years, John. You didn't ask me whether it was a conference

V-34

EP IGLESIAS Sub Resp 000207

or not. Did you?

MR. DE LEON: I understood he was getting nine years.

THE COURT: Well, I am going to allow you to explore that and find out exactly what his understanding of it is. I am going to overrule the objection.

(The following proceedings were had in open court:)

Objection is overruled.

MR. DE LEON: Q Would you tell us what you expect to do if you are given that nine years?

A Fifty-four months.

THE COURT: What was your answer?

THE WITNESS: Fifty-four months.

MR. DE LEON: Q So in fifty-four months you would expect as part of your agreement that you will be back out on the street, right?

A After fifty-four months, yes.

Q Now, you say Geraldo spoke to you about this case when you went into a bullpen in Division X, is that right?

A Yes.

Q That is located in Division X?

A Yes.

Q And was that when you were being taken to court?

A It was in the process of taking us to the other

V-35

EP IGLESIAS Sub Resp 000208

bullpens.

Q    When you are taken to court, on that occasion and on any other occasion there is a group of people going to court, isn't there?

A    Yes.

Q    It is not just you and him, right?

A    There are other people, yes.

Q    There are also Cook County Sheriffs that accompany you when you walk through the halls or walk through to the bullpen or wherever you go there are Cook County Sheriffs accompanying you, isn't that right?

A    Yes.

Q    How many would accompany your group?  On the day you said this conversation took place.

A    Well, there are plenty of deputies around, plenty of sherifs around.

Q    How many?  Give me a guess.

A    I don't pay attention to the deputies.

Q    More than five, more than ten, how many?

A    About ten.

Q    Ten deputies?

A    Yes.

Q    And other inmates.  How many inmates approxi-mately on this occasion?

V-36

EP IGLESIAS Sub Resp 000209

A    Well, I don't sit there and count all the inmates, you know.

Q    Well, give us a guess.

A    About fifteen, nineteen.

Q    So fifteen to nineteen inmates, ten deputies.

Who else overheard Geraldo Iglesias telling you that he shot this person?

MR. STUDENROTH:  Objection.

THE COURT:  Sustained.

THE DEFENDANT:  Well, I don't know --

THE COURT:  The objection is sustained.  When the objection is made, you have to wait until I rule on the objection.

THE WITNESS:  Okay.

MR. DE LEON:  Q  Did you tell any of the deputies about this, these ten deputies that were in the area?

A    No, sir.

Q    On the date you say --  What date did you say, I am sorry, that this conversation took place?

A    June 25th, July 1st.  One of the two dates.

Q    Then you said you were not sure, isn't that what you said?

A    That is what I sam saying.  June 25th or July 1st because I don't remember right now.

V-37

EP IGLESIAS Sub Resp 000210

Q    Well, when you testified back this year, October 18th of 1994, in a proceeding before his Honor Judge Bolan weren't you asked these questions and didn't you give these responses?

"You spoke to him on June 25, 1993, is that right?"

A    Spoke to who?

Q    Geraldo Iglesias.

And you answered, "Yes.

And you were able to remember the dates of this stuff, is that right?"

And you answered, "Yes."

Then you were asked again, this was by an attorney by the name of Greg Vasquez, "And you remember specifically that it was on June 25, 1993, correct?"

And you answered "Yes, I do, I just went to court."

Do you remember telling Mr. Vasquez that?

A    No, I don't.

Q    Were you sure then when you testified or are you just not sure today?

A    I am not sure today.  I know it was in Division X, maximum security, one of the holding cells.

Q    Now, again going to this statement that you say

V-38

EP IGLESIAS Sub Resp 000211

that you got, you were on your way you said to court, is that right?

A    Yes.

Q    Weren't you on your way to talk to detectives and the State's Attorney about another murder case?

A    Yes.

Q    Where you got a confession?

A    Huh?

Q    Right?

A    What was that?

Q    Weren't you on your way to be interviewed about another murder case where you say you got a confession when you say you got this confession?

A    Yes.

Q    So on your way to go to talk to the State's Attorney and the detectives about another murder case that you got a confession Geraldo just happened to confess to you too?

A    Yes, but he didn't know what he was doing, he didn't know where I was going.

Q    I didn't ask you that, sir.

A    Well, I am just telling you.

Q    Is that the way it happened?  You were on your way to talk about one murder where you say someone confessed

V-39

EP IGLESIAS Sub Resp 000212

to you and another guy confesses to you?

A    Yes, he stipulated (sic) out of his mouth what he had did.

Q    So you are -- Are you just a lucky guy; people just come up to you and confess to you all the time, is that it?

MR. STUDENROTH:  Objection.

THE COURT:  Sustained.

MR. DE LEON:  Q  When you got to where you were going to talk to the detectives about this other murder case, did you then tell those same detectives that Geraldo just confessed to you?

A    Yes.

Q    Did you tell those detectives or did you ask those -- strike that.  Did the detectives say to you I tell you what, Mr. Vincente, how about if we put a wire on you and you go in there and get this down on tape; did they do that with you?

MR. STUDENROTH:  Objection.

THE WITNESS:  No, sir.

THE COURT:  Just a moment, sir.  Again remember when there is an objection you have to wait until I rule on it.

Basis of your objection?

MR. STUDENROTH:  Hearsay.  It is not relevant, Judge.

V-40

EP IGLESIAS Sub Resp 000213

MR. DE LEON:  I think it is relevant, your Honor.

THE COURT:  I am going to overrule it.  The answer will stand.

MR. DE LEON:  The answer was what, Judge?

THE COURT:  Could you read it, Miss Reporter?

(Whereupon, the Court Reporter read the record.)

MR. DE LEON:  Q  Did you offer to put on a tape recorder and go back to Division X or wherever to talk to Geraldo so you could get this down on tape for the detectives?

A     No.

Q     So there is no tape anywhere in existence of your conversation with Geraldo, right?

A     (No audible response.)

Q     Correct?

A     No.

Q     You also spoke to an Assistant State's Attorney, isn't that true, about this statement; Mary Roberts I believe her name was?

A     Yes.

Q     Do you remember that young lady?

A     Yes.

Q     And you remember she wrote down what you told

V-41

EP IGLESIAS Sub Resp 000214

her, right?

A    Yes.

Q    About this case, about what you say Geraldo told you, right?

A    Yes.

Q    And you read it and signed it, is that right?

A    Yes.

Q    And I am going to ask you to look at this and have you seen a copy of this before?

A    Yes.

Q    That is the statement you gave to Assistant State's Attorney Mary Roberts about this case?

A    Yes.

Q    Or at least a copy of it, right?

A    A copy.

Q    And that is your signature on it, right?

A    Yes, it is.

Q    And you told us today that Geraldo told you that a female came out of the house with a baby, isn't that right?

A    Yes.

Q    Did you tell that to Mary Roberts?

A    Yes.

Q    Would you show me in your statement --  You have

V-42

EP IGLESIAS Sub Resp 000215

previously read this. Would you show me where it is in there?

A    It is right here. With another female.

Q    Where does it say baby? Where do you talk about baby in there?

A    Well, female is baby. That is what he stated.

Q    I see. But there is nothing in here about a baby, is there?

A    No, there isn't. He said it was a female.

Q    I asked you if there is anything in here about a baby. Would you answer the question?

MR. STUDENROTH: Objection.

THE COURT: Sustained. Arguing with the witness.

MR. DE LEON: Q  Is this funny to you?

A    No, it is your attitude.

THE COURT: Just one second, sir.

THE WITNESS: Your attitude.

THE COURT: Hold it. I will run this courtroom.

Mr. DeLeon, my first question of you is, I missed it if you identified that statement. Did you mark it?

MR. DE LEON: Defendant's Exhibit No. 1, your Honor. I don't believe I have had any others at this point.

THE COURT: Sir, you will simply answer the questions that are asked to the best of your ability. If you have a

V-43

EP IGLESIAS Sub Resp 000216

problem answering the questions, indicate that. I will ask Counsel to rephrase it.

THE WITNESS: Okay.

MR. DE LEON: Q Now, you told us that Geraldo told you that this shooting happened on Spaulding and Palmer, isn't that right?

A Yes.

Q And that is what you told the State's Attorney and the detective?

A Yes.

Q Did either the State's Attorney or detective ever tell you hey that is the wrong street --

MR. STUDENROTH: Objection.

MR. DE LEON: Q -- that is not where Monica Ramon was shot?

THE COURT: Basis of the objection.

MR. STUDENROTH: Relevance, Judge.

THE COURT: I will sustain that.

MR. DE LEON: Your Honor, I am going to ask for a sidebar.

THE COURT: No. Sustained. Let's move on.

MR. DE LEON: Q Do you know now that the shooting did not happen on Spaulding, the shooting of Monica Ramon?

A That is what I am hearing now.

V-44

Q    Right now for the first time, is that what you are telling us?

A    No, I have heard it before.

Q    You heard it before you hit the stand today, right?

A    Yes.

Q    But you tell us that Geraldo told you Spaulding?

A    That is what he told me.

Q    But you know that it happened on Sawyer?

A    I wasn't there.  That is what I hear.

Q    I know you weren't there.  You learned through the investigation that it happened on Sawyer and Palmer, right?

A    Yes.

Q    Did you ever tell the detectives hey well he gave me a different street?

MR. STUDENROTH:  Objection.

THE COURT:  Sustained.

MR. DE LEON:  Q  You also claim that Geraldo told you that when he fired he was with some of his boys and some shorties, isn't that right?

A    Yes.

Q    Did he tell you how many boys or shorties were with him?

V-45

EP IGLESIAS Sub Resp 000218

A     No, he didn't.

Q     But you say plural, boys, in other words more than one?

A     Yes.

Q     And shorties meaning some young gang member that he sent for a gun, right?

A     Yes.

Q     You know now, don't you, that the investigation has shown there was only one person standing on that corner shooting?

MR. STUDENROTH:  Objection.

THE COURT:  Sustained.

MR. DE LEON:  Your Honor, I again would ask for a sidebar on that issue.

THE COURT:  Sustained.  It is irrelevant.

MR. DE LEON:  I think it is strongly relevant, your Honor.

THE COURT:  I will sustain the objection.

MR. DE LEON:  Q  You indicated that Geraldo told you that when he approached the car to shoot that he approached with his boys; isn't that what you said Geraldo told you?

A     Yes.

Q     And again haven't you learned now that there was no group that approached the car?

V-46

EP IGLESIAS Sub Resp 000219

MR. STUDENROTH:  Objection.

THE COURT:  Sustained.

MR. DE LEON:  Q  So Geraldo didn't tell you, did he, that he was alone when he fired the gun?

A  No.

Q  Geraldo didn't tell you, did he, that he shouted King love?

A  He told me he started false flagging, that is what he told me.

Q  He told you he was disrespecting the Latin Kings, isn't that what he said?

A  Yes.

Q  That is what you said he told you and that is what you said in the statement?

A  Yes.

Q  But he didn't tell you that he shouted King love, did he?

A  Well, he said he was false flagging.  That is what false flagging is.

Q  Would you tell me where in the statement to the State's Attorney you say that Gerald told you that he was false flagging?

A  It ain't even in there.

Q  Figment of your imagination maybe?

V-47

EP IGLESIAS Sub Resp 000220

A     No.  That is what he told me.

Q     Well, if he told you that --  Did you tell the State's Attorney that?

A     No.  If it doesn't say it there, that means I didn't say it.

Q     So now you are remembering something he told you but you didn't tell the State's Attorney?

A     Representing one way or the other is the same thing.  Throwing down signs, throwing it up, it is all the same thing, it is disrespect.

Q     The term false flagging is your term, right?

A     There is disrespecting, false flagging, there are plenty of names for it.

Q     Did you say he false flagged?

A     That is what I am saying.

Q     That is what you are saying here in court but that is not in your State's Attorney's statement?

A     No.

Q     Now, you also told the State's Attorney and the detectives, didn't you, that your mother had given you details or told you about this shooting, the one we are on trial for today?

A     Not details.  She just told me there was a shooting at Spaulding and Palmer.

V-48

EP IGLESIAS Sub Resp 000221

Q    Now, when you were at the jail, correct me if I am wrong, the gangs there have an information grapevine more or less; do you know what I am saying?  You hear about things at the jail, don't you?

A    We all know what we are in for, okay.

Q    So it is not unusual for you to know what Geraldo is charged with, which murder it is and what he is in for?

A    If he is telling me, of course I am going to know.

Q    I am talking about without him telling you.

A    No.

Q    You wouldn't know what he was charged with unless he told you; is that what you are telling us?

A    Right.

Q    At the jail there is no way your gang guys find out what anybody else is charged with unless the guy tells you; that is what you are telling us?

A    Yes.

Q    And you don't hear about things in the jail that happen out on the street, do you?

A    Of course, if you have access to the outside world.

Q    And you have access to the outside world, don't you?

V-49

EP IGLESIAS Sub Resp 000222

A    Yes.

Q    And you did back in July of 1993, didn't you?

A    Yes.

Q    And you had people visiting you, gang friends visiting you, family members visiting you?

A    No, family members.

Q    Family members?

A    Right.

Q    And when they visit you they tell you things that happen out on the street, right?

A    Right.

Q    Things they may read in the paper that happen in the neighborhood, right?

A    Well, my mom told me over the phone about the murder on Spaulding.

THE COURT:  Once again, sir, I am going to ask you if you will please understand that your job as a witness is to listen carefully to the question that is asked, answer only the question asked to the best of your ability.  If you have a problem with the question as it is asked, tell me.  I will ask counsel to rephrase it.

Do you understand that?

THE WITNESS:  Yes.

THE COURT:  Let's move on.

V-50

EP IGLESIAS Sub Resp 000223

MR. DE LEON:  Q  So you received information in July. And you even receive information now about what is happening out on the streets, don't you?

A  No.

Q  Your family doesn't visit you?  They still visit you, don't they?

A  They come every other month.

Q  Now, also in this State's Attorney's statement, the very last line here, if you remember the State's Attorney gave you an opportunity to make additions or corrections to the statement.  Do you remember that, the State's Attorney telling you that?

A  Yes.

Q  And you didn't make any additions to the statement other than what she already wrote down; you just signed your name at the bottom, right?

A  No, I went through it with her.

Q  You went through it with her?

A  Yes, and made my little corrections.

Q  You made corrections on spelling or a couple of little words, right; but you didn't add any other information to it, did you?

A  No.

Q  Other than what is contained in here, other than

V-51

EP IGLESIAS Sub Resp 000224

what we have gone over, right?

A   Right.

Q   Well, did you tell the State's Attorney that Geraldo told you what kind of gun he used?

A   He didn't tell me what kind of gun he used.

Q   Did you tell the State's Attorney that Geraldo told you where he hid the gun?

A   No.

Q   Did you tell the State's Attorney anything about that Geraldo told you what kind of car those people were in?

A   No.

Q   Did you tell the State's Attorney that Geraldo told you what color the car was?

A   No.

Q   And did you tell the State's Attorney that Geraldo told you where he was standing when he shot?

A   He said he was standing on the corner.

Q   Of Spaulding?

A   Yes, Palmer and Spaulding.

Q   Not Sawyer?

A   That is what he told me.

Q   He told you Spaulding?

A   He said Spaulding.

Q   So could you tell us if Geraldo told you one

V-52

EP IGLESIAS Sub Resp 000225

detail that only the killer would know?

MR. STUDENROTH: Objection.

THE COURT: Sustained.

MR. DE LEON: Q Did he tell you anything else that you can remember as you sit here?

A That's it.

Q Now, you are facing, as we already know, three armed robbery charges, correct?

A Yes.

Q And you are aware that those armed robbery charges carry from six to thirty years as punishment?

MR. STUDENROTH: Objection.

THE COURT: That is overruled.

MR. DE LEON: Q Is that right?

A Yes.

Q And you are facing one robbery charge, is that correct?

A Yes.

Q And that robbery charge carries with it four to fifteen years, isn't that right?

MR. STUDENROTH: Objection.

THE COURT: Sustained.

MR. DE LEON: Q I am sorry. Three to seven, right?

A Yes.

V-53

EP IGLESIAS Sub Resp 000226

[ ]

Q   So potentially you could face a sentence of, if you were given anywhere -- the mimimum, twenty-one on the minimum, six for each armed robbery and three for the robbery, so it would be anywhere from twenty-one to ninety-seven years if you faced those charges and you lose them?

I am not saying you wouldn't maybe go to trial and win some of them but theoretically you would be facing ninety-seven years, isn't that right, at the worse?

A   Yes.

Q   So you think you struck a pretty good deal, haven't you?

MR. STUDENROTH:   Objection.

THE COURT:   Sustained.

MR. DE LEON:   Q   Now, you told us that while your name is Francisco Vincente there have been times when you have not been truthful with the police about your name, isn't that right?

A   Yes.

Q   In other words, I believe it was back in September of 1990 you used the name of Carlos Morales, is that right?

A   Yes.

Q   And you also lied to the police about your age on that date, is that right?

V-54

EP IGLESIAS Sub Resp 000227

A    Yes.

Q    Telling them your birthdate was October 19, 1968, isn't that right?

A    Yes.

Q    And that is not your birthdate; your birthdate is April 18, 1971, isn't it?

A    Yes.

Q    And on another occasion you -- where you lied and said your name was Carlos Morales was back in July of 1992, that was on the robbery charge; you also lied about your age telling them a birthdate of October 24th, 1969, isn't that right?

A    Yes.

Q    Do you find it easy to lie to the police?

MR. STUDENROTH:  Objection.

THE COURT:  Sustained.

MR. DE LEON:  Q  And we know, as the State brought out, that you also have a prior conviction for delivery of controlled substance, is that right?

