# EXHIBIT 94

AR-L 624673

Order Granting Certificate of Innocence                                                    CCCR_____

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## CRIMINAL DIVISION

THE PEOPLE OF THE STATE OF ILLINOIS )
)
vs.                            )        No.: 1993 CR 1817303
)
___Jose Montanez___            )        DRAFT 06/10/11
Defendant/Petitioner

### ORDER GRANTING CERTIFICATE OF INNOCENCE

This cause comes before the Court on the Defendant/Petitioner's Petition for Certificate of Innocence pursuant to 735 ILCS 5/2-702. The Court being fully advised finds by a preponderance of evidence that:

1. The Defendant/Petitioner was convicted of one or more than one felonies by the State of Illinois in the County of Cook and was subsequently sentenced to a term of imprisonment, and has served all or any part of the sentence;

2. ☒ The Defendant/Petitioner's judgment or conviction was reversed or vacated, and the indictment or information dismissed or, ☐ a new trial was ordered and either s/he was found not guilty at the new trial or s/he was not retried and the indictment and information is dismissed; or ☐ the statute or application thereof on which the indictment or information was based violated the Constitution of the United States or the State of Illinois;

3. The Defendant/Petitioner's indictment or information was dismissed or s/he was acquitted, and a Petition was filed within 2 years of the dismissal of the indictment or information or acquittal;

4. ☒ The Defendant/Petitioner is innocent of the offenses charged in the indictment or information or ☐ Defendant/Petitioner's acts or omissions charged in the indictment or information did not constitute a felony or misdemeanor against the State;

5. The Defendant/Petitioner did not his/her own conduct voluntarily cause or bring about his/her conviction.

IT IS THEREFORE ORDERED as follows:

1. That the Petition for Certificate of Innocence is GRANTED.

2. That the Clerk of the Circuit Court shall transmit a copy of the Certificate of Innocence to the Clerk of the Court of Claims, together with the Defendant/Petitioner's current address as indicated on the Petition.

ENTERED:

Dated: ___11-2-16___                               _____  _____
                                                          Judge              Judge's No.

**ENTERED**
JUDGE LeROY K. MARTIN JR.-1844
**NOV 02 2016**
DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL
DEPUTY CLERK

DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

RR 003889

Order Granting Certificate of Innocence            CCCR_____

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## CRIMINAL DIVISION

THE PEOPLE OF THE STATE OF ILLINOIS     )
                                      )
         vs.                      )    No.: _1993_ CR _1817301___
                                      )
___Arnoldo Serrano_____      )    DRAFT 06/10/11
Defendant/Petitioner

### ORDER GRANTING CERTIFICATE OF INNOCENCE

This cause comes before the Court on the Defendant/Petitioner's Petition for Certificate of Innocence pursuant to 735 ILCS 5/2-702. The Court being fully advised finds by a preponderance of evidence that:

1. The Defendant/Petitioner was convicted of one or more than one felonies by the State of Illinois in the County of Cook and was subsequently sentenced to a term of imprisonment, and has served all or any part of the sentence;

2. ☒ The Defendant/Petitioner's judgment or conviction was reversed or vacated, and the indictment or information dismissed or, ☐ a new trial was ordered and either s/he was found not guilty at the new trial or s/he was not retried and the indictment and information is dismissed; or ☐ the statute or application thereof on which the indictment or information was based violated the Constitution of the United States or the State of Illinois;

3. The Defendant/Petitioner's indictment or information was dismissed or s/he was acquitted, and a Petition was filed within 2 years of the dismissal of the indictment or information or acquittal;

4. ☒ The Defendant/Petitioner is innocent of the offenses charged in the indictment or information or ☐ Defendant/Petitioner's acts or omissions charged in the indictment or information did not constitute a felony or misdemeanor against the State;

5. The Defendant/Petitioner did not his/her own conduct voluntarily cause or bring about his/her conviction.

IT IS THEREFORE ORDERED as follows:

1. That the Petition for Certificate of Innocence is GRANTED.

2. That the Clerk of the Circuit Court shall transmit a copy of the Certificate of Innocence to the Clerk of the Court of Claims, together with the Defendant/Petitioner's current address as indicated on the Petition.

ENTERED:

Dated: _11-2-16_____

ENTERED
JUDGE LeROY K. MARTIN JR.-1844
NOV 02 2016
DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL
DEPUTY CLERK

_____
Judge         Judge's No.

DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

RR 003890

# EXHIBIT 95

identify and describe all property or possible evidence recovered at the end of the Narrative in column form. Show exactly where found, when found, who found it and its description (include Property Inventory numbers). If property taken was scribed for Operation Identification, indicate I.D. number at end of Narrative. Offender's approximate description, if possible, should include name if known, nickname, sex, race code, age, height, weight, color eyes & hair, complexion, scars, marks, etc. If suspect is arrested, give name, sex, race code, age, C.B. or I.R. number, if known, and state "In Custody."

# SUPPLEMENTARY REPORT
## CHICAGO POLICE — FOR USE BY B.I.S. PERSONNEL ONLY

All descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

**4. DATE OF ORIG. OCCURRENCE–TIME** DAY 5 MO. Feb. YR. 1993 0532

| 1. OFFENSE/CLASSIFICATION LAST PREVIOUS REPORT | I-UCR OFF. CODE | 2. ADDRESS OF ORIG. INCIDENT/OFFENSE ☒1 VERIFIED ☐2 CORRECTED | 3. BEAT OF OCCUR. |
|---|---|---|---|
| Homicide/First Degree Murder | 0110 | 1838 N. Springfield | 2533 |

| 5. VICTIM'S NAME AS SHOWN ON CASE REPORT | CORRECT ☐1 YES ☒2 NO | IF NO, CORRECT ALL VICTIM INFORMATION IN BOXES 20 THROUGH 27. | 6. FIRE RELATED ☐1 YES ☒2 NO | 7. BEAT ASSIGNED |
|---|---|---|---|---|
| VARGAS, Rodrigo | X | | | 5535 |

| 8. TYPE OF LOCATION OR PREMISE WHERE INCIDENT/OFFENSE OCCURRED | LOCATION CODE | 9. NO. OF VICTIMS | 10. NO. OF OFFENDERS |
|---|---|---|---|
| Vehicle/Non Commerical | 259 | 1 | (3) |

**CIRCUMSTANCES**
| 11. ☒ VERIFIED ☐ UPDATE TO | 12. OBJECT/WEAPON CODE NOS. | 13. FIREARM FEATURES CODE NO. | 14. POINT/ENTRY CODE NO. | 15. POINT/EXIT CODE NO. | 16. BURGLAR ALARM CODE NOS. | 17. SAFE BURGLARY METHOD CODE NO. | 18. IF RESIDENCE WHERE WERE OCCUP. CODE NO. |
|---|---|---|---|---|---|---|---|

**PROPERTY**
19. ☐ VERIFIED ☐ UPDATE TO — DESCRIBE PROPERTY IN NARRATIVE. T = TAKEN: R = RECOVERED. FILL IN THE FULL AMOUNT OF ONLY THOSE VALUES WHICH EITHER DIFFER FROM OR WERE NOT REPORTED ON THE ORIGINAL CASE REPORT OR THE LAST PREVIOUS SUPPLEMENTARY REPORT.

| 1 MONEY ☐T $ ☐R | 2 JEWELRY ☐T $ ☐R | 3 FURS ☐T $ ☐R | 4 CLOTHING ☐T $ ☐R | 7 OFFICE EQUIPMENT ☐T $ ☐R | 8 TV, RADIO, STEREO ☐T $ ☐R |
|---|---|---|---|---|---|
| 9 HOUSEHOLD GOODS ☐T $ ☐R | 0 CONSUM. GOODS ☐T $ ☐R | (-) FIREARMS ☐T $ ☐R | & NARC./DANGEROUS DRUGS ☐T $ ☐R | 5 OTHER ☐T $ ☐R | 6 NONE ☐T ☐R |

**VICTIMS UPDATE ONLY**
| | 20. NAME (LAST–FIRST–M.I.) | 21. I-UCR OFFENSE CODE | 22. HOME ADDRESS (NO., DIR., STREET, APT. NO.) | 23. SEX–RACE–AGE CODE | 24. HOME PHONE | 25. BUSINESS PHONE | 26. INJURED YES / NO | 27. VICTIM REL. CODE |
|---|---|---|---|---|---|---|---|---|
| 1. | | | | | | | | |
| 2. | | | | | | | | |
| 3. | | | | | | | | |

**OFFENDERS UPDATE ONLY**
| | 28. OFFENDER'S NAME (OR DESCRIBE CLOTHING, ETC.) | 29. HOME ADDRESS | 30. SEX–RACE–AGE CODE | HEIGHT | WEIGHT | EYES | HAIR | COMPL. |
|---|---|---|---|---|---|---|---|---|
| 1. | | | | | | | | |
| 2. | | | | | | | | |

| | 31. C.B. NO. | I.R. NO., Y.D. NO. OR J.D.A. NO. | OFFENDER REL. CODE | C.B. NO. | I.R. NO., Y.D. NO. OR J.D.A. NO. | OFFENDER REL. CODE | 32. NO. ARRESTED | ARREST UNIT NO. |
|---|---|---|---|---|---|---|---|---|
| OFF. 1 | | | OFF. 2 | | | | | |

**DATA ENTERED D AREA 5**

| 33. OFF'S. VEHICLE ☐USED ☐STOLEN | YEAR | MAKE | BODY STYLE | COLOR | V.I.N. | STATE LICENSE NO. | STATE |
|---|---|---|---|---|---|---|---|

34. SERIAL NOS. OR IDENTIFICATION NOS. ☒1 DNA ☐2 VERIFIED ☐3 CORRECTED — LIST ALL CORRECTIONS & NEW OR ADDITIONAL NOS. OBTAINED IN NARRATIVE

| 50. OFFENSE/CLASS. THIS DATE (IF SAME ENTER DNA) | REV. CODE | 51. METHOD CODE | 52. METHOD ASSIGNED ☒ FIELD ☐3 SUMMARY | UNIT NO. 652 | 53. STATUS ☒0 PROGRESS ☐1 SUSPENDED ☐2 UNFOUNDED |
|---|---|---|---|---|---|
| DNA | | | | | |

STATUS CONT'D.
☐3 CLSD. CLOSED  ☐4 CLRD. OPEN  5 EXC. ☐ CLRD. CLOSED  6 EXC. ☐ CLRD. OPEN  7 CLSD. ☐ NON-CRIM.

54. IF CASE CLEARED, HOW CLEARED: ☐1 ARREST & PROSEC. ☐2 DIRECTED TO JUV. CRT. ☐3 COMPL. RFUSD. TO PROSECUTE ☐4 COMMUNITY ADJUSTMENT ☐5 OTHER EXCEPT. | ☐ ADULT ☐ JUV

55. ☐ FOR SUMMARY CASES ONLY – THE ORIGINAL CASE REPORT IS SUBSTANTIALLY CORRECT, AND CONTACT WITH THE VICTIM HAS DISCLOSED NO ADDITIONAL PERTINENT INFORMATION.

**80. NARRATIVE**

WANTED FOR QUESTIONING: SERRANO, Armando M/WH/Age 20, DOB 29 Sep. 72, 4615 W. Altgeld, 5-06, 150 lbs. Hair black, Eyes Brown, Build medium, Complexion medium, Known member of the Imperial Gangsters Street Gang IR# 874175

PACHECO, Jorge M/WH/Age 22, DOB 14 Feb. 71, 2332½ N. Spualding, 5-11, 175 lbs. Hair black Eyes brown, Build slender, Complexion medium.

| 90. EXTRA COPIES REQUIRED (NO. & RECIPIENT) | 91. DATE THIS REPORT SUBMITTED DAY IR# 863500 | TIME | 92. SUPERVISOR APPROVING (PRINT NAME) | STAR NO. |
|---|---|---|---|---|
| | 2 June 1993 | 2300 | BIEBEL | 1545 |

| 93. REPORTING OFFICER (PRINT NAME) | STAR NO. | 94. REPORTING OFFICER (PRINT NAME) | STAR NO. | SIGNATURE |
|---|---|---|---|---|
| Det. E. HALVORSEN | 20692 | Det. R. GUEVARA | 20861 | Biebel |

SIGNATURE / SIGNATURE

95. DATE APPROVED (DAY-MO.-YR.) 3 JUN 1993 TIME 1145

35. R.D. NO. X-054183

CPD-14 (Rev. 8/85) *MUST BE COMPLETED IN ALL CASES

JR-L 03683

AR-L 565388

```
DETECTIVE DIVISION                    2                    2 JUNE 1993
AREA FIVE VIOLENT CRIMES                                   RD# X-054183
```

HOMICIDE/FIRST DEGREE MURDER
VICTIM: VARGAS, Rodrigo

WANTED FOR QUESTIONING: MONTANEZ, Jose  M/WH/Age 25, DOB 23 Aug. 67, 1913 N. Kildare, 6-03, 240 lbs. Hair black, Eyes brown, Known member of the Imperial Gangsters Street Gang, IR# 736499

On 2 June 93, the R/Dets. had a meeting with a circumstantial witness who for his own safety must remain anonymous at this time. This witness provided the following information.

He is a member of the Imperial Gangsters Street Gang. On Friday 5 Feb. 93, he was hanging out by a dope spot at Hamlin and Altgeld. Between 0830-0900 hrs. a car arrived at this location. He recognized the driver of the car as being "PISTOL PETE". Also in the car were "JORDAN", and "MONDO". He recognized all three of these guys as they were also members of the Imperial Gangsters. They were riding in a Tan colored Buick Regal, that he recognized as being "PISTOL PETE'S" car. "JORDAN" and "MONDO", got out of the car. "PISTOL PETE", sat in the car playing around with a bag of dope. The three of them were talking about a robbery they had just done, that had gone bad. "PISTOL PETE" stated, "MONDO fucked up, he went at that guy wrong, we would never did what we did if MONDO never fucked up". "JORDAN" stood around laughing as "PISTOL PETE" yelled at "MONDO". The witness asked "PISTOL PETE" what he was talking about. "PISTOL PETE" stated, "We shot a stud, we hurt that stud bad". "PISTOL PETE" told "MONDO", "Man you better think about it, if we had got caught up". "PISTOL PETE" told the witness that the day before the three of them had spotted a victim with lots of money. "PISTOL PETE" was getting change for a dollar when the victim walked in and showed a lot of money. "PISTOL PETE" and the other two guys decided to rob this victim and followed him home. At the last minute they held off sticking this guy up because he was with his lady and some kids. They knew this guy would be a sweet victim so they laid out for him. The witness saw "PISTOL PETE" take a large frame, 9mm semi-automatic pistol from under the dashboard of the car and put the gun in one of the heating ducts in the dashboard. "PISTOL PETE" stated that they did not get money from the victim they popped, and needed to get some money to buy dope, (Heroin). "PISTOL PETE" stated that they robbed some kid on the street with his school bags. "MONDO" stated that he took the school ring off the victims finger. "PISTOL PETE" stated he took this victims three neck chains, and his bracelet. The witness, got into "PISTOL PETE'S" car, along with "JORDAN" and "MONDO". They all drove to a place called, "Gold Busters", located at Diversey and Harding. They went there to sell the jewelry to get money to buy heroin. They got to "Gold Busters" around 0930 hrs. and found the store not yet open. They drove back to Hamlin and Altgeld.

JR-L 03684

AR-L 565389

DETECTIVE DIVISION                              3                        2 JUNE 1993
AREA FIVE VIOLENT CRIMES                                                 RD# X-054183

HOMICIDE/FIRST DEGREE MURDER
VICTIM: VARGAS, Rodrigo

Around 1000 hrs. they all drove back to "Gold Busters". "MONDO" and "PISTOL PETE" went into the store and sold the jewelry. They all then went looking to buy heroin at a different dope spot at Springfiled and Thomas. They finally drove back to Hamlin and Altgeld where the witness left them.

Two days later the witness was at Hirsch and Lemoyne. "PISTOL PETE" drove up in the same car he previously had. The witness noticed new damage to the left front fender, and asked "PISTOL PETE" what happened to his car. "PISTOL PETE" stated that after they popped the victim, he was driving his car and smashed into a parked car as they drove off. The witness asked "PISTOL PETE", what went wrong. "PISTOL PETE" stated that the victim who was a Mexican came out carrying a car radio. "MONDO" was supposed to grab the victim around the neck, so they could go into the victims pockets. "MONDO" got greedy when he saw the radio and, instead of grabbing the victim he went for the radio. The victim started fighting, and got shot. "PISTOL PETE" and "MONDO" jumped back into the car.

The R/Dets. were familiar with the Imperial Gangsters Street Gang and had photos of "PISTOL PETE", "JORDAN" and "MONDO". The witness was shown these photos and identified Jose MONTANEZ, IR #736499 as being "PISTOL PETE", George PACHECO, IR# 863500 as being "JORDAN" and Armando SERRANO IR# 874175 as being "MONDO".

On 2 June 93, Det. R. GUEVARA interviewed Wilda VARGAS, the victims wife. She provided the following information.

VARGAS, Wilda                           in summary stated the following. On Thurs. 4 Feb. 93, she, her husband and children went to the bank. On the way home they stopped at the gas station at North Ave. and Central Park. A tan car pulled up and parked directly in front of them in the gas station. She could see that there were three M/WH'S in the car. Her husband went into the station to make a purchase. The driver of this car walked into the station behind her husband. Her husband had a roll of money, about $350.00. She looked at the man next to her husband. She also looked at the man who was seated in the front passenger seat of this tan car. She could not see the man in the back seat clearly. Her husband got back into their car, and they had to back out to get around the tan car. She watched the driver of the tan car, get back into his car. The people in the tan car began to follow them, all the way back to her house on Springfield.

JR-L 03685

AR-L 565390

DETECTIVE DIVISION            4            2 JUNE 1993
AREA FIVE VIOLENT CRIMES                 RD# X-054183

HOMICIDE/FIRST DEGREE MURDER
VICTIM: VARGAS, Rodrigo

On 2 June 93, Det. R. GUEVARA showed Wilda VARGAS a photo array, that consisted of (8), CPD B&W Identification Photos. Wilda VARGAS identified Jose MONTANEZ, "PISTOL PETE", as the person who followed her husband into the gas station. She also identified Armando SERRANO, "MONDO", as the person she saw seated in the front passenger seat of the tan car that followed them. These photos were inventoried for evidence.

Det. R/Dets. gained information that Jose MONTANEZ was staying with a girlfriend in the 3900 block of W. DICKENS. The R/Dets. checked this block and observed a tan colored, 1984, 2Dr. Buick Regal, VIN# 1G4AM69A1EH587157. This car had damage to the left front fender. This car also had a bullet hole in the trunk and in the left passenger door. There were no license plates displayed on this car. The VIN# number was checked and this car was found to be registered to Jose MONTANEZ, 2516 N. McVicker. Jose MONTANEZ, is "PISTOL PETE".

Det. R. GUEVARA drove Wilda VARGAS around the neighborhood of the 3900 block of West Dickens. Wilda VARGAS was asked if she recognized the car that had followed her the day before her husband was killed. She positively identified the 1984, 2Dr. Buick Regal of Jose MONTANEZ, as the car that followed her from the gas station.

On 6 June. 93, the R/Dets. took photos of this 1984 Buick Regal.

Det. E. HALVORSEN #20692
 Det. R. GUEVARA   #20861



# EXHIBIT 96

**LOG OF CRIMINAL HISTORY RECORDS ISSUED**
Identification Section/CHICAGO POLICE EPARTMENT

I.R. 736499

| DATE | NAME OF PERSON REQUESTING RECORD | AGENCY OR C. P. D. UNIT | Complete Record | CPD & ISB Data Only | CPD Conviction Data Only | ISSUED BY |
|---|---|---|---|---|---|---|
| 4-20-87 | Fallon 5351 | 760-N | ✓ | | | Uwms |
| 5 Jun 87 | Karlett 1281 | 162 | ✓ | | | Butner |
| JAN 19 1988 | Hughes A | @CAPD | ✓ | | | Wu |
| JUN 1 1988 | RILEY AS | CC APD | ✓ | | | M |
| NOV 16 1988 | Hughes R | CCAPD | ✓ | | | |
| PR 10 1988 | Riley L | C CAPP | ✓ | | | Uw |
| Jun 239 | Poulosk 6803 | 652 | ✓ | | | |
| OCT 22 1991 | TERM | CC APN | — | | | |
| OCT 03 199 | Det Holec 50694 | 652 | — | | | Johnson |
| 10 May 93 | Det. R. Guevara 26861 | C.P.D | ✓ | | | Johns |
| 24 May 93 | Det. R. Guevara #2861 | 652 | | | ✓ | Iuss |
| 22 July 93 | | SUBPoenAS | ✓ | | | Briggs |
| 10-28-54 | Kiled 851 | ClARK | ✓ | | | S |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

CPD-31, 915 (Rev. 1/78)

RFC-Serr/Mont 000222

LOG OF CRIMINAL HISTORY RECORDS ISSUED
Identification Section/CHICAGO POLICE EPARTMENT

I. R. NO. **874175**

| DATE | NAME OF PERSON REQUESTING RECORD | AGENCY OR C. P. D. UNIT | Complete Record | CPD & ISB Data Only | CPD Conviction Data Only | ISSUED BY |
|---|---|---|---|---|---|---|
| | | 165 | | | | |
| 9-22-92 | | VOP | CCRC | | | |
| 3 Dec 92 | Mariato 10779 | 025 | | | | |
| 1-19-93 | | VOP | CCBO | | | |
| 24 May 93 | Det. R. Guevara #2086 | 652 | | | ✓ | |
| 30 Aug 93 | MATTHEW | A.S.A. | ✓ | | | Albert |
| 10-27-93 | A. (a) T | CCAPO | ✓ | | | |
| 10-27-94 | A. (a) FBI | CPD | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

PD-31.915 (Rev. 1/78)

RFC-Serr/Mont 000226

# EXHIBIT 97

#3

CITY OF CHICAGO / DEPARTMENT OF POLICE / 1121 South State Street
IDENTIFICATION SECTION  Chicago, Illinois 60605

ISSUED ON INQUIRY
MAY 8 ~ 1993
BY NAME CHECK ONLY

| CRIMINAL HISTORY OF | MONTANEZ, Jose E. | M/WH |
|---|---|---|
| DATE | 27 Mar 85 | |
| DATE OF BIRTH | 25 Aug 67 | |

| I.R. NO. 736499 | FBI NO. 730 931 DA7 | S.I.D. NO. 08101881 |
|---|---|---|

| NAME & ADDRESS | C.B. NO. | DATE OF ARREST | ARRESTING OFFICER & DISTRICT | CHARGE | DISPOSITION |
|---|---|---|---|---|---|
| Jose E. MONTANEZ<br>1913 N. Kildare<br>23 Aug 67 | 9298361<br><br>ce | -07 Jan 93, Off. Martinez, Dist. 025., Theft Wrt<br>4 Feb 93,Theft(38-16-1a1)Bf/SOL,Judge Smith,Doc#<br>92-0376018,TEMPFLEET TMC | | | |
| Jose MARTINEZ<br>1913 N. Kildare Ave<br>23 Aug 67 | 9358645<br><br>gd | -29 Mar 93, Off. Lezimis, Dist. 025, No FOID Card | | | |
| Jose E MONTANEZ<br>1913 N Kildare<br>23 Sep 67 | 9394261<br><br>cc | - 17 May 93, Off. Van, Dist.025., BFW NO FOID | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

CPD-31 903 (REV 7/88)

CONFIDENTIAL - Further dissemination of information contained in this record is forbidden.
When this record has served the purpose for which it was issued, it must be destroyed (U.S.
Dept. of Justice Rules & Regulations S.S. 20.33).

AR-L 140672
RFC-Serr/Mont 000105

**CITY OF CHICAGO / DEPARTMENT OF POLICE /** 112 South State Street
IDENTIFICATION SECTION    Chicago, Illinois    60605

| CRIMINAL HISTORY OF | MONTANEZ, Jose E.   M/WH |
| DATE | 27 Mar 85 |
| DATE OF BIRTH | 25 Aug 67 |

ISSUED ON INQUIRY
MAY 25 1993
BY NAME CHECK ONLY

| I.R. NO. | FBI NO. |
|---|---|
| 736499 | 730 931 DA7 |

| NAME & ADDRESS | C.B. NO. | DATE OF ARREST / ARRESTING OFFICER & DIST. / CHARGE | DISPOSITION |
|---|---|---|---|
| Jose E. MONTANEZ 1815 N. Harding 23 Aug 67 | 8270739 jlw | -05 May 89, Off. Wojcik, 025, Poss Cannabis<br>20 Jun 89, POSS CANN WRT, PG/FG 2 days tcs, Judge Branch 23-2 | |
| Jose MONTANEZ 1815 N Harding 23 Aug 67 | 8376833 | - 16 Sept 89, Off Babich, 25th Dist Agg Battery<br>11 Oct 89, Agg. Battery, (38-12-4-A), FNPC, Judge Locallo (89MC1-301710)<br>11 Oct 89, Agg. batt. (38-12-4), FNPC, Judge LOcall<br>Doc#, (Ambak)em | |
| Joseph MARTINEZ 1815 Harding 23 Aug. 67 pa | 8429905 | 28 Nov. 89, Off. Rowan. Gangs/N (25th) CTTL<br>16 Jan 90, CTTL(38-21-3), BF/SOL, JUDGE DIVANE, DOC#89283295  (AMBAK)CU | |
| Joe Montanez 1850 Handing 23 Aug 67 | 8492563 th | -2 Mar 90, Off. Alvean 25th Dist., Tres. Land<br>4 Apr 90, CTTV (38-21-2), BF NOLLE, Judge Kowalski DOC#90220365 ambak eh | |
| Jose MONTINEZ 1913 N. Kildare 23 Aug 67 lm | 8572247 | -15 Jun 90, Off. Williams, 25th, S/Batt<br>31 July 90,G.J. IND. #90CR-16801,First Degree Murde (3cts) | |
| Jose E. MONTANEZ 1813 N. Kildare 23 Aug 67 lm | 8573492 | -17 Jun 90, Off. Munoz, Gangs No., (25), Murder<br>31 July 90,G.J. IND - #90CR-16801,First Degree Murder (2cts)Att First Degree Murder<br>4 Oct 91, First Deg. Mur., Att. First Deg. Mur.,(90CR-16801)<br>FINDING NOT GUILTY, Judge Savage | |
| Jose E. MONTZNEZ 1913 N. Kildare 23 Sep 67 | 9109723 md | -30 Apr 92, Off. Santiago, Dist. 025, CTTV<br>14 May 92, CTTV (38-21-2)SOL,Judge Spitzer,Doc#92243639 TEMPFLEET YP | |
| Jose E. MONTANEZ 3822 W. North Ave 23 Aug 67 | 9124415 ls | -20 May 92, Off. Maniates, Dist. 25, D/C<br>24 Jun 92, D/C(38-26-1al), BFSOL, Judge Spitzer, do 92287538, TEMPFLEET tj | |
| Jose MARTINEZ 1913 N Kildare 23 Aug 67 | 9184253 cc | - 04 Aug 92,Off. Antpl, Dist.025., Robbery<br>28Aug92, Robb(38-18-Ia)MS/NOLLE PROS Judge Linn Doc#92326727 TEMPFLEET CU | |
| Jose MONTANEZ 1915 N Kildare 23 Aug 67 | 9231402 cc | - 03 Oct 92, Off. Healy, Dist.025., Robbery, Armed Att<br>28 Oct 92 Armed Robbery(38-8-4) NOLLE Judge Linn Doc# 92333644 TEMPFLEET si | |
| Jose E. MONTANEZ 1913 N. Kildare 23 Aug 67 | 9278434 gd | -07 Dec 92, Off. Kroll, Dist. 025, Retail Theft<br>30 Dec 92 Theft (38-16-a3a) BFW Judge Smith Doc3 92376018 | |

*CONFIDENTIAL* —Further dessemination of information contained in this record is forbidden. When this record has served the purpose for which it was issued, it must be destroyed. (U.S. Dept. of Justice Rules & Regulations S.S. 20,33).

CPD-31.303 (REV. 10/75)

AR-L 140673
RFC-Serr/Mont 000106

CITY OF CHICAGO / DEPARTMENT OF POLICE / 11__ South State Street
IDENTIFICATION SECTION  C__go, Illinois  60605

ISSUED ON INQUIRY
MAY 25 1993
RECORD REVISED 89
BY NAME CHECK ONLY

CRIMINAL HISTORY OF  MONTANEZ, Jose E.  M/WH

DATE  27 March 1985

DATE OF BIRTH  25 Aug 1967  736499

I.R. NO.  736499

FBI NO.  730  931  DA7  08/01

| NAME & ADDRESS | C.B. NO. | DATE OF ARREST, ARRESTING OFFICER & DIST., CHARGE, DISPOSITION |
|---|---|---|
| Jose E. MONTANEZ<br>2206 No. Avers<br>25 Aug 1967 | 7319347 | -26 Mar 85. Off. Sanders, 25th Dist, Criminal Damage to Prop<br>22 Apr 85. CDTP(38-21-1a) SOL Judge O'Brien(dkt 85-125941) |
| Jose MONTANEZ<br>2206 Avers<br>23 Aug 67 | 7367185 | - 5 June 85, Off., Noon, GCU-N (025th Dist.,) Dam toProp<br>2 Aug 85, CDTP (38-21-1a1) SOL, Judge Wilens (Doc No.<br>85195347) |
| Jose MONTANEZ<br>2206 N.Avers<br>23 Aug. 67 | 7443016 | -24 Sept. 85, Off. Brennan GCU/N (25th Dist) Att. Robbery<br>14 Nov 85. S. Battery(38-12-3a) SOL Judge Bolan(85276576)dk |
| Jose E MONTANEZ<br>2206 Avers<br>23 Aug 67 | 7482760 | -27 Nov 85, Off Depke, GSU-N, 025th Dist., Assault<br>10 Dec 85 Simple Assault (38-12-1), MS/SOL, Judge<br>Wilens, Doc# 85 273803 |
| Jose MONTANEZ<br>1815 N. Harding<br>23 Aug. 1967 | 7773 017 | -24 Mar. 87, Off. Whalen, Gang Crime Unit North, (25) Dist.<br>Agg. Assault<br>9 April 87, Agg Assault (38-12-2a) PGFG 1yr ct.<br>Supv. Judge Wilens (Doc# 87148117) |
| Jose E. MONTANEZ<br>1815 N. Harding<br>23 Aug 67 | 7848147 | -22 Jul 87, Off. Schalk, A5VC, (25th) Dist., Robbery    vmd<br>26 Aug 87, INFO#87-cR11121, Robbery<br>20 Nov 87, Robbery(87CR-11121)PG 4 YRS. PROBATION, $360 Fine<br>Judge Maloney |
| Jose MONTANEZ<br>1815 N. Harding<br>23 Aug 67 | 7892228 | -27 Sept 87, Off Kobaft 025th Dist., PCS<br>22 Oct 87, Poss.Cont.Sub.(56½-1402)Poss.Cann.<br>(56½-704c)FNPC, Judge Bastone (doc#87247483) |
| Jose MONTANEZ<br>1815 N. Harding<br>23 Aug 67 | 8019379 | -01 May 88, Off. Muskerin, 025, Agg Assault.<br>16 May 88, Agg Assault(38-12-2a1), SOL, Judge Chrones,<br>Doc#88160875 |
| Jose MONTANEZ<br>1815 N. Harding<br>23 Aug 67 | 8123475<br>(WRW) | -30 Sep 88, Off. Whalen, PH/N(025), Robbery: |
| Jose E. MONTANEZ<br>1815 N. Harding<br>23 Aug. 67, | 8175963 | -18 Dec. 88, Off. Wojcik, 25th Dist. Poss. Marij.   -cd-<br>27 Feb. 89, Poss of Cann, (56½-704a), BFW, Judge Brady, Doc#<br>88356942 |
| Jose E. MONTANEZ<br>1815 N. Harding<br>23 Aug 67    tb | 8193970 | -17 Jan 89, Off. Ramierz 14th Dist., PCS<br>30 Mar 89, Poss. of Cannabis (56½-704a) BF/SOL,<br>Judge Chrones, (Doc# 89102019) |
| Jose MONTANEZ<br>1850 N. Harding<br>23 Aug. 67, | 8203427 | -29 jan. 89, Off. Petrizzi, 25th Dist. ID Check    -cd- |

CONFIDENTIAL —Further dessemination of information contained in this record is forbidden. When this record has served the purpose for which it was issued, it must be destroyed. (U.S. Dept. of Justice Rules & Regulations S.S. 20.33).

CPO-31.903 (REV. 10/75)    ES

AR-L 140674<br>RFC-Serr/Mont 000107

CITY OF CAGO / DEPARTMENT OF POLICE / 1121 h State Street
IDENTIFICATION SECTION   Chicago, Illinois 60605

| CRIMINAL HISTORY OF | SERRANO, Orlando | M/WH |
| DATE. | 22 Dec 88 | 874175 |
| DATE OF BIRTH | 06 Sep 71 | |

**ISSUED ON**
MAY 25 19
BY NAME CHECK ONLY

| I.R. NO. | FBI NO. | STD NO. |
| 874175 | | |

| NAME & ADDRESS | C.B. NO. | DATE OF ARREST | ARRESTING OFFICER & DISTRICT | CHARGE | DISPOSITION |
|---|---|---|---|---|---|
| Orlando SERRANO 4615 W. Altgeld 06 Sep 71 | 8177209 (WRW) | -20 Dec 88, Off. Mahon, GC/N(025), Assault. 13 Jan 89, sim Ass(38-12-1a), BFSOL, Judge WIlens, (doc.# 88308237) | | | |
| Miguel ROMAN 4615 W. Atgeld 29 Sept. 71, | 8203205 | -29 jan. 89, Off. Riccio, GCU-N (25th) Dist. Assault -cd- | | | |
| Freddy BARRRIOS 3522 W Dickens 28 Sep 71 | 8357487 mh | -23 aug 89, Off. Putis, 014th Dist., Theft | | | |
| Fernando SERRANO 3521 W. Dickens 06 Feb 71 | 8709856 ce | -03 Dec 90, Off. Stasch, Dist. 025., Theft 16 Jan91, Theft(38-16-1a1)BF/SOL JUdge Br#23 Doc# 90115235 Grayuc | | | |
| Fernando GONZALEZ 3522 W. Dickens 6 Mar 71 | 8724970 lt | -23 Dec 90, Off. Ortiz 14th Dist., Obs of Traffic 01 Feb 91, Obstruct. Traffic (9-80-180), Non Suit, Judge Chrones, Doc#90454084     GRAY AE | | | |
| Armando SERRANO 4615 W. Altgeld 29 Sep 71 | 8749232 cc | - 29 Jan 91, Off. Cusack, GCU-N (025).,   BFW Battery | | | |
| Fernando GONZALEZ 3522 W. Dickens 29 Sep 72 | 8773883 lt | -1 Mar 91, Off. Scalise 14th Dist., Poss Cann 17 Apr 91 Poss. Cannabis(56½-704)BF?SOL Judge Davi DOc#91243112 GRAY SD | | | |
| Arnando SERRANO 4615 W. Altgeld 28 Sep 72 | 8824704 dc | -08 May 91, Off. Bella, Dist. 025, Armed Robbery 21 Nov 91, Robb, Agg Unlaw. Res. (91CR-13045), FINDING GUILTY, 2 Yrs Prob. Judge Close | | | |
| Armando SERRANO 4615 W. Altgeld Ave. 29 Sep 72 | 9195848 ls | -18 Aug 92, Off. Figueroa, GCU-N, (14), Del Con WRT 13 Oct 92, Disord. Cond. wt (38-26-1) BF/SOL, Judge Coco Doc#900251956  TEMPFLEET  SD | | | |
| Armando SERRANO 4615 W Altgeld 29 Sep 72 | 9275309 ls | -03 Dec 92, Off. Uding, Dist. 025, Batt Sting 29 March 93 Battery(38-12-3A) resisting Arrest (38-31-1) BF Judge Gillespie  Doc# 92148851 TEMPFLEET si | | | |
| Armando SERRANO 4615 W. Aldgeld 29 Sept 72 | 9300197 gd | -09 Jan 93, Off. Haynes, Dist. 011, Disorderly Conduct 3 Feb 93, Disord. Cond.(38-26-1a1), BF/SOL, Judge Wilens, Doc#93191496, TEMPFLEET CB | | | |
| Armando SERRANO 4615 W. Altgeld 29 Sept 72 | 9327150 gd | -13 Feb 93, Off. Acevedo, Dist. 017, Traffic Viol/No Ident 31 Mar 93, TO APPEAR IN TRAFFIC COURT, TEMPFLEET CB | | | |

CPD-31 903 (REV. 7/88)

CONFIDENTIAL · Further dissemination of information contained in this record is forbidden. When this record has served the purpose for which it was issued, it must be destroyed (U.S. Dept. of Justice Rules & Regulations S.S. 20.33).

AR-L 140675
RFC-Serr/Mont 000108

Page 2

CITY OF CHICAGO / DEPARTMENT OF POLICE / 1121 South State Street
IDENTIFICATION SECTION   Chicago, Illinois 60605

MAY 25 19

BY NAME CHECK ONLY

| CRIMINAL HISTORY OF | SERRANO, Orlando   M/Wh | | | | |
|---|---|---|---|---|---|
| DATE | 22 Dec 88 | | | | |
| DATE OF BIRTH | 06 Sep 71 | | | | |

| I.R. NO. 874175 | | FBI NO. | | S.I.D. NO. | |
|---|---|---|---|---|---|

| NAME & ADDRESS | C B NO. | DATE OF ARREST | ARRESTING OFFICER & DISTRICT | CHARGE | DISPOSITION |
|---|---|---|---|---|---|
| Angel SERRANO<br>3523 W. Dickens<br>05 Sept 73 | 9376332<br><br>gd | -23 Apr 93, Off. Williams, Dist. 025, Disorderly Conduct | | | |
| Armando SERRANO<br>4615 W. Altgeld<br>29 Sept 72 | 9379443<br><br>gd | -27 Apr 93, Off. Depke, Dist.025, Assault | | | |

CPD-11.903 (REV. 7/88)

CONFIDENTIAL - Further dissemination of information contained in this record is forbidden. When this record has served the purpose for which it was issued, it must be destroyed (U.S. Dept. of Justice Rules & Regulations S.S. 20.33).

AR-L 140676
RFC-Serr/Mont 000109

# EXHIBIT 98

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

JOSE MONTANEZ,                    )

           Plaintiff,       )

  vs.                             )  No. 17-CV-4560

CHICAGO POLICE OFFICERS     )

REYNALDO GUEVARA, ERNEST     )

HALVORSEN, EDWARD            )

MINGEY, AND UNKNOWN          )

OFFICERS;MATTHEW             )

COGHLAN, JOHN DILLON,        )

THE CITY OF CHICAGO AND      )

COOK COUNTY,                 )

        Defendants.

     The videotaped deposition of WILDA VARGAS, called for examination pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before MARY ELLYN D'ANDREA, at 550 East Devon, Itasca, Illinois, on December 12, 2018, at the hour of 10:00 a.m.

REPORTED BY:  MARY ELLYN D'ANDREA, CSR.

LICENSE NO:    084-002317



Bouto 011469

APPEARANCES:

      LOEVY & LOEVY, by

      RUSSELL AINSWORTH,

      312 NORTH MAY STREET

      SUITE 100

      CHICAGO, IL, 60607

      312-243-5900

      russell@loevy.com

          Representing the Plaintiff;

          Jose Montanez


      BONJEAN LAW GROUP, by

      JENNIFER BONJEAN, ESQUIRE,

      1000 DEAN STREET

      SUITE 422

      BROOKLYN, NY, 11238

      718-875-1850

      jennifer@bonjeanlaw.com

          Representing the Plaintiff;

          Armando Serrano



APPEARANCES

THE SOTOS LAW FIRM, P.C.

JEFFREY R. KIVETZ

JOSH ENGQUIST

500 EAST DEVON AVENUE

SUITE 150

ITASCA, IL, 60143

630-735-3300

jkivetz@jsotoslaw.com

jengquist@jsotoslaw.com

Representing the Defendants;

Ernest Halvorsen, Edward Mingey

ROCK FUSCO & CONNELLY, LLC., by

EILEEN ROSEN

321 NORTH CLARK STREET

SUITE 2200

CHICAGO, IL, 60654

312-494-1000

erosen@rockfuscoconnelly.com

Representing the Defendant

City of Chicago



Bouto 011471

APPERANCES:

JONES DAY, by

KRISTINA CERCONE

77 WEST WACKER DRIVE

35TH FLOOR

CHICAGO, IL, 60601

312-782-3939

kcercone@jonesday.com

Representing the Defendant;

Matthew Coghlan

ASSISTANT STATE'S ATTORNEY

JULIE NIKOLAEVSKAYA

500 RICHARD J. DALEY CENTER

CHICAGO, IL, 60602

312-603-4366

Yulia.nikolaevskaya@cookcountyil.com

Representing the Defendant;

John Dillon and Cook County



Bouto 011472

APPEARANCES:

     LEINENWEBER BARONI & DAFFADA, LLC., by

     JAMES V. DAFFADA

     120 NORTH LASALLE STREET

     SUITE 2000

     CHICAGO, IL, 60602

     312-663-3003

     jim@ilesq.com

        Representing the Defendant;

        Reynoldo Guevara


     ALSO PRESENT:

     JOHN D'ANDREA, Videographer

     ALEX GAITAN, Interpreter



Bouto 011473

                        I N D E X

WITNESS                              EXAMINATION

WILDA VARGAS

  By MR. KIVETZ                        9, 272

  By MR. AINSWORTH                    93, 277

  By MS. BONJEAN                     200, 282

  By MS. CERCONE                         237

  By MS. ROSEN                          251




                E X H I B I T S

NUMBER                             MARKED FOR ID

VARGAS Deposition Exhibit

  Exhibit No. 1                         23

  Exhibit No. 2                         42

  Exhibit No. 3                         43

  Exhibit No. 4                         58

  Exhibit No. 5                         67

  Exhibit No. 6                         70

  Exhibit No. 7                         74

  Exhibit No. 8                        146



Bouto 011474

THE VIDEOGRAPHER: Good morning. My name is John D'Andrea, legal video specialist with McCorkle Litigation Services located in Chicago, Illinois. I'm the videographer on Wednesday, December the 12th, 2018 for the recording of the deposition of Wilda Vargas being taken at the Sotos Law Firm, 550 East Devon Avenue in Itasca, Illinois, at the time of 10:04 a.m. in the matter Jose Montanez, Plaintiff, versus Chicago Police Officers Reynaldo Guevara, et. al, Defendants, filed in the United States District Court for the Northern District of Illinois, Case No. 17CV4560.

Will counsel please identify themselves for the record beginning with Plaintiff's counsel, and then the witness will be sworn in by the court reporter.

MR. AINSWORTH: This is Russell Ainsworth appearing on behalf of Mr. Montanez.

MS. BONJEAN: This is Jennifer Bonjean, B-o-n-j-e-a-n, on behalf of Co-Plaintiff Armando Serrano under the caption Serrano versus Guevara, et. al. The case number is 2017CV2869.

MS. NIKOLAEVSKAYA: Assistant State's



Bouto 011475

Attorney Julie Nikolaevskaya on behalf of the County and John Dillon.

MS. CERCONE: Kristie Cercone on behalf of Matthew Coghlan.

MR. DAFFADA: James Daffada on behalf of Rey Guevara.

MS. ROSEN: Eileen Rosen on behalf of Defendant City of Chicago.

MR. ENGQUIST: Josh Engquist on behalf of Defendants Halvorsen and Mingey.

MR. KIVETZ: And Jeff Kivetz on behalf of Defendants Halvorsen and Mingey.

ALEX GAITAN,

called as an interpreter herein, was sworn to interpret the questions from the English language to the Spanish language and the answers from the Spanish language to the English language.

(Whereupon, the witness was duly sworn.)

WILDA VARGAS,

having been first duly sworn, was examined and testified as follows:

Bouto 011476

DIRECT EXAMINATION

BY MR. KIVETZ:

Q.   Good morning, Ms. Vargas.  Again, my name is Jeff Kivetz.  I'm going to ask -- be asking you a lot of the questions here today.

Can you please state and spell your full name for the record?

A.   Wilda Rosanna Vargas.

Q.   First, I want to go over a few ground rules before we continue with your deposition. All right?

A.   Yes.

Q.   First and foremost, we have a Spanish interpreter here today who will be interpreting everything I say from English to Spanish and everything you say from Spanish to English.  As such, although you may understand some of my questions, I ask that you only provide responses in Spanish after the interpreter has completed interpreting my questions.  Do you understand that direction?

A.   That's correct.

Q.   Additionally, some of the other attorneys may assert objections to some or even



many of my questions, and as such I ask that you please wait for the interpreter to interpret those objections before you start to answer my questions.  Do you understand that direction?

A.  That's correct.

Q.  If at any time you do not understand a question, please let me know, and I'll attempt to rephrase.  But if you provide an answer to my question, we are all going to assume that you understood my question and provided an appropriate response.  Do you understand this direction?

A.  Yes, I do.

Q.  Additionally, we don't want you to guess at any point in time in response to any questions posed here today.  If you do not know the answer, it's perfectly acceptable to tell us that you either don't remember or you don't know.  But if you do know the answer and can remember, we want you to provide us with an answer.  Do you understand this direction?

A.  That's correct.

Q.  Finally, if you need a break at any time, just let me know.  We'll be happy to take



a break, and we'll continue after that.  Okay?

A.   That's correct.

Q.   Okay.  Ms. Vargas, how old are you?

A.   I am 56 years old.

Q.   And what is your date of birth?

A.   6/15 of '62.

Q.   And where were you born?

A.   In San Pedro Sula, Honduras.

Q.   When did you move to the U.S.?

A.   April of 1984.

Q.   What town did you originally move to?

A.   Illinois.

Q.   Where in Illinois?

A.   South side, south side.

Q.   Is that in the south side of Chicago area?

A.   Yes, Little Village, 18th Street.

Q.   Do you remember the address there?

A.   Yes.  It was 18 -- no -- 1918 West Cullerton.

Q.   And how long did you live at the address at 1918 West Cullerton?

A.   Two years.

Q.   And where did you move after that?

Bouto 011479

A.    To Leavitt.  21 -- let me see -- yes, 22 -- yeah, 2219 Leavitt -- no -- 21st Street, 21st.

Q.    And did you move there in 1986 approximately?

A.    Correct, yes.

Q.    How long did you live on Leavitt?

A.    One year.

Q.    And where did you move to next around 1987?

A.    Yes, 18 -- 1838 Springfield on the north side.

Q.    And how long did you live at 1838 North Springfield?

A.    Yeah, bought a house in '80 -- no -- '90, '91 -- '91.

Q.    Okay.  Where did you move to in 1991?

A.    Yes, I lived there with the person that passed -- passed away, and then the same month that the person passed I moved to 1704 North Springfield.

Q.    So, did you live at 1838 North Springfield when your husband Rodrigo Vargas died in February of 1993?



Bouto 011480

A.   Yes, I used to live there.

Q.   And where do you currently live now?

A.   1704 North Springfield.

Q.   No -- where do you live now?

A.   At 1704 North Springfield.

Q.   Okay.  And when did you move to 1704 North Springfield?

A.   I used to live in Maywood.  I moved to Maywood in 2003.

Q.   Okay.

A.   And then I moved four years ago in 2014, yes.

Q.   Okay.  And are you currently married?

A.   I am divorcing right now.

Q.   Okay.  Did you get remarried after -- is this your second husband?

A.   Yes.

Q.   What is his name?

A.   Santiago Morello.

Q.   And who do you currently live with at 1704 North Springfield?

A.   With my children.

Q.   And what are the names of your children?

Bouto 011481

A.   Elke Rodriguez Rodrigo Vargas.   Second one, Omar Jonathan Vargas.

Q.   What do you currently do for work?

A.   Right now I have a restaurant.

Q.   Where is the restaurant?

A.   1911 West Rice -- Rice in Melrose Park. Yes, the name is El Picosito Bar and Grill.

Q.   Ms. Vargas, what's your highest level of education?

A.   I finished high school, and I studied business and public accounting.  And here I studied to teach driving, driving classes.

Q.   When did you graduate high school?

A.   In 1983.

Q.   And where did you study business and public accounting?

A.   In Honduras.

Q.   And, Ms. Vargas now I just want to remind you of one rule regarding the deposition, if you just wait until the interpreter's done interpreting the question until you answer the question.  Do you understand that?

A.   Yes.

Q.   Thank you for that, I appreciate it.



How old is Elke?

A.   31 years of age.

Q.   What is his date of birth?

A.   August 12 of 1986.

Q.   And how old is Omar?

A.   And Omar was born May 19th of '89.

Q.   And they were both born in Illinois?

A.   Yes.

Q.   And they're both U.S. citizens?

A.   Yes.

Q.   What does Elke do for work?

A.   He has a barbershop.

Q.   He owns his own barbershop?

A.   Yes.

Q.   And what does Omar do for work?

A.   He is a truck driver.

Q.   Do you know the name of the company that Omar works for?

A.   I don't remember.

Q.   And Elke and Omar's father was Rodrigo Vargas; correct?

A.   Correct.

Q.   Do you remember Rodrigo's date of birth?



A.   May -- May 5th of '66 -- '65, sorry.

Q.   Where was Rodrigo born?

A.   In Mexico, in Zacatecas.

Q.   When did he move to the United States?

A.   That, I don't know.  When he was a child.

Q.   Where did you meet Rodrigo?

A.   I met him because he was a friend through my sister's husband.

Q.   And you ultimately married Rodrigo; is that correct?

A.   Yes.

Q.   When did you guys get married?

A.   February 10th of 2002.

Q.   February 10th of -- of 1992 do you mean?

A.   Yes.  Yeah, we had children already, but we got married later.

Q.   Okay.  I'm sorry, I thought you said 2002, but you said 1992?

A.   '92.

Q.   And what did Rodrigo do for work when you were married?

A.   He was a supervisor for the noodles



company in Chinatown.

Q. And do you remember the name of the noodle company that he worked for?

A. It was called Noodle -- Noodle Hong Kong I think, something like that.

Q. What did Rodrigo do at -- at Noodle Hong Kong?

A. He made the cookies that had the little paper inside and the noodles.

Q. He made the fortune cookies?

A. Yes.

Q. And he was a supervisor there; correct?

A. Yes.

Q. Did he -- did Rodrigo work at the noodle shop until he died in February of 1993?

A. That's correct.

Q. And do you remember the date that Rodrigo died?

A. Yeah, in February 3rd -- February 3rd of '93, yes. It's either February 3rd or 5th.

Q. Okay.

A. February 3rd, I think.

Q. Where did you work in early February 1993?



Bouto 011485

A.   I lived at 1838 Springfield.

Q.   Where did you work?

A.   At Barce Company.

Q.   How do you spell that?

A.   It's B-a-r-c-e Company.

Q.   And what did you do at the Barce Company?

A.   I did work with material, sewing, seamstress.  I would make bags for vacuums, just bags.

Q.   And how long did you work at the Barce Company?

A.   18 years.

Q.   And you said that you were living at 1838 North Springfield when Rodrigo died in February of 1993?

A.   Yes.

Q.   Did you and Rodrigo own any other properties before his death?

A.   Yes.

Q.   What properties did you own?

A.   1704 North Springfield.

Q.   And were you using that as a rental property at the time?



Bouto 011486

A.    Yes.

Q.    What type of building is 1704 North Springfield?

A.    What do you mean like; you mean like brick or --

Q.    Is it a house, is it a two-flat, is it a three-flat?

A.    Two-flat.  Two stories.

Q.    And would you -- and would you rent out those two stories in February of 1993?

A.    Two were rented, one was empty.  It was being fixed because we were planning on moving there.

Q.    And who was working on 1704 North Springfield in February of 1993?

A.    He was.

Q.    Rodrigo was?

A.    Yeah.  When he was not working, he would go there.  You know, at night he would go and work there.

Q.    What type of work did he do on the building?

A.    He would like do the walls, fixing the walls.



Q.    And you guys were planning on moving to 1704 North Springfield before he died?

A.    Yes.

Q.    Since you were both working, did you have anyone watching your children?

A.    When we would go to work, yes.

Q.    And what were your regular work hours in February of '93?

A.    It was 7:45, and I would get out at 4:15.

Q.    And who watched your children?

A.    A lady called Velez, Anna Velez, Velez.

Q.    And where did Ms. Velez live?

A.    She lived in the same block.

Q.    Would you bring your children to Ms. Velez's house or would she bring -- or would you -- or would she come over?

A.    She will come to my house to pick them up.

Q.    Do you remember what address she lived at?

A.    I was in 1838, so -- she was like in 1834.

Q.    So she lived a few houses down from

Bouto 011488

your house?

A.   One house over.

Q.   One house over, okay.

How often did Rodrigo work before his death?

A.   He would come in at 6:00, and he would leave at 2:00.

Q.   And what would he -- did he have a second job or anything after he got back from work?

A.   No.

Q.   When Rodrigo wasn't working, what would he do in his spare time?

A.   With free time, you know, we were fixing up the house, so we would fix up the house when he got out.

Q.   What about social activities, what did Rodrigo like to do socially?

A.   We would go on Sundays to, you know, mom's house.

Q.   Would you do that together as a family?

A.   As a family.

Q.   And what would you do at Rodrigo's mother's house?



Bouto 011489

A.   All the siblings would get together, you know, the ladies, children, and she will cook for everybody.

Q.   So you guys would have a family meal every Sunday?

A.   Yeah, but first we would go to a flea market, you know, on Canal and 18th Street.  We used to go to Racine, Racine Street, there was a flea market there, and then from there we would go to grandmother's house.

Q.   Okay.  And did Rodrigo have any brothers or sisters?

A.   Yes.

Q.   How many?

A.   Six.

Q.   How many bothers and how many sisters?

A.   Four boys, and three girls.

Q.   Did Rodrigo do any other type of social activities that you remember?

A.   Yeah, we would go to the park with the children.

Q.   Anything else that you can remember?

A.   No -- yeah, he would work as a mechanic, fixing his cars, too, you know, before



Bouto 011490

we would go to see the family.

Q. Did Rodrigo have any close friends?

A. That I know of, just his siblings. And when we were dating he would have friends, but then after we got married he didn't.

Q. He became more of a family man at that time?

A. Yes.

Q. How old was Rodrigo when he died?

A. 25.

Q. He was a young man?

A. Yes.

Q. I want to show you what we're going to mark as Exhibit 1.

(Whereupon, VARGAS Deposition Exhibit No. 1 was marked for identification.)

BY MR. KIVETZ:

Q. Ms. Vargas, can you tell us what you see in Exhibit 1, please?

A. That is my husband.

Q. And is that a picture of Rodrigo as approximately how he looked in February of 1993?

A. That's how he was.



Q.   Mrs. Vargas, could you please just hold the picture up and show it to the camera?  Okay. Thank you.

And, Ms. Vargas, we have some tissues here.

And I want to talk a little bit more about Rodrigo and his death.  And I understand that this is a sensitive issue for you and your family, but is it okay if we talk a little bit about the morning that your husband was murdered?

A.   Correct.

Q.   Do you remember that Rodrigo died on February 5th, 1993?

A.   Yes.

Q.   And around what time did Rodrigo get up that morning?

A.   Yeah, he would get up at 5:00 and he would leave at 5:15, 5:20.

Q.   And did you get up with Rodrigo?

A.   No.  Sometimes I would feed him, sometimes I would not.

Q.   And what about the morning of February 5th, 1993, did you feed him breakfast that



Bouto 011492

morning?

A.   No.

Q.   What about your children, were your children up on the morning of February 5th, 1993?

A.   No.  No, because I would get up at 7:00 and then I would get the kids up to change them to get them ready.

Q.   And did -- so, you did not see Rodrigo leave for work on the morning of February 5th?

A.   No, I did not.

Q.   You and your children were both sleeping at the time?

A.   That's correct.

Q.   And what did you do after Rodrigo left the house that morning?

A.   I didn't hear him when he left.

Q.   Okay.  Did you get up at 7:00 approximately on February 5th?

A.   Yes, because I had an alarm and it would always go off at 7:00.

Q.   And what did you do after you got up that morning?

A.   You know, I heard the door.  They were



Bouto 011493

knocking at the door and they were ringing the bell.

Q.   Around what time did you hear the knocking on the door?

A.   Yeah, it -- it was around 7:00.  It was early.  It was before Anna Velez got there, so it was maybe 10 to 7:00 they were knocking on the door.

Q.   Was it Anna Velez that was knocking on your door?

A.   Yes, it was Anna Velez.  I thought it was something that happened to her husband because he's, you know, suffered from the heart. And then I asked what happened, and she said Rodrigo is outside.  And then I said no, he is working -- no, he's -- yeah, he said -- he say he's on the bus and he's dead.

Q.   So, was it only Anna Velez who was at your door that morning?

A.   That's correct.

Q.   And Ms. Velez told you that Rodrigo had died?

A.   That's correct.

Q.   And what did you do after she told you

that Rodrigo had died?

A. I ran outside to see if it was true.

Q. And where did you go?

A. And then I yelled at her -- I yelled at her and I said why didn't you tell me earlier.

Q. And what did she say in response?

A. That she was -- that she was afraid to come and tell me because it was too early, and she did not have phone to call me.

Q. And after you had that conversation with Ms. Velez, did you run outside?

A. I went out running to see if it was true.

Q. And what did you see when you went outside?

A. I saw the window that was shot at and broke. He was, you know, slumped down, facing down with his radio.

Q. Was he inside your car?

A. He was in his car like that.

Q. What type of car did he drive?

A. It's a conversion van.

Q. Do you remember the color of the van?

A. It was a little blue with gray.



Bouto 011495

Q.   Where was the car parked?

A.   In front of the house.

Q.   And what did you do after you saw Rodrigo's body?

A.   I couldn't believe it, so I went inside and called the police.  And then they did not understand me because I was speaking Spanish. And then I told them that he was dead, for them to come right away, and then I put the neighbor on so -- on the phone.

Q.   And when you were -- did you call from inside your house?

A.   Yes, from inside my house.

Q.   When you went outside to check on Rodrigo, were there neighbors in the vicinity?

A.   Yes.

Q.   And do you remember any of their names?

A.   I don't anymore.

Q.   But you remember Anna Velez being there?

A.   Yes.

Q.   Where were your children when you went outside?

A.   They were inside the house.

Q. And they didn't see Rodrigo's body; correct?

A. No, no, they did not see it. The oldest was looking out the window, that's it.

Q. And a little later on that morning, did you speak with detectives?

A. The police came and then the detectives came.

Q. Okay. And did you have any conversation with any police officers before you spoke with detectives?

A. Yes, I did.

Q. Okay. Do you remember any of the conversations that you had with any police officers outside or at your house that morning?

A. I don't remember the names. I don't remember their faces either.

Q. But you do remember talking to two detectives at your house?

A. Yes. They spoke English.

Q. They spoke English?

A. Yes.

Q. Do you remember their names being Detective Jack and Shack?



Bouto 011497

A.    Yes.

Q.    Okay.  And did you talk with them at your house that morning?

A.    Yes.

Q.    Did you talk with Detective Shack and Jack in English or in Spanish?

A.    In English.

Q.    Was there an interpreter there to help the discussions with Detective Jack and Shack?

A.    Anna Velez was with me, and she spoke English.

Q.    Did Ms. Velez act as an interpreter for you?

A.    Yes, and the neighbor next door who called the police.

Q.    And what was the name of the neighbor next door?

A.    I don't remember.  I know they were pastors, but I don't remember.

Q.    You know that they were -- they were pastors did you say?

A.    They were pastors.

Q.    Do you know what church they were pastors at?

Bouto 011498

A.   I know where the church is located --
let me see -- Pentecostal.

Q.   And where was the Pentecostal church
located?

A.   That church was at -- let me see --
about five blocks away from the house.  I don't
know the exact address, but I know how to get
there, because I would go with them.  They would
take me.

Q.   And was the church on Springfield?

A.   It was near Wabansia and, you know,
going towards like Central.

Q.   And do you remember your conversations
that you had with Detective Jack and Shack on
the morning that your husband died?

A.   Yes, I do.

Q.   What did you tell the detectives?

A.   Well, they were asking me where I was
at when he died, and then I -- and then I told
him that I couldn't, you know, hear him when,
you know, he got up, and I told him that
sometimes I would hear him and sometimes I would
not.  And, you know, if he -- if I had cooked
for him, if he had eaten, you know, I told him



Bouto 011499

that, you know, he did at night, not in the morning. And -- you know, and that he didn't want to bother us getting up that early in the morning because he didn't like getting us up that early in the morning.

Q. Do you remember telling them anything else?

A. I don't remember.

Q. Do you remember if they asked you any questions about your husband's job?

A. Oh, yes, yes.

Q. What did you tell them?

A. Yeah, they asked me at what time he would leave, and I told them that he would leave around 5:15 or 5:20, because he worked at the -- the Chinatown neighborhood.

Q. Did they -- did they ask you where you were living?

A. Yes.

Q. And you told them that you resided at 1838 North Springfield?

A. Yes.

Q. Did they ask you about how you found Rodrigo's body that morning?



Bouto 011500

A.    Yes.

Q.    What did you tell them?

A.    That Anna Velez came knocking on my door earlier because she sees the children, and she was the one that let me know.

Q.    Did they ask you if Rodrigo had any enemies?

A.    I said no, that he did not.

Q.    Did they ask you if Rodrigo had any problems recently?

A.    Yeah, they asked me, but I said he hadn't had any problems recently.

Q.    Okay.  Did you tell them that Rodrigo's van had recently been stolen?

A.    Yes.  Yeah, you know, it had been stolen recently.  It had been maybe six -- four months or six months.

Q.    And you told Detectives Jack and Shack that?

A.    Yes.

Q.    And during this conversation with the detectives, did you tell them anything about the event that occurred the night before on February 4th, 1993?

Bouto 011501

A. I'm sorry, could you say the question again?

Q. When you talked with the detectives on the morning that your husband died, did you tell them anything about what happened the night before on February 4th, 1993?

A. No.

Q. Can you describe how you were feeling when you talked with the detectives that morning?

A. I feel bad. I couldn't believe what was happening.

Q. It's fair to say you were very emotional at the time?

A. Of course.

Q. Do you remember anything else about what you told the detectives on the morning that your husband passed?

A. They asked me about a day before where I had been with him.

Q. Okay. And did you -- what did you tell them about that?

A. That we had -- that we were going to the bank. That he told Anna Velez to get the



Bouto 011502

kids ready because we were going to be going to
the bank.

Q.   And I'm -- I'm talking about what
happened on February 5th when you talked to the
detectives.

Did you tell the detectives that you
went to the bank?

A.   Yes.

Q.   What else did you tell them?

A.   That we were coming from the bank --
that we went to the bank.  I got out at 4:15
from work, I picked up the children, and the
children were ready, and they were waiting for
me to go to the bank.  That was around 4:30.
And then the bank was on 21st and Cermak.  And
the bank's name is Mutual Federal Savings.  We
were to deposit checks, my checks and his
checks, to make the payments for the house.

Q.   And you told this to Detective Jack and
Shack on February 5th, the day that your husband
died?

A.   They asked me what I had done the day
before with him.

Q.   Okay.  Did you talk with any other



detectives on February 5th -- on February 5th?

A. On February 5th there were two detectives.

Q. Okay. So, and those were Detective Jack and Detective Shack; correct?

A. Yes.

Q. Did you talk with Rey Guevara on February 5th, 1993?

A. Rey Guevara came after.

Q. Okay. Did you talk with --

A. Because I -- because I did not speak English, so I did not understand.

Q. And do you remember talking with Ernie Halvorsen on the morning that your husband died?

A. Yes.

Q. Do you remember, as you sit here today, talking with more than two detectives on February 5th, 1993?

A. I spoke to two detectives. I don't remember anybody else. I spoke to two gentlemen.

Q. Okay. And they were Detective Jack and Detective Shack; right?

A. Yeah, I didn't know the names at the

Bouto 011504



time, but when they came later, you know, that's when I learned the names because they gave me the card.

Q.   Okay.  Now, did Rodrigo's funeral take place shortly after February 5th?

A.   Yeah, his funeral was on a Monday.  I remember that this happened on a Thursday and we -- they gave him back to us until Monday.

Q.   Where was the funeral?

A.   It was -- his funeral was on 18th Street.  I don't remember the name either, but it was on 18th Street.

Q.   Was he buried?

A.   Yes.

Q.   Where was he buried?

A.   He was buried at Roosevelt, you know, Mount Carmel -- Mount Carmel.

Q.   Now, after Rodrigo's death, you ultimately decided to move out of your house on Springfield Avenue?

A.   Yes.  I was afraid to be there.

Q.   And when did you move out?

A.   This happened in February.  In March, a month later.



Bouto 011505

Q.   And you moved to 1704 North Springfield?

A.   Yes.

Q.   You said that you spoke with a Detective Guevara after your husband's death; is that correct?

A.   Yes.

Q.   And do you remember speaking with him a few months afterwards?

MS. BONJEAN:  I'm going to object, foundation and --

MR. AINSWORTH:  And leading.

MS. BONJEAN:  Yes.

BY MR. KIVETZ:

Q.   Do you remember when you spoke with Detective Guevara?

A.   Yes.  I don't remember when he came to talk to me, but he did speak to me because he spoke Spanish.

Q.   Do you remember if it was warm or cold outside when he spoke with you?

A.   It was cold.

Q.   And do you remember having a conversation with Detective Guevara about events



Bouto 011506

that occurred the night before your husband's death on February 4th, 1993?

A. I'm sorry, could you say the question again?

Q. Do you remember talking with Detective Guevara about events that occurred on February 4th, 1993, the day before your husband passed away?

A. No, but I didn't know him then. I mean, how am I going to talk to him the day before if he came later.

Q. Okay. I think that you might be a little -- bad question. Let me try to rephrase it.

Do you remember ever talking with Detective Guevara on the phone?

A. That was after he interviewed me.

Q. Okay. And did you ever talk to Detective Guevara about an incident at a gas station that occurred on February 4th, 1993?

A. Yes. Yeah, that was the only thing that I could explain when he was on his way back, the incident that happened.

Q. And you told him --



Bouto 011507

MS. BONJEAN: I'm going to object. Did she say something about a bank? I heard banco in there, and I didn't hear a translation to banco.

THE WITNESS: When we were coming from the bank -- we were coming from the bank.

BY MR. KIVETZ:

Q. And was that the first time when you spoke with Detective Guevara that you told anybody about what happened after the bank on February 4th, 1993?

A. Yes.

Q. And when you were speaking with him about events that happened on February 4th after you visited the bank, were you talking with him on the phone or in person?

A. No, in person.

Q. But did you first make plans to meet up with him by phone?

A. He made -- he made an appointment, he made an appointment.

Q. So he made an appointment by phone before you saw him in person and told him about the events that happened on February 4th, 1993?

A. Yes.



Bouto 011508

Q. And when you met with him, did you tell him about an incident that occurred at a gas station the night before your husband's death?

A. Yes.

Q. And what -- what happened after work on February 4th, 1993; what did you do?

A. We went to the bank. We were going to exchange the checks to make the payments for the house.

Q. And where was the bank?

A. At 21st and Cermak, and the bank's name is Mutual Federal Savings.

Q. And before you went to Mutual Federal Savings, did you meet at your house?

A. Of course.

Q. And who was with you when you left your house to go to the bank?

A. My children, my husband, and me.

Q. And what -- approximately what time did you meet up with your husband and children to go to the bank?

A. About 4:30. I left work at 4:15, so I walked over to the house, I walked into the house, and they were ready for us to go.



Q.   And did you leave in your blue van?

A.   Yes, a conversion van.

Q.   I want to show you what we're going to mark as Exhibit 2.

(Whereupon, VARGAS Deposition Exhibit No. 2 was marked for identification.)

BY MR. KIVETZ:

Q.   And is this a picture of the car that you traveled in to the bank on February 4th, 1993?

A.   Yes.

Q.   And that was the car that you and Rodrigo owned; correct?

A.   Correct, yes.

Q.   Why did you go to the bank that day?

A.   Because we had to exchange the checks, his and mine, so that we could make the payment for the house.  Yeah, it was -- you know, it was the 3rd, so we had to make the payments for the house.

Q.   And what did you do after you got to the bank?

A.   We turned right back and we went by the



Bouto 011510

gas station to fill up with gas. That was around 6:15, 6:20.

Q. And what gas station did you go to?

A. Central and North Avenue.

Q. Do you remember the name of the gas station?

A. No, I don't know what the name was.

(Whereupon, VARGAS Deposition Exhibit No. 3 was marked for identification.)

BY MR. KIVETZ:

Q. I want to show you what we've marked as Exhibit 3, and ask you what does that picture depict?

A. A gas station.

Q. Is that the gas station that you visited on February 4th, 1983?

A. Yes.

Q. We have just a couple minutes left on the videotape, so we're going to take a break here and continue on after they change the tape.

THE VIDEOGRAPHER: The time is 10:59. We're off the record.



(Whereupon, a short recess was taken.)

THE VIDEOGRAPHER: We are back on the record. The time is 11:11.

BY MR. KIVETZ:

Q. Ms. Vargas, when you arrived at the gas station on February 4, were the -- were the lights on in the gas station?

A. Yes, they were on.

Q. Was it dark outside?

A. Yes, it was dark.

Q. And when you first arrived to the gas station, did -- did anyone get out of the car?

A. Yes, my husband got out of the vehicle to fill it up with gas.

Q. And did he fill the van up with gas?

A. Yes.

Q. And where were you seated when he was filling up the car with gas?

A. I was sitting in the front with my child on my lap.

Q. So you were sitting in the front passenger seat?

A. Yes.



Q.    Which child did you have in your lap?

A.    The youngest one, the little one.

Q.    And what happened after Rodrigo filled up the gas tank?

A.    He climbed into the car, and then there was a vehicle across, and then he was honking the horn in order to be able to get out of the parking -- you know, out of the station.  And then he lowered the window in his car and he told them, you know, you -- you mother fuckers, move, and then the other guys answered him back, and then they said you're the mother fucker, and then they moved back.

Q.    Ms. Vargas, before your husband got back in the car, did he go inside to pay for the gas?

A.    Yes.

Q.    And how long was he inside the car -- inside the gas station?

A.    About 10 minutes.

Q.    And before --

A.    Because there were other people paying.

Q.    And while he was inside, is that the point in time when the car blocked your car?



Bouto 011513

A.   Well, the vehicle was stopped, but it was kind of like that, and the other vehicle was across.

Q.   When the other vehicle blocked your car, was your husband inside the gas station paying?

A.   I mean, when he -- when he came, he got out to pump the -- the gas, but, you know, you have to pay first in order to pump the gas.

Q.   And my question, Ms. Vargas, is was he inside when the other car came in front of your car and blocked it?

A.   No, the vehicle was already there.

Q.   Okay.  And the vehicle was there while Rodrigo was pumping the gas?

A.   Yes.

Q.   Can you describe what the vehicle that blocked you in looked like?

A.   Yes.

Q.   What did it look like?

A.   It was -- it was a four-door car, big one, brown on the top -- yeah, like some sort of cloth material on top, and a cream color or a light brown.



Bouto 011514

Q. And could you tell from your vantage point how many people were in the car?

A. There were three people.

Q. And where were the three people sitting in the car when you saw them?

A. There were two in the front and one in the back.

Q. And can you describe what the person looked like who was driving the car?

A. What I could see, because it was high, and the other person was across, I could see the person driving. It was a person tall, he didn't have any hair here. I mean, that's it.

Q. And what about the front seat passenger, can you describe him at all?

A. Yes, because he came around and I could see the other person on the seat.

Q. And what did the person who was sitting in the front seat passenger side look like?

A. The other person was short, dark, with his hair kind of long.

Q. Okay. And was -- what nationality was the driver?

A. That, I don't know.

Bouto 011515

Q.   Was he white, black, Hispanic?

A.   Hispanic.

Q.   And what about the front seat passenger, was he white, black, or Hispanic?

A.   They look like -- they look Latinos.

Q.   And what about the person sitting in the back seat, can you describe what he looked like?

A.   I couldn't see it because I was high and he was in the back.

Q.   So all you could see was the tall driver and the short front seat passenger; is that correct?

A.   Yes.

Q.   Was this the first time that you've ever seen these individuals?

A.   Yes.

Q.   Did you know their names?

A.   No.

Q.   And then what happened after the tan car blocked you in?

A.   They wouldn't move, so any way he could he got out of the way.  But, you know, he was able to get out, but because of they were saying



Bouto 011516

to each other, you know, you mother fuckers and stuff like that, you know, the car followed him after he left the gas station.

Q. Did anybody get out of the -- the tan-colored car before this altercation occurred?

MS. BONJEAN: Objection to the mischaracterization of the event.

THE WITNESS: You know, when -- when he was going out to the street, you have to wait for the vehicles to pass by. And at Wabansia Street there was a stop sign there, you know, because you had to turn to Wabansia, because Central is here, and Wabansia is here, so they were following him. And then he saw -- he saw them in the rearview mirror, and then he said to me they're following me because, you know, they're honking their horn, and then, you know, he was stopped and they were stopped.

BY MR. KIVETZ:

Q. So, after Rodrigo honked the horn, the tan-colored car followed you down Wabansia; is that what you said?

A. To Wabansia, and then we turned towards



Bouto 011517

the house towards Springfield, and then they continued following him doing the same thing.

Q. Okay. So, did the tan-colored car follow you all the way home from the gas station?

MR. AINSWORTH: Objection to the form of the question.

MR. KIVETZ: Let me rephrase.

BY MR. KIVETZ:

Q. Did the -- did the tan-colored car that Rodrigo honked at follow you home from the gas station?

A. Until the house.

Q. And this is the same car that blocked your blue van in at the gas station; correct?

A. Yes.

Q. Before the car followed you home, at the gas station did you ever see the driver get out of the car -- out of the tan-colored car?

A. He did not get out of his car.

Q. What about the front seat passenger, before they followed you home did you see the front seat passenger at all get out of the car?

A. No.



Bouto 011518

Q.   Did anyone -- did either vehicle, either your husband or the tan-colored vehicle, screech its tires at any point in time?

A.   They were squealing the tires when they were following us.

Q.   And when your husband was yelling at them to get out of the way at the gas station, who responded from the tan-colored car?

A.   The person driving the car.

Q.   Do you remember the route that you took home that day from the gas station?

A.   Yes, I do.

Q.   And when your husband -- did your husband have any -- a lot of money on him at the time when he was at the gas station?

MR. AINSWORTH:  Object to the form of the question.

MR. KIVETZ:  Let me rephrase.

BY MR. KIVETZ:

Q.   Do you know how much money your husband had on him at the time he was paying for the gas at the gas station?

A.   About 300, but he had the checks for the payments from the house.

 Bouto 011519

Q.    Was it $300 in cash?

A.    That's what I'm estimating.

Q.    And how did he keep his money; was it rolled up or folded in half?

A.    He had it in his wallet because the detectives gave it to me.

Q.    The detectives gave you the money after his death?

A.    After the funeral.  They gave it to my in-laws, and my in-laws gave it to me.

Q.    Did you see Rodrigo pull his wallet out and pay for the gas while you were at the gas station?

A.    Well, he would always take his wallet out and he would pay.  I did not see him, but he had to pay.

Q.    Do you know if he paid with cash or credit card when he was at the gas station?

A.    He did not use credit cards.

Q.    Did he even have any credit cards?

A.    No.  No, he only had his bank card, but, you know, when you get a bank account, that they -- you know, they would give you an ID.

Q.    Okay.  Now, I want to show you what



Bouto 011520

we're going to mark as Exhibit -- actually, you know what, strike that.

What did you do after you got back to your house on February 4th?

A. February 4?

Q. Yes, the day before your husband died.

A. Yeah, we were going -- I was coming from the factory, from work.

Q. After you came back from the gas station, what did you do next?

A. I took the children out to -- and then -- you know, because the car was coming, and then he said take the children out and go inside. And then the vehicle went by, and then he was at the house.

Q. Did your husband stay inside the car while you got out of the car and went to the house?

A. He stayed parking the car.

Q. Okay. So he dropped you off at the house and then parked the car?

A. Before that he parked the car and then he said to me go inside with the children, and then he remained parking the car.



Bouto 011521

Q.   And when you went inside the house with the children, did you see the same tan-colored car from the gas station pass you by?

A.   When I -- when I was taking the children out and on my way to the house, they were coming, and then as I was taking the children in, they drove by.

Q.   And them continued on past the house?

A.   They went by.

Q.   Did you tell Detective Guevara about this gas station incident the night before your husband's death -- strike that, I'm sorry.

Did you tell Detective Guevara about the gas station incident?

A.   Yes, I told him what had happened, but I couldn't believe that what had happened was, you know, enough to kill him or not.

Q.   And did you tell Detective Guevara that you'd be able to identify the individuals that you saw in the car -- in the tan-colored car at the gas station?

A.   Yes.

Q.   And did Detective Guevara try to coerce you in any way into telling the story about what



Bouto 011522

happened at the gas station?

A. No -- could you repeat the question, please?

Q. Did Detective Guevara try to coerce you or force you in any way to tell the story about the gas station incident?

A. No.

Q. And is what you're telling us here today about what occurred at the gas station on February 4th, 1993 the truth?

A. It is the truth.

Q. After you told Detective Guevara about the gas station incident, did you look at some photos with him?

A. Yes.

Q. And did he come over to your house to show you some photos?

A. I don't remember.

Q. Okay. But you do remember looking at photos with Detective Guevara?

A. Yes.

Q. And you told him that you would be able to identify the individuals that were in the tan-colored car from the gas station on February



Bouto 011523

4th; correct?

MS. BONJEAN:  Object to form, leading.

THE WITNESS:  Yes.

BY MR. KIVETZ:

Q.    Did you eventually review photos with Detective Guevara?

A.    Yes.

Q.    And can you describe the process in which he showed you the photos?

A.    Yes.

Q.    Can you tell us what happened?

A.    Okay.  He told me to go to Station 5, and then they showed me some folders that had pictures in them.

Q.    Do you remember approximately how many photos there were?

A.    About two books.

Q.    Okay.  And when you -- did he show you some Polaroids of any individuals while you were there?

A.    Yes, they had pictures.

Q.    And were you able to point out and identify the driver of the tan car that was at the gas station on February 4th when you



Bouto 011524

reviewed the photos?

A.    Yes.

Q.    And were you able to identify the front seat passenger of the tan car that was at the gas station on February 4th, 1993?

A.    That's correct.

Q.    While you were reviewing the photos with -- well, strike that.

You were reviewing the photos with Detective Guevara --

MS. BONJEAN:  I'm going to object to the form and the leading.

THE WITNESS:  Yes.

BY MR. KIVETZ:

Q.    Do you remember the detectives that were showing you the photos when you were at the police station?

A.    Yes.

Q.    Do you remember how many detectives there were?

A.    There were like seven of them, six or seven.

Q.    Do you remember was Detective Guevara part of the seven?



Bouto 011525

A.   Yes.

Q.   And did Detective Guevara force you or coerce you in identifying any of the individuals that were in the tan car when you were reviewing those pictures?

A.   No.

Q.   Did any detective force or coerce you into identifying the individuals that were in the tan car at the gas station while you were reviewing photos?

A.   The people?

Q.   The other detectives that were present when you -- when you were reviewing the photo, did any of them force or coerce you to pick out a particular photo?

A.   No.

(Whereupon, VARGAS Deposition Exhibit No. 4 was marked for identification.)

BY MR. KIVETZ:

Q.   I want to show you what we're going to mark as Group Exhibit 4.  And I'm going to hand this to you, but first I'd like you to take each photo and show it to the camera so they can zoom



Bouto 011526

in so we can have a clear record. Okay?

A. May I remove this?

Q. Yes.

And there are eight pictures there. I want to show each of the eight pictures to the camera so we can have a clear record.

A. Okay.

Q. Okay. Okay. The next one, please. Next one, please. Next one, please. Next one, please. Next one, please. Next one, please. Thank you. Next one, please. Okay, thank you. Next one, please. Thank you.

Now, Ms. Vargas, can you now pick out and show to the camera the picture of the driver of the tan car that you saw at the gas station on February 4th, 1993?

There are two photos underneath, Ms. Vargas. And, Ma'am, if you're unable to tell from the photos, you can just let us know.

A. This was the one driving.

Q. That's the one driving, okay.

Now, can you please use my pen here and in either English or Spanish write the word driver and initial it.

Bouto 011527

A. Driver.

Q. And can you please initial.

And can you please first -- I'm just going to identify the Bates number as Cook County SAO Serrano-Montanez 5207.

Now, Ma'am, can you please just show that picture again to the camera?

And, Ms. Vargas, that's the person that was driving the car that blocked you and Rodrigo in at the gas station on February 4th, 1993; correct?

A. Correct.

Q. Now, again, taking a look at Group Exhibit 4, can you please pick out and show to the camera the picture of the other passenger of the car that you recognize at the gas station on February 4th, 1993?

And can you now please write passenger in either English or Spanish on that exhibit and write your initials down at the bottom.

Let the -- and let the record reflect that it's Bates stamped CCSAO Serrano-Montanez 5211.

Ma'am, you can go ahead and put the



Bouto 011528

rest of the exhibit down.  Thank you.

After you reviewed and identified photos of the persons that you believed were in the tan car on February 4th, 1994, did you ever go and try to look for the tan car with -- with police officers?

A.    Afterwards.

Q.    After you did the photo array, correct?

A.    Yes.

Q.    And do you know if it was a couple days or a couple months after you saw the photo array?

A.    It was after.  I don't remember if it was a month or two months.

Q.    Okay.  And you don't know if it was just a few days afterwards as well; correct?

MR. AINSWORTH:  Object to the leading.

THE WITNESS:  I don't remember.

BY MR. KIVETZ:

Q.    Who did you go to look with for the tan car?

A.    With Guevara and another detective.

Q.    Do you remember the other detective's name?



Bouto 011529

A.   Jack I think.  If I see him, I would recognize him by his face.

Q.   Do you -- but you don't remember as you sit here today?

A.   No.

Q.   Okay.  But you remember Detective Guevara being there?

A.   Yes.

Q.   And did you -- where did you meet up with the detectives to go and search for the tan car?

A.   After work he called me to set up an appointment because I was working to go look and see vehicles that were there that were abandoned.

Q.   Who called you?

A.   Guevara.

Q.   And did they -- what happened after they -- after they set up the appointment; what happened next?

A.   After work he took me to the area to see vehicles that had been, you know, thrown away.

Q.   And were you a passenger in the car;



Bouto 011530

did he drive you around?

A.   No, I was behind.  They came to get me.

Q.   So, you sat in the back seat of the detective's vehicle; is that correct?

A.   Yes, in the back, because there were two detectives in the front.

Q.   And how long did you drive around with the two detectives?

A.   For about an hour.

Q.   And do you know what area you were in when you -- or strike that.

Do you know where you were in the city when you were looking for the tan vehicle?

A.   It's in the same neighbor there.

Q.   And were you able to identify and find the tan-colored vehicle that was at the gas station on February 4th, 1994?

MS. BONJEAN:  I'm going to object to form and assumes facts not in evidence.

THE WITNESS:  Yes.

BY MR. KIVETZ:

Q.   Were you able to find the car that was at the gas station on February 4th, 1993 that blocked you in?



A.   That's correct.

Q.   Can you tell us the circumstances under which you were able to identify the tan car that was at the gas station on February 4th?

A.   Yes.  I -- I recognized it because it has some sort of material.  It was like a cloth material at the top.  It was not the same material that was at the bottom of the car.

Q.   Were you driving -- when you were driving around, did you point out the vehicle to the detectives?

MR. AINSWORTH: Object to the form of the question.

BY MR. KIVETZ:

Q.   Strike that.

When you were driving around, how did you identify for the detectives the vehicle that you saw, the tan -- at the gas station in February -- on February 4th, 1993?

A.   Yes, because they were -- they were driving me around looking for the vehicles -- looking for the descriptions of the vehicle.

Q.   And --

A.   How it looked.  I mean, I didn't see



Bouto 011532

the make, but I did see how the vehicle looked like.

Q. And -- but how did you tell the detectives that that's the car?

MS. BONJEAN: Objection to the form, assumes facts not in evidence, foundation.

THE WITNESS: Yeah, I drove by and I told him to stop. I told him that was -- that's the vehicle, that that vehicle looked like the vehicle that I saw at the gas station.

BY MR. KIVETZ:

Q. And --

A. And then we all got out to look at the vehicle. But I asked the question, and then I asked why is the vehicle crashed and why does it have a bullet in it.

Q. And did you get a response to that question?

A. Yes.

Q. What did they say?

A. That the bullet -- that the vehicle had looked like the bullet that Rodrigo had, that that could be the vehicle.

Q. Did they tell you that the bullet hole



Bouto 011533

that was in the car that you saw when you were driving around with the officers matched the bullet that killed your husband?

A. That it looked like it.

Q. That it looked like it?

A. Yes.

Q. And they didn't tell you 100 percent that that was the bullet that -- that was the bullet -- strike that.

So, the detective said that the bullet hole could be a match to the bullet that killed Rodrigo; is that correct?

MR. AINSWORTH: Object to the form of the question.

MS. BONJEAN: Objection, mischaracterizes her testimony.

THE WITNESS: That it could be.

BY MR. KIVETZ:

Q. And this was in response to your question as to -- about the bullet hole; right?

A. Yes. I wanted to know what had happened with that.

Q. Did the detectives ever try to get you to identify a particular car?



Bouto 011534

A.   Well, they had me identify several vehicles that looked like the one that was at the gas station.

Q.   But did they ever try to -- did they force you or tell you to pick a particular car?

MS. BONJEAN:  Objection to the form.

THE WITNESS:  No.

BY MR. KIVETZ:

Q.   Were you the one that ultimately showed the detectives which car was at the gas station on February 4th, 1993?

MR. AINSWORTH:  Objection, leading. Objection, form.

MS. BONJEAN:  Join.

THE WITNESS:  Yes.

BY MR. KIVETZ:

Q.   Okay.  I want to show you a group of photos that we're going to mark as Exhibit 6 -- I'm sorry -- Exhibit 5.

(Whereupon, VARGAS Deposition Exhibit No. 5 was marked for identification.)

BY MR. KIVETZ:

Q.   Ma'am, can you please take a look at



Bouto 011535

Exhibit 5?  Do you recognize the vehicle that's depicted in Exhibit 5?

A.    This is Exhibit 5?

Q.    Correct.

A.    This is the car.

Q.    This is the car that was at the gas station on February 4th, 1994?

A.    When I saw the vehicle at the gas station, it didn't have that.

Q.    It didn't have the damage to the front left side of the -- of the vehicle?

A.    No.

Q.    And, Ma'am, just so we have the record clear, can you please raise Exhibit -- the top page of Exhibit 5 to the camera and show the damage that you're talking about that's on the left front fender of the vehicle.

Ma'am, is this a picture of the photo that you identified to the detectives when you were driving around searching for the vehicle?

A.    Yes.

Q.    And was the driver that you identified in the previous exhibit driving that specific car?



Bouto 011536

A.   Yes.

Q.   And was the passenger that you identified in previous exhibit in that specific car as well on February 4th, 1994 -- '3?

A.   Yes.

Q.   What about the bullet hole that's depicted in one of the exhibits in Group 5, did you recognize a bullet hole to be present when you saw the car at the gas station on February 3rd, 1993?

MR. AINSWORTH:  Object to the form of the question.

MS. BONJEAN:  Join.

THE WITNESS:  Yes, I asked a question because the vehicle had been crashed and, you know, why did it have a hole.

BY MR. KIVETZ:

Q.   My question is a little bit different, Ms. Vargas.  I'm wondering when you saw the vehicle that you're looking at now.  Did it have a bullet hole in it when you saw it at the gas station on February 4th, 1993?

A.   No, I didn't notice any of that, no.

Q.   Okay.  And after you went around



looking for the vehicle, did you then ever go to the police station to look at a live lineup?

A. That's correct.

Q. And do you remember how long it was after you picked out the car from the gas station to when you went to view the live lineup?

A. Yes, the pictures and the lineup.

Q. Okay. Now, when you -- were you able to identify one of the individuals that you saw in the tan car from the gas station incident during the live lineup?

A. Yes.

Q. I want to show you what we're going to mark as Exhibit 6.

(Whereupon, VARGAS Deposition Exhibit No. 6 was marked for identification.)

BY MR. KIVETZ:

Q. Ma'am, do you -- as you sit here today, you don't remember the date that you saw a live lineup; is that correct?

A. Mm-mm.

Q. Okay. And does the picture --



THE INTERPRETER: Interpreter speaking.

We didn't get an answer, we got an mm-mm.

BY MR. KIVETZ:

Q. Okay. Is that a no?

A. No.

Q. And taking a look at Exhibit 6 that's in front of you, does that photo accurately reflect how individuals were seated when you viewed the lineup?

A. Yes.

Q. And after having an opportunity to look at Exhibit 6 in front of you, do you recognize any of the individuals in that photo?

MS. BONJEAN: I'm going to object -- I'm going to object to the form, foundation -- object to the form.

THE WITNESS: Yes, I do.

BY MR. KIVETZ:

Q. Were any of the individuals that are depicted in Exhibit 6 inside the tan-colored car that you viewed at the gas station on February 4th, 1993?

A. Inside it.



Q.   Yes.  Can you please circle the person that you recognize as being inside the tan-colored car at the gas station on February 4th, 1993.  And can you please add your initials.

Where was the person that you depicted -- that you identified in Exhibit 6 seated in the tan-colored vehicle at the gas station on February 4th, 1993?

A.   The passenger in the front seat.

Q.   Can you please show for the camera and for the record the photo in Exhibit 6.

And let the record reflect that this is CCSAO Serrano-Montanez 5140, and that Ms. Vargas has circled the individual all the way on the left side of the photo and circled his face.

Do you remember participating in a -- in a second lineup after you viewed this first one?

A.   Yes.

Q.   And, actually, I just want to go back to Exhibit 6 for one second.

Is the person -- was Detective Guevara present when you viewed the lineup that's

Bouto 011540

depicted in Exhibit 6?

A. Yes.

Q. And did you identify for Detective Guevara the same individual that you identified here today as being a passenger in the vehicle that you saw at the gas station on February 4th, 1993?

A. I identified him.

Q. Okay. And did Detective Guevara try to persuade you in any way into identifying a particular person that was in the lineup that's depicted in Exhibit 6?

A. No.

Q. Were there other detectives present when you viewed the lineup that's depicted in Exhibit 6?

A. There were about five.

Q. Did any other -- did any detective try to persuade you into identifying any particular person that was participating in the lineup that's depicted in Exhibit 6?

A. No.

Q. And you remember participating in a second lineup after this first lineup that's



Bouto 011541

depicted in Exhibit 6; correct?

A.    Yes.

Q.    And do you remember any of the detectives that were present with you when you viewed a second lineup?

A.    Yes.

Q.    And when you viewed the second lineup, were you able to identify one of the individuals that you saw in the tan-colored car at the gas station on February 4th, 1993?

A.    Yes.

                    (Whereupon, VARGAS Deposition
                     Exhibit No. 7 was marked for
                     identification.)

BY MR. KIVETZ:

Q.    I want to show you Exhibit 7 and ask does this photo accurately reflect how the individuals were seated when you viewed the second lineup with Detective Guevara?

A.    Yes.

Q.    After reviewing Exhibit 7, do you recognize any of the individuals participating in the lineup?

A.    Yes.



Bouto 011542

Q. Were any of the individuals that are participating in that lineup inside the tan-colored car that you viewed at the gas station on February 4th, 1993?

A. Yes.

Q. Can you please circle the person that you identified as being inside the tan-colored car at the gas station on February 4th, 1993.

A. Yes.

Q. Can you please circle it, Ma'am.

Let the record reflect that she's also added her initials.

Ma'am, for the purposes of documenting this, can you please show it to the camera.

And let the record reflect that this is Cook County SAO Serrano-Montanez 5143, Exhibit 7, and Mrs. Vargas has identified this individual here.

Ms. Vargas, where was the person that you identified in Exhibit 7 seated in the tan-colored car at the gas station on February 4th, 1993?

A. On the seat of the driver, on the driver.



Bouto 011543

Q. Did Detective Guevara try to persuade you in any way into identifying any person that was participating in the second lineup?

A. If he told me to check and see --

Q. He told you to -- he told you to pick out the person that was -- that was at -- in the tan-colored car at the gas station incident on February 3rd, 1993; is that correct?

MR. AINSWORTH: Objection, form, leading.

MR. KIVETZ: I'm repeating what she just said.

THE WITNESS: Yes.

BY MR. KIVETZ:

Q. Did he force you or tell you who to pick out of that lineup that you're reviewing in Exhibit 7?

A. No.

Q. Did any detective who was present with you when you viewed that second lineup that's depicted in Exhibit 7 tell you who to pick out?

A. No.

Q. Okay. Ma'am, we have to take another break in order to change the tape on the video camera, so we're going to take a ten-minute



Bouto 011544

break.  Okay.

THE VIDEOGRAPHER:  The time is 12:06.  We're off the record.

(Whereupon, a short recess was taken.)

THE VIDEOGRAPHER:  We are back on the record. The time is 12:19.

BY MR. KIVETZ:

Q.  Ms. Vargas, do you remember testifying at the criminal trial related to Rodrigo's murder in October of 1994?

A.  Yes.

Q.  Did you testify truthfully during the October 1994 criminal trial?

A.  Yes.

Q.  Would you agree that you had a better memory of the events surrounding Rodrigo's death in October of 1994 than you currently do now?

A.  Yes.

Q.  And when you testified in October of 1994, was this the first time that you've ever testified in a criminal or civil trial?

A.  The first time.

Q.  And were you a little nervous when you



testified?

A. Yes.

Q. Now, before you testified in October 1994, do you remember talking with any prosecutors in preparing for testimony?

A. I don't remember.

Q. So, you don't remember meeting with anybody -- strike that.

Do you remember a prosecutor asked you questions during your October 1994 criminal trial?

MS. BONJEAN: Object. Her criminal trial, or -- I'm sorry, can you repeat the question?

(Whereupon, the record was read as requested.)

MR. KIVETZ: Fair enough. It's a bad question. I'll rephrase.

BY MR. KIVETZ:

Q. In any event, do you remember a prosecutor ask you questions when you provided testimony in October of 1994?

A. I'm sorry, could you repeat the question?

Q. Do you remember a State's Attorney,



someone from the government, asking you questions during your testimony that you provided in October of 1994?

A. Yes.

Q. And before you provided your testimony in October of 1994, did you meet with the same prosecutor that was asking you questions?

A. Yes.

Q. When you met with the prosecutor, was anyone else present?

A. They were people there that spoke Spanish.

Q. Were there -- how many people were there?

A. There were several people.

Q. When you met with the prosecutor to prepare for your testimony, were there any detectives present?

A. There were several detectives.

Q. And this was before you provided testimony you met with a prosecutor and several detectives; is that what you're saying?

A. Yes.

Q. Did you meet with a prosecutor in a

conference room or at his office before you provided testimony?

A.   I had an office.

Q.   Did you meet with a prosecutor and a translator alone ever?

MR. AINSWORTH:  Object to the form of the question.

BY MR. KIVETZ:

Q.   Is that a yes, Ma'am?

A.   Yes.

Q.   How many times did you meet with a prosecutor and -- and an interpreter alone in preparation for your trial?

MR. AINSWORTH:  Object to the form of the question.

THE WITNESS:  About five or six times.

BY MR. KIVETZ:

Q.   Do you recall during your criminal -- during the criminal -- strike that.

Do you recall that were you asked to pick out the individuals at the gas station on February 4th, 1993 when you were providing testimony at the criminal trial?

A.   Yes.



Bouto 011548

Q.    And did the individuals that were standing trial for the murder of your husband look different than how they appeared on February 4th, 1993?

MR. AINSWORTH:  Objection, form and leading.

THE WITNESS:  Yes.

BY MR. KIVETZ:

Q.    Before you testified at trial, did anyone from the Montanez family ever try to talk with you?

A.    Yes.

Q.    Who tried to talk with you?

A.    Serrano's parents.

Q.    Serrano or Montanez's parents?

A.    Armando Serrano's.

Q.    Okay.  You remember that one of the suspect's family members tried to talk with you before you provided trial testimony; is that correct?

A.    Yes.

Q.    And do you remember their names at all?

A.    I don't know their names.

Q.    When did you meet with them?

A.    I was at my house.  I don't remember



Bouto 011549

the date.  I was at the house.  There was a gentleman providing me with an estimate for windows.  When they knocked on the door, I went down, and then there was a couple, older people, and they wanted to talk to me.

Q.    What did they want to talk to you about?

A.    They told me that was -- that they were the parents of one of the persons that was in jail.

Q.    And did you talk to them about anything else?

A.    Yes.  They told me that they were innocent, that it was someone else that had done that.  And they asked me how much I would be paid for me to say that it was not them in court.  No, and I told them that it was his son that did it, that he should pay for what he did; that I did not want any money, that I wanted them to be in jail.

Q.    Did you tell anybody about this incident?

A.    Yeah.  The person that was doing the estimate for the windows.  As soon as I finished



talking to them, I told the person that was doing the estimate for the windows what was happening, and then he told me call the detectives, call the police.

Q. And what did you do?

A. I called the police. I called Guevara because he spoke Spanish.

Q. Did you tell him that the families -- one of the families of the suspects tried to offer you money?

A. Yes.

Q. Did the family tell you that they wanted you to identify someone else?

A. Yes.

Q. Who did they want you to identify?

A. Yes, to be honest, I didn't even care who it was. You know, what I wanted was for their sons, that they killed Rodrigo Vargas, for them to be in jail.

Q. And they were --

A. They just told me that the person that had done it had left for Miami.

Q. And they tried to offer you money to not testify that it was their son?



Bouto 011551

MS. BONJEAN: Objection to the form, leading.

THE WITNESS: Yes.

BY MR. KIVETZ:

Q. Did you ever meet with students from Northwestern University?

A. Yes.

Q. How many times did you meet with students from Northwestern University?

A. Many times.

Q. Did the students ever tell you why they wanted to meet with you?

A. Yes, because they wanted to investigate the case of the guys that were in jail.

Q. Do you remember any of the names of the students that you met with?

A. There were a lot of them. There were different ones every time, so there were many of them.

Q. Do you know the approximate age of the students?

A. Maybe 30, 20-something.

Q. Did they ever tell you anything about Rodrigo's death?

A. They would ask -- they would ask me



Bouto 011552

questions, same thing as to what had happened, and they always said that he was innocent.

Q.   That who was innocent?

A.   The guys that were in jail.

Q.   Did they ever try to get you to change your October 1994 testimony at all?

A.   I don't know about that.

Q.   Did they ever try to --

MS. BONJEAN:  Object to the form.

BY MR. KIVETZ:

Q.   Did they ever ask you to -- strike that.  Just give me one second.

Did the students ever ask you to say something that wasn't true related to the events that happened on February 4th, 1993?

A.   No.

Q.   Did the students ever ask you to say something that wasn't true about your interactions with Detective Guevara?

A.   They said that Guevara had made that up.

Q.   Made what up?

A.   The thing about the car and what happened at the gas station.



Bouto 011553

Q.   And what happened at the gas station that you've told us today is the truth; correct?

A.   Yes.  What I said was what I saw at the gas station, what happened, and after that I don't know anything.

Q.   And Detective Guevara never tried to get you to make up the story about the gas station incident; correct?

A.   No, no.

Q.   Ms. Vargas, have you ever met Mr. Ainsworth who is sitting here to your right?

A.   Yes.  Yes, he's the attorney.

Q.   Do you know who he represents?

A.   Armando, and the other friend of his.

Q.   How many --

A.   Montanez or Serrano.  I think they asked both last names.

Q.   So you don't know who he actually represents; you think it's just one, either Serrano or Montanez?

A.   Serrano.

Q.   Are you guessing, Ma'am?

A.   I'm guessing, yeah.  One of the two.

Q.   What did you -- how many times did you



Bouto 011554

--

A.   The two of them are attorneys, right?

Q.   Have you met --

A.   Yes, they both have come looking for me.

Q.   So you've also met Ms. Bonjean who is sitting next to -- excuse me -- you've also met Ms. Bonjean sitting next to Mr. Ainsworth?

A.   Yes.

Q.   When is the last time that you spoke with Mr. Ainsworth?

A.   The gentleman or the lady?

Q.   The gentleman, Mr. Ainsworth?

A.   Three, four days.  Last week, yes.

Q.   What did you guys talk about?

A.   We talked about the case, this same one.

Q.   Did -- do you remember anything that he told you about the case?

A.   That the case is open, and that they are free, and that they are innocent.

Q.   Did he try to persuade you to make any false statements about your interactions with Detective Guevara?



Bouto 011555

A.   No, he just said that they were innocent.

Q.   Did he try to get you to make any statements about the case when you spoke with him?

A.   No, he said tell the truth and the truth.

Q.   Okay.  And how many times have you met with Mr. Ainsworth in total, do you know?

A.   Many times.

Q.   Many times.

During the times that you spoke with him, has he ever tried to get you to say something that wasn't true?

A.   No, I am saying the truth of what I saw.

Q.   My question is, did Mr. Ainsworth ever try to get you to say something that wasn't true?

A.   No, he just says that they were innocent.

Q.   Okay.  And you said that you met Ms. Bonjean before; is that correct?

A.   Yes.



Bouto 011556

Q. How many times have you met Ms. Bonjean?

A. About five times.

Q. And how long ago did you meet with Ms. Bonjean?

A. The first time I think it was on my business.

Q. You met at your bar -- at your bar and grill that you own?

A. Yes.

Q. When was the last time that you met with Ms. Bonjean?

A. It was at my house about four years ago -- no -- five years ago, about 2011 or 2012.

Q. Did she tell you why she was at your house?

A. Yes.

Q. What did she say?

A. Because she was coming to the house to talk to me about the case for Serrano and Armando -- Montanez, because they're innocent.

Q. Did she tell you anything else?

A. Question about the car and the bullet, something like that.



Q.   What were her questions about the cars and the bullets?

A.   If the car that I had seen had this thing, or if he had that thing, if Guevara had told me for me to identify that car.

Q.   And did she ever try to get you to -- well, did you ever tell her that Detective Guevara tried to get you to identify a specific car?

A.   To identify the vehicles that I went to see.

Q.   But did she try to get you to say that Detective Guevara -- strike that.

Did Ms. Bonjean ever try to get you to say statements that weren't true?

A.   They're saying that he made up this thing.

Q.   What thing?

A.   The thing at the gas station and the car.

Q.   And Ms. -- Ms. Bonjean told you that Detective Guevara made up the gas station incident and you identifying the car?

A.   They're saying that.



Bouto 011558

Q.    But that's not true?

A.    No, it is not true.

Q.    And did she or Mr. Ainsworth ever try to get you to sign anything?

A.    Some of the students came to ask me to sign something because they were free for them to get out for, you know, free.

Q.    Okay.

A.    That they had been in jail for a long time already.

Q.    But my question is, did Mr. Ainsworth or Ms. Bonjean try to get you to sign anything?

A.    No, not them, no.  The students did, yes.

Q.    And did Ms. Bonjean try to get you to say anything that was untrue about Detective Guevara and your interactions with him?

A.    They were always asking me questions about Guevara.  They would always be asking the same thing.

Q.    Now, do you know who killed your husband, Rodrigo?

A.    I don't know which one of the two killed him.

Q.   Okay.

A.   I want to know.

Q.   But you weren't present when Rodrigo was killed on February 5th, 1993; correct?

A.   No.

Q.   Okay.  I'm going to take a five-minute break.  Thank you.

THE VIDEOGRAPHER:  The time is 12:41.  We're off the record.

(Whereupon, a short recess was taken.)

THE VIDEOGRAPHER:  The time is 13:05, and we're back on the record.

BY MR. KIVETZ:

Q.   Ms. Vargas, have we ever met before today?

A.   No.  Like 15 days before you came to my business.

Q.   Yes.  Ms. Vargas, I came to your place of business Pancitos about a week ago; is that correct?

A.   Yes.

Q.   And I also came to your place of business yesterday; is that correct?



Bouto 011560

A.    That is the second time I see you.

Q.    So, this is actually the third time that we've ever met in person; is that correct?

A.    Correct.

Q.    And during our two meetings together before today, did I ever try to get you to make any type of false statement?

A.    No.

Q.    Did I ever try to get you to say something that was not true?

A.    No.

Q.    Okay.  I have no further questions at this point in time.

                    CROSS-EXAMINATION

BY MR. AINSWORTH:

Q.    Ms. Vargas, my name is Russell Ainsworth and I represent Jose Montanez, and I have some -- I have some questions for you.  Is that okay?

A.    That's correct.

Q.    Okay.  So, I just want to take you back to the day before Rodrigo was murdered.

        You went to the bank, and then you went to the gas station, and then you went home; is



Bouto 011561

that correct?

A. Correct.

Q. And when you got home, you took your two little kids inside; right?

A. Inside the house.

Q. And when you went inside the house with your two little kids, Rodrigo was still outside with the van; is that right?

A. Yes.

Q. And he was parking the van when he was with -- did not have his wife or his kids with him; is that right?

A. No.

Q. No, meaning his wife and kids were not with him; is that right?

A. I was going inside the house.

Q. And Rodrigo was parking the van; is that right?

A. Correct.

Q. And he was parking the van right in front of your house; is that right?

A. Inside the house -- I'm sorry -- out in front of the house.

Q. And at the time it was dark; is that



Bouto 011562

right?

A.   Yes.

Q.   You mentioned that the police provided you with Rodrigo's wallet; is that right?

A.   I'm sorry, the question?

Q.   The -- the next day after Rodrigo was killed, the police provided you with his wallet; is that right?

MS. NIKOLAEVSKAYA:  Objection, misstates the evidence -- or what she testified to.

THE WITNESS:  No, the wallet was not returned right away.  The wallet was given at the funeral.  And they did not give it to me, they gave it to my brother-in-law.

BY MR. AINSWORTH:

Q.   I understand.

Are you aware of anything that was stolen from either Rodrigo or his van during the crime?

A.   That I am aware of, they did not steal his watch or his wallet.

Q.   Did Rodrigo have any other jewelry on him at the time that he died?

A.   His watch.



Bouto 011563

Q.   Now, in the course of the investigation of your husband's murder, you met Rey Guevara; is that right?

A.   Yes.

Q.   You wanted to help solve your husband's murder; is that right?

A.   I wanted to know who killed him and what happened.

Q.   You did not hide information from the police; is that right?

A.   No.

Q.   When you and I met, you told me that it was in February that you told Guevara about the gas station encounter; is that right?

A.   In February?  That was afterwards, because it was investigated what had happened, what did we do the day before and the day that he passed.  And some detectives came first, and then Guevara came.

Q.   And Guevara came after the day that your husband was murdered; right?

A.   Yes.

Q.   And you told Guevara about the gas station incident; right?



Bouto 011564

A.    Yes.

Q.    And when you and I talked, you explained to me that you told Guevara about what had happened shortly before, that it was recent when the gas stationed had happened; do you recall that?

A.    No, I don't remember.  Yeah, what I know is that they wanted to know if he had enemies, and he did not have any enemies.

Q.    And the police also wanted to know what you had done with Rodrigo the day before he died; is that right?

A.    That is correct.

Q.    And what did you tell the police when they asked you about what you and Rodrigo had done the day before?

A.    Yes, that I had come and picked up the children, we went to the bank, and on our way back we stopped at a gas station, and then home.

Q.    And you told the police about encountering the brown car at the gas station; is that right?

A.    Yes, yeah, and the thing on top.

Q.    A different color on top?



Bouto 011565

A.   Yeah, it was kind of brown on top.

Q.   The cloth was brown on top?

A.   Yes, it was brown on top.

Q.   And you told this to the police officers who first came to the house; is that right?

A.   Yes.

Q.   And that's the Detectives Jack and Shack who are questioning you the day that your husband was killed; is that right?

A.   Yes.

Q.   And you also told this to -- well, strike that.

Guevara was nice to you; is that right?

A.   Yeah, yeah, he was a nice guy.  They behaved.

Q.   And he was -- he was a Spanish speaker; is that right?

A.   Yeah, he spoke Spanish.

Q.   And that was helpful to you; right?

A.   Yes.

Q.   It was also a comfort to be able to speak to him in your native language; is that right?

A.    Yes.

Q.    Guevara has testified that he started investigating this case the day after your husband's murder.  Does that sound about right to you in terms of when you first started interacting with Rey Guevara?

MS. ROSEN:  Objection to the form, foundation.

THE WITNESS:  Yeah, questions and answers, yes.

BY MR. AINSWORTH:

Q.    And when Guevara would talk to you about the case, would you tell him about your relationship with Rodrigo?

A.    Yes.

Q.    Would you tell him -- would you tell Guevara about whether Rodrigo had any enemies?

A.    I said no.

Q.    Did you tell Guevara about the -- what you had done the day before the murder about going to the bank and going to the gas station?

A.    Yes.

Q.    And is it true that you were talking to Guevara in February, shortly after your husband

was murdered, about the case?

A. Yes.

Q. And when you spoke to Guevara in February shortly after your husband had been killed, did you tell Guevara about what you had done with Rodrigo the day before he was murdered, meaning going to the bank and going to the gas station?

A. Yeah, he asked me specifically what it is I had done a day before.

Q. And -- and that was when he was talking to you in February; is that correct?

A. Yes.

Q. Do you know how long after your husband's murder you talked to Rodrigo about -- sorry -- strike that.

Do you know how long after your husband's murder you talked to Guevara about what you and Rodrigo had done the day before -- before he was killed?

A. Yeah. I remember that he was investigating, and I told him that we had a problem at the gas station with one vehicle and the other vehicle at the gas station.



Bouto 011568

Q.   Did you wait until June, four months after the murder, before telling the police about the incident at the gas station?

A.   Well, yes, but it was not, you know, like the reason they killed him, right, for that reason.

Q.   So, you don't know whether the gas station incident had anything to do with Rodrigo's death; is that right?

A.   No, I don't know.

Q.   When Guevara was questioning you in February, did you withhold any information from him?

MS. ROSEN:  Object to the form.

THE WITNESS:  No.

BY MR. AINSWORTH:

Q.   In February did you tell Guevara everything that you knew about the crime?

MR. KIVETZ:  Objection, form, foundation.

THE WITNESS:  That the crime at the gas station you mean?

BY MR. AINSWORTH:

Q.   Both, either about the crime or about the gas station or about anything?



Bouto 011569

A.   Oh, at the gas station I said --

MR. KIVETZ:  I'm just inserting an objection to form and foundation.

BY MR. AINSWORTH:

Q.   And so, is there any question in your mind that you told Guevara about the gas station incident in February of 1993?

A.   What happened at the gas station.

Q.   And that's what you told Guevara?

A.   That is what I said to him.

Q.   After you told Guevara about the gas station incident, did Guevara have you look at books that contained photographs of people?

A.   He asked me to look at some books and to see if I could identify the people that I saw at the gas station.  I saw two books.

Q.   And were you able to recognize anyone in those books?

A.   Yes.

Q.   Can you describe those books that you looked at?

A.   They were like in a big -- in a folder file.  They had them like in shelves, and there were a lot of them on the wall.



Bouto 011570

Q.   Do you know where you -- strike that.

Do you know how long after the murder it was that you looked at those books?

A.   That was after about three, four months.  I don't quite remember.

Q.   And where were you when you looked at those books?

A.   I was at my house, and I went to Station 5 in the division where they were investigating, you know, the case.

Q.   At Grand and Central?

A.   Grand and Central.

Q.   And was it Guevara who drove you to Grand and Central?

A.   I went with the babysitter because I didn't know how to drive.  I didn't know where it was.

Q.   And when you arrived at Area 5, who was it who showed you the books?

A.   Guevara was.

Q.   And was anyone with Guevara when he showed you those books?

A.   Yes.  There was another detective there.  I think his name was Jack.  It was --



Bouto 011571

you know, it was with a J, I don't quite remember, because he gave me his card, and then after three weeks I threw it away.

Q. Was the detective who was with Guevara, was he the same detective who was with Guevara when he drove you to go look at the car?

A. Yes.

Q. And just for the record, so the detective who was with Guevara when he showed you the books was the same detective who was with Guevara when he drove you to the car; is that right?

A. Yes.

MS. ROSEN: Object to the form.

THE WITNESS: There were others.

BY MR. AINSWORTH:

Q. There were other detectives who were present; is that what you're saying?

A. About four or five, yes.

Q. Are you saying there were four or five additional detectives in addition to Guevara and the person who you talked about before?

A. Yeah, it was Guevara, Jack, and another three detectives, so about five of them.



Bouto 011572

Q.   And how many people did you recognize in those books?

A.   I recognized two people.

Q.   Were they in the same book or in different books?

A.   They were in the same book but in different pages.  Yeah, and, in fact, I recognize a co-worker, and I asked, you know, what he was doing there, because it was my boss. Yeah, it's true, true.  Yeah, I asked what was -- what he was doing there.

Q.   I take it that your boss was not one of the people that you are saying you picked out from the book; is that right?

A.   No, but I saw he was there, so I asked what he was doing there.

Q.   Can you describe the two people who you picked out of those books on that day when you're at Area 5?

A.   Yes.

Q.   What did they look like?

A.   He was tall, the guy that was driving the car, tall.  He was -- he was not skinny; he was -- yeah, he had a body on him.  He was not



Bouto 011573

fat.  Yeah, he was tall.  He was maybe five-ten and maybe six, and he didn't have hair here, a bit lighter than me.  And that's what I saw on his face, because he was sitting.  You can see he was tall because of the car.

Q.    And what did the other person look like?

A.    Yeah, he was a bit darker -- a bit darker than my color with his hair a bit longer. He had like a little mustache.

Q.    And just to be clear, I'm asking you to describe the second person that you picked out from that -- those books?

A.    Yes, that's what I'm describing.

Q.    The men that you saw in that car at the gas station, what were they wearing?

A.    They had jackets on.

Q.    What kind of jackets?

A.    I don't know.  You know, they had a jacket on.  I saw their faces.

Q.    Do you remember what color their jackets were?

A.    It was a dark -- it's a jacket.  It looked dark.

Bouto 011574

Q. And -- and I don't mean to suggest that you should know the answer to these questions. I know it's been a long time and all that. Do you understand that?

A. Yeah, I was just looking at their faces because they were sitting.

Q. Was your babysitter present when you were looking at the books?

A. No, she had my kids.

Q. Did your kids come with you to Area 5?

A. Yes, but they had them in the room downstairs. I was on the second floor. That was located on the second floor.

Q. Can you tell us what Guevara said to you before you started looking at the books?

A. He asked me that -- he told me that he was going to show me the books to see if I recognize the people that I had seen at the gas station, and when you recognize them, you tell me which ones were the ones you saw.

Q. Did you -- did he tell you what the books contained?

A. He gave me the books to see if I could recognize the people -- recognize the people



that were in the books, because the people that were in these books were people that had done something bad.

Q. Did Guevara tell you that the people -- that the people from the gas station might not be in the books?

A. Sorry, could you repeat that?

Q. Did Guevara tell you that the people from the gas station might not be in the books?

A. No, he did not say anything about that.

Q. Could you tell from looking at the cover of the books or anything inside the books whether the books were members of a particular gang?

MR. KIVETZ: Objection, form, leading.

THE WITNESS: No, I didn't know anything. I asked him actually, yeah, I asked these people that I had selected, what they had done, and they said that they had done bad things on the street.

BY MR. AINSWORTH:

Q. Was anyone taking notes while you were looking at the books?

A. No, I don't remember.



Bouto 011576

Q.   Do you know what happened -- well -- strike that.

What happened when you identified the first person that you recognized as being one of the people from the gas station?

A.   The first person that I saw was the face of the person that was driving the car, and I asked why he was there, and then that was the person that I saw at the gas station.

Q.   And so when you -- you identified that person, what did Guevara or anyone else say at the time that you made that identification?

A.   They said that they had robbed somebody in another place, and that they were gang bangers.  I don't know what gang.

Q.   Did anyone take the photograph out of the book at the time that you identified that person?

A.   They took the picture out because it was in several ways.  They had, you know, like this with the front with the numbers in the side and on the other side.

Q.   So, the -- the photograph of the person that you picked out, they had the person take it



Bouto 011577

from different angles from front and then a profile to the right and a profile to the left?

A. That's how they were in the book. All of the ones that were in the book were like that with numbers.

Q. And the numbers were like mugshots, booking photos; is that right?

MS. ROSEN: Objection, foundation.

MR. KIVETZ: Objection, form.

THE WITNESS: Right here, I mean, they had them there.

BY MR. AINSWORTH:

Q. And can you just describe the -- the numbers that you're referring to?

A. I don't know. They were white numbers, and they had a black thing, you know, right here. I don't know, but they were numbers.

Q. Have you seen mugshots on TV?

A. Yes.

Q. Did the photographs that you -- did the photographs that you observed in that book appear to you to be mugshots?

A. I don't know if they were mugshots or not, but they had the numbers on them, I mean,



Bouto 011578

like they show on TV.

Q. Like after a person has been arrested and they take the photograph of the person with the number in front of them; is that what you're referring to?

A. Yes.

Q. And did they take all three of the photos out of the book when you identified the first person?

MS. NIKOLAEVSKAYA: Objection. I believe she said two --

MS. BONJEAN: Objection. You're misstating what she said.

MR. KIVETZ: No, actually she's not misstating what she said, so objection, misstates the evidence, form, foundation.

THE WITNESS: I'm sorry, what was the question?

BY MR. AINSWORTH:

Q. The photograph of the driver that you saw in the book --

A. Yes.

Q. -- it had there were three photographs of that person; one straight on, one to the



Bouto 011579

right, and one to the left, is that correct?

A. Yes.

Q. Did they take all three of those photographs out when you identified the first person from the book?

A. They marked it and they put them to the side on the book, they put them to the side, because there were two books.

Q. And what do you mean they put it to the side?

A. Yeah, like, you know, you're looking at a book and it has pages in it, and then, you know, I said this is the person I saw at the gas station, you know, and they had, you know, pages on it, so they put the page and they took the pictures out.

Q. So they -- they took those pictures out to make -- put them to the side?

A. They took them. I don't know what they did with them.

Q. And then --

A. They had the folder.

Q. After you identified the first person, did you keep looking through the book to see if

you could recognize anyone else?

A.   Yes.

Q.   And did you then identify the second person or a second person that you had seen at the gas station?

A.   Yes.

Q.   And what did you say when you recognized the second person from the gas station?

A.   That this was a person that I had seen at a gas station, and that this was the person that was as a passenger.

Q.   And did you say anything -- well, strike that.

Did Guevara say anything to you when you identified the second person from the gas station in the book?

A.   Yes.

Q.   What did he say?

A.   That he said to me are you looking at his face really well, is that the person you saw at the gas station, and I said yes.

Q.   And for that second person, were there also three photographs of that person?



Bouto 011581

A.   Three pictures.

Q.   And did Guevara take those three photographs out of the book as well?

A.   Yes.  And those were the people that had numbers on them already because they had -- they had been arrested, you know, several times before and they had a record.

Q.   Did you ask Guevara what that person had done?

A.   Yes.

Q.   And what did Guevara say?

A.   That these persons were in a group with the other people, robbing people.

Q.   And was it Guevara who took out the photo of the driver, the -- the first person you identified from the book?

A.   They put them to the side because there was another Detective Jack, because, you know, since he spoke Spanish, he would tell the other one.

Q.   And so Guevara told Jack who is the same person who was in the car when you drove to -- to look at the car from the gas station; right?



Bouto 011582

MR. KIVETZ:  Object to the form.

THE WITNESS:  I told him, yes.

BY MR. AINSWORTH:

Q.  And so was it Guevara or the other Detective Jack who took the photo out of the driver?

MR. KIVETZ:  Objection, form.

MR. AINSWORTH:  Let me -- let me strike that.

BY MR. AINSWORTH:

Q.  Was it -- was it Guevara who took the photograph out of the book that was the photograph of the driver and then he gave it to the other detective?

A.  Yes, I said to him I saw him at the gas station, and then they set the pictures aside.

Q.  Okay.  Why don't we change the tape.

THE VIDEOGRAPHER:  The time is 13:41.  We're off the record.

(Whereupon, a short recess was taken.)

THE VIDEOGRAPHER:  We are back on the record. The time is 13:56.

BY MR. AINSWORTH:

Q.  Did Guevara tell you that he knew who



had killed your husband?

A. No.

Q. Did he mention another witness or a witness to the case?

A. No.

Q. Did Guevara explain to you why he thought the people from the gas station had something to do with your husband's murder?

MR. KIVETZ: Objection, form.

THE WITNESS: I'm sorry, what was your question?

BY MR. AINSWORTH:

Q. Did Guevara explain to you why he thought the people from the gas station had something to do with your husband's murder?

MS. NIKOLAEVSKAYA: Objection, form and foundation.

MR. KIVETZ: Objection, form -- objection, form, foundation.

THE WITNESS: That -- that they had to investigate, you know, they had something to do with it.

BY MR. AINSWORTH:

Q. There came a time when Guevara and



Bouto 011584

another detective took you in a car to -- to look for the car that you'd seen at the gas station.  Do you recall that?

A.  Yes.

Q.  According to the police reports, the detective who was with Guevara was a Detective Halvorsen.  Does that -- does that sound familiar to you?

A.  No, I don't remember.

Q.  Do you have any reason to dispute that it was Detective Halvorsen who was with Guevara while you were in the car looking for the car from the gas station?

A.  I would have to look at him.  I don't know what his name is.

Q.  Okay.  Earlier you told us that Guevara and the other detective drove you to several vehicles; is that right?

MR. KIVETZ:  Objection, form, misstates the evidence.

THE WITNESS:  Yes.

BY MR. AINSWORTH:

Q.  And he drove you to -- or they drove you to several abandoned vehicles; is that



Bouto 011585

right?

A.    Yes.

Q.    So, would Guevara drive you to a car and then stop and then ask you if that was the car that you had seen?

MR. KIVETZ:  Objection, form, leading.

THE WITNESS:  He would take -- he would take me to recognize the car, to see if I would recognize the vehicle.

BY MR. AINSWORTH:

Q.    Okay.  So, can you describe how it went; when you're in the car with Guevara and the other detective and they drove off, can you tell of us how they went about trying to have you identify the car?

A.    I would see the vehicles that were on the street, some were -- you know, the tires were flat, and some of them abandoned, some of them were crashed, you know, at several places, and then finally I was able to see one that was the one that was at the gas station.

Q.    Did Guevara tell you that the car that was involved in your husband's murder had sustained damage?



Bouto 011586

MR. KIVETZ: Objection to form, leading.

THE WITNESS: Well, they took me to the car and they asked me if I could recognize the car, and then, you know, what happened to the car because it had been crashed and it had a hole in it.

BY MR. AINSWORTH:

Q. Before they took you to that car, did they take -- did the detectives take you to other cars?

A. I had already seen like about five other cars.

Q. And these were cars that the detectives drove you to; is that correct?

A. Yes.

Q. And would the detectives drive up to the car and then stop the car and then let you observe the car?

A. Yes, if I would recognize the car, and then I would say no.

Q. Were each of those cars, cars that had flat tires or some damage to them?

A. All the vehicles were stopped were kind of like abandoned.



Q.   Did Guevara tell you why he was taking you to see abandoned vehicles?

A.   He took me to see the abandoned vehicles to see if I could recognize the vehicle that I had seen.

Q.   Did he tell you why he was taking you to see abandoned vehicles as opposed to, you know, other vehicles that were in working condition?

A.   Because he asked me if I would recognize the vehicle.

Q.   Do you know why he didn't take you to see any vehicles that did not appear to be abandoned?

MS. ROSEN:  Objection, foundation.

MR. KIVETZ:  Objection, form and foundation.

THE WITNESS:  No, I don't know.

BY MR. AINSWORTH:

Q.   Referencing Exhibit No. 5, the car that was -- that's depicted in this photograph, did Guevara drive you to this car?

A.   Yeah, we went by the street and I saw the vehicle.

Q.   And when you -- did Guevara drive you



Bouto 011588

to that street?

A. Yes.

Q. And did Guevara drive up to this car that's depicted in Exhibit 5?

A. Yeah, we went by -- we went by that vehicle, and there was another vehicle there, too. It was under a bridge.

Q. Was this during daylight or in the dark?

A. In the afternoon.

Q. What did the other car look like?

A. The other vehicle looked different. It was smaller. It was like a Toyota. It was little.

Q. Did Guevara tell you that the car in Exhibit No. 5 had damage to its front because of the -- as a result of the murder of your husband?

MR. KIVETZ: Objection, leading.

MS. ROSEN: Objection, leading.

THE WITNESS: Yes.

BY MR. AINSWORTH:

Q. What did Guevara tell you about how the car pictured in Exhibit 5 got the damage to its



Bouto 011589

front?

    A.    That they were -- probably when they were running away, that they hit something.

    Q.    And did Guevara tell you -- I'm going to show you Exhibit 5.

        Before when I was referring to Exhibit 5, I was referring for the record to the first photo in Exhibit 5 which is Bates number CCSAO Serrano-Montanez 00005193.  And now I'm showing you another photograph from Group Exhibit 5 that ends with Bates number 5950.

        Did Guevara tell you that the bullet hole in the vehicle depicted in Group Exhibit 5 was matched to bullets from the scene of your husband's murder?

    MR. DAFFADA:  Objection, foundation.

    MR. KIVETZ:  Objection, form, foundation, leading.

    THE WITNESS:  That -- that it could be, that they matched.

BY MR. AINSWORTH:

    Q.    Did you ask Guevara about the bullet holes in -- in the car depicted in Exhibit No. 5?



A.   Why that vehicle had that hole.

Q.   And what did Guevara tell you about the bullet hole in the car depicted in Exhibit No. 5?

A.   That he said that when they shot, the vehicle could have hit them.

Q.   Meaning that one of the bullets from the perpetrators may have hit their own car; is that what you mean?

A.   Yes.

Q.   And that's what Guevara told you?

A.   Yes.

Q.   Did Guevara ever tell you that there was no link between the forensic evidence on the car depicted in No. 5 and the crime scene?

MR. KIVETZ:  Objection, form, leading.

THE WITNESS:  I'm sorry, what was the question?

BY MR. AINSWORTH:

Q.   Did Guevara ever tell you that there was no link, no connection between the bullet hole or the damage to the front of the car depicted in No. -- in Exhibit No. 5 and the crime scene?



Bouto 011591

MR. KIVETZ:  Objection, form, leading.

THE WITNESS:  He only said that the -- that the bullet matched with the hole in the car.

BY MR. AINSWORTH:

Q.    You met with Jeff two times; is that right?

A.    Yes.

Q.    Was he with some other people?

A.    Two people.

Q.    And was one of them a Spanish speaker?

A.    Yes.

Q.    Jeff showed you photographs; is that right?

A.    Yes.

Q.    And just to be clear, Jeff showed you the photographs that have been marked as Exhibit No. 5?

A.    Yeah, like the ones I saw on the street.

Q.    And can you -- just so we know what we're talking about, would you please just hold up Exhibit No. -- just the first page of Exhibit No. 5?  Thank you.  You can put that down.

When Jeff met with you, he told you



Bouto 011592

that the car in Exhibit No. 5 belonged to Jose Montanez; is that right?

MR. KIVETZ: Objection, form, leading.

THE WITNESS: Yes.

BY MR. AINSWORTH:

Q. And when you met with Jeff yesterday, he showed you the photographs that have been marked as Group Exhibit 4 -- let me get the first page -- is that right?

MR. KIVETZ: Objection, form.

THE WITNESS: He showed me the group.

BY MR. AINSWORTH:

Q. And -- and just so we're clear, can you show -- can you show the first page of Exhibit 4 to the camera? Thank -- thank you.

May I see those? Thank you.

And when you met with Jeff yesterday, he told you that this photo of Exhibit No. 4 Bates numbered CCSAO Serrano-Montanez 00005207 was Jose Montanez; is that right?

MR. KIVETZ: Objection, form, leading.

THE WITNESS: I told him. I recognized him.

BY MR. AINSWORTH:

Q. Did you know his name?



Bouto 011593

A.   No.  No, just his face.

Q.   And Jeff told you his name; right?

MR. KIVETZ:  Objection, form, leading.

THE WITNESS:  No.  What is his name?

BY MR. AINSWORTH:

Q.   I can't answer questions in a deposition.  But I -- when Jeff met with you, he met with you you said 15 days ago; is that right?

A.   Last week.

Q.   Last week?

A.   I don't know what day it was, but it was last week.

Q.   Do you know if it was before I met with you or after?

A.   You were first.

Q.   And when Jeff met with you last week, did he show you the photographs in Exhibit No. 4?

A.   All the pictures.

Q.   And so he showed you all the photographs last week and then he showed you all the photographs in Exhibit No. 4 again yesterday; is that right?



Bouto 011594

A.   No, yesterday he didn't show me anything.

Q.   So, last week he showed you the photographs?

A.   Yes.

Q.   When Jeff met with you yesterday, did he tell you that you had identified Mr. Montanez and Mr. Serrano previously?

MR. KIVETZ:  Objection, form, leading.

THE WITNESS:  No, I identified them with the pictures.  That's what I remember from the gas station, that's it.

BY MR. AINSWORTH:

Q.   When Jose Montanez and Armando Serrano were released from prison, it was on the news; right?

A.   I heard the news.

Q.   And you saw it on TV?

A.   Yes.  And the whole Vargas family called me to see what was happening.

Q.   And you saw pictures of Jose and Armando when they were released from prison; is that right?

A.   Yes.



Bouto 011595

Q.   When Jose and Armando were incarcerated, would you look on the website to see that there's -- where they were in -- in the Illinois Department of Corrections?

A.   No, never.

Q.   You came to Court in the --

A.   I did not want to know.

Q.   About five years ago or so you came to court at 26th and California; is that right?

A.   Yes.

Q.   And you were -- you were not allowed to testify that day; is that right?

A.   Yes.

Q.   But you came into the courtroom; right?

A.   I was there.

Q.   And you saw Jose Montanez and Armando Serrano in the courtroom; right?

A.   I did not see them because they moved me out, that I should not be there.

Q.   When you met with Jeff, he showed you Exhibit No. 6; is that right?

A.   Yes.

Q.   And when you met with Jeff, he showed you Exhibit No. 7; correct?



Bouto 011596

A.    Yes.

Q.    And just so we know which ones -- which photos we're talking about, would you mind holding up each of these for a moment until the videographer gives you a nod of the head yes.

Okay.  Now, can you show the -- and that was Exhibit No. 6 -- or sorry -- No. 7, so now let's show Exhibit No. 6.  Thank you.

When you met with Jeff, did you talk with him about the gas station incident?

A.    Yes.

Q.    And did you tell Jeff that you told Guevara about the gas station incident?

A.    Yes.

Q.    Did you tell Jeff how long after the murder you told Guevara about the gas station incident?

A.    After the detectives came that did not speak Spanish.  I don't remember if it was a week or a month, I don't remember, but we were doing the funeral.

Q.    It was around the time of the funeral?

A.    No, because it was not in the case. Guevara was not in the case.  Guevara came after



the case.

Q. After the -- after the day of the murder; is that right?

MR. KIVETZ: Objection, form, leading, mischaracterization of testimony.

MS. ROSEN: Objection, misstates testimony.

THE WITNESS: After the murder? He came after -- about a week after to ask me questions also.

BY MR. AINSWORTH:

Q. And so was it about a week after the murder that you told Guevara about the gas station incident?

MR. KIVETZ: Objection, form, leading.

MS. ROSEN: Mischaracterizes her testimony.

THE WITNESS: Yes, because -- like I said, because he came to ask me questions because the other guys did not speak Spanish. Yeah, and, you know, it was with all the detectives, they spoke English, and they said that they were going to take the case.

BY MR. AINSWORTH:

Q. Guevara told you he was going to take the case?



Bouto 011598

A.    That he was going to handle the case because several would come.

Q.    And so, Guevara had you recount to him everything that you knew about the crime and initial conversation with him; is that right?

A.    Yes.  Well, what we had done the day before when we went to the bank.

Q.    When you went to the bank and to the gas station?

A.    And he also investigated that I was telling the truth, that I was working, too.

Q.    So, he looked -- so, Guevara looked to see that you really were working the day before on -- on February 4th?

A.    Yes.  Yeah, he went to investigate to make sure that I had punched in and out, the hours that I was there.  He investigated our work with the supervisors and co-workers, everything.

Q.    And so, at that time there was -- there were no -- everybody was a potential suspect?

A.    Yes.

Q.    They even investigated you?

A.    Yes.



Bouto 011599

Q.   And they investigated Anna Velez?

A.   Yes, Anna Velez, yes.

Q.   She had to go and take a polygraph test?

A.   That, I don't know.

Q.   All right.

A.   I don't know.

Q.   How do you know that Guevara investigated where you were the day before?

A.   Because the -- because the day after they were asking around there at work.  You know, for awhile different detectives were over there asking.  And at his job, too.  Yeah, the person, the deceased person, too.  They were investigating everything, where everything was coming from.

Q.   And so, at your work did people tell you that the detectives were there to establish your whereabouts?

A.   They were investigating my days of work, my hours of work, and then they would call me at the office, they called me out.

Q.   And this was about a week or so after the murder?

Bouto 011600

A.   Yeah, it took -- it took quite awhile that they investigated.

Q.   Did it start about a week after the murder?

A.   Yes, after.

Q.   A week after?

A.   A week, two weeks, three weeks.  They were always coming to work, yeah, but I was working.  If I was not at the house, I was working -- I was at work.

Q.   So, the whole month of February people were coming to your work and verifying things at your work; is that right?

A.   Always.  And -- you know, and even up to date, 25 years later, everybody's looking for me.

Q.   I'm sorry.

A.   Yes, everybody is looking for me, 25 years.

Q.   And in that initial conversation you had with Guevara about a week after the murder, did you tell them that you had been working the day before the murder?

A.   Yes, I was working.  I went to work.



Bouto 011601

Five days, six days, I would work a lot.  I had to go to work.

Q.   In his questioning Jeff referenced your testimony at the trial back in 1994; is that right?

A.   Yes.

Q.   When Jeff met with you, did he show you your testimony, the transcript of your testimony?

A.   No.

Q.   So you haven't seen your transcript of your testimony since -- or ever?

A.   He showed me a paper where I had put my initials, and -- and then those -- those initials were taken by the students from the university saying that they were -- that he was innocent.  That they had been in jail for 20-something years, and it was time enough for them to get out.

Q.   Did Jeff talk with you about that piece of paper with your initials on it?

A.   Yes.

Q.   What did Jeff say about that?

A.   If I had read the paper, and I told --



Bouto 011602

yeah, that he -- I told him that I had read it in a rush because when the students came, they always came as a group with a lot of people. That there -- there were always a lot of people. And they -- when they were there, they would always be there for three to four hours, and without an appointment.  They would just come right, you know, unannounced.

Q.   Sounds like students.

Earlier you agreed with Jeff that your testimony -- well, strike that.

Earlier you agreed with Jeff that your memory was fresher in October of 1994 when you testified than it is here today 25 years later?

A.   Yes, that is correct.

Q.   I want to read you a portion of your testimony from that trial in 1994.

MR. KIVETZ:  What page?

MR. AINSWORTH:  Page J54.

MR. KIVETZ:  J54?  Is there any other Bates stamps that you have?  There's like four of them on mine.

MR. AINSWORTH:  Well, it could be just 54.  I have two versions of it.  One says 54 and one



says J54.

MR. KIVETZ:  Starting with the car was following you; is that right?

MR. AINSWORTH:  Yes.

BY MR. AINSWORTH:

Q.   Okay.  Let's go to line 9.  Question; So then you and your husband talked about these people following you, correct?  And you answered, he told me, and we both observed that they were following us.

Question; Now how -- what streets did you go down?  Answer; On Central Park.

Question; Did you go down another street?  Answer; We turned into Wabansia and then from there we went home.

Question; When you were on Central Park, was the car still following you?  Answer; We didn't look up.

Question; When you were on Wabansia, was the car still following you?  Answer; Probably, but we didn't look up.

Question; When you got home was the car still following you?  Answer; We didn't look up.

Question; So, the car didn't follow you



all the way home, did it?  Answer; We don't know.  We didn't look up.

Now, did you -- were you asked those questions, and did you give those answers?

A.   Whenever -- I remember the answer was that the vehicle would follow us, then he would stop when he was on Wabansia, but it was a different street, Wabansia, and then all of a sudden he looked at the rearview mirror and he saw the vehicle was coming again.  When we turned onto Springfield, the vehicle came again and it was following us.

Q.   When you testified in 1994, as I just read to you, you testified that you did not see the car follow you all the way home?

A.   The vehicle was behind us.  He said that he was looking at the car through the rearview mirror.

Q.   You mean Rodrigo was?

A.   Yes, he said that.

Q.   Let me -- let me read a little bit more of your testimony.  Let's start back on Page -- let's start on Page 583, Line 18.

Question; Did your husband back up the



Bouto 011605

car then and finally leave the gas station?

Answer; No.

Question; He just drove forward and left the gas station?  Answer; Yes.

Question; You knew when you left the gas station this car was following you, is that right?  Answer; Yes.

Question, and you know that because you saw it following you, is that right?  Answer; My husband was looking through the glass, and when he told me that they were following us, I looked to see in the glass mirror that they were following us.

Question; So then you and your husband talked about these people following you, correct?  Answer; He told me that, and both observed that they were following us.

Question; Now, what streets did you go down?  Answer; On Central Park.

Question; Did you go down another street?  Answer; We turned into Wabansia and then from there we went home.

MS. ROSEN:  I'm going to object to you repeating the same stuff that you just read to



Bouto 011606

her two minutes ago.

BY MR. AINSWORTH:

Q. Question; When you were on Central Park, was the car still following you? Answer; We didn't look up.

Question; When you were on Wabansia, was the car still following you? Answer; Probably. We didn't look up.

Question; When you got home, was the car still following you? Answer; We didn't look up.

Question; So, the car didn't follow you all the way home, did it? Answer; We don't know. We didn't look up.

My question to you is, were you truthful in that testimony that I just read to you?

A. I said the truth.

Q. And that is true, that at first you and Rodrigo saw the car following behind you; right?

A. Yes, yeah, but they were wrong there, because they were only talking about Central Street and Wabansia, and they didn't put down that we turned on Springfield.



Bouto 011607

Q.   You understand that this is your testimony?

A.   Yes.

Q.   And so what I just read to you is what you testified to at court.  And so when you testified in -- at court that you didn't look up when you were on Wabansia, was that true?

A.   I was not driving.  He was the one driving.

Q.   But you did -- you did not look up to see if the car was still following you when you were on Wabansia; is that right?

A.   He told me that he was being followed.

Q.   And you just assumed that the car followed you all the way home; right?

A.   All the way to the house, and when we got to the house, he said get out with the children and go inside, and he stayed parking the vehicle.  And the vehicle went by, and that was it.  And when I went inside the house, he was already coming.

Q.   When you testified at trial, you did not testify that you saw the car pass your home on Springfield; correct?



Bouto 011608

MS. ROSEN:  Object to the form.

THE WITNESS:  Did they ask that?

BY MR. AINSWORTH:

Q.  They asked you the question on Page 55, Line 3.  Question; So, the car didn't follow you all the way home, did it?  And you answered, we don't know.  We didn't look up.

A.  He's saying that I said no, that I didn't know.

Q.  So, my question to you --

MR. KIVETZ:  I'm just objecting to form because you're not reading the following page where it talks about what she said.

MS. BONJEAN:  I'm going to object to you --

MR. KIVETZ:  All I said was it talks about what she said, Ms. Bonjean, thank you, because your question is improper.

BY MR. AINSWORTH:

Q.  You didn't testify at trial that you saw the car on Springfield; correct?

MR. KIVETZ:  Objection -- objection, form, foundation, misstates testimony.

THE WITNESS:  I don't mention Springfield there.  I'm talking about Wabansia.  I mean,



Bouto 011609

we're talking about Central Park and Wabansia and not Springfield, and that's the one that we live on.

BY MR. AINSWORTH:

Q.   And you told Detective Guevara that the car followed you home; right?

A.   Yes.

Q.   And that's because you --

A.   That he followed us.

Q.   And that was your belief at the time that you talked to Guevara; right?

A.   Yes.

Q.   And that belief was based on what your husband said to you; right?

A.   Yes.

Q.   And what you observed when the car was initially following you when you pulled out of the gas station; right?

A.   Yes.

Q.   If you -- if you saw the car on --
well, strike that.

Again, back in 1994 your memory was better than it is today; right?

A.   Of course.



Bouto 011610

Q.   If you saw the car on Springfield, then why did you testify that you don't know if the car followed you all the way home because you didn't look up?

MS. ROSEN:  Objection to the form.

MR. KIVETZ:  Join.

THE WITNESS:  Because when we got to the house, he told me get out of the car and go inside because he was looking in the rearview mirrors and onto the side.  He -- if he told me to get out, it was for a reason; right?  He said, you know, take the children -- take the children inside like he said to, and I was holding on to one and I was, you know, pulling the other.  And then he parked, and then -- and then I looked out the door, and he was coming, and then the vehicle went by.

BY MR. AINSWORTH:

Q.   If -- if you saw the vehicle actually drive by your home, why didn't you testify that at trial when you were asked so the car didn't follow you all the way home, did it?

MR. KIVETZ:  Objection, form --

MS. ROSEN:  Objection, form --



Bouto 011611

MR. KIVETZ:  -- asked and answered.

THE WITNESS:  Because when -- because when he told me to get out of the car, I saw the vehicle go by later, because I got out first.

BY MR. AINSWORTH:

Q.  And so, one of the reasons why you believe the car followed you all the way home is because according to you now in 2018 you're saying that you saw the car drive by your home; right?

MR. KIVETZ:  Objection, form --

MS. ROSEN:  Objection, form --

MR. KIVETZ:  -- misstates her testimony.

THE INTERPRETER:  Can I have that read again, again?

(Whereupon, the record was read as requested.)

THE WITNESS:  Yes, that is correct.

BY MR. AINSWORTH:

Q.  So, what I'm trying to find out is when you testified at trial in response to the questions so the car didn't follow you all the way home, did it, and you answered we don't know, we didn't look up, why didn't you say I



Bouto 011612

saw the car after I got out of -- I saw the car drive by my home after I got out of the car with my two kids?

MS. ROSEN: Objection, form.

THE WITNESS: When I saw the -- when I saw the vehicle, I was already inside with my children, and my husband was coming on the vehicle that went by, because my house was way set back. You know, it's not like you had a garage, so it was set back, it was all yard, and then you have to walk. He was walking towards the house, and then he went by.

BY MR. AINSWORTH:

Q. So, when the car went by your home, your husband was alone with the van; is that what you're saying?

A. He was at the gate coming in, because I was inside the house already with the door open.

Q. So your husband was outside on the other side of the gate alone; correct?

A. He was coming in already.

Q. He was coming in through the gate from the sidewalk?

A. Yes, inside the house when the car went



by.

Q. So, how long was it after you arrived at the house that this car went by?

A. The vehicle was coming like on Wabansia we still had to turn on Springfield, and he was coming fast -- he was coming fast. And then he said get out and go inside with the children, and then I went with the children and I went inside -- because my house is not right on the street, it's set back. And then I put the children in, and I looked back, and then I saw him coming. And then the car went by. And I did see when the vehicle went by.

Q. Was it a brown car that went by?

A. Yes, the one that had the brown thing on the top, yes. But he didn't say anything anymore. He was already inside the house, and the car was parked already.

Q. Let's mark this as Exhibit No. 8.

(Whereupon, VARGAS Deposition Exhibit No. 8 was marked for identification.)

BY MR. AINSWORTH:

Q. What we've marked as Exhibit No. 8 is



Bouto 011614

Bates numbered CCSAO 0005330 through 332.

Is this your handwriting on the first page?

A.    Yes.

Q.    Is that your date of birth?

A.    Yes.

Q.    And did you write in your -- your date of birth there?

A.    Yes, June 15th of '62, yes.

Q.    And this Exhibit No. 8 is written in Spanish; is that right?

A.    Yes.

Q.    And those are your initials to the left of your birthday and your -- and where you were born; correct?

A.    Yes.

Q.    And the -- this document, Exhibit No. 8, this is an affidavit; correct?

MR. KIVETZ:  Objection, form, foundation.

BY MR. AINSWORTH:

Q.    Is that a yes?

A.    Yes.

Q.    And the affidavit refers to an Elizabeth Rodriguez.  Who is the Elizabeth



Rodriguez referred to in this affidavit?

A. Elizabeth Rodriguez is me. Because when he passed, then he gave me the papers. He was a resident. And when he passed, then they told me that I was not going to be given documents. So, since he didn't give me the papers, then I had to find other -- another one for me to be able to work. That's when I started using this paperwork in order for me to be able to work, and that's what I was signing this, but that's me, myself.

Q. So, you were using a different name?

A. Not anymore, because I -- I do have my immigration papers now. My children are the ones now, you know, taking care of it.

Q. But at the time that this affidavit was signed, you were using a different name to allow you to work; is that right?

A. Of course, yes.

Q. And you are using that name to file papers with the Federal Government?

A. This I use to be able to work because I had to support my children because they didn't give me the documentation. Immigration knows



all of my problems, and they -- they know who I am, and they use my proper name.

Q. Now you do?

A. Yes.

Q. But back in --

A. I hope so. I mean, on January 8th I have to go to immigration to see what they decide. I have an appointment for the 8th.

Q. So, back in 2006 you were using a fake name to allow you to work; right?

A. Correct, yes.

Q. And -- and you didn't tell the people that you used that name with -- that it was fake; right?

A. No, because they would always know me as Elizabeth.

Q. And that allowed you to file --

A. At work that was my name, Elizabeth.

Q. And at work that was your fake name that you used; right?

A. Yes.

Q. In this affidavit you used the initials ER because that was the false name that you were using at the time; right?

Bouto 011617

A.   Yes, that was the one I was using.

Q.   And those are your initials ER at the bottom of the first page of Exhibit 8; right?

A.   Correct.

Q.   And you initialed the bottom of the first page of this Exhibit No. 8 after you read it; correct?

A.   Yes.

Q.   And then if you go on to the second page of Exhibit No. 8, you initialed the bottom of the second page of Exhibit 8; right?

A.   I'm sorry, the second page?

Q.   Yes.

A.   The second one, yes.

I'm sorry, what happened?

Q.   Those are your initials at the bottom of the second page; right?

A.   Yes.

Q.   And you initialed the bottom of the second page after you read the second page; is that right?

A.   Yes.

Q.   And then if you go on to the third page of Exhibit No. 8, that is your signature; is



Bouto 011618

that right?

A.   Yes.

Q.   And you signed it on May 23rd, 2006?

A.   Yes.   These are because of the students.

Q.   Sure, let's go off the record.

THE VIDEOGRAPHER:   The time is 14:55.   We're off the record.

(Whereupon, a short recess was taken.)

THE VIDEOGRAPHER:   We are back on the record. The time is 15:10.

BY MR. AINSWORTH:

Q.   Do you remember the Northwestern students coming and asking you to give a videotaped statement?

A.   Yes.

Q.   And did they videotape you talking about the events that you observed?

A.   Yes.

Q.   And that was around 2006 or 2005, somewhere in there?

A.   Something like that.

Q.   And your memory was better than -- back



Bouto 011619

in 2005 or 2006 than it is today; is that right?

A.   Yes, but I was busy because I was in the business.

Q.   Well, you wouldn't lie just because you were busy; is that right?

A.   Yes.

Q.   You told the students the truth; right?

A.   What truth?

Q.   The truth about what you observed?

A.   Yes.

Q.   Let me show you a video of your interviews.  You can watch it and hear what you said at the time.

A.   Okay.

Q.   You can adjust the screen just if it helps you see it.

          (Whereupon, the video was being played.)

MR. KIVETZ:  Why aren't we translating this?

MR. AINSWORTH:  Hit pause for a second.

THE INTERPRETER:  For the record, she's being spoken to in English, and she's answering in English.

MR. KIVETZ:  Well, there's also some



Bouto 011620

interpretation in there as well.

MS. BONJEAN:  There will be.

MR. KIVETZ:  And, hold on, and just so the record is clear, you know, I'm not sure that the student in there who is interpreting is doing the best of jobs, so that's why I think it might be most prudent for us to have the interpreter interpret the questions and her responses I guess in Spanish, and that way we'll stay consistent with how we've been proceeding forward that's in my initial direction that we keep everything in Spanish which is her native language.

MR. AINSWORTH:  By having her view what happened, not an interpretation of what happened; I'd like her to see the exhibit in its native format.

If you would like to play it for her and have it translated, that's -- you know, your right.  But there's -- I don't want to alter what occurred in this videotaped encounter.

MS. ROSEN:  So, just so that we have clarity, you plan to play the entirety of the -- of the video and then ask her questions about it?

Bouto 011621

MR. AINSWORTH:  Yes.

MS. ROSEN:  Okay.  So we'll make whatever objections we deem appropriate once you conclude the video and ask whatever questions --

MR. AINSWORTH:  -- very good.

THE INTERPRETER:  And interpreter speaking, so for my -- for the record, my instruction is to remain --

MR. KIVETZ:  Even though I respectfully disagree, it's his portion of the deposition, and he can proceed however he wants even though it's not sages of wisdom --

MS. BONJEAN:  -- for the record, I will -- with everyone's permission, I will forward a copy to the court reporter of this exact video that she's listening to, and we'll attach it to the transcript, if that's okay.

MR. KIVETZ:  That's fine.  I don't -- that's not the problem.  The problem is whether or not she understood the questions that were being asked of her.

MS. BONJEAN:  You certainly can probe all that, but I think we have the right --

MR. KIVETZ:  Well, I think it's unfair to the



witness if you're going to be asking her

questions about what she -- what she is viewing

without having a complete understanding of --

MS. BONJEAN:  Can you stop coaching the

witness right now, because that's exactly what

you're doing.

MR. KIVETZ:  That's not what I'm doing.  We

can ask her to step out of the room.  That's not

what I'm trying to do.  I'm trying to make as

clear -- a clear as record for her so she can

understand.

MR. AINSWORTH:  For her -- it's not the

purpose --

MR. KIVETZ:  Ms. Vargas, could you please

step out of the room for a second?

THE VIDEOGRAPHER:  Do you want to go off the

record?

MR. KIVETZ:  No, stay on.

MS. ROSEN:  No.

(Whereupon, the witness exited

the room.)

MR. KIVETZ:  Russell, from my point of view,

it's pretty simple.  You said that your

intention is to ask her questions about what



Bouto 011623

happened in the video.  If she's not able to understand specifically what the questions were of her at the time of the video, even though she did respond in English, then she should be entitled to have that translation at this, you know, federal deposition.

It makes -- it makes perfect sense.  I don't know why you want to show her something that's -- that's entirely in English when we've been proceeding with the entirety of this deposition in Spanish interpretation.

MR. AINSWORTH:  Anything else you want to say?

MR. KIVETZ:  No, I don't think so.

MR. AINSWORTH:  All right.  Let's get Ms. Vargas back in.

MR. KIVETZ:  So, just -- well, I guess I do want to -- if you're not going to -- if you're not going to be willing to change, then I object to this line of questioning, because a lack of foundation that she won't be able to understand appropriately what was questioned and answered.

MR. AINSWORTH:  Okay.

MS. BONJEAN:  Any other objections?

 Bouto 011624

MR. KIVETZ: Oh, gosh, I wish there were. Thank you, Ms. Bonjean.

MS. BONJEAN: You're welcome. Only here to help.

MR. KIVETZ: Thank you.

(Whereupon, the witness entered the room.)

THE VIDEOGRAPHER: We're still on the record.

MR. AINSWORTH: Okay. We will now proceed with the playing of the video exhibit.

(Whereupon, the video exhibit was being played.)

MR. AINSWORTH: All right. That concludes the playing of the video.

THE WITNESS: Correct.

BY MR. AINSWORTH:

Q. **Were you truthful in your responses to the students in that video?**

MS. ROSEN: Objection to the foundation.

THE WITNESS: Yes.

BY MR. AINSWORTH:

Q. **So, Rodrigo didn't beep his horn while he was at the gas station?**

A. Yes, he did honk the horn in order to

Bouto 011625



get out of the place where he was at.

Q.   Do you hear yourself say on the video or on the videotape that Rodrigo did not beep his horn?

MS. ROSEN:  Object to the foundation.

THE WITNESS:  He honked the horn in order to get out of there.  But in the questions they were asking, if there were -- if there were three other men there.  In the questions they asked if there were three other men there.

BY MR. AINSWORTH:

Q.   Well, according to you, you saw three men in the car; right?

A.   Yes.

Q.   And in the video they're asking you about Rodrigo honking his horn or not; do you recall that questioning in the video?

MR. KIVETZ:  Objection, foundation.

MS. ROSEN:  Foundation.

THE WITNESS:  They said horn.  I don't know what horn it was.  What is it?  If they said they would have -- if they would have said that they hit the horn in the car -- they didn't say it.  They said it in English.  How do you say



Bouto 011626

honk; right?  Honk.

BY MR. AINSWORTH:

Q.    Do you know the word beep?

A.    No.

Q.    You never heard the word beep?

A.    No.

Q.    But you know honk?

A.    Not until now -- not until now -- beep.

Q.    Now, you -- are you saying that today is the first time you've heard the word honk?

A.    Yes.

Q.    Then why did you say honk before anybody else said honk?

A.    Because that's what the kids are saying.

Q.    So, you understood in the video that they're asking about whether Rodrigo either beeped his horn or honked his horn; right?

A.    But you were asking me if -- you know, if they -- if he honked the horn, if the horn was honked.  You were saying that to me right now.

Q.    No, Ms. Vargas, you said the word honk before anybody else did.  Do you remember that?



Bouto 011627

A.    Honk?

Q.    **Yes.**

A.    Okay.  It's on the video.  You can repeat it.

Q.    **So, why did you say the word honk?**

MS. ROSEN:  Objection, foundation.

THE WITNESS:  Because you were asking me that the students said if he had honked the horn; right?  That's -- that's what you asked; right?

BY MR. AINSWORTH:

Q.    **And so you understood that to honk a horn or to beep a horn means to make -- where a car makes a loud noise; right?**

MS. ROSEN:  Objection to the form, foundation.

THE WITNESS:  Yes, when the vehicle says -- you know, goes beep.

BY MR. AINSWORTH:

Q.    **And you knew that back at the time that you were talking to the students; right?**

A.    Yes.

Q.    **And you told the students that Rodrigo did not beep his horn while he was at the gas station; right?**



Bouto 011628

A.    Yes, when he was at the gas station.

Q.    But now you're saying that he did beep his horn?

A.    Yes, he did honk the horn so that the vehicle in front could move so that he could get out of there because they did not move out of there.

Q.    Back in 2005 or 2006 you had a better memory of what happened at the gas station than you do today; is that right?

A.    2005, 2006?

Q.    Yes.

A.    Yes.

Q.    And you told the students that -- well, strike that.

You told the students that there was no fight between Rodrigo and the -- the men; right?

A.    I mean, because they didn't fight.  I mean, they were just -- they were just, you know, with words that -- because he wanted to leave, and they didn't fight.

Q.    So, in the -- in the affidavit that we've marked as Exhibit No. 8, could you please put that in front of you, for Paragraph No. 2.

Bouto 011629


A.    This one; right?

Q.    Yes.

For Paragraph No. 2, the information in that paragraph is correct; is that right?

A.    Right here; right?

Q.    Is correct back in 2006; right?

A.    Yes.

Q.    That was your address in Maywood; correct?

A.    Yes.

Q.    And that was your age?

A.    Yes.

Q.    All right.  And then in the third paragraph you understood that what you were signing might be used in court in Armando Serrano's case; right?

A.    In Paragraph 3?

Q.    Yes.

A.    Yes.

Q.    And in Paragraph 5, it talks about the night before your husband was killed.  You talked about purchasing gas at the gas station on the corner of North and Central Park.

A.    Husband and me, and he went to buy it

for himself.

Q.   But it is true that you and your husband were at the gas station together; right?

A.   Yes, I was in the car and he was out.

Q.   You stayed in the car and your husband went in to actually purchase the gas; right?

A.   Yes.

Q.   And this was at approximately 6:30 p.m.?

A.   6:20, 6:30, around then.

Q.   And in Paragraph No. 6 it says it was dark outside; right?

A.   That it was dark out.  But there were lights, and there was snow.

Q.   And it was dark at the time?  The sun was down; right?

A.   Yes.

Q.   And then Paragraph 7 says there were three Hispanic men at the gas station as well?

A.   There were people paying, but there were people.

Q.   And that was true?

A.   Yes.

Q.   And Paragraph 8 says Rodrigo told you

that one of the men saw the money in his wallet when he was inside paying for gas?

A. He was paying, and there was -- and there a line behind him, so he was in line. So, they saw that money in his wallet. That's what I know.

Q. And that's what you told the students; right?

A. Correct.

Q. And Paragraph No. 9 says there's no argument or confrontation between Rodrigo and the three men who you and your husband saw at the gas station?

A. That they -- that they didn't fight with their fists, they were only, you know, with words.

Q. But the -- the paragraph says there was no argument or confrontation, there's no arguments between you and -- or between Rodrigo and the three men?

A. There was no -- no argument or confrontation. That was when he went into the car when he wanted to get out. It doesn't say inside or outside. It doesn't explain it. It



Bouto 011632

doesn't explain it.

Q.   All right.  But according to the affidavit, it says there was no argument or confrontation between Rodrigo and the three men who we saw at the gas station; right?

A.   But the three men were inside the car, see, they were not outside the car.

Q.   I'm just trying to find out do you agree that that's what this Paragraph 9 says that says there was no argument or confrontation between Rodrigo and the three men who we saw at the gas station?

A.   Inside the gas station.

Q.   Paragraph 10 says the men did not block our van with their car.  They did not prevent us from exiting the station, is that correct?

A.   That part is wrong there.

Q.   But that's what the affidavit says.  It says the men did not block our way with their --

A.   They didn't block our vehicle --

THE INTERPRETER:  I'm sorry, counsel.

BY MR. AINSWORTH:

Q.   They did not prevent us from exiting the station.  Let me try that again.

Bouto 011633

Just according to the affidavit, what's written here says the men did not block our van with their car, they did not prevent us from exiting the station.

MS. ROSEN: Are you asking her if that's what it says?

MR. AINSWORTH: Yes.

THE WITNESS: Yes, that is what it says.

BY MR. AINSWORTH:

Q. All right. And then Paragraph 11, it says Rodrigo was not angry, and he did not honk his horn. That's what the affidavit says, right?

A. Yeah, that's what it says.

Q. And in Paragraph 12 it says the men did not drive away quickly screeching the tires of their car; that's correct?

A. It says that here.

Q. And Paragraph 13 says the men drove behind us for approximately four blocks down a one-way street, as Rodrigo parked the van in front of our house, the men continued driving without pausing or slowing.

A. Yes.



Bouto 011634

Q.   And Paragraph 14 says, when shown six photos by Northwestern University journalism students in April 2006 including a photo of Armando Serrano, I was unable to positively identify any of the pictured men.

MS. ROSEN:  Are you asking her if that's what it says?

MR. AINSWORTH:  Yes.

THE WITNESS:  Yes, that is what it says.

MS. ROSEN:  And then just for purpose of clarity, Paragraph 13 you did not read in its entirety.  You only read a portion of it.  You only read maybe the first sentence or two.  Yeah, I don't believe you read the whole --

MR. AINSWORTH:  I think I did, but --

MS. ROSEN:  Okay.

BY MR. AINSWORTH:

Q.   Paragraph 15 says, I am making this statement of my own freewill, I have not been threatened in any way or promised anything to make this statement.

A.   I am, yes.

Q.   And that was true; right?

A.   It is not clear here what it says that

 Bouto 011635

there was four blocks, you know, to the house, because from the house to the gas station is four blocks.

Q. All right. So, for purposes of this question, the information in Paragraph 15 that you're making the statement of your own freewill and you've not been threatened or promised anything, that was true; right?

A. Yes, that's true. The kids were saying that they were innocent.

Q. And after this affidavit was typed, you had the opportunity to read it; right?

MR. KIVETZ: Objection, form.

THE WITNESS: I read it quickly.

BY MR. AINSWORTH:

Q. And you knew that you would be signing this document that might be filed in court in the case involving one of the men who was convicted of killing your husband; right?

MR. KIVETZ: Objection, form, foundation, leading.

THE WITNESS: Correct.

BY MR. AINSWORTH:

Q. You take this case involving the men



who are accused of killing your husband very seriously, right?

A. Yes.

Q. You want to make sure that everything involving the case of Armando Serrano and Jose Montanez is true and accurate; right?

A. That is correct.

Q. And after -- and you had the opportunity to make any changes if you wanted to to this affidavit, Exhibit No. 8; right?

A. No, I didn't make any changes. No, I left it like that.

Q. Right. You could have said this part is incorrect, can you please change this; right?

A. They didn't leave me the page for me to read. They took it with them. They did not leave me a copy of this.

Q. I mean before you signed it, you could have had them change anything that you wanted changed before you signed the affidavit?

A. It's a mistake, yes.

Q. But I'm just saying you had the opportunity to change anything you wanted changed in this affidavit if it -- if it was



incorrect; right?

A.   Yes.  Yes, you are correct.

Q.   And you had the choice if the affidavit was incorrect to not sign it; right?

A.   Correct.

Q.   And you signed this affidavit; right?

A.   Yes.

Q.   At that trial -- I'm going to read to you a portion of your testimony from Page 16. Let's start on --

MR. KIVETZ:  Page what?

MR. AINSWORTH:  Page 16.

MR. KIVETZ:  And which version; are you reading a different version now?

MR. AINSWORTH:  The same version.

MR. KIVETZ:  16?

MR. AINSWORTH:  16.

BY MR. AINSWORTH:

Q.   Line is 17.  Question; When this car arrived, where was your husband?  Answer; Inside the gas station.

     Question; And how many people were inside this car?  Answer; Three people. Question; As they pulled up, where were they

seated?  Answer; One in the front seat, and two in the rear seat.

Those were the answers that you gave at trial to those questions; correct?

A.    Correct.

Q.    Is it fair to say that 25 years later you don't remember exactly where people were seated inside that -- that car?

A.    That's 25 years.

Q.    You don't remember if there were two people in the front seat and one in the back, or two in the back and one in the front; is that right?

A.    I know that there were three, and I recognized two.

Q.    But you don't know where in the car they were seated; right?

A.    If they were in the front or the back, one of them was driving in the front.

Q.    And you don't know where the two passengers were seated in the car; right?

A.    There was a passenger in the front or in the back.  There were three -- there were three people there.



Q.    At that trial you were asked to identify some of the Defendants, right?

A.    Yes.

Q.    And you had a hard time telling the Defendants apart; right?

A.    Okay.

Q.    Do you recall that?

A.    Yes.

Q.    You couldn't really tell which of the Defendants were in which -- well -- strike that.

You kept confusing the Defendants among each other; right?

MR. KIVETZ:  Objection, form.

THE WITNESS:  Because I didn't know the name of each one of them, just the face.

BY MR. AINSWORTH:

Q.    Well, let me read some more from that transcript, and let's pick up on Page 16, Line 24 -- actually -- yeah, Line 24.

Question; Now, after that car parked, what happened?  Answer; One stepped out and went inside.

Question; Were you able to get a good look at that person?  Answer; Yes.



Bouto 011640

Question; How far away were you from that person?  Answer; Four feet more or less.

Question; You were sitting in the front of your van, is that correct?  Answer; Yes.

Question; And were you able to see the person's face?  Answer; Yes.

Question; Could you describe this person?  Answer; Yes.

Question; Please do so.  Answer; Do I draw him or what?

Question; No.  How tall was he? Answer; He was tall.

Question; Okay.  And was he white or black?  Answer; Neither.

Question; what nationality?  Answer; I don't know, Hispanic.

Question; I would ask you to take a look around the courtroom today and see if you see the persons who got out of the car in court. Answer; Yes.

Question; Would you please point to him and describe what he is wearing and where he is sitting?  Answer; He's right there by the corner, right here.

Question; In the far right, or far left? Answer; To the far left.

Question; Is he wearing glasses, or -- Answer; No, no glasses.

And then it's stated by one of the lawyers indicating for the record, and the judge says Mr. Serrano.

And so --

MR. KIVETZ: Objection, rule of completeness --

MR. AINSWORTH: I will keep reading.

MR. KIVETZ: Okay.

BY MR. AINSWORTH:

Q. At -- at that point in the testimony you had identified Mr. Serrano as the person who got out of the driver's seat to the car, correct?

MR. KIVETZ: Objection, rule of completeness, foundation, form.

BY MR. AINSWORTH:

Q. And I will keep reading.

The prosecutor then says, I would ask the three Defendants to stand up, Judge. The Court said -- told them to rise. And then

 Bouto 011642

you're asked, the individual that you saw getting out of the car, the driver of the car, which person is it? And you answered, the third one, the one that wears glasses, that's the one that left the car. And the court says all right. Now she has indicated a different person, Mr. Montanez.

So, in your testimony you first identified Mr. Serrano, and then you said it was Mr. Montanez who was the person who exited the car; do you remember that?

MR. KIVETZ: Same objection.

THE WITNESS: Yes.

BY MR. AINSWORTH:

Q. When you were in Court there were only three Defendants to choose from; right?

A. Yes.

Q. And Mr. Montanez is a really tall guy, and Mr. Serrano is a short guy; right?

MS. ROSEN: Object to the form.

MR. KIVETZ: Join.

THE WITNESS: Yes, that's correct.

BY MR. AINSWORTH:

Q. There's a third guy, a George Pacheco;



Bouto 011643

right?

MR. KIVETZ:  Objection to form, leading.

THE WITNESS:  I'm sorry, the question was?

BY MR. AINSWORTH:

Q.   There's a third Defendant, right, Jorge Pacheco?

MR. KIVETZ:  Objection to form, foundation.

THE WITNESS:  I know there was another person but I don't know the name of the other person.

BY MR. AINSWORTH:

Q.   Okay.  All right.  And then you also had a problem telling Pacheco apart from Serrano at trial; right?

MS. ROSEN:  Object to form.

MS. NIKOLAEVSKAYA:  Object to the form.

THE WITNESS:  I'm sorry, what is the question?

BY MR. AINSWORTH:

Q.   You had a problem at the trial telling Mr. Pacheco apart from Mr. Serrano; correct?

MS. ROSEN:  Same objection.

THE WITNESS:  Yes.

BY MR. AINSWORTH:

Q.   All right.  And at that trial you were



asked the following question starting on Line --
on Page 27, Line 16.

Question; Now I would like to direct your attention to June 11th of 1993. Did you go to the police station to view a lineup? Answer; Yes.

Question; And did you view a lineup? Answer; Yes.

Question; Could you describe what happened when you viewed the lineup? Answer; Yes.

Question; Please do so. Answer; I walked into the room, I saw a line, and I identified from the persons that were there one person.

Question; And which person -- which number of person was that person in the lineup? And then you were asked again what -- what number was that person in the lineup, and you answered number one.

Question; And who did you recognize that person to be? Answer; I recognized person number two here. And the Court says indicating Pacheco. And then the prosecutor says,



Bouto 011645

Question; I'm going to show you People's Exhibit No. 33, and then you answered number one.

And then you were asked would you place an X over the individual that you identified, and then Mr. Coghlan states, the prosecutor, and for the record she has placed an X over the Defendant Armando Serrano.

Were those the answers you gave to the questions at the trial?

A. Okay. Yes.

Q. So, you couldn't tell Armando Serrano apart from Jorge Pacheco; correct?

MR. KIVETZ: Objection to form.

MS. ROSEN: Objection, form.

THE WITNESS: Correct.

BY MR. AINSWORTH:

Q. Before you testified at the trial you met with the prosecutor at least five times I think you told us earlier; right?

A. Yes.

Q. And in those meetings with the prosecutor he showed you the photographs that you had seen before that Guevara had showed you; right?



Bouto 011646

A.    Yes.

Q.    And you practiced with the prosecutor about which photograph was which Defendant, right?

MS. ROSEN:  Object to the form.

THE WITNESS:  Yes.

BY MR. AINSWORTH:

Q.    But you still had trouble at trial telling the Defendants apart from each other, right?

A.    Because the -- the prosecutor was only asking the questions.

Q.    He wasn't telling you what the answers were; right?

A.    No.

Q.    So, when you had to answer the questions on your own without help from anyone, you had a hard time telling -- determining which Defendant was which, right?

MR. KIVETZ:  Objection, form.

MS. ROSEN:  Object to the form.

THE WITNESS:  Yes.

BY MR. AINSWORTH:

Q.    I want to take you back when -- after



Bouto 011647

you looked at those books and photographs and you made those two identifications; do you remember that?

A.    Yes, I remember.

Q.    What was the next thing that you remember happening in the investigation?

A.    In the investigation they eventually said that they were the ones that -- you know, that killed him.  And then, you know, later on, you know, people were saying -- some people came up saying that they were not the ones, that they were not guilty, and then I started saying to myself, you know, what was happening then with the investigation, and then now I'm saying, well, who was it then, what is going on.

Q.    So, after you identified the two people from those books, somebody told you that they were the ones who committed the murder; is that right?

MS. ROSEN:  Object to form.

THE WITNESS:  Probably.

BY MR. AINSWORTH:

Q.    Who was it who told you that the people that you picked out were the ones who killed

your husband?

A.   The detectives.

Q.   Which detectives?

A.   Detective Jack and Detective Guevara.

Q.   So, after Detective Guevara told you that -- well, strike that.

Did you ever talk to the detective that you called Detective Jack; did he ever speak to you in Spanish?

A.   No, he does not speak Spanish, only English.

Q.   Did you speak to him in English?

A.   No.

Q.   You just -- you only spoke to Detective Guevara at that point; right?

A.   Yes.

Q.   So, it was Detective Guevara who told you that those two people were the people who killed your husband, and he was in the presence of the other detective; is that right?

A.   Yes.

Q.   After Detective Guevara told you that those were the two people who killed your husband, did he then show you a photo array



Bouto 011649

where the -- did he then show you a photo array with the photo where you looked at six photos together to see if you could identify someone from the photographs?

MS. ROSEN:  Object to the form, mischaracterizes her testimony, foundation.

MR. KIVETZ:  Objection to form, foundation.

THE WITNESS:  No.

BY MR. AINSWORTH:

Q.    When did -- did you view -- did Guevara show you photographs to see -- strike that.

After the books that you looked through, did Guevara show you photographs like those in Exhibit No. 4 where it had photographs of different people on it?

A.    I don't remember.

Q.    You don't remember him showing you photographs?

A.    More pictures?

Q.    More than -- well -- strike that.

First there were the -- the books of photographs where you looked through all those photographs; right?

A.    Yes.



Bouto 011650

Q.    On a different day did Guevara ask you to look at more photographs?

A.    The same day I saw everything that I remember.

Q.    And can you tell us what -- do you remember seeing any photographs other than those photographs that were in the book?

A.    There were a lot of pictures.

Q.    And in the two books?

A.    Yes.  It was like this thick, a lot of them.

Q.    And those are the only photographs that you looked at on that day were the photographs in those two books; right?

A.    Yes.

Q.    And then after that day you didn't look at anymore photographs; is that right?

A.    I don't remember, no.

Q.    And let me show you Exhibit No. 4 again.

Did Guevara ever show you these -- these photographs without numbers in front of the people but just Polaroid photos of people?

A.    These photographs were in the book and



Bouto 011651

they had the numbers on it.

Q.   And my question is a little bit different.

A.   Okay.

Q.   Did Guevara ever show you this kind of photo where it was Polaroid photos and they were not in the books but separate?

MS. ROSEN:  Objection, asked -- objection, asked and answered.

THE WITNESS:  Yes, these pictures and other pictures.

BY MR. AINSWORTH:

Q.   Those pictures in the books?

A.   These pictures were in the folders in the book.  And the same folders that were -- they were pictures with the numbers.  They there were two books.

Q.   And -- and what I'm just trying to understand is whether the -- whether Guevara ever showed you not in the book but just laid out photographs that did not have numbers on them and -- and put them before you like I'm doing here where I'm just laying six of the photos from Exhibit No. 4 in front of you?



MS. ROSEN:  Objection, asked and answered.

MR. KIVETZ:  Join.

THE WITNESS:  He had pictures in folders.  He had pictures in the folder.  He had folders there.

BY MR. AINSWORTH:

Q.    And were the folders part of the book?

A.    They were there where the pictures were.

Q.    Can you describe what was in the folders?

A.    Pictures of people like that.

Q.    And were they mugshots; were they arrest photos as well?

A.    No, they were pictures like that one, like those.

Q.    Okay.  Polaroid photos?

A.    Yeah, those are the instant ones; right?

Q.    Yes.  How many photos were in the folders that Guevara showed you?

A.    There were many of them.  I don't know how many.

Q.    Like more than a dozen?



Bouto 011653

A.    Oh, yeah.

Q.    More than a hundred?

A.    About a hundred.  There were a lot of pictures, a lot of people.

Q.    So, Guevara never showed you just six or eight photos laid in front of you; is that right?

MS. ROSEN:  Objection, asked and -- asked and answered.

THE WITNESS:  Like that, no.  No, just a lot of them.

MR. AINSWORTH:  Okay.  We can go off the record.

THE VIDEOGRAPHER:  The time is 16:07.  We're off the record.

(Whereupon, a short recess was taken.)

THE VIDEOGRAPHER:  We are back on the record. The time is 16:21.

BY MR. AINSWORTH:

Q.    Ms. Vargas, those folders, did you look at those folders of -- well, did Detective Guevara show you folders of photographs?

A.    He showed me folders for me to look at

Bouto 011654



pictures.

Q. Was that at the same time you're looking at the books?

A. I was looking at the books, yes.

Q. Do you know how many folders you looked at?

A. I saw two.

Q. Two books and two folders?

A. Two books and one folder.

Q. And was the folder, was it like a three-ring binder where it had plastic pages with photos in them and you could just flip through the pages?

A. It was like a book, you know, for pictures to be put into it, you know.

Q. Like a photo book?

A. Yes, like that.

Q. And you didn't identify anyone from the folder, right, just from the books?

A. From the books.

Q. So, when you went through the photographs with Polaroid photos like what's shown in Exhibit No. 4, you didn't identify anybody from that folder; right?



Bouto 011655

MR. KIVETZ:  Objection, form.

THE WITNESS:  No.

BY MR. AINSWORTH:

Q.    That's correct?

A.    Correct.

Q.    And then after you identified those two photographs from the -- from the books, Guevara told you that the two people were the ones responsible for killing your husband; is that correct?

MR. KIVETZ:  Objection, form --

MS. ROSEN:  Objection to form, leading.

MR. KIVETZ:  -- misstates -- and misstates her previous testimony.

THE WITNESS:  Correct, probably.

BY MR. AINSWORTH:

Q.    Did Guevara tell you that those two people were responsible for killing your husband before you viewed a lineup in this case?

A.    No.

Q.    How did you learn that you were being -- going to be asked to view a lineup?

A.    They told me after look at the pictures the following day, they told me to come and look

 Bouto 011656

at the lineup.

Q. And who -- when you say they, are you referring to Detective Guevara?

A. Yes.

Q. How did you get to the -- well, strike that.

What did Guevara tell you when he told you that he -- that you were going to be asked to view a lineup?

A. I had never been, you know, in that before. Yes, he took me in a room and he told me, you know, we're going to show you the people that -- you know, to see if any of those are the ones you saw in the pictures.

Q. Did Guevara tell you before you viewed the lineup that the person who was at the gas station might not be in the lineup?

A. No, he did not say that to me, no.

Q. Did he tell you that they would continue investigating even if you didn't select somebody from the lineup?

A. Yes.

Q. Did he tell you that -- did he tell you that --



Bouto 011657

MS. ROSEN: I'm sorry, did you have something that you wanted to put on the record?

MS. BONJEAN: Not to you. It wasn't directed at you.

BY MR. AINSWORTH:

Q. Ms. Vargas, how did you get to the police station to view the first lineup?

MR. KIVETZ: Objection, asked and answered.

THE WITNESS: They told me to go over there, they told me to come over, and I went in my car. Even if I was not able to drive, but I went anyway. I was learning.

BY MR. AINSWORTH:

Q. When you were at the police station, did you view any photographs before you viewed the lineup?

A. Pictures we saw before that -- I don't remember if it was the day after or two days after that I went to look at the lineup.

Q. On the -- on the same day that you viewed the lineup, did Guevara show you the photographs that you had picked out before when you were looking at the books?

MR. KIVETZ: Objection, form, leading.



MS. ROSEN:  Asked and answered.

THE WITNESS:  I saw the pictures the day before.  Then I -- then I saw the lineup.  I didn't see the lineup first and then the pictures.

BY MR. AINSWORTH:

Q.  But did they -- did they -- did you see the photos again after you picked them out of that -- those books; did Guevara show you those photographs again after you picked them out of the books?

MR. KIVETZ:  Objection, form, leading.

THE WITNESS:  No, not anymore.

BY MR. AINSWORTH:

Q.  When you viewed the lineup, were you trying to pick out the person who was in the photograph that you had seen either the day before or two days before in the book?

MR. KIVETZ:  Objection, form, foundation, leading.

THE WITNESS:  Yes.

BY MR. AINSWORTH:

Q.  How long did it take you to -- well, strike that.



Bouto 011659

When you viewed the lineup, can you describe what happened?

A. Okay. I saw the lineup that was like that. I was able to recognize the face of one of them.

Q. Did you -- did the people in the lineup turn at any point?

A. They were on the side first, and then I couldn't see the side where they were so I told them to face forward, and I was able to recognize him.

Q. And were they seated or standing in that first lineup?

A. They were standing. They were not seated, they were standing.

Q. Did any of them step forward during the lineup?

A. I don't remember -- well, I remember that he told me -- no, I don't remember. I don't remember.

Q. What were you thinking you were told?

MS. ROSEN: Objection to form.

THE WITNESS: For me to look at the face as well for the person, and when I saw the face of



Bouto 011660

the person, I said this is the one.

BY MR. AINSWORTH:

Q. Did you take your time in viewing each of the faces of the people in the lineup?

A. Yes.

Q. And did you view all of the people in the lineup at the same?

A. They were all there in a line behind the glass, and I was behind it.

Q. For how long did you view the lineup before you made an identification?

A. About five minutes.

Q. And after you made your identification, did anyone ask you how confident you were in your identification before telling you whether you picked the suspect or not?

A. No.

Q. And I take it you didn't tell anyone how confident you were?

A. No.

Q. After you viewed the lineup, did anyone tell you whether you picked the suspect or not?

A. No, just Guevara told me are you sure are you looking at the one, do you remember the



Bouto 011661

gas station, and I said yes, that's the person I saw at the gas station.

Q.   Did Guevara say -- well, tell us what happened right before Guevara said are you sure do you remember the gas station?

A.   No, he said -- you know, he didn't say -- he said are you sure that's the one you saw at the gas station, and I said okay.

Q.   Had you said anything before Guevara said are you sure that's the one at the gas station?

A.   I said yes.

Q.   So, tell us -- so, you were viewing the lineup; correct?

A.   Yes.

Q.   And -- and Guevara at some point says are you sure that's the one from the gas station; correct?

MR. KIVETZ:  Objection, form, misstates her testimony.

MS. ROSEN:  Yeah, object to the form.

THE WITNESS:  He asked are you sure that's the face you saw at the gas station, and I said yes.



Bouto 011662

BY MR. AINSWORTH:

Q. Had you made an identification or said anything before Guevara asked you if you were sure?

MR. KIVETZ: Objection, asked and answered.

THE WITNESS: Yes.

BY MR. AINSWORTH:

Q. And -- and what had you said before Guevara asked you if you were sure?

MR. KIVETZ: Same objection.

THE WITNESS: Because the day before I had seen the folders with the pictures.

BY MR. AINSWORTH:

Q. And so you were matching up the person you saw in the photos to the person you saw in the lineup?

MR. KIVETZ: Objection, form.

THE WITNESS: Correct.

BY MR. AINSWORTH:

Q. When did Guevara tell you that you had gotten the right person in the lineup?

MR. KIVETZ: Objection, asked and answered, form.

THE WITNESS: That he was going to



investigate the person to see if what I said was the truth or not.

BY MR. AINSWORTH:

Q. Did he tell you anything about the person who you picked out his criminal background?

A. That he had done bad things out on the street. That they were robbing people.

Q. And he told you that before the lineup after you picked out his photo; right?

MR. KIVETZ: Objection, form, misstates her testimony.

THE WITNESS: When I picked the picture.

BY MR. AINSWORTH:

Q. Did he tell you what he was going to do to investigate to find out if that really was the right person?

A. They were investigating, so --

Q. Do you know what he did to try and find out if that was the right person?

MR. KIVETZ: Objection, foundation.

THE WITNESS: No, I don't know.

BY MR. AINSWORTH:

Q. How did you learn there was going to be



Bouto 011664

a second lineup?

A. It was after. I don't know if it was the second or the third day, I don't remember, but there was a second lineup.

Q. And how did you learn there was going to be a second lineup?

A. Because they called me on the phone to see -- to see if I could come during my work hours, could I come during my work hours. They would always find a way with my work.

Q. Did you have to take off work to go to the second lineup?

A. I had already left my work.

Q. Did you miss any work because of the second lineup?

A. I don't remember.

Q. Did anyone drive you to the police station for the second lineup, or did you drive yourself?

A. I don't remember the second one, I don't remember.

Q. What did Guevara say to you before you viewed the second lineup?

A. He told me that I was there for the



Bouto 011665

second lineup to see if I knew those people.

Q. Did he tell you that the person who was at the gas station might not be in the lineup?

A. No, he just told me for me to look if I could recognize any face that I had seen at the gas station.

Q. Did he tell you that they would continue to investigate even if you didn't make a selection for the lineup?

A. That's correct.

Q. Did the second lineup go the same as the first lineup; that is that you looked at the people sideways first and then looked at them straight on?

A. Yes.

Q. And did you take your time to view the people in the lineup in the second lineup?

A. Yes.

Q. Did you view the second lineup for about the same time as the first, for about five minutes, before you made an identification?

A. I -- I stayed looking about five, seven minutes.

Q. And how did you indicate that -- well,



strike that.

Were you trying to look in the lineup for the person whose photograph you had seen from the photo books?

A. Yes.

Q. You were trying to match the -- the photograph from the photo books to a person in the lineup; is that right?

MR. KIVETZ: Objection, form, leading.

THE WITNESS: Correct.

BY MR. AINSWORTH:

Q. And I take it the same as the first lineup, nobody asked you after the lineup how confident you were before they revealed the results of the lineup; is that right?

MR. KIVETZ: Objection, form, leading.

THE WITNESS: I recognized the face.

BY MR. AINSWORTH:

Q. Right. But nobody asked you how confident you were; is that right?

A. No.

Q. And I take it that you didn't tell anyone how confident you were; is that correct?

A. No.



Q.    Correct?

A.    Correct.

Q.    How did you learn that -- well, strike that.

Did you ever learn that the people you would identify in the lineup were the same people as were in the books that you viewed?

MR. KIVETZ:  Objection, form.

THE WITNESS:  Yes, they were the same people.

BY MR. AINSWORTH:

Q.    How did you learn that?

A.    Because the picture that -- the face that was in the picture was the same face that was in the lineup, and they were the ones that I had seen at the gas station.

Q.    Did anyone ever tell you that you -- you picked the same people from the lineup as were in the photographs?

A.    No.

Q.    I don't have any further questions.

CROSS-EXAMINATION

BY MS. BONJEAN:

Q.    Good evening, Ms. Vargas.  I don't have a lot of questions for you, but I have a couple.

Bouto 011668

Okay?

You mentioned earlier today that Rodrigo's wallet was returned to you at his funeral; is that correct?

A. They didn't give it to me, they gave it to my brother-in-law.

Q. And do you know who it was that gave the wallet to your brother-in-law?

A. No, I don't. He gave it to me with a bag with all his clothes and his watch and everything that he was -- he was given that in a bag.

Q. And you remember receiving the bag actually on the day of the funeral?

A. No, I don't know. I know my brother-in-law came up with a bag with a wallet, with the clothes, with the checks that he had, the watch, and he gave it to me. I would have to ask him.

Q. Okay. But I'm asking you when you received it, was it on the day of the funeral, the day after, or --

A. No, no. He was given -- it was a Thursday -- no -- they turned that in like on a



Monday.

Q. Okay. A Monday. And when you say Monday, do you mean after the funeral or before the funeral?

A. Before the funeral, before the funeral.

Q. So, police officers provided your husband's belongings to your brother-in-law who then provided them to you before the funeral; is that right?

A. Yes.

Q. And when you reviewed the contents of the bag, is it true that you didn't notice anything missing or did you see anything missing?

A. No, there was nothing missing. My brother-in-law threw the clothes away because he did not want me to see it.

Q. Understood.

Was your brother-in-law and your husband close?

A. Yes.

Q. And did they ever do business things together?

A. No.



Bouto 011670

Q.   And what did your brother-in-law do for work?

A.   Right now he has a company of dump trucks.  You know, they work in construction and cement.

Q.   Is that the type of work he did in February of 1993 as well?

A.   No, he had another type of work.  Yeah, he was -- he works at a kitchen working with -- you know, he would -- he would cook Chinese food.

Q.   He also worked in a Chinese-related industry restaurant?

A.   Yes.

Q.   Okay.

A.   Everybody started working at the Chinese factory where he was at, and then they left one by one.

Q.   All of his brothers worked at the Chinese factory?

A.   That's what it would start out.  And then he was the one that stayed there and his father, so my father retired about six years ago.



Bouto 011671

Q. Your father worked there as well?

A. Yes, the whole family did.

Q. And did your father retire as a supervisor of some type?

A. No, he was -- he was a cleaning person. He would sweep.

Q. And what's the highest position that Rodrigo held at the Hong Kong Factory?

A. He was the interpreter, and he was the one that would tell people where to go because -- you know, because he spoke Spanish. And he would say what everybody was going to do, each one of them.

Q. And how much money did he make an hour?

A. I don't know. I only know he would pay -- he was paid every two weeks, and they would work on Saturdays overtime. I think it was like 700 for every two weeks, which back then it was a lot of money.

Q. And was it from that job that allowed Rodrigo to buy a building over on Springfield?

A. He would buy cars in the -- in an auction, and then he would sell them. He would fix them up and he would sell them.

Bouto 011672

Q. So, he had a side job where he would purchase cars at auctions and then fix them up and sell them to third parties?

A. Yes. We would go once a month to Michigan to get cars, two or three cars. He would fix them up, and then he would sell them because he used to like the mechanical work.

Q. And did he do that by himself, or did he have any help by his brothers or friends?

A. No, he did it himself. An uncle showed him how to do that job.

Q. So, apart from working at the Hong Kong Factory and the side job of restoring vehicles, did he have any other sources of income?

A. No. I would work, you know, me.

Q. You -- did you say you sewed the vacuum bags; is that correct?

A. Yeah. I made more than him.

Q. Oh, you did?

A. Yes.

Q. What did you make an hour?

A. I was making 14 an hour, about 14, 15, 16, because it was piecemeal, you know, depending upon the pieces that you would -- that

Bouto 011673

you would make.  Sometimes by noon, and I would already have the job done, and then from 12:00 on then that was my own.

Q.    Ms. Vargas, you indicated that Jeff over here visited you yesterday; is that right?

A.    Yes.

Q.    Yesterday.

And did you say yesterday he was with two other individuals?

A.    Yes.

Q.    Can you tell me whether the individuals were men or women?

A.    One man and one woman.

Q.    And do you see any of those individuals here in this room?

A.    Yes.

Q.    Who else?

A.    The lady.

Q.    The lady?

A.    And another person that is not here.

Q.    Okay.  And the other person that was not here is a male?

A.    It is a male.

Q.    Okay.  And approximately how old?



Bouto 011674

A. I don't know, 50.

Q. What color hair did he have?

A. He was bald.

Q. Well, okay. And do you know how tall he was approximately?

A. No.

Q. Okay. Do you remember his name?

A. He said the name to me, but I'm bad with names. She told me her name, too, and I don't know. I don't -- I don't remember those things.

Q. Okay. And when Jeff went to see you the week prior to this week, when he came to see you last week, was it the same individuals with him?

A. No, different ones.

Q. Different ones; and how many -- how many total?

A. Two -- no -- no, it was one, just one.

Q. Just one, in addition to Jeff?

A. The first time, just him and somebody else.

Q. And can you describe that person?

A. It was a white person, green eyes, his



Bouto 011675

size, American.  He was not Hispanic.

Q.  Do you know how old?

A.  I'd say about, you know, 42.

Q.  Anyone in this room?

A.  No.

Q.  Did he identify himself to you?

A.  Yes, but I forgot the name.

Q.  Okay.  Did he ask you any questions?

A.  No, he did not say anything.

Q.  Was he an interpreter, or was he --

A.  No.

Q.  The first time that Jeff went to see you last week, was there an interpreter there that was translating?

A.  Yes, there was an interpreter, yes, a tall one.

Q.  Okay.  So now there were three people there last week?

A.  Three with him.

Q.  Okay.  Ma'am, I'm talking about last week.

A.  The first time.

Q.  Not yesterday.

A.  The first time.

Bouto 011676

Q.   The first time.  I thought you testified that it was just two people that came to see you?

A.   The first time with him, it would be three people.

Q.   So it was three people, okay.

Anybody here?

A.   No.

Q.   Okay.  So, let's talk about the person that was with Jeff.  The first time you met with him, there was a gentleman, correct, Ma'am?

A.   Yes.

Q.   Were there any women?

A.   No.

Q.   Okay.  So, describe one of the men that you -- that was with Jeff?

A.   There's a tall one.

Q.   Okay.

A.   He was six feet.  He was Hispanic, he spoke Spanish.  He was maybe 38 years old.

Q.   What else?

A.   He said to me that he was from Venezuela.  He said his name to me, but I don't remember it.



Bouto 011677

Q.   So, he's tall?

A.   Tall, about six feet, thin.

Q.   He told you he was from Venezuela?

A.   Yes.

Q.   And did he act as an interpreter during this meeting?

A.   Yes.

Q.   What was the complexion of his skin?

A.   My color.

Q.   And you said he was in his 40s -- or 38, I'm sorry?

A.   38, around that, 38, 40.

Q.   Okay.  And anything else you remember about this person?

A.   No.

Q.   Okay.  Now, you said there was another person there apart from Jeff?

A.   Yeah, the white person that was my size.  He -- he was -- he didn't say anything. He was just waiting.  I don't know if it was the ride or what it was.

Q.   Okay.  So, there was a third person there that was a white person?

MS. ROSEN:  The one with the green eyes and



Bouto 011678

the blond hair that she already described.

MS. BONJEAN:  I'm going to ask that you not -- I don't remember anything about blond hair, but --

THE WITNESS:  But a lot of people come to talk to me, so for me it's kind of hard.

BY MS. BONJEAN:

Q.   It's hard -- it's hard to remember. And this is just something that happened last week; right?

A.   Yes.

Q.   And it's hard to remember what happened last week, isn't it?

A.   Yes.

Q.   And so, this third person that you said is a white person, you said he had green eyes?

A.   Yes.  They were color eyes.  They were not brown, they were not black.  They were from a color.

Q.   Okay.  Light colored.

What color hair?

A.   Yellow.

Q.   Blond?

A.   Yes.

 Bouto 011679

Q. And how old?

A. I'd say about 42.

Q. Okay. And was this person anyone in this room?

MS. ROSEN: Objection, asked and answered.

THE WITNESS: No.

BY MS. BONJEAN:

Q. Okay. Now, was there any other person at this meeting last week other than Jeff, the tall Venezuelan man, and the green-eyed blond man?

A. No. Yeah, they were alone in the business, there was nobody else.

Q. How long did that meeting last last week?

A. About two hours.

Q. Two hours?

A. Two hours.

Q. Do you know if anyone was taking notes during the meeting?

A. No, I don't remember. Taking notes?

Q. Yes.

A. No, I don't remember. She was there, but I don't remember.



Bouto 011680

Q.   Oh, so she -- I'm sorry, what was --

MS. CERCONE:  Cercone.

BY MS. BONJEAN:

Q.   Okay.  Ms. Cercone was at the meeting last week also?

A.   No, yesterday, the day before.

Q.   Okay.  So let's -- let's stick on the meet -- the first meeting from last week.

A.   The first meeting of last week.

Q.   And is that the meeting that lasted two hours?

A.   Yes.

Q.   You hesitated.  Are you sure?

A.   I don't remember if it was two hours or an hour.  I don't remember.  I go there and I look at the time and I just want to go.

Q.   Okay.  So, when you said two hours, you were just kind of guessing?

A.   May have been an hour and a half.

Q.   Okay.  And do you remember anyone taking notes at that first meeting?

A.   Yes.

Q.   Okay.  Which person at that meeting was taking the notes?

A.   The person that spoke Spanish.

Q.   The Venezuelan person?

A.   Yes.

Q.   Now, at that meeting were you presented with any documents to look at?

A.   No.

Q.   Did you look at any photographs?

A.   No.

Q.   Okay.  When -- okay -- strike that.

So, you testified previously that you had looked at some of these photographs prior to today; do you remember that?

A.   Yes.

Q.   When was it that you looked at these photographs which have been marked as Exhibit 4?

A.   About three days ago.

Q.   Okay.  And who showed you these photographs three days ago?

A.   The gentleman, the attorney.

Q.   Okay.  So, when you say three days ago, do you mean on Monday?

A.   Today -- what are we, Wednesday?

Q.   Correct.

A.   Correct.



Q. Okay. So, Jeff came and visited you on Monday also?

A. He came twice, a week ago and Monday.

Q. Okay. Did he come to visit you yesterday?

A. No.

Q. I'm not trying to confuse you, but I thought you testified earlier that you met with Jeff yesterday?

A. Let me see if I can remember.

Yes -- yes, because yesterday was my day off. It was yesterday.

Q. Okay. So, did he also visit you on Monday or he didn't visit you on Monday?

A. No, not Monday. Yeah, because if he didn't come yesterday, I would have forgotten that the appointment was today. That's why I have the address here.

Q. I see.

So, back to my original question, the photographs depicted in Exhibit 4, did you look at these yesterday or before yesterday?

A. I saw them yesterday.

Q. You did see these photographs



Bouto 011683

yesterday?

A.    Yes.

Q.    And how long did the meeting last yesterday?

A.    Little, about 40 minutes.

Q.    40 minutes?

A.    Yes.

Q.    And who -- who gave you the photographs to look at?

A.    He did.

Q.    Okay.  And when you looked at these photographs, did you remember seeing them before?

MS. ROSEN:  Object to form -- object to form.

THE WITNESS:  Yes, I have seen them before at the police.

BY MS. BONJEAN:

Q.    So, you remembered seeing these photographs at the police station?

A.    Yes.

Q.    Now, when Jeff came to see you yesterday, did he also show you these photographs which are Exhibits 6 and 7?

A.    Yes, I did see those.

Q.   And when you looked at these photographs yesterday, did you remember seeing these photographs previously?

A.   I saw them at the police station.

Q.   Did you see the photographs at the police station?

A.   Yes.

Q.   Okay.  Do you remember actually seeing these men in real life?

MR. KIVETZ:  Objection, form, foundation.

THE WITNESS:  I saw them at the station and where they were in the lineup.

BY MS. BONJEAN:

Q.   Is -- does Exhibit 6 and 7 depict the actual lineup you looked at?

MR. KIVETZ:  Objection, form.

THE WITNESS:  Yes.

BY MS. BONJEAN:

Q.   Okay.  And in addition to seeing this live lineup, you also have seen these photographs before; right?

A.   Yes.

Q.   Now, what else did Jeff show you yesterday at the meeting besides these



Bouto 011685

photographs and -- that are marked as Exhibit 4 and the photographs that are marked as Exhibit 5 and 6?

A.    The car.

Q.    The car.  Anything else?

A.    That's it, and questions.

Q.    And did he read any of your prior testimony to you through the help of an interpreter?

A.    Yes.

Q.    And did he provide you with a copy of your prior testimony?

A.    I have never had copies of that.

Q.    Okay.  Did he leave you with copies of any papers?

A.    No.

Q.    So, he would read through the testimony with the help of an interpreter and then ask you questions; is that fair to say?

A.    Yes.

Q.    And did Jeff remind you -- strike that.

Did Jeff show you or read to you in your testimony where you previously identified Mr. Serrano and Mr. Montanez?



Bouto 011686

MR. KIVETZ:  Objection, form.

THE WITNESS:  I'm sorry, the question was?

BY MS. BONJEAN:

Q.    Sure.  When Jeff was reading your prior testimony to you yesterday, did he read the part where you identified Mr. Serrano and Mr. Montanez in court?

MR. KIVETZ:  Objection, form.

THE WITNESS:  No.

BY MS. BONJEAN:

Q.    Do you remember what part of the testimony he read to you?

A.    This and the video.

Q.    Okay.  Oh, did you look at the video yesterday, too?

A.    Yes.

Q.    So, you had seen the video before today; right?

A.    Yes.

Q.    Okay.  And did Jeff ask you questions about the video?

A.    Yes.

Q.    And what did he ask you about it?

A.    Yeah, supposedly what I had said, that



Bouto 011687

it was different there than supposedly in the question.

Q.   Did he ask you why that was?

A.   Because the students are saying that he is innocent, and that they -- that they did not do it, and that they had already had a lot of time in jail and it was time for them to get out.  And this paper was so that -- so they could get out.

Q.   So, you wanted to help them get out?

A.   They said that they wanted to graduate as attorneys, and that this paper was going to help them with their gradation.

Q.   Okay.  So, it's your testimony that you signed this affidavit after the students told you that it was going to help them graduate?

A.   They said that this was going to help with their graduation to -- to end the case.  I don't know if they graduated or not.

Q.   Okay.  But you wouldn't lie under oath just to help someone graduate from a class, would you?

A.   No, but they said that this was going to help out with their class.



Bouto 011688

Q.   Okay.

A.   And that Detective Guevara had lied about everything.

Q.   Okay.

A.   They said -- they always said that they were innocent.

Q.   Okay.  They told you they believed he was innocent; right?

A.   Yes.

Q.   Okay.  And you didn't -- strike that.

You -- you listened to what they had to say; right?

A.   In part because they didn't have an interpreter.  They spoke a little.

Q.   Okay.  But that statement there is in Spanish; right?

A.   It is in Spanish, but I would read parts of it and parts I did not, because it says here that there were three men in the gas station that were Latinos but there were parts there like, for example, that the men thought that he had money, but he always had money in his wallet.  They couldn't say that he didn't have any money because he had the rent money.



Bouto 011689

Q.   So, the fact that he had --

A.   There are things that I said that are true, but, you know, let's see another part here, because when they came in they already had with them, they had it in a book and then they came up with this.  They didn't -- they did write it and then they take it with them.  When they came, I just signed it.  They didn't let me read it.

Q.   They didn't let you read it now?

A.   No.  When they came here, I read the first part, my name and my initials that I put on, and then here I read the first part and then I signed it, because they wrote it and they came -- they, you know, showed up with this.

Q.   But they were kids; right?

MR. KIVETZ:  Objection, form.

THE WITNESS:  No, they were not children.  I mean --

BY MS. BONJEAN:

Q.   They were college students; right?

A.   They were 26, 28 years old.  They're not children.

Q.   Okay.  But they were -- you were older

than them; right?

A.   Yes, I was older than them.  Yes, of course.

Q.   So, is it your testimony that you signed a sworn statement and you didn't read the whole thing?

A.   I did not.

Q.   And even though you swore it was true?

A.   Swearing that this was true?

Q.   Yeah.

A.   They're saying that they're honking the horn.

Q.   You said they were honking the horn?

MR. KIVETZ:  Objection, form.

THE WITNESS:  He honked the horn, you know, to be able to get out.

BY MS. BONJEAN:

Q.   Okay.  Ma'am, my question, though, is simply you put your signature at the end of the statement; right?

A.   Yes.

Q.   And you filled in the part where you put your date of birth; right?

A.   Yes, correct.



Q.   And you initialed each page at the bottom; right?

A.   Yes.

Q.   And on the last page do you see where it says subscrita?

A.   Where; this here?  Subscrita, sworn before me, yes.

Q.   You swore to the truth of this?

A.   I don't remember.

Q.   Okay.  So, and when you put your name Elizabeth Rodriguez, that was a lie, wasn't it?

A.   No.  Why would it be a lie?  It was me.

Q.   Is it your legal name?

A.   Yes.

Q.   It is your legal name?

A.   Yeah, it's legal, but immigration didn't know and the state didn't know.

Q.   So, you lied to immigration?

A.   Yes.  I was locked up in immigration for three months.

Q.   Right.  And Elizabeth Rodriguez is not your legal-given name, is it?

A.   No.

Q.   What is your legal name?



Bouto 011692

A.    Wilda Vargas.

Q.    Okay.  So --

A.    My ID?

Q.    No, I believe you.

But when you put your name here, that was -- that was a lie?

A.    Yes.

THE VIDEOGRAPHER:  The time is 17:19.  We're off the record.

(Whereupon, a short recess was taken.)

THE VIDEOGRAPHER:  The time is 17:31.  We're back on the record.

BY MS. BONJEAN:

Q.    Ms. Vargas, just a couple more questions.

After Detective Guevara brought you to the police station to look at those books of photographs, do you -- do you know how long you were at the police station looking at the photographs?

A.    About an hour.

Q.    And in that hour you looked at two pretty large books that contained photographs,

Bouto 011693

is that right?

A.   Yes.

Q.   And also during that hour you looked at photographs that were contained in a folder?

A.   The folder was after.

Q.   Was it the same night or on a different night?

A.   No, that same day.

Q.   Okay.  So, was it at the same visit that you looked at the books and the folders?

A.   Yes.

Q.   Okay.  And -- but you started with the books if I understand you correctly?

A.   Yes.

Q.   Okay.  And after looking at the books, is that when you looked at the folders and photographs as well?

A.   Yes.

Q.   Did you look at any other photographs that night?

MS. ROSEN:  Objection, asked and answered.

THE WITNESS:  No.

BY MS. BONJEAN:

Q.   And then the next day, is that right,

Bouto 011694

you came back to the police station?

A.   Yes.

Q.   And I don't know if you -- if you testified to this earlier.  Did you again look at the photographs?

MS. ROSEN:  Objection, asked and answered.

MR. KIVETZ:  Leading.

THE WITNESS:  No, not anymore.

BY MS. BONJEAN:

Q.   And did you looked -- that's when you looked at a live lineup?

A.   The lineup.

Q.   Okay.  And you had -- you looked at another lineup sometime after that as well?

A.   Yes.

Q.   When was the next time you looked at any photographs connected to this case?

A.   I didn't see any pictures anymore.

Q.   Okay.  When you went to trial, did you look at any photographs, when you testified at trial?

A.   No.

Q.   Do you remember looking at any of the -- any of these photographs either before the



trial or during the trial?

MR. KIVETZ:  Objection to form.

THE WITNESS:  No.

MR. AINSWORTH:  And that was Exhibit 6 and 7.

MS. BONJEAN:  Yeah.

BY MS. BONJEAN:

Q.   Now, you said Northwestern students came to visit you.  They brought you photographs; right?

A.   Yes.

Q.   Okay.  And did Detective Guevara ever bring you photographs again after you viewed the live lineup?

MR. KIVETZ:  Objection, asked and answered.

THE WITNESS:  No.

BY MS. BONJEAN:

Q.   Anybody else from the police department?

A.   No.

Q.   Okay.  And do you remember if the prosecutor showed you any photographs?

A.   No.

Q.   Do you remember talking to Detective Guevara while the trial was going on?



Bouto 011696

A.   I didn't see him talking.  You know, there was a table there, I was outside, and then they would get together there, and then they would call me.

Q.   My question is a little different.

At any point during the trial, do you remember having a conversation of any type with Reynaldo Guevara?

A.   No, they would just bring me to court and that's it.

Q.   Did you ever talk to them when they brought you to court?

A.   No, they wouldn't say anything to me. They would just bring me to court.

Q.   Okay.  But Detective Guevara brought you to court?

A.   At the beginning, because I did not know where it was.  Once or twice.

Q.   Did Detective Guevara ever introduce you to any other individuals who were supposedly witnesses in the case?

A.   No.

Q.   Do you remember a person by the name of Francisco Vicente?

A.   Yes, but I haven't seen him.  They talk about him, but I don't know.  I don't know what he did.

Q.   Okay.  Did you ever meet him?

A.   Where?

Q.   Ever, anywhere?

A.   I don't remember.

Q.   Do you remember seeing him in court ever?

A.   I don't remember.

Q.   Okay.  And I just want to touch briefly on when Detective Guevara and the other detective took you to look at the vehicles, the cars.  Do you remember that?

A.   Yes.

Q.   Okay.  And what -- what did Detective Guevara -- strike that.

So, as I understand it, Detective Guevara and the other detective drove you around and you were in the back seat; right?

A.   Yes.

Q.   Did he say why he was going to any particular area of the city to show you cars?

A.   Because he knew that in those areas



Bouto 011698

there was dumped vehicles.  There were always reports of vehicles being burned, and they would always call.

Q.    And did he explain to you why he thought the vehicle that you saw at the gas station would have been dumped?

MR. KIVETZ:  Objection, form, leading.

THE WITNESS:  No, no, I don't know.

BY MS. BONJEAN:

Q.    So, why -- why -- what's the relevance of it being dumped?

MR. KIVETZ:  Objection, form, foundation.

MS. ROSEN:  Objection, foundation, calls for speculation.

THE WITNESS:  I don't know.  He said there were always calls about vehicles being dumped.

BY MS. BONJEAN:

Q.    And did you ask him so why is that important?

MR. KIVETZ:  Objection, form.

THE WITNESS:  I asked why there were so many vehicles abandoned.  The majority were stolen.

BY MS. BONJEAN:

Q.    But why did Guevara think that this car



Bouto 011699

would have been abandoned?

MR. KIVETZ:  Objection, form, foundation.

MS. ROSEN:  Form, foundation, calls for speculation.

THE WITNESS:  I don't know.

BY MS. BONJEAN:

Q.  You didn't ask?

MR. KIVETZ:  Same objections.

THE WITNESS:  No, I don't know.

BY MR. AINSWORTH:

Q.  So, he just randomly took you to abandoned cars; right?

MS. ROSEN:  Objection, form.  Object to the argumentative.

MR. KIVETZ:  Objection, form.

THE WITNESS:  Yes.

BY MS. BONJEAN:

Q.  Okay.  He didn't explain why he was bringing you to abandoned cars; right?

MS. ROSEN:  Objection, asked and answered.

THE WITNESS:  That's correct.

BY MS. BONJEAN:

Q.  And then he had you look at one car after the next; correct?



Bouto 011700

A. He would take me to different places, different streets, to see if I could recognize any vehicles in the area, because when an accident like that happens, the person lives in the area.

Q. Okay. So, he told you he thought the offender lived in the area?

MR. KIVETZ: Object to the form.

THE WITNESS: Well, that happens in the area. He says a lot of bad things happen there. It was a bad neighborhood.

BY MS. BONJEAN:

Q. And so, he -- he told you that he thought that it was likely that the car was in that area?

MS. ROSEN: Objection to form.

THE WITNESS: Probably.

BY MS. BONJEAN:

Q. The description that you had provided to Detective Guevara about the car was a color of the car; right?

A. Yes.

Q. You didn't know that -- I'm sorry?

A. More or less how the car looked like.



Q.   Okay.  You didn't know the make of the car; right?

A.   No.

Q.   And did you know the year of the car?

A.   No, I did not know that either, no.

Q.   Did you know if it was two doors or four doors?

A.   I remember it was a four-door, big, with something on the top.

Q.   Something on the top?

A.   Yes, that it was different from the material on the bottom, that's what I remember.

Q.   Okay.  And from that description, Guevara took you around some different blocks to see if you could identify a car; right?

A.   Yes.

Q.   How many streets did you go down, do you know?

A.   It was on Central Park -- Wabansia and Central Park, Armitage and Kedzie, Pulaski and Cicero, and North Avenue and Cicero, and Pulaski and the other street -- the following streets which name is Mozart, and then Fullerton and Pulaski.  And then I found a vehicle on Mozart



Bouto 011702

and Pulaski in the park by Mozart.

Q. The -- you testified earlier that you looked at -- you saw five cars before?

A. Yes.

Q. And how did -- how were you certain that those were not the cars that were involved?

A. Because the other ones were different. They were smaller, they were Toyotas. You know, they were smaller, they were little ones. They were older cars. There were different cars, and there were -- some were little trucks.

Q. So, he showed you some trucks?

A. Yes, yes, little trucks.

Q. And they were different colors maybe?

A. They were all different colors.

Q. And he showed you some very small cars?

A. Smaller.

Q. Okay. And none of those fit the -- fit the description; right?

A. No.

Q. But then he took you to a street that had a large -- larger four-door car?

A. Yes.

Q. Now, was the car abandoned?



MR. KIVETZ: Objection, form, foundation.

THE WITNESS: Yes, it was abandoned there. It was dumped there.

BY MS. BONJEAN:

Q. How do you know it was dumped?

A. Because they said that the cars had been there for days and it was just, you know, dumped there. That that's when he said.

Q. So, Detective Guevara told you that that car had been there for days?

A. I don't know how many, but that it had been dumped there for days, because they would make reports for police to pick up those vehicles.

Q. I see.

So, just -- just so I understand, Detective Guevara told you that?

A. Yes.

Q. And what did he tell you about the car that you identified?

A. I -- I told him, hey, stop, because that vehicle looks like the one I saw. And then he said, are you sure, and then I got out of the car with him. And then he said to me, are you

sure that's the car, and then I said, that looks like the car that I saw at the gas station.  And I asked him why the vehicle was dented and damaged.

THE VIDEOGRAPHER:  Hold on one second.

(Whereupon, a short recess was taken.)

THE VIDEOGRAPHER:  Okay.  We're back on, I'm sorry.  Okay.  We're back on the record.  The time is 17:46.

MR. KIVETZ:  You can continue your answer. She can continue her answer.

THE WITNESS:  And the question was what?

BY MS. BONJEAN:

Q.    **That's okay, yeah.  But my specific question was at what point -- strike that.**

**He told you that the car had been dumped there; right?**

MS. ROSEN:  Object to form.

MR. KIVETZ:  Objection, form, foundation.

THE WITNESS:  Yes.

MS. BONJEAN:  All right.  Hold on one second.

That's all I have.



Bouto 011705

CROSS-EXAMINATION

BY MS. CERCONE:

Q. And, Ms. Vargas, we know it's been a long day, so thank you for bearing with us.

Mr. Ainsworth read to you parts of your testimony from the 1994 trial. Do you remember that earlier today?

A. '94, yes.

Q. And he asked you if you had difficulty at trial identifying the men you saw at the gas station the night before your husband was murdered; do you remember that?

A. Correct.

Q. Now, at the time of trial when you were testifying, do you remember giving a reason why you were having trouble identifying the men?

A. Yes.

Q. What was that reason?

A. The reason was that I saw he had glasses on.

Q. Glasses on?

A. Yes.

Q. Do you remember any other reasons why you were having trouble recognizing them?



Bouto 011706

A.   I remember that he had glasses and he was a little chubbier.

Q.   Okay.  And who were you talking about when you say he had glasses and he was a little chubbier?

A.   The person that was tall.

Q.   Okay.  And you testified earlier that the tall man was the driver of the car at the gas station?

A.   That's correct.

Q.   Okay.  So, my next question is not about the trial, it's about the time period before the trial.  Okay.  Okay?

A.   Yes.

Q.   At any point before the trial was the prosecutor, the lawyer that asked you questions at the trial, was he ever with you when you identified the men you saw at the gas station?

A.   No.

Q.   During your testimony at the trial in 1994 the prosecutor asked you questions about how you were able to identify the men you saw in the live lineup; do you remember that?

A.   I don't remember.



Q. Okay. So, I have your testimony from the trial on Page J74, and at Line 9 the prosecutor during the trial asked you, the defense attorneys asked you about the lineup, how many lineups did you look at, and you answered two.

He asks you, and in either of those lineups did you ever identify two people, and you answered no, one person.

He then asks you in the first lineup how many people did you identify, and you answered one.

And he asks and that was -- and in the second lineup how many people did you identify, and you answer one.

He asks you in the first lineup the person that you identified, who did you recognize him or where had you seen that person before, and you answered from the gas station.

The prosecutor asks you and in that -- and in the second lineup that you viewed the person you identified, where had you seen that person before, and you answer, in the gas station, too.



Bouto 011708

The prosecutor asks you when you viewed the first lineup, did Detective Guevara tell you who to identify, and you say no.

In the second -- now the prosecutor says in the second lineup did Detective Guevara tell you who to identify, and you again answer no.

And the prosecutor asks you in the second lineup did anyone tell you who to identify, and you say no.

And the prosecutor says and, again, in the first lineup did anyone tell you who to identify, and you say no.

The prosecutor asks you a question that gets objected to, and he has to rephrase the question. And when he rephrases the question, he asks did anyone tell you to say that you saw these men in the gas station, and you answered no.

When you were giving this testimony in 1994, did you testify truthfully?

MR. AINSWORTH: Objection, prior consistent statement, it's hearsay, and it's -- it's improper rehabilitation. It's not --



Bouto 011709

MS. BONJEAN: Join.

BY MS. CERCONE:

Q. Do you need me to ask the question again?

A. Ask again.

Q. When you testified at the 1994 trial, did you testify truthfully?

MR. AINSWORTH: Same objections.

THE WITNESS: Yes.

BY MS. CERCONE:

Q. And during your testimony in 1994, the prosecutor asked you questions about how you were able to identify the men you saw at the gas station in photos that you were presented; right?

A. Correct.

Q. And, again, in your testimony at J77, Line 11, prosecutor asks you, Ms. Vargas, when Detective Guevara brought you the photographs to look at, did Detective Guevara tell you who to identify, and again you answer no.

And that was a truthful statement, wasn't it, Ms. Vargas?

MR. AINSWORTH: Objection, prior consistent



statement, hearsay, improper rehabilitation.

THE WITNESS:  Yes.

BY MS. CERCONE:

Q.  Now, again, my next question is going to be about before trial, not the actual trial. Okay?

A.  Okay.

Q.  I'm going to ask you about some -- I'm going to ask you some questions about your meetings with the prosecutor.

Do you remember meeting with any other prosecutors other than the man who asked you questions at the trial?

A.  There was another prosecutor.

Q.  Okay.  Do you remember if it was a male or a female?

A.  It was a man.

Q.  Do you remember if he was -- what ethnicity he was, whether he was white, black, Hispanic?

A.  He was white.

Q.  And do you remember his name?

A.  I don't remember the name.

Q.  Do you remember how many times you met



Bouto 011711

with him?

A. About three times.

Q. And did you meet with him along with the prosecutor that asked you the questions meaning that they were -- you were all three in the same room together?

A. Yes.

Q. And was there a translator present for these three meetings?

A. Yes, the secretary.

Q. And the secretary translated from English to Spanish?

A. Yes.

Q. And during any of those meetings, did the prosecutor ever tell you what you should say to the judge?

A. No.

Q. During any of those meetings did the prosecutor ever tell you to say something to the judge that you knew was not true?

A. No.

Q. Earlier in the day, way earlier in the day, Mr. Kivetz asked you questions about these meetings with the prosecutor, and you said you



Bouto 011712

may have met with the prosecutor and translator five or six times, is that correct?

A. Yes.

Q. The three times you met with two prosecutors, is that counted within those five to six times?

A. Yes.

Q. Okay. So, in all of those five to six meetings did the prosecutor ever tell you what you should say to the judge?

A. No.

Q. During any of those meetings, those five to six meetings, did the prosecutor ever tell you to say something to the judge that you knew was not true?

A. Yes.

Q. And I believe you also testified earlier today that you met with the prosecutor when several detectives were present; do you remember saying that?

A. Yes.

Q. Was this meeting when several detectives were present the same day as the trial for your husband's murder was happening or



Bouto 011713

was it some other time?

A.   No, it was the day of trial.

Q.   Okay.  And where was this meeting?

A.   At 26th Street.

Q.   Okay.  Were you in a courtroom?

A.   It was -- it was like I was in the prosecutor's office, you know, like where we meet like this.  And when the court would start, then they would take me over there.  I don't remember the number either.

Q.   Okay. Did you talk with any of the detectives while you were sitting there waiting for court to start?

A.   No.

Q.   Did the -- did any of the detectives sitting there with you say anything to you while you were waiting for court to start?

A.   No, they just told me to wait for my turn.

Q.   Okay.  Now, you said yesterday I was present for your meeting with Mr. Kivetz; right?

A.   Yes.

Q.   Before yesterday had you ever met me before?



Bouto 011714

A. No.

Q. And if you look at what's been previously marked as Group Exhibit 4, that's Group Exhibit 4. Mr. Kivetz handed you that group of photos yesterday; right?

A. Yes.

Q. And did you look through those photos in front of Mr. Kivetz and myself?

A. Yes.

Q. And did you point out to Mr. Kivetz who you recognize as the driver of the car at the gas station from those photos?

MR. AINSWORTH: Objection, form, leading.

THE WITNESS: Yes.

BY MS. CERCONE:

Q. And were you able to point out to Mr. Kivetz who you saw as the passenger of the car at the gas station from looking at those photos?

MR. AINSWORTH: Objection, leading.

MS. BONJEAN: Join.

THE WITNESS: Yes.

BY MS. CERCONE:

Q. And before you identified those individuals to Mr. Kivetz yesterday, did he

Bouto 011715

point out anybody -- anybody specifically in those photos?

MR. AINSWORTH: Objection, leading.

THE WITNESS: No.

BY MS. CERCONE:

Q. And if you look at what's been marked as Group Exhibit 5, I believe you testified that Mr. Kivetz showed you this group of photos yesterday as well; right?

A. Yes.

Q. And did you point out to Mr. Kivetz that you recognized that car to be the one you saw at the gas station the night before your husband was murdered?

MR. AINSWORTH: Objection, leading.

THE WITNESS: Yes.

BY MS. CERCONE:

Q. And before you identified the car for Mr. Kivetz, did he tell you who the car belonged to?

MR. AINSWORTH: Objection, leading.

THE WITNESS: No, no.

BY MS. CERCONE:

Q. Do you know who that car belonged to?

Bouto 011716

A.   No, I don't know.

Q.   And if you look at what's been previously marked as Exhibit 6, did Mr. Kivetz show you that photo yesterday?

A.   Yes.

Q.   And during your meeting with Mr. Kivetz and myself yesterday, were you able to recognize the passenger of the tan car you saw at the gas station in that photo?

A.   Yes.

Q.   And before you identified this person to Mr. Kivetz and myself, did anybody tell you who those people were in that photo?

A.   No.

Q.   If you look at what's been marked as Exhibit 7, did Mr. Kivetz show you this photo yesterday?

A.   Yes.

Q.   Yesterday were you able to point to Mr. Kivetz who you recognize as the driver of the car you saw at the gas station the night before your husband's murder?

A.   Yes.

Q.   Before you identified this person --



Bouto 011717

before you identified this person yesterday, did anybody tell you who the individuals in this photo were?

A.  No.

Q.  Yesterday did Mr. Kivetz tell you what you should say here today?

A.  No.

Q.  Yesterday did I tell you what you should say here today?

A.  No, just for me to be present here.

Q.  Yesterday did Mr. Kivetz ask you to say anything here today that you knew was not true?

A.  No, he told me to tell the truth.

Q.  And same question for me.  Yesterday did I ask you to say anything here today that is -- you knew not to be true?

A.  No.

Q.  And you mentioned that there was a third person at our meeting yesterday; correct?

A.  Yes.

Q.  He was a man that was speaking Spanish to help us translate?

A.  Yes.

Q.  Did that man tell you what you should

Bouto 011718

say here today?

A. No.

Q. Did that man ask you to say anything here today that you knew was not true?

A. No.

Q. In looking at all of the photos that we have in front of you, did that man point out any individuals to you before you recognized anyone?

A. No.

Q. I have nothing further.

CROSS-EXAMINATION

BY MS. ROSEN:

Q. Hi, I have just a few questions.

You testified earlier that there were Northwestern students that came to speak to you many times over the years; correct?

A. Many times.

Q. Do you recall when the first time was -- how many years ago the first time was that Northwestern students came out to talk to you?

A. Yes.

Q. How -- how many years ago?

A. In 2004.

Q. In 2004.

And were those the first people that had come to talk to you since the trial?

A.   They were always different ones.

Q.   Right.  But 2004 was the first time?

A.   I think it was 2003.

Q.   Okay.  And was that the first time that anybody came out to talk to you, whether it was the Northwestern students or any lawyers, since the trial?

A.   Yes.

Q.   Okay.  When those Northwestern students first came to see you in 2003, did they tell you that they were investigating your husband's murder?

A.   Yes.

Q.   Did they tell you that they believed that the men that had been convicted were innocent?

A.   Yes.

Q.   Did they tell you why they thought he was innocent?

A.   Because they said that Guevara had lied.

Q.   Did they tell you what they -- what



Bouto 011720

Guevara lied about?

A. Because he said that one of the -- one of the young men had said that he had lied.

Q. One of the -- the young men that had been convicted?

A. There were three people, that one of those people had lied, saying that Guevara had said that he was going to get less time, something like that.

Q. Okay. And this is what the students were telling you?

A. Yes.

Q. Did they tell you anything else about why they believed that the men that were convicted were innocent?

A. They said that they were innocent.

Q. And did the students, when they first talked to you, ask you about what happened in the gas station?

A. Yes.

Q. And did you tell them the same things you told us here today?

MS. BONJEAN: Objection, form.

THE WITNESS: Yes.



Bouto 011721

BY MS. ROSEN:

Q. Did you tell them anything different than what you told us here today about what happened in the gas station?

MS. BONJEAN: Same objection.

THE WITNESS: But they came several times, the students did.

BY MS. ROSEN:

Q. Sure. But the first time -- I just want to focus just the first time. When you talked to them the first time, those -- that first group of students, did they ask you about the gas station?

A. Yes.

Q. Okay. And then how much time passed before the students came again?

A. They would come back like -- you know, like two times a month, two times during a month.

Q. Okay.

A. Sometimes they would stop and then they would come back two or three months.

Q. And every time they came, did they tell you again that they believed that the men that



got convicted were innocent?

A.   They were investigating to see if they were innocent.

Q.   Did -- why were they talking to you; did they tell you?

A.   Yes.

Q.   Why were they talking to you?

MR. AINSWORTH:  Objection, foundation.

THE WITNESS:  Because they were investigating to see if Serrano and the other guy were innocent.

BY MS. ROSEN:

Q.   At any point when you met with the students, did they show you your testimony from the criminal trial?

A.   No, not yet.

Q.   Did they want you to help them to get Mr. Serrano out of prison?

MS. BONJEAN:  Objection, form.

THE WITNESS:  They were saying that they were innocent.

BY MS. ROSEN:

Q.   Did you believe them?

A.   To be honest, I don't know, because I



didn't see them killing him.

Q. And for how many years did they come to visit you?

A. From 2003 until -- until 2007 -- no -- 2006.

Q. And every time they came, did they tell you that they believed that the men were innocent?

A. They were always saying that they were innocent.

Q. And other than telling you that Guevara lied, did they give you any other reasons why they believed that the men were innocent?

A. Yeah. They said that Guevara made it up, that he had invented it.

Q. What did he make up?

A. That he had made up all of -- this thing about the gas station.

Q. They told you that, that -- you have to say yes --

A. Correct, yes.

Q. So, they told you that Guevara had made up the story about the gas station?

A. Correct.



Q. And what did you say to them when they -- when they told you that Guevara made up that story?

A. For what reason; why would he do it?

Q. Did you tell them that the story was true because you were there?

A. Yes. But he said that he had made it up, that that's what they were saying, that he had made that up.

Q. Okay. Anything else that he told you other than Guevara made up the story about the gas station and he lied?

A. And that they said that he wants to close the case quickly.

Q. That's why Guevara did it?

A. To do the case quickly.

Q. Okay. Anything else that he told you?

A. No, that was it.

Q. Okay. Now, Mr. Ainsworth has come to visit you, too; correct?

A. Yes.

Q. And I don't remember from this morning. How many times did you say Mr. Ainsworth has come to see you?

A. How many times -- 2011 -- '11, '12, my house -- two times at my house, and three or four times at -- at the business, at work.

Q. Okay. So --

A. Correct, at the house; at the house? You two came to my house in Maywood, yes.

Q. They can't answer you, yeah. We'll ask them questions.

So, a couple of times you say at the house, two times at the house, and three or four times at the business?

A. Yes, at the business.

Q. When Mr. Ainsworth came, did he always come with Ms. Bonjean or did he come with -- by himself or other people?

A. He came, and other people -- with other people came, interpreters.

Q. Okay. And when was the first time that you recall Mr. Ainsworth coming to see you?

A. 2011.

Q. And that first time, was he by himself or was he with other people?

A. No, the first time, it was different. It was with her, and they came together. He



Bouto 011726

would always come with more people.

Q. The first time was with Ms. Bonjean; is that what you say?

A. Yes. I remember, yes.

Q. Okay. And was that at the house or at the business?

A. At my house.

Q. But was it just the two of them or were there other people?

A. Another person, one more person.

Q. And do you know who that other person was?

A. I don't know. It was a Hispanic person that -- he spoke Spanish.

Q. Was that person there to help translate?

A. Yes.

Q. And when they came to see you, did they tell you that they represented Mr. Serrano and Mr. Montanez?

A. No, they -- they just came to tell me that they were going to investigate, to ask me questions. And then they spoke to me about Serrano and the other person.



Bouto 011727

Q. But they didn't tell you that they were Mr. Serrano and Mr. Montanez's lawyers?

A. They -- they told me inside later that they were attorneys when we were sitting at the table.

Q. But originally they didn't tell you that?

A. No.

Q. When they first met with you, did they tell you that they believed that Mr. Serrano and Mr. Montanez were innocent?

A. Yes.

Q. And did they tell you why they believed Mr. Serrano and Mr. Montanez were innocent?

A. They just told me that they believed that they were innocent because the guys did not do that.

Q. Did they tell you how they knew the guys didn't do it?

A. That they believed in them that they were innocent.

Q. Did they talk to you about Mr. Guevara?

A. Yes.

Q. When they -- when Mr. Ainsworth and Ms.

Bouto 011728

Bonjean came to talk to you, did they tell you that eventually they were going to file a lawsuit?

A.    They did not tell me that.

Q.    Okay.  Did they ever tell you in any of the times that they've come to talk to you that now they represent Mr. Serrano and Mr. Montanez and that they're suing the police, and the City and they're trying to get money?

MS. BONJEAN:  Objection to the form, assumes facts not in evidence.

THE WITNESS:  No, they never said that to me.

BY MS. ROSEN:

Q.    Do you know, as you sit here today, that Mr. Serrano and Mr. Montanez are suing the city and the police officers and the State's Attorney and they're trying to get money?

A.    That that's what I was told, no.

Q.    Nobody told you that?

A.    No.

Q.    Okay.  So, now going back to the first time that you spoke with Mr. Ainsworth and Ms. Bonjean, did you say that they talked about Mr. Guevara with you?



Bouto 011729

A. I'm sorry, what was your question again?

Q. Yeah. The first time that you spoke with Mr. Ainsworth and Ms. Bonjean, did they bring up Mr. Guevara's name and talk to you about Mr. Guevara?

A. Yes.

Q. And what did they say to you about Mr. Guevara?

A. They always said that Guevara planned this out, and that these people are innocent, that they did not do that.

Q. Did they explain to you why it was they believed that Mr. Guevara planned this out?

A. Yes, because he said that there was a person in the group that testified that Guevara said that he should say certain things, but I -- but I don't know. They didn't say who the people were -- who the person was.

Q. Okay. And did they ask you questions about what happened at the gas station?

A. Yes.

Q. And what did you tell them about the gas station?



A.   The same thing that I repeated the first time, that we went to put gas in the car, then first it was from work, from work to the bank, and bank to the gas station, and then they followed us home.

Q.   Okay.  And did they show you any photographs when they came to see you the first time?

A.   I don't remember.

Q.   Do you remember in any of the times that you've met with Mr. Ainsworth or Ms. Bonjean if they've ever shown you any photographs?

A.   No.

Q.   Did -- that first time when you spoke with Mr. Ainsworth and Ms. Bonjean, did they speak to you about the car?

A.   Yes.

Q.   And what did you discuss about the car?

A.   About the car, how the car looked like, four door.

Q.   Did they ask you about how it was that Detective Guevara drove you around to find the car?



Bouto 011731

A.   Yes.

Q.   Anything else that you remember them talking to you about that first time?

A.   They talked about the car and the hole that the car had.  Yes, they asked questions about the hole that the car had.

Q.   And what questions did they ask about the hole?

A.   They asked me if Guevara has said -- had asked questions about the hole that the car had, and I was the one that asked the questions about the hole that the car had.

Q.   And did they accept your answer?

A.   Yes.

Q.   Okay.  Anything else that they talked about with you that first time that you recall?

A.   I don't remember.

Q.   Okay.  And when's the next time that you recall meeting with Mr. Ainsworth?

A.   I think it was in 2012 or maybe the same year, I don't know.

Q.   Okay.  And -- and was Mr. Ainsworth by himself or was he with Ms. Bonjean again?

A.   No, the two of them were there, but



Bouto 011732

another interpreter came.

Q. Okay. And was this at your house or at your business?

A. At the house.

Q. And what did they want to talk about this time?

A. Same thing, the same thing.

Q. Were they trying to get you to tell them something?

A. Well, yes, same thing.

Q. Did they ask you the same questions about the car?

A. They would ask questions about the car and the bullets.

Q. Okay. We have to switch the tape.

THE VIDEOGRAPHER: The time is 18:30. We're off the record.

(Whereupon, a short recess was taken.)

THE VIDEOGRAPHER: The time is 18:34. We're back on the record.

BY MS. ROSEN:

Q. Okay. So, we took a break. We were talking about the second time that they came to



Bouto 011733

see you, and, again, they were telling you that they believed that Mr. Serrano and Mr. Montanez were innocent; right?

A.   Yes.

Q.   And they were talking about the car and the bullet holes in the car; correct?

A.   Yes.

Q.   And anything else that you remember them talking to you about that second visit in either late 2011 or sometime in 2012?

A.   Correct.

Q.   And when's the next time you remember Mr. Ainsworth coming out to visit with you?

A.   About two weeks ago.

Q.   Two weeks ago; Mr. Ainsworth?

A.   Yes.

Q.   Between the time in 2012 and two weeks ago, did you see Mr. Ainsworth in between then, so between 2012 and 2018?

A.   Yes.

Q.   How many times?

A.   Four times.

Q.   And were those times at the bar?

A.   At the bar.

Bouto 011734

Q.    And was Ms. Bonjean with him also?

A.    No.

Q.    Okay.  And when Mr. Ainsworth came to see you those four times, do you know what years those were?

A.    In 2011 or '12, around then.

Q.    Oh, so this was all around the same timeframe?

A.    Because they will come -- they say they came together to the house.

Q.    Yeah, but I'm talking about at the bar?

A.    At the bar, no.  At the bar was only -- let me see -- yeah, they came to the bar, the two of them.

Q.    And when was that?

A.    When it was -- used to be called Copa Cabana.

Q.    Okay.  And what did they talk to you about when they came to see you at the bar when it was called Copa Cabana?

A.    Same thing about the case and Guevara.

Q.    And were they, again, saying that Mr. Montanez and Mr. Serrano were innocent?

A.    Yes.



Bouto 011735

Q. And were they talking to you about the car and the bullet holes in the car?

A. And at the gas station.

Q. And at the gas station.

Did they tell you that Mr. Guevara made up the story about the gas station?

A. Yes.

Q. And did you tell them that's not true, that you were at the gas station and that's a true story?

A. And then I asked them why would he lie.

Q. And what did they say?

A. That they are innocent.

Q. When -- when's the last time that you spoke with Mr. Ainsworth?

A. It was last week.

Q. Okay. And how about the last time you spoke with Ms. Bonjean?

A. She came to my house like in 2011 or '12.

Q. Okay. So, since then you haven't seen Ms. Bonjean?

A. No.

Q. Has she tried to call you or anything?

A.   No, she doesn't have my phone number.

Q.   Okay.  When Mr. Ainsworth came to see you last week, where did he come to see you?

A.   At the business.

Q.   And what did Mr. Ainsworth want to talk to you about?

A.   About the case of Armando Serrano and the other guy.

Q.   And did he again talk to you about the fact that they were innocent and that Mr. Guevara lied?

A.   And for me to tell the truth.

Q.   Okay.  Did he talk to you about the car and the bullet holes?

A.   No.

Q.   Did you talk about the gas station?

A.   No, it was just an appointment for me to -- you know, to come here, because they're innocent.

Q.   Did he show you the affidavit that you signed?

A.   I don't remember.

Q.   Did he show you the video that we played here today that the students took?

Bouto 011737

A.   No.

Q.   Did he show you any photographs?

A.   No, he did not either.

Q.   At any point in time that where you met with Ms. Bonjean, did you and she get into any kind of argument or disagreement about the car and the bullet holes?

A.   Yes.

Q.   Can you describe that for me?

A.   I told her about the car, that there was a car that I had seen at the gas station, and I told her that that was the vehicle that I had seen at the gas station.  And that I asked the detective, that I asked him the question as to why the vehicle had that hole, and he said -- that he said that the hole the vehicle had matched the holes in the car from the bullets that had been fired at Rodrigo Vargas.  And then she said no, that that was -- that was a lie, that -- that he's lying.

Q.   That Guevara is lying?

A.   Yes.

Q.   Anything else that you recall about that conversation?



Bouto 011738

A.   Just -- just that.

Q.   When you met with Mr. Ainsworth last week, was he by himself or was he with somebody else, Mr. Ainsworth?

A.   He was with somebody else.

Q.   And do you recall who that was?

A.   He had an interpreter.

Q.   Okay.  Did -- when Mr. Ainsworth and Ms. Bonjean would come out to talk to you, did they always have an interpreter?

A.   Yes.

Q.   When the students would come out to talk to you, would they always have an interpreter?

A.   No.

Q.   So, the times that they would come to talk to you and they didn't have an interpreter, would you just try and communicate as best as you could?

A.   No, they would call me here, they didn't have one, and they would call me to a table, and then I would talk to them.

Q.   And you would talk to them in English?

A.   A little.



Bouto 011739

Q.   As best as you could?

A.   Well, yes.

Q.   Did you understand everything that they were saying to you?

A.   Half I did, half I did not.

Q.   When we were watching the video today, did you understand all of the English that was being said?

A.   A little, because, you know, I was speaking half in Spanish, half in English.

Q.   So you didn't understand everything that they were saying?

A.   No.

Q.   I don't have any more questions.

REDIRECT EXAMINATION

BY MR. KIVETZ:

Q.   I have just a few follow-up questions regarding our meeting last week with the two other gentlemen.  Do you remember that meeting?

A.   Yes.

Q.   And last week when we spoke, I showed you a group of exhibits that is now identified as Exhibit 4; do you remember that?

A.   Yes.



Bouto 011740

Q.   And when I showed you the group of photos that's now identified in Exhibits 4, were you able to identify the two individuals that you saw at the gas station on February 4th, 1993?

A.   Yes.

Q.   And before you identified those two individuals, did I tell you who to pick out?

A.   No.

Q.   And last week did we -- did I also show you a group of pictures that's now identified as Exhibit 5?

A.   Yes.

Q.   And when I showed you those pictures, were you able to tell me whether or not that was the -- that was a picture of the car that you saw at the gas station on February 4th, 1993?

A.   Yes.

Q.   And before you identified that vehicle as being at the gas station on February 4th, 1993, did I tell you that that was indeed the vehicle that was there?

A.   No.

Q.   And did I tell you who that vehicle



Bouto 011741

belonged to?

A.   No, you did not.

Q.   And when we met last week, did I show you what's now been identified as Exhibit 6?

A.   Yes.

Q.   And when we -- and when I showed you Exhibit 6 or what's now been identified as Exhibit 6, were you able to identify one of the passengers in the tan car that you saw at the gas station on February 4th, 1993?

A.   Yes.

Q.   And before you identified one of the passengers that was at the gas station, did I tell you who to pick out?

A.   No.

Q.   And, Ms. Vargas, did I also show you what's now been identified as Exhibit 7 during our meeting last week?

A.   Yes.

Q.   And before -- and when I showed you Exhibit 7, were you able to identify one of the individuals that was in the tan-colored car at the gas station on February 4th, 1993?

A.   Yes.



Q. And before you identified one of the individuals that was in the tan-colored car at the gas station on February 4th, 1993, did I tell you who to pick out?

A. No.

Q. And when I showed you what's now been marked as Exhibit 4 through 7, did anybody else who was present at that meeting tell you what to identify?

A. No.

Q. And you also recall Ms. Cercone just asked you a couple questions about our meeting yesterday; do you remember that line of questioning?

A. Yes.

Q. And when we showed you Exhibit 4, did Ms. Cercone tell you who to identify?

A. No.

Q. And when we showed you Exhibit 5, did she tell you who to identify -- excuse me -- strike that.

When we showed you Exhibit 5, did she tell you that that was the identity of the tan car that was at the gas station on February 4th,



1993?

A. Yes.

Q. Maybe I mis-phrased my question.

When we -- you identified during our meeting yesterday that this car in Exhibit 5 was the car that you saw at the gas station on February 4th, 1993?

A. Yes.

Q. Before you identified the vehicle that you saw at the gas station on February 4th, 1993, did Ms. Cercone tell you that that was the car?

A. No.

Q. And when we showed you Exhibit 6 and before you identified the individual that was at the gas station, did Ms. Cercone point out any of the individuals to you?

A. No.

Q. And before you identified one of the individuals in Exhibit 7 as being present at the gas station on February 4th, 1993, did Ms. Cercone point out any of those individuals to you?

A. No.



Q.   And during our meeting, do you remember -- did I tell you that we'd like you to tell the truth here today?

MR. AINSWORTH:  Objection, leading.

THE WITNESS:  Yes.

BY MR. KIVETZ:

Q.   And did I tell you that I would like you to tell the truth in our -- in the meeting last week?

MR. AINSWORTH:  Objection, leading.

THE WITNESS:  Yes, you did.

MR. KIVETZ:  No further questions.

RECROSS-EXAMINATION

BY MR. AINSWORTH:

Q.   So, the lawyers for Halvorsen and Mingey showed you photos last week and yesterday; is that right?

A.   Not -- not yesterday, last week.

Q.   Do you know why -- do you know why Mr. Kivetz was just asking you about showing you photographs yesterday?

MS. ROSEN:  Objection, form.

THE WITNESS:  He showed me the thing in the computer, the paper that I signed, and he showed



me some pictures also.

BY MR. AINSWORTH:

Q.   And he showed you those last -- he showed you the pictures last week and yesterday; correct?

A.   Not last week, yesterday.

Q.   So, you don't really know whether you saw pictures last week or yesterday, is that right?

MR. KIVETZ:  Objection, form.

Ms. Vargas, do you need a break?

THE WITNESS:  Yes, I do.

MR. AINSWORTH:  There's a question pending.

MR. KIVETZ:  She can answer and then we can take a break.

MR. AINSWORTH:  Was there an answer?

THE WITNESS:  Sorry, the question, could you repeat the question?

BY MR. AINSWORTH:

Q.   So, you don't know whether you saw photos last week or yesterday or both times; is that correct?

A.   Yesterday.

MR. KIVETZ:  Hold on.  Before you ask your



Bouto 011746

next question, how much time have we gone so far today?

THE VIDEOGRAPHER:  Approximately seven hours and ten minutes.

MR. KIVETZ:  Seven hours and ten minutes, so we're over the time limit right now.

How many -- how many more minutes do you have, Russell?

MR. AINSWORTH:  Three minutes.

MR. KIVETZ:  Three?

MR. AINSWORTH:  Yeah.

MS. BONJEAN:  I have one minute.

MR. KIVETZ:  One minute.

It's just becoming pretty clear that we're getting tired.  I think that's true for everyone.

MR. DAFFADA:  I haven't asked anything.  I can pick it up for you guys.

BY MR. AINSWORTH:

Q.   I didn't ask you before, Ms. Vargas, at the second lineup you viewed, were the people standing or seated in that second lineup?

A.   They were standing.

Q.   Ms. Vargas, you and I and Ms. Bonjean,



Bouto 011747

we met at your house in Maywood many years ago, right?

A.   Yes.

Q.   Around 2013 or so; does that sound about right?

MS. ROSEN:  Object to the leading.

MR. KIVETZ:  Join.

BY MR. AINSWORTH:

Q.   '13?

A.   Yes, maybe.  Because you were at my house?

Q.   Yes.

And then I spoke to you again at court when you came to court.  Do you remember that?

MS. ROSEN:  Objection, leading.

THE WITNESS:  Yes.

BY MR. AINSWORTH:

Q.   And then I met with you again last week when I came to your work; right?

MS. ROSEN:  Object to the leading.

THE WITNESS:  Yes.

BY MR. AINSWORTH:

Q.   And that was the first time I had ever been to your restaurant; right?



MS. ROSEN:  Object to the leading.

THE WITNESS:  You had already come before.

BY MR. AINSWORTH:

Q.   Was it somebody that looked like me or is it me?

MS. ROSEN:  I'm going to object --

MR. KIVETZ:  Objection, form.

THE WITNESS:  You had already come to my restaurant with the students; right?

MS. BONJEAN:  No.

MR. KIVETZ:  You can't answer any of her questions, Mrs. Vargas.

BY MR. AINSWORTH:

Q.   Are you -- so, you thought that I used to come with the students?

MS. ROSEN:  Objection, leading.

THE WITNESS:  Yes.

BY MR. AINSWORTH:

Q.   Are you aware that I -- I don't work for Northwestern and I don't have any connection to the students; are you aware of that?

MS. ROSEN:  Objection, leading --

MR. KIVETZ:  Objection, form --

MS. ROSEN:  -- foundation.



Bouto 011749

MR. KIVETZ: -- objection, form.

THE WITNESS: I don't know.

BY MR. AINSWORTH:

Q. But you just -- you -- you thought that I came with the students; right?

MS. ROSEN: Objection, leading.

MR. KIVETZ: Form.

THE WITNESS: Yes.

MR. KIVETZ: Russell, we're over seven hours. You said it was going to be three minutes. It's been longer.

BY MR. AINSWORTH:

Q. And there's only one time that I came to your home, is that right?

MS. ROSEN: Object to the leading.

THE WITNESS: Yes, to the house.

MR. AINSWORTH: I don't have any further questions for you.

RECROSS-EXAMINATION

BY MS. BONJEAN:

Q. I just have two.

Mr. Ainsworth and I came to your house; right, one time; right?

A. I remember seeing you twice at my



Bouto 011750

house.

Q.   Was I alone or with somebody?

A.   No, with him.

Q.   So, you -- it's your testimony we came to your house twice?

A.   I remember in my house you came twice. The first time that you came in saying that you were with students, and then second time you came in saying that you were Mr. Serrano's lawyers.

Q.   It's your testimony that I came to your house and told you I was a student?

MR. KIVETZ:  Objection --

MS. BONJEAN:  No, no, we're going to get to the bottom of this.

MR. KIVETZ:  Argumentative.

THE WITNESS:  That you were a student.

BY MS. BONJEAN:

Q.   So, Ma'am, it's your testimony under oath -- you understand you're under oath today; right?

MR. KIVETZ:  Objection, argumentative.

THE WITNESS:  Yes, I am.

BY MS. BONJEAN:

Q.   You understand that you're swearing to tell the truth?

MR. KIVETZ:  You do not need to yell.

THE WITNESS:  Yes.

BY MS. BONJEAN:

Q.   And it's -- and it's your sworn testimony that I told you I was a student?

MR. KIVETZ:  Asked and answered.

THE WITNESS:  Well, you look like the students that were coming, you know, to see me.

BY MS. BONJEAN:

Q.   So I looked like the students that were coming to see you?

A.   Yes.  Yeah, they're skinny like you.

Q.   Do you know I'm 48 years old?

MR. KIVETZ:  Object -- Ms. Bonjean, come on now.

THE WITNESS:  You look very young.

BY MS. BONJEAN:

Q.   Just one last question.

When did your restaurant become -- go from Copa Cabana to -- what's it named now?

A.   Picosito.

Q.   What year did you change names?



Bouto 011752

A.    In 2014.

Q.    2014?

A.    2014.

MR. KIVETZ:  Thank you.  We have no other questions.  This deposition's concluded.

MS. ROSEN:  Reserve -- or waive signature.

MR. KIVETZ:  It's in English.

MS. ROSEN:  She still has the right.

MR. KIVETZ:  Okay.  Ms. Vargas, you have an opportunity to review the deposition transcript for any potential grammatical errors, or alternatively you can trust that the court reporter sitting to your right has accurately taken down what you've testified to today.

If you trust that everything that she has taken down is accurate, you have to say I waive signature.  Or alternatively, if you'd like to review the transcript for any errors, you can say reserve signature.

THE WITNESS:  I reserve the signature.  I don't want mistakes like last time.

MR. KIVETZ:  Understood.  So, what will happen then is we'll get in touch with you through the court reporter, and she'll send you



a copy of your deposition transcript to review

for any grammatical errors.  You will not be

able to make any substantive changes.

Okay.  Thank you.

THE VIDEOGRAPHER:  The time is 19:03, and

we're off the record.

(Proceedings concluded at

7:03 p.m.)



Bouto 011754

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

JOSE MONTANEZ,                    )

        Plaintiff,               )

   vs.                            ) No. 17 CV 4560

CHICAGO POLICE OFFICERS      )

REYNALDO GUEVARA ET.AL.,      )

        Defendants.

    This is to certify that I have read the transcript of my deposition taken in the above-entitled cause by MARY ELLYN D'ANDREA, Certified Shorthand Reporter, on December 12, 2018, and that the foregoing transcript accurately states the questions asked and the answers given by me as they now appear.

        _____

                    WILDA VARGAS

SUBSCRIBED AND SWORN TO

before me this _____ day

of _____ 2018.

_____

Notary Public

Bouto 011755



STATE OF ILLINOIS          )

                           )    SS:

COUNTY OF C O O K          )

I, MARY ELLYN D'ANDREA, a notary public within and for the County of Cook and State of Illinois, do hereby certify that heretofore, to-wit, on December 12, 2018, personally appeared before me, at 77 West Wacker Drive, Chicago, Illinois, WILDA VARGAS, in a cause now pending and undetermined in the Northern District of, Illinois, wherein JOSE MONTANEZ is the Plaintiff, and CHICAGO POLICE OFFICERS REYNALDO GUEVARA ET.AL. Defendants.

I further certify that the said witness was first duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by said witness was reported stenographically by me in the presence of the said witness, and afterwards reduced to typewriting by Computer-Aided Transcription, and the foregoing is a true and correct transcript of the testimony so given by said witness as aforesaid.



Bouto 011756

I further certify that the signature to the foregoing deposition was reserved by counsel for the respective parties.

I further certify that the taking of this deposition was pursuant to Notice, and that there were present at the deposition the attorneys hereinbefore mentioned.

I further certify that I am not counsel for nor in any way related to the parties to this suit, nor am I in any way interested in the outcome thereof.

IN TESTIMONY WHEREOF:  I have hereunto set my hand and affixed my notarial seal this 20th day of December, 2018.

_____
MARY ELLYN D'ANDREA, CSR.



Bouto 011757

McCorkle Court Reporters, Inc.
200 N. LaSalle Street  Suite 2900
Chicago, Illinois 60601-1014

CERTIFIED MAIL

12/20/18

WILDA VARGAS
1704 NORTH SPRINGFIELD
CHICAGO, IL, 60647

IN RE:  MONTANEZ V. GUEVARA ET.AL.
DATE OF DEPOSITION: 12/12/18

Dear Ms. Vargas

    Your deposition in the above-entitled cause is now ready for reading and signing as required by law.

    Please call the Signature Department upon receipt of this letter to schedule an appointment to come to the above address to read and sign your deposition.  You have 28 days from the date of this correspondence in which to appear for reading and signing.

    If you fail to appear or notify us so that we may make arrangements for another appointment, your deposition will be completed and forwarded to the attorneys and will be "... used as fully as though signed."

        _____  Procedure outlined in Rule 207 (a)
        of the Illinois Supreme Court Rules

        __x____  Procedure outlined in Rule 30 (e)
        of the Rules of Civil Procedure for the U.S.
        District Courts

Sincerely,

MARY ELLYN D'ANDREA, CSR.

Cc:  All attorneys of record.



Bouto 011758

Bouto 011759



Bouto 011760



Bouto 011761



Bouto 011762



Bouto 011763



Bouto 011764



Bouto 011765



Bouto 011766



Bouto 011767



Bouto 011768



Bouto 011769



Bouto 011770

# EXHIBIT 99

ASSISTANT STATE'S ATTORNEY: (For State's Attorney Use Only)
Enter each continuance here. In cases of multiple defendants indicate which
defendants, if any, did not join in the continuance. Also indicate dates of
all demands for trial, and by whom demands were made.

**•••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••**

COURT BRANCH: 66                                    R.D.# X- 054183

| IR NUMBER | DEFENDANTS | AGE | DATE OF ARREST | CHARGE |
|-----------|------------|-----|----------------|--------|
| 863500 | PACHECO, Jorge | 22 | 12 Jul 93 | FIRST DEGREE MURDER CH.72075-9-1a2 |
| | | | | |
| | | | | |
| | | | | |

DATE OF OFFENSE: 5 Feb 93     TIME: 532   ( )am ( )pm  PLACE: 1838 N Springfield
Chicago/Cook County, Illinois

The facts briefly stated are as follows: DECEASED VICTIM Rodrigo VARGAS, was
walking out the front gate of his home at 1838 N Springfield. Rodrigo was on his way to
to work. Rodrigo VARGAS was stopped by the defendant and two other offenders, Armando
SERRANO and Jose MONTANEZ. Jorge PACHECO and the two other defendants attemted to rob
Rodrigo VARGAS of his money and a car radio he was carrying. Rodrigo VARGAS ran to his van
which was parked on the street. Armando SERRANO pulled out a 9mm semi-automatic pistol.
Jorge MONTANEZ yelled out " GO AHEAD, GO AHEAD". Jorge PACHECO yelled " DO HIM, DO HIM".
Armando SERRANO then shoots through the glass in the drivers side door, shooting Rodrigo
VARGAS five times. Rodrigo VARGAS was pronounced dead on 5 Feb 93, at 9-55 AM, by
Investigator C. SANDERS, of the Medical Examiners. An autopsy was conducted by Dr.Nancy
JONES, reference M.E. Case # 079 Feb. 1993. Cause of death was " Multiple Gunshot Wounds.
Manner of death was, Homicide.

WITNESSES: Spell out first & last name; First name first. Also furnish
address & phone number of each witness.

| PROSECUTING WITNESS | ADDRESS | HOME PHONE | BUS. PHONE |
|---------------------|---------|------------|------------|
| Timothy RANKINS | 3508 W Sakespeara | none | none |
| Francisco VICENTE | 2600 S. California | NONE | NONE |
| Wilda VARGAS | 1838 N Springfield | 235-5119 | |
| Det. Ernest HALVORSEN 20692 | Area Five Violent Crimes | 746 - 8282 | |
| Det. Reynaldo GUEVARA 20861 | " | " | |

A.S.A. HUGHES                    APPROVED FELONY CHARGE(S)

BOND, $_____        _____        ASST.STATE'S ATTY._____ DATE

AR-L 140599
RFC-Serr/Mont 000032

# EXHIBIT 100





CCSAO-Serr-Mont_00005193



CCSAO-Serr-Mont_00005150



CCSAO-Serr-Mont_00005147



CCSAO-Serr-Mont_00005152

# EXHIBIT 101

AR-L 514230



ATTORNEY WORK PRODUCT
PRIVILEGED AND CONFIDENTIAL

## MEMORANDUM

| | |
|---|---|
| TO: | File |
| FROM: | Daniel Greenfield<br>Jeff Carroll |
| RE: | Guevara Investigation – Robert Bouto |
| DATE: | March 3, 2015 |

---

## I.  Introduction

We investigated three cases in which defendants purportedly confessed to the same person: Francisco Vicente. The defendants in these cases are Robert Bouto, Armando Serrano and Jose Montanez, and a third defendant.

Principally, the factual background relevant to claims of misconduct and actual innocence is as follows. On 5/14/93, Francisco Vicente, a member of the Imperial Gangsters street gang, was arrested in connection with three armed robberies and one simple robbery he was suspected of having committed over the prior ten months. Beginning the following morning and continuing for approximately six weeks, Dets. Rey Guevara and Ernest Halvorsen reported that Vicente had obtained confessions in three unrelated murder cases. In each case, the record indicates that Vicente's confession evidence was corroborated by a second informant—Edwin Maldonado in connection with the case against Bouto; Timothy Rankins in connection with the case against Montanez and Serrano; and a still-anonymous confidential informant in connection with the case against the third defendant.[1] In two of the cases, Dets. Guevara and Halvorsen reported that Vicente first provided that evidence to someone other than them—in the Bouto case, the record indicates that Vicente first shared evidence against Bouto with Det. Maher or another detective or officer, who then alerted Det. Halvorsen; in the Montanez/Serrano case, the record indicates that Rankins first provided evidence against Montanez, Serrano, and Pacheco to Sgt. Ed Mingey, who then alerted Dets. Guevara and Halvorsen.

---

[1] Bouto, Serrano, and Montanez remain incarcerated pursuant to these convictions, whereas the third defendant was released under supervision recently.

AR-L 514251

# SIDLEY

Since Dets. Guevara and Halvorsen initially reported this information, it has been recanted by Rankins, Maldonado, and Vicente. First, beginning in 1994 and continuing to the present day, Rankins has recanted the evidence that he provided against Montanez and Serrano, alleging that it was coerced from him by a lengthy list of police and prosecution personnel, including Dets. Guevara and Halvorsen. Then, starting in 1996 and continuing to the present day, Maldonado recanted the evidence that he provided against Bouto, alleging first that he was pressured to do so by Vicente but years later also claiming that police personnel coerced him. In 2003, Vicente told students investigating possible wrongful convictions that the confession evidence he provided in all three cases had been fabricated, alleging that he had been coerced by Dets. Guevara and Halvorsen. On later occasions he negotiated for various benefits in return for executing an affidavit and potentially providing testimony in connection with the Montanez/Serrano post-conviction matter. Other individuals who served time with Vicente—specifically, Lydell Williams and Valentine Gomez (aka "Tomato")—have also provided information potentially corroborating Vicente's recantations in the Bouto and Montanez/Serrano matters, respectively. Finally, some non-informant witnesses in the Bouto and Montanez/Serrano matters have described actions by Det. Guevara that, if accurate, could constitute misconduct.

For purposes of investigating these allegations, we analyzed the record and conducted interviews with individuals involved in these cases. In this report, we present a detailed statement of facts, our analyses and findings, and our conclusions regarding allegations of misconduct and claims of actual innocence in the Bouto case. We are not able to make comprehensive conclusions in the third defendant's matter.

## II.     The Robert Bouto Case

### 1.     Introduction

We reviewed and analyzed the complete record in the matter. We also interviewed fifteen people connected with the investigation, including the following:

- Det. Ernest Halvorsen (reporting detective)
- Carl Richmond (State's witness)
- Rey Lozada (State's witness)
- Margaret Fleming (State's witness)
- Edwin Maldonado (informant)
- Tania Astefan (alibi witness)
- Helen Kandah (alibi witness)
- Robert Bouto (defendant)

We note that Det. Guevara, Vicente, and State's witness Michael Fleming, who also had significant roles in the matter, did not consent to interviews. Specifically, Det. Guevara and Vicente have been advised by counsel not to meet with us. Fleming would not take our calls, and his mother, State's witness Margaret Fleming, informed us that he did not wish to cooperate with our investigation for reasons that we explain below.

First, we present the facts, then we present our analysis and findings, and finally, our conclusions. That analysis begins with an examination of the alibi evidence provided by Tania

2



AR-L 514232

Astefan and Helen Kandah. The analysis continues with our examination of the confession evidence provided by Vicente and Maldonado, including its recantation. Our analysis concludes with an examination of the evidence provided by sources other than Vicente and Maldonado, including State's witnesses Carl Richmond, Rey Lozada, Michael Fleming, Margaret Fleming, and Officer Alan Pergande.

2. **Facts**

a. **Francisco Vicente's Arrest**

On 5/14/93, Francisco Vicente, a member of the Imperial Gangsters street gang, was arrested by Officers Lupe Pena and L. Marron in connection with three armed robberies, all class X offenses, and one simple robbery he was suspected of having committed over the prior ten months. (5/14/93 Francisco Vicente Arrest Report; 9/23/96 Francisco Vicente Change of Plea Hearing.) Vicente, an admitted heroin addict who has acknowledged robbing people in order to support his habit, committed three of the robberies in order to steal his victim's gold jewelry, all of them at gun or knifepoint. (*Id.*) In the other, he stole a bicycle from a school-age child. (9/23/96 Francisco Vicente Change of Plea Hearing.) Vicente also had an extensive prior criminal history. (*Id.*) He was placed into holding cell 7-2 at the 25th District Police Station. (5/15/93 Roster of Persons in Custody.)

b. **The Shooting**

Also on 5/14/93, at approximately 3:05 p.m., Salvador Ruvalcaba, 15, was shot to death outside of Roosevelt High School. (5/14/93 General Offense Case Report.) Chicago Police Department ("CPD") officers and detectives began arriving on scene at 3:25 p.m., and Dets. Guevara and Halvorsen arrived on the scene at 3:50 p.m. and 4:30 p.m., respectively. (*Id.*)

As reported by Dets. Guevara and Halvorsen in a Supplementary Report ("Supp. R."), the victim was with State's witnesses Carl Richmond and Rey Lozada, and also Frank Escobar and Jacobo Lozada, all four members of the Spanish Cobras street gang, when he was shot.[2] (5/16/93 Supp. R. by G/H.) The victim, however, was not a member of any gang. (5/9/14 Interview with Rey Lozada.)

Lozada told us that he saw "the gentleman who did the shooting" riding a bicycle in the area near the shooting on multiple occasions during the ten- to fifteen-minute period before it occurred. (*Id.*) Lozada said that he was within twenty yards of the bicycle-riding offender and, accordingly, got a close look at him. (*Id.*) Other eyewitnesses also viewed the shooter on a bicycle, Lozada said, and he recalled a post-shooting conversation in which they discussed this. (*Id.*) Lozada also informed us that he did not mention this detail to police or to the prosecution. (*Id.*) State's witness Richmond informed us that he was not in a position to have seen the offender at this time, and could shed no light on Lozada's account regarding the bicycle. (10/31/14 Interview with Carl Richmond.) We asked Tania Astefan, one of Bouto's alibi

---

[2] For purposes of clarity, we henceforth refer to Rey Lozada as "Lozada" and his brother, Jacobo Lozada, as "Jacobo."

AR-L 514233
SIDLEY AUSTIN LLP
SIDLEY

witnesses, whether Bouto might have been riding a bicycle the day of the Ruvalcaba shooting, but she said that "he didn't have a bike," and that "I know he was walking, not riding a bike." (5/9/14 Interview with Tania Astefan.) (She was not aware that Lozada had informed us that Bouto had been riding a bicycle prior to the shooting, and did not know the reason for our question.) In response to a similar question, Bouto also denied riding a bicycle on the day of the shooting. (5/20/14 Interview with Robert Bouto.) He stated further that although he knew how to ride a bike in 1993, he did not own one. (*Id.*) (Like Tania, Bouto did not know why the question was posed, or what information Lozada had shared.)

Richmond testified that he was walking on Kimball Avenue when he saw a group of Spanish Cobras flashing gang signs across the street at members of a rival gang, the Puerto Rican ("P.R.") Stones. (7/31/96 Trial Transcript, Vol. 3 at 89.) Richmond testified that he was joined then by his friends, Lozada, Jacobo, Ruvalcaba, and Escobar. (*Id.* at 92-93.) As they began to walk away from the confrontation, according to Richmond, "someone hollered out, 'Gun!'" (5/5/15 Interview with Carl Richmond.) (That gun, according to Escobar, had been delivered to the offender by a someone riding a bicycle named "Mario." (5/16/93 Supp. R. by G/H).)[3] At that point, Richmond testified, he looked up and saw "four [P.R.] Stones running up to the corner."[4] (7/31/96 Trial Transcript, Vol. 3 at 94.) Three stopped, while one "walked all the way out to the corner, almost out to the street." (*Id.*)

That person pulled out a gun, and "started shooting." (*Id.*) Richmond told us that to evade the gunfire, he ran away from the shooter in a "zig zag" pattern and then dove to the ground. (5/5/14 Interview with Carl Richmond.) Lozada testified that when the gunfire erupted, he fell to the ground, and "looked [at] the floor" for "[a]bout" ten seconds, before then "star[ing] at who was shooting at us" for the next fifty seconds. (7/31/14 Trial Transcript, Vol. 3 at 63.) After shooting Ruvalcaba, Lozada testified, the offender fled. (*Id.* at 31.) Richmond testified that when the shooter was running away, he saw him "hand the gun to somebody in the alley." (6/1/93 Grand Jury Transcript at 7.) Richmond testified that he could not describe that person, though, because "the corner of the building was blocking my view to whoever he was handing the gun to." (7/31/96 Trial Transcript, Vol. 3 at 99.)

---

[3] For purposes of clarity, we note when a report was authored by Det. Guevara, Det. Halvorsen, or both using the following designations: "G" for Det. Guevara alone, "H" for Det. Halvorsen alone, and "G/H" for both.

[4] Some time after the show-up, after which Bouto was arrested for the shooting, teenagers William Lupo, Luis Oquendo, and Cesar Matias were also detained because they were identified by witnesses as having been "behind the offender at the time of the shooting." (5/16/93 Supp. R. by G/H.) Dets. Guevara and Halvorsen then interviewed Lupo, Oquendo, and Matias, and "[a]ll three denied being there." (*Id.*) The investigation record contains no further mention of Lupo, Oquendo, or Matias. Lupo told our private investigator, Jim Kirby, that he was at a KFC restaurant in the neighborhood with his mother when he was detained, and that he had not been at the scene of the shooting or known about it prior to being detained. (7/31/14 Interview with William Lupo.)

4

AR-L 514234

**SIDLEY** SIDLEY AUSTIN LLP

At the scene, CPD Officers S. Shier and C. Baumann interviewed at least six neighbors who also witnessed the shooting, State's witness Margaret Fleming, Melissa Melendez, Ida Rodriguez, Patricia Fleming, Christopher Fleming, and Melissa Costello. (5/14/93 General Offense Case Report.) Det. Halvorsen interviewed State's witness Michael Fleming, Margaret's son. (5/14/93 General Progress Report ("GPR") by H.)

Like Richmond and Lozada, the neighborhood eyewitnesses said that the shooter ran toward the victim, fired several shots, and fled. (*Id.*) Margaret Fleming said she saw the offender "r[u]n into the alley." (7/31/96 Trial Transcript, Vol. 3 at 151.) There, the offender handed the weapon to a girl with "[s]ilver piercings" on her face, she told us. (8/8/14 Interview with Margaret Fleming.) Michael Fleming also testified that he "[s]aw a man running with a gun shooting." (7/31/96 Trial Transcript, Vol. 3 at 165-66.) As reported by Dets. Guevara and Halvorsen, Michael Fleming said that the offender ran into an alley behind the Flemings' apartment and handed his weapon to a girl with "light blonde hair, wearing a red and white Jordan type pull over jacket and red pants," (5/16/93 Supp. R. by G/H), but soon lost sight of her. (7/31/96 Trial Transcript, Vol. 3 at 170-71.) Fleming then saw the offender run away, he testified. (*Id.*)

c.    **On-Scene Witness Descriptions**

CPD collected descriptions of the offender from at least two separate groups of witnesses—the neighborhood eyewitnesses and the Spanish Cobras.

(i)    **Vantage Point**

Lozada testified that he was fifteen to twenty feet away from the shooter "when the shooting started." (7/31/96 Trial Transcript, Vol. 3 at 33-34.) Richmond testified that he was "no more than maybe 5 to 10 yards from the corner" of his side of the street, while the shooter stood six inches from the curb on his side, thus placing Richmond, in his estimation, "ten to fifteen feet; could have been twenty" feet from the shooter. (7/31/96 Trial Transcript, Vol. 3 at 95, 137-38.) However, the defense expert, private investigator David Press, testified that there were 245 feet, or about eighty-two yards, between the place where the shell casings were found and where Ruvalcaba's body came to rest. (8/1/96 Trial Transcript, Vol. 4 at D-62.) In other words, conservatively, the defense argued that this measurement indicated that eyewitnesses Richmond and Lozada were at least sixty yards away from the shooter. (*Id.* at D-176.) When we asked Lozada to demonstrate the distance between him and the shooter, he walked off a distance that we estimated to be approximately thirty yards. (5/9/14 Interview with Rey Lozada.)

But for Margaret Fleming, the distance from the neighborhood eyewitnesses to the offender is not reported. Margaret Fleming testified that she lived in a second-floor apartment unit at the time of the shooting, and that she heard what "sounded like [a] shot in front of my house," and so she ran downstairs and then outdoors. (7/31/96 Trial Transcript, Vol. 3 at 150.) At that time, she testified, she saw "a person standing . . . with a gun in his hand." (*Id.*) Margaret Fleming testified that only about three and a half feet separated her and the person holding the gun.(*Id.*)

(ii)    **Descriptions**

5

AR-L 514235

**SIDLEY**
SIDLEY AUSTIN LLP

After Officers Shier and Baumann interviewed neighborhood eyewitnesses Margaret Fleming, Melissa Melendez, Ida Rodriguez, Patricia Fleming, Christopher Fleming, and Melissa Costello, they reported that the offender was a 16-year-old white male Hispanic wearing white high-top sneakers, black ¾ length baggy pants, and a black t-shirt, with "Blk hair, shaved, with a ponytail."[5] (5/14/93 General Offense Case Report.)

The group of Spanish Cobra witnesses who were with Ruvalcaba when he was shot also were reported to have described the offender as having a ponytail. (9/27/94 Supp. R.) At a hearing, Officer Alan Pergande testified that after speaking with Richmond, Escobar, Jacobo, and Lozada, he was able to compile a description of the shooting suspect that included "black hair with shaved sides and the hair on top pulled back into a tail, small ponytail." (5/3/95 Motion to Quash Arrest Hearing at 6.) Additionally, as reported by CPD Officers Pergande and King, it was noted that they interviewed Escobar, Lozada, and Jacobo. (9/27/94 Supp. R.) Thereafter they reported that Escobar "related that a M/4/16-17, 507, 140lbs wearing a blue hoodie, black long shorts, shaved hair on sides w/ pony tail had shot the victim." (*Id.*) At trial, when asked whether the offender had a ponytail, Lozada stated, "I didn't see it." (7/31/96 Trial Transcript, Vol. 3 at 58.) On cross, Richmond was asked whether he had originally described the offender as ponytailed. He responded: "I don't recall." (*Id.* at 126.) He also said he did not recall whether the offender actually had a ponytail. (*Id.*) Officer Pergande also testified at a hearing that he received a second description that other police officers had relayed to him after speaking to other eyewitnesses, of an offender with a black T-shirt and white shoes, along with "black hair that was shaved on the side with a ponytail[.]"(5/3/95 Motion to Quash Arrest Hearing at 11.)

At the scene, neighbor Michael Fleming described the offender as "clean shaven" according to Det. Halvorsen's handwritten notes. (5/14/93 General Progress Report by H.) Margaret Fleming told us that she also remembered the shooter being clean shaven. (8/8/14 Interview with Margaret Fleming.) However, Dets. Guevara and Halvorsen reported that neighbors Margaret and Michael Fleming stated that the offender was "wearing a hooded pull over shirt," and "they could not see his face." (5/16/93 Supp. R. by G/H.) At trial, too, Michael Fleming that he did not see the shooter's face, though there was nothing blocking his view of the shooter. (7/31/14 Trial Transcript, Vol. 3 at 167-68.) He further testified that he could not tell if the shooter was either clean-shaven or wearing his hair in a pony tail. (*Id.* at 175-76.) Margaret Fleming could not see his face, she testified on cross, because "he had the thing [hoodie] on his head," and that it was pulled down "real tight." (*Id.* at 162.) She also testified that the shooter's sweatshirt had "some sort of writing" on it, a description she is not reported to have offered prior to trial. (*Id.* at 163.)

Several of the Spanish Cobras also discussed the offender's sweatshirt. Jacobo stated, as reported by Dets. Guevara and Halvorsen, that he "saw a male wearing a dark blue pullover sweatshirt firing a gun," but did not see his face. (5/16/93 Supp. R. by G/H.) Lozada testified that

---

[5] Although not reported in the RD File, Michael Summerfelt witnessed the shooting and called 911. (5/14/93 EMS Handwritten Notes.) The notes of that call, which are not included in the investigative file, reported that the offender was wearing "orange shorts" and a "black hood." (*Id.*)

6

AR-L 514236
SIDLEY AUSTIN LLP
SIDLEY

that "[b]efore he approached the corner, there was no hoodie" on the shooter, and that the shooter only put the hoodie on "[w]hen he was running towards the corner." (7/31/96 Trial Transcript, Vol. 3 at 58.) Regarding the hood, Richmond clarified that it was "one of them half hoodies" that "didn't go all the way over his head." (*Id.* at 124-25.)

### d.     **Robert Bouto is Detained**

At 4 p.m., Bouto, 16, and a member of the P.R. Stones street gang, was detained several blocks from the crime scene because, according to arresting Officer Pergande's testimony at trial, he "pretty much fit the description" of the offender. (7/31/96 Trial Transcript, Vol. 3 at 183.) Pergande did not find a weapon or bullets on Bouto. (*Id.* at 184.)

Officer Pergande, who arrested Bouto, testified at a hearing on Bouto's Motion to Quash Arrest that although he knew Bouto prior to arresting him, he arrested him based on the physical description that he received from multiple witnesses on the scene, including Ruvalcaba's friends Richmond, Escobar, and the Lozada brothers. (5/3/96 Motion to Quash Hearing at 12-13.) Likewise, as explained below, although Richmond knew Bouto prior to 5/14/93, Officer Pergande and Richmond each testified that Richmond provided only a physical description of the offender to him. (*Id.*) That is, Richmond did not describe the offender by name or by describing his prior interactions with Bouto, despite the fact that Richmond has indicated that he knew Bouto's street name, "Sadam," prior to Ruvalcaba's death.[6] (*Id.*; 5/5/14 Interview with Carl Richmond.) Lozada and Frank Escobar also knew Bouto prior to that day, according to Bouto (5/20/14 Interview with Robert Bouto), but also only provided physical descriptions of the offender. (9/27/94 Supp. R.)

Booking photographs indicate that Bouto was wearing a dark blue, hooded, Karl Kani-brand T-shirt with cursive writing scrawled across the front, and dark blue baggy shorts. (Robert Bouto Booking Photos.) Frontal and profile booking photographs also indicate that Bouto had a "soul patch" under his lip and a mustache. (*Id.*) Bouto was described in the arrest report prepared by Officer Pergande as having a dark complexion and short dark hair. (5/14/93 Robert Bouto Arrest Report.) The report does not describe a ponytail. (*Id.*) The frontal and profile booking photographs do not show a ponytail, either. (Robert Bouto Booking Photos.)

However, Pergande later testified that upon arrest, Bouto had a small ponytail. (5/3/95 Motion to Quash Arrest Hearing at 19-20.) With his fingers, Pergande indicated, in court, that Bouto's ponytail was about three inches long. (7/31/96 Trial Transcript, Vol. 3 at 186.) The line-up photos taken from those angles Bouto was photographed from do indicate that several other participants had short ponytails. (Robert Bouto Booking Photos.)

Officer Pergande's testimony was contradicted by several individuals. Defense alibi witness Tania Astefan, Bouto's girlfriend at the time of the shooting, testified that he did not

---

[6] Note that in an interview with us, Richmond did tell us that he identified Bouto by name to Officer Pergande (5/5//14 Interview with Carl Richmond), notwithstanding the fact that he and Officer Pergande testified contrary to that, and that no police report or other evidence so indicates.

7

have a ponytail. (8/1/96 Trial Transcript, Vol. 4 at D-105.) In their grand jury appearances, State informants Vicente and Edwin Maldonado both testified that Bouto described himself as not having a ponytail. (5/19/93 Grand Jury Transcript at 6, 27.) Helen Kandah, Tania Astefan's best friend at the time and Bouto's other alibi witness, told Bouto's investigator that he did not have a ponytail. (5/1/96 Answer to Discovery.) In the same report, Bouto's grandmother, Mariam Bouto, also said that he did not have a ponytail when he lived with her. (*Id.*)

On 5/1/96, Bouto provided an Answer to Discovery including information gathered from his barber and his barber's assistant regarding his hairstyle. (5/1/96 Answer to Discovery.) After correctly selecting Bouto from the police lineup photo as his former customer, Bouto's barber stated specifically that he "had cut Bouto's hair for approximately one year," and that "Bouto always wore his hair short, and that Bouto never had a ponytail." (*Id.*) The barber's assistant also told the investigator that "Bouto never had a ponytail." (*Id.*) At trial, Bouto's barber testified that regular customers like Bouto were "very familiar to me," and that Bouto did not wear a ponytail. (8/1/96 Trial Transcript, Vol. 4 at D-20-21, 23.)

At the time of his arrest, Bouto had an extensive recent criminal history, particularly in the months leading up to the shooting. (Robert Bouto Criminal History.) His prior arrests included multiple arrests for possession of cannabis and disorderly conduct, as well as a gun possession charge. (*Id.*) At Bouto's sentencing proceeding, it was brought out that he also had several assault charges, including once against his mother and once in retaliation after being accidentally struck by a baseball bat. (9/11/96, Trial Transcript, Vol. 5 at 25, 34-35.) In his interview with us, Bouto said that he was wrongfully accused of the gun charge, but acknowledged that he was involved in criminal activity at the time. (5/20/14 Interview with Robert Bouto.)

Bouto told us that he was, at the time, a recent high school dropout who was "just a flunkie, a lackey . . . a body they needed to fight their battles" in his street gang, the P.R. Stones. (*Id.*) Of his relationship with the police in 1993, Bouto said: "I was a pain in the ass. They just wanted me off the streets." (*Id.*) Bouto also speculated that police had a vendetta against him for assisting a friend with an earlier police brutality claim. (*Id.*) Helen told us that Bouto frequently caused trouble for himself with police because, although he "was a nice guy" and "had a good heart," he also "had a very, very smart mouth" and "got mouthy with the cops," including one unnamed plain-clothes officer who was "always picking on" Bouto. (2/19/14 Interview with Helen Kandah.)

After he was arrested, Bouto said the police drove him to the area near the intersection of Sunnyside and Kimball streets. (5/20/14 Interview with Robert Bouto.) Accompanying Bouto back to the scene were several other teen-agers walking nearby him when he was picked up by Officer Pergande. (*Id.*) The other teenagers did not match the description of the offender, according to Officer Pergande's testimony, but were only briefly detained based upon their proximity to Bouto. (5/3/95 Motion to Quash Arrest Hearing at 14.) When they arrived at the scene, Bouto recalled that a crowd of people had gathered and police tape had been hung to block the key sites from pedestrians. (5/20/14 Interview with Robert Bouto.) Bouto recalled: "Right there was a dead kid lying on the floor. . . . We're all looking at each other, like, 'Woah.'" (*Id.*)

8



AR-L 514238

e.    **The Show-Up**

A show-up was conducted on scene with Bouto and his companions participating as suspects. (7/31/96 Trial Transcript, Vol. 3 at 185, 100, and 34-35). Lozada testified about the show-up, saying that police "asked me if I can identify someone, if I could identify somebody that was involved in the shooting." (7/31/96 Trial Transcript, Vol. 3 at 34.) At that time, Lozada continued,  he "looked at five people standing in front of a car, the police car," and that he recognized "[t]he shooter," i.e. Bouto. (*Id.* at 35.) Richmond later testified regarding the on-the-scene show-up. Richmond said that Pergande "brought back four individuals and we were all separated and they asked us all one at a time, do you recognize any of these guys." (7/31/96 Trial Transcript, Vol. 3 at 100.) Richmond also identified Bouto at the scene. (*Id.*) Jacobo identified Bouto as wearing clothing similar to the shooter. (9/27/94 Supp. R.)

We believe, but cannot conclusively state, that show-up was conducted by Det. Guevara with the assistance of Officer Pergande. (*Id.*; 5/20/14 Interview with Robert Bouto.) Robert Bouto and Richmond both recalled Guevara participating. (5/20/14 Interview with Robert Bouto; 5/5/14 Interview with Carl Richmond.) Officer Pergande filed a Supp. R. that appears to reference the show-up (9/27/14 Supp. R.), and also testified to the events of the show-up on multiple occasions. (*See, e.g.,* 7/31/96 Trial Transcript, Vol. 3 at 186.)

As noted above, Bouto told us he knew Richmond and Lozada, both of whom identified him at the scene (and also Frank Escobar who identified him later at the lineup) "from gang-banging over the years." (5/20/14 Interview with Robert Bouto.) At a prior police line-up, Bouto and Richmond got into a fight, according to both of them. (5/5/14 Interview with Carl Richmond; 5/20/14 Interview with Robert Bouto.) Richmond described that altercation to us on two occasions and it is reported in the record in an affidavit filed under oath by Richmond in connection with the Montanez/Serrano matter. (6/7/08 Affidavit of Carl Richmond.) At trial, Richmond admitted that prior to identifying Bouto he did not like him and believed that Bouto had prior animosity toward him. (7/31/96 Trial Transcript, Vol. 3 at 112-113.) In his interview, Bouto confirmed the Area 5 confrontation, and also said that he and Richmond had had at least one other altercation, in the area near Roosevelt High School. (5/20/14 Interview with Robert Bouto.) Lozada confirmed to us that Escobar knew Bouto beforehand, but said that he himself did not. (5/9/14 Interview with Rey Lozada.) Bouto told us that Lozada, his brother Jacobo, and Escobar were participants in one of the two altercations he had with Richmond near Roosevelt High School, which involved "throwing up gang symbols and calling each other names," just a few days before the shooting. (5/20/14 Interview with Robert Bouto.) Bouto said that he knew Escobar by his street name, "Tall Frank." (*Id.*)

Although he has been steadfast that he believes Bouto was guilty of the shooting, Richmond informed us, referencing the show-up, that Det. Guevara "didn't make it fair for him at the scene." (5/5/14 Interview with Carl Richmond.) He continued: "They were bringing guys there that didn't have mustaches…. They were just bringing guys randomly…. They were bringing guys there that didn't look like him."[7] (*Id.*) Similarly, Lozada described to us a show-up with very few participants and noted, specifically, that one of the other suspects was an

9

AR-L 514239
SIDLEY AUSTIN LLP
SIDLEY

overweight white teen nicknamed "Fat Rat" that didn't "look anything like" Bouto. (5/9/14 Interview with Rey Lozada.) Like Richmond, Lozada still believes that Bouto committed the crime. (*Id.*)

According to Lozada, when Bouto arrived on-scene, Lozada, his brother, Jacobo, and Frank Escobar hung back, reluctant to help police. (*Id.*) Said Lozada: "We're gang bangers and we're not supposed to tell on each other, (so) we didn't know what to say." (*Id.*) Richmond, however, according to Lozada, had no such hesitation, and was the ringleader on the scene.[8] (*Id.*) According to Lozada, when police brought Bouto to the scene in a police car, Richmond "threw himself at the car. . . . Carl went all crazy at the car."(*Id.*) Lozada said that Richmond was crying at the scene, which Lozada said was not genuine. (*Id.*) Lozada said that Richmond "knew all the detectives. He knew them by name." (*Id.*) After approaching the car, Lozada told us, Richmond then said aloud "that was him," i.e. that Bouto was the shooter. (*Id.*) That is, Richmond, according to Lozada, made it clear to everyone around—including to him and to Escobar—that he thought Bouto was the shooter. (*Id.*) Margaret Fleming told us that she was also there at the show-up. (8/18/14 Interview with Margaret Fleming.) After he had been identified as the shooter by the three rival gang members, Bouto told us, Guevara "pulled me out of the car and said, 'You did this.' I said, 'I didn't do nothing.' He said, 'You did this,' and he put me back in the car.'" (5/20/14 Interview with Robert Bouto.)

f.      **Police Station Identifications**

After the show-up, eyewitnesses were taken to the Area 5 station for further identifications.

There is no report of a photo array in the record. However, Lozada described in detail with us a photo array conducted at the police station shortly after the show-up.[9] (5/9/14 Interview with Rey Lozada.) According to Lozada, after arriving at the station, he, Jacobo, Richmond, Escobar, and unnamed police officers and/or detectives sat at a table together examining photos and "pass[ing] the pictures around." (*Id.*) Those pictures, Lozada said, consisted of a Polaroid photo of Bouto, along with separate Polaroid photos of six other individuals. (*Id.*) Lozada said that "one or two of us picked the wrong person" and were informed of such, either by the unnamed police personnel or by other witnesses. (*Id.*) After being so informed, allegedly, the witnesses then selected anew. (*Id.*) Although Richmond did not recall examining photos, he did recall being gathered into a room with the other witnesses at the police station. (Interview with Carl Richmond 10/31/14; Interview with Carl Richmond 5/5/14.) According to Richmond: "We were all congregating about" and listening to "what the cops were saying and what was being said instead of being interviewed separately about what had happened." (5/5/14 Interview with

---

[8] Bouto independently corroborated this characterization of Richmond's outsized role in conversation with us. (5/20/14 Interview with Robert Bouto.)

[9] The Chicago Police Department's current directives on identification procedures states that, "In no case will a lineup or photo array be conducted without a Supplementary Report being completed." (9/18/12 Chicago Police Department Lineup Procedures.)

10

AR-L 514240



Carl Richmond.) We do not know whether Richmond and Lozada are describing the same or separate incidents.

To ensure Richmond's cooperation in the investigation, Richmond said that Det. Guevara threatened to prosecute him for unnamed crimes, i.e. to "put a case on me," which Richmond said in his affidavit—and confirmed to us—that he understood to mean "they would implicate me in an unsolved murder case." (6/7/08 Affidavit of Carl Richmond; 5/5/14 Interview with Carl Richmond.) Richmond told us that he at first did not want to be involved at all in the investigation into the Ruvalcaba shooting, but that Det. Guevara said, "[y]ou're gonna get involved because if you don't, we have ways to make you get involved." (5/5/14 Interview with Carl Richmond.) Det. Halvorsen, Richmond said, was not involved in the alleged conduct. (*Id.*)

At 7 p.m., a lineup was conducted at Area Five Violent Crimes. (5/16/93 Supp. R. by G/H, Line-Up Report.) As reported by Dets. Guevara and Halvorsen, Richmond, Lozada, and Escobar identified Bouto as the shooter. (*Id.*) Jacobo, Margaret Fleming, and Michael Fleming "identified the person in the number 3 spot Robert BOUTO wearing the same clothing as the shooter." (*Id.*)

We discussed the line-up identification with Richmond. (5/5/14 Interview with Carl Richmond.) Richmond told us that Det. Guevara informed the eyewitnesses which position Bouto would be standing in before they entered the identification room, help he insisted he did not need. (*Id.*) Said Richmond: "He was telling us, 'He's No. 3 in the line-up, the third one from left to right.' He told me that, he told Rey Lozada that, and he told Frank Escobar that. Every time we came back into the room, he would tell [the next witness,] 'He's No. 3.'" (*Id.*) Richmond claimed the same in an affidavit he executed on 6/7/08:

> I was asked to view a line-up that evening. Detective Guevara told the other witnesses and me that they had the shooter, and that all we had to do was identify Bouto as the shooter. He whispered to each of us what position the suspect would be in. Detective Guevara then led each of us into the room to view the line-up. Each witness came back and confirmed to the other witnesses that the suspect was in that position.

(6/7/08 Affidavit of Carl Richmond.)

Lozada, who said he has not spoken to Richmond in seventeen years, told us, in contrast, that Det. Guevara did not tell him who to select in the line-up. (5/9/14 Interview with Rey Lozada.)

Margaret Fleming, who, according to the record of the line-up identified Bouto by clothing only (5/16/93 Supp. R. by G/H, Line-Up), told us that she went to the police station for the line-up, where she "pointed . . . out" the shooter, Bouto. (8/8/14 Interview with Margaret Fleming.) She said, however, that Bouto was dressed differently at the line up than he had been when she saw him firing the gun.[10] (*Id.*) She continued that she would never forget looking at

---

[10] There is no other assertion that Bouto was dressed differently at the police station than he had been earlier in the day.

11

AR-L 514241
SIDLEY AUSTIN LLP
SIDLEY

Bouto: "He had sort of a round face. Looked like a typical Hispanic. Clean shaven." (*Id.*) Fleming did not allege that she was coerced to identify Bouto as the shooter. (*Id.*)

### g. Bouto Raises Alibi Defense

That same evening, at 8 p.m., Bouto was interviewed by Dets. Guevara and Halvorsen, at which time, as reported by Dets. Guevara and Halvorsen, Bouto "denied shooting the victim or being at the scene of the murder." (5/16/93 Supp. R. by G/H.) Bouto stated further "he was with his girlfriend, Tan[i]a," but "does not know her last name or where she lives." (*Id.*)

At 10 p.m., Bouto was interviewed again, this time by Dets. Guevara and Halvorsen and Assistant State's Attorney ("ASA") Kevin Hughes. (5/14/93 Statement by G/H.) Handwritten notes memorializing the meeting indicate that Bouto reiterated that he could not have committed the crime because he was with his girlfriend Tania. (*Id.*) Specifically, he stated: "I picked up my lady at Roosevelt High School at about 2:45" and then "walked down the alley and kissed." (*Id.*) Bouto continued: "Then I went home and sat out in front of my house. My lady's name is Tan[i]a but I don't know her last name and I don't know where she lives." (*Id.*) Bouto continued: "When I was at my house out in front Helen, Tan[i]a's girlfriend came by with Moses my friend. I don't know Helen's or Moses's last name and I don't know where they live or their phone numbers. I don't know Tan[i]a's phone either." (*Id.*)

In conversation with us, Bouto disputed the record account, explaining that he provided to Det. Guevara Tania's last name, Astefan.[11] (5/20/14 Interview with Robert Bouto.) He said that, as the notes indicated, he did not know her home address, but told the detectives that she lived "around the corner," and that her father owned a store on the first floor of her apartment building. (*Id.*) Bouto told us that he told Det. Guevara the precise route that he had walked with Tania, but that Det. Guevara had said, "This timing ain't right. I don't think the timing is right." (*Id.*) Bouto also stated that he had earlier provided this same information during an undocumented conversation with different police personnel. (*Id.*) During that earlier meeting, according to Bouto, he offered to retrieve Tania's phone number from his pager. (*Id.*) In response, Bouto told us, an unnamed officer removed the battery from his pager, thus erasing its memory and, accordingly, Tania's phone number.[12] (*Id.*)

---

[11] We interviewed Helen Kandah, Tania Astefan, and Robert Bouto on 2/19/14, 5/9/14 and 5/20/14, respectively. Helen told us that she had not been in contact with Bouto since approximately the year 2000. Tania told us that she had not been in contact with Bouto since several months before his 1996 trial. Bouto said he last saw Tania when she testified at trial, and last saw Helen in 2006 or 2007.

[12] Bouto also told us, of his interactions with CPD personnel, that he asked them to administer a gun residue test to see if he had fired a gun. He said: "They said, 'We don't do this. This ain't TV.' I said, 'You could give me a poly. You could check for gun residue, whatever you want to show I didn't do this.' They reiterated, he said, 'We don't do this. This ain't television.'" (5/20/14 Interview with Robert Bouto.) At trial, CPD forensic investigator Thomas A. Reynolds

AR-L 514242

**SIDLEY**
SIDLEY AUSTIN LLP

Helen told us that Bouto told her that he had actually began to bring police to Tania's apartment, but upon arriving in the vicinity changed his mind, causing the police to abandon the effort. (2/19/14 Interview with Helen Kandah.) (Bouto, in our interview with him, did not discuss doing so. (5/20/14 Interview with Robert Bouto.).) Helen explained that Bouto said he did so in order to avoid bringing police to the Astefan home, which would have led to Tania getting in trouble with her family. (2/19/14 Interview with Helen Kandah.) According to Helen, as well as Bouto and Tania, in separate interviews we conducted, Tania's family was very strict and expressly prohibited dating. (*Id.*; 5/20/14 Interview with Robert Bouto; 5/9/14 Interview with Tania Astefan.) Tania, Helen, and Bouto explained to us that Tania would have been disciplined by her family if she were discovered to have been dating Bouto in violation of its rules, particularly given that he was a member of a street gang. (*Id.*)

Eventually Bouto did provide further identifying information. Specifically, on 9/7/94, Bouto filed an Answer to Discovery in which he notified the State that he planned to assert an alibi defense, relying on Tania, Helen, and a newly introduced person, Joanie LNU (i.e., last name unknown).[13] (9/7/94 Answer to Discovery.) That Answer included both Tania's and Helen's full names, home addresses, and dates of birth. (*Id.*) In relevant part, the Answer stated the following:

> Tania and Helen were students at Roosevelt High School in May, 1993. Tania was the girlfriend of Robert Bouto at that time. Robert Bouto had met Tania at Roosevelt High School and was walking her back to his home at 4533 N. Spaulding Avenue. Robert Bouto picked her up at school at 2:45 PM and remained with her until 3:30 PM. While Robert Bouto was walking Tania back to his house they were accompanied by Helen Kanda (sic) and Joanie LNU.

(*Id.*)

Bouto supplemented this information on 5/1/96 when he filed a second Answer to Discovery, to which he appended the transcripts of defense investigators' 11/22/95 interviews with Tania and Helen. Bouto's grandmother also provided alibi evidence at that time.[14] (5/1/96 Answer to Discovery.)

---

testified that he did not administer a gun shot residue test because none was requested by the investigating detectives. (7/31/96 Trial Transcript, Vol. 3 at 215.)

[13] Because Robert Bouto identified the two principal girls by first name only in his initial conversations with Dets. Guevara and Halvorsen, for purposes of clarity we have elected to primarily use their first names throughout this memorandum, as well.

[14] Bouto's grandmother stated the following: "That Robert Bouto awoke about 2:30 PM on May 14, 1993 and freshened up. He stated he had to pick-up his girlfriend Tania. He left the house at about 2:40 PM and proceeded to Roosevelt High School. That Robert Bouto came back home at about 3:00 PM after he left Helen Kandah and Tania Astefan. Robert then went to the bathroom, a few minutes later he asked for some toilet paper and came out approximately TEN minutes

13

AR-L 514243

SIDLEY AUSTIN LLP
**SIDLEY**

Tania stated to Bouto's investigator that she heard gunshots while she was walking with Bouto at approximately 3:04 p.m., a time she recalled with some precision because "I was trying to get home" because "I'm going to have to be late." (*Id.* at 7.) Tania also said in her interview with Bouto's investigator that Bouto told her after they separated that he was going to go home and get money to eat. (*Id.* at 11.) In her conversation with Bouto's investigator, Tania also participated in the following conversation:

Q: Would you be available at a later time for future statements?

A: Such as going to court for him and testifying?

Q: Yes.

A: No.

Q: Why?

A: Because then my parents end up finding out everything, you know.

Q: Everything about what?

A: That I used to date him. I don't want them finding out….

Q: Is that the only reason why you wouldn't want to testify in a court of law because they'd find out and be very upset over that?

A: Yes.

(*Id.* at 18-19.)

At trial, Tania testified consistent with her earlier statements to Bouto's investigator, adding that she "got very scared" when she heard the gunshots that killed Ruvalcaba. (8/1/96 Trial Transcript, Vol. 4 at D-76-110, D-87.) On cross, ASA Dillon questioned Tania about why she did not go to the police to exonerate Bouto. (*Id.* at D-103-04.) She asserted that, when she first found out that Bouto had been arrested for murder, she did not realize when or where the murder occurred. (*Id.* at D-101.) As the investigation progressed, she testified, she did not go to the police because, "I would never go to the cops, I'm very afraid of them." (*Id.* at D-103.) She testified that she did not go to the State's Attorney's Office because "I was assuming you guys would come to me" and that, "[i]f you guys would have came to me early, I would have said

---

later after brushing his hair and brushing his teeth and so forth. Robert and I talked for about fifteen minutes and then he asked me for some money to go buy some lunch. I gave him the TEN Dollar bill that his father gave me. Robert then left our home at approximately 3:30 PM. Robert Bouto has lived with his father and myself. In that time Robert Bouto never had a pony-tail." (5/1/96 Answer to Discovery.)

14

AR-L 514244

SIDLEY AUSTIN LLP
**SIDLEY**

something." (*Id.* at D-104.) She testified further that she was testifying only as a result of a subpoena that issued compelling her testimony. (*Id.* at D-106.)

Within the investigator's transcript, Helen stated that when the shots sounded, she "was attempting to go into the alley when I seen Robert and Tania." (5/1/96 Answer to Discovery at 7.) Then, more shots sounded, and Helen said that Tania and Bouto were "right there in the alley." (*Id.*) In total, Helen said she heard two light shots—"like firecrackers"—followed by three loud shots. (*Id.* at 9.) Helen told Bouto's investigator that she arrived home the afternoon of the shooting at precisely 3:11 p.m. (*Id.* at 11.) Like Tania, Helen testified at trial consistent with her interview with Bouto's investigator. (8/1/96 Trial Transcript, Vol. 4 at 112-145.) On cross, as he did with Tania, ASA Dillon questioned Helen about why she did not go to the police to exonerate Bouto. (*Id.* at D-140.) Helen testified that she did not go to the police or prosecutors with alibi information because she "had no idea what was going on with the lawyers or anything." (*Id.*) She testified further that she did not know that a murder had taken place until three days later, and did not immediately realize that Bouto was in custody for the crime, nor that the killing had taken place near her school. (*Id.* at 137-38.)

In our interviews with Bouto, Helen, and Tania, we discussed with each the substance of the their alibi evidence. Tania asserted that Bouto "was with me at the time of the shooting." (5/9/14 Interview with Tania Astefan.) When asked to quantify her conviction that Bouto was innocent, Tania stated, with "110 percent" certainty, that she was embracing Bouto in an alley when she was "startled" by gunshots fired in the vicinity of Roosevelt High School. (*Id.*) She noted further, again with "110 percent" certainty, that Bouto was innocent. (*Id.*)

Similarly, Helen informed us that she saw Bouto and Tania embracing in an alley as gunshots sounded in the vicinity of Roosevelt High School. (2/19/14 Interview with Helen Kandah.) Specifically, Helen said that she heard "a lot of shots" begin to sound, then she rushed into a nearby alley, where she saw Tania and Bouto embracing. (*Id.*) When asked to quantify her conviction that Bouto was innocent, Helen, a devout Catholic, responded that she was "one-thousand percent certain." (*Id.*) She continued: "[H]e did not do it. He did not do it. I'll put my hands on Jesus Christ. I'll swear on my kids' lives. He did not do it. There's no ifs, ands, or buts."[15] (*Id.*)

Bouto said that he was with Tania in an alley, alone, and that they had entered the alley in order to avoid Tania's mother, who might be driving around on the way home from grocery shopping. (5/20/14 Interview with Robert Bouto.) At that point, Bouto said, he and Tania began "kissing, making out." (*Id.*) Soon thereafter, he said they heard gun shots ring out from nearby: "Next thing you know, we just started hearing gun fire: 'Bang! Bang! Bang!' Three or four shots." (*Id.*) He said that he and Tania were by themselves when they heard the shots, and that the shots occurred approximately ten minutes after school had let out at Roosevelt. (*Id.*) Bouto did not think that Helen was looking at him and Tania when the shots sounded. (*Id.*) Bouto estimated, from the sound, that the gun shots had occurred about a "block and a half away" from

---

[15] At that time, Helen did, in fact, rise from the kitchen table, walk across the room, and touch her palm to a crucifix hanging on her wall to emphasize her certainty regarding Bouto's innocence. (2/19/14 Interview with Helen Kandah.)



where he and Tania were stationed in the alley. (*Id.*) (We confirmed this approximate distance in a site visit.) He also said that he did not think much of the gun shots at the time, because they were common in his neighborhood. (*Id.*) Asked if he witnessed fighting nearby, Bouto said that "we saw a bunch of people running back and forth, everyone dispersing out of there. They didn't really look like anything out of the ordinary." (*Id.*)

In his interview with us, Bouto said that after hearing the shots fired he and Tania retraced their steps down the alley. (*Id.*) At that point, at Tania's suggestion, they separated so she could go home without her parents seeing them together. (*Id.*) Said Bouto: "So we kissed and she went north toward Sunnyside and I went toward Eastwood to get something to eat." (*Id.*) Bouto said that he walked to Golden Crust pizza parlor, about two blocks away. (*Id.*)

### h. Informant Evidence Introduced

At 10 a.m. on 5/15/93, ASA Hughes relayed the evidence collected thus far to ASA Sally Bray of the State's Attorney's Felony Review Unit. (5/16/93 Supp. R. by G/H.) Bray requested "that this be held as a continuing investigation," and that, in the meantime, she "wanted the R/Dets. to try and locate the offenders alleged girlfriend, Tanya, and the individual known only as Mario who handed Robert Bouto the gun." (*Id.*) The record does not indicate that the detectives did so.

As reported by Dets. Guevara and Halvorsen, at 3 p.m. on 5/15/93, Det. Richard Maher was "at work in Area Five VC on an unrelated robbery investigation." (5/16/93 Supp. R. by G/H.) Francisco Vicente was "one of the offenders in [Det. Maher's] robbery investigation" and had been transferred by Det. Maher to Area Five VC for questioning. (*Id.*) According to Dets. Guevara and Halvorsen, Vicente "informed Det. Maher, that another prisoner in the lock-up had confessed to him about committing a murder." (*Id.*) After receiving this information Det. Maher "informed Det. E. Halvorsen of this new revelation." (*Id.*)

At 5 p.m., Det. Halvorsen alone interviewed Vicente. (*Id.*) At that time, Vicente told Det. Halvorsen that an inmate, who identified himself simply as a "P.R. Stone," confessed to him and to another inmate, Edwin Maldonado, the murder of Ruvalcaba. (*Id.*) This purportedly occurred while he, Maldonado, and the P.R. Stone were being held in separate cells in cell block 7 in the 25th District Lock-Up on the morning of 5/15/93. (*Id.*)

Specifically, as reported by Dets. Guevara and Halvorsen, Vicente told Det. Halvorsen that on the evening of 5/14/93, he and Maldonado were standing in line-ups, and at that time "saw other M/WH's who were also in the office."[16] (*Id.*) The following morning, Vicente stated that he and Maldonado were joined in conversation by someone describing himself as a "P.R.

---

[16] We also spoke with now Capt. Lupe Pena, Vicente's arresting officer, who recalled Vicente conversing with other inmates in the upstairs line-up area: "Vicente was a good talker. Whether he uses that gift of gab to get information or to lie, who knows?" (7/10/14 Interview with Lupe Pena.)

16

AR-L 514246
SIDLEY AUSTIN LLP
SIDLEY

Stone," whom Vicente referred to as "Stone Boy." (*Id.*) Vicente told the P.R. Stone that he was a member of the "Almighty" street gang.[17] (*Id.*) Vicente related the following to Det. Halvorsen:

> "Stone Boy" said that he was in for the murder. He asked "Stone Boy" if he did the murder. "Stone Boy" said, "Yeah, I shot a Spanish Cobra, I was with my lady." . . . "Stone Boy" said that he went to Roosevelt High School to pick up his bitch. "Stone Boy" and the bitch were walking by the school when he heard gunshots. "Stone Boy" met up with his "Stone Brothers", (sic) the Shorties. "Stone Boy" said that the Shorties told him that the Cobras, had just popped at them. "Stone Boy" said that a Shorty, drove up to him and handed him a gap. "Stone Boy" said that some Spanish Cobras came up and started, representing. "Stone Boy" pulled out the gun a 9 mm pistol, and started popping at the crowd. He popped 4-5 times. One of the people started yelling, "I'm Hit." The Shorties broke and, ran off. "Stone Boy" turned around and gave the gap to his lady. "Stone Boy" and his lady walked about two blocks away. His lady panicked and gave the gun back to him. "Stone Boy" said he got rid of the gun and went back by his ladies house. "Stone Boy" stated that he owed the nation a gap because he got rid of the gap he used. "Stone Boy" said I did this shit, there are three young studs that picked me out, how much time do you think I'll do.

(*Id.*)

After Vicente shared this information with Det. Halvorsen, the 25th District Lock-Up records were examined, and "[i]t was determined from the Roster of Persons in Custody Log, that Francisco Vicente, Edwin Maldonado, and Robert Bouto were all held in cell block 7" in cells 7-2, 7-4, and 7-6, respectively. (*Id.*) At that time "[i]t was also determined that Edwin Maldonado had already been sent to court and could not be interviewed." (*Id.*)The Roster of Persons in Custody Log indicates that every cell in the block was filled. (5/14/93 Roster of Persons in Custody Roster.)

On 7/24/96, Bouto filed a Supplemental Answer to Discovery in which his investigator noted, after taking measurements at the 25th District Lock-Up, that because of the distance between Vicente's and Bouto's cells, "it would be very difficult for conversations to be heard from one cell to another." (7/24/96 Answer to Discovery.) We visited the 25th District Lock-Up and determined that per the cell assignments in the roster of persons in custody log, Bouto and Vicente were separated by at least twenty-seven feet. We also determined that if Bouto and Vicente were to have stood anywhere within their cells other than the sides nearest each other, the distance could have been as many as fifty feet.

---

[17] Vicente stated to a grand jury on 5/19/93 that he purposely obscured his gang affiliation in order to gain the confidence of the P.R. Stone. (5/19/93 Grand Jury Transcript.) Specifically, Vicente said that he told Bouto that he was an "Almighty," hoping that Bouto would think that he was an "Almighty Latin King," a gang affiliated with the P.R. Stones, rather than an Almighty Imperial Gangster, a gang affiliated with the opposing "nation" of street gangs, a group that includes the Spanish Cobras. (5/19/93 Grand Jury Transcript at 8-9.)

AR-L 514247

# SIDLEY

There is some evidence, however, that Vicente and Bouto may have been in adjacent cells for a time. On 11/21/95, Bouto gave an interview to his private investigator. (5/1/96 Answer to Discovery.) At that time, Bouto stated that detectives removed him from cell 7-6 and brought him upstairs, at which time he alleged the detectives "told him he committed the murder." (*Id.*) When Bouto was returned to the cell block, he alleged that he was placed in cell 7-1. (*Id.*) Approximately ten minutes later, Bouto alleged, Vicente was placed into cell 7-2. (*Id.*) Bouto allegedly stated that although "[t]here was very little conversation between" them, Vicente told Bouto that Vicente had passed up an opportunity to escape and that detectives provided him with food, including candy bars. (*Id.*) In fact, Bouto alleged that Vicente sold him a candy bar for $10 that Vicente claimed had been given him by detectives. (*Id.*) (Vicente provided statements to undergraduate students investigating potential wrongful convictions that may corroborate Bouto's statement to his investigator. Specifically, he stated: : "[They told me to] talk to him, carry out a little friendship." (Undated Affidavit Notes.))

At 6:35 p.m. on 5/15/93, Vicente signed a handwritten statement prepared by Det. Halvorsen and ASA Hughes, in which he detailed a confession obtained from the inmate several cells away who, according to the handwritten statement, volunteered a description of himself as "the P.R. Stone with the shaved head on the side and that he did not have a pony tail just shaved side." (5/15/93 Francisco Vicente Handwritten Statement by H.) As reported by Dets. Guevara and Halvorsen, thereafter, ASA Hughes approved murder charges against Bouto. (5/16/93 Supp. R. by G/H.) Dets. Guevara and Halvorsen then "requested that this case be filed, CLEARED BY ARREST/CLOSED." (*Id.*)

We discussed with Det. Halvorsen the evidence he and Det. Guevara reported that Vicente obtained from Bouto. Det. Halvorsen told us he did not have any recall of the Bouto case.[18] (7/1/14 Interview with Ernest Halvorsen.) He then asked to review the police reports in the Bouto record for purposes of refreshing his recollection. (*Id.*) After he reviewed them, he stated, based upon his review but not on his personal recollection: "Bouto was held overnight" while we "tri[ed] to locate Tania." (*Id.*) It appears that we were "[u]nable to locate" her. (*Id.*) Then, Bouto "gives this statement" to me. (*Id.*) He then "gives a handwritten statement to Kevin Hughes. After that, Bouto is charged." Det. Halvorsen noted further that it appeared that "Vicente's statement was the deciding factor in charging Bouto." (*Id.*) Det. Halvorsen concluded: "You read this thing, he didn't even see the guy in this jail. They were just yelling back and forth across the cell block. Why Bouto decided to talk to this guy is beyond me." (*Id.*)

On 5/19/93, Vicente testified before a grand jury in the presence of then ASA (now judge) Mary Roberts, at which time he detailed a confession to murder obtained from the inmate several cells away. (5/19/93 Grand Jury Transcript.) Vicente did not testify to having shared the Bouto confession with Det. Maher. Instead, he testified that he shared it with the "arresting officer in my case." (*Id.* at 17.) As noted above, Vicente was arrested by Officers Pena and Marron. The relevant excerpt follows:

---

[18] Specifically, he said: "The case itself, I remember nothing. Someone encounters one homicide case in their life, they remember everything. I've had dozens, if not hundreds. I'd like to remember everything I possibly can for you guys, but it seems everything gets jumbled together." (7/1/14 Interview with Ernest Halvorsen.)

18

AR-L 514248

**SIDLEY**
SIDLEY AUSTIN LLP

Q: Now after [Bouto] told you this, did you tell anyone? . . .

A: I did.

Q: And when, when did you have an opportunity to tell someone?

A: While they were taking me upstairs for questioning. The arresting officer in my case, I was talking to him in the elevator and I happened to tell him, you know, about the murder and about the Spanish Cobra being shot and that if he knew anything about the Spanish Cobra, you know, did he make it or anything.

Q: Okay. Now after you told him that, did you have an opportunity to talk to Detective Halvorsen and an Assistant State's Attorney by the name of Hughes?

A: Yes.

(*Id.*)

On the same day, Maldonado also appeared before the grand jury, again in the presence of ASA Roberts, and also detailed a confession obtained from an inmate several cells away who described himself as having "[s]hort hair on the sides and no ponytail." (*Id.* at 27.) Maldonado's grand jury testimony largely aligned with that tendered by Vicente. Specifically, Maldonado said that Bouto told him that "I shot a Spanish Cobra. I was with my girlfriend." (*Id.* at 31.) The rest of the narrative that Maldonado told to the grand jury also aligned precisely with Vicente's testimony almost verbatim. Maldonado, like Vicente, said that Bouto said to them, after confessing, "I did this shit and how long you think I'm going to do." (*Id.* at 37.) Vicente and Maldonado both testified that they saw Bouto upstairs prior to conversing with him in the lock-up. (*Id.* at 7, 28.) This is the only reporting in the record of Maldonado's evidence. Indeed, ASA John Dillon later stated in response to testimony regarding Maldonado that "there was never a handwritten statement taken from" him, although he acknowledged the fact that Maldonado represented in his affidavit recanting the evidence against Bouto that one had been executed. (6/12/96 Motion to Suppress ID Hearing at 50.)

We asked Lozada to read and respond to Vicente's statement. (5/9/14 Interview with Rey Lozada.) We did not inform Lozada why we wanted him to review the confession statement. After reviewing Vicente's statement, Lozada announced: "Nothing happened the way he said it." (*Id.*) He than proceeded to detail the errors with Vicente's statement, starting with the fact that no initial set of shots occurred, and that he had been "close enough to have heard shots if shots would have been fired." (*Id.*) Lozada continued: "There was never a shooting before then. That's a lie. . . . [T]he cops would have heard it right away and been there. . . . The two security guards, [pejoratively nicknamed] 'Beavis' and 'Butthead,' would have seen it. They walked back and forth." (*Id.*) He also told us that Ruvalcaba did not say "I'm hit, I'm hit" upon being shot.

Bouto denied in his conversation with us that he confessed to Maldonado or Vicente. (5/20/14 Interview with Robert Bouto.) He told us that he "barely said a word" while in the lock-

19

AR-L 514249

**SIDLEY** | SIDLEY AUSTIN LLP

up,[19] but that Det. Guevara nonetheless summoned him at one point from there. (*Id.*) At that time, Bouto said, Det. Guevara said, "I've got you, I've got you. You talk too much." (*Id.*) Bouto said that he thought that Det. Guevara was referring to a drug sale he had executed while in the lock-up. (*Id.*) However, Det. Guevara continued: "You opened your mouth. I've got someone saying you did this. . . . You're down there telling people you committed a murder. You're down there bragging." (*Id.*) In his earlier, pre-trial interview with his investigator, Bouto told a variation of this same story, saying that "the Detectives took him out of his cell, 7-6, and brought him upstairs and told him that they had him on tape making a confession to the murder. Bouto again denied that he committed the murder[.]" (5/1/96 Answer to Discovery.) When Bouto denied this, he said, Det. Guevara responded, "I'm done with you. I've got everything I needed." (*Id.*)

Richmond informed us in our interview with him that when Det. Guevara emerged from an interview with Bouto on 5/14/93, he announced, "I've got him." (5/5/14 Interview with Carl Richmond.) Richmond said he now assumes—incorrectly—that Bouto signed a statement implicating himself. (*Id.*) Presumably, this was the meeting in which Bouto tendered his alibi, minus last names and addresses for the key witnesses, and at which time Det. Guevara reportedly told Bouto that the timing did not line up. (5/20/14 Interview with Robert Bouto.)

i.      **Informant Evidence Partially Recanted**

Bouto filed a motion to reduce his bond on 6/7/93, noting that he was aware that "an individual whom he believes is known as 'Lobo' Maldonado will give or has given a statement alleging that … Bouto made statements acknowledging his participation in a shooting." (6/7/93 Motion to Reduce Bond.) Bouto argued that he "adamantly denies ever having made any such statement" and will offer evidence "from another inmate who will attest that 'Lobo' Maldonado has fabricated that story in exchange for preferential treatment regarding his pending matters in the criminal courts building." (*Id.*) Bouto argued further he has an alibi and has knowledge of an "occurrence witness who told police officers that he … was not the shooter." (*Id.*)

Then, on 3/6/96, Lydell Williams, who had been an inmate in cell block No. 7, in a cell adjacent to Bouto's, on the day of the purported Bouto confession to Vicente, was interviewed by Bouto's defense investigators. (5/1/96 Answer to Discovery.) Williams told Bouto's investigators that in addition to the fact that he had never heard Bouto confess to murdering Ruvalcaba, on approximately 5/16/93, while he and Vicente were riding on a bus to court, Vicente "told Williams that Vicente had given up Bouto and made a deal to reduce his time with the state." (*Id.*) The investigator's report continues: "Williams said [Vicente] gave up this guy and [Bouto] did not do that murder. Vincente (sic) told him ['] yeah, he was protecting himself. He was not going to go away for a long time now that he had something to bargain with.[']" (*Id.*) In a phone call with us, Williams recalled only that "something happened with Bouto at the jail" but was not able to shed any additional light on his statement to Bouto's investigators because he

---

[19] Although Bouto told us he did not speak with Vicente in the lock-up, he told us that he did later speak with Vicente during a ride to 26th and California, during which they were handcuffed together and smoked marijuana. (5/20/14 Interview with Robert Bouto.)

AR-L 514250

SIDLEY AUSTIN LLP
SIDLEY

did not remember the details , presumably due to the passage of time. (2014 Interview with Lydell Williams.) In conversation with us, Bouto recalled Williams being in a cell adjacent to him, telling us that he sold to him a small amount of crack cocaine. (5/20/14 Interview with Robert Bouto.)

On 4/30/96, Maldonado recanted, via affidavit, his grand jury testimony implicating Bouto in the murder of Ruvalcaba, stating that Vicente had encouraged him to do so, and that Bouto was "innocent." (4/30/96 Affidavit of Edwin Maldonado.) Maldonado's affidavit also stated, in part, that, "Robert Bouto never confessed to me or to Francisco Vicente about committing a murder," and he called his statements to both the Chicago Police Department and the Grand Jury "false." (*Id.*) Specifically, he stated in the affidavit that Vicente approached him in lock-up and said "he had a way … to get out of the charges we were in custody for." (*Id.*) Vicente then allegedly told Maldonado that he was going to "set up" Bouto by "implicating him for murder," the affidavit states. (*Id.*) Vicente, according to Maldonado's affidavit, allegedly "put great pressure" on Maldonado "to make similar statements." (*Id.*) He said that, "[s]ince Bouto was a P.R. Stone, Vicente said, 'Let's make it up and help ourselves out.'" (4/30/96 Affidavit of Edwin Maldonado.) Maldonado noted in his affidavit that he "feared great bodily harm" from Vicente, a "respected member of the IG's."[20] (*Id.*) Although he did not independently recall Vicente's name when we interviewed him, referring to him as "that Imperial Gangster," Maldonado also stated to us that Vicente drove him to implicate Bouto. (3/2/14 Interview with Edwin Maldonado.)

Maldonado said in the affidavit, as well, that he was provided the facts by an ASA and a detective:

> A short time later I met with an assistant state's attorney who told me what Francisco Vicente had stated to them. I then repeated to them the same thing that the assistant state's attorney told me. I made a statement and signed my signature on that statement at the urging of the assistant state's attorney and the Chicago Police Department. The contents of the statement was what the state's attorney told me that Francisco Vicente had earlier said to them and the police. If they did not tell me what Francisco Vicente had told them, I would not have been able to corroborate Francisco Vicente's statements. I made the statement according to what they told me.

(*Id.*) Maldonado did not allege coercion by CPD or State personnel at that time, saying only that they provided him with Vicente's story. (*Id.*)

Maldonado reiterated to us the above allegations from his affidavit, executed nearly twenty years prior, but also alleged coercion for the first time: "The officers took me into a separate room. They said they will let me and Vicente go if we went ahead and do what they say and sign this statement that they had typed up. 'This is what we want you to say. We're going to show  you the lineup.' Vicente said, 'Let's just go along with it, and we'll get out of it.'" (3/2/14 Interview with Maldonado.) He continued, stating  that CPD personnel informed him that he

---

[20] Maldonado stated that his resolve was further weakened by severe "withdrawal symptoms from my heroin habit." (4/30/96 Affidavit of Edwin Maldonado.)

21

AR-L 514251
SIDLEY AUSTIN LLP
SIDLEY

"needed" to "point someone out in a line up," and to "make sure you pick the right guy there," Bouto, and that "they would talk [him] through it." (*Id.*) Maldonado said that CPD officers told him that he would be released if he cooperated, but that they could "make things hard" for him if he refused. (*Id.*) Maldonado specifically stated at that time that Det. Guevara, who he recognized in a photo he reviewed, had helped drive him to implicate Bouto. (*Id.*)

### j. Bouto Raises Allegations of Police Misconduct

In addition to claiming that Vicente and Maldonado fabricated the confession evidence against him, Bouto raised two separate allegations of misconduct, both connected to the identification of him. On 5/1/96, Bouto filed an Answer to Discovery in which he alleged the following:

> Bouto advises that when he was at Area 5 Detective Guevara opened the washroom door where Bouto was handcuffed and asked if the Lozada brothers and Richmond could make a positive identification prior to the lineup being done.

(5/1/96 Answer to Discovery.)

Bouto alleged in a Motion to Suppress Identification that the Lozada brothers were also there at the time (Undated Motion to Suppress ID). Lozada told us that he only heard about, but did not witness, the incident. (5/9/14 Interview with Rey Lozada). However, he testified at a hearing on Bouto's Motion to Suppress Identification hearing that he did not see Bouto handcuffed to a "latrine." (6/12/96 Motion to Suppress ID Hearing at 28.) Richmond told us that he did see Bouto handcuffed in the bathroom (5/5/14 Interview with Carl Richmond), but he also testified at a hearing on Bouto's Motion to Quash Identification that he did not. (6/12/96 Motion to Suppress ID Hearing at 37-38.) Maldonado also stated that he recalled seeing Bouto handcuffed in an upstairs bathroom at the lock-up. (4/30/96 Affidavit of Edwin Maldonado; 5/1/96 Answer to Discovery.)

Also, in Bouto's Motion to Suppress Identification, upon which a hearing was conducted on 6/12/96, Bouto alleged that he was described to witnesses at both the show-up and the line-up as the "Murderer." Bouto alleged further that in his presence at the 25th District police station, Det. Guevara described Bouto to Richmond, Lozada, Jacobo, and Frank Escobar as "the shooter." On 6/12/96, at the hearing on the motion, Pergande testified that prior to the show-up, he informed CPD that he wanted witnesses to observe Bouto for purposes of determining if he was "the shooter," but that he did not make that statement in the presence of witnesses. (6/12/96 Motion to Suppress ID Hearing at 10.) Lozada testified that prior to the show-up he was asked by CPD to "see if any of them were the shooter." (*Id.* at 24.) Richmond testified that he knew Bouto prior to identifying him at the show-up as the "shooter." (*Id.* at 35-36.)

### k. Trial of Robert Bouto

Beginning 7/29/96, Bouto was tried for the murder of Ruvalcaba. Neither Maldonado, who had already recanted, nor Vicente, testified. Richmond, Lozada, Margaret and Michael Fleming, and Officer Pergande testified for the State. Lozada identified Bouto in court as the shooter. (7/31/96 Trial Transcript, Vol. 3 at 36.) Richmond also identified Bouto in court as the

22



AR-L 514252

shooter. (*Id.* at 96.) Margaret Fleming and Michael Fleming identified Bouto in court as the person they identified at the line-up by clothing. (*Id.* at 155, 173.) Tania, Helen, and Bouto's barber, Mario Issa, testified for the defense. At the conclusion of the jury trial, Bouto was convicted and sentenced to forty-five years. (9/11/96 Trial Transcript, Vol. 5 at 73.) Speaking on his own behalf at sentencing, Bouto said: "I truly am innocent." (*Id.* at 72-73.)

l.      **Sentencing of Francisco Vicente**

On 9/23/96, approximately two months after the last of the three cases in which Vicente provided evidence concluded with a guilty verdict, Vicente was sentenced on his three armed robberies and one simple robbery. (9/23/96 Change of Plea Hearing.) ASA Dillon represented the State at that hearing and recommended a sentence of nine years. (*Id.*) Vicente had previously acknowledged that each of his three pending Class X charges for armed robbery carry sentences of between 6 and 30 years and his single simple robbery charge carries a sentence of three to seven years. (10/18/94 Trial Transcript, Vol. 2 at 72, 76.) Vicente was sentenced in accordance with the State's request. (9/23/96 Change of Plea Hearing.)

Before the sentencing judge was also a letter from Lt. Earl F. Tucker, a Division Nine Shift Commander. In that letter, Lt. Tucker described Vicente's assistance in procuring for him photos of a corrections officer "standing in the cell with his arm around several inmates and money on the bed." (9/22/96 Lt. Tucker Letter.) As a result of that assistance, Lt. Tucker noted that "[i]t has been brought to my attention that his life, along with his families [sic] has been threatened after he gets out …. [and] states attorney John Dillon is aware of the danger his family is in." (*Id.*)Tucker noted further that "the service that he gave us is extraordinary." (*Id.*) He concluded with "any consideration that you deem fit may or may not have any influence on future actions." (*Id.*) It is not clear whether that letter did in fact influence the sentence.

m.      **Francisco Vicente Recants**

Seven years later, on 6/19/03, Vicente told students investigating possible wrongful convictions that the confession evidence he provided in all three cases had been fabricated[21], after he was coerced by Dets. Guevara and Halvorsen. (6/19/03 Email.) On later occasions he negotiated for various benefits in return for executing an affidavit (5/26/04 Francisco Vicente Affidavit) and potentially providing testimony in the Montanez/Serrano post-conviction case.

n.      **Bouto Seeks Clemency on Grounds of Actual Innocence**

Although Bouto claimed to have missed the deadline to file an Illinois post-conviction petition or a Section 2254 federal habeas petition "due to erroneous advice from lawyers," on

---

[21] Det. Halvorsen told us that he did not remember that Vicente had also received a confession in the third defendant's matter, stating: "That's news to me." (7/1/14 Interview with Ernest Halvorsen.) When we asked him to examine the Supp. R. attributed to him and Det. Guevara reporting Vicente's information, Det. Halvorsen expressed surprise, stating: "He got another one? In the Cook County jail?" (*Id.*) Det. Halvorsen then stated of Vicente, "This guy's a roving confession elicitor" [sic]. (*Id.*)

23

## SIDLEY
SIDLEY AUSTIN LLP

5/27/05, Bouto filed a Petition for Executive Clemency, claiming actual innocence. (5/27/05 Bouto Petition.) Bouto also wrote that he believed that the P.R. Stones street gang knew who actually committed the crime, but "they refused to turn in the person" even though he "asked and begged them to help me." (*Id.*) Bouto wrote that "they told me to be tough and hang in there and everything will be alright." (*Id.*)

Within the clemency petition, Bouto reiterated information already in the record, but added several relevant details. First, Bouto claimed that eyewitnesses Richmond and Lozada both walked up to the police car that brought him to the scene of the Ruvalcaba slaying, and that "Richmond looked at me and smiled, at that point it was clear that he was going to implicate me as being involved with the incident." (*Id.*) Finally, Bouto reiterated his alibi defense, claiming:

> On May 14, 1993, I left the apartment, where I lived with my father, at 4533 N. Spaulding, in Chicago, at around 2:30 p.m. to pick up my girlfriend, Tania Astefan, at Roosevelt High School located at the corners of Kimball and Wilson. I waited across the street for her to be dismissed at 2:45 p.m. A friend of Tania's, Helen Kanda, came out of the school and told me that Tania was running late but was on her way. Five minutes later Tania came out. We started walking with Helen and another girl named Joanie. Helen and Joanie were walking behind us by about five feet as we walked on Wilson towards Kedzie Avenue. Tania and I decided to walk south toward Christiana Street and into the alley. Halfway down the alley, we heard 3 to 4 gunshots ahead of us. Fearful, we turned and went back the way we entered to Wilson Avenue where we then walked to Sawyer Street. I dropped Tania off there and went on to Golden Crust Pizza Restaurant at Eastwood and Kedzie.

(*Id.*)

### 3. Analysis

Having presented the facts, we now begin our analysis. That analysis begins with an examination of the alibi evidence provided by Tania Astefan and Helen Kandah. The analysis continues with our examination of the confession evidence provided by Francisco Vicente and Edwin Maldonado, including its recantation. Our analysis concludes with an examination of the evidence provided by sources other than Vicente and Maldonado, including State's witnesses Carl Richmond, Rey Lozada, Michael Fleming, Margaret Fleming, and Officer Alan Pergande.

#### a. Bouto's Alibi Evidence

We begin our analysis of Bouto's alibi evidence by considering the consistency of the alibi evidence. Next we consider the credibility of the alibi witnesses. Finally, we consider the timing of Bouto's alibi evidence. We conclude our analysis of Bouto's alibi evidence by presenting our finding on it.

##### (i) Consistency of Alibi Evidence

As to the material facts of each of their stories, Helen and Tania have both been largely consistent through nearly twenty years of talking about the afternoon of the Ruvalcaba murder.

24

AR-L 514254

**SIDLEY**
SIDLEY AUSTIN LLP

As discussed above, each has spoken three times about the events. On 11/22/95, each was interviewed separately by investigators hired by Bouto's trial defense counsel. About a year later, both testified at trial, for the defense. Finally, both submitted to interviews with us to assist in this investigation.

Tania, for her part, has said in all three instances that Bouto picked her up from school at approximately 2:45 p.m. the afternoon of the shooting, at which time they began to walk, along with Helen, her best friend at the time. At some point, the couple walked into an alley, she has stated, and hugged and kissed. At this time, she states in all instances, the shots that killed Ruvalcaba rang out, frightening her. Tania, in both her conversation with Bouto's investigator and at trial, placed the time of the shooting at 3:04 p.m., saying she recalls the time because her parents imposed a strict after-school curfew of 3:05 p.m. Soon thereafter, she and Bouto walked out of the alley, eventually separating for the evening.

Likewise, the core elements of Helen's recollection have remained consistent. She has maintained that she first met Bouto outside of Roosevelt High School, having been released from school with her class a few minutes earlier than Tania. Once Tania joined them, all three began walking together, she has maintained, with the couple eventually breaking away from the group and entering an alley. Helen has also referred in all cases to the presence of a third girl, an unpopular Roosevelt student named Joanie. Helen described to Bouto's investigators two sets of shots in rapid succession, a pair of lighter shots that she compared to firecrackers, followed by a series of louder gun shots. Helen has consistently said that she walked into the alley as the shots sounded, at which time she saw Bouto and Tania together.

It is also instructive to examine Bouto's own words regarding his alibi. Bouto has consistently maintained that he was with Tania, kissing in an alley, when the shots sounded that killed Ruvalcaba. However, Bouto has provided inconsistent evidence regarding at least two secondary details: (1) Helen's observation of him and Tania; (2) his post-shooting but pre-arrest whereabouts.

With respect to the former, handwritten notes reflecting a conversation between Dets. Guevara and Halvorsen and ASA Hughes and Bouto indicate that Bouto told them that Helen visited his house after the shooting. Since then, however, he has stated on the record that Helen walked with the group, meeting him outside the school. In conversation with us, finally, Bouto told us that he did not recall Helen seeing him and Tania at that time. Neither did he recall mentioning Helen to the police, though we see no other way they would have known her name.

With respect to the latter, Bouto has maintained, including in his interview with us and in his clemency petition, that he did not go home between separating from Tania and going to Golden Crust Pizza, where he was arrested. However, he reportedly told Dets. Guevara and Halvorsen and ASA Hughes the night of his arrest that he did go home. Tania also stated in her interview with Bouto's investigator that Bouto told her he was going to stop home for money so he could go eat, which aligns with the recollection of his grandmother Mariam Bouto, detailed above.

(ii) **Credibility of Alibi Witnesses**

25

AR-L 514255

SIDLEY AUSTIN LLP
**SIDLEY**

Regarding background, Tania appears to have been raised in a strict, religious household. Although she briefly dated Bouto, there is no evidence or allegation that Tania was involved with gangs. Further, Tania was an honor roll student with near-perfect attendance at Roosevelt High School. (8/1/96 Trial Transcript, Vol. 4 at 78.) She later graduated from Northeastern Illinois University in Chicago. Currently, Tania is a married, working mother of three. She has long been employed by Banner Health Systems in Arizona, where she is a management-level executive recruiter. Similarly, Helen was raised in a strict, religious household, and she remains devout. (2/19/15 Interview with Helen Kandah.) Also as is the case with Tania, there is no evidence or allegation that Helen was involved with gangs. Like Tania, Helen graduated from Roosevelt High School, and Helen attended at least some college. (8/1/96 Trial Transcript, Vol. 4 at D-113-114.) Currently, Helen is a married mother of three, and lives in Skokie. (2/19/14 Interview with Helen Kandah.)

Regarding incentives to falsely testify, at the time of the Ruvalcaba murder, Tania and Bouto, both young teenagers, had been dating for only several weeks, and Tania testified that it was "not serious." (*Id.* at D-84.) Helen corroborated that description to us, characterizing Tania's relationship with Bouto as short-term and casual. (2/19/14 Interview with Helen Kandah.) For the most part, Helen explained, Tania and Bouto's relationship existed only during the short period of time when they walked home from school together. (*Id.*)

Helen appears to have had an even more tenuous connection to Bouto, explaining to us that she and Bouto were just acquaintances at the time of Ruvalcaba's murder. (*Id.*) She later grew closer to him after he was incarcerated. (*Id.*) She felt empathy for him, she explained, because she believed his life had been ruined by a wrongful charge and conviction. (*Id.*) Helen was friendly with Ruvalcaba at the time of his death, and testified that she "freaked out" when she learned that he had been murdered. (*Id.*)

Helen testified that she met with Bouto approximately five times between his arrest and trial. Tania also testified that she met with Bouto approximately five times between his arrest and trial, which, we recognize, may have afforded them the opportunity to prepare a false alibi in concert. However, there is no allegation that Bouto forced Tania or Helen—through threats or coercion, for instance—to provide false alibi evidence. In their meetings with us, both Tania and Helen denied that Bouto had coerced them, and each indicated, independently, that they had long since lost touch with Bouto. Nor was either Tania or Helen in contact with anyone representing Bouto's interests, such as counsel.

Related to this point, neither Tania nor Helen appeared at trial voluntarily, but rather were subpoenaed. Tania and Helen have consistently stated since 11/22/95, the date of their interviews with Bouto's investigator, that they did not wish to participate in Bouto's trial for fear that they would be subject to severe discipline from their parents. As was detailed prior to and during trial, Tania came from a strict, traditional Middle-Eastern family, was expressly forbidden from dating, and feared repercussions for doing so.

26

AR-L 514256



Tania also confirmed as much in conversation with us, and Helen elaborated, explaining that Tania was routinely subject to significant discipline for infractions of household rules.[22] Helen, for her part, noted that her parents, both Iraqi immigrants, were terrified of the police as a result of historical experience in Iraq. (2/19/14 Interview with Helen Kandah.) They would have been very upset with her, she explained, if she were to involve her family in a police investigation. (*Id.*)

Third, in their conversations with us, Tania and Helen presented themselves as truthful individuals. Each was cooperative, and offered to meet further should it be necessary, although they wondered, too, what point there was in contacting them now given that Bouto may be released from prison next year.

### (iii)    Timing of the Alibi Evidence

Important to the veracity of Tania and Helen's alibi evidence is the timing of the shooting at approximately 3:05 p.m. Tania, as noted above, recalled that the shots had sounded at 3:04 p.m. If she is correct about the time that she was with Bouto, then it would indicate that the shots that she heard were those that killed Ruvalcaba. This is the time of the shooting as described in multiple contemporaneous police reports, and there is no indication in the investigative record that the shooting took place at any time other than 3:05 p.m. Neither is there any indication that another shooting took place at the same time shortly before or after 3:05 p.m. (As discussed below, although Vicente stated that a preliminary gunfight proceeded the firefight that killed Ruvalcaba, his statement is not corroborated by the record or by any witness we spoke to.)

### (iv)    Finding on Alibi Evidence

Our examination of Bouto's alibi evidence leads us to conclude that it is more likely than not that, as Bouto has maintained from his first meeting with Dets. Guevara and Halvorsen and ASA Hughes, that he was embracing in an alley with his high school girlfriend Tania Astefan when the shots that killed Ruvalcaba were fired. All three principal figures here have gone on record multiple times during the twenty years since the shooting. Each tells a detailed account that varies from the other not materially, but rather in the ways one would expect from people who experienced the series of events from slightly differing perspectives. As discussed above, Tania and Helen both present as credible eyewitnesses.

We acknowledge that Bouto's story has shifted, in some aspects, over the last twenty years. First, Bouto did not mention the presence of Helen Kandah in his first meeting with police or to us. However, this should not be surprising, as Bouto did not believe at the time that Helen was nearby him during the key moment, and would not have had reason to see her while he embraced Tania, and we spoke with him twenty-one years after the events occurred. He has also inconsistently recalled his whereabouts between the time he separated from Tania and the time he was picked up by Officer Alan Pergande while entering Golden Crust Pizza. While we think it

---

[22] Helen told us that Tania faced physical punishment by her father from time to time for violating his house rules, and Bouto later corroborated in conversation with us that Tania came from a strict, "traditional" family, particularly when it came to dating.

27

AR-L 514257
SIDLEY AUSTIN LLP
SIDLEY

understandable that one would misremember this kind of non-essential detail, we also cannot dismiss the possibility that this is not a simple failure of memory but instead an attempt to withhold information.

Likewise, we consider it more likely than not that Bouto did omit details regarding Tania's address and last name, which harmed his credibility with police at the time although we believe he likely did so in order to avoid causing trouble for Tania with her family. Beyond that, if it is true that Bouto claimed not to know his girlfriend's and her friend's last names or addresses, it makes sense that Dets. Halvorsen and Guevara did not pursue Tania for follow-up questioning. It may have very well seemed unlikely that Bouto would not know any of those details, and his withholding of that information may have convinced them that he had invented an alibi.

Notwithstanding Bouto's flawed credibility in these regards, we remain confident that Tania and Helen's alibi evidence is truthful and do not consider it likely that all three coordinated a falsehood that they carry out to this day.

### b. The Evidence Obtained From Vicente and Maldonado

We begin our analysis of the informant evidence by examining the circumstances of Bouto's purported confession. Second, we compare Vicente's and Maldonado's evidence with evidence obtained from other sources. Third, we examine Vicente's and Maldonado's recantations of that evidence.

### (i) Circumstances of Purported Confession.

As explained above, the roster of persons in custody log indicates that Vicente and Bouto were, at least initially, incarcerated in cells separated by a minimum twenty-seven-foot distance, and potentially as many as fifty feet. Although Bouto did say in one interview, to his trial counsel's investigator, that he was briefly in a cell adjacent to Vicente, there is no allegation in the record that the alleged conversation took place while they were housed in adjacent cells. Indeed, Vicente and Maldonado both testified before the grand jury that their cells were situated as described by the roster. Moreover, Vicente told students investigating potential wrongful convictions that "he and Bouto had to yell to one another between their cells to communicate during this time," which would tend to corroborate the information contained in the roster.

Assuming that Vicente and Bouto were primarily held in cells 7-6 and 7-2 as the roster indicates, our visit to cell block 7 leads us to credit Bouto's investigator's opinion that ""it would be very difficult for conversations to be heard from one cell to another." At either distance, we could not hear each other without raising our voices considerably, as the acoustics of Cell Block No. 7 also render conversation difficult. Even in an otherwise empty and silent cell block—i.e., with no other inmates—we found extended conversation very difficult as a result of both distance and echo effects. Routine, short phrases were often incomprehensible. Under the circumstances that existed at the time of Bouto's purported confession to Vicente—i.e., a full block with six other inmates—the din of conversation and movement may have made attempts to carry out sustained conversation even more difficult.

28

AR-L 514258
SIDLEY AUSTIN LLP
SIDLEY

Not only were the cells far apart, spatially, but their alignment in the room would have made it difficult for Bouto to know who else was in the cell block at the time of his purported confession. From his cell, Bouto could not have seen the individuals in any other cell. Nor could Bouto have seen from his cell the area adjacent to the entrance to the cell block. As well, Vicente testified in the third defendant's case that the cells were frequently patrolled by CPD, which current CPD officers confirmed to us during our visit. Thus, because of the lack of visibility of the rest of the room from inside Bouto's cell, he could not have known for sure that CPD personnel were not in the room and in a position to overhear his conversation with Vicente. Nor could he have known that a rival gang member affiliated with, for instance, the Spanish Cobras, was not nearby, listening in.

The cells were also equipped with a two-way intercom, through which CPD officers could have surreptitiously listened in on the inmate conversations. During our site visit, CPD personnel confirmed that inmates were aware that the two-way intercom was in use because they responded over the intercom to requests from inmates. Even if we assume that the two-way intercom was not used during the twelve- to fourteen-hour period Bouto was incarcerated prior to purportedly confessing to Vicente, Bouto had been arrested several times prior to 5/14/93, including the night before, and may have been aware of this prior to 5/14/93.

Assuming that Bouto and Vicente were in adjacent cells for at least some period of time, they may have been able to converse. Note, however, that this placement of the two inmates receives mention nowhere else in the record, and Bouto did not mention it in his interview with us, saying instead that his only meaningful conversation with Vicente occurred on a later ride from Area 5 lock-up to Cook County Jail. As noted above, Vicente did not, in any of his statements or testimony in the case, say that the Bouto confession occurred while the two were in adjacent cells. All of that being said, we note that conversation would have been more feasible from that distance as a result of a reduction of the acoustical problems described above. Proximity would not, however, entirely negate the other problems identified, including the fact that it seems unlikely that Bouto would confess to a murder to a stranger, a point that Det. Halvorsen raised in our interview with him.

(ii)     **Comparison of Confession Evidence to Evidence Obtained from Other Sources.**

There are several aspects of Bouto's purported confession that either accurately reflect Ruvalcaba's murder or, at the least, reflect information gathered by police in the hours after the shooting and memorialized in the investigation record. That Vicente and Maldonado were reported to have shared this information leads us to consider a few possibilities. First, they may have obtained this information from Bouto, who actually did commit the crime and confess on the morning of 5/15/93. Second, they may have obtained this information in some other way, either from police or ASAs investigating the case, from an innocent Bouto, who nonetheless may have known some details about the crime from his own discussions with police and prosecution personnel, and shared it with his cell mates, or from some combination thereof.

To determine which of these is more likely, first, we consider whether Vicente or Maldonado provided any verifiable information that had not been reported by police prior to Vicente's statement or Maldonado's grand jury testimony. Second, we consider whether Vicente

29

AR-L 514259

## SIDLEY

SIDLEY AUSTIN LLP

or Maldonado provided any inaccurate information that had been reported by police prior to Vicente's statement or Maldonado's grand jury testimony. Neither Vicente nor Maldonado provided any verifiable information that had not previously been reported by police. Vicente did, however, provide three pieces of information that, although not reported by police prior to his statement, appear to be inaccurate. We begin with the verifiable information previously reported by police.

First, according to Vicente and Maldonado, Bouto told them that he had picked up his girlfriend at Roosevelt High School prior to shooting Ruvalcaba. As detailed above, hand-written notes dated the previous evening reflected Bouto's alibi statement. At that time, Bouto told Dets. Guevara and Halvorsen and ASA Hughes that he was with girlfriend at the time of the shooting and had picked her up at Roosevelt High School. As well, neighborhood eyewitness Michael Fleming had told Halvorsen that the shooter had handed his gun after the shooting to a blonde female wearing red.[23]

Second, Vicente claimed in his statement and Maldonado testified before the grand jury that Bouto shared with them his gang affiliation—P.R. Stones—and that the murder was a result of a confrontation between the rival P.R. Stones and Spanish Cobras. That Bouto was a P.R. Stone was known to CPD prior to the Ruvalcaba murder, and CPD's knowledge of his gang affiliation was one of the reasons that Officer Pergande brought him to the crime scene. Moreover, that the murder of Ruvalcaba resulted from a gang-related confrontation between Bouto's P.R. Stones and the rival Spanish Cobras was reported to police in the immediate aftermath of the shooting by eyewitnesses Richmond, Lozada, Jacobo, and Frank Escobar.

Third, Vicente said that Bouto told him that the gun was delivered by a "shorty" who came up to Bouto and handed him a gun. Maldonado testified similarly before the grand jury. A police report notes that someone recognized as "Mario" delivered the gun to the shooter via bicycle.

Fourth, Vicente stated that Bouto said that he handed the gun to his "lady" after the shooting, and Maldonado testified similarly before the grand jury. Recall that within minutes of the shooting, Det. Halvorsen had obtained from neighborhood resident Michael Fleming a description of a female accomplice wearing all or mostly all red, to whom the offender handed his weapon.

Fifth, Vicente stated that Bouto had told him that he had shot Ruvalcaba using a 9 mm pistol. By that time, crime scene investigators had already identified shell casings found at the scene as having been fired from a 9 mm gun, which is noted in the 5/16/93 Supp. R.

---

[23] Tania Astefan, by all accounts, had dark hair, and was never blonde. A contemporaneous photo of her that we acquired from Helen Kandah verifies that information. Current photos of Tania also depict her with dark hair. We asked Bouto what she was wearing the day of the Ruvalcaba shooting. He told us that she was wearing a "baby blue blouse" and "black pants." (5/20/14 Interview with Robert Bouto.)

AR-L 514260



Vicente and Maldonado provided only three pieces of material information that had not previously been reported. None can be verified, however. First, they detailed an initial shooting prior to the one that killed Ruvalcaba. That fact is significant because only if there were two distinct shootings could Bouto have been with Tania at the time that shots were reported fired but nevertheless killed Ruvalcaba. Second, they said that Bouto told him that a group of "shorties," i.e. young gang members, came to summon him to the scene of those shots. Finally, according to Vicente's and Maldonado's accounts, Bouto stated that upon being gunned down, Ruvalcaba stated, "I'm hit, I'm hit."

Regarding the first piece of material information that had not previously been reported, according to Vicente's statement, Bouto was walking with his girlfriend near Roosevelt High School when he "heard some shots." Vicente then said that Bouto told him that his "Stone Brothers, the shorties, came up to him and his lady and told him that the Cobras had popped [i.e., shot] at them." As an initial matter, other than Vicente's statement, there is no allegation by the police or the prosecution that there were two sets of gun shots. Moreover, no witnesses reported two sets of shots as described by Vicente, including both civilian neighborhood witnesses and witnesses who were opposition gang members.[24] Richmond told us that he did not recall hearing or seeing any shots other than the ones purported to be from Bouto. Moreover, as noted above, Lozada told us that Vicente's allegation regarding the earlier shooting was "a lie." He continued: "The two security guards, [pejoratively nicknamed] 'Beavis' and 'Butthead,' would have seen it. They walked back and forth."

Second, Vicente and Maldonado say that Bouto had told them that he was alerted to the circumstances of the first set of shots by his "'Stone Brothers,' the Shorties." According to Vicente, "the Shorties told him that the Cobras, had just popped at them." At that point, "a Shorty, drove up to him and handed him a gap." As noted above, the record does include eyewitness reports of a delivery-by-bicycle of the murder weapon. However, the conversation between Bouto and the so-called "shorties" only appears in Vicente's statement and his and Maldonado's grand jury testimony and, accordingly, it cannot be corroborated.

Finally, Vicente and Maldonado provide one additional piece of evidence not reported prior to Vicente's statement or Maldonado's grand jury testimony. Specifically, according to Vicente's and Maldonado's accounts, Bouto informed them that upon being gunned down, Ruvalcaba stated, "I'm hit, I'm hit." Both Richmond and Lozada, each of whom was far nearer to Ruvalcaba than the offender, informed us that detail was false. Thus, this piece of evidence, too, cannot be corroborated. (5/5/14 Interview with Carl Richmond; 5/9/14 Interview with Rey Lozada.)

### (iii) Vicente's and Maldonado's Recantations

First, we examine the consistency of Vicente's recantations. Second, we examine the consistency of Maldonado's recantations. Third, we examine potential benefits received by both

---

[24] Helen described two sets of shots to Bouto's investigators, but in rapid succession, not minutes apart.

AR-L 514261

SIDLEY AUSTIN LLP
SIDLEY

informants in exchange for recantations. Fourth, we examine potential benefits received by both informants in exchange for providing evidence against Bouto.

(a)     <b>Consistency of Vicente's Recantations of the Evidence Against Bouto</b>

Vicente is reported to have stated to multiple people, on multiple occasions over a period spanning more than a decade, that the confession evidence he provided against Bouto was fabricated. Those recantations are consistent with respect to the claim that the evidence he provided against Bouto was fabricated. Notably, while Vicente has long maintained that Bouto did not confess to him, he has no independent knowledge of Bouto's guilt or innocence.

(b)     <b>Consistency of Maldonado's Recantations of the Evidence Against Bouto</b>

Edwin Maldonado has maintained for nearly two decades, from shortly before trial to a 3/2/14 interview with us, that the evidence he provided against Bouto was fabricated. Like Vicente, Maldonado has maintained consistently that this evidence was fabricated, but he has provided inconsistent reasons for having done so.

Maldonado's three recantations—first to Bouto's investigators, then formally via an affidavit, and finally in a 3/2/14 interview with us—share several core facts. Most importantly, Maldonado has been unwavering in his contention that Bouto did not confess to a murder while the two were in the Area 5 lockup together. He has said, also, that he did not know Bouto before that day of the purported confession. He has also consistently implicated Vicente as the person who in large part instigated his participation. Maldonado has also consistently stated that he was assisted in implicating Bouto by both CPD personnel and prosecution personnel. Finally, Maldonado has said throughout his various recantations that he was suffering drug withdrawal symptoms at the time of his implication of Bouto, which played a role in his decision to implicate Bouto.

While Maldonado has maintained his core allegations, the recantations are also marked by some inconsistencies. First and foremost, Maldonado inconsistently discusses CPD personnel's role in his decision to give false evidence against Bouto. In his affidavit, Maldonado appears to place all of the blame on Vicente, his co-informant, for encouraging him to implicate Bouto. The police and prosecution, on the other hand, are only involved insofar as they give to him Vicente's story. When speaking to us, however, Maldonado said that CPD personnel played a larger role, actively coercing him, and that "cops back then" expected gang members to provide false information against rivals at risk of being framed for crimes themselves. (3/2/14 Interview with Edwin Maldonado.) Maldonado told us that, in the Bouto case, "cops said 'make sure you pick that guy there'"—i.e, Bouto—and that "they would talk [him] through it." (*Id.*)

Second, Maldonado has also provided inconsistent details regarding his biography, which harms his credibility with us to some degree. Initially, in his interview with Bouto's investigators, Maldonado said that he was in the same gang as Vicente, the Imperial Gangsters, which incentivized his cooperation in the scheme to falsely accuse Bouto. In his affidavit, Maldonado does not directly identify himself as a member of the Imperial Gangsters, although

32

AR-L 514262

SIDLEY AUSTIN LLP

# SIDLEY

he implies it by stating that "Francisco Vicente was a respected member of the IG's (Imperial Gangsters), and I felt that I had to do what he told me to do or else face trouble." However, when he spoke with us, Maldonado said he was never a member of the Imperial Gangsters, but rather the Maniac Latin Disciples. (3/2/14 Interview with Edwin Maldonado.) He also said that the nickname used for him throughout the Bouto record, including in his interview with Bouto's investigator, was wrong. (*Id.*) He was not known as "Lobo," Maldonado said, but rather as "Count." (*Id.*) Finally, Maldonado acknowledged to us that the birth date he stated at his Grand Jury appearance was inaccurate by five years. (*Id.*)

We also note that although he believes that Bouto was innocent, and claims at various times that Vicente, CPD personnel, and prosecution personnel had assisted him in his role in implicating Bouto for the Ruvalcaba murder, Maldonado also said that his heavy drug use in the mid-1990s had made some events difficult to recall. (*Id.*) For example, he did not remember executing the affidavit. (*Id.*) He told us, however, that he has been sober for six years at the present time. (*Id.*)

(c)     **Benefits Offered or Provided for Recanting**

At the time Maldonado recanted prior to Bouto's trial, he was incarcerated at Cook County Jail. There is no evidence that he received a benefit for recanting. Moreover, potentially, he risked more by antagonizing the State than he could have hoped to have gained by recanting. By the time Maldonado spoke to us, repeating his allegation, Bouto's case had been inactive for many years, time-barred as to both Illinois post-conviction and Section 2254 federal habeas. Bouto is not currently represented by counsel and, accordingly, no advocate was in a position to attempt to negotiate benefits for Maldonado in exchange for recanting the grand jury testimony he provided against Bouto. Notably, Maldonado was, upon first contact, extremely reluctant to submit to an interview with us.

Finally, there is no evidence that Lydell Williams was offered a benefit in exchange for relaying Vicente's recantation to Bouto's investigator.

Vicente recanted before negotiating for various benefits in return for his testimony in the Montanez/Serrano matter.

(d)     **Benefits for Providing Evidence Against Bouto**

Vicente may have received benefits for participating in the Bouto case. Foremost among them, on a potentially lengthy sentence, Vicente served only three years.[25] ASA Dillon, who prosecuted the case against Bouto, represented the State at Vicente's sentencing hearing, and

---

[25] It is impossible to predict what sentence Vicente would have received had he not cooperated with the Bouto, Montanez/Serrano, and third defendant investigations and still pleaded guilty. Had he gone to trial and been convicted on the three armed robberies and one simple robbery, the maximum sentence he could receive allegedly would be ninety-seven years. It is reasonable to assume, however, that pleading guilty on those charges would have resulted in sentence far shorter than ninety-seven years even if he did not cooperate.

AR-L 514263

recommended a nine-year sentence at that time. It is possible that his apparent assistance in breaking up a drug-smuggling ring may also have contributed to the sentence he received, although his reported efforts there were not mentioned at the hearing or, indeed, outside of the unsigned letter from Lt. Tucker. After reportedly providing evidence against Bouto, Montanez/Serrano/Pacheco, and the third defendant, Vicente also was transferred to the witness quarters at Cook County Jail. There, he testified in the Montanez/Serrano matter, he was allowed visitors, contact visits, and home-cooked meals. (10/18/94 Trial Transcript, at 79-80.)

There is no indication that Maldonado received sentencing benefits for his participation against Bouto. He has stated, however, to us that he hoped for such benefits, and that Vicente told him that this was a possibility for both of them. Maldonado told us that, "I lied. I lied. I was trying to get out of trouble, and it cost" Bouto. (3/2/14 Interview with Edwin Maldonado.)

> (iv) **Findings Regarding Vicente's and Maldonado's Evidence**

We find that it is more likely than not that Bouto did not confess to the murder of Salvador Ruvalcaba while in the Area 5 lock-up. Thus, it is more likely than not that the two informants instead obtained the verifiable information in other ways, either from police or prosecution personnel or from Bouto himself, who may have been knowledgeable about the details of the case due to the discussions with police and the State in which he professed his innocence. First, it is implausible that Bouto would have confessed the intimate details of this level of crime to a room full of strangers, and our visit to the cell block verified that, even had he been so inclined to do so, the conditions—namely the acoustics of the room and his distance from Vicente, in particular—would have made this difficult to do. We are also swayed by the contents of the purported confession, which lacks verifiable information not already reported in the record but contains verifiably false or otherwise likely false information, detailed above. Had the confession been legitimate, we would have expected that one of the two men would have shared at least some verifiable details not already collected by investigators. Also, while we would expect that their stories of the same event would mostly align, that Maldonado offered largely a verbatim recitation of Vicente's evidence, also makes us suspicious of the veracity of the evidence and leads us to this finding.

Finally, we also give some weight both to the fact that we consider it unlikely that Vicente would have obtained three separate confessions to three unrelated crimes and that we have independently determined that Vicente likely fabricated those other confessions, too.[26]

> c. **Evidence Obtained From Sources Other Than Vicente and Maldonado**

---

[26] Although we did not make a finding regarding innocence in the third defendant's case, we did for several reasons determine that the confession to Vicente in that matter, purportedly occurring in the "Bullpen" waiting room at the Cook County Jail while the two were surrounded by several other people, was fabricated.

AR-L 514264

SIDLEY AUSTIN LLP
SIDLEY

First, we here analyze the evidence in connection with eyewitness descriptions of the offender. Second, we analyze the evidence in connection with the circumstances under which the identifications of Bouto were conducted.

### (i)    Eyewitness Descriptions of Offender

We present here the evidence concerning eyewitness descriptions of the offender. First, we present evidence concerning eyewitness descriptions of the offender's hairstyle, and Bouto's hairstyle at the time of his arrest. Second, we present evidence concerning eyewitness descriptions of the offender's facial hair, and Bouto's facial hair at the time of his arrest. Third, we present evidence concerning State's witness Lozada's statement that the offender was canvassing the crime scene on a bicycle during the period preceding the shooting.

### (a)    Offender's Hair

The fact that various witnesses told police that the shooter wore his hair in a ponytail has been a point of contention by Bouto and his defense counsel throughout the course of the case. They have argued that Bouto did not wear his hair in a ponytail, and thus could not have been the shooter.

First, if the shooter did indeed wear his hair in a ponytail, it would seem to definitively rule out Bouto as the perpetrator. Although line-up photos were all taken from either the front of Bouto or in side profile, it is evident from our examination of the profile photos that Bouto did not have a ponytail when he was arrested shortly after the shooting.[27] Several other individuals in the line-up did wear their hair in short ponytails or rat-tails, and even from these angles, that they have them is evident. The photographic evidence establishes that Bouto did not have a ponytail upon being arrested.

On this topic, an additional point is worth noting. We agree with defense counsel's argument at the 5/3/95 Motion to Quash hearing that the absence of a photograph showing Bouto with a ponytail is circumstantial evidence that he did not have one. Put another way, under circumstances where the offender was described by multiple sources at multiple times as having a ponytail, if the offender had a ponytail upon arrest, the police likely would have photographed it or noted it in the arrest report. Recall, too, that no report describes Bouto as having a ponytail and, in fact, both Vicente and Maldonado describe him as not having a ponytail.

On the question of whether the shooter wore a ponytail, we afford considerable weight to the fact that the tail was described by two groups of independent witnesses, the six neighbors

---

[27] There is no evidence or allegation that Bouto shaved his ponytail in the short time between Ruvalcaba's death, and Bouto's arrest nearby and, as noted above, there is circumstantial evidence he did not. First, his barber told his investigators and testified at trial that Bouto did not have a ponytail. Second, Tania denied that he ever had a ponytail in a meeting with Bouto's investigator, at trial and in conversation with us. Third, Helen told us that Bouto never had a ponytail because his grandmother would not have allowed it.

AR-L 514265

**SIDLEY** | SIDLEY AUSTIN LLP

listed in the initial case report, and the Spanish Cobra eyewitnesses. While the shooter is sometimes described as having worn a hooded sweatshirt, as discussed above only Margaret and Michael Fleming, among eyewitnesses, stated prior to trial that the hood was up when they saw the shooter, and Margaret informed us that his hood was only up a portion of the time that she saw him. In the initial description gathered from neighbors, there is no mention of a hood, either on or off of the shooter's head.[28] The neighbors are credited with describing a ponytailed offender wearing a black T-shirt. While it is theoretically possible that that the multiple groups of witnesses independently got the ponytail detail wrong, in the chaos of the moment, they did converge on certain other aspects of the description, including the length and hue of the offender's shorts, and the fact that he was wearing a dark shirt, rendering a significant error in connection with a defining characteristic unlikely.

To be sure, the Spanish Cobra witnesses, Ruvalcaba's friends, and the shooter were facing one another, with a city street in between them, when the shots were fired. The view would have been of the offender's face, not the back of his head. In other words, had this been their only view of him, they would have had no way of knowing whether the offender was wearing a pony tail or not. However, in his interview with us, Lozada said that Jacobo and Richmond both mentioned the tail. (5/9/14 Interview with Rey Lozada.) Lozada also told us that the offender, who he still believes was Bouto, had been riding a bicycle before the shooting, which would have afforded the eyewitnesses another opportunity to see a ponytail. It is also possible that the eyewitnesses saw the ponytail as they looked back at the fleeing offender. Richmond and Lozada both acknowledged doing so from the ground, after the shooting. At trial, as discussed above, Lozada said that the shooter did not put his hood up until he fired the fatal shots, and Richmond called the shirt "one of them half hoodies" that still afforded him a look at the shooter's hair.

In sum, we find that the weight of the evidence indicates that the offender had a ponytail, and Bouto did not.

### (b) Bouto's Facial Hair

As detailed above, record evidence photos indicate that Bouto had a visible mustache, "soul patch," and a very slight goatee on the day of the shooting. However, no eyewitness descriptions noted the presence of facial hair on the shooter, and the hand-written General Progress Report prepared by Det. Halvorsen noted that eyewitness Michael Fleming described the shooter as "clean shaven."

Whether this aspect of the descriptions is an indication of Bouto's innocence is dependent upon whether the witnesses would have gotten a good enough look at the shooter's face to determine the presence of facial hair. In this instance the Spanish Cobra witnesses would have

---

[28] We include here only the six neighborhood witnesses listed on the initial crime scene report and not 911 caller Michael Summerfelt, who noted a "hood," but not whether it was up or down, and also was the only witness to describe orange rather than dark shorts worn by the shooter, suggesting he may have confused the offender with someone in the vicinity of the offender—i.e., perhaps one of the three individuals described as next to the offender as he fired the weapon.

36

SIDLEY AUSTIN LLP
**SIDLEY**

been positioned to see facial hair, as the offender was facing them. However, that fact does not necessarily mean that they would have noticed it and in the immediate aftermath of the shooting told police investigators about it. There was some distance between the shooter and the witnesses, as many as sixty-five yards. It is possible that they would not have noticed Bouto's facial hair from that distance. It is also quite possible that the eyewitnesses simply did not see the shooter for a long enough time to make the facial hair determination. According to both Richmond and Lozada, in our interviews with them, the shooter emerged from a group of Puerto Rican Stones gang members, at which time he began firing into the crowd of Spanish Cobras. Their focus would very likely have been on fleeing gun fire rather than cataloguing the shooter's facial hair.[29]

The inconsistencies of Michael Fleming's descriptions and statements do give us pause. Fleming specifically described the shooter as "clean shaven." (At trial Bouto's defense counsel failed to confront Fleming with a prior inconsistent statement as to this fact.) Likewise, Margaret Fleming told us that the offender was clean-shaven.

Although we recognize the possibility that Bouto's facial hair may have been a detail that witnesses did not notice or simply failed to see due to fast-moving circumstances at the scene, we do accord some weight, although non-dispositive, to the fact that Bouto had facial hair and no witness so described the offender.

(c) **Rey Lozada Informs Us That The Offender Canvassed Area on Bicycle Prior to Shooting.**

Lozada is unlikely to have seen Bouto riding a bike. The bicycle detail was not noted in the record, so, to the best extent we can tell, Bouto was never aware of the allegation. Nonetheless, both he and Tania, in independent interviews with us, said Bouto had been on foot the entire afternoon, not on a bicycle.

It is quite possible that the bicycle description is simply a mistake that Lozada made due to the passage of more than twenty years since the incident. Although there is a description in the record of a person named "Mario" delivering a gun on a bicycle to the shooter, there is nothing that matches up with Lozada's description of the shooter on a bicycle. As noted above, fellow eyewitness Richmond told us that he did not see Bouto on a bicycle, although he conceded that he had not arrived in time to see the events leading up to the shooting. Nonetheless, this did not

---

[29] The presence of a gun, particularly a gun fired into the crowd, also contributes to the skepticism with which we must treat the eyewitness identifications in this case. In a phenomenon that expert Elizabeth Loftus discusses in her book "Eyewitness Testimony," "a crime victim might spend a great deal of time concentrating on the gun that the assailant is waving about, and much less time processing other aspects of the situation. In fact, there is some evidence that this is exactly what people do. The term weapon focus has been used to refer to the situation in which a crime victim is faced with an assailant who is brandishing a weapon. The weapon appears to capture a good deal of the victim's attention, resulting in, among other things, a reduced ability to recall other details from the environment, to recall details about the assailant, and to recognize the assailant at a later time."

AR-L 514267



seem like an aspect of the story that Richmond was familiar with, even from speaking to others. Perhaps Lozada saw someone other than the shooter on a bicycle before the shooting, and in the years hence has conflated the two individuals in his mind. Perhaps there was no bicyclist at all, and Lozada is confusing the afternoon of 5/14/93 with another afternoon. Without any corroborating statements unearthed, it is difficult to know.

Had Lozada actually seen the shooter on a bicycle before the shooting, that would make it much less likely that Bouto was the offender. However, the lack of corroboration of Lozada's account, either contemporaneous or in the course of our investigation, limits its value to our findings.

### (ii)     Eyewitness Identifications of Bouto

Beginning with the on-scene show-up, there are many reasons to believe that the identifications of Bouto as the shooter may have been undermined and, thus, ultimately unreliable. As an initial matter, eyewitness Richmond told us in our interview with him that he did not believe that the show-up process was fair to Bouto. It is notable that Richmond is the one raising these allegations. First, Richmond still believes that Bouto was the shooter, and, in fact, was at first hostile toward our attempts to interview him about the incident. Richmond, in conversation with us, described Ruvalcaba as his "best friend" and made it clear that he hopes Bouto serves out the remainder of his sentence. (5/5/14 Interview with Carl Richmond.) The fact that Richmond has no vested interest in Bouto's release, still believes him guilty, and in fact wants to see the conviction maintained, lends his allegations about the show-up and line-up some degree of credibility.

Second, the nature of their relationship was such that Richmond may have been predisposed to identify Bouto, as it has been established that Richmond did not like Bouto at the time of the shooting.[30] Moreover, Richmond believed that Bouto had every reason to want to harm him, and told us that he thought Bouto intended to shoot him, not Ruvalcaba. In other words, the idea of Bouto as the shooter made sense to Richmond. Nonetheless, there is no indication in the record that Bouto told Pergande, the investigating officer at the scene, that Bouto was the shooter. Instead, he offered only a physical description of an offender. Richmond knew Bouto and recognized him right away when he was brought to the scene by Pergande. That familiarity, reasonably should have led to Richmond identifying Bouto by name or other characterization as the shooter, rather than giving a mere physical description of a shooter.

The circumstances of the shooting may further undermine Richmond's show-up identification of Bouto. At that distance, it may have been difficult to distinguish Bouto from any number of teenagers, especially when the opportunity to see the offender was limited, as it was, according to Richmond's testimony, while Richmond ducked for cover to evade gunfire, perhaps at a distance as great as sixty yards away.

---

[30] Loftus, in "Eyewitness Testimony," discusses the phenomenon of "unconscious transference[,] . . . in which a person seen in one situation is confused with or recalled as a person seen in a second situation."

AR-L 514268

# SIDLEY
SIDLEY AUSTIN LLP

If it is true that, as Bouto said, Lozada and Escobar had been involved in a prior altercation with him, as well, then Lozada and Escobar may have also been predisposed to identify Bouto as the offender. Even if that was not the case, though, Richmond's actions at the scene, as detailed above, may have served to hinder the reliability of any subsequent identifications of Bouto as the shooter. According to Lozada, who still believes that Bouto was the shooter and alleges no misconduct by Dets. Guevara or Halvorsen, Richmond first loudly identified Bouto, and made a significant showing of his certainty that Bouto had been the offender. This created the possibility that the other eyewitnesses were responding not to their own belief that Bouto had shot Ruvalcaba, but rather to Richmond's expressed certainty.

The show-up, of course, was just one identification of Bouto in a series of them on the relevant date. Although we have not been able to confirm that a photo array was conducted as Lozada described—Richmond told us he did not recall examining photos but described a group interview with police and witnesses—we believe it possible that it was. First, as a gang member rival to Bouto and as a friend of the decedent, Lozada, like Richmond, does not appear to be incentivized to fabricate information that calls into doubt the reliability of Bouto's conviction, although he certainly could be mistaken or confusing it with another case. Second, Dets. Guevara and Halvorsen often conducted photo arrays. We note, however, it is not clear why a photo array would have been necessary in this matter given the show-up conducted on scene, unless police sought additional positive identifications from witnesses beyond Richmond, Lozada, and Escobar.

Like the show-up, the circumstances of the photo array, if reported accurately by Lozada, took place under circumstances rendering its utility questionable. First, the witnesses would have looked at the Polaroid photos shortly after already seeing Bouto at the scene during the show-up, increasing the likelihood that they would have identified him not necessarily because he was the shooter, but because he had already been presented to them as such.[31] Second, guidelines regarding suspect identification processes advise that witnesses make their identification independently, outside of the presence of other witnesses, who might act as an influence.[32] In this instance, if Lozada's account is accurate, those present actually corrected other witnesses, serving to further undermine the reliability of the selection. Finally, the photo array might have impacted the reliability of the line-up held soon after, because it gave the eyewitnesses yet another opportunity to view Bouto ahead of time and associate his face with the shooting and informed witnesses of the identity of the suspected offender.

---

[31] Behrman, B.W. & Vayder, L.T. (1994). "The Biasing Influence of a Police Showup: Does the Observation of a Single Suspect Taint Later Identification?" *Perceptual and Motor Skills*, 79, 1239-1248. The study examined whether the presentation of an innocent person in a show-up would affect eyewitness performance at a lineup. The authors found that the witnesses, here viewing the lineup five to seven days later, were significantly more likely to again select the innocent suspect from the lineup than a control group who had not viewed the showup.

[32] Paterson, Helen M.; Richard I. Kemp; Jodie R. Ng (January-February 2011). "Combating Co-Witness Contamination: Attempting to Decrease the Negative Effects of Discussion on Eyewitness Memory." *Applied Cognitive Psychology* 25 (5): 43-52.

AR-L 514269

**SIDLEY** | SIDLEY AUSTIN LLP

There is also evidence that Det. Guevara showed Bouto to the line-up witnesses while he was handcuffed in a bathroom, perhaps prior to the line-up. If this was indeed the case, it would have given the witnesses another opportunity to familiarize themselves with Bouto as the shooting suspect, and also, as an unendorsed and undocumented method of identification, also evidences potential police misconduct. Assuming this event took place as the bulk of the evidence suggests, it is unclear whether this qualifies as a third viewing prior to the lineup procedure, as it is unclear whether this incident took place before or after the lineup. Bouto told us in our interview with him that it did occur prior to the line-up, saying that the door "opened up and Detective [Guevara] said, 'That's the one who did it,' and a bunch of guys said, 'Yeah, that's him. That's him.'" (5/20/14 Interview with Robert Bouto.)

Finally, the accuracy of identifications of Bouto as the shooter at the Area 5 line-up may also be questionable. First, this was, at the very least, the second identification of Bouto that day and possibly the third or fourth, depending on whether the photo array discussed above and a bathroom viewing discussed above actually occurred as described to us. However, there is little doubt that by the time of the line-up, the eyewitnesses—in particular the Spanish Cobra eyewitnesses who positively identified him—were familiar with Bouto as the suspect. Notably, neighborhood witness Margaret Fleming also said that she saw Bouto at the show-up, though this is not elsewhere documented. Those who do not appear to have participated in the show-up or photo array, including Margaret Fleming and her son Michael, were only able to identify Bouto as wearing clothing similar to that worn by the offender. (Jacobo, who participated in both the show-up and possibly the potential photo-array, also identified Bouto only by clothing at the line-up.)

On the last point, some scholars have argued that clothing-based identifications are inherently unreliable.[33] At the very least, in order to yield a reliable identification of an offender, the suspect should be surrounded by individuals who appear similar to the suspect.[34] Here, the offender's clothing was a central component of the identification process. As mentioned above, at least three eyewitnesses, Jacobo, and Margaret and Michael Fleming, identified Bouto, not by his facial appearance, but because he was wearing clothing the same or similar to the shooter. However, Bouto was the only member of the lineup wearing a hooded shirt, as well as the only member of the lineup wearing shorts of the length described by witnesses. One lineup member wore red pants and a white Chicago Bulls T-shirt. Another one wore white pants. All wore outfits that varied in significant ways from both Bouto and from the initial descriptions of the

---

[33] "Clothing bias occurs when the clothing worn by a suspect at the time of the identification is similar to the clothing of the culprit described by the witnesses. Clothing bias can produce mistaken identifications in lineups, but it provides an even bigger problem in showups." *See* the 2012 Psychology Press book "The Psychology of Eyewitness Identification," which was written by James Michael Lampinen (professor of psychology at the University of Arkansas), Jeffrey S. Neuschatz (associate professor and chair of the psychology department, University of Alabama-Huntsville), and Andrew D. Cling (professor and chair of the department of philosophy at the University of Alabama-Huntsville).

[34] See supra.

40

AR-L 514270
SIDLEY AUSTIN LLP
SIDLEY

shooter, taken by investigators before Bouto was picked up. Under these circumstances, it was unlikely that the process would have yielded an identification of anyone but Bouto.

Moreover, Bouto's general clothing style (hooded shirt, shorts) was very common at the time, as was the specific brand of shirt he wore. Indeed, according to contemporaneous news accounts, hooded Karl Kani shirts like the one Bouto wore at the time of his arrest were very fashionable at the time. A 7/4/93 Chicago Sun-Times newspaper article, detailing youth fashion trends at the Taste of Chicago festival, noted that "'Kani,' as in Karl Kani, is the designer name of the moment, scrawled across hooded shirts, shorts and baseball caps worn by kids and teenagers." Later that year, on 12/19/93, the Los Angeles Times quoted a teen-age mall-goer that called Karl Kani clothing "the hottest thing going." Helen Kandah also told us that Kani-brand clothing was ubiquitous at her high school in the summer of 1993. (2/19/14 Interview with Helen Kandah.)

Finally, it may be notable that we assessed Margaret Fleming as somewhat unreliable in her conversations with us. Fleming's recall of certain details was the worst of any witness we spoke to. For example, she recalled that the shooter wore a white T-shirt and blue jeans, but not a hood. (8/8/14 Interview with Margaret Fleming.) She later changed her recollection, aligning it more with the record evidence, but this was only after we had refreshed her recollection, and it is unclear whether she truly remembered the details of the shooting, or was instead extremely suggestible. (*Id.*) She explained to us that she suffers from post-traumatic stress disorder after being shot in her neighborhood by a gang member while she was serving on a neighborhood crime watch program. (*Id.*) Fleming said: "You're talking to a real dummy. I was diagnosed with PTSD and severe panic attacks." (*Id.*)

Having discussed reasons that the identifications of Bouto as the shooter may have been unreliable, we now turn to the reasons that the identifications may have in fact been reliable.

First, we above noted that Richmond loudly, immediately, and confidently identified Bouto as the perpetrator when Bouto was brought to the scene in Pergande's police car. Though this certainly may have tainted the other eyewitnesses' identification of Bouto due to the power of suggestion, we also do not dismiss the idea that a rapid and confident identification of Bouto may tilt in favor of reliability.

Second, Bouto did share some characteristics with descriptions of the shooter gathered from eyewitnesses. To start, he wore a dark-colored, hooded shirt, along with ¾-length, dark shorts. Although he is Middle Eastern, Bouto's skin tone, particularly in his neighborhood, could certainly lead one to identify him as Hispanic, as witnesses had. The fact that Bouto shared at least some characteristics with the shooter could be judged to support the reliability of the identifications of him as the shooter.

Third, there is the sheer number of identifications of Bouto as the offender. The charging of Bouto was based not on identification by a single witness, or even two, but rather identifications of him as the shooter by several witnesses—specifically, three who identified him positively and three who identified him by his clothing. Included were neighborhood witnesses Margaret and Michael Fleming, who identified him by his clothing, as well as several rival gang members who had witnessed the shooting, including State trial witnesses Richmond and Lozada,

41

AR-L 514271

SIDLEY AUSTIN LLP
SIDLEY

as well as Frank Escobar and Jacobo, Lozada's brother who identified Bouto by his clothing. Even as many as six identifications are not a guarantee of accuracy, particularly in light of much of the context discussed in the section above. However, all things being equal, six identifications of an offender are certainly more reliable than a lower number.

Finally, unlike the circumstantial witnesses who would later recant their allegation that Bouto had confessed to the crime, none of the living eyewitnesses who identified Bouto as the shooter have since disavowed their identifications. Richmond and Lozada both still believe that they identified the correct person, despite Richmond's contentions about the process being tainted by alleged police misconduct. As well, Margaret Fleming expressed no hindsight uncertainty about her selection of Bouto as the shooter. We have been unable to speak to Michael Fleming. However, his mother Margaret told us that he told her, "Mom, you know more about that because you were right there." (8/8/14 Interview with Margaret Fleming.) She continued: "I saw way more of this than my son did. He just saw the aftermath." (*Id.*)

(iii)     **Finding Regarding Evidence Obtained From Non-Informants**

The number of identifications of Bouto by eyewitnesses makes the charging of him with Ruvalcaba's murder, at the time, understandable. However, we ultimately find that the evidence shows that it is more likely than not that the identifications were mistaken.

To recapitulate, the descriptions of the shooter, collected before Bouto was arrested, suggest that the witnesses more likely than not saw someone other than Bouto fire the weapon that killed Ruvalcaba. We recognize, and discussed above, the fact that eyewitnesses make mistakes in their flash descriptions of offenders. Thus, it is not out of the realm of possibility that a witness might misremember a ponytail where none actually existed. However, here, that the shooter wore a ponytail was the consensus among two groups of independent witnesses. This leads us to believe that it was more likely than not that the shooter wore his hair in a ponytail. Likewise, mistakes could be made with respect to facial hair. However, we ultimately believe that someone, from a group of nearly a dozen witnesses named in the investigation record, would have noted that the shooter wore facial hair. Instead, the only description tendered regarding this aspect of the shooter's appearance was by Michael Fleming, who said that the person he viewed was "clean shaven," a description corroborated by Margaret Fleming, whereas Bouto was not, but wore a mustache and a "soul patch." It is true that Bouto's clothing matched some of the general descriptions obtained in the immediate aftermath of the shooting. But the descriptions were not precise—for example, there is no contemporaneous indication that the shooter had been wearing a shirt with writing on its front—and Bouto's style of apparel was common at the time..

We now, then, address the next step in the identification of Bouto as the killer of Salvador Ruvalcaba. We note, first and foremost, that Richmond's actions at the show-up likely affected the reliability of all identifications that would come afterward. Richmond, recall, told us that the identification procedure was "unfair" for Bouto because Bouto was the only one at the scene who resembled the description of the offender. But it may be that Richmond's on-scene actions, independently related to us by Lozada and Bouto and corroborated in large part by the record evidence, played a significant part in making this so. Lozada also described a photo array, which Richmond may have partially corroborated, conducted under circumstances that, if

42

AR-L 514272

SIDLEY AUSTIN LLP
SIDLEY

accurate, render it unreliable. We note also that Bouto was placed in a lineup with a group of fillers that were not dressed similar to him. Finally, we take note of the fact that some witnesses viewed Bouto up to four times, making it increasingly likely that they would identify him as the shooter, while increasingly unlikely that they were doing so because he actually was the shooter. Indeed, with so many opportunities to see Bouto, it is difficult to imagine that the eyewitnesses, viewing the line-up, would have selected anybody other than the person they saw just a few hours before, on the scene, dressed exactly the same.

4.     **Conclusion**

a.       **Regarding Allegations of Misconduct**

As to our first task in the Robert Bouto matter, we find it unlikely that Det. Guevara purposefully provided informants Francisco Vicente and Edwin Maldonado with false information in an effort to implicate Robert Bouto in the murder of Salvador Ruvalcaba. At the time Vicente provided the evidence, Det. Guevara and his partner, Det. Halvorsen, had already obtained positive identifications of Bouto as the shooter from three eyewitnesses, and partial, clothing-based identifications from three others. This, we feel, may have been enough evidence to charge Bouto with the slaying, rendering the informant evidence unnecessary, although Det. Halvorsen told us after reviewing the police record that Vicente's information was the "deciding" factor in the charging decision. Thus, Dets. Guevara and Halvorsen may have had little motive to elicit false informant testimony. Likewise, Vicente does not purport to have first gone to Det. Guevara with the confession information, but rather to either Det. Richard Maher, or one of the arresting officers, Capt. Lupe Pena or Officer L. Marron. The involvement of other CPD personnel makes it less likely that Dets. Guevara or Halvorsen, would have initiated such a scheme with Vicente and Maldonado. Finally, Bouto's inconsistent story about how much contact he had with Vicente makes it difficult to make any determination regarding how much he may have revealed to Vicente about the crime he was accused of committing.

However, we do find it more likely than not that Det. Guevara engaged in misconduct in two instances. First, it is more likely than not that he told Richmond, and perhaps others, who to select from the lineup. Richmond believes Bouto guilty, and would have little to no motive to falsely attempt to undermine the identification process that helped lead to his conviction of the murder of Richmond's "best friend" Ruvalcaba. Second, we find it more likely than not that Det. Guevara engaged in misconduct when showing witnesses Bouto handcuffed to a bathroom fixture. Although accounts of the timing differ, possibly due to the passage of time, multiple independent recollections of this event leave us confident that it happened. The most likely scenario, we find, is that Det. Guevara showed the witnesses Bouto, in the bathroom, as a precursor to the line-up process.

b.       **Regarding Claims of Actual Innocence**

As to the task of determining the actual innocence of Robert Bouto, we find it more likely than not that Bouto is innocent of the murder of Salvador Ruvalcaba.

First, as discussed above, Bouto has maintained a credible and corroborated alibi from the night of the shooting until the present day. That alibi has never been substantively

43

AR-L 514273

SIDLEY AUSTIN LLP
**SIDLEY**

undermined, even at trial. We find Bouto, despite some inconsistencies in his retelling, convincing as to the core assertions of his alibi story. We find Tania Astefan and Helen Kandah, meanwhile, credible and convincing.

Second, for multiple reasons, we find it more likely than not that both Francisco Vicente and Edwin Maldonado fabricated the event of Bouto's confession to the crime. The confession, as detailed in the record, is simply not plausible. We do not believe that the conversation, as alleged, could have taken place given the acoustics and other elements of the cell block as detailed above. Neither do the contents plausibly relate a confession, due to the fact that, first, the confession contains only verifiable information already collected by Dets. Guevara and Halvorsen and, second, other information included in the purported confession is either unverifiable or, simply, false.

Third and finally, we find the eyewitness testimony, the linchpin of the conviction of Bouto, unreliable. While it is true that Bouto marginally fit the description of the offender, the presence of a Hispanic-appearing teen, wearing dark clothing with a hood, scarcely would have narrowed the field of potential suspects in the summer of 1993, especially in the neighborhood of the shooting. On the other hand, reported details like the ponytail and the clean shave do not align with Bouto whatsoever. We suspect that in the aftermath of the shooting, Richmond, eager for swift justice, quickly pinned the blame on a suspect that made sense to him. Others likely followed. All of the station house identifications that followed, as discussed above, were tainted either by possible misconduct by Det. Guevara or by other circumstances that otherwise rendered them inherently inaccurate. Eyewitness identifications can be unreliable for a multitude of reasons, and many, if not most, are present here, as we detailed above. Thus, we find that the identifications of Bouto were likely mistaken.

In sum, we find Bouto's alibi evidence more credible than the eyewitness identifications of Bouto as the shooter, and certainly more credible than the purported jailhouse confession to Vicente and Maldonado. Although we accord some weight to the improbability that Vicente received three separate confessions to three unrelated murders in 1993, two of them within six weeks of each other, it does not meaningfully impact our conclusion here. In other words, even if this were the only confession Vicente purportedly received, our analysis would not change. Thus, it follows that we must also find it more likely than not that someone other than Robert Bouto shot and killed Salvador Ruvalcaba on the afternoon of 5/14/93.

44

# EXHIBIT 102



**ATTORNEY WORK PRODUCT**
**PRIVILEGED AND CONFIDENTIAL**

**<u>MEMORANDUM</u>**

| | |
|---|---|
| FROM: | Scott R. Lassar<br>Michael P. Doss |
| RE: | Guevara Investigation – Gabriel Solache and Arturo Reyes |
| DATE: | December 12, 2014 |

## I.    INTRODUCTION AND SUMMARY CONCLUSIONS

We were retained by the City of Chicago to investigate allegations of misconduct made against former Police Detective Reynaldo Guevara and to evaluate whether the alleged misconduct resulted in convictions of innocent people currently serving prison sentences. This Memorandum summarizes our conclusions from the investigation of such allegations made by defendants Gabriel Solache and Arturo Reyes, who are currently serving life sentences.

Solache and Reyes were convicted (along with co-defendant Adriana Mejia) for the 1998 murders of Jacinta and Mariano Soto and the kidnapping of the Soto children, three year-old Santiago and two month-old Maria. Both Solache and Reyes claim innocence and allege that their signed confessions to these murders were coerced by physical abuse by Detective Guevara.

In the course of our investigation, we have (i) conducted 10 interviews, including of Solache and Reyes and their counsel, Adriana Mejia, Rosauro Mejia, Horatio Mejia, Viola-Rouse Armijo, Ernest Halvorsen, and counsel for the City; (ii) reviewed transcripts and court filings of pre-trial, trial, and post-conviction proceedings; and (iii) reviewed police and forensic reports made available to us that document the investigation of the crimes at issue.

Detective Guevara and Youth Officer Daniel Trevino declined to be interviewed by Sidley.[1]

As explained in further detail below, we have come to the following conclusions based on our investigation:

(i) First, we find it more likely than not that Solache and Reyes were physically abused by Detective Guevara and were otherwise subjected to unreasonable treatment during the course of their interrogations.

---

[1] In our analysis of the facts and conclusions we did not draw any negative inference arising from Guevara's and Trevino's decisions to decline our interview requests.

AR-L 517175



(ii) Second, despite the abusive conduct during the course of their interrogations, we nevertheless reject both Solache's and Reyes' claims of actual innocence, noting in particular that Adriana Mejia continues to identify both of them as involved with her in the murders.

## II.     BACKGROUND FACTS

Unless otherwise indicated, the following background facts are undisputed.

### A.     Solache and Reyes Convictions and Legal Proceedings.

On June 20, 2000, Gabriel Solache and Arturo de Leon Reyes[2] were each convicted of two counts of murder, two counts of aggravated kidnapping, and one count of home invasion. Reyes was sentenced to life in prison, and Solache was sentenced to death. Their convictions were affirmed on appeal. A third co-defendant, Adriana Mejia, pled guilty and is serving a life sentence.

Both men maintain their innocence. They claim that Detective Guevara physically abused them and caused them to confess to participating in the crimes. Both have filed post-conviction petitions based upon an alleged pattern and practice of misconduct by Detective Guevara, and the hearings in those proceedings have been ongoing for roughly a year and a half.

### B.     Relationship Between Co-Defendants Solache, Reyes, and Mejia.

In 1998, Gabriel Solache, Arturo Reyes, and Adriana Mejia lived together in a house located at 6234 S. Mozart, Chicago, Illinois. A number of other adults also lived at the same address—Rosauro Mejia (Adriana's husband), Carlos Martinez (Adriana's brother), Jorge Mejia (Rosauro's brother), and Jorge Mejia's wife Guadalupe Mejia. Carlos Martinez and Gabriel Solache shared a bedroom, while Arturo Reyes had his own room. All of the adult members of the household had immigrated to the United States from Mexico.

Solache is Adriana Mejia's cousin and they are from the same small town in Mexico. Rosauro Mejia also knew Solache from their youth in Mexico—they used to play basketball together. Solache moved into the Mozart address in September 1996. Initially, he lived in the basement apartment with Jorge and Guadalupe Mejia, but at some point, he moved up to the first floor where Rosauro and Adriana Mejia and Carlos Martinez lived. He states that he paid $100 per month in rent, and $30 per week for food, to either Adriana or to Rosauro.

Arturo Reyes was not related to any of the members of the household. He was, however, the brother-in-law of one of Rosauro Mejia's other brothers, Manuel, who lived close by. Rosauro allowed Reyes to move into the house at 6234 S. Mozart as a favor to Manuel. Reyes moved into the Mozart address in January 1998, and he states he paid $150 per month in rent to Rosauro Mejia.

---

[2] Some police records and court filings in this case refer to Arturo as "De Leon," but most refer to him as "Reyes," and for consistency's sake, we will do so as well.



## C.    Solache and Reyes Background.

In March 1998, Solache was working full-time as a machine operator at a metal factory located at 47th and Cicero.  He reports having worked there since the fall of 1997, working five days a week from approximately 4:30 p.m. to 12:30 a.m. (although occasionally stayed late to earn overtime).  Solache reports previously having worked at a cardboard factory in Franklin Park, which he lost following a non-job accident and hospitalization in the summery of 1997.  Before the instant offenses, Solache had no criminal record in Mexico or in the United States.  He also has no record of any gang-related activities.

In March 1998, Reyes was working full-time at the Ed Miniat Meat Packing Company in South Holland.  (Reyes had left his wife and at least one child back in Mexico when he came to the United States.)  He reports having worked there since late January or early February 1998 and working seven days a week from approximately noon to midnight.  Before the instant offenses, Reyes had no criminal record in Mexico or in the United States.  He also has no record of in any gang-related activities.

## D.    The Crime.

At some point in mid-1997, Adriana Mejia began perpetuating the lie that she was pregnant.  In fact, she was unable to conceive.  But she told her husband, her housemates, and her extended family that she was pregnant and due in mid-March 1998.  No one, not even her husband, reports having learned that she had been faking her pregnancy until after she was arrested. (As discussed further below, in our interview Adriana Mejia stated that she told Solache about her fake pregnancy but no one else.)

On the morning of Friday, March 27, 1998, Adriana asked her husband Rosauro to take her to the University of Illinois-Chicago clinic where she had been pretending to receive prenatal care.  She told Rosauro that she was going to be induced.  Adriana told him not to stay, and Rosauro went to work that day.  At some point later that day, Adriana called Rosauro to tell him that she had had a baby girl and that he should pick her up at the hospital the following morning.

At some point in the early hours of Saturday, March 28, 1998, Adriana went to the residence of Jacinta and Mariano Soto.  The Sotos were the parents of a three year-old boy named Santiago and a baby girl, approximately two months old, named Maria.  Adriana reports that Reyes and Solache accompanied her to the Soto residence, where the three of them broke into the basement apartment, stabbed Mariano and Jacinta to death, and kidnapped their two children.  At some point thereafter, Adriana returned to the hospital with both of the Soto children and later brought them home, presenting the baby as her own and the boy as the son of someone (Norma Salazar) she had met at the hospital.

Solache and Reyes deny any involvement in the murders and kidnappings.

3

AR-L 51717

SIDLEY AUSTIN LLP
**SIDLEY**

### E.    Activity Between the Crime and Eventual Confessions.

On the morning of Saturday, March 28, 1998, Rosauro Mejia and Guadalupe Mejia (the wife of Rosauro's brother) went to the hospital to pick up Adriana and the child they thought was the newborn baby of Adriana and Rosauro.  Rosauro reports being surprised to find Adriana also had a young boy with her; Adriana told everyone that the boy's mother, a woman named Norma Salazar, was having a caesarian section at the hospital and that she had asked Adriana to look after the boy for a day or so.  When Adriana returned to the house that morning, Reyes and Solache were both home, though they both left shortly thereafter—Reyes to go to work and Solache to go pick up his paycheck.

During the course of the week that followed, various questions were raised with Adriana about the three-year-old boy who remained in her care at the house.  Adriana gave various explanations, including telling her husband Rosauro that the boy's mother had AIDS and could no longer take care of him.

On the evening of Thursday, April 2, 1998, Guadalupe Mejia saw a news story about the Soto murders.  During the news report, she saw a picture of a little boy that was missing from the Soto residence, and she recognized him as the same little boy Adriana had brought home from the hospital.  Guadalupe reported confronting Adriana and demanding that she take the little boy to the police, but Adriana refused.

When Rosauro Mejia returned from work in the early morning hours of Friday, April 3, 1998, Guadalupe told him of the news story, and Rosauro decided that they should take the little boy to the police station.  After some discussion, it ultimately was decided that Rosauro, Solache, and Reyes would together take the boy to the local police station.  When they arrived, the three men were told to wait until they could speak with a Spanish-speaking officer.  Eventually, Officer Juan Solis arrived to speak with them, and Rosauro explained how his wife had come home from the hospital with the little boy, that the boy's mother, Norma Salazar, was unable to care for him, and that they brought him to the police when they realized that he was missing.  The police later confirmed the identity of the boy as Santiago Soto.

That same morning, April 3, 1998, the police went to the residence at 6234 S. Mozart to speak with Adriana Mejia.  According to police reports, she willingly let the police into the home and showed them the baby.  Adriana was arrested and taken to the Area 5 police headquarters at Grand and Central.  At some point during the afternoon of Friday, April 3, 1998, the police also moved Rosauro, Solache, and Reyes to Area 5 headquarters.

The nature of the interrogations that followed are subject to dispute and are discussed in greater detail below.  It is undisputed, however, that Adriana, Rosauro, Solache, and Reyes were held at Area 5 and interrogated about their involvement in the Soto murders during the period from the afternoon of Friday, April 3rd until the early morning hours of Sunday, April 5th.

According to police reports, Adriana initially told the police that the little boy belonged to Norma Salazar, a woman at the hospital who asked Adriana for help.  Later, during a

4

AR-L 517178

**SIDLEY** SIDLEY AUSTIN LLP

polygraph exam, Adriana said that she needed a baby because she couldn't tell her husband she was not actually pregnant, and she had purchased the children from Norma Salazar for $600; she failed the exam.

Adriana eventually confessed to having participated in the murders after she was presented with a pair of her shoes seized from her residence that had blood stains on them.[3] According to police reports, Adriana initially stated that she had paid Arturo Reyes $600 to kill the Sotos and take their children but did not mention Solache. One police report in fact reported that Adriana had expressly denied Solache was involved. Police reports further state that Reyes was the next to confess, on the afternoon of Saturday, April 4, 1998, while being interrogated by Detective Guevara, and in the course of doing so, he implicated Solache in the murders. The reports state that when the police went back to Adriana and told her Reyes had implicated Solache, then she too stated that Solache participated in the crimes. Police reports also state that later that evening, while Guevara interviewed him, Solache also confessed to participating in the murders.

By early Sunday morning, Adriana, Solache, and Reyes had each signed written statements admitting involvement in the Soto murders. Rosauro Mejia also signed a statement, in which he denied knowing that his wife was not in fact pregnant and recounted his interactions with his wife and the kidnapped children she brought home from the hospital. Each written statement was signed in the presence of an Assistant State's Attorney ("ASA").

F.      **Police Investigation.**

The bodies of Mariano and Jacinta Soto were discovered by police on Wednesday, April 1, 1998 (four days after the murders) after family members of the Sotos reported them missing. According to police reports, Mariano was found laying face up, five feet from the front door with multiple stab wounds all over his body. A kitchen knife was found under his right arm. Another knife was found in a box behind the sofa.

Jacinta Soto was found on the floor in the bedroom. She too had multiple knife wounds, mostly to the back and buttocks. Blood was splattered on the bedroom wall five feet from her body.

Police collected a number of pieces of physical evidence from the scene, including:

- A knife that was in a box behind the couch in the Soto residence;
- A knife that was on the ground underneath Mariano Soto;
- Physical specimens from both victims including a vial of blood; oral, rectal, and vaginal swabs; clothing; hair samples; and fingernail clippings;
- Blood-stained baby blanket and baby pants.

---

[3] Adriana Mejia was also presented with the jacket Santiago Soto was wearing when he was brought to the police station, which, according to an April 30, 1998 police report, had blood stains on it. However, subsequent lab reports concluded that there in fact was no blood found on the jacket.

5

AR-L 517179

SIDLEY AUSTIN LLP
SIDLEY

The bloody sheets from the bedroom were not collected.  The latent fingerprints taken from the crime scene were deemed not suitable for comparison.

The police later twice searched the Mejia residence at 6234 S. Mozart.  During the first search, the police found a pair of Adriana's shoes which had blood stains on them (which later DNA tests confirmed was the blood of victim Mariano Soto).  Adriana's shoes also tested positive for an "additional" DNA type, but the amounts of that profile were too small to be compared.   During the second search, the police recovered a pair of Adriana's pants that also had blood on them (also later shown to be Mariano Soto's blood).

The police also recovered physical evidence from Rosauro Mejia's car, including:

- The floor mats;
- A black cloth scarf;
- A bag with a dirty rag that was stored in the trunk wheel well;
- A cushion from the rear seat of the car;
- A blood-stained green towel from the rear window deck behind the seat.

The green towel seized from Rosauro Meija's car later tested positive for Adriana Mejia's DNA, and also tested positive for DNA belonging to another unidentified male.  In addition, a knife seized at the Soto residence also tested positive for Adriana Mejia's DNA.

When Solache and Reyes were detained for questioning, the police collected Solache's shoes and Reyes's pants and shoes.  No blood or any DNA from the Sotos was found on any of these items.  The police tested the physical evidence seized for DNA comparisons against Mariano and Jacinta Soto, Adriana Mejia, Solache, and Reyes.  No tests were conducted for comparisons against any of the other residents of 6234 S. Mozart, including Rosauro Mejia, Carlos Martinez, or Jorge and Guadalupe Mejia.

### G.      The Trial and Subsequent Court Proceedings

Adriana Mejia pled guilty while Solache and Reyes were tried together before separate juries and convicted in June 2000.

The central evidence presented against Solache and Reyes were their written confessions in which they admitted participating in the murders of Jacinta and Mariano Soto.  Adriana Mejia did not testify; nor was her statement implicating Solache and Reyes otherwise presented to the jury.  Both Solache and Reyes contended their confessions had been coerced.  The State put on witnesses to rebut Solache's and Reyes's claims that their confessions were coerced, including the testimony of Detective Guevara.  Beyond the confessions, no other evidence was introduced to establishing their involvement in the Soto murders.

Rosauro Mejia testified in support of the defendants' claims of physical abuse.  He testified that when he was being questioned by Guevara, Guevara asked him how much he paid for the little girl, and when Rosauro answered that he had not paid anything, Guevara hit him repeatedly.  Trial Tr., June 19, 2000, in *People v. Solache*, et al., Case No. 98-12440, Circuit

6

AR-L 517180

# SIDLEY
SIDLEY AUSTIN LLP

Court of Cook County, at Q - 22. Rosauro testified that he believed Guevara hit him because he did not believe him. *Id.*

In Detective Guevara's testimony, he denied hitting, striking, or slapping anyone and said he never saw Solache or Reyes exhibiting any signs of having been beaten by anyone else. *Id.* at Q – 239-40. Detective Guevara further testified that, as far as he knew, neither defendant had complained of being struck by an officer. *Id.* at Q – 214-15.

After both Solache and Reyes were found guilty, the court denied their motions for a new trial. The State sought the death penalty and, at sentencing, Solache and Reyes waived their right to a jury. The court found sufficient mitigating factors with respect to Reyes to preclude the death penalty, and he was sentenced to life in prison. Solache, however, was sentenced to death. On January 10, 2003, while Solache's appeal to the Supreme Court was pending, Governor Ryan commuted all death sentences in Illinois to life sentences.

In August and September 2003, the defendants' convictions were affirmed. The appellate court[4] noted that the case hinged on credibility and that the trial court, best positioned to adjudge credibility, did not find the defendants credible. Three months later, the defendants filed post-conviction petitions, citing new evidence that throughout his career, Detective Guevara had systematically coerced confessions and witness identifications. In March 2004, the trial court summarily dismissed both defendants' petitions as frivolous and patently without merit.

In December 2006, the Illinois appellate court issued an opinion in the consolidated cases, reversing the trial court's dismissal of the post-conviction petitions and remanding the matter for a hearing with directions that it be reassigned to a new trial judge.

In May 2013, Judge Obbish, Cook County Circuit Court, began hearing testimony in the Solache and Reyes post-conviction hearing. Solache and Reyes have both testified about their allegations of misconduct at these proceedings. The court has also heard from other witnesses regarding Guevara's alleged pattern and practice of misconduct, including Annie Turner, Adrian Duta, Leshurn Hunt, David Velazquez, Adolfo Frias, Graciela Flores, Samuel Perez, and Bill Dorsch. Currently, the State is putting on its rebuttal witnesses, and these hearings are still ongoing.

## III. INVESTIGATION SCOPE AND PROCEDURES

### A. Interviews

Sidley conducted nine interviews in the course of its investigation of the Solache and Reyes case. Specifically, Sidley interviewed the three defendants, Adriana Mejia, Gabriel Solache, and Arturo Reyes, along with witnesses Rosauro and Horatio Mejia. Additionally, Sidley interviewed Solache's trial counsel, Viola-Rouse-Armijo, and his current post-conviction counsel, Jane Raley and Karen Daniel, and Reyes's current post-conviction counsel, Andrew Vail and David Saunders. Sidley also met with Detective Halvorsen, who assisted in the

---

[4] After his death sentence was converted to life without parole, Solache's appeal was remanded to the appellate court.

7

AR-L 517181
SIDLEY AUSTIN LLP
SIDLEY

investigation of the Soto murders, and the Assistant State's Attorneys ("ASAs") currently representing the State in the post-conviction proceedings, Celeste Stack and Jim Papa. Those who submitted to interviews cooperated fully with the investigation.

Detective Reynaldo Guevara and Youth Officer Daniel Trevino declined to be interviewed by Sidley. Moreover, Sidley attempted to interview Carlos Martinez, Adriana Mejia's brother, but was unable to locate him.

### B. Document Review

Sidley's investigation also involved the review of numerous documents received from Solache's and Reyes's current counsel, as well as from the State. Sidley reviewed transcripts from (1) pre-trial proceedings, including the hearings regarding the defendants' motions to suppress their statements; (2) the trial; (3) the sentencing and other post-trial proceedings; and (4) the post-conviction hearings. Sidley also reviewed a number of police reports, crime scene records, forensics reports, and medical records related to the case. Additionally, Sidley reviewed various court filings and prior court opinions.

## IV. ALLEGATIONS OF WRONGDOING AGAINST DETECTIVE GUEVARA

Each of the four individuals detained and questioned about the Soto murders—Solache, Reyes, Rosauro, and Adriana—claims mistreatment by Guevara. In addition, these statements were corroborated by Horatio Mejia, Rosauro's brother. We detail these claims below.

### A. Allegations of Misconduct Against Guevara

1. Rosauro Mejia

As previously noted, Rosauro Mejia was Adriana Mejia's husband. Since the trial, Rosauro divorced Adriana and has re-married. He reports that he has been continually employed for the past fifteen years at Welch Packaging, where he started as a machine operator and is currently a forklift operator.

When interviewed by Sidley, Rosauro stated his reluctance to revisit the history of this case, explaining he has moved on with his life and finds the memories painful. He stated that he was interrogated by Detective Guevara and others over a period of 2-3 days, he believes beginning Friday April 3, 1998, after he and Solache and Reyes were transferred to a police station further north from the one at which they all arrived with the young boy (Santiago Sotos).[5] He said he was hit repeatedly by Guevara during the questioning, first after Guevara asked him "how much he paid for the baby girl" and Rosauro responded that he did not know what Guevara was talking about. Rosauro said he was not handcuffed, but that he was restrained by another officer while he was being hit by Guevara. Rosauro said that Guevara hit him with a fist many times; he noted that there weren't any marks from the beating because Guevara mostly hit him in

---

[5] Based on police records and trial testimony, Rosauro Mejia, Solache, and Reyes initially arrived at the 8th District headquarters (3515 West 63d, Chicago) with the boy, Santiago Sotos, and subsequently were taken the Area 5 headquarters for questioning.

8

# SIDLEY
### SIDLEY AUSTIN LLP

the stomach. Rosauro said that Guevara kept trying to get him to admit to involvement in the crime. He said he had no recollection of providing or signing a written statement (records show his written statement was taken on April 5, 1998 at 4:00 a.m. He explained that he was held in the same room for days without sleeping or eating. He believes he was given water "one time," and was first offered food shortly before he was cleared to leave. He stated that he was allowed to use the bathroom.[6]

Rosauro stated that he has no knowledge whether Solache or Reyes were also beaten, or otherwise how they were treated, and said that they had been split up and were not ever questioned together. Rosauro said he understood he was ultimately released because Adriana told the police he was not involved in the killings.

Rosauro's statements during our interview were consistent with his testimony at trial in all material respects (Rosauro was called as a defense witness).

2.      Horatio Mejia

Horatio Mejia is Rosauro Mejia's brother, and reports having been employed for the past thirty years at Kronos, where he currently is works as a machine operator.

When interviewed by Sidley, Horatio stated that he was at the Mejia residence when the police came to speak with Adriana in connection with the Soto murders, and he (and others at the house) to come to the Area 5 police station for questioning. At the station, Horatio was interviewed in Spanish by a Puerto Rican officer he believes to be Guevara. Horatio reports he was questioned for only a couple of hours. Horatio said he did not witness anyone being struck while at the station. However, he , but that he heard sounds of someone being hit while he was at the station, who he thought was his brother Rosauro. Horatio said that he heard someone yelling—he believes at his brother—and telling him not to lie. Horatio also reported having seen Adriana Mejia at one point while she was walking from one place to another with officers and he thought her face was reddened as if she had been hit. Horatio also reported that after Rosauro was released, he returned home and told Horatio that he had been beaten by the police and was accused of lying.

3.      Adriana Mejia

Adriana Mejia was interviewed by Sidley at the Logan Correctional Facility. Regarding the issue of Guevara's conduct, Adriana also claims she was mistreated during her interrogation, including physically abused by Guevara. In particular, she stated that while Guevara was interrogating her, he hit her in the face, causing her nose to bleed, and that he also hit her hard on the back. She at one point stated that two other officers were in the room when she was hit, but at another point said no one else saw Guevara hit her.[7] Adriana also stated that Guevara threatened that an "accident" might happen to her family if she did not cooperate.

---

[6] Rosauro Mejia's signed statement, in contrast, says that Rosauro was "treated fairly," and had "been given food to eat and drink."

[7] At the spring 2000 suppression hearing, she testified to somewhat different physical abuse by Guevara—she stated that he pulled her hair and hit her in the back very hard, and told her that he was tired of her lies—she did not then

9

AR-L 517183

**SIDLEY**
SIDLEY AUSTIN LLP

Adriana also stated that at one point she was taken by Guevara to a room where Solache was being held, and they were told to discuss what they had planned. She said that, when they both stayed quiet, Guevara "slapped him around." She said Solache was handcuffed during this time. In addition, Adriana stated that, when she was taken away from that room, she heard Guevara and another officer yelling at Solache and cursing him. Adriana also stated that she was similarly taken to a room where Reyes was being held, but did not see Reyes being struck.

Adriana said she was handcuffed during almost the entire time she was being held, sometimes to the wall, and sometimes with her hands together. She reported being held in the same room from Friday until Sunday and that she was not allowed to go to a bathroom and given no food or drink until Sunday afternoon, when she received a hamburger and a juice. She stated that she did not believe she had slept during this entire period.[8] Adriana reported being told by Guevara that she should talk to the police so that she could help herself and eventually go home and that they refused to allow her to speak with an attorney or with any family members.

4. Gabriel Solache

Solache's original counsel, Viola Rouse-Armijo, reported to us that Solache told her of physical abuse by Detective Guevara at her first meeting with him. Since then, he has consistently maintained that he was physically abused by Guevara throughout the life of his case.[9]

In his interview with Sidley, Solache stated that when he was first was questioned by Guevara, Guevara hit him more than once with the open palm of his hand on the left side of Solache's face. Solache stated that his right arm was handcuffed to the wall so Guevara couldn't readily reach the right side of his face. He also stated that, at some point, Guevara brought Adriana Mejia into the room where Solache was being questioned and asked Solache if he would deny his participation in the crimes in front of her. After Guevara took Adriana out of the room, he returned without her, and repeatedly punched Solache in the stomach, until eventually Solache admitted he had participated in the crimes. Solache stated that this physical abuse prompted him to admit involvement in the murders.

The version of Solache's allegations against Guevara as reported to us is substantially similar to Solache's testimony motion to suppress hearing. He told essentially the same story at the hearing but with the added detail that Guevara hit him across the face while Adriana was in the room. Mot. to Suppr. Hr'g Tr., March 3, 2000, at 128-31. Solache's June 2000 trial

---

[8] testify that he hit her in the face. Mot. to Suppr. Hr'g Tr. March 30, 2000, at D – 69-70. At the hearing, she did state that, at some point during her detention, her nose began to bleed but she did not state that the nosebleed was a result of physical abuse. *Id.* at D – 84-85.

[8] Adriana Mejia's signed statement says that she was "treated well by the police," and that "she was allowed to use the bathroom whenever she needed to."

[9] However, Solache's signed a written statement stating that he "was treated good by the police" while in custody and that he made the statement "freely and voluntarily." Solache also did not communicate the alleged mistreatment to officials at Cook County jail.

10

SIDLEY AUSTIN LLP
**SIDLEY**

testimony and April 2013 post-conviction hearing testimony was also consistent with his prior statements: He again stated that (1) Guevara hit him on the left side of his face several times while questioning him; (2) Guevara brought Adriana into the room where Solache was being held, questioned them both, and then hit Solache in the face again in front of Adriana, and; (3) Guevara took Adriana out of the room and then returned and hit Solache in the stomach. Trial Tr. June 19, 2000, at Q – 102-104; PC Hr'g Tr. April 9, 2013, at 49-51.

Solache also told us that he suffered hearing loss in his left ear after being hit by Guevara. Solache also stated that in June or July of 1997, a family member threw a brick at his head during a dispute about the family member's drinking, resulting in a head injury that required Solache to be hospitalized for eighteen days. He still has a noticeable scar above his left ear from his injury. Solache told us that he did not know whether the injury had affected his hearing in some way, but he was sure that he could still hear out of his left ear after the accident. Solache admitted that he previously told the hospital attendants the injury was the result of a car accident because he did not want to get his family member in trouble. When questioned about his injury at trial, there too, he falsely reported that it was the result of a car accident. Mot. to Suppr. Hr'g Tr. March 3, 2000, at 160-61.

According to Solache's trial testimony, he realized he had suffered hearing loss when, sometime after his interrogation and arrest, he was attempting to use a phone when he realized that he could not hear from his left ear. Trial Tr. Jun 19, 2000 at Q – 108. Solache reported his hearing loss to Dr. Ross Romin, a physician at the Cook County jail in May 1998—roughly a month after his arrest. *Id.* at Q – 60-61. Dr. Romin testified at trial that Solache did indeed have significant hearing loss in his left ear, and that Solache told him he believed the hearing loss was a result of police abuse he had suffered. *Id.* at Q - 61. Dr. Romin also testified that Solache told him about the accident he suffered the previous year (which, at the time, Solache still described as a car accident). *Id.* at Q - 63. Dr. Romin was unable to identify the cause of Solache's hearing loss.

In rebuttal of Solache's physical abuse allegations, the State proffered Officer Saul Basurto and Medical Technician John Musa at the suppression hearing. Basurto, who speaks Spanish, processed Solache at Cook County lock-up on April 5, 1998. He testified that when he processed Solache, he observed no evidence of physical abuse, and Solache reported no such abuse. Mot. to Suppr. Hr'g Tr. November 23, 1999, at V–8, V-10. Similarly, Musa testified that he performed the medical intake process for Solache on April 6, 1998, and that he observed no evidence of physical abuse, and Solache reported no such abuse. Mot. to Suppr. Hr'g Tr. March 3, 2000, at 91-9. Basurto also testified during the State's case against Solache at trial, but Musa did not.

In our interview, Solache also maintained that, while detained from early Friday morning until his confession on Sunday, he were not given food or drink until the time frame when he signed a confession. He stated that for most of this period, he was handcuffed, often to the wall.

11



AR-L 517185

Solache also stated that he was only once taken to the bathroom, and that he was forced to urinate into a container in the room in which he was being held.[10]

### 5. Arturo Reyes

Reyes's account of the physical abuse he claims Guevara subjected him to has remained consistent over time. When Sidley interviewed him, he told us that Guevara physically abused him on two separate occasions during the course of his interrogation. The first time when was during Reyes's first encounter with Guevara when, according to Reyes, Guevara slapped him across the face and asked him why he did it. The second time was during a subsequent interview in which Guevara was questioning Reyes, and when Reyes did not admit to his involvement in the crimes, Guevara repeatedly slapped him across the face. Reyes told us that this went on for "a long time." Reyes's suppression hearing, trial, and post-conviction testimony regarding his allegations of abuse by Guevara were essentially the same. The only potential inconsistency is that in some versions of his first encounter with Guevara, Reyes mentions that Guevara removed his hat before hitting him and in other versions, he omits the detail about the hat.

In rebuttal of Reyes's physical abuse allegations at the suppression hearing, the State proffered Officer Saul Basurto. Basurto, who speaks Spanish, processed Reyes at Cook County lock-up on April 5, 1998. He testified that when he processed Reyes, he observed no evidence of physical abuse, and Reyes reported no such abuse. Similarly, Musa testified that he performed the medical intake process for Reyes on April 6, 1998, and that he observed no evidence of physical abuse, and Reyes reported no such abuse. (Basurto also testified during the State's case against Reyes at trial, but Musa did not.)

Reyes also stated that he was handcuffed during most of his time while being detained and interrogated, that he was only given a single sandwich during his detention from Friday through Sunday, and that he was denied bathroom breaks.[11]

### C. Conclusions Regarding Allegations of Misconduct

We find the allegations that Guevara physically abused Solache and Reyes in an effort to coerce them to admit their involvement in the Soto murders are credible, and that it is more likely than not that Solache and Reyes were, in fact, physically abused during the course of their interrogations. In this regard, we given substantial weight to our interviews of Rosauro Mejia and Horatio Mejia, neither of whom have any apparent reason to lie in this matter and both of whom appeared credible. Although less compelling, we also credit Adriana Mejia's statement of having witnessed Solache being struck by Guevara, given that she had no apparent motivation to assist Solache in this regard (as discussed further below, for example, she continued to identify Solache as having been involved in the murders). We further note that the defendants promptly

---

[10] In contrast, his written statement says that he had receive "three sandwiches to eat and pop and water to drink and cigarettes to smoke" and had "been able to use the bathroom when he wanted." In addition the Assistant States Attorney who took his statement testified that Solache was smoking a cigarette during the time of her interview.

[11] Reyes written statement, however, says that "he was given sandwiches to eat, pop to drink, and was allowed to use the washroom whenever he wanted." The statement also says he "was treated very well by the police."

AR-L 517186

**SIDLEY**
SIDLEY AUSTIN LLP

raised allegations of physical abuse with counsel (although not to Cook County jail officials or to the ASAs taking their statements), and that there appears to be no claim that they unreasonably or suspiciously delayed raising these allegations.

We also did not view the absence of any notable markings from the abuse to refute defendants' claims, given that their descriptions of the manner in which they were hit would not necessarily leave any marks. Neither defendant claimed (either to us or in prior testimony) to have suffered bruising, bleeding, or other symptoms as a result of the beatings. Moreover, Solache and Reyes have consistently maintained that they were slapped across the face with an open palm or punched in the stomach and do not claim to have been physically marked by this conduct. In addition, Rosauro Mejia similarly reported that he left with no noticeable marks or bruises following his interrogation. Notably, in reaching our conclusion, we did *not* credit Solache's claim that his hearing loss was the result of Guevara's abuse (we believe there was substantial evidence to suggest that the hearing loss may have instead arisen from his fight in 1997).

## V.    ACTUAL INNOCENCE CLAIMS

Our finding that Detective Guevara physically abused Solache and Reyes in the course of his interrogations, and that this abuse taints their ultimate confessions, does not, however, mean that their confessions were materially false or that they are actually innocent of the charges. In fact, we have concluded that the evidence available to us leads us to reject their claims of actual innocence. This section of our Report details the evidence related to the claims of actual innocence presented by Solache and Reyes.

### A.    Evidence Concerning Actual Innocence Claims

1.    Adriana Mejia.

In our interview with Adriana Mejia, she continued to admit her own involvement in the murders, continued to identify Solache and Reyes as participants in crime, and more than once stated that all three were equally responsible. She did not implicate anyone else. That said, in her interview she not only alleged abuse by Guevara (as discussed above) but also contended that the facts were materially different than what was reflected in her signed confession. She contended that she did no understand what was in the written statement at time of her signing it, and at one point claimed that Guevara had written the statement and told her she could go home if she signed it.

Although she contended the facts were different than what was reflected in her statement, none of the differences were exculpatory in nature. Her main complaint about the details of the confession was that she felt if blamed her more than Solache, but that in fact all three were equally responsible. For example, Adriana stated that she told Solache, not Reyes, that she was not pregnant and Solache told her of idea to pay money to Norma Salazar for a baby. She claimed that she gave $600 to Solache, not to Reyes, and claimed that she was surprised when Reyes showed up with Solache when they drove to get the baby. She explained that she was closer to Solache, whom she had known since childhood in Mexico, than to Reyes. Adriana also

13


SIDLEY AUSTIN LLP

denied that she had followed Mariano Soto and her baby to the Sotos home, and instead contended that she first saw them both at the time of the murders.[12]

Adriana Mejia also provided additional details that do not appear to be included in the police records or her written statement. She stated that one of Soto's knives used in the murders was taken by her from the scene (she said the knife had been wrapped up with the baby girl somehow), and that Solache asked for the knife from her after they left; she said she did not know what Solache did with that knife. Adriana also said that she later saw Solache and Reyes washing their clothes with bleach when back home, and said they threw their clothes out; she said she asked Solache about this and was told "all was under control" and she did not need to do the same. Adriana also stated that she had "written everything down" before her sentencing and mailed it to her mother in Mexico.

Adriana's story of the murders has of course changed over time, with her initially denying any involvement, failing a polygraph examination, and apparently giving different descriptions of precisely what happened even after admitting involvement in the murders (she now denies giving different stories, and claims that her written statement contains numerous errors that mischaracterizes what she actually said). Her statement to us also minimized her own culpability in the planning, claiming, for example, that Solache identified the Sotos baby, and that she had thought she was paying Solache to buy the baby and not to assist with the murders. Under these circumstances, we believe it would be improper to reach any conclusions about the precise details of the planning and the murders themselves based solely on Adriana's say so.

That said, it is undisputed that the murders were committed by multiple persons, Adriana's own participation is undisputed (and supported by physical evidence), and Adriana does not appear to have a current motive to continue to identify both Reyes or Solache as involved in the murders. Moreover, her interview with us was consistent with her prior statements to police and the ASA on the fundamental points of the murders regarding the basic facts and who was involved.

2.      Other Evidence Relating to Solache

**Brualdi/Guevara.** With respect to the case against Solache, Detective Guevara and ASA Heather Brualdi testified about Solache's confession. Detective Guevara testified that Solache told him that he went to the Soto residence with Reyes and Adriana, Adriana knocked on the door, and when Jacinto Soto came to the door, Reyes stabbed her in the chest. Guevara stated further that Solache told him that Adriana then stabbed Jacinta, while Solache grabbed a knife from the kitchen, went to the bedroom where Mariano Soto was sleeping, and stabbed him multiple times. Then, according to Guevara, Solache said he ran out to the car, and shortly thereafter, Adriana came out with the baby girl, and then Reyes came out with the little boy;

---

[12] Regarding other differences between her written statement and our interview, Adriana told us that (1) Solache told her that Norma Salazar was going to sell them a baby; (2) she called Solache, not Reyes, from the hospital at some point prior to the murders; (3) Solache was driving the car on the night of the murders; (4) when they got to the Soto residence, Solache opened the front door with a coat hanger; (5) it was Solache's idea to bring Santiago Soto with them.

14

AR-L 517188

# SIDLEY
SIDLEY AUSTIN LLP

Reyes and Solache then dropped Adriana off at the hospital with the two children before returning home.

ASA Brualdi (whose conduct has never been credibly challenged in this case) testified that Guevara translated for her as she interviewed Solache. She first took an oral statement from Solache, which she said took about 45 minutes, and later took the written statement used at trial, which she said took about an hour. At trial, she described Solache as providing a narrative description of his involvement in the murders (as translated by Guevara) in response to her questions, which she characterized as in the nature of open-ended "what happened next?" questions. Brualdi testified that, after she wrote the statement, she gave it to Guevara who interpreted it line by line for Solache to confirm it was correct (she acknowledged, however, that she did not understand any of the Spanish spoken by Solache and Guevara). Brualdi also testified that she, Guevara, and Solache signed every page of the statement and initialed all changes made.

**Halvorsen.** When we interviewed Ernest Halvorsen, Guevara's former partner, he recalled little about the investigation of the Soto murders, but he did mention one detail related to Solache. He told us that he had heard that Santiago Soto told Officer Trevino that Solache was "the boogeyman" and that when they brought Solache into the office, the boy started "screaming his head off," and called Solache "Diablo." However, any such statements were translated through Officer Trevino (who declined to meet with us) and were not memorialized in any police report. Because of our inability to confirm this exchange with Officer Trevino, we have given it little if any weight in our analysis.

**Rosauro Mejia/Horatio Mejia.** When separately interviewed by us, Rosauro and Horatio Mejia both denied any knowledge of the murders and denied having known that Adriana was in fact not pregnant.[13] Rosauro stated, however, that money they had saved was in fact missing from the house after the murders (he did not know who took it). Rosauro also stated that the boy (Santiago Soto) "seemed afraid of them" (Solache and Reyes), although he also said that the boy always acted scared and did not talk (except to say his name was Chago).[14] When asked generally what he thought of Solache's and Reyes' innocence claims, Rosauro said "only they and God know what happened." [15] Horatio Mejia also stated that he believed Solache sometimes drove Adriana to the health clinic.

**Solache.** In our interview, as at trial, Solache denied any knowledge of the murders and denied having known that Adriana was in fact not pregnant. On the day of the murders (March 28, 1998), Solache stated he had worked from 4:30 p.m. (on March 27) until 3:00 a.m. (March 28). He estimated that he reached home at around 4:30 a.m., saw and spoke briefly with Carlos

---

[13] Horatio Mejia, however, stated that, once Adriana was home with the baby, "everyone thought the baby was too big," and he thought it was odd that a woman at the hospital would simply give the three-year old to Adrianna.

[14] We understand that Chango is in fact a common nickname for Santiago.

[15] Rosauro Mejia reported that in his limited contacts with Adriana after her arrest, she never said anything about Solache or Reyes. In particular, Rosauro reported receiving a letter from Adriana Mejia, which he tore up, which said in part that "she did it for me." Rosauro reporting receiving telephone calls on two or three occasions from Adriana where "she said she did if for me because she knew I couldn't have kids."

AR-L 517189

**SIDLEY**
SIDLEY AUSTIN LLP

Martinez (Adriana's brother with whom Solache shared a room) who was also on his way to bed.[16] Solache said he went to bed and when he got up in middle of the day Adriana already had the baby at the house along with the little boy (he said he woke up to the baby crying). Solache stated he did not see Reyes or anyone else besides Carlos before going to bed. For the rest of that week, Solache said he went to work, as normal (Monday – Friday) and described nothing unusual until his return from work early Friday morning April 3, 1998. At that point, he came upon Rosauro and Adriana Mejia arguing about the little boy and heard of the television news story that the boy's parents had been murdered. Rosauro asked Solache to go with him to the police station. Solache agreed and he, Rosauro, and Reyes all went together with the boy to the station. Solache reported that he never talked with Adriana Mejia regarding her having identified him as involved in the murders, and that he could not think of any reason why she would have falsely identified him (he described her as an "acquaintance" not a friend). Solache did however report to us that he received "two or three" letters from Adriana shortly after he was jailed, but said he could not recall what she said in the letters and no longer has them.

With regard to the manner in which his statement was taken by ASA Brualdi, at trial Solache testified that he simply said "yes" or "no" to Guevara's leading statements, and did not provide a narrative. He said he agreed with Guevara in order to avoid being hit. In our interview, Solache similarly stated that he confessed in order to avoid being abused further. Solache did not, however, explain that he simply said "yes" or "no" to leading statements from Guevara while being interviewed by Brualdi; he instead said he could not recall the specifics of the interview, and simply said he responded to questions and Brualdi "wrote things down."

2. Other Evidence Relating to Arturo Reyes

**O'Malley/Guevara.** With respect to the case against Reyes, Detective Guevara testified that Reyes confessed to participating in the murders of Jacinta and Mariano Soto. Relying on his April 30, 1998 supplementary report of the Soto murder investigation to refresh his recollection, Detective Guevara recounted what Reyes told him during Guevara's second interview of Reyes. According to Guevara, Reyes then told Guevara that he and Solache had helped Adriana Mejia kill the Sotos so she could get a baby. Guevara reported that Reyes admitted that he stabbed Jacinta Soto in the chest, saw Adriana stabbing Jacinta Soto, and saw Solache stabbing Mariano Soto. Detective Guevara also testified that Reyes had two pieces of paper in his pocket with the names "Norma Salazar, " "Adriana Martinez," "Leonardo," and the word "hospital" on them, along with several phone numbers.[17] (None of the numbers were in service except for

---

[16] At trial, Solache stated that Carlos Martinez was laying in bed when he spoke with him on the morning of March 28, 1998. According to police reports, Carlos Martinez told officers that he arrived home after midnight on morning of March 28, 1998 and went to bed. He made no mention of seeing Solache, or anyone else, although it does not appear he was specifically asked. Carlos Martinez was not called as a witness at trial by either the state or defendants. We note that Solache stated that Carlos Martinez visited him at the jail, but they did not talk about the case. We were unable to locate Carlos Martinez, and thus did not interview him.

[17] "Martinez" is Adriana Mejia's maiden name. "Leonardo," is what Adriana called Santiago Soto while he was in her care.

16

**SIDLEY**
SIDLEY AUSTIN LLP

Adriana's). Guevara testified further that Reyes had a calendar book in his possession with Norma Salazar's name written on one of the pages.[18]

Notably, Guevara was not present for Reyes' interview and confession before ASA O'Malley. Instead, Youth Officer Daniel Trevino served as the translator for Reyes while he gave a statement to ASA O'Malley. Trevino's testimony at trial concerning the substance of Reyes's confession is substantially the same as Guevara's.

ASA O'Malley (whose conduct has not been credibly challenged in this case) testified that he first met with Reyes for about an hour, with Trevino acting as translator. O'Malley stated that, during this initial interview, Reyes gave a largely narrative statement of what happened. He later returned to Reyes and took a written statement from him, which again took about an hour. O'Malley characterized his questions during this session as generally open ended, in the nature of "what happened next." According to O'Malley, he took the statement line by line—either Reyes would give a narrative or answer a question posed by O'Malley, Trevino would translate into English, O'Malley would write the statement and read it back to Trevino, who would then translate it into Spanish and confirm with Reyes that the statement was accurate. Additionally, O'Malley testified that, at one point, Reyes got up and demonstrated how he stabbed Jacinto Soto. O'Malley stated that he, Trevino, and Reyes signed the bottom of each page and when the statement was completed, Trevino translated it for Reyes in its entirety.

**Guadalupe Mejia.** Guadalupe Mejia gave a written statement to the police, not presented at trial, in which she said that, at some point after Adriana brought the children home from the hospital but before the defendants took Santiago Soto to the police station, she overheard a phone call between Adriana and Reyes. Specifically, she said she was on an extension of the phone, and she heard Reyes ask, "What did they say?" and Adriana responded, "Nine o'clock at their house." Then Reyes asked how he would know the address and Adriana said "they" would call back. Then, according to Guadalupe, Reyes said, "You are the only one that knows[,] I hope you don't send me up head first," and Adriana replied that she would not. In our interview with Reyes, he denied any knowledge of this alleged conversation.

**Reyes.** In our interview, as at trial, Reyes denied any knowledge of the murders and denied having known that Adriana was in fact not pregnant. On the day of the murders, Reyes said he had returned from work in the early morning of March 28, 1998, and went to sleep in his room. He stated that he had not seen anyone when he came home (he did not share a bedroom). Reyes said after getting up later that morning, he heard the doorbell and opened the door for Rosauro, Adriana, and Guadalupe Mejia, who came in together with a baby and a small boy. He said the little boy went to the basement where Guadalupe and her husband lived. Reyes further stated that when he went to the kitchen to prepare his lunch for work, that Guadalupe was

---

[18] In our interview, Reyes explained his possession of these items as follows: He told us, consistent with his prior testimony, that on Monday, March 30, 1998, Adriana Mejia asked him to babysit Santiago Soto (others confirmed that he took car of the Soto boy for one day). He stated further that Adriana gave him the two pieces of paper in case of emergency, and told him that Norma Salazar was the child's mother. In our analysis, we do not give any weight to Reyes' possession of these papers, because they appear equally consistent with either Reyes' guilt or innocence.

17

**SIDLEY** SIDLEY AUSTIN LLP

changing the baby and then began changing her own clothes. (His statements about the arrival of the baby and boy and Guadalupe's conduct were not elicited in his prior trial testimony.) With regard to the remainder of the week before going to the police station with the boy, Reyes told us he went to work as normal except for one day when he babysat the Soto boy at Adriana's request.

With regard to the manner in which his statement was taken by ASA O'Malley, Reyes has given inconsistent testimony and statements. At trial, Reyes broadly denied that he said anything about the murders of the Sotos in his interview with O'Malley and Trevino. He further denied having any awareness that the statement he signed was a confession to his involvement in these murders. In our interview with Reyes, however, he stated that Officer Trevino gave him "examples" of what to say, and he would repeat the examples in response to O'Malley's questions. For instance, Reyes stated that Trevino gave him an "example" of something to say about stabbing the Sotos and that he repeated it out of fear that, if he did not, he would be returned to a room with Guevara. Reyes stated in the interview that he did not understand or recall exactly what Trevino was saying or what exactly he (Reyes) repeated. Reyes also stated in our interview that could not recall whether Trevino read him the statement in Spanish, but he told us that he did not understand that the statement he signed said that he had helped kill the Sotos.[19]

### C.    Conclusions Regarding Actual Innocence Claims

Although the evidence at trial depended almost entirely on defendants' confessions, which we find were obtained in part through physical abuse by Detective Guevara, we nonetheless reject both Solache's and Reyes' claims of actual innocence. Adriana Mejia continues to identify them both as involved with her in the double murders, even while also supporting their claims of physical abuse while in custody. There are of course many reasons to doubt Adriana's credibility, especially concerning the details of the crimes, yet it is undisputed that she was assisted in the murders by at least one male, she has no apparent motive to continue to misidentify both Reyes and Solache, and neither Solache nor Reyes presented alibi evidence (to us or at trial) beyond their unsubstantiated claims of being asleep at home on the morning of the murders.

In addition, the defendants' detailed statements of the murders before ASAs Brualdi and O'Malley are inconsistent with their innocence claims. Defendants have not given a coherent explanation as to how or why, if they are indeed innocent and wholly ignorant of the events, they were able to supply the ASAs with detailed facts describing their roles in the crimes. Moreover, their characterizations of how these statements were taken are directly at odds with the testimony of the ASAs, which we credit. In particular, Reyes gave different explanations of how his statement was taken (at trial claiming nothing was said about the Sotos murders during the ASA

---

[19] Reyes's more recent testimony in post-conviction proceedings is similar to what he stated to us in our interview. There too, he said that Officer Trevino gave him "examples" of what he could say. He testified in more detail about these examples than during our interview, stating that Trevino told him to say that Solache picked him up on the night of the murders and then drove to pick up Adriana before the three of them headed to the Soto residence; and that that he stabbed Jacinta Soto and grabbed her baby girl. Reyes testified that all those statements were untrue, and were provided to avoid further abuse from Guevara.

18

# SIDLEY
SIDLEY AUSTIN LLP

meeting and now claiming he simply repeated "examples" provided to him by Trevino) which we believe renders his characterization of how the statement was given not credible. Solache's claim (at trial) that he simply provided "yes" or "no" answers is similarly not credible given the ASA's testimony describing Solache's narrative responses to questions (even though the ASA did not understand Spanish, she certainly could testify to the nature of her questions and Solache's responses without any reference to the accuracy of Guevara's translation).[20]

Finally, in reaching this conclusion, we recognize that the case against both Solache and Reyes is very thin if one does not take into consideration their confessions. No physical evidence was discovered that tied either Solache or Reyes to the crime scene (despite the grisly nature of the murders and the fact that Adriana Mejia's DNA was found there).[21] Moreover, they had no criminal backgrounds before this case, and had little apparent motive to assist Adriana in these crimes (they were both employed, making the promised $600 payment an even more meager incentive than it appears on its face). Thus, in rejecting Solache's and Reyes' claims of actual innocence, we do not mean to suggest that we found the case against them to be a strong one.

---

[20] It should be noted that the evidence of guilt against Reyes is stronger than against Solache, given that, accordingly to police reports, Adriana Mejia did not initially identify Solache as being involved (with one report expressly denying his involvement), and Guadalupe Mejia provided a statement of a suspicious telephone conversation between Adriana Mejia and Reyes in the week after the murders.

[21] We also note the unexplained presence of DNA belonging to an unidentified male on the blood-stained green towel recovered from Rosauro Mejia's car. Mariano Soto, Arturo Reyes, and Gabriel Solache were all affirmatively excluded as possible matches for this DNA. No other samples were tested against it.

19

# EXHIBIT 103

AR-L 515102



**ATTORNEY WORK PRODUCT**
**PRIVILEGED AND CONFIDENTIAL**

**MEMORANDUM**

| | |
|---|---|
| TO: | File |
| FROM: | Daniel Greenfield |
| | Jeff Carroll |
| RE: | Guevara Investigation – Armando Serrano and Jose Montanez |
| DATE: | March 3, 2015 |

---

## I.    Introduction

We investigated three cases in which defendants purportedly confessed to the same person: Francisco Vicente. The defendants in these cases are Robert Bouto, Armando Serrano and Jose Montanez, and a third defendant.

Principally, the factual background relevant to claims of misconduct and actual innocence is as follows. On 5/14/93, Francisco Vicente, a member of the Imperial Gangsters street gang, was arrested in connection with three armed robberies and one simple robbery he was suspected of having committed over the prior ten months. Beginning the following morning and continuing for approximately six weeks, Dets. Rey Guevara and Ernest Halvorsen reported that Vicente had obtained confessions in three unrelated murder cases. In each case, the record indicates that Vicente's confession evidence was corroborated by a second informant—Edwin Maldonado in connection with the case against Bouto; Timothy Rankins in connection with the case against Montanez and Serrano; and a still-anonymous confidential informant in connection with the case against third defendant.[1] In two of the cases, Dets. Guevara and Halvorsen reported that Vicente first provided that evidence to someone other than them—in the Bouto case, the record indicates that Vicente first shared evidence against Bouto with Det. Maher or another detective or officer, who then alerted Det. Halvorsen; in the Montanez/Serrano case, the record indicates that Rankins first provided evidence against Montanez, Serrano, and Pacheco to Sgt. Ed Mingey, who then alerted Dets. Guevara and Halvorsen.

Since Dets. Guevara and Halvorsen initially reported this information, it has been recanted by Rankins, Maldonado, and Vicente. First, beginning in 1994 and continuing to the present day, Rankins has recanted the evidence that he provided against Montanez and Serrano, alleging that it was coerced from him by a lengthy list of police and prosecution personnel, including Dets. Guevara and Halvorsen. Then, starting in 1996 and continuing to the present day,

---

[1] Bouto, Serrano, and Montanez remain incarcerated pursuant to these convictions, whereas the third defendant was released under supervision recently.

**SIDLEY** | SIDLEY AUSTIN LLP

Maldonado recanted the evidence that he provided against Bouto, alleging first that he was pressured to do so by Vicente but years later also claiming that police personnel coerced him. In 2003, Vicente told students investigating possible wrongful convictions that the confession evidence he provided in all three cases had been fabricated, alleging that he had been coerced by Dets. Guevara and Halvorsen. On later occasions he negotiated for various benefits in return for executing an affidavit and potentially providing testimony in connection with the Montanez/Serrano post-conviction matter. Other individuals who served time with Vicente— specifically, Lydell Williams and Valentine Gomez (aka "Tomato")—have also provided information potentially corroborating Vicente's recantations in the Bouto and Montanez/Serrano matters, respectively. Finally, some non-informant witnesses in the Bouto and Montanez/Serrano matters have described actions by Det. Guevara that, if accurate, could constitute misconduct.

For purposes of investigating these allegations, we analyzed the record and conducted interviews with individuals involved in these cases. In this report, we present a detailed statement of facts, our analyses and findings, and our conclusions regarding allegations of misconduct and claims of actual innocence in the Montanez/Serrano case. We were not able to make comprehensive conclusions in the third defendant's matter.

## II.     The Montanez/Serrano Case

### 1.     Introduction

To analyze the case against Serrano and Montanez for purposes of assessing claims of misconduct and, separately, their claims that they are actually innocent, we reviewed and analyzed the complete record in the matter. We also interviewed or met with sixteen people connected with the case, including the following:

- Det. Ernest Halvorsen (reporting detective)
- Sgt. Ed Mingey (interviewed purported eyewitness Tim Rankins)
- Capt. Lupe Pena (arrested Francisco Vicente and Jose Montanez)
- Jose Montanez (defendant)
- Armando Serrano (defendant)
- Tim Rankins (purported eyewitness)
- Demond Williams (aka "Shorty Folks") (purported eyewitness)

We note that we were unable to interview Det. Guevara or State's witnesses Francisco Vicente, Wilda Vargas, and Anna Velez, who also had significant roles in the matter. Specifically, Det. Guevara and Vicente have been advised by counsel not to consent to interviews with us. Wilda did not respond to multiple messages left by us at her home or the bar she co-owns, and appears to be avoiding us. Velez, we learned from our private investigator, is suffering from dementia, and had no relevant recall during a conversation with him.

First, we present the facts, and then our analysis. We begin our analysis by examining the confession evidence provided by Vicente and Rankins, including its recantation. We conclude our analysis by examining the evidence provided by sources other than Vicente and Rankins.

2



AR-L 515104

## 2. Statement of Facts

### a. The Shooting

On 2/5/93, at approximately 5:32 a.m., Rodrigo Vargas was shot to death in his van in front of his home at 1838 N. Springfield Ave. (2/6/93 Supplemental Report ("Supp. R.").) The bullets that killed Vargas had been "fired into the vehicle from the driver's side door area," shattering the front driver's side window. (*Id.* at 7.) Springfield is a one-way street, and therefore the driver's door was adjacent to the curb. (*Id.*)

The shattering glass caused "numerous cuts on the face in an around the eyes" [sic] of Vargas. (*Id.* at 2; *also see* Photos in Evidence.) Vargas was shot five times. (*Id.* at 2.) One shot entered his "left upper arm" and exited "the inside of his left upper arm." (*Id.*) Two shots entered his lower back and two entered his upper back. (*Id.*) Two "essentially intact" bullets were "found in the front upper clothing of the victim[.]" (*Id.* at 7.) Vargas's "feet were to the front, under the dashboard" when found, and, combined with the abrasions on his face, police determined that "[i]t appeared that the victim was looking at the window at the time one of the shots was fired before he attempted to get to the rear of the vehicle." (*Id.*)

### b. The Initial Investigation

Chicago Police Department ("CPD") officers and detectives began arriving on the scene at 8:25 a.m. (2/5/93 General Offense Case Report.) Upon arriving, they found the van's engine running, its parking gear engaged, and its doors locked. (10/18/94 Trial Transcript, Vol. 1 at 64-65.) Vargas was holding a pull-out radio and lay atop a lunch bag. (2/6/93 Supp. R. at 7.) On Vargas's person was found $190 in cash (10/19/94 Trial Transcript, Vol. 3 at 10), and a receipt for $300 from an unidentified source. (2/5/93 General Progress Report.) After examining the scene and interviewing witnesses, Dets. N. Jack and R. Schak reported that "[t]he victim was shot several times as he sat in his vehicle preparing to go his place of employment." (2/6/93 Supp. R. at 3.) Vargas was still wearing his scarf and a cap. (Photos in Evidence.) There was no evidence of a struggle according to responding Officer Jeff Show. (10/18/94 Trial Transcript, Vol. 1 at 65.)

Police canvassed the neighborhood interviewing potential witnesses. (2/5/93 Supp. R.; 2/6/93 Supp. R. at 8-11.) Wilda Vargas, the victim's wife, informed CPD that her husband had "no enemies" and "no problems" and that she could think of no reason for his murder, noting only that her husband's van had been stolen a year earlier but recovered.[2] (2/6/93 Supp. R. at 8-9.) She further informed police that nothing appeared to have been taken from Vargas's van or his person. (*Id.* at 7.)

---

[2] For purposes of clarity, we henceforth refer to the victim as "Vargas" and his widow as "Wilda."

3

AR-L 515105
SIDLEY AUSTIN LLP
SIDLEY

Anna Velez, Vargas's neighbor and friend, had discovered Vargas's body and called CPD. (2/6/93 Supp. R. at 8.) She stated to police on-scene that at 5:30 a.m. she looked out her window and noticed Vargas's van parked at the curb beneath with its engine running. (2/5/93 Supp. R. at 8.) Velez, who lived two houses south of the Vargas home, "sometimes" saw Vargas as he warmed up his van in the morning. (10/18/94 Trial Transcript, Vol. 1 at 32, 37). On the morning of the murder, she "saw the van was – he was heating up the van." (*Id.* at 38.) She could tell, she said, because of "the smoke that comes out through the back when you turn on the car." (*Id.*) Velez stated that two to three minutes later, while she was in the bathroom (*Id.* at 29), she heard gun shots and looked out the window, but "did not observe anyone, did not see any cars moving and did not notice anything unusual." (2/6/93 Supp. R. at 8.) Velez also specified she did not hear any yelling from outside. (10/18/94 Trial Transcript, Vol. 1 at 32, 37.) Later, after it became light out, she observed that Vargas's van remained parked at the curb, still running, at which time she discovered his body. (2/6/93 Supp. R. at 8.)

Police also spoke to Gary Shoop, another neighbor. (2/5/93 Supp. R. at 3.) He was awakened by gunshots and "peered out the window." (10/18/94 Trial Transcript, Vol. 1 at 44.) At that time, he saw an older, light brown sedan, possibly a two-door vehicle, driving northbound on Springfield Ave. (2/5/93 Supp. R. at 3.)

Judy Milinkovic, who was on her way to visit her mother-in-law two doors away from the Vargas home at about 5:30 a.m.—i.e., about two minutes prior to the shooting—as she did most mornings at that time, told CPD that she "believed" she saw Vargas as he was exiting his home. (2/6/93 Supp. R. at 9-10.) She reported that she did not see anyone on the street other than Vargas. (*Id.*) "A few moments later," after entering her mother-in-law's home, Milinkovic heard gun shots. (*Id.*) Milinkovic also saw the sedan that Shoop described. (*Id.*)

The day after the shooting, 2/6/93, Detectives N. Jack and R. Schak interviewed Benjamin Salazar because he and a friend, Antonio Rojo, had been victimized several weeks earlier during an incident characterized by police as "very similar." (2/6/93 Supp. R. at 11.) Although both Salazar and Rojo saw the African-American offenders, Rojo had a better vantage, and Dets. Jack and Schak reported plans to interview Rojo "as soon as possible."[3] (*Id.*) The investigative record went silent, however, on 2/6/93, and remained so until 3/11/93.[4]

---

[3] Neither Rojo nor Salazar participated in the line-up identifications of Montanez and Serrano (6/11/93 Supp. R. by G/H, Rankins Line-Up; 6/11/93 Supp. R. by G/H, Wilda Line-Up; 7/10/93 Supp. R. by G/H, Line-Up), which both took place before ballistics evidence was returned indicating that the same weapon was not used in the incident involving them and the murder of Vargas. (9/25/93 Ballistics Comparison.)

[4] Although Dets. Guevara and Halvorsen each testified that he began investigating the case on 2/6/93, the day after the murder (10/21/94 Trial Transcript at 4; 10/19/94 Trial Transcript, Vol. 3 at 108), the initial investigation reports were prepared by other personnel and do not reference the participation of either Det. Guevara or Halvorsen. Det. Halvorsen's name first appears in the record within the Supp. R. dated 6/2/93.

4

AR-L 515106

**SIDLEY** | SIDLEY AUSTIN LLP

On 3/11/93, at the request of Det. Guevara, Velez submitted to a polygraph examination. (3/17/93 Crime Lab Report.) Det. Guevara's request reflected the first time his name appeared in the Vargas investigative record. (*Id.*) The resulting report indicated that Velez "allegedly tells people [she] saw offenders," which she denied during the polygraph.[5] (*Id.*) Handwritten notes accompanying the polygraph report read: "Deception Indicated." (*Id.*) After Velez's polygraph results were reported on 3/17/93, the investigative file in the Montanez/Serrano case again goes silent through 6/2/93, but for a ballistics laboratory report and Vargas's toxicology laboratory report. (4/6/93 Ballistics Report; 2/16/93 Toxicology Report.)

> ### c. Vicente is Arrested

On 5/14/93, Francisco Vicente, aka "Chino," a member of the Imperial Gangsters street gang, was arrested by Officers Lupe Pena and Luis Marron in connection with three armed robberies, all class X offenses, and one simple robbery he was suspected of having committed over the prior ten months. (5/14/93 Francisco Vicente Arrest Report; 9/23/96 Francisco Vicente Change of Plea Hearing.) A suspected accomplice of Vicente's, Kenneth Thrane, nicknamed "Kenny," was also arrested at about that time. (Vicente Armed Robbery File.) (Vicente, who admitted to having a "bad" heroin habit and who later acknowledged robbing people in order to support his habit, committed three of the robberies in order to steal his victim's gold jewelry, all of them at gun or knifepoint. (Vicente Armed Robbery File.)) In the other, he stole a bicycle from a school-age child. (9/23/96 Francisco Vicente Change of Plea Hearing.) Vicente also had an extensive prior criminal history. (*Id.*)

> ### d. Unknown CPD or ASAs Request Criminal History of Defendants

Although not reported in the Vargas investigative file (i.e., the RD File), on 5/25/93 unknown police or prosecution personnel requested the criminal histories of Jose Montanez, Armando Serrano, and Jorge Pacheco.[6] (5/25/93 Criminal Histories.) There is no evidence that we are aware of that Montanez, Serrano, or Pacheco committed any criminal activity on or about that date.[7]

---

[5] Velez did not participate in the eventual police station line-up identifications of Montanez and Serrano. (6/11/93 Supp. R. by G/H, Rankins Line-Up; 6/11/93 Supp. R. by G/H, Wilda Line-Up; 7/10/93 Supp. R. by G/H, Line-Up.)

[6] We obtained this documentation from the City in July of 2014 in response to requesting from our client additional material concerning this and other cases we were asked to evaluate.

[7] Montanez's criminal history contains a 5/17/93 entry, reading "BFW No FOID," which means "Bond Forfeiture Warrant" related to a weapons charge. (5/25/93 Criminal Histories.) Serrano obtained some minor charges in late April, but none in May. (*Id.*) And Pacheco was not charged with anything in April or May of 1993. (*Id.*)

5

AR-L 515107
SIDLEY AUSTIN LLP
SIDLEY

e.      **The Evidence Reportedly Obtained From Vicente**

(i)      **Det. Halvorsen Decides to Question Vicente About the Vargas Murder**

One week later, in a Supp. R. dated 6/2/93, and approved 6/3/93, but reflecting evidence reported to have been gathered as late as 6/6/93, significant investigative activity is reported for the first time since Velez's polygraph. (6/2/93 Supp. R. by G/H.) Specifically, at time unknown on 6/2/93, a "circumstantial witness who for his own safety must remain anonymous" was reported to have informed both Dets. Guevara and Halvorsen that on 6/2/93, he had been present, four months earlier, when Montanez, Serrano, and Pacheco discussed having murdered Vargas.[8] (*Id.*) The anonymous circumstantial witness was described as a member of the Imperial Gangsters street gang, and he identified the defendants by street name, accurately, as Pistol Pete, Mando, and Jordan.[9] (*Id.*) More than three weeks later, the circumstantial witness was identified as Vicente.[10] (6/28/93 Vicente HW Statement by H.)

At trial, Det. Halvorsen described the circumstances of that meeting, explaining that he interviewed Vicente on 6/2/93 because he "had heard rumors on the street that a guy by the name of Pistol Pete was involved" in the Vargas murder.[11] (10/19/94 Trial Transcript, Vol. 3 at 82.) These rumors, according to Det. Halvorsen, were "unsubstantiated" and he "had no evidence to involve Pistol Pete in a crime whatsoever." (*Id.*) Moreover, there were "many Pistol Petes" in the "nickname file," a circumstance that he testified rendered the alias information "utterly useless" to him. (*Id.* at 116.) Det. Halvorsen had learned, however, during the course of "talk[ing] to [Vicente] about the Robert Bouto investigation" on "[t]he date Francisco Vicente was

---

[8] It is not clear to us whether Det. Guevara was in fact at the meeting with Vicente as it is reported in the Supp. R. dated 6/2/93. Although Vicente testified that Dets. Guevara and Halvorsen were both present (Trial Transcript, Vol. 2 at 98-99, 128), Det. Halvorsen testified that he interviewed Vicente without Det. Guevara present. (10/19/94 Trial Transcript, Vol. 3 at 81.) However, Det. Halvorsen told us that he and Det. Guevara were both present for the 6/2/93 meeting. (10/21/93 Interview with Ernest Halvorsen.)

[9] Montanez told us that his nicknames were "Gordo" and "Pistol Pete." (10/17/13 Interview with Jose Montanez.) The latter street name was a reference to basketball great Pistol Pete Maravich, and reflected Montanez's skill from the three-point line, Montanez told us. (*Id.*) On occasion, he noted, Pistol Pete was diminutized to "Pito." (*Id.*)

[10] Accordingly, we refer to the circumstantial witness as Vicente from this point forward for purposes of clarity. Similarly, although Vicente refers to the defendants by their street names, Pistol Pete, Mando, and Jordan, for purposes of clarity we primarily refer to them as Montanez, Serrano, and Pacheco, respectively.

[11] Those rumors are not reflected in the investigative record.

6

AR-L 515108
SIDLEY AUSTIN LLP
SIDLEY

arrested"—i.e., 5/14/93—that Vicente had been "arrested with a second offender who had a nickname of Pistol Pete," according to Det. Halvorsen.[12] (*Id.* at 114.) Thus, he was "curious whether or not [Vicente] might be able to assist" in the Vargas murder investigation. (*Id.* at 82.)

At that time, Det. Halvorsen testified, Vicente informed him he "had the right nickname but I had the wrong Pistol Pete, I wanted big Pistol Pete and not little Pistol Pete." (*Id.* at 83.) Vicente testified that he then told Det. Halvorsen, "I knew two Pistol Petes, the one that I had the armed robbery with" and Montanez.[13] (10/18/94 Trial Transcript, Vol. 2 at 28-29.) Then Vicente "supplied [Det. Halvorsen] the three nicknames of Pistol Pete, Mando and Jordan." (10/19/94 Trial Transcript, Vol. 3 at 83.) After talking to Vicente, Det. Halvorsen testified, "I checked my nickname files at my office and I saw that Pistol Pete was in fact Jose Montanez, Mando was Armando Serrano and Jordan was Jorge Pacheco." (*Id.*) Det. Halvorsen testified that he knew all three from prior investigations.[14] (*Id.*) Det. Halvorsen testified that he then "went and obtained black and white CPD identification photos of them … and I showed these three photos to Francisco Vicente" who identified them "as being the individuals that he had given the statement regarding." (*Id.* at 84.)

---

[12] Vicente's arrest records for the four relevant robberies, which we obtained and examined, indicate that he was not arrested with (nor did he commit any of his robberies with) a Pistol Pete. (Vicente Armed Robbery File.) Rather, Vicente's only co-perpetrator on these robberies was Kenneth Thrane, nicknamed simply "Kenny," and the pair were not actually arrested together. (*Id.*) Notwithstanding this evidence, Vicente testified at trial that he had in fact been arrested with a Pistol Pete. (10/18/94 Trial Transcript, Vol. 2 at 28.) Vicente also testified at trial that he gave a statement against that other Pistol Pete—i.e., not Montanez—in connection with the robbery they allegedly committed together, another assertion we have been unable to confirm through our search of Vicente's criminal records. (*Id.* at 126-27, 129.)

[13] Captain Lupe Pena, Vicente's arresting officer on his armed robberies, told us that he knew of only two Pistol Petes in the neighborhood at that time, Montanez and another man named Jose Cotto. (7/17/14 Interview with Lupe Pena.) The "little Pistol Pete" referenced by Vicente and Halvorsen is Angel Sanchez, according to information obtained by student investigators from Montanez's family, whose brother Armando Quinones was nicknamed, like Armando Serrano, simply "Mando." (5/4/03 Email.) Quinones confirmed these nicknames in an interview with us. (Interview with Armando Quinones.) Both Sanchez and Quinones were members of the Imperial Gangsters (*id.*), and have extensive criminal histories, including for the following charges: armed robbery, burglary, narcotics possession, mob action, theft, receipt of stolen property, and receipt of stolen vehicle. (7/14/14 Armando Quinones Background; 12/13/94 Angel Sanchez Criminal History.)

[14] Halvorsen was the arresting officer of Montanez's co-defendant in a prior murder trial. (6/24/90 Jose Baez Arrest Report by H.) (Montanez was acquitted at trial in that case, and told us he had been innocent of the crime. (10/17/13 Interview with Jose Montanez.)

7

AR-L 515109

SIDLEY AUSTIN LLP
SIDLEY

(ii)     **The 2/5/93 Confession**

Regarding the details of the confession, Vicente was reported to have informed the "R/Dets." that he was hanging out at a "dope spot" at the corner of Hamlin and Altgeld on 2/5/93. (6/2/93 Supp. R. by G/H.) Vicente had spent the entire night on that corner and had used heroin at about 1:30 or 2 a.m.[15] (10/18/94 Trial Transcript, Vol. 2 at 88.) Then, between 8:30 and 9 a.m., when Vicente was "coming down off of" his heroin high, Montanez drove up in a tan-colored Buick. (*Id.* at 10-11.) Serrano and Pacheco, he said, were passengers.[16] (*Id.* at 89.) Although there is a large church and school complex on the corner of Hamlin and Altgeld, Vicente testified that he was not aware of the church or school, and did not see any other people during the time he spent on that corner with Montanez, Serrano, and Pacheco.[17] (*Id.* at 123, 130-31.)

Serrano and Pacheco exited the car and Montanez, who remained inside of it, placed a "large frame, 9 mm semi-automatic pistol" in one of the vehicle's air vents. (6/2/93 Supp. R. by G/H.) (At trial, in contrast, Vicente described for the first time Montanez hiding his weapon by "plac[ing] it outside somewhere." (10/19/94 Trial Transcript, Vol. 2 at 33.)) While parked on the corner, Montanez also "play[ed] with a bag of … dope," i.e. heroin. (6/2/93 Supp. R. by G/H; 10/18/94 Trial Transcript, Vol. 2 at 10-11.) Thereafter, in Vicente's presence, "[t]he three of them were talking about a robbery they had just done, that had gone bad" because Serrano "fucked up" and "went at the guy wrong." (6/2/93 Supp. R. by G/H.) Montanez continued, "we

---

[15] At trial, Vicente referred instead twice to a meeting at *Harding* and Altgeld. (10/18/94 Trial Transcript, Vol. 2 at 8, 116-17.) However, later in his testimony he again began referring to *Hamlin* and Altgeld as the site of the meeting with the defendants. (*Id.* at 130-131, 140.) At trial, ASA Coghlan referred to the streets only as Hamlin and Altgeld, with the references occurring after Vicente said Harding. (*Id.* at 130-31, 140.) Vicente referred to Hamlin once more, in a 5/26/04 affidavit he executed recanting his statements and testimony against Montanez, Serrano, and Pacheco. (5/26/04 Affidavit of Francisco Vicente.)

[16] Vicente told the grand jury that he had known Montanez for seven years prior to the corner meeting, that he had known Pacheco "nine or eight years" before the meeting, and that he had known Serrano for "about six years" before the meeting." (7/1/93 Grand Jury Testimony of Francisco Vicente.) Vicente and Serrano had been in a fight in July of 1992, after Vicente had informed someone that Serrano had broken into his car. (7/13/99 Affidavit of Felix Serrano.) In conversation with us, Serrano denied that he had broken into that car, but confirmed the fight. (10/17/13 Interview with Armando Serrano.) Vicente has not specifically discussed the fight, to our knowledge, but did tell student investigators that he "hated" Serrano. (6/19/03 Email.)

[17] Stephanie Turner, an investigator employed by the Cook County Public Defender's Office, testified that "[T]here's a big Catholic school there at the corner and the school is very large. It goes all the way around and all the way up to Ridgeland and all around. So it's a very large school." (10/21/94 Trial Transcript at 42-43.) We visited that location and confirmed the accuracy of her characterization.

8

would have never did what we did if [Serrano] never fucked up." (*Id.*) At that time, Pacheco "stood around laughing as [Montanez] yelled at [Serrano]." (*Id.*) When Vicente asked for clarification, Montanez stated "we shot a stud" and "we hurt that stud bad." (*Id.*) Vicente and the occupants of the Buick conversed for three to four hours, at the corner of Hamlin and Altgeld, on Vicente's porch, and on the drive to Gold Busters, Vicente testified. (10/19/94 Trial Transcript, Vol. 2 at 12.)

Montanez continued: "the day before the three of them had spotted a victim with lots of money" at an undescribed location. (6/2/93 Supp. R. by G/H.) Specifically, "Pistol Pete was getting change for a dollar when the victim walked in and showed a lot of money."[18] (*Id.*) (At trial, Vicente stated for the first time that Pacheco also discussed with him the fact that they had spotted Vargas the night before they killed him. (10/18/94 Trial Transcript, Vol. 2 at 111.)) Then, Montanez, Serrano, and Pacheco followed him home, but held off robbing him because "he was with his lady and some kids." (6/2/93 Supp. R. by G/H.) (At trial, Vicente testified that Montanez, Serrano, and Pacheco held off on the robbery "because the guy's wife was aware that they were being followed." (10/18/94 Trial Transcript, Vol. 2 at 10-11.)) Instead, because they "knew this guy would be a sweet victim . . . they laid out for him." (6/2/93 Supp. R. by G/H.)

According to Vicente, Montanez stated that "they did not get money from the victim they popped, and needed to get some money to buy" heroin. (*Id.*) In fact, they did not take anything from Vargas, Vicente testified. (10/18/94 Trial Transcript, Vol. 2 at 19.) Accordingly, Montanez allegedly stated that "they robbed some kid on the street with his school bags." (6/2/93 Supp. R. by G/H.) Montanez continued, according to Vicente, stating "he took this victims [sic] three neck chains, and his bracelet." (*Id.*) Serrano allegedly stated that "he took the school ring off the victims [sic] finger." (*Id.*)

Vicente then reportedly accompanied Montanez, Serrano, and Pacheco to a store called "Gold Busters," where they fenced the gold chains and school ring "to get money to buy heroin." (*Id.*) Det. Halvorsen told us that he and Det. Guevara determined that Gold Busters did not exist. (10/21/13 Interview with Ernest Halvorsen.) Said Det. Halvorsen: "Gold Busters was bullshit." (*Id.*) We have independently determined, through a search of relevant public records, that no store called Gold Busters existed in Chicago at that time. (10/20/14 Public Records Search.)

(iii)    **The 2/7/93 Confession**

Vicente is also reported to have stated to the "R/Dets." on 6/2/93 that on 2/7/93, two days after the initial reported meeting, Montanez again drove up to Vicente. (6/2/93 Supp. R. by G/H.) That second visit, Vicente testified, was motivated by Montanez's need to repair his muffler, a job Vicente had agreed to do for Montanez. (10/18/94 Trial Transcript, Vol. 2 at 120-21.) When

---

[18] Vicente later expanded upon this in a handwritten statement (6/28/93 Vicente H/W Statement by H) and at trial, explaining that Montanez informed him that the "day before" Montanez had "seen this Mexican guy walk into the gas station." (10/18/94 Trial Transcript, Vol. 2 at 16.)

AR-L 515111

SIDLEY AUSTIN LLP
**SIDLEY**

Montanez arrived, Vicente said, he first "noticed new damage to the left front fender" of Montanez's car.[19] (6/2/93 Supp. R. by G/H.)

Vicente asked "'Pistol Pete' what happened to his car," and Montanez reportedly informed Vicente that "after they popped" Vargas, "he was driving his car and smashed into a parked car as they drove off" from the scene. (*Id.*) Vicente then sought clarification, asking Montanez "what went wrong." (*Id.*) In response, Montanez stated:

> The victim who was a Mexican came out carrying a car radio. Mondo was supposed to grab the victim around the neck, so they could go into the victim's pockets. Mondo got greedy when he saw the radio and, instead of grabbing the victim he went for the radio. The victim started fighting, and got shot. Pistol Pete and Mondo jumped back into the car.[20]

(*Id.*)

At trial, Vicente stated for the first time that he was with a "friend" known to him only as "Rick" when Montanez described the Vargas murder on 2/7/93. (10/18/94 Trial Transcript, Vol. 2 at 22.) Vicente acknowledged that he had not, prior to trial, specifically discussed with anyone Rick's presence during the confession. (*Id.* at 112-13.) He stated, however, that he had previously informed ASA Coghlan that a "friend" was with him on 2/7/93. (*Id.*) (That prior disclosure is not reflected in the record.)

As reported by Dets. Guevara and Halvorsen, the "R/Dets. were familiar with the Imperial Gangsters Street Gang and had photos of Pistol Pete, Jordan and Mondo," which Vicente then identified as Montanez, Pacheco, and Serrano, respectively. (6/2/93 Supp. R. by G/H.)

Jose Garcia, a mechanic, later submitted an affidavit in which he noted that on 2/19/93, Montanez brought in his car for repair. (3/2/95 Affidavit of Jose Garcia.) Garcia stated that it was part of his standard practice to examine customer vehicles for damage, and that there was no damage on Montanez's vehicle. (*Id.*) Attached to the affidavit was a receipt for repair, dated 2/19/93. (*Id.*) Montanez told us that he damaged his car by hitting a parked vehicle when he was "high." (10/17/13 Interview with Jose Montanez.)

Det. Halvorsen did not take notes during the 6/2/93 interview with Vicente, he testified. (10/19/94 Trial Transcript, Vol. 3 at 111.)

---

[19] Vicente would later tell ASA Coghlan and testify at trial that he actually noticed the damage on 2/5/93, but did not disclose that fact to anyone. (9/21/94 Investigative Report; 10/18/94 Trial Transcript, Vol. 2 at 120.)

[20] During the 2/7/93 meeting between Montanez and Vicente, Montanez purportedly did not describe Pacheco's involvement in the robbery or shooting. (6/2/93 Supp. R. by G/H.)

10

AR-L 515112
SIDLEY AUSTIN LLP
SIDLEY

f.      **Dets. Guevara and Halvorsen Obtain Evidence From Wilda Vargas**

(i)      **Wilda Discusses the "Gas-Station Incident"**

Also, at time unknown on 6/2/93, Det. Guevara reportedly met alone with Wilda, Vargas's widow. (6/2/93 Supp. R. by G/H.) Det. Halvorsen testified that while he was "seated in the car on the street," Det. Guevara "went into the house." (10/19/94 Trial Transcript, Vol. 3 at 85.)

Wilda informed Det. Guevara that she, Vargas, and their children went to the bank on 2/4/93, and then, at some time between 6:40 and 7 p.m., "stopped at the gas station at North Ave. and Central Park." (10/19/94 Trial Transcript, Vol. 3 at 12; 6/2/93 Supp. R. by G/H.) At that point, a vehicle "pulled up and parked directly in front of them." (6/2/93 Supp. R. by G/H.) Although Dets. Guevara and Halvorsen reported that Wilda described that vehicle as a "tan car" (*Id.*), Det. Guevara later testified that Wilda did not describe to him the vehicle she saw at the gas station. (10/21/94 Trial Transcript at 25.)

Wilda could "see that there were three" male Latino occupants, a driver, a front passenger, and a rear passenger. (6/2/93 Supp. R. by G/H.) Wilda "looked at the man next to her husband" and the "man who was seated in the front passenger seat." (*Id.*) (At trial, Wilda testified, in contrast, that both passengers sat in the back seat. (10/19/94 Trial Transcript, Vol. 3 at 16.))

Wilda informed Det. Guevara that after "[h]er husband went into the station to make a purchase" the "driver of this car walked into the station behind her husband." (6/2/93 Supp. R. by G/H.) Her husband, Wilda reportedly stated, "had a roll of money, about $350" with him. (*Id.*) (At trial, however, Wilda testified several times that by the time the occupant of the tan sedan entered the cashier's station at the gas station, her husband had already exited the cashier's station and was either pumping gas or seated in their van.[21] (10/19/94 Trial Transcript, Vol. 3 at 13, 20, 69.)) Wilda and her family and the occupants of the tan car were at the gas station together for three minutes, she testified. (10/19/94 Trial Transcript, Vol. 3 at 71.)

At the expiration of this time, the "people in the tan car began to follow them, all the way back to her house on Springfield." (6/2/93 Supp. R. by G/H.) (At trial, in contrast, Wilda testified several times that she did not know whether the vehicle she saw at the gas station followed her all the way home.[22])

-----

[21] On one occasion, on cross examination, Wilda she testified that Vargas was still in the cashier's station when the occupant of the tan sedan entered. (10/19/94 Trial Transcript, Vol. 3 at 70.)

[22] Specifically, Wilda testified that although she and Rodrigo believed that the car followed them directly out of the gas station, they were not sure whether it followed them after they made their

11

AR-L 515113
SIDLEY AUSTIN LLP
SIDLEY

Det. Guevara then showed Wilda eight black and white CPD identification photos—specifically, Montanez, Serrano, and Pacheco plus five fillers.[23] (*Id.*) Wilda identified Montanez as the person who "followed her husband into the gas station" and Serrano as the person she "saw seated in the front passenger seat." (*Id.*) She could not, however, "see the man in the back seat clearly." (*Id.*) According to Vicente, that would have been Pacheco. (*Id.*)

After Wilda identified Serrano and Montanez, Det. Guevara "asked her to go with us and show us the route that they took that night at the gas station going home." (10/21/94 Trial Transcript at 10.) Det. Guevara and Wilda then exited her home, and all three drove to the gas station at the corner of Central Park and North Avenue. (*Id.*) There, Det. Halvorsen "watched as Wilda Vargas explained in Spanish to Detective Guevara the events that had taken place in that gas station the day before her husband was murdered." (10/19/94 Trial Transcript, Vol. 3 at 85.) (Det. Halvorsen told us that he did not speak Spanish. (10/21/13 Interview with Ernest Halvorsen.))

(ii)    **Wilda Identifies Montanez's Car**

As also reported in the Supp. R. dated 6/2/93, at time and date unknown, the "R/Dets. gained information" regarding the location of Montanez's car, a "tan colored, 1984, 2Dr, Buick Regal" with "damage to the left front fender" and a "bullet hole in the trunk and in the left passenger door." (6/2/93 Supp. R. by G/H.)

Then, Wilda, in the presence only of Det. Guevara, reportedly drove around. (*Id.*) At that time, Wilda "was asked if she recognized the car that had followed her the day before her husband was killed."[24] (*Id.*) As reported, Wilda "positively identified the 1984 2Dr. Buick Regal

---

first of several turns. (10/19/94 Trial Transcript, Vol. 3 at 53-55, 57-60, 76.) On 5/23/06, however, in connection with a student investigation of potential wrongful convictions, Wilda executed an affidavit in which she asserted that she *did* notice that the men drove behind the van until the Vargases reached their home, but that they then "continued driving without pausing or slowing," and that "[i]t did not appear to me that we were being 'followed' by these men," and that Rodrigo Vargas also did not indicate that he thought they had been followed. (5/23/06 Affidavit of Wilda Vargas.)

[23] We have not been able to locate this photo array among the Impounded Evidence, although a 3/8/95 Impounding Order confirms that the array was impounded, and the trial transcript indicates that Wilda was shown the photo array photos at trial. (10/19/94 Trial Transcript, Vol. 3 at 21-23.)

[24] Dets. Guevara and Halvorsen both testified that they did not look for Montanez's car with Wilda on 6/2/93, but rather on 6/6/93. (10/21/94 Trial Transcript at 10; 10/19/94 Trial Transcript, Vol. 3 at 86-87.) As reported in the Supp. R. dated 6/2/93, it was not until "6 June 93 [that] the R/Dets. took photos of this 1984 Buick Regal." (6/2/93 Supp. R. by G/H.) A 6/6/93 Crime Scene Processing Report confirms this. (6/6/93 Crime Scene Processing Report by H.)

12

AR-L 515114
SIDLEY AUSTIN LLP
SIDLEY

of Jose Montanez as the car that followed her from the gas station." (*Id.*) (In actuality, the car was a four-door. (Photos in Evidence.))

However, prior to the 2013 post-conviction proceedings in this matter, Wilda allegedly told Russell Ainsworth and Jennifer Bonjean, post-conviction counsel to Montanez and Serrano, respectively, that Det. Guevara had pointed out Montanez's car to her, and asked if it was the vehicle that had followed her home. (5/15/13 Hearing Transcript at 194-98.) Specifically, she allegedly stated that Dets. Guevara and Halvorsen drove her around looking for the car that blocked Vargas's van at the gas station on the eve of his murder. (*Id.*) She allegedly stated that she was not able to identify the car that she saw at that gas station. (*Id.*) She stated, allegedly, that Det. Guevara than brought her to a car and identified it to Wilda as the car that had been driven by the offenders. (*Id.*) Upon being pointed out the car by Det. Guevara, Wilda purportedly said only that the vehicle was "similar," at which time Det. Guevara responded that the bullet holes in Montanez's car matched the ballistics evidence from the crime scene and that the fender damage on Montanez's car "matched the accounts of the crime." (*Id.*) There is no evidence to support Det. Guevara's alleged statement regarding the ballistics match or fender damage. In fact, the bullet damage to Montanez's car was to a passenger side door and the trunk, neither of which would have been exposed to gunfire emanating from the driver's side sidewalk on a one-way street. (Photos in Evidence.) Wilda, allegedly, was prepared to testify to this event at the post-conviction hearing, according to an offer of proof, but was barred from testifying by the post-conviction court. (5/15/13 Hearing Transcript at 194-198.)

g.      **Sequencing of Vicente's and Wilda's Evidence**

At trial, Dets. Guevara and Halvorsen testified to the sequencing of these events. Upon concluding his meeting with Vicente, Det. Halvorsen testified that he "informed [his] partner Detective Reynaldo Guevara of the statement that I had gotten from Francisco Vicente." (10/19/94 Trial Transcript, Vol. 3 at 85.) After receiving this information from Det. Halvorsen, Det. Guevara testified that he "immediately" called Wilda, with whom he had been "keeping constant contact" since the "day after" the murder, and "asked her if anything unusual happened the night before the murder." (10/21/94 Trial Transcript at 4-5.) In response, Wilda said, "yes." but did not elaborate and, accordingly, Det. Guevara drove to her house with Det. Halvorsen to elicit additional information, he testified. (*Id.* at 6-7.) After Det. Guevara had a conversation with Wilda at her home, she accompanied Dets. Guevara and Halvorsen to the gas station where she described the incident that occurred. (10/19/94 Trial Transcript, Vol. 3 at 85.)

Wilda also testified to the sequencing of these events, stating several times, however, that she, rather than Det. Guevara, first introduced the incident that took place on the eve of her husband's murder.[25] (*Id.* at 10-11, 36-39.) Like Det. Guevara, Wilda testified that she and Det.

---

[25] Wilda stated three times at trial that she volunteered the 2/4/93 incident to Det. Guevara. On direct, she said that Det. Guevara asked her if she had been to the bank the night before the murder, at which time she told him "[t]hat we went to the gas station to pay gas for the van." (10/19/94 Trial Transcript, Vol. 3 at 10-11.) Asked whether "the detective asked you if you had been at the gas station," she responded, "No, I told him that we went to the gas station." (*Id.* at

13

AR-L 515115
SIDLEY AUSTIN LLP
SIDLEY

Guevara had been in contact in the months after the murder, stating: "I used to get in touch with him." (*Id.* at 38.) Wilda testified inconsistently regarding when she and the detectives visited the gas station and surrounding streets in an effort to locate the car she saw at the gas station, describing it variously as 2/8/93 and June of 1993. (*Id.* at 61-62, 23-25.) (Det. Halvorsen testified that "nobody showed her any cars" on 2/8/93. (*Id.* at 104.))

We also asked Det. Halvorsen about the sequencing of these events. Det. Halvorsen told us that when he was working on the Supp. R. in which this evidence was reported—i.e., the Supp. R. dated 6/2/93—"Rey [Guevara] came into the office and told" him "by the way" at some point prior to 6/2/93, Wilda had informed him that she "remembered something happened the night before [the murder] at a gas station." (10/21/13 Interview with Ernest Halvorsen.) Det. Halvorsen recalled exclaiming at the time, "You're just telling me about this now?" (*Id.*) When we asked Det. Halvorsen whether Vicente instead might have introduced that incident into the case, Det. Halvorsen said, "no," explaining that Vicente "had no knowledge of that." (*Id.*)

h.    **Serrano and Pacheco are Detained for Questioning**

On 6/8/93, Serrano was brought into Area 5 Violent Crimes for questioning. (6/14/93 Supp. R. I by G/H.) At that time, he "denied having any knowledge" of the incident, and requested a polygraph. (*Id.*) At the conclusion of the polygraph, he was "informed that he had failed the test and that he had knowledge or participated in the incident." (*Id.*) A report accompanying the test reads, in part, "Deception Indicated." (6/8/93 Crime Lab Report.)

The following day, Pacheco was brought into Area 5 VC to be interviewed. (6/14/93 Supp. R. by G/H II.) Pacheco, like Serrano, "denied having any knowledge of the incident and also requested to be taken for a polygraph test." (*Id.*) Pacheco was also "told that he failed the test" but he "kept on denying any knowledge of the incident." (*Id.*) A report accompanying his test reads, also, in part, "Deception Indicated." (6/9/93 Crime Lab Report.)

i.    **Tim Rankins Claims to Have Witnessed Shooting**

(i)    **Rankins Meets with Sgt. Mingey**

On 6/10/93, at approximately 11 p.m., Timothy Rankins (aka "Loco"), 19, a member of the Spanish Cobras street gang, was arrested moments after allegedly committing a robbery. (6/10/93 Timothy Rankins Arrest Report.) At 1:05 a.m., Demond Williams (aka "Shorty Folks"), 15, a member of the Gangster Disciples street gang, was arrested in connection with the same robbery, and described as Rankins's co-perpetrator. (6/11/93 Demond Williams Arrest Report.)

---

36-37.) She then verified that sequence when asked a clarifying question. (*Id.* at 38.) In a later interview with student investigators, Wilda said that she told police investigators about the gas-station incident on the day that Rodrigo was shot and killed. (4/24/06 Interview with Student Investigators at 6.)

14

AR-L 515116
SIDLEY AUSTIN LLP
SIDLEY

After Rankins was brought in, Sgt. Ed Mingey decided to interview him because, as reported by Dets. Guevara and Halvorsen, "preliminary information . . . indicated" that a victim in another case had been murdered by a Spanish Cobra. (6/14/93 Supp. R. II by G/H.) (The defendant in that case, an Imperial Gangster, was later convicted of that murder, in part, on his alleged confession to Vicente. As noted in the introduction to this report, we investigated his case, as well, but were unable to make a final finding regarding innocence.[26]) Rankins was reported to have revealed to Sgt. Mingey at that time that "he was a witness to a murder that occurred in Feb. 93," which Sgt. Mingey recognized as a reference to the Vargas murder. (*Id.*) Mingey knew that Dets. Guevara and Halvorsen "had previously gained information as to suspects" in that case, and thus contacted them for purposes of requesting that they take a statement from Rankins. (*Id.*) Specifically, Sgt. Mingey told us, "[t]he lead they were working on was this Vicente guy . . . who was Halvorsen's snitch on other cases." (4/7/14 Interview with Ed Mingey.) There are no notes in the record from Sgt. Mingey memorializing his interview with Rankins, although he told us that he did take brief notes of the conversation, containing only Rankins's nicknames for the assailants—Barrel Belly, Stripes, and Joker—which he then turned over to Dets. Guevara and Halvorsen.[27] (*Id.*)

Sgt. Mingey told us that Rankins was "the best witness I ever had." (*Id.*) Mingey said that Rankins "was extremely cooperative and easy to talk to," and that it was "obvious" after talking to Rankins "that one, he was the offender or, two, he actually witnessed it." (*Id.*) Sgt. Mingey continued:

> When I talked to this guy, I never talked to anyone who gave me more info and it turned out to be totally legit. . . . I've never talked to a guy who was a better informant. He spewed out all this information. It seems strange, but that's exactly what happened.

(*Id.*)[28]

---

[26] The reporting in the third defendant's case indicates that the preliminary information pointed at the Imperial Gangsters rather than the Spanish Cobras, as Sgt. Mingey was reported by Dets. Guevara and Halvorsen to have believed. (6/24/93 Supp. R. by G/H.) Moreover, Sgt. Mingey told us that he did not, in fact, participate in that murder investigation. (4/7/14 Interview with Ed Mingey.)

[27] Serrano told us that Joker and Stripes were well-known gang members in the neighborhood. (10/17/13 Interview with Armando Serrano.) Stripes, according to Serrano, lived near Monticello Park. (*Id.*) Another Imperial Gangster, Armando Quinones (aka "Mondo") told us in an interview on 8/9/14, too, that Stripes and Joker were well-known Imperial Gangsters. (2014 Interview with Armando Quinones.)

[28] Mingey currently serves as the Director of Security for the Illinois Racing Board. (4/7/14 Interview with Ed Mingey.)

15

AR-L 515117
SIDLEY AUSTIN LLP
SIDLEY

(ii)     **Rankins Meets with Dets. Guevara and Halvorsen and Gives a Handwritten Statement**

At 2 p.m. on 6/11/93, Dets. Guevara and Halvorsen interviewed Rankins. (6/14/93 Supp. R. II by G/H.) At 11:35 p.m., he met with ASA Jon King and Det. Halvorsen and gave a handwritten statement.[29] (6/11/93 Timothy Rankins H/W Statement by H.) Rankins stated that on 2/4/93 he was standing on the corner of Spaulding and Armitage, "a hangout for the Imperial Gangsters Street Gang." (*Id.*) Rankins noted that at that time, "his gang was friendly with the Imperial Gangsters Street Gang" because they were "part of the 'Folk Nation.'" (*Id.*) At about 9 p.m. (*Id.*), a "tan colored Buick Regal" drove up. (6/14/93 Supp. R. II by G/H.) That car, according to Rankins, was driven by an Imperial Gangster "he knows as Moses" or "Barrel Belly" (Montanez), the latter nickname a reference to his "large stomach." (*Id.*) An Imperial Gangster "he knows as Joker" (Serrano) was also in the car.[30] (*Id.*) Serrano exited the car and said, "I want you to go with us tonight to go pick up some guns and drugs." (*Id.*) According to Rankins, he had done so with Serrano, Montanez, and other Imperial Gangsters on two prior occasions because he is fast runner and could outrun the police if stopped with contraband. (*Id.*)

As planned, Rankins arrived at Monticello Park at 4:30 a.m. (*Id.*) There, he found Serrano and Montanez and another Imperial Gangster "he knows as 'Stripes'" (Pacheco). (*Id.*) Rankins's girlfriend "Sabrina" and "a guy he knows as Shorty Folks" (Demond Williams) were also in the park with Serrano, Montanez, and Pacheco. (*Id.*) Then, according to Rankins, he talked to his girlfriend while Montanez, Serrano, and Pacheco had a conversation by themselves.[31] (*Id.*) Rankins "could not hear what they were saying." (*Id.*) After a time, Serrano approached Rankins and said, "Come on now, we're going to do this." (*Id.*) Then, Serrano and Montanez got into the "same tan Buick that they had been riding in earlier." (*Id.*) Williams and Pacheco got into a "red van with white stripes on the bottom."[32] (*Id.*) That van, according to Rankins, had been borrowed from another Imperial Gangster, but he did not know from whom specifically. (*Id.*)

Upon departing Monticello Park, Rankins, Williams, and Pacheco drove down Springfield and then "parked their van at the corner of Springfield and Cortland." (*Id.*) Pacheco

---

[29] The content of that handwritten statement is almost identical to the content of the 6/14/93 Supp. R. memorializing Dets. Guevara and Halvorsen's 2 p.m. meeting with Rankins.

[30] For purposes of clarity, we primarily refer to the defendants as Montanez, Serrano, and Pacheco under circumstances where Rankins referred to them by purported nicknames.

[31] In the handwritten statement, in contrast, Rankins indicated that Williams also took part in this conversation with the defendants. (6/11/93 Timothy Rankins Handwritten Statement by H.)

[32] An Imperial Gangster commonly known as Joker (i.e., not Serrano), in fact, owned the red and white van that Rankins described, according to Serrano. (10/17/13 Interview with Armando Serrano.)

16

AR-L 515118
SIDLEY AUSTIN LLP
SIDLEY

exited the red and white striped van and met Montanez and Serrano near another "van that was parked on Springfield"—i.e., Vargas's van. (*Id.*) Pacheco, Serrano, and Montanez were standing on the sidewalk "about seven or eight houses away from where Rankins was watching." (*Id.*) A "couple of minutes" later, a man exited a "gate" and was stopped by Serrano, Montanez, and Pacheco. (*Id.*) Although Serrano, Montanez, and Pacheco "said something to this man," Rankins "could not make out the words." (*Id.*) Rankins noticed that the man was carrying a "Snatch Out Radio." (*Id.*) Then the "man ran to a blue and grey van that was parked on Springfield." (*Id.*) As he ran, Pacheco "was yelling out, 'DO HIM, DO HIM.'" (*Id.*) When the man jumped inside the van, Montanez "yelled out, 'GO AHEAD, GO AHEAD.'" (*Id.*) Then Serrano "pulled out a large semi-automatic pistol" and started "firing into the van." (*Id.*) Rankins could "hear the glass on the drivers side window shatter." (*Id.*) After Serrano fired into the van "6-9 times," he and Montanez "ran back to the tan Buick and drove off." (*Id.*) Pacheco then got back into the van, at which point he stated to Rankins and Williams, "If you tell anyone what you saw, we'll kill you too." (*Id.*)

Rankins told Dets. Guevara and Halvorsen that as he was "afraid he would be killed," he had not talked to anyone about the shooting. (6/11/93 Timothy Rankins Handwritten Statement by H.) However, when Rankins was locked up for a robbery on 6/11/93, "he asked to speak with Sgt. Eddie Mingey who Timothy knows and trusts."[33] (*Id.*). Rankins noted that "is scared of being killed by the Imperial Gangsters but came forward to Sgt. Mingey anyway." (*Id.*)

After Rankins shared this information, Dets. Guevara and Halvorsen "asked Timothy Rankins to verify the information he was providing, by showing the R/Dets. the exact location where the man was shot." (6/14/93 Supp. R. II by G/H.) Det. Halvorsen testified that he said the following to Rankins at the conclusion of the interview: "I wanted to believe the information he was providing me but he is going to have to demonstrate to me that he actually had evidence of this." (10/19/94 Trial Transcript, Vol. 3 at 93.) Det. Halvorsen testified he then informed Rankins "that they were going to drive North on Springfield, and that Timothy Rankins should indicate the location where the victim was shot." (*Id.* at 93.) Rankins "instructed the R/Dets. to stop in front of 1838 N. Springfield" (i.e., the Vargas home) and "pointed out the gate that the Victim walked out of, and pointed to the spot on the street where the victim['s] van was parked." (6/14/93 Supp. R. II by G/H.) After Rankins viewed the crime scene, he was "returned to Area Five VC" where he viewed a photo array consisting of eight color photos, and identified Stripes as Pacheco, Joker as Serrano, and Barrel Belly as Montanez. (*Id.*) He also stated that he had known Montanez, Serrano, and Pacheco for about "seven years." (6/11/93 Timothy Rankins Handwritten Statement by H.)

On 6/15/93, Rankins appeared before a grand jury, and provided testimony largely consistent with his prior statements. (6/15/93 Grand Jury Transcript.) At that time, he also stated the following for the first time: (1) He knew Jorge Pacheco by the nickname "Jordan" in addition

---

[33] Sgt. Mingey told us that he "may have" known Rankins previously, but "I really don't know." (4/7/14 Interview with Ed Mingey.) He continued: "Something tells me I may have known this guy from some place. If he was arrested previously and it was a robbery case, I could have been involved in arresting him previously." (*Id.*)

AR-L 515119
SIDLEY AUSTIN LLP
SIDLEY

to the nickname "Stripes"; and (2) He knew Montanez by the nickname "Pistol Pete," in addition to the nicknames "Moses" and "Barrel Belly." He also, at this time, did not describe his girlfriend as having been at the Monticello Park. (*Id.*)

Det. Guevara testified before a grand jury on 7/29/93, at which time he related the evidence provided by Rankins. (7/29/93 Grand Jury Transcript.)

We discussed with Det. Halvorsen his attempt to corroborate Rankins's evidence. (7/1/14 Interview with Ernest Halvorsen.) Said Det. Halvorsen: "I just remember this black guy that was as crazy as crazy could be. He was just making up stories. This guy was way off his bean. He didn't have any of the facts of the case, to me." (*Id.*) We asked Det. Halvorsen directly if he recalled driving Rankins to the scene of Vargas's murder. (*Id.*) He said: "I don't remember if we did or not, but I remember the guy didn't have any of the facts. He was sitting up in the office and Mingey sent us to go talk to him. Mingey said, 'Go talk to this guy, Rankins.' Why he was up there in the first place, I don't know. . . . He had no information. Everything he had was goofy, talking to him. I imagine I told Eddie, 'This guy's nuts.'" (*Id.*)

We also interviewed Williams, identified in the record as "Shorty Folks." (5/1/14 Interview with Demond Williams.) As an initial matter, it appeared that he learned both of the Vargas murder and his reported connection to it from us. (*Id.*) Williams credibly appeared baffled when we explained to him why we were interested in speaking with him and denied any knowledge of the crime. (*Id.*) He claimed also not to know Montanez, Serrano, or Pacheco. (*Id.*) Nor did he have any knowledge of Dets. Guevara or Halvorsen or Sgt. Mingey. (*Id.*) He stated, further, he did not associate with Imperial Gangsters. (*Id.*) As he said, "I would never fuck with those guys, I would never hang with [them]. I got nothing to do with those IGs." (*Id.*) He did, however, vividly recall Tim Rankins, and informed us that Rankins falsely implicated him in a robbery in June of 1993 for which he served four years in jail, and for which he maintained his innocence. (*Id.*) Said Williams: "Rankins lied on and said me and him did a robbery in 1993. I was fifteen years old…. I will never forget his name." (*Id.*) At the conclusion of the interview, he said of Rankins's allegedly false statements regarding his role in the Vargas murder, "If I ever see Tim Rankins again, I'll kill him." (*Id.*)

### j.     Serrano Is Arrested

One hour after Dets. Guevara and Halvorsen first met with Rankins, they arrested Serrano. (6/11/93 Serrano Arrest Report.) Serrano's arrest was approved by ASA King. (*Id.*) The arrest report indicated that Serrano was "identified by an eyewitness [i.e., Rankins], and a circumstantial witness [i.e., Vicente] as the person who shot to death, Rodrigo Vargas." (*Id.*) Later that evening, at 6:45 p.m., Rankins identified Serrano in a lineup in the presence of Dets. Guevara and Halvorsen. (6/11/93 Supp. R. by G/H, Rankins Line-Up.)

Also at 6:45 p.m. on 6/11/93, Wilda, in the presence of Dets. Guevara and Halvorsen, identified Serrano as the front-seat passenger of the vehicle that was parked in front of her husband's van at the gas station on the evening of 2/4/93. (6/11/93 Supp. R. by G/H, Wilda Line-Up.)

18

AR-L 515120
SIDLEY AUSTIN LLP
SIDLEY

Serrano had several prior arrests, including arrests for possession of marijuana, armed robbery, battery, obstructing traffic, disorderly conduct, and assault. (5/25/93 Criminal Histories.) Serrano told us that he also stole cars and car radios on a regular basis. (8/22/13 Interview with Armando Serrano.) His primary income, however, came from selling drugs, he told us. (*Id.*) Typically, he sold crack, cocaine, and marijuana, he said. (*Id.*) Serrano claimed not to carry a gun, and he described himself as a low-volume, "street-level" dealer. (*Id.*) Finally, Serrano described himself to us as a "punk" and a "typical gang banger." (*Id.*) He insisted, however, that he "never shot anyone, never killed anyone, never owned a gun." (*Id.*)

### k. Vicente Is Identified as Confidential Informant

Several weeks later, on 6/28/93, Vicente signed a hand-written statement, which was prepared by Det. Halvorsen and ASA Solita Pandit. Therein he was first identified as the previously "anonymous" witness who reportedly gave evidence against Montanez, Serrano, and Pacheco on 6/2/93. (*Id.*) But for some minor additions and differences, described as follows, his hand-written statement was consistent with the evidence reflected in the Supp. R. dated 6/2/93: (1) Vicente specifically identified the place where Montanez saw Vargas with money as a gas station for the first time; and (2) During their second meeting, Vicente said, Montanez asked Vicente to repair his muffler, Vicente stated for the first time. (*Id.*) After Vicente executed the statement, ASA Pandit approved arrest warrants for Montanez and Pacheco. (7/3/93 Supp. R. by G/H.)

### l. Dets. Guevara and Halvorsen Appear Before Grand Jury, Montanez and Pacheco Are Arrested, and Vicente and Rankins Are Placed in Witness Quarters

On 7/1/93, Det. Halvorsen appeared before the grand jury. (7/1/93 Grand Jury Transcript.) His testimony was consistent with the evidence provided exclusively by Rankins. (*Id.*) Specifically, Det. Halvorsen testified that after evading Montanez, Serrano, and Pacheco, Vargas "was able to run and get in his van." (*Id.*) Then, according to Det. Halvorsen, "[h]e closed the van door and locked it" and "Serrano ran up to the van, shot through the window." (*Id.*)

Vicente also appeared before the grand jury on 7/1/93. (*Id.*) His testimony was consistent with his statement as reported by Dets. Guevara and Halvorsen in the Supp. R. dated 6/2/93. On 7/7/93, Vicente was moved to the Witness Quarters, also known as the "Q," at the Office of the State's Attorney. (6/19/12 Subpoena Attachment 1.)

The following day, 7/8/93, Montanez was arrested for the Vargas murder by Officers Lupe Pena, Luis Marron, J. Silva, and R. Rodriguez. (7/8/93 Montanez Arrest Report.) We discussed the Montanez arrest with now-Capt. Lupe Pena. (7/7/14 Interview with Lupe Pena.) Capt. Pena said that he had gone to high school with Montanez, recalling him as a "funny guy" and "very personable." (*Id.*) He recalled, however, that Montanez later developed a heroin habit. (*Id.*) On the day of the arrest, he said, he went to Montanez's girlfriend's house, having been informed that Montanez's car was parked there. (*Id.*) Capt. Pena said that after Montanez's girlfriend's father let him into the home, Montanez emerged from a hiding spot behind the door

19

AR-L 515121
SIDLEY AUSTIN LLP
**SIDLEY**

of a bedroom. (*Id.*) Capt. Pena said that Montanez appeared shocked to learn that there was a warrant for his arrest for murder, and would not believe it until Pena "ran a name check over the wire in front of him." (*Id.*) However, Capt. Pena said that Montanez "didn't go crazy after learning it." (*Id.*)

Prior to 7/8/93, Montanez had an extensive criminal history, including charges for armed and simple robbery and first-degree murder (of which he was acquitted in a 1991 trial.[34]) (5/25/93 Criminal Histories.) Regarding the robberies, Montanez told us that he had been involved in "more than ten stick ups." (10/17/13 Interview with Jose Montanez.) Typically, he "stuck up drug dealers" for their "dope and money," he explained. (*Id.*) Although he had "access to guns" and had "handled guns," he claimed that he had not directly used one in a crime. (*Id.*) Primarily, he explained, "back then, we fought with our hands." (*Id.*) He conceded, however, that on "one or two" occasions, his co-conspirators had been armed with a gun during the course of a stick-up. (*Id.*)

Thereafter, Dets. Guevara and Halvorsen were notified of the arrest. (7/10/93 Supp. R. by G/H.) Montanez was identified in a lineup by Wilda "as the person she saw the night before in the gas station staring at the Victim and his money." (7/10/93 Supp. R. by G/H, Line-Up Report.) Det. Guevara testified at trial that he was with Wilda when she identified Montanez, (10/21/94 Trial Transcript at 11), whereas the 7/10/13 Supp. R. Line-Up Report indicates that Dets. Guevara and Halvorsen were both present.[35] (7/10/93 Supp. R. by G/H, Line-Up Report.) At the time of the lineup, Montanez was wearing a jacket with his first name, Jose, appliquéd to the front of the jacket. (Photos in Evidence.)

On 7/12/93, Pacheco was arrested by Officers Pena and Marron. (7/12/93 Pacheco Arrest Report.) Thereafter, Dets. Guevara and Halvorsen were notified of the arrest and Det. Guevara alone interviewed him. (7/13/93 Supp. R. by G/H.) Det. Guevara asked whether Pacheco would talk about "the incident" to which Pacheco responded, he "would think about it." (*Id.*) Although the impounded evidence in this case contains line-up photos with Pacheco (Photos in Evidence), and the 7/13/93 Supp. R. notes that line-up photos were taken, no line-up involving Pacheco is reported in the record.

Pacheco had prior arrests for possession of marijuana (multiple times), trespass of a vehicle, discharging a weapon within city limits, and mob action. (5/25/93 Criminal Histories.) On 11/14/90, he was arrested for first-degree murder and armed robbery, but was released the following day without being charged. (*Id.*)

On 7/30/93, Rankins was also placed into the Q. (3/6/12 Rankins Disposition Sheet.) There, Vicente and Rankins appear to have met for the first time, as there is no evidence that we

---

[34] As noted above, Det. Halvorsen was involved in that case peripherally, as an arresting officer of Montanez's co-defendant. (6/24/90 Jose Baez Arrest Report by H.)

[35] Montanez told us that he knew Det. Guevara but not Det. Halvorsen prior to his arrest. (10/17/13 Interview with Jose Montanez.)

AR-L 515122
SIDLEY AUSTIN LLP
SIDLEY

are aware of that Vicente and Rankins knew each other prior to their time in the Q. In a sworn statement given to Serrano's post-conviction counsel, Jennifer Bonjean, Rankins said that after meeting Vicente in the Q, Vicente told him that Det. Guevara wanted them to coordinate their statements and instructed Vicente "to go over my statement with me." (4/4/12 Rankins Sworn Statement at 28.) Rankins then told Vicente that he would not "get on the stand and testify against an innocent person." (*Id.* at 28.) Thereafter, according to Rankins, Vicente began to pressure Rankins to cooperate. (*Id.* at 28-29.) That pressure, according to Rankins, caused Rankins to attack Vicente with a pool stick. (*Id.*) Rankins told us he was removed from the Q after the incident (3/2/14 Interview with Timothy Rankins), and the record confirms that he was placed back in the Cook County jail and, on 10/18/93, under house arrest. (3/6/12 Rankins Disposition Sheet.) In a discussion with student investigators, Vicente partially corroborated Rankins's story regarding the altercation, though he claimed to be the aggressor rather than Rankins. Vicente said that he "chased this guy with a stick and beat this black guy in the Q so I could get out of there." (Francisco Vicente Affidavit Notes.)

### m. Montanez's Parents Reportedly Attempt to Bribe Wilda

As documented in an unattributed handwritten General Progress Report ("GPR"), dated 8/2/93, Montanez's parents reportedly offered Wilda "a couple thousand dollars to come to the pre-hearing of their son (Jose Montanez) and say that it was someone [else] and not thier [sic] son that killed her husband." (8/2/93 GPR.) In response, Wilda reportedly stated "she would not do such thing [sic]." (*Id.*) At that point, Montanez's parents reportedly "got very upset and left." (*Id.*) Reportedly, the conversation was also witnessed by James Montalbano, for whom a phone number was provided. (*Id.*) Our private investigator attempted to locate Montalbano, but no one by that name could be connected to the phone number listed on the report.

We discussed this incident with Montanez. (2013 Interview with Jose Montanez.) He told us that his parents had in fact met with Wilda, but had not offered her any money. (*Id.*) Instead, he said, his parents "wanted to know why she" had implicated him. (*Id.*) His parents, he said, were "just trying to help him out." (*Id.*) Montanez did not instruct them to meet with her, he said. (*Id.*)

### n. Rankins Recants

On 3/29/94, Rankins recanted his statement and grand jury testimony implicating Montanez, Serrano, and Pacheco in the Vargas murder.[36] (3/29/94 Rankins Recantation.) In the handwritten statement, Rankins alleged that after he was arrested on an armed robbery charge, two unnamed "police" stated that they would have the charge "drop" in exchange for "testifie on a murder case for us." [sic] (*Id.*) Allegedly, when Rankins protested, "I know noting about the murder case so how is Im going to testiefie to something I know nothing about [sic]," the police

---

[36] Rankins's handwritten statement was purportedly obtained from Montanez's family by undergraduate students investigating potential wrongful convictions. (5/4/03 Email.) The circumstances of the execution of this recantation are unknown to us.

21

AR-L 515123

**SIDLEY**

stated, "your testifie cause if not were charge you with this fucking murder." (*Id.*) Then, according to Rankins, the police "start telling me what to say" to the "state attorney [sic]." (*Id.*) Rankins continued, the "reason why I sign the statement for the State Attorney cause the police threat me with case and that the State maid me a offer I couldn't refuse [sic]." (*Id.*) Rankins noted that he is certain of Montanez, Serrano, and Pacheco's innocence because "sergeant Eddie Mingy told me the reason why they gat these guys is cause he couldn't catch them up on any case but he knew that they sailing drugs [sic]." (*Id.*) Finally, Rankins alleged that he was in Gary, Indiana, on the day of the Vargas murder, and that his mother, Ella Rankins, and his girlfriend, Janet Clark, could corroborate that.[37] (*Id.*) For each, he provided a phone number. (*Id.*) Rankins claimed to have "writ[ten] th[e] statement on my own behalf[,] no deal or threats has been made[.]" (*Id.*)

In 1999, 2012, and 2014, Rankins provided additional recantation evidence. Those recantations are detailed below.

o.        **Vicente Provides New Evidence to ASA Coghlan**

On 9/21/94, Vicente met with ASA Coghlan and State's Attorney Investigator Jose Martinez for purposes of preparing for trial, at which time Vicente modified his statements and grand jury testimony implicating Montanez, Serrano, and Pacheco in the Vargas murder. (9/21/94 Investigative Report.) Specifically, upon being asked to review Dets. Guevara and Halvorsen's Supp. R. dated 6/2/93, in which the substance of Vicente's evidence was first reported, Vicente stated that the report is "basically correct" but offered several modifications. (*Id.*)

First, Vicente stated that "when [Montanez] was yelling at [Serrano], [Serrano] responded by saying that [Montanez] should have 'ganked' the victim himself so that [Serrano] could have gone through the victim's pockets."[38] (*Id.*) Vicente continued, "[Pacheco] took [Serrano's] side during the conversation and told [Montanez] that 'yeah, you're bigger than us, you should have ganked him from behind.'" (*Id.*) (Prior to this time, only Rankins had attributed inculpatory statements to Serrano and Pacheco.) Second, Vicente stated that Montanez, Serrano, and Pacheco were arguing about the robbery—Montanez "was angry because the victim had a lot of money and the robbery had gone bad" because they did not obtain anything from Vargas. (*Id.*) In response, according to Vicente, Serrano said, "'well, we can always do another one,'" meaning to commit another robbery.(*Id.*) Third, Vicente stated that on 2/7/93, "Montanez had said that [Pacheco], not [Montanez], was driving the car as the defendants fled the murder

---

[37] We obtained Indiana medical records for Rankins from February of 1993, confirming his hospital admission, but they were for several days after the Vargas murder, not the day of, as he alleged. (2/17/93 Rankins Medical Records.)

[38] Ganking, Vicente explained, is a "street saying meaning to grab someone by the neck in a choke hold." (9/21/94 Investigative Report.)

22

AR-L 515124

SIDLEY AUSTIN LLP
SIDLEY

scene."[39] (*Id.*) Fourth, Vicente stated that he had actually "noticed the bullet holes and damage to Montanez's car" the first time he saw Montanez, Serrano, and Pacheco—i.e., on the morning of 2/5/93—although that fact had not been reported in Dets. Guevara or Halvorsen's report or in his handwritten statement, which both indicated that he did not notice the damage until 2/7/93. (*Id.*)

Vicente later testified that prior to meeting with ASA Coghlan on 9/21/94, he had had six or seven meetings with him. (10/18/94 Trial Transcript, Vol. 2 at 126.) He testified, too, that he had not previously provided to CPD, or shared with the Grand Jury, any of the information shared with ASA Coghlan on 9/21/94. (*Id.* at 124-26, 138-39.) Vicente responded affirmatively when ASA Coghlan questioned whether Vicente was "recovering from [his] heroin addiction" on 6/2/93—when he initially gave a statement against Montanez, Serrano, and Pacheco—and, accordingly, whether his "recollection of those events bec[a]me clearer as [Vicente] recovered more and more from [his] addiction to heroin"—i.e., by 9/21/94. (*Id.* at 139-40.)

p. **Alibi Evidence**

Montanez and Pacheco offered some alibi evidence prior to, during, and after trial. Serrano did not.

Regarding Montanez, before the commencement of the trial, Montanez filed an Amended Answer to Discovery and noted that he would assert an alibi defense. (10/11/94 Montanez Answer to Discovery.) Specifically, he stated that he was with his parents during the time of the offense. (*Id.*) He did not assert such a defense at trial, however. On 3/15/95, Montanez's girlfriend, Jacqueline Pacheco (no relation to Jorge), submitted an affidavit in which she stated that Montanez was with her from 5 p.m. on 2/4/93 until 8:30 a.m. on 2/5/93. (3/15/94 Affidavit of Jacqueline Pacheco.) She noted further that Montanez's defense counsel was aware of this alibi prior to trial but considered it unlikely to sway the finder of fact given that she was Montanez's girlfriend. (*Id.*) Pacheco stated further that Montanez's car was damaged on 3/13/93. (*Id.*) This assertion would later be corroborated by Montanez's mechanic, as explained above. (3/2/95 Affidavit of Jose Garcia.)

Regarding Jorge Pacheco, on 7/13/93, in the presence of ASA Kevin Hughes and possibly Det. Guevara, Pacheco provided a partial alibi, stating that he was with his girlfriend, Michelle Zaleske, "on the date in question." (7/13/93 Supp. R. by G/H.) On 7/13/93, Zaleske gave a statement to Det. Guevara and ASA Hughes in which she provided a partial alibi for Pacheco. (7/13/93 Zaleske H/W Statement by G.) Specifically, Zaleske stated that she was with Pacheco at her Des Plaines, Illinois, home until 3 p.m. on 2/4/93, the day before the Vargas murder. (*Id.*) Zaleske stated further that Pacheco returned to her home in Des Plaines at 7:30 p.m. on 2/4/93, where he remained until 9 p.m. (*Id.*) The evidence indicates further that Zaleske stated that she did not see Pacheco from 9 p.m. on 2/4/93 until 7 p.m. on 2/5/93. (*Id.*) At trial, Zaleske testified consistent with this information. (10/21/94 Trial Transcript at 62.) A diary that she

---

[39] At trial, Vicente would elaborate, confirming that the fact that Pacheco was driving also meant that Pacheco "had smashed the car" when he fled the scene. (10/18/94 Trial Transcript, Vol. 2 at 23.)

23

AR-L 515125
SIDLEY AUSTIN LLP
SIDLEY

claimed corroborated this account was offered into evidence, but not admitted. (*Id.* at 66.) Also, on 9/30/94, State's Attorney Investigators Martinez and Thomas Finnelly interviewed Felix Rodriguez, the ex-husband of Jorge Pacheco's sister. (9/30/94 Investigative Report.) Rodriguez stated he was "home all day" with Pacheco on 2/5/93, the date that Vargas was murdered and, thus, "knows that Jorge didn't do this shooting." (*Id.*) He reportedly qualified the alibi defense, however, by noting that "he was drinking most of" the relevant day and, thus, "doesn't remember what time he went to bed or if Jorge went to bed before him or if Jorge even went to sleep." (*Id.*) Reportedly, he noted that if contacted by defense counsel he would testify on Pacheco's behalf "because he has had trouble with the Police and States Attorney before" and "wouldn't help them." (*Id.*) He reportedly stated further that "he likes Jorge Pacheco very much" and "wants to see Jorge get out of jail." (*Id.*)

Serrano told us that he would be "lying" if he said he knew where he was the night before the Vargas murder. He speculated that he was "running the streets" as he "didn't have a job" at that point. (10/17/13 Interview with Armando Serrano.) He said that he was usually at home with his parents and now ex-wife at 5:30 a.m., but said that he has attempted to come up with a verifiable alibi for years for the relevant dates, and has been unable to do so. (*Id.*) Serrano told us that he considered Vicente's and Rankins's evidence incredible, among other reasons, because Vargas's car radio was playing when his body was discovered. (8/22/14 Interview with Armando Serrano.) That evidence, according to Serrano, indicated that Vargas was in his car, warming up the engine, and listening to the radio, when he was shot. However, Serrano is mistaken. As discussed above, Vargas's radio was not on when Vargas was murdered—in fact, Vargas's body was discovered atop his radio. Serrano received his information while later researching the case, he said, from a Chicago Tribune article in which the fact was erroneously reported. (*Id.*)

### q. The Trial

On 10/18/94, the trial of Montanez, Serrano, and Pacheco began. Vicente, Wilda, Velez, Shoop, Dets. Guevara and Halvorsen, Investigator Martinez, and Officer Show testified for the State. For Pacheco, alibi witness Zaleske testified. Office of Public Defender Investigator Stephanie Turner testified for Serrano. Montanez did not put on any witnesses.

### (i) Francisco Vicente

Vicente responded affirmatively to ASA Coghlan's question of whether "in return for your testimony in this case and other cases I have indicated to you that I would recommend a total of nine years … on your cases." (10/18/94 Trial Transcript, Vol. 2 at 4.) On cross, Vicente acknowledged that each of his three pending Class X charges for armed robbery carry sentences of between six and thirty years and his single simple robbery charge carries a sentence of three to seven years. (*Id.* at 72, 76.) On cross, Vicente also described his living arrangements in the Witness Protection Quarters, and stated that CPD bought him a Walkman, Nike track suits, and cigarettes, and allowed him "home-cooked meals," visits with friends, and visits with his girlfriend. (*Id.* at 79-80.)

Vicente correctly identified each of the three defendants in court. (*Id.* at 5-6.)

24


AR-L 515126

### (ii)    Wilda Vargas

Upon being asked to perform an in-court identification of the man who entered the cashier's station, the vehicle's driver, she chose Serrano initially, an action attributed in the record to Montanez. (10/19/94 Trial Transcript, Vol. 3 at 17-18.) (After ASA Coghlan asked the defendants to stand up, however, Wilda correctly identified Montanez. (*Id.* at 18-19.)) On being asked to perform an in-court identification of one of the passengers (described in the Supp. R. dated 6/2/93 as a front-seat passenger), she chose Pacheco twice, although at the line-up Vargas identified Serrano as the only passenger she saw. (10/19/94 Trial Transcript, Vol. 3 at 19, 23.) (She was reported to have stated at the time that she was not able to see the rear seat passenger— i.e., Pacheco—clearly. (6/2/93 Supp. R. by G/H.))

### (iii)    Gary Shoop

Vargas's neighbor, Shoop, testified that he was unable to definitely state that Montanez's car was the car he saw after hearing gunshots, although he said that it was "similar" to the car he saw and answered affirmatively when asked if it "appear[ed] to be the same car." (10/18/94 Trial Transcript, Vol. 1 at 47.) On cross, Shoop testified that he told CPD that the vehicle was "possibly a two door" and had not told CPD that the car was two-toned with a vinyl top. (*Id.* at 54.) He testified, however, that he believed his original description consistent with Montanez's car. (*Id.* at 47.) Shoop testified further that as the auto drove away, he heard its "tires squealing" as it rounded several corners. (*Id.* at 44.) He did not, however, hear a subsequent car crash. (*Id.* at 44, 53.) He also testified on cross that he did not see any passengers in the car. (*Id.* at 52.)

### (iv)    Investigator Jose Martinez

State's Attorney Investigator Martinez testified that he tried, but failed, to locate Rankins.[40] (10/21/94 Trial Transcript at 32-33.) His efforts, Martinez testified, included contacting "a girlfriend by the name of Janet Clark in Gary, Indiana," a name that appears within Rankins's 3/29/94, handwritten recantation, but nowhere else in the record. (*Id.* at 33.) Martinez testified further that Clark "said she hasn't seen Rankins for about a year and couldn't give me any other information on Rankins at all." (*Id.*) At the conclusion of Martinez's testimony, ASA Coghlan requested a continuance "to make one last effort to locate Timothy Rankins." (*Id.* at 34.) The Court denied the request, explaining that the State had already devoted a day to the task without success. (*Id.*)

### (v)    Det. Halvorsen

---

[40] Although not in the record, Rankins was arrested on a domestic violence charge along with a Sabrina Hernandez less than a month before trial, but failed to appear for a scheduled hearing days before the commencement of the Montanez/Serrano trial. (9/15/94 Rankins Domestic Documents.) We consider it likely, but cannot assert definitively, that this is the same Sabrina referenced in the statements against Montanez, Serrano, and Pacheco.

AR-L 515127
SIDLEY AUSTIN LLP
SIDLEY

Det. Halvorsen testified to the genesis of and content of Rankins's evidence. (10/19/94 Trial Transcript, Vol. 3 at 89-93.) Det. Halvorsen also testified that he did not discuss with the State's Attorney possibly charging Rankins with murder. (*Id.* at 106.)

### (vi) Verdict and Findings

At the conclusion of the bench trial, the court found all three defendants guilty. (10/21/94 Trial Transcript at 119.) Thereafter, Serrano, Montanez, and Pacheco each moved for a new trial. (1/10/95 Hearing.) The court granted Pacheco's motion, acquitting him, but denied Montanez's and Serrano's motions. (*Id.* at 30-31.) Montanez and Serrano were later sentenced to fifty-five years. (3/3/95 Hearing at 97.)

### r. Vicente is Sentenced

As explained above in the Bouto section, on 9/23/96, approximately two months after the last of the three cases in which Vicente provided evidence concluded with a guilty verdict, Vicente was sentenced on his three armed robberies and one simple robbery. (9/23/96 Francisco Vicente Change of Plea Hearing.) ASA Dillon represented the State at that hearing and recommended a sentence of nine years. (*Id.*) Vicente was sentenced in accordance with the State's request. (*Id.*) Before the sentencing judge was also a letter from Lt. Earl F. Tucker, a Division Nine Shift Commander. (9/22/96 Letter from L.T. Tucker.) In that letter, Lt. Tucker described Vicente's assistance in procuring for him photos of a corrections officer "standing in the cell with his arm around several inmates and money on the bed." (*Id.*) As a result of that assistance, Lt. Tucker noted that "[i]t has been brought to my attention that his life, along with his families (sic) has been threatened after he gets out …. [and] states attorney John Dillon is aware of the danger his family is in." (*Id.*) Tucker noted further that "the service that he gave us is extraordinary." (*Id.*) He concluded with "any consideration that you deem fit may or may not have any influence on future actions." (*Id.*)

### s. Rankins Recants Again

As noted above, Rankins recanted several more times in the years after the trial, specifically in 1999, 2012, and 2014. Although Rankins continued to maintain that his evidence against Montanez, Serrano, and Pacheco had been fabricated, he alleged different misconduct and perpetrators within each iteration.

### (i) 1999

On 4/30/99, Rankins, incarcerated in California, petitioned, pro se, for relief under Section 1983, naming ASA Coghlan as defendant. (4/30/99 Timothy Rankins §1983 Claim.) As additional defendants, he named "John Doe 1-3 … Detectives at Grand and Central Police Station," Cook County State's Attorney Jack O'Malley, and ASA Jack Hines. (*Id.*) Rankins alleged therein that in 1993, "Doe # 1-3 beat and force" him to "sign a statement" under threat of being "beat and charge[d] with murder." (*Id.*) Rankins alleged further that ASAs Coghlan and Hines and State's Attorney O'Malley physically abused him and threatened that he would "go down for the crime" if he didn't testify against "George Pacheco and two more people." (*Id.*)

26

AR-L 515128
SIDLEY AUSTIN LLP
SIDLEY

Then, according to Rankins, he was "charge[d] with arm robbery and placed in jail and then in the witness program were another witness on the case was hired by the defendant to teach plaintiff what to say." (*Id.*) When he got out of jail, Rankins was told by State's Attorney O'Malley that "if he came to court against the state" he would be charged with murder and "his family will be killed." (*Id.*)

Rankins then fled to Puerto Rico to evade "being harassed." (*Id.*) Rankins has discussed his Puerto Rico trip on several subsequent occasions, including in a 6/23/99 letter to Montanez (6/23/99 Rankins Letter) and in a 3/2/14 interview with us. In the letter to Montanez, Rankins said that he asked Montanez's father and his private investigator Julio Lebron to take him to Puerto Rico, and that Montanez's family was exceedingly gracious to him during that time. (6/23/99 Rankins Letter.) Rankins also wrote in the letter that he slept at Montanez's sister's house in Chicago and Puerto Rico, slept at Montanez's grand parents's house "for two days," and "ate your families table with all this you showed me much love even though I sign a statement against you by force." (*Id.*) Rankins was paroled out of custody on 7/28/94 (8/26/14 Rankins Custody Record) and was arrested and charged with battery in Chicago on 9/19/94 (3/14/14 Rankins Background), and his trip to Puerto Rico likely occurred some time between those two dates.

### (ii) 2012

On 4/4/12, Rankins, incarcerated at a federal prison in West Virginia, provided a sworn statement to Bonjean, Serrano's current post-conviction counsel. (4/4/12 Rankins Sworn Statement.) According to Rankins, Det. Guevara informed him that Montanez, Serrano, and Pacheco had previously provided evidence against Rankins's brother.[41] (*Id.* at 10.)

Then, according to Rankins, Dets. Halvorsen and Guevara and Sgt. Mingey gave him a prepared statement against Montanez, Serrano, and Pacheco. (*Id.* at 12.) Det. Guevara "threw his statement on the floor with three pictures in front of me and he said, these are the guys who did the murder." (*Id.*) Rankins said that Dets. Guevara and Halvorsen and Sgt. Mingey provided Rankins with nicknames—Barrel Belly, Stripes, and Joker—but not birth names for the men depicted in the photos. (*Id.* at 17-18.) Det. Guevara informed Rankins "you need to study that statement … and you're going to sign it." (*Id.* at 12.) Rankins stated that Dets. Guevara and Halvorsen and Sgt. Mingey also brought him to the murder scene. (*Id.* at 22.)

When Rankins refused to cooperate, Det. Guevara kicked him out of a chair, he alleged. (*Id.* at 11.) Det. Guevara assaulted him further, kicking him, beating him with a phone book and a flash light, and choking him, Rankins claimed. (*Id.* at 12-13, 18.) Although Det. Guevara doled out most of the physical abuse, Rankins alleged that Det. Halvorsen and Sgt. Mingey participated, too. (*Id.* at 13.)

---

[41] In our interview with him, Serrano confirmed this fact. (8/22/14 Interview with Armando Serrano.) He said that he had been the target of a murder attempt by Rankins's brother, and, that being the case, later testified at his sentencing hearing. (*Id.*)

27

AR-L 515129
SIDLEY AUSTIN LLP
SIDLEY

He was "assaulted until [he] signed the statement," Rankins said. (*Id.* at 19.) Rankins alleged that he later informed ASA Coghlan that his statement implicating Serrano, Montanez, and Pacheco was fabricated and coerced. (*Id.* at 21.) According to Rankins, ASA Coghlan responded: "I don't care what you're saying, you're going to get on the stand and you're going to tell me what this statement said." (*Id.* at 21-22.)

Rankins stated that he was housed in the State's Attorney Witness Quarters. (*Id.* at 23.) While in the Witness Quarters, Rankins stated that he met on multiple occasions with Det. Guevara and ASA Coghlan. (*Id.* at 25.) While in the Witness Quarters, Rankins also alleged that he received "shoes, jumpsuits, cigarettes, special visits, [and] phone calls." (*Id.*) He continued: "[y]our girlfriend or your family could come down and they could sit with you and watch a movie and they can cook food in the kitchen[.]" (*Id.* at 26.) Rankins stated that conjugal visits were possible, but that he did not have any. (*Id.* at 26-27.) Det. Guevara, according to Rankins, also provided him with cash in the Witness Quarters, on occasion. (*Id.* at 26.)

Vicente was also in the Witness Quarters at that time, Rankins stated and the record evidence confirms. (*Id.* at 24; 6/19/12 Subpoena Attachment.) Allegedly, Vicente informed Rankins that Det. Guevara had instructed that they were to "go over our statements with each other[], so that he could know what I'd say in Court and I could know what he had to say in Court." (4/4/12 Rankins Sworn Statement at 28.) Vicente also informed Rankins that he had been abused by Det. Guevara. (*Id.* at 27-28.) When Rankins told Vicente that he would not "get on the stand and testify against an innocent person," Vicente raised his own "armed robbery cases." (*Id.* at 28.) Vicente explained, according to Rankins, that "[t]here's some cases that he himself was going to get off on that was promised him." (*Id.* at 28-29.) When Vicente persisted, Rankins stated that he beat Vicente with a broomstick. (*Id.*) (Vicente has related a similar account, although he said that he was the one who hit Rankins with the stick. (Francisco Vicente Affidavit Notes.)) That fight, according to Rankins, resulted in his transfer out of the Witness Quarters. (4/4/12 Rankins Sworn Statement at 29.) Dets. Guevara and Halvorsen and ASA Coghlan approached him after and stated, "I should have just cooperated and stayed inside the witness quarter protection program and that everything would have been alright." (*Id.*)

### (iii) 2014

#### (a) Interview

We interviewed Rankins on 3/2/14. (3/2/14 Interview with Timothy Rankins.) Rankins said that he was shown three Polaroid photos of the three defendants by Dets. Guevara and Halvorsen and Sgt. Mingey, and told that the man wearing a striped shirt (Jorge Pacheco) would be known as "Stripes" in his statement, that the man with "a big stomach" (Jose Montanez) would be known as "Barrel Belly," and that the man smiling (Armando Serrano) would be known as "Joker." (*Id.*) Rankins said: "There was no line-up and there was no photo array. There were three photos and they came and told me, 'This is who killed this man, this is what you're gonna say.'" (*Id.*)

After being told what they wanted him to attest to, Rankins said, Rankins was shepherded by the detectives to the office of ASA Coghlan, in whose presence Rankins said he was beaten

28

AR-L 515130

**SIDLEY** | SIDLEY AUSTIN LLP

by Dets. Guevara and Halvorsen: "I was punched in my private, I was hit in my mouth, punched in my stomach, given water. Every time I drank water, I'd get punched." (*Id.*) Rankins said that Sgt. Mingey was present for much of this exchange, but would occasionally leave the room. (*Id.*)

Rankins said that he explained to ASA Coghlan that "if they put me on the stand to say anything, I'm gonna tell the truth. I'm gonna tell how they beat me up." (*Id.*) Rankins said that ASA Coghlan then took him to a judge's chambers, where Rankins told the judge, "I wasn't there, I wasn't there. This is a lie." (*Id.*) The judge responded: "You signed it, this is what you're gonna testify to, and we're gonna get this case over with." (*Id.*) Rankins stated that he visited the judge's chambers "six to eight times." (*Id.*) According to Rankins, at some point, Det. Guevara and ASA Coghlan told him, "If you back out on us, we could just kill you." (*Id.*)

In order to assist him in committing to memory the details of the story they wanted him to tell, Rankins said that he was taken to the scene four times. (*Id.*) Rankins said that Dets. Guevara and Halvorsen took him to the scene the first time, that ASA King took him the second time, that ASAs King and Coghlan took him the third time, and that the fourth and final time he was taken by ASA Coghlan, Dets. Guevara and Halvorsen, and Sgt. Mingey.[42] (*Id.*) He said that he was taken to the scene, specifically, "to memorize how we got there, where the people were standing, and what took place." (*Id.*)

Rankins said that he was eventually placed on house arrest, ending his incarceration for the armed robbery (*id.*), which is corroborated by a 10/18/93 court order. (3/6/12 Rankins Disposition Sheet.) He said that during the course of his house arrest, he was visited frequently by Det. Halvorsen. (3/2/14 Interview with Timothy Rankins.) Rankins said that Det. Halvorsen would supply him with money - $15,000 overall - and remind him that he was expected to testify as a "key witness" in the Montanez/Serrano/Pacheco trial. (*Id.*) Rankins said he continually told Det. Halvorsen that he was going to decline to go through with his testimony. (*Id.*) Rankins said that Det. Halvorsen's steady supply of cash was not unusual, particularly in this case. (*Id.*) He said, "I used to get called by these guys, and if I was with a girl and she needed anything or I needed money to do anything, I got it from them. It wasn't a problem. This was how bad they wanted this case." (*Id.*)

Rankins also said that during that time, "Halvorsen, Mingey, Guevara and these other dirty detectives were grabbing us and putting guns on us." (*Id.*) Rankins said that he remembered the names of fellow gang members who could corroborate this aspect of his story, but declined to share their names during the interview, allegedly for fear of retaliation. (*Id.*) Rankins said that Dets. Halvorsen and Guevara had been running a drug trade in the neighborhood they patrolled, and he speculated that Montanez, Serrano, and Pacheco had declined to participate with them, and perhaps being charged with the Vargas murder served as retaliation by the detectives. (*Id.*)

---

[42] Other than reflected in Rankins's recantation, there is no evidence that any ASAs accompanied Rankins on a site visit. Moreover, Sgt. Mingey told us that he did not accompany Dets. Guevara and Halvorsen when they went along with Rankins to the scene for purposes of verifying his evidence. (4/7/14 Interview with Ed Mingey.)

29

AR-L 515131

SIDLEY AUSTIN LLP
SIDLEY

Rankins said that he returned to the continental United States from Puerto Rico before the commencement of the Montanez/Serrano/Pacheco trial. (*Id.*) Some time after his return, Rankins said, he was arrested, and approached again about testifying at trial against the three defendants in the Vargas trial. (*Id.*) He said: "I said if you put me on the stand, I'm gonna tell you the truth. That's when the judge and the state's attorney and Halvorsen and Mingey (said), 'Look, we're gonna say we just can't find you.'" (*Id.*) According to Rankins, the judge said that the prosecution could "always use Vicente" instead as a witness "to seal the deal.'" (*Id.*) Rankins said that the judge in this incident was a different judge than the one he had met with several times in the months prior. (*Id.*) He did not know the judge's name. (*Id.*)

### (b)    The Second Section 1983 Claim

On 3/31/14 Rankins once again filed a law suit under Section 1983, naming as defendants Dets. Guevara and Halvorsen, Sgt. Mingey, Judge Coghlan, Area 5 Chicago Police Department, the Rochelle and Elgin, Illinois, police departments, John Doe correctional officer, John Doe police officer, State's Attorney John Doe 1, State's Attorney John Doe 2, the Chicago division of the Office of State's Attorney, the Illinois Department of Corrections, the Illinois Department of Justice, the cities of Chicago, Elgin, Rochelle, Pasadena, and Oregon [sic], the California Department of Justice, the Pasadena State's Attorney's Office, the Oregon State's Attorney's Office, the Rochelle Public Defender's Office, Judge John Payne, Mr. F.N.U Miller, Corporal F.N.U. Hilliard, and the Ramada Inn and Suites. (3/31/14 Timothy Rankins §1983 Claim.)

According to Rankins, in approximately June of 1993, Dets. Guevara and Halvorsen and Sgt. Mingey approached Rankins. (*Id.* at 5.) Det. Guevara told him "they need me to do them a favor." (*Id.*) Although Rankins "knew these detective's to make people sale drugs for them when they is caught or do some dirty works agust other people [sic]" Rankins told them "I ain't doing anything." (*Id.*) Det. Halvorsen responded, "yes you is" and Rankins was placed in a car with Dets. Guevara and Halvorsen and Sgt. Mingey. (*Id.*) Det. Guevara said, "Loco you going to put three guys away for us" who "don't want to do what we tell them." (*Id.*) Det. Guevara continued: "they have to go[,] these are our streets." (*Id.*) When Rankins refused again, Det. Guevara "smack[ed]" him with the back of his hand. (*Id.*) Sgt. Mingey then explained that failure to cooperate would lead to an armed robbery charge, which would entail a six- to thirty-year sentence. (*Id.*)

Rankins was taken to the Grand and Central police station and placed in an interview room with Dets. Guevara and Halvorsen and Sgt. Mingey, he said. (*Id.*) When Rankins refused to cooperate once again, Det. Halvorsen "jump up and smack me out the chair [sic]" and "punch me in the stomack [sic]" and "slam my face on the table while I was cuff from behind [sic]." (*Id.* at 5-6.) Sgt. Mingey told Rankins that Rankins had the ability to "make this stop." (*Id.* at 6.) After Rankins refused again, Sgt. Mingey placed him in a "choke hold" while Det. Halvorsen continued to punch him. (*Id.*) At that point, Rankins said, he agreed to cooperate. (*Id.*)

After further resistance, Rankins said, he signed an already prepared statement. (*Id.*) Rankins was then instructed "to say everything on the statement to the state's attorney John Doe # 1 who came and seen us." (*Id.*) Rankins told him that the "police beat me and made me sign that statement." (*Id.*) ASA John Doe # 1 stated, allegedly, "I don't care what happen to you[,] I

30

AR-L 515132
SIDLEY AUSTIN LLP
SIDLEY

just care about getting promoted [sic]." (*Id.*) Several days later, Rankins was taken before ASA Coghlan. (*Id.*) He told ASA Coghlan that he was "beat and made to sign a statement and it was a lie." (*Id.*) ASA Coghlan responded, "I don't care what happen to you or anyone else[,] Pacho[,] Montanez[,] and Surrano is going down for this murder [sic]." (*Id.*)

Rankins was "taken before the Grand Jury and I told them I was beaten." (*Id.*) At that point, Rankins was removed from the grand jury room and "told by Judge John Doe # 1, I'm crazy[,] I was facing 30 years[,] and if I don't go and say what I stated on the statement[,] I'll be gone for a long time." (*Id.* at 6-7.) Rankins relented then, and "told the Grand Jury what the statement said." (*Id.* at 7.)

Later, Rankins entered the Witness Protection Program, where he met "witness John Doe # 1[,] a witness" against "Surrano, Pacheco and Montanez [sic]." (*Id.*) That witness informed Rankins that he was "getting paid by the State's Attorney Office and all his cases would be drop or he would be given liss time for all his crimes [sic]." (*Id.*) Several weeks later, Rankins "beat witness John Doe # 1 with a pool stick." (*Id.*) ASA Coghlan then asked Rankins if he wanted to "play Hard Ball?" (*Id.*) When Rankins reiterated that he would not give false testimony at trial, ASA Coghlan removed him from the witness quarters and placed him in the "county jail very late at night" in a "cell with Montanez[,] the defendant in the murder." (*Id.*)

Montanez, according to Rankins, said "a few guys wanted to kill" Rankins, but he instructed them not to because doing so would "fuck my case up" and "start another gang war." (*Id.* at 8.) Then Montanez presented Rankins and a corrections officer with "a copy of the statement I sign[ed] by force." (*Id.*) Recognizing that Rankins was "the key witness" in the case against Montanez, the corrections officer assigned Rankins to a different cell. (*Id.*)

Later, after being placed on home monitoring, Rankins met with a lawyer who reviewed Rankins's statement against Montanez, Serrano, and Pacheco. (*Id.*) The lawyer said "he didn't want anything to do with the case" because Rankins "implicated myself in a murder" but "was not charge with the murder [sic]." (*Id.*) The lawyer thought that indicated "something was very wrong." (*Id.*)

While on home monitoring, Rankins said he was "bother twice a week by Halvorsen showing up at my house letting me know they keeping a eye on me." (*Id.*) Det. Guevara also came by on occasion and gave Rankins money, "telling me to take it, or they know I turn on them [and] will kill me." (*Id.*) Later, Rankins was "caught at gun point by Guevara" and instructed to "keep quiet about things cause people will lose they jobs family and they life [sic]." (*Id.* at 9.) Before that would happen, Det. Guevara stated, Rankins "will [lose those things.]" (*Id.*)

In 1997, after Rankins was charged in Ogle County, Illinois, he contacted ASA Coghlan and threatened to meet with CBS and WGN reporters regarding the Montanez, Serrano, and Pacheco matter unless the Ogle County charges were dropped. (*Id.*) ASA Coghlan contacted Judge John Payne and several unnamed Ogle County State's Attorneys, Rankins said. (*Id.*) The Ogle County personnel "beat and sexually assaulted" Rankins. (*Id.*) Rankins was then told to

31

AR-L 515133
SIDLEY AUSTIN LLP
SIDLEY

"keep my mouth close[d]" about "Montanez and Surrano [sic]" unless he wanted to serve a longer sentence or "be killed." (*Id.* at 9-10.)

In 1998, Rankins said he was "contacted by Couglin [sic] and Guevara" who stated that "Surrano was appealing his case and I'll have to testify and keep him in prison [sic]." (*Id.* at 10.) Rankins was given $10,000 to "travel to California and Vegas." (*Id.*) In Pasadena, Rankins and several friends rented a room at the Ramada Inn. (*Id.*) After Rankins and his friends participated in an "orgy" with several prostitutes, Rankins received a phone call from Det. Guevara and ASA Coghlan. (*Id.* at 10-11.) Det. Guevara stated, according to Rankins, "see no matter were you go we are" there. (*Id.* at 11.) ASA Coghlan told Rankins the "fun" he just had would "cost" him if he did not keep "quiet." (*Id.*) Later that evening, Rankins was arrested for raping one of the prostitutes. (*Id.*) Several weeks later, Rankins was informed by Pasadena prosecution personnel that ASA Coghlan "asks us to work with you" and "want you to keep your mouth closed on the Surrano case [sic]." (*Id.*)

In 2013, after speaking with Bonjean "a few times," Rankins was "threatened" by "lawyers" and an "investigator" who "said they work for Coughlin and Gueverra [sic]." (*Id.* at 12.) Later that year, Rankins was contacted by telephone and informed that he was a "walking dead man." (*Id.*)

   t.  **Vicente Recants**

On 6/19/03 Vicente told students investigating possible wrongful convictions that the confession evidence he shared against Montanez, Serrano, and Pacheco (and against Bouto and the third defendant, too[43]) had been fabricated, after he had allegedly been "coerced" and "beat" by Dets. Guevara and Halvorsen. (6/19/03 Email.) Serrano, who he "hated," and Montanez were innocent, he stated. (*Id.*) On later occasions he negotiated for various benefits in return for executing an affidavit and his potential testimony in connection with the Montanez/Serrano post-conviction matter.

On 8/24/04 and 9/16/05, respectively, Montanez and Serrano moved for post-conviction relief, primarily relying on Vicente's allegations.[44] (8/24/04 Montanez Postconviction Petition;

---

[43] Det. Halvorsen told us that he did not remember that Vicente had also received a confession in the third defendant's matter, stating: "That's news to me." (7/1/14 Interview with Ernest Halvorsen.) When we asked him to examine the Supp. R. attributed to him and Det. Guevara reporting Vicente's information, Det. Halvorsen expressed surprise, stating: "He got another one? In the Cook County jail?" (*Id.*) Det. Halvorsen then stated of Vicente, "This guy's a roving confession elicitator" [sic]. (*Id.*)

[44] Previously, on 8/9/99, Serrano had petitioned pro se for post-conviction relief under the Illinois Post-Conviction Act, but his petition was dismissed as untimely. (Serrano Postconviction Petition at 2.) On 10/27/00, Serrano petitioned, pro se, for federal habeas relief, alleging, among other things, that "[t]he State knowingly used the perjured testimony of Francisco Vicente who was a professional snitch who had already testified in two other cases…." (10/27/00 Serrano

AR-L 515134
SIDLEY AUSTIN LLP
SIDLEY

Serrano Postconviction Petition at 2.) At a hearing, both Det. Guevara and Vicente appeared, but invoked their Fifth Amendment rights. (7/22/13 Hearing.)

On 5/16/13, during the pendency of the Montanez/Serrano post-conviction matter, a former inmate, Valentine Gomez (aka "Tomato"), testified that in 1995 or 1996 Vicente told him then that "he had caught a case and in order for him to cut a deal with some officer, he "lied on" Montanez, Serrano, and Pacheco and "pointed the finger" at them. (5/16/93 Hearing at 108-09.) Vicente also told Gomez that his trial testimony "was a lie." (*Id.* at 109.) Gomez testified further that he had not seen Serrano or Montanez for nearly twenty years and that he had not spoken to them about their case or Vicente's statements to him. (*Id.* at 111.) On cross exam, Gomez testified that although he was acquainted with both Montanez and Serrano he did not know them to be friends and had never seen them together. (*Id.* at 119-20.)

3. **Analysis**

First we analyze the evidence obtained from Vicente and Rankins. Then we analyze the evidence obtained from other sources.

a. **The Evidence Provided by Vicente and Rankins**

As was also the case in the Bouto and third defendant matters, the informants—here, Vicente and Rankins—knew details about the murder that they could only have learned through participating in or witnessing the murder, by learning about it from the participants after its commission, or by learning of it from another party knowledgeable about it, a category that includes the police investigating it or verifiable eyewitnesses to it. Rankins, in particular, provided detailed information about the murder, including regarding its location, Vargas's van, the radio, and that the gunfire shattered the passenger window. First we consider Vicente's evidence, then we consider Rankins's evidence.

(i) **Vicente's Evidence**

To determine whether it is more likely that Vicente obtained the evidence from Montanez, Serrano, and Pacheco or from one or more of the other categories of possible sources identified above, we analyze that evidence as it relates to the following: (1) whether it includes verifiable information not previously obtained from other sources; (2) the introduction of the evidence regarding a 2/4/93 incident with the victim; (3) its possible corroboration by Wilda and other sources; (4) its consistency (or lack thereof); (5) the purported circumstances of its receipt; and (6) its recantation.

(a) **Inclusion of Verifiable Information Not Previously Obtained from Other Sources**

Habeas Petition.) His federal habeas petition was dismissed as untimely on 7/24/01. (7/24/01 Serrano Habeas Dismissal.)

AR-L 515135
SIDLEY AUSTIN LLP
SIDLEY

For purposes of assessing whether Montanez, Serrano, and Pacheco confessed to Vicente, or whether Vicente instead became knowledgeable about the crime through other sources, it is useful to consider whether Vicente provided any verifiable information that had not been reported to police prior to Vicente's statement.

We begin with Vicente's description of the genesis of the crime. According to Vicente, Montanez, Serrano, and Pacheco decided to rob Vargas because they spotted him displaying a significant amount of cash. At least as early as the first day of the investigation, a General Progress Report noted that a receipt for $300 was found on the person of Vargas. Moreover, Vargas was discovered with $190 in cash in his wallet. Relatedly, as we explain below, the 2/4/93 incident with Latino men was likelier than not known to police before Vicente reportedly discussed it with Dets. Guevara and Halvorsen.

Second, Vargas's pull-out car radio played a significant role in Vicente's story. Vargas was found holding such a radio, as reported in a Supp. R. which issued the day after the murder.

Third, Vicente stated that Montanez, Serrano, and Pacheco were in Montanez's car when they spotted the victim and, the following morning, committed the crime. As early as 2/5/93, the day of the shooting, it was reported in a GPR and a Supp. R. that several of Vargas's neighbors, including State's witness Gary Shoop, saw a brown or light brown car driving north on Springfield after the shots were fired.

Fourth, Vicente described the victim, Vargas, as a "Mexican." On 2/6/93, the day after Vargas was murdered, Dets. Schak and Jack reported that Vargas had been born in Mexico. Moreover, it is not clear how Montanez, Serrano, or Pacheco would know the victim's country of origin.

To summarize, we find that all of the verifiable information that Vicente allegedly provided had been previously mentioned in some form in the investigation record, and that Vicente did not introduce any new, verifiable information.

| (b) | **The Introduction of Evidence Regarding a 2/4/93 Incident Involving Latino Men and the Victim** |

Making some determination of whether Vicente first introduced evidence regarding an incident on the eve of Vargas's murder involving several Latino men and the victim is instructive. If Vicente first introduced into the case that evidence—i.e., no one else knew about it, and Wilda subsequently confirmed that information—it would be meaningful evidence that Montanez, Serrano, and Pacheco confessed to him. If, however, Wilda first introduced that information, then Vicente's knowledge of it would not establish that Montanez, Serrano, and Pacheco confessed to him, for Vicente could have learned the information from another source, including police who may have previously received that information from Wilda.

34

AR-L 515136
SIDLEY AUSTIN LLP
SIDLEY

We first consider evidence suggesting that Wilda merely confirmed information first introduced into the case by Vicente. We then examine evidence suggesting that Wilda introduced into the case the evidence prior to its alleged reporting by Vicente.

First, as detailed above, at trial Det. Guevara testified that he contacted Wilda after speaking with Vicente on 6/2/93, asking her "if anything unusual happened the night before the murder." Det. Guevara was suggesting, we believe, that Vicente introduced the incident, and that Wilda then confirmed it. Second, there is no mention of the incident in the record until Dets. Guevara and Halvorsen filed the Supp. R. dated 6/2/93. Although the Supp. R. dated 6/2/93 does not reference the sequence of evidence-gathering, the introduction of the incident in that report would tend to suggest that the incident had not been discussed by Wilda prior to the meeting she had with Dets. Guevara and Halvorsen as reflected in that report.

Regarding the evidence that Wilda first introduced evidence about a 2/4/93 confrontation into the case, we consider the following. First, Wilda stated at trial on several occasions that she introduced the incident into the evidence. That is, Wilda testified that she volunteered the evidence to them. Related to this point, Det. Guevara and Wilda both testified that they were in frequent contact, commencing the day after Vargas was murdered. It is unlikely that Wilda would not have shared this detail during one of those conversations. Second, Det. Halvorsen told us that Wilda, not Vicente, first introduced into the case the evidence of a 2/4/93 confrontation. (10/21/13 Interview with Ernest Halvorsen.) Of course, in connection with this point, we do not overlook the fact that Det. Halvorsen was speaking to us about an event that occurred more than twenty years ago. Still, Det. Halvorsen's statement to us is consistent with Wilda's testimony.

Third, the important Supp. R. dated 6/2/93, which memorialized Dets. Guevara and Halvorsen's meetings with Vicente and Wilda, did not itself indicate that Wilda corroborated evidence first provided by Vicente. With regard to Vicente and timing, the Supp. R. reads, "On 2 June 93, the R/Dets. had a meeting with a circumstantial witness who for his own safety must remain anonymous at this time." With regard to Wilda and timing, the Supp. R. reads, "On 2 June 93, Det. R. Guevara interviewed Wilda Vargas, the victims [sic] wife." Although Vicente's evidence precedes Vargas's evidence within the report, there is no indication within this or other Supp. R.'s that we reviewed that this is a meaningful distinction. This is particularly so where, as Det. Halvorsen explained to us, the report was prepared on word processing software.[45] (10/21/13 Interview with Ernest Halvorsen.) Moreover, there is no statement of sequencing within the report. For instance, the report does not state that Dets. Guevara and Halvorsen (or anyone else) met with Vicente and then met with Wilda, or that Wilda confirmed evidence previously provided by Vicente. The document asserts only that Dets. Guevara and Halvorsen spoke to Vargas and Vicente on the same day, but does not indicate at which time or in what order they spoke.

---

[45] That the Supp. R. dated 6/2/93 is backdated, i.e. it reports activity occurring on 6/6/93, four days later, is another reason that the report itself is an unreliable metric of sequencing in connection with the gas station evidence.

AR-L 515137
SIDLEY AUSTIN LLP
SIDLEY

        (c)      **Corroboration of Evidence Provided by Vicente**

For purposes of assessing the veracity of Vicente's purported receipt of confession evidence, it is also useful to consider whether Vicente's evidence is corroborated by other sources and evidence. First, we consider whether Wilda did or did not corroborate aspects of Vicente's evidence. Then we consider whether other witnesses or evidence did or did not corroborate Vicente's evidence.

        (1)      **Corroboration by Wilda**

Here we consider evidence that Wilda did and did not corroborate other evidence reportedly disclosed to Vicente by Montanez, Serrano, and Pacheco. We begin with the ways in which she corroborated evidence.

To begin, the record evidence indicates that Wilda identified Montanez and Serrano at Area 5 station line-ups conducted by Dets. Guevara and Halvorsen as the men she saw at a gas station the night before her husband's murder. If reliable, these line-up identifications would tend to corroborate Vicente's evidence that Montanez and Serrano spotted Vargas the day before he was murdered.

Second, the Supp. R. dated 6/2/93 indicates that Wilda identified Montanez's car in the presence of Dets. Guevara and Halvorsen as the car she saw at the gas station. If reliable, this is meaningful corroboration, as well, of Vicente's evidence.

We now consider ways in which Wilda did not corroborate evidence reportedly disclosed to Vicente by Montanez, Serrano, and Pacheco.

First, while it is important to Vicente's evidence regarding motive that Montanez saw Vargas, with his money visible, Wilda testified in answer to three separate questions at trial that her husband was already out of the store and back to the family van by the time that Montanez entered the store. (However, she stated otherwise on one occasion at trial, at the conclusion of her testimony, on cross examination.) If Wilda's first three responses are accurate—i.e., that Vargas was out of the gas station store by the time the driver of the tan car entered the cashier's line—there would no longer exist an incentive for the defendants to target Vargas as a potential robbery victim; the driver of the tan vehicle would not have seen his money.

Second, Wilda failed several times at trial to accurately identify Montanez and Serrano, which may raise questions regarding the reliability of her reported photo array and lineup identifications.

Third, Wilda testified in response to multiple questions at trial that she did not see the car follow her husband home, although she acknowledged that Det. Guevara reported differently in the Supp. R. dated 6/2/93. (10/19/94 Trial Transcript, Vol. 3 at 55-56.) Absent following the Vargases home, the Latino men spotted at the gas station would have no way of knowing where they lived. (As noted above, years later, however, in an affidavit executed on 5/23/06 in

AR-L 515138

conjunction with a student investigation of potential wrongful convictions, Wilda did state that the vehicle from the gas station was still behind her when she and Vargas arrived at home, although she did not believe they were being "followed.")

Fourth, although Dets. Guevara and Halvorsen reported and testified that Wilda was riding with them when she spontaneously identified Montanez's car outside his girlfriend's house as the car that she saw at the gas station, Wilda herself has allegedly since said that she did not, according to Montanez's and Serrano's post conviction attorneys. Specifically, she reportedly stated that Det. Guevara pointed out the car to her, at which point she conceded only that it was similar to the car she saw at the gas station. Relatedly, Det. Guevara testified that Wilda did not describe to him the car she spotted at the gas station (10/21/94 Trial Transcript at 25), which may suggest that she could not have identified Montanez's car without assistance.

(2)     **Corroboration of Vicente's Evidence by Other Sources or Evidence**

We also consider whether Vicente's evidence is corroborated by other witnesses or evidence. First, we examine Vicente's linking of the Vargas murder to a botched robbery. Second, we examine Vicente's linking of Montanez's car to the Vargas murder. Third, we examine Vicente's trial testimony concerning "Rick" and a purported trip to "Gold Busters" with Montanez, Serrano, and Pacheco.

i)     **Regarding a Purported Connection Between the Vargas Murder and an Attempted Robbery**

A significant component of the evidence provided by Vicente is his statement and testimony that Montanez, Serrano, and Pacheco killed Vargas after attempting to rob him. We consider here evidence that Vargas's murder did and did not arise from a failed robbery.

We begin with the latter. There is no significant evidence that Vargas had any meaningful enemies and, accordingly, would have been the subject of a targeted and planned crime, rather than the victim of a robbery perpetrated by strangers, such as Montanez, Serrano, and Pacheco. First, while students investigating the case spoke with Vargas's brother Ramiro Vargas, who told the students that Vargas's family had speculated that the killing had been related to the drug trade, we are aware of no evidence supporting Ramiro's speculation. (3/7/03 Email.) Second, although some of his co-workers told police that Vargas's employers had been "grouchy" about his continuation of a worker's compensation lawsuit (2/5/93 General Progress Report at 11), there is no follow-up indicating that this was examined further or considered to be a credible lead. Moreover, such a lawsuit does not seem likely to motivate a planned killing. Third, while Vargas's family members reportedly told students investigating the case that an ex-girlfriend "stalker" might have been upset that Vargas's first wedding anniversary with Wilda was nearing, we are aware of no evidence supporting this theory. (5/4/03 Email.)

37

AR-L 515139

# SIDLEY
SIDLEY AUSTIN LLP

Regarding the possibility that Vargas's murder did not result from Montanez, Serrano, and Pacheco's failed attempt to rob Vargas, we consider the following. First, the story of a sidewalk confrontation between the defendants and Vargas and a botched "ganking" while struggling over a car radio is not corroborated by the eye and ear witnesses to Vargas's murder. Both Anna Velez and Judy Milinkovic likely would have seen Montanez, Serrano, and Pacheco on the sidewalk beside Vargas's home waiting for him to exit the gate, but did not. Indeed, Velez provided evidence tending to indicate that Vargas was sitting in his car, warming the engine, at the time of the confrontation that resulted in his death. Moreover, witnesses Hector and Iris Melendez, who were near enough to the crime scene to have reported hearing footsteps, did not report hearing a mugging (or the shouts described by Rankins). (2/5/93 GPR at 8.)

Second, the physical evidence at the scene is examined for consistency with the tale of a failed robbery. As an initial matter, it is unlikely that the defendants would shoot to death their target, but then not steal the goods that they were after, particularly under circumstances where those items were accessible. Having shot out a portion of the window, the assailants need only have reached into the van, unlocked the door, and taken Vargas's money and radio. (Photos in Evidence.) Relevant to this point, Vicente described Montanez, Serrano, and Pacheco as sufficiently in need of cash to procure drugs that they then committed a second robbery, this time in broad daylight. Under such circumstances, it is not clear why the perpetrators would not take the extra few seconds to obtain Vargas's cash or his radio. At 5:32 a.m., the extra risk from that action may have been marginal.

Relatedly, Vargas was discovered lying face down between the front seats of his van, positioned in a fashion indicating that he was, according to CPD, shot "as he sat in his vehicle preparing to go to his place of employment." He was holding his radio, his lunch bag was underneath his body, and his scarf, hood, and baseball cap were not disturbed. (Photos in Evidence.) It is unlikely that Vargas, after being confronted on the sidewalk by three assailants, would have held onto both a radio and a plastic lunch bag while running to his van, locking the doors behind him, starting the vehicle, and positioning himself to drive away. Indeed, on-scene investigators determined that there was no evidence of a struggle, and the medical examiner determined that Vargas had no defensive wounds. (2/6/93 Supp. R. at 7.)

ii) **Regarding Possible Connections Between Montanez's Car and the Shooting**

Another important component of Vicente's evidence is the link between Montanez's car and the Vargas murder. We consider here evidence that Montanez's car was connected to the Vargas murder. We then consider evidence that Montanez's car was not connected to the Vargas murder.

Regarding the former, we consider the following. First, Vargas's neighbor, Gary Shoop, testified that the car he saw fleeing the crime scene was similar to Montanez's car. The evidence indicates that Montanez purchased his car on 1/4/93—i.e., before the murder. (6/6/93 Montanez Vehicle History.) It is at least possible, then, that the car that Shoop viewed was Montanez's.

38

AR-L 515140

**SIDLEY** | SIDLEY AUSTIN LLP

Second, Dets. Guevara and Halvorsen reported, in the Supp. R. dated 6/2/93, that Wilda identified Montanez's car. Assuming the reliability of that identification, that is meaningful evidence that Montanez's vehicle was involved in the murder.

Regarding the possibility that Montanez's car was not connected to the Vargas murder, we now consider the following.

First, as detailed above, Det. Guevara testified that Wilda did not describe to him in advance the car she later purportedly positively identified, which may diminish the importance of the identification because it suggests she did not recall the car with particularity. Moreover, Wilda allegedly informed post-conviction counsel to Montanez and Serrano that Det. Guevara engaged in misconduct in connection with her identification of that car, which, if true, further calls into question the reliability of that identification. Furthermore, it is unlikely that she would remember the car after four months when she did not mention the incident the day of the murder.

Second, although Vicente purportedly asserted that Montanez explained to him that there was damage to his front fender because he crashed his car "into a parked car as they drove off," there is no reference in the investigation record of such a car crash in the vicinity of the crime. Indeed, although ten ear and eyewitnesses described hearing the shooting, and Shoop described hearing the tires squeal as it rounded corners several blocks away, none described hearing a car crash. (2/5/93 Supp. R.; 2/6/93 Supp. R.)

Third, Montanez's mechanic attested in an affidavit that Montanez brought the car into his shop for repair well after the shooting, and it did not have any damage. Relatedly, Montanez's former girlfriend executed an affidavit attesting similarly. (Montanez informed us that he crashed his car in March of 1993 when he was under the influence of narcotics. (10/17/13 Interview with Jose Montanez.)

Fourth, Montanez's car was a distinctive, two-toned vehicle—its body was light tan and its vinyl top was dark brown, which Shoop did not reference prior to trial. Milinkovic also described viewing a brown car driving away from the scene, and did not describe it as two-toned or reference the vinyl top. Such distinguishing details are the sort that we expect Shoop would have shared with on-scene personnel given the specificity of his description on scene.[46] Relatedly, Montanez's car was a four-door sedan, whereas Shoop told police the car he saw may have been a two-door.

---

[46] As we noted in our discussion of the Robert Bouto case, in "Eyewitness Testimony" psychology and law professor Elizabeth F. Loftus terms such details that are noted by many witnesses "salient details," which have a "high probability of being spontaneously mentioned by individuals who witness a particular event." A two-toned color scheme on a vehicle could qualify as such a detail, meaning it would be unlikely that multiple witnesses viewing the car would fail to note that aspect of its appearance.

39

AR-L 515141
SIDLEY AUSTIN LLP
SIDLEY

Finally, tan was a popular color for cars produced in the 1980s and early 1990s[47], and Montanez drove a sedan, a very popular body style. Considering the size and population density of the city of Chicago, a description of a tan or brown sedan may not have meaningfully limited the universe of possible vehicles used in commission of the crime.

iii) **Regarding "Rick" and "Gold Busters"**

We consider here two additional pieces of evidence that Vicente provided against Montanez and Serrano. First, we consider Vicente's testimony that the second time that Montanez confessed to him, Vicente was with his friend "Rick." Second, we consider Vicente's statement and testimony regarding a trip to "Gold Busters" with Montanez, Serrano, and Pacheco to fence gold.

We begin with Rick. Vicente's trial testimony stands as the only reference to Rick in the record, and nothing in the record corroborates Vicente's testimony regarding him. Although Vicente testified at trial that he informed ASA Coghlan on 9/21/94 that he was with a friend when Montanez confessed on 2/7/93, (10/18/94 Trial Transcript, Vol. 2 at 112-113), that purported statement is not reflected in the record, and we consider it unlikely that both ASA Coghlan and Investigator Martinez would have failed to note such a detail if provided to them. We note, too, that Montanez may have been unlikely to have confessed to murder in front of a stranger, and Vicente did not allege that Rick and Montanez were acquainted.

Second, we examine Vicente's statements and testimony regarding Gold Busters. While Dets. Halvorsen and Guevara both included the Gold Busters evidence in the Supp. R. dated 6/2/93, and Vicente testified to it at trial, Det. Halvorsen told us, as noted above, that he and Det. Guevara investigated that portion of Vicente's story and determined that Gold Busters did not exist. Also as noted above, we have independently determined that no store called Gold Busters existed in Chicago at that time.

(d) **Consistency of Vicente's Evidence**

We consider here internal consistencies and inconsistencies in connection with evidence provided by Vicente, parameters also useful for assessing credibility.

First, we describe the internal consistencies in connection with evidence provided by Vicente. Prior to his recantation in 2003, Vicente spoke on the record five times about the confession he allegedly received from Montanez, Serrano, and Pacheco: (1) As an unidentified confidential informant, as documented in a Supp. R. prepared by Dets. Guevara and Halvorsen dated 6/2/93; (2) In a handwritten statement memorialized by ASA Solita Pandit and Det.

---

[47] *See* Kelly, John. "Today's Popular Car Colors Rev No Engines," *Washington Post*, 4/23/12. (noting that brown and beige were among the most popular car colors during the relevant time period).

AR-L 515142
SIDLEY AUSTIN LLP
SIDLEY

Halvorsen on 6/28/93; (3) Before the grand jury on 7/1/93; (4) To ASA Coghlan and Investigator Martinez on 9/21/94; and (5) At trial on 10/18/94.

In all but the 9/21/94 statement, which is limited to new or altered information, Vicente related a complete telling or retelling of the confession. In each instance, he was standing near an intersection, when Montanez pulled up in his car, with Serrano and Pacheco. Consistently, Montanez explained to Vicente that the three men saw Vargas with money out the night before, and followed him to his home because of it, electing to hold off on robbing him then because his wife and children were present. Also in each instance, Vicente said that Montanez told him that Vargas was shot after Serrano attempted unsuccessfully to steal his pull-out radio. He also consistently told of a second meeting, with Montanez, that occurred two days later, and at which Montanez explained further the events of that morning.

Now, we examine the internal inconsistencies in connection with Vicente's evidence. We begin by examining the additions and alterations Vicente made to his evidence on 9/21/94 in a meeting with ASA Coghlan and Investigator Martinez. Then we examine inconsistencies that arose at trial.

In Vicente's original statements, Pacheco and Serrano had not spoken in front of him about their role in the murder. In the 9/21/94 update, however, Vicente said that Serrano and Pacheco made inculpatory statements. It may be notable that prior to Rankins's recantation, which predated the 9/21/94 meeting, Rankins's alleged eyewitness account was the only evidence that attributed comments specifically to Serrano and Pacheco admitting involvement in the shooting.

Second, while Vicente, in his initial statements to police, said that the defendants had indicated that Montanez was the getaway driver after the Vargas shooting, in the 9/21/94 report and at trial, Vicente described Pacheco as the driver instead. Recall that in Rankins's statement, Pacheco drove the striped van while Montanez drove his own sedan.

Third, as reported in the Supp. R. dated 6/2/93, and also in the hand-written statement executed a few weeks later, Vicente reportedly stated that he first noticed damage to Montanez's car on 2/7/93, two days after he initially spoke to the defendants about the Vargas murder. On 9/21/94, however, he stated that he "had noticed the bullet holes and damage to Montanez's car when he first talked to the defendants on 2/5/93—i.e., during the first purported conversation with defendants.

Regarding trial inconsistencies, first, as reported in the Supp. R. dated 6/2/93, and also in the hand-written statement executed a few weeks later, Vicente reportedly stated that he spoke with the three defendants outside, on the corner, and during a trip to Gold Busters. At trial, however, Vicente said that the conversation with the defendants took place in considerable part on his porch.

41

AR-L 515143

SIDLEY AUSTIN LLP

# SIDLEY

Second, Vicente introduced for the first time at trial the assertion that Montanez disposed of the murder weapon, his 9 mm gun, somewhere outside the vehicle before driving to Gold Busters. Previously, he had only said that Montanez hid the gun in the car's heating vent.

Finally, at trial, as discussed above, Vicente for the first time introduced a new witness to the confession—Rick.

(e)   **The Circumstances of the Confession's Purported Receipt by Vicente**

We consider here the circumstances of the purported receipt by Vicente of confession evidence.

The record indicates and Vicente testified that he received the confession from the defendants after meeting with them at 8:30 or 9 a.m. on 2/5/93 at the corner of Hamlin and Altgeld streets. We consider first ways in which the circumstances of the receipt of the purported confession contribute to its reliability. Then we consider ways in which the circumstances of its receipt detract from its reliability.

Regarding the former, we note, first, that this was, we have verified, the neighborhood that Vicente lived in at the time. It would, therefore, make some sense that Vicente would have been spending time at that location. Second, Vicente knew Montanez and Serrano, and possibly Pacheco and, accordingly, may have had reason to converse upon seeing each other. Specifically, Montanez told us that he had recruited Vicente into the Imperial Gangsters well before the Vargas murder, although he said that they did not have contact after that. (10/17/13 Interview with Jose Montanez.) Vicente later referred to Montanez as a "friend" in conversation with students investigating the case. Regarding Serrano, Vicente and Serrano had a prior altercation, discussed above. In fact, Vicente told students investigating the case that he "hated Serrano." At trial, Vicente stated that he had known Pacheco for "nine, eight years," although he does not elsewhere discuss a prior relationship with Pacheco, and we have not been unable to locate any corroborating evidence from Pacheco.

Third, Montanez, Serrano, and Pacheco were at least acquainted with each other and, thus, it is at least plausible that they would have committed a crime together. Specifically, Serrano told us that he was "aware of" Montanez and Pacheco, but "didn't really hang" with either regularly. (10/17/13 Interview with Armando Serrano.) Serrano also said that he had smoked marijuana with Pacheco a few times, and knew his girlfriend or sister, but that he had not socialized with Montanez. (*Id.*) Montanez said he knew Serrano, but did not socialize with him due to their differences in ages. (10/17/13 Interview with Jose Montanez.) Montanez said that he knew Pacheco better, and had "partied" with him on several occasions, but had not participated in criminal activity with either man. (*Id.*)

We consider now the ways in which the circumstances of its purported receipt detract from its reliability.

42

AR-L 515144
SIDLEY AUSTIN LLP
SIDLEY

First, Vicente testified that he was not aware of the fact that Our Lady of Grace Catholic church and school are situated at Hamlin and Altgeld, notwithstanding the fact that the complex dominates several blocks there. Relatedly, Vicente testified that he did not see anyone other than the defendants during the hours he spent at the corner, notwithstanding the fact that on the morning of 2/5/93 (a non-holiday weekday), clergy, church employees, children, their parents, teachers, and other staff would likely have been arriving for the start of the work and school day.

Second, recall that Vicente discussed Montanez, Serrano, and Pacheco "yelling" at each other about how they had just killed someone. During that conversation, they were also purportedly using heroin. But for the church and school complex, this was not an otherwise vacant neighborhood. On the corners not dominated by the church and school, four- and five-story brick homes and apartment complexes stand. It may have been unlikely that Montanez, Serrano, and Pacheco would have handled a firearm, used heroin, and shouted about a murder next to a church and school in a crowded neighborhood. Moreover, no one reported overhearing their argument about a murder or witnessing them use drugs.

Third, according to our research, the outside temperature was in the high 20s and low 30s Fahrenheit, during that time period, which may have made it difficult to spend the entire evening and morning outside.

Fourth, the relationship between Serrano on one hand and Vicente on the other hand, may not have been such that he would have been likely to have confessed to him. It is also possible that Pacheco did not know Vicente, a circumstance which would also tend to make Pacheco unlikely to confess murder to Vicente.

Fifth, the relationship among the individual defendants may not have been such that they were likely to commit a crime together. In fact, there is no evidence that we are aware of indicating that any defendant had committed a crime with any other prior to their reported involvement in the Vargas murder.

(f)     **Vicente's Recantation**

(1)     **Consistency or Inconsistency**

Vicente has stated on several occasions that he fabricated the evidence he provided against Montanez, Serrano, and Pacheco, although he has provided inconsistent reasons for having done so. We examine here the ways in which those recantations are consistent and the ways in which they are inconsistent.

Some time prior to 2003, undergraduate students investigating potential wrongful convictions were informed that Vicente had told his co-defendant in another case, Valentine Gomez, aka "Tomato," that he had "admitted to falsely testifying against" Montanez and Serrano. (5/21/03 Email.) There is no evidence that Vicente told Tomato that he had been coerced to do so. Instead, Vicente apparently informed Tomato that he had been motivated by the promise of sentencing leniency.

43

AR-L 515145
SIDLEY AUSTIN LLP
SIDLEY

On 6/19/03 Vicente told students investigating possible wrongful convictions that the confession evidence he shared against Montanez, Serrano, and Pacheco was fabricated, but this time alleging that he was "coerced" and "beat" by Dets. Guevara and Halvorsen. (6/19/03 Email.)

>           (2)       **Potential Incentives for Providing False Evidence or Falsely Recanting**

We detailed Vicente's sentencing benefits for providing evidence above, in our discussion of the Robert Bouto case. To summarize, Vicente was facing a possible lengthy sentence for his armed robberies. In exchange for his cooperation as an informant in the three murder cases, Vicente was sentenced instead to nine years and served only three. He also received at least standard witness quarters benefits at Cook County Jail, such as better meals and more comfortable surroundings, and "contact visits" with family members.

Regarding other incentives to provide false evidence against the defendants, we note that Vicente allegedly had a pre-existing bad relationship with Serrano, as detailed above.

Regarding incentives to falsely recant, we note that Vicente informally recanted on 6/19/03 and only later negotiated for incentives in exchange for possibly executing a recantation affidavit and testifying at the Montanez/Serrano post-conviction matter. Similarly, we are not aware of any evidence that Montanez or Serrano coerced Vicente to recant prior to 6/19/03.

>           (ii)      **Rankins's Evidence**

To determine whether it is more likely that Rankins witnessed the murder or instead learned details of the crime from one or more of the other categories of sources identified above, we analyze that evidence as it relates to the following: (1) its inclusion of verifiable information not previously obtained from other sources; (2) its corroboration; (3) the circumstances of its receipt; and (4) its recantation.

>           (a)       **Inclusion of Verifiable Information Not Previously Obtained from Other Sources**

For purposes of assessing whether Rankins witnessed the murder or instead became knowledgeable about the crime through other sources, it is useful to consider whether Rankins provided any verifiable information on 6/11/93 that had not been reported to police previously.

First, Rankins stated that Vargas was confronted over a pull-out radio. As we noted above, that Vargas was found with a pull-out radio was a detail included in the Supp. R. filed the day after the murder, and Vicente reportedly provided this information, too. Second, Rankins stated that Vargas was shot to death while inside a blue-gray van parked in front of his home, a fact reported early in the police investigation. Third, Rankins allegedly accurately identified the make and model of Montanez's car four and a half months after he allegedly witnessed the shooting. (6/11/93 General Progress Report.) By the time that Dets. Guevara and Halvorsen

44

AR-L 515146



spoke to Rankins, they had already purportedly identified Montanez's Buick Regal as the vehicle involved in the shooting, based in part on Vicente's evidence.

We are aware of no verifiable information obtained from Rankins that had not already been obtained from other sources, including Vicente.

### (b) Corroboration of Rankins's Evidence

For purposes of assessing the veracity of Rankins's evidence, it is also useful to consider whether the evidence not previously known to police prior his statement to ASA King and Det. Halvorsen on 6/11/93 can be corroborated by other sources and evidence. First, we consider whether it is corroborated by ear and eyewitnesses to the crime or by any other verifiable evidence. Second, we consider whether Demond Williams (aka "Shorty Folks") and Sabrina corroborated Rankins's evidence. Third, we compare Rankins's evidence to Vicente's evidence.

### (1) Corroborating Rankins's Evidence with Ear and Eyewitness Evidence and Other Verifiable Evidence

First, Rankins described the three defendants waiting on the sidewalk in front of Vargas's home, then surrounding Vargas when he exited his gate, and finally Montanez and Pacheco yelling out encouragement to Serrano to shoot Vargas. Among the many eyewitnesses interviewed on 2/5 and 2/6/93, not one saw the defendants waiting on the sidewalk or surrounding Vargas. Nor did any ear or eyewitness hear the purported exhortations (or, indeed, any voices at all issuing from outside during the relevant time frame that might have represented what Rankins described). However, a number of ear and/or eyewitnesses would have had an opportunity to see three assailants on the street and/or hear these shouts, including at the very least, Velez, Milinkovic, and Melendez.

Related to the above evidence, Rankins stated several times that he was parked, inside the van, seven or eight houses away from the Vargas home. This would have been well over two-hundred feet from where Vargas was walking when he was purportedly apprehended by Montanez, Serrano, and Pacheco, while it was dark out.[48] We have confirmed, by visiting the site after sundown, that at the distance described by Rankins it likely would have been impossible to determine that Vargas was carrying a radio. Not only that, but it likely would have been impossible to clearly see Vargas, the assailants, and Vargas's van, at all. It likely would have been impossible to see Vargas exit his gate. Finally, it likely would have been impossible to hear the encouragements—"Do him! Do him!" and "Go ahead! Go ahead!" attributed to Pacheco and Montanez, respectively—at all, let alone to be able to attribute them, from that distance, to individual assailants.

---

[48] The sun rose at 6:58 a.m. on 2/5/93, nearly an hour and a half after the shots that killed Vargas. (http://www.wunderground.com/history/airport/KMDW/1993/2/5/DailyHistory.html?req_city=N A&req_state=NA&req_statename=NA)

AR-L 515147
SIDLEY AUSTIN LLP
SIDLEY

Second, the nicknames Rankins assigned to the assailants do not match the known nicknames of the three defendants. In the course of our investigation, we have not uncovered any evidence that linked any of the three defendants to any of the nicknames appearing in Rankins's statement. In an interview with us, Rankins offered an explanation: He was shown photos of the three defendants, one showing an overweight Montanez (hence, Barrel Belly), one showing Pacheco dressed in a striped shirt (hence, Stripes), and one showing Serrano smiling (hence, Joker). (3/2/14 Interview with Timothy Rankins.) From those photos, Rankins said, the detectives invented the nicknames assigned to the defendants in his statement. (*Id.*) We have identified in the record and examined what we presume are these photos, and note that the defendants' appearance therein is consistent with Rankins's characterization. (Photos in Evidence.) Also regarding nicknames, Serrano told us during his interview with us that upon arresting him, Guevara kept referring to him as "Joker" in front of groups of other police officers, which he said he did not understand. (8/22/14 Interview with Armando Serrano.)

Third, Rankins also described a second get-away vehicle, a van with distinctive stripes. There is no other evidence in the record regarding such a vehicle.

(2) **Corroborating Rankins's Evidence with Demond Williams and Sabrina**

Rankins's evidence is also not corroborated by the two additional participants—Demond Williams (aka "Shorty Folks") and Sabrina—he introduces into the story of the Vargas shooting. There is no evidence in the record that police sought to confirm Rankins's account with Williams even though Williams was in custody on the charge that brought Rankins into custody and remained there until the completion of his four-year sentence, well after the trial of Montanez, Serrano, and Pacheco. As noted above, we spoke to Williams, who credibly professed no knowledge of the Vargas murder, and thus could not corroborate Rankins's account.

Finally, the record reflects—and there is no allegation in the record—that Dets. Guevara or Halvorsen were able to corroborate Rankins's evidence with Rankins's alleged girlfriend, Sabrina. We believe she was arrested alongside Rankins prior to the start of Montanez, Serrano, and Pacheco's trial, thus potentially affording the opportunity to do so.

(3) **Corroborating Rankins's Evidence with Vicente's Evidence**

Rankins's evidence corroborates Vicente's evidence in some instances, and in other instances it adds additional details that cannot be reconciled with the account allegedly tendered by Vicente.

Regarding the ways in which Rankins's evidence corroborates Vicente's, we first note that in both informants' stories, the three defendants all approached Vargas on the sidewalk outside his home. Also according to both, Serrano then attempted to steal the victim's pull-out radio. Then, according to both Rankins and Vicente, Vargas was shot after fleeing to his van.

46

AR-L 515148
SIDLEY AUSTIN LLP
**SIDLEY**

The evidence provided by Rankins, however, also differs from Vicente's in several significant ways. According to Rankins, there was not one vehicle, Montanez's car, but two, including a van driven by Pacheco, at the scene of the Vargas murder. There were also two additional people present in Rankins's telling of the story, Rankins and Williams. Additionally, in Rankins's story, Montanez and Pacheco loudly encouraged Serrano to shoot Vargas after he escaped the robbery attempt. Vicente did not relate this exchange, and did not identify a shooter in any of his five statements. It is also notable that in Vicente's telling, all three defendants arrived in one car, that driven and owned by Montanez.

(c)    **Rankins's Recantation**

Rankins has stated on multiple occasions that he fabricated the evidence he provided against Montanez, Serrano, and Pacheco. We examine here the ways in which those recantations are consistent and the ways in which they are inconsistent. We also examine potential benefits that may have tainted either his initial statements against the defendants or the subsequent series of recantations.

(1)    **Consistency or Inconsistency**

We begin with consistency. Rankins is consistent in one of his core assertions, that he did not witness Montanez, Serrano, and Pacheco murder Vargas. He has consistently alleged that he was provided the story by police and prosecution personnel—but by an inconsistent cast of characters. In each instance, official personnel offered to dispense with his armed robbery charge in exchange for cooperating, and threatened him with malicious prosecution for the Vargas murder should he not cooperate. But for his initial recantation, Rankins has also consistently stated since then that he was taken to the scene of the Vargas murder and provided the salient details of the murder, although by an inconsistent cast of characters.

Regarding inconsistencies, we continue with Rankins's allegations regarding physical abuse. Notably, there is no such allegation in his 1994 recantation, and the allegations instead first arise five years later, beginning in his first §1983 claim. While it is true that Rankins has alleged abuse in every instance since then, the actual abuse alleged has varied considerably since that time. Similarly, Rankins's recantations implicate a tremendously varied and continuously expanding cast of characters. Notably, he did not name Dets. Guevara and Halvorsen in any of his recantations until speaking with Jennifer Bonjean, Serrano's post conviction counsel, in 2012. Prior to that time, with one exception, he referenced police personnel only anonymously, by the designation "John Doe Detectives 1-3" and "police."[49]

(2)    **Potential Benefits for Providing False Evidence or Falsely Recanting**

---

[49] Within the 3/29/94 recantation, Rankins referred to Sgt. Mingey by name. (3/29/94 Rankins Recantation.)

AR-L 515149
SIDLEY AUSTIN LLP
SIDLEY

Rankins did not allege specific sentencing benefits discussed with him for cooperating in the investigation, and since he ended his cooperation before the Montanez/Serrano trial and did not testify, unlike in Vicente's case there is no confirmed record of benefits received. He has said, rather, more generally, that CPD and State's Attorney's Office personnel would ensure that he would be provided benefits in connection with his armed robbery charge if he were to cooperate. For instance, in his 3/29/94 recantation, Rankins said that two unnamed officers told him that "you have an arm robbery and we can get it drop," and that "the state maid me an offer I couldn't refuse." Moreover, he spent at least a portion of his pre-trial incarceration in comparative comfort—first in the Witness Protection Quarters known as the "Q," and later at home on electronic monitoring.

Rankins told us that he did not recall the circumstances under which he drafted and executed his initial hand-written recantation. However, student investigators said in emails related to their investigation of Serrano's case that Rankins executed the recantation at the behest of private investigator Julio Lebron, who was at the time working for the Montanez family. (10/20/03 Email; 12/19/03 Email; 5/4/03 Email.) Perhaps bolstering the theory that Montanez's family was involved in procuring Rankins's initial recantation, Rankins wrote a letter to Montanez, which the Montanez family forwarded to the student investigators, indicating that Montanez's father arranged his trip to Puerto Rico, where he stayed at times with Montanez family members.

Regarding financial benefits, Rankins's 1999 § 1983 claim included a prayer for relief of "22.80 billion dollars." In his 2014 §1983 claim, Rankins requests relief in the amount of $3.780 million, with $4.280 million of that [sic] to be given to the Chicago Public Schools, and also makes several non-monetary requests for relief, such as an exemption from registering as a sex offender.

(iii)   **Findings on Vicente and Rankins's Evidence**

We begin with Vicente's evidence. We find it more likely than not that Vicente fabricated the confession he purportedly obtained from Montanez, Serrano, and Pacheco.

First, Vicente did not provide to police verifiable information that had not already been obtained from other sources. Had Montanez, Serrano, and Pacheco confessed to him, we would expect that he would know some accurate information that was unknown to police prior to the reporting of his evidence in the Supp. R. dated 6/2/93.

Second, we find it more likely than not that Wilda, rather than Vicente, introduced the evidence regarding an incident involving several Latino men and the victim on the eve of his murder, thus indicating that Vicente did not have independent knowledge of this critical fact.

Third, the remainder of Vicente's evidence lacks meaningful corroboration. We begin with Wilda. As an initial matter, Vicente described Montanez spotting Vargas's money, but Wilda testified, primarily, that Rodrigo had returned to the van prior to the arrival of the relevant vehicle, thus negating motive. Related to that point, Vicente described Montanez following home the Vargas family but Wilda testified, primarily, that the vehicle did not follow them home, thus

48

AR-L 515150
SIDLEY AUSTIN LLP
SIDLEY

negating opportunity. Wilda also struggled to identify Montanez and Serrano at trial, suggesting that her photo array and lineup identifications of them lack reliability. Finally, Det. Guevara testified and Wilda reportedly has since provided evidence casting doubt on the reliability of her purported identification of Montanez's car.

Vicente's evidence is also difficult to reconcile with the State's theory of the case—i.e., that Vargas was murdered during the course of an attempted robbery. As an initial matter, Vicente described an attempted mugging, but no ear or eyewitness reported hearing such a struggle, although several were in a position to do so. Related to that point, Vicente described the defendants as requiring money in order to procure drugs, but Vargas was discovered with nearly $200 on his person. Also, Velez's evidence, and the analysis of on-scene CPD personnel who reported no evidence of a struggle, suggests that Vargas was warming up his car when he was shot, a detail that is incompatible with the State's theory. Related to that point, we consider it unlikely that Vargas would have evaded his attackers while maintaining control of both a sandwich bag and his radio, all while keeping his scarf and cap in place.

Vicente's evidence regarding Montanez's car's involvement in the murder also lacks meaningful corroboration for reasons beyond the potential misconduct connected with Wilda's reported identification. As an initial matter, although Vicente stated that Montanez crashed his car while fleeing the scene, no witnesses reporting hearing a crash, and Montanez submitted evidence that, if accurate, would tend to indicate that his car was undamaged in mid-February. Additionally, Shoop and other eyewitnesses did not provide a description of the suspected get-away car that is consistent with Montanez's car in any but the most superficial manner.

Fourth, Vicente's evidence regarding Gold Busters and Rick also cannot be corroborated. Regarding the latter, we emphasize here the implausibility that Vicente, as he testified, mentioned Rick to ASA Coghlan during their 9/21/94 meeting, which was attended not only by ASA Coghlan, but also by Investigator Martinez. After the meeting, Investigator Martinez prepared an Investigative Report documenting it, and describing the new evidence that Vicente provided. Investigator Martinez's report did not reference Rick. Since Rick would be another witness to the confession, one would expect the presence of Rick to be mentioned in the report if it were related by Vicente.

Fifth, Vicente provided a significantly altered account of the confession nearly eighteen months after he purportedly received it, which further undermines his credibility. Several of those altered details apportioned blame to Serrano and Pacheco in ways that only Rankins's account had before. Related to this point, Rankins allegedly told Vicente while they were in the witness quarters that he did not plan to cooperate in the matter, which may have provided Vicente the motive and information required to modify his account.

Sixth, the reported circumstances of the receipt of the confession call into question the veracity of Vicente's evidence.

Seventh, if Vicente had this information, it is likely he would have raised it with the police at the same time that he related the Bouto confession since he was trying to get a lower sentence for his armed robberies.

49

AR-L 515151

**SIDLEY AUSTIN LLP**
**SIDLEY**

Eighth, Vicente had a meaningful incentive to provide false evidence. In contrast, he recanted to Tomato without incentive and to students investigating potential wrongful convictions prior to negotiating for benefits in exchange for future testimony. Regarding his recantation, Vicente's belated claim of abuse in this and the Bouto and third defendant cases is incredible. Vicente has demonstrated—more than amply—that sentencing benefits were more than sufficient motivation.

We also give some weight both to the fact that we consider it unlikely that Vicente would have obtained three separate confessions to three unrelated crimes and that we have independently determined that Vicente likely fabricated those other confessions, too.[50]

For all of these reasons, we find that it is likely that Vicente fabricated the evidence he provided against Montanez, Serrano, and Pacheco. The most likely scenario, we find, is that Wilda at some point related the evidence regarding the 2/4/93 incident to Det. Guevara, as Det. Halvorsen told us and as she testified, and perhaps even to other CPD personnel or non-State personnel such as friends or neighbors. Then that aspect of the case was for some reason and by some unknown means related to Vicente during the course of the investigation.

We also find it more likely than not that Rankins fabricated the evidence that he witnessed the Vargas murder.

First, Rankins, like Vicente, did not provide any verifiable evidence that had not already been reported by other sources.

Second, Rankins's account of the Vargas murder is not corroborated. As an initial matter, Rankins's evidence regarding an attempted mugging and exhortations to murder cannot be reconciled with ear and eyewitness accounts of the Vargas murder. Related to that proposition, Rankins's own account of witnessing the murder is not credible, because he described himself— consistently— having witnessed the crime from a vantage point from which he could not have seen or heard what he described. Additionally, Rankins attributed to the defendants nicknames that likely were not associated with them, a mistake he would not have made had he participated with the defendants in a robbery scheme and witnessed the conversations he claimed to have witnessed. Finally, Williams repudiated Rankins's evidence and there is no evidence that police were able to corroborate it with Sabrina.

Third, Rankins had incentives to provide false evidence against Montanez, Serrano, and Pacheco, including the fact that had, like Vicente had, an adversarial history with Serrano, and so a reason to implicate him, given the chance.

---

[50] Although we did not make a finding regarding innocence in the third defendant's case, we did for several reasons determine that the confession to Vicente in that matter, purportedly occurring in the "Bullpen" waiting room at the Cook County Jail while the two were surrounded by other people, was fabricated.

AR-L 515152

**SIDLEY**
SIDLEY AUSTIN LLP

For these reasons, we find it more likely than not that Rankins's evidence was fabricated. As with Vicente, we find that the most likely scenario is that Rankins learned the facts of the case from some unknown person or persons during the course of the investigation.

Although not dispositive, we also give some weight to the fact that Rankins has consistently recanted the evidence he provided against Montanez, Serrano, and Pacheco. (We note that if Rankins's evidence regarding his temporary incarceration with Montanez is accurate, it is conceivable that Montanez coerced Rankins into recanting. Assuming such a factor motivated his initial recantation, we consider it somewhat unlikely that Rankins would continue to recant to this day. Moreover, any such coercion would not negate the other defects with Rankins's evidence identified above).

Regarding the abuse alleged by Rankins, however, we cannot credit at all his sprawling and lurid tale of a vast conspiracy involving extreme physical coercion at the hands of dozens of police and prosecution personnel from this and several out-of-state jurisdictions. Det. Halvorsen described Rankins to us as "crazy," and we suspect that his assessment is correct.

### b. The Case Without Vicente's and Rankins's Evidence

Having found it more likely than not that the evidence provided by Vicente and Rankins was fabricated, we turn to the question of what the identification evidence, standing alone, nonetheless may indicate. We begin our analysis with the evidence provided by Wilda. Second, we examine the evidence provided by Shoop.

### (i) The Evidence Provided By Wilda

First we discuss reasons that Wilda's evidence might tend to indicate that the defendants are guilty. Second, we discuss reasons that Wilda's evidence may not tend to bolster a theory that the defendants committed the murder.

Regarding the former, Dets. Guevara and Halvorsen's Supp. R. dated 6/2/93 indicated that she identified Montanez and Serrano from a black-and-white photo array during a meeting with Det. Guevara at her home on 6/2/93, although we have been unable to locate those photos, which renders us unable to evaluate the photo array. The investigation record also indicates that Wilda identified Serrano and Montanez from lineups in the presence of Dets. Guevara and Halvorsen. Dets. Guevara and Halvorsen's Supp. R. dated 6/2/93 indicated that Wilda identified Montanez's car as the vehicle she saw at the gas station the night before the murder. Finally, an unattributed GPR indicated that Wilda refused Montanez's parents offer to implicate someone other than their son in Vargas's murder, although we have not been able to corroborate the content of that meeting. (As noted above, Montanez confirmed to us that her parents had, in fact, met with Wilda, but stated they did not attempt to bribe her, but merely wanted to know why she had identified their son. (10/17/13 Interview with Jose Montanez.)) Such a refusal would, of course, suggest that Wilda strongly believed Montanez, at least, was guilty.

We now discuss reasons that Wilda's evidence may not indicate guilt, beginning with her identifications of Montanez and Serrano. As an initial matter, as detailed above, Wilda was

51

AR-L 515153
**SIDLEY** AUSTIN LLP
**SIDLEY**

unable to credibly identify Montanez and Serrano at trial. Although this does not necessarily mean that her prior identifications were unreliable, her trial performance does increase the likelihood that her prior identifications lacked reliability. Moreover, Wilda, by her own account, only saw the Latino men at the gas station for approximately three minutes. Related to that point, she did not apparently consider them a sufficiently obvious threat to cause her to focus intently on them, as she initially told investigators that her husband had "no enemies" and she could think of "no reason" for the murder. Additionally, Wilda allegedly first identified Montanez and Serrano from an array of black and white photographs during a private meeting with Det. Guevara four months after the purported gas station sighting. The lineup identifications occurred beginning several days after that, on 6/11/93 for Serrano and 7/10/93 for Montanez—i.e., more than five months after the brief eve-of-murder incident. Recall that Montanez was wearing a jacket with his name emblazoned on the front during the line-up. Also, for reasons we discussed in our analysis of the evidence provided by Vicente and Rankins, Wilda's line-up and photo-array identifications are not bolstered by Vicente's and Rankins's evidence, which we conclude was more likely than not fabricated.

There are also reasons to doubt the reliability of Wilda's identification of Montanez's car, reportedly in June of 1993. First, this identification suffers from one of the same problems that casts her identifications of the defendants themselves into doubt: The length of time (approximately four months) between the gas station incident and the identification of Montanez's car may have made an accurate identification nearly impossible. As well, as detailed above, Wilda allegedly told post conviction counsel for Montanez and Serrano that Det. Guevara pointed Montanez's car out to her, told her that it was the get-away car, and that she then merely told him it was "similar" to the car she recalled from the gas station incident.

Additionally, as noted above, Wilda's evidence suggests that the Latino men she saw at the gas station had neither motive nor opportunity to target Vargas. That is, there is some reason to doubt that the men she saw at the gas station were connected in any way to the murder of her husband.

(ii)     **The Evidence Provided by Shoop**

First we discuss reasons that Shoop's evidence might tend to indicate that the defendants are guilty. Second, we discuss reasons that Shoop's evidence may not suggest that the defendants committed the murder. Regarding the former, Shoop told police in the hours after the shooting that he saw an older, light brown sedan, possibly a two-door vehicle, pulling out of the neighborhood, giving a description of a vehicle style (common at the time) that had some similarities with Montanez's car.

Regarding the latter, as discussed above, Montanez's car was actually a two-toned (brown and tan) four-door sedan with a vinyl roof top, distinctive features that Shoop did not describe in the aftermath of the shooting, and which he may have been unlikely to have omitted had he seen Montanez's car. We note, however, that Shoop testified at trial that Montanez's car was "similar" to the vehicle he saw departing the scene, notwithstanding these differences.

52

AR-L 515154
SIDLEY AUSTIN LLP
SIDLEY

      (iii)    **Finding Regarding the Case Without Vicente's and Rankins's Evidence**

For the reasons detailed above, we find that the identification evidence provided by Wilda and Shoop is, standing alone, unreliable and insignificant. In summary, Wilda's identifications of both the defendants and Montanez's car, for the reasons describe above, are unreliable. Moreover, there is some evidence suggesting that her identification of Montanez's car was improperly suggested by Det. Guevara. As noted above, Wilda reportedly stated that Det. Guevara pointed out the car to her and then provided false evidence regarding bullet holes and body damage linking it to Vargas's murder. Thus, we find it more likely than not that Wilda did not see Montanez or Serrano at the gas station. Related to this finding, we also find it more likely than not that the incident Wilda witnessed on the evening of 2/4/93 was wholly unrelated to Vargas's murder for the reasons explained above regarding lack of motive and lack of opportunity.

As well, neighbor Shoop tendered a very general description of a common style of car during the time period, but did not describe the distinctive features of Montanez's car. Thus, we find it more likely than not that Shoop saw a car other than Montanez's departing the scene of Vargas's murder.

    4.    **Conclusion**

      a.    **Regarding Allegations of Misconduct**

      (i)    **Vicente's and Rankins's Evidence**

Both Vicente and Rankins had knowledge of the crime that someone told them. It was either the perpetrators, the police, someone else, or some combination. It is also possible that the police provided the evidence wittingly, unwittingly, or through some combination. It is also possible that the police provided information to only one of them.

We first turn to facts that make misconduct less likely than it otherwise would be. First, the two informants, Vicente and Rankins, told two stories that contained material differences. First, as discussed above, there is no evidence we are aware of that the three defendants were ever known by the nicknames Rankins provided. If Dets. Guevara and Halvorsen were working in concert to set up these defendants, it is inconceivable that they would supply a completely different set of nicknames to Vicente and Rankins, let alone the wrong ones. Second, Rankins placed two extra people at the scene: Himself and Demond Williams, aka Shorty Folks. Third, Rankins placed an extra vehicle at the scene, a car driven by Pacheco, whereas in Vicente's telling all three defendants traveled in Montanez's vehicle. Fourth, in Rankins's story, Pacheco and Montanez shouted encouragement to Serrano, the shooter. (A shooter was never identified by Vicente.)

Second, as in the Bouto case, where Vicente reportedly first provided confession evidence to someone other than Dets. Guevara or Halvorsen, an informant here made first contact regarding the case with someone other than Dets. Guevara and Halvorsen. Here, the

53

AR-L 515155
SIDLEY AUSTIN LLP
SIDLEY

record indicates that Rankins first related the confession to Sgt. Mingey, who then called Dets. Guevara and Halvorsen. Thus according to Sgt. Mingey, Rankins came up with the confession before speaking with Dets. Guevara and Halvorsen.

Third, we note that accusations by the informants of physical coercion by Dets. Guevara and Halvorsen changed over time. In particular, Rankins at first did not allege physical coercion in his first recantation in 1994, but in later recantations included extensive allegations of physical abuse. Upon first telling co-defendant Valentine Gomez about his involvement in the Montanez/Serrano case, Vicente first allegedly only revealed that he participated in exchange for sentencing benefits. Like Rankins, it was only in later iterations that Vicente alleged physical coercion by the detectives. The changing nature of the allegations of misconduct against Dets. Guevara and Halvorsen make misconduct less likely than it otherwise would be—it also makes allegations of misconduct related to physical abuse unlikelier than it otherwise would be.

We next turn to facts that make misconduct more likely. First, on 5/25/93, just one week before the Vicente evidence purportedly broke the case, unknown CPD personnel requested criminal histories of Montanez, Serrano, and Pacheco notwithstanding the fact that they had no contemporary criminal history. Under the circumstances, the most likely reason that this occurred is that the three men had already been targeted as suspects in the Vargas murder. We cannot reconcile this event with Det. Halvorsen's later explanation that he was acting upon a rumor that an unknown "Pistol Pete" had committed the crime, information he considered "useless" until he approached Vicente for information about the murder, reportedly on 6/2/93. In fact, as discussed above, Vicente was not arrested with someone nicknamed "Pistol Pete." We find it a strong possibility that rather than being a cold case at the time of Vicente's initial involvement, Dets. Guevara and Halvorsen had already zeroed in on the defendants as primary suspects.

Related to this point, we also note that it may be significant that in the neighborhood at the time of the Vargas murder lived two brothers, both well-known members of the Imperial Gangsters, named Angel Sanchez and Armando Quinones. The pair were nicknamed "Pistol Pete" and "Mando," respectively. Because the two men share nicknames with Montanez and Serrano, but actually have a substantial connection to one another, unlike Serrano and Montanez, we consider it possible that Dets. Guevara, Halvorsen, or both may have suspected, for some unknown reason, that "Pistol Pete" was involved with the Vargas crime, but then, for another unknown reason, focused their investigation upon the wrong Pistol Pete and, later, the wrong Mando.

Second, although they provided different nicknames of the defendants and Rankins included several extra facts, discussed above, the core narratives of Vicente and Rankins share most of the same key characteristics. That these characteristics, describing an armed robbery, do not align with the untainted evidence, as discussed above, make it more likely than not that the evidence provided by Vicente and Rankins was provided to them. As discussed above, there is no evidence or allegation that Vicente and Rankins knew one another prior to meeting in the witness quarters, after they had already provided evidence in the case. Thus, it is most likely that

54

AR-L 515156
SIDLEY AUSTIN LLP
SIDLEY

the facts were provided to Vicente and Rankins, intentionally or not, by one or both of the detectives.

Third, there are two instances in which Det. Halvorsen has admitted to us that portions of the informants' story that became key components of the narrative told at trial were fabricated or otherwise not true. Det. Halvorsen told us that he and Det. Guevara knew that Gold Busters did not exist, which we confirmed. Nonetheless, Dets. Guevara and Halvorsen reported it as fact and Vicente testified to its existence. Second, Det. Halvorsen informed us that Rankins did not have "any of the facts" correct. Nonetheless, Det. Halvorsen himself testified at trial to the evidence provided by Rankins, and Det. Guevara did so before the grand jury.

Fourth, it is notable that this is the second of three cases from the summer of 1993 in which Vicente provided confession evidence against defendants in murder cases. Although we above found it more likely than not that Vicente fabricated the Bouto confession on his own, without willful police misconduct, that does not mean that that is the case in this instance, as well. It is unlikely that Vicente would have obtained multiple murder confessions in three cases investigated in the same year by the same two detectives. Also, unlike in Bouto, where Vicente had verified access to the defendant because the two were jailed in the same cell block, here no such verifiable meeting occurred. In fact, we find it unlikely that Vicente would have elected to provide evidence against Bouto immediately upon being incarcerated but withheld the evidence of Montanez and Serrano's guilt for weeks, given that he was incentivized to provide as much evidence as possible to secure sentencing benefits.

Fifth, we find it improbable that Det. Halvorsen did not take notes during his meeting with Vicente, as he testified at trial. Vicente's story about the purported confession was lengthy, taking place over multiple days and multiple locations and involving three defendants and the victim. It seems difficult to believe that he would have been able to accurately transfer the telling of such a story to a report by memory, unless he had a role in developing it.

Sixth, police did not charge Rankins as an accomplice to the Vargas murder, despite his alleged proximity to it and purported confession to agreeing to accompany the men on a drug and gun run. Perhaps even more tellingly, they did not charge or even attempt to discuss the crime with Williams, aka Shorty Folks, who was at the scene according to Rankins's statement, and available to provide evidence because he was incarcerated for the entire relevant period. That Dets. Guevara and Halvorsen did not attempt to speak with Williams makes it possible that they did not believe Rankin's story, but were willing to use it at trial.

Seventh, also related to Rankins's role, we find the one-hour time span reported between Dets. Guevara and Halvorsen's initial meeting with Rankins and the arrest of Serrano to be improbably short, raising the possibility that Rankins's evidence did not actually motivate the arrest of Serrano, contrary to reports in the record. This is particularly true because Dets. Guevara and Halvorsen allegedly drove Rankins to the scene of the shooting in that time frame, as well, to test Rankins's knowledge of the crime. Relatedly, inconsistencies regarding the reported genesis of Rankins's involvement with the case seem to weigh in favor of misconduct. While Dets. Guevara and Halvorsen wrote in their 6/14/93 Supp. R. that Rankins was questioned

55

AR-L 515157

**SIDLEY**
SIDLEY AUSTIN LLP

by Sgt. Mingey regarding an unrelated murder when Rankins revealed his knowledge about the Vargas murder, in an interview with us Sgt. Mingey said he did not investigate the other crime.

Eighth, and again related to Rankins, Rankins's later statements that he was taken to the scene and Det. Halvorsen's corroboration of that fact, would have offered an easy opportunity to provide Rankins with the facts of the case.

Finally, related to both informants, we find it important that neither provided verifiable information about the crime that was not previously known. Between two informants relating detailed accounts, we would expect that verifiable details would have emerged that were previously unknown about the crime scene. As discussed above in detail, none did, thus making it more likely than it would otherwise be that the facts of the case were shared with the informants by CPD personnel.

Looking at all the facts known to us, we cannot conclude whether or not there was misconduct by the police regarding the alleged confessions. There are too many possibilities, too many inconsistent facts, and a lack of credible witnesses.

Due to inconsistencies in the portion of Vicente's and Rankins's allegations of abuse, we find it more likely than not that neither Dets. Guevara nor Halvorsen engaged in physical abuse of the two informants.

(ii)     **Wilda Vargas's Evidence**

We next turn to possible misconduct related to the participation of Wilda in the investigation. First, we discuss reasons that make it less likely that Dets. Guevara, Halvorsen, or both committed misconduct in their contact with Wilda. Next, we discuss reasons that make it more likely that Dets. Guevara, Halvorsen, or both participated in misconduct in their contact with Wilda.

Regarding the facts that make misconduct more likely, we recall that Wilda told post-conviction counsel for Montanez that she did not independently identify Montanez's vehicle to Det. Guevara, as was argued at trial, but rather that he pointed the car out to her as they drove past it. Relatedly, Wilda allegedly revealed that Det. Guevara told her that the bullet holes in Montanez's car matched ballistics tests from the crime scene, which was not true and was never argued by the State. However, we were not able to interview Wilda for purposes of examining the validity of these allegations.

Regarding facts that make it less likely that Dets. Guevara, Halvorsen, or both committed misconduct related to their contact with Wilda, we first note that Wilda did not allege misconduct at trial, in particular when she was asked about her identifications of a photo array including the defendants, line-ups including Montanez and Serrano, and the identification of Montanez's vehicle.

56

AR-L 515158
SIDLEY AUSTIN LLP
SIDLEY

To conclude, we are unable, based upon the available evidence, to determine whether or not Det. Guevara, Det. Halvorsen, or both, committed misconduct regarding Wilda's identification of Montanez's car.

### b. Regarding Claims of Actual Innocence

First, for the reasons detailed above, the evidence Vicente and Rankins provided against the defendants is not credible. To recapitulate briefly, neither Vicente nor Rankins provided to police any verifiable information that had not already been obtained from other sources, a circumstance that both undermines the value of their evidence and raises the possibility of official misconduct. In contrast, that evidence which is original to Vicente or Rankins cannot be corroborated by untainted sources or evidence; if Vicente or Rankins possessed legitimate evidence, this would not likely be the case. Vicente and Rankins also had significant incentives to fabricate evidence, but recanted—at least initially—without obvious incentive. Causing us to additionally doubt Vicente's credibility, after Rankins ceased cooperating, Vicente provided to ASA Coghlan a significantly altered account—more than eighteen months after he began to provide evidence against the defendants. Finally, although not dispositive, we give some weight to our finding that the confession evidence Vicente provided against Bouto and the third defendant was also more likely than not fabricated.

Second, as explained above, the identification evidence provided by Wilda and Shoop, considered in isolation from the informant evidence, is neither meaningful nor persuasive. We begin with Wilda. In summary, Wilda's identification of the defendants is unreliable, her identification of Montanez's car not only unreliable but perhaps also predicated on official misconduct. Shoop's evidence is even less consequential. Recall that he merely provided a description of a common vehicle, and that description can be meaningfully distinguished from Montanez's two-toned car.

Third, the remaining evidence is inconsistent with the State's theory of the case. As an initial matter, if Wilda's trial testimony was accurate, the Latino men she spotted at a gas station on the eve of her husband's murder lacked both motive and opportunity to commit the crime because, according to that testimony, the men could not have seen Montanez's money and did not follow them all the way home. Moreover, there is no reason to believe that even if those men had spotted Vargas's money and knew where he lived, they would have known that he departed for work at 5:30 a.m., an unusual hour at which to depart for work. Also, several witnesses had reason to see and/or hear three assailants attempting to mug Vargas, but none did. Indeed, Velez's evidence suggests that Vargas was likely murdered as he sat in his car, warming the engine, a finding consistent with CPD's initial analysis. Finally, had the crime been motivated by the defendants' need to obtain money to procure heroin, the failure to take anything from Vargas—whether the nearly $200 cash or radio on him—despite the opportunity to do so, is illogical.

Moreover, there is also some affirmative evidence of innocence, which we do not consider dispositive, but do take into account.

AR-L 515159

SIDLEY AUSTIN LLP
**SIDLEY**

We begin with Serrano. First, in conversation with us, Serrano misstated an important fact regarding the crime scene, an error the perpetrator would not likely have made. Specifically, as detailed above, Serrano told us that Vargas's car radio was playing when his body was discovered. Second, other than common gang membership, there is no significant link between Serrano on the one hand and Pacheco and Montanez on the other hand. Third, Det. Halvorsen's testimony regarding the genesis of his solving the case, implicated Montanez not Serrano. Finally, we found credible Serrano's protestation of innocence when we met with him.

Regarding Montanez, first, Montanez has presented some evidence that his car was not damaged until well after Vargas's murder. Second, Capt. Pena told us that Montanez seemed genuinely shocked when he was arrested for Vargas's murder. Third, we also found credible Montanez's protestation of innocence when we met with him.

There is also some additional affirmative evidence of innocence. First, Vicente and Rankins both maintain that Montanez and Serrano are actually innocent. Second, CPD reported that the Vargas murder appeared to be similar to the crime perpetrated against Rojo and Salazar, and that crime was committed by African-American men. Third, no physical evidence links the defendants to the crime: (1) no weapon was recovered; (2) Montanez's car either tested negative for gun shot residue or was not tested for it; (3) the radio either tested negative for Serrano's fingerprints or it was not tested for them; and (4) the medical examiner did not report defensive wounds that might point to an attempted mugging. Fourth, the untainted physical evidence suggests that Vargas was murdered in a planned "hit" by someone familiar with his unusual work schedule, and there is no evidence linking Montanez or Serrano to a crime-for-hire scheme.

Having considered these flaws, we conclude that the only remaining potential evidence of guilt is as follows: (1) Montanez and Serrano were members of the Imperial Gangsters street gang, and knew each other; (2) Montanez and Serrano committed crimes, although there is no evidence that they committed crimes together; (3) Montanez and Serrano both committed armed robberies and, indeed, Montanez committed them with some frequency; (4) Montanez and Serrano used drugs and, in fact, Montanez sometimes committed robberies for the purpose of obtaining money to buy heroin; and (5) Serrano stole car radios with some frequency. That evidence, however, may not make Montanez or Serrano meaningfully more likely to have committed this crime than many other members of a Chicago street gang in 1993.

Looking at all the evidence, we conclude that Montanez and Serrano are more likely than not actually innocent.

58

# EXHIBIT 104

AR-L 515165



**ATTORNEY-CLIENT PRIVILEGED AND ATTORNEY WORK PRODUCT**

<u>**MEMORANDUM**</u>

TO:          City of Chicago/Guevara Investigation - File

FROM:      Kelly Albinak Kribs
                Michael Doss

RE:           Final Report on Roberto Almodovar Case

DATE:       February 9, 2015

---

## I.     INTRODUCTION AND SUMMARY CONCLUSIONS

We were retained by the City of Chicago to investigate allegations of misconduct made against former Police Detective Reynaldo Guevara and to evaluate whether the alleged misconduct resulted in convictions of innocent people currently serving prison sentences. This Memorandum summarizes our conclusions from the investigation of such allegations made by defendant Roberto Almodovar, who is currently serving a life sentence.

Almodovar was convicted of two counts of first degree murder and two counts of attempted first degree murder. Almodovar claims that he is innocent and that his conviction was obtained through a suggestive line-up.

In the course of our investigation, we have (i) conducted 11 interviews, including of the defendant, his former counsel and co-defendant Negron, alibi witnesses, and one of the two testifying eyewitnesses to the crime; (ii) reviewed transcripts and court filings of pre-trial, trial, and post-conviction proceedings; and (iii) reviewed police made available to us that document the investigation of the crimes at issue.

Detective Guevara declined to be interviewed by Sidley, as did one of the two eyewitnesses to the crime, Jackueline Grande.

As explained in more detail below, we have come to the following conclusions based on our investigation:

     (i) We are unable to substantiate the allegation that Detective Guevara improperly influenced the selection of Almodovar from a photo array and subsequent line-up. The evidence on that issue is conflicting and inconclusive and does not provide a basis for us to conclude that it is more likely than not that such improper conduct occurred or that it influenced the subsequent identification.

AR-L 515166

**SIDLEY**
SIDLEY AUSTIN LLP

(ii) We conclude, based on our interviews and other evidence made available to us, that it is more likely than not that Robert Almodovar is in fact innocent of the murders for which he was convicted. We found his alibi evidence (which witnesses continue to support) to be compelling and to outweigh the testimony of the remaining eyewitness who identifies him as the shooter (the second eyewitness, Kennelly Saez, no longer identifies Almodovar as involved in the crime.)

## II.    INVESTIGATION SCOPE AND PROCEDURES

### A.    Interviews

Sidley conducted eleven interviews in the course of its investigation of the Almodovar case. Specifically, Sidley interviewed defendant Roberto Almodovar, his former counsel Melissa Power and Judge Matthew Kennelly, and alibi witnesses Mary Rodriguez (Almodovar's aunt), Azalia Carrillo (Almodovar's girlfriend at the time of the murders). Sidley also interviewed one of the two eyewitnesses to the crime, Kennelly Saez. Sidley also met with Detective Halvorsen, who assisted Detective Guevara in the investigation of the shooting. Sidley also met with current counsel for the defendant, Jennifer Bonjean, and current counsel for the State, Assistant State's Attorneys Celeste Stack and Jim Papa. Those who submitted to interviews cooperated fully with the investigation.

Detective Guevara declined to be interviewed. We also attempted to interview eyewitness Jackueline Grande, whose last known residence is in Vancouver, Washington, but were unable to do so despite making calls and sending correspondence. (We understand that Ms. Grande also had declined to be interviewed by current counsel for William Negron during an in-person visit in 2013.).

### B.    Document Review

Sidley's investigation also involved the review of numerous documents received from the State as well as from Almodovar's and Reyes's current counsel. Sidley reviewed transcripts from (1) pre-trial proceedings, including the hearings regarding the defendants' motions to suppress the witness identifications; (2) the trial; (3) the sentencing and other post-trial proceedings; and (4) Almodovar's first post-conviction hearing. Sidley also reviewed a number of police reports and crime scene records related to the case. Additionally, Sidley reviewed various court filings and prior court opinions.

*Privileged & Confidential*

AR-L 515167



## III.  BACKGROUND FACTS

Unless otherwise indicated, the following background facts are undisputed.

### A.  Almodovar Conviction and Legal Proceedings

In November 1995, Roberto Almodovar and William Negron were each convicted of two counts each of murder and attempted murder and sentenced to life in prison.  The convictions were affirmed on appeal.  Both have since filed post-conviction petitions challenging their convictions on grounds of alleged misconduct by Detective Guevara.  In particular, Almodovar and Negron assert their innocence and contend that eyewitnesses to the shooting were improperly influenced by Detective Guevara to misidentify them.

The defendants post-conviction proceedings are currently pending before Judge Linn in the Cook County Circuit Court.

### B.  Almodovar Background

At the time of the murders, then nineteen year-old Almodovar was working full-time at the Farley Candy Company and taking classes to obtain his G.E.D.  Almodovar had gotten the job at Farley's through his aunt, Mary Rodriguez, with whom he lived and who also worked at Farley's.  Almodovar typically worked Monday through Saturday from 6:00 a.m. to 6:00 p.m.  He also attended G.E.D. classes at Wright Junior College from roughly 6:00 p.m. to 10:00 p.m. on Mondays and Wednesdays.

When we met with him, Almodovar told us that he and co-defendant Negron had been close friends and members of the same gang, but that they went their separate ways; at the time of the shooting, Almodovar contends he had not seen Negron in roughly a year.

Before his convictions in this case, Almodovar had no prior criminal convictions.  He reported that he had been arrested on multiple occasions for "mob action," but that those arrests always resulted in his being released on his own recognizance and the charges being dropped.  Almodovar admitted that he had been a member of the Insane Dragons street gang, but states that he left the gang in March 1994 when his then-girlfriend, Azalia Carrillo, gave birth to their daughter.

### C.  The Crime

On September 1, 1994, Jackueline Grande, Kennelly Saez, Jorge Rodriguez, and Amy Merkes were talking on the front stoop at 3920 W. Cortland.  Saez and Rodriguez were cousins and both members of the Maniac Latin Disciples gang.[1]  Around 12:45 a.m., a dark blue, four-door Oldsmobile with three young men inside pulled up.  The rear passenger, who had his

---

[1] At times, witnesses have referred to the this gang as the Young Latino Organization Disciples or "YLODs."

*Privileged & Confidential*

AR-L 515168

**SIDLEY**
SIDLEY AUSTIN LLP

window partially rolled down, said, "What's up, folks?" Saez started walking over to the car, and as he asked, "Who's there?", the rear passenger fired a gun at the group on the front stoop.[2]

When the shooting began, Saez dove for the ground and Grande, Rodriguez, and Merkes turned and started running into the building. Grande, Rodriguez, and Merkes were each shot, and both Merkes and Rodriquez were killed. Grande suffered a bullet wound to the shoulder and spent several days in the hospital before being released.

### D.     Police Investigation

The first officers on the scene were flagged down by Juan Velez, an off-duty sheriff's deputy who saw the assailants' car pull into his alley and turn around; shortly thereafter, Velez heard the gunshots.[3] The initial police report from the crime scene described the assailants as three males "16-20 yrs old wearing starter jackets," but did not attribute the description to any particular witness. A subsequent report dated September 1, 1994, and prepared by Detective McDonald and Rutherford stated that the assailants were "3 male white Hispanics in their late teens skinny medium to light complexion NFD."[4]

Kennelly Saez was interviewed that same day and described the vehicle as a "dark blue short body Delta 88 4dr." The September 1, 1994 report of his initial interview does not include a physical description of any of the vehicle's occupants. According to the report, Saez also told police that he was member of the Maniac Latin Disciple gang and that his gang was at war with the Dragons and Latin Kings gangs; he also stated the Dragons has been trying to "take over" the corner where the shooting occurred.

Jackie Grande was not interviewed at the scene due to her injuries; she was first interviewed at the hospital on September 1, 1994, by Detective Dombrowski. According to Dombrowski's police report, Grande described the car as a "dark blue older square mid sized car," and described the three occupants of the car as "male white Hispanics;" the driver was "tall and skinny, light complexion with dark hair;" the front passenger was "skinny with a long face[,] light face[,] wearing a black jacket and a red hat," and the rear passenger—the shooter—was "skinny med complexion with dark hair, clean looking."

A subsequent police report dated September 13, 1994,[5] states that assigned Detectives Halvorsen, Guevara, and Troken suspected that the shooting targeted Saez and Rodriguez, members of the Maniac Latin Disciples, and was in retaliation for the shooting of Carlos Olan (nicknamed "Popeye"), a member of the Insane Dragons gang who was killed two days earlier,

---

[2] Some initial police reports also state that the driver was firing a weapon.

[3] A September 1, 1994 report prepared by Detective Rutherford and McDonald states that Velez reported that he "got a good look at the driver of the vehicle and believes that he could identify this person." When Almodovar and Negron were later brought in for a line-up, the police asked Velez to view the line-up. Velez, however, stated that he was misunderstood; he did not get a good look at any of the individuals in the vehicle—only the vehicle itself.

[4] We understand "NFD" to be abbreviation for "no further details."

[5] There are no other reports of the status of the investigation between September 1, 1994, and September 13, 1994, and Officer Guevara admitted in testimony that he did not take any other notes or prepare any other reports.

*Privileged & Confidential*

AR-L 515169

**SIDLEY**
SIDLEY AUSTIN LLP

on August 30, 1994. The detectives believed this incident was part of an ongoing turf war between the Insane Dragons and the Maniac Latin Disciples, and thus focused their investigation on Insane Dragons members.

The detectives learned from Officers Olszewski and Siwa (who worked the district in which the shooting occurred) of their recent arrests of three purported Insane Dragons members in possession of a sawed off shotgun. Olszewski and Siwa provided photos of those three individuals, one of whom Roberto Almodovar. According to the police report, the detectives noted that Almodovar had a rectangular-shaped head with long hair in the back and that "this was the description of one of the offenders provided by gunshot victim Jackueline Grande." (However, the report does not state when or to whom she gave this description and Grande is not otherwise reported as having providing this description; as noted above, a September 1, 1994 report stated that she described the shooter as "skinny med complexion with dark hair, clean looking.") The detectives then learned from Gang Crime Specialists Rodriguez and Wiora that Roberto Almodovar hung around with Willie Negron, another purported Insane Dragons member, and were given a photo of Negron.

On September 5, 1994, Grande was released from the hospital, and Detective Guevara visited her at home. He showed her a 12-photo array and, according to the September 13, 1994 report, Grande identified Almodovar as the shooter in the rear of the car and Negron as the driver of the vehicle who "also fired a gun."

On September 11, 1994, the police separately arrested Almodovar and Negron. When arrested, Negron was driving a 1978 Buick Regal Coupe (as noted above, the car used in the shooting was described as a 1985 Oldsmobile). Both Almodovar and Negron denied any involvement in the shootings.

In his statement to police, Almodovar reportedly admitted to being a member of the Insane Dragons, and acknowledged a war between his gang and the Maniac Latin Disciples.[6] Almodovar stated that on the day of the shooting he had worked at the Farley Candy Company from roughly 6:00 a.m. until leaving to attend a G.E.D. classes at Wright Junior College from 6:00 p.m. until 9:15 p.m. Almodovar said that, after class, he took the bus home and was with his girlfriend for the remainder of the evening. The police telephoned Almodovar's 15-year-old girlfriend, Azalia Carrillo, and asked her to come to the station for questioning, but Carrillo never went in and the police did not follow up with her.[7]

In his statement to police following his arrest, Negron reportedly admitted being an Insane Dragons member and a good friend of Almodovar. Negron similarly acknowledged a gang war between his gang and the Maniac Latin Disciples. Negron stated that, on the night of the shooting, he had gone to the wake of a fellow gang member and then went out "partying"

---

[6] As detailed further below, Almodovar maintains that he told the police he was formerly a member of the Insane Dragons and had left the gang months before when his daughter was born.

[7] As detailed further below, Carrillo explained to us that, after the initial call with the police, Almodovar Aunt, Almodovar's aunt, Mary Rodriguez, persuaded Carrillo her not to go to the station without a parent or lawyer given her age and the nature of the charges.

*Privileged & Confidential*

**SIDLEY** SIDLEY AUSTIN LLP

with fellow gang members. Negron, however, refused to identify the friend with whom he went out or to state where they went.

On September 12, 1994, the police brought Grande and Saez into the station for a line-up. The September 13, 1994 report states that Grande and Saez viewed the line-up separately, and that Saez had not viewed any photos of Almodovar and Negron in advance. Independently, both Grande and Saez identified Almodovar as the shooter in the rear of the car and Negron as the driver and second shooter. On that same day, Saez gave a written statement memorializing his account of the shooting and his identification of Almodovar and Negron.

No weapon or vehicle associated with the shooting was ever recovered, and the third person in the vehicle has never been identified.

### F.    The Trial and Subsequent Court Proceedings

Almodovar's and Negron's trial took place in November 1995. Saez and Grande identified Almodovar as the shooter and Negron as the driver of the car. Detective Guevara testified about the photo array that Grande viewed and the subsequent line-up that both Grande and Saez viewed.[8] Guevara further testified that both Saez and Grande described the rear shooter as having a rectangular face with long hair in the back. Guevara acknowledged, however, that no police report attributed any such description to Saez, and the one report that connects this description to Grande provides no supporting detail on when or how this description was made. Guevara testified, however, that he obtained this description from Grande when he called her on the morning of September 5, 1994. Guevara also testified about the police theory that the shooting was in retaliation for the murder of an Insane Dragon who has been killed in a drive-by shooting two days prior. The parties stipulated at trial to the initial description provided police (recounted above) of the assailants.

Negron did not testify at trial. Nor did Negron's counsel offer any alibi witnesses to support his prior statement that, on the evening of the shooting, he had attended a wake and went out with friends.

Almodovar did take the stand, testifying (as he stated to the police) that, on the night of the shooting, he returned home at about 10:45 p.m. after a day of work and an evening of G.E.D. classes. Thereafter, he and his girlfriend, Azalia Carrillo, got into a fight and stayed up arguing until about 1:30 a.m. (The crime occurred around 12:45 a.m.) Almodovar's aunt (with whom he lived), Mary Rodriguez, and Carrillo (his girlfriend) corroborated Almodovar's alibi. Both testified that Almodovar got home after class, Carrillo came home with the baby shortly thereafter, and then an argument ensued. Rodriguez and Carrillo also testified that Amaris and Sergio Almodovar (Carrillo's sister and Almodovar's cousin, who are married) came over around midnight to try and settle the dispute and that they left around 1:30 a.m.

---

[8] Guevara testified that on September 5, 1994, he took the photos of Almodovar and Negron to Grande's house to conduct a photo array. Since Almodovar had long hair, Guevara said, he placed his photo in an array with photos of five other long-haired young men, whereas for Negron, who had short hair, he placed his photo in an array with photos of five other short-haired men. Guevara testified that Grande identified Almodovar as the rear shooter and Negron as the driver.

6                                                          *Privileged & Confidential*

AR-L 515171



Both Almodovar and Negron were convicted of two counts and murder and two counts of attempted murder, and sentenced to life in prison The convictions were affirmed on appeal.

Both Almodovar and Negron initiated post-conviction proceedings in 1998. Negron's was denied at the outset, but Almodovar's proceeded to a hearing. Almodovar's counsel at the time, Matthew Kennelly,[9] argued that Detective Guevara had improperly influenced the eyewitness identifications—the sole basis for the convictions. As discussed in greater detail below, Saez then testified that Guevara and Grande showed him a photo array in advance of the line-up and indicated who to identify. Both Guevara and Grande testified that this did not happen. The court dismissed the petition and found Saez's rendition of the photo array "totally incredible."

In April 2010, Almodovar filed a successive post-conviction petition based on new evidence of Guevara's alleged pattern and practice of misconduct. Though the trial court initially denied the petition on procedural grounds, it was reversed on appeal. On remand, evidentiary hearings have recently begun and are ongoing.

## III. Allegations of Wrongdoing Against Detective Guevara

### A. Allegations of Misconduct

Almodovar alleges that Detective Guevara improperly influenced the witness identifications by steering Saez and Grande to identify him and his co-defendant Negron. In particular, the Almodovar contends that before his line-up, Guevara showed both Saez and Grande photos of Almodovar and Negron and indicated that they had been involved in the shootings. We discuss the facts related to these allegations in more detail below.

#### 1. Kennelly Saez

Saez has given different accounts of his identification of Almodovar and Negron over the course of the case.

First, Saez identified Almodovar and Negron in a police line-up on September 12, 1994. This fact is recorded in a Detectives Halvorsen's and Guevara's September 13, 1994 report, which also notes that "Saez had not viewed any photos of [Almodovar and Negron] prior to the line-up."

However, on March 1,1995, Saez went to the offices of then-counsel for Almodovar, Melinda Power, and told Power that his September 12, 1994 identification of Almodovar and Negron was inaccurate. Saez signed an affidavit, prepared by Power and by her sister Margaret Power, who works as Melinda's interpreter, stating that he "told the police that it was Roberto Almodovar and William Negron because [he] believed it was them, but really [he] couldn't see,"

---

[9] Matthew Kennelly is now a federal district court judge for the Northern District of Illinois.

*Privileged & Confidential*

AR-L 515172

**SIDLEY**
SIDLEY AUSTIN LLP

and that he "looked at photographs and picked out a person [he] thought was the shooter, but [he] was wrong." In interviews, both Saez and Melinda Power confirmed this meeting.

Power reported that Saez came to her office with another young man, explaining he brought his friend as a safety precaution because Power's office was in rival gang territory.[10] Power then interviewed Saez, in the presence of her sister Margaret, and Saez answered her questions while his companion remained silent. Saez told Power he was there of his own free will and, after she prepared the affidavit, he reviewed it and signed it. Power's account of her meeting with Saez was consistent with the affidavits she and her sister Margaret gave in connection with Almodovar's first post-conviction petition and with Power's testimony at a 2014 post-conviction hearing.

At the subsequent trial, however, Saez testified that his statement to Power had been coerced by his fellow gang members and that the person who accompanied him was actually a high-ranking member of the gang who came to ensure Saez recanted his identification. As previously noted, Saez then made an in-court identification of Almodovar and Negron.

In February 1996, Saez again changed his story in a statement to an investigator sent by Almodovar's post-trial counsel, Matthew Kennelly. Saez told the investigator that, before he viewed the line-up, an officer showed him pictures of Almodovar and Negron. Kennelly later obtained a sworn statement from Saez in August 1998 in which Saez stated that, three or four days after the shooting, Grande came by his apartment and told him that a police officer wanted to meet with him. Saez said that he went downstairs where he met with a Latino police officer who had two photos in his hand of Almodovar and Negron, and asked "Are these the guys?" According to Saez, Grande then said, "Yes, those are the guys." Saez stated that he didn't know whether Grande had already seen the photos, but he got the impression that she had. The Latino officer told Saez that the men in the pictures were Insane Dragons. Saez stated that he then agreed with Grande, essentially because Grande and the officer seemed so confident that the men in the photos were the assailants and, without their influence, he would not have been able to identify the men as the assailants. (Saez did not identify the Latino officer as Detective Guevara at the time, although there is no dispute that Detective Guevara arranged for Saez's attendance at the line-up.)

Saez stated he then went in the officer's squad car with Grande to view a line-up, and, on the way, the officer told him not to tell anyone that he had seen the photos. Saez also stated that, on the way to the line-up, Grande continued to talk about her confidence that the men in the photos were the assailants. At the line-up, Saez he recognized the two men from the photos he was shown—Almodovar and Negron—and identified them as the shooter and the driver, respectively.

In his sworn statement, Saez explained his trial testimony by contending that he was hoping his testimony would allow him to obtain favorable treatment from the state regarding a pending violation of a parole charge. In particular, he said that the week before the Almodovar-

---

[10] Power's account to Sidley of her meeting with Saez was consistent with the affidavits and testimony she gave in connection with Almodovar's first post-conviction petition.

*Privileged & Confidential*

**SIDLEY** SIDLEY AUSTIN LLP

Negron trial, he had been arrested on a parole violation and, while in jail, was contacted by ASA Callahan about testifying at the Almodovar-Negron trial. Saez stated that he told the ASA that he would testify if the ASA could get him out of jail. According to Saez, ASA Callahan said he could make no such promises, but Saez nonetheless understood that, if he testified for the state, they would likely obtain his release. Notably, Saez's probation was terminated on November 30, 1995, two days after his November 28, 1995 trial testimony.

Sidley interviewed Saez in July 2014 and he recounted the same core facts reflected in his sworn statement with Kennelly described above. Saez elaborated to explain that the Latino detective spoke Spanish and made Saez feel "cool" with the officer, like he could trust him. When the detective showed him the photo,[11] Grande exclaimed, "That's him! That's him!" Saez said that Grande seemed so sure of her identification he just went along with it, even though he was not himself able to provide an identification. Saez further explained that at the time he was very upset by the murders of his cousin and his girlfriend, and he wanted someone to pay.

In our interview, Saez also stated that when he went to Power's office he was in fact accompanied by a gang leader, Kiki, who was pressuring him to recant his earlier identification. Saez understood that leaders of the Maniac Latin Disciples agreed with leaders of the Insane Dragons that Saez would not testify against Almodovar and Negron. Saez noted that, in pressuring him to recant, the gang was actually encouraging him to testify truthfully because he could not, in fact, identify either Almodovar and Negron. Saez further explained that he ultimately agreed to testify after speaking with ASA Callahan because he saw it as "his ticket out" of jail on the probation violation charge. Saez stated that he was being "selfish," and a "young kid" in offering to testify in exchange for assistance from ASA Callahan. Saez reported that Callahan never promised to get him off but that he "would see what he could do."[12] Saez also stated in our interview that when Kennelly's investigator got in touch with him a few months later after his trial testimony, he "decided to come clean."

In our interview, Saez also gave his view of the reasons for the shooting. He believed he was targeted because he held a leadership role in his gang, which he described as the Young Latino Organization Disciples or YLODs , and thus would be considered a "trophy." He disagreed with the police theory that the shooting was connected with a turf war, and, said he had never heard of Carlos Olon or any theory that he was shot at in retaliation for Olon's murder.

Saez told us he did not separately talk with Jackie Grande about her identification of the assailants. He said he distanced himself from her after the shootings.

In sum, since Saez's August 1998 sworn statement to Kennelly, he has consistently maintained that (i) he saw photos of Almodovar and Negron before the line-up, (ii) that his line-up identifications were based on his prior viewing of the photos and the comments made by

---

[11] Saez only had a memory of seeing Negron's photo and identifying him. He remembered going to the line-up and identifying two assailants, but he couldn't really picture Almodovar. He did, however, recall that the defendant that was not Negron had the same nickname as him (Saez)—"Joker." Indeed, both Saez and Almodovar were nicknamed "Joker."

[12] Callahan testified at the post-conviction hearing that he never said anything to Saez to give him the impression that he would try to help him resolve his violation of parole.

*Privileged & Confidential*

AR-L 515174

**SIDLEY**

Grande and Detective Guevara, (iii) that Guevara told him not to tell anyone he saw the photos, and (iv) that he in fact could not identify any of the assailants. He testified on these points at a 1998 post-conviction hearing for Almodovar, at a June 2008 deposition in connection with the Juan Johnson civil suit, and most recently in our meeting with him in July 2014.

2.      Jackueline Grande

Jackie Grande, however, has disagreed that her identification of Almodovar and Negron was improperly swayed by Detective Guevara. The initial allegation that Guevara influenced Grande's identification comes from Melinda Power, Almodovar's original attorney. In our interview (and previously), Power reports that she and her investigator, Amy Myers, interviewed Grande outside the Jewel grocery store where Grande worked on April 6, 1995 (six months after the shooting). Power recalls, and her notes from the conversation reflect, that Grande told her that, while she was in hospital, two police officers visited her, showed her six to nine photos, and said, "Here are the guys who did it." In our interview, Power said she was never again able to speak with Grande about the murders.

Grande has denied having this conversation with Power. Instead, she has consistently maintained that when she viewed the photo array on September 5, 1994, Guevara did not make any suggestions as to who she should identify and that she identified Almodovar as the shooter and Negron as the driver on her own. For example, at the motion to suppress hearing, Grande testified that while two male officers showed her a photo array in the hospital, they did not say, "These are the guys who did it" or anything similar. Mot. to Suppress Hrg. Tr. 21-25.

We attempted to speak with Grande, sending letters to her last known address (confirmed by counsel for Negron) in Vancouver, Washington and making telephone calls to a number we obtained for her. She did not respond to our letters and we were unable to reach her by telephone. In our interview with Negron's current counsel, Russell Ainsworth, he recounted having appeared at Grande's house in Vancouver and speaking with her briefly at her front door. He stated that she was "hostile" to him once she learned the purpose of his visit, and made clear to him that she "knows what she saw" and would not be changing her identification testimony.

Aside from her interactions with Power, there are some inconsistencies in the record regarding the descriptions of the assailants that Grande reportedly gave to police at various times. For example, as noted above, the initial reports of the three assailants were that they were three males "16-20 yrs old wearing starter jackets," and "3 male white Hispanics in their late teens skinny medium to light complexion NFD." Neither description is attributed to a particular witness, however.

Besides the line-up and photo array issues, counsel for Almodovar has also highlighted apparent discrepancies in the descriptions given by Grande. As noted above, the first description attributed to Grande (by Officer Dombrowski during a hospital visit) describes the driver as "tall and skinny, light complexion with dark hair," the front passenger as "skinny with a long face[,] light face[,] wearing a black jacket and a red hat," and the rear passenger—the shooter—as "skinny med complexion with dark hair, clean looking." Detective Guevara testified that when he telephoned her on September 5, 1994, Grande described the shooter somewhat differently, as

*Privileged & Confidential*

AR-L 515175

**SIDLEY**
SIDLEY AUSTIN LLP

having a rectangular-shaped head with long hair in the back. (As noted above, this description was the stated reason for Guevara initially selecting Almodovar's photo as a possible suspect.)

At trial, these descriptions were raised with Grande, who testified that, while at the hospital, she described the shooter as "light skinned, long curls" and [h]e looked clean and his face was thin and long." When defense counsel confronted her with the descriptions from Dombrowski's report, Grande said that she didn't recall what exactly she told him.

### B. Analysis of Misconduct Allegations.

The evidence regarding the allegation that Guevara improperly influenced the identifications of Almodovar is mixed and inconclusive. Grande has consistently denied that Guevara engaged in any misconduct that led her to identify the assailants. Power's description of Grande's statement about a police hospital visit is credible, especially given her supporting notes prepared immediately afterward that recount Grande's statement that police showed her 6-9 photos and said "Here are the guys who did it." But Power is unable to say that this visit included Detective Guevara (Grande's alleged statement to Power does not say so, and she was visited by other police while in the hospital). Moreover, Power's notes from this meeting further state that Grande "is sure it is them because she had a good opportunity to see them," undercutting a claim that her identification was the result of improper influence.

If believed, Saez's current statement that he was shown only pictures of Almodovar and Negron by Guevara before attending the line-up, and was counseled by Guevara not to mention these photos, would support a finding of misconduct against Guevara. However, Saez's shifting stories over time and under oath leaves us unable to reach a conclusion of misconduct in reliance on Saez's say so. This is not to say that his current description of events is incredible or unbelievable—he in fact has consistently maintained this description of events since 1996, has given believable (but uncorroborated) explanations for his prior statements, and has no apparent motive today to take this position falsely. But despite the fact that Saez's statements today, for those reasons, might reasonably be believed, there is at least equal cause to disbelieve them, given that he has shown himself willing to lie and that Grande's testimony is to the contrary.

For these reasons, we do not find that the evidence renders it more likely than not that Guevara engaged in misconduct in connection with the identification procedures used with Grande and Saez that improperly influenced their identification of Almodovar.

## IV. Actual Innocence Claims

### A. Evidence Supporting The Conviction

As explained above, the only evidence at trial specifically linking Almodovar to the drive-by shooting was the testimony by Grande and Saez identifying Almodovar as the rear shooter. There is no physical evidence connecting Almodovar to the shooting. No weapon used in the shooting was ever recovered, nor was the car used in the shooting. Grande has consistently maintained her identification of Almodovar and has given no indication of any

*Privileged & Confidential*

**SIDLEY** | SIDLEY AUSTIN LLP

change of heart. Saez, in contrast, has recanted his trial testimony and has instead stated (since 1996) that he is unable to identify the assailants who shot at him and the others.[13]

### B. Evidence Of Actual Innocence.

Roberto Almodovar has consistently presented an alibi defense to his conviction, which has been corroborated by others. Significantly, Almodovar's alibi defense continues to be supported by his aunt Mary Rodriguez[14] and his former girlfriend, Azalia Carrillo, as well as other third-party witnesses. We summarize below our investigation of this alibi defense.

**Mary Rodriguez.** In our interview of Almodovar's aunt, Mary Rodriguez, she recounted the details of this alibi and who had previously testified at trial. In our meeting, Mary Rodriguez stated that on the night of the shooting, Almodovar arrived home at about 10:30 p.m. after working all day and attending his G.E.D. class in the evening[15] and found that his girlfriend was still out with their baby. When Carrillo arrived shortly thereafter, Almodovar and Carrillo went to their room (which was the first floor dining room converted to a bedroom) and began arguing about whether Carrillo should have been out so late with the baby. Rodriguez asked them to keep it down because her son Joey, who slept on the couch in the living room just outside Almodovar's and Carrillo's bedroom, had his first day of school the next day, September 1, 1994.

Mary Rodriguez reported that the argument escalated, prompting her to call Sergio Almodovar, Roberto's cousin, who was married to Carrillo's sister, Amaris Almodovar. Sergio and Amaris came over in an effort to mediate the argument; they all reportedly stayed until roughly 1:30 a.m., when Rodriguez finally demanded that they leave and that everyone go to bed.

Rodriguez stated that she was able to place the date of the argument as the evening/early morning of the shooting (September 1, 1994), because September 1 was the date that her son Joey began school that year. Rodriguez stated (as she also relayed in her earlier affidavit) that the school year actually began on August 30, 1994, but Joey attended a private school and Rodriguez did not have the funds to pay tuition until August 31, 1994. She told us that she took August 31st off from work so she could pay the tuition and go shopping with Joey for other school supplies he needed. An affidavit from the principal of Joey's school, Paula Calvert, that was submitted in support of Almodovar's post-conviction petition, confirms that Joey did not attend school until September 1, 1994, two days after the official start of the school year. Mary's

---

[13] Police reports note witnesses reporting hearing numerous shots with someone repeatedly yelling "Joker." But because both victim Saez and defendant Almodovar acknowledged having had the nickname "Joker" we do not view that evidence as material to question of Almodovar's innocence claim.

[14] Mary Rodriguez reports consistent employment over the past plus-twenty years by Farley's Candy Company (Farley has been acquired and now operates under a different name). She is married and has one son, Joey. She still lives in the same house she shared with Almodovar at the at the time of the shooting.

[15] Almodovar's attendance at both work and school were corroborated by other undisputed evidence submitted in connection with his post-conviction petition.

*Privileged & Confidential*

AR-L 515177

**SIDLEY**
SIDLEY AUSTIN LLP

statements in our interview were consistent with her prior trial testimony and her affidavit submitted in support of Almodovar's 1998 post-conviction petition.

**Azalia Carrillo**. In our interview of Almodovar's former girlfriend, Azalia Carrillo, she recounted the same essential story about the fight she had with Almodovar on the night of the shooting (consistent with her trial testimony). She estimated the time of the fight as 11:00 pm. She also stated that when the fight ended, she and Almodovar went to bed, and he stayed in bed until he got up to go to work the following morning. Carrillo also explained that she had scratched Almodovar on the face during the fight, when he was holding her down, and she recalled that Almodovar later told her he was embarrassed to go to work with the scratch on his face. (Almodovar's scratched face also was corroborated by an affidavit from a co-worker that was prepared in connection with his post-conviction proceedings.)

Carrillo also corroborated Almodovar's claim that he had left the Insane Dragons gang by the time of the shooting. She said she understood he had left the gang around time when they had a baby together approximately three months before the shooting, and that she no longer saw gang members coming around during that period. (She confirmed that Almodovar was a member of the Insane Dragons gang when she first met him.) Carrillo also explained that, after Almodovar's arrest, she spoke with an officer on the phone who and initially agreed to go to the station for questioning, but afterwards Almodovar's aunt, Mary Rodriguez, persuaded her not to go. (Rodriguez separately reported that she was concerned about sending fifteen year-old Carrillo to the police station without a parent or a lawyer.) Carrillo stated that, at Rodriguez's urging, she did not respond to the original police request about Almodovar's whereabouts the night of the shooting, and the police did not separately follow up with her. Carrillo stated further that she long ago ceased having any contact or relationship with Almodovar. However, her daughter (by Almodovar), now twenty, still has some occasional contact.

**Roberto Almodovar**. When we met with him, Almodovar recounted the story of his fight with Carrillo in a manner consistent with both his prior testimony and with his other alibi witnesses. He restated that the day after the fight, he got a ride to work from his neighbor, Jose Sanchez, who told Almodovar that he heard the argument from next door, and that Sanchez teased Almodovar about the scratch on his face and getting beat up by his girlfriend.

Almodovar also told us about an incident that occurred sometime between the shooting and his arrest that, he believes, explains why his photo was presented to the detectives as one of three possible Insane Dragon suspects. He told us that on September 4 or 5, 1994, he was "hanging out" with his cousin Sergio Almodovar after work and Sergio drove to a house he was moving out of "to pick up something" (Almodovar could not recall what). Almodovar reports that, while at Sergio's house, neighborhood friends "Dean" and "Russell" came over. The four were inside the house when officers arrived and accused them of having a gang meeting and proceeded to search the house. One of the officers, Officer Olszewski, found a sawed off shotgun elsewhere in the house and questioned Sergio about it in another room. Almodovar reports overhearing Olszewski hitting Sergio and asking about a drive-by shooting. Almodovar stated that Sergio separately asked him to "take the rap" for the shotgun, but Almodovar refused. All four were taken to the police station where Polaroid pictures were taken of each of them,

13                                                          *Privileged & Confidential*

AR-L 515178

**SIDLEY**

including Almodovar. Almodovar stated that although he had previously been arrested for mob action, this was the first time his picture had been taken.

Notably, Almodovar admitted in our interview that each of the men in the house, other than him, were then-current members of the Insane Dragons gang. This arrest for mob action a week before the shootings thus raises a real question as to Almodovar's claim that he had by that time withdrawn from the gang. The police reports we have received confirm this arrest on September 4, 1994, and identifies Almodovar as a member of the Insane Dragons gang; the reports of this arrest further state that the Dragons were at war with the Disciples gang (Saez's gang and noted "shootings in the past week."[16] (The reports we have received do not reflect any further pursuit of claims against Almodovar for this early September arrest.)

**Alibi Corroboration**. Almodovar's alibi is also corroborated by various affidavits and supporting documents obtained by his post-conviction counsel. These include, most significantly, a statement from a school principal confirming the date of Joey Rodriguez's first day of school as on the same date as the shooting (corroborating Mary Rodriguez on this point), and a statement from Jose Sanchez (Almodovar's neighbor) confirming the fight between Carrillo and Almodovar and Sanchez's remarks about the scratch on Almodovar's face the next morning. These affidavits also include statements from Amaris and Sergio Almodovar, who reported having come to the Rodriguez home to mediate the fight between Almodovar and his girlfriend Carrillo.

## IV.    Conclusion.

Regarding the allegation that Detective Guevara improperly influenced the selection of Almodovar from a photo array and subsequent line-up, the evidence is conflicting and inconclusive. Our investigation thus does not provide a basis for us to conclude that it is more likely than not that such improper conduct by Guevara occurred or that it influenced the subsequent identification by victim Jackie Grande. In particular, Grande has never waivered in her testimony that she was not steered by Guevara to identify either defendant. Although she declined to be interviewed by us, we do not view that denial as raising a question as to her prior testimony, and her remarks to Negron's counsel in 2013 indicate that she would likely present the same testimony now if required to do so. Counsel Melinda Power's report regarding Grande's prior statement is credible, especially given Power's contemporaneous notes, but we do not view that as sufficient by itself to find that Grande's identification was based on improper conduct by Guevara. Finally, witness Kennelly Saez's flip-flopping statements in this regard, even though now explained by him in a credible fashion, are insufficient in our view to undermine Grande's contrary position. That said, given Saez's recantation of his own

---

[16] For his part, Almodovar contended that officer Olszewski had "something against him" and had previously arrested him for mob action that Almodovar felt was unfounded. Almodovar reported that Olszewski once threatened him while he was walking down the street with Carrillo and told him, "You'll be going away for a long time." Almodovar suggested officer Olszewski may have somehow improperly influenced the use of his photo in Detective Guevara's photo array, and noted that, after his arrest for these murders, officer Olszewski popped his head in the holding cell, said "Gotcha!" and walked away laughing. However, the records we have reviewed provide no corroboration for Almodovar's suspicions about officer Olszewski's conduct.

*Privileged & Confidential*

AR-L 515179

**SIDLEY**
SIDLEY AUSTIN LLP

identification, we conclude that his prior testimony against Almodovar should be given little weight in our evaluation of their actual innocence claims.

With regard to Almodovar's claim of actual innocence, we conclude that it is more likely than not that he is in fact innocent of the murders for which he was convicted. The evidence linking Almodovar to the shooting is slim—the testimony of one remaining victim-eyewitness (given Saez's recantation) under undisputedly challenging circumstances: the assailants were inside a car; only moments passed between their arrival and shots being fired; and the shootings occurred in the middle of the night. Moreover, Almodovar's alibi evidence is compelling, with multiple witnesses recounting a similar story of a fight between Almodovar and his girlfriend on the night of the shooting. A critical component of this alibi – the date of the fight between Almodovar and his girlfriend – was supported not only by Mary Rodriguez and her son but also the school principal's affidavit and related records. We of course recognize that Almodovar's relatives would have a motive to lie about his alibi, and that both Rodriquez and Carrillo testified at trial and their testimony was apparently rejected by the jury. However, we found Mary Rodriquez (who has been steadily employed and has no apparent criminal record) to be forthcoming and credible in our meeting with her, and her position on the key facts has remained consistent over the years. Similarly, we found Carrillo to be credible, and took note that her lack of any apparent ongoing relationship with Almodovar lessens any incentive she might have to lie on his behalf (for example, she could have simply declined our interview request, as did Jackie Grande). Finally, we note that when the shooting occurred Almodovar appeared to have redirected his life, as confirmed by independent sources—he was working six days a week, attending night classes to obtain his G.E.D., and helping to raise his infant daughter.[17] In sum, we conclude that Almodovar's alibi evidence substantially outweighs the evidence against him by a single credible eyewitness.

---

[17] In reaching this conclusion, however, we did not consider Almodovar's claim that he was no longer a member of the Insane Dragons' gang at the time of the shooting. The evidence of his withdrawal is based largely on his own say so, and his arrest a week before with other admitted gang members raises questions about his claim. We thus believe the evidence of his alleged withdrawal from the gang is inconclusive.

*Privileged & Confidential*