**Rosa Bello**
**October 15, 2021**

Pages 1-92
Exhibits 1-3

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NO. 18CV2342

JOSE JUAN MAYSONET,
                Plaintiff,

v.

REYNALDO GUEVARA, et al.,
                Defendants.

_____

VIDEOCONFERENCE DEPOSITION

OF ROSA BELLO

TAKEN OCTOBER 15, 2021

AT THE OFFICES OF

REAL TIME COURT REPORTING

9 HAMMOND STREET

WORCESTER, MASSACHUSETTS

Reporter:  Rebecca J. Gladu

REAL-TIME COURT REPORTING
  14 Main Street               9 Hammond Street
Springfield, MA  01144     Worcester, MA  01610

**Real Time Court Reporting**
**413.732.1157**

GONZALEZ 000820

**Rosa Bello**
**October 15, 2021**                                                     **2**

```
APPEARANCES:


For the Plaintiff:
BONJEAN LAW GROUP, PLLC
750 Lexington Avenue, 9th Floor
New York, New York 10022
BY:  JENNIFER A. BONJEAN, ESQ.
     ASHLEY B. COHEN, ESQ.
718.875.1850
jennifer@bonjeanlaw.com
ashley@bonjeanlaw.com



For the Defendants Halvorsen, Epplen, Mingey,
Montilla, and Paulnitsky:
THE SOTOS LAW FIRM, P.C.
141 West Jackson, Suite 124A
Chicago, Illinois 60604
BY:  JOSH M. ENGQUIST, ESQ.
630.735.3300
jengquist@jsotoslaw.com



For the Defendant Guevara:
LEINENWEBER, BARONI & DAFFADA, LLC
120 North LaSalle Street, Suite 2000
Chicago, Illinois 60602
BY:  MEGAN K. McGRATH, ESQ.
312.663.3003
mkm@ilesq.com



For the Defendant DiFranco:
HINSHAW & CULBERTSON, LLP
151 North Franklin Street, Suite 2500
Chicago, Illinois 60606
BY:  V. BRETTE BENSINGER, ESQ.
312.704.3000
bbensinger@hinshawlaw.com
```

**Real Time Court Reporting**
**413.732.1157**

GONZALEZ 000821

**Rosa Bello**
**October 15, 2021**                                                                 **3**

```
APPEARANCES:   (continued)



For the Defendant City of Chicago:
ROCK, FUSCO & CONNELLY, LLC
312 North Clark, Suite 2200
Chicago, Illinois 60654
BY:  EILEEN E. ROSEN, ESQ.
     AUSTIN G. RAHE, ESQ.
312.494.1000
erosen@rfclaw.com
arahe@rfclaw.com



In Attendance:
Alex Jandrow, Videographer, Real Time Court
Reporting
Carlos Melendez
```

GONZALEZ 000822

**Rosa Bello**
**October 15, 2021**                                                                                         **4**

```
INDEX:

                                                    PAGE

WITNESS:  ROSA BELLO

Examination by Mr. Engquist .............. 8

Examination by Ms. Bensinger ............. 54

Examination by Ms. Bonjean ............... 58

Further Examination by Mr. Engquist....... 79

Further Examination by Ms. Bonjean........ 82

Further Examination by Ms. Bensinger ..... 86


EXHIBITS:

EXHIBIT   DESCRIPTION                      PAGE

No. 1     Transcript dated March 26, 1992,  16

          Bates No. CCSAO002429 and

          CCSAO002519 - CCSAO002545

No. 2     Objection of Witness to Extended  29

          Media Coverage of Testimony,

          Bates No. CCSAO000493

No. 3     Statement of Rosa Bello dated     43

          8/23/90, Bates No. CCSAO000306 -

          CCSAO000309
```

**Real Time Court Reporting**
**413.732.1157**

GONZALEZ 000823

**Rosa Bello**
**October 15, 2021**                                                                                                      **5**

S T I P U L A T I O N S


It is agreed by and between the parties that all objections, except objections as to the form of the questions, are reserved and may be raised at the time of trial for the first time.


It is further agreed by and between the parties that all motions to strike unresponsive answers are reserved and may be raised at the time of trial for the first time.


It is further agreed by and between the parties that the sealing of the original deposition transcript is hereby waived.


It is further agreed by and between the parties that the notification to all parties of the receipt of the original deposition transcript is hereby waived.

GONZALEZ 000824

**Rosa Bello**
**October 15, 2021**                                                      **6**

* * * * *

ROSA BELLO, Deponent, having produced satisfactory identification by means of Massachusetts Driver's License, was duly sworn, deposes and states as follows:

THE VIDEOGRAPHER: We are on the record. The date is October 15, 2021, and the time on the monitor is 10:13 a.m.

This is the video-recorded deposition of Rosa Bello being taken in the matter of Jose Juan Maysonet versus Reynaldo Guevara, et al., Case No. 18CV2342. This matter is being heard in the United States District Court for the Northern District of Illinois, Eastern Division.

This deposition is being held via Zoom. My name is Alex Jandrow. I'm a legal videographer representing Real Time Reporting. The court reporter is Rebecca Gladu representing Real Time Reporting.

Counsel will now introduce themselves for the record, beginning with plaintiff's counsel, stating whom you

GONZALEZ 000825

**Rosa Bello**
**October 15, 2021**                                                7

represent and any stipulations that apply to this deposition.

MS. BONJEAN:  Good morning. Jennifer Bonjean -- that's B-O-N-J-E-A-N -- and Ashley Cohen, C-O-H-E-N, on behalf of the plaintiff.

MR. ENGQUIST:  John Engquist on behalf of Defendants Halvorsen, Epplen, Mingey, Montilla, and Paulnitsky.

MS. McGRATH:  Megan McGrath on behalf of Defendant Guevara.

MS. BENSINGER:  Brette Bensinger on behalf of Defendant State's Attorney DiFranco.

MS. ROSEN:  Eileen Rosen and Austin Rahe on behalf of Defendant City of Chicago.

MR. ENGQUIST:  Just for the record, the deponent's husband is also in the room just as an observer.  Sir, if you could just put your name on the record.

MR. MELENDEZ:  Carlos Melendez.

THE VIDEOGRAPHER:  Will the

GONZALEZ 000826

**Rosa Bello**
**October 15, 2021**                                                                8

court reporter please swear in the witness

and we can proceed.

(Witness sworn)

EXAMINATION BY MR. ENGQUIST:

Q.      Can you please state your name and spell your last name?

A.      Rosa Bello, B-E-L-L-O.

Q.      Now, Ms. Bello, have you ever given a deposition before?

A.      No.

Q.      Okay.  I know, right before this started, you came in with -- your husband asked about some of the ground rules.  And I talked about them, but I'm going to go through them again on the record, okay?

A.      Okay.  Sure.

Q.      Okay.  This is just like your other testimony before.  It's under oath, like what you just did, but what's a little bit different about it is the fact that we don't a have judge here.  So like I told you before, there's probably going to be objections at certain times.  So if you could do your best to wait until the objection is complete before you start

GONZALEZ 000827

**Rosa Bello**
**October 15, 2021**                                                                                        **9**

answering, just so we don't have people talking over each other, all right?

A.      Okay.

Q.      Also, you may know exactly where I'm going with a question, but if you could wait until I'm done with it before you start answering, that way it will be easier so that no one will be talking over each other, all right?

A.      Okay.

Q.      If you don't understand a question that anyone asks you, let us know.  We'll do our best to rephrase it or repeat it or slow down or whatever we need to do, okay?

A.      Okay.

Q.      Ah-huhs and mm-hmms -- this is one of the things we talked about.  Ah-huhs and mm-hmms and things like that don't come across on the record.  So if you do that, someone will probably prompt you, is that a yes or no, okay?

A.      Okay.  That's fine.

Q.      Also, this is not an endurance contest.  If you need to take a break at any time, just let us know.

A.      Okay.

GONZALEZ 000828

**Rosa Bello**
**October 15, 2021**                                                                                   **10**

Q.      The only thing we ask is, if there's a question pending, you answer the question before we take the break.

Is that okay?

A.      That's fine.

Q.      Okay.  Ma'am, where do you currently live?

A.      I live in Fitchburg, Massachusetts.

Q.      Okay.  And how long have you been there?

A.      17 years.

Q.      And who do you currently live with there?

A.      My husband and my four daughters.

Q.      And you also have a son; is that correct?

A.      Yes, I do.

Q.      And where does he live?

A.      He lives in Fitchburg.

Q.      Okay.  Does he also live with you?

A.      No, he doesn't.

Q.      Are you currently employed?

A.      Yes, I am.

Q.      Where are you employed, ma'am?

GONZALEZ 000829

A.     I work in a market kitchen.

Q.     In what kitchen?

A.     Market Basket kitchen.  I'm a cook.

Q.     Now, in 1990, where did you live?

A.     In Chicago, Illinois.

Q.     And do you remember where you lived back in 1990?

A.     No, I do not.

Q.     Do you remember living at 1302 North Bowman?

A.     It's been too many years.  I don't recall.

Q.     I want to direct your attention to August of 1990 -- I'm sorry, May 25 of 1990.

Do you recall who you lived with back then?

A.     At the time it was my two youngest daughters, my two oldest that I have now.

Q.     Did you also live with Jose Maysonet at that time?

A.     Yes.

Q.     And how do you know Jose Maysonet?

A.     We were dating.

Q.     Okay.  And when did you start

GONZALEZ 000830

**Rosa Bello**
**October 15, 2021**                                                              **12**

dating him?

A.    I don't recall.  It's been a very long time on that, too.  So I don't keep track.

Q.    Did he ever live with you?

MS. BONJEAN:  Objection to the foundation of that question.

BY MR. ENGQUIST:

Q.    You can still answer.

THE WITNESS:  I can still answer?

MS. BONJEAN:  There will be objections along the way.  You can answer.

A.    Yes, he did live with me a short time.

BY MR. ENGQUIST:

Q.    And how long did he live with you?

A.    About six or seven months.  I'm not sure.

Q.    Now, do you recall giving testimony in the case of The People of the State of Illinois versus Alfredo Gonzalez?

A.    It's been a very long time.  I don't recall.  It's been a long time.

Q.    I understand it's been a long time.

GONZALEZ 000831

**Rosa Bello**
**October 15, 2021**                                                                 **13**

I'm not asking if you recall everything that's happened then, but do you recall testifying in a case -- a murder case of Alfredo Gonzalez?

MS. BONJEAN:  Objection.

BY MR. ENGQUIST:

Q.    Go ahead.

A.    Yes.

Q.    And have you reviewed that testimony at all since you gave it back in March of 1992?

MS. BONJEAN:  Objection to the form and foundation of that question.

A.    I don't remember.

BY MR. ENGQUIST:

Q.    Okay.  When you testified back in March 26 of 1992 in a case People versus Alfredo Gonzalez, did you tell the truth?

MS. BONJEAN:  Objection to the form and foundation of that question.  Are you asking -- I'm sorry.

MR. ENGQUIST:  I'm asking the question I asked, so --

MS. BONJEAN:  Okay.  Well, I mean, I think you're asking questions

GONZALEZ 000832

**Rosa Bello**
**October 15, 2021**                                                        **14**

that -- is she aware that she has certain

rights?

        MR. ENGQUIST:  You're really

pushing it on this certain position, and I

don't know why you're doing it.  I'm just

asking her a question about whether or not

she told the truth back on March 26, 1992

when she testified under oath.  It's a

fair question.

        MS. BONJEAN:  It's a fair

question.  I just think she ought to know

that -- she's not represented here.  She

doesn't have an attorney here.  So she

should know that she has the right to have

an attorney, if she wanted an attorney.  I

assume you told her that when you spoke to

her because that would be the right thing

to do.

        MR. ENGQUIST:  Are you

serious?

        MS. BONJEAN:  Yes.  I mean,

you're the one that notified -- that

noticed her deposition.  I think that you

would have let her know that she had a

GONZALEZ 000833

**Rosa Bello**
**October 15, 2021**                                                        **15**

right to counsel if you're going to ask her questions that would -- you know, those types of questions.

BY MR. ENGQUIST:

Q.    Ma'am, could you answer the question, please?  Do you need it repeated?

A.    Yes, I told the truth.

Q.    Thank you.

Now, prior to testifying on March 26, 1992, you also gave a statement to an assistant state's attorney by the name of Frank DiFranco back in August of 1990.

Do you recall that?

A.    Like I said, it's been many years, and I don't keep track of everything.

Q.    Ma'am, as you sit here today, do you recall an incident back in 1990 involving Jose Maysonet and some of his -- some people that he knew and a handgun in your home?

