# EXHIBIT 116

STATE OF ILLINOIS )
                   )   ss
COUNTY OF C O O K )

          IN THE CIRCUIT COURT OF COOK COUNTY
        COUNTY DEPARTMENT - CRIMINAL DIVISION

THE PEOPLE OF THE )
STATE OF ILLINOIS )
                  )   Case No. 93 CR 15177
     vs.          )
                  )   Charge: MURDER
GERALDO INGLESIAS )

                REPORT   OF   PROCEEDINGS

          BE IT REMEMBERED that on the 23rd day of

February, 1995, this cause came on for hearing

before the Honorable SHELVIN SINGER, Judge of said

Court, upon the information herein, the defendant

having entered a plea of not guilty.

        APPEARANCES:
             HON. JACK O'MALLEY,
             State's Attorney of Cook County, by
             MR. PRADEEP ROY-SINGH,
             Assistant State's Attorney,
             Appeared on behalf of the People;

             MR. JOHN DE LEON,
             Appeared on behalf of the Defendant.

Kenneth Madoch
Official Court Reporter
Circuit Court of Cook County
County Department-Criminal Division.

                        AA  1

EP IGLESIAS Sub Resp 010919

THE CLERK: Geraldo Inglesias.

THE COURT: Motion for new trial has been denied.

MR. DE LEON: The last Court date there was an issue about requesting extended term.

THE COURT: You have had an opportunity to address that.

MR. DE LEON: Right.

THE COURT: And the case law has been tendered which supports your position.

MR. ROY-SINGH: Did you have a chance to read the case I submitted.

THE COURT: Yes.

First, both sides have read the pre-sentence investigation?

MR. DE LEON: Yes, your Honor.

THE COURT: Any additions or corrections?

MR. DE LEON: I believe there was one that I believe the State corrected on our copy, I wish to know if its clear on your copy, Mr. Inglesias has one conviction for misdemeanor battery. There is a state B. of I. in error that indicates he was convicted of a robbery class 2 and received imprisonment for 2 years. I have a notation here

AA 2

EP IGLESIAS Sub Resp 010920

Allen Howard. Not the defendant.

MR. ROY-SINGH: His only conviction is the battery.

MR. DE LEON: The battery. I just want to make sure the Court was aware that was in error.

THE COURT: I am.

MR. DE LEON: Other than that correction, I have read it and pretty much in agreement with the pre-sentence investigation in the case.

THE COURT: State have any additions or corrections?

MR. ROY-SINGH: No, Judge.

THE COURT: Matters in aggravation.

MR. ROY SINGH: Yes, Judge. We don't have any witnesses, Judge. But we did on the last Court date file the victim impact statement and I would like you to take note of that.

THE COURT: I looked at that. Did you take the file? Okay.

MR. ROY-SINGH: On the last Court date I indicated I talked to the victim's mother and aunt. They indicated to me they did not wish to testify.

THE COURT: All right. The statement will

AA 3

EP IGLESIAS Sub Resp 010921

be part of the record. I assume that counsel had an opportunity to review it as well.

MR. DE LEON: Yes, your Honor, I did.

THE COURT: Anything more from the state.

MR. ROY SINGH: Yes, Judge. Can I start my argument.

THE COURT: Yes.

MR. ROY SINGH: Judge, one of the conditions for extended term as well as for natural life is that the act has been exceptionally brutal and heinous. We assert, Judge, that what happened on this particular date was exceptionally brutal and heinous and we're asking that he be sentenced under extended term. In People versus McGee, Judge, it states, they gave a definition of brutal and heinous and go on to say that brutal or heinous does not mean that there has to be a torture or unnecessary pain upon the victim in order to find, in order for your Honor to find it brutal or heinous. And then they define heinous as found in the Webster's dictionary as hatefully or shockingly evil, grossly bad. Brutal includes brutal cruel and cold-blooded.

In McGee it is, Judge, the extended

AA 4

EP IGLESIAS Sub Resp 010922

term was imposed because the act, the shooting of the victim in that case even though it was an apparent retribution to what had happened a few days earlier but the act on the day of the shooting, that was unprovoked and in that case, it said you have to look at the whole spectrum of facts.

Here Judge, the facts in the case here at bar is even more compelling because on the day of the incident, there was nothing that provoked, that the victim did anything that provoked the defendant to do what he did on that day.

Furthermore it's even more compelling here because here the victim and the defendant did not know each other. Just to refresh your memory, Judge, as to what happened and what was the testimony of the witnesses, on that particular date, the defendant was standing across the street, the victim was in the car, there were other people in the car. There was another person right next to the car with a baby in her hand. The defendant as he looks across the street he gives gang signs. Nobody responds to

AA 5

EP IGLESIAS Sub Resp 010923

those gang signs, there was testimony here during the trial that no gang signs were made by any of the people in the car.

Now the car starts moving. As it starts moving, the defendant sees that he's going to lose his opportunity to kill somebody. He does not even wait to find out whether those people are gang members or not. And as the car starts moving, he sees that he's going to lose his opportunity of getting the thrill that he does from shooting and killing people. That's the reason as the car starts moving, he did not want to disappoint himself of that thrill and that's why he shot. He fires one shot, not one, but 4 or 5 shots and that's the reason why he did what he did, was just the thrill of it. That's what makes this case exceptionally brutal or heinous.

Even the 3 cases counsel gave us, in all those 3 cases there is some kind of motive, some kind of a reason, no matter how morbid the reasons may be but there was some kind of a reason as to why the defendant did what he did in those cases.

First one was in the course of a

AA 6

EP IGLESIAS Sub Resp 010924

robbery, one of the cases that counsel had given. The second one was the officer in the course of his duty while he was trying to arrest the defendant, the facts are not really clear in the case that he has given to us. The third one is of course, where the shooting happened -- the third one is where the victims were also gang members and the persons had gone inside the store and came back and gang signs were flashed inside the store as well as outside. Talk about the people being from opposite gangs while they were inside the store.

So at least we may not agree with the defendant's reasoning for doing what they did in those 3 cases but clearly there was some kind of reason. Here there was nothing. All he saw when he saw the car going by, he starts shooting. He's doing it just for the -- for his own sake. That's what makes this case exceptionally brutal and in all the years, Judge, I'm sure, all the years you've been on this bench and heard these numerous murder cases, in every murder case there is usually some kind of reason. Even in McGee, Judge, which was an attempt murder case, the

AA 7

EP IGLESIAS Sub Resp 010925

defendant and the victim, they knew each other, even though on the date of the incident, it was an unprovoked attack but at least they knew each other.

Here Judge, it's a murder case. They did not know each other. It was unprovoked. That's what makes it exceptionally brutal and heinous. The facts in this case, it's also different from the facts in the 3 cases that counsel has given us. In all those 3 cases, a single shot was fired. In this case here, there is more than a single shot that was fired. There were 4 shots fired the way I recall it. One shot hits Monica and he's lucky that the other shots did not find their mark because there were other people in the car and more so, there was another person on the sidewalk with a baby. On that date, he was lucky. That's when he got his big break because had another shot found its mark he would have been looking at a death case.

Furthermore, Judge, the defendant has all the appearances of a person who can be a productive citizen in our society, he's done his G.E.D.. He was working on his G.E.D., he had a

AA 8

EP IGLESIAS Sub Resp 010926

job, he was working with a program in the gang intervention program and his pre-sentence report indicates that even before that job, he had other jobs. He's not like many of the others who come here before you who are uneducated, who have had no jobs ever in their whole life and whose family lives are disrupted.

The pre-sentence report here indicates that he had a normal family life. A good family life. He's a defendant who as he stands here before you has had more opportunities in his life than the millions of other people in this world. Furthermore, Judge, what makes him even sinister really is because of his appearance, that he can be a productive citizen, he goes ahead and does what he did on that date. And for no reason. No reason at all. Just doing it for his own sake, that's what it was about, that's what makes him dangerous.

The situation that he found himself in on that date is a situation that happened often in his life. He will be walking down the sidewalk and he'll come across cars where there are young people in the car. And who knows what he'll do

AA 9

EP IGLESIAS Sub Resp 010927

again on that date in the future. He'll probably do the same thing that he did on this particular date when he shot Monica. That's what makes him more dangerous and it makes him more dangerous because he's unpredictable. All the inferences that can can be drawn from the facts that you heard during trial and also consequently, the pre-sentence investigation, even though particular likely we would ask for natural life, but the State at this time would be asking for extended term which puts him in the range between 60 to a hundred and of that we're asking for substantial years and we ask that you sentence him accordingly.

THE COURT: Mr. DeLeon.

MR. DE LEON: Your Honor, I would indicate to the Court that what the State is doing basically is asking for extended term based on wild speculation by the State's Attorney of what was in the shooter's mind when he shot. He's speculating as to that. He's speculating as to what the motive was, he's speculating on things that you cannot possibly infer from the evidence because none of that evidence came out. There is a

AA 10

EP IGLESIAS Sub Resp 010928

dispute as to what happened there and there is no evidence that you can infer from the testimony that shows that the killer did this for a thrill. Who knows why the killer did it.

It appears that the State's motive for it, the State's idea of the motive was gang rivalry and now they're saying there was no motive. Now they're saying it was just a random shooting at a car for no reason. Again just pure speculation. There is no evidence of any of this. That it was some sort of a thrill kill of a total stranger, no evidence of that and they're asking you to base extended term on pure speculation. It's not reasonable inferences, just totally unreasonable inferences. Their theory was it was a gang rivalry thing and now in sentencing saying just a thrill killing for no reason, totally inconsistent and not based on any evidence.

The case they've presented to you, People versus McGee is totally different than the case here. Factually it's totally distinguishable and not applicable to make this case an extended term case.

AA 11

EP IGLESIAS Sub Resp 010929

In that case, and I'm sure your Honor read it, there is a prior disagreement between 2 people. The person then specifically goes out and gets a shotgun which as the Court in that case said and ruled in their opinion is a weapon that inflicts particularly cruel pain because of the type of weapon it is, a scatter gun. It was fired in a night club. The ramifications of it could have been terrible and were terrible.

THE COURT: Didn't that occur outside.

MR. ROY SINGH: Outside.

MR. DE LEON: In front of a night club.

THE COURT: In front.

MR. DE LEON: And my point is in that case also, your Honor, the person, the operation necessitates the removal of 3 quarters of his small bowel, part of his large bowel, he'll suffer permanent digestive functioning virtually the rest of his life because of the type of weapon used, this scatter gun.

The person in that case had a prior conviction, a class 2 it indicates here, that was also taken into consideration. The case is just

AA 12

EP IGLESIAS Sub Resp 010930

distinguishable on the facts, not like this case.

I tendered to the Court 3 other cases where the Appellate Court indicated and Supreme Court indicated, for example, in People's versus Andrews, 70 years for a murder conviction was an abuse of discretion. In that case, the State is arguing well they had a reason to shoot in that case. I don't see what they see here. In this case, your Honor, the defendant stopped a car that exited the Eisenhower Expressway at a traffic signal, while waiting for the light to change approached by two men, one of them got in the passenger side of the car, pointed a gun at both Stinebrecker and Attalis, Attalis identified the man as the defendant, Lawrence Andrews, the subject of the appeal. The other man remains outside the car.

It says after trying unsuccessfully to pull away by moving the gear shift Stinebrecker told the two men be cool, we'll give you what you want, here the victims are cooperating, in spite of that Attalis testified she heard a crack and saw the defendant had shot Stinebrecker, after the victim says Stinebrecker says be cool we'll give

AA 13

EP IGLESIAS Sub Resp 010931

you whatever you want.

If this isn't a cold-blooded murder I don't know what is. Here there is contact between the victim and the victim is telling them I'll give you the money, give you whatever you want and for no apparent reason, no resistance, this killer shoots the person face to face. In that case an abuse of discretion to give the extended term, your Honor. The case People versus Curtis, it also indicates to the Court, your Honor, that some crimes are by nature inherently cruel and heinous, extended term are for cases that are exceptionally brual and heinous, not intended to cover every offense in an extraordinary term subject to extend the term.

