# In The Matter Of:

*Maysonet v.*
*Guevara*

*Justino Cruz*
*November 1, 2019*



**RIZMANRAPPAPORT**
CERTIFIED COURT REPORTERS

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
T (973)992-7650 F (973)992-0666
www.rizmanrappaport.com
reporters@rizmanrappaport.com

*Min-U-Script® with Word Index*

GONZALEZ 000483

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOSE JUAN MAYSONET, JR.,          )
                                  )
          Plaintiff,              )
                                  )
     vs.                          ) No. 18 CV 02342
                                  )
REYNALDO GUEVARA, ERNEST          )
HALVORSEN, EDWARD MINGEY,         )
LEE EPPLEN, FERNANDO              )
MONTILLA, ROLAND PAULNITSKY,      )
FRANK DIFRANCO, CITY OF           )
CHICAGO and COOK COUNTY,          )
                                  )
          Defendants.             )

          The deposition of JUSTINO CRUZ, called by
the Plaintiff for examination, pursuant to notice and
pursuant to the Federal Rules of Civil Procedure for the
United States District Courts pertaining to the taking
of depositions, taken before Mary Maslowski, Certified
Shorthand Reporter and Notary Public within and for the
County of Cook and State of Illinois at 141 West Jackson
Boulevard, Suite 1240A, Chicago, Illinois, commencing at
the hour of 10:32 o'clock on November 1, 2019.

GONZALEZ 000484

2

A P P E A R A N C E S:

BONJEAN LAW GROUP, PLLC
BY MS. JENNIFER BONJEAN and MS. ASHLEY COHEN
467 Saint Johns Place
Brooklyn, New York 11238
(718) 875-1850
jennifer@bonjeanlaw.com
ashley@bonjeanlaw.com

        and

GREENBERG TRIAL LAWYERS
BY MR. STEVEN A. GREENBERG
53 West Jackson Boulevard, Suite 1260
Chicago, Illinois 60604
(312) 399-2711
steve@greenbergcd.com

        On behalf of Plaintiff;

LEINENWEBER BARONI & DAFFADA, LLC
BY MR. JUSTIN L. LEINENWEBER
120 North LaSalle Street, Suite 2000
Chicago, Illinois 60602
(312) 380-6635
justin@ilesq.com

        On behalf of Defendant Reynaldo Guevara;

THE SOTOS LAW FIRM, P.C.
BY MR. JOSH M. ENGQUIST
141 West Jackson Boulevard, Suite 1240A
Chicago, Illinois 60604
(312) 735-3303
jengquist@jsotoslaw.com

        On behalf of Defendants Ernest Halvorsen,
        Edward Mingey, Lee Epplen, Fernando Montilla
        and Roland Paulnitsky;

GONZALEZ 000485

3

A P P E A R A N C E S: (Cont'd.)

ROCK FUSCO & CONNELLY, LLC
BY MS. EILEEN E. ROSEN
321 North Clark Street
Chicago, Illinois 60654
(312) 494-1000
erosen@rfclaw.com

On behalf of the Defendant City of Chicago;

ASSISTANT STATE'S ATTORNEY OF COOK COUNTY
BY MR. EDWARD M. BRENER
500 Richard J. Daley Center
Chicago, Illinois 60602
(312) 603-5971
edward.brener@cookcountyil.gov

On behalf of Defendants Frank DiFranco and
Cook County;

DVORAK LAW OFFICES, LLC
BY MR. ADRIAN BLEIFUSS PRADOS
900 West Jackson Boulevard, Suite 5W
Chicago, Illinois 60607
(630) 568-3190
adrianbp@civilrightsdefenders.com

On behalf of the Witness.

CSR License No. 084-003278.

GONZALEZ 000486

4

I N D E X

| WITNESS | DX | CX | _RDX | RCX |
|---|---|---|---|---|

JUSTINO CRUZ

By Ms. Bonjean                       5

By Ms. Rosen                              111

By Mr. Engquist                           242

By Mr. Leinenweber                        253

By Mr. Brener                             271


E X H I B I T S

| DEPOSITION EXHIBIT | MARKED FOR ID |
|---|---|
| No. 1 | 5 |
| No. 2 | 5 |
| No. 3 | 33 |
| No. 4 | 59 |
| No. 5 | 62 |
| No. 6 | 80 |
| No. 7 | 87 |
| No. 8 | 103 |
| No. 9 | 115 |
| No. 10 | 219 |
| No. 11 | 222 |

GONZALEZ 000487

5

(Whereupon Deposition Exhibit Nos. 1 and 2 were marked for identification prior to the commencement of testimony.)

JUSTINO CRUZ,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. BONJEAN:

Q    Good morning, Mr. Cruz.

A    Good morning.

Q    My name is Jennifer Bonjean and I represent the plaintiff, Jose Maysonet, in a federal civil action that's pending in the United States District Court for the Northern District of Illinois.  Are you aware of that?

A    No.

Q    Okay.  Well, the name of the case is Maysonet vs. Guevara, et al. and it's pending in federal court here in the city of Chicago, okay?

A    (Nodding).

Q    Do you know Jose Maysonet?

A    Yes.

Q    We're here today so that the parties, with me starting off, can take your deposition. Do you know what a deposition is?

GONZALEZ 000488

6

A    Yes.

Q    And have you ever had your deposition taken before?

A    Don't remember.

Q    I'm going to ask you questions related to the underlying events that were related to your arrest and prosecution for the Wiley brothers murders.  You understand that, right?

A    Yes.

Q    And the court reporter is going to be taking down my questions and she's going to be taking down your answers, okay?

A    (Nodding).

Q    It's important that we not talk over each other because she can't take us down talking at the same time.  So I'd ask that you let me finish my question before you answer it, okay?

A    Okay.

Q    And I will do my best -- it's really more my issue -- to try not to step on your answers, okay?

A    (Nodding).

Q    I know these events took place in

GONZALEZ 000489

7

some respects over 30 years ago, so I'm going to ask you to do your best to recollect. If at any time you need to estimate or approximate an answer, that's fine. Just let me know that you're doing that, okay?

A     (Nodding).

Q     Understand?

A     Yes.

Q     And it's important that you answer yes or no or audibly to all of my questions because the court reporter can't take down you shaking your head yes or no, okay?

A     Okay.

Q     That being said, I don't want you to guess. So if you don't know an answer to the question, that's a perfectly acceptable response as well, okay?

A     Okay.

Q     If you don't understand one of my questions, will you let me know?

A     Okay, yes.

Q     And I'll try to rephrase it so you do, okay?

A     (Nodding).

Q     If at any point you need a break,

GONZALEZ 000490

8

you certainly can have a break.  I'd just ask that if I have a question pending, that you answer it and then you let me know you need a break and you can confer with your counsel, okay?

A    Okay.

Q    Or if you need a bathroom break. Let's see.  Do you understand, sir, that you're under oath today?

A    Yes.

Q    And that oath means that you're going to tell the truth, to the best of your ability?

A    Yes.

Q    All right.  Give me one second and we'll get started.  Can you please state your full legal name for the court reporter.

A    Yes, Justino Cruz.

Q    And how do you spell your last name?

A    C-r-u-z.

Q    Do you have a nickname, Justino?

A    Tino.

Q    Tino.  Did you ever go by the nickname or name Chris Cruz?

A    No.

Q    How old are you, Mr. Cruz?

A    50.

GONZALEZ 000491

9

Q    And what is the highest level of education you have received?

A    College.  I mean, I got an associate degree when I was locked up.

Q    Okay.  Did you graduate high school?

A    Yes.

Q    Or did you get a GED?

A    No, I graduated.

Q    And what high school did you graduate from?

A    Clemente High School.

Q    And what year did you graduate high school?

A    '88.

Q    What's your birthday?

A    2/16/69.

Q    And where did you go to grade school?

A    Don't remember.

Q    Okay.  Did you grow up in Chicago?

A    Yes.

Q    What area or what neighborhood?

A    Humboldt Park.

Q    Do you have any siblings?

A    Yes.

Q    Who are your siblings?

GONZALEZ 000492

10

A   Efrain Cruz, Luis Cruz, Nancy Cruz, Yolanda Cruz and Rosie Sanchez.

Q   So you have a big family it sounds like?

A   Yes.

Q   Where did you and Efrain Cruz fall in the -- in terms of age?  Are you older?  Is he older?

A   Who?

Q   Efrain.

A   Oh, Efrain?

Q   Oh, my apologies.  Efrain, yes.

A   Efrain's my older brother.

Q   Efrain's your older brother.  Where do you currently live?  And you don't have to give an exact address.  Just generally.

A   Franklin Park.

Q   How long have you lived there?

A   Sixteen years.

Q   And with whom do you live in Franklin Park?

A   With my wife.

Q   Do you have any children?

A   Yes.

Q   How many?

A   Two.

GONZALEZ 000493

11

Q    How long have you been married?

A    Twelve years.

Q    Do you work?

A    Yes.

Q    Where do you work?

A    Acme Industry.

Q    Can you spell that?

A    A-c-m-e.

Q    And what do you do for Acme Industry?

A    Shipping and receiving.

Q    How long have you worked for Acme?

A    Seven years.

Q    And prior to working for Acme did you work anywhere else?

A    Yes.

Q    Where is that, if you remember?

A    When I was -- I don't remember because they changed their name.

Q    Okay, understood.  What type of work were you doing before you worked in shipping and receiving with Acme?

A    Same thing.

Q    Now, Mr. Cruz, you went to prison in connection with the Wiley brothers murders, right?

GONZALEZ 000494

12

A    Yes.

Q    What year were you released from prison?

A    2001.

Q    Do you remember what month it was?

A    April.

Q    So April 2001 you were released from prison, is that right?

A    Yes.

Q    And after you were released from prison in April of 2001, where did you live?

A    Don't remember the address.

Q    What city, though?

A    Oh, it was in Chicago.

Q    It was in Chicago.  And did you live with family or who did you live with?

A    My wife.

Q    Okay.  Did you get married while you were in prison?

A    No.

Q    So what year did you get married?

A    2003.

Q    So she was a girl friend, is that right?

A    Yes.

Q    Got it.  So you moved in with your girl friend when you got out of prison?

GONZALEZ 000495

13

A      (Nodding).

Q      And you lived in Chicago for some time?

A      Yes.

Q      And then it sounds like you then moved to Franklin Park?

A      Yes.

Q      When you got out of prison, did you work or try to work immediately?

A      Yes.

Q      You've been out of prison it looks like close to about 18 years, something like that?

A      Yes.

Q      Have you been back to prison since then?

A      No.

Q      And have you worked fairly consistently from the time that you were released from prison until today?

A      Yes.

Q      Have you been involved in any gang activity since you were released from prison until today?

A      No.

Q      When was the last time you spoke to Jose Maysonet?

A      I don't remember.

GONZALEZ 000496

14

Q    Is it in the last 15 years?

A    No.

Q    Did you speak with him when you were in prison?

A    No.

Q    Have you spoken to him since you got out of prison?

A    No.

Q    It's possible you spoke to him in the Cook County Jail at some point?

A    No.

Q    So pretty much since you've been arrested is the last time you spoke to him it sounds like?

A    Yes.

MS. ROSEN:  Objection, form.

BY MS. BONJEAN:

Q    Can you remember a time that you've spoken to him since you were arrested in 1990?

A    No.

Q    I'm going to hand you what's been marked as Exhibit 1.

MS. BONJEAN:  It's his affidavit.

MS. ROSEN:  Okay.

GONZALEZ 000497

15

BY MS. BONJEAN:

Q    Mr. Cruz, I'm going to have you look at what's been marked as Exhibit 1.  It's a one-page document, but it's double-sided so you can look at both sides.  Do you recognize this document?  And you can turn it over.

A    Yes.

Q    Is that your signature on the back there?

A    Yes.

Q    And is this an affidavit that you prepared in connection with Alfredo Gonzalez's case?

A    Yes.

Q    Who is Alfredo Gonzalez?

A    My uncle.

Q    All right.  And how is he your uncle exactly?

A    My mother's brother.

Q    Got it.  And do you know when -- well, it says you prepared this affidavit in January of 2018, is that correct?

A    Yes.

Q    All right.  How often do you speak to your uncle, Alfredo Gonzalez?

GONZALEZ 000498

16

A    I don't.

Q    When's the last time you spoke to him?

A    Don't remember.

Q    Would it have been around the same time that you spoke to Mr. Maysonet?

A    Don't remember.

Q    Have you spoken to him since you were released from prison?

A    No.

Q    Did you have an opportunity to speak to him while you were in prison?

A    No.

Q    So you know for a fact you didn't speak to him while you were in prison, right?

A    No.

Q    And you know you have not spoken to him since you were released from prison?

A    No.

Q    That's correct, right?

A    Yes.

Q    I want to go through your affidavit with you, if I could, okay?  At the time that you prepared this affidavit you were -- a couple years ago you were 48 years old it looks like, right?

GONZALEZ 000499

17

A    Yes.

Q    All right.  And specifically No. 7, you swore in this affidavit -- and I'm going to quote you -- "I did not participate in or witness the murders of the Wiley brothers on May 25, 1990."  Do you see that?

A    Yes.

Q    Is that a true statement?

A    Yes.

Q    Okay.  Did you witness the murders of the Wiley brothers on May 25, 1990?

A    No.

Q    Did you participate in the murders of the Wiley brothers in 1990?

A    No.

Q    I want to draw your attention to the next -- or No. 9.  It says on August 24, 1990 at approximately 5 a.m. I was arrested near the intersection of North Avenue and Kimball.  Do you see that?

A    Yes.

Q    Is that a true statement, sir?  Do you remember being arrested at around that time at North Avenue and Kimball?

A    I think the time is --

GONZALEZ 000500

18

Q    The time's a little off?

A    Yeah.

Q    It does say approximately.  What's your recollection of when you were arrested?

A    It was around 6 p.m.

Q    Oh, you think it was earlier?  I mean --

A    No, later.

Q    Later?

A    Yeah.

Q    Okay.  So you think this time is not exactly correct?

A    Yeah.

Q    Okay.  No. 10 it says, "Before he began interrogating me, Detective Guevara did not inform me that I had the right to contact an attorney."  Do you see that?

A    Yes.

Q    Did Detective Guevara tell you you had the right to an attorney?

A    No.

Q    No. 11, again, it says Detective Guevara threatened you.  Did he threaten you?

A    Yes.

        MR. ENGQUIST:  Objection, leading.

GONZALEZ 000501

19

BY MS. BONJEAN:

Q    And it also says, "Detective Guevara threatened me and told me I had killed the Wiley brothers."  Did Detective Guevara tell you you had killed the Wiley brothers?

MR. ENGQUIST:  Objection, leading.

A    Yes.

BY MS. BONJEAN:

Q    It says in your affidavit, "At the time I had no idea who the Wiley brothers were and had no knowledge of any murders committed on May 25, 1990."  Do you see that?

A    Yes.

Q    Sir, did you have any knowledge about the murders of the Wiley brothers when you were arrested?

A    No.

MR. ENGQUIST:  Objection, leading.

BY MS. BONJEAN:

Q    Did Detective Guevara tell you that Mr. Maysonet and Mr. Gonzalez had implicated you or pointed the finger at you in connection with those murders?

A    Yes.

Q    Did Detective Guevara threaten to arrest

GONZALEZ 000502

20

members of your family unless you provided a statement?

A    Yes.

Q    Did he strike you multiple times?

A    Yes.

Q    And I'm going to ask you for some further detail, but I just wanted to go through your affidavit first to make sure that it was accurate, okay?

A    Um-hmm, yes.

Q    Did Detective Guevara tell you that he would let you go and speak to an attorney if you just went along with what he was telling you to say?

A    Yes.

Q    Did Detective Guevara provide you the story that he wanted you to go along with and then tell you that, you know, you'd be able to work it out after you were released?

A    Yes.

MR. ENGQUIST:  Objection, leading.

BY MS. BONJEAN:

Q    How were your reading skills at the time that you gave a statement to Detective Guevara?

A    Not that good.

GONZALEZ 000503

21

Q    And how about your English, how was it?

A    So-so.

Q    Okay.  You can put it aside for now, and then we'll get back to some of these questions.

A    (Witness complies).

Q    I do want to bring you back to around this time period of May of 1990, okay?

A    Okay.

Q    You would have been 21 years old, sound right?

A    Yes.

Q    Where did you live in May of 1990? You don't have to give an exact address, but do you know like an intersection?

A    North Avenue and Kedzie.

Q    North Avenue and Kedzie?

A    Yeah.

Q    Would that be Humboldt Park?

A    Yes.

Q    And with whom did you live in May of 1990?

A    With Efrain Cruz.

Q    That's your brother?

A    Yes.

Q    Were you working at the time that you

GONZALEZ 000504

22

were arrested in May of 1990?

A    Yes.

Q    Where were you working?

A    In a printing shop.

Q    What type of work were you doing?

A    Printing checks.

Q    Okay.  Now, were you a member of the Latin Kings street gang at that time, May of 1990?

A    Yes.

Q    And I take it your brother was as well, right?

A    Yes.

Q    And did you know Jose Maysonet?

A    Yes.

Q    And, again, the time frame I'm talking about is May of 1990, right?

A    Yes.

Q    Did you know Jose Maysonet as a fellow member of the gang?

A    Yes.

Q    What about Alfredo Gonzalez, your uncle?

A    Yes.

Q    Okay.  Did you know Christopher Goosens back in May of 1990?

GONZALEZ 000505

23

A    Don't know the name.

Q    Okay.  Let me ask you this.  You said you did know, of course, Efrain Cruz.  What about Francisco Varas, did you know a Francisco Varas or Cisco?

A    Yes.

Q    Was he also a member of the Latin Kings street gang?

A    Yes.

Q    Were you all part of the same sort of sect or division, if you will, of the gang?

A    Yes.

Q    What about a person by the name of -- who went by either Jeffrey or Black Jeffrey, did you know him?

A    Yes.

Q    Okay.  Was he also a member of the Latin Kings street gang?

A    Yes.

Q    Was he part of your sect?

A    Don't remember.

Q    Okay.  Now, Christopher Goosens, was he part of your sect of the Latin Kings street gang?

MS. ROSEN:  Objection, foundation.  He said he doesn't know that name.

GONZALEZ 000506

24

BY MS. BONJEAN:

Q   You can answer.

A   I don't remember that name.

Q   What about the nickname Fro?

A   I know a lot of Fros.

Q   We do too actually.  He would have been Fro who was, I would say, more dark complected?

MS. ROSEN:  Objection, form.

A   Don't remember.

BY MS. BONJEAN:

Q   Okay.  Did you know a Fro that was a dark-complected Hispanic or maybe half Hispanic individual?

A   Yes.

Q   Okay.  And where did you know him from?

A   From the neighborhood.

Q   Okay.  Was he in your sect of the Latin Kings?

A   No.

Q   Okay.  Do you know whether he was a Latin King?

A   Yes.

Q   And do you know what area he was from?

A   No.

Q   But he wasn't someone that you knew

GONZALEZ 000507

25

from your group, right?

A     No.

Q     How about Santiago Sanchez, did you know him?

A     No.

Q     He went by the nickname Macho?

A     Don't remember.

Q     Okay.  When was the first time that you learned anything about the Wiley brothers murders?

A     When I got locked up.

Q     When you got arrested?

A     Yes.

Q     So prior to your arrest had you heard even anything on the street about these two African-American men that had been shot on North Avenue?

A     No.

Q     Now, we talked about this.  According to police reports you were arrested on the morning of August 24, 1990.  Is that your recollection?

A     It was in the evening.

Q     You believe it was in the evening?

A     Yeah, because -- yes.

Q     Okay.  Where were you when you were

GONZALEZ 000508

26

arrested?

A    On the corner of North Avenue and Homan.

Q    Were you near your home?

A    No, I was at the bus stop.

Q    And what were you doing?

A    I was going to take the bus to go to work.

Q    And what time did you start work?

A    Hopefully around 8 o'clock.

Q    All right.  And who arrested you?

A    Officer -- I don't remember his name.

Q    Describe him.

A    Latino.

Q    Guevara?

A    Yeah, and --

        MS. ROSEN:  Object to the leading.

A    And another officer, a white officer.

BY MS. BONJEAN:

Q    Did it appear that they were partners?

        MS. ROSEN:  Objection, form, foundation.

A    Yes, they were in the car together.

BY MS. BONJEAN:

Q    Well, let me ask it this way.  Were they
in plainclothes?

A    Yes.

Q    Were they detectives?

GONZALEZ 000509

27

A    Yes.

Q    One of them was Latino?

A    Yes.

Q    And another one was a white officer?

A    Yes.

Q    And how was it that they arrested you?  Strike that.  Let me ask it differently. You were standing at the bus stop you said?

A    Yes.

Q    Did they come together in a car?

A    Yes.

Q    Or were they on foot?

A    In a car.

Q    All right.  Now, did you voluntarily or willingly go with Detectives Guevara and Halvorsen?

A    No.

MR. ENGQUIST:  Objection, form.

MR. LEINENWEBER:  Objection, form, foundation, totally leading.

MS. BONJEAN:  What?

MS. COHEN:  You said Halvorsen.

MS. BONJEAN:  Oh, did I?  My apologies.

Q    You remember the Latino detective, right?

GONZALEZ 000510

28

A    Yes.

Q    You don't know who the other detective was, right?

A    He was a white guy who was with him.

Q    Was he in plainclothes or in uniform?

A    Plain -- they were both with a more plain uniform.

Q    So did you go voluntarily with Detective Guevara and the other plainclothes detective who happened to be a white man?

A    No.

Q    All right.  What if anything did either of those detectives say to you when they pulled up when you were standing at the bus stop?

A    They asked if I was Justino Cruz.

Q    And what did you say?

A    Yes.

Q    Had you ever seen Detective Guevara before?

A    No.

Q    Had you ever seen the other detective before?

A    No.

Q    All right.  And after they pulled up and said were you Justino Cruz, what did you

GONZALEZ 000511

29

say?

A    Yes.

Q    And what did either one of those individuals, Detective Guevara or the other detective, say to you at that time?

A    Don't remember.

Q    What did they do?

A    They jumped out of the car and arrested me.

Q    Did they put you in handcuffs?

A    Yes.

Q    Okay.  Did they tell you why they were handcuffing you?

A    For some questioning.

Q    Did they tell you what they were going to question you about?

A    No.

Q    Did you have any idea why they were going to arrest you --

A    No, no.

Q    Did you have any idea why they were handcuffing you and indicating that they were going to question you?

A    No.

Q    Did they tell you that it was related to any type of murders or anything like that at

GONZALEZ 000512

30

the time?

A    No.

Q    So where did they put you, in the car?

A    Yes.

Q    And where did you go after they handcuffed you and put you in the car?

A    Grand and Central.

Q    Had you been in Grand and Central before?

A    No.

Q    Now, when you got to Grand and Central, where were you placed?

A    In a holding room.

Q    Were you alone or were you with anyone?

A    Alone.

Q    Did you see anyone else in custody at Grand and Central?

A    No.

Q    For instance, did you see Jose Maysonet after you were brought to Area 5?

A    No.

Q    Did you see Alfredo Gonzalez after you were brought to Area 5?

A    No.

Q    So you were placed in a holding area?

GONZALEZ 000513

31

A    Yes.

Q    Did you remain handcuffed?

A    Yes.

Q    And can you describe the room that you were brought to, to the best of your recollection?

A    Just a little small room with a bench. I was handcuffed to the wall.

Q    Was there like a hook on the wall?

A    Don't remember.

Q    But you remember being handcuffed to the wall?

A    Yes.

Q    Both hands or one?

A    Just one.

Q    And after you were brought to Area 5 and placed in this holding room where you were handcuffed to the wall, did they tell you at that point why you had been arrested?

A    No.

Q    Eventually at some point they told you why you had been arrested, right?

A    Yes.

        MR. ENGQUIST:  Objection, form.

GONZALEZ 000514

32

BY MS. BONJEAN:

Q    After you were brought into this holding area, where did Detective Guevara and the other detective go, if you know?

A    Don't know.

Q    Did they leave you there?

A    Yes.

Q    How long were you left there?

A    Don't remember.

Q    Was it some period of time?

A    Yes.

Q    Were you wondering why you were in custody?

A    Oh, yes.

Q    Were you scared?

A    Yes.

Q    Did you continue to -- oh, by the way, did you speak to Guevara in Spanish or English?

A    English.

Q    Did he give you a phone call or tell you you could call anyone?

MS. ROSEN:  Objection to form.

A    No.

GONZALEZ 000515

33

BY MS. BONJEAN:

Q    All right.  So what's the next thing that happened after you were handcuffed in a holding area at Area 5?

A    Couple of hours later they walked into the room.

Q    And you're talking about Guevara?

A    Yes.

Q    And was it the same white detective?

A    Yes.

Q    The two of them?

A    (Nodding).

MS. BONJEAN:  Can you mark this.

(Whereupon Deposition Exhibit No. 3 was marked for identification.)

Q    Okay.  Mr. Cruz, I'm having you look at what's been marked as Exhibit 3.  Have you ever seen this supplemental report before?

A    Don't remember.

MR. LEINENWEBER:  I'm sorry.  Can I ask you to clarify?  You said Exhibit 2 or Exhibit 3?

MS. BONJEAN:  It's 3.  I premarked 2.

MR. LEINENWEBER:  Oh, okay.

MS. BONJEAN:  Sorry.

MR. ENGQUIST:  Oh, this is 3?

GONZALEZ 000516

34

MS. BONJEAN: Yeah, it's going to be 3. Sorry. I deviated, which is why I never premark.

MR. ENGQUIST: Just to be clear, it's two sup reports, right?

MS. BONJEAN: Yeah, it's two sup reports.

MR. ENGQUIST: Okay.

MR. LEINENWEBER: What was your question? I'm sorry.

MS. BONJEAN: I asked him whether he'd ever seen this supplemental report before.

MR. LEINENWEBER: Thank you.

BY MS. BONJEAN:

Q    And your answer was?

A    Don't remember.

Q    You don't remember ever seeing it. Do you see your name on -- about halfway down it says In Custody, Justino Cruz?

A    Yes.

Q    And do you see below that it says Arresting Officers?

A    Yes.

Q    I would like you to turn to the next page. Actually, it would be the third page of this document and it's Bates stamped RFC Maysonet 44.

GONZALEZ 000517

35

MS. BONJEAN: Adrian, I don't know if you want to help him get there. I don't know if he knows what a Bates stamp -- it's in the right-hand corner there. Yeah, you've got it.

Q    I want to draw your attention about halfway down where it says at 330 hours?

A    Yes.

Q    Are you able to follow along with me?

A    Yes.

Q    Okay. It says at 330 hours -- and that is -- it's military time, so that would be 3:30 a.m. in the morning -- on August 24, 1990 detectives located Justino Cruz a/k/a Chris Cruz. Do you see that?

A    Yes.

Q    Did you also have an alias by the name of Chris Cruz?

A    No.

Q    Do you know why whoever prepared this report believed that you had an a/k/a or an alias as Chris Cruz?

A    No.

MS. ROSEN: Objection, foundation.

BY MS. BONJEAN:

Q    And it says located you on the street

GONZALEZ 000518

36

at Kimball and North Avenue.  Is the location correct?

A    Yes.

Q    Is that where you were waiting for the bus?

A    Yes.

Q    It says he was known on sight by Detective Guevara.  Cruz was informed of the statements given by Jose Maysonet and Alfredo Gonzalez implicating him in these murders.  Is that true?  Did they tell you at the bus stop that you had been implicated for murders by Jose Maysonet and Alfredo Gonzalez?

MR. LEINENWEBER:  Objection to form, foundation.

MR. ENGQUIST:  Join.

BY MS. BONJEAN:

Q    "Cruz stated that it was a lie and agreed to come to Area 5 and confront his accusers."  Did you agree to go to Area 5 and confront your accusers when you were arrested on August 24, 1990?

A    No.

Q    This report also indicates that after you arrived at Area 5 it says, next paragraph,

GONZALEZ 000519

37

Justino Cruz was seen by both Alfredo Gonzalez and Jose Maysonet and identified by both of these persons as Tino, as being the Tino they spoke of. Did you see Gonzalez and Maysonet at Area 5?

A    No.

Q    And then it says on August 24, 1990 at 5 a.m. Justino Cruz was arrested for these murders, but due to the late hour Cruz was allowed to sleep in an interview room at Area 5. Did Detective Guevara allow you to sleep in the cozy accommodations of Area 5?

A    No.

MS. ROSEN:  Object to the form, foundation.

MR. ENGQUIST:  Form.

BY MS. BONJEAN:

Q    Were you able to sleep?

A    No.

Q    So you can put that aside for the moment.  We probably will return to that.

A    (Witness complies).

Q    So you previously testified that when you were in this holding area, eventually Detective Guevara and another white detective came back a couple hours later I think is what you said, is that right?

GONZALEZ 000520

38

A    Yes.

Q    Tell me when they came back, what if anything did either of those detectives say to you?

A    They started asking me questions.

Q    And did Detective Guevara ask you questions?

A    Yes.

Q    And did the white detective ask you questions too?

A    Yes.

Q    Okay.  And can you tell me what Detective Guevara asked you?

A    I don't remember.

Q    Well, what was -- do you remember generally what they were saying?

A    That I was going to be arrested for murder.

Q    And did they say who the murder was that you were going to be arrested for?

A    Don't remember.

Q    What about the white detective, did he say anything specific that you can recall?

A    No.

Q    And when they said you were going to be arrested for murder, what did you say back to

GONZALEZ 000521

39

them?

A    I don't know what you're -- they were talking about.

Q    And did you tell them you didn't know what they were talking about?

A    Yes.

Q    And what did they say when they told you -- when you told them I don't know what you're talking about?

A    I don't remember.

Q    Well, what did they do?

A    Don't remember.

Q    Okay.  Well, in your affidavit, as you recall -- as you said in your affidavit, at some point you were threatened by Detective Guevara, right?

A    Yes.

MS. ROSEN:  Object to the form.

MR. ENGQUIST:  Leading.

MS. BONJEAN:  Well, I'm --

Q    Did they leave -- how long were they in the interrogation room with you or the holding room when they first came in?  Strike that.  How long were they with you in that interview room after they came in after --

GONZALEZ 000522

40

A     Couple hours.

Q     Okay.  How long -- I'm sorry.  Say that again?

A     Couple hours.

Q     And how long did they stay in there with you?

A     Couple hours.

Q     Were they coming in and out or were they in there for two hours straight or what?

A     Two hours straight.

Q     They were in there for two hours straight?

A     (Nodding).

Q     And what was being said?

A     Asking questions.

Q     Okay.  And what types of questions were they asking you?

A     Don't remember.

Q     Okay.  Well, were they asking you about the murders?

A     Yes.

MS. ROSEN:  Object to the form.

A     About, yeah, the murders.

BY MS. BONJEAN:

Q     Well, generally what do you remember?

41

I mean --

A    Them asking me questions about the murder.  They said that Alfredo and Juan Maysonet said I was there with them.  I tell them I don't know what they were talking about.

Q    Okay.  And did at any point Detective Guevara do anything against you or with -- any sort of physical act towards you?

MS. ROSEN:  Object to form.

A    Yeah, he grabbed me through the throat.

BY MS. BONJEAN:

Q    He what?

A    He grabbed me through the throat.

Q    He did?

A    Yeah.

Q    And when he grabbed you through the throat, what did he say, if anything?

A    That I murdered two guys.  I said I don't know what you're talking about.

Q    And did he do anything else after he grabbed you by the throat?

A    He hit me in my left ear.

Q    And how did he hit you in your left ear?

A    Slapped me.

Q    And were you surprised by that?

GONZALEZ 000524

42

A    Yes.

Q    And were you frightened?

A    Yes.

Q    And what was the white detective doing when he was doing this?

A    Just sitting there.

Q    Did he do anything, like say, hey, stop, Guevara?

A    No.

Q    And when he hit you or was choking you --

MR. ENGQUIST:  Objection to the form.

BY MS. BONJEAN:

Q    -- did he say anything?  Did Detective Guevara say anything when he was taking those actions against you?

MR. LEINENWEBER:  Object to form, asked and answered.

MS. ROSEN:  Object to form.

A    Just do you remember now what we're talking about?  I still don't know what you're talking about.

BY MS. BONJEAN:

Q    Okay.  And this went on for some time?

A    Yes.

GONZALEZ 000525

43

MS. ROSEN: Object to the form.

BY MS. BONJEAN:

Q How long? Can you approximate?

A Around two hours.

Q Okay. And during this two-hour period that Guevara was telling you do you remember now and either choking you or hitting you, what did you keep telling him?

MS. ROSEN: Object to the form.

A I don't remember what --

MR. LEINENWEBER: Objection to form, foundation.

A -- they're talking about. I got no understanding what they're talking about.

BY MS. BONJEAN:

Q And did you have any understanding of what they were talking about?

A No.

Q In what other ways did Detective Guevara threaten you?

MS. ROSEN: Object to the form.

MR. LEINENWEBER: Join.

A Threatened me about arresting my family members.

GONZALEZ 000526

44

BY MS. BONJEAN:

    Q   Did he tell you he would arrest your family members?

    A   Yes.

        MS. ROSEN:  Objection, asked and answered.

BY MS. BONJEAN:

    Q   Did he say that you were going to be charged?

    A   No.

    Q   What did he say with regards to charging anyone?

        MS. ROSEN:  Object to the form.

    A   Don't remember.

BY MS. BONJEAN:

    Q   What did he want you to do?

        MR. ENGQUIST:  Objection, foundation.

        MR. LEINENWEBER:  Foundation, form.

    A   Say that I was there, that I committed the murder with Alfredo and Juan Maysonet.

BY MS. BONJEAN:

    Q   And whatever words he used, how many times did he communicate to you that he wanted you to implicate or say that you did it with Juan Maysonet and Alfredo Gonzalez --

        MS. ROSEN:  Object to the form.

GONZALEZ 000527

45

BY MS. BONJEAN:

Q     -- if you remember?

MS. ROSEN:  Object to the form.

A     I don't remember.

MR. LEINENWEBER:  Objection, leading.

BY MS. BONJEAN:

Q     Was it more than once?

A     Yes.

Q     Was it multiple times?

A     Yes.

MS. ROSEN:  Object to the form.

BY MS. BONJEAN:

Q     Did he tell you that he wanted you to make a statement?

MS. ROSEN:  Object to the leading.

A     Yes.

BY MS. BONJEAN:

Q     I'm going to have you look at Exhibit 2.  Mr. Cruz, I'm going to have you look at what's been marked as Exhibit 2.  First of all, I'd like you to look at the first page where it says Statement of Justino Cruz.  Do you see that?

A     Yes.

Q     And it says on August 24, 1990 at

GONZALEZ 000528

46

2:45 p.m. Do you see that?

A Yes.

Q Is it your belief that you were in custody from -- or arrested actually the evening before, is that right?

MR. LEINENWEBER: Objection to form.

A Don't remember.

BY MS. BONJEAN:

Q Well, this says 2:45 p.m., right?

A Yes.

Q And you didn't write that, though, right?

A No.

Q And you said you were arrested at 6 o'clock p.m., right?

A Yes.

Q So obviously you were arrested before you made this statement, right?

A That's what they're saying.

Q Okay. You're suggesting --

MS. ROSEN: I'm sorry. What was your answer? What was his answer?

(Whereupon the portion of the record was read as requested.)

MS. ROSEN: Okay, thank you.

GONZALEZ 000529

47

BY MS. BONJEAN:

Q    You're saying that that's the time they're saying, right?

A    Yes.

Q    You don't know if that's accurate, though?

A    Yes.

Q    Fair enough.  I want you to look at the last page of it and see if you see your name or signature at the very end there where it says Justino Cruz.  Do you see that?

A    Yes.

Q    Do you remember signing this statement?

A    Don't remember.

Q    All right.  You didn't write it, though, right?

A    No.

Q    Would you agree that that's your handwriting at the end, though, that says Justino Cruz there?

A    That printing?

Q    Yeah.

A    Yes.

Q    Okay.  Now, I would like to go through the statement -- oh, and also, I'm sorry, if you

GONZALEZ 000530

48

look and see your -- on the first page it says Justino Cruz. Is that your printing right there?

A Yes.

Q It says, "After first being advised of his rights and stating he understood his rights, I told Justino Cruz that I am an assistant state's attorney." Do you remember sitting with an assistant state's attorney?

A Don't remember.

Q Okay. Do you remember being told that you had certain rights?

A Don't remember.

Q Okay. Do you know what Miranda rights are?

A No.

Q Were you told that you had the right to an attorney?

A No.

Q Were you told that you didn't have to speak to anybody if you didn't want to?

A No.

Q Were you told that if you wanted an attorney, an attorney would be made available to you?

A No.

GONZALEZ 000531

49

Q    Going to the second paragraph, second sentence it says, "He," being you, "further stated that on the evening of May 24, 1990 at about 11:30 p.m., Justino, Alfredo Gonzalez, Chris Hernandez and Jose Maysonet went to Jose's house at 1302 North Homan to pick up a gun."  Do you see that?

A    Yes.

Q    Is that a true statement?

A    No.

Q    Now, did you write that statement here?

A    No.

Q    The next sentence is, "They picked up the gun because Alfredo Gonzalez said they were going to do a shooting.  The gun was a 9 millimeter automatic" -- I think it says chrome.  I don't know what the word is before that but -- "pistol and Alfredo put it in his belt."  Did you -- is that a true statement?

A    No.

Q    And did you write that statement?

A    No.

Q    "The four men got into the car with Jose driving, Alfredo next to him, Chris seated behind Alfredo and Justino Cruz seated behind the

GONZALEZ 000532

50

driver."  Do you see that?

A    Yes.

Q    Did you write that statement?

A    No.

Q    And is that a true statement?

A    No.

Q    Justino stated that they drove around for a short while and stopped in the vicinity of North and St. Louis in the alley. Do you see that?

A    Yes.

Q    Did you write that statement?

A    No.

Q    And is that a true statement?

A    No.

Q    Chris Hernandez and -- I want to stop there.  Do you even know who Chris Hernandez is?

A    No.

Q    Chris Hernandez and Alfredo Gonzalez got out of the car with Justino.  Chris and Alfredo hooded up, meaning they put the hoods from the sweatshirts on their heads.  Justino stated this indicated that they will shoot or rob someone.  Chris and Alfredo approached two black guys in a vacant lot on North Avenue.

GONZALEZ 000533

51

Alfredo had the gun in his front pocket.  While Chris and Alfredo were talking to the black guys, Jose was in the car with the car running and Justino was watching their backs.  Did you write that?

A    No.

Q    Are any of those statements true?

A    No.

Q    Justino stated that he was making sure no one, including the police, approached from the alley.  Justino said he heard five to six shots and saw Chris and Alfredo running from the car.  Alfredo had the gun in his hand. Justino said he jumped in the car and they drove away.  He stated he went home.  Do you see that?

A    Yes.

Q    Did you write any of those statements?

A    No.

Q    And are any of those statements true?

A    No.

Q    Justino stated that he had been treated well by the police and the state's attorneys. Was that true?

A    No.

Q    Did you write that statement?

GONZALEZ 000534

52

A    No.

Q    Were you treated well by the police?

A    No.

Q    He was given something to eat and drink and he was allowed to use the bathroom. He said no one had coerced or threatened him in any way to give this statement. Justino said he gave this statement because it is the truth. Did you write that?

A    No.

Q    And was the statement the truth?

A    No.

Q    Justino, why did you sign this statement if it wasn't true?

A    I was threatened.

Q    And who were you threatened by?

A    By the officers.

Q    And which ones specifically?

A    The Latino.

Q    And do you know whether or not there were any other detectives involved in -- well, strike that. Do you remember reading this statement when you signed it?

A    No.

Q    Were you able to read cursive or script

GONZALEZ 000535

53

like this?

A    No.

Q    So back in May of 1990 did you even have the ability to read this statement?

MS. ROSEN:  Object to the form, foundation.

A    No.

BY MS. BONJEAN:

Q    There's certain points where they had -- where you have -- strike that.  Well, do you see at the bottom of the first page there's some words that are crossed out and it looks like there's some initials that say JC?

A    Yes.

Q    Were you asked to initial certain parts of the statement?

A    Don't remember.

Q    Okay.  You don't remember.  Again, do you remember actually putting JC at the bottom of this statement?

A    Don't remember.

Q    Are you able to read this statement today?

A    A little bit.

Q    Can you read it for me starting at the very top?

GONZALEZ 000536

54

A    As far as being -- I can't even --

Q    Just do your best.

A    After just at first being of his right and state he understood the right, I told Justino Cruz that I am a state's attorney, an attorney working with the police, and not his -- not his attorney, Justino Cruz, to give the following statement and summary.

Q    Okay.  So today, almost what, 30 years later, you're able to read it a little bit?

MS. ROSEN:  Object to the form.

MR. LEINENWEBER:  Objection, form.

MR. ENGQUIST:  Join.

A    Yes.

BY MS. BONJEAN:

Q    Back in 1990 were you able to read -- as a 21-year-old, were you able to read this script?

A    No.

MS. ROSEN:  Objection to form.

BY MS. BONJEAN:

Q    Did you read this statement before you signed it?

MS. ROSEN:  Object to the form.

A    No.

GONZALEZ 000537

55

BY MS. BONJEAN:

Q    And what did you think was going to happen after you signed this statement? Strike that.  I'm going to ask it a little bit different.  Back in May 25th, or I guess May -- I'm sorry, strike that.  August 24th of 1990, after you put your signature on here, did you have an understanding or did you believe something was going to happen after you signed it?

A    Don't remember.

Q    Did you know you were going to get charged with murder?

A    Don't remember.

Q    Well, you don't remember what you thought was going to happen?

MR. BRENER:  Asked and answered.

MR. LEINENWEBER:  Objection to form.

MS. ROSEN:  Objection.

BY MS. BONJEAN:

Q    I mean, did you think you were going to go to jail or did you think you were going to get released?

MS. ROSEN:  Object to the form.

A    Go to jail.

GONZALEZ 000538

56

BY MS. BONJEAN:

Q    You did think you were going to go to jail?

A    Well, he said I was going to Cook County.

Q    Okay.  He did tell you you were going to go to Cook County?

A    (Nodding).

Q    And did you go to Cook County after that?

A    Yes.

Q    Did Detective Guevara give you the option to do a court-reported statement?

MS. ROSEN:  Object to the form, foundation.

A    Don't remember.

MR. LEINENWEBER:  Form, foundation.

MR. ENGQUIST:  Join.

BY MS. BONJEAN:

Q    Do you know what a court-reported statement is?

A    No.

Q    Did he give you the opportunity to make a statement in front of a video?

MS. ROSEN:  Object to the form, foundation.

A    No.

GONZALEZ 000539

57

BY MS. BONJEAN:

Q    Okay.  Did he give you an opportunity to make a statement with a court reporter like this?

A    No.

MS. ROSEN:  Objection, form, foundation.

BY MS. BONJEAN:

Q    Did he give you any options about how you were going to make this statement?

A    No.

MS. ROSEN:  Object to the form, foundation.

BY MS. BONJEAN:

Q    Did any detective give you an option regarding how you were going to make this statement?

A    No.

MS. ROSEN:  Object to the form, foundation.

BY MS. BONJEAN:

Q    Okay.  Did any detective give you the opportunity to have a video camera record what you had to say?

A    No.

MS. ROSEN:  Objection, form, foundation.

BY MS. BONJEAN:

Q    Did any detective ever show

GONZALEZ 000540

58

you statements that were signed by Jose Maysonet while you were in custody at Area 5?

A    No.

Q    What about Alfredo Gonzalez, did any detective ever show you any statement that had been made by Alfredo Gonzalez while you were at Area 5?

A    No.

Q    No?

A    No.

Q    You don't remember being shown anything, right?

A    No.

Q    Did you know Rosa Bello?

A    Who?

Q    Rosa Bello?

A    No.

Q    Did you know Jose Maysonet's girl friend or wife?

A    No.

Q    Had you ever been to Jose Maysonet's home?

A    No.

Q    And I'm talking, again, back in May, June, July of 1990.  Had you ever even been

GONZALEZ 000541

59

inside Mr. Maysonet's home?

A    No.

Q    And you didn't know his wife, correct?

A    No.

MS. BONJEAN:  Let's mark this one first.

(Whereupon Deposition Exhibit No. 4 was marked for identification.)

Q    Mr. Cruz, I'm handing you what has been marked Exhibit 4, and it purports to be a statement of Rosa Bello that was taken on August 23, 1990 at 2:10 p.m.  Do you see that?

A    Yes.

Q    And you don't know who this person is, right?

A    No.

Q    In this statement, if you look at the first page, I'll read the second paragraph. It says Rosa Bello stated that she's 24 years old and lives with Jose Maysonet.  Rosa's currently pregnant with Jose's child.  It goes on to say on May 24, 1990 at around 11:30 p.m. Rosa was at home with Jose and her two children watching television.  Three of Jose's friends stopped by known to Rosa as Lluvia, Fro and Tino.  Do you see that?

GONZALEZ 000542

60

A    Yes.

Q    Did you ever stop by Jose's home on May 24, 1990 at 11:30 p.m. with Lluvia, Fro and yourself?

A    No.

Q    So this statement is not true, correct?

MS. ROSEN:  Object to the form, foundation.

A    Yes.

BY MS. BONJEAN:

Q    She also goes on to say that Lluvia -- and, by the way, you know who Lluvia is, though, right?

A    Yes.

Q    Who's Lluvia?

A    Alfredo.

Q    Okay.  So it goes on to say Lluvia asked Jose for a gun.  Were you ever in Jose Maysonet's home with Lluvia and Fro at which point Lluvia asked Jose for a gun?

A    No.

Q    Rosa became upset because she does not allow guns in the house.  Rosa said the gun was a 9 millimeter and was wrapped in a towel. Were you ever in Jose Maysonet's house on May 24, 1990 with Lluvia and Fro during which Lluvia

GONZALEZ 000543

61

asked for a gun and Jose provided a 9 millimeter that was wrapped in a towel?

A No.

Q That statement is false, right?

A Yes.

Q Rosa put the gun in a plastic bag and Jose handed the gun to Lluvia. It then says that all four men, that being Lluvia, Fro, yourself and Jose, left the apartment. Did you ever leave the apartment with a gun with Lluvia and Fro on May 24th of 1990?

A No.

Q Can you go to the last page.

A (Witness complies).

Q Who is that?

A Don't know.

Q Don't recognize that?

A No.

Q Is that Alfredo Gonzalez?

A It could be.

Q Yeah.

A I don't know.

Q You haven't seen him in a lot of years?

A Yeah.

Q What about the last page -- the very

GONZALEZ 000544

62

last page, sorry.  Do you recognize this photo?

A     No.

Q     If you take a quick -- I mean, I know it's kind of dark.  I'll give you two seconds -- I'll give you a little longer to look at it.  If you don't, you don't.

A     No.

MS. BONJEAN:  Would you mark this Exhibit 5. It's Maysonet's statement.

(Whereupon Deposition Exhibit No. 5 was marked for identification.)

Q     Mr. Cruz, I've handed you what's been marked as Exhibit 5.  It says Statement of Jose Maysonet.  Do you see that?

A     Yes.

Q     Have you ever seen this before?

A     At court.

Q     You remember seeing it at court?

A     (Nodding).

Q     When you were in custody?

A     Yes.

Q     I want to go through it with you. I have one other question about this.  Did you ever see this in the police station?

A     No.

GONZALEZ 000545

63

Q    Okay.  If you can go to the second page of this document, and I'll -- actually, the third page.  I'm sorry.  Well, let's start on the second page.  I'm going to read it.  In the middle of the page it says on May 20, 1990 at approximately 12:45 p.m. where were you?  Answer, home.  Question, where do you live?  1302 North Homan.  Did anything unusual happen?  Answer, yes, Lluvia came to my house.  He told me that I -- if I can hide a pistol for him.  Question, what did you say to Lluvia?  I told him I can hide the pistol for you but you can go to get it back as soon as possible.  What did Lluvia say then?  He said don't worry about it.  I'll pick it up as soon as possible.  You can go to the next page.  Question, what kind of pistol or gun did Lluvia give?  Answer, 9 millimeter.  Do you see that?

A    Yes.

Q    Okay.  Then it goes on to say, Question, on May 24, 1990 about 11:30 where were you?  Answer, home.  What if anything happened about that time?  Answer, Lluvia, Fro, Tino came to my house.  Again, did you go to Jose Maysonet's house on May 24, 1990 with Lluvia and

GONZALEZ 000546

64

Fro at about 11:30 p.m.?

A    No.

MR. LEINENWEBER:  Objection, asked and answered.

MS. ROSEN:  Objection, form, foundation.

BY MS. BONJEAN:

Q    And that statement is a false statement, correct?

MS. ROSEN:  Objection, form, foundation.

A    Yes.

BY MS. BONJEAN:

Q    Well, is it a true statement?

A    No.

MS. ROSEN:  Object to the form.

MR. LEINENWEBER:  Objection, also argumentative.

BY MS. BONJEAN:

Q    And then it says -- I'm going to jump ahead to the bottom.  It says what happened when Lluvia and Tino came over.  Do you see that at the bottom of the page, or close to the bottom of the page?

A    Okay.

Q    Question, what happened when Lluvia and Tino came over?  Answer, they came over that

GONZALEZ 000547

65

night and they told me they needed a pistol.  Do you see that, the answer?  I can point it to you if you need to.

A    Okay, yeah.

Q    Okay.  Did you ever go to Jose Maysonet's house with your uncle on May 24, 1990 and tell Jose that you needed a pistol?

A    No.

MS. ROSEN:  Objection, foundation, asked and answered.

BY MS. BONJEAN:

Q    And, Question, it says what did they say they needed the pistol for?  Answer, they got the two guys on Drake and North Avenue waiting for dope, crossed out, and then something.

Justino, did you ever go to Jose Maysonet's house on May 24, 1990 with your uncle and tell Jose that you needed a pistol because you had two guys on Drake and North Avenue waiting for either dope or something?

A    No.

Q    Again, is that statement a true or false statement?

MS. ROSEN:  Objection, form --

GONZALEZ 000548

66

A     False.

MS. ROSEN:  -- foundation.

MR. LEINENWEBER:  Join.

BY MS. BONJEAN:

Q     Going to the next page there's a question that says, All right.  And what were they going to do that evening, being Lluvia and Tino.  Answer, what they were going to do that evening is they were going to go to the two guys they were waiting for for dope, crossed out, something.  Question, when you left, who drove? I drove.  Lluvia was in the front passenger seat. Question, where was Fro?  In the back of Lluvia. Question, where was Tino?  In my back, in the back behind the driver's seat.  Question, who had the gun at the time?  Answer, Lluvia.

Mr. Cruz, did you ever leave Jose Maysonet's house on -- shortly before midnight on May 24, 1990 with Lluvia and Fro with a gun to go toward the guys who were waiting for dope or something?

A     No.

Q     Okay.  And are these statements true or false statements?

A     False.

GONZALEZ 000549

67

MS. ROSEN: Object to the form -- sorry, late -- foundation.

BY MS. BONJEAN:

Q    Okay.  Next question, where did you go?  I go -- I took Homan to Potomac, Potomac all the way to St. Louis, St. Louis all the way to North Avenue, North Avenue to Drake and parked in the alley.  Question, when you parked in the alley, what happened then?  Answer, Lluvia got out of the car.  He put the hood on his head and put the front seat to the front.  Fro came out of the car and Tino came out of the car.  Question, was anyone else around at that time?  Answer, two guys.  Who were the two guys -- or where were the two guys?  Answer, by the corner.  Question, okay.  Where was the gun at this time?  Answer, Lluvia got the gun in his front pocket.  Question, okay.  What did Lluvia, Fro and Tino do then?  Answer, they started walking towards the guys.

Okay.  Mr. Cruz, did you ever go to this location on North Avenue near St. Louis with Lluvia, Fro and Jose Maysonet with a gun?

A    No.

GONZALEZ 000550

68

Q    Did any of this happen that I've just read to you?

A    No.

Q    And you'd agree that those statements are untrue or false statements, right?

MS. ROSEN:  Objection, form, foundation.

A    Yes.

BY MS. BONJEAN:

Q    Question, what happened next? They waited.  They were waiting about five -- talking for about five minutes and then the shooting happened.  Shot about five to six times. Question, what did you see when you heard the five or six shots?  Answer, I looked -- when I looked, the two guys was on the floor laying down and Lluvia had the 9 millimeter in his hand pointing it at the guy to see if he was going to move or not.  Question, what happened next?  And then we didn't see no move.  We started walking towards my car with the pistol.  Question, where was Tino and Fro?  They started walking towards my car too.  Question, all right.  And what happened?  And they went inside the car, so then I drove all the way to 1302 North Hammond -- Homan.

GONZALEZ 000551

69

Sir, were you present at this location while Lluvia shot the two black men that were on North Avenue?

A   No.

Q   Okay.  Did you ever drive there in a car with Tino -- strike that.  Did you ever drive there in a car with Fro and Lluvia, get out of the car and witness a double murder?

A   No.

Q   Are those statements true or false statements?

MS. ROSEN:  Objection, form, foundation.

A   False.

BY MS. BONJEAN:

Q   Now, it goes on to say, Question, what happened when you got back home?  Answer, when I got back home, I got out of the car. Lluvia jumped in the driver's side and he left with the car and the gun.  Let's see.  Go on to the next page.  Well, I don't know if I read this.  Question -- at the bottom of the fifth page of the statement Bates stamped CCSAO291 it says, Question, all right.  When did you see -- next see Lluvia that day?  Answer, I seen Lluvia that day at 11 a.m.  Question, where did you see

GONZALEZ 000552

70

Lluvia?  Answer, at LeMoyne and Spaulding.

Question, what if anything did Lluvia say to

you?  Answer, I killed two black motherfuckers.

Question, what happened next?  Then they told me

you are not going to say nothing, right?  I said

no, I wasn't going to say nothing.  They said

keep it under your hat, keep my mouth shut.

Did you ever tell Jose Maysonet

to keep the murders under his hat?

MS. ROSEN:  Objection, form, foundation.

A    No.

BY MS. BONJEAN:

Q    Were you present when Lluvia said

anything like that to Mr. Maysonet?

A    No.

Q    Did Lluvia ever tell you I killed two

black motherfuckers?

A    No.

Q    Now, it goes on, August 16, 1990

about 10 p.m., where were you?  Answer, home.

What if anything happened then?  Answer, Lluvia,

Fro, Tino, Cisco, King, they came out to my

house.

Did you ever go to Mr. Maysonet's

house on August 16, 1990 at 10 p.m. with Alfredo

GONZALEZ 000553

71

Gonzalez, Christopher Goosens or Fro, Francisco Varas or Cisco, Efrain Cruz or King?  Did you ever go to Mr. Maysonet's house together as a group?

    A    No.

    Q    Is that a true statement or a false statement?

    MS. ROSEN:  Objection, form, foundation.

    A    False.

BY MS. BONJEAN:

    Q    What happened when they came to your house?  Answer, they put a 9 millimeter to my head.  Who put the 9 millimeter to your head?  Answer, King.  What did he say?  Answer, you know about the two murders.  If you talk, we're going to put you 6 feet under.

    First of all, my first question is were there movie cameras there?

    MS. ROSEN:  Object to the form.

    MS. BONJEAN:  I'm kidding.  I strike that.

    Q    But were you ever at Mr. Maysonet's house with this crew of people with a 9 millimeter?

    A    No.

    Q    Did you ever threaten Mr. Maysonet with

GONZALEZ 000554

72

a 9 millimeter?

A    No.

Q    Did you ever see your brother threaten Mr. Maysonet with a 9 millimeter?

A    No.

Q    Did you ever see Lluvia threaten Mr. Maysonet with a 9 millimeter?

A    No.

Q    Did you ever see Fro or Cisco threaten Mr. Maysonet with a 9 millimeter?

A    No.

Q    Were you ever in Mr. Maysonet's house at any point together on August 16, 1990 or any other time?

A    No.

MR. LEINENWEBER:  Objection to form.

MS. ROSEN:  Object to the form --

MR. LEINENWEBER.  Asked and answered.

MS. ROSEN:  -- foundation.

BY MS. BONJEAN:

Q    All right.  You can put that to the side.

A    (Witness complies).

Q    Now, after you provided -- or strike that.  After you signed this statement that was

GONZALEZ 000555

73

prepared by someone, you were brought to Cook County Jail, right?

A    Yes.

MS. ROSEN:  Object to the form.

MR. ENGQUIST:  Objection to form, argumentative.

MS. ROSEN:  Prepared by someone.

BY MS. BONJEAN:

Q    Well, do you know who prepared this?

A    No.

MS. ROSEN:  Object to the form and argumentative.

MS. BONJEAN:  It's not argumentative. What do you mean?

MR. LEINENWEBER:  Your tone was reflecting --

MS. BONJEAN:  What?

MR. LEINENWEBER:  The tone of your voice is reflecting the argument.

MS. BONJEAN:  Okay.  The tone of my voice?

MS. ROSEN:  Is reflecting the argumentative nature of the question.  Really?  Some document that someone on the planet prepared?  Maybe it was prepared phantomly by, I don't know, an elf.

MS. BONJEAN:  Do you know who prepared this?  I don't think anyone at this table knows who

GONZALEZ 000556

74

prepared it.

MS. ROSEN: Object to the form of the question.

MS. BONJEAN: I know you all take everything at face value, but that doesn't mean the rest of the world does always.

MR. LEINENWEBER: The issue is just making the objection for the record. That's all we're trying to do.

MS. BONJEAN: Fair enough, okay. But even the objections are like, oh, my God, it's so argumentative. I can't believe it.

MS. ROSEN: Okay. So if we had a video recording here for your dramatic reading of all of this, then we could like memorialize who's the one that's got the tone of voice today, but we can move on.

MS. BONJEAN: I will try to suppress my inner passion.

MS. ROSEN: That's one way to describe it.

MR. LEINENWEBER: For acting?

MS. ROSEN: Talk about movie cameras.

BY MS. BONJEAN:

Q    Mr. Cruz, your handwritten statement that has been marked as Exhibit, I think, 3 --

GONZALEZ 000557

75

and I'm only calling it your handwritten statement because you have a signature on it.

MS. COHEN:  It's Exhibit 2, by the way.

BY MS. BONJEAN:

Q    It's Exhibit 2.  I'm sorry.

A    Okay.

Q    You don't know who drafted this statement, correct?

A    No.

Q    And do you remember seeing anyone draft this statement?

A    No.

Q    Was the statement when you signed it -- strike that.  Did someone put the words on the piece of paper while you were present like watching it?  If you don't understand my question, don't try --

A    I don't understand.

Q    Okay.  Someone wrote these words on this piece of paper, right?

A    Yes.

Q    Were you in the room when the person did that?

A    Don't remember.

Q    Okay.  And if you don't remember that,

GONZALEZ 000558

76

do you remember who put the words on the piece of paper?

MS. ROSEN: Object to the form.

A     No.

BY MS. BONJEAN:

Q     Okay. Do you know if it was a woman or a man, for instance?

A     No.

Q     Do you know what the race of the person was who did it?

A     No.

Q     Do you know if it was a state's attorney or a detective?

A     No.

Q     So after you left Area 5, did you know you were charged with a double murder?

A     Yes.

Q     And where did you go?

A     Cook County.

Q     What happened when you got to Cook County?

A     I got processed to the County.

Q     And had you seen Alfredo Gonzalez or Jose Maysonet at any point prior to arriving in Cook County and getting processed there?

GONZALEZ 000559

77

A     No.

MR. BRENER:  Objection to form.

BY MS. BONJEAN:

Q     After you got processed, what happened?

A     Got sent to one of the divisions.

Q     Did you have any contact with any family members up until that point?

A     No.

Q     Were you trying to reach anyone?

A     Don't remember.

Q     So when is the first time you had contact with someone other than a Chicago police officer or someone associated with the Cook County Jail?

A     When I got to the County.

Q     Okay.  And when you say when I got to the County, what do you mean by that?

A     Cook County, 26th and California.

Q     And where were you when you had contact with someone other than an officer or a --

A     Division 6.

Q     And who did you meet with or who did you see?

A     I had called one of my family members.

Q     Do you remember what family member?

GONZALEZ 000560

78

A    No.

Q    All right.  And what did you tell your family member when you called them?

MS. ROSEN:  Objection, form.

A    That I was locked up.

BY MS. BONJEAN:

Q    Did you tell them why you were locked up?

A    Yes.

Q    And did you tell them that you had been wrongly accused?

A    Yes.

MS. ROSEN:  Objection, form, leading.

BY MS. BONJEAN:

Q    And what else, if you remember, did you tell them at the time?

A    Just called and told them they were charging me for murder.

Q    And did you tell -- and what else did you say, if anything?

A    I don't remember.

Q    Okay.  And what happened after you told them that?

A    Don't remember.

Q    Did you ever meet with your family

GONZALEZ 000561

79

members at some point?

A    Visiting hours.

Q    Did you ever go to court?

A    Yes.

Q    How long after you arrived at Cook County Jail did you go to court?

A    Don't remember.

Q    Did you eventually go to court?

A    Yes.

Q    Did you eventually get a lawyer?

A    A public defender.

Q    Yeah.  Did you eventually get assigned a public defender?

A    Yes.

Q    All right.  And did you know who that public defender is or was?

A    No.

Q    Did you eventually have a meeting with a public defender?

A    Yes.

MS. BONJEAN:  Okay.  Can we take a break?  I want to confer with Adrian about privilege.  I don't know what they're going to do.

MS. ROSEN:  Okay.

GONZALEZ 000562

80

(Whereupon a recess was taken from 11:46 a.m., to 11:52 a.m., after which the following proceedings were had:)

(Whereupon Deposition Exhibit No. 6 was marked for identification, MM.)

BY MS. BONJEAN:

Q    Mr. Cruz, I've handed you what has been marked as Exhibit 6.

MR. ENGQUIST:  Which is --

MS. BONJEAN:  The motion to suppress statements.

Q    Do you see the caption People of the State of Illinois vs. Justino Cruz?

A    Yes.

Q    And do you know what a motion to suppress statements is?

A    Yes.

Q    And this says that now comes the defendant, Justino Cruz, and his attorney, Randolph Stone, public defender of Cook County, by Michael J. Vahey, assistant public defender. Do you remember who Mr. Vahey was?

A    Yes.

Q    Because you remember him being your public defender or --

GONZALEZ 000563

81

A    Yes.

Q    Did your attorney file this for you?

A    Yes.

Q    Okay.  I want to draw your attention specifically to paragraph 5.

A    Okay.

Q    I'm sorry.  Paragraph 6, actually. Are you with me?

A    Yes.

Q    Okay.  Paragraph 6 says the statements sought to be suppressed were obtained as a result of physical coercion illegally directed against the defendant, specifically, striking about the ear and head, grabbing by the throat and pushing his head against the wall and that as such statements were, therefore, involuntary.  Do you see that?

A    Yes.

Q    This information that your attorney put in this motion, where did he get that information from?

A    From me.

Q    Did you tell him that?

A    Yes.

Q    Okay.  And, No. 7, that the statements

GONZALEZ 000564

82

sought to be suppressed were obtained as a result of psychological and mental coercion illegally directed against the defendant and that such statements were, therefore, involuntary. Did you tell your attorney about the circumstances under which you made the statements?

A    Yes.

Q    Okay. Did you tell your public defender about the handwritten -- the statement that you had signed that's marked as Exhibit 2?

A    Yes.

Q    Did you tell him that it was true or false?

A    That it was false.

Q    Did you tell him that?

A    Yes.

Q    Did you tell him that you were innocent of the crime?

A    Yes.

Q    Did you tell him who was responsible for providing the story that you signed there, if you understand my question?

A    No, I don't understand.

Q    Okay. Did you tell your public defender who had physically abused you?

83

A    Yes.

Q    Did you describe the officer to him?

A    Yes.

Q    Okay.  And what did he say when you told him you were innocent of the crime and that the statement that you had signed was not true?

A    Don't remember.

Q    Okay.  You don't remember anything about what he said?

A    Who?

Q    Don't answer my question if you --

A    Oh, okay.

Q    Don't just say I don't remember unless you, you know -- if you don't understand my question, tell me you don't understand and I'll rephrase it, okay?

A    Okay.  I don't understand.

Q    Okay.  What did your attorney or your public defender say to you when you said I didn't make this statement, it's all a lie, generally?

MR. BRENER:  Objection to the form.

MS. ROSEN:  Object to the form.

A    He's going to put a motion to dis -- to throw it out.

GONZALEZ 000566

84

BY MS. BONJEAN:

Q    Okay.  And is that what happened -- is that what was filed and marked as Exhibit 6?

A    Yes.

Q    Okay.  Did you ever end up going to a hearing on this motion?

A    Don't remember.

Q    Did your attorney tell you that he believed you about this, if you remember?

A    No.

Q    At some point --

MS. ROSEN:  Is that no, you don't remember?

THE WITNESS:  I don't remember.

MS. ROSEN:  It was a bad question.

BY MS. BONJEAN:

Q    At some point you worked out a deal with the State, right?

A    Yes.

Q    Tell me how that happened.

A    I don't --

Q    You don't understand my question?

A    Yeah.

Q    Okay.  You ended up testifying against your uncle, right?

A    Yes.

GONZALEZ 000567

85

Q    Why?

A    Because they threatened -- they said you can take the deal or you can go to jail for life.

Q    And who told you that?

A    State's attorney.

Q    Did you ever have any conversations directly with the Cook County state's attorney who was prosecuting the case?

MR. BRENER:  Objection to form.

A    At court?

BY MS. BONJEAN:

Q    Yeah, anywhere, yeah.

A    Yeah, at the court hearing.

Q    When did you first find out that the Cook County state's attorney wanted to offer you a deal?

A    Public defender.

Q    So your public defender told you that?

A    Yeah.

Q    And what did he tell you?

A    That they wanted me -- to give me a deal for my testimony, for me to turn state's on Alfredo Gonzalez.

Q    Okay.  Did you tell your attorney --

GONZALEZ 000568

86

well, strike that. And what type of deal did they want to give you?

A    Don't remember.

Q    Did they tell you that they wanted to give you some lower sentence or something else?

MR. LEINENWEBER:  Objection to form.

A    Lower sentence.

BY MS. BONJEAN:

Q    Well, what did you understand you were going to get if you testified?

A    Not life in prison.

Q    Something less than life in prison?

A    Yes.

Q    And who first told you about this deal?

A    My public defender.

Q    And did he want you to take the deal?

A    He said it was better in your interests to take it.

Q    And did he explain why it was in your interests to take it?

A    Because if I don't take it, I could go to prison for life.

Q    Did you want to go to prison for life --

A    No.

Q    -- for something you didn't do?

GONZALEZ 000569

87

A    No.

Q    Did you want to testify falsely against your uncle?

A    No.

Q    Did you feel you had a choice?

A    No.

Q    Why not?

A    They says you testify or you go to prison for life.

Q    But you knew --

MS. BONJEAN:  Well, I'm going to mark this.

(Whereupon Deposition Exhibit No. 7 was marked for identification.)

Q    I'm handing you what's been marked as Exhibit 7, which are transcripts from your testimony, okay, Mr. Cruz?

A    Yes.

Q    And it says your name right there, right?  Do you see that?

A    Yes.

Q    Justino Cruz?

A    Yes.

Q    And you were questioned by it looks like a Mr. Marek.  Do you see that?

A    Yes.

GONZALEZ 000570

88

Q    And on the second page if you look, maybe this will help refresh your recollection, but it says -- the question that's asked of you, do you have an agreement with the Cook County State's Attorney's Office regarding your testimony?  Answer, yes.  Tell the Ladies and Gentlemen of the Jury what that agreement is. Answer, for my testimony I'd be getting 22 years. At the recommended 20 years for my testimony. Do you see that?

A    Yes.

MR. ENGQUIST:  22 years.

BY MS. BONJEAN:

Q    I'm sorry, 22 years.  And is that what your understanding of the deal you were going to get if you testified?

A    Yes.

Q    And would that have been a day for day -- would you get day-for-day good time for that?

A    Yes.

Q    You didn't serve a full 22, right?

A    No.

Q    How much did you serve, about half that?

A    Yes.

GONZALEZ 000571

89

Q    How much time in custody did you have in by the time that you testified at your uncle's trial?

A    Five years.

Q    And I'm going to have you look at -- if you'd go to page, okay, page 23 of the transcript that's starting at Maysonet 15586.

A    Which one?

Q    Page 23 of the transcript.

A    Okay.

Q    Do you see 23?

A    Yes.

Q    Just at the very last question it says, Question, when you got to Belmont and Kimball, what did you do?  Answer -- if you can turn to the next page, do you see that?

A    Um-hmm.

Q    Got on the Kimball bus.  Do you see that?

A    Yes.

Q    And, Question, where did you go on the Kimball bus?  Answer, towards North Avenue. Question, and did you get off the bus?  Answer, I got off at LeMoyne and Kimball.  Question, and after you got off the bus, where were you

GONZALEZ 000572

90

walking?  Answer, down LeMoyne going towards Spaulding.  Question, which direction were you walking?  Answer, east.  As you were walking down the street, did you see anybody?  Answer, yes. Who did you see?  Alfredo Gonzalez and Fro. Question, and Fro is also Chris Hernandez?  Yes.

Okay.  You provided this testimony at your uncle's trial.  Do you remember that?

A     Yes.

Q     Was that a truthful statement?

A     No.

Q     And was Fro Chris Hernandez, as far as you knew?

A     Yes.

Q     You knew him?

A     No, no.

Q     Listen to my question.

A     No, I thought you were just -- okay.

Q     Yeah, just listen.

A     Um-hmm.

Q     Did you know Fro as Chris Hernandez?

A     No.

Q     And that is the defendant who is here in court today, Alfredo Gonzalez, correct?  Answer,

GONZALEZ 000573

91

yes.

MS. ROSEN:  Was that a question?

MS. BONJEAN:  Hold on.  I'm getting my bearings.

MS. ROSEN:  Well, you just asked a question and an answer and now you're moving pages. So is there --

MS. BONJEAN:  Because I'm going to the next page.  I'm trying to see if I can cut to -- I don't need everything.  I'm trying to --

MS. ROSEN:  I know, but we now just have you reading testimony.

MS. BONJEAN:  Okay.  Strike my reading the testimony and give me a second.

Q    Let's go to page 39.

A    (Witness complies).

Q    Are you there, Mr. Cruz?

A    Yes.

Q    Okay.  At the top it says, Mr. Cruz, as you were standing next to the car containing Alfredo Gonzalez and Fro, without telling the Ladies and Gentlemen of the Jury what exactly was said at that time, did you have a conversation, a brief conversation with Fro?  Answer, yes. Question, after you had that very first brief

GONZALEZ 000574

92

conversation with Fro, what did you do?  Answer, jumped in the car.  Do you see that testimony?

A    Yes.

Q    Was that testimony truthful?

A    No.

Q    And did you ever jump in a car with Fro and Alfredo Gonzalez?

A    No.

Q    Why did you give that false testimony?

A    For a lower sentence.

Q    For the lower sentence?

A    (Nodding).

Q    Now, the next question is after you got in the car, where were you going?  Answer, to Maysonet's house.  Question, now, as you were in the car, did the defendant Alfredo Gonzalez say anything?  Answer, going to Juan's house to pick up a gun.  Answer -- or, Question, at that time did Fro say anything?  Answer, yes, sir.  Question, while you were in the car on your way to Maysonet's house, did Fro tell you why -- there's an objection.  You can turn the page.  Question, while you were in the car with Alfredo and Juan -- strike that.  With Alfredo and Fro on your way to Juan's house, did Fro tell you

GONZALEZ 000575

93

why you were going to get a gun?  Answer, yes.
What did he tell you?  Answer, to do a drug sale.
                    Okay.  Was that testimony
that you provided at your uncle's trial truthful
testimony?

        A    No.

        Q    Were you ever in a car with Alfredo
and Fro and going to Juan's house to get a gun to
do a drug sale?

        A    No.

        Q    It goes on, Question, did you then
go anywhere in the car?  Answer, to Maysonet's
house.  Question, where was that?  On Potomac
and Homan.  Question, when you got -- by the way,
did Maysonet live in a house or an apartment?
Answer, an apartment.  And which floor did
he live on?  Answer, second floor.  Question,
did you get to the building where Maysonet's
apartment was?  Yes.  And what happened when
the car arrived at the location?  Got out of the
car.  Where did you park the car?  On Potomac and
Homan.  And after you got out of the car -- by
the way, who all got out of the car?  Me, Alfredo
and Fro.  Question, where did you go after you
got out of the car?  Answer, to Juan's house.

GONZALEZ 000576

94

Mr. Cruz, was that testimony truthful?

A     No.

Q     And did you ever go to Mr. Maysonet's house with Alfredo and Fro and yourself?

A     No.

Q     Let's go to page 42.

A     (Witness complies).

Q     We'll start with, Question, when you got inside the house, was anybody else in there? Answer, Maysonet.  Question, while you were in the apartment did the defendant Alfredo Gonzalez say anything to Juan Maysonet?  Answer, yes. What did he say?  Answer, let me get the -- come to get the gun.  Question, and after the defendant Alfredo Gonzalez said go get the gun, what happened then?  Juan and Alfredo went into the bedroom.  Question, where were you at the time?  In the living room.  Question, and who was in the living room with you?  Answer, Fro.  Question, by the way, where was Rosa Bello? Answer, she was in the kitchen.  Then she walked in the bedroom.  Question, is that the same bedroom that the defendant Alfredo Gonzalez and Juan Maysonet walked into?  Answer, yes, sir. Question, did anyone come out of the bedroom?

Rizman Rappaport (973)992-7650
"When every word counts"

GONZALEZ 000577

95

Answer, yes.  Question, who came out?  Juan and Alfredo.  Question, were either of these people carrying anything?  Answer, yes.  Question, who was carrying something?  Answer, Alfredo. Question, what was he carrying?  Answer, a gun. Question, what kind of gun was it?  Answer, a 9 millimeter automatic.  Do you see that testimony?

A    Yes.

Q    Was any of that testimony truthful, sir?

A    No.

Q    Were you ever in Mr. Maysonet's house with Alfredo Gonzalez and Fro obtaining a gun?

A    No.

MR. LEINENWEBER:  Objection to form, foundation.

BY MS. BONJEAN:

Q    Did you ever see Lluvia or Alfredo Gonzalez holding a gun in Mr. Maysonet's house?

A    No.

Q    All right.  Go to page 45, please.

A    (Witness complies).

Q    We'll start with, Question, after the defendant and Maysonet came out the bedroom, what happened then?  Answer, we just left.  Question,

GONZALEZ 000578

96

do you mean you left the apartment?  Answer, yes.

Question, after you left the apartment, where did

you go?  Answer, towards the car.  Question, and

did you get back into the car?  Answer, yes.

Question, when you got -- what positions did

everyone get into inside the car?  Answer, Juan

was the driver.  Alfredo was the passenger.

Fro was behind the passenger.  I was behind the

driver.  Question, the defendants still had the

gun at the time?  Answer, yes, sir.  Question,

where did you go once you were in the car?

Answer, towards St. Louis.  Question, what

direction was St. Louis from where you were

coming from?  Answer, east.  Question, and were

you north or south of North Avenue?  Answer, we

were south.  Question, what street were you

driving on?  Answer, Potomac.  There are some

objections.  Question, where did you go after you

were on Potomac?  Answer, went towards St. Louis.

From St. Louis they went north to North Avenue.

Question, now, right before you -- by the way,

did you cross North Avenue?  Answer, yes, sir.

Question, now, right before you got to North

Avenue did you see the defendant Alfredo Gonzalez

do anything with the gun?  Answer, he looked

GONZALEZ 000579

97

at it.  That's it.  Question, well, did he take it out of his pants?  There's an objection. Question, did he take the gun out of his pants and look at it?  You can turn the page.  Do you see that answer, yes?

A    Yes.

Q    Did you ever go to the location of North Avenue and St. Louis with Alfredo Gonzalez and observe him take a gun out and look at it?

A    No.

Q    And was that testimony that you provided at Mr. Gonzalez's trial truthful testimony?

A    No.

Q    Let's go to page 49 at the top.

A    (Witness complies).

Q    Question, now, at the time you parked the car, what happened then?  Answer, we jumped out of the car.  Question, now, when you say we jumped out of the car, who do you mean?  Answer, me, Fro and Alfredo.  Question, as you got out of the car, did anyone say anything to you?  Answer, Fro.  What did he tell you?  Make sure nobody come down the alley.  Question, so what did you do at that time?  I started looking towards St. Louis and Kimball.  Question, where were

GONZALEZ 000580

98

you standing?  In the alley.  Question, where were you relative to the garbage that the car was by?

MS. ROSEN:  The garage.

MS. BONJEAN:  Oh, shoot.  Sorry.

Q    Where were you relative to the garage that the car was by?  Answer, by the empty lot.

Mr. Cruz, did you actually jump out of the car at around -- in the alley and make sure nobody came down the alley?

A    No.

Q    Okay.  And was that testimony truthful testimony?

A    No.

Q    Going to the next page, Question, what did the defendant Alfredo Gonzalez and Fro do at the time?  Answer, started walking down the empty lot towards North Avenue.  Question, now, did you see anybody in the empty lot?  Answer, two guys.  Question, describe these guys.  Answer, two black guys.  Question, where were they standing in the empty lot?  On North Avenue by the empty lot by the house.  Question, now, what were you doing at this time?  Answer, just looking towards St. Louis and Kimball.  As you were doing that,

GONZALEZ 000581

99

could you see what Alfredo Gonzalez and Fro were doing with the two black guys?  Answer, talking. Question, for how long were Fro and Alfredo Gonzalez talking to the two black guys?  Around five or ten minutes.  And, Question, were you watching the defendant Alfredo Gonzalez and Fro talking to the two black guys the whole time or were you also looking up and down the alley? Answer, I was looking towards St. Louis and Kimball.  Question, what happened then?  Answer, when I was looking towards St. Louis and Kimball, I heard three to four shorts.  Question, and what happened then?  When I was looking, I heard one or two shots.  I see Fro and Alfredo running towards the car.  Question, and were they running back through the empty lot?  Answer, yes. Question, at the time that you saw Alfredo and Fro running back towards the empty lot, did you see anything else in the empty lot?  Answer, one of the guys on the ground.  When you say one of the guys on the ground, do you mean one of the -- Answer, black guys.  Question, those were the black guys that had been talking to Alfredo and Fro earlier?  Answer, yes, sir.

Okay.  That testimony, sir, did

GONZALEZ 000582

100

you ever see Fro and Alfredo Gonzalez talking to the two black guys and then hear gunshots?

A    No.

Q    And was that testimony truthful testimony?

A    No.

Q    And did you ever see Alfredo and Fro come running back towards the car after the gunshots were fired?

A    No.

Q    And was that testimony that you provided at Alfredo Gonzalez's trial truthful testimony?

A    No.

Q    Going on it says, Question, did the defendant Alfredo Gonzalez and Fro get back to the car?  Answer, yes.  Question, when they got back to the car, did the defendant Alfredo Gonzalez say anything?  Answer, let's get out of here.  Question, did he say anything else?  Answer, we just shot two guys.  Question, what did you do then?  Answer, we all jumped in the car.

Sir, you provided that testimony. Did you all jump in the car and Alfredo Gonzalez

GONZALEZ 000583

101

admit that he had shot the two guys?

A    No.

Q    Did that ever happen?

A    No.

Q    And this testimony that you provided, was it truthful?

A    No.

Q    Prior to giving this testimony at Alfredo Gonzalez's trial were you designated as a state witness or a state cooperating witness in some way?

MS. ROSEN:  Object to the form.

A    Yes.

BY MS. BONJEAN:

Q    And did you have to go anywhere after you were going to become a state witness?

A    Can you rephrase the question?

Q    Sure.  Did you stay in your cell at the Cook County Jail or did you get moved somewhere?

A    I got moved somewhere else.

Q    And where did you go?

A    Someplace the state's attorney had state witnesses, at Division 1 in the basement somewhere.

Q    So you were moved to a portion of Division 1 where other state witnesses were

GONZALEZ 000584

102

housed?

A    Yes.

Q    Do you remember what it looked like?

A    No.

Q    Do you know how long you were there?

A    Don't remember.

Q    Did you get any -- strike that. While you were in the witness area or the witness quarters, was it the same or -- strike that.  How many other people were there housed in the area where the witnesses were, do you know?

MR. BRENER:  Foundation.

A    Around seven guys.

BY MS. BONJEAN:

Q    Were there Cook County sheriffs there or was it a different type of security there?

MR. ENGQUIST:  Objection, foundation.

A    Don't know.

BY MS. BONJEAN:

Q    Don't remember?

MS. ROSEN:  No, don't know.

MR. ENGQUIST:  No.

BY MS. BONJEAN:

Q    Oh, don't know?

A    I don't know if they're state's attorney

GONZALEZ 000585

103

cops or Cook County cops.  There were just officers there.

Q    Okay, fair enough.  Did you get some financial benefits also?

A    No.

Q    Okay.  Did you get relocation money at some point?

A    No.

Q    Nothing?

A    Nothing.

Q    Did you -- I'm going to ask you to -- oh, before I do, hold on a second.

MS. BONJEAN:  Can you mark this.

(Whereupon Deposition Exhibit No. 8 was marked for identification.)

Q    I'm handing you what's been marked as Exhibit 8.  Do you see this medical document here?

A    Yes.

Q    Is that your name at the top, Justino Cruz?

A    Yes.

Q    And the date is August 25, 1990?

A    Yes.

Q    Where were you living on August 25,

GONZALEZ 000586

104

1990?

    A    On Pierce, 3337 West Pierce.

    Q    Right.  That was your address -- and let me be clear.  You were in custody, though, at this point, right?

    A    Yes.

    Q    In fact, did you receive medical assistance or medical services from Cermak Health Services --

    A    Yes.

    Q    -- after you were arrested?

    A    Yes.

    Q    And I want to draw your attention to the remarks there.  It says ear infection.  Do you see that?

    A    Yes.

    Q    Did you get treated for an ear infection when you got to the Cook County Jail?

    A    Yes.

    Q    Okay.  When you went to the Illinois Department of Corrections, were you designated to a particular area of the Illinois Department of Corrections?  I'll start over.  Did you have any specific or particular status when you went to the Illinois Department of Corrections as

GONZALEZ 000587

105

a witness?

A    I don't understand the question.  Like when? I left the County?

Q    Yeah.  When you went to the Illinois Department of Corrections after you had -- well, let's back up.  I'm sorry.  Strike that.  You pled guilty at some point, right?

A    Yes.

Q    Did you plead guilty before or after you testified against Alfredo Gonzalez?

A    After.

Q    After.  And you ended up getting your deal, right?

A    Yes.

Q    Which was what, 22 years?

A    Yes.

Q    Day-for-day good time?

A    Yes.

Q    How much time did you actually do in the Illinois Department of Corrections, do you know?

A    Got sentenced in '95 and got out 2001.

Q    So you actually were in the County until 1995?

A    Yes.

GONZALEZ 000588

106

Q   And were you supposed to testify against Jose Maysonet also?

A   Don't remember.

Q   But you didn't, right?

A   No.

Q   And then you went to the Illinois Department of Corrections in '95 and you got out when?  You said 2001?

A   Yes.

Q   So you were only in the Illinois Department of Corrections for about six years, is that right?

A   Yes.

Q   I don't mean to say only.

A   Yeah, yeah, yeah.

Q   That's a long time.

A   Yes.

Q   But it was not 22 years, right?

A   No.

Q   And while you were in the Illinois Department of Corrections where did you do most of your time?

A   Illinois Correctional Center.

Q   Illinois River?

A   Illinois River.

GONZALEZ 000589

107

Q    And were you in a specific unit at Illinois River?

MR. BRENER:  Form and foundation.

A    It was a -- I don't remember what unit, but it was separated from the population.

BY MS. BONJEAN:

Q    That's what I'm asking.

A    Yes.

Q    Special Management Unit?

A    I don't remember the name.

Q    SMU sound familiar?

A    Yes, yes.

Q    Were you in the SMU?

A    Yes.

Q    And why were you in the SMU?

A    Because I was a protected witness.

Q    So were you in protective custody?

A    Yes.

Q    And why were you in protective custody?

A    Because of my statement, the testimony.

Q    And when you got out of custody, did the state's attorney's office give you any relocation funds?

A    No.

Q    In fact, they denied you relocation

GONZALEZ 000590

108

funds, didn't they?

A    Yes.

Q    I want to go back to Exhibit 1, which is your affidavit.

A    (Witness complies).

Q    I'm sorry.  Give me one second.  At No. 31 of your affidavit it says in approximately 2016 I learned of Detective Guevara's record of abuse via a news article and I realized I should tell my story and I began telling people.  Do you remember seeing Detective Guevara in a news article or on TV or where did you first see Detective Guevara in 2016?

MS. ROSEN:  Object to the form.

MR. LEINENWEBER:  Objection, form.

A    On the news.

BY MS. BONJEAN:

Q    On the news?

A    Yes.

Q    Did you see his face?

A    Yes.

Q    And did you recognize him?

A    Yes.

Q    And did you recognize him as the person who had questioned you in that holding

GONZALEZ 000591

109

room back in 1990?

A    Yes.

Q    Yes?

A    Yes.

MR. LEINENWEBER:  Wait, wait.  Object to form and foundation.  Can we just make sure we're not talking over each other?

MS. BONJEAN:  Yeah, sure.

THE WITNESS:  My apologies.

BY MS. BONJEAN:

Q    That's okay.  You're fine.  So when you saw Detective Guevara on the news, did you recognize him as the person who had choked you in the holding room?

MR. LEINENWEBER:  Objection to form.

A    Yes.

BY MS. BONJEAN:

Q    And when you saw Detective Guevara on the news, did you recognize him as the person who had physically assaulted you in that room?

MR. LEINENWEBER:  Objection to form.

A    Yes.

BY MS. BONJEAN:

Q    And when you saw Detective Guevara on that news show, did you recognize him as the

GONZALEZ 000592

110

person who hit you in your ear on the side with an open hand?

MR. LEINENWEBER:  Objection to form.

A     Yes.

BY MS. BONJEAN:

Q     And when you saw Detective Guevara on the news, did you recognize him as the person who -- as the person who told you what to say in that statement?

MS. ROSEN:  Object to the form, leading.

MR. LEINENWEBER:  Yes, join, yeah.

A     Yes.

BY MS. BONJEAN:

Q     I'm sorry?

A     Yes.

Q     And when I'm talking about the statement, I'm talking about the statement you put your name on when you were in custody, okay? Did you recognize Guevara as the person who told you that you had to put your name on a statement?

MS. ROSEN:  Objection, form, foundation.

MR. LEINENWEBER:  Join.

A     Yes.

MR. LEINENWEBER:  Also leading.

MS. BONJEAN:  Okay.  Give me one minute.

GONZALEZ 000593

111

I think I might be finished.  Go off the record for one second.

(Whereupon a recess was taken from 12:29 p.m., to 12:32 p.m., after which the following proceedings were had:)

MS. BONJEAN:  So, Mr. Cruz, I am finished asking you questions.  The other attorneys in the room are going to be asking you questions now.  And also, I actually have to catch a flight.  So Ashley's going to be defending from here on if that's okay, if nobody has an objection to that.

MR. ENGQUIST:  That's fine.

MS. ROSEN:  No, not a problem.

(Whereupon a lunch recess was taken from 12:33 p.m., to 1:10 p.m., after which the following proceedings were had:)

A F T E R N O O N   S E S S I O N

JUSTINO CRUZ,

called as a witness herein, having been previously sworn and examined, testified further as follows:

CROSS-EXAMINATION

BY MS. ROSEN:

Q    Okay.  So I'm going to now ask you some questions and then some of the other lawyers might.

GONZALEZ 000594

112

A     Okay.

Q     Okay.  You have a lawyer here today yourself, right?

A     Yes.

Q     Why is that?

A     For the questions you guys are asking me. He's my attorney.

Q     I know.  Why do you feel like you have to have an attorney?

A     I don't understand.

Q     Yeah.  Why do you feel like you need an attorney?

MR. PRADOS:  I'm just going to object on the grounds that, you know, we represent Mr. Cruz in a Torture Commission claim.  And we, you know, we don't want to get -- we don't want the questioning to get into any conversations between Mr. Cruz and his lawyers.

MS. ROSEN:  I didn't ask him about any conversations.  I asked him why he had a lawyer.

Q     Why do you have a lawyer?

A     Because a couple, like two years ago the state's attorney came to my job and threatened me about this case again and I said I'm going to go get a lawyer.  That's when I went and got a lawyer.

GONZALEZ 000595

113

Q    And what state's attorney threatened you?

A    It was a state's attorney and detectives who worked for the state's attorney came to my job.

Q    What was that state's attorney's name?

A    That was two years ago.  I'd have to go back and -- I don't remember from the top of the head because they came to my job.  I was like -- I was working and my boss came and said you got two persons who want to talk to you.  He goes I didn't know who they were when I walked in.  That's when they said they were from the state's attorney office.

Q    Was it a male state's attorney or a female state's attorney?

A    Both men, both men.

Q    What were their race?

A    White.

Q    And how long did you speak with those state's attorneys at your work two years ago?

A    They came and they was asking me questions around a half hour.

Q    And what kinds of questions were they asking you?

A    Did I know about Juan Maysonet coming

GONZALEZ 000596

114

retrial.  I said no.

Q    What else did they ask you about?

A    Don't remember.

Q    What was the threat?  You said they threatened you.  What was the threat?

A    They asked -- talking about I need to testify.  I told them I never testified against Juan Maysonet.

Q    And what was the threat?  You said they threatened you.

A    Oh, locking me up again.  I said you can't lock me up again.  I already did my time.

Q    What did they say they were going to lock you up for?

A    If I don't testify, like hold me in contempt.

Q    Because you told them you didn't want to testify?

A    I said I wasn't.

Q    You refused to testify?

A    Yes.  I said I didn't testify against him in the first time, and I wasn't doing none of that stuff again.  I was done with all that.

Q    And did they serve you with a subpoena?

A    No.

GONZALEZ 000597

115

(Whereupon Deposition Exhibit No. 9 was marked for identification, MM.)

Q    I'm going to ask you to take a look and what we've marked as Exhibit No. 9. Do you see this document that's a subpoena with the caption People vs. Jose Maysonet?  Do you see the document?

A    Yes.

Q    Okay.  And it says at the top Subpoena. "The People of the State of Illinois to all Peace Officers in the State, Greeting:  We command that you summon Justino Cruz" -- that's your name, right?

A    Yes.

Q    -- "2601 Silver Creek, Franklin Park, Illinois, 60130."  Was that your address in 2017?

A    Yes.

Q    Okay.  And it says that you are commanded to appear before the Honorable Judge Rickey Jones on February 22, 2017 at 9 a.m.  Do you see that?

A    Yes.

Q    Okay.  So did you receive a copy of this subpoena?

A    No.

GONZALEZ 000598

116

Q    Do you see at the bottom of the subpoena it says Service, I served this Subpoena by handing a copy to Justino Cruz on January 31, 2017?  Do you see that?

A    Yes, down at the bottom, yeah.

Q    Yeah.  So this document indicates that you were served on January 31, 2017.  Is that not accurate?

A    I don't remember.

Q    Do you understand that a subpoena is a court order?

A    Yes.

Q    So if you were subpoenaed in 2017 to appear in court, did you understand that you could not refuse that subpoena?

A    Yes.

Q    Do you believe that the conversation that you had with the state's attorneys was after you received the subpoena?

A    I don't understand the question.

Q    The discussion that you had that you talked about with the state's attorney where you said the state's attorney told you that you could be held in contempt, do you believe that that happened after you were served with the

GONZALEZ 000599

117

subpoena?

        MS. COHEN:  Objection, form.

    A   Like did I get that before they came to see me?

BY MS. ROSEN:

    Q   Yes.

    A   No.

    Q   You don't think you did?

    A   No.

    Q   Did they hand it to you when they saw you?

    A   No, they didn't give me nothing when -- they just came and talked to me.

    Q   Okay.  And as you sit here today, are you saying you didn't get the subpoena or you don't remember getting the subpoena?

    A   I don't remember.

    Q   Okay.  And the attorney -- when did you hire your attorney?

    A   January 2, 2018.

    Q   So did your attorney prepare the affidavit that's marked Exhibit No. 1?

    A   Yes.

    Q   What's the name of your attorney that prepared this document?

GONZALEZ 000600

118

A   It was the other attorney.  I always forget his name.  It was his partner.

Q   And the attorney that's here with you today, what's his name?

A   My attorney?

Q   The one that's here today sitting with you, what's his name?

A   It starts with -- I'm bad with names. That's why -- just I'm just real bad with names. I can't -- his name's Adrian.

Q   Adrian?

A   Yeah.

Q   Do you know Adrian's last name?

A   No.  The truth, I can't pronounce the last name.

Q   And before today how many times have you met with Adrian?

A   Just talked to him on the phone.

Q   How many times have you talked to him on the phone?

A   Counting the times, a bunch of -- more than five or six times.

Q   Okay.  And the other attorney whose name you can't remember, have you ever met with him in person?

GONZALEZ 000601

119

A    Yes, in his office.

Q    Where's his office?

A    It's on 83rd and it's in the suburbs. I always forget the other street because I've been there one time, and the rest of the time I talked to him on the phone.

Q    Got it.  How did you find the attorneys that you hired?

A    Through my wife's cousin.

MR. GREENBERG:  I'm going to object to the relevance.

BY MS. ROSEN:

Q    Okay.  Through what?

A    Wife's cousin.

Q    And what was your wife's name?

A    Elizabeth Cruz.

Q    And what's the name of your wife's cousin?

A    The one who gave us the attorney's name is -- you know, I can't remember which one because she -- we talked to around two of her cousins.  I don't remember which ones did it, who.

Q    And when did you decide you needed an attorney?

A    After they came to my job.

GONZALEZ 000602

120

Q    So after the state's attorney and the state's attorney investigator came to your job about Mr. Maysonet's case, you decided you needed to have a lawyer, right?

A    Yes.

Q    And if I understand you correctly, you asked around and one of your wife's cousins recommended the lawyer that you have today, correct?

A    Yes.

Q    And what are the lawyers doing for you?

MR. PRADOS:  I'd just caution my client not to get into the substance of any conversations that he's had with us.

BY MS. ROSEN:

Q    Sure, yeah.  I don't want to know about what you talked about.  I want to know what work they're doing for you.

A    Just keeping me out of jail because I was threatened from the officers.

Q    Got it.

A    And the state's attorney.

Q    Now, your attorney when I started asking these questions said that they represent you in a TIRC Commission proceeding.  Do you know

GONZALEZ 000603

121

what that is?

A No.

Q Do you know what he's talking about?

A Yes.

Q What is he talking about?

A About the officer who threatened me, who abused me when I was locked up.

Q So you have some proceeding that you're bringing against the officer that locked you up?

A Yes.

Q And do you remember the officer's name?

A The Latino officer.

Q Do you remember his name?

A No.

Q Okay. So the Latino officer that you have been talking about earlier today, the one that you said choked you?

A Yes.

Q Okay. So you have filed some sort of action against that police officer, correct?

A Yes.

Q And what is your goal in connection with that action that you filed against the police officer? What do you want to have happen?

A Justice.

GONZALEZ 000604

122

Q    And what is justice for you?

A    Get my name clear.

Q    And how do you expect to get your name cleared?

A    Overturn the conviction.

Q    So you want to get your conviction overturned too, correct?

A    Yes.

Q    And then after you get your conviction overturned, do you plan to file a lawsuit like Mr. Maysonet?

A    I don't understand.  I don't know what he's doing, what Maysonet is doing.  I don't --

Q    You don't know what Mr. Maysonet's doing?

A    No.

Q    Do you know why you're here today?

A    For my statement.

Q    Right.  But do you know, you know -- Ms. Bonjean, you had met her before today, right, the lawyer?

A    Just one time, yeah.

Q    Yeah.  And she told you she represents Mr. Maysonet, right?

A    Yes.

GONZALEZ 000605

123

Q    And do you know today, this deposition, for what kind of case it's for?

MS. COHEN:  Objection, form.

A    No.

BY MS. ROSEN:

Q    Do you understand that Mr. Maysonet got his conviction overturned?

A    Yes, it was on the news.

Q    Right, okay.  And so that case is over, right?

A    I don't know.

Q    Do you know that Mr. Maysonet has now filed a lawsuit against the City of Chicago and the police officers seeking money?

A    I don't know.

Q    If you get your conviction overturned, are you planning to file a lawsuit to get money to compensate you for the years you spent in prison?

A    I'll discuss that with my lawyers.

Q    I understand that.  But my question is is that your goal, your plan?  As you sit here today, if you get your conviction overturned do you plan to file a lawsuit to get money for the ten years or so that you spent in prison?

GONZALEZ 000606

124

A    I don't know.

Q    Is it a possibility?

A    Maybe.

Q    Now, if you take a look at Exhibit No. 1, do you see at the top there it says People of the State of Illinois vs. Alfredo Gonzalez? Do you see that there?

A    Yes.

Q    And do you know why that caption is on the document?  Did anybody tell you why this document was prepared, other than your lawyers? Do you know why it was prepared in The People vs. Gonzalez case?

A    I don't understand the question.

Q    You told me that the state's attorney came out to your work with his investigator to talk to you about Mr. Maysonet's case, right?

A    Yes.

Q    He wasn't talking to you about Mr. Gonzalez's case, right?

A    He did mention Alfredo too.

Q    He did?

A    Yes.

Q    And what did he say about Alfredo?

A    That he's still locked up.

GONZALEZ 000607

125

Q    Anything else?

A    I don't remember.

Q    So you don't know why the document says what it says at the top?

A    Maybe talking about my case and everything.

Q    I just want to know if you know why the top of the document says People vs. Gonzalez. If you don't, that's fine --

A    No, I don't know.

Q    -- but do you know?

A    No.

Q    Okay.  And you said you did not prepare this affidavit, right, your lawyers did?

A    Yes.

Q    Did your lawyers talk to anybody other than you, to your knowledge, to prepare this affidavit?

A    I don't know.

Q    Okay.  We'll get back to the affidavit in a minute.  You said earlier today that at the time of your arrest in 1990 you were a member of the Latin Kings, correct?

A    Yes.

Q    When did you begin your membership with the Latin Kings?

GONZALEZ 000608

126

A    Don't remember.

Q    You were what, 21 in 1990, is that right?

A    Yes.

Q    How old were you when you started hanging and associating with the Latin Kings?

MS. COHEN:  Objection, foundation.

A    I was in my teens.

BY MS. ROSEN:

Q    Early teens or late teens?

A    Late.

Q    So 17, 18?

A    Around there.  I was 16, around there.

Q    16.  And why did you become a member of the Latin Kings?

A    I lived in the neighborhood.

Q    And what about the fact that you lived in that neighborhood caused you to join the Latin Kings?

A    Don't remember.

Q    What did you do as a member of the Latin Kings?  What were your activities?

A    Sell drugs and hang around together.

Q    Did you have any rank within the street gang?

GONZALEZ 000609

127

A    No.

Q    Did your brother have rank within the street gang?

A    Yes.

Q    What was your brother's rank?

A    Don't remember.

Q    And I'm talking about Efrain.  Efrain, is that how you say it, Efrain?

A    Efrain.

Q    That's the brother I'm talking about.

A    Yes.

Q    You don't recall his rank?

A    No.

Q    Are you close with your brother Efrain?

A    Yes.

Q    Where does he live today?

A    In Chicago.

Q    Where?

A    I don't know his address.

Q    Do you have a phone number for him?

A    No.

Q    How do you get in touch with him?

A    Through my sister.

Q    Which sister?

A    Yolanda Cruz.

GONZALEZ 000610

128

Q    So if you want to get in touch with your brother Efrain, you have to contact Yolanda?

A    Yes.

Q    Why?

A    Because she sees him every day.

Q    Why does she see him every day?

A    Because I think they live close to each other because they live in the city.  I live in Franklin Park.

Q    Do you have her phone number?

A    Yes.

Q    Do you know her address?

A    Right now, no, because she just moved to the South Side.

Q    When's the last time you talked to your brother Efrain?

A    Probably around three weeks ago.

Q    Does he know that you had to give a deposition in this case?

A    No.

Q    Have you talked to him at all about the deposition in this case?

A    No.

Q    Have you talked to him at all about the affidavit that you prepared, Exhibit No. 1?

GONZALEZ 000611

129

A    No.

Q    Have you talked to him at all about the fact that the state's attorney's office came out to your employment two years ago?

A    No.

Q    Is Efrain older than you or younger than you?

A    Older.

Q    How much older?

A    A year.

Q    Are you still a member of the Latin Kings?

A    No.

Q    When did you leave the Latin Kings?

A    When I got locked up.

Q    When you got locked up?

A    Yes.

Q    So on the date of your arrest?

A    No.

Q    Okay.  So when did you leave the Latin Kings?

A    Don't remember.  But I was locked up when I left the Latin Kings.

Q    Were you still in Cook County Jail or were you in the Illinois Department of

GONZALEZ 000612

130

Corrections?

A    Don't remember.

Q    What did you do to remove yourself from the gang?

A    I just told them I was done.

Q    Who did you tell?

A    I don't recall who I talked to.

Q    If you want to leave the street gang, who do you have to tell, somebody of rank? What's the procedure?

A    I don't remember what the procedures are.  I've been out of this over 20 years.  I don't remember.

Q    So you went and talked to somebody while you were in custody?

A    Yes.

Q    So you talked to somebody that was in custody or --

A    No, I called somebody on the phone in the County.

Q    From the County?

A    Yes.

Q    So now you recall that you removed yourself from the street gang while you were still in County?

GONZALEZ 000613

131

A    Yeah, that's what I -- yes, when I was locked up.

Q    Right.  But you were first locked up in Cook County Jail and then you went to the Illinois Department of Corrections.

A    Yes.

Q    Right.  So in terms of trying to pinpoint when you left the street gang, it was during the period of time while you were in Cook County Jail, right?

A    Yes.

Q    So sometime before, what, 1995?

A    Somewhere around there.

Q    Right, because you went into the -- you got sentenced in 1995, right?

A    Yes.

Q    And once you got sentenced you went to the Illinois Department of Corrections, right?

A    Yes.

Q    So you called somebody and said you were done, is that how it went?

MS. COHEN:  Objection, form.

A    Yes, that's what -- I called somebody.

BY MS. ROSEN:

Q    You just don't remember who?

GONZALEZ 000614

132

A    No.

Q    Did you report to somebody in the street gang when you were out on the street?

A    No.

Q    Was there somebody above you?

A    Yeah, you got ranks, people who are ranks.  You got soldiers and you got -- I think I was just -- I was just a regular soldier.

Q    Okay.  So you were a soldier.  And what rank was above you?

A    Like same thing like in the Army, lieutenants and like that.

Q    So what was the rank directly above a soldier?

A    Don't know.

Q    If you wanted to quit the gang, who would you call, the rank right above you or somebody higher up in the chain of command?

MS. COHEN:  Objection, foundation.

A    Don't remember.

BY MS. ROSEN:

Q    Did you suffer any consequences as a result of removing yourself from the street gang?

A    Don't understand the question.  What do you

GONZALEZ 000615

133

mean by that?

Q    Do you know what it means to be violated?

A    Yes.

Q    What does it mean?

A    You get three minutes or -- depends what they put -- you get beat up.

Q    And that's by fellow gang members, right?

A    Yes.

Q    And that's some sort of punishment, right?

A    Yes.

Q    For a variety of things, right?

A    Yes.

Q    Do you have to get violated to gain entrance into the Latin Kings?

A    Yes, yes.

Q    So you were violated to become a member of the Latin Kings?

A    Yes.

Q    Do you have to get violated to exit the Kings?

A    Yes.

Q    Did you get violated to exit the Kings?

GONZALEZ 000616

134

A    Don't remember.

Q    Other than being violated to become a member of the Latin Kings, did you get violated any other time during the course of time that you were a member of the Latin Kings?

A    Don't remember.

Q    Were you concerned when you testified against your uncle about what the gang would do to you?

MS. COHEN:  Objection, form.

A    Don't remember.

BY MS. ROSEN:

Q    At the time that you were a member of the Latin Kings back in the late '80s and early '90s, did gang members get violated for testifying against fellow gang members?

A    To my knowledge, yes.

Q    So when you testified against your uncle, Alfredo Gonzalez, a fellow Latin King, were you concerned that you were going to get violated?

A    Yes.

Q    Is your brother Efrain still a Latin King?

A    Don't know.

GONZALEZ 000617

135

Q    Are there any other of your family members that are Latin Kings?

A    Don't know because I don't stay in touch with none of them.

Q    When's the last time you had any contact with Mr. Maysonet?

MS. COHEN:  Objection, asked and answered.

A    I haven't talked to him.

BY MS. ROSEN:

Q    I'm not asking solely about talking to him.  I'm asking about any contact whatsoever. So when's the last time you had any contact at all with Mr. Maysonet, whether it's in person, by phone, by text, by email, on social media, any contact whatsoever?

MS. COHEN:  Objection, form, compound.

A    Don't remember.  Probably like in the '80s.

BY MS. ROSEN:

Q    Okay.  And how did you know Mr. Maysonet back in the 1980s?

A    In the neighborhood.

Q    Is he somebody you hung out with?

A    No.

Q    Somebody you sold drugs with?

A    Yes.

GONZALEZ 000618

136

Q   How often would you sell drugs for the Latin Kings?

MS. COHEN:  Objection, foundation.

A   Don't remember.

BY MS. ROSEN:

Q   Was it often?

A   Like on the weekends.

Q   Was it every weekend?

A   Yes.

Q   And how often did you sell drugs with Mr. Maysonet?

MS. COHEN:  Objection, foundation.

A   I'd sell with a lot of different guys. I don't remember who I sold with.

BY MS. ROSEN:

Q   What kinds of drugs did you sell?

A   Marijuana.

Q   Anything else?

A   No.

Q   Your Uncle Alfredo, did he have rank in the street gang?

A   Don't know.

Q   You didn't know back in the 1980s if he had a rank or anything?

A   Don't know.

GONZALEZ 000619

137

Q    How much older than you is he?

A    I've got no idea.

Q    Well, back when you got arrested you were 21, right?

A    Yes.

Q    And approximately how old was he?

A    I don't know.

Q    Was he 50?

A    I don't know how old he was.  He was older than me by I think around 10 or 15.  I think so.

Q    Okay.  So around 10 or 15 years older than you?

A    Yes.

Q    And you said -- how is he related to you?  He's your --

A    He's my mom's brother.

Q    Your mother's brother.  And when's the last time you had any contact with him?

A    Around in the '80s or '90s, like that.

Q    Around the time of these events, the arrests?

A    Before.

Q    Before that.  And your mother, is she still alive?

GONZALEZ 000620

138

A    Yes.

Q    And what's your relationship with her?

A    Talk to her on the phone all the time.

Q    When's the last time you saw your mother?

A    Like a month ago I had to take -- I was in the hospital with her.

Q    She was in the hospital?

A    Yes.

Q    Is she okay?

A    Yes.

Q    And what's her relationship with your -- with her brother, if you know?

A    They don't talk.

Q    Do you know why not?

A    I don't get into it.

Q    She's never told you why she stopped talking to her brother?

A    No.

Q    And why did you stop talking to your uncle?

A    Because of the case.  That's the last time.

Q    Before you were arrested in 1990, when's the last contact you recall you had with your uncle?

GONZALEZ 000621

139

MS. COHEN:  Objection, form.

A    Maybe a birthday party or something.

BY MS. ROSEN:

Q    Now, you testified earlier about being arrested at a bus stop by the Latino detective and a white detective.  How did you know they were detectives?

A    Because of the car they were in.  They were in a plain car and they wore regular street -- regular uniforms, regular clothes.

Q    So because of the car that they were driving and the clothes that they were wearing?

A    Yes.

Q    Any other reason that you concluded they were both detectives?

A    No, because I lived in the neighborhood and you know what kind of cars the detectives drive, plain cars and they're in street clothes.

Q    But there's no other reason other than that, right?

A    Yeah.

Q    Okay.  And I think you said earlier before you were arrested, you had never seen this Latino officer before, right?

A    Yes.

GONZALEZ 000622

140

Q    After you gave your handwritten statement that night, which is Exhibit 2, did you ever see that Latino detective again?

MS. COHEN:  Objection, form.

A    After --

BY MS. ROSEN:

Q    After you did that, after you signed that document, did you ever see that Latino detective again?

A    Don't remember.

Q    So I want to talk a little bit about your questioning that you described earlier by the Latino detective and the white detective. And you said that they brought you to the police station, put you in a room and left you there for a couple hours, right?

A    Yes.

Q    And then they came back and then they stayed in the room with you I think you said for two hours straight, right?

A    For over two hours or more.

Q    Or more, okay.  And you told us earlier they were asking you questions and then you also described being grabbed by the throat and slapped in the left ear, right?

GONZALEZ 000623

141

A    Yeah.  He grabbed me to the throat and when he grabbed me to the throat, like I was close to the wall because I was handcuffed to the wall.  That's when I got banged -- my head got hit to the wall, and he slapped me a couple times in the ear.

Q    Other than grabbing you by the throat and pushing you against the wall, causing you to strike the back of your head on the wall and slapping you a couple times in the left ear -- is that what you said?

A    Yes.

Q    -- did the Latino detective use any other physical force against you?

A    No, just grabbed me to the throat and smacked me around and everything.

Q    So how many times did he grab you by the throat?

A    Don't recall.  I know it was a couple of times, more than twice or three times.  He just -- every time he tried to talk to me maybe.

Q    So he on multiple occasions grabbed you by the throat and knocked your head against the wall?

A    Yes.

GONZALEZ 000624

142

Q    Was it more than three times?

A    Don't recall.  I know it was just -- he was -- every time he speak to me, he was grabbing me, hitting me in the ear and everything.

Q    Okay.  So I want to kind of break it down a little bit, okay?  So you said he on multiple occasions grabbed you by the throat, right?

A    Yes.

Q    Was it with one hand or two hands?

A    Both hands.

Q    And then he thrust you, pushed you against the wall, right?

A    Yes.

Q    And each time he did that you hit your head against the wall, correct?

A    Yes.

Q    Okay.  And can you tell us approximately how many times he did it?  Was that five times or a hundred times?

A    Around five to ten times.

Q    And each time he did that you struck your head against the wall, correct?

A    Yeah, because I was like -- this is -- I was sitting right here and this -- I was handcuffed

GONZALEZ 000625

143

like this.  Every time he grabbed me, I'm so close to the wall, boom, boom and everything.

Q    And did he strike you against the wall with force?

A    Yes.

Q    It was hard?

A    Yes.

Q    Did you crack your skull, you know?  Did your skull have any bleeding?

A    A bump.

Q    A bump?

A    Yeah.

Q    And you felt the bump at the -- later on when you touched your head?

A    Yes.

Q    Did you have one bump or more than one bump?

A    Just one.

Q    And can you tell us where the bump was?

A    In the back of the head because that's where --

Q    So like about the middle of the back of your head?

A    Yes.

Q    Okay.  And then you said he slapped

GONZALEZ 000626

144

you in the face on the left side, right, by your ear?

A    Ear, ear.

Q    And that just happened to be the ear that you had an ear infection in, right?

A    Yes, because he knew I had an ear infection because I had medication.  When they picked me up, they saw medication on me.

Q    I see.  What kind of medication did you have on you?

A    For an infection on my left ear.

Q    What kind of medication was it?

A    Whatever the doctor give you for an infection.

Q    And when did you go to the doctor to get that medication?

A    Like a couple of days before they picked me up.

Q    And who was your doctor?

A    Don't recall.

Q    And did you have a regular doctor back in 1990?

A    No.

Q    So where did you go to get the medication?  Did you go to a doctor's office or

GONZALEZ 000627

145

a clinic or the hospital?

MS. COHEN: Objection, form.

A    Doctor's office.

BY MS. ROSEN:

Q    Doctor's office?

A    Yes.

Q    But you didn't have a regular doctor, right?

A    No.

Q    So where did you get the name of a doctor?

A    Don't recall.

Q    So you had this medication in your pocket when you got arrested?

A    Yes.

Q    And did the medication say ear infection in the left ear, ear infection in the right ear?

A    In the left ear.

Q    It said that on the medication?

A    Yes.

Q    And so did the Latino detective say anything about your ear infection?

A    Don't recall.

Q    So how many times did he hit you in your left ear?

GONZALEZ 000628

146

A     More than five times.

Q     More than five times.  And he hit you hard, right?

A     Yes.

Q     And did you have swelling or redness on your face?

A     Redness around the ear and everything.

Q     And did it bruise?

A     Yes, because when I got to the County, I had to go see -- they had to take me to go see a doctor and everything.

Q     And they saw the bruises, right? You talked about the fact that your ear was bruised?

A     Yeah.

Q     Yeah.  And that's why you went to the doctor, right, because you had this ear infection and then the police officer hit you?

A     Yes.

Q     And it was hurting you, right?

A     Yes.

Q     And so you told those doctors that the detective hurt you, right?

A     I think so.  I did.

Q     Yeah.  And you showed them where you had

GONZALEZ 000629

147

the bruising --

A    Yeah.

Q    -- and they gave you whatever medicine they gave you, right?

A    Yes.

Q    Okay.  Other than choking you -- did you have, by the way, any marks on your throat from the choking?

A    Don't recall.  So many years.

Q    Yeah.  Do you remember seeing bruises or anything because of the way he grabbed you around your throat?

A    No.  The only bruise I remember, it was the ear because it was bothering me.  I was like kind of bleeding a little bit, and that's what I was more concerned about, losing my ear from hearing and everything.

Q    Right.  Did you lose any hearing?

A    A little bit.

Q    Yeah.  And did you go to -- continue to go to the doctors about your hearing loss?

A    Yeah, when I was in the County and plus when I was in the penitentiary.

Q    Yeah.  So even into the Illinois Department of Corrections you were still having

GONZALEZ 000630

148

trouble?

A     Yes.

Q     Okay.  And when you got out, did you go to doctors for your hearing?

A     Yes.

Q     Yeah.  And what doctors when you got out did you go to for your hearing?

A     The doctor my wife was seeing at the time.

Q     And what's his name?

A     He's Indian.  I've got his name on my phone, but I can't recall because it's like an Indian name.

Q     You can check your phone and give us his name.

MR. GREENBERG:  You can stop asking him questions.

MS. ROSEN:  Why?

MR. GREENBERG:  Because he already -- he doesn't remember him.

MR. ENGQUIST:  He's got it right there.

MS. ROSEN:  He's got it.

A     Dr. Sawlani.

Q     Can you spell it?

A     S-a-w-l-a-i -- I mean n-i.

Q     L-a-n-i?

GONZALEZ 000631

149

A     S-a-w-l-a-n-i.

Q     And do you have a phone number there?

A     (773) 237-4554.

Q     Thank you.  And when's the last time you saw Dr. Sawlani for your ear issue?

A     Don't remember.

Q     Was it within the last five years?

A     Every time I go he checks my ear.

Q     All right.  So during this two hours or more that you were with the detectives and they were talking to you, you told us earlier they were asking you questions and you didn't remember all the questions.  Do you remember any of the questions that they asked you?

A     About Alfredo and Juan, that did I know they were locked up, and I told them I heard about them being locked up.  And they started asking me about any murder.  I said I don't know nothing about no murder.

Q     So before you were arrested, you had already heard that Alfredo and Mr. Maysonet had been arrested?

A     I don't remember.

Q     Maybe I misunderstood you.  I thought what you just said is that --

GONZALEZ 000632

150

A    He asked me in there did I know --
he told me that Juan and Alfredo was locked up.
It was like I didn't know.

Q    Oh, you didn't know.  He told you.

A    Yeah.

Q    I see, okay.  I misunderstood you.
So he told you they were locked up.  What else
did he tell you?

MS. COHEN:  Objection, form.

A    I don't remember.

BY MS. ROSEN:

Q    And did he ask you questions about
the murders?

A    Yeah, he just started asking me questions
about murders.  I told him I don't know what he was
talking about.

Q    Okay.  And then he kept pressing you,
I take it?

A    Yes.

Q    And then did you eventually say you did
know what he was talking about?

A    No.

Q    So you never in that room with that
detective the whole time, never said that you
knew what he was talking about?

GONZALEZ 000633

151

A    I never knew what he was talking about.  I told him I don't know what he was talking about.

Q    So he was in the room with you for two hours or more asking you questions and choked you and hit you and then the interview ended, right?  They were done talking to you at some point?

A    Yeah, he would leave.  Then they'd come back then.

Q    At any point in time did you say, yeah, I confess, I did it, I was part of it, I was involved in the murder?

MS. COHEN:  Objection, form.

A    No.

BY MS. ROSEN:

Q    You never admitted it?

A    I told them I didn't know what they were talking about.

Q    The whole time?

A    Yes.

Q    So you never told the detectives at the end of their talking to you that you were involved in the murder?

A    No.

GONZALEZ 000634

152

Q    Or that you observed Mr. Maysonet and Mr. Gonzalez --

A    No.

Q    -- in the murder, being involved in the murders?

A    No.

Q    Okay.  So I want to talk to you then about your statement, Exhibit No. 2.  So do you recall this document from back in 1990 from having seen it?

A    When the -- when they gave it to me.

Q    Who gave it to you?

A    The state's attorney or the officer.

Q    So do you remember talking to a state's attorney?

A    I remember -- it was the officer or the state's attorney handed it over.

Q    Right.  So my question's a little bit different.  Do you recall while you were at the police station at any point in time talking to a state's attorney?

A    Don't remember.

Q    So it's possible you did and possible you didn't?

        MS. COHEN:  Objection, form.

GONZALEZ 000635

153

A    Maybe.

BY MS. ROSEN:

Q    Maybe.  Do you see at the top of this statement it says Present ASA Perkaus?  Do you see that there?

A    Yes.

Q    And do you understand that ASA means assistant state's attorney?

A    No.

Q    You don't, okay.  And then beneath that it says Detective Schak.  Do you see that, S-c-h-a-k?

A    Yes.

Q    Do you recall speaking to a detective named Schak?

A    No.

Q    And then if we look to the typewritten language in the middle of the statement, do you see it says I understand I have a right to remain silent and that anything I say can be used against me in a court of law. I understand that I have a right to talk to a lawyer and have him present with me during questioning and if I can't afford to hire a lawyer, one will be appointed by the court

GONZALEZ 000636

154

to represent me before any questioning. Understanding these rights, I wish to give a statement. Do you see that there?

A    Yes.

Q    And do you see your signature below that?

A    Yes.

Q    Is that your handwriting?

A    Yes.

Q    Okay. Do you recall either reading it, that paragraph, or somebody reading it to you and then signing your name?

A    Don't remember.

Q    Do you doubt that that's your name?

A    No.

Q    In your handwriting?

A    No, that's my writing.

Q    Okay. And I'm not going to go through the whole statement with you. Ms. Bonjean asked you a bunch of questions about it. And you have told us that the statement basically is not true, correct?

A    Yes.

Q    And at the time of these events and before you signed the statement was somebody

GONZALEZ 000637

155

reading -- did somebody read this statement to you?

A    Don't remember.

Q    Why did you sign this statement?

A    Because I was threatened for my life.

Q    Because what?

A    I was threatened of my life.

Q    Who threatened you?

A    The officer abusing me in the -- when I was in that little room.

Q    And who came up with the story that's in this statement?

A    The officer.

Q    The officer.  Did he discuss it with you or was it all just written down and you signed it?

A    I just -- everything was already written.

Q    So before the state's attorney -- you don't recall the state's attorney at all, right?

A    Don't recall.

Q    Okay.  Before you signed this statement, had you read what was in it or had it been read to you so that you knew the words that were on the page before you signed it?

A    Don't recall.

GONZALEZ 000638

156

Q    Before you signed this statement, did the detectives tell you what you should say about the crime?

MS. COHEN:  Objection, form, foundation. Detectives.

A    I don't recall.

BY MS. ROSEN:

Q    Did any detective tell you what to say about the crime?

A    The only thing I recall, they say if I sign it, I'll get -- I could probably be let go.

Q    Did you understand when you were signing this statement that you were signing a statement that involved you in a murder?

MS. COHEN:  Objection, form.

A    I don't recall.

BY MS. ROSEN:

Q    If you look at the top part of the document, it says this statement is taken regarding the fatal shooting of Torrence Wiley and Kevin Wiley.  Do you see that there?

A    Yes.

Q    So when you signed this document, did you notice that it said it was about a fatal shooting of two people?

GONZALEZ 000639

157

A    The only thing I knew was a shooting because that's the questions they were asking me in the room.

Q    So you didn't pay attention to the words on this piece of paper before you signed it?

A    No, no.

Q    No?

A    Because I didn't understand that much English.

Q    You said you graduated from high school, right?

A    Yeah, but I was a bilingual student when I was in high school.

Q    Spanish and English?

A    Yes.

Q    Where were you born?

A    Puerto Rico.

Q    When did you come to the United States?

A    Don't recall.

Q    Were you 5 or 15?

A    I was young.  Then I went back to Puerto Rico and lived there a couple more years.

Q    How many years did you attend -- you said you went to Clemente?

GONZALEZ 000640

158

A    Yeah, four years.

Q    And did you take English-speaking classes at Clemente?

A    It was bilingual, English and Spanish.

Q    Right.  But you were taught in both languages, right?

A    Yes.

Q    And did you go to grammar school here in the United States?

A    Went to both Puerto Rico and here.

Q    In Puerto Rico did they teach you both English and Spanish?

A    Spanish.

Q    Spanish only?

A    (Nodding).

Q    Yes?

A    Yes.

Q    When you graduated high school, could you speak English?

A    A little bit, not that good.  But to get me around, yes.

Q    And did you have a driver's license?

A    Yes.

Q    Did you take a driver's test?

A    A Spanish one.

GONZALEZ 000641

159

Q    And where did you say you worked?

A    Acme Industry.

Q    And what did you do for them?

A    I do shipping and receiving.

Q    Where did you work back in 1990?

A    Oh, at that time?

Q    Sorry.

A    Oh, my fault.

Q    No, bad question.

A    I worked at a printing shop.

Q    And what did you do at the printing shop?

A    Print checks, set it up to print checks.

Q    I see, okay.  So I just want to go to the statement.  If you look at the first page, the second paragraph it says, "Justino stated he is a graduate of Clemente High School and can read and write."  Do you see that?

A    Yes.

Q    Did you tell either the detective or the state's attorney that was talking to you that you were a graduate of Clemente High School and could read and write?

A    Don't recall.  I just recall they asked me if I went to -- if I graduated from high school,

GONZALEZ 000642

160

and I told them yes.

Q   So that's not false information.  That's true, right?

A   Them asking me about if I graduated from high school?

Q   Yeah.

A   Yes.

Q   So that's accurate?

A   That part, yes.

Q   And you could read and write, yes?

A   A little bit I told them.

Q   Okay.  But it says you can read and write.  That's accurate, right?

A   Yes.

Q   Now, the statement says that you on May 24, 1990 at about 11:30 p.m. with Alfredo Gonzalez, Chris Hernandez and Jose Maysonet went to Jose's house at 1302 North Homan to pick up a gun.  Do you see that there?

A   Yes.

Q   Did you know that Mr. Maysonet lived at 1302 North Homan?

A   No.

Q   As you sit here today, do you know whether or not Mr. Maysonet lived at 1302 North

GONZALEZ 000643

161

Homan back in 1990?

A    No.

Q    Okay.  And you said you don't know anybody by the name of Chris Hernandez?

A    Yes.

Q    Is that correct, you don't?

A    No, I don't.

Q    And I want to draw your attention to the last page of the document where it has your signature, Justino Cruz.  Do you see that?

A    Yes.

Q    And then beneath your name it looks like Detective, and then it's hard to make out the name, but then it's got 5333.  Do you see that there?

A    Yes.

Q    Do you recall that the detective that was with you signed this statement too?

A    Don't recall.

Q    And then below that you see it says ASA Perkaus?  Do you see that?

A    Yes.

Q    Do you recall that the assistant state's attorney that was at the police station that night --

GONZALEZ 000644

162

A   Don't recall.

Q   -- that talked to you signed that?  You don't recall?

A   No.

MR. PRADOS:  I'd just remind my client to wait for the question to be finished before you answer.

BY MS. ROSEN:

Q   And I think you testified earlier that you don't know Rosa Bello, right?

A   Yes.

Q   And you also told us that Lluvio was your uncle, right?

A   Who?

Q   Lluvio?  Did I say it right?

MR. ENGQUIST:  Lluvia.

A   Oh, Lluvia?  Yes.

BY MS. ROSEN:

Q   That's your uncle?

A   Yes.

Q   And you said he did not tell you that he killed two black guys, right?

A   No, never had no conversation.

Q   So I want to have you take a look at Exhibit No. 7, which is your testimony.  Before

GONZALEZ 000645

163

your deposition today, have you had a chance to review your testimony that you gave in the trial against your uncle?

A    No.

Q    Have you ever looked at your testimony?

A    Don't recall.

Q    Since you hired your lawyers, have you looked at your testimony?

A    No.

Q    All right.  So I'm going to ask you some questions about this.  Now, do you remember, you testified in a courtroom, right?

A    Yes.

Q    And there was a court reporter there like there is one here?

A    Yes.

Q    And before you testified you were sworn in, right?

A    Yes.

Q    You raised your hand and you were -- you promised to tell the truth, right?

A    Yes.

Q    Just like you did here today?

A    Yes.

Q    But as I understand your testimony

GONZALEZ 000646

164

from this morning, the testimony you gave was not in fact truthful. It was false, right, in the trial?

A    Yes.

Q    So that was false testimony?

A    This?

Q    Yes.

A    Yes.

Q    Just by the fact that you raised your hand and said you were going to tell the truth, you did not tell the truth, right?

A    Yes.

Q    So I want you to look at page 14. And that was a jury trial, right? There were people, a jury in that jury box, right? That wasn't just the judge?

A    I don't recall.

Q    Okay. Let me -- maybe this will help refresh your recollection. If you look at the first question on page 14 it says, "Do you have an agreement with the Cook County State's Attorney's Office regarding your testimony? Answer, yes. Question, tell the Ladies and Gentlemen of the Jury what that agreement is." Do you see that?

GONZALEZ 000647

165

A    Yes.

Q    So does that help refresh your recollection that there was actually a jury there that was deciding your uncle's fate?

A    Yes.

Q    And your answer to the question of tell the Ladies and Gentlemen of the Jury what that agreement was, you testified, "For my testimony I'd be getting 22 years.  At the recommended 22 years for my testimony."  And then the followup question is, "Question, that's for your truthful testimony?  Answer, yeah."
Do you see that there?

A    Yes.

Q    So you told those 12 ladies and gentlemen of the jury that the testimony that you were about to give was going to be the truth, right?

A    Yes.

Q    But you were lying?

A    Yes.

Q    And you were lying to that jury despite the fact that you knew that the testimony that you were going to give could get you into serious trouble with the Latin Kings, right?

GONZALEZ 000648

166

A   I don't understand.

Q   Well, you told us earlier that you knew that if you testified against a fellow Latin King, you could get violated, right?

A   Yes.

Q   So you told the ladies and gentlemen of that jury that your testimony was going to be truthful, and then you testified knowing that you likely were going to get violated, right?

MS. COHEN:  Objection, form.

A   Maybe.

BY MS. ROSEN:

Q   And isn't it true that one of the main reasons you were in the witness protection section of the Cook County Jail was to protect you from gang retaliation, right?

A   I was put there at most -- around trial time.  Before that I was in population.

Q   Right.  But when you struck your deal with the state's attorney's office and you were going to testify, they moved you, right?

A   Yes.

Q   To protect you, right?

A   Don't recall.

Q   And then if we look at page 16,

GONZALEZ 000649

167

line 10 you were asked, "Now, Mr. Cruz, did you ever approach the state's attorney's office through your lawyer and offer to testify for the State?  Answer, no."  Do you see that question and answer?

A     Yes.

Q     Was that truthful testimony?

A     I never approached the state's attorney.

Q     So that was truthful?

A     Yeah.

Q     And then if we look at line 19, "Question, in fact, we approached you through your attorney, Mr. Vahey, in the beginning of January of this year with regard to a possible agreement for your testimony, correct?  Yes." Do you see that there?

A     Yes.

Q     Is that accurate, truthful testimony?

A     Yeah, they approached my lawyer.

Q     So that's accurate?

A     Yeah.

Q     Okay.  So then if we go to the bottom of page 16, line 24, "At that time how long had you been in custody awaiting trial in Cook County Jail?  Answer, around 15 months."  Was that

GONZALEZ 000650

168

accurate testimony?

A    Don't recall.  Maybe.  I don't remember.

Q    Okay.  And then reading further beginning at line 3, "And when the state's attorney's office first approached you through your attorney about our agreement for your truthfulness, in January you indicated to us that you -- through your attorney -- that you wouldn't testify for us, correct?  Answer, yes."

Is that accurate, that when the State first approached you, you said no, you weren't going to testify?

A    Yes.

Q    And then if you go to page 18, line 10, the question was, "In fact, you, through your attorney Mr. Vahey, did not accept the State's proposed agreement to testify in this case until March 13th of 1992, correct?"  And then if you go to line 22 after the objections -- or line 24, your answer is yes.

A    Yes.

Q    But is it correct that you initially rejected the State's offer?

A    Yes.

Q    But then eventually you agreed to

GONZALEZ 000651

169

testify?

A     Yeah.

Q     Why?  Why did you change your mind?

A     Don't recall.

Q     All right.  Now, if you look at page 19, you were asked some questions beginning at line 4 about your Uncle Alfredo.  And then at the bottom there the question is, "How long have you known the defendant, Alfredo Gonzalez? Answer, all my life."  Do you see that?

A     Yes.

Q     Is that accurate testimony?

A     Yes, he's my uncle.

Q     Okay.  So you knew him for your entire life, right?

A     Yes.

Q     And before the events that occurred in 1990, how would you describe your relationship with your uncle?

MS. COHEN:  Objection, foundation, form.

A     I don't recall.

BY MS. ROSEN:

Q     Was he somebody you saw regularly?

A     No.

Q     Was he somebody that you were friendly

GONZALEZ 000652

170

with?

A   Just saw him like at birthday parties, family gatherings.

Q   Did you participate in any street gang activities with him?

MS. COHEN:  Objection, foundation.

A   No.

BY MS. ROSEN:

Q   But you knew he was a member of the Latin Kings, right?

A   Yes.

Q   And where did he live in relation to where you lived?

A   Don't recall where he used to live at.

Q   Was it close to you?

A   Can't remember.

Q   But I think you told us earlier today he was part of the same section of the Latin Kings?

A   Yes.

Q   And that's a geographic location, right?  The way that the Latin Kings' sections are divided is by geography, right?

A   Don't recall.

Q   Well, Latin King members that are

GONZALEZ 000653

171

part of your section are typically Latin Kings
that are in your neighborhood, right?

    MR. GREENBERG:  Objection, foundation.

    MS. COHEN:  Objection, form.

BY MS. ROSEN:

Q    You can answer.

A    Well, we all lived around Humboldt Park.

Q    So the Latin Kings that you hung around
with and that you participated in gang activities
with were not Latin Kings from the South Side of
Chicago, right?

A    I talked to them.

Q    You talked to the gang members from
other parts of the city?

A    Yeah.

Q    Yeah.  Would you see your Uncle Alfredo
in the neighborhood?

A    Once in a while.

Q    Did he sell drugs?

A    Don't recall.

Q    Did the Latin Kings that you were
a part of have a particular territory in which
they sold drugs?

A    No.

Q    They sold drugs anywhere?

GONZALEZ 000654

172

A    Around Humboldt Park.

Q    And were there rivals to the Latin Kings back in the mid '80s to early '90s?

A    Yeah, because there's People and Folks. Latin Kings were one gang.  Then Folks were like Disciples, Dragons.  That's the opposite gangs.

Q    So the Latin Kings were, what did you say, People?

A    Yeah.

Q    So the rivals were gangs that were a part of the Folk Nation, right?

A    Yes.

Q    So people that were part of the Folk Nation couldn't come into Latin Kings territory, right?

A    No.

Q    What would happen to them if they did?

A    They'd get beat up.

Q    And are there particular individuals within the street gang that are responsible for keeping rival gangs out of Latin King territory or was it everybody's responsibility?

        MS. COHEN:  Objection to form.

A    I don't recall.

GONZALEZ 000655

173

BY MS. ROSEN:

Q    Did you ever have to keep the Latin King territory secure and beat up somebody from a rival gang that ever came into Latin King territory?

A    No.

Q    What was your arrangement with the Kings with respect to selling the drugs that you sold on the weekends?

A    I was just a Latin King member. Everybody, we all sell drugs to make money in the neighborhood.

Q    Where did the drugs come from?

A    Don't recall.

Q    And what happened to the money that you got from the drugs that you sold?

A    It was my money.  I kept it for myself.

Q    All of it?

A    Yes.

Q    But you would have to buy the drugs to sell the drugs?

A    Yes.

Q    And would you buy the drugs from Latin Kings?

A    Get it from wherever -- I get it from

GONZALEZ 000656

174

it could be Latin Kings or it could be another gang banger.

Q    Of a different gang?

A    No.  From People, from the gang People.

Q    So other people -- other members of gangs that were under the umbrella of the People Nation?

A    Yes.

Q    And did you have to pay dues to the gang?

A    No.

Q    If somebody from the Folks Nation came to try and sell drugs in Latin King territory, what would happen?

A    They wouldn't even come to the neighborhood.

Q    Why not?

A    Because everybody had their -- where they hang at.

Q    Where did you hang?

A    Humboldt Park.

Q    The whole entire area of Humboldt Park?

A    Pierce and Kedzie.

Q    Did you know somebody named Jacques Rivera?

A    Who?

GONZALEZ 000657

175

Q    Jacques Rivera.

MS. COHEN:  Objection, relevance.

A    Don't know who that is.

BY MS. ROSEN:

Q    Have you ever heard of the rank of Inca within the Latin Kings street gang?

A    Yes.

Q    What's an Inca?

A    The chief of the Latin Kings.

Q    Who was the chief of the Latin Kings in 1989 and 1990?

A    Got no idea.

Q    All right.  I'm going to direct your attention back to the transcript now, page 20. At the top of the page it says, "Question, how old is Alfredo Gonzalez?  Answer, around 32." Do you see that there?

A    Yes.

Q    And was that accurate, your estimate of how old your uncle was back at the time you gave this testimony?

A    Maybe.

Q    Well, you weren't lying about that, right?

A    I don't recall.

GONZALEZ 000658

176

Q    Oh, you might have been?

A    Lying?

Q    Yeah.

A    This is all false.

Q    I know.  So that's what you're saying today, is it's all false.  But what I'm asking you is is it possible that this particular answer was truthful and not a lie or were you just making it all up?

A    I don't recall his age.

Q    And the next question is, "Do you also know an individual named Jose Maysonet?  Answer, yes, sir."  Now, that's not a lie, right?  You know him?

A    Around the neighborhood.

Q    You've sold drugs with him?

A    No.

Q    You told us earlier you sold drugs with him.

A    I sold drugs around with different guys, Latin Kings.  But specifically with him, no. Different guys altogether.

Q    So are you saying you don't know Jose Maysonet?

A    I knew him around the neighborhood.

GONZALEZ 000659

177

Q     What does that mean, I knew him around the neighborhood?

A     Because we all live around the same neighborhood, I heard about him and everything. But have a relationship with him, I never had a relationship with him.

Q     You knew his name?

A     Yes.

Q     You knew he was a Latin King?

A     Yes.

Q     You knew he sold drugs in the neighborhood?

A     To my knowledge, yes.

Q     "Question, as of May 1990 how long had you known Jose Maysonet?  Answer, around a year and a half."  Is that the truth or a lie?

A     Lie.

Q     How did you come up with a year and a half?

A     That's around -- I was around the neighborhood around -- that's when I was deep into the neighborhood, around there.

Q     When you were deep into the neighborhood?

A     Yes.

GONZALEZ 000660

178

Q    What does that mean?

A    Deep into like gang banging and selling drugs, deep, real -- selling drugs real hard, a year and a half of selling drugs, just selling drugs.

Q    Did somebody tell you to say that you had known Jose for a year and a half or was that just something you made up on your own?

A    Something I just did.  It was around there.

Q    Okay.  So the Latino detective didn't tell you to say you knew Maysonet for a year and a half, right?

A    Don't recall.

Q    The state's attorney, did he tell you to say that you knew Jose Maysonet for a year and a half?

A    I don't recall.

Q    These questions in this transcript where you testified, you were being asked questions by an assistant state's attorney, right, not your lawyer at the beginning here, these questions that you were being asked, right?

MS. COHEN:  Objection, form.

A    I don't remember.

BY MS. ROSEN:

Q    Do you remember --

GONZALEZ 000661

179

A    I don't remember who was asking me questions first, if it was state's attorney or my lawyer.  I don't remember.

Q    Well, both of them asked you questions, right?

A    Yes, but I don't know who went first and who went second.

Q    Okay.  Did you ever meet with the state's attorney that was prosecuting your uncle's case before you testified?

A    The one -- whoever I made the deal with, whoever came to my attorney, asked me -- said we'll give you 22 years, that's the first time I spoke to them.

Q    And before you took the stand and testified, did you meet with that state's attorney or any other state's attorney to go over your testimony?

A    I might have.

Q    Okay.  Did you meet with your own lawyer, the lawyer that was representing you before you testified in your uncle's case to go over your testimony?

A    Don't recall.

Q    And I think you told us earlier that

GONZALEZ 000662

180

you told your lawyer that you were innocent and that your statement was false, right?

A    Yes.

Q    And did you discuss with your lawyer that you were going to get up on the stand and lie?

A    No.

Q    So how is it that it came about that you got up on the stand and lied?

A    I don't understand the question.

Q    Sure.  You knew you were going to have to testify against your uncle?

A    Yeah, after I made -- when the attorney -- when my -- when the state's attorney approached my lawyer.  It's a plea bargain deal and everything.

Q    Right.  So you knew in exchange for that plea bargain deal you were going to have to get up on the stand and testify against your uncle, right?

A    Yes.

Q    And you were going to have to testify about going to Mr. Maysonet's house, getting the gun, going back to the intersection, your uncle getting out of the car, shooting the two guys. You knew you had to testify about all that,

GONZALEZ 000663

181

right?

    A    Yes.

    MS. COHEN:  Objection, form.

BY MS. ROSEN:

    Q    And did you discuss -- and you had already told your lawyer that all of that was a lie, right?

    A    Yes.

    Q    So did you discuss your testimony, what you were going to say up on the stand, with your lawyer?

    A    Don't recall.

    Q    If we go back to page 20, line 9, "Do you know an individual by the nickname of Fro?  Answer, yes, sir.  Question, do you know what Fro's real name is?  Answer" -- and these are your words -- "Chris Hernandez."  Do you see that there?

    A    Yes.

    Q    And I think you told us earlier you don't know who Chris Hernandez is, right?

    A    Yes.

    Q    How did you know to answer the question do you know what Fro's real name is to say the words Chris Hernandez?

GONZALEZ 000664

182

A    No.

Q    How did you know to say that?

A    Because that's what was on the statement.

Q    What was on the statement?

A    His name.

Q    Who told you that Fro's name was Chris Hernandez?

A    The police officer and the state's attorney.

Q    Which state's attorney?

A    Don't recall the name.

Q    The one that took the handwritten statement?

A    It could be.

Q    So they're the ones that gave you the name?

A    Yes.

Q    So when you told the jury in your uncle's case that you knew Fro's real name was Chris Hernandez, that was a lie, right?

A    Yes.

Q    Then the next line, "As of May 1990 how long had you known Chris Hernandez?  Answer, around a year."  Do you see that there?

A    Yes.

Q    And was that a lie too?

GONZALEZ 000665

183

A     Yes.

Q     Who told you to say it was -- that you had known Mr. Hernandez for about a year?

A     Don't recall.

Q     Is that something that you just made up?

A     No.

Q     So somebody told you to say one year?

A     Like I tell you, I can't recall.

Q     So it's possible you just made it up?

A     I can't recall.

Q     Then line 19, "What gang are you a member of?  Answer, Latin Kings."  Now, that's the truth, right?

A     Yes, I was a Latin King.

Q     Yeah.  And then line 21, "As of May 1990 how long had you been a Latin King?  Answer, around two years."  Was that the truth or was that a lie?

A     Around there.

Q     So that's the truth?

A     The years, it could be more or it could be less.

Q     Did anybody tell you to say around two years or did you just make that up?

A     Maybe I said two years.

GONZALEZ 000666

184

Q   Okay.  And then the last question on that same page, "Is Alfredo Gonzalez a member of the Latin Kings?  Answer, yes, sir.  Is Jose Maysonet a member of the Latin Kings?  Answer, yes, sir.  Question, is Chris Hernandez, also known as Fro, a member of the Latin Kings?  Answer, yes, sir."

So with respect to your uncle and Mr. Maysonet, that's true, right?

A   Yeah, we all were Latin Kings.

Q   Yeah.  And then with respect to Mr. Hernandez, Fro, is that the truth, a lie, you don't recall?

A   Don't recall.

MS. COHEN:  Objection, form.

BY MS. ROSEN:

Q   You did know somebody named Fro, though, that was a Latin King, right?

A   I knew a couple of Fros.

Q   Yeah.  If we go to page 22 of the testimony, you were asked some questions about your work.  At the top of the page it says, "Question, back in May of 1990 what were your hours of work?  Answer, from 3 to 11.  Question, is that morning or in the afternoon?  In the

GONZALEZ 000667

185

afternoon.  Question, would you get off -- do you would get off at work at 11 o'clock at night?  Answer, yes, sir."

So was that accurate, that in May of 1990 your hours of work were 3 p.m. to 11 p.m.?

A     Maybe, maybe not.  I can't recall.

Q     Okay.  Did a detective or a state's attorney tell you to lie about your work hours?

A     No.

Q     And then if you look at line 9, "Question, I'm going to direct your attention to the evening of May 24th going into the morning of May 25th.  Did you get off of work at about 11 o'clock in the evening?  Answer, yes.  Question, what did you do?  Answer, I was going to my lady's house.  Question, when you say you were going to your lady's house, was that near North and St. Louis in Chicago?"  And then there's some objections.  And the question's reasked, "Question, where was your lady's house located at that time?  Answer, Hirsch and Kedzie."  Do you see that there?

A     Yes.

Q     Was that truthful testimony, the

GONZALEZ 000668

186

testimony I just read?

A     Around that time she used to live around Kedzie and Spaulding, around there.

Q     Is that near Kedzie and Hirsch?

A     Yes.

Q     So was that accurate and truthful?

A     Yes.

Q     Okay.  And did you in the late evening hours into early morning hours of May 24th into the 25th get off of work at 11 o'clock and head to your lady's house?

A     Maybe.  Can't recall what time.

Q     And then if you go to the next page, page 23 at the top, line 4, "What is your lady's name?  Answer, Elizabeth Rivera.  Question, do you have any children by Elizabeth Rivera? Answer, yes, one.  Question, is that a boy or a girl?  Answer, a girl.  What's her name?  Answer, Priscilla.  Question, how old is she?  Answer, 11 months."  Do you see that?

A     Yes.

Q     Was that all truthful testimony there?

A     To my knowledge, yes.

Q     Okay.  Then if you go to line 17, "As you were going towards -- going from work

GONZALEZ 000669

187

to Elizabeth Rivera's house, how did you first get from your place of work?  Answer, got on the El station.  And where did you take the El to? Answer, to Belmont and Kimball."  Do you see that?

A    Yes.

Q    Is that accurate?  Is that the way you would go from work to Elizabeth's house?

MS. COHEN:  Objection, form.

A    Maybe.  And I'd take the bus and the El train, but I don't remember which ones.

BY MS. ROSEN:

Q    Okay.  Did anybody tell you to lie and say that, that that's how you would go from work to Elizabeth's house?

A    No, because that's what I'd take, the bus and the train to go to work.

Q    And then if we go to the bottom of page 23, "Question, when you got to Belmont and Kimball, what did you do?  Answer, got on the Kimball bus.  And where did you go on the Kimball bus?  Answer, towards North Avenue.  And did you get off the bus?  I got off at LeMoyne and Kimball.  And after you got off the bus, where were you walking?  Answer, down LeMoyne going

GONZALEZ 000670

188

towards Spaulding.  Which direction were you walking?  East."  Do you see all that?

A     Yes.

Q     Is that how you would typically go from work to your girl friend's house?

A     Don't recall.  Might be.

Q     Might be.  But it's close enough, right?

A     Right.

Q     It's in the vicinity?

A     Yeah.

Q     And then further down it says, "As you were walking down the street, did you see anybody?  Answer, yes.  Question, who did you see?  Answer, Alfredo Gonzalez and Fro."  And then the question is, "And Fro is also Chris Hernandez?  Answer, yes."  Do you see that?

A     Yes, I see that.

Q     Okay.  And was that truthful testimony or a lie?

A     A lie.

Q     A lie, okay.  And then further down, line 21, "Question, when you saw them, were they on foot or in a car?  Answer, in a car.  Question, what kind of car was it?  Answer, Buick.  Question, do you remember what color it

GONZALEZ 000671

189

was?  Answer, blue."  Do you see those questions and answers?

A    Yes.

Q    Were those truthful answers or were those lies?

A    Don't recall.

Q    So it's possible that you saw Alfredo Gonzalez in a car that was a blue Buick, right?

A    No.

Q    That's not possible?

A    (Shaking head).

Q    No?

A    No.

Q    So then that's a lie?

A    Yes.

Q    So where did you come up with blue Buick?

A    Maybe the officer or something.  Don't remember.

Q    Why don't you take a look at your statement.  Do you see anything about a blue Buick in the statement?

A    No.

Q    So when exactly would the officers have told you about the blue Buick?

GONZALEZ 000672

190

A    I don't recall.

Q    Do you remember how much time passed between the time you gave your statement on August 24, 1990 and the time you testified against your uncle in his criminal case?

A    No.

Q    I think the transcript said you'd been in custody for about 15 months, right?  When we read it earlier, it said --

A    From the first statement?  That one when I was in the police station?

Q    Correct.

A    And this one?  No, that's -- I was locked up longer.

Q    You think you were locked up longer?

A    Yes, because I got locked up in -- if you see, in --

Q    It's about August of 1990, right?

A    -- '90 and I was sentenced in '95.  That means I was already there going on almost four and a half years.

Q    Right, but I'm asking about your testimony.  I think your testimony was in 1992.

A    No.

Q    No?

GONZALEZ 000673

191

A    I don't think so.

Q    You think it was later?

A    Yes.

Q    Okay.  Well, we'll get to that.  In any event, between the time of your statement in the police station and the time you testified, you told us earlier you didn't see that Latino detective again, right?

A    Don't recall.

Q    All right.  I'm going to have you look at page 40.  Will you look at line 16?  The question is, "Did you then go anywhere in the car?  Answer, to Maysonet's house.  Question, where was that?  Answer, on Potomac and Homan."  And I think you told us earlier you'd never been to Maysonet's house, right?

A    Yes.

Q    And you didn't know where he lived?

A    Yes.

Q    How did you know to answer the question Potomac and Homan?

A    Don't recall.

Q    The next question is, "Did Maysonet live in a house or an apartment?  Answer, an apartment."  How did you know to answer the

GONZALEZ 000674

192

question apartment?

A    Just because around there that's all there is is apartment buildings around there.

Q    Okay.  So you just knew there weren't houses --

A    Yes.

Q    -- in the neighborhood because of your familiarity with the neighborhood?

A    Yes.

Q    So you knew that neighborhood well enough to know that the residential buildings at Potomac and Homan are all apartment buildings?

A    Yes.

Q    Then the next question is, "And which floor did he live on?  Answer, second floor."  Do you see that?  How did you know to say second floor?

A    Don't remember.

Q    Go to page 41 beginning at line 16. "And when you got to the front door of the apartment, what happened?  Answer, we rang the doorbell.  Question, did anyone answer the door? Answer, Rose.  Question, by the way, do you know Rose?  Answer, yes.  And who did you know her to be?  Answer, Maysonet's lady."  Do you see those

GONZALEZ 000675

193

questions and answers?

A    Yes.

Q    Was that truthful testimony or a lie?

A    It was a lie.

Q    And how did you know to answer the question who rang -- who answered the door, Rose?

A    Like I said, it's a lie.  I don't remember.

Q    How did you know how to answer the question who Rose was?

MS. COHEN:  Objection, form.

A    Maybe the state's attorney or something. I don't remember.

BY MS. ROSEN:

Q    So maybe the state's attorney told you that?

A    Might be.

Q    If you go to page 42, line 13, "Question, and after the defendant Alfredo Gonzalez said go get the gun, what happened then? Answer, Juan and Alfredo went into the bedroom. Question, where were you at this time?  Answer, in the living room.  Question, and who was in the living room with you?  Answer, Fro.  Question, by the way, where was Rosa Bello?  Answer, she was in the kitchen.  Then she walked into the

GONZALEZ 000676

194

bedroom." Is that testimony truthful or a lie?

A    Lie.

Q    How did you know how to answer the question, by the way, where was Rosa Bello to say she was in the kitchen?

A    Like I said, it was a lie.

Q    How did you know how to answer the question, by the way, where was Rosa Bello?

A    I didn't.

Q    So you just made it up?

A    Like I said, it was a lie.

Q    I know, but you answered a question. So how did you know how to answer the question?

A    Don't recall.

Q    If you go to page 43, line 16, "Question, had you ever seen a 9 millimeter automatic pistol before?  Answer, yes.  Question, where had you seen it?  Answer, streets."  Was that truthful testimony?

A    Yes, I would see plenty of guns in the streets.

Q    Have you ever owned a gun?

A    No.

Q    Have you ever held a gun?

A    To my knowledge, yes.

GONZALEZ 000677

195

Q    Have you ever fired a gun?

A    Don't recall.

Q    Question, line 21 at the same page, "Now, where was the defendant, Alfredo Gonzalez, carrying that 9 millimeter automatic pistol when he came out of the bedroom?  Answer, inside his pants.  Question, I would like you to stand up, Mr. Cruz, and show the Ladies and Gentlemen of the Jury where the defendant had the gun. Answer, here.  Question, may the record reflect that the witness is pointing to the front of his pants.  You may sit down."

Do you remember doing that in the courtroom, standing up for the ladies and gentlemen of the jury and showing them where you saw Mr. Gonzalez holding the 9 millimeter automatic pistol?

A    Don't recall.

Q    How did you know to stand up and do that, to show the ladies and gentlemen of the jury where Mr. Gonzalez was holding the gun?

A    Like I said, I can't remember.  I don't recall.

Q    Was that truthful testimony?

A    No.

GONZALEZ 000678

196

Q    Page 44, line 12, "By the way, what was everybody wearing that night?  Answer, sweatshirt hoodies.  Question, would that be sweatshirts with hoods?  Answer, yes, sir.  Question, you were wearing one, correct?  Answer, yes. Question, and was the Defendant Gonzalez wearing one?  Answer, yes."  Do you see that there?

A    Yes.

Q    Is that truthful testimony or was that also a lie?

A    Lie.

Q    Did you typically back in the late '80s and early '90s wear hoodies?

A    Don't recall.

Q    Was that something that you and your fellow Latin King members wore on a regular basis?

A    Don't recall.

Q    What were the colors of the Latin Kings?

A    Black and gold.

Q    And you guys often wore clothing that were black and gold, right?

A    No.

Q    No, you didn't?

A    No.

GONZALEZ 000679

197

Q    All right.  I'm going to have you take a look at page 57.

A    (Witness complies).

Q    If you start at line 8, "Now, Mr. Cruz, I'm going to show you what's been marked People's Exhibit No. 15 for identification.  Take a look at that photograph.  Tell the Ladies and Gentlemen of the Jury if you remember what that photograph shows.  Answer, yes.  Question, what does it show?  Answer, the empty lot where we was at.  Question, and which view or which direction does that photo show?  Answer, going towards North Avenue.  Question, can you see the location that you were standing at in that photograph?  Answer, yes.  Question, do you see the garage that you were standing next to in that photograph?  Answer, yes."

Do you remember being shown photographs when you were testifying at your uncle's criminal trial?

A    Don't recall.

Q    Was your testimony here where you indicate that you see the place that you were standing near the empty lot truthful testimony or false?

GONZALEZ 000680

198

A    Don't understand the question.

Q    This testimony that I just read to you --

A    Is false.

Q    How did you known how to identify where you were standing in the photograph?

A    Like I said, it's false because I don't remember no photograph.

Q    I'm sorry.  I don't understand what you said.

A    I don't understand the question.  This is -- all this is false.

Q    You don't remember being shown a photograph, right?  That's what you just said?

A    To my knowledge, no.

Q    At the trial?

A    I don't remember.

Q    Are you saying that the transcript is wrong, that you weren't shown a photograph or you just don't remember?

A    I don't remember.  That's what I'm saying.

Q    Okay.  So the testimony in this transcript says that you were shown a photograph and you were answering questions about the photograph.  So my question to you is are the

GONZALEZ 000681

199

answers that you gave about where you were

standing when you were looking at that photograph

and when the attorney was asking you questions

about that, is that truthful testimony or false

testimony?

MS. COHEN:  Objection, form.

A    I was never in the empty lot.  It was false.

BY MS. ROSEN:

Q    Okay.  So when you were identifying

on the picture where you were standing, that was

a lie?

A    Yes.

Q    Okay.  How did you know where to

point out on the picture where you were standing

if it was a lie?

A    I didn't.

Q    Okay.  But the transcript says you did.

So how did you know how to do that?

A    I just pointed.  The picture --

they showed me a picture.  Maybe I just pointed.

I don't remember.  Like I said, this was all a lie.

Q    If you go to page 58, line 9, "I'm

going to show you what has previously been marked

People's Exhibit No. 13 for identification.  Take

a look at that.  Do you recognize what that photo

200

is?  Answer, yes, the empty lot."

So based on this transcript, it looks like you were shown a second photograph. Do you agree with me?

A    Don't recall.  That's -- maybe.  I don't recall.  That's what it says.  I don't recall.

Q    Well, you're not quarreling that the court reporter got it wrong, right?

A    I don't know.

Q    It may be the court reporter got it wrong?

A    The only thing I -- I don't remember seeing no pictures.  I don't remember.

Q    Okay, and that's fine.  It was a long time ago.  My question is are you saying that you think the transcript is in error or you just don't remember?

A    I don't remember.

Q    Okay.  So now if you look at the question and the answer, you're shown a photograph and then you answer -- do you recognize what that photo is?  And you say yes, the empty lot, right?  That's what your testimony is, yes, the empty lot?

A    That's what my testimony states, yes.

GONZALEZ 000683

201

Q    Right, okay.  So did you identify the empty lot in front of the jury?

A    Don't recall.

Q    If you had identified the empty lot in front of the jury, was that truthful testimony or false testimony?

A    False.

Q    How did you know that you were to identify the empty lot in front of that jury?

MS. COHEN:  Objection, form.

A    Like I said the first time, it's false.

BY MS. ROSEN:

Q    I understand that you're saying that it's false.  My question's a little bit different.  You were shown a photograph when you were testifying at your uncle's's trial.

A    Like I said, I can't remember.

Q    I understand that.  But the transcript tells us that you were shown a photograph, right?

A    Yes.

Q    Okay.  And then you were asked what's in that photograph and your answer was the empty lot, right?

A    Yes.

Q    How did you know to answer that question

GONZALEZ 000684

202

the empty lot?

A   Picture.

Q   The next question is, "And which view of the empty lot does that show?  Answer, front of the empty lot, North Avenue.  Question, is that from the alley going north towards North Avenue?  Answer, yes.  Question, and can you see the side of the garage next to which you were standing?  Answer, no.  Question, can you see the side of the building that was near the garage?  Answer, yes."  Was that testimony truthful or false?

A   False.

Q   How did you know how to answer those questions when you were being asked those questions at your uncle's trial?

MS. COHEN:  Objection, form.

A   Lie.

BY MS. ROSEN:

Q   I know it's a lie.  How did you know what lie to tell?

A   I don't.

Q   So you were just making it up?

A   I don't recall.

MR. PRADOS:  Can we take a ten-minute break?  Unless you have just a few questions.

GONZALEZ 000685

203

MS. ROSEN: No, no, sure. I have a little bit to go.

(Whereupon a recess was taken from 2:50 p.m., to 3 p.m., after which the following proceedings were had:)

Q All right. Now, I want to direct your attention to page 70 -- actually, we're at page 60. I'm going to direct your attention to the bottom of page 60, line 21. "Does this chart truly and accurately depict the area behind the vacant lot and the two alleys and North Avenue? Answer, yes. Question, now, Mr. Cruz, I would like you to show the Ladies and Gentlemen of the Jury with your hands how the car first came to enter the alley behind North Avenue. Answer, towards St. Louis. Question, and point which direction you were first traveling in. Answer, this way, we turned this way. Question, now, point for the Ladies and Gentlemen of the Jury to the area the defendant, Maysonet, turned the car around. Answer, turned this alley. At the alley, went back this way towards the lot. Question, could you demonstrate slowly with your hand exactly how he maneuvered the car? Answer, this alley turned, came back this way and parked.

GONZALEZ 000686

204

Question, now could you show the Ladies and Gentlemen with your finger where it was that Defendant Maysonet parked the car?  Answer, right here.  Question, at the time that he parked the car show the Ladies and Gentlemen of the Jury with your hand where you were standing.  Answer, on the side of the building right here.  Question, with your finger show where the Defendant Alfredo Gonzalez and Fro went.  Answer, came down, walking down the empty lot towards North Avenue.  Question, show the Ladies and Gentlemen of the Jury where you saw the two black men.  Answer, right here.  Question, and where did the conversation between Fro and the Defendant Alfredo Gonzalez and the two black men take place approximately?  Answer, right here.  Question, Mr. Cruz, show the Ladies and Gentlemen of the Jury where the one -- approximately with your finger, where the one black man was laying after you heard the shots.  Answer, around here."

Do you recall utilizing some kind of chart or map to demonstrate to the jury the things that you saw at the shooting?

A    I can't recall.

MS. COHEN:  Objection, form.

GONZALEZ 000687

205

BY MS. ROSEN:

Q    I'm sorry.  What?

A    I can't recall.

Q    Okay.  But having heard me read this testimony, it sounds like that's what happened, right, that there was a chart?

A    Yes, yes.

Q    And the person that was asking -- the lawyer that was asking you the question was asking you to point out when different things occurred?

A    Yes.

Q    How did you know how to answer those questions and where to point?

A    Can't recall.

Q    I'm going to ask you to turn to page 73, line 21.  Let me know when you're there.

A    What page?

Q    73, line 21.

A    Okay.

Q    Okay.  "Question, Mr. Cruz, I want to direct your attention back to when you were riding in the car towards the alley behind North Avenue.  Did anyone in the car do anything with regard to their clothes?  Answer, put on their

GONZALEZ 000688

206

hoodies. Question, now, when you say put on their hoodies, do you mean pull their hoodies off their heads? Yes. Did you pull your hoodie up? Answer, yes. And did everyone in the car pull the hoods up on their sweatshirts? Answer, yes. Question, what was the purpose of pulling the hoods on the sweatshirts up? For -- wasn't for anything. Question, well, what purpose does it -- why did you pull the hood, your sweatshirt over your head? Answer, to cover your face." Do you see that, those questions and answers there?

A    Yes.

Q    Is that truthful testimony or a lie?

A    Lie.

Q    How did you know how to answer the questions about what you guys did with the hoodies?

A    Can't recall.

Q    I'm going to direct your attention to the bottom of page 74, line 22. "What significance does it have in your experience as a Latin King when the hoodies are pulled up? Answer, when I stick up -- when you go stick somebody up selling drugs, cover your face.

GONZALEZ 000689

207

Nobody will see it.  Question" -- actually, that's sustained.

Is that truthful testimony that you gave there about the significance of pulling the hoodie up as a Latin King?

A     No.

Q     Would you typically pull your hoodie up to cover your face if you were engaged in criminal activity so nobody would see you and recognize your face?

A     Yes.

Q     I want to direct your attention to page 80, line 18.  "Question, and you said that you're a friend of Jose Maysonet, is that true?  Answer, yes.  Question, now, you were a very close friend of Jose, isn't that true?  Answer, no.  Question, well, isn't it a fact that you had been over to Jose and Bello's apartment on several occasions prior to May 24th of 1990?  No.  Question, well, how many times had you been there, sir?  Answer, once, May 24th.  Question, oh, I see.  That was the first time you had been at their apartment?  Answer, the last time I went to their house, that was when they were living on Pierce.  Question, so what you're saying is then

GONZALEZ 000690

208

that the first time you went to their apartment on -- the apartment you visited on May 24th, was on that day? Yes." Did you testify truthfully there?

A    No.

Q    How did you know that Mr. Maysonet lived on Pierce before he lived at the apartment that -- I don't remember the name of the street, on Homan?

MS. COHEN:  Objection, form, foundation.

A    Can't recall.

BY MS. ROSEN:

Q    Go to page 82, please, line 4. "Question, how many times had you been to the other places where Jose and Bello Rosa were living? When they were living on Potomac -- I mean, on Pierce? A lot of times. Question, and you knew and socialized with Jose and Bello on many occasions prior to May 24th of 1990, didn't you? Question, and Rosa Bello? No. Question, well, you just said that you were at their other place on a number of occasions, isn't that true? Answer, because we used to hang around there, that's why. Used to be outside together all the time. Question, was Rosa Bello outside with you

209

at that time?  Answer, once in a while she used to be outside with us."  Were those answers truthful or a lie?

A    Can't recall.  It's a lie.

Q    You think it's a lie?

A    To my knowledge, yes.

Q    So who told you to say that you used to hang out in front of Maysonet's house on Pierce and that sometimes Rosa Bello was with you?

A    Maybe at the police station.

Q    The police maybe told you to say that?

A    Um-hmm.  It would be in the police station because so many questions they asked me and everything.

Q    So you think that the detectives told you that someday when you testify that you should say that you were hanging out with Mr. Maysonet on Pierce?

A    No, I didn't say that.  No, he asked me where we used to hang out and I told him we used to hang out on Pierce, the officers.

Q    So that's true, right?  You used to hang out with Maysonet on Pierce?

A    No, the whole group hang out on Pierce.

GONZALEZ 000692

210

I didn't know where he lives at.  We all were on Pierce.  That's where we hang out at, Pierce.

Q    You and Maysonet on Pierce with others, is that what you're saying?

A    Yes, that's where we all hang out, all the guys.  All the guys hang out on Pierce.

Q    Okay.  But this says that you knew that he lived on Pierce, that he lived at a different location on Pierce.

A    No.

MS. COHEN:  Objection, form.

BY MS. ROSEN:

Q    How did you know that?

A    I don't.

Q    Then why did you say it?

A    I didn't say -- maybe I did.  Maybe -- I don't remember.

Q    I'm going to ask you to look at page 83, line 1.  "When you were hanging with Jose and Rosa, Alfredo Gonzalez wasn't hanging around with you, was he?  Answer, yes.  He was? In what year -- by the way, when did Rosa Bello and Jose live on that apartment on Pierce? Answer, since last time I know them in 1988. Since I started knowing them in '88, they be

GONZALEZ 000693

211

living there.  Question, when did they move to the apartment you visited on May 24th of 1990? Answer, I don't know."  Is that truthful testimony or is that false testimony?

A    I can't recall because I would just be around there all the time.  I don't know if they lived there or not.

Q    But you testified that you knew they lived there, right?

A    Yes.

Q    So is it possible that you knew that they lived there back in 1990 and you don't remember it today?

A    No.

Q    You know that's a lie?

A    Yes.

Q    All right.  I'm going to ask you to take a look at page 90, line 6.  "And you say that when Alfredo Gonzalez got back to the car, he said I just shot two guys, isn't that right?  Answer, yes."  Now, you've told us that's a lie, right?

A    Yes.

Q    Okay.  Now, line 10, "Question, but on August 24, 1990 when you were interviewed

GONZALEZ 000694

212

and talked to about this case by Officer Smitka and Officer -- and Detective Schak, you never told them that Alfredo Gonzalez said anything, did you? Answer, repeat that question again. Question, yes. On August 24th of 1990 at Area 5, Violent Crimes, when you were interviewed by Detective Smitka and Detective Schak and you told them what happened that night, you never told them that Alfredo Gonzalez got into the car and said I had shot two people, did you? Answer, I don't remember. Question" -- do you remember whether or not you told the detectives that -- these two detectives, Smitka and Schak, that Alfredo Gonzalez got back in the car and said I shot two guys?

A No.

Q You don't remember if you said it?

A No, I never -- I don't know who those detectives are.

Q Oh, you don't even know who those detectives are?

A Yes.

Q Do you remember talking to those detectives at Area 5 the night of your arrest?

A No. The one I was talking to was the

GONZALEZ 000695

213

Latino.

Q    Only?

A    Latino and his partner.

Q    You never talked to Detective Smitka and Detective Schak, is that what you're saying?

A    Yes.  The only one -- like I said, the only one I spoke to were the Spanish -- the Latino, the Latino and his partner.

Q    And you figured that out when you saw him on TV in 2016, right?

A    No, that's who was -- who picked me up.

Q    That's who picked you up?

A    Yeah.

Q    Yeah.

A    And that's who was speaking to me when I was locked up in Grand and Central.

Q    And this testimony where you're asked questions about Detective Smitka and Detective Schak, are you saying you never talked to those detectives or you don't remember talking to those --

A    I never talked to them.

Q    You did not talk to them?  You are absolutely saying today you did not talk to them, right?

GONZALEZ 000696

214

A    To my knowledge, I never -- the only ones, like I said, I spoke with the Latino guy and his partner.

Q    All right.  Line 22, "Well, on August 24, 1990 when Assistant State's Attorney Perkaus was questioning you, you never told Assistant State's Attorney Perkaus that Alfredo Gonzalez said I just shot two people, did you?" Then there's an objection and then the question's reasked.  "You never told Assistant State's Attorney Perkaus that Alfredo Gonzalez had said I just shot two people, did you?  Answer, no.  Question, in fact, the first time you ever told anyone about that statement that Alfredo Gonzalez made was when you made your deal with the state's attorneys after March 13th of 1992, isn't it?  Answer, no.  Who did you tell before that?  Answer, my lawyer knew about it. Question, oh, your lawyer.  Did you tell any police officers?  Yes.  What police officers did you tell?  Police officers from the police station."

Did you tell your lawyer that Alfredo Gonzalez came back into the car and said I just shot two guys?

GONZALEZ 000697

215

A    No.

Q    So the testimony here where you said who did you tell before that at line 18, Answer, my lawyer knew about it, that's a lie?

A    To my lawyer, this was a false statement.

Q    You lied to your lawyer?

A    I told my lawyer I never shot nobody. I never was in no crime.

Q    I'm asking you about the question and answer that you were asked at your uncle's trial. You were questioned about the statement that you testified to at your uncle's trial that your uncle got back into the car and said he just shot two guys, right?  That's how you testified at the trial, correct?

MR. GREENBERG:  I'm going to object to the form of that question.

BY MS. ROSEN:

Q    Okay.  Isn't that how you testified at the trial?  Go to page 90, line 6.  "And you say that when Alfredo Gonzalez got back in the car, he said I just shot two guys, isn't that right?  Answer, yes."  That was your testimony at your uncle's trial --

MR. GREENBERG:  Objection, form of the

GONZALEZ 000698

216

question.

BY MS. ROSEN:

Q    -- right?

A    Yes.

Q    Okay.  Then you're asked who was the first person you ever told that your uncle got back into the car and said I just shot two guys. And when you're being asked those questions, do you say at line 18, "Question, who did you tell before that?  Answer, my lawyer knew about it"?

MS. COHEN:  Objection, form, foundation.

BY MS. ROSEN:

Q    Do you see that?

MR. GREENBERG:  Wait, wait.  You're on a different page, right, page 91 now?

MS. ROSEN:  Correct.  Did I misspeak?  91, I'm sorry.  Let me start that over again.

Q    Okay.  We've established that on page 90 you testified at your uncle's trial that your uncle came back into the car and said I just shot two guys, correct?  Page 90, line 6 through line 9.

A    Yeah, that's what it says there.

Q    Right.  And that's how you testified, right?

GONZALEZ 000699

217

A     Yes.

Q     Okay.  Then when you're being asked more questions about that topic, you're asked at page 91, line 18, "Question, who did you tell before that?  Answer, my lawyer knew about it."  Do you see that there?

A     Where are you at?

Q     Page 91.

A     Yes.

Q     Line 18.

A     Yeah, I see it.

Q     Okay.  So my question to you is did you tell your lawyer before March 13th of 1992 that your uncle got back into the car and said I just shot two guys?

A     No.

Q     Okay.  So when you testified that you had told your lawyer before March 13th of 1992 that your uncle came back into the car and said I just shot two guys, that was a lie?

A     Yes.

Q     Why did you say that?

A     I don't recall but I -- I don't recall.

Q     All right.  We can put that aside for the moment.  Did you know that your Uncle Alfredo

GONZALEZ 000700

218

Gonzalez was an enforcer for the Latin Kings street gang?

MS. COHEN: Objection, foundation.

A No.

BY MS. ROSEN:

Q Do you know what an enforcer is?

A No.

Q Never heard that phrase before?

A No, we were just Latin Kings. We're all Latin Kings and just whoever's lieutenants and whoever's in charge of that group and everything.

Q Like the Inca?

A Yeah.

Q But you never heard anybody called an enforcer?

A No.

Q All right. Did you know that after you had reached your deal with the state's attorney's office and testified against your uncle and pled guilty and got sentenced, that the state's attorney's office was going to make a recommendation to the Illinois Department of Corrections to put you in that SMU unit?

MS. COHEN: Objection, form.

A Don't recall. See, I was being sentenced

GONZALEZ 000701

219

and I was going to go down to -- from Joliet, then from Joliet they will send me wherever Joliet going to send me to.

BY MS. ROSEN:

Q    Right.  But you knew that you -- you ended up being housed in a special unit, right?

A    Yes.

Q    Did you know that the state's attorney was going to make a recommendation for you to get housed in that unit because of your cooperation?

A    Don't remember.

MS. ROSEN:  All right.  Let's go ahead and mark this.

(Whereupon Deposition Exhibit No. 10 was marked for identification.)

Q    I'm going to ask you to take a look at what we've marked as Exhibit No. 10, and you'll see that it's a letter written by Assistant Cook County State's Attorney Frank Marek and it's dated July 21, 1995.  And do you see that it references your name, Justino Cruz there?  Do you see that?

A    Yes.

Q    And you'll see that it's written to somebody named Ms. Diane Jockisch with

GONZALEZ 000702

220

the Illinois Department of Corrections and it states that Mr. Cruz testified as a witness for the prosecution against his Uncle Alfredo Gonzalez, an enforcer for the Latin Kings street gang. And then it goes on to say as a result of Mr. Cruz's testimony, Alfredo Gonzalez was convicted of the murders of Torrence and Kevin Wiley and sentenced to natural life imprisonment. Mr. Gonzalez is now serving his sentence in the Illinois Department of Corrections. Without the testimony of Mr. Cruz, the conviction of Mr. Gonzalez, the man who actually pulled the trigger during this execution-style double murder by Latin Kings, would have been impossible. There were no eyewitnesses to the crime except the other participants, and Mr. Gonzalez denied any participation in this incident. By his own admission, Mr. Cruz acted as the lookout while the victims were shot to death after they were mistaken for rival gang members while waiting for a bus in Latin King turf. On July 19, 1995 Mr. Cruz entered his plea of guilty to one count of first degree murder and was sentenced to 22 years in the Illinois Department of Corrections, which was the sentence recommended

GONZALEZ 000703

221

by the state's attorney's office.  Because of the obvious threat to Mr. Cruz's physical statement resulting from the testimony against a high-level street gang enforcer, the state's attorney's office is requesting that Mr. Cruz serve his sentence in the Special Protection Unit of the Illinois River Correctional Center, Canton, Illinois.  Do you see that there?

A    Yes.

Q    Did you realize that the state's attorney's office had written a letter like that to get --

A    No, I didn't know.

Q    You have to let me finish the question.

A    Okay.

Q    Did you realize that the state's attorney's office had written a letter like that to ensure your safety in the Special Protection Unit as a result of your testimony?

A    No.

Q    While you were in the Special Protection Unit at Illinois River did you ever have any threats made on you as a result of your testimony?

MS. COHEN:  Objection, form.

GONZALEZ 000704

222

A    I can't recall.

MS. ROSEN:  All right.  Let's mark this one Exhibit No. 11.

(Whereupon Deposition Exhibit No. 11 was marked for identification.)

Q    Do you recall when you were -- when it was time, just about time for you to be released that you wrote a letter to the state's attorney's office about your status?

A    Can't recall making no letters.

Q    You don't remember?

A    (Shaking head).

Q    I'm going to ask you to take a look at Exhibit No. 11.  Do you recognize this document?

A    Yes.

Q    Did you prepare the document?

A    I think I did when I was -- me and one of the inmates there.

Q    Helped you to write it?

A    Yeah.

Q    Yes.  That's your signature at the bottom there?

A    Yes.

Q    Do you remember, is that your inmate number?

GONZALEZ 000705

223

A    It could be.  I don't remember my inmate number.

Q    And at the bottom it says cc Elizabeth Rivera.  That's your wife now, right?

A    Yes.

Q    It was your girl friend then?

A    Yes.

Q    And this letter is dated October 13, 2000, right?

A    Yes.

Q    And it's directed to the Cook County State's Attorney's Office, Victims and Witness Unit, right?

A    Yes.

Q    And in the letter you state, "My name is Justino Cruz and I am currently an inmate at the Illinois River Correctional Center Special Management Unit.  SMU is designed to house inmates who have cooperated with federal, state and/or prison authorities.  I have attached a copy of my statement of facts as verification of my cooperation with your office."  Do you see that there?

A    Yes.

Q    So you were writing to the

GONZALEZ 000706

224

state's attorney's office and reminding them that you had cooperated with them in connection with your uncle's case, right?

A     Yes.

Q     Okay.  Then you write, "The reason why I write is because I am requesting your assistance under the Witness Protection Act and/or the Gang Crime Witness Protection Act.  On April 25, 2001 I will be released from prison, and due to my cooperation with your office, my life is in danger.  I ask if you can submit me for these funds so I can relocate and get my life back on track."  Do you see that there?

A     Yes.

Q     And so you believed that once you got released from prison your life was in danger, right?

A     Yes.

Q     Because of the fact that you testified against your uncle, correct?

A     Yes.

Q     And that's for the reasons we talked about earlier.  He's a Latin King and you testified against a Latin King and you could suffer severe consequences as a result of that

GONZALEZ 000707

225

testimony, right?

MS. COHEN:  Objection, form.

A     Yes.

BY MS. ROSEN:

Q     And it says please inform me of the procedures that I must take, if any.  If you have any questions, please feel free to contact me. And I think you testified earlier that you were not provided any funds upon your release from the state's attorney's office, right?

A     Nope.  They never answered the letter or nothing.

Q     And how did that make you feel, that they didn't respond to you after you had cooperated in the case against your uncle?

MS. COHEN:  Objection, form.

A     Never thought about it.  I just left it alone.

BY MS. ROSEN:

Q     Were you angry?

A     No.

Q     Did you feel like they were abandoning you after you had cooperated and provided that testimony that secured the conviction of your uncle?

GONZALEZ 000708

226

A    Can't recall.

Q    Were you afraid for your life?

A    At first, yes, but by the time I was getting out I had -- I had gave my life to God and I wasn't even thinking about that.

Q    So between October 13, 2000 when you wrote the letter and April 25, 2001, which was your scheduled release date, you no longer worried about it because you gave your life to God?

A    I just left it in God's hands.  If they want to help me, they do and if they don't, you know what, I'll go live my life and I'll just stay away from the neighborhood.

Q    And you have stayed away from the neighborhood, haven't you?

A    Yes.

MS. ROSEN:  All right.  Why don't we take a short break.

(Whereupon a recess was taken from 3:33 p.m., to 3:45 p.m., after which the following proceedings were had:)

Q    Okay.  I'm going to ask you to take a look at Exhibit No. 1, which is your affidavit.  Got it?

GONZALEZ 000709

227

A    Yeah.

Q    Okay.  So my understanding from your earlier testimony is this was prepared by one of your own lawyers, correct?

A    Yes.

Q    Yes.  And do you know why that affidavit was prepared, to give to who?

A    To the state's attorney maybe?  I don't remember.

Q    You don't remember, okay.  And this was prepared -- you've signed it January 2, 2018, right?

A    Yes.

Q    So this was less than two years ago, right?

A    Yes.

Q    But as you sit here today, you don't remember why you were preparing the affidavit?

A    This was because I was getting harassed by the state's attorney and for them -- if they want to talk to me, they got to go through my lawyer.

Q    I see.  And do you know, did your lawyers give the affidavit to the state's attorneys that came out to your work?

A    To my knowledge, yes.

GONZALEZ 000710

228

Q    Okay.  And then paragraph 17 it says, "I subsequently gave the coerced false statement to the state's attorney and signed my name to it."  Do you see that?

A    Yes.

Q    What is that referring to?

A    Testimony, the statement at the police station or something.

Q    I'm asking you.  It's your affidavit. So when you say, "I subsequently gave the coerced false statement to the state's attorney and signed my name to it," what are you referring to?

A    To the one in the police station, the one with -- No. 2.

Q    Exhibit No. 2, is that what you're saying?

A    Yes.

Q    Okay.  And so based on your affidavit, does that mean that you gave that handwritten statement to the state's attorney?

A    To the officer or the state's attorney. I mean --

Q    Well, I'm asking you.  Your affidavit says, "I subsequently gave the coerced false statement to the state's attorney

GONZALEZ 000711

229

and signed my name to it."  And you've told me that the statement you are referring to is Exhibit No. 2, the handwritten statement that was prepared while you were at the police station in 1990.

So my question is, is that a statement that was prepared by the state's attorney?

A    State's attorney or police officer. I don't remember.  I think, to my knowledge, I think when it was done, they turned it over to the state's attorney.

Q    Okay.  Then what are you referring to in paragraph 17?  What coerced false statement did you make to the state's attorney that you signed your name to?

A    The only one signed is only this one here signed.

Q    Okay.  So does that lead you to believe that your reference in paragraph 17 to a coerced false statement you made to the state's attorney is Exhibit No. 2?

MS. COHEN:  Objection to the form.

A    I don't understand.  What, are you saying I was lying or something?

GONZALEZ 000712

230

BY MS. ROSEN:

Q    No, I'm not saying you were lying at all.  I'm asking you what you're talking about in paragraph 17.  So in paragraph 17 of your affidavit that you prepared with your lawyers --

A    Yeah, this one right here.  This is --

Q    The affidavit, right?

A    Yes.

Q    You prepared it with your lawyer, right?

A    Yes.

Q    Okay.  So in the affidavit you say, "I subsequently gave the coerced false statement to the state's attorney and signed my name to it." And when I asked you what you were referencing, you said Exhibit No. 2, right?

A    But I don't know -- I don't understand -- I don't remember which statement I gave the state's attorney because I signed so many papers when I was locked up and everything.  And the only thing I gave the state's attorney was -- false statement was the one I -- was this one, Exhibit 7.

Q    The testimony?

A    The testimony.

Q    Okay.  But this says signed your name to it, and you didn't sign your name to your

GONZALEZ 000713

231

testimony, right?  That was just in a courtroom and a court reporter was there and the court reporter took it all down.  So this paragraph 17 is talking about something else it sounds like.

A    The only thing I signed was this when I gave -- it was -- to my knowledge it was through the officer.  Maybe he gave it to the state's attorney maybe -- it was so long ago.  I know this -- these are the only two statements I ever say.

Q    Okay.  So the only two things that you have -- the only statements you've made are the handwritten statement that's Exhibit No. 2 and your testimony, right?

A    Yes.

Q    So the paragraph 17 then where you say you gave the coerced false statement to the state's attorney and signed my name to it has to be Exhibit No. 2 because that's the only thing you signed, right?

A    Yes.

Q    Okay.  So did you remember back in January of 2018 that in fact that statement, Exhibit No. 2, was a statement you gave to the state's attorney, not the police officer?

A    I gave it to -- the police officer gave

232

it to me and I just signed it.  The Latino officer gave it to me and I just signed it.

Q   Did you ever speak to a state's attorney at the police station?

A   Can't recall.

Q   So what are you talking about in paragraph 17?

A   This right -- and you said -- this is the only one I signed, was Exhibit 1.  I gave it to the police officer.  Maybe they gave it to the state's attorney because so many years ago, I can't recall who was in -- exactly who was in that little room.

MR. PRADOS:  And for the record, my client referenced Exhibit 1.  In fact, he's gesturing towards Exhibit 2.

THE WITNESS:  Oh, 2.  My fault.

MS. ROSEN:  Thank you for the clarification.

Q   Okay.  But paragraph 17 is something you wrote with your lawyers, right?

A   Yes.

Q   In the affidavit.  And that was, you know, less than two years ago, right?

A   Yes.

Q   So you were talking about something,

GONZALEZ 000715

233

right, when you were talking about paragraph 17, "I subsequently gave the coerced false statement to the state's attorney and signed my name to it," right?

A   Yes.

Q   Okay.  So the state's attorney, that has to be that exhibit, right, Exhibit No. 2?

A   Yes.

Q   Okay.  So did you or didn't you talk to the state's attorney that night when you were in custody in 1990?

A   Talked to the Latino officer.

Q   That's it, the Latino officer?

A   There was another person in there.  I don't remember --

Q   The white detective that was with him?

A   Inside the room, yes.

Q   I'm going to direct your attention to paragraph 34 of your affidavit.  Actually, let's start with 33.  In early 2017 an ASA and an investigator -- an investigate SAO came over.  Through them I learned that Jose Maysonet was challenging his conviction and was granted a retrial.  Do you see that there?

A   Yes.

GONZALEZ 000716

234

Q    Okay.  So you knew in 2017 that Mr. Maysonet was challenging his conviction, right?

A    Yeah, that's when they came to my work.

Q    Right.  And you knew they came to your work because Mr. Maysonet was challenging his conviction?

A    That's the first time I heard about it.

Q    Right.  But that's how you knew it?

A    Yes.

Q    And then in paragraph 34 you say, "Soon after the state's attorney dropped the charges against Jose Maysonet, Brendan Shiller from Shiller Preyar Law Offices contacted me through my attorney Richard Dvorak."  Do you see that there?

A    Yes.

Q    Why did Mr. Shiller contact you through your attorneys?

MR. PRADOS:  Objection.  That gets into conversations he's had with his attorney.

BY MS. ROSEN:

Q    Did you ever speak to Mr. Shiller?

A    Who's Mr. Shiller?

Q    I don't know.  You wrote it in your

GONZALEZ 000717

235

affidavit, paragraph 34.  It says --

A    Oh, that was the state's attorney who came to --

Q    No, no.  Wait, wait.  "Soon after the state's attorney dropped the charges against Jose Maysonet, Brendan Shiller from the Shiller Preyar Law Offices contacted me through my attorney."  Do you see that there?

A    Yes.

Q    Did you ever speak to Mr. Shiller from Shiller Preyar Law Offices?

A    No.

Q    And how did you become aware that Mr. Shiller was trying to contact you?

A    Maybe through my attorney.

Q    This is a yes-or-no question.  Did you have a conversation with your attorney about why Mr. Shiller was contacting you?

MR. PRADOS:  You can answer yes or no, if you can.

A    No.

BY MS. ROSEN:

Q    Why did you put paragraph 34 in your affidavit?

MR. GREENBERG:  I'm going to object.

GONZALEZ 000718

236

I think this is getting into -- I don't know if his attorney wants to object -- privileged things.

MS. ROSEN: He put it in an affidavit. If it's privileged --

MR. GREENBERG: Yeah, but why?

MR. PRADOS: I mean, the paragraph is there to explain why this affidavit was authored.

MR. GREENBERG: It gets into work product, doesn't it?

MS. ROSEN: I didn't put it in the affidavit, so I'm asking -- it's his affidavit. He signed it. I get to ask questions. They get to object if they think it's privileged.

MR. GREENBERG: But you're asking about what's in the affidavit.

MS. ROSEN: This is in the affidavit.

MR. GREENBERG: Well, asking about why it's in the affidavit is a different question.

MS. ROSEN: Well, okay. If there's an objection, they can make the objection. I don't know why you're putting this information into an affidavit if it's privileged information.

MR. GREENBERG: I said it could be work product also.

MS. ROSEN: This would still be privileged.

GONZALEZ 000719

237

I know.  Well, at some point you waive privilege when you only like reveal the part you want to reveal, so I'm exploring it.  I have no idea why anybody would put this in an affidavit.

Q   Okay.  I just want to be clear on paragraph 34.  In the affidavit you write, "Soon after the state's attorney's office dropped the charges against Jose Maysonet, Brendan Shiller from Shiller Preyar Law Offices contacted me through my attorney, Richard Dvorak."  Do you see that there?

A   Yes.

Q   Do you know why Mr. Shiller wanted to contact you?

MS. ROSEN:  And if you have an objection to that, go ahead.

MR. PRADOS:  I do have an objection based on attorney-client privilege, and I would instruct my client not to answer.

MS. ROSEN:  Okay.

MR. LEINENWEBER:  Can I ask a clarifying question?

MS. ROSEN:  Yeah.

MR. LEINENWEBER:  I'm just curious.  Who does Mr. Shiller represent?  Does he represent --

GONZALEZ 000720

238

MR. GREENBERG: Gonzalez.

MS. COHEN: Gonzalez.

MR. ENGQUIST: He did represent Gonzalez.

MR. LEINENWEBER: So you're claiming there's a privilege over the communication between Shiller and your client?

MR. PRADOS: Over discussions that we had about what goes into this affidavit, yes.

MR. GREENBERG: I think the discussion was between Shiller and the lawyers. That's what I'm getting at.

MR. LEINENWEBER: And I think that's what the question is aimed at is what did Mr. Shiller want to know, which would in no way, shape or form encroach, I don't think. I might be -- Eileen, I might be stepping on your toes.

MS. ROSEN: No, no, no, it's fine. I don't really understand -- I don't understand at all why --

MS. COHEN: You're asking Justino what his attorney told him about why --

MS. ROSEN: I'm not asking him -- his attorney -- I'm asking him --

MR. GREENBERG: You're asking him why Shiller wanted to do something.

MS. ROSEN: And if the only way he knows

GONZALEZ 000721

239

it is through conversations with his lawyer, then that's the objection.

MR. GREENBERG: Right.

MS. COHEN: Right, right, right.

MS. ROSEN: But no one's said that yet.

MR. GREENBERG: But you haven't asked do you know why.

MS. ROSEN: Okay. I can't even get there.

MR. GREENBERG: That's the first. Start there. Thank you.

BY MS. ROSEN:

Q    Do you know why Mr. Shiller was contacting your lawyers?

A    No.

MR. GREENBERG: That solves that.

BY MS. ROSEN:

Q    And just to be clear, you've never had a conversation with Mr. Shiller?

A    No.

Q    Do you know who Loevy & Loevy are, lawyers from the law office of Loevy & Loevy? Have you ever heard that name?

A    No.

Q    Do you know somebody by the name of Steve Art?

GONZALEZ 000722

240

A    No.

Q    I take it nobody from Loevy & Loevy have reached out to talk to you about this case?

A    No.

Q    Steve Art, has he reached out to talk to you about this case?

A    No.

Q    How much are you paying your lawyers to represent you?

A    Nothing.

Q    So they're just doing this for free, representing you for free?

MR. PRADOS:  I'm just going to object on the basis of attorney-client privilege, and I'll instruct my -- no, you can answer the question.

BY MS. ROSEN:

Q    Are they just representing you for free?

A    No.

MR. PRADOS:  If you know.

A    To my -- no.  When we sat down -- when I sat down with the lawyer --

MR. PRADOS:  I'm going to just -- I think we're just going into a dangerous avenue and I would just instruct you not to answer any further.

THE WITNESS:  Okay.

GONZALEZ 000723

241

MS. ROSEN: Based on?

MR. PRADOS: Attorney-client privilege.

BY MS. ROSEN:

Q    Do you have some kind of fee arrangement with your lawyers? That's a yes or a no.

A    No.

Q    Do you have any kind of deal with your lawyers that if you get your conviction overturned and they file a lawsuit for you or a lawsuit gets filed on your behalf, that they get a piece of the lawsuit? They get paid out of the proceeds of the lawsuit?

MS. COHEN: Objection to form.

MR. PRADOS: You can answer yes or no, if you know.

A    No, I don't know.

BY MS. ROSEN:

Q    Did you sign any documents with your lawyers related to their representation of you?

MR. PRADOS: You can answer yes or no, if you know.

A    Yes.

BY MS. ROSEN:

Q    Was it some kind of a retainer agreement?

GONZALEZ 000724

242

MR. PRADOS: Same instruction.

A    Yes.

BY MS. ROSEN:

Q    Do you have a copy of it? I don't mean with you today, but do you have a copy of it?

A    Yes.

MS. ROSEN: I don't have any more questions at this time.

MR. ENGQUIST: All right. I'm just going to bounce around a little bit.

CROSS-EXAMINATION

BY MR. ENGQUIST:

Q    Sir, when you were talking about -- you were selling drugs and at one point you were talking about that you were -- the next couple years you were heavy into the neighborhood. Do you remember those --

A    Yes.

Q    Okay. When you were, as you put it, heavy in the neighborhood when you were selling drugs for the Latin Kings, how much money were you making a week?

A    Around 4 or $500.

Q    And that was just your money, correct?

GONZALEZ 000725

243

A     Yes.

Q     As you said, you weren't kicking money up to anybody else?

A     No.

Q     And that's when you were really invested in the drug sales, correct?

A     Yes.

Q     And just to be clear, you didn't have to give money up to any other Latin King for kind of any protection or the right to sell at a certain corner?

A     No.

Q     Okay.  And I think this is right. Just to be clear, you didn't sell drugs with or for Jose Maysonet, is that correct?

A     Did I sell drugs for Jose?

Q     Yeah.

A     No.

Q     And you never sold drugs with him, correct?

A     No.

Q     Do you know if he sold drugs?

A     I don't know.  I don't know.

Q     Do you know Jose's sister, Rose?

A     No.

GONZALEZ 000726

244

Q    Have you ever heard about Jose or Jose's sister supplying underage girls for sex?

A    No.

MS. COHEN:  Objection, foundation.

MR. ENGQUIST:  It's from your questions, actually.

Q    Did you ever know them to procure underage girls for sex?

A    This is the first time I even heard about that.

MS. COHEN:  Just Rose?

MR. ENGQUIST:  Rose or Jose, either one.

Q    I just want to make sure it's clear about Exhibit No. 2 again.  It's the handwritten statement.

A    Yes.

Q    Just to be clear, the first time you saw Exhibit No. 2 it was already filled out, is that correct?

A    Yes.

Q    And just to be clear, you never told anybody that you -- when you were at the police station after your arrest, okay, that night you never told anybody that you were involved in the shooting of the Wiley brothers, correct?

GONZALEZ 000727

245

A    Yes.

Q    And you never told anybody you knew anything about it, is that correct?

A    Yes.

Q    Okay.  So you never gave an oral statement taking any responsibility that night, is that right?

A    Yes, I didn't say nothing.

Q    So the first time there's a recorded statement by you that you did anything -- where you say you actually gave a statement was in court, is that right?

A    Yes.

Q    Now, when you -- I'm talking about after you made -- after you agreed to testify for the prosecution, do you remember after that point?  At some point you agreed to testify for the State?

A    Yes.

Q    Okay.  After that point did you ever meet with the state's attorney -- anybody from the state's attorney's office with your attorney, Mr. Vahey?

A    Before the testimony or --

Q    Before your testimony, yeah.

GONZALEZ 000728

246

A    Yes, with the state's attorney.

Q    Okay.  Was Mr. Vahey with you?

A    Can't recall.

Q    Do you think you met with the state's attorney's office without Mr. Vahey?

A    Could be, yes.

Q    Is it possible that you met him with Mr. Vahey?

A    Can't recall.

Q    Did you meet with Mr. Vahey after you gave your testimony against your uncle?

A    Yes.

Q    Okay.  And was that before you pled guilty for your sentencing?

MS. COHEN:  Objection to the form.

A    I don't understand the question.

BY MR. ENGQUIST:

Q    Was Mr. Vahey your attorney all the way up to the point where you pled guilty and were sentenced?

A    Yes.

Q    And so you did talk to him about your testimony after you gave it, your testimony against your uncle, correct?

A    Don't recall.

GONZALEZ 000729

247

Q    Did Mr. Vahey ever raise any concerns about the fact that you were going to give perjured testimony on the stand?

A    Can't recall.

Q    Do you know what I mean by perjured testimony?

A    Lying on the stand.

Q    Yes, that's what I mean.  Did he ever give you any -- express any concerns about the fact that you were going to lie on the stand?

A    Can't recall.

Q    Okay.  But just to be clear, you're saying that Mr. Vahey knew you were going to lie on the stand, correct?

A    No.

Q    Did you ever tell Mr. Vahey that you did it, that you were involved in the murders?

A    No.

Q    You specifically, if I have this right, you told Mr. Vahey that you didn't know anything about the murders, correct?

A    Yes.

Q    And you told Mr. Vahey that you weren't involved in the murders, correct?

A    Yes.

GONZALEZ 000730

248

Q    And so if Mr. Vahey knew that you were going to give testimony opposite of that, is it fair to say that Mr. Vahey was aware that you were going to lie on the stand?

A    If I -- yes.

Q    When you pled guilty and got your -- and were sentenced, up until that point had you ever told Mr. Vahey you were involved in the murders at all?

A    No.

Q    You always maintained to Mr. Vahey that you knew nothing about this?

A    Yes.

Q    About the murders of the Wiley brothers, correct?

A    Yes.

Q    When you were in Cook County Jail for this case, were you in contact with any other members of the Latin Kings?

A    No.

Q    When you were in Cook County Jail, were you ever visited by your brother Efrain?

A    No.

Q    When you were in IDOC, were you ever visited by your brother Efrain?

GONZALEZ 000731

249

A    No.

Q    Were you ever visited by any members of your family?

A    My dad.

Q    No one else?

A    My dad, his wife, my girl friend, and she used to bring my daughter.

Q    Anybody else?

A    Family member, like my dad's brother and sisters.

Q    Anybody else you can think of?

A    No.

Q    Did you receive any communications from -- either letters or any other kind of communications, phone calls or whatever, from anybody from the Latin Kings, who were members of the Latin Kings?

A    No.

Q    You said before that you're still seeing your doctor having to do with some hearing issues, is that correct?

A    Yes.

Q    Okay.  Have you ever been diagnosed with any kind of hearing loss in your left ear?

A    Just certain percentage loss on the left

GONZALEZ 000732

250

ear.

Q In your left ear?

A Yes.

Q Do you know what that is? Do you know what the percentage loss of hearing is in your left ear?

A No.

Q Has it hindered you from anything in your life, your work at all?

A Yeah, I have to -- where I work I have to wear earplugs because the loud noise bothers my ear.

Q Oh, okay. Where you work there's a lot of heavy machinery that makes a lot of noise?

A Yes.

Q And do other people where you work wear ear protection?

A The ones who work at the production side, but like I work in the shipping department. I have to wear them because the noise bothers me. It gives me headaches.

Q And when were you first diagnosed with any kind of hearing loss in your left ear?

A Before -- when I was locked up. When I was locked up.

GONZALEZ 000733

251

Q    In Cook County Jail or in the IDOC?

A    Cook County.

Q    In Cook County Jail?

A    Yes.

Q    And is that just in your left ear or do you know if it's in both ears?

A    No, the left.

Q    Just in the left.  You talked about the Latino officer and the white officer who arrested you on the street.

A    Yes.

Q    Okay.  The white officer that was with the Latino officer, can you describe him at all other than a white male?

A    No, they both -- he was a male.  I can't recall.  He was a male officer, white.

Q    So you can recall he was a male officer and white, correct?

A    Yes.

Q    Do you remember height?

A    Around 5'8", 5'9".

Q    Okay.  Do you remember what color hair at all?

A    No.

Q    Do you remember if he had glasses or

GONZALEZ 000734

252

anything like that?

A    Like I said, it was like 20 years ago.  I can't -- I can't recall what he wear and everything.

Q    Facial hair?

A    I know he had a beard or something.

Q    He had a beard?

A    Yeah.

Q    Okay.  Like a full -- like you have like more of a goatee and I have more of a full beard.  What kind of a beard did he have?

A    Like a beard (indicating).

Q    Like a what?

A    Just a beard.

Q    Just a mustache?

A    Yeah, mustache.

Q    Just a mustache?

A    Yeah, just a mustache.

Q    Okay.  And after that night at the police station -- and just to be clear, those were the only two police officers that you dealt with at the police station, correct?

A    Yes.

Q    And after that night you never saw them again, am I right?

A    Just at the police station.

GONZALEZ 000735

253

Q    So after that night you never saw them again?

A    Yes.

Q    Okay.  And just to be clear, you never saw them before then either, correct, before your arrest?

A    No.

Q    Is that correct?

A    Yes.

MR. ENGQUIST:  Go ahead.

MR. LEINENWEBER:  Thanks.

CROSS-EXAMINATION

BY MR. LEINENWEBER:

Q    I just want to make sure.  Are you able to hear me okay from the opposite end of the table?

A    Yeah, yeah.

Q    If you can't hear me, just let me know. Sticking with the injured ear for a second, I think you said the job you were working at at the time of your arrest was a printing facility, is that right?

A    Yes.

Q    Was that a sort of loud workplace with lots of machinery and factory --

GONZALEZ 000736

254

A    We only had around six machines because it was a small printing shop.

Q    Sure.  What did they print?

A    Checks.

Q    Checks.  Like checks that you would write someone for money?

A    Yes.

Q    But so was the workplace, was it kind of loud from the printing floor, if you will?

A    Not that loud.

Q    Not that loud.  Did you wear hearing protection?

A    No.

Q    Turning back to -- well, let me -- earlier you testified that the first time you heard that Mr. Maysonet was challenging his conviction was when the state's attorneys came to you, right?

A    Yes.

Q    And that that I think you said was in early 2017?

A    Yeah, that's when they came to my job.

Q    Okay.  In fact, if we look at your affidavit -- which I think is Exhibit 2, is that right?

255

MR. ENGQUIST:  I think it's Exhibit 1.

BY MR. LEINENWEBER:

Q    Exhibit 1.  So take a look at Exhibit 1, paragraph 33.  It says, "In early of 2017 an ASA and an investigator -- investigate SAO came over.  Through them I learned that Jose Maysonet was challenging his conviction and was granted a retrial."  Do you see that?

A    Yes.

Q    Is that a true statement?

A    Yes.

Q    Okay.  Had you met with Ms. Bonjean before that date?

A    Who?

Q    Ms. Bonjean, the attorney that was questioning you this morning.

A    No, no.

Q    Did you ever meet with Ms. Bonjean?

A    Yes.

Q    When did you meet with Ms. Bonjean?

A    I think after the state's attorney came.

Q    After the state's attorney came?

A    Yeah.

Q    So it was after the state's attorney came, then Ms. Bonjean found you?

GONZALEZ 000738

256

A    Yes.

Q    Okay.  Did Ms. Bonjean tell you that Mr. Maysonet was suing for his -- to have his conviction overturned?

MS. COHEN:  Objection to the form.

A    I think, to my knowledge, he was getting a retrial.

BY MR. LEINENWEBER:

Q    That he was getting a retrial?

A    Yeah.

Q    So if the date that you met with Ms. Bonjean was January 5, 2017, okay -- just listen to the question first, okay, before looking.  If the date that you met with Ms. Bonjean was January 5, 2017, okay, then according to your affidavit and according to your statement, you would have had to have met with the ASAs on either January 1st, January 2nd, January 3rd, January 4th of 2017, right?

MS. COHEN:  Objection to the form.

A    I don't remember the day.  I know it was early 2017.

BY MR. LEINENWEBER:

Q    It was early 2017, but it was also -- you know that it was before you met with

GONZALEZ 000739

257

Ms. Bonjean?

A    To my knowledge, yes.

Q    Okay.  So if I told you that you met with Ms. Bonjean on January 5, 2017, okay, that means it had to be during the first four days of the year that you met with the ASA, right?

A    I can't recall --

Q    Okay.

A    -- when I met with her and everything.

Q    But if I'm telling you it was January 5th -- I'll represent to you that it was January 5, 2017.  So according to that then, you would have had to have met with the ASA before then, right?

A    Yes.

Q    Okay.  The area that you -- let's talk about May 1990, okay?  So I want to go back to the period of your life May 1990, okay?  You said that you were living -- I think first you said near North and Kedzie, right?

A    Yeah.

Q    Okay.  And I think on the medical form -- which I don't know what exhibit number it is.  But if someone could help me, that would be awesome.

GONZALEZ 000740

258

MR. ENGQUIST: Exhibit 8.

BY MR. LEINENWEBER:

Q    Exhibit 8 you list an address there, right, on Pierce?

A    Yes.

Q    Is that the address that was near North and Kedzie that you lived at?

A    Yes.

Q    So in May 1990 you were living at 3337 West Pierce in Chicago, Illinois?

A    Yes.

Q    Okay. And you said that as a member of the Latin Kings, you would -- well, okay. So what days of the week did you work at the printing shop?

A    Monday through Friday.

Q    Okay. So Monday through Friday you were doing the night shift at the printing shop, right?

A    Yes.

Q    Okay. Weekends come around and you are selling drugs with Latin King members, right?

A    Yes.

Q    Where were you selling these drugs?

A    In the neighborhood.

GONZALEZ 000741

259

Q     In the neighborhood around where you lived?

A     Yes.

Q     Okay.  And you said that you spent kind of a lot of time on the streets, right?  You worked the streets I think you said essentially?

A     Yeah.

Q     Okay.  And you knew the other Latin Kings that were out on the streets, right?

A     Yeah.

Q     And, in fact, you said I think -- correct me if I'm wrong -- that you knew Jose Maysonet, at least knew who he was, by being out on the streets, right?

A     Yes.

Q     And you said -- at one point today you testified, yeah, that's where we hung out, on Pierce, right?

A     Yes.

Q     So earlier Ms. Bonjean asked you when the first time you heard anything about the Wiley brothers was.  Do you remember that question?

A     Yes.

Q     And you testified that the first

GONZALEZ 000742

260

time you heard anything about the fact that the Wiley brothers were murdered was when you were in custody with the Chicago police, right?

A    Yes.

Q    So do you know where the Wiley brothers were murdered?

A    I found out in the police station.

Q    And where were they murdered?

A    From the police station, they told me they were murdered on St. Louis and North Avenue.

Q    Okay.  How far away is St. Louis and North Avenue from your apartment on Pierce Street?

A    St. Louis and North Avenue?

Q    Yeah.

A    I think around 2 miles.  I think so.

Q    Two miles, is that what you said?

A    I think so, yeah.

Q    Would it surprise you to hear that it's 2/10s of a mile?

A    Could be.

Q    Okay.  So your address was 3357 West Pierce?

A    37.

Q    3337 West Pierce.  So if I told

GONZALEZ 000743

261

you that the Wiley brothers were murdered at 3428 West North Avenue, does that refresh your recollection of this neighborhood as to how far away it was that they were murdered from your apartment?

A    No.

Q    It doesn't, okay.  Well, I'll represent to you that I pulled it up on Google Maps and it's .2 miles away.  So what I'd like to know is how is it possible that the streets that you worked on selling marijuana, that two people were murdered .2 miles from your house and you didn't know about it?

A    Because you don't hear that on the news or nothing.

Q    You don't hear on the news?  What about in the neighborhood?  You guys weren't talking, hey, did you hear about the two guys that got shot up over there?  Yeah, they got killed?

A    No.

Q    You didn't hear anything?

A    No.

Q    So your testimony is even though these two guys were shot less than a five-minute walk from your house and on the streets where you

GONZALEZ 000744

262

were selling drugs, you had no idea that they were murdered?

A    Yes.

Q    How did you know that the Wiley brothers were black?

A    From the police station.

Q    The police station told you?

A    Yes.

Q    So the only way that you knew they were black was based on the police -- the conversation you had --

A    That I had with the Latino officer and everything.

Q    With the Latino officer in the police station?

A    Yes.

Q    When was the first time you heard the name Rosa Bello?

A    Right now because I didn't --

Q    No, no, no, that cannot be.  Let's start over.  Let's start over for a second.  When is the first time that you heard the name Rosa Bello?

A    Maybe the police station in the -- locked up in the police station.

GONZALEZ 000745

263

Q    So the detectives you think --

A    Yes.

Q    -- told you about Rosa Bello?  Okay.
Is that yes?

A    Yes.

Q    So between the time -- let's go to your
handwritten statement for a second, Exhibit 2,
okay?  Is that in front of you?

A    Yes.

Q    Did you see that statement at any
time between your -- the time you signed it and
then the time you testified?  Did you have a copy
of it?

A    No.

Q    Did you get to review it?

A    First time I saw this when they took me
out of the police station lockup into their office.

Q    Okay.

A    First time.  That's the first time I saw
this.

Q    And that was the time you signed it?

A    Yes.

Q    And I'm a little bit unclear.  Were you
able to read it at that time?

A    I can't recall.

GONZALEZ 000746

264

Q    Okay.  But you can read it now we established, right?

A    Yes.

Q    Can you look in there and tell me if Rosa Bello's name is in there anywhere?

A    No.

Q    No, it's not in there?  Is that your testimony?

A    Yes.

Q    So let's go to -- I think it was Exhibit 7 is the transcript testimony, and I'd like you to go to page 41.  And just let me know when you're there, okay?

A    Yes.

Q    Okay.  Page 41, line 19 -- let me just back up for a second.  Page 41, line 12, "Where did you go after you got out of the car?  To Juan's house.  Did you -- Question, did you go to the front door of his apartment?  Answer, yes.  Question, and when you got to the front door of the apartment, what happened?  Answer, we rang the doorbell.  Question, did anyone answer the door?  Answer, Rose.  Question, by the way, did you know Rose?  Answer, yes.  Question, and who did you know her to be?  Answer, Maysonet's

GONZALEZ 000747

265

lady."

So my question for you is how is it that you remembered her name between the time it was told to you in the police station and the time that you testified to it?

A    In the police station, the officer.

Q    So you heard it from the officer?

A    Yes.

Q    Okay.  And then you remembered it for two years that Rose was her name?

A    I think the state's attorney brung it up.

Q    The state's attorney brought it up?

A    Again before we talked about getting on the stand, testimony.

Q    So that -- what did the state's attorney say?  First of all, which state's attorney talked to you about Rose?

A    Mark, when we were going through the statement.

Q    Mark?  Do you mean Mr. Marek?

A    Yeah, Mr. Marek.

Q    And you just said Mr. Marek when we were going through the statement, right?

A    Yeah, this.

Q    What statement?

GONZALEZ 000748

266

A     This one.

Q     The testimony you mean?

A     Yes.

Q     So you're saying during the testimony he told you Rosa Bello's name?

A     No, at -- before trial at his office when we was going through this.

Q     So to prepare for the trial --

A     Yeah.

Q     -- you're saying that the state's attorney told you Rosa Bello's name?

A     At first I learned it at the police station.  Then again he remind me at the state's attorney's office when we were going through and everything.

Q     Okay.  So what else did he tell you about Rosa Bello?

A     That that was Juan's girl friend.

Q     So did he tell you what to testify to? Because you said -- earlier you said it was a lie, that you did not know who she was, right?

A     No, I didn't.  I learned about her in the police station about when Juan and Alfredo was locked up, the police station told me, the officers -- the Latino officer asked me, told me did I knew I was

GONZALEZ 000749

267

getting locked up. I said no. He goes Alfredo and Juan signed statements against you saying you -- and I said I don't know what they're talking about because they're lying, and then he goes do you know Rose. That's Juan's girl friend he told me. I go no.

Q All right. You're finished?

A Yes.

Q All right. So what I want to know, though, is what did the state's -- you said that all your testimony -- a lot of your testimony that you gave at the trial in Exhibit 7, that it was a lie, right?

A Yes.

Q And part of that was that you knew who Rose was. And we talked about that it was a lie that you had been to their house, it was a lie that you knew that they had previously lived on Pierce, it was a lie that you had been to the apartment on Homan, right?

A Yes.

Q So who gave you all those details?

A Police officer at the police station.

MR. LEINENWEBER: I'm sorry. Can you read back his answer.

GONZALEZ 000750

268

(Whereupon the portion of the record was read as requested.)

Q    And I just want to clarify, we had said Rose but I meant Rosa Bella, Rosa.  Is that your understanding, it's Rosa Bella -- Rosa Bello?

A    Rose, Rosa Bello, yeah.

Q    Okay.  Earlier you talked about what it means to be violated.  Could you just explain that a little bit?  What does it mean to be violated in terms of the Latin Kings?

A    You mean --

MS. COHEN:  Objection, form.

A    I don't understand, violated.

BY MR. LEINENWEBER:

Q    Okay.  So earlier you were asked if you knew what it meant to be violated, and I believe you testified that it was a form of either indoctrination into the Latin Kings or retribution from the Latin Kings, right?

A    Okay, how you get into the gang, okay.  Violated, you could take that as all different ways.

Q    Sorry.  So I meant specifically when you were talking about it earlier with regard to essentially being beat up by the Latin Kings.

GONZALEZ 000751

269

A    To get into the Latin Kings you get a three-minute violation.

Q    And what does that mean?

A    You get beat up.

Q    How many people?

A    Can't recall.

Q    And it happened to you?

A    It happens to everybody who wants to become a Latin King.

Q    So that's a yes, it did happen to you?

A    Yes.

Q    And how many people beat you up?

A    Like I said, I can't recall.

Q    You don't recall, okay.  Did you have any injuries from it?

A    No, because they show you how to cover yourself up so you won't have that much bruises.

Q    So you weren't injured from it?

A    No.

Q    So you didn't have to go to a hospital or a clinic or anything like that?

A    No.

Q    You had said between the day you gave your written statement to the police and the day of your testimony you did not see the Latino

GONZALEZ 000752

270

detective, right?

A    The last time I saw him was at the police station.

Q    At the time you gave the written statement?

A    When they brought me the statement.

MS. COHEN:  Object to the form.

BY MR. LEINENWEBER:

Q    And you would probably remember if you saw him again, right?

A    Yes.

Q    In fact, you do remember seeing him on TV almost 20 years later?

A    On TV and in the newspaper.

Q    Okay.  You said you graduated from Clemente High School?

A    Yes.

Q    Were you -- do you have any recollection what kind of student you were?

A    D, C average.

Q    D, C average.  But you graduated?

A    Yes.

Q    I can't remember if this question was asked.  But Exhibit 1, your affidavit.

A    Yes.

GONZALEZ 000753

271

Q    Did you read that before you signed it?

A    This one here, Exhibit 1?

Q    Yes.

A    Yes.

Q    You read it?

A    Yes.

Q    Did you understand it?

A    Yes, he had -- the state's attorney --
I mean, my attorney explained it to me.

Q    I don't want to get into anything
that your attorney told you, but I just want to
make sure you read that and you understood it?

A    Yes.

        MR. LEINENWEBER:  All right.  I don't have
any further questions.

                CROSS-EXAMINATION
BY MR. BRENER:

Q    Mr. Cruz, you testified today that
you didn't have much of a relationship with Jose
Maysonet in 1989 and 1990, right?

A    Yes.

Q    And to the extent you gave testimony
that the two of you were friends, that testimony
was a lie, right?

A    Yes.

GONZALEZ 000754

272

Q    And you've testified that you didn't know his girl friend, Rosa Bello, correct?

A    Yes.

Q    You also didn't know his sister, Rose Maysonet, correct?

A    Yes.

Q    Do you know his parents?

A    No.

Q    Do you know if he had siblings?

A    No.

Q    Do you know if he had a nickname in the gang?

A    No.

Q    You referred to him as Juan repeatedly today.  You also referred to him as Juan in your trial testimony in a number of places.  Why didn't you call him Jose?

A    Because that's what everybody called him, Juan.

Q    Who's everybody?

A    The guys in the street.

Q    So the guys knew him as Juan?

A    Yes.

Q    Do you know if that's his name?

MS. ROSEN:  You have to answer out loud.

GONZALEZ 000755

273

A    Don't know.

BY MR. BRENER:

Q    Is that a yes or a no?

A    Don't know.

Q    So you don't know why you called him Juan?

A    Because that's what everybody called him in the neighborhood when we was out there selling drugs.

Q    Did you refer to him as Juan in person when you saw him?

A    Whenever I saw him in the street when we was out there sometimes.

Q    And when would you see him out in the street?

A    Like I said, when we all together talking or he passes buy.

Q    When you were selling drugs, would you see him in the street and call him Juan?

A    Yes.

Q    Okay.  I want to just clarify some timing things here.  Your testimony is that you were arrested on August 24th of 1990, is that right?

A    Yes.

GONZALEZ 000756

274

Q    And your testimony is that the arrest was in the evening, correct?

A    Yes.

Q    Approximately 6 o'clock in the evening?

A    Around 5 or 6 in the evening.

Q    Sure.  But not in the morning?

A    No.

Q    And not on the previous day either?

A    Day?

Q    You were not arrested before August 24th of 1990 --

A    No.

Q    -- with respect to the Wiley brothers murders, correct?

A    No.

MR. GREENBERG:  The record should reflect when you asked the question earlier, that he was looking at the exhibits in front of him before answering.

MR. BRENER:  Is that an objection?

MR. GREENBERG:  No, it's just the record should reflect that he was looking at the exhibits.

BY MR. BRENER:

Q    So the answer to my question is no, correct?

GONZALEZ 000757

275

A    What was the question again?

MR. BRENER:  Can you read it back, please.

(Whereupon the portion of the record was read as requested.)

A    Yes.

Q    That's a yes, you were not arrested prior to August 24, 1990, right?

A    Yes.

Q    That means that you didn't speak to anybody in Area 5 on August 23, 1990, correct?

MR. GREENBERG:  Can the record reflect he's looking at these papers in front of him?  Can we take the papers away?

MR. LEINENWEBER:  He's been doing that the entire time.

MR. ENGQUIST:  And he has counsel.

MR. LEINENWEBER:  Yeah.

A    I can't recall the date.

BY MR. BRENER:

Q    Let me reask my question.  You did not speak to anyone in Area 5 the day before you were arrested, correct?

A    The day before, no.

Q    And that's because you weren't at Area 5 the day before you were arrested, right?

GONZALEZ 000758

276

A    No.

Q    You didn't go to Area 5 until after you were arrested, correct?

A    Yes.

Q    Does the name Frank DiFranco mean anything to you?

A    No.

Q    Do you remember speaking to anyone by that name?

A    No.

Q    Have you ever heard it before, to the best of your knowledge?

A    No.

MR. BRENER:  I have nothing further.

MR. GREENBERG:  Can we have five minutes before we decide if we're going to ask questions?

MR. ENGQUIST:  Absolutely.

(Whereupon a recess was taken from 4:34 p.m., to 4:40 p.m., after which the following proceedings were had:)

MR. GREENBERG:  I don't have any questions, but it's up to Ashley.

MS. COHEN:  I don't think we have any other questions.

MS. ROSEN:  Oh, okay.

GONZALEZ 000759

277

MR. ENGQUIST:  I don't have any followup.
Waive or reserve?

MR. PRADOS:  We waive.

MR. ENGQUIST:  Thank you very much, sir.
We're done.

(Reporter retained exhibits.)

(WITNESS EXCUSED)

GONZALEZ 000760

278

NORTHERN DISTRICT OF ILLINOIS)
EASTERN DIVISION           )
STATE OF ILLINOIS          )
                           ) SS.
COUNTY OF COOK             )

I, Mary Maslowski, Certified Shorthand Reporter and Notary Public in and for the County of Cook, State of Illinois, do hereby certify that on November 1, 2019, the deposition of the witness, JUSTINO CRUZ, called by the Plaintiff, was taken before me, reported stenographically and was thereafter transcribed by me.

The said witness, JUSTINO CRUZ, was first duly sworn to tell the truth, the whole truth, and nothing but the truth, and was then examined upon oral interrogatories.

I further certify that the foregoing is a true, accurate and complete record of the questions asked of and answers made by the said witness, at the time and place hereinabove referred to.

The signature of the witness was waived by agreement.

The deposition terminated at 4:41 p.m.

The undersigned is not interested in the within case, nor of kin or counsel to any of the parties.

Witness my official signature and seal as Notary Public, in and for Cook County, Illinois on this 11th day of November, A.D., 2019.

GONZALEZ 000761

279

Mary Maslowski, CSR, RPR
Notary Public

Rizman Rappaport (973)992-7650
"When every word counts"

GONZALEZ 000762

Maysonet v.
Guevara

Justino Cruz

**$**

**$500 (1)**
242:24

**A**

**a/k/a (2)**
35:13,20
**abandoning (1)**
225:22
**ability (2)**
8:11;53:4
**able (10)**
20:18;35:8;37:16;
52:25;53:21;54:10,
16,17;253:15;263:24
**above (4)**
132:5,10,13,17
**absolutely (2)**
213:24;276:17
**abuse (1)**
108:9
**abused (2)**
82:25;121:7
**abusing (1)**
155:9
**accept (1)**
168:16
**acceptable (1)**
7:16
**accommodations (1)**
37:11
**According (4)**
25:19;256:16,16;
257:12
**accurate (14)**
20:9;47:5;116:8;
160:8,13;167:18,20;
168:1,10;169:12;
175:19;185:4;186:6;
187:7
**accurately (1)**
203:10
**accused (1)**
78:11
**accusers (2)**
36:20,21
**Acme (6)**
11:6,9,11,13,21;
159:2
**A-c-m-e (1)**
11:8
**act (3)**
41:8;224:7,8
**acted (1)**
220:18
**acting (1)**
74:21
**action (3)**
5:13;121:20,23
**actions (1)**

**42:16**
**activities (3)**
126:22;170:5;171:9
**activity (2)**
13:20;207:9
**actually (17)**
24:6;34:23;46:4;
53:18;63:2;81:7;98:8;
105:19,23;111:9;
165:3;203:7;207:1;
220:12;233:19;244:6;
245:11
**address (10)**
10:15;12:11;21:13;
104:3;115:16;127:19;
128:12;258:3,6;
260:22
**admission (1)**
220:18
**admit (1)**
101:1
**admitted (1)**
151:17
**Adrian (5)**
35:1;79:22;118:10,
11,17
**Adrian's (1)**
118:13
**advised (1)**
48:4
**affidavit (45)**
14:23;15:11,21;
16:21,23;17:3;19:9;
20:8;39:13,14;108:4,
7;117:22;125:13,17,
19;128:25;226:24;
227:6,18,23;228:9,18,
24;230:5,7,11;
232:22;233:19;235:1,
24;236:3,7,11,11,15,
16,18,21;237:4,6;
238:8;254:24;256:16;
270:24
**afford (1)**
153:24
**afraid (1)**
226:2
**African-American (1)**
25:16
**afternoon (2)**
184:25;185:1
**again (23)**
18:21;22:16;40:3;
53:17;58:24;63:24;
65:23;112:24;114:11,
12,23;140:3,9;191:8;
212:4;216:17;244:14;
252:24;253:2;265:13;
266:13;270:10;275:1
**against (43)**
41:7;42:16;81:12,
15;82:3;84:23;87:2;
105:10;106:1;114:7,

**21;121:9,20,23;**
**123:13;134:8,16,18;**
**141:8,14,23;142:13,**
**16,23;143:3;153:21;**
**163:3;166:3;180:12,**
**18;190:5;218:19;**
**220:3;221:3;224:20,**
**24;225:15;234:13;**
**235:5;237:8;246:11,**
**24;267:2**
**age (2)**
10:6;176:10
**ago (14)**
7:1;16:24;112:22;
113:6,20;128:17;
129:4;138:6;200:15;
227:14;231:8;232:11,
23;252:2
**agree (4)**
36:20;47:18;68:4;
200:4
**agreed (4)**
36:19;168:25;
245:15,17
**agreement (9)**
88:4,7;164:21,24;
165:8;167:15;168:6,
17;241:25
**ahead (4)**
64:19;219:12;
237:16;253:10
**aimed (1)**
238:13
**al (1)**
5:18
**Alfredo (103)**
15:12,15,25;22:22;
30:22;36:9,13;37:1;
41:3;44:19,24;49:4,
14,18,24,25;50:19,21,
24;51:1,2,12,13;58:4,
6;60:15;61:19;70:25;
76:23;85:23;90:5,25;
91:21;92:7,16,23,24;
93:7,23;94:4,11,15,
16,23;95:2,4,13,18;
96:7,24;97:8,20;
98:16;99:1,3,6,14,17,
23;100:1,7,12,16,18,
25;101:9;105:10;
124:6,21,24;134:19;
136:20;149:15,21;
150:2;160:16;169:7,
9;171:16;175:16;
184:2;188:14;189:7;
193:18,20;195:4;
204:9,15;210:20;
211:19;212:3,9,14;
214:7,11,14,24;
215:21;217:25;220:3,
6;266:23;267:1
**alias (2)**
35:16,21

**alive (1)**
137:25
**alley (15)**
50:9;51:11;67:8,9;
97:23;98:1,9,10;99:8;
202:6;203:15,21,22,
25;205:23
**alleys (1)**
203:11
**allow (2)**
37:10;60:22
**allowed (2)**
37:9;52:5
**almost (3)**
54:9;190:20;270:13
**alone (3)**
30:14,15;225:18
**along (3)**
20:13,17;35:8
**altogether (1)**
176:22
**always (4)**
74:6;118:1;119:4;
248:11
**and/or (2)**
223:20;224:7
**angry (1)**
225:20
**answered (10)**
42:18;44:5;55:17;
64:4;65:10;72:18;
135:7;193:6;194:12;
225:11
**apartment (26)**
61:9,10;93:15,16,
19;94:11;96:1,2;
191:24,25;192:1,3,12,
21;207:18,23;208:1,2,
7;210:23;211:2;
260:12;261:5;264:19,
21;267:20
**apologies (3)**
10:11;27:23;109:9
**appear (3)**
26:18;115:19;
116:14
**appointed (1)**
153:25
**approach (1)**
167:2
**approached (8)**
50:24;51:10;167:8,
12,19;168:5,11;
180:14
**approximate (2)**
7:3;43:3
**approximately (9)**
17:18;18:3;63:6;
108:7;137:6;142:18;
204:16,18;274:4
**April (5)**
12:5,6,10;224:8;
226:7

**area (32)**
9:21;24:23;30:20,
23,25;31:16;32:3;
33:4,4;36:19,20,25;
37:4,9,11,22;58:2,7;
76:15;102:8,10;
104:22;174:21;
203:10,20;212:5,24;
257:16;275:10,21,25;
276:2
**argument (1)**
73:18
**argumentative (6)**
64:16;73:6,12,13,
20;74:12
**Army (1)**
132:11
**around (68)**
16:4;17:23;18:5;
21:6;26:8;43:4;50:8;
59:21;67:13;98:9;
99:4;102:13;113:22;
119:21;120:7;126:13,
13,23;128:17;131:13;
137:10,12,20,21;
141:16;142:21;146:7;
147:11;158:21;
166:17;167:25;171:7,
8;172:1;175:16;
176:15,20,25;177:1,3,
15,20,20,21,22;178:8;
182:23;183:17,19,23;
186:2,2,3;192:2,3;
203:21;204:20;
208:23;210:21;211:6;
242:11,24;251:21;
254:1;258:21;259:1;
260:16;274:5
**arrangement (2)**
173:7;241:4
**arrest (12)**
6:7;19:25;25:14;
29:18;44:2;125:21;
129:18;212:24;
244:23;253:6,21;
274:1
**arrested (38)**
14:13,19;17:18,23;
18:4;19:16;22:1;
25:12,20;26:1,9;27:6;
29:8;31:19,22;36:21;
37:7;38:17,19,25;
46:4,14,17;104:11;
137:3;138:23;139:5,
23;145:14;149:20,22;
251:9;273:23;274:10;
275:6,22,25;276:3
**Arresting (2)**
34:20;43:23
**arrests (1)**
137:22
**arrived (3)**
36:25;79:5;93:20

Rizman Rappaport (973)992-7650
"When every word counts"

GONZALEZ 000763

Maysonet v.
Guevara

Justino Cruz

**arriving (1)**
76:24
**Art (2)**
239:25;240:5
**article (2)**
108:9,12
**ASA (7)**
153:4,7;161:21;
233:20;255:5;257:6,
13
**ASAs (1)**
256:18
**Ashley (1)**
276:22
**Ashley's (1)**
111:9
**aside (3)**
21:3;37:18;217:24
**assaulted (1)**
109:20
**assigned (1)**
79:12
**assistance (2)**
104:8;224:6
**assistant (10)**
48:6,8;80:21;153:8;
161:23;178:19;214:5,
7,10;219:18
**associate (1)**
9:3
**associated (1)**
77:13
**associating (1)**
126:6
**attached (1)**
223:20
**attend (1)**
157:24
**attention (14)**
17:16;35:5;81:4;
104:13;157:4;161:8;
175:14;185:12;203:7,
8;205:22;206:20;
207:12;233:18
**attorney (135)**
18:16,19;20:12;
48:7,8,17,23,23;54:5,
5,7;76:12;80:19;81:2,
19;82:5;83:18;84:8;
85:6,8,16,25;101:22;
102:25;112:7,9,12,23;
113:1,3,4,12,13,14;
116:22,23;117:18,19,
21,24;118:1,3,5,23;
119:24;120:1,2,22,23;
124:15;152:13,15,17,
21;153:8;155:18,19;
159:21;161:24;167:8,
13;168:6,8,16;178:13,
19;179:2,9,12,17,17;
180:13,14;182:8,9;
185:9;193:11,14;
199:3;214:5,7,11;

219:8,19;227:8,20;
228:3,11,20,21,25;
229:8,9,12,15,21;
230:13,18,20;231:8,
17,24;232:3,11;233:3,
6,10;234:12,15,21;
235:2,5,7,15,17;
236:2;237:10;238:20,
22;245:21,22;246:1,
18;255:15,21,22,24;
265:11,12,15,16;
266:11;271:8,9,11
**attorney-client (3)**
237:18;240:14;
241:2
**attorneys (9)**
51:22;111:7;
113:19;116:18;119:7;
214:16;227:24;
234:19;254:17
**Attorney's (23)**
88:5;107:22;113:5;
119:19;129:3;164:22;
166:20;167:2;168:5;
218:19,21;221:1,4,11,
17;222:8;223:12;
224:1;225:10;237:7;
245:22;246:5;266:14
**audibly (1)**
7:10
**August (22)**
17:17;25:21;35:12;
36:22;37:6;45:25;
55:6;59:11;70:19,25;
72:13;103:23,25;
190:4,18;211:25;
212:5;214:5;273:23;
274:10;275:7,10
**authored (1)**
236:7
**authorities (1)**
223:20
**automatic (5)**
49:16;95:7;194:17;
195:5,17
**available (1)**
48:23
**Avenue (35)**
17:19,24;21:15,16;
25:17;26:2;36:1;
50:25;65:14,21;67:7,
7,22;69:3;89:22;
96:15,20,22,24;97:8;
98:18,22;187:22;
197:13;202:5,6;
203:11,15;204:11;
205:24;240:23;
260:10,12,14;261:2
**average (2)**
270:20,21
**awaiting (1)**
167:24
**aware (3)**

5:15;235:13;248:3
**away (7)**
51:15;226:13,15;
260:11;261:4,9;
275:13
**awesome (1)**
257:25

**B**

**back (70)**
13:13;15:8;21:4,6;
22:25;37:24;38:2,25;
53:3;54:16;55:5;
58:24;63:13;66:13,
14,15;69:16,17;96:4;
99:16,18;100:8,16,18;
105:6;108:3;109:1;
113:7;125:19;134:14;
135:20;136:23;137:3;
140:18;141:9;143:20,
22;144:21;151:10;
152:9;157:22;159:5;
161:1;172:3;175:14,
20;180:23;181:13;
184:23;196:12;
203:22,25;205:22;
211:12,19;212:14;
214:24;215:13,21;
216:7,20;217:14,19;
224:12;231:21;
254:14;257:17;
264:16;267:25;275:2
**backs (1)**
51:4
**bad (4)**
84:14;118:8,9;
159:9
**bag (1)**
61:6
**banged (1)**
141:4
**banger (1)**
174:2
**banging (1)**
178:2
**bargain (2)**
180:15,17
**based (5)**
200:2;228:18;
237:17;241:1;262:10
**basement (1)**
101:23
**basically (1)**
154:21
**basis (2)**
196:17;240:14
**Bates (3)**
34:24;35:3;69:22
**bathroom (2)**
8:6;52:5
**beard (6)**
252:5,6,9,10,11,13

**bearings (1)**
91:4
**beat (6)**
133:7;172:18;
173:3;268:25;269:4,
12
**became (1)**
60:21
**become (6)**
101:16;126:14;
133:19;134:2;235:13;
269:9
**bedroom (8)**
94:17,22,23,25;
95:24;193:20;194:1;
195:6
**began (2)**
18:14;108:10
**begin (1)**
125:24
**beginning (5)**
167:13;168:4;
169:6;178:20;192:19
**behalf (1)**
241:10
**behind (8)**
49:25,25;66:15;
96:8,8;203:10,15;
205:23
**belief (1)**
46:3
**Bella (2)**
268:4,5
**Bello (22)**
58:14,16;59:10,18;
94:20;162:10;193:24;
194:4,8;208:15,18,20,
25;209:9;210:22;
262:18,23;263:3;
266:17;268:6,7;272:2
**Bello's (4)**
207:18;264:5;
266:5,11
**Belmont (3)**
89:14;187:4,19
**below (3)**
34:19;154:5;161:20
**belt (1)**
49:19
**bench (1)**
31:7
**beneath (2)**
153:10;161:12
**benefits (1)**
103:4
**best (6)**
6:21;7:2;8:11;31:5;
54:2;276:12
**better (1)**
86:17
**big (1)**
10:3
**bilingual (2)**

157:13;158:4
**birthday (3)**
9:15;139:2;170:2
**bit (15)**
53:23;54:10;55:4;
140:11;142:6;147:15,
19;152:19;158:20;
160:11;201:14;203:2;
242:11;263:23;
268:10
**Black (21)**
23:14;50:25;51:2;
69:2;70:3,17;98:20;
99:2,4,7,22,23;100:2;
162:22;196:20,22;
204:13,15,19;262:5,
10
**bleeding (2)**
143:9;147:15
**blue (5)**
189:1,8,16,21,25
**BONJEAN (128)**
5:8,11;14:17,23;
15:1;19:1,8,19;20:22;
24:1,10;26:17,21;
27:21,23;32:1;33:1,
13,22,24;34:1,5,9,12;
35:1,24;36:17;37:15;
39:20;40:24;41:11;
42:13,23;43:2,15;
44:1,6,14,20;45:1,6,
12,17;46:8;47:1;53:7;
54:15,20;55:1,20;
56:1,17;57:1,7,12,18,
24;59:5;60:9;62:8;
64:6,11,17;65:11;
66:4;67:3;68:8;69:14;
70:12;71:10,20;
72:20;73:8,13,16,19,
24;74:4,10,18,23;
75:4;76:5;77:3;78:6,
14;79:21;80:6,10;
84:1,15;85:12;86:8;
87:11;88:13;91:3,8,
13;95:17;98:5;
101:14;102:14,19,23;
103:13;107:6;108:17;
109:8,10,17,23;110:5,
13,25;111:6;122:20;
154:19;255:12,15,18,
20,25;256:2,12,15;
257:1,4;259:20
**boom (2)**
143:2,2
**born (1)**
157:17
**boss (1)**
113:9
**both (15)**
15:5;28:6;31:14;
37:1,2;113:15,15;
139:15;142:11;158:5,
10,11;179:4;251:6,15

Rizman Rappaport (973)992-7650
"When every word counts"

GONZALEZ 000764

Maysonet v.
Guevara

Justino Cruz

**bothering (1)**
147:14
**bothers (2)**
250:11,20
**bottom (15)**
53:10,18;64:19,21,
21;69:21;116:1,5;
167:22;169:8;187:18;
203:9;206:21;222:22;
223:3
**bounce (1)**
242:11
**box (1)**
164:15
**boy (1)**
186:17
**break (8)**
7:25;8:1,4,6;79:22;
142:5;202:24;226:19
**Brendan (3)**
234:13;235:6;237:8
**BRENER (13)**
55:17;77:2;83:21;
85:10;102:12;107:3;
271:17;273:2;274:20,
23;275:2,19;276:14
**brief (2)**
91:24,25
**bring (2)**
21:6;249:7
**bringing (1)**
121:9
**brother (19)**
10:12,13;15:19;
21:23;22:11;72:3;
127:2,10,14;128:2,16;
134:23;137:17,18;
138:13,18;248:22,25;
249:9
**brothers (18)**
6:8;11:24;17:5,11,
14;19:4,5,10,15;25:9;
244:25;248:14;
259:22;260:2,5;
261:1;262:4;274:13
**brother's (1)**
127:5
**brought (9)**
30:20,23;31:5,16;
32:2;73:1;140:14;
265:12;270:6
**bruise (2)**
146:8;147:13
**bruised (1)**
146:14
**bruises (3)**
146:12;147:10;
269:17
**bruising (1)**
147:1
**brung (1)**
265:11
**Buick (5)**

188:25;189:8,17,
22,25
**building (3)**
93:18;202:10;204:7
**buildings (3)**
192:3,11,12
**bump (6)**
143:10,11,13,16,17,
19
**bunch (2)**
118:21;154:20
**bus (18)**
26:4,6;27:8;28:14;
36:5,11;89:18,22,23,
25;139:5;187:10,16,
21,22,23,24;220:21
**buy (3)**
173:20,23;273:17

**C**

**California (1)**
77:18
**call (5)**
32:21,22;132:17;
272:17;273:19
**called (12)**
5:5;77:24;78:3,17;
111:19;130:19;
131:20,23;218:14;
272:18;273:5,7
**calling (1)**
75:1
**calls (1)**
249:15
**came (51)**
37:24;38:2;39:23,
25;63:9,24;64:20,25,
25;67:11,12;70:22;
71:11;95:1,24;98:10;
112:23;113:4,8,9,21;
117:3,13;119:25;
120:2;124:16;129:3;
140:18;155:11;173:4;
174:12;179:12;180:8;
195:6;203:14,25;
204:10;214:24;
216:20;217:19;
227:24;233:21;234:4,
5;235:3;254:17,22;
255:6,21,22,25
**camera (1)**
57:20
**cameras (2)**
71:18;74:22
**can (70)**
5:24;8:1,4,14;11:7;
14:18;15:4,6;21:3;
24:2;31:4;33:13,20;
37:18;38:12,22;43:3;
53:24;61:13;63:1,10,
11,12,15;65:2;72:21;
74:16;79:21;85:3,3;

89:15;91:9;92:22;
97:4;101:17;103:13;
109:6;142:18;143:19;
148:13,15,23;153:21;
159:17;160:12;171:6;
197:13;202:7,9,24;
217:24;224:11,12;
235:19,20;236:20;
237:21;240:15;
241:14,20;249:11;
251:13,17;264:1,4;
267:24;275:2,11,12;
276:15
**Canton (1)**
221:7
**caption (3)**
80:12;115:6;124:9
**car (83)**
26:20;27:10,13;
29:8;30:3,6;49:23;
50:20;51:3,3,13,14;
67:10,12,12;68:20,22,
23;69:6,7,8,17,19;
91:20;92:2,6,14,16,
20,23;93:7,12,20,21,
21,22,23,25;96:3,4,6,
11;97:17,18,19,21;
98:2,7,9;99:15;100:8,
17,18,23,25;139:8,9,
11;180:24;188:23,23,
24;189:8;191:13;
203:14,21,24;204:3,5;
205:23,24;206:4;
211:20;212:9,14;
214:24;215:13,21;
216:7,20;217:14,19;
264:17
**carrying (4)**
95:3,4,5;195:5
**cars (2)**
139:17,18
**case (25)**
5:17;15:13;85:9;
112:24;120:3;123:2,
9;124:3,17,20;
125:5;128:19,22;
138:22;168:18;
179:10,22;182:18;
190:5;212:1;224:3;
225:15;240:3,6;
248:18
**catch (1)**
111:9
**caused (1)**
126:18
**causing (1)**
141:8
**caution (1)**
120:12
**cc (1)**
223:3
**CCSAO291 (1)**
69:22

**cell (1)**
101:18
**Center (3)**
106:23;221:7;
223:17
**Central (5)**
30:7,8,11,17;
213:16
**Cermak (1)**
104:8
**certain (5)**
48:11;53:8,14;
243:11;249:25
**certainly (1)**
8:1
**chain (1)**
132:18
**challenging (5)**
233:23;234:2,6;
254:16;255:7
**chance (1)**
163:1
**change (1)**
169:3
**changed (1)**
11:18
**charge (1)**
218:11
**charged (3)**
44:8;55:13;76:16
**charges (3)**
234:13;235:5;237:8
**charging (2)**
44:10;78:17
**chart (3)**
203:9;204:22;205:6
**check (1)**
148:13
**checks (7)**
22:6;149:8;159:13,
13;254:4,5,5
**Chicago (12)**
5:19;9:19;12:13,14;
13:2;77:12;123:13;
127:17;171:11;
185:19;258:10;260:3
**chief (2)**
175:9,10
**child (1)**
59:20
**children (3)**
10:22;59:22;186:16
**choice (1)**
87:5
**choked (3)**
109:13;121:17;
151:6
**choking (4)**
42:10;43:7;147:6,8
**Chris (26)**
8:22;35:13,17,21;
49:5,24;50:16,17,19,
20,24;51:2,12;90:6,

13,22;160:17;161:4;
181:17,21,25;182:6,
19,22;184:5;188:15
**Christopher (3)**
22:24;23:22;71:1
**chrome (1)**
49:17
**circumstances (1)**
82:5
**Cisco (4)**
23:5;70:22;71:2;
72:9
**city (5)**
5:19;12:12;123:13;
128:8;171:14
**civil (1)**
5:13
**claim (1)**
112:15
**claiming (1)**
238:4
**clarification (1)**
232:18
**clarify (3)**
33:21;268:3;273:21
**clarifying (1)**
237:21
**classes (1)**
158:3
**clear (13)**
34:3;104:4;122:2;
237:5;239:17;243:8,
14;244:13,17,21;
247:12;252:19;253:4
**cleared (1)**
122:4
**Clemente (6)**
9:11;157:25;158:3;
159:17,22;270:16
**client (5)**
120:12;162:5;
232:14;237:19;238:6
**clinic (2)**
145:1;269:21
**close (9)**
13:11;64:21;
127:14;128:7;141:3;
143:1;170:15;188:7;
207:16
**clothes (4)**
139:10,12,18;
205:25
**clothing (1)**
196:21
**coerced (9)**
52:6;228:2,10,25;
229:14,20;230:12;
231:16;233:2
**coercion (2)**
81:12;82:2
**COHEN (56)**
27:22;75:3;117:2;
123:3;126:7;131:22;

GONZALEZ 000765

**Maysonet v. Guevara**                                                                                   **Justino Cruz**

132:19;134:10;135:7, 16;136:3,12;139:1; 140:4;145:2;150:9; 151:14;152:25;156:4, 15;166:10;169:20; 170:6;171:4;172:23; 175:2;178:22;181:3; 184:15;187:9;193:10; 199:6;201:10;202:16; 204:25;208:10; 210:11;216:11;218:3, 24;221:25;225:2,16; 229:23;238:2,19; 239:4;241:13;244:4, 11;246:15;256:5,20; 268:13;270:7;276:23
**College (1)**
9:3
**color (2)**
188:25;251:22
**colors (1)**
196:19
**coming (3)**
40:8;96:14;113:25
**command (2)**
115:11;132:18
**commanded (1)**
115:19
**commencement (1)**
5:3
**Commission (2)**
112:15;120:25
**committed (2)**
19:11;44:18
**communicate (1)**
44:22
**communication (1)**
238:5
**communications (2)**
249:13,15
**compensate (1)**
123:18
**complected (1)**
24:7
**complies (10)**
21:5;37:20;61:14; 72:23;91:16;94:7; 95:22;97:15;108:5; 197:3
**compound (1)**
135:16
**concerned (3)**
134:7,20;147:16
**concerns (2)**
247:2,9
**concluded (1)**
139:14
**confer (2)**
8:4;79:22
**confess (1)**
151:12
**confront (2)**
36:19,21

**connection (5)**
11:24;15:12;19:22; 121:22;224:2
**consequences (2)**
132:22;224:25
**consistently (1)**
13:15
**contact (16)**
18:15;77:6,12,19; 128:2;135:5,11,12,15; 137:19;138:24;225:7; 234:18;235:14; 237:14;248:18
**contacted (3)**
234:14;235:7;237:9
**contacting (2)**
235:18;239:13
**containing (1)**
91:20
**contempt (2)**
114:16;116:24
**continue (2)**
32:17;147:20
**conversation (9)**
91:23,24;92:1; 116:17;162:23; 204:14;235:17; 239:18;262:11
**conversations (6)**
85:7;112:17,20; 120:13;234:21;239:1
**convicted (1)**
220:7
**conviction (15)**
122:5,6,9;123:7,16, 23;220:11;225:24; 233:23;234:2,7; 241:8;254:17;255:7; 256:4
**Cook (32)**
14:10;56:4,6,8; 73:1;76:19,20,25; 77:13,18;79:5;80:20; 85:8,16;88:4;101:19; 102:15;103:1;104:18; 129:24;131:4,9; 164:21;166:15; 167:24;219:18; 223:11;248:17,21; 251:1,2,3
**cooperated (4)**
223:19;224:2; 225:15,23
**cooperating (1)**
101:10
**cooperation (3)**
219:10;223:22; 224:10
**cops (2)**
103:1,1
**copy (6)**
115:23;116:3; 223:21;242:4,5;

263:12
**corner (4)**
26:2;35:4;67:15; 243:11
**Correctional (3)**
106:23;221:7; 223:17
**Corrections (16)**
104:21,23,25; 105:5,20;106:7,11,21; 130:1;131:5,18; 147:25;218:23;220:1, 10,25
**correctly (1)**
120:6
**counsel (2)**
8:4;275:16
**count (1)**
220:22
**Counting (1)**
118:21
**County (42)**
14:10;56:4,6,8; 73:2;76:19,21,22,25; 77:14,15,17,18;79:6; 80:20;85:8,16;88:4; 101:19;102:15;103:1; 104:18;105:3,23; 129:24;130:20,21,25; 131:4,10;146:9; 147:22;164:21; 166:15;167:24; 219:19;223:11; 248:17,21;251:1,2,3
**couple (15)**
16:23;33:5;37:24; 40:1,4,7;112:22; 140:16;141:5,10,19; 144:17;157:23; 184:19;242:16
**course (2)**
23:3;134:4
**Court (24)**
5:14,19;6:11;7:11; 8:15;57:3;62:17,18; 79:3,6,8;85:11,14; 90:25;116:11,14; 153:21,25;163:14; 200:8,10;231:2,2; 245:12
**court-reported (2)**
56:12,18
**courtroom (3)**
163:12;195:14; 231:1
**cousin (3)**
119:9,14,18
**cousins (2)**
119:22;120:7
**cover (4)**
206:10,25;207:8; 269:16
**cozy (1)**

37:11
**crack (1)**
143:8
**Creek (1)**
115:15
**crew (1)**
71:22
**crime (7)**
82:18;83:5;156:3,9; 215:8;220:15;224:8
**Crimes (1)**
212:6
**criminal (3)**
190:5;197:20;207:9
**cross (1)**
96:22
**crossed (3)**
53:11;65:15;66:10
**CROSS-EXAMINATION (4)**
111:21;242:12; 253:12;271:16
**CRUZ (75)**
5:4,9;8:16,22,24; 10:1,1,1,2,5;11:23; 15:2;21:22;23:3; 28:15,25;33:16; 34:17;35:13,13,17,21; 36:8,18;37:1,7,8; 45:19,22;47:11,20; 48:2,6;49:25;54:5,7; 59:8;62:12;66:17; 67:21;71:2;74:24; 80:7,13,19;87:16,21; 91:17,19;94:1;98:8; 103:21;111:6,18; 112:14,17;115:12; 116:3;119:16;127:25; 161:10;167:1;195:8; 197:4;203:12;204:17; 205:21;219:21;220:2, 11,18,22;221:5; 223:16;271:18
**C-r-u-z (1)**
8:18
**Cruz's (2)**
220:6;221:2
**curious (1)**
237:24
**currently (3)**
10:14;59:19;223:16
**cursive (1)**
52:25
**custody (18)**
30:16;32:13;34:17; 46:4;58:2;62:20;89:1; 104:4;107:17,19,21; 110:18;130:15,18; 167:24;190:8;233:11; 260:3
**cut (1)**
91:9

**D**

**dad (2)**
249:4,6
**dad's (1)**
249:9
**danger (2)**
224:11,16
**dangerous (1)**
240:23
**dark (2)**
24:7;62:4
**dark-complected (1)**
24:12
**date (7)**
103:23;129:18; 226:8;255:13;256:11, 14;275:18
**dated (2)**
219:20;223:8
**daughter (1)**
249:7
**day (15)**
69:24,25;88:18,19; 128:5,6;208:3; 256:21;269:23,25; 274:8,9;275:21,23,25
**day-for-day (2)**
88:19;105:17
**days (3)**
144:17;257:5; 258:14
**deal (16)**
84:16;85:3,17,22; 86:1,14,16;88:15; 105:13;166:19; 179:11;180:15,17; 214:15;218:18;241:7
**dealt (1)**
252:20
**death (1)**
220:19
**decide (2)**
119:23;276:16
**decided (1)**
120:3
**deciding (1)**
165:4
**deep (4)**
177:21,23;178:2,3
**defendant (23)**
80:19;81:13;82:3; 90:24;92:16;94:11, 15,23;95:24;96:24; 98:16;99:6;100:16, 18;169:9;193:18; 195:4,9;196:6; 203:20;204:3,9,15
**defendants (1)**
96:9
**defender (13)**
79:11,13,16,19;

GONZALEZ 000766

80:20,21,25;82:9,24;
83:19;85:18,19;86:15
**defending (1)**
111:10
**degree (2)**
9:3;220:23
**demonstrate (2)**
203:23;204:22
**denied (2)**
107:25;220:16
**Department (17)**
104:21,22,25;
105:5,20;106:7,11,21;
129:25;131:5,18;
147:25;218:22;220:1,
10,24;250:19
**depends (1)**
133:6
**depict (1)**
203:10
**Deposition (17)**
5:1,24,25;6:2;
33:14;59:6;62:10;
80:4;87:12;103:14;
115:1;123:1;128:19,
22;163:1;219:14;
222:4
**Describe (7)**
26:11;31:4;74:20;
83:2;98:20;169:18;
251:13
**described (2)**
140:12,24
**designated (2)**
101:9;104:21
**designed (1)**
223:18
**despite (1)**
165:23
**detail (1)**
20:7
**details (1)**
267:22
**Detective (75)**
18:14,18,21;19:2,4,
20,25;20:11,16,24;
27:24;28:2,9,10,18,
21;29:4,5;32:3,4;
33:9;36:8;37:10,23,
23;38:6,9,13,21;
39:15;41:7;42:4,15;
43:19;56:11;57:13,
19,25;58:5;76:13;
108:8,11,13;109:12,
18,24;110:6;139:5,6;
140:3,9,13,13;141:13;
145:21;146:23;
150:24;153:11,14;
156:8;159:20;161:13,
17;178:9;185:8;
191:8;212:2,7,7;
213:4,5,18,19;233:16;
270:1

**detectives (22)**
26:25;27:15;28:13;
35:13;38:3;52:21;
113:3;139:7,15,17;
149:10;151:22;156:2,
5;209:16;212:12,13,
19,21,24;213:20;
263:1
**deviated (1)**
34:2
**diagnosed (2)**
249:23;250:22
**Diane (1)**
219:25
**different (13)**
55:5;102:16;
136:13;152:19;174:3;
176:20,22;201:15;
205:10;210:8;216:15;
236:18;268:22
**differently (1)**
27:7
**DiFranco (1)**
276:5
**DIRECT (9)**
5:7;175:13;185:12;
203:6,8;205:22;
206:20;207:12;
233:18
**directed (3)**
81:12;82:3;223:11
**direction (5)**
90:2;96:13;188:1;
197:11;203:17
**directly (2)**
85:8;132:13
**dis (1)**
83:23
**Disciples (1)**
172:6
**discuss (5)**
123:20;155:14;
180:4;181:5,9
**discussion (2)**
116:21;238:9
**discussions (1)**
238:7
**District (2)**
5:14,15
**divided (1)**
170:23
**division (4)**
23:11;77:21;
101:23,25
**divisions (1)**
77:5
**doctor (10)**
144:13,15,19,21;
145:7,11;146:11,17;
148:8;249:20
**doctors (4)**
146:22;147:21;
148:4,6

**doctor's (3)**
144:25;145:3,5
**document (21)**
15:4,5;34:24;63:2;
73:21;103:17;115:5,
7;116:6;117:25;
124:10,11;125:3,7;
140:8;152:9;156:19,
23;161:9;222:14,16
**documents (1)**
241:18
**done (6)**
114:23;130:5;
131:21;151:7;229:11;
277:5
**door (6)**
192:20,22;193:6;
264:19,20,23
**doorbell (2)**
192:22;264:22
**dope (4)**
65:15,21;66:10,21
**double (3)**
69:8;76:16;220:13
**double-sided (1)**
15:4
**doubt (1)**
154:14
**down (27)**
6:12,13,16;7:11;
34:16;35:6;68:15;
90:1,3;97:23;98:10,
17;99:8;116:5;142:6;
155:15;187:25;
188:11,12,22;195:12;
204:10,10;219:1;
231:3;240:20,21
**Dr (2)**
148:22;149:5
**draft (1)**
75:10
**drafted (1)**
75:7
**Dragons (1)**
172:6
**Drake (3)**
65:14,20;67:7
**dramatic (1)**
74:14
**draw (5)**
17:16;35:5;81:4;
104:13;161:8
**drink (1)**
52:5
**drive (3)**
69:5,7;139:17
**driver (3)**
50:1;96:7,9
**driver's (4)**
66:15;69:18;
158:22,24
**driving (3)**
49:24;96:17;139:12

**dropped (3)**
234:12;235:5;237:7
**drove (5)**
50:7;51:14;66:11,
12;68:24
**drug (3)**
93:2,9;243:6
**drugs (36)**
126:23;135:24;
136:1,10,16;171:19,
23,25;173:8,11,13,16,
20,21,23;174:13;
176:16,18,20;177:11;
178:3,3,4,4,4;206:25;
242:15,22;243:14,16,
19,22;258:22,24;
262:1;273:9,18
**due (2)**
37:8;224:9
**dues (1)**
174:9
**duly (1)**
5:5
**during (9)**
43:5;60:25;131:9;
134:4;149:9;153:23;
220:13;257:5;266:4
**Dvorak (2)**
234:15;237:10

**E**

**ear (40)**
41:22,23;81:14;
104:14,17;110:1;
140:25;141:6,11;
142:4;144:2,3,3,5,5,6,
11;145:16,17,17,17,
18,22,25;146:7,13,17;
147:14,16;149:5,8;
249:24;250:1,2,6,12,
17,23;251:5;253:19
**earlier (28)**
18:6;99:24;121:16;
125:20;139:4,22;
140:12,23;149:11;
162:9;166:2;170:17;
176:18;179:25;
181:20;190:9;191:7,
15;224:23;225:8;
227:3;254:15;259:20;
266:20;268:8,16,24;
274:17
**Early (10)**
126:10;134:14;
172:3;186:9;196:13;
233:20;254:21;255:4;
256:22,24
**earplugs (1)**
250:11
**ears (1)**
251:6
**east (3)**

90:3;96:14;188:2
**eat (1)**
52:4
**education (1)**
9:2
**Efrain (19)**
10:1,5,9,10,11;
21:22;23:3;71:2;
127:7,7,8,9,14;128:2,
16;129:6;134:23;
248:22,25
**Efrain's (2)**
10:12,13
**Eileen (1)**
238:15
**either (15)**
23:14;28:13;29:3;
38:3;43:7;65:21;95:2;
154:10;159:20;
244:12;249:14;253:5;
256:18;268:19;274:8
**El (3)**
187:3,3,11
**elf (1)**
73:23
**Elizabeth (5)**
119:16;186:15,16;
187:1;223:3
**Elizabeth's (2)**
187:8,15
**else (21)**
11:14;30:16;41:20;
67:13;78:15,19;86:5;
94:9;99:19;100:20;
101:20;114:2;125:1;
136:18;150:7;231:4;
243:3;249:5,8,11;
266:16
**email (1)**
135:14
**employment (1)**
129:4
**empty (22)**
98:7,17,19,22,22;
99:16,18,19;197:10,
24;199:7;200:1,23,
24;201:2,4,9,22;
202:1,4,5;204:10
**encroach (1)**
238:15
**end (5)**
47:10,19;84:5;
151:23;253:15
**ended (4)**
84:23;105:12;
151:7;219:6
**enforcer (5)**
218:1,6,15;220:4;
221:4
**engaged (1)**
207:8
**English (8)**
21:1;32:19,20;

GONZALEZ 000767

**Maysonet v. Guevara**

**Justino Cruz**

157:10,15;158:4,12, 19
**English-speaking (1)**
158:2
**ENGQUIST (37)**
18:24;19:6,18; 20:21;27:18;31:24; 33:25;34:3,6;36:16; 37:14;39:19;42:12; 44:16;54:13;56:16; 73:5;80:9;88:12; 102:17,22;111:12; 148:20;162:16;238:3; 242:10,13;244:5,12; 246:17;253:10;255:1; 258:1;275:16;276:17; 277:1,4
**enough (5)**
47:8;74:10;103:3; 188:7;192:11
**ensure (1)**
221:18
**enter (1)**
203:15
**entered (1)**
220:22
**entire (3)**
169:14;174:21; 275:15
**entrance (1)**
133:17
**error (1)**
200:16
**essentially (2)**
259:6;268:25
**established (2)**
216:18;264:2
**estimate (2)**
7:3;175:19
**et (1)**
5:18
**even (13)**
25:15;50:17;53:3; 54:1;58:25;74:11; 147:24;174:15; 212:20;226:5;239:8; 244:9;261:23
**evening (12)**
25:22,23;46:4;49:3; 66:7,9;185:13,15; 186:8;274:2,4,5
**event (1)**
191:5
**events (5)**
6:6,25;137:21; 154:24;169:17
**Eventually (8)**
31:21;37:22;79:8, 10,12,18;150:20; 168:25
**Everybody (7)**
173:11;174:17; 196:2;269:8;272:18,

20;273:7
**everybody's (1)**
172:22
**everyone (2)**
96:6;206:4
**exact (2)**
10:15;21:13
**exactly (6)**
15:18;18:11;91:22; 189:24;203:24; 232:12
**EXAMINATION (1)**
5:7
**examined (2)**
5:6;111:20
**except (1)**
220:15
**exchange (1)**
180:16
**EXCUSED (1)**
277:7
**execution-style (1)**
220:13
**Exhibit (69)**
5:1;14:22;15:3; 33:14,17,21,21;45:19, 20;59:6,9;62:8,10,13; 74:25;75:3,5;80:4,8; 82:10;84:3;87:12,15; 103:14,17;108:3; 115:1,4;117:22; 124:4;128:25;140:2; 152:8;162:25;197:6; 199:24;219:14,17; 222:3,4,14;226:24; 228:15;229:3,22; 230:15,21;231:12,18, 23;232:9,15,16;233:7, 7;244:14,18;254:24; 255:1,3,4;257:23; 258:1,3;263:7; 264:11;267:12; 270:24;271:2
**exhibits (3)**
274:18,22;277:6
**exit (2)**
133:22,25
**expect (1)**
122:3
**experience (1)**
206:22
**explain (3)**
86:19;236:7;268:10
**explained (1)**
271:9
**exploring (1)**
237:3
**express (1)**
247:9
**extent (1)**
271:22
**eyewitnesses (1)**
220:15

**F**

**face (8)**
74:5;108:20;144:1; 146:6;206:10,25; 207:8,10
**Facial (1)**
252:4
**facility (1)**
253:21
**fact (22)**
16:13;104:7; 107:25;126:17;129:3; 146:13;164:2,9; 165:23;167:12; 168:15;207:17; 214:13;224:19; 231:22;232:15;247:2, 10;254:23;259:11; 260:1;270:12
**factory (1)**
253:25
**facts (1)**
223:21
**Fair (4)**
47:8;74:10;103:3; 248:3
**fairly (1)**
13:15
**fall (1)**
10:5
**false (43)**
61:4;64:7;65:23; 66:1,24,25;68:5; 69:10,13;71:6,9; 82:13,14;92:9;160:2; 164:2,5;176:4,6; 180:2;197:25;198:4, 7,12;199:4,7;201:6,7, 11,14;202:11,12; 211:4;215:5;228:2, 11,25;229:14,21; 230:12,20;231:16; 233:2
**falsely (1)**
87:2
**familiar (1)**
107:11
**familiarity (1)**
192:8
**family (14)**
10:3;12:15;20:1; 43:23;44:3;77:6,24, 25;78:3,25;135:1; 170:3;249:3,9
**far (4)**
54:1;90:13;260:11; 261:3
**fatal (2)**
156:20,24
**fate (1)**
165:4

**fault (2)**
159:8;232:17
**February (1)**
115:20
**federal (3)**
5:13,19;223:19
**fee (1)**
241:4
**feel (6)**
87:5;112:8,11; 225:7,13,22
**feet (1)**
71:16
**fellow (6)**
22:19;133:8; 134:16,19;166:3; 196:16
**felt (1)**
143:13
**female (1)**
113:14
**few (1)**
202:25
**fifth (1)**
69:21
**figured (1)**
213:9
**file (5)**
81:2;122:10; 123:17,24;241:9
**filed (5)**
84:3;121:19,23; 123:13;241:10
**filled (1)**
244:18
**financial (1)**
103:4
**find (2)**
85:15;119:7
**fine (6)**
7:4;109:11;111:12; 125:8;200:14;238:17
**finger (4)**
19:22;204:2,8,19
**finish (2)**
6:18;221:14
**finished (4)**
111:1,6;162:6; 267:7
**fired (2)**
100:9;195:1
**first (58)**
5:5;20:8;25:8; 39:23;45:20,21;48:1, 4;53:10;54:3;59:5,17; 71:17,17;77:11; 85:15;86:14;91:25; 108:12;114:22;131:3; 159:15;164:20;168:5, 11;179:2,6,13;187:1; 190:10;201:11; 203:14,17;207:22; 208:1;214:13;216:6;

220:23;226:3;234:8; 239:9;244:9,17; 245:9;250:22;254:15; 256:13;257:5,19; 259:21,25;262:17,22; 263:16,19,19;265:16; 266:12
**five (14)**
51:11;68:10,11,12, 14;89:4;99:5;118:22; 142:19,21;146:1,2; 149:7;276:15
**five-minute (1)**
261:24
**flight (1)**
111:9
**floor (7)**
68:15;93:16,17; 192:15,16,17;254:9
**Folk (2)**
172:11,13
**Folks (3)**
172:4,5;174:12
**follow (1)**
35:8
**following (7)**
54:7;80:2;111:4,15; 203:4;226:21;276:19
**follows (2)**
5:6;111:20
**followup (2)**
165:11;277:1
**foot (2)**
27:12;188:23
**force (2)**
141:14;143:4
**forget (2)**
118:1;119:4
**form (121)**
14:16;24:8;26:19; 27:18,19;31:24; 32:23;36:14;37:13, 14;39:18;40:22;41:9; 42:12,17,19;43:1,9, 11,21;44:12,17,25; 45:3,11;46:6;53:5; 54:11,12,19,23;55:18, 24;56:13,15,23;57:6, 11,17,23;60:7;64:5,9, 14;65:25;67:1;68:6; 69:12;70:10;71:8,19; 72:16,17;73:4,5,11; 74:2;76:3;77:2;78:4, 13;83:21,22;85:10; 86:6;95:15;101:12; 107:3;108:14,15; 109:6,15,21;110:3,10, 21;117:2;123:3; 131:22;134:10; 135:16;139:1;140:4; 145:2;150:9;151:14; 152:25;156:4,15; 166:10;169:20;171:4;

Rizman Rappaport (973)992-7650
"When every word counts"

**(285) English-speaking - form**

GONZALEZ 000768

**Maysonet v.**
**Guevara**

**Justino Cruz**

172:23;178:22;181:3;
184:15;187:9;193:10;
199:6;201:10;202:16;
204:25;208:10;
210:11;215:17,25;
216:11;218:24;
221:25;225:2,16;
229:23;238:14;
241:13;246:15;256:5,
20;257:23;268:13,18;
270:7
**found (2)**
255:25;260:7
**foundation (46)**
23:24;26:19;27:20;
35:23;36:15;37:13;
43:12;44:16,17;53:5;
56:13,15,23;57:6,11,
17,23;60:7;64:5,9;
65:9;66:2;67:2;68:6;
69:12;70:10;71:8;
72:19;95:16;102:12,
17;107:3;109:6;
110:21;126:7;132:19;
136:3,12;156:4;
169:20;170:6;171:3;
208:10;216:11;218:3;
244:4
**four (6)**
49:23;61:8;99:12;
158:1;190:20;257:5
**frame (1)**
22:16
**Francisco (3)**
23:4,4;71:1
**Frank (2)**
219:19;276:5
**Franklin (5)**
10:16,19;13:5;
115:15;128:9
**free (4)**
225:7;240:11,12,17
**Friday (2)**
258:16,17
**friend (10)**
12:22,25;58:18;
207:14,16;223:6;
249:6;266:18;267:5;
272:2
**friendly (1)**
169:25
**friends (2)**
59:23;271:23
**friend's (1)**
188:5
**frightened (1)**
42:2
**Fro (60)**
24:4,7,11;59:24;
60:3,18,25;61:8,11;
63:23;64:1;66:13,19;
67:11,18,23;68:21;
69:7;70:22;71:1;72:9;

90:5,6,13,22;91:21,
24;92:1,7,19,21,24,
25;93:8,24;94:4,20;
95:13;96:8;97:20,22;
98:16;99:1,3,6,14,18,
24;100:1,8,16;
181:15;184:6,12,17;
188:14,15;193:23;
204:9,14
**front (18)**
51:1;56:22;66:12;
67:11,11,17;192:20;
195:11;201:2,5,9;
202:4;209:8;263:8;
264:19,20;274:18;
275:12
**Fros (2)**
24:5;184:19
**Fro's (4)**
181:16,24;182:6,18
**full (4)**
8:15;88:22;252:8,9
**funds (4)**
107:23;108:1;
224:12;225:9
**further (9)**
20:7;49:3;111:20;
168:3;188:11,21;
240:24;271:15;
276:14

## G

**gain (1)**
133:16
**gang (42)**
13:19;22:8,20;23:8,
11,18,23;126:25;
127:3;130:4,9,24;
131:8;132:3,16,24;
133:8;134:8,15,16;
136:21;166:16;170:4;
171:9,13;172:5,20;
173:4;174:2,3,4,10;
175:6;178:2;183:11;
218:2;220:5,20;
221:4;224:7;268:21;
272:12
**gangs (4)**
172:6,10,21;174:6
**garage (5)**
98:4,6;197:15;
202:8,10
**garbage (1)**
98:2
**gatherings (1)**
170:3
**gave (43)**
20:24;52:8;119:19;
140:1;147:3,4;
152:11,12;163:2;
164:1;175:21;182:14;
190:3;199:1;207:4;

226:4,9;228:2,10,19,
24;230:12,17,19;
231:6,7,16,23,25,25;
232:2,9,10;233:2;
245:5,11;246:11,23;
267:12,22;269:24;
270:4;271:22
**GED (1)**
9:7
**generally (4)**
10:15;38:16;40:25;
83:20
**Gentlemen (16)**
88:7;91:22;164:24;
165:7,16;166:6;
195:8,15,20;197:8;
203:13,19;204:2,5,12,
17
**geographic (1)**
170:21
**geography (1)**
170:23
**gesturing (1)**
232:15
**gets (3)**
234:20;236:8;
241:10
**girl (11)**
12:22,24;58:18;
186:18,18;188:5;
223:6;249:6;266:18;
267:5;272:2
**girls (2)**
244:2,8
**given (2)**
36:9;52:4
**gives (1)**
250:20
**giving (1)**
101:8
**glasses (1)**
251:25
**goal (2)**
121:22;123:22
**goatee (1)**
252:9
**God (3)**
74:11;226:4,10
**God's (1)**
226:11
**goes (12)**
59:20;60:10,16;
63:20;69:15;70:19;
93:11;113:10;220:5;
238:8;267:1,4
**gold (2)**
196:20,22
**Gonzalez (77)**
15:15,25;19:21;
22:22;30:22;36:10,
13;37:1,4;44:24;49:5,
14;50:19;58:4,6;
61:19;71:1;76:23;

85:24;90:5,25;91:21;
92:7,16;94:11,15,23;
95:13,19;96:24;97:8;
98:16;99:1,4,6;100:1,
16,19,25;105:10;
124:6,13;125:7;
134:19;152:2;160:17;
169:9;175:16;184:2;
188:14;189:8;193:19;
195:4,16,21;196:6;
204:9,15;210:20;
211:19;212:3,9,14;
214:8,11,15,24;
215:21;218:1;220:4,
6,9,12,16;238:1,2,3
**Gonzalez's (5)**
15:12;97:12;
100:12;101:9;124:20
**Good (6)**
5:9,10;20:25;88:19;
105:17;158:20
**Google (1)**
261:8
**Goosens (3)**
22:24;23:22;71:1
**grab (1)**
141:17
**grabbed (12)**
41:10,13,16,21;
140:24;141:1,2,15,22;
142:7;143:1;147:11
**grabbing (3)**
81:14;141:7;142:3
**grade (1)**
9:17
**graduate (5)**
9:5,9,12;159:17,22
**graduated (7)**
9:8;157:11;158:18;
159:25;160:4;270:15,
21
**grammar (1)**
158:8
**Grand (5)**
30:7,8,11,17;
213:16
**granted (2)**
233:23;255:8
**GREENBERG (25)**
119:10;148:15,18;
171:3;215:16,25;
216:14;235:25;236:5,
8,14,17,23;238:1,9,
23;239:3,6,9,15;
274:16,21;275:11;
276:15,21
**Greeting (1)**
115:11
**ground (2)**
99:20,21
**grounds (1)**
112:14
**group (4)**

25:1;71:4;209:25;
218:11
**grow (1)**
9:19
**guess (2)**
7:15;55:5
**Guevara (38)**
5:18;18:14,18,21;
19:2,4,20,25;20:11,
16,24;26:13;27:15;
28:9,18;29:4;32:3,18;
33:7;36:8;37:10,23;
38:6,13;39:15;41:7;
42:8,15;43:6,19;
56:11;108:11,13;
109:12,18,24;110:6,
19
**Guevara's (1)**
108:8
**guilty (7)**
105:7,9;218:20;
220:22;246:14,19;
248:6
**gun (40)**
49:7,14,15;51:1,13;
60:17,19,22;61:1,6,7,
10;63:16;66:16,20;
67:16,17,24;69:19;
92:18;93:1,8;94:14,
15;95:5,6,13,19;
96:10,25;97:3,9;
160:19;180:23;
193:19;194:22,24;
195:1,9,21
**guns (2)**
60:22;194:20
**gunshots (2)**
100:2,9
**guy (3)**
28:4;68:17;214:2
**guys (50)**
41:18;50:25;51:2;
65:14,20;66:10,20;
67:14,14,15,20;68:15;
98:19,20,21;99:2,4,7,
20,21,22,23;100:2,21;
101:1;102:13;112:6;
136:13;162:22;
176:21,22;180:24;
196:21;206:17;210:6,
6;211:20;212:15;
214:25;215:14,22;
216:7,21;217:15,20;
261:17,18,24;272:21,
22

## H

**hair (2)**
251:22;252:4
**half (10)**
24:12;88:24;
113:22;177:16,19;

GONZALEZ 000769

**Maysonet v. Guevara**                                                                 **Justino Cruz**

178:4,6,11,15;190:21
**halfway (2)**
34:16;35:6
**Halvorsen (2)**
27:16,22
**Hammond (1)**
68:24
**hand (10)**
14:21;51:13;68:16;
110:2;117:10;142:10;
163:20;164:10;
203:24;204:6
**handcuffed (8)**
30:6;31:2,8,11,18;
33:3;141:3;142:25
**handcuffing (2)**
29:12,21
**handcuffs (1)**
29:9
**handed (4)**
61:7;62:12;80:7;
152:17
**handing (4)**
59:8;87:14;103:16;
116:3
**hands (5)**
31:14;142:10,11;
203:14;226:11
**handwriting (3)**
47:19;154:8,16
**handwritten (10)**
74:24;75:1;82:9;
140:1;182:11;228:19;
229:3;231:12;244:14;
263:7
**hang (12)**
126:23;174:18,19;
208:23;209:8,21,22,
23,25;210:2,5,6
**hanging (4)**
126:6;209:18;
210:19,20
**happen (10)**
55:3,9,16;63:8;
68:1;101:3;121:24;
172:17;174:14;
269:10
**happened (34)**
28:10;33:3;63:22;
64:19,24;67:9;68:9,
12,18,23;69:16;70:4,
21;71:11;76:20;77:4;
78:22;84:2,19;93:19;
94:16;95:25;97:17;
99:10,13;116:25;
144:4;173:15;192:21;
193:19;205:5;212:8;
264:21;269:7
**happens (1)**
269:8
**harassed (1)**
227:19
**hard (4)**

143:6;146:3;
161:13;178:3
**hat (2)**
70:7,9
**head (19)**
7:12;67:10;71:13,
13;81:14,15;113:8;
141:4,9,23;142:16,23;
143:14,20,23;186:10;
189:11;206:10;
222:12
**headaches (1)**
250:21
**heads (2)**
50:22;206:3
**Health (1)**
104:8
**hear (8)**
100:2;253:15,18;
260:19;261:14,16,18,
21
**heard (24)**
25:15;51:11;68:13;
99:12,13;149:16,21;
175:5;177:4;204:20;
205:4;218:8,14;
234:8;239:22;244:1,
9;254:16;259:21;
260:1;262:17,22;
265:7;276:11
**hearing (12)**
84:6;85:14;147:16,
18,21;148:4,7;249:20,
24;250:5,23;254:11
**heavy (3)**
242:17,21;250:14
**height (1)**
251:20
**held (2)**
116:24;194:24
**help (6)**
35:2;88:2;164:19;
165:2;226:12;257:24
**Helped (1)**
222:19
**herein (2)**
5:5;111:19
**Hernandez (19)**
49:5;50:16,17,19;
90:6,13,22;160:17;
161:4;181:17,21,25;
182:7,19,22;183:3;
184:5,12;188:16
**hey (2)**
42:7;261:18
**hide (2)**
63:10,12
**high (12)**
9:5,9,11,12;157:11,
14;158:18;159:17,22,
25;160:5;270:16
**higher (1)**
132:18

**highest (1)**
9:1
**high-level (1)**
221:3
**hindered (1)**
250:8
**hire (2)**
117:19;153:24
**hired (2)**
119:8;163:7
**Hirsch (2)**
185:22;186:4
**Hispanic (2)**
24:12,12
**hit (10)**
41:22,23;42:10;
110:1;141:4;142:15;
145:24;146:2,18;
151:6
**hitting (2)**
43:7;142:4
**Hold (3)**
91:3;103:12;114:15
**holding (12)**
30:13,25;31:17;
32:3;33:4;37:22;
39:22;95:19;108:25;
109:14;195:16,21
**Homan (15)**
26:2;49:6;63:8;
67:5;68:25;93:14,22;
160:18,22;161:1;
191:14,21;192:12;
208:9;267:20
**home (12)**
26:3;51:15;58:22;
59:1,22;60:2,18;63:7,
22;69:16,17;70:20
**Honorable (1)**
115:19
**hood (2)**
67:10;206:9
**hooded (1)**
50:21
**hoodie (3)**
206:3;207:5,8
**hoodies (7)**
196:3,13;206:1,2,2,
18,23
**hoods (4)**
50:21;196:4;206:5,
7
**hook (1)**
31:9
**Hopefully (1)**
26:8
**hospital (4)**
138:7,8;145:1;
269:20
**hour (2)**
37:8;113:22
**hours (22)**
33:5;35:6,10;37:24;

40:1,4,7,9,10,11;43:4;
79:2;140:16,20,21;
149:10;151:5;184:24;
185:5,9;186:9,9
**house (48)**
49:6;60:22,24;63:9,
24,25;65:6,18;66:18;
70:23,25;71:3,12,22;
72:12;92:15,17,21,25;
93:8,13,15,25;94:4,9;
95:12,19;98:23;
160:18;180:22;
185:17,18,21;186:11;
187:1,8,15;188:5;
191:13,16,24;207:24;
209:8;223:18;261:12,
25;264:18;267:17
**housed (4)**
102:1,10;219:6,10
**houses (1)**
192:5
**Humboldt (6)**
9:22;21:18;171:7;
172:1;174:20,21
**hundred (1)**
142:20
**hung (3)**
135:22;171:8;
259:17
**hurt (1)**
146:23
**hurting (1)**
146:20

## I

**idea (7)**
19:10;29:17,20;
137:2;175:12;237:3;
262:1
**identification (12)**
5:2;33:15;59:7;
62:11;80:5;87:13;
103:15;115:2;197:6;
199:24;219:15;222:5
**identified (2)**
37:2;201:4
**identify (3)**
198:5;201:1,9
**identifying (1)**
199:9
**IDOC (2)**
248:24;251:1
**illegally (2)**
81:12;82:2
**Illinois (30)**
5:15;80:13;104:20,
22,25;105:4,20;106:6,
10,20,23,24,25;107:2;
115:10,16;124:6;
129:25;131:5,18;
147:24;218:22;220:1,
10,24;221:7,8,22;

223:17;258:10
**immediately (1)**
13:8
**implicate (1)**
44:23
**implicated (2)**
19:21;36:12
**implicating (1)**
36:10
**important (2)**
6:15;7:9
**impossible (1)**
220:14
**imprisonment (1)**
220:8
**Inca (3)**
175:5,8;218:12
**incident (1)**
220:17
**including (1)**
51:10
**Indian (2)**
148:10,11
**indicate (1)**
197:23
**indicated (2)**
50:23;168:7
**indicates (2)**
36:24;116:6
**indicating (2)**
29:21;252:11
**individual (3)**
24:13;176:12;
181:14
**individuals (2)**
29:4;172:19
**indoctrination (1)**
268:19
**Industry (3)**
11:6,9;159:2
**infection (10)**
104:14,18;144:5,7,
11,14;145:16,17,22;
146:17
**inform (2)**
18:15;225:5
**information (5)**
81:19,20;160:2;
236:21,22
**informed (1)**
36:8
**initial (1)**
53:14
**initially (1)**
168:22
**initials (1)**
53:12
**injured (2)**
253:19;269:18
**injuries (1)**
269:15
**inmate (3)**
222:24;223:1,16

GONZALEZ 000770

**Maysonet v. Guevara**                                        **Justino Cruz**

**inmates (2)** 222:18;223:19
**inner (1)** 74:19
**innocent (3)** 82:17;83:5;180:1
**inside (6)** 59:1;68:23;94:9; 96:6;195:6;233:17
**instance (2)** 30:19;76:7
**instruct (3)** 237:18;240:15,24
**instruction (1)** 242:1
**interests (2)** 86:17,20
**interrogating (1)** 18:14
**interrogation (1)** 39:22
**intersection (3)** 17:19;21:14;180:23
**interview (3)** 37:9;39:24;151:6
**interviewed (2)** 211:25;212:6
**into (43)** 32:2;33:5;49:23; 94:17,24;96:4,6; 112:17;120:13; 131:14;133:17; 138:16;147:24; 165:24;172:14;173:4; 177:21,23;178:2; 185:13;186:9,9; 193:20,25;212:9; 214:24;215:13;216:7, 20;217:14,19;234:20; 236:1,8,21;238:8; 240:23;242:17; 263:17;268:19,21; 269:1;271:10
**invested (1)** 243:5
**investigate (2)** 233:21;255:5
**investigator (4)** 120:2;124:16; 233:21;255:5
**involuntary (2)** 81:16;82:4
**involved (10)** 13:19;52:21; 151:13,24;152:4; 156:14;244:24; 247:17,24;248:8
**issue (3)** 6:22;74:7;149:5
**issues (1)** 249:21

**J**

**Jacques (2)** 174:23;175:1
**Jail (20)** 14:10;55:22,25; 56:3;73:2;77:14;79:6; 85:3;101:19;104:18; 120:19;129:25;131:4, 10;166:15;167:25; 248:17,21;251:1,3
**January (17)** 15:21;116:3,7; 117:20;167:14;168:7; 227:11;231:22; 256:12,15,18,18,19, 19;257:4,11,12
**JC (2)** 53:12,18
**Jeffrey (2)** 23:14,14
**Jennifer (1)** 5:11
**job (7)** 112:23;113:4,8; 119:25;120:2;253:20; 254:22
**Jockisch (1)** 219:25
**Join (8)** 36:16;43:22;54:13; 56:16;66:3;110:11, 22;126:18
**Joliet (3)** 219:1,2,2
**Jones (1)** 115:20
**Jose (62)** 5:12,21;13:23; 22:14,19;30:19;36:9, 12;37:2;49:5,24;51:3; 58:1,18,21;59:19,22; 60:17,17,19,24;61:1, 7,9;62:14;63:24;65:5, 7,18,19;66:18;67:23; 70:8;76:24;106:2; 115:6;160:17;176:12, 23;177:15;178:6,14; 184:3;207:14,16,18; 208:15,18;210:20,23; 233:22;234:13;235:5; 237:8;243:15,16; 244:1,12;255:6; 259:12;271:19; 272:17
**Jose's (7)** 49:6;59:20,23;60:2; 160:18;243:24;244:2
**Juan (23)** 41:3;44:19,23; 92:24;94:12,16,24; 95:1;96:6;113:25;

114:8;149:15;150:2; 193:20;266:23;267:2; 272:14,15,19,22; 273:6,10,19
**Juan's (7)** 92:17,25;93:8,25; 264:18;266:18;267:5
**Judge (2)** 115:19;164:16
**July (3)** 58:25;219:20; 220:21
**jump (4)** 64:19;92:6;98:9; 100:25
**jumped (7)** 29:8;51:14;69:18; 92:2;97:17,19;100:22
**June (1)** 58:25
**Jury (25)** 88:7;91:22;164:14, 15,15,24;165:3,7,16, 22;166:7;182:17; 195:9,15,21;197:8; 201:2,5,9;203:14,19; 204:6,12,18,22
**Justice (2)** 121:25;122:1
**JUSTINO (41)** 5:4;8:16,19;28:15, 25;34:17;35:13;37:1, 7;45:22;47:11,19; 48:2,6;49:4,25;50:7, 20,22;51:4,9,11,14, 21;52:7,13;54:4,7; 65:17;80:13,19; 87:21;103:20;111:18; 115:12;116:3;159:16; 161:10;219:21; 223:16;238:19

**K**

**Kedzie (8)** 21:15,16;174:22; 185:23;186:3,4; 257:20;258:7
**keep (5)** 43:8;70:7,7,9;173:2
**keeping (2)** 120:19;172:21
**kept (2)** 150:17;173:17
**Kevin (2)** 156:21;220:7
**kicking (1)** 243:2
**kidding (1)** 71:20
**killed (6)** 19:3,5;70:3,16; 162:22;261:19

**Kimball (16)** 17:19,24;36:1; 89:14,18,22,24;97:25; 98:25;99:10,11; 187:4,20,21,21,24
**kind (22)** 62:4;63:16;95:6; 123:2;139:17;142:5; 144:9,12;147:15; 188:24;204:22;241:4, 7,24;243:10;249:14, 24;250:23;252:10; 254:8;259:5;270:19
**kinds (2)** 113:23;136:16
**King (26)** 24:21;70:22;71:2, 14;134:19,24;166:4; 170:25;172:21;173:3, 4,10;174:13;177:9; 183:14,16;184:18; 196:16;206:23;207:5; 220:21;224:23,24; 243:9;258:22;269:9
**Kings (64)** 22:8;23:7,18,23; 24:18;125:22,25; 126:6,15,19,22; 129:12,14,21,23; 133:17,20,23,25; 134:3,5,14;135:2; 136:2;165:25;170:10, 19;171:1,8,10,21; 172:2,5,7,14;173:8, 24;174:1;175:6,9,10; 176:21;183:12;184:3, 4,6,10;196:19;218:1, 9,10;220:4,14; 242:22;248:19; 249:16,17;258:13; 259:9;268:11,19,20, 25;269:1
**Kings' (1)** 170:22
**kitchen (3)** 94:21;193:25;194:5
**knew (52)** 24:25;87:10;90:14, 16;144:6;150:25; 151:1;155:23;157:1; 165:23;166:3;169:14; 170:9;176:25;177:1, 7,9,11;178:10,14; 180:11,16,25;182:18; 184:19;192:4,10; 208:18;210:7;211:8, 11;214:18;215:4; 216:10;217:5;219:5; 234:1,5,9;245:2; 247:13;248:1,12; 259:8,12,13;262:9; 266:25;267:15,18; 268:17;272:22

**knocked (1)** 141:23
**knowing (2)** 166:8;210:25
**knowledge (16)** 19:11,14;125:16; 134:17;177:13; 186:23;194:25; 198:15;209:6;214:1; 227:25;229:10;231:6; 256:6;257:2;276:12
**known (9)** 36:7;59:24;169:9; 177:15;178:6;182:22; 183:3;184:6;198:5
**knows (3)** 35:3;73:25;238:25

**L**

**Ladies (16)** 88:6;91:22;164:23; 165:7,15;166:6; 195:8,14,20;197:7; 203:13,19;204:1,5,11, 17
**lady (2)** 192:25;265:1
**lady's (5)** 185:17,18,21; 186:11,14
**language (1)** 153:18
**languages (1)** 158:6
**L-a-n-i (1)** 148:25
**last (26)** 8:17;13:23;14:1,13; 16:2;47:9;61:13,25; 62:1;89:13;118:13, 14;128:15;135:5,12; 137:19;138:4,22,24; 149:4,7;161:9;184:1; 207:23;210:24;270:2
**late (7)** 37:8;67:2;126:10, 11;134:14;186:8; 196:12
**later (8)** 18:7,8;33:5;37:24; 54:10;143:13;191:2; 270:13
**Latin (85)** 22:8;23:7,17,23; 24:17,21;125:22,25; 126:6,15,19,21; 129:11,14,20,23; 133:17,20;134:3,5,14, 19,23;135:2;136:2; 165:25;166:3;170:10, 19,22,25;171:1,8,10, 21;172:2,5,7,14,21;

GONZALEZ 000771

**Maysonet v. Guevara**

**Justino Cruz**

173:2,4,10,23;174:1,13;175:6,9,10;176:21;177:9;183:12,14,16;184:3,4,6,10,18;196:16,19;206:23;207:5;218:1,9,10;220:4,14,21;224:23,24;242:22;243:9;248:19;249:16,17;258:13,22;259:8;268:11,19,20,25;269:1,9

**Latino (29)**
26:12;27:2,24;52:19;121:12,15;139:5,24;140:3,8,13;141:13;145:21;178:9;191:7;213:1,3,8,8;214:2;232:1;233:12,13;251:9,13;262:12,14;266:25;269:25

**law (6)**
153:21;234:14;235:7,11;237:9;239:21

**lawsuit (8)**
122:10;123:13,17,24;241:9,10,11,12

**lawyer (38)**
79:10;112:2,20,21,25,25;120:4,8;122:21;153:23,25;167:3,19;178:20;179:3,21,21;180:1,4,15;181:6,11;205:9;214:18,19,23;215:4,5,6,7;216:10;217:5,13,18;227:21;230:9;239:1;240:21

**lawyers (19)**
111:24;112:18;120:11;123:20;124:11;125:13,15;163:7;227:4,23;230:5;232:20;238:10;239:13,21;240:8;241:5,8,19

**laying (2)**
68:15;204:19

**lead (1)**
229:19

**leading (12)**
18:24;19:6,18;20:21;26:15;27:20;39:19;45:5,15;78:13;110:10,24

**learned (6)**
25:9;108:8;233:22;255:6;266:12,22

**least (1)**
259:13

**leave (8)**
32:6;39:21;61:10;

66:18;129:14,20;130:8;151:9

**left (31)**
32:8;41:22,23;61:9;66:11;69:18;76:15;95:25;96:1,2;105:3;129:23;131:8;140:15,25;141:10;144:1,11;145:17,18,25;225:17;226:11;249:24,25;250:2,6,23;251:5,7,8

**legal (1)**
8:15

**LEINENWEBER (50)**
27:19;33:20,23;34:7,11;36:14;42:17;43:11,22;44:17;45:5;46:6;54:12;55:18;56:15;64:3,15;66:3;72:16,18;73:15,17;74:7,21;86:6;95:15;108:15;109:5,15,21;110:3,11,22,24;237:21,24;238:4,12;253:11,13;255:2;256:8,23;258:2;267:24;268:15;270:8;271:14;275:14,17

**LeMoyne (5)**
70:1;89:24;90:1;187:23,25

**less (5)**
86:12;183:22;227:14;232:23;261:24

**letter (8)**
219:18;221:11,17;222:8;223:8,15;225:11;226:7

**letters (2)**
222:10;249:14

**level (1)**
9:1

**license (1)**
158:22

**lie (51)**
36:18;83:20;176:8,13;177:16,17;180:6;181:7;182:19,25;183:18;184:12;185:9;187:13;188:19,20,21;189:14;193:3,4,7;194:1,2,6,11;196:10,11;199:11,15,21;202:17,19,20;206:14,15;209:3,4,5;211:15,22;215:4;217:20;247:10,13;248:4;266:21;267:13,17,18,19;271:24

**lied (2)**
180:9;215:6

**lies (1)**

189:5

**lieutenants (2)**
132:12;218:10

**life (20)**
85:4;86:11,12,22,23;87:9;155:5,7;169:10,15;220:8;224:10,12,16;226:2,4,9,13;250:9;257:18

**likely (1)**
166:9

**line (43)**
167:1,11,23;168:4,15,19,20;169:7;181:13;182:21;183:11,15;185:11;186:14,24;188:22;191:11;192:19;193:17;194:15;195:3;196:1;197:4;199:22;203:9;205:17,19;206:21;207:13;208:13;210:19;211:18,24;214:4;215:3,20;216:9,21,22;217:4,10;264:15,16

**list (1)**
258:3

**Listen (3)**
90:18,20;256:13

**little (20)**
18:1;31:7;53:23;54:10;55:4;62:5;140:11;142:6;147:15,19;152:18;155:10;158:20;160:11;201:14;203:1;232:12;242:11;263:23;268:10

**live (22)**
10:14,19;12:10,14,15;21:12,20;63:7;93:15,17;127:16;128:7,8,8;170:12,14;177:3;186:2;191:24;192:15;210:23;226:13

**lived (21)**
10:17;13:2;126:16,18;139:16;157:23;160:21,25;170:13;171:7;191:18;208:7,7;210:8,8;211:7,9,12;258:7;259:2;267:18

**lives (2)**
59:19;210:1

**living (11)**
94:18,19;103:25;193:22,23;207:24;208:16,16;211:1;257:19;258:9

**Lluvia (45)**
59:24;60:3,10,11,

14,16,18,19,25,25;61:7,8,10;63:9,11,13,17,23,25;64:20,24;66:7,12,13,16,19;67:9,17,18,23;68:16;69:2,7,18,24,24;70:1,2,13,16,21;72:6;95:18;162:16,17

**Lluvio (2)**
162:12,15

**located (3)**
35:13,25;185:22

**location (8)**
36:1;67:22;69:2;93:20;97:7;170:21;197:13;210:9

**lock (2)**
114:12,14

**locked (26)**
9:4;25:11;78:5,7;121:7,9;124:25;129:15,16,22;131:2,3;149:16,17;150:2,7;190:13,15,16;213:16;230:19;250:24,25;262:24;266:23;267:1

**locking (1)**
114:11

**lockup (1)**
263:17

**Loevy (6)**
239:20,20,21,21;240:2,2

**long (21)**
10:17;11:1,11;32:8;39:21,24;40:2,5;43:3;79:5;99:3;102:5;106:16;113:18;167:23;169:8;177:14;182:22;183:16;200:15;231:8

**longer (4)**
62:5;190:14,15;226:8

**look (41)**
15:2,4;33:16;45:18,19,21;47:8;48:1;59:16;62:5;88:1;89:5;97:4,9;115:4;124:4;153:17;156:18;159:15;162:24;164:13,19;166:25;167:11;169:5;185:11;189:20;191:11,11;197:2,6;199:25;200:19;210:18;211:18;219:16;222:13;226:24;254:23;255:3;264:4

**looked (6)**
68:14,15;96:25;102:3;163:5,8

**looking (11)**

14,16,18,19,25,25;61:7,8,10;63:9,11,13,17,23,25;64:20,24;66:7,12,13,16,19;67:9,17,18,23;68:16;69:2,7,18,24,24;70:1,2,13,16,21;72:6;95:18;162:16,17

**Lluvio (2)**
162:12,15

**located (3)**
35:13,25;185:22

**location (8)**
36:1;67:22;69:2;93:20;97:7;170:21;197:13;210:9

**lock (2)**
114:12,14

**locked (26)**
9:4;25:11;78:5,7;121:7,9;124:25;129:15,16,22;131:2,3;149:16,17;150:2,7;190:13,15,16;213:16;230:19;250:24,25;262:24;266:23;267:1

**locking (1)**
114:11

**lockup (1)**
263:17

**Loevy (6)**
239:20,20,21,21;240:2,2

**long (21)**
10:17;11:1,11;32:8;39:21,24;40:2,5;43:3;79:5;99:3;102:5;106:16;113:18;167:23;169:8;177:14;182:22;183:16;200:15;231:8

**longer (4)**
62:5;190:14,15;226:8

**look (41)**
15:2,4;33:16;45:18,19,21;47:8;48:1;59:16;62:5;88:1;89:5;97:4,9;115:4;124:4;153:17;156:18;159:15;162:24;164:13,19;166:25;167:11;169:5;185:11;189:20;191:11,11;197:2,6;199:25;200:19;210:18;211:18;219:16;222:13;226:24;254:23;255:3;264:4

**looked (6)**
68:14,15;96:25;102:3;163:5,8

**looking (11)**

97:24;98:24;99:8,9,11,13;199:2;256:14;274:18,22;275:12

**lookout (1)**
220:18

**looks (6)**
13:10;16:24;53:11;87:23;161:12;200:3

**lose (1)**
147:18

**losing (1)**
147:16

**loss (5)**
147:21;249:24,25;250:5,23

**lot (33)**
24:5;50:25;61:23;98:7,18,19,22,22;99:16,18,19;136:13;197:10,24;199:7;200:1,23,24;201:2,4,9,23;202:1,4,5;203:11,22;204:10;208:17;250:13,14;259:5;267:11

**lots (1)**
253:25

**loud (6)**
250:11;253:24;254:9,10,11;272:25

**Louis (18)**
50:9;67:6,6,23;96:12,13,19,20;97:8,25;98:25;99:9,11;185:19;203:16;260:10,11,14

**lower (4)**
86:5,7;92:10,11

**Luis (1)**
10:1

**lunch (1)**
111:14

**lying (8)**
165:20,22;175:23;176:2;229:25;230:2;247:7;267:4

## M

**machinery (2)**
250:14;253:25

**machines (1)**
254:1

**Macho (1)**
25:6

**main (1)**
166:14

**maintained (1)**
248:11

**makes (1)**
250:14

**making (6)**
51:9;74:7;176:9;

GONZALEZ 000772

Maysonet v.
Guevara

Justino Cruz

202:22;222:10;
242:23
**male (5)**
113:13;251:14,15,
16,17
**man (4)**
28:10;76:7;204:19;
220:12
**Management (2)**
107:9;223:18
**maneuvered (1)**
203:24
**many (18)**
10:24;44:21;
102:10;118:16,19;
141:17;142:19;
145:24;147:9;157:24;
207:20;208:14,19;
209:14;230:18;
232:11;269:5,12
**map (1)**
204:22
**Maps (1)**
261:9
**March (4)**
168:18;214:16;
217:13,18
**Marek (5)**
87:24;219:19;
265:20,21,22
**Marijuana (2)**
136:17;261:11
**mark (9)**
33:13;59:5;62:8;
87:11;103:13;219:13;
222:2;265:18,20
**marked (27)**
5:2;14:21;15:3;
33:15,17;45:20;59:7,
9;62:11,13;74:25;
80:5,8;82:10;84:3;
87:13,14;103:15,16;
115:2,4;117:22;
197:5;199:23;219:15,
17;222:5
**marks (1)**
147:7
**married (3)**
11:1;12:17,20
**May (45)**
17:5,11;19:11;21:7,
12,20;22:1,8,17,25;
49:3;53:3;55:5,5;
58:25;59:21;60:3,24;
61:11;63:5,21,25;
65:6,18;66:19;
160:16;177:14;
182:21;183:15;
184:23;185:5,13,14;
186:9;195:10,12;
200:10;207:19,21;
208:2,19;211:2;
257:17,18;258:9

**maybe (34)**
24:12;73:22;88:2;
124:3;125:5;139:2;
141:21;149:24;153:1,
3;164:18;166:11;
168:2;175:22;183:25;
185:7,7;186:12;
187:10;189:18;
193:11,14;199:20;
200:5;209:11,12;
210:16,16;227:8;
231:7,8;232:10;
235:15;262:24
**Maysonet (81)**
5:12,18,21;13:24;
16:5;19:21;22:14,19;
30:19;34:24;36:9,13;
37:2,4;41:3;44:19,24;
49:5;58:1;59:19;
62:14;67:23;70:8,14;
71:25;72:4,7,10;
76:24;89:7;93:15;
94:10,12,24;95:24;
106:2;113:25;114:8;
115:6;122:11,13,24;
123:6,12;135:6,13,19;
136:11;149:21;152:1;
160:17,21,25;176:12,
24;177:15;178:10,14;
184:4,9;191:23;
203:20;204:3;207:14;
208:6;209:19,24;
210:3;233:22;234:2,
6,13;235:6;237:8;
243:15;254:16;255:7;
256:3;259:13;271:20;
272:5
**Maysonet's (30)**
58:18,21;59:1;
60:18,24;62:9;63:25;
65:6,18;66:18;70:24;
71:3,21;72:12;92:15,
21;93:12,18;94:3;
95:12,19;120:3;
122:14;124:17;
180:22;191:13,16;
192:25;209:8;264:25
**mean (32)**
9:3;18:6;41:1;
55:21;62:3;73:14;
74:5;77:17;96:1;
97:19;99:21;106:14;
133:1,5;148:24;
177:1;178:1;206:2;
208:17;228:19,22;
236:6;242:5;247:5,8;
265:20;266:2;268:10,
12;269:3;271:9;276:5
**meaning (1)**
50:21
**means (7)**
8:10;133:2;153:7;
190:20;257:5;268:9;

275:9
**meant (3)**
268:4,17,23
**media (1)**
135:14
**medical (4)**
103:17;104:7,8;
257:22
**medication (9)**
144:7,8,9,12,16,25;
145:13,16,19
**medicine (1)**
147:3
**meet (9)**
77:22;78:25;179:8,
16,20;245:21;246:10;
255:18,20
**meeting (1)**
79:18
**member (22)**
22:7,20;23:7,17;
77:25;78:3;125:21;
126:14,21;129:11;
133:19;134:3,5,13;
170:9;173:10;183:12;
184:2,4,6;249:9;
258:13
**members (19)**
20:1;43:24;44:3;
77:7,24;79:1;133:8;
134:15,16;135:2;
170:25;171:13;174:5;
196:16;220:20;
248:19;249:2,16;
258:22
**membership (1)**
125:24
**memorialize (1)**
74:15
**men (8)**
25:16;49:23;61:8;
69:2;113:15,15;
204:13,15
**mental (1)**
82:2
**mention (1)**
124:21
**met (14)**
118:17,24;122:20;
246:4,7;255:12;
256:11,14,17,25;
257:3,6,9,13
**Michael (1)**
80:21
**mid (1)**
172:3
**middle (3)**
63:5;143:22;153:18
**midnight (1)**
66:19
**might (9)**
111:1,25;176:1;
179:19;188:6,7;

193:16;238:15,16
**mile (1)**
260:20
**miles (4)**
260:16,17;261:9,12
**military (1)**
35:11
**millimeter (16)**
49:16;60:23;61:1;
63:17;68:16;71:12,
13,23;72:1,4,7,10;
95:7;194:16;195:5,16
**mind (1)**
169:3
**minute (2)**
110:25;125:20
**minutes (4)**
68:11;99:5;133:6;
276:15
**Miranda (1)**
48:13
**misspeak (1)**
216:16
**mistaken (1)**
220:20
**misunderstood (2)**
149:24;150:6
**MM (2)**
80:5;115:2
**moment (2)**
37:19;217:25
**mom's (1)**
137:17
**Monday (2)**
258:16,17
**money (12)**
103:6;123:14,17,
24;173:11,15,17;
242:22,25;243:2,9;
254:6
**month (2)**
12:4;138:6
**months (3)**
167:25;186:20;
190:8
**more (21)**
6:22;24:7;28:6;
45:7;118:21;140:21,
22;141:20;142:1;
143:16;146:1,2;
147:16;149:10;151:5;
157:23;183:21;217:3;
242:8;252:9,9
**morning (10)**
5:9,10;25:20;35:12;
164:1;184:25;185:13;
186:9;255:16;274:6
**most (2)**
106:21;166:17
**mother (2)**
137:24;138:5
**motherfuckers (2)**
70:3,17

**mother's (2)**
15:19;137:18
**motion (5)**
80:10,15;81:20;
83:23;84:6
**mouth (1)**
70:7
**move (4)**
68:18,19;74:16;
211:1
**moved (7)**
12:24;13:4;101:19,
20,24;128:13;166:21
**movie (2)**
71:18;74:22
**moving (1)**
91:6
**much (13)**
14:12;88:24;89:1;
105:19;129:9;137:1;
157:9;190:2;240:8;
242:22;269:17;
271:19;277:4
**multiple (4)**
20:4;45:9;141:22;
142:7
**murder (17)**
38:17,18,25;41:3;
44:19;55:13;69:8;
76:16;78:18;149:18,
19;151:13,24;152:4;
156:14;220:13,23
**murdered (9)**
41:18;260:2,6,8,10;
261:1,4,12;262:2
**murders (27)**
6:8;11:24;17:5,10,
13;19:11,15,23;
25:10;29:25;36:10,
12;37:8;40:20,23;
70:9;71:15;150:13,
15;152:5;220:7;
247:17,21,24;248:8,
14;274:14
**must (1)**
225:6
**mustache (4)**
252:14,15,16,17
**myself (1)**
173:17

### N

**name (79)**
5:11,17;8:15,17,22;
11:18;23:1,13,25;
24:3;26:10;34:16;
35:16;47:9;87:18;
103:20;107:10;
110:18,20;113:5;
115:12;117:24;118:2,
4,7,13,15,24;119:15,
17,20;121:11,13;

GONZALEZ 000773

Maysonet v. Guevara　　　　　　　　　　　　　　　　　　　　　　Justino Cruz

122:2,3;145:10;
148:9,10,12,14;
154:12,14;161:4,12,
14;177:7;181:16,24;
182:5,6,10,15,18;
186:15,18;208:8;
219:21;223:16;228:3,
12;229:1,16;230:13,
25,25;231:17;233:3;
239:22,24;262:18,22;
264:5;265:3,10;
266:5,11;272:24;
276:5,9
**named (5)**
153:15;174:23;
176:12;184:17;
219:25
**names (2)**
118:8,9
**name's (1)**
118:10
**Nancy (1)**
10:1
**Nation (4)**
172:11,14;174:7,12
**natural (1)**
220:8
**nature (1)**
73:21
**near (9)**
17:18;26:3;67:22;
185:18;186:4;197:24;
202:10;257:20;258:6
**need (8)**
7:3,25;8:3,6;65:3;
91:10;112:11;114:6
**needed (6)**
65:1,7,13,19;
119:23;120:3
**neighborhood (30)**
9:21;24:16;126:16,
18;135:21;139:16;
171:2,17;173:12;
174:15;176:15,25;
177:2,4,12,21,22,24;
192:7,8,10;226:14,16;
242:17,21;258:25;
259:1;261:3,17;273:8
**news (11)**
108:9,11,16,18;
109:12,19,25;110:7;
123:8;261:14,16
**newspaper (1)**
270:14
**next (28)**
17:17;33:2;34:22;
36:25;49:13,24;
63:16;66:5;67:4;68:9,
18;69:20,24;70:4;
89:16;91:9,20;92:13;
98:15;176:11;182:21;
186:13;191:23;
192:14;197:16;202:3,

8;242:16
**n-i (1)**
148:24
**nickname (6)**
8:19,21;24:4;25:6;
181:14;272:11
**night (14)**
65:1;140:2;161:25;
185:2;196:2;212:8,
24;233:10;244:23;
245:6;252:18,23;
253:1;258:18
**nobody (7)**
97:22;98:10;
111:11;207:1,9;
215:7;240:2
**Nodding (12)**
5:20;6:14,24;7:6,
24;13:1;33:12;40:13;
56:7;62:19;92:12;
158:15
**noise (3)**
250:11,14,20
**none (2)**
114:22;135:4
**Nope (1)**
225:11
**North (47)**
17:19,24;21:15,16;
25:17;26:2;36:1;49:6;
50:9,25;63:7;65:14,
20;67:7,7,22;68:24;
69:3;89:22;96:15,15,
20,20,22,23;97:8;
98:18,22;160:18,22,
25;185:19;187:22;
197:13;202:5,6,6;
203:11,15;204:11;
205:23;257:20;258:6;
260:10,12,14;261:2
**Northern (1)**
5:14
**Nos (1)**
5:1
**notice (1)**
156:24
**number (8)**
127:20;128:10;
149:2;208:22;222:25;
223:2;257:23;272:16

**O**

**oath (2)**
8:8,10
**Object (45)**
26:15;37:13;39:18;
40:22;41:9;42:17,19;
43:1,9,21;44:12,25;
45:3,11,15;53:5;
54:11,23;55:24;
56:13,23;57:11,17;
60:7;64:14;67:1;

71:19;72:17;73:4,11;
74:2;76:3;83:22;
101:12;108:14;109:5;
110:10;112:13;
119:10;215:16;
235:25;236:2,13;
240:13;270:7
**Objection (113)**
14:16;18:24;19:6,
18;20:21;23:24;24:8;
26:19;27:18,19;
31:24;32:23;35:23;
36:14;42:12;43:11;
44:5,16;45:5;46:6;
54:12,19;55:18,19;
57:6,23;64:3,5,9,15;
65:9,25;68:6;69:12;
70:10;71:8;72:16;
73:5;74:8;77:2;78:4,
13;83:21;85:10;86:6;
92:22;95:15;97:2;
102:17;108:15;
109:15,21;110:3,21;
111:11;117:2;123:3;
126:7;131:22;132:19;
134:10;135:7,16;
136:3,12;139:1;
140:4;145:2;150:9;
151:14;152:25;156:4,
15;166:10;169:20;
170:6;171:3,4;
172:23;175:2;178:22;
181:3;184:15;187:9;
193:10;199:6;201:10;
202:16;204:25;
208:10;210:11;214:9;
215:25;216:11;218:3,
24;221:25;225:2,16;
229:23;234:20;
236:20,20;237:15,17;
239:2;241:13;244:4;
246:15;256:5,20;
268:13;274:20
**objections (4)**
74:11;96:18;
168:19;185:20
**observe (1)**
97:9
**observed (1)**
152:1
**obtained (2)**
81:11;82:1
**obtaining (1)**
95:13
**obvious (1)**
221:2
**obviously (1)**
46:17
**occasions (5)**
141:22;142:7;
207:19;208:19,22
**occurred (2)**
169:17;205:11

**o'clock (6)**
26:8;46:15;185:2,
15;186:10;274:4
**October (2)**
223:8;226:6
**off (14)**
5:24;18:1;89:23,24,
25;111:1;185:1,2,14;
186:10;187:23,23,24;
206:3
**offer (3)**
85:16;167:3;168:23
**Office (32)**
88:5;107:22;
113:12;119:1,2;
129:3;144:25;145:3,
5;164:22;166:20;
167:2;168:5;218:19,
21;221:1,5,11,17;
222:9;223:12,22;
224:1,10;225:10;
237:7;239:21;245:22;
246:5;263:17;266:6,
14
**Officer (45)**
26:10,16,16;27:4;
77:13,20;83:2;121:6,
9,12,15,20,24;139:24;
146:18;152:13,16;
155:9,13,14;182:8;
189:18;212:1,2;
228:21;229:9;231:7,
24,25;232:1,10;
233:12,13;251:9,9,12,
13,16,17;262:12,14;
265:6,7;266:25;
267:23
**Officers (13)**
34:20;52:17;103:1;
115:11;120:20;
123:14;189:24;
209:22;214:20,20,21;
252:20;266:24
**officer's (1)**
121:11
**Offices (4)**
234:14;235:7,11;
237:9
**often (5)**
15:24;136:1,6,10;
196:21
**old (10)**
8:24;16:24;21:9;
59:18;126:5;137:6,9;
175:16,20;186:19
**older (10)**
10:6,7,12,13;129:6,
8,9;137:1,10,12
**once (7)**
45:7;96:11;131:17;
171:18;207:21;209:1;
224:15
**one (70)**

7:19;8:13;27:2,4;
29:3;31:14,15;51:10;
52:6;59:5;62:23;
74:15,20;77:5,24;
89:8;99:13,19,20,21;
108:6;110:25;111:2;
118:6;119:5,19,20;
120:7;121:16;122:22;
142:10;143:16,16,18;
153:25;158:25;
163:15;166:13;172:5;
179:11;182:11;183:7;
186:17;190:10,13;
196:5,7;204:18,19;
212:25;213:6,7;
220:22;222:3,17;
227:3;228:13,13;
229:17,17;230:6,21,
21;232:9;242:15;
244:12;249:5;259:16;
266:1;271:2
**one-page (1)**
15:3
**ones (6)**
52:18;119:22;
182:14;187:11;214:2;
250:18
**one's (1)**
239:5
**only (26)**
75:1;106:10,14;
147:13;156:10;157:1;
158:14;200:12;213:2,
6,7;214:1;229:17,17;
230:19;231:5,9,10,11,
18;232:9;237:2;
238:25;252:20;254:1;
262:9
**open (1)**
110:2
**opportunity (4)**
16:10;56:21;57:2,
20
**opposite (3)**
172:6;248:2;253:15
**option (2)**
56:12;57:14
**options (1)**
57:8
**oral (1)**
245:5
**order (1)**
116:11
**others (1)**
210:3
**out (78)**
12:25;13:7,10;14:6;
20:19;29:8;40:8;
50:20;53:11;65:15;
66:10;67:10,11,12;
69:7,17;70:22;83:24;
84:16;85:15;93:20,
22,23,25;94:25;95:1,

GONZALEZ 000774

**Maysonet v. Guevara** **Justino Cruz**

24;97:2,3,9,18,19,20;
98:9;100:19;105:22;
106:7;107:21;120:19;
124:16;129:3;130:12;
132:3;135:22;148:3,
6;161:13;172:21;
180:24;195:6;199:14;
205:10;209:8,18,21,
22,24,25;210:2,5,6;
213:9;226:4;227:24;
240:3,5;241:11;
244:18;259:9,13,17;
260:7;263:17;264:17;
272:25;273:8,13,14
**outside (3)**
208:24,25;209:2
**over (25)**
6:16;7:1;15:6;
64:20,25,25;104:23;
109:7;123:9;130:12;
140:21;152:17;
179:17,23;206:10;
207:18;216:17;
229:11;233:21;238:5,
7;255:6;261:19;
262:21,21
**Overturn (1)**
122:5
**overturned (7)**
122:7,10;123:7,16,
23;241:9;256:4
**own (4)**
178:7;179:20;
220:17;227:4
**owned (1)**
194:22

## P

**page (79)**
34:23,23;45:21;
47:9;48:1;53:10;
59:17;61:13,25;62:1;
63:2,3,4,5,16;64:21,
22;66:5;69:20,22;
88:1;89:6,6,9,16;91:9,
15;92:22;94:6;95:21;
97:4,14;98:15;
155:24;159:15;161:9;
164:13,20;166:25;
167:23;168:14;169:6;
175:14,15;181:13;
184:2,20,22;186:13,
14;187:19;191:11;
192:19;193:17;
194:15;195:3;196:1;
197:2;199:22;203:7,
8,9;205:17,18;
206:21;207:13;
208:13;210:19;
211:18;215:20;
216:15,15,19,21;
217:4,8;264:12,15,16

**pages (1)**
91:6
**paid (1)**
241:11
**pants (4)**
97:2,3;195:7,12
**paper (4)**
75:15,20;76:2;
157:5
**papers (3)**
230:18;275:12,13
**paragraph (25)**
36:25;49:1;59:17;
81:5,7,10;154:11;
159:16;228:1;229:14,
20;230:4,4;231:3,15;
232:7,19;233:1,19;
234:11;235:1,23;
236:6;237:6;255:4
**parents (1)**
272:7
**Park (12)**
9:22;10:16,20;13:5;
21:18;93:21;115:15;
128:9;171:7;172:1;
174:20,21
**parked (6)**
67:7,8;97:16;
203:25;204:3,4
**part (13)**
23:10,20,23;
151:12;156:18;160:9;
170:18;171:1,22;
172:11,13;237:2;
267:15
**participants (1)**
220:16
**participate (3)**
17:4,13;170:4
**participated (1)**
171:9
**participation (1)**
220:17
**particular (5)**
104:22,24;171:22;
172:19;176:7
**parties (2)**
5:23;170:2
**partner (4)**
118:2;213:3,8;
214:3
**partners (1)**
26:18
**parts (2)**
53:14;171:14
**party (1)**
139:2
**passed (1)**
190:3
**passenger (3)**
66:12;96:7,8
**passes (1)**
273:17

**passion (1)**
74:19
**pay (2)**
157:4;174:9
**paying (1)**
240:8
**Peace (1)**
115:10
**pending (3)**
5:13,18;8:2
**penitentiary (1)**
147:23
**people (27)**
71:22;80:12;95:2;
102:10;108:10;115:6,
10;124:5,12;125:7;
132:6;156:25;164:14;
172:4,8,13;174:4,4,5,
6;212:10;214:8,12;
250:16;261:11;269:5,
12
**People's (2)**
197:5;199:24
**percentage (2)**
249:25;250:5
**perfectly (1)**
7:16
**period (5)**
21:7;32:10;43:5;
131:9;257:18
**perjured (2)**
247:3,5
**Perkaus (5)**
153:4;161:21;
214:6,7,11
**person (17)**
23:13;59:13;75:22;
76:9;108:25;109:13,
19;110:1,7,8,19;
118:25;135:13;205:8;
216:6;233:14;273:10
**persons (2)**
37:3;113:10
**phantomly (1)**
73:23
**phone (13)**
32:21;118:18,20;
119:6;127:20;128:10;
130:19;135:14;138:3;
148:11,13;149:2;
249:15
**photo (4)**
62:1;197:12;
199:25;200:22
**photograph (16)**
197:7,9,14,17;
198:6,8,14,19,24,25;
199:2;200:3,21;
201:15,19,22
**photographs (1)**
197:19
**phrase (1)**
218:8

**physical (4)**
41:8;81:12;141:14;
221:2
**physically (2)**
82:25;109:20
**pick (4)**
49:6;63:14;92:18;
160:18
**picked (5)**
49:13;144:7,17;
213:11,12
**picture (5)**
199:10,14,19,20;
202:2
**pictures (1)**
200:13
**piece (5)**
75:15,20;76:1;
157:5;241:11
**Pierce (25)**
104:2,2;174:22;
207:25;208:7,17;
209:9,19,22,24,25;
210:2,2,3,6,8,9,23;
258:4,10;259:18;
260:12,23,25;267:19
**pinpoint (1)**
131:8
**pistol (12)**
49:18;63:10,12,16;
65:1,7,13,19;68:20;
194:17;195:5,17
**place (5)**
6:25;187:2;197:23;
204:16;208:22
**placed (3)**
30:12,25;31:17
**places (2)**
208:15;272:16
**plain (4)**
28:6,6;139:9,18
**plainclothes (3)**
26:23;28:5,9
**plaintiff (1)**
5:12
**plan (3)**
122:10;123:22,24
**planet (1)**
73:22
**planning (1)**
123:17
**plastic (1)**
61:6
**plea (3)**
180:15,17;220:22
**plead (1)**
105:9
**please (6)**
8:14;95:21;208:13;
225:5,7;275:2
**pled (5)**
105:7;218:20;
246:13,19;248:6

**plenty (1)**
194:20
**plus (1)**
147:22
**pm (25)**
18:5;46:1,9,15;
49:4;59:11,21;60:3;
63:6;64:1;70:20,25;
111:4,4,15,15;160:16;
185:5,6;203:3,4;
226:20,21;276:18,19
**pocket (3)**
51:1;67:17;145:14
**point (33)**
7:25;14:10;31:19,
21;39:15;41:6;60:19;
65:2;72:13;76:24;
77:7;79:1;84:11,16;
103:7;104:5;105:7;
151:8,11;152:20;
199:14;203:16,19;
205:10,14;237:1;
242:15;245:17,17,20;
246:19;248:7;259:16
**pointed (3)**
19:22;199:19,20
**pointing (2)**
68:17;195:11
**points (1)**
53:8
**police (56)**
25:20;51:10,22;
52:2;54:6;62:24;
77:12;121:20,23;
123:14;140:14;
146:18;152:20;
161:24;182:8;190:11;
191:6;209:11,12,13;
214:20,20,21,21;
228:7,13;229:4,9;
231:24,25;232:4,10;
244:22;252:19,20,21,
25;260:3,7,9;262:6,7,
10,14,24,25;263:17;
265:4,6;266:12,23,24;
267:23,23;269:24;
270:2
**population (2)**
107:5;166:18
**portion (4)**
46:23;101:24;
268:1;275:3
**positions (1)**
96:5
**possibility (1)**
124:2
**possible (13)**
14:9;63:13,15;
152:23,23;167:14;
176:7;183:9;189:7,
10;211:11;246:7;
261:10
**Potomac (10)**

GONZALEZ 000775

Maysonet v.
Guevara

Justino Cruz

67:5,5;93:13,21;
96:17,19;191:14,21;
192:12;208:16
**PRADOS (18)**
112:13;120:12;
162:5;202:24;232:14;
234:20;235:19;236:6;
237:17;238:7;240:13,
19,22;241:2,14,20;
242:1;277:3
**pregnant (1)**
59:20
**premark (1)**
34:2
**premarked (1)**
33:22
**prepare (5)**
117:21;125:13,16;
222:16;266:8
**prepared (22)**
15:12,21;16:23;
35:19;73:1,7,9,22,23,
24;74:1;117:25;
124:11,12;128:25;
227:3,7,11;229:4,7;
230:5,9
**preparing (1)**
227:18
**present (5)**
69:1;70:13;75:15;
153:4,23
**pressing (1)**
150:17
**pretty (1)**
14:12
**previous (1)**
274:8
**previously (4)**
37:21;111:19;
199:23;267:18
**Preyar (4)**
234:14;235:6,11;
237:9
**print (3)**
159:13,13;254:3
**printing (11)**
22:4,6;47:21;48:2;
159:10,11;253:21;
254:2,9;258:15,18
**prior (8)**
5:2;11:13;25:14;
76:24;101:8;207:19;
208:19;275:7
**Priscilla (1)**
186:19
**prison (27)**
11:23;12:2,7,9,18,
25;13:7,10,13,16,20;
14:4,7;16:8,11,14,17;
86:11,12,22,23;87:8;
123:19,25;223:20;
224:9,16
**privilege (6)**

79:23;237:1,18;
238:5;240:14;241:2
**privileged (5)**
236:2,4,13,22,25
**probably (5)**
37:19;128:17;
135:17;156:11;270:9
**problem (1)**
111:13
**procedure (1)**
130:10
**procedures (2)**
130:11;225:6
**proceeding (2)**
120:25;121:8
**proceedings (6)**
80:3;111:5,16;
203:4;226:21;276:19
**proceeds (1)**
241:12
**processed (3)**
76:22,25;77:4
**procure (1)**
244:7
**product (2)**
236:8,24
**production (1)**
250:18
**promised (1)**
163:21
**pronounce (1)**
118:14
**proposed (1)**
168:17
**prosecuting (2)**
85:9;179:9
**prosecution (3)**
6:7;220:3;245:16
**protect (2)**
166:15,23
**protected (1)**
107:16
**protection (9)**
166:14;221:6,18,
22;224:7,8;243:10;
250:17;254:12
**protective (2)**
107:17,19
**provide (1)**
20:16
**provided (11)**
20:1;61:1;72:24;
90:7;93:4;97:11;
100:12,24;101:5;
225:9,23
**providing (1)**
82:21
**psychological (1)**
82:2
**public (13)**
79:11,13,16,19;
80:20,21,25;82:8,24;
83:19;85:18,19;86:15

**Puerto (4)**
157:18,22;158:10,
11
**pull (5)**
206:2,3,5,9;207:7
**pulled (5)**
28:14,24;206:23;
220:12;261:8
**pulling (2)**
206:6;207:4
**punishment (1)**
133:11
**purports (1)**
59:9
**purpose (2)**
206:6,8
**pushed (1)**
142:12
**pushing (2)**
81:14;141:8
**put (33)**
21:3;29:9;30:3,6;
37:18;49:18;50:21;
55:7;61:6;67:10,11;
71:12,13,16;72:21;
75:14;76:1;81:19;
83:23;110:18,20;
133:7;140:15;166:17;
205:25;206:1;217:24;
218:23;235:23;236:3,
10;237:4;242:20
**putting (2)**
53:18;236:21

## Q

**quarreling (1)**
200:7
**quarters (1)**
102:9
**question's (4)**
152:18;185:20;
201:14;214:9
**quick (1)**
62:3
**quit (1)**
132:16
**quote (1)**
17:4

## R

**race (2)**
76:9;113:16
**raise (1)**
247:1
**raised (2)**
163:20;164:9
**Randolph (1)**
80:20
**rang (3)**
192:21;193:6;
264:21

**rank (11)**
126:24;127:2,5,12;
130:9;132:10,13,17;
136:20,24;175:5
**ranks (2)**
132:6,7
**reach (1)**
77:9
**reached (3)**
218:18;240:3,5
**read (33)**
46:23;52:25;53:4,
21,24;54:10,16,17,21;
59:17;63:4;68:2;
69:20;155:1,22,23;
159:18,23;160:10,12;
186:1;190:9;198:2;
205:4;263:24;264:1;
267:24;268:1;271:1,
5,12;275:2,3
**reading (9)**
20:23;52:22;74:14;
91:12,13;154:10,11;
155:1;168:3
**real (6)**
118:9;178:3,3;
181:16,24;182:18
**realize (2)**
221:10,16
**realized (1)**
108:9
**really (4)**
6:21;73:21;238:18;
243:5
**reask (1)**
275:20
**reasked (2)**
185:21;214:10
**reason (3)**
139:14,19;224:5
**reasons (2)**
166:14;224:22
**recall (104)**
38:22;39:14;
127:12;130:7,23;
138:24;141:19;142:2;
144:20;145:12,23;
147:9;148:11;152:9,
19;153:14;154:10;
155:19,20,25;156:6,
10,16;157:20;159:24,
24;161:17,19,23;
162:1,3;163:6;
164:17;166:24;168:2;
169:4,21;170:14,24;
171:20;172:24;
173:14;175:25;
176:10;178:12,16;
179:24;181:12;
182:10;183:4,8,10;
184:13,14;185:7;
186:12;188:6;189:6;
190:1;191:9,22;

194:14;195:2,18,23;
196:14,18;197:21;
200:5,6,6;201:3;
202:23;204:21,24;
205:3,15;206:19;
208:11;209:4;211:5;
217:23,23;218:25;
222:1,6,10;226:1;
232:5,12;246:3,9,25;
247:4,11;251:16,17;
252:3;257:7;263:25;
269:6,13,14;275:18
**receive (3)**
104:7;115:23;
249:13
**received (2)**
9:2;116:19
**receiving (3)**
11:10,21;159:4
**recess (6)**
80:1;111:3,14;
203:3;226:20;276:18
**recognize (14)**
15:5;61:17;62:1;
108:22,24;109:13,19,
25;110:7,19;199:25;
200:22;207:10;
222:14
**recollect (1)**
7:2
**recollection (8)**
18:4;25:21;31:6;
88:2;164:19;165:3;
261:3;270:18
**recommendation (2)**
218:22;219:9
**recommended (4)**
88:9;120:8;165:9;
220:25
**record (12)**
46:23;57:20;74:8;
108:8;111:1;195:10;
232:14;268:1;274:16,
21;275:3,11
**recorded (1)**
245:9
**recording (1)**
74:14
**redness (2)**
146:5,7
**refer (1)**
273:10
**reference (1)**
229:20
**referenced (1)**
232:15
**references (1)**
219:21
**referencing (1)**
230:14
**referred (2)**
272:14,15
**referring (4)**

GONZALEZ 000776

Maysonet v.
Guevara

Justino Cruz

228:6,12;229:2,13
**reflect (4)**
195:10;274:17,22;
275:11
**reflecting (3)**
73:15,18,20
**refresh (4)**
88:2;164:19;165:2;
261:2
**refuse (1)**
116:15
**refused (1)**
114:20
**regard (3)**
167:14;205:25;
268:24
**regarding (4)**
57:14;88:5;156:20;
164:22
**regards (1)**
44:10
**regular (7)**
132:8;139:9,10,10;
144:21;145:7;196:16
**regularly (1)**
169:23
**rejected (1)**
168:23
**related (5)**
6:6,7;29:24;137:15;
241:19
**relation (1)**
170:12
**relationship (6)**
138:2,12;169:18;
177:5,6;271:19
**relative (2)**
98:2,6
**release (2)**
225:9;226:8
**released (12)**
12:2,6,9;13:16,20;
16:8,17;20:19;55:23;
222:7;224:9,16
**relevance (2)**
119:11;175:2
**relocate (1)**
224:12
**relocation (3)**
103:6;107:22,25
**remain (2)**
31:2;153:20
**remarks (1)**
104:14
**remember (182)**
6:4;9:18;11:16,17;
12:4,11;13:25;14:18;
16:3,6;17:23;23:21;
24:3,9;25:7;26:10;
27:24;29:6;31:10,11;
32:9;33:19;34:14,15;
38:14,15,20;39:10,12;
40:18,25;42:20;43:6,

10;44:13;45:2,4;46:7;
47:13,14;48:7,9,10,
12;52:22;53:16,17,18,
20;55:11,14,15;
56:14;58:11;62:18;
75:10,24,25;76:1;
77:10,25;78:15,21,24;
79:7;80:22,24;83:7,8,
13;84:7,9,12,13;86:3;
90:8;102:3,6,20;
106:3;107:4,10;
108:11;113:7;114:3;
116:9;117:16,17;
118:24;119:20,22;
121:11,13;125:2;
126:1,20;127:6;
129:22;130:2,11,13;
131:25;132:20;134:1,
6,11;135:17;136:4,
14;140:10;147:10,13;
148:19;149:6,13,13,
23;150:10;152:14,16,
22;154:13;155:3;
163:11;168:2;170:16;
178:23,25;179:1,3;
187:11;188:25;
189:19;190:2;192:18;
193:7,12;195:13,22;
197:8,18;198:8,13,17,
20,21;199:21;200:12,
13,17,18;201:17;
208:8;210:17;211:13;
212:11,11,17,23;
213:20;219:11;
222:11,24;223:1;
227:9,10,18;229:10;
230:17;231:21;
233:15;242:18;
245:16;251:20,22,25;
256:21;259:22;270:9,
12,23;276:8
**remembered (2)**
265:3,9
**remind (2)**
162:5;266:13
**reminding (1)**
224:1
**remove (1)**
130:3
**removed (1)**
130:23
**removing (1)**
132:23
**repeat (1)**
212:4
**repeatedly (1)**
272:14
**rephrase (3)**
7:22;83:16;101:17
**report (5)**
33:18;34:10;35:20;
36:24;132:2
**reporter (10)**

6:11;7:11;8:15;
57:3;163:14;200:8,
10;231:2,3;277:6
**reports (3)**
25:20;34:4,5
**represent (10)**
5:12;112:14;
120:24;154:1;237:25,
25;238:3;240:9;
257:11;261:8
**representation (1)**
241:19
**representing (3)**
179:21;240:12,17
**represents (1)**
122:23
**requested (3)**
46:24;268:2;275:4
**requesting (2)**
221:5;224:6
**reserve (1)**
277:2
**residential (1)**
192:11
**respect (4)**
173:8;184:8,11;
274:13
**respects (1)**
7:1
**respond (1)**
225:14
**response (1)**
7:16
**responsibility (2)**
172:22;245:6
**responsible (2)**
82:20;172:20
**rest (2)**
74:5;119:5
**result (7)**
81:11;82:1;132:23;
220:5;221:19,23;
224:25
**resulting (1)**
221:3
**retained (1)**
277:6
**retainer (1)**
241:24
**retaliation (1)**
166:16
**retrial (5)**
114:1;233:24;
255:8;256:7,9
**retribution (1)**
268:20
**return (1)**
37:19
**reveal (2)**
237:2,2
**review (2)**
163:2;263:15
**RFC (1)**

34:24
**Richard (2)**
234:15;237:10
**Rickey (1)**
115:20
**Rico (4)**
157:18,23;158:10,
11
**riding (1)**
205:23
**right (282)**
6:9;8:13;11:25;
12:7,22;15:17,24;
16:14,19,25;17:2;
18:15,19;21:10;
22:12,17;25:1;26:9;
27:14,25;28:3,12,24;
31:22;33:2;34:4;
37:25;39:16;46:5,9,
12,15,18;47:3,15,16;
48:2,16;54:3,4;58:12;
59:14;60:12;61:4;
66:6;68:5,22;69:23;
70:5;72:21;73:2;
75:20;78:2;79:15;
84:17,24;87:18,19;
88:22;95:21;96:21,
23;104:3,5;105:7,13;
106:4,12,18;112:3;
115:13;120:4;122:19,
20,24;123:9,10;
124:17,20;125:13;
126:3;128:13;131:3,
7,10,14,15,18;132:17;
133:9,12,14;137:4;
139:20,24;140:16,20,
25;142:8,13,25;144:1,
5;145:8,17;146:3,12,
17,20,23;147:4,18;
148:20;149:9;151:7;
152:18;153:20,22;
155:19;157:12;158:5,
6;160:3,13;162:10,13,
15,22;163:10,12,18,
21;164:2,11,14,15;
165:18,25;166:4,9,16,
19,21,23;169:5,15;
170:10,22,23;171:2,
11;172:11,15;175:13,
24;176:13;178:11,19,
21;179:5;180:2,16,
19;181:1,7,21;
182:19;183:13;184:9,
18;188:7,8;189:8;
190:8,18,22;191:8,10,
16;196:22;197:1;
198:14;200:8,23;
201:1,19,23;203:6;
204:4,7,13,16;205:6;
209:23;211:9,17,21,
22;213:10,25;214:4;
215:14,22;216:3,15,
24,25;217:24;218:17;

219:5,6,12;222:2;
223:4,9,13;224:3,17;
225:1,10;226:18;
227:12,15;230:6,7,9,
15;231:1,13,19;232:8,
20,23;233:1,4,7;
234:3,5,9;239:3,4,4,4;
242:10;243:10,13;
245:7,12;247:19;
252:24;253:22;
254:18,25;256:19;
257:6,14,20;258:4,19,
22;259:5,9,14,18;
260:3;262:19;264:2;
265:23;266:21;267:7,
9,13,20;268:20;270:1,
10;271:14,20,24;
273:24;275:7,25
**right-hand (1)**
35:4
**rights (5)**
48:5,5,11,13;154:2
**rival (3)**
172:21;173:4;
220:20
**rivals (2)**
172:2,10
**River (6)**
106:24,25;107:2;
221:7,22;223:17
**Rivera (5)**
174:24;175:1;
186:15,16;223:4
**Rivera's (1)**
187:1
**rob (1)**
50:24
**room (26)**
30:13;31:4,7,17;
33:6;37:9;39:22,23,
24;75:22;94:18,19;
109:1,14,20;111:8;
140:15,19;150:23;
151:4;155:10;157:3;
193:22,23;232:13;
233:17
**Rosa (33)**
58:14,16;59:10,18,
21,24;60:21,22;61:6;
94:20;162:10;193:24;
194:4,8;208:15,20,25;
209:9;210:20,22;
262:18,22;263:3;
264:5;266:5,11,17;
268:4,4,5,5,7;272:2
**Rosa's (1)**
59:19
**Rose (16)**
192:23,24;193:6,9;
243:24;244:11,12;
264:23,24;265:10,17;
267:5,16;268:4,7;
272:4

Rizman Rappaport (973)992-7650
"When every word counts"

GONZALEZ 000777

**Maysonet v. Guevara**

**Justino Cruz**

**ROSEN (159)**
14:16,24;23:24;
24:8;26:15,19;32:23;
35:23;37:13;39:18;
40:22;41:9;42:19;
43:1,9,21;44:5,12,25;
45:3,11,15;46:21,25;
53:5;54:11,19,23;
55:19,24;56:13,23;
57:6,11,17,23;60:7;
64:5,9,14;65:9,25;
66:2;67:1;68:6;69:12;
70:10;71:8,19;72:17,
19;73:4,7,11,20;74:2,
13,20,22;76:3;78:4,
13;79:24;83:22;
84:12,14;91:2,5,11;
98:4;101:12;102:21;
108:14;110:10,21;
111:13,22;112:19;
117:5;119:12;120:15;
123:5;126:9;131:24;
132:21;134:12;135:9,
18;136:5,15;139:3;
140:6;145:4;148:17,
21;150:11;151:16;
153:2;156:7,17;
162:8,18;166:12;
169:22;170:8;171:5;
173:1;175:4;178:24;
181:4;184:16;187:12;
193:13;199:8;201:12;
202:18;203:1;205:1;
208:12;210:12;
215:18;216:2,12,16;
218:5;219:4,12;
222:2;225:4,19;
226:18;230:1;232:18;
234:22;235:22;236:3,
10,16,19,25;237:15,
20,23;238:17,21,25;
239:5,8,11,16;240:16;
241:1,3,17,23;242:3,
8;272:25;276:25
**Rosie (1)**
10:2
**running (6)**
51:3,12;99:14,15,
18;100:8

## S

**safety (1)**
221:18
**sale (2)**
93:2,9
**sales (1)**
243:6
**same (13)**
6:17;11:22;16:4;
23:10;33:9;94:22;
102:9;132:11;170:18;
177:3;184:2;195:3;

242:1
**Sanchez (2)**
10:2;25:3
**Santiago (1)**
25:3
**SAO (2)**
233:21;255:6
**sat (2)**
240:20,20
**saw (29)**
51:12;99:17;
109:12,18,24;110:6;
117:10;138:4;144:8;
146:12;149:5;169:23;
170:2;188:22;189:7;
195:16;204:12,23;
213:9;244:18;252:23;
253:1,5;263:16,19;
270:2,10;273:11,12
**S-a-w-l-a-i (1)**
148:24
**Sawlani (2)**
148:22;149:5
**S-a-w-l-a-n-i (1)**
149:1
**saying (23)**
38:16;46:19;47:2,3;
117:15;176:6,23;
198:18,21;200:15;
201:13;207:25;210:4;
213:5,19,24;228:16;
229:24;230:2;247:13;
266:4,10;267:2
**scared (1)**
32:15
**Schak (7)**
153:11,15;212:2,7,
13;213:5,19
**S-c-h-a-k (1)**
153:12
**scheduled (1)**
226:8
**school (14)**
9:5,9,11,13,17;
157:11,14;158:8,18;
159:17,22,25;160:5;
270:16
**script (2)**
52:25;54:17
**seat (3)**
66:12,15;67:11
**seated (2)**
49:24,25
**second (21)**
8:13;49:1,2;59:17;
63:1,4;88:1;91:14;
93:17;103:12;108:6;
111:2;159:16;179:7;
192:15,17;200:3;
253:19;262:21;263:7;
264:16
**seconds (1)**
62:4

**sect (4)**
23:11,20,23;24:17
**section (3)**
166:15;170:18;
171:1
**sections (1)**
170:22
**secure (1)**
173:3
**secured (1)**
225:24
**security (1)**
102:16
**seeing (9)**
34:15;62:18;75:10;
108:11;147:10;148:8;
200:12;249:20;
270:12
**seeking (1)**
123:14
**sees (1)**
128:5
**Sell (12)**
126:23;136:1,10,
13,16;171:19;173:11,
21;174:13;243:10,14,
16
**selling (14)**
173:8;178:2,3,4,4;
206:25;242:15,21;
258:22,24;261:11;
262:1;273:8,18
**send (2)**
219:2,3
**sent (1)**
77:5
**sentence (9)**
49:2,13;86:5,7;
92:10,11;220:9,25;
221:6
**sentenced (10)**
105:22;131:15,17;
190:19;218:20,25;
220:8,23;246:20;
248:7
**sentencing (1)**
246:14
**separated (1)**
107:5
**serious (1)**
165:25
**serve (4)**
88:22,24;114:24;
221:5
**served (3)**
116:2,7,25
**Service (1)**
116:2
**services (2)**
104:8,9
**serving (1)**
220:9
**set (1)**

159:13
**Seven (2)**
11:12;102:13
**several (1)**
207:19
**severe (1)**
224:25
**sex (2)**
244:2,8
**shaking (3)**
7:11;189:11;222:12
**shape (1)**
238:14
**sheriffs (1)**
102:15
**shift (1)**
258:18
**Shiller (21)**
234:13,14,18,23,24;
235:6,6,10,11,14,18;
237:8,9,13,25;238:6,
10,13,23;239:12,18
**Shipping (4)**
11:10,20;159:4;
250:19
**shoot (2)**
50:23;98:5
**shooting (8)**
49:15;68:12;
156:20,25;157:1;
180:24;204:23;
244:25
**shop (6)**
22:4;159:10,12;
254:2;258:15,18
**short (2)**
50:8;226:19
**shortly (1)**
66:18
**shorts (1)**
99:12
**shot (21)**
25:16;68:12;69:2;
100:21;101:1;211:20;
212:10,15;214:8,12,
25;215:7,13,22;216:7,
21;217:15,20;220:19;
261:19,24
**shots (4)**
51:12;68:14;99:14;
204:20
**show (17)**
57:25;58:5;109:25;
195:8,20;197:5,10,12;
199:23;202:4;203:13;
204:1,5,8,11,17;
269:16
**showed (2)**
146:25;199:20
**showing (1)**
195:15
**shown (9)**
58:11;197:18;

198:13,19,23;200:3,
20;201:15,19
**shows (1)**
197:9
**shut (1)**
70:7
**siblings (3)**
9:23,25;272:9
**side (10)**
69:18;72:22;110:1;
128:14;144:1;171:10;
202:7,9;204:7;250:18
**sides (1)**
15:5
**sight (1)**
36:7
**sign (5)**
52:13;155:4;
156:10;230:25;
241:18
**signature (7)**
15:8;47:10;55:7;
75:2;154:5;161:10;
222:21
**signed (42)**
52:23;54:22;55:3,9;
58:1;72:25;75:13;
82:10,21;83:6;140:7;
154:25;155:16,21,24;
156:1,23;157:5;
161:18;162:2;227:11;
228:3,12;229:1,16,17,
18;230:13,18,24;
231:5,17,19;232:1,2,
9;233:3;236:12;
263:11,21;267:2;
271:1
**significance (2)**
206:22;207:4
**signing (4)**
47:13;154:12;
156:13,13
**silent (1)**
153:20
**Silver (1)**
115:15
**sister (5)**
127:23,24;243:24;
244:2;272:4
**sisters (1)**
249:10
**sit (5)**
117:14;123:22;
160:24;195:12;
227:17
**sitting (4)**
42:6;48:7;118:6;
142:25
**six (6)**
51:12;68:12,14;
106:11;118:22;254:1
**Sixteen (1)**
10:18

Rizman Rappaport (973)992-7650
"When every word counts"

GONZALEZ 000778

Maysonet v. Guevara                                                                                           Justino Cruz

**skills (1)**
20:23
**skull (2)**
143:8,9
**Slapped (4)**
41:24;140:25;
141:5;143:25
**slapping (1)**
141:10
**sleep (3)**
37:9,10,16
**slowly (1)**
203:23
**smacked (1)**
141:16
**small (2)**
31:7;254:2
**Smitka (5)**
212:1,7,13;213:4,
18
**SMU (5)**
107:11,13,15;
218:23;223:18
**social (1)**
135:14
**socialized (1)**
208:18
**sold (12)**
135:24;136:14;
171:23,25;173:9,16;
176:16,18,20;177:11;
243:19,22
**soldier (3)**
132:8,9,14
**soldiers (1)**
132:7
**solely (1)**
135:10
**solves (1)**
239:15
**somebody (25)**
130:9,14,17,19;
131:20,23;132:2,5,18;
135:22,24;154:11,25;
155:1;169:23,25;
173:3;174:12,23;
178:5;183:7;184:17;
206:25;219:25;
239:24
**someday (1)**
209:17
**someone (12)**
24:25;50:24;73:1,7,
22;75:14,19;77:12,13,
20;254:6;257:24
**Someplace (1)**
101:22
**sometime (1)**
131:12
**sometimes (2)**
209:9;273:13
**somewhere (4)**
101:19,20,23;

131:13
**soon (5)**
63:13,15;234:12;
235:4;237:6
**sorry (24)**
33:20,24;34:2,8;
40:2;46:21;47:25;
55:6;62:1;63:3;67:1;
75:5;81:7;88:14;98:5;
105:6;108:6;110:14;
159:7;198:9;205:2;
216:17;267:24;
268:23
**sort (5)**
23:10;41:8;121:19;
133:11;253:24
**So-so (1)**
21:2
**sought (2)**
81:11;82:1
**sound (2)**
21:9;107:11
**sounds (5)**
10:3;13:4;14:14;
205:5;231:4
**south (4)**
96:15,16;128:14;
171:10
**Spanish (8)**
32:18;157:15;
158:4,12,13,14,25;
213:7
**Spaulding (4)**
70:1;90:2;186:3;
188:1
**speak (15)**
14:3;15:24;16:10,
14;20:12;32:18;
48:20;113:18;142:3;
158:19;232:3;234:23;
235:10;275:9,21
**speaking (3)**
153:14;213:15;
276:8
**Special (6)**
107:9;219:6;221:6,
18,21;223:17
**specific (3)**
38:22;104:24;107:1
**specifically (7)**
17:2;52:18;81:5,13;
176:21;247:19;
268:23
**spell (3)**
8:17;11:7;148:23
**spent (3)**
123:18,25;259:4
**spoke (9)**
13:23;14:9,13;16:2,
5;37:3;179:13;213:7;
214:2
**spoken (4)**
14:6,19;16:7,16

**St (18)**
50:9;67:6,6,23;
96:12,13,19,20;97:8,
25;98:25;99:9,11;
185:19;203:16;
260:10,11,14
**stamp (1)**
35:3
**stamped (2)**
34:24;69:22
**stand (13)**
179:15;180:5,9,18;
181:10;195:7,19;
247:3,7,10,14;248:4;
265:14
**standing (15)**
27:8;28:14;91:20;
98:1,21;195:14;
197:14,16,24;198:6;
199:2,10,14;202:8;
204:6
**start (11)**
26:7;63:3;94:8;
95:23;104:23;197:4;
216:17;233:20;239:9;
262:21,21
**started (12)**
8:14;38:5;67:19;
68:19,21;97:24;
98:17;120:23;126:5;
149:17;150:14;
210:25
**starting (3)**
5:24;53:24;89:7
**starts (1)**
118:8
**state (17)**
8:14;54:4;80:13;
84:17;101:10,10,16,
22,25;115:10,11;
124:6;167:4;168:11;
223:15,19;245:18
**stated (9)**
36:18;49:3;50:7,23;
51:9,15,21;59:18;
159:16
**statement (132)**
17:8,22;20:2,24;
45:14,22;46:18;
47:13,25;49:9,11,19,
21;50:3,5,12,14;
51:25;52:7,8,11,13,
23;53:4,15,19,21;
54:8,21;55:3;56:12,
19,22;57:3,9,15;58:5;
59:10,16;60:6;61:4;
62:9,13;64:7,7,12;
65:23,24;69:22;71:6,
7;72:25;74:24;75:2,8,
11,13;82:9;83:6,20;
90:11;107:20;110:9,
17,17,20;122:18;
140:2;152:8;153:4,

19;154:3,19,21,25;
155:1,4,12,22;156:1,
13,14,19;159:15;
160:15;161:18;180:2;
182:3,4,12;189:21,22;
190:3,10;191:5;
214:14;215:5,11;
221:2;223:21;228:2,
7,11,20,25;229:2,3,7,
14,21;230:12,17,20;
231:12,16,22,23;
233:2;244:15;245:6,
10,11;255:10;256:17;
263:7,10;265:19,23,
25;269:24;270:5,6
**statements (21)**
36:9;51:7,17,19;
58:1;66:23,24;68:4,5;
69:10,11;80:11,16;
81:10,16,25;82:4,6;
231:9,11;267:2
**States (5)**
5:14;157:19;158:9;
200:25;220:2
**state's (118)**
48:7,8;51:22;54:5;
76:12;85:6,8,16,23;
88:5;101:22;102:25;
107:22;112:23;113:1,
3,4,5,12,13,14,19;
116:18,22,23;120:1,2,
22;124:15;129:3;
152:13,14,17,21;
153:8;155:18,19;
159:21;161:24;
164:21;166:20;167:2,
8;168:4,17,23;178:13,
19;179:2,9,16,17;
180:14;182:8,9;
185:8;193:11,14;
214:5,7,10,16;218:18,
21;219:8,19;221:1,4,
10,16;222:8;223:12;
224:1;225:10;227:8,
20,23;228:3,11,20,21,
25;229:7,9,11,15,21;
230:13,17,20;231:7,
17,24;232:3,11;233:3,
6,10;234:12;235:2,5;
237:7;245:21,22;
246:1,4;254:17;
255:21,22,24;265:11,
12,15,16;266:10,13;
267:10;271:8
**stating (1)**
48:5
**station (33)**
62:24;140:15;
152:20;161:24;187:3;
190:11;191:6;209:11,
14;214:22;228:8,13;
229:4;232:4;244:23;
252:19,21,25;260:7,9;

262:6,7,15,24,25;
263:17;265:4,6;
266:13,23,24;267:23;
270:3
**status (2)**
104:24;222:9
**stay (4)**
40:5;101:18;135:3;
226:13
**stayed (2)**
140:19;226:15
**step (1)**
6:22
**stepping (1)**
238:16
**Steve (2)**
239:25;240:5
**stick (2)**
206:24,24
**Sticking (1)**
253:19
**still (11)**
42:21;96:9;124:25;
129:11,24;130:25;
134:23;137:25;
147:25;236:25;
249:19
**Stone (1)**
80:20
**stop (10)**
26:4;27:8;28:14;
36:11;42:7;50:16;
60:2;138:20;139:5;
148:15
**stopped (3)**
50:8;59:23;138:17
**story (4)**
20:17;82:21;
108:10;155:11
**straight (4)**
40:9,10,12;140:20
**street (34)**
22:8;23:8,18,23;
25:15;35:25;90:4;
96:16;119:4;126:24;
127:3;130:8,24;
131:8;132:2,3,23;
136:21;139:9,18;
170:4;172:20;175:6;
188:12;208:8;218:2;
220:4;221:4;251:10;
260:13;272:21;
273:12,15,19
**streets (8)**
194:18,21;259:5,6,
9,14;261:10,25
**strike (19)**
20:4;27:7;39:23;
52:22;53:9;55:4,6;
69:6;71:20;72:24;
75:14;86:1;91:13;
92:24;102:7,9;105:6;
141:9;143:3

GONZALEZ 000779

Maysonet v.
Guevara

Justino Cruz

**striking (1)**
81:13
**struck (2)**
142:22;166:19
**student (2)**
157:13;270:19
**stuff (1)**
114:23
**submit (1)**
224:11
**subpoena (12)**
114:24;115:5,9,24;
116:2,2,10,15,19;
117:1,15,16
**subpoenaed (1)**
116:13
**subsequently (5)**
228:2,10,24;
230:12;233:2
**substance (1)**
120:13
**suburbs (1)**
119:3
**suffer (2)**
132:22;224:25
**suggesting (1)**
46:20
**suing (1)**
256:3
**summary (1)**
54:8
**summon (1)**
115:12
**sup (2)**
34:4,5
**supplemental (2)**
33:18;34:10
**supplying (1)**
244:2
**supposed (1)**
106:1
**suppress (3)**
74:18;80:10,16
**suppressed (2)**
81:11;82:1
**sure (15)**
20:8;51:10;97:22;
98:10;101:18;109:6,
8;120:16;180:11;
203:1;244:13;253:14;
254:3;271:12;274:6
**surprise (1)**
260:19
**surprised (1)**
41:25
**sustained (1)**
207:2
**sweatshirt (2)**
196:2;206:9
**sweatshirts (4)**
50:22;196:3;206:5,
7
**swelling (1)**

146:5
**swore (1)**
17:3
**sworn (3)**
5:5;111:20;163:17

**T**

**table (2)**
73:25;253:16
**talk (20)**
6:15;71:15;74:22;
113:10;124:17;
125:15;138:3,14;
140:11;141:21;152:7;
153:22;213:23,24;
227:21;233:9;240:3,
5;246:22;257:17
**talked (31)**
25:19;116:22;
117:13;118:18,19;
119:5,21;120:17;
128:15,21,24;129:2;
130:7,14,17;135:8;
146:13;162:2;171:12,
13;212:1;213:4,19,
22;224:23;233:12;
251:8;265:13,16;
267:16;268:8
**talking (62)**
6:17;22:16;33:7;
39:3,5,9;41:5,19;
42:21,22;43:13,14,17;
51:2;58:24;68:11;
99:2,4,7,23;100:1;
109:7;110:16,17;
114:6;121:3,5,16;
124:19;125:5;127:7,
10;135:10;138:18,20;
149:11;150:16,21,25;
151:1,2,7,19,23;
152:14,20;159:21;
212:23,25;213:20;
230:3;231:4;232:6,
25;233:1;242:14,16;
245:14;261:17;267:3;
268:24;273:16
**taught (1)**
158:5
**teach (1)**
158:11
**teens (3)**
126:8,10,10
**television (1)**
59:23
**telling (6)**
20:13;43:6,8;91:21;
108:10;257:10
**tells (1)**
201:19
**ten (3)**
99:5;123:25;142:21
**ten-minute (1)**

202:24
**terms (3)**
10:6;131:7;268:11
**territory (6)**
171:22;172:14,21;
173:3,5;174:13
**test (1)**
158:24
**testified (43)**
5:6;37:21;86:10;
88:16;89:2;105:10;
111:20;114:7;134:7,
18;139:4;162:9;
163:12,17;165:8;
166:3,8;178:18;
179:10,16,22;190:4;
191:6;211:8;215:12,
14,19;216:19,24;
217:17;218:19;220:2;
224:19,24;225:8;
254:15;259:17,25;
263:12;265:5;268:18;
271:18;272:1
**testify (23)**
87:2,8;106:1;114:7,
15,18,20,21;166:21;
167:3;168:9,12,17;
169:1;180:12,18,21,
25;208:3;209:17;
245:15,17;266:19
**testifying (4)**
84:23;134:16;
197:19;201:16
**testimony (119)**
5:3;85:23;87:16;
88:6,8,9;90:8;91:12,
14;92:2,4,9;93:3,5;
94:1;95:8,10;97:11,
12;98:12,13;99:25;
100:4,5,11,13,24;
101:5,8;107:20;
162:25;163:2,5,8,25;
164:1,5,22;165:8,10,
12,16,23;166:7;167:7,
15,18;168:1;169:12;
175:21;179:18,23;
181:9;184:21;185:25;
186:1,22;188:18;
190:23,23;193:3;
194:1,19;195:24;
196:9;197:22,24;
198:2,22;199:4,5;
200:23,25;201:5,6;
202:11;205:5;206:14;
207:3;211:4,4;
213:17;215:2,23;
220:6,11;221:3,19,24;
225:1,24;227:3;
228:7;230:22,23;
231:1,13;245:24,25;
246:11,23,23;247:3,6;
248:2;261:23;264:8,
11;265:14;266:2,4;

267:11,11;269:25;
271:22,23;272:16;
273:22;274:1
**Thanks (1)**
253:11
**therefore (2)**
81:16;82:4
**thinking (1)**
226:5
**third (2)**
34:23;63:3
**though (10)**
12:12;46:11;47:6,
15,19;60:11;104:4;
184:17;261:23;
267:10
**thought (4)**
55:16;90:19;
149:24;225:17
**threat (4)**
114:4,5,9;221:2
**threaten (7)**
18:22;19:25;43:20;
71:25;72:3,6,9
**threatened (17)**
18:22;19:3;39:15;
43:23;52:6,15,16;
85:2;112:23;113:1;
114:5,10;120:20;
121:6;155:5,7,8
**threats (1)**
221:23
**Three (6)**
59:23;99:12;
128:17;133:6;141:20;
142:1
**three-minute (1)**
269:2
**throat (15)**
41:10,13,17,21;
81:14;140:24;141:1,
2,8,15,18,23;142:7;
147:7,12
**throw (1)**
83:24
**thrust (1)**
142:12
**times (24)**
20:4;44:22;45:9;
68:12;118:16,19,21,
22;141:5,10,17,20,20;
142:1,19,19,20,21;
145:24;146:1,2;
207:20;208:14,17
**time's (1)**
18:1
**timing (1)**
273:22
**Tino (15)**
8:20,21;37:3,3;
59:24;63:23;64:20,
25;66:8,14;67:12,18;
68:21;69:6;70:22

**TIRC (1)**
120:25
**today (33)**
5:23;8:8;13:17,21;
53:22;54:9;74:16;
90:25;112:2;117:14;
118:4,6,16;120:8;
121:16;122:17,20;
123:1,23;125:20;
127:16;160:24;163:1,
23;170:18;176:6;
211:13;213:24;
227:17;242:5;259:16;
271:18;272:15
**toes (1)**
238:16
**together (7)**
26:20;27:10;71:3;
72:13;126:23;208:24;
273:16
**told (96)**
19:3;31:21;39:8,8;
48:6,10,16,19,22;
54:4;63:9,11;65:1;
70:4;78:17,22;83:5;
85:5,19;86:14;110:8,
19;114:7,17;116:23;
122:23;124:15;130:5;
138:17;140:22;
146:22;149:11,16;
150:2,4,7,15;151:2,
18,22;154:21;160:1,
11;162:12;165:15;
166:2,6;170:17;
176:18;179:25;180:1;
181:6,20;182:6,17;
183:2,7;189:25;
191:7,15;193:14;
209:7,12,17,21;
211:21;212:3,7,8,12;
214:6,10,14;215:7;
216:6;217:18;229:1;
238:20;244:21,24;
245:2;247:20,23;
248:8;257:3;260:9,
25;262:7;263:3;
265:4;266:5,11,24,25;
267:5;271:11
**tone (4)**
73:15,17,19;74:16
**took (6)**
6:25;67:5;179:15;
182:11;231:3;263:16
**top (14)**
53:25;91:19;97:14;
103:20;113:7;115:9;
124:5;125:4,7;153:3;
156:18;175:15;
184:22;186:14
**topic (1)**
217:3
**Torrence (2)**
156:20;220:7

Rizman Rappaport (973)992-7650
"When every word counts"

GONZALEZ 000780

**Torture (1)**
112:15
**totally (1)**
27:20
**touch (3)**
127:22;128:1;135:3
**touched (1)**
143:14
**toward (1)**
66:20
**towards (27)**
41:8;67:19;68:20,
21;89:22;90:1;96:3,
12,19;97:24;98:18,
24;99:9,11,15,18;
100:8;186:25;187:22;
188:1;197:12;202:6;
203:16,22;204:10;
205:23;232:16
**towel (2)**
60:23;61:2
**track (1)**
224:13
**train (2)**
187:11,17
**transcript (12)**
89:7,9;175:14;
178:17;190:7;198:18,
23;199:17;200:2,16;
201:18;264:11
**transcripts (1)**
87:15
**traveling (1)**
203:17
**treated (3)**
51:21;52:2;104:17
**trial (25)**
89:3;90:8;93:4;
97:12;100:12;101:9;
163:2;164:3,14;
166:17;167:24;
197:20;198:16;
201:16;202:15;
215:10,12,15,20,24;
216:19;266:6,8;
267:12;272:16
**tried (1)**
141:21
**trigger (1)**
220:13
**trouble (2)**
148:1;165:25
**true (28)**
17:8,22;36:11;49:9,
19;50:5,14;51:7,19,
23;52:14;60:6;64:12;
65:23;66:23;69:10;
71:6;82:12;83:6;
154:21;160:3;166:13;
184:9;207:15,16;
208:22;209:23;
255:10
**truly (1)**

203:10
**truth (13)**
8:11;52:8,11;
118:14;163:21;
164:11,11;165:17;
177:16;183:13,17,20;
184:12
**truthful (35)**
90:11;92:4;93:4;
94:1;95:10;97:12;
98:12;100:4,12;
101:6;164:2;165:12;
166:8;167:7,9,18;
176:8;185:25;186:6,
22;188:18;189:4;
193:3;194:1,19;
195:24;196:9;197:24;
199:4;201:5;202:11;
206:14;207:3;209:3;
211:3
**truthfully (1)**
208:3
**truthfulness (1)**
168:7
**try (6)**
6:22;7:22;13:8;
74:18;75:17;174:13
**trying (6)**
74:9;77:9;91:9,10;
131:7;235:14
**turf (1)**
220:21
**turn (7)**
15:6;34:22;85:23;
89:15;92:22;97:4;
205:16
**turned (5)**
203:18,20,21,25;
229:11
**Turning (1)**
254:14
**TV (4)**
108:12;213:10;
270:13,14
**Twelve (1)**
11:2
**twice (1)**
141:20
**Two (77)**
10:25;25:16;33:11;
34:4,5;40:9,10,11;
41:18;43:4;50:24;
59:22;62:4;65:14,20;
66:9;67:13,14,15;
68:15;69:2;70:3,16;
71:15;98:19,20;99:2,
4,7,14;100:2,21;
101:1;112:22;113:6,
9,19;119:21;129:4;
140:20,21;142:10;
149:9;151:5;156:25;
162:22;180:24;
183:17,23,25;203:11;

204:12,15;211:20;
212:10,13,15;214:8,
12,25;215:14,22;
216:7,21;217:15,20;
227:14;231:9,10;
232:23;252:20;
260:17;261:11,18,24;
265:10;271:23
**two-hour (1)**
43:5
**type (5)**
11:19;22:5;29:25;
86:1;102:16
**types (1)**
40:16
**typewritten (1)**
153:18
**typically (4)**
171:1;188:4;
196:12;207:7

---

## U

**umbrella (1)**
174:6
**Um-hmm (4)**
20:10;89:17;90:21;
209:13
**uncle (39)**
15:16,17,25;22:22;
65:6,19;84:24;87:3;
134:8,19;136:20;
138:21,25;162:13,19;
163:3;169:7,13,19;
171:16;175:20;
180:12,19,23;184:8;
190:5;215:13;216:6,
20;217:14,19,25;
218:20;220:3;224:20;
225:15,25;246:11,24
**unclear (1)**
263:23
**uncle's (14)**
89:2;90:8;93:4;
165:4;179:10,22;
182:18;197:20;
202:15;215:10,12,24;
216:19;224:3
**uncle's's (1)**
201:16
**under (7)**
8:8;70:7,9;71:16;
82:6;174:6;224:7
**underage (2)**
244:2,8
**underlying (1)**
6:6
**understood (4)**
11:19;48:5;54:4;
271:12
**uniform (2)**
28:5,7
**uniforms (1)**

139:10
**unit (11)**
107:1,5,9;218:23;
219:6,10;221:6,19,22;
223:13,18
**United (3)**
5:14;157:19;158:9
**unless (3)**
20:1;83:14;202:25
**untrue (1)**
68:5
**unusual (1)**
63:8
**up (93)**
9:4,19;25:11;28:14,
25;49:6,14;50:21;
63:15;77:7;78:5,8,
84:5,23;92:18;99:8;
105:6,12;114:11,12,
14;121:7,9;124:25;
129:15,16,22;131:2,4;
132:18;133:7;144:8,
18;149:16,17;150:2,
7;155:11;159:13;
160:18;172:18;173:3;
176:9;177:18;178:7;
180:5,9,18;181:10;
183:5,9,24;189:16;
190:14,15,16;194:10;
195:7,14,19;202:22;
206:4,5,7,23,24,25;
207:5,8;213:11,12,16;
219:6;230:19;243:3,
9;246:19;248:7;
250:24,25;261:8,19;
262:25;264:16;
265:11,12;266:24;
267:1;268:25;269:4,
12,17;276:22
**upon (1)**
225:9
**upset (1)**
60:21
**use (2)**
52:5;141:13
**used (12)**
44:21;153:21;
170:14;186:2;208:23,
24;209:1,8,21,21,23;
249:7
**utilizing (1)**
204:21

---

## V

**vacant (2)**
50:25;203:11
**Vahey (19)**
80:21,22;167:13;
168:16;245:23;246:2,
5,8,10,18;247:1,13,
16,20,23;248:1,3,8,11
**value (1)**

74:5
**Varas (3)**
23:4,4;71:2
**variety (1)**
133:14
**verification (1)**
223:21
**via (1)**
108:9
**vicinity (2)**
50:9;188:9
**victims (2)**
220:19;223:12
**video (3)**
56:22;57:20;74:13
**view (2)**
197:11;202:3
**violated (16)**
133:3,16,19,22,25;
134:2,3,15,21;166:4,
9;268:9,11,14,17,22
**violation (1)**
269:2
**Violent (1)**
212:6
**visited (5)**
208:2;211:2;
248:22,25;249:2
**Visiting (1)**
79:2
**voice (3)**
73:17,19;74:16
**voluntarily (2)**
27:14;28:8
**vs (6)**
5:18;80:13;115:6;
124:6,12;125:7

---

## W

**wait (7)**
109:5,5;162:6;
216:14,14;235:4,4
**waited (1)**
68:10
**waiting (7)**
36:4;65:15,21;
66:10,20;68:10;
220:20
**waive (3)**
237:1;277:2,3
**walk (1)**
261:25
**walked (5)**
33:5;94:21,24;
113:11;193:25
**walking (11)**
67:19;68:19,21;
90:1,3,3;98:17;
187:25;188:2,12;
204:10
**wall (16)**
31:8,9,12,18;81:15;

GONZALEZ 000781

Maysonet v. Guevara

Justino Cruz

141:3,4,5,8,9,24;
142:13,16,23;143:2,3
**wants (2)**
236:2;269:8
**watching (4)**
51:4;59:22;75:16;
99:6
**way (35)**
26:22;32:18;52:7;
60:11;67:6,6;68:24;
74:20;75:3;92:20,25;
93:14,23;94:20;
96:21;101:11;147:7,
11;170:22;187:7;
192:23;193:24;194:4,
8;196:1;203:18,18,22,
25;210:22;238:14,25;
246:19;262:9;264:23
**ways (2)**
43:19;268:22
**wear (6)**
196:13;250:11,16,
20;252:3;254:11
**wearing (4)**
139:12;196:2,5,6
**week (2)**
242:23;258:14
**weekend (1)**
136:8
**weekends (3)**
136:7;173:9;258:21
**weeks (1)**
128:17
**weren't (9)**
168:12;175:23;
192:4;198:19;243:2;
247:23;261:17;
269:18;275:24
**West (5)**
104:2;258:10;
260:22,25;261:2
**What's (23)**
9:15;14:21;15:3;
18:3;33:2,17;45:20;
62:12;87:14;103:16;
117:24;118:4,7;
119:17;130:10;138:2,
12;148:9;175:8;
186:18;197:5;201:21;
236:15
**whatsoever (2)**
135:11,15
**Whenever (1)**
273:12
**When's (8)**
16:2;128:15;135:5,
12;137:18;138:4,24;
149:4
**Where's (1)**
119:2
**Whereupon (19)**
5:1;33:14;46:23;
59:6;62:10;80:1,4;

87:12;103:14;111:3,
14;115:1;203:3;
219:14;222:4;226:20;
268:1;275:3;276:18
**wherever (2)**
173:25;219:2
**white (18)**
26:16;27:4;28:4,10;
33:9;37:23;38:9,21;
42:4;113:17;139:6;
140:13;233:16;251:9,
12,14,16,18
**whoever's (2)**
218:10,11
**whole (6)**
99:7;150:24;
151:20;154:19;
174:21;209:25
**Who's (4)**
60:14;74:15;
234:24;272:20
**whose (1)**
118:23
**wife (7)**
10:21;12:16;58:19;
59:3;148:8;223:4;
249:6
**wife's (5)**
119:9,14,15,17;
120:7
**Wiley (21)**
6:8;11:24;17:5,11,
14;19:3,5,10,15;25:9;
156:20,21;220:8;
244:25;248:14;
259:22;260:2,5;
261:1;262:4;274:13
**willingly (1)**
27:15
**wish (1)**
154:2
**within (5)**
126:24;127:2;
149:7;172:20;175:6
**without (3)**
91:21;220:10;246:5
**witness (33)**
5:5;17:4,10;21:5;
37:20;61:14;69:8;
72:23;84:13;91:16;
94:7;95:22;97:15;
101:10,10,16;102:8,8;
105:1;107:16;108:5;
109:9;111:19;166:14;
195:11;197:3;220:2;
223:12;224:7,8;
232:17;240:25;277:7
**witnesses (3)**
101:23,25;102:11
**woman (1)**
76:6
**wondering (1)**
32:12

**word (1)**
49:17
**words (9)**
44:21;53:11;75:14,
19;76:1;155:23;
157:5;181:17,25
**wore (3)**
139:9;196:16,21
**work (39)**
11:3,5,14,19;13:7,
8;20:19;22:5;26:6,7;
113:19;120:17;
124:16;159:5;184:22,
24;185:2,5,9,14;
186:10,25;187:2,8,14,
17;188:5;227:24;
234:4,6;236:8,23;
250:9,10,13,16,18,19;
258:14
**worked (9)**
11:11,20;13:15;
84:16;113:4;159:1,
10;259:6;261:11
**working (6)**
11:13;21:25;22:3;
54:6;113:9;253:20
**workplace (2)**
253:24;254:8
**world (1)**
74:6
**worried (1)**
226:9
**worry (1)**
63:14
**wrapped (2)**
60:23;61:2
**write (19)**
46:11;47:15;49:11,
21;50:3,12;51:4,17,
25;52:9;159:18,23;
160:10,13;222:19;
224:5,6;237:6;254:6
**writing (2)**
154:17;223:25
**written (8)**
155:15,17;219:18,
24;221:11,17;269:24;
270:4
**wrong (4)**
198:19;200:8,11;
259:12
**wrongly (1)**
78:11
**wrote (5)**
75:19;222:8;226:7;
232:20;234:25

**Y**

**year (16)**
9:12;12:2,20;
129:10;167:14;
177:16,18;178:3,6,10,

14;182:23;183:3,7;
210:22;257:6
**years (49)**
7:1;10:18;11:2,12;
13:11;14:1;16:24,24;
21:9;54:9;59:18;
61:23;88:8,9,12,14;
89:4;105:15;106:11,
18;112:22;113:6,19;
123:18,25;129:4;
130:12;137:12;147:9;
149:7;157:23,24;
158:1;165:9,10;
179:13;183:17,21,24,
25;190:21;220:24;
227:14;232:11,23;
242:17;252:2;265:10;
270:13
**yes-or-no (1)**
235:16
**Yolanda (3)**
10:1;127:25;128:2
**young (1)**
157:22
**younger (1)**
129:6

**1**

**1 (18)**
5:1;14:22;15:3;
101:23,25;108:3;
117:22;124:5;128:25;
210:19;226:24;232:9,
15;255:1,3,4;270:24;
271:2
**1:10 (1)**
111:15
**10 (10)**
18:13;70:20,25;
137:10,12;167:1;
168:15;211:24;
219:14,17
**11 (11)**
18:21;69:25;
184:24;185:2,6,15;
186:10,20;222:3,4,14
**11:30 (6)**
49:4;59:21;60:3;
63:21;64:1;160:16
**11:46 (1)**
80:2
**11:52 (1)**
80:2
**12 (3)**
165:15;196:1;
264:16
**12:29 (1)**
111:4
**12:32 (1)**
111:4
**12:33 (1)**
111:15

**12:45 (1)**
63:6
**13 (4)**
193:17;199:24;
223:8;226:6
**1302 (6)**
49:6;63:7;68:24;
160:18,22,25
**13th (4)**
168:18;214:16;
217:13,18
**14 (2)**
164:13,20
**15 (7)**
14:1;137:10,12;
157:21;167:25;190:8;
197:6
**15586 (1)**
89:7
**16 (10)**
70:19,25;72:13;
126:13,14;166:25;
167:23;191:11;
192:19;194:15
**17 (12)**
126:12;186:24;
228:1;229:14,20;
230:4,4;231:3,15;
232:7,19;233:1
**18 (8)**
13:11;126:12;
168:14;207:13;215:3;
216:9;217:4,10
**19 (5)**
167:11;169:6;
183:11;220:21;
264:15
**1980s (2)**
135:20;136:23
**1988 (1)**
210:24
**1989 (2)**
175:11;271:20
**1990 (74)**
14:19;17:6,11,14,
17;19:12;21:7,12,21;
22:1,9,17,25;25:21;
35:12;36:22;37:6;
45:25;49:4;53:3;
54:16;55:6;58:25;
59:11,21;60:3,25;
61:11;63:5,21,25;
65:7,18;66:19;70:19,
25;72:13;103:23;
104:1;109:1;125:21;
126:2;138:23;144:22;
152:9;159:5;160:16;
161:1;169:18;175:11;
177:14;182:21;
183:16;184:23;185:5;
190:4,18;207:19;
208:19;211:2,12,25;
212:5;214:5;229:5;

Rizman Rappaport (973)992-7650
"When every word counts"

GONZALEZ 000782

**Maysonet v. Guevara**                                                                 **Justino Cruz**

233:11;257:17,18;
258:9;271:20;273:23;
274:11;275:7,10
**1992 (5)**
168:18;190:23;
214:16;217:13,19
**1995 (5)**
105:24;131:12,15;
219:20;220:21
**1st (1)**
256:18

### 2

**2 (30)**
5:2;33:21,22;45:19,
20;75:3,5;82:10;
117:20;140:2;152:8;
227:11;228:14,15;
229:3,22;230:15;
231:12,18,23;232:16,
17;233:7;244:14,18;
254:24;260:16;261:9,
12;263:7
**2/10s (1)**
260:20
**2/16/69 (1)**
9:16
**2:10 (1)**
59:11
**2:45 (2)**
46:1,9
**2:50 (1)**
203:3
**20 (7)**
63:5;88:9;130:12;
175:14;181:13;252:2;
270:13
**2000 (2)**
223:9;226:6
**2001 (7)**
12:3,6,10;105:22;
106:8;224:8;226:7
**2003 (1)**
12:21
**2016 (3)**
108:8,13;213:10
**2017 (16)**
115:16,20;116:4,7,
13;233:20;234:1;
254:21;255:5;256:12,
15,19,22,24;257:4,12
**2018 (4)**
15:22;117:20;
227:11;231:22
**21 (10)**
21:9;126:2;137:4;
183:15;188:22;195:3;
203:9;205:17,19;
219:20
**21-year-old (1)**
54:17
**22 (15)**

88:8,12,14,22;
105:15;106:18;
115:20;165:9,10;
168:19;179:13;
184:20;206:21;214:4;
220:24
**23 (7)**
59:11;89:6,9,11;
186:14;187:19;
275:10
**237-4554 (1)**
149:3
**24 (23)**
17:17;25:21;35:12;
36:22;37:6;45:25;
49:3;59:18,21;60:3,
24;63:21,25;65:6,18;
66:19;160:16;167:23;
168:20;190:4;211:25;
214:5;275:7
**24th (12)**
55:6;61:11;185:13;
186:9;207:19,21;
208:2,19;211:2;
212:5;273:23;274:10
**25 (7)**
17:5,11;19:11;
103:23,25;224:8;
226:7
**25th (3)**
55:5;185:14;186:10
**2601 (1)**
115:15
**26th (1)**
77:18
**2nd (1)**
256:18

### 3

**3 (11)**
33:14,17,21,22,25;
34:1;74:25;168:4;
184:24;185:5;203:4
**3:30 (1)**
35:12
**3:33 (1)**
226:20
**3:45 (1)**
226:21
**30 (2)**
7:1;54:9
**31 (3)**
108:7;116:3,7
**32 (1)**
175:16
**33 (2)**
233:20;255:4
**330 (2)**
35:6,10
**3337 (3)**
104:2;258:10;
260:25

**3357 (1)**
260:22
**34 (5)**
233:19;234:11;
235:1,23;237:6
**3428 (1)**
261:2
**37 (1)**
260:24
**39 (1)**
91:15
**3rd (1)**
256:19

### 4

**4 (6)**
59:6,9;169:7;
186:14;208:13;
242:24
**4:34 (1)**
276:18
**4:40 (1)**
276:19
**40 (1)**
191:11
**41 (4)**
192:19;264:12,15,
16
**42 (2)**
94:6;193:17
**43 (1)**
194:15
**44 (2)**
34:25;196:1
**45 (1)**
95:21
**48 (1)**
16:24
**49 (1)**
97:14
**4th (1)**
256:19

### 5

**5 (31)**
17:18;30:20,23;
31:16;33:4;36:19,20,
25;37:4,7,9,11;58:2,7;
62:8,10,13;76:15;
81:5;157:21;212:5,
24;256:12,15;257:4,
12;274:5;275:10,21,
25;276:2
**50 (2)**
8:25;137:8
**5333 (1)**
161:14
**57 (1)**
197:2
**58 (1)**
199:22

**5'8 (1)**
251:21
**5'9 (1)**
251:21
**5th (1)**
257:11

### 6

**6 (14)**
18:5;46:15;71:16;
77:21;80:4,8;81:7,10;
84:3;211:18;215:20;
216:21;274:4,5
**60 (2)**
203:8,9
**60130 (1)**
115:16

### 7

**7 (8)**
17:2;81:25;87:12,
15;162:25;230:21;
264:11;267:12
**70 (1)**
203:7
**73 (2)**
205:17,19
**74 (1)**
206:21
**773 (1)**
149:3

### 8

**8 (6)**
26:8;103:14,17;
197:4;258:1,3
**80 (1)**
207:13
**80s (5)**
134:14;135:17;
137:20;172:3;196:12
**82 (1)**
208:13
**83 (1)**
210:19
**83rd (1)**
119:3
**88 (2)**
9:14;210:25

### 9

**9 (24)**
17:17;49:16;60:23;
61:1;63:17;68:16;
71:12,13,23;72:1,4,7,
10;95:7;115:1,4,20;
181:13;185:11;
194:16;195:5,16;
199:22;216:22

**90 (5)**
190:19;211:18;
215:20;216:19,21
**90s (4)**
134:15;137:20;
172:3;196:13
**91 (4)**
216:15,16;217:4,8
**95 (3)**
105:22;106:7;
190:19

GONZALEZ 000783