**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

*Daniel Rodriguez v. City of Chicago, et al.,*
**Case No. 1:22-cv-06141**

**EXPERT REPORT OF THOMAS J. TIDERINGTON**
*August 08, 2025*

**INTRODUCTION**

I have been retained by attorneys representing Plaintiff Daniel Rodriguez. I was asked to assess two primary issues:

(1) whether there were deviations from generally accepted police practices in the investigation into the 1991 murder of Jose Hernandez, Jr., conducted by members of the Chicago Police Department; and

(2) whether the Chicago Police Department's policies and practices at the time—particularly those related to eyewitness identification procedures (photo arrays and lineups), documentation and notetaking, and the creation, preservation, and disclosure of investigative materials in homicide cases—were adequate and aligned with generally accepted policing standards nationwide.

I have reached conclusions on both issues.

Based on my review of the investigative materials, court records, and sworn testimony related to the Hernandez homicide, I conclude to a reasonable degree of professional certainty that the investigation conducted by Detectives Reynaldo Guevara, Ernest Halvorsen, and others grossly deviated from generally accepted police practices. Furthermore, it is more likely than not that in order to secure a prosecution and conviction of Daniel Rodriguez, the officers knowingly and intentionally suppressed exculpatory evidence, fabricated witness statements, and coerced a false confession.

Consistent with my conclusions, I note that Defendant Guevara has invoked his Fifth Amendment right when questioned about whether he manipulated eyewitnesses, fabricated evidence, and suppressed material favorable to Mr. Rodriguez's defense. In other words, he has not denied committing the serious misconduct that tainted this investigation.

Second, based on my review of Chicago Police Department's (CPD) policies and practices governing how information learned during homicide investigations was to be documented, stored and disclosed, as well as my review of numerous other documents and depositions and many dozens of homicide files and comparator criminal defense attorney files, it is my opinion to a

1

reasonable degree of professional certainty that CPD's policies and practices related to homicide file documentation, storage/preservation and disclosure were woefully inadequate, deviated substantially from accepted practices in other departments, and resulted in the routine failure to disclose documents and information to criminal defendants. The policies themselves were inadequate, they were routinely not followed, the practices that instead were followed did not result in the thorough and accurate documentation of homicide investigations and the investigative information learned, and ultimately resulted in the routine failure to disclose potentially exculpatory or impeaching documents and information to criminal defendants.

In conducting this analysis, I have drawn upon my 44 years of law enforcement experience, including my specialized knowledge in criminal investigations, police practices, and decades of law enforcement training. My conclusions are based on my review of the available case materials, including police reports, deposition transcripts, and relevant policies and procedures. The following report details my findings, grounded in recognized police protocols and practices. Attachments to this report include the following:

- Attachment A - Listing of testimony and publications.
- Attachment B - List of materials reviewed.
- Attachment C - My rate of compensation.
- Attachment D - Complete and detailed curriculum vitae.
- Attachment E - Spreadsheet of my data analysis in Reyes/Solache regarding 1995-1998 files.
- Attachment F - Spreadsheet of my data analysis in this case regarding 1991-1995 files.
- Attachment G- Michael Brasfield's expert report in *Fields v. City of Chicago.*
- Attachment H- Michael Brasfield's expert report in *Rivera v. City of Chicago.*

In addition, my opinions are corroborated by, and consistent with, my review of materials and evidence in preparing my expert reports in *Reyes/Solache v. City of Chicago*, *Thomas Sierra v. City of Chicago*, *Geraldo Iglesias v. City of Chicago, Demetrius Johnson v. City of Chicago,* and *Jose Maysonet v. City of Chicago*, cases in which defendants Guevara and Halvorsen were among the principal investigators.

Of course, if any new material is provided to me related to this matter or my opinions set forth in this report, I will consider it. I, therefore, reserve the right to amend my opinions and/or form additional opinions regarding this case upon disclosure to me of further information or documentation.

**SUMMARY OF QUALIFICATIONS**

For the past 44 years, including 20 years as Chief of Police (retired June 2022), I have served as a full-time law enforcement officer with three different police departments, and as a Group Supervisor for the United States Drug Enforcement Administration's South Florida Regional Task Force. I have trained over 10,000 federal, state, and local law enforcement officers on police practices and criminal investigations. For over 30 years, I have been an instructor at

numerous regional, national, and international law enforcement training events and have lectured on a wide variety of police practices and criminal investigations.

Over the last five years, I have been engaged as a criminal justice consultant, trainer, case reviewer, and expert witness in law enforcement-related matters. As a recently retired Police Chief of 20 plus years, I have reviewed and approved policies and procedures relating to every aspect of police operations, including criminal investigations, case development, report writing, maintenance and retention of police records, complaints against police officers, training, supervision, and employee discipline.

I am currently a member of the International Association of Chiefs of Police (IACP), a member of the Police Executive Research Forum (PERF), and a life member of the Michigan Association of Chiefs of Police (MACP). Throughout my law enforcement career, I have frequently worked and interacted with federal agencies such as the Federal Bureau of Investigation (FBI), the Department of Homeland Security Investigations (HSI), the Internal Revenue Service (IRS), the Secret Service, the United States Marshalls Service (USMS), the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), the Office of the Inspector General (DOJ-OIG), and the Drug Enforcement Administration (DEA). I have also worked cooperatively with numerous state and local police agencies, including the Chicago Police Department.

As a result of my many decades of working extensively with many federal, state, and local agencies, I am familiar with the many similarities of investigative methods and strategies, as well as nationally acceptable practices and protocols. I also have many years of extensive practical experience in investigating and supervising complex criminal investigations, including violent crimes and homicide investigations.

During my 44-plus year law enforcement career I have been responsible for the review and processing of hundreds of disciplinary actions up to and including suspensions and terminations. I also managed and supervised the accreditation process for both the Fort Lauderdale and Plymouth Township Police Departments. The accreditation process furthers an agency's professional development and ensures that its methods, policies, procedures, and daily operations follow the best practices or "professional standards" in the law enforcement arena. As a Police Chief for over twenty years, I have reviewed and approved policies and procedures of every kind, including (but not limited to) criminal investigations, retention and maintenance of police records, complaints against police officers, training, supervision, and discipline.

My role in presenting this report and any subsequent depositions and trial testimony is to assist the trier of facts in reaching its conclusions. The information that I relied on consists of the type of information that is reasonably relied upon in my field of expertise. All my opinions are rendered to a reasonable degree of professional certainty in the field of police practices, law enforcement training, administration, and discipline and are based upon my education, training, and employment as a law enforcement officer, as well as my work as a law enforcement trainer, and my experience as a consultant in the field. My qualifications are summarized in greater detail in my curriculum vitae, attached to this report.

A list of my court and deposition testimony in the last four years is attached to this report. I am

3

being compensated for my time at the rate of $375.00 per hour. My compensation is not contingent on the outcome of this litigation nor on the opinions I express in this report or subsequent court testimony.

**METHODOLOGY**

In this case, I applied the same rigorous methodology I have used throughout my law enforcement career when overseeing and evaluating the performance of investigators under my supervision and command. My supervisory experience in criminal investigations has always ensured that proper protocols are followed, evidence is collected and preserved accurately, and that all investigative actions are conducted with integrity and professionalism. Over the years, I have been responsible for identifying deficiencies in investigative procedures, ensuring compliance with legal and departmental standards, and providing guidance to detectives to correct and improve their work. My role required me to critically assess the completeness of investigations, including the documentation of witness statements, the preservation of physical evidence, and adherence to policies related to searches, interrogations, and evidence disclosure.

The method I used in reaching my conclusions in this case included a review of materials provided by Plaintiff's counsel and vetted against what I have come to know through my years of specialized education, training, and experience as generally accepted practices in the field of law enforcement. These standards have also been established in model policies promulgated by professional organizations such as the International Association of Chiefs of Police (IACP)[1], and the Commission on Accreditation for Law Enforcement (CALEA)[2]. These practices have also been consistently reinforced by research-based organizations such as the Police Executive Research Forum (PERF). Lastly, these practices have often times been vetted through our courts as evidenced by innumerable United States Supreme Court decisions, some of which are cited within this report. I mention these important court decisions not to invade the province of the fact finder but because these decisions provide the guiding principles on which law enforcement policy and practices are based.

There is a substantial body of knowledge and literature about the practices and standards that modern, reasonably managed, and administered police agencies across the United States should follow and apply to their operations. These generally accepted practices have developed over time to encourage and assist police agencies in delivering police services to communities that are

---

[1] IACP-The International Association of Chiefs of Police (IACP) is the world's largest and most influential professional association for police leaders. With more than 32,000 members in over 170 countries, the IACP is a recognized leader in global policing, committed to advancing safer communities through thoughtful, progressive police leadership. Since 1893, the association has been serving communities by speaking out on behalf of law enforcement and advancing leadership and professionalism in policing worldwide.

[2] CALEA-The Commission on Accreditation for Law Enforcement Agencies, Inc. (CALEA®), was created in 1979 as a credentialing authority through the joint efforts of law enforcement's major executive associations: International Association of Chiefs of Police (IACP), National Organization of Black Law Enforcement Executives (NOBLE), National Sheriffs' Association (NSA), Police Executive Research Forum (PERF). The CALEA Accreditation programs provide public safety agencies with an opportunity to voluntarily meet an established set of professional standards.

professional, reasonable, effective, and legal. Many of these generally accepted practices have been developed from law enforcement's critical analysis of field incidents and examinations of incidents reported to cause police liability, deficiencies, and employee misconduct.

My opinions in this report may include terminology resembling legal terms or standards. The use of such terms is not intended to draw legal conclusions, undermine the court's role, or improperly influence the trier of fact. Instead, terms such as "reasonable," "reckless," "negligent," "unreasonable," "foreseeable," "excessive," "deliberate indifference," and "gross deviation" are commonly used in my field of expertise and are integral to law enforcement practices. These terms are not only part of my professional vocabulary as a former Police Chief, but are also embedded in police department policies and procedures. Throughout my career, I have routinely used these terms when training, supervising, and communicating with law enforcement personnel. These concepts are fundamental to evaluating officer conduct and decision-making in the field. For example, assessing whether an officer's actions were "reasonable" or whether a particular outcome was "foreseeable" is critical when determining compliance with departmental policies or when evaluating use-of-force incidents. Therefore, while these terms may resemble legal language, they are deeply rooted in the practical application of police work and are essential to my professional assessment of investigative practices. Such terminology is common in my field and reflects my assessment of the officers' actions relative to accepted police practices. Any legal determination remains the responsibility of the court and factfinders.

My analysis and report avoids determining the credibility of the various parties and witnesses, or choosing between disputed accounts, as that is outside the purview of my work and remains within the province of the fact finder. Additionally, my opinions are provided to educate the jury on generally accepted police practices and procedures.

My opinions are interspersed throughout this report and extend beyond the explicitly identified opinions. Excerpts extracted from reports contained within the case file, which are referenced in this report, are indicated in *italics*.

## SUMMARY OF FACTS

This summary of facts relevant to the homicide investigation is derived from various written documents and other materials, as outlined in Attachment B - List of Materials Reviewed. This summary is not an exhaustive account of all the facts relevant to this matter. Rather, it is only intended to provide the reader with sufficient context for the remainder of this report. Without attempting a comprehensive recitation, but rather to give a brief summary of the matter sufficient to allow the reader to place the rest of this report in context, the following is provided:

### The Crime and the Investigation:

On March 17, 1991, in the early morning hours, Jose Hernandez, Jr., was fatally shot in the neck while inside his vehicle near 4152 W. North Avenue. Following the shooting, Mr. Hernandez's vehicle crashed into a parked car, and he succumbed to his injuries. Initial observations by police from the scene indicated that at least one witness (Delbert McCullum) saw two vehicles

departing westbound on North Avenue. Importantly, no witnesses at the scene provided descriptions of the shooter or the driver of the fleeing vehicles. No description of the fleeing vehicles is documented either, although initial responding officers "toured area with witness looking for offenders vehicle."[3]

Initial investigative leads pursued by Detectives O'Shea and Holec on March 17 led to the identification of two potential suspects, Raymond Navarro and Juan Sepulveda.[4]

Ulisses Arroyo, the owner of a TacoNazo restaurant very near to the location of the shooting, reported to an Officer Jambrosek that minutes before the shooting Arroyo had approached several individuals who were loitering at his restaurant and asked them to leave, at which point one of them stated he had a gun. After seeing emergency vehicles arrive after the shooting, Arroyo went outside and informed Officer Jambrosek that he saw the same individual who stated he had a gun standing nearby. The individual identified himself to Officer Jambrosek as Raymond Navarro. Initial follow-up with Arroyo by Detectives Guevara and Fleming led to the identification of Juan Sepulveda as another suspect who Arroyo identified as someone he believed had a gun in his pocket and had been walking in and out of the restaurant nervously shortly before the shooting.[5] Documentation indicates that Detectives Guevara and Fleming conducted some limited investigation into Navarro and Sepulveda over the next few days, which did not eliminate either individual as a suspect. But there is no documentation of any further follow-up on these leads over the ensuing weeks and months.

Almost two months after the shooting, George Laureano ("Fro") and Daniel Rodriguez were formally charged with murder. The basis for their arrests appears to be based primarily on a written statement obtained from Jason Rivera on May 9, 1991, during an interrogation conducted by Detectives Guevara and Halvorsen. The following day, May 10, David Velasquez signed a written statement implicating Rodriguez and Laureano, also in the presence of Detective Halvorsen and Guevara.[6] On May 11, 1991, Rodriguez provided a court-reported statement, again while in the custody of Detectives Halvorsen and Guevara. Laureano was not arrested until November, following the issuance of a warrant. He did not give any statement implicating himself and requested to speak to a lawyer.[7]

---

[3] General Offense Case Report, RFC-DRodriguez at 211.
[4] Investigative File, RFC-DRodriguez at 181-192, 207.
[5] March 17 Supplementary Report, 181-183.
[6] May 10 Supplementary Report, RFC-DRodriguez at 163-67.
[7] November 20 Supplementary Report, RFC-DRodriguez at 103.

**Key Statements and Witnesses**:

Jason Rivera's Statement (May 9, 1991):

Jason Rivera's statement appears to have been handwritten by Assistant State's Attorney Patrick Walsh and witnessed by Detectives Reynaldo Guevara and Ernest Halvorsen. However, there is a complete absence of documentation regarding what occurred prior to ASA Walsh's involvement, including whether Rivera was questioned, how long he was in custody, or whether any prior statements or discussions took place with detectives.

Based on my decades of law enforcement training and experience and having reviewed numerous homicide investigations conducted by the Chicago Police Department, this lack of documentation is not an isolated oversight; it reflects a broader, systemic failure in the Department's investigative standards and practices. In many of the CPD homicide cases I have reviewed, suspects or witnesses were subjected to hours of interrogation and psychological pressure long before the arrival of an Assistant State's Attorney. Yet these pre-ASA interactions are routinely undocumented, with no notes, no audio or video recordings, and no formal or detailed accounting of what was said prior to the ASA's interview of the suspect.

This practice is deeply problematic. It creates a significant gap in the investigative record, obscures the conditions under which statements were made, and prevents meaningful oversight or assessment of whether coercion, promises, threats, or improper techniques were used to obtain information. From a police best practices standpoint, any time a suspect or key witness is questioned, particularly in a homicide case, there should be clear and contemporaneous documentation of when the interview began, who was present, what was discussed, and the method by which any statement was obtained.

The failure to document these critical interactions violates accepted norms of professional police work and compromises the integrity of the case. In effect, it leaves the door open for potential abuse, suppresses the ability to assess voluntariness or reliability, and contributes to a pattern that I have repeatedly observed in CPD cases, one where statements appear to be cleanly formalized in front of an ASA, but the events leading up to that moment are a "black box". This lack of transparency is not only contrary to modern investigative standards but also undermines public trust in law enforcement and the criminal justice process.

- o Detective Halvorsen testified that on April 29, 1991, he and Detective Guevara stopped a blue 1983 Toyota Corolla, and the driver identified himself as Daniel Rodriguez, but they let him go. Almost two weeks later, the detectives showed a picture of Rodriguez to Rivera, who then identified Rodriguez, leading to Rivera's May written statement.

- o Rivera provided a written statement in the presence of Detectives Guevara and Halvorsen. According to police, Rivera had allegedly first told Halvorsen that he witnessed Junito's shooting and implicated Fro and Rodriguez on March 25, 1991, eight days after the incident, while preparing for a different Grand Jury case. However, the

7

investigative files do not contain any documented statements, notes, or reports from either the initial claim or the follow-up three days later. No documentation of this statement exists within the police files for the Hernandez murder case.

- o Rivera's May 9th statement, along with Velasquez's the next day, indicated they were at Taco Nazo Restaurant and saw Junito park. They then observed Rodriguez and Fro arrive in what Velasquez described as Fro's 1983 blue Toyota Corolla, with Rodriguez driving.

- o Rivera claimed Rodriguez and Fro parked for 15 minutes before approaching Junito's car as he started to leave. The statements allege that Fro leaned out the passenger side and shot at Junito's car, after which Junito's passenger fled, and Rodriguez and Fro pursued them.

Plaintiff alleges that Rivera was not merely a witness in the Cortes case. Instead, he was an uncharged co-conspirator in the violent double murder at issue in that case.[8] Rivera helped Cortes sell stolen goods he obtained from the robbery and murder of the victims, including facilitating the sale of the murder weapon.[9] In fact, there is evidence that it was Rivera, not Cortes, who was responsible for the murders at issue in that case.[10] Although there is reference in the police file and in Halvorsen's trial testimony to Rivera participating in grand jury proceedings in another matter, the Police Officer Defendants did not disclose Rivera's potential involvement in a conspiracy to commit double murder at any point during the investigation or prosecution of Plaintiff's criminal case. Notably, according to Rivera and Halvorsen, Rivera simply volunteered the information about Laureano and Rodriguez's involvement in the Hernandez shooting, unprompted.[11] As discussed below, Rivera's incentives to cooperate with police given his own legal jeopardy highlights the importance of making attempts to test the veracity of Rivera's claims, given that he was a potentially compromised witness with ulterior motives for providing information to investigators.

Furthermore, it is also alleged that Rivera's mother, Alicia Velez (Rivera), was an employee of the Chicago Police Department and that Velez was in a sexual relationship with Defendant Guevara at the time Rivera adopted the Police Officer Defendants' false statement as his own.[12] There appears to be substantial corroboration of this relationship in the record, and further, that Rivera was used as a witness by Guevara on multiple occasions.[13] Other than a passing reference in Rivera's trial testimony to the fact that Rivera's mother worked at the police station with Halvorsen, the Police Officer Defendants did not disclose Rivera's or his mother's

---

[8] Post-Conviction Petition of Daniel Rodriguez, D. Rodriguez at 3973-74.

[9] E.g., Supreme Court of Illinois decision summarizing evidence, D. Rodriguez at 2945-2964.

[10] Affidavit of Raul Burgos, D. Rodriguez at 3262.

[11] People v. Daniel Rodriguez. Trial Record at D. Rodriguez at 005032.

[12] Post-Conviction Petition of Daniel Rodriguez, D. Rodriguez at 3973-74, 3975.

