**Eyewitness Identification Expert Report of Dr. Jennifer Dysart in**
*Daniel Rodriguez v. Reynaldo Guevara, et al.*
**(Case No. 1:22-cv-06141)**

**Report Date: August 8, 2025**

**I. Overview and Credentials of Dr. Dysart**

My name is Dr. Jennifer Dysart and I am a tenured Associate Professor of Psychology at John Jay College of Criminal Justice, in New York City. I have been testifying as an Eyewitness Identification Expert since 2006. I was contacted by attorneys representing Mr. Daniel Rodriguez and asked to review materials in the above referenced case and provide my opinions regarding the eyewitness identification evidence relating to the wrongful conviction of Mr. Rodriguez for the 1991 shooting death of Jose Hernandez, Jr. After serving nearly 15 years for the wrongful conviction of Mr. Hernandez Jr., Mr. Rodriguez was granted a Certificate of Innocence on September 29, 2022. I am being compensated for my time writing this report at a rate of $400/hr. My fee for testimony (deposition and trial) is $600/hr.

*Employment:* I am a tenured Associate Professor of Psychology at John Jay College of Criminal Justice of the City University of New York. Prior to my faculty appointment at John Jay College in January of 2006, I was an Assistant Professor of Psychology at Southern Connecticut State University, New Haven, CT (2003-2006).

*Education:* I hold a PhD in Social Psychology from Queen's University, Kingston, Ontario, a Master's degree in Psychology (Brain, Behavior and Cognitive Science) also from Queen's University, and a Bachelor of Arts degree in Psychology from St. Thomas University, Fredericton, New Brunswick.

*Teaching Experience:* I have taught about eyewitness identification research in psychology courses at the undergraduate, Master's and doctoral levels. I have supervised more than a dozen undergraduate and Master's thesis research projects and one doctoral dissertation on the topic of eyewitness accuracy.

*Testimony & Consulting:* I have given testimony as an eyewitness expert approximately 100 times in various pre-trial hearings, trials, post-conviction hearings, and civil cases in California, Connecticut, Delaware, Florida, Georgia, Illinois, Kansas, Louisiana, Maryland, Massachusetts, Michigan, Nevada, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Tennessee, Texas, Vermont, Virginia, and St. Thomas, USVI. I have also testified at a criminal jury trial in Federal court in New Jersey. I have never been deemed unqualified as an Eyewitness Identification expert in court. In addition to testifying, I have consulted in numerous other cases. Although most of my consulting has been for criminal defendants and plaintiffs in civil cases, I have also worked for prosecutors in Conviction Review Units in several states including the wrongful conviction case of Mr. Mark Denny in Kings County, New York, who was ultimately released from prison in December, 2017. A list of my testimony over the past four years is attached to this report as Appendix A.

*Publications:* I am an author or co-author of over two dozen eyewitness publications including original research articles published in peer-reviewed scientific journals, book chapters, a law review article, and a book on eyewitness identification accuracy titled "Eyewitness Identification: Civil and Criminal, 6th Edition" published by LexisNexis.

*Presentations:* I have given more than 180 presentations over the past 25 years on Eyewitness Identification at Psychology conferences and at conferences attended by judges, attorneys, police officers, investigators, law students, and the general public concerning the accuracy of eyewitness identification and factors that may increase or decrease its reliability.

*Curriculum Vitae:* My complete academic curriculum vitae is attached to this report as Appendix B.

## II. Materials Reviewed in this Case

As an eyewitness identification expert witness, I ask the attorney or firm who has retained me to provide me with all available relevant materials related to the eyewitness evidence in the case, including police reports, copies of all identification procedures, testimony of the victim(s) and/or witness(es), and any other documentation that is relevant to the eyewitness identification at hand. In this case, I reviewed the materials listed in Appendix C plus other materials cited in this report:

If other materials related to the eyewitness evidence in this case are provided to me at a later time, I reserve the right to supplement and/or edit my report where I deem relevant based on this additional information.

## III. Summary of Case and Opinions

Mr. Rodriguez was wrongfully convicted of the murder of Jose Hernandez, Jr. in 1991. Evidence from two purported eyewitnesses – David Velazquez (17 years old) and Jason Rivera (17 years old) (000163) – was presented at his trial. Mr. Rivera identified Mr. Rodriguez at trial however Mr. Velazquez testified that he was not present and was coerced to implicate Mr. Rodriguez by Defendants Guevara and Halvorsen. There was no physical evidence connecting Mr. Rodriguez to the homicide. Mr. Rodriguez was granted a Certificate of Innocence in this case after serving over 3 decades wrongfully incarcerated.

On March 17, 1991, Jose Hernandez, Jr. (aka Junito, aka Young Boy) was shot and killed in a drive-by shooting while he was driving his car.

George Laureano (aka Fro) was alleged to be Mr. Rodriguez's accomplice in the shooting (passenger side shooter). He was tried separately and at his criminal trial (which preceded Mr. Rodriguez's trial) and found not guilty by a directed verdict.

Mr. Velazquez has repeatedly testified – 6 times – that he was forced by Defendants Guevara and Halvorsen to implicate Mr. Rodriguez in this crime under the threat of being falsely accused for murder and he has consistently rejected the false account that Defendants Guevara and Halvorsen have attributed to him during his interview in March 1991.

Mr. Velazquez testified at trial that he had known Mr. Rodriguez (aka Don Juan) for approximately 5 years, Mr. Laureano (Fro) for a few years. (004941-2), and Mr. Rivera all his life. (004943). Mr. Velazquez and Fro were part of the same gang, the Insane Spanish Cobras, (004942), as was Mr. Rodriguez (Dep. 13) and Mr. Rivera was a member of the Maniac Latin Disciple. (004943). Mr. Hernandez, Jr. was a member of the Latin Kings. (004944).

Mr. Velazquez testified at trial that he was at home with his family when Mr. Hernandez, Jr. was shot and killed (004946) and did not see the shooting (004948) and did not tell Defendants Guevara and Halvorsen anything about the shooting because he was not there. Mr. Velazquez testified at his deposition that when he was being "interviewed" by Defendant Guevara (Dep 31) on May 10, 1991, he was handcuffed to the wall (Dep 27) and was being tortured by Defendant Guevara. (Dep 28). A white female wearing a maroon dress kept coming in and out of the room where he was handcuffed (Dep 27-28) and being beaten. (Dep 35). She and another male returned with a paper that he signed (Dep 29) but he does not know what it said because he could not read nor write at the time. (Dep. 30). The female individual told him to comply and that he could home after he signed the paper. (Dep 34). He signed the paper and he was released from custody. (Dep 30).

Mr. Velazquez testified at trial that he was shown individual photographs of Mr. Rodriguez (Don Juan) and Mr. Laureano (Fro) and he identified them as Don Juan and Fro. (004952-3; 000167).

Evidence suggests that Mr. Rivera may have been a motivated witness in Mr. Rodriguez's criminal trial because his mother, who worked for the Chicago Police Department, was in a sexual relationship with Defendant Guevara, and a potential co-conspirator in a double murder at the time of the Hernandez, Jr. investigation. In an interview with Lisa Brean and Diane Doyle, attorney for George Laureano, on April 15, 1992, Mr. Rivera stated that he did not know anything about the murder of Jose Hernandez, Jr. because he was locked up on the day of the shooting (from February 17, 1991 to approximately May 1, 1991). He also stated that police showed him an unsigned statement allegedly made to them by Mr. Velazquez. (000067). At trial, he testified that Mr. Laureano's aunt Joanne Garcia threatened him to make that statement.[1] (004991). It was also revealed that he was paid more than a thousand dollars before he testified at that hearing, and was paid again before testifying many years later in an unrelated post-conviction hearing.

Despite the information above, there are witness statements in the record attributed to Mr. Rivera and Mr. Velazquez regarding their observations of the Hernandez, Jr. shooting. A police report (000165) summarizes the statement Mr. Rivera allegedly gave to Defendants Guevara and Halvorsen on March 25, 1991. According to this summary, Mr. Rivera contacted Defendant Halvorsen and told him that he witnessed a murder.[2] According to the statement, Mr. Rivera and Mr. Velazquez went to the Taconazo Restaurant to get something to eat around 1:00am on March 17, 1991.[3] Around 1:15am, they saw the victim, whom they knew as "Junito", pull up in his car.[4] They then saw Rodriguez and Laureano pull up in a car. Mr. Rivera testified at trial that in March 1991 he had known Mr. Rodriguez for 3-4 years and Mr. Laureano for 5 years. (004973). He saw Laureano lean out the passenger side of the car and fire shots at Hernandez, Jr.'s car and then drove away. Defendants Guevara and Halvorsen then showed him a single photograph of Laureano and he identified it as the person he knows as "Fro". (000165). On May 9, 1991, Defendants Guevara and Halvorsen showed Mr. Rivera a single photograph of Mr. Rodriguez and he identified it as the person he knows as "Don Juan". (000167).

In his deposition, when asked a variety of questions related to the Hernandez, Jr. murder (e.g., witnessing it, speaking to police, and testifying), Mr. Rivera repeatedly testified that he did not remember. He also testified that he did not remember if his brother had been tried and acquitted for murder, or whether he had ever witnessed a murder himself. In my nearly two decades of experience as an expert witness, I have never before encountered a witness who responded "I don't remember" to questions as frequently as did Mr. Rivera. It is true that a lot of time had passed between 1991 and his 2025 deposition, however he testified that he did not remember major life events such as witnessing a homicide. He also testified that he did not know anyone in the Cobra street gang with the nickname Don Juan or Fro. (Dep 55).

In this report, I make no credibility judgements regarding whether Mr. Velazquez's trial testimony (and other testimony provided under oath on multiple occasions) denying that he made a statement to Defendants Guevara and Halvorsen that he witnessed the shooting is true. If it is true and he did not observe the

---

[1] In his deposition, he testified that he had never been threatened by someone named Joanne Garcia. (Dep 71-2).

[2] At trial, Rivera testified that he first discussed the Hernandez, Jr. case with Halvorsen when Halvorsen picked him up to go testify in grand jury proceedings in another case on May 9, 1991. (005026).

[3] Velazquez testified at his deposition that Taconazo was Mexican food and he is Puerto Rican so he did not recall ever eating there. (Dep 20).

[4] In his deposition, Rivera testified that he had never known anyone (besides his cousin) with the nickname of Junito. (Dep 50).

3

shooting, then there can be no value in Mr. Velazquez as an eyewitness in the criminal case against Mr. Rodriguez and Defendants should have known in 1991 that there was no value in his alleged statement. Further, I make no credibility judgements regarding whether Mr. Rivera's statement to Lisa Brean and Diane Doyle that he did not observe the shooting because he was incarcerated on the day of the shooting is true. If it is true and he did not observe the shooting, then there can be no value in Mr. Rivera as an eyewitness in the criminal case against Mr. Rodriguez and Defendants should have known in 1991 that there was no value in his statement.

If the trier of fact determines that both Mr. Velazquez and Mr. Rivera were eyewitnesses to the shooting of Mr. Hernandez, Jr. on March 17, 1991, there are several scientific factors related to eyewitness perception and identification that are relevant to consider including, but not limited to, the opportunity to see at the time of the crime, distance, lighting conditions, stress/arousal, and the use of a photo showup for purposes of identification. Although both Mr. Velazquez and Mr. Rivera testified in 1992 that they had prior familiarity with Mr. Rodriguez in March 1991, it is the opportunity to view at the time of the crime that is critical to assess with respect to a witness' ability to accurately perceive. In his 2025 deposition, Mr. Rivera testified that he has never known anyone that went by Mr. Rodriguez's nickname (Don Juan).

One of the most critical issues with respect to witness reliability in this case is the use of a single photo (showup) during the identification procedures. Showups are known to be highly suggestive and are recommended for use only in exigent circumstances (e.g., witness is injured and may not survive). The fact that single photographs were shown to witnesses in this case, when no extenuating circumstances were described, was highly improper and likely caused the witnesses to select the photographs that Defendants presented to them.

## IV. Basis for Opinions in This Case

In this section, I identify a series of factors, relevant to the current case, that have been shown through scientific peer-reviewed research to influence the reliability of eyewitness identifications. As this research relates to the selection of Mr. Rodriguez, I will first outline the factors known to affect eyewitness accuracy that are *not* under the control of law enforcement (known as "estimator variables"), followed by the factors that are under the control of law enforcement (known as "system variables").[5] It is critical to understand the impact of both types of variables on eyewitness accuracy so that an evaluation of an eyewitness's ability to view and perceive the events and subsequent likelihood of making an accurate identification can be made. In addition, "reflector variables" including eyewitness confidence and decision speed also will be discussed with respect to their relationship to eyewitness accuracy.[6]

As far back as 1966, the International Association of Chiefs of Police (IACP) published law enforcement training keys on the subject of eyewitness memory where they warned of the fallibility of eyewitness testimony and provided guidance on how to assess eyewitness reliability. IACP also published eyewitness training keys in 1983, 1992, and 2006. The IACP website currently has roll call training videos and additional documentation regarding eyewitness identification best practices.[7] In 2015, the law in Illinois regarding eyewitness identification procedures was amended and this law is consistent with best practices described in this report.[8]

---

[5] Wells (1978). Applied eyewitness testimony research: System variables and estimator variables. *Journal of Personality and Social Psychology, 36,* 1546 –1557.

[6] Wells (2020). Psychological science on eyewitness identification and its impact on police practices and policies. *American Psychologist, 75(9),* 1316-1329.

[7] See: https://www.theiacp.org/resources/policy-center-resource/eyewitness-identification

[8] IL ST CH 725 § 5/107A-0.1

Based on my review of the above materials, the estimator and system variables relevant to the selection of Mr. Rodriguez include:

**Estimator Variables:**
1) Effects of Limited Opportunity to Observe at the Time of the Event
    a) Exposure Time & Time Estimates
    b) Distance
    c) Lighting
    d) Prior Familiarity
2) Stress/Arousal

**System Variables:**
1) Post-event contamination
2) Photo Showup
3) Pre-identification Warnings/Instructions
4) Non-blind Administration
5) Witness Confidence

### V. General Background on Eyewitness Research

Over a period of decades, researchers have established that when we experience an important event, we do not simply record it in our memory as a video recorder would. The situation is much more complex.[9] In fact, the National Research Council Report on eyewitness identification titled "Identifying the Culprit: Assessing Eyewitness Identification"[10] concluded the following with respect to humans' ability to accurately perceive their environment (P. 55):

> *Perception does not reflect the sensory world passively, as camera film detects patterns of light.*

In fact, the prevailing theory of memory divides it into three stages. First, a witness perceives an event and some of that information is entered into the memory system. Next, some time passes before a witness tries to remember the details of the event. Finally, the witness tries to retrieve the information that was stored in memory. The National Research Council report reminds us that (P.57-58):

> *The way an observer experiences a visual scene—the setting, the people, and the actions associated with a crime —is commonly influenced as much by expectations from prior experience with the world as it is by the precise patterns of light cast upon the retina. (P. 57) In view of this inherent dependence of perception on prior experiences and context—and, importantly, the fact that the viewer is commonly none the wiser when perception differs from the "ground truth" of the external world— it appears that accurate eyewitness identification may be difficult to achieve.*

Psychologists who conduct research in this area investigate the factors that play a role and can affect memory in each of the three stages. Specifically, researchers have identified a number of ways that eyewitness evidence – a witness' recollection of events – like other forms of **trace evidence** in an investigation, can be altered and/or affected through **contamination**, especially when the witness' memory for the event is not strong to begin with. Contamination of a witness' memory can come from many sources including information learned from (or about) other witnesses, information provided by law enforcement

---

[9] For a review of science of perception and witness memory, see National Research Council (2014). *Identifying the culprit: Assessing eyewitness identification.* Washington, DC: The National Academies Press.
[10] Ibid.

or other individuals charged with the collection (and preservation) of eyewitness evidence, and media and social media accounts relating to the case. Regardless of the source, however, once a witness' memory has been exposed to post-event information, it is extremely difficult to ascertain the full impact of this contamination on a witness' subsequent recollection of events and people.

