Dr. Richard A. Leo, Ph.D., J.D.
**JUSTICE RESEARCH & CONSULTING, INC.**
15 Ashbury Terrace
San Francisco, CA 94117

_____

Phone: (415) 661-0162
Email: rleo@jrcsf.com

August 8, 2025

Steve Art
Attorney at Law
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Floor
Chicago, Illinois 60607

**Re:     Daniel Rodriguez v. Reynaldo Guevara, et al.**
         **Case No. 22 C 6496**

Dear Mr. Art,

      This report is per your request in the above-referenced case of *Daniel Rodriguez v. Reynaldo Guevara, et al.*

## I. Qualifications

      I am the Hamill Family Professor of Law and Psychology at the University of San Francisco, and formerly a tenured Associate Professor of Psychology and an Associate Professor of Criminology at the University of California, Irvine. My areas of research, training, and specialization include social psychology, criminology, sociology, and law. For over 30 years, I have conducted and published extensive empirical research on police interrogation practices, the psychology of interrogation and confessions, psychological coercion, police-induced false confessions, and erroneous convictions. In the last three decades, I have observed, studied and analyzed thousands of interrogations and confessions; I have researched, written, and published numerous peer-reviewed articles on these subjects in scientific and legal journals; and I have written several books on these subjects, including *Police Interrogation and American Justice* (Harvard University Press, 2008) and *Confessions of Guilt: From Torture to Miranda and Beyond* (Oxford University Press, 2012).

      I am regarded as a national and leading expert on these topics, and I have won numerous individual and career achievement awards for my scholarship and publications. My scholarship has often been featured in the news media and cited by appellate courts, including the United States Supreme Court, on multiple occasions. To date, I have consulted with criminal and civil attorneys on more than 2,400 cases involving disputed interrogations and/or confessions, and I have been qualified and testified as an expert witness 430 times in state, federal, and military

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 2

courts in 38 states and the District of Columbia, including 42 times in federal and military courts, including multiple times in the 7th Circuit. I have given many lectures to judges, defense attorneys, prosecutors, and other criminal justice professionals, and I have taught interrogation training courses and/or given lectures to police departments in the United States, China, and the Republic of Cyprus.

My qualifications are summarized in greater detail in my curriculum vitae, which is attached to this report (Exhibit A). A list of my court and deposition testimony in the last four years is attached to this report (Exhibit B). I am being compensated for my time at the rate of $525 per hour. This is my typical hourly rate. My compensation is not contingent on the outcome of this litigation nor on the opinions I express in this report or in subsequent court testimony.

## II. Materials Reviewed

In conjunction with my preparation of this report, I have reviewed the following materials:

1. First Amended Complaint (Rodriguez v. Guevera et al.)
2. Investigative File (RFC-DRodriguez 000001-000222)
3. Permanent Retention File (RFC-DRodriguez 000223-000276)
4. Photographs from RD File (D. Rodriguez 005507, D. Rodriguez 005927-005942)
5. Trial Transcripts (Rodriguez) (D.Rodriguez 004924-005270)
6. Deposition of Daniel Rodriguez (and Exhibits) (April 11, 2024)
7. Deposition of Reynaldo Guevara (and Exhibits) (October 17, 2023)
8. Deposition of Edward Mingey (and Exhibits) (December 6, 2023)
9. Deposition of George Laureano (and Exhibits) (October 22, 2024)
10. Deposition of Jason Rivera (and Exhibits) (Non-Appearances)
11. Deposition of Jason Rivera (and Exhibits) (January 22, 2025)
12. Deposition of Robert Biebel (and Exhibits) (December 5, 2023)
13. Deposition of Patrick Walsh (and Exhibits) (June 3, 2024)
14. Petition for Relief from Judgment (2-1401 Petition and Exhibits) (D.Rodriguez 003960-3986)
15. First Supplement to Petition for Relief from Judgment (D.Rodriguez 003877-003885)
16. Second Supplement to Petition for Relief from Judgment (D.Rodriguez 004182-004249)
17. Motion for Judgment as a Matter of Law (and Exhibits) (D.Rodriguez 004855-4291)
18. Petition for Certificate of Innocence (and Exhibits) (D.Rodriguez 000189-000277)
19. Certificate of Innocence Order (D.Rodriguez 000186-188)
20. Testimony of Daniel Rodriguez in Reynaldo Munoz v. People July 14, 2021 (D. Rodriguez 004329- 004379)
21. Deposition of David Velazquez April 24, 2024 (and Exhibits)

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 3

22. Deposition of David Velazquez in DeLeon-Reyes/Solache June 28, 2021 volume I of II (and Exhibits)
23. Deposition of David Velazquez in DeLeon-Reyes/Solache September 08, 2021 volume II of II (and Exhibits)
24. David Velazquez Testimony in People v. Armando Serrano and Jose Montanez May 16, 2013 (D. Rodriguez 000874 – 000968)
25. Crime Lab Report (RFC-DRodriguez 000277-000285)
26. Crime Lab Request for Analysis and Findings (RFC-DRodriguez 000318-000323)
27. Daniel Rodriguez Mugshot (RFC-DRodriguez 000294)
28. Daniel Rodriguez Mugshots (RFC-DRodriguez 004163- 004165)
29. George Laureano Mugshots (RFC-DRodriguez 004166-004175)
30. Raymond Navarro Mugshots (RFC-DRodriguez 004176-004182)
31. Juan Sepulveda Mugshots (RFC-DRodriguez 004183-004187)
32. Decision in People v. Jackie Wilson dated June 20, 2018 (PTP-NOTICE-000709-827)
33. 118 Documented Burge Area 2 and Area 3 Torture Victims 1972-1991 (PTP-NOTICE-000829-842)
34. Summary of Statements of City Council Members, July 24, 2007 (PTP-NOTICE-000843-844)
35. Decision in People v. Cortez Brown dated June 3, 2009 (PTP-NOTICE-000845-854)
36. People v. Stanley Wrice, 406 Ill. App. 3d 43 (4th Dist. 2010) (PTP-NOTICE-000855-877)
37. People v. Stanley Wrice, 2012 IL 111860 (2012) (PTP-NOTICE-00879-893)
38. Testimony of Diane Panos in U.S. v. Burge (PTP-NOTICE-000895-899)
39. Testimony of Sammy Lacey in U.S. v. Burge (PTP-NOTICE-000901-918)
40. Statement of Facts and Conclusions of Law in People v. Tillman, No. 92 CR 27711 dated January 11, 2010 (PTP-NOTICE-000919-927)
41. Decision in People v. Stanley Wrice dated December 10, 2013 (PTP-NOTICE-000929-939)
42. Testimony of Michael McDermott in U.S. v. Burge (PTP-NOTICE-000941-982)
43. Transcript of Sentencing of Jon Burge in U.S. v. Burge (PTP-NOTICE-000983-994)
44. Excerpts of 2016 Police Accountability Task Force Report (PTP-NOTICE-000995-1065)
45. Excerpts of 2017 DOJ Pattern and Practice Report (PTP-NOTICE-001067-1140)
46. Affidavit of Kenneth Caddick (PTP-NOTICE-001141-1142)
47. Affidavit of Joanne Archibald (PTP-NOTICE-001143-1144)
48. U.S. v. Burge, 711 F.3d 803 (7th Cir. 2013) (PTP-NOTICE-0001145-1152)
49. Chicago Torture Resolution and Ordinance 2015 (PTP-NOTICE-001153-1157)
50. List of Burge's Assertions of the Fifth Amendment (PTP-NOTICE-001159)
51. Affidavit and Testimony of Darlene Lopez (PTP-NOTICE-001160-1175)
52. People v. Shawn Whirl, 2015 IL App (1st) 111483 (PTP-NOTICE-001176-1211)
53. Daley News Statements (PTP-NOTICE-001212-1218)
54. Daley July 19, 2007 Code of Silence Statement (PTP-NOTICE-001219)
55. Deposition of Michael Kill re N Word (PTP-NOTICE-001220-1224)

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 4

56. People v. James Gibson, 2018 IL App (1st) 162177 (PTP-NOTICE-001226-1265)
57. CPD Code of Silence Court Decisions 2012-2106 (PTP-NOTICE-001268-1347)
58. Special Prosecutor's Report July 19, 2006 (PTP-NOTICE-002893-3183)
59. Citizens' Report on Special Prosecutor Failures (PTP-NOTICE-001348-1463)
60. Brceczek Letter to Daley with Raba Letter dated February 25, 1982 (PTP-NOTICE-001464-1465)
61. City Memo Admitting Pattern of Torture 1.22.92 (PTP-NOTICE-001466-1497)
62. City Admissions Regarding Torture of Melvin Jones and Andrew Wilson 5.15.95 (PTP-NOTICE-001498-1521)
63. Amnesty Torture Report and Related Letters 5.12.90 (PTP-NOTICE-001522-1532)
64. Wilson Verdict Form Finding Policy of Area 2 Abuse 6.8.89 (PTP-NOTICE-001533)
65. Burge Police Board Finding Decision 2.1.93 (PTP-NOTICE-001534-1594)
66. Burge Police Board Appellate Decision (PTP-NOTICE-001595-1623)
67. Melvin Duncan Affidavit dated April 19, 2004 (PTP-NOTICE-002020-2021)
68. Doris Byrd Statement dated November 9, 2004 (PTP-NOTICE-002022-2065)
69. Walter Young Statement dated November 2, 2004 (PTP-NOTICE-002066-2098)
70. William Parker Statement dated October 4, 2004 (PTP-NOTICE-002099-2131)
71. People v. Darrell Cannon, 293 Ill. App. 3d 634 (1st Dist. 1997) (PTP-NOTICE-001647-1653)
72. December 24, 1990 Torture Hearing Before City Council (PTP-NOTICE-001694-1744)
73. Anonymous Letters (2.2.89, 3.6.89, 3.15.89, 6.16.89) (PTP-NOTICE-002208-2215)
74. Governor Ryan's Innocence Pardon Statement 1.10.03 (PTP-NOTICE-002473-2490)
75. Expert Report of Anthony Bouza in Orange v. Burge dated August 19, 2006 (PTP-NOTICE-000681-687)
76. Hillard Deposition (PTP-NOTICE-001943-1989)
77. News articles Regarding Daley, Martin, et al. (PTP-NOTICE-002216-2234)
78. Fogel City Council Testimony 10.6.89 (PTP-NOTICE-002237-2247)
79. Fogel and Martin Excerpts City Council Testimony 10.11.89 (PTP-NOTICE-002248-2262)
80. Brzeczek Affidavit 8.26.04 (PTP-NOTICE-002271-2276)
81. Fogel Memo to Mayor Regarding OPS 10.19.87 (PTP-NOTICE-002277-002284)
82. Tribune Article Regarding Secreting Torture Findings 2.23.99 (PTP-NOTICE-002310-2314)
83. Citizens Alert Letter to Hillard (PTP-NOTICE-002318-2324)
84. History of Police Disciplinary Proceedings in 105 Torture Cases (PTP-NOTICE-002458-2467)
85. U.N. Committee Against Torture Burge Findings 5.18.06 (PTP-NOTICE-003187)
86. Expert Report of Richard Rosenthal in Smith v. Burge dated July 24, 2018 (PTP NOTICE-0031930-3223)
87. 12/16/2005 Order in People v. Gray (PTP-J GRAY-000001-28)
88. Testimony of Jason Gray in People v. Gray (PTP-J GRAY-000029-31)
89. Amended Petition for Post-Conviction Relief in People v. Gray (PTP-J GRAY-000032 - 123)

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 5

90. Affidavit of Manuel Bobe (PTP-M BOBE-000001)
91. People v. Robinson, 238 Ill.App.3d 48 (1992) (PTP-A ROBINSON-000001- 000006)
92. People v. Bounds, 171 Ill.2d 1 (1995) (PTP-F BOUNDS-00001-30)
93. Excerpt of Second Amended Petition for Post-Conviction Relief in People v. Kitchen (PTP-R KITCHEN-000001-178)
94. Special Prosecutor Reports regarding Ronald Kitchen (PTP-R KITCHEN-000179-208)
95. Deposition of Michael Kill in Wiggins v. Burge, et al. (PTP-JOHNNY AND PHILLIP WALKER-000001-42)
96. Excerpt of 04/03/1989 Report of Proceedings in People v. Phillip Walker (PTP-JOHNNY AND PHILLIP WALKER-000043-50)
97. Complaint in Burton v. Kill, et al. (PTP-A BURTON-000001-9)
98. Complaint Register #166416 Summary Report Digest (PTP-M CRAIGHEAD 000001-4)
99. People v. Lash, 252 Ill.App.3d 239 (1993) (PTP-A LASH-000001-11)
100. Affidavit of Demond Weston (PTP-D WESTON-000001)
101. 04/05/2006 OSP File Memo (PTP-D WESTON-000002-3)
102. Affidavit of Dwayne Macklin (PTP-D WESTON-000004)
103. Complaint in Young v. City of Chicago, et al. (PTP-D YOUNG-000001-39)
104. Excerpt of 09/19/1994 Report of Proceedings in People v. Young (PTP-D YOUNG-000040-94)
105. Excerpt of 09/19/1994 Report of Proceedings in People v. Young (PTP-D YOUNG-000095-169)
106. Excerpt of 09/19/1994 Report of Proceedings in People v. Young (PTP-D YOUNG-000170-187)
107. Appellate Opinion in Hill v. Coppelson, et al. (PTP-H HILL-000001-10)
108. Amended Complaint in Hill v. City of Chicago, et al. (PTP-H HILL-000011-46)
109. Affidavit of Peter Williams (PTP-H HILL-000047-49)
110. Volume I of Deposition of Demoni Clemon in Saunders v. City of Chicago, et al. (PTP-JESSE & DEMONI & IMARI CLEMON 000001-26)
111. Deposition of Jesse Clemon in Saunders v. City of Chicago, et al. (PTP-JESSE & DEMONI & IMARI CLEMON 000027-95)
112. Volume II of Deposition of Demoni Clemon in Saunders v. City of Chicago, et al. (PTP-JESSE & DEMONI & IMARI CLEMON 000096-276)
113. Deposition of Marcus Wiggins in Wiggins v. Burge, et al. (PTP-M WIGGINS-000001-103)
114. Complaint in Wiggins v. Burge, et al. (PTP-M WIGGINS-000104-149)
115. Chicago Tribune article – "Veteran detective's murder cases unravel" (PTP-A NEAL-000001-8)
116. 01/29/1993 Report of Proceedings in People v. Day (PTP-A DAY-000001-37)
117. TIRC Disposition regarding Claim of Arnold Day (PTP-A DAY-000038-52)
118. Affidavit of Arnold Day (PTP-A DAY-000053-55)
119. Complaint in Day v. Boudreau, et al. (PTP-A DAY-000056-105)
120. Complaint in Jakes v. Boudreau, et al. (PTP-A JAKES-000001-37)

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 6

121. 12/02/1992 Report of Proceedings in People v. Jakes (PTP-A JAKES-000038-84)
122. 08/18/2015 Report of Proceedings in People v. Jakes and Anderson (PTP-A JAKES-000085-204)
123. Appellate Opinion in People v. Jakes (PTP-A JAKES-000205-219)
124. Testimony of Anthony Jakes (PTP-A Jakes-000220-312)
125. 09/10/2013 Report of Proceedings in People v. Jakes (PTP-A JAKES-000313-378)
126. TIRC Disposition regarding Claim of Anthony Jakes (PTP-A JAKES-000379-409)
127. People v. Plummer, 306 Ill.App.3d 574 (1999) (PTP-J PLUMMER -000001-10)
128. Complaint in Watkins v. Halloran, et al. (PTP-K WATKINS-000001-14)
129. Affidavit of Kilroy Watkins (PTP-K WATKINS-000015)
130. Complaint in Smith v. City of Chicago, et al. (PTP-C SMITH-000001-10)
131. Complaint Register #203754 (PTP-F EWING-000001-143)
132. Complaint in Ewing v. O'Brien, et al. (PTP-F EWING-000144-150)
133. First Amended Petition for Post-Conviction Relief and Petition for Relief from Judgment In People v. Gillespie (PTP-J GILLESPIE-000001-20)
134. Motion to Hold Appeal in Abeyance in People v. Gillespie (PTP-J GILLESPIE-000021-30)
135. Affidavit of Tyrone Reyna (PTP-T REYNA-00001-00005)
136. Affidavit of Nicholas Escamilla (PTP-T REYNA-000006-10)
137. Statement of Miguel Morales (PTP-T REYNA-000011-18)
138. People v. Williams, 303 Ill.App.3d 33 (1999) (PTP-A WILLIAMS-00001-8)
139. Third Amended Complaint in Fulton v. Yanow, et al. (PTP-D FULTON-000001-29)
140. 04/16/1996 Report of Proceedings in People v. Fulton (PTP-D FULTON-000030-86)
141. Second Amended Complaint in Coleman v. City of Chicago, et al. (PTP-N COLEMAN-000001-41)
142. 06/28/1996 Report of Proceedings in People v. Coleman (PTP-N COLEMAN-000042-105)
143. Complaint in Flewellen v. City of Chicago, et al. (PTP-D FLEWELLEN-000001-15)
144. Deposition of Harold Richardson in Richardson v. City of Chicago, et al. (PTP-H RICHARDSON-000001-238)
145. Order in People v. Thames, et al. (PTP-H RICHARDSON-000239-247)
146. First Amended Complaint in Richardson v. City of Chicago, et al. (PTP-H RICHARDSON-000248-300)
147. FBI 302 Reports regarding Terence Johnson (PTP-H RICHARDSON-000301-306)
148. Order in People v. Thames, et al. (PTP-M SAUNDERS-000001-12)
149. Vol. I of Deposition of Michael Saunders in Saunders v. City of Chicago, et al. (PTP-M SAUNDERS-000013-313)
150. Vol. II of Deposition of Michael Saunders in Saunders v. City of Chicago, et al. (PTP-M SAUNDERS-000314-607)
151. Complaint in Saunders v. City of Chicago, et al. (PTP-M SAUNDERS-000608-658)
152. Complaint in Swift v. City of Chicago, et al. (PTP-T SWIFT-000001-28)

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 7

153. Vol. I of Deposition of Terrill Swift in Swift v. City of Chicago, et al. (PTP-T SWIFT-000029-295)
154. Vol. II of Deposition of Terrill Swift in Swift v. City of Chicago, et al. (PTP-T SWIFT-000296-576)
155. Vol. III of Deposition of Terrill Swift in Swift v. City of Chicago, et al. (PTP-T SWIFT-000577-600)
156. Vol. I of Deposition of Vincent Thames in Saunders v. City of Chicago, et al. (PTP-V THAMES-000001-97)
157. Vol. II of Deposition of Vincent Thames in Saunders v. City of Chicago, et al. (PTP-V THAMES-000098-186)
158. First Amended Complaint in Thames v. City of Chicago, et al. (PTP-V THAMES-000187-212)
159. Appellate Opinion in People v. Murray (PTP-K MURRAY-000001-13)
160. TIRC Disposition regarding Claim of Kevin Murray (PTP-K MURRAY-000014-28)
161. Order in People v. Seaton (PTP-F SEATON-000001-12)
162. Opinion in Seaton v. Kato, et al. (PTP-F SEATON-000013-19)
163. Complaint in Seaton v. Kato, et al. (PTP-F SEATON-000020-35)
164. Appellate Opinion in People v. Shelton (PTP-G SHELTON-000001-6)
165. Opinion in Steward v. Summerville, et al. (PTP-T STEWARD-BEY-000001-4)
166. Complaint Register #165728 (PTP-STEWARD-BEY-000005-92)
167. Complaint Register #240931 (PTP-STEWARD-BEY-000093-000157)
168. Chicago Reader article – "Good Cop, Bad Cop" (PTP-K WASHINGTON-000001-32)
169. Order in People v. Washington (PTP-K WASHINGTON-000033-65)
170. Complaint Register #171359 (PTP-S HARDY-000001-50)
171. Complaint Register #184112 (PTP-M HOLSTON-000001-73)
172. Appellate Opinion in People v. West (PTP-R WEST-000001-8)
173. Chicago Tribune article – "Fine line between tough police work, brutality" (PTP-H LUCAS-000001-4)
174. Opinion in Waslewski v. Kato (PTP-M WASLEWSKI-000001-5)
175. Order in People v. Prince (PTP-P PRINCE-000001-8)
176. Petitioner's Closing Memorandum in Prince v. State of Illinois (PTP-P PRINCE-000009-16)
177. Order granting Certificate of Innocence in People v. Prince (PTP-P PRINCE-000017)
178. Appellate opinion in People v. Harvey (PTP-D HARVEY-000001-13)
179. 08/29/1995 Report of Proceedings in People v. Wallace (PTP-A WALLACE-000001-32)
180. Appellate opinion in People v. Wallace (PTP-A WALLACE-000033-53, PTP-A WALLACE-000073-93)
181. Order in People v. Wallace (PTP-A WALLACE-000054-66)
182. Amended Complaint in Wallace v. Kato, et al. (PTP-A WALLACE-000067-72)
183. Complaint Register #206469 (PTP-A WALLACE-000094-117)
184. Complaint Register #240931 (PTP-X JOHNSON-000001-65)

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 8

185. Complaint Register #235098 (PTP-K MITCHELL-000001-34)
186. Appellate opinion in People v. Wright and Threatt (PTP-JEREMIAH WRIGHT & ELIJAH THREATT-000001-7)
187. Complaint in Chatman v. City of Chicago, et al. (PTP-C CHATMAN-000001-48)
188. Appellate opinion in People v. Chatman (PTP-C CHATMAN-000049-82)
189. Opinion in Hunt v. Jaglowski (AR-L 545335-545336)
190. Opinion in Hunt v. Jaglowski (AR-L 545337-545338)
191. Opinion in Hunt v. Jaglowski (AR-L 545339-545345)
192. Appellate opinion in Hunt v. Jaglowski (AR-L 545346-545351)
193. 07/14/1986 Report of Proceedings in People v. Perez and Pena (AR-L 154619-154687)
194. Affidavit of Victor Vera (AR-L 154810-154813)
195. Affidavit of Daniel Rodriguez (AR-L 147462-147466)
196. Excerpt of 07/14/2021 Report of Proceedings in Munoz v. People (AR-L 155313-155363)
197. Affidavit of David Rivera (AR-L 155028-155029)
198. 03/31/1995 Report of Proceedings in People v. Cruzado (AR-L 155033-155055)
199. 04/11/2013 Report of Proceedings in People v. Reyes & Solache (AR-L 154693-154805)
200. Affidavit of Adrian Duta (AR-L 154806-154809)
201. Complaint in Maysonet v. Beuke, et al. (AR-L 537371-537383)
202. Deposition of Edwin Davila in Johnson v. Guevara, et al. (AR-L 154814-155027)
203. Deposition of Gloria Ortiz Bordoy in Johnson v. Guevara, et al. (AR-L 148767-148860)
204. Complaint in Gomez v. Guevara, et al. (AR-L 532490-532533)
205. Affidavit of Jed Stone (AR-L 155056-155058)
206. Complaint Register #124631 (AR-L 648760-648819)
207. Complaint Register #150473 (AR-L 648889-648898)
208. Letter from Leshurn Hunt to Eugene Hudson regarding CR #145129 (AR-L 545458-545460)
209. Complaint Register #152902 (RFC-Solache/Reyes 31530-31592)
210. Complaint Register #217624 (RFC-Solache/Reyes 31756-31791)
211. Deposition of Jose E. Melendez in Sierra v. Guevara, et al. (AR-L 155271-155312)
212. Orders granting Certificates of Innocence in People v. Montanez and People v. Serrano (AR-L 154691-154692)
213. Sworn Statement of Timothy Rankins (AR-L 155230-155268)
214. Corrected First Amended Complaint in Montanez v. Guevara, et al. (AR-L 563644-563688)
215. Complaint in Serrano v. Guevara, et al. (AR-L 563597-563643)
216. G.O. 87-07 (JR-L 006141-006155)
217. Deposition of Commander Eric Winstrom
218. Deposition of Gabriel Solache (Vols. I, II, and III)
219. Affidavit of Leshurn Hunt

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 9

220. State of Wisconsin v Emmett White Transcript of Proceedings April 17, 1993 (PTP-E WHITE-000001-000007)
221. Tyrone Hood v. City of Chicago Plaintiff's Response to City's Motion for Summary Judgement and Plaintiff's Response to the Individual Defendant Officers (PTP-T HOOD & W WASHINGTON-000001-000396)
222. November 1884 and February 1885 David Fogel Report for 11 Cases of Electric Shock (PTP-GENERAL-000001-000006)
223. December 18, 2020 COI Order for Jackie Wilson (PTP-GENERAL-000007-000065)
224. Dr. Leo Report June 12, 2010 (PTP-GENERAL-000066-000085)
225. Excerpt from Kill Deposition (PTP-J COSTON-000001-000003)
226. Affidavit of Joseph Jackson (PTP-J JACKSON-000001-000003)
227. "Good Cop, Bad Cop" Chicago Reader Article by Steve Bogira December 12, 1991 (PTP-M CAGE-000001-000063)
228. March 14, 2008 Deposition of Abel Quinones in Hill v. City of Chicago (PTP-O GOMEZ & A QUINONES-000001-000232)
229. March 19, 2008 Deposition of Oscar Gomez in Hill v. City of Chicago (PTP-O GOMEZ & A QUINONES-000233-438)
230. Cruzado MTS Testimony Transcript (AR-L 524149-524167)
231. January 31, 1995 People v. Maysonet Trial Transcript (AR-L 537618-537792)
232. Hunt Affidavit and Letter (AR-L 545497-545501)
233. April 7, 1999 Dembski Transcript (Bluhm 034650-34753)
234. Affidavit of Adolfo Frias Munoz (Bluhm 010887-010888)
235. Gomez PC Petition (JR-L 300501-300555)
236. People v. Santos Flores MTS Guevara Testimony (JR-JJ 040337-040388)
237. George Anderson Amended TIRC Disposition (PTP-A NEAL-000009-PTP-A NEAL-000012)
238. ANDERSON amended determination (PTP-A NEAL-000009-PTP-A NEAL-000012)
239. 1997.09.12 Motion to Suppress Gregory Watkins Testimony Continued (PTP-D FLEWELLEN-000016-PTP-D FLEWELLEN-000024)
240. 1997.09.12 Motion to Suppress Gregory Watkins Testimony (PTP-D FLEWELLEN-000025-PTP-D FLEWELLEN-000044)
241. 2015.09.19 Daniel Gasca Deposition in Chatman v. Chicago et al (PTP-D GASCA-000001-PTP-D GASCA-000107)
242. 1991.03.28 Harold Lucas Motion to Suppress testimony transcript (PTP-H LUCAS-000005-PTP-H LUCAS-000025)
243. 1991.08.07 Harold Lucas Motion to Suppress testimony transcript (PTP-H LUCAS-000026-PTP-H LUCAS-000079)
244. Joseph Jackson trial testimony excerpt (undated) (PTP-J JACKSON-000004-PTP-J JACKSON-000018)
245. Affidavit of Johnnie Plummer (PTP-J PLUMMER-000011-PTP-J PLUMMER- 00001)
246. Johnnie Plummer CR 194392 (Clancy Foley) (PTP-J PLUMMER-000145-PTP-J PLUMMER-000354)

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 10

247. Johnnie Plummer CR 262538 (Lipkin and Laurin) (PTP-J PLUMMER-000586- PTP-J PLUMMER-000641)

248. Kilroy Watkins Motion to Suppress Transcript Excerpt (PTP-K WATKINS-000016- PTP-K WATKINS-000042)

249. 1993.04.27 Waslewski v. Kato et al. Judgment (PTP-M WASLEWSKI-000006- PTP-M WASLEWSKI-000007)

250. 2015.09.25 - Chatman v. Chicago et al. - Waslewski dep. (PTP-M WASLEWSKI-000008-PTP-M WASLEWSKI-000032)

251. Waslewski v. Kato et al. Complaint (PTP-M WASLEWSKI-000033-PTP-M WASLEWSKI-000048)

252. Coleman Agreed Certificate of Innocence Order (PTP-N COLEMAN-000106-PTP-N COLEMAN-000107)

253. Muniz, Virgilio Calderon Affidavit (PTP-V MUNIZ-000001-PTP-V MUNIZ-000001

### III. Overview of Case Specific Opinions

In this report, I will first provide an overview of the relevant social science research on the psychology of police interrogation practices and techniques, police-induced false confessions, risk factors for false confession, physical and psychological coercion, police interrogation contamination and scripting, and indicia of unreliability. I will then discuss these issues as they relate to the police investigation, interrogation, and interrogation-induced confession statement of Daniel Rodriguez on May 11, 1991.[1]

1) Daniel Rodriguez's description of what occurred during his unrecorded custodial interrogation on May 11, 1991 by Chicago police detectives Reynaldo Guevara and Ernest Halvorsen that led to his confession statement is consistent with the empirical social science research on the types of interrogation techniques, methods, and practices that explain how and why innocent individuals are moved to make and/or agree to false and unreliable confession statements;

2) Daniel Rodriguez's description of what occurred during his unrecorded custodial interrogation on May 11, 1991 by Detectives' Guevara and Halvorsen contains numerous examples of physically coercive interrogation techniques, methods, and strategies that are known to cause false and unreliable incriminating statements, admissions and confessions;

3) According to Daniel Rodriguez's description, the custodial interrogation on May 11, 1991 by Chicago police detectives Reynaldo Guevera and Ernest Halvorsen that led to his confession statement was guilt-presumptive, accusatory, confession-driven and confirmatory. According to Mr. Rodriguez's description, the interrogation was structured to break down Mr.

---

[1] Because there is no recording of Daniel Rodriguez's 5 and ½ hours of custody and interrogation on May 11, 1991, we do not have objective record of what occurred during his custodial detention and interrogation sessions.

