Vol. 5 of 6

STATE OF ILLINOIS )
                   )  SS:
COUNTY OF C O O K  )

     IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
         COUNTY DEPARTMENT - CRIMINAL DIVISION

PEOPLE OF THE STATE    ) Criminal
OF ILLINOIS,           ) Case No. 99 CR 7227
                       )
     VS                ) Judge Michael P. Toomin
                       ) March 21, 2000
DAVID GECHT            )
RUBEN HERNANDEZ        )
RICHARD KWIL           )


                    Court was convened pursuant to

adjournment.

     PRESENT:

          MR. RICHARD A. DEVINE,
          State's Attorney of Cook County, by:
          MR. JOHN KARNEZIS,
          MR. BRIAN SUTH,
          Assistant State's Attorney,
              appeared for the people;

          MR. PHILLIP BARTOLEMENTI,
          MR. MARK SOLOCK,
          MR. ROBERT GROSSMAN,
              appeared for the defendants.


Cecilia A. Peterson, CSR
Official Court Reporter
Circuit Court of Cook County
Criminal Division
CSR # 084-001826

Gecht 018602

DAVID GECHT,

called as a witness on his own behalf, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY

MR. BARTOLEMENTI:

Q. State your name.

A. David Gecht, G-E-C-H-T.

Q. Mr. Gecht, you were arrested in this case on or about March 1 -- excuse me March 2, 1999?

A. About that date, yes.

Q. Now, have you ever been to Bristols Nightclub?

A. No, I haven't.

Q. Let me back up a minute. What's your present age?

A. I'm 19.

Q. And at the time of the arrest you were 18, correct?

A. Yes, I was.

Q. What education do you have?

L-175

**Gecht 018681**

A.    High school diploma.

Q.    Where did you go to school?

A.    Jewish Children's Bureau Day School.

Q.    What type of school is that with your understanding?

A.    Therapeutic day school is what I say.  I go for therapy two times a week and for emotional disorder

Q.    Who did you live with January 29?

A.    My mother Rosemary and my sister Spring.

Q.    Where did you live?

A.    4653 North Avers.

Q.    Now, on March 2, 1999 where were you at approximately 1:00 o'clock in the morning?

A     My home.

Q.    And what happened at that time?

A.    I was using the washroom and I heard my ma scream, "David" and I came out the bathroom.

Q.    Who was in the house?

A.    The officers were in the house, detectives.

Q.    What happened after that?

A.    They placed me in handcuffs, told me that I was under arrest.

Q.    Did they tell you what for at that time?

L-176

Gecht 018682

A.   No, they didn't.  They said that -- actually they said they wanted to question me at first.

Q.   Now, where were you taken?

A.   I was taken to Grand and Central.

Q.   And when you got to Grand and Central where were you placed?

A.   In a living room, I guess interrogation room.

Q.   And what was in the room?

A.   There was only a bench, and there was little hooks on the wall.

Q.   Now, at the time of your arrest which you said was about 1:00 o'clock in the morning, had you been up the whole previous day?

A.   Yes.  I woke up about 9:00 o'clock that morning.

Q.   Were you handcuffed?

A.   Yes, I was.

Q.   In what manner?

A.   One arm behind me into the hook.

Q.   Hook on the wall?

A.   Yes.

Q.   During the course of the next several hours did you speak to anyone?

A.   Other than detectives, no.

L-177

Gecht 018683

Q. You spoke with detectives?

A. Yes.

Q. And did you eventually also speak with a state's attorney?

A. I guess it was the next morning, yes.

Q. And you didn't speak with anyone else throughout that entire time you were in custody, correct?

A. No, I didn't.

Q. Did you make any phone calls while you were in custody?

A. No, I didn't.

Q. Were you permitted to sleep during that time?

A. No, I wasn't.

Q. Were you given anything to eat?

A. No, I wasn't.

Q. Now, by the time the state's attorney spoke to you have the detectives previously spoke to you?

A. Numerous times.

Q. Do you know how many times they interrogated you?

A. Just numerous, I couldn't give you approximate.

Q. Was it the same detective that interrogated

Gecht 018684

you on all those occasions?

A. No.

Q. How many different detectives?

A. I'd say three.

Q. Now, when you were brought into Area 5 originally -- do you remember who the first detective was that spoke to you?

A. The very first, I think his name is Guevarra.

Q. And did you know when you were brought to area 5 that Ruben Hernandez and Richard Kwil were already there?

A. No, I didn't.

Q. Did you find that out subsequent to your arrival at Area 5?

A Yes, I did.

Q. Who told you that?

A. The detectives.

Q. Guevarra?

A. Guevarra and Pergande.

Q. You think that's the other detective, Pergande?

A. Yes. The one with glasses, bald head.

Q. Now, what did Detective Guevarra tell you when he first came in to interrogate you?

L-179

**Gecht 018685**

A.    He asked me if I knew a gentleman in the picture, photocopy picture.

Q.    A picture of who?

A.    At first I didn't know.

Q.    Did you subsequently learn the identity of the person in the photo?

A.    Yes, I did.

Q.    Was that Roberto Cruz?

A.    Yes, it was.

Q.    Now, throughout the course of these interrogations did the detectives come in one at a time or alone?

A.    Guevarra was always there by himself but Pergande came in with another detective.

Q.    The third detective?

A.    Yes.

A.

