*DeLeon-Reyes v. Guevara, et al.*
Case No. 18 CV 01028

*Solache v. Guevara, et al.*
Case No. 18 CV 02312

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ARTURO DeLEON-REYES,              )
                                  )
              Plaintiff,          )
                                  )
         vs.                      )    No. 18 CV 01028
                                  )    consolidated with
REYNALDO GUEVARA, et al.,         )    No. 18 CV 02312
                                  )
              Defendants.         )
_____   )
                                  )
GABRIEL SOLACHE,                  )
                                  )
              Plaintiff,          )
                                  )
       vs.                        )
                                  )
REYNALDO GUEVARA, et al.,         )
                                  )
              Defendants.         )

          The deposition of KARL A. REICH, Ph.D.,

taken pursuant to the Federal Rules of Civil

Procedure, before Donna M. Urlaub, Certified

Shorthand Reporter No. 084-000993, via Zoom, on

Friday, October 14, 2022, commencing at 10:02 a.m.,

pursuant to notice.

KARL A. REICH, PHD, 10/14/2022                                          Page 2..5

---

Page 2

APPEARANCES:

LOEVY & LOEVY, by
MR. STEVE ART
MR. SEAN STARR
(311 North Aberdeen Street, Third Floor
Chicago, Illinois  60607
312.243.5900
steve@loevy.com
sean@loevy.com)
   appeared on behalf of the plaintiff
   Arturo DeLeon-Reyes;

PEOPLE'S LAW OFFICE, by
MS. JAN SUSLER
MS. NORA SNYDER
(1180 North Milwaukee Avenue
Chicago, Illinois  60622
771.235.0070
jsusler@peopleslawoffice.com)
   appeared on behalf of the plaintiff
   Gabriel Solache;

ROCK FUSCO & CONNELLY, LLC, by
MS. CATHERINE M. BARBER
(333 West Wacker Drive, 19th Floor
Chicago, Illinois  60606
312.494.1000
cbarber@rfclaw.com)
   appeared on behalf of the defendant
   City of Chicago;

SOTOS LAW FIRM, PC, by
MS. CAROLINE JAMIESON GOLDEN
(141 West Jackson Boulevard, Suite 1240A
Chicago, Illinois  60604
630.735.3300
cgolden@jsotoslaw.com)
   appeared on behalf of individual
   defendants except Guevara;

---

Page 3

APPEARANCES:  (Cont'd)

LEINENWEBER BARONI & DAFFADA, LLC, by
MR. THOMAS MORE LEINENWEBER
(120 North LaSalle Street, Suite 2000
Chicago, Illinois  60602
312.663.3003
thomas@ilesq.com)
   appeared on behalf of the defendant
   Reynaldo Guevara;

ALSO PRESENT:
   MS. CYNTHIA SOBOLEWSKI
   Urlaub Bowen & Associates
   Exhibit technician

---

Page 4

I N D E X

Witness:                                              Page
   KARL A. REICH, Ph.D.
      Examination by:
         Ms. Golden...................      6

E X H I B I T S

No.   Description                    First Referenced

      Email from Sean Starr to Caroline P.
      Golden Re: Solache/Reyes deposition
      of Richard Leo - Thursday, October
4     13, 2022 - 2 pgs...................... 10

      1/15/22 Independent Forensics report
1     of Dr. Karl A. Reich - 36 pgs.......... 21
      Invoices - Reich 000319,
2     Reich 000318, Reich 000322............. 31

      Invoices - Reich 000279 - 000343 -
3     65 pgs................................. 31
      Association of Forensic DNA Analysts
      and Administrators - Summer Meeting -
      May 30-31, San Antonio - Don't Throw
5     That Away! 278 pgs..................... 51

      Illinois State Police - December 16,
      1999 - Evidence Received April 6,
6     1998 - SDT-ISP 141-144................. 58

      Illinois State Police - January 29,
      2000 - Evidence Received April 6,
8     1998 - SDT-ISP 333-335................. 61

---

Page 5

E X H I B I T S (cont'd)

No.   Description                    First Referenced

      Illinois State Police - May 13, 1998
16    SDT-ISP 265-270....................... 71

      Illinois State Police - Laboratory
      Worksheet - Date Examined 4/14/98 -
13    SDT-ISP 625-626....................... 84

      LDIS Specimen Delete Report -
20    SDT-ISP 298-299....................... 86

      Illinois State Police - Laboratory
      Worksheet - Date Examined 4/16/98 -
7     SDT-ISP 630........................... 97

      Illinois State Police - Laboratory
      Worksheet - Date Examined 4/14/98 -
12    SDT-ISP 616........................... 97

      Illinois State Police - Laboratory
      Worksheet - Date Examined 4/16/98 -
9     SDT-ISP 632........................... 100

      Illinois State Police - IDENTIFILER
11    PLUS STR SUMMARY FORM - SDT-ISP 797.... 104

                (Exhibits attached/scanned.)

                        - - -

---

Urlaub Bowen & Associates, Inc.  312-781-9586

KARL A. REICH, PHD, 10/14/2022                                    Page 6 .. 9

Page 6

(Witness sworn.)

KARL A. REICH, Ph.D.
called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. GOLDEN:

Q. Good morning, Dr. Reich. How are you this morning?

A. Good morning.

Q. I understand you've given a deposition or two before in your -- in the last ten or so years?

A. I have. A few.

Q. Okay. So I won't -- I'll spare you the general preamble, but --

A. Okay.

Q. -- the most important things are if you need a break at any time, just let me know. Okay?

A. Certainly.

Q. And if you answer my question, I'm going to assume that you understood it. If you don't understand my question, ask me to explain it, and I'll do my best. Okay?

A. Understood.

Page 7

Q. All right. If we could pull up -- actually, before we do that, can I ask you what you did to prepare for the deposition today?

A. I reread my report. I reread some of the ISP reports. I reread some of the police evidence scene documents; not quite sure how to describe those.

I looked over some of the crime scene photographs. There was a one-page very abbreviated autopsy summary that I looked at again.

Looked through some of those documents sort of to refamiliarize myself with the names of the items and some of the numbers.

That's basically what I did.

Q. When did you do that?

A. I've done that over the last several days. So I've been on the road a lot, and I came back on Tuesday, so that's between now and when I got back, sort of bits and pieces as time permitted.

Q. Sure. And how much time did you spend doing that?

A. Oh, I don't know; I would guess something like an hour maybe total? Maybe an hour and 20 minutes? I didn't write down every minute;

Page 8

that's not how I operate. So here and there.

Q. Okay. So the report you issued in this case you -- I can't remember if it's dated -- it's dated January 15, 2022. Does that --

A. That's correct.

Q. Do you have that in front of you?

A. Yes.

Q. Do you have the report in front of you?

A. I do.

Q. And so have you done any work on this case in between January 15, 2022, and when you prepared for the deposition over the last several days?

A. That is the work in the case to prepare for the deposition.

Q. Okay. Other than preparing for the deposition which you did over the last several days, have you done any other work on the case in between that time and January of 2022?

A. No.

Q. Okay.

A. There's no other report. This is the only report.

Q. Okay. And so when you started getting

Page 9

ready for the deposition a few days ago, the last time you'd worked on the case was January of 2022.

A. Sounds about right.

Q. Have you received any documents to review from anyone relating to this case in the last several days?

A. The attorneys, sure. They re-sent me the same materials, they talked to me about the Bates numbers of them, things like that.

My document doesn't have Bates numbers, and so there was -- they wanted to know what I meant by some of the list of documents that I have in my report, since I don't have -- I don't -- didn't identify those by Bates numbers. I'm not sure they had numerical --

MR. ART: Dr. Reich, I'm going to stop you right there and instruct you not to discuss the substance of your conversations with us during preparation.

THE WITNESS: Okay.

BY MS. GOLDEN:

Q. Okay. So I think I asked you if you received any additional documents over the last few days.

Urlaub Bowen & Associates, Inc.   312-781-9586

KARL A. REICH, PHD, 10/14/2022                                    Page 10..13

Page 10

A.   No.  I received additional copies of the same documents, but not new ones to me.

Q.   Okay.  And so let's look at Exhibit 4.

A.   Okay.

Yes.

Q.   And this is a letter -- this is an email from Sean Starr to the group of lawyers in this case identifying the range of documents on your Documents Reviewed list from your c.v. -- from your report.

A.   Yes.

Q.   Okay.  So do you -- so the documents that you reviewed don't have Bates stamps on them?

MR. ART:  Objection to form.  I'll instruct you not to answer that question, Dr. Reich.  That kind of information is draft report information, and it is subject to work product privilege and not subject to disclosure under the rules.  We have provided the defendants with the Bates stamps of the documents you reviewed, and that's the exhibit we're looking at.

MS. GOLDEN:  Okay.  So are you going to stipulate that the documents that are listed here in Exhibit 4 are the only documents that he

Page 11

reviewed?

MR. ART:  Do you have a question for the witness?

MS. GOLDEN:  No, I don't.  But what he reviewed is certainly not privileged, so your objection is not well taken.  And if you're not going to let me ask him questions about what he reviewed, then we should probably just stop and go ask the judge.

MR. ART:  No, I -- my objection was to asking whether the documents he originally received had Bates stamps on them.

MS. GOLDEN:  Yeah; how is that privileged? If he reviewed documents, whether or not they have a Bates stamp on them, how is that privileged?

MR. ART:  I mean, are you testing him about what Bates stamps go with what documents, or are you asking him what documents he reviewed?  The documents he reviewed are in this exhibit.

MS. GOLDEN:  Exhibit 4 lists the documents that he reviewed.

MR. ART:  I mean, that's the Bates numbers of the documents --

MS. GOLDEN:  All right.  You can do it -- I

Page 12

can do it a different way.  Okay.
BY MS. GOLDEN:

Q.   So, Dr. Reich, we can't do this an easy way, right?  So did you bring with you all the documents that you reviewed?

A.   Are you asking me?

Q.   Yes, I am.

A.   They're on my computer, but I didn't physically bring them with me.  I don't have hard copies of anything except the report because that's what I was asked to do.

Q.   Right.  But you were asked -- the subpoena we sent asked you to bring copies.  And electronic files is fine.

Can you go into your computer and -- well, do you have anything printed with you other than your report?

A.   No.

Q.   Okay.  And do all of the documents, do you have them in one particular file that you can access during the deposition?

A.   In one particular folder probably.

Q.   Okay.  So why don't you open the folder, please.

Page 13

A.   I can do that.

Okay.  I have -- I'm in the wrong spot, but that's okay.  We have to go to current cases ...

Okay.  I have most of them in one folder.  There's a second folder as well.

Q.   Okay.  Are they -- how many different files are in the folder?

A.   Oh, my goodness.  So 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23 in one folder labeled Lab Discovery; and then there's 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19 in another.  And there's another folder as well.  So there's maybe 40 or 50 different files.

Q.   Okay.  Let's open up the first folder in the -- the first file in the first folder, and why don't you tell me what the Bates are.

A.   Let's see if I have a Bates.

No, the Illinois State Police reports do not have Bates numbers.  I don't have a unique page identifier on these materials. That's pretty standard for Rule 417 materials.

Q.   When you say Rule 417 materials, what

KARL A. REICH, PHD, 10/14/2022                                    Page 14..17

Page 14

are you referring to?

A.    So the Illinois State Police -- I'm sorry -- the Illinois State Supreme Court has a discovery rule called Rule 417, and it is a list of materials that the proponent of the DNA shall provide.  And it is a standard list of documents, files, and computer files which the proponent of the DNA has to provide in a DNA case.

And the Illinois State Police laboratory reports and case files come from the 417 discovery requirement, and those are the reports I received from the Illinois State Police in this case.  Those documents never, from ISP, have a unique page identifying number, Bates number, on the bottom that I get.  So I only can reference them, as I did in the Documents Reviewed section of my report, by what they are to me, which is an Illinois State Police report dated whatever.

Q.    So the documents in the first folder you received from Illinois State Police; is that right?

A.    They come from them; that's where they're originated from.  They come from the attorneys who send me the material.  Illinois State

Page 15

Police doesn't send me materials directly.

Q.    Okay.  All of the materials you received in this case, did they all come from Mr. Reyes's attorneys?

A.    They did.

Q.    Okay.  Did any of the materials you received come from Mr. Solache's attorneys?

A.    I actually don't know who's who.  They all came from attorneys.

Q.    Did they all come from attorneys at Loevy & Loevy?

A.    Don't know that either.  I just know the attorneys, they send me the materials.  I don't know where the attorneys work or for which defendant they work for.  It's not something I ask or know.

Q.    Okay.  Other than records from -- that originated at the Illinois State Police, what other sorts of records have you reviewed?

A.    Fair enough.  There are -- let's go up a thing.  There are crime scene processing reports, there's an autopsy report, there are photographs, or images of photographs, if you want, things like that.  I can open one of those and see if that has

Page 16

a page number on it.

Yes, it does.  So here, for example, is a document that has Reyes_Jenner 10034.  I assume that's the number you're referring to.

Q.    Okay.  Other than police reports, other than documents that originated at the Chicago Police Department and Illinois State Police, have you reviewed any other kinds of documents?

A.    Anything I have comes from the attorneys.  I've done no research of any of those materials on my own, nor have I received other materials --

Q.    How can you say that you didn't get anything new?  Did you keep track of what you got recently?

A.    No.  So I don't date them when they come in.  It's a file I put it in a folder.  And if it's the same file I have already, then it just copies it over.

Q.    Okay.  Other than looking at documents, have you done anything else to prepare for the deposition today?

A.    No.

Q.    Did you meet with attorneys for

Page 17

Mr. Solache and Mr. Reyes?

A.    We had phone conversations.

Q.    And when were they?

A.    Probably -- I'd have to go back into my calendar.  There was one certainly this week, and there was probably one before I left on my travel.

Q.    And how long ago was that?

A.    Maybe two, three weeks; three, four weeks at the maximum, something like that.  I was out for two weeks most recently, and then a week and a half before that.  So I've been on the road, unfortunately, a lot.

Q.    Other than those two phone calls, have you had any other contacts with counsel for the plaintiffs to prepare for the deposition today?

A.    There might have been one other a long time ago, but that's it.

Q.    Okay.  And the most -- the conversation that was most recent in time about a week ago -- or this week, how long did that last?

A.    An hour, 50 minutes, something like that.

Q.    And who participated in that conversation?

Urlaub Bowen & Associates, Inc.   312-781-9586

KARL A. REICH, PHD, 10/14/2022                              Page 18..21

Page 18

A.   There was a Mr. Starr for sure.  It was by phone call, so I don't have names associated with who's on the phone call, but he certainly was on the call.

Q.   Was there anybody else there?

A.   Yes, there were other people.

Q.   How many other?

A.   Two, three.  I'm not sure.

Q.   And then did you review any documents at that time during the call?

A.   There was a discussion of documents.

Q.   And what documents were discussed?

A.   The ones we just talked about --

MR. ART:  I object.  That is privileged information, and it's not subject to disclosure.  You're not entitled to ask the expert about the substance of our preparation with the expert.  So I'm going to instruct him not to answer that question.

BY MS. GOLDEN:

Q.   Did you review any documents during that phone call?

MR. ART:  I object.  You're not entitled to that information.  You can ask what documents he

Page 19

received.  You're not allowed to ask about the substance of the preparation.

MS. GOLDEN:  I am entitled to ask what documents he reviewed.  So are you instructing him not to answer?

MR. ART:  You're entitled to ask him what he reviewed in preparation for the deposition, what documents he received prior to the deposition.  You are not allowed to ask him about the substance of the preparation with attorneys.  Just like with a party.

BY MS. GOLDEN:

Q.   All right.  My question is, did you review any documents during the conversation with the attorneys a week ago?

A.   No.

Q.   Okay.  Did you -- and then that second conversation that you -- I think you said was between two and four weeks ago, how long was that?

A.   Shorter is what I recall.

Q.   Do you recall who participated?

A.   I do not.

Q.   Do you recall how many other people participated?

Page 20

A.   On a phone call, a conference call, I do not know how many people are on the line.  There's no way for me to know that information.

Q.   Do you have any idea how many other people were on the line?

A.   More than one.

Q.   And you don't recall the name of any person in particular that was present during that phone call?

A.   I do not.

Q.   Did you review any documents during that conversation?

A.   Nope.

Q.   And so other than, you know, reading the reports and the photos over the last few days, and those two phone calls with attorneys for the plaintiff, have you done anything else to prepare for the deposition today?

A.   I wore a shirt and tie.

Q.   Did you have a good breakfast?

A.   I ate breakfast.

Q.   Okay.  Anything else you did focused on the case?

A.   No.

Page 21

Q.   All right.  If we can look at Exhibit 1, page 14.  This is -- Exhibit 1 -- actually, we probably should look at the first page of it.

It's the report you issued in this case on January 15, 2022.

A.   Looks correct.

Q.   Okay.  If you go to page 13 -- actually, page 11, I think it is.  Did you sign the report?  Ah, page 8.  I'm sorry.  At the bottom.  That's your signature?

A.   Certainly.

Q.   Okay.  And then after the report there -- on page 14 came your c.v.

A.   Certainly.

Q.   And I imagine --

A.   Someone assembled it.  That seems reasonable.

Q.   Okay.  Is this -- your c.v., is that something that you prepared?

A.   Yes, of course.

Q.   And it was, I assume, accurate and current as of January 2022?

A.   Probably.  It only changes slowly.

KARL A. REICH, PHD, 10/14/2022                                    Page 22..25

Page 22

Q.   Okay.  And in Professional Experience there on -- down in the middle of the page, it talks -- it refers to Independent Forensics.  You see that?

A.   I do.

Q.   Okay.  What is your position at Independent Forensics?

A.   I think it's listed.  I'm the managing partner and the laboratory director and the chief scientific officer, I am also the bottle washer, at Independent Forensics.

Q.   Are you an owner?

A.   I am.

Q.   Okay.  How much of it do you own?

A.   I have 53 1/2 percent, something like that.

Q.   And how many employees are there?

A.   Varies a bit.  We're now at 14.  We're going to go up to 15 and then back down to 14.  So it varies between 13 and 15, and that's where it's been for many years.

Q.   And what kind of work does Independent Forensics do?

A.   We do a variety of things here.

Page 23

They're all related to forensic DNA.  We accept items of evidence for forensic DNA testing under current accreditation standards.

We do family relationship testing, otherwise known as paternity testing, also under an accreditation standard.

We have developed a series of products for forensic DNA laboratories, and we manufacture, quality control, sell, and support those products to forensic laboratories around the world.

We also do case review and case observations for attorneys who ask for it.

Q.   And does -- the expert services you're providing in this case, does that fall under the rubric of what you described as case review?

A.   It does.

Q.   Okay.  And what percent of the business of Independent Forensics is case review?

A.   Define what you mean by that.  Do you mean in terms of revenue?  Do you mean in terms of head count?  Do you mean in terms of hours?  There's different ways of answering that question depending on which part of information you're

Page 24

asking for.

Q.   I think revenue.

A.   It's never been more than 10 percent of our total revenue.

Q.   And what about in terms of a percent of your time?

A.   Oh.  A lot.  So well over half of my time.

Q.   And I saw from the invoices that were produced that you're charging $300 an hour in this case?

A.   In almost every case.

Q.   Okay.  In what kinds of cases do you charge different amounts?  Or under what circumstances do you charge different amounts?

A.   When a government agency that has less resources and they ask for a government rate, I will give them a $250-an-hour rate versus the 300.

Q.   Are you a -- you're not a -- are you a -- I see you went to Harvard Medical School.  Do you have license to practice medicine?

