*DeLeon-Reyes v. Guevara, et al.*
Case No. 18 CV 01028

*Solache v. Guevara, et al.*
Case No. 18 CV 02312

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION


ARTURO DELEON-REYES vs. REYNALDO GUEVARA, et al.


No. 18 CV 01028

_____


GABRIEL SOLACHE vs. REYNALDO GUEVARA, et al.


No. 18 CV 02312

_____


VOLUME II

VIDEOTAPED VIDEOCONFERENCE DEPOSITION

OF RICHARD A. LEO, Ph.D., J.D.


ON BEHALF OF DEFENDANT CITY OF CHICAGO


SEPTEMBER 29, 2022

RICHARD A. LEO, PHD, JD, 09/29/2022                    Page 261..264

Page 261

I N D E X

PAGE

WITNESS

For the Defendant City of Chicago:

RICHARD A. LEO, Ph.D., J.D.

        Examination by Ms. Rosen ................. 265

        Examination by Ms. Golden ................ 524

E X H I B I T S

NUMBER        DESCRIPTION        MARKED/REFERENCED

Exhibit 4    University of San Francisco Law

             Research Paper No. 2013-19,

             Predicting Erroneous Convictions . 279

Exhibit 5    Leo/Ofshe Article, Consequences

             of False Confessions ............. 286

Exhibit 6    Torture Victims Chart ............ 368

Exhibit 7    Invoices, Leo 000001-000009 ...... 510

Exhibit 8    Invoices, Leo 000931-000983 ...... 513

Page 263

APPEARANCES:
    FOR THE PLAINTIFF ARTURO DELEON-REYES
    and WITNESS RICHARD LEO:
        LOEVY & LOEVY
        311 North Aberdeen Street, 3rd Floor
        Chicago, IL  60607
        By: Steven Art    (via Zoom)
            Sean C. Starr   (via Zoom)
        (312) 243-5900
        steve@loevy.com

    FOR THE PLAINTIFF GABRIEL SOLACHE:
        PEOPLE'S LAW OFFICE
        1180 North Milwaukee Avenue
        Chicago, IL  60622
        By: Ben H. Elson    (via Zoom)
        (773) 235-0070
        ben.elson79@gmail.com

    FOR THE DEFENDANT CITY OF CHICAGO:
        ROCK FUSCO & CONNELLY, LLC
        333 West Wacker Drive, 19th Floor
        Chicago, IL  60606
        By:  Eileen E. Rosen    (via Zoom)
             Catherine M. Barber    (via Zoom)
             Jessica Zehner    (via Zoom)
        (312) 494-1000
        erosen@rfclaw.com

    FOR THE INDIVIDUAL POLICE OFFICER DEFENDANTS:
        THE SOTOS LAW FIRM
        141 West Jackson Boulevard, Suite 1240A
        Chicago, IL  60604
        By:  Caroline Jamieson Golden   (via Zoom)
        (630) 735-3300
        cgolden@jsotoslaw.com

    FOR THE DEFENDANT GUEVARA:
        LEINENWEBER BARONI & DAFFADA, LLC:
        120 North LaSalle Street, Suite 2000
        Chicago, IL  60602
        By:  Megan McGrath    (via Zoom)
        (312) 663-3003
        mkm@ilesq.com

    ALSO PRESENT:
        Rachel Welling, Certified Legal Videographer
        Robyn Falasz, Exhibits Coordinator

Page 262

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

ARTURO DELEON-REYES,              )
                                  )
                                  )
        Plaintiff,                )
                                  )
vs.                               ) No. 18-CV-01028
                                  )
                                  )
REYNALDO GUEVARA, et al.,         )
                                  )
                                  )
        Defendants.               )
_____
                                  )
GABRIEL SOLACHE,                  )
                                  )
                                  )
        Plaintiff,                )
                                  )
vs.                               ) No. 18-CV-2312
                                  )
                                  )
REYNALDO GUEVARA, et al.          )
                                  )
        Defendants.               )
                                  )

        VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF

RICHARD A. LEO, Ph.D., J.D., sworn and examined on

behalf of the Defendant City of Chicago on September

29, 2022, before RUTH S. MORRIS, Illinois CSR 2322.

Page 264

THE VIDEOGRAPHER:  This is the beginning of Media Unit 1, and we are now on the video record at 9:04 a.m.  This is the videotaped videoconference deposition of Richard Leo being taken on September 29th, 2022.

This deposition is being taken on behalf of the Defendant in the matter of Arturo Deleon-Reyes versus Reynaldo Guevara, et al.

The case number is 18 CV 1028, consolidated with 18 CV 2312 filed in the United States District Court for the Northern District of Illinois, Eastern Division.

My name is Rachel Welling, certified legal videographer representing Urlaub Bowen & Associates with offices at 20 North North Clark Street, Suite 600, Chicago, Illinois.  The court reporter today is Ruthie Morris also of Urlaub Bowen & Associates.

Counsel, please identify yourselves for the video record and the parties which you represent.

MR. ART:  Steve Art and Sean Starr for Plaintiff Reyes.  Ben Elson for Plaintiff Solache.

Urlaub Bowen & Associates, Inc.  312-781-9586

RICHARD A. LEO, PHD, JD, 09/29/2022                    Page 265..268

Page 265

MS. ROSEN: Eileen Rosen and Katie Barber on behalf of Defendant City of Chicago, and I believe we have Jessica Zehner watching from our office.

MS. GOLDEN: Caroline Golden for the Individual Officer Defendants.

MS. McGRATH: Megan McGrath on behalf of Defendant Guevara.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness.

RICHARD A. LEO, Ph.D., J.D., of lawful age, being sworn and examined on behalf of the Defendant City of Chicago, testified as follows:

EXAMINATION

QUESTIONS BY MS. ROSEN:

THE WITNESS: I couldn't tell yesterday or today who Megan McGrath represents just because she spoke so fast. Could she repeat that?

MR. ART: It's --

MS. McGRATH: It's Defendant Guevara.

THE WITNESS: Okay, thank you.

Q    (By Ms. Rosen) Good morning, Dr. Leo, how are you today?

A    Waking up. Good morning.

Page 266

Q    Did you have an opportunity after the deposition was over yesterday to take a look at your documents to determine the Bates number of the General Progress Report that you referenced in your report that are not listed in the materials reviewed?

A    I did not. I apologize, I forgot about that.

Q    Okay. And I don't think I asked you yesterday but what, if anything, did you do to prepare for your deposition before it began yesterday?

A    Well, I reviewed materials and I consulted with counsel, and I prepared notes from my report and from materials that I reviewed in this case on some of the issues.

Q    What materials did you review?

MR. ART: Eileen, I apologize. Are we talking about before we started yesterday?

MS. ROSEN: Yes.

Q    (By Ms. Rosen) What materials did you review before we started yesterday?

A    Okay. So, I reviewed my report. I reviewed the confession statements of Mr. Reyes and Mr. Solache. I reviewed the Lassar Report. I reviewed Judge Cook's opinion in the Jackie Wilson

Page 267

case. And I reviewed materials in some of the cases, not Mr. Reyes and Solache, but some of the other cases that are later in the report.

I'm trying to think if there is anything else I reviewed. Give me just a second to look over the -- the materials listed in the report. Yes, these are the materials that I reviewed.

Now, I would have to tell you the names of the cases in which I reviewed some materials if you'd like me to go through all of them that are named.

Q    The names of the cases that you recently reviewed, meaning in advance of the dep on today --

A    Would you like me to do that or not?

Q    When you say many, how many? More or less than ten?

A    More than ten. I would say -- hold on just a second, I can tell you exactly -- 38 cases I reviewed materials from.

Q    Okay. And what are you -- when I asked you the question about what materials you reviewed, it looked like you were reading from something. What were you reading from?

A    Just my report which is Exhibit 1. And

Page 268

the reason I was reading from that was because it lists, as you know, all the materials in the case. And I just wanted to make sure that I had not missed anything in Reyes and Solache that I reviewed.

Q    Okay. And what did you look at to tell me that you reviewed materials from 38 other cases?

A    Okay. Well, I looked at my report, and then I also looked at some of the materials in the -- in the cases. Again, do you want me to go through this specifically?

Q    No. My question is when I asked you how many other cases -- when you told me you could list the names, you told me to tell me how many, and then you gave me the number 38, and then you looked over to your side to tell me that you reviewed 38 cases. So, I want to know what you looked at to determine that you looked at 38 cases.

A    Okay. Sorry, I misunderstood the question.

Q    Okay.

A    So, I -- so, I -- so, I have notes on each of these cases that I took from materials that I reviewed for the report, including my summaries from the report, as memory aids on these cases.

And what I was looking at was the index

RICHARD A. LEO, PHD, JD, 09/29/2022                Page 269..272

Page 269

that I had prepared for each of the three areas, Area 3, Area 4, and Area 5, of these cases. And so I have notes on 25 cases from Area 3, on ten cases from Area 4, and on three cases from Area 5.

And because I prepared an index listing the names and enumerating them, I just needed to add up those three numbers to tell you the exact number. And that's what I was looking at after I was looking at my report.

And then I also -- I forgot to mention, but I mentioned this yesterday -- I also reviewed the opinion of Clayborn Smith prior to the deposition, the recent opinion.

Q   Okay.

A   And that's the only new document as I mentioned yesterday that I reviewed post the preparation of the report on January 15th of 2022.

Q   Okay.

MS. ROSEN:  And it's still our position that the notes that he's reading from are -- we're entitled to them and they should be produced.  But we don't have to rehash all of that now, but at a later time.

MR. ART:  And I'll just state for the

Page 270

record that our position remains the same as it did during the first part of this deposition yesterday.

Q   (By Ms. Rosen) And what, if anything, did you do between the conclusion of your deposition yesterday and this morning to prepare for your deposition today?

A   I consulted with counsel and I reviewed -- I reviewed my report.  And I think that's it.  I reviewed Mr. Solache's confession -- written confession statement, and I reviewed my notes.

Q   How long was your consultation with counsel?

A   After the deposition?

Q   Yes.

A   I think fifteen to twenty minutes maybe.

Q   And how much time did you spend last night reviewing your report or yesterday afternoon for you?

A   Yeah.  So, my report and the other things I mentioned, probably about two, two and a half hours.

Q   And how many times did you meet with counsel before you began -- before we began the

Page 271

deposition yesterday?

A   I --

MR. ART:  Objection to the form.  Do you mean since his report?

MS. ROSEN:  In preparation for the deposition.  Let me start over.

Q   (By Ms. Rosen) Before your deposition yesterday, you indicated that to prepare you had meetings with counsel.  How many meetings with counsel did you have?

A   Either four or five.

Q   Over the course of what period of time?

A   The month of September.

Q   And who specifically did you meet with?

A   Mr. Art and Mr. Elson, and some of those also were with Miss Susler and Mr. Starr.  And I think that's it.

Q   And how much time total do you believe you spent meeting with counsel over these four or five meetings during the month of September?

A   I would have to look at my time sheets.  I would estimate maybe three to five hours.

Q   What type of time sheets do you keep when you do work like the work you're doing in Solache

Page 272

and Reyes?

A   I write down start and stop times, and then when I compute a bill I throw away the papers on which the start and stop times were written.

Q   So, the start and stop times are noted on a piece of paper that you throw away once you prepare your bill?

A   Correct.

Q   And do you prepare your bills monthly?

A   I wish.  No, I do not prepare bills monthly.

Q   Do you have a regular period of time that you prepare your bills?

A   No, just when I can get to them and sometimes that takes months.

Q   Okay.  In the materials reviewed, we already talked about this yesterday, you identify deposition transcripts of various people, correct?

A   Yes.

Q   When you were provided the deposition transcripts, were you also provided the various exhibits that went to the depositions?

A   I don't remember.  I don't think so because I -- because I already had those materials.

RICHARD A. LEO, PHD, JD, 09/29/2022                    Page 273..276

Page 273

But in order to accurately answer that question I would have to go back into the electronic files and see if they contained the exhibits.

Q   Before we start talking about Mr. Solache and your opinions of him -- related to him and his confession, I just have some clarifying questions about some of the terminology that you used yesterday. So, if I understand you correctly, you categorized a confession statement as a proven false confession if it meets one of four criteria that we discussed yesterday, correct?

A   Yes.

Q   And how do you define a false confession?

A   A false confession would be a confession that's factually false. It could be a hundred percent factually false or it could be less than a hundred percent factually false, so that's partially false.

So, sometimes we talk about pure false confessions or partial false confessions. Of course, a partial false confession could also be a partial true confession. But just the definition of a false confession would be a factually false confession in whole or in part.

Page 274

I do want to say that the term confession sometimes has a dual meaning or can have more than one meaning.

So, a confession can refer to an incriminating statement, an admission, or a full narrative confession in one sense. Sometimes when people talk about false confessions, it may be they're using that term, people in my field, they're using that term to refer to what might not be a full narrative confession and might just be a series of incriminating statements or ambiguous incriminating statements or just an admission but no narrative.

And sometimes the word confession refers to only -- excuse me, only an admission plus a narrative. So, false confession could have those dual or multiple meanings.

Q   When you say admission plus a narrative, what do you mean?

A   Okay. So, taking a step back, when we talk about confession -- let's just start with that -- that term can be an umbrella term for either an incriminating statement or an admission, "I did X," or an admission plus the narrative, "I did X and here's how and why I did it."

Page 275

So, one meaning of confession is kind of along -- any term along that spectrum from an incriminating statement to "I did it" or admission, to "I did it" plus the narrative. Or a confession might just refer to the "I did it" plus the narrative. Is that clear?

Q   Is a full narrative confession the same thing as an admission plus narrative?

A   Yes, that -- I'm using that interchangeably.

Q   Okay. All right. And when you say -- when you use the term a false -- when you use the term false confession, it could be a hundred percent factually false or something less than a hundred percent factually false, you mean there could be details in the narrative of the confession that are false, but there could be details in the confession that are not factually false?

A   Correct. And even in the proven false confession you often see details that are accurate. And often times those details, as we mentioned yesterday, are believed to be the product of contamination, or demonstrated to be.

Q   Okay. And we also talked yesterday -- so, do you equate a false confession, whether it's a

Page 276

hundred percent factually false or something less than a hundred percent factually false, as being unreliable?

MR. ELSON:  Objection to the form.

THE WITNESS:  The term reliable is a broader concept which means it could be partially or wholly unreliable. So, I guess I need clarification. Maybe if you just repeat the question, do I -- go ahead.

Q   (By Ms. Rosen) Do you equate a false confession, whether it's a hundred percent factually untrue or something less than that, as unreliable? Are those the same or are they different?

A   No, they're different. Reliability refers to degree -- unreliability, that is. And false confessions, even though they may contain factually accurate details, often refer to or typically refer to whole false confessions.

So, if I were to say a confession is unreliable, that might mean -- in my opinion, that might mean that the confession is partially or wholly unreliable. If I say in my research I think a confession is false, what I typically mean is entirely false, not just partially false.

RICHARD A. LEO, PHD, JD, 09/29/2022                    Page 277..280

Page 277

So, the concept unreliable is broader than false confession.

Q   Okay.  And we talked yesterday about the two studies that you were a part of, the Ofshe/Leo Study and the Drizen/Leo Study, and those -- both of those studies examined proven false confessions, correct?

A   Correct.

Q   Are there any other studies that you are aware of that examine proven false confessions?

A   Well, the other studies that I mentioned, the study that I did with Jon Gould in 2013-2014, the work in progress that I mentioned.

There is a very prominent researcher in England, Gisli Gudjonsson, spelled -- his first name is spelled G-i-s-l-i.  His last name is G-u-d-j-o-n-s-s-o-n.  He's published hundreds of papers.  They tend to be on the smaller side, and so it's sometimes hard to keep track of them all.

I believe he's also written about proven false confessions.  I don't -- I don't think he's aggregated cases quite in the same way I have.  He may have in a couple of those papers, but not in the same detail.  And he's also written about proven

Page 278

false confessions in books.  But, other than that, I don't think there are studies just on proven false confessions.

Q   And the Gould Study does not utilize your -- the four criteria that you identified in the Drizen/Leo Study, right?  That looked at -- that had a different standard for classifying a confession as factually false, right?

A   Yes and no.  So, the Gould Study was the study of wrongful convictions and funded by the Department of Justice.  And so we gathered data on 460 cases.  Actually, it was a study of error in the criminal justice system, so 460 cases.

The standard was that we believed that the evidence was indisputable that the person did not commit the crime.

In the subset of confession cases, I made sure that they met one of the four criteria.  So, we didn't write about that in the body of the paper because the standard was not proven wrongful conviction but it was indisputable evidence of innocence whether the person was convicted or not.

Q   Why don't we mark as Exhibit Number -- what are we on, 4, Robyn?  Yeah, okay.

Page 279

Exhibit Number 4, Predicting Erroneous Convictions which is the Gould Study -- if you can shrink the document so we can see the title.  And that's the study you were just discussing, correct, Dr. Leo?

A   Correct, yeah.  And if you scroll down we can see if this is a published version or a pre-published version.

Q   Okay.  Let's scroll down.

A   Yes, it looks like a published version.

Q   Okay.  And if we go to Page 483 of the document the way it's paginated, okay.  And can you scroll up that way so we can see the whole page?  Good.

So, this section here describes the data collection and case coding, correct?

A   Correct.

Q   Okay.  And in this study that -- what the study indicates was involved was -- and I'm just reading from the -- from that first paragraph is, "Every case in our study involved a factually innocent Defendant who was indicted post-1980 by a state for a violent felony against a person and was subsequently relieved of all legal responsibility

Page 280

for the crime," right?

A   Yes.

Q   Okay.  And the cases that you analyzed and described in the 1998 study with Dr. Ofshe and the 2004 study with Mr. Drizen included individuals who had not been relieved of all legal responsibility for the crime, correct?

A   Correct.

Q   In fact, some of them remained in prison and were in prison at the time that you published each of those studies, correct?

A   Correct.

Q   Okay.  And then it indicates here, "We created two categories:  (1), quote, erroneous convictions, end quote, for those defendants who were factually exonerated after conviction, and (2), quote, near misses, end quote, for those who had charges dismissed before conviction or were acquitted on the basis of factual innocence," right?

A   Correct.

Q   Okay  so, the study was -- this study was focused on individuals with respect to the convictions who were factually exonerated, right?

A   Or factually innocent, yes.

RICHARD A. LEO, PHD, JD, 09/29/2022                    Page 281..284

Page 281

Q   And the determination of whether or not they were factually innocent was by looking at whether or not they were factually exonerated, or the charges were dismissed before conviction, or were acquitted on the basis of factual innocence, right?

A   Yeah, but -- but, you're showing me -- it says, "We established." I haven't looked at this article in a long time, but you're showing -- so I'm going on memory, but you're showing me the bottom of this and it says there's two separate components but I only see one of them. So, I don't know if you want to scroll to the next page --

Q   Well, we'll get there. And then it says -- the next paragraph says, "The project employed a conservative definition of factual innocence that clearly distinguishes factual innocence, (i.e., the defendant did not commit the crime) from innocence based on procedural error or other purely legal criteria (so-called legal innocence)." Do you see that there?

A   Yes.

Q   So, in this study the choice was to use this conservative definition as explained in this

Page 282

sentence, correct?

A   Yes.

Q   And when you -- when you determine that a confession is a proven false confession because it meets one of the four criteria that you have established with first Dr. Ofshe and then Mr. Drizen, are you equating a proven false confession with factual innocence?

A   Not explicitly in the sense that we're just going through and saying did the -- did the -- did the evidence meet one of these four criteria. But if the evidence does meet one of the four criteria, then our working assumption or belief is that the person is factually innocent.

Q   So, if a person meets criteria for a proven false confession under your analysis, then that is the equivalent of factual innocence, right?

A   Yes. When I'm doing research if I believe that a case meets one of the four criteria, then I believe the person is factually innocent. I haven't -- I can't think of a case in which there's a proven false confession where I did not think the person was factually innocent.

Q   And then if we read further it says, "In

Page 283

each case analyzed in this study, we established factual innocence based on two separate components: (1), a judicial, executive, or legislative acknowledgment that the individual did not commit the crime for which he was erroneously indicted (including a statement of innocence by a prosecutor, governor, judge, state compensation board, or a juror after an acquittal," right?

A   Yes.

Q   That's the first component. And then the second component is, "And evidence that we believe would convince a reasonable person that the individual did not commit the crime (such as post-conviction DNA testing, the prosecution and conviction of another individual for the crime, or a new diagnosis of the victim's condition)." Do you see that there?

A   Yes.

Q   And so those are the two separate components that were relied upon by you and your fellow researchers in this study to define factual innocence, right?

A   Generally, yes.

Q   Okay. And so in this particular study the

Page 284

evidence that you and your fellow researchers relied upon to determine that individuals were factually innocent did not include physical impossibility, which is a criteria that you utilized to determine that a particular confession is a proven false confession, correct?

A   I believe -- I believe there were cases of physical impossibility. Number 2, "evidence that we believe would convince a reasonable person that the individual did not commit the crime," and then it lists essentially three of -- three examples from three of the four criteria such as post conviction DNA testing, that's the scientific exculpation; the prosecution of another individual, that's true perpetrator identified; or a new diagnosis of the victim's condition is no crime occurred.

It didn't list all the examples. We could have also listed, and that it was physically impossible.

So, I believe there were cases in there, I'd have to look at the dataset, where it was physically impossible and that met criteria two here. So, this is really different language but the same idea.

RICHARD A. LEO, PHD, JD, 09/29/2022                    Page 285..288

Page 285

Q   But three of the four criteria that you rely on are specifically identified in the parenthetical, right?

A   As examples, yes.

Q   And the dataset, like we discussed yesterday, is -- because of the grant involved, is private, right, like we can't get access to it, correct?

A   Correct.  It's illegal and there is no way to get access to that, yeah, to the -- to the data because of the Department of Justice's rules as a condition of the grant.

Q   Okay.  And this study did not analyze or list out -- let me start over.

This study did not provide a list of the individuals that met the researchers' definition of factual innocence like the 1998 study or the 2004 study, correct?

A   Correct.  I would have liked to have done that, but unfortunately because of the grant and the condition of confidentiality required by it, legally we could not do that.

Q   Okay.  We can take down Exhibit Number 4, and then let's take a look at what we'll mark as

Page 286

Exhibit Number 5 which is the -- it's called "Predicting Erroneous" -- no, that's not the right one, hold on a second.  It's "Consequences of False Confessions" which is the Leo/Ofshe article.

Okay.  So, this is the 1989 publication that memorialized the research that you and Dr. Ofshe did where you first coined the phrase "proven false confession," correct?

A   Yes.

Q   So, this is ground zero, so to speak, of the proven false confession analysis and study?

MR. ART:  Objection to form.

Q   (By Ms. Rosen) You can answer.

A   There were other studies that looked at false confessions prior to this.  But, yes, this is the study where we defined the concept of proven false confession.

Q   Okay.  And previous to this nobody utilized the four criteria that you and Dr. Ofshe utilized to determine that any given confession constituted a proven false confession, correct?

A   Correct.  But, they might have used the criteria without the terminology, you know, one of the four criteria or more, but yes, nobody

Page 287

systematized it or named it that the way we did in 1998.

Q   Okay.  So, let's take a look at Page 34, 35 as the document is paginated.  No, it's got to be Page 435, sorry -- of the document, the way the document is paginated, not the PDF.  So, it's early -- very early, there we go.

Okay.  So, this section details the method -- the methodology that you and Dr. Ofshe utilized to select and classify the cases, correct?

A   Yes.

Q   Okay.  And if we look at the methodology section under A, it says, "Cases of disputed confessions were identified through multiple sources, electronic media, database searches directly from case files, and from secondary sources."  Do you see that there?

A   Yes.

Q   And so in some of the cases that you utilized, the 68 cases I believe total that you end up discussing, am I correct that for some of the cases the sole source of the information that you obtained was from electronic media databases?

A   I'm sure there were some cases where that

Page 288

was all we could obtain, yes.

Q   Okay.

A   I don't think there were many, but there were some.

Q   Okay.  And then when you say directly from case files, when you say case files, can you tell me what you're referring to?

A   Yes.  So, in some of these cases Dr. Ofshe had been a consultant or an expert witness, so he had access to files that he had worked on.

In other cases we received materials from attorneys working on the cases, even if we weren't involved, and we may have received case file materials also from researchers and journalists who had access to those.

So, the case files would have -- I don't know if these case files were the entirety.  I suspect in many cases they were not, if not all of the cases, but they would have included some combination of police reports, pre-trial transcripts, trial transcripts, DNA reports or ballistics reports.  They might have included other records on the individual or from the file, witness statements.  So, the typical kinds of things you

RICHARD A. LEO, PHD, JD, 09/29/2022                    Page 289..292

Page 289

would find in a criminal case file.

Q   Okay.  But I think you said that you were pretty certain that for each of the cases you didn't have all of the materials --

A   Yes --

Q   -- you had a subset of the materials?

A   Correct.

Q   Okay.  And then it says --

MR. ART:  Objection to the form.  Give me a chance to object, Dr. Leo.

THE WITNESS:  Sorry.

Q   (By Ms. Rosen) And then it says, "The 60 cases discussed below do not constitute a statistically adequate sample of false confession cases.  Rather they were selected because they share a single characteristic, an individual was arrested primarily because the police obtained an inculpatory statement that later turned out to be a proven or highly likely false confession."  Do you see that there?

A   Yes.

Q   Okay.  And when you say later -- when you and Dr. Ofshe say that later turned out to be a proven or highly likely false confession, you mean

Page 290

that in the way that you and Dr. Ofshe used that terminology as later described in this article, correct?

A   Yes.

Q   Okay.  And then if we go to the last paragraph on that same page, Page 436, and we're just going to focus on the proven false confessions for purposes of my questions.  You indicate in the -- in the article here, you and Dr. Ofshe, "For the 34 cases classified as proven false confessions the confessor's innocence was established by at least one dispositive piece of independent evidence.  For example, a defendant's confession was classified as proven false if the murder victim turned up alive."  So, that's one, correct?

A   Yes.

Q   "The true perpetrator was caught and proven guilty," that's two, correct?

A   Yes.

Q   And then "Or scientific evidence exonerated the defendant," that's three, correct?

A   Correct.

Q   And then let's go to the bottom of this page, the last paragraph reads, "We recognize for

Page 291

any case that could not be classified as a proven false confession there is a possibility that our classification of the case might be in error."  Do you see that?

A   Yes.

Q   Okay.  But that qualification only applies to the lessor standards, right, the highly probable or the probable, correct?

A   Correct.

Q   And so with respect to a proven false confession you and Dr. Ofshe do not concede that there could be any error in your classification, correct?

A   Not in that paragraph, correct.

Q   Well, do you concede that any circumstance where you classify a case as a proven false confession, that your classification might be in error?

MR. ART:  Objection to form.

THE WITNESS:  I concede the possibility, yes.

Q   (By Ms. Rosen) Okay.  With respect to any case in your career that you have classified as a proven false confession, have you conceded that any

Page 292

one of those cases where you have so classified the confession was done in error?

MR. ART:  Objection to form.

THE WITNESS:  I cannot think of a case where there was evidence that the confession -- in proven false confession cases -- there was evidence that our classification was incorrect.

Q   (By Ms. Rosen) Okay.  And if we go now to Page 444 of the article, so six more pages, okay, this is -- this table here is a table that lists the cases that you and Dr. Ofshe classified as proven false confessions, correct?

A   Correct.

Q   Okay.  And so Number 1 is an individual by the name -- the professor has identified an individual by the name of Anthony Atkinson, do you see that there?

A   Yes.

Q   Can you tell me what criteria was met in Mr. Atkinson's case that allowed you and Dr. Ofshe to classify his confession as a proven false confession?

A   I do not recall.  I haven't thought about that case in twenty plus years, so I just don't

RICHARD A. LEO, PHD, JD, 09/29/2022                    Page 293..296

Page 293

remember. I would have to refresh my recollection on that case, I would have to look at some documents.

Q   What kind of documents -- what kind of documents would you look at?

A   Well, any document that -- with that -- that described why it fit into one of our four categories showing either the crime didn't occur or that it was physically impossible for Mr. Atkinson to have committed it, or there was dispositive scientific evidence, or the true perpetrator was identified, so I just don't recall.

Some of these cases I do recall more of than others, but that's not one that I recall anything about now twenty-four, twenty-five years later.

Q   And nowhere in the -- in this article that you and Dr. Ofshe wrote regarding your analysis and your findings do you specifically identify the criteria that any of these particular individuals met, correct?

A   Well, we may have described it in the text. Some of the cases are discussed more than others, and so in our case discussions I believe we described some of them, but we don't list out in a

Page 294

table to the best of my recollection which criteria was met for each individual case.

The case -- the case including Mr. Atkinson, you know, they come with citations. So, the two citations, one to Caldwell and one to Denver Registy, in Footnotes 34 and 35 presumably would contain the information of which category or categories those two -- that case fits into.

Q   Do you have this particular article in front of you that you're referring to as you're answering questions?

A   Yes, I do. I have a copy of the document that you put up in front of me.

Q   Okay. What other documents do you have in front of you?

A   Well, I have the other exhibits that you put out that you -- the "Inside the Interrogation Room" article, the North Carolina article. I have the report -- I happen to have, I think, the Lassar Report in front of me, the Clayborn Smith opinion, Judge Hooks' Opinion in Jackie Wilson, and then I have notes. And I have a big table of things spread out. I see confession statements as well.

Q   Whose confession statements?

Page 295

A   I have a binder of confession statements. The binder includes Guadalupe Mejia, Rosauro Mejia, Arturo Deleon-Reyes, Gabriel Solache, and Adriana Mejia.

And not in front of me but immediately to my right, maybe four feet away, I have a floor to ceiling bookshelf that contains numerous binders of case materials in this case.

Q   Okay. All right. Looking at the individual that's identified in Line 2, Richard Bingham, are you able to tell us what criteria Mr. Bingham met that allowed you to conclude that his confession qualified as a proven false confession?

A   My recollection is that Professor Ofshe worked on that case, and my recollection is that it was a DNA exculpation. But this is not a case I've thought about for a long time. So, that's my best recollection as I sit here today.

Q   And do you recall anything more about the DNA exculpation as you sit here today?

A   I do not.

Q   Okay. And then Number 3, Leo Bruce, can you tell us what criteria he met?

Page 296

A   Yeah, so Leo Bruce was part of a case called The Phoenix Temple Four, and he was one of four people who falsely confessed, and the true perpetrators were eventually identified and successfully prosecuted.

So, there was a murder of nine Buddhist monks and their assistants at a temple in Phoenix, and the police had extracted or coerced confessions from Leo Bruce and three other people, and eventually they found -- after they had done this, they found the murder weapon which led them to two high school students who had left evidence at the crime scene, and who I believe confessed to committing the crime and then were successfully prosecuted. And the prosecutors acknowledged that Leo Bruce and his three co-defendants were innocent and falsely confessed. And they settled the civil case shortly after that if I'm recalling correctly.

Q   Okay. And with respect to Individual Number 4, Lavale Burt, do you recall what criteria he met?

A   I do not. I know that that is an Illinois or Chicago case, but I don't recall the specific criteria in that case.

RICHARD A. LEO, PHD, JD, 09/29/2022                    Page 297..300

Page 297

Q   Okay.  And if we go to the next page for Christopher Cole listed in Line 5, do you recall what criteria he met?

A   I do not.

Q   How about Bradley Cox?

A   Mr. Cox, no, I do not.

Q   Do you recall the criteria that you and Dr. Ofshe found with respect to Billy Gene Davis?

A   I would have to review materials.  I think Billy Gene Davis was one of those rare cases where the murder victim showed up alive, but I would have to review materials to double-check that.  So, if my memory is correct, he would have confessed to a murder that didn't happen.

Q   Okay.  And how about Pedro Delvillar?

A   I do not recall without reviewing additional documents.

Q   And how about Ralph Jacobs?

A   I do not recall without reviewing additional documents.

Q   How about William Kelley?

A   Same answer, I do not recall without reviewing additional documents.

Q   How about Guy Lewis?

Page 298

A   I do not recall without reviewing additional documents.

Q   Steven Linscott?

A   Yes, I do recall Steven Linscott's case.  He was -- I believe there was DNA that definitely exculpated him.

Q   When you say definitely exculpated him, what do you mean?

A   I believe his conviction was reversed.  And he wasn't prosecuted again, and the DNA indicated that he did not commit the crime.

Q   Yeah.  So, you use the descriptive definitively as opposed to you didn't just say the DNA exculpated him.  So, I'm just wondering, did you use definitively purposefully to mean something in particular?

A   Yeah, I meant to say that it removed doubt about his guilt.

Q   So, not all DNA evidence removes doubt about guilt?

A   Well, not necessarily.  One would have to analyze the DNA at the scene and the case facts and make a judgment about that.

Q   Do you -- sorry, were you done?

Page 299

A   But my recollection is in this case it did in our judgment.

Q   How about Jose Martinez?

A   I do not recall the basis for that.

Q   How about Christopher Mason?

A   So, I think that's Christina Mason --

Q   Oh, Christina, sorry.

A   Yeah, and my recollection is that her baby died and they got her to confess to killing the baby before the autopsy results, and she confessed to killing it.  I don't know, giving the baby cocaine is what I recall.  And it turned out when the autopsy results came back, the cause of death was not homicide, had nothing to do with cocaine, and the prosecutors dismissed the charges and acknowledged her innocence.

Q   How about Robert Moore?

A   I do not recall without reviewing documents the basis for that classification.

Q   How about Rick Nieskins or Nieskins?

A   Yes.  I do not recall that one either without reviewing the documents.

Q   And how about the Mr. Nunez, Mark Nunez?

A   Yes.  So, Mr. Nunez was one of the Phoenix

Page 300

Temple Four Co-Defendants --

Q   Okay.

A   -- so the same situation as Leo Bruce, Number 3.

Q   And what about Dante Parker?

A   He was also one of the Phoenix Temple Four Co-Defendants.  So, he had also falsely confessed like Mark Nunez in 17 and Leo Bruce in Number 3.

Q   And what about George Parker?

A   I do not recall without reviewing additional documents which category George Parker fits into.

Q   If we can go -- if I focus your attention back on Mr. Dante Parker, the -- next to 1991, which is the year, the source of -- it says under "Source," Ofshe and Leo and then Kimball and Greenberg.  Do you see that?

A   Yes.

Q   So, when -- source in this table, what does that mean?

A   Well, the source is just the citations.  This was a Law Review Hybrid Social Science Journal as I described yesterday, but they used the Law Review format and so they wanted and we provided

Page 301

citations for each of the cases where somebody interested can read about the case and check our reasons for classifying them or including the case in our article.

Q   So, each of these sources, the footnotes, if we were to review them, we would be able to figure out the criteria that you and Dr. Ofshe determined the particular circumstance fit that allowed you to conclude that the confession was a proven false confession, is that what you're --

MR. ART:  Objection, form -- sorry, Eileen.  Objection, form.

THE WITNESS:  My best belief without reviewing those documents is that in most or all of these cases, if we reviewed the cited documents we would be able to know why the confession was classified as false.

It might not -- there might be a couple of exceptions or a few exceptions, but I believe most or virtually all, or all, that the citations would tell us why.

Q   (By Ms. Rosen) And so for Dante Parker, you cite to Ofshe and Leo, Social Psychology, supra note 4, so what is that a citation to?

Page 302

A   Well, it's a citation to an article we published a year earlier that's referenced in Footnote 4 which is a very long footnote but the article is in the beginning of the second paragraph on Footnote 4 at the bottom of Page 430, and that's called the Social Psychology of Police Interrogation, The Theory and Classification of True and False Confessions, published in a journal called "Studies in Law, Policy, and Society."

And that article describes the Phoenix Temple Four case including Mr. Parker's case over five pages, 230 -- 226 to 231, as mentioned in Footnote 59.

Q   And how did you become familiar with the Phoenix Temple Four case?

A   It was a high profile case so it had been covered in the media.  I think Nightline did a show on it.

I believe, but I may be wrong, that Dr. Ofshe had also been retained in the case.  The four people, Mr. Parker, Mr. Nunez, Mr. Bruce that we mentioned, as well as I believe one more that we haven't, I think they were charged with capital murder and were in jail for sixty days, somewhere

Page 303

around that, for a couple of months, maybe more.

And in that time period, I believe Dr. Ofshe was retained and had received case materials. And I think that's how I found out about it, but it was -- it was a big case where -- I mean a high profile case, the kind of case unlike most of these or many of them, that garnered national media attention.

Q   Okay.  And then the next person on the list, Laverne Pavlinac, do you recall what criteria were met there?

A   I do not.

Q   How about George Peterson?

A   Yeah, I do -- without reviewing I think -- I think what happened, I think I do recall George Peterson.  I think George Peterson had confessed to killing somebody in Flagstaff, Arizona.  And I think the Phoenix Temple Four investigation led them to the true perpetrator of that.

I think it may have been the same kids who committed the nine murders -- I would have to refresh -- but I think that led then the Flagstaff prosecutors to dismiss charges against George Peterson in that case.  So, I think it was a true

Page 304

perpetrator identifying case.

Q   Okay.  And if we go to the next page, looking at the individuals named in Lines 22 through 34, do you recall any of the criteria on that for any of those individuals?

A   Twenty-two through 34, John Purvis, I do not recall without reviewing documents.  Paul Reggetz, I do not recall without reviewing documents.

Peter Reilly I do recall.  He was convicted of murdering his mother.  He was seventeen years old at the time, and his conviction was reversed.  I don't recall the exact reason.  And the prosecutor who had initially prosecuted him had died of a heart attack shortly after that.  And the new prosecutor for the re-trial discovered documents in the file that had not been turned over that demonstrated that Peter Reilly was at an event that would have made it physically impossible for him to make it back to the crime scene -- or the murder at his house where his mother was murdered -- in time.  And so it was a physical impossibility classification.

Ivan Reliford, I don't recall without reviewing more documents -- without reading the documents.  Melvin Reynolds, I do not recall without

Page 305

reviewing more documents.

James Reyos was the one case that I mentioned had been challenged -- yesterday I mentioned -- had been challenged by Professor Cassell, where the appellate prosecutor said this guy is innocent. And my recollection without reviewing the documents is that he was like seven hours away by car, and he would have had to have driven like eighty or a hundred miles an hour to get to the crime scene in time. And that drive in New Mexico would have involved mountainous roads.

So we, like the appellate prosecutor believed that that -- it was physically impossible for Mr. Reyos to have committed that crime because it was impossible for somebody to have driven that fast in those conditions to get to the crime scene in time to commit the bloody crime which was a homicide.

I do not recall without reviewing further the basis for the classification of Martin Salazar, Number 28; Donald Shoup, Number 29; Christopher Smith, Number 30; Ruben Trujillo, Number 31.

David Vasquez was, I believe, the first

Page 306

DNA exoneration of an innocent criminal defendant. There was a serial killer who was eventually executed, and he had committed the rape and murder that David Vasquez had been convicted of, had falsely confessed to, had been convicted of and actually had pled guilty to, I believe.

So, that was a DNA exoneration or scientific evidence dispositively exculpated him.

Earl Washington was the same situation. He had confessed to a rape and a murder, and the DNA conclusively demonstrated that he did not commit the crime. And the Virginia authorities as in the David Vasquez case acknowledged that. So, that was the basis for the classification there.

And Johnny Lee Wilson, I do not recall the basis for that without reviewing more documents.

Q   Okay. And so if I understood you correctly, with respect to Mr. Reilly and Mr. Reyos, the evidence that you analyzed and discovered made it physically impossible for them to have committed the crime because of where they were at the time the crime was committed, correct?

A   Yes.

Q   Okay. And then with respect to the two

Page 307

DNA cases that we just talked about, Vasquez and Earl Washington, those were circumstances where the evidence was collected at the time of the murders which would have been, I assume, 1984 and 1983, before DNA testing was available, correct?

A   I believe so, yes.

Q   And then later the evidence was tested because there was new technology and that's how the DNA ended up exculpating both of those individuals, correct?

A   Correct.

Q   Okay. In our case in 1998 we know obviously the DNA evidence -- when I say "our case," I mean Mr. Solache's and Mr. Reyes's case, DNA evidence -- DNA testing was available, right?

A   In 1998, yes.

Q   And of course, we know that Adriana Mejia -- her DNA was -- there was DNA from the crime scene tested, and the DNA from the crime scene not only matched Ms. Mejia but the crime victims in some respect, correct, depending on which evidence we're talking about?

A   Correct.

Q   And then also there was DNA -- there was

Page 308

evidence taken from Ms. Mejia's clothing and DNA evidence was found from the victims on her clothing, correct?

A   Correct.

Q   Okay. Do you know whether or not -- whether or not all of the materials that were collected from the crime scene were tested for DNA?

MR. ART: Objection, form.

THE WITNESS: I do not know.

Q   (By Ms. Rosen) Do you know what evidence was collected that to this day has remained untested?

A   I do not.

MR. ART: Objection.

THE WITNESS: Sorry.

Q   (By Ms. Rosen) You say you do not?

A   Yes.

Q   And did you notice as you were reviewing the materials that there was evidence that was collected that potentially could be DNA tested?

A   I do not recall if I did or not.

Q   Okay. We can take down Exhibit Number 5. Let's go back to Exhibit Number 1 which is Dr. Leo's Report, if we could start at Page 52. Okay. So, I want to ask some questions about Mr. Solache's

RICHARD A. LEO, PHD, JD, 09/29/2022                Page 309..312

**Page 309**

confession.

And your discussion regarding Mr. Solache begins at the bottom of Page 52, correct --

A   Yes.

Q   -- of your report?  And if we go to the next page, Page 53, about the middle of the first paragraph, you indicate that Mr. Solache was subjected to a relentlessly brutal physically and psychologically coercive incommunicado interrogation lasting almost forty-eight hours in total.  Do you see that there?

A   I think it says forty, and I heard you say forty-eight.  Maybe I misheard you.

Q   It says forty-eight.

A   Oh, I'm sorry, I was looking -- I was looking at a different sentence, sorry.

Q   Do you see it?

A   Yes.  Okay, now I see the sentence you're at, yes.

Q   Okay.  And above you say, "More than forty hours of custody" which is where your eye must have gone initially, correct?

A   Yes.

Q   Was it forty or forty-eight?

**Page 310**

A   My recollection is the total time in custody over which the interrogation was taken was closer to forty-eight.

Q   And the line about the description of the circumstances surrounding the interrogation, the relentlessly brutal physically and psychologically coercive incommunicado interrogation, that comes from your reading of Mr. Solache's account of what occurred, correct?

A   Yes

MR. ART:  Objection, form.

THE WITNESS:  Sorry.

Q   (By Ms. Rosen) And can you identify specifically what portions of Mr. Solache's testimony you were relying on in that particular portion of your report?

A   No.  It would be his testimony in deposition and at pretrial, and trial, and in post conviction proceedings, but I can't from memory tell you what portions or pages in those transcripts that I read where he describes these conditions.  But that is where he describes them.

Q   And did you review Mr. Solache's motion to suppress testimony, his trial testimony, his post

**Page 311**

conviction testimony, and his deposition testimony?

A   That's my recollection, yes.

Q   And did you compare the -- the different -- the different transcripts and analyze whether or not the accounts that Mr. Solache was providing were consistent?

A   My recollection is that they were generally consistent.  Some were more detailed than others.  There may have been a few minor inconsistencies that were trivial.

I don't recall seeing anything that caused me to doubt the overall strong consistency of his descriptions and recollections.

Q   Okay.  And then if we go to Section B of the report, you conclude that Mr. Solache's confession statement meets the criteria of a proven false confession because it was not physically possible for Mr. Solache -- and then you say or Mr. Reyes -- to have committed the Soto double murder and double child abduction given the documentation of his work records and given the DNA testing of the crime scene evidence dispositively excluded both Mr. Reyes and Mr. Solache as the source of any physical evidence left by the

**Page 312**

perpetrator while linking -- I'm summarizing -- Adriana Mejia.  Do you see that?

A   Yes.

Q   Okay.  So, you have concluded that Mr. Solache's confession meets two criteria for a proven false confession, not physically possible for him to have committed the crime, and the DNA exculpation, correct?

A   Yes.

Q   Okay.  And with respect to it not being physically possible for Mr. Solache to have committed the crime, can you explain to me how you arrived at that conclusion?

A   Well, it was the same discussion that I made yesterday about the work records contradicting the descriptions in the two confessions, of the timing.  I believe Mr. Solache was at work according to his work records at the time Mr. Reyes said that he picked up Mr. Solache and they committed the crime in the confession statements.

Q   What time -- irrespective of what the confession statements say about the time of the murder, what time did the murder happen?

MR. ART:  Objection to the form.

Page 313

THE WITNESS: I don't think we know exactly what time the murder happened. I think there is what the confessions say, and then there is also what police reports say, which as I mentioned yesterday, I believe there is an inconsistency in the closing report with what is said in an earlier report, if I remember correctly. But I think we -- also we don't know the exact time of death.

Q  (By Ms. Rosen) And since we don't know the exact time of death, how can you conclude that it was physically impossible for Mr. Solache or Mr. Reyes to have committed the double murder and double abduction?

MR. ART: Objection.

THE WITNESS: Again, my conclusion would be that what is in the confession statement is physically impossible given that it contradicts the work records which place him in a different location than at the time the confessions say they killed -- they committed the double murder and child abduction.

Q  (By Ms. Rosen) Can you identify any other case where you have concluded that an individual --

Page 314

that an individual confession statement met criteria for a proven false confession based on physical impossibility, based not on the time that the crime actually occurred but based solely on a comparison between the purported physical impossibility and the time stated in a given particular confession?

MR. ART: Objection to the form.

THE WITNESS: Without reviewing other physical impossibility cases, off the top of my head, no, I cannot.

Q  (By Ms. Rosen) Is there any way for you, if I asked you to do it, to review all of the physical impossibility cases that you have reviewed where you could get an answer to that question for me?

MR. ART: Objection to the form.

THE WITNESS: The -- the -- I no longer have most of the materials for the 1998 study. I believe I no longer have most of the materials from the 2004 study.

The study with Professor Gould, obviously I couldn't name any of the cases in that study, and the study that I'm now doing again with Professor Drizen, at least two hundred and fifty new cases, we haven't finished the

Page 315

coding.

So, for the cases that I have materials, I can certainly go back and look at those materials, but that could take an enormous amount of time, and I wouldn't do it, you know, pro bono. So, in theory, yes, I could do that. I don't know how soon I could get to it. But, if I did that, I would have to charge you for my time and I have no idea how much time it would take.

Q  (By Ms. Rosen) And just so that I'm clear about what you said, you've concluded that Mr. Solache -- it was physically impossible -- let me start over.

You have concluded that it was physically impossible for Mr. Solache to have committed the crime because of what time Mr. Reyes said he picked up Mr. Solache to go commit the crime, correct?

MR. ART: Objection to form.

THE WITNESS: In Mr. Reyes's confession statement, correct.

Q  (By Ms. Rosen) So, you're not even comparing Mr. Solache's work records to Mr. Solache's own confession? You're comparing it

Page 316

to Mr. Reyes's confession, right?

A  Correct. When I did the report, I was treating these confession statements together since they were confession statements to the same crime.

Q  What time did Mr. Solache say the crime was committed?

A  I don't recall. I would have to look through his confession statement for sure.

Q  Okay.

A  I don't recall whether it said.

Q  Okay. And then with respect to the second criteria that you say were met, the DNA testing of the crime scene you say dispositively excluded both Mr. Reyes and Mr. Solache, correct?

A  Correct.

Q  And can you -- I assume that your analysis regarding this purported DNA exclusion is the same as it was for Mr. Reyes which we discussed yesterday, correct?

A  Correct.

Q  And as I think you indicated earlier today, you have no idea if every bit of evidence that was collected from the crime scene was tested, right?

RICHARD A. LEO, PHD, JD, 09/29/2022                    Page 317..320

Page 317

MR. ART: Objection to the form.

THE WITNESS: I think you asked earlier if it was tested for DNA. Yes, I have. I do not know whether every single piece of evidence at the crime scene that yielded DNA or could have yielded DNA was tested for DNA.

Q   (By Ms. Rosen) And certainly if we were to test that, any of that material today, and it came back to Mr. Reyes or Mr. Solache, then you no longer could conclude that the DNA evidence dispositively excluded them from the crime, correct?

MR. ELSON: Objection to the form.

THE WITNESS: Your question is a hypothetical question. There's obviously no evidence to that, but yes, in that hypothetical alternative universe if that were true, then I would modify my conclusion.

Q   (By Ms. Rosen) And in that circumstance, Mr. Solache's and Mr. Reyes's confession statements would no longer meet criteria based on a DNA exclusion, right.

A   I believe so. I believe that's right.

Q   And this is not the circumstance -- this particular case, this particular crime scene, the

Page 318

evidence collected, and the status of the DNA is not the same as evidence that is collected at a time when DNA technology was unavailable that later became available that then was conclusive evidence that the individual charged did not commit the crime, right?

MR. ELSON: Objection to the form.

THE WITNESS: Not sure I understand your question. Can you ask it slightly differently?

Q   (By Ms. Rosen) Sure. So, in the -- in the typical DNA exoneration cases, the evidence is collected at a time when DNA technology was unavailable or was in its infancy, correct?

A   Yes.

Q   And it's the technology that becomes available later that allows for us to go back and test that evidence which then leads to the reasonable conclusion that the individual that was charged didn't commit the crime because the DNA came back to somebody else, right?

A   In most of the DNA exonerations, yes, their post conviction DNA exonerations. When --

Q   That's not -- sorry, I didn't mean to interrupt you.

Page 319

A   Right. When -- when the new technology is applied to existing evidence, there are some cases that have been DNA exonerations where there was DNA collected and tested during the pendency of the trial, but those are the exceptions of the DNA exoneration cases.

Q   And this case is not one of the former, right, where the DNA -- we didn't have DNA technology at the time of the crime, right?

MR. ELSON: Objection to the form.

THE WITNESS: Sorry. Correct.

Q   (By Ms. Rosen) And your conclusion that the DNA dispositively excluded both Mr. Reyes and Mr. Solache is based solely on your assumption that based on the crime scene, it is inconceivable to you that they would not have left, "they" being Mr. Reyes and Mr. Solache, would not have left DNA behind, correct?

MR. ART: Objection to the form.

THE WITNESS: I would disagree with you in the way you phrased the question. I would just say again, you know, I've been analyzing false confessions and proven false confessions, dozens of which involve DNA and DNA evidence

Page 320

in homicide cases, sometimes multiple homicide cases, for a very long time, and so I guess I'm taking issue with your use of the word "assumption."

This is based on my expertise, my experience, and my analysis of this case. And when I say expertise and experience, I mean as an expert on false confession cases who has studied and analyzed hundreds of them.

And my analysis of this case -- and I think analysis is very different than assumption. So, that's the reason why I disagree with your question as phrased.

Q   (By Ms. Rosen) What expertise allows you to conclude that it is inconceivable that Mr. Reyes and Mr. Solache participated in this crime without leaving any DNA behind that was eventually collected by police?

MR. ART: Objection to the form.

THE WITNESS: Again it's the expertise in analyzing false confessions and proven false confessions from an empirical social science perspective, the training that goes into that expertise, and the logical and analytical skills

RICHARD A. LEO, PHD, JD, 09/29/2022 — Page 321..324

**Page 321**

that one's trained in in graduate school, and the teaching and research and publication and analysis and testimony, like the legislative testimony. That's all part of that area of expertise.

There are numerous cases in which the DNA has exonerated, convictions have been reversed, and yet the police and sometimes the prosecutors continue to maintain that the person is guilty even though everybody else has said it's inconceivable, it's ruled out as a logical possibility. This case is not unique in that regard.

Q   (By Ms. Rosen) What is it about your training and expertise that makes you believe you're competent to testify regarding whether or not, number one, DNA evidence would have been left behind by Mr. Reyes and Mr. Solache based on this crime scene?

A   The short answer is again research, experience, training, history of analysis. But I just want to clarify that, of course, I can only opine based on the materials that I've reviewed. And based on the materials I've reviewed, I stand by

**Page 322**

these conclusions.

If I were provided with new materials, I would be happy to review them. And if they provided information that was inconsistent with other materials or altered my opinions, I would change my opinions. And I think I mentioned that at the end of my report.

Q   What background and expertise allows you to conclude that even if Mr. Reyes and Mr. Solache had left DNA behind at the crime scene, that it would necessarily have been collected by the police based on the nature of that particular crime scene?

MR. ELSON:  Objection to the form.

THE WITNESS:  I can only go based on what is described in the materials.

I've already explained that I don't know for certain if the DNA was collected. Usually in crimes this serious all of the significant DNA is collected.

And so my assumption is that this investigation was -- the collection of the physical evidence was competently done. And I think you're discussing a hypothetical that's not in evidence, and then asking me how I could

**Page 323**

be -- make an expert opinion about something that is completely not in evidence.

And again I can only opine about what has been put in front of me. And again my expertise is in the analysis of these cases of false confession and proven false confession that is the basis for my conclusions.

But again, I don't know if every single piece of evidence was collected -- that was possible for DNA testing was collected.

Q   (By Ms. Rosen) You saw the crime scene photos, right, you've listed that in the materials that you reviewed?

A   Yes.

Q   And I think you testified yesterday that there was blood everywhere, right?

A   Correct.

Q   So, how exactly -- what is your understanding of how exactly the DNA should be collected in a circumstance where there is blood everywhere?

MR. ELSON:  Objection to the form.

THE WITNESS:  I'm not an expert in how DNA is collected.  What I said was I assume based

**Page 324**

on the materials that I reviewed, that extensive DNA from the crime scene was collected and was tested.

Q   (By Ms. Rosen) So, you have no idea how -- how -- let's say there's blood all over the carpet. Do you have any idea at all how the DNA from the carpet would be collected?

A   No.  I'm -- I'm not aware of the specific or technical methods of DNA collection in a scenario like that.

Q   How about if there is blood all over the walls?  How would crime scene investigators collect any DNA evidence that would be available with blood all over the walls?

A   I assume they would remove the DNA, but I don't know -- or the blood, some or all of the blood, but I don't know the specifics of or the technicalities of how that DNA would be collected or even processed --

Q   And do you believe that they would collect all of the blood?

A   I do not know whether they would collect all of it or just most of it or some of it in some places and all of it in other places.

RICHARD A. LEO, PHD, JD, 09/29/2022                    Page 325..328

Page 325

Q   And do you know how it is that they collect -- how it is that crime scene investigators collect blood off of carpet?

A   The actual method of doing that, no, I do not know.

Q   How about blood off a couch?

A   The specific technical method of collecting blood off a couch, I do not know.

Q   How about blood off of a wall?

MR. ELSON:  Objection to form.

THE WITNESS:  I thought you asked that.  I do not know the specific method of collecting blood off a wall either.

Q   (By Ms. Rosen) Do you know any specific methods of collecting DNA evidence off of any surface?

MR. ART:  Objection to the phrase "specific methods."

THE WITNESS:  Well, I mean I know that in a sexual assault case often a rape kit is done and sometimes, you know, mouths are swabbed and hairs are plucked.  But I don't actually know if that's done that way, or if there is a more technical method in that kind of a situation.

Page 326

I don't know the specifics about that, and I don't know the specifics about the method or how DNA is taken off a carpet or a wall if there is blood, other than that it is collected.  Some or all of it is collected and subjected to further analysis.

Q   (By Ms. Rosen) And you don't know about -- do you know of any collection methods for obtaining DNA off of surfaces as opposed to DNA off of a person?

MR. ELSON:  Objection to the form.

THE WITNESS:  Other than that it is collected by crime scene analysts with training in collecting DNA and other types of physical evidence, no.

MS. ROSEN:  Okay.  Let's go to Page 54.  On the top of the page you describe Mr. Solache's recitation of the -- of his interactions with police.  And at the -- in the first line at the top of Page 54 you indicate that Mr. Solache indicated that he sat on a metal bench for what he described as a lot of time.  Do you see that there?

A   Yes.

Page 327

Q   And I assume you took that from something that Mr. Solache said, correct?

A   Correct.

Q   But you can't be any more definitive about what Mr. Solache meant by a lot of time, correct?

A   Correct.

Q   And then Mr. Solache described that an officer came into the room and took his shoes without questioning him, correct?

A   Correct.

Q   And then he was moved into -- the next time an officer interacted with him he was moved to a larger room, correct?

A   Correct.

Q   And then a Spanish speaking officer came in and questioned him for about ten to fifteen minutes, right?

A   Correct.

Q   And by Mr. Solache's own account that's the first time that he was interviewed or interrogated by any police officer, correct?

A   Correct.

Q   And that lasted ten to fifteen minutes by his own account, right?

Page 328

A   In his estimation, yes.

Q   Well, that's all we have to go by with respect to Mr. Solache's account, right, his own estimation?

A   Correct, because there's no recording, correct.

Q   Okay.  And then this officer told Mr. Solache that he had been accused of two deaths, and Mr. Solache said he was innocent.  And this police officer told Mr. Solache he needed to tell the truth or else he would, quote, get fucked, unquote, correct?

A   Correct.

Q   And in that particular place, you actually cite to the suppression hearing testimony, right?

A   Correct.

Q   And that's the first citation to any of the factual record that we have so far in your report, isn't that correct?

A   I believe so.  Obviously, I would have to review the report.  But, we discussed this yesterday, yes, in the descriptions by Mr. Reyes and Mr. Solache, I was taking them from three, four, or five of their accounts and various testimony, and I

RICHARD A. LEO, PHD, JD, 09/29/2022                    Page 329..332

Page 329

did not provide specific citations and here I did because I was quoting something that was said.

Q   Well, you quoted other places, too, right?

A   I might have quoted other places.  You're going to have to direct me in the report, but that's the reason why I think I provided the citation here.

Q   Okay.  And then the next paragraph describes Mr. Solache's description of his interaction with Detective Guevara, right?

A   Correct, the first full paragraph on Page 54.

Q   Which includes Mr. Solache's account that Detective Guevara struck him on the left side of his face, correct?

A   Correct.

Q   And then also that Adriana Mejia was brought into the room and accused Mr. Solache of assisting her in the double murder, double abduction, right?

A   Correct.

Q   And then the next paragraph provides Mr. Solache's recitation of what happened, what he claims happened between him and Detective Guevara once Ms. Mejia left the room, right?

Page 330

A   Correct.

Q   And then you have Mr. Solache's account that he signed the false confession statement because he couldn't take the beating anymore, correct?

A   Correct.

Q   Okay.  And then you identify here that he signed the confession statement that ASA Brualdi prepared at 3:35 a.m., on April 5th, right?

A   Correct.

Q   All right.  And if we go to Page 55, under Risk Factors if you look at the third line down, you have written that he was subjected to a lengthy custodial interrogation of over the more than forty hours.  Do you see that?

A   I do.  At some point I'm going to need to take a brief restroom break.

Q   Sure.  And here again, the reference is forty hours and not forty-eight.  Is there a particular reason why throughout this portion of Mr -- your account -- I'll start over.

Is there a particular reason why in the section addressing Mr. Solache's confession statement you sometimes refer to a forty hour or more than forty hour lengthy unrecorded custodial

Page 331

interrogation, and other places you put forty-eight hours on it?

A   No.  I mean forty-eight hours is more than forty, but I don't recall why I put more than forty as opposed to forty-eight.  I thought I would put forty-eight in one place, but I might have put it in more than one.  I thought I would more often use more than forty for both.

Q   Okay.  All right.  This is it.  We can take a break here if you need to use the restroom.

MR. ART:  Okay.  So, are we taking a five minute break, a ten minute break --

MS. ROSEN:  Let's do ten minutes so everybody has a chance to go to the restroom or grab something to eat.

THE WITNESS:  So, 9:00 my time, 11:00 your time.

MS. ROSEN:  Sure.

THE VIDEOGRAPHER:  We're off the video record at 10:48 a.m.

(At this time, a short break was taken off the record.)

THE VIDEOGRAPHER:  We're back on the video record at 11:03 a.m.

Page 332

Q   (By Ms. Rosen) Okay.  Returning to Page 55 of your report, I take it with respect to the calculation of more than forty hours, particularly based on what we just reviewed based on Mr. Solache's own account you are, as you did with Mr. Reyes, combining the length of time Mr. Solache was in custody as well as the length of time that he was interrogated?

A   The length of time that he was in police custody for purposes of interrogation over which the confession was eventually taken.

Q   Okay.  So, it is not simply interrogation time, correct?

A   It's not simply talking time, yes.

Q   Okay.  If we could go back to the Leo Drizen article, the problem of false confessions that we marked yesterday, Exhibit 2, North Carolina Law Review, is that right?

THE EXHIBITS COORDINATOR:  Yes, Eileen, that's correct.

MS. ROSEN:  Thank you.

Q   (By Ms. Rosen) If we take a look at Page 948 when you were discussing the length of interrogation for purposes of this article that you

RICHARD A. LEO, PHD, JD, 09/29/2022                    Page 333..336

Page 333

wrote with Mr. Drizen, the way you describe the interrogation time is -- if we take a look at the second paragraph you state, "Of the cases in which the length of interrogation was either reported or could be determined, 16 percent lasted less than six hours, 34 percent between six and twelve hours, 39 percent between twelve and twenty-four hours, 7 percent between twenty-four to forty-eight hours, 2 percent between forty-eight and seventy-two hours, and 2 percent between seventy-two hours and ninety-six hours."

You then go on to say these numbers are staggering. "More than 80 percent of the false confessors were interrogated for more than six hours, and 50 percent of false confessors were interrogated for more than twelve hours. The average length of interrogation was 16.3 hours, and and the median length of interrogation was twelve hours." Do you see that there?

A  Yes.

Q  And nowhere in any of that do you use the word custody or custodial, correct?

A  Not in the part that you've read, correct.

Q  So, isn't it a fair reading of this

Page 334

article that when you and Mr. Drizen were analyzing the length of interrogation, you were actually analyzing talking time?

MR. ELSON:  Objection to the form.

THE WITNESS:  That's not my recollection of how we came up with the time, and I don't recall if there is somewhere else in the article where we describe this as being the custodial period during which the interrogations occurred.

Q  (By Ms. Rosen) So, you think perhaps somewhere else in the article that might be discussed, the custodial period?

A  It might be or it might not be.

Q  And as you sit here today, you don't recall how you and Mr. Drizen tallied interrogation time?

A  No.  My recollection is we did it the same way that I do it in this case.  The period of time the person is in the interrogation room or interrogation rooms, if it's multiple sessions or multiple rooms, during which they are questioned even if there are long periods of time or short periods of time -- excuse me, where they are left alone and not

Page 335

questioned.

Q  And if you don't explicitly say that somewhere in this article, which I don't believe you do, is there a particular reason why?

A  I don't recall that there was any particular reason why we did not say that.  It's obviously a long article and it may have -- it may have just been something that we didn't think to say if we don't say it explicitly in the article.

Q  Okay.  Let's go back to Exhibit Number 1. We go to the paragraph that discusses Mr. Solache's allegations regarding physical abuse.  In the middle of the paragraph, you write that "Because Mr. Solache was chained to the wall with a right handcuff, Detective Guevara repeatedly hit Mr. Solache on the left side of his head causing Mr. Solache extreme pain in his left ear and, Mr. Solache believes, permanent hearing loss in his left ear." Do you see that there?

A  Yes.

Q  And did you review in any of the materials any documentation related to Mr. Solache's medical history or any medical records related to Mr. Solache?

A  I don't recall if I reviewed any medical

Page 336

records.  It would be -- if I did, they would be listed in the materials reviewed.

I do recall reviewing documents that described Mr. Solache's perception that this caused permanent hearing loss, and my recollection is that there was some medical testimony or reference to a medical opinion that that was not the case because he had a prior accident -- I don't recall if it was a car accident or someone through a brick at him.

And then in a subsequent document that I read, I think there was testimony or a description of testimony by a doctor that said despite the prior injury, he still could have had permanent hearing loss caused if he was injured in the way he says by Detective Guevara because the prior injury would have made the ear that much more vulnerable to losing hearing in the event of physical assault or serious physical injury to the ear in the future. That's my best recollection.

Q  Okay.  If we go to Page 56 in section -- or under the heading Paragraph 2, "Lengthy (Incommunicado) Interrogation and Sleep Deprivation," with respect to your statement that the more than forty hours of custody and interrogation of Gabriel

Urlaub Bowen & Associates, Inc.  312-781-9586

RICHARD A. LEO, PHD, JD, 09/29/2022                    Page 337..340

Page 337

Solache on April 3rd through 5th was extraordinarily lengthy by traditional police standards existing both then and now, what police standards are you referring to?

A   Again, the Reid Manual as we discussed yesterday. The 1986 edition, which was the current issue at the time, said don't go over four hours unless it's extraordinary. And as I mentioned yesterday, the Reid Manual is considered the Bible of interrogation. It sets national interrogation standards. And earlier editions of the Reid Manual had said the same thing as does the current and subsequent editions of the Reid Manual.

Q   And in the Reid Manual, the four hours is a reference to talking time, right, not -- not custodial time?

MR. ELSON: Objection to the form.

THE WITNESS: I'd have to review that section. My best recollection without reviewing it is that they don't distinguish between talking and custodial time. They just describe interrogation.

Q   (By Ms. Rosen) And you just infer that to mean -- to be defined in the same way that you've

Page 338

chosen to define it, right?

A   Yes. I mean I haven't spoken to the Reid people about this, but if somebody is in a room for eight hours, 9:00 to 5:00, and they're not interrogated the first two, they're interrogated for two, they get a two hour break, they're interrogated for two more, I would think that Reid would count that as eight and not four, but I could be wrong. I don't know how they account for long delays between multiple interrogation sessions in the same interrogation room, for example.

Q   And you said that the Reid Manual or the Reid method is considered the Bible. What is your basis for saying that?

MR. ELSON: Objection, asked and answered.

THE WITNESS: That's the scholarly consensus. They were one of the first manuals in 1942. I believe they were the first national training firm, and it is represented and believed -- represented by them and believed by everyone I'm aware of that they've trained hundreds of thousands and more than anybody else, and I'm not the only scholar who has referred to that as the Bible of

Page 339

interrogation, American interrogation within American policing.

So, the basis would be representations inside the policing community by Reid and others and representation by scholars, not just me, that it's a common understanding.

And I think I mentioned yesterday that in my 2008 book, "Police Interrogation and American Justice," I had a whole chapter on the rise of Reid and the Reid Manual and that approach in American interrogation which is often treated as synonymous with American interrogation.

Q   (By Ms. Rosen) Who treats it as synonymous? What community treats it as synonymous?

A   I would say the scholarly community. And what I mean by that is that I have reviewed dozens of unpublished and dozens of published interrogation training manuals, and a lot of them are completely or almost completely derivative of the Reid method. They've even sued people, sued firms for copyright infringement.

Now, I have heard in public settings interrogators, police, say sometimes I don't use the Reid method and then go on to describe the methods

Page 340

they use or used that are exactly from the Reid Manual that I would describe and I believe anybody familiar with the Reid Manual or method would describe as the Reid method.

So, it's my belief based on the materials I've reviewed in the last three plus decades, and I do not believe I'm alone in the scholarly community that many other interrogation training materials that do not explicitly describe themselves as using the Reid method or the Reid Manual are using Reid techniques nevertheless similar to or identical to what Reid teaches and advocates and has for decades.

Q   Have you compared the Reid method to the training that was provided to police officers in the mid to late nineties in the Chicago Police Department?

A   Have I explicitly compared that? No. However, in another civil case that doesn't involve any of the litigants here, my recollection -- and that's subject to a confidentiality order as well -- my recollection is that when I reviewed the Chicago Police Department Manual that was provided to me in discovery in that case, and it was either in the late -- my recollection, I'd have to double-check this, is that it was sometime between the late

RICHARD A. LEO, PHD, JD, 09/29/2022                    Page 341..344

Page 341

eighties and the late nineties, I could be wrong, that there were similarities.

But I probably reviewed that manual a year and a half ago, maybe two years ago, I don't recall the specific date. So, that would be I think the only time that I had looked at a Chicago unpublished manual.

I think in this case, there may have been some unpublished training materials provided as well, but it wasn't the same as what appeared in that other case to be a substantial unpublished manual.

Q    And did you say that this other case that you're describing where you compared or you reviewed an unpublished CPD manual from an unknown time period is in a case that is under a confidentiality order so you can't tell us the name of the case?

A    Correct. With respect to the first question, rarely have I been involved in a case that has a confidentiality order where I've been reminded so many times about that confidentiality order. And the report that I wrote in that case, as an example, has in the heading where, you know, the page headings, every page where I list the name of

Page 342

the attorney and the date and the page number, it has "Confidential/Subject to Confidentiality Order," that I put in at the request of the attorney.

So, with respect to your second question, I don't know if I can tell you the name of that case. I would be happy to -- to inquire with the attorney and say, "Is this confidential information for me to reveal this," and if she said, "No," I would be happy to provide that, the name of that case.

But I'm a little bit nervous about saying anything about that case without first consulting with the attorney because of the extraordinary lengths -- extraordinary lengths that she has gone to to remind me that that case is subject to a confidentiality order.

Q    Okay. If we go to Page 57 of your report with respect to "Rush to Judgment," you say in the middle of the report, "Detective Guevara did not seek to evaluate Mr. Solache's possible guilt or innocence, but instead single-mindedly sought to elicit a confession from him that confirmed Detective Guevara's lazy pre-existing conjectures and speculations." Do you see that there?

Page 343

A    Yes.

Q    And are you opining that Detective Guevara was lazy?

MR. ART: Objection to the form.

THE WITNESS: Right, I think we discussed something similar yesterday where I said based on the materials I reviewed which, of course, include Mr. Reyes's account, it was my interpretation that because Mr. Reyes and Mr. Solache and Rosauro, Mr. Mejia, showed up with the baby, there was an immediate -- child rather -- there was an immediate presumption that they were involved in the crime, and they all describe being accused upon interrogation or shortly after they met with -- they were interrogated by Detective Guevara, and of course, being assaulted as well.

If I reviewed or were presented with materials, additional materials that contradicted this opinion, then I would certainly be happy to modify it. But based on the materials that I did review in this case, and of course, in this section I'm basing the analysis on Mr. Reyes's and Mr. Solache's

Page 344

descriptions, that's my conclusion, that this was an immediate presumption of guilt without significant prior investigation. That was lazy.

Q    (By Ms. Rosen) Okay. Let's go to 59 of your report. If we go to the bottom of the page, the last sentence reads, "Put differently, Mr. Solache came to perceive that the only way to put an end to Detective Guevara's torture was to do as Detective Guevara demanded and sign the statement. Mr. Solache perceived he had no choice to do otherwise." Do you see that there?

A    Yes.

Q    Is your use of the word "torture" deliberate?

A    Well, it wasn't accidental. Punching somebody in the stomach and slapping them across the face with an open fist hard many times, I think would qualify as torture of one -- you know, one form of torture when torture is explicitly defined and analyzed, for example, in other contexts like international interrogations as physical assault. I think any physical assault meets the definition of torture. So, I don't think this is erroneous, and I'm sure when I wrote it it wasn't accidental.

RICHARD A. LEO, PHD, JD, 09/29/2022                    Page 345..348

Page 345

Q   Okay.  Let's go to Page 60.  In the top paragraph you describe Mr. Solache's personal background, and conclude that it is likely that he was more vulnerable to the physical and psychological coercion he describes because of his personal background.

I don't recall if I asked you yesterday when I asked you about Mr. Reyes, but did you interview Mr. Solache about his personal background?

A   I did not.

Q   Did you ask to?

A   I did not.

Q   And why not?

A   Because as I described yesterday, given my area of expertise, I typically do not interview people who have been interrogated unless there is no recording of the interrogation and I'm seeking to get their best recollection of what occurred during the interrogation.  And when I do that, it's typically in criminal cases that are going to trial for the first time and the interrogation did not occur that long ago and the interrogation was not recorded.

And I think I mentioned yesterday that

Page 346

circumstance has changed a lot in the last fifteen years because most departments these days record their interrogations.

In civil cases where it wasn't recorded and the interrogation occurred decades ago and there is a record, an imperfect record, by lawyers questioning the interrogated person -- the person who had been interrogated in pretrial or trial or post conviction, I wouldn't typically interview them about what occurred during the interrogation because so much time had passed and they had already given an account or a contemporaneous -- relatively contemporaneous account.

I don't interview people to test them because I'm not a clinical psychologist.  So, the purpose of my interviewing is different than a clinical psychologist.

Q   Okay.  And then you say, "Mr. Deleon-Reyes did not speak or understand English and had only been in the United States for a few months."  Do you see that there?

A   Yes.

Q   But in this section we're talking about Mr. Solache, right?

Page 347

A   Yes, that's a typo.

Q   In fact, isn't this paragraph other than changing the first two words from Mr. Deleon-Reyes to Mr. Solache, isn't that complete paragraph a cut and paste from what you said about Mr. Deleon-Reyes regarding his personal background?

MR. ART:  Objection to the form.

THE WITNESS:  Give me just a second here.

MR. ART:  Dr. Leo, I guess I would add to the objection that we've instructed you not to answer any questions with information about your report drafting process.  So, you can answer the question whether those paragraphs are the same, but not about how you drafted the report.

THE WITNESS:  That paragraph is similar to the paragraph at the bottom of Page 44 that you're referencing.  And I believe it's just as accurate as that, that both Mr. Reyes and Mr. Solache had not -- did not speak English or understand English, at least that's what they've represented, and others have, and because of the language barriers and because they were relatively new to the United States.

Page 348

Q   (By Ms. Rosen) Well, but the -- the paragraphs are more than just similar, they're identical except for in the paragraph on Page 60, it says, "Mr. Solache" in the first -- at the beginning of the paragraph.  And on Page 44, it says Mr. Deleon-Reyes.  Every other word is the same, correct?

MR. ART:  Objection, form, asked and answered.

THE WITNESS:  Yes, that is correct.

Q   (By Ms. Rosen) Okay.  If we go to the paragraph that begins, "7), Police Interrogation Contamination and Scripting," the second line, it says, "Mr. Solache did not know that Mariano and Jacinta Soto had been murdered or that their children had been abducted prior to his interrogations by Detective Guevara."  Do you see that there?

A   Yes.

Q   But Mr. Solache knew, right, when he took the little boy to the police station that he had been abducted, so that's not accurate.

MR. ART:  Objection to the form.

Q   (By Ms. Rosen) That was the reason for

RICHARD A. LEO, PHD, JD, 09/29/2022                                    Page 349..352

Page 349

taking the boy to the police station, right, because somebody saw on TV that the boy had been abducted?

MR. ART: Objection to the form.

THE WITNESS: I thought that -- without reviewing materials that describe it, I thought that the boy was missing is what he knew, not necessarily that the boy had been abducted.

Q (By Ms. Rosen) Okay. Let's go to Page 61, the portion of your report under the heading "Violation of National Police Interrogation Training Standards, Protocols, and Best Practices." That section that runs through the top of Page 63 is nearly verbatim the same as what you wrote with respect to Mr. Reyes other than adjusting for Mr. Solache's particular circumstances, correct?

MR. ART: Objection, form.

THE WITNESS: They may be similar based on their descriptions of what Detective Guevara and others did to them. That is similar, but they're not verbatim, if by verbatim you mean every word is identical.

Q (By Ms. Rosen) I don't believe I used the word verbatim. I think I said they're similar.

MR. ART: You said verbatim.

Page 350

MS. ROSEN: Okay. I'll withdraw the word verbatim.

Q (By Ms. Rosen) They're similar with respect to other than where you substitute out Mr. Solache's experiences for Mr. Reyes's experiences, correct?

MR. ART: Objection, form.

THE WITNESS: They're very similar because both individuals described the same patterns of physical and psychological abuse and the same violations of national standards. And so, yes, there is a similarity in the enumeration and identification and description of those violations of national training standards and commonly accepted best practices because the --

Q (By Ms. Rosen) Sorry, go ahead.

A No, I was finished.

Q So, the answers that you gave yesterday with respect to national standards and best practices apply equally to this section, correct?

A Correct, that -- that they're the same violations, the same abuses, the same bad practices, with slight variations. I believe that Mr. Reyes does not describe being punched in the stomach, but

Page 351

Mr. Solache does. There are some minor differences, but the same -- the same violations overall.

Q Okay. And then on Page 63, that's where you discussed Detective Guevara and Assistant State's Attorney Brualdi's account of the interrogation of Mr. Solache, and you note that according to Detective Guevara, he first came into contact with Mr. Solache on April 3rd at 11:45 p.m., correct?

A Correct.

Q And then according to Detective Guevara, he introduced himself to Mr. Solache, told him he'd be talking to him later, inspected Mr. Solache's clothes and shoes and then removed a pair of gym shoes that Mr. Solache was wearing and left the room, right?

A Correct.

Q And then, according to Detective Guevara, he returned to the same interview room at 12:15 a.m. on April 4th, correct?

A Correct.

Q And at that time according to Detective Guevara he advised Mr. Solache of his Miranda Rights in Spanish, confirmed that Mr. Solache understood his Miranda Rights, and then interviewed Mr. Solache

Page 352

for ten to fifteen minutes, right?

A Correct.

Q And then according to Detective Guevara, he observed Mr. Solache sleeping later in the morning and did not interview him again until 9:00 p.m., on April 4th, correct?

A Correct.

Q And according to Detective Guevara he reminded Mr. Solache of his Miranda warnings to which Mr. Solache responded that he understood, and then he discussed the case with Mr. Solache, and Mr. Solache initially denied any involvement, correct?

A Correct.

Q And then according to Detective Guevara, it was during this interview that he told Mr. Solache that both Mr. Reyes and Ms. Mejia were implicating him in the double homicide and double child abduction, correct?

A I'm sorry, I kind of lost where you were reading from, but I see it now. Yes.

Q Okay. So if, in fact, by the time Detective Guevara spoke to Mr. Solache at 9:00 p.m., on April 4th, he had interviewed Mr. Reyes and Ms.

RICHARD A. LEO, PHD, JD, 09/29/2022                    Page 353..356

Page 353

Mejia, and both of them were implicating him in the double homicide and double child abduction, would you still characterize Mr. Reyes -- I mean Mr. Guevara's approach as a rush to judgment?

MR. ART: Object to the form.

THE WITNESS: Yes, I would still characterize it that way because there was no evidence implicating Mr. Solache at that point other than Miss Mejia's accusation of Mr. -- Mr. Solache's involvement with her. And she describes being physically abused during that interrogation, and we don't have a record of what occurred during that interrogation, an objective record, and of course, Detective Guevara has a pattern and practice as I detail elsewhere of allegations of abuse.

So, I would still say it was a premature rush to judgment because there is no objective evidence of guilt at that point, and to my mind Andriana Mejia's accusation is tainted by her description of being physically abused and by Detective Guevara's record of allegations of physical abuse which in this case also involved Rosauro Mejia.

Page 354

Q (By Ms. Rosen) When you say there was no objective evidence implicating Mr. Solache, what do you mean by objective evidence?

A Non-testimonial evidence that is not the product of a Guevara interrogation linking Mr. Solache to the double murder and double child abduction.

Q And so your conclusions and opinions about circumstances of these interrogations necessarily conclude that Mr. Guevara did the things that he's accused of doing, right?

MR. ART: Objection to form.

THE WITNESS: I'm not concluding that he did the things that he's accused of doing as a factual matter in my testimony. I'm relying on-- in the opinion that you referred to, I thought you were referring to the opinion earlier where I said there was a premature rush to judgment, and Detective Guevara was lazy in his conclusion that Mr. Solache was involved in the crime prior to interrogating him.

So, in this section of the report, I'm not making a factual determination. I'm not making any factual determinations. I'm saying based

Page 355

on the materials that I reviewed, and based on Mr. Solache's and Mr. Reyes's description, that's my opinion. Lazy investigation, premature conclusion of guilt.

Elsewhere in the report which we haven't got to, I describe, as you know, a pattern and practice of documented abuses across the Chicago Police Department from Area 2 to Area 5, and in Area 5 obviously you know that there are numerous documented allegations of abuse against Mr. Guevara going back many years predating the Reyes and Solache interrogations and prosecutor written confession statements in 1998.

Q (By Ms. Rosen) But, my question had to do with what you meant by objective -- in order for you to conclude that there wasn't a rush to judgment with respect to Mr. Solache, you said you needed objective evidence. And when I asked you to describe what that was, you said non-testimonial evidence that indicated that Mr. Solache was involved that wasn't tainted -- I believe was the word you used but I could be wrong -- by Mr. Guevara's pattern and practice or something like that. Did I

Page 356

get that wrong?

MR. ART: Objection to form. Did you get your summary of his last answer wrong?

MS. ROSEN: Did I -- did I understand him incorrectly?

MR. ART: Objection to form. You can answer if you understand the question, Dr. Leo.

THE WITNESS: I think you're correctly recalling the beginning portion of that answer but not the whole answer itself.

Q (By Ms. Rosen) So, tell me again what you mean by objective evidence.

A Evidence that would directly link Mr. Solache to the double abduction and double murder that is not testimonial evidence produced by an unrecorded interrogation, but is objective in the sense that it's objectively verifiable like fingerprints, DNA, records -- work records that place somebody at -- or other records if there were GPS location records, for example, something that can be verified independent of one person's perception or recollection.

Q And is that something that you -- that you believe would be necessary in every case so that in

RICHARD A. LEO, PHD, JD, 09/29/2022          Page 357..360

Page 357

order to find that there wasn't a rush to judgment, or is that simply an opinion you have in this case based on the circumstances of this case because it involves Detective Guevara?

MR. ART: Objection to form.

THE WITNESS: What I would say is that the Reid people say there needs to be a thorough, factual investigation and factual basis preceding an interrogation, and if there isn't a factual basis preceding an interrogation, then there -- there typically is in my experience, a rush to judgment, a premature conclusion.

And that appears to be a striking pattern in the Detective Guevara cases that I've reviewed, especially here.

Q (By Ms. Rosen) Okay. So absent objective physical evidence, then your interpretation of the Reid Manual is that interrogations should not occur?

MR. ART: Objection to the form.

THE WITNESS: I didn't really say that. I said a thorough investigation based on facts, I think they say a factual basis. They also say there should be -- somebody should only be

Page 358

subjected to an interrogation if the interrogating detective or detectives have reasonably concluded that the person is guilty of the crime that they're about to be interrogated for.

Q (By Ms. Rosen) And can testimonial evidence provide a factual basis?

A Testimonial evidence could provide a factual basis, yes.

Q And in this case, the testimonial evidence that was provided according to Detective Guevara by Mr. Reyes and Miss Mejia is insufficient, correct?

A The reason I'm skeptical of that is because everybody, by which I mean Mr. Mejia, Miss Mejia, Mr. Reyes, and Mr. Solache, all allege physical abuse, physical coercion during their interrogations.

And then we have all the other allegations against Detective Guevara and how he conducts interrogations prior to 1998.

And so again, I think any unrecorded interrogation by Detective Guevara is highly problematic, and we have no objective record of the interrogations to compare the accounts and see who's

Page 359

telling the truth and who is not, or who is accurately recalling and who is not.

Q Okay. Let's turn to Page 65 of your report, and at the bottom of the page, Section XII, the heading reads, "The Chicago Police Department's Widespread and Systemic Pattern and Practice of physically and psychologically coercive interrogations (Especially of African-American and Latino men) from 1972 to at least 2000; and the City of Chicago's continuing notice of systemic physical coercion and abuse to extract and fabricate confessions to high ranking officials in the Chicago -- in the City of Chicago, high ranking officials in the Chicago Police Department and police command personnel." Do you see that?

A I do, yes.

Q And so based on that heading, is it fair to conclude that you are opining that the City of Chicago in fact had a widespread and systemic pattern and practice of physically and psychologically coercive interrogations, especially of African-American and Latino men, from 1972 to at least 2000?

A Yes. And of course that opinion is

Page 360

fleshed out in the pages that follow.

Q And so you are concluding as a matter of fact that multiple individuals were subjected to physical and psychological coercive interrogations, correct?

MR. ART: Objection to form.

THE WITNESS: I'm not making factual determinations. I'm saying that in my -- in the materials that I reviewed, I noticed a pattern and practice that was undeniable, systemic, and widespread based on -- based on the allegations across departments -- I'm sorry, Areas 2, 3, 4, and 5 spanning this almost thirty year period.

Q (By Ms. Rosen) So, in order to conclude that there was a widespread and systemic pattern of physically and psychologically coercive interrogations, that means that you have determined that the individual cases that you have reviewed to reach this conclusion established that factually physical and psychological coercion occurred during interrogations, right?

MR. ART: Objection to form, asked and answered.

Page 361

THE WITNESS: I'm not sitting here in the role of a juror. I'm sitting here in the role of an expert witness. And I'm saying that based on my expertise, my training, my knowledge, there's a clear pattern here through the -- through the allegations. And one sees it over and over, and the officials -- through multiple documents and data sources, and officials were on notice of that for many years.

I'm not trying to make a factual determination that a jury would make. I'm saying based on the materials I reviewed, this is the pattern and practice that is clearly present there. And this is also the evidence of notice of this allegation of pattern and practice.

Q (By Ms. Rosen) Okay. Well, I want to separate out notice for a second and focus on widespread and systemic pattern and practice.

Do you know what a Monell claim is?

MR. ART: Objection to form, foundation.

THE WITNESS: I do generally. I don't know specifically. I haven't read that case in

Page 362

at least two decades, so I don't remember the details.

Q (By Ms. Rosen) Do you know what it is that Mr. Solache and Mr. Reyes have to prove in order to prove that the City of Chicago itself is directly responsible for any alleged constitutional violation they might prove?

MR. ART: Objection, form, foundation, calls for a legal conclusion. Go ahead.

THE WITNESS: I think if a Monell claim is being pled, I think a pattern and practice has to be established. But I don't know again the details of the law there or the legal requirement. And of course, my -- you know, my observations are as a social scientist.

Q (By Ms. Rosen) So, you know that Mr. Solache and Mr. Reyes, to prevail on their Monell claim, need to prove a pattern and practice against the City of Chicago, right?

MR. ART: Objection, misstates the law. Objection to form, foundation, asked and answered.

Q (By Ms. Rosen) You can answer.

A Again, I don't know the details, and I

Page 363

think that's part of the requirement, but I'm not sure that's the entire requirement or exactly how it's phrased in Monell or in Monell's progeny.

Q And -- and you are, or essentially if you're allowed to provide this opinion before the jury in this case, going to be informing the jury that the City of Chicago through its police department had a widespread and systemic pattern and practice of physically and psychologically coercive interrogations, especially of African-American and Latino men, from 1972 to at least 2000, right?

MR. ART: Objection to form and to the phrase "informing the jury."

THE WITNESS: I would -- well, you know, of course, I don't ask myself questions and I don't know whether limitations would be placed on my testimony, but yes, I would presume that if this case goes to trial, and if asked about my opinions, I would offer the same opinions that I've provided in the report and tried to illustrate in the report.

Q (By Ms. Rosen) Okay. With respect to the cases that you analyzed in support of the opinions that begin at the bottom of Page 65 of your report,

Page 364

you detail obviously specific cases. And am I correct that with respect to the cases that you have detailed in your report that all of the materials you rely upon are cited in the report?

A The materials I rely upon, yes, all of the materials are cited in the report unless there's a mistake like with those general progress reports and I inadvertently did not include them.

However, I have been teaching and writing about this or at least mentioning it in my writings for many years. So, I'm familiar -- though I didn't rely on it in this report directly -- I am familiar with scholarly and other research on torture scandals and allegations of torture in the Chicago Police Department both in the Burge era and subsequent to Burge's firing in 1993.

But the materials I directly relied on are all cited in the report unless I inadvertently left out a material that I was provided and did not cite.

Q What have you written about related to the Burge era?

A I don't think I've written anything specific on the Burge era. I think I mentioned it

RICHARD A. LEO, PHD, JD, 09/29/2022                Page 365..368

Page 365

in a 2004 book chapter in an edited volume where I write about the History of the Third Degree in America as well as in my 2008 book, "Police Interrogation and Criminal Justice."

And usually for the point that -- those two -- that -- those two chapters, the 19 -- the 2004 book chapter in an edited volume that I can identify on my CV if you like, and the 2008 book chapter, what they are about is the History of the Third Degree which in the United States pretty much ended in the 1930's and 40's, the third degree being a synonym for physical abuse, physical torture, psychological abuse, psychological torture to extract confessions.

And the reference to Chicago would be that everywhere else in the United States the third degree ended. And even where there were allegations or a scandal involving physical abuse in the interrogation room, they were one offs.

Whereas, in Chicago the third degree persisted in this era, 1972 to 2000 roughly and appeared to be systemic with hundreds, or dozens if not hundreds, of allegations of physical abuse and torture during interrogation.

Page 366

So, it's not that I wrote something specifically on this, but that I mentioned it in the context of something very historically similar where I had done substantial detailed research analyzing patterns and practices of third degree interrogation abuse earlier in American history.

Q   And in the two book chapters -- well, the book chapter in the book that you just mentioned, the 2004 and the 2008 publications, do you discuss anything post Burge's firing in 1993?

A   I don't recall specifically without referring to those whether I mentioned any allegations of physical abuse or coercion post 1993.

Q   Okay.  And if we look at the top paragraph on Page 66, in the middle of the paragraph you reference "in-court admissions of city lawyers."  Do you see it there?

A   We're on Page 66 in the first paragraph?

Q   Yes, it's like five lines, six lines from the bottom.

A   I don't see it.  Maybe our pagination is different.  What --

Q   If you look up at the screen --

A   Page 66 -- oh, I'm sorry.

Page 367

Q   Five lines -- six lines from the bottom on the left side "from in-court admissions of city lawyers" --

A   Oh, okay, okay.  I was looking at the bottom of the page, I'm sorry.  Yeah, okay.  Yes, I see that.

Q   What are you referencing there?

A   I would have to go through and find it in the report.  It's there, I just don't know where it is.  I thought there were attorneys who acknowledged -- Cook County's attorneys, either City attorneys or Attorney Generals -- who acknowledged in court that there had been some physical abuse by Burge or his acolytes.  And so I just have to go through this long chronology and find the specific place where that is.

Q   Okay.  If we go down to the first paragraph under B, and you say, "It has been well documented that Jon Burge and those under his command, first at Area 2 and later at Area 3, collectively tortured at least one hundred and twenty-five suspects from 1972 to 1991," do you see that there?

A   Yes.

Page 368

Q   And then you cite to the "Torture Victims Chart"?

A   Correct.

Q   And I take it you received the Torture Victims Chart from Plaintiff's counsel, right?

A   Correct.

Q   And if we could mark the Torture Victims Chart as exhibit -- whatever one we're on now.

THE EXHIBITS COORDINATOR:  It would be 6, yes.

THE WITNESS:  Also, I just want to flag that we should be mindful of lunch at some point soon.  I ended up eating breakfast at 5:00 in the morning to be on Chicago time.  So, whenever people think a lunch break would be appropriate, that would be nice.

Q   (By Ms. Rosen) Okay.  Let's go -- let's go a little bit more and then we can take the lunch break.

Okay.  Is this the Torture Chart that you were referencing?

A   I believe so, yes.

Q   Who prepared this chart?

MR. ART:  Objection to form.

RICHARD A. LEO, PHD, JD, 09/29/2022                          Page 369..372

Page 369

THE WITNESS: I'm not a hundred percent sure, but I believe it would have been prepared by Flint Taylor in Mr. Taylor's office.

Q   (By Ms. Rosen) And Mr. Taylor, right, is the founding member of -- or one of the founding members of the People's Law Office, correct?

MR. ART: Objection to form.

THE WITNESS: That's my belief and understanding, yes.

Q   (By Ms. Rosen) And the People's Law Office represents Mr. Solache in this case, correct?

A   Correct.

Q   And so you are relying on in part for some of your opinions in this case on a document prepared by Mr. Solache's lawyers, right?

MR. ART: Objection to form, go ahead.

THE WITNESS: In part, but I think that's -- I want to be careful to emphasize that I'm relying on a lot of materials and a lot of other materials, and this is just one very small piece of the materials that I'm relying on.

And in that paragraph that you've cited on Page 66, I list, you know, the categories of

Page 370

these materials. So, it's not that I'm relying on this document for any conclusions, or this document alone. This is merely one small part of the bigger picture and the substantial amount of documents that I reviewed and relied on.

Q   (By Ms. Rosen) But, you rely solely on the Torture Victims Chart in support of the proposition that Burge and those under his command, first at Area 2 and later at Area 3, collectively tortured at least one hundred and twenty-five suspects from 1972 to 1991? That's the sole cite there, right, is this Torture Victims Chart?

MR. ELSON: Objection, form --

MR. ART: Objection, asked and answered. Objection, mischaracterizes his report.

Q   (By Ms. Rosen) You can answer.

A   Sorry. it's the sole citation, but that is not the sole document that I relied on. And it's just the sole citation for that sentence.

Q   If we go to Page 68 of your report, the sentence -- the paragraph that begins, "During his tenure as Cook County State's Attorney more than fifty additional cases of torture and abuse by

Page 371

Lieutenant Burge and his fellow detectives came out of Area 2." See, it says torture but I think it means Torture Victims Chart because the Bates number is the same. Do you see that there?

A   Yes.

Q   So again, you're relying on the Torture Victims Chart for that proposition, correct?

MR. ART: Objection to the form.

THE WITNESS: In part, yes. That is the sole cite there, but there were other materials that I reviewed that support that proposition.

Q   (By Ms. Rosen) What other materials that you reviewed support the proposition that during his tenure as Cook County State's Attorney more than fifty additional cases of torture and abuse by Lieutenant Jon Burge and his fellow detectives came out of Area 2?

A   I'd have to go through this list, but I believe there were other materials that I reviewed that established that point.

Q   And then if we go down to the paragraph that begins, "In 1982," the last sentence says, "As former Police Chief Richard Rosenthal has opined the loss of this many police reports has to have" --

Page 372

sorry, let me start over. "As former Police Chief Richard Rosenthal has opined, the loss of this many police reports had to have been a deliberate act." Do you see that there?

A   Yes.

Q   And that opinion was rendered in connection with a civil case where Mr. Rosenthal was paid to provide those opinions, right?

MR. ART: Objection to form.

THE WITNESS: He may have received compensation as an expert witness, I don't recall.

Q   (By Ms. Rosen) And was it a report that he prepared in connection with a case that he was doing for and hired by the Peoples Law Office to -- let me start over.

The report he prepared was for the People's Law Office, correct?

MR. ART: Objection to form.

THE WITNESS: Without reviewing it, I don't recall.

Q   (By Ms. Rosen) Let's go to Page 69 of your report at the top of the page it says, "In 1986, the CPD promoted Jon Burge to Commander, transferred him

RICHARD A. LEO, PHD, JD, 09/29/2022                    Page 373..376

Page 373

to the Bomb and Arson Unit, and replaced him in Area 2 with Lieutenant Phil Cline. Cline, while Lieutenant at Area 2, did no investigations nor made any inquiry concerning alleged torture at Area 2 under his predecessors there." Do you see that?

A   Yes.

Q   And you don't have any citation there. What is the basis of your conclusion that Lieutenant Phil Cline did no investigations nor made any inquiry regarding alleged torture at Area 2?

MR. ART: Objection to form.

THE WITNESS: I don't recall specifically which documents I gleaned this information from.

MS. ROSEN: Can you guys hear me? I lost my microphone for a second.

Q   (By Ms. Rosen) Let's go to Page 70 of the report. If we scroll down a little bit more, the paragraph that says, "Also similar was the way in which several victims were threatened with consequences if they refused to make a statement." Do you see that there?

A   Yes.

Q   And then you -- a couple of lines down you

Page 374

begin, "The most striking similarities, however, are found in the methods of torture used on the suspects. Wilson was electroshocked by Yucaitis using the black box and by Burge who used the black box and a curling iron looking device, was "bagged" and beaten and was threatened with a gun placed in his mouth."

With respect to those methods of torture that you detailed there that were alleged by Andrew Wilson, did you see in any of the Area 3 cases similar allegations of the precise methods of torture?

MR. ART: Object to form, and misrepresents what you're reading from in the report.

MS. ROSEN: Okay.

Q   (By Ms. Rosen) You can answer.

A   Okay. So -- so, you were quoting something that I didn't write but that I excerpted, right? And I just want to be clear, you're asking me if I saw any examples of bagging, beating, gun play, electrocution? Can you just tell me what specific category of the many categories of torture and abuse you're asking about with respect to Area 3?

Q   The particular ones that are detailed

Page 375

right there in the report, that I just read.

A   I lost you when you were reading. I think you were reading the paragraph that said, "Also similar -- "

Q   No, okay, let's start over then if you're confused.

In the report -- in the section of the report it is noted that the most striking similarities, however -- similarities between the allegations made by the individuals that are discussed above -- are found in the methods of torture used on the suspects. Are you with me so far?

A   Yes.

MR. ART: Object to the form of the question, and then I just want to note that you're reading a block quotation from the document.

MS. ROSEN: Thank you for that. I didn't know what I was reading from, Steve.

MR. ART: You're attributing in your question this text that is a block quotation to Dr. Leo.

MS. ROSEN: No, I was not at all.

MR. ART: Okay --

Page 376

MS. ROSEN: I quoted it -- I am -- I am directing him -- I'm not going to fight with you. Make your objection and we can move on.

MR. ART: I would just ask that you don't misrepresent what's in the report as his opinions. It is a block quotation from a source --

MS. ROSEN: I never said this was his opinion. I am reading from something he put in his report. That's all I'm doing.

MR. ART: Okay.

Q   (By Ms. Rosen) It indicates here, "The most striking similarities, however, are found in the methods of torture used on the suspects," right?

A   Yes.

Q   And it goes on to say here in this block quote, "Wilson was electroshocked by Yucaitis using the black box and by Burge who used the black box and a curling iron looking device, was "bagged" and beaten and was threatened with a gun placed in his mouth." Do you see that?

A   Yes.

Q   I am asking you if you saw in any of the cases you reviewed relating to Area 3 any allegations

Urlaub Bowen & Associates, Inc.  312-781-9586

Page 377

that described these particular methods of torture as described in this paragraph?

MR. ART: Objection to the form.

THE WITNESS: Okay. Thank you. I'm just going to have to review these materials. Yes, I did, just looking at Page 77 of my report, Damari Clemon described being electroshocked and threatened with a pistol by Detective Boudreau and other detectives.

So, that would be one similarity between the block quote that you read and allegations of torture occurring in Area 3.

Essentially, you described four or five categories in your reading of that quote, electroshock, torture, bagging, beating, gun playing, or threatening with a gun. And that one, just that third one that I list describes two of those three categories -- two of those four categories.

Q   (By Ms. Rosen) Any others from Area 3?

A   I'm just going to keep going. But rather than stating them all up, I'm just going to do them one at a time and then pause and then answer, and then pause and continue my answer.

Page 378

In the writeup in my report on Page 78 of Nevest Coleman and Darrell Fulton, the allegation is that Detectives Boudreau, Halloran, and another Area 3 detective punched both Coleman and Fulton in the face, and that's similar to the beating described here. And a detective threatening Fulton that he would put a bullet in his brain, which is similar to being threatened with a gun in the block quote portion that you read.

Detective -- in the James Coston case on Page 78, Detective Kill is alleged to have struck him in the jaw which is similar to the beating described in the block quote.

There's also the block quote -- also, Mark Craighead, Number 6 on Page 78, makes an allegation in Area 3 of beating.

Arnold Day makes an allegation of physical coercion and abuse, in other words, beating.

In Number 7 on Page 78 --

Q   Oh, the actual -- the method that was described in that first paragraph was "bagged" and beaten, so that's really what I was asking about, but go ahead.

MR. ART: I would state that the witness

Page 379

should be allowed to finish answering the question in any other Area 3 cases which he was in the middle of.

THE WITNESS: Yeah, I would like to continue answering.

Q   (By Ms. Rosen) And you understand my question to be focused on the particular methods that I pointed out to you, right?

MR. ART: I object to the interruption, and the witness should be allowed to finish his answer.

THE WITNESS: Yes --

MS. ROSEN: I want him answering my question.

MR. ART: Objection.

THE WITNESS: I didn't mention Alnoraindus Burton who was Number 2. I understood your question as I said before I started going through these cases to include electroshock, bagging, beating, and threatening with a gun. So, I understood at least four categories in your question.

Alnoraindus -- I'm not sure I'm pronouncing his name right -- but he also alleges being

Page 380

beaten.

Fred Ewing and Darnell Stokes allege beating in Area 3. Oscar Gomez alleges beating. He alleges being threatened with a gun as well. Harold Hill alleges beating in Area 3.

Tyrone Hood alleges beating and being threatened with a gun. Wayne Washington alleges also being hit or beat.

Q   (By Ms. Rosen) Where are you reading from, Mr. Hood and Mr. Washington?

MR. ART: I object. Mr. Leo, you should finish your response to the --

MS. ROSEN: I'm entitled to know where he's reading from.

MR. ART: You can ask that question after he completes his answer --

MS. ROSEN: Well, he cannot just meander through his whole report for forty-five minutes and then not answer specific questions about it. He can go right back to reading and identifying. I want to know where he's reading from in his report.

Q   (By Ms. Rosen) Doctor Leo, please tell me

RICHARD A. LEO, PHD, JD, 09/29/2022                    Page 381..384

Page 381

where you're reading from in your report.

MR. ART: Doctor Leo, I instruct you to finish your answer to her question at which point counsel can ask you follow-up questions.

MS. ROSEN: Are you instructing him not to answer my question?

MR. ART: I'm instructing him to answer the previous question which was --

MS. ROSEN: This is absurd, Steve.

Q   (By Ms. Rosen) Doctor Leo, please answer my question.

MR. ART: You cannot ask him in a pattern opinion, are there any other cases from Area 3 and then interrupt his answer to that question about the pattern of other cases in Area 3 by asking other questions.

MS. ROSEN: I am not interrupting the answer. I'm asking him to direct me to where he is reading from, and then I'm going to let him keep identifying whatever cases he wants to identify for his pattern.

Q   (By Ms. Rosen) Please tell me what page you're reading from.

MR. ART: Doctor Leo, you can tell counsel

Page 382

what page you're reading from, but then please continue your answer to the prior question.

THE WITNESS: I am not reading from a page in my report. I'm reading from notes that I prepared that are based in part on my report and are based also on documents that I reviewed in preparation for the report.

Q   (By Ms. Rosen) How many -- how many pages of notes are you reading from today?

MR. ART: I object to form. Do you mean how many has he read from so far, how many is he reading from --

MS. ROSEN: I will ask the question again.

Q   (By Ms. Rosen) How many pages are the notes that you're reading from right now to answer the question about Hood and Washington about what they were specifically -- what they specifically alleged?

A   Two pages.

Q   And are these different notes than the notes you were reading yesterday?

MR. ART: Objection to form.

THE WITNESS: I eventually want to finish my original answer, but yes, because the notes

Page 383

that I prepared yesterday if I'm recalling correctly had to do with the Reyes and Solache case. And that was separate notes that I prepared. Again, same thing, based on what I had written in the report and based on materials that I had reviewed in preparation for the report which were voluminous.

So, these are different notes in that they're stapled separately to different sheets of paper, but they are similar in that they were derived from my report and from materials that I reviewed in preparation for my report.

Q   (By Ms. Rosen) And with respect to all of the answers you've provided identifying the pattern that I asked about initially, are you reading from your -- to provide the answers that you've provided up to this point in time, are you reading from your report or reading from your notes?

MR. ART: And just to clarify, Eileen, do you mean the question are there any other Area 3 cases?

MS. ROSEN: Yes.

THE WITNESS: Okay. So, when I started my answer to your question in the very beginning,

Page 384

I was reviewing my report and I was answering the first case or maybe the first or second case, I was answering based on the review from my report.

But, then you -- you and I had an exchange where you said I'm not asking about this, I'm asking about that. And so at that point I shifted to the notes because the notes are a little bit more detailed on some of these cases. And I think you were saying that your question was about beatings during baggings, but I had interpreted the quote to mean baggings and beatings.

So, I wanted to go to the notes because they're a little bit more thorough than what is in the report on some of these many cases that I reviewed the documents for.

Q   (By Ms. Rosen) When did you prepare the notes?

MR. ART: I think Dr. Leo should be given -- we let you ask questions in the middle of his answer about what he was reading from, and you can ask questions about the notes at any time. But he should be permitted to complete

Urlaub Bowen & Associates, Inc.  312-781-9586

RICHARD A. LEO, PHD, JD, 09/29/2022 Page 385..388

Page 385

his answer about the Area 3 cases.

Q (By Ms. Rosen) Can you -- when you're answering -- as you go through and answer that question and identify cases, please let me know if you're reading from your notes or from you report and then you may continue.

MR. ART: Well, I object to the instruction and the form, but Dr. Leo, please do so, and if "both" is the answer, please let us know that as well.

THE WITNESS: Okay. So, I believe we finished with Tyrone Hood and Wayne Washington. I'm looking at my report on Page 79. Harold Hill, Dan Young, Peter Williams all allege that they were beaten.

With regard to Joseph Jackson, I'm looking at both. He describes being beaten. He describes bagging which is another category in the block quote that you quoted from.

I'm moving on to Anthony Jakes, and he describes being beaten, and I am looking at both.

Ronald Kitchen describes being beaten, and I'm looking at both. I'm just looking at my report, Eric Wilson also describes being beaten.

Page 386

Anthony Lash describes being beaten, I'm looking at both. I'm looking at both on Johnny Plummer and he describes being beaten. I'm looking at my report, Tyrone Reyna describes being beaten. I'm also looking at my notes.

Mr. Escamilla, Nicholas Escamilla, also describes being beaten. Mr. Miguel Morales also describes being beaten. I was looking at my notes.

Anthony Robinson describes being beaten, I'm looking at my notes and the report. Clayborn Smith, just looking at my report, he describes being beaten. Looking in the notes he also describes -- he describes being beaten in multiple ways as do many of these individuals.

Johnny Walker describes being beaten, I'm looking at my report and my notes. Kilroy Watkins, K-i-l-r-o-y, he describes being beaten.

Demond Watson -- I'm sorry, Weston -- describes being beaten, I'm looking at -- I'm looking just at my report, just at my report.

Emmett White describes being beaten, looking just at my report. Marcus Wiggins

Page 387

describes both being electroshocked and being beaten, I'm looking at my notes.

Anthony Williams describes being beaten, I'm looking just at my report. And then finally looking at my notes and the report, Robert Wilson listed as Number 30 under Area 3 describes being beaten. So, that's my answer.

Q (By Ms. Rosen) Okay. Can you tell me when you prepared the notes that you have been utilizing to answer my questions about Area 3?

A In the last couple of weeks or so, I don't know, since the beginning of September.

Q As you stated earlier, the notes are more detailed in some places than your report on some of the individuals and their allegations.

A Yes.

MR. ART: Object to the form. It mischaracterizes his prior testimony.

Q (By Ms. Rosen) What documents did you review that provided you with the greater detail that's in the notes?

MR. ART: So, I just want to, for the record, restate our objections from yesterday. In our view the notes that the witness has

Page 388

made in order to prepare himself for the deposition are not subject to discovery because they are privileged and they are not subject to disclosure under Rule 26(a)2.

We are going to allow Dr. Leo to answer questions about the notes, when he prepared them, whether he's looking at them as he responds. We don't think the substance of those notes is subject to discovery under the rules.

But with respect to that question that Miss Rosen just asked, which is what is the information that is more detailed in the notes than the -- than what is in your report and the materials that you reviewed, you can answer that question.

In other words, if it's okay with you, Eileen, is there information in your notes that is not contained in the report or the materials you reviewed.

MS. ROSEN: That was actually a cute answer to that question. The follow-up question was what materials did he rely on to prepare the notes.

RICHARD A. LEO, PHD, JD, 09/29/2022                    Page 389..392

Page 389

MR. ART: I disagree, and that's the confusion that I am trying to clear up. But I think it is worth asking whether there is any information in his notes that does not appear either in his report or in the materials he reviewed.

MS. ROSEN: Well, we know that it's true because the answer he gave with respect to Hood and Washington is more -- has information and details that are not in the report.

His answer with respect to Hood and Washington in the report, it simply says Detective Boudreau coerced a false confession from Washington. Both men's convictions were subsequently overturned.

Doctor Leo read from his notes and provided detail about the allegations that Mr. Hood and Mr. Washington were making, having to do with beating and whatever else, I don't recall specifically.

So, we know that the notes are more detailed than the report and I --

MR. ART: I agree with that proposition. What I said on the record just a moment ago was

Page 390

that the notes do not contain any information that is not in his report or the materials that he reviewed in preparing that report.

And so your next question, if I recall it correctly, was what detail is in his notes that is not in the report or the materials he reviewed. We're going to allow him to answer that question despite our objection.

THE WITNESS: Everything in the notes is based on materials that I reviewed in preparation of the report. So, there is no new materials.

What I did was go back to -- what I did in preparation for the deposition is review some of the original materials that I had been provided when I prepared the report.

Q   (By Ms. Rosen) Okay. This is a good place to take a lunch break.

THE VIDEOGRAPHER: We're off the video record at 12:47 p.m.

(At this time, a lunch break was taken off the record.)

THE VIDEOGRAPHER: We're back on the video record at 1:32 p.m.

Q   (By Ms. Rosen) Okay, Dr. Leo. If we could

Page 391

get Exhibit Number 1 back up on the screen. If you could turn to Page 71 of your report. And if you look at the bottom of the page, you cite a case called U.S. ex. rel. Maxwell versus Gilmore. Do you see that yet there?

A   Yes.

Q   And how did you locate that case?

A   That case was provided to me by counsel. I believe it's in the materials reviewed.

Q   And that's a Northern District of Illinois case from 1999, right?

A   Correct.

Q   And that's after the Solache and Reyes arrests, correct?

MR. ART: Objection to form.

THE WITNESS: It's a 1999 case in publication, but I think the facts occurred before that. But I would have to double-check the published opinion to refresh my recollection about when the facts in that case occurred.

Q   (By Ms. Rosen) Okay. The published opinion, though, was not published until 1999, correct?

A   That published opinion, yes.

Page 392

Q   Okay. And the finding that's recited in your report was not published until 1999, right?

MR. ART: Objection to form.

THE WITNESS: The quotation from that opinion that you're referring to, yes.

Q   (By Ms. Rosen) Okay. And it says -- part of the quote indicates, "It is now common knowledge that in the early to mid-1980s Chicago Police Commander Jon Burge and many officers working under him regularly engaged in physical abuse and torture," correct?

A   Yes.

Q   And to the extent, Dr. Leo, for the rest of the afternoon, if you're answering a question by reviewing notes that you have in front of you, I'm going to ask you to alert us to the fact that you're referring to notes while -- in answer to the question, okay?

MR. ART: And we state our previous objection to those notes not being discoverable and protected by privilege. And it's fine with us if Dr. Leo informs counsel that he is looking at notes before or after the answer, but we think that the notes themselves and the

Urlaub Bowen & Associates, Inc.   312-781-9586

RICHARD A. LEO, PHD, JD, 09/29/2022　　　　　　　　　Page 393..396

Page 393

substance of those notes are not discoverable for the reasons previously stated.

MS. ROSEN: Okay. And we obviously think they are discoverable, so I'm going to ask, Dr. Leo, that you be sure to retain all of the notes that you had in front of you for the last couple of days so that if we end up having to litigate this and you're ordered to produce the notes, you have them, okay?

THE WITNESS: Okay.

MR. ART: We will preserve the notes.

MS. ROSEN: Okay, thank you.

Q   (By Ms. Rosen) Going to Page 72 of your report, the first full paragraph says, "From 2002 to 2006, retired Justice Edward Egan served as a Cook County Special Prosecutor." Do you see that there?

A   Yes.

Q   And obviously, 2002 is after 1998, right?

A   Correct.

Q   And then the next paragraph says, "On January 10th, 2003, Illinois Governor George Ryan pardoned Aaron Patterson, Madison Hobley, Leroy Orange, and Stanley Howard based on innocence." Obviously, 2003 is after 1998, correct?

Page 394

MR. ART: Objection to form.

THE WITNESS: Correct.

Q   (By Ms. Rosen) And in the last paragraph you cite to a 2007 Seventh Circuit opinion in a case called Hinton. Obviously, that opinion was published in 2005 which would be after 1998, correct?

MR. ART: Objection to form.

THE WITNESS: Correct.

Q   (By Ms. Rosen) And then on the next page, Page 73, the first full paragraph references something that Chief Cook County Criminal Court Judge Paul Biebel said in 2006, right?

A   Correct.

Q   And 2006 is obviously after 1998?

MR. ART: Objection to form.

THE WITNESS: Correct.

Q   (By Ms. Rosen) And then in July, 2006, the Special Prosecutors that you referenced earlier issued their report, and obviously 2006 is after 1998, correct?

A   Correct.

Q   And then if we go to Page 74, there's a reference to Mayor Richard Daley regarding a statement he made about the Special Prosecutor's

Page 395

Report that came on July 21st, 2006. That obviously is after 1998, correct?

MR. ART: Objection to form.

THE WITNESS: Yes.

Q   (By Ms. Rosen) And then you reference the enactment -- the enactment of the Illinois Torture and Inquiry Commission in 2009. And 2009 is after 1998, correct?

MR. ART: Objection to form.

THE WITNESS: Correct.

Q   (By Ms. Rosen) And then you cite to a court opinion that came out May 22nd, 2009. 2009 is obviously after 1998, correct?

MR. ART: Objection to form.

THE WITNESS: Yes.

Q   (By Ms. Rosen) And you cite to a 2010 opinion in the case called People versus Wrice. 2010 is after 1998, correct?

MR. ART: Objection to the form.

THE WITNESS: Correct.

Q   (By Ms. Rosen) And then you reference the fact that Mr. Burge was convicted by a federal jury June 28th, 2010. And 2010 is obviously after 1998, correct?

Page 396

MR. ART: Objection to form.

THE WITNESS: Yes.

Q   (By Ms. Rosen) And then on Page 75 of your report you cite to the Seventh Circuit opinion that was issued in 2013 that affirmed Mr. Burge's conviction, and obviously 2013 is after 1998.

MR. ART: Objection to form.

Q   (By Ms. Rosen) Correct?

MR. ART: Objection to the form.

THE WITNESS: Correct.

Q   (By Ms. Rosen) And then on Page 76 you reference the enactment of the Reparations Ordinance and Resolution in May of 2015, and obviously 2015 is after 1998, correct?

MR. ART: Objection to the form.

THE WITNESS: Correct.

Q   (By Ms. Rosen) And then you referenced Judge Hooks' opinion in June of 2018 in the case of People versus Jackie Wilson, and quite obviously 2018 is twenty years after 1998, correct?

MR. ART: Objection to form.

THE WITNESS: Correct.

Q   (By Ms. Rosen) And then you quote Mayor Lightfoot's statement in September of 2018

RICHARD A. LEO, PHD, JD, 09/29/2022                    Page 397..400

Page 397

regarding the death of Jon Burge. And obviously again, 2018 is twenty years after 1998, correct?

MR. ART: Objection to the form.

THE WITNESS: Correct.

Q (By Ms. Rosen) And then your conclusion -- concluding paragraph to this section of the report is at the bottom of Page 76, right?

MR. ART: Objection to the form.

THE WITNESS: It's really a summary.

Q (By Ms. Rosen) Okay.

A And it's at the bottom of Page 76, correct.

Q Okay. So, that's your summary of your opinions that began at the bottom of Page 65, right?

A Correct, with respect to Area 2, yes -- actually, you know, I would say, yeah, it's a summary of the opinions there.

Q And you spend approximately eleven pages discussing Burge and the various cases related to Burge and some of the individuals that worked under him, correct?

MR. ELSON: Objection to the form.

THE WITNESS: That's part of what I discussed. Obviously, I discussed more, but

Page 398

yes, that is accurate. That is among the things that I discussed in these eleven pages.

Q (By Ms. Rosen) Well, as I understand the opinions that begin under Section B of Page 66 of your report and go all the way through to the bottom of Page 76 of your report is that the information and the analysis and the citations that you provide are all in support of your opinion that is listed under Subheading B, "Systemic and Widespread Torture, Physical Abuse, and Coercive Interrogation at Area 2 under Jon Burge, and Continuing Notice to High Ranking Officials in the City of Chicago, High Ranking Officials in the Chicago Police Department, and Police Command Personnel," right?

A Correct.

Q And in any of the materials you reviewed, did you find any connection between Jon Burge and any of the Defendant Officers in this case?

A It depends on what you mean by connection. They're -- they're both employed by the Chicago Police Department, they're both investigators. They're part of a common investigative culture. They both were accused of acts of physical and psychological abuse and torture. There's overlap in

Page 399

the types of acts that they were accused to.

So, I think it would be a mistake to say there is no connection between them because they're part of the same department, part of the same culture, overlapping years, part of the same pattern and practice, just in different parts of the Chicago Police department.

So, I believe there is a connection. It's -- it's merely the -- the level of generalization with which we discussed that connection.

Q Did you find any evidence in any of the materials that you reviewed that Detective Reynaldo Guevara knew Jon Burge?

MR. ART: Objection to form.

MS. GOLDEN: I'm incredibly sorry to interrupt. Rachel, our videographer, is asking if we can take just one pause really quick. She's having technical issues and so the exhibit is not being captured.

MR. ART: Sure.

MS. GOLDEN: Sorry about that.

MS. ROSEN: No worries, let's go off the record.

THE VIDEOGRAPHER: Sorry, folks, we're

Page 400

back. Just so you know, I'm still recording on one screen that entire time, it's just that the exhibit was not up on the screen at the time because I have two different versions. So, how do you want to proceed? It's up to you.

MS. ROSEN: Okay. We can just -- as far as I'm concerned, we can just proceed. It doesn't matter to me that we didn't capture the exhibit for some period of time. If anybody else has an objection to that, let me know.

MR. ART: No, we agree.

THE VIDEOGRAPHER: Okay, thank you.

Q (By Ms. Rosen) Okay. All right. I forgot what my last question was, so I'm sorry if I asked it but I need to run through the list.

So, of the materials you reviewed, did you find any evidence that Detective Reynaldo Guevara knew Jon Burge?

A I don't recall if there was any document reviewed that said they had met.

Q In any of the documents and materials that you reviewed, did you find any evidence that Detective Reynaldo Guevara worked for Jon Burge?

A I do not recall if I reviewed any of the

RICHARD A. LEO, PHD, JD, 09/29/2022                    Page 401..404

Page 401

documents that established a working relationship between the two.

Q   In all of the materials that you reviewed, did you ever find any evidence that Reynaldo Guevara worked at Area 2 at any point in time during his career?

A   I don't recall reviewing any documents that said that, or if I did.

Q   Do you know where Area 2 is located within the City of Chicago?

A   I have a rough idea, but I couldn't tell you the exact coordinates.

Q   Do you have any idea where Area 5 is located in the City of Chicago, or was located in the City of Chicago back in the nineties?

A   I do not recall.

Q   Do you know what the distance was between Area 2 and Area 5 in the nineties?

A   I do not.

Q   In any of the materials that you reviewed, did you find any evidence that Detective Ernest Halvorsen knew Jon Burge?

A   I don't recall if I did.

Q   In all of the materials that you reviewed

Page 402

did you find any evidence that suggested that Ernest Halvorsen ever worked for Jon Burge?

A   I don't recall if I did.

Q   In any of the materials you reviewed did you find any evidence that Ernest Halvorsen worked at Area 2 at any point in his career?

A   I don't recall if I did.

Q   In all of the materials you reviewed did you find any evidence that Edwin Dickenson worked -- knew Jon Burge?

A   I don't recall if I did.

Q   In any of the materials you reviewed did you find any evidence that Edwin Dickenson worked for Jon Burge?

A   I don't recall if I did.

Q   In any of the materials you reviewed did you review any evidence that Edwin Dickenson was assigned to Area 2 at any point during his career?

A   I don't recall if I did.

Q   In any of the materials that you reviewed did you find any evidence that Robert Rutherford knew Jon Burge?

A   I don't recall if I did.

Q   In any of the materials that you reviewed

Page 403

did you find any evidence that Robert Rutherford worked for Jon Burge?

A   I don't recall if I did.

Q   In any of the materials you reviewed did you find any evidence that Robert Rutherford worked at Area 2 at any point in his career?

A   I don't recall if I did.

Q   In all of the materials you reviewed did you find any evidence that Officer Stankus knew Jon Burge?

A   I don't recall if I did.

Q   In all of the materials that you reviewed did you find any evidence that Officer Stankus worked at Area 2 at any point in his career?

A   I don't recall if I did.

Q   In any of the materials you reviewed did you find any evidence that Officer Stankus worked at Area 2 during his career?

A   I don't recall if I did.

Q   In any of the materials that you reviewed did you find any evidence that Officer Nejovus worked for Jon Burge at any point in his career?

A   I don't recall if I did.

Q   At any point -- in any of the materials

Page 404

you reviewed did you review any -- let me start over.

In any of the materials you reviewed did you review any evidence or find any evidence that Officer Nejovus worked at Area 2 at any point in his career?

A   I don't recall if I did.

Q   In any of the materials you reviewed did you find any evidence that Officer Karalow, K-a-r-a-l-o-w, worked for or knew Jon Burge?

A   I don't recall if I did.

Q   In any of the materials that you reviewed did you find any evidence that Officer Karalow worked for Jon Burge?

A   I don't recall if I did.

Q   In any of the materials you reviewed did you find any evidence that Officer Karalow ever worked at Area 2 during the course of his career?

A   I don't recall if I did.

Q   And the remaining Defendant Officers in the case are Mark Harvey, Daniel Trevino, Edward Mingey, Officer Biebel, Officer Cavatelli.  Did you find any evidence in any of the materials that any of those officers knew Jon Burge?

A   I don't recall if I did.

RICHARD A. LEO, PHD, JD, 09/29/2022                    Page 405..408

Page 405

Q   Did you find any evidence in the materials that any of those officers ever worked for Jon Burge?

A   I don't recall if I did.

Q   Did you find any evidence in all of the materials that any of those officers worked at Area 2 at any point in their careers?

A   I don't recall if I did.

Q   And did you find any evidence that Jon Burge ever worked at Area 5 during the course of his career?

A   I don't believe so.

Q   And you said something earlier about overlapping careers -- overlapping time frames of the officers that provided some kind of a connection. Do you know when any of the officers whose names I just asked you about, starting with Reynaldo Guevara and ending with Officer Cavatelli, do you know when any of those officers began working for the Chicago Police Department?

MR. ART: Objection to the form.

THE WITNESS: Off the top of my head I do not know in what year or month or day those -- any of those officers began their employment with the City of Chicago Police Department.

Q   (By Ms. Rosen) Okay. And then with

Page 406

respect to the summary that you provided at the bottom of Page 76, you indicate that there is a substantial body of extensive evidence clearly establishing that, dating back to at least the early 1970s it was well known that the City of Chicago Police Department had a systemic practice of subjecting African-American and Latino suspects who were interrogated by detectives and supervisors to physically abusive -- let me start that over.

The sentence -- the first sentence in the summary reads, "In sum, there is a substantial body of extensive evidence clearly establishing that dating back to at least the early 1970s it was well known that the City of Chicago's Police Department had a systemic practice of subjecting African-American and Latino suspects who were interrogated by detectives and supervisors to physically abusive and coercive interrogations (e.g. beating, suffocating, electroshocks, mock executions, threatening physical violence, et cetera) with the result of coercing and/or fabricating false and/or unreliable inculpatory evidence to be used against the interrogated suspects without regard to their actual guilt or

Page 407

innocence." Do you see that there?

A   Yes.

Q   Okay. With respect to any of the cases that you evaluated for this section of your report, did you conclude that any of the confessions that were at issue met criteria for a proven false confession?

MR. ART: Objection, form.

MR. ELSON: Objection, form.

THE WITNESS: Okay. I'm going to ask a clarifying question and then I will, if I have this right, answer your question.

You are referring to the cases that -- there are no case summaries of cases in Area 2 in the report. The case summaries are of cases in Area 3, 4, and 5. So, when you say "these cases," I guess I got a little thrown. Can you tell me which cases you're referring to?

Q   (By Ms. Rosen) Well, while you don't provide case summaries, you provide details about certain cases, right? You go on to a discussion about Andrew Wilson. You go on to a discussion about Maxwell. There's cases that you cite. I just want to know if you -- I guess if you evaluated

Page 408

any of these cases to determine whether or not that any of them met criteria for a proven false confession.

MR. ART: Objection to the form.

THE WITNESS: I think the only way that I could answer that question is if I was asked specific questions about -- you know, I had a list of cases that were the Area 2 cases.

Many years ago I studied the Ronald Jones case which was an early Jon Burge torture case. And if that's an Area 2 case, that was definitely a proven false confession.

But I would have to see a list of cases or at least be given case names and then I could say whether I knew the case well enough to determine whether for research purposes based on what I know I would classify it as a proven false confession.

Q   (By Ms. Rosen) With respect to the work that you did in this case evaluating the practices at Area 2, did you analyze any of the cases to determine whether any of the Area 2 cases met criteria for a proven false confession?

MR. ART: Objection to form, asked and

Urlaub Bowen & Associates, Inc.   312-781-9586

RICHARD A. LEO, PHD, JD, 09/29/2022                    Page 409..412

Page 409

answered.

THE WITNESS: Not with respect to this -- my preparation of this report, no.

Q   (By Ms. Rosen) Okay. And so your conclusion in the summary at the bottom of Page 76 that the result of the practice that you've identified resulted in the coercing and/or fabricating false and/or unreliable inculpatory evidence to be used against the interrogated suspects without regard to their actual guilt or innocence is based on what?

MR. ART: Objection to form.

THE WITNESS: It's based on a wide spectrum of evidence that I mentioned in the report. Accusations that were made against supervisors and detectives in Area 2; the testimony of criminal defendants who made accusations at motions to suppress hearings and at trial; findings of the Office of Professional Standards Reports; cases and allegations in federal and state court decisions, judicial findings, media articles, reports, and at trials; allegations in civil lawsuits.

The four people who were pardoned by

Page 410

Governor Ryan in 2003 who were on death row. You know, Governor -- I saw Governor Ryan give a speech at Northwestern where he said they were innocent, and I've read descriptions where he genuinely believed that they were innocent, that they had been coerced into falsely confessing.

Admissions of City officials, including the Governor, I guess, is under a state official. There was the Embassy International Report, and I think there was a United Nation report.

So, all of those materials are listed in my report, and that's the basis for -- for my opinions here.

Q   (By Ms. Rosen) And from those things that you've just identified, that's how you're -- that's the basis for concluding that certain confessions were coerced, right?

A   Yes.

MR. ART: Objection to the form.

THE WITNESS: Sorry. Those are the materials that I drew on.

Q   (By Ms. Rosen) And that certain

Page 411

confessions were fabricated and false, right?

MR. ART: Objection to form.

THE WITNESS: I just want to be clear here. This is a wide range of evidence which ranges from allegations by criminal defendants and in civil complaints all the way to judicial findings, admissions by City Officials, and commissioned -- government commissioned reports. And my opinions about the pattern and practices of these allegations and in these cases is based on my analysis of these materials.

I did not go through and do an analysis of whether any of these cases met a proven false confession. But I did rely on these materials in this and other sections of the report as part of my analysis and the basis for those conclusions as well as other opinions in the report.

Q   (By Ms. Rosen) Okay. Let's move to Page 77 of your report and your discussion of Area 3. This section is entitled, "Physical Abuse and Coercive Interrogation at Area 3 Involving Detectives Kill, Boudreau, Halloran, and others."

Page 412

Do you see that?

A   Yes.

Q   Okay. So, are you concluding that Detectives Kill, Boudreau, Halloran, and others, in fact, physically abused individuals?

MR. ART: Objection to the form.

THE WITNESS: Again I'm not positioning myself as a finder of fact or as doing what a jury would do at a trial. But like any expert, I've been provided materials. I've been asked to review those materials and to offer expert opinions based on the materials I've reviewed.

And there is a pattern of cases in which in the same types of materials those allegations or findings have been made ranging from mere allegations to judicial findings and admissions by City officials and in police and government reports.

Q   (By Ms. Rosen) And are the materials that you're referencing all listed in this section of the report that discusses Area 3?

MR. ART: Objection to form.

THE WITNESS: No. The materials I'm

RICHARD A. LEO, PHD, JD, 09/29/2022                    Page 413..416

Page 413

referencing would be listed at the beginning of the report. There might be some that I relied on in my analysis here that are in the materials reviewed section of the report that aren't explicitly summarized in these pages on Area 3.

Q    (By Ms. Rosen) Well, I guess I'm wondering, you said that there are judicial findings related to Area 3, and maybe as we walk through each of these cases you can identify for me the judicial findings that you say you -- you rely upon to support the conclusions related to Area 3.

MR. ART:  Is there a question?

MS. ROSEN:  Pardon me?

MR. ART:  Was there a question?

MS. ROSEN:  Yeah, I'm just signaling to the witness that I'd like for him to point out to me any time he sees a judicial finding as we work through these opinions.

MR. ART:  In response to any questions you ask?

MS. ROSEN:  In response to any portion of the report that I'm going through in Area 3.

MR. ART:  Okay.  We object to that request

Page 414

and instruction as unreasonable and not something an expert would do.

If you want to ask him particular questions about judicial findings that appear in the report and the materials reviewed you, of course, can do so.

Q    (By Ms. Rosen) Dr. Leo, if you look at the opening paragraph of this section, about six lines from the bottom of the paragraph it says -- well, actually you can go up to the beginning of that sentence.  "The evidence comes from the repeated documented allegations that accumulated against Detectives Kill, Boudreau, Halloran, and other Area 3 Chicago Police Detectives; from the testimony of numerous criminal defendants at motion to suppress hearings and trials in Area 3 cases; from federal and state court decisions in Area 3 cases."  Do you see that there?

A    Yes.

Q    Can you identify for me the federal and state court decisions you're referring to right there?

A    Yes.  And I'm reviewing my notes.  In the case of Frank Bounds, People v. Bounds, 171 Ill.2d,

Page 415

1995.

Q    Did you say 171 Ill.2d, 1995?

A    Correct.

Q    Your report says 1996.  So -- and it's the same -- but it's the same 171 Ill.2d.

A    Correct.  So, it's either 1995 or 1996.

Q    But the 171 Ill.2d citing to Page 1, the report says 1, 29-30, that's accurate, right?

A    Correct.

Q    And that's one of the federal or state court decisions that supports your conclusions that Detective Kill physically abused and coerced an interrogation, right?

MR. ART:  Objection to form.

THE WITNESS:  That there was an allegation that he did that.

Q    (By Ms. Rosen) Oh, that's -- that's not a judicial finding that he did that, that's just simply someplace where it's memorialized that he was alleged to have done that?

A    I would have to review the opinion to see whether it was written as a judicial finding of fact or it was merely summarized as an allegation in the statement of facts.

Page 416

Q    So, as you sit here today, you don't know whether or not People versus Bounds -- if that court decision determined that Detective kill, in fact, did what he was alleged to have done?  Is that what you're saying?

A    Without reviewing the document, correct.

MR. ART:  I would just lodge an objection to form to the extent that you're asking him about judicial findings.  I'm not -- I'm not reading that in the paragraph that you're referring to about that.

MS. ROSEN:  Yeah, I wasn't asking him about the paragraph.  I was asking him to provide to me federal and state court decisions that supported what he said in the above paragraph.  We're not there yet, so --

MR. ART:  No, let -- let me just make the record clear.  You asked him a question about whether he found judicial findings in People against Bounds, and he said he would have to review it.  But there's no discussion of judicial findings in the paragraph above.  You asked him initially for --

MS. ROSEN:  Steve, speaking objection,

RICHARD A. LEO, PHD, JD, 09/29/2022                    Page 417..420

Page 417

this is a speaking objection and I'm not going to have speaking objections. I know what questions I've asked and he's answered my questions. So, no speaking objections. If you have an objection to the form of the question or something else, please make it. Otherwise, no speaking objections.

MR. ART: Okay. I have a record to make about you misleading the witness --

MS. ROSEN: I am not misleading the witness, and you are not -- you cannot pretend like you're making a record and use it as a way to make a speaking objection. That's improper.

MR. ART: Okay. I'm going to make a record. Let me know when you're ready for me to make it.

MS. ROSEN: I object to you making speaking objections in an effort to coach the witness.

MR. ART: That's not what I'm doing. You read from the paragraph above the Bounds case and said to him, "What federal and state court decisions are you asking about?" And he pointed to Bounds to be one. And then you said, "Where in that do you see a judicial finding?"

Page 418

And what I'm asking you to clarify is when you're asking about federal and state court decisions as this report says, or judicial findings, which we do not see in that paragraph. And if we're missing it, let us know.

MS. ROSEN: Are you done?

MR. ART: Yes.

MS. ROSEN: Great.

Q    (By Ms. Rosen) With respect to the federal and state court decisions that you cite in the paragraph, in addition to the People versus Bounds, what other federal and state court decisions are you referring to?

A    In the Damari Clemon case, Number 3; the Marcus -- I'm sorry, I'm misreading this, sorry. I'm not referring to that, so I withdraw that.

There is a state court decision in the State of Illinois versus Jerry Gillespie that is referred to in Number 10.

Q    Is that PTP-J Gillespie-000001-000020?

MR. ART: Objection.

Q    (By Ms. Rosen) Is that what you're referencing, Dr. Leo?

A    I think that's the Motion to Hold the

Page 419

Appeal. What I'm referencing is -- if I heard you right -- it's the first citation there, the 000001-000020.

Q    Okay.

A    In the Anthony Lash case on Page 18 there's a case cite -- a published opinion cited there, 252 Ill.App.3d, in 1993 starting at Page 239.

There was an appellate opinion in the Anthony Jakes case.

Q    Is that cited in the Paragraph 16 of Anthony -- of Anthony Jakes?

A    It is not, no. The Bates range for that is PTP-A JAKES 000205-219.

Q    How do you know that? Are you reading from notes?

A    I was reviewing my notes, yes.

Q    Okay.

A    Also, the Anthony Jakes case is a case that I've worked on and reviewed many documents for prior to this.

The Johnny Plummer case, Number 20 on the list, People v. Plummer, 306 Ill.App.3d from 1999.

I mentioned earlier in the Clayborn Smith case that I reviewed a recent opinion by the

Page 420

Appellate Court of Illinois. This is the only document that I referred to that I've reviewed prior to -- subsequent to preparing the report, a new document. And I mentioned that, I think, very early on yesterday. The working citation for this is 2022 Ill.App.1st 201256-U, Number 1-20-1256, Second Division, June 21st, 2022.

In the Robinson case, the Anthony Robinson case, Number 22 on Page 81, People v. Robinson, 238 Ill.App.3d -- Ill.App.3d from 1992.

In the Marcus Wiggins case, Number 28, Page 82; People v. Clemon, C-l-e-m-o-n, 259 Ill.App. 3d, 1994.

In the Anthony Williams case right below that, Number 29 on Page 282 -- I'm sorry, on Page 82, People v. Williams, 303 Ill.App.3d, 1999.

Those are the -- those are the cases here in this section. Obviously, there are other cases I've reviewed in connection with this report, and other cases I've worked on, my teaching, and my research as well.

Q    Okay. Let's talk about the individuals that you identify in this section of the report. There's thirty of them, right, thirty cases that you

RICHARD A. LEO, PHD, JD, 09/29/2022                    Page 421..424

Page 421

summarized in some way here?

A   Correct.  And this isn't all the cases.  This is just a partial list of Area 3 cases.

Q   What do you mean this isn't all the cases?

A   This is not all of the cases in which there have been accusations of physical abuse or torture by Area 3 detectives or, to my knowledge, Detective Kill, Halloran, and Boudreau.  There are other cases in which those accusations have been made that are not in this report or in this section.

Q   And how do you know that there are other allegations that have been made against Detectives Kill, Boudreau, Halloran, and others at Area 3?

MR. ART:  Objection, form.

THE WITNESS:  Because I've worked on some of those cases.  I would have to review my records, but I have worked on other cases that are not mentioned in this report.  And also I recall in some of the stuff I've read that was -- was not read for this report but I've read in other contexts.

I should qualify my answer that I would have to review those materials to confirm that they involve Detective Kill, Detective

Page 422

Halloran, or Detective Boudreau, but I know there are more Area 3 cases.  And if my memory serves, there are more Area 3 cases involving accusations against Detective Kill, Detective Boudreau, and/or Detective Halloran than these thirty cases.

Q   (By Ms. Rosen) And are you relying on those other -- well, let me back up.

Can you identify any other cases other than those that are either listed here in your report or anywhere else in your report to support your opinions regarding the allegations against Detectives from Area 3?

A   I would need to review materials that I have to answer that question with specific case names.

Q   So, without reviewing materials you cannot answer my question about identifying any other cases other than the thirty that are listed here, right?

MR. ART:  Objection, form.

THE WITNESS:  Cases that I've worked on in Area 3 that I believe -- I have to confirm -- in Area 3 that are not listed here I think

Page 423

include Corinthian Bell, James -- and James Andrews, and I think Eric Cane.  So, I would just need to confirm if those cases were Area 3 cases.

Q   (By Ms. Rosen) Are you relying on information that you obtained doing work on Corinthian Bell, James Andrews, and Eric Cane in support of the opinions that you're providing in this case?

MR. ART:  Objection to form.  Go ahead and answer.

THE WITNESS:  I did not rely on the work I did in those cases in support -- or in the preparation of this report.  But, if I'm -- obviously, if I'm testifying as an expert witness about my knowledge of cases and allegations and evidence about police torture and physical abuse, coerced confessions and false confession in the Chicago Police Department, then I would be relying on my broad expertise which would include my research on the subject that was not done in connection with this report as well as my teaching lectures, legislative testimony, et^cetera.

Page 424

Q   (By Ms. Rosen) What legislative testimony have you provided related to allegations of abuse related to Area 3 Detectives?

MR. ART:  Objection to form.

THE WITNESS:  I don't recall if I provided any specific testimony about that.  I do know that I testified, I believe it was in 1999, to a subcommittee of the Illinois State Legislature on the issue of electronically recording interrogations.  And I believe there were some discussions of allegations of physical abuse that I referenced in that testimony.

Q   (By Ms. Rosen) But you're not certain if it had anything to do with Area 3?

A   It would have had to do with Area 2 and Area 3 at that time.

Q   And you discussed specific cases out of Area 3?

A   No, I don't believe that I discussed specific cases.

Q   Okay.  Let's talk about Frank Bounds, the individual you list in Item Number 1.

A   Okay.

Q   You state in your report that Detective

RICHARD A. LEO, PHD, JD, 09/29/2022      Page 425..428

Page 425

Kill hit Bounds on the head, tried to kick him in the groin, and threatened to bring Bounds' girlfriend into the case if he did not confess, causing Bounds to falsely confess to a murder. Did I read that correctly?

A You did, but there's a mistake in the report. That's Detective Kelly and not Detective Kill. That was a mistake that I didn't catch in the proofreading.

Q Okay. So, are you concluding that Mr. Bounds falsely confessed to a murder?

MR. ART: Objection to form.

THE WITNESS: No, I'm not making a finding of fact there. He alleged that he falsely confessed.

Q (By Ms. Rosen) You don't say that, though, in that paragraph, right? You simply state that as a conclusion that he falsely confessed?

MR. ART: Objection to form, mischaracterizes the report.

Q (By Ms. Rosen) You state there that he -- do you say "alleged" or "alleges" that he falsely confessed?

A I do not.

Page 426

Q What you meant to say was that he alleged he falsely confessed?

MR. ART: Objection to form.

THE WITNESS: Causing him to assert that he falsely confessed to the murder.

Q (By Ms. Rosen) And are you -- are you crediting Mr. Bounds' allegations that Detective Kelly hit him in the head, tried to kick him in the groin, and threatened to bring his girlfriend into the case?

MR. ART: Objection to the form.

THE WITNESS: Not crediting his opinion. He made that assertion and this -- his -- he's alleging that, and I'm saying that this is a pattern and this is part of that pattern. So, I'm not trying to suggest that I'm making a factual determination. I'm merely saying that -- I'm merely saying here that that was his assertion.

Q (By Ms. Rosen) Right, that's what you're saying now. It doesn't read that way, so I'm trying to get clarity on what you're intending.

So, my question is, are you simply reciting Mr. Bounds' allegations in this particular

Page 427

paragraph, or are you drawing conclusions based on his allegations regarding whether or not the confession -- whether or not the physical abuse occurred and whether or not that led to a false confession?

MR. ART: Objection, asked and answered.

Q (By Ms. Rosen) You can answer.

A I'm relying on his testimony and the testimony of his girlfriend indirectly, Susan Mitchnick.

Q Where did you find the name of his girlfriend, Susan Mitchnick?

A It's in the opinion and I'm reviewing, as I said earlier, my notes on this case.

Q So once again, your notes have more details than your report, correct?

A Yes, but my notes are from the materials I reviewed in the case in preparation of the report.

Q But you prepared the notes after you prepared the report, correct?

A After the report, yes.

Q And in preparation for this deposition here today?

A Yes.

Page 428

Q When you were reviewing the court opinion, People versus Bounds, to create your notes so that you could answer questions here today at your deposition, did you happen to notice whether or not Mr. Bounds' allegations were sustained by the court or overruled by the court, or whether there were any factual findings made about his allegations?

MR. ART: Objection to form, compound, calls for a legal conclusion.

THE WITNESS: I don't recall. I'd have to review the document again.

Q (By Ms. Rosen) Do you recall whether or not his conviction was affirmed?

MR. ART: Objection to form. Are you talking about in that judicial opinion?

MS. ROSEN: Correct.

THE WITNESS: I do not recall.

Q (By Ms. Rosen) And you didn't write that in your notes, right?

A I did not note that.

Q Does it matter to you whether or not -- for purposes of your opinions in this case, whether or not Mr. Bounds' conviction was affirmed?

MR. ART: Again, you're asking about on

RICHARD A. LEO, PHD, JD, 09/29/2022                    Page 429..432

Page 429

direct appeal?

MS. ROSEN: I'm asking about the case citation that we are discussing.

MR. ART: Okay. So, objection to form. Go ahead.

THE WITNESS: In this part of the report I'm making a pattern and practice opinion. And so it's less relevant to me whether a court at some stage in the process affirms or doesn't affirm a conviction.

The important point is that that is one of many data points of cases and allegations of physical abuse in this case in Area 3, but in Areas 2, 3, 4, and 5 together.

And so -- so, it's the allegations and the evidence supporting those allegations that go to the pattern and practice opinions, not whether on a different issue or other issues or among other issues a judicial opinion is affirmed or reversed. Those are typically more complicated issues. And there may be an affirmation or reversal on other grounds, or it might be on procedural grounds.

So, I would put less weight on the

Page 430

affirmation of an opinion than I would if I -- if I were arriving at a different kind of opinion.

Q   (By Ms. Rosen) So, in an effort -- in your analysis when you are analyzing cases to determine whether or not there's a pattern and practice, what do you do with evidence that undermines the allegations?

MR. ART: Objection to form.

THE WITNESS: I would look at the sum total of the evidence in front of me, and I would evaluate it. And in all of these cases, including all of the Jon Burge cases, they're always disputed by the officers who are alleged or have been found to engage in the acts of physical and psychological coercion.

Even Jon Burge himself never admitted, at least not in any legal setting, that he committed any act of torture or abuse, and yet there are -- there are judicial findings there and City admissions and a mountain of evidence as many courts have said, so I would consider that evidence.

But in all of these cases, the alleged --

Page 431

the officers who are alleged to have engaged in these forms of psychological and physical abuse always dispute and deny.

Q   (By Ms. Rosen) I'm not really focusing on -- my question was not focused on whether or not the officers denied it. My focus was on what you did with evidence that contradicted the allegations, separate and apart -- well, maybe not separate and apart, but there's other evidence, right, that could undermine the allegations other than a police officer's denial, right?

A   That is possible, yes. And these cases are disputed, and I would be happy to consider any other evidence that I didn't review if you want to put that in front of me.

And to swing back to your question, I would consider any evidence that contradicted or disputed the accusations. Of course, I'm going to evaluate all the evidence that's put in front of me and analyze which evidence fits with patterns and practices or adds up to -- accumulates to patterns and practices and make my analysis.

Q   So, if you are confronted with a case where there were allegations of physical abuse that

Page 432

led to an alleged coerced or false confession, if you had evidence that contradicted that, not from a police officer but from some other source, what would you do with that evidence in order to consider it to determine whether or not the allegation fit within whatever pattern and practice, what would be your methodology to evaluate it?

MR. ART: Objection to form.

THE WITNESS: Well, the methodology is first and foremost to look at all the cases and all the evidence in all the cases and look for patterns to connect dots and figure out whether they're -- they are isolated events or whether there is a widespread or pervasive not isolated practice.

With respect to a particular piece of evidence, I would analyze it within that case in light of other evidence in that case and make my best analysis about the weight of the evidence in that case on both sides in light of what we know about the case and how I evaluate the strength of the evidence.

But I want to be clear that, you know, even if we threw out the Frank Bounds case,

Urlaub Bowen & Associates, Inc.   312-781-9586

RICHARD A. LEO, PHD, JD, 09/29/2022                    Page 433..436

Page 433

there's still numerous cases of allegations of the physical and psychological abuse in Area 3 as in the other areas that are more than sufficient to establish a pattern and practice in my opinion.

Q   (By Ms. Rosen) Okay.  Let's take a look at Mr. Burton's case.  With respect to Mr. Burton, you write, "Detective Kill kicked Burton in the groin, slammed his head against the wall, slapped him across the face, and told him he could kill him causing Burton to falsely confess."  Do you see that there?

A   Yes.

Q   Are you concluding that Mr. Burton falsely confessed?

A   As a factual matter, no, I would -- I would say today, causing him to assert that he falsely confessed.

Q   And as a factual matter, have you determined that Detective Kill, in fact, kicked Mr. Burton in the groin, slammed his head against the wall, slapped him across the face, and told him he could kill him?

A   I'm not trying to make any factual

Page 434

determinations, that is Mr. Burton --

(At this time, a short break was taken due to technical issues.)

Q   (By Ms. Rosen) I think my question was, are you -- are you stating that those allegations are facts or not?

A   I am not making a factual determination. I'm offering an opinion based on the materials I reviewed.

Q   Okay.  And the materials that you reviewed that support what you state here in Paragraph 2 are cited there, correct?

MR. ART:  Objection to form, asked and answered.

Q   (By Ms. Rosen) Is that correct?

A   I believe so, yes.

Q   And then with respect to Mr. Clemon, again, are you crediting his allegations or simply recounting what he alleges?

MR. ART:  Objection to form.

THE WITNESS:  Again, I'm not making any findings of fact.  I'm not making a factual assertion.  I'm analyzing a pattern and relying on his assertion that he was electroshocked and

Page 435

threatened.

Q   (By Ms. Rosen) And is there any particular reason why you wrote these as if you were stating a fact as opposed to qualifying it in the way you are in your testimony here today?

MR. ART:  Objection to form.

THE WITNESS:  The amount of material that I reviewed in this case was voluminous.  I don't think I've ever reviewed more material in any case for which I've written a report, and this took an enormous amount of time.  You have my records, I believe.  And when you write something that is this long, sometimes you don't have the opportunity to double and triple and quadruple proof a report.

So, if I had to write things today, there might be parts of the report that I would write slightly different -- differently.  I stand by the opinions that I've written in the report.

MR. ELSON:  Eileen, I need to take a ten minute break.  Can we do that now?

MS. ROSEN:  Yeah, no problem.

THE VIDEOGRAPHER:  We're off the video record at 2:44 p.m.

Page 436

(At this time, a short break was taken off the record.)

THE VIDEOGRAPHER:  We're back on the video record at 2:57 p.m.

THE WITNESS:  Miss Rosen, I keep forgetting to tell you this, but I have the Bates stamp numbers for the general progress reports that you asked about at the beginning of the deposition that I had forgotten to get last night.

Q   (By Ms. Rosen) Sure.

A   Okay.  CCSAO 48905 to 49177.

Q   Okay.  Thank you.  All right.

Let's turn to Page 78 of your report.  At the top of 78, Paragraph 4, you discuss Nevest Coleman and Darrell Fulton.  Do you see that?

A   Yes.

Q   And the first sentence of that reads, "Detective Boudreau, Detective Halloran, and another Area 3 Detective punched Coleman in the face repeatedly until he falsely confessed."  Do you see that?

A   Yes.

Q   And in this particular paragraph, did you

RICHARD A. LEO, PHD, JD, 09/29/2022                    Page 437..440

Page 437

also mean to say alleged or asserted or something like that?

MR. ART: Object to form, mischaracterizes his prior testimony.

Q   (By Ms. Rosen) You can answer.

A   So, there's a range of evidence that I reviewed and he is asserting that he falsely confessed, but in these cases there's a range of evidence that supports that.

I would have to review the materials in this case, but I actually think this case meets the definition or may meet the definition of a proven false confession. So, what I meant to communicate or I mean to communicate, I shouldn't say meant, is that this is one among many cases where I've reviewed a body of evidence ranging in evidentiary strength, and it's one data point in a pattern where there's an assertion and there's evidence to support that assertion, and in this particular case that it may be a proven false -- or meet the criteria of a proven false confession

Q   What's your basis for saying that this case may meet criteria for a proven false confession?

A   That Coleman and Fulton were excluded from

Page 438

the male DNA on the victim's underwear. That's the basis.

Q   And how do you know that, that Coleman and Fulton's DNA was excluded from the victim's underwear?

A   Well, based on the materials I reviewed in preparation of this report when I wrote the report as mentioned in the report. That's where that -- that's where I reviewed the materials and that's what I reference in the report.

And this would be a good example of the range of evidence in these cases to establish a pattern. This would be on the very strong end, at least with respect to factual innocence.

Q   So, you cite two things in support of Paragraph 4, PTP-D Fulton-0001 to 00086, and PTP-N Coleman 0001 to 00010. Do you see that?

A   I do.

Q   And is that what you're relying on exclusively with respect to whatever your opinion is with respect to Mr. Coleman and Mr. Fulton?

MR. ART: Objection to form.

THE WITNESS: That's what I relied on directly when I prepared this report, yes.

Q   (By Ms. Rosen) Did you rely on something

Page 439

indirectly?

A   Well, when you say exclusively, I want to be clear that I rely on my expertise, my background knowledge, on other materials. This is merely what I cited in this report in support of what I wrote in this paragraph.

Q   With respect to the factual assertions that you make in this paragraph, other than the two documents cited at the conclusion of the paragraph, are you relying on anything else?

MR. ART: Objection to form and to factual assertions.

Q   (By Ms. Rosen) What are you reading from?

A   I'm reviewing my notes. There's also PTP -- PTP-N Coleman-000042-0000105 that I also relied on that I did not -- that I do not believe are-- that are cited in the materials reviewed but aren't in the report. So, I did rely on them in the preparation of the report but are not cited in this paragraph.

Q   Why aren't they cited in this paragraph?

A   I don't recall.

Q   So far we've found two citations that you have in your notes that we haven't found in your

Page 440

report in the place where you are discussing the particular case, right?

MR. ART: Objection to form.

Q   (By Ms. Rosen) Hood and Washington I think you had an additional cite, and now in Fulton and Coleman you have an additional cite. Is that correct?

MR. ART: Objection to form. There's also additional material provided in the Smith case that he's testified at length on.

MS. ROSEN: I'm sorry, I forgot. And the Smith opinion.

THE WITNESS: I believe these materials are in the report, they're just not cited in that section. Again, it was a massive undertaking, and I didn't always cite everything that I reviewed in a particular case in a particular section of the report where I reviewed it.

But, I did cite everything that I reviewed in preparation for the report in the materials reviewed section except for anything I inadvertently excluded like those general progress report numbers that I just gave you.

Urlaub Bowen & Associates, Inc.   312-781-9586

RICHARD A. LEO, PHD, JD, 09/29/2022                    Page 441..444

Page 441

Q   (By Ms. Rosen) Did you obtain the information that Coleman and Fulton were excluded from male DNA on the victim's underwear?

MR. ART:  Objection, asked and answered.

THE WITNESS:  I would have to go through the documents I reviewed to tell you specifically, and I have thousands of pages of documents organized into probably two dozen binders on my shelves.  So, I could spend the time and look for it, but without the ability to review my massive file, I couldn't tell you off the top of my head.

Q   (By Ms. Rosen) Other than the three documents that we've talked about, the two that are actually cited in Paragraph 4 and the one that you brought from your notes, do you have any other materials specifically related to Mr. Fulton and Mr. Coleman?

MR. ART:  Objection to form.

THE WITNESS:  I would have to go through all of my documents to see whether there's anything in addition to what I've mentioned and what is listed in this paragraph.  If so, it would be in the materials reviewed at the

Page 442

beginning of the report.

Q   (By Ms. Rosen) Okay.  Let's move to Number 5, Mr. Coston.  Is says, "Detective Kill struck him in the jaw, grabbed him around the neck, and pushed him against the wall while questioning him about a murder (Coston was a witness in a murder case)."  Do you see that?

A   Yes.

Q   And are you crediting -- crediting any of Mr. Coston's allegations or are you simply reciting the allegations?

A   Well, again, I reviewed a body of evidence.  There's evidentiary support for his allegations.  This is one data point in a larger pattern.  I'm not a fact witness.  I'm not purporting to be a fact witness.  I am applying my analysis to the materials and evidence that I reviewed in this as well as other cases.

Q   With respect to what you say about Mr. Coston here in Paragraph 5, you cite to PTP-J Coston-000001 to 3.  Do you see that?

A   Yes.

Q   So, if I look at those three pages, I will find the information that you have reported in this paragraph of the report, right?

Page 443

A   Yes.

Q   Okay.  Let's move to Paragraph 6, Mr. Craighead.  It says, "Detective Kill and other Area 3 Detectives beat Craighead and deprived him of food and water until he falsely confessed.  Photographs of Craighead taken after his interrogation depict his injuries."  Do you see that?

A   Yes.

Q   So, are you opining that Mr. Craighead falsely confessed?

MR. ART:  Objection.

THE WITNESS:  Again, I'm not making a factual determination.  I'm not acting as the jury here.  I reviewed a body of evidence including in this case -- which includes this case, and I'm offering an expert opinion.  And in this case there -- I've been saying that there is a range of evidence from moderate to strong in the record that I reviewed supporting the assertions.  And this is an example of a case that had stronger evidence than some of the others with the photographs of Mr. Craighead depicting injuries.  There are other cases obviously that have that as well.

Page 444

The important point is that this is evidence of a pattern, and this is one case in a broader pattern.  And that's what the opinion in this section is about.

Q   (By Ms. Rosen) Did you see the photographs that documented his injury?

A   If they were in the materials I reviewed, yes, I did.  I don't have an independent memory as I sit here nine, ten months after reviewing the massive discovery that I did not re-review for preparation of the deposition, but I believe I did.

Q   So, because of this line in Paragraph 6 that says, "Photographs of Craighead taken after his interrogation depict his injuries," you would categorize this on -- did you say on the stronger side?

MR. ART:  Objection to form.

THE WITNESS:  Yeah.  But I want to be clear about the point that I was trying to make.  I'm an expert evaluating a body of evidence.  The evidence ranges in strength, and the amount of evidence in each case also ranges.  And there's some evidence like allegations of coercion or abuse or false confession that all I

RICHARD A. LEO, PHD, JD, 09/29/2022                    Page 445..448

Page 445

have is the complaint that was filed in the civil case.

And there are other cases where I have testimony by the victim or the person who was interrogated. And then there are other cases where I have judicial Findings, commission reports, admissions by city officials.

So, the evidence that I relied on to make my opinions, to arrive at my opinions particularly in the pattern part of the report, varies. And that's one point I've been trying to make.

And all I'm saying here is that photographic evidence of abuse that corroborates the accusations made by somebody who alleges they were physically assaulted like in this case, like in the Andrew Wilson case, and I believe like in some of the other cases, is stronger than in some other cases where the evidence might be at the low end of that spectrum, like an allegation in a complaint, and it's not as strong as evidence at the other end like judicial findings of fact or commission reports or admissions by City officials.

Page 446

Q   (By Ms. Rosen) Okay.  Let's move to Arnold Day.  In this paragraph you say, "Detective Boudreau and another Area 3 detective choked Day and threatened to throw him out of a window until he falsely confessed to a murder.  Day was acquitted after presenting his allegations of physical abuse and coercion."

You cite to Mr. Day's affidavit and his complaint, correct?

A   Yeah, in the report I do, yes.

Q   In your notes do you have other cites?

MR. ART:  Objection to form.  I would instruct him based on our previous objections about content not to answer that question.

Q   (By Ms. Rosen) Are you reading from your notes?

A   I'm not reading from my notes.  I was reviewing my notes but I'm not reading from them.

Q   When you said that's all you have in the report, what did you mean?

A   What I meant was cited here in this section of the report.  There are other materials about the Arnold Day case that are cited in the beginning of the report where I have the

Page 447

comprehensive list of all the materials that I've reviewed.

Q   In the materials reviewed section?

A   Yes.

Q   That would be the January 29th, 1993 Report of Proceedings, correct?

A   I need to go to the materials reviewed section of the report.  Can you tell me what page you're on?

Q   Eight.

A   Okay.  Eight, sorry, 7th -- what number is it?

Q   How did you know that you had additional materials cited for the Day case in the materials reviewed section?

MR. ART:  I object to the form and to the premise of the question.

Q   (By Ms. Rosen) Okay.  You can answer.

A   I think I mentioned earlier that some of -- some of these cases I only cited some of the materials that -- in the actual writeup that I relied on.

Q   So, when we were talking about Mr. Day I asked you about the two -- I asked you about the two

Page 448

citations in the paragraph which were the affidavit and the complaint, and you said, "That's all I cite there.  I have more materials cited in the materials reviewed section."  Did you simply remember that?

MR. ART:  Object to the form of the question and to the -- his complaint cites an affidavit -- or sorry.  The page of the report that you're reading from cites an affidavit, complaint, and a Bates range.  And then you were representing to him what's in that Bates range, and it's not correct.

MS. ROSEN:  You're speaking objections are becoming tedious and I --

MR. ART:  You cannot tell a witness -- here's what you --

MS. ROSEN:  This is his report, this is his report.  If I'm mischaracterizing his report, he's more than capable of correcting me.  He doesn't need your help, Steve.  You're --

MR. ART:  All you're -- you're trying to trick the witness --

MS. ROSEN:  Oh, my gosh.  I can quick -- I can trick Dr. Leo.

RICHARD A. LEO, PHD, JD, 09/29/2022                    Page 449..452

Page 449

MR. ART: You just said that all Paragraph 7 about Arnold Day cites is an Affidavit and a Complaint. And it actually cites a hundred and five pages of Bates range which are then also listed in the Materials Reviewed, and you're trying to say to him why -- why did you know that you've listed -- you reviewed other materials --

MS. ROSEN: You know what, this debate is over. Your speaking objections are over --

MR. ART: If you want to ask --

MS. ROSEN: Your speaking objections are over. He's more than capable of correcting me if I'm misreading his report. He wrote it.

MR. ART: You are intentionally inserting confusion about what he cited in an effort to make it seem as though he hasn't supported his opinions so you can later go to court and say he didn't know what he had cited, but you're misrepresenting what's written in the paragraph.

MS. ROSEN: He is more than capable of telling me that. He doesn't need your help.

Q (By Ms. Rosen) With respect to Arnold Day's allegations, what materials did you rely on in

Page 450

support of Paragraph 7 other than his affidavit and other than his civil complaint?

A The testimony that he gave at the Motion to Suppress and the testimony that he gave to the Torture -- the Torture Inquiry and Relief Commission which are contained in the documents cited in the Bates range from 01 -- 0001 to 000105, but are not explicitly listed by name in that small paragraph in Number 7.

Q And with respect to the statement that he falsely confessed, is that -- are you -- do you hold an opinion that he falsely confessed?

MR. ART: Objection to form, asked and answered.

THE WITNESS: Again, it's not for me to say whether somebody falsely confessed or make any other finding of fact. What I'm saying is I reviewed materials, evidence in this case, and that supports the opinion that there was the pattern and practice here, and that evidence is -- is -- varies in range.

And in this case remember, I had mentioned that at the lower end there would be something like allegations made in a complaint.

Page 451

This is stronger than that because there is not only allegations but there is also sworn testimony.

So, that's what I relied on as part of the evidence supporting my pattern opinion in this section of the report. And again, the evidence of the pattern here is so strong that even if we threw out the Arnold Day case, there's scores and scores of other cases that support that opinion.

Q (By Ms. Rosen) Let's look at Paragraph 8, Fred Ewing and Darnell Stokes. You indicate there, "Detective Boudreau coerced confessions from two developmentally disabled juveniles, Fred Ewing (IQ=56) and Darnell Stokes. Both were acquitted."

What are you citing in support of that proposition?

MR. ART: Objection to form.

MS. ROSEN: Well, there's what I cite right here, and then there's the additional materials I reviewed that are -- that are listed earlier in the report.

So, as you can see here, a newspaper article is cited, but there are -- there were

Page 452

other materials as well. There was the complaint. There were materials from a complaint register that were also -- that I also reviewed in this case.

Q (By Ms. Rosen) And what are you looking at that indicates to you that there were other materials that you reviewed in addition to what you have cited in that Paragraph 8?

MR. ART: Objection to form.

THE WITNESS: Again, I'm reviewing my report and I'm reviewing my notes.

Q (By Ms. Rosen) So, it's --

A Again, in conjunction -- in preparation for this deposition based on materials that I had reviewed in the report, nothing new since the preparation of the report.

Q But you're relying on your notes to answer that question in part, correct?

MR. ART: Object to the form of the question.

Q (By Ms. Rosen) You can answer.

A Reviewing my notes as a memory aid in addition to what is written in the report.

Q Okay. Let's talk about Derrick

RICHARD A. LEO, PHD, JD, 09/29/2022                    Page 453..456

Page 453

Flewellen -- well, let me go back to Ewing and Stokes. Have you -- are you opining that Detective Boudreau coerced the confessions?

MR. ART: Objection to form.

THE WITNESS: Again, I'm not making a factual determination. I'm saying that there is evidence in the record to support that, and that this is evidence of a broader pattern of coercion in Area 3 in this particular instance.

Q (By Ms. Rosen) When you say you're not making a factual determination about coercion, what do you mean exactly?

MR. ART: Objection to form, asked and answered.

THE WITNESS: That I'm here to offer an expert opinion, not a factual opinion; that I have been provided with thousands and thousands of pages of materials and I've analyzed those materials based on my expertise and my training, and I've offered opinions based on those materials.

That I am not making factual determinations about what did or did not occur but like any expert, I'm reviewing materials that contain

Page 454

facts and evidence and assertions of varying degrees of support, and I'm offering an opinion.

And I don't want my opinions to be misconstrued as factual assertions. That's what I mean.

Q (By Ms. Rosen) Do you hold the opinion that Detective Boudreau coerced confessions out of Ewing and Stokes as an expert.

MR. ART: Objection to the form.

THE WITNESS: I hold the opinion that based on the materials I reviewed there is evidence supporting that assertion in the materials I reviewed.

Q (By Ms. Rosen) Okay.

A And that is part of a larger pattern when there is substantial evidence of widespread coercion in Area 3 as well as other areas.

Q Going back to Mr. Coston in Paragraph 5, do you hold an expert opinion as you've been describing it that Detective Kill struck him in the jaw, grabbed him around the neck, and pushed him against the wall while questioning him about a murder?

A Again, I don't hold a factual opinion

Page 455

about that. That's one data point. I wasn't there. Like all of the interrogations in all of the cases I've worked on involving Detective Kill, there's no -- there's no record of the interrogation, and there's a disputed account where Detective Kill denies and Mr. Coston -- and the suspect asserts he was beaten or otherwise physically or psychologically coerced.

So, I'm not offering the opinion that he was coerced in this case. I'm offering the opinion that there is evidence that I reviewed that supports his assertion -- well, there's evidence that I reviewed of his assertion in this case, and there are other cases -- all these cases have evidence ranging in strength, evidentiary strength, supporting assertions in cases of coercion.

Q Okay. I'm trying to zero in on Mr. Coston, right, and you told me about there's a range of evidence that supports the assertions.

So, let's focus singularly on Mr. Coston's case. And I would like to know whether or not you hold the expert opinion, not the factual opinion, but the expert opinion as you define it that Detective Kill struck him in the jaw, grabbed him

Page 456

around the neck, and pushed him against the wall while questioning him about a murder.

MR. ART: Objection to form, asked and answered.

THE WITNESS: I don't hold the expert opinion per^se that Detective Kill struck him in the jaw, grabbed him around the neck, and pushed him against the wall.

My opinion is that that assertion is consistent with every other case I've studied involving Detective Kill, and that there is an abundance of evidence supporting the assertion that Detective Kill engaged in the pattern and practice of that kind of coercive activity, even if it didn't involve the specifics of that case.

But in that case, I do not hold an expert opinion about what did or did not specifically happen.

Q (By Ms. Rosen) With respect to Mr. Craighead's case, do you hold an expert opinion regarding what did or did not happen?

MR. ART: I object to the form of that question, did or did not happen.

RICHARD A. LEO, PHD, JD, 09/29/2022                    Page 457..460

Page 457

MS. ROSEN: I'm just using his words.

Q   (By Ms. Rosen) You can answer the question.

A   I think you're asking me to -- whether I hold factual opinions as an expert, and I'm trying to distinguish between facts and expert opinions.

There is evidence that I reviewed that supports that assertion but I'm not here to say what did or did not happen. And even though you want to go through these cases individually, this is -- this is a pattern evidence opinion. And that's what my opinion is about, and that's what I'm here to do in this case. I'm not here to make factual opinions.

So, I'm not opining that this in this particular case did or did not happen. I'm saying there is evidence. I reviewed that evidence. I reviewed the evidence in other cases. It's consistent with what I've seen in other cases.

Q   And when you say it's consistent with what you've seen in other cases, do you mean the allegations are consistent, or do you mean there's evidence to support the allegations?

MR. ART: Objection to form.

Page 458

THE WITNESS: Both, that there is a range of evidence in these cases. Detective Kill is one of the most notorious of the detectives who have been accused of engaging in widespread pervasive systemic torture and psychological coercion in these cases.

His name comes up over and over and over again in the materials that I've reviewed, both in preparation of this report as well as in cases I've worked on as well as in scholarly books and articles that I've used in my teaching and my research.

That's what I mean by consistent, and that's one of the reasons that I opine in this report that there's a pattern here, and this is part of a pattern. There's substantial evidence of a pattern, whether or not it happened in this particular case.

Q   (By Ms. Rosen) Right. But the point of your opinion is to say that since there's -- it's irrelevant -- let me strike that.

The pattern and practice evidence is irrelevant if every single one of these allegations is false, right?

Page 459

MR. ART: Objection to form.

THE WITNESS: When you say every single one of these allegations is false, are you referring to Area 3 only, or are you referring to every one of these allegations of 2, 3, 4, and 5?

Q   (By Ms. Rosen) I am referring to the allegations in 1 through 30 in your report which is what you have indicated provides the basis for your opinions regarding Area 3.

So, if -- if allegations -- the allegations that are made by each of these individuals as set forth by you in your report in Paragraphs 1 through 30 related to Area 3, if every single one of these people are lying and the allegations are not true, then the pattern and practice evidence is irrelevant, correct?

MR. ART: Objection to form, a gross mischaracterization of his testimony.

THE WITNESS: There is substantial evidence of a pattern, but if we're going to -- if we're going to engage in that hypothetical, if we imagined hypothetically as you've asked that every single one of these individuals was

Page 460

lying, and the abuse that they assert and is supported by a wide range of evidence varying in strength did not occur, then I would say that these cases in that hypothetical -- which I think is contradicted by a mountain of evidence -- do not support my pattern and practice opinion in Area 3.

But as I also indicated, I think there are Area 3 cases that I've worked on and thus I've studied more documents in great detail that would support that opinion.

And I think there are also Area 3 cases that are not mentioned here that are in the public domain where there have been allegations against Detective Kill and other Area 3 detectives. But I would have to review materials to confirm that.

So, I don't think, to circle back to the language you used, that if hypothetically in an alternative universe, all thirty of these people were lying and none of this alleged abuse occurred despite everything we know about allegations of abuse in the Chicago Police Department in this area and others, I still

RICHARD A. LEO, PHD, JD, 09/29/2022

Page 461

think there might be other evidence out there supporting the pattern and practice opinion.

Q   (By Ms. Rosen) Okay.  Let's talk about Derrick Flewellen, Paragraph 9.  You indicate, "Detective Boudreau and other Area 3 detectives interrogated Derrick Flewellen for more than thirty-six hours during which they slapped, kicked, punched him until he signed a false confession. Flewellen was exonerated based on DNA evidence after serving close to five years in prison."

What do you rely on in support of the assertions that you set forth in Paragraph 9?

A   Well, I'm relying specifically on the materials I reviewed in this report which are the -- the materials cited here in the complaint and any other materials that I cited in the materials reviewed Section which I would have to go back into that part of the report to tell you.

But I also want to point something out to you which is that in the North -- which relates to Derrick Flewellen.  In the North Carolina Law Review article that I published in 2004, which is one of the exhibits to this deposition which you've asked me many questions about, Number 39 of the 125

Page 462

proven false confessions, Page 936 of the article, the 2004 article, lists Derrick Flewellen.  So, he is a data point in the 125 proven false confession article.  And this illustrates the point I've been trying to make about the quantum and degree of evidence across cases.

This would be an example of another proven false confession.  This would be an example of a case where there is much stronger evidence on the evidence spectrum supporting the assertion by the person who alleges that they were abused and has evidence supporting their assertion of a coerced false confession.

Q   What materials did you have when you were reviewing Mr. Flewellen's case in preparation for the 2004 article?

A   I do not recall what materials specifically I had when preparing that article.

Q   Okay.  Let's go to the next page of your report.  Paragraph 10 discusses Mr. Gillespie.  You indicate here that "Detective Boudreau and other Area 3 detectives beat, kicked, slapped, and choked Mr. Gillespie, threatened him with further beating including burning him with a cigarette if he did not

Page 463

sign a written confession they prepared."  Do you see that there?

A   Yes.

Q   And are you concluding that Mr. Gillespie's confession was false?

MR. ART:  Objection to form.

THE WITNESS:  Again, I'm not concluding that any of these individuals' confessions were false.  I'm not offering a factual opinion about that.

Again, I'm merely providing my opinion about a pattern based on a range of evidence I reviewed that supports it.

Q   (By Ms. Rosen) What evidence did you review with respect to Mr. Gillespie?

A   Well, the evidence that's cited here as well as any other materials that are cited in the materials reviewed section.

Q   What about the individuals you're talking about in Paragraph 11, Oscar Gomez, Abel Gomez, and Abel Quinoles?  You indicate here, "Detective Halloran and Detective Boudreau held all three men for more than thirty hours and beat them while they were shackled to a wall."  Did these individuals

Page 464

confess?

MR. ART:  Objection to form.

Q   (By Ms. Rosen) What are you reviewing?

A   I'm reviewing the notes that I -- that I made, that I -- the same notes I've referred to earlier in preparation for this report -- I'm sorry, in preparation for this deposition -- that are based on materials that I reviewed in preparation for the report as memory aids given the volume of materials and the number of cases.

I do not recall that they confessed.  I would have to review these materials to confirm that, but that's my recollection, that they asserted that they were beaten but that they did not confess. But I would have to review the materials to confirm.

Q   And what materials did you rely on with respect to what you have written in Paragraph 11?

A   The materials that are cited here and any other materials that are mentioned in the materials reviewed section.

Q   In Paragraph 12 you reviewed -- discussed two individuals, Jason Gray and Manuel Bobe, I think.  What materials did you rely on in support of your discussion here about Mr. Gray and Mr. Bobe?

RICHARD A. LEO, PHD, JD, 09/29/2022                    Page 465..468

Page 465

A   Again, the materials that are cited here in this paragraph as well as any other materials in the -- in the materials reviewed section of the report.

Q   You note here, "The trial judge rejected Detective Kill's trial testimony, and the appellate court upheld that ruling, finding:  Detective Kill's actions and the possibility that he may have testified under oath falsely -- testified falsely under oath in a deposition and in many other prosecutions, has much bearing on the credibility of his testimony."  Do you see that?

A   Yes.

Q   And then the case was remanded, right?

A   I believe so.

Q   And do you know what ultimately happened with Mr. Gray's conviction and whether or not his confession was ultimately allowed into evidence?

MR. ART:  Objection to form, compound.

THE WITNESS:  I do not recall without reviewing more materials as I sit here today.

Q   (By Ms. Rosen) Okay.  And then Tyrone Hood and Wayne Washington, Number 13, you indicate here, "Detective Boudreau coerced a false confession from

Page 466

Washington" and that "Both men's convictions were subsequently overturned."  Do you see that?

A   Yes.

Q   Are you opining that the confession that was taken from Mr. Washington was coerced?

MR. ART:  Objection to form.

THE WITNESS:  Again, I'm not opining factually what did and did not happen.  I'm offering an expert opinion about the evidence that I reviewed and the patterns that I saw, and this is one of many data points that supports that.

Q   (By Ms. Rosen) And the materials that you relied on for Paragraph 13 are cited here in this paragraph -- at the end of this paragraph, right?

A   No, there's more materials in the materials reviewed section.

Q   What are you reading from?

A   I'm not reading from anything.  I reviewed notes that listed more materials.

Q   So, the notes that you have, how many pages of notes do you have in front of you today?

MR. ART:  Are you talking about in total, Eileen?

Page 467

MS. ROSEN:  Yes.

MR. ART:  Actually, you can answer that question if you know the answer.

THE WITNESS:  I would have to estimate the number of pages.  I would estimate it to be around fifty.  It might be a little lower, it might be a little higher.  That would be my estimate.

Q   (By Ms. Rosen) And this is a different set of notes than the notes you were using yesterday, is that correct?

MR. ART:  Objection to form, asked and answered.

THE WITNESS:  I had all my notes in front of me.  I don't recall which notes I was relying on in the questioning yesterday.

Q   (By Ms. Rosen) So, when you say fifty pages of notes, is that the total number of notes that you've been using throughout the course of the two days of this deposition?

MR. ART:  Objection to form.

MS. ROSEN:  Again, it's just an estimate of the number of pages.  And yes, when appropriate I've reviewed notes that are not

Page 468

based on any new materials, that are just based on materials that are mentioned in the report, documented in the report, as memory aids to assist me in answering these questions.

Q   (By Ms. Rosen) And you took the time when you were preparing these notes with respect to the pattern and practice evidence that we've been discussing here related to Area 3 to add additional citations that are not included in Pages 77 through 82 of your report, correct?

MR. ART:  Objection to form.  That calls for information not subject to disclosure and information that's privileged, and I instruct him not to answer.

Q   (By Ms. Rosen) Why did you add additional citation materials in your notes when you were preparing your notes for this deposition?

MR. ART:  Same objection, same instruction not to answer.

Q   (By Ms. Rosen) Why didn't you include all of the citations that you relied on in support of each of the individual paragraphs identified at Page 77 through 82 of your report?

MR. ART:  Is the question why didn't he

RICHARD A. LEO, PHD, JD, 09/29/2022                    Page 469..472

Page 469

include them in his report?

MS. ROSEN: Yes.

MR. ART: You can answer that question about whether you included those in your report.

THE WITNESS: When preparing the report I had an overwhelming amount of materials or a massive amount of materials to review. As I mentioned before, it's the longest report I've ever written.

And it's not uncommon when writing a report or even an academic article or anything to list some but not all of the citations that support a particular point. So, when I was writing the report, I didn't feel a need to list every single document on every single case in the pattern and practice section.

Q   (By Ms. Rosen) But you felt the need to add those cites into your notes, right?

MR. ART: Objection to form. Objection to the extent that it calls for privileged information and information not subject to disclosure, and I instruct you not to answer that question, Dr. Leo.

Page 470

Q   (By Ms. Rosen) Let's go to Paragraph 14 with respect to Harold Hill, Dan Young, and Peter Williams. Do you see that there?

A   I do.

Q   With respect to Paragraph 14, are the materials that you relied on in preparing the summary that's included in Paragraph 14 cited in this paragraph, at the end of this paragraph?

MR. ART: Objection to form.

THE WITNESS: I don't know if all of them are. This may be a subset of the materials that I reviewed that are cited in the materials reviewed section of my report.

Q   (By Ms. Rosen) Let's go to Page 80 of your report, Mr. Joseph Jackson. You cite to Jackson 00001 to 00004 in support of the summary that you provide on Mr. Jackson's case. Do you see that there?

A   Yes.

Q   Are there any additional materials that you relied on other than those materials?

A   Again, I would have to look at the materials reviewed section to refresh my recollection to see if there were additional

Page 471

materials.

Q   In this particular paragraph are you reaching any opinions regarding the allegations Mr. Jackson made against Detective Boudreau?

MR. ART: Objection, form.

THE WITNESS: Again, I'm not offering any factual opinions. I'm offering a pattern opinion here. There's evidence that I reviewed in Mr. Jackson's case that supports the evidence of a widespread pattern and practice of abuse, physical abuse, psychological abuse in Area 3 as well, as well as elsewhere.

This specific case is about Area 3, but my opinion here is part of a broader opinion about Areas 2, 3, 4, and 5.

Q   (By Ms. Rosen) With respect to Paragraph 16 you had a discussion about Anthony Jakes, correct?

A   Correct.

Q   And you indicate that "Detective Boudreau slapped, punched, and kicked fifteen year old Jakes until he falsely confessed to being the lookout during a murder. Jakes was held incommunicado for over sixteen hours and deprived of food and water

Page 472

and denied access to his aunt." Do you see that there?

A   Yes.

Q   And you cite PTP-A Jakes 00001 through 409, correct?

A   Yes.

Q   Are you relying on anything else in support of the summary that you've provided here with respect to Anthony Jakes?

A   I would have to double check to see what I listed in the materials reviewed. This is one of those cases where I've worked on separately from this, and I've reviewed hundreds of pages of documents in that case separate from the materials I reviewed in this case, in this -- in this litigation.

Q   And do you hold an opinion with respect to Mr. Jakes regarding whether or not Detective Boudreau slapped, punched, and kicked him until he falsely confessed?

A   Again, I'm not offering a factual opinion about Mr. -- about what did or did not happen in Mr. Jakes' case because I reviewed extensive materials in that case. When I reviewed that case

Page 473

it was clear to me that -- and I opined and opine now that the -- the accounts that the detectives in Mr. Jakes' case give about what occurred during the many hours of unrecorded interrogation do not fit with the social science research evidence on how and why false and unreliable confessions occur that Mr. Jakes' account does, and that there were substantial indicia of unreliability in that case or evidence of substantial indicia of unreliability in that case.

But again, that's an expert opinion as the opinion here is an expert opinion. It's not a factual opinion. I'm not making any -- offering any factual opinions. This is for purposes here, one data point, in a -- in a wider pattern that I've reviewed evidence supporting.

**Q   Did you opine in Mr. Jakes' case that he met criteria for a proven false confession?**

A   That was not part of my opinion in that -- in that -- in my work in that case.

**Q   Are you relying on the sum total of the work you did, including your expert opinion in the Jakes' case, in support of your opinions in this case as it relates to Mr. Jakes?**

Page 474

MR. ART: Objection to form. Go ahead.

THE WITNESS: When I prepared this report I was only relying directly, or at the moment I should say, on the materials that I reviewed for this case.

But obviously, when I'm providing an expert opinion I rely on my expertise and my background knowledge of the subjects of my expertise. And as I mentioned before, I've done research on these -- on many Chicago cases. I've taught and lectured about many Chicago cases, and I've worked on and studied primary documents on many of the Chicago cases, and this is one of those cases.

So, this forms part of the basis of my expertise and opinion, though when preparing this report I was only relying immediately on the documents I had reviewed.

**Q   (By Ms. Rosen) Is there anything that you you learned in connection with the work you did in Anthony Jakes' case that leads you to conclude that anything you've written here is inaccurate or incorrect?**

MR. ART: Objection to form.

Page 475

THE WITNESS: Not that I recall.

**Q   (By Ms. Rosen) Okay. Let's go to Paragraph 17, Ronald Kitchen, Marvin Reeves, and Eric Wilson. In this case you cite to PTP-0001 to 000208. Do you see that?**

A   Yes.

**Q   What's contained in those materials?**

A   I believe there are excerpts from an Amended Petition for Post Conviction Relief, and there is a letter as mentioned here from Donald Hubert to Edward Egan and Robert Boyler at -- I would have to review those materials to see if there is additional material contained in those pages.

**Q   In answering my question, were you reviewing your notes?**

A   I did glance at my notes, yes, and review them.

**Q   And do you hold an opinion with respect to whether or not any of the individuals mentioned in Paragraph 17 falsely confessed or gave falsely inculpatory statements?**

MR. ART: Objection to form.

THE WITNESS: Again, I'm not offering a factual opinion. Again, I reviewed -- in this

Page 476

case like the others, I reviewed a range of evidence varying in strength, and in this case there were medical records that -- that corroborate Mr. Kitchen's allegations or offer corroboration.

So, this case had evidence, like many of these cases, that was in addition to or there was multiple -- there was multiple sources of evidence. But again, I'm not making a factual determination, and this is a pattern opinion based on the evidence that I reviewed.

**Q   (By Ms. Rosen) I don't see any reference to medical records in Paragraph 17. How do you know there were medical records?**

A   I thought I reviewed part of the Special Prosecutor Report or referenced to the Special Prosecutor Report that contained documentation, or I should say reference to, reference to him going to a doctor or hospital about abuse he suffered during the interrogation.

**Q   And is that something that you're recalling because you reviewed your notes or you independently recall that?**

MR. ART: To the extent that that requires

RICHARD A. LEO, PHD, JD, 09/29/2022                    Page 477..480

Page 477

you to testify about what's in the substance of the notes that you took, we re-assert the objection. Those notes are not subject to disclosure and I instruct you not to answer. To the extent that you can answer without divulging that information, you may answer.

THE WITNESS: Mr. Kitchen wrote a book about his abuse that I had read many years ago. I recall that in that book, if my memory is accurate, that he had mentioned this.

But, I believe this is the material that I reviewed for the report. I did not look at his book again or review that in conjunction with the preparation -- in my preparation for this report.

Q    (By Ms. Rosen) Let's talk about Mr. Lash, Anthony Lash. Do you hold an opinion that Mr. Lash falsely confessed?

A    Again, I'm not offering a factual opinion that any individual did or did not falsely confess.

I'm offering an expert opinion about evidence that I reviewed that supports a pattern and practice of coercive -- physically and psychologically coercive interrogation that resulted in some number of

Page 478

unreliable or false confessions or increased the risk of eliciting false and unreliable confessions.

Q    And the materials that you relied on in support of Paragraph 18 are listed at the end of the paragraph, correct?

A    Correct, unless I reviewed anything in addition to this in the materials reviewed section. I don't recall that I did, but I would have to review that section to confirm.

Q    Okay. Let's move to Alfonzia Neal, this is 19. "Detective Boudreau beat a murder confession out of Alfonzia Neal who had an IQ in the 40's and likely did not understand much, if anything, of the confession." Do you see that there?

A    Yes.

Q    Are you concluding that Alfonzia Neal likely did not understand much, if anything, of the confession, or is that somebody else's conclusion that you're simply reciting in this paragraph?

MR. ART: Objection to the form.

THE WITNESS: As part of my area of expertise, I've studied what used to be called mental retardation which is now called intellectual disability. This is something

Page 479

that's been involved in many of the proven false confession cases. It is a risk factor for false confession.

And somebody -- as you probably know, there are gradations of what used to be called mental retardation or intellectual disability. Somebody with an IQ in the 40s would have a hard time understanding much of what was going on in an accusatory or adversarial interrogation that is severely intellectually disabled.

And so this is -- this is -- this condition -- this observation is stated probabilistically likely, but I'm not repeating somebody else's conclusion, this is my observation.

Anybody with an IQ in the 40s, not merely Mr. Alfonzia Neal who was in an interrogation that involved aggressive interrogation and potential abuse, almost certainly would not have understood any Miranda warnings and would have had a hard time understanding anything that was said to them in rapid succession.

Q    (By Ms. Rosen) So, the conclusion that he likely did not understand much is your conclusion based on the fact that his IQ was in the 40s?

Page 480

A    If his IQ was in the 40s, like anybody with an IQ at that level, yes.

Q    All right. Let's go Johnny Plummer, Paragraph 20. It says, "Detective Boudreau and other Area 3 detectives interrogated fifteen year old Johnny Plummer for thirty-six hours, during which they denied him food and hit him in the face, stomach, and side (including with a flashlight) until he falsely confessed to the murder." Do you see that?

A    I do.

Q    And are you opining that Mr. Plummer falsely confessed?

MR. ART: Objection to the form.

THE WITNESS: Again, I'm not offering a factual opinion here. Again, I'm offering an expert opinion based on the evidence that I reviewed in this -- other cases of a widespread pattern and practice of psychologically and physically coercive interrogation techniques that increased the risk of eliciting false and involuntary confessions in this and many, many other cases in Area 2's -- 2, 3, 4, and 5.

Q    (By Ms. Rosen) With respect to Mr. Plummer's case, what do you rely on in support of the

RICHARD A. LEO, PHD, JD, 09/29/2022                    Page 481..484

Page 481

information that you provide in Paragraph 20?

A   The opinion, the published opinion that I referred to here, as well as any other materials in the materials reviewed section.

Q   And can you tell me where -- never mind.

Paragraph 21 is Tyrone Reyna and Nicholas Escamilla and Miguel Morales. It indicates, "Detective Boudreau and other Area 3 Detectives beat sixteen year old Reyna. Detective Halloran slapped him in the face and kicked him in the leg. Detective Boudreau and Detective Halloran spit on him, refused to let him contact his family, and intimidated him into confessing to a murder he did not commit.

Boudreau and other Area 3 Detectives also beat and threatened Reyna's co-defendants, Nicholas Escamilla and Miguel Morales, causing Escamilla to falsely confess after hours of abuse." Do you see that?

A   Yes.

Q   And are you concluding that Mr. Escamilla falsely confessed after hours of abuse?

MR. ART:  Objection to the form.

THE WITNESS:  Again, I'm not offering any factual opinions. I'm offering an expert

Page 482

opinion based on a wide range of evidence across numerous cases that I reviewed and analyzed supporting the pattern opinion that the Chicago Police Department in Areas 2, 3, 4, and 5 engaged in a pervasive, widespread, systemic pattern of physical and psychological coercion during interrogations that increased the risk of eliciting involuntary and false confessions. And this is one data point that I evaluated for that opinion, one data point of evidence.

And again, if we threw out this case entirely there would still be strong evidence of a pattern and practice of physical and psychological abuse.

Q   (By Ms. Rosen) Are you aware of an opinion issued by Judge Hooks in a case called George Anderson that discusses many of the individuals that are listed in your report?

MR. ART:  Objection to form.

THE WITNESS:  I'm not recalling it as I sit here, and so I would have to look at my materials reviewed section to see whether it was among the voluminous materials that I

Page 483

reviewed in preparation of this report almost a year ago.

But I am happy to review it if you would like me to answer any questions about it or anything stated in it.

Q   (By Ms. Rosen) Let's take a look at Paragraph 22, Anthony Robinson. Are you concluding with respect to Mr. Robinson that he falsely confessed to a murder?

MR. ART:  Objection to the form.

THE WITNESS:  Again, I'm not making any factual determinations or conclusions. I'm offering an expert opinion about the materials that I reviewed that contained a wide range of evidence supporting my opinion that there was a pattern and practice of physical and psychological coercion across Areas 2, 3, 4, and 5 in numerous cases that increased the risk of eliciting false, unreliable, and involuntary confessions in numerous cases.

Q   (By Ms. Rosen) Can you tell me specifically what materials you relied on in preparing Paragraph 22 of your report?

A   Well, I cite to those seven pages or six

Page 484

pages that were among the materials that I reviewed. Without looking at the materials reviewed section of my report, I don't recall if that was -- those were the only materials I reviewed when I prepared the report in the Anthony Robinson case or if I reviewed other materials as well.

Q   And with respect to the opinion that you cite there in the Anthony Robinson case, is there a judicial finding in that opinion that concludes that, in fact, Detective Kill and other Area 3 detectives kicked and slapped Anthony Robinson until he falsely confessed to a murder?

MR. ART:  Objection to the form.

THE WITNESS:  I would have to review the opinion to refresh my recollection about what the judge wrote in that case.

Q   (By Ms. Rosen) Okay. Number 23 is Mr. Clayborn Smith, and he's the individual that you recently were provided a new opinion for, correct?

A   Correct.

Q   And with respect to Anthony -- and with respect to Clayborn Smith, are you opining that he falsely confessed to the murder?

A   Again, I am not making -- I'm not offering

RICHARD A. LEO, PHD, JD, 09/29/2022                    Page 485..488

Page 485

a factual -- I'm not offering an opinion of fact or a determination of fact. I'm offering an expert opinion based on a wide range of evidence that I reviewed about physical and psychological coercion in Areas 2, 3, 4, and 5 that increased the risk of of eliciting false and unreliable and involuntary confessions, and that in my opinion established evidence for a widespread, pervasive, systemic pattern and practice of that physical and psychological coercion.

Q    And the materials that you relied on with respect to Clayborn Smith are the materials cited here and the materials cited in the materials reviewed section of your report, and the new opinion that you were recently provided, correct?

A    That's what -- the materials that are cited here and any additional materials in the materials reviewed section, I relied on in my analysis of this case for purposes of this paragraph, and I supplemented that analysis, not in the report, but in preparation for the deposition with the updated Second Division Illinois Appellate Court Opinion that I -- I provided the citation to yesterday.

Page 486

Q    And with respect to the individuals that you've identified in Paragraphs 24, 25, 26, 27, 28, 29, 30, are you concluding that any of those individuals falsely confessed as a result of the physical abuse they alleged?

MR. ART: Objection to form.

Q    (By Ms. Rosen) You can answer.

A    And again, I'm not making any factual conclusions about what did or did not happen in the interrogation room or whether their confession is accurate or inaccurate, their confession statements.

I'm offering an expert opinion based on a wide range of substantial evidence about a pattern and practice of physical and psychological abuse that increased the risk of eliciting involuntary and unreliable confessions.

The one thing I will add to that is that Mr. Weston, Number 26, and Mr. King, Number 30, I worked on those civil cases both a number of years ago. I did not review those materials when I was preparing the report in this case, and I did not review those materials from those civil cases in preparation for my deposition.

But I did review a substantial number of

Page 487

documents in both of those cases, particularly in Mr. Weston's case, when working on those cases. And so I have deep background knowledge of those cases that is -- background knowledge of those cases that's deeper than in many if not all of the cases in this section of the report.

Q    When did you work on Mr. Weston's case?

A    If you let me access my records I can tell you the exact year. If you do not, I can estimate when that was. But I don't know -- I don't know if the estimate would be accurate.

Q    Well, there's a citation here to a report dated June 12th, 2010 --

A    Okay, thank you for -- thank you for reminding me of that. I forgot that I cited the report in these materials. I think that tells you the answer. It would have been around 2010, most likely I was retained in 2008 or 2009, and I produced the report in 2010.

It's possible I was retained in 2010. I recall -- obviously, this was twelve years ago. I recall being provided a substantial amount of information in those cases, thousands of pages of documents.

Page 488

Q    And were you -- did you provide those opinions in connection with a civil case for Mr. Weston?

A    My recollection is that it was a post conviction case, it was not a civil proceeding. But, you know, I would -- to be a hundred percent sure, I would want to check my records, but that's my recollection.

Q    Okay. And then all of the materials that you relied upon in support of the summaries you provide in Paragraphs 24 through 30 are either cited at the end of those paragraphs or in the materials reviewed section of your report, correct?

A    Yes. In preparation of the report and then in preparation for the deposition. Of course, the only additional material is the -- this Appellate Court Opinion we've referred to multiple times in the Clayborn Smith case.

Q    Okay. And then with respect to Page 83 through the top of 88, those are your opinions regarding Area 4 cases, and the individual cases identified in Paragraphs 1 through 19 are cases that you specifically reviewed in support of your opinions related to Area 4, correct?

RICHARD A. LEO, PHD, JD, 09/29/2022                Page 489..492

Page 489

MR. ART: Objection to form and the phrase "opinions related to."

Q   (By Ms. Rosen) You can answer.

A   At some point I might need to take a bathroom break. Yes, as in other parts of the report, these are -- these -- I reviewed materials, the materials listed in the materials reviewed section of the report in these 18 cases as part of my opinion, expert opinion about the pattern and practice that was widespread in this and other areas and the risks that that created. I did not review any materials that are not listed in the materials reviewed section in preparation of the report or in preparation for the deposition in these cases.

Q   And to the extent in Paragraphs 1 through 8 -- 1 through 19 -- strike that.

With respect to your summaries as set forth in Paragraphs 1 through 19 of the report, are you rendering any opinions that any of these individuals falsely confessed as a result of the physical abuse they allegedly received in connection with their interrogation?

MR. ART: Objection to form and to the extent it's asking about more than a dozen

Page 490

cases.

THE WITNESS: Again, I'm not offering any factual opinion about whether a confession is true or false, coerced or not coerced. I'm offering an opinion about based on a wide range of evidence as I've articulated before supporting that there was a pattern and practice of physical and psychological abuse in these nineteen cases as well as in the other cases that increased the risk of eliciting false, unreliable, and/or involuntary confessions.

MS. ROSEN: Okay, let's take a break.

THE WITNESS: So, can we come back at no earlier than 4:30, so that would be a twelve minute break, unless you want to take a longer break.

MR. ART: Let's come back at 4:30.

THE VIDEOGRAPHER: We're off the video record at 4:17 p.m.

(At this time, a short break was taken off the record.)

THE VIDEOGRAPHER: We're back on the video record at 4:32 p.m.

Page 491

Q   (By Ms. Rosen) Okay. Doctor Leo, I want to direct your attention to Page 88 of your report, Section E is entitled, "Physical Abuse and Coercive Interrogation at Area 5 Involving Detective Guevara, Detective Halvorson, and Other Area 5 Chicago Police Detectives." Do you see that?

A   Yes, I do see that.

Q   Okay. And in this section of the report it's formatted similarly to the analysis you did in your discussion about Area 3 and Area 4, correct?

A   It is correct that it's formatted in the same way, but I do see all of these as part of one overall pattern that's widespread across the Chicago Police Department.

Q   Okay. And in this particular case -- I mean in this particular section in the first paragraph you identify other individuals who have had their convictions overturned in cases investigated by Detective Guevara. Do you see that?

A   Yes, and these -- this is based on materials that I was provided and reviewed in preparation for this report.

Q   What materials were you provided with -- in with -- what materials were you provided in

Page 492

relation to Jacques Rivera?

A   The materials that are listed in the materials reviewed section of the report. The reason I mention this, if I mentioned that in my prior answer, is because recently -- I don't know, maybe three weeks ago -- I'm on -- I got an email from The National Registry of Exonerations. I'm on their email list saying that there were thirty some odd exonerations related to Detective Guevara in that online database.

I did not review The National Registry of Exonerations in preparation for this deposition. I only meant to communicate in my prior answer that I only discussed the cases that I was provided materials for based on that email from The National Registry of Exonerations. There may be more cases involving Detective Guevara that I did not review in preparation for this report.

Q   Okay. So, let me -- I understand, thanks for the clarification.

With respect to this particular paragraph, you reference an individual by the name of Jacques Rivera. Do you see that?

A   Yes.

Urlaub Bowen & Associates, Inc.   312-781-9586

RICHARD A. LEO, PHD, JD, 09/29/2022                    Page 493..496

Page 493

Q   And I just looked at the Materials Reviewed Section and I don't see anything related to Jacques Rivera.

A   That should be --

Q   Can you point me -- can you point me to the materials that you reviewed -- can you look at your report and point me to the materials -- the item number of the materials you reviewed related to Jacques Rivera?

MR. ART:  I apologize. objection to form.

THE WITNESS:  Okay.  I'm looking and I'm trying to find that right now.

I don't see in my materials reviewed any documents with Jacques Rivera's name on it.  I do see Number 244, an affidavit of David Rivera who is mentioned in the subsequent cases.

Q   (By Ms. Rosen) Do you have a belief that David Rivera is somehow connected to Jacques Rivera?

MR. ART:  Objection, form.

THE WITNESS:  I would have to review materials to answer that question.  I don't recall as I sit here.

Q   (By Ms. Rosen) If you were not provided any materials related to Jacques Rivera, then how

Page 494

did you become aware that Jacques Rivera's conviction was overturned and that his case was investigated by Detective Guevara?

MR. ART:  Objection, form.

THE WITNESS:  There are documents that I've reviewed in the mass of documents that I was provided that are listed at the beginning of the report that sometimes refer to other cases but aren't documents on those cases.

And so if I did not review anything in Mr. Jacques Rivera's case, I would have learned through other materials that I reviewed in preparation for the report.  Though, I don't recall specifically which material or materials that I did review that mentioned Mr. Rivera's name or case.

Q   (By Ms. Rosen) How about Juan Johnson, what materials did you review related to Juan Johnson?

MR. ART:  Objection to form.

THE WITNESS:  I do not see any specific materials with Mr. Johnson's name on them in the materials that I reviewed.

Q   (By Ms. Rosen) How about Roberto

Page 495

Almodovar?

MR. ART:  Objection to form.

Q   (By Ms. Rosen) What materials did you review in relation to Mr. Almodovar?

A   I do not recall which materials I reviewed that mentioned or were about Mr. Almodovar's case.

Q   What about Mr. William Negron?

MR. ART:  Objection to form.

Q   (By Ms. Rosen) What materials did you review in relation to Mr. Negron?

A   I do not recall which materials I reviewed in relation to Mr. Negron.

Q   And there's nothing listed in the materials reviewed section specifically related to Mr. Negron, right?

MR. ART:  Objection to the form.

Q   (By Ms. Rosen) Is that correct?

A   There's no document that I saw in my review just now that mentions Mr. Negron by name. But, as I mentioned earlier, many of the documents refer to individuals in other cases, and so some of the documents may have described his case even though I didn't see in my review just a moment ago any documents that list his name.

Page 496

Q   And then with respect to Angel Rodriguez, Henry Johnson, Xavier Arcos, Ricardo Rodriguez, Geraldo Iglesias, and Demetrius Johnson, I can represent to you that I did a word search just now of your report, and I don't see any documents identified in the materials reviewed section related to those individuals.  If, in fact, my word search is correct and there is nothing listed in the materials reviewed section of your report, is it true that the information you have related to those individuals come from some other materials you reviewed in connection with the opinions you're providing in this case?

MR. ART:  Objection to the form. Objection to the representation that you did a word search and found that none of the documents related to those individuals.  I don't think you can do a word search that does that, but with those objections, you can answer if you can, Dr. Leo.

THE WITNESS:  I would have to do a word search, if that's possible, to verify what you're saying, but I think you're asking a hypothetical question.  And based on your hypothetical

RICHARD A. LEO, PHD, JD, 09/29/2022                    Page 497..500

Page 497

question, if there are no documents in the materials I reviewed bearing the names of the individuals that you mentioned, then any information that I -- any information that I -- any information that I analyzed about their cases or learned about their cases would have been contained in other documents among the voluminous documents that I reviewed.

Q   (By Ms. Rosen) Okay.  And then if we look down to the paragraphs -- the summary paragraphs that followed in sequence in this report, they're numbered Paragraphs 1 through 13, are you providing any opinions with respect to any of those individuals that there were confessions that were elicited that were the result of physical abuse and resulted in a either coerced or false confession?

MR. ART:  Objection to the form.

THE WITNESS:  Well, I would want to go through the cases individually to answer a question about each one.  But, more generally, as I said before, no, I'm not providing any factual opinions about what did or did not occur.

My opinions are expert opinions about

Page 498

evidence of a wide range and varying evidence supporting the pattern of practice of physical and psychological abuse in Area 5 as well as across other areas in the Chicago Police Department that increased the risk of eliciting involuntary and/or false confessions.

As in other parts of the report, the cases vary in the strength of evidence that supports the assertions by the individuals who said they were tortured.  And so if we went through these cases individually, I would note that some have a stronger evidentiary support than others or have multiple sources, more sources than others.

But even if we removed one or more of these opinions, even if we removed an entire section, there's still a substantial evidentiary support for the widespread pattern and practice across the Chicago Police Department that I wrote about in this report in my opinion.

Q   (By Ms. Rosen) With respect to -- actually let me ask you.  You said if you were permitted to go through them, you could identify, did you say, the

Page 499

strength of the evidence?

A   Well, the point I was trying to make is that in some cases there's more evidence than in other cases.  And I was trying to build on an earlier point I made which is that the documents that I analyzed in these cases ranged -- and when I'm talking about the cases, I mean all the cases.

They range from only having a complaint to having reports and judicial findings and commission and government reports, and some are in between.  So, I was only meaning to suggest that if we went through them individually, we might discuss that there is a varying range of evidence, depending on the individual case, supporting the pattern and practice opinions in this section of my report.

Q   The varying range of evidence that you relied on in support of your summaries in this section and the other sections are either cited in the individual summaries or in the materials reviewed section of your report, correct?

A   Correct, across the various sections, correct.

Q   I want to talk specifically about, if we go to Page 90 of your report, Ariel Gomez at Paragraph

Page 500

7.  And in Paragraph 7 you write, "Ariel Gomez alleges that Detective Guevara coerce from him a false murder confession."  Do you see that?

A   Yes.

Q   And then it says, "In 2018, Mr. Gomez was exonerated after three witnesses swore under oath that Guevara repeatedly attempted to coerce them into identifying Gomez as the shooter."  Do you see that?

A   Yes.

Q   And in that particular sentence, you cite to a BuzzFeed article by Melissa Segura, correct?

A   Yes.

Q   And is that your support for the statement that in 2019 Mr. Gomez was exonerated after three witnesses swore under oath that Guevara repeatedly attempted to coerce them into identifying Gomez as the shooter?

MR. ART:  Objection to the form.

THE WITNESS:  That is the citation in the report for that point, but I also reviewed other documents in his case, some or all of which are listed in that paragraph, and there may be others that I would have to review the

RICHARD A. LEO, PHD, JD, 09/29/2022                    Page 501..504

Page 501

materials reviewed section to see if there is more listed there.

Q   (By Ms. Rosen) Do any of those other materials support the specific point that you -- the specific point that Mr. Gomez was exonerated after three witnesses swore under oath that Guevara repeatedly attempted to coerce them into identifying Gomez as the shooter in 2018?

MR. ART: Objection to the form.

THE WITNESS: I would have to review the materials in the materials reviewed section on Mr. Gomez's case to fresh my recollection in order to answer that question.

Q   (By Ms. Rosen) If we look at Number 8, Leshurn Hunt, you cite to a district court opinion in this case. Is that the district court opinion that was issued after the trial where Detective Guevara was found not liable with respect to the allegations Mr. Hunt made against him in the civil case?

MR. ART: Objection to the form of the question.

THE WITNESS: I don't recall. I would need to review that document to answer your

Page 502

question.

Q   (By Ms. Rosen) Would it matter to you in your analysis if Mr. Hunt filed a civil case, went to trial, and the jury found Detective Guevara not liable with respect to the allegations Mr. Hunt was making -- all the allegations Mr. Hunt was making against him?

MR. ART: I object to the characteristic of a lawsuit.

Q   (By Ms. Rosen) You can answer.

A   If -- it would not matter to me in terms of my pattern and practice opinions in this case because even if we threw out Mr. Hunt's case or threw out any case in these sections on pattern and practice, there is still substantial and overwhelming evidence of a widespread and pervasive practice, not only across the Chicago Police Department but also by Detective Guevara himself.

So, it would not matter to me. It would not in the sense that it would not change my analysis or opinions in this case.

Q   If we go to Page 92 of your report, there's a section that identifies some of the civilian or numerous civilian -- let me start over.

Page 503

At Page 92, there's a section that identifies complaints that were received by the Chicago Police Department regarding Detective Guevara, correct?

A   Yes.

Q   And what is the point of you listing these five cases where individuals made complaints to the Chicago Police Department regarding Detective Guevara's conduct?

MR. ART: Objection to form.

THE WITNESS: The point is among the massive materials that I reviewed to illustrate the basis for my opinions in this report, and one of the important points to me that I tried to emphasize in this deposition is that there are numerous sources of evidence for my analysis and expert witness opinion that there was substantial evidence of a pattern and practice of physical and psychological abuse in interrogations leading to or creating the risk of leading to involuntary or false confessions.

So, this is highlighting one source among many of evidence. Some of these cases have multiple sources, but that's the reason I've

Page 504

broken out into the sort of subsection of cases involving civilian complaints.

Q   (By Ms. Rosen) And you identify five complaints here, right?

A   Five examples, yes.

Q   And it's over the course of thirteen years, right?

A   From 1982 to 1995, yes.

Q   And do you have any idea how many complaints other police officers in the Chicago Police Department on average obtained in a similar time frame?

MR. ART: Objection to form.

THE WITNESS: I do not know what the average rate of complaints by Chicago Police Detectives from 1982 to 1985, who were similarly situated to Detective Guevara.

Q   (By Ms. Rosen) And when you say similarly situated, what do you mean?

A   Well, as you know, a police department is a hierarchical organization, and so you have street officers and desk sergeants and detectives and lieutenants and captains and commanders and chiefs, and so I just assumed -- and you can correct me if

RICHARD A. LEO, PHD, JD, 09/29/2022                Page 505..508

Page 505

this is a mistaken assumption in my answer -- that if one wanted to compare Detective Guevara's complaint rate to other Chicago Police employees and police officers, you would want to take that section of the department that performed comparable work, otherwise you would be comparing apples to oranges.

Q    Okay.  And then if we go to the next, I guess, section of your report, you say, "In other cases" -- this is Page 93 -- "In other cases, individuals allege they've been abused by Detective Guevara in attempts to obtain confessions or to provide false testimony against other suspects."

And the first one that you identify is Mr. Rankins in relation to Mr. Serrano and Mr. Montanez.  Do you see that there?

A    Yes.

Q    In the materials that you were provided in this case with respect to Mr. Rankins and Mr. Serrano and Mr. Montanez, did you see any materials or any testimony from any of the individuals that discussed the fact that Mr. Montanez's family, before the trial against Mr. Serrano and Mr. Montanez, paid for Mr. Rankins to go to Puerto Rico and stay with Mr. Montanez's family members so that he would not be

Page 506

around for the trial to testify against Mr. Serrano and Mr. Montanez?

MR. ART:  Objection to the form of the question.

Q    (By Ms. Rosen) You can answer.

A    I do not recall seeing that.  I would need to review the materials to know whether it was contained and that -- that assertion was contained or if the fact was contained in the materials I reviewed.

What I do recall, though, is that this was one of the cases that had a higher quantum of evidence supporting the accusations than some of the other cases, and in particular that Mr. Montanez and Mr. Serrano both received Certificates of -- Certificates of Innocence.

And though I did not work on these cases, I have worked on and studied other cases where I've read full blown transcripts of Certificate of Innocence Hearings where there is a lot of questioning about any adverse facts typically by the prosecution.

So -- but I don't know -- I don't recall I should say -- whether any of the documents that I reviewed included that what you're representing as

Page 507

fact.

Q    Did you see -- did you see a transcript of the Certificate of Innocence preceding -- for Mr. Serrano and Mr. Montanez's case?

A    I do not recall reviewing that, and if -- -- if -- if it's not listed in the materials reviewed, then I didn't.  And if it is, then I simply do not recall.

Q    If we go to Page 94 of your report, you discuss Scott Lassar and his investigation.

A    Correct.

Q    Were you provided materials related to Mr. Lassar's investigation into Mr. Almodovar, Mr. Serrano, Mr. Montanez, and Mr. Bouto's case?

MR. ART:  Objection to form.

THE WITNESS:  I would have to review the list of materials reviewed to know whether I was provided -- to recall, to refresh my recollection about whether I was provided with specific materials by Mr. Lassar and his firm on those cases.

What I do recall being provided was a memorandum that I referred to and I think others referred to as the Lassar Report which

Page 508

was one of the documents as I mentioned earlier that I reviewed in preparation for this deposition and have in front of me with the Bates stamps numbers AR-Jenner 019812 to 019843.

Q    (By Ms. Rosen) And that's the report that discusses Mr. Solache's and Mr. Reyes's case, right?

A    That's my recollection, correct.

Q    Well, you're looking at it.  You just said you're looking at it, right?

A    Correct.  And it's titled "Guevara Investigation, Gabriel Solache and Arturo Reyes, dated December 12th, 2014."

Q    And so that particular memorandum that you have in front of you simply discusses Mr. Solache's and Mr. Reyes's case, not the other cases, okay.

And then if we look to the final paragraph before the conclusion it says, "In sum, Chicago police commanders and high ranking City of Chicago officials (including police command personnel) were on continuing notice since as early as 1982 that there was a pattern and practice of police interrogation, torture, and coercion to extract confessions in Area 5 involving Detective Guevara, Detective Halvorson, and

RICHARD A. LEO, PHD, JD, 09/29/2022                    Page 509..512

Page 509

other Area 5 Chicago police detectives."  Do you see that?

A  Yes.

Q   And what is your basis for your conclusion specific to Area 5?  Because that's what this paragraph says, that there were Chicago police commanders and high ranking City of Chicago officials that were on notice about Area 5 detectives.

MR. ART:  Objection to form.

THE WITNESS:  The basis would be the materials I reviewed that pertain to Area 5. Although, as I said before, I think this pattern and practice was widespread across the areas, and it's artificial to separate the areas since there are five -- since they're all part of the same police department and police departmental culture, even though I broke it down into areas for simplicity of analysis in the report.

Q   (By Ms. Rosen) Okay.  We can take down Exhibit Number 1.

Can we mark as an exhibit what's been marked previously, the PDF that's called "Invoices Number 1."

THE EXHIBITS COORDINATOR:  Eileen, I don't

Page 510

think we marked this one previously, so should we make this Number 7?

MS. ROSEN:  Yes, please.

Q   (By Ms. Rosen) So, Invoices Number 1, the first six pages relate to the work you did in Sanchez versus The Village of Wheeling case, right? You can scroll through the pages so you can take a look.

And then when we get to Page 7, that's your invoices related to this case.  Do you see that?

A  Yes.

Q   If we could just go back to Page 6 for a second -- oh, actually, let's go back to Page 4, sorry.  I think we talked about this a little bit earlier yesterday, but it seems like a very long time ago.  Here the hourly rate for the opinions you've provided in the Sanchez matter was $375.00 an hour?  Do you see that?

A  I do.

Q   And then underneath it, it says "Reduced Rate."  Do you see that?

A  I do.

Q   So, does that mean that you -- that your

Page 511

hourly rate for that time period was higher, but for whatever reason you agreed to bill at a reduced rate in that particular case?

A  Yes.

Q   Okay.  Is there a particular reason you agreed to the reduced rate?

MR. ART:  Objection to the form.  And I just want to caution you, Dr. Leo, to the extent that your answer would divulge conversations between your counsel in that case, I would instruct you not to answer.  To the extent you can answer it without divulging that information, you can go ahead.

THE WITNESS:  There may have been a reason.  I don't recall as I sit here today what that reason is.

Q   (By Ms. Rosen) Okay.  And then if we go to Page 7, this is an invoice for this case, Solache and Reyes.  Here the billable rate is $400.00 an hour, but again it says "Reduced Rate."  And it appears to me that this invoice spans, based on the dates, from July 24th, 2019, to January 5th, 2022. Do you see that there?

MR. ART:  Objection to the form.  It's

Page 512

January 15.

MS. ROSEN:  Oh, sorry.  Let me say that again.

Q   (By Ms. Rosen) The dates on the invoice appear to cover the time frame of July 24th, 2019, through January 15th, 2022, correct?

A  Yes.

Q   So, in that time frame, which is over two years, you billed a hundred and seventy-five hours -- l75.7 hours in connection with the work that you did in this case, is that right?

A  Correct.

Q   And then if we go back to the Sanchez invoice, we go to Page 1, this invoice covers July 20th, 2020, through March 24th, 2021, correct?

A  Yes.

Q   And that this invoice covers -- in that time period you billed 39.6 hours, is that right?

MR. ART:  Objection to the form.

THE WITNESS:  Correct.

Q   (By Ms. Rosen) And then if we go to Page 4, that invoice has a date range of March 25th, 2021, through January 31st, 2022, and the total amount of hours listed on that invoice was a hundred

Urlaub Bowen & Associates, Inc.  312-781-9586

RICHARD A. LEO, PHD, JD, 09/29/2022                    Page 513..516

Page 513

and five hours, correct?

A    Correct.

Q    So, if I quickly do the math in the Sanchez matter from the time period of July 20th, 2020, through January 31st, 2022, you billed approximately a hundred and forty-five hours, right?

A    Correct.

Q    Okay. All right. If we can mark as Exhibit Number 7, Invoice Number 2 --

MR. ART: Is this 7 or 8?

MS. ROSEN: Yes, this is 8, sorry.

Q    (By Ms. Rosen) Exhibit 8. Okay. So, the first two pages -- three pages -- hold on, the first six pages of this exhibit, so it's Bates stamped 931 through 936 and are related to a case called Amor versus Naperville. Do you see that?

A    I do.

Q    And in this particular case you bill at $450.00 an hour, correct?

A    Correct.

Q    Okay. And then if we go to Page 937, that looks like your invoice for Anthony Jakes. And in that case you bill at $450.00 an hour and that says 2020 rate. Do you see that?

Page 514

A    Yes.

Q    And so does that mean that in 2020 -- let me start over.

Does that mean if you were hired in 2020 to review a case, that your hourly -- your typical hourly rate was $450.00 an hour?

A    Yes, for civil cases or privately retained cases, not for public defender cases. They were prosecutor cases or appointed cases.

Q    Okay. And then Page 945 is blank. Page 946 is blank. And then if we go to Bates stamped had 947, this is for a case called Nickie Miller versus Montgomery County. And here it looks like your hourly rate is $475.00, but it looks like this is for work you did in 2021.

So, is it fair for me to assume that your normal hourly rate for cases -- for private cases or civil matters that were initiated in 2021, was $475.00?

MR. ART: Objection to form.

THE WITNESS: That's my best recollection, yes.

Q    (By Ms. Rosen) And then if we go to the page Bates stamped 950, that's for a case called

Page 515

Anderson versus Knox County, and that's a 2020 case, and it looks like your hourly rate there is $450.00 which is consistent with what we saw earlier for one of the other invoices, right?

MR. ART: Object to the form of a 2020 date.

Q    (By Ms. Rosen) Cases initiated in -- initiated with you in 2020.

A    I think it's consistent with one of the other bills. I don't recall if my private hourly rate in 2020 was $450.00 an hour. I believe it was.

Q    Okay. And then if we go to Bates stamp 953, this is something -- a matter called Andrew Royer. It looks like you did work on this case -- looks like you were hired -- looks like the initial work you did on this case was December 30th, 2018. And here the hourly rate which you indicate is a "Reduced Rate" is $350.00 per hour, correct?

A    Correct.

Q    And do you know why in this particular case you provided a reduced rate?

A    This was not a civil case. This was a post conviction case, and although I don't remember

Page 516

specifically why, that may be the reason.

Q    Do you remember -- do you know the result of that post conviction case?

A    I believe he was released and exonerated.

Q    Okay. And then if we go to Bates stamp 956, this is another invoice for the Amor case, again at the $450.00 rate, correct?

A    Correct.

Q    Okay. And then if we go to Bates stamp 959, this is another invoice in connection with the Jakes matter, and the rate for this one is $450.00 an hour, right?

A    Correct.

Q    And then Page 963 and 964 are blanks. And then Page 965 appears to be a duplicate of the invoice that we looked at that was marked in Exhibit 1. The date is July 24th, 2019, to January 15th, 2022, correct?

A    Yes.

Q    And then 967 is another duplicate of the same invoice for Solache and Reyes, correct?

A    Yes.

Q    And then beginning at 969, we have an invoice in a case called Tobias versus Los Angeles

Urlaub Bowen & Associates, Inc.   312-781-9586

RICHARD A. LEO, PHD, JD, 09/29/2022                Page 517..520

Page 517

for work that it looks like it began February 23rd, 2018, and in that case your hourly rate was $400.00 an hour, correct?

A   Correct.

Q   And then if we go to 973, there's another Toias invoice again at the $400.00 an hour hourly rate, correct?

A   Correct.

Q   And then if we go to 976, we have another Reyes invoice.  This one it looks like for work spanning from October 11th, 2018, through February 4th, 2019.  Do you see that there?

A   Yes.

Q   And the total amount of hours billed on this invoice is 50.4, correct?

A   Yes.

Q   And this invoice is itemized by -- it appears to be itemized, I can't tell because a lot of it is redacted, but it appears to be itemized by date that you did the work, October 11th, 2018, and October 12, 2018, and so on.  Do you see that there?

A   Yes.

Q   And you break down the hours that you worked on whatever the tasks were that have been

Page 518

redacted from this report, from this invoice, right?

A   Correct.

Q   But the other invoice that we looked at that was in Exhibit Number 7, spanned that two year period and it didn't detail the dates in this way, correct?

A   Correct.

MR. ART:  Well, I just want to lodge an objection that I think we intended to redact these bills further because we think that the information that is redacted is not subject to disclosure under the rules.  But, apparently in this statement we did not, and so we'll permit the questioning but we have objections to questioning about line item bills from other cases, and we should have redacted them.

MS. ROSEN:  Okay.  Are you saying that what we're looking at right here on Page -- that is Bates stamped Leo 976, should be further redacted?

MR. ART:  Yes, I think so.  I think -- I mean I think you're entitled to know what the expert's hourly rate is, what the expert charged in total for work on a particular case including

Page 519

the number of hours, but not more than that.

MS. ROSEN:  Okay.  Well, there's no reason to debate it at this point.

Q   (By Ms. Rosen) Okay.  My question really is this 2018 -- late 2018, early 2019 invoice as well as some of the other invoices that we looked at provides a more detailed breakdown of the work you did and the time you spent on a particular matter per day.  But the invoice that spans July, 2019, to January 15th, 2022, in the Reyes matter was not created in that way.

And my question is why did you do that in the other bill in the less detailed fashion?

A   I cannot answer that question in light of Mr. Elson's admonition to me five or ten minutes ago.

Q   Okay.  All right.  And then Page 979 is for a case, Anderson versus Knox County, and this particular hourly rate for this case that looks like was for work being done in 2020, is $450.00 an hour, correct?

A   Yes.

Q   And then finally if we get to 981, we have this report, that is in a case called Rosario.  And

Page 520

your hourly rate for work being done in 2021, is $475.00 an hour, correct?

MR. ART:  Objection to form, and I'll just state for the record that this was produced unredacted inadvertently by my office, apparently.  We would assert the same privileges and the same redactions would apply to these pages.

So, I'm going to actually call these back.  You can ask about the hourly rate.  And you can ask about the line items that were produced in the redacted version, but we have objections to questions about the privileged information that's not subject to disclosure under Rule 26.

MS. ROSEN:  I'm in disagreement with you about your reading, but in any event I don't intend to ask questions about the line items on this particular invoice.  And you're asking to call it back.  You can call it back, but we can have a discussion about your position regarding line item redactions.

MR. ART:  Very good.

MS. ROSEN:  Okay.  Why don't we take a break so I can review my notes.  And then

Urlaub Bowen & Associates, Inc.   312-781-9586

RICHARD A. LEO, PHD, JD, 09/29/2022                    Page 521..524

Page 521

hopefully the next segment will be close to the last segment.

THE VIDEOGRAPHER: We're off the video record at 5:28 p.m.

(At this time, a short break was taken off the record.)

THE VIDEOGRAPHER: We are back on the video record at 5:41 p.m.

Q   (By Ms. Rosen) All righty, we're in the home stretch.  Dr. Leo, your report with respect to your opinions related to pattern and practice identify case summaries for cases that span the period of approximately 1987 to 2002, correct?

MR. ART: Objection to the form.

THE WITNESS: I believe so.  I would have to go through the report to confirm that, but I believe that's the approximate range.  Although, One of the headings indicated that some of the Area 2 cases were from the 1970s.

Q   (By Ms. Rosen) Right.  But as we discussed earlier and you made the point of you didn't do case summaries for the Area 2 cases, right?

MR. ART: Object to the form of the question, mischaracterizes his testimony.

Page 522

THE WITNESS: In the report, correct, I did not do Area 2 case summaries.

Q   (By Ms. Rosen) Okay.  So, focusing on the case summaries, I am correct that the time period is approximately 1987 to 2002, correct?

A   Correct.

Q   And do you know how often criminal defendants in that time period brought motions To suppress statements based on allegations of physical abuse?

A   I do not know the number and I do not believe -- I do not believe that number exists. But there's a governmental body that tabulates that number and that number would be accessible.

Q   Do you have any idea how often, meaning in how many cases in any given year, during the 1995 to 1998 time frame criminal defendants bring or brought motions to suppress based on allegations of physical abuse?

A   I have to apologize, one of my kids is at the door and apparently I locked it thinking I had left it unlocked, so I just need to run down.  If you want to go off the record, it literally will just be thirty seconds.

Page 523

Q   I just need an answer to my question before you run off, sorry.

A   Oh, I'm sorry, go ahead.  Can you repeat the question?

Q   Sure.  Do you know how often criminal defendants brought motions to suppress based on allegations of physical abuse during the 1995 to 1998 time period?

A   I do not know that number.  I don't think anybody knows that number.

Q   Okay.  Why don't you go let your child in.

A   I'll be right back.  I promise it will be very, very brief.

Q   Okay.

A   Back, sorry about that.

Q   No worries.  Do you know in the 1995 to 1998 time period how many criminal defendants brought motions to suppress alleging physical -- motions to suppress their statements alleging physical abuse involving police officers employed by the Chicago Police Department?

MR. ART: Objection to form.

THE WITNESS: I do not know that number. I do not know the source that has tabulated

Page 524

that number.

MS. ROSEN: I have no further questions at this time, but I believe Miss Golden does.

QUESTIONS BY MS. GOLDEN:

Q   Good afternoon, Doctor.  My name is Caroline Golden and I represent some of the individual officer defendants in this case.  Thank you for hanging in there.

Does your -- I will try to be as brief as I can but I'm going to be shuffling through papers, so please bear with me.

Does your report contain any opinion about or description of the role of Investigator Harvey in the custodial interrogation of Mr. Solache or Mr. Reyes?

MR. ART: Objection, form.

Q   (By Ms. Golden) Do you want me to break it down?  Does your report contain any opinion about the role of Investigator Harvey in the custodial interrogation of Mr. Solache?

MR. ART: Objection to form.

THE WITNESS: I'm just going to review my report for a moment.

Q   (By Ms. Golden) Sure.

RICHARD A. LEO, PHD, JD, 09/29/2022                    Page 525..528

Page 525

A   I don't mention Detective Harvey by name, but I do not know if he was one of the detectives that Mr. Solache described interrogating and in Mr. Solache's description of the interrogation. And if so, it would apply -- the opinions -- an opinion or more in the report could apply to him.

Q   Do you have any criticism of the work that -- of the forensic investigators that were assigned to the Soto homicide investigation?

MR. ART:  Object to form.

THE WITNESS:  I don't believe in the report I analyzed the work of the forensic investigators.

Q   (By Ms. Golden) Do you in your report analyze the work of Sergeant Biebel?

MR. ART:  I mean I guess I object to the extent the report, what's in it, speaks for itself.

THE WITNESS:  I don't recall if I mentioned Sergeant Biebel in the report.

Q   (By Ms. Golden) Do you recall mentioning Sergeant Mingey or Sergeant Cavatelli in the report?

MR. ART:  Same objection.  Go ahead.

THE WITNESS:  Without going through the

Page 526

report, I don't recall.

Q   (By Ms. Golden) Okay.  I expect that if they had a significant role in the custodial interrogation of Mr. Solache or Mr. Reyes you would recall it, right?

MR. ART:  Objection to the form.

THE WITNESS:  Yes, I would be more likely to recall it as I sit here today.

Q   (By Ms. Golden) Okay.  Do you agree that a guilty person's confession can contain details that are not accurate?

A   Yes, I agree that is possible.

Q   Do you agree that confessions -- truthful confessions can be -- I'm sorry.

Do you agree that a guilty person's confession can only be -- can be only partially true?

A   Not necessarily.  You could have a confession that is a hundred percent factually true and the person could be guilty.  So, it's not only the case that a guilty person's confession could be partially true, it can also be entirely true.

Q   Some confessors, some guilty confessors actually intentionally misstate the facts and

Page 527

circumstances of the crime they have committed, don't they?

MR. ART:  Objection to form.

THE WITNESS:  I'm sure that that occurs in some cases.  It may -- but there are other reasons as well.

Q   (By Ms. Golden) Are you done?

A   Yes.

Q   Would you expect to find victim DNA in the car used to commit the Soto homicides?

MR. ART:  Objection to the form, incomplete hypothetical.

THE WITNESS:  Possibly, yes.

Q   (By Ms. Golden) Do you think that Adriana Mejia commited the Soto homicides and kidnapping alone?

A   It's not for me to say who did or did not commit the crime.  But I think there is strong evidence that she did commit the crime.  I do not know whether she committed the crime alone or in concert with somebody else.  I think the unknown male DNA at the crime scene and possibly left elsewhere -- I'm not recalling everywhere it was -- would suggest that she had an -- potentially had an

Page 528

accomplice.

Q   Do you think it's possible for a woman of her -- by the way, did you review any videotaped deposition testimony?

A   I reviewed deposition transcripts.

Q   Did you also review any videotaped depositions?

A   I did not, just the transcripts.

Q   And you would -- I think we agree that Adriana Mejia is, in fact, guilty of the Soto homicides and kidnappings, right?  I think we can agree to that.

A   What I said is that there is strong evidence of her guilt.

Q   Okay.  But you would agree that her confession is only partially true?

MR. ART:  Objection to the form.

THE WITNESS:  I would -- I believe the evidence does not support her assertion that Mr. Reyes or Mr. Solache were involved in the crime with her.

Q   (By Ms. Golden) Are there any other facts in her confession that you believe are unsupported by the evidence in the case?

Urlaub Bowen & Associates, Inc.   312-781-9586

Page 529

MR. ART: Objection to form.

THE WITNESS: I haven't looked at her confession statement for at least nine months, so in order to answer that question I would have to be allowed to review it, and then I can answer it for you.

Q   (By Ms. Golden) What is your degree of confidence that the confession statement of Mr. Reyes meets the criteria for a proven false confession?

MR. ART: Objection to form and to the statement "degree of confidence." You can go ahead and answer. Objection to form and to the phrase "degree of competence."

MS. GOLDEN: I said confidence.

MR. ART: Objection to form and to the phrase "degree of confidence."

Q   (By Ms. Golden) You can answer.

A   I don't think I can put a number on it, but I would say that I am confident that that confession statement meets the criteria or at least one of the criteria of the proven false confession.

Q   Do you draw any distinction between a prosecutor acknowledging innocence and a prosecutor

Page 530

making a statement that he or she declines to prosecute?

MR. ART: Objection to form.

THE WITNESS: Well, a prosecutor might decline to prosecute for reasons not related to innocence. A prosecutor may also believe that the person is innocent, but may not want to state that publicly for -- for any number of reasons.

Q   (By Ms. Golden) You agree, though, that a prosecutor might decline to prosecute even if -- even though they believe a suspect or a person is guilty if they just don't have the evidence for the prosecution?

A   Yes, I believe that's possible.

Q   And there's a very high evidentiary burden in a criminal case, right?

A   If -- if you mean beyond a reasonable doubt, yes.

Q   Okay. Do you think or do you have an opinion about whether or not -- what is your understanding of the injuries -- I'm going to withdraw that.

Would you agree that one reason a person

Page 531

can agree to confess is because they're guilty?

A   Yes.

Q   Do you agree that one reason a person can be moved from denying involvement in a crime to admitting it is because they're guilty?

MR. ART: Objection to form.

THE WITNESS: I think that's an incomplete answer because even guilty people typically don't confess in a vacuum. And so unless a guilty person spontaneously confessed, if the confession is in response to police interrogation practices or techniques, then that would also -- or the police interrogation situation, or other factors, that could also influence the decision to confess of a guilty person.

Q   (By Ms. Golden) Did you -- I think we talked earlier about the Lassar Report. Do you remember that?

MR. ART: Objection to form.

Q   (By Ms. Golden) Something that we -- something that you reviewed and considered in connection with your work in this case?

A   Yes.

Page 532

Q   Do you agree with the Lassar Report's conclusion that more likely than not Solache -- Mr. Solache and Mr. Reyes were physically abused during the course of the interrogation?

A   I don't think it's for me to make a factual determination about what did or did not happen, but I do believe that there is substantial evidence supporting that, and that the evidence would come from multiple sources.

One would be the assertions of Mr. Reyes and Mr. Solache. Two would be that Miss Mejia and Rosauro Mejia also assert that they, too, were physically assaulted. Three would be that, as you know, I believe it meets the criteria of a proven false confession. And in addition, there's substantial indicia of unreliability, and that their account fits with why you would have that, whereas Detective Guevara's account does not. And four, there is substantial evidence of a pattern and practice, not only across the areas in the Chicago Police Department of physical and psychological abuse in interrogations, but more specifically also by Detective Guevara, and that would also be evidence.

And then I would add to that the Lassar

RICHARD A. LEO, PHD, JD, 09/29/2022                    Page 533..536

Page 533

Report's opinion as evidence as well supporting Mr. Reyes and Mr. Solache's repeated testimony under oath over many, many years that they were physically and psychologically assaulted and coerced by Mr. -- I'm sorry, by Detective Guevara.

Q   Does the Lassar Report support the conclusion that Mr. Solache and Mr. Reyes are not innocent?

MR. ART:  Objection to form.

THE WITNESS:  My recollection is that they declined to opine whether they are -- they believe he's innocent -- Mr. Reyes or Mr. Solache are innocent --

Q   (By Ms. Golden) Did you --

A   -- but I would have to review the report which I could easily do if I'm misremembering anything about that.

Q   Was it your -- was it your practice as you were reviewing the record to pick and choose what parts of what documents you intended to believe or not believe?

MR. ELSON:  Objection to the form.

THE WITNESS:  I would disagree with the way you stated that question.  It implies a

Page 534

kind of arbitrariness and selection bias.  I would say that in any case, including this case, an expert is presented with a range in documents, and this is -- I have -- there's very few cases in which I've been presented with the amount of documents as I've been presented in this case.

But, even in cases where I've been presented with far less, hundreds instead of thousands or tens of thousands of pages, any analyst, any expert has to analyze those, and by necessity based on their expertise, based on their analysis, put a different amount of weight on different pieces of evidence depending on what that evidence is.

So, it's not so much picking and choosing, it's what weight one assigns in the analysis of evidence in a particular case or with respect to a particular opinion.  And I've tried in this deposition to discuss some of that, that I would put less weight on evidence of allegations that were contained in one civilian complaint as opposed to evidence that was from a complaint and judicial findings and a police report -- or I'm sorry, a government report or a DNA test.

Page 535

So, I do think we put different weight and I did put different weights on evidence in this case that I analyzed, but I don't think it was a matter of just picking and choosing in the colloquial connotation of that phrase.

Q   (By Ms. Golden) All right.  You understand that Rosauro Mejia was also a Spanish speaker, correct?

A   Yes.

Q   Do you have any reason to believe that he had any less or more difficulty with the language than did Mr. Solache or Mr. Reyes?

MR. ELSON:  Objection to the form.

THE WITNESS:  I do not know what his level of difficulty was or was not

Q   (By Ms. Golden) What is the purpose of scripting as you've described it?

A   Pressuring a suspect to adopt a narrative that is consistent with what the police believe occurred in the crime and that will present a plausible, if not persuasive, account to prosecutors, judges, and juries.

Q   Okay.  I think in your report you pointed out what you called factual errors in the confession

Page 536

that were inconsistent with crime scene facts including the location of the bodies, the absence of blood on Mr. Solache, no blood on the shoes of Mr. Solache, Mrs. Soto screaming while -- I'm sorry, Mrs. Soto screaming while her husband was sleeping, and the $600.00 motive.

And so is there anything that will prevent the plaintiff's counsel from arguing to the jury about these facts if you don't testify?

MR. ELSON:  Objection to the form, mischaracterizes --

MS. GOLDEN:  Let me put it differently.

Q   (By Ms. Golden) If you're not allowed to testify, the plaintiff's counsel can still argue these facts to the jury, right?

MR. ELSON:  Same objections.

THE WITNESS:  I think that's beyond the scope of my expertise because if there was a challenge to the plaintiff's making those arguments, a judge would rule on that evidentiary challenge.  And we're talking about a future event, so I don't know.

Q   (By Ms. Golden) You had -- got a law degree and some other degree at the same time.  What

Urlaub Bowen & Associates, Inc.   312-781-9586

RICHARD A. LEO, PHD, JD, 09/29/2022                    Page 537..540

Page 537

was the second degree in?

A   A Ph.D. in an interdisciplinary law and social science field where I specialized in social psychology, criminology, and sociology.

Q   So, you have a Juris Doctorate like the other lawyers in the case, right?

MR. ART:  Object to form.

THE WITNESS:  I do have a Juris Doctorate Degree --

Q   (By Ms. Golden) But you're not admitted to practice law anywhere?

MR. ART:  Were you done with your answer, Dr. Leo? I think you cut him off.

THE WITNESS:  Yeah, I was going to say I never sat for the bar exam, and I've, of course, never litigated a case, and I've never worked for a law firm in the capacity of a clerk or a lawyer.  So, while I formally have a J.D. Degree, my experience and -- and occupation is very different from any of the lawyers in this case.

Q   (By Ms. Golden) And you've never been a police officer, right?

A   Correct.

Page 538

Q   And you've never investigated a crime or taken -- interrogated a suspect, right?

MR. ART:  Objection to form.

THE WITNESS:  Correct.

Q   (By Ms. Golden) I want to ask you a little bit about the idea that physical abuse or torture can cause someone to falsely confess.  That is generally accepted, correct?

A   It's generally accepted in the scientific community and the research literature that physical coercion and torture can and does sometimes lead to false confessions.

Q   And that's something that's generally understood by the average American, right?

MR. ELSON:  Objection to the form.

MR. ART:  Objection to the form.

THE WITNESS:  I don't know if there's a survey establishing that, but it certainly would be less counterintuitive than that psychological methods of interrogation --

Q   (By Ms. Golden) I'm sorry.

A   -- that lead to false confessions.

Q   Okay.  Are you aware of any studies that support the idea that expert testimony is necessary

Page 539

to explain to a jury that physical abuse can cause someone to falsely confess?

MR. ART:  Objection, form.  Totally irrelevant, calls for a legal conclusion.  Go ahead.

THE WITNESS:  I'm not aware of any study that makes that argument.  I don't think any study would ever argue that expert testimony is necessary.  A study might marshal evidence that suggests expert testimony could be helpful under certain circumstances or generally, but I don't think any study would say that it's necessary.

Q   (By Ms. Golden) Are you aware of any study that says that expert testimony is helpful for jurors to understand the concept that physical abuse and torture can cause someone to falsely confess?

MR. ART:  Objection, form and relevance. Go ahead.

THE WITNESS:  I'm not aware of any specific study that argues that.

Q   (By Ms. Golden) You state in your report that you said that the accounts of Officer Trevino, Detective Guevara, Detective Dickenson, and

Page 540

Detective Rutherford could not explain how Mr. Reyes moved from a denial to an admission of guilt, is that fair?

MR. ART:  Objection to form.

THE WITNESS:  It could explain how you move from a denial to an admission, but it's a stretch.  And what I thought I was getting at in the report was that it isn't consistent with what we know leads to proven false confessions.

Q   (By Ms. Golden) If you eliminate what Mr. Reyes says about his custodial interrogation and only credit the testimony of Mr. -- or ASA O'Malley, Detective Guevara, Detective Dickenson, and Detective Rutherford, their accounts of the custodial interrogation are not inconsistent with Mr. Reyes's guilt, correct?

MR. ART:  Objection, incomplete hypothetical.  Is he disregarding Solache's testimony as well or just Reyes's?

Q   (By Ms. Golden) Well, so you don't -- you don't address Mr. Solache's testimony in the portion of your report that addresses no, he doesn't need to disregard Solache's testimony because Solache wasn't there.

RICHARD A. LEO, PHD, JD, 09/29/2022                    Page 541..544

Page 541

MR. ART: Okay. Same objection, and he's disregarding all the evidence in the case except for those officers you just testified about?

Q   (By Ms. Golden) So, if Mr. -- if Mr. Reyes is guilty and there is no other -- oh, forget it.

Mr. Reyes's guilt is enough to -- hold on, let me just find the report. It's so hard without the report.

I mean do you conceive of the possibility that Mr. Reyes confessed because he's guilty.

MR. ELSON: Objection to the form.

THE WITNESS: I don't think, as I mentioned earlier, generally somebody's guilt explains specifically enough why they would confess even if they are guilty unless it's a spontaneous confession. They would still, even if they are guilty hypothetically be responding to police interrogation pressure or techniques or tactics even if it was not a super long interrogation.

So, I resist the language generally that somebody confesses because they're guilty. It's too vague and ambiguous unless they spontaneously confess in the absence of interrogation. And

Page 542

even there I might rephrase it a little bit differently.

So, if -- if you hypothesize that -- for a hypothetical question, that Mr. Reyes or Mr. Solache are guilty because they were interrogated, it would still be something else or something broader that led them to confess in your hypothetical.

Q   (By Ms. Golden) How many interrogations have you personally observed?

A   Just a clarification, when you say personally observed, am I correct to interpret you to mean that I sat in on as they were occurring or --

Q   Yes.

A   So, you do not mean electronically recorded interrogations?

Q   Correct.

A   Okay. A hundred and twenty-two live interrogations inside the Oakland Police Department. Felony Investigative Divisions, there were five. There were --

Q   Are you -- are you actually intentionally lengthening your answers so I don't get to ask as

Page 543

many questions as I would like?

MR. ELSON: That's absurd. You need to let him finish his answer --

MS. GOLDEN: I'm just looking -- I'm just looking at a transcript --

MR. ART: You just asked him how many times he had been in interrogation, and he's answering that question and told you --

MS. GOLDEN: He's answered -- he's answering --

MR. ART: -- the number of times he's participated in a particular location, and as soon as he said as the first response to your question, after asking for clarification, you stopped him from speaking and you said to him, "Are you trying to lengthen your answers to my questions so I don't get as many questions."

I mean he's answering literally the only thing you asked about with directly responsive information. And badgering the witness in response by interrupting his answer --

MS. GOLDEN: You've --

MR. ART: -- is totally inappropriate.

Q   (By Ms. Golden) You've been asked that

Page 544

question before, and I'm looking at it in a transcript --

MR. ART: He did not finish his answer. Please stop interrupting my witness. He is going to finish his answer before you interrupt him and ask another question. Go ahead, Doctor.

Q   (By Ms. Golden) Do you remember the question?

A   Yes. I was right at the end of my answer. All I was saying was that it -- that those occurred in 1992 to 1993.

Q   So, the last time you personally observed an interrogation was 1992 or 1993?

A   Correct.

Q   And it's true, is it not, that you can't infer that just because someone was physically tortured that the confession is false?

A   By that fact alone, correct. But, it substantially increases the risk of getting a false confession.

Q   All right. You've been offering expert services -- I'm sorry. You've been offering services as an expert witness since 1996 or 1997,

Urlaub Bowen & Associates, Inc.   312-781-9586

RICHARD A. LEO, PHD, JD, 09/29/2022      Page 545..548

Page 545

does that sound about right?

A  Correct.

Q  And I think that about 95 percent of your work is testifying or working with criminal defense -- in criminal -- in criminal cases, is that also correct?

A  That's my estimate. I haven't counted it up, but that's what I would estimate. It might be 90 percent, but in that range.

Q  And when a criminal defense attorney consults with you, it's because they want to develop a defense that a false confession has occurred, is that true?

A  Not necessarily, no. There might be a range of reasons why a criminal defense attorney would consult with me.

Q  Have you ever testified that when a criminal defense attorney consults with you, they're consulting with you because they want to develop the defense that a false confession has occurred?

MR. ELSON: Objection to the form.

THE WITNESS: I might have testified to that, but if I was allowed to give a fuller answer, I would have given the answer that I

Page 546

just gave right now.

Q  (By Ms. Golden) You think when you gave that testimony you were cut off?

MR. ART: Objection to form.

MR. ELSON: Objection to the form.

MR. ART: Are you going to show us the testimony?

MS. GOLDEN: No.

MR. ART: So, we're just taking your word for it that he gave testimony?

Q  (By Ms. Golden) Do you think -- can you answer the question?

MS. ROSEN: You're accusing her of misrepresenting a transcript?

MR. ART: Yes, and I'm asking to see the transcript.

MS. GOLDEN: I will give it to you later.

Q  (By Ms. Golden) Doctor Leo, do you --

MS. ROSEN: That is inappropriate.

MR. ART: Provide us the document that you're supposedly cross examining him about so that we can see it and answer questions about the testimony.

MS. ROSEN: You are too much. You're

Page 547

accusing her of misrepresenting the testimony. That's wonderful.

MR. ART: I am accusing her of not providing the witness with a document and characterizing the testimony in a way favorable to the defense in this case in order to make a point.

And I think if she wants to ask questions about the reasons Dr. Leo gave testimony in a past case that we are not identifying, she should provide the transcript that she's questioning based on.

MS. ROSEN: Well, it's her -- as your office has repeatedly told us when your people are asking questions, it's her -- it's her time to ask the questions in her way and you should stop being offensive and accusing her of misrepresenting the transcript.

MR. ART: Okay --

MS. GOLDEN: Steve, if I have -- if I have impeachment evidence, I will provide it to you but --

MR. ART: If you're going to ask questions --

Page 548

MS. GOLDEN: -- we need to move on.

MR. ART: Okay. So, if you're going to ask questions about sworn testimony in other cases, I'd like to see it so the witness can read the testimony before he answers questions about it.

MS. GOLDEN: That's -- that's just not how it works, but anyway --

Q  (By Ms. Golden) Does your report contain any conclusion that Mr. Solache or Mr. Reyes has an intellectual disability or disorder or are mentally ill?

A  Not in my report.

Q  Does either Mr. Solache or Mr. Reyes -- were either of them juveniles at the time they confessed?

A  No.

Q  Does your report contain any conclusion that Mr. Solache or Mr. Reyes had a low IQ or low level of cognitive functioning?

A  No.

Q  Okay. Can we go to Exhibit 1, Page 164, please. And are you aware, Dr. Leo, of -- I'm sorry. First of all, when you -- when you testify

RICHARD A. LEO, PHD, JD, 09/29/2022          Page 549..552

Page 549

in a motion to suppress, generally what is the purpose of your testimony?

A  Generally the purpose of the testimony is to educate the judge about the psychological research literature on police interrogation, psychological coercion, and sometimes unreliable confessions or statements, and then to provide an analysis of which techniques were used in the particular interrogation and what the research says about those techniques or what the findings have been that bears on the judge's decision about whether to admit or exclude the confession statement that was the product of the interrogation.

There are some cases, not a majority, but some cases where the interrogation is of a witness, and so it's -- it's the same reason, that it doesn't apply to the suspect.

Q  And the decision being made in a motion to suppress is whether or not typically to suppress a confession, correct?

MR. ELSON:  Objection to form.

THE WITNESS:  Correct.

Q  (By Ms. Golden) Okay.  And then if the motion to suppress is denied, does that necessarily

Page 550

mean that the confession was not given involuntarily?

MR. ELSON:  Objection to form.  Answer if you can.

THE WITNESS:  Well, if -- if the -- if the defense attorney is arguing that it was involuntary and the judge admits the confession, doesn't exclude it and says it was voluntary, then as a matter of law the confession has been found to be voluntary.  It may be the case that I have opined that as a matter of psychology it was my opinion that psychologically coercive techniques were used, but the judge has made the legal decision, which is how I understand your question.

Q  (By Ms. Golden) Okay.  I think so.  Do you -- in the pages -- let's go to Page -- let's go down 1, 2, 3, 4 -- go to the deposition section.  Do you see the cases listed here on Page 167 of Exhibit 1?

A  I do.

Q  Okay.  Did you issue a report in any of these cases -- I'm sorry, strike that.

Did you testify in any of these depositions that the confession statement at issue

Page 551

met the criteria for a proven false confession?

A  I do not recall whether I did.  I believe -- I would have to look at the transcripts.  I believe that in the Henry Lee McCollum case, that's four up from the bottom, my recollection is that that was not disputed.  I may be wrong, but I would have to review the testimony.

Q  Have you testified at trial in any of these cases that are listed here as those in which you gave deposition testimony?

A  I testified in the Henry Lee McCollum case at the civil trial.  I did not testify in any of the -- I do not believe I testified in any of these other cases.  I don't think any of the other cases went to or have gone yet to trial.

Q  And sometimes when you testify -- well, do you generally find out what happens in the case after you testify?

A  Usually I inquire if I'm not told, and usually I'm told but not always.

Q  Do you have any estimate as to the number of times in which you've testified in a motion to suppress and the suspect has pled guilty to the crime?

Page 552

MR. ELSON:  Objection to the form.

THE WITNESS:  I do not know and I don't have an estimate that would be better than a guess, and I don't want to guess.

Q  (By Ms. Golden) But it's happened, right?

A  Yes.

Q  And has it also happened that you testify at a motion to suppress and the judge makes a determination that the confession was not involuntary?

MR. ELSON:  Objection to form.

THE WITNESS:  Yes.

Q  (By Ms. Golden) And do you have any estimate as to the number of times that that's happened?

A  I would say more than fifty percent, but I don't know how much more than fifty percent.

Q  So, fifty percent of the times you've testified at a motion to suppress the confession is allowed to be used as evidence at trial?

A  I think that misstates my testimony.  I would say more than fifty percent.  I just -- I'm reluctant to provide an estimate above that because I just don't know.

RICHARD A. LEO, PHD, JD, 09/29/2022                    Page 553..556

Page 553

Q   Okay. And sometimes when you testify at trial the criminal defendant is found guilty, correct?

A   Correct.

Q   And do you have any estimate as to the number of times you testified at trial that the criminal defendant is found guilty?

A   No. I would just be guessing and I don't want to guess.

Q   And it's my understanding from correspondence with your counsel that you've never testified in a criminal case that a particular confession met the criteria for a proven false confession, is that right?

A   I don't recall ever testifying in a criminal case to that.

Q   Okay. I apologize if we've covered this, but the false evidence ploy is a perfectly legal technique, correct?

MR. ELSON: Objection to the form.

THE WITNESS: I would say that it's -- it's legal, but "perfectly" might not be the right word to attach to it because you could and sometimes do have false evidence ploys that

Page 554

imply leniency or threaten harsher punishment. And in that case the false evidence ploy would be suppressed by a judge as unlawful.

But usually false evidence ploys in our system are considered lawful, and by themselves don't result in involuntary confessions.

Q   (By Ms. Golden) Have you ever under oath described the false evidence ploy as a perfectly legal technique?

MR. ELSON: Objection to the form.

THE WITNESS: Without seeing the transcript I don't know, but if I had, I would say -- I would -- I would say that I overstated that because there are some circumstances in which false evidence ploys, as I just mentioned, would not be perfectly lawful, and that would be if they implied threat or promise or otherwise caused an involuntary confession or statement.

Q   (By Ms. Golden) It's true, is it not, that a true evidence -- that convicting a guilty suspect with evidence that is, in fact, true is very powerful to persuade them to admit to their involvement in a crime?

Page 555

MR. ELSON: Objection to form.

THE WITNESS: I would say that it's a powerful interrogation technique psychologically, yes, whether it's a true evidence ploy or a false evidence ploy.

Q   (By Ms. Golden) But confronting a guilty suspect with evidence of his guilt that he knows to be true is very persuasive, correct?

MR. ART: Objection, form, asked and answered.

THE WITNESS: It can be persuasive, yes.

Q   (By Ms. Golden) I would think so. And those confessions are true or mostly true, is that correct?

MR. ART: Objection to the form.

THE WITNESS: That is the conventional wisdom. We don't know what percentage of confessions are true or partially true, or false or partially false, but that is the conventional wisdom.

Q   (By Ms. Golden) Okay. So, as I understand your opinion and -- your opinions in this case, sometimes in order to terminate the stress of an interrogation, the suspect might confess falsely

Page 556

just to get out of there, right?

A   Correct. The longer the interrogation goes or the more risk factors are used or the more psychologically or physically coercive the interrogations.

Q   And they can also confess truthfully just to get out of there, right?

MR. ELSON: Objection, form.

THE WITNESS: That's true. That is a possibility generally.

Q   (By Ms. Golden) Do you have a degree in psychology?

A   I do not have a degree in psychology. As I mentioned earlier, it's an interdisciplinary social science degree. I have been a professor of psychology and I am considered a social psychologist, but I don't have a formal degree in psychology.

Q   What does it mean to objectively establish something?

A   That it's -- it's verifiable.

Q   And it's -- it's pretty much common sense, is it not, that if a crime -- that if a person confesses to a crime that didn't happen, it's a false confession?

RICHARD A. LEO, PHD, JD, 09/29/2022          Page 557..560

Page 557

MR. ART: Can you let me know what you mean by "it is pretty much common sense"?

Q (By Ms. Golden) Well, what do you think common sense means?

MR. ART: Objection to the form.

Q (By Ms. Golden) Let me -- I'll try to phrase it differently.

Don't you think that the average person can understand without the aid of expert testimony that if a person confessed to a crime that they didn't commit that their confession must be false?

MR. ELSON: Objection to the form.

THE WITNESS: No, I think that's a tautological question. What the research shows is that people don't by and large understand why false confessions occur. It doesn't make sense to them. They don't understand why if they're told that somebody falsely confessed why they would have falsely confessed unless they were tortured or mentally ill.

Q (By Ms. Golden) You don't think that the average person can understand that if there was no crime that the confession can't be true?

Page 558

MR. ELSON: Objection to form.

THE WITNESS: I do -- I think that's a different question. I do think that if the murder victim, for example, showed up alive that people would understand, yeah, the confession has to be false. But, I don't think they would understand why somebody gave a false confession, or how often false confessions have been documented, why they happen in such apparently large numbers.

Q (By Ms. Golden) Isn't it also pretty easy to understand -- isn't it also fair to say that the average person could understand that if a person was in Mexico at the time a crime was committed in Chicago, that they couldn't have committed the crime, and that's like the alibi defense that's presented all the time, right?

MR. ART: Objection.

THE WITNESS: Yeah, you've asked a compound question. So, on the second question, I don't know if it's an alibi defense that is presented all the time. I would certainly be surprised if in Chicago it was presented all the time that the defendant was in Mexico, but

Page 559

I just don't know.

I think that if there was objective evidence indicating that somebody in Chicago was in Mexico, and then a case was dismissed because of that, I think people would understand that, yes, you can't be in two places at the same time. But again, I don't think they would understand why a person would have falsely confessed to that, or likely understand, unless that person was tortured or mentally ill.

Q (By Ms. Golden) On Page 53 of your report, in Section B at the bottom there, in the middle of the first paragraph, it says, "Physical evidence left by the true perpetrators at the very bloody crime scene." Do you see that reference there?

A Yes.

Q And by "the very bloody crime scene," you're referring to the Soto home, correct?

MR. ELSON: Objection, asked and answered.

THE WITNESS: Correct.

Q (By Ms. Golden) And what evidence, what physical evidence was left by the true perpetrator at the very bloody crime scene?

Page 560

MR. ART: Objection to the form.

MR. ELSON: Objection, asked and answered.

THE WITNESS: Well, presumably DNA evidence at the very least because we have a DNA match to two people at least.

Q (By Ms. Golden) I misunderstood you then. I thought you were saying that the true perpetrator -- and maybe this was somewhere else in your report and I just have the wrong reference -- left DNA at the crime scene that was discovered. Is that not your position?

A No. It's my position that at a crime scene that bloody, that blood soaked, where somebody had been stabbed more than fifty times, or two people rather, combined, that almost certainly the true perpetrator would have left their DNA at that crime scene. And in fact, that we have two people's DNA at that crime scene and we do not have Mr. Reyes' or Mr. Solache's DNA at that crime scene.

Q Is it your belief that the unidentified male DNA profile was found in the Soto home?

MR. ART: Objection to the form.

THE WITNESS: I don't recall specifically if the unidentified male DNA was found in the home or if it was found in the car. I would

RICHARD A. LEO, PHD, JD, 09/29/2022                Page 561..564

Page 561

have to review materials to refresh my recollection, but I believe it was found in one of those two places.

**Q   (By Ms. Golden) Have you ever been allowed to testify that one person's account of a custodial interrogation fits with your research and another person's does not?**

MR. ART:  Objection to the form.

THE WITNESS:  In the way that you phrased the question, I don't believe so because when I testify I'm not testifying about my research in particular.  I'm a small part of a very large field and body of research on these subjects.  But I do believe there have been some cases where I have been allowed to testify that a piece of evidence or an account is consistent with findings or inconsistent with findings from the research literature.

I don't recall a specific case on hand, but I do believe in some cases I have been allowed to discuss whether something is or is not consistent with findings in the research literature.

MR. ART:  We're at fourteen hours now.

Page 562

MS. GOLDEN:  I don't -- are we quite there?  I think we have a few minutes left, I was just going to take a break and --

MR. ART:  Yeah, no, I think we're at fourteen hours.  Let's -- if you want to take a break and go off the record you can, and we'll get the time.  But if we are at fourteen we are done for the day.

THE VIDEOGRAPHER:  We are at fourteen hours.

MR. ART:  That is the end of the time allotted for Dr. Leo's deposition.  We will reserve signature.

MS. GOLDEN:  Thank you, Dr. Leo.

MS. ROSEN:  Thank you, Dr. Leo.

THE WITNESS:  Thank you.

THE VIDEOGRAPHER:  We're off the video record at 6:41 p.m.

Page 563

CERTIFICATE OF REPORTER

I, RUTH S. MORRIS, an Illinois Certified Shorthand Reporter, do hereby certify that the witness whose testimony appears in the foregoing deposition transcript was duly sworn by me; that the testimony of said witness was taken by me to the best of my ability, and thereafter reduced to typewriting under my direction; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto; nor am I financially or otherwise interested in the outcome of this action.

IN WITNESS WHEREOF I have hereunto set my hand this 17th day of October, 2022.

*Ruth S. Morris*

Ruth S. Morris

IL CSR 084.002322

Page 564

STATE OF _____)

COUNTY OF _____)

I, RICHARD LEO, do hereby certify:

That I have read the foregoing deposition transcript;

That I have made such changes in form and/or substance to the transcript as might be necessary to render the same true and correct;

That having made such changes thereon, I hereby subscribe my name to the transcript.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _____ day of _____, 2022.

_____

Richard Leo

_____

Notary Public

My commission expires: _____.

RICHARD A. LEO, PHD, JD, 09/29/2022          Page 565

Page 565

Errata Sheet

NAME OF CASE: ARTURO DELEON-REYES vs REYNALDO GUEVARA

DATE OF DEPOSITION: 09/29/2022

NAME OF WITNESS: Richard A. Leo, PhD, JD

Reason Codes:

    1. To clarify the record.

    2. To conform to the facts.

    3. To correct transcription errors.

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

_____

Index: $350.00-2005

RICHARD A. LEO, PHD, JD, 09/29/2022

**Exhibits**

**4 Leo 092922-4** 261:12 279:1 285:23

**5 Leo 092922-5** 261:15 286:1 308:21

**6 Leo 092922-6** 261:17

**7 Leo 092922-7** 261:18 513:9 518:4

**8 Leo 092922-8** 261:19 513:12

**$**

**$350.00** 515:19

**$375.00** 510:18

**$400.00** 511:19 517:2,6

**$450.00** 513:19,23 514:6 515:2,11 516:7,11 519:20

**$475.00** 514:14,19 520:2

**$600.00** 536:6

**(**

**(1)** 280:14 283:3

**(2)** 280:16

**0**

**000001-000020** 419:3

**00001** 470:16 472:4

**00004** 470:16

**0001** 438:16 450:7

**00010** 438:16

**000105** 450:7

**000205-219** 419:13

**000208** 475:5

**00086** 438:15

**01** 450:7

**019812** 508:4

**019843** 508:5

**1**

**1** 264:2 267:24 292:14 308:22 335:10 391:1 415:7,8 424:22 459:8,14 488:22 489:15,16,18 497:12 509:20,23 510:4 512:14 516:17 548:22 550:17,19

**1-20-1256** 420:6

**10** 418:19 462:20

**1028** 264:9

**10:48** 331:20

**10th** 393:21

**11** 463:20 464:17

**11:00** 331:16

**11:03** 331:24

**11:45** 351:8

**11th** 517:11,20

**12** 464:21 517:21

**125** 461:24 462:3

**12:15** 351:18

**12:47** 390:19

**12th** 487:13 508:13

**13** 465:23 466:14 497:12

**14** 470:1,5,7

**15** 512:1

**15th** 269:17 512:6 516:17 519:10

**16** 333:5 419:10 471:17

**16.3** 333:17

**164** 548:22

**167** 550:18

**17** 300:8 475:3,20 476:13

**171** 414:24 415:2,5,7

**18** 264:9,10 419:5 478:4 489:8

**19** 365:6 478:11 488:22 489:16,18

**1930's** 365:11

**1942** 338:18

**1970s** 406:5,13 521:19

**1972** 359:9,22 363:11 365:21 367:22 370:11

**1982** 371:22 504:8,16 508:21

**1983** 307:4

**1984** 307:4

**1985** 504:16

**1986** 337:6 372:23

**1987** 521:13 522:5

**1989** 286:5

**1991** 300:14 367:22 370:12

**1992** 420:10 544:12,14

**1993** 364:16 366:10,13 419:7 447:5 544:12,14

**1994** 420:13

**1995** 415:1,2,6 504:8 522:16 523:7,16

**1996** 415:4,6 544:24

**1997** 544:24

**1998** 280:4 285:17 287:2 307:12, 16 314:17 355:14 358:20 393:18, 24 394:6,14,20 395:2,8,13,18,23 396:6,14,20 397:2 522:17 523:8,17

**1999** 391:11,16,22 392:2 419:22 420:16 424:7

**1:32** 390:23

**2**

**2** 284:8 295:10 332:17 333:8,10 336:21 355:8 360:13 367:20 370:10 371:2,17 373:2,3,4,10 379:17 397:15 398:11 401:5,9,18 402:6,18 403:6,14,18 404:4,17 405:6 407:14 408:8,11,21,22 409:16 424:15 429:14 434:11 459:5 471:15 480:22 482:4 483:17 485:5 513:9 521:19,22 522:2 550:17

**2's** 480:22

**20** 264:15 419:21 480:4 481:1

**2000** 359:9,23 363:11 365:21

**2002** 393:14,18 521:13 522:5

**2003** 393:21,24 410:1

**2004** 280:5 285:17 314:19 365:1,7 366:9 461:22 462:2,16

**2005** 394:6

Index: 2006-59

RICHARD A. LEO, PHD, JD, 09/29/2022

**2006** 393:15 394:12,14,17,19 395:1

**2007** 394:4

**2008** 339:8 365:3,8 366:9 487:18

**2009** 395:7,12 487:18

**2010** 395:16,18,23 487:13,17,19, 20

**201256-U** 420:6

**2013** 396:5,6

**2013-2014** 277:12

**2014** 508:13

**2015** 396:13

**2018** 396:18,20,24 397:2 500:5 501:8 515:17 517:2,11,20,21 519:5

**2019** 500:15 511:22 512:5 516:17 517:12 519:5,9

**2020** 512:15 513:5,24 514:2,4 515:1,5,8,11 519:20

**2021** 512:15,23 514:15,18 520:1

**2022** 264:5 269:17 420:5,7 511:22 512:6,23 513:5 516:18 519:10

**20th** 512:15 513:4

**21** 481:6

**21st** 395:1 420:7

**22** 304:3 420:9 483:7,22

**226** 302:12

**22nd** 395:12

**23** 484:17

**230** 302:12

**231** 302:12

**2312** 264:10

**238** 420:9

**239** 419:7

**23rd** 517:1

**24** 486:2 488:11

**244** 493:15

**24th** 511:22 512:5,15 516:17

**25** 269:3 486:2

**252** 419:6

**259** 420:12

**25th** 512:22

**26** 486:2,18 520:14

**26(a)2** 388:4

**27** 486:2

**28** 305:21 420:11 486:2

**282** 420:15

**28th** 395:23

**29** 305:21 420:15 486:3

**29-30** 415:8

**29th** 264:5 447:5

**2:44** 435:24

**2:57** 436:4

---

**3**

**3** 269:2,3 295:23 300:4,8 360:13 367:20 370:10 374:9,23 376:24 377:12,20 378:4,16 379:2 380:3,6 381:13,15 383:21 385:1 387:6,10 407:16 411:21,23 412:22 413:6,9, 12,23 414:13,16,17 418:14 421:3, 7,13 422:2,3,13,23,24 423:3 424:3, 14,16,18 429:13,14 433:2 436:20 442:20 443:4 446:3 453:9 454:17 459:4,5,10,14 460:7,9,12,15 461:5 462:22 468:8 471:12,13,15 480:5, 22 481:8,14 482:4 483:17 484:10 485:5 491:10 550:17

**30** 305:22 387:6 459:8,14 486:3,18 488:11

**303** 420:16

**306** 419:22

**30th** 515:17

**31** 305:23

**31st** 512:23 513:5

**34** 287:4 290:10 294:6 304:4,6 333:6

**35** 287:4 294:6

**38** 267:18 268:6,14,15,17

**39** 333:7 461:24

**39.6** 512:18

**3:35** 330:8

**3d** 420:13

**3rd** 337:1 351:8

---

**4**

**4** 269:2,4 278:24 279:1 285:23 296:20 301:24 302:3,5 360:13 407:16 429:14 436:15 438:15 441:15 459:5 471:15 480:22 482:4 483:17 485:5 488:21,24 491:10 510:14 512:22 550:17

**40's** 365:11 478:12

**409** 472:5

**40s** 479:7,15,24 480:1

**430** 302:5

**435** 287:5

**436** 290:6

**44** 347:17 348:5

**444** 292:9

**460** 278:12,13

**483** 279:11

**48905** 436:12

**49177** 436:12

**4:17** 490:20

**4:30** 490:15,18

**4:32** 490:24

**4th** 351:19 352:6,24 517:12

---

**5**

**5** 269:2,4 286:1 297:2 308:21 355:9 360:13 401:13,18 405:9 407:16 429:14 442:3,19 454:18 459:6 471:15 480:22 482:5 483:18 485:5 491:4,5 498:3 508:23 509:1,5,8,11

**50** 333:15

**50.4** 517:15

**52** 308:23 309:3

**53** 309:6 559:12

**54** 326:16,20 329:11

**55** 330:10 332:1

**56** 336:20

**57** 342:17

**59** 302:13 344:4

RICHARD A. LEO, PHD, JD, 09/29/2022

**5:00** 338:4 368:14

**5:28** 521:4

**5:41** 521:8

**5th** 330:8 337:1 511:22

---

**6**

**6** 368:9 378:15 443:2 444:12 510:13

**60** 289:12 345:1 348:3

**600** 264:16

**61** 349:8

**63** 349:12 351:3

**65** 359:3 363:24 397:14

**66** 366:15,18,24 369:24 398:4

**68** 287:20 370:21

**69** 372:22

**6:41** 562:18

---

**7**

**7** 333:7 348:12 378:19 449:2 450:1,9 500:1 510:2,9 511:18 513:9,10 518:4

**70** 373:17

**71** 391:2

**72** 393:13

**73** 394:10

**74** 394:22

**75** 396:3

**76** 396:11 397:7,11 398:6 406:2 409:5

**77** 377:6 411:21 468:9,23

**78** 378:1,11,15,19 436:14,15

**79** 385:13

**7th** 447:11

---

**8**

**8** 451:11 452:8 489:16 501:14 513:10,11,12

**80** 333:13 470:14

**81** 420:9

**82** 420:12,16 468:10,23

**83** 488:19

**88** 488:20 491:2

---

**9**

**9** 461:4,12

**90** 499:24 545:9

**92** 502:22 503:1

**93** 505:9

**931** 513:14

**936** 462:1 513:15

**937** 513:21

**94** 507:9

**945** 514:10

**946** 514:11

**947** 514:12

**948** 332:23

**95** 545:3

**950** 514:24

**953** 515:14

**956** 516:6

**959** 516:10

**963** 516:14

**964** 516:14

**965** 516:15

**967** 516:20

**969** 516:23

**973** 517:5

**976** 517:9 518:19

**979** 519:17

**981** 519:23

**9:00** 331:16 338:4 352:6,23

**9:04** 264:3

---

**A**

**a.m.** 264:3 330:8 331:20,24 351:18

**Aaron** 393:22

**abducted** 348:16,22 349:2,7

**abduction** 311:20 313:14,22 329:19 352:19 353:2 354:7 356:14

**Abel** 463:20,21

**ability** 441:10

**absence** 536:2 541:24

**absent** 357:17

**absurd** 381:9 543:2

**abundance** 456:12

**abuse** 335:12 350:10 353:16,23 355:10 358:16 359:11 365:12,13, 18,23 366:6,13 367:13 370:24 371:15 374:22 378:18 392:10 398:10,24 411:22 421:6 423:18 424:2,11 427:3 429:13 430:19 431:2,24 433:2 444:24 445:14 446:6 460:1,22,23 471:11 476:19 477:8 479:18 481:17,21 482:15 486:5,14 489:21 490:8 491:3 497:15 498:3 503:19 522:10,19 523:7,20 532:21 538:6 539:1,16

**abused** 353:11,21 412:5 415:12 462:11 505:10 532:3

**abuses** 350:22 355:7

**abusive** 406:9,18

**academic** 469:12

**accepted** 350:15 538:8,9

**access** 285:7,10 288:10,15 472:1 487:8

**accessible** 522:14

**accident** 336:8,9

**accidental** 344:15,24

**accomplice** 528:1

**account** 310:8 327:19,24 328:3 329:12 330:2,20 332:5 338:9 343:8 346:12,13 351:5 455:5 473:7 532:16,18 535:21 561:5,16

**accounts** 311:5 328:24 358:24 473:2 539:23 540:14

**accumulated** 414:12

**accumulates** 431:21

**accurate** 275:19 276:17 347:19 348:22 398:1 415:8 477:10 486:11 487:11 526:11

**accurately** 273:1 359:2

RICHARD A. LEO, PHD, JD, 09/29/2022

**accusation** 353:9,20

**accusations** 409:15,18 421:6,9
422:4 431:18 445:15 506:13

**accusatory** 479:9

**accused** 328:8 329:17 343:14
354:11,14 398:23 399:1 458:4

**accusing** 546:13 547:1,3,17

**acknowledged** 296:15 299:16
306:13 367:10,12

**acknowledging** 529:24

**acknowledgment** 283:4

**acolytes** 367:14

**acquittal** 283:8

**acquitted** 280:19 281:5 446:5
451:15

**act** 372:3 430:19

**acting** 443:13

**actions** 465:8

**activity** 456:14

**acts** 398:23 399:1 430:15

**actual** 325:4 378:20 406:24 409:10
447:21

**add** 269:6 347:9 468:8,15 469:19
486:17 532:24

**addition** 418:11 441:22 452:7,23
476:7 478:7 532:15

**additional** 297:17,20,23 298:2
300:11 343:19 370:24 371:15
440:5,6,9 447:13 451:20 468:8,15
470:20,24 475:13 485:17 488:16

**address** 540:21

**addresses** 540:22

**addressing** 330:22

**adds** 431:21

**adequate** 289:14

**adjusting** 349:14

**admission** 274:5,12,14,17,22,23
275:3,8 540:2,6

**admissions** 366:16 367:2 410:8
411:7 412:18 430:21 445:7,23

**admit** 549:12 554:23

**admits** 550:6

**admitted** 430:17 537:10

**admitting** 531:5

**admonition** 519:15

**adopt** 535:18

**Adriana** 295:3 307:17 312:2
329:16 527:14 528:10

**advance** 267:13

**adversarial** 479:9

**adverse** 506:21

**advised** 351:22

**advocates** 340:12

**affidavit** 446:8 448:1,7,8 449:2
450:1 493:15

**affirm** 429:10

**affirmation** 429:22 430:1

**affirmed** 396:5 428:13,23 429:20

**affirms** 429:9

**African-american** 359:8,22
363:10 406:7,16

**afternoon** 270:18 392:14 524:5

**age** 265:12

**aggregated** 277:22

**aggressive** 479:17

**agree** 389:23 400:11 526:9,12,13,
15 528:9,12,15 530:10,24 531:1,3
532:1

**agreed** 511:2,6

**ahead** 276:9 350:16 362:9 369:16
378:23 423:10 429:5 474:1 511:13
523:3 525:23 529:13 539:5,19
544:6

**aid** 452:22 557:9

**aids** 268:23 464:9 468:3

**alert** 392:16

**Alfonzia** 478:10,12,16 479:16

**alibi** 558:16,21

**alive** 290:14 297:11 558:4

**allegation** 361:16 378:2,15,17
415:15,23 432:5 445:20

**allegations** 335:12 353:16,22
355:10 358:18 360:12 361:6
364:14 365:17,23 366:13 374:10

375:10 376:24 377:11 387:15
389:17 409:20,23 411:5,10 412:16,
17 414:12 421:12 422:12 423:17
424:2,11 426:7,24 427:2 428:5,7
429:12,15,16 430:8 431:7,10,24
433:1 434:5,18 442:10,11,13
444:23 446:6 449:24 450:24 451:2
457:22,23 458:23 459:3,5,8,11,12,
16 460:14,23 471:3 476:4 501:19
502:5,6 522:9,18 523:7 534:20

**allege** 358:15 380:2 385:14 505:10

**alleged** 362:6 373:4,10 374:8
378:11 382:18 415:20 416:4
425:14,22 426:1 430:14,24 431:1
432:1 437:1 460:21 486:5

**allegedly** 489:21

**alleges** 379:24 380:3,4,5,7,9
425:22 434:19 445:15 462:11
500:2

**alleging** 426:14 523:18,19

**allotted** 562:12

**allowed** 292:20 295:12 301:9
363:5 379:1,10 465:18 529:5
536:13 545:23 552:20 561:4,15,21

**Almodovar** 495:1,4 507:13

**Almodovar's** 495:6

**Alnoraindus** 379:16,23

**altered** 322:5

**alternative** 317:16 460:20

**ambiguous** 274:11 541:23

**Amended** 475:9

**America** 365:3

**American** 339:1,2,8,11,12 366:6
538:14

**Amor** 513:15 516:6

**amount** 315:5 370:5 435:7,11
444:22 469:7,8 487:22 512:24
517:14 534:5,12

**analysis** 282:16 286:11 293:17
316:16 320:6,10,11 321:3,21 323:5
326:6 343:24 398:7 411:11,13,17
413:3 430:5 431:22 432:19 442:16
485:19,20 491:9 502:3,21 503:17
509:18 534:12,16 549:8

**analyst** 534:10

**analysts** 326:13

RICHARD A. LEO, PHD, JD, 09/29/2022

**analytical** 320:24

**analyze** 285:13 298:22 311:4 408:21 431:20 432:17 525:15 534:10

**analyzed** 280:3 283:1 306:19 320:9 344:20 363:23 453:18 482:3 497:5 499:6 525:12 535:3

**analyzing** 319:22 320:21 334:1,3 366:4 430:5 434:23

**and/or** 406:21,22 409:7,8 422:5 490:11 498:6

**Anderson** 482:18 515:1 519:18

**Andrew** 374:8 407:22 445:17 515:14

**Andrews** 423:2,7

**Andriana** 353:20

**Angel** 496:1

**Angeles** 516:24

**answering** 294:11 379:1,5,13 384:1,3 385:3 392:14 468:4 475:14 543:8,10,18

**answers** 350:18 383:14,16 542:24 543:16 548:5

**Anthony** 292:16 385:20 386:1,10 387:3 419:5,9,11,18 420:8,14 471:17 472:9 474:21 477:17 483:7 484:5,8,11,21 513:22

**anymore** 330:4

**apologize** 266:6,16 493:10 522:20 553:17

**apparently** 518:12 520:6 522:21 558:10

**appeal** 419:1 429:1

**appeared** 341:10 365:22

**appears** 357:14 511:21 516:15 517:18,19

**appellate** 305:5,12 419:8 420:1 465:6 485:22 488:17

**apples** 505:6

**applied** 319:2

**applies** 291:7

**apply** 350:20 520:7 525:5,6 549:17

**applying** 442:16

**appointed** 514:9

**approach** 339:10 353:4

**approximate** 521:17

**approximately** 397:18 513:6 521:13 522:5

**April** 330:8 337:1 351:8,19 352:6, 24

**AR-JENNER** 508:4

**arbitrariness** 534:1

**Arcos** 496:2

**are--** 439:17

**area** 269:2,3,4 321:4 345:15 355:8, 9 367:20 370:10 371:2,17 373:1,3, 4,10 374:9,22 376:24 377:12,20 378:3,16 379:2 380:3,6 381:13,15 383:20 385:1 387:6,10 397:15 398:11 401:5,9,13,18 402:6,18 403:6,14,18 404:4,17 405:5,9 407:14,16 408:8,11,21,22 409:16 411:21,23 412:22 413:6,9,12,23 414:13,16,17 421:3,7,13 422:2,3, 13,23,24 423:3 424:3,14,15,16,18 429:13 433:2 436:20 443:4 446:3 453:9 454:17 459:4,10,14 460:7,9, 12,15,24 461:5 462:22 468:8 471:12,13 478:21 480:5,22 481:8, 14 484:10 488:21,24 491:4,5,10 498:3 508:23 509:1,5,8,11 521:19, 22 522:2

**areas** 269:1 360:13 429:14 433:3 454:17 471:15 482:4 483:17 485:5 489:10 498:4 509:13,14,17 532:20

**argue** 536:14 539:8

**argues** 539:21

**arguing** 536:8 550:5

**argument** 539:7

**arguments** 536:20

**Ariel** 499:24 500:1

**Arizona** 303:17

**Arnold** 378:17 446:1,23 449:2,23 451:8

**arrested** 289:16

**arrests** 391:14

**arrive** 445:9

**arrived** 312:13

**arriving** 430:2

**Arson** 373:1

**Art** 264:22 265:19 266:16 269:24 271:3,15 286:12 289:9 291:19 292:3 301:11 308:8,13 310:11 312:24 313:15 314:7,15 315:19 317:1 319:19 320:19 325:17 331:11 343:4 347:7,9 348:8,23 349:3,16,24 350:7 353:5 354:12 356:2,6 357:5,20 360:6,23 361:22 362:8,20 363:12 368:24 369:7,16 370:15 371:8 372:9,19 373:11 374:12 375:14,20,24 376:4,11 377:3 378:24 379:9,15 380:12,16 381:2,7,12,24 382:10,22 383:19 384:20 385:7 387:17,22 389:1,23 391:15 392:3,19 393:11 394:1,7,15 395:3,9,14,19 396:1,7,9,15,21 397:3,8 399:14,20 400:11 405:19 407:8 408:4,24 409:12 410:21 411:2 412:6,23 413:13,15,20,24 415:14 416:7,17 417:8,14,19 418:7,21 421:14 422:21 423:10 424:4 425:12,19 426:3,11 427:6 428:8,14,24 429:4 430:9 432:8 434:13,20 435:6 437:3 438:21 439:11 440:3,8 441:4,19 443:11 444:17 446:12 447:16 448:5,14,21 449:1,11,15 450:13 451:18 452:9, 19 453:4,13 454:9 456:3,23 457:24 459:1,18 463:6 464:2 465:19 466:6,23 467:2,12,21 468:11,18,24 469:3,20 470:9 471:5 474:1,24 475:22 476:24 478:20 480:13 481:22 482:20 483:10 484:13 486:6 489:1,23 490:18 493:10,19 494:4,20 495:2,8,16 496:14 497:17 500:19 501:9,21 502:8 503:10 504:13 506:3 507:15 509:9 511:7, 24 512:19 513:10 514:20 515:5 518:8,21 520:3,22 521:14,23 523:22 524:16,21 525:10,16,23 526:6 527:3,11 528:17 529:1,11,16 530:3 531:6,20 533:9 537:7,12 538:3,16 539:3,18 540:4,17 541:1 543:6,11,23 544:3 546:4,6,9,15,20 547:3,19,23 548:2 555:9,15 557:1, 5 558:18 560:1,21 561:8,24 562:4, 11

**article** 281:9 286:4 290:2,9 292:9 293:16 294:9,18 301:4 302:1,4,10 332:16,24 334:1,8,12 335:3,7,9 451:24 461:22 462:1,2,4,16,18 469:12 500:12

**articles** 409:22 458:11

**articulated** 490:6

Index: artificial-billable

RICHARD A. LEO, PHD, JD, 09/29/2022

**artificial** 509:14

**Arturo** 264:7 295:3 508:12

**ASA** 330:7 540:12

**assault** 325:20 336:17 344:21,22

**assaulted** 343:17 445:16 532:13 533:4

**assert** 426:4 433:17 460:1 520:6 532:12

**asserted** 437:1 464:13

**asserting** 437:7

**assertion** 426:13,19 434:23,24 437:18,19 454:12 455:12,13 456:9, 12 457:8 462:10,12 506:8 528:19

**assertions** 439:7,12 443:20 454:1,4 455:16,19 461:12 498:9 532:10

**asserts** 455:6

**assigned** 402:18 525:8

**assigns** 534:16

**assist** 468:4

**Assistant** 351:4

**assistants** 296:7

**assisting** 329:18

**Associates** 264:15,18

**assume** 307:4 316:16 323:24 324:15 327:1 514:16

**assumed** 504:24

**assumption** 282:13 319:14 320:4, 12 322:20 505:1

**Atkinson** 292:16 293:8 294:4

**Atkinson's** 292:20

**attach** 553:23

**attack** 304:14

**attempted** 500:7,17 501:7

**attempts** 505:11

**attention** 300:13 303:8 491:2

**attorney** 342:1,3,7,13 351:5 367:12 370:23 371:14 545:10,15, 18 550:5

**attorneys** 288:12 367:10,11

**attributing** 375:20

**aunt** 472:1

**authorities** 306:12

**autopsy** 299:10,13

**average** 333:17 504:11,15 538:14 557:8,23 558:13

**aware** 277:10 324:8 338:21 482:16 494:1 538:23 539:6,14,20 548:23

---

**B**

---

**baby** 299:8,9,11 343:11

**back** 273:2 274:19 299:13 300:14 304:18 308:22 315:3 317:9 318:16, 20 331:23 332:15 335:10 355:11 380:21 390:12,22 391:1 400:1 401:15 406:4,13 422:8 431:16 436:3 453:1 454:18 460:18 461:17 490:14,18,23 510:13,14 512:13 520:9,19 521:7 523:12,15

**background** 322:8 345:3,6,9 347:6 439:3 474:7 487:3,4

**bad** 350:22

**badgering** 543:20

**bagged** 374:5 376:19 378:21

**bagging** 374:19 377:15 379:20 385:18

**baggings** 384:11,13

**ballistics** 288:22

**bar** 537:15

**Barber** 265:1

**barriers** 347:23

**based** 281:19 283:2 314:2,3,4 317:20 319:14,15 320:5 321:18,23, 24 322:12,14 323:24 332:4 340:5 343:6,21 349:17 354:24 355:1 357:3,22 359:17 360:11 361:4,13 382:5,6 383:4,5 384:3 390:10 393:23 408:17 409:11,13 411:11 412:12 427:1 434:8 438:5 446:13 452:14 453:19,20 454:11 461:9 463:12 464:7 468:1 476:11 479:24 480:16 482:1 485:3 486:12 490:5 491:20 492:15 496:24 511:21 522:9,18 523:6 534:11 547:12

**basing** 343:23

**basis** 280:19 281:5 299:4,19 305:20 306:14,16 323:7 338:14 339:3 357:8,10,23 358:7,9 373:8

410:14,18 411:17 437:22 438:2 459:9 474:15 503:13 509:4,10

**Bates** 266:3 371:3 419:12 436:7 448:9,10 449:4 450:7 508:4 513:14 514:11,24 515:13 516:5,9 518:19

**bathroom** 489:5

**bear** 524:11

**bearing** 465:11 497:2

**bears** 549:11

**beat** 380:9 443:4 462:22 463:23 478:11 481:8,15

**beaten** 374:5 376:20 378:22 380:1 385:15,17,21,22,24 386:1,3,5,7,8, 10,13,14,16,19,21,23 387:2,3,7 455:7 464:14

**beating** 330:4 374:19 377:15 378:5,12,16,18 379:20 380:3,4,5,7 389:19 406:19 462:23

**beatings** 384:11,13

**began** 266:10 270:24 397:14 405:17,22 517:1

**begin** 363:24 374:1 398:4

**beginning** 264:1 302:4 348:4 356:9 383:24 387:12 413:1 414:10 436:8 442:1 446:24 494:7 516:23

**begins** 309:3 348:12 370:22 371:22

**behalf** 264:6 265:2,7,12

**belief** 282:13 301:13 340:5 369:8 493:17 560:19

**believed** 275:21 278:14 305:13 338:20,21 410:5

**believes** 335:18

**Bell** 423:1,7

**Ben** 264:23

**bench** 326:21

**bias** 534:1

**Bible** 337:9 338:13,24

**Biebel** 394:12 404:21 525:15,20

**big** 294:22 303:5

**bigger** 370:4

**bill** 272:3,7 511:2 513:18,23 519:13

**billable** 511:19

RICHARD A. LEO, PHD, JD, 09/29/2022

**billed** 512:9,18 513:5 517:14

**bills** 272:9,10,13 515:10 518:10,15

**Billy** 297:8,10

**binder** 295:1,2

**binders** 295:7 441:8

**Bingham** 295:11,12

**bit** 316:22 342:11 368:18 373:18 384:9,15 510:15 538:6 542:1

**black** 374:4 376:18

**blank** 514:10,11

**blanks** 516:14

**block** 375:16,21 376:6,16 377:11 378:8,13,14 385:19

**blood** 323:16,20 324:5,11,13,16, 17,21 325:3,6,8,9,13 326:4 536:3 560:12

**bloody** 305:17 559:15,18,24 560:12

**blown** 506:19

**board** 283:7

**Bobe** 464:22,24

**bodies** 536:2

**body** 278:19 406:3,11 437:16 442:12 443:14 444:20 522:13 561:13

**Bomb** 373:1

**bono** 315:6

**book** 339:8 365:1,3,7,8 366:7,8 477:7,9,13

**books** 278:1 458:11

**bookshelf** 295:7

**bottom** 281:10 290:23 302:5 309:3 344:5 347:17 359:4 363:24 366:20 367:1,5 391:3 397:7,11,14 398:5 406:2 409:5 414:9 551:5 559:13

**Boudreau** 377:9 378:3 389:13 411:24 412:4 414:13 421:8,13 422:1,5 436:19 446:2 451:13 453:3 454:7 461:5 462:21 463:22 465:24 471:4,20 472:19 478:11 480:4 481:8,11,14

**Bounds** 414:24 416:2,20 417:20, 23 418:11 424:21 425:1,3,11 428:2 432:24

**Bounds'** 425:2 426:7,24 428:5,23

**Bouto's** 507:14

**Bowen** 264:14,18

**box** 374:4 376:18

**boy** 348:21 349:1,2,6,7

**Boyler** 475:11

**Bradley** 297:5

**brain** 378:7

**break** 330:16 331:10,12,21 338:6 368:15,19 390:17,20 434:2 435:21 436:1 489:5 490:13,16,17,21 517:23 520:24 521:5 524:17 562:3, 6

**breakdown** 519:7

**breakfast** 368:13

**brick** 336:9

**bring** 425:2 426:9 522:17

**broad** 423:20

**broader** 276:6 277:1 444:2 453:8 471:14 542:7

**broke** 509:17

**broken** 504:1

**brought** 329:17 441:16 522:8,17 523:6,18

**Brualdi** 330:7

**Brualdi's** 351:5

**Bruce** 295:23 296:1,9,16 300:3,8 302:21

**brutal** 309:8 310:6

**Buddhist** 296:6

**build** 499:4

**bullet** 378:7

**burden** 530:16

**Burge** 364:15,22,24 367:13,19 370:9 371:1,16 372:24 374:4 376:18 392:9 395:22 397:1,19,20 398:11,17 399:13 400:18,23 401:22 402:2,10,14,22 403:2,10,22 404:9,13,23 405:2,8 408:10 430:13,17

**Burge's** 364:16 366:10 396:5

**burning** 462:24

**Burt** 296:20

**Burton** 379:17 433:7,8,11,14,21 434:1

**Burton's** 433:7

**Buzzfeed** 500:12

---

**C**

---

**C-L-E-M-O-N** 420:12

**calculation** 332:3

**Caldwell** 294:5

**call** 520:9,19

**called** 286:1 296:2 302:6,8 391:4 394:5 395:17 478:22,23 479:5 482:17 509:22 513:15 514:12,24 515:14 516:24 519:24 535:24

**calls** 362:9 428:9 468:11 469:21 539:4

**Cane** 423:2,7

**capable** 448:18 449:13,21

**capacity** 537:17

**capital** 302:23

**captains** 504:23

**capture** 400:8

**captured** 399:19

**car** 305:8 336:9 527:10 560:24

**career** 291:23 401:6 402:6,18 403:6,14,18,22 404:5,17 405:9

**careers** 405:6,12

**careful** 369:18

**Carolina** 294:18 332:17 461:21

**Caroline** 265:5 524:6

**carpet** 324:5,7 325:3 326:3

**case** 264:9 266:13 267:1 268:2 279:16,21 282:19,21 283:1 287:16 288:6,13,16,17 289:1 291:1,3,16, 23 292:4,20,24 293:2,23 294:2,3,8 295:8,16,17 296:1,18,23,24 298:4, 22 299:1 301:2,3 302:11,15,16,20 303:3,5,6,24 304:1 305:2 306:13 307:12,13,14 313:24 317:24 319:7 320:6,10 321:12 325:20 334:19 336:7 340:17,22 341:8,11,13,16, 17,19,22 342:6,10,12,15 343:22 352:11 353:23 356:24 357:2,3

RICHARD A. LEO, PHD, JD, 09/29/2022

358:10 361:24 363:6,18 369:11,14 372:7,14 378:10 383:3 384:2,3 391:3,7,8,11,16,20 394:4 395:17 396:18 398:18 404:20 407:14,15, 20 408:10,11,14,15,20 414:24 417:20 418:14 419:5,6,9,18,21,24 420:8,9,11,14 422:15 423:9 425:3 426:10 427:14,18 428:22 429:2,13 431:23 432:17,18,20,21,24 433:7 435:8,10 437:11,19,23 440:2,9,17 442:6 443:15,16,17,21 444:2,22 445:2,16,17 446:23 447:14 450:18, 22 451:8 452:4 455:10,13,21 456:10,16,17,21 457:13,16 458:18 462:9,15 465:14 469:16 470:17 471:9,13 472:14,15,23,24 473:3,8, 10,17,20,23,24 474:5,21 475:4 476:1,2,6 480:24 482:12,17 484:5, 8,16 485:19 486:21 487:2,7 488:2, 5,18 491:15 494:2,11,16 495:6,22 496:13 499:14 500:22 501:12,16, 20 502:3,12,13,14,21 505:18 507:4,14 508:7,16 510:6,10 511:3, 11,18 512:11 513:15,18,23 514:5, 12,24 515:1,15,17,22,23,24 516:3, 6,24 517:2 518:24 519:18,19,24 521:12,21 522:2,4 524:7 526:21 528:24 530:17 531:23 534:2,6,17 535:3 537:6,16,21 541:2 547:6,10 550:9 551:4,11,17 553:12,16 554:2 555:22 559:4 561:19

cases 267:1,2,9,12,18 268:6,9,12, 15,17,21,23 269:2,3,4 277:22 278:12,13,17 280:3 284:7,20 287:10,13,19,20,22,24 288:8,11, 12,18,19 289:3,13,15 290:10 292:1,6,11 293:12,22 297:10 301:1,15 307:1 314:9,13,21,24 315:2 318:11 319:2,6 320:1,2,8 321:6 323:5 333:3 345:20 346:4 357:15 360:19 363:23 364:1,2 370:24 371:15 374:9 376:24 379:2, 19 381:13,15,20 383:21 384:10,16 385:1,4 397:19 407:3,13,14,15,17, 18,21,23 408:1,8,13,21,22 409:20 411:11,14 412:14 413:10 414:16, 17 420:17,18,20,24 421:2,3,4,5,9, 16,17 422:2,3,6,9,19,22 423:3,4, 13,16 424:17,20 429:12 430:5,12, 13,24 431:12 432:10,11 433:1 437:8,15 438:11 442:17 443:23 445:3,5,18,19 447:20 451:9 455:2, 14,16 457:10,18,19,21 458:2,6,10 460:4,9,12 462:6 464:10 472:12 474:10,11,13,14 476:7 479:2 480:17,22 482:2 483:18,20 486:19, 22 487:1,2,3,4,5,23 488:21,22

489:8,14 490:1,9,10 491:18 492:14,16 493:16 494:9 495:21 497:5,6,19 498:7,11 499:3,4,6,7 503:7,23 504:1 505:9 506:12,14, 17,18 507:21 508:16 514:7,8,9,17 515:7 518:16 521:12,19,22 522:16 527:5 534:4,7 545:5 548:4 549:14, 15 550:18,22 551:9,14 561:15,20

Cassell 305:5

catch 425:8

categories 280:14 293:7 294:8 369:24 374:21 377:14,18,19 379:21

categorize 444:15

categorized 273:8

category 294:7 300:11 374:21 385:18

caught 290:17

caused 311:11 336:4,14 554:18

causing 335:16 425:3 426:4 433:11,17 481:16

caution 511:8

Cavatelli 404:21 405:16 525:22

CCSAO 436:12

ceiling 295:7

Certificate 506:19 507:3

Certificates 506:15,16

certified 264:13

cetera 406:21

chained 335:14

challenge 536:19,21

challenged 305:3,4

chance 289:10 331:14

change 322:5 502:20

changed 346:1

changing 347:3

chapter 339:9 365:1,7,9 366:8

chapters 365:6 366:7

characteristic 289:16 502:8

characterize 353:3,7

characterizing 547:5

charge 315:8

charged 302:23 318:5,19 518:23

charges 280:18 281:4 299:15 303:23

chart 368:2,5,8,20,23 370:8,13 371:3,7

check 301:2 472:10 488:7

Chicago 264:16 265:2,13 296:23 340:15,20 341:6 355:8 359:5,12, 13,14,19 362:5,19 363:7 364:14 365:15,20 368:14 392:8 398:12,13, 20 399:6 401:10,14,15 405:18,23 406:5 414:14 423:19 460:23 474:10,11,13 482:4 491:5,13 498:4,19 502:17 503:3,8 504:10,15 505:3 508:18,19 509:1,6,7 523:21 532:20 558:15,23 559:3

Chicago's 359:10 406:14

Chief 371:23 372:1 394:11

chiefs 504:23

child 311:20 313:22 343:11 352:19 353:2 354:6 523:11

children 348:16

choice 281:23 344:10

choked 446:3 462:22

choose 533:19

choosing 534:15 535:4

chosen 338:1

Christina 299:6,7

Christopher 297:2 299:5 305:22

chronology 367:15

cigarette 462:24

circle 460:18

Circuit 394:4 396:4

circumstance 291:15 301:8 317:18,23 323:20 346:1

circumstances 307:2 310:5 349:15 354:9 357:3 527:1 539:11 554:14

citation 301:24 302:1 328:17 329:6 370:18,20 373:7 419:2 420:5 429:3 468:16 485:23 487:12 500:20

citations 294:4,5 300:21 301:1,21 329:1 398:7 439:23 448:1 468:9,21 469:13

RICHARD A. LEO, PHD, JD, 09/29/2022

**cite** 301:23 328:15 364:20 368:1 370:12 371:10 391:3 394:4 395:11, 16 396:4 407:23 418:10 419:6 438:14 440:5,6,16,20 442:19 446:8 448:2 451:19 470:15 472:4 475:4 483:24 484:8 500:11 501:15

**cited** 301:15 364:4,6,18 369:23 419:6,10 434:12 439:5,9,17,20,21 440:14 441:15 446:21,23 447:14, 20 448:3 449:16,19 450:6 451:24 452:7 461:15,16 463:16,17 464:18 465:1 466:14 470:7,12 485:12,13, 17 487:15 488:11 499:18

**cites** 446:11 448:6,8 449:2,3 469:19

**citing** 415:7 451:16

**city** 265:2,13 359:9,13,18 362:5,19 363:7 366:16 367:2,11 398:12 401:10,14,15 405:23 406:5,14 410:8 411:7 412:18 430:21 445:7, 23 508:19 509:7

**civil** 296:17 340:17 346:4 372:7 409:23 411:6 445:1 450:2 486:19, 22 488:2,5 501:19 502:3 514:7,18 515:23 551:12

**civilian** 502:24 504:2 534:21

**claim** 361:21 362:10,18

**claims** 329:23

**clarification** 276:8 492:20 542:11 543:14

**clarify** 321:22 383:19 418:1

**clarifying** 273:6 407:11

**clarity** 426:22

**Clark** 264:15

**classification** 291:3,12,17 292:7 299:19 302:7 304:21 305:20 306:14

**classified** 290:10,13 291:1,23 292:1,11 301:17

**classify** 287:10 291:16 292:21 408:17

**classifying** 278:7 301:3

**Clayborn** 269:12 294:20 386:11 419:23 484:18,22 485:12 488:18

**clear** 275:6 315:11 361:5 374:18 389:2 411:3 416:18 432:23 439:3 444:19 473:1

**Clemon** 377:7 418:14 420:12 434:17

**clerk** 537:17

**Cline** 373:2,9

**clinical** 346:15,17

**close** 461:10 521:1

**closer** 310:3

**closing** 313:6

**clothes** 351:13

**clothing** 308:1,2

**co-defendants** 296:16 300:1,7 481:15

**coach** 417:18

**cocaine** 299:11,14

**coding** 279:16 315:1

**coerce** 500:2,7,17 501:7

**coerced** 296:8 389:13 410:6,19 415:12 423:18 432:1 451:13 453:3 454:7 455:8,10 462:12 465:24 466:5 490:4 497:16 533:4

**coercing** 406:21 409:7

**coercion** 345:5 358:16 359:11 360:21 366:13 378:18 430:16 444:24 446:7 453:9,11 454:16 455:16 458:6 482:7 483:17 485:4, 10 508:23 538:11 549:6

**coercive** 309:9 310:7 359:7,21 360:4,17 363:9 398:10 406:18 411:23 456:14 477:23,24 480:19 491:3 550:11 556:4

**cognitive** 548:20

**coined** 286:7

**Cole** 297:2

**Coleman** 378:2,4 436:16,20 437:24 438:3,16,20 440:6 441:2,18

**Coleman-000042-0000105** 439:15

**collect** 324:12,20,22 325:2,3

**collected** 307:3 308:7,11,19 316:23 318:1,2,12 319:4 320:17 322:11,17,19 323:9,10,20,24 324:3,7,18 326:5,13

**collecting** 325:8,12,15 326:14

**collection** 279:16 322:21 324:9

326:8

**collectively** 367:21 370:10

**colloquial** 535:5

**combination** 288:20

**combined** 560:14

**combining** 332:6

**command** 359:14 367:20 370:9 398:14 508:20

**Commander** 372:24 392:9

**commanders** 504:23 508:19 509:7

**commission** 395:7 445:6,23 450:5 499:9

**commissioned** 411:8,9

**commit** 278:16 281:18 283:4,13 284:10 298:11 305:17 306:11 315:18 318:5,19 481:13 527:10,18, 19 557:11

**commited** 527:15

**committed** 293:9 303:21 305:14 306:3,20,22 311:19 312:7,12,19 313:13,21 315:16 316:6 430:19 527:1,20 558:14,15

**committing** 296:14

**common** 339:6 392:7 398:22 556:21 557:2,4

**commonly** 350:15

**communicate** 437:13,14 492:13

**community** 339:4,14,15 340:7 538:10

**comparable** 505:5

**compare** 311:3 358:24 505:2

**compared** 340:13,16 341:14

**comparing** 315:23,24 505:6

**comparison** 314:4

**compensation** 283:7 372:11

**competence** 529:14

**competent** 321:16

**competently** 322:22

**complaint** 445:1,21 446:9 448:2,6, 9 449:3 450:2,24 452:2,3 461:15 499:8 505:2 534:21,22

RICHARD A. LEO, PHD, JD, 09/29/2022

**complaints** 411:6 503:2,7 504:2, 4,10,15

**complete** 347:4 384:24

**completely** 323:2 339:18,19

**completes** 380:17

**complicated** 429:21

**component** 283:10,11

**components** 281:11 283:2,20

**compound** 428:8 465:19 558:20

**comprehensive** 447:1

**compute** 272:3

**concede** 291:11,15,20

**conceded** 291:24

**conceive** 541:10

**concept** 276:6 277:1 286:16 539:16

**concerned** 400:7

**concert** 527:21

**conclude** 295:12 301:9 311:15 313:11 317:10 320:15 322:9 345:3 354:10 355:17 359:18 360:15 407:5 474:21

**concluded** 312:4 313:24 315:12, 15 358:3

**concludes** 484:9

**concluding** 354:13 360:2 397:6 410:18 412:3 425:10 433:14 463:4, 7 478:16 481:20 483:7 486:3

**conclusion** 270:5 312:13 313:16 317:17 318:18 319:12 344:1 354:20 355:4 357:13 360:20 362:9 373:8 397:5 409:5 425:18 428:9 439:9 478:18 479:14,22,23 508:18 509:4 532:2 533:7 539:4 548:10,18

**conclusions** 322:1 323:7 354:8 370:2 411:18 413:12 415:11 427:1 483:12 486:9

**conclusive** 318:4

**conclusively** 306:11

**condition** 283:16 284:16 285:12, 21 479:11

**conditions** 305:16 310:21

**conduct** 503:9

**conducts** 358:19

**confess** 299:9 425:3,4 433:11 464:1,14 477:20 481:17 531:1,9,15 538:7 539:2,17 541:15,24 542:7 555:24 556:6

**confessed** 296:3,13,17 297:13 299:10 300:7 303:16 306:5,10 425:11,15,18,23 426:2,5 433:15,18 436:21 437:8 443:5,10 446:5 450:11,12,16 464:11 471:22 472:20 475:20 477:18 480:9,12 481:21 483:9 484:12,23 486:4 489:20 531:10 541:11 548:16 557:10,19,20 559:9

**confesses** 541:22 556:23

**confessing** 410:7 481:13

**confession** 266:22 270:10,11 273:6,9,13,14,21,22,23,24 274:1,4, 6,10,13,15,20 275:1,4,7,12,15,16, 19,24 276:11,19,21,23 277:2 278:7,17 282:4,8,16,22 284:5,6 286:8,11,17,20,21 289:14,19,24 290:13 291:2,11,17,24 292:2,5,6, 21,22 294:23,24 295:1,13,14 301:9,10,17 309:1 311:16,17 312:5,6,20,22 313:17 314:1,2,6 315:20,24 316:1,3,4,8 317:19 320:8 323:6 330:3,7,22 332:11 342:22 355:13 389:13 407:7 408:3, 12,18,23 411:15 423:19 427:3,5 432:1 437:13,21,23 444:24 461:8 462:3,8,13 463:1,5 465:18,24 466:4 473:18 478:11,14,18 479:2,3 486:10,11 490:3 497:16 500:3 526:10,16,19,21 528:16,23 529:3, 8,10,21,22 531:11 532:15 535:24 541:17 544:18,21 545:12,20 549:12,20 550:1,6,8,24 551:1 552:9,19 553:13,14 554:18 556:24 557:11,24 558:6,8

**confessions** 273:20 274:7 276:16,18 277:6,10,21 278:1,3 286:4,15 287:14 290:7,10 292:12 296:8 302:8 312:16 313:3,20 319:23 320:21,22 332:16 359:12 365:14 407:5 410:18 411:1 423:18 451:13 453:3 454:7 462:1 463:8 473:6 478:1,2 480:21 482:9 483:20 485:7 486:16 490:12 497:14 498:6 503:21 505:11 508:23 526:13,14 538:12,22 540:9 549:7 554:6 555:13,18 557:16 558:8

**confessor's** 290:11

**confessors** 333:14,15 526:23

**confidence** 529:8,12,15,17

**confident** 529:20

**confidential** 342:7

**Confidential/subject** 342:2

**confidentiality** 285:21 340:19 341:16,20,21 342:2,16

**confirm** 421:23 422:23 423:3 460:17 464:12,15 478:9 521:16

**confirmed** 342:22 351:23

**confronted** 431:23

**confronting** 555:6

**confused** 375:6

**confusion** 389:2 449:16

**conjectures** 342:23

**conjunction** 452:13 477:13

**connect** 432:12

**connected** 493:18

**connection** 372:6,14 398:17,19 399:3,8,10 405:14 420:19 423:22 474:20 488:2 489:21 496:12 512:10 516:10 531:23

**connotation** 535:5

**consensus** 338:17

**consequences** 286:3 373:21

**conservative** 281:16,24

**considered** 337:9 338:13 531:22 554:5 556:16

**consistency** 311:12

**consistent** 311:6,8 456:10 457:19,20,22 458:13 515:3,9 535:19 540:8 561:17,22

**consolidated** 264:10

**constitute** 289:13

**constituted** 286:21

**constitutional** 362:6

**consult** 545:16

**consultant** 288:9

**consultation** 270:12

**consulted** 266:11 270:8

**consulting** 342:12 545:19

RICHARD A. LEO, PHD, JD, 09/29/2022

**consults** 545:11,18

**contact** 351:7 481:12

**contained** 273:3 388:19 450:6 475:7,13 476:17 483:14 497:7 506:8,9 534:21

**contamination** 275:22 348:13

**contemporaneous** 346:12,13

**content** 446:14

**context** 366:3

**contexts** 344:20 421:21

**continue** 321:9 377:24 379:5 382:2 385:6

**continuing** 359:10 398:11 508:21

**contradicted** 343:20 431:7,17 432:2 460:5

**contradicting** 312:15

**contradicts** 313:18

**conventional** 555:16,19

**conversations** 511:10

**convicted** 278:22 304:9 306:4,5 395:22

**convicting** 554:21

**conviction** 278:21 280:16,18 281:4 283:14,15 284:12 298:9 304:11 310:19 311:1 318:22 346:9 396:6 428:13,23 429:10 465:17 475:9 488:5 494:2 515:24 516:3

**convictions** 278:10 279:2 280:15, 23 321:7 389:14 466:1 491:18

**convince** 283:12 284:9

**Cook** 367:11 370:23 371:14 393:15 394:11

**Cook's** 266:24

**coordinates** 401:12

**COORDINATOR** 332:19 368:9 509:24

**copy** 294:12

**copyright** 339:20

**Corinthian** 423:1,7

**correct** 272:8,18 273:11 275:18 277:7,8 279:4,6,16,17 280:7,8,11, 12,20 282:1 284:6 285:8,9,18,19 286:8,21,22 287:10,21 289:7 290:3,15,18,21,22 291:8,9,13,14

292:12,13 293:20 297:13 306:22 307:5,10,11,21,23 308:3,4 309:3, 22 310:9 312:8 315:18,21 316:2, 14,15,19,20 317:11 318:13 319:11, 18 323:17 327:2,3,5,6,9,10,13,14, 18,21,22 328:5,6,12,13,16,19 329:10,14,15,20 330:1,4,5,9 332:13,20 333:22,23 341:18 348:7, 10 349:15 350:6,20,21 351:8,9,16, 19,20 352:2,6,7,13,14,19 358:12 360:5 364:2 368:3,6 369:6,11,12 371:7 372:18 391:12,14,23 392:11 393:19,24 394:2,6,8,13,16,20,21 395:2,8,10,13,18,20,24 396:8,10, 14,16,20,22 397:2,4,12,15,21 398:15 415:3,6,9 416:6 421:2 427:16,20 428:16 434:12,15 440:7 446:9 447:6 448:11 452:18 459:17 467:11 468:10 471:18,19 472:5 478:5,6 484:19,20 485:15 488:13, 24 491:10,11 495:17 496:8 499:20, 21,22 500:12 503:4 504:24 507:11 508:8,11 512:6,12,15,20 513:1,2,7, 19,20 515:19,20 516:7,8,13,18,21 517:3,4,7,8,15 518:2,6,7 519:21 520:2 521:13 522:1,4,5,6 535:8 537:24 538:4,8 540:16 542:12,18 544:15,19 545:2,6 549:20,22 553:3,4,19 555:8,14 556:2 559:19, 21

**correcting** 448:18 449:13

**correctly** 273:8 296:18 306:18 313:8 356:8 383:2 390:5 425:5

**correspondence** 553:11

**corroborate** 476:4

**corroborates** 445:14

**corroboration** 476:5

**coston** 378:10 442:3,6,19 454:18 455:6,17

**Coston's** 442:10 455:20

**Coston-000001** 442:20

**couch** 325:6,8

**counsel** 264:19 266:12 270:8,13, 24 271:9,10,19 368:5 381:4,24 391:8 392:22 511:10 536:8,14 553:11

**count** 338:7

**counted** 545:7

**counterintuitive** 538:19

**County** 370:23 371:14 393:16 394:11 514:13 515:1 519:18

**County's** 367:11

**couple** 277:23 301:18 303:1 373:24 387:11 393:7

**court** 264:11,17 265:9 367:12 394:11 395:12 409:21 414:17,21 415:11 416:2,14 417:21 418:2,10, 12,17 420:1 428:1,5,6 429:8 449:18 465:7 485:23 488:17 501:15,16

**courts** 430:22

**cover** 512:5

**covered** 302:17 553:17

**covers** 512:14,17

**Cox** 297:5,6

**CPD** 341:15 372:24

**Craighead** 378:15 443:3,4,6,9,22 444:13

**Craighead's** 456:21

**create** 428:2

**created** 280:14 489:11 519:11

**creating** 503:20

**credibility** 465:11

**credit** 540:12

**crediting** 426:7,12 434:18 442:9

**crime** 278:16 280:1,7 281:19 283:5,13,15 284:10,16 293:7 296:13,14 298:11 304:19 305:10, 14,16,17 306:12,21,22 307:18,19, 20 308:7 311:22 312:7,12,20 314:3 315:17,18 316:4,5,13,23 317:5,11, 24 318:6,19 319:9,15 320:16 321:18 322:10,12 323:11 324:2,12 325:2 326:13 343:13 354:21 358:4 527:1,18,19,20,22 528:21 531:4 535:20 536:1 538:1 551:24 554:24 556:22,23 557:10,24 558:14,16 559:16,18,24 560:9,11,15,17,18

**crimes** 322:18

**criminal** 278:13 289:1 306:1 345:20 365:4 394:11 409:17 411:5 414:15 522:7,17 523:5,17 530:17 545:4,5,10,15,18 553:2,7,12,16

**criminology** 537:4

**criteria** 273:10 278:5,18 281:20

RICHARD A. LEO, PHD, JD, 09/29/2022

282:5,11,13,15,19 284:4,12,22 285:1 286:19,23,24 292:19 293:19 294:1 295:11,24 296:20,24 297:3,7 301:7 303:10 304:4 311:16 312:5 314:1 316:12 317:20 407:6 408:2, 23 437:20,23 473:18 529:9,21,22 532:14 551:1 553:13

**criticism** 525:7

**cross** 546:21

**culture** 398:22 399:5 509:17

**curling** 374:5 376:19

**current** 337:6,12

**custodial** 330:13,24 333:22 334:9, 13 337:16,21 524:14,19 526:3 540:11,15 561:5

**custody** 309:21 310:2 332:7,10 333:22 336:24

**cut** 347:4 537:13 546:3

**cute** 388:21

**CV** 264:9,10 365:8

## D

**Daley** 394:23

**Damari** 377:7 418:14

**Dan** 385:14 470:2

**Daniel** 404:20

**Dante** 300:5,14 301:22

**Darnell** 380:2 451:12,15

**Darrell** 378:2 436:16

**data** 278:11 279:15 285:10 361:8 429:12 437:17 442:14 455:1 462:3 466:11 473:15 482:9,10

**database** 287:15 492:10

**databases** 287:23

**dataset** 284:21 285:5

**date** 341:5 342:1 512:22 515:6 516:17 517:20

**dated** 487:13 508:13

**dates** 511:22 512:4 518:5

**dating** 406:4,13

**David** 305:24 306:4,12 493:15,18

**Davis** 297:8,10

**day** 308:11 378:17 405:21 446:2,3, 5,23 447:14,23 449:2 451:8 519:9 562:8

**Day's** 446:8 449:24

**days** 302:24 346:2 393:7 467:20

**death** 299:13 313:9,11 397:1 410:1

**deaths** 328:8

**debate** 449:9 519:3

**decades** 340:6,12 346:5 362:1

**December** 508:13 515:17

**decision** 416:3 418:17 531:15 549:11,18 550:13

**decisions** 409:21 414:17,21 415:11 416:14 417:22 418:3,10,12

**decline** 530:5,11

**declined** 533:11

**declines** 530:1

**deep** 487:3

**deeper** 487:5

**defendant** 264:7 265:2,8,13,20 279:22 281:18 290:21 306:1 398:18 404:19 553:2,7 558:24

**defendant's** 290:13

**defendants** 265:6 280:15 409:17 411:5 414:15 522:8,17 523:6,17 524:7

**defender** 514:8

**defense** 545:4,10,12,15,18,20 547:6 550:5 558:16,21

**define** 273:13 283:21 338:1 455:23

**defined** 286:16 337:24 344:19

**definition** 273:22 281:16,24 285:16 344:22 437:12

**definitive** 327:4

**definitively** 298:13,15

**degree** 276:15 365:2,10,11,16,20 366:5 462:5 529:7,12,14,17 536:24 537:1,9,19 556:11,13,15,17

**degrees** 454:2

**delays** 338:9

**Deleon-reyes** 264:8 295:3 346:18 347:3,5 348:6

**deliberate** 344:14 372:3

**Delvillar** 297:15

**demanded** 344:9

**Demetrius** 496:3

**Demond** 386:20

**demonstrated** 275:22 304:16 306:11

**denial** 431:10 540:2,6

**denied** 352:12 431:6 472:1 480:7 549:24

**denies** 455:6

**Denver** 294:6

**deny** 431:3

**denying** 531:4

**dep** 267:13

**department** 278:11 285:11 340:15,21 355:8 359:14 363:8 364:15 398:13,21 399:4,7 405:18, 23 406:6,15 423:20 460:24 482:4 491:14 498:5,20 502:17 503:3,8 504:11,20 505:5 509:16 523:21 532:20 542:20

**Department's** 359:5

**departmental** 509:16

**departments** 346:2 360:12

**depending** 307:21 499:13 534:13

**depends** 398:19

**depict** 443:7 444:14

**depicting** 443:23

**deposition** 264:4,6 266:2,10 269:12 270:2,5,7,14 271:1,6,7 272:18,20 310:18 311:1 388:2 390:13 427:22 428:4 436:9 444:11 452:14 461:23 464:7 465:10 467:20 468:17 485:21 486:23 488:15 489:14 492:12 503:15 508:3 528:4,5 534:19 550:17 551:10 562:12

**depositions** 272:22 528:7 550:24

**Deprivation** 336:22

**deprived** 443:4 471:24

**derivative** 339:19

**derived** 383:11

**Derrick** 452:24 461:4,6,21 462:2

**describe** 326:17 333:1 334:8 337:21 339:24 340:2,4,9 343:14 345:2 349:5 350:24 355:6,20

**describes** 279:15 302:10 310:21, 22 329:8 345:5 353:11 377:17 385:17,18,21,22,24 386:1,3,4,7,8, 10,12,14,16,18,21,23 387:1,3,7

**describing** 341:14 454:20

**description** 310:4 329:8 336:11 350:13 353:21 355:2 524:13 525:4

**descriptions** 311:13 312:16 328:22 344:1 349:18 410:4

**descriptive** 298:12

**desk** 504:22

**detail** 277:24 353:15 364:1 387:20 389:17 390:5 460:10 518:5

**detailed** 311:8 364:3 366:4 374:8, 24 384:9 387:14 388:13 389:22 519:7,13

**details** 275:15,16,19,20 276:17 287:8 362:2,13,24 389:10 407:20 427:16 526:10

**detective** 329:9,13,23 335:15 336:15 342:19,23 343:2,16 344:8,9 348:17 349:18 351:4,7,10,17,21 352:3,8,15,23 353:14,22 354:19 357:4,15 358:2,11,19,22 377:8 378:4,6,10,11 389:13 399:12 400:17,23 401:21 415:12 416:3 421:8,24 422:1,4,5 424:24 425:7 426:7 433:8,20 436:19,20 442:3 443:3 446:2,3 451:13 453:2 454:7, 20 455:3,5,24 456:6,11,13 458:2 460:15 461:5 462:21 463:21,22 465:6,7,24 471:4,20 472:18 478:11 480:4 481:8,9,10,11 484:10 491:4, 5,19 492:9,17 494:3 500:2 501:17 502:4,18 503:3,8 504:17 505:2,10 508:24 525:1 532:17,22 533:5 539:24 540:1,13,14

**detectives** 358:2 371:1,16 377:9 378:3 406:8,17 409:16 411:24 412:4 414:13,14 421:7,12 422:13 424:3 443:4 458:3 460:16 461:5 462:22 473:2 480:5 481:8,14 484:11 491:6 504:16,22 509:1,8 525:2

**determination** 281:1 354:23 361:12 426:17 434:7 443:13 453:6, 11 476:10 485:2 532:6 552:9

**determinations** 354:24 360:8 434:1 453:22 483:12

**determine** 266:3 268:16 282:3 284:2,4 286:20 408:1,16,22 430:5 432:5

**determined** 301:8 333:5 360:18 416:3 433:20

**develop** 545:11,19

**developmentally** 451:14

**device** 374:5 376:19

**diagnosis** 283:16 284:15

**Dickenson** 402:9,13,17 539:24 540:13

**died** 299:9 304:13

**differences** 351:1

**differently** 318:9 344:6 435:18 536:12 542:2 557:7

**difficulty** 535:11,15

**direct** 329:5 381:18 429:1 491:2

**directing** 376:2

**directly** 287:16 288:5 356:13 362:5 364:12,17 438:23 474:3 543:19

**disability** 478:24 479:6 548:11

**disabled** 451:14 479:10

**disagree** 319:20 320:13 389:1 533:23

**disagreement** 520:15

**disclosure** 388:4 468:12 469:23 477:4 518:12 520:14

**discoverable** 392:20 393:1,4

**discovered** 304:15 306:19 560:10

**discovery** 340:22 388:2,9 444:10

**discuss** 366:9 436:15 499:12 507:10 534:19 561:21

**discussed** 273:10 285:5 289:13 293:22 316:18 328:21 334:13 337:5 343:5 351:4 352:11 375:10 397:24 398:2 399:10 424:17,19 464:21 492:14 505:20 521:20

**discusses** 335:11 412:22 462:20 482:18 508:7,15

**discussing** 279:4 287:21 322:23 332:23 397:19 429:3 440:1 468:8

**discussion** 309:2 312:14 407:21, 22 411:21 416:21 464:24 471:17 491:10 520:20

**discussions** 293:23 424:11

**dismiss** 303:23

**dismissed** 280:18 281:4 299:15 559:4

**disorder** 548:11

**dispositive** 290:12 293:9

**dispositively** 306:8 311:22 316:13 317:10 319:13

**dispute** 431:3

**disputed** 287:13 430:14 431:13,18 455:5 551:6

**disregard** 540:23

**disregarding** 540:18 541:2

**distance** 401:17

**distinction** 529:23

**distinguish** 337:20 457:6

**distinguishes** 281:17

**district** 264:11,12 391:10 501:15, 16

**Division** 264:12 420:7 485:22

**Divisions** 542:21

**divulge** 511:9

**divulging** 477:6 511:12

**DNA** 283:14 284:13 288:21 295:17, 21 298:5,10,14,19,22 306:1,7,10 307:1,5,9,13,14,15,18,19,24 308:1, 7,19 311:21 312:7 316:12,17 317:3,5,6,10,20 318:1,3,11,12,19, 21,22 319:3,5,8,13,17,24 320:17 321:6,17 322:10,17,19 323:10,19, 23 324:2,6,9,13,15,18 325:15 326:3,9,14 356:18 438:1,4 441:3 461:9 527:9,22 534:24 560:3,5,9, 15,16,18,20,23

**doctor** 336:12 380:24 381:2,10,24 389:16 476:19 491:1 524:5 544:7 546:18

**Doctorate** 537:5,8

**document** 269:15 279:3,12 287:4, 5,6 293:5 294:12 336:10 369:14 370:2,3,19 375:17 400:19 416:6 420:2,4 428:11 469:16 495:18 501:24 546:20 547:4

RICHARD A. LEO, PHD, JD, 09/29/2022

**documentation** 311:21 335:22 476:17

**documented** 355:7,10 367:19 414:12 444:6 468:3 558:9

**documents** 266:3 293:2,3,4 294:14 297:17,20,23 298:2 299:19, 22 300:11 301:14,16 304:7,8,15, 23,24 305:1,7 306:16 336:3 361:8 370:5 373:13 382:6 384:17 387:19 400:21 401:1,7 419:19 439:9 441:6,7,14,21 450:6 460:10 472:14 474:12,18 487:1,24 493:14 494:5, 6,9 495:20,22,24 496:5,17 497:1,7, 8 499:5 500:22 506:23 508:1 533:20 534:3,6

**domain** 460:14

**Donald** 305:21 475:10

**door** 522:21

**dots** 432:12

**double** 311:19,20 313:13,14,21 329:18 352:18 353:2 354:6 356:14 435:14 472:10

**double-check** 297:12 340:23 391:18

**doubt** 298:17,19 311:12 530:19

**dozen** 441:8 489:24

**dozens** 319:24 339:16,17 365:22

**drafted** 347:14

**drafting** 347:12

**draw** 529:23

**drawing** 427:1

**drew** 410:23

**drive** 305:10

**driven** 305:9,15

**Drizen** 280:5 282:7 314:23 332:16 333:1 334:1,16

**Drizen/leo** 277:5 278:6

**dual** 274:2,16

**due** 434:3

**duplicate** 516:15,20

———————————

**E**

———————————

**e.g** 406:18

**ear** 335:17,18 336:16,18

**Earl** 306:9 307:2

**earlier** 302:2 313:7 316:21 317:2 337:11 354:18 366:6 387:13 394:18 405:11 419:23 427:14 447:19 451:22 464:6 490:15 495:20 499:5 508:1 510:16 515:3 521:21 531:18 541:14 556:14

**early** 287:7 392:8 406:4,13 408:10 420:4 508:21 519:5

**easily** 533:16

**Eastern** 264:12

**easy** 558:12

**eat** 331:15

**eating** 368:13

**edited** 365:1,7

**edition** 337:6

**editions** 337:11,13

**educate** 549:4

**Edward** 393:15 404:20 475:11

**Edwin** 402:9,13,17

**effort** 417:18 430:4 449:16

**Egan** 393:15 475:11

**eighties** 341:1

**eighty** 305:9

**Eileen** 265:1 266:16 301:12 332:19 383:19 388:18 435:20 466:24 509:24

**electrocution** 374:20

**electronic** 273:2 287:15,23

**electronically** 424:9 542:16

**electroshock** 377:15 379:19

**electroshocked** 374:3 376:17 377:7 387:1 434:24

**electroshocks** 406:19

**eleven** 397:18 398:2

**elicit** 342:22

**elicited** 497:14

**eliciting** 478:2 480:20 482:8 483:19 485:6 486:15 490:10 498:5

**eliminate** 540:10

**else's** 478:18 479:13

**Elson** 264:23 271:15 276:4 317:12 318:7 319:10 322:13 323:22 325:10 326:11 334:4 337:17 338:15 370:14 397:22 407:9 435:20 533:22 535:13 536:10,16 538:15 541:12 543:2 545:21 546:5 549:21 550:2 552:1,11 553:20 554:10 555:1 556:8 557:12 558:1 559:20 560:2

**Elson's** 519:15

**email** 492:6,8,15

**Embassy** 410:10

**Emmett** 386:23

**emphasize** 369:18 503:15

**empirical** 320:22

**employed** 281:16 398:20 523:20

**employees** 505:3

**employment** 405:22

**enactment** 395:6 396:12

**end** 280:15,17 287:20 322:6 344:8 393:7 438:12 445:20,22 450:23 466:15 470:8 478:4 488:12 544:10 562:11

**ended** 307:9 365:11,17 368:13

**ending** 405:16

**engage** 430:15 459:22

**engaged** 392:10 431:1 456:13 482:5

**engaging** 458:4

**England** 277:15

**English** 346:19 347:20,21

**enormous** 315:4 435:11

**entire** 363:2 400:2 498:16

**entirety** 288:17

**entitled** 269:21 380:14 411:22 491:3 518:22

**enumerating** 269:6

**enumeration** 350:12

**equally** 350:20

**equate** 275:24 276:10

**equating** 282:7

Index: equivalent–extract

RICHARD A. LEO, PHD, JD, 09/29/2022

**equivalent** 282:17

**era** 364:15,22,24 365:21

**Eric** 385:24 423:2,7 475:4

**Ernest** 401:21 402:1,5

**erroneous** 279:1 280:14 286:2 344:23

**erroneously** 283:5

**error** 278:12 281:19 291:3,12,18 292:2

**errors** 535:24

**Escamilla** 386:6 481:7,16,20

**essentially** 284:11 363:4 377:13

**establish** 433:4 438:11 556:18

**established** 281:8 282:6 283:1 290:11 360:20 362:12 371:20 401:1 485:7

**establishing** 406:4,12 538:18

**estimate** 271:22 467:4,5,8,22 487:9,11 545:7,8 551:21 552:3,14, 23 553:5

**estimation** 328:1,4

**et al** 264:8

**et^cetera** 423:24

**evaluate** 342:20 430:12 431:19 432:7,21

**evaluated** 407:4,24 482:10

**evaluating** 408:20 444:20

**event** 304:17 336:17 520:16 536:22

**events** 432:13

**eventually** 296:4,10 306:2 320:17 332:11 382:23

**evidence** 278:15,21 282:11,12 283:11 284:1,8 290:12,20 292:5,7 293:10 296:12 298:19 306:8,19 307:3,7,13,15,21 308:1,2,10,18 311:22,24 316:22 317:4,10,15 318:1,2,4,11,17 319:2,24 321:17 322:22,24 323:2,9 324:13 325:15 326:15 353:8,19 354:2,3,4 355:19, 21 356:12,13,15 357:18 358:7,8,10 361:15 399:11 400:17,22 401:4,21 402:1,5,9,13,17,21 403:1,5,9,13, 17,21 404:3,8,12,16,22 405:1,4,8 406:3,12,23 409:9,14 411:4 414:11 423:17 429:16 430:7,11,21,23

431:7,9,14,17,19,20 432:2,4,11,17, 18,20,22 437:6,9,16,18 438:11 442:12,16 443:14,18,21 444:1,21, 22,23 445:8,14,19,21 450:18,21 451:5,6 453:7,8 454:1,12,16 455:11,12,14,19 456:12 457:7,11, 17,18,23 458:2,16,22 459:17,21 460:2,6 461:1,9 462:6,9,10,12 463:12,14,16 465:18 466:9 468:7 471:8,10 473:5,9,16 476:2,6,9,11 477:22 480:16 482:1,11,13 483:15 485:3,8 486:13 490:6 498:1,8 499:1,3,13,16 502:16 503:16,18,23 506:13 527:19 528:14,19,24 530:13 532:8,19,23 533:1 534:13, 14,17,20,22 535:2 539:9 541:2 547:21 552:20 553:18,24 554:2,4, 8,15,21,22 555:4,5,7 559:3,14,22, 23 560:4 561:16

**evidentiary** 437:16 442:13 455:15 498:12,18 530:16 536:21

**Ewing** 380:2 451:12,14 453:1 454:8

**exact** 269:7 304:12 313:9,11 401:12 487:9

**exam** 537:15

**EXAMINATION** 265:14

**examine** 277:10

**examined** 265:12 277:6

**examining** 546:21

**examples** 284:11,17 285:4 374:19 504:5

**exceptions** 301:19 319:5

**excerpted** 374:17

**excerpts** 475:8

**exchange** 384:5

**exclude** 549:12 550:7

**excluded** 311:23 316:13 317:11 319:13 437:24 438:4 440:23 441:2

**exclusion** 316:17 317:21

**exclusively** 438:19 439:2

**exculpated** 298:6,7,14 306:8

**exculpating** 307:9

**exculpation** 284:13 295:17,21 312:8

**excuse** 274:14 334:24

**executed** 306:3

**executions** 406:20

**executive** 283:3

**exhibit** 267:24 278:23 279:1 285:23 286:1 308:21,22 332:17 335:10 368:8 391:1 399:19 400:3,9 509:20,21 513:9,12,14 516:16 518:4 548:22 550:18

**exhibits** 272:22 273:3 294:16 332:19 368:9 461:23 509:24

**existing** 319:2 337:2

**exists** 522:12

**exonerated** 280:16,23 281:3 290:21 321:7 461:9 500:6,15 501:5 516:4

**exoneration** 306:1,7 318:11 319:6

**exonerations** 318:21,22 319:3 492:7,9,12,16

**expect** 526:2 527:9

**experience** 320:6,7 321:21 357:12 537:19

**experiences** 350:5,6

**expert** 288:9 320:8 323:1,23 361:3 372:11 412:10,12 414:2 423:15 443:16 444:20 453:16,24 454:8,19 455:22,23 456:5,17,21 457:5,6 466:9 473:11,12,22 474:6 477:21 480:16 481:24 483:13 485:2 486:12 489:9 497:24 503:17 518:23 534:3,10 538:24 539:8,10, 15 544:22,24 557:9

**expert's** 518:23

**expertise** 320:5,7,14,20,24 321:5, 15 322:8 323:5 345:15 361:4 423:21 439:3 453:19 474:7,8,16 478:22 534:11 536:18

**explain** 312:12 539:1 540:1,5

**explained** 281:24 322:16

**explains** 541:14

**explicitly** 282:9 335:2,9 340:9,16 344:19 413:5 450:8

**extensive** 324:2 406:3,12 472:23

**extent** 392:13 416:8 469:21 476:24 477:5 489:15,24 511:9,12 525:17

**extract** 359:11 365:14 508:23

RICHARD A. LEO, PHD, JD, 09/29/2022

**extracted** 296:8

**extraordinarily** 337:1

**extraordinary** 337:8 342:13,14

**extreme** 335:17

**eye** 309:21

---

### F

**fabricate** 359:11

**fabricated** 411:1

**fabricating** 406:22 409:8

**face** 329:14 344:17 378:5 433:10, 22 436:20 480:7 481:10

**fact** 280:9 347:2 352:22 359:19 360:3 392:16 395:22 412:5,8 415:23 416:3 425:14 433:20 434:22 435:4 442:14,15 445:22 450:17 479:24 484:10 485:1,2 496:7 505:21 506:9 507:1 528:10 544:19 554:22 560:16

**factor** 479:2

**factors** 330:11 531:14 556:3

**facts** 298:22 357:22 391:17,20 415:24 434:6 454:1 457:6 506:21 526:24 528:22 536:1,9,15

**factual** 280:19 281:5,16,17 282:8, 17 283:2,21 285:17 328:18 354:15, 23,24 357:8,10,23 358:7,9 360:7 361:11 426:17 428:7 433:16,19,24 434:7,22 438:13 439:7,11 443:13 453:6,11,16,22 454:4,24 455:22 457:5,14 463:9 471:7 472:21 473:13,14 475:24 476:9 477:19 480:15 481:24 483:12 485:1 486:8 490:3 497:22 532:6 535:24

**factually** 273:15,16,17,23 275:13, 14,17 276:1,2,11,16 278:8 279:21 280:16,23,24 281:2,3 282:14,20,23 284:2 360:20 466:8 526:19

**fair** 333:24 359:17 514:16 540:3 558:12

**false** 273:9,13,14,15,16,17,18,19, 20,21,23 274:7,15 275:11,12,13, 14,16,17,18,24 276:1,2,10,15,18, 23,24 277:2,6,10,21 278:1,2,8 282:4,7,16,22 284:5 286:3,8,11,15, 17,21 289:14,19,24 290:7,10,14 291:2,10,16,24 292:6,12,21 295:13 301:10,17 302:7 311:17 312:6

314:2 319:22,23 320:8,21 323:6 330:3 332:16 333:13,15 389:13 406:22 407:6 408:2,12,18,23 409:8 411:1,14 423:19 427:4 432:1 437:13,20,21,23 444:24 458:24 459:3 461:8 462:1,3,8,13 463:5,9 465:24 473:6,18 478:1,2 479:2,3 480:20 482:8 483:19 485:6 490:4, 11 497:16 498:6 500:3 503:21 505:12 529:9,22 532:14 538:12,22 540:9 544:18,20 545:12,20 551:1 553:13,18,24 554:2,4,8,15 555:4, 18,19 556:23 557:11,16 558:6,7,8

**falsely** 296:3,17 300:7 306:5 410:6 425:4,11,14,18,22 426:2,5 433:11, 14,18 436:21 437:7 443:5,10 446:5 450:11,12,16 465:9 471:22 472:20 475:20 477:18,20 480:9,11 481:17, 21 483:8 484:12,23 486:4 489:20 538:7 539:2,17 555:24 557:19 559:9

**familiar** 302:14 340:3 364:11,12

**family** 481:12 505:21,24

**fashion** 519:13

**fast** 265:18 305:16

**favorable** 547:5

**February** 517:1,12

**federal** 395:22 409:21 414:16,20 415:10 416:14 417:21 418:2,9,12

**feel** 469:15

**feet** 295:6

**fellow** 283:21 284:1 371:1,16

**felony** 279:23 542:21

**felt** 469:18

**field** 274:8 537:3 561:13

**fifteen** 270:16 327:16,23 346:1 352:1 471:21 480:5

**fifty** 314:24 370:24 371:15 467:6, 17 552:16,17,18,22 560:13

**fight** 376:2

**figure** 301:7 432:12

**file** 288:13,23 289:1 304:15 441:11

**filed** 264:10 445:1 502:3

**files** 273:2 287:16 288:6,10,16,17

**final** 508:17

**finally** 387:5 519:23

**find** 289:1 357:1 367:8,15 398:17 399:11 400:17,22 401:4,21 402:1, 5,9,13,21 403:1,5,9,13,17,21 404:3,8,12,16,22 405:1,4,8 427:11 442:23 493:12 527:9 541:8 551:17

**finder** 412:8

**finding** 392:1 413:18 415:18,22 417:24 425:13 450:17 465:7 484:9

**findings** 293:18 409:19,22 411:7 412:16,17 413:8,11 414:4 416:9, 19,22 418:4 428:7 430:20 434:22 445:6,22 499:9 534:23 549:10 561:17,18,22

**fine** 392:21

**fingerprints** 356:18

**finish** 379:1,10 380:13 381:3 382:23 543:3 544:3,5

**finished** 314:24 350:17 385:12

**firing** 364:16 366:10

**firm** 338:19 507:20 537:17

**firms** 339:20

**fist** 344:17

**fit** 293:6 301:8 432:5 473:4

**fits** 294:8 300:12 431:20 532:17 561:6

**flag** 368:11

**Flagstaff** 303:17,22

**flashlight** 480:8

**fleshed** 360:1

**Flewellen** 453:1 461:4,6,9,21 462:2

**Flewellen's** 462:15

**Flint** 369:3

**floor** 295:6

**focus** 290:7 300:13 361:19 431:6 455:20

**focused** 280:22 379:7 431:5

**focusing** 431:4 522:3

**folks** 399:24

**follow** 360:1

**follow-up** 381:4 388:22

RICHARD A. LEO, PHD, JD, 09/29/2022

**food** 443:5 471:24 480:7

**footnote** 302:3,5,12

**footnotes** 294:6 301:5

**foremost** 432:10

**forensic** 525:8,12

**forget** 541:6

**forgetting** 436:6

**forgot** 266:6 269:10 400:13 440:11 487:15

**forgotten** 436:9

**form** 271:3 276:4 286:12 289:9 291:19 292:3 301:11,12 308:8 310:11 312:24 314:7,15 315:19 317:1,12 318:7 319:10,19 320:19 322:13 323:22 325:10 326:11 334:4 337:17 343:4 344:19 347:7 348:8,23 349:3,16 350:7 353:5 354:12 356:2,6 357:5,20 360:6,23 361:22 362:8,21 363:12 368:24 369:7,16 370:14 371:8 372:9,19 373:11 374:12 375:14 377:3 382:10,22 385:8 387:17 391:15 392:3 394:1,7,15 395:3,9,14,19 396:1,7,9,15,21 397:3,8,22 399:14 405:19 407:8,9 408:4,24 409:12 410:21 411:2 412:6,23 415:14 416:8 417:5 421:14 422:21 423:10 424:4 425:12,19 426:3,11 428:8,14 429:4 430:9 432:8 434:13,20 435:6 437:3 438:21 439:11 440:3,8 441:19 444:17 446:12 447:16 448:5 450:13 451:18 452:9,19 453:4,13 454:9 456:3,23 457:24 459:1,18 463:6 464:2 465:19 466:6 467:12,21 468:11 469:20 470:9 471:5 474:1,24 475:22 478:20 480:13 481:22 482:20 483:10 484:13 486:6 489:1,23 493:10,19 494:4,20 495:2,8,16 496:14 497:17 500:19 501:9,21 503:10 504:13 506:3 507:15 509:9 511:7,24 512:19 514:20 515:5 520:3 521:14, 23 523:22 524:16,21 525:10 526:6 527:3,11 528:17 529:1,11,13,16 530:3 531:6,20 533:9,22 535:13 536:10 537:7 538:3,15,16 539:3,18 540:4 541:12 545:21 546:4,5 549:21 550:2 552:1,11 553:20 554:10 555:1,9,15 556:8 557:5,12 558:1 560:1,21 561:8

**formal** 556:17

**formally** 537:18

**format** 300:24

**formatted** 491:9,11

**forms** 431:2 474:15

**forty** 309:12,20,24 330:13,18,23,24 331:4,8 332:3 336:24

**forty-eight** 309:10,13,14,24 310:3 330:18 331:1,3,5,6 333:8,9

**forty-five** 380:19 513:6

**found** 296:10,11 297:8 303:4 308:2 374:2 375:11 376:13 416:19 430:15 439:23,24 496:16 501:18 502:4 550:9 553:2,7 560:20,23,24 561:2

**foundation** 361:22 362:8,21

**founding** 369:5

**fourteen** 561:24 562:5,7,9

**frame** 504:12 512:5,8 522:17

**frames** 405:12

**Frank** 414:24 424:21 432:24

**Fred** 380:2 451:12,14

**fresh** 501:12

**front** 294:10,13,15,20 295:5 323:4 392:15 393:6 430:11 431:15,19 466:22 467:14 508:3,15

**fucked** 328:11

**full** 274:5,9 275:7 329:10 393:14 394:10 506:19

**fuller** 545:23

**Fulton** 378:2,4,6 436:16 437:24 438:20 440:5 441:2,17

**Fulton's** 438:4

**Fulton-0001** 438:15

**functioning** 548:20

**funded** 278:10

**future** 336:18 536:22

---

**G**

---

**G-I-S-L-I** 277:16

**G-U-D-J-O-N-S-S-O-N** 277:17

**Gabriel** 295:3 336:24 508:12

**garnered** 303:7

**gathered** 278:11

**gave** 268:14 350:18 389:8 440:24 450:3,4 475:20 546:1,2,10 547:9 551:10 558:7

**Gene** 297:8,10

**general** 266:4 364:7 436:7 440:23

**generalization** 399:9

**generally** 283:23 311:8 361:23 497:20 538:8,9,13 539:11 541:14, 21 549:1,3 551:17 556:10

**Generals** 367:12

**genuinely** 410:5

**George** 300:9,11 303:13,15,16,23 393:21 482:17

**Geraldo** 496:3

**Gillespie** 418:18 462:20,23 463:15

**Gillespie's** 463:4

**Gillespie-000001-000020** 418:20

**Gilmore** 391:4

**girlfriend** 425:2 426:9 427:9,12

**Gisli** 277:15

**give** 267:5 289:9 347:8 410:2 473:3 545:23 546:17

**giving** 299:11

**glance** 475:16

**gleaned** 373:13

**Golden** 265:5 399:15,21 524:3,4,6, 17,24 525:14,21 526:2,9 527:7,14 528:22 529:7,15,18 530:10 531:17, 21 533:14 535:6,16 536:12,13,23 537:10,22 538:5,21 539:14,22 540:10,20 541:5 542:9 543:4,9,22, 24 544:8 546:2,8,11,17,18 547:20 548:1,7,9 549:23 550:15 552:5,13 554:7,20 555:6,12,21 556:11 557:3,6,22 558:11 559:12,22 560:6 561:4 562:1,14

**Gomez** 380:3 463:20 499:24 500:1,5,8,15,17 501:5,8

**Gomez's** 501:12

**good** 265:22,24 279:14 390:16 438:10 520:22 524:5

**gosh** 448:23

RICHARD A. LEO, PHD, JD, 09/29/2022

**Gould** 277:12 278:4,9 279:2 314:20

**government** 411:8 412:19 499:10 534:24

**governmental** 522:13

**governor** 283:7 393:21 410:1,2,9

**GPS** 356:20

**grab** 331:15

**grabbed** 442:4 454:21 455:24 456:7

**gradations** 479:5

**graduate** 321:1

**grant** 285:6,12,20

**Gray** 464:22,24

**Gray's** 465:17

**great** 418:8 460:10

**greater** 387:20

**Greenberg** 300:17

**groin** 425:2 426:9 433:8,21

**gross** 459:18

**ground** 286:10

**grounds** 429:22,23

**Guadalupe** 295:2

**Gudjonsson** 277:15

**guess** 276:7 320:2 347:9 407:17, 24 410:9 413:7 505:8 525:16 552:4 553:9

**guessing** 553:8

**Guevara** 264:8 265:8,20 329:9,13, 23 335:15 336:15 342:19 343:2,16 344:9 348:17 349:18 351:4,7,10, 17,22 352:3,8,15,23 353:15 354:5, 10,19 355:11 357:4,15 358:11,19, 22 399:13 400:17,23 401:4 405:16 491:4,19 492:9,17 494:3 500:2,7, 16 501:6,18 502:4,18 503:4 504:17 505:11 508:11,24 532:22 533:5 539:24 540:13

**Guevara's** 342:23 344:8 353:4,22 355:23 503:9 505:2 532:18

**guilt** 298:18,20 342:20 344:2 353:19 355:4 406:24 409:10 528:14 540:2,16 541:7,14 555:7

**guilty** 290:18 306:6 321:9 358:3

**Gould** 526:10,15,20,21,23 528:10 530:13 531:1,5,8,10,15 541:6,11,16,18,22 542:5 551:23 553:2,7 554:21 555:6

**gun** 374:6,19 376:20 377:15,16 378:8 379:20 380:5,8

**guy** 297:24 305:6

**guys** 373:15

**gym** 351:13

---

**H**

---

**hairs** 325:22

**half** 270:21 341:4

**Halloran** 378:3 411:24 412:4 414:13 421:8,13 422:1,5 436:19 463:22 481:9,11

**Halvorsen** 401:22 402:2,5

**Halvorson** 491:5 508:24

**hand** 561:19

**handcuff** 335:15

**hanging** 524:8

**happen** 294:19 297:14 312:23 428:4 456:19,22,24 457:9,16 466:8 472:22 486:9 532:7 556:23 558:9

**happened** 303:15 313:2 329:22,23 458:17 465:16 552:5,7,15

**happy** 322:3 342:6,9 343:21 431:13 483:3

**hard** 277:19 344:17 479:7,20 541:8

**Harold** 380:5 385:13 470:2

**harsher** 554:1

**Harvey** 404:20 524:13,19 525:1

**head** 314:10 335:16 405:20 425:1 426:8 433:9,21 441:12

**heading** 336:21 341:23 349:9 359:5,17

**headings** 341:24 521:18

**hear** 373:15

**heard** 309:12 339:22 419:1

**hearing** 328:15 335:18 336:5,13, 17

**hearings** 409:18 414:16 506:20

**heart** 304:13

**held** 463:22 471:23

**helpful** 539:10,15

**Henry** 496:2 551:4,11

**hierarchical** 504:21

**high** 296:12 302:16 303:5 359:12, 13 398:12 508:19 509:7 530:16

**higher** 467:7 506:12 511:1

**highlighting** 503:22

**highly** 289:19,24 291:7 358:22

**Hill** 380:5 385:14 470:2

**Hinton** 394:5

**hired** 372:15 514:4 515:16

**historically** 366:3

**history** 321:21 335:23 365:2,9 366:6

**hit** 335:15 380:9 425:1 426:8 480:7

**Hobley** 393:22

**hold** 267:17 286:3 418:24 450:11 454:6,10,19,24 455:22 456:5,17,21 457:5 472:17 475:18 477:17 513:13 541:7

**home** 521:10 559:19 560:20,24

**homicide** 299:14 305:18 320:1 352:18 353:2 525:9

**homicides** 527:10,15 528:11

**Hood** 380:7,11 382:16 385:12 389:8,11,18 440:4 465:22

**Hooks** 482:17

**Hooks'** 294:21 396:18

**hospital** 476:19

**hour** 305:9 330:23,24 338:6 510:19 511:20 513:19,23 514:6 515:11,19 516:12 517:3,6 519:20 520:2

**hourly** 510:17 511:1 514:5,6,14,17 515:2,10,18 517:2,6 518:23 519:19 520:1,10

**hours** 270:22 271:22 305:8 309:10,21 330:14,18 331:2,3 332:3 333:6,7,8,9,10,11,15,16,17,19 336:24 337:7,14 338:4 461:7 463:23 471:24 473:4 480:6 481:17, 21 512:10,18,24 513:1,6 517:14,23 519:1 561:24 562:5,10

**house** 304:19

RICHARD A. LEO, PHD, JD, 09/29/2022

**Howard** 393:23

**Hubert** 475:11

**hundred** 273:15,17 275:12,13 276:1,2,11 305:9 314:23 367:21 369:1 370:11 449:3 488:6 512:9,24 513:6 526:19 542:19

**hundreds** 277:17 320:9 338:22 365:22,23 472:13 534:8

**Hunt** 501:15,19 502:3,5,6

**Hunt's** 502:13

**husband** 536:5

**Hybrid** 300:22

**hypothesize** 542:3

**hypothetical** 317:14,15 322:23 459:22 460:4 496:23,24 527:12 540:18 542:4,8

**hypothetically** 459:23 460:19 541:18

---

**I**

**i.e** 281:18

**idea** 284:24 315:9 316:22 324:4,6 401:11,13 504:9 522:15 538:6,24

**identical** 340:11 348:3 349:21

**identification** 350:13

**identified** 278:5 284:15 285:2 287:14 292:15 293:11 295:10 296:4 409:7 410:17 468:22 486:2 488:22 496:6

**identifies** 502:23 503:2

**identify** 264:19 272:17 293:18 310:13 313:23 330:6 365:8 381:21 385:4 413:10 414:20 420:23 422:9 491:17 498:24 504:3 505:13 521:12

**identifying** 304:1 380:22 381:20 383:14 422:18 500:8,17 501:7 547:10

**Iglesias** 496:3

**ill** 548:12 557:21 559:11

**Ill.2d** 414:24 415:2,7

**Ill.2d.** 415:5

**Ill.app.** 420:12

**Ill.app.1st** 420:6

**Ill.app.3d** 419:7,22 420:10,16

**illegal** 285:9

**Illinois** 264:12,16 296:22 391:10 393:21 395:6 418:18 420:1 424:8 485:22

**illustrate** 363:21 503:12

**illustrates** 462:4

**imagined** 459:23

**immediately** 295:5 474:17

**impeachment** 547:21

**imperfect** 346:6

**implicating** 352:18 353:1,8 354:2

**implied** 554:17

**implies** 533:24

**imply** 554:1

**important** 429:11 444:1 503:14

**impossibility** 284:3,8 304:21 314:3,5,9,13

**impossible** 284:19,22 293:8 304:18 305:13,15 306:20 313:12, 18 315:13,16

**improper** 417:13

**in-court** 366:16 367:2

**inaccurate** 474:22 486:11

**inadvertently** 364:8,18 440:23 520:5

**inappropriate** 543:23 546:19

**include** 284:3 343:8 364:8 379:19 423:1,21 468:20 469:1

**included** 280:5 288:19,22 468:9 469:4 470:7 506:24

**includes** 295:2 329:12 443:15

**including** 268:22 283:6 294:3 301:3 302:11 410:8 430:13 443:15 462:24 473:22 480:8 508:20 518:24 534:2 536:2

**incommunicado** 309:9 310:7 336:22 471:23

**incomplete** 527:12 531:7 540:17

**inconceivable** 319:15 320:15 321:11

**inconsistencies** 311:10

**inconsistency** 313:6

**inconsistent** 322:4 536:1 540:15 561:17

**incorrect** 292:7 474:23

**incorrectly** 356:5

**increased** 478:1 480:20 482:7 483:18 485:5 486:15 490:10 498:5

**increases** 544:20

**incredibly** 399:15

**incriminating** 274:5,11,22 275:3

**inculpatory** 289:17 406:22 409:8 475:21

**independent** 290:12 356:21 444:8

**independently** 476:23

**index** 268:24 269:5

**indicating** 559:3

**indicia** 473:8,9 532:16

**indicted** 279:22 283:5

**indirectly** 427:9 439:1

**indisputable** 278:15,21

**individual** 265:6 283:4,13,15 284:10,14 288:23 289:16 292:14, 16 294:2 295:10 296:19 313:24 314:1 318:5,18 360:19 424:22 468:22 477:20 484:18 488:21 492:22 499:14,19 524:7

**individually** 457:10 497:19 498:11 499:12

**individuals** 280:5,22 284:2 285:16 293:19 304:3,5 307:9 350:9 360:3 375:10 386:15 387:15 397:20 412:5 420:22 459:13,24 463:19,24 464:22 475:19 482:18 486:1,4 489:20 491:17 495:21 496:7,11,17 497:3,13 498:9 503:7 505:10,20

**individuals'** 463:8

**infancy** 318:13

**infer** 337:23 544:17

**influence** 531:15

**information** 287:22 294:7 322:4 342:7 347:11 373:13 388:13,18 389:4,9 390:1 398:6 423:6 441:2 442:23 468:12,13 469:22 477:6 481:1 487:23 496:10 497:4,5 511:13 518:11 520:13 543:20

RICHARD A. LEO, PHD, JD, 09/29/2022

**informing** 363:6,13

**informs** 392:22

**infringement** 339:21

**initial** 515:16

**initially** 304:13 309:22 352:12 383:15 416:23

**initiated** 514:18 515:7,8

**injured** 336:14

**injuries** 443:7,23 444:14 530:22

**injury** 336:13,15,18 444:6

**innocence** 278:22 280:19 281:5, 17,18,19,21 282:8,17 283:2,6,22 285:17 290:11 299:16 342:21 393:23 407:1 409:10 438:13 506:16,19 507:3 529:24 530:6

**innocent** 279:22 280:24 281:2 282:14,20,23 284:3 296:16 305:6 306:1 328:9 410:4,5 530:7 533:8, 12,13

**inquire** 342:6 551:19

**inquiry** 373:3,10 395:7 450:5

**inserting** 449:15

**inside** 294:17 339:4 542:20

**inspected** 351:12

**instance** 453:9

**instruct** 381:2 446:13 468:13 469:23 477:4 511:11

**instructed** 347:10

**instructing** 381:5,7

**instruction** 385:7 414:1 468:18

**insufficient** 358:12

**intellectual** 478:24 479:6 548:11

**intellectually** 479:10

**intend** 520:17

**intended** 518:9 533:20

**intending** 426:22

**intentionally** 449:15 526:24 542:23

**interacted** 327:12

**interaction** 329:9

**interactions** 326:18

**interchangeably** 275:9

**interdisciplinary** 537:2 556:14

**interested** 301:2

**international** 344:21 410:10

**interpret** 542:12

**interpretation** 343:9 357:18

**interpreted** 384:12

**interrogated** 327:21 332:8 333:14,16 338:5,6 343:16 345:16 346:7,8 358:5 406:8,17,23 409:9 445:5 461:6 480:5 538:2 542:6

**interrogating** 354:21 358:2 525:3

**interrogation** 294:17 302:6 309:9 310:2,5,7 330:13 331:1 332:10,12, 24 333:2,4,17,18 334:2,16,20 336:22,24 337:10,22 338:10,11 339:1,8,11,12,17 340:8 343:14 345:17,19,21,22 346:5,10 348:12 349:10 351:5 353:12,13 354:5 356:16 357:9,10 358:1,22 365:4, 18,24 366:5 398:10 411:23 415:13 443:6 444:14 455:4 473:4 476:20 477:24 479:9,16,17 480:19 486:10 489:22 491:4 508:22 524:14,20 525:4 526:4 531:12,13 532:4 538:20 540:11,15 541:19,20,24 543:7 544:14 549:5,9,13,15 555:3, 24 556:2 561:6

**interrogations** 334:10 344:21 346:3 348:17 354:9 355:12 357:19 358:17,20,24 359:8,21 360:5,18,22 363:10 406:18 424:10 455:2 482:7 503:20 532:21 542:9,17,20 556:5

**interrogators** 339:23

**interrupt** 318:24 381:14 399:16 544:5

**interrupting** 381:17 543:21 544:4

**interruption** 379:9

**interview** 345:9,15 346:9,14 351:18 352:5,16

**interviewed** 327:20 351:24 352:24

**interviewing** 346:16

**intimidated** 481:12

**introduced** 351:11

**investigated** 491:19 494:3 538:1

**investigation** 303:18 322:21 344:3 355:3 357:8,22 507:10,13 508:12 525:9

**investigations** 373:3,9

**investigative** 398:22 542:21

**Investigator** 524:13,19

**investigators** 324:12 325:2 398:21 525:8,13

**invoice** 511:18,21 512:4,14,17,22, 24 513:9,22 516:6,10,16,21,24 517:6,10,15,17 518:1,3 519:5,9 520:18

**invoices** 509:22 510:4,10 515:4 519:6

**involuntarily** 550:1

**involuntary** 480:21 482:8 483:19 485:6 486:15 490:11 498:6 503:21 550:6 552:10 554:6,18

**involve** 319:24 340:17 421:24 456:15

**involved** 279:19,21 285:6 288:13 305:11 341:19 343:13 353:23 354:20 355:22 479:1,17 528:20

**involvement** 352:12 353:10 531:4 554:24

**involves** 357:4

**involving** 365:18 411:23 422:3 455:3 456:11 491:4 492:17 504:2 508:24 523:20

**IQ** 478:12 479:7,15,24 480:1,2 548:19

**IQ=56** 451:15

**iron** 374:5 376:19

**irrelevant** 458:21,23 459:17 539:4

**irrespective** 312:21

**isolated** 432:13,14

**issue** 320:3 337:7 407:6 424:9 429:18 550:21,24

**issued** 394:19 396:5 482:17 501:17

**issues** 266:14 399:18 429:18,19, 21 434:3

**item** 424:22 493:8 518:15 520:21

**itemized** 517:17,18,19

RICHARD A. LEO, PHD, JD, 09/29/2022

**items** 520:11,17

**Ivan** 304:22

---

**J**

**J.D.** 265:11 537:18

**Jacinta** 348:15

**Jackie** 266:24 294:21 396:19

**Jackson** 385:16 470:15 471:4

**Jackson's** 470:17 471:9

**Jacobs** 297:18

**Jacques** 492:1,22 493:3,9,14,18, 24 494:1,11

**jail** 302:24

**Jakes** 385:20 419:9,11,13,18 471:17,21,23 472:4,9,18 473:24 513:22 516:11

**Jakes'** 472:23 473:3,7,17,23 474:21

**James** 305:2 378:10 423:1,7

**January** 269:17 393:21 447:5 511:22 512:1,6,23 513:5 516:17 519:10

**Jason** 464:22

**jaw** 378:12 442:4 454:21 455:24 456:7

**Jerry** 418:18

**Jessica** 265:3

**John** 304:6

**Johnny** 306:15 386:2,16 419:21 480:3,6

**Johnson** 494:17,19 496:2,3

**Johnson's** 494:22

**Jon** 277:12 367:19 371:16 372:24 392:9 397:1 398:11,17 399:13 400:18,23 401:22 402:2,10,14,22 403:2,10,22 404:9,13,23 405:2,8 408:10 430:13,17

**Jones** 408:9

**Jose** 299:3

**Joseph** 385:16 470:15

**journal** 300:22 302:8

**journalists** 288:14

**Juan** 494:17,18

**judge** 266:24 283:7 294:21 394:12 396:18 465:5 482:17 484:16 536:20 549:4 550:6,12 552:8 554:3

**judge's** 549:11

**judges** 535:22

**judgment** 298:23 299:2 342:18 353:4,18 354:19 355:17 357:1,12

**judicial** 283:3 409:21 411:7 412:17 413:8,10,18 414:4 415:18,22 416:9,19,22 417:24 418:3 428:15 429:19 430:20 445:6,22 484:9 499:9 534:23

**July** 394:17 395:1 511:22 512:5,15 513:4 516:17 519:9

**June** 395:23 396:18 420:7 487:13

**juries** 535:22

**Juris** 537:5,8

**juror** 283:8 361:2

**jurors** 539:16

**jury** 361:12 363:6,13 395:22 412:9 443:14 502:4 536:8,15 539:1

**justice** 278:11,13 339:9 365:4 393:15

**Justice's** 285:11

**juveniles** 451:14 548:15

---

**K**

**K-A-R-A-L-O-W** 404:9

**K-I-L-R-O-Y** 386:18

**Karalow** 404:8,12,16

**Katie** 265:1

**Kelley** 297:21

**Kelly** 425:7 426:8

**kick** 425:1 426:8

**kicked** 433:8,20 461:7 462:22 471:21 472:19 481:10 484:11

**kidnapping** 527:15

**kidnappings** 528:11

**kids** 303:20 522:20

**kill** 378:11 411:24 412:4 414:13 415:12 416:3 421:8,13,24 422:4

425:1,8 433:8,10,20,23 442:3 443:3 454:20 455:3,5,24 456:6,11, 13 458:2 460:15 484:10

**Kill's** 465:6,7

**killed** 313:21

**killer** 306:2

**killing** 299:9,11 303:17

**Kilroy** 386:17

**Kimball** 300:16

**kind** 275:1 293:3 303:6 325:24 352:20 405:13 430:2 456:14 534:1

**kinds** 288:24

**King** 486:18

**kit** 325:20

**Kitchen** 385:22 475:3 477:7

**Kitchen's** 476:4

**knew** 348:20 349:6 399:13 400:18 401:22 402:10,22 403:9 404:9,23 408:15

**knowledge** 361:5 392:7 421:7 423:16 439:4 474:8 487:3,4

**Knox** 515:1 519:18

---

**L**

**l75.7** 512:10

**language** 284:23 347:23 460:19 535:11 541:21

**large** 557:15 558:10 561:13

**larger** 327:13 442:14 454:15

**Lash** 386:1 419:5 477:16,17

**Lassar** 266:23 294:19 507:10,20, 24 531:18 532:1,24 533:6

**Lassar's** 507:13

**lasted** 327:23 333:5

**lasting** 309:10

**late** 340:15,23,24 341:1 519:5

**Latino** 359:9,22 363:11 406:7,16

**Lavale** 296:20

**Laverne** 303:10

**law** 300:22,23 302:9 332:18 362:13,20 369:6,10 372:15,18

RICHARD A. LEO, PHD, JD, 09/29/2022

461:21 536:23 537:2,11,17 550:8

**lawful** 265:12 554:5,16

**lawsuit** 502:9

**lawsuits** 409:23

**lawyer** 537:18

**lawyers** 346:6 366:16 367:3 369:15 537:6,20

**lazy** 342:23 343:3 344:3 354:19 355:3

**lead** 538:11,22

**leading** 503:20,21

**leads** 318:17 474:21 540:9

**learned** 474:20 494:11 497:6

**leaving** 320:17

**lectured** 474:11

**lectures** 423:24

**led** 296:11 303:18,22 427:4 432:1 542:7

**Lee** 306:15 551:4,11

**left** 296:12 311:24 319:16,17 321:17 322:10 329:13,24 334:24 335:16,17,18 351:14 364:19 367:2 522:22 527:22 559:15,23 560:9,15 562:2

**leg** 481:10

**legal** 264:13 279:24 280:6 281:20 362:9,13 428:9 430:18 539:4 550:13 553:18,22 554:9

**legally** 285:21

**legislative** 283:3 321:3 423:24 424:1

**Legislature** 424:8

**length** 332:6,7,9,23 333:4,17,18 334:2 440:10

**lengthen** 543:16

**lengthening** 542:24

**lengths** 342:14

**lengthy** 330:12,24 336:21 337:2

**leniency** 554:1

**Leo** 264:4 265:11,22 279:5 289:10 295:23 296:1,9,16 300:3,8,16 301:23 332:15 347:9 356:7 375:22 380:12,24 381:2,10,24 384:20

385:8 388:5 389:16 390:24 392:13, 22 393:5 414:7 418:23 448:24 469:24 491:1 496:20 511:8 518:19 521:10 537:13 546:18 547:9 548:23 562:14,15

**Leo's** 308:22 562:12

**Leo/ofshe** 286:4

**Leroy** 393:22

**Leshurn** 501:15

**lessor** 291:7

**letter** 475:10

**level** 399:9 480:2 535:14 548:20

**Lewis** 297:24

**liable** 501:18 502:5

**Lieutenant** 371:1,16 373:2,8

**lieutenants** 504:23

**light** 432:18,20 519:14

**Lightfoot's** 396:24

**limitations** 363:16

**lines** 304:3 366:19 367:1 373:24 414:8

**link** 356:13

**linking** 312:1 354:5

**Linscott** 298:3

**Linscott's** 298:4

**list** 268:12 284:17 285:14,15 293:24 303:10 341:24 369:24 371:18 377:17 400:15 408:8,13 419:22 421:3 424:22 447:1 469:13, 16 492:8 495:24 507:17

**listed** 266:5 267:6 284:18 297:2 323:12 336:2 387:6 398:8 410:13 412:21 413:1 422:10,19,24 441:23 449:5,7 450:8 451:22 466:20 472:11 478:4 482:19 489:7,12 492:2 494:7 495:13 496:8 500:23 501:2 507:6 512:24 550:18 551:9

**listing** 269:5 503:6

**lists** 268:2 284:11 292:10 462:2

**literally** 522:23 543:18

**literature** 538:10 549:5 561:18,23

**litigants** 340:18

**litigate** 393:8

**litigated** 537:16

**litigation** 472:16

**live** 542:19

**locate** 391:7

**located** 401:9,14

**location** 313:20 356:20 536:2 543:12

**locked** 522:21

**lodge** 416:7 518:8

**logical** 320:24 321:12

**long** 270:12 281:9 295:18 302:3 320:2 334:23 335:6 338:9 345:22 367:15 435:13 510:16 541:20

**longer** 314:16,18 317:9,20 490:16 556:2

**longest** 469:9

**looked** 267:22 268:7,8,14,16,17 278:6 281:8 286:14 341:6 493:1 516:16 518:3 519:6 529:2

**lookout** 471:22

**Los** 516:24

**losing** 336:17

**loss** 335:18 336:5,14 371:24 372:2

**lost** 352:20 373:15 375:2

**lot** 326:22 327:5 339:18 346:1 369:19,20 506:20 517:18

**low** 445:20 548:19

**lower** 450:23 467:6

**lunch** 368:12,15,18 390:17,20

**lying** 459:15 460:1,21

**M**

**made** 278:17 304:17 306:19 312:15 336:16 373:3,9 375:10 388:1 394:24 409:15,17 412:16 421:10,12 426:13 428:7 445:15 450:24 459:12 464:5 471:4 499:5 501:19 503:7 521:21 549:18 550:12

**Madison** 393:22

**maintain** 321:9

**majority** 549:14

RICHARD A. LEO, PHD, JD, 09/29/2022

**make** 268:3 298:23 304:18 323:1 361:11,12 373:21 376:3 416:17 417:6,8,13,14,16 431:22 432:19 433:24 439:8 444:20 445:8,12 449:17 450:16 457:13 462:5 499:2 510:2 532:5 547:6 557:17

**makes** 321:15 378:15,17 539:7 552:8

**making** 354:23 360:7 389:18 417:12,17 425:13 426:16 429:7 434:7,21,22 443:12 453:5,11,22 473:13 476:9 483:11 484:24 486:8 502:6 530:1 536:19

**male** 438:1 441:3 527:22 560:20, 23

**manual** 337:5,9,11,13,14 338:12 339:10 340:2,3,10,21 341:3,7,12, 15 357:19

**manuals** 338:17 339:18

**Manuel** 464:22

**March** 512:15,22

**Marcus** 386:24 418:15 420:11

**Mariano** 348:14

**mark** 278:23 285:24 299:23 300:8 368:7 378:14 404:20 509:21 513:8

**marked** 332:17 509:22 510:1 516:16

**marshal** 539:9

**Martin** 305:20

**Martinez** 299:3

**Marvin** 475:3

**Mason** 299:5,6

**mass** 494:6

**massive** 440:15 441:11 444:10 469:8 503:12

**match** 560:5

**matched** 307:20

**material** 317:8 364:19 435:7,9 440:9 475:13 477:11 488:16 494:14

**materials** 266:5,11,13,15,19 267:1,6,7,9,19,21 268:2,6,8,21 272:16,24 288:11,14 289:4,6 295:8 297:9,12 303:3 308:6,18 314:17,19 315:2,4 321:23,24 322:2,5,15 323:12 324:1 335:21 336:2 340:5,8

341:9 343:7,19,22 349:5 355:1 360:9 361:13 364:3,5,6,17 369:19, 20,21 370:1 371:10,12,19 377:5 383:6,11 388:15,19,23 389:5 390:2,6,10,11,14 391:9 398:16 399:12 400:16,21 401:3,20,24 402:4,8,12,16,20,24 403:4,8,12,16, 20,24 404:2,7,11,15,22 405:1,5 410:13,23 411:12,15 412:10,11,12, 15,20,24 413:4 414:5 421:23 422:14,17 427:17 434:8,10 437:10 438:5,8 439:4,17 440:13,21 441:17,24 442:16 444:7 446:22 447:1,3,7,14,21 448:3 449:5,8,24 450:18 451:21 452:1,2,6,14 453:18,19,21,24 454:11,13 458:8 460:17 461:14,15,16 462:14,17 463:17,18 464:8,9,12,15,16,18,19, 23 465:1,2,3,21 466:13,16,17,20 468:1,2,16 469:7,8 470:6,11,12,20, 21,23 471:1 472:11,14,24 474:4 475:7,12 478:3,7 481:3,4 482:23, 24 483:13,22 484:1,2,4,6 485:11, 12,13,16,17,18 486:20,22 487:16 488:9,12 489:6,7,12 491:21,23,24 492:2,3,15 493:1,6,7,8,13,21,24 494:12,14,18,22,23 495:3,5,9,11, 14 496:6,9,11 497:2 499:19 501:1, 4,11 503:12 505:17,19 506:7,9 507:6,12,17,20 509:11 561:1

**math** 513:3

**matter** 264:7 354:15 360:2 400:8 428:21 433:16,19 502:2,11,19 510:18 513:4 515:14 516:11 519:8, 10 535:4 550:8,10

**matters** 514:18

**Maxwell** 391:4 407:23

**Mayor** 394:23 396:23

**Mccollum** 551:4,11

**Mcgrath** 265:7,17,20

**meander** 380:18

**meaning** 267:13 274:2,3 275:1 499:11 522:15

**meanings** 274:16

**means** 276:6 360:18 371:3 557:4

**meant** 298:17 327:5 355:16 426:1 437:13,14 446:21 492:13

**media** 264:2 287:15,23 302:17 303:7 409:22

**median** 333:18

**medical** 335:22,23,24 336:6,7 476:3,13,14

**meet** 270:23 271:14 282:11,12 317:20 437:12,20,23

**meeting** 271:19

**meetings** 271:9,20

**meets** 273:10 282:5,15,19 311:16 312:5 344:22 437:11 529:9,21 532:14

**Megan** 265:7,17

**Mejia** 295:2,4 307:17,20 312:2 329:16,24 343:10 352:17 353:1,24 358:12,14,15 527:15 528:10 532:11,12 535:7

**Mejia's** 308:1 353:9,20

**Melissa** 500:12

**Melvin** 304:24

**member** 369:5

**members** 369:6 505:24

**memorandum** 507:23 508:14

**memorialized** 286:6 415:19

**memory** 268:23 281:10 297:13 310:19 422:2 444:8 452:22 464:9 468:3 477:9

**men** 359:9,22 363:11 463:22

**men's** 389:14 466:1

**mental** 478:23 479:6

**mentally** 548:11 557:21 559:11

**mention** 269:10 379:16 492:4 525:1

**mentioned** 269:11,16 270:21 275:20 277:11,13 302:12,22 305:3, 4 313:5 322:6 337:8 339:7 345:24 364:24 366:2,8,12 409:14 419:23 420:4 421:18 438:7 441:22 447:19 450:23 460:13 464:19 468:2 469:9 474:9 475:10,19 477:10 492:4 493:16 494:15 495:6,20 497:3 508:1 525:20 541:13 554:16 556:14

**mentioning** 364:10 525:21

**mentions** 495:19

**mere** 412:17

**met** 278:18 284:22 285:16 292:19 293:20 294:2 295:12,24 296:21

RICHARD A. LEO, PHD, JD, 09/29/2022

297:3 303:11 314:1 316:12 343:15 400:20 407:6 408:2,22 411:14 473:18 551:1 553:13

**metal** 326:21

**method** 287:9 325:4,7,12,24 326:2 338:13 339:19,24 340:3,4,10,13 378:20

**methodology** 287:9,12 432:7,9

**methods** 324:9 325:15,18 326:8 339:24 374:2,7,10 375:11 376:14 377:1 379:7 538:20

**Mexico** 305:11 558:14,24 559:4

**microphone** 373:16

**mid** 340:15

**mid-1980s** 392:8

**middle** 309:6 335:12 342:19 366:15 379:3 384:21 559:13

**Miguel** 386:7 481:7,16

**miles** 305:9

**Miller** 514:12

**mind** 353:19 481:5

**mindful** 368:12

**Mingey** 404:21 525:22

**minor** 311:9 351:1

**minute** 331:12 435:21 490:16

**minutes** 270:16 327:17,23 331:13 352:1 380:19 519:15 562:2

**Miranda** 351:22,24 352:9 479:19

**mischaracterization** 459:19

**mischaracterizes** 370:16 387:18 425:20 437:3 521:24 536:11

**mischaracterizing** 448:17

**misconstrued** 454:4

**misheard** 309:13

**misleading** 417:9,10

**misreading** 418:15 449:14

**misremembering** 533:16

**misrepresent** 376:5

**misrepresenting** 449:20 546:14 547:1,18

**misrepresents** 374:12

**missed** 268:3

**misses** 280:17

**missing** 349:6 418:5

**misstate** 526:24

**misstates** 362:20 552:21

**mistake** 364:7 399:2 425:6,8

**mistaken** 505:1

**misunderstood** 268:18 560:6

**Mitchnick** 427:10,12

**mock** 406:19

**moderate** 443:18

**modify** 317:17 343:21

**moment** 389:24 474:3 495:23 524:23

**Monell** 361:21 362:10,17 363:3

**Monell's** 363:3

**monks** 296:7

**Montanez** 505:15,19,22 506:2,14 507:14

**Montanez's** 505:21,24 507:4

**Montgomery** 514:13

**month** 271:13,20 405:21

**monthly** 272:9,11

**months** 272:15 303:1 346:20 444:9 529:3

**Moore** 299:17

**Morales** 386:7 481:7,16

**morning** 265:22,24 270:6 352:5 368:14

**Morris** 264:17

**mother** 304:10,20

**motion** 310:23 414:15 418:24 450:3 549:1,18,24 551:22 552:8,19

**motions** 409:18 522:8,18 523:6, 18,19

**motive** 536:6

**mountain** 430:21 460:5

**mountainous** 305:11

**mouth** 374:6 376:21

**mouths** 325:21

**move** 376:3 411:20 442:2 443:2 446:1 478:10 540:6 548:1

**moved** 327:11,12 531:4 540:2

**moving** 385:20

**multiple** 274:16 287:14 320:1 334:21 338:10 360:3 361:8 386:15 476:8 488:17 498:13 503:24 532:9

**murder** 290:14 296:6,11 297:11,14 302:24 304:19 306:3,10 311:20 312:23 313:2,13,21 329:18 354:6 356:15 425:4,11 426:5 442:6 446:5 454:23 456:2 471:23 478:11 480:9 481:13 483:9 484:12,23 500:3 558:4

**murdered** 304:20 348:15

**murdering** 304:10

**murders** 303:21 307:3

---

**N**

---

**named** 267:11 287:1 304:3

**names** 267:8,12 268:13 269:6 405:15 408:14 422:16 497:2

**Naperville** 513:16

**narrative** 274:6,10,12,15,17,23 275:4,6,7,8,15 535:18

**Nation** 410:11

**national** 303:7 337:10 338:19 349:10 350:11,14,19 492:7,11,15

**nature** 322:12

**Neal** 478:10,12,16 479:16

**necessarily** 298:21 322:11 349:7 354:9 526:18 545:14 549:24

**necessity** 534:11

**neck** 442:4 454:21 456:1,7

**needed** 269:6 328:10 355:18

**Negron** 495:7,10,12,15,19

**Nejovus** 403:21 404:4

**nervous** 342:11

**Nevest** 378:2 436:15

**newspaper** 451:23

**nice** 368:16

**Nicholas** 386:6 481:6,15

RICHARD A. LEO, PHD, JD, 09/29/2022

**Nickie** 514:12

**Nieskins** 299:20

**night** 270:17 436:10

**Nightline** 302:17

**nineteen** 490:9

**nineties** 340:15 341:1 401:15,18

**ninety-six** 333:11

**non-testimonial** 354:4 355:20

**normal** 514:17

**North** 264:15 294:18 332:17 461:20,21

**Northern** 264:11 391:10

**Northwestern** 410:3

**note** 301:24 351:6 375:15 428:20 465:5 498:11

**noted** 272:5 375:8

**notes** 266:12 268:20 269:3,20 270:11 294:22 382:4,9,15,20,21,24 383:3,8,18 384:8,14,19,23 385:5 386:5,9,11,13,17 387:2,5,9,13,21, 24 388:6,9,13,18,24 389:4,16,21 390:1,5,9 392:15,17,20,23,24 393:1,6,9,11 414:23 419:15,16 427:14,15,17,19 428:2,19 439:14, 24 441:16 446:11,16,17,18 452:11, 17,22 464:4,5 466:20,21,22 467:10,14,15,18,24 468:6,16,17 469:19 475:15,16 476:22 477:2,3 520:24

**notice** 308:17 359:10 361:9,16,19 398:11 428:4 508:21 509:8

**noticed** 360:9

**notorious** 458:3

**number** 264:9 266:3 268:14 269:7 278:23 279:1 284:8 285:23 286:1 292:14 295:23 296:20 300:4,8 305:21,22 308:21,22 321:17 335:10 342:1 371:3 378:15,19 379:17 387:6 391:1 418:14,19 419:21 420:6,9,11,15 424:22 442:2 447:11 450:9 461:24 464:10 465:23 467:5,18,23 477:24 484:17 486:18,19,24 493:8,15 501:14 509:20,23 510:2,4 513:9 518:4 519:1 522:11,12,14 523:9,10,23 524:1 529:19 530:8 543:11 551:21 552:14 553:6

**numbered** 497:12

**numbers** 269:7 333:12 436:7 440:24 508:4 558:10

**numerous** 295:7 321:6 355:10 414:15 433:1 482:2 483:18,20 502:24 503:16

**Nunez** 299:23,24 300:8 302:21

---

**O**

---

**O'MALLEY** 540:12

**Oakland** 542:20

**oath** 465:9 500:6,16 501:6 533:2 554:7

**object** 289:10 353:5 374:12 375:14 379:9 380:12 382:10 385:7 387:17 413:24 417:17 437:3 447:16 448:5 452:19 456:23 502:8 515:5 521:23 525:10,16 537:7

**objection** 271:3 276:4 286:12 289:9 291:19 292:3 301:11,12 308:8,13 310:11 312:24 313:15 314:7,15 315:19 317:1,12 318:7 319:10,19 320:19 322:13 323:22 325:10,17 326:11 334:4 337:17 338:15 343:4 347:7,10 348:8,23 349:3,16 350:7 354:12 356:2,6 357:5,20 360:6,23 361:22 362:8, 20,21 363:12 368:24 369:7,16 370:14,15,16 371:8 372:9,19 373:11 376:3 377:3 379:15 382:22 390:8 391:15 392:3,20 394:1,7,15 395:3,9,14,19 396:1,7,9,15,21 397:3,8,22 399:14 400:10 405:19 407:8,9 408:4,24 409:12 410:21 411:2 412:6,23 415:14 416:7,24 417:1,5,13 418:21 421:14 422:21 423:10 424:4 425:12,19 426:3,11 427:6 428:8,14 429:4 430:9 432:8 434:13,20 435:6 438:21 439:11 440:3,8 441:4,19 443:11 444:17 446:12 450:13 451:18 452:9 453:4, 13 454:9 456:3 457:24 459:1,18 463:6 464:2 465:19 466:6 467:12, 21 468:11,18 469:20 470:9 471:5 474:1,24 475:22 477:3 478:20 480:13 481:22 482:20 483:10 484:13 486:6 489:1,23 493:10,19 494:4,20 495:2,8,16 496:14,15 497:17 500:19 501:9,21 503:10 504:13 506:3 507:15 509:9 511:7, 24 512:19 514:20 518:9 520:3 521:14 523:22 524:16,21 525:23

526:6 527:3,11 528:17 529:1,11, 13,16 530:3 531:6,20 533:9,22 535:13 536:10 538:3,15,16 539:3, 18 540:4,17 541:1,12 545:21 546:4,5 549:21 550:2 552:1,11 553:20 554:10 555:1,9,15 556:8 557:5,12 558:1,18 559:20 560:1,2, 21 561:8

**objections** 387:23 417:2,4,7,18 446:13 448:12 449:10,12 496:19 518:14 520:12 536:16

**objective** 353:14,18 354:2,3 355:16,19 356:12,16 357:17 358:23 559:2

**objectively** 356:17 556:18

**observation** 479:12,14

**observations** 362:15

**observed** 352:4 542:10,12 544:13

**obtain** 288:1 441:1 505:11

**obtained** 287:23 289:17 423:6 504:11

**obtaining** 326:8

**occupation** 537:19

**occur** 293:7 345:22 357:19 453:23 460:3 473:6 497:23 557:16

**occurred** 284:16 310:9 314:4 334:10 345:18 346:5,10 353:13 360:21 391:17,20 427:4 460:22 473:3 535:20 544:11 545:12,20

**occurring** 377:12 542:13

**occurs** 527:4

**October** 517:11,20,21

**odd** 492:9

**offensive** 547:17

**offer** 363:19 412:11 453:15 476:4

**offered** 453:20

**offering** 434:8 443:16 454:2 455:9, 10 463:9 466:9 471:6,7 472:21 473:13 475:23 477:19,21 480:14, 15 481:23,24 483:13 484:24 485:1, 2 486:12 490:2,5 544:22,23

**office** 265:4 369:3,6,10 372:15,18 409:19 520:5 547:14

**officer** 265:6 327:8,12,15,21 328:7,10 403:9,13,17,21 404:4,8, 12,16,21 405:16 432:3 524:7

537:23 539:23

**officer's** 431:10

**officers** 340:14 392:9 398:18 404:19,23 405:2,5,13,14,17,22 430:14 431:1,6 504:10,22 505:4 523:20 541:3

**offices** 264:15

**official** 410:10

**officials** 359:12,13 361:7,9 398:12,13 410:8 411:8 412:18 445:7,24 508:19 509:7

**offs** 365:19

**Ofshe** 280:4 282:6 286:7,19 287:9 288:9 289:23 290:1,9 291:11 292:11,20 293:17 295:15 297:8 300:16 301:7,23 302:20 303:3

**Ofshe/leo** 277:4

**on--** 354:16

**one's** 321:1

**online** 492:10

**open** 344:17

**opening** 414:8

**opine** 321:23 323:3 458:14 473:1, 17 533:11

**opined** 371:23 372:2 473:1 550:10

**opining** 343:2 359:18 443:9 453:2 457:15 466:4,7 480:11 484:22

**opinion** 266:24 269:12,13 276:20 294:20,21 323:1 336:7 343:20 354:16,17 355:3 357:2 359:24 363:5 372:6 376:9 381:13 391:19, 22,24 392:5 394:4,5 395:12,17 396:4,18 398:8 415:21 419:6,8,24 426:12 427:13 428:1,15 429:7,19 430:1,3 433:5 434:8 438:19 440:12 443:16 444:3 450:12,19 451:5,10 453:16 454:2,6,10,19,24 455:9,10, 22,23 456:6,9,18,21 457:11,12 458:20 460:7,11 461:2 463:9,11 466:9 471:8,14 472:17,21 473:11, 12,13,19,22 474:7,16 475:18,24 476:10 477:17,19,21 480:15,16 481:2 482:1,3,10,16 483:13,15 484:7,9,15,19 485:1,3,7,14,23 486:12 488:17 489:9 490:3,5 498:21 501:15,16 503:17 524:12, 18 525:5 530:21 533:1 534:18 550:11 555:22

**opinions** 273:5 322:5,6 354:8 363:19,23 369:14 372:8 376:6 397:14,17 398:4 410:15 411:9,18 412:12 413:19 422:12 423:8 428:22 429:17 435:19 445:9 449:18 453:20 454:3 457:5,6,14 459:10 471:3,7 473:14,23 481:24 488:2,20,24 489:2,19 496:12 497:13,22,24 498:16 499:15 502:12,21 503:13 510:17 521:11 525:5 555:22

**opportunity** 266:1 435:14

**opposed** 298:13 326:9 331:5 435:4 534:22

**Orange** 393:23

**oranges** 505:6

**order** 273:1 340:19 341:17,20,22 342:2,16 355:16 357:1 360:15 362:4 388:1 432:4 501:13 529:4 547:6 555:23

**ordered** 393:8

**Ordinance** 396:12

**organization** 504:21

**organized** 441:8

**original** 382:24 390:14

**Oscar** 380:3 463:20

**overlap** 398:24

**overlapping** 399:5 405:12

**overruled** 428:6

**overstated** 554:13

**overturned** 389:15 466:2 491:18 494:2

**overwhelming** 469:7 502:15

---

**P**

---

**p.m.** 351:8 352:6,23 390:19,23 435:24 436:4 490:20,24 521:4,8 562:18

**pages** 292:9 302:12 310:20 360:1 382:8,14,19 397:18 398:2 413:5 441:7 442:22 449:4 453:18 466:22 467:5,18,23 468:9 472:13 475:13 483:24 484:1 487:23 510:5,7 513:13,14 520:8 534:9 550:16

**paginated** 279:12 287:4,6

**pagination** 366:21

**paid** 372:7 505:22

**pain** 335:17

**pair** 351:13

**paper** 272:6 278:19 383:10

**papers** 272:3 277:18,23 524:10

**paragraph** 279:20 281:15 290:6, 24 291:14 302:4 309:7 329:7,10,21 333:3 335:11,13 336:21 345:2 347:2,4,16,17 348:3,5,12 366:14, 15,18 367:18 369:23 370:22 371:21 373:19 375:3 377:2 378:21 393:14,20 394:3,10 397:6 414:8,9 416:10,13,16,22 417:20 418:4,11 419:10 425:17 427:1 434:11 436:15,24 438:15 439:6,8,9,20,21 441:15,23 442:19,24 443:2 444:12 446:2 448:1 449:1,20 450:1,8 451:11 452:8 454:18 461:4,12 462:20 463:20 464:17,21 465:2 466:14,15 470:1,5,7,8 471:2,16 475:3,20 476:13 478:4,5,19 480:4 481:1,6 483:7,22 485:20 491:17 492:21 499:24 500:1,23 508:17 509:6 559:14

**paragraphs** 347:13 348:2 459:14 468:22 486:2 488:11,12,22 489:15, 18 497:10,12

**Pardon** 413:14

**pardoned** 393:22 409:24

**parenthetical** 285:3

**Parker** 300:5,9,11,14 301:22 302:21

**Parker's** 302:11

**part** 270:2 273:24 277:4 296:1 321:4 333:23 363:1 369:13,17 370:3 371:9 382:5 392:6 397:23 398:22 399:4,5 411:17 426:15 429:6 445:10 451:4 452:18 454:15 458:16 461:18 471:14 473:19 474:15 476:15 478:21 489:8 491:12 509:15 561:12

**partial** 273:20,21,22 421:3

**partially** 273:17 276:7,21,24 526:16,22 528:16 555:18,19

**participated** 320:16 543:12

**parties** 264:20

**parts** 399:6 435:17 489:5 498:7

RICHARD A. LEO, PHD, JD, 09/29/2022

533:20

**passed** 346:11

**past** 547:10

**paste** 347:5

**pattern** 353:15 355:6,24 357:14 359:6,20 360:10,16 361:5,14,16,20 362:11,18 363:8 381:12,15,21 383:14 399:5 411:10 412:14 426:15 429:7,17 430:6 432:6 433:4 434:23 437:17 438:12 442:14 444:2,3 445:10 450:20 451:5,7 453:8 454:15 456:13 457:11 458:15,16,17,22 459:16,21 460:6 461:2 463:12 468:7 469:17 471:7, 10 473:15 476:10 477:22 480:18 482:3,6,14 483:16 485:8 486:13 489:9 490:7 491:13 498:2,18 499:14 502:12,14 503:18 508:22 509:12 521:11 532:19

**patterns** 350:9 366:5 431:20,21 432:12 466:10

**Patterson** 393:22

**Paul** 304:7 394:12

**pause** 377:23,24 399:17

**Pavlinac** 303:10

**PDF** 287:6 509:22

**Pedro** 297:15

**pendency** 319:4

**people** 272:18 274:7,8 296:3,9 302:21 338:3 339:20 345:16 346:14 357:7 368:15 395:17 396:19 409:24 414:24 416:2,19 418:11 419:22 420:9,12,16 428:2 459:15 460:21 531:8 547:14 557:15 558:5 559:5 560:5,13

**people's** 369:6,10 372:18 560:16

**Peoples** 372:15

**per^se** 456:6

**perceive** 344:7

**perceived** 344:10

**percent** 273:16,17 275:12,14 276:1,2,11 333:5,6,7,8,9,10,13,15 369:1 488:6 526:19 545:3,9 552:16,17,18,22

**percentage** 555:17

**perception** 336:4 356:22

**perfectly** 553:18,22 554:8,16

**performed** 505:5

**period** 271:12 272:12 303:2 334:9, 13,19 341:16 360:14 400:9 511:1 512:18 513:4 518:5 521:13 522:4,8 523:8,17

**periods** 334:23

**permanent** 335:18 336:5,13

**permit** 518:13

**permitted** 384:24 498:23

**perpetrator** 284:15 290:17 293:10 303:19 304:1 312:1 559:23 560:7, 15

**perpetrators** 296:4 559:15

**persisted** 365:21

**person** 278:15,22 279:23 282:14, 15,20,23 283:12 284:9 303:9 321:9 326:10 334:20 346:7 358:3 445:4 462:11 526:20 530:7,12,24 531:3, 10,16 556:22 557:8,10,23 558:13 559:8,10

**person's** 356:21 526:10,15,21 561:5,7

**personal** 345:2,5,9 347:6

**personally** 542:10,12 544:13

**personnel** 359:15 398:14 508:20

**perspective** 320:23

**persuade** 554:23

**persuasive** 535:21 555:8,11

**pertain** 509:11

**pervasive** 432:14 458:5 482:5 485:8 502:16

**Peter** 304:9,17 385:14 470:2

**Peterson** 303:13,16,24

**Petition** 475:9

**Ph.d.** 265:11 537:2

**Phil** 373:2,9

**Phoenix** 296:2,7 299:24 300:6 302:10,15 303:18

**photographic** 445:13

**photographs** 443:6,22 444:5,13

**photos** 323:12

**phrase** 286:7 325:17 363:13 489:1 529:14,17 535:5 557:7

**phrased** 319:21 320:13 363:3 561:9

**physical** 284:3,8 304:21 311:24 314:2,5,9,12 322:22 326:14 335:12 336:17,18 344:21,22 345:4 350:10 353:23 357:18 358:16 359:10 360:4,21 365:12,18,23 366:13 367:13 378:17 392:10 398:10,23 406:20 411:22 421:6 423:18 424:11 427:3 429:13 430:16 431:2, 24 433:2 446:6 471:11 482:6,14 483:16 485:4,9 486:5,14 489:21 490:8 491:3 497:15 498:2 503:19 522:9,18 523:7,18,20 532:21 538:6,10 539:1,16 559:14,23

**physically** 284:18,22 293:8 304:18 305:13 306:20 309:8 310:6 311:17 312:6,11 313:12,18 315:13, 15 353:11,21 359:7,20 360:17 363:9 406:9,18 412:5 415:12 445:16 455:7 477:23 480:19 532:3, 12 533:3 544:17 556:4

**pick** 533:19

**picked** 312:19 315:17

**picking** 534:15 535:4

**picture** 370:4

**piece** 272:6 290:12 317:4 323:9 369:21 432:16 561:16

**pieces** 534:13

**pistol** 377:8

**place** 313:19 328:14 331:6 356:19 367:15 390:16 440:1

**places** 324:24 329:3,4 331:1 387:14 559:7 561:3

**Plaintiff** 264:23

**plaintiff's** 368:5 536:8,14,19

**plausible** 535:21

**play** 374:20

**playing** 377:16

**pled** 306:6 362:11 551:23

**ploy** 553:18 554:2,8 555:4,5

**ploys** 553:24 554:4,15

**plucked** 325:22

**Plummer** 386:3 419:21,22 480:3,

RICHARD A. LEO, PHD, JD, 09/29/2022

6,11

**Plummer's** 480:23

**point** 330:15 353:8,19 365:5 368:13 371:20 381:4 383:17 384:7 401:5 402:6,18 403:6,14,22,24 404:4 405:6 413:17 429:11 437:17 442:14 444:1,19 445:11 455:1 458:19 461:19 462:3,4 469:14 473:15 482:9,10 489:4 493:5,7 499:2,5 500:21 501:4,5 503:6,11 519:3 521:21 547:7

**pointed** 379:8 417:22 535:23

**points** 429:12 466:11 503:14

**police** 288:20 289:17 296:8 302:6 313:4 320:18 321:8 322:11 326:19 327:21 328:9 332:9 337:2,3 339:8, 23 340:14,15,21 348:12,21 349:1, 10 355:8 359:5,14 363:7 364:15 365:3 371:23,24 372:1,3 392:8 398:13,14,21 399:7 405:18,23 406:6,14 412:18 414:14 423:17,19 431:10 432:3 460:23 482:4 491:5, 14 498:4,19 502:17 503:3,8 504:10,11,15,20 505:3 508:18,20, 22 509:1,6,16 523:20,21 531:11,13 532:20 534:23 535:19 537:23 541:18 542:20 549:5

**policing** 339:2,4

**Policy** 302:9

**portion** 310:16 330:19 349:9 356:9 378:9 413:22 540:21

**portions** 310:14,20

**position** 269:19 270:1 520:20 560:10,11

**positioning** 412:7

**possibility** 291:2,20 321:12 465:8 541:10 556:10

**possibly** 527:13,22

**post** 269:16 284:12 310:18,24 318:22 346:9 366:10,13 475:9 488:4 515:24 516:3

**post-** 283:13

**post-1980** 279:22

**potential** 479:18

**potentially** 308:19 527:24

**powerful** 554:23 555:3

**practice** 353:15 355:7,24 359:6,20

360:10 361:14,17,20 362:11,18 363:9 399:6 406:6,15 409:6 429:7, 17 430:6 432:6,15 433:4 450:20 456:14 458:22 459:17 460:7 461:2 468:7 469:17 471:10 477:23 480:18 482:14 483:16 485:9 486:14 489:10 490:8 498:2,19 499:14 502:12,15,16 503:19 508:22 509:13 521:11 532:19 533:18 537:11

**practices** 349:11 350:15,20,22 366:5 408:20 411:10 431:21,22 531:12

**pre-existing** 342:23

**pre-published** 279:8

**pre-trial** 288:20

**preceding** 357:9,10 507:3

**precise** 374:10

**predating** 355:12

**predecessors** 373:5

**Predicting** 279:1 286:2

**premature** 353:17 354:18 355:4 357:12

**premise** 447:17

**preparation** 269:17 271:5 382:7 383:6,12 390:10,13 409:3 423:14 427:18,22 438:6 439:19 440:21 444:11 452:13,16 458:9 462:15 464:6,7,8 477:14 483:1 485:21 486:23 488:14,15 489:13,14 491:22 492:12,18 494:13 508:2

**prepare** 266:9 270:6 271:8 272:7, 9,10,13 384:18 388:1,24

**prepared** 266:12 269:1,5 330:8 368:23 369:2,14 372:14,17 382:5 383:1,4 387:9 388:6 390:15 427:19,20 438:23 463:1 474:2 484:4

**preparing** 390:3 420:3 462:18 468:6,17 469:6 470:6 474:16 483:22 486:21

**present** 361:15 535:20

**presented** 343:18 534:3,5,6,8 558:17,22,23

**presenting** 446:6

**preserve** 393:11

**pressure** 541:19

**Pressuring** 535:18

**presume** 363:17

**presumption** 343:12 344:2

**pretend** 417:11

**pretrial** 310:18 346:8

**pretty** 289:3 365:10 556:21 557:2 558:11

**prevail** 362:17

**prevent** 536:7

**previous** 286:18 381:8 392:19 446:13

**previously** 393:2 509:22 510:1

**primarily** 289:17

**primary** 474:12

**prior** 269:12 286:15 336:8,12,15 344:3 348:16 354:21 358:20 382:2 387:18 419:20 420:2 437:4 492:5, 13

**prison** 280:9,10 461:10

**private** 285:7 514:17 515:10

**privately** 514:7

**privilege** 392:21

**privileged** 388:3 468:13 469:21 520:13

**privileges** 520:6

**pro** 315:6

**probabilistically** 479:12

**probable** 291:8

**problem** 332:16 435:22

**problematic** 358:23

**procedural** 281:19 429:23

**proceed** 400:5,7

**proceeding** 488:5

**proceedings** 310:19 447:6

**process** 347:12 429:9

**processed** 324:19

**produce** 393:8

**produced** 269:22 356:15 487:19 520:4,11

**product** 275:21 354:5 549:13

RICHARD A. LEO, PHD, JD, 09/29/2022

**Professional** 409:19

**professor** 292:15 295:15 305:4 314:20,23 556:15

**profile** 302:16 303:6 560:20

**progeny** 363:3

**progress** 266:4 277:13 364:7 436:7 440:24

**project** 281:15

**prominent** 277:14

**promise** 523:12 554:17

**promoted** 372:24

**pronouncing** 379:23

**proof** 435:15

**proofreading** 425:9

**proposition** 370:8 371:7,11,13 389:23 451:17

**prosecute** 530:2,5,11

**prosecuted** 296:5,15 298:10 304:13

**prosecution** 283:14 284:14 506:21 530:14

**prosecutions** 465:10

**prosecutor** 283:6 304:12,14 305:5,12 355:13 393:16 476:16,17 514:9 529:24 530:4,6,11

**Prosecutor's** 394:24

**prosecutors** 296:15 299:15 303:23 321:8 394:18 535:21

**protected** 392:21

**Protocols** 349:11

**prove** 362:4,5,7,18

**proven** 273:9 275:18 277:6,10,20, 24 278:2,20 282:4,7,16,22 284:5 286:8,11,16,21 289:18,24 290:7, 10,14,18 291:1,10,16,24 292:6,11, 21 295:13 301:10 311:16 312:6 314:2 319:23 320:21 323:6 407:6 408:2,12,18,23 411:14 437:12,20, 21,23 462:1,3,7 473:18 479:1 529:9,22 532:14 540:9 551:1 553:13

**provide** 285:15 329:1 342:9 358:7, 8 363:5 372:8 383:16 398:7 407:20 416:14 470:17 481:1 488:1,11 505:12 546:20 547:11,21 549:7

552:23

**provided** 272:20,21 300:24 322:2, 3 329:6 340:14,21 341:9 358:11 363:20 364:19 383:14,16 387:20 389:17 390:15 391:8 405:13 406:1 412:10 424:2,5 440:9 453:17 472:8 484:19 485:15,23 487:22 491:21, 23,24 492:14 493:23 494:7 505:17 507:12,18,19,22 510:18 515:22

**providing** 311:6 423:8 463:11 474:6 496:13 497:12,21 547:4

**psychological** 345:4 350:10 360:21 365:13 398:24 430:16 431:2 433:2 458:5 471:11 482:6,15 483:17 485:4,9 486:14 490:8 498:3 503:19 532:21 538:20 549:4,6

**psychologically** 309:9 310:6 359:7,21 360:4,17 363:9 455:7 477:23 480:18 533:4 550:11 555:3 556:4

**psychologist** 346:15,17 556:16

**psychology** 301:23 302:6 537:4 550:10 556:12,13,15,17

**PTP** 439:15

**PTP-0001** 475:4

**PTP-A** 419:13 472:4

**PTP-D** 438:15

**PTP-J** 418:20 442:19

**PTP-N** 438:15 439:15

**public** 339:22 460:14 514:8

**publication** 286:5 321:2 391:17

**publications** 366:9

**publicly** 530:8

**published** 277:17 279:7,10 280:10 302:2,8 339:17 391:19,21,22,24 392:2 394:5 419:6 461:22 481:2

**Puerto** 505:23

**punched** 350:24 378:4 436:20 461:8 471:21 472:19

**Punching** 344:15

**punishment** 554:1

**pure** 273:19

**purely** 281:20

**purported** 314:5 316:17

**purporting** 442:15

**purpose** 346:16 535:16 549:2,3

**purposefully** 298:15

**purposes** 290:8 332:10,24 408:16 428:22 473:14 485:19

**Purvis** 304:6

**pushed** 442:4 454:21 456:1,8

**put** 294:13,17 323:4 331:1,4,5,6 342:3 344:6,7 376:9 378:7 429:24 431:15,19 529:19 534:12,20 535:1, 2 536:12

---

**Q**

**quadruple** 435:15

**qualification** 291:6

**qualified** 295:13

**qualify** 344:18 421:22

**qualifying** 435:4

**quantum** 462:5 506:12

**question** 267:21 268:11,18 273:1 276:9 314:14 317:13,14 318:9 319:21 320:13 341:19 342:4 347:13 355:15 356:7 375:15,21 379:2,7,14,18,22 380:16 381:3,6,8, 11,14 382:2,13,16 383:20,24 384:11 385:4 388:11,16,22,23 390:4,8 392:14,18 400:14 407:11, 12 408:6 413:13,15 416:18 417:5 422:15,18 426:23 431:5,16 434:4 446:14 447:17 448:6 452:18,20 456:24 457:3 467:3 468:24 469:3, 24 475:14 493:21 496:24 497:1,20 501:13,22 502:1 506:4 519:4,12,14 521:24 523:1,4 529:4 533:24 542:4 543:8,14 544:1,6,9 546:12 550:14 557:14 558:3,20 561:10

**questioned** 327:16 334:22 335:1

**questioning** 327:9 346:7 442:5 454:22 456:2 467:16 506:20 518:14,15 547:12

**questions** 265:15 273:6 290:8 294:11 308:24 347:11 363:15 380:20 381:4,16 384:21,23 387:10 388:6 408:7 413:20 414:3 417:3,4 428:3 461:24 468:4 483:4 520:13, 17 524:2,4 543:1,17 546:22 547:8, 15,16,23 548:3,5

RICHARD A. LEO, PHD, JD, 09/29/2022

**quick** 399:17 448:23

**quickly** 513:3

**Quinoles** 463:21

**quotation** 375:16,22 376:6 392:4

**quote** 280:14,15,17 328:11 376:17 377:11,14 378:8,13,14 384:12 385:19 392:7 396:23

**quoted** 329:3,4 376:1 385:19

**quoting** 329:2 374:16

———————————

**R**

———————————

**Rachel** 264:13 399:16

**Ralph** 297:18

**range** 411:4 419:12 437:6,8 438:11 443:18 448:9,11 449:4 450:7,21 455:18 458:1 460:2 463:12 476:1 482:1 483:14 485:3 486:13 490:5 498:1 499:8,13,16 512:22 521:17 534:3 545:9,15

**ranged** 499:6

**ranges** 411:5 444:21,22

**ranging** 412:16 437:16 455:15

**ranking** 359:12,13 398:12,13 508:19 509:7

**Rankins** 505:14,18,23

**rape** 306:3,10 325:20

**rapid** 479:21

**rare** 297:10

**rarely** 341:19

**rate** 504:15 505:3 510:17,22 511:1, 2,6,19,20 513:24 514:6,14,17 515:2,11,18,19,22 516:7,11 517:2, 7 518:23 519:19 520:1,10

**re-assert** 477:2

**re-review** 444:10

**re-trial** 304:15

**reach** 360:20

**reaching** 471:3

**read** 282:24 301:2 310:21 333:23 336:11 361:24 375:1 377:11 378:9 382:11 389:16 410:4 417:20 421:19,20 425:4 426:21 477:8 506:18 548:5

**reading** 267:22,23 268:1 269:20 279:20 304:23 310:8 333:24 352:21 374:13 375:2,3,16,19 376:9 377:14 380:10,15,21,22 381:1,19, 23 382:1,3,4,9,12,15,21 383:15,17, 18 384:22 385:5 416:10 419:14 439:13 446:15,17,18 448:8 466:18, 19 520:16

**reads** 290:24 344:6 359:5 406:11 436:18

**ready** 417:15

**reason** 268:1 304:12 320:12 329:6 330:19,21 335:4,6 348:24 358:13 435:3 492:4 503:24 511:2,5,15,16 516:1 519:2 530:24 531:3 535:10 549:16

**reasonable** 283:12 284:9 318:18 530:18

**reasons** 301:3 393:2 458:14 527:6 530:5,9 545:15 547:9

**recall** 292:23 293:11,12,13 295:20 296:20,23 297:2,7,16,19,22 298:1, 4 299:4,12,18,21 300:10 303:10,15 304:4,7,8,9,12,22,24 305:19 306:15 308:20 311:11 316:7,10 331:4 334:7,16 335:5,24 336:3,8 341:5 345:7 366:11 372:12,21 373:12 389:20 390:4 400:19,24 401:7,16,23 402:3,7,11,15,19,23 403:3,7,11,15,19,23 404:6,10,14, 18,24 405:3,7 421:19 424:5 428:10,12,17 439:22 462:17 464:11 465:20 467:15 475:1 476:23 477:9 478:8 484:3 487:21, 22 493:22 494:14 495:5,11 501:23 506:6,11,22 507:5,8,18,22 511:15 515:10 525:19,21 526:1,5,8 551:2 553:15 560:22 561:19

**recalling** 296:18 356:9 359:2 383:1 476:22 482:21 527:23

**received** 288:11,13 303:3 368:4 372:10 489:21 503:2 506:15

**recent** 269:13 419:24

**recently** 267:12 484:19 485:15 492:5

**recitation** 326:18 329:22

**recited** 392:1

**reciting** 426:24 442:10 478:19

**recognize** 290:24

**recollection** 293:1 294:1 295:15, 16,19 299:1,8 305:6 310:1 311:2,7 334:5,18 336:5,19 337:19 340:18, 20,23 345:18 356:22 391:19 464:13 470:24 484:15 488:4,8 501:12 507:19 508:8 514:21 533:10 551:5 561:2

**recollections** 311:13

**record** 264:3,20 270:1 328:18 331:20,22,24 346:2,6 353:12,14,22 358:23 387:23 389:24 390:19,21, 23 399:23 416:18 417:8,12,15 435:24 436:2,4 443:19 453:7 455:4 490:20,22,24 520:4 521:4,6,8 522:23 533:19 562:6,18

**recorded** 345:23 346:4 542:17

**recording** 328:5 345:17 400:1 424:9

**records** 288:23 311:21 312:15,18 313:19 315:23 335:23 336:1 356:18,19,20 421:17 435:12 476:3, 13,14 487:8 488:7

**recounting** 434:19

**redact** 518:9

**redacted** 517:19 518:1,11,16,20 520:12

**redactions** 520:7,21

**reduced** 510:21 511:2,6,20 515:19,22

**Reeves** 475:3

**refer** 274:4,9 275:5 276:17 330:23 494:8 495:21

**reference** 330:17 336:6 337:15 365:15 366:16 394:23 395:5,21 396:12 438:9 476:12,18 492:22 559:16 560:9

**referenced** 266:4 302:2 394:18 396:17 424:12 476:16

**references** 394:10

**referencing** 347:18 367:7 368:21 412:21 413:1 418:23 419:1

**referred** 338:24 354:16 418:19 420:2 464:5 481:3 488:17 507:23, 24

**referring** 288:7 294:10 337:4 354:17 366:12 392:5,17 407:13,18 414:21 416:11 418:13,16 459:4,7 559:19

RICHARD A. LEO, PHD, JD, 09/29/2022

**refers** 274:13 276:14

**refresh** 293:1 303:22 391:19 470:23 484:15 507:18 561:1

**refused** 373:21 481:11

**regard** 321:13 385:16 406:24 409:10

**Reggetz** 304:8

**register** 452:3

**Registry** 492:7,11,16

**Registy** 294:6

**regular** 272:12

**regularly** 392:10

**rehash** 269:22

**Reid** 337:5,9,11,13,14 338:2,7,12, 13 339:4,10,19,24 340:1,3,4,10,12, 13 357:7,19

**Reilly** 304:9,17 306:18

**rejected** 465:5

**rel** 391:4

**relate** 510:5

**related** 273:5 335:22,23 364:21 397:19 413:9,12 424:2,3 441:17 459:14 468:8 488:24 489:2 492:9 493:2,8,24 494:18 495:14 496:6, 10,17 507:12 510:10 513:15 521:11 530:5

**relates** 461:20 473:24

**relating** 376:24

**relation** 492:1 495:4,10,12 505:14

**relationship** 401:1

**released** 516:4

**relentlessly** 309:8 310:6

**relevance** 539:18

**relevant** 429:8

**Reliability** 276:14

**reliable** 276:5

**relied** 283:20 284:1 364:17 370:5, 19 413:2 438:22 439:16 445:8 447:22 451:4 466:14 468:21 470:6, 21 478:3 483:22 485:11,18 488:10 499:17

**Relief** 450:5 475:9

**relieved** 279:24 280:6

**Reliford** 304:22

**reluctant** 552:23

**rely** 285:2 364:4,5,12 370:7 388:23 411:15 413:11 423:12 438:24 439:3,18 449:24 461:11 464:16,23 474:7 480:24

**relying** 310:15 354:16 369:13,19, 22 370:1 371:6 422:7 423:5,20 427:8 434:23 438:18 439:10 452:17 461:13 467:16 472:7 473:21 474:3,17

**remained** 280:9 308:11

**remaining** 404:19

**remains** 270:1

**remanded** 465:14

**remember** 272:23 293:1 313:7 362:1 448:4 450:22 515:24 516:2 531:19 544:8

**remind** 342:15

**reminded** 341:21 352:9

**reminding** 487:15

**remove** 324:15

**removed** 298:17 351:13 498:15,16

**removes** 298:19

**rendered** 372:6

**rendering** 489:19

**Reparations** 396:12

**repeat** 265:18 276:8 523:3

**repeated** 414:11 533:2

**repeatedly** 335:15 436:21 500:7, 16 501:7 547:14

**repeating** 479:13

**rephrase** 542:1

**replaced** 373:1

**report** 266:4,5,12,21,23 267:3,6,24 268:7,22,23 269:9,17 270:9,18,20 271:4 294:19,20 308:23 309:5 310:16 311:15 313:6,7 316:2 322:7 328:19,21 329:5 332:2 341:22 342:17,19 344:5 347:12,15 349:9 354:22 355:5 359:4 363:20,21,24 364:3,4,6,12,18 367:9 370:16,21 372:13,17,23 373:18 374:13 375:1, 7,8 376:5,10 377:6 378:1 380:19,

23 381:1 382:4,5,7 383:5,7,11,12, 18 384:1,4,16 385:6,13,24 386:4, 11,12,17,22,24 387:4,5,14 388:14, 19 389:5,10,12,22 390:2,3,6,11,15 391:2 392:2 393:14 394:19 395:1 396:4 397:6 398:5,6 407:4,15 409:3,15 410:11,12,14 411:16,19, 21 412:22 413:2,4,23 414:4 415:4, 8 418:3 420:3,19,23 421:10,18,20 422:11 423:14,23 424:24 425:7,20 427:16,18,20,21 429:6 435:10,15, 17,19 436:14 438:6,7,9,23 439:5, 18,19 440:1,14,18,21,24 442:1,24 445:10 446:10,20,22,24 447:6,8 448:7,16,17,18 449:14 451:6,22 452:11,15,16,23 458:9,15 459:8,13 461:14,18 462:20 464:6,9 465:4 468:2,3,10,23 469:1,5,6,9,12,15 470:13,15 474:2,17 476:16,17 477:12,15 482:19 483:1,23 484:3,5 485:14,21 486:21 487:6,12,16,19 488:13,14 489:6,8,13,18 491:2,8, 22 492:3,18 493:7 494:8,13 496:5, 9 497:11 498:7,20 499:15,20,24 500:21 502:22 503:13 505:8 507:9, 24 508:6 509:18 518:1 519:24 521:10,16 522:1 524:12,18,23 525:6,12,14,17,20,22 526:1 531:18 533:6,15 534:23,24 535:23 539:22 540:8,22 541:8,9 548:9,13,18 550:21 559:12 560:8

**Report's** 532:1 533:1

**reported** 333:4 442:23

**reporter** 264:17 265:9

**reports** 288:20,21,22 313:4 364:7 371:24 372:3 409:20,22 411:9 412:19 436:8 445:7,23 499:9,10

**represent** 264:21 496:4 524:6

**representation** 339:5 496:15

**representations** 339:3

**represented** 338:19,20 347:22

**representing** 264:14 448:10 506:24

**represents** 265:17 369:11

**request** 342:3 413:24

**required** 285:21

**requirement** 362:14 363:1,2

**requires** 476:24

**research** 276:22 282:18 286:6 321:2,20 364:13 366:4 408:16

RICHARD A. LEO, PHD, JD, 09/29/2022

420:21 423:21 458:12 473:5 474:9 538:10 549:5,9 557:14 561:6,11, 13,18,22

**researcher** 277:14

**researchers** 283:21 284:1 288:14

**researchers'** 285:16

**reserve** 562:13

**resist** 541:21

**Resolution** 396:13

**respect** 280:22 291:10,22 296:19 297:8 306:18,24 307:21 312:10 316:11 328:3 332:2 336:23 341:18 342:4,18 349:14 350:4,19 355:18 363:22 364:2 374:7,22 383:13 388:11 389:8,11 397:15 406:1 407:3 408:19 409:2 418:9 432:16 433:7 434:17 438:13,19,20 439:7 442:18 449:23 450:10 456:20 463:15 464:17 468:6 470:2,5 471:16 472:9,17 475:18 480:23 483:8 484:7,21,22 485:12 486:1 488:19 489:17 492:21 496:1 497:13 498:22 501:18 502:5 505:18 521:10 534:17

**responded** 352:10

**responding** 541:18

**responds** 388:8

**response** 380:13 413:20,22 531:11 543:13,21

**responsibility** 279:24 280:6

**responsible** 362:6

**responsive** 543:19

**rest** 392:13

**restate** 387:23

**restroom** 330:16 331:10,14

**result** 406:21 409:6 486:4 489:20 497:15 516:2 554:6

**resulted** 409:7 477:24 497:15

**results** 299:10,13

**retain** 393:5

**retained** 302:20 303:3 487:18,20 514:7

**retardation** 478:23 479:6

**retired** 393:15

**returned** 351:18

**Returning** 332:1

**reveal** 342:8

**reversal** 429:22

**reversed** 298:9 304:11 321:7 429:20

**review** 266:15,20 297:9,12 300:22, 24 301:6 310:23 314:12 322:3 328:21 332:18 335:21 337:18 343:22 377:5 384:3 387:20 390:13 402:17 404:1,3 412:11 415:21 416:21 421:16,23 422:14 428:11 431:14 437:10 441:10 460:16 461:21 463:15 464:12,15 469:8 475:12,16 477:13 478:9 483:3 484:14 486:20,22,24 489:11 492:11,17 493:20 494:10,15,18 495:4,10,19,23 500:24 501:10,24 506:7 507:16 514:5 520:24 524:22 528:3,6 529:5 533:15 551:7 561:1

**reviewed** 266:5,11,13,21,22,23,24 267:1,5,7,9,13,19,21 268:4,6,15,22 269:11,16 270:8,9,10,11 272:16 301:15 314:13 321:23,24 323:13 324:1 332:4 335:24 336:2 339:16 340:6,20 341:3,14 343:7,18 355:1 357:16 360:9,19 361:13 370:5 371:11,13,19 376:24 382:6 383:6, 12 384:17 388:15,20 389:6 390:3, 7,10 391:9 398:16 399:12 400:16, 20,22,24 401:3,20,24 402:4,8,12, 16,20,24 403:4,8,12,16,20 404:1,2, 7,11,15 412:13 413:4 414:5 419:19,24 420:2,19 427:18 434:9, 10 435:8,9 437:7,16 438:5,8 439:18 440:17,19,20,22 441:6,24 442:12,17 443:14,19 444:7 447:2, 3,7,15 448:4 449:5,7 450:18 451:21 452:4,7,15 454:11,13 455:11,13 457:7,17,18 458:8 461:14,17 463:13,18 464:8,20,21 465:3 466:10,17,19 467:24 470:12, 13,23 471:8 472:11,13,15,23,24 473:16 474:4,18 475:24 476:1,11, 15,22 477:12,22 478:6,7 480:17 481:4 482:2,23 483:1,14 484:1,2,4, 5 485:4,14,18 488:13,23 489:6,7, 13 491:21 492:3 493:2,6,8,13 494:6,12,23 495:5,11,14 496:6,9, 12 497:2,8 499:19 500:21 501:1,11 503:12 506:10,24 507:7,17 508:2 509:11 528:5 531:22

**reviewing** 270:18 297:16,19,23 298:1 299:18,22 300:10 301:14

303:14 304:7,8,23 305:1,7,19 306:16 308:17 314:8 336:3 337:19 349:5 372:20 384:1 392:15 401:7 414:23 416:6 419:16 422:17 427:13 428:1 439:14 444:9 446:18 452:10,11,22 453:24 462:15 464:3, 4 465:21 475:15 507:5 533:19

**Reyes** 264:23 266:22 267:2 268:4 272:1 311:19,23 312:18 313:13 315:17 316:14,18 317:9 319:13,16 320:15 321:18 322:9 328:22 332:5 343:9 345:8 347:19 349:14 350:23 352:17,24 353:3 355:12 358:12,15 362:4,17 383:2 391:13 508:12 511:19 516:21 517:10 519:10 524:15 526:4 528:20 529:9 532:3, 10 533:2,7,12 535:12 540:1,11 541:5,11 542:4 548:10,14,19

**Reyes'** 560:17

**Reyes's** 307:14 315:20 316:1 317:19 343:8,24 350:5 355:2 508:7,16 540:16,19 541:7

**Reyna** 386:4 481:6,9

**Reyna's** 481:15

**Reynaldo** 264:8 399:12 400:17,23 401:4 405:16

**Reynolds** 304:24

**Reyos** 305:2,14 306:18

**Ricardo** 496:2

**Richard** 264:4 265:11 295:10 371:23 372:2 394:23

**Rick** 299:20

**Rico** 505:23

**Rights** 351:22,24

**righty** 521:9

**rise** 339:9

**risk** 330:11 478:1 479:2 480:20 482:8 483:18 485:5 486:15 490:10 498:5 503:20 544:20 556:3

**risks** 489:11

**Rivera** 492:1,23 493:3,9,15,18,24

**Rivera's** 493:14 494:1,11,15

**roads** 305:11

**Robert** 299:17 387:6 402:21 403:1, 5 475:11

**Roberto** 494:24

RICHARD A. LEO, PHD, JD, 09/29/2022

**Robinson** 386:10 420:8,9 483:7,8 484:5,8,11

**Robyn** 278:24

**Rodriguez** 496:1,2

**role** 361:2 524:13,19 526:3

**Ronald** 385:22 408:9 475:3

**room** 294:18 327:8,13 329:17,24 334:20 338:3,11 351:15,18 365:19 486:10

**rooms** 334:21

**Rosario** 519:24

**Rosauro** 295:2 343:10 353:24 532:11 535:7

**Rosen** 265:1,15,22 266:18,19 269:19 270:4 271:5,7 276:10 286:13 289:12 291:22 292:8 301:22 308:10,15 310:13 313:10, 23 314:11 315:11,22 317:7,18 318:10 319:12 320:14 321:14 323:11 324:4 325:14 326:7,16 331:13,18 332:1,21,22 334:11 337:23 339:13 344:4 348:1,11,24 349:8,22 350:1,3,16 354:1 355:15 356:4,11 357:17 358:6 360:15 361:18 362:3,16,23 363:22 368:17 369:4,10 370:7,17 371:12 372:13, 22 373:15,17 374:14,15 375:18,23 376:1,8,12 377:20 379:6,13 380:10,14,18,24 381:5,9,10,17,22 382:8,13,14 383:13,22 384:18 385:2 387:8,19 388:12,21 389:7 390:16,24 391:21 392:6 393:3,12, 13 394:3,9,17 395:5,11,16,21 396:3,8,11,17,23 397:5,10 398:3 399:22 400:6,13 405:24 407:19 408:19 409:4 410:16,24 411:20 412:20 413:7,14,16,22 414:7 415:17 416:12,24 417:10,17 418:6, 8,9,22 422:7 423:5 424:1,13 425:16,21 426:6,20 427:7 428:12, 16,18 429:2 430:4 431:4 433:6 434:4,15 435:2,22 436:5,11 437:5 438:24 439:13 440:4,11 441:1,13 442:2 444:5 446:1,15 447:18 448:12,16,23 449:9,12,21,23 451:11,19 452:5,12,21 453:10 454:6,14 456:20 457:1,2 458:19 459:7 461:3 463:14 464:3 465:22 466:13 467:1,9,17,22 468:5,15,20 469:2,18 470:1,14 471:16 474:19 475:2 476:12 477:16 479:22 480:23 482:16 483:6,21 484:17 486:7 489:3 490:13 491:1 493:17,

23 494:17,24 495:3,9,17 497:9 498:22 501:3,14 502:2,10 504:3,18 506:5 508:6 509:19 510:3,4 511:17 512:2,4,21 513:11,12 514:23 515:7 518:17 519:2,4 520:15,23 521:9,20 522:3 524:2 546:13,19,24 547:13 562:15

**Rosenthal** 371:23 372:2,7

**rough** 401:11

**roughly** 365:21

**row** 410:1

**Royer** 515:15

**Ruben** 305:22

**rule** 388:4 520:14 536:20

**ruled** 321:11

**rules** 285:11 388:10 518:12

**ruling** 465:7

**run** 400:15 522:22 523:2

**runs** 349:12

**rush** 342:18 353:4,18 354:18 355:17 357:1,12

**Rutherford** 402:21 403:1,5 540:1, 14

**Ruthie** 264:17

**Ryan** 393:21 410:1,2

---

**S**

**Salazar** 305:21

**sample** 289:14

**Sanchez** 510:6,18 512:13 513:4

**sat** 326:21 537:15 542:13

**scandal** 365:18

**scandals** 364:14

**scenario** 324:9

**scene** 296:13 298:22 304:19 305:10,16 307:18,19 308:7 311:22 316:13,23 317:5,24 319:15 321:19 322:10,12 323:11 324:2,12 325:2 326:13 527:22 536:1 559:16,18,24 560:10,12,16,17,18

**scholar** 338:23

**scholarly** 338:16 339:15 340:7 364:13 458:10

**scholars** 339:5

**school** 296:12 321:1

**science** 300:22 320:22 473:5 537:3 556:15

**scientific** 284:13 290:20 293:10 306:8 538:9

**scientist** 362:15

**scope** 536:18

**scores** 451:9

**Scott** 507:10

**screaming** 536:4,5

**screen** 366:23 391:1 400:2,3

**scripting** 348:13 535:17

**scroll** 279:6,9,13 281:13 373:18 510:7

**Sean** 264:22

**search** 496:4,7,16,18,22

**searches** 287:15

**secondary** 287:16

**seconds** 522:24

**section** 279:15 287:8,13 311:14 330:22 336:20 337:19 343:23 346:23 349:12 350:20 354:22 359:4 375:7 397:6 398:4 407:4 411:22 412:21 413:4 414:8 420:18, 23 421:10 440:15,18,22 444:4 446:22 447:3,8,15 448:4 451:6 461:17 463:18 464:20 465:3 466:17 469:17 470:13,23 478:7,9 481:4 482:23 484:2 485:14,18 487:6 488:13 489:8,13 491:3,8,16 492:3 493:2 495:14 496:6,9 498:17 499:15,17,20 501:1,11 502:23 503:1 505:4,8 550:17 559:13

**sections** 411:16 499:18,21 502:14

**seek** 342:20

**seeking** 345:17

**sees** 361:6 413:18

**segment** 521:1,2

**Segura** 500:12

**select** 287:10

**selected** 289:15

**selection** 534:1

RICHARD A. LEO, PHD, JD, 09/29/2022

**sense** 274:6 282:9 356:17 502:20 556:21 557:2,4,17

**sentence** 282:1 309:16,18 344:6 370:20,22 371:22 406:10 414:11 436:18 500:11

**separate** 281:11 283:2,19 361:19 383:3 431:7,8 472:14 509:14

**separately** 383:9 472:12

**September** 264:5 271:13,20 387:12 396:24

**sequence** 497:11

**Sergeant** 525:15,20,22

**sergeants** 504:22

**serial** 306:2

**series** 274:10

**Serrano** 505:14,18,22 506:1,15 507:4,14

**served** 393:15

**serves** 422:3

**services** 544:23,24

**serving** 461:10

**sessions** 334:21 338:10

**set** 459:13 461:12 467:9 489:17

**sets** 337:10

**setting** 430:18

**settings** 339:22

**settled** 296:17

**seventeen** 304:10

**Seventh** 394:4 396:4

**seventy-five** 512:9

**seventy-two** 333:9,10

**severely** 479:10

**sexual** 325:20

**shackled** 463:24

**share** 289:15

**sheets** 271:21,23 383:9

**shelves** 441:9

**shifted** 384:8

**shoes** 327:8 351:13,14 536:3

**shooter** 500:8,18 501:8

**short** 321:20 331:21 334:23 434:2 436:1 490:21 521:5

**shortly** 296:18 304:14 343:15

**Shoup** 305:21

**show** 302:17 546:6

**showed** 297:11 343:10 558:4

**showing** 281:7,9,10 293:7

**shows** 557:15

**shrink** 279:3

**shuffling** 524:10

**side** 268:15 277:18 329:13 335:16 367:2 444:16 480:8

**sides** 432:20

**sign** 344:9 463:1

**signaling** 413:16

**signature** 562:13

**signed** 330:3,7 461:8

**significant** 322:18 344:3 526:3

**similar** 340:11 343:6 347:16 348:2 349:17,19,23 350:3,8 366:3 373:19 374:10 375:4 378:5,7,12 383:10 504:11

**similarities** 341:2 374:1 375:9 376:13

**similarity** 350:12 377:10

**similarly** 491:9 504:17,18

**simplicity** 509:18

**simply** 332:12,14 357:2 389:12 415:19 425:17 426:23 434:18 442:10 448:4 478:19 507:7 508:15

**single** 289:16 317:4 323:8 458:23 459:2,15,24 469:16

**single-mindedly** 342:21

**singularly** 455:20

**sit** 295:19,21 334:15 416:1 444:9 465:21 482:22 493:22 511:15 526:8

**sitting** 361:1,2

**situated** 504:17,19

**situation** 300:3 306:9 325:24 531:14

**sixteen** 471:24 481:9

**sixty** 302:24

**skeptical** 358:13

**skills** 320:24

**slammed** 433:9,21

**slapped** 433:9,22 461:7 462:22 471:21 472:19 481:9 484:11

**slapping** 344:16

**Sleep** 336:22

**sleeping** 352:4 536:5

**slight** 350:23

**slightly** 318:9 435:18

**small** 369:21 370:3 450:8 561:12

**smaller** 277:18

**Smith** 269:12 294:20 305:22 386:12 419:23 440:9,12 484:18,22 485:12 488:18

**so-called** 281:20

**soaked** 560:12

**social** 300:22 301:23 302:6 320:22 362:15 473:5 537:3 556:14,16

**Society** 302:9

**sociology** 537:4

**Solache** 264:24 266:23 267:2 268:4 271:24 273:4 295:3 309:2,7 311:5,18,23 312:11,17,19 313:12 315:13,16,18 316:5,14 317:9 319:14,17 320:16 321:18 322:9 326:20 327:2,5,7 328:8,9,10,23 329:17 332:6 335:14,16,17,23 337:1 343:10 344:7,10 345:9 346:24 347:4,20 348:4,14,20 351:1,6,8,11,14,22,23,24 352:4,9, 10,11,12,17,23 353:8 354:2,6,20 355:12,18,21 356:14 358:15 362:4, 17 369:11 383:2 391:13 508:12 511:18 516:21 524:14,20 525:3 526:4 528:20 532:2,3,11 533:7,13 535:12 536:3,4 540:23 542:5 548:10,14,19

**Solache's** 270:10 307:14 308:24 310:8,14,23 311:15 312:5 315:23, 24 317:19 326:17 327:19 328:3 329:8,12,22 330:2,22 332:4 335:11,22 336:4 342:20 343:24 345:2 349:15 350:5 351:12 353:10 355:2 369:15 508:7,15 525:4 533:2 540:18,21,23 560:18

RICHARD A. LEO, PHD, JD, 09/29/2022

**sole** 287:22 370:12,18,19,20 371:10

**solely** 314:4 319:14 370:7

**somebody's** 541:14

**someplace** 415:19

**sort** 504:1

**Soto** 311:19 348:15 525:9 527:10, 15 528:10 536:4,5 559:19 560:20

**sought** 342:21

**sound** 545:1

**source** 287:22 300:15,16,19,21 311:24 376:7 432:3 503:22 523:24

**sources** 287:15,17 301:5 361:8 476:8 498:13 503:16,24 532:9

**span** 521:12

**Spanish** 327:15 351:23 535:7

**spanned** 518:4

**spanning** 360:13 517:11

**spans** 511:21 519:9

**speak** 286:10 346:19 347:20

**speaker** 535:7

**speaking** 327:15 416:24 417:1,2, 4,7,13,17 448:12 449:10,12 543:15

**speaks** 525:17

**Special** 393:16 394:18,24 476:15, 16

**specialized** 537:3

**specific** 296:23 324:8 325:7,12, 14,18 329:1 341:5 364:1,24 367:15 374:21 380:20 408:7 422:15 424:6, 17,20 471:13 494:21 501:4,5 507:20 509:5 539:21 561:19

**specifically** 268:10 271:14 285:2 293:18 310:14 361:24 366:2,11 373:12 382:17 389:20 441:6,17 456:18 461:13 462:18 483:21 488:23 494:14 495:14 499:23 516:1 532:22 541:15 560:22

**specifics** 324:17 326:1,2 456:15

**spectrum** 275:2 409:14 445:20 462:10

**speculations** 342:24

**speech** 410:3

**spelled** 277:15,16

**spend** 270:17 397:18 441:9

**spent** 271:19 519:8

**spit** 481:11

**spoke** 265:18 352:23

**spoken** 338:2

**spontaneous** 541:16

**spontaneously** 531:10 541:23

**spread** 294:22

**stabbed** 560:13

**stage** 429:9

**staggering** 333:13

**stamp** 436:7 515:13 516:5,9

**stamped** 513:14 514:11,24 518:19

**stamps** 508:4

**stand** 321:24 435:18

**standard** 278:7,14,20

**standards** 291:7 337:2,3,11 349:11 350:11,14,19 409:20

**Stankus** 403:9,13,17

**Stanley** 393:23

**stapled** 383:9

**Starr** 264:22 271:16

**start** 271:6 272:2,4,5 273:4 274:20 285:14 308:23 315:14 330:20 372:1,16 375:5 404:1 406:9 502:24 514:3

**started** 266:17,20 379:18 383:23

**starting** 405:15 419:7

**state** 269:24 279:23 283:7 333:3 378:24 392:19 409:21 410:9 414:17,21 415:10 416:14 417:21 418:2,10,12,17,18 424:8,24 425:17,21 434:11 520:4 530:8 539:22

**State's** 351:4 370:23 371:14

**stated** 314:6 387:13 393:2 479:12 483:5 533:24

**statement** 270:11 273:9 274:5,22 275:3 283:6 289:18 311:16 313:17 314:1 315:21 316:8 330:3,7,23 336:23 344:9 373:21 394:24 396:24 415:24 450:10 500:14

**518:13** 529:3,8,12,21 530:1 549:12 550:24 554:19

**statements** 266:22 274:11,12 288:24 294:23,24 295:1 312:20,22 316:3,4 317:19 355:13 475:21 486:11 522:9 523:19 549:7

**States** 264:11 346:20 347:24 365:10,16

**stating** 377:22 434:5 435:3

**station** 348:21 349:1

**statistically** 289:14

**status** 318:1

**stay** 505:23

**step** 274:19

**Steve** 264:22 375:19 381:9 416:24 448:19 547:20

**Steven** 298:3,4

**Stokes** 380:2 451:12,15 453:2 454:8

**stomach** 344:16 350:24 480:8

**stop** 272:2,4,5 544:4 547:17

**stopped** 543:15

**street** 264:16 504:21

**strength** 432:22 437:17 444:21 455:15 460:3 476:2 498:8 499:1

**stress** 555:23

**stretch** 521:10 540:7

**strike** 458:21 489:16 550:22

**striking** 357:14 374:1 375:8 376:13

**strong** 311:12 438:12 443:19 445:21 451:7 482:13 527:18 528:13

**stronger** 443:21 444:15 445:18 451:1 462:9 498:12

**struck** 329:13 378:11 442:3 454:20 455:24 456:6

**students** 296:12

**studied** 320:9 408:9 456:10 460:10 474:12 478:22 506:18

**studies** 277:4,6,9,11 278:2 280:11 286:14 302:8 538:23

**study** 277:5,12 278:4,6,9,10,12 279:2,4,18,19,21 280:4,5,21

RICHARD A. LEO, PHD, JD, 09/29/2022

281:23 283:1,21,24 285:13,15,17, 18 286:11,16 314:17,19,20,21,22 539:6,8,9,12,14,21

**stuff** 421:19

**subcommittee** 424:8

**Subheading** 398:9

**subject** 340:19 342:15 388:2,3,9 423:22 468:12 469:22 477:3 518:11 520:14

**subjected** 309:8 326:6 330:12 358:1 360:3

**subjecting** 406:7,15

**subjects** 474:8 561:14

**subsection** 504:1

**subsequent** 336:10 337:13 364:16 420:3 493:16

**subsequently** 279:24 389:15 466:2

**subset** 278:17 289:6 470:11

**substance** 388:8 393:1 477:1

**substantial** 341:11 366:4 370:4 406:3,11 454:16 458:16 459:20 473:8,9 486:13,24 487:22 498:17 502:15 503:18 532:7,15,19

**substantially** 544:20

**substitute** 350:4

**successfully** 296:5,14

**succession** 479:21

**sued** 339:20

**suffered** 476:19

**sufficient** 433:4

**suffocating** 406:19

**suggest** 426:16 499:11 527:24

**suggested** 402:1

**suggests** 539:10

**Suite** 264:16

**sum** 406:11 430:10 473:21 508:18

**summaries** 268:22 407:14,15,20 488:10 489:17 499:17,19 521:12, 22 522:2,4

**summarized** 413:5 415:23 421:1

**summarizing** 312:1

**summary** 356:3 397:9,13,17 406:1,11 409:5 470:7,16 472:8 497:10

**super** 541:20

**supervisors** 406:8,17 409:16

**supplemented** 485:20

**support** 363:23 370:8 371:11,13 398:8 413:12 422:11 423:8,13 434:11 437:18 438:14 439:5 442:13 450:1 451:9,16 453:7 454:2 457:23 460:6,11 461:11 464:23 468:21 469:14 470:16 472:8 473:23 478:4 480:24 488:10,23 498:12,18 499:17 500:14 501:4 528:19 533:6 538:24

**supported** 416:15 449:17 460:2

**supporting** 429:16 443:19 451:5 454:12 455:15 456:12 461:2 462:10,12 473:16 482:3 483:15 490:7 498:2 499:14 506:13 532:8 533:1

**supports** 415:11 437:9 450:19 455:11,19 457:8 463:13 466:12 471:9 477:22 498:8

**supposedly** 546:21

**suppress** 310:24 409:18 414:15 450:4 522:9,18 523:6,18,19 549:1, 19,24 551:23 552:8,19

**suppressed** 554:3

**suppression** 328:15

**supra** 301:23

**surface** 325:16

**surfaces** 326:9

**surprised** 558:23

**surrounding** 310:5

**survey** 538:18

**Susan** 427:9,12

**Susler** 271:16

**suspect** 288:18 455:6 530:12 535:18 538:2 549:17 551:23 554:21 555:7,24

**suspects** 367:22 370:11 374:2 375:12 376:14 406:7,16,24 409:9 505:12

**sustained** 428:5

**swabbed** 325:21

**swear** 265:10

**swing** 431:16

**swore** 500:6,16 501:6

**sworn** 265:12 451:2 548:3

**synonym** 365:12

**synonymous** 339:12,14

**system** 278:13 554:5

**systematized** 287:1

**systemic** 359:6,10,19 360:11,16 361:20 363:8 365:22 398:9 406:6, 15 458:5 482:6 485:8

---

**T**

**table** 292:10 294:1,22 300:19

**tabulated** 523:24

**tabulates** 522:13

**tactics** 541:19

**tainted** 353:20 355:22

**takes** 272:15

**taking** 274:19 320:3 328:23 331:11 349:1 546:9

**talk** 273:19 274:7,20 420:22 424:21 452:24 461:3 477:16 499:23

**talked** 272:17 275:23 277:3 307:1 441:14 510:15 531:18

**talking** 266:17 273:4 307:22 332:14 334:3 337:15,21 346:23 351:12 428:15 447:23 463:19 466:23 499:7 536:21

**tallied** 334:16

**tasks** 517:24

**taught** 474:10

**tautological** 557:14

**Taylor** 369:3,4

**Taylor's** 369:3

**teaches** 340:12

**teaching** 321:2 364:9 420:20 423:23 458:12

**technical** 324:9 325:7,24 399:18 434:3

RICHARD A. LEO, PHD, JD, 09/29/2022

**technicalities** 324:18

**technique** 553:19 554:9 555:3

**techniques** 340:11 480:19 531:12 541:19 549:8,10 550:12

**technology** 307:8 318:3,12,15 319:1,9

**tedious** 448:13

**telling** 359:1 449:22

**tells** 487:16

**temple** 296:2,7 300:1,6 302:11,15 303:18

**ten** 267:16,17 269:3 327:16,23 331:12,13 352:1 435:20 444:9 519:15

**tend** 277:18

**tens** 534:9

**tenure** 370:23 371:14

**term** 274:1,8,9,21 275:2,11,12 276:5

**terminate** 555:23

**terminology** 273:7 286:23 290:2

**terms** 502:11

**test** 317:8 318:17 346:14 534:24

**tested** 307:7,19 308:7,19 316:23 317:3,6 319:4 324:3

**testified** 265:13 323:15 424:7 440:10 465:8,9 541:3 545:17,22 551:8,11,13,22 552:19 553:6,12

**testify** 321:16 477:1 506:1 536:9, 14 548:24 550:23 551:12,16,18 552:7 553:1 561:5,11,15

**testifying** 423:15 545:4 553:15 561:11

**testimonial** 356:15 358:6,8,10

**testimony** 310:15,17,24 311:1 321:3,4 328:15,24 336:6,11,12 354:15 363:17 387:18 409:17 414:14 423:24 424:1,6,12 427:8,9 435:5 437:4 445:4 450:3,4 451:3 459:19 465:6,11 505:12,20 521:24 528:4 533:2 538:24 539:8,10,15 540:12,19,21,23 546:3,7,10,23 547:1,5,9 548:3,5 549:2,3 551:7,10 552:21 557:9

**testing** 283:14 284:13 307:5,15 311:22 316:12 323:10

**text** 293:22 375:21

**theory** 302:7 315:6

**thing** 275:8 337:12 383:4 486:17 543:19

**things** 270:20 288:24 294:22 354:10,14 398:1 410:16 435:16 438:14

**thinking** 522:21

**thirteen** 504:6

**thirty** 360:14 420:24 422:6,19 460:20 463:23 492:8 522:24

**thirty-six** 461:7 480:6

**thought** 292:23 295:18 325:11 331:5,7 349:4,5 354:17 367:10 476:15 540:7 560:7

**thousands** 338:22 441:7 453:17 487:23 534:9

**threat** 554:17

**threaten** 554:1

**threatened** 373:20 374:6 376:20 377:8 378:8 380:4,8 425:2 426:9 435:1 446:4 462:23 481:15

**threatening** 377:16 378:6 379:20 406:20

**threw** 432:24 451:8 482:12 502:13, 14

**throw** 272:3,6 446:4

**thrown** 407:17

**time** 269:23 270:17 271:12,18,21, 23 272:12 280:10 281:9 295:18 303:2 304:11,20 305:10,17 306:21 307:3 310:1 312:18,21,22,23 313:2,9,11,20 314:3,6 315:5,9,17 316:5 318:2,12 319:9 320:2 326:22 327:5,12,20 331:16,17,21 332:6,7, 9,13,14 333:2 334:3,6,17,19,23 337:7,15,16,21 341:6,15 345:21 346:11 351:21 352:22 368:14 377:23 383:17 384:24 390:20 400:2,3,9 401:5 405:12 413:18 424:16 434:2 435:11 436:1 441:9 468:5 479:8,20 490:21 504:12 510:17 511:1 512:5,8,18 513:4 519:8 521:5 522:4,8,17 523:8,17 524:3 536:24 544:13 547:15 548:15 558:14,17,22,24 559:7 562:7,11

**times** 270:23 272:2,4,5 275:20

341:21 344:17 488:18 543:7,11 551:22 552:14,18 553:6 560:13

**timing** 312:17

**title** 279:3

**titled** 508:11

**Tobias** 516:24

**today** 264:17 265:17,23 267:13 270:7 295:19,21 316:22 317:8 334:15 382:9 416:1 427:23 428:3 433:17 435:5,16 465:21 466:22 511:15 526:8

**Toias** 517:6

**told** 268:12,13 328:7,10 351:11 352:16 433:10,22 455:18 543:8 547:14 551:19,20 557:18

**top** 314:9 326:17,20 345:1 349:12 366:14 372:23 405:20 436:15 441:11 488:20

**torture** 344:8,13,18,19,23 364:13, 14 365:12,13,24 368:1,4,7,20 370:8,13,24 371:2,3,6,15 373:4,10 374:2,7,11,21 375:11 376:14 377:1,12,15 392:10 395:6 398:10, 24 408:10 421:7 423:17 430:19 450:5 458:5 508:23 538:6,11 539:17

**tortured** 367:21 370:10 498:10 544:18 557:20 559:10

**total** 271:18 287:20 309:10 310:1 430:11 466:23 467:18 473:21 512:23 517:14 518:24

**totally** 539:3 543:23

**track** 277:19

**traditional** 337:2

**trained** 321:1 338:22

**training** 320:23 321:15,21 326:13 338:19 339:18 340:8,14 341:9 349:10 350:14 361:4 453:19

**transcript** 507:2 543:5 544:2 546:14,16 547:11,18 554:12

**transcripts** 272:18,21 288:21 310:20 311:4 506:19 528:5,8 551:3

**transferred** 372:24

**treated** 339:11

**treating** 316:3

**treats** 339:13,14

RICHARD A. LEO, PHD, JD, 09/29/2022

**Trevino** 404:20 539:23

**trial** 288:21 310:18,24 319:5 345:20 346:8 363:18 409:19 412:9 465:5,6 501:17 502:4 505:21 506:1 551:8,12,15 552:20 553:2,6

**trials** 409:23 414:16

**trick** 448:22,24

**triple** 435:14

**trivial** 311:10

**true** 273:22 284:14 290:17 293:10 296:3 302:7 303:19,24 317:16 389:7 459:16 490:4 496:10 526:17, 19,22 528:16 544:16 545:13 554:20,21,22 555:4,8,13,18 556:9 557:24 559:15,23 560:7,14

**Trujillo** 305:22

**truth** 328:10 359:1

**truthful** 526:13

**truthfully** 556:6

**turn** 359:3 391:2 436:14

**turned** 289:18,23 290:14 299:12 304:16

**TV** 349:2

**twelve** 333:6,7,16,18 487:21 490:15

**twenty** 270:16 292:24 396:20 397:2

**twenty-five** 293:14 367:22 370:11

**twenty-four** 293:14 333:7,8

**twenty-two** 304:6 542:19

**type** 271:23

**types** 326:14 399:1 412:15

**typical** 288:24 318:11 514:5

**typically** 276:17,23 345:15,20 346:9 357:11 429:20 506:21 531:8 549:19

**typo** 347:1

**Tyrone** 380:7 385:12 386:4 465:22 481:6

---

**U**

**U.S.** 391:4

**ultimately** 465:16,18

**umbrella** 274:21

**unavailable** 318:3,13

**uncommon** 469:11

**undeniable** 360:10

**undermine** 431:9

**undermines** 430:7

**underneath** 510:21

**understand** 273:8 318:8 346:19 347:21 356:4,7 379:6 398:3 478:13,17 479:23 492:19 535:6 539:16 550:13 555:21 557:9,16,18, 23 558:5,7,12,13 559:6,8,10

**understanding** 323:19 339:6 369:9 479:8,20 530:22 553:10

**understood** 306:17 351:23 352:10 379:17,21 479:19 538:14

**undertaking** 440:16

**underwear** 438:1,4 441:3

**unidentified** 560:19,23

**unique** 321:12

**Unit** 264:2 373:1

**United** 264:11 346:20 347:24 365:10,16 410:11

**universe** 317:16 460:20

**unknown** 341:15 527:21

**unlawful** 554:3

**unlike** 303:6

**unlocked** 522:22

**unpublished** 339:17 341:7,9,11, 15

**unquote** 328:11

**unreasonable** 414:1

**unrecorded** 330:24 356:16 358:21 473:4

**unredacted** 520:5

**unreliability** 276:15 473:8,9 532:16

**unreliable** 276:3,7,12,20,22 277:1 406:22 409:8 473:6 478:1,2 483:19 485:6 486:16 490:11 549:6

**unsupported** 528:23

**untested** 308:11

**untrue** 276:12

**updated** 485:22

**upheld** 465:7

**Urlaub** 264:14,18

**utilize** 278:4

**utilized** 284:4 286:19,20 287:10,20

**utilizing** 387:9

---

**V**

**vacuum** 531:9

**vague** 541:23

**variations** 350:23

**varies** 445:11 450:21

**vary** 498:8

**varying** 454:1 460:2 476:2 498:1 499:13,16

**Vasquez** 305:24 306:4,13 307:1

**verbatim** 349:13,20,23,24 350:2

**verifiable** 356:17 556:20

**verified** 356:21

**verify** 496:22

**version** 279:7,8,10 520:12

**versions** 400:4

**versus** 264:8 391:4 395:17 396:19 416:2 418:11,18 428:2 510:6 513:16 514:13 515:1 516:24 519:18

**victim** 290:14 297:11 445:4 527:9 558:4

**victim's** 283:16 284:16 438:1,4 441:3

**victims** 307:20 308:2 368:1,5,7 370:8,13 371:3,7 373:20

**video** 264:2,20 331:19,23 390:18, 22 435:23 436:3 490:19,23 521:3,8 562:17

**videoconference** 264:4

**view** 387:24

**Village** 510:6

**violation** 349:10 362:6

RICHARD A. LEO, PHD, JD, 09/29/2022

**violations** 350:11,14,22 351:2

**violence** 406:20

**violent** 279:23

**Virginia** 306:12

**virtually** 301:20

**volume** 365:1,7 464:9

**voluminous** 383:7 435:8 482:24 497:7

**voluntary** 550:7,9

**vulnerable** 336:16 345:4

---

**W**

**Waking** 265:24

**walk** 413:9

**Walker** 386:16

**wall** 325:9,13 326:3 335:14 433:9, 22 442:5 454:22 456:1,8 463:24

**walls** 324:12,14

**wanted** 268:3 300:24 384:14 505:2

**warnings** 352:9 479:19

**Washington** 306:9 307:2 380:8,11 382:16 385:12 389:9,12,14,18 440:4 465:23 466:1,5

**watching** 265:3

**water** 443:5 471:24

**Watkins** 386:18

**Watson** 386:20

**Wayne** 380:8 385:12 465:23

**ways** 386:15

**weapon** 296:11

**wearing** 351:14

**weeks** 387:11 492:6

**weight** 429:24 432:19 534:13,16, 20 535:1

**weights** 535:2

**Welling** 264:13

**Weston** 386:20 486:18 488:3

**Weston's** 487:2,7

**Wheeling** 510:6

**White** 386:23

**wholly** 276:7,22

**wide** 409:13 411:4 460:2 482:1 483:14 485:3 486:13 490:5 498:1

**wider** 473:15

**widespread** 359:6,19 360:11,16 361:20 363:8 398:9 432:14 454:16 458:4 471:10 480:17 482:5 485:8 489:10 491:13 498:18 502:16 509:13

**Wiggins** 386:24 420:11

**William** 297:21 495:7

**Williams** 385:14 387:3 420:14,16 470:3

**Wilson** 266:24 294:21 306:15 374:3,9 376:17 385:24 387:6 396:19 407:22 445:17 475:4

**window** 446:4

**wisdom** 555:17,20

**withdraw** 350:1 418:16 530:23

**witnesses** 500:6,16 501:6

**woman** 528:2

**wonderful** 547:2

**wondering** 298:14 413:8

**word** 274:13 320:3 333:22 344:13 348:6 349:20,23 350:1 355:23 496:4,7,16,18,21 546:9 553:23

**words** 347:3 378:18 388:17 457:1

**work** 271:24 277:13 311:21 312:15,17,18 313:19 315:23 356:18 408:19 413:19 423:6,12 473:20,22 474:20 487:7 505:5 506:17 510:5 512:10 514:15 515:15,17 517:1,10,20 518:24 519:7,20 520:1 525:7,12,15 531:23 545:4

**worked** 288:10 295:16 397:20 400:23 401:5 402:2,5,9,13 403:2,5, 14,17,22 404:4,9,13,17 405:2,5,9 419:19 420:20 421:15,17 422:22 455:3 458:10 460:9 472:12 474:12 486:19 506:18 517:24 537:16

**working** 282:13 288:12 392:9 401:1 405:17 420:5 487:2 545:4

**works** 548:8

**worries** 399:22 523:16

**worth** 389:3

**Wrice** 395:17

**write** 272:2 278:19 335:13 365:2 374:17 428:18 433:8 435:12,16,17 500:1

**writeup** 378:1 447:21

**writing** 364:9 469:11,15

**writings** 364:10

**written** 270:10 272:4 277:20,24 330:12 355:13 364:21,23 383:5 415:22 435:10,19 449:20 452:23 463:1 464:17 469:10 474:22

**wrong** 302:19 338:8 341:1 355:23 356:1,3 551:6 560:9

**wrongful** 278:10,20

**wrote** 293:17 333:1 341:22 344:24 349:13 366:1 435:3 438:6 439:5 449:14 477:7 484:16 498:20

---

**X**

**Xavier** 496:2

**XII** 359:4

---

**Y**

**year** 300:15 302:2 341:4 360:14 405:21 471:21 480:5 481:9 483:2 487:9 518:4 522:16

**years** 292:24 293:14 304:10 341:4 346:2 355:11 361:10 364:11 396:20 397:2 399:5 408:9 461:10 477:8 486:19 487:21 504:7 512:9 533:3

**yesterday** 265:16 266:2,9,10,17, 20 269:11,16 270:3,6,18 271:1,8 272:17 273:7,11 275:21,23 277:3 285:6 300:23 305:3 312:15 313:5 316:19 323:15 328:22 332:17 337:6,9 339:7 343:6 345:7,14,24 350:18 382:21 383:1 387:23 420:5 467:10,16 485:24 510:16

**yielded** 317:5,6

**Young** 385:14 470:2

**Yucaitis** 374:3 376:17

RICHARD A. LEO, PHD, JD, 09/29/2022

---

**Z**

---

**Zehner** 265:3

RICHARD A. LEO, PHD, JD, 09/29/2022