*DeLeon-Reyes v. Guevara, et al.*
Case No. 18 CV 01028

*Solache v. Guevara, et al.*
Case No. 18 CV 02312

# EXHIBIT 2

Dr. Richard A. Leo, Ph.D., J.D.
**JUSTICE RESEARCH & CONSULTING, INC.**
15 Ashbury Terrace
San Francisco, CA 94117

_____

(415) 661-0162 (Phone)
(415) 422-6433 (FAX)
Email: rleo@usfca.edu

January 15, 2022

Ben Elson,
Attorney at Law
The People's Law Office
1180 North Milwaukee Avenue
Chicago, IL, 60642

Steve Art and Anand Swaminathan,
Loevy and Loevy
Attorneys at Law
311 N Aberdeen Street, Suite 3
Chicago, IL 60607

**Re:     Arturo DeLeon-Reyes v. Reynaldo Guevara, et. al.**
           **Case No.: 1:18-cv-01028**

           **Gabriel Solache v. City of Chicago, et. al.**
           **Case No.: 1:18-cv-02312**

Dear Counsel,

This report is per your request in the above-referenced cases of Arturo DeLeon Reyes v. Reynaldo Guevara, *et. al.* and *Gabriel Solache v. City of Chicago, et. al.*

### I. Qualifications

I am the Hamill Family Professor of Law and Psychology at the University of San Francisco, and formerly an Associate Professor of Psychology and an Associate Professor of Criminology at the University of California, Irvine. My areas of research, training, and specialization include social psychology, criminology, sociology, and law. For more than two decades, I have conducted extensive empirical research on police interrogation practices, the psychology of interrogation and confessions, psychological coercion, police-induced false confessions, and erroneous convictions. In 1992 and 1993, I spent nine months doing field research inside the Oakland Police Department, which included sitting in on and

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 2


contemporaneously observing one-hundred twenty-two (122) felony interrogations; in 1993, I also observed sixty (60) fully videotaped interrogations in the Vallejo and Hayward Police Departments in northern California. Since then, I have analyzed thousands of cases involving interrogations and confessions; I have researched, written, and published numerous peer-reviewed articles on these subjects in scientific and legal journals; and I have written several books on these subjects, including *Police Interrogation and American Justice* (Harvard University Press, 2008) and *Confessions of Guilt: From Torture to Miranda and Beyond* (Oxford University Press, 2012).

I am regarded as a national and leading expert on these topics, and I have won numerous individual and career achievement awards for my scholarship and publications. My scholarship has often been featured in the news media and cited by appellate courts, including the United States Supreme Court, on multiple occasions. To date, I have consulted with criminal and civil attorneys on more than two-thousand and two-hundred (2,200) cases involving disputed interrogations and/or confessions, and I have been qualified and testified as an expert witness three-hundred and eighty-five (385) times in state, federal, and military courts in thirty-eight (38) states and the District of Columbia, including thirty-five (35) times in federal and military courts (which includes the 7th circuit). I have given many lectures to judges, defense attorneys, prosecutors, and other criminal justice professionals, and I have taught interrogation training courses and/or given lectures to police departments in the United States, China, and the Republic of Cyprus. I am currently a pro bono consultant to the Pima County, Arizona and San Francisco, California prosecutors' offices.

My qualifications are summarized in greater detail in my curriculum vitae, which is attached to this report. A list of my court and deposition testimony in the last four years is attached to this report. I am being compensated for my time at the rate of $400 per hour. My compensation is not contingent on the outcome of this litigation nor on the opinions I express in this report or in subsequent court testimony.

## II. Materials Reviewed

In conjunction with my preparation of this report, I have reviewed the following materials:

1. Solache testimony at Motion to Suppress hearing (Solache 5275, Solache 5394-5441)
2. Solache handwritten statement (RFC-Solache/Reyes 004006-4014)
3. Lassar Memo regarding Reyes and Solache and Articles (AR-Jenner 019812-19843)
4. CCSAO Supplementary File and Additional Notes regarding Reyes, Solache, and Adriana Mejia (CCSAO Supp. 1-18)
5. Full transcript of sentencing hearing for Adriana Mejia (Reyes 008686-8725)
6. 4/06/1998 hearing transcript (Solache 007808-7817)

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 3

7. 6/20/2008 Solache Amended Petition for Post-Conviction Relief (Reyes_Jenner 000250-317)

8. 12/02/2008 Reyes Revised Amended Petition for Post-Conviction Relief (Reyes_Jenner 000482-533)

9. 8/13/2015 Petitioners' Joint Post-Hearing Brief in Support of Their Individual Petitions for Post-Conviction Relief (Reyes_Jenner 003669-3703)

10. Crime scene photographs (Reyes_Jenner 004371-4381)

11. Crime scene photographs (Reyes_Jenner 004382-4399)

12. Crime scene photographs (Reyes_Jenner 004400-4410)

13. Combined Reports of Proceedings in *People v. Reyes* (Reyes_Jenner 004411-6984)

14. 5/11/1998 Illinois State Police Evidence Report (Reyes_Jenner 009559)

15. 5/13/1998 Illinois State Police Evidence Report (Reyes_Jenner 009560-9566)

16. 5/28/1998 Illinois State Police Evidence Report (Reyes_Jenner 009567-9569)

17. 10/20/1999 Illinois State Police Evidence Report (Reyes_Jenner 009570-9571)

18. 12/16/1999 Illinois State Police Evidence Report (Reyes_Jenner 009572-9575)

19. 1/29/2000 Illinois State Police Evidence Report (Reyes_Jenner 009576-9578)

20. 8/17/2016 Illinois State Police Evidence Report (Reyes_Jenner 009579-9580)

21. 8/30/2016 Illinois State Police Evidence Report (Reyes_Jenner 009581)

22. 2016 Correspondence from ASA Jim Papa regarding ISP DNA testing (Reyes_Jenner 009582-9583)

23. 1/15/2017 Illinois State Police Evidence Report (Reyes_Jenner 009584-9586)

24. 6/23/1999 testimony of Gabriel Solache at Motion to Suppress hearing in *People v. Reyes and Solache* (JR-L 093169-93282, Bluhm 22852-22965)

25. 2/04/2000 Hearing testimony of Reynaldo Guevara and Daniel Trevino in *People v. Reyes and Solache* (JR-L 093587-93646)

26. 3/03/2000 Hearing testimony of Maria Rivera, John Musa, Reynaldo Guevara, and Gabriel Solache in *People v. Reyes and Solache* (JR-L 093647-93819)

27. 3/30/2000 Hearing testimony of Reynaldo Guevara and Ernest Halvorsen in *People v. Reyes and Solache* (JR-L 093831-93888)

28. 3/30/2000 Hearing testimony of Adriana Mejia in *People v. Reyes and Solache* (JR-L 93889-93929)

29. 12/21/2017 Order vacating the conviction of Arturo DeLeon-Reyes (Reyes_Jenner 012174)

30. 6/29/2016 Order granting Reyes and Solache new hearing on Motion to Suppress

31. 2/14/2013 Post-conviction hearing transcript in *People v. Reyes and Solache* (Reyes_Jenner 010526-10614)

32. 4/09/2013 Post-conviction hearing transcript in *People v. Reyes and Solache* (Reyes_Jenner 010615-10729)

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 4

33. 7/29/2013 Post-conviction hearing transcript in *People v. Reyes and Solache* (Reyes_Jenner 011080-011125)
34. 10/17/2017 Post-conviction hearing transcript in *People v. Reyes and Solache* (Reyes_Jenner 011866-12059)
35. 10/30/2017 Post-conviction hearing transcript in *People v. Reyes and Solache* (Reyes_Jenner 012060-12121)
36. 3/28/1998 Supplementary Report (Reyes_Jenner 010028)
37. 4/01/1998 Major Incident Log (Reyes_Jenner 010029-10030)
38. 4/01/1998 Supplementary Report (Reyes_Jenner 010031-10033)
39. 4/02/1998 Cause of Death Report (Reyes_Jenner 010034)
40. 4/02/1998 Crime Scene Processing Report (Reyes_Jenner 010035)
41. 4/02/1998 Crime Scene Processing Report (Reyes_Jenner 010036)
42. 4/02/1998 General Offense Case Report (Reyes_Jenner 010037-10038)
43. 4/02/1998 Supplementary Report (Reyes_Jenner 010039-10047)
44. 4/02/1998 Youth Supplementary Report (Reyes_Jenner 010048-10049)
45. 4/03/1998 Solache Arrest Report (Reyes_Jenner 010050)
46. 4/03/1998 Reyes Arrest Report
47. 4/03/1998 Reyes Arrest Report (Reyes_Jenner 010052)
48. 4/03/1998 Crime Scene Processing Report (Reyes_Jenner 010053)
49. 4/03/1998 Crime Scene Processing Report (Reyes_Jenner 010054)
50. 4/03/1998 Crime Scene Processing Report (Reyes_Jenner 010055)
51. 4/03/1998 Supplementary Report (Reyes_Jenner 010056-10058)
52. 4/04/1998 Crime Scene Processing Report (Reyes_Jenner 010059)
53. 4/04/1998 Statement of Guadalupe Mejia (Reyes_Jenner 010060-10067)
54. 4/04/1998 Supplementary Report (Reyes_Jenner 010068-10069)
55. 4/04/1998 Supplementary Report (Reyes_Jenner 010070-010073)
56. 4/05/1998 Crime Scene Processing Report (Reyes_Jenner 010074)
57. 4/05/1998 Statement of Arturo DeLeon-Reyes (Reyes_Jenner 010075-10085)
58. 4/09/1998 Supplementary Report (Reyes_Jenner 010086-10087)
59. 4/15/1998 Supplementary Report (Reyes_Jenner 010088-10090)
60. 4/18/1998 Supplementary Report (Reyes_Jenner 010091)
61. 4/27/1998 Grand Jury testimony of Ernest Halvorsen (Reyes_Jenner 010092-10099)
62. 4/30/1998 Supplementary Report (Reyes_Jenner 010100-10120)
63. Illinois State Police Evidence Submission form (Reyes_Jenner 010121)
64. 5/06/1998 Illinois State Police Forensic Receipt (Reyes_Jenner 010122)
65. 5/13/1998 Illinois State Police Forensic Receipt (Reyes_Jenner 010123-10128)
66. Deposition transcript of Adriana Mejia
67. Deposition transcript of Heather Brualdi

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 5

68.  Deposition transcript of Jorge Soto
69.  Deposition transcript of Jose Aranda
70.  Deposition transcript of David Navarro
71.  Deposition transcript of Thomas O'Malley
72.  Deposition transcript of Arturo DeLeon-Reyes on 2.27.20, 2.28.20
73.  Deposition transcript of Rosa Aranda
74.  Deposition transcript of Rosauro Mejia (Vol. I and II)
75.  Deposition transcript of Daniel Trevino
76.  Deposition transcript of Reynaldo Guevera
77.  Deposition transcript of Robert Rutherford (Vol. I and II)
78.  Deposition transcript of Edwin Dickinson (Vol. I and II)
79.  Decision in People v. Jackie Wilson dated June 20, 2018 (PTP-NOTICE-000709-827)
80.  118 Documented Burge Area 2 and Area 3 Torture Victims 1972-1991 (PTP-NOTICE-000829-842)
81.  Summary of Statements of City Council Members, July 24, 2007 (PTP-NOTICE-000843-844)
82.  Decision in People v. Cortez Brown dated June 3, 2009 (PTP-NOTICE-000845-854)
83.  People v. Stanley Wrice, 406 Ill. App. 3d 43 (4th Dist. 2010) (PTP-NOTICE-000855-877)
84.  People v. Stanley Wrice, 2012 IL 111860 (2012) (PTP-NOTICE-00879-893)
85.  Testimony of Diane Panos in U.S. v. Burge (PTP-NOTICE-000895-899)
86.  Testimony of Sammy Lacey in U.S. v. Burge (PTP-NOTICE-000901-918)
87.  Statement of Facts and Conclusions of Law in People v. Tillman, No. 92 CR 27711 dated January 11, 2010 (PTP-NOTICE-000919-927)
88.  Decision in People v. Stanley Wrice dated December 10, 2013 (PTP-NOTICE-000929-939)
89.  Testimony of Michael McDermott in U.S. v. Burge (PTP-NOTICE-000941-982)
90.  Transcript of Sentencing of Jon Burge in U.S. v. Burge (PTP-NOTICE-000983-994)
91.  Excerpts of 2016 Police Accountability Task Force Report (PTP-NOTICE-000995-1065)
92.  Excerpts of 2017 DOJ Pattern and Practice Report (PTP-NOTICE-001067-1140)
93.  Affidavit of Kenneth Caddick (PTP-NOTICE-001141-1142)
94.  Affidavit of Joanne Archibald (PTP-NOTICE-001143-1144)
95.  U.S. v. Burge, 711 F.3d 803 (7th Cir. 2013) (PTP-NOTICE-0001145-1152)
96.  Chicago Torture Resolution and Ordinance 2015 (PTP-NOTICE-001153-1157)
97.  List of Burge's Assertions of the Fifth Amendment (PTP-NOTICE-001159)
98.  Affidavit and Testimony of Darlene Lopez (PTP-NOTICE-001160-1175)
99.  People v. Shawn Whirl, 2015 IL App (1st) 111483 (PTP-NOTICE-001176-1211)

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 6

100. Daley News Statements (PTP-NOTICE-001212-1218)
101. Daley July 19, 2007 Code of Silence Statement (PTP-NOTICE-001219)
102. Deposition of Michael Kill re N Word (PTP-NOTICE-001220-1224)
103. People v. James Gibson, 2018 IL App (1st) 162177 (PTP-NOTICE-001226-1265)
104. CPD Code of Silence Court Decisions 2012-2106 (PTP-NOTICE-001268-1347)
105. Special Prosecutor's Report July 19, 2006 (PTP-NOTICE-002893-3183)
106. Citizens' Report on Special Prosecutor Failures (PTP-NOTICE-001348-1463)
107. Brceczek Letter to Daley with Raba Letter dated February 25, 1982 (PTP-NOTICE-001464-1465)
108. City Memo Admitting Pattern of Torture 1.22.92 (PTP-NOTICE-001466-1497)
109. City Admissions Regarding Torture of Melvin Jones and Andrew Wilson 5.15.95 (PTP-NOTICE-001498-1521)
110. Amnesty Torture Report and Related Letters 5.12.90 (PTP-NOTICE-001522-1532)
111. Wilson Verdict Form Finding Policy of Area 2 Abuse 6.8.89 (PTP-NOTICE-001533)
112. Burge Police Board Finding Decision 2.1..93 (PTP-NOTICE-001534-1594)
113. Burge Police Board Appellate Decision (PTP-NOTICE-001595-1623)
114. Melvin Duncan Affidavit dated April 19, 2004 (PTP-NOTICE-002020-2021)
115. Doris Byrd Statement dated November 9, 2004 (PTP-NOTICE-002022-2065)
116. Walter Young Statement dated November 2, 2004 (PTP-NOTICE-002066-2098)
117. William Parker Statement dated October 4, 2004 (PTP-NOTICE-002099-2131)
118. People v. Darrell Cannon, 293 Ill. App. 3d 634 (1st Dist. 1997) (PTP-NOTICE-001647-1653)
119. December 24, 1990 Torture Hearing Before City Council (PTP-NOTICE-001694-1744)
120. Anonymous Letters (2.2.89, 3.6.89, 3.15.89, 6.16.89) (PTP-NOTICE-002208-2215)
121. Governor Ryan's Innocence Pardon Statement 1.10.03 (PTP-NOTICE-002473-2490)
122. Expert Report of Anthony Bouza in Orange v. Burge dated August 19, 2006 (PTP-NOTICE-000681-687)
123. Hillard Deposition (PTP-NOTICE-001943-1989)
124. News articles Regarding Daley, Martin, et al. (PTP-NOTICE-002216-2234)
125. Fogel City Council Testimony 10.6.89 (PTP-NOTICE-002237-2247)
126. Fogel and Martin Excerpts City Council Testimony 10.11.89 (PTP-NOTICE-002248-2262)
127. Brzeczek Affidavit 8.26.04 (PTP-NOTICE-002271-2276)
128. Fogel Memo to Mayor Regarding OPS 10.19.87 (PTP-NOTICE-002277-002284)
129. Tribune Article Regarding Secreting Torture Findings 2.23.99 (PTP-NOTICE-002310-2314)
130. Citizens Alert Letter to Hillard (PTP-NOTICE-002318-2324)

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 7

131. History of Police Disciplinary Proceedings in 105 Torture Cases (PTP-NOTICE-002458-2467)

132. U.N. Committee Against Torture Burge Findings 5.18.06 (PTP-NOTICE-003187)

133. Expert Report of Richard Rosenthal in Smith v. Burge dated July 24, 2018 (PTP-NOTICE-0031930-3223)

134. 12/16/2005 Order in *People v. Gray* (PTP-J GRAY-000001-28)

135. Testimony of Jason Gray in *People v. Gray* (PTP-J GRAY-000029- 31)

136. Amended Petition for Post-Conviction Relief in *People v. Gray* (PTP-J GRAY-000032 -123)

137. Affidavit of Manuel Bobe (PTP-M BOBE-000001)

138. *People v. Robinson*, 238 Ill.App.3d 48 (1992) (PTP-A ROBINSON-000001- 000006)

139. *People v. Bounds*, 171 Ill.2d 1 (1995) (PTP-F BOUNDS-00001-30)

140. Excerpt of Second Amended Petition for Post-Conviction Relief in *People v. Kitchen* (PTP-R KITCHEN-000001-178)

141. Special Prosecutor Reports regarding Ronald Kitchen (PTP-R KITCHEN-000179-208)

142. Deposition of Michael Kill in *Wiggins v. Burge, et al.* (PTP-JOHNNY AND PHILLIP WALKER-000001-42)

143. Excerpt of 04/03/1989 Report of Proceedings in *People v. Phillip Walker* (PTP-JOHNNY AND PHILLIP WALKER-000043-50)

144. Complaint in *Burton v. Kill, et al.* (PTP-A BURTON-000001-9)

145. Complaint Register #166416 Summary Report Digest (PTP-M CRAIGHEAD 000001-4)

146. *People v. Lash*, 252 Ill.App.3d 239 (1993) (PTP-A LASH-000001-11)

147. Affidavit of Demond Weston (PTP-D WESTON-000001)

148. 04/05/2006 OSP File Memo (PTP-D WESTON-000002-3)

149. Affidavit of Dwayne Macklin (PTP-D WESTON-000004)

150. Complaint in *Young v. City of Chicago, et al.* (PTP-D YOUNG-000001-39)

151. Excerpt of 09/19/1994 Report of Proceedings in *People v. Young* (PTP-D YOUNG-000040-94)

152. Excerpt of 09/19/1994 Report of Proceedings in *People v. Young* (PTP-D YOUNG-000095-169)

153. Excerpt of 09/19/1994 Report of Proceedings in *People v. Young* (PTP-D YOUNG-000170-187)

154. Appellate Opinion in *Hill v. Coppelson, et al.* (PTP-H HILL-000001-10)

155. Amended Complaint in *Hill v. City of Chicago, et al.* (PTP-H HILL-000011-46)

156. Affidavit of Peter Williams (PTP-H HILL-000047-49)

157. Volume I of Deposition of Demoni Clemon in *Saunders v. City of Chicago, et al.* (PTP-JESSE & DEMONI & IMARI CLEMON 000001-26)

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 8

158. Deposition of Jesse Clemon in *Saunders v. City of Chicago, et al.* (PTP-JESSE & DEMONI & IMARI CLEMON 000027-95)

159. Volume II of Deposition of Demoni Clemon in *Saunders v. City of Chicago, et al.* (PTP-JESSE & DEMONI & IMARI CLEMON 000096-276)

160. Deposition of Marcus Wiggins in *Wiggins v. Burge, et al.* (PTP-M WIGGINS-000001-103)

161. Complaint in *Wiggins v. Burge, et al.* (PTP-M WIGGINS-000104-149)

162. Chicago Tribune article – "Veteran detective's murder cases unravel" (PTP-A NEAL-000001-8)

163. 01/29/1993 Report of Proceedings in *People v. Day* (PTP-A DAY-000001-37)

164. TIRC Disposition regarding Claim of Arnold Day (PTP-A DAY-000038-52)

165. Affidavit of Arnold Day (PTP-A DAY-000053-55)

166. Complaint in *Day v. Boudreau, et al.* (PTP-A DAY-000056-105)

167. Complaint in *Jakes v. Boudreau, et al.* (PTP-A JAKES-000001-37)

168. 12/02/1992 Report of Proceedings in *People v. Jakes* (PTP-A JAKES-000038-84)

169. 08/18/2015 Report of Proceedings in *People v. Jakes and Anderson* (PTP-A JAKES-000085-204)

170. Appellate Opinion in *People v. Jakes* (PTP-A JAKES-000205-219)

171. Testimony of Anthony Jakes (PTP-A Jakes-000220-312)

172. 09/10/2013 Report of Proceedings in *People v. Jakes* (PTP-A JAKES-000313-378)

173. TIRC Disposition regarding Claim of Anthony Jakes (PTP-A JAKES-000379-409)

174. *People v. Plummer*, 306 Ill.App.3d 574 (1999) (PTP-J PLUMMER -000001-10)

175. Complaint in *Watkins v. Halloran, et al.* (PTP-K WATKINS-000001-14)

176. Affidavit of Kilroy Watkins (PTP-K WATKINS-000015)

177. Complaint in *Smith v. City of Chicago, et al.* (PTP-C SMITH-000001-10)

178. Complaint Register #203754 (PTP-F EWING-000001-143)

179. Complaint in *Ewing v. O'Brien, et al.* (PTP-F EWING-000144-150)

180. First Amended Petition for Post-Conviction Relief and Petition for Relief from Judgment In *People v. Gillespie* (PTP-J GILLESPIE-000001-20)

181. Motion to Hold Appeal in Abeyance in *People v. Gillespie* (PTP-J GILLESPIE-000021-30)

182. Affidavit of Tyrone Reyna (PTP-T REYNA-00001-00005)

183. Affidavit of Nicholas Escamilla (PTP-T REYNA-000006-10)

184. Statement of Miguel Morales (PTP-T REYNA-000011-18)

185. *People v. Williams*, 303 Ill.App.3d 33 (1999) (PTP-A WILLIAMS-00001-8)

186. Third Amended Complaint in *Fulton v. Yanow, et al.* (PTP-D FULTON-000001-29)

187. 04/16/1996 Report of Proceedings in *People v. Fulton* (PTP-D FULTON-000030-86)

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 9

188. Second Amended Complaint in *Coleman v. City of Chicago, et al.* (PTP-N COLEMAN-000001-41)

189. 06/28/1996 Report of Proceedings in *People v. Coleman* (PTP-N COLEMAN-000042-105)

190. Complaint in *Flewellen v. City of Chicago, et al.* (PTP-D FLEWELLEN-000001-15)

191. Deposition of Harold Richardson in *Richardson v. City of Chicago, et al.* (PTP-H RICHARDSON-000001-238)

192. Order in *People v. Thames, et al.* (PTP-H RICHARDSON-000239-247)

193. First Amended Complaint in *Richardson v. City of Chicago, et al.* (PTP-H RICHARDSON-000248-300)

194. FBI 302 Reports regarding Terence Johnson (PTP-H RICHARDSON-000301-306)

195. Order in *People v. Thames, et al.* (PTP-M SAUNDERS-000001-12)

196. Vol. I of Deposition of Michael Saunders in *Saunders v. City of Chicago, et al.* (PTP-M SAUNDERS-000013-313)

197. Vol. II of Deposition of Michael Saunders in *Saunders v. City of Chicago, et al.* (PTP-M SAUNDERS-000314-607)

198. Complaint in *Saunders v. City of Chicago, et al.* (PTP-M SAUNDERS-000608-658)

199. Complaint in *Swift v. City of Chicago, et al.* (PTP-T SWIFT-000001-28)

200. Vol. I of Deposition of Terrill Swift in *Swift v. City of Chicago, et al.* (PTP-T SWIFT-000029-295)

201. Vol. II of Deposition of Terrill Swift in *Swift v. City of Chicago, et al.* (PTP-T SWIFT-000296-576)

202. Vol. III of Deposition of Terrill Swift in *Swift v. City of Chicago, et al.* (PTP-T SWIFT-000577-600)

203. Vol. I of Deposition of Vincent Thames in *Saunders v. City of Chicago, et al.* (PTP-V THAMES-000001-97)

204. Vol. II of Deposition of Vincent Thames in *Saunders v. City of Chicago, et al.* (PTP-V THAMES-000098-186)

205. First Amended Complaint in *Thames v. City of Chicago, et al.* (PTP-V THAMES-000187-212)

206. Appellate Opinion in *People v. Murray* (PTP-K MURRAY-000001-13)

207. TIRC Disposition regarding Claim of Kevin Murray (PTP-K MURRAY-000014-28)

208. Order in *People v. Seaton* (PTP-F SEATON-000001-12)

209. Opinion in *Seaton v. Kato, et al.* (PTP-F SEATON-000013-19)

210. Complaint in *Seaton v. Kato, et al.* (PTP-F SEATON-000020-35)

211. Appellate Opinion in *People v. Shelton* (PTP-G SHELTON-000001-6)

212. Opinion in *Steward v. Summerville, et al.* (PTP-T STEWARD-BEY-000001-4)

213. Complaint Register #165728 (PTP-STEWARD-BEY-000005-92)

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 10

214. Complaint Register #240931 (PTP-STEWARD-BEY-000093-000157)
215. *Chicago Reader* article – "Good Cop, Bad Cop" (PTP-K WASHINGTON-000001-32)
216. Order in *People v. Washington* (PTP-K WASHINGTON-000033-65)
217. Complaint Register #171359 (PTP-S HARDY-000001-50)
218. Complaint Register #184112 (PTP-M HOLSTON-000001-73)
219. Appellate Opinion in *People v. West* (PTP-R WEST-000001-8)
220. *Chicago Tribune* article – "Fine line between tough police work, brutality" (PTP-H LUCAS-000001-4)
221. Opinion in *Waslewski v. Kato* (PTP-M WASLEWSKI-000001-5)
222. Order in *People v. Prince* (PTP-P PRINCE-000001-8)
223. Petitioner's Closing Memorandum in *Prince v. State of Illinois* (PTP-P PRINCE-000009-16)
224. Order granting Certificate of Innocence in *People v. Prince* (PTP-P PRINCE-000017)
225. Appellate opinion in *People v. Harvey* (PTP-D HARVEY-000001-13)
226. 08/29/1995 Report of Proceedings in *People v. Wallace* (PTP-A WALLACE-000001-32)
227. Appellate opinion in *People v. Wallace* (PTP-A WALLACE-000033-53, PTP-A WALLACE-000073-93)
228. Order in *People v. Wallace* (PTP-A WALLACE-000054-66)
229. Amended Complaint in *Wallace v. Kato, et al.* (PTP-A WALLACE-000067-72)
230. Complaint Register #206469 (PTP-A WALLACE-000094-117)
231. Complaint Register #240931 (PTP-X JOHNSON-000001-65)
232. Complaint Register #235098 (PTP-K MITCHELL-000001-34)
233. Appellate opinion in *People v. Wright and Threatt* (PTP-JEREMIAH WRIGHT & ELIJAH THREATT-000001-7)
234. Complaint in *Chatman v. City of Chicago, et al.* (PTP-C CHATMAN-000001-48)
235. Appellate opinion in *People v. Chatman* (PTP-C CHATMAN-000049-82)
236. Opinion in *Hunt v. Jaglowski* (AR-L 545335-545336)
237. Opinion in *Hunt v. Jaglowski* (AR-L 545337-545338)
238. Opinion in *Hunt v. Jaglowski* (AR-L 545339-545345)
239. Appellate opinion in *Hunt v. Jaglowski* (AR-L 545346-545351)
240. 07/14/1986 Report of Proceedings in *People v. Perez and Pena* (AR-L 154619-154687)
241. Affidavit of Victor Vera (AR-L 154810-154813)
242. Affidavit of Daniel Rodriguez (AR-L 147462-147466)
243. Excerpt of 07/14/2021 Report of Proceedings in *Munoz v. People* (AR-L 155313-155363)
244. Affidavit of David Rivera (AR-L 155028-155029)
245. 03/31/1995 Report of Proceedings in *People v. Cruzado* (AR-L 155033-155055)

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 11

246. 04/11/2013 Report of Proceedings in *People v. Reyes & Solache* (AR-L 154693-154805)
247. Affidavit of Adrian Duta (AR-L 154806-154809)
248. Complaint in *Maysonet v. Beuke, et al.* (AR-L 537371-537383)
249. Deposition of Edwin Davila in *Johnson v. Guevara, et al.* (AR-L 154814-155027)
250. Deposition of Gloria Ortiz Bordoy in *Johnson v. Guevara, et al.* (AR-L 148767-148860)
251. Complaint in *Gomez v. Guevara, et al.* (AR-L 532490-532533)
252. Affidavit of Jed Stone (AR-L 155056-155058)
253. Complaint Register #124631 (AR-L 648760-648819)
254. Complaint Register #150473 (AR-L 648889-648898)
255. Letter from Leshurn Hunt to Eugene Hudson regarding CR #145129 (AR-L 545458-545460)
256. Complaint Register #152902 (RFC-Solache/Reyes 31530-31592)
257. Complaint Register #217624 (RFC-Solache/Reyes 31756-31791)
258. Deposition of Jose E. Melendez in Sierra v. Guevara, et al. (AR-L 155271-155312)
259. Orders granting Certificates of Innocence in *People v. Montanez* and *People v. Serrano* (AR-L 154691-154692)
260. Sworn Statement of Timothy Rankins (AR-L 155230-155268)
261. Corrected First Amended Complaint in *Montanez v. Guevara, et al.* (AR-L 563644-563688)
262. Complaint in *Serrano v. Guevara, et al.* (AR-L 563597-563643)
263. G.O. 87-07 (JR-L 006141-006155)
264. Deposition of Commander Eric Winstrom
265. Deposition of Gabriel Solache (Vols. I, II, and III)
266. Affidavit of Leshurn Hunt
267. State of Wisconsin v Emmett White Transcript of Proceedings April 17, 1993 (PTP-E WHITE-000001-000007)
268. Tyrone Hood v. City of Chicago Plaintiff's Response to City's Motion for Summary Judgement and Plaintiff's Response to the Individual Defendant Officers (PTP-T HOOD & W WASHINGTON-000001-000396)
269. November 1884 and February 1885 David Fogel Report for 11 Cases of Electric Shock (PTP-GENERAL-000001-000006)
270. December 18, 2020 COI Order for Jackie Wilson (PTP-GENERAL-000007-000065)
271. Dr. Leo Report June 12, 2010 (PTP-GENERAL-000066-000085)
272. Excerpt from Kill Deposition (PTP-J COSTON-000001-000003)
273. Affidavit of Joseph Jackson (PTP-J JACKSON-000001-000003)

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 12

274. "Good Cop, Bad Cop" Chicago Reader Article by Steve Bogira December 12, 1991 (PTP-M CAGE-000001-000063)
275. March 14, 2008 Deposition of Abel Quinones in Hill v. City of Chicago (PTP-O GOMEZ & A QUINONES-000001-000232)
276. March 19, 2008 Deposition of Oscar Gomez in Hill v. City of Chicago (PTP-O GOMEZ & A QUINONES-000233-438)
277. Cruzado MTS Testimony Transcript (AR-L 524149-524167)
278. January 31, 1995 People v. Maysonet Trial Transcript (AR-L 537618-537792)
279. Hunt Affidavit and Letter (AR-L 545497-545501)
280. April 7, 1999 Dembski Transcript (Bluhm 034650-34753)
281. Affidavit of Adolfo Frias Munoz (Bluhm 010887-010888)
282. Gomez PC Petition (JR-L 300501-300555)
283. People v. Santos Flores MTS Guevara Testimony (JR-JJ 040337-040388)

### III. Overview

In this report, I will first provide an overview of the relevant social science research on the psychology of police interrogation practices and techniques, police-induced false confessions, risk factors for false confession, psychological coercion, police interrogation contamination and scripting, and indicia of unreliability. I will then discuss these issues as they relate to the investigation, interrogations, and confession statements of Arturo DeLeon-Reyes and Gabriel Solache.[1]

1) The interrogation-induced signed confession statements of Arturo DeLeon-Reyes and Gabriel Solache meet the criteria for what is known as a *proven false confession* in the social scientific research literature. Based on the empirical and psychological science, Arturo Deleon-Reyes' and Gabriel Solache's signed statements are properly classified as *coerced-compliant false confessions*.

2) Arturo DeLeon–Reyes' description of what occurred during his lengthy, unrecorded custodial interrogations on April 3-5, 1998 is consistent with the empirical social science research on the types of interrogation techniques, methods, practices and effects that lead to false confessions.

3) The accounts by Detective Reynaldo Guevara, Detective Dickinson, Detective Rutherford, Youth Officer Trevino and ASA O'Malley of what occurred during the lengthy, unrecorded custodial interrogations of Arturo DeLeon-Reyes are not consistent with the

---

[1] Because the Chicago police Reynaldo Guevara and Daniel Trevino failed to electronically record any of the interrogations of Arturo DeLeon-Reyes or Gabriel Solache on April 3-5, 1998 – despite having the capacity to do so – we are forever deprived of an objective record of what occurred during these interrogations.

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 13

empirical findings of the social science research literature on what leads to false confessions. These accounts fail to provide a reasonable or coherent explanation of how or why Mr. DeLeon-Reyes would have signed a *proven false confession* to participating in a double murder and double kidnapping after forty plus hours of custodial isolation and interrogation.

4) Arturo DeLeon-Reyes' description of what occurred during his lengthy, unrecorded custodial interrogations on April 3-5, 1998 contains examples of physically and psychologically coercive interrogation techniques, methods, strategies and effects that are known to cause involuntary confessions. These interrogation techniques, methods, strategies and effects have been shown to cause suspects to perceive that they have no meaningful choice but to comply with the demands and requests of their interrogators.

5) Arturo DeLeon-Reyes' account of what occurred during his lengthy, unrecorded custodial interrogations on April 3-5, 1998 contains a description of interrogation techniques, methods, strategies and effects that have been demonstrated by social science research to increase the risk of eliciting false statements, admissions and/or confessions (*i.e.*, *situational* risk factors). These *situational* risk factors for false confession include: lengthy interrogation, sleep deprivation, premature rush to judgment and guilt-presumptive interrogation, false evidence ploys, explicit and implicit threats, explicit and implicit promises, and physical and psychological coercion.

6) The lengthy, unrecorded custodial interrogations described by Arturo DeLeon-Reyes as occurring on April 3-5, 1998 involved instances of police interrogation contamination (*i.e.*, leaking and disclosing non-public case facts) and police interrogation scripting (i.e., pressuring and persuading the suspect to accept the police narrative of how and why the alleged crime occurred), which increased the risk that Mr. DeLeon-Reyes' interrogation-induced confession statement would, misleadingly, appear to be detailed, accurate and self-corroborating.

7) The lengthy, unrecorded custodial interrogations described by Arturo DeLeon-Reyes as occurring on April 3-5, 1998 demonstrated a profoundly reckless disregard for finding the truth of what occurred in the double murder of Mariano and Jacinta Soto and the double kidnapping of their 3 year old son Santiago and infant daughter Maria.

8) The lengthy, unrecorded custodial interrogations described Arturo DeLeon-Reyes as occurring on April 3-5, 1998 violated numerous universally accepted police investigative and interrogation national training standards, police protocols and best practices that existed in 1998.

9) Gabriel Solache's description of what occurred during his lengthy, unrecorded custodial interrogations on April 3-5, 1998 is consistent with the empirical social science research on the types of interrogation techniques, methods, practices and effects that lead to false confessions.

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 14

10) The account by Detective Reynaldo Guevara and ASA Brualdi of what occurred during the lengthy, unrecorded custodial interrogations of Gabriel Solache are not consistent with the empirical findings of the social science research literature on what leads to false confessions. These accounts fail to provide a reasonable or coherent explanation of how or why Mr. Solache would have signed a *proven false confession* to participating in a double murder and double kidnapping after forty plus hours of custodial isolation and interrogation.

11) Gabriel Solache's description of what occurred during his lengthy, unrecorded custodial interrogations on April 3-5, 1998 contains examples of physically and psychologically coercive interrogation techniques, methods, strategies and effects that are known to cause involuntary confessions.  These interrogation techniques, methods, strategies and effects have been shown to cause suspects to perceive that they have no meaningful choice but to comply with the demands and requests of their interrogators.

12) Gabriel Solache's account of what occurred during his lengthy, unrecorded custodial interrogations on April 3-5, 1998 contains a description of interrogation techniques, methods, strategies and effects that have been demonstrated by social science research to increase the risk of eliciting false statements, admissions and/or confessions (*i.e.*, *situational* risk factors).  These *situational* risk factors for false confession include: lengthy interrogation, sleep deprivation, premature rush to judgment and guilt-presumptive interrogation, false evidence ploys, explicit and implicit threats, explicit and implicit promises, and physical and psychological coercion.

13) The lengthy, unrecorded custodial interrogations described by Gabriel Solache as occurring on April 3-5, 1998 involved instances of police interrogation contamination (*i.e.*, leaking and disclosing non-public case facts) and police interrogation scripting (i.e., pressuring and persuading the suspect to accept the police narrative of how and why the alleged crime occurred), which increased the risk that Mr. Solache's interrogation-induced confession statement would, misleadingly, appear to be detailed, accurate and self-corroborating.

14) The lengthy, unrecorded custodial interrogations described by Gabriel Solache as occurring on April 3-5, 1998 demonstrated a profoundly reckless disregard for finding the truth of what occurred in the double murder of Mariano and Jacinta Soto and the double kidnapping of their three year old son Santiago and infant daughter Maria.

15) The lengthy, unrecorded custodial interrogations described Gabriel Solache as occurring on April 3-5, 1998 violated numerous universally accepted police investigative and interrogation national training standards, police protocols and best practices that existed in 1998.

16) Starting in 1972 and continuing up to at least 2000, the City of Chicago's Police Department had a systemic practice of subjecting African American and Latino suspects who

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 15

were interrogated by detectives and supervisors to physically abusive and coercive interrogations with the result of coercing and/or fabricating false and/or unreliable inculpatory evidence to be used against the interrogated suspect without regard to his actual guilt or innocence.

17) At least as early as February of 1982 and continuing through the 1990s, high ranking officials in the City of Chicago and the Chicago Police Department and numerous police command personnel, received continuing notice of this systemic practice of physical abuse and coercion of Black and Latino suspects in order to coerce and fabricate confessions, including from the repeated documented allegations that accumulated against supervisors and detectives, first at Area 2 Detective Division, and later at Areas 3, 4 and 5; from the testimony of criminal defendants at motion to suppress hearings and trials; from numerous court decisions in criminal cases; from the findings in numerous Office of Professional Standards reports; from federal and state court decisions; and from the admissions of City officials.

### IV. The Scientific Study of Police Interrogation and False Confessions

There is a well-established empirical field of research in the academic disciplines of psychology, criminology, and sociology on the subjects of police interrogation practices, psychological coercion, and false confessions. This research dates back to 1908; has been the subject of extensive publication (hundreds of academic journal articles, stand-alone books, and book chapters in edited volumes); has been subjected to peer review and testing; is based on recognized scientific principles, methods, and findings; and is generally accepted in the social scientific community. Significantly, numerous courts have held repeatedly that these principles, methods, and findings are generally accepted in the social science community[2] and therefore accepted expert testimony in criminal and civil rights litigation.[3]

---

[2]   *See* Saul Kassin, Allison Redlich, Fabiana Alceste and Timothy Luke (2018). "On the General Acceptance of Confessions Research: Opinions of the Scientific Community" *American Psychologist*, 73, 63-80.

[3]   *See Harris v. City of Chicago*, 14 C 4391, 2017 WL 2436316, at *9 (N.D. Ill. June 5, 2017) (finding false confession expert Richard Leo's methodology to be "sound, accepted and reliable" and that he could testify as to the reliability of the plaintiff's confession); *Kluppelberg v. Burge*, 13 C 3963, 2016 WL 6821138, at *4-*5 (N.D. Ill. Sept. 16, 2016) (denying defendants' motion to bar the testimony of plaintiff's false confession expert Richard Ofshe as his methodology is "sound" and could be applied to the facts of the case); *Caine v. Burge*, 11 C 8996, 2013 WL 1966381, at *3 (N.D. Ill. May 10, 2013) (denying defendants' motion to bar the testimony of Richard Leo); *Scott v. City of Chicago*, 07 C 3684, 2010 WL 3034254, at *5 (N.D. Ill. Aug. 3, 2010) (denying defendants' motion to bar the testimony of Richard Ofshe); *United States v. Hall*, 974 F. Supp. 1198, 1206 (C.D. Ill. 1997) , *aff'd,* 165 F.3d 1095 (7th Cir. 1999) (denying the Government's motion to bar the testimony of a criminal defendant's expert, Dr. Richard Ofshe).

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 16

This research has analyzed numerous police-induced false confessions and identified the personal and situational factors associated with, and believed to cause, false confessions.[4]  The fact that police-induced false confessions can and do occur has been well-documented and is no longer disputed by anyone in the law enforcement or academic communities.  Social scientists have documented hundreds of false confessions in America since the early 1970s,[5] but this is surely an underestimate and thus the tip of a much larger iceberg for multiple reasons.  First, false confessions are difficult for researchers to discover because neither law enforcement nor any private organization keep a comprehensive database of the interrogations that have produced them.  Second, even when they are discovered, false confessions are notoriously hard to establish because of the factual and logical difficulties of establishing the confessor's factual innocence to an absolute certainty.  As a result, Richard Ofshe and I coined the term "*proven* false confession" in 1998,[6] showing that there are four ways in which a disputed confession can be classified as proven beyond any doubt to be false:

1) When it can be objectively established that the suspect confessed to a crime that did not happen;

2) When it can be objectively established that it would have been physically impossible for the confessor to have committed the crime;

3) When the true perpetrator is identified and his guilt is objectively established; and/or

4) When scientific evidence dispositively establishes the confessor's innocence.

However, only a small number of cases involving a disputed confession will ever come with independent case evidence that allows the suspect to prove his innocence beyond dispute because doing so is akin to proving the negative. The documented number of false confessions in

---

[4]  *See* Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38; Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press); and Gisli Gudjonsson (2003). THE PSYCHOLOGY OF INTERROGATIONS AND CONFESSIONS: A HANDBOOK (John Wiley & Sons Inc.).

[5]  The largest published study of false confessions to date is Steven Drizin and Richard A. Leo (2004). "The Problem of False Confessions in the Post-DNA World" *North Carolina Law Review*, 82, 891-1007.  For a review of the literature documenting proven false confessions, *see* Richard A. Leo (2008).  POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).  Since 2004, Steve Drizin, Gillian Emmerich, Amy Shlosberg and I have collected an additional two-hundred and fifty false confessions that are the subject of an academic article we are currently drafting but have not yet submitted for publication.

[6]  Richard A. Leo and Richard Ofshe (1998).  "The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation." *The Journal of Criminal Law and Criminology*.  Vol. 88, No. 2.  Pp. 429-496.

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 17

the scientific research literature is, therefore, a dramatic undercount of the actual false confessions that police have elicited in the United States in recent decades. There have almost certainly been far more police-induced false confessions than researchers have been able to discover and classify as false. Indeed, in a survey of police that my colleagues and I published in 2007, police investigators themselves estimated that they elicited false confessions in 4.78% of their interrogations.[7] If this estimate is accurate, American police elicit tens, if not hundreds of thousands of false confessions every year.

The subject of police interrogation and false confessions is beyond common knowledge and highly counter-intuitive.[8] Police detectives receive specialized training in psychological interrogation techniques; most people, including most jurors, do not know what these techniques are or how the techniques are designed to work (*i.e.*, move a suspect from denial to admission). In addition, most people also do not know what psychological coercion is, why some techniques are regarded as psychologically coercive, and what their likely effects are. Moreover, most people do not know which interrogation techniques create a risk of eliciting false confessions or how and why the psychological process of police interrogation can, and sometimes does, lead suspects to falsely confess. This unfamiliarity causes most people to assume that virtually all confessions are true.

### V. The Social Psychology of Police Interrogation[9]

Police interrogation is a cumulative, structured, and time-sequenced process in which detectives draw on an arsenal of psychological techniques in order to overcome a suspect's

---

[7] Saul Kassin, Richard Leo, Christian Meissner, Kimberly Richman, Lori Colwell, Amy-May Leach, and Dana La Fon (2007). "Police Interviewing and Interrogation: A Self-Report Survey of Police Practices and Beliefs" *Law and Human Behavior*, 31, at 392-393 ("Omission of outliers succeeded in normalizing the distribution and suggested that an average of 4.78% of innocent respondents provide a false confession (Med = 0; Range = 0 to 30; SD = 7.66; N = 380; this estimate was significantly greater than 0, $z$ = 12.16 in a one-sample z test), with an average of 3.80% of innocent suspects providing a partial admission and 0.97% providing a complete false confession").

[8] *See* Danielle Chojnacki, Michael Cicchini and Lawrence White (2008). "An Empirical Basis for the Admission of Expert Testimony on False Confessions" *Arizona State Law Journal*, 40, 1-45; Richard A. Leo and Brittany Liu (2009). "What Do Potential Jurors Know About Police Interrogation and False Confessions?" *Behavioral Sciences and the Law*, 27, 381-399; Linda Henkel, Kimberly Coffman, and Elizabeth Dailey (2008). "A Survey of People's Attitudes and Beliefs About False Confessions," *Behavioral Sciences and the Law*, 26, 555-584; Iris Blandon-Gitlin, Kathryn Sperry, and Richard A. Leo (2011). "Jurors Believe Interrogation Tactics Are Not Likely to Elicit False Confessions: Will Expert Witness Testimony Inform Them Otherwise?" *Psychology, Crime and Law*, 17, 239-260; and Mark Costanzo, Netta Shaked-Schroer and Katherine Vinson (2010). "Juror Beliefs About Police Interrogation, False Confession and Expert Testimony" *The Journal of Legal Empirical Studies,* 7, 231-247.

[9] *See* Richard A. Leo (2009). "False Confessions: Causes, Consequences and Implications" *Journal of the American Academy of Psychiatry and Law*, 37, 332-343.

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 18

denials and elicit incriminating statements, admissions, and/or confessions. This is the sole purpose of custodial interrogation (as opposed to interviews). To achieve this purpose, interrogators use techniques that seek to influence, persuade, manipulate, and deceive suspects into believing that their situation is hopeless and that their best interest lies in confessing.[10] Sometimes, however, interrogators cross the line and employ techniques and methods of interrogation that are coercive and increase the likelihood of eliciting false confessions or statements.

Dating back to the early 1940s, psychological interrogation methods in the United States have been structured to persuade a rational guilty person who knows he is guilty to rethink his initial decision to deny culpability and choose instead to confess.[11] Police interrogators know that it is not in any suspect's rational self-interest to confess. They expect to encounter resistance and denials to their allegations, and they know that they must apply a certain amount of interpersonal pressure and persuasion to convince a reluctant suspect to confess. As a result, interrogators have, over the years, developed a set of subtle and sophisticated interrogation techniques whose purpose is to alter a guilty suspect's perceptions so that he will see the act of confessing as being in his self-interest.

These interrogation techniques were developed for the purpose of inducing guilty individuals to confess to their crimes, and police are admonished in their training to use them only on suspects believed to be guilty.[12] When these same techniques are used on innocent suspects, they carry the risk that they will elicit false statements, admissions and/or confessions.

The goal of an interrogator is to persuade a suspect to view his immediate situation differently by focusing the suspect's attention on a limited set of choices and alternatives, and by convincing him of the likely consequences that attach to each of these choices. The process often unfolds in two steps: first, the interrogator causes the suspect to view his situation as hopeless; and, second, the interrogator persuades the suspect that only by confessing will the suspect be able to improve his otherwise hopeless situation. The interrogator makes it clear what information he is seeking and attempts to convince the suspect that his only rational option is to confirm the information the interrogator purports to already know.

---

[10] Deborah Davis and William O'Donohue (2004). "The road to perdition: Extreme influence tactics in the interrogation room" in William O'Donohue, ED. (2004). *Handbook of Forensic Psychology* (San Diego: Academic Press) at 897-996.

[11] Fred Inbau, John Reid and Joseph Buckley (1986). CRIMINAL INTERROGATION AND CONFESSIONS, 3rd Edition (The Williams and Wilkins Company).

[12] *See* Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013). CRIMINAL INTERROGATION AND CONFESSIONS, 5th Edition ( Jones & Bartlett Learning) at 187 ("These nine steps are presented in the context of the interrogation of suspects whose guilt seems definite or reasonably certain"). For empirical support for this observation, *see* Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 19

The first step or stage of an interrogation consists of causing a suspect to view his situation as hopeless. If the interrogator is successful at this stage, he will undermine the suspect's self-confidence and cause the suspect to reason that there is no way to escape the interrogation without incriminating himself. To accomplish this, interrogators accuse the suspect of having committed the crime; they attack and try to undermine a suspect's assertion of an alibi, alternate sequence of events, or verbalization of innocence (pointing out or inventing logical and factual inconsistencies, implausibilities, and/or impossibilities); they exude unwavering confidence in their assertions of the suspect's and his accomplices' guilt; they refuse to accept the possibility of the suspect's denials; and, most importantly, they confront the suspect with incontrovertible evidence of his guilt, whether real or non-existent. Because interrogation is a cumulative and time-sequenced process, interrogators often draw on these techniques repeatedly and/or in succession, building on their earlier accusations, challenges and representations at each step in the interrogation process.

Through the use of these techniques, the interrogator communicates to the suspect that he has been caught, that there is no way he will escape the interrogation without incriminating himself and other suspects, and that his future is determined—that regardless of the suspect's denials or protestations of innocence, he is going to be arrested, prosecuted, convicted, and punished. The interrogator seeks to convince the suspect that this is a fact that has been established beyond any doubt, and thus that any objective person must necessarily reason to this conclusion. By persuading the suspect that he has been caught, that the existing evidence or case facts objectively prove his guilt, and that it is only a matter of time before he will be prosecuted and convicted, the interrogator seeks to alter the suspect's perceptions, such that he comes to view his situation as hopeless and to perceive that resisting the interrogator's demands is futile.

Once the interrogator has caused the suspect to understand that he has been caught and that there is no way out of this predicament, the interrogator seeks to convince the suspect that the only way to improve his otherwise hopeless situation is by confessing to the offense(s) of which he is accused and confirming the information the interrogator is seeking to extract from the suspect. The second step of the interrogation thus consists of offering the suspect inducements to confess—reasons or scenarios that suggest the suspect will receive some personal, moral, communal, procedural, material, legal or other benefit if he confesses to the interrogator's version of the offense. One goal of these scenarios or inducements is to downplay both the seriousness of the alleged crime and the suspect's role in the alleged crime as well as the consequences of confessing, leading the suspect to perceive that the consequences of continuing to deny the accusations will be worse than the consequences of admitting to participation in the crime. The interrogator's attempt to diminish the suspect's perception of the consequences of confessing is combined with techniques that are designed to increase the suspect's anxiety in

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 20

order to create the perceived need for release from the stress of prolonged interrogation. [13]
Investigators also use scenarios to plant ideas or suggestions about how or why the suspect may
have committed the crime which they may later pressure the suspect to accept and repeat.

Researchers have classified the types of inducements investigators use during the second
step of interrogation into three categories: *low-end* inducements, *systemic* inducements, and
*high-end* inducements.

*Low-end* inducements refer to interpersonal or moral appeals the interrogator uses to
convince a suspect that he will feel better if he confesses. For example, an interrogator may tell
a suspect that the truth will set him free if he confesses, that confessing will relieve his anxiety or
guilt, that confessing is the moral or Christian thing to do, or that confessing will improve his
standing in the eyes of the victim or the eyes of the community.

*Systemic* inducements refer to appeals that the interrogator uses to focus the suspect's
attention on the processes and outcomes of the criminal justice system in order to get the suspect
to come to the conclusion that his case is likely to be processed more favorably by all actors in
the criminal justice system if he confesses. For example, an interrogator may tell a suspect that
he is the suspect's ally and will try to help him out—both in his discussions with the prosecutor
as well as in his role as a professional witness at trial—but can only do so if the suspect first
admits his guilt. Or the interrogator may ask the suspect how he expects the prosecutor to look
favorably on the suspect's case if the suspect does not cooperate with authorities. Or the
interrogator may ask the suspect what a judge and jury are really going to think, and how they
are likely to react, if he does not demonstrate remorse and admit his guilt to authorities.
Interrogators often couple the use of *systemic* incentives with the assertion that this is the
suspect's one and only chance—now or never—to tell his side of the story; if he passes up this
opportunity, all the relevant actors in the system (police, prosecutor, judge and jury) will no
longer be open to the possibility of viewing his actions in the most favorable light. This tactic
may incentivize a suspect to either falsely confess or confirm an incorrect story for the
interrogator based on the belief that the suspect will not have the same opportunity to help
himself again in the future. Interrogators rely on *systemic* inducements to persuade the suspect to
reason to the conclusion that the justice system naturally confers rewards for those who admit
guilt, demonstrate remorse, and cooperate with authorities, whereas it inevitably metes out
punishment for those who do not.

---

[13]    See Brian Jayne (1986). "The Psychological Principles of Criminal Interrogation," in Fred Inbau, John Reid
and Joseph Buckley (1986). CRIMINAL INTERROGATION AND CONFESSIONS, 3rd Edition (Baltimore,
MD: Williams & Wilkins) at 332. ("The goal of interrogation is therefore to decrease the suspect's perception
of the consequences of confessing, while at the same time increasing the suspect's internal anxiety associated
with his deception.").

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 21

Finally, *high-end* inducements refer to appeals that directly communicate the message that the suspect will receive less punishment, a lower prison sentence and/or some form of police, prosecutorial, judicial or juror leniency if he complies with the interrogator's demand that he confess, but that the suspect will receive a higher sentence or greater punishment if he does not comply with the interrogator's demand that he confess. High-end inducements may either be implicit or explicit: the important question is whether the interrogation technique communicates the message, or is understood to communicate the message, that the suspect will receive a lower criminal charge and/or lesser punishment if he confesses as opposed to a higher criminal charge and/or greater amount of punishment if he does not.

Explicit *high-end* inducements can include telling a suspect that there are several degrees of the alleged offense, each of which carry different amounts of punishment, and asking the suspect which version he would like to confess to. Or the interrogator may explicitly tell the suspect that he will receive a long prison sentence—or perhaps even the death penalty—if he does not confess to the interrogator's version of events. The interrogator may also point out what happens to men of the suspect's age, or men accused of crime, in prison if the suspect does not confess to the interrogator's minimized account. Sometimes interrogators who rely on *high-end* inducements will present the suspect with a simple two-choice situation (good vs. bad): if the suspect agrees to the good choice (a minimized version of the offense, such as involuntary manslaughter or self-defense, or the implication of another person), he will receive a lower amount of punishment or no punishment at all; but if he does not confess right then, criminal justice officials will impute to him the bad choice (a maximized version of the offense, such as pre-meditated first degree murder, or that the suspect was acting alone), and he will receive a higher level of punishment, or perhaps the harshest possible punishment.[14] The purpose of *high-end* inducements is to communicate to a suspect that it is in his rational self-interest to confess to the minimized or less-incriminating version of events that the interrogator is suggesting because if the suspect does so, he will receive a lower charge, a lesser amount of punishment and/or no time in prison, but if he fails to do so, he will receive a higher charge, a greater amount of punishment and more time in prison, perhaps even the death penalty.

High-end inducements are psychologically coercive. Psychologically coercive interrogations are problematic because they induce both involuntary and unreliable information, statements, admissions and/or confessions by causing suspects to feel trapped, hopeless, frightened and/or that they have no meaningful choice but to comply with the demands of their interrogator(s). To evaluate whether a particular interrogation was psychologically coercive, an expert must evaluate the interrogator's techniques, methods, and strategies in the light of the

---

[14] This technique is sometimes referred to in the academic literature as the maximization/minimization technique. *See* Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38; Richard A. Leo (2008), POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 22

generally accepted findings of the social science research literature on the subjects of interrogation, coercive influence techniques, and confessions.

Social science research has repeatedly demonstrated that some *systemic* inducements (depending on the content of the inducement, how explicitly or vaguely it is stated, and the message that it communicates) and all *high-end* inducements are coercive because they rely on implicit and/or explicit promises of leniency and threats of harm to induce compliance. *Systemic* and *high-end* inducements increase the likelihood of eliciting false confessions and false statements from suspects because of the *quid pro quo* arrangement and the benefit a suspect expects to receive in exchange for the information the interrogator is seeking, regardless of whether the suspect knows that information to be true or not. Such promises of leniency and threats of harm are regarded as coercive in the social science literature because of the messages they convey and their demonstrated impact on the decision-making of individuals. The expert may also evaluate whether the interrogation techniques, either individually or cumulatively, had the effect of causing a suspect to perceive that he had no choice but to comply with the demands of the interrogator, and thus, the interrogation, in effect, overbore the suspect's will.

### VI. The Three Types of False Confessions

False confessions and false statements, of course, will occur in response to traditionally-coercive methods of interrogation such as the use of physical violence, threats of immediate physical harm, excessively long or incommunicado interrogation, or deprivation of essential necessities such as food, water, and/or sleep. The psychological techniques of interrogation that cross the line and sometimes cause false confessions typically involve one of two patterns: (1) the interrogator communicates to the suspect, implicitly or explicitly, that he will receive a higher charge and harsher sentence or punishment if he does not provide a satisfactory statement, but that he will receive a lesser charge or sentence, or perhaps no punishment at all, if he does; or (2) the interrogator wears down and distresses the suspect to the point that the suspect subjectively feels that he has no choice but to comply with the interrogator's demands if he is to put an end to the intolerable stress of continued interrogation and/or escape the oppressive interrogation environment.

Whether a police-induced false confession or statement is caused primarily by coercive interrogation techniques or by a suspect's pre-existing vulnerabilities to interrogation, or some combination of both, there are three fundamental types of false confessions and statements: a *voluntary* false confession or statement (*i.e.*, a false confession knowingly given in response to little or no police pressure); a *coerced-* or *stress-compliant* false confession or statement (*i.e.*, a false confession knowingly given to put an end to the interrogation or to receive an anticipated benefit or reward in exchange for confession); and a *coerced-* or *non-coerced-persuaded* false confession or statement (*i.e.*, a confession given by a suspect who comes to doubt the reliability of his memory and thus comes to believe that he may have committed the crime, despite no

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 23

actual memory of having done so).[15] These different types of false confession typically involve different levels of police pressure, a different psychology of influence and decision-making, and different beliefs about the likelihood of one's guilt.

## VII. The Three Sequential Police Errors
## That Can Lead to False (But Sometimes Detailed) Confessions

There are three important decision points in the interrogation process that are known to be linked to false confessions or statements. The first decision point is the police decision to classify someone as a suspect. This is important because police only *interrogate* individuals whom they first classify as suspects; police *interview* witnesses and victims. There is a big difference between interrogation and interviewing: unlike interviewing, an interrogation is accusatory, involves the application of specialized psychological interrogation techniques, and the ultimate purpose of an interrogation is to get an incriminating statement from someone whom police believe to be guilty of the crime. False confessions or statements occur when police misclassify an innocent suspect as guilty and then subject him to a custodial interrogation, and are satisfied with elicitation of a version of events that, in fact, is not true. This is called *the misclassification error*. It is one reason why interrogation training manuals implore detectives to investigate their cases before subjecting any potential suspect to an accusatorial interrogation.[16]

The second important decision point in the process occurs when the police interrogate the suspect. Again, the goal of police interrogation is to elicit an incriminating statement from the suspect by moving him from denial to admission. To accomplish this, police use psychologically-persuasive, manipulative, and deceptive interrogation techniques. As described in detail in the previous sections, police interrogators use these techniques to accuse the suspect of committing the crime, to persuade him that he is caught and that the case evidence overwhelmingly establishes his guilt, and then to induce him to confess by suggesting it is the best course of action for him, sometimes resulting in false confessions from innocent suspects. This is called *the coercion error*. However, properly trained police interrogators do not use

---

[15] *See* Richard Ofshe and Richard A. Leo (1997). "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions." *Studies in Law, Politics & Society*, 16, 189-251.

[16] *See* Fred Inbau and John Reid (1967). CRIMINAL INTERROGATION AND CONFESSIONS, 2nd Edition (Williams & Wilkins) at 13-15 ("Prior to the interrogation, and preferably before any contact with the suspect, become thoroughly familiar with all the known facts and circumstances of the case…. All too often, time and effort are unnecessarily expended in the interrogation of a suspected innocent person when an alibi check could have readily established the fact of his innocence."). *See also* Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013). CRIMINAL INTERROGATION AND CONFESSIONS, 5th Edition (Burlington, MA: Jones & Bartlett Learning) at 18 ("One basic principle to which there must be full adherence is that the interrogation of suspects should follow, and not precede, an investigation conducted to the full extent permissible by the allowable time and circumstances of the particular case. The authors suggest, therefore, that a good guideline to follow is "investigate before you interrogate").

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 24

physically- or psychologically-coercive techniques because they may result in involuntary and/or unreliable incriminating statements, admissions, and/or confessions.[17]

The third important decision point in the interrogation process occurs after the police have elicited an admission—an "I did it" statement—from the suspect. This is referred to as the post-admission phase of the interrogation. The post-admission phase of the interrogation is important because it is here that the police can acquire information and evidence that will either support or not support the accuracy of the suspect's admission. Properly-trained police interrogators should know that innocent people sometimes falsely confess to crimes they did not commit. Although the "Reid" Manual[18] did not include a full chapter on false confessions until the Fourth Edition in 2001, the need for police interrogators to be diligent to avoid false confessions has been present for decades. From the very first manual in 1942 and in all subsequent editions (1948, 1953, 1962, 1967, 1986, 2001 and 2013), it has repeatedly implored interrogators not to use any methods that are "apt to make an innocent person confess to a crime he did not commit," such as "the use of force, threats, o promises of leniency," suggesting that interrogators do know that suspects can be made to falsely confess to crimes they did not commit.

Properly-trained interrogators also know that guilty suspects sometimes implicate others for crimes they themselves committed in order to diminish their role in the crime.[19] Interrogators therefore will seek to elicit information (that is not generally known and cannot likely be guessed by chance) from the suspect that either demonstrates, or fails to demonstrate, independent knowledge of the crime scene details and case facts. Properly-trained interrogators, therefore, will not ask leading or suggestive questions and will not educate the suspect about details of the victim's allegations or of the alleged crime. This is called *the contamination error*. Instead, properly trained interrogators will let the suspect supply the details of the case independently. Properly-trained interrogators will also seek to test the suspect's post-admission account against the physical and other credible evidence. Truthful confessions and statements are typically corroborated by solid physical evidence and independent knowledge of underlying case facts that have not been suggested to the suspect; false confessions and false statements are not.[20]

---

[17] Fred Inbau and John Reid (1967). CRIMINAL INTERROGATION AND CONFESSIONS, 2nd Edition (Williams & Wilkins), at 114-115, 198-200.

[18] Fred Inbau and John Reid (1986). CRIMINAL INTERROGATION AND CONFESSIONS, 3rd Edition (Williams & Wilkins).

[19] Fred Inbau and John Reid (1986). CRIMINAL INTERROGATION AND CONFESSIONS, 3rd Edition (Williams & Wilkins).

[20] Richard A. Leo and Richard Ofshe (1998). "The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation" *The Journal of Criminal Law and Criminology*, 88, No. 2 at 429-496. This observation has been made in the police interrogation training literature as well. *See also* Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013). CRIMINAL INTERROGATION AND CONFESSIONS, 5th Edition (Burlington, MA: Jones & Bartlett Learning) at 354-360.

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 25

## VIII. Evaluating the Reliability of Incriminating
## Statements, Admissions and Confessions

In addition to studying the psychology of police interrogation and the correlates and causes of false confessions from the innocent, scientific researchers have also analyzed the patterns, characteristics and indicia of reliability in true and false confession cases. To evaluate the likely reliability or unreliability of an incriminating statement, admission or full confession from a suspect, scientific researchers analyze the fit between the suspect's post-admission narrative and the crime facts and/or corroborating evidence derived from the confession (*e.g.*, location of the missing murder weapon, loot from a robbery, the victim's missing clothing, etc.).[21]

The purpose of evaluating the fit between a suspect's post-admission narrative and the underlying crime facts and derivative crime evidence is to test the suspect's actual knowledge of the crime. If the suspect's post-admission narrative corroborates details only the police know, leads to new or previously undiscovered evidence of guilt, explains apparent crime fact anomalies and is corroborated by independent facts and evidence, then the suspect's post-admission narrative objectively demonstrates that he possesses the actual knowledge that would be known only by the true perpetrator and therefore is strong evidence of guilt. If the suspect cannot provide police with the actual details of the crime, fails to accurately describe the crime scene facts, cannot lead the police to new or derivative crime evidence, and/or provides an account that contains factual errors and is disconfirmed by the independent case evidence, then the suspect's post-admission narrative demonstrates that he fails to possess the actual knowledge that would be known only by the true perpetrator and is therefore strongly consistent with innocence. Indeed, absent contamination (*i.e.*, the leaking and disclosing of non-public crime facts that cannot easily be guessed by chance), the fit between the suspect's post-admission narrative and both the crime scene facts and the derivative crime evidence therefore provides an objective basis for evaluating the likely reliability of the suspect's incriminating statements.

The well-established and widely accepted social science research principle of using the fit standard to evaluate the validity of a confession statement is also a bedrock principle of criminal investigation within law enforcement. Well-trained police detectives realize that an "I did it" statement is not necessarily evidence of guilt and may, instead, turn out to be evidence of

---

[21]  *See* Richard Ofshe and Richard A. Leo (1997). "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions." *Studies in Law, Politics & Society*, 16, 189-251; and Richard A. Leo and Richard Ofshe (1998). "The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation" *The Journal of Criminal Law and Criminology*, 88, No. 2. at 429-496.

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 26

innocence.[22]  For example, in high-profile murder cases, police regularly screen out volunteered confessions by seeing whether or not the person can tell the police details known only to the perpetrator or lead the police to derivative crime evidence that either corroborates, or fails to demonstrate, the person's guilty knowledge.[23]  Police often keep particularly heinous or novel aspects of the crime from the press so that they can be used to demonstrate a confessor's guilty knowledge.  Police sometimes deliberately include an error in media releases or allow incorrect statements to go uncorrected so that a true perpetrator will be able to demonstrate his personal knowledge of the crime.  In other types of cases, police detectives regularly rely upon the fit standard to identify a true admission that might be mixed in with a collection of volunteered statements.

Using the fit standard to evaluate the validity of a suspect's incriminating statements, admissions or confessions is a bedrock principle of law enforcement because police detectives realize that seeking corroboration during the post-admission phase of interrogation is essential to proper investigative work.[24]  This is because it is a fundamental principle of police investigation that true explanations can be supported and false explanations cannot be supported (assuming no contamination has occurred), and because false explanations will not fit the facts of the crime, lead to derivative evidence or be corroborated by independent evidence.

Moreover, post-admission narrative analysis and the fit standard are central to proper criminal investigation because well-trained detectives should realize that the purpose of detective work is not to clear a crime or get a conviction, but to carefully collect evidence in a way that will lead to the arrest, prosecution and conviction of the guilty while at the same time ensuring that no innocent individual is wrongly arrested, prosecuted or convicted.

A suspect's post-admission narrative therefore provides potential evidence to the unbiased, well-trained detective who is seeking to ferret out the truth.  If the suspect is guilty, the collection of a detailed post-admission narrative will allow the detective to establish the suspect's guilt beyond question, both by demonstrating the suspect's actual knowledge and by corroborating the suspect's statements with derivative evidence.  Properly-trained detectives realize that the strongest form of corroboration comes through the development of new evidence

---

[22]  Fred Inbau and John Reid (1967).  CRIMINAL INTERROGATION AND CONFESSIONS, 2nd Edition (Williams & Wilkins).

[23]  Fred Inbau, John Reid, and Joseph Buckley (1986).  CRIMINAL INTERROGATION AND CONFESSIONS, 3rd Edition (Williams & Wilkins) at 173 ("The interrogator should attempt to develop information that can be corroborated by further investigation, and he should seek from the suspect full details of the crime and also about his subsequent activities. What should be sought particularly are facts that would only be known by the guilty person (*e.g.*, information regarding the location of the murder weapon or the stolen goods, the means of entry into the building, the type of accelerant used to start the fire, and the type of clothing on the victim").

[24]  Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013).  CRIMINAL INTERROGATION AND CONFESSIONS, 5th Edition (Burlington, MA: Jones & Bartlett Learning) at 354-360.

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 27

using a suspect's post-admission narrative. While it is not possible to verify every post-admission narrative with the crime facts, a skillful interrogator will seek as much verifiable information about the crime as he can elicit. The more verifiable information elicited from a suspect during the post-admission period, and the better it fits with the crime facts, the more clearly the suspect demonstrates his responsibility for the crime.

If the suspect is innocent, the detective can use the suspect's post-admission narrative to establish his lack of knowledge and thus demonstrate his likely or certain innocence. Whereas a guilty suspect can corroborate his admission because of his actual knowledge of the crime, the innocent suspect cannot. The more information the interrogator seeks, the more frequently and clearly an innocent suspect will demonstrate his ignorance of the crime. His answers will turn out either to be wrong, to defy evaluation, or to be of no value for discriminating between guilt and innocence. Assuming that neither the investigator nor the media have contaminated the suspect by transferring information about the crime facts, or that the extent of contamination is known, the likelihood that his answers will be correct should be no better than chance. Absent contamination, the only time an innocent person will contribute correct information is when he makes an unlucky guess. The likelihood of an unlucky guess diminishes as the number of possible answers to an investigator's questions grows large. If, however, his answers about missing evidence are proven wrong, he cannot supply verifiable information that should be known to the perpetrator, and he inaccurately describes verifiable crime facts, then the post-admission narrative provides evidence of innocence.

This, of course, assumes that the suspect's knowledge of the crime has not been contaminated by the media, community gossip, the police or some other source with inside knowledge about crime details. If a suspect has learned unique or non-public crime facts from one of these sources, then the fact that his confession contains these details is, of course, not indicative of pre-existing knowledge or probative of guilt. This is an important point to emphasize because an innocent suspect's confession, if contaminated, will often contain both inaccurate as well as accurate crime facts—inaccurate because the innocent suspect lacks personal knowledge of the crime details, accurate because these crime details have been suggested to him by third parties or the police interrogators, even if inadvertently. This problem is discussed in detail in the following section.

### IX. The Problem of Police Interrogation Contamination and Police Interrogation Scripting

Police interrogation contamination (*i.e.*, leaking and disclosing non-public case facts) and police interrogation scripting (pressuring and persuading a suspect to parrot back a police-driven narrative of how and why the crime occurred) increase the risk that a confession statement may misleadingly appear to be detailed, accurate and self-corroborating.

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 28

The confession-taking process is about more than merely eliciting information from the suspect. Investigators in practice have been observed to shape the suspect's narrative to make the confession as persuasive as possible and to enhance the chances of conviction.[25] In this way, confessions are scripted or constructed by interrogators. A persuasive crime narrative requires an explanation of why the crime happened—the motives and explanations of the suspect for committing the crime. It also should contain a statement of the suspect's emotions, not only his emotions at the time of committing the crime, but also the shame, regret, or remorse the suspect now feels for having committed the crime. Interrogators are also trained to get the suspect to cleanse the interrogation process, usually by providing statements to the effect that the confession was voluntary. Interrogators will ask the suspect, usually after the suspect's resistance has been broken down and he has been made to believe that it is in his best interests to confess, whether the suspect was treated well, given food and drink, bathroom breaks, and other comforts, and whether any promises or threats were made to the suspect. Finally, and perhaps most importantly, interrogators seek to ensure that the confession contains both general and specific crime knowledge—the details of the crime that only the true perpetrator should know. One interrogation scripting technique that stands out is known as "The Error Insertion Trick," in which the interrogator writes out the suspect's confession statement, intentionally inserts minor factual or grammatical errors, and then has the suspect correct and initial these errors. The purpose of "The Error Insertion Trick" is to create the impression of validating a confession's voluntariness, accuracy and the confessor's guilt by appearing to demonstrate his personal knowledge of the crime facts.[26]

The problem of contamination and scripting in false confession cases arises when the interrogator pressures a suspect during the post-admission narrative phase to accept a particular account of the crime story—one that usually squares with the interrogator's theory of how the crime occurred—and then suggests crime facts to the suspect, leads or directs the suspect to infer correct answers, and sometimes even suggests plausible motives for committing the crime.[27] Because they are trained to presume the guilt of those whom they interrogate, police assume that

---

[25] Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press) at 165-194.

[26] See Richard A. Leo (2008). *Police Interrogation and American Justice* (Harvard University Press). Pp. 175-177. There is evidence that prosecutors, like police, are also trained to use the Error Insertion Trick. See Mark Godsey (2017). BLIND JUSTICE: A FORMER PROSECUTOR EXPOSES THE PSYCHOLOGY AND POLITICS OF WRONGFUL CONVICTION (University of California Press) at P. 144 ("I was also told when I started as a prosecutor not to make the various witness statements *too* in line with one another. If we did, it would give the defense attorney ammunition at trial to claim that we were telling the witnesses what to say. So we would intentionally include in our notes incorrect information supplied by the witnesses on minor points – points that didn't matter to the case – to show that we weren't coaching them.").

[27] Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 29

they are interrogating suspects who already know the correct crime facts.  But this is not true when they are mistakenly interrogating an innocent person.

Instead, the innocent suspect is often pressured to use facts disclosed to him by his interrogators in order to construct a plausible-sounding confession and post-admission narrative. Indeed, the presence of these details in the suspect's confession falsely gives the suspect's narrative credibility and the appearance of corroboration.  After police interrogators have contaminated the suspect with non-public crime facts, they often attribute "guilty knowledge" to the suspect when he repeats back and incorporates into his confession the very facts that they first educated him about.  One researcher has called these contaminated details "misleading specialized knowledge."[28]  In many false confession cases, police and prosecutors argue that the suspect's confession corroborates his guilt because he "knows facts only the true perpetrator would know," even though the suspect first learned these facts from his interrogators.

Researchers have found that contamination by police regularly occurs in interrogation-induced false confession cases.  In a study of the first two-hundred and fifty (250) post-conviction DNA exonerations of innocent prisoners in the American criminal justice system, Professor Brandon Garrett of the University of Virginia Law School showed that this pattern was present in 95% of the false confession cases in this data set (38 of 40 cases).  In other words, in the overwhelming majority of these proven false confession cases, police interrogators fed the suspect unique non-public facts that "only the true perpetrator would know," but the prosecutor erroneously alleged that the suspect volunteered these facts and that the suspect thereby corroborated the reliability of his confession.  But because the jury in each case mistakenly believed the prosecutor rather than the defense, each of the confessors was convicted, and in each of these cases the defendant's innocence (and the falsity of the confession) was only proven many years later by DNA.[29]  In a recent follow-up study of more recent false confession DNA exonerations, Garrett found that another 21 of 23 (91%) were contaminated.[30]

### X. The Custodial Interrogations and Police-Induced Confession Statement of Arturo DeLeon-Reyes on April 3-5, 1998

### A) Introduction

Because the Chicago police detectives failed to electronically record any of their interrogations of Arturo DeLeon-Reyes on April 3-5, 1998 – despite having the ability to do so (with hand-held tape recorders readily available at the time) -- there is no objective record of

---

[28]  Gisli Gudjonsson (2003).  THE PSYCHOLOGY OF INTERROGATIONS AND CONFESSIONS: A HANDBOOK (John Wiley & Sons Inc.).

[29]  Brandon Garrett (2011).  CONVICTING THE INNOCENT (Harvard University Press).

[30]  Brandon Garrett (2015).  "Contaminated Confessions Revisited" *University of Virginia Law Review*, 101, 395-454.

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 30

what occurred, or who said or did what, during the more than 40 hour period of custody and interrogation that produced the confession statement in English that Mr. DeLeon-Reyes, who neither reads nor speaks Spanish, signed almost two full days after being transported to the Area 5 police station. As a result, the only (highly imperfect) record that exists of Mr. DeLeon-Reyes' lengthy custodial interrogations on April 3-5, 1998 are the recollections of the various participants: Arturo DeLeon-Reyes and detectives Reynaldo Guevara, Robert Rutherford, Edwin Dickinson, Youth Officer Daniel Trevino and former Assistant State's Attorney Thomas O'Malley, all of whom testified in pre-trial hearings, at trial, in post-conviction proceedings and/or in depositions about their recollections, or absence of recollections, of what occurred during Arturo DeLeon-Reyes' custodial interrogations on April 3-5, 1998. Not surprisingly, this case therefore presents a classic swearing contest: the account of what occurred during the lengthy, unrecorded custodial interrogations by Arturo DeLeon-Reyes, on the one hand, and the account by detectives Guevara, Rutherford and Dickinson, Youth Officer Trevino and former ASA O'Malley, on the other hand, are dramatically different. Factually, they cannot be reconciled. In the remainder of this section of the report, I will apply the findings of this empirical social science literature to both sets of accounts of Arturo DeLeon-Reyes' custodial interrogations on April 3-5, 1998, and discuss the implications and concerns that social science research raises for each set of accounts while offering my professional expert opinions based on the social science research literature on police interrogation and confessions.

### B) Arturo DeLeon-Reyes' and Gabriel Solache's Proven False Confessions

As discussed earlier in this report, Professor Richard Ofshe and I coined the term *proven false confession* in 1998, and it has been since been accepted in the empirical social science research literature on police interrogation, psychological coercion and false confessions. As also discussed earlier in this report, a confession is proven false to near or absolute certainty in one or more of four different ways: (1) if the objective case establishes that the crime did not occur; (2) if the case evidence establishes that it would have been physically impossible for the confessor to have committed the crime; (3) if scientific evidence dispositively establishes that the confessor did not commit the crime; and/or (4) if the true perpetrator is identified. These four criteria are not mutually exclusive. A confession is proven false if it meets any one of these four criteria; Mr. DeLeon-Reyes' confession meets at least two (and possibly three) of these four criteria, and contains additional indicia of unreliability as well.

Mariano and Jacinta Soto were brutally murdered: they were stabbed more than 50 times, leaving a crime scene that was full of the victim's blood, DNA and other physical evidence. The police found two bloody knives; a butcher block; blood-stained clothing and bed coverings; broken glass; shoeprints dried in blood; blood spatter on the bedroom wall; defensive wounds on the back of both of Mariano Soto's hands; hairs; and fingerprints throughout the house, among other items. The true perpetrator or perpetrators who committed this crime would have left their own DNA at the crime scene, and DNA from the crime scene would have been left on them.

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 31

Neither Arturo DeLeon-Reyes' nor Gabriel Solache's DNA was found at the DNA-rich crime scene nor was any of either murder victims' DNA found on Mr. DeLeon-Reyes or Mr. Solache. Not a single piece of the substantial forensic evidence (hair, fingerprints, DNA, etc.) linked either Mr. DeLeon-Reyes or Mr. Solache to this brutal double murder. In other words, the DNA evidence and DNA testing excluded both Mr. DeLeon-Reyes and Mr. Solache as the source of any of the physical evidence left by the true perpetrator(s) at the crime scene. By contrast, Adriana's Mejia's DNA was found at the bloody crime scene, conclusively demonstrating that she was the perpetrator, or one of the perpetrators, of this crime. In addition, DNA testing of the physical evidence left at the crime scene revealed the victims' DNA, as expected, as well as the DNA profile of an unidentified male.

In addition, it was physically impossible for Arturo DeLeon-Reyes to have committed the double murder of Mariano and Jacinta Soto as described in his confession statement. In that statement, Mr. DeLeon-Reyes describes Gabriel Solache picking him up on March 26, 1998 at 1:30 a.m. to commit the crime. But, as Mr. Solache's employee time sheets verify, he was at work at 1:30 a.m. on March 26, 1998, and did not get off of work that morning until 3:00 a.m., a fact that Detective Guevara did not know at the time of Mr. DeLeon Reyes' and Mr. Solache's interrogations on April 3-5, 1998. Detective Guevara also disregarded employee timesheets showing that Mr. DeLeon-Reyes was at work both the day of and the day before the crime. If Mr. DeLeon-Reyes' and Mr. Solache's confession statements are accurate, it was physically impossible for them to have committed the double murder and double child abduction as their statements describe.

Even apart from meeting the criteria of a *proven false confession*, both Mr. DeLeon-Reyes and Mr. Solache's confession statements are riddled with factual errors and are inconsistent with crime scene facts, physical evidence, and logic. For example, the confessions state the Mr. DeLeon-Reyes and Mr. Solache rushed into the Soto's apartment and stabbed Jacinta Soto to quiet her down. But she was found lying face down in her bed in another room, not by the front door. Mr. DeLeon-Reyes' confession statement says that he saw Mr. Solache killing Mariano Soto in the bed. But the Mr. Soto's body was found by the front door, not by the bed, which was in a separate room (i.e., the bedroom). Mr. Solache's confession says that he stabbed Mariano Soto while he was face up, but no blood was found on Mr. Solache. Mr. Solache's confession statement also states that he noticed blood on his shoes, but there was no blood found on Mr. Solache's shoes nor anywhere else on his person.[31] Another example: Mr. Solache's confession statement states that Jacinto Soto was near the front door being stabbed and

---

[31]  By contrast, there was substantial physical evidence linking Adriana Mejia to the crime. Mariano Soto's blood was found on Adriana Mejia's shoes and pants, and her blood was found on the knife that had been recovered from behind the couch in the Soto's apartment. Her blood was also found on the green towel recovered from the car -along with an additional unidentified profile - that the prosecution believed had been used in the crime (a 1984 Toyota Corolla). In addition, both of the Soto's abducted children were found in Adriana Mejia's possession.

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 32

screaming while Mariano was asleep in the back bedroom of the apartment and sleeping through his wife's brutal, bloody and loud murder. This does not logically cohere. Another aspect of the confession statements by Mr. DeLeon-Reyes and Mr. Solache that does not logically cohere is the motive that was imputed to them in their police directed statements, as occurs in many police-induced false confession cases: Mr. Solache had only lived with Adriana Mejia for two and a half months; Mr. DeLeon-Reyes did not know her. And yet they were alleged to have been part of an elaborate scheme to kidnap a baby for and commit murders in exchange for $600. As confessions go, this is not a strong motive to commit a double murder and double child abduction.

### C) Arturo DeLeon-Reyes's Description of His Custodial Interrogation and Police-Induced Confession Statement on April 3-5, 1998

Arturo DeLeon-Reyes (along with Gabriel Solache, Rosauro Mejia and 3 year old Santiago Soto) voluntarily came to the District 8 police station in Chicago at approximately 2:00 a.m. on April 3, 1998. They were told to wait for a Spanish-speaking officer to get there, and waited for over two hours. At approximately 4:15 a.m., a Spanish-speaking officer arrived and the three men were transported in police squad cars to Area 5 headquarters, where they were separated and each placed in locked interrogation rooms.

Sometime after that but still in the morning of on April 3, 1998, Detective Reynaldo Guevara, according to Mr. DeLeon-Reyes, entered the interrogation room, took off the hat on Mr. DeLeon-Reyes' head, slapped him hard across the face, and asked Mr. DeLeon-Reyes why he did it. Detective Guevara handcuffed Mr. DeLeon-Reyes to the bench. Mr. Reyes denied the accusations and told Detective Guevara that he had no idea what Detective Guevara was talking about. Mr. DeLeon-Reyes did not know that the boy he, Rosauro Mejia and Gabriel Solace had brought to the station (Santiago Soto) had been kidnapped, and he did not know that the boy's parents had been murdered. Detective Guevara then left the interrogation room, leaving Mr. DeLeon-Reyes handcuffed to the wall. According to Mr. DeLeon-Reyes, an officer subsequently came into the interrogation room to cover the little window on the door inside the room.

Eventually Detective Guevara came back into the interrogation room, bringing a form for Mr. DeLeon-Reyes to sign—permission to search his house—ordering and screaming at Mr. Reyes to sign it. Mr. DeLeon-Reyes signed it. With Mr. DeLeon-Reyes still chained to the wall, Guevara left the interrogation room. Detective Guevara would subsequently bring Mr. DeLeon-Reyes to a larger conference room, where two police officers were also present, one of whom was Youth Officer Daniel Trevino. According to Mr. DeLeon-Reyes, Detective Guevara started writing on the chalkboard in English. Detective Guevara asked Mr. DeLeon-Reyes if he recognized what Detective Guevara was writing on the board, and Mr. DeLeon-Reyes said no. Detective Guevara then left the room and Officer Trevino continued writing things on the

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 33


chalkboard. Officer Trevino also asked Mr. DeLeon-Reyes if he recognized what Officer Trevino was writing on the board, and Mr. DeLeon-Reyes again said no.

Detective Guevara returned and told Mr. DeLeon-Reyes that he was not helping himself, that he was letting other people blame him.  Detective Guevara also issued an explicit death penalty threat, telling Mr. DeLeon-Reyes that if he did not confess to his role in the double murder/double abduction most likely he was going to get the electric chair.  Detective Guevara then left Mr. DeLeon-Reyes, but Officer Trevino returned to the room and told Mr. DeLeon-Reyes that he would help him and got him a Coke (up to that point Mr. DeLeon-Reyes had been held at the police station for more than a full day and had not had anything to eat or drink).  Mr. DeLeon-Reyes explained his innocence, Officer Trevino reiterated Detective Guevara's accusations, and explained that Adriana Mejia was claiming that she paid Mr. DeLeon-Reyes money to participate in the double murder and kidnapping. Officer Trevino left the room.

According to Mr. DeLeon-Reyes, after the passage of time, the next thing that happened was that Detective Guevara entered the room, brought Mr. DeLeon-Reyes a pair of pants and had Mr. DeLeon-Reyes change the pants and take off his shoes.  Detective Guevara accused Mr. DeLeon-Reyes of participating in the double murder/double abduction and every time Mr. DeLeon-Reyes denied Detective Guevara's loud accusations, Detective Guevara would slap Mr. DeLeon-Reyes on the face.  According to Mr. DeLeon-Reyes, this happened many times, and on both sides of his face.

At some point after this, Detective Guevara left the room. He returned with Adriana Mejia, who, at Detective Guevara's instruction, accused Mr. DeLeon-Reyes of having participated in the double murder/double child abduction.  Detective Guevara also told Mr. DeLeon-Reyes that there were witnesses (plural) accusing him of having committed the double murder.  After a while Youth Officer Trevino came in the room and took Mr. DeLeon-Reyes to another room and gave him a sandwich, the first food he had had to eat in more than 24 hours.  At some point Assistant State Attorney Thomas O'Malley came into the room.  ASA O'Malley wrote out a statement in English, with Officer Trevino orally translating, and Mr. DeLeon-Reyes signed it because he was told to do so.  The statement was never read to Mr. DeLeon-Reyes, nor could Mr. DeLeon-Reyes read it on his own since he does not read or speak English, and so Mr. DeLeon-Reyes did not know what the statement said.  According to Mr. DeLeon-Reyes, he signed the statement because he believed that Detective Guevara would continue to physically assault him if he did not sign it and because Officer Trevino told Mr. DeLeon-Reyes that he (Officer Trevino) could only help Mr. DeLeon-Reyes if Mr. DeLeon-Reyes signed the statement. Mr. DeLeon -Reyes did not know what he was signing and he believed that signing it could actually help him. ASA O'Malley wrote out the confession statement in English that Mr. DeLeon-Reyes signed.  Officer Trevino directed Mr. DeLeon-Reyes to initial cross-outs in the confession statement, again in English, that Mr. DeLeon-Reyes could neither read nor understand and that were not read to him.  By this time, it was 2:00 a.m. on April 5, 1998,

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 34

approximately 40 hours after Mr. DeLeon-Reyes had first arrived at the police station on April 3, 1998. During this nearly two-day period, Mr. DeLeon-Reyes reports he was unable to sleep, and he only had one sandwich to eat and one coke to drink.

### D) Risk Factors for False Confession in Arturo DeLeon-Reyes's Account

Arturo DeLeon-Reyes' account describes how and why Detective Reynaldo Guevara, Detective Edwin Dickinson, Detective Robert Rutherford, Youth Officer Trevino and ASA O'Malley moved him from adamantly denying that he knew anything about the double murder/double kidnapping and professing his innocence to signing a confession statement forty plus hours later that meets the criteria of a *proven false confession*. In his account of the lengthy, unrecorded custodial interrogations involving Detective Guevara, Detective Dickinson, Detective Rutherford, Officer Trevino and ASA O'Malley, Arturo DeLeon-Reyes describes numerous interrogation techniques, methods and strategies, as well as other factors, that decades of empirical social science research have shown significantly increases the risk of eliciting false, unreliable and involuntary confessions. These include:

1) *Physical Abuse and Coercion*. Once common, the historical use of physical coercion by police detectives in the United States to extract confessions has been well-documented.[32] The fact that physical coercion leads to false and unreliable statements, admissions, and confessions is so well-established that no one – neither police nor social scientists – dispute it, and it has been prohibited by federal constitutional law that has applied to the States for more than eighty (80) years. Police interrogation training manuals emphatically advise police never to use any physical force or intimidation whatsoever during interrogation because it is illegal, will render a confession inadmissible and universally recognized as apt to make an innocent person falsely confess. All police officers and investigators are trained that the use of physical coercion to elicit confessions during interrogation is absolutely impermissible.

As discussed above, according to Arturo DeLeon-Reyes, Detective Guevara violently physically assaulted Mr. DeLeon-Reyes during the interrogation while Mr. DeLeon-Reyes was handcuffed to the wall ring in the interrogation room. According to Mr. DeLeon-Reyes, this happened repeatedly, and Detective Guevara would hit him harder when he denied Detective Guevara's increasingly angry accusations (Deposition of Arturo DeLeon-Reyes, P. 263 and P. 335). There are multiple sources of evidence supporting Mr. Arturo DeLeon-Reyes's assertion of being physically abused by Detective Guevara. First, as I will describe in more detail later, Detective Guevara's explanation of how and why Mr. DeLeon-Reyes was moved from initial denial to signing a *proven false confession* many, many hours later does not fit with the investigators' accounts of what they allege did and did not transpire during Mr. DeLeon-Reyes'

---

[32]   See Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 35

lengthy custody and multiple unrecorded interrogation sessions in the Area 5 police station on April 3-5, 1998. Second, the fact that Gabriel Solache, Rosauro Mejia and Adriana Mejia all assert that they too were physically assaulted by Detective Guevara during their lengthy custody and interrogations for the Soto double homicide/double child abduction in the Area 5 police station on April 3-5, 1998 corroborates Mr. DeLeon-Reyes's account. Third, numerous other suspects and witnesses in other cases have accused Detective Guevara of physically coercing their statements and confessions during his interrogations of them. And fourth, after reviewing Detective Guevara's history of eliciting false confessions during interrogation, the Lassar Report found that it was "more likely than not that Solache and Reyes were physically abused by Detective Guevara and were otherwise subjected to unreasonable treatment during the course of their interrogations." (AR-Jenner 019812).

The testimony of Gabriel Solache, Adriana Mejia, and Rosauro Mejia that Detective Guevara physically assaulted them at Area 5 in early April, 1998; accounts of numerous other suspects and witnesses in other cases that Detective Guevara physically assaulted them during interrogations, and the Lassar report conclusion that it was "more likely than not that Mr. Solache and Mr. DeLeon-Reyes were physically abused by Detective Guevara and were otherwise subjected to unreasonable treatment during the course of their interrogations" corroborate Mr. DeLeon-Reyes' assertion of being physically abused by Detective Guevara.

There is no dispute that the physical coercion that Mr. DeLeon-Reyes describes has long been regarded as a direct cause of interrogation-induced false confessions from innocent suspects in the empirical social science research literature. The physical coercion and violence that Arturo DeLeon-Reyes describes would have significantly increased the risk of eliciting false compliance and a false confession from Mr. DeLeon-Reyes.

2) *Lengthy (Incommunicado) Interrogation, Sleep Deprivation, Exhaustion and Fatigue.* Researchers consider the length of an interrogation to include both the time that a suspect is being questioned and/or accused as well as any breaks between questioning/accusation sessions, because breaks between accusation and questioning add to the stress and fatigue of the interrogation and sometimes are used as an interrogation technique itself. It is the total amount of time in custody during interrogation that matters. Some police use a technique known as "letting the suspect stew" in which they intentionally let the suspect wait in a locked interrogation room, thinking it will raise the suspect's anxiety and contribute to the softening up (what interrogators refer to as rapport-building) process that precedes interrogations.[33] Other times, police will intentionally take breaks during interrogation as part of their strategy to elicit a confession. These breaks contribute to a suspect's fatigue and exhaustion. The amount of time (over 40 hours) that Mr. DeLeon-Reyes was either detained or in custody, and interrogated on

---

[33] Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 36

April 3-5, 1998 was *extraordinarily* lengthy per traditional police standards existing both then and now.

Lengthy custodial detention and accusatory interrogation leads to fatigue and exhaustion, conditions that significantly increase the risk of overbearing a suspect's will and eliciting false and unreliable statements, admissions and/or confession. Lengthy interrogation/custody is a *situational* risk factor that could overbear a suspect's will and could cause a suspect to make or agree to a false confession during police interrogation.[34] Empirical studies indicate that the overwhelming majority of routine custodial interrogations last less than one hour,[35] whereas the combined time period of custody and interrogation in most interrogations leading to a false confession is more than six hours.[36] Once again, researchers count the total amount of time during interrogation when measuring the length of an interrogation and its correlates because even time for custodial breaks or questioning after an initial admission during the interrogation process can contribute to fatigue, exhaustion, depletion of mental or physical energy, learning impairments, loss of accurate memory recall, and a decrease in one's ability to concentrate and resist pressure. The 1986 Reid and Associates police interrogation training manual (which was the current version in 1998) specifically recommends that police interrogate for no longer than four (4) hours absent "exceptional situations" and that "most cases require considerably fewer than four hours."[37] Lengthy detention and interrogation is a significant risk factor for false confessions because the longer an interrogation lasts, the more likely the suspect is to become fatigued and depleted of the physical and psychological resources necessary to resist the pressures and stresses of accusatory interrogation,[38] especially where interrogators use psychologically aggressive, manipulative and/or coercive methods.[39] The longer custody and interrogation last, the more pressure interrogators can bring to bear on the suspect and the more techniques and strategies they may use to move the suspect from denial to admission. Lengthy interrogation, fatigue and exhaustion increase the risk that a suspect's will could be overborne and that an innocent suspect will make or agree to a false statement, admission and/or confession.

---

[34] *See* Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38.

[35] Richard A. Leo (1996). "Inside the Interrogation Room" Journal of Criminal Law and Criminology, 86, 266-303. *See also* Barry Feld (2013). *Kids, Cops and Confessions: Inside the Interrogation Room* (New York, NY: New York University Press).

[36] Steven Drizin and Richard A. Leo (2004). "The Problem of False Confessions in the Post-DNA World. *North Carolina Law Review*, 82, 891-1007.

[37] Fred Inbau, John Reid, and Joseph Buckley (1986). CRIMINAL INTERROGATION AND CONFESSIONS, 3rd Edition (Williams & Wilkins) at 310.

[38] Deborah Davis and Richard A. Leo (2012). "Interrogation Related Regulatory Decline: Ego-Depletion, Failures of Self-Regulation and the Decision to Confess" *Psychology, Public Policy and Law*, 18, 673-704.

[39] Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38.

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 37

Longstanding social science research has demonstrated that sleep deprivation is another significant risk factor for false confession because the more sleep deprived the suspect is, the more likely he or she is to become fatigued and depleted of the physical and psychological resources necessary to resist the pressures and stresses of accusatory interrogation,[40] especially when investigators use psychologically aggressive, manipulative and/or coercive methods.[41] Sleep deprivation heightens interrogative suggestibility by impairing decision-making abilities, such as the ability to sustain attention and flexibility of thinking as well as the ability anticipate risks and consequences, inhibit behavioral impulses and resist suggestive questioning.[42] Sleep deprivation also impairs the ability to sustain attention and flexibility in thinking and, more generally, it diminishes a suspect's ability to resist suggestive and/or coercive influences, especially the longer an interrogation lasts. Fatigue and exhaustion increase the risk that a suspect's will could be overborne and that an innocent suspect will make or agree to a false statement, admission and/or confession. Mr. DeLeon-Reyes reports that he was unable to sleep during his two days and two nights of custody and interrogation at the Area 5 police station.

As noted above, a forty-hour plus period of detention/custody and interrogation is considered extraordinarily lengthy and creates the risk of exhausting, fatiguing and psychologically weakening, if not impairing, a suspect's ability to freely choose to continue participating in the interrogation. In addition, Mr. DeLeon-Reyes was already exhausted from a long day of labor on April 2, 1998 and had only had a couple hours of sleep prior to arriving at the District 8 police station at approximately 4:00 a.m. on April 3rd and from his lengthy interrogation on April 3-5, 1998. Mr. DeLeon-Reyes had been awake since the early morning hours of April 3, 1998. Mr. DeLeon-Reyes also reports that he was only offered food and drink once by his various interrogators over the two day/two night period of custodial interrogation on April 3-5, 1998. As substantial empirical research supports, lengthy interrogation, as well as the fatigue, exhaustion and depletion of psychological resources it contributes to and produce, substantially increased the likelihood that Mr. DeLeon-Reyes would falsely comply and falsely confess on April 3-5, 1998.

---

[40]   Deborah Davis and Richard A. Leo (2012). "Interrogation Related Regulatory Decline: Ego-Depletion, Failures of Self-Regulation and the Decision to Confess" *Psychology, Public Policy and Law*, 18, 673-704.

[41]   Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38.

[42]   Mark Blagrove (1996). "Effects of length of sleep deprivation on interrogative suggestibility" *Journal of Experimental Psychology: Applied*, 2, 48-59. *See also* Stephen Frenda, Shari R. Berkowitz, Elizabeth F. Loftus, and Kimberly M. Fenn (2016). "Sleep Deprivation and False Confessions" *Proceedings of the National Academy of Sciences*, 113, 2047-2050 (February 23, 2016).

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 38

3) *Rush to Judgment Based on a Premature Presumption of Guilt, Presumption of Guilty Knowledge, and Investigative Bias*.[43]  The *misclassification error*, briefly discussed earlier in this report, is born of an investigative rush to judgment that leads to a premature behavioral presumption of guilt in the interrogation room. Substantial social science research has demonstrated that a behavioral presumption of guilt leads to tunnel vision, confirmation bias, and investigative bias among police investigators, who, as a result, often end up eliciting unreliable case information.[44]  When investigators rush to judgment and begin with or arrive at a premature belief in the suspect's guilt, empirical studies show that they seek to build a case against an individual whose guilt they assume *a fortiori*—rather than seeking to even-handedly collect factual information and objectively evaluate independent case evidence.  Under these circumstances, investigators act as if they are seeking to prove their pre-existing theories or conclusions rather than investigate a hypothesis or go where the evidence leads them.  This mental framework causes investigators to disregard contradictory information and evidence, selectively [mis]characterize existing information and evidence, [mis]interpret a suspect's statements and behavior to conform to the investigators' pre-existing assumptions, and to more aggressively interrogate suspects whose guilt they presume.[45]  Significantly, social science research has demonstrated that an investigative rush to judgment based on premature and pre-existing presumption of guilt puts innocent suspects at an elevated risk of making or agreeing to a false statement, admission, or confession in order to satisfy overzealous investigators and put an end to the accusatory pressures of sustained police interrogation.[46] At its worst, a premature rush to judgment and pre-existing presumption of guilt demonstrates reckless disregard for the truth.

In my professional opinion, Detective Guevara demonstrated a breathtakingly reckless and incompetent disregard for the truth from the very beginning of his investigation of the murders of Mariano and Jacinta Soto and the abduction of their two children.  Detective Guevara simply presumed the guilt of Arturo DeLeon-Reyes (as well as the guilt of Gabriel Solache and Rosauro Mejia) for these crimes without any basis for, or evidence supporting, his reckless conjectures, as if his goal was merely to close the high-profile double murder/double abduction case as quickly as possible without regard to actual guilt or innocence.  Detective Guevara began

---

[43]    *See* Saul Kassin, Christine Goldstein, and Kenneth Savitsky (2003).  "Behavioral Confirmation in the Interrogation Room: On the Dangers of Presuming Guilt" *Law and Human Behavior*, 27, 187-203; C. Hill, A. Memon, and P. McGeorge (2008).  "The Role of Confirmation Bias in Suspect Interviews: A systematic Evaluation" *Legal & Criminological Psychology*, 13, 357-371; and Fadia Narchet, Christian Meissner, and Melissa Russano (2011).  "Modeling the Influence of Investigator Bias on the Elicitation of True and False Confessions" *Law and Human Behavior*, 35, 452-465.

[44]    *See* Carol Tavris and Elliott Aronson (2015*)*.  MISTAKES WERE MADE (BUT NOT BY ME), (Harcourt Books).

[45]    *See* Saul Kassin, Christine Goldstein, and Kenneth Savitsky (2003).  "Behavioral Confirmation in the Interrogation Room: On the Dangers of Presuming Guilt." *Law and Human Behavior*, 27, 187-203.

[46]    Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010).  "Police-Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38.

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 39

his investigation into the double murder/double child abduction with a rush to judgment: The first thing he did upon entering the interrogation room was hit Mr. DeLeon-Reyes across the face and demand – without any factual or logical basis -- to know why Mr. DeLeon-Reyes did it. Detective Guevara repeatedly beat and also threatened Mr. DeLeon-Reyes in an effort to get Mr. DeLeon-Reyes to agree to Detective Guevara's accusations and confess to Detective Guevara's pre-existing speculations about his alleged involvement in the double murder/double child abduction.  Officer Trevino also recklessly presumed the guilt of Mr. DeLeon-Reyes, suggesting that the abuse would continue if Mr. DeLeon-Reyes did not comply with Detective Guevara's demands while at the same time promising Mr. DeLeon-Reyes help/leniency in exchange for agreeing to and signing a confession statement that Mr. DeLeon-Reyes could neither read nor understand. Mr. DeLeon-Reyes describes an extraordinarily guilt-presumptive interrogation whose goal was not to get the truth but to get a confession corroborating the investigators' pre-existing assumptions.

Put differently, based on the interrogation techniques Mr. DeLeon-Reyes describes Detective Guevara and Officer Trevino employing, their investigative approach in this case was not to treat Mr. DeLeon-Reyes' possible guilt as a hypothesis to be investigated and independently corroborated or falsified depending on where the evidence took them.  Rather, on the basis of gut hunches and speculations, the detectives, according to Mr. DeLeon-Reyes' description, conducted the lengthy interrogation as if there were already substantial evidence of Mr. DeLeon-Reyes' guilt.  The investigators refused to accept Mr. DeLeon's repeated denials of guilt and proclamations of innocence, and were, even putting the substantial physical and psychological coercion aside, far more aggressive in interrogating Mr. DeLeon-Reyes than an even-handed investigative effort to gather factual information would have required.  The investigators' guilt-presumptive tactics increased the risk that they would overbear Mr. DeLeon-Reyes will and elicit involuntary and/or false compliance, and an involuntary and false confession, from him.  The investigators' interrogation of Mr. DeLeon-Reyes was not only guilt-presumptive but it was also truth-presumptive.  In coercively pressuring and persuading Mr. DeLeon-Reyes to sign the statement, the investigators sought not to objectively or independently investigate or test the truth, but rather to have Mr. DeLeon-Reyes repeat back their preconceived suppositions about what they speculated must have occurred.  After the 40 hour interrogation in which the detectives, according to Mr. DeLeon-Reyes, physically and psychologically coerced him into signing the confession statement, the detectives failed to conduct any follow up investigation to test or attempt to test or corroborate the accuracy of their theory about Mr. DeLeon-Reyes' involvement (for example, the detectives never investigated Adriana Mejia's family members to see if any of them could have been involved as Ms. Mejia's accomplices to the double murder/double child abduction; nor, to take another example, did the detectives take DNA samples from Rosauro Mejia or Carlos Martinez; nor did they fully investigate Norma Salazar as a potential accomplice to Adriana Mejia, who, unlike Mr. DeLeon-Reyes and Mr. Solache, left her DNA and blood at the crime scene; nor did they ever attempt to get Mr. DeLeon-Reyes to submit to a polygraph examination, as they had with Adriana Mejia).

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 40

Since Mr. DeLeon-Reyes meets the criteria for a *proven false confession*, as discussed above, it is my opinion that Detective Guevara made a *misclassification* error (i.e., subjecting a factually innocent person to a guilt-presumptive and accusatory interrogation designed for a factually guilty suspect) with respect to Mr. DeLeon-Reyes. As discussed earlier, it was impossible for Mr. DeLeon-Reyes to have committed the double murder/homicide, both based on his employee timesheets showing his long workdays the day of, and the day before, the crime; and based on the DNA testing from the bloody crime scene that dispositively excluded him as the source of any forensic evidence left behind by the true perpetrators at the crime scene (it would not have been possible for the true perpetrator to have committed the crime as described in Mr. DeLeon-Reyes confession statement without leaving behind significant DNA evidence, as did Ms. Mejia). Detective Guevara, Officer Trevino, Detective Dickinson, Detective Rutherford and ASA O'Malley were not gathering evidence against Mr. DeLeon-Reyes; instead, they were creating and fabricating it.

As well-established social science research has repeatedly demonstrated, once an investigator rushes to judgment about a suspect's guilt (typically following their gut hunches, speculation or human lie detectors/scientifically discredited judgments about body language or demeanor), an interrogator's guilt-presumptive or truth-presumptive investigative tactics substantially increase the risk of eliciting involuntary, false and unreliable statements, admissions and/or confessions from innocent suspects. The investigators' unwavering presumption of Mr. DeLeon-Reyes' guilt and confession-driven interrogation led to investigative bias, behavioral confirmation bias and tunnel vision: The investigators not only refused to accept Mr. DeLeon-Reyes' protestations of innocence, but also saw his later interrogation-induced compliance and incriminating statements as corroboration of their belief in his guilt, as opposed to the product of their own guilt-presumptive and physically and psychologically coercive interrogation techniques. These types of investigative and confirmation biases have been documented in many psychological studies and in cases of police-induced false confession and erroneous conviction of the innocent.[47] Detective Guevara's rush to judgment, premature presumption of Mr. DeLeon-Reyes' guilt, and reckless disregard of the truth increased the risk that he would elicit false compliance and a *proven false confession* from Mr. DeLeon-Reyes.

4) *False evidence ploys.* Police interrogators routinely tell criminal suspects that the evidence establishes their guilt: If police possess real evidence, this is called a true evidence ploy. If police are making up, lying about, or exaggerating non-existent evidence, this is called a false evidence ploy. The social science research literature has demonstrated that false evidence ploys are potentially psychologically coercive techniques that are virtually always present in, and

---

[47]   Keith Findley and Michael Scott (2006). "The Multiple Dimensions of Tunnel Vision in Criminal Cases" *University of Wisconsin Law Review*, 291-397.

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 41

substantially likely to increase the risk of, eliciting false statements, admissions, and/or confessions. False evidence ploys are among the most well-documented *situational* risk factors for eliciting false and unreliable statements, admissions, and/or confessions, as described in the social science research literature.[48] The use of false evidence ploys can create or contribute to the suspect's perception that he is trapped, there is no way out, and/or that his conviction will be inevitable. False evidence ploys can lead the suspect to perceive that he is in a hopeless situation and thus has little choice but to agree to or negotiate the best available outcome or mitigation of punishment given the perceived, subjective reality of his situation.[49]

Since Arturo DeLeon-Reyes' interrogation-induced and confession statement meets the criteria of a *proven false confession*, it is my opinion that there was at least one false evidence ploy in Detective Guevara's lengthy, multiple interrogations of Arturo DeLeon-Reyes on April 3-5, 1998. Since Arturo DeLeon-Reyes' confession statement is provably false, it follows as a matter of logic that Adriana Mejia's accusation that he participated with her in the double homicide of Mariano and Jacinta Soto was factually false. In addition, Detective Guevara told Mr. DeLeon-Reyes that there were witnesses (plural) accusing him of committing the murder. The logic of Detective Guevara bringing Ms. Mejia into the interrogation to falsely accuse Mr. DeLeon-Reyes of committing the double murder with her was to convince Mr. DeLeon-Reyes that the evidence conclusively established his guilt, that no one would believe his denials and therefore that he had no meaningful choice but to stop denying and, instead, admit to Detective Guevara's accusations. Detective Guevara's false evidence ploy here likely contributed to Mr. DeLeon-Reyes' perception of feeling hopeless during the lengthy interrogation and ultimately to complying with Detective Guevara and Youth Officer Trevino's demand that he ultimately sign and initial the confession statement that he was neither able to read nor understand.

As a century of basic psychological research on misinformation effects has shown[50] (as well as decades of applied psychological research on police lying to suspects during interrogation)[51] false evidence ploys are effective at eliciting compliance,[52] confusing some suspects into believing that they have been framed or that such evidence really does exist,[53]

---

[48] Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38.

[49] *See* Richard Ofshe and Richard A. Leo (1997). "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions." *Studies in Law, Politics & Society*, 16, 189-251.

[50] Elizabeth Loftus (2005). "Planting Misinformation in the Human Mind: A 30 Year Investigation of the Malleability of Memory" *Learning & Memory*, 12, 361-366.

[51] Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38.

[52] Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

[53] Richard Ofshe and Richard A. Leo (1997). "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions." *Studies in Law, Politics & Society*, 16, 189-251.

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 42

causing some suspects to doubt themselves (deferring to interrogators' authoritative assertions of irrefutable evidence despite knowing they did not commit a crime),[54] and even causing some suspects to develop false beliefs and/or memories of committing crimes.[55]  Based on well-established basic and applied social scientific research going back decades, Detective Guevara's false evidence ploy during the lengthy custody and unrecorded interrogation of Arturo DeLeon-Reyes significantly increased the risk of eliciting false compliance and confession from him.

     5) *Threats and Promises*.  As discussed earlier in this report, the use of implicit and/or explicit promises (for example, of leniency, immunity and/or a tangible benefit) as well as implicit and/or explicit threats (for example, of physical harm, a higher charge, longer sentence or harsher punishment) significantly increases the risk of eliciting a false and/or unreliable statement, admission, and/or confession.  Indeed, as empirical social science research has repeatedly demonstrated, promises of leniency and threats of harm, whether implicit or explicit, are widely associated with police-induced false confession in the modern era and are believed to be among the leading causes.

     There are two significant threats of harm by Detective Guevara and one significant promise of leniency by Youth Office Trevino in Arturo DeLeon-Reyes' account of what occurred during his lengthy unrecorded custodial detention and interrogation on April 3-5, 1998. First, Mr. DeLeon-Reyes describes being violently and repeatedly slapped across the face by Detective Guevara when Mr. DeLeon-Reyes did not provide the answers Detective Guevara was demanding.  Detective Guevara implicitly, if not explicitly, threatened that Mr. DeLeon-Reyes would continue to be physically assaulted if he did not comply with Detective Guevara's demand for compliance and confession.  Detective Guevara also explicitly threatened Mr. DeLeon-Reyes with the death penalty (i.e., death by electrocution) if he did not comply and confess.  Both of these threats were also implicit promises – that Mr. DeLeon-Reyes would be spared further physical abuse, as well as the electric chair, if he complied and confessed.  According to Mr. DeLeon-Reyes, Officer Trevino promised Mr. DeLeon-Reyes help if he signed and initial the statement that he could neither read nor understand.  This too functioned as an implicit threat – that Mr. DeLeon-Reyes would not receive the promised help from Officer Trevino if he continued to deny participating in the double murder of the Soto's and the double abduction of their children.

---

[54]    Richard Ofshe and Richard A. Leo (1997).  "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions." *Studies in Law, Politics & Society*, 16, 189-251.

[55]    Richard A. Leo (2008).  POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).  *See also* Deborah Wright, Kimberly Wade and Derrick Watson (2013).  "Delay and Déjà Vu: Timing and Repetition Increase the Power of False Evidence" *Psychonomic Bulletin Review*, 20, 812-818; Julia Shaw and Don Read (2014).  "Constructing Rich False Memories of Committing Crime" *Psychological Science*, 1-11 (published online January 14, 2015); and Julia Shaw (2016).  THE MEMORY ILLUSION (Random House).

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 43

The use of implicit and explicit promises of leniency, immunity and/or a tangible benefit, as well as the use of implicit and explicit threats of harm, significantly increases the risk of overbearing a suspect's will and eliciting an involuntary false statement, admission, and/or confession when applied to the innocent. Indeed, as empirical social science research has repeatedly demonstrated, promises of leniency and threats of harm or harsher punishment are widely associated with police-induced false confession in the modern era and are believed to be among the leading causes. There may be no psychological interrogation technique more potent than the use of threats and promises. Promises and threats (whether implied or express) are inherently coercive because they exert substantial pressure on a suspect to comply and thus can easily overbear the will or ability of a suspect to resist an interrogator's demands or requests. Like other *high-end* inducements, promises and threats contribute to creating a sense of despair and hopelessness about a suspect's perceptions of his available options during interrogation. The explicit and implicit threats and promises that Mr. DeLeon-Reyes describes that Detective Guevara and Officer Trevino used in his lengthy unrecorded custodial interrogations on April 3-5, 1998 frightened Mr. DeLeon-Reyes and significantly increased the likelihood of eliciting false compliance and a false confession from him. Indeed, Mr. DeLeon-Reyes states that Detective Guevara's physical abuse, and ultimately Mr. DeLeon-Reyes' desire to put an end to it, is why he signed the false confession statement written by ASA O'Malley.

6) *Psychological Coercion.* As discussed earlier, it is well-established that psychologically coercive interrogation techniques increase the risk of eliciting false and/or involuntary incriminating statements, admissions and/or confessions.[56] In my professional opinion, the lengthy, unrecorded custodial detention and interrogations described by Arturo DeLeon-Reyes occurring on April 3-5, 1998 were extremely psychologically coercive for three reasons.

First, as just discussed, the lengthy, unrecorded custody and interrogation sessions occurring on April 3-5, 1998 described by Arturo DeLeon-Reyes contained both implicit and explicit threats of harm and implicit and explicit promises of help/leniency. Detective Guevara implied that he would continue to physically assault Mr. DeLeon-Reyes if Mr. DeLeon-Reyes did not comply with Detective Guevara's demands, and Detective Guevara explicitly threatened Mr. DeLeon-Reyes with the death penalty by electrocution if Mr. DeLeon-Reyes did not stop denying involvement in the Soto double murder and instead start admitting to it. Youth Officer Trevino promised help, and by implication leniency, if Mr. DeLeon-Reyes complied with Detective Guevara's demands and confessed involvement in the double murder/abduction.

---

[56]   Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38; Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press); Richard Ofshe and Richard A. Leo (1997). "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions" *Studies in Law, Politics & Society*, 16, 189-251.

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 44

Threats and promises are regarded as inherently psychologically coercive because they are so likely to overbear a suspect's will and lead to involuntary statements. Avoiding the use of threats of harm—especially extreme ones such as being physically assaulted and receiving the death penalty for failing to comply and confess, as Mr. DeLeon-Reyes describes here—and promises of help/leniency in exchange for confessing, is among the most fundamental prohibitions in American police interrogations,[57] second only to the prohibition against using physical violence on suspects to elicit confessions,[58] which Mr. DeLeon-Reyes had also described and which, of course, made the threat of additional physical violence by Detective Guevara seem all the more real and certain if Mr. DeLeon-Reyes did not ultimately agree to confess. Threats and promises are so psychologically coercive that they taint the rest of an interrogation.[59]

Second, the detectives' interrogation methods, according to Mr. DeLeon-Reyes, caused him to perceive that his situation was hopeless and that there was no way out of the interrogation room other than to sign the confession statement -- in other words, the investigators' interrogation techniques cumulatively caused Mr. DeLeon-Reyes to perceive that he had no meaningful choice but to comply with and to submit to their demands to sign the statement if he wished to put an end to lengthy and overbearing interrogation. As Mr. DeLeon-Reyes describes, he felt forced to sign the statement out of fear that he would continue to be assaulted by Detective Guevara if he did not and the promise of help from Officer Trevino if he did. Mr. DeLeon-Reyes describes a highly psychologically coercive interrogation that took away his free will and in which he was made to comply involuntarily with the Detective Guevara's and Officer Trevino's demands.

Mr. DeLeon-Reyes was also likely more vulnerable to the physical and psychological coercion he describes because of his personal background. Mr. DeLeon-Reyes did not speak or understand English and had only been in the United States for a few months. His language barriers and inability to comprehend what was going on during the interrogation he describes, especially the physical abuse and psychological threats, would have likely heightened his feelings and hopelessness and helplessness and thus augmented the coerciveness of the lengthy custody and interrogations.

---

[57] Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).
[58] Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).
[59] Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38; Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press); Richard Ofshe and Richard A. Leo (1997). "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions" *Studies in Law, Politics & Society*, 16, 189-251.

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 45

Third, Mr. DeLeon-Reyes has repeatedly testified that he was never informed that he had a right to silence or a right to counsel or a right to contact the Mexican consulate throughout the extremely lengthy and overbearing custodial interrogations. The investigators' failure to provide Mr. DeLeon-Reyes with *Miranda* warnings and their failure to elicit voluntary and knowing consent from him to participating in the interrogation sent the message to Mr. DeLeon-Reyes that he had no ability to assert his will and terminate the interrogation unless he submitted to the investigators' demands that he sign and initial the statement. Mr. DeLeon-Reyes describes here classic psychological coercion by the detectives leading to involuntary compliance.

Psychologically coercive interrogation pressures and techniques substantially increase the risk that an innocent person will be forced to make or agree to false and unreliable statements, admissions and/or confessions. The psychologically (in addition to the physically) coercive interrogation pressures that Arturo DeLeon-Reyes describes being subject to by Detective Guevara and Youth Officer Trevino during his lengthy, unrecorded interrogation and detention on April 3-5, 1998 substantially increased his risk of falsely complying and falsely confessing.

7) *Police Interrogation Contamination and Scripting.* As mentioned earlier, police interrogators are trained to refrain from contaminating a suspect by leaking or disclosing non-public case facts to him or her but, instead, to hold back unique case information and let the suspect volunteer case details in order to demonstrate inside knowledge of the crime details to corroborate the accuracy of any incriminating statements. The absence of contamination allows police to verify the reliability of interrogation-induced confessions, but the presence of contamination prevents police from corroborating confessions that are true and makes confessions that are false misleadingly appear true (because they contain non-public crime scene details suggested by the interrogators, and repeated by the suspect, police and prosecutors falsely claim that they were volunteered by the suspect). Though police interrogation contamination is believed to often be inadvertent rather than intentional, it can make otherwise completely false confessions appear not only to be true and voluntary but persuasively so.[60]

Related to police interrogation contamination, police investigators sometimes "script" a suspect's confession by not only providing the suspect with details of the crime, but also by coaching, directing and/or leading the suspect to adopt a specific police-driven narrative of how and why he or she must have committed the crime. Interrogators sometimes seek to shape and edit the suspect's narrative in order to incriminate the suspect and build a more specific case against him or her that will ensure conviction. To do so, interrogators usually try to elicit an account that is consistent with their theory of the crime. If the suspect's narrative does not fit the interrogators' pre-existing expectations about how and why the suspect must have committed the

---

[60]    Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 46

crime, interrogators continue to interrogate the suspect, often correcting the suspect and pressuring and persuading him or her to adopt the interrogators' scripted version of what they believe must have happened to cause the crime and why.[61] The problem with scripting is that it is truth-presumptive and replaces what should be an investigative function (seeking the truth) with a prosecutorial function (making a case against someone whose guilt they assume). Instead of pursuing truthful information from someone who knows what occurred, by scripting investigators are seeking to create evidence that confirms their pre-existing assumptions, speculations, beliefs and/or theories. This is problematic when police are interrogating a suspect because, after all, the whole point of police interrogation should be to get a truthful account from the person who committed the crime, as opposed to pressuring and persuading the suspect to regurgitate back to the investigators what they want to believe occurred. Like police interrogation contamination, police interrogation scripting can make otherwise completely false confessions appear not only to be true and voluntary but persuasively so as well.[62]

Without a recording of the interrogation, it is usually not possible to know with complete certainty whether non-public crime facts in a suspect's confession statement originated with the suspect or originated with police interrogators who already knew those facts and suggested them to the suspect, who then parroted them back in a statement. However, in cases whose confessions meet the criteria of a *proven false confession*, it stands to reason that the details of the crime could only have originated from the police interrogators themselves unless the suspect was exposed to non-public case information from third parties. According to Mr. Reyes-DeLeon, he did not know anything about the crime, not even who Mariano and Jacinta Soto were, let alone that they had been murdered or how. Nor did he know their children or that they had been abducted. According to Mr. DeLeon-Reyes, Detective Guevara educated him about the crime, repeatedly suggested detailed crime scene facts to him that he did not know (e.g., how the murders occurred), repeatedly tried to put words in his mouth, and repeatedly and coercively pressured Mr. DeLeon-Reyes to agree with their description of theory of the facts of the double murder/double abduction. In other words, all the details in Mr. DeLeon-Reyes' confession statement came from his interrogators, including Detective Guevara, who had repeatedly been to the crime scene prior to interrogating Mr. DeLeon-Reyes on April 3-5, 1998.

Eventually, after many hours of physically and psychologically coercive guilt-presumptive accusatory interrogation according to Mr. DeLeon-Reyes, he signed a statement that had literally been scripted, word for word, by Officer Trevino. They, along with Detective Guevara, had provided Mr. DeLeon-Reyes with all of the facts and details of the double murder/double child abduction. Arturo DeLeon-Reyes did not write a single word of his confession, it was not read to him out loud, and he unable to read it in any event because he did

61  Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE. *Justice* (Harvard University Press).

62  Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 47

not read or understand English. Instead, he signed and initialed it where directed by Officer Trevino and ASA O'Malley. In addition, Officer Trevino and ASA O'Malley used the "Error Insertion Trick," a police interrogation scripting technique discussed above in which the interrogator initially inserts trivial errors into the statement, scratches out or corrects them, and then directs the suspect to initial each correction, as if the suspect had directed the corrections and edited them rather than the police interrogator. The interrogation of Arturo DeLeon-Reyes (and the interrogation of Gabriel Solache, to be discussed below) is perhaps the most egregious example of the Error Insertion Trick that I have ever seen since Mr. DeLeon-Reyes could not have read or understood the errors in his statement created by Officer Trevino and ASA O'Malley since Mr. DeLeon-Reyes did not read English. Instead, Mr. DeLeon-Reyes signed it and initialed the errors where told do so at the direction of Officer Trevino and ASA O'Malley. Yet Officer Trevino and ASA O'Malley insisted that Mr. DeLeon-Reyes, not Officer Trevino or ASA O'Malley, spotted the trivial errors in his statement and then Mr. DeLeon-Reyes directed Officer Trevino and ASA O'Malley to correct the trivial errors, after which Mr. DeLeon-Reyes voluntarily initialed the error corrections. As mentioned earlier, police interrogators use "The Error Insertion Trick" technique to (1) create the impression of validating a confession's voluntariness and accuracy and (2) "confirm" the confessor's guilt by appearing to demonstrate his personal knowledge of the crime facts.[63]

Police interrogation contamination and scripting are not so much a risk factor for eliciting a confession as a process that makes an otherwise false confession statement appear to be true. As mentioned above, police interrogation contamination is often believed to be inadvertent, not deliberate. Police interrogation contamination and scripting make false confessions appear true, and persuasively true, because the innocent suspect's confession is said to contain "details that only the true perpetrator would know" (erroneously since the details were supplied by the police), and it contains characteristics that most people associate with a true confession (*e.g.*, a story line, motive, explanation, emotions and an attribution of voluntariness), even though it is completely false.[64] Police interrogation contamination and scripting therefore increase the risk that once a suspect has falsely complied or falsely confessed to a crime he or she did not commit, third parties—such as prosecutors, judges, juries, the media and outside observers—will mistakenly believe that the confession statement is self-corroborating and therefore true and accurate. Officer Trevino's and ASA O'Malley's contamination and scripting in this case did not increase the risk that Mr. DeLeon-Reyes would make or sign a false confession as much as it increased the risk that his false statement, once signed, would cause third parties (such as judges, juries and the media) to erroneously believe that in contained indicia of reliability, and thus that it was corroborated, and erroneously convict him.

---

[63] *See* Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press) at 175-177.

[64] Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 48


8) *Violation of National Police Interrogation Training Standards, Protocols and Best Practices.* Arturo DeLeon-Reyes' account of his more than 40 hours of custody and interrogation Detective Guevara and ASA O'Malley on April 3-5, 1998 repeatedly violated national police interrogation standards, protocols and best practices in general as they existed in 1998.

First, American police investigators are universally trained to absolutely avoid the use of physical force and coercion in the interrogation room, which is unlawful, unconstitutional and correctly believed by law enforcement to lead to both involuntary and false confessions. As discussed above, Arturo DeLeon-Reyes describes the use of a sustained violent physical assault by Detective Guevara while Mr. DeLeon-Reyes was chained to a wall ring. Physically coercive interrogation has not only been a violation of universal American police interrogation standards since 1936, but is also illegal as all police investigators and prosecutors knew in 1998 and know today.

Second, American police investigators are trained generally to avoid the use of threats of harm (implicit or explicit) and promises of leniency (implicit or explicit) to elicit statements, admissions and/or confessions because threats and promises are understood by law enforcement to be psychologically coercive and thus to lead to involuntary and/or false confessions. As discussed above, Mr. DeLeon-Reyes describes custodial interrogations in which Detective Guevara threatened the possibility of additional physical assault if Mr. DeLeon-Reyes continued to deny his accusations, and Detective Guevara also threatened that Mr. DeLeon-Reyes would receive the death penalty and be put to death by electrocution; Officer Trevino promised Mr. DeLeon-Reyes that he would receive help and leniency from the police and prosecution if he stopped denying the accusations and agreed to sign the confession statement. Detective Guevara's explicit and implicit threats, and Officer Trevino's explicit and implicit promises of help/leniency, were impermissible, unlawful and violated universal American police interrogation standards as they existed in 1998.

Third, relatedly, American police are trained never to deprive a suspect of essential necessities such as food, drink, sleep or rest during interrogation because that is also unconstitutional and is universally recognized by law enforcement to lead to coerced, involuntary and/or false confessions. Mr. DeLeon-Reyes describes only having been provided with one sandwich and one drink during his two straight days of custody and interrogation, and both of those well after 24 hours into the 40 plus hour incommunicado interrogation ordeal. Mr. DeLeon-Reyes also describes already being tired from a long day of work when he voluntarily came to the 8th District police station in the early morning hours of April 3, 1998. And he describes not being able to sleep during the two day period of interrogation and custody on April 3-5, 1998. The extreme sleep, food and water deprivation that Mr. DeLeon-Reyes describes violated American police interrogation standards and best practices as they existed in 1998.

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 49

Fourth, and related, Detective Guevara, Detective Dickinson, Detective Rutherford and Officer Trevino violated best practice standards with respect to the extraordinary length of Mr. DeLeon-Reyes' custody and interrogations. As discussed earlier, the 1986 Reid and Associates police interrogation training manual specifically recommends that police interrogate suspects for no longer than four (4) hours absent "exceptional situations" and that "most cases require considerably fewer than four hours."[65] The 40 plus hour period custody and interrogations that the investigators subjected Mr. DeLeon-Reyes to on April 3-5, 1998 was extraordinary and violated American police interrogation standards and best practices as they existed in 1998.

Fifth, as described above, American police interrogators are trained to avoid contaminating a suspect by leaking or disclosing non-public case facts to him or her but, instead, to hold back unique case information and let the suspect volunteer case details in order to demonstrate inside knowledge of the crime details to corroborate the accuracy of any incriminating statements. Yet Detective Guevara and Officer Trevino, as well as ASA O'Malley, leaked numerous non-public crime details, as well as their theory of how and why the double murder the Soto's and the double abduction of their children occurred, to Mr. DeLeon-Reyes, educating him about a crime that he knew nothing about prior to his interrogation on April 3-5, 1998, as previously discussed. Detective Guevara's, Officer Trevino's and ASA O'Malley's contamination of Arturo DeLeon-Reyes and their fraudulent scripting and fabrication of his confession statement during his lengthy period of custody and interrogation on April 3-5, 1998 violated American police interrogation standards and best practices as they existed in 1998.

Sixth, the Reid and Associates training manuals and programs have always repeatedly implored police investigators not to use any interrogation technique that are "apt to make an innocent person confess."[66] Yet, according to Arturo DeLeon-Reyes' description of what occurred during the more than 40 hours of custody and interrogation, Detective Guevara and Officer Trevino used numerous techniques that the Reid Manual specifically teaches investigators not to use because they are apt to cause a false confession: physical coercion, explicit and implicit threats of physical and psychological harm, explicit and implicit promises of leniency, and deprivation of essential necessities (sleep, food, water). In addition, Detective Guevara and Officer Trevino failed to inform Mr. DeLeon-Reyes of *Miranda* rights to silence, counsel or notice during the 40 hours of custody and interrogation, they failed to elicit a voluntary or knowing waiver to his *Miranda* rights and they failed to notify him of his right to contact the Mexican consulate, all of which are required by law as any properly trained American police detective would know. All of these techniques and practices violated American police interrogation standards and best practices as they existed in 1998.

---

[65]  Fred Inbau, John Reid, and Joseph Buckley (1986). CRIMINAL INTERROGATION AND CONFESSIONS, 3rd Edition (Williams & Wilkins) at 310.

[66]  *See* Fred Inbau, John Reid, and Joseph Buckley (1986). CRIMINAL INTERROGATION AND CONFESSIONS, 3rd Edition at xiv (Williams & Wilkins).

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 50

**E) Detective Reynaldo Guevara's, Youth Officer Daniel Trevino's, Detective Robert Rutherford's, Detective Edwin Dickinson's and Assistant State Attorney Thomas O'Malley's Account of the Lengthy and Unrecorded Multiple Custodial Interrogation Sessions of Arturo DeLeon-Reyes on April 3-5, 1998**

According to Detective Guevara, on 11:30 p.m. on April 3, 1998, he first went to the interrogation room housing Mr. DeLeon-Reyes at Area 5 police station, Detective Guevara identified himself, advised Mr. DeLeon-Reyes of his *Miranda* rights in Spanish from a preprinted card, and Mr. DeLeon-Reyes, according to Detective Guevara, knowingly and voluntarily waived his rights. Detective Guevara states that after giving the *Miranda* warnings, he confronted Mr. DeLeon-Reyes with Adriana Mejia's statement implicating him in the double murder of the Soto's and the double abduction of their children. According to Detective Guevara, Mr. DeLeon-Reyes was not handcuffed, and this interview lasted only 15 minutes.

The next time Detective Guevara approached Mr. DeLeon-Reyes was at 3:00 p.m. on April 4, 1998, almost 16 hours later. Once again, Detective Guevara was alone with Mr. DeLeon-Reyes, and he states that he asked Mr. DeLeon-Reyes if he remembered his *Miranda* rights, he indicated he still understood them, and said that he was still willing to speak to Detective Guevara. According to Detective Guevara, that interview lasted about 30 minutes and this is when Mr. DeLeon-Reyes first admits involvement in the crimes.

At approximately 6:00 p.m. on April 4, Detective Guevara again spoke to Mr. DeLeon-Reyes, this time in a larger conference room and this time, Detective Rutherford, Detective Dickinson and Youth Officer Daniel Trevino were also present. Detective Guevara states that he was in and out during this interrogation, which he estimates lasted a half hour, and involved Youth Officer Trevino drawing on a blackboard and Mr. DeLeon-Reyes indicating what he had done on the blackboard (Officer Trevino indicates that he gave Mr. DeLeon-Reyes his *Miranda* warnings in Spanish, and elicited a knowing and voluntary waiver during this interrogation session). As with the two prior interviews, Detective Guevara states that Mr. DeLeon-Reyes was not handcuffed (Detective Guevara denies ever cuffing Mr. DeLeon-Reyes to a wall). Detective Guevara also reports that he checked in on Mr. Reyes at 3:00 a.m. on the morning of April 4, and that Mr. Reyes was sleeping. Detective Guevara denies physically abusing Mr. DeLeon-Reyes or making any threats. During one of the interrogation sessions, Detective Guevara states that he confronted Mr. DeLeon-Reyes with Adriana Mejia's statement implicating Mr. DeLeon-Reyes in the double murder of the Soto's and the double abduction of their children.

The interview Detectives Guevara, Dickinson, Rutherford, and Officer Trevino conducted with Mr. DeLeon-Reyes is documented on a handwritten Chicago Police Department general progress report. Detectives Guevara, Dickinson, Rutherford, and Officer Trevino also took notes on a general progress report of an interview with Adriana Mejia. These handwritten police notes, which purported to have been composed shortly before Arturo DeLeon-Reyes' and

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 51

Gabriel Solache's statements were taken, contain many factual inconsistencies when compared to Mr. DeLeon-Reyes' and Mr. Solache's statements. While this might have been done to corroborate and lend credibility to Detective Guevara's interrogations, the inconsistencies suggest that the Detectives were still in the process of scripting what the story of the crime would be.

At approximately 11:30 p.m. on April 4, 1998, Officer Trevino and ASA Thomas O'Malley interviewed Mr. DeLeon-Reyes yet again. ASA O'Malley advised Mr. DeLeon-Reyes of his *Miranda* rights, and Officer Trevino translated them into Spanish. Mr. DeLeon-Reyes knowingly and voluntarily waived his *Miranda* rights, according to Officer Trevino, while indicating that he wished to speak to ASA O'Malley. According to Detective Guevara, this interview took approximately an hour, during which time Mr. DeLeon-Reyes indicated that he wished to give a handwritten statement. The handwritten statement was taken at 2:00 a.m. on April 5, 1998. ASA O'Malley read the statement line by line, and Officer Trevino translated it into Spanish line by line. Corrections were made to the statement during this process, with the mistakes in the written statement explained to Mr. DeLeon-Reyes. Mr. DeLeon-Reyes, Officer Trevino and ASA O'Malley then all initialed the corrections in the confession statement, in English, that ASA O'Malley had written out. According to Officer Trevino, Mr. DeLeon-Reyes indicated that he had had a sandwich to eat and a pop to drink at that time, and that he was able to go to the bathroom. In addition, according to Officer Trevino, Mr. DeLeon-Reyes, who had been held in incommunicado custody at the Area 5 police station for close to 40 hours, stated he was impressed and surprised by how well he had been treated by police. Officer Trevino denied ever seeing Detective Guevara or anyone else assault Mr. DeLeon Reyes, and Officer Trevino denied making, or seeing anyone make, any promises of help/leniency (if Mr. DeLeon-Reyes agreed to comply and confess) or threat of execution by electric chair (if Mr. DeLeon-Reyes did not agree to comply and confess). Detectives Dickinson and Rutherford and ASA O'Malley made similar denials. When testifying under oath and asked in a post-conviction proceeding in 2013, and in his deposition in 2020, about what occurred during the interrogations of Mr. DeLeon-Reyes, what interrogation techniques and practices he used, and whether he physically assaulted and coerced Mr. DeLeon-Reyes, Detective Guevara invoked his 5th Amendment Privilege Against Self-Incrimination, and thus avoided answering these and other questions about the nature and circumstances of Mr. DeLeon-Reyes' custody and interrogations on April 3-5, 1998, and the resulting involuntariness and unreliability of Mr. DeLeon-Reyes' resulting statement.

### F) Comparing Arturo DeLeon-Reyes and the Law Enforcement Accounts of the Unrecorded Interrogation of Arturo DeLeon-Reyes on April 3-5, 1998

The accounts (by Arturo DeLeon-Reyes on the one hand, and Detective Guevara, Youth Officer Trevino, Detective Dickinson, Detective Rutherford and ASA O'Malley on the other) of what occurred during the lengthy unrecorded interrogation on April 3-5, 1998 are dramatically

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 52

different and diverge on virtually every key factual detail.  In Mr. DeLeon-Reyes' telling, there were numerous interrogation techniques and approaches (*e.g.*, accusations, attacks on denials, time pressure, yelling, escalation of pressure, threats, promises, and physical violence) as well as interrogation contamination and interrogation scripting.  These interrogation techniques were physically and psychologically coercive and involved several known risk factors for eliciting false confessions according to decades of empirical scientific research on the psychology of police interrogations and suspect confessions.  The interrogation methods, strategies and techniques that Mr. DeLeon-Reyes describes fit with the empirical research on the kinds of interrogation techniques, methods, practices and effects that lead to false compliance and false confessions.

In the law enforcement telling, the entirely unrecorded questioning of Arturo DeLeon-Reyes -- despite the extraordinary length of custody and detention – was brief, mostly conversational and more interview than interrogation (*i.e.*, mostly question and answer), and involved only one interrogation technique (Detective Guevara confronting Mr. DeLeon-Reyes with Adriana Mejia's oral statement implicating him) before Mr. DeLeon-Reyes, who was never tired, hungry, frightened, in pain or discomfort, or desirous of an attorney or stopping the interrogation (despite being in the 8th District and Area 5 police stations for nearly 48 hours from early in the morning on April 3, 1998 to early in the morning on April 5, 1998), voluntarily confessed to the double murder of the Soto's and the abduction of their children.

In my professional opinion, Mr. DeLeon-Reyes' more robust and detailed account of the lengthy, unrecorded interrogation sessions on April 3-5, 1998 fits with the findings of the empirical and scientific research literature on how and why individuals can be moved to make or agree to false compliance and give a *proven false confession*.  Detective Guevara's, Officer Trevino's, Detective Rutherford's, Detective Dickinson's, and ASA O'Malley's accounts do not.  They fail to provide any explanation of how or why Mr. DeLeon-Reyes would have been moved to make or agree to a *proven false confession*.  Moreover, so many individuals (witnesses and suspects in prior cases) – Jose Melendez, Daniel Pena, Wilfredo Rosario David Velazquez, Adolfo Frias, Leshun Hunt, Adrian Duta and Robert Ruiz --have testified that Detective Guevara physically abused them that there is a pattern and practice of abuse and misconduct alleged against Detective Guevara that does explain how and why he elicited a *proven false confession* from Arturo DeLeon-Reyes on April 3-5, 1998.

### XI. The Custodial Interrogations and Police-Induced Confession
### Statement of Gabriel Solache on April 3-5, 1998

### A) Introduction

Because the Chicago police detectives failed to electronically record any of their interrogation of Gabriel Solache on April 3-5, 1998 – despite having the ability to do so (with

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 53


hand-held tape recorders available at the time) -- there is no objective record of the lengthy period of custody and interrogation that produced Mr. Solache's confession statement. As a result, the only (highly imperfect) record that exists of Mr. Solache's interrogation on April 3-5, 1998 are the recollections of the various participants: Gabriel Solache, Detective Reynaldo Guevara, and former Assistant State Attorney Heather Brualdi, all of whom testified in pre-trial hearings, at trial, in post-conviction proceedings and/or in depositions about their recollections, or absence of recollections, regarding what occurred during Gabriel Solache's more than 40 hours of custody and interrogation on April 3-5, 1998. Not surprisingly, this case – as with Mr. DeLeon-Reyes' -- therefore presents a classic swearing contest: the accounts of what occurred during this lengthy interrogation by Gabriel Solache, on the one hand, and Detective Guevara and former ASA Brualdi, on the other hand, are dramatically different. They are virtually polar opposite: one account describes a relentlessly brutal physically and psychologically coercive incommunicado interrogation lasting almost 48 hours in total, and the other describes one of the most sanitized and polite interrogations imaginable for a double homicide/double murder investigation, with the suspect even expressing how well he was treated at the end of it. Factually, these accounts cannot be reconciled. In the remainder of this section of the report, I will apply the findings of this empirical social science literature to both sets of accounts of Gabriel Solache's extended custody and interrogations on April 3-5, 1998, and I will discuss the implications and concerns that the social science research literature raises for each set of accounts and offer my professional expert opinions. Section XI of this report incorporates by reference (adopting and including as if stated herein) the empirical, academic social science research literature discussed in Section X.

### B) Gabriel Solache's Proven False Confession

As discussed in detail above, Gabriel Solache's confession statement meets the criteria of a *proven false confession* because it was not physically possible for Mr. Solache (or Mr. DeLeon-Reyes) to have committed the Soto double murder and double child abduction given the documentation of his work records, and given that the DNA testing of the crime scene evidence dispositively excluded both Mr. DeLeon-Reyes and Mr. Solache as the source of any of the physical evidence left by the true perpetrator(s) at the very bloody crime scene, while linking Adriana Mejia directly to the crime and the crime scene. In addition, Gabriel Solache's confession statement contains factual errors and inconsistences that contradict the physical evidence found at the crime scene, and are further indicia of its unreliability, as discussed earlier in this report.

### C) Gabriel Solache's Description of His Custodial Interrogation and and Police-Induced Confession Statement on April 3-5, 1998

Like Arturo DeLeon-Reyes, Gabriel Solache was taken from the 8th District police station to the Area 5 headquarters in the early morning hours of April 3rd and placed into a small,

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 54

locked interrogation room where he sat on a metal bench for what he has described as a lot of time. An officer came in and took his shoes without questioning him, and then the next time an officer came in, Mr. Solache was moved to a larger room. At that time, a Spanish speaking officer came in and questioned Mr. Solache for 10-15 minutes. He told Mr. Solache that he was being accused of two deaths, he rejected Mr. Solache's assertion of innocence, and he told Mr. Solache that he needed to tell the truth or else he would "get fucked." (Suppression Hearing Testimony, Bates Stamped Bluhm 022859). Mr. Solache was subsequently handcuffed and taken to a small interrogation room, where he remained handcuffed.

The next person to come in was Detective Guevara, who told Mr. Solache that he was being accused of committing the double murder. When Mr. Solache explained his innocence, Detective Guevara called Mr. Solache a liar and started beating Mr. Solache, who was handcuffed to a ring on the wall, repeatedly hitting Mr. Solache with his open hand on the left side of Mr. Solache's face, and threatened that something bad was going to happen to Mr. Solache if he did not confess. Mr. Solache continued to deny the accusations. Detective Guevara then left and returned with Adriana Mejia, who accused Mr. Solache of helping her commit the double murder/double abduction. When Mr. Solache again denied the accusations and professed his innocence, Detective Guevara again hit Mr. Solache, who was still handcuffed to a ring on the wall, with an open hand across his face, this time in front of Ms. Mejia (Ms. Mejia has testified that she saw Detective Guevara hit Mr. Solache very hard across the left side of his head when she was present during Mr. Solache's interrogation, and she has testified that Detective Guevara beat her as well during his interrogation of her in the Area 5 police station).

Detective Guevara then exited the room with Ms. Mejia, only to return alone a couple minutes later and start beating Mr. Solache by punching him in the stomach while Mr. Solache remained handcuffed to a ring on the wall. Mr. Solache reports that he signed the false confession statement because he could not take the beating anymore (at the suppression hearing in 2000, Mr. Solache estimated that Detective Guevara hit him 15-20 times, and that another detective had kicked his leg with the tip of his foot after taking Mr. Solache's shoes during one point in the lengthy custody and interrogation process). Eventually Assistant State Attorney Heather Brualdi came in the room to take Mr. Solache's confession statement, with Detective Guevara telling her what Mr. Solache was allegedly saying to him. Because ASA Brualdi did not read or understand Spanish, Ms. Brualdi assumed that Detective Guevara was accurately relaying Mr. Solache's statements but had no way of verifying anything Detective Guevara was saying. Mr. Solache did not understand anything ASA Brualdi said to Detective Guevara, nor did he understand anything Detective Guevara said to ASA Brualdi. Gabriel Solache states that Detective Guevara did not read anything to him. Mr. Solache signed the confession statement, written in English, by ASA Brualdi, and initialed corrected mistakes on the confession statement as he had been instructed to do by Detective Guevara, at 3:35 a.m. on April 5, 1998, even though Mr. Solache does not read English. Mr. Solache reports that Detective Guevara never read the confession statement to him, that he was never told of his right to an attorney or to terminate

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 55

questioning, and that he learned the details of the crime from Detective Guevara. Mr. Solache also reports that over this two day period of custodial detention and interrogation, he was given one sandwich, allowed to use the bathroom once (his subsequent requests had been refused), only given water once and was not able to sleep during this entire time.

**D) Risk Factors for False Confession in Gabriel Solache's Account**

Gabriel Solache has testified on multiple occasions about what he recalls occurring during his lengthy, unrecorded custodial interrogations by Detective Guevara and ASA Heather Brualdi over the more than 40 hours that he was in police custody on April 3-5, 1998. Mr. Solache describes how Detective Guevara moved him from adamantly denying that he had anything to do with the Soto double murder and professing his innocence to signing a statement that Mr. Solache asserts is false, and that, as mentioned above, meets the criteria of a *proven false confession*. In his account of the lengthy, unrecorded custodial interrogations by Detective Guevara and ASA Brualdi on April 3-5, 1998, Gabriel Solache describes numerous interrogation techniques, methods and strategies, as well as other factors, that decades of empirical social science research has shown significantly increases the risk of eliciting false, unreliable and involuntary confessions. These include:

1) *Physical Abuse and Coercion.* As discussed above, Gabriel Solache reports that Detective Guevara violently and repeatedly physically assaulted Mr. Solache over the course of multiple interrogation sessions on April 3-5, 1998. According to Mr. Solache, Detective Guevara repeatedly hit Mr. Solache across the face while Mr. Solache was handcuffed to a ring on the wall when Mr. Solache denied Detective Guevara's accusations and refused to admit involvement in the Soto double murder/double child abduction. According to Mr. Solache, Detective Guevara hit Mr. Solache across the left side of his face and ear with an open hand. Because Mr. Solache was chained to the wall with a right handcuff, Detective Guevara repeatedly hit Mr. Solache on the left side of his head, causing Mr. Solache extreme pain in his left ear and, Mr. Solache believes, permanent hearing loss in his left ear. According to Mr. Solache, Detective Guevara also hit Mr. Solache in the presence of Adriana Mejia, who also reports that she was beaten by Detective Guevara during her lengthy custody and interrogation on April 3-5, when he brought her into the interrogation room to accuse Mr. Solache of being involved in the Soto double murder/double child abduction. Adriana Mejia has testified that Detective Guevara beat Mr. Solache in her presence, corroborating Mr. Solache's account of physical abuse at the hands of Detective Guevara. Mr. Solache also reports that Detective Guevara subsequently repeatedly punched him in the stomach when Mr. Solache failed to provide the answers that Detective Guevara was seeking and continued to deny involvement in the crime. As mentioned above, Mr. Solache estimated that Detective Guevara hit him 15-20 times over the course of his more than 40 hours of custody and interrogation on April 3-5, 1998, and that another detective had kicked Mr. Solache's leg with the tip of his foot. Mr. Solache has testified that the primary reason he agreed to sign a false confession statement to the Soto

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 56

double murder/double was to put an end to Detective Guevara's physical beating and coercion of him.

As described earlier, testimony by Arturo Deleon-Reyes, Adriana Mejia, and Rosauro Mejia that Detective Guevara physically assaulted them at Area 5 in early April, 1998; accounts of numerous other suspects and witnesses in other cases that Detective Guevara physically assaulted them during interrogations, and the Lassar report conclusion that it was "more likely than not that Mr. Solache and Mr. DeLeon-Reyes were physically abused by Detective Guevara and were otherwise subjected to unreasonable treatment during the course of their interrogations" corroborate Mr. Solache's assertion of being physically abused by Detective Guevara. As described earlier, there is no dispute that the physical coercion that Gabriel Solache describes has long been regarded as a direct cause of interrogation-induced false confessions from innocent suspects in the empirical social science research literature, and that this kind of physical coercion would have significantly increased the risk of eliciting false compliance and a false confession from Mr. Solache. Mr. Solache describes it as the direct cause of his *proven false confession*.

2) *Lengthy (Incommunicado) Interrogation and Sleep Deprivation*. As mentioned earlier, researchers consider the length of an interrogation to include both the time that a suspect is being questioned and/or accused as well as any breaks between questioning/accusation sessions because breaks between accusation and questioning add to the stress and fatigue of the interrogation and sometimes are used as an interrogation technique itself. The more than 40 hours of custody and interrogation of Gabriel Solache on April 3-5, 1998 was *extraordinarily* lengthy by traditional police standards existing both then and now. As noted above, even a 4 hour custodial interrogation is considered lengthy and is warranted only in exceptional situations, because it creates the risk of exhausting, fatiguing and psychologically weakening, if not overcoming, a custodial suspect's ability to freely choose to continue participating in the interrogation. As also discussed above, lengthy interrogation, and the sleep deprivation that it sometimes leads to (Mr. Solache's interrogation, like Mr. DeLeon-Reyes occurred over two days and two nights during which Mr. Solache, like Mr. DeLeon-Reyes, reported he was unable to get any sleep) significantly increases the risk of overbearing a suspect's will and eliciting false and unreliable statements, admissions and/or confessions. Like Mr. DeLeon-Reyes, Mr. Solache reports that over this two day period (Mr. Solache had been in custody detention and interrogation inside the Area 5 police station for more than 40 hours) he was given one sandwich, allowed to use bathroom once, and was only given water once during this period of time. The extreme deprivation of sleep, food and water that Mr. Solache describes caused exhaustion, fatigue and physical weakening that – as is well-known in both science and law -- is a risk factor for police-induced false confessions.

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 57


3) *Rush to Judgment Based on a Premature Presumption of Guilt, Presumption of Guilty Knowledge and Investigative Bias.*[67] As in Arturo DeLeon-Reyes' lengthy custody and interrogations on April 3-5, 1998, Detective Guevara presumed Gabriel Solache's guilt from the start in the Soto double murder/double child abduction despite no evidence or basis for doing so, and aggressively and coercively sought to pressure Mr. Solache to confess to this crime in order to build a case against him regardless of his guilt or innocence. Detective Guevara also aggressively and coercively pressured Arturo DeLeon-Reyes and Adriana Mejia to implicate Mr. Solache.  Based on Mr. Solache's description of his lengthy, unrecorded custodial interrogations on April 3-5, 1998, Detective Guevara did not seek to evaluate Mr. Solache's possible guilt or innocence but instead single-mindedly sought to elicit a confession from him that confirmed Detective Guevara's lazy pre-existing conjectures and speculations.  As discussed above, social science research has demonstrated that investigators' pre-existing presumption of guilt and investigative bias leads to tunnel vision that puts innocent suspects at an elevated risk of making or agreeing to a false statement, admission, or confession in order to satisfy overzealous investigators and put an end to the accusatory pressures of sustained police interrogation.[68] And, as with the lengthy and unrecorded custodial interrogations of Mr. DeLeon-Reyes, Detective Guevara demonstrated a profoundly reckless disregard for the truth in his multiple interrogations of Gabriel Solache. Furthermore, he did not attempt to have Mr. Solache submit to a polygraph examination, as he did with Adriana Mejia; nor did he attempt to have Mr. Solache sign a consent to search the room he rented at the Mozart residence.

Since Mr. Solache meets the criteria for a *proven false confession*, as discussed above, it is my opinion that Detective Guevara made a *misclassification* error (i.e., subjecting a factually innocent person to a guilt-presumptive and accusatory interrogation designed for a factually guilty suspect) with respect to Mr. Solache just as he had done with Mr. DeLeon-Reyes.  As discussed earlier, it was impossible for Mr. Solache to have committed the double murder/homicide, both based on his employee timesheets showing his long workdays the day of, and the day before, the crime; and based on the DNA testing from the bloody crime scene that dispositively excluded him as the source of any forensic evidence left behind by the true perpetrators at the crime scene (it would not have been possible for the true perpetrator to have committed the crime as described in Mr. Solache's  statement without leaving behind DNA evidence).  As in Mr. DeLeon-Reyes lengthy, psychologically and physically coercive interrogation, due to their rush to judgment, premature presumption of guilt and guilty

---

[67]  *See* Saul Kassin, Christine Goldstein, and Kenneth Savitsky (2003).  "Behavioral Confirmation in the Interrogation Room: On the Dangers of Presuming Guilt" *Law and Human Behavior*, 27, 187-203; C. Hill, A. Memon, and P. McGeorge (2008).  "The Role of Confirmation Bias in Suspect Interviews: A systematic Evaluation" *Legal & Criminological Psychology*, 13, 357-371; and Fadia Narchet, Christian Meissner, and Melissa Russano (2011).  "Modeling the Influence of Investigator Bias on the Elicitation of True and False Confessions" *Law and Human Behavior*, 35, 452-465.

[68]  Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010).  "Police-Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38.

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 58


knowledge, and tunnel vision, Detective Guevara and ASA Brualdi were not gathering evidence against Mr. Solache: rather, they were creating and fabricating it.

4) *False evidence ploys.*  As mentioned earlier, police interrogators routinely tell criminal suspects that the evidence establishes their guilt, and if police are making up, lying about, or exaggerating non-existent evidence, this is called a false evidence ploy.  The social science research literature has demonstrated that false evidence ploys are potentially psychologically coercive techniques that are virtually always present in, and substantially likely to increase, the risk of eliciting false statements, admissions, and/or confessions.  False evidence ploys are among the most well-documented *situational* risk factors for eliciting false and unreliable statements, admissions, and/or confessions, as described in the social science research literature.[69]  In Gabriel Solache's interrogations on April 3-5, 1998, as in Arturo DeLeon-Reyes' interrogations, Detective Guevara brought Adriana Mejia into the interrogation at some point to falsely accuse Mr. Solache of committing the double murder/double child abduction with her.

Since Gabriel Solache's interrogation-induced confession statement meets the criteria of a *proven false confession*, it is my opinion that there was at least one false evidence ploy in Detective Guevara's lengthy, multiple interrogations of Gabriel Solache on April 3-5, 1998.  Since Gabriel Solache's confession statement is provably false, it follows as a matter of logic that Adriana Mejia's accusation that he participated with her in the double homicide of Mariano and Jacinta Soto was factually false.  In addition, Detective Guevara obtained a confession from Mr. Solache only after he had obtained statements from other witnesses (plural) accusing Mr. Solache of committing the murder.  The logic of Detective Guevara bringing Ms. Mejia into the interrogation to falsely accuse Mr. Solache of committing the double murder with her was to convince Mr. Solache that the evidence conclusively established his guilt, that no one would believe his denials and therefore that he had no meaningful choice but to stop denying and, instead, admit to Detective Guevara's accusations.   Detective Guevara's false evidence ploy here likely contributed to Mr. Solache's perception of feeling hopeless during the lengthy interrogation and ultimately to complying with Detective Guevara demand that he ultimately sign and initial the confession statement that he was neither able to read nor understand.   As discussed earlier, empirical research has shown that the use of false evidence ploys significantly increases the risk of eliciting false confessions from the innocent.

5) *Threats and Promises*. As discussed earlier in this report, the use of implicit and/or explicit promises (for example, of leniency, immunity and/or a tangible benefit) as well as implicit and/or explicit threats (for example, of physical harm, a higher charge, longer sentence or harsher punishment) significantly increases the risk of eliciting a false and/or unreliable statement, admission, and/or confession.  Indeed, as empirical social science research has

---

[69]     Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38.

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 59

repeatedly demonstrated, promises of leniency and threats of harm, whether implicit or explicit, are widely associated with police-induced false confession in the modern era and are believed to be among the leading causes. Gabriel Solache describes interrogation sessions on April 3-5, 1998 that contained both explicit threats of harm and implicit promises of leniency. As mentioned earlier, Mr. Solache describes the initial threat as coming from the unnamed officer who told him he would "get fucked" if he did not tell the truth. The clear implication is that Mr. Solache would be harmed if he did not provide an account that his interrogators deemed truthful (whether or not it was in fact truthful), and that he would be treated more leniently if he did (i.e., that if he complied he would not "get fucked"). Detective Guevara subsequently threatened Mr. Solache that something bad happening to him if he did not agree with Detective Guevara's accusations. This explicit threat occurred after Detective Guevara had started beating Mr. Solache. The explicit threat also carried an implicit promise: that if Mr. Solache bent to Detective Guevara's threats, nothing bad would happen to him and he would not continue to get physically beat and pummeled by Detective Guevara.

As discussed earlier, the use of implicit and explicit threats of harm, as well as implicit and explicit promises of leniency, immunity and/or a tangible benefit, significantly increases the risk of overbearing a suspect's will and eliciting an involuntary false statement, admission, and/or confession.

6) *Psychological Coercion*. As discussed earlier, it is well-established that psychologically coercive interrogation techniques increase the risk of eliciting false and/or involuntary incriminating statements, admissions and/or confessions.[70] In my professional opinion, the lengthy, unrecorded custodial detention and interrogation sessions described by Gabriel Solache, like those described by Arturo DeLeon-Reyes, occurring on April 3-5, 1998 were extremely psychologically coercive for several reasons.

First, as just described, Mr. Solache was explicitly threatened with ongoing physical and psychological harm if he did not comply and confess and implicitly promised he would not be, or not continue to be, physically and psychologically harmed if he complied and confessed.

Second, Detective Guevara's interrogation methods, especially his physical slapping, punching and beating of Mr. Solache, wore Mr. Solache down and overcame his will to resist. Put differently, Mr. Solache came to perceive that the only way to put an end to Detective Guevara's torture was to do as Detective Guevara demanded and sign the statement; Mr. Solache perceived he had no choice to do otherwise.

---

[70] Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38; Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press); Richard Ofshe and Richard A. Leo (1997). "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions" *Studies in Law, Politics & Society*, 16, 189-251.

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 60

Mr. Solache was also likely more vulnerable to the physical and psychological coercion he describes because of his personal background. Mr. DeLeon-Reyes did not speak or understand English and had only been in the United States for a few months. His language barriers and inability to comprehend what was going on during the interrogation he describes, especially the physical abuse and psychological threats, would have likely heightened his feelings and hopelessness and helplessness and thus augmented the coerciveness of the lengthy custody and interrogations.

Third, like Mr. DeLeon-Reyes, Gabriel Solache has repeatedly testified that he was never informed at any point over the course of the lengthy period of custodial interrogation that he had a right to silence or a right to counsel or to contact the Mexican consulate throughout the extremely lengthy and overbearing interrogation. Detective Guevara's failure to provide Mr. Solache with *Miranda* warnings and his failure to elicit voluntary and knowing waiver from Mr. Solache to participating in the interrogation added to Mr. Solache's perception that he had no ability to assert his will and terminate the interrogation unless he submitted to Detective Guevara's demands that he sign and initial the edited statement. For all three reasons, Detective Guevara's interrogation techniques over the course of this extremely lengthy interrogation were psychologically coercive (in addition to being physically coercive) and ultimately elicited involuntary compliance to Detective Guevara's demand that Mr. Solache sign a confession statement.

7) *Police Interrogation Contamination and Scripting*. As with Arturo DeLeon-Reyes' lengthy and overbearing police interrogations on April 3-5, 1998 leading to his proven false confession, Mr. Solache did not know that Mariano and Jacinta Soto had been murdered or that their children had been abducted prior to his interrogations by Detective Guevara. Detective Guevara educated him about crime details as well as about his theory of how and why the crime occurred. In other words, according to Mr. Solache, Detective Guevara both contaminated Mr. Solache and scripted his prosecution-written and edited confession statement. According to Mr. Solache, his confession statement was not read to him out loud, and even if it had been he would not have been able to understand it since it is in English and he only speaks Spanish. Nor was Mr. Solache provided the opportunity to read confession statement, but, again, even if he had been he would not have been able to understand it since again it was in English and he read only Spanish. Instead, he signed and initialed the prosecution-written and edited confession statement where directed by Detective Guevara and ASA Brualdi. As with Officer Trevino and ASA O'Malley in Mr. DeLeon-Reyes' interrogation-induced and prosecution-written confession statement, Detective Guevara and ASA Brualdi used the "Error Insertion Trick" technique of inserting trivial errors into the statement, crossing out and correcting them, and then directing Mr. Solache to initial each correction, while representing that it was Mr. Solache who had first spotted the trivial errors in his confession statement and then directed Detective Guevara and ASA Brualdi to correct them, all three of whom then signed the prosecution-written and edited

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 61

corrected confession statement errors to validate this deception. The fact that it would have been impossible for Mr. Solache to spot the errors and direct Detective Guevara and ASA Brualdi to correct the errors -- because Mr. Solache did not read or understand English and thus could not have spotted the errors that ASA Brualdi wrote out in English -- gives away the lie to Detective Guevara's and ASA Brualdi's fraudulent scripting and fabrication of Mr. Solache's confession statement. As mentioned earlier, the use of police interrogation contamination and scripting techniques increase the risk of making an otherwise false confession statement misleadingly appear true and persuasive by creating the false impression that the details in it voluntarily originated with the suspect and the false impression that the confession statement is true, detailed and self-corroborating – and persuasively so.

8) *Violation of National Police Interrogation Training Standards, Protocols and Best Practices.* Like Arturo DeLeon-Reyes' account of his more than 40 hours of custody and interrogation on April 3-5, 1998, Gabriel Solache's account describes numerous interrogation techniques and practices that repeatedly violated national police interrogation standards, protocols and best practices in general as they existed in 1998.

First, as mentioned above, American police investigators are universally trained to absolutely avoid the use of physical force and coercion in the interrogation room, which is unlawful, unconstitutional and correctly believed by law enforcement to lead to both involuntary and false confessions. American police are trained that the use of physical force and coercion to obtain confessions is also unethical, unlawful and never permissible. As discussed above, Gabriel Solache describes the use of repeated violent physical assaults by Detective Guevara – being repeatedly struck and slapped across the face and being repeatedly punched in the stomach – while Mr. Solache's right hand was chained to a wall ring. As has been well-known in American policing since 1936, physically coercive interrogation is not only been a violation of universal American police interrogation standards, it is also illegal.

Second, as discussed above, American police investigators are trained generally to avoid the use of threats of harm (implicit or explicit) and promises of leniency (implicit or explicit) to elicit statements, admissions and/or confessions because threats and promises are understood by law enforcement to be psychologically coercive and thus to lead to involuntary and/or false confessions. And as also discussed above, Mr. Solache describes interrogation sessions in which an unnamed officer and Detective Guevara issued implicit and explicit threats of harm and promises of leniency. These threats and promises were impermissible, unlawful and violated universal American police interrogation standards as they existed in 1998.

Third, as discussed above, American police are trained never to deprive a suspect of essential necessities such as food, drink, sleep or rest during interrogation because that is also unconstitutional and is universally recognized by law enforcement to lead to coerced, involuntary and/or false confessions. Like Mr. DeLeon-Reyes, Gabriel Solache describes only

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 62


having been provided with one sandwich and one drink during his 40 plus hours of custody and interrogation by the Chicago police.  Mr. Solache, who voluntarily came to the 8th District police station in the early morning hours of April 3, 1998, describes not being able to sleep during the two day period of interrogation and custody on April 3-5, 1998. The extreme sleep, food and water deprivation that Mr. Solache describes violated American police interrogation standards and best practices as they existed in 1998, and was also unconstitutional.

Fourth, and related, Detectives Guevara, also violated American police interrogation practice standards with respect to the extraordinary length of Mr. Solache's custody and interrogation (as he and other investigators had done with Mr. DeLeon-Reyes as well).  As discussed earlier, the 1986 Reid and Associates police interrogation training manual specifically recommends that police interrogate suspects for no longer than four (4) hours absent "exceptional situations" and that "most cases require considerably fewer than four hours."[71] The 40 plus hours of custody and interrogation that the detectives subjected Mr. Solache (like Mr. DeLeon-Reyes) to on April 3-5, 1998 was truly extraordinary and violated American police interrogation standards and best practices as they existed in 1998.

Fifth, as described above, American police interrogators are trained to avoid contaminating a suspect by leaking or disclosing non-public case facts to him or her but, instead, to hold back unique case information and let the suspect volunteer case details in order to demonstrate inside knowledge of the crime details to corroborate the accuracy of any incriminating statements.  Yet Detective Guevara leaked numerous non-public crime details, as well as their theory of how and why the double murder the Soto's and the double abduction of their children occurred, to Mr. Solache, just as they had done to Mr. DeLeon-Reyes, educating him about crimes that he knew nothing about prior to his interrogation on April 3-5, 1998, as previously discussed. Detective Guevara's contamination of Gabriel Solache and their fraudulent scripting and fabrication of his confession statement during his lengthy period of custody and interrogation on April 3-5, 1998 violated American police interrogation standards and best practices as they existed in 1998.

Sixth, as mentioned earlier, the Reid and Associates training manuals and programs have always repeatedly implored police investigators not to use any interrogation technique that is "apt to make an innocent person confess."[72]  Yet, according to Gabriel Solache's description of what occurred during his more than 40 hours of custody and interrogation on April 3-5, 1998, Detective Guevara used numerous techniques that the Reid Manual specifically teaches investigators not to use because they are apt to cause a false confession: physical coercion and abuse, explicit and implicit threats of physical and psychological harm, explicit and implicit

---

[71]  Fred Inbau, John Reid, and Joseph Buckley (1986).  CRIMINAL INTERROGATION AND CONFESSIONS, 3rd Edition (Williams & Wilkins) at 310.

[72]  *See* Fred Inbau, John Reid, and Joseph Buckley (1986).  CRIMINAL INTERROGATION AND CONFESSIONS, 3rd Edition at xiv (Williams & Wilkins).

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 63

promises of leniency, excessively lengthy interrogation and deprivation of essential necessities (sleep, food, water). In addition, Detective Guevara failed to inform Mr. Solache of his *Miranda* rights to silence, counsel or notice during his more than 40 hours of custody and interrogation on April 3-5, 1998, failed to elicit a voluntary or knowing waiver to his *Miranda* rights and failed to notify him of his right to contact the Mexican consulate, all of which are required by law and properly trained American police detectives in 1998 would have been expected to know. All of these techniques and practices violated American police interrogation standards and best practices as they existed in 1998.

### E) Detective Reynaldo Guevara's and Assistant State Attorney Heather Brualdi's Account of the Unrecorded Custodial Interrogations of Gabriel Solache on April 3-5, 1998

According to Detective Guevara, he first came in contact with Gabriel Solache on April 3, 1998 at 11:45 p.m. in an interview room in the Area 5 police station. According to Detective Guevara, he introduced himself and told Mr. Solache that he would be talking to him later. Detective Guevara also inspected Mr. Solache's clothes and shoes, and removed a pair of gym shoes that Mr. Solache was wearing and left the room. Detective Guevara states that he returned to the same interview room at 12:15 a.m. on April 4, 1998. At that time, Detective Guevara advised Mr. Solache of his Miranda rights in Spanish from a preprinted Miranda card, and then confirmed that Mr. Solache understood every one of his *Miranda* rights. Detective Guevara then interviewed Mr. Solache for 10-15 minutes. No one else was present during this interview.

According to Detective Guevara, he observed Mr. Solache sleeping later that morning and did not interview him again until 9:00 p.m. on April 4th. At the beginning of this interview, Detective Solache reminded Mr. Solache of his Miranda rights and again asked whether Mr. Solache understood each of his *Miranda* rights, to which Mr. Solache responded "yes." Detective Guevara discussed the case with Mr. Solache, and Mr. Solache initially denied any involvement. However, according to Detective Guevara, it was during this interview that he told Mr. Solache that both Mr. DeLeon-Reyes and Ms. Mejia were implicating him in the double homicide/double child abduction. According to Detective Guevara, Mr. Solache then responded that he was there and that he would tell Detective Guevara what happened. According to Detective Guevara, this interview lasted approximately 30 minutes.

Detective Guevara states that the next time he interviewed Mr. Solache was at 11:25 p.m. on April 4, 1998 in a conference room that Detective Guevara brought Mr. Solache to. At that time, Detective Guevara says he was with Assistant State Attorney Heather Brualdi, who he reports advised Mr. Solache of his Miranda rights from memory while Detective Guevara translated what she was saying from English to Spanish since Mr. Solache did not understand English. According to Detective Guevara, this interview lasted approximately 45-60 minutes. Mr. Solache was then returned to an interview room.

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 64

Finally, at 3:35 a.m. on April 5, 1998, Detective Guevara and ASA Brualdi brought Mr. Solache back to the conference room where, in a question and answer fashion, they took a handwritten statement from him. ASA Brualdi would ask Mr. Solache a question in English, Detective Guevara would translate it into Spanish, Mr. Solache would answer it in Spanish, and then Detective Guevara would translate Mr. Solache's answer into English. ASA Brualdi would then write out the statement in English. According to Detective Guevara, this took 45-60 minutes, after which ASA Brualdi gave the statement, written in English, to Detective Guevara to read to Mr. Solache in Spanish. According to Detective Guevara it took him 45-60 minutes to review the statement. Whenever there was a mistake in the English statement, which Mr. Solache could not read, Detective Guevara, ASA Brualdi and Mr. Solache all initialed the mistake. According to ASA Brualdi, Mr. Solache corrected her whenever she wrote out a sequence that was incorrect, causing her to cross out a portion of a sentence she had written and then rewrite it.

According to Detective Guevara, Mr. Solache indicated that he was treated well by the police. In addition, Mr. Solache indicated that he was allowed to use the bathroom, and that he had had three sandwiches to eat, pop and water to drink, and cigarettes to smoke. Detective Guevara denied physically assaulting Mr. Solache when he was alone with Mr. Solache, denied physically assaulting Mr. Solache in the presence of Adriana Mejia, and denied making any promises or threats or threats to Mr. Solache.

When testifying under oath and asked in a post-conviction proceeding in 2013, and in his deposition in 2020, about what occurred during the interrogations of Mr. Solache, what interrogation techniques and practices he used, and whether he physically assaulted and coerced Mr. Solache, Detective Guevara invoked his 5th Amendment Privilege Against Self-Incrimination, and thus avoided answering these and other questions about the nature and circumstances of Mr. Solache's custody and interrogations on April 3-5, 1998, and the resulting involuntariness and unreliability of Mr. Solache's resulting statement.

### F) Comparing Gabriel Solache's and the Law Enforcement Accounts of the Unrecorded Interrogation of April 3-5, 1998

Gabriel Solache's account of what occurred during his more than 48 hours in custody and multiple interrogation sessions from the early morning hours of April 3, 1998 to the early morning hours of April 5, 1998 differs dramatically from the accounts of Detective Guevara and ASA Brualdi. They differ on virtually every relevant factual detail. The accounts are so different that they are impossible to reconcile. Like Arturo DeLeon-Reyes, Gabriel Solache describes numerous interrogation techniques (*e.g.*, accusations, attacks on denials, escalation of pressure, threats and promises, physical violence) as well as interrogation contamination and scripting. These interrogation techniques were physically and psychologically coercive and

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 65

involved several known risk factors for eliciting false confessions according to decades of empirical scientific research on the psychology of police interrogations and suspect confessions. The interrogation methods, strategies and techniques that Mr. Solache, describes – as with those described by Mr. DeLeon-Reyes -- fit with the empirical research on the kinds of interrogation techniques, methods, practices and effects that lead to false compliance and false confession. The parallels between what Mr. DeLeon-Reyes and Mr. Solache describe occurring during their 40+ hours of custody and interrogation in the Area 5 police station are striking, and thus corroborate one another.

According to Detective Guevara, despite the extraordinary length of Gabriel Solache's custody and detention, the entirely unrecorded questioning of Gabriel Solache – was brief relatively brief, mostly conversational and more interview than interrogation (*i.e.*, mostly question and answer), and involved only one interrogation technique (Detective Guevara telling Mr. Solache that Mr. DeLeon-Reyes and Mr. Mejia implicated Mr. Solache in the double murder/double child abduction before Mr. Solache, who was never tired, hungry, frightened, in pain or discomfort, or desirous of an attorney or stopping the interrogation (despite being in the 8th District and Area 5 police stations for nearly 48 hours from early in the morning on April 3, 1998 to early in the morning on April 5, 1998), voluntarily confessed to the double murder of the Soto's and the abduction of their children.

In my professional opinion, Mr. Solache's more detailed and robust account of the lengthy, unrecorded custody and interrogation sessions on April 3-5, 1998 fits with the findings of the empirical and scientific research literature on how and why individuals can be moved to make or agree to false compliance and give a *proven false confession*. Detective Guevara's and ASA Brualdi's accounts do not. They fail to provide any explanation of how or why Mr. Solache would have been moved to make or agree to a *proven false confession*. As mentioned earlier, however, so many individuals (witnesses and suspects in prior cases) have testified that Detective Guevara physically abused them in their cases that there exists a pattern and practice of abuse and misconduct alleged against Detective Guevara that does explain how and why he elicited a *proven false confession* from Gabriel Solache on April 3-5, 1998.

**XII. The Chicago Police Department's Widespread and Systemic Pattern and Practice of Physically and Psychologically Coercive Interrogations (Especially of African-American and Latino Men) from 1972 to at Least 2000; and The City of Chicago's Continuing Notice of Systemic Physical Coercion and Abuse to Extract And Fabricate Confessions to High Ranking Officials in the City of Chicago, High-- Ranking Officials in the Chicago Police Department, and Police Command Personnel**

**(A) Introduction**

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 66

Starting in 1972 and continuing up to at least 2000, the City of Chicago's Police Department had a systemic practice of subjecting suspects (primarily African-American and Latino men) to physically abusive and coercive interrogations with the result of coercing and/or fabricating confession statements without regard to the interrogated suspects' actual guilt or innocence. Moreover, at least as early as February of 1982 and continuing through the 1990s, high ranking officials in the City of Chicago and the Chicago Police Department and numerous police command personnel, received continuing notice of this systemic practice of torture, physical abuse and coercion of (primarily Black and Latino) suspects resulting in coerced and fabricated confessions, including from the repeated documented allegations that accumulated against supervisors and detectives, first at Area 2 detective Division, and later at Areas 3, 4 and 5; from the testimony of numerous criminal defendants at motion to suppress hearings and trials; from in-court admissions of city lawyers; from the findings in numerous Office of Professional Standards reports; from federal and state court decisions; from media articles, reports and editorials; from innocence pardons by the Governor of Illinois; from numerous civil lawsuits alleging physical abuse and coercion to extract and fabricate confessions; from the findings of the United Nation's Committee against Torture and from Amnesty International; and from the admissions of City officials.

In this section, I will review the evidence establishing the basis for these opinions, as well as briefly summarize many of the cases that illustrate the substantial empirical basis for these opinions.

**(B) Systemic and Widespread Torture, Physical Abuse and
Coercive Interrogation At Area 2 Under Jon Burge, and Continuing
Notice to High Ranking Officials in the City of Chicago, High-Ranking
Officials in the Chicago Police Department, and Police Command Personnel**

It has been well documented that Jon Burge and those under his command, first at Area 2 and later at Area 3, collectively tortured at least one-hundred and twenty-five (125) suspects from 1972 to 1991. (*See* Torture Victims Chart PTP-NOTICE-000842). On May 6, 2015, the Chicago City Council passed the landmark Reparations for Burge Torture Victims Ordinance and accompanying resolution that included the creation of a Reparations fund of $5.5 million for approximately 60 living victims of police torture by Burge or those under his command, waived tuition at City Colleges, established a mandatory Public Schools curriculum to educate students about police torture under Burge, and provided for the creation of a public memorial. (PTP-NOTICE-001153-1157). On May 6, 2015, Mayor Rahm Emanuel apologized to the victims of Chicago police torture at the Chicago City Council meeting, stating:

> This is another step but an essential step in righting a wrong, removing a stain on the reputation of this great city. Chicago finally will confront its past and come to terms with it and recognize when something wrong was done and be able to be strong enough to say

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 67

something was wrong. I want to thank you for your persistence. I want to thank you for never giving in and never giving up and allowing the city to join you on that journey to come face-to-face with the past and be honest enough and strong enough to say when we are wrong and try to make right what we've done wrong. This stain cannot be removed from the history of our city. But it can be used as a lesson of what not to do and the responsibility that all of us have.[73]

On February 9, 1982 CPD officers Fahey and O'Brien were murdered. Jon Burge, who was then a Lieutenant at Area 2, led the investigation of the murders of Fahey and O'Brien and the notorious manhunt looking for the perpetrators. In February of 1982, Area 2 consisted of a two-story building with a basement at 91st Street and Cottage Grove Avenue in Chicago, Illinois. *See People v. Jackie Wilson* (Circuit Court of Cook County, June 20, 2018) (PTP-NOTICE-000709-827).

Doris Byrd retired as a Sergeant in the CPD in 2004. Byrd was hired at the CPD in 1977 and was later assigned to be a detective in the Area 2 Violent Crimes Unit. According to Byrd, there were a group of detectives named the "A Team" at Area 2. This group consisted of detectives who handled mostly homicides and high publicity cases. Sammy Lacey, a former Sergeant in the CPD, testified that the "A-Team" was a euphemism for Burge's "Ass-kicking" team. According to Byrd, there was visible "camaraderie" between Lt. Burge and the "A Team", as they often socialized with each other outside of the station as well. Lacey testified that the "A-Team" had a high proportion of cases cleared through confessions, that the "A-Team" had access to torture devices at Area 2, that the building was heated through radiators which "were very hot" to the touch and Area 2 had typewriters on the second floor with plastic vinyl covering. Byrd testified that not only did Burge and his "A-Team" have access to such devices, but she actually heard people being tortured at Area 2 while she was there. For instance, Byrd heard screaming and other unusual noises coming out of the interview rooms when the midnight shift was interrogating suspects. Some of these individuals confided in Byrd that they were tortured by the "A-Team." Byrd also learned that some of these suspects were tortured with devices such as telephone books, bags, and electroshock. Detective Byrd later learned from fellow detectives and suspects that the "black box…was running rampantly through the unit up there." According to Byrd, it was an open secret that this type of torture existed at Area 2 under the supervision of Jon Burge. Three additional African American Area 2 detectives confirmed that Burge had an electric shock device at Area 2 that he used on African American suspects in the 1970s and 1980s. In the 1970's, Bill Parker saw it in use and Melvin Duncan saw it on a table, while Walter

---

[73] Fran Spielman, City Council approves $5.5 million in reparations for Burge torture victims, CHI. SUN-TIMES (May 6, 2015); Hal Dardick & John Byrne, Mayor: Approval of Burge victims fund a step toward 'removing a stain', CHI. TRIB. (May 6, 2015).

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 68

Young saw it in the early 1980s. *See People v. Jackie Wilson* (Circuit Court of Cook County, June 20, 2018).

On February 14, 1982, Burge and detectives working under his command arrested Andrew and Jackie Wilson for the murders and tortured confessions from them. On February 17, 1982, Dr. John Raba, medical director of Cermak Hospital, made an official complaint by letter to CPD Superintendent Richard Brzeczek demanding an investigation of allegations that Andrew Wilson had been tortured and abused at Area 2. The letter described numerous injuries that Dr. Raba observed on Andrew Wilson and Wilson's allegations that he had been electric shocked. PTP-GENERAL-000001-000065. On February 25, 1982, Police Superintendent Richard Brzeczek sent a later to Cook County State's Attorney (and eventually mayor) Richard Daley, informing him of Dr. John Raba's reported abuse of Andrew Wilson by Chicago police during interrogation. Daley took no action in response to the letter. (*See* PTP-NOTICE-001464-1465).

During his tenure as Cook County State's Attorney, more than 50 additional cases of torture and abuse by Lt. Jon Burge and his fellow detectives came out of Area 2. (*See* Torture PTP-NOTICE-000842). Twenty years later (2002), Mr. Brzeczek would tell a Chicago Tribune reporter that, "There is no doubt in my mind that Burge and his detectives tortured some suspects. The whole situation at Area 2 [was] a disgrace and embarrassment." (Steve Mills, Chicago Tribune, April 29, 2002).

In 1982, attorney Ronald Samuels, who was President of the Cook County Bar Association, contacted the Chicago Police Department's Office of Professional Standards (the city of Chicago governmental entity tasked with oversight of the Chicago Police Department) because of the number of complaints that had been made against Chicago police officers for misconduct in their hunt for the people who killed to police officers. OPS staff informed Mr. Samuels that they had lost 120 complaints that had been made. *People v. Jackie Wilson* (Circuit Court of Cook County, June 20, 2018). As former police chief Richard Rosenthal has opined, the loss of this many police reports had to have been a deliberate act. (*See* PTP-NOTICE-003193-003223)

In January 1983, Leroy Martin Sr. was appointed Commander of Area 2 and as such was Jon Burge's direct supervisor.

In 1984, David Fogel, who at that time was the Chief Administrator of OPS, sent a report to Superintendent Fred Rice listing reports of Chicago Police Department officers who had used electrical shocking devices on prisoners over the previous 12 months. PTP-GENERAL-000001-000006; PTP-NOTICE-002277-002284)

In 1986 Andrew Wilson filed a civil case alleging torture by Burge and other Area 2 detectives.

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 69

In 1986, the CPD promoted Jon Burge to Commander, transferred him to the Bomb and Arson Unit, and replaced him at Area 2 with Lt. Phil Cline. Cline, while Lieutenant at Area 2, did no investigation nor made any inquiry concerning alleged torture at Area 2 under his predecessors.

In 1987, The Illinois appellate court reversed Andrew Wilson's criminal conviction for failure to suppress his confession due to physical abuse.  The Illinois Supreme Court upheld the appellate court's reversal of Andrew Wilson's criminal conviction.

In 1989, an anonymous police source sent letters to Andrew Wilson's lawyers stating that Burge was the torture ringleader, identified his "asskickers," which included Sergeant John Byrne and Detective Peter Dignan., and stated that Melvin Jones was tortured by Area 2 police officers. In August of 1989 a federal jury in the Andrew Wilson civil case found that the CPD had a policy and practice of "allowing police officers to torture persons suspected of killing or wounding officers." (*See* PTP-NOTICE-002208-2215, 001533)

In January 25, 1990 John Conroy published an article entitled, "the House of Screams" in the Chicago Reader detailing the torture of Jon Burge and others at the area 2 police station and the case of Andrew Wilson in particular.

In February of 1990, Amnesty International sent a report to Ira Raphaelson, the Acting United States Attorney for the northern District of Illinois, detailing the allegations of torture of suspects in Area 2 that it had received, focusing on Andrew Wilson's case and noting that numerous individuals alleging they had been tortured and coerced during Area 2 interrogations had to that date filed complaints with OPS. (*See* PTP-NOTICE-001522-1532)

In 1990 and 1991, the CPD's Office of Professional Standards (OPS), in its "Goldston Report," found that abuse occurred at Area 2 Police Headquarters, and that the abuse was "systematic." The Goldston Report further found:

> As to the matter of alleged physical abuse, the preponderance of the evidence is that abuse did occur and that it was systematic. The time span involved covers more than ten years. The type of abuse described was not limited to the usual beating, but went into such esoteric areas as psychological techniques and planned torture. The evidence presented by some individuals convinced juries and appellate courts that personnel assigned to Area 2 engaged in methodical abuse.

> The number of incidents in which an Area 2 command member is identified as an accused can lead to only one conclusion. Particular command members were aware of the systematic abuse and perpetuated it either by actively participating in same or failing to

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 70

take any action to bring it to an end. This conclusion is also supported by the number of incidents in which Area 2 offices are named as the location of the abuse (OPS Special Project Conclusion Reports and Findings, November 2, 1990 (Goldston Report)).

The Goldston Report was approved by OPS Director Gayle Shines and forwarded to LeRoy Martin Sr. who had been named police Superintendent in 1987. When the Goldston Report became public in 1992 pursuant to court order, Martin attempted to publicly discredit its findings as did Mayor Richard M. Daley who stated publicly that it "was just rumors."

On January 22, 1992, the City of Chicago and Police Superintendent Martin in their arguments before the Chicago Police Board made the following admissions concerning the evidentiary relevance between Burge and other Area 2 detectives' pattern and practice in torturing Anthony Holmes, Melvin Jones, George Powell, Lawrence Poree, Leroy Orange, Shadeed Mu'min and Donald White, and the torture of Andrew Wilson:

> There is no question that the similarities between [Andrew] Wilson's testimony and the similar victims' testimony is more than sufficient to meet the [Federal Rules of Evidence] 404 b standard. Burge was the main perpetrator of the torture in almost all of the cases, and, when he was not the principal, he was still involved. In the case of all but one of the victims, the victim was picked up and taken to Area 2 where he was then interrogated regarding his knowledge or involvement in a serious offense. Although Donald White was taken instead to Area 1, he was taken there and interrogated by Area 2 detectives. All of the victims were black and generally had significant criminal histories.

> Also similar was the way in which several victims were threatened with consequences if they refused to make a statement. After an initial refusal, the punishment would begin and then would become stronger and more painful as the refusals to speak persisted. The most striking similarities, however, are found in the methods of torture used on the suspects. Wilson was electroshocked by Yucaitis using the black box and by Burge who used the black box and a curling-iron looking device, was "bagged" and beaten, and was threatened with a gun placed in his mouth. Jones, Holmes, Poree, Powell and Orange were similarly electroshocked by Burge. Holmes, Powell, White and Mumin were all "bagged" and beaten to the point where they lost or almost lost consciousness. Burge pointed a cocked gun at Jones's head, hit Poree in the head with a pistol, and placed a revolver containing one bullet at Mumin's head and snapped it three times slowly. White had a gun placed in his mouth. Additionally, each of the victims was slapped around and punched.

> Burge's statements to the victims were also very similar. Burge told both Jones and Mumin that nobody would ever believe their word against his. As he did in relation to Wilson, he referred to the absence of marks on Mumin's body. He said "fun time" as he

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 71

> approached Wilson and Poree with the black box, and laughed when he bagged Mumin. He told Wilson he would "fry his black ass" and Jones he would "blow his black head off."
>
> As the case law cited above aptly demonstrates, these actions or the condoning of these actions are overwhelming in their similarity. Indeed, as the testimony of the similar victims shows, respondents [Burge, Yucaitis and O'Hara] counted on the fact that their testimony would be believed over that of a convict when they persisted in their pattern of torture.

(PTP-NOTICE-001466-1497)

In February of 1993 the Chicago Police Board fired Burge for torturing Andrew Wilson and this decision was affirmed on appeal. (PTP-NOTICE-001534-1622). In June of 1993, the Seventh Circuit Court of Appeals in the Wilson civil case found that "A rational jury could have inferred from the frequency of the abuse, the number of officers involved in the torture of Wilson, and the number of complaints from the black community, that Brzeczek knew that officers in Area 2 were prone to beat up suspected cop killers."

In 1993 and 1994, the CPD's Office of Professional Standards reinvestigated approximately ten cases of alleged torture by electric shock, baggings, beatings, mock executions, and other gun play that occurred at Area 2 from 1982 to 1984 that were previously found to be "not sustained" and recommended sustained findings in six cases against Area 2 detectives who worked were close Burge associates and members of the Asskickers: Lee Holmes (September 1982); Gregory Banks (October 1983); Darrell Cannon (November 1983); Thomas Craft (January 1984); Phillip Adkins (June 1984); Stanley Howard (November 1984). *See People v. Jackie Wilson* (Circuit Court of Cook County, June 20, 2018).

OPS Director Gayle Shines did not act on these sustained findings for five years, from 1993 to 1998, and kept the files in her office. After she was replaced in 1998, CPD Superintendent Terry Hillard, through his administrative assistant, Thomas Needham, summarily reversed these sustained findings.

On May 15, 1995 in *Andrew Wilson v. City of Chicago*, 86-C-2360 the City of Chicago admitted in official judicial pleadings that Melvin Jones had been electrically shocked by Jon Burge on his genitals and thigh with a device in a wooden box and threatened with a gun, while he was handcuffed to a ring in the wall in an Area 2 interview room in an attempt to coerce a confession from him.

In *U.S. ex. rel. Maxwell v. Gilmore*, 37 F.Supp.2d 1078, 1094 (N.D. Ill. 1999), Judge Milton Shadur found "It is now common knowledge that in the early to mid-1980s Chicago

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 72

Police Commander Jon Burge and many officers working under him regularly engaged in the physical abuse and torture of prisoners to extract confessions. Both internal police accounts and numerous lawsuits and appeals brought by suspects alleging such abuse substantiate that those beatings and other means of torture occurred as an established practice, not just on an isolated basis."

From 2002 to 2006, retired justice Edward Egan served as a Cook County Special Prosecutor to investigate allegations of police torture to get confessions and found that Lt. Burge and the detectives under his command had likely committed torture.

On January 10, 2003, Illinois Governor George Ryan pardoned Aaron Patterson, Madison Hobley, Leroy Orange and Stanley Howard based on actual innocence, finding that they had all been physical coerced and tortured by Jon Burge and his colleagues into giving false and fabricated confessions. Governor Ryan stated:

> The category of horrors was hard to believe. If I hadn't reviewed the cases myself, I wouldn't believe it. We have evidence from four men, who did not know each other, all getting beaten and tortured and convicted on the basis of the confessions they allegedly provided. They are perfect examples of what is so terribly broken about our system.

(*See* PTP-NOTICE-002473-2489)

In her concurring opinion in *Hinton v. Uchtman*, 395 F.3d 810, 822-23 (7th Cir. 2005), Seventh Circuit Court of Appeals Judge Diane Wood found:

> [T]he claim Hinton has made regarding his confession illustrates dramatically the high price our system of criminal justice pays when police abuse runs rampant: a cloud hangs over everything that the bad actors touched . . . [A] mountain of evidence indicates that torture was an ordinary occurrence at the Area 2 station of the Chicago Police Department during the exact time period pertinent to Hinton's case. Eventually, as this sorry tale came to light, the Office of Professional Standards Investigation of the Police Department looked into the allegations, and it issued a report that concluded that police torture under the command of Lt. Jon Burge — the officer in charge of Hinton's case — had been a regular part of the system for more than ten years. And, in language reminiscent of the news reports of 2004 concerning the notorious Abu Ghraib facility in Iraq, the report said that "[t]he type of abuse described was not limited to the usual beating, but went into such esoteric areas as psychological techniques and planned torture." The report detailed specific cases, such as the case of Andrew Wilson, who was taken to Area 2 on February 14, 1982. There a group led by Burge beat Wilson, stuffed a bag over his head, handcuffed him to a radiator, and repeatedly administered electric shocks to his ears, nose, and genitals. See People v. Wilson, 506 N.E.2d 571 (Ill. 1987).

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 73

Burge eventually lost his job with the police, though not until 1992. See In the Matter of the Charges Filed Against Jon Burge, No. 91-1856 (Chicago Police Board, February 11, 1993). To this day, Burge has not been prosecuted for any of these actions, though it appears that he at least thinks that he may still be at some risk of prosecution. See, for example, "Cop brutality probe must be thorough, fair," Chi. Sun-Times, May 16, 2002 (editorial); Hal Dardick, "Burge repeatedly takes 5th; Former police commander stays mum on torture questions," Chi. Tribune, Sept. 2, 2004 (noting allegations that Burge or people reporting to him had tortured 108 Black and Latino suspects between August 1972 and September 1991). . . .Behavior like that attributed to Burge imposes a huge cost on society: it creates distrust of the police generally, despite the fact that most police officers would abhor such tactics, and it creates a cloud over even the valid convictions in which the problem officer played a role. Indeed, the alleged conduct is so extreme that, if proven, it would fall within the prohibitions established by the United Nations Convention Against Torture ("CAT"), which defines torture as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession . . .," thereby violating the fundamental human rights principles that the United States is committed to uphold.

In 2006, Chief Cook County Criminal Court Judge Paul Biebel stated that: "Over the past 30 years, the public has demanded to know why no complete investigation was ever conducted into the [torture] allegations," suggestions that these allegations were common knowledge among the public (and therefore by implication among high ranking police personnel) since at least the early 1980s, if not before. Judge Biebel went on to write that "The [Special Prosecutor's] investigation was ordered because of an open sore on the civil body of the City of Chicago which has festered for many years." (Memorandum Opinion and order of 5/19/06, Pp. 9, 17-18).

In July 2006, the Special Prosecutors issued their report, finding that Jon Burge and numerous other Area 2 Chicago Police detectives had physically abused and coerced confessions from numerous criminal suspects. The Special Prosecutor found that Lt. Jon Burge was "guilty of abusing persons with impunity" and that it therefore "necessarily follows that a number of those serving under his command recognized that if their commander could abuse persons with impunity, so could they." The Special Prosecutor found that Superintendent Brzeczek was guilty of a "dereliction of duty" and "did not act in good faith in the investigation of Andrew Wilson. Despite the fact that Brzeczek believed that officers in the Violent Crimes unit of Detective Area 2 had tortured Andrew Wilson he kept that belief to himself for over twenty years." The Special Prosecutor further found that:

[Brzeczek] "received and believed evidence that prisoner, [Andrew Wilson] had been brutalized by the Superintendent's subordinates, that the prisoner had confessed; that those subordinates had testified under oath on a motion to suppress and before a jury and

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 74

he had to believe, they testified perjuriously; that the prisoner had been sentenced to death, and that the Superintendent still remained silent.  For over twenty years he not only remained silent, but he approved a unit citation for all Area 2 personnel, including Burge, on September 1, 1982, for their work on the Andrew Wilson case; and, more egregiously, he kept Burge in command at Area 2 as long as he remained Superintendent."

Two days later on July 21, 2006, Chicago Mayor Richard Daley stated that the City "strongly supported the release" of the "Special Prosecutor's Report on the practice of abuse and torture of suspects in the 1970's and 1980's at the Calumet Police District" because "the public has the right to know about this shameful episode in our history." (Daley Statement, P. 1), and that Burge and his unit participated in a "pattern of misconduct" (Daley Statement, P. 2)

In 2009, The Illinois legislature enacted the Illinois Torture and Inquiry commission "to address claims of abuse by police officers in the City of Chicago"

In *People v. Cortez Brown* (May 22, 2009), Judge Clayton Crane of the Circuit Court of Cook County vacated Brown's conviction after an evidentiary hearing and ordered a new trial based on findings that Brown had presented "staggering" and "damning" evidence that the detectives under Burge's command at Area 3, where he had been assigned as Commander in January of 1988, similarly tortured other interrogation suspects.

In *People v. Wrice*, 940 N.E.2d 102, 108-09 (1st Dist. 2010), the Illinois Appellate Court granted Area 2 torture victim Stanley Wrice, who was tortured by Area 2 "asskickers" Sgt. John Byrne and detective Peter Dignan, an evidentiary hearing on a second successive post-conviction petition on the basis of the July 2006 Special Prosecutor's Report and its findings of "widespread systematic torture of prisoners at Area 2."

On June 28, 2010, Burge was convicted by a federal court jury of committing perjury and obstruction of justice when he denied, under oath, that he had participated in, supervised or had knowledge of the torture of suspects, including, but not limited to, Andrew Wilson, Anthony Holmes, Melvin Jones, and Shadeed Mu'min.

At Burge's sentencing hearing in January of 2011, federal Judge Joan Lefkow found that there was a "mountain of evidence" of torture, and that "When a confession is coerced the truth of the confession is called into question. When this becomes widespread, as one can infer from the accounts that have been presented here in this court, the administration of justice is undermined irreparably. How can one trust that justice will be served when the justice system has been so defiled? This is why crimes of obstructing justice and perjury, and even more so when it is about matters relating to the duties of one's office, are serious offenses."

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 75

In *U.S. v. Burge*, 711 F.3d 803, 806 (7th Cir. 2013), the Seventh Circuit Court of Appeals, while affirming Burge's conviction found:

> Former Chicago Police Commander Jon Burge presided over an interrogation regime where suspects were suffocated with plastic bags, electrocuted until they lost consciousness, held down against radiators, and had loaded guns pointed at their heads during rounds of Russian roulette. The use of this kind of torture was designed to inflict pain and instill fear while leaving minimal marks. When Burge was asked about these practices in civil interrogatories served on him years later, he lied and denied any knowledge of, or participation in, torture of suspects in police custody. But the jury heard overwhelming evidence to contradict that assertion and convicted Burge for obstruction of justice and perjury.

In *U.S. v. Burge*, the Court further discussed the history of Area 2 torture under Burge:

> For many years a cloud of suspicion loomed over the violent crimes section of the Area 2 precinct of the Chicago Police Department (CPD) located on Chicago's south side. Jon Burge joined the CPD in 1970 and rose to commanding officer of the violent crimes section in the 1980s, but his career was marked by accusations from over one hundred individuals who claimed that he and officers under his command tortured suspects in order to obtain confessions throughout the 1970s and 1980s. Burge was fired in 1993 after the Office of Professional Standards investigated the allegations, but he was not criminally charged. Years later the Circuit Court of Cook County appointed special prosecutors to investigate the allegations of torture, but due to statutes of limitation, prosecutors never brought direct charges of police brutality against Burge. Eventually, the City of Chicago began to face a series of civil lawsuits from victims seeking from victims seeking damages for the abuse they endured. It was in one of these lawsuits that Burge denied in sworn interrogatory answers that he had knowledge of, or participated in, any acts of torture or physical abuse, and these statements lead to his federal indictment and trial.

In *U.S. v. Burge*, the Court summarized the record of "decades of abuse" as follows:

> At trial, the government called multiple witnesses to testify about the methods of torture and abuse used by Burge and others at Area 2 in order to establish that Burge lied when he answered the interrogatories in the Hobley case... [T]he witnesses at trial detailed a record of decades of abuse that is unquestionably horrific. The witnesses described how they were suffocated with plastic bags, electrocuted with homemade devices attached to their genitals, beaten, and had guns forced into their mouths during questioning. Burge denied all allegations of abuse, but other witnesses stated that he bragged in the 1980s

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 76

about how suspects were beaten in order to extract confessions. Another witness testified that Burge told her that he did not care if those tortured were innocent or guilty, because as he saw it, every suspect had surely committed some other offense anyway.

In May of 2015, the Reparations Ordinance and Resolution as detailed above, was unanimously adopted by the Chicago City Council and Mayor Emanuel publicly apologized to the torture survivors.

In June of 2018 Cook County Circuit Court Judge William H. Hooks found that "[P]attern and practice evidence shows shocking suspects was common" at Area 2. *See People v. Jackie Wilson* (Circuit Court of Cook County, June 20, 2018) (PTP-NOTICE-000709-827). . Judge Hooks further found in December of 2020 while granting Jackie Wilson a certificate of innocence that "the unparalleled nearly 39 years of unconstitutional misconduct was not an isolated occurrence. Rather, it was part of several interrelated patterns and practices of systemic torture and physical abuse of African American suspects at the Area 2 and, later, at the Area 3 Police Headquarters under Defendant Jon Burge's command and supervision." *See People v. Jackie Wilson* (Circuit Court of Cook County, December 18, 2020) PTP-GENERAL-000007-000065.

Upon the death of Jon Burge in September of 2018, soon to be elected Chicago Mayor Lori Lightfoot publicly stated that "with the passing of Jon Burge, we must reflect on the dark legacy that he embodied. So many lives shattered, and a horrible stain on the legitimacy of policing that resonates today."[74]

In sum, there is a substantial body of extensive evidence clearly establishing that, dating back to at least the early 1970s, it was well-known that the City of Chicago's Police Department had a systemic practice of subjecting African American and Latino suspects who were interrogated by detectives and supervisors to physically abusive and coercive interrogations (e.g. beating, suffocating, electroshocks, mock executions, threatening physical violence, etc.) with the result of coercing and/or fabricating false and/or unreliable inculpatory evidence to be used against the interrogated suspects without regard to their actual guilt or innocence.  There is also substantial evidence establishing that high-ranking officials in the City of Chicago (including in the Cook County Attorney's Office), the Chicago Police Department and numerous police command personnel received continuing notice of this systemic practice of physical abuse and coercion of Black and Latino suspects in order to coerce and fabricate confessions, including from the repeated documented allegations that accumulated against supervisors and detectives, at Area 2 detective Division (and later at Areas 3, 4 and 5).

---

[74] https://www.theguardian.com/us-news/2018/sep/19/chicago-cop-jon-burge-torture-dies

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 77

**(C) Physical Abuse and Coercive Interrogation at Area 3
Involving Detectives Kill, Boudreau, Halloran and Others**

The physical abuse and coercion of custodial suspects to obtain confessions was also systemic and widespread at Area 3, and repeatedly involved Detectives Kill, Boudreau, Halloran and several other Chicago Police detectives who routinely used physical coercion and abuse to extract incriminating statements and fabricate false confessions from criminal suspects during lengthy incommunicado and unlawful interrogations. Detectives Kill, Boudreau, Halloran and other Area 3 Chicago Police detectives have a long history of using physical force and psychological abuse to coerce and fabricate confession statements from suspects and manipulate witnesses during interrogation. There exists a substantial body of evidence establishing that the Detectives Kill, Boudreau and other Area 3 Chicago Police detectives engaged in systematic misconduct whose purpose was to extract through coercion (primarily in homicide cases) confessions (primarily from African American and Latino suspects) to quickly and recklessly close cases without meaningful regard guilt or innocence. The evidence comes from the repeated documented allegations that accumulated against Detectives Kill, Boudreau, Halloran and other Area 3 Chicago Police Detectives; from the testimony of numerous criminal defendants at motion to suppress hearings and trials in Area 3 cases; from federal and state court decisions in Area 3 cases; and from media articles, reports and editorials, among other sources. There are dozens of known cases establishing a pattern and practice in which detectives Kill, Boudreau, Halloran and other Area 3 Chicago Police detectives physically and psychologically abused, coerced and tortured suspects and witnesses in homicide cases and coerced false testimonial evidence from them. The following summaries represent a portion of these cases:

1. **Frank Bounds (1987)**: Detective Kill hit Bounds on the head, tried to kick him in the groin, and threatened to bring Bounds' girlfriend into the case if he did not confess causing Bounds to falsely confess to a murder. *People v. Bounds*, 171 Ill.2d 1, 29-30 (1996). (PTP-F BOUNDS-000001-000030)

2. **Alnoraindus Burton (1989)**: Detective Kill kicked Burton in the groin, slammed his head against the wall, slapped him across the face, and told him he could kill him causing Burton to falsely confess. (PTP-NOTICE-000829-000842; PTP-A BURTON-000001-000009)

3. **Damari Clemon (1991):** Detective Boudreau and other detectives beat Mr. Clemon, electroshocked him and threatened him with a pistol. Deposition of Marcus Wiggins, June 4, 1996, *Marcus Wiggins v. Jon Burge et al.*; Complaint, *Marcus Wiggins v. Jon Burge et al.;* PTP-JESSE & DEMONI & IMARI CLEMON-000001-000026).

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 78

4. **Nevest Coleman and Darrell Fulton (1994)**: Detective Boudreau, Detective Halloran and another Area 3 detective punched Coleman in the face repeatedly until he falsely confessed. Fulton also alleged that he was punched in the face repeatedly, that a detective told him he would put a bullet in Ful'on's brain if Fulton would not implicate himself in the crime, and that if he confessed he could go home and nothing bad would happen to anyone in his family. Coleman and Fulton were excluded from male DNA on the vic'im's underwear (Third Amended Complaint, *Derrell Fulton v. Geri Lynn Yanow et al.*; Transcript of testimony of Nevest Colman, in *State of Illinois v. Nevest Coleman*, June 28, 1996; PTP-D FULTON-000001-000086; PTP-N COLEMAN-000001-00010)

5**.** **James Coston (1988)**: Detective Kill struck him in the jaw, grabbed him around the neck and pushed him against the wall while questioning him about a murder (Coston was a witness in a murder case). PTP-J COSTON-000001-000003.

6. **Mark Craighead (1989)**: Detective Kill and other Area 3 detectives beat Craighead and deprived him of food and water until he falsely confessed. Photographs of Craighead taken after his interrogation depict his injuries (Summary Report Digest, Complaint register No. 166416, PTP-M Craighead-000001-000004).

7. **Arnold Day (1992)**: Detective Boudreau and another Area 3 detective choked Day and threatened to throw him out of a window until he falsely confessed to a murder. Day was acquitted after presenting his allegations of physical abuse and coercion (Affidavit of Arnold Day, February 4, 1992; Complaint, *Arnold Day v. Kenneth Boudreau*, et al.; PTP-A DAY-000001-105).

8. **Fred Ewing and Darnell Stokes (1993)**: Detective Boudreau coerced confessions from two developmentally disabled juveniles, Fred Ewing (IQ=56) and Darnell Stokes. Both were acquitted. (Maurice Possley, Steve Mills & Ken Armstrong, *Veteran Detective's Murder Cases Unravel*, Chi. Trib., Dec. 17, 2001.; PTP-F EWING-000001-00015)

9. **Derrick Flewellen (1995)**: Detective Boudreau and other Area 3 detectives interrogated Derrick Flewellen for more than 36 hours during which they slapped, kicked, and punched him until he signed a false confession. Flewellen was exonerated based on DNA evidence after serving close to five years in prison (Complaint, *Derrick Flewellen v. City of Chicago, et al.;* PTP-D-FLEWELLEN-000001-000015).

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 79

10. **Jerry Gillespie (1993)**: Detective Boudreau and other Area 3 detectives beat, kicked, slapped, and choked Gillespie, and threatened him with further beating, including burning him with a cigarette, if he did not sign a written confession they prepared (First Amended Petition for Post-Conviction Relief and Petition for Relief from Judgement, *State of Illinois v. Jerry Gillespie*, PTP-J Gillespie-000001-000020; Motion to Hold Appeal in Abeyance, *State of Illinois v. Jerry Gillespie*, PTP-J Gillespie-000021-000030)

11. **Oscar Gomez, Abel Gomez and Abel Quinoles (1995)**: Detective Halloran and Detective Boudreau held all three men for more than 30 hours and beat them while they were shackled to a wall. All three were acquitted. PTP-O GOMEZ & A QUINONES-000001-00043).

12. **Jason Gray and Manuel Bobe (1986)**: According to fifteen-year-old Gray, Detective Kill grabbed him, threw him on the floor, threatened him with a life sentence, and fabricated a false inculpatory statement from him. The trial judge rejected Detective Kill's trial testimony, and the appellate court upheld that ruling, finding: Detective "[K]ill's actions, and the possibility that he may have testified falsely under oath in a deposition and in many other prosecutions, has much bearing on the credibility of his testimony here." Detective Kill also coerced Gray's co-defendant, Manuel Bobe, into implicating Gray and himself in the murder. According to Bobe, Detective Kill threatened him and told him he could go home if he just signed a statement implicating Gray, punched him in his chest, slapped him on the face, and pointed a gun at Bobe's neck and threatened to shoot him (Order, *State of Illinois v. Jason Gray*; Transcript of testimony of Jason Gray at Motion to Suppress hearing, *State of Illinois v. Jason Gray*; Amended Petition for Post- Conviction Relief, *State of Illinois v. Jason Gray;* PTP-J GRAY-000001-000123; PTP-M BOBE-000001)

13. **Tyrone Hood and Wayne Washington (1993)**: Detective Boudreau coerced a false confession from Washington. Both men's convictions were subsequently overturned. PTP-T HOOD & W WASHINGTON-000001-00039

14. **Harold Hill, Dan Young, Peter Williams (1990)**: Detective Boudreau and other Area 3 detectives beat and coerced Hill, Young (whose IQ was 56), and Williams into falsely confessing to rape and murder. DNA tests subsequently proved that the men were innocent and the State dismissed all charges against them. Young and Hill were 16 years old at the time, Williams was 19 (Complaint, *L.C. Young v. City of Chicago*, February 8, 2007; Transcript of Proceedings, *People v. Dan Young*, September 19, 1994; PTP-D YOUNG-000001-187; PTP-H HILL-000001-000049).

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 80

15. **Joseph Jackson (1998)**: Detective Boudreau placed a book on Mr. Jackson's chest and stomach and hit the book with a blackjack. Detective Halloran placed a typewriter cover over Jackson's head and cut off his air supply. PTP-J JACKSON-000001-000004)

16. **Anthony Jakes (1991)**: Detective Boudreau slapped, punched and kicked fifteen-year-old Jakes until he falsely confessed to being the lookout during a murder. Jakes was held incommunicado for over sixteen hours, and deprived of food and water, and denied access to his aunt (Complaint, *Anthony Jakes v. Kenneth Boudreau et al.*, April 1, 2019; (PTP-A JAKES-000001-000409)

17. **Ronald Kitchen Marvin Reeves and Eric Wilson (1988)**: Detective Kill and Burge beat Ronald Kitchen until he falsely confessed to a murder. Detective Kill punched Kitchen in the face, back, chest, and groin. Kill interrogated Kitchen's cousin, Eric Wilson, about the same murder. Kill beat Wilson in the groin, chest, and head until Wilson falsely inculpated Kitchen and another man. Wilson heard Kitchen screaming and moaning in pain (Letter from Donald Hubert to Edward Egan and Robert Boyler, May 24, 2005; PTP-R KITCHEN-000001-000208)

18. **Anthony Lash (1989)**: Detective Kill and other Area 3 detectives interrogated sixteen-year-old Anthony Lash about a murder without his parents or his attorney present. Detective Kill beat Lash and slammed his head into a wall, causing him to falsely confess to the murder. *People v. Lash*, 252 Ill.App.3d 239, 245-36 (1st Dist. 1993; PTP-R LASH-000001-000011).

19. **Alfonzia Neal (1991)**: Detective Boudreau beat a murder confession out of Alfonzia Neal who had an IQ in the 40s and likely did not understand much, if anything, of the conrfession. (Maurice Possley, Steve Mills & Ken Armstrong, *Veteran Detective's Murder Cases Unravel*, Chi. Trib., Dec. 17, 2001.; PTP- A NEAL-000001-000008)

20. **Johnny Plummer (1991)**: Detective Boudreau and other Area 3 detectives interrogated fifteen-year-old Johnny Plummer for 36 hours, during which they denied him food and hit him in the face, stomach and side (including with a flashlight, until he falsely confessed to a murder. *See People v. Plummer*, 306 Ill. App. 3d 574, 578-79 (1st Dist. 1999); PTP- J PLUMMER-000001-000010)

21. **Tyrone Reyna, Nicholas Escamilla and Miguel Morales (1993)**: Detective Boudreau and other Area 3 detectives beat sixteen-year-old Reyna (Detective

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 81

Halloran slapped him in the face and kicked him in the leg; Detective Boudreau and Detective Halloran spit on him), refused to let him contact his family, and intimidated him into confessing to a murder he did not commit. Boudreau and other Area 3 detectives also beat and threatened Reyna's co-defendants, Nicholas Escamilla and Miguel Morales, causing Escamilla to falsely confess after hours of abuse (Affidavit of Tyrone Reyna, April 22, 2004; Affidavit of Nicholas Escamilla, March 19, 2004; Affidavit of Miguel Morales, February 25, 2001; PTP-T REYNA-000001-000018)

22. **Anthony Robinson (1987)**: Detective Kill and other Area 3 detectives kicked and slapped Anthony Robinson until he falsely confessed to a murder. Robinson suffered injuries including a perforated ear. *People v. Robinson*, 238 Ill. App. 3d 48, 50-51 (1st Dist. 1992); PTP-A ROBINSON-000001-000006).

23. **Clayborn Smith (1992)**: Detective Boudreau and other Area 3 detectives hit Smith in the face and head, punched him in the ribs, grabbed his neck, pulled his hair and pulled his finger back until he falsely confessed to a murder (Complaint, *Clayborn Smith v. City of Chicago et al.*, June 19, 2003; PTP-C SMITH-000001-000010).

24. **Johnny Walker and Phillip Walker (1988)**: Detective Kill beat Johnny and Phillip Walker in the groin and face until they falsely confessed to a murder. The detectives also beat thirteen-year-old Andre Wilks until he falsely identified Phillip Walker as the shooter. Phillip Walker was acquitted and Johnny Walker was never charged with a crime (Transcript of Report of Proceedings, *State of Illinois v. Phillip Walker*, April 3, 1989; PTP-JOHNNY AND PHILLIP WALKER-000001-000042

25. **Kilroy Watkins (1992)**: Detective Boudreau and Detective Halloran choked and punched Watkins in the face until he gave a false confession (Complaint Under the Civil Rights Act, Title 42 Section, Kilroy Watkins v. Detective J. Halloran et al., May 6, 2002; Affidavit of Kilroy Watkins, January 17, 2004); PTP-K WATKINS-000001-000015).

26. **Demond Weston (1990):** Detective Kill and other Area 3 detectives slapped, beat (Detective Moser and Detective Maslanka), choked, and threatened Weston until he falsely confessed to a murder. Detective Kill also struck, yelled at, and threatened Dwayne Macklin into falsely implicating Weston in the crime (Report of Dr. Richard A. Leo, dated June 12, 2010; PTP-D WESTON-000001-000004).

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 82

27. **Emmett White (1993):** Detective Boudreau and Detective O'Brien arrested Mr. White, and Detective O'Brien subsequently beat him in the head and face, threw him to the ground, and dragged his head across the floor of the interrogation room. PTP-E WHITE-000001-000007.

28. **Marcus Wiggins, Demoni Clemon, Jesse Clemon, Imani Clemon, Dyez Owen (1991):** Detective Kill, Detective Boudreau, and others handcuffed thirteen-year-old Marcus Wiggins to a wall, denied him access to his mother, and beat and electroshocked him until he gave a false confession. The Clemons brothers and Owen were also beaten until they confessed. Two of the confessions were suppressed and all of the defendants were either acquitted or the State declined to prosecute their cases. *People v. Clemon*, 259 Ill. App. 3d 5, 8, 10 (1st Dist. 1994); PTP-M WIGGINS-000001-000149; PTP-JESSE & DEMONI & IMARI CLEMON-000001-000276.

29. **Anthony Williams (1994):** Detective Kill beat learning disabled Anthony Williams until he confessed to a murder and armed robbery. *People v. Williams*, 303 Ill. App. 3d 33, 43 (1st Dist. 1999); PTP-A WILLIAMS-000001-000008.

30. **Robert Wilson (1997):** Mr. Wilson reports that Detective O'Brien slapped him repeatedly, and that Mr. Wilson became fearful that he would continue to be physically assaulted if he did not agree to a false confession. Detective Halloran also slapped and threatened Mr. Wilson (Report of Dr. Richard A. Leo dated June 12, 2010) PTP-GENERAL-000066-000085.

These are some, but by no means all, of the Area 3 police torture cases. The physical abuse and coercion of custodial suspects to obtain confessions was systemic and widespread at Area 3, and repeatedly involved Detectives Kill, Boudreau, Halloran and many other Chicago Police detectives who routinely used physical coercion and abuse to extract incriminating statements and fabricate false confessions from criminal suspects during lengthy incommunicado and unlawful interrogations. Chicago police commanders and high ranking City of Chicago officials (including police command personal and the Cook County Attorney's Office) were on continuing notice since at least as early as 1986 that there was a pattern and practice of police interrogation torture and coercion to extract confessions among Area 3 detectives, particularly from (but not limited to) Detectives Kill, Boudreau and Halloran.

**(D) Physical Abuse and Coercive Interrogation at Area 4 Involving Detective Kato, Detective John Summerville, Detective Clarence Lewis, Detective John Roberts, Detective Same Cirone and Others**

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 83

Chicago police commanders and high ranking City of Chicago officials (including police command personnel and the Cook County Attorney's Office) were on continuing notice since as early as 1987 that there was a pattern and practice of police interrogation torture and coercion to extract confessions among Area 4 detectives, particularly from (but not limited to) Detective Kriston Kato and the Area 4 detectives with whom he worked cases. The following summaries represent a portion of the cases in which Detective Kriston Kato has been accused of physically abusive and coercive interrogations with the result of coercing and/or fabricating false and/or unreliable inculpatory evidence to be used against the interrogated suspect without regard to his actual guilt or innocence:

1. **Tony Bey (aka Tony Steward) (1988)**: Detective Kato purportedly obtained a murder confession from Mr. Bey during an abusive interrogation. Mr. Bey alleged that Detective Kato "put a pistol in his mouth and threatened to make him 'a statistic.'" Mr. Bey also alleges that Detective Summerville physically abused him during one of his post-arrest interrogations in Area 4. Mr. Bey was treated at the hospital for multiple lacerations after the interrogation, complained of severe stomach pain, and was diagnosed with acute appendicitis. Tony Bey Complaint Register & OPS Investigation. Bey was acquitted at trial. *Steward v. Kato, et al.*, 1992 U.S. Dist. LEXIS 15690, at *8 (N.D. Ill. 1992); PTP-T SEWARD-BEY-000001-000157.

2. **Michael Cage (1988)**. Detective Kato slapped Mr.Cage in the face, while Detective Summerville read cases facts to him, and later Detective Kato connected a gadget to his chest that resembled an electric shaver with antennas attached to it. Cage felt shocked and passed out. When Mr. Cage regained consciousness, Detective Kato stretched his leg into the doorway and slammed the door on his ankle. Eventually Cage gave a confession, but it was eventually suppressed at a pre-trial hearing because the State failed to prove that the detectives had not caused Mr. Cage's injuries. Steve Bogira, *Good Cop, Bad Cop: What is it about Detective Kato that Makes Murder Suspects So Eager to Confess?*, Chicago Reader (Dec. 12, 1991); PTP-M CAGE-000001-0000063.

3. **Carl Chatman (2002)**: Mr. Chatman, who had an IQ of 68 and a long history of mental disorders, was wrongly convicted of sexually assaulting Susan Riggio in the Daley Center. *Chatman v. Chicago, et al.*, 2018 WL 1519160 (N.D. Ill. Mar. 28, 2018). Mr. Chatman was arrested, denied any involvement in the crime, and after he had been in custody for 12 hours without anything to eat or drink, Detective Kato interrogated him, threatening and abusing him while he was handcuffed to a wall, including striking him so hard that he almost lost consciousness, after which Mr.

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 84

Chatman falsely confessed (Detective John Roberts had also used force and threats of force to coerce Mr. Chatman to confess). Mr. Chatman was convicted and spent more than a decade in prison, before the Cook County State's Attorney reinvestigated his case and dismissed the charges against him. Mr. Chatman was granted a certificate of innocence by the State of Illinois after his release from prison. *Id.* at *9. A Chicago police detective filed an anonymous complaint in May 2002 with the Office of Professional Standards relating that Detective Kato had physically abused Mr. Chatman and forced him sign a false confession. (OPS Anonymous Complaint). The detective wrote that when Detective Kato hit Mr. Chatman, "That blow I thought would kill him for sure" and said that Detective "Kato took the victim's account of the assault, word for word and laid it out for the homeless suspect to sign. The suspect didn't even read it and didn't know what he was signing." and that "It is a well-known fact from questioning and the suspect's condition that he did not commit this assault. However Detective Kato stated that 'they wanted someone to be accountable, so I gave them someone. He's homeless anyway, at least now (laughingly) he'll get three meals a day. That's my contribution to help feed the homeless.'" *Id.*; PTP-C CHATMAN-000001-000082.

4. **Shawn Hardy (1989)**: Detective Kato accused Mr. Hardy of committing a murder, punched and kicked him in the chest, but he did not confess. Mr. Hardy was diagnosed with a chest contusion a few days after the interrogation. Command Channel Review – Complaint Register Investigation No. 171359 (PTP-S-Hardy 000001-000050)

5. **Derrick Harvey (1993)**: Harvey claimed that he adopted the confession urged by Detective Kato only because "he was struck by Detective Kato prior to giving his statement and . . . Detective Kato promised him he would be released if he gave a statement." *People v. Harvey*, 211 Ill.2d 368 (2004); PTP-D HARVEY-000001-000023.

6. **Miller Holston (1989)**: Detective Kato struck and kicked Mr. Holston, deprived him of sleep for more than 20 hours, refused him access to legal counsel, and coerced him into confessing to murder. Mr. Holston also alleged that Detective Summerville struck and kicked him. The charges against Mr. Holston were dismissed. Command Channel Review – Complaint Register Investigation No.184112, PTP- M SHOLSTON-000001-000073)

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 85

7. **Xavier Johnson (1997)**: Detective Kato and Officer Sam Cirone interrogated Mr. Johnson, who was 16-years-old, about a murder, denied him access to his family, slapped his face repeatedly, struck, kicked and kneed him in the genitals while he was handcuffed to a wall, and pushed him into a wall until he confessed. (Johnson Complaint Register & OPS Investigation; PTP-X JOHNSON-000001-000065).

8. **Harold Lucas (1989)**: Detective Kato punched Mr. Lucas, who was 15-years-old, in the stomach, slapped him, and stepped on his genitals while he was sitting down until Mr. Lucas purportedly confessed to a murder David Jackson, *Fine Line Between Tough Police Work, Brutality, Chicago Tribune*, at 3 (Jul 14, 1991); PTP-H LUCAS-000001-000004.

9. **Keith Mitchell (1997)**: Detective Kato interrogated Mr. Mitchell for three days and forced him to by Detective Kato and was forced to sign a witness statement for a murder he did not witness. Detective Kato elbowed him in the head, kneed him in groin, and threatened to charge him with "setting up" the victim for the murder. (Mitchell Complaint Register & OPS Investigation); PTP-K MITCHELL-000001-000034).

10. **Kevin Murray (1987)**: Detective Kato denied Mr. Murray access to the bathroom, sleep, and food and whenever Murray professed his innocence, Detective Kato repeatedly slapped him in the face, punched him in the stomach, and kicked him in the chest until Mr. Murray confessed. Area 4 Detective John Summerville slapped Mr. Murray on the side of the head and kicked him between the legs, and "backpunched" Murray when he asked for a lawyer. *People v. Murray*, 626 N.E.2d 1140 (1st Dist. 1993). In 2013, the Torture Inquiry and Relief Commission found that Murray had stated a credible claim of torture.

11. **Patrick Prince (1991)**: Detective Kato arrested Mr. Prince, took him to Area 4, held him for hours, physically abused him, and forced him to sign a written statement. *People v. Prince*, 91 CR 26365-01, Apr. 26, 2017 Order (Cir. Ct. Cook Co.); *People v. Prince*, 91 CR 26365-01, Apr. 25, 2017 Closing Memorandum (Cir. Ct. Cook Co.). In 2017, following a multi-day evidentiary hearing, Judge Thaddeus Wilson granted Prince post-conviction relief, explaining that "the testimony and submissions presented . . . seriously call into question the vitality and fidelity of the conviction, especially given the disparities, inconsistencies and newly discovered evidence presented to this Court . . . . This is a case that arose during the times, thinking, sentiments, customs and practices of the 1990s. Petitioner was just 19

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 86

years old . . . . The only evidence against Petitioner was his confession. Allegations and findings of past misconduct by police during questioning of suspects are now at an unprecedented high and we now better understand the psychology of false confession." *Id.* at 7-8. The charges against Prince were dismissed, and he was granted a certificate of innocence. (Prince Certificate of Innocence; PTP-K MURRAY-000001-000028).

12. **Angelo Rogers (1990)**: Mr. Rogers, who was 19-years-old, claimed that Detective Kato "kept him awake and unfed overnight, shoved him around and threatened him" causing him to confess to a murder he did not commit. Mr. Rogers was acquitted of the murder. David Jackson, *Fine Line Between Tough Police Work, Brutality, Chicago Tribune*, at 1 (Jul 14, 1991); PTP-H LUCAS-000001-000004.

13. **Frederick Seaton (1988)**: Detective Kato, Detective John Summerville and Detective Clarence Lewis (all from Area 4) interrogated Mr. Seaton for longer than a day and physically coerced (slapping, kicking, abusing and threatening) him into making a false confession. Following the interrogation, there was blood in Mr. Seaton's urine, his groin was swollen, and his face was red and sore. The Illinois Appellate Court overturned Mr. Seaton's conviction and ordered that his statement be suppressed, finding that they were the product of an illegal arrest. *People v. Seaton*, 242 Ill.App.3d 1105 (1st Dist. 1993); PTP-F SEATON-000001-000035.

14. **Gregory Shelton (1988)**: Detective Kato questioned Mr. Shelton for more than 24 hours about a murder and instructed Mr. Shelton to stand, at which point Detective "Kato kicked defendant in the groin with his left foot." Officer Jason Vucko joined Detective Kato in the interrogation and slapped Mr. Shelton, slammed his head in the wall, and promised Mr. Shelton that "the beating would stop if he confessed to the murder of [the victim]." Mr. Shelton alleged that Detective Kato refused his request for an attorney. *People v. Shelton*, 264 Ill. App.3d 763 (1st Dist. 1993); PTP-G SHELTON-000001-000006.

15. **Andre Wallace (1994)**: While Mr. Wallace, who was 15-years-old, was handcuffed in an interview room, Detective Kato slapped him, kicked him, and squeezed his testicles, and made promises of leniency, telling him he could leave if he signed a confession. Mr. Wallace's conviction was overturned on appeal and the charges against him were dismissed. *People v. Wallace*, 299 Ill.App.3d 9, 12-13, 19 (1998); (Wallace Complaint Register & OPS Investigation; PTP-A WALLACE-000001-000117).

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 87

16. **Keith Washington (1989)**: Detective Kato interrogated Mr. Washington for 28 hours, denied him food and water, punched him in the chest, "kicked [him] in [his] ankles," "hit [him] a couple times, choked [him], said, 'You see what it feels like to be strangled?'" Mr. Washington also alleges that Detective Kato slapped him on both sides of his face and kicked him in the ribs as part of Detective Kato's effort to coerce Mr.Washington to confess. Steve Bogira, *Good Cop, Bad Cop: What is it about Detective Kato that Makes Murder Suspects So Eager to Confess?*, Chicago Reader (Dec. 12, 1991); PTP-K WASHINGTON-000001-000065.

17. **Michael Waslewski and Daniel Gasca (1990)**: Mr. Waslewski claimed that, during an overnight interrogation, Detective Kato and another detective beat him in order to secure a confession. David Jackson, *Fine Line Between Tough Police Work, Brutality, Chicago Tribune*, at 2 (Jul 14, 1991). Gasca claimed that he was held for 26 hours, during which time Kato entered the interrogation room, told him "'You're a killer and you have no remorse,'" and when Gasca denied the accusation, Detective Kato hit the side of his head. Following the interrogations, Mr. Waslewski adopted a confession that Detective Kato provided to him, "giv[ing] a detailed statement describing how he and a friend, Daniel Gasca, stabbed [the victim] to death during a fight over money, then put [the victim's] body in the trunk of a car that they left in an alley near Cook County Jail." *Id.* The confession was shown to be false when records emerged showing that Gasca could not have been involved in the crime because he had been in prison on the night it occurred. *Id.* Waslewki was acquitted at trial. *Waslewski v. Kato*, 1993 U.S. Dist. LEXIS 269, at *1-2 (N.D. Ill. 1993); PTP-M WASLEWSKI-000001-000006.

18. **Ronald West (1989)**: Mr. West testified that Detective Kato and Detective Summerville physically coerced him into falsely confessing to a murder. Mr. West testified "that the police slapped him around, kicked him and chopped him in the throat during the interrogation." *People v. West*, 263 Ill. App. 3d 1041(1st Dist. 1994); PTP-R WEST-000001-000008.

19. **Jeremiah Wright and Elijah Threatt (1999):** Jeremiah Wright and Elijah Threatt, who were 18 and 17-years-old, respectively, and suffered from serious cognitive deficits, were convicted of murder based on confessions elicited by Detective Kato. They testified that Detective Kato and Detective Cirone beat them, threw water on them, and refused one of them access to his inhaler unless he confessed. The Court of Appeals held that defendants' trial counsel was ineffective for failing to

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 88

investigate and offer evidence of Detective Kato coercing confessions in other cases. *People v. Wright*, 2013 IL App (1st) 103052-U; PTP-JERMIAH WRIGHT & ELIJAH THREATT-000001-000007.

In short, substantial evidence exists that there was a pattern and practice of police interrogation torture and coercion to extract confessions among Area 4 detectives, particularly from (but not limited to) Detective Kriston Kato and the Area 4 detectives with whom he worked cases. These summaries represent a portion of the cases in which Detective Kriston Kato has been accused of physically abusive and coercive interrogations with the result of coercing and/or fabricating false and/or unreliable inculpatory evidence to be used against the interrogated suspect without regard to his actual guilt or innocence. Chicago police commanders and high ranking City of Chicago officials were on continuing notice since at least as early as 1987 that a pattern and practice of police interrogation torture and coercion to extract confessions among Area 4 detectives existed, particularly from (but not limited to) Detective Kriston Kato and the Area 4 detectives with whom he worked cases.

### (E) Physical Abuse and Coercive Interrogation at Area 5
### Involving Detective Guevara, Detective Halvorson and
### Other Area 5 Chicago Police Detectives

Chicago police commanders and high ranking City of Chicago officials (including police command personnel and the Cook County Attorney's Office) were on continuing notice since as early as 1987 that there was a pattern and practice of police interrogation torture and coercion to extract confessions in Area 5 involving Detective Guevara, Detective Halvorson and other Area 5 Chicago police detectives. In addition to the cases of Arturo DeLeon-Reyes and Gabriel Solache that are the subject of this report, eighteen individuals have had their convictions overturned in cases investigated by Detective Guevara. Those men are Jacques Rivera, Juan Johnson, Jose Montanez, Armando Serrano, Jorge Pacheco, Roberto Almodovar, William Negron, Jose Maysonet, Angel Rodriguez, Santos Flores, Henry Johnson, Ariel Gomez, Xavier Arcos, Ricardo Rodriguez, Robert Bouto, Thomas Sierra, Geraldo Iglesias, and Demetrius Johnson.

The following summaries represent a portion of the cases in which Detective Guevara has been accused of physically abusive and coercive interrogations with the result of coercing, fabricating or otherwise creating false and/or unreliable inculpatory evidence to be used against the interrogated suspect without regard to his actual guilt or innocence:

1. **Gloria Ortiz Bordoy (1995)**: Detective Guevara threatened to hit Gloria Ortiz Bordoy, threatened that her children would be taken by the Department of Children and Family Services, called her "the B word," and told her that she was involved in the crime and was "going down for a long time." Ms. Bordoy signed a statement

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 89

that the detectives wrote out for her, without reading its contents, because she just wanted to "get out of there." Detective Guevara kept trying to make her say things she was "not aware of." (Deposition of Gloria Ortiz Bordoy, February 19, 2008, *Juan Johnson v. Reynaldo Guevara et al.*; Testimony of Reynaldo Guevara in Motion to Suppress Hearing; AR-L 148767-148860.)

2. **Elizer Cruzado (1993)**: Detective Guevara arrested fifteen-year-old Elizer Cruzado, who could barely read and write, told him he could go home and see his family again if he agreed to make a statement implicating himself in a murder, and threatened him with life imprisonment if he did not make a statement (Testimony of Elizer Cruzado in Motion to Suppress Hearing, March 31, 1995; *State of Illinois v. Elizer Cruzado*, Motion to Quash Arrest and Suppress Statements, March 31, 1995; AR-L 155033-155055).

3. **Edwin Davila (1995)**: Detective Guevara cuffed Mr. Davila to the wall of an interrogation room and told him that he was going to frame him for murder. When Mr. Davila denied involvement in the murder, Detective Guevara forced him to participate in a lineup in which two witnesses falsely identified Mr. Davila as the perpetrator, despite the fact that each witness previously told the police that they had not been able to see the shooter (Deposition of Edwin Davila, Sr., February 26, 2008, *Juan Johnson v. Reynaldo Guevara*; AR-L 154814-155027)

4. **Voytek Dembski (1997)**: Detective Guevara arrested Voytek Dembski and beat, slapped, and yelled at him while he was handcuffed to a chair in an interrogation room. Detective Guevara later got another detective take a statement from Mr. Dembski in English, which Mr. Dembski signed even though he could not speak or read English (Affidavit of Jed Stone, February 20, 2008, *State of Illinois v. Gabriel Solache*; AR-L 155056-155058; April 7, 1999 Testimony of Voytek Dembski; Bluhm 034650-034753).

5. **Adrian Duta (1994)**: Detective Guevara interrogated Mr. Duta about a murder he knew nothing about, smacked him in the head with a folder, and punched him in the stomach causing Mr. Duta signed a statement prepared by Detective Guevara who promised him he could go home if he did (Affidavit of Adrian Duta, June 30, 2008; AR-L 154806-154809).

6. **Adolfo Frias (1993)**: Mr. Frias was handcuffed to a ring on the wall of the extremely cold interrogation room, slapped in the face by Detective Guevara, and

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 90

beaten by two other Area 5 detectives until he agreed to implicate himself in a murder. Detective Guevara brought Mr. Frias's nephew into the room, who appeared beaten about the face and Frias could hear his wife screaming and his son crying in another room. Detective Guevara threatened Mr. Frias that if he did not confess, his wife would go to prison and his children would be taken away. Mr. Frias, who did not speak English, spoke in Spanish and Detective Guevara translated the statement so that the prosecutor could write the statement in English. Mr. Frias then signed a statement he could not read (*State of Illinois v. Arturo Reyes and Gabriel Solache*, Hearing Transcript Before James M. Obbish, April 11, 2013; AR-L 154693-154805; March 10, 2008 Affidavit of Adolfo Frias-Munoz; Bluhm-10887-10888).

7. **Ariel Gomez (1997)**: Ariel Gomez alleges that Detective Guevara coerced from him a false murder confession. In 2018, Mr. Gomez was exonerated after three witnesses swore under oath that Guevara repeatedly attempted to coerce them into identifying Gomez as the shooter.[75] Three of Mr. Gomez's four co-defendants, all also interrogated by Detective Guevara, were acquitted and the fourth had his conviction thrown out by the Illinois appellate court (Complaint, *Ariel Gomez v. Reynaldo Guevera et al.*; AR-L 532490-532533; Verified Post-Conviction Petition (December 11, 2014); JR-L300501-300555.

8. **Leshurn Hunt (1983)**: Detective Guevara and other Area 5 detectives forcibly removed Leshurn Hunt from his home, brought him to the police station, and handcuffed him to a ring on the wall, where they beat him about the head, face, and body until he confessed to a murder and robbery. Mr. Hunt was detained for approximately 23 hours and deprived of food, water, and sleep. Mr. Hunt sought medical treatment for his injuries and filed a complaint with the Office of Professional Standards. The criminal court judge suppressed Mr. Hunt's confession. Hunt filed a civil lawsuit in 1985, alleging that Detective Guevara used force against him to extract a confession. The lawsuit identified "nine recent occasions on which [Guevara and other defendants] were accused of using excessive force during arrests and interrogation." *Hunt v. Jaglowski*, 85 C 1976, 665 F. Supp. 681 (July 21, 1987); (Affidavit of Leshurn Hunt, January 26, 2008 incorporating complaint by Leshurn Hunt to OPS on February 28, 1986; AR-L 545497-545501).

---

[75] *See* https://www.buzzfeed.com/melissasegura/the-conviction-of-a-seventh-person-wrongly-framed-for?utm_term=.cwXBmgaPD5#.vup4ZXMyWQ

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 91

9. **Jose Maysonet (1995)**: Detective Guevara targeted Mr. Maysonet for arrest because Mr. Maysonet refused to pay him protection money, and that during the interrogation, Detective Guevara handcuffed him to the wall and beat him with a flashlight and phone book. Mr. Maysonet was told that his girlfriend would be put in prison and his children would be taken away if he did not cooperate. In 2016, Mr. Maysonet's conviction was vacated and prosecutors dropped all charges against Mr. Maysonet after Detective Guevara and Detective Halvorsen—among others—all alerted the court they would invoke the Fifth Amendment if they were called to the stand. Testimony of Jose Maysonet, Motion to Suppress Hearing, January 31, 1995; AR-L 537618-537792; Andy Grimm, *Double-murder charges dropped after 5 cops say they'll take the Fifth*, Chi. Sun-Times, Nov. 15, 2017.

10. **Daniel Pena (1986)**: Detective Guevara and two other Area 5 detectives hit Mr. Pena in the face and ribs, and beat him in the groin and thighs with flashlights until he confessed. Mr. Pena received medical treatment that corroborated his claims of abuse (*State of Illinois v. Juan Perez, Daniel Pena*, Transcript of Report of Proceedings, July 14, 1986; AR-L 154619-154687).

11. **David Rivera (1991)**: Detective Guevara coerced David Rivera into signing a confession by telling him that if he confessed and pled guilty, he would serve seven years in prison whereas if he did not confess, he would be sent away for forty to fifty years, and that if he signed a statement at the police station, he could go home. (Affidavit of David Rivera, February 22, 2008; AR-L 155028-155029).

12. **Daniel Rodriguez and David Velasquez (1991)**: On the way to the police station after Mr. Rodriguez's arrest, Detective Guevara threatened that if Rodriguez did not cooperate and make it easy on himself, Detective Guevara would raid his house and frame his girlfriend. Detective Guevara's partner, Detective Halverson, beat Mr. Rodriguez during the interrogation. Detective Guevara then coerced Mr. Rodriguez into signing a false statement implicating himself in a murder. Detective Guevara also coerced sixteen year-old David Velasquez to implicate Mr. Rodriguez in the murder by beating and threatening him. Velasquez has given multiple sworn statements over the last three decades about Detective Guevara's and Detective Halvorsen's misconduct, beginning with Mr. Rodriguez's 1993 trial. Affidavit of Daniel Rodriguez (March 25, 2008; AR-L 147462-147466; *Reynaldo Munoz v. State of Illinois*, Excerpt Report of Proceedings had before the Honorable Sophia Atcherson, July 14, 2021; AR-L 155313-15363).

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 92

13. **Victor Vera (1989)**: Detective Guevara threatened to lock up Mr. Vera's brother and parents if he did not confess, promised Mr. Vera that "nothing would come back to" him and that Detective Guevara would give him "total control over the Spanish Cobras neighborhood" if he admitted his involvement in a murder. When those methods were unsuccessful, Detective Guevara drove Mr. Vera to rival gang territory where there was a hit out on him, announced on a bullhorn that Mr. Vera was in the car, and tried to shove him out of the car causing Mr. Vera to agree to falsely confess. (Affidavit of Victor Vera, December 20, 2007; AR-L 154810-154813)

The Chicago Police Department received numerous civilian complaints charging Detective Guevara with using physical force to coerce suspects and witnesses, including the following:

1. **Annie and Bernard Turner (1982)**: Annie and Bernard Turner alleged that Guevara used excessive force against them for smoking on a city bus. The allegations were not sustained. CR 124631; AR-L 648760-648819.

2. **Leshurn Hunt (1983)**: As discussed above, Detective Guevara and other Area 5 detectives forcibly removed Leshurn Hunt from his home, brought him to the police station, and handcuffed him to a ring on the wall, where they beat him about the head, face, and body until he confessed to a murder and robbery. Mr. Hunt was detained for approximately 23 hours and deprived of food, water, and sleep. Mr. Hunt sought medical treatment for his injuries and filed a complaint with the Office of Professional Standards. The criminal court judge suppressed Mr. Hunt's confession. Mr. Hunt filed a civil lawsuit in 1985, alleging that Detective Guevara used force against him to extract a confession. The lawsuit identified "nine recent occasions on which [Guevara and other defendants] were accused of using excessive force during arrests and interrogation." *Hunt v. Jaglowski*, 85 C 1976, 665 F. Supp. 681 (July 21, 1987). CR 145129; AR-L 545458-545460.

3. **Rafael Garcia (1986)**: Mr. Garcia alleged that Detective Guevara, while off duty at a bar, accused him of dealing narcotics, cuffed him, punched him, threw him to the ground, and kicked him. After Detective Guevara uncuffed Mr. Garcia at the urging of the bar owner, Detective Guevara hit Mr. Garcia in the head, and threw him out of the bar. When Mr. Garcia found other officers and told them what Detective Guevara had done, Detective Guevara tried to have Mr. Garcia arrested again. All of Mr. Garcia's allegations against Detective Guevara were not sustained, but Detective Guevara received a 2-day suspension for failing to complete an officer

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 93

battery report and failing to obtain authorization prior to releasing Mr. Garcia. CR C152902; RFC 31530-31592.

4. **Melvin Warren (1986)**: Mr. Warren alleged that Detective Guevara punched and choked him. The allegation was "sustained" following an investigation but OPS subsequently overturned the "sustained" finding and changed it to "not sustained." CR C150473; AR-L 648889-648898.

5. **Juanita Martinez (1995)**: Mr. Martinez alleged that Detective Guevara "physically abused" her minor son to obtain information regarding a murder. The allegations were not sustained. CR 217624; RFC 31756-31791.

In other cases, individuals alleged they had been abused by Detective Guevara in attempts to obtain confessions or to provide false testimony against other suspects:

1. **Timothy Rankins and Armando Serrano/Jose Montanez (1993)**: Detective Guevara placed a phone book over Mr. Rankins' head and beat it with a flashlight, threw Mr. Rankins out of his chair, and placed Mr. Rankins in a chokehold to induce him to sign a statement that Detective Guevara had prepared implicating Serrano and Montanez in a murder. Mr. Serrano and Mr. Montanez have both received certificates of innocence (Sworn Statement of Timothy Rankins, *State of Illinois v. Armando Serrano*, April 3, 2012; AR-L 155230-155268; Corrected First Amended Complaint, *Jose Montanez v. Reynaldo Guevara, et al.*; AR-L 563644-563688; Complaint, *Armando Serrano v. Reynaldo Guevara, et al.*); AR-L 563597-563643).

2. **Jose E. Melendez and Thomas Sierra (1995)**: Witness Jose E. Melendez reported that Detective Guevara and others physically abused him and then retaliated against him when he could not provide information about a murder by charging him with a different murder. Jose E. Melendez was later acquitted of all charges. A different Jose Melendez (Jose M. Melendez)—who was with a victim during the murder of which Sierra was wrongly convicted—testified that when he went to Area 5 Detective Guevara pointed to a picture of Sierra and told him to identify that person as the shooter. Jose M. Melendez repeatedly testified that he told Detective Guevara that he did not know who the shooter was yet Mr. Melendez went along with Detective Guevara and "pointed out the one [Guevara] told me to point out." The other eyewitness in the case—Alberto Rodriguez—testified multiple times that he "couldn't give a good description" of the shooter. Detective Guevara coerced him into identifying Sierra by telling him that they "got the person or they know of the

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 94

person" and that the shooter was "probably the guy in these pictures" prior to showing him the photo array. In 2018, Sierra's conviction was vacated and the State's Attorney dismissed all charges (Deposition of Jose Melendez, September 13, 2021, *Thomas Sierra v. Reynaldo Guevera et al.*); AR-L 155271-155312.

In 2013, the City of Chicago commissioned an investigation into Detective Guevara and hired former United States Attorney Scott Lassar to conduct the investigation. Reports in the investigation were completed in 2015 and concluded that at least four different men who alleged misconduct by Guevara are "most likely innocent." These men are Roberto Almodovar, Armando Serrano, Jose Montanez, and Robert Bouto. As discussed earlier, Lassar also reached conclusions in the DeLeon-Reyes and Solache cases, as discussed much earlier in this report, including that the allegations "that Guevara physically abused Solache and Reyes in an effort to coerce them to admit their involvement in the Soto murders are credible, and that it is more likely than not that Solache and Reyes were, in fact, physically abused during the course of their interrogations."

In sum, Chicago police commanders and high ranking City of Chicago officials (including police command personnel) were on continuing notice since as early as 1982 that there was a pattern and practice of police interrogation torture and coercion to extract confessions in Area 5 involving Detective Guevara, Detective Halvorson and other Area 5 Chicago police detectives.

(F) Conclusion

Dating back to the early 1970s, and at least until the early 2000's, there has been an extensive and widespread practice of torture, physical abuse and coercion during police interrogations in the Chicago Police Department, resulting in numerous coerced, fabricated, unreliable and/or false confessions. The substantial evidence I have reviewed in this report indicates that this pervasive practice of abusive police interrogations to coerce and fabricate confessions, especially from African American and Latino men, was *citywide* and existed in the different detective areas. The City of Chicago has been on notice of this widespread and extensive practice at least since the early to mid-1980s. By the time of the physically abusive and coercive interrogations of Arturo DeLeon and Gabriel Solache on April 3-5, 1998, and their resulting *proven false confessions*, the City of Chicago had been on notice for many years and decades of the pervasive practice of torture, abuse and coercion by Chicago Police detectives during interrogation to extract and fabricate confessions

**XIII. Conclusion**

In conclusion, based on my detailed analysis above, it is my professional opinion that:

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 95

1) The interrogation-induced signed confession statements of Arturo DeLeon-Reyes and Gabriel Solache meet the criteria for what is known as a *proven false confession* in the social scientific research literature.  Based on the empirical and psychological science, Arturo Deleon-Reyes' and Gabriel Solache's signed statements are properly classified as *coerced-compliant false confessions*.

2) Arturo DeLeon–Reyes' description of what occurred during his lengthy, unrecorded custodial interrogations on April 3-5, 1998 is consistent with the empirical social science research on the types of interrogation techniques, methods, practices and effects that lead to false confessions.

3) The accounts by Detective Reynaldo Guevara, Detective Dickinson, Detective Rutherford, Youth Officer Trevino and ASA O'Malley of what occurred during the lengthy, unrecorded custodial interrogations of Arturo DeLeon-Reyes are not consistent with the empirical findings of the social science research literature on what leads to false confessions. These accounts fail to provide a reasonable or coherent explanation of how or why Mr. DeLeon-Reyes would have signed a *proven false confession* to participating in a double murder and double kidnapping after forty plus hours of custodial isolation and interrogation.

4) Arturo DeLeon-Reyes' description of what occurred during his lengthy, unrecorded custodial interrogations on April 3-5, 1998 contains examples of physically and psychologically coercive interrogation techniques, methods, strategies and effects that are known to cause involuntary confessions.  These interrogation techniques, methods, strategies and effects have been shown to cause suspects to perceive that they have no meaningful choice but to comply with the demands and requests of their interrogators.

5) Arturo DeLeon-Reyes' account of what occurred during his lengthy, unrecorded custodial interrogations on April 3-5, 1998 contains a description of interrogation techniques, methods, strategies and effects that have been demonstrated by social science research to increase the risk of eliciting false statements, admissions and/or confessions (*i.e.*, *situational* risk factors).  These *situational* risk factors for false confession include: lengthy interrogation, sleep deprivation, premature rush to judgment and guilt-presumptive interrogation, false evidence ploys, explicit and implicit threats, explicit and implicit promises, and physical and psychological coercion.

6) The lengthy, unrecorded custodial interrogations described by Arturo DeLeon-Reyes as occurring on April 3-5, 1998 involved instances of police interrogation contamination (*i.e.*, leaking and disclosing non-public case facts) and police interrogation scripting (i.e., pressuring and persuading the suspect to accept the police narrative of how and why the alleged crime occurred), which increased the risk that Mr. DeLeon-Reyes' interrogation-induced, police-

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 96

written confession statement would, misleadingly, appear to be detailed, accurate and self-corroborating.

7) The lengthy, unrecorded custodial interrogations described by Arturo DeLeon-Reyes as occurring on April 3-5, 1998 demonstrated a profoundly reckless disregard for finding the truth of what occurred in the double murder of Mariano and Jacinta Soto and the double kidnapping of their 3 year old son Santiago and infant daughter Maria.

8) The lengthy, unrecorded custodial interrogations described Arturo DeLeon-Reyes as occurring on April 3-5, 1998 violated numerous universally accepted police investigative and interrogation national training standards, police protocols and best practices that existed in 1998.

9) Gabriel Solache's description of what occurred during his lengthy, unrecorded custodial interrogations on April 3-5, 1998 is consistent with the empirical social science research on the types of interrogation techniques, methods, practices and effects that lead to false confessions.

10) The accounts by Detective Reynaldo Guevara and ASA Brualdi of what occurred during the lengthy, unrecorded custodial interrogations of Gabriel Solache are not consistent with the empirical findings of the social science research literature on what leads to false confessions. These accounts fail to provide a reasonable or coherent explanation of how or why Mr. Solache would have signed a *proven false confession* to participating in a double murder and double kidnapping after forty plus hours of custodial isolation and interrogation.

11) Gabriel Solache's description of what occurred during his lengthy, unrecorded custodial interrogations on April 3-5, 1998 contains examples of physically and psychologically coercive interrogation techniques, methods, strategies and effects that are known to cause involuntary confessions. These interrogation techniques, methods, strategies and effects have been shown to cause suspects to perceive that they have no meaningful choice but to comply with the demands and requests of their interrogators.

12) Gabriel Solache's account of what occurred during his lengthy, unrecorded custodial interrogations on April 3-5, 1998 contains a description of interrogation techniques, methods, strategies and effects that have been demonstrated by social science research to increase the risk of eliciting false statements, admissions and/or confessions (*i.e.*, *situational* risk factors). These *situational* risk factors for false confession include: lengthy interrogation, sleep deprivation, premature rush to judgment and guilt-presumptive interrogation, false evidence ploys, explicit and implicit threats, explicit and implicit promises, and physical and psychological coercion.

13) The lengthy, unrecorded custodial interrogations described by Gabriel Solache as occurring on April 3-5, 1998 involved instances of police interrogation contamination (*i.e.*,

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 97

leaking and disclosing non-public case facts) and police interrogation scripting (i.e., pressuring and persuading the suspect to accept the police narrative of how and why the alleged crime occurred), which increased the risk that Mr. Solache's interrogation-induced, police-written confession statement would, misleadingly, appear to be detailed, accurate and self-corroborating.

14) The lengthy, unrecorded custodial interrogations described by Gabriel Solache as occurring on April 3-5, 1998 demonstrated a profoundly reckless disregard for finding the truth of what occurred in the double murder of Mariano and Jacinta Soto and the double kidnapping of their three year old son Santiago and infant daughter Maria.

15) The lengthy, unrecorded custodial interrogations described Gabriel Solache as occurring on April 3-5, 1998 violated numerous universally accepted police investigative and interrogation national training standards, police protocols and best practices that existed in 1998.

16) Starting in 1972 and continuing up to at least 2000, the City of Chicago's Police Department had a systemic practice of subjecting African American and Latino suspects who were interrogated by detectives and supervisors to physically abusive and coercive interrogations with the result of coercing and/or fabricating false and/or unreliable inculpatory evidence to be used against the interrogated suspect without regard to his actual guilt or innocence.

17) At least as early as February of 1982 and continuing through the 1990s, high ranking officials in the City of Chicago and the Chicago Police Department and numerous police command personnel, received continuing notice of this systemic practice of physical abuse and coercion of Black and Latino suspects in order to coerce and fabricate confessions, including from the repeated documented allegations that accumulated against supervisors and detectives, first at Area 2 detective Division, and later at Areas 3, 4 and 5; from the testimony of criminal defendants at motion to suppress hearings and trials; from numerous court decisions in criminal cases; from the findings in numerous Office of Professional Standards reports; from federal and state court decisions; and from the admissions of City officials.

The opinions I express in this report are based on my own knowledge, research, and publications; research and publications in the field; and the case-specific information and evidence that has been provided to me. Should any additional information or testimony come to my attention, I reserve the right to modify any opinions expressed herein accordingly.

Ben Elson, Steve Art and Anand Swaminathan
Attorneys at Law
The People's Law Office and
Loevy and Loevy
January 15, 2022
Page 98


If you have any questions, please do not hesitate to contact me.

Sincerely yours,

Richard A. Leo, Ph.D., J.D.
Hamill Family Professor of Law and
Social Psychology
University of San Francisco

January, 2022

**DR. RICHARD A. LEO, PH.D, J.D.**

## CURRICULUM VITAE

### ADDRESSES

**Professional Office (Mailing Address)**
15 Ashbury Terrace
San Francisco, CA 94117

**University Office**
University of San Francisco
School of Law
San Francisco, CA 94117

| | | |
|---|---|---|
| Phone: | (415) 661-0162 | 415-422-6513 |
| FAX: | (415) 422-6433 | (415) 422-6433 |
| Email: | rleo@usfca.edu | rleo@usfca.edu |

Webpage:  http://www.usfca.edu/law/faculty/fulltime/leor.html
SSRN:  http://ssrn.com/author=1020356
BePress:  http://works.bepress.com/richardleo/

### POSITIONS HELD

7/06-Present  Hamill Family Professor of Law and Psychology
University of San Francisco

8/05-Present  Fellow, Institute for Legal Research
Criminal Justice Studies Program
University of California, Berkeley School of Law

9/14-6/15  Fellow, Center for the Advanced Study in the Behavioral Sciences
Stanford University

7/13-6/14  Visiting Professor of Law and
Co-Director, Program on Understanding Law, Science and Evidence
University of California, Los Angeles

7/97 – 6/06  Associate Professor of Criminology, Law and Society and
Psychology and Social Behavior
University of California, Irvine (Tenured in 2001)

8/94 - 5/97  Assistant Professor of Sociology and Adjunct Professor of Law
University of Colorado, Boulder

1

## EDUCATION

8/90 - 8/94       Ph.D. in Jurisprudence and Social Policy
**Specialization: Criminology and Social Psychology**
University of California, Berkeley

8/92 - 5/94       J.D., Boalt Hall School of Law
University of California, Berkeley

9/87 - 6/89       M.A. in Sociology
University of Chicago

9/81 - 5/85       A.B. in Sociology, with Honors
University of California, Berkeley

## ACADEMIC SPECIALIZATION

Criminology/Criminal Justice    Psychology and Law    Social Psychology
Criminal Law/Criminal Procedure    Law and Social Science    Police Organization/Behavior

## RESEARCH SPECIALIZATION

Police Interrogation    Wrongful Convictions    Coercive Persuasion
False Confessions    Miscarriages of Justice    Influence and Decision-Making

## AWARDS

Distinguished Scholar Award (2017). American Society of Criminology, Division of Policing (For outstanding contributions to the field of policing).

Academic Excellence Award (2017). International Investigative Interviewing Research Group (In recognition of outstanding achievements to ethical investigative interviewing).

Lifetime Achievement Award (2014). Society for the Study of Social Problems, Crime and Juvenile Delinquency Division. (For distinguished scholarship in the fields of crime and delinquency).

Paul Tappan Lifetime Achievement Award (2014). Western Society of Criminology. (For outstanding contributions to the field of criminology).

The President's Award (2014). Western Society of Criminology. (For contributions to the field of criminology and positive influence on the current Western Society of Criminology President's career).

Fellowship, Center for the Advanced Study in the Behavioral Sciences (2014-2015). Stanford University.

William J. Chambliss Lifetime Achievement Award (2013). Society for the Study of Social Problems, Law and Society Division. (For career-spanning excellence and achievement in the area of law and society).

Guggenheim Fellowship (2011). John Simon Guggenheim Memorial Foundation. (For men and women who have already demonstrated exceptional capacity for productive scholarship or exceptional creative ability in the arts). New York, N.Y.

Edwin H. Sutherland Outstanding Scholarship Award from the Society for the Study of Social Problems, Law and Society Division (2010) for *Police Interrogation and American Justice* (Harvard University Press, 2008). Inaugural award.

Outstanding Book Award (2010) from the Academy of Criminal Justice Sciences for *Police Interrogation and American Justice* (Harvard University Press, 2008).

Herbert Jacob Book Prize (2009) from the Law and Society Association for *Police Interrogation and American Justice* (Harvard University Press, 2008)

Distinguished Scholarship Award (2009) from the Pacific Sociological Association for *Police Interrogation and American Justice* (Harvard University Press, 2008). Honorable Mention.

Soros Senior Justice Fellowship (2004). Open Society Institute. Soros Foundation. New York, N.Y.

The Saleem Shah Career Achievement Award (2000). Given by The American Psychology-Law Society (Division 41 of the American Psychological Association) and the American Academy of Forensic Psychology for early career excellence and contributions to psychology, law and public policy.

The Ruth Shonle Cavan Young Scholar Award (1999). Given by The American Society of Criminology to recognize outstanding scholarly contributions to the discipline of criminology.

Distinguished Assistant Professor Award for Research (2000-2001). University of California, Irvine. Conferred by the Academic Senate of the University of California, Irvine for distinguished research.

Faculty Career Development Award (1998-1999). University of California, Irvine.

Graduate Student Paper Award, Honorable Mention (1994) from the American Sociological Association, Crime, Law, and Deviance Section.

Outstanding Graduate Student Instructor Award (1993). University of California, Berkeley. Department of Legal Studies.

Prosser Prize (1992), "Guggenheim Crime Policy Seminar." University of California, Berkeley, Boalt Hall Law School.

## ADDITIONAL HONORS AND DISTINCTIONS (SELECTIVE)

50 Most Downloaded U.S. Law Professors in 2021 (#38).  See
https://taxprof.typepad.com/taxprof_blog/2022/01/the-50-most-downloaded-us-law-professors-of-2021.html#more

Most impactful and widely cited scholars of all time according to HeinOnline.  (#84 as of July 23, 2020). See https://home.heinonline.org/top_authors/

Publications have been downloaded more than 50,000 times on the Social Science Research Network (Top 10% of all authors). See http://www.usfca.edu/law/faculty/fulltime/leor.html

Member (Elected), American Law Institute (October, 2011-Present).

Listed in 2016 by the *Wall Street Journal* as one of 25 U.S. Law Professors whose research and publications have been cited most often by courts.  See Nick Farris, Valerie Aggerbeck, Megan McNevin, & Greg Sisk, *Judicial Impact of Law School Faculties*, http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2826048

The subject of a full-length feature article by Mark Leviton (July, 2017).  "The Whole Truth: Richard A. Leo on Why Innocent People Confess to Crimes." *The Sun Magazine*, Pp. 6-15.  See http://thesunmagazine.org/issues/499/the-whole-truth

The subject of a *New Yorker* magazine article by Jeffrey Toobin (August 24, 2009).  See: http://www.newyorker.com/talk/2009/08/24/090824ta_talk_toobin

Listed in Brian Leiter, *Most Cited Law Professors by Specialty, 2000-2007*, Criminal Law and Procedure, (http://www.leiterrankings.com/faculty/2007faculty_impact_areas.shtml)

*Member*, Scientific Advisory Board.  National Center for Reason and Justice (3/02-Present).

*Board member*, Forensic Social Sciences Association (2/14-Present).

*Affiliate*, Center on Police Practices and Community (COPPAC). University of California, Santa Barbara Institute of Social, Behavioral & Economic Research (7/01-Present).

Fellow, Earl Warren Legal Institute Criminal Justice Program, University of California, Berkeley School of Law (10/98-8/05)

*Visiting Scholar*, Boalt Hall School of Law, University of California, Berkeley (8/03-8/05).

*Visiting Professor* of Sociology, Nankai University, Tianjin, China (10/96).

## PUBLICATIONS

4

## BOOKS

2022    Richard A. Leo and Tom Wells. THE INNOCENCE REVOLUTION: THE AMERICAN MOVEMENT AGAINST WRONGFUL CONVICTIONS (Under Submission; Expected Publication Date: 2022).

- Received Guggenheim Fellowship Award to write this book

2012    CONFESSIONS OF GUILT: FROM TORTURE TO MIRANDA AND BEYOND (with George C. Thomas III).  New York: Oxford University Press.  ISBN #: 978-0-19-533893-5. Available at: http://www.oup.com/us/catalog/general/subject/Sociology/CriminalJustice/?view=usa&ci=9780195338935

- Translated into Chinese by SHANGHAI JIAOTONG UNIVERSITY PRESS of Shanghai (2014)

2008    POLICE INTERROGATION AND AMERICAN JUSTICE (2008).  Cambridge: Harvard University Press.  ISBN #: 0-674-02648-9.  Available at: http://www.hup.harvard.edu/catalog/LEOPOL.html  or  http://www.amazon.com/Police-Interrogation-American-Justice-Richard/dp/0674026489

- Edwin H. Sutherland Outstanding Scholarship Award. The Society for the Study of Social Problems (2010).  Inaugural award.

- Outstanding Book Award (2010).  Academy of Criminal Justice Sciences.

- Herbert Jacob Book Prize (2009).  Law and Society Association.

- Distinguished Scholarship Award (2009).  Pacific Sociological Association.  Honorable Mention.

- Excerpts reprinted in Yale Kamisar Et. Al, Eds. (2008).  *Modern Criminal Procedure: Cases, Comments*, *Questions*.  Twelfth Edition.  (St. Paul, MN: West Publishing).  Pp. 540, 624, 719-720

- Paperback version published in August, 2009

- Translated into Chinese by China University of Political Science and Law Press (2012)

- Translated into Korean by Humanitas Press (2014)

2008    THE WRONG GUYS: MURDER, FALSE CONFESSIONS AND THE NORFOLK FOUR (2008) (with Tom Wells). New York: The New Press.  ISBN #: 978-1-59558-401-4.  Available at: http://amazon.com or http://thenewpress.com.  See also: http://www.wrongguys.com.

- Nominated for a National Book Award and a Pulitzer Prize

- The subject of a *New Yorker* magazine article by Jeffrey Toobin (August 24, 2009). See: http://www.newyorker.com/talk/2009/08/24/090824ta_talk_toobin

- Received Soros Senior Justice Fellowship (2004) to write this book

2008    THE PROBLEM OF FALSE CONFESSIONS IN THE POST-DNA WORLD (2008) (with Steven Drizin). Published as a book in Japan by Nippon Hyoronsha Co., LTD. ISBN #: 978-4-535-51664-9.

1998    THE MIRANDA DEBATE: LAW, JUSTICE AND POLICING (1998) (with George C. Thomas III, Eds). Boston: Northeastern University Press. ISBN #: 1-55553-338-8.

1998    THE AMERICAN CRIMINAL JUSTICE SYSTEM (1998), (Ed). (Simon & Schuster). ISBN #: 0-536-00826-4.

### ARTICLES, BOOK CHAPTERS AND OTHER PUBLICATIONS

2022    "Interrogation and the Infanticide Suspect: Mechanisms of Vulnerability to False Confession." Forthcoming in Keith Findley, Cyrille Rossant, Kana Sasakura, Leila Schneps, Waney Squier, and Knut Wester Eds. (2022). *Shaken Certainties* (Cambridge University Press)

2022    "Theorizing Failed Prosecutions" (with Jon B. Gould Victoria M. Smiegocki). Forthcoming in the *Journal of Criminal Law and Criminology*. Available at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3773751

- Reprinted in Alice Kaswan, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 14, No. 1 (2021)

2022    "A History of Interrogation and Interrogative Suggestibility," (with Laura Nirider and Deborah Davis). Forthcoming in Demos Lorandos, Ed. *The Litigator's Handbook on Forensic Medicine, Psychiatry and Psychology* (West Thomson Reuters). Available at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3773751

- Reprinted in Alice Kaswan, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 14, No. 1 (2021)

2021    "On the Synergy Between Pretext Caller and Police Interrogator" (with Deborah Davis, Tyler Livingston and Peter Rerick) in Nadine Deslauriers-Varin and Craig Bennell, Eds. (2022). *Criminal Investigation of Sexual Offenses* (Springer). Pp. 115-130. Available at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3773751

- Reprinted in Alice Kaswan, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 14, No. 1 (2021)

2020 "Science Lag and Knowledge Cumulation: Urgent Issues and Prospects in Reforming Interrogation Practices in the USA and Canada" (with Brent Snook et al.). Forthcoming in *Legal and Criminological Psychology.* Available at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3669413

- Reprinted in Alice Kaswan, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 13, No. 1 (2020)

2020 "Structural Police Deception in American Police Interrogation: A Closer Look at Minimization and Maximization." in Lutz Eidam, Michael Lindemann, and Andreas Ransiek, Eds, (2020*). Interrogation Confession and Truth: Comparative Studies in Criminal Procedure.* (Baden-Baden, Germany: Nomos Press). Pp. 183-207. Available at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3584817

- Reprinted in Tristin Green, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 13, No. 1 (2020)

2020 "The Analysis of Nonverbal Communication: The Dangers of Pseudoscience in Security and Justice Contexts" (with Vincent Denault et al.). *Annual Review of Legal Psychology*, 30, 1-12. Also simultaneously published in French (*Revue internationale de criminologie et de police technique et scientifique*) and in Spanish (*Anuario de Psicología Jurídica*).

2019 "Police Interrogation and Suspect Confessions," in Eric Miller and Tamara Lave, Eds. (2019), *The Cambridge Handbook on Policing in the United States* (Boston, MA: Cambridge University Press). Pp. 178-199. Available at: http://ssrn.com/author=1020356

- Reprinted in Tristin Green, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 11, No. 2 (2018)

2018 "Mental Health and False Confessions" (With William Follette and Deborah Davis). In Elizabeth Kelley, Ed (2018). *Representing People with Mental Disabilities: A Criminal Defense Lawyer's Best Practices Manual* (Chicago: American Bar Association). Pp. 95-124. Available at: http://ssrn.com/author=1020356

- Reprinted in Tristin Green, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 10, No. 3 (2017)

2018    "Interrogation and Confessions: Social Science, Law and Public Policy." Pp. 233-259.  In Erik Luna, Ed. (2018), *Academy for Justice: Reforming Criminal Justice, Vol. 2: Policing*. Available at: http://ssrn.com/author=1020356

- Reprinted in Tristin Green, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 10, No. 1 (2017)

2018    "Police Interrogation and Coercion in Domestic American History: Lessons for the War on Terror" (with Alexa Koenig), in Scott Anderson and Martha Nussbaum, Eds., (2018) *Confronting Torture: Essays on the Ethics, Legality, History, and Psychology of Torture Today*.  Pp. 146-174. (Chicago: University of Chicago Press). Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 3, No. 1 (2010).

2017    "What Innocence Means Today and Why It Matters," 68 *Florida Law Review*, 1569-1596 as a larger essay entitled, "Voices on Innocence" (with Lucian Dervan, Meghan Ryan, Valena Beety, Gregory Gilchrist and William Berry).  Available at: http://ssrn.com/author=1020356

- Reprinted in Michelle Travis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 9, No. 2 (2016)

2017    "The *Miranda* App: Metaphor and Machine (with Andrew Guthrie Ferguson).  *Boston University Law Review*, Vol. 97.  Pp. 935-992.  Available at: http://ssrn.com/author=1020356

- Reprinted in Tristin Green, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 10, No. 1 (2017)

2017    "The Criminology of Wrongful Conviction: A Decade Later."  *Journal of  Contemporary Criminal Justice*.  Vol. 33.  Pp. 82-106.  Available at: http://ssrn.com/author=1020356

- Reprinted in Tristin Green, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 9, No. 5 (2016)

2017    "Has the Innocence Movement Become an Exoneration Movement? The Risks and Rewards of Redefining Innocence," in Daniel Medwed, Ed. (2017), *Wrongful Convictions and the DNA Revolution: Twenty-Five Years of Freeing the Innocent* (Boston, MA: Cambridge University Press).  Pp. 57-83.  Available at: http://ssrn.com/author=1020356

- Reprinted in Michelle Travis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 9, No. 3 (2016)

2017 "Police Interrogation, False Confessions and Alleged Child Abuse Cases." *The Michigan Journal of Law Reform*, Vol. 50.  Pp. 693-721.  Available at: http://ssrn.com/author=1020356

- Reprinted in Brian Gallini, Ed. (Forthcoming). *Investigative Criminal Procedure: Inside This Century7's Most (In) Famous Cases* (West Publishing).

- Reprinted in Tristin Green, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 10, No. 1 (2017)

2017 "A Damning Cascade of Investigative Errors: Flaws in Homicide Investigation in the U.S.A." (with Deborah Davis) in Fiona Bookman, Ed. (2017).  *Handbook on Homicide* (Wiley-Blackwell). Pp. 578-598.  Available at: http://ssrn.com/author=1020356

- Reprinted in Michelle Travis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 9, No. 1 (2016)

2017 "Police Interrogation and False Confessions in Rape Cases" in Roy Hazelwood and Ann Burgess, Eds (2017).  *Practical Aspects of Rape Investigation: A Multidisciplinary Approach*. 5th Edition.  (Boca Raton, Florida: CRC Press).  Pp. 177-186.  Available at: http://ssrn.com/author=1020356

- Reprinted in Michelle Travis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 9, No. 2 (2016)

2016 "The Path to Exoneration" (with Jon Gould).  *Albany Law Review*.  Vol. 79, Pp. 325-372. Available at: http://ssrn.com/author=1020356

- Reprinted in Michelle Travis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 9, No. 1 (2016)

2016 "When Exoneration Seems Hopeless: The Special Vulnerability of Sexual Abuse Suspects to False Confession" (with Deborah Davis) in Ros Burnett, Ed. (2016).  *Wrongful Allegations of Sexual and Child Abuse* (New York: Oxford University Press).  Pp. 175-190. Available at: http://ssrn.com/author=1020356

- Reprinted in Michelle Travis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 7, No. 5 (2014)

2016 "Analyzing Videotaped Interrogations and Confessions." *The Champion*.  Vol. XL, No. 12 (December, 2016).  Pp. 40-47.  Available at: http://ssrn.com/author=1020356

- Reprinted in Michelle Travis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 9, No. 1 (2016)

9

2016    "Her Story, His Story: Sexual Miscommunication, Motivated Remembering, and Intoxication as Pathways to Honest False Testimony Regarding Sexual Consent." (With Guillermo Villalobos and Deborah Davis) in Ros Burnett, Ed. (2016). *Wrongful Allegations of Sexual and Child Abuse* (New York: Oxford University Press).  Pp. 129-142. Available at: http://ssrn.com/author=1020356

- Reprinted in Michelle Travis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 7, No. 6 (2014)

2016    "False Confessions in the 21st Century" (with Brian Cutler).  *The Champion*. Pp. 46-55.  Vol. XL, No. 4 (May, 2016).  Available at: http://ssrn.com/author=1020356

- Reprinted in Michelle Travis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 9, No. 1 (2016)

2015    "The Sound of Silence: *Miranda* Waivers, Selective Literalism and Social Context" in Lawrence Solan, Janet Ainsworth and Roger Shuy, Eds. (2015).  *Speaking of Language and Law* (New York: Oxford University Press). Pp. 255-259.  Available at: http://ssrn.com/author=1020356

- Reprinted in Michelle Travis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 7, No. 4 (2014)

2014    "The Justice Gap and the Promise of Criminological Research." *Criminology, Criminal Justice, Law & Society*, Vol. 15, No. 3.  Pp. 1-37.  Available at: http://ssrn.com/author=1020356

- Reprinted in Michelle Travis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 8, No. 1 (2015)

2014    "Predicting Erroneous Convictions" (with Jon Gould, Julia Carrano and Katie Hail-Jares). *Iowa Law Review*, Vol. 99, Pp. 471-522.  Available at: http://ssrn.com/author=1020356

- Reprinted in Russell Covey and Valena Beety, Eds. (2018).  *Reading Innocence: A Wrongful Convictions Reader*. (Durham: Carolina Academic Press).  Pp. 358-359; 595-600.

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 6, No. 3 (2013)

2014    "Disputed Interrogation Techniques in America: True and False Confessions and the Estimation and Valuation of Type I and II Errors" (with Deborah Davis) in Sarah Cooper, Ed. (2014). *Controversies in Innocence Cases in America* (Surrey, England: Ashgate Publishing Ltd).  Pp.  57-72. Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 6, No. 4 (2013)

2014   "Innocent Defendants: Divergent Case Outcomes and What They Teach Us" (with Jon Gould, Julia Carrano, and Katie Hail-Jares) in Marvin Zalman and Julia Carrano, Eds. (2014), *Wrongful Conviction and Criminal Justice Reform: Making Justice* (London: Routledge).  Pp. 73-92. Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 6, No. 4 (2013)

2014   "Interrogation and Confessions" (with Deborah Davis) in Jay Albanese, Ed. (2014).  *The Encyclopedia of Criminology and Criminal Justice*, Vol. III (New York: John Wiley & Sons).  Pp. 1199-1206.   Available at: http://ssrn.com/author=1020356

2013   "Why Interrogation Contamination Occurs," The *Ohio State Journal of Criminal Law*, Vol. 11.  Pp. 193-215.  Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 6, No. 4 (2013)

2013   "Promoting Accuracy in the Use of Confession Evidence: An Argument for Pre-Trial Reliability Assessments to Prevent Wrongful Convictions" (with Peter Neufeld, Steven Drizin, and Andrew Taslitz).  *Temple Law Review*, Vol. 85, Pp. 759-838. Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 6, No. 2 (2013)

2013   "False Confessions and the Constitution: Problems, Possibilities and Solutions."  John T. Parry and L. Song Richardson, Eds. (2013).  *The Constitution and the Future of Criminal Law in America* (New York: Cambridge University Press).  Pp. 169-186.  Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 6, No. 1 (2013).

2013   "The Problem of Interrogation-Induced False Confession: Sources of Failure in Prevention and Detection" (with Deborah Davis) in Stephen Morewitz and Mark Goldstein, Eds. (2013).  *Handbook of Forensic Sociology and Psychology* (New York: Springer).   Pp. 47-75.  Available at: http://ssrn.com/author=1020356

- Reprinted in Ira Belkin, Chao Liu, and Amy Gao (2018).  *Questioning Police Interrogation Methods: A Comparative Study* (China: Law Press).

11

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 5, No. 5 (2012).

2013    "Acute Suggestibility in Police Interrogation:  Self-Regulation Failure as a Primary Mechanism of Vulnerability" in Anne Ridley, Ed. (2013). *Suggestibility in Legal Contexts: Psychological Research and Forensic Applications*.  (Chicester: John Wiley & Sons, Ltd.).  Pp. 171-195.  Available at: http://ssrn.com/author=1020356

2013    "The Law of Interrogation" (with George C. Thomas III).  G.J.N. Bruinsma and D.L. Weisburd, Ed. (2013).  *Encyclopedia of Criminology & Criminal Justice* (New York: Springer).  Pp. 2835-2840.  Available at: http://ssrn.com/author=1020356

2012    "Interrogation Related Regulatory Decline: Ego-Depletion, Failures of Self-Regulation and the Decision to Confess" (with Deborah Davis).  *Psychology, Public Policy and Law*, Vol 18. Pp. 673-704.  Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 4, No. 4 (2011).

2012    "To Walk in Their Shoes: The Problem of Missing, Misrepresented, and Misunderstood Context in Judging Criminal Confessions" (with Deborah Davis).  *New England Law Review*.  Vol. 46, No. 4.  Pp. 737-767.  Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 5, No. 4 (2012).

2012    "Interrogation Through Pragmatic Implication: Sticking to the Letter of the Law While Violating Its Intent" (with Deborah Davis) in Lawrence Solan and Peter Tiersma, Eds. (2012).  *Oxford Handbook on Language and the Law* (Oxford University Press).  Pp. 354-366.  Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 4, No. 2 (2011).

2011    "Three Prongs of the Confession Problem: Issues and Proposed Solutions" (with Deborah Davis).  In Carol Henderson and Jules Epstein, Eds. (2011).  *The Future of Evidence: How Science and Technology Will Change The Practice of Law* (Chicago: American Bar Association Books).  Pp. 233-264.  Available at: http://ssrn.com/author=1020356

2011    "Jurors Believe Interrogation Tactics Are Not Likely to Elicit False Confessions: Will Expert Witness Testimony Inform Them Otherwise?" (With Iris Blandon-Gitlin and Kathryn Sperry).  *Psychology, Crime and Law*.  Vol. 17, 239-260. Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 4, No. 1 (2011).

2010 "One-Hundred Years Later: Wrongful Convictions after a Century of Research" (with Jon Gould). *Journal of Criminal Law and Criminology*. Vol. 100, 825-868. Available at: http://ssrn.com/author=1020356

- Reprinted in Reprinted in Russell Covey and Valena Beety, Eds. (2018). *Reading Innocence: A Wrongful Convictions Reader*. (Durham: Carolina Academic Press). Pp. 69-71.

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Volume 3, No. 4 (2010).

2010 "The Gatehouse and Mansions: Fifty Years Later" (with Alexa Koenig). T*he Annual Review of Law and Social Science*, Vol. 6, 323-339. Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Volume 3, No. 3 (2010).

2010 "From False Confession to Wrongful Conviction: Seven Psychological Processes" (with Deborah Davis). *The Journal of Psychiatry and the Law*, Vol. 38, 9-56. Available at: http://ssrn.com/author=1020356

- Excerpted in Open Access Journal of Forensic Psychology (2009), Vol. 1. Available at: http://www.forensicpsychologyunbound.ws/

- Reprinted in Asifa Begum, Ed. (2009). *Law and Justice – Psychology Role Play* (Amicus Books: The Icfai University Press) and in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Volume 2, No. 5 (2009)

2010 "White Paper Commentaries: Looking Ahead" (with Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson and Allison Redlich). *Law and Human Behavior*. Vol. 34, Pp. 49-52. Available at: http://ssrn.com/author=1020356

2010 "Police-Induced Confessions: Risk Factors and Recommendations" (with Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson and Allison Redlich). *Law and Human Behavior*.Vol. 34, Pp. 3-38. Available at: http://ssrn.com/author=1020356

- Designated a "White Paper" of the American-Psychology Law Society, Division 41 of the American Psychological Association.

- Reprinted in Reprinted in Russell Covey and Valena Beety, Eds. (2018). *Reading Innocence: A Wrongful Convictions Reader*. (Durham: Carolina Academic Press). Pp. 140-150.

13

- Reprinted in Ira Belkin, Chao Liu, and Amy Gao (2018). *Questioning Police Interrogation Methods: A Comparative Study* (China: Law Press).

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Volume 3, No. 2 (2010).

2010 "Selling Confession: Setting the Stage with the Sympathetic Detective with a Time-Limited Offer (with Deborah Davis and William Follette). *Journal of Contemporary Criminal Justice*, Vol. 26, Pp. 441-457. Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Volume 3, No. 4 (2010).

2010 "Overcoming Judicial Preferences for Person versus Situation-Based Analyses of Interrogation Induced Confessions" (with Deborah Davis). *The Journal of the American Academy of Psychiatry and the Law*, Vol. 38. Pp. 187-194. Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Volume 5, No. 3 (2012).

2010 "Reply to Samuel R. Gross and Barbara O'Brien" (with Jon Gould). *The Ohio State Journal of Criminal Law*, Vol. 8, Pp. 277-279. Available at: http://ssrn.com/author=1020356

2010 "Moving Targets: Placing the Good Faith Doctrine in the Context of Fragmented Policing" (with Hadar Aviram and Jeremy Seymour). *The Fordham Urban Law Journal*. Vol. 37, Pp. 709-742. Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Volume 5, No. 2 (2012).

2010 "The Three Errors: Pathways to False Confession and Wrongful Conviction" (with Steve Drizin) in Daniel Lassiter and Christian Meissner, Eds. (2010). *Police Interrogations and False Confessions: Current Research, Practice, and Policy Recommendations*. (Washington, D.C.: American Psychological Association). Pp. 9-30. Available at: http://ssrn.com/author=1020356

- *Police Interrogation and False Confessions* selected as recipient of the 2011 American Psychology-Law Society's Outstanding Book Award and the 2010 Publishers Award for Professional and Scholarly Excellence in the field of psychology

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Volume 5, No. 1 (February 29, 2012).

2009 "Studying Wrongful Convictions: Learning from Social Science" (with Jon Gould). *The Ohio*

14

*State Journal of Criminal Law,* Vol. 7, Pp. 7-30.   Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 3, No. 2 (2010).

2009   "False Confessions: Causes, Consequences and Implications." *The Journal of the American Academy of Psychiatry and the Law*, Vol. 37, Pp. 332-343. Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 2, No. 2. (March 13, 2009).

2009   "What Do Potential Jurors Know About Police Interrogation and False Confessions?" (With Brittany Liu). *Behavioral Sciences and the Law*, Vol. 27, Pp. 381-399.  Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 2, No. 3. (May 29, 2009).

2009   "Psychological and Cultural Aspects of Interrogations and False Confessions: Using Research to Inform Legal Decision-making" (with Mark Costanzo and Netta Shaked) in Daniel A. Krauss and Joel D. Lieberman, Eds (2009). *Psychological Expertise in Court: Psychology in the Courtroom*.  Volume II.  (Burlington, VT: Ashgate Publishing Co).  Pp. 25-56. *Available at*: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 4, No. 1 (2011).

2009   "Interrogation" (with Mark Costanzo) in Allan Jamieson and Andre Moenssens (Eds). The Wiley Encyclopedia of Forensic Science (London: John Wiley & Sons).  Volume 3.  Pp. 1586-1590. Available at: http://ssrn.com/author=1020356

2008   "Police Interrogation and False Confessions in Rape Cases." In Roy Hazelwood and Ann Burgess, Eds. *Practical Rape Investigation: A Multidisciplinary Approach*.  4th Edition. (Boca Raton, Florida: CRC Press).  Pp. 211-217.

2007   "The Problem of False Confession in America." *The Champion*.  Vol. 41, No. 10. Pp. 30-35.

2007   "Mandate the Electronic Recording of Police Interrogations" (with Kimberly D. Richman). *Crime and Public Policy*, Vol. 6, Pp. 791-798.  Available at: http://ssrn.com/author=1020356

2007   "Police Interviewing and Interrogation: A Self-Report Survey of Police Practices and Beliefs" (with Saul M. Kassin, Christian A. Meissner, Kimberly D. Richman, Lori H. Colwell, Amy

15

Leach, and Dana LaFon). *Law and Human Behavior*. Vol. 31, Pp. 381-400. *Available at*: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Volume 3, No. 2 (2010).

2007 "Mental Health Status and Vulnerability to Police Interrogation Tactics" (with William Follette and Deborah Davis). *Criminal Justice* (A publication of the American Bar Association), Vol. 22, Pp. 42-49.

2007 "Research and Expert Testimony on Interrogation and Confessions" (with Mark Costanzo). In Mark Costanzo, Dan Krauss and Kathy Pezdek, Eds. (2007). *Expert Psychological Testimony for the Courts*. (New Jersey: Erlbaum). Pp. 69-98. *Available at*: http://ssrn.com/author=1020356

2006 "Bringing Reliability Back in: False Confessions and Legal Safeguards in the Twenty-First Century" (with Steven Drizin, Peter Neufeld, Brad Hall and Amy Vatner). *Wisconsin Law Review.* Vol. 2006, Pp. 479-539. *Available at*: http://ssrn.com/author=1020356

- Reprinted in Russell Covey and Valena Beety, Eds. (2018). *Reading Innocence: A Wrongful Convictions Reader*. (Durham: Carolina Academic Press). Pp. 135-139.

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Volume 2, No. 1. (January 15, 2009).

2006 "Strategies for Preventing False Confessions and Their Consequences" (with Deborah Davis). In Mark Kebbell and Graham Davies, Eds. (2006). *Practical Psychology for Forensic Investigations and Prosecutions*. (New York: John Wiley & Sons). Pp. 121-149. Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Volume 4, No. 3. (July 21, 2010).

2006 "Psychological Weapons of Influence: Applications in the Interrogation Room" (with Deborah Davis). *Nevada Lawyer*. Pp. 14-19.

2005 "Re-Thinking the Study of Miscarriages of Justice: Developing a Criminology of Wrongful Conviction." *Journal of Contemporary Criminal Justice*. Vol. 21, Pp. 201-223. *Available at*: http://ssrn.com/author=1020356

2005 "Interrogating Guilty Suspects: Why Sipowicz Never Has to Admit He is Wrong" (with George C. Thomas III). In Glenn Yeffeth, Eds (2005). *What Would Sipowicz Do? Race, Rights and Redemption* (Dallas: BenBella Books). Pp. 35-46.

16

2005     "Interrogation and Confessions," in J. Miller Mitchell & Richard A. Wright, Eds. *The Encyclopedia of Criminology* (New York: Routledge). Vol. 2, Pp. 819-825.

2004     "The Problem of False Confessions in the Post-DNA World" (with Steve Drizin). *North Carolina Law Review*. Vol. 82. Pp. 891-1007. *Available at*: http://ssrn.com/author=1020356

- Cited by United States Supreme Court in *J.D.B. v. North Carolina*, 2011 WL 2369509.

- Cited by United States Supreme Court in *Corley v. United States*, 129 S. Ct. 1558 (2009).

- Published as a book in Japan in 2008 by Nippon Yoronsha Co., Ltd

- Reprinted in Yale Kamisar et al. (2008). *Modern Criminal Procedure: Cases, Comments*, *Questions*. Twelfth Edition. (St. Paul, MN: West Publishing). Pp. 652 and 718. Reprinted in Andrew E. Taslitz and Margaret Paris (2007). *Constitutional Criminal Procedure*, 3rd Edition (Foundation Press).

2004     "The Third Degree and the Origins of Psychological Interrogation in America." In Daniel Lassiter, Ed. (2004). *Interrogations, Confessions and Entrapment.* Perspectives in Law and Psychology Series, Vol. 20 (New York: Kluwer Academic/Plenum Publishers). Pp. 37-84. *Available at*: http://ssrn.com/author=1020356

2004     "Beating a Bum Rap." *Contexts*. Vol. 3, Pp. 68-69.

2002     "The Effects of *Miranda v. Arizona*: Embedded in Our National Culture?" (With George C. Thomas III). In Michael Tonry, Ed. *Crime and Justice – A Review of Research, Crime and Justice*. Vol. 29, Pp. 203-271. *Available at*: http://ssrn.com/author=1020356

2002     "*Miranda*, Confessions and Justice: Lessons for Japan?" In Malcolm Feeley and Setsuo Miyazawa, Eds. (2002). *The Japanese Adversary System in Context: Controversies and Comparisons* (London: Palgrave). Pp. 200-219. *Available at*: http://ssrn.com/author=1020356

2002     "Interrogation." In David Levinson, Ed. *The Encyclopedia of Crime & Punishment* (Great Barrington, MA: Berkshire Reference Works). Pp. 927-931.

2001     "Questioning the Relevance of *Miranda* in the Twenty-First Century." *The Michigan Law Review*. Vol. 99. Pp. 1000-1029. *Available at*: http://ssrn.com/author=1020356

- Cited by the United States Supreme Court in *Missouri v. Seibert*, 124 S. Ct. 2601 (2004).

- Reprinted in Yale Kamisar, Wayne LaFave, and Jerold Israel (2002). *Modern Criminal Procedure: Cases, Comments*, *Questions*. Ninth Edition. (St. Paul, MN: West Publishing).

2001     "The Truth about False Confessions and Advocacy Scholarship" (with Richard Ofshe). *The*

*Criminal Law Bulletin*.  Vol. 37, Pp. 293-370.  *Available at*: http://ssrn.com/author=1020356

2001    "False Confessions: Causes, Consequences, and Solutions." In Saundra D. Westervelt and John A. Humphrey, Eds. (2001). *Wrongly Convicted: Perspectives on Failed Justice* (Newark: Rutgers University Press).  Pp. 36-54.

2001    "Police Interrogation and False Confessions in Rape Cases." In Roy Hazelwood and Ann Burgess, Eds.  *Practical Rape Investigation: A Multidisciplinary Approach*.  3rd Edition. (Boca Raton, Florida: CRC Press).  Pp. 233-241.

2001    "Confessions" in Gillian Lindsey and Jonathan Michie, Eds.  *Reader's Guide to the Social Sciences*.  Vol. 1. (London: Fitzroy Dearborn Publishers).  Pp. 266-267.

2000    "Autism, Rape and Arson" (with Ann Burgess, David Elkovitch, Jay Jackman).  *Sexual Assault Report*. Vol. 4, Number 2.  November/December.  Pp. 17, 28-30.

1999    "Adapting to *Miranda*: Modern Interrogators' Strategies for Dealing with the Obstacles Posed by *Miranda*" (with Welsh S. White). *Minnesota Law Review.*  Volume. 84. Pp. 397-472.  *Available at*: http://ssrn.com/author=1020356

    • Cited by the United States Supreme Court in *Maryland v. Shatzer*, 130 S. Ct. 1213 (2010)

1998    "Using the Innocent to Scapegoat *Miranda*: Another Reply to Paul Cassell" (with Richard Ofshe).  *The Journal of Criminal Law and Criminology*. Vol. 88, Pp. 557-577.  *Available at*: http://ssrn.com/author=1020356

1998    "The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation" (with Richard Ofshe).  *The Journal of Criminal Law and Criminology*.  Vol. 88, Pp. 429-496.  *Available at*: http://ssrn.com/author=1020356

    • Reprinted in Alisa Smith (2004).  *Law, Social Science, and the Criminal Courts* (Durham: Carolina Academic Press).  Pp. 286-295.

1998    "*Miranda* and the Problem of False Confessions." In Richard A. Leo and George C. Thomas, III. Eds.  *The Miranda Debate: Law, Justice and Policing* (Boston: Northeastern University Press).  Pp. 271-282.

1998    "Civil Rights and Civil Liberties: Videotaping the Police." *Criminal Justice Ethics*.  Vol. 17, No. 1.  Winter/Spring.  Pp. 44-45.

1998    "Witness for False Confession No Expert." *The Forensic Echo: The Monthly Newsmagazine of Psychiatry, Law & Public Policy*.  Vol II., No. 3 (February).  Pp. 14-15.

1998    "False Confessions and Miscarriages of Justice." *The Defender* (January).  Pp. 3-6.

1997   "The Social and Legal Construction of Repressed Memory."  *Law & Social Inquiry*, Vol. 22, Pp. 653-693.  *Available at*: http://ssrn.com/author=1020356

1997   "Missing the Forest for the Trees: A Response to Paul Cassell's 'Balanced Approach' to the False Confession Problem" (with Richard Ofshe).  *Denver University Law Review*.  Vol. 74, Pp. 1135-1144.  *Available at*: http://ssrn.com/author=1020356

1997   "The Decision to Confess Falsely: Rational Choice and Irrational Action" (with Richard Ofshe).  *Denver University Law Review*.  Vol. 74, Pp. 979-1122.  *Available at*: http://ssrn.com/author=1020356

- Reprinted in Myron Moskovitz (2010).  *Cases and Problems in Criminal Procedure: The Police*.  5th Edition.

1997   "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions" (with Richard Ofshe).  *Studies in Law, Politics & Society*, Vol. 16. Pp. 189-251. Available at: http://ssrn.com/author=1020356

1997   "Some Thoughts about Police and Crime."  In Lawrence Friedman and George Fisher, Eds. (1997).  *The Crime Conundrum: Essays on Criminal Justice* (Boulder: Westview Press).  Pp. 121-125.

1997   "False Confessions and Miscarriages of Justice Today."  In Richard A. Leo, Ed. (1997).  *The American Criminal Justice System* (Simon & Schuster).  Pp. 169-206.

1997   "A Historical Overview of Confession Law."  In Richard A. Leo, Ed. (1997).  *The American Criminal Justice System* (Simon & Schuster).  Pp. 151-160.

1997   "The Criminal Justice System: An Overview."  In Richard A. Leo, Ed. (1997).  *The American Criminal Justice System* (Simon & Schuster).  Pp. 1-20.

1996   "Police Scholarship for the Future: Resisting the Pull of the Policy Audience."  *Law & Society Review*, Vol. 30, Pp. 865-879.  *Available at*: http://ssrn.com/author=1020356

1996   "The Impact of *Miranda* Revisited."  *The Journal of Criminal Law and Criminology*.  Volume 86, Pp. 621-692.  *Available at*: http://ssrn.com/author=1020356

- Reprinted in Richard A. Leo and George C. Thomas, III. Eds (1998).  *The Miranda Debate: Law, Justice and Crime Control* (Boston: Northeastern University Press).  Pp. 208-221.

1996   "*Miranda*'s Revenge: Police Interrogation as a Confidence Game."  *Law & Society Review*, Vol. 30, Pp. 259-288.  *Available at*: http://ssrn.com/author=1020356

- Reprinted in Ronald Allen et al. (2005).  Comprehensive Criminal Procedure (New York: Aspen Publishers).  2nd Ed.  Pp. 888-889.

19

1996    "Inside the Interrogation Room." *The Journal of Criminal Law and Criminology*.  Vol. 86, Pp. 266-303.  *Available at*: http://ssrn.com/author=1020356

- Reprinted in Adam M. Gershowitz (2013).  *The Wire: Crime, Law and Policy* (Durham, NC: Carolina Academic Press).  Pp. 147-161.

- Reprinted in Jeannine Bell, Ed. (2006), *Police and Policing Law*.  Ashgate Publishing, Ltd.  Pp. 99-136.  Also reprinted in Joshua Dressler and George C. Thomas III (1999), *Cases and Materials on Criminal Procedure* (West Publishing).  Pp. 566-568, 598, 673-676.

1996    "The Ethics of Deceptive Research Roles Reconsidered: A Reply to Kai Erikson." *The American Sociologist*.  Vol. 27, Pp. 122-128.

1995    "Trial and Tribulations: Courts, Ethnography, and the Need for an Evidentiary Privilege for Academic Researchers." *The American Sociologist*.  Vol. 26, Pp. 113-134.

- Reprinted in Robert Emerson (2001), *Contemporary Field Research: Perspectives and Formulations* (Prospect Heights: Waveland Press). 2nd Edition. Pp. 260-279.

1994    "Police Interrogation and Social Control." *Social and Legal Studies*: *An International Journal*, Vol. 3, and Pp. 93-120.  *Available at*: http://ssrn.com/author=1020356

1994    "Police Interrogation in America: A Study of Violence, Civility and Social Change" (Ph.D. dissertation, University of California at Berkeley).  *Available at* http://0-proquest.umi.com.ignacio.usfca.edu/pqdweb?did=742035331&sid=1&Fmt=2&clientId=16131&RQT=309&VName=PQD.

1993    "The Yale White-Collar Crime Project: A Review and Critique" (with David T. Johnson).  *Law And Social Inquiry*, Vol. 18, Pp. 63-99.  *Available at*: http://ssrn.com/author=1020356

- Reprinted in Michael Levi, Ed (1998). *Fraud: Organizational, Motivation, and Control*, Volume II (England: Ashgate Publishing Ltd). Pp. 51-88.

1992    "From Coercion to Deception: The Changing Nature of Police Interrogation in America." *Crime, Law, and Social Change: An International Journal*.  Vol. 18, Pp. 35-59.  *Available at*: http://ssrn.com/author=1020356

- Reprinted in Richard A. Leo and George C. Thomas, III. Eds (1998).  *The Miranda Debate: Law, Justice and Crime Control* (Boston: Northeastern University Press).  Pp. 65-74.

1992    "The Ethics of Deceptive Interrogation" (with Jerome H. Skolnick).  *Criminal Justice Ethics*.  Vol. 11, No. 1.  Winter/Spring.  Pp. 3-12.  *Available at*: http://ssrn.com/author=1020356

- Reprinted in Michael C. Braswell, Belinda R. McCarthy and Bernard J. McCarthy (2005)

20

*Justice, Crime and Ethics*. Fifth Edition. Pp. 69-84. Reprinted in Jeffrey Reiman (2000), *Criminal Justice Ethics* (New York: Prentice-Hall). Reprinted in *The Leadership Journal* (January-March, 1993). Pp. 23-27; (Cincinnati: Anderson Publishing Co). Reprinted in *The Boalt Hall Transcript*, spring, 1993. Pp. 21-23; Revised and expanded as a chapter in John Bizzack (Ed), *Issues in Policing: New Perspectives*. (Lexington: Autumn House Publishing). Pp. 75-95.

## OTHER WRITINGS

"Predicting Erroneous Convictions: A Social Science Approach to Miscarriages of Justice" (with Jon Gould, Julia Carrano and Joseph Young). Report to the National Institute of Justice. (December, 2012).

Amicus Curiae Brief, United States Supreme Court. *State of Florida v. Kevin DeWayne Powell* (October 30, 2009) (No. 08-1175). Sole author.

## CITATION BY APPELLATE COURTS

### United States Supreme Court

*J.D.B. v. North Carolina*, 131 S. Ct. 2394 (2011)
*Maryland v. Shatzer*, 130 S. Ct. 1213 (2010)
*Corley v. United States*, 129 S. Ct. 1558 (2009)
*Missouri v. Seibert*, 124 S. Ct. 2601 (2004)

### Canadian Supreme Court

*R. v. Oickle*, [2000] 2 S.C.R. 3 (Can.).

### All Appellate Courts

2021   *Tarlton for McCollum v. Sealey*, No. 5:15-CV-451-BO, 2021 WL 1845171 (E.D.N.C. May 7, 2021).
*Estate of Alley v. State*, No. W201902046CCAR3PC, 2021 WL 1828501 (Tenn. Crim. App. May 7, 2021).
*United States v. Knights*, 989 F.3d 1281 (11th Cir. 2021). Decision date = March 10, 2021
*Lucio v. Lumpkin*, 987 F.3d 451 (5th Cir. 2021). Decision date = Feb. 9, 2021
*Montoya v. City & Cty. of Denver*, No. 16-CV-01457-JLK, 2021 WL 1244264 (D. Colo. Mar. 4, 2021).

2020   *State v. Baker*, 465 P.3d 860 (Haw. 2020)
*Bush v. Dunn*, No. 2:12-CV-345-RAH, 2020 WL 4514585 (M.D. Ala. Aug. 5, 2020).
*Rafay v. Obenland*, No. C16-1215-RAJ-MAT, 2020 WL 5984210 (W.D. Wash. Jan. 28, 2020)
*State v. Gore*, No. W201901320CCAR3CD, 2020 WL 6793393 (Tenn. Crim. App. Nov. 18, 2020).

21

*People v. Xiong*, 54 Cal. App. 5th 1046 (2020). Decision date = Sept 22, 2020
*United States v. Begay*, No. CR 14-0747 JB, 2020 WL 2514661 (D.N.M. May 15, 2020).
*People v. Mays*, No. E070904, 2020 WL 1983878 (Cal. Ct. App. Apr. 27, 2020).
*Andersen v. City of Chicago*, No. 16 C 1963, 2020 WL 1848081 (N.D. Ill. Apr. 13, 2020).

2019   *United States v. Booker*, No. 3:18-CR-02611-GPC, 2019 WL 2717275 (S.D. Cal. June 28, 2019).
*United States v. Jumper*, 1:19 CR 5, 2019 U.S. Dist. LEXIS 195243 (W.D.N.C. Sept. 30, 2019).
*Nieves Martinez v. United States*, No. CV1300955TUCCKJLAB, 2019 WL 4785519 (D. Ariz. Sept. 30, 2019).
*State v. Matsumoto*, 145 Haw. 313, 452 P.3d 310 (2019). Opinion date = Oct. 29, 2019.
*Fontenot v. Allbaugh*, 402 F. Supp. 3d 1110 (2019). Opinion date = Aug. 21, 2019.
*People v. Lucero*, No. F072676, 2019 WL 337820 (Cal. Ct. App. Jan. 28, 2019).
*People v. Jimenez*, No. 2D CRIM. B271066, 2019 WL 1592812 (Cal. Ct. App. Apr. 15, 2019),
*People v. Chow*, No. H045576, 2019 WL 2710211 (Cal. Ct. App. June 28, 2019).
*People v. Whitley*, No. H043651, 2019 WL 6242496 (Cal. Ct. App. Nov. 22, 2019).
*People v. Scarber*, No. F068908, 2019 WL 5958004 (Cal. Ct. App. Nov. 13, 2019).
*State v. Schaetzle*, No. A-17-1050, 2019 WL 446632 (Neb. Ct. App. Feb. 5, 2019).
*State v. Young*, 9 Wash. App. 2d 1091 (2019)
*United States v. Hayat*, No. 2:05-CR-0240 GEB DB, 2019 WL 176342 (E.D. Cal. Jan. 11, 2019).

2018   *State v. Turner*, --So. 3d.--, No. 2016-KA-1841 (La. Dec. 5, 2018).
*Sanders v. Frauenheim*, No. 17-05008, 2018 WL 3777571 (N.D. Cal. Aug. 8, 2018).
*People v. Santana*, No. 2D CRIM. B261900, 2018 WL 4959443 (Cal. Ct. App. Oct. 15, 2018).
*People v. Martinez*, No. H042235, 2018 WL 3640560 (Cal. Ct. App. Aug. 1, 2018).
*People v. Torres*, 25 Cal. App. 5th 162, 235 Cal. Rptr. 3d 478 (Ct. App. 2018)
*Martinez v. United States*, No. CV1300955TUCCKJLAB, 2018 WL 3359562 (D. Ariz. July 10, 2018).
*People v. Hernandez*, No. A144628, 2018 WL 3359628 (Cal. Ct. App. July 10, 2018).
*People v. Aguilar*, No. B267955, 2018 WL 3121533 (Cal. Ct. App. June 26, 2018).
*Parmer v. Premo*, No. 6:16-CV-1090-SB, 2018 WL 3094879 (D. Or. June 20, 2018).
*People v. Tiger*, 32 N.Y.3d 91, 110 N.E.3d 509 (2018).
*Dean v. Searcey*, 893 F.3d 504 (8th Cir. 2018).
*People v. Saldana*, No. D071432, 2018 WL 387799 (Cal. Ct. App. Jan. 12, 2018).
*Harris v. City of Chicago*, No. 14 C 4391, 2018 WL 2183992 (N.D. Ill. May 11, 2018).
*United States v. Begay*, No. CR 14-074 JB, 2018 WL 1069147 (D. N.M. Feb. 23, 2018).
*Murphy v. City of Tulsa*, No. 15-CV-528-GKF-FHM, 2018 WL 468286 (N.D. Okla. Jan. 18, 2018).

2017   *Harris v. City of Chicago*, No. 14 C 4391, 2017 WL 3193585 (N.D. Ill. Jul. 27, 2017).
*United States v. Hayat*, No. 2:05-cr-0240 GEB DB, 2017 WL 6728639 (E.D. Cal. Dec. 27, 2017).
*United States v. Rodriguez-Soriano*, No. 1:17-cr-197, 2017 WL 6375970 (E.D. Va. Dec. 11,

22

2017).

*Dassey v. Dittmann*, 860 F.3d 933 (7th Cir.) (Opinion date = June 22, 2017), *vacated en banc, Dassey v. Dittmann*, 877 F.3d 297 (7th Cir. 2017) (en banc Opinion date = Dec. 8, 2017).

*Martinez v. United States*, No. CV 13-955 TUC CKJ, 2017 WL 4536177 (D. Az. Oct. 11, 2017).

*United States v. Monroe*, 264 F. Supp. 3d 376 (D. RI 2017). Opinion Date = Sept. 11, 2017

*Vega v. Montgomery*, No. 16-cv-05145-YGR, 2017 WL 4808606 (N.D. Cal. Oct. 24, 2017).

*People v. Cardman*, No. 14CA0202, 2017 WL 2806266 (Colo. App. June 29, 2017).

*People v. Wright*, No. B269217, 2017 WL 4230430 (Cal. Ct. App. Sept. 25, 2017).

*Foree v. Commonwealth*, No. 2016–CA–000599–MR, 2017 WL 3129213, (Ky. Ct. App. Jul. 21, 2017).

*People v. Cruz*, No. B276536, 2017 WL 2459874 (Cal. Ct. App. June 7, 2017).

*State v. Cardenas-Flores*, 189 Wash. 2d 243 (2017). Opinion date = Aug. 17, 2017

*People v. Davis*, No. E065184, 2017 WL 4675078 (Cal. Ct. App. Oct, 18, 2017).

*People v. Collins*, No. H042491, 2017 WL 3575190, (Cal. Ct. App. Aug. 18, 2017).

*R. v. Ururyar*, [2017] O.J. No. 3824. Ontario Superior Court of Justice

*Gupta v. State*, 156 A.3d 785 (Md. Ct. App. 2017).

*R. v. Pike*, 2017 NLTD(G) 41.

*United States v. Hayat*, No. 2:05-cr-0240 GEB DB, 2017 WL 6728639 (E.D. Cal. Dec. 27, 2017).

*United States v. Rodriguez-Soriano*, No. 1:17-cr-197, 2017 WL 6375970 (E.D. Va. Dec. 11, 2017).

*United States v. Phillipos*, 849 F.3d 464 (1st Cir. 2017).

2016    *Dassey v. Dittmann*, 201 F. Supp. 3d 963 (E.D. Wis. 2016).

*State v. Richardson*, 210 So. 3d 340 (La. Ct. App. 2016).

*Barbee v. Davis*, No. 15-70022, 2016 WL 6902479 (5th Cir. Nov. 23, 2016).

*Floyd v. Cain*, No. 11-2819, 2016 WL 6216141 (E.D. La. Sept. 14, 2016).

*United States v. Whittle*, No. 3:13-CV-00170-JHM, 2016 WL 4433685 (W.D. Ky. Aug. 18, 2016).

*State v. Rivera*, 169 Conn. App. 343 (2016).

*Jimerson v. State*, 56 N.E.3d 117 (Ind. Ct. App. 2016)

*People v. Santana*, No. B261900, 2016 WL 5845750 (Cal. Ct. App. Oct. 6, 2016).

*People v. Cavazos*, No. F069276, 2016 WL 5404083 (Cal. Ct. App. Sept. 28, 2016).

*People v. Cardman*, No. 14CA0202, 2016 WL 5219964 (Colo. App. Sept. 22, 2016).

*State v. Jackson*, 882 N.W.2d 422 (Wis. 2016).

*United States v. Thomas*, No. 13-CR-01874, 2016 U.S. Dist. LEXIS 103533 (D.N.M. Aug. 5, 2016).

*R v. Howe*, 2016 NSSC 151.

*R v. Martin*, 2016 BCPC 337.

*R v. Isaacs*, 2016 ONSC 5272.

*State v. Leniart*, 140 A.3d 1026 (Conn. App. Ct. 2016).

*People v. Cruz*, No. HO42221, 2016 Cal. App. Unpub. LEXIS 4167 (Cal. Ct. App. June 7, 2016).

*Rhoades v. State*, 880 N.W.2d 431 (Iowa 2016).

23

*People v. Peoples*, 62 Cal. 4th 718 (2016).
*R. v. R. (M.)*, [2015] O.J. No. 3885 (Can. Ont. Ct. J.).
*People v. Cortez*, No. H041081, 2016 WL 6962539 (Cal. Ct. App. Nov. 29, 2016).
*Campos v. Stone*, 201 F. Supp. 3d 1083 (N.D. Cal. 2016).
*Campos v. Stone*, 199 F. Supp. 3d 1237 (N.D. Cal. 2016).

2015  *People v. Days*, 131 A.D.3d 972 (N.Y. App. Div. 2015).
*In re Elias V.,* 237 Cal. App. 4th 568 (2015).
*People v. Angol*, No. B259874, 2015 WL 7568947 (Cal. Ct. App. Nov. 24, 2015).
*People v. Delossantos*, No. HO40746, 2015 WL 6865701 (Cal. Ct. App. Nov. 9, 2015).
*Alcox v. Beard*, No. CV-08-1587-JVS, 2015 WL 10083966 (C.D. Cal. Nov. 3, 2015).
*People v. Wyngarden*, No. 321736, 2015 WL 4746277 (Mich. Ct. App. Aug. 11, 2015).
*In re Manuel R.*, No. GO49389, 2015 WL 4640284 (Cal. Ct. App. Aug. 5, 2015).
*Barbee v. Stephens*, No. 4:09-CV-074-Y, 2015 WL 4094055 (N.D. Tex. July 7, 2015).
*Turner v. United States*, 116 A.3d 894 (D.C. 2015).
*Commonwealth v. Bland*, 115 A.3d 854 (Pa. 2015).
*Walker v. State*, No. CR-11-0241, 2015 WL 505356 (Ala. Ct. Crim. App. Feb. 6, 2015).
*Lapointe v. Comm'r Correction*, 316 Conn. 225 (2015).
*Mullen v. Barnes*, No. 2:13-cv-0165-MCE-EFBP, 2015 WL 2000764 (E.D. Cal. Apr. 30, 2015).
*Williams v. Schmidt*, No. 3:10-cv-0025 TMB, 2015 WL 1396800 (D. Alaska March 25, 2015).
*Spence v. Beard*, No. 14-cv-1624 BAS (KSC), 2015 WL 1956436 (S.D. Cal. Apr. 29, 2015).
*People v. Vega*, 236 Cal. App. 4th 484 (2015).
*Commonwealth v. Bland*, No. 33 EAP 2013, 2015 WL 3370266 (Pa. May 26, 2015).
*Barros v. State*, No. PM/11-5771, 2015 R.I. Super. LEXIS 66 (R.I. Super. Ct. May 18, 2015).
*Sessoms v. Grounds*, 776 F.3d 615 (9th Cir. 2015).

2014  *Gumm v. Mitchell*, No. 11-3363, 2014 WL 7247393 (6th Cir. Dec 22, 2014)
*Soffar v. Stephens*, No. H-12-3783, 2014 U.S. Dist. LEXIS 175331 (S.D. Tex. Dec. 18, 2014).
*Teleguz v. Davis*, No. 7:10CV00254, 2014 WL 3548982 (W.D. Va. July 17, 2014).
*Commonwealth v. Alicia*, 92 A.3d 753 (Penn. 2014).
*People v. Yi*, No. B251560, 2014 WL 5409066 (Cal. Ct. App. Oct. 24, 2014).
*People v. Boyce*, 59 Cal. 4th 672 (2014)
*State v. Fernandez-Torres*, 337 P.3d 691 (Kan. Ct. App. 2014)
*Commonwealth v. Scuderi*, No. CP-51-CR-1010101-1994, 2014 Phila. Ct. Com. Pl. LEXIS 140 (Phila. Ct. Com. Pl. May 16, 2014)
*Bies v. Sheldon*, Nos. 12-3431 & 12-3457, 2014 WL 7247396 (6th Cir. Dec. 22, 2014)
*Sessoms v. Grounds*, 768 F.3d 882 (9th Cir. 2014).
*Dean v. State*, 288 Neb. 530 (2014)
*United States v. Preston*, 751 F.3d 1008 (9th Cir. 2014)
*People v. Carino*, No. B244423, 2014 WL 1256072 (Cal. Ct. App. March 27, 2014).
*People v. Mays*, No. E055989, 2014 Cal. App. Unpub. LEXIS 405 (Cal. Ct. App. Jan. 21, 2014).
*People v. Whatley*, No. G049642, 2014 WL 1499553 (Cal. Ct. App. Apr. 17, 2014).
*Woodall v. State*, 754 S.E.2d 335 (Ga. 2014).

*Commonwealth v. Hoose*, 5 N.E.3d 843 (Mass. 2014).
*State v. Juranek*, 844 N.W.2d 791 (Neb.2014).
*State v. Bishop*, 431 S.W.3d 22 (Tenn. 2014).
*Poventud v. City of New York*, 750 F.3d 121 (2d Cir. 2014).
*R.v. Reid*, 2014 CarswellNfld 59 (Can. Nfld.) (WL).

2013    *Livers v. Schenck*, No. 8:08CV107, 2013 WL 5676881 (D. Neb. Oct. 18, 2013).
*Steele v. Harrington*, No. LA CV 10-04872-VBF-E, 2013 WL 5441750 (C.D. Cal. Sept. 25, 2013).
*Dean v. County of Gage*, No. 4:09CV3144, 2013 U.S. Dist. LEXIS 182187 (D. Neb. Dec. 31, 2013).
*Wright v. Comm'r of Corr*., 143 Conn. App. 274 (2013).
*People v. Sanford*, No. 291293, 2013 WL 5379673 (Mich. Ct. App. Sept. 26, 2013).
*People v. Linton*, 56 Cal. 4th 1146 (2013)
*Irwin v. Commonwealth*, 465 Mass. 834 (2013)
*Coleman v. State*, No. 14-12-00553-CR, 2013 WL 5758084 (Tx. Ct. App. Oct. 24, 2013)
*People v. Sanders*, No. A134386, 2013 WL 4470551 (Cal. Ct. App. Aug. 19, 2013).
*Shelby v. State*, 986 N.E. 2d 345 (Ind. Ct. App. 2013).
*Commonwealth v. Harrell*, 65 A.3d 420 (Pa. Super. Ct. 2013).
*U.S. v. Preston*, 706 F.3d 1106 (9th Cir. 2013).
*Caine v. Burge*, No. 11 C 8996, 2013 WL 1966381 (N.D. Ill. May 10, 2013).
*People v. Carrera*, No. E053997, 2013 WL 1883289 (Cal. Ct. App. May 7, 2013).
*People v. Ortega*, No. B235552, 2013 WL 1635909 (Cal. Ct. App. Apr. 17, 2013).
*In re Tyler S*., No. 4-11-0540, 2013 WL 1552421, (Ill. Ct. App. Apr. 12, 2013).
*State v. Dassey*, 827 N.W.2d 928 (Wis. Ct. App. 2013).
*Dorsey v. United States*, 60 A.3d 1171 (D.C. 2013)
*State v. Perea*, 322 P.3d 624 (Utah 2013).
*State v. Lemoine*, 827 N.W.2d 589 (Wis. 2013).
*United States v. Rodriguez*, No. 12-CR-45S, 2013 WL 6057862 (W.D. NY Nov. 13, 2013).

2012    *Harris v. Thompson*, 698 F.3d 609 (7th Cir. 2012).
*U.S. v. Fugate*, No. 11-3694, 2012 WL 3893114 (6th Cir. Sept. 7, 2012).
*U.S. v. Deuman*, 892 F. Supp. 2d 881 (W.D. Mich. 2012).
*People v. Spence*, 212 Cal. App. 4th 478 (2012)
*Vent v. State*, 288 P.3d 752 (Alaska Ct. App. 2012).
*Simmons v. State*, 105 So. 2d 475 (Fla. 2012).
*Ex parte Soffar*, Nos. WR-29980-03, WR-29980-04, 2012 WL 4713562 (Tex. Crim. App. Oct. 3, 2012).
*State ex rel. A.W*., 51 A.3d 793 (N.J. 2012).
*People v. Kowalski*, 821 N.W.2d 14 (Mich. 2012).
*State v. Stevens*, 822 N.W.2d 79 (Wis. 2012).
*United States v. Ford*, 683 F.3d 761 (7th Cir. 2012).
*State v. Rafay*, 285 P.3d 83 (Wash. Ct. App. 2012).
*People v. Perez*, 946 N.Y.S.2d 835 (N.Y. Sup. Ct. 2012).
*State v. Abdulle*, 275 P.3d 1113 (Wash. 2012).

*People v. Kinstley*, No. A130102, 2012 WL 831535 (Cal. Ct. App. Mar. 12, 2012).
*People v. Mullen*, No. C062851, 2012 WL 758145 (Cal. Ct. App. Mar. 8, 2012).
*Miner v. Neotti*, No. CV 10-07419 ODW (SS), 2012 WL 1116078 (C.D. Cal. Feb. 16, 2012).

2011   *J.D.B. v. North Carolina*, 131 S. Ct. 2394 (2011).
*Bell v Ercole*, No. 05 CV 4532(ERK), 2011 WL 5040436 (E.D.N.Y. Oct. 21, 2011)
*White v. Smith*, 808 F. Supp. 2d 1174 (D. Neb. 2011).
*Dean v. Smith*, 805 F. Supp. 2d 750 (D. Neb. 2011).
*Brown v. Blumenfeld*, 930 N.Y.S. 2d 610 (N.Y. App. Div. 2011). Decided Oct. 4, 2011.
*People v. Gaono*, No. D055290, 2011 WL 4500857 (Cal. Ct. App. Sept. 29, 2011)
*Commonwealth v. Rios*, No. 2007-1051, 2011 WL 4089553 (Mass. Super. Ct. Sept. 7, 2011)
*United States v. Michael Jacques* 784 F. Supp.2d 59 (D.Mass. 2011)
*People v. Hernandez*, No. B215707, 2011 Cal. App. Unpub. LEXIS 3039 (Apr. 25, 2011).
*People v. Dimas*, No. B223795, 2011 Cal. App. Unpub. LEXIS 2464 (Apr. 11, 2011).
*United States v. Ross*, No. CR S-99-0043 WBS EFB, 2011 WL 1253870 (E.D. Cal. Mar. 30, 2011).
*Commonwealth v. Wright,* 14 A. 3d 798 (Pa. 2011).
*People v. Sanchez*, No. 2-08-1243, 2011 Ill. App. Unpub. LEXIS 872 (Ill. App. Ct. 2/4/2011).

2010   *People v. Polk*, 942 N.E. 2d 44 (Ill. App. Ct. 2010).
*People v. Garcia*, No. B216793, 2010 WL 4868186 (Cal. Ct. App. Nov. 30, 2010).
*State v. Lockhart*, 4 A. 3d 1176 (Conn. 2010).
*United States v. Redlightning*, 624 F.3d 1090 (9th Cir. 2010).
*United States v. Slaight*, 620 F.3d 816 (7th Cir. 2010).
*People v. Kowalski*, No. 294054, 2010 WL 3389741 (Mich. Ct. App. Aug. 26, 2010).
*Dorsey v. United States*, 2 A.3d 222 (D.C. 2010).
*Crowe v. County of San Diego*, 593 F.3d 841 (9th Cir. 2010).
*Milke v. Ryan*, No. CV 98-60-PHX-RCB, 2010 WL 383412 (D. Ariz. Jan. 29, 2010).
*Kaguyutan v. Rozum*, No. 2:08-1022, 2010 WL 483791 (W.D. Pa. Feb. 5, 2010).
*Maryland v. Shatzer*, 130 S. Ct. 1213 (2010).
*Rathbun v. Scribner*, No. CV 08-3339-AG, 2010 WL 1266666 (C.D. Cal. Feb. 10, 2010).
*State v. A.N.J.*, 225 P.3d 956 (Wash. 2010).
*Wilson v. State*, 311 S.W.3d 452 (Tex. Crim. App. 2010).
*People v. Vargas*, No. G041999, 2010 WL 2525582 (Cal. Ct. App. 4th June 23, 2010).
*United States v. Brown*, 617 F.3d 857 (9th Cir. 2010).

2009   *Cason v. Hedgpeth*, No. CV 08-4576-JVS (RNB), 2009 WL 1096209 (C.D. Cal. 4/22/2009).
*Corley v. U.S.*, 129 S. Ct. 1558 (2009).
*R. v. Cech*, [2009] Q.C.C.S. 1041 (Can.).
*R. v. Edwards* [2009] CarswellOnt 6324 (Can.).
*R. v. Merceus*, [2009] Q.C.C.S. 3205 (Can.).
*R. v. T.E.*, [2009] ON.C. LEXIS 4222 (Can.).
*People v. Leon*, No. G037950, 2009 WL 249362 (Cal. Ct. App. Feb. 3, 2009).
*People v. Olague*, No. C053372, 2009 WL 924503 (Cal. Ct. App. April 7, 2009).
*State v. Fairconatue*, 773 N.W.2d 226 (Wash. Ct. App. 2009).

26

*State v. Riofta*, 209 P.3d 467 (Wash. 2009).
*Wade v. Brady*, 612 F. Supp. 2d 90 (D. Mass. April 30, 2009).
*People v. Robles*, No. G038739, 2009 WL 1364364 (Cal. Ct. App. May 15, 2009).
*Bush v. State*, No. CR-03-1902, 2009 WL 1496826 (Ala. Crim. App. May 29, 2009).
*People v. Lucas*, No. C057593, 2009 WL 2049984 (Cal. Ct. App. Aug. 4, 2009).
*Wroten v. Felker*, No. CV 08-04352-AG, 2009 WL 3171705 (C.D. Cal. Sept. 30, 2009).
*In re D.K.*, No. 289371, 2009 WL 3401152 (Mich. Ct. App. Oct. 22, 2009).
*People v. Singletary*, No. B211849, 2009 WL 3931360 (Cal. Ct. of App. Nov. 20, 2009).

2008    *People v. Madrigal*, No. F051127, 2008 WL 192310 (Cal. Ct. App. Jan. 24, 2008).
*U.S. v. Chancellor*, No. 07-20578-CR, 2008 WL 622937 (S.D. Fla. Feb. 8, 2008).
*Anthony v. State*, 980 So. 2d 610 (Fla. Dist. Ct. App. 2008).
*In re Taylor*, 144 Wash. App. 1038 (2008).
*People v. Cerda*, No. E041249, 2008 WL 2123855 (Cal. Ct. App. May 21, 2008).
*In re Detention of Law*, 144 Wash. App. 1047 (June 2, 2008).
*People v. Rosario*, 862 N.Y.S.2d 719 (2008).
*People v. Steele*, No. B193519, 2008 WL 2410394 (Cal. Ct. App. June 16, 2008).
*R. v. Choy*, [2008] 456 A.R. 177 (Can.).
*R. v. Fabas*, [2008] B.C.S.C. 677 (Can.).
*R. v. Leslie*, [2008] O.N.C.J. 666 (Can.).
*R. v. Modjani*, [2008] 458 A.R. 96 (Can.).
*Bell v. Ercole*, No. 05 CV 4532(ERK), 2008 WL 2484585 (E.D.N.Y. June 20, 2008).
*State v. Montejo*, 974 So.2d 1238 (La. 2008).
*State v. Turner*, 187 P.3d 835 (Wash. Ct. App. 2008).
*State v. Unga*, 196 P.3d 645 (Wash. 2008).
*State v. Wooden*, No. 23992, 2008 WL 2814346 (Ohio Ct. App. July 23, 2008).

2007    *People v. Cason*, No. B187189, 2007 WL 891292 (Cal. Ct. App. March 26, 2007).
*In re Bradford*, 165 P.3d 31 (Wash. Ct. App. 2007).
*In re Genaro R.*, No. A112572, 2007 WL 934886 (Cal. Ct. App. March 29, 2007).
*People v. Bean*, 847 N.Y.S.2d 903 (2007).
*People v. Villarreal*, No. H029622, 2007 WL 1556645 (Cal. Ct. App. May 30, 2007).
*People v. Rathbun*, No. B178509, 2007 WL 2391258 (Cal. Ct. App. Aug. 23, 2007).
*Doughtie v. Scribner*, No. CIV S-06-1695-FCD-CMK-P, 2007 WL 2669922 (E.D. Cal. 9/7/07)
*People v. Muratalla*, No. B192446, 2007 WL 4376374 (Cal. Ct. App. Dec. 17, 2007).
*People v. Wroten*, No. B188462, 2007 WL 4501776 (Cal. Ct. App. Dec. 26, 2007).
*R. v. Osmar*, [2007] 84 O.R.3d 321 (Can.).
*R. v. Osmar*, [2007] ONCA 50 (Can.).
*State v. Bannister*, 734 N.W.2d 892 (Wis. 2007).
*State v. Lawrence*, 920 A.2d 236 (2007).

2006    *Edmonds v. State*, 955 So. 2d 864 (Miss. Ct. App. 2006).
*People v. Doughtie*, No. C049197, 2006 WL 137426 (Cal. Ct. App. Jan. 18, 2006).
*People v. Smann*, No. D045166, 2006 WL 1075228 (Cal. Ct. App. April 25, 2006).
*R. v. Hammerstrom*, [2006] B.C.S.C. 1700 (Can.).

27

*R. v. Wilson*, [2006] 213 O.A.C. 207 (Can.).
*Alley v. State*, No. W2006-01179-CCA-R3-PD, 2006 WL 1703820 (Tenn. Crim. App. 6/ 22/06)
*People v. Fuentes*, No. B184728, 2006 WL 2102898 (Cal. Ct. App. July 31, 2006).
*Washington v. Wilmore*, No. Civ.A. 3:02CV00106, 2006 WL 2471511 (W.D. Va.8/23/2006).
*Reyes v. Duncan*, No. C 05-04078 SI, 2006 WL 2529106 (N.D. Cal. Aug. 31, 2006).
*Milke v. Schriro*, No. CV-98-0060-PHX-RCB, 2006 WL 3421318 (D. Ariz. Nov. 27, 2006).

2005    *In re Jerrell C.J.*, 699 N.W.2d 110 (Wis. 2005).
*Murray v. Earle*, 405 F.3d 278 (5th Cir. 2005).
*People v. Ford*, No. A100574, 2005 WL 236593 (Cal. Ct. App. Jan. 31, 2005).
*People v. Mora*, No. B167805, 2005 WL 1140646 (Cal. Ct. App. May 16, 2005).
*Scott v. State*, 165 S.W.3d 27 (Tex. App. 2005).
*Singletary v. Fischer*, 365 F. Supp. 2d 328 (E.D.N.Y. 2005).
*U.S. v. Bresnahan*, 62 M.J. 137 (C.A.A.F. 2005).
*In re Owens*, No. D045194, 2005 WL 2160209 (Cal. Ct. App. Oct. 7, 2005).

2004    *Commonwealth v. Cornelius*, 856 A.2d 62 (Pa. Super. Ct. 2004).
*Commonwealth v. DiGiambattista*, 813 N.E.2d 516 (Mass. 2004).
*Kerkowich v. Wwanesa Mutual Ins. Co.*, [2004] M.B.Q.B. 110 (Can.).
*Medley v. Commonwealth*, 602 S.E.2d 411 (Va. Ct. App. 2004).
*Missouri v. Seibert*, 124 S. Ct. 2601 (2004).
*People v. Ramos*, 121 Cal. App. 4th 1194 (2004).
*People v. Reyes*, No. A097648, 2004 WL 831245 (Cal. Ct. App. April 19, 2004).
*People v. Sowl*, No. A098094, 2004 WL 1080171 (Cal. Ct. App. May 14, 2004).
*People v. Ford*, No. A100574, 2004 WL 1776598 (Cal. Ct. App. Aug. 10, 2004).
*State v. Cook*, 847 A.2d 530 (N.J. 2004).
*Thorson v. State*, 895 So.2d 85 (Miss. 2005).
*Weeks v. State*, 140 S.W.3d 39 (Mo. 2004).
*West v. State*, 876 So.2d 614 (Fla. Dist. Ct. App. 2004).
*Cobb v. Bruce*, No. CIV.A. 03-3400-KHV, 2004 WL 3019345 (D. Kan. Dec. 29, 2004).
*Kerkowich v. Wawanesa Mutual Insurance Co.*, 2004 M.B.C. LEXIS 188 (Can. Man.) (Lexis).

2003    *Brown v. Crosby*, 249 F. Supp. 2d 1285 (2003).
*In re C.J.*, 674 N.W.2d 607 (Wis. Ct. App. 2003).
*People v. Martinez*, No. B157095, 2003 WL 1438802 (Cal. Ct. App. March 21, 2003).
*People v. Gonzalez*, No. B154557, 2003 WL 22977531 (Cal. Ct. App. Dec. 19, 2003).
*R v. Chalmers*, [2003] CarswellOnt 4704 (Can.).
*R. v. Watts*, [2003] B.C.S.C. 1403 (Can.).
*R. v. Wiegand*, [2003] 335 A.R. 157 (Can.).
*State v. Mauchley*, 67 P.3d 477 (Utah 2003).
*State v. Patton*, 826 A.2d 783 (N.J. Super. Ct. App. Div. 2003).
*U.S. v. Villalba-Alvarado*, 345 F.3d 1007 (8th Cir. 2003).
*Green v. City of Wenatchee*, 2003 WL 26089744 (E.D. Wash. Mar. 14, 2003)
*Vent v. State*, 67 P.3d 661 (Alaska Ct. App. 2003).

2002    *Franks v. State*, 90 S.W.3d 771 (Tex. Ct. App. 2002).
*People v. DeWeaver*, No. A091078, 2001 WL 1515830 (Cal. Ct. App. Feb. 27, 2002).
*Monroe v. Angelone*, No. 3:98CV254, 2002 U.S. Dist. LEXIS 26310 (E.D. Va. 3/28/2002).
*In re Jorge R.*, No. G028977, 2002 WL 31121106 (Cal. Ct. App. 2002).
*People v. Escobedo*, No. B150558, 2002 WL 31160879 (Cal. Ct. App. Sept. 30, 2002).
*People v. Smann*, No. D038219, 2002 WL 31608283 (Cal. Ct. App. Nov. 21, 2002).
*People v. Hernandez*, No. E030489, 2002 WL 31781129 (Cal. Ct. App. Dec. 13, 2002).
*R. v. MacKay*, [2002] 222 Sask. R. 259 (Can.).
*State v. Cobb*, 43 P.3d 855 (Kan. Ct. App. 2002).
*State v. Conger*, 652 N.W.2d 704 (Minn. 2002).
*U.S. v. Cantres*, No. 00 C 3555, 2002 WL 276132 (N.D. Ill. Feb. 27, 2002).
*U.S. v. Faulkingham*, 295 F.3d 85 (1st Cir. 2002).
*U.S. v. Rodgers*, 186 F. Supp. 2d 971 (E.D. Wis. 2002).

2001    *Cherrix v. Braxton*, 131 F. Supp. 2d 756 (E.D. Va. 2001).
*Monroe v. Angelone*, No. 3:98CV254, 2001 U.S. Dist. LEXIS 25216 (E.D. Va. 2001 4/18/01).
*People v. DeWeaver*, No. A091078, 2001 WL 1515830 (Cal. Ct. App. 2001).
*R. v. Tessier*, [2001] 245 N.B.R.2d 1 (Can.).
*U.S. v. Astello*, 241 F.3d 965 (8th Cir. 2001).

2000    *Hearndon v. Graham*, 767 So.2d 1179 (Fla. 2000).
*Lapointe v. Warden*, No. CV 970571161, 2000 WL 1409721 (Conn. Super. Ct. Sept. 6, 2000).
*R. v. Leahey*, [2000] 278 A.R. 201 (Can.).
*R. v. Oickle*, [2000] 2 S.C.R. 3 (Can.).
*State v. Davis*, 32 S.W.3d 603 (Mo. Ct. App. 2000).

1999    *Moriarty v. Garden Sanctuary Church of God*, 511 S.E.2d 699 (S.C. Ct. App. 1999).
*People v. Philips*, 692 N.Y.S.2d 915 (1999).
*State v. Rettenberger*, 984 P.2d 1009 (Utah 1999).
*State v. Schofield*, 97 Wash. App. 1085 (1999).

1998    *State v. Meade*, 963 P.2d 656 (Or. 1998).

## MEDIA COVERAGE, APPEARANCES, AND CITATION OF RESEARCH

2021    NBC *Discovery+* l                *Murder on Ice* (Podcast)
*Los Angeles Times* (Podcast)       *My Favorite Murder* (Podcast)
*Masslive.com*

2020    *The San Francisco Chronicle*      *Tennessee Commercial Appeal*
*The Intercept*                     *Undisclosed* (Podcast)
*Double Talk* (https://loeschtwins.com/)    *Sixth Hour* (Podcast)
*University of Chicago Law Review Podcast*   *The Salem News*
*Wrongful Convictions: False Confessions* (Podcast)

2019    *Washington Post*                           *The Guardian*
        *Science Magazine*                          *Injustice Watch*
        *The Flathead Beacon*                       *The Focus*
        *Medium.com*

2018    *Sacramento Bee*                            *San Francisco Chronicle*
        *NBC 9 News Denver*                         *PBS*
        *The Alton Telegraph*                       *The Indiana Lawyer*
        *East Bay Times*                            *The ABA Journal*
        *Netflix, The Innocent Man*                 *Mic*
        *Injustice Watch*                           *Capital News Service*
        *Refinery29.com*                            *9 News (Jefferson County, CO)*

2017    *San Francisco Chronicle*                   *The Canadian Press*
        *The Sun Magazine*                          *Benchmark Television (Australia)*
        *Al Jazeera*                                *Westchester County Journal News*
        *North Shore News*                          *La Tercera (Chile)*
        *Richmond Times-Dispatch*                   *El Mercurio Legal (Chile)*
        *Lohud.com*

2016    *Good Morning America*                      *Wall Street Journal*
        *The New Yorker*                            *Chicago Sun Times*
        *ABA Journal*                               *New Orleans Advocate*
        *New Orleans Advocate*                      *Charlotte Observer*
        *Radio New Zealand News*                    *Benchmark Television (Australia)*
        *The Clarion-Ledger*                        *Kokomo Tribune*
        *Vice.com*                                  *San Luis Obispo News*
        *Criminal Injustice Podcast*                *CT News Junkie*
        *Santa Barbara Independent*                 *Takepart*
        *Santa Maria Times*
        *The Marshall Project*

2015    *New York Times*                            *Life of the Law* (Podcast)
        *Los Angeles Times*                         *Slate*
        *AP Online*                                 *Virginia Pilot*
        *The Marshall Project*                      *New York Law Journal*
        *The Guardian*                              *Peru Tribune*
        *Criminal Law Reporter*

2014    *Philadelphia Inquirer*                     *Pittsburgh Post-Gazette*
        *Beatrice Daily Sun*                        *San Quentin Times*
        *The Daily Times*                           *Modesto Bee*
        *The Buffalo News*                          *Omaha World-Herald*

2013    *The New York Times*                        *The Atlantic*

30

*The New Yorker*  
*The Philadelphia Inquirer*  
*KPIX TV* (Channel 5, San Francisco)  
*Christian Science Monitor Weekly*  
*Evansville Courier-Press*  
*The Philadelphia Daily News*  

*The Nation*  
*The San Diego Union-Tribune*  
*KPBS Radio* (San Diego)  
*The Buffalo News*  
*Connecticut Law Tribune*  
*CBS News*  

2012 *USA Today*  
*Chicago Tribune*  
*Pacific Standard Magazine*  
*San Francisco Chronicle*  
*Crestline Courier- News*  
*Ground Report*  
*Owensboro Messenger-Inquirer*  

*New York Times*  
*Philadelphia Inquirer*  
*Oregon Register-Guard*  
*San Francisco Business Times*  
*Fairbanks Daily News-Miner*  
*Evansville Courier Press*  
*Inland Valley Daily Bulletin*  

2011 *San Francisco Chronicle*  
*Chicago Tribune*  
*New York Times*  
*The Lawton Constitution*  
*Vancouver Sun*  
*Brooksville, FLA Hernando Today*  
*Tampa Tribune*  

*Detroit Free Press*  
*Philadelphia Inquirer*  
*Los Angeles Times*  
*Memphis Commercial Appeal*  
*Chicago Sun-Times*  
*Great Falls Tribune*  
*Chicago Daily Herald*  

2010 *Chicago Tribune*  
*The New York Times*  
*Columbia Missourian*  
*Houston Chronicle*  
*Seattle Times*  
*Oshkosh Northwestern*  
*Sheboygan Press*  
*Aolnews.com*  
*Joplin Globe*  
*Voice of America*  
*New York Magazine*  
*Mississippi Clarion-Ledger*  
*Kansas City Star*  

*KTVU News Channel 2* (San Francisco)  
*Appleton Post-Crescent*  
*Yakima-Herald*  
*Grand Rapids Press*  
*Manitowoc Herald Times Reporter*  
*Wausau Daily Herald*  
*Chambersburg Public Opinion*  
*Green Bay Press Gazette*  
*KY3 News* (Missouri)  
*San Francisco Examiner*  
*PBS Frontline*  
*KUCI FM* (Orange County, CA)  

2009 *The New Yorker*  
*San Francisco Chronicle*  
*Miami Herald*  
*Livingston Daily News*  
*Columbia Missourian*  
KAOS Radio (Evergreen, WA)  
*Transitions,* Syndicated NPR  
*Siskiyou Daily News*  

*The Atlantic*  
*St. Petersburg Times*  
*The Detroit News*  
*American Lawyer*  
*California Lawyer*  
*Boulder Daily Camera*  
*The Texas Observer*  
*The Virginia Pilot*  

31

*The Ft. Collins Coloradoan*

2008    *Columbia Missourian*             *Washington Post*
KQED Radio, San Francisco, CA    *The Virginia Pilot*
*Orlando Sentinel*                 *San Jose Mercury News*
WUIS Radio, Springfield, Illinois    *Oakland Tribune*
KPIX, Channel 5 Bay Area       *Fairbanks News-Miner*
*Springfield State Journal-Register*    KGO Radio
KKSU Perspectives, Syndicated NPR    *Baltimore Examiner*
*Legal Intelligencer*            *KPCC Radio* Los Angeles
*Columbia Daily Tribune*        *Riverside Press-Enterprise*
*Albuquerque Journal*           *Justice Denied Magazine*
*Seattle Weekly*               *Palm Beach Daily Business Review*
*Broward Daily Business Review*    *Miami Daily Business Review*
*Omaha World Herald*           *NBC Dateline*
*Style Weekly*                *National Law Journal*
*Contra Costa Times*           *Arkansas Democrat-Gazette*
*Illinois Times*               *Fault Lines*
*Washington Examiner*

2007    *San Francisco Chronicle*       KQED Radio, San Francisco, CA
*Arkansas Democrat-Gazette*     *The Westchester Guardian*
*New York Times*            *Chicago Tribune*
*Akron Beacon Journal*        *Wisconsin Lawyer*
*Bakersfield Californian*       *National Public Radio*
*Missoula Independent*        *Evansville Courier & Press*
*Mr. Big* (Documentary)

2006    *San Jose Mercury News*       *National Law Journal*
*Contra Costa Times*           *Los Angeles Times*
*Oprah Magazine*            *Oklahoma City Journal Record*
*Atlanta Journal-Constitution*    *New York Law Journal*
*Wisconsin State Journal*       *Connecticut Law Tribune*
*Richmond-Times Dispatch*      *Pittsburgh Post-Gazette*
*Missoula Independent*        *Palm Beach Post*
*Cox News Service*            *ABC News*
*Business Wire*              *Fulton County Daily Report*
*San Mateo County Times*       *Tennessean*
*Virginian-Pilot*             *Salon.Com*

2005    *California Lawyer*         *Wisconsin State Journal*
*Vermont Brattleboro Reformer*    *Louisville Courier-Journal*
*Arizona Republic*          *Chronicle of Higher Education*
*Chicago Reader*            *Newsday*
*New York Law Journal*       *Court TV*

32

2004    *San Diego Union-Tribune*      *New York Times*
        *Los Angeles Times*      *Pittsburgh Post-Gazette*
        *Legal Times*      *San Francisco Recorder*
        *Court TV*      *Village Voice*
        *Orange County Register*      *Fort Lauderdale Sun-Sentinel*
        *Winston Salem Journal*      *Hayward Daily Review*
        *Rochester Democrat and Chronicle*

2003    *Miami Herald*      *San Diego Union-Tribune*
        *New York Times*      *Chicago Tribune*
        *Los Angeles Times*      *CBS News*
        *Law and Order*      *Copley News Service*
        *Seattle Times*      *CNN*
        *Modesto Bee*      *Amnesty International Magazine*
        *USA Today*      *Arts & Entertainment Channel*
        *San Antonio News-Express*      *Toronto Star*
        *Birmingham Post-Herald*      *Orange County Register*

2002    *Miami Herald*      *San Jose Mercury News*
        *New York Times*      *National Public Radio*
        *Oprah Magazine*      *Wisconsin State Journal*
        *Pittsburgh Post-Gazette*      *Virginian-Pilot*
        *Deseret Morning News*      *Fort Lauderdale Sun-Sentinel*
        *National Public Radio, This American Life*    *Forensic Files*
        *Milwaukee Journal Sentinel*      *Harpers Magazine*
        *Austin American-Statesman*      *San Mateo County Times*
        *FBI Law Enforcement Bulletin*      *Capital Times*

2001    *New York Times*      *Pittsburgh Post-Gazette*
        *Orange County Register*      *St. Louis Post-Dispatch*
        *Forensic Files*      *Minnesota Star Tribune*
        *Detroit Free Press*      *Boston Globe*
        *Charleston Post and Courier*      *Port Huron Times Herald*
        *Grand Rapids Press*

2000    *San Jose Mercury News*      *New York Times*
        *Chicago Tribune*      *Los Angeles Times*
        *Modesto Bee*      *Boston Globe*
        *Ascribe Newswire*      *Dallas Morning News*
        *University Wire*      *Chicago Daily Law Bulletin*
        *San Francisco Examiner*      *Syracuse Post-Standard*
        *Washington Times*      *Fort-Worth Star Telegram*
        *American Prospect*      *Reason*

1999 *San Francisco Chronicle*              *Washington Post*
     *National Public Radio*                *Los Angeles Times*
     *Newsday*                              *Milwaukee Journal Sentinel*
     *Rochester Democrat and Chronicle*     *Daily Press.Com*
     *New York Law Journal*                 *Nation*
     *American Bar Association Journal*      *Chicago Magazine*
     *Seattle Post-Intelligencer*           *Playboy Magazine*
     *Federal News Service*                 *Baltimore Sun*

1998 *Washington Post*                      *Riverside Press-Enterprise*
     *San Diego Union-Tribune*              *New York Times*
     *Chicago Tribune*                      *Los Angeles Times*
     *Seattle Times*                        *St. Louis Post-Dispatch*
     *Dallas Morning News*                  *U.S. News & World Report*
     *Hartford Courant*                     *Chicago Sun-Times*
     *Baltimore Sun*                        *New Orleans Times-Picayune*
     *Raleigh News & Observer*

1997 *Boulder Daily Camera*                 *Orlando Sentinel*
     *Riverside Press-Enterprise*           *San Diego Union-Tribune*
     *Newsday*                              *Detroit Free Press*
     *Boston Globe*                         *Charleston Post and Courier*
     *Dallas Morning News*                  *Hartford Courant*
     *Denver Post*                          *Maury Povich Show*
     *New York Post*                        *Geraldo Rivera Live*
     *New York Daily News*                  *Newark Star-Ledger*
     *Memphis Commercial Appeal*            *Memphis Commercial Appeal*
     *Vancouver Columbian*                  *Indianapolis News*
     *Philadelphia Inquirer*                *Gary Post-Tribune*
     *Morristown Daily Record*              *Wilmington News Journal*
     *Belleville News-Democrat*             *Mobile Register*
     *Greenville News*                      *Charleston Gazette-Mail*
     *Cleveland Plain Dealer*               *Wheeling Sunday News-Register*
     *Everett Herald*                       *Augusta Chronicle*
     *Columbus Dispatch*                    *Columbus Leger-Enquirer*
     *Worchester Telegram*                  *Macon Telegraph*
     *Scranton Times*                       *Contra Costa Times*
     *Dayton Daily News*                    *Canton Repository*
     *Eugene Register-Guard*                *Tacoma News Tribune*
     *Salem Statesman Journal*              *Trenton Times*
     *Bridgewater Courier-News*             *Hackensack Record*
     *Shreveport Times*                     *Orange County Network*

1996 *Los Angeles Times*                    *Louisville Courier-Journal*
     *Legal Times*                          *Shreveport Times*

34

*New Jersey Law Journal*

1995    *Boulder Daily Camera*

## **PRESENTATIONS**

2021    "The Conflation Error: The False Equation of Factual Innocence with Legally Defined Exonerations."  American Society of Criminology.  Chicago, IL.  November, 2021

"The Enduring Problem of Deception in American Police Interrogation." The Deception Research Society.  London, England.  October, 2021

"Does the Scholarly Arc of Wrongful Conviction Scholarship Bend Toward Justice?"  Loyola University Chicago School of Law.  Conference: Criminal Justice System in Review: Accountability, Reform and Policy.  Chicago, IL.  April, 2021.

2020    Analyzing and Litigating Wrongful Conviction Cases Involving Coercive Interrogations and False Confessions."  Exoneration Justice Project.  Notre Dame Law School.  Notre Dame, Indiana.  November, 2020.

"Coerced and False Confessions: Psychological Science and Implications for Practice." California Attorneys for Criminal Justice/California Public Defenders Association Capital Case Defense Seminar.  San Diego, CA.  February, 2020.

"Police Interrogation and Suspect Interrogations."  Association of American Law Schools. Washington, D.C.  January, 2020.

2019    "Analyzing Involuntary and Unreliable Confessions: Science and Practice."  Illinois Association of Criminal Defense Lawyers.  St.  Charles, IL.  December, 2019.

"Double Wrongful Convictions and Second Chance Near Misses: What Does Data from the National Registry of Exonerations Teach Us?" (with Amy Shlosberg).  American Society of Criminology.  San Francisco, CA.  November, 2019

"Interrogation, Coercion and Confessions."  California Public Defenders Association.  24th Annual Felony Defense Practice Seminar.  Yosemite, CA.  November, 2019.

"Understanding and Litigating Interrogation-Induced Statements: Psychological Science and Practice." King County Department of Public Defense.  Seattle, WA.  October, 2019.

"Interrogation, Coercion, and Unreliable Testimonial Evidence."  Federal Criminal Defense Practice Seminar for the Eastern District of North Carolina. Beaufort, NC.  October, 2019.

"Coerced and False Confessions."  Stanislaus County Public Defenders' Office.  Modesto, CA. August, 2019.

"Interrogation, Confession and Truth." University of Bielefeld, School of Law.  Bielefeld, Germany.  May, 2019.

"From Policing to Exonerations: Understanding Practices, Changing Policies, and Pursuing Social Justice."  University of California, Irvine.  Department of Criminology, Law and Society.  May, 2019.

"The Signal in the Noise: A Tribute to Sam Gross."  The National Innocence Network Conference. Atlanta, GA.  April, 2019.

"Police Interrogation, Psychological Coercion and False Confessions."  Annual Kansas Federal Criminal Defense Seminar.  Lawrence, Kansas.  April, 2019.

"Analyzing 250 New Proven False Confessions: Causes, Consequences, Solutions." Northwestern University School of Law.  Chicago, Illinois. March, 2019.

"False Confessions."  California Attorneys for Criminal Justice/California Public Defenders Association Capital Case Defense Seminar.  Monterey, CA.  February, 2019.

2018    "Analyzing Proven False Confessions in the Age of Innocence."  American Society of Criminology. Atlanta, Georgia.  November, 2018.

"Police Interrogation and False Confessions." Renmin University.  Beijing, China. May, 2018

"Police Interrogation, False Confessions and Miscarriages of Justice in the United States." People's Public Security University of China, Muxidi Campus.

"Questioning Police Interrogation Methods: A Comparative Study." Beijing Normal University.  Beijing, China.  May, 2018.

"Police Interrogation, False Confessions and Miscarriages of Justice." China University of Political Science and Law, Jimenqiao Campus.  Beijing, China.  May, 2018.

"Police Interrogation Methods and False Statements in China, the United States and the United Kingdom."  East China University of Political Science and Law.  May, 2018.  Shanghai, China.

"Police Interrogation, Psychological Coercion and False Confessions." People's Public Security University of China, Tuanhe Campus.  Beijing, China.  May, 2018

"False Confessions: The Psychological Science."  Illinois Public Defender Association. Springfield, IL.  May, 2018.

"Understanding and Litigating False Confessions."  San Francisco Public Defender's Office. San Francisco, CA.  April, 2018.

36

"Interrogating Suspects with Intellectual Disabilities."  Habeas Corpus Resource Center.  San Francisco, CA.  April, 2018.

"Suspect Confessions: Why Innocent Suspects Confess."  Annual Hamill Family Endowed Chair Lecture.  University of San Francisco Law School.  San Francisco, CA.  April, 2018.

"Litigating the Confession Suppression Motion."  California Attorneys for Criminal Justice/California Public Defenders Association Capital Case Defense Seminar.  Monterey, CA.  February, 2018.

"False Confessions."  Federal Public Defender, Northern District of California.  San Francisco, CA.  February, 2018.

"Litigating Police Interrogation and False Confessions."  Alabama Criminal Defense Lawyers Association.   Annual Capital Casework Seminar.  Birmingham, AL.  January, 2018.

2017    "Theorizing Failed Prosecutions" (with Jon Gould).  Law and Society Association of Australia and New Zealand.  Dunedin, New Zealand.  December, 2017.

"The Problem of Wrongful Conviction."  The University of Diego Portales, School of Law.  Santiago, Chile.  November, 2017.

"Conviction Integrity Units."  National Public Prosecutor's Office."  Santiago, Chile.  November, 2017.

"Police Interrogation, Psychological Coercion and False Confessions."  The National Public Defender Office.  Santiago, Chile.  November, 2017.

"Wrongful Convictions: A Comparative Perspective."  U.S.-Asia Law Institute.  New York University, School of Law. New York, New York.  October, 2017.

"Police Interrogation, False Confessions and Wrongful Convictions." International Society for the Reform of Criminal Law.  San Francisco, CA.  July, 2017

"Litigating False Confessions." National Innocence Network Conference.  San Diego, CA.  March, 2017.

"Lies, More Lies and the Reid Method: Coercion, Contamination, and Cover-Up in the Interrogation of Brendan Dassey."  American Psychology-Law Society.  Seattle, WA.  March, 2017.

"How Interrogation Techniques and Suspect Vulnerabilities Interact to Produce False Confessions."  Habeas Assistance and Training Counsel Project National Seminar on Forensic Evidence and Criminal Law.  Seattle, WA.  March, 2017.

"Interrogation and Confessions."  Criminal Justice Reform Conference.  Arizona State University Law School.  Phoenix, AZ.  February, 2017.

"False Confessions: The Psychological Science."  United States Marine Core Defense Service Organization Worldwide Training Conference. San Diego, CA.  February, 2017.

"Police Interrogation and Coerced/False Confessions."  Reno Public Defender's Office.  Reno, Nevada.  February, 2017.

"How to Avoid/Void Wrongful Convictions: False Confessions."  University of San Diego School of Law and Community Defenders, Inc. San Diego, CA.  January, 2017.

"Analyzing Proven False Confessions."  Association of American Law Schools.  San Francisco, CA.  January, 2017.

2016  "The Path to Exoneration" (with Jon Gould and Eric Martin).  American Society of Criminology.  New Orleans, LA.  November, 2016.

"The *Miranda* App" (with Andrew Ferguson).  Boston University Law School.  Boston, MA. September, 2016.  Also presented at the Annual Meeting of the American Bar Association, Criminal Justice Section.  Washington, D.C.  November, 2016.

"The Serial Case – Social Media, and the Trial of Adnan Syed."  Bar Association of San Francisco.  San Francisco, CA.  November, 2016.

"False Confessions and Wrongful Convictions."  Harvard Law School.  American Constitution Society.  Cambridge, MA.  November, 2016.

"When Prosecutions Go Wrong – Convicting the Innocent."  Nebraska Criminal Defense Attorneys Association.  Omaha, NE.  October, 2016.

"Writing (Academic and Popular) Books."  University of San Francisco School of Law, Faculty Colloquium.   September, 2016.

"The Problem of Wrongful Conviction in America." Keynote Address. University of Auckland, Criminal Bar Association of New Zealand.  Auckland, New Zealand.  August, 2016

"Police Interrogation, Psychological Coercion and False Confessions."  University of Auckland, Criminal Bar Association of New Zealand.  Auckland, New Zealand.  August, 2016.

"What Can Be Done About Wrongful Convictions?"  Institute of Criminology, University of Sydney Law School.  Sydney, Australia.  April, 2016.

"The Problem of Confessions."  Simon Fraser University, School of Criminology.

38

Vancouver, Canada.  April, 2016

"*Miranda*: 50 Years Later." University of San Diego School of Law.  San Diego, CA.  April, 2016.

"The Use of Social Framework Evidence on False Confessions in Criminal Cases." American Psychology-Law Society.  Atlanta, GA.  March, 2016.

"Does *Miranda* Protect the Innocent?"  Northern Kentucky University School of Law. Highland Heights, Kentucky.  February, 2016.

"Police Interrogation and False Confessions."  The Center for American and International Law. Plano, Texas.  February, 2016.

"The Reid Method, Police Interrogation and Confessions."  California Attorneys for Criminal Justice/California Public Defenders   Association Capital Case Defense Seminar.  San Diego, CA.  February, 2016.

"False Confessions, Convicting the Innocent and the Troubling Case of Joseph Giarratano, Jr." Washington and Lee School of Law. Lexington, VA.  February, 2016.

2015    "Successes and Failures of the Innocence Revolution."  Duke University Law School. Durham, North Carolina.  November, 2015.

"Reflections on a Classic Ten Years Later: Richard Leo's "Rethinking the Study of Miscarriages of Justice."  American Society of Criminology.  Washington, DC.  November, 2015.

"Wrongful Convictions and the Death Penalty."  University of San Francisco School of Law. Criminal Law Society.  November, 2015.

"Police Interrogation, False Confessions, and Alleged Child Abuse Cases." University of Michigan, School of Law. Conference on Child Abuse Evidence: Perspectives from Law, Medicine, Psychology and Statistics. Ann Arbor, MI.  November, 2015

"The Path to Exoneration (with Jon Gould).  National Science Foundation and National Institute of Justice Conference. "Elephants in the Courtroom: Examining Overlooked Issues in Wrongful Convictions." Arlington, Virginia.  October, 2015.

"Has the Innocence Movement Become an Exoneration Movement? The Risks and Rewards of Redefining Innocence "Wrongful Convictions and the DNA Revolution: 25 Years of Freeing The Innocent" Conference."  Northeastern University School of Law.  September, 2015.

"A Damning Cascade of Investigative Errors."  Southeastern Association of Law Schools. Boca Raton, FLA.  August, 2015.

39

"The Problem of Wrongful Conviction."  Center for the Advanced Study in the Behavioral Sciences.  Stanford University. Palo Alto, CA.  May, 2015.

"False Confessions: The Psychological Science."  American Psychology-Law Society.  San Diego, CA.  March, 2015.

"The Social Psychology of Police Interrogation, False Confessions and Wrongful Conviction." Department of Psychology, Social Psychology Program.  Stanford University.  Palo Alto, CA. March, 2015.

2014    "Litigating False Confession Cases" and "Presenting Expert Testimony."  National Forensic College.  Cardozo Law School.  New York, New York.  June, 2014.

"False Confessions, Erroneous Convictions and Safeguarding the Innocent." The Rand Corporation.  Santa Monica, CA. May, 2014

"The Problem of Wrongful Conviction."  University of California, Irvine.  The Newkirk Center for Science and Society, The Center for Law, Society and Culture, and the Center for Psychology and Law.  Irvine, CA. April, 2014.

"Police Interrogation and Coerced and False Confessions."  Los Angeles Public Defender's Office. Van Nuys and Downtown Offices.  Los Angeles, CA.  April, 2014.

"False Confession and Wrongful Conviction: Causes, Consequences, and Solutions." Susquehanna University.  Arlin M. Adams Center for Law and Society Distinguished Lecture. Selinsgrove, PA.  April, 2014.

"Legal Scholarship Employing Theory: A Critique."  Northwestern University School of Law. Boston, MA.  March, 2014.

"False Confessions."  California Attorneys for Criminal Justice/California Public Defenders Association Capital Case Defense Seminar.  Monterey, CA.  February, 2014.

"The Justice Gap and the Promise of Criminological Research."  Western Society of Criminology.  Honolulu, HI.  February, 2014.

2013    "Promoting Accuracy in the Use of Confession Evidence: An Argument for Pre-Trial Reliability Hearings to Prevent Wrongful Convictions."  UCLA School of Law.  Los Angeles, CA.  August, 2013.

"Why Interrogation Contamination Occurs."  Association of American Law Schools.  Mid-year Criminal Justice Conference.  San Diego, CA.  June, 2013.

"Social Psychological Testimony Regarding Interrogations and Confessions."  American-

40

Psychology Law Society.  Portland, OR.  March, 2013.

"To Walk in Their Shoes: The Problem of Recognizing False Confessions" (with Deborah Davis).  American-Psychology Law Society.  Portland, OR.  March, 2013.

"False Confessions."  California Attorneys for Criminal Justice/California Public Defenders Association Capital Case Defense Seminar.  Monterey, CA.  February, 2013.

2012    "Contaminated Confessions: Accuracy and Error in Decision-Making in the Criminal Justice Process."  Duke University School of Law.  Durham, North Carolina.  December, 2012.

"Innocent Differences? An Empirical Study of Wrongful Convictions vs. "Near Misses" (with Jon Gould and Julia Carrano).  American Society of Criminology. Chicago, IL.  November, 2012.

"False Confessions: Causes, Consequences, Solutions."  Roosevelt University, Department of Psychology. Wrongful Convictions Distinguished Speakers Series.  Chicago, IL.  November, 2012.

"Promoting Accuracy in the Use of Confession Evidence: An Argument for Pre-Trial Reliability Hearings to Prevent Wrongful Convictions."  American University School of Law.  Washington, D.C.  September, 2012.  U.C. Davis School of Law.  Davis, CA.  October, 2012.  Temple University School of Law.  Philadelphia, PA.  November, 2012.

"An Early Peek at the Results: An Empirical Study of Wrongful Convictions versus "Near Misses" (with Jon Gould and Julia Carrano).  Law and Society Association.  Honolulu, HI.  June, 2012.

"The Science of False Confessions."  Washington State Courts Continuing Judicial Education Conference.  Cle Elum, Washington.  April, 2012.

"The Problem of Interrogation-Induced False Confession: Sources of Failure in Prevention and Detection".  Western Psychological Association.  San Francisco, CA.  April, 2012.

"Interrogation Through Pragmatic Implication: Sticking to the Letter of the Law While Violating Its Intent."  Loyola University Law School.  Los Angeles, CA.  April, 2012.

"Two Real-Life Studies, a Meta-Analysis, and the Effects of Unanticipated Questions."  American Psychology-Law Society.  San Juan, Puerto Rico.  March, 2012.

"False Confessions: Understanding and Litigating the Issues."  New Mexico Criminal Defense Lawyers Association.  Albuquerque, NM.  March, 2012.

"False Confessions."  California Attorneys for Criminal Justice/California Public Defenders Association Case Defense Seminar Program.  Monterey, CA.  February, 2012.

41

2011   "The Dynamics of False Confessions."  The Texas Bar, Continuing Legal Education.  Dallas, Texas.  December, 2011.

"Studying Wrongful Convictions: Learning from Social Science" (with Jon Gould).  American Society of Criminology. Washington, D.C.  November, 2011.

"False Confessions: Why Innocent People Confess."  Northern California Innocence Project. Santa Clara University School of Law.  Santa Clara, CA.  October, 2011.

"The Problem of Interrogation-Induced False Confession: Sources of Failure in Prevention and Detection."   Federal Public Defender, Capital Habeas Unit.  Los Angeles, CA. August, 2011.

"The Science of False Confessions."  Texas Criminal Defense Lawyers Association.  Austin, TX.  August, 2011.

"Police Interrogation Methods and False Confessions."  New York State Justice Task Force on Wrongful Convictions.  New York, NY.  June, 2011.

"Police Interrogation: Tactics, Responses and Outcomes."  University of Minnesota School of Law.  Conference on Barry Feld's book, *Police Interrogation of Juveniles: Practice and Policy*. May, 2011.

"The Truth About False Confessions: Interrogation-Related Regulatory Decline: Ego-depletion, Failures of Self-Regulation and the Decision to Confess."   Western Psychological Association Conference.  Los Angeles, CA.  April, 2011.

"False Confessions: Causes, Consequences, Solutions."  National Innocence Network Conference.  University of Cincinnati School of Law.  April, 2011.

"Police Interrogation in the Shadow of Trial."  New York University School of Law.  Hoffinger Criminal Justice Colloquium.    March, 2011.

"Confessions of the Innocent: Causes, Consequences and Solutions."  Forensic Mental Health Association of California Annual Conference.  Keynote Address.  Seaside, CA.  March, 2011.

"Three Prongs of the Confession Problem: Issues and Proposed Solutions." University of Washington School of Law.  Faculty Colloquium. Seattle, WA. January, 2011.

2010    "Purpose-Driven Scholarship, Justice Work, and the Problem of Wrongful Conviction." University of San Francisco School of Law. Justice Forum. November, 2010.

"Innocent: Recent Advances in Uncovering Wrongful Convictions." Stanford University School of Law. Shaking the Foundations Conference. October, 2010.

42

 "*Miranda* at 50: What Have We Learned?" Seattle University School of Law. Faculty Colloquium. September, 2010.

"The Gatehouses and the Mansions: 50 Years Later." University of San Francisco School of Law. Faculty Brown Bag Series. July, 2010.

 "A Doctrinal Analysis of *Miranda v. Arizona* and its Progeny: Why the Conventional Explanation is Wrong and What's Really Going On." University of San Francisco School of Law. Faculty Colloquium. April, 2010.

"Police Interrogation, Psychological Coercion and False Confessions: Understanding and Litigating the Issues." Los Angeles County Bar Association. April, 2010.

"When Lightning Strikes Twice: Analyzing Double Wrongful Convictions." University of California, Berkeley School of Law. Center for the Study of Law and Society Faculty Colloquium. March, 2010.

 "The Psychology of Coerced and False Confessions" and "Litigating Coerced and False Confession Cases." Department of the Army, U.S. Trial Defense Service Conference. Ft. Lewis, WA. March, 2010.

"Stage Setting in Police Interrogation: Interactive Effects of a Pretext for Interrogation and Minimization" (with Osvaldo Hernandez, Deborah Davis, Crissa Draper and William Follette). American Psychology-Law Society Conference. Vancouver, Canada. March, 2010.

"When Lightning Strikes Twice: Analyzing Double Wrongful Convictions." Emory University School of Law Faculty Colloquium. February, 2010.

"Interrogation, Coercion and False Confessions: Understanding and Identifying the Issues." California Attorneys for Criminal Justice/California Public Defenders Association Case Defense Seminar Program. Monterey, CA. February, 2010.

"Interrogation Through Pragmatic Implication: Communicating Beneficence and Promises of Leniency" (with Deborah Davis and William Follette). Society for Personality and Social Psychology Conference. Las Vegas, NV. January, 2010.

"One Hundred Years of Getting It Wrong? Wrongful Convictions after a Century of Research" (with Jon Gould). Northwestern University School of Law. Conference on a Century of Criminal Law and Criminology. Chicago, IL. January, 2010

"Police Interrogation and False Confessions: A Review of the Research." Association of American Law Schools Annual Conference. New Orleans, LA. January, 2010.

2009    "The Wrong Guys: Author Meets Critics." American Society of Criminology Conference. Philadelphia, PA. November, 2009.

43

"False Confessions: Science and Research" Office of the State Appellate Defender and Illinois Institute for Continuing Legal Education Conference. Keynote Address.  Springfield, IL. October, 2009.

"Police-Induced Confessions: Risk Factors and Recommendations."  UC Hastings School of Law.  Faculty Colloquium.  San Francisco, CA.  September, 2009.

 "The Psychology of Forced Confessions" and "Litigating False Confession Cases."  Indiana Public Defender Council Conference.  Indianapolis, IN.  August, 2009.

"Interrogation, Coercion and False Confessions: Understanding and Identifying the Issues." National Association of Criminal Defense Attorneys Conference.  Santa Fe, NM.  April, 2009.

"False Confessions: Challenging Police-Induced Testimonial Evidence."  Illinois Institute for Continuing Legal Education Death Penalty Conference. Keynote Address.  Chicago, IL. March, 2009.

"Interrogation, Coercion and False Confessions: Understanding and Identifying the Issues." Contra Costa County Public Defender's Office.  Martinez, CA.  March, 2009.

 "False Confessions." California Attorneys for Criminal Justice/California Public Defenders Association Case Defense Seminar Program.  Monterey, CA.  February, 2009.

"False Confessions: Challenging Police-Induced Testimonial Evidence."  San Francisco Public Defender's Office.  February, 2009

"False Confessions: Causes, Consequences and Reforms."  Texas Court of Criminal Appeals. Criminal Justice Integrity Unit.  Austin, TX.  January, 2009.

2008    "The Wrong Guys: Murder, False Confessions and the Norfolk 4."  Northwestern University School of Law.  Chicago, IL.  November, 2008.

"Police Interrogation and American Justice: Author Meets Critics" and "When Lightning Strikes Twice: Studying Double Wrongful Convictions."  American Society of Criminology Conference.  St. Louis, Missouri.  November, 2008.

"The Psychology of False Confessions: Causes, Consequences and Reforms."  University of Illinois, Springfield.  Institute for Legal and Policy Studies and Downstate Illinois Innocence Project.  November, 2008.

"The Wrong Guys: Murder, False Confession and the Norfolk 4."  University of San Francisco, School of Law.   November, 2008.

"Police Interrogation, Psychological Coercion, and False Confessions."  California Defense

44

Investigators Association Conference.  San Jose, CA.  November, 2008.

"False Confessions: Causes, Consequences, and Implications."  American Academy of Psychiatry and Law Conference.  Keynote address.  Seattle, WA.  October, 2008.

"Police Interrogation and American Justice."  New York University School of Law.  Hoffinger Criminal Justice Colloquium.    September, 2008.

"False Confessions and Wrongful Convictions."  Innocence Project.  New York, NY.  September, 2008.

"Police Interrogation and False Confessions."  Alaska Investigators Association and Alaska Innocence Project Conference.  Anchorage, AL.  September, 2008.

 "False Confessions, Wrongful Convictions and Legal Reform."  Association of American Law Schools.  Mid-year Meeting, Evidence Section.  Cleveland, Ohio.  June, 2008.

"False Confessions" and "Police Interrogation, False Statements and Confessions".  Habeas Corpus Resource Center Conference.  San Francisco, CA.  June, 2008

"False Confessions."  National Association of Criminal Defense Attorneys Conference.  Las Vegas, NV.  April, 2008.

"Litigating False Confession Cases." National Innocence Network Conference. University of Santa Clara School of Law.  March, 2008.

 "Recommending False Confession for the Innocent" (with Deborah Davis and William Follette).  American Psychology Law Society Conference.  Ft. Lauderdale, FL.  March, 2008.

"Police Interrogation and Coercion in Domestic American History."  University of Chicago School of Law.  Conference on Torture, Law and War.  March, 2008

"Persuaded False Confessions."  University of Chicago School of Law.  Criminal Law Faculty Colloquia.  February, 2008.

"Understanding False Confessions."  California Attorneys for Criminal Justice/California Public Defenders Association Case Defense Seminar Program.  Monterey, CA.  February, 2008.

2007    "Understanding False Confessions."  California Public Defenders' Association Conference.  Yosemite, CA.  November, 2007.

 "Persuaded False Confessions" and "Effects of Interrogation Tactics on Recommendation of False Confessions for the Innocent" (with Deborah Davis and William Follette).  University of Texas, El Paso.  "Interrogation and Confessions: A Conference Exploring Current Research,

45

Practice and Policy." September, 2007.

"Police Interrogation, Psychological Coercion, False Confessions." Florida Public Defender Association Conference. Orlando, FlA. September, 2007.

"Effects of Failed Polygraph Results on Perceived Wisdom of True and False Confessions" (with Deborah Davis). American Psychological Association Conference. San Francisco, CA. August, 2007.

"Police Interrogation, Psychological Coercion, False Confessions." District of Columbia Public Defender Service. Washington, DC. June 2007.

"Understanding the Reid Method and How It Coerces Confessions." Habeas Corpus Resource Center Conference. San Francisco, CA. June, 2007.

Wrongful Convictions and False Confessions. Tel Aviv University, School of Law. Conference on New Directions in Courtroom Research. Tel Aviv, Israel. May, 2007.

"False Confessions: Causes, Consequences, Solutions." Ohio Innocence Project. University of Cincinnati School of Law. Cincinnati, OH. March, 2007.

"Wrongful Conviction: Legal and Judicial Perspectives." Academy of Criminal Justice Sciences Conference. Seattle, WA. March, 2007.

"False Confessions and the Wrongful Conviction of the Innocent." National Innocence Network Conference. Harvard University Law School. March, 2007.

"Police Interrogation, Psychological Coercion, False Confessions." National Legal Aid and Defender Association. Annual Conference on Indigent Defense. Dallas, TX. March, 2007.

"Understanding the Reid Method and How It Coerces Confessions." California Attorneys for Criminal Justice/California Public Defenders Association Case Defense Seminar Program. Monterey, CA. February, 2007.

"The Social Psychology and Consequences of Police-Induced False Confessions." Northern California Innocence Project. Santa Clara, CA. February, 2007.

"Police Interrogation, Psychological Coercion, False Confessions." Santa Clara County Public Defender's Office. San Jose, CA. February, 2007.

"Why Do Suspects Falsely Confess?" Administrative Offices of the United States Courts. Conference on Forensic Evidence and the Criminal Law. New Orleans, LA. January, 2007.

2006    "Police Interrogation, False Confession and American Justice." University of Oklahoma, Department of Psychology. Faculty Colloquium. Norman, OK. December, 2006.

"Police interrogation, Psychological Coercion, False Confessions."  Missouri State Public Defender System Conference.  St. Louis, MO.  December, 2006.

 "Police Interrogation and American Justice." University of San Francisco School of Law.  Faculty Colloquium.  November, 2006.

 "The Limits of *Miranda*."  University of Colorado School of Law.  Conference on the 40th Anniversary of *Miranda v. Arizona*.  Boulder, CO.  October, 2006.

"Interrogating Guantanamo Detainees."  University of San Francisco School of Law.  October, 2006.

"Coerced and False Confessions."  National Child Abuse Defense & Resource Center Conference.  September, 2006.  Las Vegas, NV.

"False Confessions: Causes, Consequences and Solutions." California Commission on the Fair Administration of Justice.  Los Angeles, CA.  June, 2006.

"Sympathetic Detectives with Time Limited Offers: Effects on Perceived Consequences of Confession" (with Deborah Davis, Deborah Knaack and David Bailey).  Association for Psychological Science Conference. New York, NY.  May, 2006.

"Police Interrogation and Confessions."  San Mateo Private Defender Program.  Burlingame, CA.  May, 2006.

"*Miranda*'s Past, Present and Future."   Harvard University School of Law.  Conference on Criminal Procedure Stories.  Cambridge, MA.  April, 2006.

"Incriminating Ourselves?"  U.C.L.A. School of Law.  Conference on the Faces of Wrongful Conviction:  Examining California Justice Gone Wrong.  April, 2006.

 "Police Interviewing and Interrogation: Toward A National Self-Report Survey of Police Practices and Beliefs" (with Saul Kassin, Kimberly Richman, L.H., Colwell, Amy Leach, Dana La Fon, & Christian Meissner) and  "Evaluating Law Enforcement Evidence Ploys when Confessions are False: Mock Juror Perceptions of Deception and Coercion" (with Jennifer A. Bienhoff, Krista D. Forrest & Brad J. Stastny) and "Evaluating Evidence Ploys: The Role of Ploy Type in Perceptions of Deception and Coercion" (with Brad Stastny, Krista Forrest & Jennifer Bienhoff).  American Psychology-Law Society Conference.  St. Petersburgh, FL. March, 2006.

"Police Interrogation and False Confessions: Best Practice Guidelines."  Wisconsin Criminal Justice Study Commission.  Milwaukee, Wisconsin.  February, 2006.

"Bringing Reliability Back In: False Confessions and Legal Safeguards in the Twenty-First

Century."  University of San Francisco School of Law.  Faculty Colloquium.  January, 2006.

2005    "Preventing Wrongful Convictions: Re-Examining Fundamental Principles of Criminal Law to Protect the Innocent" (with Steve Drizin).  University of Wisconsin Law School. Conference on Wrongful Convictions.  November, 2005.

"Reforming Criminal Interrogation: Legal Solutions." University of Chicago Law School. November, 2005.

"Bringing Reliability Back In: False Confessions and Legal Safeguards."   Seattle University Law School.  Faculty Colloquium. November, 2005.

"Police Interrogation and the American Adversary System."  Washington University School of Law.  Faculty Colloquium.  St. Louis, Missouri. October, 2005.

"Police Interrogation and the American Process of Justice."  Loyola University School of Law. Faculty Colloquium. Los Angeles, CA.  September, 2005.

"The Social Psychology and Consequences of Police-Induced False Confessions."  Northern California Innocence Project.  Santa Clara, CA.  July, 2005.

"Re-Thinking the Study of Wrongful Conviction."  Law and Society Association Conference. Las Vegas, NV.  June, 2005

"Beyond CSI: Psychology, Crime and Justice."   University of California, Irvine. The UCI Think Forum Series. May, 2005.

"True, False, and Suspicious Confessions: Research and Testimony on Interrogations and Confessions (with Mark Costanzo).  Symposium on Applied Social Psychology.  Claremont McKenna College.   Claremont, CA.  April, 2005.

"Proven False Confessions: What They Tell Us About Police Interrogations."  American Psychology Law Society Conference.  San Diego, CA.  March, 2005.

"Teaching Law and Society in Undergraduate Programs."  West Coast Law and Society Retreat.  University of California, Berkeley.  March, 2005.

"The Psychology of Police Interrogation and False Confessions."  California Attorneys for Criminal Justice/California Public Defenders Association Case Defense Seminar Program. Monterey, CA.  February, 2005.

"The Evidentiary Aspects of Wrongful Convictions." The Association of American Law Schools Annual Conference.  San Francisco, CA.  January, 2005.

2004    "Police Interrogation and False Confessions."  Northern California Innocence Project.

University of Santa Clara.  Santa Clara, CA.  November, 2004.

"Police Interrogation, Psychological Coercion and False Confessions."  Distinguished Faculty Scholar Lecture.  University of Pittsburgh, School of Law.   November, 2004

"Psychological Coercion and Unreliable Confessions" (with Richard Ofshe). American Society of Criminology Conference.  Nashville, TN.  November, 2004.

"The Psychology of Police Interrogation and False Confessions: What You Need to Know."  Solano County Bar Association.  Fairfield, CA.  November, 2004.

"Police Interrogation and False Confessions."  Los Angeles County Bar Association.  Los Angeles, CA.  November, 2004.

"Police Interrogation and Unreliable Statements: Thinking about the James Tucker Case."  Northern California Innocence Project.  Golden Gate University School of Law.  San Francisco, CA.  September, 2004.

"Police Interrogation, Psychological Coercion and False Confessions."   National Defender Investigation Association Western Regional Conference.  Redondo Beach, CA.  September, 2004.

"The Search for Truth."  2004 Northern District of California Judicial Conference, Ninth Circuit.  Santa Cruz, CA.  May, 2004.

"Interrogation, Confession and Innocence."  Innocence Project, Benjamin N. Cardozo Law School.  New York, N.Y.  May, 2004.

"Protecting Human Subjects vs. Preserving Social Research."  University of California, Berkeley, School of Law.  Berkeley, CA.  April, 2004.

"Police Interrogation and Confessions."  Santa Clara County Public Defender's Office.  San Jose, CA.  March, 2004.

"Police Interrogation: A Study in Deception."  San Mateo County Private Defenders Program.  Burlingame, CA.  January, 2004.

2003  "Confessions, Admission, and False Statements."  California Attorneys for Criminal Justice Conference.  San Francisco, CA.  December, 2003.

"Procedures for Interrogation and Confession."  The University of California, Irvine.  Conference on Science and the Law of Evidence.  November, 2003.

"Confessions and Coercion."  Habeas Corpus Resource Center Conference.  San Francisco, CA.  November, 2003.

49

"Understanding Police Interrogation, Coercion and Confessions." San Francisco Public Defenders' Office. San Francisco, CA. October, 2003.

"Videotaping Interrogations: Does it Enhance the Jury's Ability to Distinguish True and False Confessions?" (with Saul Kassin, C. Crocker and Lindsay Holland). Psychology & Law International Interdisciplinary Conference. Edinburgh, Scotland. July, 2003.

"Exploding the Myths of False Confession: Lessons from the Central Park Jogger Case" (with Steve Drizin). The Law and Society Association Conference. Pittsburgh, PA. June, 2003.

"Analyzing Confessions and Their Consequences." The Advanced Judicial Academy for Illinois Judges." University of Illinois. Champaign, Illinois. June, 2003

"The Social Psychology of Police Interrogation and False Confession." San Diego Psychology-Law Society. San Diego, CA. May, 2003.

"The Psychology of Police Interrogation and False Confession." The National Judicial Institute. Victoria, British Columbia. May, 2003.

"The Psychology of Police Interrogation, Coercion and False Confession." Full day training course." Miami Beach Police Department. Miami Beach, FLA. February, 2003

"False Statements." California Attorneys for Criminal Justice/California Public Defenders Association Case Defense Seminar Program. Monterey, CA. February, 2003.

2002    "The Psychology of Police Interrogation and False Confession." National Judicial Institute. Judicial Safeguards for the Prevention of Wrongful Convictions Seminar. Ottawa, Ontario. Canada. December, 2002.

"The Consequences of False Confessions Revisited in the DNA Age" (with Steve Drizin). The American Society of Criminology Conference. Chicago, IL. November, 2002.

"Influence, Persuasion and Compliance: The Psychology of Police Interrogation and Confession Evidence." University of California, San Diego. Department of Psychology. Faculty Colloquium. November, 2002.

"Studying Police Interrogation and Confessions." Long Beach Police Department. Long Beach, CA. November, 2002.

"The Psychology of Interrogation, Coercion and Police-Induced False Confession." California Public Defenders Association Conference. Rohnert Park, CA. August, 2002

"The Psychology of Police Interrogation and False Confession." Three-day training course for investigators at the Broward County Sheriff's Office. Ft. Lauderdale, Florida. July, 2002.

50

"False Confessions."  Spokane Criminal Defense Attorneys.  Spokane, WA.  June, 2002.

"Thinking About Miscarriages of Justice." The Law and Society Association Conference. Vancouver, Canada.  May, 2002.

"Police Interrogation, False Confessions and Miscarriages of Justice."  California State University, Northridge.  Department of Sociology.  Faculty Colloquium.  May, 2002.

"Public Perceptions of Interrogation Tactics in Criminal Setting" (with Jodi Quas and Brianne Beck).  The Western Psychological Association Conference.  Irvine, CA.  April, 2002.

The Psychology of Police Interrogation and False Confessions."  Invited Lecture to Military Prosecutors as part of the "Prosecuting Complex Litigation" Course Seminar.  Naval Justice School.  San Diego, CA.  April, 2002.

"Video-taping, Police-Induced False Confessions and Interrogation Reform: Defining the Problems, Finding the Solutions." National Innocence Network Conference, California Western School of Law. San Diego, CA.  January, 2002.

2001    "Police Interrogation and False Confessions." Annual Trial Defense Service Conference. United States Army.  Las Vegas, Nevada.  November, 2001.

"Analyzing False Confession Cases: How to Know Them When You See Them; What to Do When You Get Them." The Federal Defenders Program and the Illinois Association of Criminal Defense Lawyers Conference.  Chicago, IL.  October, 2001.

"How Police Induce False Confessions."  Wisconsin Public Defender Conference.  Milwaukee, WI.  October, 2001.

"Influence, Coercion and Confession: Connecting Scholarly Research and Courtroom Testimony."  The American Psychological Association Conference.  San Francisco, CA. August, 2001.

"Investigating and Correcting Official Misconduct: Preliminary Lessons from the Rampart Scandal" (with Bill Thompson and Paul Kaplan).  The Society for the Study of Social Problems Conference.  Anaheim, CA.  August, 2001.

"Police Interrogation, Coercion and False Confessions: Exposing Police Misconduct Inside the Interrogation Room and Exonerating the Innocent."  The National Association of Criminal Defense Attorneys Conference.  Minneapolis, MN.  August, 2001.

"Police Interrogation Techniques and False Confessions." New Mexico Criminal Defense Lawyers Association Seminar.  Albuquerque, NM.  July, 2001.

51

"Police Interrogation, Coercion and False Confessions." Los Angeles Public Defender's Office. Los Angeles, CA. June, 2001.

"Thinking Critically About False Memories, False Confessions and False Accusations: Past, Present and Future." University of California, Irvine. Students for Science and Skepticism. May, 2001.

"Police Interrogation, Coercive Influence Techniques, and False Confessions." Western Circuit Workshop, United States Air Force. Travis Air Force Base. Sacramento, CA. March, 2001.

"Proving Your Client's Confession is False or Coerced." Capital Case Defense Seminar. California Attorneys for Criminal Justice and the California Public Defenders Association. Monterey, California. February, 2001.

"False Confessions." Benjamin N. Cardozo School of Law, Innocence Project Lecture Series. New York City, N.Y. January, 2001.

2000 "Questioning the Relevance of *Miranda* in the Twenty-First Century." University of Michigan, School of Law. Conference on *Miranda* After *Dickerson*: The Future of Confession Law. Ann Arbor, MI. November, 2000.

"Studying Miscarriages of Justice in the Age of DNA, Video Technology and Death Row Exonerations: Understanding and Solving the Problem." Distinguished Faculty Lecture. University of California, Irvine. November, 2000.

"Police Misconduct Inside the Interrogation Room" and "Police-Induced False Confessions, Wrongful Deprivations of Liberty, and Miscarriages of Justice. The American Society of Criminology Conference. San Francisco, CA. November, 2000.

"Confessions: Creating New Approaches to Excluding False, Coerced and Unlawfully Obtained Statements." San Diego County Public Defenders' Office. November, 2000.

"The False Confession." Orange County Public Defender's Training Seminar. Santa Ana, California. November, 2000.

"Miscarriages of Justice in the 21st Century: Coercion, False Confessions and the Wrongful Conviction of the Innocent." Marian Miner Cook Athenaeum Distinguished Lecture. Claremont McKenna College. Claremont, CA. September, 2000.

"Interviewing/Interrogation." Full day Training Session. Cyprus Police Training Program. Ministry of Justice and Public Order of the Republic of Cyprus. Nicosia, Cyprus. September, 2000.

"Psychological Research and Wrongful Convictions: Influence, Suggestion and Coercion." The American Psychological Association Conference. Washington, D.C. August, 2000.

52

"Obtaining Truthful Confessions, Avoiding Coerced and/or False Confessions." Training Seminar.  Law Enforcement Coordinating Committee for the Fifth Circuit.  San Antonio, TX. July, 2000.

"Going to a Different Ivory Tower."  Association of American Law Schools Mid-Year Conference on Criminal Justice.  Washington, D.C.  June, 2000.

"Police Interrogation Methods, Coercion, and False Confessions."  West Virginia Public Defender Conference.  Davis, West Virginia.  June, 2000

"Police-Induced False Confessions."  The Mississippi Judicial College, University of Mississippi.  Tunica, Mississippi.  May, 2000.

"Coercive Interrogation and False Confessions: Reflections on the Wenatchee Cases."  The University of Washington, Washington Law School Foundation. Seattle, WA. April, 2000.

"The Legal Consequences of False Confessions."  The American Psychology-Law Society Conference.  New Orleans, LA.  March, 2000.

"Suggestive Interrogation and False Confessions."  University of California, Irvine. Miscarriages of Justice Conference.  School of Social Ecology.  March, 2000.

"Interrogations and Confessions: Implications for Attorneys and Psychologists." Half-day course for prosecutors, defense attorneys and psychologists. Sponsored by Goebel & Vigen: Clinical, Forensic & Organizational Psychology.  Shreveport, Louisiana.  March, 2000.

"False Confession Theory and Application."  Central Circuit Defense Team Conference, United States Air Force.  Randolph Air Force Base.  San Antonio, Texas.  January, 2000.

"Police Interrogation, Coercive Influence Techniques, and False Confessions."  Federal Defenders of San Diego Conference.  San Diego, CA.  January, 2000.

1999    "Coerced and False Confessions."  Indiana Public Defender Council Conference.  Indianapolis, Indiana.  December, 1999.

"False Confessions: Causes, Consequences, and Solutions."  The American Society of Criminology Conference.  Toronto, Canada.  November, 1999.

"Coerced Confessions."  The Colorado State Public Defenders' Association Conference. Crested Butte, CO.  October, 1999.

"Video-taping Interrogations and Confessions."  Testimony before the Illinois House of Representatives. Task Force on Videotaping Interrogation and Confessions.  Chicago, IL. September, 1999.

53

"Litigating a False Confession Case."  National Seminar on Mental Illness and the Criminal Law.  The Federal Defender Training Group.  Washington, D.C.  June, 1999.

"Adapting to *Miranda*: Modern Interrogators' Strategies for Dealing with the Obstacles Posed by *Miranda*."  University of Southern California School of Law.   Faculty Colloquium. March, 1999.

"Analyzing Coerced and/or False Confessions."  National Association of Criminal Defense Attorneys Conference.  St. Louis, Missouri. March, 1999.

"False Confessions: Inside the Interrogation Room from Coercion to Deception."   Criminal Defense Attorneys of Michigan Conference.  Detroit, Michigan.  March, 1999.

"The Social Psychology of Police Interrogation and False Confession."  University of California, Santa Barbara. Department of Psychology.  Social Psychology Symposium. January, 1999.

"The Social Psychology of Police Interrogation and False Confession." University of California, Irvine.  Department of Psychology and Social Behavior.  Faculty Colloquium. January, 1999.

1998   "The Regulation and Memorialization of Confessions."  Northwestern University School of Law.  Conference on Wrongful Convictions and the Death Penalty.   November, 1998.

"Science in the Courtroom."  The American Society of Criminology Conference.  Washington, D.C.  November, 1998.

"Analyzing Coerced Confession Cases."  Arizona Attorneys for Criminal Justice Conference. Tucson, AZ.  September, 1998.

"The Social Psychology of False Confessions."  American Sociological Association Conference.  San Francisco, CA.  August, 1998.

"The Psychology of Confession Evidence: From the Ivory Tower to the Realities of Practice." The Law and Society Association Conference.  Aspen, CO.  June, 1998.

"*Miranda* and the Adversary System: Lessons for Japan."  University of California, Berkeley School of Law.  Center for the Study of Law and Society.  Conference on Japanese Criminal Justice.  April, 1998.

"The Truth about False Confessions: Understanding Their Causes and Consequences."  Wayne State University. Center for Legal Studies.  Faculty Colloquium.  Detroit, MI.  April, 1998.

"The Truth About False Confessions: What Criminologists Should Know."  The Academy of

54

Criminal Justice Sciences Conference. Albuquerque, NM. March, 1998.

"Coerced Statements, False Confessions and Creating Memory, Parts I and II." The Federal Judicial Center Conference. San Diego, CA and Atlanta, GA. March, 1998.

"The Causes and Consequences of False Confessions." University of Washington, Seattle. Department of Sociology. Faculty Colloquium. January, 1998.

1997    "Police Interrogation, False Confessions and Miscarriages of Justice." The University of California, Irvine School of Social Ecology. Newport Beach, CA. November, 1997.

"Police Interrogation, False Confessions and Expert Witnesses." American Society of Criminology Conference. San Diego, CA. November, 1997.

"The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation" (with Richard Ofshe). Law and Society Association Conference. St. Louis, Missouri. May, 1997.

"The Decision to Confess." The University of Denver College of Law. Symposium on Coercion, Exploitation and the Law. Denver, CO. March, 1997.

"Police Interrogation, False Confessions, and Expert Witnessing." University of Colorado, Boulder. Department of Sociology, Graduate Student Forum. March, 1997.

"Explaining False Confessions." The University of Colorado, Boulder School of Law. Faculty Colloquium. Boulder, CO. February, 1997.

"False Confessions and Miscarriages of Justice *Today*." Conference sponsored by The Justice Committee. Salem, MA. January, 1997.

1996    "Coerced False Confessions." American Society of Criminology Conference. Chicago, Illinois. November, 1996.

"False Confessions: Documenting, Explaining and Preventing Miscarriages of Justice." University of California, Irvine. Department of Criminology, Law and Society. Faculty Colloquium. November, 1996.

"Is *Miranda* Enough or Should We Video-tape All Confessions?" Seton Hall University Law School. Newark, NJ. October, 1996.

"The Principles and Practices of Criminal Law in the United States." Tsingua University School of Law. Bejing, China. October, 1996.

"Police Interrogation in America." Chinese People's Public Security University. Department of Criminology. Bejing, China. October, 1996.

"Police Interrogation and False Confessions in America."  Supreme People's Procuratorate of the People's Republic of China."  Bejing, China.  October, 1996

"Deception by Sociologists."  American Sociological Association Conference.   New York, NY.  August, 1996.

"Secrecy and the Interrogation of Suspects."  University of Colorado, Boulder.  Conference on George Simmel's Actual and Potential Impact on Contemporary Society.  April, 1996.

"Between Reality and Metaphor: A Friendly Critique of *The Myth of Repressed Memory*." Pacific Sociological Association Conference.  Seattle, WA. March, 1996.

1995    "The Context and Outcome of Police Interrogation: A Quantitative Analysis."  American Society of Criminology Conference.  Boston, MA.  November, 1995.

"The Social and Legal Construction of Recovered Memories."  University of Delaware at Newark, Department of Legal Studies. November, 1995.

"False Confessions and Miscarriages of Justice: A Preliminary Study" and "The Mythology and Sociology of Recovered Memories."  Northern Arizona University, Departments of Sociology and Criminal Justice.   Flagstaff, AZ. October, 1995.

"The Social Meaning of the O.J. Simpson Case."  University of Colorado, Boulder. Department of Sociology, Diversity Forum.  October, 1995.

"Interrogation and Surveillance: Changing Trends in Police Detection and Social Control." American Sociological Association Conference.  Washington, D.C. August, 1995.

"False Memory, False Confession: When Police Interrogations Go Wrong."  Law & Society Association Conference.  Toronto, Canada. June, 1995.

"Trial *and* Tribulations: Courts, Ethnography, and the Need for an Evidentiary Privilege for Academic Researchers."  The Pacific Sociological Association Conference. San Francisco, CA. April, 1995.

"Police Interrogation: Empirical Observations, Legal Questions, Ethical Dilemmas." University of Colorado, Boulder School of Law.  Faculty Colloquium.  February, 1995.

"Violence, Civility and Social Change: The Case of American Police Interrogation in the Twentieth Century."  University of Minnesota, Minneapolis.  Department of Sociology. Faculty Colloquium.  January, 1995.

1994    "Westville Revisited: A Contemporary Analysis of Order, Legality, and Crime Detection." American Society of Criminology Conference.  Miami, FLA, November, 1994.

56

"The Sociologist as Detective: Reflections on the Methodology and Ethics of Fieldwork Inside the Police Interrogation Room."   University of California, Los Angeles.  Department of Sociology. October, 1994.

"The Historical Sociology of the Third Degree in America: Analyzing the Rise and Fall of a Violent Social Practice."  American Sociological Association Conference.  Los Angeles, CA.  August, 1994.

"The Impact of *Miranda* Revisited: Analyzing an Old Question with New Data."  Law & Society Association Conference.  Phoenix, AZ, June, 1994.

"Police Interrogation as a Confidence Game."  Western Society of Criminology Conference.  Berkeley, CA, February, 1994.

1993   "Inside the Interrogation Room: A Participant Observation Study of Custodial Police Questioning."  American Society of Criminology Conference.  Phoenix, AZ, October, 1993.

"How to More Effectively Elicit Confessions." Presentation to the Hayward Police, CA Department, Criminal Investigation Division. August, 1993.

"Violence, Civility and Institutional Change: The Case of American Police Interrogation."  University of Colorado, Boulder.  Department of Sociology.  Faculty Colloquium.  January, 1993.

1992   "Criminal Interrogation and Confessions Revisited: An Analysis and Critique of Inbau and Reid's Police Training Manuals and Courses." American Society of Criminology Conference.  New Orleans, LA, November, 1992.

"Police Interrogation and Social Control."  Law and Society Association Conference.  Philadelphia, PA, May, 1992.

1991   "From Coercion to Deception: An Empirical Analysis of the Changing Nature of Police Interrogation in America."  American Society of Criminology Conference.  San Francisco, CA.  November, 1991.

"The Ethics of Deceptive Interrogation" (with Jerome H. Skolnick).  University of California, Berkeley, School of Law.  Faculty Colloquium. September, 1991.

"The Social Psychology of Coerced-Internalized False Confessions" (with Richard J. Ofshe).  American Sociological Association Conference. Cincinnati, OH, August, 1991.

"Research on Police Interrogation: Some Thoughts and Questions About the Permissible Limits of Deception."  University of California, Berkeley.  Jurisprudence and Social Policy Program, Friday Forum.  May, 1991.

## LEGISLATIVE, JUDICIAL AND EXECUTIVE TESTIMONY

New York State Justice Task Force on Wrongful Convictions (2011)
Texas Court of Criminal Appeals. Criminal Justice Integrity Unit (2009)
California Commission on the Fair Administration of Justice (2006)
Wisconsin Criminal Justice Study Commission (2006)
The Illinois House of Representatives (1999)

## GRANTS AND FELLOWSHIPS

Stanford University, Center for the Advanced Study in the Behavioral Sciences (2014-2015)
Guggenheim Foundation (2011-2012)      Open Society Institute (2004-2005, 2008)
National Science Foundation (2005-2006)   Univ. of California, Irvine (1998-2002)
MacArthur Foundation (1992-1993)       Univ. of Colorado, Boulder (1994-1996)

## COURSES TAUGHT

**LAW**

Criminal Procedure
Criminal Law
Wrongful Convictions
White Collar Crime

**GRADUATE**

Miscarriages of Justice
Police Organization and Behavior
Police Scandal and Misconduct
Topics in Criminology

**UNDERGRADUATE**

Introduction to Criminology, Law and Society
Interrogation, Confession and the Law
Miscarriages of Justice
Influence, Memory and the Law
Topics in Criminology
Criminal Justice in the United States: An Introduction
American Criminal Justice System: Advanced Overview
Critical Thinking
Sociology of Law
Police, Law and Society
Police Interrogation and False Confessions
Sociology of White-Collar Crime

## POLICE INTERROGATION TRAINING (GIVEN)

2/03   Taught 8-hour training course on interrogation methods, psychological coercion and false confessions for felony investigators in the Miami Beach Police Department.  Miami Beach, FL.

7/02   Taught three 8-hour training courses on interrogation methods, psychological coercion and false confessions for felony investigators in the Broward County Sheriff's Office.  Ft. Lauderdale, FL.

9/00   Taught a full-day training session on interview and interrogation to the Cyprus Police as part of their training program in the Ministry of Justice and Public Order.  Republic of Cyprus. Nicosia, Cyprus.

7/00    Taught training seminar on obtaining truthful confessions and avoiding coerced and/or false confessions to the Law Enforcement Coordinating Committee for the Fifth Circuit.  San Antonio, TX.

## POLICE INTERROGATION TRAINING (RECEIVED)

3/93    Attended and participated in one-week advanced interrogation training course taught by the Federal Law Enforcement Training Center (FLETC).  Glynco, Georgia.  Received certificate.

1/92    Attended and participated in one-week interrogation training course taught by the San Mateo Community College, Administration of Criminal Justice Department.  San Mateo, California.  Received certificate.

11/91   Attended and participated in two-day advanced interrogation training course taught by Reid &Associates.  San Francisco, California.  Received certificate.

3/91    Attended and participated in three-day introductory interrogation training course taught by Reid & Associates.  Los Angeles, California.  Received certificate.

12/90   Attended one-day in-house interrogation training course for Sergeants.  Criminal Investigation Division, Oakland Police Department.  Alameda, California.

## OTHER LAW ENFORCEMENT RELATED SERVICE WORK

10/01-6/03    Member, Academic Education and Action Research Advisory Committee to the Chief of Police, Long Beach Police Department.  Long Beach, CA.

5/84-8/84    Voluntary Internship.  San Francisco District Attorney's Office, Consumer Fraud Division.  San Francisco, CA.

## PROFESSIONAL ACTIVITIES (SELECTIVE)

Editorial Board, *Wrongful Conviction Law Review* (2019-Present)
Editorial Board, *Journal of the Forensic Social Sciences* (2019-Present)
Editorial Board, *Behavioral Sciences and the Law* (2017-Present)
Editorial Board, *Law and Society Review* (1998-2002)

Peer Reviewer, Journals:

*Frontiers in Psychology* (2021)
*Law & Human Behavior* (2005-2006, 2008-2009; 2012-2013; 2017-2021)
*Psychology, Public Policy and Law* (2013-2014, 2019-2021)
*Behavioral Sciences & the Law* (2014, 2017-2020)

59

*Criminology and Public Policy* (2007, 2018-2019)
*Crime, Media and Culture* (2019)
*New Criminal Law Review* (2018)
*Law & Human Behavior* (2005-2006, 2008-2009; 2012-2013; 2017-2018; 2020)
*Law & Society Review* (1996-2000; 2002-2003; 2012; 2014; 2016; 2018)
*Journal of Quantitative Criminology* (2017)
*Law & Social Inquiry* (1997-1998; 2001; 2005; 2013; 2017)
*The Journal of Applied Research in Memory and Cognition* (2017)
*New Criminal Law Review* (2017)
*The American Psychologist* (2016)
*Stanford Law Review* (2015)
*Philosophy, Science and Law* (2014)
*Journal of the American Academy of Psychiatry and the Law* (2014)
*Current Directions in Psychological Science* (2014)
*Justice Quarterly* (1998, 2000, 2005, 2009, 2013)
*Sociological Quarterly* (1998, 2013)
*American Journal of Criminal Justice* (2013)
*Journal of Law and Courts* (2012)
*British Journal of Sociology* (2012)
*Basic and Applied Social Psychology* (2011)
*Psychology, Crime and Law* (2009)
*Regulation and Governance* (2009)
*Journal of Criminal Justice* (2000, 2006, 2008)
*Legal and Criminological Psychology* (2006)
*Journal of Law, Economics & Organization* (2005)
*Psychological Science* (2004)
*Psychological Science in the Public Interest* (2004)
*Law, Culture and the Humanities* (2004)
*Queen's Law Journal* (2004)
*Criminal Justice Ethics* (2003)
*Criminology* (2001-2002)
*Research in Crime & Delinquency* (1995, 1999)
*Sociological Forum* (1998-1999)
*Journal of Criminal Law and Criminology* (1996)
*Studies in Law, Politics and Society* (1996)
*Social Problems* (1996)
*American Journal of Sociology* (1995)

Peer Reviewer, Book Manuscripts:

*University of California Press* (2014, 2017, 2021)
*Oxford University Press* (2013-2014; 2020)  *Routledge, Taylor & Francis* (2020)
*New York University Press* (2006-2007, 2011-2012, 2015, 2017, 2019)
*Rowman and Littlefield Publishers* (2018)   *Hope and Life Press Books* (2017)
*Sunbury Press* (2017)                        *Ankerwycke Books* (2016)

60

*Lexington Books* (2011)  *Princeton University Press* (2008)
*University of Arizona Press* (2008)  *Cornell University Press* (2006)
*University of Michigan Press* (2005)  *AltaMira Press* (2004)
*University of Chicago Press* (2004)  *Academic Press* (2003)
*Aspen Publishers, Inc.* (2000)  *Northeastern University Press* (1999)

Tenure and Promotion Reviews:

Virginia Commonwealth University, Department of Criminal Justice (2018)
St. Joseph's University, Department of Sociology and Criminal Justice (2018)
University of Ottawa, Faculty of Social Sciences (2017)
University of California, Riverside, Department of Psychology (2016)
University of Pittsburgh, School of Law (2015)
University of North Carolina, Greensboro, Department of Sociology (2015)
Roger Williams University, Department of Psychology (2015)
Emory University, Department of Psychology (2014)
Arizona State University, School of Criminology and Criminal Justice (2014)
University of Washington, School of Law (2013)
John Jay College of Criminal Justice (New York), Department of Psychology (2010)
UC Hastings College of Law, San Francisco, CA (2010)
University of Nevada, Reno, Department of Psychology (2004)
University of California, Berkeley, School of Law (2004)
Lafayette College (Pennsylvania), Department of Sociology (2003)
Northwestern University School of Law (2002)
Franklin and Marshall College (Pennsylvania), Department of Sociology (2001)

## **PROFESSIONAL MEMBERSHIPS**

American Law Institute  American Society of Criminology
American Psychological Association  American Psychology-Law Society
Association for Psychological Science  Law and Society Association
Academy of Criminal Justice Sciences  Association of American Law Schools
Society for the Study of Social Problems  The American Sociological Association
Pacific Sociological Association  Western Psychological Association
Western Society of Criminology  International Investigative Interviewing Research Group

## **CONSULTATIONS (SELECTIVE)**

Law Enforcement

Pima County District Attorney's Office, Conviction and Sentence Integrity Unit (2021-Present)
San Francisco District Attorney's Office, Innocence Commission (2021-Present)
U.S. Department of Justice, Criminal Section, Civil Rights Division (2020-2021)
Lawrence County Prosecutor's Office, Ironton, Ohio (2020)
Seattle Community Police Commission, Seattle, WA (2018)

61

Tempe Police Department, Tempe, AZ (2018)
State of California, Department of Justice, San Diego, CA (2002-2004; 2013)
Maricopa County Sheriff's Office, Phoenix, AZ (2011)
Riverside County Sheriff's Association, Riverside, CA (2006)
Solicitor's Office, State of South Carolina, Seventh Judicial Circuit (2005)
Wyoming Association of Correctional Employees (2005)
Miami Beach Police Department, Miami Beach, FLA (2003)
Broward County Sheriff's Office, Ft. Lauderdale, FLA (2002)

Legislative, Judicial and Executive Organizations

New York State Justice Task Force on Wrongful Convictions (2011)
Texas Criminal Justice Integrity Unit (2009)
California Commission on the Fair Administration of Justice (2006)
Wisconsin Criminal Justice Study Commission (2006)
Illinois State Legislature, Task Force on Recording of Interrogations (1999-2000)

Innocence Projects and Universities (Selective)

MacArthur Justice Center, Northwestern University Law School. Chicago, IL (2009-2011; 2013; 2015-Present)
Northern California Innocence Project, Santa Clara University Law School (2004-2005; 2014-Present)
The Exoneration Justice Clinic, Notre Dame School of Law. South Bend, IN (2019-Present)
The Exoneration Project, University of Chicago School of Law (2018-2020)
Innocence Project, Cardozo Law School. New York, NY (1999-2000, 2009; 2012; 2017, 2019)
Northeastern University Law School Innocence Project. Boston, MA (2018)
The Exoneration Initiative.  New York, NY (2015-2017)
Minnesota Innocence Project.  Minneapolis, MN (2011-2016)
University of Oklahoma Innocence Project (2012-2015)
Midwest Innocence Project, Kansas City, Missouri (2014)
Pennsylvania Innocence Project, Philadelphia, PA (2014)
University of Wisconsin Innocence Project (2006; 2011-2014)
PACE University Law School Post-Conviction Criminal Defense Clinic. White Plains, NY (2010-2013)
University of California Davis School of Law, Immigration Clinic (2011-2012)
American University, Preventing Wrongful Convictions Project, Washington D.C. (2011-2013)
Centurion Ministries, Princeton, NJ (1998-2011)
Center for Wrongful Conviction, Northwestern University School of Law.  Chicago, IL (2011)
George Washington University, Preventing Wrongful Convictions Project. Washington, DC (2010-2011)
Mid-Atlantic Innocence Project, George Washington University School of Law, Washington, D.C. (2008-2010)
Downstate Illinois Innocence Project, University of Illinois (2008-2010)
Ohio Innocence Project, University of Cincinnati Law School (2007-2010)
Bluhm Legal Clinic, Northwestern University School of Law.  Chicago, IL (2008-2010)

Innocence Project Northwest, University of Washington Law School. Seattle, WA (1998-1999; 2005-2006; 2008-2010)
MacArthur Justice Center, University of Chicago Law School (1999; 2005-2006)
Innocence Project, Osgoode Hall Law School, York University. Toronto, Ontario (2000)

Law Firms (Selective)

Cheshire Parker Schneider, PLLC, Raleigh, NC (2021)
Brown, Goldstein & Levy, Baltimore, MD (2021)
Morrison & Foerster LLP, San Francisco, CA (2020-Present)
Debevoise & Plimpton, LLP, New York, NY (2020-Present)
Riley, Safer, Holmes & Cancila LLP, Chicago, IL (2020-Present)
Meyer, Shaffer & Stephans, PLLP. Missoula, MT (2016-Present)
Loevy & Loevy, LLP, Chicago, IL (2012-2013; 2015-Present)
Drinker, Biddle & Reath LLP, Princeton, NJ (2011-Present)
Squire, Patton and Boggs LLP, New York, NY (2009-Present)
Hogan Lovells LLP, Washington D.C. (2019-2021)
Skadden, Arps, Slate, Meagher & Flom LLP, Washington, D.C. (2014-2021)
Sidley Austin LLP, Chicago, IL (2009-2014; 2020-2021)
Morgan, Lewis and Bockius LLP, Chicago, IL (2012-2013; 2019-2020)
Innocence Legal Team, Walnut Creek, CA (2011-2012; 2015-2017; 2018-2019)
Tyson and Mendes LLP, San Diego, CA (2018-2019)
Neufeld, Scheck and Brustin, LLP, New York, NY (2013-2014; 2016-2019)
Riordan & Horgan, San Francisco, CA (2014-2018)
Cuomo, LLC, New York, New York (2016-2018)
The Valorem Group, Chicago, IL (2015-2017)
Arnold & Porter Kaye Scholer LLP, New York, New York (2017)
Sideman Bancroft LLP, San Francisco (2015-2016)
Venable LLP, Washington D.C. (2007-2016)
Carpenter, Lipps & Leland LLP, Columbus, OH (2016)
Arent Fox, LLP, Los Angeles, CA (2015-2016)
Rudolf, Widenhouse and Fialko, Charlotte, NC (2015)
Kirkland & Ellis, LLP, Washington, DC (2013-2014)
Bingham McCutchen LLP, Boston, MA (2005-2014)
Beldock, Levine & Hoffman, LLP, New York, NY (2004-2014)
Goodwin Procter LLP, Boston, MA (2012-2013)
Williams & Connolly LLP, Washington, D.C. (2011-2012)
Reed Smith, New York, NY (2011-2012)
Fredrikson & Byron, P.A., Minneapolis, MN (2009-2012)
McGwire Woods LLP, Richmond, VA (2011)
Lane Powell, Seattle, WA (2008-2010)
Paul, Weiss, Rifkind, Wharton & Garrison LLP (2009-2010)
Sidley & Austin LLP, San Francisco, CA (2009)
Weil, Gotshal & Manges LLP, New York, N.Y. (2009)
Kirkland & Ellis LLP, New York, N.Y. (2008-2009)

63

Cochran, Neufeld, and Scheck LLP, New York, N.Y. (2003-2009)
Holland & Knight LLP, New York, NY (2004-2005, 2007-2009)
Goodwin Proctor LLP, New York, N.Y. (2008-2009)
Covington & Burling LLP, Washington, D.C. (2006)
O'Melveny & Myers LLP Los Angeles, CA (2003, 2005-2006)
Kelley, Drye & Warren LLP, New York (2006)
Joseph, Greenwald & Laake, PA, Greenbelt, Maryland (2005-2006)
Tamburello & Hanlon, San Francisco, CA (2005)
Hallinan, Wine & Sabelli, San Francisco, CA (2003)
Jenner & Block, Chicago, IL (2000-2001)
Jackson Walker LLP, Houston, TX (2000)
Day, Berry and Howard LLP, Hartford, CT (1999-2000)

Other (Selective)

The Anthony Graves Foundation, Houston, Texas (2021)
Norwegian Centre for Human Rights, University of Oslo (2019-Present)
Center for Human Rights and Humanitarian Law, American University (2019-Present)
Association for Prevention of Torture (2019)
Original Productions, LLC (2016, 2018)
Bay Area Book Festival (2016)
Government of Mexico (2014)
NAACP Legal Defense Fund (2007-2009)
*Good Morning America.* ABC, New York, New York (2009)
Equal Justice Institute, Montgomery, ALA (2001-2004)
Beverly Monroe Coalition for Justice, Richmond, VA (1997-2003)
*Sixty Minutes*, CBS, New York, NY (2003)

## EXPERT WITNESS TESTIMONY (SELECTED CASES)

*United States v. Gregg Bigda.* Springfield, MA (2021)
*Henry Lee McCollum et al v. Robeson County et al.* Raleigh, NC (2021)
*State of California v. Daljit Atwal et al*. Modesto, CA. (2019)
*United States v. Hayad Hamat.* Sacramento, CA. (2018)
*State of California v. Gina Bailey*. Fairfield, CA. (2017)
*State of New York v. Selwyn Days*. White Plains, NY. (2017)
*James Dean et al v. Richard Smith et al*. Lincoln, Nebraska. (2016)
*Danial Williams et al. v. State of Virginia.* Richmond, Virginia. (2015)
*State of Tennessee v. Jimmy Rauhuff.* Maryville, TN. (2014)
*State of Wyoming v. John Balczewski.* Cheyenne, Wyoming. (2012)
*State of Oregon v. Angelica Swartout.* Eugene, Oregon. (2012)
*United States vs. Clifton Yarborough.* Washington, D.C. (2012)
*State of Washington v. Ted Bradford*. Yakima, WA. (2010)
*State of Wisconsin v. Brendan Dassey*. Manotowec, Wisconsin. (2010)
*United States vs. Debra Milke*. Phoenix, AZ. (2010)

*State of Arizona v. Daphne Henry.*  Flagstaff, AZ. (2009)
*State of Missouri v. Ryan Ferguson.*  (2008)
*State of Alaska v. Eugene Vent.*  Anchorage, Alaska. (2008)
*State of Arkansas v. Kenneth Osborn.*  Hamburg, Arkansas. (2008)
*State of California v. James Dees.*  Los Angeles, CA. (2007)
*State of Montana v. Barry Beach.*  Deer Lodge, Montana. (2007)
*United States v. Matthew Joyce.*  San Diego, CA. (2006)
*State of Wisconsin v. Beth LaBatte.*  Appleton, WI. (2006)
*Earl Washington v. Kenneth Buraker et al.*  Charlottesville, VA. (2006)
*State of Iowa v. Juan Macias.* Sioux City, Iowa. (2005)
*State of California v. Richard Tuite.*  San Diego, CA. (2004, 2013)
*State of Alabama v. Medell Banks.* Butler, Alabama.  (2003)
*State of California v. Robert Lee Salazar.*  Pomona, CA.  (2002)
*Beverly Monroe v. State of Virginia.* Richmond, Virginia.  (2000)
*State of Connecticut v. Richard Lapointe.* Hartford, CT. (2000)
*State of California v. Kenneth Cowling.*  Alameda County Superior Court. (2000)
*State of Washington v. Doris Green.* Wenatchee, Washington. (1999)
*State of Connecticut vs. David Saraceno.* Middletown, Connecticut. (1998)


**References Available on Request**

**CASES IN WHICH DR. RICHARD LEO HAS BEEN QUALIFIED AND TESTIFIED**
**January, 2018-January, 2022**

**EXPERT WTINESS TESTIMONY – Pre-Trial Hearings, Trials and Post-Conviction Hearings**

*United States v. Hayad Hamat*. Post-Conviction Hearing. Federal Court. United States District Court. Eastern District of California. 9th Circuit. Sacramento, CA. January, 2018.

*United States v. Lonnie Armachain*. Pre-trial Suppression Hearing. Federal Court. United States District Court. Western District of North Carolina. 4th Circuit. Asheville, North Carolina. February, 2018.

*State of California v. Quillar Evans*. Trial. Sacramento County Superior Court. Sacramento, CA. March, 2018.

*State of Colorado v. Michael Blagg*. Trial. Jefferson County District Court. Golden, CO. March, 2018.

*United States v. Bahtiyor Jumaev*. Trial. Federal Court. United States District Court. Denver, Colorado. April, 2018.

*State of Arizona v. Adrian Ponce*. Suppression Hearing. Maricopa County Superior Court. Phoenix, AZ. April, 2018.

*State of Ohio v. Aaron Robertson*. Suppression Hearing. Cuyahoga County Court of Common Pleas. Cleveland, Ohio. May, 2018.

*State of Illinois v. Michael Burgund*. Trial. Madison County Circuit Court. Edwardsville, Illinois. May, 2018.

*State of California v. Timothy Mays*. Suppression Hearing. Riverside County Superior Court. I Indio, CA. May, 2018.

*State of California v. Timothy Mays*. Trial. Riverside County Superior Court. Indio, CA. June, 2018.

*State of California v. Michael O'Donnell*. Trial. San Diego County Superior Court. El Cajon, CA. August, 2018.

*State of California v. Manuel Dominguez*. Suppression Hearing. Kern County Superior Court. Bakersfield, CA. October, 2018.

*State of California v. Christian Burton*. Trial. Alameda County Superior Court. Oakland, CA. October, 2018.

*State of Montana v. Ryan Lamb*.  Suppression Hearing.  Flathead County District Court. Kalispell, Montana.  December, 2018.

*State of California v. Chloe James*.  Trial.  Solano County Superior Court.  Fairfield, CA. December, 2018

*State of California v. Manuel Dominguez*.  Suppression Hearing (Re-Trial).  Kern County Superior Court.  Bakersfield, CA.  January, 2019

*State of California v. James Rickleffs*.  Suppression Hearing.  San Francisco County Superior Court.  San Francisco, CA.  January, 2019

*Armando Nieves v. United States*.  Trial (Civil).  Federal Court. United States District Court, District of Arizona.  Tucson, Arizona.  January, 2019

*State of California v. Benito Regalado*.  Suppression Hearing. Monterey County Superior Court. Salinas, CA.  March, 2019.

*State of California v. Amarjit Singh*.  Suppression Hearing.  Solano County Superior Court. Fairfield, CA.  April, 2019.

*State of California v. Daljit Atwal et al*.  Trial.  Stanislaus County Superior Court.  Modesto, CA.  May, 2019.

*State of California v. Curtis Leonard*.  Suppression Hearing.  Tuolumne County Superior Court.  Sonora, CA.  May, 2019.

*In the Matter of Michael Wright*.  Administrative trial.  Division of Occupational Licensing, Department of Commerce, State of Utah.  Salt Lake City, Utah. May, 2019.

*State of Montana v. Ryan Lamb*.  Trial.  Flathead County District Court.  Kalispell, Montana. June, 2019.

*State of Arizona v. Gary Worrell*.  Trial.  Yavapai County Superior Court.  Prescott, AZ.  July, 2019.

*United States v. Joseph Jumper*.  Pre-trial Suppression Hearing. Federal Court.  United States District Court. Western District of North Carolina. 4th Circuit. Asheville, North Carolina. August, 2019.

*State of California v. Gerardo Cerna*.  Suppression Hearing.  Monterey County Superior Court. Salinas, CA.  August, 2019.

*State of California v. Alejandro Benitez*.  Suppression Hearing.  Santa Clara County Superior Court.  San Jose, CA.  August, 2019.

2

*United States v. M.M.J.  Suppression Hearing*.  United States District Court for the Eastern District of North Carolina.  Raleigh, NC.  September, 2019.

*State of Ohio v. Michael Ferricci*.  Trial.  Cuyahoga County Court of Common Pleas. Cleveland, OH.  March, 2020.

*State of California v. Nicholas James*.  Suppression Hearing. Yuba County Superior Court. Marysville, CA.  March, 2020

*State of California v. Anthony Garcia*. Suppression Hearing. Orange County Superior Court. Santa Ana, CA.  July, 2020.

*United States v. K.I.W.  Suppression Hearing*.  United States District Court for the Eastern District of North Carolina.  Raleigh, NC.  July, 2020.  (Video Link).

*State of California v. Anthony Garcia*. Trial. Orange County Superior Court. Santa Ana, CA. July, 2020.

*State of California v. Herbert Mendez*.  Suppression Hearing.  Orange County Superior Court. Indio, Ca. November, 2020.

*Lavelle Jones v. City of Albany et al.* and *Carl Dukes v. City of Albany et al.*  Trial. New York State Court of Claims.  Civil.  Albany, NY.  March, 2021.

*State of California v. Anthony Garcia*. Trial. Orange County Superior Court. Santa Ana, CA. March, 2021.

*Henry Lee McCollum et al v. Robeson County et al.* (Civil). Trial United States District Court. Eastern District of North Carolina.  Federal Court.  Raleigh, North Carolina.  May, 2021

*State of California v. Jeffrey Eastman*.  Trial. Stanislaus County Superior Court.  Modesto, CA. May, 2021.

*State of Nevada v. Anita Rohr*.  Suppression Hearing.  Washoe County Superior Court.  Reno, Nevada. August, 2021

*State of Nevada v. Anita Rohr*.  Trial.  Washoe County Superior Court.  Reno, Nevada. September, 2021

*State of Missouri v. Jeremy Simmons*.  Trial.  Jackson County Superior Court.  Independence, Missouri.  September, 2021

*State of California v. Josiah Ramey*.  Trial.  Riverside County Superior Court.  Riverside, CA. November, 2021.

3

*United States v. Gregg Bigda*. Trial. United States Federal District Court for the District of Massachusetts. 1st Circuit. Springfield, MA. December, 2021. (Prosecution).

*United States v. Kathleen Richard*. Suppression Hearing. Military Court, United States Coast Guard. Norfolk, VA. December, 2021.

## DEPOSITIONS

*Daniel Taylor v. City of Chicago et al.* (Civil). February 9, 2018

*Art Tobias v. City of Los Angeles et al*. (Civil). July 10, 2018.

*Jane JBR Doe v. Neighborhood House Association*. (Civil). May 6, 2019.

*Jesus Flores v. City of Bakersfield* (Civil). July 29, 2019

*Joel Alcox v. City of Lompoc et al*. (Civil). December 9, 2019.

*Henry Lee McCollum et al v. Robeson County et al.* (Civil). June 5, 2020.

*William Amor v. Naperville Police Officer Michael Cross et al* (Civil). April 12, 2021.

*Nickie Miller v. Montgomery County et. al* (Civil). May 20, 2021.

*Arthur Brown v. City of Chicago et al.* (Civil). August 17, 2021