*DeLeon-Reyes v. Guevara, et al.*
Case No. 18 CV 01028

*Solache v. Guevara, et al.*
Case No. 18 CV 02312

# EXHIBIT 3

Case:        Derrick Flewellen
Year:        1995
Report Page:   78
Area 3

## Summary in Leo Report:

Derrick Flewellen (1995): Detective Boudreau and other Area 3 detectives interrogated Derrick Flewellen for more than 36 hours during which they slapped, kicked, and punched him until he signed a false confession. Flewellen was exonerated based on DNA evidence after serving close to five years in prison (Complaint, Derrick Flewellen v. City of Chicago, et al.; PTP-D-FLEWELLEN-000001-000015).

## Materials Provided Supporting Summary In Report:

| Description | Bates Range |
| --- | --- |
| Complaint in Derrick Flewellen v. City of Chicago, et al | PTP-D-FLEWELLEN-000001-000015) |

## Evidentiary Support for Summary:

### A. Evidence of Coercion and Abuse

- In a complaint filed in 2000, Derrick Flewellen alleged that in November 1995, the Chicago Police Department including Detectives Boudreau and Halloran took him from the hospital where he was being treated for a foot injury and was in severe pain. ( PTP-D-FLEWELLEN-
- 00002-3.)
- Flewellyn gave an inculpatory statement regarding two separate murders after being interrogated for more than 48 hours. (PTP-D-FLEWELLEN-
- 000003-4.)
- Flewellen alleged that Chicago Police Officers Boudreau and Valadez knocked Flewellen down, choked him, stomped his injured foot and slammed a metal chair into it, kicked him, denied him pain medication for his foot, and hit him in the face. (PTP-D-FLEWELLEN-
- 000004-6).

### B. Evidence of Notice to the City of Chicago

- The City was given notice of Flewellen's allegations of torture during hearing on his motions to suppress his inculpatory statement in March 1997 and November 1998. (PTP-D-FLEWELLEN-000008).

**LEO 002268**

- As of at least November 30, 1999, the City had notice of the evidence exculpating Flewellen and establishing the falsehood of his inculpatory statements with scientific evidence.
- In 2000, the City was given notice of Flewellen's allegations of coercion and torture through his civil lawsuit against them.

## C. Evidence of Innocence

- Forensic evidence showed that one victim had no semen on her body whereas Flewellen's allegedly coerced statement said that he raped her.
- DNA testing of semen from the other victim was matched to a serial killer, not to the person identified as a co-perpetrator in Flewellen's allegedly false statement. (PTP-D-FLEWELLEN-000002, 08.)
- A Judge found Flewellen not guilty of both murders on November 30, 1999. (PTP-D-FLEWELLEN-000008.)

LEO 002269

Case: Clayborn Smith (See new opinion)
Year: 1992
Report Page: 81
Area 3

**Summary in Leo Report:**

Detective Boudreau and other Area 3 detectives hit Smith in the face and head, punched him in the ribs, grabbed his neck, pulled his hair and pulled his finger back until he falsely confessed to a murder (Complaint, Clayborn Smith v. City of Chicago et al., June 19, 2003; PTP-C SMITH-000001-000010).

**Materials Provided Supporting Summary In Report:**

| Description | Bates Range |
| --- | --- |
| Complaint, Clayborn Smith v. City of Chicago et al., June 19, 2003 | PTP-C SMITH-000001-000010 |
| State v. Smith, No. 92 CR 25596 (1st Dist. 2022). | |

**Evidentiary Support for Summary:**

### A. Evidence of Coercion and Abuse

According to the complaint, Detectives Boudreau, Halloran, and other officers forcibly entered Smith's apartment by force, arrested him without a warrant for the murder of Miller Tims and Ruby Bivens, and transported him to Area One. Complaint, Clayborn Smith v. City of Chicago et al., at 2 (Cir. Ct. Cook County June 19, 2003), No. PTP-C SMITH-000002.

According to the complaint, Smith denied any knowledge of the murders, and Officer Halloran smacked him. Complaint, Clayborn Smith v. City of Chicago et al., at 2 (Cir. Ct. Cook County June 19, 2003), No. PTP-C SMITH-000002. According to the appellate opinion, Smith testified at the suppression hearing that Officer Halloran screamed in his face when Smith denied his involvement in the shooting. State v. Smuth, No. 92 CR 25596, at ¶ 18 (1st Dist. 2022).

According to the complaint, the Detectives placed Smith in a windowless room, handcuffed him to the wall, yelled at, called a liar for providing an alibi, and he was kicked and smacked by Officer Halloran. Complaint, Clayborn Smith v. City of Chicago et al., at 2 (Cir. Ct. Cook County June 19, 2003), No. PTP-C SMITH-000002.

According to the complaint and appellate opinion, Detective Boudreau threatened to charge Smith's pregnant girlfriend with the murder if Smith did not confess. Complaint,

**LEO 002270**

Clayborn Smith v. City of Chicago et al., at 3 (Cir. Ct. Cook County June 19, 2003), No. PTP-C SMITH-000003; State v. Smuth, No. 92 CR 25596, at ¶ 20 (1st Dist. 2022). According to the complaint, Detective Boudreau told Smith that Officer Halloran was abusing Smith's girlfriend in another room. Complaint, Clayborn Smith v. City of Chicago et al., at 3 (Cir. Ct. Cook County June 19, 2003), No. PTP-C SMITH-000003.

According to the complaint, Smith requested counsel and remained silent during the interrogation. Complaint, Clayborn Smith v. City of Chicago et al., at 3 (Cir. Ct. Cook County June 19, 2003), No. PTP-C SMITH-000003.

According to the complaint and appellate opinion, Officer Halloran pulled Smith's hair, smacked his head, punched him, took his shoes, socks, and other personal items, and left Smith barefoot on the floor for approximately 37 hours. Complaint, Clayborn Smith v. City of Chicago et al., at 3 (Cir. Ct. Cook County June 19, 2003), No. PTP-C SMITH-000003; State v. Smuth, No. 92 CR 25596, at ¶ 21 (1st Dist. 2022).

According to the complaint, Detective Boudreau promised to help Smith if he confessed to an Assistant State's Attorney. Complaint, Clayborn Smith v. City of Chicago et al., at 3 (Cir. Ct. Cook County June 19, 2003), No. PTP-C SMITH-000003.

## B. Evidence of Notice to the City of Chicago

According to the complaint, Assistant State's Attorney Rosenblum attempted to get Smith to confess during the interrogation, left Smith in the room to "think about what [Rosenblum] said," and Officer Halloran came back into the room and punched Smith. Complaint, Clayborn Smith v. City of Chicago et al., at 3 (Cir. Ct. Cook County June 19, 2003), No. PTP-C SMITH-000003.

According to the complaint and appellate opinion, Assistant State's Attorney Laura Lamber was present when Detective Boudreau grabbed plaintiff around the neck and dragged him to an interview room. Complaint, Clayborn Smith v. City of Chicago et al., at 4 (Cir. Ct. Cook County June 19, 2003), No. PTP-C SMITH-000004; State v. Smuth, No. 92 CR 25596, at ¶ 26 (1st Dist. 2022).

According to the complaint, Assistant State's Attorney Laura Lamber was present when Officers O'Brien and Halloran held Smith, pulled his hair, punched him, and pulled his fingers back to make Smith confess. Complaint, Clayborn Smith v. City of Chicago et al., at 4 (Cir. Ct. Cook County June 19, 2003), No. PTP-C SMITH-000004.

According to the appellate opinion, Smith provided numerous examples where individuals claimed abuse by the officers in the complaint and received payments from the City of Chicago under the Reparations for Burge Torture Victims Ordinance. State v. Smuth, No. 92 CR 25596, at ¶ 99 (1st Dist. 2022).

**LEO 002271**

Case:        Daniel Rodriguez and David Velasquez
Year:        1991
Report Page:    91
Area 5

### Summary in Leo Report:



*Both were beat and Threatened*

On the way to the police station after Mr. Rodriguez's arrest, Detective Guevara threatened that if Rodriguez did not cooperate and make it easy on himself, Detective Guevara would raid his house and frame his girlfriend. Detective Guevara's partner, Detective Halverson, beat Mr. Rodriguez during the interrogation. Detective Guevara then coerced Mr. Rodriguez into signing a false statement implicating himself in a murder. Detective Guevara also coerced sixteen year-old David Velasquez to implicate Mr. Rodriguez in the murder by beating and threatening him. Velasquez has given multiple sworn statements over the last three decades about Detective Guevara's and Detective Halvorsen's misconduct, beginning with Mr. Rodriguez's 1993 trial.

### Materials Provided Supporting Summary In Report:

| Description | Bates Range |
| --- | --- |
| Affidavit of Daniel Rodriguez | AR-L 147462-147466 |
| *Reynaldo Munoz v. State of Illinois*, Excerpt Report of Proceedings heard before the Honorable Sophia Atcherson, July 14, 2021 | AR-L 155313-155363 |

### Evidentiary Support for Summary:

#### A. Evidence of Coercion and Abuse

- Daniel Rodriguez, in a March 25, 2008 sworn affidavit, said that Guevara coached him into making a false confession, including using a map to show him the route that Rodriguez supposedly took as the driver in a shooting. Rodriguez further swore that Halvorsen put Rodriguez's car keys in front of him and told him that he could go home if he cooperated. Affidavit at AR-L 147465.
- Rodriguez also swore in that statement that Halvorsen struck him multiple times while he was handcuffed to a wall in the police station until Rodriguez broke down and told them he would do "whatever [they] want." Affidavit at AR-L 147465.
- Rodriguez also swore that Halvorsen brought him a typed statement to sign which was prepared before Rodriguez agreed to cooperate. Affidavit at AR-L 147465.

**LEO 002272**

- Rodriguez further swore that he photographed bruises on his chest from being struck by Halvorsen and sent them to his criminal defense attorney. Affidavit at AR-L 147465.
- In a court proceeding on July 14, 2021, Rodriguez testified consistently with the above. Transcript at AR-L 155330-155333 (physical violence by Halvorsen); 155335, 155340 (Halvorsen promised Rodriguez could go home if he cooperated, with Rodriguez's car keys sitting in front of him); 155335-155336 (Halvorsen told Rodriguez what to say and showed him "a piece of paper with what to say").

## B. Evidence of Notice to the City of Chicago

- In a court proceeding on July 14, 2021, Daniel Rodriguez testified that at his original criminal trial, David Velazquez testified that Guevara and Halvorsen forced him to make a statement against Daniel and a second person. Transcript at AR-L 155337.
- At that proceeding, Daniel recounted that at his original criminal trial he testified about Halvorsen beating him prior to his confession. Transcript at AR-L 155359.

## C. Evidence of Innocence

- See above - Evidence of Coercion and Abuse.

**LEO 002273**

## AREA 3

1) Frank Bounds

2) Alnoraindus Burton

3) Nevest Coleman and Derrll/Darryl Fulton

4) James Coston

5) Mark Craighead

6) Arnold Day

7) Fred Ewing and Darnell Stokes

8) Derrick Flewellen

9) Jerry Gillespie

10) Oscar Gomez, Eric Gomez and Abel Quinones

11) Harold Hill,m Dan Young and Peter Williams

12) Tyrone Hood and Wayne Washington

13) Joseph Jackson

14) Anthony Jakes

15) Ronald Kitchen, Marvin Reeves, and Eric Wilson

16) Anthony Lash

17) Alfozia Neal

18) Johnny Plummer

19) Tyrone Reyna, Nicholas Escamilla and Miguel Morales

20) Anthony Robinson

1

LEO 002274

21) Clayborn Smith

22) Johnny Walker and Phillip Walker

23) Kilroy Watkins

24) Marcus Wiggens, Demoni Clemon, Imari Clemon, Jesse Clemon, Dyez Clemon

25) Robert Wilson

LEO 002275

Case:         Frank Bounds
Year:         1987
Report Page:   77
Location:      Area 3

**Summary in Leo Report:**

Detective Kill hit Bounds on the head, tried to kick him in the groin, and threatened to bring Bounds' girlfriend into the case if he did not confess causing Bounds to falsely confess to a murder.

**Materials Provided Supporting Summary In Report:**

| Description | Bates Range |
| --- | --- |
| Supreme Court of Illinois Opinion - People v. Bounds, 171 Ill.2d 1, 29-30 (1995). | PTP-F BOUNDS-000001-000030 |

**Evidentiary Support for Summary:**

A. Evidence of Coercion and Abuse

- According to a 1995 Illinois Supreme Court opinion, Bounds stated at a suppression hearing in his criminal trial that Detectives William Foley and William Kelly denied his request to speak to an attorney following his arrest, and Kelly hit him on the forehead and tried to kick him in the groin when he denied knowing anything about the crimes. PTP-F BOUNDS-000013
- Per that opinion, Bounds also asserted that Detective Michael Kill threatened that Bounds's girlfriend would lose his job if he did not sign a statement, and all three detectives—Foley, Kelly, and Kill—promised that his girlfriend's name would not be released to the media if he signed a confession statement. PTP-F BOUNDS-000013
- Per that opinion, Bounds's girlfriend, Susan Mitchnick, testified that Detective Kill and another officer questioned her at her home about Bounds, and Kill threatened to run her name "through the mud" in the media. PTP-F BOUNDS-000013.

B. Evidence of Notice to the City of Chicago

- Per the above, the City was on notice of Frank Bounds's testimony regarding alleged physical abuse by William Kelly at the time of the suppression hearing in his criminal trial and prior to 1995.

C. Evidence of Innocence
- See evidence of coercion and abuse, above.

LEO 002276

Area 3

Case:  Alnoraindus Burton
Year:  1992
Report Page:  77

**Summary in Leo Report:**

Detective Kill kicked Burton in the groin, slammed his head against the wall, slapped him across the face, and told him he could kill him causing Burton to falsely confess. (PTP-NOTICE-000829-000842; PTP-A BURTON-000001-000009)

**Materials Provided Supporting Summary In Report:**

| Description | Bates Range |
|---|---|
| Handwritten Complaint, Civil Rights §1893, Alnoraindus Burton, March 1992 | PTP-NOTICE-000829-000842 |
| Documented Burge Area 2 and 3 Torture Victims 1972-1991, Referencing Office of Professional Standards | PTP-A BURTON-000001-000009 |

**Evidentiary Support for Summary:**

### A. Evidence of Coercion and Abuse

According to the 1992 Complaint filed by Alnoraindus Burton and documentation of torture survivors in Burge Area 2 and 3, Detectives Kill and Kelly arrested and interrogated Burton regarding the homicide of Anthony Watkins around January 1989. PTP-NOTICE-000829-000842 at 4; PTP-A BURTON-000001-000009 at 12.

- According to the Complaint, one detective "pulled out a steel stick and threatened to hit [him] with it" and shortly after said "'I'm going to ask you what happened once [sic] more time then I'm going to bash your head in!'" PTP-NOTICE-000829-000842 at 5.
- According to the Complaint, a detective then hit Burton's right hand while it was handcuffed to a ring in the wall, hitting both his hands with the steel stick. PTP-NOTICE-000829-000842 at 5.
- The same detective then kicked Burton in the groin and legs, grabbed him by the neck and "bumped [his] head against the wall. PTP-NOTICE-000829-000842 at 6.
- He told Burton he "could kill [him] and tell everyone that he tried to reach at his gun and his partner shot [him]. PTP-NOTICE-000829-000842 at 6.
- The detective then "slapped [him] across [his] face const[antly] until [he] started crying for help". PTP-NOTICE-000829-000842 at 6.
- The detectives left him in the room overnight, came back the following night, removed his clothes, and then "opened the window in the middle of January" and

**LEO 002277**

left him there "with just [his] shorts on until the next day" when his clothes were returned by other officers PTP-NOTICE-000829-000842 at 6.

- Documentation also notes that during this time he was beaten with a phone book and had a gun put in his mouth and called "nigger". PTP-A BURTON-000001-000009 at 12.
- Burton's complaint also noted that he suffered a broken left wrist and swollen hands from being beaten with the steel stick. PTP-NOTICE-000829-000842 at 6.

## B. Evidence of Notice to the City of Chicago

The City of Chicago would have received notice when Burton filed his § 1983 Civil Rights complaint in March 1992.

## C. Evidence of Innocence

N/A

LEO 002278

Case:        James Coston
Year:        1988
Area:        Area 3
Report Page:   78

**Summary in Leo Report:**

Detective Kill struck him in the jaw, grabbed him around the neck and pushed him against the wall while questioning him about a murder (Coston was a witness in a murder case). PTP-J COSTON-000001-000003.