A    Yes.

Q    You sold drugs at one time?

A    Yes.  Plenty of times.

Q    You used drugs at one time?

A    Yes, sir.

V-55

EP IGLESIAS Sub Resp 000228

Q    Do you sell drugs to kids?

A    No, sir.

Q    Sell drugs to anybody who would buy them?

MR. STUDENROTH:  Objection.

THE COURT:  It is overruled.  You may answer.

THE WITNESS:  Anybody who would buy them.

MR. DE LEON:  Q  And today when you are testifying you are doing what you need to do to save your own skin, aren't you?

MR. STUDENROTH:  Objection.

THE COURT:  Sustained.

MR. DE LEON:  Q  Well, you are testifying to save yourself a lengthy prison sentence, aren't you?

A    Yes.

MR. DE LEON:  I have no other questions.

THE COURT:  Redirect.

REDIRECT EXAMINATION

By Mr. Studenroth:

Q    Chino, when you committed the armed robberies were you using drugs then?

A    Yes, sir.

Q    Were you addicted to a form of drugs?

A    Yes, sir.

Q    What kind of drugs were you addicted to when you

V-56

EP IGLESIAS Sub Resp 000229

committed the armed robberies and the robbery?

A    Heroin, China white.

Q    Did you have a pretty bad habit?

A    Yes, sir.

Q    How bad was your habit?

A    Expensive habit, real bad.

Q    Is that why you committed the armed robberies and the robbery to get money to support your habit?

A    Yes, sir.

Q    Mr. DeLeon talked about the contact visits you have now that you are in protective custody; do you remember that?

A    Yes.

Q    Now, you are not permitted to have sex with your girlfriend or fiance during the contact visits, are you?

A    No, sir.

Q    And he also questioned you about the other cases you are testifying on and you indicated you are testifying against a Puerto Rican Stone, is that right?

A    Yes.

Q    But the other case that you are testifying, the third murder case, is against another Gangster Imperial, is that correct?

A    Yes.

V-57

EP IGLESIAS Sub Resp 000230

Q    In fact, there are three Gangster Imperials in that case, is that correct?

A    Yes, sir.

Q    And when you said you expect to do fifty-four months, that's if Judge Suria goes along with that agreement with the State's Attorney's Office, correct?

A    Yes, sir.

Q    And it is also predicated upon you having good time once you get down to the Ilinois Department of Corrections, is that correct?

A    Yes.

Q    When he was talking about you going to court and when you were in the bullpen, what was different about when you went to court compared to when the other people went to court on July 1st when you went to the State's Attorney's Office?

A    Nothing different.  We all went to one bullpen.

Q    But once you left the bullpen did everyone leave at the same time you left or were you last?

A    No.  They sent everybody upstairs to their courtroom.  Then they came and got me.

Q    Why did they get you last?

A    Because I was coming upstairs.

Q    To do what?

V-58

EP IGLESIAS Sub Resp 000231

A    Going before the Grand Jury.

Q    To break your code of silence?

A    Yes.

Q    Could you have worn a wire in Division X and gotten away with it?

A    I don't know. I don't know nothing about wires.

Q    The statement that you made with the State's Attorney, he asked you whether this statement indicated what kind of gun the defendant used, is that correct?

A    Yes.

Q    Did he ever tell you what kind of gun he used?

A    No, sir.

Q    And he also said that the statement doesn't say where he hid it, is that correct?

A    Yes, sir.

Q    Did he ever tell you where he hid the gun?

A    No, sir.

Q    He also asked about the color and the kind of car, is that correct?

A    Yes.

Q    And that it wasn't in this statement.

A    Right.

Q    Did the defendant ever tell you the color or the kind of car?

V-59

EP IGLESIAS Sub Resp 000232

A    No.

Q    The statement does indicate that he was disrespecting the Latin Kings prior to the shooting, is that correct?

A    Yes.

Q    Did you ever have any problems with Snake before, prior to you going to jail?

A    No.

Q    You never had any fights with him or any altercations?

A    No, sir.

MR. STUDENROTH:  May I have one minute, Judge?

THE COURT:  You may.

MR. STUDENROTH:  Nothing further, Judge.

THE COURT:  Anything else, Mr. DeLeon.

RECROSS EXAMINATION

By Mr. DeLeon:

Q    By July 1st of 1993 weren't you already cooperating with the State's Attorney?

A    Yes, sir.

Q    And weren't you --  Didn't you tell us you were in protective custody on July 1st of 1993?

A    No.

Q    You were not in protective custody?

V-60

EP IGLESIAS Sub Resp 000233

A     No.

Q     You were still in Division X?

A     Yes.

Q     But how long was it in time, how many months or weeks had you been cooperating with the State's Attorney or the detectives?

A     It took them about four or five months.

Q     Four or five months before July 1st?

A     Yes.

MR. DE LEON:  I have no other questions.

MR. STUDENROTH:  Just very briefly, Judge.

                    REDIRECT EXAMINATION

                    By Mr. Studenroth:

Q     Back then when you first started cooperating with the State's Attorney's Office was there any recommendation made to you on your cases?

A     No, sir.

Q     Was there any recommendation made to you when you came forward on July 1st and talked to the State's Attorney about the other murder case?

A     No, sir.

Q     Was there any recommendation when you came forth on July 16th and gave this statement to the State's Attorney on this case?

V-61

EP IGLESIAS Sub Resp 000234

A    No, sir.

Q    And by the way, Chino, when you went on July 1st to talk about the other case you did tell the detectives about what he told you on the way over, is that correct?

A    Yes, sir.

Q    And you brought that up to the detectives, didn't you?

A    Yes.

Q    What did the detectives tell you when you brought that up to them?

A    They told me let's take care of this in front of the Grand Jury, the case that we are speaking on now, forget about that.

Q    In other words, we will take one case at a time?

A    Yes, sir.

MR. STUDENROTH:   Nothing further.

RECROSS EXAMINATION

By Mr. DeLeon:

Q    Are you telling us that you told the detectives Geraldo confessed to you on a murder case and they told you forget about that for now?

A    They told me one case at a time.

Q    Did they ever tell you before the Grand Jury to testify about this case?

V-62

EP IGLESIAS Sub Resp 000235

MR. STUDENROTH: Objection. Relevance.

THE COURT: Overruled.

MR. DE LEON: Q Did they take you before the Grand Jury to testify about this case, about this alleged confession?

A They took me in front of the Grand Jury on another case.

Q Not on this case?

A No.

MR. DE LEON: I have no other questions.

MR. STUDENROTH: Nothing further based on that, Judge.

THE COURT: Thank you. You may step down.

(Witness excused.)

All right, ladies and gentlemen. We will have to eat in again today so we can make sure we get all the evidence in today. The food is here. Please leave your notes in your chairs. Do not discuss the case. Have a good lunch and we will see you in about a half an hour.

(The trial was recessed to 2:00 p.m.)

V-63

EP IGLESIAS Sub Resp 000236

STATE OF ILLINOIS      )
                       ) ss:
COUNTY OF C O O K      )

I, LINDA K. MADISON, an Official Court Reporter for the Circuit Court of Cook County, County Department-Criminal Division, do hereby certify that I reported in shorthand the proceedings had on the hearing in the above entitled cause; that I thereafter caused the foregoing to be transcribed into typewriting, which I hereby certify to be a true and accurate Report of Proceedings had before the Honorable MARY MAXWELL THOMAS, Judge of said court.

V-140

EP IGLESIAS Sub Resp 000313

(Rev. 4/2 /92) CCCR 0056

STATE OF ILLINOIS )
    COOK COUNTY ) SS.

I, AURELIA PUCINSKI, Clerk of the Circuit Court of

Cook County, in said County and State and Keeper of the Records and Seal thereof, do hereby certify the

above and foregoing to be a true and complete copy of . VOLUME FOUR OF A FIVE VOLUME RECORD . . . .

. CONSISTING OF THE REPORT OF PROCEEDINGS, ONLY. NO PRAECIPE HAVING BEEN FILED . . . . .

. PURSUANT TO THE NOTICE OF APPEAL FILED IN THE APPELLATE COURT UNDER APPELLATE . . . . .

. COURT NO. 95-0895. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

in a certain cause. . . . . . . . . . . . . . . . . . . . . . LATELY . . . . . . . . . . . . . . . . . . pending in said Court, between

The people of the State of Illinois . . . . . . . . . . . . . . WERE . . . . . . . . . . . . . . . . . . . . . . . . . . , Plaintiff and

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . GERALDO IGLESIAS WAS . . . . . . . . . Defendant . . . . .

Witness, AURELIA PUCINSKI, Clerk of the Court
and the Seal thereof, at Chicago,. In said

County, . . . . . . . . . . . . . . . . . . SEPTEMBER 26, 19. . 95.

. . . . . . . Aurelia Pucinski/mjo . . . . . . .

EP IGLESIAS Sub Resp 000314

Crim. Div. No. 94-B

EP IGLESIAS Sub Resp 000315

FILED APPELLATE COURT
1st DIST.

'96 DEC 20 P3:18

GILBERT G. MARCHAM
CLERK OF COURT

95-896

# EXHIBIT 83

AR-L 514471

**GENERAL OFFENSE CASE REPORT — CHICAGO POLICE**

| Field | Value |
|---|---|
| 1. OFFENSE/INCIDENT – PRIMARY CLASSIFICATION | HOMICIDE |
| 1-UCR OFF. CODE | 0110 |
| 2. SECONDARY CLASSIFICATION | FIRST DEGREE MURDER |
| (circled) | FS |
| APT. NO. | |
| 5. FIRE RELATED | ☐1 YES ☒2 NO |
| 6. DATE OF OCCURRENCE – TIME DAY MO. YR | 14 MAY 93 1505 |
| 3. R.D. NO. | X-209,946 |
| 7. BEAT OF OCCUR. | 1723 |
| 8. BEAT/UNIT ASSIGN | 1713 |
| 4. ADDRESS OF OCCURRENCE DIR. STREET | 3415 W SUNNYSIDE |
| 9. TYPE OF LOCATION OR PREMISE WHERE OFFENSE OCCURRED — GIVE NAME OF LOCATION IF APPLICABLE | STREET |
| 10. LOCATION CODE | 304 |
| 11. DATE R.D. ARRIVED – TIME | 14 MAY 93 1525 |
| 12. ASSIGNED BY | ☐1 C.O.S. ☐2 ON VIEW ☒3 SUPERVISOR |

All information, descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

**VICTIM**

| 20. NO. VICTIMS | 21. NAME (LAST–FIRST–M.I.) | IDENTITY VERIFIED | 22. HOME ADDRESS (NO., DIR., STREET, APT. NO.) | 23. SEX–RACE–AGE CODE | 24. HOME PHONE | 25. BUSINESS PHONE | 26. TIME AVAIL. | 27. OCCUPATION | 28. INJURED YES/NO | 29. VICTIM REL. CODE |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | RUVALCABA, SALVADOR | | 4138 N. DRAKE | M 4,15 | 4787309 | NONE | | STUDENT | X | 24 |

| PARENT/GUARDIAN, IF JUVENILE | | | |
|---|---|---|---|
| GARCIA, LUCERO | 4138 N. DRAKE | | |

**WITNESS**

| 30. NO. WIT. | 31. ☐1 DISCOVERED ☒2 WITNESSED ☐3 REPORTED OFFENSE | | | | |
|---|---|---|---|---|---|
| | MELENDEZ, MELISSA | 4932 W. MONTROSE | F 2,33 | 3826777 7946833 | |
| | RODRIGUEZ, IDA | 3315 W. SUNNYSIDE | F 4,46 | NONE | |
| | FLEMING, PATRICIA | 3338 W. SUNNYSIDE #2 | F 2,13 | NONE | |

RACE CODES: 1-BLACK 2-WHITE 3-BLACK-HISPANIC 4-WHITE-HISPANIC 5-AMER. IND./ALASK. NAT. 6-ASIAN/PACIFIC ISLANDER

OFFENDER/VICTIM RELATIONSHIP CODES (Use for Member of the Same Family or Household): 01-WIFE 02-HUSBAND 03-FORMER WIFE 04-FORMER HUSBAND 05-MOTHER 06-FATHER 07-SON 08-DAUGHTER 09-BROTHER 10-SISTER 11-AUNT 12-UNCLE 13-MOTHER-IN-LAW 14-FATHER-IN-LAW 15-SON-IN-LAW 16-DAUGHTER-IN-LAW 17-BROTHER-IN-LAW 18-SISTER-IN-LAW 19-OTHER RELA. 20-GIRL FRIEND 21-BOYFRIEND 22-FRIEND/ACQUAINTANCE 23-OTHER-SPECIFY 24-NO RELATIONSHIP

**OFFENDER**

| 40. NO. OFF. | 41. OFFENDER'S NAME (OR DESCRIBE CLOTHING, ETC.) | 42. HOME ADDRESS | 43. SEX–RACE–AGE | HEIGHT | WEIGHT | EYES | HAIR | COMPL. | MARKS, SCARS, ETC. | 44. C.B./I.R. NO. | 45. OFFENDER REL. CODE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | BLK T-SHIRT, BLK 3/4 LENGTH BAGGY PANTS WHT HIGH TOPS | | M 4,16 | 505 | 120 | | BLK SHAVED | MEDIUM | | | 24 |

**CIRCUMSTANCES**

| 51. OBJECT/WEAPON ☒1 USED ☐2 DISPLAYED ☐3 UNK |
|---|
| ☒01 HAND GUN ☐02 SHOTGUN ☐03 RIFLE ☐04 KNIFE ☐05 VEHICLE ☐06 BLUNT INSTRUMENT ☐07 THROWN OBJECT ☐08 EXPLOSIVE ☐09 LIQUID/GAS ☐10 BOTTLE/GLASS ☐11 RAZOR ☐12 PRY TOOL ☐13 HAND, FEET ☐14 OTHER ☐15 DNA |

| 52. FIREARM FEATURES | 53. POINT/ENTRY | 54. POINT/EXIT | 55. BURGLAR ALARM | 56. SAFE BURGLARY METHOD | 57. IF RESIDENCE, WHERE WERE OCCUPANTS |
|---|---|---|---|---|---|
| ☐01 CHROME/NICKEL ☒02 BLUE STEEL ☐03 SHORT BARREL ☐04 LONG BARREL ☐05 SAWED OFF ☐06 OTHER ☐07 UNKNOWN ☐08 DNA | ☐01 FRONT DOOR ☐02 REAR DOOR ☐03 WINDOW ☐04 ROOF ☐05 FLOOR ☐06 SIDE DOOR ☐07 OTHER ☐08 UNKNOWN ☐09 DNA | ☐01 FRONT DOOR ☐02 REAR DOOR ☐03 WINDOW ☐04 ROOF ☐05 FLOOR ☐06 SIDE DOOR ☐07 OTHER ☐08 UNKNOWN ☐09 DNA | ☒NONE ON PREMISE ☐1 YES ☐2 NO ALARM CIRCUMVENTED ☐1 YES ☐2 NO | ☐01 PUNCH ☐02 TORCH ☐03 EXPLOSIVE ☐04 DRILL ☐05 REMOVED ☐06 PEEL ☐07 OPEN ☒08 UNKNOWN ☐09 DNA | ☐01 WORK ☐02 VISITING ☐03 VACATION ☐04 WEDDING ☐05 FUNERAL/WAKE ☐06 OTHER ☐07 UNKNOWN ☒08 DNA |

| 58. UNUSUAL CHARACTERISTICS OF OFFENSE | 59. GANG RELATED – AFFILIATION |
|---|---|
| SEE NARRATIVE | ☒ VICTIM COBRA ☒ OFFENDER PR STONES |

**PROPERTY**

| 71. DESCRIBE PROPERTY IN NARRATIVE (T = TAKEN; R = RECOVERED) |
|---|
| 1 MONEY ☐T ☐R | 2 JEWELRY ☐T ☐R | 3 FURS ☐T ☐R | 4 CLOTHING ☐T ☐R | 7 OFFICE EQUIPMT. ☐T ☐R | 8 TV, RADIO, STEREO ☐T ☐R | 9 HOUSEHOLD GOODS ☐T ☐R | 10 CONSUM. GOODS ☐T ☐R | 11 FIREARMS ☐T ☐R | 14 NARC./DANG. DRUGS ☐T ☐R | 15 OTHER ☐T ☐R | 16 NONE |

| 72. VEHICLE/TRAILER ☐STOLEN ☐THEFT FROM ☐OFFENDER'S | YEAR | MAKE | BODY STYLE | COLOR | V.I.N. | STATE LICENSE NO. | STATE | EXPIR. MO/YR | 73. PROPERTY INVENTORY NO(S). | 74. VEH. INVENTORY NO. FOUND. |
|---|---|---|---|---|---|---|---|---|---|---|

**NARRATIVE**

WITNESS #4 – FLEMING, MARGARET L., 3338 W. SUNNYSIDE, F/2/39 NO PHONE

WITNESS #5 – FLEMING, CHRISTOPHER J., 3338 W. SUNNYSIDE, M/2/11 NO PHONE

WITNESS #6 – COSTELLO, MELISSA, 4514 N. BERNARD, F/2/36 588-0808

| 81. SOBRIETY OF VICTIM | ☒1 SOBER ☐2 HBD |
|---|---|

| 82. FLASH MESSAGE SENT? | ☒1 YES ☐2 NO |
|---|---|

**POLICE PERSONNEL**

| 91. EXTRA COPIES REQUIRED ☐NORMAL | ☒CONT'D. OTHER SIDE | 92. OFFICER NOTIFYING FOLLOW-UP INVESTIG. UNIT C.O.S. | UNIT NOTIFIED | PERSON ☐NOTIFIED ☒ARRIVED | DATE (DAY MO. YR) | TIME |
|---|---|---|---|---|---|---|
| | | | 1 AS/VC | GUEVARA #20861 BT 5535 | 14 MAY 93 | 1550 |

| 93. FIRST OFFICER AT SCENE | ☐R.O. | 94. OFFICER NOTIFYING ☒1ST D/S ☐D.T. ☐M.E. | PERSON ☐NOTIFIED ☒ARRIVED | DATE (DAY MO. YR) | TIME |
|---|---|---|---|---|---|
| D. JOHNSON 15948 BT 1712 | | SHIER | TURAND #13854 | 14 MAY 93 | 1745 |

| 95. REPORTING OFFICER'S NAME (PRINT) | STAR NO. | OFFICER'S SIGNATURE | DATE INVEST. COMPLETED – TIME | 97. SUPERVISOR APPROVING (PRINT NAME) | STAR NO. |
|---|---|---|---|---|---|
| S. SHIER | 15018 | [signature] | 14 MAY 93 | SGT. E. MEEHAN | 732 |
| 96. REPORTING OFFICER'S NAME (PRINT) | STAR NO. | OFFICER'S SIGNATURE | | APPROVAL SIGNATURE | DATE TIME |
| E. BAUMANN | 7824 | Baumann | | [signature] | 14 MAY 93 |

CPD-11.39C REV. 8/83)

AR-L 514472

OF NARRATIVE

IN SUMMARY: BT 1712 RECEIVED A CALL OF "SHOTS FIRED" AND A MAN SHOT ON THE 3400 BLOCK OF WEST SUNNYSIDE. UPON ARRIVAL ABOVE VICTIM WAS LYING ON THE GROUND BLEEDING. CFD AMB #32 ON SCENE STATED THAT VICTIM WAS DEAD. R/O'S ARRIVED ON SCENE AT 1525 HRS AND SPOKE TO WITNESS #1 MELENNEZ, WHO RELATED TO R/O'S THAT SHE SAID ABOVE DESCRIBED OFFENDER RUN W/B ON SUNNYSIDE TOWARD VICTIM FIRED SEVERAL SHOTS AT VICTIM STRIKING HIM IN THE BACK. OFFENDER THEN FLED E/B ON SUNNYSIDE

BO' ON SCENE: BT 1763, 1763 A, 1763 E, 1712, 1772 2ND WATCH, 1772 3RD WATCH, 1723, 1710, 1720.