MS. BONJEAN:  Objection to the form and foundation of that question.  If you understand it, you can answer.

A.    Like I said, it's been years.

BY MR. ENGQUIST:

GONZALEZ 000834

**Rosa Bello**
**October 15, 2021**                                                           **16**

Q.    Do you recall the general subjects that you testified to back in 1992 in a murder trial of Alfredo Gonzalez?

MS. BONJEAN:  Objection to the form of that question.  You can answer if you understand.

A.    No, I don't understand.  Can you explain it?

BY MR. ENGQUIST:

Q.    Do you remember the subject that you were testifying about in 1992?

MS. BONJEAN:  Same objection to the form.

A.    Like I said, it's been many years.

MR. ENGQUIST:  Okay.  I'll mark this as Exhibit No. 1.

(Exhibit 1, Transcript dated March 26, 1992, Bates No. CCSAO002429 and CCSAO002519 - CCSAO002545, marked for identification)

BY MR. ENGQUIST:

Q.    I'm showing you what's been marked as Exhibit No. 1.  It's marked CCSAO2429 and 2519 through 2545.

GONZALEZ 000835

**Rosa Bello**
**October 15, 2021**                                                                 **17**

Do you have that in front of you?

A.    I was going through the whole thing.  I mean --

Q.    Okay.  Do you want to read the whole thing?

A.    Yes, I would.  I would appreciate that.

MR. ENGQUIST:  Why don't we go off the record rather than just sitting here and reading it.

THE WITNESS:  That's fine.

MR. ENGQUIST:  And then we'll come back on when she's done reading through the exhibit.

THE VIDEOGRAPHER:  Okay.  Off the record at 10:26.

(A recess was taken)

THE VIDEOGRAPHER:  Back on the record at 10:28.

BY MR. ENGQUIST:

Q.    Ma'am, I'm not sure if you went through the entire thing, but --

A.    No.  I just went through the part where you talk about certain things and -- just

GONZALEZ 000836

**Rosa Bello**
**October 15, 2021**                                                                18

go ahead and ask your question.

Q.    Does that refresh your recollection as to the subject matters that you testified to on --

A.    Yes.

Q.    -- March 26, 1992?

A.    Yes.

Q.    Okay.  So that's actually what I want to focus in on.

Do you have an independent recollection of that night, ma'am?

MS. BONJEAN:  Objection to the form of that question.

MR. ENGQUIST:  That's fine.  I can rephrase that.

BY MR. ENGQUIST:

Q.    Do you have an independent recollection of the night that you testified to in here, May 24, 1990?

A.    I do not at this point, no.

MS. BONJEAN:  Objection to form.  I'm sorry, go ahead.

BY MR. ENGQUIST:

Q.    Well, let me ask you a little bit

GONZALEZ 000837

**Rosa Bello**
**October 15, 2021**                                                      **19**

about Mr. Maysonet.

Do you recall -- did Mr. Maysonet belong to a street gang?

MS. BONJEAN:  Objection to the foundation of that question, but you can answer.

A.    Yes.

BY MR. ENGQUIST:

Q.    Which gang was that?

A.    The Latin Kings.

Q.    And do you know if he had any kind of rank or authority within the gang?

MS. BONJEAN:  Objection to form and foundation of that question.

A.    No, I do not.  I was never around that.

BY MR. ENGQUIST:

Q.    Okay.  And do you remember who Lupia is?

A.    No, I do not.

Q.    How about Alfredo Gonzalez, the person you testified about there?

A.    Like I said, this happened many years ago from now.  I don't recall any of it.

**Real Time Court Reporting**
**413.732.1157**

GONZALEZ 000838

**Rosa Bello**
**October 15, 2021**                                                        **20**

I don't -- like I said, I don't pay any mind to it.  I have moved on.

Q.    How about Justino Cruz?

MS. BONJEAN:  Objection.

What's the question?

BY MR. ENGQUIST:

Q.    Do you recall him?

A.    Like I said, that was many years ago.  I don't keep track of everything.

Q.    When was the last time you spoke with Jose Maysonet?

A.    I do not.

Q.    Okay.  Just try to give me an idea.  Would it be back in 1990?  Would it be in 1992?  Do you have a --

A.    My son was only two months old, and that's when he was in jail.  Otherwise [sic] than that, no other contact.

Q.    Now, shortly before giving this testimony back in March of 1992, do you recall an incident where you were almost run down by a car?

MS. BONJEAN:  I'm sorry, I'm going to -- just a belated objection to

**Real Time Court Reporting**
**413.732.1157**

GONZALEZ 000839

**Rosa Bello**
**October 15, 2021**                                                21

foundation.  Do you need some time?

THE WITNESS:  No.

MS. BONJEAN:  Take your time.

A.    Yes.

BY MR. ENGQUIST:

Q.    And shortly before you gave this testimony, you were in -- you were being relocated by the District Attorney's Office; is that correct?

MS. BONJEAN:  I'm going to object to the leading nature of this question in case you actually intend to present this testimony at some point, but you can if you understand.

A.    Nobody did anything for me.  I did everything on my own.

BY MR. ENGQUIST:

Q.    Okay.  Prior to giving this testimony back in 1992 for Alfredo Gonzalez, did you receive any kind of threats?

MS. BONJEAN:  Objection.  Foundation.  You can answer.

A.    Yes.

BY MR. ENGQUIST:

GONZALEZ 000840

**Rosa Bello**
**October 15, 2021**                                                                                    **22**

Q.      And what was the first time you recall being threatened?

A.      I don't recall.

Q.      And do you recall who threatened you?

A.      No.

Q.      Were you threatened by members of the Latin Kings?

MS. BONJEAN:  Objection to the form and foundation.

A.      Yes.

BY MR. ENGQUIST:

Q.      Do you know who any of them were at the time they made those threats?

A.      No.

Q.      Were you ever physically harmed by anybody from the Latin Kings prior to giving this testimony back in 1992?

A.      No.

Q.      Was any of your family ever threatened by the members of the Latin Kings prior to giving this testimony in 1992?

A.      I don't know.  I broke all ties with my family, so I don't know.

GONZALEZ 000841

**Rosa Bello**
**October 15, 2021**                                                    **23**

Q.    When did you break all ties with your family?

A.    It's been years.  I haven't spoken to my family.

Q.    Did Jose Maysonet ever threaten you?

A.    The last time I saw that man was when my son was only two months old.

Q.    Can you turn to the very bottom page 2531 or page 103 if you have the full transcript?

They don't have line numbers here, but about halfway down the page, where it begins "Why", do you see that, "Why had you been staying at a hotel?"

A.    I see that.

Q.    "Question:  Why have you been staying at a hotel?

"Answer:  Because someone tried to run me over with my son.

"Question:  You said somebody tried to run you over?

"Answer:  Yes, with my son.

"Question:  You had your son at the

GONZALEZ 000842

**Rosa Bello**
**October 15, 2021**                                                                24

time?

"Answer:  Yes.  I was on my way to
the doctor.

"Question:  And approximately when
did this happen?

"Answer:  About 1:30, 2 o'clock
Friday, last Friday."

Do you see that there?

A.     Yes, I do.

Q.     Do you recall that incident, ma'am?

A.     Yes, I do.

Q.     And do you know who tried to run
you over with a car?

MS. BONJEAN:  Her car?

MR. ENGQUIST:  With a car.
It's the mask.  This actually does come
up.  If it's hard understanding me with
the mask, let us know and we'll try to say
it again.

THE WITNESS:  That's fine.

MR. ENGQUIST:  It's hard with
the enunciation, I'm sorry.

BY MR. ENGQUIST:

Q.     Okay.  So do you know now who it

GONZALEZ 000843

**Rosa Bello**
**October 15, 2021**                                              **25**

was who tried to run you over?

A.    No.

Q.    Do you have a belief as to why someone tried to run you over just prior to your testimony of Alfredo Gonzalez?

MS. BONJEAN:  Objection to the form and foundation of that question.

A.    No.

BY MR. ENGQUIST:

Q.    Do you believe it was connected in any way to giving testimony in the Alfredo Gonzalez case?

MS. BONJEAN:  Objection to form and foundation of that question.

A.    No.

BY MR. ENGQUIST:

Q.    Was that the only attempt on your life?

A.    No.

Q.    How many other times have there been attempts on your life, ma'am?

A.    Eight times.

Q.    When was the first?

A.    When they tried to run me over with

GONZALEZ 000844

**Rosa Bello**
**October 15, 2021**                                                                 **26**

my son.

Q.    And you said there was eight, so there's seven more after that?

A.    Yes.

Q.    When was the next time?

A.    I don't know.  I just kept moving myself around with my kids.  I was never in one place too long.

Q.    And when you said "they," who is the "they" that you believe --

A.    I don't know.  I just wanted to keep me and my children safe.

Q.    I understand.

Other than trying to run you over with a car, how did the other attempts -- how did they occur?

A.    Shot up my window, tried to break in my house with my children.

Q.    Anything else?

A.    I don't know.  I just don't keep track of everything anymore.  I just keep myself moving.

Q.    Is that why you moved out of Chicago, ma'am?

GONZALEZ 000845

**Rosa Bello**
**October 15, 2021**                                                    27

A.     I left Chicago because I wanted a better life for myself and my kids and I needed to do something different, so I left.  So I just decided to break all ties with family and everybody else.

Q.     And when did you leave?

A.     I left Chicago in '94.

Q.     And I know you said earlier you were dating Jose Maysonet for six or seven months.

Can you describe your relationship with him during that period of time?

A.     No comment on the relationship that I had with Juan.  I have no comment on that at all.

Q.     Did he ever threaten you during that time you were together?

MS. BONJEAN:  Objection to form and foundation of that question.

A.     I really don't have anything to say about him.  I really don't.  I really don't. When it comes to him, I have nothing to say about him, nothing.  Like I said, the last time I saw this man was when my son was two months

GONZALEZ 000846

**Rosa Bello**
**October 15, 2021**                                                                                    28

old.  I have no type of relationship with this man, and whatever we had is dead and gone.  I really don't have anything to say.

BY MR. ENGQUIST:

Q.     Why did you break off the relationship with Jose Maysonet?

A.     Do I have to answer that question?

Q.     Yes, you do.

MS. BONJEAN:  Again, I'll object.  Objection to the form, foundation, and the relevance, but you can answer.

A.     He was abusive.  There you go.

BY MR. ENGQUIST:

Q.     Ma'am, do you want to take a minute?

A.     No.

MS. BONJEAN:  Yes.  If you need one, just let us know.

THE WITNESS:  No.  I just want to get this over.  I want this over so I don't have to deal with these people anymore.  I mean, this has been consuming my life right now and I just want this

GONZALEZ 000847

over.

BY MR. ENGQUIST:

Q. Okay. When you say that he was abusive, was he abusive during that six or seven months that you were dating him?

A. We had our difficult -- a lot of arguing and pushing and -- it's been a long -- he kicked me in my face one day and -- yeah, I almost stabbed him, yes, so relationship wasn't good.

Q. You said you almost stabbed him?

A. Yes, because he kicked me in my face while I was sleeping. So anybody is going to react the way I reacted.

Q. I'm going to show you Exhibit 2. It's a one-page document.

(Exhibit 2, Objection of Witness to Extended Media Coverage of Testimony, Bates No. CCSAO000493, marked for identification)

BY MR. ENGQUIST:

Q. I'm showing you what's been marked as Exhibit No. 2. It's a one-page document. It is Bates stamp marked CCSAO493.

GONZALEZ 000848

**Rosa Bello**
**October 15, 2021**                                                              **30**

Do you want to finish reading it?

A.     Okay.

Q.     Do you see the signature on the bottom?

A.     Yes, it's my signature, but in '91? Is that what this --

Q.     No.  This wouldn't be in 1991.  The case is a 92CR case.  The case was from then, but I'm just saying this wasn't necessarily done in 1992.  You can see the filed stamp if you turn it upside down so you can read it.

A.     Yes.

Q.     The filed stamp says, "February 2017."

A.     Okay.

Q.     So that's your signature on the bottom?

A.     Yes, it is.

Q.     I just want to direct your attention to -- is that your handwriting in Section No. 3?

A.     No.

Q.     Well, do you remember signing this?

A.     No.

GONZALEZ 000849

**Rosa Bello**
**October 15, 2021**                                                                 31

Q.      Okay.  Do you recall asking -- I want to read it.  The handwritten part says, "I'm in fear of the safety of me as well as my family.  He is my ex-boyfriend and I do have a child with him and he is a very active gang member.  For these reasons, I would like it not to be aired.  Please respect my wishes."