In other words, this case and I hate to say it this way, but this case is so much like every other walk by gang shooting or drive by gang shooting that happened in this building and I don't mean to belittle it in that way but this case does not stand out as exceptionally brutal under the facts of this case. - unfortunately and sadly a young girl was killed by a bullet that went through her brain. Killed virtually

AA 14

EP IGLESIAS Sub Resp 010932

instantly by virtue of the type of wound it was. It wasn't like a stomach gunshot, gut shot from a scatter gun where the poor person suffered for an extended period of time in the hospital, she was killed instantly. Yes, of course she's dead and it's a terrible thing that she's dead but doesn't fit within the category of cases that has traditionally been considered exceptionally brutal and heinous, doesn't fit.

The defendant has no real background or criminal history which is another factor that your Honor is supposed to take into consideration. It isn't just one thing to take into consideration, the manner in which the crime was committed, his background, the facts and circumstances surrounding it, the type of injury, all these things are taken into consideration, your Honor.

In this case, your Honor, if I may for a second, it appears a 50 year term was given on this case and the Court said that was under an extended term and that was not proper.

THE COURT: That was attempt, wasn't it?

MR. ROY SINGH: Yes, it was.

AA 15

EP IGLESIAS Sub Resp 010933

MR. DE LEON: Attempt murder.

MR. ROY SINGH: There is a printing error in the case. Its attempt murder.

MR. DE LEON: In People versus Gonzales, your Honor, the third case that I've tendered to the Court and I guess we should keep the citations on the record, Lawrence Andrews, People versus Andrews, is 548 N.E. 2d, 1025, and People versus Curtis, the last case I cited, is 614 N.E. 2d, 389, a 1993 case. And People versus Gonzales, that's a murder case your Honor, that was reversed and the Court in that case goes into extensive reasoning and again indicates that -- this was a gang shooting, your Honor, it again goes to the definition of heinous and brutal and indicates that the trial Court failed to articulate reasons to support a position of an extended term though the defendant's conduct cannot be minimized the extended statute was not intended to apply to all violent crimes but where his conduct is exceptionally brutal and heinous.

And again if this case is considered by this Court as exceptionally brutal and heinous, then every drive by shooting is exceptionally

AA 16

EP IGLESIAS Sub Resp 010934

brutal and heinous and that is not what was intended by the statute and the case law I presented to the Court, clearly extended term does not apply in this case.

Your Honor, the legislature in has mandated that for murder, the term is 20 to 60 and somewhere in that range is where it would be appropriate in this case. As far as mitigation, your Honor, I would indicate to the Court that as far as I'm concerned, based on the evidence I heard, and I know your Honor has to sentence this man and will sentence this man as a convicted murderer, the jury convicted him.

I would submit to the Court that the 3 witnesses presented in this Court were so thoroughly and completely impeached that you cannot reconcile their verdict with the evidence presented. I can not. In 18 years of doing this, it's difficult for me to believe that a jury believed 2 witnesses who lied to the police, on several occasions, on their identity. You heard the testimony, I don't want to go into all of that and argued that in my motion for new trial, Judge, but the jail house informant who testified, who

AA 17

EP IGLESIAS Sub Resp 010935

had background, who had motive and reason to lie, it's difficult for me to believe the jury accepted that testimony also, your Honor. I don't know. And I do know this. Human beings make mistakes and I believe the jury made a mistake in this case based on the evidence presented in this courtroom and I think that as your Honor imposes a sentence, I submit to your Honor that you're going to be sentencing an innocent man in this case but I know that your Honor --

MR. ROY SINGH: Objection, your Honor.

MR. DE LEON: Will sentence him as a guilty person because the jury found him guilty. I know that's what you have to do. But juries make mistakes. People are not infallible, those witnesses how they could have given such a totally different description as to a person they saw as the shooter of a male white and consider this person that stands beside me 6 inches --

THE COURT: It wasn't male white, Hispanic.

MR. DE LEON: Male white Hispanic and said the white was as white as Mr. Studenroth who sits in this courtroom now, that's what the witness said but the jury accepted that and why I don't

AA 18

EP IGLESIAS Sub Resp 010936

know.  They also accepted a difference of 4 to 6 inches in height, why they accepted that I don't know but again I know your Honor has to sentence him --

THE COURT:  Counsel, we've argued that motion so let's deal with what you have to present in mitigation.

MR. DE LEON: What I have to present in mitigation your Honor is what your Honor heard also on the stand with two witnesses, a Y.M.C.A. club director who spoke very highly if your Honor recalls of this individual and also the G.E.D. teacher who came here and testified and told your Honor and the jury that he had been a teacher for something like 12 years and he had never visited, he had many young men arrested that had been in his classes that he taught for the G.E.D. classes that he had never visited one nor had he ever testified for one but he came here to testify for Geraldo because he believed in him, believed in his innocence and could not believe he was capable of such an ugly act.

Those 2 witnesses were the best character witnesses I have ever had for a

AA 19

EP IGLESIAS Sub Resp 010937

defendant, testified truthfully honestly openly in Court, the Y.M.C.A. club director indicated that this young man was working with him. Yes, he's a gang member, an admitted gang member but he was working within the gang, within the boys club to direct young people away from it. He had some what of a -- obviously he grew up in an area that is wrought with violence and gangs. He did the best he could and did a nice job of working on several jobs as the State has indicated and continued to get his education. Even after he dropped out he went to the G.E.D. program which shows initiative on his part, a person that if he is as the jury indicated guilty, he has rehabilitative potential, he's shown.

Showing that he did try and comply with societies rules and regulations of getting an education and working.. He did that. He has virtually nothing in his background other than this misdemeanor battery conviction.

I would indicate to the Court that this defendant's lack of past violent criminal record, his excellent record at work, at the G.E.D. program at the Y.M.C.A., and that at his

AA 20

EP IGLESIAS Sub Resp 010938

prior jobs does not merit either extended term or an extended period of time under the statute that allows sentencing for this young man.

You heard him testify, I believe he testified sincerely and he's not a violent person, not something that although again, I understand the jury verdict, but I just ask your Honor to -- I know there has to be some punishment in this case and very severe punishment and the minimum sentence in a murder case is a very severe punishment, anything within that range will take away a major portion of this young man's life.

He has a 2 year old child that will more than likely be well grown into adulthood or an adult by the time he's released on this case and that is a terrible punishment for him. And the victims of crime of course are not only the victims in this case, we have a great deal of the family of Monica Romano and the family of Geraldo, his mother and girlfriend will all be suffering as he will in prison.

We ask you to temper justice with mercy in this case and seek an appropriate sentence but clearly not an extended term sentence

AA 21

EP IGLESIAS Sub Resp 010939

in this case, your Honor, thank you.

THE COURT: Thank you counsel. Mr. Inglesias, you also have a right to address the Court if there is anything you wish to say before I impose sentence?

THE DEFENDANT: Yes. I would like to say that I apologize and I'm sorry for what happened to the young lady and I send my condolences to the family but I would like to say I had nothing to do with it and the Lord knows I had nothing to do with it. That's all I got to say.

THE COURT: Well, as Mr. DeLeon has indicated, the people aren't perfect, but it's a system that we have in place here, it's been in place here in our country for a couple of hundred years and before that, in England. It may not be prfect, but it's the best system I think that we have and I think it's a very good system.

I think it's important to have people in the community who are willing to give up their time to come in and to sit in judgment of a fellow citizen. It's one of the easiest rewards of community service that a person can do.

This the a very very serious

AA 22

EP IGLESIAS Sub Resp 010940

offense, the most serious offense that we have because it's something that cannot be undone. A murder is something that is a tragedy, not only for the victim and the victim's families, but certainly for any person whose lives are touched by that crime.

If a person such as the person in the McGee case, the person is shot and not killed, they have a chance to heal and while they may not life a whole and full life, at least they had some form of life. Maybe the quality of that life can be improved.

But the person that has been murdered, there is no chance, there is no chance for retribution or for any kind of repayment that is going to be meaningful to the victim or to the family. It's terminal, so final and no one, if you believe in a hire power, no one but God can undo something like that and we are not Gods, so it stands to reason we have to view this very kind of horrible tragedy with a certain respect.

One of the things that I've learned when I became a Judge is that one of the most serious duties that I would have would be to

AA 23

EP IGLESIAS Sub Resp 010941

discriminate between murders and to say this murder is worse than that murder and that's exactly what I must do and make a determination as to whether one murder was better or worse than another murder and it's almost evading the question because they are all so horrible. The.

State is asking for an extended term in this case and they're indicating that they believe that the actions that led to the death of this woman were so heinous that the rule is that this Court should impose a sentence that would reflect a judgment of that nature of the case.

Basically the testimony that we heard, some of it, I obviously do not have a transcript in front of me but basically what we heard was there was a group of people in a car, they went to a whom, one young woman got out to go and get a baby to show it to the others in the car. She brought the baby back, showed it to them and they were on their way backing out going down the street. She's walking down the street talking with them and that a person who was identified by the various witnesses who testified as this defendant was standing across the street and at

AA 24

EP IGLESIAS Sub Resp 010942

some point, either said or exhibited gang affiliation and that then some shots rang out, one of them went through, I believe, the roof of the car and really after individuals in the car had ducked and some had come up to turn and look and the car had gone down the street a ways, they realized one of their young members, a lady in the front seat of the car didn't duck, had in fact been struck by a bullet and was dead.

We don't have a shooting at close range with a shotgun as we did in the McGee case. We don't have any form of torture and certainly the cases say it does not have to be torture in order for there to be brutal and heinous behavior but what we're talking about is unfortunately, as Mr. DeLeon has characterized it, basically your garden variety drive by shooting although this was a walk by shooting instead of a drive by.

While the results are horrible and someone is dead, this Court does not see anything that is so exceptionally brutal or heinous in the events that transpired on that day that would cause this Court to believe that an extended term should be imposed by this Court.

AA 25

EP IGLESIAS Sub Resp 010943

We look at the background and take into account all of the things that both counsel have presented, both the State in aggravation and the defense in mitigation.  The record, the criminal history of this defendant is negligible as counsel has acknowledged and the defendant has, although admitting to gang affiliations and involvement, has done certainly some positive things in his life in attempting to get an education and working and he has had individuals who he entrusts to the extent they were willing to come to Court and testify on his behalf to their involvement with him and they are, the fact they were impressed with Mr. Inglesias and his work and other things that they recognized about him which were of a positive nature.

Nevertheless we cannot ignore the fact that this was another senseless killing that I believe while some of the witnesses who testified knew the defendant, I don't believe that this victim knew the defendant, there never was anything she had said or done or in fact I don't believe there was any evidence that anybody in the car had said or done anything that would in the

AA 26

EP IGLESIAS Sub Resp 010944

least invite the kind of tragic and violent response which resulted in the death of Monica Roman.

So, taking all those things into consideration and certainly this is not a situation for a minimum sentence, nor do we believe that it invites a maximum sentence. In light of the positive that we've heard on behalf of the defendant, we believe that a sentence of 35 years is one which would address all of the factors that we have touched upon and that is the sentence that we'll impose, that will be followed by 3 years of mandatory supervised release. Counsel, have you calculated credit?

MR. DE LEON: I haven't your Honor, I'm sorry, I'll do that right now.

THE COURT: Please do.

Mr. Inglesias, you have a right to appeal both the sentence and the result of the jury's deliberations. To do that, you have to file a notice of appeal in writing in this Court within thirty days of today's date. If you don't have money for a lawyer or transcript, we can see that you got both without charge and you also have

AA 27

EP IGLESIAS Sub Resp 010945

the right to ask the clerk of the Court to file a notice of appeal in your behalf. Counsel, are you requesting anything with respect to the appeal?

MR. DE LEON: Yes, your Honor, at this time, your Honor, we would ask the defendant be sworn briefly, he's basically indigent and would so testify and we ask the an Appellate Defender be appointed for purposes of appeal.

THE COURT: I don't know if it's necessary to swear him in.

MR. DE LEON: That's fine your Honor, we'll indicate that for the record, as your Honor knows he's unemployed, has no bank account, he owns no property. His mother and father were on assistance at the time of this.

THE COURT: The Appellate Defender will be appointed on appeal and Mr. DeLeon, I appoint you to make contact with them.