[13] Affidavit of David Velasquez (June 5, 2020); Testimony of G. Laureano in Almodovar-Negron Post-Conviction at D. Rodriguez 1258 (sexual relationship between Guevara and Alicia), 1263 (Jason Rivera testified for Guevara in at least three cases); Testimony of Jason Rivera in Almodovar-Negron Post-Conviction, at D. Rodriguez 1682-83 (admitting his mother worked at Grand and Central).

relationship with Guevara at any point during the investigation or prosecution of Plaintiff's criminal case.

David Velasquez's Statement (May 10, 1991):

- On May 10, 1991, approximately 24 hours after Jason Rivera's statement, David Velasquez signed a written statement in the presence of Detective Halvorsen that implicated Daniel Rodriguez in the murder of Junito. While this statement reportedly aligned with Rivera's account regarding the events at Taco Nazo, Velasquez later asserted that this statement was false and a product of coercion.
- Velasquez testified at both the criminal trials of Laureano and Rodriguez that Detectives Reynaldo Guevara and his partner (Halvorsen) coerced him to sign this false statement in May 1991. Velasquez repeatedly told the detectives that he did not witness Junito's murder and was not with Jason Rivera at the Taco Nazo when Junito was shot, stating he had no personal knowledge of who killed Junito. However, the detectives insisted that he did witness it and claimed that Jason Rivera had stated Velasquez was with him. He has repeated that testimony in post-conviction proceedings, affidavits and civil deposition testimony, including in this matter.
- Velasquez has repeatedly described being physically and psychologically coerced by Guevara and his partner until he agreed to sign the statement. Specifically, Guevara threatened to "pin a murder" on him if he did not comply. Velasquez further stated that Guevara "told me what to say to the State's Attorney. I did what I was told because I was scared."[14]
- After signing this coerced statement in May 1991, Velasquez stated that Jason Rivera and his mother continued to pressure him to testify against George Laureano and Daniel Rodriguez, telling him he "needed to go along with my statement." Velasquez affirmed that "They both knew it was a lie. I told them many times I would not because it was a lie." Detective Guevara also continued to visit Velasquez's home after the statement, insisting that he testify consistently with the false statement. Velasquez explicitly stated in his affidavit that Jason Rivera's testimony claiming Velasquez was with him and witnessed the murder "is not true." He also states that he would go to Rivera's home and observed that Guevara and Rivera's mother Alicia were in a "romantic relationship."[15]

Daniel Rodriguez's Statement (May 11, 1991):

- A day after Velasquez's statement, Daniel Rodriguez was interrogated by Guevara and Halvorsen, and then gave a court-reported statement in the presence of Detective Halvorsen. In this statement, Rodriguez claimed he and Fro saw Junito, whom they knew to be in a rival gang, park in their territory. Fro then told Rodriguez he wanted to get a gun, so they stopped to obtain one. Fro subsequently instructed Rodriguez to drive by Junito's location, and Fro shot at him, after which Rodriguez drove away. Rodriguez's statement did not mention a passenger escaping or a chase.

---

[14] Affidavit of David Velasquez, D. Rodriguez at 1008.
[15] Affidavit of David Velasquez, D. Rodriguez at 1008-1009.

- o Rodriguez testified at his criminal trial that he is innocent, and that his court-reported statement was false and the result of improper coercion. He testified that he was subjected to physical and psychological abuse, threats, and other ploys to overcome his will. He also testified that he was fed the facts of the crime by Guevara and Halvorsen.
- o Rodriguez has repeated his claims of innocence, and that the court-reported statement is false, multiple times since, including in his civil deposition in this matter.

There are no contemporaneous notes of the interrogations of Daniel Rodriguez, detailing how many times Guevara and/or Halvorsen interrogated him, how long those interactions lasted, what time they occurred, who was present for those sessions, when Rodriguez was permitted to sleep or provided food, or what he said during each interaction. I also note that the detectives had the ability to audio- or video-record their interviews with Rivera and the other witnesses and chose not to do so. By 1991, based on my extensive investigative experience, many police agencies, particularly those handling serious investigations such as homicide, had already adopted policies or informal practices of recording suspect and witness statements, to preserve the integrity of the process. Recording is widely recognized as a tool that enhances accountability, ensures transparency, and allows courts, prosecutors, and defense counsel to assess the voluntariness and reliability of statements. Based on my decades of law enforcement experience, both in the field and as a police trainer, I have consistently emphasized to officers that witness and suspect statements are among the most critical forms of evidence in any criminal investigation. As such, they must be carefully collected, preserved, and documented with the same level of care and rigor as physical evidence like fingerprints, firearms, or DNA.

The failure to document pre-ASA interactions and the decision not to record the interview in any form, including even contemporaneously documenting each interview and interaction with the witnesses or suspects, represent significant departures from what would be expected of a reasonable and properly trained homicide investigator—even under the standards that existed at the time. These omissions contribute to a broader pattern of investigative irregularities that compromise the credibility of the statement itself and the overall integrity of the investigation.

**The Arrest and Post Incident Investigation:**

George Laureano was arrested in November 1991 after a warrant was issued. He did not provide any statement implicating himself, or Rodriguez. He was charged based on the prior statements taken from Rivera, Velasquez and Rodriguez.

Laureano was tried first. Laureano had never confessed to the crime, Velasquez testified that his statement against Laureano was false and the product of coercion, and Rivera refused to appear to testify. Laureano's resulted in a directed verdict in his favor.

By the time of Rodriguez's trial, Rivera had been arrested and held in contempt, and testified that his statement against Rodriguez (and Laureano) was true. Rodriguez's confession statement was admitted against him and he testified that it was the production of abuse and coercion. Velasquez testified again that his statement implicating Rodriguez was false and the production of abuse and coercion. Rodriguez's trial ended in a conviction.

10

In 2022, Rodriguez's conviction was vacated, and all charges against him were dismissed. He was later awarded a Certificate of Innocence from the State of Illinois.

**Allegations of Police Misconduct During Investigation:**

**Coercion of David Velasquez:**

David Velasquez has consistently maintained that Detectives Reynaldo Guevara and Ernest Halvorsen coerced him into signing a false statement implicating George Laureano and Daniel Rodriguez in the shooting. Velasquez stated unequivocally that he was not present at the scene of the homicide and that the contents of his statement were fabricated under duress. He testified that Detectives Guevara and Halvorsen took him into rival gang territory, threatened to pin a murder on him, and made it clear that cooperating with their version of events was the only way to avoid further consequences. Compounding the pressure, Velasquez recalled that Jason Rivera told him at the station that he had to "go with the program."

If the jury credits Velasquez's account, and there is ample basis for doing so given his consistent testimony over the years and Guevara's refusal to deny those allegations, this would represent a serious and fundamental violation of generally accepted police practices and standards. In the post-conviction hearing for Arturo Reyes and Gabriel Solache (another civil case in which I have offered opinions that Guevara and his Area 5 colleagues failed to follow accepted police practices), Velasquez testified before Judge Obbish of the Cook County Circuit Court, after which Judge Obbish issued a ruling finding Velasquez's testimony about the threats and abuse he suffered to be credible.[16] Coercing a witness, particularly a teenager at the time, into making a false statement not only jeopardizes the integrity of the investigation but also increases the risk of convicting the wrong person and allowing the true perpetrator to go free.

Based on my decades of law enforcement experience and supervisory oversight of major criminal investigations, I can state with confidence that coercive tactics of this nature, especially threats of criminal charges or physical harm, are absolutely prohibited under any legitimate departmental policy or training. Police officers are trained to elicit voluntary, truthful statements through lawful and ethical means. Any statement obtained through intimidation, deception, or coercion undermines its reliability and violates both the constitutional rights of the individual and the integrity of the criminal justice process.

Moreover, such conduct, reflects not a momentary lapse in judgment but a systemic failure in supervision, accountability, and investigative culture.

**Coercion of Daniel Rodriguez:**

Rodriguez testified in his own defense, insisting on his innocence and providing an alibi for the time of the shooting. He detailed physical and psychological abuse by Guevara and Halvorsen to extract his confession, including Halvorsen hitting him in the chest and both detectives coaching him on what to say. Rodriguez introduced photographs, allegedly showing faint bruising, as

---

[16] Obbish Ruling in Reyes-Solache, D. Rodriguez at 628-629.

evidence of the abuse.[17] Again, if the jury credits Rodriguez's account, and there is ample basis for doing so given his consistent testimony over the years and Guevara's refusal to deny those allegations, this would represent a serious and fundamental violation of generally accepted police practices and standards.

**Jason Rivera's Shifting Accounts and Undisclosed Information:**

On April 15, 1992, Laureano's attorney, Lisa Brean, interviewed Jason Rivera, during which Rivera disclaimed his prior statement, denying he witnessed the murder and claiming he was incarcerated at the time. He even stated that a supervisor at Gateway showed officers and the assistant state's attorney paperwork proving his alibi. A written summary of this interview, signed by Jason Rivera, is contained in CPD's investigative file for this matter.[18]

- o Rivera refused to appear to testify at Laureano's criminal trial, at which Laureano was acquitted. A contempt citation had issued but Rivera was not arrested until December 1992 (after Laureano's acquittal). After being held in witness protection for two-and-a-half months, Rivera again changed his story, recanting his recantation and insisting he and Velasquez witnessed the shooting. He claimed he initially recanted only because Fro's aunt, Jo-Anne Garcia, pressured and coerced him. However, Jo-Anne Garcia has submitted a sworn statement indicating that she is not Fro's aunt and never threatened or persuaded Rivera.[19]

- o It was later discovered that the State paid Rivera $1,350 in cash on March 5, 1993, while Rodriguez's bench trial was ongoing, for his agreement to testify. An additional $1,000 was paid on October 5, 1993, after Rodriguez's conviction and during his direct appeal. These payments were not disclosed to Rodriguez or his counsel.[20]

- o Further new evidence revealed that Rivera was an uncharged co-conspirator in a separate double murder (the Gama brothers murder) investigated by Guevara and Halvorsen around the same time he implicated Rodriguez. Rivera reportedly helped sell proceeds from this double murder and facilitated a sale of the murder weapon. Some evidence suggests Rivera and Alex Torres, not Juan Cortes, were the perpetrators of the Gama murders.[21]

- o Additionally, as discussed above, it was discovered that Rivera's mother, Alicia Velez (Rivera), an employee of the Chicago Police Department, was in a sexual relationship with Detective Guevara at the time Rivera became the key witness against Rodriguez. This relationship was not disclosed to Rodriguez. David

---

[17] Trial Testimony of Daniel Rodriguez, D. Rodriguez at 5207-08.
[18] Investigative File, RFC-DRodriguez at 67.
[19] Affidavit of Jo-Anne Garcia, D. Rodriguez at 1660-1661.
[20] D. Rodriguez 1533-1534, D. Rodriguez at 1365-1366.
[21] Affidavits of Raul Burgos, Juan David Carasquillo and Luis Sosa, D. Rodriguez at 1537-1538, 1562-1563, 1658.

Velasquez swore that Rivera and his mother pressured him to maintain his false statement for trial.

- o Finally, as Rivera admitted at trial, at the time he signed a statement against Rodriguez and Laureano, his brother, Jose "Tito" Rivera was charged with a separate homicide.[22] Laureano testified at his deposition that Rivera's mother, Alicia Velez, told Laureano that Guevara had arrested Tito for murder even though they were in a romantic relationship, and she blamed Laureano and Rodriguez, and so if that happened then she would ensure Rodriguez and Laureano also went down for murder.[23] I note that I have reviewed an investigative for the October 1990 murder of Joseph Santorelli in which Jose "Tito" Rivera was indeed charged with the murder in which Guevara was heavily involved.[24] This places Guevara's relationship with Alicia Velez at the center of the motivations arounds Jason Rivera's purported statements implicating Rodriguez and Laureano.

**Detectives Guevara and Halvorsen's Refusal to Testify:** Both Guevara and Halvorsen invoked their Fifth Amendment right on every question asked about their conduct. Halvorsen is now deceased. It is particularly troubling, and highly unusual based on my decades of law enforcement experience, for Detectives Guevara and Halvorsen to have refused to answer questions about their conduct during the investigation. Law enforcement officers are not only expected but required to cooperate in legal proceedings, especially when called to testify about their official duties. The refusal to testify, particularly when invoking the Fifth Amendment, signals that the officers themselves recognize that their conduct may have been improper or unlawful. This is not a routine or acceptable position for police officers to take.

In my professional experience, officers who act within the bounds of the law, who follow protocol, and who have nothing to hide, readily provide sworn testimony regarding their investigative steps. When officers avoid such testimony, particularly when they are central figures in a contested case, it raises immediate red flags and casts doubt on the validity of the investigation and the prosecution that followed. This silence signals a breakdown in the ethical responsibilities that come with the badge and points to a culture of impunity that tolerates or conceals wrongdoing rather than confronting it. In cases like this, the impact is not just procedural, it can be life-altering for those wrongfully accused or convicted based on tainted investigations.

### I. Investigative Tunnel Vision and Failure to Follow Alternate Leads

Taken together, the investigation in this case reflects a pattern of tunnel vision, failure to pursue alternate leads, selective documentation, and inadequate corroboration. These are all significant

---

[22] Rivera Trial Testimony, D. Rodriguez at 5040.

[23] Laureano *Rodriguez* Deposition at 41-44.

[24] Investigative File for RD N-475910, RFC-Bouto 93628. See closing report and other documents referencing Jose Rivera's nickname of Tito, and Guevara's central role in obtaining the evidence against him. RFC-Bouto 93650-53, 93656-59. It appears Tito was found not guilty at trial on Decem8er 23, 1991. RFC-Bouto 93642.

deviations from generally accepted police practices and professional standards for homicide investigations. The investigative approach was not only flawed but inconsistent with investigative basic principles and evidentiary standards that officers are trained to uphold.

Based on my decades of law enforcement training and experience including my tenure as a Police Chief, police instructor, and supervisor of major criminal investigations, I know that competent investigators are trained to remain neutral, document all investigative actions in real time, and rigorously test the reliability of witness statements through corroboration and comparison with physical and testimonial evidence. Officers are also trained to identify and eliminate alternative suspects through proactive investigative steps, and to document those efforts clearly. Failing to do so increases the likelihood of wrongful arrests and prosecutions.

In this case, the failure to explore alternate suspects, disregard for exculpatory alibi evidence, absence of standard witness identification procedures, and lack of documentation surrounding critical leads all point to an investigation driven more by a rush to close the case than a commitment to uncovering the truth. These investigative shortcomings, when considered collectively, represent a clear and serious departure from the standards and practices that define professional and constitutionally sound police work.

Early in the investigation, there were promising leads implicating alternate suspects, including individuals named Navarro and Sepulveda. Taco Nazo restaurant owner Ulisses Arroyo reportedly identified Navarro as someone present at the scene shortly before the shooting, having heard him discuss possessing a firearm. Despite this potentially significant tip, detectives conducted no meaningful follow-up. A later photographic array was supposedly shown to Arroyo containing Navarro, during which Arroyo could not identify Navarro, but the vague and bizarre documentation surrounding that procedure raises more concerns than it resolves.[25]

First, why was a photo array containing Navarro being shown to Arroyo at all, when he had already identified Navarro in person at the scene? There is no documentation explaining this unusual investigative choice. Second, apparently after not selecting Navarro, Arroyo selected an individual named Jaun Sepulveda, who was then treated as a suspect and questioned. But the circumstances of the identification of Sepulveda are lacking: was he included in the photo array shown to Arroyo, and if so why? Clearly, given that he was supposedly questioned based on the identification in a photo array, he was treated as a suspect (rather than a filler identification), so then what was the basis on which Sepulveda had been deemed a potential suspect such that he was included in the photo array? Who else was included in the photo array as a suspect, or potential suspect? Third, where is the photo array, which supposedly included a positive identification of a potential suspect? It is not contained in the investigative file or inventory in that file, and is not referenced anywhere in the record made available to me. Overall, it would appear this apparent photo array procedure with Arroyo involving a photo of Navarro was an attempt to discredit Arroyo's initial identification. I also note that the officer who supposedly assisted in locating Navarro was Joseph Miedzianowksi, an infamous CPD gang crimes officer who is currently serving a life sentence in federal prison for running a criminal enterprise in which he used the power of his badge to play gangs, and gang members, off one another— protecting those who worked with him or were in his good graces, and threatening or framing

---

[25] March 17 Supplementary Report, RFC-DRodriguez at 183.

those who were not. I discuss Miedzianowski and his involvement with Guevara and other Area 5 detectives further below.

Next, the purported interview of Navarro is sparse at best, and apparently false by admission. According to the report of Guevara and Fleming, Navarro said he "did arrive home until after this incident." This critical sentence in an official typed report makes no sense. It would appear that there is a typo, and the sentence is meant to indicate that he did NOT arrive home until after the shooting, and Fleming testified to this error in his deposition.[26] This would indicate an *admission* that he was not home and could have committed the crime. But nothing in the report indicates what he said to the obvious follow-up questions: Where was he? Who was he with? What was he doing? What proof does he have of any of this? On the other hand, if the sentence is intended to communicate that he was home at the time of the crime, similar follow-up about when he arrived, who he had been with beforehand, who observed him return home, would all be critical follow-up. None of it is in the report. There is no GPR reflecting any contemporaneous notes of an interview of Navarro. Despite all of the obvious failings of the report and lack of supporting notes, Sergeant Mingey approved the report. Mingey even admitted at his deposition that he never verified the information in a report before approving it, a shocking admission about the failure to engage in basic supervisory safeguards as part of a homicide investigation.[27]

Ultimately, however one reads the report, Navarro clearly was not eliminated as a suspect under any standard or accepted police practice.

Similarly, Sepulveda was apparently briefly interviewed and released after simply denying involvement. Again, the report of this purported interview is sparse, with no documentation of obvious follow-up questions, and no contemporaneous notes of the interview of this suspect. As with Navarro, no effort was made to corroborate or challenge his account through additional investigative steps such as witness follow-up, forensic inquiries, or surveillance review which falls well short of accepted investigative standards. As with Navarro, by no applicable standard or accepted police practice was Sepulveda eliminated as a suspect. Like Mingey, Sergeant Epplen simply approved the report of the interview of Sepulveda despite the woefully inadequate documentation of that interview.

I note that Sergeant Epplen acknowledged at his deposition that based on the reports of the interviews of Navarro and Sepulveda, neither of them had been eliminated as suspects, and he would expect additional follow-up to have been done to follow up on those leads, including going back to initial scene witnesses like Delbert McCullum to show photos of the two suspects, or to try to obtain identifications of their vehicles.[28] Yet, the investigative file contains absolutely no additional documentation of any further investigative efforts involving Navarro or Sepulveda for the remaining 6-7 weeks of the investigation.

Finally, the inventory sheet lists photos of Raymond Navarro as being included in the investigative file (inventory #7&9),[29] but these photos are not contained in the investigative file

---

[26] Michael Fleming *Rodriguez* Deposition at 61.
[27] Edward Mingey *Rodriguez* Deposition at 60-61.
[28] Lee Epplen *Rodriguez* Deposition at 219-222; 229-236
[29] Inventory, RFC-DRodriguez at 41.