Numerous factors at each stage of memory affect the accuracy of an eyewitness account. Some of the factors affecting eyewitness performance include: the opportunity of the witness to see a perpetrator's face and body, and stress or fear experienced during the event. As it relates to law enforcement, research has shown that the procedures and practices police use during the retrieval stage of memory can influence the reliability of an eyewitness identification and the witness's subsequent testimony. Examples of police procedures that can affect an eyewitness' accuracy and memory include the use of pre-lineup/photo array[11] instructions, whether the identification was conducted using a double-blind administrator, and the type of post-event information provided to a witness both before and after their identification decision.

In February 2020, the American Psychology-Law Society (Division 41 of the American Psychological Association) published a revised White Paper on eyewitness identification best practices, updating their 1998 Eyewitness White Paper.[12] The 2020 White Paper[13] maintained the original four best practice recommendations from 1998[14] and added five new best practice recommendations for the collection and preservation of eyewitness evidence.[15] The opinions in this report regarding best practices are, where relevant, consistent with these best practice recommendations and the 2015 law in Illinois.

**Eyewitness Error Rates in Actual Cases**

According to the national Innocence Project database, there have been mistaken eyewitness identifications in nearly 70% of post-conviction DNA exonerations in the United States – which this database currently numbers as more than **375.**[16] In a 2011 analysis of the first 250 DNA exoneration cases in the United States, Duke University Law Professor Brandon Garrett found that the leading contributing factor in these wrongful convictions was erroneous eyewitness identification, which occurred in 76% of the first 250 cases.[17] In a quarter of all wrongful convictions studied by Garrett, eyewitness testimony was the *only* direct evidence against the defendant. In the 190 DNA cases where there was an erroneous eyewitness

---

[11] In this report, the terms "lineup" and "photo array" will be used interchangeably except when discussing the specific procedures utilized in this case.

[12] Wells, Small, Penrod, Malpass, Fulero, & Brimacombe (1998). Eyewitness identification procedures: Recommendations for lineups and photospreads. *Law and Human Behavior, 22,* 603–647.

[13] Wells, Kovera, Douglass, Brewer, Meissner, & Wixted (2020). Policy and procedure recommendations for the collection and preservation of eyewitness identification evidence. *Law and Human Behavior, 44,* 3-36.

[14] These include: how to select lineup fillers, providing witnesses with a pre-lineup warning, the use of double-blind administration, and recording a confidence statement from a witness after they have made a selection.

[15] These include: the need to conduct a pre-lineup interview with a witness, the need for evidence-based suspicion before conducting an identification procedure, video-recording the identification procedure, avoid repeated identification attempts with the same suspect, and avoid using showups when possible.

[16] This statistic has not been updated on the Innocence Project website (www.innocenceproject.org) for at least two years and therefore this figure likely is an underestimate of the current number of DNA exonerations in the United States. For example, the National Registry of Exonerations lists **630** exonerations with DNA evidence as of August 4, 2025. Visit: https://www.law.umich.edu/special/exoneration/Pages/about.aspx

[17] Garrett (2011). *Convicting the innocent: Where criminal prosecutions go wrong.* Cambridge, MA: Harvard University Press.

identification of the defendant, 36% included mistaken identifications from *more* than one eyewitness. In fact, some of the DNA cases had as many as five eyewitnesses who incorrectly testified that the defendant was the perpetrator they saw. In these exoneration cases, there is no evidence that witnesses were anything more than wrong. In other words, mistaken eyewitnesses were not accused or suspected of lying about their selection of the innocent defendant. Evidence demonstrates it is common for eyewitnesses to genuinely believe they are identifying the correct person yet still be mistaken.

In addition to the wrongful conviction cases described above, archival studies of police records also show that eyewitness identifications can be unreliable. Researchers have analyzed archival records of actual eyewitness identifications and attempted identifications from police files.[18] In the 2020 White Paper discussed above, Wells and colleagues summarized the filler identification data from several archival studies of actual eyewitnesses to crimes.[19] The authors examined 11 published articles with data from over 6,500 witnesses in actual cases. The results showed that nearly one quarter of all witnesses who viewed a photo array or lineup in actual cases chose an innocent filler. Of those who "identified"[20] a person from a photo array or lineup, more than one third (37%) chose an innocent filler as the perpetrator. Further, the overall eyewitness identification error rate must be higher than 37% because the data does not include erroneous selections of innocent suspects (it only includes known-innocent filler selections).

In summary, identification decisions in actual cases show that errors are common and that over one third of all "positive identifications" in actual cases are incorrect. While false identifications of innocent fillers invariably do not send those fillers to prison, these choices still constitute identification errors and provide valuable information about the reliability of eyewitnesses and the reliability of identification procedures generally.

**VI. Expert Opinions Regarding Eyewitness Reliability**

Following my review of the materials listed above, I have identified the following eyewitness reliability factors as being relevant to the eyewitnesses in this case. Below, I use examples from the scientific literature to support my conclusions. The cited research is not intended to be an exhaustive list of all relevant research on each topic below, rather a sample of the scientific literature. In addition, samples of testimony and other evidence from the materials reviewed in this case will be used to support the relevance of each scientific factor to this case. Not all examples found in the materials will be repeated in this report.

---

[18] Unfortunately, when using archival data and police records, it is not possible for researchers to determine when a suspect identification is correct because the ground truth about whether the suspect in a lineup or other identification procedure is guilty is not known. Despite some researchers' best efforts to *estimate* the truth, actual truth about whether the suspect in the lineup or other identification procedure is truly guilty is rarely known to researchers using archival and field data. It is possible, however, to determine general error rates as reflected in the false identification of non-suspect fillers. Dr. Ruth Horry and colleagues discuss additional concerns about archival studies in their 2014 paper: Horry, Halford, Brewer, Milne, & Bull (2014). Archival analyses of eyewitness identification test outcomes: What can they tell us about eyewitness memory? *Law and Human Behavior, 38,* 94–108.

[19] Wells, Kovera, Douglass, Brewer, Meissner, & Wixted (2020). Policy and procedure recommendations for the collection and preservation of eyewitness identification evidence. *Law and Human Behavior, 44,* 3-36.

[20] Witnesses who "identify" an innocent lineup filler are obviously not making this selection because they truly recognize the filler from the crime, so the term "identify" is not the correct term. Thus, it is important to distinguish between an identification (which is presumably made based on a recognition of a person based on match-to-memory) and *choosing* behavior (selecting someone from a showup, mug-shot, photo array or lineup procedure).

**Estimator Variables**

**1. Effects of Limited Opportunity to Observe at the Time of the Event**

Common sense might suggest that even a brief opportunity to view a perpetrator's face allows us to form a mental "snapshot" of that person. But research supports a different conclusion: the opportunity a witness has to view a perpetrator's face significantly impacts the witness' later ability to describe and identify that person. Generally, when the opportunity to see a person's face is limited (due to a short observation time, the presence of a weapon or disguise, a long distance, etc.), the result will be a weak or poor memory (trace) for that individual. What is critical with respect to reliability is the amount of time that a witness has to view a person's face *at the time of the event*.

**a) Exposure Time & Time Estimates.**

Mr. Rivera testified that he saw the car allegedly being driven by Mr. Rodriguez for 5-15 minutes before the shooting. However, there was no testimony regarding how long he was able to see the face of the driver.

In research on the effects of exposure duration – the amount of time one has to view or encode something - on eyewitness accuracy, Shapiro and Penrod found a systematic relationship between exposure time and identification accuracy in their 1986 meta-analysis on this topic.[21] That is, shorter exposure time generally correlates to less accurate identifications. In the time since this comprehensive review was published, an updated meta-analysis[22] and other research[23] have replicated the positive correlation between the amount of time a witness saw the perpetrator's face and reliability.

**Time Estimation.**

The statements given to police attributed to Mr. Velazquez and Mr. Rivera alongside the alleged confession given by Mr. Rodriguez are inconsistent with respect to the events prior to the shooting. Mr. Velazquez did not describe the shooter's vehicle stopping near the victim's vehicle for a period of approximately 15 minutes, nor did Mr. Rodriguez, but Mr. Rivera did. Thus, it is unclear from the record how long, if at all, the shooter's vehicle stopped at the scene prior to the shooting.

Researchers have investigated people's retrospective estimates of the amount of time that an interaction or event took place. The general finding shows that estimates often differ from the actual amount of time, with

---

[21] Shapiro & Penrod (1986). Meta-analysis of facial identification studies. *Psychological Bulletin, 100,* 139–156.

[22] Bornstein, Deffenbacher, Penrod, & McGorty (2012). Effects of exposure time and cognitive operations on facial identification accuracy: A meta-analysis of two variables associated with initial memory strength. *Psychology, Crime and Law, 5,* 473–490.

[23] For example, see: Longmore, Liu, & Young (2008). Learning faces from photographs. *Journal of Experimental Psychology: Human Perception and Performance, 34,* 77–100; Memon, Hope, & Bull (2003). Exposure duration: Effects on eyewitness accuracy and confidence. *British Journal of Psychology, 94,* 339–354; Read, Vokey, & Hammersley (1990). Changing photos of faces: Effects of exposure duration and photo similarity on recognition and the accuracy–confidence relationship. *Journal of Experimental Psychology: Learning, Memory, and Cognition, 16,* 870–882.

the error often in the direction of overestimating time.[24] Sometimes the estimate of time is profoundly exaggerated. For example, in one study, participants saw a 30s simulated bank robbery on videotape.[25] Two days later they were asked some questions about the tape, including how long it lasted. The average estimate of duration was 152s – more than 5 times the actual length. Very few people estimated a duration that was equal to or less than the true value of 30s. Although it was rare, some people produced inordinately long estimates of over 900s. In other words, these individuals remembered a 30s bank robbery tape as having lasted over 15 minutes. Thus, it is possible that witness testimony about the duration of their observations will be skewed such that triers of fact hear testimony that the witness had a longer opportunity to view the perpetrator than is in fact true.

**b) Distance.**

Mr. Rivera allegedly provided law enforcement with an estimate of the distance from where he was standing to where he saw the car with the shooter – 50 feet. Regardless of the exact distance, based on the overall description of the events from witnesses, it appears that distance is a relevant estimator variable in this case.

Research conducted on this topic has shown that distance can significantly impact a person's ability to view the details of another person's face.[26] In his "distance-as-filtering hypothesis", Dr. Geoff Loftus explains that as a face is viewed at further and further distances, there is less ability to detect the details of the face because facial details become coarser and coarser. As way of example, the image below from Loftus' research recreates the loss of detail when one view's a face from 20 feet (6.7 yards; left) to 100 feet (33.3 yards; right).



---

[24] For example, see: Attard & Bindemann (2014). Establishing the duration of crimes: An individual differences and eye-tracking investigation into time estimation. *Applied Cognitive Psychology, 2,* 215–225; Loftus, Schooler, Boone, & Kline (1987). Time went by so slowly: Overestimation of event duration by males and females. *Applied Cognitive Psychology, 1*, 3–13; Yarmey, & Yarmey (1997). Eyewitness recall and duration estimates in field settings. *Journal of Applied Social Psychology, 27,* 330–344.
[25] Loftus, Schooler, Boone, & Kline (1987). Time went by so slowly: Overestimation of event duration by males and females. *Applied Cognitive Psychology, 1,* 3-13.
[26] Loftus & Harley (2005). Why is it easier to identify someone close than far away? *Psychonomic Bulletin & Review, 12,* 43-65; Harley, Carlsen & Loftus (2004). The 'saw-it-all-along' effect: Demonstrations of visual hindsight bias. *Journal of Experimental Psychology: Learning, Memory and Cognition, 30,* 960-968.

In other research, scientists tested eyewitnesses on their ability to recognize a person's face from a range of distances.[27] Participants viewed faces from distances between 10 feet and 131 feet and were then immediately asked to make an identification from a six-person lineup. The results showed that the proportion of correct responses to errors was too great at distances over 49 feet for an identification to be considered probative. Accordingly, the authors recommended a 50 foot distance cutoff point as a useful "rule of thumb" for courts when assessing reliability. A replication of this study using photos of famous people led to a similar conclusion.[28] Other researchers[29] have also found significant impairments in identification accuracy when the distance between a witness and the target increases but do not recommend a particular cutoff point, as did Wagenaar and van der Schrier. The implication of the scientific research is that distances over 50 feet make it difficult to encode the details of a person's face, which is required in order to make an accurate identification decision. Further, researchers have also found that the confidence-accuracy relationship (discussed in more detail later in this report) is significantly weakened when the distance between the witness and the perpetrator is over 66 feet.[30]

**c) Lighting.**

The record is not particularly clear on what the lighting conditions were at the time of the shooting as this was not a subject of questioning at trial and there was no description of lighting conditions in the police reports. Therefore, lighting conditions may be a relevant consideration given that the shooting took place around 1:15am.

It is important to have a basic idea of how visual information gets into the brain in order to understand how lighting conditions can affect perception.[31] The answer lies in a network of millions of nerve cells. Of particular importance to the visual system are two types of receptor cells in the eye called *rods* and *cones*. Rods and cones absorb information that is eventually transmitted to the brain, telling us what we "see". Critically, rods and cones have different functions. Rods are related to *nighttime* or low-lighting visual conditions and cones are related to daytime or good-lighting conditions. Cones are the primary mechanism for color vision and this is why we see little color by moonlight because there is not enough light to stimulate the cones. We can see shades of light and dark at night because moonlight is intense enough to stimulate the rods. Rods, however, provide a much less sharp image than do cones. That is why objects and people lit by moonlight, although visible, may appear coarse and ill-defined.[32] In this case, if poor lighting conditions existed, it could not have increased the reliability of the witnesses' observations and could only have served to reduce their ability to see clearly and in detail.