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 11

Rodriguez's denials of guilt and to incriminate him by coercively pressuring and persuading him to agree with, and admit to, Detectives Guevara's and Halvorsen's pre-existing conclusion that he actively participated in the murder of Jose Hernandez, Jr. on March 17, 1991. According to Mr. Rodriguez's description of the unrecorded interrogation sessions, Detective Guevara's and Halvorsen's guilt-presumptive interrogation sessions were not structured to assess the reliability of any information they learned from Mr. Rodriguez, but purely to submit him to their will and extract an incriminating statement from him, demonstrating a reckless disregard for the truth;

4) Daniel Rodriguez's description of what occurred during his unrecorded interrogation by Detectives' Guevara and Halvorsen May 11, 1991 involved the use of psychological interrogation techniques, methods, and strategies that have been shown by social science research to increase the risk of eliciting false and unreliable statements, admissions and/or confessions (*i.e.*, *situational* risk factors) when misapplied to the innocent. According to Mr. Rodriguez's description of the interrogation sessions, these included: physical coercion and abuse, lengthy interrogation, false evidence ploys, explicit threats of harm to Mr. Rodriguez and his family members, explicit promises of freedom and leniency and psychological coercion;

5) Daniel Rodriguez's description of his custodial interrogation by Detectives' Guevera and Halvorsen on May 11, 1991 contains examples of extremely psychologically coercive interrogation techniques, methods and strategies that have been demonstrated to cause suspects to perceive their situation as hopeless and to perceive that they have no meaningful choice but to comply with the demands of their interrogators, and that are known to increase the risk of eliciting involuntary statements, admissions and/or confessions;

6) Daniel Rodriguez was at a heightened risk for making and/or agreeing to involuntary and/or unreliable statements, admissions and/or confessions during his custodial interrogation on May 11, 1991 due to his personality traits and characteristics (i.e., *personal* risk factors), specifically his relative youth (he was 19 years old at the time) and associated psychosocial immaturity at the time;

7) If Mr. Rodriguez's interrogation-induced confession statement is false, it is properly classified as what is known in the social science research literature as a *coerced-compliant* false confession because of Mr. Rodriguez's description of why he falsely confessed in response to the physically and psychologically coercive practices and techniques he has described Detectives Halvorsen and Guevara using during their interrogation of him on May 11, 1991;

8) The unrecorded custodial interrogation on May 11, 1991 described by Daniel Rodriguez involved numerous instances of police interrogation contamination (*i.e.*, leaking and disclosing non-public case facts) and police interrogation scripting (pressuring and persuading the suspect to accept the police narrative of how and why the alleged crime occurred), which increased the risk that Mr. Rodriguez's confession statement, if false, would misleadingly, appear to be detailed, accurate and self-corroborating and thus increase his risk of being falsely convicted at trial;

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 12

9) The unrecorded custodial interrogation by Detectives' Guevara and Halvorsen on May 11, 1991 described by Daniel Rodriguez violated numerous universally accepted police investigative and interrogation national training standards, police protocols and commonly accepted best practices that existed in 1991;

10) Starting in 1972 and continuing up to at least 2000, the City of Chicago's Police Department had a systemic practice of subjecting African American and Latino suspects who were interrogated by detectives and supervisors to physically abusive and coercive interrogations with the result of coercing and/or fabricating false and/or unreliable inculpatory evidence to be used against the interrogated suspect without regard to his actual guilt or innocence; and

11) At least as early as February of 1982 and continuing through the 1990s, high ranking officials in the City of Chicago and the Chicago Police Department and numerous police command personnel, received continuing notice of this systemic practice of physical abuse and coercion of Black and Latino suspects in order to coerce and fabricate confessions, including from the repeated documented allegations that accumulated against supervisors and detectives, first at the Area 2 Detective Division, and later at Areas 3, 4 and 5; from the testimony of criminal defendants at motion to suppress hearings and trials; from numerous court decisions in criminal cases; from the findings in numerous Office of Professional Standards reports; from federal and state court decisions; and from the admissions of City officials.

### IV. The Scientific Study of Police Interrogation and False Statements, Admissions and Confessions[2]

There is a well-established empirical field of research in the academic disciplines of psychology, criminology, and sociology on the subjects of police interrogation practices, psychological coercion, and false confessions. This research dates back to 1908; has been the

---

[2] There is a substantial empirical research literature on the scientific study of police interrogation, psychological coercion and false statements, admissions and/or confessions. For reviews of this literature, see: Saul Kassin (2022), DUPED: WHY INNOCENT PEOPLE CONFESS – AND WHY WE BELIEVE THEM (Latham, MD: Prometheus Books); Gisli Gudjonsson (2021) "The Science-Based Pathways to Understanding False Confessions and Wrongful Convictions," *Frontiers in Psychology*, 12, 1-15; William Woody and Krista Forrest, UNDERSTANDING POLICE INTERROGATON: CONFESSONS AND CONSEQUENCES (New York, NY: New York University Press); Gisli Gudjonsson (2018), THE PSYCHOLOGY OF FALSE CONFESSIONS: FORTY YEARS OF SCIENCE AND PRACTICE (Hoboken, NJ: John Wiley & Sons); Saul Kassin, Hayley Cleary, Gisli Gudjonsson, Richard A. Leo, Christian Meissner, Allison Redlich and Kyle Scherr (2025), "Police-Induced Confessions, 2.0: Risk Factors and Recommendations" *Law and Human Behavior*, 49, 7-53; G. Daniel Lassiter and Christian Meissner (2010), POLICE INTERROGATION AND FALSE CONFESSIONS: CURRENT RESEARCH, PRACTICE AND POLICY RECOMMENDATIONS (Washington, DC: American Psychological Association; Richard A. Leo (2009), "False Confessions: Causes, Consequences and Implications" *Journal of the American Academy of Psychiatry and Law*, 37, 332-343; and Richard A. Leo (2008), POLICE INTERROGATION AND AMERICAN JUSTICE (Cambridge, MA: Harvard University Press).

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 13

subject of extensive publication (hundreds of academic journal articles, stand-alone books, and book chapters in edited volumes); has been subjected to peer review and testing; is based on recognized scientific principles, methods, and findings; and is generally accepted in the social scientific community. Significantly, these principles, methods, and findings are generally accepted in the social science community,[3] beyond common knowledge,[4] and therefore numerous courts have repeatedly accepted expert testimony in criminal and civil rights litigation.[5]

This research has analyzed numerous police-induced false confessions and identified the personal and situational factors associated with, and believed to cause, false confessions.[6] The fact that police-induced false confessions can and do occur has been well-documented and is no longer disputed by anyone in the law enforcement or academic communities. Social scientists have documented hundreds of false confessions in America since the early 1970s,[7] but this is

[3] *See* Saul Kassin, Allison Redlich, Fabiana Alceste and Timothy Luke (2018). "On the General Acceptance of Confessions Research: Opinions of the Scientific Community" *American Psychologist*, 73, 63-80.

[4] See Fabiana Alceste, Timothy Luke, Allison Redlich, Johanna Hellgren, Aria Amrom, and Saul Kassin (2020). "The Psychology of Confessions: A Comparison of Expert and Lay opinions." *Applied Cognitive Psychology*, 25, 39-51.

[5] *See Gray v. City of* Chicago, No. 1:18-cv-02624, Dkts. 489 & 503 (N.D. Ill. May 14, 2023) at *11 (N.D. Ill. May 14, 2023) (Admitting the testimony of Dr. Melissa Russano, "If ever there were a subject that is helpful to the jury, it is on the subject of false confessions."); *Andersen v. City of Chicago*, No 16 C 1963, 2020 WL 1848081, at *2 (N.D. ILL. Apr. 13, 2020) (finding false-confession expert Dr. Saul M. Kassin qualified to speak on false confession risk factors); *Hunt v. Vantlin*, No. 3:14-cv-00092-JMS-MPB, 2019 WL 8267074 at *4-5 (S.D. Ind. Sept. 26, 2019) (finding that a false confessions expert may opine on "the circumstances under which police interrogation tactics are likely to produce false confessions"); *Harris v. City of Chicago*, 14 C 4391, 2017 WL 2436316, at *9, 16 (N.D. Ill. June 5, 2017) (finding false confession expert Richard Leo's methodology to be "sound, accepted and reliable" and that he could testify as to the reliability of the plaintiff's confession, and "Dr. Leo will be permitted to testify to various factors that can cause false confessions, and to their presence in this case."); *Kluppelb*erg *v. Burge*, 13 C 3963, 2016 WL 6821138, at *4-*5 (N.D. Ill. Sept. 16, 2016) (denying defendants' motion to bar the testimony of plaintiff's false confession expert Dr. Richard Ofshe as his methodology is "sound" and could be applied to the facts of the case); *Caine v. Burge,* 11 C 8996 2013 WL 1966381 at *3 (N.D. Ill. May 10, 2013) ("Dr. Leo will be permitted to testify to various factors that can cause false confessions, and to their presence in this case."); *Scott v. City of Chicago*, 07 C 3684, 2010 WL 3034254, at *5 (N.D. Ill. Aug. 3, 2010) (denying defendants' motion to bar the testimony of Dr. Richard Ofshe); *United States v. Hall*, 974 F. Supp. 1198, 1206 (C.D. Ill. 1997), *aff'd,* 165 F.3d 1095 (7th Cir. 1999) (denying the Government's motion to bar the testimony of a criminal defendant's expert, Dr. Richard Ofshe).

[6] *See* Saul Kassin, Hayley Cleary, Gisli Gudjonsson, Richard A. Leo, Christian Meissner, Allison Redlich and Kyle Scherr (2025), "Police-Induced Confessions, 2.0: Risk Factors and Recommendations" *Law and Human Behavior*, 49, 7-53; Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press); and Gisli Gudjonsson (2003). THE PSYCHOLOGY OF INTERROGATIONS AND CONFESSIONS: A HANDBOOK (John Wiley & Sons Inc.).

[7] The largest published study of false confessions to date is Steven Drizin and Richard A. Leo (2004). "The Problem of False Confessions in the Post-DNA World" *North Carolina Law Review*, 82, 891-1007. For a

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 14

surely an underestimate and thus the tip of a much larger iceberg for multiple reasons. First, false confessions are difficult for researchers to discover because neither law enforcement nor any private organization keep a comprehensive database of the interrogations that have produced them. Second, even when they are discovered, false confessions are notoriously hard to establish because of the factual and logical difficulties of establishing the confessor's factual innocence to an absolute certainty. As a result, Richard Ofshe and I coined the term "*proven* false confession" in 1998,[8] showing that there are four ways in which a disputed confession can be classified as proven beyond any doubt to be false:

1) When it can be objectively established that the suspect confessed to a crime that did not happen;

2) When it can be objectively established that it would have been physically impossible for the confessor to have committed the crime;

3) When the true perpetrator is identified and his guilt is objectively established; and/or

4) When scientific evidence dispositively establishes the confessor's innocence.

However, only a small number of cases involving a disputed confession will ever come with independent case evidence that allows the suspect to prove his innocence beyond dispute because doing so is akin to proving the negative. The documented number of false confessions in the scientific research literature is, therefore, a dramatic undercount of the actual false confessions that police have elicited in the United States in recent decades. There have almost certainly been far more police-induced false confessions than researchers have been able to discover and classify as false. Indeed, in a survey of police that my colleagues and I published in 2007, police investigators themselves estimated that they elicited partial or full false admissions and/or confessions in 4.78% of their interrogations.[9] If this estimate is accurate, American police elicit numerous false confessions every year.

---

review of the literature documenting proven false confessions, *see* Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

[8] Richard A. Leo and Richard Ofshe (1998). "The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation." *The Journal of Criminal Law and Criminology*. Vol. 88, No. 2. Pp. 429-496.

[9] Saul Kassin, Richard Leo, Christian Meissner, Kimberly Richman, Lori Colwell, Amy-May Leach, and Dana La Fon (2007). "Police Interviewing and Interrogation: A Self-Report Survey of Police Practices and Beliefs" *Law and Human Behavior*, 31, 381-400.

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 15

The subject of police interrogation and false confessions is beyond common knowledge and highly counter-intuitive.[10]  Police detectives receive specialized training in psychological interrogation techniques; most people, including most jurors, do not know what these techniques are or how the techniques are designed to work (*i.e.*, move a suspect from denial to admission). In addition, most people also do not know what psychological coercion is, why some techniques are regarded as psychologically coercive, and what their likely effects are.  Moreover, most people do not know which interrogation techniques create a risk of eliciting false confessions or how and why the psychological process of police interrogation can, and sometimes does, lead suspects to falsely confess.  This unfamiliarity causes most people to assume that virtually all confessions are true.

### V. The Social Psychology of Police Interrogation[11]

Police interrogation is a cumulative, structured, and time-sequenced process in which detectives draw on an arsenal of psychological techniques in order to overcome a suspect's denials and elicit incriminating statements, admissions, and/or confessions.  This is the sole purpose of custodial interrogation (as opposed to interviews).  To achieve this purpose, interrogators use techniques that seek to influence, persuade, manipulate, and deceive suspects

---

[10]  *See* Danielle Chojnacki, Michael Cicchini and Lawrence White (2008).  "An Empirical Basis for the Admission of Expert Testimony on False Confessions" *Arizona State Law Journal*, 40, 1-45; Richard A. Leo and Brittany Liu (2009).  "What Do Potential Jurors Know About Police Interrogation and False Confessions?" *Behavioral Sciences and the Law*, 27, 381-399; Linda Henkel, Kimberly Coffman, and Elizabeth Dailey (2008).  "A Survey of People's Attitudes and Beliefs About False Confessions," *Behavioral Sciences and the Law*, 26, 555-584; Iris Blandon-Gitlin, Kathryn Sperry, and Richard A. Leo (2011).  "Jurors Believe Interrogation Tactics Are Not Likely to Elicit False Confessions: Will Expert Witness Testimony Inform Them Otherwise?" *Psychology, Crime and Law*, 17, 239-260; and Mark Costanzo, Netta Shaked-Schroer and Katherine Vinson (2010).  "Juror Beliefs About Police Interrogation, False Confession and Expert Testimony" *The Journal of Legal Empirical Studies,* 7, 231-247.

[11]  There is a substantial empirical scientific research literature on the social psychology of police interrogation, psychological coercion and false statements, admissions and/or confessions.  For reviews of this literature, see: Saul Kassin (2022), DUPED: WHY INNOCENT PEOPLE CONFESS – AND WHY WE BELIEVE THEM (Latham, MD: Prometheus Books); Gisli Gudjonsson (2021) "The Science-Based Pathways to Understanding False Confessions and Wrongful Convictions," *Frontiers in Psychology*, 12, 1-15; William Woody and Krista Forrest, UNDERSTANDING POLICE INTERROGATON: CONFESSONS AND CONSEQUENCES (New York, NY: New York University Press); Gisli Gudjonsson (2018), THE PSYCHOLOGY OF FALSE CONFESSIONS: FORTY YEARS OF SCIENCE AND PRACTICE (Hoboken, NJ: John Wiley & Sons); Saul Kassin, Hayley Cleary, Gisli Gudjonsson, Richard A. Leo, Christian Meissner, Allison Redlich and Kyle Scherr (2025), "Police-Induced Confessions, 2.0: Risk Factors and Recommendations" *Law and Human Behavior*, 49, 7-53; G. Daniel Lassiter and Christian Meissner (2010), POLICE INTERROGATION AND FALSE CONFESSIONS: CURRENT RESEARCH, PRACTICE AND POLICY RECOMMENDATIONS (Washington, DC: American Psychological Association; Richard A. Leo (2009).  "False Confessions: Causes, Consequences and Implications" *Journal of the American Academy of Psychiatry and Law*, 37, 332-343; and Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Cambridge, MA: Harvard University Press).

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 16

into believing that their situation is hopeless and that their best interest lies in confessing.[12] Sometimes, however, interrogators cross the line and employ techniques and methods of interrogation that are coercive and increase the likelihood of eliciting false confessions or statements.

Dating back to the early 1940s, psychological interrogation methods in the United States have been structured to persuade a rational guilty person who knows he is guilty to rethink his initial decision to deny culpability and choose instead to confess.[13] Police interrogators know that it is not in any suspect's rational self-interest to confess. They expect to encounter resistance and denials to their allegations, and they know that they must apply a certain amount of interpersonal pressure and persuasion to convince a reluctant suspect to confess. As a result, interrogators have, over the years, developed a set of subtle and sophisticated interrogation techniques whose purpose is to alter a guilty suspect's perceptions so that he will see the act of confessing as being in his self-interest.

These interrogation techniques were developed for the purpose of inducing guilty individuals to confess to their crimes, and police are admonished in their training to use them only on suspects believed to be guilty.[14] When these same techniques are used on innocent suspects, they carry the risk that they will elicit false statements, admissions and/or confessions.

The goal of an interrogator is to persuade a suspect to view his immediate situation differently by focusing the suspect's attention on a limited set of choices and alternatives, and by convincing him of the likely consequences that attach to each of these choices. The process often unfolds in two steps: first, the interrogator causes the suspect to view his situation as hopeless; and, second, the interrogator persuades the suspect that only by confessing will the suspect be able to improve his otherwise hopeless situation. The interrogator makes it clear what information he is seeking and attempts to convince the suspect that his only rational option is to confirm the information the interrogator purports to already know.

The first step or stage of an interrogation consists of causing a suspect to view his situation as hopeless. If the interrogator is successful at this stage, he will undermine the

---

[12] Deborah Davis and William O'Donohue (2004). "The road to perdition: Extreme influence tactics in the interrogation room" in William O'Donohue, ED. (2004). *Handbook of Forensic Psychology* (San Diego: Academic Press) at 897-996.

[13] Fred Inbau, John Reid and Joseph Buckley (1986). CRIMINAL INTERROGATON AND CONFESSIONS, 3rd Edition (The Williams and Wilkins Company).

[14] *See* Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013). CRIMINAL INTERROGATION AND CONFESSIONS, 5th Edition ( Jones & Bartlett Learning) at 187 ("These nine steps are presented in the context of the interrogation of suspects whose guilt seems definite or reasonably certain"). For empirical support for this observation, *see* Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 17

suspect's self-confidence and cause the suspect to reason that there is no way to escape the interrogation without incriminating himself.  To accomplish this, interrogators accuse the suspect of having committed the crime; they attack and try to undermine a suspect's assertion of an alibi, alternate sequence of events, or verbalization of innocence (pointing out or inventing logical and factual inconsistencies, implausibilities, and/or impossibilities); they exude unwavering confidence in their assertions of the suspect's and his accomplices' guilt; they refuse to accept the possibility of the suspect's denials; and, most importantly, they confront the suspect with incontrovertible evidence of his guilt, whether real or non-existent.  Because interrogation is a cumulative and time-sequenced process, interrogators often draw on these techniques repeatedly and/or in succession, building on their earlier accusations, challenges and representations at each step in the interrogation process.

Through the use of these techniques, the interrogator communicates to the suspect that he has been caught, that there is no way he will escape the interrogation without incriminating himself and other suspects, and that his future is determined—that regardless of the suspect's denials or protestations of innocence, he is going to be arrested, prosecuted, convicted, and punished.  The interrogator seeks to convince the suspect that this is a fact that has been established beyond any doubt, and thus that any objective person must necessarily reason to this conclusion.  By persuading the suspect that he has been caught, that the existing evidence or case facts objectively prove his guilt, and that it is only a matter of time before he will be prosecuted and convicted, the interrogator seeks to alter the suspect's perceptions, such that he comes to view his situation as hopeless and to perceive that resisting the interrogator's demands is futile.

Once the interrogator has caused the suspect to understand that he has been caught and that there is no way out of this predicament, the interrogator seeks to convince the suspect that the only way to improve his otherwise hopeless situation is by confessing to the offense(s) of which he is accused and confirming the information the interrogator is seeking to extract from the suspect.  The second step of the interrogation thus consists of offering the suspect inducements to confess—reasons or scenarios that suggest the suspect will receive some personal, moral, communal, procedural, material, legal or other benefit if he confesses to the interrogator's version of the offense.  One goal of these scenarios or inducements is to downplay both the seriousness of the alleged crime and the suspect's role in the alleged crime as well as the consequences of confessing, leading the suspect to perceive that the consequences of continuing to deny the accusations will be worse than the consequences of admitting to participation in the crime.  The interrogator's attempt to diminish the suspect's perception of the consequences of confessing is combined with techniques that are designed to increase the suspect's anxiety in order to create the perceived need for release from the stress of prolonged interrogation.[15]

---

[15]  See Brian Jayne (1986).  "The Psychological Principles of Criminal Interrogation," in Fred Inbau, John Reid and Joseph Buckley (1986).  CRIMINAL INTERROGATION AND CONFESSIONS, 3rd Edition (Baltimore, MD: Williams & Wilkins) at 332. ("The goal of interrogation is therefore to decrease the suspect's perception of the consequences of confessing, while at the same time increasing the suspect's internal anxiety associated with his deception.").

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 18


Investigators also use scenarios to plant ideas or suggestions about how or why the suspect may have committed the crime which they may later pressure the suspect to accept and repeat.

Researchers have classified the types of inducements investigators use during the second step of interrogation into three categories: *low-end* inducements, *systemic* inducements, and *high-end* inducements. *Low-end* inducements refer to interpersonal or moral appeals the interrogator uses to convince a suspect that he will feel better if he confesses. For example, an interrogator may tell a suspect that the truth will set him free if he confesses, that confessing will relieve his anxiety or guilt, that confessing is the moral or Christian thing to do, or that confessing will improve his standing in the eyes of the victim or the eyes of the community.

*Systemic* inducements refer to appeals that the interrogator uses to focus the suspect's attention on the processes and outcomes of the criminal justice system in order to get the suspect to come to the conclusion that his case is likely to be processed more favorably by all actors in the criminal justice system if he confesses. For example, an interrogator may tell a suspect that he is the suspect's ally and will try to help him out—both in his discussions with the prosecutor as well as in his role as a professional witness at trial—but can only do so if the suspect first admits his guilt. Or the interrogator may ask the suspect how he expects the prosecutor to look favorably on the suspect's case if the suspect does not cooperate with authorities. Or the interrogator may ask the suspect what a judge and jury are really going to think, and how they are likely to react, if he does not demonstrate remorse and admit his guilt to authorities. Interrogators often couple the use of *systemic* incentives with the assertion that this is the suspect's one and only chance—now or never—to tell his side of the story; if he passes up this opportunity, all the relevant actors in the system (police, prosecutor, judge and jury) will no longer be open to the possibility of viewing his actions in the most favorable light. This tactic may incentivize a suspect to either falsely confess or confirm an incorrect story for the interrogator based on the belief that the suspect will not have the same opportunity to help himself again in the future. Interrogators rely on *systemic* inducements to persuade the suspect to reason to the conclusion that the justice system naturally confers rewards for those who admit guilt, demonstrate remorse, and cooperate with authorities, whereas it inevitably metes out punishment for those who do not.

Finally, *high-end* inducements refer to appeals that directly communicate the message that the suspect will receive less punishment, a lower prison sentence and/or some form of police, prosecutorial, judicial or juror leniency if he complies with the interrogator's demand that he confess, but that the suspect will receive a higher sentence or greater punishment if he does not comply with the interrogator's demand that he confess. High-end inducements may either be implicit or explicit: the important question is whether the interrogation technique communicates the message, or is understood to communicate the message, that the suspect will receive a lower criminal charge and/or lesser punishment if he confesses as opposed to a higher criminal charge and/or greater amount of punishment if he does not.

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 19

Explicit *high-end* inducements can include telling a suspect that there are several degrees of the alleged offense, each of which carry different amounts of punishment, and asking the suspect which version he would like to confess to. Or the interrogator may explicitly tell the suspect that he will receive a long prison sentence—or perhaps even the death penalty—if he does not confess to the interrogator's version of events. The interrogator may also point out what happens to men of the suspect's age, or men accused of crime, in prison if the suspect does not confess to the interrogator's minimized account. Sometimes interrogators who rely on *high-end* inducements will present the suspect with a simple two-choice situation (good vs. bad): if the suspect agrees to the good choice (a minimized version of the offense, such as involuntary manslaughter or self-defense, or the implication of another person), he will receive a lower amount of punishment or no punishment at all; but if he does not confess right then, criminal justice officials will impute to him the bad choice (a maximized version of the offense, such as pre-meditated first degree murder, or that the suspect was acting alone), and he will receive a higher level of punishment, or perhaps the harshest possible punishment.[16] The purpose of *high-end* inducements is to communicate to a suspect that it is in his rational self-interest to confess to the minimized or less-incriminating version of events that the interrogator is suggesting because if the suspect does so, he will receive a lower charge, a lesser amount of punishment and/or no time in prison, but if he fails to do so, he will receive a higher charge, a greater amount of punishment and more time in prison, perhaps even the death penalty.

High-end inducements are psychologically coercive. Psychologically coercive interrogations are problematic because they induce both involuntary and unreliable information, statements, admissions and/or confessions by causing suspects to feel trapped, hopeless, frightened and/or that they have no meaningful choice but to comply with the demands of their interrogator(s). To evaluate whether a particular interrogation was psychologically coercive, an expert must evaluate the interrogator's techniques, methods, and strategies in the light of the generally accepted findings of the social science research literature on the subjects of interrogation, coercive influence techniques, and confessions.

Social science research has repeatedly demonstrated that some *systemic* inducements (depending on the content of the inducement, how explicitly or vaguely it is stated, and the message that it communicates) and all *high-end* inducements are coercive because they rely on implicit and/or explicit promises of leniency and threats of harm to induce compliance. *Systemic* and *high-end* inducements increase the likelihood of eliciting false confessions and false statements from suspects because of the *quid pro quo* arrangement and the benefit a suspect expects to receive in exchange for the information the interrogator is seeking, regardless of whether the suspect knows that information to be true or not. Such promises of leniency and

---

[16] This technique is sometimes referred to in the academic literature as the maximization/minimization technique. *See* Saul Kassin, Hayley Cleary, Gisli Gudjonsson, Richard A. Leo, Christian Meissner, Allison Redlich and Kyle Scherr (2025), "Police-Induced Confessions, 2.0: Risk Factors and Recommendations" *Law and Human Behavior*, 49, 7-53; Richard A. Leo (2008), POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 20

threats of harm are regarded as coercive in the social science literature because of the messages they convey and their demonstrated impact on the decision-making of individuals. The expert may also evaluate whether the interrogation techniques, either individually or cumulatively, had the effect of causing a suspect to perceive that he had no choice but to comply with the demands of the interrogator, and thus, the interrogation, in effect, overbore the suspect's will. Empirical research shows that the same principles, pressures and risks that apply to the interrogation of suspects also apply to the interrogation of witnesses.[17]

## VI. The Three Types of False Confessions[18]

False confessions and false statements, of course, will occur in response to traditionally-coercive methods of interrogation such as the use of physical violence, threats of immediate physical harm, excessively long or incommunicado interrogation, or deprivation of essential necessities such as food, water, and/or sleep. The psychological techniques of interrogation that cross the line and sometimes cause false confessions typically involve one of two patterns: (1) the interrogator communicates to the suspect, implicitly or explicitly, that he will receive a higher charge and harsher sentence or punishment if he does not provide a satisfactory statement, but that he will receive a lesser charge or sentence, or perhaps no punishment at all, if he does; or (2) the interrogator wears down and distresses the suspect to the point that the suspect subjectively feels that he has no choice but to comply with the interrogator's demands if he is to put an end to the intolerable stress of continued interrogation and/or escape the oppressive interrogation environment.

---

[17] See Kirk A. B. Newring and William O'Donohue (2008), "False Confessions and Influenced Witnesses," *Applied Psychology in Criminal Justice*, Vol. 4, Pp. 81-107; Danielle Loney and Brian Cutler (2016), "Coercive Interrogation of Eyewitnesses Can Produce False Accusations," *Journal of Police and Criminal Psychology*, Vol. 31, Pp. 29-36; and Deborah Wright, Robert Nash and Kimberley Wade (2015), "Encouraging Eyewitnesses to Falsely Corroborate Allegations: Effects of Rapport-Building and Incriminating Evidence, *Psychology, Crime & Law*, Vol. 21, Pp. 648-660.

[18] There is a substantial empirical scientific research literature on the three types of false confessions. For reviews of this literature, *see*: Saul Kassin (2022), DUPED: WHY INNOCENT PEOPLE CONFESS – AND WHY WE BELIEVE THEM (Latham, MD: Prometheus Books); Gisli Gudjonsson (2021) "The Science-Based Pathways to Understanding False Confessions and Wrongful Convictions," *Frontiers in Psychology*, 12, 1-15; William Woody and Krista Forrest, UNDERSTANDING POLICE INTERROGATON: CONFESSONS AND CONSEQUENCES (New York, NY: New York University Press); Gisli Gudjonsson (2018), THE PSYCHOLOGY OF FALSE CONFESSIONS: FORTY YEARS OF SCIENCE AND PRACTICE (Hoboken, NJ: John Wiley & Sons); Saul Kassin, Hayley Cleary, Gisli Gudjonsson, Richard A. Leo, Christian Meissner, Allison Redlich and Kyle Scherr (2025), "Police-Induced Confessions, 2.0: Risk Factors and Recommendations" *Law and Human Behavior*, 49, 7-53; G. Daniel Lassiter and Christian Meissner (2010), POLICE INTERROGATION AND FALSE CONFESSIONS: CURRENT RESEARCH, PRACTICE AND POLICY RECOMMENDATIONS (Washington, DC: American Psychological Association; Richard A. Leo (2009). "False Confessions: Causes, Consequences and Implications" *Journal of the American Academy of Psychiatry and Law*, 37, 332-343; and Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Cambridge, MA: Harvard University Press).