Q.    Did they tell you things when they came in?

A.    Yes, they did.

Q.    Did they tell you anything about Ruben Hernandez and Richard Kwil?

A.    Yes, they did.

Q.    If you can tell me in general terms, what did they tell you about Ruben Hernandez and Richard Kwil?

L-180

Gecht 018686

A. They said I supposedly was with them the night of the murder and that I had shot the person.

Q. Did you ever give the detectives -- strike that. Did the detectives during these interrogations tell you more than that or facts about what happened?

A. Yes, they did.

Q. By the time you saw the state's attorney -- do you know how long it was before you saw the state's attorney?

A. It had to be at least twelve hours, at least.

Q. You didn't have a watch on, correct?

A. No.

Q. Was there a clock in the room?

A. No. I couldn't be exact.

Q. As best you can recall you think it was several hours before you saw the state's attorney?

A. Yes.

Q. By the time you saw the state's attorney I believe you testified you had spoken with these detectives on numerous occasions, correct?

A. Numerous, yes.

Q. When they would come in did they tell you things about this case that they have learned from Ruben and Richard?

L-181

**Gecht 018687**

MR. KARNEZIS: Objection.

THE COURT: Sustained.

BY MR. BARTOLEMENTI:

Q. What would they tell you about the case when they came in to interrogate you?

A. Well, they said that supposedly I got a phone call and I was supposed to be over here to shoot somebody. I'm saying that's what supposedly they told me.

Q. You have heard throughout this trial the facts, for instance the statements and other things that have been brought out by Mr. Hernandez's attorney and the state's attorneys, correct?

A. Yes.

Q. About what happened this night?

A. Yes.

Q. During the course of the interrogations how did you come into knowledge of those facts?

A. Through detectives.

Q. By the time you spoke with the state's attorney had you been told, as you know now, pretty much all of the facts of what had happened --

MR. KARNEZIS: Objection.

THE COURT: Sustained.

L-182

Gecht 018688

BY MR. BARTOLEMENTI:

Q. By the time you spoke with the state's attorney how many times had the police talked to you about what happened on this night?

A. Numerous times, every time they came in.

Q. Now, at some point you spoke with the state's attorney, correct?

A. Yes.

Q. And at some later point, actually approximately 12:15 the next afternoon, you gave a statement, a court reported statement. Do you remember that, from the court reporter?

A. Yes.

Q. The facts that are contained in that statement, where did those -- how did you come into knowledge of those facts?

A. Through detectives.

Q. Did you ever give the detectives any of the facts of this incident as they are reflected in this statement?

A. Of the incident or private?

Q. The incident?

A. The incidents, no, I didn't.

Q. Now, when you were arrested it was March 2.

L-183

Gecht 018689

As you know the incident occurred on January 29, correct?

A. I guess that's the date, yes.

Q. Do you remember when you were in custody on March 2 where you were some four weeks prior?

A. I couldn't tell you where I was four weeks prior.

Q. Do you keep a diary or anything of that nature?

A. No, I don't.

Q. Now, during the course of the interrogations with the detectives did anyone ever strike you?

A Strike me, yes.

Q. Do you know who that was?

A. Detective Guevarra and Detective Pergande.

Q. What did Detective Guevarra do to you?

A Well, I asked him if I could make a phone call or if I can have counsel and he slapped me. He told me no, I can't have nobody.

Q. At some point, -- well you knew you weren't free to leave of course.

A. No, they wouldn't let me leave.

Q. Did the detectives ask you to make a statement?

L-184

Gecht 018690

A.   Yes, they did.

Q.   And how many times if you know were you requested to make a statement?

A.   Through the course of the night, numerous.

Q.   Did they ever bring anything in to you, to the room to show to you?

A    Yes, they did.

Q.   What was that?

A.   Semiautomatic pistol.

Q.   Anything else?

A.   No, not really.

Q.   Was Ruben Hernandez ever brought into the room with you?

A.   Yes.

Q.   And in his statement or in person?

A.   In person.

Q.   Now, during the course of this interrogation -- strike that.

When the state's attorney first spoke to you did he usher you right in to take a court reported statement?

A.   No.  Not the -- about the third time, yes.

Q.   He spoke to you for a while, did he not?

A.   Yes.  He tried to ask me a couple of

L-185

**Gecht 018691**

questions.

Q. You were 18 years old you said at the time?

A. Yes, at the time.

Q. Had you ever been interrogated in this nature?

A. No.

MR. SUTH: Objection.

THE COURT: I don't know the relevance of this. Sustained. I will strike the answer and instruct the jury to disregard it.

BY MR. BARTOLEMENTI:

Q. During the course of this interrogation how did you feel at the time?

A Very scared.

Q. You don't have any training in the law, do you?

A No, I don't.

Q. After the incident on January 29 did you learn before your arrest that Roberto Cruz had been killed?

A. Yes, I did.

Q. How did you learn that?

A. Just word around.

Q. The neighborhood?

L-186

Gecht 018692

A    The neighborhood, different people, yes.

Q.    Did you have a conversation with Colleen Miller about this incident?

A.    Yes.

Q.    What did you tell her about this incident?

A.    I told her that I had the knowledge that Roberto Cruz was killed.

Q.    You told her what you had heard?

A.    Yes.

Q.    Did you ever tell her that you killed Roberto Cruz?

A.    No, I did not.

MR. BARTOLEMENTI:    That's all I have at this time, Judge.

THE COURT:    State may inquire.

MR. SUTH:    Thank you.

CROSS EXAMINATION

BY

MR. SUTH:

Q.    The first time you heard Cruz was killed where were you?

A.    I was in the neighborhood, Bucktown.

L-187

**Gecht 018693**

Q. What day was that?

A. Probably the next day after it happened.

Q. The night after it happened?

A. The next day, yes.

Q. You told Colleen Miller two hours after it happened about the incident, isn't that true?

A. No, it isn't.

Q. So Colleen Miller was lying today?

A. Yes.

Q. Colleen Miller was your girlfriend at the time?

A. Yes.

Q. She lived in your house, correct?

A. Yes.

Q She stayed in your room?