A.   Absolutely not.  I do not have a medical license and did not graduate from a medical school.

Page 25

Q.   Okay.  So the doctors that are listed on page 2 and 3 of your résumé, Dr. Schoolnik, Sigman, Wiesel, Ellson, Zinder, those are Ph.D. doctors.

A.   No.

Q.   Oh.  Are those medical doctors?

A.   No.  You gave me an entire list, and it varies.  I understand you don't understand the -- on the academic pattern; but Dr. Schoolnik was a physician, is a physician, and is the chief of infectious diseases at Stanford Hospital.  So he is definitely a physician.

Q.   Okay.

A.   Dr. Wiesel, who I worked with as a technician at Harvard Medical School the first time, was a physician.  Dr. Sigman was not.  He's a -- he was a researcher; he's now deceased.  Dr. Zinder was a researcher, now deceased.

I don't remember the other names you have for us, but it depends on who's the lab head and what the lab head was doing.

Q.   The other one was Ellson.

A.   Oh, Dr. Ellson.  Dr. Ellson was not a physician, he was a physical chemist at Cornell who

KARL A. REICH, PHD, 10/14/2022                              Page 26..29

Page 26

moved to St. Louis.

Q. Okay. I was just -- so the doctor, sometimes it means medical doctor, sometimes it means Ph.D.

A. Correct.

Q. All right. Then on page -- the bottom of page -- so this is going to be -- my pages are going to be different. If we go down to Publications, these look to me like you have them listed in reverse chronological -- or, actually, in chronological order, so the oldest --

A. Oldest first.

Q. Right. So if we go down a couple pages to --

A. That's standard old style c.v.

Q. I like it. If we go down to the -- No. 28, is there anything to add here?

A. I don't think so. I think that's probably the last one.

Q. Okay. And then if we go to -- scroll through and go to your Court & Deposition Record. The next page. I think this is also kept in the old school way.

A. I don't know whether that's old school

Page 27

or new school. Most academic c.v.s do not have a court and deposition record attached. And this is a separate document, at least in my files. And this will not be up to date because since this was provided, I have had other cases in court.

Q. How many other cases since this --

A. If you scroll all the way down to the bottom, I can give you an estimate.

Q. Sure.

A. There's like --

Q. I think it's going to be the last page of the document.

A. You're the one who assembled this document, so you would know.

No, that can't be the last page.

Q. The last page I got.

A. Oh, January 22nd. Okay, so that's correct.

I'm going to guess -- if you give me a second, I can tell you, if you'd like.

Q. Sure.

A. I need to go here and I need to go here. And I scroll to the very bottom of the page. The last one you have is McGuire; correct?

Page 28

Q. Yep, Illinois versus McGuire.

A. Give me two, three, four, five, six -- is that really right? Wow.

Cobey, Lyon, Reed, Clopton, Williams, Benfer, Guaderrama, Harvin, Noblin, Anderson, Arrington, Sherriff. So that's 12. And then -- 13, 14.

Q. 14 more?

A. I believe so.

Q. Okay. Could you pretty easily provide that list to your -- to the lawyers for Mr. Reyes?

A. I can just send them the most recent document and it will have the additional ones appended.

Q. That would be great.

Have you -- has your testimony ever been barred in any case?

A. Not that I'm aware of, no.

Q. Are you aware of any instance in which your testimony was limited in some way?

A. Oh, of course. That happens all the time.

Q. How does -- what are the circumstances -- or what are the limitations?

Page 29

A. It depends on the case. So sometimes there are stipulations or arguments made before I ever appear in court, and so I am informed as I come into the room where the judge tells me you can't talk about this, or this has already been decided, or whatever, you have to limit it to that. That's what happens sometimes.

Q. Okay. Can you remember the last time that happened?

A. Yes. So -- I can. So I was working for a pro se defendant in Champaign, and it was the second trial, and so some of the issues that were at issue in the first trial were no longer apparently an issue in the second, and before I gave testimony and before there was a jury in the courtroom, the judge gave me instructions about what was no longer relevant to this particular -- to that particular trial.

Q. And what was it that was no longer relevant to that particular trial?

A. What I recall is there was an incident of contamination on a sample, I believe, and that had been either stipulated to or resolved, I readily don't know, but it wasn't -- was no longer

KARL A. REICH, PHD, 10/14/2022                                          Page 30..33

Page 30

an issue in the case that I was there for.

Q. Okay. And is that case listed in your c.v. here, or is it in one of the ones that needs to be added?

A. It's one of the ones that needs to be added. I can tell you which one it is, if you're interested.

Q. Sure. Please.

A. I don't see why not.

It would be Illinois versus K. Williams, Kenneth Williams, Champaign County, 16CF539.

Q. 16CF539?

A. That's what I have on my record.

Q. Okay. That's it. I think we're done with Exhibit 1 for the time being.

MR. ART: Carrie, if I can interrupt for a second, we just sent you another email about the documents Dr. Reich received, and with that email and the one yesterday, we would be willing to stipulate about the Bates numbers he received.

MS. GOLDEN: Okay. Well, I'm in that -- I haven't seen the email, so I'll take a look at it at a break. But thank you for endeavoring to ...

Page 31

okay, that's just one document. I'll have a chance to look it over during the break. Thank you for doing that.

BY MS. GOLDEN:

Q. Okay. Can we put up Exhibit 2. So I received, in response to our subpoena, a bunch of invoices between your office and the law firm of Loevy & Loevy, and I've picked out of those three invoices, the only three invoices I could see that seem to relate to this case, and that is what is here in Exhibit 3. And I put them in chronological order.

So the first one you see is dated -- let me do the Bates stamps real quick. These are Bates stamped Reich 319, Reich 318, and Reich 322. You see those numbers at the bottom there?

A. I do.

Q. Okay. So if we go back to the first one, it's -- and this is dated March -- I'm sorry, February 4th, 2019. You see that?

A. I do.

Q. And the first date of service is February 4th, 2019. Does that sound about when you -- like about when you started working on this

Page 32

case?

A. I have no independent recollection. I'm sure that's as accurate as I can make it.

Q. Okay. Do you keep track of your time contemporaneously?

A. I do. I make a note at the end of a phone conversation or at the end of a long email as to how much time I think I spent. But that's about it.

Q. Okay. Do you charge for all the time you spend on a case?

A. I try.

Q. Okay. And then how do you decide when to issue an invoice in a particular case?

A. I don't think I have a hard and fast rule. Sometimes the attorney asks for sort of a -- an invoice up to the last conversation because they want to know. I look at it and I go, now it's time. I don't have a hard and fast rule, and there's nothing in the software that says submit now.

Q. So it's not always monthly, it's --

A. Absolutely not. Some people ask for per monthly, and that's a lot of extra work for me,

Page 33

and it makes no sense. So generally I try and wait till the end of the case and do it all at once, because it's time consuming to put them together and search for all the dates and the times, so I want to do that at once and then submit it. But sometimes I do it intermittently, sometimes the lawyer moves, it changes and it's a different lawyer and they want to come up to date. It's remarkably varied.

Q. Sure. That makes sense.

All right. If you go down a little bit -- or if you could just shrink it so that we could see one page at a time. I don't know if it will still be big enough for you to see, Dr. Reich.

A. I will switch glasses. How about that? Go ahead.

Q. Can you read that then?

A. Enough.

Q. Okay, good. All right. So -- and this is the first one, and it was for, it looks like -- oh, bummer -- almost -- a little less than two hours, right?

A. Sure. Whatever it is. It's -- yes, it would have to be -- I'm $300 an hour, and it's --

KARL A. REICH, PHD, 10/14/2022                     Page 34..37

Page 34

$475, it's going to be 1.75 hours.

Q.   Okay.  Great.  And then this -- the balance due means invoices has been paid; correct?  The balance being zero means it's been paid?

A.   Correct.  There's a total, there's payment, and so how much it is is zero.

Q.   Right.  Okay.  So the next page is an invoice dated October 17, 2019, for again three quarters -- no.  For two thirds of an hour.  So --

A.   40 minutes.

Q.   40 minutes.  And the bill is $200, and that's also been paid, right?

A.   That's what it appears.

Q.   Okay.  Next page is the third invoice.  I think we need to go to page 3.

There we go.  And that looks like it's 6 1/2 hours for preparing the report.  Do you see that?

A.   I do.

Q.   Okay.  And the invoice has also been paid.

A.   That's what it says.

Q.   Okay.  Do you recall spending any time on the case that's not reflected in those invoices?

Page 35

A.   Well, if I can read the little date, it looks like that's from January.  I can't really tell.  Maybe it's March.  No, it's from January.  So no -- to my knowledge, no other invoices have been submitted for any of the phone calls that have happened since.

Q.   So the phone calls and the reviewing of documents to prepare for today's deposition have yet to be invoiced.

A.   Correct.

Q.   And aside from that, do you recall working on the case at all other than as is reflected in the invoices that we just looked at?

A.   Probably not.  I mean, there might have been something, but it wouldn't have been very much because I try to make notes.

Q.   Okay.  Let's pull up Exhibit 3.

Well, maybe I can do this differently.  You've -- this is not the first case that you've worked with lawyers from Loevy & Loevy; correct?

A.   It is not.

Q.   Okay.  About how many different cases would you say you've worked on with Loevy & Loevy

Page 36

over the years?

A.   I can give you a rough estimate if you let me look up a document, but it's, I'm going to guess, like 20 cases maybe.

Q.   Okay.

A.   22, something like that, would be my guess.

Q.   I'm sorry, what did you say?

A.   22, something -- I mean, some number like that.  It isn't 50, that's for sure.

Q.   Okay.  And what percent of your time working on case reviews is spent working on cases from Loevy & Loevy?

A.   Oh, a fraction.  A small fraction.

Q.   Can you ballpark it for me?

A.   Less than 10 percent.

Q.   Okay.  All right.  We can -- we don't need -- I don't need 3.

Did you supply to -- did you go through your files and find all your invoices from Loevy & Loevy over the years?

A.   No, I have not.  I have a list of cases that I've worked for Loevy & Loevy, but it would take me a long time to pull out all the invoices

Page 37

for all those cases.

Q.   Okay.  Do you do -- you do some consulting work, right?  That's not -- where you're not anticipating to be an expert at trial.

A.   I'm not sure I understand your question.  The case comes in, I talk to an attorney.  What happens afterwards is quite varied.

Q.   Okay.  Let's go back to Exhibit 3.  So these -- and we can scroll through these.  These are exhibits that were produced to me, invoices from Independent Forensics to Loevy & Loevy on a variety of cases.  I just was trying to figure out if this included all of your work with Loevy & Loevy, or if it was just some of it over the years.  Is there a way to figure that out?

A.   Give me one second and I will try.  Let me see if I can figure out what I can do to answer that question.

I want to go here and I want to go here.

All right.  So here's an answer.  In our accounting software, which has all of the information about all the money that comes in, it only goes to one spot, I have 1, 2, 3, 4, 5, 6, 7,

KARL A. REICH, PHD, 10/14/2022          Page 38..41

Page 38

8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29 entries. So that would have been the total number of cases of any kind that I have worked with Loevy & Loevy.

And that would have been from when I first did this, which was quite a while ago, I'd have to look up the deposition I did with Mr. Ainsworth, which was the first time I ever worked with Loevy & Loevy, to now.

Q. More than a ten-year period of time? Well, actually, some of the invoices on this Exhibit 3 go back to 2008. Do you think that your --

A. That sounds about right.

Q. Oh, okay.

A. So that would be 12 or 14 years, 29, that averages out to two cases a year.

Q. Do you have a total dollar amount there available to you?

A. I do not.

Q. How much is that?

A. The accounting software only tells me what's due, it doesn't tell me what is coming.

Q. So I totaled up the invoices in --

Page 39

well, I asked someone else to total up invoices in Exhibit 3, and there was an amount of a hundred and -- approximately $170,000.

Does that sound right for all your work, or only a part of it? Is there any way for you to tell?

A. I have no idea.

Q. Okay. When you said you have the 29 entries, though, that's 29 different cases.

A. It is. Each one has a separate name.

Q. Okay. We can put that exhibit down.

I'm just going to apologize because I'm new to the DNA field. I did my best to prepare for today, but obviously you're going to know a lot more about this than I do, and my questions might be a bit inartful, but I will try to get to the point.

Can you tell me generally what DNA is?

A. DNA is an acronym for the name of the information molecule that is stored in the nucleus of most of our cells.

Q. Okay. And forensic DNA?

A. Is the analysis of that molecule to try

Page 40

and develop genetic identity information. That's the one part of forensic DNA.

The other part of forensic DNA is the identification of body fluids.

There are four forensic body fluids we can test for: blood, saliva, semen, and urine, and two cell types, epithelial and sperm.

There's no argument that humans make a wide variety of other body fluids and substances. We have no tests for them.

There are hundreds of different cell types. We have no way of analyzing those in forensic DNA.

Q. What are the tests for blood?

A. You mean the laboratory tests for blood.

Q. Yeah.

A. There are several. There are two genotypes of body fluid tests. There are confirmatory tests, and there are presumptive tests.

Presumptive tests allow you to presume maybe that the body fluid might be present. A confirmatory test gives you stronger evidence to claim the body fluid is present.

Page 41

For blood there are two general methods, a chemical-based method and an antigen-based method.

The antigen-based methods, there are two types. There are probably three or four different chemical tests. They're all quite similar, but they have a small variation in terms of how they are performed.

(Recess taken.)

MS. GOLDEN: All right. Let's go back on the record.

BY MS. GOLDEN:

Q. I think I had asked you a question about DNA, and you were telling me about the testing for blood.

Have there been advances in testing for the presence of blood since 1995?

A. No.

Q. Since 1998. No.

A. No. It's the same methods have been used for quite some time.

Q. And the same tests?

A. Same tests.

Q. Okay. DNA, you can't see it, right?

KARL A. REICH, PHD, 10/14/2022                    Page 42..45

Page 42

A.   "Can't see it."

No, but yes.

Q.   Okay.

A.   So you can certainly -- there's an old school laboratory demonstration where you can spool DNA and you can see all of the strands. It's a massive amount of DNA. But an individual DNA molecule can only be observed under the electron microscope with extra staining. So well well well below what you can see by eye.

MS. GOLDEN: Okay. So I think -- I did review the email over our break. I think we have an agreement between counsel that what's listed -- let's see here. I have to go to the exhibits. Do you have the exhibit that we put up with ... give me one second.

Okay. So Exhibit 4, if we could put that up. Obviously we have -- and I'm trying to figure out what documents you reviewed, you know, in arriving at the opinions you formed in this case. So we know you looked at the ISP file, which is ISP 1 through 839. And we know that you responded to a subpoena in this case, right? And that was Bates stamped IFI 1 through 2744.

Page 43

In terms of what other additional documents you reviewed, it appears that the plaintiff is willing to stipulate that you reviewed the documents listed here in Exhibit 4, plus one other document Bates stamped Reyes_Jenner 10100 through 10120.

Is that right, Steve?

MR. ART: Yes, yes, we will stipulate that those are all of the documents that Dr. Reich received in this case.

MS. GOLDEN: Okay, great. Thank you. We can take the exhibit down.

BY MS. GOLDEN:

Q.   Okay. So back to your report, which is Exhibit 1 -- and before that, in general you relied on the plaintiffs' attorneys to provide you with all the relevant documents, right?

A.   Of course. I don't go and get my own documents. That's not how it works. Impossible.

Q.   Were you asked to make any assumptions by the plaintiffs' attorneys?

A.   I don't recall. And if they had, I would have ignored them.

Q.   Okay. And were you asked to consider

Page 44

any facts by the plaintiffs' attorneys that were not contained in the documents that you reviewed?

A.   Probably not. And if so, I would have ignored them. I have to rely on the materials I'm provided and on what I know about the science. That's it.

Q.   Okay. Let's go to page 4 of your report. In the fourth paragraph, which starts "A simple conclusion ..."

A.   Yes.

Q.   It says, "A simple conclusion can be stated from the considerable amount of work performed during the two phases of DNA testing." Do you see that?

A.   I do.

Q.   What do you mean by a considerable amount of work performed?

A.   Well, it's clear there are a number of ISP reports, there are a number of individual items of evidence. They were tested. That's a lot of work.

Q.   What do you mean when you say that -- okay. Then it goes on to say, "The defendant, G. Solache, cannot be identified on any item of

Page 45

tested evidence."

What do you mean by "cannot be"?

A.   He's excluded. His DNA profile has not been identified.

Q.   Okay.

A.   It's pretty much what it says.

Q.   Okay. And when you say then his -- in the last sentence, "His DNA is not present on any questioned item of evidence," when you say "questioned item of evidence," what are you referring to?

A.   Ah. So in the forensic DNA laboratory there are two general classes of items. There are unknown evidentiary items; you don't know their history before they've been identified, bagged, tagged, and noted; you don't know what happened to them, where they were from, who touched them, who didn't. You know nothing about them.

And then you have reference standards which are known samples where you know everything; you know when they were taken, you know who they were taken from, the complete chain of custody of their history is known from beginning to end.

KARL A. REICH, PHD, 10/14/2022                                    Page 46..49

Page 46

So there -- the reference standard, which would be a mouth swab or a blood sample -- now almost always a buccal mouth swab -- that's the reference standard. We know everything about that. And you're going to develop a full DNA profile from those samples. That's not relevant to the unknown samples except in the comparison.

So I was specific that his DNA is not identified on any of the recovered items of evidence. Obviously his profile is going to be on his reference standard, and I just wanted to be specific about what type of evidence we're referring to.

Q. Well, when you say "questioned item of evidence," there's a lot of evidence that was not examined for DNA evidence.

Are you referring here only to the items and the places that were analyzed for DNA evidence?

A. Of course --

MR. ART: Objection to the form of the question.

THE WITNESS: There's no other information that's available.

Page 47

BY MS. GOLDEN:

Q. Okay. Page 6 of your report, where it says, "Only a limited number of reference standards were provided in this case, and all of these individuals are excluded from this sample."

And if you can see from the page before it, that we're talking about Exhibit 12B1, which is the knife, or one of the knives?

A. Correct.

Q. And then you say, "This second unknown contributor may, or may not, be probative for the case."

What do you mean by that?

A. You have an un- -- you have a profile on what is a significant or important item in the case, and the question is, is it relevant to the assault? Is it relevant to the case? And unless you have a comparison and can identify the source of that DNA, you don't know whether it's relevant to the assault or has to do with accidental DNA from first responders, or the manufacturer of the knife, or someone who came over to that apartment earlier and used it. So you don't know just from the profile, without having to know whose profile,

Page 48

whether that data which was not examined further is relevant or not. That's what that means.

Q. And in this case, do we know who that second unknown contributor is?

A. Not to my knowledge.

Q. All right. On page 8 of your report, the last paragraph, you refer to a large number of evidence samples tested in this case. Do you see that?

A. I do.

Q. And you say that, "The large number of evidence samples tested in this case demonstrate a commitment to trying to obtain probative forensic DNA results that would identify the assailants."

Do you see that?

A. I do.

Q. And what's your basis for that assessment that it was -- for that assessment?

A. Having reviewed hundreds and hundreds of other cases, and knowing the average number of samples that are in an average case, so it's pretty clear this has many more samples that were tested over a much longer period of time. That's not complicated.

Page 49

And typically DNA, its only function is to provide identity, and so you're looking for identity.

Q. Okay. What is the CSI effect?

A. CSI effect refers to the understanding by the lay public of how forensic DNA is conducted, its precision, its accuracy, its speed, and its importance. And so it doesn't really have anything to do with the actual science of forensic DNA or what can be deduced from forensic DNA, but it's more of what the assumptions might be of the lay observer.