**Materials Provided Supporting Summary In Report:**

| Description | Bates Range |
|---|---|
| Excerpt from Kill Deposition | PTP-J COSTON-000001-000003 |

**Evidentiary Support for Summary:**

A. **Evidence of Coercion and Abuse**
- **Excerpt from Kill Deposition states:**
    - In August of 1988, Coston alleged that in an interview at Area 3 headquarters Kill struck Coston in the jaw and grabbed him around the neck and pushed him against the wall while questioning him about a murder. (PTP-J COSTON 000001)
    - Kill states that the only reason he can think of that Coston made allegations against Kill is because Coston's mother and the murderer's mother were best friends, and Coston did not substantiate the murderer's alibi. (PTP-J COSTON 00002)

B. **Evidence of Notice to the City of Chicago**
- **Excerpt from Kill Deposition states:**
    - Coston filed a Complaint Report #162922 [Exhibit 1 in the deposition]. (PTP-J COSTON 000001)
    - Kill signed a statement regarding the Coston complaint and gave it to OPS. (PTP-J COSTON 000003)

1
LEO 002279

Case:       Mark Craighead
Year:        1989
Area:        Area 3
Report Page:   78

**Summary in Leo Report:**

Detective Kill and other Area 3 detectives beat Craighead and deprived him of food and water until he falsely confessed. Photographs of Craighead taken after his interrogation depict his injuries (Summary Report Digest, Complaint register No. 166416, PTP-M Craighead- 000001-000004).

**Materials Provided Supporting Summary In Report:**

| Description | Bates Range |
|---|---|
| Complaint Register #166416 Summary Report Digest | PTP-M CRAIGHEAD 000001-4 |

**Evidentiary Support for Summary:**

  A. **Evidence of Coercion and Abuse**
  - **Complaint Register (July 6, 1989) states:**
    - Craighead alleged that on January 31, 1989, at 0700 hours, unknown detectives took him to Area #3 and 1) kept him there against his will until February 2, 1989; 2) deprived him of food and water; 3) beat him about the body. (PTP-M CRAIGHEAD 000001)
    - Craighead went to Cook County emergency room on February 3, 1989 at approximately 0600 hours, for treatment of injuries that he alleged were inflicted on him when he was kept at Area 3 for the past three days against his will. (PTP-M CRAIGHEAD 000002)
    - Photos of Mark Craighead taken on February 3, 1989 show bruises and marks on his back. It is not possible to determine from the photos if these are old or recent injuries. There is a photo of a laceration on Mark Craighead's foot. This does appear to be a recent injury. (PTP-M CRAIGHEAD 000002)
    - Commander of Area 3 Violent Crimes Lieutenant John Regan said that Mark Craighead …had free access to water while he was there and he assumed that Mark Craighead got his own food on January 31, 1989 since he was free to do what he wanted. (PTP-M CRAIGHEAD 000003)

1

**LEO 002280**

- ○ Lieutenant Regan stated that he did not know where Mark Craighead slept other than in a chair. (PTP-M CRAIGHEAD 000003)
- ○ There was not an arrest report made out for the time that Mark Craighead claimed to be detained at Area 3 and interrogated from January 31, 1989 to February 2, 1989. (PTP-M CRAIGHEAD 000002)

## B. Evidence of Notice to the City of Chicago

- **Complaint Register (July 6, 1989) states:**
  - ○ On February 3, 1989, at 0710 hours, Sergeant Kenneth Kudulis, star #2269, telephoned the Office of Professional Standards on the Pax and registered this complaint with Investigator Patrick Querfurth, star #72, on behalf of complainant.
  - ○ None of the detectives listed on the case report supplemental fit the description of the officer that Mark Craighead alleged beat him. It is recommended that this investigation be closed with a finding of "UNFOUNDED" against the identified detectives. (PTP-M CRAIGHEAD 000004)
  - ○ At this point it would not be in compliance with General Order 82-14 to continue this investigation. Therefore, the reporting investigator recommends that this investigation be terminated until such time that the complainant decides to cooperate and furnish this officer with sufficient information to re-open this investigation. (PTP-M CRAIGHEAD 000004)

LEO 002281

Case:          Nevest Coleman and Derrell/Darryl Fulton
Year:          1994
Report Page:   78
Area 3

**Summary in Leo Report:**

Coleman and Fulton allege that Detective Boudreau, Detective Halloran and another Area 3 detective punched Coleman in the face repeatedly until he falsely confessed. Fulton also alleged that he was punched in the face repeatedly, that a detective told him he would put a bullet in Fulton's brain if Fulton would not implicate himself in the crime, and that if he confessed he could go home and nothing bad would happen to anyone in his family. Coleman and Fulton were excluded from male DNA on the victim's underwear. *Third Amended Complaint, Derrell Fulton v. Geri Lynn Yanow et al.; PTP-D FULTON-000001-000086; Transcript of testimony of Nevest Colman, in State of Illinois v. Nevest Coleman, June 28, 1996; PTP-N COLEMAN-000001-00010*

**Materials Provided Supporting Summary In Report:**

| Description | Bates Range |
|---|---|
| Third Amended Complaint, *Derrell Fulton v. Geri Lynn Yanow et al* | PTP-D FULTON-000001-000086 |
| Transcript of testimony of Nevest Coleman, in *State of Illinois v. Nevest Coleman*, June 28, 1996 | PTP-N COLEMAN-000042-000105 <br><br> *PTP-N COLEMAN-000001-00010 (typo in Leo Report)* |

**Evidentiary Support for Summary:**

**A. Evidence of Coercion and Abuse**

- **Transcript from Coleman testimony on June 28, 1996** says
  - Coleman alleges that after he was put in the interview room, about eight officers came in to talk to Coleman about the homicide for which he was now in court. (PTP-N COLEMAN 000052)
  - Coleman alleges than an Unidentified Defendant Officer, described as a "short little white officer" (PTP-N COLEMAN 000061) falsely told Coleman that if he just answered their questions, he would be able to go home. (PTP-D FULTON 000008)
  - Coleman alleges that Coleman lied and told the State's attorney that he was treated well by the police because Garfinkel told him all he had to do

1

**LEO 002282**

is answer the questions: all he had to do was answer the questions. (PTP-N COLEMAN 000063)

- **Third Amended Complaint Says**
  - 30 minutes after being interrogated, an Unidentified Defendant Officer came into the room, called Coleman a "lying ass nigger," and then hit Coleman twice on the side of the head with a closed fist. (PTP-D FULTON-000008)
  - Later, a different Unidentified Defendant Officer falsely told Coleman that if he just answered their questions, he would be able to go home. (PTP-D FULTON 000008)
  - The Defendant officers and Defendant Garfinkel described a scenario for Coleman in which he, Plaintiff, and Eddie Taylr participated in the rape and murder of Bridgeman ... they rehearsed with Coleman what he was to say in front of the court reporter. (PTP-D FULTON 000009).
  - During the course of Plaintiff's interrogation, an Unidentified Defendant Officer entered the room and hit Plaintiff in the face. The same ... officer threatened to remove Plaintiff from the station and "put a bullet in his brain." (PTP-D FULTON 000010)

## B. Evidence of Notice to the City of Chicago

- **Transcript from Coleman testimony on June 28, 1996** says
  - Q: Were you ever alone with the state's attorney?
  - A: Yes, I was
  - Q: And when you were alone with the state's attorney, he asked you about how you had been treated by the police, didn't he?
  - A: No, he didn't.
  - Q: Well, when you were alone with the state's attorney, did you tell him, hey, those cops, they just hit me, that big guy just hit me?
  - A: I told him.
  - (PTP-N COLEMAN 000069)

- Q: Oh, the state's attorney asked you how you had been treated by the police?
- A: Hal Garfinkel asked me earlier in time, and I told him that the police hit me in the face several times.
- Q: Did you ever say that in the - when he was asking you in front of the court reporter?
- A: No.
- Q: Did he ever tell you not to say that in front of the court reporter?
- A: Yes, he did.
- Q: Oh, he said, by the way, don't say anything about the being hit part?
- A: He said don't bring that up because we are going to worry about this at another time.
- (PTP-N COLEMAN 000076)

LEO 002283

- **Third Amended Complaint says**
  - All of the Defendant Officers, including Defendant Benoit, were aware that the Unidentified Defendant Officer entered the interrogation room to threaten and physically abuse Coleman. (PTP-D FULTON 00000-8)
  - The Defendant Officers and Defendant Garfinkel knew that Coleman's "confession" was fabricated, and that Garfinkel only gave the statement as the result of the physical and mental coercion to which they subjected him." (PTP-D FULTON 000010)
  - Policy-making officials with the Defendant City had full knowledge of detectives' widespread pattern of physically and mentally coercing criminal defendants' "confessions" and allowed it to continue by failing to adequately train, supervise, and discipline its employees for perpetuating the constitutional violations described here. (PTP-D FULTON 000016)
  - Defendant Benoit approved, assisted, condoned, and/or purposely ignored the defendant officers' and Unidentified Officers' unconstitutional conduct. (PTP-D FULTON 000023)

## C. Evidence of Innocence
- **Third Amended Complaint says**
  - At Plaintiff's trial, the only evidence connecting him to the offense was the fabricated statements and confession attributed to him by the Defendant Officers and Defendant Garfinkel. (PTP-D FULTON 000011)
  - In 2016, the Conviction Integrity Unit ... submitted [to the Illinois State Police Division of Forensic Services (ISP Lab)] the sweatshirt and underwear the victim was wearing when her body was recovered, as well as her fingernail clippings. (PTP- D FULTON 000013) A partial male profile was obtained ... Plaintiff, Coleman, and Eddie Taylor were all excluded from that profile. (PTP-D FULTON 000013)
  - Plaintiff has been excluded from every single piece of forensic evidence connected to the rape and murder that is capable of being tested. (PTP-D FULTON 000014)

LEO 002284

Case:       Jerry Gillespie (Area 39)
Year:       1993
Report Page:    79

**Summary in Leo Report**:

Detective Boudreau and other Area 3 detectives beat, kicked, slapped, and choked Gillespie, and threatened him with further beating, including burning him with a cigarette, if he did not sign a written confession they prepared (First Amended Petition for Post-Conviction Relief and Petition for Relief from Judgement, State of Illinois v. Jerry Gillespie, PTP-J Gillespie-000001-000020; Motion to Hold Appeal in Abeyance, State of Illinois v. Jerry Gillespie, PTP-J Gillespie-000021-000030).

**Materials Provided Supporting Summary In Report**:

| Description | Bates Range |
| --- | --- |
| First Amended Petition for Post-Conviction Relief and Petition for Relief from Judgement, State of Illinois v. Jerry Gillespie | PTP-J Gillespie-000001-000020 |
| Motion to Hold Appeal in Abeyance, State of Illinois v. Jerry Gillespie | PTP-J Gillespie-000021-000030 |

**Evidentiary Support for Summary**:

Evidence of Coercion and Abuse

According to the first amended petition for post-conviction relief and petition for relief from judgement, Gillespie stated that he was forcibly taken into custody and questioned about the shooting of Jeffrey Rodgers. First Amended Petition for Post-Conviction Relief and Petition for Relief from Judgement, State of Illinois v. Jerry Gillespie, No. 93 C 6684, at 4–5 (Cir. Ct. Cook County, n.d.); PTP-J GILLESPIE-000004–5.

The same materials state police detained Gillespie at the Area One police station overnight after he denied any part in the shooting and gave a written statement to that effect. First Amended Petition for Post-Conviction Relief and Petition for Relief from Judgement, State of Illinois v. Jerry Gillespie, No. 93 C 6684, at 5 (Cir. Ct. Cook County, n.d.); PTP-J GILLESPIE-000005.

The same materials state Gillespie gave a court-reported statement stating he acted as a lookout during the shooting after denying his involvement over multiple days and after hours of interrogation. First Amended Petition for Post-Conviction Relief and Petition for Relief from Judgement, State of Illinois v. Jerry Gillespie, No. 93 C 6684, at 6 (Cir. Ct. Cook County, n.d.); PTP-J GILLESPIE-000006.

**LEO 002285**

The same materials state Gillespie stated in motions to suppress this statement at trial that police arrested him at gun point, transported him to the Area One police station, held him against his will "without food, sleep, or use of the bathroom, and without an opportunity to contact his family or communicate with an attorney," spent more than 30 hours in custody where officers "threatened, choked and beat him," and forced him to give a statement "that conformed to their theory of what had occurred in the Rodgers murder." First Amended Petition for Post-Conviction Relief and Petition for Relief from Judgement, State of Illinois v. Jerry Gillespie, No. 93 C 6684, at 6–7 (Cir. Ct. Cook County, n.d.); PTP-J GILLESPIE-000006–7.

### B. Evidence of Notice to the City of Chicago

The same materials state that the Detectives who were involved in the Rodgers murder investigation—Boudreau, Paladino, Halloran, Foley, and O'Brien—and Gillespie's interrogation were the subjects of other motions to suppress for similar coercive conduct in the circuit court. First Amended Petition for Post-Conviction Relief and Petition for Relief from Judgement, State of Illinois v. Jerry Gillespie, No. 93 C 6684, at 7 (Cir. Ct. Cook County, n.d.); PTP-J GILLESPIE-000007.

According to the motion to hold appeal in abeyance, the Goldston Report released in September 1990 concluded that command members "were aware of the systemic abuse [in Area Two] and perpetuated it either by actively participating in it or by failing to take any action to stop it." Motion to Hold Appeal in Abeyance, State of Illinois v. Jerry Gillespie, No. 9J CR 6684, at *4 (1st Dist. 2003); PTP-J GILLESPIE-000024. According to the motion to hold appeal in abeyance, the Goldston Report implicated many of the detectives that were involved in Gillespie's case in the abuse in Area Two. Motion to Hold Appeal in Abeyance, State of Illinois v. Jerry Gillespie, No. 9J CR 6684, at *5 (1st Dist. 2003), PTP-J GILLESPIE-000025.

### C. Evidence of Innocence

According to the first amended petition for post-conviction relief and petition for relief from judgement, Gillespie testified before a grand jury that he had no part in the murder. First Amended Petition for Post-Conviction Relief and Petition for Relief from Judgement, State of Illinois v. Jerry Gillespie, No. 93 C 6684, at 5 (Cir. Ct. Cook County, n.d.); PTP-J GILLESPIE-000005.

According to the first amended petition for post-conviction relief and petition for relief from judgement, no witness at trial placed Gillespie at the scene of the shooting. First Amended Petition for Post-Conviction Relief and Petition for Relief from Judgement, State of Illinois v. Jerry Gillespie, No. 93 C 6684, at 7 (Cir. Ct. Cook County, n.d.); PTP-J GILLESPIE-000007.

LEO 002286

AREA 3

Case:        Oscar Gomez, Eric Gomez, and Abel Quinones
Year:        1994
Report Page:  79

**Summary in Leo Report:**

Oscar Gomez, Abel Gomez and Abel Quinoles (1995): Detective Halloran and Detective Boudreau held all three men for more than 30 hours and beat them while they were shackled to a wall. All three were acquitted. PTP-O GOMEZ & A QUINONES-000001-00043).

**Materials Provided Supporting Summary In Report:**

| Description | Bates Range |
|---|---|
| March 14, 2008 Deposition of Abel Quinones in Hill v. City of Chicago | PTP-O GOMEZ & A QUINONES-000001-000232 |
| March 19, 2008 Deposition of Oscar Gomez in Hill v. City of Chicago | PTP-O GOMEZ & A QUINONES-000233-438 |

**Evidentiary Support for Summary:**

### A. Evidence of Coercion and Abuse

- In a 2008 deposition in the case of Hill v. City of Chicago, Abel Quinones explained that he, Eric Gomez and Abel Quinones were questioned by police for more than 30 hours. PTP-O GOMEZ & A QUINONES-00000130.
- In a 2008 deposition in the case of Hill v. City of Chicago, Oscar Gomez testified that Halloran and Boudreau threatened Oscar Gomez' father with arrest and charges during his interrogation. PTP-O GOMEZ & A QUINONES-000329.
- Oscar Gomez testified that Detective Halloran pushed him against the wall and choked him, kicked him in the legs, and punched him in the stomach. PTP-O GOMEZ & A QUINONES-000317-18.
- Halloran kept telling him, "Just say you did it, you know, and this could be over"; they told him he could go home if he confessed. PTP-O GOMEZ & A QUINONES-000317.
- Oscar Gomez also testified that O'Brien got frustrated that he would not confess and held a gun to his head. PTP-O GOMEZ & A QUINONES-000321.
- Quinones alleged that O'Brien and Halloran both grabbed him by the throat while he was handcuffed to a bench. PTP-O GOMEZ & A QUINONES-000137.
- Halloran told Quinones that he would not walk out of there without being charged. PTP-O GOMEZ & A QUINONES-000160.

**LEO 002287**

### B. Evidence of Notice to the City of Chicago

In his 1995 testimony at the hearing on his motion to suppress, Oscar Gomez testified to the coercion employed against him including being threatened with a gun by a CPD officer during his interrogation. PTP-O GOMEZ & A QUINONES-000410.

### C. Evidence of Innocence

All three men were found not guilty of this murder. PTP-O GOMEZ & A QUINONES-000404.

*AREA 3*

Case:         Tyrone Hood and Wayne Washington
Year:         1993
Report Page:   79

**Summary in Leo Report:**

Tyrone Hood and Wayne Washington (1993): Detective Boudreau coerced a false confession from Washington. Both men's convictions were subsequently overturned. PTP-T HOOD & W WASHINGTON-000001-00039.