BT 5535: DET GUEVARA #20861 ARRIVED ON SCENE 1550 HRS

BT 5535 DET HALVORSEN #2068 1620 │X-2,099,46
BT 9603 CAREY #13537 ON SCENE 1631 HRS.
BT 1772 3RD WATCH REMOVED BODY TO BBLL OUT 1650 HRS. PRONOUNCED DEAD 1715 HRS BY DR LARITA
WITNESSES TURNED OVER TO BT 5535 AND RELOCATED TO AREA 5.

1799 NOTIFIED

ME. MURDOCK NOTIFIED APPROX 1800 HRS BY BT 1772. AUTHORIZED REMOVAL TO MORGUE.

1706, 1751

770

I HAVE REVIEWED THIS REPORT AND BY MY SIGNATURE INDICATE THAT IT IS ACCEPTABLE.

SUPERVISOR'S SIGNATURE   658   DATE   14 MAY 83

FOR USE BY BUREAU OF INVESTIGATIVE SERVICES ONLY

| I-UCR OFFENSE CODE | REV. CODE | I-UCR METHOD CODE | METHOD ASSIGNED | UNIT NO | OFFICER ASSIGNED STAR NO. | DATE ASSIGNED | SUPV STAR NO | INVESTIGATIVE FILE | MEASURES |
|---|---|---|---|---|---|---|---|---|---|
| □1 CORRECT □2 REVISED | | S+T | □ FIELD □2 ADMIN □3 SUMMARY | 652 | 20861 | 18593 | 2200 | □1 YES □2 NO | □1 YES |
| OFFICER REASSIGNED STAR NO. | DATE | STATUS | | | IF CASE IS CLEARED, HOW CLEARED (USE THIS BOX FOR SINGLE CLEAR UP OR FIRST CLEAR UP OF MULTIPLE CLEAR UP LIST) | | | | |
| | | □0 PROGRESS □1 SUSPENDED □2 UNFOUNDED □3 CLEARED CLOSED □4 CLEARED OPEN □5 EXC. CLRD. CLOSED □6 EXC. CLEARED OPEN □7 CLOSED - NON CRIMINAL | | | □1 ARREST & PROSECUTION □2 DIRECTED TO FAMILY COURT □3 COMPL. REFUSED TO PROSECUTE | | □ COMPLAINT ADJUSTMENT | □ TIME IF PERPETUAL | |
| VICTIM IDENTIFIERS □1 CORRECT □2 REVISED | VICTIM NO. | REVISED NAME | | | REVISED ADDRESS | | | REVISED PHONE NO | |

| VALUE OF PROPERTY TAKEN/RECOVERED | □1 DNA | □2 VERIFIED | □3 CORRECTED | | | FILL IN THE FULL AMOUNT OF ONLY THESE VALUES WHICH EITHER DIFFER FROM OR WERE NOT REPORTED ON THE REVERSE, THE NARRATIVE OR A SUPPLEMENTARY REPORT | | | |
|---|---|---|---|---|---|---|---|---|---|
| 1 MONEY | 2 JEWELRY | 3 FURS | 4 CLOTHING | 7 OFFICE EQUIPMT | 8 TV, RADIO, STEREO | 9 HOUSEHOLD GOODS | 10 CONSUM GOODS | 11 FIREARMS | 18 NARC DANG DRUGS LEATHER |
| □T $ □R | □T $ □R | □T $ □R | □T $ □R | □T $ □R | □T $ □R | □T □R | □T □R | □T 3 □R | □ |

SERIAL NOS. OR IDENTIFICATION NOS.   □1 DNA   □2 VERIFIED   □3 CORRECTED        LIST ALL CORRECTIONS & NEW OR ADDITIONAL NOS. OBTAINED

REMARKS (PERTINENT INFORMATION NOT ON ORIGINAL REPORT)

| PREPARED BY - SIGNATURE | STAR NO. | DATE (DAY MO YR) | APPROVED BY - SIGNATURE | STAR NO. | DATE (DAY MO YR) |
|---|---|---|---|---|---|
| | | | | | |

# EXHIBIT 84

Identify and describe all property or possible evidence recovered at the end of the Narrative in column form. Show exactly where found, when found, who found it and its description (include Property Inventory numbers). If property taken was scribed for Operation Identification, indicate I.D. number at end of Narrative. Offender's approximate description, if possible, should include name if known, nickname, sex, race code, age, height, weight, color eyes & hair, complexion, scars, marks, etc. If suspect is arrested, give name, sex, race code, age, C.B. or I.R. number, if known, and state "In Custody."

## SUPPLEMENTARY REPORT
### CHICAGO POLICE — FOR USE BY B.I.S. PERSONNEL ONLY

All descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

4. DATE OF ORIG. OCCURRENCE—TIME
DAY 14 MO. May YR. 93 | 1505hrs

| 1. OFFENSE/CLASSIFICATION LAST PREVIOUS REPORT | I-UCR OFF. CODE | 2. ADDRESS OF ORIG. INCIDENT/OFFENSE XX VERIFIED ☐2 CORRECTED | 3. BEAT OF OCCUR. |
|---|---|---|---|
| HOMICIDE/FIRST DEGREE MURDER | 0110 | 3415 W Sunnyside | 1723 |

| 5. VICTIM'S NAME AS SHOWN ON CASE REPORT | CORRECT ☐1 YES ☐2 NO [X] | IF NO, CORRECT ALL VICTIM INFOR-MATION IN BOXES 20 THROUGH 27. | 6. FIRE RELATED ☐1 YES [X]2 NO | 7. BEAT ASSIGNED |
|---|---|---|---|---|
| RUVALCABA, Salvador | | | | 5535 |

| 8. TYPE OF LOCATION OR PREMISE WHERE INCIDENT/OFFENSE OCCURRED | LOCATION CODE | 9. NO. OF VICTIMS | 10. NO. OF OFFENDERS |
|---|---|---|---|
| STREET | 304 | 1 | 1 |

| CIRCUMSTANCES | [XX] VERIFIED ☐UPDATE TO | 12. OBJECT/WEAPON CODE NOS. | 13. FIREARM FEATURES CODE NO. | 14. POINT/ENTRY CODE NO. | 15. POINT/EXIT CODE NO. | 16. BURGLAR ALARM CODE NOS. | 17. SAFE BURGLARY METHOD CODE NO. | 18. IF RESIDENCE WHERE WERE OCCUP. CODE NO. |
|---|---|---|---|---|---|---|---|---|

19. DESCRIBE PROPERTY IN NARRATIVE. T = TAKEN; R = RECOVERED

FILL IN THE FULL AMOUNT OF ONLY THOSE VALUES WHICH EITHER DIFFER FROM OR WERE NOT REPORTED ON THE ORIGINAL CASE REPORT OR THE LAST PREVIOUS SUPPLEMENTARY REPORT.

| PROPERTY | ☐ VERIFIED ☐ UPDATE TO | 1 MONEY ☐T $ ☐R | 2 JEWELRY ☐T $ ☐R | 3 FURS ☐T $ ☐R | 4 CLOTHING ☐T $ ☐R | 7 OFFICE EQUIPMENT ☐T $ ☐R | 8 TV, RADIO, STEREO ☐T $ ☐R |
|---|---|---|---|---|---|---|---|
| | | 9 HOUSEHOLD GOODS ☐T $ ☐R | 0 CONSUM. GOODS ☐T $ ☐R | (-) FIREARMS ☐T $ ☐R | & NARC./DANGEROUS DRUGS ☐T $ ☐R | 5 OTHER ☐T $ ☐R | 6 NONE ☐T ☐R |

| VICTIMS UPDATE ONLY | 20. NAME (LAST—FIRST—M.I.) | 21. I-UCR OFFENSE CODE | 22. HOME ADDRESS (NO., DIR., STREET, APT. NO.) | 23. SEX—RACE—AGE CODE | 24. HOME PHONE | 25. BUSINESS PHONE | 26. INJURED YES NO | 27. VICTIM REL. CODE |
|---|---|---|---|---|---|---|---|---|
| 1. | | | | | | | | |
| 2. | | | | | | | | |
| 3. | | | | | | | | |

| OFFENDERS UPDATE ONLY | 28. OFFENDER'S NAME (OR DESCRIBE CLOTHING, ETC.) | 29. HOME ADDRESS | 30. SEX—RACE—AGE CODE | HEIGHT | WEIGHT | EYES | HAIR | COMPL. |
|---|---|---|---|---|---|---|---|---|
| 1. | | | | | | | | |
| 2. | | | | | | | | |

| 31. C.B. NO. | I.R. NO., Y.D. NO. OR J.D.A. NO. | OFFENDER IREL CODE | C.B. NO. | I.R. NO., Y.D. NO. OR J.D.A. NO. | OFFENDER REL. CODE | 32. NO. ARREST ARRESTED UNIT NO. |
|---|---|---|---|---|---|---|
| OFF 1 | | | OFF. 2 | | | |

| 33. OFF'S. VEHICLE ☐USED ☐STOLEN | YEAR | MAKE | BODY STYLE | COLOR | V.I.N. | STATE LICENSE NO. | STATE |
|---|---|---|---|---|---|---|---|

| 34 SERIAL NOS. OR IDENTIFICATION NOS. | ☐1 DNA | ☐2 VERIFIED | ☐3 CORRECTED | LIST ALL CORRECTIONS & NEW OR ADDITIONAL NOS. OBTAINED IN NARRATIVE |
|---|---|---|---|---|

| 50. OFFENSE/CLASS. THIS DATE (IF SAME ENTER DNA) | REV. CODE | 51. METHOD CODE | 52. METHOD ASSIGNED | UNIT NO. | 53. STATUS |
|---|---|---|---|---|---|
| DNA | | | [X]1 FIELD ☐3 SUMMARY | 652 | [X] 0 PROGRESS ☐1 SUSPENDED ☐2 UNFOUNDED |

STATUS CONT'T
☐ CLRD. CLOSED ☐4 CLRD. ☐5 EXC. CLRD. CLOSED ☐6 EXC. CLRD. OPEN ☐7 CLSD. NON-CRIM.

54. IF CASE CLEARED, HOW CLEARED
☐1 ARREST & PROSEC. ☐2 DIRECTED TO JUV. CRT. [X] ADULT ☐JUV.

**DATA ENTERED D AREA 5**

55. ☐FOR SUMMARY CASES ONLY — THE ORIGINAL CASE REPORT IS SUBSTANTIALLY CORRECT, AND CONTACT WITH THE VICTIM HAS DISCLOSED ADDITIONAL PERTINENT INFORMATION.

80. NARRATIVE

This is a Line-Up Report:

DATE,TIME,LOCATION OF LINE OF LINE-UP:      14 May 93,Area Five Violent Crimes AT1900hrs

PHOTOGRAPHER:      DET. E. HALVORSEN #20692

PERSONS CONDUCTING LINE-up:      DET. E. HALVORSEN 20692

DET. R. GUEVARA # 20861

PERSONS VIEWING LINE-UP:      1. RICHMOND,Carl 19yrs.

2. ESCOBAR, Frank 18yrs.

CONT. PAGE TWO

| 90. EXTRA COPIES REQUIRED (NO. & RECIPIENT) | 91. DATE THIS REPORT SUBMITTED — DAY MO. YR. | TIME | 92. SUPERVISOR APPROVING (PRINT NAME) | STAR NO. |
|---|---|---|---|---|
| DNA | 16 May 93 | 1800hrs. | BIEBEL | 1545 |

| 93. REPORTING OFFICER (PRINT NAME) | STAR NO. | 94. REPORTING OFFICER (PRINT NAME) | STAR NO. | SIGNATURE |
|---|---|---|---|---|
| Det. Reynaldo Guevara | 20861 | Det. E. Halvorsen | 20692 | Biebel |

SIGNATURE Det. Guevaro 20861   Det. E. Halvorsen

95. DATE APPROVED (DAY-MO.-YR.) 17 MAY 1993   TIME 10800

*MUST BE COMPLETED IN ALL CASES

CPD-11,411-B (Rev. 8/85)

35. R.D. NO. X-209946

AR-L 140556
RFC-Bouto 000103

DETECTIVE DIVISION
AREA FIVE VIOLENT CRIMES

14 MAY 93
RD# X-209946

HOMICIDE/FIRST DEGREE MURDER
VICTIM: RUVALCABA, Salvador

PAGE 2

PERSONS VIEWING LINE-UP CONT.

3. ███████████ 17yrs.
4. ███████ 15yrs.
5. ██ 15yrs.
6. ██
39yrs.

PERSONS PARTICIPATING IN LINE-UP:

1. ███████████ 16yrs.
   5'9 130lbs ███
2. SANTIAGO, Jose 24yrs.
   5'10  155lbs CB# 9383-720
3. BOUTO, Robert 17yrs.
   5'9 140lbs 4533 N. Saulding
4. ███████████ 15yrs.
   5'6 125lbs
5. ████ 16yrs.
   5'7 145lbs ███
6. SANCHEZ, Jose 23yrs.
   5'7 150lbs CB# 9382-805
7. MATIAS, Cesar 17yrs.
   5'9 135lbs 3108 W. Eastwood
8. ████ 16yrs.
   5'8 140lbs

PERSON IDENTIFIED IN LINE-UP:

3. BOUTO, Robert

HISTORY & INVESTIGATION:

On 14 May 93, at 1930hrs. a line-up was conducted at A/5 V.C. This line-up was regarding a suspect on the RUVALCABA Homicide. Six Eye witnesses viewed this line-up separately. The results was as follows.

RICHMOND, Carl

Identified the person in the number 3 spot Robert BOUTO as the person he saw shoot and kill RUVALCABA, Salvador.

ESCOVAR, Frank

Identified the person in the number 3 spot Robert BOUTO as the person he saw shoot and kill RUVALCABA, Salvador.

████████████

Identified the person in the number 3 spot Robert BOUTO as the one he saw shoot and kill RUVALCABA, Salvador.

████████████

Identified the person in the number 3 spot Robert BOUTO as the person wearing the same clothing as the shooter.

AR-L 140557

RFC-Bouto 000104

DETECTIVE DIVISION
AREA FIVE VIOLENT CRIMES

14 MAY 93
RD# X-209946

HOMICIDE/FIRST DEGREE MURDER
VICTIM: RUVALCABA, Salvador

PAGE 3



Both identified the person in the number 3 spot Robert BOUTO wearing the same clothing as the shooter.

DET. Reynaldo Guevara # 20861
DET. Ernest Halvorsen # 20692

AR-L 140558

RFC-Bouto 000105

Identify and describe all property or possible evidence recovered at the end of the Narrative in column form. Show exactly where found, when found, who found it and its description (include Property Inventory numbers). If property taken was scribed for Operation Identification, indicate I.D. number at end of Narrative. Offender's approximate description, if possible, should include name if known, nickname, sex, race code, age, height, weight, color eyes & hair, complexion, scars, marks, etc. If suspect is arrested, give name, sex, race code, age, C.B. or I.R. number, if known, and state "In Custody."