A.      Okay.  That's not my writing.

Q.      Okay.  You never wrote that?

A.      No, I did not.

Q.      Did you submit this to the court?

A.      No, I didn't.

Q.      Did you ever ask for the media coverage not to be covered in the -- covered by the media in the Jose Maysonet case?

A.      No.

Q.      Do you recall talking to the state attorney's office back in 2017 about testifying in the post-admission process of Jose Maysonet?

A.      I talk to so many of these guys it's, like, okay.  No, I don't recall none of this.

Q.      Okay.  Do you still have concern regarding Jose Maysonet?

GONZALEZ 000850

MS. BONJEAN:  Objection to form and foundation of that question.  If you understand it, you can answer.

A.     Am I in fear?

Q.     Yes.

A.     No.  I'm good.

Can I ask a question?

Q.     Sure.  What's the question?

A.     This here is saying in the county court of Illinois.  How would my signature be on this and get to Illinois?

Q.     I'm not sure, ma'am.  That's your signature.  I'm not sure.

A.     Okay.  This is my signature, but I did not -- you know what I'm saying, so -- yeah...

MS. BONJEAN:  You can only answer what you can answer.

THE WITNESS:  Okay.

BY MR. ENGQUIST:

Q.     During the period of time Jose Maysonet lived with you, did he ever keep firearms in the apartment?

A.     Like I said, it's been years and I

GONZALEZ 000851

don't -- I don't keep track of everything.  I don't.  I don't live in the past.  I go forward.

Q.    Okay.  Let's go back to Exhibit No. 1, which is your testimony.

A.    I read it already.

MS. BONJEAN:  Can you please lay the foundation?  This is testimony from Alfredo Gonzalez's trial, not Mr. Maysonet's trial.

MR. ENGQUIST:  Yes.

MS. BONJEAN:  Okay.  Just -- you say from the past.  You know, this is not really very clear, sorry.  Which case are you directing to?

BY MR. ENGQUIST:

Q.    I just want to go to -- you said you reviewed it?

A.    Yes, but we've been talking about other things, so it's like...

Q.    No, that's fine.  What I'm going to be asking about starts on page 95.  I'm not sure if you read that part before, but if you want to read 95 through 99 or 100, you can read further so that you get to 100, that's fine, 101.  I

GONZALEZ 000852

**Rosa Bello**
**October 15, 2021**                                                                34

don't know if you read that far, if you want to refresh your recollection in that way or if you want to --

A.    No.  Whatever is in here is everything that I said.

Q.    And was everything you said truthful at the time?

A.    Yes.

Q.    But as you sit here today, you don't recall the specifics, correct?

A.    Yes, only what I'm reading in the report that I made.

Q.    So let me direct your attention to page 95.

A.    Go ahead.  Ask me the question.

Q.    I want to direct your attention to -- it would have been line -- the question was, "Now, who do you know as Lluvia?

"Answer:  Alfredo Gonzalez.

"Question:  Alfredo Gonzalez?

"Answer:  Yes.

"And who did he come over with?

"With Tino and Fro.

"Question:  And what happened when

**Real Time Court Reporting**
**413.732.1157**

GONZALEZ 000853

these -- do you know Tino's last name?

"Answer: I don't know.

"Question: When these three guys came over, what happened?

"Answer: They rang the door bell and I opened the door, let them in, and they had wanted to speak to Juan."

When you gave that testimony, that was truthful; is that correct?

A. Yes.

Q. Okay. Go to the next page. At the very bottom of the page 96, "Question: What happened then?

"Answer: Juan had called me and told me to go into the room to get something. So I went into the room and got what he asked me for.

"Question: Now, which room did you go into to get something?

"Answer: My bedroom.

"Question: And what was it that you went into the bedroom and got?

"Answer: At the time I didn't know what it was.

GONZALEZ 000854

**Rosa Bello**
**October 15, 2021**                                                                  36

"Question:  What was it -- well, what actually did you get?

"Answer:  All I know is I went into my room and I had picked up -- it was wrapped in a plastic bag and then a towel.

"Question:  Did you know what was in the towel?

"Answer:  No, I didn't.

"Question:  This package in the plastic bag, what did you do with it?

"I gave it to Lluvia."

When you gave those answers, were those answers truthful?

A.     Yes.

MS. BONJEAN:  I'm going to object to that manner of questioning, to the form of that question.

BY MR. ENGQUIST:

Q.     In this testimony, you're talking about Juan; you're talking about Mr. Maysonet; is that correct?

A.     Yes.

Q.     Without reading and going through the entire thing here, if you go to the bottom

GONZALEZ 000855

**Rosa Bello**
**October 15, 2021**                                                                37

of page 98, third line from the bottom,

"Question:  Did you see what was inside at this time?

    "Answer:  No.

    "Did you later see what was inside?

    "Answer:  Yes."

   Next page, "What was inside?

    "Answer:  A gun.

    "Had you seen a gun before?

    "Answer:  No.

    "When you saw the gun, who had the gun?

    "Lluvia.

    "What did you see Lluvia do with the gun?

    "He stuck the bullets in the thing. He stuck it in the pistol."

    "Question:  When you say stuck the bullets in the thing, what is the thing you're talking about?

    "I don't know what they call it.

    "Question:  Was it a clip?

    "Answer:  Yes."

    When you gave that testimony, was

GONZALEZ 000856

**Rosa Bello**
**October 15, 2021** 38

that truthful testimony?

A. Yes.

Q. Let's go to the next page, page, 100, about seven lines down, "Question: What was your reaction and what did you do when you first learned there was a gun inside that towel?

"Answer: I got upset.

"Did you say anything?

"Answer: Yes, I did.

"Who did you say something to?

"To Juan.

"Question: After the gun was given to Alfredo Gonzalez, what did he do with the gun?

"Answer: He wrapped it in the plastic bag and stuck it back into the towel and I gave him a plastic bag to stick it in. After that, he stuck it under his shirt."

Was that truthful testimony back in 1992?

A. Yes.

Q. Let's go to page 102. Fifth line down, "Question: Now, after the gun was given to Mr. Gonzalez and he put it inside of his

GONZALEZ 000857

shirt, what happened then?

"Answer:  They left.

"Question:  Did everybody leave?

"Answer:  All of them left.

"Question:  Including Jose Maysonet?

"Answer:  Yes.

"Do you know where they went?

"No, I don't."

Do you see that?

A.    Yes, I do.

Q.    Was that truthful testimony?

A.    Yes.

Q.    Now, if we go to the next line, "Now, I want to direct your attention to sometime later that evening.  Did Maysonet return?

"Answer:  After 12 o'clock.

"Do you remember about what time he returned?

"No, I don't.

"Question:  It was sometime after midnight?

"Answer:  Yes."

GONZALEZ 000858

Do you see that?

A.      Yes, I do.

Q.      Was that truthful testimony?

A.      Yes.

Q.      Now, at some point after that night, you learned that two young African-American men were shot and killed in your neighborhood?

MS. BONJEAN:  I'm going to object to the form and the foundation of that question, the leading nature of that question.  It assumes facts not in evidence as to timing, and I'm going to object.

BY MR. ENGQUIST:

Q.      Do you recall talking to anybody about the Wiley brothers being murdered in your neighborhood?

A.      No.

Q.      Okay.  Did you ever talk to Jose Maysonet, Jose Juan Maysonet, regarding the murders of the Wiley brothers?

A.      No.

Q.      I'm going to direct your attention

GONZALEZ 000859

**Rosa Bello**
**October 15, 2021**                                                                                   **41**

to page 107, six lines down, I believe,

"Question:  Now, when you first learned that the Wiley brothers had -- now, when did you first learn that the Wiley brothers had been murdered?

          "Answer:  The next day when I was talking to my girlfriend.

          "Question:  And that was May 26, 1990, right?

          "Answer:  More or less, yes."

          Was that truthful testimony when you gave it?

     A.     I don't recall.  Like I said, it's been years.

     Q.     Was that truthful?

          MS. BONJEAN:  Objection to form of that question.  She just answered it and, you know, you're really trying to set her up to, you know --

          MR. ENGQUIST:  No, I'm not. And don't try to imply something that --

          MS. BONJEAN:  When you ask people whether sworn testimony is truthful, you know what you're indicating or what the possibilities are.  We can go

GONZALEZ 000860

**Rosa Bello**
**October 15, 2021**                                                                                     **42**

off the record, and I'll tell you what's wrong with that type of question it is.

BY MR. ENGQUIST:

Q.    Can you answer the question, ma'am?

MS. BONJEAN:  To the best of your ability.

A.    I don't recall.

BY MR. ENGQUIST:

Q.    After looking at that testimony, do you have any memory of having a -- being upset with Jose Juan Maysonet regarding a firearm being in the house?

A.    We fought about it because I had -- at the time I had two little girls in the home.

Q.    And when did you fight about the gun, that night or after he came home --

A.    I don't recall.

Q.    And do you recall if he told you anything about why he had a gun in the house?

A.    No.

Q.    Do you recall anything other -- other than the fact that you fought, do you recall anything else about the fight?

A.    Just basically, Why the hell do you

GONZALEZ 000861

**Rosa Bello**
**October 15, 2021**                                                             **43**

have a gun in my house?

Q.      Do you recall the answer?

A.      I don't recall.  It's been years.

Q.      Was this the only time you had a fight with Jose Maysonet regarding a firearm in the house?

A.      Yes.

Q.      I'm going to show you Exhibit 2 -- 3, I'm sorry.  Exhibit No. 3, for the record, is CCSAAO306 through 309.

(Exhibit 3, Statement of Rosa Bello dated 8/23/90, Bates No. CCSAO000306 - CCSAO000309, marked for identification)

BY MR. ENGQUIST:

Q.      Do you want to take a minute to take a look at that, ma'am?

A.      Go ahead.  Ask your question.

Q.      Now, if you look at the top of this, ma'am, it says taken on 8/23/1990 at 2:10 p.m.

Do you see that?

A.      Yes, I do.

Q.      It has "Present:  ASA Frank DiFranco and Detective Fred Motilla."

GONZALEZ 000862

**Rosa Bello**
**October 15, 2021**                                                                                          44

Do you see that?

A.     Yes, I do.

Q.     Do you recall speaking to ASA Frank DiFranco?

A.     Like I said, it's been years.  This happened in 1990.  No, I can't go back at that point and really remember these people.

Q.     Okay.  Well, do you recall sitting in the police station talking to a state's attorney regarding that night that was already talked about from your earlier testimony?

MS. BONJEAN:  I'm going to object to the form and foundation of that question.

A.     Like I said, it's been years.  1990 compared to the year that we're in now.  It's been years.  So if I sat down with these people, then yes.

BY MR. ENGQUIST:

Q.     Let's look at the bottom of the first page?

A.     Okay.

Q.     Is that your signature?

A.     Yes, it is.

GONZALEZ 000863

**Rosa Bello**
**October 15, 2021**                                                                                        45

Q.    Okay.  And if we go to the second page, is that also your signature?

A.    Yes, it is.

Q.    Do you recall ever being threatened in order to give this statement?

MS. BONJEAN:  Objection to the foundation of that question.  By whom?

MR. ENGQUIST:  As I just said, threatened to give this statement.

BY MR. ENGQUIST:

Q.    Go ahead.

A.    No.

Q.    Did any police officer ever threaten you to give this statement to the state's attorney?

A.    I'm going to say no.

Q.    Did any member of the state's attorney office ever threaten you to give the statement regarding the shooting death of Torrence Wiley and Kevin Wiley?

A.    Can you repeat the question again?

MR. ENGQUIST:  Sure.  Can you read it back, please?

MS. BONJEAN:  I'm sorry,

GONZALEZ 000864

**Rosa Bello**
**October 15, 2021**                                                                 **46**

before you read it back, I have an objection to the form of that question.

(Question read by reporter)

A.      No.

BY MR. ENGQUIST:

Q.      Do you recall the detective by the name of Fred Montilla?

A.      No, I do not.

Q.      Do you recall any of the officers you dealt with the night you gave the statement?

A.      This happened in 1990.  We're in 2021.  I do not recall.  It's been years.

Q.      Okay.  I'm just going to go through some names.  I just want to see whether or not you recall any of these people.

Fred Montilla, Detective Montilla, you don't recall, correct?