MR. DE LEON: I will your Honor.

THE COURT: To make sure that they follow up in a timely fashion.

MR. DE LEON: I'll make sure his notice of appeal is filed.

Your Honor, he's never bonded out, has

AA 28

EP IGLESIAS Sub Resp 010946

been in custody since the date of June 23, '93, his credit would be from the date of arrest, I'll add up the number of days now.

THE COURT: All right.

MR. DE LEON: Thank you, your Honor.

THE COURT: We'll include that on the documents.

MR. DE LEON: Right your Honor.

THE COURT: Anything more from anyone?

MR. DE LEON: No, your Honor.

THE COURT: Thank you.

MR. ROY SINGH: Judge, tendering you a copy of the impounding order.

THE COURT: Okay.

(Which were all of the proceedings had at the hearing of the above-entitled cause.)

AA 29

EP IGLESIAS Sub Resp 010947

STATE OF ILLINOIS )
                  )  SS.
COUNTY OF C O O K )

THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT    -    CRIMINAL DIVISION

I, Kenneth Madoch, Official Shorthand Reporter of the Circuit Court of Cook County Department-Criminal Division do hereby certify that I reported in shorthand the proceedings had at the hearing in the above-entitled cause; and that I thereafter caused to be transcribed into typewriting the foregoing transcript, which I certify is a true and correct transcript of said proceedings.

_____
Official Shorthand Reporter
Circuit Court of Cook County.

Dated this 29th day of April, 1995.

AA 30

EP IGLESIAS Sub Resp 010948

# EXHIBIT 117

STATE OF ILLINOIS     )
                       ) SS.

COUNTY OF COOK     )

FILED
JUDGE THADDEUS L. WILSON-1976
MAR 20 2018
DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL

### IN THE CIRCUIT COURT OF COOK COUNTY
### COUNTY DEPARTMENT-CRIMINAL DIVISION

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CASE NO. 93 CR 15199 |
| | ) | |
| GERALDO IGLESIAS, | ) | Honorable Thaddeus L. Wilson, |
| Defendant. | ) | presiding |

---

## AMENDED SUCCESSIVE PETITION
## FOR POST-CONVICTION RELIEF

---

Russell Ainsworth
Steve Art
Anand Swaminathan
Joshua Tepfer
Exoneration Project (Atty No. 44407)
311 N. Aberdeen St., 3rd Floor
Chicago, IL 60607
312-789-4955
josh@exonerationproject.org

EP IGLESIAS Sub Resp 000877

## TABLE OF CONTENTS

I.      INTRODUCTION...................................................................................1

II.     PROCEDURAL AND FACTUAL HISTORY...................................3

      A.  Murder of Monica Roman..................................................3

      B.  Initial Investigation: Hugo Rodriguez and Rosendo Ochoa.....................4

      C.  Two Weeks Later: Detective Guevara Gets Involved.............................6

      D.  Francisco Vicente Surfaces..................................................6

      E.  Iglesias' Criminal Trial......................................................7

      F.  Conviction, Sentence, and Direct Appeal....................................9

      G.  Collateral Proceedings.......................................................10

III.    EVIDENCE OF DETECTIVE REYANLDO GUEVARA'S MISCONDUCT...11

      A.  Cases Involving Francisco Vicente.........................................11

      B.  Overturned Convictions......................................................13

            i.      Gabriel Solache and Arturo Reyes Exonerations......................13

            ii.     Roberto Almodovar and William Negron Exonerations.....................14

            iii.    Jose Maysonet Exoneration.........................................15

            iv.     Thomas Sierra Exoneration.........................................15

            v.      Jacques Rivera Exoneration.........................................16

            vi.     Juan Johnson's Exoneration and Henry Johnson's
                 Overturned Conviction...........................................17

            vii.    Angel Rodriguez's Overturned Conviction....................................17

            viii.   Santos Flores' Overturned Conviction......................................18

            ix.     Xavier Arcos' Overturned Conviction......................................18

            x.      Ariel Gomez's Exoneration.........................................18

EP IGLESIAS Sub Resp 000878

C. Statements About Guevara's Misconduct from Other Police Officers........18

    *i.*    *Officer Ron Malczyk*……………………………………………..18

    *ii.*    *Detective William Dorsch*…………………………………….....19

D. Detective Guevara Taking the Fifth When Confronted
    With His Misconduct……………………………………………...20

E. Lassar Report…………………………………………………...20

F. Sworn Statements From Guevara Victims………………………….21

    *i.*    *Evidence of Guevara rigging witness identifications in a manner
    similar to that alleged by Iglesias herein*………………………...21

    *ii.*    *Other Allegations of Investigative Misconduct*…………………..24

IV.    ARGUMENT……………………………………………………31

THE NEWLY-PRESENTED EVIDENCE OUTLINED THROUGHOUT THIS
PETITION UNDERMINING ANY CREDIBILITY OF DETECTIVE GUEVARA
OR FRANCISCO VICENTE MUST LEAD THIS COURT TO VACATE
GERALDO IGLESIAS' CONVICTION……………………………………..31

LEGAL CLAIM I: DUE PROCESS VIOLATIONS: 5TH AND 14TH
AMENDMENTS, U.S. CONSTITUTION; ARTICLE 1, SECTION 2,
ILLINOIS CONSTITUTION……………………………………………....33

LEGAL CLAIM II: ACTUAL INNOCENCE……………………………….37

LEGAL CLAIM III: *BRADY V. MARYLAND* DUE PROCESS VIOLATIONS: 5TH
AND 14TH AMENDMENTS, U.S. CONSTITUTION; ARTICLE 1, SECTION 2,
ILLINOIS CONSTITUTION……………………………………………....38

V.    CONCLUSION…………………………………………………..39

EP IGLESIAS Sub Resp 000879

STATE OF ILLINOIS      )
                             ) SS.
COUNTY OF COOK      )

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT-CRIMINAL DIVISION

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CASE NO. 93 CR 15199 |
| | ) | |
| GERALDO IGLESIAS, | ) | Honorable Thaddeus L. Wilson, |
| Defendant. | ) | presiding |

## AMENDED SUCCESSIVE PETITION
## FOR POST-CONVICTION RELIEF

Petitioner, GERALDO IGLESIAS, through his attorneys, THE EXONERATION

PROJECT, files this Amended Successive Petition for Post-Conviction Relief.[1] In support

thereof, Petitioner states as follows:

## I. INTRODUCTION

1.      The second time Detective Reynaldo Guevara testified at the 1994 trial of

Petitioner Geraldo Iglesias, normally mild-mannered, long-time criminal defense attorney John

Deleon lost his cool. Attorney Deleon called Detective Guevara's testimony "ridiculous" (T.

V132)[2] and got admonished by the trial judge for taking an overly "strident tone" during the

---

[1] Petitioner specifically reserves the right to further supplement this Amended Petition. Undersigned counsel has sought but still has not seen the entirety of the Chicago Police Department file or viewed the impounded evidence. Specifically, counsel still has not received or seen the photographs of the lineup procedures at issue in this case.

[2] The entirety of the trial transcripts are included on the disk included as part of the volumes of exhibits. Except for the trial transcripts, all of the exhibits that are specific to the Iglesias investigation are included as hard copies. Exhibits concerning Reynaldo Guevara's investigative misconduct in other instances are included on the disk in electronic format only.

1

EP IGLESIAS Sub Resp 000880

cross-examination. (T. V134). Outside the presence of the jury, Attorney Deleon apologized, explaining "[o]bviously I got angry. I shouldn't lose my emotional state but I got burned up at the officer, that is the truth, and I am sorry." (T. V138-39).

2.      In closing argument, Attorney Deleon made quite clear to the jury why, in his words, he got "very heated up": "*Guevara lied, he is a liar, it is as simple as that.*" (T. W22-23). Attorney Deleon continued: "[O]verzealous Police Officer Mr. Guevara has the us versus them mentality; . . . let me get up there and say what I got to say to convict him. And that is what he did." (T. W22).

3.      In rebuttal closing argument, the State mocked this argument, telling the jury that the defense attorney's theory came down to the idea that Detective Guevara orchestrated the witnesses' testimony—including from a jailhouse informant named Francisco Vicente—in order to pin the murder on Iglesias. The State called this scenario "ridiculous," explaining that this is "real life" and "not a movie." (T. W32-33).

4.      More than two-decades later, it turns out Attorney Deleon's allegations were very much reality. Detective Guevara is, in fact, a liar. The Honorable Judge Obbish had this to say after hearing Guevara testify recently: Detective Guevara is a "bald-faced" liar, he cannot be given "an ounce of credibility," and he "has eliminated any possibility of him being considered a credible witness in any proceeding." (Ex. 8, at 37-44).

5.      Since Attorney Deleon's prescient comments, sixteen convictions investigated by Detective Guevara have been vacated, including many that were set aside based on allegations identical to this case—that Detective Guevara rigged identifications and coerced witness statements implicating an innocent person in the crime. In fact, three of the overturned

2

EP IGLESIAS Sub Resp 000881

convictions were cases in which Detective Guevara obtained false testimony from the very same informant used in this case: Francisco Vicente.

6.      For his part, when asked specifically about his investigation leading to Geraldo Iglesias's conviction, Detective Guevara has invoked his Fifth Amendment right not to incriminate himself. (Ex. 1 at 24, 68).

7.      Ultimately, Geraldo Iglesias's conviction rests entirely on the testimony of Detective Guevara and Francisco Vicente. Given what we now know about their credibility, Iglesias's conviction cannot stand. Petitioner respectfully asks this Court to vacate his conviction.

## II. PROCEDURAL AND FACTUAL HISTORY

### A. Murder of Monica Roman

8.      On June 7, 1993, Daniel Sanchez, Monica Roman, Merci Cordero, Hugo Rodriguez, Jose Cornell, and "Jesus" were together running a variety of errands in their car. (T. R97-99). Sanchez, Rodriguez, and Cornell were in the back, with Rodriguez in the middle. Jesus was driving, Cordero was in the front passenger seat, and Roman was sitting between them. (T. R100-01).

9.      At approximately 4:00 p.m., they arrived at Cordero's home at 2135 N. Sawyer and parked in an alley. (T. R100). Cordero got out and went in her home; she came out shortly thereafter with her baby niece. (T. R102).

10.     After Cordero showed off the baby to her friends, Jesus drove off north. (T. R37). As he did, someone on the street made some gang signs, yelled "King Love," and shot five times. The shots killed Roman. (T. R102). The shooter then turned around and ran south, then turning west into the alley. (T. R40-41).

3

EP IGLESIAS Sub Resp 000882

**B. Initial Investigation: Hugo Rodriguez and Rosendo Ochoa**

11.     The initial responding police officers spoke to Hugo Rodriguez and Rosendo Ochoa, the two individuals who later testified at Iglesias' trial.

12.     Rodriguez, a Latin King who was a rival of the Imperial Gangsters, spoke in broken English to the police. (T. U66). He lied to the police about his gang affiliation, his age, and his birthdate. (T. U36-38). During several other unrelated encounters with police, Rodriguez gave false names and dates of birth. (T. U38-40). When he testified at trial, Rodriguez had pending charges for burglary, possession of a stolen vehicle, and possession of burglary tools cases. (T. U40). He also had prior convictions for burglary. (T. U41).

13.     Rodriguez was in the middle of the back seat of the targeted car when the shooting happened. He ducked down when he heard shots, popped back up "fast. Like that. … Not even 10 seconds" and then ducked back down. (T. U44). When Rodriguez briefly popped his head back up, he was looking at the rear of the shooter from an angle. (T. U45). He had never seen the shooter before. (T. U18). None of the other four individuals in the car could give a description of the shooter. (T. R. 104).

14.     Rodriguez told the responding officer that the shooter was about 18 years old, 5'7", and weighed 140 pounds. (T. U17). His skin was light complected,"[m]ore or less white." (T. U17, U65). He was clean shaven. (T. U17).

15.     Rosendo Ochoa, also a Latin King, also lied to the responding officers about his gang affiliation. (T. R34, R59). Ochoa, like Rodriguez, has lied and given police a variety of other names during unrelated encounters. (T. R34, R57-58). When Ochoa testified at trial, he was serving a four-year sentence at Stateville Correctional Center for possession of a controlled substance. (T. R33).