15

or RD file provided to me. I also do not see an evidence report or crime scene processing report indicating that the photos of Navarro were placed into evidence. In addition, the supplementary report references a photo array shown to Arroyo, but there is no photo array listed in the inventory, or listed on an inventory report entering it into evidence. Likewise, Arroyo supposedly identified Sepulveda, but there are no photos of Sepulveda in the investigative file or RD file, or even listed on an evidence report. All of this is unexplained in the records and testimony I have reviewed, and deviates from accepted police practices.

So, no efforts to pursue these leads to completion are present in the file, but by contrast, once Rivera implicated Rodriguez and Laureano, detectives made no apparent attempt to independently verify his claims. In other words, it would appear the detectives had their chosen suspects, Laureano and Rodriguez, and they would ignore any evidence pointing to their innocence, or to the guilt of anyone else. For instance:

- They never presented Arroyo with a photo array that included Rodriguez or Laureano, despite Arroyo having just seen the likely perpetrators minutes before the shooting.
- No known effort was made to determine whether Delbert McCullum or other eyewitnesses could identify the alleged getaway vehicle a blue Toyota Corolla.
- Detectives failed to locate or interview *"Spookie,"* the individual who supplied the murder weapon according to Rodriguez's court-reported statement.
- No search warrants were issued to search the homes or vehicles of Rodriguez, Laureano, or Spookie for the gun used in the crime.
- The Toyota Corolla believed to have been used in the crime was brought to Area 5 and photographed, but there is no evidence that any effort was made to search the vehicle for evidence that would corroborate (or undermine) the claim that Laureano fired from the vehicle as a passenger. For example, there is no evidence they searched the vehicle for weapons, casings, or any other evidence such as gunshot residue that might support the claim that the perpetrator fired out of that vehicle; or, any evidence that they did fingerprint testing to see if there is evidence that Laureano was seated in the car somewhere other than the driver's seat.

Additional corroborative steps that any reasonable and properly trained investigator would be expected to undertake were similarly overlooked. For instance, if Jason Rivera and David Velasquez had truly witnessed the shooting after walking out of the Taco Nazo restaurant, investigators should have taken immediate steps to verify their presence there. This could have included interviewing or showing photos of Rivera and Velasquez to Mr. Arroyo, the restaurant owner, or attempting to obtain surveillance footage from the scene. Yet, there is no documentation of any such effort in the investigative file.

This absence of documentation leads to one of two conclusions: either the officers did, in fact, follow up with Mr. Arroyo and failed to properly record and preserve the results of that investigative action, or they failed to follow up with him at all. Either scenario constitutes a serious violation of generally accepted police practices. Law enforcement officers are trained to clearly and thoroughly document all investigative steps, especially those that pertain to corroborating and documenting key witness accounts. The lack of such documentation undermines the integrity of the investigation and raises significant concerns about the objectivity

16

and thoroughness of the detectives' efforts in this case.

Rodriguez's alibi, which was corroborated by Gloria Rojas and other family members, was likewise ignored, with no indication that investigators attempted to test or disprove it.

The importance of these steps is particularly critical in a case like this one, where the entire focus on Rodriguez and Laureano, according to the detectives, began with a statement from Jason Rivera implicating them. By the detectives' own account, Jason Rivera was appearing before a grand jury in another matter, already cooperating with the detectives. According to Halvorsen's trial testimony, Rivera voluntarily offered the information about this other unrelated case without any prompting, which would raise suspicions about his motives. Halvorsen and Guevara would have understood those motives, given that he was apparently a co-conspirator in the Gama double murder case in which he was apparently cooperating. Evidence later learned about Rivera and his mother's relationship to Guevara, his testimony for Guevara in at least three cases, further calls into question his motives. So does the fact that he only testified at the criminal trial and in later post-conviction testimony in 2016 after receiving monetary payments in the thousands of dollars. This is all discussed above. What it demonstrates is that there are a number of reasons that witnesses might lie, especially Jason Rivera. That is why it is critical that detectives, as part of generally accepted police practices, make efforts to independently corroborate and verify even evidence that might implicate a suspect and provide a pathway to closing a case. The goal of an investigator is not to close a case, it is to get to the truth wherever it may lead.

Taken together, these failures reveal a pattern of tunnel vision and confirmation bias. Investigators did not meaningfully evaluate alternate theories or test the credibility of their key witness accounts. Such conduct represents a significant deviation from the standards and protocols expected in a professional homicide investigation.

## II. Inadequate Documentation and Selective Recordkeeping

Accurate contemporaneous note-taking and timely documentation of investigative steps are critical components of a competent investigation. The recordkeeping in this case falls far short of professional standards.

The police reports in this case reflect fundamental flaws in documentation and adherence to widely accepted policing standards, a problem often observed in similar (and numerous) Chicago Police Department (CPD) homicide investigations that I have reviewed involving many of the same officers.

There is no supplementary canvass report in the investigative file. There are some handwritten GPRs indicating that some additional witnesses were interviewed, but there is no typed report of these interviews as I would expect to see, both as a matter of accepted police practice and as I typically see in CPD homicide files. Even looking at the GPRs from the scene, only one witness has an address (Raul Ramos @ 1637 W Kedvale) that indicates he lived in the immediate area

17

and could have been part of a canvass.[30] Did the detectives ever conduct a canvass of the immediate area? If they did not, that would be a deviation of accepted police practices. If they did, the record indicates there were multiple gang members/people at the scene, and building with windows all around, but no documentation of conversations with those witnesses or even attempts to talk to them. If this was done, then either adequate documentation was not created, or it was created and never disclosed.

The report memorializing Jason Rivera's supposed statement from March 25, implicating Laureano and "Don Juan" (Rodriguez), was not generated until May 10, nearly six weeks later. This delay is highly irregular, particularly in a homicide case. Under generally accepted police practices, a statement like the one attributed to Rivera on March 25—implicating two specific individuals familiar to the witness in a murder—should have been promptly documented. In addition, there is additional follow-on documentation I would expect to see, such as the following: immediate attempts by Guevara and Halvorsen to locate Laureano and Rodriguez, or by other detectives assisting in the investigation if Guevara and Halvorsen were on leave, vacation or otherwise unavailable; stop orders, holds, warrants or other efforts to communicate to patrol officers and others that there was a pressing need to question Rodriguez and Laureano. The point is, these types of steps should be documented, even if they fail, and prompt pursuit of two men suspected of murder is absolutely expected. Here, there is no documentation of any of these things. The earliest record of any attempt to

In addition, according to the May 10 report, Detectives Guevara and Halvorsen wrote the narrative of the statement they obtained from Jason Rivera back on March 25, 1991 entirely from memory. There are no notes, recordings, or reports made contemporaneously with Rivera's alleged statement, a concerning lapse in protocol. This is acknowledged by Sergeant Epplen in his deposition.[31]

Similarly, as discussed above, there are no notes or documentation of interviews or interrogations of Rodriguez, Laureano, or Velazquez that reflect any initial denials, demeanor, or responses to questioning. The same is true for alternate suspects Navarro and Sepulveda—typed reports exist, but they are exceptionally sparse and lack the detail expected in documented suspect interviews.

There are many other documentation problems in the file. As discussed above, the inventory indicates there are at least two photos of Navarro that were placed in the investigative file, but they are not present in the file, and there is no evidence report or other document indicating they were entered into evidence. The same is true for the purported photo array shown to Arroyo, and any photo of Sepulveda that Arroyo identified. In addition, there is also reference in the inventory sheet to "Polaroid Photos (CIRC. Witnesses)," but those photos are not in the investigative file or listed on an evidence report entering them into evidence. Basically, there are documents that existed and were placed in the investigative file, and are no longer there.

Another example of the documentation failures in this investigation are the cryptic handwritten notes on various pages of the investigative file, such as RFC-DRodriguez 3, 11, and 222. Of

---

[30] Investigative File, RFC-DRodriguez 217.
[31] Lee Epplen *Rodriguez* Deposition at 137-143.

note, one of those notes lists Alicia Velez's name, address and phone number, without explanation in the note, or in any supplementary report, for why her name is listed in the report. Did Detectives speak to her, and if so what did she say? As discussed elsewhere in my report, Velez is Rivera's mother, worked for CPD and was allegedly in a relationship with Guevara.

This practice—where officers record only select information that supports their theory while failing to preserve broader investigative context—is inconsistent with accepted police standards. It also reinforces the problem of tunnel vision and denies courts, prosecutors, and defense counsel the ability to fairly evaluate the integrity of the investigation.

Based on my forty-four years of law enforcement experience, I know that the principles of thorough and accurate documentation were well-established long before 1993. As far back as 1978, when I attended the Detroit Police Department Academy, these standards were a central component of law enforcement training. Officers were taught that independent reporting was essential, requiring each investigator to document their actions and observations comprehensively. This practice ensures accountability by providing a clear and traceable record of each officer's contributions to an investigation, and to ensure that testimony in criminal proceedings would be truthful based on the reliance of thorough and accurate documentation rather than the fading memories of busy investigators. The failure to adhere to these principles in cases like this investigation, where reports were consolidated into a single narrative and relied heavily on memory rather than contemporaneous documentation, represents a clear deviation from these long-standing standards. Proper documentation is not a mere procedural formality; it is fundamental to upholding the integrity of the investigative process and ensuring that justice is served.

### III. Mishandling of the Jason Rivera "Lead"

Even assuming Jason Rivera did in fact provide a lead on March 25, the detectives' actions following that revelation are inexplicable and contrary to accepted police practices.

If Rivera had truly identified Rodriguez and Laureano as participants in a homicide, detectives should have taken immediate steps to corroborate the lead and act to locate the suspects. Yet there are no reports of stop orders, alerts, or attempts to contact and question Rodriguez or Laureano for more than a month.

The May 10 report claims that Detectives Guevara and Halvorsen "just happened" to stop Rodriguez on April 29, obtained his name, and then inexplicably let him go—even though Rivera had allegedly implicated him in a murder weeks earlier. There is no contemporaneous record of this stop, no attempt to arrest Rodriguez, question him, or obtain a warrant. This account is both implausible and inconsistent with the urgency expected in a homicide case involving dangerous suspects.

Moreover, Velazquez, the other supposed eyewitness, was not contacted or interviewed until May 10. The delay in following up with a key witness after Rivera's tip defies all logic and practice in violent crime investigations. Investigators also failed to investigate who "Don Juan"

19

was, despite already having sufficient information (first name, gang affiliation, rank, nickname) that could have easily led them to Daniel Rodriguez.

All of these failures, taken together, constitute such a gross deviation from accepted police practices that raises serious questions about whether a statement was ever actually obtained from Jason Rivera on March 25, 1991 implicating Rodriguez. In sum:

- The absence of any contemporaneous documentation of such a critical statement, combined with the dearth of evidence of any of the actions I would expect to see from any reasonable investigator with a credible lead for two suspects in a murder case, is shocking.
- The earliest point at which there is any documented effort to obtain Rodriguez's criminal history is May 5, 1991 when Guevara finally requested and received his criminal history,[32] approximately six weeks later than would be expected. By way of contrast, the "Issued on Inquiry" stamps on the criminal histories and arrest reports of Sepulveda and Navarro were obtained on March 17, 1991, the same day they became suspects.[33]
- There is not even any documented effort to speak to David Velasquez until May 10, 1991, even though Rivera had supposedly told Guevara and Halvorsen on March 25 that Velasquez witnessed the murder as well.
- To the extent Defendants will argue that Rivera's March 25 statement implicated "Don Juan," it would appear this should have been an easy task under the circumstances. Rivera and Velasquez both knew Daniel Rodriguez, and there is no reason to believe they did not know his real name (or that Guevara and Halvorsen asked them and they indicated they did not know). Based on deposition testimony I have reviewed in this and other matters, CPD maintained a database tracking the nicknames of known gang members, and gang crimes officers specializing in each gang would have been another resource to quickly determine the identity of Daniel Rodriguez. And when Defendants were looking for Daniel Rodriguez on May 11, 1991, right after they had obtained written statements from Rivera and Velasquez, they had no problem finding him at his home. Ultimately, if Defendants really had been taking investigative steps to identify who Don Juan was, there should be documentation of those failed attempts, but there is no such evidence in the file.
- There is no indication in the file as to why, suddenly, on May 9, 1991, Guevara and Halvorsen suddenly decided to write a report memorializing a supposed March 25 statement from Jason Rivera. Or, why they did not call an ASA to take his statement at any point before that, and then suddenly did so on May 9, 1991 as the report claims. Then suddenly, after no documented efforts to pursue this lead for approximately six weeks, they suddenly spoke to Rivera, Laureano and Rodriguez and obtained incriminating statements from all of them in about 48 hours.

Finally, according to Guevara and Halvorsen's May 10 report, they happened to see a Toyota Corolla as described by Jason Rivera on April 29, 1991 and stopped the car and learned it was

---

[32] Daniel Rodriguez IR Jacket RFC-DRodriguez at 5367; Fax stamp on Criminal History RFC-DRodriguez at 177.
[33] Investigative File, RFC -DRodriguez at 185, 189.

Daniel Rodriguez, who admitted to going by Don Juan. Again, there is no contemporaneous documentation of this supposed interaction either, again a deviation from accepted police practices. Then, inexplicably, Guevara and Halvorsen supposedly let Daniel Rodriguez go without questioning him (or any indication they attempted to and he refused), or seeking a warrant for his arrest, even though the detectives supposedly already had a statement from Jason Rivera detailing Rodriguez's involvement in the murder.

Finally, Rivera's credibility was significantly compromised. His mother had a romantic relationship with Detective Guevara, and Rivera was himself a suspect in another double homicide investigation. Rivera was also held in custody for two months before Rodriguez's trial, and the State's Attorney's Office paid him over $2,000 in "relocation" expenses shortly before his testimony (and again before his post-conviction testimony in 2016). As discussed above, these circumstances demanded thorough corroboration of his account—yet no efforts were made to do so.[34]

## IV. Coercive Interrogations and False Confession

Rodriguez's confession—obtained by Detectives Guevara and Halvorsen—was not recorded, and the circumstances surrounding it reflect significant deviations from best practices in police interrogation.

Rodriguez has consistently stated that he was held incommunicado for hours, beaten, and psychologically threatened with harm to his partner and children. He was shown prepared statements and ultimately provided a confession consistent with those statements after prolonged abuse. The same pattern applied to David Velazquez, who reported being threatened, coerced, and even taken to rival gang territory and publicly accused of murder to intimidate him. If the jury ultimately, credits the testimony of Rodriguez or Velasquez about the conduct they describe as occurring during their interrogations, it would constitute a gross deviation from accepted police practices. Disturbingly, when Guevara was questioned at his deposition about whether he and Halvorsen engaged in the misconduct Rodriguez and Velasquez describe, he pleaded the Fifth in response to all questions, refusing to answer—or deny—the misconduct.

By the early 1990s, professional police standards increasingly recognized the risk of false confessions, and departments were expected to avoid physical abuse, threats, promises, and "fact-feeding" tactics. Many departments had begun to record interrogations and were expected to document the process thoroughly. None of that was done here.

No steps were taken to evaluate the reliability of the confession. No physical evidence (e.g., firearm, fingerprints) corroborated it. No efforts were made to align the confession with

---

[34] Notably, at his deposition in this case, Rivera basically denied any memory of any of the events at issue. He claimed to have no memory of the conversations with Halvorsen and Guevara, or of witnesses the shooting, or implicating Rodriguez and Laureano. At the same time, he insisted that while he did not remember testifying at Rodriguez's trial, he would have told the truth.

eyewitness accounts or with the alleged getaway vehicle. Nor was any attempt made to examine or disprove Rodriguez's alibi.

These failings are particularly glaring in light of the stakes involved and the known misconduct history of Detectives Guevara and Halvorsen.

**V. Pattern of Corrupt Investigative Practices**

The misconduct uncovered in Daniel Rodriguez's case is not an isolated instance, it fits squarely within a broader and deeply troubling pattern of investigative abuse that has plagued the Chicago Police Department's Area Five, particularly during the tenure of Detective Reynaldo Guevara and his close associates. I have offered opinions in a number of other cases involving Guevara, all of which demonstrate similarities to the investigative missteps and failures documented here.

Over the past several years, mounting evidence has revealed that Detective Guevara engaged in a widespread and sustained pattern of misconduct, including but not limited to fabricating witness statements, coercing false confessions, suppressing exculpatory evidence, and manipulating identification procedures. These tactics have resulted in more than fifty known exonerations to date, individuals who were wrongfully convicted and imprisoned for years or even decades, based on tainted investigations led by Guevara, and almost always his long-time partner Ernest Halvorsen.

What sets Guevara's misconduct apart is not only its frequency but its consistency. The same investigative blueprint emerges repeatedly: vulnerable witnesses are isolated and subjected to pressure, threats, or abuse until they comply with the detective's narrative; suspects are interrogated without proper safeguards and coerced into making statements that fit a predetermined theory; contradictory evidence is ignored or hidden; key steps that could exonerate the accused or lead to the real perpetrator are systematically avoided or discarded; and the documentation of the investigation (or lack thereof) is consistently sparse, incomplete or oddly delayed, with almost none of the contemporaneous notes from Guevara or Halvorsen that one would expect to see. Put simply, their investigations consistently fail to follow generally accepted police practices.

In numerous legal proceedings and depositions, when called to account for his actions, Guevara has invoked his Fifth Amendment right against self-incrimination rather than answer questions about his involvement in fabricating evidence and coercing witnesses. This pattern of silence in the face of serious allegations further reinforces the perception that his investigative methods were not only unethical but potentially criminal.

Daniel Rodriguez's case bears all the hallmarks of this pattern. The detectives involved, Guevara and Halvorsen, employed tactics that closely mirror those documented in other wrongful conviction cases: reliance on a key witness of questionable credibility (Jason Rivera), under even more questioning circumstances, alleged coercion of a suspect (Rodriguez) during an interrogation using physical and psychological abuse, alleged coercion of another witness (David Velasquez), a failure to pursue alternate suspects or conduct basic corroborative steps, and significant omissions or lapses in documentation, along with all of the other issues discussed

22

above. Compounding these concerns is the fact that Guevara and Halvorsen refused to testify about their roles, further undermining the transparency and legitimacy of the investigation.

An additional aspect of the corruption relevant to this case involves Gang Crimes Officer Joseph Miedzianowski. I have prior familiarity with Miedzianowski from my work in the Jose Maysonet matter, another lawsuit in which a man was exonerated based on allegations of misconduct by Guevara and his colleagues. As detailed in my report in the Maysonet case, Maysonet alleges that he was required to pay protection money to Guevara and Miedzianowski to continue his drug selling operation, but when he refused to continue paying he was framed by Guevara and Miedzianowski.

In this case, Miedzianowski is listed as the officer who helped the detectives locate suspect Raymond Navarro. As discussed above, the circumstances surrounding the investigation into Navarro are highly unusual and raise serious concerns from a police practices perspective. The Raul Burgos affidavit I reviewed related to the Gama brothers murder (discussed above) also references Jason Rivera's participation in "gizzos," or stickups of other drug dealers, which is activity that is at the center of Miedzianowski's criminal enterprise based on the records from the federal investigation that I have reviewed. In addition, I discuss above the possible motivation to falsely implicate Rodriguez and Laureano based on charges Guevara brought against Jason Rivera's brother Tito in a 1990 murder case. In addition, I have been provided with documents consisting of federal wiretap records indicating that there was a Tito that was clearly an associate of Miedzianowski.