**d) Prior Familiarity.**

---

[27] Wagenaar & van der Schrier (1996). Face recognition as a function of distance and illumination: A practical tool for use in the courtroom. *Psychology, Crim* known in 1991 that there was no value in his alleged statement *e & Law, 2,* 321-332.

[28] De Jong, Wagenaar, Wolters, & Verstijnen (2005). Familiar face recognition as a function of distance and illumination: A practical tool for use in the courtroom. *Psychology, Crime & law, 11,* 87-97.

[29] Lindsay, Semmler, Weber, Brewer, & Lindsay (2008). How variations in distance affect eyewitness reports and identification accuracy. *Law and Human Behavior, 32,* 526-535.

[30] See Lockamyeir, Carlson, Jones, Carlson & Weatherford (2020). The effect of viewing distance on empirical discriminability and the confidence–accuracy relationship for eyewitness identification. *Applied Cognitive Psychology, 34,* 1047-1060.

[31] For a detailed review of this process, see National Research Council (2014). *Identifying the culprit: Assessing eyewitness identification.* Washington, DC: The National Academies Press.

[32] Loftus, Doyle, Dysart, & Newirth (2020). Eyewitness testimony: Civil and criminal (6th Edition). LexisNexis.

When interviewed in 1991 by Defendants Guevara and Halvorsen, Mr. Velazquez and Mr. Rivera allegedly told police that they were familiar with the victim, Mr. Rodriguez, and Mr. Laureano. Mr. Velazquez maintained in his deposition that he was familiar with these individuals. Mr. Rivera, however, testified at his deposition that he did not know the victim, Mr. Rodriguez or Mr. Laureano.

It is accurate to say that we are more likely to correctly recognize people that we are familiar with or people that we "know" than we are to recognize a stranger. Familiarity can range from a single previous observation/encounter to a family member or close friend. Although identification errors of familiar people are less likely to occur, the research on non-stranger or "familiar-other" identifications shows that even these identification circumstances are not without error.[33] For example, there have been multiple field studies (with witnesses in actual cases) examining the rate of suspect and filler identifications in stranger and non-stranger cases. On average, the rate of suspect identifications in these studies is 41% in stranger cases and 90% in non-stranger cases. Of particular interest, however, is the rate of misidentification of known-innocent fillers in the identification procedure. If a witness and perpetrator were previously known to each other, one might expect that the eyewitness would not make a mistake and choose and innocent lineup member. However, on average, 5% of non-stranger cases have filler identifications.

This pattern of results from field studies is consistent with a laboratory study conducted by Dr. Steblay and colleagues[34] where they found that 9% of witnesses in non-stranger situations made a filler identification. Further, in the first 375 DNA exoneration cases in the United States, 31 included cases where the witness was familiar with the exoneree prior to the crime. In a 2019 summary of the non-stranger literature,[35] Vallano and colleagues provide the following warning (P.133):

> Yet familiar identifications are not infallible. First, an eyewitness who states that they know who the perpetrator is does not necessarily mean that the familiar person she identified is the perpetrator. Second, familiar identifications are not all created equal. Familiar identifications involving minimal prior exposure to the perpetrator may operate similarly to stranger identifications, with similarly high error rates.

**2. Stress/Arousal**

If Mr. Velazquez and Mr. Rivera witnessed a shooting followed by the victim's car crashing on March 17, 1991, it stands to reason that this would have caused an increase in stress or arousal.

In research related to stress and arousal, Deffenbacher and colleagues published a meta-analysis on the effects of stress/arousal on eyewitness performance.[36] This meta-analysis reviewed 27 tests of the effects of heightened stress on identification accuracy and 36 tests of its effect on recall of crime-related details. The researchers found that high levels of stress negatively impact both types of memory. The meta-analysis revealed that the effect of stress was larger for target-present than for target-absent lineups—that is, stress particularly reduced correct identification rates. Significantly, the effect was also considerably larger for

---

[33] For a review of this research, see Vallano, Slapinski, Steele, Briggs & Pozzulo (2019). Familiar eyewitness identifications: The current state of affairs. *Psychology, Public Policy, and Law*, 25, 128-146.

[34] Steblay, Dietrich, Ryan, Raczynski & James (2011). Sequential lineup laps and eyewitness accuracy. *Law and Human Behavior, 35,* 262–274.

[35] Vallano, Slapinski, Steele, Briggs & Pozzulo (2019). Familiar eyewitness identifications: The current state of affairs. *Psychology, Public Policy, and Law*, 25, 128-146.

[36] Deffenbacher , Bornstein, Penrod, & McGorty (2004). A meta-analytic review of the effects of high stress on eyewitness memory. *Law and Human Behavior, 28,* 687–706.

eyewitness identification studies which simulated eyewitness conditions—e.g., staged crimes—than for studies involving simple face recognition activities.

Researchers have also found that even physical exertion – such as running – can cause increases in arousal which result in impaired eyewitness identification abilities.[37] In summary, high levels of stress and arousal, which the witnesses in this case unquestionably experienced, have been demonstrated to significantly reduce the reliability of eyewitness identifications.

**System Variables Relevant to the Current Case**

The police reports and other documentation reveal that several system variables employed in this case, in my opinion, led to or significantly increased the likelihood of a selection of Mr. Rodriguez as the driver of the car.

**1. Post-Event Contamination**

Mr. Velazquez has testified that Defendant Guevara coerced him to making statements about witnessing the murder of Mr. Hernandez, Jr. by telling him what happened that day. Guevara wrote a statement and read it back to Mr. Velazquez, telling Velazquez to memorize it. Guevara threatened him that if he messed up the story, he would pin a murder on him. (Reyes Dep 77).

According to the report written by Lisa Brean and Diane Doyle, Mr. Rivera told them that Defendant detectives showed him an unsigned statement that had been attributed to Mr. Velazquez describing Mr. Velazquez's observations on the night of the shooting. If Mr. Rivera had been shown that statement by Defendants and read that statement, it would be an example of post-event contamination.

Mr. Rivera testified at trial that at the time of the shooting he did not know the victim's real name but that he learned it from friends when he was in jail. (004994). This is another example of post-event contamination.

It is a well-established fact in the psychological literature that our memories for events can be altered by information we learn after the original event.[38] There are many sources of post-event memory contamination that can affect a witness's memory and reporting of an event. Witnesses and victims can learn information about the crime or the perpetrators from other witnesses (aka *co-witness contamination*), law enforcement, the media, etc.

For example, in one research study that examined whether learning misinformation about a suspect could influence a person's memory and identification accuracy, Zajac and Henderson[39] found evidence that memory contamination can affect both descriptions and identifications. In this study, research participants were paired with a research confederate (who was working for the researchers) that the participants believed was another participant in the study (i.e., a co-witness). Together, they viewed a video clip of a staged theft. Then, half of the participants were misinformed by the confederate that the thief's accomplice had blue eyes when in fact they were brown. Next, individual participants described the accomplice and viewed a

---

[37] Hope, Lewinski, Dixon, Blocksidge, & Gabbert (2012). Witnesses in action: The effect of physical exertion on recall and recognition. *Psychological Science, 4,* 386–390.

[38] National Research Council (2014). *Identifying the culprit: Assessing eyewitness identification.* Washington, DC: The National Academies Press.

[39] Zajac & Henderson (2009). Don't it make my brown eyes blue: Co-witness misinformation about a target's appearance can impair target-absent line-up performance. *Memory, 17,* 266-278.

target-absent (the accomplice was not present) lineup comprised of blue-eyed lineup members only. Misinformed participants were eight times more likely than those who did not receive "blue-eyed" misinformation to describe the accomplice as having blue eyes, and twice as likely to falsely identify someone with blue eyes from the line-up. What is important about this study is that merely learning information from another source can influence memory, reports, and identifications made by witnesses to a crime.

In summary, the concern with post-event contamination is that it can be difficult to accurately remember the *source* of our memories and, thus, information learned from others is likely to contaminate our "original" memory for a person or event. In many cases, the full scope and impact of post-event contamination is unknown which is why it is so important to obtain a detailed, recorded interview with a witness as soon as possible after a crime. In this case, the extent of witness contamination is unclear but the record indicates there were multiple opportunities for both witnesses to have learned information about the perpetrators from others.

**2. Photo Showup**

Mr. Velazquez and Mr. Rivera were shown a single photograph (showup) of Mr. Rodriguez for purposes of identification.

Showup identification procedures are suggestive by their nature and are dangerous because there is no particular way for law enforcement to know when an eyewitness has made an error and identified an innocent person from a show-up because, unlike lineups, there are no known-innocent fillers.[40] A meta-analysis comparing witness performance in show-ups to six-person photo arrays indicates that mistaken identifications are significantly more likely with show-ups.[41]

In addition, the Revised 2020 AP-LS White Paper recommends that showups be avoided altogether unless deemed absolutely necessary. When showups are used, safeguards should be used to reduce suggestion, such as eliminating inferences of police custody.[42] Showups that occur under suggestive circumstances lead to an increased rate of identification not because of recognition from the crime, but because of witness deduction ("This must be the person if the police are showing me one photo.").

As early as 1968, the Supreme Court provided the following guidance to police, consistent with scientific findings and best practice recommendations:

It must be recognized that improper employment of photographs by police may sometimes cause witnesses to err in identifying criminals. A witness may have obtained only a brief glimpse of a criminal, or may have seen him under poor conditions. Even if the police subsequently follow the most correct photographic identification procedures and show him the pictures of a number of individuals without indicating whom they suspect, there is some danger that the witness may make an incorrect identification. *This danger will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw, or if they show him the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized.*

---

[40] As stated elsewhere in this report, this is why it is critical to have only one suspect per lineup so that law enforcement can better ascertain whether a witness has a reliable memory.

[41] Steblay, Dysart, Fulero, & Lindsay (2003). Eyewitness accuracy rates in police showup and lineup presentations: A meta-analytic comparison. *Law and Human Behavior, 27,* 523-540.

[42] Wells, Kovera, Douglass, Brewer, Meissner, & Wixted (2020). Policy and procedure recommendations for the collection and preservation of eyewitness identification evidence. *Law and Human Behavior, 44,* 3-36.

> The chance of misidentification is also heightened if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime. Regardless of how the initial misidentification comes about, the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification.

Simmons v. United States, 390 U.S. 377, 383–84 (1968).

In summary, the showup procedure described by witnesses in this case substantially increased the likelihood that they would make an identification error.

### 3. Pre-identification Warnings/Instructions

There is no evidence in the record that Defendants Guevara and Halvorsen told the witnesses prior to showing the single photographs that the true perpetrator may or may not be shown.

Simply failing to tell a witness that the actual perpetrator may or may not be present in an identification procedure is suggestive because it implies that the perpetrator is perpetrator. Implying in any way to eyewitnesses that the perpetrator is in the identification procedure encourages witnesses to make a selection and leads to an increase in identification errors. Instead, eyewitnesses should be told explicitly that the person in question might not be shown to them and that they should not feel compelled to make an identification. This pre-identification warning/instruction follows from decades of empirical data showing that eyewitnesses are less likely to identify an innocent suspect when they are warned that the actual culprit might not be present.[43] Taken as a whole, the results show the power of pre-identification warnings and how, when properly issued, they can prevent mistaken identification decisions from happening to begin with.

In 1992, the International Association of Chiefs of Police issued Training Key (#414) on how to conduct identification procedures and that training key included recommendations for pre-identification warnings. Later, in 1999, the Department of Justice's National Institute of Justice (NIJ) issued a report that outlined several methods for minimizing mistaken eyewitness identification when collecting evidence.[44] This law enforcement guidance recommended, among other things, that cautionary instructions be provided to the eyewitness that the culprit may not be present and that the police will continue to investigate the case even if no identification is made, so as to minimize the natural inclination to guess or to be guided by suggestion simply because the witness believes that the police suspect must be in the procedure. Consistent with these recommendations, the 2015 Illinois law requires the use of pre-identification instructions and warnings in eyewitness identification procedures.

### 4. Non-blind Administration

---

[43] Steblay (1997). Social influence in eyewitness recall: A meta-analytic review of lineup instruction effects. *Law and Human Behavior, 21,* 283–297; Clark (2005). A re-examination of the effects of biased lineup instructions in eyewitness identification, *Law and Human Behavior, 25,* 575–604; Steblay (2013). Lineup Instructions, in Cutler (Ed)., *Reform of eyewitness identification procedures* (65–86). American Psychological Association.

[44] National Institute of Justice Eyewitness Technical Working Group on Eyewitness Evidence. (1999). *Eyewitness evidence: A guide for law enforcement*. United States Department of Justice, Office of Justice Programs.

By default, a photo showup identification procedure is not double-blind because the police suspect is obvious.

Contemporary police guidelines (e.g., IACP, 2006) and the law in over half of the United States for conducting identification procedures,[45] indicates that the police officer conducting the proceedings should not know who the suspect is. This procedure eliminates the possibility that the officer can influence the witness' selection. The influence by the administrator may be unintentional and it may be outside of the officer's awareness (for example, nodding and smiling), or it may be purposeful and explicit. We know that police sometimes conduct lineups in a manner that clearly shows how their knowledge of which person is the suspect can lead them to say things that focus the eyewitness on the suspect.[46] We also know that what the person administering the identification procedure says to the eyewitness at the time the eyewitness makes a selection has strong effects on the confidence of the witness, easily leading a "tentative identification" eyewitness to become positive in their identification, even when the identification is of an innocent person.[47] The most effective method of eliminating police bias or suggestion is to have an officer who does not know the identity of the suspect conduct the identification procedure. This was not done in this case.

The potential impact of administrator knowledge on witness behavior is illustrated in a study by Greathouse and Kovera[48] in which 234 witnesses viewed a videotaped speech that was interrupted by a man trying to take the projector and were later administered a photo array to see if they could recognize the thief. The "administrators" were an additional 234 people who viewed a lineup training video and received further instruction on how to administer the photo array to the witnesses. The administrators were given some background on the "case" and were told they would receive a $20 reward if the witness chose the suspect (but that they would not receive the reward if they blatantly led the witness). Half of the administrators knew who the suspect was (non-blind presentation) and half did not (double-blind presentation). Unbeknownst to the administrators, half of the time the suspect was the perpetrator (target-present arrays) and half the time the suspect was not the perpetrator (target-absent arrays). In the double-blind administrator/target-absent condition 8% of the witnesses chose the innocent suspect. In the non-blind target-absent condition 21% of the witnesses chose the innocent suspect – thus, the non-blind administrators were able to subtly steer a large number of witnesses to the suspect. The non-blind administrators were most successful in steering witnesses to the suspect when the witnesses were given biased instructions (see discussion below) and photos were presented simultaneously – under these conditions 33% of witnesses chose the innocent suspect.

Participants in the Greathouse and Kovera study also were asked whether they believed the administrator's behavior influenced their decision in the lineup and whether the administrator pressured them. It is clear from the data above that the administrator behavior did influence decision making but the question the researchers were asking here gets to heart of whether witnesses perceive that they have been influenced. The researchers also asked administrators if they had influenced the witness during the lineup procedure.