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 21

Whether a police-induced false confession or statement is caused primarily by coercive interrogation techniques or by a suspect's pre-existing vulnerabilities to interrogation, or some combination of both, there are three fundamental types of false confessions and statements: a *voluntary* false confession or statement (*i.e.*, a false confession knowingly given in response to little or no police pressure); a *coerced-* or *stress-compliant* false confession or statement (*i.e.*, a false confession knowingly given to put an end to the interrogation or to receive an anticipated benefit or reward in exchange for confession); and a *coerced-* or *non-coerced-persuaded* false confession or statement (*i.e.*, a confession given by a suspect who comes to doubt the reliability of his memory and thus comes to believe that he may have committed the crime, despite no actual memory of having done so).[19]  These different types of false confession typically involve different levels of police pressure, a different psychology of influence and decision-making, and different beliefs about the likelihood of one's guilt.

### VII. The Three Sequential Police Errors
### That Can Lead to False (But Sometimes Detailed) Confessions[20]

There are three important decision points in the interrogation process that are known to be linked to false confessions or statements.  The first decision point is the police decision to classify someone as a suspect.  This is important because police only *interrogate* individuals whom they first classify as suspects; police *interview* witnesses and victims.  There is a big difference between interrogation and interviewing:  unlike interviewing, an interrogation is accusatory, involves the application of specialized psychological interrogation techniques, and the ultimate purpose of an interrogation is to get an incriminating statement from someone whom police believe to be guilty of the crime.  False confessions or statements occur when police misclassify an innocent suspect as guilty and then subject him to a custodial interrogation, and

---

[19]  *See* Richard Ofshe and Richard A. Leo (1997).  "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions."  *Studies in Law, Politics & Society*, 16, 189-251.

[20]  There is a substantial empirical scientific research literature on the three sequential police errors that sometimes lead to interrogation-induced false statements, admissions and/or confessions.  For reviews of this literature, *see*: Saul Kassin (2022), DUPED: WHY INNOCENT PEOPLE CONFESS – AND WHY WE BELIEVE THEM (Latham, MD: Prometheus Books); Gisli Gudjonsson (2021) "The Science-Based Pathways to Understanding False Confessions and Wrongful Convictions," *Frontiers in Psychology*, 12, 1-15; William Woody and Krista Forrest, UNDERSTANDING POLICE INTERROGATON: CONFESSONS AND CONSEQUENCES (New York, NY: New York University Press); Gisli Gudjonsson (2018), THE PSYCHOLOGY OF FALSE CONFESSIONS: FORTY YEARS OF SCIENCE AND PRACTICE (Hoboken, NJ: John Wiley & Sons); Saul Kassin, Hayley Cleary, Gisli Gudjonsson, Richard A. Leo, Christian Meissner, Allison Redlich and Kyle Scherr (2025), "Police-Induced Confessions, 2.0: Risk Factors and Recommendations" *Law and Human Behavior*, 49, 7-53; G. Daniel Lassiter and Christian Meissner (2010), POLICE INTERROGATION AND FALSE CONFESSIONS: CURRENT RESEARCH, PRACTICE AND POLICY RECOMMENDATIONS (Washington, DC: American Psychological Association; Richard A. Leo (2009).  "False Confessions: Causes, Consequences and Implications" *Journal of the American Academy of Psychiatry and Law*, 37, 332-343; and Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Cambridge, MA: Harvard University Press).

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 22

are satisfied with elicitation of a version of events that, in fact, is not true. This is called *the misclassification error*. It is one reason why interrogation training manuals implore detectives to investigate their cases before subjecting any potential suspect to an accusatorial interrogation.[21]

The second important decision point in the process occurs when the police interrogate the suspect. Again, the goal of police interrogation is to elicit an incriminating statement from the suspect by moving him from denial to admission. To accomplish this, police use psychologically-persuasive, manipulative, and deceptive interrogation techniques. As described in detail in the previous sections, police interrogators use these techniques to accuse the suspect of committing the crime, to persuade him that he is caught and that the case evidence overwhelmingly establishes his guilt, and then to induce him to confess by suggesting it is the best course of action for him, sometimes resulting in false confessions from innocent suspects. This is called *the coercion error*. However, properly trained police interrogators do not use physically- or psychologically-coercive techniques because they may result in involuntary and/or unreliable incriminating statements, admissions, and/or confessions.[22]

The third important decision point in the interrogation process occurs after the police have elicited an admission—an "I did it" statement—from the suspect. This is referred to as the post-admission phase of the interrogation. The post-admission phase of the interrogation is important because it is here that the police can acquire information and evidence that will either support or not support the accuracy of the suspect's admission. Properly-trained police interrogators should know that innocent people sometimes falsely confess to crimes they did not commit, the need for police interrogators to be diligent to avoid false confessions has been present for decades. From the very first manual in 1942 and in all subsequent editions (1948, 1953, 1962, 1967, 1986, 2001 and 2013), the "Reid" Manual[23] has repeatedly implored interrogators not to use any methods that are "apt to make an innocent person confess to a crime he did not commit," such as "the use of force, threats, of promises of leniency," suggesting that

---

[21] *See* Fred Inbau, John Reid and Joseph Buckley (1986). CRIMINAL INTERROGATION AND CONFESSIONS, 3rd Edition (Williams & Wilkins) at 3-12 ("Prior to the interrogation, and preferably before any contact with the suspect, become thoroughly familiar with all the known facts and circumstances of the case…. All too often, time and effort are unnecessarily expended in the interrogation of a suspected innocent person when an alibi check could have readily established the fact of his innocence."). *See also* Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013). CRIMINAL INTERROGATION AND CONFESSIONS, 5th Edition (Burlington, MA: Jones & Bartlett Learning) at 18 ("One basic principle to which there must be full adherence is that the interrogation of suspects should follow, and not precede, an investigation conducted to the full extent permissible by the allowable time and circumstances of the particular case. The authors suggest, therefore, that a good guideline to follow is "investigate before you interrogate").

[22] Fred Inbau and John Reid (1967). CRIMINAL INTERROGATION AND CONFESSIONS, 2nd Edition (Williams & Wilkins), at 114-115, 198-200.

[23] Fred Inbau and John Reid (1986). CRIMINAL INTERROGATION AND CONFESSIONS, 3rd Edition (Williams & Wilkins).

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 23

interrogators do know that suspects can be made to falsely confess to crimes they did not commit.

Properly-trained interrogators also know that guilty suspects sometimes implicate others for crimes they themselves committed in order to diminish their role in the crime.[24]  Interrogators therefore will seek to elicit information (that is not generally known and cannot likely be guessed by chance) from the suspect that either demonstrates, or fails to demonstrate, independent knowledge of the crime scene details and case facts.  Properly-trained interrogators, therefore, will not ask leading or suggestive questions and will not educate the suspect about details of the victim's allegations or of the alleged crime.  This is called *the contamination error*.  Instead, properly trained interrogators will let the suspect supply the details of the case independently. Properly-trained interrogators will also seek to test the suspect's post-admission account against the physical and other credible evidence.  Truthful confessions and statements are typically corroborated by solid physical evidence and independent knowledge of underlying case facts that have not been suggested to the suspect; false confessions and false statements are not.[25]

## VIII. Populations with Particular Vulnerability in the Interrogation Room[26]

While coercive and/or improper interrogation techniques are often the primary cause of false confessions, certain types or groups of individuals are far more vulnerable to the pressures

---

[24]  *Id.*

[25]  Richard A. Leo and Richard Ofshe (1998).  "The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation" *The Journal of Criminal Law and Criminology*, 88, No. 2 at 429-496.  This observation has been made in the police interrogation training literature as well.  *See also* Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013).  CRIMINAL INTERROGATION AND CONFESSIONS, 5th Edition (Burlington, MA: Jones & Bartlett Learning) at 354-360.

[26]  There is a substantial empirical scientific research literature on the individuals who are more susceptible to making or agreeing to false statements, admissions and/or confessions during police interrogation.  For reviews of this literature, *see*: Saul Kassin (2022), DUPED: WHY INNOCENT PEOPLE CONFESS – AND WHY WE BELIEVE THEM (Latham, MD: Prometheus Books); Gisli Gudjonsson (2021) "The Science-Based Pathways to Understanding False Confessions and Wrongful Convictions," *Frontiers in Psychology*, 12, 1-15; William Woody and Krista Forrest, UNDERSTANDING POLICE INTERROGATON: CONFESSONS AND CONSEQUENCES (New York, NY: New York University Press); Gisli Gudjonsson (2018), THE PSYCHOLOGY OF FALSE CONFESSIONS: FORTY YEARS OF SCIENCE AND PRACTICE (Hoboken, NJ: John Wiley & Sons); Saul Kassin, Hayley Cleary, Gisli Gudjonsson, Richard A. Leo, Christian Meissner, Allison Redlich and Kyle Scherr (2025), "Police-Induced Confessions, 2.0: Risk Factors and Recommendations" *Law and Human Behavior*, 49, 7-53; G. Daniel Lassiter and Christian Meissner (2010), POLICE INTERROGATION AND FALSE CONFESSIONS: CURRENT RESEARCH, PRACTICE AND POLICY RECOMMENDATIONS (Washington, DC: American Psychological Association; Richard A. Leo (2009).  "False Confessions: Causes, Consequences and Implications" *Journal of the American Academy of Psychiatry and Law*, 37, 332-343; and Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Cambridge, MA: Harvard University Press).

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 24

of interrogation, having their will overborne and/or making a false confession.  This includes individuals who are mentally ill, and therefore may confess falsely because they are easily confused, disoriented, delusional or experiencing a non-rational emotional or mental state.  This also includes juveniles and individuals with a low IQ or low-level cognitive or intellectual functioning, who may be more vulnerable to interrogators because of their inability to understand the nature or gravity of their situation, their inability to foresee the consequences of their actions, their inability to cope with stressful situations and/or their eagerness to please others, especially authority figures.  This is especially true of individuals with intellectual disability who test in the very low borderline range of mental retardaton (an IQ of around 70 or lower).  Juveniles may also be more easily intimidated than adults and may lack the maturity, knowledge, or sense of authority needed to resist simple police pressures and manipulations.  Finally, this also includes individuals who, by their nature and personality, are naive, excessively trusting of authority, highly suggestible and/or highly compliant and who are therefore predisposed to believe that they have no choice but to comply with the demands of authorities or who simply lack the psychological resources to resist the escalating pressures of accusatorial interrogation.[27]

Juveniles and young adults are especially vulnerable to the pressures of psychological interrogation and increased risk of making or agreeing to a false confession because of their psychosocial immaturity, which affects their perceptions, reasoning processes, judgements and decision-making.  Substantial empirical research shows that juveniles and young adults are more impulsive, more averse to stress, more conflict-avoidant, more impulsive and have fewer psychological resources with which to withstand pressure from authority figures.  As a result, juveniles and young adults are more naïve, more easily led and manipulated, and more suggestible and compliant.  For all of these reasons, juveniles and young adults are disproportionately represented in the known universe of documented false confessions.  The younger the juvenile, the greater the risk that they will make or agree to a false statement, admission and/or confession in response to police interrogation pressure.

## IX. Evaluating the Reliability of Incriminating Statements, Admissions and Confessions[28]

---

[27]   *See* Saul Kassin, Hayley Cleary, Gisli Gudjonsson, Richard A. Leo, Christian Meissner, Allison Redlich and Kyle Scherr (2025), "Police-Induced Confessions, 2.0: Risk Factors and Recommendations" *Law and Human Behavior*, 49, 7-53; Richard A. Leo (2008), POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

[28]   There is a substantial empirical scientific research literature on the reliability of interrogation-induced statements, admissions and/or confessions.  For reviews of this literature, see: Saul Kassin (2022), DUPED: WHY INNOCENT PEOPLE CONFESS – AND WHY WE BELIEVE THEM (Latham, MD: Prometheus Books); Gisli Gudjonsson (2021) "The Science-Based Pathways to Understanding False Confessions and Wrongful Convictions," *Frontiers in Psychology*, 12, 1-15; William Woody and Krista Forrest, UNDERSTANDING POLICE INTERROGATON: CONFESSONS AND CONSEQUENCES (New York, NY: New York University Press); Gisli Gudjonsson (2018), THE PSYCHOLOGY OF FALSE CONFESSIONS: FORTY YEARS OF SCIENCE AND PRACTICE (Hoboken, NJ: John Wiley & Sons); Saul Kassin, Hayley Cleary, Gisli Gudjonsson, Richard A. Leo, Christian Meissner, Allison Redlich and Kyle Scherr (2025),

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 25

In addition to studying the psychology of police interrogation and the correlates and causes of false confessions from the innocent, scientific researchers have also analyzed the patterns, characteristics and indicia of reliability in true and false confession cases. To evaluate the likely reliability or unreliability of an incriminating statement, admission or full confession from a suspect, scientific researchers analyze the fit between the suspect's post-admission narrative and the crime facts and/or corroborating evidence derived from the confession (*e.g.*, location of the missing murder weapon, loot from a robbery, the victim's missing clothing, etc.).[29]

The purpose of evaluating the fit between a suspect's post-admission narrative and the underlying crime facts and derivative crime evidence is to test the suspect's actual knowledge of the crime. If the suspect's post-admission narrative corroborates details only the police know, leads to new or previously undiscovered evidence of guilt, explains apparent crime fact anomalies and is corroborated by independent facts and evidence, then the suspect's post-admission narrative objectively demonstrates that he possesses the actual knowledge that would be known only by the true perpetrator and therefore may be strong evidence of guilt. If the suspect cannot provide police with the actual details of the crime, fails to accurately describe the crime scene facts, cannot lead the police to new or derivative crime evidence, and/or provides an account that contains factual errors and is disconfirmed by the independent case evidence, then the suspect's post-admission narrative demonstrates that he fails to possess the actual knowledge that would be known only by the true perpetrator and is therefore strongly consistent with innocence. Indeed, absent contamination (*i.e.*, the leaking and disclosing of non-public crime facts that cannot easily be guessed by chance), the fit between the suspect's post-admission narrative and both the crime scene facts and the derivative crime evidence therefore provides an objective basis for evaluating the likely reliability of the suspect's incriminating statements.

---

"Police-Induced Confessions, 2.0: Risk Factors and Recommendations" *Law and Human Behavior*, 49, 7-53 G. Daniel Lassiter and Christian Meissner (2010), POLICE INTERROGATION AND FALSE CONFESSIONS: CURRENT RESEARCH, PRACTICE AND POLICY RECOMMENDATIONS (Washington, DC: American Psychological Association; Richard A. Leo (2009). "False Confessions: Causes, Consequences and Implications" *Journal of the American Academy of Psychiatry and Law*, 37, 332-343; and Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Cambridge, MA: Harvard University Press); Richard A. Leo, Peter Neufeld, Steven Drizin, and Andrew Taslitz (2013), "Promoting Accuracy in the Use of Confession Evidence: An Argument for Pre-Trial Reliability Assessments to Prevent Wrongful Convictions" *Temple Law Review*, Vol. 85, Pp. 759-838; and Richard Leo, Steven Drizin, Peter Neufeld, Brad Hall and Amy Vatner (2006), "Bringing Reliability Back in: False Confessions and Legal Safeguards in the Twenty-First Century," *Wisconsin Law Review.* Vol. 2006, Pp. 479-539.

29  *See* Richard Ofshe and Richard A. Leo (1997). "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions." *Studies in Law, Politics & Society*, 16, 189-251; and Richard A. Leo and Richard Ofshe (1998). "The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation" *The Journal of Criminal Law and Criminology*, 88, No. 2. at 429-496.

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 26

The well-established and widely accepted social science research principle of using the fit standard to evaluate the validity of a confession statement is also a bedrock principle of criminal investigation within law enforcement. Well-trained police detectives realize that an "I did it" statement is not necessarily evidence of guilt and may, instead, turn out to be evidence of innocence.[30] For example, in high-profile murder cases, police regularly screen out volunteered confessions by seeing whether or not the person can tell the police details known only to the perpetrator or lead the police to derivative crime evidence that either corroborates, or fails to demonstrate, the person's guilty knowledge.[31] Police often keep particularly heinous or novel aspects of the crime from the press so that they can be used to demonstrate a confessor's guilty knowledge. Police sometimes deliberately include an error in media releases or allow incorrect statements to go uncorrected so that a true perpetrator will be able to demonstrate his personal knowledge of the crime. In other types of cases, police detectives regularly rely upon the fit standard to identify a true admission that might be mixed in with a collection of volunteered statements.

Using the fit standard to evaluate the validity of a suspect's incriminating statements, admissions or confessions is a bedrock principle of law enforcement because police detectives realize that seeking corroboration during the post-admission phase of interrogation is essential to proper investigative work.[32] This is because it is a fundamental principle of police investigation that true explanations can be supported and false explanations cannot be supported (assuming no contamination has occurred), and because false explanations will not fit the facts of the crime, lead to derivative evidence or be corroborated by independent evidence.

Moreover, post-admission narrative analysis and the fit standard are central to proper criminal investigation because well-trained detectives should realize that the purpose of detective work is not to clear a crime or get a conviction, but to carefully collect evidence in a way that will lead to the arrest, prosecution and conviction of the guilty while at the same time ensuring that no innocent individual is wrongly arrested, prosecuted or convicted.

A suspect's post-admission narrative therefore provides potential evidence to the unbiased, well-trained detective who is seeking to ferret out the truth. If the suspect is guilty, the collection of a detailed post-admission narrative will allow the detective to establish the

---

[30]   Fred Inbau, John Reid and Joseph Buckley (1986). CRIMINAL INTERROGATION AND CONFESSIONS, 3rd Edition (Williams & Wilkins).

[31]   *Id.*, at 173 ("The interrogator should attempt to develop information that can be corroborated by further investigation, and he should seek from the suspect full details of the crime and also about his subsequent activities. What should be sought particularly are facts that would only be known by the guilty person (*e.g.*, information regarding the location of the murder weapon or the stolen goods, the means of entry into the building, the type of accelerant used to start the fire, and the type of clothing on the victim").

[32]   Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013). CRIMINAL INTERROGATION AND CONFESSIONS, 5th Edition (Burlington, MA: Jones & Bartlett Learning) at 354-360.

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 27

suspect's guilt beyond question, both by demonstrating the suspect's actual knowledge and by corroborating the suspect's statements with derivative evidence. Properly trained detectives realize that the strongest form of corroboration comes through the development of new evidence using a suspect's post-admission narrative. While it is not possible to verify every post-admission narrative with the crime facts, a skillful interrogator will seek as much verifiable information about the crime as he can elicit. The more verifiable information elicited from a suspect during the post-admission period, and the better it fits with the crime facts, the more clearly the suspect demonstrates his responsibility for the crime.

If the suspect is innocent, the detective can use the suspect's post-admission narrative to establish his lack of knowledge and thus demonstrate his likely or certain innocence. Whereas a guilty suspect can corroborate his admission because of his actual knowledge of the crime, the innocent suspect cannot. The more information the interrogator seeks, the more frequently and clearly an innocent suspect will demonstrate his ignorance of the crime. His answers will turn out either to be wrong, to defy evaluation, or to be of no value for discriminating between guilt and innocence. Assuming that neither the investigator nor the media have contaminated the suspect by transferring information about the crime facts, or that the extent of contamination is known, the likelihood that his answers will be correct should be no better than chance. Absent contamination, the only time an innocent person will contribute correct information is when he makes an unlucky guess. The likelihood of an unlucky guess diminishes as the number of possible answers to an investigator's questions grows large. If, however, his answers about missing evidence are proven wrong, he cannot supply verifiable information that should be known to the perpetrator, and he inaccurately describes verifiable crime facts, then the post-admission narrative provides evidence of innocence.

This, of course, assumes that the suspect's knowledge of the crime has not been contaminated by the media, community gossip, the police or some other source with inside knowledge about crime details. If a suspect has learned unique or non-public crime facts from one of these sources, then the fact that his confession contains these details is, of course, not indicative of pre-existing knowledge or probative of guilt. This is an important point to emphasize because an innocent suspect's confession, if contaminated, will often contain both inaccurate as well as accurate crime facts—inaccurate because the innocent suspect lacks personal knowledge of the crime details, accurate because these crime details have been suggested to him by third parties or the police interrogators, even if inadvertently. This problem is discussed in detail in the following section.

### X. The Problem of Police Interrogation Contamination and Scripting[33]

---

[33] There is a substantial empirical scientific research literature on the reliability of interrogation-induced statements, admissions and/or confessions. For reviews of this literature, see: Saul Kassin (2022), DUPED: WHY INNOCENT PEOPLE CONFESS – AND WHY WE BELIEVE THEM (Latham, MD: Prometheus Books); Gisli Gudjonsson (2021) "The Science-Based Pathways to Understanding False Confessions and Wrongful Convictions," *Frontiers in Psychology*, 12, 1-15; William Woody and Krista Forrest,

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 28

Police interrogation contamination (*i.e.*, leaking and disclosing non-public case facts) and police interrogation scripting (pressuring and persuading a suspect to parrot back a police-driven narrative of how and why the crime occurred) increase the risk that a confession statement may misleadingly appear to be detailed, accurate and self-corroborating.

The confession-taking process is about more than merely eliciting information from the suspect. Investigators in practice have been observed to shape the suspect's narrative to make the confession as persuasive as possible and to enhance the chances of conviction.[34] In this way, confessions are scripted or constructed by interrogators. A persuasive crime narrative requires an explanation of why the crime happened—the motives and explanations of the suspect for committing the crime. It also should contain a statement of the suspect's emotions, not only his emotions at the time of committing the crime, but also the shame, regret, or remorse the suspect now feels for having committed the crime. Interrogators are also trained to get the suspect to cleanse the interrogation process, usually by providing statements to the effect that the confession was voluntary. Interrogators will ask the suspect, usually after the suspect's resistance has been broken down and he has been made to believe that it is in his best interests to confess, whether the suspect was treated well, given food and drink, bathroom breaks, and other comforts, and whether any promises or threats were made to the suspect. Finally, and perhaps most importantly, interrogators seek to ensure that the confession contains both general and specific crime knowledge—the details of the crime that only the true perpetrator should know. One interrogation scripting technique that stands out is known as "The Error Insertion Trick," in which the interrogator writes out the suspect's confession statement, intentionally inserts minor factual or grammatical errors, and then has the suspect correct and initial these errors.[35] The

---

UNDERSTANDING POLICE INTERROGATON: CONFESSONS AND CONSEQUENCES (New York, NY: New York University Press); Gisli Gudjonsson (2018), THE PSYCHOLOGY OF FALSE CONFESSIONS: FORTY YEARS OF SCIENCE AND PRACTICE (Hoboken, NJ: John Wiley & Sons); Saul Kassin, Hayley Cleary, Gisli Gudjonsson, Richard A. Leo, Christian Meissner, Allison Redlich and Kyle Scherr (2025), "Police-Induced Confessions, 2.0: Risk Factors and Recommendations" *Law and Human Behavior*, 49, 7-53; G. Daniel Lassiter and Christian Meissner (2010), POLICE INTERROGATION AND FALSE CONFESSIONS: CURRENT RESEARCH, PRACTICE AND POLICY RECOMMENDATIONS (Washington, DC: American Psychological Association; Richard A. Leo (2009). "False Confessions: Causes, Consequences and Implications" *Journal of the American Academy of Psychiatry and Law*, 37, 332-343; and Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Cambridge, MA: Harvard University Press).

[34]   Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press) at 165-194.

[35]   As the 1986 Inbau and Reid manual instructs: "It is good practice to purposely arrange for inclusion, on each page of the confession, one or two errors, such as an incorrect name of a person or street, which will be subject to later correction by the confessor when the document is read by or to him. Any such corrections, of course, should be in the confessor's own handwriting, accompanied by his initials or signature in the margin alongside the corrections." Fred Inbau, John Reid and Joseph Buckley (1986). CRIMINAL INTERROGATION AND CONFESSIONS, 3rd Ed. At 185.

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 29

purpose of "The Error Insertion Trick" is to create the impression of validating a confession's voluntariness, accuracy and the confessor's guilt by appearing to demonstrate his personal knowledge of the crime facts.[36]

The problem of contamination and scripting in false confession cases arises when the interrogator pressures a suspect during the post-admission narrative phase to accept a particular account of the crime story—one that usually squares with the interrogator's theory of how the crime occurred—and then suggests crime facts to the suspect, leads or directs the suspect to infer correct answers, and sometimes even suggests plausible motives for committing the crime.[37] Because they are trained to presume the guilt of those whom they interrogate, police assume that they are interrogating suspects who already know the correct crime facts. But this is not true when they are mistakenly interrogating an innocent person.

Instead, the innocent suspect is often pressured to use facts disclosed to him by his interrogators in order to construct a plausible-sounding confession and post-admission narrative. Indeed, the presence of these details in the suspect's confession falsely gives the suspect's narrative credibility and the appearance of corroboration. After police interrogators have contaminated the suspect with non-public crime facts, they often attribute "guilty knowledge" to the suspect when he repeats back and incorporates into his confession the very facts that they first educated him about. One researcher has called these contaminated details "misleading specialized knowledge."[38] In many false confession cases, police and prosecutors argue that the suspect's confession corroborates his guilt because he "knows facts only the true perpetrator would know," even though the suspect first learned these facts from his interrogators.

Researchers have found that contamination by police regularly occurs in interrogation-induced false confession cases. In a study of the first two-hundred and fifty (250) post-conviction DNA exonerations of innocent prisoners in the American criminal justice system, Professor Brandon Garrett of the University of Virginia Law School showed that this pattern was present in 95% of the false confession cases in this data set (38 of 40 cases). In other words, in

---

[36]  *See* Richard A. Leo (2008). *Police Interrogation and American Justice* (Harvard University Press). Pp. 175-177. There is evidence that prosecutors, like police, are also trained to use the Error Insertion Trick. See Mark Godsey (2017). BLIND JUSTICE: A FORMER PROSECUTOR EXPOSES THE PSYCHOLOGY AND POLITICS OF WRONGFUL CONVICTION (University of California Press) at P. 144 ("I was also told when I started as a prosecutor not to make the various witness statements *too* in line with one another. If we did, it would give the defense attorney ammunition at trial to claim that we were telling the witnesses what to say. So we would intentionally include in our notes incorrect information supplied by the witnesses on minor points – points that didn't matter to the case – to show that we weren't coaching them.").

[37]  Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

[38]  Gisli Gudjonsson (2003). THE PSYCHOLOGY OF INTERROGATIONS AND CONFESSIONS: A HANDBOOK (John Wiley & Sons Inc.).

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 30

the overwhelming majority of these proven false confession cases, police interrogators fed the suspect unique non-public facts that "only the true perpetrator would know," but the prosecutor erroneously alleged that the suspect volunteered these facts and that the suspect thereby corroborated the reliability of his confession. But because the jury in each case mistakenly believed the prosecutor rather than the defense, each of the confessors was convicted, and in each of these cases the defendant's innocence (and the falsity of the confession) was only proven many years later by DNA.[39] In a recent follow-up study more recent false confession DNA exonerations, Garrett found that another 21 of 23 (91%) were contaminated.[40]

## XI. The Interrogation and Confession
### Statement of Daniel Rodriguez on May 11, 1991

### A) Introduction

In this section of the report, I will apply the findings of empirical social science research literature on police interrogation and false confessions to Daniel Rodriguez's account of his 5 and ½ hours of custody and interrogation on May 11, 1991, discuss the implications and issues that it raises, and offer my professional expert opinions and the basis for these opinions.

### B) Risk Factors for False Confession in Daniel Rodriguez's Account of His Custodial Interrogation and Confession Statement on August 24, 1990

Daniel Rodriguez describes how and why, over the course of approximately 5 and ½ hours of custody and interrogation on May 11, 1991, Chicago police detectives Reynaldo Guevara and Ernest Halvorsen moved him from adamant denial to orally confessing involvement in the murder of Jose Hernandez on March 17, 1991, a confession statement that Mr. Rodriguez has maintained is false from immediately after his interrogation to the present day. In his account of the multiple interrogation sessions with Detectives Guevara and Halvorsen on May 11, 1991, Mr. Rodriguez describes interrogation techniques, methods and strategies that decades of empirical social science research has shown significantly increases the risk of eliciting false, unreliable and involuntary confessions when applied to innocent suspects. These include the following.

---

[39]  Brandon Garrett (2011). CONVICTING THE INNOCENT: WHERE CRIMINAL PROSECUTIONS GO WRONG (Harvard University Press).

[40]  Brandon Garrett (2015). "Contaminated Confessions Revisited" *University of Virginia Law Review*, 101, 395-454.

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 31

### 1) *Physical Coercion and Abuse*

Once common, the historical use of physical coercion by police detectives in the United States to extract confessions has been well-documented.[41]  The fact that physical coercion leads to false and unreliable statements, admissions, and confessions is so well-established that no one – neither police nor social scientists – disputes it, and it has been prohibited by federal constitutional law that has applied to the States for more than 80 years.  Police interrogation training manuals emphatically advise police never to use any physical force or intimidation whatsoever during interrogation because it is illegal, will render a confession inadmissible and universally recognized as apt to make an innocent person falsely confess.  All police officers and investigators are trained that the use of physical coercion to elicit confessions during interrogation is absolutely impermissible.

According to Daniel Rodriguez, during his interrogation on May 11, 1991, Detective Halvorsen repeatedly and violently hit Mr. Rodriguez with a closed fist while Mr. Rodriguez had one hand handcuffed to a ring on the wall.  Detective Halvorsen hit Mr. Rodriguez in the face, chest, ribs, pectorals and stomach.  Mr. Rodriguez has testified that he was hit numerous times, estimating it to be at least 15 times and in three separate sessions. During these violent physical assaults, Detective Halvorsen, according to Mr. Rodriguez, was angry and berated Mr. Rodriguez for not cooperating and confessing. According to Mr. Rodriguez, Detective Halvorsen kept calling Mr. Rodriguez a bad ass and told him that he was going to be made to play ball and talk. Mr. Rodriguez had taken photos of his injuries, which were entered into evidence at his trial.