A. Yes, she did.

Q. In fact Colleen's been in this courthouse since that date, correct?

A. I'm sorry.

Q. Colleen's come here on certain days, correct?

A To visit, yes.

Q. And she comes to visit you in the jail?

A. Yes.

Q. And she's come here and sat during times you

L-188

**Gecht 018694**

were brought out?

A    Maybe once or twice.  I don't recall.

Q.    But it was always on your behalf, correct?

A.    I guess.  I never talked to her.

THE COURT:  Who's got the beeper?  You better take it outside, you're disturbing the court.

THE COURT:  Is there an objection?

MR. BARTOLEMENTI:  There was.

THE COURT:  What's the basis?

MR. BARTOLEMENTI:  Can I have that read back.

THE COURT:  Read back the question.

(The record was read by the court reporter as requested)

THE COURT:  Overruled.  You may answer.

THE WITNESS:  It must have been.  I don't know.

BY MR. SUTH:

Q.    How often did she visit you since you were arrested.

A.    Maybe twice a month, maybe three times.

Q.    Now, let's back up here.  The court reported statement, People's Exhibit Number 36, this is your statement, correct?

A.    Yes.

Q.    These are the words that you yourself spoke

L-189

Gecht 018695

to the court reporter, is that correct?

A. Yes.

Q. You said the words that appear on this paper?

A. Yes.

Q. When it was done you signed it, correct?

A. Yes.

Q. She was typing the same way -- she was typing down everything you said, right.

A. Yes.

Q. The same way she is here?

A. Yes.

Q. Now, you said the police told you everything to say in here, correct?

A. Most of it, yes.

Q. Well, did the police tell you that you graduated from the Jewish Children's Bureau?

A. No. Those were my own words.

Q. Did the police tell you your name was David Aaron Gecht?

A. My own words.

Q. Did the police tell you you were 18 years old?

A. Those were my own words.

Q. Did the police tell you you live at 4653

L-190

Gecht 018696

Avers.

A. My own words.

Q. Did the police tell you your mom's name was Rosemary Gecht?

A. Those are my own words.

Q. Did the police tell you your sister's name was Spring?

A. My own words.

Q. In fact all those are true, correct? All those are true?

A. Yes.

Q. You have two nephews, Thomas and Christopher, right?

A. Yes.

Q. You also indicate your girlfriend is Colleen Miller and she lives with you?

A. Yes.

Q. All that's true?

A. Yes.

Q. At the time you belonged to the Insane Unknowns, correct?

A. At the time, yes.

Q. You had been a member for three years?

A. Yes.

L-191

**Gecht 018697**

Q. That was all true?

A. Yes.

Q. You knew Ruben Hernandez, correct?

A. Yes.

Q. In fact the photograph they showed you of Ruben Hernandez you identified as Ruben Hernandez, is that correct?

A Yes, I did.

Q. That's because you knew him?

A. Yes.

Q. You knew him from the gang, correct?

A. Yes.

Q. You knew him to be one of the leaders of the gang?

A. No, I didn't.

Q. Is it your words to say that he watches over us?

A. Yes, I did. He's not the head, he just older than us so we look up to him. He's not no chief.

Q. Now, the colors of the Insane Unknowns are black and white?

A. Yes.

Q. Those were your words?

A. Yes.

L-192

Gecht 018698

Q.   Do you know Richard Kwil?

A.   Yes.

Q.   You know Richard Kwil is an Insane Unknown?

A.   He wasn't really an Unknown, he was a Cobra. He wasn't an Unknown.  We looked at him as a brother.

Q.   In your court reported were you asked this question and did you give this answer, showing you People's Exhibit Number 2:

"Who is this?

Answer:  Richard Kwil.

Question:  What gang does he belong to?

Answer:  Insane Unknowns."

A.   Cause we looked at him as an Unknown, yes.

Q.   Were you asked that question and did you tive that answer?

A.   Yes, that's right.

Q.   You knew on that date Roberto Cruz?

A.   I don't know him.  I know of him.

Q.   You knew him as TT?

A.   Yes.

Q.   You knew his car?

A.   I didn't know his car.

Q.   So when you say in here you knew what kind of car he had that's not true?

L-193

Gecht 018699

A.   No.

Q.   How did you find out what kind of car he had?

A.   That's what the police told me.

Q.   By the way, you said you talked to the police, correct?

A.   Yes.

Q.   A number of times?

A   They questioned me a number of times.

Q.    how many times did they talk to you?

A.   I can't give you an exact number.  Numerous times.

Q.   How long did the first conversation last?

A.   About five or ten minutes.

Q.   In fact you just told the courtroom that you didn't know where you were on January 29, right?

A   January 29?

Q.   Yes, 1999.

A.   No.  I don't know exactly where I was.

Q.   First time you were brought to the police station and questioned the  first thing you said you were with your girlfriend Colleen Miller, correct?

A.   That was.

MR. BARTOLEMENTI:  Judge, may I have a side bar. I'd like to be heard.

L-194

**Gecht 018700**

THE COURT: Excuse us.

(The following proceedings were had outside of the presence and hearing of the jury:)

MR. BARTOLEMENTI: Judge, his first statement is a denial by David Gecht. He denied he was involved at all. He believed he was with his girlfriend, I was barred from asking him that, statement of such kind.