Q. And what are the assumptions of the lay observer?

A. Well, I don't know precisely because I am not a lay observer, I'm an experienced observer and a practitioner. But in general, it refers to the speed at which forensic DNA can be conducted, to its precision and accuracy, which vary; to what you can deduce from forensic DNA, that is almost always overblown, and there are specific terms that are given to that exaggerated understanding of what forensic DNA can do; and that it -- and its importance in the overall narrative of the case.

KARL A. REICH, PHD, 10/14/2022 Page 50..53

Page 50

My guess is those are all exaggerations that the lay public has, and the concept would be it's derived from the many television programs that use forensic DNA ideas in their narrative.

Q. Can you be more specific in terms of the CSI effect in terms of a lay person's thought about the importance of DNA evidence in a case?

A. All I know is what I've been asked for in court, and what some people ask me when they find out what I do for a living who are not scientists and don't do forensic DNA.

There are two fallacies which are well recognized. There's the prosecution fallacy and the defense fallacy, in that somehow forensic DNA is involved in guilt or innocence. And it is not.

Forensic DNA provides identity. That's all it provides. The forensic biology can give information about the source of the DNA if the proper test is conducted, but the forensic DNA profiling only gives you identity. And the common misconception is that it somehow relates to guilt or innocence. It does not.

Page 51

Q. DNA analysis cannot tell us when DNA was deposited, right?

A. The timing is one of those issues that is not -- we are not able to address by any laboratory method.

Q. And you also can't tell how DNA was deposited on an item.

A. For the most part, that's true. If you have blood, saliva, or semen, you can make some assumptions. But the DNA itself, the profile itself doesn't give you that information.

Q. And the profile for a mixture doesn't tell you whose DNA was there first, does it?

A. It does not.

Q. And if there is DNA present, it doesn't tell you itself whether or not it's relevant to the crime.

A. The profile just gives you identity.

Q. Okay. So that's correct.

A. It just gives you identity.

Q. Okay. Let's go to Exhibit 5.

I read it.

A. Did you understand it?

Q. The small words I understood.

Page 52

Q. All right. Let's go to page 14. Okay. This looks like it's a slide for I think a presentation you gave to the Cook County Public Defender? Does that sound right?

A. Could be.

Q. It could have been something in San Antonio as well.

A. I give -- we are asked to give many presentations to many places.

Q. Okay. This is a slide that's repeated throughout these materials, and these materials were produced to us in response to the subpoena we sent to you in this case.

What do you say on the point of "Is it true that 'every contact leaves a trace'? What the quote -- original quote really said."

A. I'm sorry, I'm not sure I understand what you're asking. You're asking me what the original quotation by the card was?

Q. Well, we could start there, if you want. What was the original quote really -- what -- my question was what do you -- this is like a topic. You must speak to it in your presentations. And what do you say?

Page 53

A. I see. So this is a topic that actually underlies all of modern forensic testing of all kinds and every type.

So the original quote basically says that you can't do a bad thing without leaving something behind, and that the force needed to do a bad thing -- and I'm not using the exact French-to-English translation here -- demands that you leave something behind.

And this is the foundation of modern forensics, period, of all kinds. And everyone in the room who does forensics knows this quote and understands its use.

Q. The original quote was not directed to DNA evidence; correct?

A. It was directed to every type of physical evidence by a French forensic scientist, and it is inscribed in the wall of the forensic laboratory in Leon, France.

Q. However, it pre-dated the discovery of DNA; correct?

A. It -- not the discovery. The use of that in forensics.

Q. Okay. And then it says -- another

Urlaub Bowen & Associates, Inc. 312-781-9586

Page 54

thing it looks like you address is "questions that DNA testing cannot answer for us."

A.   Correct.

Q.   And anything other than what we just discussed?

A.   Oh, there's lots of things.  You already brought up a bunch yourself in terms of timing, order of addition, things like that. Motive.  None of those things come from the DNA.

Q.   Anything else that you usually discuss when you're discussing this topic?

A.   I don't have a usual.  Most of the times I redo the presentations, so I don't -- I try not to use the same presentation each time; it's too boring.

Q.   Is it your opinion that toolmark comparison is junk science?

A.   It's not scientifically defensible, not the way it's done.

Q.   Okay.  And would you say the same about bite mark evidence?

A.   Bite mark evidence is pure fraud.

Q.   Okay.  And ballistic lead analysis?

A.   Pure fraud.

Page 55

Q.   Okay.  Have you -- page 195 of Exhibit 5, there's a reference list.  And there's a lot of public defenders listed here.  And my question is, have you ever testified for the state or for the prosecution?

A.   Of course.

Q.   Okay.  And what percent of the time would you say when you're testifying, you testify for the state or prosecution as opposed to the defense?

A.   Five percent.  It's not my choice; it's whoever calls.

Q.   And then on page 250 of Exhibit 5, there's an article entitled "Forensic DNA: the Gold Standard or Fools' Gold?"

And it looks like this is something written by you?

A.   Don't recall.  If you scroll down, I might be able to tell you.

Q.   Sure.

A.   Ah, yes.  So this is for a different project altogether, yes.

Q.   Okay.  When did you write this?

A.   I'd have to go look up, but I'll bet

Page 56

it's five or seven years old.  There was a meeting about error rates in forensic DNA, and this is probably something I wrote for that.

Q.   Was it for a presentation?

A.   I think it was the background for a presentation.  I don't completely recall.  It was a NIST organized meeting quite some time ago, and I gave a short presentation at it, and I think there might have been a submission.  That's what I recall, but I honestly don't remember.

Q.   All right.  That's it for Exhibit 5.

If we could go back to Exhibit 1, please.  And page 4.  And it's the last paragraph here on page 4.

Okay.  So your -- your report here refers to two phases of DNA testing.  Do you recall that?

A.   Yeah.  I mean, they're phases.  They're separated in time, certainly.

Q.   Okay.  So let's go up to the first paragraph on that page.

The first paragraph reads, "The forensic DNA testing and analysis of submitted items in evidence in this case was performed at two

Page 57

separate times.  An initial round of DNA testing was performed circa 1998-2000 with a second round of laboratory analysis performed circa 2016-2017." Do you see that?

A.   I do.

Q.   Okay.  And then you refer to some testing in the last paragraph on this page.

A.   Yes.

Q.   Okay.  And this is -- this was the first round, the 1998 to 2000 testing; correct?

A.   Yes.

Q.   Okay.  And you write here that "The exclusion of G. Solache and A.D. Reyes from a series of blood stains, green towel, retrieved from 1984 Corolla (Exhibits 18A, -B, -F, and -G), extends to a series of blood stains apparently recovered from Adriana Mejia's shoes (Exhibits 19B, -C, -D, -E, and -G), continues with testing of blood stains from a towel (Exhibit 23B1 and 23B2), and is further amplified by the exclusions noted from the analysis of blood stains from Adriana Mejia's trousers (Exhibits 27A, -B, -C and -D)." Do you see that?

A.   I do.

KARL A. REICH, PHD, 10/14/2022                    Page 58..61

Page 58

Q. Okay. And those were the same conclusions reached by the Illinois State Police examiners; correct?

A. I believe so.

Q. Okay. If we can go to Exhibit 6.

And this is -- Exhibit 6 is the Illinois State Police report dated December 16, Bates stamped SDT-ISP 141 to 144.

And I think I said the date. Do you see the date December 16, 1999?

A. I do.

Q. Okay. And this is the report, you can see here towards the bottom, that reports the findings on the green towel, Adriana Mejia's shoes, next page, Exhibit 23 which is the kitchen towel found in the home, Exhibit 27 which are Adriana Mejia's pants? Do you see that?

A. I do.

Q. Okay. Directing your attention to Adriana's shoes, which is Exhibit 19, do you see that?

A. 19F and 19G.

Q. Right. The page before has -- there you go. So her shoes, blood stains from seven

Page 59

different places were collected on her shoes, right?

A. Seven different items. You don't know if they're all from different areas without the worksheets, but there's separate swabbings or collections.

Q. Okay. I note the seven swabbings. On page 3 of the report. If you can go down.

Spot 19F had insufficient DNA; correct? To make a comparison.

A. That's what they claim. That's the ISP's result.

Q. Okay. And then if you go up a little bit, keep going, and then if you stop here, you'll see Exhibit 19A was not examined at all, right?

A. Correct.

Q. Okay. And then the five remaining spots, if you go down, where the paragraph starts, A DNA profile was identified in Exhibits E, G, and then mix of profiles in B, C, and D. So in five spots they find a profile that is consistent with the victim Mariano Soto; correct?

A. Correct.

Q. And Jacinta Soto is excluded; correct?

A. That's the other victim, I believe, and

Page 60

the answer is yes.

Q. And Adriana Mejia is also excluded as contributing to any of the profiles found on her shoes.

A. So ISP states.

Q. Okay. And then for Adriana's pants, which was ISP item 27, if you can go down a little bit, you see the blood identified, and then it's in 27A, -B, -C, and -D is consistent with the victim Mariano Soto; correct?

A. That's the ISP report conclusion.

Q. And Jacinta Soto and Adriana Mejia are also excluded as having a -- from a DNA profile found on Adriana's pants; correct?

A. From those particular listed samples.

Q. Okay. And then for 23B1 and -2, which is the kitchen towel, that also, they found a profile consistent with Marian- -- the victim Mariano Soto; correct?

A. That's what the last paragraph in the conclusion states.

Q. And it -- the profile could not be that of Adriana or the other victim; correct?

A. Right.

Page 61

Q. Okay. And then on the green towel, which is ISP item 18, they find a profile consistent with Adriana; correct?

A. 18A, 18F, and 18G in the paragraph.

Q. Yep. So they find a DNA profile on the green towel that's consistent with Adriana; correct?

A. Correct.

Q. And they do not find any DNA profile that could be either of the victims; correct?

A. Not on 18A, 18F, or 18G.

Q. Or 18B, right?

A. 18B is in the next paragraph.

Q. Right. But that also excludes Jacinta Soto and Mariano Soto.

A. It does.

Q. Okay.

A. There is an additional apparent DNA result, but ISP doesn't examine it further.

Q. But whatever the additional result is, it can't be Jacinta Soto or Mariano Soto; correct?

A. That's what ISP concludes, certainly.

Q. Okay. And then can we use Exhibit 8.

All right. And this is -- let's

Urlaub Bowen & Associates, Inc.   312-781-9586

KARL A. REICH, PHD, 10/14/2022                    Page 62..65

Page 62

look at the Bates stamp. ISP report dated January 29, Bates stamped SDT-ISP 333 through 335. And this is one of the documents that you reviewed in connection with the work you did in this case?

A. January 29, 2000 report. It's on my list of documents.

Q. Did you review it?

A. Yes. It says Documents Reviewed.

Q. Okay. Did you personally read all the documents listed there in your Documents Reviewed?

A. Yes.

Q. Okay. So directing your attention to a little bit lower on the page, you see here that Exhibit 24 relates to blood stains and portions of blood stains taken from the baby blanket. Do you see that?

A. I do. 24A.

Q. Right. And then 24B also comes from the baby blanket, right?

A. Another area probably, but yes.

Q. And 24C also comes from the baby blanket?

A. It's listed as an item or as an exhibit in the Illinois State Police report.

Page 63

Q. Okay. And if you'd go down to the next page, 25A, -B, and -C relate to blood stains from baby pants, which is a different item, right?

A. Different exhibit number, certainly, and it's not pants -- and the pants probably are not the blanket.

Q. Okay. And then if you go to the Conclusions, the conclusion stated here is the blood identified in Exhibit 12A -- and putting that aside for the minute -- but the blood identified in Exhibits 24A1A, A1B, A2A, A2B, B1, B2A, B2B, are consistent with the DNA profile of Mariano Soto; correct?

A. The report so states.

Q. Right. And they exclude Jacinta Soto; correct?

A. Correct.

Q. And they also exclude Adriana Mejia.

A. They do.

Q. And they only find a single profile; correct?

A. Single source profile or a single contributor profile.

Q. So they don't find a DNA profile for

Page 64

either of the children; correct?

A. They claim that the DNA comes from one of the victims, Mariano Soto.

Q. And there's only one profile; correct?

A. Yes.

Q. Okay. The same is true for the baby pants, the 25A, -B, and -C, they only find a DNA profile consistent with one of the victims; correct?

A. You'll have to scroll up to find that paragraph, but if that's what the report says, that's what the report says.

Q. Okay. Well, isn't it right here?

A. Yes. It's in the middle of the page now.

Q. Okay. So again on the baby pants they only find a DNA profile consistent with one of the victims, not -- Mariano, not Jacinta; correct?

A. Correct.

Q. And they don't find the blood of Adriana; correct? Or did not find the profile of Adriana.

A. Not of those samples.

Q. Okay. And it's your understanding that the baby blanket and the baby pants were recovered

Page 65

from the Soto home, right?

A. It's not listed in the report, but that's my understanding.

Q. And are you aware of any DNA testing on any item other than the knives, the pants, the baby pants, the baby blanket, the green towel, the kitchen towel, Adriana's shoes, and Adriana's pants, in the initial round of DNA testing?

A. All I know is what's in the Illinois State Police reports that are listed in the Documents Reviewed. There could be additional testing. If so, they were not provided either to me or in an ISP report.

Q. Give me one second here.

Okay. Page 5, you talk about the second round of testing, initiated post-conviction, focused on the fingernail scrapings from the victims, Exhibits 5 and 6, and on a knife, Exhibit 12, apparently found beneath one of the victims.

Okay. And I want to ask you some questions about the results of the forensic testing on the fingernail scrapings; all right? Do you remember Exhibit 5 being scrapings from Jacinta,

Urlaub Bowen & Associates, Inc.   312-781-9586

Page 66

and 6 being scrapings from Mariano?

A. Sounds right.

Q. Okay. Let's look at Exhibit 10.

And this is an ISP lab report dated January 15, which is Bates stamped ISP 688 through 690. Do you see that?

A. Do I see that? Sure.

Q. Okay. Can you go back to the first page?

And then you see here Exhibit 5E is the swab of Jacinta's right fingernails, and 5F is the swab of her left fingernails.

And then 6 is a swab of Mariano Soto's right fingernails, and 6F is a swab of his left fingernails. Do you see that?

A. That's what the ISP report lists.

Q. Okay. I mean, do you have any reason to believe that's not what it is?

A. No. But that's all the information any of us have. Not having actually seen it done, you have to accept it as written.

Q. Sure. All right. And let's go down to the bottom. Do you recall what the results were of the -- without looking at the document, or do you

Page 67

want to look at the document?

A. No. The document has all the information we need.

Q. Okay. So if we go down, what was the result of the testing of Jacinta's right fingernails?

A. So I think you're referring to 5E. And 5E, ISP did not provide any conclusions.

Q. Okay. So -- and that was because the -- it was potentially a mixture and it was incomplete and not suitable for comparison, right?

A. That's -- they just didn't provide a conclusion. ISP's reason for that is not clear, but they did not provide a conclusion.

Q. Okay. So they didn't even find a DNA profile for Jacinta; correct?

A. No. There are no conclusions available.

Q. Okay.

A. You just made a conclusion, and you can't make one from 5E.

Q. They didn't find a full profile for anybody; correct?

A. They didn't find a full profile, that's clear.

Page 68

Q. Okay. But they find a low level of DNA at the D8S1179 and Amelogenin --

A. So what are -- what you said there makes no sense, so where are you?

Q. So where it says low levels -- I'm here where it's -- I'm looking -- still looking at 5E1.

A. Okay. So the report says, "Low levels of DNA were identified in Exhibit 5E1 at the D8S1179 and Amelogenin loci."

Those are two results out of 15, and the Amelogenin locus just tells you the sex of the contributors. So there's really only one short tandem repeat result at D8.

Q. Do you know what the low levels that were detected at those two different loci?

A. No. And it doesn't matter. Amelogenin just gives you the sex determination. It's not an identity marker. And if you only have one locus, there's no identity information you can derive.

Q. Can you not exclude people who don't have that locus -- loci?

A. Technically, if you believe the results are complete, you could use it for exclusion. But because the results are so poor, you can't use it

Page 69

for anything.

Q. Okay. So Exhibit 5F1 is referred to in the next paragraph here. And they find a female profile that matches Jacinta; correct?

A. Yes.

Q. And because they have the Amelogenin loci, they know that it's female; correct?

A. They know if it's a single source contributor, and they have an Amelogenin result, and the sex of the contributor can be deduced.

Q. All right. So they say it doesn't match the profile for Adriana, she can be excluded; correct?

A. Correct.

Q. Okay. And then -- so for Jacinta's fingernail scrapings, the only profile they find -- they find no profile at all in her right hand scrapings, and in her left hand they only find her DNA profile; correct?

A. It's her hand, so finding her DNA is not that informative.

It's a little concerning that from her own fingernail scrapings they don't even get her profile. But that's what they got.

KARL A. REICH, PHD, 10/14/2022                                    Page 70..73

Page 70

Q.   Right. Okay. Same with Jacinta -- I'm sorry. Same with Mariano; correct? He's 6E1 and 6F1, and for his left fingernail scrapings they find no human DNA profile, and -- actually, they don't find a humanate profile in either his right or his left fingernail scrapings; correct?

A.   Right. So it's not that they found a nonhuman profile, you need to be careful, they just didn't find any profile from 6F. And they only got one locus from 6E.

Q.   And they don't even find his profile in his fingernails, right?

A.   Correct. Somewhat concerning.

Q.   Okay. And so for Jacinta, they also don't find a profile for either of her children; correct?

A.   We've talked about what they can find, and the answer from 5E, no conclusions are possible of any kind, and from her own fingernail on F they just find her.

Q.   So they don't find the profile for her children; correct?

A.   Correct.

Q.   All right. Let's go back to page 5 of

Page 71

Exhibit 1, which is your report.

And I want to talk about -- actually, before I do that, do you recall ISP Exhibit 11 being the knife that was found in the box under the couch?

A.   We have --

Q.   I'm sorry?

A.   We have to read it. Whatever the report states is what the exhibit number is.

Q.   Okay. I'll go back to it. I don't have the exhibit handy, but we'll go back.

So this right here with page 5, in the middle of your page there, you start talking about, in the second round of testing, the testing on the knife. Do you recall that? Exhibit 12B?

A.   Yes, there's 12.

Q.   Right. And do you recall which of the two knives Exhibit -- ISP Exhibit 12 was?

A.   I don't. One was found in a box under the couch, and the other was under the, one of the victims, is what I recall.

Q.   Okay. Let's go really quickly to Exhibit 16. And on page 2, at the bottom -- and Exhibit 16 is Bates stamped SDT-ISP 265 through

Page 72

270. That's all right, you don't have to scroll. I got it. It's for the record. And it's the ISP report dated May 3rd, 1998.

And if you go to page 2, the bottom of page 2 lists ISP Exhibit 11 as the knife found in the box behind couch on east wall. Do you see that?

A.   Yes. It's what I remembered, one was in a box and one was under one of the victims.

Q.   So 11 is the one in the box. And then if you go to the next page, page 3 of Exhibit 16, on the top there, it refers to Exhibit 12 as the black handle knife found under the male victim's body in the kitchen. Do you see that?

A.   I do. So now we know which one's 11 and which one's 12.

Q.   Perfect. All right. Enough. That's sufficient with that exhibit.

And if we go back to 1, so when we were talking about Exhibit 12B1, the source of this material is the knife that was found underneath Mariano Soto's body, right?

A.   Correct.

Q.   Okay. And so the first paragraph you

Page 73

have here is that ISP reports a mixed DNA profile from Exhibit 12B1 (which is correct), and excluded the defendants, Gabriel Solache and A.D. Reyes, as contributors (which is also a correct conclusion from the data).

So in the paragraph that I just read, you're confirming the previous conclusions of the Illinois State Police; correct?