**Materials Provided Supporting Summary In Report:**

| Description | Bates Range |
|---|---|
| Tyrone Hood v. City of Chicago Plaintiff's Response to City's Motion for Summary Judgment and Plaintiff's Response to the Individual Defendant Officers | PTP-T HOOD & W WASHINGTON-000001-000396 |

**Evidentiary Support for Summary:**

### A. Evidence of Coercion and Abuse

- In a deposition in his civil case (cited within his Summary Judgment response), Tyrone Hood testified that during his interrogation for a murder, Chicago Police Detectives
    - kicked him,
    - slapped him,
    - choked him,
    - pointed a gun at him and told him to sign or they'd put five slugs in Mr. Hood,
    - beat him and stepped on his face,
    - hit him and dumped cigar ashes on him
    - threatened to lock up Hood's wife and he would never see his children again. PTP-T HOOD & W WASHINGTON-0000352.
- Mr. Hood was kept by police for two days. PTP-T HOOD & W WASHINGTON-0000350-51.
- Wayne Washington testified in a deposition that he gave a false statement implicating himself and Mr. Hood because police slapped him and told him that if he implicated Hood, he could go home. PTP-T HOOD & W WASHINGTON-0000360.
- Washington testified that he was detained by Chicago Police for two days and was not given food or water until he gave a statement implicating himself and Hood. PTP-T HOOD & W WASHINGTON-0000362-63.

**LEO 002289**

### B. Evidence of Notice to the City of Chicago

According to the documents cited in Mr. Hood's summary judgment response, Mr. Hood's sister, Mertina Chaney, filed a report with the Office of Professional Standards on 5/28/93, once she learned of Mr. Hood's beating. Ex. 61 (C.R. 200855) at CITY 6973; Ex. 62 (Chaney Dep.) at 132:6-19. PTP-T HOOD & W WASHINGTON-0000352.

Washington testified that he was slapped and deprived of food at his hearing on his motion to suppress on August 24, 1995. PTP-T HOOD & W WASHINGTON-0000362 (Summary judgment response citing Motion to Suppress Transcript).

### C. Evidence of Innocence

In 2015, the Cook County State's Attorney vacated Hood's and Washington's convictions and dropped all charges against them.

LEO 002290

AREA 3

Case: Harold Hill, Dan Young, Peter Williams
Year: 1990
Report Page: 79

**Summary in Leo Report:**

Harold Hill, Dan Young, Peter Williams (1990): Detective Boudreau and other Area 3 detectives beat and coerced Hill, Young (whose IQ was 56), and Williams into falsely confessing to rape and murder. DNA tests subsequently proved that the men were innocent and the State dismissed all charges against them. Young and Hill were 16 years old at the time, Williams was 19 (Complaint, L.C. Young v. City of Chicago, February 8, 2007; Transcript of Proceedings, People v. Dan Young, September 19, 1994; PTP-D YOUNG-000001-187; PTP-H HILL-000001-000049).

**Materials Provided Supporting Summary In Report:**

| Description | Bates Range |
|---|---|
| Complaint in Young v. City of Chicago, et al. | PTP-D YOUNG-000001-39 |
| Excerpt of 09/19/1994 Report of Proceedings in People v. Young | PTP-D YOUNG-000040-94 |
| Excerpt of 09/19/1994 Report of Proceedings in People v. Young | PTP-D YOUNG-000095-169 |
| Excerpt of 09/19/1994 Report of Proceedings in People v. Young | PTP-D YOUNG-000170-187 |
| Appellate Opinion in Hill v. Coppelson, et al. | PTP-H HILL-000001-10 |
| Amended Complaint in Hill v. City of Chicago, et al. | PTP-H HILL-000011-46 |
| Affidavit of Peter Williams | PTP-H HILL-000047-49 |

LEO 002291

**Evidentiary Support for Summary**:

### A. Evidence of Coercion and Abuse

- Harold Hill and Dan Young were convicted of the rape and murder of Kathy Morgan on October 14, 1990. PTP-H HILL-000002 (7th Circuit opinion).
- Harold Hill testified in his criminal trial on September 19, 1994, that during his interrogation by Chicago Police, after he told police he did not know anything about the crime, officers told him he was the murderer, described facts about the murder to him, and showed him crime scene photos. PTP-D YOUNG-000066.
- Hill testified that Detective Boudreau hit him in the face and rib many times while describing the crime scene to Hill. PTP-D YOUNG-000059, 60-61.
- Hill cried and told officers Boudreau and Halloran that he did not commit the murder. PTP-D YOUNG-000062.
- Hill testified that he signed an inculpatory statement for the murder becaues he was afriad that if he didn't, the police would kill him. PTP-D YOUNG-000068-69, 72.
- On September 19, 1994, Peter Williams testified in the trial of Harold Hill and Dan Young that Detectives Halloran and Boudreau handcuffed him to the wall and slapped him in the face, telling him that he assaulted a woman. PTP-D YOUNG-0000104.
- Williams also testified that Boudreau and Halloran showed him pictures of the crime scene and described the scene to him while they hit him and threatened him. PTP-D YOUNG-0000110.
- Williams testified that when he told Boudreau and Halloran that he was not involved in the rape and murder, the hit him around the chest and legs with a mallet. PTP-D YOUNG-0000117-18.
- Williams started crying and yelling in pain. PTP-D YOUNG-0000119.
- Because he was being hit and beaten, including on an open wound on his face, Williams gave signed statements that he participated in the rape and murder. PTP-D YOUNG-0000134-36
- Dan Young, who had a severe developmental delay, also testified on September 19, 1994, that the police hit him in the face and kicked him in the stomach. PTP-D YOUNG-0000184, PTP-D YOUNG-00005

### B. Evidence of Notice to the City of Chicago

- The City was given notice of Young's, Williams', and Hill's allegations of torture and coercion during their 1994 trial testimony.

**LEO 002292**

## C. Evidence of Innocence

- According to a 2009 Seventh Circuit decision, both Hill and Young were excluded by DNA evidence from every piece of evidence at the scene of the crime. The State agreed to vacate their criminal convictions. PTP-D YOUNG-00005.
- Charges were never brought against Williams since he was in jail on the day of the murder. PTP-D YOUNG-00005.

LEO 002293

Area 3

Case:        Joseph Jackson
Year:        1998
Report Page: 80
Area # 3
Officers:    Boudreau, Halloran, Coughlin

**Summary in Leo Report:**

Joseph Jackson (1998): Detective Boudreau placed a book on Mr. Jackson's chest and stomach and hit the book with a blackjack. Detective Halloran placed a typewriter cover over Jackson's head and cut off his air supply. (PTP-J JACKSON-000001-000004)

**Materials Provided Supporting Summary In Report:**

| Description | Bates Range |
|---|---|
| Joseph Jackson Sworn Affidavit | PTP-J JACKSON-000001-000004 |

**Evidentiary Support for Summary:**

A. Evidence of Coercion and Abuse

- Joseph Jackson's sworn affidavit states that Boudreau placed a book on his chest and stomach and hit the book with a black jack, so as not to leave visible marks on Jackson's body. PTP-J JACKSON-000002
- The sworn affidavit states that Halloran, using a torture technique referred to in the Department as "bagging," placed a typewriter cover over Jackson's head cutting off his air supply and causing him to lose consciousness, and shocked him to wake him up on two occasions PTP-J JACKSON-000002
- The sworn affidavit states that Boudreau repeatedly slapped Jackson in the face "until [he] couldn't feel his face" and that Boudreau and Halloran said they would continue to beat him until he confessed. PTP-J JACKSON-000001
- The sworn affidavit states that Jackson was denied food, water, access to the restroom, a phone call and the presence of a lawyer during his 8 hour confession PTP-J JACKSON-000001,000003
- Jackson's affidavit states that he was punched in the face when he attempted to tell ASA Groth that he was innocent and was being beaten by the officers, and the ASA willingly allowed him to continue to get beaten until he confessed PTP-J JACKSON-000002
- The affidavit states that Jackson eventually agreed to confess after the Officers threatened to frame and beat his fiancee. On the condition that Officers would not seek the death penalty they had threatened he would receive and that they would not beat or frame his fiancee, Jackson was coached by Boudreau on how to confess to ASA Groth. PTP-J JACKSON-000002, 000003

**LEO 002294**

## C. Evidence of Innocence

- Joseph Jackson's sworn affidavit states that he repeatedly maintained his innocence and only gave his confession out of fear for his life. PTP-J JACKSON-000002

LEO 002295

Case:       Anthony Jakes
Year:       1994
Report Page:       80
Area 3
Officers:       Kill, Boudreau

**Summary in Leo Report:**

Anthony Jakes (1991): Detective Boudreau slapped, punched and kicked fifteen year-old Jakes until he falsely confessed to being the lookout during a murder. Jakes was held incommunicado for over sixteen hours, deprived of food and water, and denied access to his aunt (Complaint, Anthony Jakes v. Kenneth Boudreau et al., April 1, 2019; (PTP-A JAKES-000001-000409)

**Materials Provided Supporting Summary In Report:**

| Description | Bates Range |
|---|---|
| People v. Jakes Appellate Opinion | PTP-A JAKES-000205-219 |
| Complaint in Anthony Jakes v. Kenneth Boudreau et al. | PTP-A JAKES-000001-000037 |
| People v. Jakes Motion to Suppress Anthony Jakes Testimony | PTP- A JAKES-000038-84 |
| People v. Jakes Post Conviction Anthony Jakes Testimony (Direct) | PTP-A JAKES-000220-312 |
| Illinois Torture Inquiry and Relief Commission Disposition Anthony Jakes | PTP-A JAKES-000379-409 |
| People v. Jakes Criminal Trial Anthony Jakes Testimony | PTP-A JAKES-000313-378 |
| People v. Jakes Post Conviction Anthony Jakes Testimony (Cross) | PTP-A JAKES-000085-204 |

**LEO 002296**

**Evidentiary Support for Summary:**

### A. Evidence of Coercion and Abuse

- The 2013 People v. Jakes post-conviction appellate opinion states officers entered Anthony Jakes' home without a warrant, arrested him, and interrogated him about the murder of Rafael Garcia for over 16 hours before he singed a statement. Photographs taken on September 18, 1991, one day after Jakes signed his statement, show that Jakes had several fresh bruises on his arm, leg, side, stomach, and back. PTP-A JAKES-000206-208, PTP-A JAKES-326
- The 2013 TIRC Disposition found that there is sufficient evidence of torture to conclude that the claim is credible and merits judicial review for appropriate relief PTP-A JAKES-000379
- The TIRC disposition confirms Jake was "slapped, punched, beaten, and kicked". The disposition states he sustained injuries to his back, stomach, knee, elbow, and ribs," citing his his sworn criminal and MTS testimonies PTP-A JAKES-000379, PTP-A JAKES-000322, PTP-A JAKES-00041
- The Appellate opinion and Jakes' sworn MTS and criminal testimonies state that Kill said some Latin Kings would attack Jake's family if Kill asked them to do so. Kill also knocked Jakes on the floor and kicked him while Boudreau watched. PTP-A JAKES-000208, PTP-A JAKES-000041, PTP-A JAKES-000322
- The appellate opinion and Jakes' post-conviction testimonies state that arresting officers slammed him against a wall and handcuffed while being arrested in his home PTP-A JAKES-000207, PTP-A JAKES-000124, PTP-A JAKES-000243
- Jakes' sworn criminal and MTS testimonies state that Officer Kill threatened Jakes to "tell [ASA] what he wants to hear" or he would continue to be beaten PTP-A JAKES-000325, PTP-A JAKES-000043
- The TIRC disposition, Jakes' sworn MTS testimony, and Jakes' sworn criminal testimony state that Jakes signed the statement as a result of the coercion and threats and out of fear of further torture PTP-A JAKES-000380, PTP-A JAKES-000049, PTP-A JAKES-000323
- The TIRC disposition states that "the claim exhibits may of the standard characteristics of a coerced, false confession case" including the OPS findings of systematic and methodical torture under Jon Burge PTP-A JAKES-000382
    - a cursory confession handwritten by the ASA, with less than 3 pages devoted to the facts of the shooting
    - The prosecution's case without the confession is "almost nil" with no physical evidence implicating Jakes and no eyewitness
    - Jakes' confession contradicts that of his co defendant, Arnold Day, who also contended he was coerced by Boudreau and was also acquitted

### B. Evidence of Notice to the City of Chicago

- The post-conviction appellate opinion and the TIRC disposition state that Kill himself in states in a sworn deposition that for the approximately 1,500 murder confessions he obtained in his career, "in 90% of those cases, defense attorneys

LEO 002297

filed motions to suppress "based on allegations of unnecessary use of physical force." PTP-A JAKES-000217

LEO 002298

### C. Evidence of Innocence

- The post-conviction Appellate opinion states that "Boudreau's testimony both at trial and on the motion to suppress puts his credibility in issue, and evidence that he committed perjury in other cases could significantly affect the credibility of his testimony here." PTP-A JAKES-000218
- The post-conviction Appellate opinion states that Jake's statement "included no verifiable, correct details about the crime that the police did not know before questioning Jakes." PTP-A JAKES-000209
- The Appellate opinion cites evidence showing that Jakes did not have a view of the street from his window and could not have seen Garcia dying in its opinion affirming Jake's ineffective counsel during his criminal trial PTP- A JAKES-000211
- The TIRC disposition states that Jake's confession conflicts with the statement of Day, which does not mention Jakes, a lookout, or any accomplice. No weapon was recovered from either of them PTP- A JAKES-000381
- The TIRC disposition states that there was "no eyewitness to the shooting, and there was no physical evidence linking [Jakes] to the offense."PTP- A JAKES-000381

LEO 002299

Case:        Ronald Kitchen, Marvin Reeves, and Eric Wilson
Year:        1988
Report Page: 80
Area 3

**Summary in Leo Report:**

Detective Kill and Burge beat Ronald Kitchen until he falsely confessed to a murder. Detective Kill punched Kitchen in the face, back, chest, and groin. Kill interrogated Kitchen's cousin, Eric Wilson, about the same murder. Kill beat Wilson in the groin, chest, and head until Wilson falsely inculpated Kitchen and another man. Wilson heard Kitchen screaming and moaning in pain (Letter from Donald Hubert to Edward Egan and Robert Boyler, May 24, 2005; PTP-R KITCHEN-000001-000208)

**Materials Provided Supporting Summary In Report:**

| Description | Bates Range |
|---|---|
| Excerpt of Second Amended Petition for Post-Conviction Relief in *People v. Kitchen* | PTP-R KITCHEN-000001-178 |
| Letter from Donald Hubert to Edward Egan and Robert Boyler, May 24, 2005<br><br>Special Prosecutor Report regarding Ronald Kitchen | PTP-R KITCHEN-000179-208 |

**Evidentiary Support for Summary:**

    **A. Evidence of Coercion and Abuse**

- **Special Prosecutor Report (May 24, 2005) states:**
  - Existing medical records provide documented proof of Kitchen's groin injury and treatment. In the notes, Kitchen reported that he was hit in the groin with a nightstick, knee, and fist. (PTP-R KITCHEN 000180)
  - The records from Cermak Hospital reflect that on August 28, 1988, at 5:30 pm, Kitchen was brought to the hospital complaining of trauma to the groin area. The Out-Patient Progress Notes state he reported the police had hit him in the groin with a nightstick, knee, and fist. He was treated for several months. (PTP-R KITCHEN 000202)

1

**LEO 002300**

- Marvin Reeves testified at Kitchen's motion to suppress. In addition to stating he heard Kitchen being beat in an adjoining room at Area 3, he testified that he was also hit, kicked, and threatened at Area 3 on August 26th sometime after 5 am. He described the police offender as 5'9", black hair, Spanish. (PTP-R KITCHEN 000204)
- Wilson testified that he was brought to the 3rd floor at 39th and California for questioning on the evening of August 25th. In addition to stating he saw Kitchen who looked beat-up, he testified that he (Wilson) was made to sit on the floor, kicked between the legs, and punched when he denied any knowledge that Kitchen or Reeves committed the murders. Wilson identified one of his attackers as a man who was wearing a white police shirt with 3 stripes and another tall, heavyset, male, Spanish police officer. (PTP-R KITCHEN 000204)

- **Second Amended Petition for Post-Conviction Relief (2008) states:**
  - After Kitchen was arrested on August 25, 1988, he was interrogated and beaten for sixteen hours at Area 3 Police Headquarters by Chicago police detectives under the supervision of Jon Burge. (PTP-R KITCHEN - 000003)
  - When Edwards (Kitchen's lawyer) arrived at Area 3, he observed Kitchen handcuffed to a wall, crying and in obvious pain. Kitchen told Edwards that Area 3 detectives had interrogated and beaten him for sixteen hours, ultimately forcing him to sign a statement confessing to five murders he did not commit. (PTP-R KITCHEN -000004)
  - Kill punched Kitchen in the face, back, chest, and groin with his fists, while Burge kicked him in his back, ribs, and groin. The first beating lasted approximately fifteen to twenty minutes. (PTP-R KITCHEN 000022).
  - Detective Byron grabbed an unattached receiver from a phone in the room and hit Kitchen on the side of the head with it. (PTP-R KITCHEN 000022)
  - Burge stood on top of a desk and kicked Kitchen out of the chair he was sitting in. Burge continued to kick Kitchen in his ribs and groin as Kitchen laid on the floor. (PTP-R KITCHEN 000023)
  - Before being placed together in a room with Kitchen, Wilson was being held by Area 3 detectives in an interrogation room adjacent to where Kitchen was being held. Wilson heard Kitchen's screams as well as the police jumping on Kitchen. Wilson personally observed Kitchen moaning, beaten and in physical pain. Later, after Wilson and Kitchen were again separated, Wilson observed Kitchen, bent over and in severe pain, in a cage. (PTP-R KITCHEN 000023)
  - Smith began beating Kitchen in the head with a telephone book and in the groin and ribs with a blackjack. As Smith beat him, Kitchen cried out that he did not know the victims of anything about what had happened to them. (PTP-R KITCHEN 000025)
  - When Kitchen answered that he did not want to speak to ASA Lukanich until his attorney arrived, Kill beat Kitchen in the ribs and the back of his