# SUPPLEMENTARY REPORT
## CHICAGO POLICE — FOR USE BY B.I.S. PERSONNEL ONLY

All descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

4. DATE OF ORIG. OCCURRENCE—TIME
DAY: 14  MO: May  YR: 1993  — 1505

| 1. OFFENSE/CLASSIFICATION LAST PREVIOUS REPORT | I-UCR OFF. CODE | 2. ADDRESS OF ORIG. INCIDENT/OFFENSE X 1 VERIFIED ☐ 2 CORRECTED | 3. BEAT OF OCCUR. |
|---|---|---|---|
| Homicide/First Degree Murder | 0110 | 3415 W. Sunnyside | 1723 |

| 5. VICTIM'S NAME AS SHOWN ON CASE REPORT | CORRECT | 6. FIRE RELATED | 7. BEAT ASSIGNED |
|---|---|---|---|
| RUVALCABA, Salvador | ☒ 1 YES ☐ 2 NO — IF NO, CORRECT ALL VICTIM INFORMATION IN BOXES 20 THROUGH 27. | ☐ 1 YES ☒ 2 NO | 5535 |

| 8. TYPE OF LOCATION OR PREMISE WHERE INCIDENT/OFFENSE OCCURRED | LOCATION CODE | 9. NO. OF VICTIMS | 10. NO. OF OFFENDERS |
|---|---|---|---|
| Street | 304 | 1 | 1 |

CIRCUMSTANCES: 11. ☐ VERIFIED ☒ / ☐ UPDATE TO

| 12. OBJECT/WEAPON CODE NOS. | 13. FIREARM FEATURES CODE NO. | 14. POINT/ENTRY CODE NO. | 15. POINT/EXIT CODE NO. | 16. BURGLAR ALARM CODE NOS. | 17. SAFE BURGLARY METHOD CODE NO. | 18. IF RESIDENCE WHERE WERE OCCUP CODE NO. |
|---|---|---|---|---|---|---|

19. DESCRIBE PROPERTY IN NARRATIVE. T = TAKEN; R = RECOVERED

FILL IN THE FULL AMOUNT OF ONLY THOSE VALUES WHICH EITHER DIFFER FROM OR WERE NOT REPORTED ON THE ORIGINAL CASE REPORT OR THE LAST PREVIOUS SUPPLEMENTARY REPORT.

PROPERTY: ☐ VERIFIED  ☐ UPDATE TO

| | | |
|---|---|---|
| 1 MONEY ☐ T $ ☐ R | 2 JEWELRY ☐ T $ ☐ R | 3 FURS ☐ T $ ☐ R |
| 4 CLOTHING ☐ T $ ☐ R | 7 OFFICE EQUIPMENT ☐ T $ ☐ R | 8 TV, RADIO, STEREO ☐ T $ ☐ R |
| 9 HOUSEHOLD GOODS ☐ T $ ☐ R | 0 CONSUM. GOODS ☐ T $ ☐ R | (-) FIREARMS ☐ T $ ☐ R |
| & NARC./DANGEROUS DRUGS ☐ T $ ☐ R | 5 OTHER ☐ T $ ☐ R | 6 NONE ☐ T ☐ R |

VICTIMS UPDATE ONLY

| | 20. NAME (LAST—FIRST—M.I.) | 21. I-UCR OFFENSE CODE | 22. HOME ADDRESS (NO., DIR., STREET, APT. NO.) | 23. SEX—RACE—AGE CODE | 24. HOME PHONE | 25. BUSINESS PHONE | 26. INJURED YES NO | 27. VICTIM REL. CODE |
|---|---|---|---|---|---|---|---|---|
| 1. | | | | | | | | |
| 2. | | | | | | | | |
| 3. | | | | | | | | |

OFFENDERS UPDATE ONLY

| | 28. OFFENDER'S NAME (OR DESCRIBE CLOTHING, ETC.) | 29. HOME ADDRESS | 30. SEX—RACE—AGE CODE | HEIGHT | WEIGHT | EYES | HAIR | COMPL. |
|---|---|---|---|---|---|---|---|---|
| 1. | BOUTO, Robert P. | 4533 N. Spualding | M/W/17 | 5-09 | 140 | Brn | Blk | Med. |
| 2. | | | | | | | | |

| | 31. C.B. NO. | I.R. NO., Y.D. NO. OR J.D.A. NO. | OFFENDER REL. CODE | C.B. NO. | I.R. NO., Y.D. NO. OR J.D.A. NO. | OFFENDER REL. CODE | 32. NO. ARRESTED | ARREST UNIT NO. |
|---|---|---|---|---|---|---|---|---|
| OFF. 1 | 9392-636 | 1035291 | 24 | OFF. 2 | | | 1 | 017 |

| 33. OFF'S. VEHICLE ☐ USED ☐ STOLEN | YEAR | MAKE | BODY STYLE | COLOR | V.I.N. | STATE LICENSE NO. | STATE |
|---|---|---|---|---|---|---|---|

34. SERIAL NOS. OR IDENTIFICATION NOS. ☒ 1 DNA ☐ 2 VERIFIED ☐ 3 CORRECTED — LIST ALL CORRECTIONS & NEW OR ADDITIONAL NOS. OBTAINED IN NARRATIVE

| 50. OFFENSE/CLASS. THIS DATE (IF SAME ENTER DNA) | REV. CODE | 51. METHOD CODE | 52. METHOD ASSIGNED | UNIT NO. | 53. STATUS |
|---|---|---|---|---|---|
| DNA | | | ☒ 1 FIELD ☐ 3 SUMMARY | 652 | ☐ 0 PROGRESS  ☐ 1 SUSPENDED  ☐ 2 UNFOUNDED |

STATUS CONT'D.

☒ 8 CLRD. CLOSED  ☐ 4 CLRD. OPEN  ☐ 5 EXC. CLRD. CLOSED  ☐ 6 EXC. CLRD. OPEN  ☐ 7 CLSD. NON-CRIM.

54. IF CASE CLEARED, HOW CLEARED
☒ 1 ARREST & PROSEC.  ☐ 2 DIRECTED TO JUV. CRT.  ☐ 3 COMPL. RFUSD. TO PROSECUTE  ☐ 4 COMMUNITY ADJUSTMENT  ☐ 5 OTHER EXCEPT.  ☒ ADULT ☐ JUV.

55. ☐ FOR SUMMARY CASES ONLY — THE ORIGINAL CASE REPORT IS SUBSTANTIALLY CORRECT, AND CONTACT WITH THE VICTIM HAS DISCLOSED NO ADDITIONAL PERTINENT INFORMATION.

80. NARRATIVE

VICTIM:  RUVALCABA, Salvador   M/WH/Age 15, DOB ▮▮▮▮

4138 N. Drake, Home Ph# 478-7309, Student at Roosevelt

High School,  Wearing a grey tee shirt. gold slacks, white

gymshoes

**DATA ENTERED "D AREA 5**

35. R.D. NO. X-209946

Continued On Page (2)

| 90. EXTRA COPIES REQUIRED (NO. & RECIPIENT) | 91. DATE THIS REPORT SUBMITTED — DAY MO. YR. | TIME | 92. SUPERVISOR APPROVING (PRINT NAME) | STAR NO. |
|---|---|---|---|---|
| | 16 May 1993 | 2300 | BIEBEL | 1545 |

| 93. REPORTING OFFICER (PRINT NAME) | STAR NO. | 94. REPORTING OFFICER (PRINT NAME) | STAR NO. | SIGNATURE |
|---|---|---|---|---|
| Det. R. GUEVARA | #20861 | Det. E. HALVORSEN | #20692 | Biebel |

SIGNATURE: Det. R. Guevara    SIGNATURE: [signature]

| 95. DATE APPROVED (DAY—MO.—YR.) | TIME |
|---|---|
| 2 3 MAY 1993 | 0815 |

CPD-11.411-B (Rev. 8/85)   *MUST BE COMPLETED IN ALL CASES

AR-L 140559
RFC-Bouto 000106

DETECTIVE DIVISION        2       14 MAY 93
AREA FIVE VIOLENT CRIMES       RD# X-209946

HOMICIDE FIRST DEGREE MURDER
VICTIM: RUVALCABA, Salvador

**IN CUSTODY:**       BOUTO, Robert M/W/Age 17, DOB ▇▇▇▇▇ 4533 N Spaulding 1st fl. 5'9, 140lbs, Hair black worn short, Build medium, Complexion medium, Wearing, a dark blue hooded pullover sweater with writing on front, black slacks, Admitted member of the Puerto Rican Stones Street Gang, Nickname of "SADAM", IR# 1035291, CB# 9392-636

**ARRESTING OFFICERS:**       P.O. PERGANDE # 10271    017
P.O. PANG # 12564    "
P.O. KING # 13602    "
P.O. DEMBOWSKI # 7837    "
P.O. ZAPRZALKA 7556    "
P.O. STEVENS # 8457    "

**DATE, TIME, LOCATION OF ARREST:**       14 May 93 at 1600hrs. 3200 W.Eastwood

**CHARGES, COURT BRANCH AND DATE:**       720/5-9-1a2 1st Degree Murder, Br 66-2 17 May 93, Charge approved by A.S.A. Kevin HUGHES, Felony Review

**INJURIES:**       (1) GSW, upper right rear back, exit center chest.

**TAKEN TO:**       Belmont Hospital by Beat 1772, Officers DZIURA #4905 & KAVANAGH # 6968 pronounced D.O.A. on 14 May 93, 1715hrs. by Dr.LAFITA

**WEAPON:**       9mm, blue steel, semi-automatic pistol, Not Recovered.

**LOCATION:**       3415 W. Sunnyside on the street

**DATE & TIME OFFENCE:**       Friday, 14 May 93 at 1505hrs.

**WEATHER & LIGHTING:**       Clear, Temp.in 70's, daylight

**MANNER/MOTIVE**       Victim walking home from school with friends, passed between rival gangs arguing on street, Spanish Cobras and P.R. Stones.

AR-L 140560

RFC-Bouto 000107

DETECTIVE DIVISION     3       14 MAY 93
AREA FIVE VIOLENT CRIMES         RD# X-209946

HOMICIDE FIRST DEGREE MURDER
VICTIM: RUVALCABA, Salvador

Offender pulled out a gun and fired 4-5 shots in the direction of the victim and his friends. Victim started to run away and was shot in the back

IDENTIFIED:        ██████████ M/WH 15yrs. DOB ████
              ██████ PH# ██████
Cousin of the victim, Identified at the scene.

EVIDENCE:       INV.1093587, CRIME LAB
(3) R-P 9MM Luger Cases recovered from grassy parkway at 3353 W. Sunnyside by Tech.T. Reynolds # 12947

INV. 1136619,A/5VC
(1) Spent Bullet recovered from Interior of a 1984 Nissan pick-up truck Lic # 181129RV at 3401 W. Sunnyside by P.O. W. RILSCHE # 15197

Photos of the scene.

NOTIFICATIONS:    M.E.INVS. BRUCCI, reference Medical Examiner case #256 May 93

ASA Kevin HUGHES, Felony Review

PERSONNEL ASSIGNED:  Listed Arresting Officers

Beat 1712 Off. D. JOHNSON # 15948

Beat 1710 Sgt. MEEHAN # 752

Beat 1772 Off. DZIURA # 4905
      Off. KAVANAGH # 6968

Beat 9603 Tech. CAREY # 13537
      Tech. THOMAS # 12947

Beat 5535 Det. E. HALVORSEN # 20692
      Det. R. GUEVARA # 20861

WITNESSES:     ESCOVAR, Frank M/W 18yrs dob ████████
4205 N St Louis House PH# 478-1733 and 478-4468 S.S.# ████████ Student at Weber H.S Senior (EYE/ORAL)

AR-L 140561
RFC-Bouto 000108

DETECTIVE DIVISION        4        14 MAY 93
AREA FIVE VIOLENT CRIMES        RD# X-209946

HOMICIDE FIRST DEGREE MURDER
VICTIM: RUVALCABA, Salvador



RICHMOND,Carl M/W 19yrs. dob ███████
3536 W.Cullom   2nd Left   PH# 267-8713
S.S.# ████████   unemployed (EYE/ORAL)

████████ M/WH/17yrs. dob ████████
Student at
Roosevelt H.S. Junior (EYE/ORAL)

████████ M/WH/15yrs.dob ████████
( EYE/ORAL )
F/W 39yrs. No Phone
(EYE/ORAL)

████████ M/W/15yrs. dob ████████
Student at
Roosevelt H.S. (EYE/ORAL )

VINCENTE, Francisco M/WH/23yrs ████████
3822   W.   Altgeld   IR#858827   (
CIRC/WRITTEN)

INTERVIEWED:        ████████ M/W 16yrs. ████████
PH#
Student at Roosevelt

████████ M/WH 15yrs. dob ████████
PH#

MATIAS, Cesar M/WH 17yrs. dob ████████
3108 W Eastwood   PH# 509-1213

INVESTIGATION:        The R/Dets. were assigned to this
investigation on 14 May 93, 3rd watch, by
SGT. R. BIEBEL, Area Five Violent Crimes. The R/Dets. proceeded to
the scene of this incident, 3415 W. Sunnyside. Upon arrival the
R/Det. observed the victim laying on the street.  The victim was
laying at the mouth of the alley at 3415 W. Sunnyside. The victim
had been turned by paramedics, prior to the arrival of the R/Dets.
The victim was fully dressed in the clothing described in the
format of this report.  The body was checked and it was observed
that there was a gunshot wound to the right rear back, with an
exit wound in the middle of the chest. The victims head was laying
next to a city light pole.  There were traces of apparent blood on
the pole.

AR-L 140562

RFC-Bouto 000109

DETECTIVE DIVISION            5            14 MAY 93
AREA FIVE VIOLENT CRIMES            RD# X-209946

HOMICIDE FIRST DEGREE MURDER
VICTIM: RUVALCABA, Salvador

The victim suffered an additional trauma to his face. This was apparently caused by the victims face striking this city light pole as he collapsed.

The address where this shooting occurred was on a residential side street. There are apartment buildings on both sides of Sunnyside at this location.

R/d then spoke with the beat officer Ptlmn. S. SHIER who provided some information as to the event. Off. SHIER in summary related the following.

OFF.S.SHIER        Related she received a call of shots fired and man shot on the 3400 block of Sunnyside. Upon arrival observed the victim laying on the ground bleeding.

Crime Lab. Techs. J. CAREY and T. REYNOLDS, arrived and processed the scene for physical evidence. Three expended 9mm shell casings were found in the grassy parkway at 3353 W. Sunnyside. Photos of the scene were taken.

It was learned that the victim was in the company of four friends Carl RICHMOND, Frank ESCOBVAR, █████████████████ and █████ R/d then interviewed the victims friends, and learned the following information.

RICHMOND,Carl       Related he was going to Roosevelt School to pick-up the victim. As he walked North on Kimball Ave. he noticed that the victim was walking South bound on Kimball toward Sunnyside with ESCOVAR, and the █████brothers. He walked behind them when he observed a group of Cobras on the corner of Sunnyside and Kimball arguing with the P.R. Stones who are rival gang and were on the East side of Kimball. He then went to break up the argument. One of the █████ brothers (███) came across Sunnyside and met with him. Both RICHMOND and LOZADA started walking west on Sunnyside. As they are walking both looked back and saw the offender pull out a gun and start shooting toward them. They both hit the ground and as they looked up, saw the victim struck by a bullet and fall. He ran to the victim's aid and called for help.

███████████        Related he was walking with the victim (RUVALCABA), his brother █████ and Frank ESCOVAR. As they got to the corner of Sunnyside and Kimball, Frank, the victim, and his brother █████ turned left on Sunnyside going

AR-L 140563

RFC-Bouto 000110

DETECTIVE DIVISION                    6                    14 MAY 93
AREA FIVE VIOLENT CRIMES                                   RD# X-209946

HOMICIDE FIRST DEGREE MURDER
VICTIM: RUVALCABA, Salvador

west. He crossed Sunnyside at Kimball and met Carl RICHMOND on the
south side of the street. Both he and Carl RICHMOND started walking
west on Sunnyside together, As he was walking he looked back and
saw the offender pull out a gun and start shooting toward both
RICHMOND and him.  As he was on the ground he looked up and saw the
victim struck by a bullet and fall.

ESCOBAR,Frank                         Related he was walking South bound with
                                      the victim ( RUVALCABA ), and the ███████
brothers ████████████.       As they got to the corner of Sunnyside and
Kimball, ██ crossed Sunnyside and met with Carl on the South side
of the street. He then looked across Kimball and observed a male
known to him a Mario riding a bike and hand a gun to the offender.
He then started walking west bound on Sunnyside with both ██████
and the victim.  They walked diagonally across Sunnyside, South
West toward the alley.  The offender shot towards them and struck
RUVALCABA in the back. He ran South, through alley to get away from
the shooting.

███████████████████        Related he was walking with the v i c t i m
                           RUVALCABA, Frank ESCOVAR, and his brother
██████ As they got to the corner his brother went across Sunnyside to
meet Carl RICHMOND.  He, Frank and the victim turned left on
Sunnyside  and  walked  west.  They  crossed  the  street  as  they
approached the alley.  He looked back and saw a male wearing a dark
blue pullover sweat shirt firing a gun toward them. As he started
running he observed the victim get shot and fall to the ground. He
went on to say that he did not get a look at the shooter's face but
saw his clothing.

████████████████████       Related  that  they  both  watched  the
                           offender fire a handgun 4-5 times.  The
offender was standing across from their building.  The offender was
standing on the street in front of the apartment building entrance
at 3353 W.Sunnyside.  The offender was wearing a hooded pull over
shirt, and they could not see his face.  After the shooting ████████
████████ saw the offender run into the alley directly behind his
house.  The offender handed his gun to a girl in the alley.  He
described this girl as being, F/WH/Age 15-16, 5-00 to 5-05, medium
build, light blond hair,  wearing a red and white Jordan type pull
over jacket and red pants.  The girl took the gun and put it up her
sleeve.  She ran off going North in the alley.  The shooter walked
away going East on Sunnyside.  Michael watched this offender as he
walked to Spualding.  The offender walked North on Spualding.