A.      No.

Q.      Do you recall ever dealing with Roland Paulnitsky?

A.      I don't remember.

Q.      Okay.  Do you ever recall with a Dectective Ernest Halvorsen?

A.      I don't recall.

GONZALEZ 000865

**Rosa Bello**
**October 15, 2021**                                                              47

Q.      Do you recall ever dealing with a sergeant by the name of Mingey?

A.      Who?

Q.      Mingey.

A.      No.

Q.      How about a sergeant with the last name of Epplen?

A.      I don't recall.

Q.      Okay.  Do you recall ever dealing with a detective by the name of Reynaldo Guevara?

A.      I don't recall.

Q.      Now, have you had a chance to read over the two-page handwritten statement there?

A.      Yes.

Q.      Okay.  Is there anything in there that you believe to be incorrect or inaccurate?

MS. BONJEAN:  Objection to the form of that question.

A.      No.  I have no objection to it.

BY MR. ENGQUIST:

Q.      I'm sorry, what was that?

A.      I have no objection to it, everything that's in it.

**Real Time Court Reporting**
**413.732.1157**

GONZALEZ 000866

**Rosa Bello**
**October 15, 2021**                                                      **48**

Q.      Do you speak Spanish?

A.      Yes, I do.

Q.      Are you fluent?

A.      When I need to be.

Q.      Okay.  Did Jose Maysonet speak English?

A.      Yes, he did.

Q.      Do you recall, when you were dating Jose Maysonet, when you were together, did you speak English, Spanish, or a little bit of both?

A.      Both.

Q.      Do you have any independent recollection, as you sit here today, about going to the police station after Jose Maysonet was arrested on this murder case?

A.      Can you repeat?

Q.      Sure.  Do you have any -- as you sit here today, do you have any independent recollection?  Do you recall actually going to the police station after Jose Maysonet was arrested for this murder case?

A.      Me and his mother?

Q.      Do you recall that?

A.      Me and his mother went to the

GONZALEZ 000867

**Rosa Bello**
**October 15, 2021**                                                                49

police station when they arrested him.  That was it.

Q.    And do you recall talking to any of the detectives or any of the police officers there?

A.    No.

Q.    You said before you don't recall giving of the statement; is that correct?

A.    I don't recall.  Which one, the one with --

Q.    The handwritten statement.

A.    This one here?

Q.    Yes, Exhibit No. 3.

A.    If it's here and it's my signature, yes, I remember that.

Q.    Do you remember talking to anyone prior to this being written up?

A.    No.

Q.    When you went to the police station with Jose's mother, did you see Jose there at all?

A.    No.

Q.    Did you talk to him at all when he was there?

GONZALEZ 000868

**Rosa Bello**
**October 15, 2021**                                                      **50**

A.      No.

Q.      Just to be clear, when you were at the police station, no one threatened you; is that correct?

MS. BONJEAN:  Objection to the form and foundation of that question.

A.      No.

BY MR. ENGQUIST:

Q.      Referring back to Exhibit No. 1, which was your testimony in the Alfredo Gonzalez trial, do you recall meeting with anyone from the state's attorney office prior to giving that testimony?

A.      No.

Q.      Okay.  Were you ever threatened by anybody in the state attorney's office prior to giving this testimony?

A.      I'm going to say no.

Q.      Were you ever threatened by anybody from the police department prior to testifying in the Alfredo Gonzalez case?

A.      I would say no.

Q.      Do you remember Jose Maysonet having -- or taking any medication at the time

GONZALEZ 000869

**Rosa Bello**
**October 15, 2021**                                                      51

you were dating?

A.      No.  To my knowledge, no.

Q.      Do you remember Jose Maysonet having any problems with anxiety?

A.      To my knowledge, no.

Q.      Now, did you ever testify in front of a grand jury?

MS. BONJEAN:  Objection.  Form and foundation.

MR. ENGQUIST:  I'm sorry, let me be more specific.

BY MR. ENGQUIST:

Q.      Do you recall testifying in front of a grand jury regarding the incident that you testified to in the People versus Alfredo Gonzalez case?

MS. BONJEAN:  Form and foundation.  Objection.

A.      No.

BY MR. ENGQUIST:

Q.      Did you testify against -- did you testify at a trial against Jose Maysonet?

A.      I'm going to say yes.

Q.      Well, do you recall actually

GONZALEZ 000870

**Rosa Bello**
**October 15, 2021**                                                    **52**

testifying against Jose Maysonet or you're just not sure?

            MS. BONJEAN:  Objection.  The way you're phrasing that question, objection to the form of that question. If you understand, by all means.

    A.    No, I don't understand.

BY MR. ENGQUIST:

    Q.    How many times do you recall testifying in court?

            MS. BONJEAN:  Ever in her life or in connection with this case?

            MR. ENGQUIST:  Good point.  In connection with this case.

            MS. BONJEAN:  I can do it for you if you need --

    A.    One time.

    Q.    One time, okay.

            MR. ENGQUIST:  Why don't we take a quick five-minute break?

            THE VIDEOGRAPHER:  Off the record at 11:11.

    (A recess was taken)

            THE VIDEOGRAPHER:  Back on the

GONZALEZ 000871

record at 11:16.

BY MR. ENGQUIST:

Q.    Ms. Bello, I want to go back when we talked about threats.

Do you recall an incident where a Molotov cocktail was thrown in the window of your mother's apartment?

MS. BONJEAN:  Her mother?

A.    My mother?

BY MR. ENGQUIST:

Q.    I believe so.  Your family's apartment.

A.    My mother has never -- I don't think -- I think you're confusing it with somebody else's.

Q.    I very well could be.

A.    Yes, because I don't know anything about that.

MS. BONJEAN:  Are you talking about the other Rosa?

MR. ENGQUIST:  Yes, I'm sorry, Jose Maysonet's mother's apartment.

BY MR. ENGQUIST:

Q.    Do you recall a Molotov cocktail

GONZALEZ 000872

**Rosa Bello**
**October 15, 2021**                                                    **54**

being thrown through that window?

    A.    I don't recall anything about that.

            MS. BONJEAN:  His sister's name is Rosa, too.  You remember that.

            MR. ENGQUIST:  Yes, I remember.  I don't think I have anything else right now, so I want to see if anybody else has any questions.

            MS. BONJEAN:  On the defense side or --

            MR. ENGQUIST:  I'm assuming the defense side would ask first.

            MS. ROSEN:  Nothing from the city.

            MS. McGRATH:  Nothing for Defendant Guevara right now.

            MS. BENSINGER:  I have a few questions from DiFranco.

            MS. BONJEAN:  Go ahead.

EXAMINATION BY MS. BENSINGER:

    Q.    Good morning, Ms. Bello.  I'm Brette Bensinger and I represent the state's attorney, Defendant DiFranco, in this matter. I've just got a couple of questions for you.

GONZALEZ 000873

**Rosa Bello**
**October 15, 2021**                                                55

First, if we could look back to the statement that you gave, I believe it's Exhibit 3.

A.     This one here?

Q.     Yes.  And it's true that you gave this statement to Assistant State's Attorney DiFranco and Detective Montilla?

A.     Yes.

Q.     Okay.  And the information contained in this statement is a true summary of the information that you told State's Attorney DiFranco?

MS. BONJEAN:  I'm going to object to the form of that question.  I don't think she's read every single line.  And you're also leading her, so I'm going to object to the form.  If you want to ask her a specific question, go ahead, but I'm objecting to the form.

BY MS. BENSINGER:

Q.     Okay.  Ms. Bello, I want to make sure that you have all the time that you need to review this statement, every single word and line, just so that we get the most accurate

GONZALEZ 000874

**Rosa Bello**
**October 15, 2021**                                                    **56**

testimony.

A.     What is your question?

Q.     My question is:  Whether the information contained in your statement is a true summary that you provided to Assistant State's Attorney DiFranco on August 23, 1990?

                    MS. BONJEAN:  Objection to the form.

A.     Can you kind of explain that a little bit better than what you're saying?

BY MS. BENSINGER:

Q.     I just -- as you sit here now, I just want to make sure that all of the information that is contained in this statement is a true and accurate depiction of a summary that you provided to Assistant State's -- let me finish -- Assistant State's Attorney Frank DiFranco on August 23, 1990?

A.     Yes.

Q.     Okay.  Now, you testified that you can speak Spanish.

       Can you also read Spanish?

A.     No, I don't read Spanish.

Q.     Okay.  Do you know if Jose Maysonet

GONZALEZ 000875

**Rosa Bello**
**October 15, 2021**                                                                57

can read Spanish?

A.      Yes, he can.

Q.      Okay.  You testified that Jose Maysonet can speak English, or at least at the time that you knew him, two months after -- you know, up until two months after your child Jose, Jr., was born, you understood that Jose Maysonet could speak English, right?

A.      No [sic], he was able to speak English.

Q.      Okay.  All right.  I'm sorry, my question was a little bit convoluted.

When you dated Jose Maysonet, you knew that he could speak English, right?

A.      Yes.

Q.      Okay.  Do you know if Maysonet, at the time, could read English?

A.      I'm going to say no.  I really don't know.

Q.      You don't know.

Do you remember writing notes?  If you wrote notes to him, would they have been in English?

A.      No.

GONZALEZ 000876

**Rosa Bello**
**October 15, 2021**                                                58

Q.    Okay.  You don't remember ever writing notes to him?

A.    No.

Q.    Okay.  So just to be clear, you don't know one way or the other if Jose Maysonet can read English; is that correct?

A.    I don't know, yes.

Q.    All right.  That's -- well, I've got one more question.

Other than providing the statement to State's Attorney DiFranco, do you remember seeing or meeting with ASA DiFranco any other time at the police station on --

A.    No.

Q.    Okay.

MS. BENSINGER:  That's all I have.

MS. BONJEAN:  I just have a few questions, if you bear with me.

EXAMINATION BY MS. BONJEAN:

Q.    Your son's birthday, when was that?

A.    April 13, 1991.

Q.    And fair to say then, based on your prior testimony, that you've had no contact with

GONZALEZ 000877

Jose Juan Maysonet, Jr., since June of 1991, correct?

A.    Yes.

Q.    I think you said --

MS. BENSINGER:  I'm just going to object.  So when I was referencing Juan, Jr., I was referencing your child.

MS. BONJEAN:  Who is this?

MS. BENSINGER:  It's Brette Bensinger.  I just want to clarify the Jr. part, Juan Maysonet, Jr.

MS. BONJEAN:  You can either object or stay quiet.  What are you doing?

MS. BENSINGER:  I'm just trying to clarify, so if you --

MS. BONJEAN:  Clarify what?

MS. BENSINGER:  Clarify the identity of the individual you're asking about, you know, but that's -- I'm happy to help, but if you don't want the help, then that's fine.

MS. BONJEAN:  I definitely don't need your help.  Okay.  We'll start over.

GONZALEZ 000878

**Rosa Bello**
**October 15, 2021**                                                                60

BY MS. BONJEAN:

Q.     You have one son with Jose Maysonet, right?

A.     Yes, I do.

Q.     Okay.  And he was born on April 13 of 1991?

A.     Yes.

Q.     And fair to say then that you haven't had any contact or conversations with Jose Juan Maysonet, Jr., his father --

A.     No.

Q.     -- your former boyfriend, since June of '91, right?

A.     Yes.

Q.     Okay.  You were asked some questions about prior testimony that you gave in the matter of People versus Alfredo Gonzalez by Mr. Engquist earlier.

As you sit here today, do you have any recollection of the person that's been referenced as Lluvia or Juvia (phonetic)?

A.     No.

Q.     For instance, if I asked you to describe him, would you be able to?

GONZALEZ 000879

**Rosa Bello**
**October 15, 2021**                                                                  **61**

A.    No.

Q.    And the individual that was referenced as Tino or Justino Cruz, any ability to recollect what that person looked like?

A.    No.

Q.    And how about the other individual that you referenced in your testimony who went by Fro?  Any idea who that is?

A.    No, I do not.

Q.    As you sit here today, can you remember, for instance, his complexion or his hair style?

I'm talking about back then.

A.    No.

Q.    By the way, do you remember Jose or Juan, as you call him, having a good friend named Santiago Sanchez who went by the name of Macho?

A.    Yes.  That he killed himself?

Q.    Yes.

A.    Yes.

Q.    Do you remember going to the services?

A.    Yes.

GONZALEZ 000880

**Rosa Bello**
**October 15, 2021**                                                                         **62**

Q.     Do you remember going to his funeral or his burial?

A.     To the funeral.

Q.     And do you remember that there were a lot of people at that funeral?

A.     Oh, there was a whole bunch of people.

Q.     Do you remember Jose being pretty upset about it?

A.     Yes, because they were best friends.

Q.     Were you aware that the murders that they're trying to say Mr. Maysonet committed occurred on the morning of Macho's funeral?