4

EP IGLESIAS Sub Resp 000883

16. Ochoa is Cordero's cousin, and he was living with her at the time. (T. R34). When Cordero got home that day and picked up her baby niece, Ochoa looked out the window from his second floor window. There, he observed Cordero with the baby near the car with her friends. Ochoa also saw a man standing on the opposite side of the street—roughly 120 feet away—making gang signs. (T. R63). The man took a gun from in between his clothes and shot it five times. (T. R40). The shooter than ran toward the alley. (T. 40). The incident he observed was "not even a minute." (T. R64-65).

17. Ochoa described the shooter as 17-19 years old, 5'5", 135-140 pounds, and clean shaven. (Ex. 2; T. R45). The shooter was wearing a black hooded sweat shirt and black pants. (Ex. 2).

18. Neither Rodriguez nor Ochoa's descriptions matches Iglesias in the least. Iglesias is 5"11. (T. U100). When he was arrested, Iglesias was not clean shaven—he had a mustache and a beard. (T. U31-32). In addition, he wore an earring, a fact that neither eyewitness mentioned. (T. U31-32). Unlike the 17-19 year-old described by witnesses, Iglesias was nearly 25 years old. (Ex. 3). When Iglesias was arrested, the officers described him as a Latino with a medium complexion, not "white" or "light complected," as the shooter had been described by Rodriguez. (T. U104)

19. Moreover, Iglesias did not remotely fit the profile of the shooter that witnesses described. His only prior conviction was for a misdemeanor. He had held many jobs. And at the time of his arrest, Iglesias was working at the YMCA in their gang interventions program to try to keep kids away from gangs. (T. V83-84 AA2).

5

EP IGLESIAS Sub Resp 000884

## C. Two weeks later: Detective Guevara Gets Involved

20. In the two weeks after the crime, between June 7 and 21, 1993, other detectives investigated the Roman shooting. There were no leads or possible suspects. (T. U84).

21. On June 21, 1993, Detective Guevara got involved in the investigation. (T. U84).

22. Detective Guevara testified that he received a phone call from a confidential informant. (T. U84-85). After that phone call, Detective Guevara got a photograph of Geraldo Iglesias. (T. U85).

23. On June 22, over two weeks after the murder, Detective Guevara and his partner Detective Ernest Halvorsen went to Ochoa's house and showed him the photo array. Ochoa identified Iglesias as the shooter. (T. U88).

24. The evening after that (June 23), Detectives Guevara and Halvorsen arrested Iglesias. (T. U89-90). Ochoa was brought to the police station, where he view a lineup conducted by Detective Guevara. Ochoa identified Iglesias in the lineup. (T. U91).

25. That same night and into the early morning hours of June 24, Rodriguez came to the station, viewed the same photo array and lineup that had been shown to Ochoa, and identified Iglesias. (T. U93-95). Detective Guevara also conducted the photo array and lineup shown to Rodriguez. (T. U93-94).

## D. Francisco Vicente Surfaces

26. The only other evidence implicating Geraldo Iglesias in the Roman shooting was the statement of Francisco Vicente.

27. According to Vicente, on either June 25 or July 1, 1993, while he was in the bullpen waiting for his criminal case to be called with 15 to 19 other inmates and ten sheriff's deputies, Iglesias supposedly confessed in detail to how he had shot Roman. (T. V16, V36-37).

6

EP IGLESIAS Sub Resp 000885

28. Although Vicente did not know where Iglesias lived or anything about his family, Vicente testified that he had known Iglesias for three years. (T. V12, V24). Vicente said that Iglesias told him that he was standing on the corner "with a few of the brothers" when he saw people he thought looked like Latin Kings. (T. V18-19). Iglesias then told "one of the shorties" to get a "gap"—meaning a gun. (T. V19-20). According to Vicente, Iglesias told him that after he got the gun, he shot at the car and "shot the bitch in the head." (T. V21).

29. By the time Vicente testified, he was in protective custody in the Cook County jail because he was cooperating with the State in three different criminal prosecutions. (T. V28-31). Vicente's story was essentially the same in all three cases: Individuals openly confessed murder to him, and the murders all happened to be cases investigated by Guevara and Halvorsen. (T. V31-32).

30. Vicente had documented incidents of lying to the police about his name, age, and birthdate. (T. V54-55).

31. At the time of his testimony against Iglesias, Vicente was a recovering heroin addict who had three armed robbery charges and one robbery charge pending against him. (T. V53). He faced potential sentences totaling between 21 and 97 years if he were convicted of all charges. (T. V54). Vicente expected that for his testimony the State would recommend a plea deal where he would serve 54 months in prison. (T. V35).

### E. Iglesias' Criminal Trial

32. In opening statements, Iglesias' attorney made his theory of the case clear: "They got the wrong young man sitting there." (T. R24).

33. The State's case against Iglesias consisted of the testimony of Rodriguez, Ochoa, Vicente, and Guevara as described above. (Ex. 4 at 19-20).

7

EP IGLESIAS Sub Resp 000886

34. Iglesias presented two character witnesses—his employer Julio Matias and his teacher James Fisher. Both testified to Iglesias' reliability, dedication, work ethic, and character for truthfulness. (T. V111-30).

35. Iglesias also testified in his own defense. He stated: "I'm sorry for the death of the girl but I had nothing to do with it." (T. V87).

36. As far as Vicente was concerned, Iglesias testified that he never knew him before he went to jail. (T. V92-94). Iglesias had encountered Vicente in lockup, and Vicente had pressed Iglesias for information about his case. But Iglesias simply repeated to Vicente that he was being accused of a murder that he had nothing to do with. He told Vicente no other details. (T. V95-96).

37. Since his arrest occurred more than two weeks after the June 7, 1993 shooting, Iglesias could not recall where he had been at 4:00 p.m. on that date. (T. V91). He repeatedly affirmed, however, that he had not been anywhere near the Roman shooting and was not involved in the crime. (T. V131). In response, the State recalled Detective Guevara, who testified falsely that Iglesias had told him that he had been out on the street with his friends at 4:00 p.m. on the day of the shooting. (T. V133).

38. It was on this point that Iglesias's attorney, John Deleon, lost his composure. (T. V132). When his objections were overruled, he referred to Detective Guevara's testimony as "ridiculous." (T. V132). During the cross-examination of Detective Guevara, Attorney Deleon had to be instructed to take a "less strident tone." (T. V134). Attorney Deleon was angered because Detective Guevara's police reports said absolutely nothing about Iglesias being out on the street with his friends at 4:00 p.m. on June 7, 1993. (T. V134). Indeed, Guevara's supplemental report said the exact opposite: the report specifically noted that Iglesias had told

8

EP IGLESIAS Sub Resp 000887

Detective Guevara that he did not recall what he did, weeks before his arrest, on June 7, 1993. (Ex. 3). Attorney Deleon later apologized to the court, explaining that he just "got burned up at the officer, that is the truth, and I am sorry." (T. V139).

39.    Once again, during closing arguments, Attorney Deleon reiterated Iglesias's innocence: "He is not the shooter. He is not the killer. … He is the wrong guy." (T. W17). Attorney Deleon told the jury he didn't necessarily know why Rodriguez or Ochoa identified the wrong person—maybe it was a "mistaken identification" or maybe the "witnesses [were] lying," (T. W18)—but as far as Francisco Vicente, he was lying. (T. W24).

40.    When commenting on Guevara, Attorney Deleon was blunt:

> [O]verzealous Police Officer Mr. Guevara has the us versus them mentality; he is a gangbanger, *let me get up there and say what I got to say to convict him. And that is what he did,* including adding to his statement where he said, and you heard Officer Guevara and I got very heated up and I apologize to the court and to you for getting emotionally involved in that question and answer but it burned me up for Mr. Guevara to get up there and say that Geraldo Iglesias confessed to him that at 4:00 he was on the street with his boys. *Guevara lied, he is a liar, it is as simple as that.*

(T. W22-23) (emphasis added).

41.    In rebuttal, the State called the allegation that Guevara orchestrated a plan to pin the case on Iglesias "ridiculous." (T. W31-32). The State suggested this was fantastical, explaining "this is not a movie, ladies and gentlemen, this is real life." (T. W32).

### F. Conviction, Sentence, and Direct Appeal

42.    The jury convicted Iglesias of first degree murder. (T. W63).

43.    The State sought an extended term sentence, from 60 years to natural life. (T. AA10).

44.    Faced with the possibility of spending the rest of his life in prison, minutes before he was about to be sentenced, Iglesias, again, asserted his innocence in allocution:

9

EP IGLESIAS Sub Resp 000888

I would like to say that I apologize and I'm sorry for what happened to the young lady and I send my condolences to the family but I would like to say I had nothing to do with it and the Lord knows I had nothing to do with it. That's all I got to say.

(T. AA22).

45. The court sentenced Iglesias to 35 years in prison. (T. AA27)

46. Iglesias challenged, *inter alia*, the sufficiency of the evidence on appeal, specifically urging the court to "completely disregard[]" Vicente's testimony. (Ex. 4 at 20). Based on the record before the court and noting the "jury's function to resolve issues regarding the credibility of witnesses and inconsistencies in the evidence," the appellate court affirmed. (Ex. 4 at 25, 27).

### G. Collateral Proceedings

47. Iglesias filed a *pro se* post-conviction petition on July 6, 1998. It was summarily dismissed on October 20, 1998. Iglesias's motion to reconsider was denied on December 10, 1998.

48. On October 17, 2005, Iglesias filed a successive post-conviction petition, which is pending. In a sworn affidavit attached to the petition, Iglesias again maintained his innocence. The petition raised actual innocence and due process claims, including claims relating to Detective Guevara's misconduct in this and other cases. The petition included as attachments letters from Attorneys Donna Makowski and John Deleon (Petitioner's trial counsel). These letters informed Iglesias that they had learned that Vicente had recanted his testimony.

49. The successive petition was docketed for second stage proceedings and the public defender was appointed.

50. Because of delays in filing an amended petition, on December 12, 2017, this Court terminated the public defender and ordered the appearance of a private attorney.

10

EP IGLESIAS Sub Resp 000889

51. On January 23, 2018, the Exoneration Project was granted leave to enter an appearance.

52. On March 10, 2018, this Court granted leave to counsel to subpoena the Chicago Police Department for their investigative files in this case and view the impounded evidence.

## III. EVIDENCE OF DETECTIVE REYNALDO GUEVARA'S MISCONDUCT

### A. Cases Involving Francisco Vicente

53. As the trial record in this case makes clear, in the same time period as this case, Francisco Vicente testified against four men other than Iglesias, in other cases, each time providing the exact same testimony that he provided against Iglesias. Not only did Vicente claim that Iglesias had confessed to him in lockup; but he testified that Jose Montanez, Armando Serrano, and Jorge Pacheco had confessed to him in another case, and that Robert Bouto had done so in a third.

54. Francisco Vicente has now sworn under oath that his in-court testimony against Montanez, Serrano, and Pacheco was false and the result of threats, intimidation, and physical abuse by Detective Guevara. Detective Guevara told Vicente exactly what to say, and in exchange for lying, Detective Guevara promised him a deal on his pending cases, money, and private visits with his wife at the time. Vicente was, in fact, placed in protective custody and given relocation money. (Ex. 5).

55. Vicente also swore under oath that Detective Guevara's fabrication of his false testimony occurred in June 1993, and he swore further that Detective Guevara "had beaten and physically abused me while making me give false information about other suspects." (Ex. 5).

11

EP IGLESIAS Sub Resp 000890

56. The convictions of Montanez, Serrano, and Pacheco have all been overturned.[3] Montanez and Serrano have since been certified innocent. (Ex. 6).

57. In the context of the Montanez and Serrano cases, the Illinois Appellate Court called Detective Guevara's actions in the case "profoundly alarming acts of misconduct." *People v. Montanez*, 2016 IL App (1st) 133726, ¶ 1; *People v. Serrano*, 2016 IL App (1st) 133493, ¶ 1.