Miedzianowksi is currently serving a life sentence in federal prison for his leadership role in a criminal drug enterprise that relied in significant part on the abuse of his police powers. During the late 1980s and 1990s, gang crimes officers, detectives, and supervisors in the Chicago Police Department conspired to operate a wide ranging criminal enterprise, which included drug trafficking and distribution, robbery, obstruction of justice (including manipulation and corruption of evidence and covering up crimes), fixing criminal cases, framing individuals, and other crimes. There were a number of participating CPD officers, who worked primarily in Area Five and Gang Crimes North, as well as district offices.

Beginning in December of 1998, some of the conspirators were arrested, indicted, and prosecuted by the United States in *United States v. Miedzianowski, et al.*, No. 98 CR 923 (N.D. Ill.), and *United States v. Woodall, et al.*, No. 03 CR 64 (N.D. Ill.). Among those prosecuted by the federal government in addition to Miedzianowski were the following Chicago Police officers: John Galligan, Miedzianowski's partner and a gang crimes officer; Jon Woodall, and Area Five detective; and Peter Matich, James Benson, Edgar Placencio and Ruben Oliveras. They all pleaded guilty to their involvement in various aspects of the enterprise. Also prosecuted were various civilians who participated in the conspiracy, principally as drug traffickers, including: Frederick Rock; Alina Lis; Mohammed Omar; Omar Feliciano; David Miranda; Lissett Rivera; Henry Rodriguez; Frankie Figueroa; and others.

Although Guevara was never indicted as part of the Miedzianowski criminal conspiracy, there are a number of indications of their connection, from this case and others. In addition, Guevara, Miedzianowski, and Galligan worked in Gang Crimes North at the same time between early

23

1980s and 1990, when Guevara became a detective at Area Five.[35] Jon Woodall was also an officer in Gang Crimes North and he worked with Miedzianowski, Galligan, Guevara, and Halvorsen there and then also became a detective at Area Five. Miedzianowski and Galligan often worked out of gang crimes office that was within the Area Five detective division at Grand and Central.[36]

Federal records from the U.S. Attorney's Office for the Northern District of Illinois and the Federal Bureau of Investigation reflect the participation of Guevara and others in the conspiracy. Mohammed Omar gave a proffer to federal authorities and Doody of Chicago Police Internal Affairs in June 2001, in which he related information about the conspiracy and stated: that he knew Guevara from the neighborhood; that Guevara had a reputation for "messing with" gang members; that Guevara's "policy" was to "catch a person with drugs or guns, but let them buy their way out of trouble;" that Guevara "was also said to have accepted bribes to change positive or negative identifications during line-ups for murder cases."[37] Omar also stated that Guevara caught a man named Abraham Omar for a murder, that Beuke represented Abraham Omar and called Guevara, and that Abraham Omar paid Beuke an additional $20,000 and the case was dropped. In addition, Mohammed Omar told federal authorities that in 1987 or 1988, Guevara arrested Marcos D for murder, Marcos D paid Beuke $20,000, and Marcos D beat the case. In addition, Samuel Perez gave a proffer to federal authorities and Doody of Chicago Police Internal Affairs in July 2001, and stated: "PEREZ knew CPD Gang Crimes officer RAY GUEVERRA (ph) from his neighborhood before he was imprisoned. GUEVERRA had a reputation for arresting people who he had a grudge against and arranging false identifications during line-ups. GUEVERRA has since been assigned to the CPD Detectives."[38]

In addition, FBI Title III wiretaps intercepted a call on November 19, 1998 between Miedzianowski and Chad Johnson about Johnson turning himself in for a crime, in which the following exchange occurred:

---

[35] Joseph Miedzianowski Deposition at 112-113.
[36] Joseph Miedzianowski Deposition at 118-119, 215.
[37] 302 Interview Mohammed Omar, RFC-Hernandez at 22275-76.
[38] 302 Interview Samuel Perez, 302 at AR-L 146333.

24

MIEDZIANOWSKI — Chad, I'll tell you what you do.

JOHNSON — Where am I gonna turn myself into? Grand & Central?

MIEDZIANOWSKI — Nah, no, but you meet, yeah, but you meet somewhere before then. Don't walk into that fuckin' building or you're fucked.

JOHNSON — Alright.

MIEDZIANOWSKI — If you want wait at the fuckin' Mc Donald's at Central & Fullerton or meet by any of them.

JOHNSON — With who? With my lawyer?

MIEDZIANOWSKI — Yeah.

JOHNSON — Yeah.

MIEDZIANOWSKI — Now if your lawyer says oh, I can't do it till Monday he's fucking you because I'll tell you Chad. Now you got to really listen what I'm saying and I really mean this. What you don't want is you know Govarra (ph) and them?

JOHNSON — No.

MIEDZIANOWSKI — That Danny Angle (ph)?

JOHNSON — No.

MIEDZIANOWSKI — Well you don't want them going out today, tomorrow, Saturday, Sunday and looking for witnesses.

JOHNSON — Yeah.

MIEDZIANOWSKI — Because what will happen is someone will, yeah, they'll find somebody who doesn't like Chad Johnson.

JOHNSON — Yeah.

MIEDZIANOWSKI — And he'll go that's right.

It appears Miedzianowski is threatening Johnson that Guevara and Engel will go out and find witnesses who do not like Johnson to implicate him in the crime.[39]

In addition to my work in this matter, and Maysonet, and a number of other cases involving Guevara (listed earlier in my report), I have also been retained in the Hernandez Brothers case and have been provided certain records from that matter. Like Maysonet, it is another case in which Guevara appears to have been working with Miedzianowski as part of his criminal enterprise, where they were motivated to frame individuals (Juan and Rosendo Hernandez) based on activities associated with Miedzianowski's criminal enterprise. Fred Rock testified that, in late 1996 or early 1997, Juan Hernandez lived together in a stash house near Fullerton and

---

[39] Joseph Miedzianowski Deposition at 178:1-179:9; Miedzianowski-Johnson Wiretap at Guevara-L 165321.

Cicero. Miedzianowski told Rock that the house was where Juan Hernandez (aka Poochie) had stolen drugs from an individual who was part of Miedzianowski's operation. Rock testified that Miedzianowski, Guevara, and Rock had multiple conversations after the stash house rip off in which Miedzianowski instructed Guevara to frame Juan Hernandez. In addition, Rock testified that Miedzianowski introduced Rock to Guevara at Area Five, telling Rock that Guevara was a close friend. Juan and Rosendo Hernandez were arrested shortly after for the June 1997 murder of Gonzalez.[40] Although I did not weigh it in any way more or less than other evidence, of particularly personal interest to me as someone who worked intimately with agents from the Bureau of Alcohol, Tobacco, Firearms, and Explosives, the criminal conspiracy described here was the subject of civil litigation brought by two ATF agents, named Diane Klipfel and Michael Casali, who worked starting in the early 1990s on a joint ATF/CPD task force with Miedzianowski. In 1992, Klipfel and Casali accused Miedzianowski of stealing money during a raid on the home of Darren Pippen. In addition, they accused him of supplying gangs with guns and drugs, and of covering up a homicide. Klipfel and Casali report this misconduct to supervisors in the Chicago Police Department.

In 1994, Klipfel and Casali brought a civil suit against Miedzianowski and the City of Chicago. Miedzianowski and CPD supervisors covered up Miedzianowski's misconduct. Miedzianowski retaliated against Klipfel and Casali for reporting the misconduct, threatening Klipfel and Casali's children. The City defended Miedzianowski and the City in that lawsuit, which ended with a $9.75 million verdict against the City of Chicago and Miedzianowski.[41]

Overall, stepping back from the facts of any one of these instances or anecdotes, there is no doubt that Miedzianowski was at the heart of a criminal enterprise that involved the knowledge and involvement of a number of Chicago Police officers across multiple units, that operated and flourished through the use of police powers, and that involved activity that was conducted both inside and outside Detective Division, Gang Crimes and other police offices. This enterprise provided a motivation for assisting some people in avoiding charges for crimes (cooperators in the conspiracy), and for framing other individuals (non-cooperators or those who crossed members of the conspiracy). Of course, it is for the trier of fact to determine whether such motivations explain the actions at issue in this case. But based on my experience and my review of these materials, the blatant deviations from generally accepted police practices in this case— generally speaking, failing to conduct basic investigation into some suspects like Navarro (who was supposedly located for questioning with the assistance of Miedzianowski), and failing to make any efforts to test the veracity of evidence against other suspects like Rodriguez and Laureano—would be consistent with, and best explained, by the conduct and motivations of the criminal conspiracy described above.

As someone with decades of experience overseeing criminal investigations and police conduct, I can say with certainty that when a consistent pattern of misconduct is traced to the same officers using the same improper tactics across multiple cases—many of which have resulted in exonerations—each subsequent investigation involving those officers must be scrutinized with heightened diligence. Rodriguez's conviction cannot be viewed in isolation. It must be

---

[40] Affidavit of Fred Rock, Affidavit of Jondalyn Fields, Deposition of Fred Rock (I & II).
[41] Klipfel Fourth Amended Complaint; Klipfel Closing Argument at Trial; Klipfel Judgment.

understood as part of a broader institutional failure that permitted and perpetuated rogue conduct under the guise of legitimate policing.

**OPINION 2: CPD's POLICIES AND PRACTICES CONCERNING DOCUMENTATION AND DISCLOSURES IN HOMICIDE INVESTIGATIONS ARE WOEFULLY INADEQUATE AND RESULT IN THE ROUTINE FAILURE TO DOCUMENT AND DISCLOSE THE DOCUMENTS AND INFORMATION LEARNED DURING THE HOMICIDE INVESTIGATION TO CRIMINAL DEFENDANTS**

A. **The CPD's policies and practices related to the documentation, storage/preservation, and disclosure of documents and information learned during homicide investigations was contrary to generally accepted police practices**

To meet their constitutional obligation to turn over investigative information to the criminal justice system, police departments typically put in place policies and practices that require officers to document the information they learn during the course of an investigation, keep all of the investigative materials and information in a centralized file, and disclose all of the investigative information in the central file to prosecutors and others in the criminal justice system. In support of these steps, departments perform training and monitoring to ensure the policies are followed and the necessary steps above are taken.

Based on my review, CPD did not maintain policies and practices to ensure that these basic steps were being taken. First and foremost, under CPD policies there was not a centralized file, but instead information related to each investigation was kept in multiple files in multiple places. Then, CPD failed to provide any training or policies to ensure that formal or informal responses to discovery requests from the criminal justice system actually resulted in the collection of all investigative material from all locations. In other words, documents related to a single investigation were in multiple places, but there was no policy, directive, checklist, or other guide to tell the subpoena responders what all those places were or how to go about ensuring that they had obtained it all. The result was predictable: a routine failure to disclose all relevant investigative materials to criminal defendants.

My review indicates that these problems were known as early as 1981, as part of two federal cases at that time, discussed below. But the policies and practices the City put in place in response to these cases was plainly inadequate to solve the problem. The policies that were put in place continued—rather than prohibited—the use of multiple, parallel files for each investigation. The policies were also wholly missing any instruction or directive to ensure that there was a process to ensure that whatever investigative material was out there, in the various places it was housed, was all being produced in response to discovery requests from the criminal justice system. There was also limited training on these new policies, and more importantly, no supervision or auditing to ensure that the new policies were being followed.

In addition to the Fred homicide file, I have reviewed many more Chicago homicide files, and corresponding criminal defense and prosecutor files. For this case, I reviewed all Area 5 homicide files (investigative files and permanent retention files) the City produced for the period from 1991-1995, as produced by the City in *Sierra v. City of Chicago*. I also reviewed all Area 5 homicide files, and corresponding criminal defense files, for the period from 1995-1998 as produced by the City in *Reyes/Solache v. City of Chicago*, which I relied on to form opinions in that case and rely on here as well. In addition, I have also reviewed the expert reports of Michael

28

Brasfield in *Fields v. City of Chicago* and *Rivera v. City of Chicago*, which involve a similar review of hundreds more homicide files and corresponding files for different time periods (Rivera) or different Areas (Fields), as well as the police homicide files in *Iglesias*, *Sierra*, *Reyes/Solache*, *Demetrius Johnson, Gomez*, *Rivera*, *Fields* and *Kluppelberg*.

Each of those cases contain examples of investigative material suppressed in CPD homicide files, or that was otherwise not documented and disclosed, that should have been turned over to the criminal justice system based on police training, and that would have clearly been considered *Brady* material under generally accepted police practices. Based on my review of all of this material together, it is my opinion to a reasonable degree of professional certainty that CPD's documentation and file-keeping policies were deficient, and that CPD maintained a widespread practice in which investigative documents and information learned during homicide investigations was routinely withheld from criminal defendants. My findings here mirror my findings in *Iglesias* and *Sierra*, other cases that involved Area 5 defendants including Detective Guevara, which involved analysis of the same set of 1991-1995 and 1995-1998 files.

Remarkably, my findings appear to be true even to this day. The City of Chicago's own Office of Inspector General issued a report in June 2020 regarding CPD Record Management, stating that "CPD's records management and production processes are inadequate to meet its constitutional and legal obligations."[42] The OIG's findings included the following:

- "CPD's Subpoena Unit and Office of Legal Affairs (OLA), the units responsible for responding to subpoenas and records requests, cannot ensure that they are identifying and locating all responsive records for production. The Department lacks the means to determine what records may exist for any case or incident, making it impossible to know whether it has identified and produced all relevant records."

- "When receiving a request for 'any and all' relevant records (i.e., requests with broad language) including but not limited to certain specific records, Subpoena Unit members routinely fail to conduct a thorough search beyond the specific categories of records enumerated, in order to satisfy the broader request."

- "When the Subpoena Unit receives subpoenas with broad language, members routinely do not attempt to identify paper records, as they cannot determine which of CPD's units may hold such records."[43]

The OIG issued a follow up report in September 2021 stating, "CPD's ability to meaningfully ensure that it is fulfilling all of its constitutional and legal obligations to produce all relevant records for criminal and civil litigation remains seriously impaired."[44] The OIG was plain as day about CPD's unwillingness to do anything to fix the problem: "OIG concludes that CPD has undertaken almost no corrective actions." As discussed below, the OIG's findings—to this day—

---

[42] June 2020 OIG Report, at 4-5.
[43] *Id.* at 4.
[44] Sept. 2021 OIG Follow-Up Report, at 2.

are consistent with my findings for the period from 1991-1995, and 1995-1998 (in *Reyes/Solache, Sierra and Iglesias*).

My opinions are discussed in more detail below.

**Standard police practice in the 1990s was to maintain a centralized repository, often referred to as a single "murder book" or "homicide file." to collect and store all investigative information learned during the course of a homicide investigation**

Necessary to every homicide investigation is not only the investigative steps taken to solve the case, but also the documentation and preservation of the information learned over the course of that investigation. By 1991, and well before, police departments as a matter of course trained their officers that they were required to thoroughly document their investigations and that they should disclose the entirety of their investigations to criminal defendants, as this was part of their constitutional Brady obligation to the prosecutors and criminal defendants.

Police departments around the country wrote policies and perpetuated practices designed to ensure these constitutional requirements related to documentation and disclosure were being net. The standard practice followed by police departments, in turn, was the obvious one: maintain a single homicide file in which all investigative material is placed and kept, and then disclose the entirety of that single, homicide file to the criminal justice system. This was typically done by having the lead detective(s) assigned to the investigation be responsible for ensuring that the investigative steps conducted (which they would have other done themselves, or been told about by assisting detectives) were documented, and for gathering and collecting all of the documents in a single homicide file. In this way, any work done by the lead detectives, assisting detectives, patrol officers or gang officers or other special units, and all the various traditional (reports, notes, etc.) and non-traditional investigative material (business cards, a photo received from a witness, etc.) was all in one place. Likewise, in this way, investigative steps documented in handwritten notes, or in typed reports, would also all be in one place. This approach not only aids the investigation—by ensuring that all investigative material is in one place and available to the lead investigators to review, and to supervisors to monitor the investigation's progress—but also provides a single, central repository from which the entire set of investigative materials can be collected and copied for production to the criminal justice system.

The standard practice I have described above is exactly the practice that was, and is, followed in each of the police departments in which I have worked. My knowledge of these standards is based on my extensive practical experience of supervising and managing criminal investigations; including my own experience as a detective and detective sergeant with multiple police agencies; and my familiarity with the policies used by departments nationwide. As a law enforcement trainer I have for several decades provided investigative training to detectives from hundreds of agencies throughout the country. In the course of my work as an independent criminal justice consultant reviewing policies and practices of police departments around the country, I am familiar with industry standards established by organizations like the International Association of Chiefs of Police (IACP) and the Police Executive Research Forum (PERF). These standards have also been documented in homicide guides and reference materials for decades, which are included in my materials reviewed.

In addition to the maintenance of a single, centralized file, there is also the question of what information should be documented and included in the centralized file. The answer is everything (within reason). The standard police practice is to document, in notes and/or reports, all of the information learned during the course of an investigation. Of course, homicide detectives were not expected to document if they stopped for coffee on their way to a crime scene, or a friendly greeting from a passerby on their way to see a witness. But putting aside the extreme, investigative steps taken to advance the investigation should be documented, even if they ultimately prove to be dead ends, or do not support the hunches or theories of the investigating officers. This is because an investigator does not know in advance which piece of information they learn will ultimately prove to be critical to solving the case, and something that seems like a bid lead today can fizzle; and something that seems like a small lead today can prove to provide the critical clue down the road. This is also one of the critical ways that detectives avoid tunnel vision, and becoming overly fixated on a single suspect or theory, a highly relevant issue in this case, as discussed above. Thorough documentation of an investigation—even those steps that might point to alternate suspects or undermine the case against the eventual suspect—is also necessary as a matter of meeting the police's constitutional obligations to criminal defendants and the criminal justice system. Put simply, in my experience detectives and other police officers are trained and expected to follow the policies and practices I've described above.

Finally, consistent with all of the above, under generally accepted police practices the complete homicide file, consisting of all of the documents and information gathered during the investigation, must be produced to the criminal justice system. This is true regardless of whether the request comes in the form of a formal subpoena, or an informal request from prosecutors, criminal defendants, or others. Investigators (or administrators, to the extent they are involved in disclosing files) must not sift through the file to decide which documents they want to produce. Pursuant to written policies and practices, direction is given that the entire file, including all investigative material, should be disclosed.

**"Street Files": the George Jones Case and the *Palmer* class action**

In the early 1980s, the City's historic practice of permitting detectives to maintain "street files" containing their own "personal" investigative notes, undisclosed to the criminal justice system, came to light. It began with the criminal prosecution of a young man named George Jones, and resulted in two federal lawsuits through which a federal judge concluded that CPD's policies and practices at the time were inadequate, and resulted in the routine withholding of investigative material from criminal defendants.