---

[45] The 2015 eyewitness identification bill passed in Illinois requires double-blind or blinded administration of identification procedures.

[46] See Wells & Seelau (1995). Eyewitness identification: Psychological research and legal policy on lineups. *Psychology, Public Policy, and Law, 1,* 765–791.

[47] Luus & Wells (1994). Eyewitness identification confidence. In Ross, Read & Toglia (Eds.), *Adult eyewitness testimony: Current trends and developments* (348–361). Cambridge University Press; Wells & Bradfield (1998). 'Good, you identified the suspect': Feedback to eyewitnesses distorts their reports of the witnessing experience. *Journal of Applied Psychology, 83,* 360–376.

[48] Greathouse & Kovera (2009). Instruction bias and lineup presentation moderate the effects of administrator knowledge on eyewitness identification. *Law and Human Behavior, 33,* 70–82.

The results demonstrated that neither participants nor administrators believed that they had been influenced or did any influencing, respectively. The researchers concluded:

> It is important to note that both the witnesses and administrators participating in the photo spread administration reported few if any differences in administrator influence as a function of single blind versus double blind administration. This finding is particularly troubling for a number of reasons. If lineup administrators are not aware that they are exhibiting behavioral cues to the suspect's identity, they obviously will not try to inhibit them. In addition, during trial, jurors rely on the witnesses' accounts of the lineup administration procedure to judge the reliability of the identification. If witnesses are not able to convey that the administrator influenced their decision, jurors will not be able to consider this in their decision making process. (P. 80)

In summary, though double-blind administration was not the norm in the United States in 1991, if double-blind administration had been used in this case, it would have eliminated the possibility that the administering detectives influenced the witnesses to select Mr. Rodriguez from the identification procedure. In cases where law enforcement have "steered" a witness toward a particular person, the resulting selection is relatively meaningless with respect to witness reliability.

**5. Witness Confidence**

In the materials I reviewed, there does not appear to be any contemporaneous recording of the witnesses' levels of confidence in their selection of Mr. Rodriguez from the photo showup. Although there is no doubt that Mr. Velazquez and Mr. Rivera had prior familiarity with Mr. Rodriguez from before the shooting, there was no level of confidence ascertained as to how certain they were that they saw Mr. Rodriguez on the night of the shooting.

Research shows that there is a relatively strong relationship between the accuracy of an eyewitness's positive identification and their confidence in that identification *at the time of the first identification attempt with a suspect when certain conditions are met.*[49] Specifically, eyewitness confidence can be extremely important and meaningful when "pristine" testing conditions are used.[50] An eyewitness who expresses high confidence in their identification is expressing a strong belief that the identified person and the perpetrator are the same individual. This belief can arise out of pure memory judgments (i.e., a perception of remarkable resemblance between the identified person and the eyewitness's memory of the culprit) or for reasons other than the eyewitness's memory including suggestion, and other factors.[51]

---

[49] See, Wells, Kovera, Douglass, Brewer, Meissner, & Wixted (2020). Policy and procedure recommendations for the collection and preservation of eyewitness identification evidence. *Law and Human Behavior, 44,* 3-36; Wixted, & Wells (2017). The relationship between eyewitness confidence and identification accuracy: A new synthesis. *Psychological Science in the Public Interest, 18,* 10–65.

[50] These include: The first uncontaminated identification procedure with the suspect using an unbiased procedure, double-blind administration, pre-lineup warnings, and obtaining a confidence statement immediately after a selection; Wixted, & Wells (2017). The relationship between eyewitness confidence and identification accuracy: A new synthesis. *Psychological Science in the Public Interest, 18,* 10–65.

[51] E.g., Leippe (1980). Effects of integrative memorial and cognitive processes on the correspondence of eyewitness accuracy and confidence. *Law and Human Behavior, 4,* 261–274; Luus & Wells (1994). Eyewitness identification confidence. In Ross, Read & Toglia (Eds.), *Adult eyewitness testimony: Current trends and developments* (348–361). Cambridge University Press; Wells & Bradfield (1998). 'Good, you identified the suspect': Feedback to eyewitnesses distorts their reports of the witnessing experience. *Journal of Applied Psychology, 83,* 360–376; Wells, Ferguson, & Lindsay (1981). The tractability of eyewitness confidence and its implications for triers of fact. *Journal of Applied Psychology, 66,* 688–696.

An important fact to consider is that the relationship between confidence and accuracy can be significantly affected by pre- and post-identification factors.

Expressions of confidence at trial, however, are relatively meaningless[52] because confidence is *malleable*, and easily affected by external sources. The lack of a meaningful relationship between confidence and accuracy at trial is concerning because there is significant evidence, going back decades, showing that witness confidence is the single most powerful determinant of whether or not triers of fact will believe that the eyewitness made an accurate identification.[53]

### 6. Post-identification Feedback

As described above, witness confidence can be a useful factor to consider when assessing witness reliability when certain conditions are met. One of the major and primary concerns with interpreting confidence, however, is that research shows *confidence is easily changed*. Confidence malleability is the tendency for an eyewitness to become more confident in their identification as a function of events that occur after the identification decision. For example, in an early demonstration of confidence malleability, researchers found that witnesses who were questioned repeatedly grew more confident about the accuracy of details in their reports.[54] Even stronger and broader effects of confidence malleability have been shown to emerge when eyewitnesses are told or led to believe that they identified the suspect (versus being told nothing about the alleged accuracy of their decision). This is known as (confirmatory) *post-identification feedback*.[55]

Post-identification feedback is any information provided to a witness or victim that suggests whether their identification decision was accurate, such as telling the witness that they have identified the suspect /defendant or that they have been a really good witness.[56] In the first research on the post-identification feedback phenomenon, Wells and Bradfield[57] found that eyewitnesses who received confirming feedback (such as that used in this case) were not only much more confident than were witnesses who received no feedback or disconfirming feedback, the feedback witnesses also distorted their reports of their witnessing conditions by exaggerating how good their view was of the culprit, how much attention they paid to the culprit's face while observing the event, and so on. The results of this study have been replicated many times and also with real witnesses in real ongoing criminal investigations.[58]

---

[52] Ibid.

[53] E.g., Cutler, Penrod & Dexter (1990). Juror sensitivity to eyewitness evidence. *Law and Human Behavior, 14,* 185-191; Leippe & Romanczyk (1989). Reactions to child (versus adult) eyewitnesses: The influence of jurors' conceptions and witness behavior. *Law and Human Behavior, 13,* 103-132; Lindsay, Wells, & O'Connor (1989). Mock-juror belief of accurate and inaccurate eyewitnesses: A replication and extension. *Law and Human Behavior, 13,* 333-339; Wells, Ferguson, & Lindsay (1981). The tractability of eyewitness confidence and its implications for triers of fact. *Journal of Applied Psychology, 66,* 688-696; Wells, Lindsay, & Ferguson (1979). Accuracy, confidence, and juror perceptions in eyewitness identification. *Journal of Applied Psychology, 64,* 440-448.

[54] Hastie, Landsman, & Loftus (1978). Eyewitness testimony: The dangers of guessing. *Jurimetrics Journal, 19,* 1–8.

[55] Wells & Bradfield (1998). 'Good, you identified the suspect': Feedback to eyewitnesses distorts their reports of the witnessing experience. *Journal of Applied Psychology, 83,* 360–376.

[56] Dysart, Lawson, & Rainey (2012). Blind lineup administration as a prophylactic against the post-identification feedback effect. *Law and Human Behavior, 36,* 312-319.

[57] Wells & Bradfield (1998). 'Good, you identified the suspect': Feedback to eyewitnesses distorts their reports of the witnessing experience. *Journal of Applied Psychology, 83,* 360–376.

[58] Wright & Skagerberg (2007). Postidentification feedback affects real eyewitnesses. *Psychological Science, 18,* 172–178.

One explanation that has been proposed to explain the post-identification feedback effect, and its strong and pervasive influence on eyewitness confidence, is the theory of cognitive dissonance.[59] In essence, this theory, which is a long-standing and well-supported theory in social psychology, states that people are in a state of discomfort when they have inconsistent or contradictory beliefs, or when they have beliefs and behaviors that are inconsistent. As it relates to eyewitness identification, a powerful example of cognitive dissonance is the DNA exoneration case of Dean Cage from Illinois. After Mr. Cage was exonerated in 2008, the victim refused to believe the accuracy of the DNA results and held on to her belief that Mr. Cage was guilty. Thus, cognitive dissonance was so powerful in that case that it was easier for the witness to believe that the DNA testing was flawed than to accept that she had made an error and identified an innocent person. Only after she was presented with independent results of the DNA testing did she come to accept that Mr. Cage was innocent and was not the man who had raped her in 1994.

In summary, post-identification feedback or confirmation of an identification decision can lead a witness to believe that they had a better opportunity to see a perpetrator than was actually the case and can make them more confident in their identification decision (along with a host of other effects outlined above). The impacts of feedback are some of the strongest effects that have been found in eyewitness research. Here, there is little evidence about what the officers said to the witnesses after their purported identifications of Rodriguez and Laureano, so we do not know the full impact this factor may have had here. We do know, however, that Velasquez testified he was abused and threatened into saying it was Rodriguez and Laureano, and that Mr. Rivera was presented with Rodriguez at his criminal trial, and Velasquez was presented with Rodriguez and Laureano at both criminal trials, a form of post-identification feedback signaling that they were the perpetrators.[60]

**VII. Summary of Opinions regarding Detective Guevara Cases**

I have been retained as an expert witness and submitted an eyewitness identification expert report or testified in several other cases where Detective Guevara is/was a Defendant. These include:

*Jacques Rivera v. Reynaldo Guevara, et al.,* Case No. 1:12 CV 04428 (April 25, 2017 deposition)
*Jose Montanez v. Reynaldo Guevara, et al.*, Case No. 17-cv-4560 (March 4, 2020 deposition)
*Armando Serrano v. Reynaldo Guevara, et al*., Case No. 17-cv-2869 (March 4, 2020 deposition)
*Robert Bouto v. Reynaldo Guevara, et al.*, Case No. 1:19-cv-02441 (December 12, 2022 deposition)
*Thomas Sierra v. Reynaldo Guevara, et al.*, Case No. 1:18-cv-03029 (January 18, 2023 deposition)
*Geraldo Iglesias v. Reynaldo Guevara, et al.,* Case No. 1:19-cv-06508 (March 2, 2023 deposition)
*Demetrius Johnson v. Reynaldo Guevara, et al.,* Case No. 20-cv-4156 (June 20, 2023 deposition)

For the current report, I was asked to comment on any similarities between Mr. Rodriguez's case and the other Det. Guevara cases (above) I have testified in with respect to estimator and system variables.

---

[59] Charman, Carlucci, Vallano & Hyman Gregory (2010). Selective Cue Integration Framework: A theory of postidentification witness confidence assessment. *Journal of Experimental Psychology: Applied, 16,* 204-218; Festinger (1957). *A theory of cognitive dissonance*. Stanford University Press; Festinger & Carlsmith (1959). Cognitive consequences of forced compliance. *Journal of Abnormal and Social Psychology, 58,* 203-210.

[60] See Steblay, Wells & Douglass (2014). The eyewitness post identification feedback effect 15 years later: Theoretical and policy implications. *Psychology, Public Policy, and Law, 20,* 1–18; Douglass & Steblay (2006). Memory distortion in eyewitnesses: A meta-analysis of the post-identification feedback effect. *Applied Cognitive Psychology, 20,* 859–869.

With respect to estimator variables, all of the cases had a series of uncontrollable factors that tend to reduce the strength of a witness' memory and consequently their ability to be an accurate witness.

It seems that a common theme in the Guevara cases I have reviewed to date is to manipulate witnesses who had poor opportunities to view the perpetrator. Most of the cases had several estimator variables factors: a limited opportunity to see the perpetrator, the presence of stress and arousal, the presence of a weapon, and issues with perpetrator descriptions (here, no descriptions were obtained). In summary, the witnesses in Guevara cases I have reviewed were likely vulnerable to suggestion and influence due to the presence of multiple estimator variables. In this case, there also is evidence that one witness (Velazquez) did not witness the shooting at all and therefore could not have possibly made an accurate identification decision.

With respect to system variables or the choices made by law enforcement during the collection of eyewitness evidence, this case stands out with respect to the use of a single photograph rather than a photo array or lineup. This case shares the following system variable issues with the previous seven cases I have reviewed:

1) Lack of pre-identification instructions;
2) Use of non-blind procedures;
3) Post-identification feedback.

In the previous seven Guevara cases I have reviewed, Defendant Guevara utilized photo arrays and those cases had the following additional system variable issues:

1) Viewing of photographs (which include the suspect) before a lineup;
2) Filler bias and use of multiple suspects in the same array;
3) Repeated identification procedures, unconscious transference and commitment.

In summary, a comparison of the eight cases reveals many similarities in the facts of each case, now revealed in post-conviction litigation discovery.

## VIII. Summary of Opinions in This Case

The evidentiary value of an eyewitness identification can be assessed by the existence or absence of factors known – empirically – to influence the strength of the witness's memory, the reliability of the identification, and the reliability of the in-court testimony. Evidentiary value of an identification is undermined when factors that have been shown to decrease reliability are present in a particular case, and the more factors present, the less probative an identification will be. In other words, when there are numerous factors present in a case that have been shown to decrease reliability, the result can easily be a misidentification of an innocent suspect.

In this case, there were many estimator and system variables present that have been shown to decrease eyewitness reliability. Given these factors, it is not difficult to arrive at a reasonable explanation as to how two witnesses allegedly came to select Mr. Rodriguez from the photo showup. The combination of a weak memory for the shooter – if they viewed the shooting at all – coupled with suggestive identification procedures easily accounts for the selections of Mr. Rodriguez who has been granted a Certificate of Innocence in this matter.

## IX. Supplemental Materials

If additional materials are provided to me in reference to this case, I reserve the right to supplement this report in the future.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 8, 2025.