The physical assaults were violent and terrorized Mr. Rodriguez into compliance. There is no dispute in the scientific research community or in the empirical social science research literature that the physical coercion that Mr. Rodriguez describes over the course of his 5 and ½ hour interrogation by Detective Halvorsen has long been regarded as a direct cause of interrogation-induced false confessions from innocent suspects.  The physical coercion and violence that that Daniel Rodriguez describes being repeatedly used on him by Detective Halvorsen would have significantly increased the risk of eliciting false compliance and a false confession statement from Mr. Rodriguez.

---

[41]   See Richard A. Leo (2008).  POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 32

2) *Premature and Unwarranted Presumption of Guilt and Investigative Bias*[42]

The *misclassification error*, briefly discussed earlier in this report, is born of an investigative rush to judgment that leads to a premature behavioral presumption of guilt in the interrogation room. Substantial social science research has demonstrated that a behavioral presumption of guilt leads to tunnel vision, confirmation bias, and investigative bias among police investigators, who, as a result, often end up eliciting unreliable case information.[43] When investigators rush to judgment and begin with or arrive at a premature belief in the suspect's guilt, empirical studies show that they seek to build a case against an individual whose guilt they assume *a fortiori*—rather than seeking to even-handedly collect factual information and objectively evaluate independent case evidence. Under these circumstances, investigators act as if they are seeking to prove their pre-existing theories or conclusions rather than investigate a hypothesis or go where the evidence leads them. This mental framework causes investigators to disregard contradictory information and evidence, selectively [mis]characterize existing information and evidence, [mis]interpret a suspect's statements and behavior to conform to the investigators' pre-existing assumptions, and to more aggressively interrogate suspects whose guilt they presume.[44] Significantly, social science research has demonstrated that an investigative rush to judgment based on premature and pre-existing presumption of guilt puts innocent suspects at an elevated risk of making or agreeing to a false statement, admission, or confession in order to satisfy overzealous investigators and put an end to the accusatory pressures of sustained police interrogation.[45] At its worst, a premature rush to judgment and pre-existing presumption of guilt demonstrates reckless disregard for the truth.

In my professional opinion, Detectives Halvorsen and Guevara demonstrated an extremely reckless disregard for the truth in their investigation of the Jose Hernandez murder and selection of Daniel Rodriguez as a suspect. According to Mr. Rodriguez, he was pulled over in his car on May 11, 1991 at approximately 4 pm, arrested at gunpoint and pulled out of his car by Detective Halvorsen, who said, "Guess what, Bart, you won. And I said, won what? He says, you won Junito's murder" (Transcript of Deposition of Daniel Rodriguez, April 11, 2044, Page 133,

---

[42] *See* Saul Kassin, Christine Goldstein, and Kenneth Savitsky (2003). "Behavioral Confirmation in the Interrogation Room: On the Dangers of Presuming Guilt" *Law and Human Behavior*, 27, 187-203; C. Hill, A. Memon, and P. McGeorge (2008). "The Role of Confirmation Bias in Suspect Interviews: A systematic Evaluation" *Legal & Criminological Psychology*, 13, 357-371; and Fadia Narchet, Christian Meissner, and Melissa Russano (2011). "Modeling the Influence of Investigator Bias on the Elicitation of True and False Confessions" *Law and Human Behavior*, 35, 452-465.

[43] *See* Carol Tavris and Elliott Aronson (2015*)*. MISTAKES WERE MADE (BUT NOT BY ME), (Harcourt Books).

[44] *See* Saul Kassin, Christine Goldstein, and Kenneth Savitsky (2003). "Behavioral Confirmation in the Interrogation Room: On the Dangers of Presuming Guilt." *Law and Human Behavior*, 27, 187-203.

[45] Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38.

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 33

Lines 16-18-Y) (at the time Mr. Rodriguez was wearing a Bart Simpson shirt). On the car ride to the Area 5 police station, Detective Guevara threatened Mr. Rodriguez that they would raid the house where Mr. Rodriguez lived with his fiancé Gloria, accuse her of drug possession if they found drugs at the residence, and that if she were arrested, his child would have to go to foster care. According to Mr. Rodriguez, Detective Halvorsen's and Detective Guevara's guilt-presumptive bias was evident from the moment they arrested Mr. Rodriguez, even prior to his lengthy interrogation. On Mr. Rodriguez's account of the unrecorded interrogation, Detectives Halvorsen and Guevera repeatedly accused him of participating in the murder of Jose Hernandez and demanded that he confess to being involved in it, ignored his repeated denials and proclamations of innocence, confronted him with false evidence, screamed at him, threatened him and his family, educated him about the facts of the crime and the detectives' theory of it, promised him he could go home after agreeing to make a recorded confession statement and, as discussed above, Detective Halvorsen repeatedly and violently physically assaulted during several interrogation sessions on May 11, 1991.

Yet the detectives had no physical, scientific or forensic evidence linking him to the murder of Jose Hernandez on March 17, 1991, and Mr. Rodriguez had a verifiable alibi that he was home watching television with his fiancé and young daughter on March 17, 1991 when Mr. Hernandez was murdered. Detectives Halvorsen and Guevera did have two police-written witness statements implicating Mr. Rodriguez, but both of these statements have been asserted to be false and themselves the product of police interrogation coercion, contamination and scripting. The first alleged witness statement was from David Velazquez, but Mr. Velazquez has testified six times that he was physically and psychologically coerced by Detectives Halvorsen and Guevara and threatened with his life if he did not sign a false police-written witness statement falsely implicating Daniel Rodriguez and George Laureano in the murder of Jose Hernandez. Mr. Velasquez has also repeatedly testified that he did not witness the murder of Jose Hernandez, and that Jason Rivera (who is alleged to have provided the second police-written witness statement) was lying when he said that he and Mr. Velasquez did. Mr. Rivera, in a 1992 interview with attorney Lisa Brean (in which a woman named JoAnne Garcia was also present) denied that he ever told Detectives Halvorsen and Guevara that he witnessed the Hernandez murder and told Ms. Brean that he showed Detectives Halvorsen and Guevara documentation that he had been incarcerated at the Gateway Foundation Juvenile Center at the time of the Hernandez murder (March 17, 1991). If true, this would have made it physically impossible for Mr. Rivera to have witnessed the murder. Whether or not Rivera was incarcerated at the time is not totally clear. What is clear is that Rivera told Detectives that he was locked up at the time and, without confirming or disproving, they used him as a key witness anyway. Mr. Rivera subsequently testified against Mr. Rodriguez at his trial, but recent records show that Mr. Rivera repeatedly received cash payments from the state after agreeing to testify at Mr. Rodriguez's trial and that he may have made a deal to implicate Mr. Rodriguez and Mr. Laureano in exchange for not being prosecuted in another homicide case (Mr. Rivera's mother was also in a romantic relationship with Detective Guevara at the time). Further, during his deposition, Mr. Rivera testified that he could not say whether he told the truth when he testified at Mr. Rodriguez's trial, and that he could not say anything about Jose Hernandez's murder

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 34


because he had no memory of even witnessing the murder. If Mr. Velazquez's and Mr. Rivera's statements are false, as Mr. Laureano (who was implicated by Mr. Rivera as the shooter in the Hernandez homicide and acquitted at his trial) has repeatedly testified, then there was no evidence – none -- linking Mr. Rodriguez to the crime, no basis for suspecting Mr. Rodriguez of having been involved in it and thus no basis for Detectives Halvorsen and Guevara ever subjecting Mr. Rivera to accusatory, guilt-presumptive, confession-interrogation and confirmatory interrogation.

In my professional opinion, based on both Mr. Rodriguez's description of his interrogation sessions on May 11, 1991, as well as the quality of Detective Guevara's and Halvorsen's pre-interrogation investigation, Detectives Guevara and Halvorsen were more interested in pinning the murder on Daniel Rodriguez (and George Laureano) and closing the case than pursuing or finding the truth. Absent any meaningful evidence linking Mr. Rodriguez to the murder of the Jose Hernandez, there was no logical reason for Detectives Guevara and Halvorsen to suspect Mr. Rodriguez of having participated in the homicide. As mentioned above, Mr. Rodriguez had a verifiable alibi at the time of the Jose Hernandez murder, and there was no physical or any other type of evidence linking Mr. Rodriguez to it. Yet detectives Guevara and Halvorsen presumed Daniel Rodriguez's guilt in the murder of Jose Hernandez and, on Daniel Rodriguez's account of what occurred during the unrecorded interrogation, their singular goal was to build a case against Mr. Rodriguez (and Mr. Laureano) based on coerced and fabricated testimonial statements and to close the case against him as quickly as possible without regard to the truth or their actual innocence or guilt.

Detective Guevara's and Halvorsen's guilt-presumptive interrogation tactics increased the risk that they would overbear Mr. Rodriguez's will and elicit an involuntary and false confession statement from him. Detective Guevara's and Halvorsen's lengthy interrogation of Mr. Rodriguez on May 11, 1991 was not only guilt-presumptive but they were also truth-presumptive. Detective Guevara's and Halvorsen's investigative approach in this case was not to treat Mr. Rodriguez's possible guilt as a hypothesis to be investigated and independently corroborated or proven false depending on where the evidence took them. Detectives Guevara and Halvorsen did not investigate the Hernandez murder in an even-handed manner or seek to independently gather factual information to develop a theory of how and why this homicide occurred but instead began with a theory, coercively pressured and persuaded Mr. Rodriguez to adopt their theory over a 5 and ½ hour interrogation, and sought to coerce Mr. Rodriguez into repeat it back to them so that they could quickly close the case. Detectives Guevara and Halvorsen then treated Mr. Rodriguez's behavior and statements as further evidence confirming their pre-existing theory.

As well-established social science research has repeatedly demonstrated, once an investigator rushes to judgment about a suspect's guilt, an interrogator's guilt-presumptive or truth-presumptive investigative tactics substantially increase the risk of eliciting involuntary, false and unreliable statements, admissions and/or confessions from innocent suspects. Detective Guevara's and Halvorsen's unwavering presumption of Daniel Rodriguez's guilt and

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 35

confession-driven interrogation led to investigative bias, behavioral confirmation bias and tunnel vision: Detectives Guevara and Halvorsen not only refused to accept Mr. Rodriguez's protestations of innocence, but also viewed his interrogation-induced compliance and incriminating statements as corroboration of their preexisting belief in Mr. Rodriguez's guilt, as opposed to the product of their own guilt-presumptive and psychologically coercive interrogation techniques over the course of a lengthy custodial interrogation. These types of investigative and confirmation biases have been documented in many psychological studies and in cases of police-induced false confession and erroneous conviction of the innocent.[46] Detective Guevara's and Halvorsen's rush to judgment, premature presumption of Mr. Rodriguez's guilt, tunnel vision and confirmation bias not only demonstrated their reckless disregard for the truth, but also increased the risk that they would elicit false compliance and a false confession statement from Mr. Rodriguez.

3) *Lengthy (Incommunicado) Interrogation, Exhaustion and Fatigue.*

Detectives Halvorsen and Guevara arrested Daniel Rodriguez at around 4 p.m. on May 11, 1991, placed in custody around 4:15 p.m. and interrogated Mr. Rodriguez off and on until 9:23 p.m. on May 11, 1991. Accordingly, as best I can tell for the purpose of this report, Rodriguez's period of interrogation and custody on May 11, 1991 was approximately 5 and ½ hours.

Researchers consider the length of an interrogation to include both the time that a suspect is being questioned and/or accused as well as any breaks between questioning/accusation sessions, because breaks between accusation and questioning add to the stress and fatigue of the interrogation and sometimes are used as an interrogation technique itself. It is the total amount of time in custody during interrogation that matters. Some police use a technique known as "letting the suspect stew" in which they intentionally let the suspect wait in a locked interrogation room, thinking it will raise the suspect's anxiety and contribute to the softening up (what interrogators refer to as rapport-building) process that precedes interrogations.[47] Other times, police will intentionally take breaks during interrogation as part of their strategy to elicit a confession. These breaks contribute to a suspect's fatigue and exhaustion. The amount of time that Daniel Rodriguez was in custody and interrogated by detectives Guevara and Halvorsen -- approximately 5 and ½ hours was lengthy per traditional police standards existing both in 1990 and today.

Lengthy custodial detention and accusatory interrogation leads to fatigue and exhaustion, conditions that significantly increase the risk of overbearing a suspect's will and eliciting false

---

[46]   Keith Findley and Michael Scott (2006). "The Multiple Dimensions of Tunnel Vision in Criminal Cases" *University of Wisconsin Law Review*, 291-397.

[47]   Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 36

and unreliable statements, admissions and/or confession. Lengthy interrogation/custody is a *situational* risk factor that could overbear a suspect's will and could cause a suspect to make or agree to a false confession during police interrogation.[48] Empirical studies indicate that the overwhelming majority of routine custodial interrogations last less than one hour,[49] whereas the combined time period of custody and interrogation in most interrogations leading to a false confession is more than six hours.[50] Once again, researchers count the total amount of time during interrogation when measuring the length of an interrogation and its correlates because even time for custodial breaks or questioning after an initial admission during the interrogation process can contribute to fatigue, exhaustion, depletion of mental or physical energy, learning impairments, loss of accurate memory recall, and a decrease in one's ability to concentrate and resist pressure. The 1986 Reid and Associates police interrogation training manual (which was the current edition of the leading police interrogation training manual in the United States in 1991) specifically recommends that police interrogate for no longer than four (4) hours absent "exceptional situations" and that "most cases require considerably fewer than four hours."[51]

Lengthy detention and interrogation is an important risk factor for understanding false confessions because the longer an interrogation lasts, the more likely the suspect is to become fatigued and depleted of the physical and psychological resources necessary to resist the pressures and stresses of accusatory interrogation,[52] especially when interrogators use physically and/or psychologically aggressive, manipulative and/or coercive methods.[53] The longer custody and interrogation last, the more pressure interrogators can bring to bear on the suspect and the more techniques and strategies they may use to move the suspect from denial to admission. Lengthy interrogation, fatigue and exhaustion increase the risk that a suspect's will could be overborne and that an innocent suspect will make or agree to a false statement, admission and/or confession.

---

[48] *See* Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38.

[49] Richard A. Leo (1996). "Inside the Interrogation Room" Journal of Criminal Law and Criminology, 86, 266-303. *See also* Barry Feld (2013). *Kids, Cops and Confessions: Inside the Interrogation Room* (New York, NY: New York University Press).

[50] Steven Drizin and Richard A. Leo (2004). "The Problem of False Confessions in the Post-DNA World. *North Carolina Law Review*, 82, 891-1007.

[51] Fred Inbau, John Reid, and Joseph Buckley (1986). CRIMINAL INTERROGATION AND CONFESSIONS, 3rd Edition (Williams & Wilkins) at 310.

[52] Deborah Davis and Richard A. Leo (2012). "Interrogation Related Regulatory Decline: Ego-Depletion, Failures of Self-Regulation and the Decision to Confess" *Psychology, Public Policy and Law*, 18, 673-704.

[53] Saul Kassin, Hayley Cleary, Gisli Gudjonsson, Richard A. Leo, Christian Meissner, Allison Redlich and Kyle Scherr (2025), "Police-Induced Confessions, 2.0: Risk Factors and Recommendations" *Law and Human Behavior*, 49, 7-53.

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 37

As noted above, a 5 and ½ hours period of detention/custody and interrogation is considered lengthy and creates a risk of exhausting, fatiguing and psychologically weakening, if not impairing, a suspect's ability to freely choose to continue participating in the interrogation. In addition, Mr. Rodriguez also reports that he was repeatedly physically beaten while handcuffed to a wall by Detective Halvorsen over multiple interrogation sessions; that he was yelled at; that he was threatened; that he was not allowed to go to the bathroom and not provided any food or water during the 5 and ½ hour interrogation; and that he was promised he would be able to go home and put an end to the psychologically abusive interrogation if he told Detectives Guevara and Halvorsen what they wanted to hear, all of which would have added to his fatigue and exhaustion during the lengthy interrogation. As substantial empirical research supports, lengthy interrogation, as well as the fatigue, exhaustion and depletion of psychological resources it contributes to and produce, increased the likelihood that Mr. Rodriguez would falsely comply and provide a false confession statement on May 11, 1991.

### 4) *Sleep Deprivation*

Longstanding social science research has demonstrated that sleep deprivation is another significant risk factor for false confession because the more sleep deprived the suspect is, the more likely he or she is to become fatigued and depleted of the physical and psychological resources necessary to resist the pressures and stresses of accusatory interrogation,[54] especially when investigators use psychologically aggressive, manipulative and/or coercive methods.[55] Sleep deprivation heightens interrogative suggestibility by impairing decision-making abilities, such as the ability to sustain attention and flexibility of thinking as well as the ability anticipate risks and consequences, inhibit behavioral impulses and resist suggestive questioning.[56] Sleep deprivation also impairs the ability to sustain attention and flexibility in thinking and, more generally, it diminishes a suspect's ability to resist suggestive and/or coercive influences, especially the longer an interrogation lasts. Fatigue and exhaustion increase the risk that a suspect's will could be overborne and that an innocent suspect will make or agree to a false statement, admission and/or confession.

---

[54] Deborah Davis and Richard A. Leo (2012). "Interrogation Related Regulatory Decline: Ego-Depletion, Failures of Self-Regulation and the Decision to Confess" *Psychology, Public Policy and Law*, 18, 673-704.

[55] Saul Kassin, Hayley Cleary, Gisli Gudjonsson, Richard A. Leo, Christian Meissner, Allison Redlich and Kyle Scherr (2025), "Police-Induced Confessions, 2.0: Risk Factors and Recommendations" *Law and Human Behavior*, 49, 7-53.

[56] Mark Blagrove (1996). "Effects of length of sleep deprivation on interrogative suggestibility" *Journal of Experimental Psychology: Applied*, 2, 48-59. *See also* Stephen Frenda, Shari R. Berkowitz, Elizabeth F. Loftus, and Kimberly M. Fenn (2016). "Sleep Deprivation and False Confessions" *Proceedings of the National Academy of Sciences*, 113, 2047-2050 (February 23, 2016).

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 38

Mr. Rodriguez testified in his trial and at his deposition that he had been up the whole night before his deposition and thus that he was sleep deprived and tired when being subjected to physically and psychologically coercive interrogation by detectives Halvorsen and Guevara In addition, Mr. Rodriguez also testified that the detectives did not allow him to go to the bathroom or provide any food or water during his interrogation on May 11, 1991. As noted above, a lengthy period of detention/custody and interrogation creates the risk of exhausting, fatiguing and psychologically weakening the suspect's will to resist, thereby increasing the risk of impairing a suspect's ability to freely choose to continue participating in the interrogation. The lengthy custodial interrogation of Daniel Rodriguez on May 11, 1991, as well as any sleep deprivation, fatigue and exhaustion that he experienced, increased the risk of eliciting a false confession from him.

5) *False and Exaggerated Evidence Ploys*

Police interrogators routinely tell criminal suspects that the evidence establishes their guilt: If police possess real evidence, this is called a true evidence ploy. If police are making up, lying about, or exaggerating non-existent evidence, this is called a false evidence ploy. The social science research literature has demonstrated that false evidence ploys are potentially psychologically coercive techniques that are virtually always present in, and substantially likely to increase the risk of eliciting, false statements, admissions, and/or confessions. False evidence ploys are among the most well-documented *situational* risk factors for eliciting false and unreliable statements, admissions, and/or confessions, as described in the social science research literature.[57] The use of false evidence ploys can create or contribute to the suspect's perception that he is trapped, there is no way out, and/or that his conviction will be inevitable. False evidence ploys can lead the suspect to perceive that he is in a hopeless situation and thus has little choice but to agree to or negotiate the best available outcome or mitigation of punishment given the perceived, subjective reality of his situation.

According to Mr. Rodriguez, Detectives Halvorsen and Guevara repeatedly told Mr. Rodriguez that his friends had snitched on him, and they showed Mr. Rodriguez written statements from David Velasquez and Jason Rivera implicating him in the murder of Jose Hernandez as they implored him to confess to it. As Mr. Rodriguez testified in his deposition on April 11, 2024: "Telling me that, you know: Your friends told on you. David Velazuez and Jason Rivera told on you. We know it was you and Fro. Cooperate. We know you did it" (Transcript of Deposition of Daniel Rodriguez, April 11, 2024, Page 148, Lines 14-17). If, as Mr. Velazquez has also testified to on 6 separate occasions, he did not witness the murder of Jose Hernandez but only falsely implicated Mr. Rodriguez because Detectives Guevara and Halvorsen physically and psychologically coerced him (even threatening his life by driving him into rival gang territory and telling him they were going to have him killed and threatening to put a murder

---

[57]  Saul Kassin, Hayley Cleary, Gisli Gudjonsson, Richard A. Leo, Christian Meissner, Allison Redlich and Kyle Scherr (2025), "Police-Induced Confessions, 2.0: Risk Factors and Recommendations" *Law and Human Behavior*, 49, 7-53.

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 39

case on him), then the detectives' repeated assertions that Mr. Hernandez implicated Mr. Rodriguez in the Hernandez murder, as well as their use of Mr. Velasquez's police-written witness statement, was a false evidence ploy. If, as Mr. Velasquez has also repeatedly testified, Jason Rivera was lying when he testified that he witnessed the murder of Jose Hernandez with David Velasquez, and if Mr. Rivera was in custody at the time that Jose Hernandez was murdered, as attorney Lisa Brean has stated Mr. Rivera told her and JoAnne Garcia in 1992, then Detectives Halvorsen's and Guevara's repeated assertion that Jason Rivera implicated him in the murder of Jose Hernandez, as well as the use of Jason Rivera's police-written statement, was also a false evidence ploy.

As a century of basic psychological research on misinformation effects has shown[58] (as well as decades of applied psychological research on police lying to suspects during interrogation)[59] false evidence ploys are effective at eliciting compliance,[60] confusing some suspects into believing that they have been framed or that such evidence really does exist,[61] causing some suspects to doubt themselves (deferring to interrogators' authoritative assertions of irrefutable evidence despite knowing they did not commit a crime),[62] and even causing some suspects to develop false beliefs and/or memories of committing crimes.[63] Based on well-established basic and applied social scientific research going back decades, Detective Guevara's and Halvorsen's false evidence ploys in their interrogation of Daniel Rodriguez on May 11, 1991 increased the risk of eliciting a false and unreliable confession from him by contributing to the sense of hopelessness and despair that often precedes the elicitation of a false confession.[64]

---

[58] Elizabeth Loftus (2005). "Planting Misinformation in the Human Mind: A 30 Year Investigation of the Malleability of Memory" *Learning & Memory*, 12, 361-366.

[59] Saul Kassin, Hayley Cleary, Gisli Gudjonsson, Richard A. Leo, Christian Meissner, Allison Redlich and Kyle Scherr (2025), "Police-Induced Confessions, 2.0: Risk Factors and Recommendations" *Law and Human Behavior*, 49, 7-53.

[60] Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press)

[61] Richard Ofshe and Richard A. Leo (1997). "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions." *Studies in Law, Politics & Society*, 16, 189-251.

[62] Richard Ofshe and Richard A. Leo (1997). "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions." *Studies in Law, Politics & Society*, 16, 189-251.

[63] Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press). *See also* Deborah Wright, Kimberly Wade and Derrick Watson (2013). "Delay and Déjà Vu: Timing and Repetition Increase the Power of False Evidence" *Psychonomic Bulletin Review*, 20, 812-818; Julia Shaw and Don Read (2015). "Constructing Rich False Memories of Committing Crime" *Psychological Science*, 291-301; and Julia Shaw (2016). THE MEMORY ILLUSION (Random House).

[64] Richard Ofshe and Richard A. Leo (1997). "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions." *Studies in Law, Politics & Society*, 16, 189-251.

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 40

### 6) *Threats and Promises*

As discussed earlier in this report, the use of implicit and/or explicit promises (for example, of leniency, immunity, freedom and/or a tangible benefit) in exchange for compliance and confession and implicit and/or explicit threats (for example, of physical harm, a higher charge, longer sentence or harsher punishment) in the absence of compliance and confession significantly increases the risk of eliciting false and/or unreliable statements, admissions, and/or confessions. Empirical social science research has repeatedly demonstrated that promises of leniency and threats of harm, whether implicit or explicit, are widely associated with police-induced false confession in the modern era and are believed to be among the leading causes of false confessions.[65] Threats and promises are two sides of the same coin: Every threat implies a promise (if one complies to avoid the threat) and every promise implies a threat (if one fails to comply with the promise).

According to Daniel Rodriguez, Detectives Guevara and Halvorsen repeatedly explicitly threatened Mr. Rodriguez with harm and harsher treatment if he did not comply with their demands and confess to the murder of Jose Hernandez, and they repeatedly explicitly and implicitly promised him more lenient treatment and freedom in exchange for complying with their demands and confessing to the murder of Jose Hernandez. According to Mr. Rodriguez, upon arrest Detective Guevara threatened to raid Mr. Rodriguez's, have his fiancée arrested by putting any drugs found in the house on her, and have his child put in foster care. As Mr. Rodriguez testified in his deposition (Transcript of Deposition of Daniel Rodriguez, April 11, 2024, Page 137, Line 15-Page 138, Line 6):

Q:     So after putting you in Detective Guevara's car, what happened next?

A:     We drove back to Grand and Central

Q:     Okay. Was anything said to you before you drove back to Grand and Central?

A.     Yes. He told me, he said, you know, they been – the police officers been watching your house all night. He said that, if you don't cooperate with us, anything found in the house – if I didn't cooperate with them, that he would raid my house and anything found in the house would be pinned on my wife – or girl – Fiancée at the time

Q.     Okay. And  you said "he" said this.  Who is the person that said this

A.     Guevara

---

[65]   Richard A. Leo (2008).  POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 41


Once at the police station, according to Mr. Rodriguez, Detective Halvorsen repeatedly threatened to continue physically pummeling Mr. Rodriguez in the stomach, chest, and ribs if he did not stop denying, and start admitting to, involvement in the Jorge Hernandez murder. "He just kept threatening me. I kept on telling him I had nothing to do with it…He kept on threatening me. I kept on telling him that I had nothing to do with it. And he said, Oh, you want to be a bad ass, and hit me" (Transcript of Deposition of Daniel Rodriguez, April 11, 2024, Page 150, Line 3-Page 151, Line 18). According to Mr. Rodriguez, Detectives Halvorsen repeatedly threatened him with ongoing physical assault and abuse if he did not say he was involved in the Jose Hernandez murder as the driver and that George Laureano shot and killed Mr. Hernandez: "He just kept on coming back into the room. Guevara came into the room with him. They both told me the same thing: you could make this easy, you could tell the truth, we already know the truth, your friends already gave you up or you can do it the hard way" (Testimony of Daniel Rodriguez, at Proceedings in *Reynaldo Muniz v. State of Illinois*, July 14, 2021, Page 18, Lines 7-11).

At the same time, Detectives Guevara and Halvorsen, according to Mr. Rodriguez, repeatedly told him that they were not going after him, but that if he cooperated and implicated George Laureano as the shooter, he could go home. "I was told if I will help, you know, if I will go along with them that they would let me go" (Transcript of Trial Testimony of Daniel Rodriguez, February 1993, Page H57, Lines 14-15). At one point the detectives even put Mr. Rodriguez's car keys on the table in the room in which he was being interrogated to make clear even more directly that he could go home once he cooperated and confessed. According to Mr. Rodriguez, he even told ASA Patrick Walsh that the detectives had told him that he could go home if he gave them a statement: "I told him before we even – before he even said anything, I told him, They said I could go home if I say what they want me to say" (Transcript of Deposition of Daniel Rodriguez, April 11, 2024 Page 166, Line 1-3)

The use of explicit and implicit threats of harm (in the absence of compliance and confession) as well as explicit and implicit promises of leniency, immunity and/or a tangible benefit (in exchange for compliance and confession) significantly increases the risk of overbearing a suspect's will and eliciting an involuntary false statement, admission, and/or confession when applied to the innocent. Indeed, as empirical social science research has repeatedly demonstrated, threats of harm or harsher punishment and promises of leniency and immunity are widely associated with police-induced false confession in the modern era and are believed to be among the leading causes. There may be no psychological interrogation technique more potent than the use of threats and promises. Threats and promises (whether implied or express) are inherently coercive because they exert substantial pressure on a suspect to comply and thus can easily overbear the will or ability of a suspect to resist an interrogator's demands or requests. Like other *high-end* inducements, threats and promises contribute to creating a sense of despair and hopelessness about a suspect's perceptions of his available options during interrogation. The explicit and implicit threats that Mr. Rodriguez describes Detectives Guevara and Halvorsen making on May 11, 1991 (of having his wife arrested, his daughter sent to foster care, and of continuing to be physically beaten by Detective Halvorsen) if he did not confess and

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 42

implicate George Laureano, as well as the promise of being released from the physically and psychologically coercive interrogation and being allowed to go home if he did, significantly increased the likelihood of eliciting false compliance and a false confession from him.

### 7) *Psychological Coercion*

As discussed earlier, it is well-established that psychologically coercive interrogation techniques increase the risk of eliciting false and/or involuntary incriminating statements, admissions and/or confessions.[66] In my professional opinion, the lengthy interrogation described by Daniel Rodriguez on May 11, 1991 was extremely psychologically coercive for multiple reasons.

First, as just discussed, the interrogation on May 11, 1991 by Detectives Guevara and Halvorsen, as described by Daniel Rodriguez, contained repeated explicit and implicit threats of harm and promises of leniency – (that Mr. Rodriguez's family members would be physically harmed and that he would continue to be physically assaulted by Detective Halvorsen) if he did not confess to involvement in the murder of Jose Hernandez and that he would be able to put an end to Detective Halvorsen's physically beatings and allowed to go home if did. These interrogation techniques are regarded as inherently psychologically coercive because they are so likely to overbear a suspect's will and lead to involuntary statements. Avoiding promises of leniency or freedom in exchange for compliance and confession, and avoiding threats in the absence of compliance/confession (whether implied or explicit) are among the most fundamental prohibitions in American police interrogation,[67] second only to the prohibition against using physical violence on suspects to elicit confessions.[68] Promises and threats are psychologically coercive and thus taint the rest of an interrogation.[69]

---

[66] Saul Kassin, Hayley Cleary, Gisli Gudjonsson, Richard A. Leo, Christian Meissner, Allison Redlich and Kyle Scherr (2025), "Police-Induced Confessions, 2.0: Risk Factors and Recommendations" *Law and Human Behavior*, 49, 7-53; Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press); Richard Ofshe and Richard A. Leo (1997). "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions" *Studies in Law, Politics & Society*, 16, 189-251.