THE COURT: So.

MR. BARTOLEMENTI: I'm objecting to state doing it now.

THE COURT: Why. It's a different theory. The state can decide, as I explained earlier, whether they want to use statement 1, 2, 3, 4 or 10. Because they are construing or interpreting the substance of the statement as either being admissions of facts exculpatory statement. They are party opponents, they can seek to introduce whatever statement they wish to introduce that a defendant makes. If they -- if this is statement 1 or 2 they go into statement 1 or 2 you can go into it on redirect. There is nothing to bar them simply because you couldn't go into it. If you could go into it, if you sought to do it it would be in realm of self-serving hearsay.

L-195

**Gecht 018701**

The rule is different for party opponent. I tried to make that distinction earlier. I did tell all the lawyers if state chose to go into other conversations besides the one that is reported here then under the doctrine of completeness you would be entitled to cross examination on that statement. But that did not give you license to open it up yourself first. Okay.

MR. BARTOLEMENTI: Very well.

(The following proceedings were had in the presence and hearing of the jury:)

BY MR. SUTH:

Q. Now, the first time you talked to the police you told them you were with Colleen Miller that night?

A. Yes.

Q. You lied to the police?

A. No, that's where I usually am at 3:00 o'clock in the morning.

Q. Well, they brought Colleen Miller to the station that night, right?

A. She was there soon afterwards.

Q. Then you changed your story and said no, I wasn't with Colleen Miller, is that true?

L-196

**Gecht 018702**

A.    In the police station?

Q.    Yes.

A.    That's what I said cause I can't recall four weeks in the past.

Q.    Do you understand my question.  First time you talked to the police without Colleen Miller in the station you said you were with her, right?

A.    Yes.

Q.    When they brought her and confronted you with the fact she was there you said you weren't there, is that correct?

MR. BARTOLEMENTI:  Objection.  Asked and answered. He said he can't recall four weeks past.  He answered the question.

THE COURT:  I think he did.

MR. SUTH:  Very good.

Q.    But you no longer said after that time you were with Colleen Miller that night, correct?

A.    I can't recall where I was so no, I didn't say I was with her exactly that night.

Q.    Any more.  The first time you did.

A.    The first time I did, yes.  That was just a guess.

Q.    So that was a guess your first time

L-197

Gecht 018703

conversation with the police?

A.    I told them that so they wouldn't hit me any more.

Q.    Who with you?

A.    Officer Guevarra.

Q.    Where did he hit you?

A.    My face.

Q.    How many times?

A.    Two or three.

Q.    Closed fist or open fist?

A.    Open fist.

Q.    Did it hurt?

A.    Yes.

Q.    Did it give you a bruise?

A.    No.

Q.    Did it swell?

A.    No.

Q.    Did you need medical attention.

A.    No.

Q.    By the way, the court reporter is writing down everything -- when you talked to the court reporter later, we agreed on that, you talked to a court reporter later?

A.    Yes.

L-198

Gecht 018704

Q. She was typing out everything you said?

A. Yes.

Q. Just like she is today?

A. Yes.

Q. Right now if I say something she writes it?

A. Yes.

Q. Did you say Detective Guevarra hit me during the court reported statement?

A. No.

Q. You said he hit you the first time on the face. How many times?

A First interview, maybe two or three.

Q. First interview is when you said you were with Colleen Miller?

A. Yes.

Q. So he hit you to get an alibi statement?

A. Yes.

Q. When you told him you weren't there he stopped hitting you, right?

A. Excuse me.

Q. When you said you weren't with Colleen Miller he stopped hitting you?

A. Until he came in the next time, yes.

Q. How much longer -- how long was he gone

L-199

**Gecht 018705**

before he came back?

A. Maybe an hour, maybe.

Q. That's when he came back with Colleen Miller?

A. She didn't come in the room, he said she was there.

Q. And at that time you said he hit you again?

A Yes.

Q. How many times did he hit you then?

A. About three or four, five.

Q. Same place?

A. Yes. He punched me in the stomach a couple of times.

Q. He hit you in the stomach twice. How many times in the face?

A. Three or four maybe.

Q. In the same spot?

A. No, not really.

Q. Side of the head sometimes, sometimes side of the face, forehead, back of the head.

A. Everywhere in my head. He punched me in my stomach.

Q. Let's get specific. First time he hit you -- second time. First hit where did it go to?

A. I can't recall exactly.

L-200

Gecht 018706

Q.    Second hit where did it go to?

A.    I can't recall.

Q.    How about the third?

A.    I can't recall exactly.

Q.    It's hard to recall what didn't happen, isn't it?

A.    No.  It did happen.

MR. BARTOLEMENTI:  Objection.  Argumentative.

THE COURT:  Overruled.

BY MR. SUTH:

Q.    Did he hit you again after that?

A.    Next time he came in.

Q.    From the second savage beating you took --

MR. BARTOLEMENTI:  Objection.

THE COURT:  Sustained.  Don't characterize it.

BY MR. SUTH:

Q.    The second time he hit you did you have any swelling?

A.    No.

Q.    Any bruising?

A.    No.

Q.    Did you have any bleeding?

A.    No.

Q.    Did it hurt?

L-201

**Gecht 018707**

**ILLINOIS DEPARTMENT OF CORRECTIONS**

# LIBRARY ACCESS & LEGAL REVIEW FORM

**Pontiac Correctional Center**

OFFENDER NAME:_____NUMBER:_____DATE:_____

<span style="font-size:small">*Print Name*</span>

CELLHOUSE:_____GALLERY #:_____CELL #:_____

**You must check the appropriate boxes in order to receive your call pass and legal review.**

☐   I am requesting a call pass to the Maximum Security Unit Library for the following date.