A.   I'm concurring with them.

Q.   Concurring. Okay. But then you differ with them on the conclusion regarding the presence of Mariano Soto; correct?

A.   I am.

Q.   Okay. And it's your opinion that there is a sufficient basis to conclude that Mariano Soto's DNA is present, and that if you take out his profile, you can deduce a profile for another contributor; correct?

A.   Almost. If you make the assumption that his profile is there, you can use that information to deduce the profile of another contributor to that sample.

Q.   Okay. And in order to do that, did you -- did you have to drop the thresholds?

KARL A. REICH, PHD, 10/14/2022 Page 74..77

Page 74

A. Probably.

Q. Okay. Do you know to what extent you had to drop the thresholds?

A. I drop them to zero. If I'm going to do a reanalysis, I take them out completely.

Q. Okay. And is that what you did here?

A. Probably. Don't recall.

Q. Do you have any records of how low you dropped the thresholds?

A. You didn't listen. I remove the thresholds. It's not a question of dropping them. I don't use them.

Q. And is that acceptable in work that you do for the government?

MR. ART: Objection to form.

THE WITNESS: It makes -- your -- that question doesn't make any sense. So I'm doing case review of the materials that are provided, and that case review identifies DNA profile to a statistical power that is without dispute. So there's no way that that analysis is incorrect. You have 29 out of 30 loci that are identified from Mr. Soto. His identity is not in dispute. So no matter what you did to that to get there, the statistics of that

Page 75

prove beyond a statistical argument that that is the correct result.

Using Mr. Soto's DNA profile, there are additional data points which can be deduced, and they are listed below.

BY MS. GOLDEN:

Q. Okay. Can you pull up Exhibit 10, please.

So there's a paragraph towards the bottom that starts "A mixture" where they're referring to 12B1. And the ISP report states that, "A mixture of human DNA profiles was identified in 12B1," and then it lists the loci, and it says the mixture will be used for exclusionary purposes at certain loci, and then it concludes that Jacinta, Adriana, Arturo DeLeon and Gabriel Solache can be excluded from this mixture.

Do you agree with the conclusion that Jacinta Soto, Adriana Mejia, Arturo DeLeon, and Gabriel Solache can be excluded from the mixture?

A. They are.

Q. So you do agree.

A. They are excluded. There are two

Page 76

contributors that can be identified. One is one of the victims, and the other is an unknown contributor whose DNA profile is listed in my report.

Q. Okay. And then -- so the second -- the last sentence in that paragraph says, "No conclusions can be drawn as to whether Mariano Soto contributed to this mixture."

And that's what you take issue with, right?

A. That's incorrect.

Q. Okay. And is it your understanding that whoever belongs to this unidentified profile that you have discerned could have wielded the knife in the attack of Jacinta and Mariano Soto?

A. There's no information -- we've already discussed what DNA can and cannot do. What we know is that there's a DNA profile on the knife that was not explored further.

Q. Okay. And your conclusion on the next page, your conclusion with respect to Exhibit 12C, which is another sample that comes from the knife that was found under Mariano Soto, is that the DNA profile on that exhibit comes from a single source,

Page 77

and that it is consistent with the victim Mariano Soto's blood -- DNA.

A. It's consistent with -- let's see if we can get some of the language here. So the earlier discussion we had about who it comes from used language that isn't quite precise either. But you can say that the victim is not excluded as a contributor to 12C, if you wanted to put it in appropriate language.

Q. Okay. But there's only one profile found, according to you, on 12C; correct?

A. It's a single contributor sample.

Q. Well, that means one profile, right?

A. It means one person.

Q. Okay. And that person is, in all likelihood, the victim, right?

A. To some -- to a strong statistical conclusion.

Q. Okay. And putting the identity of the person who -- whose -- of the profile that you discerned --

A. Deduced.

Q. -- deduced, thank you, in 12B1. Putting aside that person, the only profile -- the

Page 78

only DNA profile found is one that's consistent with -- on Exhibit 12 is consistent with Mariano Soto, the victim; correct?

A. No. You can't say it that way. You must say it in the correct fashion.

Q. How do you say it?

A. You would say there were -- different parts of the knife were identified. On one part there's a single source contributor; on the other there's a mixture from which the victim cannot be excluded, and an unknown contributor is also present.

Q. Okay. So the unknown contributor is the person who has the profile that you outline on pages 5 and 6; correct?

A. Yes.

Q. Okay. Other than Mariano and the unknown contributor whose profile you outline on pages 5 and 6, are any other profiles found on the knife which is Exhibit 12?

A. Not according to the results provided by ISP.

Q. Okay. And not according to your analysis either; correct?

Page 79

A. My analysis comes from the results obtained by ISP from the designated parts of the knife. Other parts of the knife were not tested, so we have no information about them.

Q. Okay. So then your report on page 6 talks about Exhibit 12C1. And, I'm sorry, if we go quickly to Exhibit 10, page 2, at the bottom, the paragraph that talks about "Low levels of human DNA" right there before Results [sic]?

A. Yes.

Q. Okay. So the ISP concluded in January of 2017 that the exact number of contributors to this mixture could not be determined, and it was incomplete and not suitable for comparison, right?

A. That's what the ISP paragraph states.

Q. And you took issue with that; correct?

A. Taking issue with it. So if you want to get into the weeds, the Illinois State Police report writes that the exact number of contributors to this mixture cannot be determined.

The exact number of contributors to any forensic DNA profile using short tandem repeats can never be determined. The method only provides a minimum number of contributors.

Page 80

So what that sentence means, I have no idea. It is a false sentence. You cannot determine the exact number of contributors on any samples except the reference sample. So I'm not quite sure why ISP puts that in from time to time, but it makes no sense and it's inaccurate.

And so it is a partial profile that is -- that is correct, and I mention that as well. But the fact that you can't determine the exact number of contributors is never a reason you don't attempt to interpret a mixture.

So I don't know what that sentence means. But you can in fact look at the data and derive some conclusions from it anyway, and that's what I did in the report.

Q. And your conclusion was that, with respect to 12C1, that Mariano Soto was the sole contributor to the DNA profile on this exhibit; correct?

A. That's correct.

Q. And you excluded Mr. Solache and Mr. Reyes; correct?

A. He's not -- there's -- it's a single source contributor from the victim.

Page 81

Q. So everyone else is excluded as well.

A. No one else's DNA is present.

Q. Okay. So you did not detect the DNA of Adriana Mejia or Jacinta Soto on --

A. I did not detect the DNA profile of anyone but the single contributor. We don't detect DNA per se.

Q. Okay. Thank you.

Now, you agree, do you not, that you can't test everything at a crime scene for DNA.

A. I do not agree with that. In the United States they limit the number of samples that are tested. But other parts of the world do it differently. And so the answer is you can test a great number of samples. The samples you test are chosen either by the investigator who submits them and/or by the laboratory that makes a choice.

Q. Okay. Let's go to, back to Exhibit -- well, let me ask you; you might remember off the top of your head. Do you recall Mr. Reyes's pants being an exhibit that --

A. I don't. We'll have to go and look it up.

Q. I'm sorry?

KARL A. REICH, PHD, 10/14/2022      Page 82..85

Page 82

A.   I do not.

Q.   Okay.  Exhibit 16, which I think we previously marked, but which is this May 13, 1998 ISP report Bates stamped SDT-ISP 265 to 270.

And if we go to page 4.

A.   Here we are.

Q.   You see ISP Exhibit 21 are a pair of black denim pants reportedly from Arturo Leon.  Do you see that?

A.   Yep.

Q.   Okay.  And it looks like the finding here is that no blood indicated.  Do you see that?

A.   I do.

Q.   Okay.  Do you recall this item being tested for DNA?

A.   I don't.  But no blood indicated is informative at some level.

Q.   But even though you can't see blood, you could still find DNA on the pants, right?

A.   You would have to figure out where to test is the problem.

Q.   And how is that a problem?

A.   Because you can't swab the entire fabric.  You need to find an area that's of

Page 83

interest and test that.

Q.   Okay. All right.  And Mr. --
Exhibit 20, a little bit up on the page, you see Exhibit 20 is a pair of black gym shoes reportedly from Gabriel Solache.  Do you see that?

A.   I do.

Q.   And no blood is indicated --

A.   Correct.

Q.   -- which is their finding.  Okay.  And do you recall any DNA testing of Mr. Solache's shoes?

A.   I do not.

Q.   Okay.

A.   It may have been done.  I just don't recall.

Q.   And then if we go down the page to Exhibit 28, you see there were shoes of Mr. Reyes collected as ISP Exhibit 28?

A.   I do.

Q.   And they didn't find any blood.  Do you see that?

A.   I do.

Q.   Or they didn't find blood where they tested, right?

Page 84

A.   They didn't find any blood on anything they tested from the pants or the shoe.

Q.   And do you recall any DNA testing of Mr. Reyes's shoes?

A.   No.

Q.   All right.  Can we pull up Exhibit 13?
And maybe -- is that big enough for you to see it, Dr. Reich?

A.   For the moment.

Q.   It's good for me.
Okay.  And was this in the materials that you reviewed?

A.   I can't remember, but it's -- I recognize a worksheet certainly from ISP.

Q.   Sure.  And so do you -- maybe scroll down a little.  So this is a lab worksheet dated -- hold on, let me do the Bates stamp.  Bates stamped SDT-ISP 625 to 626.  And this relates to -- if you go up just a little bit more -- item 20, which we just looked at, which was Mr. Solache's shoes, right?

A.   Correct.

Q.   Okay.  And can you tell me what the markings on the drawings are intended to represent?

Page 85

A.   So this is a typical worksheet from ISP.  Sometimes they take images of the items of evidence; sometimes they do sketches; sometimes they do both.  And it's an effort by the analyst to identify the regions she's going to test further.
She's going to do a screen for body fluid identification, and the sketches are designed to provide the location of the areas she has swabbed.

Q.   And so is it fair to say that the points outside of the circles were not swabbed?

A.   That's correct.  That's typical.  You look for regions that are potentially body fluids or of interest, and you swab those.

MS. GOLDEN:  Okay.  I need a break, maybe five to ten minutes?

MR. ART:  That sounds great.

MS. GOLDEN:  Thanks.

(Recess taken.)

MS. GOLDEN:  I'm sorry, everybody, that was longer than I intended, but I made good use of my time, and I'm almost done.
I imagine everybody's ready.  Okay, let's go back, Donna.

KARL A. REICH, PHD, 10/14/2022                                    Page 86..89

Page 86

BY MS. GOLDEN:

Q. Okay. So, Dr. Reich, I'm going to show you what we've marked as Exhibit 20.

And this came from ISP and it's Bates stamped ISP 298 to 299. Do you recognize this type of report from ISP?

A. I do.

Q. And do you see the highlighted portion there --

A. I do.

Q. -- in the comments? "Suspect's blood on towel from suspect's car - not probative." Do you know what that means?

A. Well, we can guess. So this is a document that is used to -- about to perform a DNA database search. So this is a local DNA database search, and it identifies the sample. And the DNA profile is over to the left. The markers that are used are under the title Locus, and then the allele values are listed next to it. There's the type of technique. This is -- it's an old form that they haven't updated. There's really only one technique to develop a DNA profile, but we'll leave that alone. There is sort of who did the work, and then

Page 87

the date.

And so if you're finding the suspect's blood in his own car on his own towel, I'm not quite sure how that links to the assault that we've been examining. So you would like to find the DNA of the victims on the suspect, and they are not finding that, not on anything. They have the reverse, where they have the victims' DNA on another suspect, but not on Mr. Solache or Mr. Reyes. And this is just saying we're going to use it to do a search, it's not a probative search for this particular item.

Q. And in this case, the only -- that's it for the exhibit, but you brought something up I wanted to ask you about.

In this case, the only place where the DNA profile consistent with Adriana Mejia's was found was on Exhibit 11, which was the knife in the box by the couch, right?

A. Right. I was referring to the reverse, where the victim is on -- I can't pronounce her name -- on her shoes and her -- and so, if you recall, we just looked at shoes from the original defendants --

Page 88

Q. Mr. Solache?

A. Thank you. Because there's the original defendants, and then there's the defendants now. They're different.

Q. Right.

A. So -- and I don't have a good way of explaining that.

So you would want, if you're going to assume Reyes or Solache are involved, you would like to find the Soto blood on those shoes. And you don't. You find the reverse on the other suspect, you find one of the victim's. So that's unusual. That's backwards.

In the case of the knives, you want to find the two original defendants, and you don't. So, again, it's not an affirmative identification; in fact, it's the reverse.

This is an example of just using the profile to do a search when they're claiming that it has nothing to do with the case, and they're just using that, rather than his reference single. That's what that document demonstrates.

Q. But in terms of the Soto home, the only place Adriana Mejia's DNA profile was detected was

Page 89

on Exhibit 11, which was the knife under the couch, right?

A. Correct, but --

Q. And the only DNA profiles --

MR. ART: No, no, no, no, no, you've got to let him answer the question. So you just -- he said "correct, but --" and then you cut him off.

THE WITNESS: So the answer is yes, but that's not how analysis -- that's not how probative evidence is developed, and that's not probative on its own.

You're -- at some point or another, there was an affirmative effort to prove, and that means identifying the original defendants on items of evidence that are related to the assault. And, as my report states, none was found despite a lot more effort than is usually expended on a case, both at the beginning, the 1990-2000 results, and later, in the 2018 to 2020 results. So they didn't find at all, and they found the reverse from the very beginning.

So you can go back to the knife that was found at the crime scene, but we also found crime scene results where they shouldn't have been.

KARL A. REICH, PHD, 10/14/2022                    Page 90..93

Page 90

BY MS. GOLDEN:

Q.   Was Adriana Mejia's DNA profile found anywhere in the Soto home other than on ISP Exhibit 11, which was the knife?

A.   No --

MR. ART:  Objection; form, foundation.

BY MS. GOLDEN:

Q.   Okay.

A.   To my knowledge, no, no other -- no ISP report provides that information.  But it is found on a significant item of evidence, and, more importantly for the two defendants, that is, the original defendants, their DNA is not on the knife.

Q.   Okay.  And the only two -- so let's call the person whose profile -- you said the right word.  What is it, discerned?

A.   Deduced.

Q.   Deduced.  Okay.  The person whose profile you deduced, I want to call that person contributor X.

A.   Unknown person.

Q.   Unknown person.  Okay.  And the only two profiles on the other knife which was found underneath Mariano Soto's body are the profiles of

Page 91

Mariano Soto and the unknown person.

A.   Correct.

Q.   Okay.  Is it possible that there was a third profile on that knife that -- but the amount of DNA was so insignificant as compared to the amount of DNA from Mariano's blood that it became diluted and became undetectable?

MR. ART:  Objection; form.

THE WITNESS:  That doesn't happen.

So this is a misunderstanding of what forensic DNA does.  You don't dilute samples by putting DNA on top of it.  It doesn't get washed away; it stays there.

The issue you are bringing up is could there be an invisible unknown third contributor to that sample, and the answer is you can hypothesize anything you want, but if we do so, then we need to examine the data and see if that hypothesis is supported.  That's how science is performed; you make a hypothesis, if you want to use a less fancy word, you make a guess, and then you compare the results you have to that hypothesis to determine whether it's supported by the physical evidence or not, and then you improve your

Page 92

hypothesis based on that comparison.

And at the moment, you do not have any evidence of a third contributor.  You just have the two; the victim, and somebody else, and a sufficient profile that you could in fact do searches and identify who it might be if you had spent the effort to do so.

The two original defendants are not present on an item found under the decedent.

BY MS. GOLDEN:

Q.   So is it your opinion that the unknown contributor is more likely than not the person who stabbed Mariano Soto?

A.   My opinion is you have an unknown profile and a violent assault, and you do not have the DNA of the two original defendants, so you need to look at all of the data you have, and that was not done.

I do not know and cannot determine from the DNA whether it's a probative result.  My report speaks to that.  I do know it's a profile that is out there that was not examined further.

Q.   Okay.  And the only place in the Soto home that Jacinta Soto's DNA was found is under her

Page 93

one hand of her fingernails.

MR. ART:  Object to the form of the question.

BY MS. GOLDEN:

Q.   Right?

A.   Well, yes and no.  They took a reference sample from her, so that's not really the point.  They didn't test the blood on the wall; they didn't test the blood on the television; they didn't test the blood on the refrigerator; they didn't swab the floor.  Any or all of those could have been from the other victim.

There's another victim, there's no question about that.  The only issue is did they test enough samples to determine that she was a victim.

That's not terribly informative to find the victim's DNA on -- in her own apartment on the blood on the wall.  You are searching for someone else's DNA profile, and that's the important part.  So whether you find her or not, she's a victim, no one's going to argue that, and her blood is certainly there.  She was, what, stabbed over 20 times?  So pick a few of the blood stains, which they didn't pick up, and -- because

Page 94

they figured they would only find the victim's -- and you might find her. It's not a relevant fact to the case.

Q. And the DNA profile of the children, Maria and Santiago Soto, they weren't found on any of the items tested for DNA, were they?

A. No, they weren't. They're also not suspects in the case, so far as I know, nor was it important to identify them on any item of evidence. Everyone knew that they were part of the household. They were identified later. Why would you go out of your way to find the children on an assault which they had nothing to do with.

I don't think there was any dispute as to whose children they were. That might have been a thought, but I don't recall seeing anything about that. So finding the children or not is irrelevant to the assault, and certainly is irrelevant to the knife, and is irrelevant to the blood found on Mejia's shoes. So I don't see how that's relevant in any way, shape, or form.

Q. Well, the children lived there, right?

A. Correct. But there was no effort to determine that they lived there. The assumption

Page 95

was that they did. Proving that they lived there, when everyone know they lived there, is not a probative piece of information unless you're going to dispute whether or not they should have lived there or not.

Why would you identify the two children who you know lived there, whose outfits are is there, and clothing is there, and their diapers are there? That didn't seem to be relevant to the investigators, and that's understandable.

Q. And other than items that tested positive for a DNA profile of Mariano Soto and the unknown contributor, no other male DNA was found on any other item that was tested for DNA; correct?

MR. ART: Objection to form.

THE WITNESS: I believe that's correct.

BY MS. GOLDEN:

Q. Okay. So is it your opinion that whoever handled the knife that was found underneath Mariano Soto's body would have a DNA profile detected on it?

A. Well, we do know that there was DNA detected on the knife because the blood of the victim was on the knife and so identified. So if

Page 96

you -- and we don't even know necessarily that that knife was -- which knife was used on which victim, or if they were multiple knives. I don't recall any discussion about that in the ISP reports.

But there's a knife under a victim, seems like an interesting piece of evidence. And so if that was used and someone handled it without gloves, they're going to leave their DNA behind.

My recollection is that the victims were stabbed something like 50 times altogether, and you don't do that without leaving yourself behind on the handle, unless you've deliberately worn a pair of gloves; and you're also likely to have injured yourself at some point during that assault, and so the assailant's blood might be identified as well somewhere. So those are the things that you would look for if you're an investigator and trying to do DNA to try and identify what happened at the scene.

Q. So is it your opinion that if the assailant, or if one of the assailants used the knife, which is Exhibit 12, to stab either of the victims, that their DNA would be detected?

A. That's likely. And that's why the

Page 97

knife was probably swabbed. They didn't do it just for the hell of it; they did it to try and identify who might have handled it. So that's the whole purpose of that particular effort.

Q. All right. Let me look at -- let's show you Exhibit 7, please.

And this is Bates stamped SDT-ISP 630. And do you recognize this?

A. It's an ISP worksheet. I recognize a work sheet.

Q. Okay. And, again, the diagram shows us -- can you tell us what the diagram represents?

A. "Exterior bag, towel." So they're trying to make a sketch of what they've identified, and given you shape and size, at least in inches.