2

head. The beating lasted about five minutes, until Kitchen agreed to speak to ASA Lukanich. (PTP-R KITCHEN 000027)

- Shortly after ASA Lukanich left the room, Kill re-entered the room and repeated the threats he had made several minutes earlier. He beat Kitchen for several more minutes. Finally, because he was tired, scared, and could not endure more beatings, Kitchen agreed to go along with what Kill, Smith, Byron, and Burge wanted him to say. (PTP-R 000027)
- AKA Lukanich wrote the statement as Kill dictated its content. Kill would provide a piece of the story, ASA Lukanich would ask Kitchen if Kill's account was correct, Kitchen would respond "yes," and ASA Lukanich would record Kill's statement. This pattern continued until ASA Lukanich had written a complete statement. (PTP-R KITCHEN 000028)
- While Edwards was at Area 3 on August 26, 1988, he also saw Wilson there. When Wilson saw Edwards at Area 3, he immediately told Edwards that he had heard Kitchen being beaten by the police, and that he had been beaten by the police as well. (PTP-R KITCHEN 000030)
- The next day, when Kitchen appeared before Judge Williams at Branch 66, Judge Williams saw Kitchen's physical condition and ordered that Mr. Kitchen be taken to the hospital.
- Medical records reflect that Kitchen was diagnosed with testicular trauma which doctors treated with an anti-inflammatory painkiller and a scrotal support. Medical records also reflect that Kitchen reported to Dr. Aaron Hamb that the "police hit [him] in the groin with night stick, knee, and stick." Mr. Kitchen received treatment for his groin from August 28, 1988 to December 21, 1988. (PTP-R KITCHEN 000033).
- Wilson, Kitchen's cousin, alleged Kill kicked him in the scrotum, elbowed him in the chest, and hit him with a bat in his back, arm, and top of his head, while interrogating Wilson on the night of August 25, 1988 at Area 3. … Mary Howard, Eric Wilson's aunt, saw Wilson on August 26, 1988 and remembered Wilson being swollen and having a red stomach. The OSP "regretfully" recommended the case closed, although it found Eric Wilson "persuasive" and "credible." (PTP-R KITCHEN 000126)

### B. Evidence of Notice to the City of Chicago

- **Special Prosecutor Reports (May 24, 2005) states:**
  - A transcript of Kitchen and Reeves' second court appearance in August 29, 1988 was recreated from the original court reporter's notes. Judge Bolan inquired if Kitchen's arm was injured and Kitchen replied that "it was my groin." (PTP-R KITCHEN 000181)
  - Attorney E. Duke McNeil represented Reeves and pointed out that Reeves had a black eye and requested to be allowed to photograph it. Judge Bolan granted leave for Reeves' black eye to be photographed and ordered that Reeves could go to the hospital to see if additional medical treatment was required. (PTP-R KITCHEN 000181)

3

LEO 002302

- **Second Amended Petition for Post-Conviction Relief (2008) states:**
  - The assistant public defender also stated "I have spoken to Mr. Reeves and Mr. Kitchen; both of these gentlemen have indicated to me that they were injured at the police station; they indicated that they were beaten by the police …" The prosecutor observed that she did not see any "visible injuries." The judge stated that he "observed that." The judge then said "they are remanded to the Sheriff's Department House of Corrections; if there is a determination by them – if they need hospitalization, they will have it determined there." (PTP-R KITCHEN 000034)
  - On August 29, 1988, Marvin Reeves' attorney told the court that his client had a black eye and that he had to go to Cermak Hospital. (PTP-R KITCHEN 000034)
  - At trial, a Corrections officer from Division 6 testified that he remembered thinking it was strange that Kitchen was sent directly to the hole, because Kitchen had not committed any disciplinary infractions. This officer also testified that when Mr. Kitchen arrived at Division 6 on August 28, 1988, he was "walking as if he was lame." (PTP-R KITCHEN 000033)

## C. Evidence of Innocence

- **Second Amended Petition for Post-Conviction Relief (2008) states**
  - In the prosecutor [ASA John Eannace]'s own words, "Willie Williams is the only evidence to tie these [defendants] to the 5 dead bodies." (PTP-R KITCHEN 000103)
  - Post-conviction defense counsel had had several conversations with Williams in which he admitted that he did not tell the truth at trial. Williams' recorded statements indicate that Kitchen never confessed to Williams in the first place. (PTP-R KITCHEN-000004)
  - At the time of Kitchen's trial, Edwards had in his possession police reports which documented that the Chicago Police Department investigated three other suspects: Pedro Sepulveda (Debbie Sepulveda's husband); Arturo Sepulveda (Pedro Sepulveda's brother); and Victor Vieyra (the man with whom Debbie Sepulveda was having an extramarital affair). (PTP-R KITCHEN 000171)
  - Notes taken by the police during witness interviews following the murders indicate that Pedro Spulveda was rumored to have been involved in the homicide of a large-scale narcotics dealer which occurred just says before the Sepulveda/Rodriguez murders, and that the dealer's cohorts were rumored to have killed Sepulveda's family in revenge. (PTP-R KITCHEN 000055)
  - At the time the crimes were committed, Kitchen was at a pool party. (PTP-R KITCHEN 000081)

4

LEO 002303

Case:        Anthony Lash
Year:         1989
Report Page:    80
Area 3

**Summary in Leo Report**:

Anthony Lash (1989): Detective Kill and other Area 3 detectives interrogated sixteen-year-old Anthony Lash about a murder without his parents or his attorney present. Detective Kill beat Lash and slammed his head into a wall, causing him to falsely confess to the murder. People v. Lash, 252 Ill.App.3d 239, 245-36 (1st Dist. 1993; PTP-R LASH-000001-000011).

**Materials Provided Supporting Summary In Report**:

| Description | Bates Range |
| --- | --- |
| People v. Lash, 252 Ill.App.3d 239 (1st 1993) | PTP-A LASH-000001-11 |

**Evidentiary Support for Summary**:

### A. Evidence of Coercion and Abuse

- According to the appellate opinion affirming Lash's conviction for murder, Lash was 16-years-old when he was questioned by police on in the September 14, 1989, without his parents or an attorney present, even though the police knew he had counsel and that his parents were working during the time of his interrogation. PTP-R LASH-000004-06.
- Lash testified that Kill pushed him against the wall during his interview. PTP-R LASH-000006.

### B. Evidence of Notice to the City of Chicago

Lash testified to coercion in the hearing on his motion to suppress sometime before 1993. PTP-R LASH-000004-05.

### C. Evidence of Innocence

Not addressed in documents.

**LEO 002304**

*Area S*

Case:       Alfonzia Neal
Year:       1991
Report Page:    80

**Summary in Leo Report:**

Detective Boudreau beat a murder confession out of Alfonzia Neal who had an IQ in the 40s and likely did not understand much, if anything, of the confession. (Maurice Possley, Steve Mills & Ken Armstrong, *Veteran Detective's Murder Cases Unravel*, Chi. Trib., Dec. 17, 2001.; PTP- A NEAL-000001-000008)

**Materials Provided Supporting Summary In Report:**

| Description | Bates Range |
|---|---|
| *Veteran Detective's Murder Cases Unravel*, Chi. Trib., Dec. 17, 2001 | PTP- A NEAL-000001-00008 |

**Evidentiary Support for Summary:**

     A. Evidence of Coercion and Abuse

The Chicago Tribune Article, "Veteran Detective's Murder Cases Unravel," says that Neal waived his rights and signed a handwritten statement confessing to the murder. Neal's lawyers later found that Neal "had an IQ in the 40's," and was thus "incapable of intelligently waiving his Miranda rights" before he signed the confession statement (PTP- A NEAL-000006).

     B. Evidence of Innocence

The Chicago Tribune Article, "Veteran Detective's Murder Cases Unravel," says that a jury acquitted Neal of the murder of which he was accused (PTP- A NEAL-000006).

**LEO 002305**

AREA 3

Case:              Johnny Plummer
Year:              1991
Report Page:       80

**Summary in Leo Report:**

Detective Boudreau and other Area 3 detectives interrogated fifteen-year-old Johnny Plummer for 36 hours, during which they denied him food and hit him in the face, stomach and side (including with a flashlight, until he falsely confessed to a murder. *See People v. Plummer*, 306 Ill. App. 3d 574, 578-79 (1st Dist. 1999); PTP- J PLUMMER-000001-000010)

**Materials Provided Supporting Summary In Report:**

| Description | Bates Range |
|---|---|
| People v. Plummer, 306 Ill. App. 3d 574 (1st Dist. 1999). | PTP- J PLUMMER-000001-000010 |

**Evidentiary Support for Summary:**

### A. Evidence of Coercion and Abuse

According to the 1999 appellate decision in Johnny Plummer's criminal conviction case, Detectives Kill and Boudreau were investigating an early-morning homicide on August 18, 1991 and briefly interviewed Johnny Plummer, a juvenile at the time. *People v. Plummer*, 306 Ill. App. 3d 574, 576 (1st Dist. 1999). Later that morning, Plummer was picked up and taken to the station for a witness interview related to the homicide.

- According to the defendant's testimony at trial, two detectives "took him to a police station where he was placed in a small room and handcuffed to a ring in the wall." *Id.* at 578.
- Plummer testified that his parent/guardian was not contacted before he was taken to the station. *Id.* at 578–79.
- According to his mother's testimony at trial, detectives never contacted her nor sought her permission to take him to the station. *Id.* at 579–80.
- Plummer testified that when he asked to go home or see his mother or a lawyer, Kill "laughed, hit him in the face, the stomach and in the side, pulled his hair and left the room." *Id.* at 579.
- Plummer testified that a third officer told him "he would get 40 years in prison, where he would be raped." *Id.*
- During trial, Plummer stated that "he only made his statements because he was told that he could go home if he would do so and because he was tired and afraid." *Id.*

**LEO 002306**

- Plummer testified that after providing his witness statement, the detective "hit him once in the face and three times with a flashlight." *Plummer*, 306 Ill. App. 3d at 579.
- According to his testimony, when Plummer was taken to a juvenile detention center around August 20, 1991, he notified a doctor that he had been beaten. *Id.*
- Plummer's mother also testified that when she saw her son, "his back and face were swollen and…he had dark marks on his upper chest. *Id.* at 580.

## B. Evidence of Notice to the City of Chicago

There was a hearing on the motion to suppress and at Plummer's criminal trial in the 1990s. Plummer contended that his mother had not consented to the interrogation, he had not received his *Miranda* rights, and there was medical evidence that he was more vulnerable to coercion due to his mental state. *Id.* at 582.

## C. Evidence of Innocence

Plummer testified at this criminal trial that "he only made his statements because he was told that he could go home if he would do so and because he was tired and afraid." *Id.* at 579. Plummer testified that when he was told that he was identified as the shooter and asked to sign a statement (distinct from the witness statement), he did not know what was in the statement. *Id.*

LEO 002307

AREA 3

Case: Tyrone Reyna, Nicholas Escamilla and Miguel Morales
Year: 1993
Report Page: 80-81

**Summary in Leo Report:**

Tyrone Reyna, Nicholas Escamilla and Miguel Morales (1993): Detective Boudreau and other Area 3 detectives beat sixteen-year-old Reyna (Detective Halloran slapped him in the face and kicked him in the leg; Detective Boudreau and Detective Halloran spit on him), refused to let him contact his family, and intimidated him into confessing to a murder he did not commit. Boudreau and other Area 3 detectives also beat and threatened Reyna's co-defendants, Nicholas Escamilla and Miguel Morales, causing Escamilla to falsely confess after hours of abuse (Affidavit of Tyrone Reyna, April 22, 2004; Affidavit of Nicholas Escamilla, March 19, 2004; Affidavit of Miguel Morales, February 25, 2001; PTP-T REYNA-000001-000018).

**Materials Provided Supporting Summary In Report:**

| Description | Bates Range |
|---|---|
| Affidavit of Tyrone Reyna | PTP-T REYNA-00001-00005 |
| Affidavit of Nicholas Escamilla | PTP-T REYNA-000006-10 |
| Statement of Miguel Morales | PTP-T REYNA-000011-18 |

**Evidentiary Support for Summary:**

### A. Evidence of Coercion and Abuse

- In a signed affidavit in 2004, Reyna stated that after he was arrested by CPD detectives Halloran and O'Brien, they threatened and hit him so much during the car ride that by the time he arrived at the station that he believed they were going to kill him. PTP-T REYNA-000002-03.
- Once he was in an interrogation room, the Detectives continued to threaten and hit him, especially detective O'Brien. PTP-T REYNA-000003.
- When Reyna said he knew nothing about the murder at hand and asked for his mother, the detectives hit him harder. PTP-T REYNA-000003.
- In a signed affidavit in 2004, Escamilla stated that he was placed in an interrogation room and handcuffed to the wall for 15 hours without being able to sleep, make a phone call, or use the washroom. PTP-T REYNA-000007.
- Detectives Halloran, Boudreau, O'Brien, and Ryan screamed at him, threatened him, hit him the back, head, chest, and stomach, and spat at him. PTP-T REYNA-000009.
- When Escamilla asked to use the phone and have a lawyer present, O'Brien kicked him in the legs and slapped him in the face. PTP-T REYNA-000009.

**LEO 002308**

- When he again asked for an attorney Boudreau and Halloran spat on him and hit him again. PTP-T REYNA-000009.
- Police threatened him that his daughter would be placed in DCFS custody, and his pregnant wife would go to jail. PTP-T REYNA-0000010.
- After 18 hours, he agreed to sign a false, coached statement that he was involved with the murder. PTP-T REYNA-0000010.
- In a 2001 affidavit, Miguel Morales stated that in February 1993, Chicago Police Officers handcuffed him to the wall, punched him, smacked him, and accused him of lying when he said he was not involved in the murder. PTP-T REYNA-000012-13.

## B. Evidence of Notice to the City of Chicago

Not stated in these documents.

## C. Evidence of Innocence

Not stated in these documents.

LEO 002309

AREA 3

Case:          Anthony Robinson
Year:          1987
Report Page:   81

**Summary in Leo Report**:

Detective Kill and other Area 3 detectives kicked and slapped Anthony Robinson until he falsely confessed to a murder. Robinson suffered injuries including a perforated ear. People v. Robinson, 238 Ill. App. 3d 48, 50-51 (1st Dist. 1992); PTP-A ROBINSON-000001-000006).

**Materials Provided Supporting Summary In Report**:

| Description | Bates Range |
|---|---|
| People v. Robinson, 238 Ill. App. 3d 48 (1st Dist. 1992) | PTP-A ROBINSON-000001-A ROBINSON-000006 |

**Evidentiary Support for Summary**:

**A.      Evidence of Coercion and Abuse**

According to the appellate opinion in Anthony Robinson's case, Robinson asserted at the trial level in a motion to suppress that "he was repeatedly kicked and slapped by several police officers," at the police station and that the beating lasted for several hours," that he estimated "he was hit in the face approximately 25 to 50 times and kicked approximately 25 to 50 times," and that "he was screaming loudly and blood was splatted all over his nose, ear and clothes." People v. Robinson, 238 Ill. App. 3d 48, 50 (1st Dist. 1992); PTP-A ROBINSON-000002.

According to the appellate opinion, a stipulation was entered into evidence "which supported defendant's claim that he sought and received medical treatment for a perforated ear drum . . . ." People v. Robinson, 238 Ill. App. 3d 48, 50 (1st Dist. 1992); PTP-A ROBINSON-000003.

According to the appellate opinion, Robinson's sister testified at the suppression hearing that she heard her brother in the interrogation room "holler 'don't hit me no more'" and "observed her brother in the interrogation room handcuffed to a wall and bleeding from his nose and mouth." People v. Robinson, 238 Ill. App. 3d 48, 50 (1st Dist. 1992); PTP-A ROBINSON-000003.

According to the appellate opinion, Robinson's sister testified at the suppression hearing that "when the defendant returned home he was limping and said he had been kicked in the groin area." People v. Robinson, 238 Ill. App. 3d 48, 50 (1st Dist. 1992); PTP-A ROBINSON-000003.

**LEO 002310**

According to the appellate opinion, Robinson testified at the suppression hearing that he was arrested on another occasion, "Officer Kill and another officer slapped him a few times," and he agreed to give a statement to the assistant State's attorney about the murder "[b]ecause he was frightened and felt he had no other choice . . . ." *People v. Robinson*, 238 Ill. App. 3d 48, 51 (1st Dist. 1992); PTP-A ROBINSON-000003.