                           R/Dets. received information from the
017th district tactical team that they had a suspect in custody.

AR-L 140564

RFC-Bouto 000111

DETECTIVE DIVISION                          7                        14 MAY 93
AREA FIVE VIOLENT CRIMES                                            RD# X-209946

HOMICIDE FIRST DEGREE MURDER
VICTIM: RUVALCABA, Salvador

They also had other subjects that were behind the offender at the time of the shooting. R/d then asked tactical unit beat 1763b to bring all suspects into Area Five Violent Crimes for further investigation and a line-up.

On 14 May 93 at 1900 hrs, a line-up was conducted at Area Five VC, (See Line-Up Supp.). After viewing this line-up Frank ESCOVAR. Carl RICHMOND, and ███████████ all identified Robert BOUTO as the person who shot and killed Salvador RUVALCABA. ████████████ ████████████ and ███████████████ viewed this line-up and identified the clothing worn by Robert BOUTO, as being the same clothing as worn by the shooter.

R/Dets. interviewed ██████████████████ ████████ and Cesar MATIAS. R/Dets. informed them that they were identified by witnesses, as standing behind the offender at the time of the shooting. All three denied being there.

On 14 May 93, at 2000 hrs. the first interview was conducted with Robert BOUTO in an interview room at Area Five VC. Present for this interview were Dets. E. HALVORSEN and Det. R. GUEVARA.

BOUTO, Robert                     he acknowledged understanding his Miranda Rights as they were read to him by Det. R. GUEVARA. He agreed to talk with detectives. He denied shooting the victim or being at the scene of the murder. He stated that he was with his girlfriend, Tanya. He does not know her last name or where she lives.

A.S.A. Kevin HUGHES contacted his trial supervisor Sally BRAY. A.S.A. BRAY requested that this be held as a continuing investigation until 15 May 93. A.S.A. wanted the R/Dets. to try and locate the offenders alleged girlfriend, Tanya, and the individual known only as Mario who handed Robert BOUTO the gun.

On 15 May 93, at 1500 hrs. Det. E. HALVORSEN returned to work. Det. R. MAHER was already at work in Area Five VC on an unrelated robbery investigation. On of the offenders in Det. MAHER'S robbery investigation was a Francisco VINCENTE. Franciso VINCENTE had been arrested on 14 May 93, at 1345 hrs. Francisco VINCENTE had been held overnight in the lockup at the 25th District for additional line-ups. Det. MAHER brought Franciso VINCENTE from the lock-up to the office of Area Five VC. Upon arriving in the office, Francisco VINCENTE informed Det. MAHER, that another prisoner in the lock-up had confessed to him about committing a murder.

AR-L 140565
RFC-Bouto 000112

DETECTIVE DIVISION                     8                        14 MAY 93
AREA FIVE VIOLENT CRIMES                                        RD# X-209946

HOMICIDE FIRST DEGREE MURDER
VICTIM: RUVALCABA, Salvador

                                    Det. MAHER informed Det. E. HALVORSEN of
                                    this new revelation.

                                    On 15 May 93, at 1700 hrs. the first
                                    interview was conducted with Francisco
VINCENTE.

VINCENTE, Francisco          He is a member of the, Almighty Imperial
                             Gangsters Street Gang. His nickname is
"CHINO". He and a friend of his Edwin MALDONADO, aka "LOBO", were
arrested for robbery. He and "LOBO" were both arrested in the
afternoon of 14 May 93. He and "LOBO" were up in the office of
Area Five VC on that night, while they stood in line-ups.  While
he and "LOBO" were moved around the office that night, he saw other
M/WH'S, who were also in the office. He did not know what these
other guys were in the office for, and did not speak with any of
them at this time. He and "LOBO" were both held overnight in the
25th District Lock-up. Around 1000-1030 hrs. he an "LOBO" were
talking to each other in the lock-up. He was in one cell by
himself, and "LOBO" was in a different cell by himself. As he an
"LOBO" talked to each other, this guy who was in another cell,
joined in their conversation. This guy asked them what they be
about. He told this guy that they were "Almighty". He asked this
guy what he be about. This guy said he was a P.R. Stone. From
this point on he called this guy, "Stone Boy". He asked "Stone
Boy" why he was in the lock-up. "Stone Boy" said that he was in
for the murder. He asked "Stone Boy" if he did the murder. "Stone
Boy" said "Yeah, I shot a Spanish Cobra, I was with my lady".
"Stone Boy" said that two white boys, and a short Mexican with
green pants pointed him out. "Stone Boy" said that he went to
Roosevelt High School to pick up his bitch. "Stone Boy and the
bitch were walking by the school when he heard gunshots. "Stone
Boy" met up with his "Stone Brothers", the Shorties. "Stone Boy"
said that the Shorties told him that the Cobras, had just popped at
them. "Stone Boy" said that a Shorty, drove up to him and handed
him a gap. "Stone Boy" said that some Spanish Cobras came up
and started, representing. "Stone Boy" pulled out the gun a 9mm
pistol, and started popping at the crowd. He popped 4-5 times.
One of the people starting yelling, "I'm Hit". The Shorties broke
and, ran off. "Stone Boy" turned around and gave the gap to his
lady. "Stone Boy" and his lady walked about two blocks away. His
lady panicked and gave the gun back to him. "Stone Boy" said he
got rid of the gun and went back by his ladies house. "Stone Boy"
stated that he owed the nation a gap because he got rid of the gap
he used. "Stone Boy" said I did this shit, there are three young
studs that picked me out, how much time do you think I'll do.

AR-L 140566
RFC-Bouto 000113

```
DETECTIVE DIVISION                    9                    14 MAY 93
AREA FIVE VIOLENT CRIMES                                   RD# X-209946
```

HOMICIDE FIRST DEGREE MURDER
VICTIM: RUVALCABA, Salvador

Francisco VINCENTE stated that he would provide this information to a States Attorney.   A.S.A. Kevin HUGHES arrived at Area Five VC, and took a handwritten statement from Francisco VINCENTE.

The records in the 25th District Lock-Up were checked.  It was determined from the "Roster Of Persons In Custody Log", that Francisco VINCENTE, Edwin MALDONADO, and Robert BOUTO were all held in cell block 7.   It was also determined that Edwin MALDONADO had already been sent to court and could not be interviewed at this time.

A.S.A. Kevin HUGHES after reviewing all of the facts and circumstances of this investigation, approved charging Robert BOUTO with First Degree Murder.

With the arrest and charging of the sole offender in this incident, it is requested that this case be filed, CLEARED BY ARREST/CLOSED.

Det. E. HALVORSEN #20692
Det. R. GUEVARA   #20861

AR-L 140567

RFC-Bouto 000114

# EXHIBIT 85

AR-L 514474



AR-L 514475



AR-L 514476



AR-L 514477



# EXHIBIT 86

AR-L 513225



97-0343

Transcript of Record

Appeal

to

APPELLATE _____ **Court of Illino**

FIRST _____ **District**



93CR013526/A003

**Circuit Court No.** ___93 CR 13526___

**Trial Judge** ___HENRY R. SIMMONS, JR.___

**Reviewing Court No.** ___97-0343___

THE PEOPLE OF THE STATE OF ILLLINOIS

**vs.**

ROBERT BOUTO



(3 VOL)

**from**

**CIRCUIT COURT**

**of**

**COOK COUNTY, ILLINOIS**

COUNTY DEPARTMENT, CRIMINAL DIVISION

**AURELIA PUCINSKI**

**Clerk of Court**

Per _Aurelia Pucinski_

**Deputy**

VOLUME (4) OF (5) VOLUMES
REPORT OF PROCEEDINGS

Bouto 006931

AR-L 513226

FILED

JUL 14 1997

AURELIA PUCINSKI
CLERK OF CIRCUIT COURT



STATE OF ILLINOIS    )
                     )  SS.
COUNTY OF C O O K    )

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT-CRIMINAL DIVISION

THE PEOPLE OF THE    )
STATE OF ILLINOIS    )
                     )
VS.                  )  Indictment No.  93 CR 13526
                     )
ROBERT BOUTO         )  Charge:  Murder

Before Judge Henry R. Simmons, jr., and a jury

August 1, 1996

Court convened pursuant to adjournment.

APPEARANCES:

        HON. JACK O'MALLEY
           State's Attorney of Cook County
      by  Mr. Dillon and
           Mr. Patrick McGuire
           Assistant State's Attorneys
           appeared on behalf of the People;

           Mr. James Dimens and
           Mr. Peter Kalagis and
           Mr. John Ioakimidis
           appeared on behalf of the
           Defendant.

Janet O. Davis
Official Court Reporter, CSR
2650 South California, 890-6065

D-1

Bouto 006932

INDEX

Date of Hearing:  August 1, 1996

Page Numbers:  D-1 to D-232

PROCEEDINGS

| | DX | CX | RDX | RCX | RRDX | RRCX |
|---|---|---|---|---|---|---|
| Motions: | | | | | | 3 |
| **Defense Case:** | | | | | | |
| Mr. Issa | 17 | 21 | 27 | | | |
| Det. Pergande | 29 | 34 | 36 | | | |
| Det. Guera | 37 | | | | | |
| Inv. Frycer | 40 | | | | | |
| Inv. Press | 50 | 65 | 74 | | | |
| Tania Astefan | 76 | 93 | 105 | 108 | 109 | |
| Helen Kandah | 112 | 130 | 142 | | | |

Motion for Mistrial:
Mr Dimeas:                                      148
Court's Ruling:                                 149

Instruction Conference:                         149

Defense Exhibits Introduced:                    158
Defense Rests:                                  159

Closing Arguments:
Mr. McGuire:                                    160
Mr. Dimeas:                                     169
Mr. Dillon:                                     193

Jury Instructions:                              211

Verdict:                                        228

Jury Poll:                                      229

D-2

Bouto 006933

AR-L 513301

THE CLERK: Please be seated.

TANIA ASTEFAN,

a witness called on behalf of the Defense, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. IOAKIMIDIS:

Q    Can you please state your name?

A    Tania Astefan.

Q    Can you spell your last name?

A    A-S-T-E-F-A-N.

Q    Okay.

Tania, where do you live?

A    Chicago, Illinois.

Q    And where do you live?

A    45 hundred North Kedzie.

Q    And how long have you lived there?

A    About 17 years.

Q    Do you live alone?

A    Parents.

Q    Mom and dad?

A    Yes.

Q    Are you currently employed, Tania?

A    Yes, I am.

D-76

Bouto 007007

AR-L 513302

Q    And where are you employed?

A    (Inaudible.) Memorial Hospital.

Q    How long have you been employed there?

A    About 2 years.

Q    And what's your job description?

A    Receptionist.

Q    You also going to school?

A    Yes, I am.

Q    What school are you going to?

A    Northeastern University.

Q    Is that located in Chicago?

A    Yes, it is.

Q    And what is your marriage?

A    Elementary education.

Q    What is your goal when you graduate?

A    Become a teacher.

Q    What kind of teacher do you want to become, Tania?

A    Grade school

Q    Want to teach little kids?

A    Yes, I do.

Q    Okay.

Now, taking your attention back to May 14th of 1993, were you going to school at this time?

D-77

Bouto 007008

AR-L 513303

A    Yes, I was.

Q    And what school were you going to?

A    Roosevelt High School.

Q    What grade are you in?

A    My second year.

Q    Did you graduate from Roosevelt?

A    Yes, I did.

Q    Did you graduate with any distinction or honor.

A    I was honor roll student.

Q    Now, Tania, how is your attendance at Roosevelt High School?

A    I had perfect attendance.

Q    Never had missed a day of school?

A    Missed one.  1 or 2.

Q    One day.

Now, on May 14th of 1996, '93, what time did you wake up?

A    It was about six o'clock a.m.

Q    Why did you wake that early?

A    To get ready to go to school.

Q    What time does school start?

A    It is about 8.

Q    Did you make it to school on time?

Bouto 007009

AR-L 513304

A    Yes, I did.

Q    Did you attend classes all day?

A    Yes, I did.

Q    Did you cut any classes?

A    No, I didn't.

Q    So you finished your whole day?

A    Yes.

Q    And what time did school end that day?

A    2:46.

Q    In the afternoon?

A    Yes.

Q    Okay.

          Now Tania, you left school at 2:46 that day.  What were you doing at 2:46?

A    I was sitting in my class.

Q    What class was that?

A    Spanish class.

Q.   And did a bell ring at 2:46?

A    Yes, it did.

Q    Do you remember where you --

A    I was sitting in class.

Q    Okay.

          After the bell rang, what did you do next?

D-79

Bouto 007010

AR-L 513305

A    I exited the door, I went to my locker.

Q    Were you in any particular rush, when you go to the locker?

A    No, I wasn't.

Q    Why did you go to your locker?

A    To drop my book, notebook and pen, and come out.

Q    Did you do that?

A    Yes, I did.

Q    What did you do next?

A    I went down to the first floor, because I on the third and I exited the building.

Q    Okay.

Your Honor, I ask permission that the witness step down.

THE COURT:  Yes.

(Witness leaves stand.)

MR. IOAKIMIDIS:  Q  Tania, showing you what's been marked as Defendant's Exhibit No. 1, for identification, can you please tell me what this is?

A    Roosevelt High School and the streets around the neighborhood.

Q    Do you live in this neighborhood area?

A    Yes, I do.

D-80

Bouto 007011

Q    Do you know Kimball Avenue?

A    Yes, I do.

Q    Do you know Christiana?

A    Yes, I do.

Q    Do you know this street here?

A    Yes, I do.

Q    What street here?

A    Spaulding.

Q    And this street?

A    Sawyer.

Q    And what is this street?

A    Sunnyside.

Q    How about this one?

A    Wilson.

Q    Have you walked this area before?

A    Yes, I have.

Q    How many times?

A    I live in the area.

Q    So you know -- you know it?

A    Yes, I do.

Q    Okay.

     So, after you left, after you went to the locker, what do you do next?

A    I exited the building.

D-81

Bouto 007012

AR-L 513307

Q Okay.

And where do you walk, after you exited the building?

A I came up -- came out the door.

Q Okay.

A And I crossed the street and there was -- Robert was right here.

Q What street is it that you crossed?

A Kimball.

Q Okay.

And who did you see when you crossed the street?

A I saw Robert Bouto and my friend, Helen Kandah

Q Do you see Robert in the Courtroom here today?

A Yes, I do.

Q Can you please point to where he is?

A Right there. (Indicating.)

Q And you saw Robert?

A Yes, I did.

Q When you saw Robert, approximately what time was it?

A It was about 2:50.

D-82

Bouto 007013

Q   Why do you say, it was 2:50?

A   The bell rang at 2:46, not take me not even a minute to get downstairs.

Q   Can you please mark where you saw Robert and who else did you see?

A   I seen Helen Kandah.

Q   Okay.

Right there, okay.

For the record, your Honor, the witness has placed an X, Kimball and Wilson.

THE COURT:  Yes.

MR. IOAKIMIDIS:  Q   When you saw Robert, did he look upset to you?

A   No, he didn't.

Q   Did he seem angered?

A   No, he didn't.

MR. DILLON:  Objection.

THE COURT:  Overruled.

MR. IOAKIMIDIS:  Q   Did he seem angered?

MR. DILLON:  Objection.

THE WITNESS:  No, he didn't.

THE COURT:  Overruled.

MR. DILLON:  Speculation.

MR. IOAKIMIDIS:  Okay.

D-83

Bouto 007014

AR-L 513309

Q   What did you do, when you first saw Robert?

A   Gave him a hug.

Q   You give a tight hug?

A   Yes.

Q   Did you feel anything, any metal object on his body?

A   No, I didn't.

Q   You didn't feel anything?

A   No, I didn't.

Q   Okay.

How did you come to know Robert?

A   Through some friends.

Q   What was your relationship to him at the time?

A   He was my boyfriend.

Q   A serious boyfriend?

A   No, not serious.

Q   High school sweetheart?

A   Yes.

Q   Okay.

Were you planning to marry him at the time or anything?

A   No, just --

Q   What was that?

D-84

Bouto 007015

A    I was only 16.

Q    Okay.

Now, so you met Robert on Wilson and Kimball, right?

A    Yes.

Q    What did you do next?

A    I walked down Wilson.

Q    Can you please mark your --

Now, who walked down Wilson?

A    Me and Robert.

Q    Okay.

A    Then we made an angle across the street.

Q    You made an angle at what street?

A    Wilson to Christiana.

Q    Okay.

A    And walked down, straight.

Q    Okay, okay, hold off here.

Now, you testified, you even walked down Wilson. Now, you walking with Robert?

A    Yes, I was.

Q    Okay.

You were walking in a fast rate?

A    No, just regular rate.

Q    You weren't in any kind of hurry?

D-85

Bouto 007016

AR-L 513311

A    No, I wasn't.

Q    Was Robert in any kind of hurry?

A    No, he wasn't.

Q    Okay.

So, I took it, you walked down Wilson and cut down Christiana, did you walk all the way down Christiana and Sunnyside?

A    No, we didn't.

Q    You didn't.

Where did you walk to?

A    Down an alley.

Q    Okay.

A    Walking down the alley.

Q    Yes.

And then?

A    We stopped.  We stopped and hugged and kissed, and then we made a turn to another alley.

Q    So you didn't walk down the alley all the way to Spaulding?

A    No, we didn't.