MS. McGRATH:  Objection. Form.  Foundation.

A.     No.

BY MS. BONJEAN:

Q.     Fair to say that Jose went to his friend's funeral?

A.     Yes, because I went.  Yes.

Q.     So I want to go back to some questions just about this statement as well.

GONZALEZ 000881

**Rosa Bello**
**October 15, 2021**                                                                                 **63**

A.      That's fine.

Q.      And if you don't remember, that's fine.

A.      Okay.

Q.      If you look at the top of the statement, there's some information that has your name and the time the statement was taken and who was present.

Do you see all of that?

A.      Yes, I do.

Q.      Did you fill out that information?

A.      No, I did not.

Q.      Did you see that the statement was purportedly taken on August 23, 1990, and it's the second line underneath your name right there at the top?

A.      This is August 23?

MS. McGRATH:  Objection to the form, sorry.

A.      August 23, 1990?

BY MS. BONJEAN:

Q.      Yes, at the top.

A.      Okay.

Q.      Do you see that right there?

GONZALEZ 000882

A.      Yes, I do.

Q.      And then, if you go to the middle part of the statement, it indicates that the -- the incident that they were asking you about was from May 25 of 1990, the shooting.

Do you see that?

A.      Yes, I do.

Q.      Okay.  So we admit that that's about three months --

A.      After, yes.

Q.      You were giving a statement about something that had happened three months earlier, allegedly, right?

A.      Yes.

Q.      Were you aware of that at that time?

A.      No.

Q.      Do you remember being scared being at the police station?

A.      Yes.

Q.      Okay.  Did you have young kids at home?

A.      Two, the two youngest -- the two oldest.

GONZALEZ 000883

**Rosa Bello**
**October 15, 2021**                                                          65

Q.     Were you expecting a child as well?

A.     Yes.

Q.     And I know Mr. Engquist asked you about whether or not you were threatened by the police, and you said you were going to say no to that question.

Did you ever feel that the police were pressuring you to cooperate with this investigation?

A.     Yes.

Q.     And I don't want to put words in your mouth.

Can you explain to me how it was -- strike that.

I assume you didn't want to be in the police station that night?

A.     No.  I wasn't at the police station.  At first, I was at home with Jose's mother.

Q.     And do you remember how you had to go to the police station?

A.     They called her -- first, they called and said that something happened to my dad.  I remember that.  And then all of a

GONZALEZ 000884

sudden, she said that we had to go to the police station.

Q.    Do you know who called and said something happened to your dad?

A.    My aunt, his sister.

Q.    Oh, Rose, you're talking about?

A.    No, my father's sister.  At the time my father had a stroke.

Q.    Oh, I see.

A.    Okay.  And I was pregnant with my son, and his sister, my father's sister, was taking care of my dad.  So that day she went out, and at the time I was with Juan's mother, with Rose and Tony and -- at her house.  And we were sitting there, and his mother got a phone call -- it was from my father's sister -- and asked her if I was there.  She asked if I was there.

She's like, Yeah.

She goes, Don't tell her nothing. Something happened to her dad.

So she waited until she got off the phone, and that's when she told me about my dad.

Q.    I see.  So you had a couple of

GONZALEZ 000885

things going on that night?

    A.    Yes.

    Q.    You remember it vividly because of --

    A.    My dad.

    Q.    Your dad, okay.

    Did you have to go to the hospital to see your dad?

    A.    Yes.

    Q.    Did he survive that or was that --

    A.    No.  My dad died.

    Q.    So that was around the same time Juan was arrested, or Juan?

    A.    He was in jail.  He wasn't with me.

    Q.    Do you remember -- generally, it's about the same time period; is that right?

    A.    Yes.

    Q.    When did your father die?  Do you remember the date?

    A.    I'm not sure.

    Q.    Do you remember what year?

    A.    It was 1990, but I don't really try to remember that.

    Q.    Sure.  Understood.

GONZALEZ 000886

**Rosa Bello**
**October 15, 2021**                                                        **68**

Now, it sounds like you had a lot on your mind.

Do you have a recollection of going to Grand Central, the police station?

A.    I know that his mother needed to go to the police station to find out if he had a bond.  That's what I recall, going with her to the police station because they said he had a bond.

Q.    So you weren't asked to go, but you went with his mom?

A.    Yes.

Q.    Okay.  And were you seated in the waiting area?

A.    We waited.

Q.    How was it that you come and you're just seated in the waiting area, and then all of a sudden, you end up being brought into an interview to be interviewed?

A.    I don't know.

Q.    Did you tell the police, "I have information to give you" or anything?

A.    No.  I just went to the police station with her.

GONZALEZ 000887

**Rosa Bello**
**October 15, 2021**                                                            69

Q.      Do you recall where were you when you spoke to the detective and the assistant state's attorney within the police station?

A.      I don't recall.

Q.      Okay.  Did you have a lot on your mind?

A.      Yes, because my dad was on machines.  And since I was the oldest daughter and they couldn't find my mom or -- I had to make a decision.  So being pregnant with my son -- so yes.

Q.      At any point while you were over at the police station, did any police officer suggest in any way to you that it would be in your best interest and your children's best interest if you cooperated with the investigation?

                    MR. ENGQUIST:  Objection.
Leading.
BY MS. BONJEAN:

Q.      You can answer.

A.      Yes.

Q.      Do you remember how that was communicated to you or how that was said to you?

GONZALEZ 000888

**Rosa Bello**
**October 15, 2021**                                                                 70

A.    Basically, I was a single mom and they can take my kids from me.  I basically looked at them and told them, Do what the hell you needed [sic] to do, basically.

Q.    So at some point it was mentioned that they had the power to take your kids from you?

A.    Yes.

Q.    As a mother, when someone makes that type of implication, how did it make you feel?

A.    Like I wanted to get up and hit you, basically, because these are my kids. Nobody's going to take my children from me.  For what?  There is no reason for you to threaten to take my children.

Q.    You hadn't done anything wrong, right?

A.    No.

Q.    Let me ask it this way:  Were your children the most important thing to you?

A.    Oh, yes.

Q.    More important that Jose Juan Maysonet?

GONZALEZ 000889

A.    Oh, yes.  I'm sorry to say because men come and go.  These are mine.  I carried them.  They belong to me.

Q.    And was it your first and foremost priority to protect your children?

A.    Yes.

Q.    Now, when you went to the police station, did you have any idea what Jose had been arrested for or what they --

A.    No.

Q.    Okay.  And you said you didn't talk to Jose there, right?

A.    No.

Q.    So how did you get your information about why he was in police custody?  Do you remember who told you?

A.    It's been years.  No, I don't.

Q.    Do you remember the police detectives telling you the story of why he was there?

MS. ROSEN:  Objection to form.  Foundation.

A.    No, I don't.

BY MS. BONJEAN:

GONZALEZ 000890

**Rosa Bello**
**October 15, 2021**                                                                 72

Q.      As an example, in your statement, it says the gun that you saw in the house was a 9 millimeter.

Did you know the types of guns there were out there?

A.      No.

Q.      Okay.  Who gave you the information that it was a 9 millimeter?

MS. ROSEN:  Objection.  Form. Foundation.

A.      I don't recall.

BY MS. BONJEAN:

Q.      Is it fair to say that you did not actually write out this statement?  You signed it, right?

A.      I signed it, but the statement I did not write.

Q.      The words that are on this piece of paper that are written here, other than your signature, are someone else's words, correct?

MS. BENSINGER:  Objection.

A.      Yes.

BY MS. BONJEAN:

Q.      Do you know who wrote out the

GONZALEZ 000891

**Rosa Bello**
**October 15, 2021**                                                      73

narrative in this statement?

A.     No.  I don't recall.  I don't remember.

Q.     Okay.  Do you recall whether you carefully read it after the person wrote it out before you signed it?

A.     Probably didn't.  Probably didn't.

Q.     You weren't trying to lie to anybody?

A.     No.

Q.     But fair to say you didn't probably read this very closely after --

MR. ENGQUIST:  Objection.

MS. ROSEN:  Objection.  Form.

A.     Yes.

BY MS. BONJEAN:

Q.     Did you want to get out of the police station?

A.     Yes.

Q.     Did you want to go home and protect your kids?

A.     Yes.

Q.     So when -- for instance, there's a bit of information here that says, "Rosa said

GONZALEZ 000892

**Rosa Bello**
**October 15, 2021**                                                                74

the gun was a 9 millimeter."

Was that you saying that or was that something that the author put in there and you agreed to?

MS. BENSINGER:  Objection. Assumes.  Form and -- just...

MS. BONJEAN:  Any other objection?  Go ahead.  You have the floor.

BY MS. BONJEAN:

Q.     Rosa, do you know what a 9 millimeter gun looks like?

A.     No.

Q.     Would you be able to distinguish a 9 millimeter from a .38 revolver or any other type of gun?

A.     No, only what I see on Cops on TV.

Q.     Can you look at the last page of this statement?  It's a photograph?

A.     Yes.

Q.     Well, that's the second to the last.  We'll look at that first.

Do you recognize the individual in the --

A.     In the last one?

GONZALEZ 000893

**Rosa Bello**
**October 15, 2021**                                                                                      **75**

Q.      This one right here that says Exhibit 1?

A.      No, I don't.

MS. ROSEN:  Can you give us the Bates number of the page she's looking at since it's not on the screen?

MS. BONJEAN:  Yes.  It's Exhibit 1 to the statement.  It's Bates No. CCSOA308, and I'll ask the question again.

BY MS. BONJEAN:

Q.      Ms. Bello, do you recognize the person that's depicted in this photograph?

A.      No.

Q.      And could you go to the last page, Exhibit No. 2?  And it's CCSAO309.  I know it's not a great picture.

Do you recognize the individual 234 this photograph?

A.      No.

MS. BENSINGER:  And I'm just going to say for the record that these photographs depicted in CCSAO308 and 309 -- these versions are photocopies of

GONZALEZ 000894

**Rosa Bello**
**October 15, 2021**                                                                 76

photocopies.

MS. BONJEAN:  Well, thank you for making that record.  I'm sure the record won't reflect that because it's going to be attached as an exhibit, but if you have better copies of them, why don't you ask her whether she recognizes them with the actual copy.

MS. BENSINGER:  Ms. Bonjean, thank you for offering your help.

MS. BONJEAN:  No problem.  Any time.

BY MS. BONJEAN:

Q.    Mr. Engquist asked you about the murders of the Wiley brothers.

Do you have any idea who the Wiley brothers were?

A.    No.

Q.    Do you know, for instance, where they lived?

A.    No.

Q.    Do you know where they were murdered?

A.    No.

GONZALEZ 000895

Q.     Do you know how they were murdered?

A.     No.

Q.     Do you know what their ethnicity was?

A.     No.

Q.     Do you know what their race was?

A.     No.

Q.     Do you remember hearing any talk -- well, strike that.

It's not a secret Jose was a Latin King, right?  You testified to that earlier?

A.     Yes.

Q.     Did you hear any Latin Kings talking about the Wiley brothers?

A.     No.  I don't even know who those guys were.

Q.     Do you remember any detectives being in the home that you shared with or stayed with Juan prior to his arrest?

A.     No.

Q.     Okay.  And prior to giving testimony at Alfredo Gonzalez's trial -- you may not remember, but do you remember coming to 26th Street and going to the Cook County State's

GONZALEZ 000896

**Rosa Bello**
**October 15, 2021**                                                    **78**

Attorney Office prior to giving your testimony?

A.    To the courthouse?

Q.    Yes.  You went to the courthouse, but you went to some offices before you actually testified?

A.    I didn't go to no office.  I went to the courtroom.  It was going straight to the courtroom.

Q.    Okay.  And do you remember who the Cook County state's attorney was who was handling the prosecution of --

A.    No, I do not.

MS. BONJEAN:  I may not have anything more.

BY MS. BONJEAN:

Q.    Did you ever visit Juan in Cook County jail?

A.    One time.

Q.    Okay.

A.    When my son was just born.  I took his son to see him, and that was it.

Q.    And then after that --

A.    I haven't seen him since.

Q.    Right.  And do you remember

**Real Time Court Reporting**
**413.732.1157**

GONZALEZ 000897

**Rosa Bello**
**October 15, 2021**                                                                    **79**

seeing -- well, strike that.

Do you even remember who Alfredo Gonzalez was?

A.    No.

Q.    Do you remember seeing him at the Cook County jail?

A.    No.

MS. BONJEAN:  I don't think I have anything further.  I appreciate your time.

MR. ENGQUIST:  I have a couple questions based on that.