58. As far as Robert Bouto is concerned, Vicente never testified at his trial, despite his contention that Bouto had provided a jailhouse confession. This was because witnesses who were present when Bouto supposedly had given a jailhouse confession contradicted Vicente's claim and said it had never happened. (Ex. 7 (Bouto Memo)).

59. More recently, in a report commissioned by the City of Chicago, former United States Attorney Scott Lassar concluded after investigating Bouto's case that it is "more likely than not that Bouto is innocent" and that Francisco Vicente "fabricated the event of Bouto's confession to the crime." (Ex. 7 (Lassar Report, Bouto Memo)).[4]

---

[3] Jorge Pacheco's conviction was overturned upon a motion for a new trial shortly after the guilty verdict and not as a part of any separate post-conviction proceeding.

[4] The comprehensive memo from the Lassar Report examining the Bouto case repeatedly refers to an unnamed "third case" involving Vicente. Given that the Lassar Report specifically investigated Bouto and the Montanez/Serrano/Pacheco cases, the unnamed third case is Iglesias's case. It is particularly noteworthy that the Lassar Report discusses an interview with Detective Guevara's partner—Detective Ernest Halvorsen—in relation to this unnamed third case:

> Det. Halvorsen told us that he did not remember that Vicente had also received a confession in the third defendant's matter, stating "That's news to me." When we asked him to examine the Supp. R. attributed to him and Det. Guevara reporting Vicente's information, Det. Halvorsen expressed surprise, stating: He's got another one? In the Cook County jail?" Det. Halvorsen then stated of Vicente, "This guy's a roving confession elicitator" [sic].
> (Ex. 7 (quoting 7/1/14 Interview with Ernest Halvorsen)).

Halvorsen, of course, is listed on the Supp R. in the Iglesias case and worked with Guevara on this matter.

12

EP IGLESIAS Sub Resp 000891

60. The same memorandum in the Bouto case also concluded that "it is more likely than not that Det. Guevara engaged in misconduct in two instances" in relation to eyewitness identification procedures implicating Bouto, and that "it is more likely than not that [Guevara] told [a witness], and perhaps others, who to select from the lineup. (Ex. 7 (Bouto Memo)).

61. When he was called recently to testify about the Montanez/Serrano/Pacheco and Bouto cases, both Detective Guevara and Vicente took the Fifth. (Ex. 1).

## B. Overturned Convictions

62. Including Montanez, Serrano, and Pacheco, *see supra* ¶¶ 53-61, at least sixteen individuals have had their convictions overturned in cases investigated by Detective Guevara.

### i. *Gabriel Solache and Arturo Reyes Exonerations*

63. Judge Obbish ordered a new suppression hearing in *People v. Reyes and Solache* (98 CR 12440-02, -03) in light of Detective Guevara's invocation of the Fifth Amendment in that case and reliable evidence that Detective Guevara employed methods to secure a confessional or witness statements through unconstitutional misconduct. (Ex. 9); *see also People v. Reyes & Solache*, 369 Ill. App. 3d 1 (1st Dist. 2006).

64. The suppression hearing took place. Detective Guevara testified, and Judge Obbish issued a blistering decision finding Guevara to be—in no uncertain terms—a liar.

65. Judge Obbish concluded that Detective Guevara "lied in front of me." (Ex. 8 at 37). In fact, "he lied in front of me under oath multiple times[.]" (*Id*). "He just flat out lied." (*Id.* at 39). Detective Guevara told "bald face lies." (*Id.* at 44).

66. With respect to Detective Guevara's denial of having abused the defendants, the Court concluded that his "half-hearted flimsy 'no, I would never do that' is not the testimony of a credible witness." (*Id.* at 44).

13

67. Judge Obbish said that Detective Guevara "showed what he was made of and what he truly is[.]" (*Id.*) He found that Detective Guevara "has eliminated any possibility of him being considered a credible witness *in any proceeding*." (*Id.* at 38) (emphasis added).

68. The Court concluded: "I can't give an ounce of credibility to something that he said 20 years ago—nothing—because if he would lie after he's been given immunity in front of me under oath, … what would make this Court … believe that he was telling the truth when he originally testified[?]" (*Id.* at 45-46).

69. On December 21, 2017, the State dropped all charges against both Solache and Reyes. Megan Crepeau, *Prosecutors drop murder charges against 2 who allege cop beat them into confessing*, Chi. Trib., Dec. 21, 2017.[5]

### ii. Roberto Almodovar and William Negron Exonerations

70. Roberto Almodovar and William Negron alleged that Detective Guevara rigged the lineups and identification procedures that led to their convictions. *People v. Almodovar*, 2013 IL App (1st) 101476 ¶¶ 54-55.

71. On April 14, 2017, the State dropped all charges against the two men. Referring to the evidence of the pattern and practice of Detective Guevara's misconduct, the State's Attorney stated:

> After a thorough and deliberate review of the evidence and arguments presented to the circuit court, the State's Attorney has concluded that the evidence presented could change the result of this case on retrial.
>
> In light of this decision, we have determined that proceeding with this case is no longer in the best interests of justice and we are withdrawing our opposition to petitioner's request for a new trial. Based on the totality of the evidence currently available, the office has concluded that it is insufficient to support a retrial of this case.

---

[5] http://www.chicagotribune.com/news/ local/breaking/ct-met-conviction-tossed-ex-detective-guevara-20171221-story.html

14

EP IGLESIAS Sub Resp 000893

*Foxx Drops Case Against Pair in Alleged Frame-Up By CPD's Guevara*, CBS, April 13, 2017, available at https://chicago.suntimes.com/news/foxx-drops-case-against-pair-in-alleged-frame-up-by-cpds-guevara/.

72.     Each man has now been certified innocent. (Ex. 10).

iii. *Jose Maysonet Exoneration*

73.     In 2016, nearly three decades after his conviction, Jose Maysonet's conviction was vacated when it was discovered that Maysonet's trial attorney, Richard Beuke, served as Detective Guevara's lawyer at the time Beuke was representing Maysonet. Andy Grimm, *Double-murder charges dropped after 5 cops say they'll take the Fifth*, Chi. Sun-Times, Nov. 15, 2017.

74.     Maysonet had alleged that Detective Guevara targeted him for arrest because Maysonet refused to pay protection money to the detective, and that during the investigation and interrogation, Guevara beat him with a flashlight and phone book. *Id.*

75.     On November 15, prosecutors dropped all charges against Maysonet after Detective Guevara and his partner Detective Halvorsen—amongst others—all alerted the court they would invoke the Fifth Amendment if they were called to the stand. *Id.*

76.     Iglesias does not yet have in his possession relevant transcripts from the Maysonet matter but reserves the right to present the actual court transcripts in any hearing on the Iglesias matter.

iv. *Thomas Sierra Exoneration*

77.     Thomas Sierra was convicted of a 1995 murder.

78.     Witness Jose E. Melendez has reported that Detective Guevara and others physically abused him and then retaliated against him when he could not provide information about the crime by charging him with a different murder. Jose E. Melendez was later acquitted of

15

EP IGLESIAS Sub Resp 000894

all charges. (Ex. 11).

79.     A different Jose Melendez (Jose M. Melendez)—who was with the victim during the murder of which Sierra was wrongly convicted—testified that, when he went to Area Five on May 30, 1995, Detective Guevara pointed to a picture of Sierra and told him to identify that person as the shooter. (Ex. 12).

80.     Jose M. Melendez repeatedly testified that he explained to Detective Guevara that he had no idea who was the shooter. (Ex. 12). Melendez went along with Detective Guevara and "pointed out the one [Guevara] told me to point out." (Ex. 12).

81.     The other eyewitness in the case—Alberto Rodriguez—testified multiple times that he "couldn't give a good description" of the shooter. To get the identification, Detective Guevara told him they "got the person or they know of the person" and that the shooter was "probably the guy in these pictures" prior to showing him the photo array. (Ex. 12).

82.     On January 9, 2018, after Sierra filed an amended post-conviction petition presenting evidence of Detective Guevara's misconduct in his case, and his widespread pattern of misconduct, this court vacated Sierra's conviction, and the State's Attorney dismissed all charges. (Ex. 12).

v.   *Jacques Rivera Exoneration*

83.     Jacques Rivera was wrongly convicted of the August 1988 shooting of Felix Valentin in Humboldt Park. The conviction was based solely on the testimony of a 12-year-old boy named Orlando Lopez and the testimony of Detective Guevara.

84.     On June 23, 2011, at an evidentiary hearing, Lopez testified that he identified Rivera as Valentin's killer, at the behest of Detective Guevara, in a lineup before which he had told Detective Guevara that Rivera was in fact not the killer. This Court subsequently vacated

16

EP IGLESIAS Sub Resp 000895

Rivera's conviction, and, on October 4, 2011, the State dropped the charges. Rivera was awarded a certificate of innocence on September 5, 2012. (Ex. 13).

85.     Testimony provided during Rivera's subsequent civil suit demonstrates that during the Valentin investigation, Detective Guevara submitted false reports claiming that the victim Valentin had identified Rivera as the perpetrator, even though Valentin was comatose at the time of the alleged identification. (Ex. 14).

### vi. *Juan Johnson's Exoneration and Henry Johnson's Overturned Conviction*

85.     Salvador Ortiz testified that Detective Guevara manipulated him into making identifications related to the murder of Ricardo Fernandez. Because of identifications orchestrated by Detective Guevara, Juan Johnson was charged and convicted. After many years in prison, Johnson was exonerated. (Ex. 15).

86.     A federal jury later awarded Johnson $21 million in his lawsuit against the Detective Guevara. *See* Zach Christman, *$21 Million for 11 Years in Prison*, NBC5, July 14, 2009.[6]

87.     Johnson's brother, Henry Johnson, also had his conviction overturned in the same case. Pending retrial, he pleaded guilty to avoid further prison time and the risk of another wrongful conviction.

### vii. *Angel Rodriguez's Overturned Conviction*

88.     The Illinois Appellate Court reversed Angel Rodriguez's jury conviction outright, holding that the single identification in the case orchestrated by Detective Halvorsen was unreliable. *People v. Rodriguez*, 312 Ill. App. 3d 920 (1st Dist. 2000).[7]

---

[6] https://www.nbcchicago.com/news/local/21-Million-for-11-Years-in-Prison-Juan-Johnson-wrongful-conviction.html.
[7] While this opinion does not mention Detective Guevara, upon information and belief, Detective

17

EP IGLESIAS Sub Resp 000896

viii. *Santos Flores' Overturned Conviction*

89.     The Illinois Appellate Court suppressed Santos Flores's confession elicited by Detective Guevara. *People v. Flores*, 315 Ill. App. 3d 387 (1st Dist. 2000). On information and belief, upon remand, Flores pleaded guilty to avoid further prison time and a risk of another wrongful conviction.

ix. *Xavier Arcos' Overturned Conviction*

90.     The Illinois Appellate Court reversed Xavier Arcos' conviction outright, finding that the State's sole witness was unreliable. *People v. Arcos*, 282 Ill. App. 3d 870 (1st Dist. 1996).

91.     Detective Guevara procured the unreliable statement. *Id.*

x. *Ariel Gomez's Exoneration*

92.     On February 14, 2018, Ariel Gomez was exonerated of murder. Gomez's false confession was the result of Guevara's interrogation. Three witnesses also swore under oath that Detective Guevara repeatedly attempted to coerce them into identifying Gomez as the shooter. (Exs. 16, 55-57).[8]

**C. Statements About Guevara's Misconduct from Other Police Officers**

i.     *Officer Ron Malczyk*

93.     On December 28, 2017, BuzzFeed News published a detailed investigation of Detective Guevara's investigation of the murders of Noel Andujar and Ruben Gonzalez. *See* Melissa Segura, The Night Shift, BuzzFeed News.[9] As noted above, two months ago Thomas

---

Guevara assisted Detective Halvorsen in this investigation.