  **George Jones:** In 1981, George Jones, a senior at a Chicago high school who edited the school newspaper and was nicknamed "Bookworm," was charged with the murder of Sheila Pointer. During the CPD investigation, Frank Laverty, one of the detectives investigating the case, interviewed the victim's brother, Purvy. Purvy told Laverty that there were two assailants and both were wearing stocking masks. Laverty documented this and other evidence that Jones was not the perpetrator and that Jones could have used to help defend himself. However, this information was placed "not in the police department's regular files but in its 'street files.' These

were files that the police did not turn over to the state's attorney's office as they did with their regular investigative files."[45]

Detective Laverty later learned in the newspaper that George Jones was on trial for the Pointer murder. Laverty told his Commander that Jones was innocent and being wrongly prosecuted, but his Commander did nothing to stop the prosecution. Laverty then found Jones' criminal defense attorney and told him about the information in the street file. Laverty's earlier investigative efforts documenting information that was exculpatory for Jones had not been provided to the defense attorney. After the court declared a mistrial, the State's Attorney dropped all charges against Jones.[46]

Jones then filed a civil lawsuit. He won. The jury found that the City had a practice of using "street files" that were withheld from the criminal justice system. The Seventh Circuit explained that the practice of "retaining records in clandestine files deliberately concealed from prosecutors and defense counsel cannot be tolerated."[47]

**The Palmer Litigation:** In addition to Jones' personal lawsuit, a class action was filed in federal court to prevent the use of street files.[48] The plaintiffs sought an injunction, and one was granted requiring CPD to preserve all street files and documents formerly placed in street files.[49] The TRO was amended when it came to light that detectives were continuing to treat notes and other investigative materials as their own, for personal use as part of a personal street file but not available for inclusion in any CPD file.[50]

District Judge Milton Shadur conducted a preliminary injunction hearing, after which he reached the following conclusions:

- There were no guidelines about what information in "unofficial reports" (e.g., notes, witness interviews, worksheets, memoranda, etc.) had to go into "official reports" (e.g., supplementary reports, closing reports, etc.). Judge Shadur found that "Official Reports have sometimes been prepared from the perspective of what fits the preparer's concept of the crime, so they omit information that – though highly relevant and sometimes exculpatory of the defendant charged with the offense – the preparer does not deem 'pertinent.'"[51]

- The use of parallel files containing unofficial reports, referred to as "street files," "running files," "office files" or "working files," was well known within CPD.

---

[45] *Jones v. City of Chicago*, 856 F.2d 985, 988-991 (7th Circuit 1988)
[46] Ibid. (at 991)
[47] Ibid. (at 995).
[48] *Palmer v. City of Chicago*, No. 82 C 2349
[49] Ibid (at NF-L 005606-07)
[50] Ibid (NF-L 005607)
[51] Ibid (NF-L 005609-10)

- There was no policy or practice to ensure that all relevant information was placed in official reports or transmitted to the CPD's Records Division for permanent retention, resulting in potentially relevant information not being included in official reports.[52]

- In response to subpoena requests, CPD produces the official reports maintained at the Records Division, and photographs and lab reports, but not the unofficial reports maintained at the Area or kept by the detectives.[53] CPD Records Division employees do not respond to subpoenas or defense motions for discovery by contacting individual Areas for unofficial documents.[54]

Judge Shadur found that the exclusion of relevant information from official reports "was not random or infrequent."[55] He also found that the use of street files created a "grave risk" of non-disclosure of exculpatory and impeaching information (in other words, *Brady* material). On appeal, the Seventh Circuit reversed Judge Shadur in part. It ordered CPD to preserve and produce street files for those plaintiffs who had been convicted of felonies, but otherwise vacated the preliminary injunction because the court found that the plaintiffs either lacked standing or should have asked for relief in the state courts. The Seventh Circuit did not revisit or revise Judge Shadur's factual findings.[56]

I also reviewed the Seventh Circuit's later decision regarding Plaintiff's request for attorneys' fees, denying that request. I am aware that the Court wrote that the plaintiff's attorneys had failed to identify exculpatory material in files other than Jones' case, stating, "They went on a fishing expedition, and the pond was empty. Maybe the city removed the fish, but at the moment that is just a slander."[57] I also reviewed the affidavit of Jeff Haas, one of the plaintiff's attorneys in Palmer, stating that they had not actually reviewed the files to identify exculpatory information, and did not have official CPD files (which I take to mean the permanent retention files) or prosecutor or criminal defendant files, to compare against to see if exculpatory information was withheld. I also note that Mr. Haas found evidence that some CPD files were "pre-purged" of notes and memos and other information, a practice Haas indicated witnesses in the case had testified to. This is consistent with my findings, discussed below, that many files appear to be missing notes and other investigative information I would expect to see in a homicide investigation (*e.g.*, entire homicide files with no notes whatsoever, files where there are no notes of interrogations and other substantive interviews of suspects and key witnesses, files with no evidence of investigation into other leads or alternate suspects, etc.). Regardless, for my purposes the Seventh Circuit's attorneys' fees ruling does not alter Judge Shadur's findings, and the guidance it provided to CPD policymakers about the problems that needed to be addressed by its policies.

**George Jones Appeal**: In 1988, in *Jones v. City of Chicago*, 856 F. 2d 985 (7th Cir. 1988), the Seventh Circuit affirmed the jury verdict in favor of George Jones, including the finding that

---

[52] Ibid (NF-L 005612)
[53] Ibid (NF-L 005614)
[54] Ibid (NF-L 005614)
[55] Ibid (NF-L 005615)
[56] *Palmer v. City of Chicago*, 755 F.2d 560 (7th Cir. 1985); CPD Special Order 83-2A.
[57] *Palmer v. City of Chicago*, 806 F.2d 1316 (7th Cir. 1986).

the City of Chicago had maintained an unconstitutional practice of permitting detectives to keep street files undisclosed to criminal defendants.

The appellate decision included the following: (a) the case disclosed "frightening abuse of power by members of the Chicago police force and unlawful conduct by the City itself"; (b) Laverty was charged with a disciplinary infraction, "transferred out of the detective division, ostracized by his fellow officers, and assigned to a series of menial tasks culminating in the monitoring of police recruits giving urine samples" while "none of the defendants has been disciplined for misconduct"; (c) there was "enough evidence to enable the jury to infer that [a Chicago Police Department Commander, Lieutenant and Sergeant] had known . . . [and] had approved every false step"; and (d) there was sufficient evidence against the City that the street files practice existed, caused Jones injuries, and was "consciously approved at the highest policy-making level."[58]

Notably, the decision included the following indictment of CPD leadership at the time:

> Laverty should have been commended for his adherence to the principles of honesty, decency, and justice, instead the police department charged him with a disciplinary infraction for having failed to advise the state's attorney that he planned to testify for the defense in George Jones's criminal trial should that become necessary. He was also transferred out of the detective division, ostracized by his fellow officers, and assigned to a series of menial tasks culminating in the monitoring of police recruits giving urine samples. None of the defendants has been disciplined for misconduct in the arrest and prosecution of George Jones.[59]

Based on my review in this case, discussed further below, this commentary on the failure of CPD leadership proved to be foreshadowing. The Jones and Palmer rulings reveal a consistent theme: resistance to change from detectives who insisted on continuing to keep street files, and resistance to change from CPD leadership that was more concerned about punishing Laverty for blowing the whistle than abolishing unconstitutional practices that had almost resulted in the wrongful imprisonment of an innocent high school student. The lack of a strong institutional response, and a strong message from CPD leadership that a dramatic change in practice was needed and was going to be enforced at the risk of discipline, is deeply problematic. It is no surprise, then, to see substantial evidence in this case, and the many other cases I reviewed, that the street files practice continued on for decades.

**CPD's policies after *Jones* and *Palmer* do not solve the problem, and are inadequate to ensure disclosure of all relevant investigative materials**

Despite the revelations from the Jones and Palmer lawsuits, including specific guidance from Judge Shadur regarding the failures in CPD's policies, the department's leadership made only the most tepid policy changes. The new policies were inadequate on their face, and wholly insufficient to make the sort of institutional changes necessary to ensure the consistent and complete disclosure of investigative material. The new policies were defective in nearly every

---

[58] *Jones* at 988, 991-92, 993, 995-996.
[59] *Jones*, at 991-92.

way: they did not require documenting all investigative steps, they applied only to detectives but not other officers involved in investigations, they continued to permit a system of multiple files containing different information, they lacked any express directive to disclose all investigative material in the multiple police files, and they contained no processes or instructions to ensure subpoena responders gathered all investigative information from each of the multiple repositories that existed under CPD's parallel file system. In addition, there was very limited training on the new policies, and there was no auditing and monitoring to ensure that file disclosure problems had been resolved.[60] Put simply, the policies themselves were deficient, as were the efforts to ensure those deficient policies were even followed. Given this, the continuation of the street files problem—to this day, according to the City's OIG—is entirely predictable.

**The Teletype and Detective Division Notice 82-2:** In April 1982, after a Temporary Restraining Order was issued in the *Palmer* litigation, CPD issued a teletype to commanding officers informing them of the TRO, as well as Detective Division Notice 82-2.[61] CPD designee Hickey explained that Notice 82-2 was "a quick and dirty document" designed to implement the TRO but was "not very workable."[62]

Notice 82-2 and the corresponding teletype were only about preserving documents. It did not require detectives to put notes or memos into a central repository (or any repository), and it did not even affirmatively require detectives to preserve notes or memos that had not already been turned into a police file.[63]

Six months after Notice 82-2 went into effect, Commander Stibich testified that detectives continued to believe that their notes and memos were personal property, for personal use, and that they were not required to turn them in to a department file, or even preserve them at all.[64] Judge Shadur found that Notice 82-2 responded to the TRO in "an improperly restrictive and grudging manner, under which detectives could consider their investigative writings as their personal property (and thus not 'under Detective Division control') and therefore outside the preservation requirements of Notice 82-2."[65]

**Special Order 83-1:** On January 3, 1983, Special Order 83-1 replaced Detective Division Notice 82-2. Special Order 83-1 applied only to detectives assigned to Violent Crimes.[66] Special Order 83-1 defined the term "Investigative File" and created something called an Investigative File Case Folder to secure documents relating to a criminal investigation. Special Order 83-1 also created an "Investigative File inventory sheet," to catalog all the documents placed in the Investigative File, that was to be forwarded to the Records Division when felony charges were approved.[67] Special Order 83-1 also created General Progress Reports

---

[60] Hickey *Fields* Dep. at 10, 43; Winstrom Deposition at 208-210.
[61] NF-L 008751; NF-L 008754; Hickey, *Kluppelberg* Deposition at 201
[62] Hickey *Kluppelberg* Deposition 221-22, 224; Brzezcek Test. NF-L 007517
[63] NF-L 008751-53; Hickey *Kluppelberg* Deposition at 212-13
[64] Stibich Test. (NF-L 007468-70)
[65] NF-L 005615-16
[66] NF-L 007223-27
[67] Special Order 83-1, IV(D)

("GPRs").[68] The GPR forms were to be used by detectives for taking handwritten notes or writing so-called "to-from memos" to their colleagues.

Special Order 83-1 created an obligation for detectives to place handwritten GPRs and other investigative materials in the investigative file. It also required detectives to fill out CPD case report forms, such as supplementary reports, documenting relevant information previously recorded on a GPR or other miscellaneous documents.[69]

Judge Shadur found Special Order 83-1 to still be lacking, including the following:

- There was no obligation to create an Investigative Case File Folder unless the crime fit certain violent crime categories and felony charges were approved. According to Judge Shadur, this was problematic because there was nothing to prevent against selective retention while the case was still being investigated;[70]

- It lacked direction to ensure that any assisting detective who received information relating to an investigation would forward the information to the lead/assigned detective to be included in the Investigative File Case Folder;[71]

- It required detectives to include "relevant" information in the official reports but offered no guidance as to what should be considered "relevant," permitting detectives to again choose what to include and exclude from their reports.[72]

- It lacks any guidance on how CPD should respond to a criminal subpoena or other request for disclosure of investigative material.[73]

**Special Order 83-2:** On May 2, 1983, Special Order 83-2 was issued. Under the updated policy, detectives were required to create records reflecting all relevant information, to pass along information they learn to detectives assigned to investigating that crime. In addition, under the updated policy the Investigative File Inventory Sheet was to be copied and disclosed to prosecutors and criminal defendants.[74] Special Order 83-2 also created the Investigative File Control Card, which was supposed to allow for the Investigative File to be checked out by investigating detectives and accounted for.[75]

The updated policy, although a small improvement, was still plainly deficient:

- it still perpetuated a multiple, parallel file system rather than a single, centralized file system.

---

[68] Special Order IV(E); Hickey *Kluppelberg* Deposition 170
[69] Special Order 83-1 V(B)(1) & (2), NF-L 008772-73
[70] NF-L 005620
[71] NF-L 005621
[72] Special Order 83-1 V(B) (NF-L 005620); Hickey *Kluppelberg* Deposition 238; Hickey *Kluppelberg* Deposition [2015] 20.
[73] NF-L 005621
[74] NF-L 008746-50
[75] Hickey *Kluppelberg* Deposition 228-29

- it still applied only to detectives.[76]

- it fails to state, expressly and plainly, that the investigative file MUST be disclosed in its entirety in response to requests from prosecutors or defendants.

- it lacks any process, procedure, or guidance to ensure the investigative file and any other repositories of investigative material are disclosed to the criminal justice system.

- it still fails to provide any definition of what is "relevant."[77]

- it relies on inventory sheets as the means of ensuring that documents from the police investigation are disclosed, but this is wholly inadequate since the inventory sheets are only as good as the information in them. Based on my review, inventory sheets are routinely incomplete, or contain entries that are too vague to be of any use in determining whether all investigative material has been disclosed.

- there is no provision in Special Order 83-2 requiring an audit or oversight to ensure the special order is actually being followed.

**Special Order 86-3:** On May 29, 1986, the CPD issued Special Order 86-3. Special Order 86-3 changes very little.[78] Where it does make changes, most of those changes actually weaken the overall policy rather than strengthen it. For example, it eliminates the requirement that the inventory sheet be forwarded when a criminal subpoena or discovery motion is received, and it eliminates the requirement that handwritten notes or other investigative materials be submitted "promptly (normally at the end of each tour of duty)."

In these ways, Special Order 86-3 actually deviated further from standard police practices than the special orders that came before it. Overall, it remained deficient, for at least the following reasons:

- it still perpetuated a multiple, parallel file system rather than a single, centralized file system.

- it still applied only to detectives.

- it still fails to state, expressly and plainly, that the investigative file MUST be disclosed in its entirety in response to requests from prosecutors or defendants.

- it still lacks any process, procedure, or guidance to ensure the investigative file and any other repositories of investigative material are disclosed to the criminal justice system.

---

[76] Hickey *Rivera* Deposition 55, 87-88.
[77] Hickey *Kluppelberg* Deposition 238; Hickey *Kluppelberg* Deposition [2015] 20
[78] Winstrom Deposition 44-46.

- it still fails to provide any definition of what is "relevant."[79]

- it still relies on inventory sheets as the means of ensuring that documents from the police investigation are disclosed, but this is wholly inadequate since the inventory sheets are only as good as the information in them. Based on my review, inventory sheets are routinely incomplete, or contain entries that are too vague to be of any use in determining whether all investigative material has been disclosed.

- it removed the requirement that they turn in the notes and investigative materials "promptly (normally at the end of each tour of duty)," thus permitting detectives to keep handwritten notes on their person, at home, or in their locker for extended periods of time, as they did when the street file practice came to light.

- it still provided no guidance about what information a detective was required to include in a supplementary report beyond information deemed "relevant."

- it removed the requirement of sending the inventory sheet to defense attorneys, albeit inadequate, leaving defense attorneys with no mechanism to determine whether they had received all the relevant investigative materials.

So, Judge Shadur's express statement that CPD's policies were deficient because they failed to "defin[e] the CPD's duty or procedure in responding to a criminal subpoena or request by the State's Attorney to produce information relating to a criminal proceeding," there was still absolutely no policy directive or procedure to ensure production of investigative files. Notably, the Special Order contains a single instruction about disclosure: to forward a copy of the inventory sheet to the Records Division, to be forwarded to the defense attorney. But what it does not say is to forward a copy of the entire file to the criminal defense attorney. This is an inexcusable omission.

Moreover, despite Judge Shadur's admonition, there was still no policy, procedure, or directive to ensure that subpoena unit staff, or other support staff at the Areas, were retrieving investigative material from all possible locations, or any training to that effect.[80] This, too, was an egregious violation of generally accepted police practices. Especially given that CPD chose to perpetuate a multiple, parallel file system. Indeed, as Hickey acknowledged, the lack of a centralized file, combined with lack of instruction, created confusion among detectives and subpoena personnel about their disclosure obligations.[81]

Finally, the failure to define relevance in a way to ensure the documentation of all information learned during an investigation deviates from generally accepted police practice, and is particularly egregious given Judge Shadur's concerns on this very issue. Commander Stibich

---

[79] Hickey *Kluppelberg* Deposition 238; Hickey *Kluppelberg* Deposition [2015] 20
e

[81] Hickey Rivera Deposition at 253-54. He testified to remembering conversations when he was in charge of records division in which there were questions from subpoena clerks and detectives about what they were required to produce in response to subpoenas, including whether the entire investigative files had to be turned over.

admitted that what is relevant to one detective may not be relevant to another.[82] And CPD designees on this topic, Hickey and Winstrom, have testified to exactly the problems with CPD's lack of guidance. Detectives could decide what was pertinent not contemporaneously, but whenever they chose to write their supplemental report.[83] If this occurred once a suspect had been arrested and charged, a detective could freely decide that all other evidence—perhaps investigation into an alternate suspect—could be arguably "not relevant" since it did not implicate the person charged. Indeed, Hickey and Winstrom have admitted that this is exactly what could and would occur. For example, they both testified that CPD policy did not require suspects who had been eliminated through investigative activity to be documented in any way.[84] This is contrary to accepted police practices, a recipe for violating Brady obligations, and exactly the problem Judge Shadur warned of and that CPD's deficient policies created. Alternate suspect information is exactly the type of highly relevant information for which documentation and disclosure is critical.[85]

Finally, Special Order 86-3 included a section requiring "[e]xempt members of the Detective Division" to "conduct periodic, unscheduled inspections of the subject files to ensure compliance." This is an improvement on appear; auditing is critical. However, it appears to have been nothing more than words on paper; it was not done. Hickey and Winstrom, the City's designees on the topic, were not aware of a single instance in which such auditing occurred.[86]

**Standard Operating Procedures (SOP) 1988:** In 1988, standard operating procedures were created to govern the work of detectives. Chapter 18 deals with investigative files. The policy did not change. The relevant portion of the new SOPs, Chapter 18, contains "no substantive changes of any kind" from Special Order 86-3.[87]

In other words, the deficiencies described above with regard to Special Order 86-3 remained in the SOPs and was the governing set of policies (or lack thereof) through the Soto homicide investigation in 1998.

**The policies described above are insufficient to remedy the "street files" problem**

**1. Continued use of parallel files: The** use of street files as part of a parallel file system had been in place since at least the 1970s.[88] Despite the revelations in *Jones* of the failure with this system, the City continued to perpetuate a multiple, parallel file system. For a given

---

[82] Stibich Test. NF-L 007474

[83] Hickey *Kluppelberg* Deposition [2015] 24-25, 33

[84] Hickey *Rivera* Deposition 36, 185-87. Winstrom Deposition 106-107, 189, 192-94.

[85] This does not prevent an investigating officer from also documenting information explaining why the suspect was eliminated.

[86] Hickey *Rivera* Deposition 244, 249; Winstrom Deposition 208-210.