_____
Jennifer Dysart, PhD

**Appendix A**

**List of Criminal & Civil Cases in which Dr. Jennifer Dysart has given testimony as an Eyewitness Identification Expert Witness in Previous Four Years (as of August 8, 2025)**

**California:**
*Ruben Martinez and Maria Martinez v. City of Los Angeles, et al.,* Case No. 2:20-cv-10559-PA-KS (April 19, 2022)
*Lionel Rubalcava v. City of San Jose, Joseph Perez, et al.*, Case No. 20-cv-04191-BLF (July 6, 2023)
*Joaquin Ciria v. City and County of San Francisco, et al.,* Case No. 22-cv-07510-KAW (March 13, 2024)
*Maurice Hastings v. Grant Price, et al.,* Case No. 2:23-CV-09684 (May 7, 2025)

**Florida:**
*State of Florida v. Billy Joe Holton*, Case No. 87-CF-6409 (June 14, 2023)

**Georgia:**
*Erik Tramaine Heard v. White, et al.,* Case No. SUCV201900095 (Oct 24, 2023)

**Illinois:**
*Robert Bouto v. Reynaldo Guevara, et al*., Case No. 1:19-cv-02441 (Dec 12, 2022)
*Thomas Sierra v. Reynaldo Guevara, et al*., Case No. 1:18-cv-03029 (Jan18, 2023)
*Demetrius Johnson v. Reynaldo Guevara, et al.,* Case No. 20-cv-4156 (June 20, 2023)
*Geraldo Iglesias v. Reynaldo Guevara, et al.,* Case No. 1:19-cv-06508 (March 2, 2023)

**Kansas:**
*Lamonte McIntyre & Rose Lee McIntyre v. Unified Government of Wyandotte County and Kansas City, Kansas, et al.,* Case No. 2:18-cv-02545-KHV-KGG (Sept 23, 2021)

**Maryland:**
*The Estate of Malcolm J. Bryant v. Baltimore Police Department, et al.,* Case No. 1:19-cv-00384-ELH (Sept 14, 2021)

**Missouri:**
*Lamont Campbell v. State of Missouri,* Cause No. 1122-CR04130-01, Division 11; Appeal No. ED105247 (April 14, 2022)

**New York:**
*Richard Rosario v. City of New York, et al.,* Case No. 18-cv-4023 (October 17, 2019; July 26, 2022)
*Kenyatta James v. City of Newburgh, Police Chief Daniel Cameron, et al.,* Case No. 21 CV 1673 (Nov 6, 2023)
*Valentino Dixon v. City of Buffalo and County of Erie; and Detective Mark R. Stambach, et al.,* Case No. 19-cv-01678 (Nov 30, 2023)

**Pennsylvania:**
*Commonwealth of Pennsylvania v. James Pitts* (July 12, 2024)
*Commonwealth of Pennsylvania v. Anthony Reid,* Case No. CP-51-CR-0602521-1989 (Dec 3, 2024)

**Texas:**
*State of Texas v. Eric Tostado,* Ind. No. F02-55040-QU (Jan 19, 2023)

**Appendix B**

**Academic Curriculum Vitae of Jennifer E. Dysart**

## JENNIFER E. DYSART

### Curriculum Vitae

University Address:
Department of Psychology
John Jay College of Criminal Justice
524 West 59th Street, 10th Floor
New York, NY  10019

*Email:*  jdysart@jjay.cuny.edu
*Phone:*  212.484.1160

## Academic Work Experience

| | |
|---|---|
| 2006 – present | Associate Professor of Psychology, John Jay College of Criminal Justice, CUNY, New York, NY |
| 2016 – 2019 | Director, Baccalaureate/Master's (BA/MA) Degree Program, John Jay College of Criminal Justice, CUNY, New York, NY |
| 2013 – 2016 | Deputy Chair, Department of Psychology, John Jay College of Criminal Justice, CUNY, New York, NY |
| 2011 – 2012 | Deputy Chair, Department of Psychology, John Jay College of Criminal Justice, CUNY, New York, NY |
| 2008 – 2010 | Associate Chair, Department of Psychology, John Jay College of Criminal Justice, CUNY, New York, NY |
| 2006 – 2008 | Deputy Chair of Undergraduate Education, Department of Psychology, John Jay College of Criminal Justice |
| 2003 – 2006 | Assistant Professor of Psychology, Southern Connecticut State University, New Haven, CT |
| 2005 | Adjunct Professor, Quinnipiac University, Hamden, CT |

## Education

| | |
|---|---|
| PhD | 2004, Queen's University, Kingston, Ontario (Social Psychology) *Dissertation Title:* Intoxicated Witnesses: Exploring the Effects of Alcohol on Identification Accuracy |
| MA | 1999, Queen's University (Brain, Behavior and Cognitive Science) |
| BA | 1998, St. Thomas University, Fredericton, New Brunswick (First Class Honors in Psychology) |

## Peer-Reviewed Journal Publications

Steblay, N. M., & Dysart, J. E. (2016). Repeated eyewitness identification procedures with the same suspect. *Journal of Applied Research in Memory and Cognition, 5,* 284-289.

Steblay, N. M., Dysart, J. E., & Wells, G. L. (2015). An unrepresentative sample is unrepresentative regardless of the reason: A rejoinder to Amendola and Wixted. *Journal of Experimental Criminology, 11,* 295-298.

Wells, G. L., Steblay, N. M., & Dysart, J. E. (2015). The flaw in Amendola and Wixted's conclusion on simultaneous versus sequential lineups. *Journal of Experimental Criminology, 11,* 285-289.

Wells, G. L., Steblay, N. M., & Dysart, J. E. (2015). Double-blind photo-lineups using actual eyewitnesses: An experimental test of a sequential versus simultaneous lineup procedure. *Law and Human Behavior, 39*, 1-14.

Lawson, V. Z., & Dysart, J. E. (2014). The showup identification procedure: An exploration of systematic biases. *Legal and Criminological Psychology, 19*, 54-68.

Strange, D., Dysart, J. E., & Loftus, E. F. (2014). Why errors in alibis are not necessarily evidence of guilt [Special issue]. *Zeitschrift Fur Psychologie, 222,* 82-89.

Dysart, J. E., & Strange, D. (2012). Beliefs about alibis and alibi investigations: A survey of law enforcement [Special issue]. *Psychology, Crime and Law, 18,* 11-25.

Dysart, J. E., Lawson, V. Z., & Rainey, A. (2012). Blind lineup administration as a prophylactic against the post-identification feedback effect. *Law and Human Behavior, 36,* 312-319.

Wells, G. L., Steblay, N. M., & Dysart, J. E. (2012). Eyewitness identification reforms: Are suggestiveness-induced hits and guesses true hits? *Perspectives on Psychological Science, 7,* 264-271.

Steblay, N. M., Dysart, J. E., & Wells, G. L. (2011). Seventy-two tests of the sequential superiority effect: A meta-analysis and policy discussion. *Psychology, Public Policy and Law, 17,* 99-139.

Dysart, J. E., Lindsay, R. C. L., & Dupuis, P. R. (2006). Show-ups: The critical issue of clothing bias. *Applied Cognitive Psychology, 20*, 1009-1023.

Pryke, S., Lindsay, R. C. L., Dysart, J. E., & Dupuis, P. R. (2004). Multiple independent identification decisions: A method of calibrating eyewitness identifications. *Journal of Applied Psychology, 89,* 73-84.

Steblay, N., Dysart, J. E., Fulero, S., & Lindsay, R. C. L. (2003).Eyewitness accuracy rates in police showup and lineup presentations: A meta-analytic comparison. *Law and Human Behavior, 27,* 523-540.

Dysart, J. E., Lindsay, R. C. L., MacDonald, T. K., & Wicke, C. (2002). The intoxicated witness: Effects of alcohol on identification accuracy. *Journal of Applied Psychology, 87,* 170-175.

Dysart, J. E. & Lindsay, R. C. L. (2001). A pre-identification questioning effect: Serendipitously increasing correct rejections. *Law and Human Behavior, 25,* 155-165.

Dysart, J. E., Lindsay, R. C. L., Hammond, R., & Dupuis, P. (2001). Mug shot exposure prior to lineup identification: Interference, transference, and commitment effects. *Journal of Applied Psychology, 86,* 1280-1284.

Smith, S. M., Lindsay, R. C. L., Pryke, S., & Dysart, J. E. (2001). Postdictors of eyewitness errors: Can false identifications be diagnosed in the cross-race situation? *Psychology, Public Policy, and Law, 7,* 153-169.

Steblay, N., Dysart, J. E., Fulero, S., & Lindsay, R. C. L. (2001). Eyewitness accuracy rates in sequential and simultaneous line-up presentations: A meta-analytic comparison. *Law and Human Behavior, 25,* 459-473.

## Books

Loftus, E. F., Doyle, J. M., Dysart, J. E., & Newirth, K. (2020). *Eyewitness testimony: Civil and criminal* (6th Ed.). Charlottesville, VA: LexisNexis.

Loftus, E. F., Doyle, J. M., & Dysart, J. E. (2013). *Eyewitness testimony: Civil and criminal* (5th Ed.). Charlottesville, VA: LexisNexis.

Loftus, E. F., Doyle, J. M., & Dysart, J. E. (2007). *Eyewitness testimony: Civil and criminal* (4th Ed.). Charlottesville, VA: LexisNexis.

## Book Chapters

Dysart, J. E. (2024). Eyewitness testimony: The perilous effects of contamination and social influence. In R. Hollander-Blumoff (Ed.), *Research handbook on law and psychology* (pp. 199-214). Elgar.

Dysart, J. E. (2018). The psychology of eyewitness identification. In W. Koen & M. Bowers (Eds.), *The psychology and sociology of wrongful convictions: forensic science reform.*

Lawson, V. Z., & Dysart, J. E. (2015). Searching for suspects: Mug-shot files and showups (street identifications). In T. Valentine, & J. Davis (Eds.), *Forensic facial identification: Theory and practice of identification from eyewitnesses, composites and CCTV* (pp. 71-92). Chichester, England: Wiley-Blackwell.

Dysart, J. E. & Lawson, V. Z. (2014). Eyewitness research. In G. Bruinsma, & D. Weisburd

(Eds.), *Encyclopedia of Criminology and Criminal Justice, Vol 9, Psychology of Law* (pp. 1530-1538). New York: Springer.

Dysart, J. E., & Lindsay, R. C. L. (2007). The effects of delay on eyewitness identification accuracy: Should we be concerned? In R. C. L. Lindsay, D. R. Ross, J. D. Read, & M. P. Toglia (Eds.), *The handbook of eyewitness psychology, Vol II, Memory for people* (pp. 361-376). Mahwah, NJ: Lawrence Erlbaum.

Dysart, J. E., & Lindsay, R. C. L. (2007). Show-up identifications: Suggestive technique or reliable method? In R. C. L. Lindsay, D. R. Ross, J. D. Read, & M. P. Toglia (Eds.), *The handbook of eyewitness psychology, Vol II, Memory for people* (pp. 137-154). Mahwah, NJ: Lawrence Erlbaum.

## Other Publications

Loftus, E., Doyle, J. M., Dysart, J. E., & Newirth, K. (2023). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2022.* Charlottesville, VA: LexisNexis.

Loftus, E., Doyle, J. M., Dysart, J. E., & Newirth, K. (2022). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2022.* Charlottesville, VA: LexisNexis.

Loftus, E., Doyle, J. M., Dysart, J. E., & Newirth, K. (2021). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2021.* Charlottesville, VA: LexisNexis.

Dysart, J. E. (2019). A primer on the psychology of eyewitness memory. *Loyola Law Review, 64.*

Loftus, E., Doyle, J. M., Dysart, J. E., & Newirth, K. (2018). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2017.* Charlottesville, VA: LexisNexis.

Loftus, E., Doyle, J. M., & Dysart, J. E. (2017). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2016.* Charlottesville, VA: LexisNexis.

Loftus, E., Doyle, J. M., & Dysart, J. E. (2016). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2015.* Charlottesville, VA: LexisNexis.

Loftus, E., Doyle, J. M., & Dysart, J. E. (2015). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2014.* Charlottesville, VA: LexisNexis.

Wells, G. L., Steblay, N. M., & Dysart, J. E. (2011). A test of the simultaneous vs. sequential lineup methods: An initial report of the AJS national eyewitness identification field study.

Doyle, J. M., & Dysart, J. E. (2011). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2010.* Charlottesville, VA: LexisNexis.

Doyle, J. M., & Dysart, J. E. (2010). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2009.* Charlottesville, VA: LexisNexis.

Doyle, J. M., & Dysart, J. E. (2009). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2008.* Charlottesville, VA: LexisNexis.

Doyle, J. M., & Dysart, J. E. (2008). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2007.* Charlottesville, VA: LexisNexis.

Dysart, J. E. (2007). Mugshots. *Encyclopedia of Psychology and Law, Vol 2* (pp. 551-552). Thousand Oaks, CA: Sage.

Dysart, J. E. (2007). Alcohol intoxication and eyewitness identification. *Encyclopedia of Psychology and Law, Vol. 1* (pp. 11-13)*.* Thousand Oaks, CA: Sage.

## Peer-Reviewed Conference Presentations

Dysart, J. E. (2024, March). *Post-conviction eyewitness cases: Unique opportunities for expert witnesses.* Paper presented at the American Psychology-Law Society annual conference, Los Angeles, CA.

Jaross, M., & Dysart, J. E. (2019, March). *What U.S defense attorneys know about facial composites.* Poster presented at the American Psychology-Law Society annual conference, Portland, OR.

Despodova, N., Lee, J., Khogali, M., Dysart, J. E., & Penrod, S. (2019, March). *Are perceptions of alibi credibility affected by defendant and alibi witness race, and defendant-alibi witness relationship?* Poster presented at the American Psychology-Law Society annual conference, Portland, OR.

Dysart, J. E., & Kassis, B. (2018, March). *911: What is your emergency?* Poster presented at the American Psychology-Law Society annual conference, Memphis, TN.

Dysart, J. E. (2015, June). *Showup identification procedures: Applied and methodological implications.* Symposium Discussant at the biennial meeting of the Society for Applied Research in Memory and Cognition, Victoria, BC.

Dysart, J. E. (2015, March). *NAS recommendations for expert witnesses in eyewitness identification.* Paper presented at the American Psychology-Law Society annual conference, San Diego, CA.

Dysart, J. E. (2012, March). *Eyewitness research in the courts: The Troy Davis story.* Paper presented at the American Psychology-Law Society annual conference, San Juan, PR.

Dysart, J. E., Wells, G. L., Steblay, N. K., & Mitchell, D. (2012, March). *A double-blind experiment of simultaneous versus sequential lineups using actual eyewitnesses: Lab –*

*field differences.* Paper presented at the American Psychology-Law Society annual conference, San Juan, PR.

Steblay, N. K., Wells, G. L., Dysart, J. E., & Mitchell, D. R. (2012, March). *A double-blind experiment of simultaneous versus sequential lineups using actual eyewitnesses: Principal results.* Paper presented at the American Psychology-Law Society annual conference, San Juan, PR.

Dumas, R., Dysart, J. E., Py, J., & Penrod, S. D. (2011, March). *Eyewitness identification strategies: Contribution of implicit personality theories and emotional expression.* Poster presented at the American Psychology-Law Society annual conference, Miami, FL.

Dysart, J. E., Lawson, V. Z., & Yang, N. (2011, March). *Weapon focus effect: Theoretical insights from eye-tracking research.* Poster presented at the American Psychology-Law Society annual conference, Miami, FL.

Lawson, V. Z., Dysart, J. E., & Butera, L. (2011, March). *The clothing bias effect in lineups: What can eye-tracking research teach us?* Poster presented at the American Psychology-Law Society annual conference, Miami, FL.

Wong, Y., & Dysart, J. E. (2010, May). *Witness descriptions: Is there a cross-race effect for hair?* Poster presented at the Association for Psychological Science convention in Boston, MA.