[67] Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press)

[68] *Id.*

[69] Saul Kassin, Hayley Cleary, Gisli Gudjonsson, Richard A. Leo, Christian Meissner, Allison Redlich and Kyle Scherr (2025), "Police-Induced Confessions, 2.0: Risk Factors and Recommendations" *Law and Human Behavior*, 49, 7-53; Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press); Richard Ofshe and Richard A. Leo (1997). "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions" *Studies in Law, Politics & Society*, 16, 189-251.

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 43

Second, as Daniel Rodriguez has testified on multiple occasions, Detective Guevara's and Halvorsen's interrogation methods caused him to become scared, fear for his life, and to perceive that his situation was utterly hopeless (Trial Testimony of Daniel Rodriguez, February, 2023, Page H 59, Lines 6-9)

Q.      Why did you make this statement

A.      Because I was scared

Or as Mr. Rodriguez stated in his deposition (Transcript of Deposition of Daniel Rodriguez, 4/11/24, Page 171, Line 22-Page 172, Line 1): "I was spent. I was spent. I was beat up. I was done. I would have did anything in the hopes to get out of that room to – for the chance to get home, to get those keys and go home."  And in his testimony in court proceedings involving Reynaldo Muniz, (*Reynaldo Munoz v. State of Illinois*, Court Proceedings, July 14, 2021, Page 20, Line 8-Page 21, Line 7): " I felt hopeless. I felt alone. I felt like there was nobody there to help me…I felt like I was sinking into quicksand."  Detective Halvorsen's physical coercion broke Daniel Rodriguez's will to resist: "After Halvorsen hit me in that room, I gave up I told him I will do whatever they wanted to. I was done" (*Reynaldo Munoz v. State of Illinois*, Court Proceedings, July 14, 2021, Page 39, Lines 9-11):

Daniel Rodriguez describes Detective Guevara's and Halvorsen's interrogation techniques as cumulatively causing him to perceive that he had no meaningful choice but to comply with, and to submit to, their demands if he wished to put an end to their physically and psychologically coercive interrogation on May 11, 1991.  Mr. Rodriguez describes an extremely physically and psychologically abusive interrogation that took away his free will and in which he was made to comply involuntarily with Detective Guevara's and Halvorsen's demands in order to escape the intensely distressing and physically overbearing interrogation that, Mr. Rodriguez asserts, systematically broke him down and that caused him to agree to a completely false and involuntary confession statement.

Third, the interrogation described by Daniel Rodriguez was psychologically coercive because he states that Detectives Guevara and Halvorsen never provided him with the legally Miranda rights prior to the taped recap with Assistant State' Attorney Patrick Walsh, approximately 5 and ½ hours after his interrogation had begun.  Because Detectives Guevara and Halvorsen failed to notify Mr. Rodriguez that he could legally terminate the physically and psychologically abusive interrogation without consequence, he never realized that it was not necessary to falsely to confess to get out of that interrogation room. In other words, the physically and mentally abusive interrogation that Mr. Rodriguez's describes was psychologically coercive because he was denied the ability to exercise his free will to no longer participate in the interrogation.  The clear message of Detectives Guevara's and Halvorsen's interrogation was that Mr. Rodriguez had no choice but to continue participating in and responding to Detective Guevara over the course of this lengthy interrogation, which is psychologically coercive by definition.

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 44

In sum, Daniel Rodriguez describes his interrogation on May 11, 1991 by Detectives Guevara and Halvorsen as extremely physically and psychologically coercive For multiple reasons leading to involuntary compliance and an involuntary confession statement. Psychologically coercive interrogation pressures and techniques substantially increase the risk that an innocent person will be forced against their will to make and/or agree to false and unreliable statements, admissions and/or confessions. The psychologically coercive and abusive interrogation pressures that Mr. Rodriguez describes being subjected to from Detectives Guevara and Halvorsen during his interrogation on May 11, 1991 increased his risk of falsely and involuntarily complying with their demands and falsely confessing.

8) *Personality Traits as Risk Factors for False and/or Involuntary Confessions*

In addition to the *situational* risk factors described in Mr. Rodriguez's account, Mr. Rodriguez, who was 19 years old at the time of his interrogation on May 11, 1991, was at a heightened risk of making and/or agreeing to a false and/or unreliable confession statement because of his personality traits and characteristics (*i.e.*, *personal* risk factors), specifically his relative youth.

Youth is a risk factor for false confession because of the psychological immaturity and impulsivity that is associated with the development of the adolescent brain and its effect on juveniles' judgement and decision-making. In the last two decades, substantial neurological research has confirmed that the adolescent brain continues to develop beyond the age of 18 and into the mid-20s, blurring the line, for psychological purposes, between juveniles and young adults through their mid-20s. Juveniles and young adults are disproportionately represented in the reported false confession cases, as has been well-documented by scholars[70] and in the National Registry of Exonerations.[71] They are particularly vulnerable to the pressures of psychological interrogation. Adolescence is associated not only with psychological traits such as greater psychosocial immaturity and impulsiveness, but also higher suggestibility and emotional arousability, poor decision-making, higher trust of authority figures, increased gullibility and a tendency to focus on the present rather than the future. As a result, juveniles and young adults tend to be more easily led and manipulated than adults beyond the age of 25; more naïve, gullible and suggestible; more compliant, submissive and obedient to authority; more conflict averse; more likely to engage in risky behaviors; less capable of considering long term consequences. These psychological tendencies of youth significantly increase the risk of false statements, admissions and /or confessions from juveniles and young adults. The risks are compounded by the fact that although police officers may realize that youthful suspects are easily influenced, interrogators often apply the same interrogations tactics on juveniles and young adults that they

---

[70] Steven Drizin and Richard A. Leo (2004). "The Problem of False Confessions in the Post-DNA World" *North Carolina Law Review*, 82, 891-1007.

[71] *See National Registry of Exonerations*, http://www.law.umich.edu/special/exoneration/Pages/about.aspx (last accessed July 14, 2024).

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 45

use on fully developed and older adults, as occurred during the interrogation of Daniel Rodriguez on May 11, 1991.

All other things being equal, the empirical research would predict that it would take far less time for police interrogators to break an innocent juvenile or young adult suspect and move him from denial to admission than a fully developed adult. Because of his relative youth, Mr. Rodriguez was at an increased risk of making or agreeing to false statements, admissions and/or confessions in response to police interrogation pressures, especially in response to the physically and psychologically coercive pressures that Mr. Rodriguez describes occurring during his interrogation on May 11, 1991.

### XII. Police Interrogation Contamination and Scripting: Fabricating Daniel Rodriguez's Confession Statement

As mentioned earlier, police interrogators are trained to refrain from contaminating a suspect by leaking or disclosing non-public case facts to him or her but, instead, to hold back unique case information and let the suspect volunteer case details in order to demonstrate inside knowledge of the crime details to corroborate the accuracy of any incriminating statements. The absence of contamination allows police to verify the accuracy of reliable confessions, but the presence of contamination prevents police from corroborating confessions that are true and makes confessions that are false misleadingly appear true (because they contain non-public crime scene details suggested by the interrogators, and repeated by the suspect, but police and prosecutors assert that they were volunteered by the suspect). Though police interrogation contamination may be inadvertent rather than intentional, it can make otherwise completely false confessions appear not only to be true but persuasively so.[72]

Related to contamination, police investigators sometimes "script" a suspect's confession by not only providing the suspect with details of the crime, but also by coaching, directing and/or leading the suspect to adopt a specific police-driven narrative of how and why he or she must have committed the crime. This is problematic when police are interrogating a suspect because, after all, the whole point of police interrogation should be to get a truthful account from the person who committed the crime, as opposed to pressuring and persuading the suspect to regurgitate back to the investigators what they want to believe occurred. Like contamination, scripting can make otherwise completely false confessions appear not only to be true but persuasively so.[73] Interrogators sometimes seek to shape and edit the suspect's narrative in order to incriminate the suspect and build a more specific case against him or her that will ensure conviction. To do so, interrogators usually try to elicit an account that is consistent with their theory of the crime. If the suspect's narrative does not fit the interrogators' pre-existing

---

[72] Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

[73] *Id*.

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 46

expectations about how and why the suspect must have committed the crime, interrogators continue to interrogate the suspect, often correcting and educating the suspect while pressuring and persuading him or her to adopt the interrogators' scripted version of what they believe must have happened to cause the crime and why.[74] The problem with scripting is that it is truth-presumptive and replaces what should be an investigative function (seeking the truth) with a prosecutorial function (making a case against a suspect whose guilt and guilty knowledge they presume). Instead of pursuing truthful information from someone who knows what occurred, by scripting investigators are seeking to create evidence that confirms their pre-existing assumptions, speculations, beliefs and/or theories. Just as police interrogation contamination can make otherwise completely false confessions appear not only to be true but persuasively so,[75] the same is true of police interrogation scripting.[76]

Without a recording of the interrogation, it is usually not possible to know with complete certainty whether non-public crime facts in a suspect's confession statement originated with the suspect or originated with police interrogators who already knew those facts and suggested them to the suspect, who then parroted them back in a statement. During his interrogation on May 11, 1991, according to Mr. Rodriguez's account, Detectives Guevara and Halvorsen repeatedly fed Mr. Rodriguez facts about the crime, corrected and coached him, showed him photographs from and diagrams of the crime scene. According to Mr. Rodriguez, Detectives Guevara and Halvorsen scripted Mr. Rodriguez's confession statement by providing him with a type-written confession statement to memorize and repeat back when ASA Walsh arrived and his confession statement would be taped, coaching Mr. Rodriguez on his alleged role in the murder of Jose Hernandez and the crime narrative that Detectives Guevara and Halvorsen hoped to have Mr. Rodriguez incorporate into his eventual confession statement. In his deposition on April 11, 2024, Mr. Rodriguez recounted numerous instances of interrogation contamination and scripting by Detectives Guevara and Halvorsen. At his trial in 1993, Mr. Rodriguez testified:

- "They talked to me again about the murder. They showed me a drawing on the wall of supposedly how the murder happened" (Transcript of Testimony of Daniel Rodriguez, Page H55, Lines 18-20)

- "They just showed me the diagram supposedly where me and George Laureano drove through and shot Genito Hernandez" (Transcript of Testimony of Daniel Rodriguez, Page H56, Lines 1-3)

- "He [Detective Halvorsen] talked to me for a little bit and then he told me, he came into the room with a piece of paper. He told me well, this is what I want you to say...He

---

[74] *Id.*

[75] *Id.*

[76] *Id.*

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 47

showed me exactly what to say." (Transcript of Testimony of Daniel Rodriguez, Page H58, Lines 1-9)

■ "He [Detective Halvorsen] before, before the Court Reporter and Pat Walsh talked to me, he told me more or less what to say to everything" (Transcript of Testimony of Daniel Rodriguez, Page H91, Lines 5-7)

In court proceedings in 2021 (*Reynaldo Munoz v. People of the State of Illinois*), Mr. Rodriguez testified (Transcript, Page 23, Line 22-Page 24, Line 9):

Q. The statement that you gave that Detective Halvorsen said if you gave this statement, prior to giving this statement, did Detective Halvorsen tell you essentially what you were supposed to say?

A. Yes, ma'am

Q. How did he do that?

A. He showed me a piece of paper with what to say

Q. Did you have to sort of study before you went and did this statement?

A. Yes

Q. Was; it a court-reported statement

A. No. It was a statement typed

And (Transcript, Page 37, Lines 3-17):

A. They took me into a room with diagrams

Q. How long were you in that room.

A. For a minute. At least 15, 20 minutes

Q. Who was in that room with you?

A. Halvorsen and Guevara

Q. Anybody else?

A. No

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 48

Q.      While you were in that room, did they question you about the murder?

A.      No, they didn't question me

Q.      So you just stood in that room

A.      They were showing me the diagram of how they believed the murder happened

Q.      After you left that room, where did you go?

A.      Back to the interrogation room

In his deposition in 2024, Mr. Rodriguez testified (Transcript of Deposition, *Daniel Rodriguez v. Reynaldo Guevara*, et al. Page 156, Line 18 -Page 157, Line 6):

Q:      Okay. And you're – the statements, are you talking about the statements – the handwritten statements of both David Velasquez and Jason Rivera?

A.      Yes

Q.      Okay. And when they brought them back in, what did you do?

A.      He told me to read – they told me to read them. They told me to read them and I did. And they kept on telling: You're not – you're going to go down. Your friends already told on you. You're friends told on you.

And (Transcript of Deposition, *Daniel Rodriguez v. Reynaldo Guevara*, et al. Page 159, Lines 4-12):

Q.      What happened next?

A.       And then they came and took me to a room with a diagram on it.

Q.      Okay. Now, the room with the diagram, can you describe the room?

A.      It was a big conference room with desks, you know, they had desks on the sides, and they had a big whiteboard and they had like a diagram of North Avenue, Keeler drawn.

And (Transcript of Deposition, *Daniel Rodriguez v. Reynaldo Guevara*, et al. Page p. 159, Line 23-Page 160, Line 4):

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 49

Q.   And what happens when they bring you to this room with a whiteboard with a drawing on it of the – of the streets?

A.   They were telling me: This is how the murder happened. This is the way it went down. You went this way. You did this. You did that

And (Transcript of Deposition, *Daniel Rodriguez v. Reynaldo Guevara*, et al. Page 160, Line 12-Page 161, Line 9):

Q:   So what happened next after you told them you would play ball

A.   They brought in a statement and said, This is what we want you to say

Q.   Okay. Now, was the statement typed up or handwritten?

A.   It was typed

Q.   Okay.  And do you remember how many pages it was?

A.   No, I don't

Q.   Was it more than one page?

A.   It was – yes. It was more than one page

Q.   Front and back or just single-sided?

A.   Just single pages.

Q.   Okay. And what did you do with these pages?

A.   I read them. They told me to read it. They said, this is what we want you to say.

Q.   Okay. And how many times did you read it?

A.   Twice

In addition, as mentioned earlier in this report, one scripting technique that police interrogators use is known as "The Error Insertion Trick," in which an interrogator writes out the suspect's confession statement, intentionally inserts minor factual or grammatical errors, and then has the suspect correct and initial these errors.  Daniel Rodriguez's stenographically transcribed statement contains numerous instances of corrections that were initialed by Mr. Rodriguez.  So too do the police-written statements of David Velasquez and Jason Rivera.  In my

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 50

professional opinion, the logical inference from these facts is Detective Guevara, Detective Halvorsen and/or ASA Walsh intentionally scripted these corrected error insertions into Mr. Rodriguez's statement. As mentioned earlier in this report, the purpose of "The Error Insertion Trick" is to create the impression of validating a confession's voluntariness, accuracy and the confessor's guilt by appearing to demonstrate his personal knowledge of the crime facts.[77]

Police interrogation contamination and scripting are not so much a risk factor for eliciting a confession as a process that makes an otherwise false confession statement appear to be true. Police interrogation contamination and scripting make false confessions appear true, and persuasively true, because the innocent suspect's confession is said to contain "details that only the true perpetrator would know" (erroneously since the details were supplied by the police), and it contains characteristics that most people associate with a true confession (*e.g.*, a story line, motive, explanation, emotions and an attribution of voluntariness), even though it is completely false.[78] Police interrogation contamination and scripting therefore increases the risk that once a suspect has falsely complied and/or falsely confessed to a crime he or she did not commit, third parties—such as prosecutors, judges, juries, the media and outside observers—will mistakenly believe that the confession statement is self-corroborating and therefore true and accurate. Detective Guevara's, Detective Halverson's and ASA Walsh's interrogation contamination and scripting according to Daniel's Rodriguez's account in this case – showing Mr. Rodriguez the police-written statements of David Velazques and Jason Rivera; showing Mr. Rodriguez a drawing on the wall of how the murder of Jose Hernandez allegedly happened, including a diagram of where Daniel Rodriguez allegedly drove through and George Laureano allegedly shot Jose Hernandez; (along with ASAWalsh) telling Mr. Rodriguez what to say in the brief, stenographically recorded portion of the interrogation prior to the court reporter's arrival; and numerous instances of the Error Insertion Trick – was extraordinary. According to Mr. Rodriguez's description of the interrogation, Detectives Guevara, Detective Halvorsen and ASA Walsh educated Mr. Rodriguez about their theory about the murder of Jose Hernandez, coercively fed him case facts and theories, coached him, and corrected him in order to generate a completely contaminated and scripted narrative account of Mr. Rodriguez's alleged involvement in the murder of Jose Hernandez that matched their pre-existing theory of the crime. Detective Guevara, Detective Halvorsen, and ASA Walsh's extraordinary interrogation contamination and scripting increased the risk that Mr. Rodriguez's stenographically transcribed confession

---

[77] *See* Richard A. Leo (2008). *Police Interrogation and American Justice* (Harvard University Press). Pp. 175-177. There is evidence that prosecutors, like police, are also trained to use the Error Insertion Trick. See Mark Godsey (2017). BLIND JUSTICE: A FORMER PROSECUTOR EXPOSES THE PSYCHOLOGY AND POLITICS OF WRONGFUL CONVICTION (University of California Press) at P. 144 ("I was also told when I started as a prosecutor not to make the various witness statements *too* in line with one another. If we did, it would give the defense attorney ammunition at trial to claim that we were telling the witnesses what to say. So we would intentionally include in our notes incorrect information supplied by the witnesses on minor points – points that didn't matter to the case – to show that we weren't coaching them.").

[78] Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 51

statement would cause third parties to erroneously believe that it contained indicia of reliability, and thus that it appeared corroborated, and as a result erroneously convict him. As described earlier, confession evidence, even when false, is extremely persuasive to third parties such as juries,[79] especially when it contains crime facts and a plausible confession narrative.

## XIII. Risk Factors for False Statement in the Accounts of David Velasquez's Statement to Police

There is evidence in the record that the statement of David Velasquez was the result of extreme police interrogation coercion. As explained above in reference to Daniel Rodriguez's false confession, Mr. Velasquez's witness statement bears some of the hallmarks of false statements born under duress from police interrogation.

### (1) *Physical Coercion and Abuse*

In my professional opinion, the interrogation described by David Velasquez on May 10, 1991 was extremely physically coercive for multiple reasons. To begin with, Mr. Velazquez has testified at least six times that he was physically and psychologically coerced by Detectives Halvorsen and Guevara, who threatened his life if he refused to sign a false police-written witness statement falsely implicating Daniel Rodriguez and George Laureano in the murder of Jose Hernandez. Mr. Velasquez has also repeatedly testified that he did not in fact witness the murder of Jose Hernandez, and that Jason Rivera was lying when he said that he and Mr. Velasquez did witness the murder. As explained above, physical coercion is well known to lead to false and unreliable statements, admissions, and confessions and is prohibited by federal constitutional law. In fact, all police officers and investigators are trained that the use of physical coercion to elicit information or statements is absolutely impermissible.

According to David Velasquez, during his police interrogation on May 10, 1991, Detective Guevara repeatedly and violently hit Mr. Velasquez in the back of the head while he was handcuffed to the wall, choked him, and pushed him around. Detectives Halvorsen and Guevara also doused Velasquez in water while he was chained to the wall. During these violent physical assaults, Detective Guevara, according to Mr. Velasquez, was angry and berated Mr. Velasquez for not cooperating and confessing. Velasquez was crying and was only 17 at the time.

The physical assaults were violent and terrorized Mr. Velasquez into compliance. There is no dispute in the scientific research community or in the empirical social science research literature that the physical coercion that Mr. Velasquez describes over the course of his hours-long interrogation by Detectives Guevara and Halvorsen has long been regarded as a direct cause of interrogation-induced false statements. The physical coercion and violence that Velasquez

---

[79] See William Douglas Woody and Krista D. Forrest (2020). UNDERSTANDING POLICE INTERROGATION: CONFESSIONS AND CONSEQUENCES (New York University Press).

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 52

describes being repeatedly used on him by Detective Guevara would have significantly increased the risk of eliciting false compliance and a false confession statement from Mr. Velasquez, especially given his youth at the time.

### (2) *Lengthy Interrogation, Exhaustion, Fatigue, and Sleep Deprivation*

As noted above, researchers consider the length of an interrogation to include both the time that a suspect is being questioned and/or accused as well as any breaks between questioning/accusation sessions, because breaks between accusation and questioning add to the stress and fatigue of the interrogation and sometimes are used as an interrogation technique itself. It is the total amount of time in custody during interrogation that matters.

According to Mr. Velasquez, he was picked up by Detective Guevara and taken to the Grand Station parking lot and not told why he was in custody.  Mr. Velazquez has testified that he was put in handcuffs before being asked if he knew anything about a murder that had occurred—to which he responded that he did not.  According to Mr. Velasquez, he was then taken to the Taconazo restaurant and told that a murder occurred there—which he again stated he had no knowledge of. When Mr. Velasquez continued to deny any knowledge of the murder, Detectives Guevara and Halvorsen took him to Latin King territory.  At the time, Mr. Velasquez was a Spanish Cobra, and the Latin Kings were a rival gang—something Detective Guevara would have known.  According to Mr. Velazquez, Detective Guevara then pulled Mr. Velasquez out of the car and told the local gang members that Mr. Velasquez had killed Junito (also a Latin King) and knew who else had done it. Mr. Velasquez testified that he was terrified and thought he would be killed, so he ran back to Detectives Guevara and Halvorsen and said he would do whatever they wanted.

According to Mr. Velazquez, Detectives Guevara and Halvorsen then took him back to Grand and Central and put him in an interrogation room where he was questioned and physically and psychologically coerced for hours into signing a statement.  According to Mr. Velazquez, the process took so long that he had to sleep overnight at the jail.

As discussed above, lengthy custodial detention and accusatory interrogation leads to fatigue and exhaustion, conditions that significantly increase the risk of overbearing a suspect's will and eliciting false and unreliable statements, admissions and/or confession.  Lengthy interrogation/custody is a situational risk factor that can overbear a suspect's will and can cause a suspect to make or agree to a false confession during police interrogation. A day-long interrogation is considered lengthy and creates a risk of exhausting, fatiguing and psychologically weakening, if not impairing, an individual's ability to freely choose to continue participating in the interrogation and increased the likelihood that Mr. Velasquez would falsely comply and go along with a false statement suggested or demanded by police detectives.

### (3) *Threats and Promises*

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 53

As discussed earlier in this report, the use of implicit and/or explicit threats (for example, of physical harm, a higher charge, longer sentence or harsher punishment) in the absence of compliance and confession, as well as implicit and/or explicit promises of leniency, significantly increases the risk of eliciting false and/or unreliable statements, admissions, and/or confessions. Empirical social science research has repeatedly demonstrated that promises of leniency and threats of harm, whether implicit or explicit, are widely associated with police-induced false confession in the modern era and are believed to be among the leading causes of false confessions.

Mr. Velasquez has now testified at least six times, and submitted a signed affidavit, describing the threats Detectives Guevara and Halvorsen made during his interrogation. According to Mr. Velasquez, Detectives Guevara and Halvorsen repeatedly threatened to charge him with murder, and took him to enemy gang territory and told the gang members that Velasquez killed their fellow gang member if he did not agree to falsely implicating Daniel Rodriguez, knowing the danger that would pose to him. Mr. Velasquez has also testified that he was aware of the reputation Detective Guevara had at the time for pinning murders on people, so he believed Detective Guevara's threats of framed him were credible. All of these factors added additional pressure to the teenage Mr. Velasquez to sign a false statement.

(4) *Psychological Coercion*

As discussed earlier, it is well-established that psychologically coercive interrogation techniques increase the risk of eliciting false and/or involuntary incriminating statements, admissions and/or confessions. In my professional opinion, the lengthy interrogation described by David Velasquez on May 10, 1991 was extremely psychologically coercive for multiple reasons.

First, according to Mr. Velazquez, Detectives Guevara and Halvorsen issued explicit and implicit threats of harm to Mr. Velasquez, who has repeatedly testified that he was terrified and in a hyper-emotional state in which he feared for his life and he feared for his freedom. According to Mr. Velazque, Detective Guevara repeatedly struck him, choked him, pushed him around, and poured water over him. In addition, the detectives showed Velasquez autopsy photographs of the victim. No one offered Mr. Velazquez to even speak to his mother at any point. According to Mr. Velazquez, the coercion escalated to where he felt he had no alternative for getting out of police custody but to go along with the police statement. The psychologically coercive and abusive interrogation pressures that Mr. Velasquez describes being subjected to from Detectives Guevara and Halvorsen during his time in custody on May 10, 1991 increased his risk of falsely and involuntarily complying with their demands and falsely issuing a statement inculpating Daniel Rodriguez and George Laureano. The impact of the interrogation pressure, environment and tactics of Detectives Guevara and Halvorsen on Mr. Velazquez was demonstrated immediately after he left the police station and went to tell Daniel Rodriguez, and then George Laureano, that he had been forced to sign a false statement against them.

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 54

Immediately after leaving the police station, Velasquez recanted, and he has maintained that recantation and consistently told what police did to him for the last 34 years.

### (5) *Personality Traits as a Risk Factor*

In addition to the situational risk factors described in Mr. Velasquez's account, Mr. Velasquez, who was 17 years old at the time of his interrogation on May 10, 1991, was at a heightened risk of making and/or agreeing to a false and/or unreliable statement because of his personality traits and characteristics (*i.e.*, personal risk factors), specifically his relative youth. As noted above, youth is a risk factor for false confessions and/or statements because of the psychological immaturity and impulsivity that is associated with the development of the adolescent brain and its effect on juveniles' judgement and decision-making. Juveniles may be more vulnerable to interrogators because of their inability to understand the nature or gravity of their situation, their inability to foresee the consequences of their actions, their inability to cope with stressful situations and/or their eagerness to please others, especially authority figures. Juveniles may also be more easily intimidated than adults and may lack the maturity, knowledge, or sense of authority needed to resist simple police pressures and manipulations. Mr. Velazquez's youth put him at a greater risk of making or agreeing to interrogation-induced false statements, admissions and/or confessions. In addition, David Velasquez had only completed 8th grade by May 10, 1991, and he has testified that he could not read or write at the time. The signed statement, which he has repeatedly testified is false, had to be read to him in its entirety; Mr. Velazquez has also testified that Detective Guevara inserted all the information into this statement. As a juvenile who had only completed middle school education, Velasquez would have had an increased sensitivity to the role of authority figures and likely been more likely to be suggestible and compliant and thus more likely to yield the pressure of interrogators and make and/or agree to a false and/or misleading statement, admission and/or confession.[80]

### (6) *Evidence Ploys*

A false evidence ploy was also used against Mr. Velazquez in order to get him to go along with Detectives Guevara and Halvorsen's version of events. Velazquez has repeatedly testified that he was told by Detectives that Jason Rivera had said that he and Mr. Velazquez witnessed the shooting of Jose Hernandez, which was false, and, as just described, they threatened him if he did not go along with that story. The false evidence ploy used in Mr. Velazquez increased the risk that he would make or agree to false statements and falsely implicate others in response to police interrogation demands and pressures.

### XIV. Potential Risk Factors for False Statement in the Account of Jason Rivera's Interrogation-Induced Statement to Police

---

[80]  Gisli Gudjonsson (2018), THE PSYCHOLOGY OF FALSE CONFESSIONS: FORTY YEARS OF SCIENCE AND PRACTICE (Hoboken, NJ: John Wiley & Sons).

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 55


The record as it pertains to police coercion against Jason Rivera is slightly more difficult to ascertain than it is for Daniel Rodriguez and David Velasquez. There is evidence in the materials I reviewed that the statement of Jason Rivera was potentially the result of police coercion. However, given Mr. Rivera's inconsistent statements over the years, I lack the requisite information to come to any specific conclusion about Mr. Rivera's statement implicating Daniel Rodriguez. Without making any credibility determinations, the materials I have reviewed show that Mr. Rivera is uncertain, at best, about implicating Daniel Rodriguez in the shooting death of Jose Hernandez. Nonetheless, there are several aspects relevant to Mr. Rivera worth pointing out.

The materials I have reviewed indicate that risk factors may have been present when Mr. Rivera gave his statement implicating Daniel Rodriguez. To begin with, on April 15, 1992, Rivera told Attorney Brean (and JoAnne Garcia) that he never told Detectives Halvorsen and Guevara that he witnessed the Hernandez murder and told Ms. Brean that he was incarcerated that the time of the Hernandez murder (March 17, 1991). Whether Mr. Rivera was incarcerated or not, there is evidence indicating that he told police this. The materials I have reviewed also establish that Mr. Rivera was involved, in some capacity, in crimes associated with a double homicide that occurred on February 4, 1991, just prior to the murder of Jose Hernandez Whether the detectives used this as leverage to extract a statement from Mr. Rivera is unclear, but promises of leniency in a pending case would have created a very strong incentive for Mr. Rivera to adopt and parrot back the police version of events in the Jose Hernandez. murder. Additionally, David Velasquez has testified that Mr. Rivera's mother, Alicia Rivera, had a romantic relationship with Detective Guevara and that he had witnessed them together on several occasions at the Rivera home. If true, this relationship may have further created a basis for Mr. Rivera to adopt the police version of events in the Jose Hernandez murder. Further, Mr. Velasquez has given sworn testimony that Mr. Rivera and his mother pressured him to lie about witnessing the Jose Hernandez murder. Again, if true, this could have contributed to Mr. Rivera adopting the police version of events in the Jose Hernandez murder.