Day of the Week:_____Month/Date/Year:_____

☐   I am also requesting the use of materials stored in my Legal Property Box for the same day.

Paralegal Assistant Receiving:_____Date:_____

<span style="font-size:small">*Print Name & Sign*</span>

☐   APPROVED:_____   ☐   DENIED:_____

<span style="font-size:small">*DATE SCHEDULED*</span>                                    <span style="font-size:small">*PURPOSE OF DENIAL*</span>

Distribution: Paralegal Assistants
Cellhouse

PON 0281 (eff. 01/2006)

**Gecht 018708**

NO CALL PASSES

WILL BE ACCEPTED

BY LIBRARY STAFF

UNLESS REQUESTED BY

OFFENDER MAKING

REQUEST

**Gecht 018709**

A.    Of course.

Q.    The third time he came in where did he hit you?

A.    Pergande came in between that one of them times.

Q.    Pergande hit you too?

A    Yes.

Q.    Where did Pergande hit you?

A.    He hit me with both hands and his fist on my back.

Q.    Did that cause bruising?

A.    I'm not sure.

Q.    Did it leave a mark?

A.    I'm not sure.  I can't see my back.

Q.    How many times did he hit you?

A.    Maybe four or five.

Q.    A big punch, right?

A.    Not big enough but big, yes.

Q.    So did Guevarra come back again?

A.    Yes, afterwards.

Q.    Did Guevarra hit you again?

A.    At first no, he showed me that he had -- he said he had the gun and in his possession.

Q.    So he didn't have the gun the first time he

L-202

**Gecht 018710**

talked to you?

A. No.

Q. He didn't have the gun the second time he talked to you?

A. He didn't say he did.

Q. Pergande didn't tell you about the gun when he talked to you?

A. Yes. They told me everything. They told me we know what kind of gun it is. We know this. They told me the facts.

Q. Are you saying the fourth conversation was the first time they showed you a gun?

A With Guevarra, yes.

Q. How long did the second conversation take?

A. I don't know exactly, maybe 15, 20 minutes.

Q. How about the third conversation?

A. Maybe the same.

Q. How about the 4th?

A Little bit, maybe little longer.

Q. You said Detective Guevarra hit you during the fourth conversation?

A. Yes. They hit me every time.

Q. Slow down. I don't want to miss any. How many times did he hit you the fourth time?

L-203

Gecht 018711

A. I can't recall, probably two or three.

Q. Where is the first place he hit you?

A. In my stomach.

Q. Where is the second place he hit you?

A. I can't recall. I know the first time he hit me in my stomach.

Q. How about the third place?

A. I don't know.

Q. You remember getting hit three times?

A. Yes.

Q. What about next time, were you hit again?

A. After that I agreed to whatever they wanted me to do.

Q. During any of this hitting or slapping did you ever have any swelling?

A Not that I remember.

Q. Did you have any bruising?

A. Just inside, maybe a cut inside my mouth.

Q. Was that bleeding?

A. It chipped one of my teeth.

Q. You chipped a tooth?

A. Yes. I never got a chance to go to the dentist.

Q. After everything was done you were taken to

L-204

Gecht 018712

the lockup, correct?

A. Yes.

Q. The lockup keeper on March 2, at 3:30 talked to you before you went in the lockup, correct?

A Basic questions, my name and stuff.

Q. The question is do you have any obvious pain or injury. You answered no?

A. Yes, I did.

Q. At that time when they talked to you with your new chipped tooth from the detective you didn't tell them you were beaten by the police, did you?

A. No.

Q. You didn't tell them you chipped a tooth upstairs in the area?

A. No.

Q. You didn't tell them you had a cut on the inside of your lip?

A. No.

Q. You didn't tell them you were beat about the back?

A. I didn't tell.

Q. You had an oportunity to make the treatment you wanted or any pain you had but you didn't complain, did you?

L-205

**Gecht 018713**

A.   No.   They weren't going to give me any medical attention.

Q.   You did not tell them anything, correct?

A.   No, I didn't.

Q.   You talked to a state's attorney Brendan McGuire, correct?

A.   Before lockup, yes.

Q.   Well did you talk to him in the early evening hours around little after 4 in the morning?

A.   Yes, he came in.

Q.   And he talked to you with Detective Guevarra, correct?

A.   First time I seen McGuire I hink he was with Detective Guevarra.

Q.   Then Guevarra and McGuire left, correct?

A.   Yes.

Q.   McGuire came in alone?

A.   Yes.

Q.   Did you tell McGuire an attorney, not a police officer, that you were struck by the police officers?

A.   No.

Q.   He asked you how you were doing.   Did you tell him you were hit about the back by Pergande?

L-206

Gecht 018714

A. No.

Q. Did you tell him you had a chipped tooth from this beating by the police?

A. No.

MR. BARTOLEMENTI: Objection.

THE COURT: Overruled.

BY MR. SUTH:

Q. Did you show them the cut on your mouth you received by police officers?

A. I received that after I talked to him.

Q. The police beat you after you talked to Brendan McGuire?

A. The first time they hit me, not the second time.

Q. Was Brendan McGuire present when they hit you?

A. No.

Q. At any time did you tell Brendan McGuire the police hit me?

A. No.

Q. Now, this statement is approximately 25 pages long, right?

A. I'm not sure.

Q. I will show you your statement.

L-207

Gecht 018715

Showing you what's marked People's Exhibit Number 36. This is your statement, right?