Q. And inside the circles and squares are the parts that were swabbed; correct?

A. Those are the parts that were sampled, I would say. We don't know, unless you read it, whether they took a swab or took out little pieces of the fabric itself.

Q. All right. Exhibit 12, please, which is Bates stamped SDT-ISP 616.

And this is the lab worksheet for

KARL A. REICH, PHD, 10/14/2022                                    Page 98..101

Page 98

Exhibit 12, knife.

A. Correct.

Q. And what does the diagram in this exhibit tell you?

A. So they're trying to sketch the two sides of the knife and giving you a sense of the length of the blade and the handle and the areas which -- where they swabbed. And so it's a -- the type -- the handwriting is a little small off the one side, but you can certainly see what they have attempted to do.

And the areas that they have noted, and they've called them Q1, Q2, and Q3, which is standard ISP protocol. And here you can tell exactly what they did because they removed one stain with a damp swab for Q1, they did it also for Q2, where they're just using a tiny bit of the swab to try and keep it localized, and it was small, and then for Q3 it was a larger stain, so they used the two-swab technique, which is also fairly standard. And they didn't get a lot on the swab, but they had enough, obviously, to test for later.

Q. Okay. So the Q1 area, is that to the far right there of the diagram?

Page 99

A. Let's see if we can -- yes, so it's -- if you look on the left, there's the sketch of the handle, and in -- there's a size bar which the analyst has put in, not to scale, of half an inch. And that is Q1.

Q. And that's the area that was swabbed for Q1?

A. It's what it says.

Q. And then Q2 is a very small area on the right-hand side, I think you said, that tiny little circle?

A. Go over to the other side of the sketch. Your arrow is not where -- I don't know whose arrow that is. But on the knife -- the mirror image in the middle of the diagram, there are two there, you can see there's a little tiny arrow, another arrow that says Q2.

Q. Okay. And then Q3 looks to me, but I could be wrong, that they're swabbing, like the sharp part of the knife.

A. Well, can't tell whether it's the blade or the part just above the blade, but the blade itself is very, very thin, so that's not helpful. They're going to do the area around it. And that's

Page 100

what they are swabbing for Q3. And it's a bigger area, so they used two swabs.

Q. Okay. So the entire knife is not swabbed; correct?

A. Correct. That's not useful. You want to get probative evidence from the item. You don't swab entire areas meaninglessly because you won't get anything but noise and mixtures that are uninterpretable. You are trying to identify probative evidence in forensic analysis. You don't swab everything all at once just on the half chance you're in the right area. It's not done. It's wasteful. It won't tell you information you need.

Q. Okay. Let's take that down and look at Exhibit 9, which is Bates stamped SDT-ISP 632.

A. So this is labeled Pants.

Q. Right. These are the baby pants, ISP Exhibit 25.

And I am assuming the diagrams here represent similar things as the other ones we looked at. The materials inside the circles and squares were sampled.

A. Right. So they have two of them. I'm not quite sure why they changed the lettering, but

Page 101

that's okay. And then there's a diagram of the actual item. And so it's got some design on it, and the analyst has tried to reproduce roughly where that is.

And then there's apparent, like blood stains, that were tested by a method called Kastle-Meyer, sometimes referred to as phenolphthalein. This is a presumptive test for blood. Any blood would test, so the term "human blood" here is inaccurate, but it's a reasonable assumption, considering the crime scene and where it comes from. Unless there were animals in the house, dogs, cats, ferrets or something, you wouldn't necessarily assume otherwise.

And then they save those items for further testing.

Q. Okay. And then the graph on the right, the 4 -- is that a 4 plus?

A. It is.

Q. And that means a positive result?

A. That's a -- that would be a conclusion.

So the Kastle-Meyer test is very widely used. It's a presumptive test for iron-bound heme, if you want to be precise. And it's a

KARL A. REICH, PHD, 10/14/2022                    Page 102..105

Page 102

semi-catalytic test, and in the end it turns pink. And so there's an arbitrary scoring as to how pink it gets and how fast it gets pink. So from 1, 1 plus 2 -- 1, 1 plus 2, 2, 2 plus 3, 3 plus 4, 4 plus, would be the arbitrary scoring of how pink and how fast, you might say an indication perhaps of how much blood they collected or how much reactive material was on the swab piece that they tested. So you may take that as a positive Kastle-Meyer.

**Q. And have there been any developments in the sensitivity of that test since 1995?**

A. There haven't been developments in sensitivity of that test since it was first used in forensics probably 20 years prior. It's a sensitive test, so the issue with Kastle-Meyer is not sensitivity, it is specificity.

**Q. Okay. I just can't remember now. Did we talk about the testing on Adriana Mejia's pants?**

A. We discussed it.

**Q. Okay. And the finding there was a DNA profile consistent with Mariano Soto; correct?**

A. Correct. One of the victim's was found on her pants.

Page 103

**Q. And it was a single contributor.**

A. That's -- yes, the victim -- the victims found. We wouldn't necessarily expect a mixture. It could be. But, yeah, the blood is going to be a single source, correct.

**Q. And Adriana's DNA was not found in that sample; correct?**

A. You wouldn't -- not on that sample. I believe her DNA was found on other samples, but not on that one.

**Q. Yeah. On her pants.**

A. Right.

MS. GOLDEN: I think I'm done.

Does anybody have follow-up? Or should I take a break to look at my notes?

MR. ART: Are other defense counsel going to ask questions?

MS. BARBER: Potentially, if we --

MS. GOLDEN: Why don't you go ahead, Katie, and I'll look at my notes.

MR. ART: Whatever is good for you all.

MS. BARBER: I think it would be helpful if we could take a break.

MS. GOLDEN: Okay. I'll try to be much

Page 104

faster.

MR. ART: Thank you all. Let's plan on ten minutes, if that's okay?

MS. GOLDEN: Sure.

THE WITNESS: Ten minutes it is.

(Recess taken.)

MS. GOLDEN: Okay.

MS. BARBER: Carrie, are there any further questions?

BY MS. GOLDEN:

**Q. Well, I thought I was completely done, but I do have one more exhibit I wanted to show you.**

**Exhibit 11.**

**Are you ready, Dr. Reich?**

A. I'm here.

**Q. Okay. And do you recognize -- and this is Exhibit 11 that we Bates stamped SDT-ISP 797. Do you recognize this?**

A. This is a set of reference standards from ISP, DNA profiles performed with a commercial kit called Identifiler.

**Q. Okay. And the significance of the values in the column underneath the different people are what?**

Page 105

A. There aren't any. This is just the reference standards for the individuals noted.

So there are many ways of describing a profile. Let's pick it as a phone number. So each one of the total number of results from top to bottom, again the loci that are tested are in the first column, they're those weird names D8, D21, et cetera, and then the results, the alleles at each one of the tested markers, are in each of the box underneath each of the individuals.

So these are the reference profiles, the phone number of each one of these individuals. So, in theory, if you dialed this number, only one phone in the entire world would ring.

You'll notice that three-quarters of the way down, or 60 percent of the way down, there are two markers, D2 and D19, for which there are no results. And that's because the original reference swabs were performed using a different kit that did not have D2 or D19 as the loci that are tested, so there are no results from the reference swabs from those two markers because those two markers were not in the two commercial kits that were originally used to develop the profiles from these references.

KARL A. REICH, PHD, 10/14/2022 — Page 106..109

Page 106

So there's no significance to these at all. These would be used to compare against the questioned samples when they develop a profile.

Q. So for the first locus listed there, D8S1179 --

A. Right. And I'm also lazy. We only would say D8 or D21. There's no need to read the whole one, unless you would like to.

Q. I would not like to, so I appreciate that.

So for D8 locus, this means that Gabriel Solache's DNA profile would contain alleles 13 and 14.

A. Correct.

Q. At that locus.

A. Correct.

Q. And that's true throughout the graph; the numbers listed in the column for the person corresponded to the alleles for that particular locus on the left side.

MR. ART: Objection to form.

THE WITNESS: The form is poor, I have to agree.

The DNA profile results for locus D8

Page 107

for each individual are listed on the table. There you're going to read horizontally along the row, so for -- if you want to work backwards, Gabriel Solache's profile at D8 is 13,14; Adriana Mejia's is 10,15; Arturo DeLeon's is 14,14 -- that's a homozygous result, we could go into some detail about that -- Mariano Soto's, one of the victims, his profile would be 11,13 at D8, and Jacinta's would be homozygous 13.

BY MS. GOLDEN:

Q. So if there is a 13 found at the D8 locus, does that mean you can exclude Reyes and Adriana Mejia?

A. If you believe that that 13 is correct and you are not missing any other results at that locus, and that result is unambiguous, then Arturo DeLeon could not provide a 13, and he would be excluded; and Adriana, who cannot also provide a 13 at D8, would also be excluded.

I can also say that probably 95 percent of the population would also be excluded because probably only a small percentage of the population has a 13 at that locus.

So it's not sufficient for identity,

Page 108

by any stretch, to just have one locus, one loci. But if you believe -- and if the result is very weak and there's only one allele, you don't -- you don't want to make any conclusions at all. You don't have enough data to confirm or deny that that's what it should be.

But, in essence, if everything was perfect, you'd be correct.

Q. Okay. And you could not exclude Mr. Solache, Mariano, or Jacinta Soto on the basis -- based on the presence of a 13 at that locus; correct?

A. You have to be careful. So that's not entirely true either.

So you'll notice that Jacinta Soto is a 13,13. That means that the 13 allele that came from her mother, and the allele that came from her father, both of whom delivered each an allele at D8, is the same allele.

So if you believe there's only a 13 on the questioned item tested at D8, then you can only have a homozygous person as not excluded. But suppose it's low level and incomplete and a bad sample, you could be 13 and some other locus which

Page 109

you don't see, in which case you couldn't eliminate either Soto, Mariano, Jacinta, or Gabriel Solache because they have 13, 13,14, 11,13, so you don't know whether you're missing it or not.

That's why the details of the electropherogram and the details of that profile are important. It's not just examining a table and making a comparison. That's done too, but that's not sufficient.

MS. GOLDEN: Okay. Thank you for explaining that. And I do not have any other questions.

MS. BARBER: I do not have any questions.

MR. LEINENWEBER: I do not have any questions.

MS. GOLDEN: Signature?

MR. ART: I believe no questions -- so there's no questions from plaintiff Reyes.

Jan, do you have anything?

MS. SUSLER: No, we have no questions.

MS. GOLDEN: I'm sorry.

MR. ART: And then do you want to reserve signature, Dr. Reich, or waive?

THE WITNESS: I'll waive.

MR. ART: We should probably reserve it and you should review the transcript.

KARL A. REICH, PHD, 10/14/2022                                    Page 110..113

Page 110

MS. GOLDEN: Okay. Thank you, Doctor, for your time, everyone. Not seven hours. Happy Friday.

MR. ART: Thank you. Thank you, Dr. Reich.

THE WITNESS: My pleasure.

(The proceedings adjourned at 1:13 p.m.)

Page 112

REPORTER'S CERTIFICATE

I, Donna M. Urlaub, do hereby certify that KARL A. REICH, Ph.D., was duly sworn by me to testify the whole truth, that the foregoing deposition was recorded stenographically by me and was reduced to computerized transcript under my direction, and that said deposition constitutes a true record of the testimony given by said witness.

I further certify that the reading and signing of the deposition was not waived, and the deposition was submitted to the deponent, for signature. Pursuant to Rule 30(e) of the Federal Rules of Civil Procedure, if deponent does not appear or read and sign the deposition within 30 days, the deposition may be used as fully as though signed, and this certificate will then evidence such failure to appear as the reason for signature not being obtained.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Chicago, Illinois, this 1st day of November 2022.

Donna M. Urlaub
Illinois CSR No. 084-000993

Page 111

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ARTURO DeLEON-REYES,          )
                              )
            Plaintiff,        )
                              )
      vs.                     )   No. 18 CV 01028
                              )   consolidated with
REYNALDO GUEVERA, et al.,     )   No. 18 CV 02312
                              )
            Defendants.       )
------------------------- )
etc._                         )

This is to certify that I have read my deposition taken on Friday, October 14, 2022, in the foregoing cause and that the foregoing transcript accurately states the questions asked and the answers given by me, with the changes or corrections, if any, made on the Errata Sheet attached hereto.

_____
KARL A. REICH, Ph.D.

No errata sheets submitted (Please initial)
Number of errata sheets submitted_____pages

Subscribed and sworn to before me this_____day of_____2022.

_____
Notary Public

Page 113

Errata Sheet

NAME OF CASE: ARTURO DELEON-REYES vs REYNALDO GUEVARA

DATE OF DEPOSITION: 10/14/2022

NAME OF WITNESS: Karl A. Reich, PhD

Reason Codes:

1. To clarify the record.

2. To conform to the facts.

3. To correct transcription errors.

Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____

_____

Urlaub Bowen & Associates, Inc.   312-781-9586

Index: $170,000–22

KARL A. REICH, PHD, 10/14/2022

**Exhibits**

**1 Reich 101422-1** 21:2 30:16 43:15 56:12 71:1

**2 Reich 101422-2** 31:5

**3 Reich 101422-3** 31:11 35:17 37:8 38:12 39:2

**4 Reich 101422-4** 10:3,24 11:20 42:17 43:4

**5 Reich 101422-5** 51:21 55:2,13 56:11 65:24

**6 Reich 101422-6** 58:5,6

**7 Reich 101422-7** 97:6

**8 Reich 101422-8** 61:23

**9 Reich 101422-9** 100:15

**10 Reich 101422-10** 66:3 75:7 79:7

**11 Reich 101422-11** 71:4 72:5 87:18 89:1 90:4 104:13,17

**12 Reich 101422-12** 65:19 71:18 72:12 78:2,20 96:22 97:22 98:1

**13 Reich 101422-13** 84:6

**14 Reich 101422-14**

**15 Reich 101422-15**

**16 Reich 101422-16** 71:23,24 72:11 82:2

**17 Reich 101422-17**

**18 Reich 101422-18**

**19 Reich 101422-19** 58:20

**20 Reich 101422-20** 83:3,4 86:3

**$**

**$170,000** 39:3

**$200** 34:11

**$250-an-hour** 24:18

**$300** 24:10 33:24

**$475** 34:1

**-**

**-2** 60:16

**-B** 57:15,22 60:9 63:2 64:7

**-C** 57:18,22 60:9 63:2 64:7

**-D** 57:18,22 60:9

**-E** 57:18

**-F** 57:15

**-G** 57:15,18

**1**

**1** 13:9,12 21:2 30:16 37:24 42:22, 24 43:15 56:12 71:1 72:19 102:3,4

**1.75** 34:1

**1/2** 22:15 34:17

**10** 13:10,12 24:3 36:16 38:1 66:3 75:7 79:7

**10,15** 107:5

**10034** 16:3

**10100** 43:5

**10120** 43:6

**11** 13:10,12 21:9 38:1 71:4 72:5,10, 15 87:18 89:1 90:4 104:13,17

**11,13** 107:8 109:3

**12** 13:10,13 28:6 38:1,16 65:19 71:16,18 72:12,16 78:2,20 96:22 97:22 98:1

**12A** 63:9

**12B** 71:15

**12B1** 47:7 72:20 73:2 75:11,13 77:23

**12C** 76:21 77:8,11

**12C1** 79:6 80:17

**13** 13:10,13 21:8 22:20 28:7 38:1 82:3 84:6 106:13 107:9,11,14,17, 19,23 108:11,16,21,24 109:3

**13,13** 108:16

**13,14** 107:4 109:3

**14** 13:10,13 21:2,14 22:18,19 28:7, 8 38:1,16 52:1 106:13

**14,14** 107:5

**141** 58:8

**144** 58:8

**15** 8:4,11 13:10,13 21:6 22:19,20

38:1 66:5 68:10

**16** 13:10,13 38:1 58:7,10 71:23,24 72:11 82:2

**16CF539** 30:12,13

**17** 13:10,13 34:8 38:1

**18** 13:10,13 38:1 61:2

**18A** 57:15 61:4,11

**18B** 61:12,13

**18F** 61:4,11

**18G** 61:4,11

**19** 13:10,13 38:1 58:20

**195** 55:1

**1984** 57:15

**1990-2000** 89:18

**1995** 41:17 102:12

**1998** 41:19 57:10 72:3 82:3

**1998-2000** 57:2

**1999** 58:10

**19A** 59:14

**19B** 57:17

**19F** 58:22 59:8

**19G** 58:22

**1:13** 110:7

**2**

**2** 13:9,12 25:2 31:5 37:24 71:23 72:4,5 79:7 102:4

**20** 7:24 13:11 36:4 38:1 83:3,4 84:19 86:3 93:23 102:15

**2000** 57:10 62:5

**2008** 38:12

**2016-2017** 57:3

**2017** 79:12

**2018** 89:19

**2019** 31:20,23 34:8

**2020** 89:19

**2022** 8:4,11,19 9:2 21:6,23

**21** 13:11 38:2 82:7

**22** 13:11 36:6,9 38:2

KARL A. REICH, PHD, 10/14/2022

**22nd** 27:17

**23** 13:11 38:2 58:15

**23B1** 57:19 60:16

**23B2** 57:19

**24** 38:2 62:14

**24A** 62:17

**24A1A** 63:11

**24B** 62:18

**24C** 62:21

**25** 38:2 100:18

**250** 55:13

**25A** 63:2 64:7

**26** 38:2

**265** 71:24 82:4

**27** 38:2 58:16 60:7

**270** 72:1 82:4

**2744** 42:24

**27A** 57:22 60:9

**28** 26:17 38:2 83:17,18

**29** 38:2,16 39:9 62:2,5 74:21

**298** 86:5

**299** 86:5

---

**3**

**3** 13:9,12 25:2 31:11 34:15 35:17
36:18 37:8,24 38:12 39:2 59:7
72:11 102:4

**30** 74:22

**300** 24:18

**318** 31:15

**319** 31:15

**322** 31:15

**333** 62:2

**335** 62:2

**3rd** 72:3

---

**4**

**4** 10:3,24 11:20 13:9,12 37:24
42:17 43:4 44:7 56:13,14 82:5

101:18 102:4,5

**40** 13:15 34:10,11

**417** 13:23,24 14:4,10

**4th** 31:20,23

---

**5**

**5** 13:9,12 37:24 51:21 55:2,13
56:11 65:15,18,24 70:24 71:12
78:15,19

**50** 13:15 17:21 36:10 96:10

**53** 22:15

**5E** 66:10 67:7,8,20 70:18

**5E1** 68:6,8

**5F** 66:11

**5F1** 69:2

---

**6**

**6** 13:9,12 34:17 37:24 47:2 58:5,6
65:18 66:1,13 78:15,19 79:5

**60** 105:16

**616** 97:23

**625** 84:18

**626** 84:18

**630** 97:8

**632** 100:15

**688** 66:5

**690** 66:6

**6E** 70:10

**6E1** 70:2

**6F** 66:14 70:9

**6F1** 70:3

---

**7**

**7** 13:10,12 37:24 97:6

**797** 104:17

---

**8**

**8** 13:10,12 21:10 38:1 48:6 61:23

**839** 42:22

---

**9**

**9** 13:10,12 38:1 100:15

**95** 107:21

---

**A**

**A.D.** 57:13 73:3

**A1b** 63:11

**A2a** 63:11

**A2b** 63:11

**abbreviated** 7:10

**Absolutely** 24:22 32:23

**academic** 25:9 27:1

**accept** 23:1 66:21

**acceptable** 74:13

**access** 12:21

**accidental** 47:20

**accounting** 37:22 38:22

**accreditation** 23:3,6

**accuracy** 49:7,19

**accurate** 21:22 32:3

**acronym** 39:20

**actual** 49:9 101:2

**add** 26:17

**added** 30:4,6

**addition** 54:8

**additional** 9:23 10:1 28:13 43:1
61:18,20 65:11 75:4

**address** 51:4 54:1

**adjourned** 110:6

**Adriana** 57:17,21 58:14,16 60:2,
12,23 61:3,6 63:18 64:20,21 69:12
75:16,19 81:4 87:17 88:24 90:2
102:19 107:4,13,18

**Adriana's** 58:20 60:6,14 65:7
103:6

**advances** 41:16

**affirmative** 88:16 89:13

KARL A. REICH, PHD, 10/14/2022

**agency** 24:16

**agree** 75:18,23 81:9,11 106:23

**agreement** 42:13

**ahead** 33:16 103:19

**Ainsworth** 38:8

**allele** 86:19 108:3,16,17,18,19

**alleles** 105:8 106:13,19

**allowed** 19:1,9

**altogether** 55:22 96:10

**Amelogenin** 68:2,9,11,16 69:6,9

**amount** 38:18 39:2 42:7 44:12,17 91:4,6

**amounts** 24:14,15

**amplified** 57:20

**analysis** 39:24 51:1 54:23 56:23 57:3,21 74:21 78:24 79:1 89:9 100:10

**analyst** 85:4 99:4 101:3

**analyzed** 46:18

**analyzing** 40:12

**and/or** 81:17

**Anderson** 28:6

**animals** 101:12

**answering** 23:23

**anticipating** 37:4

**antigen-** 41:2

**antigen-based** 41:4

**Antonio** 52:7

**apartment** 47:22 93:17

**apologize** 39:12

**apparent** 61:18 101:5

**apparently** 29:14 57:16 65:19

**appears** 34:13 43:2

**appended** 28:14

**approximately** 39:3

**arbitrary** 102:2,5

**area** 62:20 82:24 98:23 99:6,9,24 100:2,12

**areas** 59:3 85:8 98:7,12 100:7

**argue** 93:21

**argument** 40:8 75:1

**arguments** 29:2

**Arrington** 28:6

**arriving** 42:20

**arrow** 99:13,14,17

**ART** 9:16 10:14 11:2,10,16,22 18:14,23 19:6 30:17 43:8 46:21 74:15 85:17 89:5 90:6 91:8 93:2 95:15 103:16,21 104:2 106:21 109:15,20,23 110:4