LEO 002311

Case:          Ariel Gomez
Year:          1997
Report Page:    90
Area 5

**Summary in Leo Report:**

Ariel Gomez alleges that Detective Guevara coerced from him a false murder confession. In 2018, Mr. Gomez was exonerated after three witnesses swore under oath that Guevara repeatedly attempted to coerce them into identifying Gomez as the shooter.Three of Mr. Gomez's four co-defendants, all also interrogated by Detective Guevara, were acquitted and the fourth had his conviction thrown out by the Illinois appellate court (Complaint, Ariel Gomez v. Reynaldo Guevera et al.; AR-L 532490-532533; Verified Post-Conviction Petition (December 11, 2014); JR-L300501-300555.

**Materials Provided Supporting Summary In Report:**

| Description | Bates Range |
|---|---|
| Verified Post Conviction Petition | JR-L300501-300555 |
| Complaint | AR-L 532490-532533 |

**Evidentiary Support for Summary:**

**Evidence of Coercion and Abuse**

- Ariel Gomez was 17 years old when he was deprived of sleep, food, and physically abused at Area 5 by Det. Guevara in an attempt to get him to falsely confess to the murder of Concepcion Diaz. JR-L 300509, JR-L 300520.
- When Gomez refused to do so, he was punched in the face. *Id*. Gomez had bruises all over one side of his body. Complaint at *9. He had blood on his face when his mother and brother saw him at area 5. JR-L 300530.
- Verified post conviction petition (and complaint) says the City knew about Det. Guevara's practice of physical abuse to garner false confessions. JR-L 300524, JR-L 300552
- Guevara has taken the 5th in this case. JR-L 300532.

**Evidence of Notice to the City of Chicago**

**LEO 002312**

## Evidence of Innocence

- The verified post conviction petition contains evidence that Plaintiff was wrongfully convicted – namely the statements of Ruth Antonetty, Debbie Daniels and Marie Castro, show that the individual was innocent and the confession was false. JR-L 300527- 528. They were all pressured by Det. Guevara to identify Gomez as the shooter when they knew he wasn't. JR-L 300527-28. Ruth Antonetty refused to identify Gomez as the shooter. *Id.*
- The verified post conviction petition contains evidence Det. Guevara showed witnesses who to choose in a photo array, including Debbie Daniels. *Id,* JR-L 300528.
- The verified post conviction petition contains evidence that the bullet from Mr. Gomez's gun did not match the bullet found at the crime scene. JR-L 300525. Further, the angle from which he was sitting in the red pathfinder and where the victim was shot could not have possibly been from his gun – the fatal shot came from someone several feet away at waist height. *Id.*
- Several of Gomez's co-defendants were acquitted at trial (Dragon Jovanovic, Paul Yalda, John Yacoub), and the sole co-defendant that was convicted (Jose Dominguez) had his conviction thrown out by Judge Bucklo who stated Ariel Gomez was innocent. JR-L 300523.

LEO 002313

AREA 3

Case:        Fred Ewing and Darnell Stokes
Year:        1993
Report Page:    78

**Summary in Leo Report:**

Fred Ewing and Darnell Stokes (1993): Detective Boudreau coerced confessions from two developmentally disabled juveniles, Fred Ewing (IQ=56) and Darnell Stokes. Both were acquitted. (Maurice Possley, Steve Mills & Ken Armstrong, Veteran Detective's Murder Cases Unravel, Chi. Trib., Dec. 17, 2001.; PTP-F EWING-000001-00015).

**Materials Provided Supporting Summary In Report:**

| Description | Bates Range |
|---|---|
| Complaint Register #203754 | PTP-F EWING-000001-143 |
| Complaint in Ewing v. O'Brien, et al. | PTP-F EWING-000144-150 |

**Evidentiary Support for Summary:**

### A. Evidence of Coercion and Abuse

- According to his 1998 civil complaint against the City of Chicago, in September 16, 1993, Fred Ewing had a developmental delays and an IQ of 56 and was 17-years-old when he was arrested by the Chicago Police Department for two murders. PTP-F EWING-000146.
- Ewing alleged that Halloran and O'Brien took advantage of those delays to coerce a false confession through physical and psychological coercion and by withholding the exculpatory evidence that eventually exonerated him. PTP-F EWING-000146-47.
- According to the Summary Report Digest in the Complaint Register filed by Ewing's mother in October 1993, Ewing told the Chicago Police Department's Internal Affairs Division that after picking him up for questioning, CPD Detectives pulled into an alley and beat him around the chest and stomach with a police baton. PTP-F EWING-000004. Ewing stated that police detectives slapped him in the face. PTP-F EWING-00005.
- Ewing also stated that he saw detectives choking Darnell Stokes while Stokes was being questioned. PTP-F EWING-000006.
- Ewing alleged that he told detectives he would sign a statement because he was not able to read but after a detective slapped him and told him to sign it, Ewing did. PTP-F EWING-000006.
- Stokes also told the Chicago Police Department's Internal Affairs Division in a formal statement that detectives choked him and struck him on the back with a baton when they questioned him. PTP-F EWING-000006.

**LEO 002314**

- Stokes also alleged that he saw Detectives choke and slap Ewing and kick him when he was on the floor. PTP-F EWING-000007.
- Ewing's mother called Chicago Police Department's Internal Affairs Division on September 27, 1993, and told the investigator that Ewing had called her on September 20 and told her that investigators had beaten him and forced him to sign a confession. PTP-F EWING-0000012.
- Ewing was acquitted of these crimes.

## B. Evidence of Notice to the City of Chicago

The City of Chicago had notice of Ewing's and Stokes' allegations of abuse and torture from their September - November 1993 statements to CPD's 's Internal Affairs Division.

## C. Evidence of Innocence

Ewing and Stokes were found not guilty of both murders. PTP-F EWING-000147; Maurice Possley, Steve Mills & Ken Armstrong, Veteran Detective's Murder Cases Unravel, Chi. Trib., Dec. 17, 2001.

**LEO 002315**

AREA 3

Case: Arnold Day
Year: 1992
Report Page: 78

**Summary in Leo Report:**

Detective Boudreau and another Area 3 detective choked Day and threatened to throw him out of a window until he falsely confessed to a murder. Day was acquitted after presenting his allegations of physical abuse and coercion (Affidavit of Arnold Day, February 4, 1992; Complaint, Arnold Day v. Kenneth Boudreau, et al.; PTP-A DAY-000001-105)

**Materials Provided Supporting Summary In Report:**

| Description | Bates Range |
| --- | --- |
| People v. Day Motion to Suppress Arnold Day Testimony Transcript | PTP-A DAY-000001-000037 |
| Arnold Day Illinois Torture Inquiry and Relief Commission Disposition | PTP-A DAY-000038-000052 |
| 1994 Arnold Day Sworn Affidavit | PTP-A DAY-000053-000055 |
| Complaint in Arnold Day v. Kenneth Boudreau, et al. | PTP-A DAY-000001-105 |

**Evidentiary Support for Summary:**

### A. Evidence of Coercion and Abuse

- The 2017 TIRC disposition found that there was sufficient evidence of torture of Arnold Day warranting judicial review under the TIRC act. PTP-A DAY-000052
- In his 1993 Motion to suppress testimony, Day testifies Officer Evans "stomped" him on the back of the head during his arrest." PTP-A DAY-000005
- Day also testified that during his 9 hour interrogation, while handcuffed to a wall, Det. Foley grabbed him by the collar, pushed against the wall, and threatened to throw him out of the window. Det. Boudreau was present throughout. PTP-A DAY-000007-12. In his 1994 sworn affidavit and his TIRC form referenced in the TIRC disposition, Day states he was also choked by Det. Foley (PTP-A DAY-000054,43,45).
- Day asserted his innocence throughout the interrogation, but after being choked and threatened he agreed to provide a statement written by the ASA, "fearing for his life" PTP-A DAY-000054.

LEO 002316

- The TIRC disposition cites his 1994 testimony in the Erving murder trial, in which Day states ASA made minor corrections to the statement, which Day alleges were made to appear as though Day had made the change. PTP-A DAY-000042
- The TIRC disposition cites an interview with TIRC investigators in which Day states that he made statements based on the information and questions the officers gave him. PTP-A DAY-000045
- The 2017 TIRC disposition, Day's civil complaint, Day's 1993 suppression testimony, and his 1994 affidavit state that only after providing a statement was Day given food, allowed to make a phone call (PTP-A DAY-000016), and unhandcuffed from the wall. (PTP-A DAY-000064)

## B. Evidence of Notice to the City of Chicago

- Mr. Watson, a witness who implicated Day, recanted his statement and notified the State that the statement was false and the product of coercion from the Officers. PTP-A DAY-000048-49; PTP-A DAY-000065
- The TIRC disposition states that there is "a substantial body of evidence" suggesting that detectives Boudreau and Foley engaged in systematic conduct aimed at obtaining confessions through coercion. PTP-A DAY-000046
  - The disposition cites a 2001 Tribune article stated that Boudreau has helped get confessions from "more than a dozen" defendants in murder cases in which defendants were acquitted or charges were dropped.
  - Detectives Boudreau and Foley have been directly identified in six and seven published Illinois cases, respectively, detailing allegations of abuse against Det. them or officers working with them. PTP-A DAY-000046
  - Numerous criminal defendants have lodged formal complaints alleging he engaged in misconduct. PTP-A DAY-000046
- Day also filed an IPRA complaint against Evans, Foley, and Boudreau on November 3, 2006. IPRA found that there was "insufficient evidence" to support Day's claims. PTP-A DAY-000046
- In 2013, the CIty of Chicago paid over $6 million dollars to settle a suit brought against several officers, including Det. Foley PTP-A DAY-000046

## C. Evidence of Innocence

- The TIRC Disposition states Day was acquitted of the Raphael Garcia murder by the Jury in 1993. PTP-A DAY-000047
- TIRC Disposition also found that given the outcome of the Garcia trial, there is "credible evidence suggesting that Day's confession to the Erving murder was obtained through physical coercion". PTP-A DAY-000047
- The TIRC disposition says there are "critical inconsistencies" between Day's forced confession and the physical evidence at the scene of Erving's murder PTP-A DAY-000048
- ASA corrections made to Day's confession suggest Day did not know critical facts about the murder, and adds that "without corrections, the confession would be inconsistent with the evidence." PTP-A DAY-000048

LEO 002317

- According to the TIRC disposition and the civil complaint, both witnesses who implicated Day recanted their statement before trial. The witnesses stated that they implicated Day to secure their release from detainment and out of fear they would be implicated by Boudreau PTP-A DAY-000048, PTP-A DAY-000061-62
- Day's civil complaint states that he was granted a Certificate of Innocence in 2019. PTP-A DAY-000057
- Day's Civil complaint states that the judge granted the State's motion to vacate Mr. Day's conviction for the murder of Jerrod Irving. PTP-A DAY-000066

**LEO 002318**

*Witness*                    *Suspects*

Case: Timothy Rankins and Armando Serrano/Jose Montanez
Year: 1993
Area: 5
Report Page: 93

**Summary in Leo Report**:

Detective Guevara placed a phone book over Mr. Rankins' head and beat it with a flashlight, threw Mr. Rankins out of his chair, and placed Mr. Rankins in a chokehold to induce him to sign a statement that Detective Guevara had prepared implicating Serrano and Montanez in a murder. Mr. Serrano and Mr. Montanez have both received certificates of innocence (Sworn Statement of Timothy Rankins, *State of Illinois v. Armando Serrano*, April 3, 2012; AR-L 155230-155268; Corrected First Amended Complaint, *Jose Montanez v. Reynaldo Guevara, et al.*; AR-L 563644- 563688; Complaint, *Armando Serrano v. Reynaldo Guevara, et al.*); AR-L 563597-563643).

**Materials Provided Supporting Summary In Report**:

| Description | Bates Range |
|---|---|
| Sworn Statement of Timothy Rankins, *State of Illinois v. Armando Serrano*, April 3, 2012 | AR-L 155230-155268 |
| Corrected First Amended Complaint, *Jose Montanez v. Reynaldo Guevara, et al.* | AR-L 563644- 563688 |
| Complaint, *Armando Serrano v. Reynaldo Guevara, et al.* | AR-L 563597-563643 |

**Evidentiary Support for Summary**:

. **Evidence of Coercion and Abuse**

According to Timothy Rankins's sworn statement, Detective Guevara kicked Rankins out of his chair when he refused to testify against Serrano and Montanez. Sworn Statement of Timothy Rankins, *State of Illinois v. Armando Serrano*, April 3, 2012, at 11.

According to Timothy Rankins's sworn statement, Detective Guevara threw three pictures on the floor in front of Rankins and told him that he was "going to be the key witness," "need[ed] to study that statement," and "need[ed] to understand that [Rankins was] was going to tell what statement sa[id]." Sworn Statement of Timothy Rankins, *State of Illinois v. Armando Serrano*, April 3, 2012, at 11.

**LEO 002319**

According to Timothy Rankins's sworn statement, Detective Guevara kicked Rankins in the stomach and beat him with a phone book and mag light. Sworn Statement of Timothy Rankins, *State of Illinois v. Armando Serrano*, April 3, 2012, at 13.

According to Timothy Rankins's sworn statement, Detectives Halvorsen and Mingey participated in the beating. Sworn Statement of Timothy Rankins, *State of Illinois v. Armando Serrano*, April 3, 2012, at 13.

According to Timothy Rankins sworn statement, the statement Rankins signed was in Guevara's handwriting. Sworn Statement of Timothy Rankins, *State of Illinois v. Armando Serrano*, April 3, 2012, at 15.

According to Timothy Rankins' sworn statement, Rankins would not sign the statement, and the Detectives put him in a chokehold. Sworn Statement of Timothy Rankins, *State of Illinois v. Armando Serrano*, April 3, 2012, at 18.

## B.    Evidence of Notice to the City of Chicago

According to Montanez's first amended complaint, Detectives Guevara and Halvorsen and Assistant State's Attorneys Couglan and Dillon agreed that the only way to solve the Vargas murder was to falsely implicate Montanez in the murder with coerced testimony. Corrected First Amended Complaint, *Jose Montanez v. Reynaldo Guevara, et al.*, at 6.

According to Serrano's complaint, Guevara, Halvorsen, Couglan, and Dillon attempted to coerce a witness to testify against Serrano during a meeting at the Cook County State's Attorney's office. Complaint, *Armando Serrano v. Reynaldo Guevara, et al.*, at 10.

## C.    Evidence of Innocence

According to Serrano's complaint, both Montanez and Serrano were granted Certificates of Innocence on November 2, 2016. Complaint, *Armando Serrano v. Reynaldo Guevara, et al.*, at 3.

**LEO 002320**

## AREA 5

1)  Ariel Gomez

2)  Timothy Rankins and Armando Serrano/Jose Montanez

3)  Daniel Rodriguez and David Velasquez

LEO 002321

## AREA 4

1) Tony Bey (Also known as Tony Steward)

2) Michael Cage

3) Carl Chatman

4) Shawn Hardy

5) Harold Lucas

6) Keith Mitchell

7) Patrick Prince

8) Frederick Seaton

9) Andre Wallace

10) Michael Waslewski and Daniel Gasca

LEO 002322

Case: Tony Bey (also known as Tony Steward)
Year: 1988
Area: 4
Report Page: 83

## Summary in Leo Report:

Detective Kato purportedly obtained a murder confession from Mr. Bey during an abusive interrogation. Mr. Bey alleged that Detective Kato "put a pistol in his mouth and threatened to make him 'a statistic.'" Mr. Bey also alleges that Detective Summerville physically abused him during one of his post-arrest interrogations in Area 4. Mr. Bey was treated at the hospital for multiple lacerations after the interrogation, complained of severe stomach pain, and was diagnosed with acute appendicitis. Tony Bey Complaint Register & OPS Investigation. Bey was acquitted at trial. Steward v. Kato, et al., 1992 U.S. Dist. LEXIS 15690, at *8 (N.D. Ill. 1992); PTP-T SEWARD-BEY-000001-000157.

## Materials Provided Supporting Summary In Report:

| Description | Bates Range |
|---|---|
| Opinion in *Steward v. Summerville, et al.* | PTP-T STEWARD-BEY-000001-4 |
| Complaint Register #165728 | PTP-T STEWARD-BEY-000005-92 |
| Complaint Register #240931 | PTP-T STEWARD-BEY-000093-000157 |

## Evidentiary Support for Summary:

A.     Evidence of Coercion and Abuse

According to the district court opinion, Tony Bey was arrested at his home by Detective Summerville and "kicked, kneed, and scraped with a metal rod by certain defendants, while other stood by an watched." Steward v. Summerville, No. 90 C6956, 1992 U.S. Dist. LEXIS 15690, at *1 (N.D. Ill. Oct. 14, 1992).

According to the district court opinion and the Complaint Register Investigation No. 165728, Detective Kato placed a gun in Bey's mouth and threatened to "make [Bey] a statistic." Steward v. Summerville, No. 90 C6956, 1992 U.S. Dist. LEXIS 15690, at *1 (N.D. Ill. Oct. 14, 1992); Complaint Register #165728; PTP-T STEWARD-BEY-000022.