Q    Okay.

And what did you do?  What did you do next?

A    Go down an alley toward Sunnyside.

D-86

Bouto 007017

AR-L 513312

Q   Okay.

A   Halfway.

Q   Okay.

Did you walk all the way through the alley down to Sunnyside?

A   No, we didn't.

Q   And why didn't you walk all the way down to Sunnyside?

A   I heard gunshots and I got very scared.

Q   How many gunshots did you hear?

A   About 3 or 4.

Q   Okay.

At that time, did you know what time it was?

A   It was about 3:04.

Q   Now, Tania, why do you know it was 3:04 and not 3:12 or 2:50?

A   I was running late, and I always look at my time.

Q   Now, why do you look at your time for?

A   I'm suppose to be home at a certain time.

Q   And what time do you usually have to be home?

A   Between 3 to 3:05.  And my parents have a heart attack, if I'm late.

D-87

Bouto 007018

Q    Conservative parents?

A    Very.

Q    Did they let you date at the time?

A    Oh, no.

Q    What was a typical date with Robert?

A    Pick me up from school, walk me -- walk me home.

Q    No movies or anything?

A    Maybe once, throughout the three months, I knew him.

Q    Thank you.

Just back up a little bit so the jurors can see.

So, now, you are in the middle of the alley here, right?

A    Yes.

Q    And it is 3:04?

A    Yes, it is.

Q    When you heard the gunshots, what did you do next?

A    I got scared and turned around to Robert and asked him to -- just turned around and walked back the same way we were coming.

Q    Okay.

D-88

Bouto 007019

AR-L 513314

And when you reached this -- at this point, right here between Spaulding and Christiana, what did you do at this point?

A    Made a turn to another alley.

Q    Okay.

A    And we started going toward Spaulding.

Q    Okay.

When you were walking toward Spaulding or walking up and down the alley, were you walking in a fast rate?

A    No, we weren't.

Q    Were you in a rush?

A    No, we weren't.

Q    Did you hug and kiss in between?

A    Yes, we did.

Q    Okay.

Now, when you got to the alley, right next to Spaulding, where do you walk next?

A    Across the street walked through another alley.

Q    Okay.

And then you just continued walking through this alley?

A    Just walked all the way to Sawyer.

D-89

Bouto 007020

Q    Okay.

Let's mark this again, so, it can be a little darker.

A    (Indicating.)

Q    So you crossed Spaulding Avenue, right?

A    Yes, sir.

Q    And you continued going down the alley?

A    Yes.

Q    And did you -- did you go all the way to Sawyer?

A    Yes, we did.

Q    Okay.

A    Right here.    (Indicating.)

Q    Is that where Robert dropped you off?

A    Yes, he did.

Q    When you got to Sawyer and the alley, did he drop you off right away or --

A    He gave me a hug and a kiss, and we talked.

Q    Okay.

And then you continued to go home?

A    Yes, I did.

Q    Now, did you get home this day?

A    Yes, I did.

Q    What time did you get home that day?

D-90

Bouto 007021

A    It was about 3:13, 14, about that time.

Q    Why do you say that time?

A    When I got home, my mother was very upset.

Q    And why do you think she got upset?

MR. DILLON:  Objection, Judge.

THE COURT:  Sustained.

MR. IOAKIMIDIS:  Okay.

Q    Did you look -- did you look at a clock or watch, when you got home?

A    Yes, I did.

Q    Was there a reason why you looked at a clock and a watch, when you got home?

A    My mom told me what time it is, why are you late.

Q    Okay.

Now, you have walked this area before, right?

A    Yes, I did.

Q    Now, assuming you got home at 3:13 or 3:12 --

MR. DILLON:  Objection, Judge, it wasn't 3:12.

THE COURT:  Sustained.

MR. IOAKIMIDIS:  I didn't hear the objection.

THE COURT:  You said 3:12.  The witness never said 3:12.

D-91

Bouto 007022

AR-L 513317

MR. IOAKIMIDIS:  Q     You got home at 3:12?

A   3:13 or 3:14.

THE COURT:  Sustained.

Ask another question.

MR. IOAKIMIDIS:  Okay.

Q     From the time that you left Robert on Sawyer and Christiana, how many minutes would it take to walk to your home?

A     Shouldn't be no more than 4 minutes.

Q     Okay.

So, in your estimation, what time was it when you left Robert?

MR. DILLON:  Objection.

THE COURT:  Overruled.

MR. IOAKIMIDIS:  You could have a seat, thank you.

(Witness resumes stand.)

A couple more questions.

MR. IOAKIMIDIS:     Q     Now, Tania, from the time you saw Robert at 2:50 until 3:10 that you left, did he ever leave your presence?

A     No, he didn't.

Q     Was he always with you?

A     Yes, he was.

D-92

Bouto 007023

AR-L 513318

Q    The whole time?

A    The whole time.

MR. IOAKIMIDIS:  Thank you, Tania, I have no further questions.

THE COURT:  Cross.

MR. DILLON:  Thank you, Judge.

CROSS EXAMINATION

BY MR. DILLON:

Q    Now, Miss Astefan, just a couple of things that I need to clarify.

No. 1, when you were walking home with Robert that day, you indicated, you weren't in a hurry, is that right?

A    That's right.

Q    But you also stated that your mother would get real mad at you, if you didn't come home on time, right?

A    You are right.

Q    What time did your mother expect you to be in the home by?

A    By 3, 3:05, no later than that.

Q    And your testimony is that you got home around 3:13 or 3:14, and you know that, because you looked at the clock, because your mom was mad at you,

D-93

Bouto 007024

is that right?

A    Yes.

Q    Now, back in November of 1995, you spoke with an investigator that was working for Mr. Bouto, about the events that happened on May 14th of 1993, correct?

A    Correct.

Q    And the investigator tape-recorded that conversation that you had with him, correct?

A    Correct.

Q    And he asked you questions about what it is that happened that day, primarily after school, when you were walking home with Robert, is that right?

A    Correct.

Q    And you spoke with an investigator by the name of John Frycek, correct?

A    Correct.

Q    And when you spoke with Investigator Frycek, you also had another person in the room with you, correct?

A    Correct.

Q    And specifically, you were asked -- and this is on page 13. You were asked: So, you only together for what about 10 minutes, roughly 15 minutes, how long? And your answer was: I was with him until

D-94

Bouto 007025

around 3:10. My mom was complaining.

You were asked that question and you gave this answer to the investigator back in November of 1995, correct?

A    Correct.

MR. IOAKIMIDIS:  Objection, your Honor.

THE COURT:  Overruled.

MR. DILLON:  Q   Now, on May 14th of 1993, what was Robert Bouto wearing?

A    He was wearing a shirt that had some writings on it and shorts that went down below his knees.

Q    What color was that shirt?

A    The shirt was dark blue, black.

Q    And it is a hood on it, right?

A    I don't remember.

Q    Now, you indicated, he was wearing shorts that day?

A    Yes, he was.

Q    And those were black, three quarter length shorts, correct?

A    Yes, it was.

Q    And it is also correct, isn't it, that he was wearing white socks?

A    Yes, he was.

D-95

Bouto 007026

AR-L 513321

Q    And he was wearing black gym shoes, correct?

A    Yes, he was.

Q    Showing you what's been previously marked as People's Exhibit No. 7, for identification.

Is Robert Bouto shown in this photograph?

A    Yes, he is.

Q    The clothing that he's wearing in this photograph, is that the clothing that he was wearing on the day when you -- on May 14th of 1993?

A    Yes, it was.

Q    Okay.

Do you notice anything at the top of that shirt?

A    Yes, I do.

Q    What do you notice?

A    2 strings.

Q    And what 2 strings for?

A    A hoody.

Q    For the hoody he had on the back of his head, when you were walking home with him --

A    Yes.

Q    -- is that right?

A    Correct.

D-96

Bouto 007027

AR-L 513322

Q    Now, how tall was Robert Bouto on May 14th of 1993?

A    About -- I would say 5, 7; 5, 8.

Q    5, 7 or 5, 8.

How much does Robert Bouto weigh?

A    I wouldn't know.

Q    Well, what do you think he weighed?

A    About 140.

Q    About 140 pounds.

And you were his girlfriend, correct?

A    Correct.

Q    Now, you knew Bouto was a Puerto Rican Stone, correct?

A    Know he was a Stone, yes.

Q    Can you tell us what are the Puerto Rican Stones do?

MR. IOAKIMIDIS:  Objection, your Honor, no foundation.

THE WITNESS:  I don't know, I wouldn't know this.

THE COURT:  Sustained.  Her answer is stricken.

MR. DILLON:  Q    That's a gang, correct?

A    Correct.

MR. IOAKIMIDIS:  Objection, your Honor.

THE COURT:  Overruled.

D-97

Bouto 007028

AR-L 513323

MR. DILLON:   Q   Now, when you went back and spoke with the investigator in November of 1995, who did you go there with?

A   I went with my friend, Helen and my fiance.

Q   Okay.

When you say, went with your friend, Helen, that's Helen Kandah, correct?

A   Correct.

Q   And you drove there with her, correct?

A   My fiance drove.

Q   But you drove with Helen, correct?

A   Correct.

Q   And Helen and you actually live in the same building, don't you?

A   Correct.

Q   Were living in the same building back in May of 1993, isn't that correct?

A   Correct.

Q   Now, you indicated that you hardly ever missed any school, right?

A   Correct.

Q   Did Robert go to school back in May of 1993?

MR. KALAGIS:   Objection, your Honor.

THE COURT:   Overruled.

D-98

Bouto 007029

THE WITNESS:  Yes, he did.

MR. DILLON:  Q    Where did he go to school?

A    He went to Mather High School.

Q    What time did he get out of Mather High School?

A    I don't know.

Q    Did he go to school that day, do you know that?

MR. IOAKIMIDIS:  Objection, your Honor.

THE WITNESS:  No, he didn't go to school.  I don't know, I wouldn't know.

THE COURT:  She doesn't know.  Next question.

MR. DILLON:  Q    Where is Mather High School?

A    It is located on Peterson and California.

Q    How far away is that from Roosevelt High School?

A    I don't know.

Q    It is not a couple of blocks away, is it?

A    I don't know.

Q    Now, at some point, you became aware that Robert Bouto was arrested for murder, correct?

A    A couple of days later.

Q    A couple of days later.

         And you knew that he couldn't have

D-99

Bouto 007030

committed that crime, correct?

A    I don't know that.

Q    Well, you were with him, weren't you?

A    Yes, I was.

Q    And of course, when you knew that you were with him, when this murder happened, you went to the Chicago Police Department to tell them that they had the wrong guy, because he was with you, correct?

A    I didn't know when the murder happened.

Q    My question to you is, you went to the Chicago Police Department to tell them that he wasn't the one that committed the murder, because he was with you?

A    I was only 16 years old, I was --

THE COURT:  Hold on a second.

Ma'am, when there is an objection, please don't answer the question until I rule.

Please object after the question is asked, not in the middle of it.

Reask the question.

MR. DILLON:  Okay.

Q    You were aware that Robert Bouto was in custody for murder, correct?

A    Correct.

D-100

Bouto 007031

AR-L 513326

Q You said that you knew that a couple of days after he was arrested, correct?

A Correct.

Q And you knew that it was for a murder that happened at Sunnyside and Kimball, correct?

MR. IOAKIMIDIS: Objection, your Honor.

THE COURT: Overruled.

THE WITNESS: I didn't know where the murder occurred. I didn't know.

MR. DILLON: Q Well, you spoke -- you spoke with Robert Bouto about this case since he's been arrested, haven't you?

A But not at this time.

MR. IOAKIMIDIS: Objection.

THE COURT: Overruled.

MR. DILLON: Q My question is, you spoke to Robert Bouto since this murder had occurred, am I correct?

A No.

Q You have never spoken to him?

A Not at that time.

Q I'm not asking you about that time, I'm talking about from today. He was arrested May 14th of 1993, until you are sitting here today, are you

D-101

Bouto 007032

AR-L 513327

telling us that you never spoken to him?

A     I spoke with him.

Q     How many times have you spoken to him?

A     About -- been 5 times.

Q     Where did you speak with him at?

A     At --

MR. IOAKIMISDIS:  Objection.

THE COURT:  Overruled.

MR. DILLON:  Q     Where do you speak with him?

A     I visit him.

Q     Where?

A     Cook County.

Q     Cook County Jail?

A     Yes.

Q     So you knew he was locked up, right?

A     Correct.

Q     You knew that he was in custody for the murder of a person name Salvador Ruvalcaba, correct?

A     Correct.

Q     Because you knew Salvador Ruvalcaba was also a student at Roosevelt High School, didn't you?

A     Correct.

Q     And even though, you knew that this murder happened, what you are tell us now, you were with him,

D-102

Bouto 007033

AR-L 513328

you never went to the Chicago Police Department to tell them, he couldn't have done it because you were with him, did you?

A   Why, I didn't go.

Q   You never went to the police to tell them, he couldn't have committed that murder, because he was with you, did you ever tell them that?

A   No, I didn't.  I'm very scared to go to the --

MR. IOAKIMIDIS:  Objection, badgering the witness.

THE COURT:  Overruled.

You may complete your answer, ma'am.

MR. DILLON:  You never --

THE COURT:  Let her --

THE WITNESS:  I was only 16 years old.  I never --  I mean, I would never go to the cops, I'm very afraid of them.  And I come from a strict family, how would I have time to go over there?

MR. DILLON:  Q   So you didn't have time to go over there, but you had time to go see him at Cook County Jail, is that what you are telling us?

A   Correct.

Q   To go to see the cops as you refer to them, correct?

D-103

Bouto 007034

AR-L 513329

A      Not visit the cops.

Q      Now, you knew that he was being prosecuted by the State's Attorney's Office, correct?

A      Correct.

Q      When did -- tell us, when you went to the State's Attorney Office to tell them, you got the wrong guy on trial, he was with me, he couldn't have done it, tell me, when did you?

A      I never did that.  I was assuming, you, guys, would come to me.

Q      So now, what you are saying is three and a half years later, now, you telling us when he's on trial for this murder, I was with him, he couldn't have done it, is that what you are telling us?

A      If you, guys, would have came to me early, I would have said something.

Q      Let me ask the question again.

Are you telling us, now, that he is on trial for murder three and a half years later, now, you telling us that he was with you, is that what you are telling us?

A      Always been with me, yes.

Q      But you never bothered to mention that to the police, correct?

D-104

Bouto 007035

A    Correct.

Q    You never bothered to mention that to the State's Attorney's Office, correct?

A    Correct.

Q    You let him sit in jail for three and a half years, correct?

A    Correct.

MR. DILLON: No further questions.

THE COURT:   Redirect examination.

REDIRECT EXAMINATION

BY MR. IOAKIMIDIS:

Q    Tania, did you make it home on time on May 14th, 1993?

A    No, I didn't.

Q    Were you late that day?

A    Yes, I was.

Q    When you saw Robert, did he have a ponytail?

A    No, he didn't.

MR. DILLON:   Objection, Judge, beyond the scope.

THE COURT:   Overruled.

MR. IOAKIMIDIS:   Q    Did he have a ponytail that day?

A    No, he didn't.

Q    Was he clean shaven?

D-105

Bouto 007036

A    No, he wasn't.

Q    Why wasn't he clean shaven?

A    He had a mustache.

MR. DILLON:  Objection, Judge.

THE COURT:  Overruled.

MR. IOAKIMIDIS:  Q   You can answer the question.

A    He had a mustache.

Q    Did he have any facial hair?

A    Yes, he did.

Q    What kind of facial hair?

A    A goatee.

Q    Okay.

Tania, do you want to be here today?

A    No, I don't.

Q    Why don't you want to be here today?

MR. DILLON:  Objection, Judge.

THE COURT:  Sustained.

MR. IOAKIMIDIS:   Q . What made you come here today?

A    I was --

MR. DILLON:  Objection, Judge.

THE COURT:  Overruled.

THE WITNESS:  I was subpoenaed.

MR. IOAKIMIDIS:  Q    Tania, did the police ever

D-106

Bouto 007037

AR-L 513332

come to speak to you in the last three years?

A    No, they didn't.

Q    Did investigators come to speak to you in three years?

A    Yes, he did.

Q    What investigator spoke to you in the last three years?

A    John --

Q    John, who Frycek?

A    Yes.

Q    And who -- and what is our relationship to John Frycek?

MR. DILLON:  Objection.

THE COURT:  Well, sustained.

MR. IOAKIMIDIS:  Q    You still live in that home?

A    Yes, I do.

Q    Would you be in trouble, if your mother and father found out you were here today?

MR. DILLON:  Objection.

THE COURT:  Sustained.

MR. IOAKIMIDIS:  I have no further questions, thank you.

THE COURT:  State -- hold on one minute, State may have some questions for you.

D-107

Bouto 007038

RECROSS EXAMINATION

BY MR. DILLON:

Q    You met with Mr. Bouto's investigator back in November of 1995, correct?

A    Correct.

Q    It wasn't a problem for you to go to the investigator and talk to them, was it?

A    It was a problem, but I --

Q    But you were able to squeeze that in your schedule?

A    Yes.

Q    And how many times have you spoken to the defense attorneys before you testified?

MR. IOAKIMIDIS:  Objection.

THE COURT:  Overruled.

THE WITNESS:  About maybe 2, three times.

MR. DILLON:   2, three times.

Q    It wasn't a problem for you to go meet with those attorneys, those two or three times?

A    It was a problem.

Q    It was a problem, but you went ahead and did it, didn't you?

A    Yes, I did.

Q    But it was too much of a problem for you to

D-108

Bouto 007039

go tell the Chicago Police that you were with this person at the time the murder was committed, is that what you are telling us?