FURTHER EXAMINATION BY MR. ENGQUIST:

Q.    I believe it's Exhibit No. 3.  If we can go back, we were talking about that.  Go to the last two pages, CCSAO308 and 309.

Can you look at page 308?  Is that your signature at the bottom of that page with the photograph?

A.    Yes.

Q.    And No. 309, is that also your signature?

A.    Yes.

Q.    Okay.  If you go to page 307, right

GONZALEZ 000898

**Rosa Bello**
**October 15, 2021**                                                      **80**

above your signature, that last line, it says,

"Rosa identified attached Exhibit 1 as Lluvia

and attached Exhibit 2 as Fro."

        Do you see that?

    A.    I'm going to tell you that's not my

signature because the "O" is like an "A."

    Q.    So you don't think that's your

signature on 307?

    A.    No.

    Q.    Is that your signature on 308?

    A.    Yes, but this one here on page 307,

it looks like an "A" on the end.  And when I do

my "O"s, I put the line up.  So I know my

signature.

    Q.    Is it possible that back in 1990,

you could identify Lluvia and Fro?

        MS. BONJEAN:  Objection to the

    form and foundation of that question.

    A.    To my knowledge, I could probably

tell you right now, at this point, if I were to

see them now, no.

BY MR. ENGQUIST:

    Q.    Now I understand no.

    A.    Then?

GONZALEZ 000899

**Rosa Bello**
**October 15, 2021**                                                                          **81**

Q.    Yes.

A.    Like I said, this is from 1990, and compared to now, I probably wouldn't even notice.

Q.    Let's go back to Exhibit No. 1, please, the transcript.  Go to page -- it's CCSAO2538.

A.    You said --

Q.    2538.

A.    Okay.

Q.    Okay.  All right.  Are you done?

A.    Yes.

Q.    Okay.  This was during your cross-examine if you want at the middle of the page, where it says, "What kind of gun?"

Do you follow me there?

A.    Yes.

Q.    "Question:  What kind of gun was it?

"Answer:  A 9 millimeter.

"Question:  You knew what a 9 millimeter looked like on May 24, 1990?

"Answer:  I seen it when he unwrapped it.

GONZALEZ 000900

"Question:  I know you did, but had you seen a 9 millimeter gun before?

"Answer:  I seen it once.

"Question:  Well, does the 9 millimeter gun that you saw in May 24, 1990 have 9 millimeter written on it?

"Answer:  I wasn't looking at it.

"Question:  How do you know it was a 9 millimeter gun?

"Answer:  Just by looking at it."

Do you see that?

A.    Yes, I do.

Q.    Was that honest testimony back in 1992 when you gave your testimony in the Alfredo Gonzalez case?

A.    Yes.

MR. ENGQUIST:  I don't have any other questions.

MS. BONJEAN:  I just have one question.

FURTHER EXAMINATION BY MS. BONJEAN:

Q.    Ms. Bello, obviously, before you testified -- well, strike that.

Before you testified at Alfredo

GONZALEZ 000901

Gonzalez's trial, do you remember reviewing a statement that you had provided to the police?

A.    No.

Q.    Okay.  Did you do your best to testify truthfully at that proceeding?

A.    Yes.

Q.    Is it possible that there were possibly mistakes that you might have made in the course of that testimony?

MR. ENGQUIST:  Objection.  Foundation.

MS. ROSEN:  Objection.  Form.  Foundation.

A.    Probably.

BY MS. BONJEAN:

Q.    Okay.  Did you feel a lot of pressure testifying there?

A.    Yes.

Q.    You were scared because you had been threatened; isn't that right?

A.    Yes.

MS. BENSINGER:  Objection.

BY MS. BONJEAN:

Q.    And when you were asked if this was

GONZALEZ 000902

**Rosa Bello**
**October 15, 2021**                                                                84

truthful testimony, it was truthful to the best of your ability, right?

     A.     Yes.

     Q.     You would never purposely -- you know, you weren't purposely trying to lie, right?

     A.     No.

     Q.     Okay.  But this doesn't mean that when giving testimony, that sometimes people make mistakes or are mistaken, correct?

               MS. ROSEN:  Objection.  Form.  Foundation.

     A.     Yes.

BY MS. BONJEAN:

     Q.     And given the fact that this testimony was in 1992, is it even possible for you to look back and see whether you might have been mistaken about anything you testified to?

               MS. ROSEN:  Objection.  Form and foundation.  Calls for speculation.

     A.     Probably.  I don't know.

BY MS. BONJEAN:

     Q.     Is it difficult to look back at testimony from 1992 --

GONZALEZ 000903

**Rosa Bello**
**October 15, 2021**                                                                                    85

A.    Yes.  Compared to now, yes.

Q.      -- and to be able to look back and say whether or not everything in there was accurate or not accurate?

MS. ROSEN:  Objection.

A.    Yes.

BY MS. BONJEAN:

Q.    Would you say --

A.    I don't know.  I don't recall.

MS. ROSEN:  I object to the question.  Form.  Objection.  Form. Foundation.

MS. BONJEAN:  That's fine.  I have nothing further.  Thank you.

THE WITNESS:  Okay.  Thank you.

MR. ENGQUIST:  I don't think I have anything based off of that.  Eileen or anybody else?

MS. ROSEN:  I have nothing. Thank you.

MS. McGRATH:  I don't have anything.  Thank you.

MS. BENSINGER:  I've got a

GONZALEZ 000904

couple of questions.  This is Brette

Bensinger again on behalf of State's

Attorney DiFranco.

EXAMINATION BY MS. BENSINGER:

Q.     And I just want to bring you back

to the time of that statement that you provided

in Exhibit 3.

MS. BONJEAN:  She has it.

BY MS. BENSINGER:

Q.     Do you recall being brought into a

room to provide this statement at the police

station?

MS. BONJEAN:  Objection.

Asked and answered.

MR. ENGQUIST:  Join.

A.     I don't recall.

BY MS. BENSINGER:

Q.     Okay.  So you said, you know, you

don't -- you probably didn't study it, study the

statement, after it was written or -- do you

remember that line of testimony?

MS. BONJEAN:  Are you

asking whether she -- objection to the

form.  If you understand it.

GONZALEZ 000905

**Rosa Bello**
**October 15, 2021**                                                                 87

A.     I don't understand what you're asking.

BY MS. BENSINGER:

Q.     Okay.  As you sit here right now, are you able to testify that you're certain that you didn't read this statement after it was taken?

MS. BONJEAN:  Objection to the form.  Misstates --

BY MS. BENSINGER:

Q.     You do not know, as you sit here right now?

A.     I'm going to say no, I'm not really sure.

Q.     Okay.  You're not sure if you -- if you --

MS. BONJEAN:  Oh, God.

MS. BENSINGER:  Excuse me?

MS. BONJEAN:  Can you ask your question?  She would like to go.

MS. ROSEN:  Did you just say, Oh, God?

MS. BONJEAN:  Yes, I said, Oh, God.

GONZALEZ 000906

**Rosa Bello**
**October 15, 2021**                                                                88

MS. BENSINGER: What are you -- would you like to say something?

MS. BONJEAN: No. Just start -- we shouldn't be waiting for you to make the question, and it --

MS. BENSINGER: You know what, Ms. Bonjean, everybody was patient when you asked your questions. Can you try to give other people the same respect, please, please, please?

MS. BONJEAN: Go ahead and ask the question.

BY MS. BENSINGER:

Q. Okay. With respect to State's Attorney DiFranco, did he threaten you in any way?

MS. BONJEAN: Objection. Asked and answered.

MS. BENSINGER: It was not answered with respect to DiFranco.

MR. ENGQUIST: Actually, it was.

BY MS. BENSINGER:

Q. Did DiFranco -- I'm sorry, did

**Real Time Court Reporting**
**413.732.1157**

GONZALEZ 000907

**Rosa Bello**
**October 15, 2021**                                                                89

state's attorney -- the state's attorney that took your statement, did he threaten you in any way?

A.     No.

Q.     Did the state's attorney say anything about your children, the state's attorney specifically?

A.     No.

Q.     Was the state's attorney present when -- during your -- you know, when the police mentioned something about your children?

A.     I'm going to say no.

MS. BENSINGER:  Okay.  I have no further questions.

MS. BONJEAN:  Nothing based on that.

MR. ENGQUIST:  Nothing for me. Eileen, Megan?

MS. ROSEN:  Nothing for me.

MS. McGRATH:  Nothing from me. Thanks.

MR. ENGQUIST:  Okay. Ms. Bello, one more question.  The question comes down to when this is typed

GONZALEZ 000908

up, this transcript is typed up, you have the -- you have two different choices:  1) you can waive your signature, which means that you're trusting the court reporter, who is remote over there, has typed everything correctly; or you can say, I reserve my signature, which gives you an opportunity to read it over to verify -- you know, we're talking about -- we're not talking about changing testimony dramatically.  We're talking about if you made a mistake as to what was said, there's a spelling error, or something like that, making those changes.  But you have an opportunity to read it over beforehand.  It's up to you whether you want to waive it or reserve.  So either way, we will reserve and either Ms. Bonjean or I can't really tell you what to do because we don't represent you.  So it's really up to you.

MS. BONJEAN:  It's really up to you.  If you trust that the court reporter got your answers correctly, then

GONZALEZ 000909

so be it.  If you think that there could have been a mistake, you have every right to look at it.

THE WITNESS:  No.  I think she's got everything correctly.

MR. ENGQUIST:  So waive?

THE WITNESS:  Yes.

MR. ENGQUIST:  Then waived. Thank you very much.

THE WITNESS:  Thank you.

THE VIDEOGRAPHER:  Off the record at 11:54.

(Deposition concluded)

GONZALEZ 000910

**Rosa Bello**
**October 15, 2021**                                                              **92**

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


      I, REBECCA J. GLADU, a Notary Public in
and for the Commonwealth of Massachusetts, do
hereby certify that there came before me on
October 15, 2021, at the offices of Real Time
Court Reporting, 9 Hammond Street, Worcester,
Massachusetts, the following named person, to
wit:  ROSA BELLO, who was by me duly sworn to
testify to the truth and nothing but the truth
as to her knowledge touching and concerning the
matters in controversy in this cause; that she
was thereupon examined upon her oath and said
examination reduced to writing by me; and that
the statement is a true record of the testimony
given by the witness, to the best of my
knowledge and ability.


      I further certify that I am not a relative
or employee of counsel/attorney for any of the
parties, nor a relative or employee of such
parties, nor am I financially interested in the
outcome of the action.


      WITNESS MY HAND October 27, 2021.


      _____
      Rebecca J. Gladu
      Notary Public


My Commission expires:
July 28, 2028

**Real Time Court Reporting**
**413.732.1157**

GONZALEZ 000911

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

EXHIBIT

1

STATE OF ILLINOIS )

) SS:

COUNTY OF COOK )

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT-CRIMINAL DIVISION

THE PEOPLE OF THE )
STATE OF ILLINOIS ) Case No. 90 21787
)
-vs- ) Before: JUDGE LORETTA HALL
) MORGAN
ALFREDO GONZALEZ ) Thursday, March 26, 1992

Court having reconvened pursuant to adjournment.

APPEARANCES:

        HON. JACK O'MALLEY,
           State's Attorney of Cook County, by
      MR. JOEL LEIGHTON and
      MR. FRANK MAREK,
           Assistant State's Attorneys,
           appeared on behalf of the People;

      MR. DAVID WIENER,
           Assistant Public Defender,
           appeared on behalf of the Defendant.

ROCHINA V. CHOLEWA
Official Court Reporter
2650 S. California
Chicago, Illinois 60608

1

CCSAO002429

GONZALEZ 000912

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

Q.    Did any of the people who heard shots ever indicate to you they had seen any offenders?

A.    No.

MR. MAREK:  I have nothing else.

MR. WIENER: I have no questions of Det. Dickinson.

THE COURT:  Thank you, Detective.  You may step down.

(Witness excused.)

MR. MAREK: If I may have just a moment to see if the next witness has arrived?

THE COURT:  Yes.

(short pause)

MR. MAREK:  At this time the People, your Honor, call Rosa Bello.

THE COURT:  Very well.