[8] *See* https://www.buzzfeed.com/melissasegura/the-conviction-of-a-seventh-person-wrongly-framed-for?utm_term=.cwXBmgaPD5#.vup4ZXMyWQ

[9] https://www.buzzfeed.com/melissasegura/how-to-close-two-stubborn-murder-cases-in-one-night-chicago

18

EP IGLESIAS Sub Resp 000897

Sierra was exonerated two decades after his conviction for the Andujar murder, and Jose E. Melendez was arrested by Detective Guevara but acquitted of the Gonzalez murder. Both maintain their innocence; and both maintain that Detective Guevara orchestrated their wrongful arrests, prosecutions, and in Sierra's case conviction.

94.     Chicago Police Officer Ron Malczyk, who worked with Guevara and his partners on those cases, is quoted as saying, in reference to Detective Guevara's investigation, "'Did they once-upon-a-time me?' – Did they make it up? 'It wouldn't be the first time.'" *Id.*

### ii. Detective William Dorsch

95.     Former Chicago police detective William Dorsch has testified under oath that roughly three months before Guevara was promoted to detective, Guevara brought two juveniles to the police station who purportedly had witnessed a shooting that Dorsch had been investigating and had recorded the license plate of the shooter's vehicle. Based on the information provided, Detective Dorsch created a photo array for the juveniles to attempt to identify the shooter. While the first juvenile was viewing the photo array, and before he identified any of the photographs, Detective Guevara pointed to the suspect's photo and told the juvenile "that's him." The juvenile then agreed with Detective Guevara, saying that was the person who committed the shooting. Dorsch then directed Detective Guevara to leave the room and had the other juvenile view the same photo array; this juvenile was unable to make any identification. Based on the first juvenile's identification, the suspect was charged with murder. Subsequently, Dorsch spoke to the two juveniles without Detective Guevara present. The juveniles admitted that they had been paid to falsely claim that the suspect was the person responsible for the shooting. After prosecutors spoke to the two juveniles, the suspect was released. (Ex. 17).

19

**D. Detective Guevara Taking the Fifth When Confronted With His Misconduct**

96.     On June 17, 2013, in the context of a post-conviction hearing in the matters of Armando Serrano and Jose Montanez, Detective Guevara repeatedly took the Fifth when asked about his prior investigative work. (Ex. 1). As noted, when asked specifically about his conduct in the Iglesias investigation, Detective Guevara refused to answer the questions on the grounds his answer would incriminate him. (Ex. 1).

97.     On July 29, 2013, in the context of the post-conviction hearing in the matters of Arturo Reyes and Gabriel Solache, Detective Guevara took the Fifth to every question posed during his testimony. (Ex. 18).

98.     On December 23, 2013, in the context of his deposition testimony in the case of *Jacques Rivera v. Reynaldo Guevara*, Detective Guevara repeatedly invoked the Fifth Amendment when asked about any and all of his prior investigative work. (Ex. 19).

99.     A court may draw an adverse inference in a post-conviction proceeding from an officer's assertion of the Fifth Amendment, and, indeed, should draw "a negative inference" when the State produces no evidence to rebut the allegations. *People v. Whirl*, 2015 IL App (1st) 111483, ¶¶ 105-07.

**E. Lassar Report**

100.    As alluded to above, the City of Chicago commissioned an investigation into Detective Guevara and hired former United States Attorney Scott Lassar, now of Sidley Austin, to conduct the investigation. Reports in the investigation were completed in 2015 and concluded that at least four different men who alleged misconduct by Guevara are "most likely innocent." These men are Almodovar, Serrano, Montanez, and Robert Bouto. (Ex. 7).

101.    The Lassar Report also indicates that "it is more likely than not that Det. Guevara

20

EP IGLESIAS Sub Resp 000899

engaged in misconduct in two instances" in the Bouto case, and that "it is more likely that not that [Guevara] told [a witness], and perhaps others, who to select from the lineup." (Ex. 7, Bouto Memo at 43).

### F. Sworn Statements From Guevara Victims

102. In addition to (a) the judicial findings related to the sixteen men arrested by Guevara who have had their convictions overturned, (b) the findings from city officials and statements from other police officers related to Guevara's misconduct, and (c) Guevara's own refusal to answer questions about his investigative actions and misconduct, the bolded witnesses below have all given sworn testimony regarding Guevara's misconduct.

      *i.*    *Evidence of Guevara rigging witness identifications in a manner similar to that alleged by Iglesias herein.*

103. In May 1991, after sixteen year-old **David Velasquez** told Detective Guevara he knew nothing about the murder of "Junito," Detective Guevara took Velasquez to a rival gang's territory and falsely alerted local gang members that Velasquez was responsible for the murder of Junito (a member of the local gang). After Velasquez begged Detective Guevara to put him back in the police car, Detective Guevara and his partners drove Velasquez to the station, where they chained him to a wall, beat him, and threatened him if he did not falsely implicate Daniel Rodriguez as "Junito's" shooter two months earlier, Detective Guevara would "pin" Velasquez with it. As a result of Detective Guevara's conduct, Velasquez implicated Rodriguez in a false statement; all of the details in the statement were provided by Detective Guevara. (Ex. 20).

104. **Virgilio Calderon** swore under oath that prior to a lineup, Detective Guevara showed him pictures of Victor Vera and told him to identify Vera in the lineup. (Ex. 21).

105. Detective Guevara coerced both **Salvador Ortiz** and **Samuel Perez** to pick out particular individuals from a lineup to "solve" the murder of Ricardo Fernandez. This resulted in

21

Juan and Henry Johnson's wrongful convictions. (Exs. 15, 22); *see also supra* 85-87.

106. Sworn statements indicated that Detective Guevara instructed both **Efrian and Julio Sanchez** to pick out David Colon in a lineup as Michael Velez's murderer. (Ex. 23).

107. Detective Guevara manipulated the false identification of **Kennelly Saez,** leading to the wrongful convictions of Roberto Almodovar and William Negron, both of whom have since been certified innocent. (Ex. 58)[10]; *see supra* ¶¶ 70-72.

108. **Luis Figueroa** testified that he identified Angel Diaz as the murderer of Yolanda Leal at a lineup after Detective Guevara "told me to pick him out." Figueroa testified that Guevara "told me [Diaz] was the one that did it and he wants to take him down. . . . [W]hen I got there he was asking me . . . what did you see, you know, I told him I could not see anything, and he told me 'I found out who did it and his name is Angel Diaz." (Ex. 24).

109. At the trial of Xavier Arcos, whose conviction was later overturned on direct appeal, *see Arcos*, 282 Ill. App. 3d 870, *supra* ¶ 90, **Wilfredo Rosario** swore under oath that in 1991 Detective Guevara threatened that Rosario would be framed for the murder of Orlando Garola if he didn't falsely implicate Arcos. Rosario said that Detective Guevara instructed him to say he heard "five to seven shots." He was told that he was "either going to cooperate with us or we're going to charge you, lock you up and let the Nation [a rival gang] deal with you." (Ex. 25, at J34-39).

110. **Robert Ruiz** testified that in 1997, Detective Guevara arrived at the wake of Ruiz's friend and told Ruiz he wanted to talk to him. In the days thereafter, Detective Guevara had Ruiz detained several times for hours each time, and eventually told him that two people had

---

[10] Saez recanted his identifications of Almodovar and Negron during post-conviction proceedings. Iglesias does not have the transcripts from those proceedings but reserves the right to present them to this Court.

EP IGLESIAS Sub Resp 000901

been implicated in the shooting. Detective Guevara then told Ruiz "exactly how to say the story." Ruiz implicated Freddy and Concepcion Santiago in the murder because Ruiz believed that Detective Guevara would continue to harass him until he changed his story. (Ex. 26).

111.    Detective Guevara threatened to "put a case" on **Carl Richmond** if he didn't implicate Robert Bouto in the May 14, 1993 shooting of Salvador Ruvulcaba. At the lineup, "Detective Guevara told the other witnesses and me that they had the shooter, and that all we had to do was identify Bouto as the shooter. He whispered to each of us what position the suspect would be in." Each witness went in separately, but each came back "and confirmed to the other witnesses that the suspect was in that position." Richmond complied and implicated Bouto because Detective Guevara promised to "make [his] life uncomfortable" if he didn't. From past experiences with Detective Guevara, Richmond knew to take this threat seriously, and Richmond agreed to testify falsely because of Detective Guevara's threat. Further, while at the police station, Richmond also heard Bouto getting beat up in an interrogation room. (Ex. 27). Bouto, of course, has been found factually innocent by a report commissioned by the city. (Ex. 7 (Bouto Memo)).

112.    In 1995, Detective Guevara coerced **Rodolfo Zaragoza** into falsely identifying Ricardo Rodriguez. Detective Guevara intimidated Zaragova into identifying and later testifying against Rodriguez. Zaragoza identified Rodriguez because Detective Guevara told him that Rodriguez was the shooter. (Ex. 28).

113.    In 1995, Detective Guevara coerced **Evelyn Diaz** into making a false identification and providing false testimony to the Grand Jury against Luis Serrano. Detective Guevara threatened Diaz that if she did not identify Serrano, her children would be taken away by the Department of Children and Family Services. Detective Guevara pointed to a particular

23

EP IGLESIAS Sub Resp 000902

photograph and told Diaz "that was the guy." (Ex. 29 at 51-52, 70-71).

114. Detective Guevara abused **Timothy Rankins** by putting a phone book over his head and beating it with a flashlight, threw Rankins out of his chair, and placed Rankins in a chokehold to induce him to sign a pre-prepared statement implicating Serrano and Montanez. As a result, Rankins testified falsely against the men in the Grand Jury. (Ex. 30). Serrano and Montanez, of course, have both been certified innocent. (Ex. 6).

115. In the context of Ariel Gomez's wrongful conviction, **Ruth Antonetty, Debbie Daniels,** and **Maria Castro** have all sworn under oath that Detective Guevara attempted to force them to falsely identify Gomez. (Exs. 55-57). Antonetty and Daniels both swore that Guevara pointed specifically to a photo and told them who to identify as the killer. (Ex. 55, at ¶ 19; Ex. 56, at ¶ 7). Each swore that Guevara was very intimidating and aggressive and made them feel like they were in trouble or under arrest. (Exs. 55-57). Ariel Gomez has since been exonerated. *See supra* ¶ 92.

### ii. Other Allegations of Investigative Misconduct

116. At their post-conviction hearing, both **Arturo Reyes** and **Gabriel Solache** testified that in 1998, during their interrogations, Detective Guevara repeatedly struck and beat them while they were handcuffed as they denied the accusations that they committed a murder and stole a baby. Detective Guevara threated Reyes with the electric chair during a three-day-long interrogation. Reyes eventually signed a false inculpatory statement. For his part, due to the Detective Guevara's beatings, Solache signed a statement in English he couldn't read or understand. He signed it because Detective Guevara told him to sign it. (Exs. 31-34). After repeatedly accusing Detective Guevara of lying, Judge Obbish suppressed these two men's confessions, and both of their convictions have since been overturned. (Ex. 8), *see supra* ¶ 63-69.

24

EP IGLESIAS Sub Resp 000903

117. In 1998, in the case in which Gabriel Solache and Arturo Reyes were wrongfully convicted, Detective Guevara repeatedly hit **Rosauro Mejia** in an attempt to coerce a confession from him. Detective Guevara similarly pulled **Adriana Mejia's** hair and struck her on the back of the neck while interrogating her. Adriana also testified that Detective Guevara threatened her with life in prison. Rosauro never confessed and was finally released after being held in custody for three days. (Ex. 35, at Q22; Ex. 37 at D69).

118. In 1991, Guevara coerced a false confession from **Daniel Rodriguez** to the murder of Jose Hernandez ("Junito"). While *en route* to the police station after Rodriguez's arrest, Detective Guevara told him Rodriguez he could cooperate and make it easy on himself, or not, in which case Detective Guevara would raid his house and frame his girlfriend Gloria. During the interrogation, Detective Guevara's partner beat Rodriguez. Detective Guevara, then, told Rodriguez exactly what to say, and Rodriguez had been told that if he agreed, he could go home. Rodriguez eventually signed a false statement. (Ex. 55).