[87] Hickey *Rivera* Deposition pages 250-51; Winstrom Deposition 44-46.

[88] Hickey, the City's designated witness on this topic, testified that the practice of using street files started at least as early as 1977, when he arrived at Area 1 homicide. Similarly, during hearings on the use of street files in Palmer v. City of Chicago, John Stibich, a former commanding officer in Area 4 homicide, testified that during his time there, from December 1974 to December 1977, Area 4 homicide had a practice of using street files. Following Hickey's sampling of the various violent crimes units in 1982, Hickey determined that each of the Areas used street files.

investigation, there would be *at least* three files: a permanent retention file in the Records Division, containing only supplementary reports, general offense case reports and the arrest report filed under the accompanying RD number; a unit RD file, that Hickey testified was a slim file kept in the homicide drawer at the Area that would contain all the known official police reports (supplementary reports, etc.);[89] and an investigative file maintained by the detective area, containing documents that individual detectives assigned to investigate the case chose to include.[90] By design, the files had different information in them.[91]

In addition to these files, investigative material could also be kept in the Evidence and Recovered Property Section, arrest reports could be kept at the Identification section, and individual detectives could each keep their own running/working files during an investigation.[92] And yet additional files could be created by other units of the Chicago Police Department, because the policies only applied to the Detective Division. So, in addition to the multiple files above, patrol officers, gang crimes officers, and other special unit investigators could each have additional sets of files related to a homicide investigation. None of those files were subject to any documentation, storage and disclosure requirements.

Remarkably, Hickey himself raised some of these concerns. He informed CPD senior leaders that Special Order 83-1 was only addressed to the Detective Division,[93] and Hickey suggested that Research and Development and Auditing Internal Controls Division should get involved because there may be department-wide implications to the use of street files.[94] CPD never acted on Hickey's concerns to look beyond the detective division, and allowed yet more parallel files to be created in other parts of the Department.

CPD's multiple, parallel files created unacceptable risk. Investigative information was kept in multiple places, in multiple units, without any mechanism to even track how many parallel files had been created for a particular case, or whether they had all been collected. This is why standard police practice around the country is to have a lead investigator responsible for keeping a single centralized file with everything in it. That the City kept in place a parallel file system after *Jones* and Judge Shadur's warnings, without any protections in place to make sure that all repositories were known and collected from, is an inexcusable police failure.

**2. Discretion to determine what is relevant and needs to be documented and disclosed.** As discussed above, the policies left detectives to choose what information to document in official reports and when to turn in investigative materials. Given the street files problem and the history of resistance to change among detectives, CPD needed to provide strong, direct guidance; it did the opposite. The testimony of Hickey and Winstrom, discussed above, reveals the problem: they openly admit that it would be appropriate under CPD policy for

---

[89] Hickey *Kluppelberg* Deposition 115-16, 299-300; S.O. 86-3
[90] Hickey *Kluppelberg* Deposition 297-300
[91] Hickey *Kluppelberg* Deposition 100.
[92] Hickey *Kluppelberg* Deposition at 295-96; Hickey *Fields* April 2014 Trial Testimony at 2069.
[93] Hickey *Kluppelberg* Deposition 207-208
[94] Hickey *Kluppelberg* Deposition 208

detectives to determine that information about an alternate suspect was not relevant, if they so chose.[95]

**3. No procedures or written instructions to subpoena responders to make sure investigative material from all locations is disclosed.** Inexplicably, despite having a system of multiple, parallel files for a single investigation, CPD did provide any sort of formal training and written procedures to subpoena responders on how to go about ensuring that they were gathering the documents from all repositories.

Based on the testimony of CPD's designees on the topic, Hickey and Winstrom, requests for investigative documents were handled by the Subpoena Service Unit in the Records Division.[96] But CPD had no written policy requiring, or explaining how, the staff in the Subpoena Service Unit were to go about searching for and gathering all responsive documents.[97] There were no checklists, procedures, "safe checks" or any other guidelines or guidance to assist subpoena responders in making sure they were requesting material from all the right repositories, or to check on the back end whether they got everything they should, or even formal training to set the proper expectations and practices.[98]

As a result, whether prosecutors and criminal defendants received all of the documents and investigative material associated with a case was primarily a question of luck, as in whether the subpoena responder happened to request the right documents from the right places, and the unit that received the request copied everything in their repository.[99] Hickey described the Subpoena Service Unit's effort to respond to document requests as an "art," and that it was possible in a case with multiple units working on the same investigation for the subpoena to go to only one of those units.[100] Winstrom admitted that subpoena clerks would simply ready the subpoena and send a request for documents to whichever units they thought might have documents, and that they were not provided with any policies, directives, checklists, guidelines or training materials to guide their decision about where to obtain documents, nor were they given any forms or lists that identified all the repositories in which documents related to a homicide investigation might be found.[101]

The woefully inadequate policy and practice I have described above was in place since the 1980s, through 1995, and well into the 2000s.[102] In fact, the City's designee on the CPD's policies through 2009 testified that there is no system or procedure to follow up with the Area if it failed to respond to a request from the Records Division subpoena responder for documents.[103] The OIG

---

[95] Hickey *Kluppelberg* Deposition 339; Hickey *Kluppelberg* Deposition [2015] at 66-67.
[96] Hickey *Kluppelberg* Dep 358
[97] Hickey *Kluppelberg* Dep 36-37; City of Chicago's Amended Response to Plaintiff's Seventeenth Set of Requests to Produce Documents to the City of Chicago, p.2-3
[98] Hickey *Kluppelberg* Dep 39, 147-48, 160; Hickey *Rivera* Deposition 36, 185-87; City of Chicago's Amended Response to Plaintiff's Seventeenth Set of Requests to Produce Documents to the City of Chicago, p.2-3; Winstrom Deposition 192-94.
[e] Hickey *Rivera* Deposition 43-46
[e] Hickey *Rivera* Deposition 162; Hickey *Kluppelberg* Deposition 362-63.
[101] Winstrom Deposition 189, 192-94.
[102] Hickey, *Rivera*, 151-53; Loughran Deposition 14 Winstrom Deposition 197-201.
[103] Loughran Deposition 15.

Report discussed above demonstrates that all of the same, predictable problems continue to this day (June 2020 OIG Report, at 4):

- "CPD's Subpoena Unit and Office of Legal Affairs (OLA), the units responsible for responding to subpoenas and records requests, **cannot ensure that they are identifying and locating all responsive records for production**. The Department **lacks the means to determine what records may exist for any case or incident**, making it impossible to know whether it has identified and produced all relevant records."

- "When receiving a request for "any and all" relevant records (i.e., requests with broad language) including but not limited to certain specific records, **Subpoena Unit members routinely fail to conduct a thorough search beyond the specific categories of records enumerated**, in order to satisfy the broader request."

- "When the Subpoena Unit receives subpoenas with broad language, **members routinely do not attempt to identify paper records, as they cannot determine which of CPD's units may hold such records**."

The lack of concrete written policies, procedures, training and safeguards, in the face of a multiple file system that created a greater need for exactly such things, was an egregious departure from generally accepted police practices.

**4. There was inadequate training and monitoring/auditing to ensure compliance with the special orders.** The only training provided to detectives was one three-hour session about Special Order 83-1. But one three-hour training session on just the first iteration of the policy change, where CPD senior leaders already knew detectives were opposed to the change, was wholly insufficient to overcome a decades-long practice. Hickey himself admitted that he learned that unit detectives were reverting back to keeping their own files to take out on investigations after Special Order 83-1.[104]

CPD did nothing to monitor and assess whether the policy was being followed, or to reprimand those detectives and supervisors who refused to comply. Hickey and Winstrom admit they are not aware of, and could not identify, any sampling or auditing that occurred after the Special Orders were put in place.[105] In addition, I am not aware of the City having produced a single document demonstrating that any audit or inspection ever occurred. Hickey and Winstrom also admit that there was no discipline of detectives that did not comply with the Special Orders.[106]

Put simply, policymakers failed to train, monitor or supervise detectives to ensure compliance with the Special Orders. The result is obvious and predictable: a failure to comply. As discussed below, that is exactly what I found in my review of homicide files.

---

[104] Hickey *Kluppelberg* Deposition 321, 327.
[105] Hickey *Kluppelberg* Deposition 160-61, 166, 167, 375-76; Hickey *Rivera* Deposition 244, 249; Winstrom Deposition 208-210.
[106] Hickey *Fields* Dep. at 10, 43. Hickey *Kluppelberg* Deposition 213; Winstrom Deposition 209-210.

**Review of CPD files, and related files, from the periods from 1991-1995, and from 1995-1998, demonstrate that CPD's policies and practices were not being followed.**

I conducted a review of police files and criminal defense files for the period from 1991-1995 and 1995-1998, as follows:

Number of files reviewed:

|  | Area 5 investigative files | Corresponding permanent retention files | Corresponding PD/criminal defense files |
|---|---|---|---|
| 1991-1995 | 475 | 475[107] | N/A[108] |
| 1995-1998 | 344 | 341 | 72[109] |

**A review of investigative files shows that the Special Orders were not being followed**

As discussed above, I have opined that these policies were inadequate on their face to address the street files problem. But even if they were adequate on their face, they must also be implemented and followed. In my review, the files show that the special orders were not followed in a number of ways (which would have been obvious in any reasonable file audit).

I received two primary sets of records for my analysis of whether the Special Orders were being followed:

1. I reviewed investigative files for 344 different homicide investigations conducted by Area 5 detectives for the period from 1995-1998.[110] I reviewed the files to evaluate whether, standing alone, they demonstrated compliance with the 1986 special orders and 1988 SOPs.

2. I reviewed investigative files for 475 different homicide investigations conducted by Area 5 detectives for the period from 1991-1995. I reviewed the files to evaluate whether, standing alone, they demonstrated compliance with the 1986 special orders and 1988 SOPs.[111]

---

[107] There were actually 496 permanent retention files produced, but 21 of those had no corresponding investigative file. Hence, there were 475 files for comparison.

[108] It is my understanding that no PD files corresponding to the period from 1991-1995 were obtained in discovery.

[109] There were 105 total criminal defense files, but those files related to only 72 different investigative files (e.g., multiple defendants, PD file with no corresponding investigative file, etc.)

[110] For two homicide investigations, a permanent retention file was produced, but no investigative file: Z101225, Z160497. Those two files are still listed in Attachment E, and as a result the spreadsheet contains 346 rows, despite only 344 investigative files.

[111] For twenty-one homicide investigations, a permanent retention file was produced, but no investigative file. Those files are still listed in Attachment F, and as a result the spreadsheet contains 496 rows, despite only 475 investigative files.

The analysis I conducted is the same one I conducted in *Iglesias*, *Sierra*, and *Reyes/Solache*, and that Michael Brasfield conducted in *Rivera* and *Fields*, and my findings are entirely consistent with his. In other words, my finding that the 1991-1995 Area 5 investigative files reveal that the policies were not being followed is the same conclusion that I reached with regard to the 1995-1998 Area 5 investigative files, and that Brasfield reached with regard to 1985-1991 Area 5 investigative files, and 1984-1989 Area 1 (primarily) investigative files.

I have also reviewed investigative files and permanent retention files from Area 5 homicide investigations for the period from 1987-1990, in *Maysonet v. City of Chicago*. My review of those files, and my analysis of those files, further confirms and corroborates my opinions here, including in particular homicide detectives' systemic failure to follow the Special Orders put in place to address the street files problem and withholding of exculpatory information identified in *Jones/Palmer*.

My findings are as follows:

**Handwritten notes, not on general progress reports, are still routinely used:** As discussed above, the special orders directed officers to use GPRs to take notes, and were intended to eliminate the use of handwritten notes, which detectives had been treating as their own property and something they were not inclined to place in the CPD's file. I found that detectives consistently used handwritten notes not on GPRs, despite the direction in the special orders. For the period from 1991-1995: Only 424 of the 475 investigative files contained handwritten notes; of those, 213 of the 424 files, or approximately 50%, contained handwritten notes not on GPRs. For the period from 1995-1998: Only 334 of the 344 investigative files contained handwritten notes; of those, 154 of the 334 files, or approximately 46%, contained handwritten notes not on GPRs. This is consistent with Brasfield's findings in Rivera (61%) and Fields (82%).

**To-from memos are still being used:** As discussed above, the special orders also directed officers to stop using to-from memos to communicate investigative information, and to instead include that information in GPRs and Supplemental Reports. However, I found that detectives continued using to-from memos (not on GPRs): For the period from 1991-1995: 47 of the files, or approximately 10%, contained to-from memos not on official police forms. For the period from 1995-1998: 95 of the files, or approximately 28%, contained to-from memos not on official police forms. This is consistent with Brasfield's findings in *Rivera* (20%) and *Fields* (43%).

**Missing or Incomplete Inventory Sheets**: One of the new requirements under the policy, purportedly to ensure that prosecutors and criminal defendants could check to see if they had received all of the documents in the investigative file, was the creation of an inventory sheet to be included in the investigative file to track all the documents entered into the file. I have already opined that the inclusion of an inventory sheet in the investigative file does little to ensure all investigative information is being documented and included in the investigative file, or to ensure that the entire file is disclosed. But in any event, my review shows that inventory sheets were not consistently included in the investigative files. For the period from 1991-1995: I found that 115 files, or 24% of total investigative files, contained no inventory sheet. For the period

44

from 1995-1998: I found that 57 files, almost 17% of total investigative files, contained no inventory sheet.

Even where there was an inventory sheet in the file, in many cases the inventory sheet was incomplete. For the period from 1991-1995: I found that 359 investigative files, approximately 88% of total investigative files, contained inventory sheets that were incomplete. For the period from 1995-1998: I found that 277 investigative files, approximately 81% of total investigative files, contained inventory sheets that were incomplete.

In total then, I found that in nearly all of the investigative files, inventory sheets were either missing or incomplete.

In addition, the inventory sheets do not appear to be contemporaneously updated as each new document is added to the file. Instead, documents were routinely added in bunches, with significant time delays from when the document was created. In addition, there are other ways in which they were simply not useful for their intended purpose of serving as a cross-reference: there are examples where dates are illegible, where dates do not appear at all, where the person who entered the document is not listed, and where the entries are too vague to be able to tell what document it is referring to (e.g., "GPRs," without identifying how many or which dates, etc.). Some examples include the following:

A242406

Z243035

A276340

A636514

A744094

P18275

P124971

Z533574

**Review of permanent retention files: all relevant information in unofficial documents is not transcribed in official reports.** The special orders state that all relevant information must be transcribed into an official report, in an effort to ensure that the permanent retention file, which contains only official reports, provides a complete picture of the investigation. The special orders also require that inventories be sent to the permanent retention file for distribution to prosecutors and criminal defendants (as discussed above, an indication that CPD contemplated that it would only initially produce permanent retention files). These requirements were routinely flouted.

I was provided with permanent retention files for 477 homicide investigations from the time period 1991-1995, and 341 homicide investigations from the time period 1995 – 1998. **See Attachments E and F.**

First, I examined the permanent retention files, standing alone, to assess whether they communicated a complete picture of the investigation. I found that while they communicate a story about how the detectives got from arrest to charges of their suspect, they communicated little else in terms of investigation into other leads or suspects. Rarely was there ever documentation of investigation into avenues that led to a dead end, something that happens in homicide investigations all the time (even those that eventually result in catching the correct perpetrator).

Michael Brasfield conducted the same exercise and wrote in his report as follows: "the permanent retention files in CPD are different in kind from those I've seen in other police departments around the country. Usually, an official file reads like a novel: it tells a story, with twists and turns in the plot and characters whose importance waxes and wanes. CPD's permanent retention files routinely lack this texture; they read like a single (often final) chapter of the novel – the one that explains the information that led to charges against the person ultimately charged. Put another way, in most departments, in addition to the various strands of the investigation, there is a charging memo in the official file that explains the basis for charges; CPD's entire official file is a charging document (or file)." This is well said, and I observed the same thing in my review of files.

Second, I compared and contrasted a number of the permanent retention files with their corresponding investigative files. **See Attachment E.**

Like Brasfield, I found many examples where information on handwritten notes was not transferred into official reports. In many cases, the information is potentially exculpatory. Examples include RFC-Reyes/Solache 34554, 76011-14, 76015-16, 77368, 77452, 94060, 110176, 110180, and 104166-70; and, RFC-Sierra 121416, 121420, 79168, 92370, 109932, 110061, 110043, 110062.

These examples in the paragraph above include handwritten notes containing cryptic notations on a page, without context: a name, a phone number, an address, etc. In my experience, notes like these are often important information (a new witness or suspect previously unknown, contact information for a possible alibi witness, the license plate of the getaway car, etc.). By not transcribing information into official reports, the relevance of the information, and its potential inculpatory or exculpatory value, is lost. Obviously, a detective thought the information was important enough to take a note, and I acknowledge that often a note may only contain shorthand and abbreviations to keep up with a person as they are speaking. But then it is critical to write a report, using the note as a memory aid, to provide a more thorough explanation of the information learned and its relevance to the overall investigation. In my review, this final step is often not done. The result is a violation of the Special Orders, which require relevant information to be written down and transferred into official reports, as well as a failure to disclose important information to prosecutors and criminal defendants.

Finally, in my review I found that permanent retention files routinely did not have an inventory sheet, which according to policy should have been in the investigative file and copied into the permanent retention file (for the very purpose of ensuring prosecutors and criminal defendants could check to make sure they had received everything). Yet, for the period from 1991-1995: I

found that only 64 of 477 permanent retention files had an inventory sheet, and that of the 360 investigative files with an inventory sheet, only 58 had a copy of the inventory sheet in the permanent retention file as well. And for the period from 1995-1998: I found that only 13 of 341 permanent retention files had an inventory sheet, and that of the 287 investigative files with an inventory sheet, only 12 had a copy of the inventory sheet in the permanent retention file as well.

My review of records in this case and others shows that the continuation of the street files practice, including the failure to follow the special orders, was so rampant that it would have been confirmed through even a cursory auditing of files. In addition, as discussed below, virtually all of the defense attorney files were missing information from the investigative file. So, even superficial audits of small samples of records would have revealed these problems.

**Criminal defense files show that important investigative materials are regularly withheld from criminal defendants**

Under generally accepted police practices, CPD's policy and practice must be to require and ensure that prosecutors and criminal defendants get **everything** from the police investigation, including all documents and information about the crime that was learned during the investigation. As discussed above, the standard is not to invite detectives or other officers to make their own assessments of what is exculpatory or not, what is relevant or not, or to pick and choose what documents and information from their investigation to disclose. The standard is to instruct officers to disclose everything, and let the prosecutor and criminal defendant determine what they think is important to their prosecution or defense at trial.

This is true regardless of whether the request for the police files comes from the prosecution or defense, or in response to a formal subpoena or motion for discovery, or in response to an informal request for investigative documents. In my experience, requests can come in from any of these avenues, but the response must be the same: to disclose everything, not pick and choose.

By the 1990s, and as much as a decade before, departments knew, and officers were trained, that they were required to follow such policies and practices as part of their constitutional obligations under *Brady v. Maryland*. This means providing a defendant not just with evidence that might support his guilt, but also any evidence that might support his innocence, including evidence that might undermine or impeach the evidence against him.