DeCarlo, J., & Dysart, J. E. (2010, March). *Weapon-focus effect: Are police and civilians differentially affected?* Paper presented at the American Psychology-Law Society annual conference, Vancouver, BC, Canada.

Dysart, J. E., & Strange, D. (2010, March). *A survey of police officers' beliefs about alibis and alibi investigations.* Paper presented at the American Psychology-Law Society annual conference, Vancouver, BC, Canada.

Lawson, V. Z., & Dysart, J. E. (2010, March). *The effects of race, misinformation, and feedback on eyewitness descriptions.* Poster presented at the American Psychology-Law Society annual conference, Vancouver, BC, Canada.

Strange, D., Dysart, J. E., & Loftus, E. F. (2010, March). *Where were you? Alibi generation, accuracy and consistency.* Paper presented at the American Psychology-Law Society annual conference, Vancouver, BC, Canada.

Dysart, J. E., Rainey, A. M., & Penrod, S. D. (2009, May). *CSI effect: Real or not real?* Poster presented at the Association for Psychological Science convention in San Francisco, CA.

Dysart, J. E. (2009, May). *Naked truth: What to do after graduate school.* Invited panelist at the Association for Psychological Science convention in San Francisco, CA.

Chong, K., & Dysart, J. E. (2009, March). *Stranger alibis and eyewitness identification: What is the difference?* Paper presented at the American Psychology-Law Society annual

conference, San Antonio, TX.

Lawson, V. Z., Dysart, J. E., & Rainey, A. M. (2009, March). *Showups: A Cross-race investigation into the identification accuracy of eyewitnesses.* Poster presented at the American Psychology-Law Society annual conference, San Antonio, TX.

Mandelbaum, J., Dysart, J. E., & Vitriol, J. A. (2009, March). *Recall of specific facial features in cross-race eyewitness descriptions.* Poster presented at the American Psychology-Law Society annual conference, San Antonio, TX.

Owens, J., Rainey, A. M., & Dysart, J. E. (2009, March). *Is three really a crowd? The effects of multiple perpetrators on eyewitness identification accuracy and confidence.* Poster presented at the American Psychology-Law Society annual conference, San Antonio, TX.

Wallace, D. B., & Dysart, J. E. (2009, March). *The effects of framing on eyewitness believability.* Paper presented at the American Psychology-Law Society annual conference, San Antonio, TX.

Dysart, J. E., & Rainey, A. M. (2008, May). *Eyewitness identification: Testing a new method of presentation.* Poster presented at the Association for Psychological Science convention, Chicago, IL.

Mandelbaum, J., & Dysart, J. E. (2008, May). *Mug shot interference in a cross-race eyewitness identification.* Poster presented at the Association for Psychological Science convention in Chicago, IL.

Dysart, J. E., Rainey, A., Owens, J., Chong, K., & Lawson, V. (2008, March). *Lineup issues: Double-blind administration and the post-identification feedback effect.* Paper presented at the American Psychology-Law Society annual conference, Jacksonville, FL.

Rainey, A., Dysart, J. E., (2008, March). *The intoxicated witness: Alcohol intoxication and person description accuracy.* Paper presented at the American Psychology-Law Society annual conference, Jacksonville, FL.

Kopelovich, S., & Dysart, J. E. (2008, March). *Voice identification as a unique contributor to eyewitness identification: Exploring the cross-accent effect.* Paper presented at the American Psychology-Law Society annual conference, Jacksonville, FL.

Dysart, J. E., & Fugal, L. (2006, March). *Improving the sequential lineup? The effects of double-blind testing and the envelope technique on post-identification feedback.* Paper presented at the American Psychology-Law Society annual conference, St. Petersburg, FL.

Rainey, A., & Dysart, J. E. (2006, March). *Now you see me: The relationship between social hierarchies, social contact, and the cross-race effect.* Paper presented at the American Psychology-Law Society annual conference, St. Petersburg, FL.

Wallace, D. B., & Dysart, J. E. (2006, March). *The effects of show-up eyewitness testimony, alibi eyewitness testimony, and alibi language bias on alibi believability.* Paper presented at

29

the American Psychology-Law Society annual conference, St. Petersburg, FL.

Dysart, J. E., & Lindsay, R. C. L. (2005, March). *Intoxicated witnesses: Exploring the effects of procedural bias and alcohol intoxication on identification accuracy.* Paper presented at the American Psychology-Law Society annual conference, La Jolla, CA.

Dysart, J. E. (2004, March). *The effects of verbal overshadowing on unconscious transference from mug-shots.* Paper presented at the American Psychology-Law Society annual conference, Scottsdale, AZ.

Dysart, J. E., Lindsay, R. C. L., & Sinclair, M. (2003, July). *Unconscious transference from mug shot searches: Does is really exist?* Paper presented at the biennial meeting of the Society for Applied Research in Memory and Cognition, Aberdeen, Scotland.

Dysart, J. E., Lindsay, R. C. L., & MacDonald, T. K. (2002, March). *The effects of alcohol intoxication on identification accuracy from show-ups: A field study.* Paper presented at the biennial meeting for the American Psychology-Law Society annual conference, Austin, TX.

Dysart, J. E., Steblay, N., Fulero, S., & Lindsay, R. C. L. (2002, March). *Eyewitness accuracy in sequential versus simultaneous lineups: A meta-analytic review.* Paper presented at the biennial meeting for the American Psychology-Law Society, Austin, TX.

Steblay, N., Dysart, J. E., Fulero, S., & Lindsay, R. C. L. (2002, March). *A meta-analytic comparison of showup and lineup identification accuracy.* Paper presented at the biennial meeting for the American Psychology-Law Society, Austin, TX.

Dupuis, P. R., Lindsay, R. C. L., & Dysart, J. E. (2002, March). *Examining the use of rank combined lineups in cross-racial identification.* Paper presented at the biennial meeting for the American Psychology-Law Society, Austin, TX.

Dysart, J. E., Lindsay, R. C. L., & Dupuis, P. (2001, June). *Clothing bias and showup identifications: Does clothing type make a difference?* Paper presented at the biennial meeting for the Society for Applied Research in Memory and Cognition, Kingston, ON.

Dupuis, P., Dysart, J. E., & Lindsay, R. C. L. (2001, June). *Instruction bias effects in showup identification.* Paper presented at the biennial meeting for the Society for Applied Research in Memory and Cognition, Kingston, ON.

Dupuis, P., Lindsay, R. C. L., & Dysart, J. E. (2001, June). *Rank combined lineups: Calibrating the accuracy of individual eyewitness "identification" decisions.* Paper presented at the biennial meeting of the Society for Applied Research in Memory and Cognition, Kingston, ON.

Dysart, J. E., Lindsay, R. C. L., Bala, N., & Lee, K. (2001, June). *Qualifying child witnesses to testify: A survey of Canadian judges.* Paper presented at the annual meeting for the Canadian Psychological Association, Ste-Foy, QC.

Dysart, J. E., Lindsay, R. C. L. & Hammond, R. (2000, March). *Mug shot exposure prior to lineup identification: Interference, transference and commitment effects.* Paper presented at the biennial meeting of the American Psychology-Law Society, New Orleans, LA.

Lindsay, R. C. L., Aylen, M., Lee, K., Bala, N., & Dysart, J. E. (2000, March). *The relation between children's moral understanding of lying and their lie-telling behavior: Does the competence examination matter?* Paper presented at the biennial meeting of the American Psychology-Law Society, New Orleans, LA.

Lindsay, R. C. L., Smith, S., Pryke, S., & Dysart, J. E. (2000, March). *Are postdictors of eyewitness accuracy as useful for cross-race as same-race identification?* Paper resented at the biennial meeting of the American Psychology-Law Society, New Orleans, LA.

Dysart, J. E. & Lindsay, R. C. L. (1999, July). *The effects of delay on eyewitness identification accuracy.* Paper presented at the biennial meeting of the Society for Applied Research in Memory and Cognition, Boulder, CO.

Dysart, J. E. (1998, May). *The effect of verbal cues on face recognition: Implications for eyewitness testimony.* Poster presented at the annual meeting of the Atlantic Provinces Council on the Sciences, Antigonish, NS.

## Invited Judicial Presentations

Dysart, J. E. (2022, November). *The science of eyewitness memory and behavior.* Invited speaker at the National Judicial Institute "Preventing Wrongful Convictions" Judicial Seminar, Vancouver, BC, Canada.

Dysart, J. E. (2022, March). *Assessing credibility and reliability: Perception, memory and eyewitnesses identification.* Invited speaker at the National Judicial Institute of Canada "Criminal Law Seminar". Training provided via Zoom.

Dysart, J. E. (2022, February). *The science of eyewitness memory and behavior.* Invited speaker at the Pennsylvania Conference of State Trial Judges, Philadelphia, PA.

Dysart, J. E. (2020, January). *The science of eyewitness memory.* Invited speaker at the Court of Queen's Bench of Alberta Education Seminar, Edmonton, AB, Canada.

Dysart, J. E. (2019, December). *Eyewitness identification: The science of eyewitness memory.* Invited plenary speaker at *the Minnesota Judicial Branch 2019 Annual Conference of Judges, Bloomington, MN.*

Dysart, J. E. (2019, June). *Eyewitness misidentifications: How research informs policy so the judge and jury see what the witness could not.* Invited speaker at the Louisiana Judicial College and Louisiana State Bar Association joint summer school conference, Destin, FL.

Dysart, J. E. (2019, February). *The science of eyewitness identification.* Invited speaker and

panelist at the "Reducing the Risk of Wrongful Convictions" session. Conference of Chief Judges Midyear Meeting, Clearwater, FL.

Dysart, J. E. (2018, October). *The science of eyewitness identification.* Invited speaker at the National Judicial Institute "Preventing Wrongful Convictions" Judicial Seminar, Vancouver, BC, Canada.

Dysart, J. E. (2017, October). *The science of memory and eyewitness identification.* Invited speaker at the Fall Circuit Judges Education Conference sponsored by the Supreme Court of Appeals of West Virginia and the West Virginia Judicial Association, Charleston, WV.

Dysart, J. E. (2017, June). *Eyewitness identification: Applied scientific research.* Invited speaker at the 2017 D.C. Circuit Judicial Conference, Lancaster, PA.

Dysart, J. E. (2017, April). *The science of eyewitness identification: Reducing wrongful convictions.* Invited speaker at the 3rd Circuit Annual Judicial Conference, Lancaster, PA.

Dysart, J. E. (2017, March). *The science of eyewitness identification.* Invited speaker at the National Judicial Institute "Preventing Wrongful Convictions" Judicial Seminar, Vancouver, BC, Canada.

Dysart, J. E. (2015, July). *The science of eyewitness identification*. Invited speaker at the Pennsylvania Conference of State Trial Judges, Hershey, PA.

Dysart, J. E. (2013, June). *The psychology of eyewitness identification*. Invited speaker at the Annual NYC Criminal Court Judges Association meeting, Montauk, NY.

Dysart, J. E. (2013, February). *The psychology of (eyewitness) memory*. Invited speaker at the 2013 Louisiana Judicial College, Evidence and Procedure Conference, New Orleans, LA.

Dysart, J. E. (2012, October). *Identification evidence and eyewitness memory*. Invited speaker at the National Conference of Metropolitan Courts, Pittsburgh, PA.

Dysart, J. E. (2012, October). *The science of eyewitness identification*. Invited speaker at the New York County Lawyers Association Judicial Section CLE Symposium, New York, NY.

Dysart, J. E. (2011, June). *Eyewitness identification*. Invited speaker at the Arizona State Judicial conference, Scottsdale, AZ.

Dysart, J. E. (2011, May). *Eyewitness identification*. Invited speaker at the Ontario Judges Annual conference, Niagara Falls, ON, Canada.

Dysart, J. E. (2010, November). *Identification evidence: Eyewitness memory.* Invited speaker at the Philadelphia Municipal Court Judicial conference, Philadelphia, PA.

Dysart, J. E. (2010, October). *Eyewitness identification evidence*. Invited speaker at the National Judicial Institute "Preventing Wrongful Convictions" Seminar, St. John's, NL, Canada.

Dysart, J. E. (2010, June). *Eyewitness identification*. Invited speaker at the Arizona Judicial conference/State Bar Association Convention, Glendale, AZ.

Dysart, J. E. (2010, May). *Eyewitness identification*. Invited speaker at the D.C. Superior Court Judicial Training Program, Washington, DC.

Dysart, J. E. (2010, February). *An examination of eyewitness identification procedures: Perspectives on wrongful convictions*. Invited speaker at the Pennsylvania conference of State Trial Judges Mid-Annual Meeting, Philadelphia, PA.

Dysart, J. E. (2009, October). *Identification evidence*. Invited speaker at the Ontario Court of Justice West Regional Seminar, Toronto, ON, Canada.

Dysart, J. E. (2009, March). *Identification evidence*. Invited speaker at the National Judicial Institute "Preventing Wrongful Convictions" Seminar, Victoria, BC, Canada.

Dysart, J. E., Garcia, R., & Lieberman, S. (2008, June). *Cross-racial identification*. Invited panelist at the 2008 New York State Summer Judicial Seminar, Rye Brook, NY.

Dysart, J. E. (2007, November). *Eyewitness identification*. Invited speaker at the Atlantic Courts Education Seminar sponsored by the Canadian National Judicial Institute, St. John's, NL, Canada.

Dysart, J. E. (2007, July). *"He had a mug you couldn't forget": The psychological dynamics of mistaken eyewitness testimony.* Pennsylvania conference of State Trial Judges Annual Meeting, Hershey, PA.

Dysart, J. E. (2006, July). *Eyewitness identification*. Invited speaker at Judicial Education Institute training conference for Magistrates, Port of Spain, Trinidad and Tobago.

Dysart, J. E. (2006, April). *Eyewitness errors.* Invited speaker at the Canadian National Judicial Institute Judges training workshop on eyewitness identification, Montreal, QC, Canada.

Dysart, J. E. (2005, November). *Eyewitness errors*. Invited speaker at the Canadian National Judicial Institute Judges training workshop on eyewitness identification, Regina, SK, Canada.

Dysart, J. E. (2005, September). *Eyewitness errors*. Invited speaker at the Canadian National Judicial Institute Judges training workshop on eyewitness identification, Charlottetown, PEI, Canada.

Dysart, J. E. (2005, June). *Eyewitness identification and testimony: A matter for the experts?* Invited speaker at the Connecticut Judges Institute conference, Quinnipiac University, Hamden, CT.

---

**Invited Prosecutor/Conviction Review Unit Presentations**

Dysart, J. E. (2024, May). *Evaluating eyewitness evidence in post-conviction reviews.* Invited presentation for a joint meeting of the New York City District Attorney's Conviction Review Units, Brooklyn, NY.

Dysart, J. E. (2022, June). *The science of eyewitness memory and behavior.* Invited presentation at the Middlesex County, Massachusetts District Attorney's Office webinar on "Eyewitness Identification: Scientific Best Practices." Training provided via Zoom.