In addition, while Mr. Rivera has given contradictory testimony related to the Jose Hernandez murder, during his most recent testimony (his on January 22, 2025 in this case), Mr. Rivera claimed to have little or no memory of all the events involving the Jose Hernandez murder and police investigation of the crime. Specifically, during his January 22, 2025 deposition in this case, Mr. Rivera testified that he had no memory whatsoever of witnessing the 1991 murder of Jose Hernandez or of the police investigation of that murder. For example, he has testified that (Deposition Transcript of Jason Rivera, January 22, 2025, Page 31 Lines 11-20):

> Q. So you have no memory whatsoever of ever being involved in a 1991 murder investigation where the victim was named Jose Hernandez, Jr.?
>
> A. No.

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 56

> Q.     And you have no memory whatsoever of ever witnessing the crime in which Jose Hernandez, Jr. was shot and killed, correct?
>
> A.     No.

And (Deposition Transcript of Jason Rivera, January 22, 2025, Page 18, Lines 14-17):

> Q.     As you sit here today, sir, can you tell us anything about the Jose Hernandez shooting in March of 1991?
>
> A.     No.

Mr. Rivera had no recollection of ever seeing anyone shot in his entire life (Deposition Transcript of Jason Rivera, January 22, 2025, Page 36 Lines 8-17), testifying that:

> Q.     Do you have a recollection of ever witnessing anyone being shot at all?
>
> A.     No.
>
> Q.     No. Is it your testimony you don't have any recollection of --
>
> A.     No.
>
> Q.     -- ever seeing anyone be shot in your whole life?
>
> A.     No. No, sir

Mr. Rivera also testified that he did not recall ever being at the restaurant where Detectives Guevara and Halvorsen alleged he saw the Jose Hernandez Jr. shooting from, (Deposition Transcript of Jason Rivera, January 22, 2025, Page 47 Lines 14-19), testifying that:

> Q.     Are you familiar with the Taconazo restaurant, sir?
>
> A.     No.
>
> Q.     Do you know if you've ever been there in your life?
>
> A.     No.

In addition, Mr. Rivera testified at his deposition that he could not remember whether or not he was coerced by Detectives Guevara and Halvorsen to implicate Daniel Rodriguez (Deposition Transcript of Jason Rivera, Page 9 Line 16-Page 10 Line 23):

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 57

Q. Sir, isn't it true that Detective Guevara and Halvorsen physically and mentally abused you so that you would implicate Daniel Rodriguez and George Laureano in the March 1991 shooting death of Jose Hernandez, Jr.?

A. No. I don't remember that.

Q. You don't remember that?· Okay.· Isn't it true that Defendant Guevara and Halvorsen forced you to testify against Daniel Rodriguez during his criminal prosecution for the March 1991 shooting death of Jose Hernandez, Jr.?

A. No. I don't remember that.

Q. Sir, your testimony is you don't remember that. Does that mean that it could have happened and you're just not sure? Or what does your testimony specifically mean?

A. I just don't remember.

Q. Okay. You can't recall whether or not they physically and mentally abused you?

A. Just don't remember

And (Deposition Transcript of Jason Rivera, January 22, 2025 (Page 99, Line 1-7):

Q. You eventually did sign a handwritten statement implicating Daniel Rodriguez and George Laureano in the Hernandez murder because you felt like you had no other choice, correct?

A. Don't remember.

Jason Rivera also testified that he could not specifically recall if he told the truth at Daniel Rodriguez's criminal trial when he testified against him (Deposition Transcript of Jason Rivera, Page 37, Lines 14-16), stating:

Q. You can't tell me whether or not you testified truthfully during Daniel Rodriguez's criminal trial?

A. No.

And (Transcript, Page 12, Lines 2-6):

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 58

> Q.  Sir, you repeatedly lied on the stand during the criminal trial when you were testifying against Daniel Rodriguez about what you supposedly saw on March 17, 1991. Isn't that correct?
>
> A.  I don't remember.

### XV. Violation of National Police Interrogation Training Standards, Protocols and Commonly Accepted Best Practices in 1990

In Daniel Rodriguez's account of his approximately 5 and ½ hours of interrogation on May 11, 1991, Detectives Guevara and Halvorsen *repeatedly* violated numerous national police interrogation standards, protocols and commonly accepted practices in general as they existed in 1990.

First, American police investigators are universally trained to absolutely avoid the use of physical force and coercion in the interrogation room, which is unlawful, unconstitutional and correctly believed by law enforcement to lead to both involuntary and false confessions. As discussed above, Daniel Rodriguez describes the use of extreme physical violence and coercion by Detective Halvorsen -- being repeatedly punched, hit and beat by Detective Halverson – over the course of multiple interrogation sessions on May 11, 1991. Physically coercive interrogation has not only been a violation of universal American police interrogation standards since 1936, but is also illegal as all police detectives knew in 1991 and know today. As the 1986 Reid interrogation manual (which was the current edition of the leading American police interrogation training manual in 1991) instructs:

> "The clearest example of an interrogation practice that will void a confession is the infliction of physical force or pain upon the person under interrogation, because it is an uncontestable fact that harm of this nature may produce a confession of guilt from an innocent person…A threat of physical harm may have a similar effect – the extraction of confessions from innocent persons. Similarly, an interrogator's promise to a suspect that if he confesses he will go free or receive only a lenient penalty will nullify the confession because such a promise may induce an innocent person to confess."[81]

Second, American police investigators are trained generally to avoid threats of harm (whether explicit or implicit) and promises of leniency (whether explicit or implicit) to elicit statements, admissions and/or confessions because threats and promises are understood by law enforcement to be psychologically coercive and thus to lead to involuntary and/or false confessions. As the 1986 Inbau and Reid police interrogation training manual taught police interrogators with respect to threats and promises:

---

[81]  *Id*. at 214.

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 59

"Under no circumstances should the interrogator point out any of the possible consequences of a confession, nor should he hold out any inducement whatsoever."[82]

The 1986 Reid interrogation manual instructs:

"A threat of physical harm may have a similar effect [as the infliction of physical force or pain on the person under interrogation] – the extraction of confessions from innocent persons. Similarly, an interrogator's promise to a suspect that if he confesses he will go free or receive only a lenient penalty will nullify the confession because such a promise may induce an innocent person to confess."[83]

As discussed above, Daniel Rodriguez describes repeated explicit threats of harm (as well as the implicit threats of continued interrogation) by Detectives Guevara and Halvorsen during his lengthy custodial interrogation on May 11, 1991 in the absence of compliance and confession. Mr. Rodriguez also describes promises of leniency in exchange for compliance and confession. The numerous threats and promises describes occurring during his lengthy interrogation on May 11, 1991 were unlawful and violated universal American police interrogation standards as they existed in 1991.

Third, Detectives Guevara and Halvorsen violated commonly accepted standards with respect to the length of Daniel Rodriguez's police detention and interrogation on May 11, 1991. As discussed earlier, the 1986 Reid and Associates police interrogation training manual specifically recommends that police interrogate suspects for no longer than four (4) hours absent "exceptional situations" and that "most cases require considerably fewer than four hours."[84] In addition, the 1986 Reid interrogation training manual characterized "unduly prolonged, continuous interrogation, especially by two or more interrogators working in relays"[85] for "an unreasonable period of time"[86] as "indirect physical harm"[87] and advised against this practice because it may it may "produce a confession of guilt from an innocent person"[88]:

---

[82]   Fred Inbau, John Reid, and Joseph Buckley (1986). CRIMINAL INTERROGATION AND CONFESSONS, 3rd Ed. (Baltimore: Williams & Wilkins) at 198.

[83]   *Id*. at 214.

[84]   *Id*. at 310.

[85]   *Id*. at 214.

[86]   *Id*.

[87]   *Id*.

[88]   *Id*.

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 60

> "This [an interrogation practice that will void a confession] is also true as regards indirect physical harm; for instance, an unduly prolonged, continuous interrogation, especially by two or more interrogators working in relays, or the deprivation of food, water, or access to the toilet facilities for an unreasonable period of time."[89]

The approximately 5 and ½ hour interrogation that Detectives Guevara and Halvorsen subjected Mr. Rodriguez to on May 11, 1991 also, according to Mr. Rodriguez, violated American police interrogation standards and commonly accepted best practices as they existed in 1991.

Fourth, and related, as the prior excerpt from the 1986 Reid interrogation manual instructs, American police are trained never to deprive a suspect of essential necessities such as sleep or rest, food, drink, or access to the restroom during interrogation because that is also unconstitutional and is recognized by law enforcement to lead to coerced, involuntary and/or false confessions. As discussed earlier in this report, Mr. Rodriguez describes not being allowed access to a bathroom or provided any food or water – as well as being sleep deprived and tired -- during his 5 and ½ hour interrogation on May 11, 1991. What Mr. Rodriguez describes violated American police interrogation standards and commonly accepted practices as they existed in 1991.

Fifth, as described above, American police interrogators are trained to avoid contaminating a suspect by leaking or disclosing non-public case facts to him or her but, instead, to hold back unique case information and let the suspect volunteer case details in order to demonstrate inside knowledge of the crime details to corroborate the accuracy of any incriminating statements. Yet, according to Daniel Rodriguez, Detective Guevara, Detective Halvorsen and ASA Walsh educated Mr. Rodriguez about the other murders (according to Mr. Rodriguez, he did not even know about them at the beginning of his lengthy custodial interrogation) they repeatedly fed crime facts and details to Mr. Rodriguez and corrected his erroneous guesses, thus contaminating his knowledge of the crime). According to Mr. Rodriguez, Detective Guevara also showed Mr. Rodriguez numerous crime scene photographs, told him what to confess to, corrected his erroneous guesses, and guided his confession narrative. Detective Guevara, Detective Halvorsen and ASA Walsh contaminated and scripted Mr. Rodriguez's confession, fabricating it out of whole cloth according to Mr. Rodriguez account. Detective Guevara's contamination and scripting of Daniel Rodriguez's confession statement violated American police interrogation standards and commonly accepted practices as they existed in 1990.

Sixth, as discussed above, Daniel Rodriguez has testified on multiple occasions that he was never provided *Miranda* rights prior to the taped recap with ASA Walsh, approximately 5 and ½ hours after his custodial interrogation on May 11, 1991 had begun. All police officers and

---

[89] *Id.*

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 61

detectives have been trained since 1966 to provide *Miranda* warnings, and elicit a voluntary, knowing and intelligent *Miranda* waiver, prior to commencing any and every custodial interrogation.  This was as true in 1991 as it is today.  Yet, in Mr. Rodriguez's description of what occurred during the 5 and ½ hours of off-tape interrogation on May 11, 1991, Detectives Guevara and Halvorsen completely disregarded the law and their training. The standard police practice, in 1991 and now, is to have the suspect sign a written *Miranda* form documenting that the *Miranda* warnings were given and waived prior to the interrogation, yet I did not see any evidence of such documentation in the materials I reviewed.  Detective Guevara's and Detective Halvorsen's failure to provide *Miranda* warnings, and elicit a *Miranda* waiver, was a fundamental violation of commonly accepted standard police interrogation practices as they existed in 1991.

Seventh, and finally, the Reid and Associates training manuals and programs have always – from the first edition of their manual in 1942 to the current edition in 2013 -- repeatedly implored police investigators *not* to use any interrogation technique that is "apt to make an innocent person confess."[90]  Yet, according to Daniel Rodriguez's description of what occurred during his interrogation on May 11, 1991, Detectives Guevara and Halvorsen used several techniques that the Reid Manual specifically teaches investigators to avoid because, as the authors repeatedly state, they are apt to cause a false confession: (1) physical coercion and abuse; (2) threats of harm; (3) promises of leniency; and (4) deprivation of food, water and access to a bathroom.  Because the use of these interrogation techniques are well-known in policing to be apt to cause an innocent suspect to confess, as the Reid manual of interrogation has always maintained, Detectives Guevara and Halvorsen violated national training standard and commonly accepted practices as they existed in 1991 during Daniel Rodriguez's interrogation on May 11, 1991.

In short, according to Daniel Rodriguez's account of his interrogation on May 11, 1991, Detectives Guevara and Halvorsen coercively interrogated him, coercively contaminated and scripted his resulting confession statement, and repeatedly violated numerous national police interrogation standards, protocols and commonly accepted best practices as they existed in 1991. In my professional opinion, on Mr. Rodriguez's account, these violations individually and cumulatively would have contributed to Mr. Rodriguez's perception that his situation was hopeless and his perception that he had no other choice but to agree to Detectives Guevara's and Halvorsen's demand that he provide a confession statement in order to put an end to the extremely physically and psychologically coercive interrogation he describes.

> **XVI.  The Chicago Police Department's Widespread and Systemic Pattern and Practice of Physically and Psychologically Coercive Interrogations (Especially of African-American and Latino Men) from 1972 to at Least 2000; and The City of Chicago's Continuing Notice of Systemic Physical Coercion and Abuse to Extract**

---

[90]  *See* Fred Inbau, John Reid, and Joseph Buckley (1986).  CRIMINAL INTERROGATION AND CONFESSIONS, 3rd Edition at xiv (Williams & Wilkins).

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 62


**And Fabricate Confessions to High-Ranking Officials in the City of Chicago, High--Ranking Officials in the Chicago Police Department, and Police Command Personnel**

**(A) Introduction**

Starting in 1972 and continuing up to at least 2000, the City of Chicago's Police Department had a systemic practice of subjecting suspects (primarily African-American and Latino men) to physically abusive and coercive interrogations with the result of coercing and/or fabricating confession statements without regard to the interrogated suspects' actual guilt or innocence. Moreover, at least as early as February of 1982 and continuing through the 1990s, high ranking officials in the City of Chicago and the Chicago Police Department and numerous police command personnel, received continuing notice of this systemic practice of torture, physical abuse and coercion of (primarily Black and Latino) suspects resulting in coerced and fabricated confessions, including from the repeated documented allegations that accumulated against supervisors and detectives, first at Area 2 detective Division, and later at Areas 3, 4 and 5; from the testimony of numerous criminal defendants at motion to suppress hearings and trials; from in-court admissions of city lawyers; from the findings in numerous Office of Professional Standards reports; from federal and state court decisions; from media articles, reports and editorials; from innocence pardons by the Governor of Illinois; from numerous civil lawsuits alleging physical abuse and coercion to extract and fabricate confessions; from the findings of the United Nation's Committee against Torture and from Amnesty International; and from the admissions of City officials.

In this section, I will review the evidence establishing the basis for these opinions, as well as briefly summarize many of the cases that illustrate the substantial empirical basis for these opinions. Exhibit C summarizing some of the documents supporting these opinions is attached to my report.

**(B) Systemic and Widespread Torture, Physical Abuse and Coercive Interrogation At Area 2 Under Jon Burge, and Continuing Notice to High-Ranking Officials in the City of Chicago, High-Ranking Officials in the Chicago Police Department, and Police Command Personnel**

It has been well documented that Jon Burge and those under his command, first at Area 2 and later at Area 3, collectively tortured at least one-hundred and twenty-five (125) suspects from 1972 to 1991. (*See* Torture Victims Chart PTP-NOTICE-000842). On May 6, 2015, the Chicago City Council passed the landmark Reparations for Burge Torture Victims Ordinance and accompanying resolution that included the creation of a Reparations fund of $5.5 million for approximately 60 living victims of police torture by Burge or those under his command, waived tuition at City Colleges, established a mandatory Public Schools curriculum to educate students about police torture under Burge, and provided for the creation of a public memorial. (PTP-NOTICE-001153-1157). On May 6, 2015, Mayor Rahm Emanuel apologized to the victims of Chicago police torture at the Chicago City Council meeting, stating:

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 63

> This is another step but an essential step in righting a wrong, removing a stain on the reputation of this great city. Chicago finally will confront its past and come to terms with it and recognize when something wrong was done and be able to be strong enough to say something was wrong. I want to thank you for your persistence. I want to thank you for never giving in and never giving up and allowing the city to join you on that journey to come face-to-face with the past and be honest enough and strong enough to say when we are wrong and try to make right what we've done wrong. This stain cannot be removed from the history of our city. But it can be used as a lesson of what not to do and the responsibility that all of us have.[91]

On February 9, 1982 CPD officers Fahey and O'Brien were murdered. Jon Burge, who was then a Lieutenant at Area 2, led the investigation of the murders of Fahey and O'Brien and the notorious manhunt looking for the perpetrators. In February of 1982, Area 2 consisted of a two-story building with a basement at 91st Street and Cottage Grove Avenue in Chicago, Illinois. *See People v. Jackie Wilson* (Circuit Court of Cook County, June 20, 2018) (PTP-NOTICE-000709-827).

Doris Byrd retired as a Sergeant in the CPD in 2004. Byrd was hired at the CPD in 1977 and was later assigned to be a detective in the Area 2 Violent Crimes Unit. According to Byrd, there were a group of detectives named the "A Team" at Area 2. This group consisted of detectives who handled mostly homicides and high publicity cases. Sammy Lacey, a former Sergeant in the CPD, testified that the "A-Team" was a euphemism for Burge's "Ass-kicking" team. According to Byrd, there was visible "camaraderie" between Lt. Burge and the "A Team", as they often socialized with each other outside of the station as well. Lacey testified that the "A-Team" had a high proportion of cases cleared through confessions, that the "A-Team" had access to torture devices at Area 2, that the building was heated through radiators which "were very hot" to the touch and Area 2 had typewriters on the second floor with plastic vinyl covering. Byrd testified that not only did Burge and his "A-Team" have access to such devices, but she actually heard people being tortured at Area 2 while she was there. For instance, Byrd heard screaming and other unusual noises coming out of the interview rooms when the midnight shift was interrogating suspects. Some of these individuals confided in Byrd that they were tortured by the "A-Team." Byrd also learned that some of these suspects were tortured with devices such as telephone books, bags, and electroshock. Detective Byrd later learned from fellow detectives and suspects that the "black box…was running rampantly through the unit up there." According to Byrd, it was an open secret that this type of torture existed at Area 2 under the supervision of Jon Burge. Three additional African American Area 2 detectives confirmed that Burge had an electric shock device at Area 2 that he used on African American suspects in the 1970s and 1980s. In the 1970's, Bill Parker saw it in use and Melvin Duncan saw it on a table, while Walter

---

[91] Fran Spielman, City Council approves $5.5 million in reparations for Burge torture victims, CHI. SUN-TIMES (May 6, 2015); Hal Dardick & John Byrne, Mayor: Approval of Burge victims fund a step toward 'removing a stain', CHI. TRIB. (May 6, 2015).

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 64

Young saw it in the early 1980s. *See People v. Jackie Wilson* (Circuit Court of Cook County, June 20, 2018).

On February 14, 1982, Burge and detectives working under his command arrested Andrew and Jackie Wilson for the murders and tortured confessions from them. On February 17, 1982, Dr. John Raba, medical director of Cermak Hospital, made an official complaint by letter to CPD Superintendent Richard Brzeczek demanding an investigation of allegations that Andrew Wilson had been tortured and abused at Area 2. The letter described numerous injuries that Dr. Raba observed on Andrew Wilson and Wilson's allegations that he had been electric shocked. PTP-GENERAL-000001-000065. On February 25, 1982, Police Superintendent Richard Brzeczek sent a later to Cook County State's Attorney (and eventually mayor) Richard Daley, informing him of Dr. John Raba's reported abuse of Andrew Wilson by Chicago police during interrogation. Daley took no action in response to the letter. (*See* PTP-NOTICE-001464-1465).

During his tenure as Cook County State's Attorney, more than 50 additional cases of torture and abuse by Lt. Jon Burge and his fellow detectives came out of Area 2. (*See* Torture PTP-NOTICE-000842). Twenty years later (2002), Mr. Brzeczek would tell a Chicago Tribune reporter that, "There is no doubt in my mind that Burge and his detectives tortured some suspects. The whole situation at Area 2 [was] a disgrace and embarrassment." (Steve Mills, Chicago Tribune, April 29, 2002).

In 1982, attorney Ronald Samuels, who was President of the Cook County Bar Association, contacted the Chicago Police Department's Office of Professional Standards (the city of Chicago governmental entity tasked with oversight of the Chicago Police Department) because of the number of complaints that had been made against Chicago police officers for misconduct in their hunt for the people who killed to police officers. OPS staff informed Mr. Samuels that they had lost 120 complaints that had been made. *People v. Jackie Wilson* (Circuit Court of Cook County, June 20, 2018). As former police chief Richard Rosenthal has opined, the loss of this many police reports had to have been a deliberate act. (*See* PTP-NOTICE-003193-003223)

In January 1983, Leroy Martin Sr. was appointed Commander of Area 2 and as such was Jon Burge's direct supervisor.

In 1984, David Fogel, who at that time was the Chief Administrator of OPS, sent a report to Superintendent Fred Rice listing reports of Chicago Police Department officers who had used electrical shocking devices on prisoners over the previous 12 months. PTP-GENERAL-000001-000006; PTP-NOTICE-002277-002284)

In 1986 Andrew Wilson filed a civil case alleging torture by Burge and other Area 2 detectives.

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 65

In 1986, the CPD promoted Jon Burge to Commander, transferred him to the Bomb and Arson Unit, and replaced him at Area 2 with Lt. Phil Cline. Cline, while Lieutenant at Area 2, did no investigation nor made any inquiry concerning alleged torture at Area 2 under his predecessors.

In 1987, The Illinois appellate court reversed Andrew Wilson's criminal conviction for failure to suppress his confession due to physical abuse. The Illinois Supreme Court upheld the appellate court's reversal of Andrew Wilson's criminal conviction.

In 1989, an anonymous police source sent letters to Andrew Wilson's lawyers stating that Burge was the torture ringleader, identified his "asskickers," which included Sergeant John Byrne and Detective Peter Dignan., and stated that Melvin Jones was tortured by Area 2 police officers. In August of 1989 a federal jury in the Andrew Wilson civil case found that the CPD had a policy and practice of "allowing police officers to torture persons suspected of killing or wounding officers." (*See* PTP-NOTICE-002208-2215, 001533)

On January 25, 1990 John Conroy published an article entitled, "the House of Screams" in the Chicago Reader detailing the torture of Jon Burge and others at the area 2 police station and the case of Andrew Wilson in particular.

In February of 1990, Amnesty International sent a report to Ira Raphaelson, the Acting United States Attorney for the northern District of Illinois, detailing the allegations of torture of suspects in Area 2 that it had received, focusing on Andrew Wilson's case and noting that numerous individuals alleging they had been tortured and coerced during Area 2 interrogations had to that date filed complaints with OPS. (*See* PTP-NOTICE-001522-1532)

In 1990 and 1991, the CPD's Office of Professional Standards (OPS), in its "Goldston Report," found that abuse occurred at Area 2 Police Headquarters, and that the abuse was "systematic." The Goldston Report further found:

> As to the matter of alleged physical abuse, the preponderance of the evidence is that abuse did occur and that it was systematic. The time span involved covers more than ten years. The type of abuse described was not limited to the usual beating, but went into such esoteric areas as psychological techniques and planned torture. The evidence presented by some individuals convinced juries and appellate courts that personnel assigned to Area 2 engaged in methodical abuse.

> The number of incidents in which an Area 2 command member is identified as an accused can lead to only one conclusion. Particular command members were aware of the systematic abuse and perpetuated it either by actively participating in the same or failing to take any action to bring it to an end. This conclusion is also supported by the number of incidents in which Area 2 offices are named as the location of the abuse (OPS Special Project Conclusion Reports and Findings, November 2, 1990 (Goldston Report)).

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 66

The Goldston Report was approved by OPS Director Gayle Shines and forwarded to LeRoy Martin Sr. who had been named police Superintendent in 1987. When the Goldston Report became public in 1992 pursuant to court order, Martin attempted to publicly discredit its findings as did Mayor Richard M. Daley who stated publicly that it "was just rumors."

On January 22, 1992, the City of Chicago and Police Superintendent Martin in their arguments before the Chicago Police Board made the following admissions concerning the evidentiary relevance between Burge and other Area 2 detectives' pattern and practice in torturing Anthony Holmes, Melvin Jones, George Powell, Lawrence Poree, Leroy Orange, Shadeed Mu'min and Donald White, and the torture of Andrew Wilson:

> There is no question that the similarities between [Andrew] Wilson's testimony and the similar victims' testimony is more than sufficient to meet the [Federal Rules of Evidence] 404 b standard. Burge was the main perpetrator of the torture in almost all of the cases, and, when he was not the principal, he was still involved. In the case of all but one of the victims, the victim was picked up and taken to Area 2 where he was then interrogated regarding his knowledge or involvement in a serious offense. Although Donald White was taken instead to Area 1, he was taken there and interrogated by Area 2 detectives. All of the victims were black and generally had significant criminal histories.

> Also similar was the way in which several victims were threatened with consequences if they refused to make a statement. After an initial refusal, the punishment would begin and then would become stronger and more painful as the refusals to speak persisted. The most striking similarities, however, are found in the methods of torture used on the suspects. Wilson was electroshocked by Yucaitis using the black box and by Burge who used the black box and a curling-iron looking device, was "bagged" and beaten, and was threatened with a gun placed in his mouth. Jones, Holmes, Poree, Powell and Orange were similarly electroshocked by Burge. Holmes, Powell, White and Mumin were all "bagged" and beaten to the point where they lost or almost lost consciousness. Burge pointed a cocked gun at Jones's head, hit Poree in the head with a pistol, and placed a revolver containing one bullet at Mumin's head and snapped it three times slowly. White had a gun placed in his mouth. Additionally, each of the victims was slapped around and punched.

> Burge's statements to the victims were also very similar. Burge told both Jones and Mumin that nobody would ever believe their word against his. As he did in relation to Wilson, he referred to the absence of marks on Mumin's body. He said "fun time" as he approached Wilson and Poree with the black box, and laughed when he bagged Mumin. He told Wilson he would "fry his black ass" and Jones he would "blow his black head off."

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 67

> As the case law cited above aptly demonstrates, these actions or the condoning of these actions are overwhelming in their similarity. Indeed, as the testimony of similar victims shows, respondents [Burge, Yucaitis and O'Hara] counted on the fact that their testimony would be believed over that of a convict when they persisted in their pattern of torture.

(PTP-NOTICE-001466-1497)

In February of 1993 the Chicago Police Board fired Burge for torturing Andrew Wilson and this decision was affirmed on appeal. (PTP-NOTICE-001534-1622). In June of 1993, the Seventh Circuit Court of Appeals in the Wilson civil case found that "A rational jury could have inferred from the frequency of the abuse, the number of officers involved in the torture of Wilson, and the number of complaints from the black community, that Brzeczek knew that officers in Area 2 were prone to beat up suspected cop killers."

In 1993 and 1994, the CPD's Office of Professional Standards reinvestigated approximately ten cases of alleged torture by electric shock, baggings, beatings, mock executions, and other gun play that occurred at Area 2 from 1982 to 1984 that were previously found to be "not sustained" and recommended sustained findings in six cases against Area 2 detectives who worked were close Burge associates and members of the Asskickers: Lee Holmes (September 1982); Gregory Banks (October 1983); Darrell Cannon (November 1983); Thomas Craft (January 1984); Phillip Adkins (June 1984); Stanley Howard (November 1984). *See People v. Jackie Wilson* (Circuit Court of Cook County, June 20, 2018).

OPS Director Gayle Shines did not act on these sustained findings for five years, from 1993 to 1998, and kept the files in her office. After she was replaced in 1998, CPD Superintendent Terry Hillard, through his administrative assistant, Thomas Needham, summarily reversed these sustained findings.

On May 15, 1995 in *Andrew Wilson v. City of Chicago*, 86-C-2360 the City of Chicago admitted in official judicial pleadings that Melvin Jones had been electrically shocked by Jon Burge on his genitals and thigh with a device in a wooden box and threatened with a gun, while he was handcuffed to a ring in the wall in an Area 2 interview room in an attempt to coerce a confession from him.

In *U.S. ex. rel. Maxwell v. Gilmore*, 37 F.Supp.2d 1078, 1094 (N.D. Ill. 1999), Judge Milton Shadur found "It is now common knowledge that in the early to mid-1980s Chicago Police Commander Jon Burge and many officers working under him regularly engaged in the physical abuse and torture of prisoners to extract confessions. Both internal police accounts and numerous lawsuits and appeals brought by suspects alleging such abuse substantiate that those beatings and other means of torture occurred as an established practice, not just on an isolated basis."

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 68

From 2002 to 2006, retired justice Edward Egan served as a Cook County Special Prosecutor to investigate allegations of police torture to get confessions and found that Lt. Burge and the detectives under his command had likely committed torture.

On January 10, 2003, Illinois Governor George Ryan pardoned Aaron Patterson, Madison Hobley, Leroy Orange and Stanley Howard based on actual innocence, finding that they had all been physical coerced and tortured by Jon Burge and his colleagues into giving false and fabricated confessions. Governor Ryan stated:

> The category of horrors was hard to believe. If I hadn't reviewed the cases myself, I wouldn't believe it. We have evidence from four men, who did not know each other, all getting beaten and tortured and convicted on the basis of the confessions they allegedly provided. They are perfect examples of what is so terribly broken about our system.