A. Yes.

Q. That is your signature, right?

A. That's a printed of my name, yes.

Q. Did you write that down?

A. The print, yes.

Q. Those are your letters from your land?

A. Yes.

Q. And it's 25 pages, right?

A. Yes.

Q. And just so we're clear, maybe I misunderstood a question. All the words spoken are your words that you spoke in front of the court reporter?

A. Yes.

Q. Are you suggesting that the police had you memorize what's in this statement?

A. Over the course of the time, the whole time they were talking to me. Just most of the stuff what they were saying.

Q. You're being beaten?

A. Yes.

Q. You haven't slept, correct?

L-208

**Gecht 018716**

A. Yes.

Q. You're hungry and you're able to memorize all the facts of the case, correct?

MR. BARTOLEMENTI: Objection.

THE WITNESS: I had to get out of there. I'm sorry.

BY MR. SUTH:

Q. Let me ask you this. Did a police tell you about hollow point bullets?

A. Yes.

Q. Have you heard of hollow point bullets before that date?

A. Yes.

Q. You knew what they were talking about, right?

A. To an extent.

Q. With all these facts you remembered about the hollow point bullets, correct?

A. Yes.

Q. Now, you remember the police telling you cause you testified to it obviously, that you're at war with the Spanish Lords, right?

A There was arguments.

Q. Let me ask you this, were the Insane Unknowns and the Spanish Lords at war at that time?

L-209

**Gecht 018717**

A. They were arguing, yes, not a serious, serious war but they were arguing, yes.

Q. What's a serious, serious war?

A. Running around killing each other.

Q. Well, when you were asked the question:

Question: What problems did you have with the Spanish Lords?

Answer: War with them."
Were those your words?

A. Yes.

Q. You chose the words war with them, correct?

A. Yes.

Q. So you were at war with the Spanish Lords, right?

A. Not serious war but we were, yes.

Q. Did the police tell you to say you were at war with the Spanish Lords?

A. That was a true statement.

Q. It's also true Roberto Cruz is known as TT, right?

A. I knew him as TT. I found out his real name the night I was arrested.

Q. You knew who he was cause you recognized his picture, right?

L-210

Gecht 018718

A.   Yes.  I seen him around.

Q.   Getting back to this beating thing, at the end of the court reported statement were you asked the following questions and did you give the following answers:

"Question:  While you have been at the station have you been treated well by the police and the state's attorney?"
Were you asked that question and did you give the answer yes?

A.   No, I didn't.

Q.   Did you give that answer?

A.   No I did not.

Q.   What answer did you give?

A.   I didn't give an answer.  I don't recall being asked that question.

Q.   So when the sentence says on page 24:

"Question:  While you have been at the station have you been treated well by the police and state's attorney?"
Your answer is yes.  Your testimony is you never gave that answer?

A.   No, I didn't.

Q.   Is that your signature on the bottom of that

Gecht 018719

page?

A.   Yes.

Q.   In fact you went through this whole statement?

A.   Yes.

Q.   You actually made corrections during this statement?

A    They asked me to, yes.

Q.   None of these corrections were yours, right?

A.   Except like the stuff on my name.

Q.   Everything else was initiated by the police or the state's attorney?

A.   I don't understand.  What stuff?

Q.   Well, all the other corrections were initiated by the police or the state's attorney?

A.   You mean they put them -- are you saying they put it down there or did I actually do it?

Q.   Did you ask them to do it?

A.   I corrected what they asked me to, yes.

Q.   Was it your idea to correct these things or the state's attorney?

A.   They asked me to correct it.

Q.   So when it says do you know the territory the Insane Unknowns control you initially answered

L-212

**Gecht 018720**

probably from North Avenue and Fullerton and was corrected probably from North Avenue to Fullerton and from Hoyne to the expressway. You're saying it's Brendan McGuire's idea to change that?

A. That's not even territory.

Q. Answer the question.

A. They asked me to change that, yes.

Q. And Brendan McGuire asked you to indicate that, correct?

A. I'm sorry. What was the answer.

Q. Did Brendan McGuire tell you to put that in there?

A. What in there? I'm sorry.

Q. You don't remember?

A. I didn't hear what you said.

Q. We're talking about the same sentence about the territory. Do you remember our conversation.

A. I didn't hear the territory you said.

Q. You just told me a second ago, didn't you, that the territory I just said was wrong?

A. Yes, it was.

Q. What territory did I say?

A. I heard North Avenue to Fullerton. I didn't hear the other part, something to expressway.

L-213

**Gecht 018721**

Q. From Hoyne to the expressway.

A. That's not true.

Q. You did not ask Brendan McGuire to put that in there?

A. No.

Q. Brendan McGuire came up with that territory on his own?

A. That's not our territory.

Q. Did Brendan McGuire put that in there or did you suggest he change that?

A. He must have put that in there. I know I was asked initially that though.

Q. Were you also asked this question:

"Have you had anything to eat?

Answer: Yes."

A. After the statement I ate, yes.

Q. Did you eat before the statement took place?

A. No, I didn't.

Q. Were you asked this question, after being treated by police. Were you asked this question:

"And have you had anything to eat?

Answer: Yes."

Were those the questions you were asked and were those the answers you gave?

L-214

**Gecht 018722**

A.   Yes.  If that's the answer that's there but I ate afterwards.

Q.   Did you give that answer?

A.   Yes.

Q.   Did you ask this question and were you given this answer:

"What did you have to eat?

Answer:  McDonald's"?