**article** 55:14

**Arturo** 75:16,19 82:8 107:5,16

**asks** 32:16

**assailant** 96:21

**assailant's** 96:15

**assailants** 48:14 96:21

**assault** 47:17,20 87:4 89:15 92:15 94:12,18 96:15

**assembled** 21:17 27:13

**assessment** 48:18

**assume** 6:21 16:4 21:22 88:9 101:14

**assuming** 100:19

**assumption** 73:19 94:24 101:11

**assumptions** 43:20 49:11,13 51:10

**ate** 20:21

**attached** 27:2

**attack** 76:15

**attempt** 80:11

**attempted** 98:11

**attention** 58:19 62:12

**attorney** 32:16 37:7

**attorneys** 9:7 14:24 15:4,7,9,10, 13,14 16:10,24 19:10,15 20:16 23:13 43:16,21 44:1

**autopsy** 7:10 15:22

**average** 48:20,21

**averages** 38:17

**aware** 28:18,19 65:4

**B**

**B1** 63:11

**B2a** 63:11

**B2b** 63:11

**baby** 62:15,19,21 63:3 64:6,15,24 65:5,6 100:17

**back** 7:18,19 17:4 22:19 31:18 37:8 38:12 41:10 43:14 56:12 66:8 70:24 71:10,11 72:19 81:18 85:24 89:22

**background** 56:5

**backwards** 88:13 107:3

**bad** 53:5,7 108:23

**bag** 97:13

**bagged** 45:15

**balance** 34:3,4

**ballistic** 54:23

**ballpark** 36:15

**bar** 99:3

**BARBER** 103:18,22 104:8 109:12

**barred** 28:17

**based** 41:3 92:1 108:11

**basically** 7:14 53:4

**basis** 48:17 73:15 108:11

**Bates** 9:9,10,14 10:13,19 11:12, 15,17,22 13:18,19,21 14:14 30:21 31:14,15 42:24 43:5 58:8 62:1,2 66:5 71:24 82:4 84:17 86:5 97:7,23 100:15 104:17

**beginning** 45:23 89:18,21

**belongs** 76:13

**beneath** 65:19

**Benfer** 28:5

**bet** 55:24

**big** 33:14 84:7

**bigger** 100:1

**bill** 34:11

**biology** 50:19

**bit** 22:18 33:12 39:16 59:13 60:8 62:13 83:3 84:19 98:17

KARL A. REICH, PHD, 10/14/2022

**bite** 54:21,22

**bits** 7:19

**black** 72:13 82:8 83:4

**blade** 98:7 99:21,22

**blanket** 62:15,19,22 63:6 64:24 65:6

**blood** 40:6,14,15 41:1,15,17 46:2 51:9 57:14,16,19,21 58:24 60:8 62:14,15 63:2,9,10 64:19 77:2 82:12,16,18 83:7,20,23 84:1 86:11 87:3 88:10 91:6 93:7,8,9,18,22,23 94:20 95:23 96:15 101:6,9,10 102:7 103:4

**body** 40:4,5,9,18,22,24 72:14,22 85:6,13 90:24 95:20

**boring** 54:15

**bottle** 22:10

**bottom** 14:15 21:10 26:6 27:8,23 31:16 58:13 66:23 71:23 72:4 75:10 79:7 105:6

**bound** 101:24

**box** 71:5,19 72:6,9,10 87:19 105:10

**break** 6:18 30:24 31:2 42:12 85:15 103:15,23

**breakfast** 20:20,21

**bring** 12:4,9,13

**bringing** 91:14

**brought** 54:7 87:14

**buccal** 46:3

**bummer** 33:21

**bunch** 31:6 54:7

**business** 23:18

---

**C**

---

**c.v.** 10:9 21:14,19 26:15 30:3

**c.v.s** 27:1

**calendar** 17:5

**call** 18:2,3,4,10,22 20:1,9 90:15,19

**called** 6:3 14:4 98:13 101:7 104:21

**calls** 17:13 20:16 35:5,7 55:12

**car** 86:12 87:3

**card** 52:19

**careful** 70:8 108:13

**Carrie** 30:17 104:8

**case** 8:3,11,14,18 9:2,5 10:8 14:8, 10,13 15:3 20:23 21:6 23:12,15,16, 19 24:11,12 28:17 29:1 30:1,2 31:10 32:1,11,14 33:2 34:24 35:12, 19 36:12 37:6 42:21,23 43:10 47:4, 12,16,17 48:3,8,12,21 49:24 50:8 52:13 56:24 62:4 74:17,19 87:13, 16 88:14,20 89:17 94:3,8 109:1

**cases** 13:4 24:13 27:5,6 35:23 36:4,12,22 37:1,12 38:3,17 39:9 48:20

**cats** 101:13

**cell** 40:7,12

**cells** 39:22

**cetera** 105:8

**chain** 45:22

**Champaign** 29:11 30:11

**chance** 31:1 100:11

**changed** 100:24

**charge** 24:14,15 32:10

**charging** 24:10

**chemical** 41:6

**chemical-based** 41:2

**chemist** 25:24

**Chicago** 16:6

**chief** 22:9 25:10

**children** 64:1 70:15,22 94:4,12,15, 17,22 95:7

**choice** 55:11 81:17

**chosen** 81:16

**chronological** 26:10,11 31:11

**circa** 57:2,3

**circle** 99:11

**circles** 85:11 97:16 100:21

**circumstances** 24:15 28:23

**claim** 40:24 59:10 64:2

**claiming** 88:19

**classes** 45:13

**clear** 44:18 48:22 67:13,24

**Clopton** 28:4

**clothing** 95:8

**Cobey** 28:4

**collected** 59:1 83:18 102:7

**collections** 59:5

**column** 104:23 105:7 106:18

**comments** 86:11

**commercial** 104:20 105:23

**commitment** 48:13

**common** 50:22

**compare** 91:22 106:2

**compared** 91:5

**comparison** 46:7 47:18 54:17 59:9 67:11 79:14 92:1 109:8

**complete** 45:22 68:23

**completely** 56:6 74:5 104:11

**complicated** 48:24

**computer** 12:8,15 14:7

**concept** 50:3

**conclude** 73:15

**concluded** 79:11

**concludes** 61:22 75:15

**conclusion** 44:9,11 60:11,21 63:8 67:13,14,19 73:4,11 75:18 76:20, 21 77:18 80:16 101:21

**conclusions** 58:2 63:8 67:8,17 70:18 73:7 76:7 80:14 108:4

**concurring** 73:9,10

**conducted** 49:6,18 50:21

**conference** 20:1

**confirm** 108:5

**confirmatory** 40:19,23

**confirming** 73:7

**connection** 62:4

**considerable** 44:12,16

**consistent** 59:20 60:9,18 61:2,6 63:12 64:8,16 77:1,3 78:1,2 87:17 102:22

**consulting** 37:3

Index: consuming–diagrams

KARL A. REICH, PHD, 10/14/2022

**consuming** 33:3

**contact** 52:15

**contacts** 17:14

**contained** 44:2

**contamination** 29:22

**contemporaneously** 32:5

**continues** 57:18

**contributed** 76:8

**contributing** 60:3

**contributor** 47:11 48:4 63:23 69:9,10 73:18,22 76:3 77:8,12 78:9,11,13,18 80:18,24 81:6 90:20 91:16 92:3,12 95:13 103:1

**contributors** 68:12 73:4 76:1 79:12,19,21,24 80:3,10

**control** 23:9

**conversation** 17:18,24 19:14,18 20:12 32:7,17

**conversations** 9:18 17:2

**Cook** 52:3

**copies** 10:1 12:10,13 16:19

**Cornell** 25:24

**Corolla** 57:15

**correct** 8:5 21:7 26:5 27:18,24 34:3,5 35:10,21 47:9 51:19 53:15, 21 54:3 57:10 58:3 59:9,15,21,22, 23 60:10,14,19,23 61:3,7,8,10,21 63:13,16,17,21 64:1,4,8,17,18,20 67:16,22 69:4,7,13,14,19 70:2,6, 13,16,22,23 72:23 73:2,4,8,12,18 75:2 77:11 78:3,5,15,24 79:16 80:8,19,20,22 83:8 84:22 85:12 89:3,7 91:2 94:23 95:14,16 97:17 98:2 100:4,5 102:22,23 103:5,7 106:14,16 107:14 108:8,12

**corresponded** 106:19

**couch** 71:5,20 72:6 87:19 89:1

**counsel** 17:14 42:13 103:16

**count** 23:22

**County** 30:11 52:3

**couple** 26:13

**court** 14:3 26:21 27:2,5 29:3 50:10

**courtroom** 29:16

**crime** 7:8 15:21 51:17 81:10 89:23, 24 101:11

**CSI** 49:4,5 50:7

**current** 13:3 21:23 23:3

**custody** 45:23

**cut** 89:7

---

### D

---

**D19** 105:17,20

**D2** 105:17,20

**D21** 105:7 106:7

**D8** 68:13 105:7 106:7,11,24 107:4, 8,12,19 108:19,21

**D8s1179** 68:2,9 106:5

**damp** 98:16

**data** 48:1 73:5 75:4 80:13 91:18 92:17 108:5

**database** 86:16

**date** 16:16 27:4 31:22 33:8 35:1 58:9,10 87:1

**dated** 8:3,4 14:18 31:13,19 34:8 58:7 62:1 66:4 72:3 84:16

**dates** 33:4

**days** 7:17 8:13,18 9:1,6,24 20:15

**deceased** 25:17,18

**decedent** 92:9

**December** 58:7,10

**decide** 32:13

**decided** 29:6

**deduce** 49:20 73:17,21

**deduced** 49:10 69:10 75:4 77:22, 23 90:17,18,19

**defendant** 15:15 29:11 44:23

**defendants** 10:19 73:3 87:24 88:3,4,15 89:14 90:12,13 92:8,16

**Defender** 52:4

**defenders** 55:3

**defense** 50:15 55:10 103:16

**defensible** 54:18

**Define** 23:20

**Deleon** 75:16,19 107:17

**Deleon's** 107:5

**deliberately** 96:12

**delivered** 108:18

**demands** 53:8

**demonstrate** 48:12

**demonstrates** 88:22

**demonstration** 42:5

**denim** 82:8

**deny** 108:5

**Department** 16:7

**depending** 23:24

**depends** 25:20 29:1

**deposited** 51:2,7

**deposition** 6:10 7:3 8:12,15,17 9:1 12:21 16:22 17:15 19:7,8 20:18 26:21 27:2 35:8 38:7

**derive** 68:19 80:14

**derived** 50:3

**describe** 7:7

**describing** 105:3

**design** 101:2

**designated** 79:2

**designed** 85:7

**detail** 107:6

**details** 109:5,6

**detect** 81:3,5,6

**detected** 68:15 88:24 95:21,23 96:23

**determination** 68:17

**determine** 80:3,9 91:23 92:19 93:14 94:24

**determined** 79:13,20,23

**develop** 40:1 46:5 86:23 105:24 106:3

**developed** 23:7 89:10

**developments** 102:11,13

**diagram** 97:11,12 98:3,24 99:15 101:1

**diagrams** 100:19

KARL A. REICH, PHD, 10/14/2022

**dialed** 105:13

**diapers** 95:9

**differ** 73:10

**differently** 35:19 81:14

**dilute** 91:11

**diluted** 91:7

**directed** 53:14,16

**directing** 58:19 62:12

**directly** 15:1

**director** 22:9

**discerned** 76:14 77:21 90:16

**disclosure** 10:18 18:15

**discovery** 13:11 14:4,11 53:20,22

**discuss** 9:17 54:10

**discussed** 18:12 54:5 76:17
102:20

**discussing** 54:11

**discussion** 18:11 77:5 96:4

**diseases** 25:11

**dispute** 74:20,23 94:14 95:4

**DNA** 14:5,8 23:1,2,8 39:13,19,20,
23 40:2,3,13 41:14,24 42:6,7 44:13
45:3,8,12 46:5,8,16,18 47:19,20
48:14 49:1,6,9,10,18,20,23 50:4,8,
12,16,18,20,21 51:1,6,10,13,15
53:15,21 54:2,9 55:14 56:2,16,23
57:1 59:8,18 60:13 61:5,9,18
63:12,24 64:2,7,16 65:4,8 67:15
68:1,8 69:19,20 70:4 73:1,16 74:19
75:3,12 76:3,17,18,23 77:2 78:1
79:9,22 80:18 81:2,3,5,7,10 82:15,
19 83:10 84:3 86:15,16,17,23 87:6,
9,17 88:24 89:4 90:2,13 91:5,6,11,
12 92:16,20,24 93:17,19 94:4,6
95:12,13,14,20,22 96:8,18,23
102:21 103:6,9 104:20 106:12,24

**doctor** 26:2,3 110:1

**doctors** 25:1,4,6

**document** 9:10 16:3 27:3,12,14
28:13 31:1 36:3 43:5 66:24 67:1,2
86:15 88:22

**documents** 7:6,12 9:4,12,23 10:2,
8,9,12,20,23,24 11:11,14,17,18,19,
20,23 12:5,19 14:6,13,16,19 16:6,
8,20 18:9,11,12,21,24 19:4,8,14
20:11 30:19 35:8 42:19 43:2,4,9,

17,19 44:2 62:3,6,8,10 65:11

**dogs** 101:13

**dollar** 38:18

**Donna** 85:24

**draft** 10:16

**drawings** 84:24

**drawn** 76:7

**drop** 73:24 74:3,4

**dropped** 74:9

**dropping** 74:11

**due** 34:3 38:23

**duly** 6:3

---

**E**

**earlier** 47:23 77:4

**easily** 28:10

**east** 72:6

**easy** 12:3

**effect** 49:4,5 50:7

**effort** 85:4 89:13,17 92:7 94:23
97:4

**electron** 42:8

**electronic** 12:14

**electropherogram** 109:6

**eliminate** 109:1

**Ellson** 25:3,22,23

**else's** 81:2 93:19

**email** 10:7 30:18,19,23 32:7 42:12

**employees** 22:17

**end** 32:6,7 33:2 45:24 102:1

**endeavoring** 30:24

**English** 53:8

**entire** 25:7 82:23 100:3,7 105:14

**entitled** 18:16,23 19:3,6 55:14

**entries** 38:2 39:9

**epithelial** 40:7

**error** 56:2

**essence** 108:7

**estimate** 27:8 36:2

**everybody's** 85:23

**evidence** 7:6 23:2 40:23 44:20
45:1,9,10 46:10,12,15,16,19 48:8,
12 50:8 53:15,17 54:21,22 56:24
85:3 89:10,15 90:11 91:24 92:3
94:9 96:6 100:6,10

**evidentiary** 45:14

**exact** 53:7 79:12,19,21 80:3,9

**exaggerated** 49:22

**exaggerations** 50:2

**EXAMINATION** 6:5

**examine** 61:19 91:18

**examined** 6:4 46:16 48:1 59:14
92:22

**examiners** 58:3

**examining** 87:5 109:7

**exclude** 63:15,18 68:20 107:12
108:9

**excluded** 45:3 47:5 59:23 60:2,13
69:12 73:2 75:17,20,24 77:7 78:11
80:21 81:1 107:18,19,21 108:22

**excludes** 61:14

**exclusion** 57:13 68:23

**exclusionary** 75:14

**exclusions** 57:20

**exhibit** 10:3,20,24 11:19,20 21:2
30:16 31:5,11 35:17 37:8 38:12
39:2,11 42:15,17 43:4,12,15 47:7
51:21 55:2,13 56:11,12 57:19 58:5,
6,15,16,20 59:14 61:23 62:14,23
63:4,9 65:19,24 66:3,10 68:8 69:2
71:1,4,9,11,15,18,23,24 72:5,11,
12,18,20 73:2 75:7 76:21,24 78:2,
20 79:6,7 80:18 81:18,21 82:2,7
83:3,4,17,18 84:6 86:3 87:14,18
89:1 90:4 96:22 97:6,22 98:1,4
100:15,18 104:12,13,17

**exhibits** 37:10 42:14 57:15,17,22
59:18 63:11 65:18

**expect** 103:3

**expended** 89:17

**Experience** 22:1

**experienced** 49:16

**expert** 18:16,17 23:14 37:4

KARL A. REICH, PHD, 10/14/2022

**explain** 6:22

**explaining** 88:7 109:10

**explored** 76:19

**extends** 57:16

**extent** 74:2

**Exterior** 97:13

**extra** 32:24 42:9

**eye** 42:10

---

**F**

**fabric** 82:24 97:21

**fact** 80:9,13 88:17 92:5 94:2

**facts** 44:1

**fair** 15:20 85:10

**fairly** 98:20

**fall** 23:15

**fallacies** 50:13

**fallacy** 50:14,15

**false** 80:2

**family** 23:4

**fancy** 91:21

**fashion** 78:5

**fast** 32:15,19 102:3,6

**faster** 104:1

**father** 108:18

**February** 31:20,23

**female** 69:3,7

**ferrets** 101:13

**field** 39:13

**figure** 37:12,15,17 42:19 82:20

**figured** 94:1

**file** 12:20 13:17 16:17,18 42:21

**files** 12:14 13:8,15 14:7,10 27:3
   36:20

**find** 36:20 50:11 59:20 61:2,5,9
   63:20,24 64:7,9,16,19,20 67:15,21,
   23 68:1 69:3,16,17,18 70:4,5,9,11,
   15,17,20,21 82:19,24 83:20,23
   84:1 87:6 88:10,11,12,15 89:20
   93:17,20 94:1,2,12