According to the Complaint Register Investigation No. 165728, Detective Cherby told Bey in the interrogation room that he "had a beating coming." Complaint Register #165728; PTP-T STEWARD-BEY-000017.

According to the Complaint Register Investigation No. 165728, Detective Summerville kneed Bey in the lower right side of Bey's abdomen and said to Bey, "You're either going to talk to me or my partner Keto." Complaint Register #165728; PTP-T STEWARD-BEY-000017.

LEO 002323

According to the Complaint Register Investigation No. 165728, Detective Keto scrapped Bey's back with a metal rob. Complaint Register #165728; PTP-T STEWARD-BEY-000018.

According to the Complaint Register Investigation No. 165728, Bey sustained cuts on his back and a ruptured appendix, and he was treated for these injuries. Complaint Register #165728; PTP-T STEWARD-BEY-000019. According to the Complaint Register No. 165728, Cook County Hospital Records show Bey was treated for acute appendicitis after the interrogation. Complaint Register #165728; PTP-T STEWARD-BEY-000053.

According to the district court opinion, the defendant Detectives did not seriously argue that Bey's allegations did not occur, just whether they violated the Fourteenth Amendment. Steward v. Summerville, No. 90 C6956, 1992 U.S. Dist. LEXIS 15690, at *10 (N.D. Ill. Oct. 14, 1992).

LEO 002324

*Area 4*

Case:       Michael Cage
Year:       1988
Report Page:   83

**Summary in Leo Report**:

Michael Cage (1988). Detective Kato slapped Mr. Cage in the face, while Detective Summerville read case facts to him, and later Detective Kato connected a gadget to his chest that resembled an electric shaver with antennas attached to it. Cage felt shocked and passed out. When Mr. Cage regained consciousness, Detective Kato stretched his leg into the doorway and slammed the door on his ankle. Eventually Cage gave a confession, but it was eventually suppressed at a pre-trial hearing because the State failed to prove that the detectives had not caused Mr. Cage's injuries. Steve Bogira, Good Cop, Bad Cop: What is it about Detective Kato that Makes Murder Suspects So Eager to Confess?, Chicago Reader (Dec. 12, 1991); PTP-M CAGE-000001-0000063.

**Materials Provided Supporting Summary In Report**:

| Description | Bates Range |
|---|---|
| Steve Bogira, Good Cop, Bad Cop: What is it about Detective Kato that Makes Murder Suspects So Eager to Confess?, Chicago Reader (Dec. 12, 1991) | PTP-M CAGE-000001-0000063 |

**Evidentiary Support for Summary**:

### A. Evidence of Coercion and Abuse

According to Reader article, Detectives abused and coerced Michael Cage regarding a homicide in December 1988, during a police interrogation. PTP-M CAGE-000001-0000063 at 60. While in police custody, Cage made a statement confessing that one of his friends committed the homicide. *Id.* He and two friends were convicted. *Id.* In October 1991, the court heard a motion to suppress a confession, because Cage alleged that the confession had been coerced. *Id.*

- At the hearing, Cage's attorney said that Cage's statement was "nothing more than a parroting under duress of information he had been indoctrinated with by the use of threats and physical abuse." *Id.*
- Cage testified at the hearing that during the 1998 interrogation, Cage denied knowing anything about the crime and detectives began to slap him in the face and read a statement regarding the circumstances. *Id.*
- Cage testified that while being interrogated, a detective entered the room, pulled up his sweater, and connected a machine to his chest a machine which shocked

him to the point that he lost consciousness. When Cage regained consciousness, a detective read him the statement again. PTP-M CAGE-000001-0000063 at 60.

- Cage testified at the hearing that a detective stretched his leg into the doorway of the interview room and slammed the door on his ankle. *Id.*
- At the motion to suppress hearing, Cage's lawyer offered as evidence photos taken of Cage the day after his arrest, which showed marks on Cage's chest, believed to be blisters from the shock probes, and Cage's swollen ankle. *Id.* at 60-61

## B. Evidence of Notice to the City of Chicago

Cage filed a motion to suppress and the court heard evidence and found that Cage's injuries were sustained while in police custody. *Id.*

## C. Evidence of Innocence

The court ruled that the evidence showed Cage had sustained his injuries while in police custody and, because the state could not prove that the injuries did not lead to Cage's confession, the motion to suppress the statement was granted. *Id.* at 61.

LEO 002326

Case:      Carl Chatman
Year:      2002
Report Page:      83
Area 4

**Summary in Leo Report:**

Carl Chatman (2002): Mr. Chatman, who had an IQ of 68 and a long history of mental disorders, was wrongly convicted of sexually assaulting Susan Riggio in the Daley Center. Chatman v. Chicago, et al., 2018 WL 1519160 (N.D. Ill. Mar. 28, 2018). Mr. Chatman was arrested, denied any involvement in the crime, and after he had been in custody for 12 hours without anything to eat or drink, Detective Kato interrogated him, threatening and abusing him while he was handcuffed to a wall, including striking him so hard that he almost lost consciousness, after which Mr. Chatman falsely confessed (Detective John Roberts had also used force and threats of force to coerce Mr. Chatman to confess).

Mr. Chatman was convicted and spent more than a decade in prison before the Cook County State's Attorney reinvestigated his case and dismissed the charges against him. Mr. Chatman was granted a certificate of innocence by the State of Illinois after his release from prison. Id. at *9. A Chicago police detective filed an anonymous complaint in May 2002 with the Office of Professional Standards relating that Detective Kato had physically abused Mr. Chatman and forced him to sign a false confession. (OPS Anonymous Complaint). The detective wrote that when Detective Kato hit Mr. Chatman, "That blow I thought would kill him for sure" and said that Detective "Kato took the victim's account of the assault, word for word and laid it out for the homeless suspect to sign. The suspect didn't even read it and didn't know what he was signing." and that "It is a well-known fact from questioning and the suspect's condition that he did not commit this assault. However Detective Kato stated that 'they wanted someone to be accountable, so I gave them someone. He's homeless anyway, at least now (laughingly) he'll get three meals a day. That's my contribution to help feed the homeless.'" Id.; PTP-C CHATMAN-000001-000082.

**Materials Provided Supporting Summary In Report:**

| Description | Bates Range |
| --- | --- |
| People v. Chatman Appellate Opinion | PTP-C CHATMAN-000049-82 |
| Chatman Civil Complaint<br><br>Chatman v. Chicago, et al., 2018 WL 1519160 (N.D. Ill. Mar. 28, 2018) | PTP-C CHATMAN-000001-48 |

**LEO 002327**

## Evidentiary Support for Summary:

### A. Evidence of Coercion and Abuse

- The civil complaint alleges while under arrest at Area 4, he was held for over 12 hours and not allowed to take his medication, which causes him to experience "disorganized thoughts, pressured speech, and an inability to think in a linear or logical manner". PTP-C CHATMAN-000012
- The civil complaint states that during the interrogation, Defendant Roberts used force and threats of force to coerce Mr. Chatman to confess. PTP-C CHATMAN-000012
- The civil complaint alleges that Defendants Holmes, Roberts, Midona, and Walsh took advantage of Chatman's mental instability by feeding him details of the crime and walking him through the crime scene to ensure that he had first-hand knowledge of the crime scene. These Defendants were subjectively aware that Mr. Chatman had no information about the alleged rape from his initial interrogation, and they walked him through the crime scene in order to provide him with the relevant facts and circumstances PTP-C CHATMAN-000013

### B. Evidence of Notice to the City of Chicago

- A Chicago police detective filed an anonymous complaint in May 2002 with the Office of Professional Standards relating that Detective Kato had physically abused Mr. Chatman and forced him to sign a false confession. (OPS Anonymous Complaint).

### C. Evidence of Innocence

- According to the appellate opinion and the civil complaint, Mr. Chatman was granted a certificate of innocence by the State of Illinois after his release from prison. PTP-C CHATMAN-000053, PTP-C CHATMAN-000004
- According to the appellate opinion, the State moved to vacate defendant's 2004 rape conviction and sentence in People v. Chatman, No. 02 CR 14572 (Cir. Ct. Cook Co.), and asked "that the matter be reinstated and redocketed," so that it could "move to vacate the conviction and sentence and move to nolle pros the conviction" and "request that the defendant, Carl Chatman, be released immediately from the custody of the Illinois Department of Corrections." PTP-C CHATMAN-000052
- The appellate opinion affirmed the trial court's dismissal of the motion to dismiss the petition to vacate the order granting Chatman a certificate of innocence PTP-C CHATMAN-000057
- According to the civil complaint, DNA testing revealed that neither Mr. Chatman's semen, hair, nor any other genetic material from Mr. Chatman (nor anyone else, for that matter) was found on Defendant Riggio's vagina, rectum, other body parts, or clothing PTP-C CHATMAN-000014

LEO 002328

- The civil complaint states that Defendant Riggio's genetic material was not found anywhere on Mr. Chatman's body or clothing. Furthermore, Chatman's fingerprints were not found anywhere at the scene, even on the items he had allegedly touched PTP-C CHATMAN-000014-15

LEO 002329

AreA 4

Case:          Shawn Hardy
Year:          1989
Report Page:   85

**Summary in Leo Report**:

Shawn Hardy (1989): Detective Kato accused Mr. Hardy of committing a murder, punched and kicked him in the chest, but he did not confess. Mr. Hardy was diagnosed with a chest contusion a few days after the interrogation. Command Channel Review – Complaint Register Investigation No. 171359 (PTP-S-Hardy 000001-000050)

**Materials Provided Supporting Summary In Report**:

| Description | Bates Range |
| --- | --- |
| Complaint Register Investigation No. 171359 | PTP-S-Hardy 000001-000050 |

**Evidentiary Support for Summary**:

### A. Evidence of Coercion and Abuse

Shawn Hardy's mother filed a Complaint with the Office of Professional Standards in October 1989, stating that a detective punched and kicked her son in the chest during an interrogation. *Id.* at 3, 5.

According to the CR file, on September 30, 1989, Shawn Hardy was subjected to abuse and coercion during an interrogation at the police station by detectives investigating a July 9, 1989 homicide. Hardy had been interrogated on July 10, 1989, and denied having any involvement in the homicide.
- During the September 30 interrogation, detectives asked if he wanted to make a statement, and when he didn't respond, one proceeded to punch him "with his fist, two quick punches to the right chest. PTP-S-Hardy 000001-000050 at 4. The detective then "kicked him in the chest as he was seated on top of a desk in front of him." *Id.* at 4.
- During an interview related to the OPS investigation, Hardy explained that the detective "asked [him] if [he] had a statement. [He] did not say anything. At this time, [detective] punched [him] in the right chest with his fist, twice. He then kicked [him] with his foot in the right side of [his] chest. *Id.* at 34.
- Shawn Hardy's mother alleged that detectives abused Hardy when his attorney was not in the room. *Id.* at 3, 6, 34–35.
- Hardy received medical treatment on October 4, 1989 following the incident and was diagnosed as having a chest wall contusion. *Id.* at 4, 8, 46.

**LEO 002330**

- During his interview for the OPS investigation, Hardy said, that he was eventually released, went to receive medical help, and that "[he] had a bruise and sore right chest." *Id.* at 35.
- Medical records from Hardy's visit note that he had complained of chest pain and tenderness. PTP-S-Hardy 000001-000050 at 3, 46.

## B. Evidence of Notice to the City of Chicago

The City of Chicago would have received notice when Hardy's mother filed a Complaint with the Office of Professional Services on October 4, 1989 and detailed the allegations of the abuse Hardy endured during his September interrogation. *Id.* at 3. The City would have remained aware of the issue as the investigation proceeded over the next couple of weeks as statements and records were collected. Within two weeks of investigating the Complaint, the detective was notified by the department of the specific allegations of abuse that Hardy had endured. *Id.* at 39.

## C. Evidence of Innocence

According to investigation reports filed with the Complaint, on July 10 during the first interrogation, Hardy denied any knowledge of or involvement in the homicide that was under investigation. *Id.* at 29. He also denied arguing with the homicide victim and denied knowing him in a particularly personal capacity. *Id.*

LEO 002331

AREA 4

Case: Harold Lucas
Year: 1989
Report Page: 85

## Summary in Leo Report:

Harold Lucas (1989): Detective Kato punched Mr. Lucas, who was 15-years-old, in the stomach, slapped him, and stepped on his genitals while he was sitting down until Mr. Lucas purportedly confessed to a murder David Jackson, Fine Line Between Tough Police Work, Brutality, Chicago Tribune, at 3 (Jul 14, 1991); PTP- H LUCAS-000001-000004.

## Materials Provided Supporting Summary In Report:

| Description | Bates Range |
|---|---|
| Fine Line Between Tough Police Work, Brutality, Chicago Tribune, at 3 (Jul 14, 1991) | PTP- H LUCAS-000001-000004 |

## Evidentiary Support for Summary:

### A. Evidence of Coercion and Abuse

According to a 1991 article in the Chicago Tribune, Harold Lucas Jr., who was 15 at the time, was abused and coerced into signing a sworn statement confessing to a homicide during a police investigation. PTP- H LUCAS-000001-000004 at 3.

- According to internal police records, Lucas's father and godmother saw him at the station and he told them he coughed up blood. *Id.*
- According to Lucas, a detective punched him in the stomach, slapped him, and stepped on his genitals while he was sitting down. *Id.*
- After the interrogation and abuse, Lucas signed a statement. *Id.*

### B. Evidence of Notice to the City of Chicago

Internal police records related to Lucas' interrogation noted that he was coughing up blood and police records noted that Lucas said that detective had slapped him, punched him and stepped on his genitals. *Id.*

The Tribune article was published in 1991.

### C. Evidence of Innocence

According to police records, another detective reported that Lucas "did not fit the description of the killer provided by witnesses." PTP- H LUCAS-000001-000004 at 3.

LEO 002332

*Area 4*

*— Witness Not A Suspect*

Case:  Keith Mitchell
Year:  1997
Report Page:  85

**Summary in Leo Report:**

Keith Mitchell (1997): Detective Kato interrogated Mr. Mitchell for three days and forced him to by Detective Kato and was forced to sign a witness statement for a murder he did not witness. Detective Kato elbowed him in the head, kneed him in groin, and threatened to charge him with "setting up" the victim for the murder. (Mitchell Complaint Register & OPS Investigation); PTP-K MITCHELL-000001-000034.

**Materials Provided Supporting Summary In Report:**

| Description | Bates Range |
|---|---|
| CR File – OPS Investigation | PTP-K MITCHELL-000001-000034 |

**Evidentiary Support for Summary:**

### A. Evidence of Coercion and Abuse

Note Mitchell was a witness, not a suspect. PTP-K MITCHELL-000004.

The CR file says that Mitchell made a complaint to CPD that "Detective Edward W. Kaizer and a male Oriental detective [Kato] . . . forced him to sign a witness statement regarding a murder." PTP-K MITCHELL-000004.

Mitchell also alleged that "the male Oriental handcuffed him to the wall, elbowed him on the head, and kneed him on the groin area." *Id.*

Mitchell also complained that the accused detectives "held him for three days" in the Area 4 Interview Room "until he signed the witness statement," even though "he told the accused he never witnessed the murder." *Id.*

Mitchell further alleged that the Detectives threatened to accuse him of involvement in the crime by threatening to say that he "set up the victim who was murdered." *Id.*

Detective Kaizer admitted that Mitchell was at the Area 4 Detective Division for two days – from 3/2/97 to 3/4/97 – but claimed that this was at Mitchell's request. *Id.* at 30.

### B. Evidence of Notice to the City of Chicago

Notice on 3/6/97 - date CR filed. PTP-K MITCHEL-000003.

### C. Evidence of Innocence

Not applicable. Mitchell was not a suspect in the crime. PTP-K MITCHELL-000004.

**LEO 002333**

Case:          Keith Mitchell
Year:          1997
Report Page:    85

**Summary in Leo Report:**

Keith Mitchell (1997): Detective Kato interrogated Mr. Mitchell for three days and forced him to by Detective Kato and was forced to sign a witness statement for a murder he did not witness. Detective Kato elbowed him in the head, kneed him in groin, and threatened to charge him with "setting up" the victim for the murder. (Mitchell Complaint Register & OPS Investigation); PTP-K MITCHELL-000001-000034.

**Materials Provided Supporting Summary In Report:**

| Description | Bates Range |
| --- | --- |
| CR File – OPS Investigation | PTP-K MITCHELL-000001-000034 |

**Evidentiary Support for Summary:**

### A. Evidence of Coercion and Abuse

Note Mitchell was a witness, not a suspect. PTP-K MITCHELL-000004.

The CR file says that Mitchell made a complaint to CPD that "Detective Edward W. Kaizer and a male Oriental detective [Kato] . . . forced him to sign a witness statement regarding a murder." PTP-K MITCHELL-000004.

Mitchell also alleged that "the male Oriental handcuffed him to the wall, elbowed him on the head, and kneed him on the groin area." *Id.*

Mitchell also complained that the accused detectives "held him for three days" in the Area 4 Interview Room "until he signed the witness statement," even though "he told the accused he never witnessed the murder." *Id.*

Mitchell further alleged that the Detectives threatened to accuse him of involvement in the crime by threatening to say that he "set up the victim who was murdered." *Id.*

Detective Kaizer admitted that Mitchell was at the Area 4 Detective Division for two days – from 3/2/97 to 3/4/97 – but claimed that this was at Mitchell's request. *Id.* at 30.