A    I was expecting --

MR. IOAKIMIDIS:  Objection, asked and --

THE COURT:  Sustained, argumentive.

MR. DILLON:  Nothing further.

THE COURT:  Counsel?

MR. IOAKIMIDIS:  Yes.

RE-REDIRECT EXAMINATION

BY MR. IOAKIMIDIS:

Q    Tania, do you know where exactly the victim in this case was shot?

MR. DILLON:  Objection.

THE COURT:  Sustained.

MR. IOAKIMIDIS:  Q    On May -- so, when did you first find out there was A shooting in the neighborhood --

MR. DILLON:  Objection, Judge.

THE COURT:  Overruled.

A    Did I find out, it was Sunday.

Q    Would that be May 16th of 1993?

A    Yes.

Q    Okay.

D-109

Bouto 007040

Do you know where the shooting was?

A    No, I don't.

Q    Do you know when, what time the shooting took place?

MR. DILLON:  Objection to all of this, Judge.

THE COURT:  Overruled.

THE WITNESS:  No, I don't.

MR. IOAKIMIDIS:  Q    Did you know the victim in this case?

A    Salvador?

Q    Yes.

A    From school, yes.

Q    Was he -- so you talked to him before?

A    No.

MR. IOAKIMIDIS:  Okay, I have no further questions, your Honor, thank you.

THE COURT:  You may step down.

                              (Witness excused.)

We'll take a short recess, ladies and gentlemen.

Do not discuss this case with anyone, not between yourselves or allow anyone to discuss it in your presence until the case has been concluded and I give it to you for deliberations.

D-110

Bouto 007041

All rise for the jury.

We'll take a 10 minute recess on this case.

(Whereupon said case is passed, afterwhich the following proceedings were had outside the presence and hearing of the jurors:)

THE COURT: We're back on the case of Robert Bouto.

The defense indicates they have one more witness to call. And I instructed the defense, they could rest in front of the jury. If they wish to have their photos displayed to the jury, before they formally rested, that's fine. And then I'll apprise the jury that we taking a recess for lunch. And if there is any rebuttal evidence, we'll hear that after lunch. We go into closing arguments.

While they are taking a lunch break, we will go over jury instructions.

Okay, bring in the jury.

(Whereupon the following proceedings had in the presence and hearing of the jurors:)

THE COURT: All right, please be seated, ladies and gentlemen.

D-111

Bouto 007042

AR-L 513337

Please raise your righthand to be sworn.

(Witness duly sworn.)

THE WITNESS:  Yeah, yes.

THE COURT:  Please be seated.

All the parties are present.

You may proceed.

MR. IOAKIMIDIS:  Thank you.

HELEN KANDAH,

a witness called on behalf of the Defense, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. IOAKIMIDIS:

Q     Can you please state your name?

A     Helen Kandah.

Q     Please spell your last name.

A     K-A-N-D-A-H.

Q     Okay.

And where do you live?

A     On 3208 West Sunnyside.

Q     Is that located in Chicago?

A     Yes, it is.

Q     And how long have you lived at that address?

A     About 10 years.

D-112

Bouto 007043

Q    And with whom do you live with?

A    My mother.

Q    Are you currently employed?

A    Yes, I am.

Q    And where are you employed?

A    At Silver Cue Billiards.  My uncle and my father own a pool hall.

Q    And what is your duties there, what is your job description?

A    A manager.  I deal with ordering the pop and candy and deal with the money and cashier, just about everything.

Q    Are you also going to school?

A    Yes, I am.

Q    Where are you enrolled at?

A    At Northeastern University.

Q    And what's your major?

A    I'm computer science.

Q    And what do you want to do when you graduate?

A    Anything to do with computers.

Q    On May 14th of 1993, were you going to school at that time?

A    Yes, sir.

Q    What school were you going to?

D-113

Bouto 007044

AR-L 513339

A       Roosevelt.

Q       Roosevelt High School?

A       Yes, it is.

Q       And what year were you in?

A       I was a sophomore.

Q       Did you eventually graduate from Roosevelt?

A       Yes, I did.

Q       You did graduate?

A       Yes.

Q       Okay.

Now, on May 14th of 1993, what time did you wake up?

A       About 7:20.

Q       And why did you wake up that early?

A       Because Tania would come over my house to pick me up to go to school.

Q       Did you make it to school that day?

A       Yes, I did.

Q       Did you make it on time to school this day?

A       Yes, I did.

Q       Now, did you complete all your courses that day at school?

A       Yes, I did.

Q       And what time did your last period get out

D-114

Bouto 007045

AR-L 513340

that day?

A    2:46.

Q    2:46.

One moment.

Now, Helen, what class were you in? What was your last class?

A    It was gym.

Q    And what time did you finish that class?

A    At 2:36, but I got out early.

Q    You got out a little early?

A    Yeah.

Q    Why did you get out early?

A    Because we had gym and we had our gym clothes on, and he let us out 10 minutes early to change, and I just changed and changed my shorts and left.

Q    Okay.

So you exited the school, and where did you go next?

A    I walked out from the back door.

Q    Of the school?

A    Yeah.  And I went toward Wilson.

Q    Wilson and what?

A    I went toward Kimball.

Q    Kimball?

D-115

Bouto 007046

A      Yeah.

MR. IOAKIMIDIS:  Your Honor, may I ask permission, the witness step down?

THE COURT:  Yes.

MR. IOAKIMIDIS:  Thank you.

(Witness leaves stand.)

Q      Now, showing you what's marked as Defendant's Exhibit No. 1, for identification.

Can you please tell us what this is?

A      This is my neighborhood.

Q      And how many years have you lived in this neighborhood?

A      About 10 years.

Q      So you are acquainted with these streets here, Spaulding, Christiana, Kimball?

A      Uh-huh.

Q      Okay.

Can you please tell me what this is over here, marking to the upper lefthand of this exhibit?

A      It's my school.  My high school.

Q      Okay.

Now, after you exited your gym class, where did you go?  Don't mark it yet.

A      I walked out this door, right here, right

D-116

Bouto 007047

here. (Indicating.)

Q Okay.

And what did you do next?

A I came here and I came down here to Kimball. (Indicating.)

Q And what did you do next?

A I came here and all the way to almost right here. (Indicating.)

Q Can you put your initials there?

A My initials?

Q Uh-huh.

A (Indicating.)

MR. IOAKIMIDIS: Your Honor, for the record, the witness has marked her initials on the streets of Kimball and Wilson Avenue.

Q Now, when you got to Kimball and Wilson, who did you see?

A I saw Robert.

Q And did you start walking with Robert at that point?

A We just waited for a time.

Q You waited for who?

A Tania.

Q Is that Tania Astefan?

D-117

Bouto 007048

AR-L 513343

A    Yes, it is.

Q    When you saw Robert, was he upset?

A    No, he seemed --

Q    When you saw Robert did he seem upset?

MR. DILLON:  Objection.

THE COURT:  Overruled.

You may answer.

THE WITNESS:  No, he seemed sleepy to me.

MR. IOAKIMIDIS:  Q    Was he angered?

MR. DILLON:  Objection.

THE COURT:  Overruled.

You may -- answer may stand.

THE WITNESS:  No.

MR. IOAKIMIDIS:  Okay.

Q    And when you saw Robert, did you wait there for a few minutes?

A    Yeah.

Q    And why were you waiting there for a few minutes?

A    For Tania to come out of school.

Q    And did Tania come out of school?

A    Yes, she did.

Q    And did Tania come up to you?

A    She came up to me, Robert.

D-118

Bouto 007049

Q    Okay.

Was there anybody else there?

A    Another girl came up, her name is Joanie.

Q    Her name was Joanie?

A    Yeah.

Q    Okay.

So while you all sitting there, all 4 of of you, what happened at that point?

A    Actually when Tania came, we just left.

Q    Okay.

A    So we left from there and took Wilson and then across the street from here.  (Indicating.)

Q    You took Wilson going -- when you took Wilson, did you go all the way to Christiana?  Can you move back here, if you could just --  did you walk all the way to Christiana?

A    We walked here.  (Indicating.)

Q    You were walking at a fast rate?

A    No.

Q    In any particular rush?

A    No.

Q    Just walking casually?

A    Yes.

Q    What was Robert and Tania, when this -- you,

D-119

Bouto 007050

AR-L 513345

guys?

A    They were front of me.

Q    And who were you walking with?

A    I was -- I was walking with this girl name Joanie.

Q    So, you walked down Wilson and you got to the intersection of Wilson and Christiana, correct?

A    Uh-huh.

Q    And --

THE COURT:   Yes or no?

THE WITNESS:   Yes.

MR. IOAKIMIDIS:   Q    And what did you do when you got to Christiana?

A    We got to Christiana, Tania and Robert went to the alley.   (Indicating.)

Q    Hold on.  Can you mark this?  Can you mark?

A    Oh.

Q    Which is fine, can you make that a little thicker, if you can.  Oh, okay.

Now, were you walking down Christiana, how much down Christiana did you walk?

A    I walked to Sunnyside.

Q    Did you cross this alley here?

A    I passed it up, yes.

D-120

Bouto 007051

AR-L 513346

Q    You passed it.

Did Robert and Tania continue walking with you at this time?

A    No, they turned into the alley.

Q    Okay.

So, can you please mark what you just testified to?

A    (Indicating.)

Q    Okay.

So you walked from Wilson, all the way down to Sunnyside, right?

A    Right.

Q    Did you walk at a fast rate?

A    No.

Q    Were you in any kind of rush?

A    No.

Q    Just walking normally like any other day?

A    Uh-huh.

Q    Okay.

When you got to Wilson and Sunnyside, what happened?

A    There is some people, you know, throwing things at each other, like rocks and stuff.  And I was right here, and I had turned my head, and there was --

D-121

Bouto 007052

there was like a bunch of girls right here.
(Indicating.)

Q    Okay.

A    The girl that I was with, they don't like her, so I told her, Joanie --

MR. DILLON:  Objection, Judge.

THE COURT:  Sustained.

MR. IOAKIMIDIS:  Okay, continue.

THE WITNESS:  And she -- she -- she -- I had told her, look Joanie --

MR. DILLON:  Objection, Judge.

THE COURT:  She can only testify as to what she saw, observed or said.

MR. IOAKIMIDIS:  Q    What did you do after you said, look Joanie?

THE WITNESS:  Then turned around, I told her -- I turned -- I turned around, there was a bunch of girls. I told her to run, and she ran, because they don't like her.

MR. DILLON:  Objection, Judge.

THE COURT:  Sustained to the fact that somebody doesn't like her, that's hearsay.

The jury is instructed not to -- to disregard that statement.

D-122

Bouto 007053

AR-L 513348

MR. IOAKIMIDIS: Q    After she ran what happened?

THE WITNESS:   She was gone and I ---

MR. IOAKIMIDIS:   Q    Where did you go after she ran?

A    I ran from here.  I was going to go to the alley.

Q    Okay.

        Can you draw that, please?

        And were you going into the alley?

A    I was going into the alley.

Q    And you heard gunshots at that point?

A    Yes, I did.

Q    How many gunshots did you hear?

A    About 3 or 4.

Q    3 or 4 gunshots?

A    Right.

Q    When you going into the alley, did you notice anything else at that time?

A    Tania was right by here.  (Indicating.)

Q    Can you put an X, where they were?

A    (Indicating.)

Q    Is that the alley in between Christiana and Spaulding?

A    Yes, it is.

D-123

Bouto 007054

Q    Did you actually see them in the alley, when you heard the gunshots?

A    Yes, I did.

Q    Did you go up the alley?

A    Then, no, I didn't.

Q    What did you do at this point?

A    I turned back.

Q    Okay.

You can draw it, that's fine.

A    I went back and I went this way.

Q    Okay.

A    I continued running to here.    (Indicating.)

Q    So you ran approximately, probably -- where did you actually run, actually?

A    This way, and the rest, I walked.

THE COURT:  Here, when you are walking, your voice is going that way, away from the court reporter, so, you know, if you switch sides with her, it would make more sense to me, so she is talking to the person.

MR. IOAKIMIDIS:  Okay.  Could you stand like this. This way, okay, that's fine.

Q    Okay.

So, you are at the alley here, you see Robert and Tania here, right?

D-124

Bouto 007055

A    Uh-huh.

Q    You hear some gunshots?

A    Uh-huh.

Q    So you start walking, right?

A    Yeah, I turned back.

Q    And did you go all the way to Spaulding?

A    Yeah.

Q    And when you got to Spaulding, what did you do?

A    I ran up to like the second or third house, so, I stopped right here.  (Indicating.)

Q    That's fine, you can mark it.

A    So I started walking --

Q    Uh-huh.

A    -- to this right here.  (Indicating.)

Q    Can you mark it a little -- a little heavier, if you can, okay.

A    And I went across the street like this to the alley.

Q    Okay.

A    This alley here.  (Indicating.)

Q    Now, is this the same alley that you originally left Robert and Tania?

A    Right, yeah.

D-125

Bouto 007056

Q    On Christiana?

A    Right.

Q    Okay.

Now, when you got to this alley, did you -- what happened?

A    I continued walking this way.  (Indicating.)

Q    Uh-huh.

A    As I got about to here, I turned back and Robert and Tania were like right here.  They were up a little.

Q    Can you put a little X there, where you saw them again, okay.

Did you hear anything at this point?

A    Yeah, I heard very, very loud gunshots.

Q    How many shots did you hear?

A    Those were about two or three.

Q    And in your estimation, where were those gunshots come from?

MR. DILLON:  Objection.

THE COURT:  Sustained.

MR. IOAKIMIDIS:  Q    Were they gunshots near you?

MR. DILLON:  Objection.

THE COURT:  Sustained.

MR. IOAKIMIDIS:  Q    How many gunshots did you

D-126

Bouto 007057

AR-L 513352

hear?

A   2 to 3.

Q   2 to 3.

Now, that wasn't the same gunshots you heard?

A   No.

Q   That was a separate set of gunshots, right?

A   Right.

Q   Now, when you saw -- when you heard shots, gunshots, did you see Tania and Robert?

A   Yeah, I had turned around again and they were -- they were kissing.

Q   Okay.

So you see Robert and Tania?

A   Uh-huh.

Q   And did you continue walking down the alley?

A   I --

Q   Just write it in there.

A   I continued this way, and I went --

Q   Okay, all right, that's fine.

When you walked, were you in a particular kind of rush?

A   No.

Q   No?

D-127

Bouto 007058

AR-L 513353

A    Not really.

MR. IOAKIMIDIS:   Okay.

That's all, I have no questions.

Over here you can sit down.

(Witness resumes stand.)

Now, Helen, did you get home this day?

A    Yes, I did.

Q    And approximately what time did you get home this day?

A    When I got home, my mother --

THE COURT:  What time did you get home, not what your mother did, what time did you get home?

THE WITNESS:  Well, when I came home, I didn't -- by the time I looked at the clock, it was 3:11.

MR. IOAKIMIDIS:  Q    What time was it when you looked at the clock?

A    It was 3:11.

Q    3:11.

So, you did get home this day?

A    Yeah.

Q    Now, Helen, did you give a recorded statement to a private investigator?

A    Yes, I did.

Q    And who was that private investigator?

D-128

Bouto 007059

A    David Press.

Q    Okay.

Now, did any police come to your house to question you about this crime?

A    No, they didn't.

Q    Did the State's Attorney's Office come to your office to question you about this crime?

A    No, they didn't.

Q    Did any official agency come to your home and question you about the crime?

A    No, they haven't.

Q    Hypothetically speaking, if my firm had never hired the private investigators, David Press or John Frycek, do you think anybody would have come to talk to you about this crime?

MR. DILLON:  Objection, Judge.

THE COURT:  Sustained.

MR. IOAKIMIDIS:  Your Honor, one moment.

Q    Now, Helen, why didn't you go to the police to speak to them about what you testified to today?

A    Because I didn't know what would happen.  I mean, I didn't know that somebody died until another day.  And I didn't know that Robert was the one who did it, because --

D-129

Bouto 007060

Q    So you didn't know the details of any of this?

A    No.

Q    Do you want to be here today?

MR. DILLON:  Objection.

THE COURT:  Overruled.

MR. IOAKIMIDIS:  Continue.

A    No, not really.

Q    And you are nervous or --

A    Yes.

Q    Okay.

And why are you here?

A    I was subpoenaed.

MR. DILLON:  Objection, Judge.

THE COURT:  Overruled.

MR. IOAKIMIDIS:  Q    Yes, continue.

A    I was subpoenaed.

MR. IOAKIMIDIS:  Okay.

I have no further questions.

CROSS EXAMINATION

BY MR. DILLON:

Q    Now, back on May 14th of 1993, Robert Bouto was a Puerto Rican Stone, correct?

A    I don't know about the Puerto Rican, but the

D-130

Bouto 007061

Stones, yes.

Q You knew about a Stone, correct? You have to answer, yes or no.

A Yes, yes.

Q That's a gang, right?

A Yes.

Q And back in May of 1993, Robert was Tania's girlfriend, correct?

A Yes, correct.

Q He was also your friend?

A A friend.

Q You see Robert in the Courtroom here today?

A Yes, I do.

Q Where is he.

A (Indicating.)

Q Where is he at the table?

A The last one.

Q On the left?

A Yes.

MR. DILLON: For the record, your Honor, she has identified the defendant in open on Court.

THE COURT: Yes.

MR. DILLON: Q Now, you have spoken with Robert since his arrest, haven't you?

D-131

Bouto 007062

AR-L 513357

A    Like visits?

Q    Yes.

A    Yes.

Q    How many times have you visited him?