R O S A    B E L L O,


called as a witness by the State's Attorney herein, having been first duly sworn, was examined and testified as follows:


DIRECT EXAMINATION

90

CCSAO002518

GONZALEZ 000913

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

By: Mr. Marek

Q. Miss Bello, state your name for the record, please?

A. My name is Rosa Bello.

Q. You have to speak nice and loud.

A. Rosa Bello.

Q. Miss Bello, do you know an individual by the name of Jose Maysonet?

A. He is the father to my son.

Q. How long have you known Jose Maysonet?

A. Four years.

Q. Do you know an individual by the name of Alfredo Gonzalez?

A. Yes, I do.

Q. How long have you known him?

A. About two years.

Q. Is he in court right now?

A. Yes.

Q. He is. Would you point him out for the record?

A. There he is; there.

Q. What is he wearing right now?

A. White shirt with gray pants.

91

CCSAO002519

GONZALEZ 000914

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

MR. MAREK: May the record reflect in-court identification of the defendant, Alfredo Gonzalez.

THE COURT: Very well.

BY MR. MAREK:

Q. Do you also know the name of -- an individual by the name of Justino Cruz?

A. Yes, I do.

Q. How long have you known him?

A. About the same time; two years.

Q. Do you know an individual by the -- whose street nickname is Fro?

A. Yes.

Q. Do you know his real name?

A. No.

Q. How long have you known him?

A. Long time.

Q. Do you know all of these individuals to be members of any street gang?

A. Yes, I do.

Q. What street gang is that?

A. Latin Kings.

Q. Miss Bello, I want to direct your attention to May 25th of -- Strike that.

I want to direct your attention to

92

CCSAO002520

GONZALEZ 000915

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

the evening of May 24th, 1990.

Where were you living back then?

A.   1302 North Homan.

Q.   Who were you living there with?

A.   Juan Maysonet.

Q.   Is Juan Maysonet, is his full name Juan Jose Maysonet?

A.   Yes.

Q.   Were you living there with any children also?

A.   Yes; my two daughters.

Q.   Now is Juan Jose Maysonet the father of your two daughters?

A.   No, he is not.

Q.   Do you have a child by Juan Jose Maysonet?

A.   Yes, I do.

Q.   Which child is that?

A.   A little boy.  His name was Juan.

Q.   When was Juan born?

A.   April 13, 1991.

Q.   Were you -- So Juan was born after the evening of May 24, 1990?

A.   Yes, he was.

Q.   Miss Bello, I want to direct your

93

CCSAO002521

GONZALEZ 000916

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

attention to May 24, 1990, about 11:30 P.M.

Do you know where you were on that date at that time?

A.   I was in my house.

Q.   Who else if anybody was with you?

A.   Me, my two daughters and the baby's father, Juan.

Q.   And what was everybody doing?

A.   The girls had went to sleep and I went into the kitchen to clean up the kitchen.

Q.   Was anybody watching TV?

A.   No.  The TV was just on.

Q.   Did anybody come by your house May 24, 1990?

A.   Yes.

Q.   Who was that?

A.   Lluvia, Tino, and Fro.

Q.   Now, the name Lluvia, is that a nickname or street name?

A.   Nickname.

Q.   Do you know how that is spelled?

A.   No, I don't.

Q.   Would it be like, is that L-l-u-v-i-a as far as you know?

94

CCSAO002522

GONZALEZ 000917

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

MR. WIENER: Objection. She said she didn't know how it was spelled.

THE COURT: Overruled. It may stand.

BY MR. MAREK:

Q. Now, who do you know as Lluvia?

A. Fredo, Alfredo.

Q. Alfredo Gonzalez?

A. Yes.

Q. And who did he come over with?

A. With Tino and Fro.

Q. And what happened when these -- Do you know Tino's last name?

A. No, I don't.

Q. When these three guys came over what happened?

A. They had rung the doorbell and I had opened the door, let them in, and they had wanted to speak to Juan.

Q. Did you let them into the apartment?

A. Yes, I did.

Q. What happened when you let them into the apartment?

A. They wanted to speak to him so he was taking a shower and I had knocked on the door and

95

CCSAO002523

GONZALEZ 000918

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

he had came out.

Q. Did Juan speak to any of these three individuals?

A. Yes, he did.

Q. Who was that?

A. Lluvia, Tino, and Fro.

Q. And where were you at when Juan was speaking to these three individuals?

A. I was in the kitchen.

Q. Where were Jose, Lluvia, Tino, and Fro when they were speaking to each other?

A. Like in the frontroom, like in the middle part of the house.

Q. Is that where the TV was?

A. No. The TV was by the window. They were by a closet.

Q. Were they in the same room, though, in the living room?

A. Right.

Q. Were you, Miss Bello, able to overhear anything that these four guys were talking about?

A. No.

Q. What happened then?

A. Juan had called me and told me to go into

96

CCSAO002524

GONZALEZ 000919

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

the room to get something.  So I went into the room and I had got what he had asked me for.

Q.   Now which room did you go into to get something?

A.   My bedroom.

Q.   And what was it that you went into the bedroom and got?

A.   At the time I didn't know what it was.

Q.   What was it -- Well, what actually did you get?

A.   All I know is I went into my room and I had picked up, it was wrapped in a plastic bag and then a towel.

Q.   Did you know what was in the towel?

A.   No, I didn't.

Q.   This package or this plastic bag, what did you do with it?

A.   I gave it to Lluvia.

Q.   What if anything -- Was that -- Is there any reason why you gave it to Lluvia?

A.   Juan had told me to give it to him.

Q.   And where were Juan and Lluvia when you handed over this package or this towel?

A.   In the middle of the front room by the

CCSAO002525

GONZALEZ 000920

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

closet.

Q. Let me ask you this. Where did you go to get this package?

A. In my bedroom in the closet on the top shelf.

Q. When you went into your bedroom and got this from your closet where were Alfredo Gonzalez and Jose Maysonet?

A. By the closet. They didn't go into my room.

Q. Were they outside your room?

A. Yes; by the door.

Q. Now, Jose, when you handed over this package, this towel to Alfredo Gonalez where did you do that?

A. When did I do what?

Q. Where was he standing when you handed this over; by the door?

A. By the door.

Q. And did you see what was inside at this time?

A. No.

Q. Did you later see what was inside?

A. Yes.

CCSAO002526

GONZALEZ 000921

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

Q. What was inside?

A. A gun.

Q. Had you ever seen that gun before?

A. No.

Q. When you saw the gun who had the gun?

A. Lluvia.

Q. What did you see Lluvia do with the gun?

A. He stuck the bullets in the thing. He stuck it in the pistol.

Q. When you say he stuck the bullets in the thing, what is the thing that you are talking about?

A. I don't know how they call it.

Q. Was it a clip?

A. Yes.

Q. So first, and just so it is clear, Lluvia is Alfredo Gonzalez; is that right?

A. Right.

Q. First he put the bullets in the clip?

MR. WIENER: Objection. He is leading the witness. She can testify.

THE COURT: That has been testified to. I am assuming he is just reorienting the witness.

Overruled.

99

CCSAO002527

GONZALEZ 000922

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

BY MR. MAREK:

Q. You saw him put the bullets in the clip?

A. Yes.

Q. What did he then do with the clip?

A. He put the clip in the gun.

Q. What part of the gun?

A. The back part.

Q. What was your reaction or what did you do when you first learned that there was a gun inside that towel?

A. I got upset.

Q. Did you say anything?

A. Yes, I did.

Q. Who did you say something to?

A. To Juan.

Q. Now after the gun was given to Alfredo Gonzalez what did he do with the gun?

A. He wrapped it back in the plastic bag and stuck it back into the towel and I gave him a plastic bag to stick it.

After that he stuck it under his shirt.

Q. Now where under his shirt did he stick the bag?

100

CCSAO002528

GONZALEZ 000923

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

A.     He had a hood.

Q.     Where under his shirt?

A.     Like underneath and stuck it like this.

MR. MAREK:    For the record the witness has indicated the front of the shirt at approximately the waist area.

THE COURT:    That is the description, would you agree to, counsel?

MR. WIENER:    Surely.

THE COURT:    Very well.

BY MR. MAREK:

Q.     Now, what kind of a sweatshirt was Alfredo Gonzalez wearing that night?

A.     A black hoodie.

MR. WIENER:    Objection.    There is no testimony that he was wearing a sweatshirt.

THE COURT:    I believe the witness testified to it as a hoodie.    Perhaps we can clarify.

BY MR. MAREK:

Q.     What is a hoodie, Miss Bello?

A.     Just a long black shirt with a hat.

Q.     By a hat you mean a hood?

A.     Hooked to the shirt; hooked up.

Q.     Okay.    And that is what Mr. Gonzalez was

101

CCSAO002529

GONZALEZ 000924

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

wearing that night?

A.    Yes.

Q.    Do you remember when he left -- Do you remember did he have the hood on or off?

A.    Don't recall.

Q.    Now after the gun was given to Mr. Gonzalez and he put it inside of his shirt what happened then?

A.    They left.

Q.    Did everybody leave?

A.    All of them left.

Q.    Including Jose Maysonet?

A.    Yes.

Q.    Do you know where they went?

A.    No, I don't.

Q.    Now, I want to direct your attention to some time later that evening.  Did Jose Maysonet return?

A.    After 12:00 o'clock.

Q.    Do you remember about what time he returned?

A.    No, I don't recall.

Q.    It was sometime after midnight?

A.    Yes.

102

CCSAO002530

GONZALEZ 000925

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

Q. Did he return with anybody or did he return by himself?

A. By hisself.

Q. Now, Miss Bello, in exchange for your testimony here today the State's Attorney's office has offered to relocate you; is that correct?

A. Yes.

Q. And in fact the last several days you have been staying in a hotel at the State's, at the expense of the State's Attorney's office; is that correct?

A. Yes.

Q. Why have you been staying at a hotel?

A. Because somebody tried to run me over with my son.

Q. You said somebody tried to run you over?

A. Yes; with my son.

Q. You had your son at the time?

A. Yes. I was on my way to the doctor.

Q. And approximately when did this happen?

A. About 1:30, 2:00 o'clock Friday, last Friday.

MR. MAREK: No further questions.

THE COURT: Go ahead.

103

CCSAO002531

GONZALEZ 000926

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

CROSS EXAMINATION

By: Mr. Wiener

Q.    Miss Bello, you say you have known Alfredo Gonzalez for two years?

A.    Yes.

Q.    When did you first meet him?

A.    I met him through Juan.

Q.    When did you first meet him?

A.    It has been a long time. I don't don't recall.

Q.    Well this is March of 1992. Did you meet him in March of 1990?

A.    No, I didn't.

Q.    Did you meet him in April of 1990?

A.    No, I didn't.

Q.    Well when did you meet him?

A.    Don't recall. It has been a long time.

Q.    You just told the State, you answered a question, you said you have known him for two years.

MR. MAREK: Objection.

THE COURT: Overruled.

CCSAO002532

GONZALEZ 000927

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

THE WITNESS: About two years.

BY MR. WIENER:

Q. Two years from today?

A. Yes.

Q. So May 25, 1990 was 22 months ago from today; isn't that true?

A. Should be; yes.

Q. So you knew him about two months before you said he came to your apartment on May 24, 1990?

A. That is a lie.

Q. Excuse me; that is a lie?

A. That is a lie.

Q. How long had you known him then?

A. I been knowing him for two years. He did have came to my house a couple of times.

Q. Now you lived on May 25th of 1990 with Jose Maysonet; right?

A. Right.

Q. How long had you lived with him at that time?

A. About two-and-a-half years.

Q. And you agreed with the State to testify today in return for their relocating you; is that right?

105

CCSAO002533

GONZALEZ 000928

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

A.   Yes.

Q.   And you know Jose Maysonet is a defendant in this case, don't you?

A.   Yes, I do.

Q.   And he is charged along with Mr. Justino Cruz and this defendant with the murders of the Wiley brothers, isn't he?

A.   Yes.

Q.   You want to see justice served, don't you?

A.   Yes, I do.

Q.   And you agreed with the State that you would also testimony against Jose Maysonet, didn't you?

A.   No, I didn't.

Q.   You did not agree to testify in the trial if any of Jose Maysonet that a gun was supplied to Alfredo Gonzalez by Jose Maysonet that evening?

A.   No.

Q.   You are not going to testify at the trial of Jose Maysonet, if any?

A.   No, I am not.

Q.   That Jose Maysonet left with three other people?

A.   No, I am not.

CCSAO002534

GONZALEZ 000929

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

Q.   And took a gun with him that night?

A.   No, I am not.

Q.   In fact the only person you agreed to testify against was Alfredo Gonzalez; isn't that true?

A.   Yes.

Q.   Now when did you first learn that the Wiley brothers had been murdered?

A.   The next day when I was talking to my girlfriend.

Q.   That was May 26th, 1990; right?

A.   More or less; yes.

Q.   You went to the police, didn't you?

A.   Did I go to the police?  The police came and got me.

Q.   On May 26th?

A.   May 25th.

Q.   The police came and got you on May 25th?

A.   Yes.

Q.   You told them about this on May 25th, didn't you?

A.   Think so. It has been a while.

Q.   And you told them exactly what happened on May 25, 1990 when they came to your house?  You

107

CCSAO002535

GONZALEZ 000930

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

told them the exact same story that you told the jury; isn't that true?