119. In February 1983, Detective Guevara and other officers forcibly removed **Leshurn Hunt** from his home and handcuffed him to a ring in the wall at the police station where he was beaten about the head, face, and body until he confessed to murder and robbery charges. Hunt was detained for approximately 23 hours and deprived of food, water, and sleep until after he confessed. Hunt sought medical treatment for his injuries and filed a complaint with the Office of Professional Standards. Witnesses who saw Hunt while in custody corroborated his claim of a beating by the police. The criminal court judge suppressed Hunt's confession, and Hunt brought a successful civil rights action against Detective Guevara and others. (Ex. 36).

120. In 1986, Detective Guevara and two other officers coerced a confession from **Daniel Pena** by beating him in the face and ribs with their hands, and the groin and thighs with

25

EP IGLESIAS Sub Resp 000904

flashlights, during an interrogation. Pena was taken to see a doctor where he complained about being beaten by the police. The doctor found bruising to Pena's legs and abrasions and lacerations to Pena's nose. Family members corroborated Pena's claim that he had been beaten while in police custody. (Ex. 38).

121.    Detective Guevara hit **Armando Serrano** in the face and body while Serrano was shackled to a police station wall in an attempt to get Serrano to confess to murder. When Serrano's mother and father arrived at the police station, they could hear their son screaming for a lawyer. (Ex. 39). Serrano, of course, has since been exonerated, upended by the overwhelming evidence that Francisco Vicente fabricated his statement at the behest of Detective Guevara. (Ex. 6), *see supra* ¶ 54-57.

122.    In 1993, Detective Guevara used physical force and threats to coerce a false confession from **Adolfo Friar** to the murder of Dora Alva. Over the course of a two-day interrogation, Friar was handcuffed to a ring on the wall of the interrogation room, hit in the face by Detective Guevara, and beaten by two other officers. Though isolated in a locked interrogation room, Frias could hear his wife screaming and his son crying in another room. Detective Guevara also brought Frias's nephew into the room, who appeared beaten about the face. Detective Guevara threatened Frias that if he did not confess, his wife would go to prison and his children would be taken away. Frias, who did not speak English, agreed to give a statement to an assistant state's attorney. Frias spoke in Spanish and Detective Guevara translated the statement so that the prosecutor could write the statement in English. Frias then signed a statement he could not read. (Ex. 20).

123.    **Adrian Duta** testified that in 1994, Detective Guevara interrogated him about a murder he knew nothing about. During the interrogation, Detective Guevara became mad,

26

smacked him in the head with a folder, and punched him in the stomach. After getting punched, Duta signed a statement prepared by Detective Guevara because Detective Guevara promised him he could go home if he did. Duta did not go home, but as soon as his Dad visited him in county jail, Duta told his Dad what Detective Guevara did. (Ex. 40).

124. In 1989, Detective Guevara coerced a false confession from **Victor Vera** to the murder of Edwin Castaneda. While Vera maintained his innocence and refused to implicate himself, Detective Guevara threatened to lock up Vera's brother and parents if he did not confess. Detective Guevara also promised Vera that "nothing would come back to" him and that Detective Guevara would give him "total control over the Spanish Cobras neighborhood" if he admitted his involvement. When that still didn't work, Detective Guevara drove him to rival gang territory and announced on a bullhorn that Vera was in the car, and Detective Guevara tried to shove Vera out of the car. At that point, fearing for his life, Vera agreed to falsely confess. (Ex. 41).

125. In 1995, Detective Guevara arrested **Edwin Davila** and, in an attempt to coerce a confession, chained him to the wall of an interrogation room and told Davila that he was going to frame him for murder. After Davila told Detective Guevara that he did not commit the murder, Detective Guevara forced Davila to participate in a lineup in which two witnesses identified Davila as the perpetrator, despite the fact that each of those witnesses had previously told the police that they had not been able to see the shooter. (Ex. 42).

126. In 1991, Detective Guevara coerced **David Rivera** into signing a confession by telling him that if he confessed and pled guilty, he would serve seven years in prison whereas if he did not confess, he would be sent away for fifty years. Detective Guevara also promised Rivera that if he signed a statement at the police station, he could go home. (Ex. 43).

27

EP IGLESIAS Sub Resp 000906

127. In 1985, Detective Guevara arrested **Reynaldo Munoz** and questioned him about multiple crimes. During the process, Detective Guevara hit Munoz in the mouth with his fist. Detective Guevara also drove Munoz to rival gang territory and threatened to throw him out of the car and let rival gang members do to him "whatever they were going to do." Indeed, Detective Guevara did stop the car, pulled Munoz out of the car, and let rival gang members spit and beat on Munoz. (Ex. 44).

128. In 1993, Detective Guevara arrested fifteen-year-old **Elizer Cruzado** and threatened him with life imprisonment if he did not make a statement implicating himself in a murder. Detective Guevara also told Cruzado that he could go home and see his family again, but only if he agreed to make a statement. At the time, Cruzado had a limited ability to read and write. (Ex. 45).

129. According to an affidavit of attorney Jed Stone, in 1997, Detective Guevara arrested **Voytek Dembski**, a Polish National who did not speak English. During a subsequent interrogation, Dembski alleged that Detective Guevara beat, slapped, and yelled at him while he was handcuffed to a chair in an interrogation room. Detective Guevara later got a partner to secure a statement from Dembski in English, which Dembski signed even though he could not read English. (Ex. 46).

130. In an FBI report detailing the criminal activity of Chicago Police Joseph Miedzianowski,[11] Detective Guevara was named by the same informant who implicated Miedzianowski as a corrupt officer who would apprehend drug and gun dealers and then allow them to "buy their way of trouble." According to the report, Detective Guevara also took bribes

---

[11] Disgraced Officer Miedzianowski has been called "the most corrupt cop in the city's history." He is currently serving a life sentence in a federal prison. Todd Lighty & Matt O'Connor, *Rogue cop gets life*, Chi. Trib., January 25, 2003.

EP IGLESIAS Sub Resp 000907

to alter lineups in murder investigations. Finally, the report states that Detective Guevara, using an attorney as a conduit, would receive cash in exchange for the ultimate dismissal of murder cases he investigated. (Ex. 47).

131.    In 1982, Detective Guevara and another officer arrested and physically assaulted **Annie Turner** for smoking on a bus. Detective Guevara called her a "bitch" and pushed her out the back door of the bus. Detective Guevara twisted her arm, threatened to "snap" it, and handcuffed her so tightly that her skin broke. He also hit her across the face with a metal bracelet he was wearing and called her a "nigger bitch." Turner sought medical treatment and filed a complaint with the Office of Professional Standards. (Ex. 48).

132.    In 1982, Detective Guevara and three other officers broke through the locked front door of **Almarie Lloyd** and conducted a warrantless search of her home. When Lloyd asked who they were, she was told to shut up. The officers terrified Lloyd, her brother, and her two children, and left the home in shambles. Lloyd filed a complaint with the Office of Professional Standards the next day. (Ex. 49).

133.    During a six-to-eight-hour interrogation in 1995, Detective Guevara threatened to hit **Gloria Ortiz Bordoy,** threatened that her children would be taken by the Department of Children and Family Services, called her "the B word," and told her that she was involved in the crime and was "going down for a long time." Finally, without reading its contents, Bordoy signed a statement that the detectives wrote out for her because she just wanted to "get out of there." Detective Guevara kept trying to make her say things she was "not aware of." (Ex. 50 at 44-82, 101-06).

134.    In 1986, Detective Guevara threw **Rafael Garcia** against a car, struck him in the face several times, kicked him, and hit him in the head. Garcia filed a complaint with the Chicago Police Department's Office of Professional Standards. Although Detective Guevara denied the

29

charges, Garcia's complaints were corroborated by physical evidence, as he was treated at the hospital for lacerations to the head. After an investigation into the incident, OPS found that Guevara had lied about the incident and recommended that Detective Guevara be suspended for two days. (Ex. 51).

135. In 1986, Guevara pulled over **Melvin Warren** because Warren cut him off while driving westbound on Augusta Boulevard. Detective Guevara called Warren a "nigger dog" and "threatened to tear [Warren's] head off." Detective Guevara hit Warren in the face with a closed fist and then forced him down into the front seat of his car and began to choke him. Two eyewitnesses confirmed that Detective Guevara initiated the beating. In response to this incident, Warren sought medical treatment and filed a complaint with the Office of Professional Standards. OPS sustained Warren's allegations that Detective Guevara had physically and verbally assaulted him and recommended that Detective Guevara be reprimanded. (Ex. 52).

136. In 1984, Detective Guevara and other officers physically assaulted **Graciela Flores** and her 14-year old sister **Anna Flores** during a search of their home, during which the officers did not identify themselves as police. Detective Guevara repeatedly slapped Graciela, called her a "bitch," and pulled her hair. As a result of this incident, Graciela's arm was put in a sling and she spent one week in the hospital. (Ex. 53).

30

EP IGLESIAS Sub Resp 000909

## IV. ARGUMENT

**THE NEWLY-PRESENTED EVIDENCE OUTLINED THROUGHOUT THIS PETITION UNDERMINING ANY CREDIBILITY OF DETECTIVE GUEVARA OR FRANCISCO VICENTE MUST LEAD THIS COURT TO VACATE GERALDO IGLESIAS' CONVICTION.**

137. Geraldo Iglesias was convicted on the basis of two categories of evidence:

138. *First*, the purportedly untainted eyewitness identifications of Rosendo Ochoa and Hugo Rodriguez more than two weeks after the murder of Monica Roman. For the two weeks prior, Detective Guevara was uninvolved in the investigation and, according to Guevara's own testimony, there were "no leads." (T. U84). Indeed, Ochoa only had minimal time to view the incident from up to 120 feet away; and Rodriguez had fewer than ten seconds to view the shooter from a vehicle facing north, while the shooter ran south. Unsurprisingly, they both gave only vague descriptions of the shooter on the day of the incident, descriptions that come nothing close to describing Iglesias. Yet immediately upon Guevara's involvement, the case was "solved" by Ochoa and Rodriguez's identifications. These identifications were the result of photo arrays and lineups orchestrated by Guevara.

139. *Second*, roughly one week after Petitioner Iglesias' arrest, Francisco Vicente claimed that Iglesias made a jailhouse confession to him. What we now know about Vicente, however, is that during the exact same time period, he made the same "jail house confession claim" in two other prosecutions: *People v. Jose Montanez, Armando Serrano, & Jorge Pacheco* and *People v. Robert Bouto*.

   a. In the first case, Vicente recanted, admitting he lied after being coerced by Guevara. (Ex. 5 at ¶ 17). Montanez, Serrano, and Pacheco have all had their convictions overturned. Montanez and Serrano were formally certified innocent after more than two decades of wrongful conviction. *See supra* ¶¶ 53-57.

31

b. As to Robert Bouto, an independent City review conducted by former federal prosecutor Scott Lassar has concluded that Bouto, too, is innocent, and that Detective Guevara committed misconduct in orchestrating Bouto's conviction. (Ex. 7 (Bouto Report)); *see supra* ¶¶ 58-61).

140. Sixteen convictions have now been overturned based on Guevara's misconduct. *See supra* ¶¶ 62-92. There is also a litany of allegations—many of which have been sustained— where Guevara manipulated identifications to close cases. *See supra* ¶¶ 103-115. Guevara himself does not stand by his investigations, pleading the Fifth across the board, including as it relates to *this* investigation. *See supra* ¶¶ 96-99. When Guevara was forced to testify, the Honorable Judge Obbish concluded that Guevara is a "bald faced liar" who "has eliminated any possibility of him being considered a credible witness in any proceeding." *See supra* ¶¶ 63-69. Two police officers apparently feel the same, publicly stating or testifying that Guevara fabricates evidence. *See supra* ¶¶ 93-95. Ultimately, Guevara's use of Vicente as an informant has been completely undermined both by Vicente's own recantations and law enforcement investigations that concluded that Vicente lied. *See supra* ¶¶ 53-61.

141. Iglesias' trial theory was that Detective Guevara and Francisco Vicente were lying. With the overwhelming newly presented evidence entirely discrediting these witnesses and corroborating this trial theory, Iglesias' conviction cannot stand. This Court must vacate his conviction based upon any of the legal theories outlined below.