Given the standards set forth above, any review of prosecutor and criminal defense files should reveal a simple finding: all of the documents in the police files up to the point of conviction are contained in the criminal defense attorney's file and the prosecutor's file.

Based on my review of the criminal defense files provided to me, as compared to the investigative files, that is not what I observed. Instead, I found that documents in the investigative file were routinely missing from criminal defense files. In a number of cases, this included investigative material withheld from criminal defendants that was relevant, exculpatory investigative information that should have been disclosed under generally accepted police practices. This is not surprising, given the lack of any such express requirement or instruction in the CPD policies (discussed above). My findings across these files is consistent with my findings from reviewing the police files from the Soto homicide investigation, where detectives did not

47

disclose investigative information and documents that was exculpatory and impeaching and should have been disclosed. I discuss these conclusions below.

*Background on the Area Five investigative files and my file review*

I compared criminal defense files to investigative files and permanent retention files from Area 5 homicide investigations for the period from 1995-1998. It is my understanding that this is the set of files that were ordered to be produced in discovery in this matter, and so I was provided with all such documents (not a sample or selected portion). I note that I did not conduct this comparison of criminal defense files to investigative files and permanent retention files from Area 5 homicide investigations for the years 1991, 1992, 1993, or 1994, because no criminal defense files were provided for comparison. Instead, the only criminal defense files made available were the files from 1995-1998, and so I compared those to the corresponding investigative files and permanent retention files for that period. I previously conducted this analysis in *Reyes/Solache*, and it is reproduced below.

The law firm of Loevy & Loevy provided me with a spreadsheet that served as an index of the investigative files, permanent retention files, and criminal defense files for the period from 1995-1998, attached as **Attachment E**. A similar spreadsheet, **Attachment F**, was provided for the period from 1991-1995, from *Sierra*, but without the green columns reflecting comparison to criminal defense files (since none were provided). I spot-checked, reviewed and double-checked the spreadsheets, and reviewed numerous files to make sure I was familiar with the information contained in the spreadsheets and how they were compiled. My analysis in this section—focused on comparing the homicide files to the criminal defense files—is limited to the 1995-1998 files previously produced in *Reyes/Solache*, referenced in **Attachment E**.

My intention and understanding is for the information contained in Attachment E to be objective – that is, it does not contain subjective determinations about how fields are to be coded, whether something is relevant, whether something it administrative, etc. In this way, anything that was contained in the investigative file but not in the criminal defense file was identified in the spreadsheet. That spreadsheet is attached to this report as **Attachment E.**[112]

For file comparison purposes, for the 1995-1998 time period there were 105 criminal defense files provided corresponding to 72 investigative files (there were some cases with multiple defendants, so multiple criminal defense files for a single investigative file; or where the PD file produced did not have a corresponding investigative file;[113] or where the PD file either contained no police documents or so few that it was treated as incomplete and not counted[114]). After

---

[112] I intend to rely on the spreadsheet included as Attachment E at trial to help explain the differences between the particular files to the jury.

[113] Those cases are Y188817, C381983, C166557, K340833, X146756, A12723, B29657, B540081, C112684, X234861, and C166557.

[114] Where there was a PD file that contained no police documents in it (e.g., just court transcripts, pleadings or other documents), it was marked in Attachment E as being an investigation with no corresponding PD file. Those cases are as follows:  A496779, A594174, A732463, C650817, C713913, C739679.  Where there were *some* police records in the PD file but it appeared to partial or incomplete, in the interest of giving the City the benefit of the doubt and remaining objective in terms of what goes into Attachment E, the case was included in the spreadsheet and marked at being an investigation with a

excluding partial or incomplete PD files, there were a total of 64 criminal defense files included in my analysis.

Finally, I gave the City the benefit of the doubt for purposes of my analysis of criminal defense files as compared to investigative files. To that end, I excluded from my analysis criminal defense files in which it appears that the criminal defense file was incomplete, as mentioned above and in footnote 114. The files available came from the Public Defender's Office, so it is likely that in many of these instances the case was transferred to private counsel, and so the criminal defense file may not be complete. Those files contain a strikethrough in Attachment E (leaving 63 files for calculation and analysis). I also gave the City the benefit of the doubt in my comparison to criminal defense files by assuming that all material in the criminal defense file had been there at the time of the original criminal trial (even if it might have been added subsequently, for example, as part of appeals or post-conviction proceedings). And finally, I gave the City the benefit of the doubt by assuming that the only police documents related to an investigation were those in the investigative file and the permanent retention file the City produced in this case. But of course, as discussed above, the Special Orders regarding documentation and file-keeping applied only to detectives, and so patrol officers, gang crimes officers and others could keep their own notes and reports that were not required to be included in the investigative file.

*Criminal defense files are missing pages from the police investigative files*

I conducted a case-by-case analysis of what documents are included in the police investigative files but are missing from criminal defense files. As discussed above, my comparison exercise was objective rather than subjective. I then analyzed the types of documents withheld across the files, focusing in particular on whether there were the types of documents withheld that could be of importance to prosecutors or defense attorneys and should have been disclosed.

Of course, not all of the material withheld is of equal importance. Some of the documents not turned over to criminal defendants were administrative in nature and unlikely to have been important to prosecutors or defense attorneys (although administrative records can be important, such as the inventory sheets discussed above, an inventory control card identifying detectives who may have checked out the file and participated in the investigation, and even a homicide file checklist noting investigative steps that were taken); while other records were clearly investigative in nature and highly relevant. Regardless, any withheld pages that had been created before trial and conviction, regardless of importance, are evidence that there was not a policy of copying **all** documents in the police files. Instead, what the files reveal is that individual officers or others are making *ad hoc* decisions about what to disclose from each file. Picking and choosing what materials to produce, or failing to have a procedure to ensure complete production of all material in all police investigation files, are both egregious departures from generally accepted police practices.

---

corresponding PD file ("Yes" in column S), but the row was stricken out and not counted for purposes of my calculations and analysis. Those files are: A103098, A325358, A440114, A482669, B662923, C037884, C250890, and C722335.

My comparison of the investigative files to corresponding defense attorney files revealed that every one of the criminal defense files are missing documents that were contained in the corresponding police investigative files.

The documents missing from the defense attorney files are important investigative materials. For example, the following significant discoverable items were routinely absent, and are precisely the kinds of documents that should be routinely disclosed to a criminal defendant under normal police practices.

> **Handwritten Notes and General Progress Reports:** 37 of the criminal defense files (or approximately 59% of the 63 files analyzed) were missing handwritten notes that were present in the investigative files (see Row Z of Attachment E). Likewise, 26 of the criminal defense files, or 41%, were missing GPRs that were present in the investigative files (see Row X of Attachment E). The handwritten notes are often found on what appear to be plain sheets of paper, scraps of paper, and so on, none of which were the official GPRs on which such information was supposed to be documented.

> **Investigative File inventories:** 43 of the 63 criminal defense files did not have an inventory to serve as an index of documents in the police investigative files.

> As discussed above, CPD created the requirement of an inventory sheet in the wake of *Jones/Palmer*, with the idea that prosecutors and criminal defendants could review the inventory to make sure they got all the documents. As discussed above, this is not an adequate safeguard, and the inventories were often missing, incomplete or too vague, and on top of that it appears that the inventory sheets were not getting to criminal defendants at all in most cases. In other words, the safeguard CPD purportedly built into its policy was useless.

> **Issuing a subpoena**: In many of the cases I reviewed, the defense attorney issued a subpoena specifically for "street files," and that subpoena appears in the investigative file. But not all the documents in the investigative file were disclosed in response to those subpoenas. So, even in cases where a criminal defense attorney went out of his or her way to send a subpoena requesting the "investigative" or "street files," there was no guarantee that a defense attorney would receive the complete investigative file (even assuming that was all the documents in the file).

*Examples of relevant information in police files that was withheld from criminal defendants but should have been disclosed*

Below are some examples from the comparison of the defense attorney files and the corresponding police investigative files that demonstrate that the information withheld from criminal defendants included investigative material that should have been disclosed.

### C687989 - Kim Mathis

This case involves the beating death of a child. The investigation revealed that Kim Mathis, the child's mother, admitted hitting the child on the back with a belt four to five times, and that he died two days later. The child died from blunt trauma to the abdomen. (RFC-Solache/Reyes

65178.) Detectives pursued Mathis, and, according to her testimony, beat, threatened, and intimidated her into signing a statement that she had not read. (AR-PD 30237-60.) The handwritten statement and corresponding supplementary report say that Mathis admitted hitting the child in the back with a belt and also stomping on his abdomen with her heel. (RFC-Solache/Reyes 65192, 110155-60.) Mathis denied to the CCPD that she kicked or stomped on her son. (AR-PD 29833)

The investigative file includes handwritten notes with a potential witness to the beating. The handwritten note states that Mathis's sister had been at the apartment when the beating occurred (RFC-Solache/Reyes 110176), but the cleared/closed report says that Mathis's sister was not at the apartment during the beating and did not see the child at that time (RFC-Solache/Reyes 65212). Given that Mathis disputed that she had stomped on her son's abdomen and testified that she was coerced into giving her statement, it would have been critical for the defense attorney to know of all witnesses who were at the house when the supposed beating occurred.

### Z475236 – Ardell Clemons

This case involves the stabbing death of a woman named Nyree Johnson. The investigation revealed that Ardell Clemons, the victim's friend, had been living with the victim at the time of the murder. (RFC-Solache/Reyes 51121.) Detectives pursued Clemons, who had fled to Florida. Clemons was arrested just a few days after the crime.

The investigative file includes several documents that could have been relevant to the defense but were not in the public defender's file. One handwritten note not in the PD file documents another potential suspect who had previously worked with the victim and was dating the victim. (RFC-Solache/Reyes 44288). While the police report lists this individual as a witness and states that he had briefly stayed with the victim, it also stated that they were "only friends. (RFC-Solache/Reyes 51121.). Another document in the investigative file but not in the PD file is an apartment lease noting that the victim left her former residence due to domestic violence, what would have been a lead into another potential alternate suspect (RFC-Solache/Reyes 044260). Another document in the investigative file but not in the PD file is a handwritten note that lists the name of another potential alternate suspect named Harold. (RFC-Solache/Reyes 44290).

### B442532 – Oscar Soto

This case involves a gang-involved shooting from one vehicle to another vehicle. The victim was a man named Miguel Salas who was shot on July 17, 1997 and died a few days later. Detectives investigating an unrelated aggravated battery decided to show a photo array from that case to the witnesses to the Salas shooting. Three witnesses allegedly identified two individuals as a passenger and the shooter on July 20, 1997. (RFC-Solache/Reyes 093896-97). Later, on July 23, 1997, after Detective Guevara was apparently assigned to the case (RFC-Solache/Reyes 093922), a different man, Oscar Soto, was identified as shooter. (RFC-Solache/Reyes 093917).

Two supplementary reports identifying the initial two suspects (RFC-Solache/Reyes 059529) and indicating that witnesses could not identify those suspects in a lineup (RFC-Solache/Reyes 059532) are in the permanent retention file. However, other documents related to these alternate suspects were not: officers believed that this shooting was linked to a separate aggravated battery

in which the same two initial suspects were suspected, and were identified in the other case by a witness who was familiar with them. The arrest reports for those suspects, providing this information—including that they were suspected in a related shooting and had been identified in a familiar-perpetrator identification—is contained in the investigative file but is not in the PD file (RFC 93896-97). Officers

The investigative file also contains several handwritten GPRs (RFC-Solache/Reyes 93888-93; 95; 93924-25) which do not appear to be in the public defender's file, along with other missing documents. These GPRs contain conflicting information regarding whether the witnesses were able to identify the initial suspects and vehicle used in the crime, as well as police notes documenting interviews with the witnesses.

### B023979 – Leon Fields
A 1997 shooting of two victims, Howard Ervin (aka Charles Johnson) and Michael Welch in a game room. One of two offenders, Leon Fields, was identified in a line up by the surviving victim, Welch (RFC-Solache/Reyes 81373).

Critically, the PD file is missing a handwritten GPR that appears to be the 2nd pg. of an interview with eyewitness, Tierre Moton, (RFC-Solache/Reyes 81464) and includes details not in any supplemental report. For example, it includes the fact that shooter had a "scar and bumps" (RFC-Solache/Reyes 81465).  It is notable that defendant Fields does not appear to have "scars and bumps" in photos contained in the investigative file (RFC-Solache/Reyes 81365, 81417-18). The supplementary report of the interview of Moton omits the information about "scar and bumps" contained in the GPR (RFC-Solache/Reyes 81368).

Other items missing from the PD file include one typed GPR containing information not in any typed supplementary report, including details from an interview with the surviving victim Welch (RFC-Solache/Reyes 81445), in which Welch provides numerous details about the crime, is noted to "very reluctant to identify who shot him," discusses potential motives, and provides information about other individuals (including someone named "Noon" Curtis Henderson) with potential information about the crime. It also contains a handwritten note referencing the name "Calvin Morris. " This interview of Welch is not documented in any supplementary report, and the reference to Calvin Morris is unexplained and does not appear in any other report, including in the PD file.

### A403252 - Guy Rainey
Cedric Morris was shot to death on June 10, 1996. Witnesses reported seeing one or two assailants with dark hoodies pulled over their faces, and an eyewitness heard that one of the offenders went by a street name containing "Little." RFC-Solache/Reyes 53995, 54002-03. Detectives requested over a dozen IR photos of individuals with nickname containing "Little," sufficient to compile multiple photo arrays. See RFC Solache-Reyes 72767, 72788, 72802, 72831, 72838, 72768-87, 72789-90, 72792-801, 72803-30, 72832-7, 72839-55. This indicates that there were multiple potential suspects and potentially multiple photo identification

procedures performed, but the defense file does not include the Request for Photos forms listing the individuals requested, or any of the mugshot photos that were received in response to the more than one dozen individuals whose photos were requested. Many of these names are contained on a GPR that was in the investigative file and in the PD file, but not all, meaning at least one alternate suspect was not disclosed. In addition, even if many of the names were disclosed in a note, the photos themselves in the investigative file should have been disclosed, as they are independently of value (e.g., defense counsel might find some of the alternate suspects looked like his client, or fit the witness descriptions, supporting defense of mistaken identity).

Further, according to a lineup and supplementary report, Donnie Morris identified Guy Rainey out of a line-up. Rainey was ultimately charged. Morris's identification appears to be the only inculpatory evidence in the file. But there is a handwritten note in the investigative file, RFC-Solache/Reyes 72857, with Morris's name on it and the statement, "Kevin Haas pull file to see if he is still wanted." If Morris was possibly wanted at the time, that should have been disclosed, as it might be relevant to the sole eyewitness's motivation to cooperate with police, his credibility, etc.

### P272087 – Demetrius Johnson

I was also provided with a copy of the investigative file and permanent retention file related to the investigation resulting in the arrest of Demetrius Johnson. This is a file that was part of the 1985-1991 files reviewed by Michael Brasfield. I reviewed this file as well, and have now opined on it at great length in my report in *Johnson v. City of Chicago*, and I refer the reader to that report for a thorough discussion of the exculpatory and suppressed evidence in that case. It remains a remarkable example of the misconduct that can occur when detectives are able to suppress documents contained in investigative files.

In connection with this investigation, Demetrius Johnson was charged with the murder of Fred Erwin and was convicted on June 12, 1991. The investigative file contains documentation of an in-person lineup by Detective Erickson, in which a witness positively identified an alternative suspect named Bryan Johns. See Bates No. RFC 15470-71. The report of this lineup and all references to this lineup occurring are omitted from the permanent retention file and were not provided to Erwin or his criminal defense attorneys and are also missing from the CCSAO file. Instead, a typed police report by defendant Guevara included in the permanent retention file states the exact opposite: that Bryan Johns was not selected in a lineup that night (see supplementary report at RFC 15480).[115] I note that it is Guevara that wrote the lineup report claiming there was no identification, contrary to the lineup report of Erickson stating that there was a positive identification; and in addition, Guevara was involved in the lineups and other steps that resulted in Demetrius Johnson's prosecution and conviction.

---

[115] The withheld lineup information is also missing from the CCSAO file for this case. And more importantly, I was provided with the depositions of the prosecutor (Kevin Sheehan) and criminal defense attorneys (Deb Gubin and Ruth Miller), all of whom testified with certainty that they had not received the Erickson

**Rivera, Fields, Kluppelberg, Reyes and Sierra are additional examples of cases in which previously missing street files containing highly exculpatory information were discovered in civil litigation decades after the original criminal trials**

My findings above, and the Roman investigation itself (as discussed below), are consistent with the facts and circumstances of other wrongful conviction cases involving CPD in which exculpatory information was withheld, including *Fields v. City of Chicago*, *Kluppelberg v. City of Chicago, Rivera v. City of Chicago, Reyes/Solache v. City of Chicago and Sierra v. City of Chicago*. These cases are, respectively, a 1984 homicide investigation in Area 1, a 1984 homicide investigation in Area 3, a 1988 homicide investigation in Area 5, and a 1998 homicide investigation in Area 5. I reviewed the underlying police files and related records from these cases. Collectively, they are further evidence that the street files practices at issue in *Jones* and *Palmer* continued unabated for decades, and that the practice was Citywide. A brief summary of each of those cases is provided below, and further information is contained in **Attachments G and H**.

**Fields v. City of Chicago:** Nathson Fields was convicted of the 1984 double murder of Jerome Smith and Talman Hickman based on a homicide investigation conducted by Area 1 detectives. Fields' conviction was thrown out after a court granted his petition for post-conviction relief, but he was re-tried in 2009 and acquitted. He then filed a civil rights lawsuit against the City of Chicago in 2010, and during discovery for the civil lawsuit, a street file of over a hundred pages of police reports and notes concerning the Smith/Hickman murders were located in a file cabinet at Area Central, along with files relating to other murders. The City admitted that the file had not been previously disclosed to Mr. Fields or to prosecutors.

The documents newly produced in the street file, which were not contained in any of the earlier files, include handwritten notes, memos, and other documents identifying multiple alternate suspects and potential leads demonstrating that Nathson Fields was not involved in the Hickman and Smith homicides. Notably, it also included a previously undisclosed rap sheet for an alternate suspect with an issued on inquiry date stamp that undermined the prosecution's theory of the case. Nathson Fields name, meanwhile, was never mentioned as a possible suspect in any of these documents.

In December 2016, a jury found that the failure to disclose the street file to Mr. Fields was the result of a pattern and practice of CPD and awarded Mr. Fields compensatory damages of $22 million.

**Kluppelberg v. City of Chicago:** James Kluppelberg was convicted for a 1984 fire that killed six people. In 1984 the fire was investigated by CPD's Bomb and Arson division and Area 3 detectives. Bomb and Arson investigators could not determine the origin of the fire and Area 3 detectives closed the case as accidental. But the case was re-opened in 1988. During the 1988 investigation, Area 3 detectives found new fire investigators to rule the case an arson, and James Kluppelberg was coerced into confessing to the crime. At his 1988 criminal trial, Kluppelberg only had the documents from the 1988 Area 3 investigation. The 1984 Area 3 and Bomb and Arson files were withheld.