Dysart, J. E. (2021, October). *The science of eyewitness memory and behavior.* Invited presentation to the State Attorney's Office, 17th Judicial Circuit, Conviction Integrity Review Division & Assistant State Attorneys. Conducted under the Bureau of Justice Assistance Grant. Training provided via Zoom.

Dysart, J. E. (2021, July). *The science of eyewitness memory and behavior.* Invited presentation to the State Attorney's Office, 4th Circuit, Florida, Conviction Integrity Review Division & Assistant State Attorneys. Training provided via Zoom.

Dysart, J. E. (2021, April). *The science of eyewitness memory and behavior.* Invited presentation to the Suffolk County, MA Conviction Review Unit Team. Training provided via Zoom.

Dysart, J. E. (2013, September). *The science of eyewitness identification*. Invited speaker at the Eyewitness Identification Best Practices Seminar for law enforcement and prosecutors, Forsyth, GA.

Dysart, J. E. (2013, February). *Identification evidence and eyewitness memory*. Invited speaker at the Pennsylvania District Attorneys Annual Conference, Pittsburgh, PA.

Dysart, J. E. (2010, October). *Eyewitness identification.* Invited speaker at the Pennsylvania District Attorneys Association meeting, College Park, PA.

## Invited Bar Association Presentations

Dysart, J. E. (2016, April). *Eyewitness identification*. Invited panelist at the annual meeting of the American Bar Association, Chicago, IL.

Dysart, J. E. (2012, October). *The science of eyewitness identification*. Invited speaker at the New York State Bar Association program on "Forensics and the Law", New York, NY.

Dysart, J. E. (2012, June). *Eyewitness identification: A psychological perspective.* Invited speaker at the State Bar of Michigan Eyewitness Identification Task Force meeting, Lansing, MI.

Dysart, J. E. (2013, February). *Identification evidence and eyewitness testimony*. Invited speaker at the Kings County Bar Association meeting, Brooklyn, NY.

Dysart, J. E. (2012), June). *Eyewitness identification: A psychological perspective.* Invited

keynote speaker and panelist at the Pennsylvania Bar Institute's 20th Annual Criminal Law Symposium, Harrisburg, PA.

Dysart, J. E. (2011, November). *Eyewitness identification.* Invited speaker at the Louisiana State Bar Association conference, New York, NY.

Dysart, J. E. (2011, September). *Eyewitness identification*. Invited speaker at the Montgomery County Bar Association Bench Bar conference, Hamburg, NJ.

Dysart, J. E. (2008, March). *Eyewitness identification*. Invited speaker at the Nassau County Bar Association meeting, Mineola, NY.

Dysart, J. E. (2007, November). *Eyewitness identification*. Invited speaker at the Suffolk County Bar Association CLE program "Police encounters of the first kind", Hauppauge, NY.

Dysart, J. E. (2006, July). *Eyewitness identification*. Invited speaker at Judicial Education Institute training conference for the Bar Association, Port of Spain, Trinidad and Tobago.

## Invited Law Enforcement/Investigator Presentations

Dysart, J. E. (2019, April). *The science of eyewitness memory: Understanding and preventing identification errors.* Invited speaker at the National Defender Investigator Association 2019 National Meeting, San Diego, CA.

Dysart, J. E. (2017, May). *The science of eyewitness identification.* Invited speaker/trainer at the Denver Fire Investigators Conference, Denver, CO.

Dysart, J. E. (2016, September). *Eyewitness identification: A psychological perspective.* Invited speaker at the National Defender Investigator Association Regional conference, Newport Beach, CA.

Dysart, J. E. (2014, June). *Eyewitness identification: A psychological perspective.* Invited speaker at the Michigan Association of Chiefs of Police Annual Training Conference, Traverse City, MI.

Dysart, J. E. (2014, May). *Eyewitness identification: A psychological perspective.* Invited speaker at the Las Vegas Metropolitan Police Department, Las Vegas, NV.

Dysart, J. E. (2013, June). *The psychology of eyewitness identification.* Invited speaker at the Pennsylvania Chiefs of Police Association Annual Conference, Harrisburg, PA.

Dysart, J. E. (2013, June). *The science of eyewitness identification*. Invited speaker at the Baltimore City Police Department training seminar on Eyewitness Identification, Baltimore, MD.

Dysart, J. E. (2013, March). *The psychology of eyewitness identification*. Invited speaker at the NYPD training meeting on Wrongful Convictions, New York, NY.

Dysart, J. E. (2013, March). *The psychology of eyewitness identification*. Invited speaker at the "Enhancing Law Enforcement's Ability to Ensure Accurate Convictions – Techniques & Scientific Developments" Seminar for WV Law Enforcement, Charleston, WV.

Dysart, J. E. (2012, November). *Eyewitness identification: A psychological perspective*. Invited speaker at the seminar "How Idaho Law Enforcement Can Ensure More Accurate Identifications: Practice Techniques & Scientific Developments", Boise, ID.

Dysart, J. E. (2012, April). *Eyewitness identification: A psychological perspective.* Invited speaker at the 2012 National Defender Investigator Association conference, Atlanta, GA.

Dysart, J. E. (2011, December). *Enhancing law enforcement's ability to ensure accurate convictions – Techniques & Scientific Developments: Evidence that the updates work.* Invited speaker at the Mississippi Chiefs of Police conference, Oxford, MS.

Dysart, J. E. (2011, May). *Eyewitness identification*. Invited speaker at the Committee for Public Counsel Services conference, Worcester, MA.

Dysart, J. E. (2011, April). *Eyewitness identification*: A scientific review. Invited speaker at the joint Innocence Project, The Palmetto Innocence Project & The South Carolina Law Enforcement Division conference, Columbia, SC.

Dysart, J. E. (2011, February). *Eyewitness identification: A scientific review*. Invited speaker at the Society of Professional Investigators monthly meeting, New York, NY.

Dysart, J. E. (2010, September). *Eyewitness identification procedures*. Invited speaker at the National Defender Investigator Association annual training conference, Savannah, GA.

Dysart, J. E. (2010, February). *False identifications: A scientific approach to limiting mistakes*. Invited speaker at the Texas District and County Attorneys Association Investigator School conference, Odessa, TX.

Dysart, J. E. (2008, November). *Eyewitness identification*. Invited speaker at the Royal Canadian Mounted Police's Major Crime conference, Halifax, NS, Canada.

Dysart, J. E. (2008, September). *The psychology of eyewitness identification*. Invited speaker at the Denver Fire Department's Annual Advanced Fire Investigation Seminar, Denver, CO.

Dysart, J. E. (2006, September). *Eyewitness identification*. Invited talk at the International Association of Women in Policing conference, Saskatoon, SK, Canada.

Dysart, J. E. (2006, July). *Eyewitness identification*. Invited speaker at Judicial Education

Institute training conference for Senior Police Officers, Trinidad and Tobago.

## Invited Defense Attorney Presentations

Dysart, J. E. (2016, June). *Eyewitness memory and perception.* Invited speaker at the National Forensic College third annual conference, NACDL and Benjamin N. Cardozo School of Law, Yeshiva University, New York, NY.

Dysart, J. E. (2014, November). *Eyewitness identification: A psychological perspective.* Invited keynote speaker at the Wisconsin State Public Defender's Annual Criminal Defense Conference, Milwaukee, WI.

Dysart, J. E. (2014, June). *Eyewitness memory and perception.* Invited speaker at the National Forensic College Conference, Benjamin N. Cardozo School of Law, Yeshiva University, New York, NY.

Dysart, J. E. (2013, April). *The psychology of eyewitness identification*. Invited speaker at the Ohio Association of Criminal Defense Lawyers "Eyewitness Identification" Seminar, Columbus, OH.

Dysart, J. E. (2012, December). *The science of eyewitness identification*. Invited speaker at the Delaware County Association of Criminal Defense Lawyers meeting, Media, PA.

Dysart, J. E. (2012, August). *The science of eyewitness identification*. Invited speaker at the Texas Criminal Defense Lawyers Association conference, Austin, TX.

Dysart, J. E. (2012, June). *Eyewitness identification: A psychological perspective*. Invited keynote speaker at the Public Defender Service Forensic Science conference, Washington, DC.

Dysart, J. E. (2012, April). *Eyewitness identification: Why innocent people are wrongly identified.* Invited speaker at the 2012 New York State Wrongful Convictions conference, Rochester Institute of Technology, Rochester, NY.

Dysart, J. E. (2011, August). *Eyewitness identification*. Invited speaker at the Florida Defender Summer School 2011 conference, Orlando, FL.

Dysart, J. E. (2011, February). *Eyewitness identification: A scientific review*. Invited speaker at the Manhattan Legal Aid Society training seminar, New York, NY.

Dysart, J. E. (2011, February). *Eyewitness identification*. Invited speaker at the California Capital Case Defense Seminar, Monterey, CA.

Dysart, J. E. (2010, April). *The science of eyewitness evidence*. Invited speaker at the Missouri Association of Criminal Defense Attorneys convention titled "Eyewitness Identification Litigation Training", Branson, MO.

Dysart, J. E. (2009, November). *Eyewitness identification*. Invited speaker at the Rochester Institute of Technology Public Defender CLE program, Rochester, NY.

Dysart, J. E. (2009, October). *Eyewitness identification*. Invited speaker for the Criminal Appeals Bureau CLE program, New York, NY.

Dysart, J. E. (2009, September). *The investigative process and eyewitness evidence.* Invited speaker at the Short Course in Crime Scene Analysis for Trial Lawyers in Criminal Cases, New York, NY.

Dysart, J. E. (2009, May). *Eyewitness identification*. Invited speaker at the Bronx Legal Aid Society CLE program on Eyewitness Identification, Bronx, NY.

Dysart, J. E (2009, May). *Eyewitness (mis)identification.* Invited speaker at the Nassau County Legal Aid Society CLE Program on Eyewitness Identification, Mineola, NY.

Dysart, J. E. (2009, March). *Eyewitness identification*. Invited speaker at the Brooklyn Legal Aid Society CLE Program on Eyewitness Identification, Brooklyn, NY.

Dysart, J. E., & Perrone, A. (2008, October). *Changing strategies to change the law of identification evidence.* Invited speaker at the New Jersey Office of the Public Defender Annual training conference, "Changing Times – Changing Strategies: Striking a New Balance, Kean University, Union, NJ.

Dysart, J. E., & Schecter, M. (2008, October). *Everything you always wanted to know but were afraid to ask about ID evidence*. Invited speaker at the New Jersey Office of the Public Defender Annual training conference, "Changing Times – Changing Strategies: Striking a New Balance, Kean University, Union, NJ.

Dysart, J. E. (2008, August). *Eyewitness identification*. Invited speaker at the Federal Defender Services of Idaho, Capital Habeas Unit's Annual Death Penalty conference, Boise, ID.

Stetler, R., Friedman, J., Garcia, R., & Dysart, J. E. (2008, March). *Developing the right facts: Investigation and discovery.* Invited panelist at the National Association of Criminal Defense Lawyers CLE conference, "A new legal architecture: Litigating eyewitness identification cases in the 21st Century", New York University, New York, NY.

Dysart, J. E. (2007, July). *Misidentification and eyewitness testimony*. Invited speaker at the Georgia Capital Public Defenders Association seminar, Atlanta, GA.

Dysart, J. E., & Carroll, P. (2006, May). *Eyewitness evidence*. Invited speaker at the Maryland Public Defender conference, Ocean City, MD.

---

**Invited Presentations for Combined Judicial, Law Enforcement, and Attorney Audiences**

Dysart, J. E. (2016, June). Moderator on '*Emerging Issues'* panel. Invited speaker at the National Symposium on Eyewitness Identification Reform, Yale University, New Haven, CT.

Dysart, J. E. (2014, May). *Eyewitness identification: A psychological perspective.* Invited speaker at the Eyewitness Identification Best Practices Symposium, San Francisco, CA.

Dysart, J. E. (2014, May). *The science of eyewitness identification*. Invited speaker at the Joint Eyewitness Identification Statewide Training Symposium, co-sponsored by the Connecticut State Eyewitness Identification Task Force, Hartford, CT.

Dysart, J. E. (2013, April). *Eyewitness memory and the social science research*. Invited speaker at the Annual Virginia Journal of Criminal Law Symposium at the University of Virginia School of Law, Charlottesville, VA.

Dysart, J. E. (2012, May). *Best practices in eyewitness ID: Model policy and procedures.* Invited speaker and panelist at the Best Practices in Law Enforcement Investigations Program, Center for American and International Law, Plano, TX.

Dysart, J. E. (2011, October). *Eyewitness identification*. Invited speaker at the Newfoundland Department of Justice conference, St. Johns, NL, Canada.

Dysart, J. E. (2011, July). *Eyewitness identification*. Invited speaker at the "Eyewitness Identification and False Confession" conference, sponsored by the Center for American and International Law, Plano, TX.

Dysart, J. E. (2011, March). *Eyewitness identification*. Invited speaker at the "Actual Innocence: Establishing Innocence or Guilt August - Causes of and Solutions to Wrongful Convictions" conference, sponsored by the Center for American and International Law, Plano, TX.

Dysart, J. E. (2010, March). *Eyewitness identification – What is its value in criminal cases?* Invited speaker at the "Actual Innocence: Establishing Innocence or Guilt" conference, sponsored by the Center for American and International Law, Plano, TX.

Dysart, J. E., & Patenaude, K. (2009, March). *Eyewitness identification*. Invited speaker at the "Actual Innocence: Establishing Innocence or Guilt. Future of Forensic Science, Eye-Witness Identification and the Impact of the NAS report" conference, sponsored by the Center for American and International Law, Austin, TX.

Dysart, J. E., & Edwards, E. (2009, January). *Eyewitness identification: New science and new litigation strategies.* Invited speaker at the Fifth National Seminar on Forensic Evidence and the Criminal Law, Philadelphia, PA.

Dysart, J. E. (2008, August). *Why eyewitnesses make mistakes*. Invited speaker at The Center for American and International Law conference, "Actual Innocence: Forensics, False Confessions, and Eyewitness Identification", Plano, TX.

---

**Invited Law School and University Presentations**

Dysart, J. E. (2021, January). Invited speaker at the Wrongful Convictions Panel Series, Institute for Innovation in Prosecution at John Jay College of Criminal Justice. Meeting via Zoom.

Dysart, J. E. (2018, November). *The science of eyewitness identification.* Invited speaker at the "Protecting the Innocent: Louisiana's Reform of Eyewitness Identification" conference, Loyola University New Orleans College of Law, New Orleans, LA.

Dysart, J. E. (2016, November). *Eyewitness identification.* Invited speaker at the Department of Psychology sponsored colloquium titled "Faculty Perceptions: Eyewitnesses, Juries, and Consequences." John Jay College of Criminal Justice, New York, NY.

Dysart, J. E. (2014, January). *The science of eyewitness identification*. Invited speaker at the Association of American Law Schools Annual Conference, New York, NY.