(*See* PTP-NOTICE-002473-2489)

In her concurring opinion in *Hinton v. Uchtman*, 395 F.3d 810, 822-23 (7th Cir. 2005), Seventh Circuit Court of Appeals Judge Diane Wood found:

> [T]he claim Hinton has made regarding his confession illustrates dramatically the high price our system of criminal justice pays when police abuse runs rampant: a cloud hangs over everything that the bad actors touched . . . [A] mountain of evidence indicates that torture was an ordinary occurrence at the Area 2 station of the Chicago Police Department during the exact time period pertinent to Hinton's case. Eventually, as this sorry tale came to light, the Office of Professional Standards Investigation of the Police Department looked into the allegations, and it issued a report that concluded that police torture under the command of Lt. Jon Burge — the officer in charge of Hinton's case — had been a regular part of the system for more than ten years. And, in language reminiscent of the news reports of 2004 concerning the notorious Abu Ghraib facility in Iraq, the report said that "[t]he type of abuse described was not limited to the usual beating, but went into such esoteric areas as psychological techniques and planned torture." The report detailed specific cases, such as the case of Andrew Wilson, who was taken to Area 2 on February 14, 1982. There a group led by Burge beat Wilson, stuffed a bag over his head, handcuffed him to a radiator, and repeatedly administered electric shocks to his ears, nose, and genitals. See People v. Wilson, 506 N.E.2d 571 (Ill. 1987). Burge eventually lost his job with the police, though not until 1992. See In the Matter of the Charges Filed Against Jon Burge, No. 91-1856 (Chicago Police Board, February 11, 1993). To this day, Burge has not been prosecuted for any of these actions, though it appears that he at least thinks that he may still be at some risk of prosecution. See, for example, "Cop brutality probe must be thorough, fair," Chi. Sun-Times, May 16, 2002 (editorial); Hal Dardick, "Burge repeatedly takes 5th; Former police commander stays mum on torture questions," Chi. Tribune, Sept. 2, 2004 (noting allegations that Burge or people reporting to him had tortured 108 Black and Latino suspects between August 1972

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 69

and September 1991). . . .Behavior like that attributed to Burge imposes a huge cost on society: it creates distrust of the police generally, despite the fact that most police officers would abhor such tactics, and it creates a cloud over even the valid convictions in which the problem officer played a role. Indeed, the alleged conduct is so extreme that, if proven, it would fall within the prohibitions established by the United Nations Convention Against Torture ("CAT"), which defines torture as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession . . .," thereby violating the fundamental human rights principles that the United States is committed to uphold.

In 2006, Chief Cook County Criminal Court Judge Paul Biebel stated that: "Over the past 30 years, the public has demanded to know why no complete investigation was ever conducted into the [torture] allegations," suggestions that these allegations were common knowledge among the public (and therefore by implication among high ranking police personnel) since at least the early 1980s, if not before. Judge Biebel went on to write that "The [Special Prosecutor's] investigation was ordered because of an open sore on the civil body of the City of Chicago which has festered for many years." (Memorandum Opinion and order of 5/19/06, Pp. 9, 17-18).

In July 2006, the Special Prosecutors issued their report, finding that Jon Burge and numerous other Area 2 Chicago Police detectives had physically abused and coerced confessions from numerous criminal suspects. The Special Prosecutor found that Lt. Jon Burge was "guilty of abusing persons with impunity" and that it therefore "necessarily follows that a number of those serving under his command recognized that if their commander could abuse persons with impunity, so could they." The Special Prosecutor found that Superintendent Brzeczek was guilty of a "dereliction of duty" and "did not act in good faith in the investigation of Andrew Wilson. Despite the fact that Brzeczek believed that officers in the Violent Crimes unit of Detective Area 2 had tortured Andrew Wilson he kept that belief to himself for over twenty years." The Special Prosecutor further found that:

[Brzeczek] "received and believed evidence that prisoner, [Andrew Wilson] had been brutalized by the Superintendent's subordinates, that the prisoner had confessed; that those subordinates had testified under oath on a motion to suppress and before a jury and he had to believe, they testified perjuriously; that the prisoner had been sentenced to death, and that the Superintendent still remained silent. For over twenty years he not only remained silent, but he approved a unit citation for all Area 2 personnel, including Burge, on September 1, 1982, for their work on the Andrew Wilson case; and, more egregiously, he kept Burge in command at Area 2 as long as he remained Superintendent."

Two days later on July 21, 2006, Chicago Mayor Richard Daley stated that the City "strongly supported the release" of the "Special Prosecutor's Report on the practice of abuse and torture of suspects in the 1970's and 1980's at the Calumet Police District" because "the public

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 70

has the right to know about this shameful episode in our history." (Daley Statement, P. 1), and that Burge and his unit participated in a "pattern of misconduct" (Daley Statement, P. 2)

In 2009, The Illinois legislature enacted the Illinois Torture and Inquiry commission "to address claims of abuse by police officers in the City of Chicago"

In *People v. Cortez Brown* (May 22, 2009), Judge Clayton Crane of the Circuit Court of Cook County vacated Brown's conviction after an evidentiary hearing and ordered a new trial based on findings that Brown had presented "staggering" and "damning" evidence that the detectives under Burge's command at Area 3, where he had been assigned as Commander in January of 1988, similarly tortured other interrogation suspects.

In *People v. Wrice*, 940 N.E.2d 102, 108-09 (1st Dist. 2010), the Illinois Appellate Court granted Area 2 torture victim Stanley Wrice, who was tortured by Area 2 "asskickers" Sgt. John Byrne and detective Peter Dignan, an evidentiary hearing on a second successive post-conviction petition on the basis of the July 2006 Special Prosecutor's Report and its findings of "widespread systematic torture of prisoners at Area 2."

On June 28, 2010, Burge was convicted by a federal court jury of committing perjury and obstruction of justice when he denied, under oath, that he had participated in, supervised or had knowledge of the torture of suspects, including, but not limited to, Andrew Wilson, Anthony Holmes, Melvin Jones, and Shadeed Mu'min.

At Burge's sentencing hearing in January of 2011, federal Judge Joan Lefkow found that there was a "mountain of evidence" of torture, and that "When a confession is coerced the truth of the confession is called into question. When this becomes widespread, as one can infer from the accounts that have been presented here in this court, the administration of justice is undermined irreparably. How can one trust that justice will be served when the justice system has been so defiled? This is why crimes of obstructing justice and perjury, and even more so when it is about matters relating to the duties of one's office, are serious offenses."

In *U.S. v. Burge*, 711 F.3d 803, 806 (7th Cir. 2013), the Seventh Circuit Court of Appeals, while affirming Burge's conviction found:

> Former Chicago Police Commander Jon Burge presided over an interrogation regime where suspects were suffocated with plastic bags, electrocuted until they lost consciousness, held down against radiators, and had loaded guns pointed at their heads during rounds of Russian roulette. The use of this kind of torture was designed to inflict pain and instill fear while leaving minimal marks. When Burge was asked about these practices in civil interrogatories served on him years later, he lied and denied any knowledge of, or participation in, torture of suspects in police custody. But the jury heard overwhelming evidence to contradict that assertion and convicted Burge for obstruction of justice and perjury.

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 71

In *U.S. v. Burge*, the Court further discussed the history of Area 2 torture under Burge:

> For many years a cloud of suspicion loomed over the violent crimes section of the Area 2 precinct of the Chicago Police Department (CPD) located on Chicago's south side. Jon Burge joined the CPD in 1970 and rose to commanding officer of the violent crimes section in the 1980s, but his career was marked by accusations from over one hundred individuals who claimed that he and officers under his command tortured suspects in order to obtain confessions throughout the 1970s and 1980s. Burge was fired in 1993 after the Office of Professional Standards investigated the allegations, but he was not criminally charged. Years later the Circuit Court of Cook County appointed special prosecutors to investigate the allegations of torture, but due to statutes of limitation, prosecutors never brought direct charges of police brutality against Burge. Eventually, the City of Chicago began to face a series of civil lawsuits from victims seeking from victims seeking damages for the abuse they endured. It was in one of these lawsuits that Burge denied in sworn interrogatory answers that he had knowledge of, or participated in, any acts of torture or physical abuse, and these statements lead to his federal indictment and trial.

In *U.S. v. Burge*, the Court summarized the record of "decades of abuse" as follows:

> At trial, the government called multiple witnesses to testify about the methods of torture and abuse used by Burge and others at Area 2 in order to establish that Burge lied when he answered the interrogatories in the Hobley case... [T]he witnesses at trial detailed a record of decades of abuse that is unquestionably horrific. The witnesses described how they were suffocated with plastic bags, electrocuted with homemade devices attached to their genitals, beaten, and had guns forced into their mouths during questioning. Burge denied all allegations of abuse, but other witnesses stated that he bragged in the 1980s about how suspects were beaten in order to extract confessions. Another witness testified that Burge told her that he did not care if those tortured were innocent or guilty, because as he saw it, every suspect had surely committed some other offense anyway.

In May of 2015, the Reparations Ordinance and Resolution as detailed above, was unanimously adopted by the Chicago City Council and Mayor Emanuel publicly apologized to the torture survivors.

In June of 2018 Cook County Circuit Court Judge William H. Hooks found that "[P]attern and practice evidence shows shocking suspects was common" at Area 2. *See People v. Jackie Wilson* (Circuit Court of Cook County, June 20, 2018) (PTP-NOTICE-000709-827). . Judge Hooks further found in December of 2020 while granting Jackie Wilson a certificate of innocence that "the unparalleled nearly 39 years of unconstitutional misconduct was not an isolated occurrence. Rather, it was part of several interrelated patterns and practices of systemic torture and physical abuse of African American suspects at the Area 2 and, later, at the Area 3

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 72


Police Headquarters under Defendant Jon Burge's command and supervision." *See People v. Jackie Wilson* (Circuit Court of Cook County, December 18, 2020) PTP-GENERAL-000007-000065.

Upon the death of Jon Burge in September of 2018, soon to be elected Chicago Mayor Lori Lightfoot publicly stated that "with the passing of Jon Burge, we must reflect on the dark legacy that he embodied. So many lives shattered, and a horrible stain on the legitimacy of policing that resonates today."[92]

In sum, there is a substantial body of extensive evidence clearly establishing that, dating back to at least the early 1970s, it was well-known that the City of Chicago's Police Department had a systemic practice of subjecting African American and Latino suspects who were interrogated by detectives and supervisors to physically abusive and coercive interrogations (e.g. beating, suffocating, electroshocks, mock executions, threatening physical violence, etc.) with the result of coercing and/or fabricating false and/or unreliable inculpatory evidence to be used against the interrogated suspects without regard to their actual guilt or innocence. There is also substantial evidence establishing that high-ranking officials in the City of Chicago (including in the Cook County Attorney's Office), the Chicago Police Department and numerous police command personnel received continuing notice of this systemic practice of physical abuse and coercion of Black and Latino suspects in order to coerce and fabricate confessions, including from the repeated documented allegations that accumulated against supervisors and detectives, at Area 2 detective Division (and later at Areas 3, 4 and 5).

### (C) Physical Abuse and Coercive Interrogation at Area 3 Involving Detectives Kill, Boudreau, Halloran and Others

The physical abuse and coercion of custodial suspects to obtain confessions was also systemic and widespread at Area 3, and repeatedly involved Detectives Kill, Boudreau, Halloran and several other Chicago Police detectives who routinely used physical coercion and abuse to extract incriminating statements and fabricate false confessions from criminal suspects during lengthy incommunicado and unlawful interrogations. Detectives Kill, Boudreau, Halloran and other Area 3 Chicago Police detectives have a long history of using physical force and psychological abuse to coerce and fabricate confession statements from suspects and manipulate witnesses during interrogation. There exists a substantial body of evidence establishing that the Detectives Kill, Boudreau and other Area 3 Chicago Police detectives engaged in systematic misconduct whose purpose was to extract through coercion (primarily in homicide cases) confessions (primarily from African American and Latino suspects) to quickly and recklessly close cases without meaningful regard guilt or innocence. The evidence comes from the repeated documented allegations that accumulated against Detectives Kill, Boudreau, Halloran and other Area 3 Chicago Police Detectives; from the testimony of numerous criminal defendants at

---

[92] https://www.theguardian.com/us-news/2018/sep/19/chicago-cop-jon-burge-torture-dies

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 73

motion to suppress hearings and trials in Area 3 cases; from federal and state court decisions in Area 3 cases; and from media articles, reports and editorials, among other sources. There are dozens of known cases establishing a pattern and practice in which detectives Kill, Boudreau, Halloran and other Area 3 Chicago Police detectives physically and psychologically abused, coerced and tortured suspects and witnesses in homicide cases and coerced false testimonial evidence from them. The following summaries represent a portion of these cases:

1. **Frank Bounds (1987)**: Detective Kelly hit Bounds on the head, tried to kick him in the groin, and threatened to bring Bounds' girlfriend into the case if he did not confess causing Bounds to falsely confess to a murder. *People v. Bounds*, 171 Ill.2d 1, 29-30 (1996). (PTP-F BOUNDS-000001-000030)

2. **Alnoraindus Burton (1989)**: Detective Kill kicked Burton in the groin, slammed his head against the wall, slapped him across the face, and told him he could kill him causing Burton to falsely confess. (PTP-NOTICE-000829-000842; PTP-A BURTON-000001-000009)

3. **Damari Clemon (1991)**: Detective Boudreau and other detectives beat Mr. Clemon, electroshocked him and threatened him with a pistol. Deposition of Marcus Wiggins, June 4, 1996, *Marcus Wiggins v. Jon Burge et al.*; Complaint, *Marcus Wiggins v. Jon Burge et al.;* PTP-JESSE & DEMONI & IMARI CLEMON-000001-000026).

4. **Nevest Coleman and Darrell Fulton (1994)**: Detective Boudreau, Detective Halloran and another Area 3 detective punched Coleman in the face repeatedly until he falsely confessed. Fulton also alleged that he was punched in the face repeatedly, that a detective told him he would put a bullet in Fulton's brain if Fulton would not implicate himself in the crime, and that if he confessed he could go home and nothing bad would happen to anyone in his family. Coleman and Fulton were excluded from male DNA on the victim's underwear (Third Amended Complaint, *Derrell Fulton v. Geri Lynn Yanow et al.*; Transcript of testimony of Nevest Colman, in *State of Illinois v. Nevest Coleman*, June 28, 1996; PTP-D FULTON-000001-000086; PTP-N COLEMAN-000042-00105)

5. **James Coston (1988)**: Detective Kill struck him in the jaw, grabbed him around the neck and pushed him against the wall while questioning him about a murder (Coston was a witness in a murder case). PTP-J COSTON-000001-000003.

6. **Mark Craighead (1989)**: Detective Kill and other Area 3 detectives beat Craighead and deprived him of food and water until he falsely confessed. Photographs of Craighead taken after his interrogation depict his injuries

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 74

(Summary Report Digest, Complaint register No. 166416, PTP-M Craighead-000001-000004).

7. **Arnold Day (1992)**: Detective Boudreau and another Area 3 detective choked Day and threatened to throw him out of a window until he falsely confessed to a murder. Day was acquitted after presenting his allegations of physical abuse and coercion (Affidavit of Arnold Day, February 4, 1992; Complaint, *Arnold Day v. Kenneth Boudreau*, et al.; PTP-A DAY-000001-105).

8. **Fred Ewing and Darnell Stokes (1993)**: Detective Boudreau coerced confessions from two developmentally disabled juveniles, Fred Ewing (IQ=56) and Darnell Stokes. Both were acquitted. (Maurice Possley, Steve Mills & Ken Armstrong, *Veteran Detective's Murder Cases Unravel*, Chi. Trib., Dec. 17, 2001.; PTP-F EWING-000001-00015)

9. **Derrick Flewellen (1995)**: Detective Boudreau and other Area 3 detectives interrogated Derrick Flewellen for more than 36 hours during which they slapped, kicked, and punched him until he signed a false confession. Flewellen was exonerated based on DNA evidence after serving close to five years in prison (Complaint, *Derrick Flewellen v. City of Chicago, et al.;* PTP-D-FLEWELLEN-000001-000015).

10. **Jerry Gillespie (1993)**: Detective Boudreau and other Area 3 detectives beat, kicked, slapped, and choked Gillespie, and threatened him with further beating, including burning him with a cigarette, if he did not sign a written confession they prepared (First Amended Petition for Post-Conviction Relief and Petition for Relief from Judgement, *State of Illinois v. Jerry Gillespie*, PTP-J Gillespie-000001-000020; Motion to Hold Appeal in Abeyance, *State of Illinois v. Jerry Gillespie*, PTP-J Gillespie-000021-000030)

11. **Oscar Gomez, Abel Gomez and Abel Quinoles (1995)**: Detective Halloran and Detective Boudreau held all three men for more than 30 hours and beat them while they were shackled to a wall. All three were acquitted. PTP-O GOMEZ & A QUINONES-000001-00043).

12. **Jason Gray and Manuel Bobe (1986)**: According to fifteen-year-old Gray, Detective Kill grabbed him, threw him on the floor, threatened him with a life sentence, and fabricated a false inculpatory statement from him. The trial judge rejected Detective Kill's trial testimony, and the appellate court upheld that ruling, finding: Detective "[K]ill's actions, and the possibility that he may have testified falsely under oath in a deposition and in many other prosecutions, has much bearing on the credibility of his testimony here." Detective Kill also coerced Gray's co-defendant, Manuel Bobe, into implicating Gray and himself in

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 75

the murder. According to Bobe, Detective Kill threatened him and told him he could go home if he just signed a statement implicating Gray, punched him in his chest, slapped him on the face, and pointed a gun at Bobe's neck and threatened to shoot him (Order, *State of Illinois v. Jason Gray*; Transcript of testimony of Jason Gray at Motion to Suppress hearing, *State of Illinois v. Jason Gray*; Amended Petition for Post- Conviction Relief, *State of Illinois v. Jason Gray;* PTP-J GRAY-000001-000123; PTP-M BOBE-000001)

13. **Tyrone Hood and Wayne Washington (1993)**: Detective Boudreau coerced a false confession from Washington. Both men's convictions were subsequently overturned. PTP-T HOOD & W WASHINGTON-000001-00039

14. **Harold Hill, Dan Young, Peter Williams (1990)**: Detective Boudreau and other Area 3 detectives beat and coerced Hill, Young (whose IQ was 56), and Williams into falsely confessing to rape and murder. DNA tests subsequently proved that the men were innocent and the State dismissed all charges against them. Young and Hill were 16 years old at the time, Williams was 19 (Complaint, *L.C. Young v. City of Chicago*, February 8, 2007; Transcript of Proceedings, *People v. Dan Young*, September 19, 1994; PTP-D YOUNG-000001-187; PTP-H HILL-000001-000049).

15. **Joseph Jackson (1998)**: Detective Boudreau placed a book on Mr. Jackson's chest and stomach and hit the book with a blackjack. Detective Halloran placed a typewriter cover over Jackson's head and cut off his air supply. PTP-J JACKSON-000001-000003)

16. **Anthony Jakes (1991)**: Detective Boudreau slapped, punched and kicked fifteen-year-old Jakes until he falsely confessed to being the lookout during a murder. Jakes was held incommunicado for over sixteen hours, and deprived of food and water, and denied access to his aunt (Complaint, *Anthony Jakes v. Kenneth Boudreau et al.*, April 1, 2019; (PTP-A JAKES-000001-000409)

17. **Ronald Kitchen Marvin Reeves and Eric Wilson (1988)**: Detective Kill and Burge beat Ronald Kitchen until he falsely confessed to a murder. Detective Kill punched Kitchen in the face, back, chest, and groin. Kill interrogated Kitchen's cousin, Eric Wilson, about the same murder. Kill beat Wilson in the groin, chest, and head until Wilson falsely inculpated Kitchen and another man. Wilson heard Kitchen screaming and moaning in pain (Letter from Donald Hubert to Edward Egan and Robert Boyler, May 24, 2005; PTP-R KITCHEN-000001-000208)

18. **Anthony Lash (1989)**: Detective Kill and other Area 3 detectives interrogated sixteen-year-old Anthony Lash about a murder without his parents or his attorney present. Detective Kill beat Lash and slammed his head into a wall, causing him

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 76

to falsely confess to the murder. *People v. Lash*, 252 Ill.App.3d 239, 245-36 (1st Dist. 1993; PTP-R LASH-000001-000011).

19. **Alfonzia Neal (1991)**: Detective Boudreau beat a murder confession out of Alfonzia Neal who had an IQ in the 40s and likely did not understand much, if anything, of the confession. (Maurice Possley, Steve Mills & Ken Armstrong, *Veteran Detective's Murder Cases Unravel*, Chi. Trib., Dec. 17, 2001.; PTP- A NEAL-000001-000008)

20. **Johnny Plummer (1991)**: Detective Boudreau and other Area 3 detectives interrogated fifteen-year-old Johnny Plummer for 36 hours, during which they denied him food and hit him in the face, stomach and side (including with a flashlight, until he falsely confessed to a murder. *See People v. Plummer*, 306 Ill. App. 3d 574, 578-79 (1st Dist. 1999); PTP- J PLUMMER-000001-000010)

21. **Tyrone Reyna, Nicholas Escamilla and Miguel Morales (1993)**: Detective Boudreau and other Area 3 detectives beat sixteen-year-old Reyna (Detective Halloran slapped him in the face and kicked him in the leg; Detective Boudreau and Detective Halloran spit on him), refused to let him contact his family, and intimidated him into confessing to a murder he did not commit. Boudreau and other Area 3 detectives also beat and threatened Reyna's co-defendants, Nicholas Escamilla and Miguel Morales, causing Escamilla to falsely confess after hours of abuse (Affidavit of Tyrone Reyna, April 22, 2004; Affidavit of Nicholas Escamilla, March 19, 2004; Affidavit of Miguel Morales, February 25, 2001; PTP-T REYNA-000001-000018)

22. **Anthony Robinson (1987)**: Detective Kill and other Area 3 detectives kicked and slapped Anthony Robinson until he falsely confessed to a murder. Robinson suffered injuries including a perforated ear. *People v. Robinson*, 238 Ill. App. 3d 48, 50-51 (1st Dist. 1992); PTP-A ROBINSON-000001-000006).

23. **Clayborn Smith (1992)**: Detective Boudreau and other Area 3 detectives hit Smith in the face and head, punched him in the ribs, grabbed his neck, pulled his hair and pulled his finger back until he falsely confessed to a murder (Complaint, *Clayborn Smith v. City of Chicago et al.*, June 19, 2003; PTP-C SMITH-000001-000010).

24. **Johnny Walker and Phillip Walker (1988)**: Detective Kill beat Johnny and Phillip Walker in the groin and face until they falsely confessed to a murder. The detectives also beat thirteen-year-old Andre Wilks until he falsely identified Phillip Walker as the shooter. Phillip Walker was acquitted and Johnny Walker was never charged with a crime (Transcript of Report of Proceedings, *State of*

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 77

*Illinois v. Phillip Walker*, April 3, 1989; PTP-JOHNNY AND PHILLIP WALKER-000043-000050.

25. **Kilroy Watkins (1992)**: Detective Boudreau and Detective Halloran choked and punched Watkins in the face until he gave a false confession (Complaint Under the Civil Rights Act, Title 42 Section, Kilroy Watkins v. Detective J. Halloran et al., May 6, 2002; Affidavit of Kilroy Watkins, January 17, 2004); PTP-K WATKINS-000001-000015).

26. **Demond Weston (1990):** Detective Kill and other Area 3 detectives slapped, beat (Detective Moser and Detective Maslanka), choked, and threatened Weston until he falsely confessed to a murder. Detective Kill also struck, yelled at, and threatened Dwayne Macklin into falsely implicating Weston in the crime (Report of Dr. Richard A. Leo, dated August 28, 2019; PTP-D WESTON-000001-000004; and Report of Dr. Richard A. Leo dated January 22, 2024).

27. **Emmett White (1993):** Detective Boudreau and Detective O'Brien arrested Mr. White, and Detective O'Brien subsequently beat him in the head and face, threw him to the ground, and dragged his head across the floor of the interrogation room. PTP-E WHITE-000001-000007; PTP-N COLEMAN-000021.

28. **Marcus Wiggins, Demoni Clemon, Jesse Clemon, Imani Clemon, Dyez Owen (1991)**: Detective Kill, Detective Boudreau, and others handcuffed thirteen-year-old Marcus Wiggins to a wall, denied him access to his mother, and beat and electroshocked him until he gave a false confession. The Clemons brothers and Owen were also beaten until they confessed. Two of the confessions were suppressed and all of the defendants were either acquitted or the State declined to prosecute their cases. *People v. Clemon*, 259 Ill. App. 3d 5, 8, 10 (1st Dist. 1994); PTP-M WIGGINS-000001-000149; PTP-JESSE & DEMONI & IMARI CLEMON-000001-000276.

29. **Anthony Williams (1994)**: Detective Kill beat learning disabled Anthony Williams until he confessed to a murder and armed robbery. *People v. Williams*, 303 Ill. App. 3d 33, 43 (1st Dist. 1999); PTP-A WILLIAMS-000001-000008.

30. **Robert Wilson (1997):** Mr. Wilson reports that Detective O'Brien slapped him repeatedly, and that Mr. Wilson became fearful that he would continue to be physically assaulted if he did not agree to a false confession. Detective Halloran also slapped and threatened Mr. Wilson (Report of Dr. Richard A. Leo dated June 12, 2010) PTP-GENERAL-000066-000085.

These are some, but by no means all, of the Area 3 police torture cases. The physical abuse and coercion of custodial suspects to obtain confessions was systemic and widespread at

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 78

Area 3, and repeatedly involved Detectives Kill, Boudreau, Halloran and many other Chicago Police detectives who routinely used physical coercion and abuse to extract incriminating statements and fabricate false confessions from criminal suspects during lengthy incommunicado and unlawful interrogations. Chicago police commanders and high ranking City of Chicago officials (including police command personal and the Cook County Attorney's Office) were on continuing notice since at least as early as 1986 that there was a pattern and practice of police interrogation torture and coercion to extract confessions among Area 3 detectives, particularly from (but not limited to) Detectives Kill, Boudreau and Halloran.

### (D) Physical Abuse and Coercive Interrogation at Area 4 Involving Detective Kato, Detective John Summerville, Detective Clarence Lewis, Detective John Roberts, Detective Same Cirone and Others

Chicago police commanders and high ranking City of Chicago officials (including police command personnel and the Cook County Attorney's Office) were on continuing notice since as early as 1987 that there was a pattern and practice of police interrogation torture and coercion to extract confessions among Area 4 detectives, particularly from (but not limited to) Detective Kriston Kato and the Area 4 detectives with whom he worked cases. The following summaries represent a portion of the cases in which Detective Kriston Kato has been accused of physically abusive and coercive interrogations with the result of coercing and/or fabricating false and/or unreliable inculpatory evidence to be used against the interrogated suspect without regard to his actual guilt or innocence:

1. **Tony Bey (aka Tony Steward) (1988)**: Detective Kato purportedly obtained a murder confession from Mr. Bey during an abusive interrogation. Mr. Bey alleged that Detective Kato "put a pistol in his mouth and threatened to make him 'a statistic.'" Mr. Bey also alleges that Detective Summerville physically abused him during one of his post-arrest interrogations in Area 4. Mr. Bey was treated at the hospital for multiple lacerations after the interrogation, complained of severe stomach pain, and was diagnosed with acute appendicitis. Tony Bey Complaint Register & OPS Investigation. Bey was acquitted at trial. *Steward v. Kato, et al.*, 1992 U.S. Dist. LEXIS 15690, at *8 (N.D. Ill. 1992); PTP-T SEWARD-BEY-000001-000157.

2. **Michael Cage (1988)**. Detective Kato slapped Mr. Cage in the face, while Detective Summerville read the case facts to him, and later Detective Kato connected a gadget to his chest that resembled an electric shaver with antennas attached to it. Cage felt shocked and passed out. When Mr. Cage regained consciousness, Detective Kato stretched his leg into the doorway and slammed the door on his ankle. Eventually Cage gave a confession, but it was eventually suppressed at a pre-trial hearing because the State failed to prove that the detectives had not caused Mr. Cage's injuries. Steve Bogira, *Good Cop, Bad Cop: What is it*

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 79

> *about Detective Kato that Makes Murder Suspects So Eager to Confess?*, Chicago Reader (Dec. 12, 1991); PTP-M CAGE-000001-0000063.

3. **Carl Chatman (2002)**: Mr. Chatman, who had an IQ of 68 and a long history of mental disorders, was wrongly convicted of sexually assaulting Susan Riggio in the Daley Center. *Chatman v. Chicago, et al.*, 2018 WL 1519160 (N.D. Ill. Mar. 28, 2018). Mr. Chatman was arrested, denied any involvement in the crime, and after he had been in custody for 12 hours without anything to eat or drink, Detective Kato interrogated him, threatening and abusing him while he was handcuffed to a wall, including striking him so hard that he almost lost consciousness, after which Mr. Chatman falsely confessed (Detective John Roberts had also used force and threats of force to coerce Mr. Chatman to confess). Mr. Chatman was convicted and spent more than a decade in prison, before the Cook County State's Attorney reinvestigated his case and dismissed the charges against him. Mr. Chatman was granted a certificate of innocence by the State of Illinois after his release from prison. *Id.* at *9. A Chicago police detective filed an anonymous complaint in May 2002 with the Office of Professional Standards relating that Detective Kato had physically abused Mr. Chatman and forced him sign a false confession. (OPS Anonymous Complaint). The detective wrote that when Detective Kato hit Mr. Chatman, "That blow I thought would kill him for sure" and said that Detective "Kato took the victim's account of the assault, word for word and laid it out for the homeless suspect to sign. The suspect didn't even read it and didn't know what he was signing." and that "It is a well-known fact from questioning and the suspect's condition that he did not commit this assault. However, Detective Kato stated that 'they wanted someone to be accountable, so I gave them someone. He's homeless anyway, at least now (laughingly) he'll get three meals a day. That's my contribution to help feed the homeless.'" *Id.*; PTP-C CHATMAN-000001-000082.

4. **Shawn Hardy (1989)**: Detective Kato accused Mr. Hardy of committing a murder, punched and kicked him in the chest, but he did not confess. Mr. Hardy was diagnosed with a chest contusion a few days after the interrogation. Command Channel Review – Complaint Register Investigation No. 171359 (PTP-S-Hardy 000001-000050)

5. **Derrick Harvey (1993)**: Harvey claimed that he adopted the confession urged by Detective Kato only because "he was struck by Detective Kato prior to giving his statement and . . . Detective Kato promised him he would be released if he gave a statement." *People v. Harvey*, 211 Ill.2d 368 (2004); PTP-D HARVEY-000001-000023.