A.   Yes.

Q.   You indicated to the court reporter you had a sausage biscuit, correct?

A.   That's what it says.

Q.   Yes.  That's what you said, correct?  Did you say that?

A.   Yes.

Q.   You said it was a sausage biscuit?

A.   Yes.

Q.   Incidentally you had been shot in the stomach, right.

A   Yes, I did get shot.

Q.   You indicated in your court reported statement on the same page:

"Were you offered a bologna sandwich?

Yes, but my stomach ever since I got

L-215

**Gecht 018723**

shot I can't eat it."

Right?

    A.    That's what I said.

    Q.    That' on the page, right, showing you People's Exhibit 36. That's here on the page, right?

    A.    Yes.

    Q.    And that's what you said. You said the word McDonald's when asked what you had to eat above that and above that it said did you have anything to eat, correct and you said yes?

    A.    Yes.

    Q.    You're saying the sentence above while you have been at the station have you been treated well by the police and state's attorney the answer is yes, you still say you never said that?

    A.    I said yes but that's just what I said to get out of it.

    Q.    So you did say yes to that question?

    A.    If I recall.

    Q.    You said a couple of different things. Let's get that straight.

    MR. BARTOLEMENTI: Objection.

BY MR. SUTH:

    Q.    When you were asked that question while at

Gecht 018724

the station have you been treated well by the police and the state's attorney did you answer yes?

A. It says that on there.

Q. That's not my question. Did you answer yes?

A. I can't recall.

Q. You don't remember?

A. No, I don't.

Q. That's fair enough. But you remember everything the police told you to say in the court reported, right?

A. Yes, at the time I did.

Q. And the police told you to say TT's car is a gray hatchback with a broken window?

A. That's what they said his car was. That's what he said his car was.

Q. When you were asked this question:

"What did his car look like?

Answer: Gray hatchback with a broken

back window."

A. Yes.

Q. Was that from your knowledge?

A. That's what I was told by the police during interrogation.

Q. Which police told you to say that?

L-217

Gecht 018725

A. They didn't tell me to say it they told me the facts as they came in through interrogation, Pergande and Guevarra.

Q. And you remembered everything they told you, right?

A It's kind of hard to forget when you're getting smacked.

Q. So when you talked to Brendan McGuire you remembered everything he told you the first four times, right?

A. They told me it every four times, yes.

Q. When you talked to Brendan McGuire you told him everything they had told you?

A. I'm sorry. Would you repeat that.

Q. When you spoke to Brendan McGuire you told Brendan McGuire everything that's in this court reported statement, right?

A The first time, no.

Q. When is the first time you talked to Brendan McGuire?

A. Not first time. I spoke with him I think three times.

Q. And the first time you talked to him was it a little after 4, maybe 4:15 in the morning?

L-218

Gecht 018726

A.  I can't recall the exact time.

Q.  You identified a picture of a car, correct?

A  Yes.

Q.  Is it your testimony that the car you identified you had never seen before that day?

A.  I'm sorry.

Q.  Showing you what's been marked as Court Reported Exhibit 5, you identified a picture of this car?

A.  Yes.

Q.  Is it your testimony that you have never seen the car before that date?

A.  I can't recall.  Here or in the statement?

Q.  When you gave the court reported statement is it your testimony that you had never seen that car before that date?

A.  I think it was.  I'm not positive.

Q.  Well, had you seen the car before that day?

A.  No.

Q.  So you had never seen the car before that date but identified it in the court reported statement as TT's car?

A.  That's what I was told, yes.

Q.  Now, by the way did the policeman also tell

L-219

Gecht 018727

you that the car's tires were flat?

A. I can see them in the picture.

Q. You said the rear passenger, right, you flattened the rear passenger?

A. I'm sorry.

Q. You told the police you flattened the rear passenger tire in your court reported statement, right?

A. Yes.

Q. Showing you what been marked as People's Exhibits Court Reported Statement 5 and 6, does this show the passenger side or driver's side?

A. It shows the driver's side but you can see the passenger side tire.

Q. You can?

A. Yes you can, right there.

Q. This is the driver's side of the car?

A. Yes.

Q. This is behind the driver's side, correct?

A. Yes.

Q. And the picture behind, the rear seat is behind the driver, right?

A. Yes.

Q. That would be the rear driver's seat,

L-220

Gecht 018728

correct?

A.   This side of the picture, yes.

Q.   That's what it shows?

A.   Yes.

Q.   That tire isn't even flat, is it?

A.   No, the passenger side is.

Q.   Where in the photograph can you see that?

A.   You can see it right here, sir.

Q.   You're basing it on the fact you can look very close and see the rear tire flattened?  That' why you said that?

A.   Yes.

Q.   The front is also flattened, right?

A.   Yes.

Q.   You said in the statement you did not flatten the front tire, right?

A.   No.

Q.   Why flatten one and not the other?

A.   I didn't flatten none.

Q.   Why would you say you only flattened one in your statement?

A.   That's what I was told.

Q.   They told you you only flattened one tire?

A.   They told me one tire was flattened.

L-221

Gecht 018729

Q. Did you see it or did they tell you?

A Excuse me.

Q. Did you see it or did they tell you?

A. When they showed me that picture I seen it.

Q. You decided because they showed you a picture with a flat tire it would be really helpful for the statement you were making up that you flattened a tire?

A. I told what they wanted to hear.

Q. Who told you the fire was flat?

A. Guevarra and Pergande.

Q. Which conversation?

A. I can't recall exactly which one.

Q. Which tire did they tell you to say was flat?

A. They said two tires were flat.

Q. You decided it would be good to say only one of them in the statement?

A. I just said one of them, the rear.

Q. Did they tell you what color building was on the street?

A. They came in and told me that one of my codefendant said I was standing by a red building.

Q. One of your codefendants? And you remembered that when you gave your statement too, right?

L-222

**Gecht 018730**

A. That was what was asked of me.

Q. Showing you what's marked People's Exhibit 9. This is a red building, right?

A I'm sorry where?