**finding** 69:20 82:11 83:9 87:2,7
   94:17 102:21

**findings** 58:14

**fine** 12:14

**fingernail** 65:17,23 69:16,23 70:3,
   6,19

**fingernails** 66:11,12,14,15 67:6
   70:12 93:1

**firm** 31:7

**floor** 93:10

**fluid** 40:18,22,24 85:7

**fluids** 40:4,5,9 85:13

**focused** 20:22 65:17

**folder** 12:22,24 13:6,8,11,14,16,17
   14:19 16:17

**follow-up** 103:14

**Fools'** 55:15

**force** 53:6

**forensic** 23:1,2,8,10 39:23 40:2,3,
   5,13 45:12 48:13 49:6,9,10,18,20,
   23 50:4,12,15,18,19,21 53:2,17,18
   55:14 56:2,23 65:22 79:22 91:11
   100:10

**forensics** 22:3,7,11,23 23:19
   37:11 53:11,12,23 102:15

**form** 10:14 46:21 74:15 86:21 90:6
   91:8 93:2 94:21 95:15 106:21,22

**formed** 42:20

**found** 58:16 60:3,14,17 65:19 70:7
   71:4,19 72:5,13,21 76:23 77:11
   78:1,19 87:18 89:16,20,23 90:2,10,
   23 92:9,24 94:5,20 95:13,19
   102:23 103:3,6,9 107:11

**foundation** 53:10 90:6

**fourth** 44:8

**fraction** 36:14

**France** 53:19

**fraud** 54:22,24

**French** 53:17

**French-to-** 53:7

**Friday** 110:3

**front** 8:6,8

**full** 46:5 67:21,23

**function** 49:1

---

**G**

**Gabriel** 73:3 75:16,20 83:5 106:12
   107:3 109:2

**gave** 25:7 29:15,16 52:3 56:8

**general** 6:15 41:1 43:15 45:13
   49:17

**generally** 33:1 39:18

**genetic** 40:1

**genotypes** 40:18

**give** 24:18 27:8,19 28:2 36:2 37:16
   42:15 50:20 51:11 52:8 65:14

**giving** 98:6

**glasses** 33:15

**gloves** 96:8,13

**Gold** 55:14,15

**GOLDEN** 6:6 9:21 10:22 11:4,13,
   20,24 12:2 18:20 19:3,12 30:22
   31:4 41:10,12 42:11 43:11,13 47:1
   75:6 85:15,18,20 86:1 90:1,7 92:10
   93:3 95:17 103:13,19,24 104:4,7,
   10 107:10 109:10,14,19 110:1

**good** 6:7,9 20:20 33:19 84:10
   85:21 88:6 103:21

**goodness** 13:9

**government** 24:16,17 74:14

**graduate** 24:23

**graph** 101:17 106:17

**great** 28:15 34:2 43:11 81:15 85:17

**green** 57:14 58:14 61:1,6 65:6

**group** 10:7

**Guaderrama** 28:5

**guess** 7:22 27:19 36:4,7 50:1
   86:14 91:21

**guilt** 50:16,23

**gym** 83:4

---

**H**

**half** 17:11 24:7 99:4 100:11

**hand** 69:17,18,20 93:1

KARL A. REICH, PHD, 10/14/2022

**handle** 72:13 96:12 98:7 99:3

**handled** 95:19 96:7 97:3

**handwriting** 98:9

**handy** 71:11

**happen** 91:9

**happened** 29:9 35:6 45:16 96:19

**Happy** 110:2

**hard** 12:9 32:15,19

**Harvard** 24:20 25:15

**Harvin** 28:5

**head** 23:22 25:20,21 81:20

**hell** 97:2

**helpful** 99:23 103:22

**heme** 101:24

**highlighted** 86:8

**history** 45:15,23

**hold** 84:17

**home** 58:16 65:1 88:23 90:3 92:24

**homozygous** 107:6,9 108:22

**honestly** 56:10

**horizontally** 107:2

**Hospital** 25:11

**hour** 7:23 17:21 24:10 33:24 34:9

**hours** 23:22 33:22 34:1,17 110:2

**house** 101:13

**household** 94:10

**human** 70:4 75:12 79:8 101:9

**humanate** 70:5

**humans** 40:8

**hundred** 39:2

**hundreds** 40:11 48:19

**hypothesis** 91:19,20,22 92:1

**hypothesize** 91:17

---

**I**

**idea** 20:4 39:7 80:2

**ideas** 50:4

**identification** 40:4 85:7 88:16

**identified** 44:24 45:4,15 46:9 59:18 60:8 63:9,10 68:8 74:22 75:12 76:1 78:8 94:11 95:24 96:16 97:14

**identifier** 13:22

**identifies** 74:19 86:17

**Identifiler** 104:21

**identify** 9:14 47:18 48:14 85:5 92:6 94:9 95:6 96:19 97:3 100:9

**identifying** 10:8 14:14 89:14

**identity** 40:1 49:2,3 50:18,22 51:18,20 68:18,19 74:23 77:19 107:24

**IFI** 42:24

**Illinois** 13:20 14:2,3,9,12,18,20,24 15:18 16:7 28:1 30:10 58:2,7 62:24 65:9 73:8 79:18

**image** 99:15

**images** 15:23 85:2

**imagine** 21:16 85:23

**importance** 49:8,24 50:8

**important** 6:17 47:15 93:20 94:9 109:7

**importantly** 90:12

**Impossible** 43:19

**improve** 91:24

**inaccurate** 80:6 101:10

**inartful** 39:16

**inch** 99:4

**inches** 97:15

**incident** 29:21

**included** 37:13

**incomplete** 67:11 79:14 108:23

**incorrect** 74:21 76:11

**independent** 22:3,7,11,22 23:19 32:2 37:11

**indication** 102:6

**individual** 42:7 44:19 107:1

**individuals** 47:5 105:2,10,12

**infectious** 25:11

**information** 10:16 18:15,24 20:3 23:24 37:23 39:21 40:1 46:23

50:20 51:11 66:19 67:3 68:19 73:21 76:16 79:4 90:10 95:3 100:13

**informative** 69:21 82:17 93:16

**informed** 29:3

**initial** 57:1 65:8

**initiated** 65:16

**injured** 96:14

**innocence** 50:16,24

**inscribed** 53:18

**inside** 97:16 100:21

**insignificant** 91:5

**instance** 28:19

**instruct** 9:17 10:14 18:18

**instructing** 19:4

**instructions** 29:16

**insufficient** 59:8

**intended** 84:24 85:21

**interest** 83:1 85:14

**interested** 30:7

**interesting** 96:6

**intermittently** 33:6

**interpret** 80:11

**interrupt** 30:17

**investigator** 81:16 96:18

**investigators** 95:10

**invisible** 91:15

**invoice** 32:14,17 34:8,14,20

**invoiced** 35:9

**invoices** 24:9 31:7,9 34:3,24 35:4, 13 36:20,24 37:10 38:11,24 39:1

**involved** 50:16 88:9

**iron-** 101:23

**irrelevant** 94:18,19

**ISP** 7:5 14:13 42:21,22 44:19 60:5, 7,11 61:2,19,22 62:1 65:13 66:4,5, 16 67:8 71:3,18 72:2,5 73:1 75:11 78:22 79:2,11,15 80:5 82:4,7 83:18 84:14 85:2 86:4,5,6 90:3,9 96:4 97:9 98:14 100:17 104:20

**ISP's** 59:11 67:13

KARL A. REICH, PHD, 10/14/2022

**issue** 29:13,14 30:1 32:14 76:9 79:16,17 91:14 93:13 102:16

**issued** 8:2 21:5

**issues** 29:12 51:3

**item** 44:24 45:9,10 46:14 47:15 51:7 60:7 61:2 62:23 63:3 65:5 82:14 84:19 87:12 90:11 92:9 94:9 95:14 100:6 101:2 108:21

**items** 7:13 23:2 44:19 45:13,14 46:9,18 56:24 59:2 85:2 89:14 94:6 95:11 101:15

### J

**Jacinta** 59:23 60:12 61:14,21 63:15 64:17 65:24 67:16 69:4 70:1, 14 75:15,19 76:15 81:4 92:24 108:10,15 109:2

**Jacinta's** 66:11 67:5 69:15 107:8

**Jan** 109:17

**January** 8:4,11,19 9:2 21:6,23 27:17 35:2,3 62:2,5 66:5 79:11

**judge** 11:9 29:4,16

**junk** 54:17

**jury** 29:15

### K

**KARL** 6:2

**Kastle-** 102:9

**Kastle-meyer** 101:7,22 102:16

**Katie** 103:19

**Kenneth** 30:11

**kind** 10:16 22:22 38:4 70:19

**kinds** 16:8 24:13 53:3,11

**kit** 104:21 105:19

**kitchen** 58:15 60:17 65:7 72:14

**kits** 105:23

**knew** 94:10

**knife** 47:8,22 65:18 71:4,15 72:5, 13,21 76:15,18,22 78:8,20 79:3 87:18 89:1,22 90:4,13,23 91:4 94:19 95:19,23,24 96:2,5,22 97:1 98:1,6 99:14,20 100:3

**knives** 47:8 65:5 71:18 88:14 96:3

**knowing** 48:20

**knowledge** 35:4 48:5 90:9

### L

**lab** 13:11 25:20,21 66:4 84:16 97:24

**labeled** 13:11 100:16

**laboratories** 23:8,10

**laboratory** 14:10 22:9 40:15 42:5 45:12 51:5 53:19 57:3 81:17

**language** 77:4,6,9

**large** 48:7,11

**larger** 98:19

**law** 31:7

**lawyer** 33:7,8

**lawyers** 10:7 28:11 35:20

**lay** 49:6,11,13,16 50:2,7

**lazy** 106:6

**lead** 54:23

**leave** 53:8 86:23 96:8

**leaves** 52:15

**leaving** 53:5 96:11

**left** 17:6 66:12,15 69:18 70:3,6 86:18 99:2 106:20

**LEINENWEBER** 109:13

**length** 98:7

**Leon** 53:19 82:8

**letter** 10:6

**lettering** 100:24

**level** 68:1 82:17 108:23

**levels** 68:5,7,14 79:8

**license** 24:21,23

**likelihood** 77:16

**limit** 29:6 81:12

**limitations** 28:24

**limited** 28:20 47:3

**links** 87:4

**list** 9:12 10:9 14:4,6 25:7 28:11

36:22 55:2 62:6

**listed** 10:23 22:8 25:1 26:10 30:2 42:13 43:4 55:3 60:15 62:10,23 65:2,10 75:5 76:3 86:20 106:4,18 107:1

**listen** 74:10

**lists** 11:20 66:16 72:5 75:13

**lived** 94:22,24 95:1,2,4,7

**living** 50:11

**local** 86:16

**localized** 98:18

**location** 85:8

**loci** 68:9,15,21 69:7 74:22 75:13, 15 105:6,20 108:1

**locus** 68:11,18,21 70:10 86:19 106:4,11,15,20,24 107:12,16,23 108:1,12,24

**Loevy** 15:11 31:8 35:20,24 36:13, 21,23 37:11,13,14 38:4,9

**long** 17:7,16,20 19:19 32:7 36:24

**longer** 29:13,17,19,24 48:23 85:21

**looked** 7:8,10,11 35:13 42:21 84:20 87:23 100:21

**lot** 7:17 17:12 24:7 32:24 39:14 44:20 46:15 55:3 89:16 98:21

**lots** 54:6

**Louis** 26:1

**low** 68:1,5,7,14 74:8 79:8 108:23

**lower** 62:13

**Lyon** 28:4

### M

**made** 29:2 67:19 85:21

**make** 32:3,6 35:16 40:8 43:20 51:9 59:9 67:20 73:19 74:17 91:20,21 97:14 108:4

**makes** 33:1,10 68:4 74:16 80:6 81:17

**making** 109:8

**male** 72:13 95:13

**managing** 22:8

**manufacture** 23:9

KARL A. REICH, PHD, 10/14/2022

**manufacturer** 47:21

**March** 31:19 35:3

**Maria** 94:5

**Marian-** 60:18

**Mariano** 59:21 60:10,19 61:15,21 63:12 64:3,17 66:1,13 70:2 72:22 73:12,15 76:7,15,23 77:1 78:2,17 80:17 90:24 91:1 92:13 95:12,20 102:22 107:7 108:10 109:2

**Mariano's** 91:6

**mark** 54:21,22

**marked** 82:3 86:3

**marker** 68:18

**markers** 86:18 105:9,17,22

**markings** 84:24

**massive** 42:7

**match** 69:12

**matches** 69:4

**material** 14:24 72:21 102:8

**materials** 9:8 13:22,23,24 14:5 15:1,2,6,13 16:11,12 44:4 52:11 74:18 84:11 100:21

**matter** 68:16 74:23

**maximum** 17:9

**Mcguire** 27:24 28:1

**meaninglessly** 100:7

**means** 26:3,4 34:3,4 48:2 77:13,14 80:1,13 86:13 89:14 101:20 106:11 108:16

**meant** 9:12

**medical** 24:20,23 25:6,15 26:3

**medicine** 24:21

**meet** 16:24

**meeting** 56:1,7

**Mejia** 60:2,12 63:18 75:19 81:4 107:13

**Mejia's** 57:17,22 58:14,17 87:17 88:24 90:2 94:20 102:19 107:4

**mention** 80:8

**method** 41:2,3 51:5 79:23 101:6

**methods** 41:2,4,20

**Meyer** 102:10

**microscope** 42:9

**middle** 22:2 64:13 71:13 99:15

**minimum** 79:24

**minute** 7:24 63:10

**minutes** 7:24 17:21 34:10,11 85:16 104:3,5

**mirror** 99:15

**misconception** 50:23

**missing** 107:15 109:4

**misunderstanding** 91:10

**mix** 59:19

**mixed** 73:1

**mixture** 51:12 67:10 75:10,12,14, 17,21 76:8 78:10 79:13,20 80:11 103:4

**mixtures** 100:8

**modern** 53:2,10

**molecule** 39:21,24 42:8

**moment** 84:9 92:2

**money** 37:23

**monthly** 32:22,24

**morning** 6:7,8,9

**mother** 108:17

**Motive** 54:9

**mouth** 46:2,3

**moved** 26:1

**moves** 33:7

**multiple** 96:3

---

**N**

**names** 7:13 18:2 25:19 105:7

**narrative** 49:24 50:5

**necessarily** 96:1 101:14 103:3

**needed** 53:6

**NIST** 56:7

**Noblin** 28:5

**noise** 100:8

**nonhuman** 70:8

**note** 32:6 59:6

**noted** 45:16 57:20 98:12 105:2

**notes** 35:16 103:15,20

**notice** 105:15 108:15

**nucleus** 39:21

**number** 14:14 16:1,4 36:9 38:3 44:18,19 47:3 48:7,11,20 63:4 71:9 79:12,19,21,24 80:3,10 81:12,15 105:4,5,12,13

**numbers** 7:13 9:9,11,14 11:22 13:21 30:21 31:16 106:18

**numerical** 9:15

---

**O**

---

**object** 18:14,23 93:2

**objection** 10:14 11:6,10 46:21 74:15 90:6 91:8 95:15 106:21

**observations** 23:13

**observed** 42:8

**observer** 49:12,14,16

**obtain** 48:13

**obtained** 79:2

**October** 34:8

**office** 31:7

**officer** 22:10

**oldest** 26:11,12

**one's** 72:15,16 93:21

**one-page** 7:9

**open** 12:23 13:16 15:24

**operate** 8:1

**opinion** 54:16 73:14 92:11,14 95:18 96:20

**opinions** 42:20

**opposed** 55:9

**order** 26:11 31:12 54:8 73:23

**organized** 56:7

**original** 52:16,19,21 53:4,14 87:23 88:3,15 89:14 90:13 92:8,16 105:18

**originally** 11:11 105:23

KARL A. REICH, PHD, 10/14/2022

**originated** 14:23 15:18 16:6

**outfits** 95:7

**outline** 78:14,18

**overblown** 49:21

**owner** 22:12

---

**P**

**p.m.** 110:7

**pages** 26:7,13 78:15,19

**paid** 34:3,4,12,21

**pair** 82:7 83:4 96:13

**pants** 58:17 60:6,14 63:3,5 64:7, 15,24 65:5,6,8 81:20 82:8,19 84:2 100:16,17 102:19,24 103:11

**paragraph** 44:8 48:7 56:13,21,22 57:7 59:17 60:20 61:4,13 64:10 69:3 72:24 73:6 75:9 76:6 79:8,15

**part** 23:24 39:5 40:2,3 51:8 78:8 93:20 94:10 99:20,22

**partial** 80:7

**participated** 17:23 19:21,24

**partner** 22:9

**parts** 78:8 79:2,3 81:13 97:17,18

**party** 19:11

**paternity** 23:5

**pattern** 25:9

**payment** 34:6

**people** 18:6 19:23 20:2,5 32:23 50:10 68:20 104:24

**percent** 22:15 23:18 24:3,5 36:11, 16 55:7,11 105:16 107:21

**percentage** 107:22

**perfect** 72:17 108:8

**perform** 86:15

**performed** 41:8 44:13,17 56:24 57:2,3 91:20 104:20 105:19

**period** 38:10 48:23 53:11

**permitted** 7:19

**person** 20:8 77:14,15,20,24 78:14 90:15,18,19,21,22 91:1 92:12 106:18 108:22

**person's** 50:7

**personally** 62:9

**Ph.d.** 6:2 25:3 26:4

**phases** 44:13 56:16,18

**phenolphthalein** 101:8

**phone** 17:2,13 18:2,3,22 20:1,9,16 32:7 35:5,7 105:4,12,14

**photographs** 7:9 15:22,23

**photos** 20:15

**physical** 25:24 53:17 91:23

**physically** 12:9

**physician** 25:10,12,16,24

**pick** 93:23,24 105:4

**picked** 31:8

**piece** 95:3 96:6 102:8

**pieces** 7:19 97:20

**pink** 102:1,2,3,5

**place** 87:16 88:24 92:23

**places** 46:18 52:9 59:1

**plaintiff** 20:17 43:3 109:16

**plaintiffs** 17:15

**plaintiffs'** 43:16,21 44:1

**plan** 104:2

**pleasure** 110:5

**point** 39:17 52:14 89:12 93:7 96:14

**points** 75:4 85:11

**police** 7:5 13:20 14:2,9,12,18,20 15:1,18 16:5,7 58:2,7 62:24 65:10 73:8 79:18

**poor** 68:24 106:22

**population** 107:21,23

**portion** 86:8

**portions** 62:14

**position** 22:6

**positive** 95:12 101:20 102:9

**post-conviction** 65:16

**potentially** 67:10 85:13 103:18

**power** 74:20

**practice** 24:21

**practitioner** 49:17

**pre-dated** 53:20

**preamble** 6:15

**precise** 77:6 101:24

**precisely** 49:15

**precision** 49:7,19

**preparation** 9:19 18:17 19:2,7,10

**prepare** 7:3 8:14 16:21 17:15 20:17 35:8 39:13

**prepared** 8:12 21:20

**preparing** 8:16 34:17

**presence** 41:17 73:11 108:11

**present** 20:8 40:22,24 45:8 51:15 73:16 78:12 81:2 92:9

**presentation** 52:3 54:14 56:4,6,8

**presentations** 52:9,24 54:13

**presume** 40:22

**presumptive** 40:19,21 101:8,23

**pretty** 13:23 28:10 45:6 48:21

**previous** 73:7

**previously** 82:3

**printed** 12:16

**prior** 19:8 102:15

**privilege** 10:17

**privileged** 11:5,13,15 18:14

**pro** 29:11

**probative** 47:11 48:13 86:12 87:11 89:9,10 92:20 95:3 100:6,10

**problem** 82:21,22

**proceedings** 110:6

**processing** 15:21

**produced** 24:10 37:10 52:12

**product** 10:17

**products** 23:8,10

**Professional** 22:1

**profile** 45:3 46:5,10 47:14,24 51:10,12,18 59:18,20 60:13,18,22 61:2,5,9 63:12,20,22,23,24 64:4,8, 16,20 67:16,21,23 69:4,12,16,17, 19,24 70:4,5,8,9,11,15,21 73:1,17, 20,21 74:19 75:3 76:3,13,18,24