### B. Evidence of Notice to the City of Chicago

Notice on 3/6/97 - date CR filed. PTP-K MITCHEL-000003.

### C. Evidence of Innocence

Not applicable. Mitchell was not a suspect in the crime. PTP-K MITCHELL-000004.

LEO 002334

Case:          Patrick Prince
Year:          1991 - murder; 1994 - convicted
Report Page:   89

**Summary in Leo Report**:

Prince alleges that Det. Kato arrested Mr. Prince, took him to Area 4, held him for hours, physically abused him, and forced him to sign a written statement. *People v. Prince, 91 CR 26365-01, Apr. 26, 2017 Order (Cir. Ct. Cook Co.); People v. Prince, 91 CR 26365-01, Apr. 25, 2017 Closing Memorandum (Cir. Ct. Cook Co.).* In 2017, following a multi-day evidentiary hearing, Judge Thaddeus Wilson granted Prince post-conviction relief, explaining that "the testimony and submissions presented . . . seriously call into question the vitality and fidelity of the conviction, especially given the disparities, inconsistencies and newly discovered evidence presented to this Court . . . . This is a case that arose during the times, thinking, sentiments, customs and practices of the 1990s. Petitioner was just 19 years old . . . . The only evidence against Petitioner was his confession. Allegations and findings of past misconduct by police during questioning of suspects are now at an unprecedented high and we now better understand the psychology of false confession." *People v. Prince, 91 CR 26365-01, Apr. 26, 2017 Order (Cir. Ct. Cook Co.), p. 7-8.* The charges against Prince were dismissed, and he was granted a certificate of innocence. *(Prince Certificate of Innocence; PTP-K MURRAY-000001-000028).*

[NOTE THE ERROR IN THE BATES REFERENCE IN THE REPORT]

**Materials Provided Supporting Summary In Report:**

| Description | Bates Range |
|---|---|
| Order in People v. Prince | PTP-P PRINCE-000001-8 |
| Petitioner's Closing Memorandum in Prince v. State of Illinois | PTP-P PRINCE-000009-16 |
| Order Granting Certificate of Innocence in People v. Prince | PTP-P PRINCE-000017 |

1

**LEO 002335**

**Evidentiary Support for Summary**:

### A. Evidence of Coercion and Abuse

- **April 26, 2017 order from Judge Thaddeus Wilson** says
  - Allegations and findings of past misconduct by police during questioning of suspects are now at an unprecedented high and we now better understand the psychology of false confessions. (PTP-P PRINCE 000008)
  - This is even more troubling given the apparent concern expressed by the trial judge who heard the case regarding the quantity and quality of the evidence. (PTP-P PRINCE 000007)
- **April 25, 2017 Closing Memorandum** says
  - Petitioner has presented evidence from 22 people who, like Prince, claim that Detective Kato abused them in interrogation rooms in Area 4. (PTP-P PRINCE -000014)
  - In 2015 testimony, Detective Kato refused to say one way or the other whether he physically abused [14] people - he instead asked to see his prior testimony andor refused to deny the allegation. (PTP-P PRINCE -000013)
  - Kato's claim that he never interrogated Prince, that Prince spontaneously confessed, and that Prince was never handcuffed looks completely different in light of the fact that the First District has rejected multiple times (e.g. Frederick Seaton, Keith Washington, Andre Wallace) Kato's claim that they were at the station overnight and voluntarily." (PTP-P PRINCE -000016)

### B. Evidence of Notice to the City of Chicago

- **April 26, 2017 order from Judge Thaddeus Wilson** says
  - "This is a case that arose during the times, thinking, sentiments, customs, and practices of the 1990s." (PTP-P PRINCE-000007)

### C. Evidence of Innocence

- **June 15, 2018 Order Granting Certificate of Innocence** says
  - "The Defendant/Petitioner did not by his own conduct voluntarily cause or bring about his conviction." (PTP-P PRINCE 000017)

- **April 26, 2017 order from Judge Thaddeus Wilson** says
  - There were no eyewitnesses to the actual shooting that testified at trial. No physical evidence connects Petitioner to the crime. No forensic evidence connects Petitioner to the crime. The only evidence against the Petitioner was his confession. (PTP-P PRINCE 000007-08)
  - The testimony and submissions presented here seriously call into question the vitality and fidelity of the conviction, especially given the disparities,

2

LEO 002336

inconsistencies, and newly discovered evidence presented to this court."
(PTP-P PRINCE-000007)

- ○ "To ensure substantial justice is done, Defendant should be granted a new trial so that all of these matters can be properly flushed out, chased down, vetted, and resolved one way or the other." (PTP-P PRINCE 000008)
- **April 25, 2017 Closing Memorandum** says
  - ○ [Keith] Gunn, who was 13 years old at the time of the shooting, testified that he witnessed the shooting of Edward Porter and that the shooter was not Mr. Prince. (PTP-P PRINCE -000011)
  - ○ Mr. Gunn further testified, consistent with his affidavit, that he had anonymously called the police falsely claiming that Prince did the crime because he was jealous of Prince's girlfriend, Barbara Starling." (PTP-P PRINCE -000011)

3

LEO 002337

Case:        Frederick Seaton
Year:        1988
Report Page: 86
Area 4

**Summary in Leo Report:**

Frederick Seaton (1988): Detective Kato, Detective John Summerville and Detective Clarence Lewis (all from Area 4) interrogated Mr. Seaton for longer than a day and physically coerced (slapping, kicking, abusing and threatening) him into making a false confession. Following the interrogation, there was blood in Mr. Seaton's urine, his groin was swollen, and his face was red and sore. The Illinois Appellate Court overturned Mr. Seaton's conviction and ordered that his statement be suppressed, finding that they were the product of an illegal arrest. People v. Seaton, 242 Ill.App.3d 1105 (1st Dist. 1993); PTP-F SEATON-000001-000035.

**Materials Provided Supporting Summary In Report:**

| Description | Bates Range |
| --- | --- |
| Order in People v. Seaton | PTP-F SEATON-000001-12 |
| Opinion in Seaton v. Kato, et al. | PTP-F SEATON-000013-19 |
| Complaint in Seaton v. Kato, et al. | PTP-F SEATON-000020-35 |

**Evidentiary Support for Summary:**

### A. Evidence of Coercion and Abuse

- According to a 1993 appellate opinion, Seaton went to the police station at 8 p.m. on October 21, 1998 to ask about his brother.
- Seaton testified at the hearing on his motion to suppress that Chicago Police Detectives asked to question him and then shackled him to the wall and beat him. PTP-F SEATON-000002.
- Seaton testified that he agreed to sign a statement because he could not take any more abuse, but then he told the State's Attorney that Detectives had beaten him. PTP-F SEATON-000002. The State's Attorney called the Detectives back and they beat Seaton further. PTP-F SEATON-000002.
- During his arraignment, Seaton told the Court that he had blood in his urine and a painful and swollen groin from police abuse. PTP-F SEATON-000003.
- The appellate court found in 1993 that the police did not have probable cause to arrest Seaton, so his inculpatory statement should have been suppressed. PTP-F SEATON-0000010.

**LEO 002338**

## B. Evidence of Notice to the City of Chicago

- Seaton filed a civil complaint against the City of Chicago in 1994 alleging that the Chicago Police Department had a code of silence to cover up police brutality. PTP-R LASH-0000014.

## C. Evidence of Innocence

After Seaton's confession was suppressed, the charges against him were dropped by the State in 1994. PTP-R LASH-0000013.

LEO 002339

Case:          Andre Wallace
Year:          1994
Area:          Area 4
Report Page:   86

**Summary in Leo Report:**

While Mr. Wallace, who was 15-years-old, was handcuffed in an interview room, Detective Kato slapped him, kicked him, and squeezed his testicles, and made promises of leniency, telling him he could leave if he signed a confession. Mr. Wallace's conviction was overturned on appeal and the charges against him were dismissed. *People v. Wallace*, 299 Ill.App.3d 9, 12-13, 19 (1998); (Wallace Complaint Register & OPS Investigation; PTP-A WALLACE-000001- 000117).

**Materials Provided Supporting Summary In Report:**

| Description | Bates Range |
|---|---|
| 08/29/1995 Report of Proceedings in *People v. Wallace* | PTP-A WALLACE-000001-32 |
| Order in *People v. Wallace* | PTP-A WALLACE-000054-66 |
| Appellate opinion in *People v. Wallace* | PTP-A WALLACE-000033-53, PTP-A WALLACE-000073-93 |
| Complaint Register #206469 | PTP-A WALLACE-000094-117 |
| Amended Complaint in *Wallace v. Kato, et al.* | PTP-A WALLACE-000067-72 |

1

**LEO 002340**

**Evidentiary Support for Summary**:

### A. Evidence of Coercion and Abuse

- Report of Proceedings on a Motion to Suppress Statements (August 29, 1995) states
  - "About an hour and a half and two hours after I arrived [to Area 4]" Detective Kato "slapped me … with his back hand … across my mouth." (PTP-A WALLACE 000005)
  - "About 2 hours after that … [Detective Kato] kicked me in my knee." (PTP-A WALLACE 000006)
  - "[Kato] squeezed my testicles … he just stuck his hand down there and he had one arm in one hand, squeez[ed] my testicles with the other … [for] a couple of seconds." (PTP-A WALLACE 000006)
  - "He told me that if – if I didn't do what he said, he was going to talk to me with his hands … [this was] probably four and a half hours [into the interrogation]." (PTP-A WALLACE 000008)
  - "He said if I cooperated and signed the statement, he would get it dropped down to second degree and I would be going home … probably about four hours [into the interrogation]." (PTP-000009)
  - From 9 pm when he arrived them until approximately 6 am, Wallace's left hand was handcuffed to a wall. (PTP-A WALLACE 000019)

- **Order in People v. Wallace (August 31, 2001)** states:
  - Jackson's statement was procured during Jackson's own illegal detention after Jackson and defendant were brought to the police station together. Jackson's statement therefore could not properly be used to attenuate the taint of defendant's illegal arrest. (PTP-A WALLACE 000065)
  - For the foregoing reasons, the judgment of the trial court is reversed and the case is remanded for a new trial in which defendant's confession must be suppressed. (PTP-A WALLACE 000066)

- **Appellate Opinion in People v. Wallace (September 21, 1998)** states:
  - Defendant was never informed that he was free to leave. (PTP-A WALLACE 000038)
  - Defendant asserts that at some point after he arrived at the Area 4 police station he was illegally detained without probable cause, and the trial court ruling to the contrary was against the manifest weight of the evidence. [The Court] agreed and reversed the trial court's order denying defendant's motion to quash his arrest. (PTP-A WALLACE 000043)
  - Defendant remained in the same room - with the door closed - from his arrival at the station (roughly 8:30 pm) until he made his

2

**LEO 002341**

incriminating statement (at 4:30 am the following morning) (PTP-A WALLACE 000046)

B. Evidence of Notice to the City of Chicago

- **Complaint Register (May 6, 1994) states:**
  - On January 27, 1994, at 1244 hours, the complainant [Janice Wallace, Andre Wallace's mother] telephoned Civilian Employee Selena LOMACK of the Office of Professional Standards and registered this complaint on behalf of the victim. The complainant and victim alleges that [Detective KATO] while in the interview room 1) kicked the victim on his right knee, 2) grabbed the victim by the testicles and squeezed same, 3) left the interview room and returned and then slapped the victim in the mouth one time, and 4) then threatened the victim with physical harm. (PTP-A WALLACE 000096)
  - The victim claimed there were no witnesses present at the time of the alleged abuse and threats. Two detectives (Detectives ROY and RYBICKI) claimed that the victim was never questioned alone and denied the allegations made against Detective KATO. The victim did not sustain any injury as a result of the incident. Therefore, the undersigned investigator recommends that this investigation be closed with the findings of NOT SUSTAINED. (PTP-A WALLACE 000099)
  - The Office of Professional Standards conducted and completed a thorough investigation into all allegations and … after evaluating all of the available evidence, classified this Complaint Register as NOT SUSTAINED. (PTP-A WALLACE 000095)

C. **Evidence of Innocence**

- **Amended Complaint (April 28, 2004) states:**
  - After unlawfully arresting plaintiff, defendants KATO and ROY used a variety of coercive techniques to cause plaintiff to make a false confession to a murder. (PTP-A WALLACE 000067)
  - As a result of the foregoing, plaintiff made a false confession to a murder that he had not committed. (PTP-A WALLACE 000070)

3

LEO 002342

AReA 4

Case:        Michael Waslewski and Daniel Gasca
Year:        1990
Report Page: 87

**Summary in Leo Report**:

Mr. Waslewski claimed that, during an overnight interrogation, Detective Kato and another detective beat him in order to secure a confession. David Jackson, Fine Line Between Tough Police Work, Brutality, Chicago Tribune, at 2 (Jul 14, 1991). Gasca claimed that he was held for 26 hours, during which time Kato entered the interrogation room, told him "'You're a killer and you have no remorse,'" and when Gasca denied the accusation, Detective Kato hit the side of his head. Following the interrogations, Mr. Waslewski adopted a confession that Detective Kato provided to him, "giv[ing] a detailed statement describing how he and a friend, Daniel Gasca, stabbed [the victim] to death during a fight over money, then put [the victim's] body in the trunk of a car that they left in an alley near Cook County Jail." Id. The confession was shown to be false when records emerged showing that Gasca could not have been involved in the crime because he had been in prison on the night it occurred. Id. Wasleswki was acquitted at trial. Waslewski v. Kato, 1993 U.S. Dist. LEXIS 269, at *1-2 (N.D. Ill. 1993); PTP-M WASLEWSKI-000001-000006.

**Materials Provided Supporting Summary In Report**:

| Description | Bates Range |
|---|---|
| Motion to Dismiss Ruling | PTP-M WASLEWSKI-000001-000006 |
| Chicago Tribune Article | PTP-H LUCAS-000001-000004 |
| Chicago Reader Article | PTP-K WASHINGTON-000001-000032 |

**Evidentiary Support for Summary**:

   A. **Evidence of Coercion and Abuse**

   - The Chicago Reader reported that Waslewski was found not guilty of murder after presenting the defense that CPD detectives pressured him into confessing. The jury deliberated just over an hour. PTP-K WASHINGTON-000031.
   - The Chicago Tribune reported that Waslewski's "murder confession," given to Det. Kato, implicated his friend Daniel Gasca in the killing, even though Gasca was in Cook County jail that night. PTP-H LUCAS-000003.
   - Per the Chicago Reader, Waslewski stated that Kato assaulted him with kicks and strikes, threatened to "kick [him] in the kidneys and [he] would be pissing blood for a week," and further threatened to fabricate an account of the killing to convict him. PTP-K WASHINGTON-000031.

**LEO 002343**

- The Chicago Tribune reported that Daniel Gasca, Waslewski's friend, was held for questioning for 26 hours by Kato and said that Kato hit him in the head when questioning him. PTP-H LUCAS-000003. The Reader reported that Gasca said Kato struck and choked him and screamed at him. PTP-K WASHINGTON-000031.
- The Reader reported that Waslewski and Gasca both said that Kato told them what he wanted them to say about the murder. PTP-K WASHINGTON-000031.
- Per the Tribune, Brian Kane, Gasca and Waslewski's friend, said that Kato questioned him and "pulled his hair until he cried" during the questioning. PTP-H LUCAS-000003.

## B. Evidence of Notice to the City of Chicago

- In 1991, the City received notice through news articles in the Chicago Tribune (July 14, 1991) and the Chicago Reader (Dec. 12, 1991). PTP-H LUCAS-000001; PTP-K WASHINGTON-000001.
- In 1991 and 1992, further notice was provided through Waslewski's criminal trial (Nov. 1991) and a lawsuit Waslewski filed in January 1992. PTP-M WASLEWSKI-000001.

## C. Evidence of Innocence

- As described above, Waslewski was found not guilty of the homicide he was charged with. PTP-K WASHINGTON-000031.
- As described above, Waslewski's "confession" was inconsistent with Gasca being in jail at the time of the killing. PTP-H LUCAS-000003.
- As described above, Waslewski, Gasca, and Kane all alleged physical abuse by Kato. PTP-H LUCAS-000003, PTP-K WASHINGTON-000031.
- As described above, Waslewski and Gasca both asserted that Kato tried to fabricate evidence against them. PTP-K WASHINGTON-000031.

LEO 002344

*Area 3*

Case: Johnny Walker and Phillip Walker
Year: 1988
Report Page: 81

**Summary in Leo Report:**

Detective Kill beat Johnny and Phillip Walker in the groin and face until they falsely confessed to a murder. The detectives also beat thirteen-year-old Andre Wilks until he falsely identified Phillip Walker as the shooter. Phillip Walker was acquitted and Johnny Walker was never charged with a crime (Transcript of Report of Proceedings, State of Illinois v. Phillip Walker, April 3, 1989; PTP-JOHNNY AND PHILLIP WALKER-000001-000042).