A    I'm not sure.

Q    More than 5?

A    Probably about 5.

Q    About 5.

Now, you were asked questions about when you went and spoke with Mr. Press, correct?

A    I was asked questions --

Q    About when you met with Mr. Press, the investigator for Robert?

A    Yeah.

Q    Right?

A    Questions about that, like?

Q    You were asked questions as to whether or not you met with a Mr. Press, right, by this attorney, just a few second ago?

A    Yes.

Q    And you met with him, correct?

A    Yes.

Q    And that was in November of 1995, correct?

A    Yes.

D-132

Bouto 007063

AR-L 513358

Q    And it is true, isn't it, that you met with Mr. Bouto at Cook County Jail, the day before you went to go see Mr. Press, isn't that right?

A    I don't remember.

Q    Now, how many times had you seen Mr. Bouto at jail, before you went to go speak with the investigator back in November of 1995?

MR. IOAKIMIDIS:   Objection, your Honor, asked and answered.

THE COURT:   Overruled.

THE WITNESS:   How many times did I visit, could you repeat it?

MR. DILLON:   Sure.

Q    How many times had you gone to see Mr. Bouto before you went to go see the investigator?

A    I don't remember.

Q    You don't know?

A    No.

Q    Now, back in May 14th of 1993, could you tell us, what Mr. Bouto was wearing the day that you walked home with him?

A    He had like dark blue shorts and a shirt that had like orange writing on it, and I think it was orange.

D-133

Bouto 007064

AR-L 513359

Q    Those shorts that he had, those were black, about three quarter length shorts, right?

A    I don't think they were black.

Q    They were dark color?

A    Yeah, they were dark.

Q    And the blue shirt that he had, had a hood on it, didn't it?

A    I don't think so.

Q    Do you remember what shoes he was wearing?

A    He had on Jordan's.

Q    Dark?

A    Yeah.

Q    Gym shoes, correct?

A    Yes.

Q    He was wearing white socks, correct?

A    I don't think -- I think, maybe.

Q    You're not sure?

A    No, I'm not sure.

Q    Show you what I have marked as People's Exhibit No. 7, for identification.

Does this picture show Robert Bouto in it?

A    Yes, it does.

Q    Does that picture show the clothes that

D-134

Bouto 007065

Robert Bouto was wearing the day that you walked him home in May 14th, 1993?

A    Yes, it does.

Q    And do you notice anything about the shirt up at the top of it?

A    Yeah.

Q    What do you notice?

A    Has a hoody.

Q    So, he was wearing a hoody on this day, is that right?

A    Yes, he was.

Q    Now, were you asked, why you never went to the police, remember those questions?

A    Yes, I do.

Q    When you heard gunshots, did you stay in that area for the police to interview you?

A    No.

Q    You left that area, right?

A    Yes.

Q    And when you left that area, you were never interviewed by the police, correct?

A    Correct.

Q    So, how would it be that police would know to come see you, if you never let them know that you were

D-135

Bouto 007066

AR-L 513361

with someone?

MR. IOAKIMIDIS: Objection, calls for speculation.

THE COURT: Sustained.

MR. DILLON: Q But you knew that Robert Bouto was in custody for the murder of Salvador Ruvalcaba --

A No, I didn't.

Q -- right?

MR. DILLON: May I have a, moment Judge.

This is on page 13.

Q Well, you spoke with investigators?

MR. IOAKIMIDIS: Your Honor, your Honor, objection. Your Honor, hearsay. I don't know what he's referring to.

THE COURT: Overruled.

MR. DILLON: Q You spoke with Investigator Press on November 22nd of 1995, correct?

A Yes.

Q And by the way, when you went there, you went there with Tania, correct?

A Correct.

Q And you spoke with Tania before you went there, correct?

A About the situation, no, I haven't.

Q You never spoke with her about that?

D-136

Bouto 007067

AR-L 513362

A    About -- I mean, before like a year or 2 years before, but ever since, no.

Q    But you spoke with her about it, correct?

A    Yes.

Q    And you were asked the question, when you first found out --

MR. IOAKIMIDIS:  Objection, your Honor, hearsay.

THE COURT:  Overruled.

MR. DILLON:  Q    When you first found out that Salvador, Sadom was locked up?

MR. IOAKIMIDIS;  Objection, sidebar.

MR, DIMEAS:  Violation of motion in limine.

THE COURT:  Overruled.

MR. DILLON:  Q    Question was asked of you, when you first found out Sadom was locked up, which would be the 16th, and did you hear anything on the street about what happened?

A    Oh, yeah, we walked pass.  I don't remember what street it was, they said something supposedly that Cobra, Spanish Cobras came in the neighborhood and so, I found out -- actually, I looked at it, I didn't realize what happened.  When I went to school, I freaked out, because you know, he was a nice guy and they say, he died.

D-137

Bouto 007068

AR-L 513363

Q    The nice guy was the one that died, did you ask those questions and given those answers on --

A    Yes, I did.

Q    -- 1995, correct, that was regarding Salvador Ruvalcaba, correct?

A    Yes, it was.

Q    So you did know who it was that was killed on this day?

A    Not this day.

Q    You knew 2 days later, correct, when you went back to school the following week?

A    I didn't know, Solo was Salvador.  I found out Monday, Solo was Salvador.

Q    So on May the 18th, you found out that the person that was killed was Salvador Ruvalcaba, correct?

A    Yes, I did.

Q    And you knew that that killing occurred on Kimball and Sunnyside?

A    No, I didn't.

Q    Are you telling us that you don't know that Robert Bouto was arrested for the murder of Salvador Ruvalcaba?

A    I found out that Sunday, that he was

D-138

Bouto 007069

AR-L 513364

arrested, but I didn't know it was for a murder.

Q    When did you find out that he was in custody for the murder of Salvador Ruvalcaba?

A    When he was -- I think, because when we were walking, our parents had a -- my family.

Q    Do you understand my question?

A    Yes, I do.  I'm trying to tell you how I find out.

THE COURT:  He's asking you, when you found out, not how.  When did you find out?

THE WITNESS:  Me and Tania walked down the street and like I said, there was a thing, and there is some --  there is some guys down there and they're saying that Robert got locked up for a murder.

Q    When did you find out that Robert Bouto --

A    That Sunday.

Q    That Sunday?

A    Right.

Q    That he was charged with the murder of Salvador Ruvalcaba, correct?

A    Yeah.

Q    Correct?

A    Ruvalcaba?

Q    Ruvalcaba.

D-139

Bouto 007070

AR-L 513365

A    He was charged for his murder, right.

Q    So you knew that as of May 16th of 1993?

A    Yeah.

Q    Okay.

And your testimony is, you never went to the police to tell them that he couldn't have done that, because you saw him with Tania, did you?

A    I didn't go to the police, correct.

Q    You never did?

A    No.

Q    And you knew that the State's Attorney's Office was prosecuting Robert Bouto for that murder, didn't you?

A    I had no idea what was going on with the lawyers or anything.

Q    You had no idea?

A    No.

Q    You knew to come to Court to testify to this, right?

A    Yeah, yes.

Q    And you knew about it in November of 1995, when the investigators had you come down and speak with them about what happened, correct?

A    Uh-huh, yes.

D-140

Bouto 007071

AR-L 513366

Q    Now, when you met with the investigator back in November of 1995, you drew on a map then, didn't you, to show how it is you went from school to your home?

A    The map wasn't accurate.

Q    That's not any question.

You drew on the map, didn't you?

A    Yes.

Q    You know where that map is today?

A    It was -- I mean, no.

Q    So you have no idea where the map is that you drew back on November 21st of 1995, to show where you went?

A    The map?

Q    Yeah.

A    The map, I drew like on a paper.  It was scrap, it was kind --

Q    My question to you was?

A    No, I don't know where that paper is.

Q    You don't know where it is, right, correct?

A    Correct.

Q    And Tania drew on that, too, didn't she?

A    Correct.

Q    And you don't know where that is today?  You

D-141

Bouto 007072

have to answer, yes or no.

A    No, I don't.

MR. DILLON:  No further questions.

THE COURT:  Defense may.

MR. IOAKIMIDIS:  Thank you, your Honor.

REDIRECT EXAMINATION

BY MR. IOAKIMIDIS:

Q    Helen, you testified that on the afternoon, you heard two sets of gunshots, correct?

A    Correct.

Q    At both times you saw Tania and Robert, right?

A    Correct.

Q    These gunshots that you heard, did you hear -- I mean, did you see anybody shoot?

A    No, I didn't.

Q    Did you see anything that day?

A    No, I didn't.

Q    But you did see Robert and Tania, right?

A    Yes, I did.

Q    Now, on this Sunday or was it Monday, when you found out about the crime?

A    Sunday, I found out Salvador died and Monday I found out really, they -- I really find -- found

D-142

Bouto.007073

AR-L 513368

out Monday that he was charged, Robert was charged.

Q   Did you know anything more, know any details?

A   No.

Q   Okay.

Now, you knew Salvador, didn't you?

A   Yes, I did.

Q   And how did you know him?

A   I had a lot of classes with him in school from freshman year and sophomore year.

Q   Was he a friend?

A   Yes, he was.

Q   Were you sadden by his death?

MR. DILLON:  Objection, Judge.

THE COURT:  Overruled, overruled.

THE WITNESS:  Continue?

MR. IOAKIMIDIS:  Q   Yes, you can.

A   Yes, I was.

Q   So you lost a good friend or a friend?

A   A friend, yeah.

Q   Now, Helen, hypothetically speaking, if you knew a person --

THE COURT:  All right, it is improper to ask this type of witness a hypothetical question.  I'll not let you continue on.

D-143

Bouto 007074

Ask another question.

MR. IOAKIMIDIS: Q Now, when you were with the private investigator, when you -- when you had the interview with the private investigator --

A Uh-huh.

Q -- was it this kind of map that you used?

A No.

Q Was it a survey map like this?

A It was not as good as that. It was really messed up.

Q I mean, did somebody draw this map?

A It was drawn.

Q Handwritten?

A Yeah.

Q I mean, the streets -- the street names on this map, were they I.D'd or tagged?

A Just like with the S or C, for Christiana or S for Spaulding, that's how it was. W for Wilson.

Q Did it show all the houses on the streets?

A No, it doesn't.

Q Did it show the alleys on the streets?

A We had to draw it in.

Q So it was drawn at that time, right?

A But it wasn't good. Right.

D-144

Bouto 007075

AR-L 513370

MR. IOAKIMIDIS: One moment, your Honor.

Q    Now, Helen, what was this map drawn on?

A    Regular scrap paper.

Q    Just --

A    Regular paper.

MR. IOAKIMIDIS: Okay, I have no further questions.

Helen, thank you.

MR. DILLON: No further questions, your Honor.

THE COURT: You may step down, thank you.

(Witness excused.)

We'll take a lunch break.

Now, ladies and gentlemen, do not discuss this evidence with anyone, not between yourselves or allow anyone to discuss it in your presence until the conclusion of this trial, when I give it to you for deliberations.

All rise for the jury.

(Whereupon the following proceedings had outside the presence and hearing of the jurors:)

THE COURT: Please be seated.

Would you close that door.

All right, the jury is outside of our

D-145

Bouto 007076

AR-L 513457

STATE OF ILLINOIS    )
                     )  SS.
COUNTY OF C O O K    )

I, Janet O. Davis, Official Court Reporter of the Circuit Court of Cook County, County Department-Criminal Division, do hereby certify that I reported in shorthand the proceedings had on the trial in the above entitled cause; that I thereafter caused to be transcribed into computation the above Report of Proceedings, which I hereby certify is a true and correct transcript of the proceedings had upon the trial of the defendant before the Honorable Henry R. Simmons, jr., Judge of this Court.

_____
Official Court Reporter of the
Circuit Court of Cook County,
Criminal Division.

D-232

Bouto 007163

AR-L 513458

(Rev. 2/18/93)  CCCR-56

STATE OF ILLINOIS } ss
COUNTY OF COOK }

I, AURELIA PUCINSKI, Clerk of the Circuit Court of Cook County, in said County and State, and Keeper of the Records and Seal thereof, do hereby certify the above and foregoing to be a true, perfect and complete copy of . . VOLUME ( 4 ) OF A ( 5 ) VOLUME . . . . RECORD CONSISTING OF THE REPORT OF PROCEEDINGS, ONLY. NO PRAECIPE HAVING BEEN FILED PURSUANT TO THE NOTICE OF APPEAL FILED IN THE APPELLATE COURT UNDER APPELLATE COURT NO. 97-0343. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

in a certain cause . . . . . . . . . . . . . . . . . . . . . . LATELY . . . . . . . . . . . . . . . . . . . . . pending in said Court, between

The People of the State of Illinois. . . . . . . . . . . . . . . . . . . . . . WERE . . . . . . . . . . . . . . . . . . . . . ., Plaintiffs and

. . . . . . . . . . . . . . . . . ROBERT BOUTO . . . . . . . . . . . WAS . . . . . . . . . . . . . . . . . . . . . . . . . ., Defendant. . . .

Witness:  AURELIA PUCINSKI,
Clerk of the court, and the Seal thereof, at Chicago
In said County, . . 15 JULY . . . . . . . . . . . . . ., 19 97 . .

*Aurelia Pucinski*
Clerk

**AURELIA PUCINSKI, CLERK OF THE CIRCUIT COURT OF COOK COUNTY**

Bouto 007164

# EXHIBIT 87

## AFFIDAVIT OF CARL RICHMOND

I, Carl Richmond, do state on oath that the following facts are true to the best of my knowledge:

1.      I was born on December 15, 1973. I previously testified at Robert Bouto's trial for the murder of Salvador Ruvulcaba.

2.      I understand that this affidavit is being prepared for the case of *People v. Gabriel Solache & Arturo Reyes,* Cook County No. 98 CR 12440, and that this affidavit may be filed in court in that case.

3.      I am making this statement of my own free will. No one has offered, promised, or given me anything in exchange for making this statement. No one has threatened me in connection with this statement.

4.      I witnessed the shooting of Salvador Ruvulcaba on May 14, 1993. At that time, I was a member of the Spanish Cobras gang. Also present at the shooting were Rey Lozada and Frank Escobar.

5.      I did not want to speak to the police about the shooting, but I had been told by a police officer who knew me personally that if I did not identify the shooter, the police would "put a case on me." I believed this meant they would implicate me in an unsolved murder case. I had heard of past incidents where other people had cases put on them even though they were not involved with them.

6.      After the shooting, Detective Guevara arrived at the crime scene. He took Lozada and me to a patrol car. Robert Bouto and two or three other men were in the back seat. I knew Bouto was in a gang that was a rival to mine. Both Lozada and I identified Bouto as the shooter.

-1-

AR-L 514508

7.    Lozada, Escoabar, and I were taken to the police station at Area 5 later on May 14 to be interviewed by the police and to view a line-up. Once there, the other witnesses and I were placed in a room all together. While at the station, and before the line-up, I saw Bouto through what I thought was a two-way mirror. He was handcuffed in an empty interrogation room a few doors down from the room we were placed in. From the room we were in, I heard someone whom I assumed was Bouto getting beaten up and screaming.

8.    The other witnesses to the crime and I were given pizza and cigarettes while waiting for the line up to be conducted. Detective Halvorsen was in the room with us. Detective Guevara came in and out of the room. I was not allowed to contact my family or use the phone. I was also threatened with obstruction of justice if I left. I was detained by the officers until 9:00 or 10:00 p.m. that evening.

9.    I was asked to view a line-up that evening. Detective Guevara told the other witnesses and me that they had the shooter, and that all we had to do was identify Bouto as the shooter. He whispered to each of us what position the suspect would be in. Detective Guevara then led each of us into the room to view the line-up. Each witness came back and confirmed to the other witnesses that the suspect was in that position.

10.   While I was at the police station, Detective Guevara told me that he had a lot of pull with street cops, and that he could make my life very uncomfortable. I had seen how the police made life uncomfortable for other acquaintances of mine and believed that Detective Guevara would follow through with his threat. I agreed to testify because of Detective Guevara's statement.

11.   After identifying Robert Bouto in the line up, the other witnesses and I were

dropped off in our neighborhood.

12.    Prior to signing this three-page affidavit, I have read and initialed each page, and I

have made and initialed any necessary corrections to this affidavit.

6-7-08

Carl Richmond

SUBSCRIBED AND SWORN TO BEFORE ME
this ___ day of June, 2008.

_____
NOTARY PUBLIC

"*OFFICIAL SEAL*"
KIM L. DAUGHTRY
Notary Public State of Illinois
My Commission Expires 06/15/2011

-3-

# EXHIBIT 88

Order AR-L 517227           (Rev. 02/24/05) CCG N002

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

**ENTERED**

**APR 3 0 2018**

**PEOPLE OF THE STATE OF ILLINOIS**

JUDGE JAMES M. OBBS
CIRCUIT COURT - 175

v.

No. 93CR1352601

Robert Bouto

**AGREED ORDER**

The matter coming on the call, the parties being present, the Court being fully informed, it is hereby ordered:

1. The pending petition seeking relief under the Illinois Post Conviction Hearing Act is granted;

2. The judgment of conviction and sentence imposed on Count I of the indictment on September 11, 1996 is vacted.

3. Counts I and II of the indictment are reinstated and redocketed.

4. Bond is set at $10,000 I.

5. The matter is continued for status by agreement of the parties to May 29, 2018

Attorney No.: _____

Name: Carol Rogala ASA

Atty. for: CCSAO

Address: 2650 S. California

City/State/Zip: Chgo IL 60608

Telephone: 773-674-3365

**ENTERED:**

Dated: _____ , _____

_____
Judge          Judge's No.

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**