A.   Yes.

Q.   Isn't it a fact that the first time you told the police anything about what happened was on August 23 of 1990, three months after this alleged visit to your house occurred?

A.   I don't recall when I did it.

Q.   You didn't tell the police anything in May of 1990 about Alfredo Gonzalez, did you?

A.   No.

Q.   You didn't tell the police anything in June of 1990 about Alfredo Gonzalez?

A.   No.

Q.   You didn't tell the police anything in July of 1990 about Alfredo Gonzalez?

A.   No.

Q.   You didn't tell anybody about this until August 23, 1990 after Jose Maysonet was arrested and charged with this crime; isn't that true?

A.   Yes.

Q.   So you knew the next day that two brothers were killed and you say you saw a gun taken out of your place and you never went to the police; isn't

108

CCSAO002536

GONZALEZ 000931

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

that true?

A.    Yes.

Q.    Now you say that when these people came to your house Jose asked you to get a package out of your bedroom; isn't that right?

A.    Yes.

Q.    But you told them on August 23, 1990 Assistant State's Attorney DeFranco and Det. Fred Matilla (phonetic) when they came to your house Lluvia, Fro, and Tino asked Jose for a gun?

A.    I did not hear the conversation.

Q.    Well, you didn't tell Officer, I mean Assistant State's Attorney DeFranco and Det. Fred Matilla on August 23, 1990 that Lluvia, Fro, and Tino asked Jose for a gun?

A.    I did not listen to the conversation.

Q.    So when you went to the closet you didn't know you were getting a gun?

A.    No, I didn't.

Q.    And on August 22, 1990 didn't you tell Det. Halvorsen, Gawrys, Guevara and Paulnitsky that when the three of them came into your house they asked Jose to get a gun?

A.    I did not hear the conversation.

CCSAO002537

GONZALEZ 000932

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

Q. So you didn't tell those detectives that, did you?

A. I didn't hear the conversation.

Q. And when you saw that gun did you recognize what kind of a gun that was?

A. At first I didn't.

Q. I asked you did you ever recognize what kind of a gun that was?

A. After a while I did.

Q. What kind of a gun was it?

A. .09 mm., millimeter.

Q. You knew what a .09 millimeter gun looked like on May 24, 1990?

A. I seen it when he unwrapped it.

Q. I know you did but had you seen .09 millimeter guns before?

A. I seen it once.

Q. Well does the .09 millimeter gun that you saw on May 24, 1990 have .09 millimeter written on it?

A. I wasn't looking at it.

Q. Well how did you know it was a .09 millimeter gun?

A. Just by looking at it.

110

CCSAO002538

GONZALEZ 000933

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

MR. MAREK: Objection. She has answered it.

THE COURT: Overruled.

BY MR. WIENER:

Q. How did you know it was a .09 millimeter gun?

A. Just by looking at it.

Q. Had you seen other .09 millimeter guns?

A. No. Only by books.

Q. By books?

A. Yes.

Q. Did you have gun books in your house?

A. No, I didn't.

Q. When did you study guns so that you could identify a .09 millimeter gun?

A. It was just looking at it; glancing.

Q. After May 24, 1990, in fact after Jose came home May 25, 1990 did you ever see any other guns in your house?

MR. MAREK: Objection.

MR. WIENER: I asked her --

MR. MAREK: Objection. How is it it relevant?

THE COURT: Sustained.

BY MR. WIENER:

Q. Well, have you ever seen another .09

111

CCSAO002539

GONZALEZ 000934

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

millimeter gun in your house after May 25th, 19 --

MR. MAREK: Objection.

THE WITNESS: No.

THE COURT: Sustained. That is the same question.

The objection will be sustained; the answer stricken

BY MR. WIENER:

Q. Before May 25, 1990 how many .09 millimeter guns had you seen?

A. None.

Q. But didn't you tell Dets. Halvorsen, Gawrys, Rivera, and Paulnitsky August 22, 1990 or 23rd that you recognized the gun as a .09 millimeter automatic pistol, 15 shot?

A. Just by looking at it.

Q. And didn't you tell on August 23, 1990 Assistant State's Attorney DeFranco and Det. Fred Matilla that you recognized the gun as a .09 millimeter gun and it was wrapped in a towel?

MR. MAREK: Objection. That is not impeaching.

THE COURT: Sustained.

The jury is instructed to disregard it.

112

CCSAO002540

GONZALEZ 000935

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

BY MR. WIENER:

Q. How many times before May 24th of 1990 had Tino visited your house?

A. Only been to my house a couple times.

Q. How many times before May 24, 1990 did Alfredo Gonzalez visit your house?

A. The same amount; a couple times.

Q. How many times did Fro visit your house?

A. Twice.

Q. You remember all of these events. What makes this night so special that you remember all of these events?

A. Because I got very upset.

Q. And you remember where you were at the time; is that correct?

A. Yes, I do.

Q. You remember what rooms you were in?

A. I was in the kitchen.

Q. And you remember where you went?

A. From the kitchen to the bedroom.

Q. And at any time when you went into the bedroom did anybody tell you to go get a gun?

A. No. They just told me to go in the closet and get the package.

113

CCSAO002541

GONZALEZ 000936

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

MR. WIENER: Thank you.

I have nothing further of Miss Bello.

THE COURT: Any Redirect?

MR. MAREK: May we have a moment, Judge?

THE COURT: Yes.

REDIRECT EXAMINATION

By: Mr. Marek

Q. Miss Bello, the statement that you gave to the Assistant State's Attorney about the .09 millimeter weapon -- Strike that. I am going to show you --

MR. WIENER: Objection.

THE COURT: Objection to what, counsel?

MR. WIENER: That he show her a written statement. I just asked what he said.

THE COURT: I have no idea what he is going to show her.

MR. WIENER: All right.

BY MR. MAREK:

Q. I am going to show you People's Exhibit No. 21. Do you recognize this?

114

CCSAO002542

GONZALEZ 000937

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

THE COURT:  Did you show it to him?

MR. WIENER:  I know what it is.  I have an objection at this time.

MR. MAREK:  May I approach?

THE COURT:  Yes. Let's step around here.

(Whereupon, a discussion was had in chambers outside the presence of the jury.)

THE COURT:  First of all somebody tell me what People's 21 is.

MR. WIENER:  A statement.

MR. MAREK:  Felony Review.

MR. LEIGHTON: The handwritten counsel cross examined her on.

MR. WIENER: Not handwritten.  Written by the Felony Assistant.

THE COURT:  I know what those are.

MR. WIENER:  I Cross Examined her, I asked her if in fact --

THE COURT:  I remember all of that.

MR. WIENER: Okay.

She said she did.  To show her a statement that she wrote, merely a statement that she signed in order to restore her is improper.

115

CCSAO002543

GONZALEZ 000938

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

THE COURT: I have no idea that is what you will do.

What is it you are going to do?

MR. MAREK: Counsel left the distorted impression she identified this as a .09 millimeter gun. The statement said, she said the gun was a .09 millimeter and wrapped in a towel.

MR. WIENER: That is correct. I said that and in her other statement she said many other things that I impeached her on.

MR. LEIGHTON: He does not get it both ways.

THE COURT: There is the rule of completeness and that is correct.

When you utilize a document and take out a segment of that document your opponent, whichever side that is, is entitled to bring out other things but what I am saying is the point to which you, what you just read I have stricken as not impeaching.

MR. WIENER: That is correct.

THE COURT: The jury has been instructed to disregard. I am saying what you just read to me that she went to the closet and it was a .09 millimeter wrapped in a towel, he read that in, you

116

CCSAO002544

GONZALEZ 000939

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

objected.

I don't know that she answered or not. I struck that question because it was not impeaching, that was she said she did. I didn't see any impeachment there.

That has been stricken so I don't know where that leaves it. All I am saying is that was stricken.

MR. MAREK: You are right, Judge.

(Whereupon the trial was resumed in open court in the presence of the jury.)

MR. MAREK: Your Honor, we have no further questions of this witness.

THE COURT: Very well. You may step down.

MR. MAREK: May we approach?

THE COURT: Sure.

(Whereupon, a discussion was held off the record.)

THE COURT: Ladies and gentlemen, I have just had a conversation with the attorneys. The next

117

CCSAO002545

GONZALEZ 000940

From:VALLEY STREAM      978 345 0791     02/16/2017 08:29   #626 P.002/002

CONFI

Objection of Witness to Extended Media Coverage of Testimony       (12/22/14) CCG 0130

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
_____ DEPARTMENT, _____ DISTRICT/DIVISION

_State Of Illinois_

Plaintiff(s)/Petitioner(s)

v.

Case No. _92CR-10146_

_Jose Maysonet._

Defendant(s)/Respondent(s)

**EXHIBIT**

**2**

### OBJECTION OF WITNESS TO EXTENDED MEDIA COVERAGE OF TESTIMONY

_____ states as follows:

Name of Objecting Witness

1. I expect to be called as a witness in this proceeding by the: ☑ plaintiff/petitioner ☐ defendant/respondent.

2. Extended media coverage of the above matter has been: ☑ requested ☐ granted.

3. I object to extended media coverage of my testimony for the following reasons (please be specific):

   I'm in fear of the safety of me as well as my family. He is my ex boyfriend and I do have a child with him, and he is a very active gang member. For these reasons I would like it not to be aired. Please respect my wishes

4. This objection is filed with the Clerk of the Court prior to the commencement of the proceeding for which extended media coverage has been requested or granted.

5. Notice of this objection to the assigned judge, all counsel of record, parties appearing without counsel, the media coordinator, and the court media liaison, shall be given by (check one): ☐ me ☑ the Clerk of the Court.

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, 735 ILCS 5/1-109, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief, and as to such matters the undersigned certifies as aforesaid that s/he verily believes the same to be true.

WHEREFORE, I object to extended media coverage of my testimony in this proceeding for the above stated reasons.

Respectfully submitted,

_____     _Bello Melender_
Signature                    Print Name

Address: _____

City/State/Zip Code: _____

Telephone: _____

Email: _____

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

CUSAO000493

GONZALEZ 000941

EXHIBIT

3

exhibitsticker.com

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

STATEMENT OF

Rosa Bello

Taken 8-23-90 At 2:10 pm

At Area 5 Violent crimes

Present ASA Frank DiFranco

Det. Fred Motilla

This statement taken regarding the _Shooting Deaths_
Torrence Wiley
of _Kevin Wiley_ which occurred on _May 25 1990_
at _1:00 am_ at _3428 North ave. Chg IL._

I understand I have the right to remain silent and that anything I
say can be used against me in a court of law. I understand that I
have the right to talk to a lawyer and have him present with me
during questioning, and if I cannot afford to hire a lawyer one
will be appointed by the court to represent me before any questioning.
Understanding these rights, I wish to give a statement.

After being advised that Frank DiFranco
is an Assistant States Attorney, a lawyer working
w/th the police and not Jose Maisonet's
lawyer. Rosa Bello agreed to give the
following statement in summary.
Rosa Bello stated that she is 24
years old and lives with Jose Maisonet,
Rosa is currently pregnant with Jose's
child.
On May 24 1990 around 11:30 pm
Rosa was at home with Jose and
her two children watching television.
Three of Jose's friends stopped by known
to Rosa as, Liuvia, Fro and Tihd.
One of the three asked Jose for

n° Liuvia

Rosa Bello

CCSAO000306

GONZALEZ 000942

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

a gun, Rosa became upset because she does not allow guns in the house. Rosa said the gun was a 9mm and was wrapped in a towel. Rosa put the gun in a plastic bag and Jose handed the gun to Lluvia.

All four men then left the apartment and only Jose returned about 1:00am. Rosa asked Jose where he had been and Jose stated that he was no where special. Jose stated that he went out with the guys and that he was driving. Later that evening Jose told Rosa that two guys got shot.

Rosa identified Attached exhibit #1 as Lluvia and attached exhibit #2 as Fro.

ASA Frank O. Isave

Det. Stan L. Montoo

Rosa Collor

CCSAO000307

GONZALEZ 000943

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

Exhibit #1

CCSAO000308

GONZALEZ 000944

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER







Exhibit #2

CCSAO000309

GONZALEZ 000945