32

EP IGLESIAS Sub Resp 000911

**LEGAL CLAIM I:**

## DUE PROCESS VIOLATIONS: 5TH AND 14TH AMENDMENTS, U.S. CONSTITUTION; ARTICLE 1, SECTION 2, ILLINOIS CONSTITUTION

142.    Petitioner Iglesias incorporates each of the preceding paragraphs as though fully restated herein.

143.    It is well established that a petitioner is entitled to a hearing on a claim that his conviction violates due process when he sets forth substantial newly discovered evidence of police misconduct that supports a claim that investigative misconduct procured an unconstitutional conviction. *See People v. Patterson*, 192 Ill. 2d 93, 145 (2000); *People v. King*, 192 Ill. 2d 189, 198-99 (2000) (new evidence of police misconduct at Area 2, which did not come to light until after the defendants' trials in those cases, was sufficient in terms of relevancy and materiality to call for relaxation of *res judicata* and to require evidentiary hearings on the petitioners' claims of torture); *People v. Cannon,* 293 Ill. App. 3d 634 (1st Dist. 1997); *People v. Mitchell*, 2012 IL App (1st) 100907 (1st Dist. 2014); *People v. Nicholas*, 2013 IL App (1st) 103202, ¶ 44; *People v. Whirl,* 2015 IL App (1st) 111483; *People v. Tyler*, 2015 IL App (1st) 123470 (courts reconsidered the voluntariness of the defendants' alleged confessions that would otherwise be barred due to the pervasive pattern of criminal conduct by police officers in Area 2). These courts have so held for both initial post-conviction petitions, as well as successive petitions, noting that the 2006 Special Prosecutor's Report and other sources shedding light on the Jon Burge scandal, for example, satisfy the "cause" element for the "cause-and-prejudice" test that applies to successive petitions. *See e.g., Mitchell* at ¶ 60; *see also* 725 ILCS 5/122-1(f).

144.    More specifically, appellate courts have also repeatedly held that newly discovered allegations of Detective Reynaldo Guevara's investigative misconduct are cognizable under the Post-Conviction Hearing Act and warrant evidentiary hearings under the same due

33

process legal theory and, again, even for successive petitions. *See People v. Reyes*, 369 Ill. App. 3d 1, 14-24 (2006) (citing *Patterson*, 192 Ill. 2d 93); *People v. Almodovar*, 2013 IL App (1st) 101476 (noting the newly-discovered allegations against Detective Guevara establish cause-and-prejudice).

145. The appellate courts have so held for both allegations of Guevara's misconduct during suspect interrogations as well as identification procedures. In so concluding, these courts have relied on many of the same allegations cited within and relied upon in paragraphs 62-137 of this pleading. *See e.g., Reyes*, 369 Ill. App. 3d at 15-17 (citing to the allegations that Guevara improperly influenced the identification testimony of David Velasquez, Luis Figueroa, and Jose Melendez, and the allegations of Guevara's improper and illegally coercive interrogations of Armando Serrano and Daniel Pena, and mistreatment of Melvin Warren (all similarly cited herein as well). Notably, the courts in *Reyes* and *Almodovar* so held even prior to the Lassar report (which substantiated that Guevara had a pattern of misconduct and concluded that at least four of Guevara's victims were innocent), prior to many of the sixteen overturned convictions documented in this case, and prior to Detective Guevara's repeated invocations of the Fifth (including in the instant case). *See supra* ¶¶ 62-137; *see also People v. Whirl*, 2015 IL App (1st) 111483, ¶107 (explaining that in a post-conviction proceeding, a negative inference should be drawn where a detective takes the Fifth Amendment when asked about allegations of misconduct).

146. Substantively, a petitioner is entitled to relief under a due process claim based upon newly discovered evidence of a pattern of misconduct by the investigating police officers if the evidence is (1) of such conclusive character that it will probably change the result on retrial; (2) material to the issue, not merely cumulative; and (3) discovered since trial and of such

34

character that the defendant in the exercise of due diligence could not have discovered it earlier. *Mitchell* at ¶ 61 (citing *People v. Orange*, 195 Ill. 2d 437, 450-51 (2001)); *Tyler* at ¶ 158. The standard requires the court to determine whether the allegations undermine the credibility of the investigating officers to the extent that the result of a new trial would be different. *See Almodovar* at ¶ 69 (explaining that "[t]he new evidence merely sought to establish a pattern and practice of abuse by Detective Guevara, which, if true, would have a severe negative impact on the credibility of Detective Guevara's testimony that no such abuse occurred in defendants' case"); *Tyler* at ¶ 193 (citing *Patterson*, 192 Ill. 2d at 145) (noting that the standard requires the court "to determine whether any of the detectives who interrogated the defendants may have participated in systemic and methodical abuse and whether those detectives' credibility at trial might have been impeached as a result").

147. Both the appellate court decisions in *Almodovar* and *Reyes* establish that the allegations against Detective Guevara are material and either newly discovered or could not have been discovered with due diligence. *See Reyes* at ¶¶ 18-19; *Almodovar* at ¶¶ 67-68. Again, many of these allegations mirror the ones discussed in those appellate decisions, which found that in cases from the same era, evidence of Detective Guevara's misconduct that pre-dated their trials was still newly discovered. Of course, almost all of the evidence in this petition—like Judge Obbish's findings about Guevara's credibility, the Lassar report, both Guevara's repeated invocation of the Fifth and his specific invocation in this case, and all sixteen of the convictions overturned—long post-date Iglesias' trial, so could not have been discovered earlier. *See Whirl*, 2015 IL App (1st) 111483, ¶107.

148. Further, the newly-discovered allegations relating to Detective Guevara's investigative misconduct are conclusive and would likely change the result on retrial.

35

EP IGLESIAS Sub Resp 000914

149. First, there is a specific, sustained pattern of Detective Guevara manipulating Francisco Vicente to falsely implicate innocent men. Of the four other men that Francisco Vicente implicated, three (Montanez, Serrano, and Pacheco) have been exonerated. *See supra* ¶¶ 53-57. As to the fourth individual (Robert Bouto), the city has concluded he is innocent, Guevara manipulated testimony, and Vicente testified falsely. (Ex. 7 (Bouto Report)).

150. Second, in order to corroborate Iglesias' *repeated* claims of innocence, *see supra* ¶¶ 32, 35, 39, 44, Attorney Deleon's entire trial theory was that Detective Guevara and Francisco Vicente were lying. *See* ¶¶ 39-40; T. W22-24. Needless to say, if Attorney Deleon had available to him the overwhelming evidence presented in this petition that (a) Detective Guevara and Francisco Vicente are liars who have repeatedly lied under oath, (b) Guevara won't stand by his work in this or any other investigation, and (c) Guevara has a specific pattern of rigging identification procedures and witness statements and forcing individuals to stand by this false testimony in court, there is no possibility that Iglesias would have been convicted.

151. The evidence of the pattern of Detective Guevara's misconduct is a stain on this city. In cases like this one, where Detective Guevara's credibility is paramount because he was responsible for closing the case, the convictions cannot stand. This is especially so in this case, which utilized Guevara's same, willing informant that we now know provided false statements against four other innocent individuals. Accordingly, this Court must vacate Petitioner Iglesias' conviction.

36

EP IGLESIAS Sub Resp 000915

**LEGAL CLAIM II:**

**ACTUAL INNOCENCE**

152.    Petitioner Iglesias incorporates each of the preceding paragraphs as though fully restated herein.

153.    To establish a claim of actual innocence under the Post-Conviction Hearing Act, a petitioner must set forth evidence that is new, material, noncumulative, and of such conclusive nature that it would probably change the result on retrial. *People v. Coleman*, 2013 IL 113307, ¶ 84. In *People v. Tyler*, 2015 IL App (1st) 123470, ¶¶ 189, 200, the First District Appellate Court held that "evidence of systemic police misconduct is sufficient to support defendant's claim of actual innocence" under the Post-Conviction Hearing Act. Based on allegations of police misconduct alone, the *Tyler* court remanded for an evidentiary hearing on petitioner's actual innocence claim. *Tyler* at ¶¶ 200-02. *See also Almodovar* at ¶¶ 77-79 (concluding it need not rule on the issue but stating that "a strong argument could be made" that petitioner's allegations relating to Detective Guevara would satisfy the actual innocence standard in light of the questionable inculpatory evidence and the import of Guevara's credibility).

154.    Iglesias has steadfastly maintained his innocence, claims now supported by the overwhelming evidence of Guevara's misconduct. In addition, the State's crucial witness, Francisco Vicente, has recanted and explained that Detective Guevara manipulated him into falsely implicating innocent people. (Ex. 5). Guevara himself has refused to answer questions about his investigation in this case in order to avoid potentially incriminating himself. (Ex. 1). The circumstances of the eyewitness identifications in this case have always been dubious, and with this newly discovered evidence, we now have an explanation as to why: They were

37

EP IGLESIAS Sub Resp 000916

manipulated by a corrupt detective who, in Attorney Deleon's own words, was a "liar" who used any means necessary to get convictions. (T. W22-23).

155. Based on these grounds and the allegations and reasons indicated throughout this pleading, Petitioner is entitled to relief on his claim of actual innocence. All of this evidence is new, material and noncumulative, and conclusive. *See Coleman*, 2013 IL 113307, ¶ 84.

**LEGAL CLAIM III:**

### *BRADY V. MARYLAND* DUE PROCESS VIOLATIONS: 5TH AND 14TH AMENDMENTS, U.S. CONSTITUTION; ARTICLE 1, SECTION 2, ILLINOIS CONSTITUTION

156. Petitioner Iglesias incorporates each of the preceding paragraphs as though fully restated herein.

157. A petitioner establishes a *Brady* violation by showing that (1) undisclosed evidence by the State is favorable to the accused because it is either exculpatory or impeaching; (2) the evidence was suppressed by the State either willfully or inadvertently; and (3) the accused was prejudiced because the evidence is material to guilt. *People v. Beaman*, 229 Ill. 2d 56, 74 (2008). A *Brady* error is never harmless. *Id.*

158. Based upon the same factual allegations, Iglesias is entitled to relief under the Post-Conviction Hearing Act that the State violated his rights by withholding *Brady v. Maryland* evidence of Guevara's investigative misconduct. Any and all of the allegations outlined in paragraphs 53-136 of this pleading that pre-dated Iglesias' trial were *Brady* material that was required to be disclosed. *See Mitchell* at ¶¶ 71-72 (explaining that under *Kyles v. Whitley*, 514 U.S. 419 (1995), knowledge by any agents of the State, such as police officers, is imputed to the State); *People v. Wrice*, No. 82 C 865503, Order of January 25, 2013, at 5-6 (Clay, J.), attached as Ex. 59 (petitioner's *Brady* claim that the State failed to disclose exculpatory evidence

38

regarding systemic abuse at Area 2 Police Headquarters warrants an evidentiary hearing); *People v. Smith*, No. 83 C 769 (02), Tr. of Proceedings at 6, July 17, 2014 (Reddick., J), attached as Ex. 60.

159.    Obviously, Detective Guevara was aware that he engaged in investigative misconduct in these instances (indeed, he has taken the Fifth in relation to these allegations), including in this case (again, he took the Fifth), and this information therefore is imputed to the State and falls under the rubric of *Brady. But see People v. Orange*, 195 Ill. 2d 437, 456-58 (2001); *People v. Mahaffey*, 194 Ill. 2d 154, 171-74 (2000) (rejecting the argument that "*Brady* requires the prosecution to disclose information about misconduct in unrelated cases known only to individual police officers where the nexus between the other cases of alleged abuse and the defendant's case was not known until years after the defendant's trial").

## V.    CONCLUSION

160.    For the reasons stated herein, Petitioner Iglesias respectfully requests this Court vacate his conviction.

161.    Petitioner specifically reserves the right to further supplement this Amended Petition.

Respectfully Submitted,

One of Petitioner's Attorneys

Russell Ainsworth
Steve Art
Anand Swaminathan
Joshua Tepfer
Exoneration Project (Atty No. 44407)
311 N. Aberdeen St., 3rd Floor
Chicago, IL 60607
312-789-4955

39

EP IGLESIAS Sub Resp 000918