Following his exoneration, Kluppelberg filed a civil case. In 2014, during the civil case, a new file was discovered that had never been disclosed in the criminal proceedings. That file contained investigative materials from the 1984 Area 3 investigation, and included critical exculpatory information.  Specifically, it included handwritten notes that a neighbor had reported there was loose and dangerous wiring in the basement that got wet sometimes -- undermining the arson determination and supporting the evidence that the fire was accidental. It contained numerous references to individuals who had had arguments or fights with the victims. And the file also contained a memo between detectives that recounted a statement from an alternate suspect named Isabel Ramos who had started another porch fire in a building nearby and just hours before the fire for which Kluppelberg was convicted. Moreover, Ramos reported that she had been intoxicated at the time, could not remember what she had done, but thought she perhaps set other fires.

The file was found on a pallet among other Area 3 files at the records warehouse, and it appears it was packed up in 1991 when Area 3 was relocated.  Neither of the Bomb and Arson files (from 1984 or the reinvestigation in 1988) has been located, much like the gang crimes documents in this case.

In both of these cases, the undisclosed documents should have been produced to Mr. Fields and Mr. Kluppelberg before their original criminal trials in 1986 and 1988 (and at numerous points after that). These documents should have been produced under generally accepted police practices related to creating, retaining, and disclosing investigative materials.

**Rivera v. City of Chicago:** Jacques Rivera was convicted of a 1988 shooting that killed a young man named Felix Valentin. He was convicted based on the eyewitness identification of a single person, a 12-year old boy. The investigation was conducted by Area 5 violent crime detectives and officers from Gang Crimes North, including Reynaldo Guevara. Mr. Rivera was exonerated in 2011 after the sole eyewitness recanted his previous identification or Rivera.

During civil discovery, an investigative file was produced that contained a number of documents not previously produced to Mr. Rivera or his criminal defense attorney, Ken Wadas. Based on a comparison to Wadas' file, the documents in the investigative file that were WRON 0001-0008, 0011-0014, 0018-0021, 0037-0038, 0042, 0045-0048, 0052-0069. These documents included all of the GPRs, the inventory sheet, arrest reports and hold reports, and a rap sheet for Mr. Rivera. These documents proved to be of critical importance.

The rap sheet for Mr. Rivera included an "issued on inquiry" date stamp of 8/27/1988, the same day as the Valentin shooting. But Mr. Rivera did not become a suspect in the investigation until he was purportedly selected from a book of gang photos by the sole eyewitness on 8/27/1988, two days later. This was highly exculpatory information because it established that Guevara and the other officers had made Mr. Rivera a suspect *before* the sole eyewitness supposedly identified him. This document is contained only the investigative file – it was excluded from the permanent retention file, the CCSAO file, and Judge Wadas's file.

There were other important exculpatory documents withheld from Mr. Rivera. The withheld GPRs included a handwritten note documenting an interview with the sole eyewitness. That GPR indicated that the witness had been "by the store," placing him much further from the shooting

(and far less likely to be able to make an identification) than was otherwise known. The investigative file also contained hold reports and other documents indicating that Mr. Rivera had been placed in a lineup several days before the lineup documented in the official typed reports.

Mr. Rivera won a jury verdict against Guevara, his partner, and his Sergeant, as well as against the City of Chicago for the same policy and practice failures disclosed in this report. Mr. Rivera was awarded $17.175 million.

**Reyes/Solache v. City of Chicago:** Arturo Reyes and Gabriel Solache were convicted of the 1998 double murder of Mariano and Jacinta Soto, and the kidnapping of their young children. They were convicted based on an investigation conducted by Area 5 detectives, including several of the Defendants in this case. Detective Guevara was the primary investigator involved in conducting the interrogations that resulted in the confessions of Reyes and Solache, which formed the primary evidence used to obtain their convictions. Reyes and Solache asserted at their trials that their convictions were the result of physical and psychological abuse by Guevara, and that they were innocent. Their convictions were thrown out more than two decades later, after a hearing in which Guevara's pattern of physical abuse and coercion of suspects was presented at a hearing and the criminal trial judge, Judge Obbish, ultimately concluded that Guevara was a "bald faced liar" and credited Reyes and Solache's accounts of abuse and coercion.

In the civil case, an investigative file was produced that contained photographs and other documents not previously disclosed to Reyes and Solache. Among them were a set of Polaroid photos that were missing from both the prosecutor and criminal defense files, which were taken of several witnesses: Guadalupe Mejia, Jorge Mejia, Rosa Aranda, and Felicia Soto.[116] Based on their deposition testimony in the civil case, which included describing accusatory and threatening interrogation techniques, these individuals appear to have each been treated as alternate suspects.

The fact that Rosa Aranda, Jose Aranda, and Guadalupe Mejia were each questioned about the murder, subject to accusatory interrogations, and denied involvement is all information that should have been documented, along with the reasons they were detained and suspected. The fact that each of these individuals were treated as an alternate suspect is itself important exculpatory and impeachment evidence.

Next, the Polaroid photos were evidence that each of these individuals had been questioned by Detectives at Area 5, and that they had been treated as alternate suspects in the murder and kidnapping of the Soto family. In fact, the only other individuals that the detectives took Polaroid photos of were DeLeon-Reyes, Solache, Adriana Mejia, and Rosauro Mejia, all of whom had been treated as suspects and interrogated over days. The very fact that they were treated as alternate suspects is the type of quintessential *Brady* evidence that police are required to document and disclose to the criminal justice system. Had defense counsel had these Polaroid photos, he or she would have had additional reason to contact these witnesses, and to learn about why they had been at the station and questioned, and what information they had revealed. DeLeon-Reyes' or Solache's counsel may have wanted to call these witnesses to argue that they

---

[116] RFC-Solache/Reyes 76-81.

were alternate suspects, or to testify about their treatment by Guevara to corroborate their own claims of physically and psychologically abusive interrogation tactics.

In this case, such an inquiry would have yielded critical information. That Guadalupe Mejia was treated as a suspect is of particular importance for DeLeon-Reyes, because after being questioned by Guevara she signed a statement claiming that she heard DeLeon-Reyes make incriminating statements on a phone call with Adriana. DeLeon-Reyes claims that statement is false, and so evidence that Guadalupe Mejia had been treated as a suspect, accused of the crime and subjected to harassing behavior, could have been critical to the defense in explaining why she signed a false statement incriminating Reyes.

Likewise, the Polaroid photo indicating that Rosa Aranda was interrogated at Area 5 is also of critical importance. At her deposition, Rosa Aranda revealed that the victim, Jacinta Soto, had made a new friend at a clinic in the weeks before the crime; that the new friend sometimes went to Jacinta's house; and that in the days before the murder, Jacinta had complained that her keys to the apartment had gone missing, and that the friend was over at the same time the keys went missing.[117] She also testified that when the detectives interrogated her, she told them everything.[118] These facts severely undermine the version of events contained in DeLeon-Reyes and Solache's confessions, powerful evidence in a case where they were alleging that their confessions were false and the product of coercion. According to the confessions, Jacinta Soto was a random target that DeLeon-Reyes found at the hospital on the day of the crime; and when they then went to the home later that night they knocked on the door, Jacinta opened the door, at which point DeLeon-Reyes barged in and immediately began stabbing the victim. Rosa Aranda's information about Jacinta's new friend and lost keys would have been powerful evidence that Plaintiffs' confessions were in fact false. This information may have also permitted the defense to argue that Adriana Mejia could have acted alone, if she was able to gain entry while the family was sleeping (rather than needing to physically overwhelm an adult male and female).

Ultimately, the question of exactly how the defense would have used this evidence is besides the point: it is investigative information contained in the Soto investigative file, and there is no excuse for failing to disclose it. In fact, that Polaroid photos of DeLeon-Reyes, Solache and Adriana were all disclosed, but not these, suggests that these photos may have been deliberately withheld, for the reasons set out above. Regardless, the fact that these Polaroids were not disclosed is consistent with my findings about CPD's documentation and disclosure policies and practices discussed above.

In addition, and much like this case, there was a lot of additional investigative information that CPD detectives learned during the Soto investigation that they simply failed to document (or was documented in files that was placed in parallel files other than the investigative file). All of it was investigative information of exactly the type detectives are expected to document and disclose, including interview notes, and lineup reports.

---

[117]  Rosa Aranda deposition (pg. 84-85, 91-92).
[118]  Rosa Aranda deposition (pg. 60).

**Sierra v. City of Chicago**: Sierra was convicted of a 1995 murder in which the offenders from one moving car shot into another moving car at night, from a car with tinted windows. In many ways, the facts of that case mirror this one. In both cases, the primary incriminating evidence was two dubious eyewitness identifications despite extremely challenging viewing circumstances. And in both cases, Guevara and his colleagues obtained statements from witnesses claiming to have knowledge of incriminating evidence against the police suspect (Hector Montanez, Francisco Vicente). Both of those individuals later testified that they were pressured or coerced in various ways to give false statements incriminating Sierra and Iglesias.

The Sierra case is particularly notable for the lack of a single GPR or other handwritten note in the homicide file, strongly suggesting the file had been purged of such information. There are no notes of interviews with either of the two eyewitnesses who were later used to obtain identifications. One of those eyewitnesses, Jose Melendez, testified at Sierra's criminal trial, and consistently since, that Guevara pointed to a picture of Sierra and told him that is who he should pick. There is also no documentation of interviews of Hector Montanez, who eventually gave a statement incriminating Sierra (later recanted).

In addition, the underlying homicide was linked by Guevara to another homicide several days earlier of man named Ruben Gonzalez, based on evidence related to vehicles used in the two shootings. There was evidence in the investigative file in the Gonzalez shooting that Guevara created a fabricated report claiming that a beat officer at the scene of that shooting, Ron Malczyk, had provided information linking the two cases (and linking the crime to Hector Montanez's car). This was directly contradicted by an earlier detective's report from Ron Malczyk. In his deposition, Malczyk testified that Guevara's report was false and fabricated. Neither of the reports from the Gonzalez shooting regarding Malczyk were ever disclosed in the Sierra murder investigation.

**Iglesias v. City of Chicago:** Iglesias involved a 1993 shooting of a young woman named Monica Roman, in which a shooter was standing on one side of the street, and fired into a moving car driving away. Similar to this case, Mr. Iglesias was convicted based on two highly dubious eyewitness identifications. The additional evidence used against Mr. Iglesias was a supposed confession by Iglesias to a jailhouse snitch named Francisco Vicente, who later admitted to making up the confession based on physical abuse, threats and promises by Defendants Guevara and Halvorsen. These two defendants had used Mr. Vicente to claim that men suspected in two other cases had also confessed to him, all within a matter of weeks. All of those men have since had their convictions thrown out.

A typed supplementary report contained in the homicide files from another case (JR-L 3687), involving the same Francisco Vicente, states that during the early stages of the Roman investigation there was a credible lead that the homicide had been committed by two or more Spanish Cobras, and that a Sergeant questioned a known Spanish Cobra about his knowledge of the crime. This report, and the information in the typed report regarding the Spanish Cobras lead, is not contained anywhere in the Roman investigative file or permanent retention file, or the CCSAO file (no criminal defense was found in that case) ,and is not discussed at all by the prosecution or defense at Iglesias's trial. This report was simply buried in the file of another

investigation. Iglesias was not affiliated with the Spanish Cobras and so the Spanish Cobras lead, and whatever witness or evidence resulted in the lead, were potential alternate suspect information that should have been disclosed.

In addition, a handwritten note in the Roman investigative file (not on a GPR) includes notes about several witnesses, including Bernice Bullocks, Hyatt S. Bullocks, Arnell (bus driver), and Sarah Torres. These appear to be notes of interviews of these witnesses, and should have been disclosed.

What stands out most is the handwriting along the left margin of the page, stating next to notes regarding Sarah Torres: "Son came from the boys club, knows shooter [or shorti]." This is important information that should have been disclosed. It is not contained in any of the typed reports discussing the police interviews of Sarah Torres and her son, Efrain Torres. It is not entirely clear if the note states that Torres knows "shooter" or "Shorti," but in either case it is potentially critical exculpatory information (either he knew the shooter but did not make an identification of Iglesias, or he knew Shorti who becomes an alternate suspect).These cryptic notes should have been explained and expanded on in a typed report, but were not. And the handwritten note was not contained in the prosecutor file (again, the criminal defense file was not found).

Overall, the Iglesias case is yet another example of a homicide investigation in which documents containing exculpatory information were not properly disclosed to the prosecution or defense.

59

**The failure to turn over crucial documents in the Hernandez homicide investigation was a direct result of the failed policies and practices discussed above.**

As discussed above, I have thoroughly reviewed thousands of pages of records and testimony from the Hernandez homicide investigation, including the complete police files from the case. I have also received the Cook County Public Defender's file from Laureano's case, and the documents made available from the prosecutor.

Based on my review, what is apparent is that (1) there were important investigative steps taken, and investigative information that CPD detectives learned, that detectives simply failed to document, and thus disclose; and (2) there were materials contained in the police files—in multiple locations—that were not produced to the criminal defendants. All of it was investigative information of exactly the type detectives are expected to document and disclose.

It is my understanding that in this case, a criminal defense file for Daniel Rodriguez was not obtained, but a criminal defense file for George Laureano was found. In addition, a large prosecutor's file was produced, and made available to me.

While some of the withheld documents are not investigative nature (e.g., court attendance sheet, subpoenas), and some may not be of obvious investigative value, as discussed above the failure to disclose to prosecutors the full contents of the investigative file before trial is an indication that detectives were not producing complete files, and picking and choosing, or purging, the files before disclosing them.

For the two pages of handwritten notes in the entire file that are on GPRs, RFC-DRodriguez 215&217, the individuals identified in those notes are not the subject of any typed report even though they were witnesses at the scene who may have had knowledge of the crime. In Raul Ramos's case, there is information about the description of a person and the clothes they were wearing, and of a blue Oldsmobile Cutlass—is this a description of him and/or his vehicle (if so, why would descriptive information be provided for him but none of the others in the note?), or of an individual or vehicle that he observed? This could be quite important, but because it is not more fully explained in a supplementary report, we do not know. Even for those individuals listed on as "no knowledge," understanding more about where they were and what they saw can still be important to corroborating or disproving testimony being provided by others (e.g., Arroyo, Rivera, Velasquez) about what occurred or who was present. The failure to document these interviews in a typed report is contrary to CPD policy and a deviation from police practice.

The documents contained in the investigative file also include handwritten notes not contained on GPRs, at RFC-DRodriguez 219-220. This is contrary to the Special Orders discussed above that were put in place to address the very issue of file suppression, and evidence in this investigation that the CPD file disclosure policies were not being followed. In addition, although some of the information in these handwritten notes is reflected in a supplementary report regarding the interviews of Delbert McCullum, Clifford Carter and Raymond Graciano, information about other witnesses listed in the same notes and what they had to say is not (e.g., Alicia [Chiprey?] and Jeffrey Watts).

60

Similarly, there are several cryptic notes in the file that are difficult to interpret, and that are not further explained or contextualized in any typed report (*e.g.*, RFC-DRodriguez 11, 222).

In addition, there were documents created related to the Hernandez investigation, but that were not disclosed; documents that contained important investigative information that should have been disclosed, including the following:

**Photos referenced in Inventory sheet and in investigative file (RFC-DRodriguez 41, 181-183):**

- There is no copy in the investigative file of the Navarro photos and "Polaroid photos (Circ. Witnesses)" referenced in the inventory, or anywhere else in the RD File or other police records I was provided. Nor do I see such photos in the criminal defense file or prosecutor file.
- A typed supplementary report indicates that a photo array was shown to Arroyo in which he did not identify Navarro but did identify Juan Sepulveda, who was then questioned as a potential suspect. So there was some reason to believe that this was not an identification of a filler but of a suspect, which would suggest that whatever other individuals were included in the photo array were also suspects. But that photo array (and the reasons those photos of potential suspects were included) is not preserved in the investigative file, RD File or in any other collection of police files I received, nor is there any evidence report or other document indicating that the photo array was entered into evidence.
- All of these photos—shown to the Taco Nazo owner Arroyo, who was identifying a person he believed to have a gun just minutes before the shooting just outside his restaurant, is important evidence that should have been properly inventoried, stored and disclosed.

**Note regarding Alicia Velez, the mother of Jason Rivera (RFC-DRodriguez 11):** The cryptic note at the beginning of the file listing the name, address and phone number of Alicia Velez is information that is not contained anywhere else in the investigative file or other police files in this case. It is also not included in the criminal defense or prosecutor file. As discussed above, Alicia is the mother of Jason Rivera, and was allegedly in a relationship with Guevara. The potential importance of this connection, and its impact on potential motives for Jason Rivera to lie against Laureano and Rodriguez, is discussed in detail above. The fact that she is specifically identified in the investigative file—indicating that one of the detectives spoke to her in the context of this investigation—is important exculpatory information that may have supported defenses available to Rodriguez and Laureano, and should have been disclosed.

**Additional investigative information not documented or disclosed**: In addition to all of this, there is ample additional investigative information that CPD detectives learned during their investigation that they simply failed to document. All of it was investigative information of exactly the type detectives are expected to document and disclose. Much of this is discussed at length in my Opinion 1, and includes the following:

- Interview Notes:

61

- o Halvorsen supposedly learned information from Jason Rivera in late March 1991 indicating that he and Velasquez had witnessed the shooting and that they witnesses Rodriguez and Laureano commit the crime, but this is not documented in any contemporaneous handwritten note, or in any other note at all. It first appears in a typed report in May 1991, without any indication as to why, more than six weeks later, this lead was suddenly followed up on and documented, with Rivera brought to Area 5 to memorialize his statement. Or, how detectives could write a report from memory more than six weeks later.
- o There are no notes of the interviews of George Laureano and David Velasquez at Area 5.
- o There are no notes of the numerous interactions with Rodriguez over the course of his interrogation. There appears to be no dispute that detectives came in and out over many hours, but there is no documentation of the progression of his interrogation, any denials, what information was told to him, or any other information that would explain the course of an interrogation that led ultimately to a purported confession.
- o There are no notes of the interviews of Arroyo, Navarro or Sepulveda. Navarro and Sepulveda had been identified as potential perpetrators, yet (as discussed above) the documentation of their interviews is woefully inadequate in the typed reports, and completely absent from any contemporaneous notes that would shed some light on what was actually asked of these two suspects. There is no documentation of any efforts to eliminate them as suspects (or continue to investigate them).

Based on these failures to document and failures to disclose, the investigative file in the Hernandez homicide investigation suffers from the same systemic problems observed in the investigative files I reviewed as a whole, from this case, the hundreds of other investigative files I reviewed, and others cases such as *Rivera*, *Fields*, *Kluppelberg, Sierra, Iglesias, Johnson*, and *Reyes/Solache*. Various important investigative steps should have been documented and disclosed under generally accepted police practices but were not as a result of CPD's deficient policies and practices related to documentation and disclosure of investigative information learned in homicide investigations.

## CONCLUDING STATEMENT

I have provided my opinions based upon my training, experience, and my review of thousands of pages of records in this case. I applied generally accepted police management principles and methods. I hold the opinions set forth above to a reasonable degree of professional certainty and based on longstanding and well-accepted law enforcement practices.

If additional information is presented to me, I am happy to consider it. I reserve the right to supplement or modify this report and my opinions expressed in the report.

*Thomas J. Tiderington*

/s/Thomas J. Tiderington

8/08/2025