Dysart, J. E. (2013, August). *The science of eyewitness identification.* Invited speaker at the Social Justice Workshop Seminar, Santa Clara Law School, Santa Clara, CA.

Dysart, J. E. (2012, April). *The science of eyewitness identification.* Invited speaker at the "Eyewitness Identification Symposium" sponsored by Emory Law School, Atlanta, GA.

Dysart, J. E. (2012, February). Invited panelist at the 7th Annual H.F. Guggenheim Symposium on Crime in America session titled "Did You See That Man? The Challenge to Eyewitness ID", New York, NY.

Dysart, J. E. (2010, April). *The science of eyewitness identification*. Invited panelist speaker at the Brown University Eyewitness Identification Summit, The Taubman Center for Public Policy Brown University, Providence, RI.

Dysart, J. E. (2009, September). *The psychology, law, and ethics of eyewitness identification cases.* Invited speaker at the Innocence and Forensics CLE program, Widener Law School, Wilmington, DE.

Dysart, J. E. (2007, May). *Eyewitness identification*. Invited speaker at "Wrongful Convictions: Causing Pain, Allowing Gain", sponsored by The Arlin M. Adams Center for Law and Society at Susquehanna University, Ceremonial Courtroom, Federal District Court, Philadelphia, PA.

Dysart, J. E. (2007, February). *Understanding eyewitness identification*. Invited speaker at Susquehanna University seminar "Wrongful Convictions", Selinsgrove, PA.

Dysart, J. E. (2006, November). *Understanding the science of memory: Distinguishing eyewitness confidence from accuracy.* Invited talk at Emory Law School, Atlanta, GA.

Dysart, J. E. (2006, March). *The effects of alcohol on eyewitness identification accuracy from show-ups.* Invited talk for the Department of Psychology at Lehman College, CUNY, Bronx, NY.

## Invited Non-Profit Presentations

Dysart, J. E. (2023, February). *The science of eyewitness memory and behavior.* Invited speaker at the Innocence Project Staff Training seminar. Training provided via Zoom.

Dysart, J. E. (2017, November). *The science of eyewitness identification.* Invited speaker at the Innocence Project 25th Anniversary Conference, Cardozo Law School, New York, NY.

Dysart, J. E. (2013, May). *The psychology of eyewitness identification*. Invited speaker at the Innocence Project Staff Training seminar, New York, NY.

Dysart, J. E. (2012, June). *Psychology of misidentification*. Invited speaker at the 2012 Innocence Policy Network conference, New Orleans, LA.

Dysart, J. E. (2011, October). *Eyewitness identification*. Invited Shea Lecturer, sponsored by the Charter Oak State College Foundation, Hartford, CT.

## Supervision of Doctoral Students at John Jay College of Criminal Justice

2010        John DeCarlo (Criminal Justice Doctoral Student)
          Topic: Eyewitness Identification Accuracy of Police Officers & Citizens

2009-2011    Victoria Lawson (Forensic Psychology Doctoral Student)
          Topic: Eyewitness Identification

2006-2009    Anna Rainey (Forensic Psychology Doctoral Student)
          Topics: Showups; Cross-race identification

2006-2009    Brian Wallace (Forensic Psychology Doctoral Student)
          Topics: Alibi believability; Mug shot searching.

## Supervision of Masters Theses at John Jay College of Criminal Justice

2018 – 2020   Elena Christofi
          Topic: 911 Transcripts in Eyewitness Calls

2018 – 2019   Samantha Kosziollek
          Topic: 911 Dispatchers

2016 – 2018   Marisa Jaross
          Topic: Composite sketches

2016 – 2017   Brittany Kassis
          Topic: 911 Dispatchers

2011 – 2012    Tamara Andrade
                    Topic: Composite creation in cross-race identifications

2010 – 2011    Jennifer Savion
                    Topic: Composite creation in cross-race identifications

2009 – 2010    Lindsey Butera
                    Topic: Eye-tracking and lineup accuracy with biased lineups
               Yinglee Wong
                    Topic: Cross-race description accuracy of hair/hairstyles
               Nancy Yang
                    Topic: Eye-tracking and weapon focus effect

2008 – 2009    Alexander Buijsrogge
                    Topic: Cross-race composite creation of famous faces
               Kristin Chong
                    Topic: Stranger alibis and identification accuracy
               Victoria Lawson
                    Topic: Cross-race showup and lineup accuracy
               Jessica Owens
                    Topic: Multiple-perpetrator crimes and identification accuracy

2007 – 2008    Sarah Kopelovich
                    Topic: Cross-race and Accent effects on identification accuracy
               Jason Mandelbaum
                    Topic: Cross-race effects in mug shot searching


## Supervision of Master's Theses at Southern Connecticut State University

2005           Lisbeth Fugal
                    Topic: Post-identification feedback
               Anna Rainey
                    Topic: Cross-race identification and "contact" with other groups

2004           Sandra Soucie
                    Topic: CSI Effect


## Supervision of Undergraduate Honor's Thesis at Southern Connecticut State University

2005           Daniel Csuka
                    Topic: Multiple Independent Identification Accuracy

## Awards and Scholarships

| | |
|---|---|
| 2017 | PSC CUNY research grant ($3,500) |
| 2008 | John Jay College Research Assistance Program Grant ($1,000) |
| 2005 | Connecticut State University Research Grant ($4,400) |
| 2005 | Junior Faculty Research Fellowship, Southern Connecticut State University (9 credits teaching release time for Fall 2005) |
| 2003-2005 | Social Sciences and Humanities Research Council of Canada (SSHRC) Post- Doctoral Fellowship ($40,000 and $35,000 annually; declined) |
| 2002 | American Psychological Foundation/Council of Graduate Departments of Psychology (APF/COGDOP) Graduate research scholarship ($1,500) |
| 2002 | American Psychology-Law Society Grants-in-Aid award ($650) |
| 2001-2003 | Social Sciences and Humanities Research Council of Canada (SSHRC) Doctoral Award ($17,900 annually) |
| 2000-2001 | Ontario Graduate Scholarship ($15,000) |
| 1999-2000 | Natural Sciences and Engineering Research Council of Canada (NSERC) PGS-B scholarship ($18,900) |
| 1998-1999 | Natural Sciences and Engineering Research Council of Canada (NSERC) PGS-A scholarship ($17,300) |

## Courses Taught

**John Jay College of Criminal Justice, New York, NY**
- Introduction to Psychology (undergraduate course)
- Psychology and Law (undergraduate course)
- Forensic Social and Experimental Psychology (undergraduate course)
- Mental Health Professionals, Social Science and the Law (Masters course)
- Eyewitness Identification (Masters course)
- Prospectus Seminar (Masters course)
- Research Methods and Design (Psychology doctoral course)
- Survey of Psychology and Criminal Justice (Criminal Justice doctoral course)

**Southern Connecticut State University, New Haven, CT**
- Experimental Methods (undergraduate course)
- Social Psychology (undergraduate course)
- Experimental Research Internship (undergraduate course)

43

    - Psychology and Law (undergraduate course)
    - Issues in Psychology, Law, and Ethics (Masters course)

**Quinnipiac University, Hamden, CT**
    - Introduction to Psychology (undergraduate course)

---

## University Committee Service

| | |
|---|---|
| 2025 – present | College Council Alternate Member, John Jay College of Criminal Justice |
| 2025 – present | Faculty Senate Executive Committee Member, John Jay College of Criminal Justice |
| 2025 – present | Faculty Senate Member, John Jay College of Criminal Justice |
| 2023 – 2024 | Faculty Senate Member, John Jay College of Criminal Justice |
| 2023 – 2024 | College Council Alternate Member, John Jay College of Criminal Justice |
| 2016 – 2019 | Graduate Studies Council, John Jay College of Criminal Justice |
| 2013 – 2016 | College Council Member, John Jay College of Criminal Justice |
| 2013 – 2016 | Faculty Senate Member, John Jay College of Criminal Justice |
| 2013 – 2014 | College Council Executive Committee Member, John Jay College of Criminal Justice |
| 2010 – 2012 | College Council Executive Committee Member, John Jay College of Criminal Justice |
| 2010 – 2012 | College Council Member, John Jay College of Criminal Justice |
| 2010 – 2012 | Faculty Senate Executive Committee Member, John Jay College of Criminal Justice |
| 2010 – 2012 | Faculty Senate Member, John Jay College of Criminal Justice |
| 2008 – 2012 | College Scholarships and Awards Committee, John Jay College of Criminal Justice |
| 2010 – 2011 | Task Force on the Year-round College, John Jay College of Criminal Justice |
| 2007 – 2010 | Department Curriculum Committee, Department of Psychology, John Jay |

|  | College of Criminal Justice |
|---|---|
| 2007 – 2010 | College Curriculum Committee Member, John Jay College of Criminal Justice |
| 2006 – 2008 | Coordinated Undergraduate Education (CUE) Committee Member, John Jay College of Criminal Justice |
| 2006 – 2007 | College Council Member, John Jay College of Criminal Justice |
| 2006 – 2007 | Faculty Senate Member, John Jay College of Criminal Justice |
| 2006 – 2007 | Major/Minor Fair Committee, John Jay College of Criminal Justice |
| 2004 – 2005 | Subject Pool Ad Hoc Committee, Department of Psychology, Southern Connecticut State University |
| 2004 – 2005 | Faculty Development Advisory Committee – Arts and Sciences Rep, Southern Connecticut State University |
| 2004 – 2005 | New Faculty Orientation Committee, Southern CT State University |
| 2004 – 2005 | New Faculty Mentor, Southern Connecticut State University |
| 2004 | New Student Orientation Committee, Southern Connecticut State University |
| 2003 – 2005 | Department of Psychology Web-site Committee, Southern Connecticut State University |
| 2003 – 2004 | Connecticut State University Psychology Day Research Conference – Organizing Committee |
| 1999 – 2003 | Graduate Student Representative at Department of Psychology Meetings, Queen's University |

## Professional Activities

| 2006 – present | Consultant, eyewitness identification expert |
|---|---|
| 2016 – present | Appointed Member of the 3rd Circuit Task Force on Eyewitness Identification |
| 2009 – 2021 | Research Advisory Board Member, Innocence Project, New York, NY |

| 2016 | Testified at City Council - joint hearing of the Committee on Public Safety and Committee on Courts and Legal Services on "Wrongful Convictions: Using Evidence-Based procedures and Technology to Keep Innocent People Out of Jail", New York, NY. |
|------|------|
| 2012 | Testified before the Maryland House and Senate Judiciary Committees, Annapolis, MD |
| 2011-2012 | Advisory Board member for the Houston Police Department Eyewitness Identification Experiment |
| 2011 | Testified before Connecticut Eyewitness Identification Task Force, Hartford, CT |
| 2011 | Reviewed model policy for Texas HB 215 on eyewitness identification |
| 2007 – 2012 | Member of a national field study team led by Dr. Gary Wells of Iowa State University investigating the use of simultaneous and sequential double-blind lineups in the field. |
| 2010 – 2011 | Site scientist in Austin, TX for National eyewitness field study (above) |
| 2010 – 2011 | Conference Co-Chair for the 9th biennial conference for the Society for Applied Research in Memory and Cognition, New York City, June 2011 |
| 2007 | Conference Chair and Organizer: "Off the Witness Stand: Using Psychology in the Practice of Justice", New York, NY |

## Reviewing (past and current)

Law and Human Behavior
Psychology, Public Policy and Law
Applied Cognitive Psychology
Journal of Experimental Psychology: Applied
Psychology, Crime & Law
National Science Foundation
American Psychology-Law Society annual meetings
Society for Applied Research in Memory and Cognition meetings

## Professional Affiliations

American Psychology–Law Society
Society for Applied Research in Memory and Cognition

**Appendix C**

**Materials Reviewed**

In conjunction with my preparation of this report, I have reviewed the following materials:

1. Complaint Daniel Rodriguez v. Guevara et al., October 06, 2023
2. Investigative File (RFC-DRodriguez 000001-000222)
3. Photographs from RD File (D. Rodriguez 005507, D. Rodriguez 005927-005942)
4. Crime Scene Photographs (RFC 004351-004370)
5. Records Division File (RFC-DRodriguez 000223-000276)
6. Crime Lab Report (RFC-DRodriguez 000277-000285)
7. Crime Lab Request for Analysis and Findings (RFC-DRodriguez 000318-000323)
8. Daniel Rodriguez Mugshot (RFC-DRodriguez 000294)
9. Daniel Rodriguez Mugshots (RFC-DRodriguez 004163- 004165)
10. George Laureano Mugshots (RFC-DRodriguez 004166-004175)
11. Raymond Navarro Mugshots (RFC-DRodriguez 004176-004182)
12. Juan Sepulveda Mugshots (RFC-DRogriguez 004183-004187)
13. Daniel Rodriguez Petition for Certificate of Innocence with Exhibits (D. Rodriguez 000189-000277)
14. Daniel Rodriguez Certificate of Innocence (D. Rodriguez 000186-000188)
15. Deposition of Daniel Rodriguez April 11 2024 and Exhibits
16. Deposition of David Velazquez April 24, 2024 and Exhibits
17. Deposition of David Velazquez in Deleon-Reyes and Solache June 28, 2021 volume I of II and Exhibits
18. Deposition of David Velazquez in Deleon-Reyes and Solache September 08, 2021 volume II of II and Exhibits
19. Deposition of Edward Mingey December 06, 2023 and Exhibits
20. Deposition of George Laureano October 22, 2024 and Exhibits
21. Deposition of Jason Rivera January 22, 2025 and Exhibits
22. Statement of Non-Appearance of Jason Rivera February 21, 2023
23. Statement of Non-Appearance of Jason Rivera November 13, 2023
24. Statement of Non-Appearance of Jason Rivera July 24, 2024
25. Deposition of Patrick Walsh June 03, 2024 and Exhibits
26. Deposition of Reynaldo Guevara October 17, 2023 and Exhibits
27. Deposition of Robert Biebel December 05, 2023 and Exhibits
28. Affidavit of David Velazquez June 05, 2025 (D. Rodriguez 001008- 001009)
29. Daniel Rodriguez First Supplement to Petition for Relief from Judgement (D. Rodriguez 003877-003885)
30. Daniel Rodriguez Second Supplement to Petition for Relief from Judgement (D. Rodriguez 004182- 004249)
31. People v. Daniel Rodriguez. Trial Transcript Vol. A (D. Rodriguez 004924-005138)
32. People v. Daniel Rodriguez. Trial Transcript Vol. B (D. Rodriguez 005139-005270)
33. David Velazquez Testimony in People v. Armando Serrano and Jose Montanez May 16, 2013 (D. Rodriguez 000874 – 000968)
34. Jason Rivera Testimony in People v. Roberto Almodovar and William Negron September 15, 2016 (D. Rodriguez 001662- 001753)

47

35. Jason Rivera Testimony in People v. Arturo Reyes and Gabriel Solache March 27, 2015 (D. Rodriguez 001370- 001425).
36. Affidavit of Daniel Rodriguez (DRodriguez 1059-1063)