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 80

6. **Miller Holston (1989)**: Detective Kato struck and kicked Mr. Holston, deprived him of sleep for more than 20 hours, refused him access to legal counsel, and coerced him into confessing to murder. Mr. Holston also alleged that Detective Summerville struck and kicked him. The charges against Mr. Holston were dismissed. Command Channel Review – Complaint Register Investigation No.184112, PTP- M SHOLSTON-000001-000073)

7. **Xavier Johnson (1997)**: Detective Kato and Officer Sam Cirone interrogated Mr. Johnson, who was 16-years-old, about a murder, denied him access to his family, slapped his face repeatedly, struck, kicked and kneed him in the genitals while he was handcuffed to a wall, and pushed him into a wall until he confessed. (Johnson Complaint Register & OPS Investigation; PTP-X JOHNSON-000001-000065).

8. **Harold Lucas (1989)**: Detective Kato punched Mr. Lucas, who was 15-years-old, in the stomach, slapped him, and stepped on his genitals while he was sitting down until Mr. Lucas purportedly confessed to a murder David Jackson, *Fine Line Between Tough Police Work, Brutality, Chicago Tribune*, at 3 (Jul 14, 1991); PTP-H LUCAS-000001-000004.

9. **Keith Mitchell (1997)**: Detective Kato interrogated Mr. Mitchell for three days and forced him to by Detective Kato and was forced to sign a witness statement for a murder he did not witness. Detective Kato elbowed him in the head, kneed him in groin, and threatened to charge him with "setting up" the victim for the murder. (Mitchell Complaint Register & OPS Investigation); PTP-K MITCHELL-000001-000034).

10. **Kevin Murray (1987)**: Detective Kato denied Mr. Murray access to the bathroom, sleep, and food and whenever Murray professed his innocence, Detective Kato repeatedly slapped him in the face, punched him in the stomach, and kicked him in the chest until Mr. Murray confessed. Area 4 Detective John Summerville slapped Mr. Murray on the side of the head and kicked him between the legs, and "backpunched" Murray when he asked for a lawyer. *People v. Murray*, 626 N.E.2d 1140 (1st Dist. 1993). In 2013, the Torture Inquiry and Relief Commission found that Murray had stated a credible claim of torture.

11. **Patrick Prince (1991)**: Detective Kato arrested Mr. Prince, took him to Area 4, held him for hours, physically abused him, and forced him to sign a written statement. *People v. Prince*, 91 CR 26365-01, Apr. 26, 2017 Order (Cir. Ct. Cook Co.); *People v. Prince*, 91 CR 26365-01, Apr. 25, 2017 Closing Memorandum (Cir. Ct. Cook Co.). In 2017, following a multi-day evidentiary hearing, Judge Thaddeus

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 81

Wilson granted Prince post-conviction relief, explaining that "the testimony and submissions presented . . . seriously call into question the vitality and fidelity of the conviction, especially given the disparities, inconsistencies and newly discovered evidence presented to this Court . . . . This is a case that arose during the times, thinking, sentiments, customs and practices of the 1990s. Petitioner was just 19 years old . . . . The only evidence against Petitioner was his confession. Allegations and findings of past misconduct by police during questioning of suspects are now at an unprecedented high and we now better understand the psychology of false confession." *Id.* at 7-8. The charges against Prince were dismissed, and he was granted a certificate of innocence. (Prince Certificate of Innocence; PTP-P PRINCE-000001-000017).

12. **Angelo Rogers (1990)**: Mr. Rogers, who was 19-years-old, claimed that Detective Kato "kept him awake and unfed overnight, shoved him around and threatened him" causing him to confess to a murder he did not commit. Mr. Rogers was acquitted of the murder. David Jackson, *Fine Line Between Tough Police Work, Brutality, Chicago Tribune*, at 1 (Jul 14, 1991); PTP-H LUCAS-000001-000004.

13. **Frederick Seaton (1988)**: Detective Kato, Detective John Summerville and Detective Clarence Lewis (all from Area 4) interrogated Mr. Seaton for longer than a day and physically coerced (slapping, kicking, abusing and threatening) him into making a false confession. Following the interrogation, there was blood in Mr. Seaton's urine, his groin was swollen, and his face was red and sore. The Illinois Appellate Court overturned Mr. Seaton's conviction and ordered that his statement be suppressed, finding that they were the product of an illegal arrest. *People v. Seaton*, 242 Ill.App.3d 1105 (1st Dist. 1993); PTP-F SEATON-000001-000035.

14. **Gregory Shelton (1988)**:  Detective Kato questioned Mr. Shelton for more than 24 hours about a murder and instructed Mr. Shelton to stand, at which point Detective "Kato kicked defendant in the groin with his left foot." Officer Jason Vucko joined Detective Kato in the interrogation and slapped Mr. Shelton, slammed his head in the wall, and promised Mr. Shelton that "the beating would stop if he confessed to the murder of [the victim]." Mr. Shelton alleged that Detective Kato refused his request for an attorney. *People v. Shelton*, 264 Ill. App.3d 763 (1st Dist. 1993); PTP-G SHELTON-000001-000006.

15. **Andre Wallace (1994)**: While Mr. Wallace, who was 15-years-old, was handcuffed in an interview room, Detective Kato slapped him, kicked him, and squeezed his testicles, and made promises of leniency, telling him he could leave if he signed a confession. Mr. Wallace's conviction was overturned on appeal and the charges

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 82

against him were dismissed. *People v. Wallace*, 299 Ill.App.3d 9, 12-13, 19 (1998); (Wallace Complaint Register & OPS Investigation; PTP-A WALLACE-000001-000117).

16. **Keith Washington (1989)**: Detective Kato interrogated Mr. Washington for 28 hours, denied him food and water, punched him in the chest, "kicked [him] in [his] ankles," "hit [him] a couple times, choked [him], said, 'You see what it feels like to be strangled?'" Mr. Washington also alleges that Detective Kato slapped him on both sides of his face and kicked him in the ribs as part of Detective Kato's effort to coerce Mr. Washington to confess. Steve Bogira, *Good Cop, Bad Cop: What is it about Detective Kato that Makes Murder Suspects So Eager to Confess?*, Chicago Reader (Dec. 12, 1991); PTP-K WASHINGTON-000001-000065.

17. **Michael Waslewski and Daniel Gasca (1990)**: Mr. Waslewski claimed that, during an overnight interrogation, Detective Kato and another detective beat him in order to secure a confession. David Jackson, *Fine Line Between Tough Police Work, Brutality, Chicago Tribune*, at 2 (Jul 14, 1991). Gasca claimed that he was held for 26 hours, during which time Kato entered the interrogation room, told him "'You're a killer and you have no remorse,'" and when Gasca denied the accusation, Detective Kato hit the side of his head. Following the interrogations, Mr. Waslewski adopted a confession that Detective Kato provided to him, "giv[ing] a detailed statement describing how he and a friend, Daniel Gasca, stabbed [the victim] to death during a fight over money, then put [the victim's] body in the trunk of a car that they left in an alley near Cook County Jail." *Id.* The confession was shown to be false when records emerged showing that Gasca could not have been involved in the crime because he had been in prison on the night it occurred. *Id.* Wasleswki was acquitted at trial. *Waslewski v. Kato*, 1993 U.S. Dist. LEXIS 269, at *1-2 (N.D. Ill. 1993); PTP-M WASLEWSKI-000001-000006.

18. **Ronald West (1989)**: Mr. West testified that Detective Kato and Detective Summerville physically coerced him into falsely confessing to a murder. Mr. West testified "that the police slapped him around, kicked him and chopped him in the throat during the interrogation." *People v. West*, 263 Ill. App. 3d 1041(1st Dist. 1994); PTP-R WEST-000001-000008.

19. **Jeremiah Wright and Elijah Threatt (1999):** Jeremiah Wright and Elijah Threatt, who were 18 and 17-years-old, respectively, and suffered from serious cognitive deficits, were convicted of murder based on confessions elicited by Detective Kato. They testified that Detective Kato and Detective Cirone beat them, threw water on them, and refused one of them access to his inhaler unless he confessed. The Court

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 83

of Appeals held that defendants' trial counsel was ineffective for failing to investigate and offer evidence of Detective Kato coercing confessions in other cases. *People v. Wright*, 2013 IL App (1st) 103052-U; PTP-JERMIAH WRIGHT & ELIJAH THREATT-000001-000007.

In short, substantial evidence exists that there was a pattern and practice of police interrogation torture and coercion to extract confessions among Area 4 detectives, particularly from (but not limited to) Detective Kriston Kato and the Area 4 detectives with whom he worked cases. These summaries represent a portion of the cases in which Detective Kriston Kato has been accused of physically abusive and coercive interrogations with the result of coercing and/or fabricating false and/or unreliable inculpatory evidence to be used against the interrogated suspect without regard to his actual guilt or innocence. Chicago police commanders and high ranking City of Chicago officials were on continuing notice since at least as early as 1987 that a pattern and practice of police interrogation torture and coercion to extract confessions among Area 4 detectives existed, particularly from (but not limited to) Detective Kriston Kato and the Area 4 detectives with whom he worked cases.

### (E) Physical Abuse and Coercive Interrogation at Area 5 Involving Detective Guevara, Detective Halvorson and Other Area 5 Chicago Police Detectives

Chicago police commanders and high ranking City of Chicago officials (including police command personnel and the Cook County Attorney's Office) were on continuing notice since as early as 1987 that there was a pattern and practice of police interrogation torture and coercion to extract confessions in Area 5 involving Detective Guevara, Detective Halvorson and other Area 5 Chicago police detectives.

In addition to the case of Daniel Rodriguez that is the subject of this report, more than four dozen individuals have had their convictions overturned in cases investigated by Detective Guevara. They are Jacques Rivera, Juan Johnson, Jose Montanez, Armando Serrano, Jorge Pacheco, Roberto Almodovar, William Negron, Jose Maysonet, Angel Rodriguez, Santos Flores, Arturo DeLeon-Reyes, Gabriel Solache, Ariel Gomez, Xavier Arcos, Ricardo Rodriguez, Robert Bouto, Thomas Sierra, Geraldo Iglesias, Demetrius Johnson, David Gecht, Richard Kwil, Ruben Hernandez, Juan Hernandez, Rosendo Hernandez, Ray Munoz, David Lugo, Carlos Andino, Jaime Rios, Jose Cruz, Marilyn Mulero, Nelson Gonzalez, Johnny Flores, Adolfo Rosario, Eruby Abrego, Jeremiah Cain, Edwin Davila, Alfredo Gonzalez, Gamalier Rivera, Fabian Santiago, Madeline Mendoza, John Martinez, Jose Tinajero, Thomas Kelly, Louis Robinson, Tony Gonzalez, Edwin Ortiz, Oscar Soto, David Krueger, Antonio McDowell, and Tyrece Williams. .

The following summaries represent a portion of the cases in which Detective Guevara has been accused of physically abusive and coercive interrogations with the result of coercing, fabricating or otherwise creating false and/or unreliable inculpatory evidence to be used against the interrogated suspect without regard to his actual guilt or innocence:

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 84

1. **Gloria Ortiz Bordoy (1995)**: Detective Guevara threatened to hit Gloria Ortiz Bordoy, threatened that her children would be taken by the Department of Children and Family Services, called her "the B word," and told her that she was involved in the crime and was "going down for a long time." Ms. Bordoy signed a statement that the detectives wrote out for her, without reading its contents, because she just wanted to "get out of there." Detective Guevara kept trying to make her say things she was "not aware of." (Deposition of Gloria Ortiz Bordoy, February 19, 2008, *Juan Johnson v. Reynaldo Guevara et al.*; Testimony of Reynaldo Guevara in Motion to Suppress Hearing; AR-L 148767-148860.)

2. **Elizer Cruzado (1993)**: Detective Guevara arrested fifteen-year-old Elizer Cruzado, who could barely read and write, told him he could go home and see his family again if he agreed to make a statement implicating himself in a murder, and threatened him with life imprisonment if he did not make a statement (Testimony of Elizer Cruzado in Motion to Suppress Hearing, March 31, 1995; *State of Illinois v. Elizer Cruzado*, Motion to Quash Arrest and Suppress Statements, March 31, 1995; AR-L 155033-155055).

3. **Edwin Davila (1995)**: Detective Guevara cuffed Mr. Davila to the wall of an interrogation room and told him that he was going to frame him for murder. When Mr. Davila denied involvement in the murder, Detective Guevara forced him to participate in a lineup in which two witnesses falsely identified Mr. Davila as the perpetrator, despite the fact that each witness previously told the police that they had not been able to see the shooter (Deposition of Edwin Davila, Sr., February 26, 2008, *Juan Johnson v. Reynaldo Guevara*; AR-L 154814-155027)

4. **Voytek Dembski (1997)**: Detective Guevara arrested Voytek Dembski and beat, slapped, and yelled at him while he was handcuffed to a chair in an interrogation room. Detective Guevara later got another detective take a statement from Mr. Dembski in English, which Mr. Dembski signed even though he could not speak or read English (Affidavit of Jed Stone, February 20, 2008, *State of Illinois v. Gabriel Solache*; AR-L 155056-155058; April 7, 1999 Testimony of Voytek Dembski; Bluhm 034650-034753).

5. **Adrian Duta (1994)**: Detective Guevara interrogated Mr. Duta about a murder he knew nothing about, smacked him in the head with a folder, and punched him in the stomach causing Mr. Duta signed a statement prepared by Detective Guevara who promised him he could go home if he did (Affidavit of Adrian Duta, June 30, 2008; AR-L 154806-154809).

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 85

6. **Adolfo Frias (1993)**: Mr. Frias was handcuffed to a ring on the wall of the extremely cold interrogation room, slapped in the face by Detective Guevara, and beaten by two other Area 5 detectives until he agreed to implicate himself in a murder. Detective Guevara brought Mr. Frias's nephew into the room, who appeared beaten about the face and Frias could hear his wife screaming and his son crying in another room. Detective Guevara threatened Mr. Frias that if he did not confess, his wife would go to prison and his children would be taken away. Mr. Frias, who did not speak English, spoke in Spanish and Detective Guevara translated the statement so that the prosecutor could write the statement in English. Mr. Frias then signed a statement he could not read (*State of Illinois v. Arturo Reyes and Gabriel Solache*, Hearing Transcript Before James M. Obbish, April 11, 2013; AR-L 154693-154805; March 10, 2008 Affidavit of Adolfo Frias-Munoz; Bluhm-10887-10888).

7. **Arturo DeLeon-Reyes and Gabriel Solache (1998)**: The interrogation-induced signed confession statements of Arturo DeLeon-Reyes and Gabriel Solache meet the criteria for what is known as a proven false confession in the social scientific research literature. Their descriptions of what occurred during their lengthy, unrecorded custodial interrogations conducted by Detective Guevara and others on April 3-5, 1998 is consistent with the empirical social science research on the types of interrogation techniques, methods, practices and effects that lead to false confessions and contain examples of physically and psychologically coercive interrogation techniques, methods, strategies and effects that are known to cause involuntary confessions. Their convictions were set aside, their confessions were suppressed, and they were awarded certificates of innocence. (Reports of Dr. Richard Leo, *Reyes v. Guevara* and *Solache v. City of Chicago*, dated January 15, 2022 and January 31, 2023, and materials cited).

8. **Leshurn Hunt (1983)**: Detective Guevara and other Area 5 detectives forcibly removed Leshurn Hunt from his home, brought him to the police station, and handcuffed him to a ring on the wall, where they beat him about the head, face, and body until he confessed to a murder and robbery. Mr. Hunt was detained for approximately 23 hours and deprived of food, water, and sleep. Mr. Hunt sought medical treatment for his injuries and filed a complaint with the Office of Professional Standards. The criminal court judge suppressed Mr. Hunt's confession. Hunt filed a civil lawsuit in 1985, alleging that Detective Guevara used force against him to extract a confession. The lawsuit identified "nine recent occasions on which [Guevara and other defendants] were accused of using excessive force during arrests and interrogation." *Hunt v. Jaglowski*, 85 C 1976, 665 F. Supp. 681 (July 21,

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 86

1987); (Affidavit of Leshurn Hunt, January 26, 2008 incorporating complaint by Leshurn Hunt to OPS on February 28, 1986; AR-L 545497-545501).

9. **Jose Maysonet (1995)**: As discussed earlier in this report, Detective Guevara targeted Mr. Maysonet for arrest because Mr. Maysonet refused to pay him protection money, and that during the interrogation, Detective Guevara handcuffed him to the wall and beat him with a flashlight and phone book. Mr. Maysonet was told that his girlfriend would be put in prison and his children would be taken away if he did not cooperate. In 2016, Mr. Maysonet's conviction was vacated and prosecutors dropped all charges against Mr. Maysonet after Detective Guevara and Detective Halvorsen—among others—all alerted the court they would invoke the Fifth Amendment if they were called to the stand. Testimony of Jose Maysonet, Motion to Suppress Hearing, January 31, 1995; AR-L 537618-537792; Andy Grimm, *Double-murder charges dropped after 5 cops say they'll take the Fifth*, Chi. Sun-Times, Nov. 15, 2017.

10. **Daniel Pena (1986)**: Detective Guevara and two other Area 5 detectives hit Mr. Pena in the face and ribs, and beat him in the groin and thighs with flashlights until he confessed. Mr. Pena received medical treatment that corroborated his claims of abuse (*State of Illinois v. Juan Perez, Daniel Pena*, Transcript of Report of Proceedings, July 14, 1986; AR-L 154619-154687).

11. **David Rivera (1991)**: Detective Guevara coerced David Rivera into signing a confession by telling him that if he confessed and pled guilty, he would serve seven years in prison whereas if he did not confess, he would be sent away for forty to fifty years, and that if he signed a statement at the police station, he could go home. (Affidavit of David Rivera, February 22, 2008; AR-L 155028-155029).

12. **Victor Vera (1989)**: Detective Guevara threatened to lock up Mr. Vera's brother and parents if he did not confess, promised Mr. Vera that "nothing would come back to" him and that Detective Guevara would give him "total control over the Spanish Cobras neighborhood" if he admitted his involvement in a murder. When those methods were unsuccessful, Detective Guevara drove Mr. Vera to rival gang territory where there was a hit out on him, announced on a bullhorn that Mr. Vera was in the car, and tried to shove him out of the car causing Mr. Vera to agree to falsely confess. (Affidavit of Victor Vera, December 20, 2007; AR-L 154810-154813)

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 87

The Chicago Police Department received numerous civilian complaints charging Detective Guevara with using physical force to coerce suspects and witnesses, including the following:

1.  **Annie and Bernard Turner (1982)**: Annie and Bernard Turner alleged that Guevara used excessive force against them for smoking on a city bus. The allegations were not sustained. CR 124631; AR-L 648760-648819.

2.  **Leshurn Hunt (1983)**: As discussed above, Detective Guevara and other Area 5 detectives forcibly removed Leshurn Hunt from his home, brought him to the police station, and handcuffed him to a ring on the wall, where they beat him about the head, face, and body until he confessed to a murder and robbery. Mr. Hunt was detained for approximately 23 hours and deprived of food, water, and sleep. Mr. Hunt sought medical treatment for his injuries and filed a complaint with the Office of Professional Standards. The criminal court judge suppressed Mr. Hunt's confession. Mr. Hunt filed a civil lawsuit in 1985, alleging that Detective Guevara used force against him to extract a confession. The lawsuit identified "nine recent occasions on which [Guevara and other defendants] were accused of using excessive force during arrests and interrogation." *Hunt v. Jaglowski*, 85 C 1976, 665 F. Supp. 681 (July 21, 1987). CR 145129; AR-L 545458-545460.

3.  **Rafael Garcia (1986)**: Mr. Garcia alleged that Detective Guevara, while off duty at a bar, accused him of dealing narcotics, cuffed him, punched him, threw him to the ground, and kicked him. After Detective Guevara uncuffed Mr. Garcia at the urging of the bar owner, Detective Guevara hit Mr. Garcia in the head, and threw him out of the bar. When Mr. Garcia found other officers and told them what Detective Guevara had done, Detective Guevara tried to have Mr. Garcia arrested again. All of Mr. Garcia's allegations against Detective Guevara were not sustained, but Detective Guevara received a 2-day suspension for failing to complete an officer battery report and failing to obtain authorization prior to releasing Mr. Garcia. CR C152902; RFC 31530-31592.

4.  **Melvin Warren (1986)**: Mr. Warren alleged that Detective Guevara punched and choked him. The allegation was "sustained" following an investigation but OPS subsequently overturned the "sustained" finding and changed it to "not sustained." CR C150473; AR-L 648889-648898.

5.  **Juanita Martinez (1995)**: Mr. Martinez alleged that Detective Guevara "physically abused" her minor son to obtain information regarding a murder. The allegations were not sustained. CR 217624; RFC 31756-31791.

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 88

In other cases, individuals alleged they had been abused by Detective Guevara in attempts to obtain confessions or to provide false testimony against other suspects:

1. **Timothy Rankins and Armando Serrano/Jose Montanez (1993)**: Detective Guevara placed a phone book over Mr. Rankins' head and beat it with a flashlight, threw Mr. Rankins out of his chair, and placed Mr. Rankins in a chokehold to induce him to sign a statement that Detective Guevara had prepared implicating Serrano and Montanez in a murder. Mr. Serrano and Mr. Montanez have both received certificates of innocence (Sworn Statement of Timothy Rankins, *State of Illinois v. Armando Serrano*, April 3, 2012; AR-L 155230-155268; Corrected First Amended Complaint, *Jose Montanez v. Reynaldo Guevara, et al.*; AR-L 563644-563688; Complaint, *Armando Serrano v. Reynaldo Guevara, et al.*); AR-L 563597-563643).

2. **Jose E. Melendez and Thomas Sierra (1995)**: Witness Jose E. Melendez reported that Detective Guevara and others physically abused him and then retaliated against him when he could not provide information about a murder by charging him with a different murder. Jose E. Melendez was later acquitted of all charges. A different Jose Melendez (Jose M. Melendez)—who was with a victim during the murder of which Sierra was wrongly convicted—testified that when he went to Area 5 Detective Guevara pointed to a picture of Sierra and told him to identify that person as the shooter. Jose M. Melendez repeatedly testified that he told Detective Guevara that he did not know who the shooter was yet Mr. Melendez went along with Detective Guevara and "pointed out the one [Guevara] told me to point out." The other eyewitness in the case—Alberto Rodriguez—testified multiple times that he "couldn't give a good description" of the shooter. Detective Guevara coerced him into identifying Sierra by telling him that they "got the person or they know of the person" and that the shooter was "probably the guy in these pictures" prior to showing him the photo array. In 2018, Sierra's conviction was vacated and the State's Attorney dismissed all charges (Deposition of Jose Melendez, September 13, 2021, *Thomas Sierra v. Reynaldo Guevera et al.*); AR-L 155271-155312.

In 2013, the City of Chicago commissioned an investigation into Detective Guevara and hired former United States Attorney Scott Lassar to conduct the investigation. Reports in the investigation were completed in 2015 and concluded that at least four different men who alleged misconduct by Guevara are "most likely innocent." These men are Roberto Almodovar, Armando Serrano, Jose Montanez, and Robert Bouto. Lassar also reached conclusions in the DeLeon-Reyes and Solache cases, including that the allegations "that Guevara physically abused Solache and Reyes in an effort to coerce them to admit their involvement in the Soto murders are credible, and that it is more likely than not that Solache and Reyes were, in fact, physically abused during the course of their interrogations."

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 89

In sum, Chicago police commanders and high ranking City of Chicago officials (including police command personnel) were on continuing notice since as early as 1982 that there was a pattern and practice of police interrogation torture and coercion to extract confessions in Area 5 involving Detective Guevara, Detective Halvorson and other Area 5 Chicago police detectives.

(F) Conclusion

Dating back to the early 1970s, and at least until the early 2000's, there has been an extensive and widespread practice of torture, physical abuse and coercion during police interrogations in the Chicago Police Department, resulting in numerous coerced, fabricated, unreliable and/or false confessions. The substantial evidence I have reviewed in this report indicates that this pervasive practice of abusive police interrogations to coerce and fabricate confessions, especially from African American and Latino men, was *citywide* and existed in the different detective areas. The City of Chicago has been on notice of this widespread and extensive practice at least since the early to mid-1980s. By the time of the physically abusive and coercive interrogation of Daniel Rodriguez on May 11, 1991, the City of Chicago had been on notice for many years and decades of the pervasive practice of torture, abuse and coercion by Chicago Police detectives during interrogation to extract and fabricate confessions.

## XVII. Conclusion

In conclusion, based on my detailed analysis above, it is my professional opinion that:

1) Daniel Rodriguez's description of what occurred during his unrecorded custodial interrogation on May 11, 1991 by Chicago police detectives Reynaldo Guevara and Ernest Halvorsen that led to his confession statement is consistent with the empirical social science research on the types of interrogation techniques, methods, and practices that explain how and why innocent individuals are moved to make and/or agree to false and unreliable confession statements;

2) Daniel Rodriguez's description of what occurred during his unrecorded custodial interrogation on May 11, 1991by Detectives' Guevara and Halvorsen contains numerous examples of physically coercive interrogation techniques, methods, and strategies that are known to cause false and unreliable incriminating statements, admissions and confessions;

3) According to Daniel Rodriguez's description, the custodial interrogation on May 11, 1991 by Chicago police detectives Reynaldo Guevera and Ernest Halvorsen that led to his confession statement was guilt-presumptive, accusatory, confession-driven and confirmatory. According to Mr. Rodriguez's description, the interrogation was structured to break down Mr. Rodriguez's denials of guilt and to incriminate him by coercively pressuring and persuading him to agree with, and admit to, Detectives Guevara's and Halvorsen's pre-existing conclusion that

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 90

he actively participated in the murder of Jose Hernandez, Jr. on March 17, 1991. According to Mr. Rodriguez's description of the unrecorded interrogation sessions, Detective Guevara's and Halvorsen's guilt-presumptive interrogation sessions were not structured to assess the reliability of any information they learned from Mr. Rodriguez, but purely to submit him to their will and extract an incriminating statement from him, demonstrating a reckless disregard for the truth;

4) Daniel Rodriguez's description of what occurred during his unrecorded interrogation by Detectives' Guevara and Halvorsen May 11, 1991 involved the use of psychological interrogation techniques, methods, and strategies that have been shown by social science research to increase the risk of eliciting false and unreliable statements, admissions and/or confessions (*i.e.*, *situational* risk factors) when misapplied to the innocent. According to Mr. Rodriguez's description of the interrogation sessions, these included: physical coercion and abuse, lengthy interrogation, false evidence ploys, explicit threats of harm to Mr. Rodriguez and his family members, explicit promises of freedom and leniency and psychological coercion;

5) Daniel Rodriguez's description of his custodial interrogation by Detectives' Guevera and Halvorsen on May 11, 1991 contains examples of extremely psychologically coercive interrogation techniques, methods and strategies that have been demonstrated to cause suspects to perceive their situation as hopeless and to perceive that they have no meaningful choice but to comply with the demands of their interrogators, and that are known to increase the risk of eliciting involuntary statements, admissions and/or confessions;

6) Daniel Rodriguez was at a heightened risk for making and/or agreeing to involuntary and/or unreliable statements, admissions and/or confessions during his custodial interrogation on May 11, 1991 due to his personality traits and characteristics (i.e., *personal* risk factors), specifically his relative youth (he was 19 years old at the time) and associated psychosocial immaturity at the time;

7) If Mr. Rodriguez's interrogation-induced confession statement is false, it is properly classified as what is known in the social science research literature as a *coerced-compliant* false confession because of Mr. Rodriguez's description of why he falsely confessed in response to the physically and psychologically coercive practices and techniques he has described Detectives Halvorsen and Guevara using during their interrogation of him on May 11, 1991;

8) The unrecorded custodial interrogation on May 11, 1991 described by Daniel Rodriguez involved numerous instances of police interrogation contamination (*i.e.*, leaking and disclosing non-public case facts) and police interrogation scripting (pressuring and persuading the suspect to accept the police narrative of how and why the alleged crime occurred), which increased the risk that Mr. Rodriguez's confession statement, if false, would misleadingly, appear to be detailed, accurate and self-corroborating and thus increase his risk of being falsely convicted at trial;

Steve Art, Esq.
LOEVY AND LOEVY
August 8, 2025
Page 91

      9) The unrecorded custodial interrogation by Detectives' Guevara and Halvorsen on May 11, 1991 described by Daniel Rodriguez violated numerous universally accepted police investigative and interrogation national training standards, police protocols and commonly accepted best practices that existed in 1991;

      10) Starting in 1972 and continuing up to at least 2000, the City of Chicago's Police Department had a systemic practice of subjecting African American and Latino suspects who were interrogated by detectives and supervisors to physically abusive and coercive interrogations with the result of coercing and/or fabricating false and/or unreliable inculpatory evidence to be used against the interrogated suspect without regard to his actual guilt or innocence; and

      11) At least as early as February of 1982 and continuing through the 1990s, high ranking officials in the City of Chicago and the Chicago Police Department and numerous police command personnel, received continuing notice of this systemic practice of physical abuse and coercion of Black and Latino suspects in order to coerce and fabricate confessions, including from the repeated documented allegations that accumulated against supervisors and detectives, first at the Area 2 Detective Division, and later at Areas 3, 4 and 5; from the testimony of criminal defendants at motion to suppress hearings and trials; from numerous court decisions in criminal cases; from the findings in numerous Office of Professional Standards reports; from federal and state court decisions; and from the admissions of City officials.

      The opinions I express in this report are based on my own knowledge, research, and publications; research and publications in the field; and the case-specific information and evidence that has been provided to me. Should any additional information or testimony come to my attention, I reserve the right to modify any opinions expressed herein accordingly.

      If you have any questions, please do not hesitate to contact me.

                  Sincerely yours,

                  Richard A. Leo, Ph.D., J.D.
                  Hamill Family Professor of Law and
                  Social Psychology
                  University of San Francisco