Q. This is a red building there, right?

A. Brownish brick, yes.

Q. Your testimony is that you have never seen that building before?

A. I have never seen that street before.

Q. Yet you said in your statement you were standing in front of a building across from his car?

A. Yes. That's what they told me my codefendant said about me.

Q. And you remembered all that, right?

A. I was getting smacked so I remembered everything they said, yes.

Q. And you hadn't slept either, right?

A. No.

Q. Was somebody in there with you the whole time you were in there?

A. Not the whole time.

Q. How did somebody prevent you from sleeping when there was nobody in the room with you?

A. I was just sitting there.

L-223

Gecht 018731

Q. So nobody prevented you from sleeping when they left the room, correct?

A They told me they would be back, they didn't tell me not to sleep.

Q. No one sat there and woke you up every time you put your head down, did they?

A. When I came in I was just getting interrogated, I couldn't sleep.

Q. You testified a little while ago during direct examination that they wouldn't let you sleep. I'm trying to find out how they didn't let you sleep.

A. Because I asked them to send me to the cell.

Q. So the fact they didn't send you to the cell and they left you in the room, that's preventing you from sleeping?

A. Yes, it is.

Q. Okay.

A. With all due respect it's hard to sleep when you're handcuffed to a wall.

Q. When Brendan McGuire spoke to you were you wearing handcuffs?

A. Yes.

Q. When the court reporter spoke to you were you in handcuffs?

L-224

Gecht 018732

A.    I was in different room.

Q.    When you spoke to Brendan McGuire you were cuffed to the wall?

A.    First two times.

Q.    Now other than all the times you recall getting beat was there any other times I missed?

A.    I'm sorry.

Q.    Were you hit on any other occasion than the four times you already talked about?

A.    It could have been maybe one more interrogation but I think it was only four.

Q.    When you went to the jail after you were charged you were examined by a paramedic, right?

A.    If that's what you want to call him.

Q.    You walked in, they had you strip, right?

A.    Yes.

Q.    They had you turn around, looked you over, right?

A.    Yes.

Q.    They asked you questions?

A.    The officers strip searched me and checked me.

Q.    You were viewed by a doctor when you first walked in, correct?

A.    He did, I guess -- I don't know what kind of

L-225

Gecht 018733

test, some kind of test.

Q. Showing you what's marked People's Exhibit 40, for identification. This is a medical intake record. Is that your signature?

A Yes.

Q. Does that say David Gecht?

A. Ye.

Q. You signed that?

A. Yes.

Q. March 3, 1999?

A. Yes.

Q. That was when you were first brought to Cook County Jail when they examined you?

A. Yes.

Q. You didn't tell them at that time you had been beaten by the police?

A. No.

Q. You didn't complain of any injuries to this paramedic at this time, did you?

A. There was really no serious injuries to report.

Q. And he didn't observe -- he didn't note or you weren't advised of any injuries you had to your back, correct?

Gecht 018734

A.   There was no real injuries.  I mean I got hit, I was smacked and punched but there was no real injuries.

Q.   Well, let me ask you this.  After this you went to the jail.  You're outside Area 5, right?

A.   I'm sorry.

Q.   You're outside of Area 5 after you went to the jail, right?

A.   After I went to jail?

Q.   Right.  You weren't in Area 5?

A.   No.

Q.   Detective Guevarra wasn't there?

A.   No.

Q.   Detective Pergande wasn't there?

A.   No.

Q.   They weren't there when you talked to the paramedic?

A.   No.

Q.   After you went to the jail did you call up the Office of Professional Standards and say I have been beaten in police custody?

A    No.

Q.   Have you ever since that date called up the Office of Professional Standards and said, hey, these

L-227

**Gecht 018735**

two detectives beat me?

A. It wasn't very serious, so no, I didn't.

Q. It wasn't very serious. It didn't hurt that much?

A. It didn't really hurt afterwards at all.

Q. You realized what you were saying during this statement is that you shot somebody, correct.

A. That's what it says, yes.

Q. Are these your words?

A. Yes.

Q. And you realized when you were saying these words what you were saying, right?

A. Yes.

Q. You realized you were saying you pointed a gun at somebody's back and fired until you emptied a clip?

A. Yes.

Q. Are you saying that you did that because you were beaten and not seriously hurt?

A. No. I did that because I was scared.

Q. Okay. You realize when you were doing that you were confessing to a murder?

A. They said I was making a court reported statement. I didn't know I was confessing to a

L-228

Gecht 018736

murder.

Q.   What part about shooting somebody multiple times and him dying didn't you understand to be a murder?

A.   I didn't understand it to be a confession.

Q.   What part about shooting an unarmed man in the back didn't you understand to be a confession?

A.   I didn't understand it to be a confession.  I didn't understand it.

Q.   Did you think you might be charged with a crime after you talked to the court reporter?

A.   After they told me I was going to go home, no.  I didn't think I was going to get charged.

Q.   Who told you you were going to go home?

A.   The detectives.

Q.   At what point?

A.   Every time he asked me to make a statement.

Q.   So not only did he beat you but then he told you you could go home after you said what they wanted to hear?

A.   Yes.

Q.   Were you asked this question during the court reported statement:

      "Question:  No promises or threats

L-229

**Gecht 018737**