KARL A. REICH, PHD, 10/14/2022

77:10,13,20,24 78:1,14,18 79:22 80:7,18 81:5 86:18,23 87:17 88:19,24 90:2,15,19 91:4 92:5,15,21 93:19 94:4 95:12,20 102:22 105:4 106:3,12,24 107:4,8 109:6

**profiles** 59:19 60:3 75:12 78:19 89:4 90:23,24 104:20 105:11,24

**profiling** 50:22

**programs** 50:4

**project** 55:22

**pronounce** 87:21

**proper** 50:21

**proponent** 14:5,7

**prosecution** 50:14 55:5,9

**protocol** 98:14

**prove** 75:1 89:13

**provide** 14:6,8 28:10 43:16 49:2 67:8,12,14 85:8 107:17,18

**provided** 10:19 27:5 44:5 47:4 65:12 74:18 78:21

**providing** 23:15

**Proving** 95:1

**public** 49:6 50:2 52:3 55:3

**Publications** 26:9

**pull** 7:1 35:17 36:24 75:7 84:6

**pure** 54:22,24

**purpose** 97:4

**purposes** 75:14

**put** 16:17 31:5,11 33:3 39:11 42:15,17 77:8 99:4

**puts** 80:5

**putting** 63:9 77:19,24 91:12

**Q**

**Q1** 98:13,16,23 99:5,7

**Q2** 98:13,17 99:9,17

**Q3** 98:13,19 99:18 100:1

**quality** 23:9

**quarters** 34:9

**question** 6:20,22 10:15 11:2 18:19 19:13 23:23 37:6,18 41:13 46:22

47:16 52:22 55:4 74:11,17 89:6 93:2,13

**questioned** 45:9,10 46:14 106:3 108:21

**questions** 11:7 39:15 54:1 65:22 103:17 104:9 109:11,12,13,15,16,18

**quick** 31:14

**quickly** 71:22 79:7

**quotation** 52:19

**quote** 52:16,21 53:4,12,14

**R**

**range** 10:8

**rate** 24:17,18

**rates** 56:2

**re-sent** 9:7

**reached** 58:2

**reactive** 102:8

**read** 33:17 35:1 51:22 62:9 71:8 73:7 97:19 106:7 107:2

**readily** 29:24

**reading** 20:14

**reads** 56:22

**ready** 9:1 85:23 104:14

**real** 31:14

**reanalysis** 74:5

**reason** 66:17 67:13 80:10

**reasonable** 21:18 101:10

**recall** 19:20,21,23 20:7 29:21 34:23 35:11 43:22 55:18 56:6,10,16 66:23 71:3,15,17,21 74:7 81:20 82:14 83:10,15 84:3 87:23 94:16 96:3

**received** 9:4,23 10:1 11:11 14:12,20 15:3,7 16:11 19:1,8 30:19,21 31:6 43:10

**recent** 17:19 28:12

**recently** 16:15 17:10

**recess** 41:9 85:19 104:6

**recognize** 84:14 86:5 97:8,9 104:16,18

**recognized** 50:14

**recollection** 32:2 96:9

**record** 26:21 27:2 30:14 41:11 72:2

**records** 15:17,19 74:8

**recovered** 46:9 57:17 64:24

**redo** 54:13

**Reed** 28:4

**refamiliarize** 7:12

**refer** 48:7 57:6

**reference** 14:15 45:19 46:1,4,11 47:3 55:2 80:4 88:21 93:6 104:19 105:2,11,18,21

**references** 105:24

**referred** 69:2 101:7

**referring** 14:1 16:4 45:11 46:13,17 67:7 75:11 87:20

**refers** 22:3 49:5,17 56:16 72:12

**reflected** 34:24 35:13

**refrigerator** 93:9

**regions** 85:5,13

**Reich** 6:2,7 9:16 10:15 12:3 30:19 31:15 33:14 43:9 84:8 86:2 104:14 109:21 110:4

**relate** 31:10 63:2

**related** 23:1 89:15

**relates** 50:23 62:14 84:18

**relating** 9:5

**relationship** 23:4

**relevant** 29:17,20 43:17 46:6 47:16,17,19 48:2 51:16 94:2,21 95:9

**relied** 43:15

**rely** 44:4

**remaining** 59:16

**remarkably** 33:9

**remember** 8:3 25:19 29:8 56:10 65:24 81:19 84:13 102:18

**remembered** 72:8

**remove** 74:10

**removed** 98:15

KARL A. REICH, PHD, 10/14/2022

**repeat** 68:13

**repeated** 52:10

**repeats** 79:22

**report** 7:4 8:2,8,22,23 9:13 10:10, 16 12:10,17 14:17,18 15:22 21:5, 10,13 34:17 43:14 44:8 47:2 48:6 56:15 58:7,12 59:7 60:11 62:1,5,24 63:14 64:10,11 65:2,13 66:4,16 68:7 71:1,9 72:3 75:11 76:4 79:5, 19 80:15 82:4 86:6 89:16 90:10 92:21

**reportedly** 82:8 83:4

**reports** 7:5 13:21 14:10,11 15:21 16:5 20:15 44:19 58:13 65:10 73:1 96:4

**represent** 84:24 100:20

**represents** 97:12

**reproduce** 101:3

**requirement** 14:11

**reread** 7:4,5

**research** 16:10

**researcher** 25:17,18

**reserve** 109:20,23

**resolved** 29:23

**resources** 24:17

**respect** 76:21 80:17

**responded** 42:23

**responders** 47:21

**response** 31:6 52:12

**result** 59:11 61:19,20 67:5 68:13 69:9 75:2 92:20 101:20 107:6,16 108:2

**results** 48:14 65:22 66:23 68:10, 22,24 78:21 79:1,9 89:18,19,24 91:22 105:5,8,18,21 106:24 107:15

**retrieved** 57:14

**revenue** 23:21 24:2,4

**reverse** 26:10 87:8,20 88:11,17 89:20

**review** 9:5 18:9,21 19:14 20:11 23:12,16,19 42:12 62:7 74:18,19 109:24

**reviewed** 10:9,13,20 11:1,5,8,14, 18,19,21 12:5 14:16 15:19 16:8

19:4,7 42:19 43:2,3 44:2 48:19 62:3,8,10 65:11 84:12

**reviewing** 35:7

**reviews** 36:12

**Reyes** 17:1 28:11 57:13 73:3 80:22 83:17 87:10 88:9 107:12 109:16

**Reyes's** 15:4 81:20 84:4

**Reyes_jenner** 16:3 43:5

**right-hand** 99:10

**ring** 105:14

**road** 7:17 17:11

**room** 29:4 53:12

**rough** 36:2

**roughly** 101:3

**round** 57:1,2,10 65:8,16 71:14

**row** 107:2

**rubric** 23:16

**rule** 13:23,24 14:4 32:16,19

**rules** 10:18

**résumé** 25:2

---

**S**

**saliva** 40:6 51:9

**sample** 29:22 46:2 47:5 73:22 76:22 77:12 80:4 86:17 91:16 93:6 103:7,8 108:24

**sampled** 97:18 100:22

**samples** 45:20 46:6,7 48:8,12,21, 22 60:15 64:22 80:4 81:12,15 91:11 93:14 103:9 106:3

**San** 52:7

**Santiago** 94:5

**save** 101:15

**scale** 99:4

**scene** 7:6,9 15:21 81:10 89:23,24 96:19 101:11

**school** 24:20,24 25:15 26:23,24 27:1 42:5

**Schoolnik** 25:2,9

**science** 44:5 49:9 54:17 91:19

**scientific** 22:10

**scientifically** 54:18

**scientist** 53:17

**scientists** 50:12

**scoring** 102:2,5

**scrapings** 65:17,23,24 66:1 69:16, 18,23 70:3,6

**screen** 85:6

**scroll** 26:20 27:7,23 37:9 55:18 64:9 72:1 84:15

**SDT-ISP** 58:8 62:2 71:24 82:4 84:18 97:8,23 100:15 104:17

**Sean** 10:7

**search** 33:4 86:16,17 87:11 88:19

**searches** 92:6

**searching** 93:18

**section** 14:16

**sell** 23:9

**semen** 40:6 51:9

**semi-catalytic** 102:1

**send** 14:24 15:1,13 28:12

**sense** 33:1,10 68:4 74:17 80:6 98:6

**sensitive** 102:16

**sensitivity** 102:12,14,17

**sentence** 45:8 76:6 80:1,2,12

**separate** 27:3 39:10 57:1 59:4

**separated** 56:19

**series** 23:7 57:14,16

**service** 31:22

**services** 23:14

**set** 104:19

**sex** 68:11,17 69:10

**shape** 94:21 97:15

**sharp** 99:20

**sheet** 97:10

**Sherriff** 28:6

**shirt** 20:19

**shoe** 84:2

KARL A. REICH, PHD, 10/14/2022

**shoes** 57:17 58:14,20,24 59:1 60:4 65:7 83:4,11,17 84:4,20 87:22,23 88:10 94:20

**short** 56:8 68:12 79:22

**Shorter** 19:20

**show** 86:2 97:6 104:12

**shows** 97:11

**shrink** 33:12

**sic** 79:9

**side** 98:10 99:10,12 106:20

**sides** 98:6

**Sigman** 25:3,16

**sign** 21:9

**signature** 21:11 109:14,21

**significance** 104:22 106:1

**significant** 47:15 90:11

**similar** 41:7 100:20

**simple** 44:9,11

**single** 63:20,22 69:8 76:24 77:12 78:9 80:23 81:6 88:21 103:1,5

**size** 97:15 99:3

**sketch** 97:14 98:5 99:2,13

**sketches** 85:3,7

**slide** 52:2,10

**slowly** 21:24

**small** 36:14 41:7 51:24 98:9,18 99:9 107:22

**software** 32:20 37:22 38:22

**Solache** 17:1 44:24 57:13 73:3 75:16,20 80:21 83:5 87:9 88:1,9 108:10 109:2

**Solache's** 15:7 83:10 84:20 106:12 107:4

**sole** 80:17

**sort** 7:12,19 32:16 86:24

**sorts** 15:19

**Soto** 59:21,23 60:10,12,19 61:15, 21 63:12,15 64:3 65:1 73:12 74:22 75:19 76:7,15,23 78:3 80:17 81:4 88:10,23 90:3 91:1 92:13,23 94:5 95:12 102:22 108:10,15 109:2

**Soto's** 66:14 72:22 73:16 75:3

77:2 90:24 92:24 95:20 107:7

**sound** 31:23 39:4 52:4

**sounds** 9:3 38:14 66:2 85:17

**source** 47:18 50:20 63:22 69:8 72:20 76:24 78:9 80:24 103:5

**spare** 6:14

**speak** 52:23

**speaks** 92:21

**specific** 46:8,12 49:21 50:6

**specificity** 102:17

**speed** 49:7,18

**spend** 7:20 32:11

**spending** 34:23

**spent** 32:8 36:12 92:7

**sperm** 40:7

**spool** 42:5

**spot** 13:3 37:24 59:8

**spots** 59:17,20

**squares** 97:16 100:22

**St** 26:1

**stab** 96:22

**stabbed** 92:13 93:23 96:10

**stain** 98:16,19

**staining** 42:9

**stains** 57:14,16,19,21 58:24 62:14, 15 63:2 93:24 101:6

**stamp** 11:15 62:1 84:17

**stamped** 31:15 42:24 43:5 58:8 62:2 66:5 71:24 82:4 84:17 86:5 97:7,23 100:15 104:17

**stamps** 10:13,19 11:12,17 31:14

**standard** 13:23 14:6 23:6 26:15 46:1,4,11 55:15 98:14,20

**standards** 23:3 45:20 47:3 104:19 105:2

**Stanford** 25:11

**Starr** 10:7 18:1

**start** 52:20 71:13

**started** 8:24 31:24

**starts** 44:8 59:17 75:10

**state** 13:20 14:2,3,9,12,18,20,24 15:18 16:7 55:4,9 58:2,7 62:24 65:10 73:8 79:18

**stated** 44:12 63:8

**states** 60:5,21 63:14 71:9 75:11 79:15 81:12 89:16

**statistical** 74:19 75:1 77:17

**statistics** 74:24

**stays** 91:13

**Steve** 43:7

**stipulate** 10:23 30:21 43:3,8

**stipulated** 29:23

**stipulations** 29:2

**stop** 9:16 11:8 59:13

**stored** 39:21

**strands** 42:6

**stretch** 108:1

**strong** 77:17

**stronger** 40:23

**style** 26:15

**subject** 10:17,18 18:15

**submission** 56:9

**submit** 32:20 33:5

**submits** 81:16

**submitted** 35:5 56:23

**subpoena** 12:13 31:6 42:23 52:12

**substance** 9:18 18:17 19:2,9

**substances** 40:9

**sufficient** 72:18 73:15 92:5 107:24 109:9

**suitable** 67:11 79:14

**summary** 7:10

**supply** 36:19

**support** 23:9

**supported** 91:19,23

**suppose** 108:23

**Supreme** 14:3

**SUSLER** 109:18

**suspect** 87:6,9 88:12

KARL A. REICH, PHD, 10/14/2022

suspect's 86:11,12 87:3

suspects 94:8

swab 46:2,3 66:11,12,13,14 82:23 85:14 93:10 97:20 98:16,17,21 100:7,11 102:8

swabbed 85:9,11 97:1,17 98:8 99:6 100:4

swabbing 99:19 100:1

swabbings 59:4,6

swabs 100:2 105:19,21

switch 33:15

sworn 6:1,4

**T**

table 107:1 109:7

tagged 45:16

Taking 79:17

talk 29:5 37:6 65:15 71:2 102:19

talked 9:8 18:13 70:17

talking 47:7 71:13 72:20

talks 22:3 79:6,8

tandem 68:13 79:22

Technically 68:22

technician 25:15

technique 86:21,22 98:20

television 50:4 93:8

telling 41:14

tells 29:4 38:22 68:11

ten 6:11 85:16 104:2,5

ten-year 38:10

term 101:9

terms 23:21,22 24:5 41:7 43:1 49:21 50:6,7 54:7 88:23

terribly 93:16

test 40:6,23 50:21 81:10,14,15 82:21 83:1 85:5 93:7,8,9,14 98:22 101:8,9,22,23 102:1,12,14,16

tested 44:20 45:1 48:8,12,22 79:3 81:13 82:15 83:24 84:2 94:6 95:11, 14 101:6 102:9 105:6,9,20 108:21

testified 6:4 55:4

testify 55:8

testifying 55:8

testimony 28:16,20 29:15

testing 11:16 23:2,4,5 41:15,16 44:13 53:2 54:2 56:16,23 57:1,7, 10,18 65:4,8,12,16,22 67:5 71:14 83:10 84:3 101:16 102:19

tests 40:10,14,15,18,19,20,21 41:6,22,23

theory 105:13

thin 99:23

thing 15:21 53:5,7 54:1

things 6:17 9:9 15:23 22:24 54:6, 8,9 96:17 100:20

thirds 34:9

thought 50:7 94:16 104:11

three-quarters 105:15

thresholds 73:24 74:3,9,11

tie 20:19

till 33:2

time 6:18 7:19,20 8:19 9:2 17:17, 19 18:10 24:6,8 25:16 28:22 29:8 30:16 32:4,8,10,19 33:3,13 34:23 36:11,24 38:8,10 41:21 48:23 54:14 55:7 56:7,19 80:5 85:22 110:2

times 33:4 54:13 57:1 93:23 96:10

timing 51:3 54:8

tiny 98:17 99:10,16

title 86:19

today 7:3 16:22 17:15 20:18 39:14

today's 35:8

toolmark 54:16

top 72:12 81:20 91:12 105:5

topic 52:23 53:1 54:11

total 7:23 24:4 34:5 38:3,18 39:1 105:5

totaled 38:24

touched 45:17

towel 57:14,19 58:14,15 60:17 61:1,6 65:6,7 86:12 87:3 97:13

trace' 52:15

track 16:14 32:4

transcript 109:24

translation 53:8

travel 17:6

trial 29:12,13,18,20 37:4

trousers 57:22

true 51:8 52:15 64:6 106:17 108:14

Tuesday 7:18

turns 102:1

two-swab 98:20

type 46:12 53:3,16 86:6,20 98:9

types 40:7,12 41:5

typical 85:1,12

typically 49:1

**U**

un- 47:14

unambiguous 107:16

underlies 53:2

underneath 72:21 90:24 95:19 104:23 105:10

understand 6:10,22 25:8 37:5 51:23 52:17

understandable 95:10

understanding 49:5,22 64:23 65:3 76:12

understands 53:13

understood 6:21,24 51:24

undetectable 91:7

unidentified 76:13

uninterpretable 100:9

unique 13:22 14:14

United 81:12

unknown 45:14 46:6 47:10 48:4 76:2 78:11,13,18 90:21,22 91:1,15 92:11,14 95:13

unusual 88:13

updated 86:22

KARL A. REICH, PHD, 10/14/2022

**urine** 40:6

**usual** 54:12

---

**V**

---

**values** 86:20 104:23

**variation** 41:7

**varied** 33:9 37:7

**varies** 22:18,20 25:8

**variety** 22:24 37:12 40:9

**vary** 49:19

**versus** 24:18 28:1 30:10

**victim** 59:21,24 60:9,18,23 77:1,7, 16 78:3,10 80:24 87:21 92:4 93:11, 12,15,21 95:24 96:2,5 103:2

**victim's** 72:13 88:12 93:17 94:1 102:23

**victims** 61:10 64:3,8,17 65:18,20 71:21 72:9 76:2 87:6 96:9,23 103:3 107:7

**victims'** 87:8

**violent** 92:15

---

**W**

---

**wait** 33:1

**waive** 109:21,22

**wall** 53:18 72:6 93:7,18

**wanted** 9:11 46:11 77:8 87:15 104:12

**washed** 91:12

**washer** 22:10

**wasteful** 100:13

**ways** 23:23 105:3

**weak** 108:3

**weeds** 79:18

**week** 17:5,10,19,20 19:15

**weeks** 17:8,9,10 19:19

**weird** 105:7

**wide** 40:9

**widely** 101:23

**wielded** 76:14

**Wiesel** 25:3,14

**Williams** 28:5 30:11

**word** 90:16 91:21

**words** 51:24

**wore** 20:19

**work** 8:10,14,18 10:17 15:14,15 22:22 32:24 37:3,13 39:5 44:12,17, 21 62:4 74:13 86:24 97:10 107:3

**worked** 9:2 25:14 35:20,24 36:23 38:4,9

**working** 29:10 31:24 35:12 36:12

**works** 43:19

**worksheet** 84:14,16 85:1 97:9,24

**worksheets** 59:4

**world** 23:11 81:13 105:14

**worn** 96:13

**Wow** 28:3

**write** 7:24 55:23 57:12

**writes** 79:19

**written** 55:17 66:21

**wrong** 13:2 99:19

**wrote** 56:3

---

**Y**

---

**year** 38:17

**years** 6:12 22:21 36:1,21 37:14 38:16 56:1 102:15

**yesterday** 30:20

---

**Z**

---

**Zinder** 25:3,18

---

Urlaub Bowen & Associates, Inc.   312-781-9586