**Materials Provided Supporting Summary In Report:**

| Description | Bates Range |
| --- | --- |
| Transcript Report of Proceedings, State of Illinois v. Phillip Walker, No. 88 CR 01596 (Cir. Ct. Cook County April 3, 1989) | PTP-JOHNNY AND PHILLIP WALKER-000043-000050 |

**Evidentiary Support for Summary:**

A. Evidence of Coercion and Abuse

According to the transcript report of proceedings, a witness testified at trial that Detectives beat him repeatedly with a flashlight while trying to convince him to falsely identify Phillip Walker as the perpetrator of the crime. Transcript Report of Proceedings, State of Illinois v. Phillip Walker, No. 88 CR 01596, at 42 (Cir. Ct. Cook County April 3, 1989), 39–42; PTP-JOHNNY AND PHILLIP WALKER-000044–47

B. Evidence of Innocence

According to the transcript report of proceedings, a witness at trial testified at trial that Detectives tried to convince him that Phillip Walker was the perpetrator of the crime. Transcript Report of Proceedings, State of Illinois v. Phillip Walker, No. 88 CR 01596, at 42 (Cir. Ct. Cook County April 3, 1989); PTP-JOHNNY AND PHILLIP WALKER-000047. According to the transcript report of proceedings, the witness testified at trial that Phillip Walker was not the perpetrator. Transcript Report of Proceedings, State of Illinois v. Phillip Walker, No. 88 CR 01596, at 42 (Cir. Ct. Cook County April 3, 1989); PTP-JOHNNY AND PHILLIP WALKER-000047.

**LEO 002345**

Case:        Kilroy Watkins
Year:        1994
Area:        Area 3
Report Page: 78

**Summary in Leo Report:**

Detective Boudreau and Detective Halloran choked and punched Watkins in the face until he gave a false confession (Complaint Under the Civil Rights Act, Title 42 Section, Kilroy Watkins v. Detective J. Halloran et al., May 6, 2002; Affidavit of Kilroy Watkins, January 17, 2004); PTP-K WATKINS-000001-000015)

**Materials Provided Supporting Summary In Report:**

| Description | Bates Range |
|---|---|
| Affidavit of Kilroy Watkins | PTP-K WATKINS-000015 |
| Complaint Under the Civil Rights Act, Title 42 Section, Kilroy Watkins v. Detective J. Halloran et al., May 6, 2002 | PTP-K WATKINS 000001-000014 |

**Evidentiary Support for Summary:**

A. **Evidence of Coercion and Abuse**
- **Affidavit (Jan. 17, 2004) states**
    o Affiant was taken into custody on or about January 15, 1992 and transported to the Area Three Violent Crimes Division … the affiant was escorted into the interrogation room on the third floor by Detective Halloran and partner Boudreau. The affiant was handcuffed to a ring in the wall. (PTP-K WATKINS 000015)
    o Once the affiant denied any involvement in shooting incident on August 27, 1991, the affiant was physically choked and assaulted repeatedly by Det. Boudreau. (PTP-K WATKINS 000015)
    o Det. Halloran failed to stop or prevent abuse. (PTP-K WATKINS 000015).
    o As a result of Detective's physical and psychological, as well as coercive procedures, the affiant was forced into signing a false confession, which was used at trial to obtain my conviction for a crime I did not commit. (PTP-K WATKINS 000015)
- **Civil complaint (May 6, 2002) states**
    o Once Plaintiff arrived at Area Three, and some hours later, the Defendants escorted the Plaintiff to a small isolated room in the rear office on the third

1

LEO 002346

floor, where Plaintiff was restrained to a rind in the wall. (PTP-K WATKINS 000006)

- o Defendant Boudreau came around the table and grabbed Plaintiff by his neck "choking" Plaintiff with one hand and "punched" the Plaintiff in the face, all while Plaintiff was handcuffed to a ring in the wall. (PTP-K WATKINS 000006)
- o Defendant Boudreau choked the Plaintiff repeatedly while screaming at Plaintiff to stop the "Bull-Shit" and tell [us] what you know about the murder incident on August 27, 1991. (PTP-K WATKINS 000006)
- o Defendant knew Plaintiff had been held in custody over 30 or so hours without any sleep or anything to eat, during the time of their interrogation. (PTP-K WATKINS 000007)
- o Plaintiff suffered mental, emotional, and physical abuse as a result of Defendants' actions, specifically, but not exclusively: his left side of the face, jaw area swollen, and bruised, he experienced neck pain and extreme soreness, and other mental and emotional complaints and traumas. (PTP-K WATKINS 000007)

B. **Evidence of Notice to the City of Chicago**
- **Complaint (May 6, 2002) states**
    - o Plaintiff attempted to bring all allegations of coercion and physical abuse by the Defendants to the attention of his trial attorney and trial judge back in July of 1992. The police denied all allegations of flagrant misconduct and physical abuse when confronted by Watkins's attorney. (PTP-K WATKINS 000007)

C. **Evidence of Innocence**

2

LEO 002347

AReA 3

Case: Marcus Wiggins, Demoni Clemon, Imari Clemon, Jesse Clemon, Dyez Clemon
Year: 1991
Report Page:

**Summary in Leo Report**: 82

Marcus Wiggins, Demoni Clemon, Jesse Clemon, Imani Clemon, Dyez Owen (1991): Detective Kill, Detective Boudreau, and others handcuffed thirteen-year old Marcus Wiggins to a wall, denied him access to his mother, and beat and electroshocked him until he gave a false confession. The Clemons brothers and Owen were also beaten until they confessed. Two of the confessions were suppressed and all of the defendants were either acquitted or the State declined to prosecute their cases. People v. Clemon, 259 Ill. App. 3d 5, 8, 10 (1st Dist. 1994); PTP-M WIGGINS-000001-000149; PTP-JESSE & DEMONI & IMARI CLEMON-000001-000276.

**Materials Provided Supporting Summary In Report**:

| Description | Bates Range |
|---|---|
| People v. Clemon, 259 Ill. App. 3d 5 (1st Dist. 1994). | |
| Volume I of Deposition of Demoni Clemon in Saunders v. City of Chicago, et al. | PTPJESSE & DEMONI & IMARI CLEMON 000001-26 |
| Deposition of Jesse Clemon in Saunders v. City of Chicago, et al. | PTP-JESSE & DEMONI & IMARI CLEMON 000027-95 |
| Volume II of Deposition of Demoni Clemon in in Saunders v. City of Chicago, et al. | PTP-JESSE & DEMONI & IMARI CLEMON 000096-276 |
| Deposition of Marcus Wiggins in Wiggins v. Burge, et al | PTP-M WIGGINS-000001-103 |
| Complaint in Wiggins v. Burge, et al. | PTP-M WIGGINS-000104-149 |

**LEO 002348**

**Evidentiary Support for Summary:**

### A. Evidence of Coercion and Abuse

On September 25, 1991, eleven suspects, including Marcus Wiggins, Demoni Clemon, Imari Clemon, Jesse Clemon, and Dyez Owen, many of whom were juveniles, were in custody for the murder of Alfredo Hernandez at the same time for 12 to 13 hours. PTP-M WIGGINS-000044; *People v. Clemon*, 259 Ill. App. 3d 5, 8, 10 (1st Dist. 1994). According to the appellate opinion in Jesse Clemon's case, Criminal Court Judge Earl Strayhorn's found the atmosphere of detaining so many young suspects and witnesses so close together that they could hear each other screaming was "horrendously oppressive" and he suppressed Jess Clemon's inculpatory statement. *People v. Clemon*, 259 Ill. App. 3d 5, 8 (1st Dist. 1994). A third party witness at the scene, Myron James, whom Judge Strayhorn found "very credible", testified at Clemons' suppression hearing that he heard Marcus and Jesse screaming and saw them nursing injuries after their interrogations by police. *People v. Clemon,* 259 Ill. App. 3d 5, 7-8 (1st Dist. 1994).

In a sworn deposition in 1996 in his civil case against the Chicago Police Department, Marcus Wiggins testified that in September 1991 Chicago Police Officers hit him in the chest until he cried and called him a liar when he would not admit to Hernandez's murder. PTP-M WIGGINS-000030-31. He testified that a Chicago Police Officer shocked him until he passed out. PTP-M WIGGINS-0000033-41. He testified that he felt like he was going to die, so when the officers told him he could go home if he signed something, he signed an inculpatory statement without reading it. PTP-M WIGGINS-000041.

In a sworn deposition in 2015 in *Saunders v. City of Chicago* (Jesse Clemon Dep., PTP-Jesse & Demoni & Imari Clemon 00027-95), Jesse Clemon testified that when he was being questioned in 1991, police officers hit him on the head with a flashlight causing him to cry in pain. PTP-Jesse & Demoni & Imari Clemon 00045. According to the appellate decision, Jesse Clemon's mother also saw police officers beating him with a flashlight when he was arrested. People v. Clemon, 259 Ill. App. 3d 5, 8, 10 (1st Dist. 1994). Jesse testified that he was taken from the police station to the hospital after his interrogation and inculpatory statement to police. PTP-Jesse & Demoni & Imari Clemon 00056. He also testified that he saw Chicago police officers hit his brother Demoni in the chest while Demoni was handcuffed. PTP-Jesse & Demoni & Imari Clemon 00046. Jesse Clemons saw the police punch Marcus Wiggins. PTP-Jesse & Demoni & Imari Clemon 00044.

In sworn deposition in 2016 in *Saunders v. City of Chicago*, Demoni Clemon testified that police officers hit him with a telephone book while he was handcuffed to a chair. PTP-JESSE & DEMONI & IMARI CLEMON 0000187. Demoni also testified that an officer pointed a gun at him, spun the bullet in the barrel, and told Demoni that he would keep doing that until Demoni signed an inculpatory statement. PTP-JESSE & DEMONI & IMARI CLEMON 000192-95.

**LEO 002349**

## B. Evidence of Notice to the City of Chicago

In a complaint filed by Marcus Wiggins against the City of Chicago on January 19, 1993, Wiggins described the oppressive atmosphere found by the criminal court and alleged that on September 25, 1991, when he was 13-years-old, Chicago Police Department Detective James O'Brien, prevented his mother from accompanying him in a police car to the station and then Detective O'Brien hit Wiggins in a head with the flashlight during the car. PTP-M WIGGINS-000107-08.

## C. Evidence of Innocence

Imari Clemon was never charged with the murder of Alfredo Hernandez. Demoni Clemon Deposition, PTP-JESSE & DEMONI & IMARI CLEMON 000162-63. The supposed inculpatory statements of Jess Clemon, Marcus Wiggins, Demoni Clemon, and Dyez Owens were all suppressed. PTP-M WIGGINS-000111, *People v. Clemon*, 259 Ill. App. 3d 5, 10 (1st Dist. 1994).

LEO 002350

*HREA 3*

Case:         Robert Wilson
Year:         1997
Report Page:    82

**Summary in Leo Report**:

Robert Wilson (1997): Mr. Wilson reports that Detective O'Brien slapped him repeatedly, and that Mr. Wilson became fearful that he would continue to be physically assaulted if he did not agree to a false confession. Detective Halloran also slapped and threatened Mr. Wilson. (Report of Dr. Richard A. Leo dated June 12, 2010) PTP-GENERAL-000066-000085.

**Materials Provided Supporting Summary In Report**:

| Description | Bates Range |
|---|---|
| Report of Dr. Richard A. Leo dated June 12, 2010 | PTP-GENERAL-000066-000085. |

**Evidentiary Support for Summary**:

### A. Evidence of Coercion and Abuse

- I wrote a report in 2010 about Robert Wilson's interrogation for his civil case against the City of Chicago after reviewing extensive documents including Wilson's 1999 trial testimony and deposition testimony in his civil case. PTP-GENERAL-000066-000085.
- Wilson was detained for over 24 hours. He had high blood pressure and repeatedly told police that he needed his medication. PTP-GENERAL-000078-79.
- Wilson testified in his criminal trial in 1999 that the CPD Detective O'Brien slapped him repeatedly and he agreed to sign an inculpatory statement because he believed he would not survive a beating especially when he considered O'Brien's size. PTP-GENERAL-000077-78.

### B. Evidence of Notice to the City of Chicago

Wilson testified to the abuse during his trial in 1999.

**LEO 002351**

## C. Evidence of Innocence

- The victim who identified Wilson has recanted her identification and said she was manipulated into making it by Chicago police detectives after she told them she was not sure if Wilson was her attacker.
- Jerryco Wagner, the true perpetrator of the assault and stabbing of the victim, has since confessed to the attack and was charged with six other similar assaults.

LEO 002352

## INDICIA OF UNRELIABILITY –
### The confessions statements are riddled with factual errors and are inconsistent with crime scene facts, physical evidence, and logic

1) The confessions state that Mr. Reyes and Mr. Solache rushed into the Soto's apartment and stabbed Jacinta Soto to quiet her down, but she was found laying face down in her bed in another room, not by the front door

2) Mr. Reeyes confession statement says that he saw Mr. Solache killing Mariano Soto in the bed. But Mr. Soto's body was found by the front door, not by the bed, which was in a separate room (i.e., the bedroom).

3) Mr. Solache's confession statement says that he stabbed Mariano Soto while he was face up, but no blood was found on Mr. Solache

4) Mr. Solache's confession statement also states that he noticed blood on his shoes, but there was no blood found on Mr. Solache's shows nor anywhere else on his person

5) Mr. Solache's confession statement states that Jacinto Soto was near the front door being stabbed and screaming while Mariano was asleep in the back bedroom of the apartment and sleeping through his wife's brutal, bloody and loud murder. Doesn't make sense that he would sleep through that

6) Motive imputed to them: they were alleged to have been part of an elabore scheme to kidnap a baby for and commit murders in exchange for $600

LEO 002353

## Evidence of a Proven False Confession – DNA Exclusion

1) Mariano and Jacinta Soto were stabbed more than 50 times, leaving a crime scene that was full of the victim's blood, DNA and other physical evidence

2) Police found:

- Two bloody knives

- A butcher's block;

- Blood-stained clothing

- Blood-stained bed coverings

- Broken glass

- Shoeprints dried in blood

- Blood spatter on the bedroom wall

- Defensive wounds on the back of both of Mariano Soto's hands

- Hairs

- Fingerprints throughout the house

3) The true perpetrator or perpetrators who committed this crime would have left their own DNA at the crime scene, and DNA from the crime scene would have been left on them

4) Neither Arturo Reyes nor Gabriel Solache's DNA was found at the DNA-rich crime scene nor was any of either murder victims' DNA found on Mr. Reyes or Mr. Solache

5) Not a single piece of forensic evidence linked Mr. Reyes or Mr. Solache to the double murder; DNA testing excluded both individuals as the source of any evidence at the crime scene

6) By contrast, Andriana Mejia's DNA was found at the bloody crime scene; and the victim's blood was on her

Andriana's blood WAS Found on one of The KNives at The Soto home, as well as one The towel Found in the car. Mariano Soto's blood was Found on Andriana's pants and Shoes. A Male DNA profile was Found on towel From Andriana's car but That profile was Not linked to anyone

LEO 002354

Adriana's blood found on one of the knives @ the Soto home

Adriana's blood found on the towel in the car

Soto's
Mariano's blood found on Adriana's pants and shoes

A Male DNA profile was found on the towel from Adriana's car, but that profile was not linked to anyone

Adriana's DNA was on a box of knives behind the couch

Mariano Soto's DNA on Adriana Mejia's shoes, trousers, towel recovered from her home

DNA from unknown contributor found on Adriana's shoes

Adriana Mejia's and unknown contributor's DNA on green towel recovered from Mosturo's car connected to the crime

LEO 002355

## SOURCES OF PATTERN/PRACTICE/NOTICE

1) Repeated Allegations that accumulated against supervisors and detectives, first at Area 2 detective Division and later at Areas 3, 4 and 5

2) The testimony of numerous criminal defendants at motion to suppress hearings and trials

3) The in-court admissions of city lawyers

4) The findings of numerous Office of Professional Standards reports

5) From federal and state court decisions

6) From media articles, reports and editorials

7) From innocent pardons by the Governor of Illinois

8) From numerous civil lawsuits alleging physical abuse and coercion to extract and fabricate confessions

9) From the findings of the United Nation's Committee Against Torture and from Amnesty International

10) From the admissions of city officials

LEO 002356

## EVIDENCE OF A PROVEN FALSE CONFESSION – PHYSICAL IMPOSSIBILITY

1)  Mr. Reyes confession statement describes Gabriel Solache picking him up on March 28 at 1:30 a.m. to commit the crime. But, as Mr. Solache's employee time sheets verify, he was at work at 1:30 a.jm. on March 28, 1998, and did not get off of work that morning until 3:00 a.m.

2)  Mr. Reyes time sheets also show he was at work both the day of and the day before the crime

LEO 002357

## Interrogation of Arturo Reyes

### POLICE

Reynaldo Guevara

Robert Rutherford

Edwin Dickinson

Youth Officer Daniel Trevino

Former ASA Thomas O'Malley

### VICTIMS

Mariano and Jacinta Soto -- Parents

Maria (3 yrs old) and Santiago (infant) – Children

## Interrogation of Gabriel Solache

### POLICE

Reynaldo Guevara

ASA Heather Brualdi

LEO 002358