*DeLeon-Reyes v. Guevara, et al.*
Case No. 18 CV 01028

*Solache v. Guevara, et al.*
Case No. 18 CV 02312

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ARTURO DELEON-REYES,                )
                Plaintiff,          )
                                    )
                -vs-                )Case Number 18 CV 01028
                                    )
REYNALDO GUEVARA, et al.,           )
                Defendants.         )
*****************************
GABRIEL SOLACHE,                    )
                Plaintiff,          )
                                    )
                -vs-                )Case Number 18 CV 02312
                                    )
REYNALDO GUEVARA, et al.,           )
                Defendants.         )

VIDEOTAPED

AUDIO-VIDEOCONFERENCE DEPOSITION

RICHARD LEO

a witness herein, called for examination pursuant to Notice

and the Federal Rules of Civil Procedure as they pertain to

the taking of depositions before Lea Ruth Cohen, CSR, and a

Notary Public in and for the County of Peoria, State of

Illinois, on Monday, April 24, 2023, commencing at the hour

of 11:04 a.m., via Zoom platform.

ALL APPEARANCES VIA ZOOM:

SEAN C. STARR, ESQUIRE
a n d
RACHEL BRADY, ESQUIRE
Loevy & Loevy
311 North Aberdeen Street, Third Floor
Chicago, Illinois  60607
(312)243-5900
sean@loevy.com
rachel@loevy.com
on behalf of Plaintiff Arturo Deleon-Reyes;

BEN ELSON, ESQUIRE
People's Law Office
1180 North Milwaukee Avenue, Third Floor
Chicago, Illinois  60622
(773)235-0070
ben.elson79@gmail.com
on behalf of Plaintiff Gabriel Solache;

MICHAEL SHALKA, ESQUIRE
a n d
NORA SNYDER, ESQUIRE
Leinenweber Baroni & Daffada, LLC
120 North LaSalle Street, Suite 2000
Chicago, Illinois  60603
(866)786-3705
mjs@ilesq.com
on behalf of Defendant Reynaldo Guevara;

CAROLINE GOLDEN, ESQUIRE
The Sotos Law Firm, P.C.
141 West Jackson Boulevard, Suite 1240A
Chicago, Illinois  60604
(630)735-3300
CGolden@jsotoslaw.com
on behalf of individual police officer Defendants;

EILEEN E. ROSEN, ESQUIRE
Rock Fusco & Connelly, LLC
321 North Clark Street, Suite 2200
Chicago, Illinois  60654
(312)494-1000
erosen@rfclaw.com
on behalf of Defendant City of Chicago;

ALSO PRESENT VIA ZOOM:

NICK TROTTA, Certified Legal Videographer
ROBYN FALASZ, Exhibit Technician
Urlaub Bowen & Associates
20 North Clark Street, Suite 600
Chicago, Illinois   60602(312)781-9586
ntrotta@urlaubbowen.com
robin@urlaubbowen.com.

RICHARD LEO, 04/24/2023                                         Page 4

                              I N D E X


Called on behalf of Defendant City of Chicago:

RICHARD LEO

Direct Examination by Ms. Rosen                    6

Cross-Examination by Ms. Golden            153

Exhibit                Page        Description


Exhibit 01 . . .   15     4/11/2019 Invoice No. 1

Exhibit 02 . . .   17     2/1/2022 Invoice No. 2

Exhibit 03 . . .   21     4/7/2023 Invoice

Exhibit 04 . . .   24     1/31/2023 Leo report

*Exhibit 06  . .   39     Monell opinion

*Exhibit 08  . . 121      LEO2268-2358

                  *(Indicates skip in sequence.)


Urlaub Bowen & Associates, Inc.   312-781-9586

THE VIDEOGRAPHER:  Good morning.  This is the beginning of Media Unit 1.  We are now on the video record at 11:04 a.m.

This is the videotaped video-conferenced discovery deposition of Dr. Richard Leo being taken on April 24th, 2023.  This deposition is being taken on the behalf of the Defendant in the matter of Arturo Deleon-Reyes versus Reynaldo Guevara, et al.  The case numbers are 18 CV 1028 and 18 CV 2312, filed in the United States District Court for the Northern District of Illinois, Eastern Division.

My name is Nick Trotta, Legal Videographer, representing Urlaub Bowen & Associates with offices at 20 North Clark Street, Suite 600, Chicago, Illinois.  The court reporter today is Lea Cohen, also of Urlaub Bowen & Associates.

Counsel, please identify yourselves for the video record and the parties which you represent.

MR. ELSON:  Ben Elson and Nora Snyder for Gabriel Solache.

MR. STARR:  Sean Starr on behalf of Arturo Reyes.

MS. ROSEN:  Eileen Rosen on behalf of Defendant City of Chicago.

RICHARD LEO, 04/24/2023                                                Page 6

MS. GOLDEN:  Caroline Golden for the individual officer Defendants.

MR. SHALKA:  And Michael Schalka on behalf of Defendant Guevara.

THE VIDEOGRAPHER:  Will the court reporter please swear in the witness?

(Witness sworn.)

RICHARD LEO, having been called on behalf of Defendant City of Chicago, being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. ROSEN:

Q.   Good morning, Dr. Leo.  How are you doing today?

A.   Good morning.  Thank you.  Good.

Q.   Can you tell me, do you have anything in front of you today as you're taking your deposition?

A.    I do, yeah, I have four things in front of me.  I have my rebuttal report to Dr. Welner, I have the Dr. Welner report, and I have Bates-stamps notes that were produced to you from the last deposition, and then I have my original report in Reyes and Solache.

Q.    And the notes that you have in front of you, the ones that are Bates-stamped, are they Bates-stamped LEO2268

through LEO2358?

A. Yes.

Q. And the version of the notes that I have been provided are typewritten but then they also have some handwriting on them. Is that the same version that you have?

A. Yes.

Q. Generally speaking, the handwriting that's on the notes that are Bates-stamped 2268 through 2358, is that handwriting your handwriting?

A. Yes.

Q. Since these documents were produced to us, have you added any additional handwriting to the notes?

A. No.

Q. The rebuttal report that you have in front of you, does it have any handwritten notes added to it?

A. No.

Q. Dr. Welner's report that you have in front of you, does it have handwriting on it?

A. Yeah, this Dr. Welner's notes does have some handwriting, not much, and some underlining.

Q. So Dr. Welner's report? Is that what you mean?

A. Yeah. My copy of Dr. Welner's report I did underline and make some notes on, yes.

RICHARD LEO, 04/24/2023                                    Page 8

Q.   When did you underline and make the notes on the hard copy of Dr. Welner's report that you have in front of you?

A.   I don't recall.

Q.   Your original report that you have in front of you, does it have any handwriting or notations on it?

A.   Yes, it does.

Q.   When did you make the notes and handwriting on your report?

A.   I believe it was in preparation for my two depositions by you in late September.

Q.   Is that the same copy of your report that you had in front of you when you were answering questions back in September?

A.   Yes.

Q.   Have you added any additional notes --

A.   No.

Q.   Let me just finish my question so it's clear for the record.

Have you added any additional notes or handwritings to the original report, the original report that you have in front of you, since your two depositions in September?

A.   No.

RICHARD LEO, 04/24/2023                                    Page 9

Q.   When you were answering questions in your deposition in September, did you have the report with your handwritten notes in front of you to assist you in answering questions?

MR. ELSON:  Hold on, Dr. Leo.  I'm going to insert an objection here.  I don't think -- I think this material is covered by privilege which is consistent with the objection we asserted during the last session of the deposition.

Given the meet-and-confer that we had on this issue prior to today's deposition, I'll allow him to answer this question but subject to the same conditions that we produced the notes under and allowed him to answer questions on this topic before.  We are not waiving any privilege here, but I'll allow him to answer this question.

Do you need it read back?

THE WITNESS:  Yeah, that would be helpful. Thank you.

MR. STARR:  I would just like to join that objection.  Eileen, if it's convenient for you, I would have a standing joiner of any objections that Ben makes.

MS. ROSEN:  Yeah, that's fine.

MR. STARR:  Okay, thank you.

(Record read as follows:

RICHARD LEO, 04/24/2023                                           Page 10

"Question:  When you were answering

questions in your deposition in

September, did you have the report with

your handwritten notes in front of you

to assist you in answering questions?"

A.    To the best of my recollection, I had the report in front of me with the notations on the report.  There is no -- what I'm referring to is not any separate handwritten notes as the question implies but notes that are written or underlinings on the report itself.

Q.    I did not mean to imply by my question that you had additional separate notes.  It's my understanding that the notes that you have in front of you during the September deposition comprise the notes that were produced to us after the fact that are currently Bates-stamped LEO2268 through 2358.  Do I have that correct?

A.    It's possible that I misunderstood your question. I thought you were referring to notations that I made on my January 15th, 2022 report.

Q.    Okay, hold on one second, let me make it clear because I think there might be some confusion.  So just so that we're clear about what we're talking about.

So we have -- you have in front of you today four hard copy documents, correct?

RICHARD LEO, 04/24/2023                                    Page 11

A.    Yes.

Q.    And you have in front of you your Guevara report that has no notations or handwritten notes on the actual document itself, correct?

A.    Correct.

Q.    Okay.  You also have Dr. Welner's report which does have your handwritten notes and some underlining, I believe is what you said, correct?

A.    Yes, on the document itself.

Q.    Correct.  You have no separate notes related specifically to your rebuttal report, correct?

A.    Correct.

Q.    You have no separate notes related specifically to Dr. Welner's report, correct?

A.    Correct.

Q.    Okay.

MR. ELSON:  Objection to the form of that last question.  Go ahead.

Q.    And then you also have the notes that you had in front of you when you were answering questions in your September depositions to assist you in answering questions, you have those in front of you, correct?

A.    Correct.

Q.    Okay.  And there are handwritten notes and

RICHARD LEO, 04/24/2023                                      Page 12

underling and other notations on the notes that are Bates-stamped 2268 through 2358, but those notations and the handwriting are the same as they were at the time of your deposition and the same as what was produced to us after your deposition, correct?

A.   To the best of my memory, yes.

Q.   Okay.  Then you also now today have a copy of your original report in front of you, correct?

A.   Correct.

Q.   And you also had -- strike that.

The copy of the original report that you have in front of you today contain notes and handwriting on it, correct?

A.   Some, correct, yeah, underlining and notations, yes.

Q.   That's your underlining and your notations, correct?

A.   Correct.

Q.   And the notations and the handwriting that you've just described that is on the actual report, the hard copy of the report, those are the same notes and handwriting that were on the original report at the time of your September depositions, correct?

A.   To the best of my memory, yes.

Urlaub Bowen & Associates, Inc.   312-781-9586

Q.   Okay.  And did you use that report with the notes and the handwriting on it to assist you in answering questions during your two sessions of deposition in September?

A.   I don't recall.

Q.   Did you have that same report in front of you as you were answering questions in September?

A.   Yeah, most likely, but I don't recall.

Q.   What did you do to prepare for your deposition today?

A.   I reviewed the four documents that we just discussed and I spoke to counsel on the phone.

Q.   When did you review the documents?

A.   I reviewed them over the weekend.

Q.   How much time did you spend reviewing the documents?

A.   I would estimate maybe five hours total, maybe a little bit more, maybe a little bit less.

Q.   When did you speak to counsel?

A.   I spoke to counsel this morning and one of the days, I'd have to look at my notes, one of the days towards the end of last week, probably Thursday.

Q.   When you spoke to counsel last week, who specifically did you speak with?

A.    Ben Elson, Nora Snyder and Steve Art.

Q.    How long did that conversation with Ben, Nora and Steve last?

A.    So Nora may not have been on the conversation last week, I'd have to look at my notes.  My best recollection is that conversation lasted a half-hour, give or take.

Q.    And the conversation this morning that you had with counsel, who specifically did you have that conversation with?

A.    Again, Ben Elson, Steve Art and Nora Snyder.

Q.    And how long did that conversation this morning last?

A.    Again, I'd have to look at my time sheet, but my estimate would be around 20 minutes.

Q.    When you say you would have to look at your time sheet, what are you referring to?

A.    I'd have to look at my notation about when the conversation started and ended or I'd have to look at my iPhone and see what it says about how long that conversation was.

Q.    Do you typically track -- keep track of the amount of time you spend speaking with counsel --

A.    Yes.

Q.    -- so that you can eventually invoice them, correct?

MR. STARR:  Objection to form.

A.    Correct.  Sorry.

MS. ROSEN:  Did we get an answer?  Is that correct?

THE REPORTER:  "Correct."

BY MS. ROSEN:

Q.    Other than reviewing the documents and the two conversations you described, have you done anything else to prepare for your deposition?

A.    Not specifically, no.

Q.    Let's take a look at what we've marked as Exhibit Number 1 which will get put up on the screen.  This is one of your invoices --

(Remote screen sharing.)

Q.    -- Dr. Leo, which I believe we looked at last time, but I just want to make sure I have now all of your invoices and that they're current for all of the work you've done up until the last week or so.

This is an invoice dated April 11th, 2019, it says Reyes/Solache Cases, says Invoice No. 1.  If we go to the -- I believe it's the next page of the document we can see that the time frame of the invoice is through

February 4th, 2019, and it looks like the total amount of hours between October 11th, 2018, which is the first entry on the first page of the document, and February 4th, 2019, is 50.4 hours.  Do you see that there?

A.    I do, yes.

Q.    And is that an accurate reflection of the amount of time you spent between October 2018 and February 2019 working on the Solache/Reyes cases?

A.    It should be, yes.

Q.    And then on the second page of Exhibit Number 1 we see at the bottom there, Minus retainer check -- you don't need to scroll, sorry -- of $7,500.  Is that just the typical retainer that you request when you -- at the inception of a case when you begin consulting?

A.    That number has changed over the years and it sometimes changes in response to particular cases where I'm privately retained.  So I don't know that that number is typical.

Q.    Okay, fair enough.  So we know that through February "14th," 2019, you billed 50.4 hours on this matter, correct?

A.    I think you said February 14th.  It looks like February 4th.

Q.   I did, you are correct.  I apologize.

So through February 4th, 2019, you billed 50.4 hours in total for the work you completed in connection with these two cases, correct?

A.   I believe so.

Q.   Then, if we can look at Exhibit Number 2, this is again an invoice that was provided to us in connection with the Solache and Reyes cases, it says Invoice No. 2, and then this invoice has the dates July 24th, 2019 through January 15th, 2022.  Do you see that there?

A.   Yes.

Q.   I think we talked about it the last time at your deposition that the form of this invoice is different in that it's not itemized, it's just for a global period of time, correct?

A.   I believe so.

Q.   Do you have separate records where you itemize the hours that you spent so that when you prepare an invoice like this one that spans six months or so -- actually, more than that, it's from 2019 to 2022 so 18 months or so, so that you can accurately invoice the client?

MR. ELSON:  Objection to the form, and also I'm objecting to the extent that this line of questioning

implicates privilege under Rule 26(b)(4)(B) and (C).  I'm not going to instruct you not to answer this question.  You can answer this question, but I want to caution you that any answer you give related to communications between counsel or drafts of any type of disclosure is privileged under the rule and we would not -- we would instruct you not to answer those questions.

MR. STARR:  We again join.

MR. ELSON:  You can answer this question.

A.    Okay.  So can the question be read back?

(Record read as follows:

"Question:  Do you have separate

records where you itemize the hours

that you spent so that when you prepare

an invoice like this one that spans six

months or so -- actually, more than

that, it's from 2019 to 2022 so 18

months or so, so that you can

accurately invoice the client?"

A.    Yes.

Q.    And do you maintain those records until today or do you destroy them after you send the invoice?

A.    No, I maintain them.

Q.    Is there a reason that you didn't produce

those -- the records that you keep that separately itemize the work that you did in response to the subpoena that you received in this case?

MR. ELSON:  Objection to the form of the question.  That question calls for an answer that would divulge information that is privileged under Rule 26(b)(4)(B) and (C), and I instruct you not to answer.

MS. ROSEN:  Carrie, were you saying something?

MS. GOLDEN:  I was just going to, you know, correct, because the rule specifically excludes from privilege communications that relate to compensation so.

MS. ROSEN:  So we obviously disagree with your instruction but we don't have to get into the debate here.

BY MS. ROSEN:

Q.   Dr. Leo, I take it you're going to take your attorney's advice and not answer the question, correct?

A.   Correct.

Q.   We're going to ask that you maintain those records to the extent that we intend to pursue them -- well, I'm putting you on notice that we're going to likely pursue those records.  So please do not destroy them and please maintain them in a place where they can be

accessible if and when the parties agree to their production or the Court orders it. Okay?

A. Yes.

Q. Thank you.

If we scroll down a little bit on this document, for this 18-month period of time or 18-month-or-so period of time from July 24th, 2019 through January 15th, 2022, it looks like you spent 175.7 hours doing work in this case, correct?

A. Correct.

Q. From this invoice, generally speaking, the work that you are invoicing for includes email correspondence -- email correspondence, telephone consultation, review analysis and synthesis of case materials, preparation of report and revision of report. Do I have that correct?

A. Yes.

Q. And just for frame of reference, the original report was dated January 15th, 2022, so it looks like this invoice covered the period of time leading up to the preparation of and disclosure of the original report, right?

A. Correct.

Q. And so up until January 15th, 2022, which is when the original report was tendered, you had spent, if we

RICHARD LEO, 04/24/2023                                            Page 21

add the two invoices together, approximately 225 hours in the various tasks that you did to prepare the January 15th, 2022 report; is that correct?

A.  Well, I wouldn't agree with the wording because a lot of that was not in preparation for the report, but I think I would agree with the spirit of the question which is in that I believe four-year period or roughly four-year period, if you add the hours of the two invoices together, then, yes, that's the amount of time that I spent on the case.

Q.  Okay.  That's a fair point.  I assume part of the time that you were reviewing materials was not necessarily in preparation of the report, correct, that's the distinction you're drawing?

MR. ELSON:  Objection to the form.

A.  Correct.

Q.  Okay.  Then, if we can look at Exhibit Number 3, this is the invoice we just received in connection with our request that you supplement your subpoena response.  This invoice is dated April 7th, 2023, it covers activities from March 18th, 2022, to March 16th, 2023, so approximately a one-year period of time, correct?

A.  Yes.

Q.  Then this invoice generally describes that the

Urlaub Bowen & Associates, Inc.   312-781-9586

RICHARD LEO, 04/24/2023                                              Page 22

activity being invoiced for includes email correspondence with counsel, telephone consultation with counsel, downloading and printing case materials, review and analysis of case materials, preparation or revision of rebuttal report.  Do you see that there?

A.    Correct.

Q.    And then the total amount of time for those activities that covered the last year is 47 hours?

A.    Correct.

Q.    So in total the amount of time you spent doing work on this case, excluding the amount of time that you billed the Defendants for for your depositions in this matter, totals approximately 275 hours' worth of work.  Do I have that approximately correct?

A.    If that number is the sum of the three -- hours on the three invoices, then that would be correct through the date of the most recent invoice which is April 7th, 2023.

Q.    Right.  So it excludes whatever work you've been doing between April 7th and today?

A.    Correct.

Q.    Okay.  Then this invoice talks about downloading and printing case materials.  Did you receive new case materials after you tendered your original report

RICHARD LEO, 04/24/2023                                      Page 23

January 15th, 2022?

A.   I don't recall if I did or not, but I do list in my rebuttal report a few materials, I just don't -- that I reviewed in preparation with the -- in preparation for the rebuttal report, and I just don't recall when, other than Dr. Welner's original report, when -- if I received those prior to or after the September depositions.

Q.   In order to answer my question you were looking at a document.  What document were you looking at?

A.   My rebuttal report for Dr. Welner dated January 31st, 2023.

Q.   Okay.  We'll talk about the materials that you're talking about when we get to that report.

But beyond that, as you sit here today you can't recall any other case materials that you were provided that you reviewed and analyzed, correct?

A.   Correct.

Q.   Or downloaded and printed, correct?

A.   Correct.

Q.   This invoice said that you had a telephone consultation with David Owens.  Do you see that there?

A.   Correct.

Q.   Who does David Owens represent in this case?

MR. ELSON:  Objection to the form.

Urlaub Bowen & Associates, Inc.   312-781-9586

RICHARD LEO, 04/24/2023                                        Page 24

A.   I think David Owens is an attorney for Loevy and Loevy.

Q.   Is it your understanding that he represents Mr. Reyes?

MR. ELSON:  Objection to the form.

A.   It was, no -- it's my -- yes, if Loevy is the firm that's representing Reyes then, yes, he would be part of the firm that represents Mr. Reyes.

Q.   Let's take a look at what we've previously marked as Exhibit Number 4 -- actually, let me go back.  Sorry.  Can we go back to the invoice, the current invoice or the most recent invoice, Number 3.

(Remote screen sharing.)

Q.   Can you tell me approximately how much time you spent preparing and revising your rebuttal report?

MR. ELSON:  Objection to the form.

A.   No, I couldn't tell you off the top of my head.  I don't know.  I would just have to guess.

Q.   Can you approximate it in any way?  How much of the 47 hours that you've billed on this invoice for the work that you did from the period of time of March 18th, 2022, to March 16th, 2023, approximately how much of that time was spent preparing and revising your rebuttal report?

A.   Again, this would be speculation, but if you want

RICHARD LEO, 04/24/2023                                    Page 25

me to speculate I would speculate between 10 and 20 hours.

Q.   And then how much time out of that 47 hours do you think you spent reviewing Dr. Welner's report?

A.   Well, Dr. Welner's report probably a couple hours.  Again, that's my best guess.

Q.   As with the other invoice, do you keep itemized records -- do you keep a record that itemizes the amount of time you spent doing different tasks so that when you prepare this invoice -- an invoice like this one you can accurately bill for the time you worked on the matter?

MR. ELSON:  Objection to the form.

A.   Yes.

Q.   And do you still have that record?

A.   Yes.

Q.   As with the other one, we ask that you maintain the record -- well, let me do it this way.

Is there a reason why you didn't produce that record in response to the subpoena that we tendered to you in this case?

MR. ELSON:  Objection.  Same objection I made before, we're asserting the privilege.

BY MS. ROSEN:

Q.   Dr. Leo, I assume you're going to take your attorney's advice and not answer my question?

A.     Correct.

Q.     I'm going to make the same request I did of your itemized log, or whatever, is please maintain whatever itemized records you have that are associated with this particular invoice, Exhibit Number 3, for the reasons I stated before.  Okay?

A.     Yes.

Q.     Thank you.

Let's go to Exhibit Number 4 which is your rebuttal opinion.  Taking a look at the first page of the document here it's dated January 31st, 2023.  Do you see that?

A.     Yes.

Q.     And then do you recognize this to be the first page or the first half of the page, what's on the screen here, of the rebuttal report you prepared in this case?

A.     Yes.

Q.     And this is the same, if we just scroll to the last page I guess of this document, it ends with a list of depositions.  Is that the last page of the version of the report you have in front of you?

A.     Yes.

Q.     Okay.  Then if we go to page 11 of the document, that's actually the end of your report and your signature,

RICHARD LEO, 04/24/2023                                          Page 27

correct?

A.    Yes.

Q.    And that's the same report that you have in front of you, right?

A.    Correct.

Q.    Let's go to the first page of the report again. And this format follows fairly closely to the format that you used for your original report dated January 15th, 2023, meaning that it is addressed to counsel, it has the case caption, it has your title and contact information at the top of the page, right?

A.    Correct.

Q.    And that's the normal way that you do your reports, at least in the recent history, is that correct, for these types of -- for civil cases?

A.    Correct, yeah.  The first third or half of the first page, yes.

Q.    Then, if we look at the bottom of this page, it identifies some additional materials that you reviewed in connection with this report, correct?

A.    Correct.

Q.    Are you all right there, Dr. Leo?

A.    I am, yeah.  I have a small dog and contractors may be showing up and I'm on the top floor of my house.  I

Urlaub Bowen & Associates, Inc.   312-781-9586

just wanted to make sure she wasn't going down the stairs. Thank you.

Q.   If you need to take a break then, just let us know and we'll do that.

A.   Okay.  Thank you.

Q.   So the first item, the first item you reviewed in connection with your rebuttal report is Dr. Welner's report, correct?

A.   Yes.

Q.   And you said you took maybe a couple hours to review that, right?

A.   Right.  That was my best estimate.

Q.   But your itemized log or whatever it is, whatever document you keep, would provide an accurate answer to the question of how much time you spent reviewing Dr. Welner's report, correct?

MR. ELSON:  Objection to the form.  Same objection as before.  I think that questions about an itemization of how he spent his time invades the privileges set forth in 26(b)(4)(B), (C), and we're asserting that privilege here.

We can meet and confer about this.  I know you don't want to have this debate right now.  We can meet and confer after the deposition about this, but as to that

specific question you can answer.

A.   I don't believe I would have that information.

Q.   So your -- you don't believe your itemized -- so where do you keep your itemization of the time spent working on the Solache/Reyes case so that you could send the invoice dated -- let me strike that.

With respect to Exhibit Number 3 which is the invoice dated April 7th, 2023, that encompasses work you did over a one-year period of time, what document or documents do you maintain where you itemize the work you did so that you can send this global invoice as reflected in Exhibit Number 3?

A.   So I maintain time sheets, and then when I prepare a report I no longer keep those time sheets, but you'll notice that one category on this document is review and analysis of case materials which is a broader category than one particular document in the case.

Q.   The time sheets, are those the things that you still have?

A.   No, not after I prepare an invoice.

Q.   What document were you referring to earlier that you said you still maintained that reflects the itemization?

A.   An itemized invoice.

Q.   Got it.  So let me just understand the process so I understand exactly wherein the dispute might lie between the parties.

As you're working on the case you create time sheets contemporaneously with the work that you're doing?

A.   Correct for the categories that appear on my invoices, yes.

Q.   And are those handwritten time sheets or computerized time sheets?

A.   Handwritten.

Q.   And if you were spending time today working on a particular matter, would you create the time sheet as you went, worked throughout the day, or at the end of the day or at some other time?

A.   No, it has to be contemporaneous.

Q.   And if you were reviewing materials in connection with a case and you were keeping time sheets, would you itemize the particular records you were reviewing?

A.   No.

MR. ELSON:  Objection to form.  Go ahead.

MS. ROSEN:  Was there an answer?  I'm sorry.

THE REPORTER:  Yes, the answer was "No."

BY MS. ROSEN:

Q.   How would you -- if you were reviewing materials

in connection with a case, how would your -- what would your time sheets indicate in association with that task?

A. That I reviewed case materials.

Q. So you don't break it down by particular document or material, you don't break it down in any way, it's just review and analyze case materials?

A. Correct.

Q. Okay. So is that why you said that if we looked at your -- wait. Let me back up.

So now once you do your time sheets then you create an itemized invoice; is that correct?

A. Correct.

Q. If we could go back to Exhibit Number 1 for a second?

(Remote screen sharing.)

Q. Is that the type of itemized invoice you were referring to?

A. Yes.

Q. Okay. So let's go to the first page of this document. So, for example, October 11th, 2018, you did some task that's been redacted from this invoice for a total of .2 hours, correct?

A. Correct. I just need, I think, a 30-second break to make sure that the dog is on this floor and to put up a

barrier to prevent her from going down the stairs.  This does not even need to be a five-minute break.  Just give me 30 seconds to retrieve the dog and put the barrier up. I'll be right back.

Q.   Okay.

THE VIDEOGRAPHER:  Do you want to stay on?

MS. ROSEN:  Yeah, if it's really 30 seconds we can just stay on, unless people want to take a break?

THE WITNESS:  I'm back.  The dog never left and I put the barrier up.

MS. ROSEN:  Sounds good, thank you.

BY MS. ROSEN:

Q.   So looking at Exhibit Number 1 --

A.   Sorry, I just need to close doors.  Just a second.  Just for sound reasons I needed to close the doors.

All right.  I'm back and looking at Exhibit Number 1.

Q.   Okay.  Looking at Exhibit Number 1, and the first entry there it looks like you did some task that we don't know what it is because it's redacted out on October 11th, 2018, for .2 hours, correct?

A.   Correct.

Q.   And the way you would have transferred the

information to this itemized invoice is you would have taken it from a time sheet that would have reflected whatever the activity was on October 11th, 2018, for .2 hours, right?

A.   Correct.

Q.   And then you would have discarded -- you would have thrown away the time sheet then after you had completed the invoice; is that right?

A.   Correct.

Q.   Okay.  All right.  Then, with respect to Exhibit Number 2.

(Remote screen sharing.)

Q.   Did you create the time sheets contemporaneously with the work you did, create an itemized invoice and then create this other version of the invoice to submit to counsel?

A.   Yes.

Q.   Okay.  And it's the itemized version of Exhibit Number 2 that you still have that we've asked you to maintain, correct?

A.   Correct.

Q.   And then, going to Exhibit Number 3 again, beginning in March of -- March 18th, 2022, through March 16th, 2023, you created contemporaneous time sheets

RICHARD LEO, 04/24/2023                                   Page 34

that reflected the work that you did on the case and then from those time sheets created an itemized invoice which you still have, but then from the itemized invoice you created this summary version of the invoice to produce to counsel to produce to us; is that correct?

MR. ELSON:  Objection to the form.

A.   Yes.

Q.   And you still have the itemized version of this invoice in your possession and that's the thing that we've asked you to maintain, correct?

A.   Correct.

Q.   But you no longer have the time sheets associated with the itemized invoice for the work you did beginning March 18th, 2022, through March 16th, 2023, correct?

A.   Correct.

Q.   Does this summary in this invoice reflect all of the categories of work that you did from the period of time March 18th, 2022, to March 16th, 2023?

A.   To the best of my knowledge, yes.

Q.   So from this invoice we have five categories of activities:  Email correspondence, telephone consultation, downloading and printing case materials, review and analysis of case materials and preparation and revision of rebuttal report.  Do I have that right?

A.   Yes.

Q.   I take it that if we were to look at either the itemized bills or the -- the itemized invoice or the time sheets if they still existed we would see a bunch of entries that say -- no.  Let me strike that.

If we were to look at the itemized invoice or the time sheets if they still existed we would see notations that matched the categories, the five categories identified in this invoice; is that right?

MR. ELSON:  Objection to the form.

A.   Correct.

Q.   So we would not, if we were looking at your either itemized invoice or your time sheets if they still existed where you -- where the work you were doing constituted downloading and printing case material, we would not learn from either the time sheet or the itemized invoice specifically what materials you were downloading and printing, correct?

A.   Correct.

Q.   And the same applies for review and analysis of case materials?  If we looked at the itemized invoice or the time sheets if they still existed we would not be able to discern which case materials you were reviewing and analyzing on any particular day for any particular amount

of time, correct?

MR. ELSON: Objection to the form.

A. Yes.

MR. ELSON: Calls for speculation.

A. Typically, I would just indicate that I spent X amount of time reviewing and analyzing case materials.

Q. Okay. And then preparation and revision of rebuttal report, if we were to look at your time sheets if they still existed or the itemized version of your invoice we would not see a separation or a distinction between the time spent preparing the report and revising the report; is that right?

MR. ELSON: Objection to the form.

A. I believe so.

Q. Okay. Let's go back to Exhibit Number 4. So you reviewed the report of Dr. Welner, you reviewed Dr. Welner's deposition in a case called Taylor versus City of Chicago that was taken May 17th, 2018. Do you see that there?

A. Yes.

Q. Can you tell us approximately how much time you had spent reviewing that deposition transcript of Dr. Welner's?

A. I don't recall.

RICHARD LEO, 04/24/2023                                          Page 37

Q.   Do you recall how long that transcript, how many pages the transcript was?

A.   I do not.

Q.   Had you ever read that dep transcript before?

A.   I don't remember previously reading it, no.

Q.   Were you involved in the Taylor versus City of Chicago case?

A.   I was, yes.

Q.   And during your work in Taylor did you have occasion to review Dr. Welner's deposition in that case?

A.   Not -- sorry.  Not that I recall, no.

Q.   Then, if we go to the next page, the third item listed here is the deposition of Dr. Welner in Patrick versus City of Chicago, deposition that was taken July 22nd, 2015.  Do you see that there?

A.   Yes.

Q.   Do you recall how much time you spent reviewing Dr. Welner's deposition testimony in the Patrick case?

A.   I do not.

Q.   Were you involved in the Patrick case?

A.   I was not.

Q.   Had you ever read Dr. Welner's deposition testimony in Patrick before being provided -- before it being provided to you in connection with your work in this

RICHARD LEO, 04/24/2023                                    Page 38

case?

A.   Not that I recall, no.

Q.   Do you recall how many pages the transcript of Dr. Welner's deposition in Patrick was or is?

A.   I don't recall.

Q.   Do you recall how much time you spent reviewing that transcript?

A.   I do not.

Q.   Are these three items listed on pages one and two of your report the only additional material that you reviewed and analyzed in preparation of your rebuttal report?

A.   Yes.

Q.   Going back to Exhibit Number 3 for a second.  Is the Welner report, the Welner deposition in Taylor and the Welner deposition in Patrick, are those the only case materials that you downloaded, printed, reviewed and analyzed as reflected in the invoice dated April 7th, 2023?

MR. ELSON:  Objection to the form.

A.   To the best of my memory, yes.

Q.   All right.  Let's go back to the report.  We look at the first paragraph of the report under the heading Rebuttal Opinions.  You indicate that it's not feasible to

Urlaub Bowen & Associates, Inc.   312-781-9586

RICHARD LEO, 04/24/2023                                          Page 39

address every aspect of the report for -- with which I disagree, and my silence on any particular point should not be taken as an agreement.  Do you see that -- or, as agreement.  Do you see that there?

A.    Yes.

Q.    Why do you have that qualifier in your opening paragraph of your report?

A.    Because Dr. Welner's report is lengthy and because I want to make sure that if I don't address every small detail in his report with which I disagree that that's not misconstrued as agreement.

Q.    Okay.  Under the heading, Dr. Welner is not qualified to opine about the study of police interrogation and false confessions.  Do you see that there?

A.    Yes.

Q.    The first sentence is, Dr. Welner's report is fatally flawed because he's not qualified to opine on the social science research of police interrogation and false confessions.  Do you see that?

A.    Yes.

Q.    Are you saying that only individuals -- well, what are you saying there?  Why is Dr. Welner not qualified?

MR. ELSON:  Objection to the form.

RICHARD LEO, 04/24/2023                                          Page 40

A.    Well, he's not qualified for multiple reasons. One reason is that there is no field of forensic psychiatry that does research or studies empirically police interrogations or false confessions.

So he went to medical school and he's presumably qualified to be a medical doctor, but in his medical education he never would have studied this field.  And there is several aspects to this.  So he would not have studied the substance of this science.  He would not have been trained by professors in this area substantively.  He also would not have received any methodological training in social science or empirical research as part of his medical training to become a doctor, and so, you know, we -- I don't mean in any way to put down his accomplishment as achieving an M.D. degree, but it's not a degree that trains you to do research, to understand research in the social sciences or any substantive research in this field.

Since receiving his medical degree, he hasn't done any research or at least any published research in this field.  He says he's interviewed people who have confessed, but we have no record of his interviews of people who he says have confessed.  He's never collected data and published that data.  We have no way of assessing his verbal assertions that he has any expertise in actually

studying interrogations or confessions.

It appears that he's read a few articles, but that's not enough to be an expert.

Q. According to who it's not enough to be an expert?

A. According to me.

Q. And what expertise do you have that allows you to determine who is and who isn't an appropriate expert in this field as you've described it?

MR. ELSON: Objection to the form.

A. My training, research, experience, publication in this field, and also more generally as a social scientist.

Q. Where can somebody go to get trained on the social science research of police interrogation involving confessions?

A. Well, anyplace where courses are being offered -- graduate level courses are being offered in social psychology or cognitive psychology or criminology or any other relevant social science field where there is training both substantively and methodologically in empirical social science research.

Q. When you say methodologically, what do you mean?

A. So when one gets a PhD degree which is a research degree one goes to a graduate PhD program, and part of that program involves training somebody on social science

RICHARD LEO, 04/24/2023                                            Page 42

research methods and data analysis.

Typically, a part or most of the first year would be the basics and then there would be advanced courses as well. And the purpose of that training is to train somebody, the future researcher who is in the PhD program, to train that person on different empirical methods of research, what they are and what the expectations are in the social scientific field, how to do those various types of research and how to evaluate research that is done using those methodologies.

Q. That doesn't need to be strictly in the area of police interrogation and false confessions, right?

A. When you say "it," I assume you mean the graduate training?

Q. Correct.

A. Well, there is the methodological training and then there are substantive courses. For example, on social psychology or on police investigation and in those substantive courses there may or may not be coverage of police interrogation and confessions, but one would be able based on one's training both methodologically and substantively to do independent research studies or literature reviews that would then be supervised by professors in those fields, criminology, psychology, et

cetera.

Q. Let's go to page three of your rebuttal report. This is under the heading, Dr. Welner's critique of the concept of proven false confession is unsupported.

About the middle of the paragraph it says, Since its introduction into the research literature in 1998, the concept of proven false confessions has been generally accepted. No one has challenged it in the literature and it has repeatedly been referenced, cited to and applied and/or used by others. Do you see that sentence there?

A. Yes.

Q. When you say since its introduction into the research literature in 1998, what are you referring to?

A. Well, I'm referring to an article in 1998 that coined the term and the concept.

Q. What article specifically?

A. It was an article that I wrote with Richard Ofshe. I think it's called the Consequences of False Confessions. It was published in the Journal of Criminal Law and Criminology.

Q. And that's when the concept and phrase proven false confession was first introduced into the research literature, correct?

A. Correct.

Q.    Then you say, No one has challenged it in the literature.  Do you see that phrase?

A.    Yes.

Q.    What do you mean by that, No one has challenged it in the literature?

A.    That, to my knowledge, no one has criticized or critiqued it and said it's problematic the term.

Q.    When you say in the literature, what are you referring to?

A.    The social science research literature on police interrogation and confessions and specifically false confessions, as well as the research literature on wrongful convictions of the innocent which also encompasses false confessions.

Q.    Then you say, It is a straightforward set of criteria that is well established.  Do you see that?

A.    Yes.

Q.    And that straightforward set of criteria, are you referring to the four criteria that you discussed in your report?

A.    Correct.

Q.    And those four criteria were first introduced in 1998 as well?

A.    Correct.

Q.    In the next paragraph you say, Dr. Welner posits that only confessions whose falseness is undisputed should qualify as proven false confessions, but that view is wholly unsupported.  Do you see that?

A.    Correct.

Q.    When you say wholly unsupported, what do you mean?  Wholly unsupported by whom?

A.    Well, wholly unsupported by logic that in many cases where confessions are provably false the original police and/or prosecutors and sometimes experts representing them in litigation will continue to maintain that the confession is true and reliable.

So just because a confession's accuracy is disputed doesn't mean that -- I should put it differently. Just because it's disputed doesn't mean it's not a proven false confession.  There are people who might dispute that the world is round and believe that the world is flat. That doesn't mean that the world is flat, right.  There are things in the world that you can prove to a near absolute certainty regardless of whether somebody disputes that.

Q.    So you're equating the circumstance where it has been determined by you or others like you that a confession meets criteria for a proven false confession -- let me strike that.

RICHARD LEO, 04/24/2023                                            Page 46

You're equating a dispute over whether a confession is false when you or others like you have determined it meets criteria for a proven false confession to individuals holding the opinion that the world is flat?

MR. ELSON:  Objection to the form.  Mischaracterizes his testimony.

A.    I wouldn't agree with the word equate.  I was comparing it.  I was just giving an example of something that you could prove is wrong even though some people continue to dispute it.  So it was a comparison.  It wasn't an equation.

We can take the Central Park Five case as a good example.  There is dispositive DNA that proves that all five of those individuals were not involved in the crime.  Who did the crime, there is substantial other evidence.  There are many other cases like that.  And in that case the prosecutors who wrote books about the case before the DNA came out and the police continue to maintain that those individuals were guilty.  And there is many others -- and that the confessions are right.  There are many other cases like that.  So I'm not equating it.  I'm just making a comparison.  I could have chosen other things which we know are false but people nevertheless dispute.  The criteria for whether it's false is independent of whether or not

it's disputed.  We can't equate those.

Q.   Did you say in the Central Park Five case that the prosecutors maintained that the confessions were true before the DNA came out?

A.   To my knowledge, some of them have maintained it afterwards as well.

Q.   What's your basis for saying that?

A.   Op-eds written by prosecutors or interviews given by them.  I haven't looked at that case recently, but that's my understanding, as well as comments after the $41 million settlement that occurred some years ago in that case.

Q.   Okay.  And then in the next sentence in that same paragraph you write, His view has not been adopted in the field, for good reason.  Many false confessions are still disputed by police, prosecutors and civil defense attorneys despite substantial evidence dispositively proving the confession false.  Do you see that there?

A.   Yes.

Q.   That's the point you were just getting at, right?

A.   Correct.

Q.   When you say dispositively proving the confession false, what do you mean?

A.   What I mean is conclusively.  It's just saying

RICHARD LEO, 04/24/2023                                            Page 48

the same thing that to a certainty, an absolute certainty or a near absolute certainty the evidence establishes that the confession was false.

MS. ROSEN:  Why don't we take a short break here and then we'll come back for the hour, a little bit more than an hour, and then we'll take the hour lunch break.

MR. ELSON:  How long do you want to take?

MS. ROSEN:  Just ten minutes.

THE VIDEOGRAPHER:  All right.  We are off the video record at 12:16 p.m.

(Whereupon a recess was taken.)

THE VIDEOGRAPHER:  We are back on the video record, and this is the beginning of Media Unit 2 at 12:30 p.m.

MS. ROSEN:  I just want to note for the record that I think that Reyes' counsel has switched out because I see that Rachel Brady is now here for Mr. Reyes and Mr. Starr is gone.  So we note that for the record.

BY MS. ROSEN:

Q.    Okay.  Let's put Exhibit 4 back up on the screen which is the rebuttal report and we're on page three.

(Remote screen sharing.)

Q.    Then you go on to note that Dr. Welner's

Urlaub Bowen & Associates, Inc.   312-781-9586

deposition testimony in Taylor -- actually, in Patrick, I guess, he identifies -- he offered certain criteria that you note are remarkably similar to the ones he rejects here.  Do you see that?

A.   Yes.

Q.   Then you identify three criteria that Dr. Welner testified about in the Patrick case, 1. When physical evidence proves conclusively that the individual could not have committed the crime.  Do you see that?

A.   Yes.

Q.   Then, 2. When the true perpetrator emerges through identification, and then 3. When alibi evidence conclusively establishes that the confessor could not have been present?

A.   Correct.

Q.   Okay.  And when the alibi evidence conclusively establishes that the confessor could not have been present meaning could not have been present at the time the crime was committed, right?

A.   Correct.

Q.   Okay.

A.   I mean it's not that I mean this because this is from Dr. Welner's deposition, but that's what I understand him to mean.

RICHARD LEO, 04/24/2023                                          Page 50

Q.   Correct.  And you're noting here that the criteria Dr. Welner is describing is remarkably similar to the ones you claim he rejects in the Solache and Reyes case, right?

A.   Correct.

Q.   So -- I withdraw that.

With respect to, if we go to the bottom of the page under, The empirical social scientific study of police interrogation, psychological coercion and false confessions is well established in social science and generally accepted.  Do you see that there?

A.   Yes.

Q.   When you say empirical social scientific study, what do you mean?

A.   I mean the body of research that empirically goes out and studies any issue related to police interrogation, psychological coercion or confessions including false confessions.  So one of the reasons why I criticize about Dr. Welner as not being qualified is he -- and as I describe in this report is he simply doesn't understand what the word empirical means.

Empirical doesn't refer to one's clinical experience as a doctor or as a psychologist as he mistakenly states in his report.  It refers to gathering

RICHARD LEO, 04/24/2023                                    Page 51

data about how something works in the real world, and there are a number of possible ways one can do that through real world case analysis, sometimes referred to as archival or documentary case analysis, through experimental re-creations, through interviewing, through field observation, through surveys, et cetera. So it's that body of social science research knowledge based on empirical data that I'm referring to here.

THE VIDEOGRAPHER: Counsel, just really quick, just by chance, sorry to interrupt, but, Doctor, is there a printer maybe in the background?

THE WITNESS: Yeah, there is a printer going in the background and I can't stop it but it will stop soon.

THE VIDEOGRAPHER: Okay. I just wanted to make sure that we were getting -- if it will stop soon, we can continue. Sorry. I just wanted to make sure because it was coming through. Sorry, counsel.

THE WITNESS: Sorry.

MS. ROSEN: No, I could hear it, too. It seems like it might be done now.

THE WITNESS: I don't know when it's going to be done but it's printing very quickly. I would guess within a minute or two but I don't know. I can try to stop

it but then I'm going to get a paper jam that's going to emit a loud beep and cause me a headache.  I'm pretty sure it's going to stop very soon.

MS. ROSEN:  We can try and plow forward, but if it becomes too distracting then maybe we need to break.

THE VIDEOGRAPHER:  Thanks, counsel.  I apologize about that.

MS. ROSEN:  Yeah, no worries.  It was distracting to me as well.

BY MS. ROSEN:

Q.  You talked about that empirical refers to the gathering of data in a sort of general way, right?

A.  Correct.

Q.  And then you provided categories of data.  Can you run that list by me one more time?

A.  Yeah.  One would be experimental re-creations, right, where there are laboratories and experiments are done under controlled conditions with randomized assignment.

Okay, so the printer just stopped.

Another would be field observation going to the natural environment and observing the phenomena under study.  Another would be interviews with the relevant community or group that one is studying for the phenomena

RICHARD LEO, 04/24/2023                                    Page 53

under study.  Another would be surveys, surveys of a group under study for the research question.  And another would be what's sometimes called archival or documentary analysis where one analyzes real world documents and materials either historical or contemporary.

Q.   The experimental re-creation, that's -- I think what you're talking about there is things like the Kassin, the 1996 Kassin alt key study, right?

A.   Correct, that would be one example.

Q.   Can you tell me in those last, say, I don't know, ten years what experimental re-creations have been done with respect to police interrogations, psychological coercion and false confession?

A.   Well, there is a vast literature.  I can point you to bibliographies, but if you want me to cite off the top of my head every experiment, no, I couldn't do that. And oftentimes when I am writing papers and I'm citing to experiments or other studies, I don't remember the exact year, I have to look it up and write the citation.  But there have been a number of experimental studies on various aspects of interrogation and confession in the last ten years.

Q.   Can you name one?

A.   Yeah, I mean, I could name some, sure, but I

would sort of have to have a bibliography in front of me to really name them. But Allison Redlich has done some studies, her last name is spelled R-E-D-L-I-C-H. Stephanie Madon has done some studies. Kyle Scherr. I'm sorry, Madon is M-A-D-O-N. Scherr is S-C-H-E-R-R. I mean there is a number of researchers who have regularly -- those are only three. I could keep going. Saul Kassin, K-A-S-S-I-N. But to name the study and describe the study, I just have to look at a bibliography, refresh my recollection, and I can say there is this study, there is that study, here is what this study is about, here is what that study is about, but there is numerous experimental studies in this field in the last ten years.

Q. Then with respect to field observation, can you put a little more meat on that? Is that like the observational study you did to get your PhD? Is that what you're describing there?

A. Well, it could be. My PhD study in the early 1990s involved more than just observation but that was the centerpiece of the empirical methods.

There have been others who have observed interrogations, but in the early 1990s there has been a profusion of departments -- proliferation of departments that electronically record. So one could also analyze

actual interrogations based on electronic recordings, not -- of the full interrogation, not just sitting in on and observing interrogations which is much harder to do for research purposes.

Q.   So you would include in this category of field observation the ability to obtain and analyze recorded interviews and confessions, correct?

A.   In a systematic way, yeah.  If one were to set out to do a study of recorded interrogations and then gather and systematically analyze them, that would be a source of data, yes.

Q.   Has that been done?

A.   I believe it has been done, but I would have to look back at some of the studies I'm thinking of to see whether they were in person or electronically recorded.

Q.   Have you done any field observations -- have you done any field observation study other than the one that you did in connection with your PhD?

A.   Not in person where I sit in and observe interrogations.  I have done studies where I've collected cases and part of the analysis has been based on partial or complete interrogation transcripts and recordings.

Q.   Have you published on your field observation studies the cases that you've collected?

(Technical interruption.)

A. I'm sorry, there is some noise in the background. I can't do anything about this. I don't think it's going to be long.

Q. Well, I can't hear you.

A. Can you hear me now? I need to somehow get back to my volume which doesn't seem like I can do with the share screen.

But the answer to the question is I have not done any more field -- in-person field observation studies of interrogations, and I have done studies where I collected -- I've done studies where I have collected cases and analyzed those cases which involved in part recordings of interrogations or partial recordings of interrogations.

Q. A lot of your words are being covered up by the noise so it's hard to follow your answers because I'm missing words.

MR. ELSON: I wasn't missing any of the words. I hear the noise but I don't think it covered up his words.

MS. ROSEN: Well, it did for me.

THE VIDEOGRAPHER: Yeah, I'm sorry, counsel. It's just not coming through as clean as we would like it to on my end. I don't know if that's going to be something

that we can stop or is it going to be for a little bit?  I don't know if we need to take a recess early.

THE WITNESS:  I would take a five-minute break.  It's not something I can stop but I don't think it's going to last very long.

MS. ROSEN:  Dr. Leo, are these people doing the work that you were referencing earlier?  Is that what that noise is?

THE WITNESS:  Yeah, there are some people that are cutting out a small part of the ceiling just to see -- in a room on this floor just to see which way the joists run.  It should be very brief.  I can confer with them over the break, but for scheduling reasons I don't think I can get rid of them, but -- I can find out more information, but my understanding is it would be very brief.

MS. ROSEN:  Okay.  It seems like it's quiet now.  If it happens again, then we're going to have to take a break and you're going to have to find out how much -- how long this disruption is going to happen, you know, if it's in short bursts then we can break around the bursts or whatever.  I'm having difficulty following your answers.

THE VIDEOGRAPHER:  Thank you.

MS. ROSEN:  Yep.

RICHARD LEO, 04/24/2023                                          Page 58

BY MS. ROSEN:

Q.   With respect to your in-person field observation studies, other than the one that you did in connection with your PhD, did you do any others?

A.   No.  I didn't sit in and observe interrogations and gather after that dataset that I collected during my dissertation.

Q.   Then with respect to the circumstance where you collected cases which involved in part recorded or partially recorded confessions, what were you referring to there?

A.   Well, off the top of my head, my 1998 article, the Consequences of False Confession.  My 2004 article with Steve Drizin in the North Carolina Law Review.  Two articles I did in 1997 with Richard Ofshe.  I would have to review my CV to refresh my recollection on other studies since then.

Q.   Have you done any other studies since 2004 where you have collected -- where you have collected recordings either in whole or in part of interviews and confessions?

A.   Yes.

Q.   But, as you sit here today, without reviewing your CV you can't identify those for us, right?

A.   Well, I mean if I give it some more thought I

could identify some of them.

There was a 2013 or '14 study I published with John Gould, G-O-U-L-D, which would fall into that category. I believe there is some work I've done with Professor Deborah Davis that would fall into that category.

Sorry, I know you can't hear.  We can take a five-minute break if you want and I can try to find more information out.

MS. ROSEN:  Why don't we do that.

THE VIDEOGRAPHER:  Going off the video record at 12:47 p.m.

(Pause in Proceedings.)

THE VIDEOGRAPHER:  We're back on the video record at 12:55 p.m.

DIRECT EXAMINATION (cont.)

BY MS. ROSEN:

Q.   From -- we were talking about empirical data and how it's defined by you and others in your field.  With respect to any experimental re-creation, have you yourself been personally involved in any experimental re-creations?

A.   Yes, I've been on a few studies where there has been experimental re-creations but I have not been the ones doing the -- running the actual experimental, the actual experiments.

Q.   What was your role in those cases?

A.   In those studies my role was to help with the conceptual aspect of the study and to write up parts of the study and to analyze part or all of the data.

Q.   And will we find those studies that you were involved in on your CV?

A.   Yes.

Q.   And same with the field observation, either the in-person or the recorded ones that were implicated in the collected cases, will we find all of that in your CV?

A.   Yes, all the ones that are published.  I have studies in progress that are not listed on the CV that involve some of these methods as well, but the ones that have been published, yes, you would find on my curriculum vitae.

Q.   How many studies do you have in progress?

A.   At least two, I just have to give -- well, there is studies that are completed but have not yet been published that are in the publication process, and then there are studies that are still in progress that have not been written up or if they've been partially written they have not been submitted for publication.

So I would say around half a dozen studies or articles, I'd have to give it a little bit more thought,

RICHARD LEO, 04/24/2023                                         Page 61

but that's around the number that I've got that are not listed on the CV that are either in the publication process or in the data gathering and analysis and write-up process.

Q.   You had talked about at the last deposition a study that you were working on with Mr. Drizin that had been going on for, I don't remember precisely what you said, but something like a decade.  Is that one of the ones you're referring to as being a study in progress?

A.   Yes.  There are two studies involving Professor Drizin.  One of them has not been going on that long, and the one I think you're referring to has been going on probably longer than that.

Q.   The one that's been going on longer than a decade, I think what you said at your last deposition was that there had not been much work being done on it in the last couple of years because of a variety of reasons that you provided in your deposition.  Is that still true?

A.   Yes.

Q.   Okay.  And what's the second one involving Mr. Drizin that you just referenced?

A.   We have around 25 cases of proven false confession in cases in which the person has falsely confessed to harming, I believe they're all murder cases, or killing a loved one defined as a child or a parent or

immediate relative, and we're analyzing those cases.

Q.    When did you start that work?

A.    I don't recall specifically.  I guess maybe four or five years ago.

Q.    Is that one in the data-gathering phase or in the publication process?

A.    It's kind of in between the two.  We've gathered the data and we're in the drafting process.  We haven't submitted it for publication.

Q.    What's the purpose of this particular study with respect to the fact that you're focusing in on the murder of loved ones?

A.    The purpose is to analyze whether people who are interrogated in the immediate aftermath of the murder of their close relatives may be more vulnerable to making or agreeing to false confessions, what patterns or insights we get from looking at that, a subset of that kind of case.

Q.    How many are in the -- of the half dozen or so studies that you said are in some form of progress, how many are in the publication process?

A.    Yeah, I just want to clarify.  Some of them are not -- are more analytical pieces, not necessarily data-gathering pieces.  I think there are -- you said in the publication process, right?

RICHARD LEO, 04/24/2023                                             Page 63

Q.   Uh-huh.  Yes.

A.   Right.  That would mean that they've been submitted for publication.  I can think of at least two that are in the publication process -- three.  I think three are in the publication process.

Q.   And what are the general topics of those three pieces?

A.   One of them is a -- is a reflection on the 1997 Decision to confess article -- Falsely Confess article that Richard Ofshe and I published in 1997.  And so in that publication journal they apparently contacted authors whose work had been cited in the last 25 years most frequently and invited us to write a reflection and analysis of what had transpired in the last 25 years.  So that's one.

Another is an article called Interrogation by Proxy which is an empirical study that involves different types of interrogations that police do that they essentially direct third parties to do to help them gather confession evidence.

And then the third of the three I mentioned is on the issue of sleep depravation and how and why that can compromise testimonial evidence gathered during interrogations.

Q.   Did you say the second one was an empirical data

RICHARD LEO, 04/24/2023                                          Page 64

analysis?

A.    Yes.

Q.    Okay.    What about the sleep depravation one?

A.    The sleep depravation one discusses some cases but is more a review and synthesis type article.

Q.    You also mentioned another method is interviewing -- interviews with the relevant community?

A.    Correct.

Q.    And what types of things are you talking about there?  Who would be the relevant community, what types of interviews?  Can you just put a little more descriptive on that?

A.    Well, it depends on the purpose of the study, and that would determine who the relevant community was and one would do structured interviews of that community.  It could be interrogated suspects, it could be police interrogators, it could be police trainers, it could be police leaders, it could be prosecutors, it could be criminal defense attorneys, it could be judges.  It just depends on what the research question is in the study.  And, of course, in different fields, different areas of study, social science researchers would interview different subject populations that were relevant to answering the research question in structured ways.

Q.    Have you conducted any of that type of research or data analysis?

A.    I have, yes.

Q.    And who was the -- who was the relevant community or what was the relevant community for the studies you did?

A.    So this was part of my doctoral dissertation research, and I interviewed police interrogators, I interviewed police interrogation trainers, I interviewed police managers and I interviewed prosecutors and defense attorneys.

Q.    Is that the only time that you utilized that technique?

A.    It's the only time -- I mean that dataset was part of a number of publications in the 1990s, but, yes, to the best of my recollection.  It might be if I looked over my CV I might jog my memory, but I'm not thinking of any others as I sit here right now.

Q.    Then you also discussed surveys.  Tell me a little bit about that.

A.    Well, surveys are a very standard method of empirical data gathering.  Again, social scientists are trained on survey construction and systematic analysis of survey data, and I think some of the exhibits for this deposition involve some of my published surveys.

There was a 2007 one that I refer to, I believe, in this report with Saul Kassin, other researchers, that was a survey of police themselves. I believe I did some surveys early in my graduate career of police and churchgoers or community members. So there is a few studies I've done, published studies, that involve surveys and survey methodology. This is a very, I think a lot of people know this is a very standard methodology, political scientists use it, other social scientists use it.

Q. Okay. And then the fifth method of empirical data gathering you talked about was archival document analysis, I think is what how you put it, either historical or contemporary. That's the type of thing that you and Mr. Drizin did, right, for purposes of the 2004 article?

A. Yeah. I mean some of these articles involve more than one method of data analysis but that would be an example of it.

Q. Okay. Let's go to page four of your rebuttal opinion -- actually, sorry, let's go back to page three, bottom of the page, so we have some context.

At the bottom of page three you indicate under the heading, The empirical social scientific study of police interrogation, psychological coercion and false confessions is well established in social science and

generally accepted.  Then you say, Throughout his report, Dr. Welner paints a distorted picture of the empirical social scientific study of police interrogation, psychological coercion and false confessions.  He suggests that the field is a boutique area comprised of a few researchers who repeatedly cite to one another and whose work therefore has no wider validity.  Then you go on to say, In fact, the field is well established in social science and generally accepted, and then, It dates back to at least 1908.  Do you see that?

A.   Yes.

Q.   What's the 1908 reference to?

A.   I think it's a book by Hugo Munsterberg, M-U-N-S-T-E-R-B-E-R-G, I think is the spelling of his last name.  He was in 1908 a professor, a distinguished professor of psychology at Harvard University, and he published a book that was based on analysis of cases and other materials, and in that book he described false confessions growing out of police interrogations.

Q.   Okay.  So what you're pointing to is not the criteria -- the four criteria that you developed and coined to establish proven false confessions; you're talking simply about the study of false confessions goes back to 1908, right?

RICHARD LEO, 04/24/2023                                      Page 68

MR. ELSON: Objection to the form.

A. Yeah, I'm talking about the empirical social scientific study of police interviewing and interrogation, psychological methods of interrogation including psychologically coercive techniques and true and false confessions.

Q. Okay. Then you say in that same sentence, The field started to really develop in the early 1980s and then to explode in the quantity and variety of empirical social science research. When you're referencing the early 1980s, are you referencing something specific or just generally?

A. No, I'm referencing generally that's when the methodology became more sophisticated and the studies started to take off.

Q. Then you go on to say there have been hundreds if not thousands of peer-reviewed studies on the subject and dozens of books. Do you see that?

A. Yes.

Q. I'm curious in terms of your phraseology there, there is a difference to me between saying there is hundreds of things versus saying there is thousands of things. So I'm trying to pin it down a little bit in terms of when you say hundreds if not thousands, why do you use that phrase?

Urlaub Bowen & Associates, Inc.   312-781-9586

RICHARD LEO, 04/24/2023                                    Page 69

A.    Because I don't know the exact number.  I don't know if it's 973 or 2,973.  As you know, on page five I cite a table of published research on the topic and it ranges from hundreds to thousands.  I haven't gone through and collected these studies and verified the numbers, but I was just trying to be a little bit on the cautious side in case I was wrong that it wasn't thousands and it was merely hundreds though I believe it to be thousands.

Q.    Then, if we go to the table on page five, Table 2.1, Advancement in Interrogation Research, you've taken a table from which -- this table comes from the article at footnote six, right?

A.    That's actually a book, but, yeah, it comes from the book that is cited published by New York University Press in 2020 referenced in footnote six.

Q.    Got it, okay.  And then -- but with respect to that table, do you know how many of those publications talk about criteria for meeting proven false confessions as you've coined the term?

A.    I do not, no.  That's not what I'm referring to in this section, but I have no idea how many of them refer to that criteria.

Q.    This is just a reference to the more general topic of the field of study that we're talking about here,

right?

    A.   Correct.

          MR. ELSON:  Objection to form.

    Q.   Then you below the table you indicate in the last sentence of the paragraph, There is no dispute, none, in the social science research community, which is the relevant community, that the psychological and empirical study of police interrogation, psychological coercion and false confessions is generally accepted and has been for decades.  Do you see that there?

    A.   Yes.

    Q.   When you say the social science research community, which is the relevant community, why do you say that the social science research community is the relevant community?

    A.   Because this is the community of researchers, psychologists, criminologists, sociologists and other PhD social scientists that have generated this body, the substantial body of peer-reviewed empirical knowledge on these subjects.

    Q.   When you say "these subjects," you mean the general subjects, right?  Not on the issue of whether meeting one of the four criteria that you've coined establishes that a confession can be categorized as a

proven false confession, right?

MR. ELSON:  Objection to the form.

A.    Correct, as it refers to the psychological and empirical study of police interrogations, psychological coercion, false confessions.  In that last sentence that you previously read, that's what I'm referring to.

Q.    Then if we go to the next sentence -- I mean the next paragraph, the second sentence, There is no known error rate as measurement error simply does not apply to this scientific field.  Do you see that there?

A.    Yes.

Q.    Why doesn't a measurement of error -- a measurement of error apply to this scientific field?

A.    It has to do with the nature of what we're studying.

Q.    Can you explain that, please?

A.    Well, if you were studying other things then you have to be concerned with measurement errors.  If you're preparing, for example, a sample taken and run through some medical test or compared to some preexisting piece of information or data, then you would have -- you can talk about measurement error, you can talk about measurement error in the study of DNA, for example, or polygraphs, but here you don't have that same issue.  There isn't -- it's

RICHARD LEO, 04/24/2023                                    Page 72

not like we're comparing something taken from somebody's body to a crime scene or, you know, we're not -- we don't have an instrument that has an error rate and we're trying to figure out what that error rate is.  Some sciences have that issue, other sciences don't.  There is no measurement devised that generates a measurement error in this field.

Q.   Well, with respect to the four criteria that you have developed -- or identified, I should say.  Let me strike that.

With respect to the four criteria that you have identified that establish a proven false confession, as you coined the phrase and used the phrase, how can anybody determine whether or not you're correct?

A.   Well, they could go through and analyze the cases and then they could verify or attempt to falsify the analysis and they could explain why they disagreed with that.

In the 25 years since we published that article and since we have -- that coined the term and done studies on this, there is only one case that in the published literature that the -- that somebody has criticized and said we were wrong about.  That case is the James Harry Reyos case, spelled R-E-Y-O-S, and that case is a proven false confession, as prosecutors have acknowledged.  And so

RICHARD LEO, 04/24/2023                                    Page 73

the person who criticized us who wasn't a social scientist is simply wrong about that.  But if one wanted to systematically analyze cases of proven false confession in the literature, gather the relevant data and publish a study explaining why they thought we were wrong, they could certainly do that.  There is nobody prevented from doing that.

Q.   So that would be the only way in your view that anyone could determine whether or not you are correct when you say or conclude that if an individual meets one of the four criteria then their confession constitutes a proven false confession which, as you indicated earlier today, dispositively establishes that the disputed confession was false?

MR. ELSON:  Objection to the form.

A.   Correct.  Social scientists would do systematic analysis.  They wouldn't refer to unnamed interviews of people in prison or cases that they worked on where it was their anecdotal opinion that the person was actually guilty.

They would do a systematic analysis of the available evidence and they would publish it in a process presumably that went through some kind of peer review and analysis and that simply hasn't been done.  One person, a

former prosecutor and law professor, as I think you know, published a study challenging one categorization of a proven false confession and that person is wrong according to the prosecutors in the case.

Q.   Okay.

A.   As well as the research that I and my colleague did and published twice, both in peer-reviewed journals, on that one case that I previously named.

Q.   Further down in the same paragraph you say, This is an explanatory science.  Do you see that?

A.   Yes.

Q.   What is that?  What's the definition of explanatory science?

A.   Well, a science that seeks to explain the phenomena that it studies.  Some sciences have measurement instruments that register measurement error.  We don't have that.  It's not that type of science.

We collect and analyze data based on the protocols and our methodological training and we present that in our articles.  And our methodologies are not perfect, they're not perfect in any science.  Some have certain strengths and weaknesses, others have compensating strengths and weaknesses, but we don't have measurement instruments with known measurement error rates.  That's

what I'm getting at.  But it doesn't make it any less of a science.

Q.   Okay.  Let's go to page six of the report.  The middle of the page you say, In addition to being a well-established, generally accepted social science, the social science research literature that is the basis of my expertise is relevant and will greatly assist the jury because of the powerful nature of confession evidence.  Do you see that?

A.   Yes.

Q.   Relevant to what?

A.   Well, I just want to make sure I understand which part of the question you're asking about.  Let me just review this real quick.

So an explication of the social science research literature as it's relevant to the issues in this case could greatly assist the jury.  I guess it would be relevant to -- your question is relevant to what, right, or compared to what did you ask?

Q.   The sentence reads, In addition to being a well-established, generally accepted social science based on empirical peer-reviewed studies that are capable of testing and have involved testing, the social science literature -- social science research literature that is

the basis of my expertise is relevant.

So I think what you're saying is that the social science research literature that is the basis of your expertise is relevant to something.  I want to know what it's relevant to.

A.   Well, it would be relevant to explaining how police interrogation works, what the techniques are and how and why those techniques can sometimes lead innocent people to make or agree to false confessions and what the issues and problems are with those techniques and practices based on that social science research.

Q.   Then you go on to say, And will greatly assist the jury because of the powerful nature of confession evidence.  Do you see that?

A.   Yes.

Q.   When you say will greatly assist the jury, do you mean the jury in this case?

A.   No.  I mean more generally a jury in a disputed interrogation/disputed confession case that typically has to make a judgment about confession evidence and its veracity or lack of veracity.

Q.   Okay.  And in this particular case you would like to tell the jury that you have concluded dispositively because Mr. Solache and Mr. Reyes meet one, at least one of

the four criteria that their confession is a proven false confession, correct?

MR. ELSON:  Objection to the form.

A.    I think I would agree with the wording that I put in my report that they meet the criteria.  Of course, I don't get to tell the jury anything, I just -- proactively. I respond to questions that I'm asked that are permitted.

So, yes, if asked do these cases in your opinion meet the criteria of a proven false confession, as I mention in the report I would say yes, and if asked why I would explain why as I do in my original report.

Q.    And then you would, if permitted or asked, go on to explain that once you've determined, you or somebody like you in your field has determined that an individual meets criteria then that dispositively establishes that the confession is a proven false confession, correct?

MR. ELSON:  Objection to the form.

A.    I mean I don't think I would use the word dispositively in the way you're using it.  I would say that based on my expertise and the review of the documents I believe it meets one or more of these four criteria.

And if somebody asked me, as you did earlier, what do you mean by a proven false confession, I would say, as I did earlier, that a confession that meets one of these

four criterias to a near or absolute certainty.

Q.   Okay.  When you say the powerful nature of confession evidence, what do you mean?

A.   That as research has indicated, empirical research that the courts have recognized, that people are biased by confession evidence.  That when people hear that somebody has confessed they tend to assume the confession is true and voluntary, that they are very skeptical of the idea of a false confession, that they don't believe they would confess falsely, they're skeptical that somebody who was innocent would confess falsely.  That's what I mean that it's preju -- it's a very biasing, from a social science standpoint a very biasing and prejudicial form of evidence because it's so counterintuitive.

Q.   But there is more recent research, right, that you're aware of that I think we talked about at the last deposition that lay opinions and lay people's views on this over time have changed dramatically, right, and that the power of confession evidence has diminished in recent history based on a variety of things, right?

MR. ELSON:  Objection to the form.

A.   I don't think the power of confession evidence has diminished, and if I'm recalling correctly I think you might have asked me about a 2018 survey in the last

RICHARD LEO, 04/24/2023                                              Page 79

deposition, and I think -- my recollection, I haven't reviewed that article in preparation for this deposition, but my recollection is that more people were aware.

Sorry, this is my 11:30 alarm going off. After I finish answering this question, I'm going to have to go for an hour for this hour lunch break.

That more people are aware of the phenomenon of false confession in that survey than in prior surveys but that doesn't support the idea that confession -- that false confession evidence is any less prejudicial or powerful especially when the assertion is that somebody falsely confessed.

MS. ROSEN: Okay. Let's take a break.

THE WITNESS: Thank you.

THE VIDEOGRAPHER: All right. We're off the video record at 1:30 p.m.

(Whereupon a recess was taken.)

THE VIDEOGRAPHER: We are back on the video record at 2:31 p.m.

DIRECT EXAMINATION (cont.)

BY MS. ROSEN:

Q.   Okey-doke. If we could get Exhibit 4 back up?

(Remote screen sharing.)

Q.   We are on page -- just finishing six so let's go

RICHARD LEO, 04/24/2023                                    Page 80

on to page seven.  The first full paragraph, a couple lines down, you state he, in reference to Dr. Welner, confused the concept of empirical which you define as going out into the world to gather and analyze data, with the concept of practical experience.  Do you see that there?

A.    Yes.

Q.    And what do you mean when you say that he confused, meaning Dr. Welner, the concept of empirical with the concept of practical experience?

A.    I believe in his report he defines empirical as practical experience, and I'm aware of other times in other cases where he's made that equation.

So practical experience and empirical are not the same thing.  So his definition is incorrect which is not surprising because, again, he's not trained as an empirical researcher.  He has to my knowledge no graduate level or professional training as a researcher.  That's not what medicine is about.

Secondly, he repeatedly says, as I say in this report, that there is no empirical field or no empirical study of false confessions and he's a thousand percent wrong about that.  So it's clear to me that he doesn't understand one of the most basic concepts about social science, what it means to say something is empirical, what

RICHARD LEO, 04/24/2023                                          Page 81

constitutes empirical research.

Q.    How do you define practical experience?

A.    It doesn't matter how I define it.  It's how he defines it, and he seems to define it, as best I can tell in this and other materials in other cases where I've encountered either his reports or affidavits, as I'm a psychiatrist and I talk to people and I talked to people a bunch of years ago when I worked in prison and sometimes I give talks to lawyers and that's my practical experience. I, Michael Welner, have studied cases and talked to people and that's not only my practical experience as Michael Welner but also what we do in psychiatry.

So I think he's just describing his practical experience as anything he does in the course of his work as a psychiatrist as empirical.

Q.    So how do you understand him to be using practical experience?

MR. ELSON:  Objection to the form.

A.    Yeah, I understand him to be using the term practical experience to be referring to his experience as a forensic psychiatrist who once talked to some people in prison who confessed and who has worked on some cases as a rebuttal expert witness where he's studied some documents and/or interviewed some people in an unsystematic,

RICHARD LEO, 04/24/2023                                      Page 82

unstructured, nonresearch-based, non-falsifiable, nonreviewable way.

Q.   Non -- what did you say?

A.   Nonreviewable.  He says, for example, as part of his practical experience --

Q.   I just want to know what you said.  I'm not asking for more than what you said.  So you said non "something" and nonreviewable.  What were the two words that you said?

A.   You're going to have to ask the court reporter to read it back.

(Record read as follows:

"Question:  Yeah, I understand him to

be using the term practical experience

to be referring to his experience as a

forensic psychiatrist who once talked

to some people in prison who confessed

and who has worked on some cases as a

rebuttal expert witness where he's

studied some documents and/or

interviewed some people in an

unsystematic, unstructured,

nonresearch-based, non-falsifiable,

nonreviewable way."

Urlaub Bowen & Associates, Inc.  312-781-9586

Q.    Did you say non-falsifiable?

A.    Yes.

Q.    What does that mean?

A.    It means that all his discussion about practical experience, we don't have any data or information where we can verify whether it's accurate.

Q.    Do you still have the data from your 2004 article with Mr. Drizin?

MR. ELSON:  Objection, asked and answered.

Q.    You can answer.

A.    Yeah.  I think we covered that in the last deposition.  I might somewhere but I don't know where it is at the moment.

Q.    I think you said you didn't have it at the last deposition.  So I'm just confirming that you still don't have it?

A.    I stand by whatever I said at the last deposition.

Q.    Okay.  So when you say non-falsifiable you mean that it can't be falsified?  Is that what you mean?

A.    I mean there is no way of knowing whether anything he says about the number of people he has spoken to who have confessed is accurate or any of his impressions are accurate.  There is no way to review.  He's never

published anything on this topic.  There is no way to review whether or not anything he's saying is true or accurate, or I should say the basis for what he's claiming is true or accurate.

Q.   If we go to the bottom paragraph on page seven it says, Dr. Welner also asserts that the field lacked what is known as ecological validity, and then you say, This is a false statement and again just advocacy by Dr. Welner.

When you say just advocacy, what do you mean?

A.   Again, this goes back to his not being trained as a social scientist, not being trained in any research methodology and appearing to know very little about research methodologies if anything.

Ecological validity, the realism that an experiment or a dataset embodies, is always a matter of degree.  And so he's asserting it as if it's a binary.  It exists for him in his world as a forensic psychologist he will assert because of his practical experience which he mis-equates with empirical research but it doesn't exist for the scientific field that does experiments as well as collects and analyzes data based on the other methods that I mentioned.

So all I'm saying which is pretty clear in the report is it's not a binary.  It's not something that

exists or doesn't exist.  It's a matter of degree.  And because of his apparent ignorance of basic social science research concepts he doesn't know what he's talking about.

Q.    Can you define ecological validity?

A.    Yeah, I just did in my last answer.  It's the degree to which the data in the study captures or represents how that data or phenomena works in the real world.  That's ecological validity.

Q.    And your criticism of Dr. Welner's point regarding whether or not your field lacks ecological validity is because it's not binary when we're talking about social science?  Is that what you're saying?

MR. ELSON:  Objection to the form, mischaracterizes his testimony.

A.    I'm saying that from his written report and other things he's written it's very clear that he does not understand what that concept means.  It's not a binary, something that exists or doesn't exist.  And so he's -- like so many things in his rebuttal report, he's just factually wrong and it's the kind of error that, you know, a first-year graduate student would not make.  Anybody who's had a week or two in a basic methodology course would not make.

So, first of all, you would talk about the degree

to which a particular study has ecological validity. He's trying to tar this entire field as lacking ecological validity, and it doesn't make sense conceptually because we talk about degrees and it doesn't make sense to tar an entire field, and it doesn't make sense also because different studies, different methodologies depending on the phenomena, the data, would have different degrees of ecological validity.

So to me it appears, like so much of what he does, he's acting as an advocate, as somebody who doesn't know something and is trying to make a rhetorical argument, not somebody who understands what he's talking about

Q. You've also discussed at the bottom of the paragraph on the bottom of page seven the concept of convergent validity. Do you see that there?

A. Yes.

Q. The statement here is because there is convergent validity that gives us greater confidence that the findings established across different methodologies have validity, right?

A. Correct.

Q. I'm summarizing.

A. Are more likely to be valid, yes.

Q. When you are talking about the concept of

RICHARD LEO, 04/24/2023                                          Page 87

convergent validity is when you're talking about combining
the different methodologies that have been used in this
field, correct, that we talked about a little bit earlier
and that you lay out a little more clearly and a little
differently, I guess, at page eight, at the top of page
eight?  We can go there, right?

A.   To the extent I understand your question, yes,
that there is --

Q.   If you didn't understand the question, then don't
answer it.

When you are talking about the concept of
convergent validity and that in this field, the field that
we're talking about, the field that you have expertise in
that when there is convergent validity it gives us greater
confidence in the finding established across different
methodologies, right, that's the point?

A.   Correct.

Q.   Okay.  When you're talking about convergent
validity you're talking about different methods of data
analysis, correct?

A.   Different methods of data gathering that may or
may not lead to different types of data analysis so like
experiments versus surveys versus field research.

Q.   Then, if we go to page eight of your report, at

Urlaub Bowen & Associates, Inc.   312-781-9586

RICHARD LEO, 04/24/2023                                      Page 88

the top of this page you indicate that this is what has happened in this field and then reference experimental study findings which converge with the field studies and the studies from real world cases.  Do you see that?

A.    Yes, and I -- yes.

Q.    Then you say, In effect, the findings of controlled laboratory studies have been supported by data collected from real world settings, correct?

A.    Correct.

Q.    When you're referencing real world settings in that sentence, what are you referring to specifically?

A.    The kinds of field research where people sit in on and observe interrogations, the research that analyzes electronically recorded interrogations, the research that is archival or documentary, that other types of studies with different methodologies whose methodologies contain different strengths and weaknesses than experiments report consistent results.

Q.    When you say report consistent results, specifically what do you mean?

A.    I meant that as a general statement.  I didn't mean it specifically.  What I mean is that we don't find research about, for example, false confessions from the archival, the documentary analysis contradicting what we

find from the experimental studies.

Q.   And is there convergent validity to your determination that if an individual meets one of four criteria then the confession can be characterized as a proven false confession?

MR. ELSON:  Objection to the form.

A.   That's not something you would get at with an experimental methodology whether or not something is a proven false confession because in the experiment you would know the ground truth, you would know what happened and whether or not that was a false confession or not a false confession.  There is nothing about an experiment that would contradict that but it wouldn't really be applicable.

Q.   How about field observation?  Have there been any field observation studies that converge with your study that support the idea that if an individual meets one of four criteria then the confession qualifies as a proven false confession as you've coined the term?

MR. ELSON:  Objection to the form.

A.   Usually field studies are observing a phenomena in practice like how police investigate or interview or interrogate.  You typically couldn't know that a confession was false if you were watching an interrogation live.  The only way to know that it was false typically would be after

you review evidence that demonstrates it's false or not and so that too would not likely be applicable.

On the other hand, if you observed an interrogation and then subsequently gathered all the evidence there is no reason why if it were a false confession, a proven false confession, you wouldn't be able to categorize it. It's just usually early -- as a proven false confession. It's just that you would be observing the phenomena of interrogation earlier in the process.

Q. What about interviews with relevant community? Do any of the empirical data that's gathered in the methodologies that are reliant on interviews with relevant communities converge with your study that you claim established that if an individual meets one of four criteria then the confession constitutes a proven false confession?

MR. ELSON: Objection to the form.

A. Interviews are typically about process, not about outcome like whether something can be categorized as a proven false confession. There is no reason why if somebody was -- if I was conducting an interview studying a case and, again, eventually gathered additional information I couldn't categorize it as a proven false confession if one or more of the criteria were met.

If we are conducting interviews with police interrogators they might describe a situation where there was a proven false confession so there is no reason why that couldn't occur, but it's not a methodology that typically one uses to evaluate whether somebody -- something is a proven false confession or not.

Q.   Is there any methodology that can be utilized other than the methodology you utilized in support of the 2004 study and article?

MR. ELSON:  Objection to the form.

A.   Okay.  So your question is I think too broad when you say in support of that article.  Do you mean specifically classifying cases as proven false confessions or do you mean some other aspect of that article?

Q.   I mean specifically proving -- establishing criteria for a proven false confession.  Any other methodology that would converge -- that would provide convergent validity for your conclusion that if an individual meets criteria for one -- meets one of the four criteria that you've laid out then the confession is a proven false confession?

A.   The proven false confession conclusion that a case -- a confession meets the criteria would have to be based on documentary evidence establishing the confession

is false.  Laboratory generated false confessions are provably false as well but you wouldn't call them proven false confessions or use those criterias because you would know that they were false based on the conditions of the laboratory experiment.

Q.   Then in the next paragraph there is a discussion about the Kassin/Kiechel, is that how you say her name, study?

A.   I think so, yes.

Q.   And that's the study with the college students or grad students who were told not to touch the alt key otherwise the computer would crash, and then the computer crashed and they were all told that they pressed the alt key, and there was an analysis done about how many people would falsely confess to having done that, right?  I'm summarizing very generally.

A.   Correct.

Q.   And that's the type of experimental studies that have been done in this area, right?

A.   That's one type of experimental study, yes.

Q.   What other types of experimental studies have been done other than this -- the type originally done by Kassin and Kiechel in 1996?

A.   Well, I guess if we use the word type, type would

refer to kind of any experimental study, right.  So there have been lots of other experimental studies on other issues that are not re-creating a false confession, you know, generating a laboratory-based false confession.

The other type and kind of laboratory study that generates a false confession is where people are induced in a laboratory to cheat and some people do cheat, some people don't, and then they are accused of cheating, and some people confess truthfully that they did cheat and some people that didn't cheat confess falsely.

Q.   Okay.  Any other general type of experimental study designed at generating a false confession?

A.   Yeah, there was one study in 2009 that used some type of video evidence or equipment -- I'd have to review the study, it's been many years, that also generated laboratory-based false confessions, and there may be others I'm not thinking of at this moment.

Q.   Okay.  If we go to page nine, the first paragraph, the last two sentences, Dr. Welner writes that, quote, "There is no empirical social science research that resolves whether the Reyes/Solache confessions were true or false."  Do you see that?

A.   Yes.

Q.   Then you say, I never said that the social

RICHARD LEO, 04/24/2023                                    Page 94

science research resolves whether the confessions are true or false, only that they meet the research criteria of a proven false confession and I explained why.

A.   Correct.

Q.   Do you see that?

A.   Yes.

Q.   I'm still struggling with trying to understand where you're drawing the line here because you told us earlier that while people could dispute that the confession was false that if a particular confession meets one of the four criteria then it dispositively establishes that the confession was proven false.

So I'm just trying to understand the distinction you're drawing between whether or not the confession is true or false or whether it's a proven false confession?

MR. ELSON:  Objection to the form.

A.   I understand what you're -- I think what you're saying you're confused about but I don't think you asked a question.

Q.   Okay.  Well, let me try it again.  So I am confused about the distinction you're drawing in the sentence that reads, I never said that social science research resolves whether the confessions are true or false, only that they meet the research criteria of a

RICHARD LEO, 04/24/2023                                    Page 95

proven false confession and I explained why.  That's the sentence I'm focusing on, okay?

     A.    Okay.

     Q.    With that sentence in mind, you earlier said that if a case meets criteria then that establishes dispositively that the confession constitutes a proven false confession, and dispositively you defined as a proven false confession to an absolute certainty or to a near absolute certainty.

          So I guess the question is, based on what you've testified to today and in your previous dep and what you've said in your report, what distinction are you drawing in this sentence when you say you never said that the social science research resolves whether the confessions are true or false?  Isn't that exactly what you're doing, you're saying the social science research resolves the question and the confessions are false?

               MR. ELSON:  Objection to the form.

     A.    No.  I'm saying there is this research construct we call proven false confession.  There are four criteria that are not mutually exclusive.  If the case facts allow one to categorize a disputed confession case as being one of those four criteria or more then we would classify those for research purposes as what we call a proven false

confession.

I didn't say the social science research resolves this, and obviously in a court of law it's for the jury to decide or the trier of fact to decide whether or not a piece of evidence is true or false. But I'm saying in the research community we have these criteria and when we apply them and if one or more are met then we say it is a proven false confession, and my analysis in the earlier report was that one or more of the criteria in Mr. Reyes and Mr. Solache's case were met and we discussed those in the last two depositions.

Q. Then at the -- towards the bottom of the page, the last paragraph actually, you talk about a survey study that you published with Professor Kassin and you're criticizing his criticisms of you, but I just want to understand the survey that you're referencing here. What was the survey question that was asked --

A. I don't recall.

Q. -- that elicited the response that got you to the 5% number?

A. I would -- the survey was published in 2007. I would have to go back and look for it. I don't recall off the top of my head what the exact question was.

Q. Is the survey instrument still publicly available

so that we could go find it and see what question was asked?

A.   I don't know.  It might be appended to the end of the article.  I'd have to look at the article.

Q.   Okay.  As you sit here today, you're not sure is what you're saying?

A.   Correct.

Q.   Okay.  If we go to the next page, page 10, Dr. Welner distorts my past remarks, you say at the top of the page, when he states that I have only seen 5 to 15 proven false confessions in my career.  You testified in a Michigan case that of the approximately 400 cases in which I testified, I did not know how many were proven false confessions, but I estimated at that time the number to be 5 to 15.  Do you see that?

A.   Yes.

Q.   So I just wanted to be clear on what your clarification here is.  So in the Michigan case that Dr. Welner was discussing, that's a case that you actually testified in court, correct?

A.   Correct.

Q.   So it's not a research paper or anything like that?  It's actually testimony.  And you were asked a question about how many times you had testified that a case

fit criteria for a proven false confession and your estimate at that time was between 5 and 15?  Is that what you're saying or do I have that wrong?

A.   I think you've got it right.  I was asked -- my recollection is I was asked of these 400 cases in which you've testified as an expert witness, what percentage of these or what number of these do you think met the criteria for proven false confession, and my recollection is I said I don't know, and then I was asked to estimate it and I made an estimate, and these cases -- this was just in the -- first of all, I don't know the number but I just guessed an estimate, but these are cases I've worked on. These are not necessarily cases that I've studied or written about in a research context.

Q.   Right.  That's a different category, right, is the cases that you've researched or written about.  So these are all cases where you were hired as an expert, right, the 400 number, correct?

A.   Correct.  I mean I might have worked pro bono on some of them.  So hired, I would say retained.

Q.   Retained, that's a better word.  You're retained as an expert in these approximately 400 cases, and when you're retained as an expert in these 400 or so cases you're provided materials like you were provided materials

in this case, right, by the person that -- the individual that hired you or retained you?

    A.    Correct.

    Q.    Okay.  So you have at your disposal in those approximately 400 cases presumably a lot of case materials from which you can analyze and draw conclusions and then ultimately arrive at some opinions that obviously must vary from case to case, right?

    A.    Some of the cases you don't have a lot of materials.  Most of the cases I work on, 90% or more are criminal cases that are going to trial.  They're not civil cases with boxes and boxes of materials.  So there are some cases where there is a lot of materials, there are other cases where there are not.

    Q.    Okay.  In any event, in the particular cases where you're retained you are provided access to whatever materials the individual who has retained you believes are relevant for you to opine on whatever the particular issue is that's relevant to that person's case, right?

    A.    Yes.

    Q.    Okay.  So of those 400 or so cases, when you were asked the question in the Michigan case you estimated that while you did not know precisely how many of the 400 cases fit criteria for proven false confession you estimated the

number to be about 5 to 15.  Do you see that there?

    A.    Yes.  At that time, yes.

    Q.    Okay.  And do you have a different number now?

    A.    Well, I would give a different estimate, yeah, I think the number is higher than that but I don't know how much higher.  I don't know if it's 20, 25, 30, but I do think that I was underestimating but I don't have the precise number.

    Q.    Why do you think you were underestimating?

    A.    Because subsequent to that I was looking over the list of cases in which I had testified and I believe that I counted more than 15 that I would find as proven false confessions.

    Q.    Okay.  But you don't know the number now either, right?

    A.    Off the top of my head, no.

    Q.    Well, could you look it up?

    A.    Well, I mean, I could look at the number of cases in which I've testified and I could go through them one by one and some of them I wouldn't know or remember enough to know whether I would classify it as proven false confession, but of the ones that I do remember and know well enough I could look that up and then I could say, yes, here is 26 or 32 that I can tell from memory I would have

RICHARD LEO, 04/24/2023                                              Page 101

classified or have classified as a proven false confession.

So I could determine that number to a degree at which I would say it's no longer an estimate. It's based on what I remember this is the number in the list.

Q. And why isn't that a number -- you keep track of a number of different things, the number of times you testify, the number of times you've been retained, we went through all of this at your last deposition, why are you not interested in keeping a tally of how many cases where you've been retained as distinct from cases that you've reviewed for purposes of research or publication? Why aren't you interested in keeping a tally of that number?

MR. ELSON: Objection to the form.

A. It's usually something that comes up in research. It doesn't usually come up in the cases. So prior -- I think prior to that question on cross-examination, nobody had asked me how many times of the cases I've worked on, or if they had I didn't remember it, what number of the cases I've worked on would I classify as a proven false confession. And this is not even the cases I've worked on. This is just the number of cases I've testified in.

Q. Right because you've worked on more -- you've been retained to evaluate more cases than the ones where you actually ended up testifying in, right?

RICHARD LEO, 04/24/2023                                               Page 102

A.     Substantially, correct.

Q.     Yeah, okay.  You say the issue about a proven false confession usually comes up in research, not in cases?  Is that what you said, usually comes up in research?

A.     Sorry, go ahead.

Q.     Yeah.  You said that the issue about whether a confession meets criteria to be a proven false confession usually comes up in research and not in cases where you're testifying or being retained to evaluate.  Why do you say that?  What do you mean?

A.     What I mean is that I might do articles involving proven false confessions and assemble a dataset and analyze it, so that would be in research and publication where I might read other articles where the concept is referred to or referenced, but in my expert witness testimony I'm usually only asked general questions about proven false confessions and nobody has ever asked me what number of cases or what are the names of the cases that you've testified in that you would classify as proven false confessions.

Q.     How many cases where you've been retained have you been asked to evaluate whether the confession met criteria for a proven false confession?

A.    I couldn't give you a number.  I have no idea.

Q.    Because that's not a number you keep track of?

A.    Correct.

Q.    And I think you said -- I think -- actually, I could probably look, but my recollection is you've consulted, been retained in something like 2,000 cases, right?

A.    Correct.

Q.    As of the report -- the January 15, 2022 report, 2,200 cases is what the report says and presumably that number has gone up, right?

A.    Correct.

Q.    So of the 2,200 or so cases as of January 15th, 2022, as you sit here today you can't tell us in how many of those cases you've been asked to assess whether or not the confession met criteria to be a proven false confession, right?

A.    Correct.

Q.    Are you always asked to evaluate the confession to determine whether or not it meets criteria to be a proven false confession?

A.    No.

Q.    How often are you asked to evaluate a confession in these cases, this 2,200 or whatever the current number

is?  What percentage of the time are you asked to determine whether or not the confession meets criteria to be a proven false confession?

A.  It would be a pure speculative guess and the problem with making speculative guesses is then they get reified into subsequent questions as specific numbers as if that's the number.  So I don't want to guess.  I have no idea, as I said earlier.

Q.  At the bottom of the page, the same page, page 10, it says, Dr. Welner relies on an Alaska trial judge from 1998 who falsely states that I had been excluded in every forum where a pretrial admissibility hearing was held.  Do you see that?

A.  Yes.

Q.  The Alaska trial judge who falsely stated you've been excluded in every forum, do you know why the trial judge made that mistake?

MR. ELSON:  Objection, form, calls for speculation.

Q.  You can answer.

A.  Sorry.  I have no idea.

Q.  If we go to now Exhibit A to your report so it's page I think 12 of this document.  This is a list of cases in which you've been qualified and testified from

RICHARD LEO, 04/24/2023                                    Page 105

January 2019 to January 2023?

    A.    Correct.

    Q.    Okay.  If we -- well, let's see.  Let's go through the list.  State of California versus Manuel Dominguez.  Do you know what the result of the suppression hearing was?

    A.    I don't recall.  I think the confession was suppressed.

    Q.    How about the next one, State of California versus James Rickleffs, do you know what the result of the suppression hearing was?

    A.    I think the confession was not suppressed.

    Q.    And the next one, is that a civil case?

    A.    Correct.

    Q.    Against the United States government?

    A.    Correct.

    Q.    And said that you were retained -- were you retained to evaluate the confession to determine whether or not it met criteria?

    A.    I don't recall if it met the criteria of a false confession.  I don't recall whether it was or not.  I'd have to review it.

    Q.    The next one is State of California versus Regalado.  Do you know what the result of that suppression

Urlaub Bowen & Associates, Inc.   312-781-9586

hearing was?

A.   I don't recall.  I think it was not suppressed but I'm not sure.

Q.   Do you know how often you testified in a pretrial hearing, a suppression hearing, what the percentage of times are that the statement was suppressed versus not suppressed?  Do you keep that stat?

A.   I don't know -- no, I don't keep the statistic and I'm not always told either.

Q.   Do you ask?

A.   Sometimes I ask, yes, but I'm still not always told.  It may be that the result doesn't occur for months and then I say please let me know and I forget to follow up and they don't tell me.

Q.   In this --

A.   Or it might be -- sorry.  Or it might be, you know, they tell me two hours later.

Q.   Okay.  And then State of California versus Singh, do you know whether or not the statement was suppressed?

A.   I do not recall whether it was suppressed or not.

Q.   And -- did I just ask you about Singh?  I'm sorry.  In Singh -- State of California versus Singh, do you know whether or not the statement was suppressed?

A.   I don't recall.

Q.    Then State of California versus Atwal, it says trial.  Was that a criminal case or a civil case?

A.    No, it was a criminal case.

Q.    What did you testify to at the trial?  What was the purpose of your testimony?

A.    The purpose was the use of interrogation techniques to coerce false statements or create a risk of coercing false statements from alleged witnesses and/or co-conspirators.

Q.    And do you know what the result of the trial was?

A.    Yes.  All of the criminal defendants were acquitted.

Q.    Were acquitted?

A.    Correct.

Q.    Were you testifying on behalf of a particular defendant or multiple defendants?

        MR. ELSON:  Objection to the form.

A.    Well, I was retained by one defendant but the testimony was on behalf of more than one defendant, several defendants.

Q.    Okay.  Do you know what the criminal defendants were accused of in that case?

A.    Yes.  It was a homicide case.

Q.    Okay.  Then State of California versus Curtis

Leonard, that was a suppression hearing.  Do you know whether or not the statement was or was not suppressed?

A.    I don't recall.

Q.    Then in the matter of Michael Wright, administrative trial, what was that about?

A.    Michael Wright was a pharmacist in Utah and I think it was a licensing hearing, whether or not his license was going to get taken away, and I think he was accused of improperly taking or improperly prescribing or dispensing some medication, and so it was a multi-day licensing board hearing and that's why it was an administrative trial.

Q.    And what was your role?

A.    He was interrogated and he claimed that under duress he gave false statements to put an end to the interrogation, and my role was to explain based on the social science how and why that could happen.

Q.    And what was the result of the administrative trial?

A.    I don't remember the result exactly, but I think it was kind of split like, you know, he didn't get his license taken away but he was suspended for three months. That's an example of what -- the kind of decision that was made but I don't remember the details.  So I think he got a

RICHARD LEO, 04/24/2023                                    Page 109

lower level of punishment than revocation of his license.

Q.   Okay.   And then State of Montana versus Ryan Lamb, is that a criminal trial?

A.   Yes, that was a criminal trial.

Q.   And what testimony did you offer in that case?

A.   I believe I offered testimony again about police interrogation, psychological interrogation methods and confessions, true and false confessions.  General testimony.  There may have been case specific testimony about the techniques used, I don't recall.

Q.   And do you know what the outcome of the trial was?

A.   I think he was convicted.

Q.   Okay.  And then State of Arizona versus Gary Worrell.  Was that another criminal case, criminal trial?

A.   It was, yes.

Q.   Did you testify similarly as you've been talking about here about interrogation techniques, et cetera?

A.   Yes.

Q.   Do you know what the outcome of that criminal trial was?

A.   Yes.  He was convicted.

Q.   U.S. versus Jumper, that was a suppression hearing.  Do you know what the outcome of the suppression

RICHARD LEO, 04/24/2023                                     Page 110

hearing was?

A.    I think it was suppressed but I'm not 100% sure.

Q.    State of California versus Cerna, another suppression hearing.  Do you know what the outcome of the suppression hearing was?

A.    I don't recall.

Q.    State of California versus Benitez, another suppression hearing.  Do you know what the outcome of that suppression hearing was?

A.    I don't recall.

Q.    The next page at the top, United States versus MMG -- I mean MMJ, another suppression hearing.  Do you know what the outcome of the suppression hearing was?

A.    I think it was suppressed but I'm not 100% sure.

Q.    Then State of Ohio versus Ferricci, another trial.  Is that a criminal case?

A.    Yes.

Q.    Then did you testify consistently with the way you've testified in other cases?

A.    Yes.

Q.    Do you know what the outcome of the trial was?

A.    I believe he was convicted.

Q.    State of California versus Nicholas James, that's another suppression hearing?

RICHARD LEO, 04/24/2023                                    Page 111

A.    I believe that was suppressed, yes.

Q.    Then how about State of California versus Garcia, another suppression hearing?

A.    I don't recall what the outcome was of that.

Q.    The next one, U.S. versus KIW, another suppression hearing.  Do you know what the outcome of that was?

A.    I think it was suppressed but I don't know for sure.

Q.    State of California versus Garcia, it says trial.  Is that a criminal case?

A.    Yes, and I think he was convicted.

Q.    State of California versus Mendez, that's another suppression hearing.  Do you know what the outcome of the suppression hearing was?

A.    Yeah.  Hold on a second.  I think there was a hung jury on the July 2020 Garcia trial.  I don't think he was convicted because I think he was convicted at a subsequent trial.

On Mendez, I don't recall the outcome.

Q.    The next one, Lavelle Jones and Carl Dukes, that's a civil case?

A.    Yeah.  These were two joint civil cases in which I testified and I don't know what the result was, whether

RICHARD LEO, 04/24/2023                                    Page 112

they've settled or not that particular case, the one in the state court of claims.

Q.   Okay.  But it also says trial.  Did you testify at the trial?

A.   I think it was a bench trial.

Q.   Okay.  In the court of claims?

A.   Correct.

Q.   And were you asked to evaluate whether or not, I assume, Mr. Jones and Mr. Dukes gave a -- provided a confession or an inculpatory statement; is that right?

A.   Correct.

Q.   Were you asked to evaluate whether or not they met one of the four criteria to be a proven false confession?

A.   I don't recall.  I'd have to go back and look at my notes or report in that case.

Q.   Okay.  Then the Garcia case, that's the retrial after the hung jury from July of 2020; is that right?

A.   Correct.

Q.   And do you know the outcome of that case then?

A.   I think he was convicted.

Q.   And then there is another civil case, McCollum versus Robeson County; is that right?

A.   Correct.

RICHARD LEO, 04/24/2023                                    Page 113

Q.    And did you testify at the trial?

A.    I did.

Q.    Do you know what the verdict was?

A.    Yes.  It was in favor of the plaintiffs, and I think it was an $85 million verdict, in that neighborhood between 80 and $90 million.

Q.    It was more than one plaintiff?

A.    There were two plaintiffs, Henry McCollum and I think his stepbrother Leon Brown.

Q.    And in that particular case were you asked to determine whether or not the confessions in that case met one of the four criteria to be a proven false confession?

A.    I think it was taken as given because it was a D -- a clear DNA exoneration.  So I think everybody agreed that it was a proven false confession.  I may be misremembering.  I would have to go back and look at my report in that case.

Q.    State of California versus Eastman.  Was that a criminal trial?

A.    Yes.

Q.    Do you know the result of the criminal trial?

A.    I do not recall.  I think he was convicted but I do not recall.

Q.    State of Nevada versus Rohr, that's a suppression

RICHARD LEO, 04/24/2023                                    Page 114

hearing.  Do you know what the result of the suppression hearing was?

A.    Yeah.  The statement was admitted.

Q.    And then Nevada, State of Nevada versus Anita Rohr.  Is that a criminal trial?

A.    Yes, and she was convicted, and a few months ago the conviction got reversed on appeal by an appellate court.

Q.    Do you know what the basis for the appeal was?

A.    I reviewed the opinion.  It had -- I think it had something to do with the confession, whether it was improperly admitted or whether certain statements by law enforcement were improperly allowed.  I think that was it but I'd have to reread the opinion.

Q.    Okay.  State of Missouri versus Simmons, that's another criminal trial; is that right?

A.    Correct.  It's a criminal trial, that's correct.

Q.    And was Mr. Simmons convicted or acquitted?

A.    I don't recall.

Q.    State of -- I'm sorry, were you done?

A.    Yes.

Q.    Okay.  State of California versus Ramey, that's another criminal trial, right?

A.    Correct.

RICHARD LEO, 04/24/2023                                    Page 115

Q.    And was Mr. Ramey convicted or acquitted?

A.    I don't recall.

Q.    The next one is U.S. versus Bigda?

A.    Correct.

Q.    It says prosecution there.  What does that mean?

A.    I was -- I worked on behalf of the prosecution in that case, not on behalf of the defense.

Q.    And what did the prosecution ask you to do in that case?

A.    It was essentially a police interrogation standards expert.  So Mr. Bigda was a police officer in a county in Massachusetts and he had arrested somebody and was interrogating them in a neighboring county and he may not have realized that his interrogation was being recorded and so he made a number of threats about physically assaulting and beating up the person he was interrogating, who was a minor, if that person didn't confess.  So the Department of Justice was prosecuting him for violating federal law in terrorizing and threatening that minor on tape in an interrogation.

So they wanted an expert to testify, as I did at the federal trial, about police interrogation training, practices and standards with respect to threats of violence, physical assault and other abusive interrogation

techniques.

Q.   And you were permitted to testify in that -- to the topics that you just described, right?

A.   Correct.

Q.   Was Mr. Bigda convicted or acquitted?

A.   He was acquitted.

Q.   U.S. versus Kathleen Richard, that's a suppression hearing.  Was the confession suppressed or not?

A.   No.  It was admitted.

Q.   Then you testified again at the trial?

A.   Correct.

Q.   And what happened at the trial?

A.   She was convicted.

Q.   State of California versus Gonzales.  That's another criminal trial, right?

A.   Correct.

Q.   Was Mr. Gonzales acquitted or convicted?

A.   I don't recall whether he was convicted or acquitted.

Q.   State of California versus Kourchenko, is that another criminal trial?

A.   Correct.

Q.   Was Mr. Kourchenko acquitted or convicted?

A.   I believe he was convicted.

RICHARD LEO, 04/24/2023                                      Page 117

Q.   State of California versus Jimmy Rosales, is that another criminal case?

A.   Yes.

Q.   Was he -- Mr. Rosales convicted or acquitted?

A.   I think he was acquitted but I'm not 100% sure. I'd have to double check.

Q.   And then State of Illinois versus David Wright, post-conviction hearing.  Do you see that?

A.   Yes.

Q.   And that's here in Cook County, right?

A.   Correct.

Q.   "Here" meaning where I am, not where you are.

Who retained you to represent Mr. Wright?

A.   The Exoneration Project at the University of Chicago Law School, I believe.

Q.   What was the substance of your testimony?

A.   I believe it was the same as it usually is about the social science on police interrogation, psychological coercion and false confessions and some case specific analysis.

Q.   Were you asked to analyze whether or not Mr. Wright's confession met one of the four criteria for it to be a proven false confession?

A.   I don't recall.

RICHARD LEO, 04/24/2023                                    Page 118

Q.   And do you know what the status of the post-conviction proceeding is for Mr. Wright?

A.   I think he was released but I could be wrong. I'd have to double check.

Q.   State of Colorado versus Lyndarr, that's another post-conviction --

A.   Correct.

Q.   -- hearing in Colorado.  Who retained you on behalf of Mr. Lyndarr?

A.   It was the post-conviction attorney in Colorado. I don't remember his name.

Q.   And what did you testify to in that particular post-conviction hearing?

A.   About interrogation practices, psychological coercion, false statements and false confessions.

Q.   Do you know what the outcome of that hearing was?

A.   I don't.  I think it was one of those situations where he told me the outcome wouldn't be determined for months, that after the hearing both sides would have to brief it, there would be a written opinion and he would get back to me, and I haven't heard since.

Q.   Okay.  The next one is State of California versus Sidney Russell.  Is that another criminal trial?

A.   Correct.

Q.   What was the outcome of that criminal trial?

A.   Don't recall.  I think he was convicted but I'm not 100% sure.

Q.   And then U.S. versus Ronald Jacobs, that's a suppression hearing.  Was the statement suppressed?

A.   I think it was suppressed, but recently I heard that an appellate court reversed the suppression.

Q.   Do you know the basis for the appellate court's decision to reverse the suppression?

A.   I do not.

Q.   Then the next one is State of California versus Robert Earl Davis.  That's another criminal trial; is that right?

A.   Correct, and I don't recall the outcome.

Q.   And the next one is U.S. versus -- I don't know how to say that name, Racion or Racion?

A.   Yeah, I pronounce it Racion but I don't know either.  My recollection is he was convicted.

Q.   Okay.  Then the next one is the State of Tennessee versus Lowe.  That's another post-conviction hearing; is that right?

A.   Correct, and her conviction was reversed.

Q.   What were you asked to testify to in that post-conviction hearing?

A.    About interrogations, confessions, the Reid method, risk factors.

Q.    Were you allowed -- were you asked to evaluate whether or not Miss Lowe's confession met one of the four criteria for a proven false confession?

A.    I don't believe I was asked but I'd have to double check to confirm for sure.

Q.    Okay.  Then the next one is State of California versus Knowles, another post-conviction hearing.  Do you know what the outcome of that hearing was?

A.    No.  I believe the attorney was going to get back to me and never did or it might still be undecided.

Q.    Okay.  And then were you asked to evaluate Mr. Knowles' confession to determine whether or not it met criteria, one of the four criteria to be a proven false confession?

A.    I don't believe so.

Q.    Then the last one, Commonwealth of Kentucky versus McCullon, that's another suppression hearing.  Do you know what the outcome of that hearing was?

A.    I don't believe they ever got back to me on that so I don't recall.

Q.    Okay.  All right.  I think we're done with this exhibit, and this is probably a good place to take a break

RICHARD LEO, 04/24/2023                                    Page 121

since I'm going to switch gears a little bit, and then we can talk about your notes for a bit.  So I'm going to go off the record.

A.  Can we take a 10-minute break, not a 5-minute break or a 15-minute break, just longer than our usual break, usual five-minute break?

Q.  Yeah, sure, we can do -- if you need 15, that's fine.

A.  Either 10 or 15 is fine with me.

MS. ROSEN:  Nick, you're muted.

THE VIDEOGRAPHER:  Thank you.  Going off the video record at 3:38 p.m.

(Whereupon a recess was taken.)

THE VIDEOGRAPHER:  This is the beginning of Media Unit 4, and we are back on the video record at 3:53 p.m.

DIRECT EXAMINATION (cont.)

BY MS. ROSEN:

Q.  All right.  If we could switch gears a little bit and take a look at Exhibit Number 8.

(Remote screen sharing.)

Q.  Dr. Leo, these are the notes that you were utilizing to assist your memory during the September 2022 deposition in this case --

Urlaub Bowen & Associates, Inc.   312-781-9586

RICHARD LEO, 04/24/2023                                           Page 122

A.    Okay.

Q.    -- that are Bates-stamped LEO2268 through LEO2358.  I think from this morning we talked -- we talked about this and you testified that you have a hard copy of these documents in front of you, correct?

A.    Yes.

Q.    Okay.  And you testified in the September deposition or depositions, I don't remember which day, that you prepared these notes in the weeks leading up to your deposition to assist you for the deposition answering questions because the report you wrote in this case contained a lot of information and was either the longest or one of the longest reports you'd ever written.  Do I have that summarized accurately?

A.    I believe so.

Q.    Okay.  And so these notes are not only summaries of I believe it's 38 of the cases that you analyzed in the Monell portion of your opinion but also have three different indexes and then also has some notes typewritten and handwritten related to the underlying case, meaning Mr. Reyes and Mr. Solache's case.  Is that right?

A.    Yes.

Q.    Okay.  Why -- what made you decide to, let's focus on the notes related to Mr. Solache and Mr. Reyes'

cases which begin at page -- at Bates-stamped 2353 which is I think about eight pages from before the end of the packet. So starting here, Indicia of Unreliability, the confessions are riddled with factual errors and are inconsistent with crime scene facts, physical evidence and logic. Do you see that?

A. Yes.

Q. So the next few pages, six pages, address the Solache and Reyes case itself. Why did you prepare notes with respect to this aspect of your report?

MR. ELSON: Objection. You just summarized his previous testimony from the 14-hour deposition as to why and when these notes were prepared. So my objection is, number one, based on asked and answered.

Number two, we asserted privilege objections during the 14-hour deposition in relation to these notes and, as you know, we had a meet-and-confer process about this subsequently where we explained the basis of our objections, but in an effort to reach a compromise we produced these notes even though we believed they weren't discoverable subject to our reservation of our privilege right.

During our meet-and-confer process, we discussed the timing of a potential redeposition related to these

notes. We never reached a resolution of that issue but we agreed -- we offered some additional time for you to reask questions if you wanted to reask them regarding when and why the notes were created which have already been asked and answered.

So I'm going to allow him to answer the question you just asked, but I'm making this record because I'm guessing we're going down a road where I'm going to have to reassert our privilege objections and I want to caution the witness about that, but we'll take it on a question by question basis and you can answer this particular question.

And it probably needs to be read back and it needs to be read back for my own sake. So I would ask the court reporter to do that.

(Record read as follows:

"Question: So the next few pages, six pages, address the Solache and Reyes case itself. Why did you prepare notes with respect to this aspect of your report?"

A. So these are memory aids that Reyes and Solache case, as I think was asked maybe in a previous question or mentioned at least, is I think the longest report I've ever prepared, certainly one of the longest. I reviewed a

RICHARD LEO, 04/24/2023                                        Page 125

voluminous amount of materials.  It's the longest time I've ever been deposed, right, you got an extra seven hours your second day.  So this was just an effort to be prepared for the deposition and to have notes in front of me should my mind go blank or should I not remember something buried in the reports.  So it was just to help me more adequately and accurately answer your questions in the two-day, 14-hour deposition.

BY MS. ROSEN:

    Q.   Okay.  And when did you -- specifically when did you prepare the notes as it relates to the Reyes and Solache portion of your report?

    A.   I don't recall when I prepared, exactly when I prepared those notes.  It would have been around the time of my deposition, prior to my deposition, but I don't recall specifically.

    Q.   And with respect to this page of the notes, what did you do to create the notes?  Meaning what documents did you review, if any, to prepare the six points that appear at Bates stamp LEO2353?

            MR. ELSON:  Objection.  We are asserting privilege under Rule 26(b)(4)(B) and (C) with regard to that question and instruct the witness not to answer.

    Q.   I assume you're going to take your attorney's

advice and not answer my question, correct?

    A.    Correct.

            MS. ROSEN:  And, actually, I hate to do this, but can you read back my question just so that I have it in my head precisely?

            THE REPORTER:  Yes.

                (Record read as follows:

            "Question:  And with respect to this

            page of the notes, what did you do to

            create the notes?  Meaning what

            documents did you review, if any, to

            prepare the six points that appear at

            Bates stamp LEO2353?"

BY MS. ROSEN:

    Q.    Let's go to the next page of the note.  Now, this page is titled Evidence of Proven False Confession DNA Exclusion, and it identifies information on the document, items 1) through 6), beginning with the point about the victims being stabbed more than 50 times, bullet point 2) is items found by the police, item 3) is a statement that the true perpetrator or perpetrators would have left DNA at the crime scene and DNA from the crime scene would have been left on them, item number 4) is that neither Reyes nor Solache's DNA was found at the DNA-rich crime scene nor

were any of either murder victims' DNA found on Mr. Reyes or Solache, number 5) not a single piece of forensic evidence linked Reyes or Solache to the double murder, DNA testing excluded both individuals as the source of any evidence at the crime scene, and then by contrast Miss Mejia's DNA was found at the scene and the victim's blood was on her.  Do you see that?

A.   Yes.

Q.   And you -- what did you do to create the notes?  What documents did you review to create the typed portion of the notes at page Bates-stamped LEO2354?

MR. ELSON:  Objection.  We assert the privilege pursuant to Rule 26(b)(4)(B) and (C) in response to this question, and I instruct the witness not to answer.

BY MS. ROSEN:

Q.   With respect to -- I assume you're going to take your attorney's advice and not answer the question, correct?

A.   Correct.

Q.   Did you prepare these notes independently of anybody else?

MR. ELSON:  Objection.  Same objection as before, same privilege asserted, same instruction not to answer.

RICHARD LEO, 04/24/2023                                    Page 128

BY MS. ROSEN:

Q.    There is handwritten notes at the bottom -- I'm going to assume, just so we're not wasting time, that every time you're instructed not to answer you're going to take your lawyer's advice.  Is that assumption correct?

A.    Correct.

MR. ELSON:  For the record, I'm not his lawyer.  He is the expert.  I'm the party's attorney.  But understood, and, yes, you can save us time by making that clear.  I appreciate that.

MS. ROSEN:  You're representing him, aren't you, for purposes of this deposition?

MR. ELSON:  I don't know if that's the correct technical way to put it.  I mean he is an expert witness and I represent the Plaintiff in the case and he has been retained by the Plaintiff, but I don't know that it's accurate to say that I'm his lawyer.

MS. ROSEN:  Okay.  Well, we don't need to get into this debate, but I'm going to assume you're going to take Mr. Elson's advice or Miss Brady's advice if she decides to chime in and instructs you not to answer, correct?

MS. BRADY:  I would like to put on the record that, as we stated at the beginning of this

Urlaub Bowen & Associates, Inc.   312-781-9586

RICHARD LEO, 04/24/2023                                   Page 129

deposition, our objection in the Reyes case, we're joining all the objections made by Mr. Elson and I've been declining for efficiency that that rule still stands.

MS. ROSEN:  Yeah, I didn't assume that it somehow evaporated because you appeared, but thanks for clarifying.

BY MS. ROSEN:

Q.   At the bottom of LEO2354, there is some handwritten notes, correct?

A.   Yes, correct.

Q.   That's your handwriting, right?

A.   Correct.

Q.   When did you add the handwriting in relation to when the notes were typed?

MR. ELSON:  Objection.  Same objection, same privilege asserted, same instruction not to answer.

MS. ROSEN:  The when?  You allowed him to answer a when question earlier.  What's the difference?

MR. ELSON:  Because I allowed him to answer the when question with regard to when these notes were created in terms of after his report was issued and before the deposition, but if you're getting into the details of what specific writings contained in each document were placed on the document, then I'm going to assert the

Urlaub Bowen & Associates, Inc.   312-781-9586

RICHARD LEO, 04/24/2023                                    Page 130

privilege.

MS. ROSEN:  Okay.  I don't understand but okay.

BY MS. ROSEN:

Q.   Why did you add the handwritten notes to the typed version of the document at LEO2354?

MR. ELSON:  Objection, asserting the privilege, and instructing the witness not to answer.

Q.   Let's look at page 2355.  Are these your handwritten notes?

A.   Yes.

Q.   When did you write these notes in comparison to the typed notes at page 2354 that we just looked at?

MR. ELSON:  You can answer that question if you know the answer.

A.   I don't recall exactly when I wrote out these notes.

Q.   Is it possible you wrote out the handwritten notes before you did the typed notes?

MR. ELSON:  You can answer that.

A.   It's possible.

Q.   Go to the next page, Bates-stamped 2356.  This says Sources of Pattern/Practice/Notice.  Do you see that?

A.   Yes.

Q.   This now goes to the Monell portion of your report, right, your opinions related to the City of Chicago's policies and practices; is that correct?

A.   Yes.

MR. ELSON:  Objection to the form.

Q.   And when did you prepare these notes?

MR. ELSON:  You can answer that.

A.   I don't recall.

Q.   Was it in the same time period in the weeks leading up to the September deposition?

MR. ELSON:  You can answer that.

A.   It was after the report, prior to the deposition. I don't know how much prior to the deposition, but closer to the deposition than to the completion of the report.

Q.   And certainly your deposition occurred September I believe it's 28th and 29th of 2022.  Do you recall that?

A.   Yes.

Q.   And if you testified in September -- on September 28th and/or September 29th that you prepared the notes in the few weeks leading up to your deposition, would that have been accurate testimony?

A.   I believe it would have been if that's what I testified to during the deposition.

Q.   Okay.  So based on that testimony is it fair to say that you prepared all of the notes that are in this packet of materials that are marked as Exhibit 8 during the month of September leading up to your September 28th and September 29th deposition?

A.   If that's what I previously testified to then, yes, I believe that would be accurate.

Q.   Okay.  Then turning to this page that we have up on the screen right now, Bates-stamped 2356 of Exhibit 8, it identifies the source -- the document is called Sources of Pattern/Practice and Notice and then it has 10 bullet points.  Do you see that there?

A.   Yes.

Q.   And what did you review in order to create those notes?

MR. ELSON:  Objection, assert the privilege under Rule 26(b)(4)(B) and (C) and instruct the witness not to answer.

BY MS. ROSEN:

Q.   Did you prepare this page 2356 in one sitting?

MR. ELSON:  Object -- same objection, same instruction.

Q.   Let's go to the next page, 2357.  This page now says, Evidence of a Proven False Confession, Physical

Impossibility.  It has two bullet points, right?

A.    Correct.

Q.    This goes back to your opinion regarding Mr. Solache and Mr. Reyes' underlying case, right?  It's not the Monell claim anymore?

A.    Correct.

Q.    Where do you maintain these notes, the one's we've been talking about, 2353, 2354, 2355, 2356, 2357?

MR. ELSON:  Objection to the form.  You can answer if you understand the question.

A.    They should be in my file, my paper file for the case, or three-hole punched into binders that are essentially a paper file of the case.

Q.    Do you maintain an electronic file of your case, of the case?

A.    If I've been sent documents electronically then yes, I would maintain an electronic file.

Q.    Do you maintain an electronic version of your original report that was prepared and tendered in January of 2022?

A.    Yes, I have an electronic copy of that.

Q.    Do you have an electronic copy of the rebuttal report that we were talking about this morning, Exhibit Number 4?

A.    Yes.

Q.    Do you have an electronic copy of these notes?

A.    I should, yes.

Q.    And when you prepared these notes, I assume you prepared them on the same computer or word processor or whatever it is that you prepared your reports on; is that correct?

MR. ELSON:  Objection, assert the privilege under Rule 26(b)(4)(B), (C), instruct the witness not to answer.

BY MS. ROSEN:

Q.    In advance of your deposition, after you typed the notes to assist you to answer the questions for your two-day deposition, did you then print a copy of the note?

MR. ELSON:  Objection to the form of the question.  You can answer whether you printed a copy of the notes.

A.    Yes.

Q.    And then after you printed a copy of the notes did you then add the handwritten additional notations that we see throughout the note?

MR. ELSON:  You can answer that question.

A.    For the most part, yes.  Yeah, the handwritten notations I believe on all the typewritten notes would have

been added after I printed out the typewritten notes.

Q. Okay. And if we go to the last page of this exhibit, at the top it says Interrogation of Arturo Reyes, it identifies certain police officers, it identifies the victims, and then it says Interrogation of Gabriel Solache and it identifies police officers. Do you see that?

A. Yes.

Q. Under police officers it says ASA Heather Brualdi. Do you see that?

A. Yes.

Q. You know that ASA is not a police officer, right?

A. Correct.

Q. Okay. And so in these particular notes, pages 23 to -- 2353 to 2358, all of the notes, the typed written notes relate to Mr. Solache and Mr. Reyes' underlying case except for page 2356 which says Sources of Pattern/Practice/Notice. Do you see that there?

A. Yes.

Q. And then if we go to the first page of the packet of notes, Exhibit Number 8, at this point now there is a lengthier summary that begins with Mr. Flewellen's case, right?

A. Correct.

Q. And let me ask you this: Did you print these

RICHARD LEO, 04/24/2023                                    Page 136

notes, pages 2268 through 2352, off of your computer and then write handwritten notes on them?

MR. ELSON:  You can answer that question.

A.    Yes.

Q.    Are these notes saved in the electronic version of your file with your original report and your rebuttal report?

A.    Yes.

Q.    And did you create these notes on the same computer that you created your original report and your rebuttal report using the same word processor?

MR. ELSON:  Objection, assert the privilege, instruct the witness not to answer.

BY MS. ROSEN:

Q.    Taking a look at the first page here Bates-stamped 2268, at the top it says, Case Derek Flewellen, it says year 1995, and then it says Report Page 78.  What is that a reference to the 78?

A.    I'm not sure.  It might be a report -- it's prob -- I have to crosscheck it.  It's probably a reference to page 78 of my report.

Q.    And then it says Area 3, what is that a reference to?

A.    Well, as you know, my report discussed Areas 2,

Urlaub Bowen & Associates, Inc.  312-781-9586

RICHARD LEO, 04/24/2023                                    Page 137

3, 4 and 5 in the systematic widespread pattern and practice discussion and so I tried to group these together by area just to keep them straight in my mind.  And then, as you pointed out, there were indexes that -- for the cases in each of the areas as well.  There is so many cases it was hard for me to just remember all the names and which area they corresponded to.

Q.   Okay.  Then below Area 3 it says, Summary in Leo Report.  Do you see that there?

A.   Yes.

Q.   And then below that, what is reflected there under the heading Summary in Leo Report?

A.   It's just a very brief summary of the case.

Q.   Where did it come from?

A.   It came from --

MR. ELSON:  Objection to form.  You can answer.  No, you can answer.

A.   These were memory aids to help me in the deposition.  All the material came from the materials I reviewed in the report.

Q.   Right.  I'm asking that particular paragraph. Did you type that?  Is that new information that you typed as you were typing the notes or did you get it from somewhere else?

MR. ELSON:  Objection, assert the privilege, instruct the witness not to answer.

Q.    Why does the heading say Summary in Leo Report? Could it be a summary from somewhere else?

MR. ELSON:  Same objection, same instruction.

Q.    Below that paragraph it says Materials Provided Supporting Summary in Report.  Do you see that?

A.    Yes.

Q.    And then there is a sort of a two-cell table or something that says Description and then it says, Complaint in Derek Flewellen versus City of Chicago, and then Bates range PTP-D-FLEWELLEN with the numbers.  Do you see that?

A.    Yes.

Q.    And where did that information come from?

MR. ELSON:  Object to the form of the question.  I think there is a way for you to ask this that doesn't implicate the privilege but you would need to phrase it differently.  I'm not trying to be obstructionist or to make a speaking objection, but the way you phrased that question I'm going to assert the privilege and instruct the witness not to answer.

BY MS. ROSEN:

Q.    Was there a particular reason that you used a

table in the notes, in these summaries of the different cases?

MR. ELSON: Objection, assert the privilege, instruct the witness not to answer.

Q. Below the table it says Evidentiary Support for Summary, and then it says, Evidence of Coercion and Abuse. Do you see that?

A. Yes.

Q. And then it says, In a complaint filed in 2000 Derrick Flewellen alleged in November 1995 the Chicago Police Department, including Detectives Boudreau and Halloran, took him from the hospital where he was being treated for a foot injury and was in severe pain. Then it cites to PTP-FLEWELLEN pages 2 and 3. Do you see that?

A. Yes.

Q. What methodology were you utilizing to create the bullet points under Evidence of Coercion and Abuse in creating these notes?

MR. ELSON: Objection, assert the privilege, instruct the witness not to answer.

Q. Let's take a look at for a second Exhibit Number 6 which is the Monell only opinion.

(Remote screen sharing.)

Q. And go to page 78. You're just going to have to

RICHARD LEO, 04/24/2023                                    Page 140

scroll.  It's 78 of the full report.  Yeah, that's not going to work.  It's my page 13 try.  Sorry, okay.

Let's go to the bottom of this page.  That bullet point number 9 is Mr. Flewellen, correct, Derek Flewellen?

A.    Correct.

Q.    And the extent of the discussion regarding Mr. Flewellen's case comprises whatever that is, six lines, right?

A.    Yes.

Q.    If we go to the next page you'll see that's now a different discussion of Mr. Gillespie's case.  So if we go back to page 78, that's Mr. Flewellen's case, and yet the notes, if we go back to Exhibit Number 8 for Mr. Flewellen's case, are a page and a half, 2268 and 2269.

Why did you decide to add so much detail in the notes that you prepared to aid your memory so that you could answer questions at the deposition?

MR. ELSON:  Objection, assert the privilege, instruct the witness not to answer.

BY MS. ROSEN:

Q.    The notes -- well, let's actually go to Bates-stamped 2274 of the notes.  This is the index that you created, right, for the Area 3 cases?

A.    Correct.

RICHARD LEO, 04/24/2023                                    Page 141

Q.   And there are 25 Area 3 cases listed on this index, right?

A.   Correct.  Although a number of them have multiple criminal defendants/potential or real plaintiffs even though they're grouped into a single case, but yes.

Q.   Correct.  And how -- so, for example, take a look at number 3) Nevest Coleman and Derrll/Darryl, spelled a different way, Fulton.  How do you summarize that in your report, as one or two cases?

A.   I summarize it as one case.

Q.   Okay.  All right.  When did you create the index in relation to creating the note?

MR. ELSON:  Objection.  Objection, assert the privilege and instruct you not to answer that question.

BY MS. ROSEN:

Q.   Let's go back to the first page of the document, 2268.  There is a note off to the side at the top there it says, Proven DNA.  Do you see that?

A.   Yes.

Q.   When did you add that note?

MR. ELSON:  Objection, asked and answered.

A.   Yeah, I don't recall.

Q.   And then at the bottom of this page under section B it says, Evidence of Notice to the City of Chicago,

right?

    A.   Yes.

    Q.   And then, if we go to the next page, it says, Evidence of Innocence, correct?

    A.   Yes.

    Q.   And then I guess we skipped -- let's go back to the first page again.  Section A is Evidence of Coercion and Abuse, correct?

    A.   Correct.

    Q.   So each of the notes follow the same format, right, it's got the case name at the top, the year, the page of the report, the particular area, and then each note says Summary in Leo Report and then it says Materials Provided Supporting Summary Report, and then it says Evidentiary Support for Summary, A. Evidence of Coercion Abuse, after that it says, B. Evidence of Notice to the City of Chicago, and then after that it says, C. Evidence of Innocence.  And all of the notes related to the Monell portion of your report follow this same format, correct?

    A.   Correct.

    Q.   This is not the format that you used in your -- in the report that you tendered January 15, 2022, right?

    A.   Correct.

    Q.   How much time did it take you to create these

detailed, copious notes in preparation for your deposition?

MR. ELSON:  Objection to the form, objection based on the privilege, instruct the witness not to answer.

MS. ROSEN:  Let's take a break.

THE WITNESS:  Ten minutes?

MS. ROSEN:  Yes, please.

THE VIDEOGRAPHER:  All right.  We're off the video record at 4:29 p.m.

(Pause in Proceedings.)

THE VIDEOGRAPHER:  This is the beginning of Media Unit 5.  We are back on the video record at 4:42 p.m.

(Remote screen sharing.)

DIRECT EXAMINATION (cont.)

BY MS. ROSEN:

Q.   Taking a look at what we've marked as Exhibit Number 8, the first page of it still.  With respect to section A. under Evidence of Coercion and Abuse, what methodology did you utilize to identify the bullet points that you have here to support evidence of coercion and abuse?

MR. ELSON:  Objection, assert the privilege, and instruct the witness not to answer.

Q.   Moving to section B. Evidence of Notice to the City of Chicago.  What methodology did you utilize in

RICHARD LEO, 04/24/2023                                    Page 144

reviewing the materials or anything else to include the three bullet points in your notes that support your claim of evidence of notice to the City of Chicago?

MR. ELSON:  Objection to the form, objection based on the privilege, instruct the witness not to answer.

BY MS. ROSEN:

Q.    And then if we go to the next page under section C. Evidence of Innocence, what methodology did you use in reviewing the materials you were provided to come up with the three bullet points that you indicate in your notes are evidence of innocence?

MR. ELSON:  Same objections, same instruction.

Q.    The order in which these notes were produced, is this the order that you have them saved on your computer?

MR. ELSON:  Objection, assert the privilege and instruct him not to answer.

Q.    These notes are an appendix to your recent report in the Gomez case; is that correct?

MR. ELSON:  You can answer that question.

A.    These notes are a subset of my notes that I produced in the Gomez case.

Q.    Well, the Gomez case you produced a report, right?

RICHARD LEO, 04/24/2023                                          Page 145

A.    Correct.

Q.    And these notes are in Appendix C of your Gomez report, right?

MR. ELSON:  Objection to the form.  You can answer.

A.    Correct.

Q.    And the notes in Exhibit C are produced in a different order than they were produced here.  Why is that?

MR. ELSON:  Objection to the form, and I will assert the privilege to that question and instruct you not to answer.

Q.    Let's go to page 2282, Bates-stamped 2282. Scroll up a little bit.

This is the summary that you provided with respect to the Nevest Coleman and Derrell Fulton case, correct?

A.    Yes.

Q.    And if you look in the table under Materials Provided Supporting Summary Report, at the bottom right corner it says PTP-N COLEMAN00001 to 00010, and then (typo in Leo Report).  Do you see that there?

A.    Yes.

Q.    What's the typo?

MR. ELSON:  Objection to the form.  You can

RICHARD LEO, 04/24/2023                                        Page 146

answer if you can.

Q.    What's the typo that you're referencing there?

A.    I don't recall.  I'd have to compare it to the report.

Q.    Do you often refer to yourself in the third person?

        MR. ELSON:  Objection to the form.

A.    I wouldn't say often.  I would say sometimes.

Q.    Why did you note that there was a typo in your original report on page 2282?

        MR. ELSON:  Objection, assert the privilege, instruct the witness not to answer.

Q.    Let's go to page 2335, Bates-stamped 2335.  Under Summary in Leo Report it says in brackets and highlighted, Note the error in the Bates reference in the report.  Do you see that?

A.    Yes.

Q.    What error are you referring to?

A.    I don't recall.  I'd have to compare this to the report to figure it out at this late date.

Q.    Why did you include that in the notes of the Prince case?

        MR. ELSON:  Objection, assert the privilege, instruct the witness not to answer.

RICHARD LEO, 04/24/2023                                  Page 147

Q.   These summaries are for only 38 of the total cases that are summarized in the Monell portion of your report, right?

A.   I believe so.

Q.   Why did you summarize these cases and not the others?

MR. ELSON:  Objection to the form, foundation.

Q.   Let me rephrase it.  Why did you prepare detailed notes for these 38 cases and not for the other cases that are listed in your report?

MR. ELSON:  Objection to the form, and based on how that question is phrased I'm asserting the privilege and instructing him not to answer.  I understand where you're going with this this, Eileen, and I could assist in how you want to phrase this question if you'd like to get the answer you're looking for.

MS. ROSEN:  No.  I'm going to ask my questions.  I disagree with your assertion of the privilege throughout so -- and I guess we'll have to take that up at another time.

BY MS. ROSEN:

Q.   Is there a typical font that you utilize when you're preparing reports, Dr. Leo?

RICHARD LEO, 04/24/2023                                    Page 148

A.    I typically use the Times New Roman 12 on reports though I don't always use it on other documents.

Q.    What other font do you use on other documents?

A.    Whatever default font there is on the computer, Word program.

Q.    Well, does your Word program have a standard default font?

A.    It probably does, I just haven't paid attention to what it's called.

Q.    If we look at page 2274 again, that's the index for the Area 3 cases, that's in Times New Roman, right?

A.    Correct.

Q.    And then if we look at let's go to Bates-stamped 2353, that and the following typed pages are also all in Times New Roman, right?

A.    Correct.

Q.    If we go back to the first page of the report -- of these notes, the notes that are the detailed summaries of the cases you discuss in the report are not in Times New Roman, right?

A.    Correct.

Q.    Why is that?

MR. ELSON:  Objection, assert the privilege, instruct the witness not to answer.

RICHARD LEO, 04/24/2023                                    Page 149

BY MS. ROSEN:

Q.   Dr. Leo, are you sure that you prepared all of these summaries of the cases discussed in the Monell portion of the report or did somebody else prepare them for you?

MR. ELSON:  Objection to the form, assert the privilege, instruct the witness not to answer.

MS. ROSEN:  Okay.  We are going to suspend the deposition, we have approximately three hours left on the record, so that we can take up this assertion of privilege and litigate it if we need to, but we are reserving the rest of the time.

MR. ELSON:  We don't agree to suspend the deposition.  We met and conferred on this issue back in January.  You had months and months to reach a resolution about this prior to today's deposition and you decided not to do that, you decided to move ahead today.  You've already deposed this man for almost 20 hours.  The idea that you're going to bring him back for a fourth session is absolutely out of the question from our perspective.  So we do not agree.

MS. ROSEN:  Okay.  Well, we are going to suspend the deposition because you are asserting what we believe is a privilege that is not applicable to these

circumstances or these notes.  You produced the notes, we had Rule 37 discussions, we had debates, and you suggested we table the debates since you were going to be producing a rebuttal report.  So that's what we did.

It is your choice to make these objections.  We couldn't have possibly known the scope of the objections until we got the notes produced to us because they weren't produced to us during the first 14 hours of his deposition when they should have been.

So that's our position.  We are reserving the time.  We will have a Rule 37.  I hear what your position is now, and if we have to take it to the judge, we'll take it to the judge and the judge will decide.

MR. ELSON:  You knew what our position was back in January.  We made our position crystal clear in our email correspondence during our meet and confer.  Our position remains the same as we've expressed it during this deposition.  It hasn't changed.

So you certainly did have an opportunity to resolve this issue prior to the deposition.  The issue that we tabled was the issue of timing.  You asked for an additional full day based on the notes.  We were willing to give you as a compromise so that we didn't have to waste the court's time an additional hour, and you turned down

that offer and we decided to table the issue of timing because he was going to issue a rebuttal report and you were going to have another opportunity to depose him anyway.  It was your choice not to pursue the privilege issue any further before the deposition today.

So we're not willing to suspend the deposition and bring him back another time based on the privilege issue.

MS. ROSEN:  Well, it's not going to be your choice eventually.  It's going to be a judge's choice.  So we are suspending the deposition.  We are reserving the time.  We were entitled to seven hours today.  We are reserving the time and we are going to have this resolved by the court if we can't reach agreement.

MR. ELSON:  Just to be --

MS. ROSEN:  I understand what your position is, and I'm not going to waste more time on the record debating.  So we can go off the record, and if you want to further debate it, we can further debate it, but I'm not going to eat up deposition time debating it.

MR. ELSON:  Fine.  I don't want to further debate it either, but I just want to make one point clear since this deposition was supposed to be in relation to his rebuttal report and you've gone through his rebuttal report

RICHARD LEO, 04/24/2023                                          Page 152

in exhausting detail, reading almost every sentence of the report and asking him questions about each sentence, asking him questions about each of the cases that he listed in the appendix. Are you finished with your questioning in relation to the rebuttal report?

MS. ROSEN: I am finished with my questions in relation to the rebuttal report.

Miss Golden, do you have any questions with respect to the rebuttal report?

MS. GOLDEN: None at this time but I might when we resume.

MR. ELSON: No. Well, we're not -- if you have questions in relation to the rebuttal report, you should ask them now, as should counsel for Defendant Guevara, because we're not suspending the deposition -- we're not agreeing to suspend the deposition for any reason, and we're absolutely not agreeing to allow you to come back at a later date to ask questions about the rebuttal report that you could have asked today.

MS. GOLDEN: I think I'd have followup on the notes when I think we get answers to the questions that we're asking about the notes. I don't know that I have any questions about the body of the report but I'd have to take a break and look at my notes to figure that out. So we can

Urlaub Bowen & Associates, Inc.   312-781-9586

RICHARD LEO, 04/24/2023                                   Page 153

address that if it's an issue.

MR. ELSON:  Let's take a break, then, and you can determine whether you have any questions related to the rebuttal report before we end for the day.

MS. GOLDEN:  Okay.

THE VIDEOGRAPHER:  In agreeance to go on break?

MR. ELSON:  I'm sorry?

MS. ROSEN:  Yes, we are in agreement to go on a short break.

THE VIDEOGRAPHER:  All right.  We're off the video record at 4:56 p.m.

(Whereupon a recess was taken.)

THE VIDEOGRAPHER:  We are back on the video record at 5:01 p.m.

CROSS-EXAMINATION

BY MS. GOLDEN:

Q.   Okay.  Good afternoon or good evening, Dr. Leo. I have just a few questions for you, not very many, I can assure you, but I do want to put up Exhibit 4 which is your report and ask the tech to go to Exhibit A which starts on page 12 -- actually, go to page 13 which is the list of cases in which you've been qualified and testified.

(Remote screen sharing.)

RICHARD LEO, 04/24/2023                                        Page 154

Q.    Do you see that?

A.    Yes.

Q.    So does this list include cases in which you have been determined not to be qualified to testify?

A.    I don't believe there are any in that time period that I can recall in which a court said I wasn't legally qualified to testify, but if such case existed it would not be on this list because it wouldn't have been a testimony at a suppression hearing, a trial or post-conviction hearing.

Q.    And you don't keep track of the times in which the court declines to allow your testimony, correct?

A.    Correct.

Q.    Do any of the cases that appear on your list of cases in which you testified relate to cases in which you gave in-court testimony about whether a confession was a proven false confession as you define it in your reports?

A.    I don't recall.  I'd have to go through the testimony on some of these cases, particularly the two civil cases -- three civil cases.

Q.    So which ones are you referring to?

A.    Well, the Nieves case, Armando Nieves versus United States on page one or what would be page 12.

And the Lavelle -- on the middle of page two or

RICHARD LEO, 04/24/2023                                          Page 155

what I think is 13, Lavelle Jones versus City of Albany and Carl Dukes versus City of Albany.

And then a couple down from that, the Henry Lee McCollum, et al., case.

It's possible it came up in a fourth case, the one of State of Illinois v David Wright on page three or page 14.  Again, I would have to review the transcript.

It's possible it came up on the very next one after that, so that would be five, State of Colorado versus Acacia Lyndarr.

It's possible it came up -- sorry, I'm just looking at this more closely -- the State of Tennessee versus Lindsey Lowe at the bottom of page three.

Those would be the ones in which if -- if I had all the materials in front of me, transcripts of my testimony, those would be the ones I would look for to see if that was specifically discussed.

Q.  Have you ever been told by a court that you are not allowed to testify that a confession is proven false?

A.  I don't recall if I've ever been told that.

Q.  Have you ever been told by an attorney before you take the stand that you are not permitted to testify on a particular topic?

A.  Yes.

RICHARD LEO, 04/24/2023                                          Page 156

Q.   And what topics have you not been allowed to testify about?

A.   Well, it's usually case specific.  You know, it might be, for example, that part of the interrogation process involved a polygraph and the court did not want me to mention the word polygraph or lie detector.

Q.   Aside from being advised that you should not testify about a polygraph, can you think of any other topic on which you've been advised prior to taking the stand that you should not testify about?

A.   Yeah.  Again, it's case specific.  I think there have been times when judges have not wanted me to testify about the DNA exonerations or wrongful convictions say in a suppression hearing, for example.  Yeah, that -- so those are the examples that come to mind off the top of my head.

Q.   Can you think of any other particular topic you've been advised not to testify about before you took the stand other than a polygraph, a DNA exoneration or a wrongful conviction?

MR. ELSON:  Objection, asked and answered.

A.   The -- sometimes particular cases, you know, we don't want you to testify about the Central Park jogger case.  But other than that, no, as I sit here today I can't recall any other specific admonitions not to testify.

Q.    What other particular cases have you been -- received an admonition about not testifying other than Central Park jogger case?

A.    That's the only one I recall.

Q.    And in terms of the wrongful conviction is it -- what exactly was the instruction, that you weren't supposed to refer to a conviction as wrongful or was there some other specific instruction you were given?

A.    I don't recall.

Q.    Okay.  I think aside from the cases that you mentioned when I first started asking you questions, Nieves, Jones, McCollum cases and the like, are there any other cases in which you think you might have or possibly testified that a confession was in fact a proven false confession?

            MR. ELSON:  Objection, asked and answered.

A.    Well, this is a list of four years of testimony. I've been testifying since 1997 so there might be other cases that predate this or even post-date it in which I was asked whether or not a case met the criteria of a proven false confession.  I just don't recall.

Q.    You don't recall any other cases; that's correct?

A.    Off the top of my head, correct.

Q.    Okay.  And I think on the next page, page four of

RICHARD LEO, 04/24/2023                                    Page 158

Exhibit A so if we go to the list of depositions.  Since you were deposed in this case in September it looks like you gave a deposition in the John Horton versus City of Rockford case?

A.    Correct.

Q.    And for whom were you retained in that case?

A.    The plaintiff.

Q.    And what was the plaintiff's lawyer's name?

A.    I think it's Elliot Slosar.

Q.    At Loevy and Loevy?

A.    Correct.

Q.    Have you reviewed a copy of your deposition in that case?

A.    I don't believe so.

Q.    And did you issue a report in that case opining that the confession at issue was a proven false confession?

A.    I don't recall.  I'd have to look at the report.

MS. GOLDEN:  Okay.  That is it for me. Thank you.

MS. ROSEN:  We can't hear you, Michael. You're still muted.  Try now.

(Technical difficulties)

MR. SHALKA:  Can you hear me now?

MS. ROSEN:  Yes.

RICHARD LEO, 04/24/2023                                    Page 159

MR. SHALKA:  I have no further questions based on the report.

MS. ROSEN:  Okay.  So we're suspending the deposition.  We've completed our questions related to the rebuttal report and we're reserving the remaining time to ask questions about the notes to the extent that either we persuade Plaintiff's counsel that they're wrong or a court agrees with us.

Can we get the official time on the record now?

THE VIDEOGRAPHER:  Sure.  Just one second. 4 hours, 12 minutes.

MS. ROSEN:  Thank you.

Thanks, Dr. Leo.  Have a good evening.

THE VIDEOGRAPHER:  This concludes the video deposition of Dr. Richard Leo.  We are off the video record at 5:11 p.m.

(Record closed.)

STATE OF ILLINOIS :
                    : SS
COUNTY OF PEORIA   :

        I, Lea Ruth Cohen, CSR, and Notary Public in and for the County of Peoria, State of Illinois, do hereby certify that heretofore, to-wit, on Monday, April 24, 2023, appeared before me via remote audiovisual means:

        RICHARD LEO, a witness herein.

        I further certify that the said witness was by me first duly sworn to testify to the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by said witness was reported stenographically by me via remote audiovisual means and afterwards reduced to typewriting, and the foregoing is a true and correct transcript of the testimony so given by said witness as aforesaid.

RICHARD LEO, 04/24/2023                                      Page 161

I further certify that I am not counsel for nor in any way related to any of the parties to this suit, nor am I in any way interested in the outcome thereof.

In testimony whereof, I hereunto set my hand and affix my notarial seal on this Thursday, April 27, 2023.

_____

Notary Public

Lea Ruth Cohen, Certified Shorthand Reporter
(State of Illinois License #084-002868)
My commission expires 4/12/2026

RICHARD LEO, 04/24/2023

**Exhibits**

**1 Leo 042423-1** 15:14 16:11 31:13 32:13,18,19

**2 Leo 042423-2** 17:6 33:11,19

**3 Leo 042423-3** 21:17 26:5 29:7, 12 33:22 38:14

**4 Leo 042423-4** 24:10 26:9 36:15 48:21 79:22 133:24 153:20

**6 Leo 042423-6** 139:22

**8 Leo 042423-8** 121:20 132:3,9 135:20 140:13 143:16

---

**$**

**$41** 47:11

**$7,500** 16:13

**$85** 113:5

**$90** 113:6

---

**(**

**(B)** 19:7

**(C)** 18:1 19:7 28:20 125:22 127:13 132:17 134:9

---

**0**

**00010** 145:20

---

**1**

**1** 5:2 15:14,22 16:11 31:13 32:13, 18,19 49:7 126:18

**10** 25:1 97:8 104:10 121:9 132:11

**10-minute** 121:4

**100%** 110:2,14 117:5 119:3

**1028** 5:9

**11** 26:23

**11:04** 5:3

**11:30** 79:4

**11th** 15:21 16:2 31:20 32:22 33:3

**12** 104:23 148:1 153:22 154:23 159:11

**12:16** 48:11

**12:30** 48:15

**12:47** 59:11

**12:55** 59:14

**13** 140:2 153:22 155:1

**14** 59:2 150:8 155:7

**14-hour** 123:12,16 125:7

**14th** 16:21,23

**15** 97:10,15 98:2 100:1,12 103:9 121:7,9 142:22

**15-minute** 121:5

**15th** 10:19 17:10 20:7,18,23 21:3 23:1 27:8 103:13

**16th** 21:21 24:22 33:24 34:14,18

**175.7** 20:8

**17th** 36:18

**18** 5:9 17:20 18:17

**18-month** 20:6

**18-month-or-so** 20:6

**18th** 21:21 24:21 33:23 34:14,18

**1908** 67:10,12,15,24

**1980s** 68:8,10

**1990s** 54:19,22 65:14

**1995** 136:17 139:10

**1996** 53:8 92:23

**1997** 58:15 63:8,10 157:18

**1998** 43:6,13,14 44:23 58:12 104:11

**1:30** 79:16

---

**2**

**2** 17:6,8 31:22 32:22 33:4,11,19 48:14 49:11 126:19 136:24 139:14

**2,000** 103:6

**2,200** 103:10,13,24

**2,973** 69:2

**2.1** 69:10

**20** 5:13 14:15 25:1 100:6 149:18

**2000** 139:9

**2004** 58:13,18 66:14 83:7 91:9

**2007** 66:1 96:21

**2009** 93:13

**2013** 59:2

**2015** 37:15

**2018** 16:2,8 31:20 32:22 33:3 36:18 78:24

**2019** 15:21 16:1,4,8,21 17:2,9,20 18:17 20:7 105:1

**2020** 69:15 111:17 112:18

**2022** 10:19 17:10,20 18:17 20:8, 18,23 21:3,21 23:1 24:22 33:23 34:14,18 103:9,14 121:23 131:16 133:20 142:22

**2023** 5:6 21:20,21 22:18 23:11 24:22 26:11 27:9 29:8 33:24 34:14, 18 38:19 105:1

**225** 21:1

**2268** 7:9 12:2 136:1,16 140:14 141:17

**2269** 140:14

**2274** 140:22 148:10

**2282** 145:12 146:10

**22nd** 37:15

**23** 135:13

**2312** 5:9

**2335** 146:13

**2352** 136:1

**2353** 123:1 133:8 135:14 148:14

**2354** 130:13 133:8

**2355** 130:9 133:8

**2356** 130:22 132:9,20 133:8 135:16

**2357** 132:23 133:8

**2358** 7:9 10:16 12:2 135:14

**24th** 5:6 17:9 20:7

**25** 61:21 63:12,14 72:18 100:6 141:1

**26** 100:24

**26(b)(4)** 19:6

**26(b)(4)(b)** 18:1 28:20 125:22 127:13 132:17 134:9

Index: 275-agreed

RICHARD LEO, 04/24/2023

**275** 22:13

**28th** 131:16,20 132:4

**29th** 131:16,20 132:5

**2:31** 79:19

---

**3**

**3** 21:17 24:12 26:5 29:7,12 33:22 38:14 49:12 126:20 136:22 137:1,8 139:14 140:23 141:1,7 148:11

**30** 32:3,7 100:6

**30-second** 31:23

**31st** 23:11 26:11

**32** 100:24

**37** 150:2,11

**38** 122:17 147:1,10

**3:38** 121:12

**3:53** 121:16

---

**4**

**4** 24:10 26:9 36:15 48:21 79:22 121:15 126:23 133:24 137:1 153:20 159:11

**400** 97:12 98:5,18,22,23 99:5,21,23

**47** 22:8 24:20 25:2

**4:29** 143:8

**4:42** 143:11

**4:56** 153:12

**4th** 16:1,4,24 17:2

---

**5**

**5** 97:10,15 98:2 100:1 127:2 137:1 143:11

**5%** 96:20

**5-minute** 121:4

**50** 126:19

**50.4** 16:4,21 17:2

**5:01** 153:15

**5:11** 159:16

---

**6**

**6** 126:18 139:22

**600** 5:14

---

**7**

**78** 136:18,21 139:24 140:1,12

**7th** 21:20 22:17,20 29:8 38:18

---

**8**

**8** 121:20 132:3,9 135:20 140:13 143:16

**80** 113:6

---

**9**

**9** 140:4

**90%** 99:10

**973** 69:2

---

**A**

**a.m.** 5:3

**ability** 55:6

**absolute** 45:19 48:1,2 78:1 95:8,9

**absolutely** 149:20 152:17

**abuse** 139:6,17 142:8,16 143:17, 20

**abusive** 115:24

**Acacia** 155:10

**accepted** 43:8 50:11 67:1,9 70:9 75:5,21

**access** 99:16

**accessible** 20:1

**accomplishment** 40:14

**accuracy** 45:13

**accurate** 16:7 28:14 83:6,23,24 84:3,4 128:17 131:22 132:7

**accurately** 17:21 18:19 25:10 122:14 125:7

**accused** 93:8 107:22 108:9

**achieving** 40:15

**acknowledged** 72:24

**acquitted** 107:12,13 114:18 115:1 116:5,6,17,19,23 117:4,5

**acting** 86:10

**activities** 21:20 22:8 34:21

**activity** 22:1 33:3

**actual** 11:3 12:20 55:1 59:23

**add** 21:1,8 129:13 130:5 134:20 140:15 141:20

**added** 7:13,16 8:16,20 135:1

**addition** 75:4,20

**additional** 7:13 8:16,20 10:12 27:19 38:10 90:22 124:2 134:20 150:22,24

**address** 39:1,9 123:8 124:17 153:1

**addressed** 27:9

**adequately** 125:6

**administrative** 108:5,12,18

**admissibility** 104:12

**admitted** 114:3,12 116:9

**admonition** 157:2

**admonitions** 156:24

**adopted** 47:14

**advance** 134:12

**advanced** 42:3

**Advancement** 69:10

**advice** 19:18 25:24 126:1 127:17 128:5,20

**advised** 156:7,9,17

**advocacy** 84:8,9

**advocate** 86:10

**affidavits** 81:6

**aftermath** 62:14

**afternoon** 153:18

**agree** 20:1 21:4,6 46:7 76:9 77:4 149:13,21

**agreeance** 153:6

**agreed** 113:14 124:2

RICHARD LEO, 04/24/2023

**agreeing** 62:16 152:16,17

**agreement** 39:3,4,11 151:14 153:9

**agrees** 159:8

**ahead** 11:18 30:20 102:6 149:17

**aid** 140:16

**aids** 124:21 137:18

**alarm** 79:4

**Alaska** 104:10,15

**Albany** 155:1,2

**alibi** 49:12,16

**alleged** 107:8 139:10

**Allison** 54:2

**allowed** 9:13 114:13 120:3 129:17, 19 155:19 156:1

**alt** 53:8 92:11,13

**amount** 14:23 16:1,7 21:9 22:7,10, 11 25:7 35:24 36:6 125:1

**analysis** 20:14 22:4 29:16 34:23 35:20 42:1 51:3,4 53:3 55:21 61:3 63:13 64:1 65:2,22 66:12,16 67:17 72:16 73:17,21,24 87:20,22 88:24 92:14 96:8 117:20

**analytical** 62:22

**analyze** 31:6 54:24 55:6,10 60:4 62:13 72:14 73:3 74:18 80:4 99:6 102:13 117:21

**analyzed** 23:16 38:11,18 56:13 122:17

**analyzes** 53:4 84:21 88:13

**analyzing** 35:24 36:6 62:1

**and/or** 43:10 45:10 81:24 82:20 107:8 131:20

**anecdotal** 73:19

**Anita** 114:4

**answering** 8:13 9:1,4 10:1,5 11:20,21 13:2,7 64:23 79:5 122:10

**answers** 56:16 57:22 152:21

**anymore** 133:5

**anyplace** 41:15

**apologize** 17:1 52:7

**apparent** 85:2

**apparently** 63:11

**appeal** 114:7,9

**appeared** 129:5

**appearing** 84:12

**appears** 41:2 86:9

**appellate** 114:7 119:7,8

**appended** 97:3

**appendix** 144:18 145:2 152:4

**applicable** 89:13 90:2 149:24

**applied** 43:9

**applies** 35:20

**apply** 71:9,13 96:6

**approximate** 24:19

**approximately** 21:1,22 22:13,14 24:14,22 36:21 97:12 98:22 99:5 149:9

**April** 5:6 15:21 21:20 22:17,20 29:8 38:18

**archival** 51:3 53:3 66:11 88:15,24

**area** 40:10 42:11 67:5 92:19 136:22 137:3,7,8 140:23 141:1 142:12 148:11

**areas** 64:21 136:24 137:5

**argument** 86:11

**Arizona** 109:14

**Armando** 154:22

**arrested** 115:12

**arrive** 99:7

**Art** 14:1,11

**article** 43:14,16,17 58:12,13 63:9, 15 64:5 66:14 69:12 72:18 79:2 83:7 91:9,12,14 97:4

**articles** 41:2 58:15 60:24 66:15 74:20 102:12,15

**Arturo** 5:7,21 135:3

**ASA** 135:8,11

**aspect** 39:1 60:3 91:14 123:10 124:19

**aspects** 40:8 53:21

**assault** 115:24

**assaulting** 115:16

**assemble** 102:13

**assert** 84:18 127:12 129:24 132:16 134:8 136:12 138:1,21 139:3,19 140:18 141:13 143:21 144:16 145:10 146:11,23 148:23 149:6

**asserted** 9:8 123:15 127:23 129:16

**asserting** 25:21 28:20 84:16 125:21 130:7 147:13 149:23

**assertion** 79:11 147:19 149:10

**assertions** 40:24

**asserts** 84:6

**assess** 103:15

**assessing** 40:23

**assignment** 52:19

**assist** 9:3 10:5 11:21 13:2 75:7,17 76:12,16 121:23 122:10 134:13 147:15

**Associates** 5:13,16

**association** 31:2

**assume** 21:11 25:23 42:13 78:7 112:9 125:24 127:16 128:3,19 129:4 134:4

**assumption** 128:5

**assure** 153:20

**attempt** 72:15

**attention** 148:8

**attorney** 24:1 118:10 120:11 128:8 155:21

**attorney's** 19:18 25:24 125:24 127:17

**attorneys** 47:16 64:19 65:10

**Atwal** 107:1

**authors** 63:11

**aware** 78:16 79:3,7 80:11

---

**B**

---

**back** 8:13 9:16 18:10 24:10,11 31:9,13 32:4,9,17 36:15 38:14,22 48:5,13,21 55:14 56:6 59:13 66:19 67:9,23 79:18,22 82:11 84:10 96:22 112:15 113:16 118:21 120:11,21 121:15 124:12,13 126:4 133:3 140:12,13 141:16 142:6

RICHARD LEO, 04/24/2023

143:11 148:17 149:14,19 150:15 151:7 152:18 153:14

**background** 51:11,13 56:2

**barrier** 32:1,3,10

**based** 42:21 51:7 55:1,21 67:17 74:18 75:21 76:10 77:20 78:20 84:21 91:24 92:4 95:10 101:3 108:16 123:14 132:1 143:3 144:5 147:12 150:22 151:7 159:2

**basic** 80:23 85:2,22

**basics** 42:3

**basis** 47:7 75:6 76:1,3 84:3 114:9 119:8 123:18 124:11

**Bates** 125:20 126:13 138:12 146:15

**Bates-stamped** 6:24 7:9 10:15 12:2 122:2 123:1 127:11 130:22 132:9 136:16 140:22 145:12 146:13 148:14

**Bates-stamps** 6:20

**beating** 115:16

**beep** 52:2

**begin** 16:15 123:1

**beginning** 5:2 33:23 34:13 48:14 121:14 126:18 128:24 143:10

**begins** 135:21

**behalf** 5:7,21,23 6:3,9 107:15,19 115:6,7 118:9

**believed** 123:20

**believes** 99:17

**Ben** 5:19 9:21 14:1,2,11

**bench** 112:5

**Benitez** 110:7

**biased** 78:6

**biasing** 78:12,13

**bibliographies** 53:15

**bibliography** 54:1,9

**Bigda** 115:3,11 116:5

**bill** 25:10

**billed** 16:21 17:2 22:12 24:20

**bills** 35:3

**binary** 84:16,24 85:11,17

**binders** 133:12

**bit** 13:18 20:5 48:5 57:1 60:24 65:19 68:22 69:6 87:3 121:1,2,19 145:13

**blank** 125:5

**blood** 127:7

**board** 108:11

**body** 50:15 51:6 70:18,19 72:2 152:23

**bono** 98:19

**book** 67:13,17,18 69:13,14

**books** 46:17 68:17

**bottom** 16:12 27:18 50:7 66:20,21 84:5 86:13,14 96:12 104:9 128:2 129:8 140:3 141:23 145:19 155:13

**Boudreau** 139:11

**boutique** 67:5

**Bowen** 5:13,15

**boxes** 99:12

**brackets** 146:14

**Brady** 48:18 128:23

**Brady's** 128:20

**break** 28:3 31:4,5,23 32:2,8 48:4,7 52:5 57:4,13,19,21 59:7 79:6,13 120:24 121:4,5,6 143:4 152:24 153:2,7,10

**bring** 149:19 151:7

**broad** 91:11

**broader** 29:16

**Brown** 113:9

**Brualdi** 135:9

**bullet** 126:19 132:11 133:1 139:17 140:3 143:18 144:2,10

**bunch** 35:4 81:8

**buried** 125:5

**bursts** 57:21

---

**C**

**California** 105:4,9,23 106:18,22 107:1,24 110:3,7,23 111:2,10,13 113:18 114:22 116:14,20 117:1 118:22 119:11 120:8

**call** 92:2 95:20,24

**called** 6:9 36:17 43:18 53:3 63:15 132:10 148:9

**calls** 19:5 36:4 104:18

**capable** 75:22

**caption** 27:10

**captures** 85:6

**career** 66:4 97:11

**Carl** 111:21 155:2

**Carolina** 58:14

**Caroline** 6:1

**Carrie** 19:8

**case** 5:8 16:15 19:3 20:9,14 21:10 22:3,4,11,23 23:15,23 25:19 26:16 27:10 29:5,16,17 30:4,17 31:1,3,6 34:1,22,23 35:15,21,23 36:6,17 37:7,10,18,20 38:1,16 46:12,16,17 47:2,9,12 49:7 50:4 51:3,4 62:17 69:7 72:20,22,23 74:4,8 75:16 76:17,19,22 90:22 91:23 95:5,21, 22 96:10 97:12,18,19,24 99:1,5,8, 19,22 105:13 107:2,3,22,23 109:5, 9,15 110:16 111:11,22 112:1,16, 17,20,22 113:10,11,17 115:7,9 117:2,19 121:24 122:11,20,21 123:9 124:18,22 128:15 129:1 133:4,12,13,14,15 135:15,21 136:16 137:13 140:7,11,12,14 141:5,10 142:11 144:19,22,23 145:15 146:22 154:7,22 155:4,5 156:3,11,23 157:3,20 158:2,4,6,13, 15

**cases** 15:22 16:9,17 17:4,8 27:15 45:9 46:16,20 55:21,24 56:12,13 58:9 60:1,10 61:21,22,23 62:1 64:4 67:17 72:14 73:3,18 77:8 80:12 81:5,10,22 82:18 88:4 91:13 97:12 98:5,10,12,13,16,17,22,23 99:5,9, 10,11,12,13,14,15,21,23 100:11,18 101:9,10,15,17,18,20,21,23 102:4, 9,19,22 103:6,10,13,15,24 104:23 110:19 111:23 122:17 123:1 137:5 139:2 140:23 141:1,9 147:2,5,10 148:11,19 149:3 152:3 153:23 154:3,14,15,19,20 156:21 157:1, 10,12,13,19,22

**categories** 30:6 34:17,20 35:8 52:14

**categorization** 74:2

RICHARD LEO, 04/24/2023

categorize 90:7,23 95:22

categorized 70:24 90:19

category 29:15,16 55:5 59:3,5 98:15

caution 18:3 124:9

cautious 69:6

ceiling 57:10

centerpiece 54:20

Central 46:12 47:2 156:22 157:3

Cerna 110:3

certainty 45:20 48:1,2 78:1 95:8,9

cetera 43:1 51:6 109:18

challenged 43:8 44:1,4

challenging 74:2

chance 51:10

changed 16:16 78:18 150:18

characterized 89:4

cheat 93:7,9,10

cheating 93:8

check 16:12 117:6 118:4 120:7

Chicago 5:14,24 6:9 36:18 37:7,14 117:15 138:12 139:10 141:24 142:17 143:24 144:3

Chicago's 131:3

child 61:24

chime 128:21

choice 150:5 151:4,10

chosen 46:22

churchgoers 66:5

circumstance 45:21 58:8

circumstances 150:1

citation 53:19

cite 53:15 67:6 69:3

cited 43:9 63:12 69:14

cites 139:14

citing 53:17

City 5:24 6:9 36:17 37:6,14 131:2 138:12 141:24 142:17 143:24 144:3 155:1,2 158:3

civil 27:15 47:16 99:11 105:13

107:2 111:22,23 112:22 154:20

claim 50:3 90:13 133:5 144:2

claimed 108:14

claiming 84:3

claims 112:2,6

clarification 97:18

clarify 62:21

clarifying 129:6

Clark 5:14

classified 101:1

classify 95:23 100:21 101:19 102:20

classifying 91:13

clean 56:23

clear 8:18 10:20,22 80:22 84:23 85:16 97:17 113:14 128:10 150:15 151:22

client 17:22 18:19

clinical 50:22

close 32:14,15 62:15

closed 159:17

closely 27:7 155:12

closer 131:13

co-conspirators 107:9

coerce 107:7

coercing 107:8

coercion 50:9,17 53:13 66:23 67:4 70:8 71:5 117:19 118:15 139:6,17 142:7,15 143:17,19

coercive 68:5

cognitive 41:17

Cohen 5:15

coined 43:15 67:21 69:19 70:23 72:12,19 89:18

Coleman 141:7 145:15

COLEMAN00001 145:20

colleague 74:6

collect 74:18

collected 40:22 55:20,24 56:12 58:6,9,19 60:10 69:5 88:8

collects 84:21

college 92:10

Colorado 118:5,8,10 155:9

combining 87:1

comments 47:10

committed 49:9,19

Commonwealth 120:18

communications 18:4 19:12

communities 90:13

community 52:24 64:7,10,14,15 65:4,5 66:5 70:6,7,13,14,15,16 90:10 96:6

compare 146:3,19

compared 71:20 75:19

comparing 46:8 72:1

comparison 46:10,22 130:12

compensating 74:22

compensation 19:12

complaint 138:11 139:9

complete 55:22

completed 17:3 33:8 60:18 159:4

completion 131:14

comprise 10:14

comprised 67:5

comprises 140:7

compromise 63:22 123:19 150:23

computer 92:12 134:5 136:1,10 144:15 148:4

computerized 30:9

concept 43:4,7,15,21 80:3,4,8,9 85:17 86:14,24 87:11 102:15

concepts 80:23 85:3

conceptual 60:3

conceptually 86:3

concerned 71:18

conclude 73:10

concluded 76:23

concludes 159:14

conclusion 91:18,22

RICHARD LEO, 04/24/2023

**conclusions** 99:6

**conclusively** 47:24 49:8,13,16

**conditions** 9:12 52:18 92:4

**conducted** 65:1

**conducting** 90:21 91:1

**confer** 28:22,24 57:12 150:16

**conferred** 149:14

**confess** 63:9 78:10,11 92:15 93:9, 10 115:17

**confessed** 40:21,22 61:23 78:7 79:12 81:22 82:17 83:23

**confession** 43:4,22 45:12,16,22, 23 46:2,3 47:18,22 48:3 53:13,21 58:13 61:22 63:19 70:24 71:1 72:11,24 73:3,11,12,13 74:3 75:8 76:13,19,20 77:1,2,9,16,23,24 78:3,6,7,9,19,22 79:8,9,10 89:4,5, 9,11,12,17,18,22 90:6,8,15,16,20, 23 91:3,6,16,20,21,22,23,24 93:3, 4,6,12 94:3,9,10,12,14,15 95:1,6,7, 8,20,22 96:1,8 98:1,8 99:24 100:22 101:1,20 102:3,8,23,24 103:16,17, 19,21,23 104:2,3 105:7,12,18,21 112:10,14 113:12,15 114:11 116:8 117:22,23 120:4,5,14,16 126:16 132:24 154:16,17 155:19 157:14, 15,21 158:16

**confession's** 45:13

**confessions** 39:14,19 40:4 41:1, 14 42:12,20 43:7,19 44:11,12,14 45:2,3,9 46:20 47:3,15 50:9,17,18 55:7 58:10,20 62:16 66:24 67:4,19, 22,23 68:6 69:18 70:9 71:5 76:9 80:21 88:23 91:13 92:1,3 93:16,21 94:1,23 95:14,17 97:11,14 100:13 102:13,18,21 109:8 113:11 117:19 118:15 120:1 123:4

**confessor** 49:13,17

**confidence** 86:18 87:15

**confirm** 120:7

**confirming** 83:15

**confused** 80:2,8 94:18,21

**confusion** 10:21

**connection** 17:3,7 21:18 27:20 28:7 30:16 31:1 37:24 55:18 58:3

**Consequences** 43:18 58:13

**consistent** 9:7 88:18,19

**consistently** 110:18

**constituted** 35:15

**constitutes** 73:11 81:1 90:15 95:6

**construct** 95:19

**construction** 65:22

**consultation** 20:13 22:2 23:21 34:21

**consulted** 103:6

**consulting** 16:15

**cont** 59:15 79:20 121:17 143:13

**contact** 27:10

**contacted** 63:11

**contained** 122:12 129:23

**contemporaneous** 30:15 33:24

**contemporaneously** 30:5 33:13

**contemporary** 53:5 66:13

**context** 66:20 98:14

**continue** 45:11 46:10,18 51:17

**contractors** 27:23

**contradict** 89:13

**contradicting** 88:24

**contrast** 127:5

**controlled** 52:18 88:7

**convenient** 9:20

**converge** 88:3 89:15 90:13 91:17

**convergent** 86:15,17 87:1,12,14, 18 89:2 91:18

**conversation** 14:2,4,6,8,10,12,19, 21

**conversations** 15:10

**convicted** 109:13,22 110:22 111:12,18 112:21 113:22 114:6,18 115:1 116:5,13,17,18,23,24 117:4 119:2,18

**conviction** 114:7 119:22 156:19 157:5,7

**convictions** 44:13 156:13

**Cook** 117:10

**copious** 143:1

**copy** 7:23 8:2,12 10:24 12:7,11,20 122:4 133:21,22 134:2,14,16,19

158:12

**corner** 145:20

**correct** 10:16,24 11:4,5,8,10,11, 12,14,15,22,23 12:5,8,9,13,14,17, 18,23 15:2,4,6,7 16:22 17:1,4,15 19:11,18,19 20:9,10,15,22 21:3,13, 16,22 22:6,9,14,16,21 23:16,17,18, 19,22 26:1 27:1,5,12,14,16,20,21 28:8,16 30:6 31:7,11,12,22,23 32:22,23 33:5,9,20,21 34:5,10,11, 14,15 35:11,18,19 36:1 42:15 43:23,24 44:21,24 45:5 47:21 49:15,20 50:1,5 52:13 53:9 55:7 64:8 70:2 71:3 72:13 73:9,16 77:2, 16 86:21 87:3,17,20 88:8,9 92:17 94:4 97:7,20,21 98:18,19 99:3 102:1 103:3,8,12,18 105:2,14,16 107:14 112:7,11,19,24 114:17,24 115:4 116:4,11,16,22 117:11 118:7,24 119:14,22 122:5 126:1,2 127:18,19 128:5,6,14,22 129:9,10, 12 131:3 133:2,6 134:7 135:12,23 140:4,5,24 141:3,6 142:4,8,9,19, 20,23 144:19 145:1,6,16 148:12, 16,21 154:12,13 157:22,23 158:5, 11

**correctly** 78:23

**corresponded** 137:7

**correspondence** 20:12,13 22:1 34:21 150:16

**counsel** 5:17 13:12,19,20,23 14:9, 23 18:5 22:2 27:9 33:16 34:5 48:17 51:9,18 52:6 56:22 152:14 159:7

**counted** 100:12

**counterintuitive** 78:14

**county** 112:23 115:12,13 117:10

**couple** 25:4 28:10 61:16 80:1 155:3

**courses** 41:15,16 42:3,17,19

**court** 5:10,15 6:5 20:2 82:10 96:3 97:20 112:2,6 114:8 119:7 124:14 151:14 154:6,12 155:18 156:5 159:7

**court's** 119:8 150:24

**courts** 78:5

**coverage** 42:19

**covered** 9:7 20:19 22:8 56:15,19 83:11

RICHARD LEO, 04/24/2023

**covers** 21:20

**crash** 92:12

**crashed** 92:13

**create** 30:4,12 31:11 33:13,14,15 107:7 125:18 126:10 127:9,10 132:14 136:9 139:16 141:11 142:24

**created** 33:24 34:2,4 124:4 129:21 136:10 140:23

**creating** 139:18 141:12

**crime** 46:14,15 49:9,18 72:2 123:5 126:22,24 127:5

**criminal** 43:19 64:18 99:11 107:2, 3,11,21 109:3,4,15,20 110:16 111:11 113:19,21 114:5,16,17,23 116:15,21 117:2 118:23 119:1,12 141:4

**criminologists** 70:17

**criminology** 41:17 42:24 43:20

**criteria** 44:16,18,19,22 45:23 46:3, 23 49:2,6 50:2 67:21 69:18,22 70:23 72:7,10 73:11 77:1,5,9,15,21 89:4,17 90:15,24 91:16,19,20,23 94:2,11,24 95:5,20,23 96:6,9 98:1, 7 99:24 102:8,24 103:16,20 104:2 105:19,20 112:13 113:12 117:22 120:5,15 157:20

**criterias** 78:1 92:3

**criticism** 85:9

**criticisms** 96:15

**criticize** 50:18

**criticized** 44:6 72:21 73:1

**criticizing** 96:15

**critique** 43:3

**critiqued** 44:7

**cross-examination** 101:16 153:16

**crosscheck** 136:20

**crystal** 150:15

**curious** 68:19

**current** 15:19 24:11 103:24

**curriculum** 60:14

**Curtis** 107:24

**cutting** 57:10

**CV** 5:9 58:16,23 60:6,10,12 61:2 65:16

---

**D**

**data** 40:23 42:1 51:1,8 52:12,14 55:11 59:17 60:4 61:3 62:8 63:24 65:2,21,23 66:11,16 71:21 73:4 74:18 80:4 83:5,7 84:21 85:6,7 86:7 87:19,21,22 88:7 90:11

**data-gathering** 62:5,23

**dataset** 58:6 65:13 84:15 102:13

**date** 22:17 146:20 152:18

**dated** 15:21 20:18 21:20 23:10 26:11 27:8 29:6,8 38:18

**dates** 17:9 67:9

**David** 23:21,23 24:1 117:7 155:6

**Davis** 59:5 119:12

**day** 30:13 35:24 122:8 125:3 150:22 153:4

**days** 13:21

**debate** 19:14 28:23 128:19 151:19,22

**debates** 150:2,3

**debating** 151:18,20

**Deborah** 59:5

**decade** 61:7,14

**decades** 70:10

**decide** 96:4 122:23 140:15 150:13

**decided** 149:16,17 151:1

**decides** 128:21

**decision** 63:9 108:23 119:9

**declines** 154:12

**declining** 129:3

**default** 148:4,7

**defendant** 5:7,24 6:4,9 107:16,18, 19 152:14

**defendants** 6:2 22:12 107:11,16, 20,21

**defendants/potential** 141:4

**defense** 47:16 64:18 65:9 115:7

**define** 80:3 81:2,3,4 85:4 154:17

**defined** 59:18 61:24 95:7

**defines** 80:10 81:4

**definition** 74:12 80:14

**degree** 40:15,18 41:22,23 84:16 85:1,6,24 101:2

**degrees** 86:4,7

**Deleon-reyes** 5:8

**demonstrates** 90:1

**dep** 37:4 95:11

**Department** 115:18 139:11

**departments** 54:23

**depending** 86:6

**depends** 64:13,19

**depose** 151:3

**deposed** 125:2 149:18 158:2

**deposition** 5:5,6 6:17,21 9:2,9,11 10:2,14 12:4,5 13:3,9 15:11 17:13 28:24 36:17,22 37:10,13,14,18,22 38:4,15,16 49:1,23 61:4,14,17 65:24 78:17 79:1,2 83:12,15,18 101:8 121:24 122:8,10 123:12,16 125:4,8,15 128:12 129:1,22 131:10,12,13,14,15,21,24 132:5 134:12,14 137:19 140:17 143:1 149:9,14,16,23 150:8,18,20 151:5, 6,11,20,23 152:15,16 158:3,12 159:4,15

**depositions** 8:11,22 11:21 12:23 22:12 23:7 26:20 96:11 122:8 158:1

**depravation** 63:21 64:3,4

**Derek** 136:16 138:12 140:4

**Derrell** 145:15

**Derrick** 139:10

**Derrll/darryl** 141:7

**describe** 50:20 54:8 91:2

**describes** 21:24

**describing** 50:2 54:17 81:13

**Description** 138:11

**descriptive** 64:11

**designed** 93:12

**destroy** 18:22 19:23

**detail** 39:10 140:15 152:1

RICHARD LEO, 04/24/2023

**detailed** 143:1 147:9 148:18

**details** 108:24 129:22

**Detectives** 139:11

**detector** 156:6

**determination** 89:3

**determine** 41:7 64:14 72:13 73:9 101:2 103:20 104:1 105:18 113:11 120:14 153:3

**determined** 45:22 46:3 77:13,14 118:18 154:4

**develop** 68:8

**developed** 67:21 72:8

**devised** 72:6

**difference** 68:20 129:18

**differently** 45:14 87:5 138:19

**difficulties** 158:22

**difficulty** 57:22

**diminished** 78:19,23

**direct** 6:12 59:15 63:18 79:20 121:17 143:13

**disagree** 19:13 39:2,10 147:19

**disagreed** 72:16

**discarded** 33:6

**discern** 35:23

**disclosure** 18:5 20:20

**discoverable** 123:21

**discovery** 5:5

**discuss** 148:19

**discussed** 13:12 44:19 65:18 86:13 96:10 123:23 136:24 149:3 155:17

**discusses** 64:4

**discussing** 97:19

**discussion** 83:4 92:6 137:2 140:6, 11

**discussions** 150:2

**dispensing** 108:10

**disposal** 99:4

**dispositive** 46:13

**dispositively** 47:17,22 73:13 76:23 77:15,19 94:11 95:6,7

**dispute** 30:2 45:16 46:1,10,23 70:5 94:9

**disputed** 45:14,15 47:1,16 73:13 76:18 95:22

**disputes** 45:20

**disruption** 57:20

**dissertation** 58:7 65:6

**distinct** 101:10

**distinction** 21:14 36:10 94:13,21 95:12

**distinguished** 67:15

**distorted** 67:2

**distorts** 97:9

**distracting** 52:5,9

**District** 5:10

**Division** 5:11

**divulge** 19:6

**DNA** 46:13,17 47:4 71:23 113:14 126:16,21,22,24 127:1,3,6 141:18 156:13,18

**DNA-RICH** 126:24

**doctor** 40:6,13 50:23 51:10

**doctoral** 65:6

**document** 11:4,9 15:23 16:3 20:5 23:9 26:11,19,23 28:14 29:9,15,17, 21 31:4,20 66:11 104:23 126:17 129:23,24 130:6 132:10 141:16

**documentary** 51:4 53:3 88:15,24 91:24

**documents** 7:12 10:24 13:11,13, 16 15:9 29:10 53:4 77:20 81:23 82:20 122:5 125:18 126:11 127:10 133:16 148:2,3

**dog** 27:23 31:24 32:3,9

**Dominguez** 105:5

**doors** 32:14,16

**double** 117:6 118:4 120:7 127:3

**downloaded** 23:18 38:17

**downloading** 22:3,22 34:22 35:15,17

**dozen** 60:23 62:18

**dozens** 68:17

**drafting** 62:8

**drafts** 18:5

**dramatically** 78:18

**draw** 99:6

**drawing** 21:14 94:8,14,21 95:12

**Drizin** 58:14 61:5,10,20 66:14 83:8

**Dukes** 111:21 112:9 155:2

**duly** 6:10

**duress** 108:15

**E**

**Earl** 119:12

**earlier** 29:21 57:7 73:12 77:22,24 87:3 90:9 94:9 95:4 96:8 104:8 129:18

**early** 54:18,22 57:2 66:4 68:8,10 90:7

**Eastern** 5:11

**Eastman** 113:18

**eat** 151:20

**ecological** 84:7,14 85:4,8,10 86:1, 2,8

**education** 40:7

**effect** 88:6

**efficiency** 129:3

**effort** 123:19 125:3

**Eileen** 5:23 9:20 147:15

**electronic** 55:1 133:14,17,18,21, 22 134:2 136:5

**electronically** 54:24 55:15 88:14 133:16

**elicited** 96:19

**Elliot** 158:9

**Elson** 5:19 9:5 11:17 14:1,11 17:23 18:9 19:4 21:15 23:24 24:5, 16 25:11,20 28:17 30:20 34:6 35:10 36:2,4,13 38:20 39:24 41:9 46:5 48:8 56:18 68:1 70:3 71:2 73:15 77:3,17 78:21 81:18 83:9 85:13 89:6,19 90:17 91:10 94:16 95:18 101:13 104:18 107:17 123:11 125:21 127:12,22 128:7,13 129:2,15,19 130:7,14,20 131:5,7, 11 132:16,21 133:9 134:8,15,22

136:3,12 137:16 138:1,5,16 139:3, 19 140:18 141:13,21 143:2,21 144:4,12,16,20 145:4,9,24 146:7, 11,23 147:7,12 148:23 149:6,13 150:14 151:15,21 152:12 153:2,8 156:20 157:16

**Elson's** 128:20

**email** 20:12,13 22:1 34:21 150:16

**embodies** 84:15

**emerges** 49:11

**emit** 52:2

**empirical** 40:12 41:19 42:6 50:8, 13,21,22 51:7 52:11 54:20 59:17 63:16,24 65:21 66:10,22 67:2 68:2, 9 70:7,19 71:4 75:22 78:4 80:3,8, 10,13,15,20,24 81:1,15 84:19 90:11 93:20

**empirically** 40:3 50:15

**encompasses** 29:8 44:13

**encountered** 81:6

**end** 13:22 26:24 30:13 56:24 97:3 108:15 123:2 153:4

**ended** 14:19 101:24

**ends** 26:19

**enforcement** 114:13

**entire** 86:2,5

**entitled** 151:12

**entries** 35:5

**entry** 16:3 32:20

**environment** 52:22

**equate** 46:7 47:1

**equating** 45:21 46:1,21

**equation** 46:11 80:12

**equipment** 93:14

**error** 71:9,12,13,22,23 72:3,4,6 74:16,24 85:20 146:15,18

**errors** 71:18 123:4

**essentially** 63:18 115:10 133:13

**establish** 67:22 72:11

**established** 44:16 50:10 66:24 67:8 86:19 87:15 90:14

**establishes** 48:2 49:13,17 70:24 73:13 77:15 94:11 95:5

**establishing** 91:15,24

**estimate** 13:17 14:15 28:12 98:2, 9,10,12 100:4 101:3

**estimated** 97:14 99:22,24

**et al** 5:8 155:4

**evaluate** 42:9 91:5 101:23 102:10, 23 103:19,23 105:18 112:8,12 120:3,13

**evaporated** 129:5

**evening** 153:18 159:13

**event** 99:15

**eventually** 15:1 90:22 151:10

**evidence** 46:15 47:17 48:2 49:8, 12,16 63:19,22 73:22 75:8 76:14, 20 78:3,6,14,19,22 79:10 90:1,5 91:24 93:14 96:5 123:5 126:16 127:3,5 132:24 139:6,17 141:24 142:4,7,15,16,17 143:17,19,23 144:3,8,11

**Evidentiary** 139:5 142:15

**exact** 53:18 69:1 96:23

**EXAMINATION** 6:12 59:15 79:20 121:17 143:13

**examined** 6:10

**examples** 156:15

**excluded** 104:11,16 127:4

**excludes** 19:11 22:19

**excluding** 22:11

**Exclusion** 126:17

**exclusive** 95:21

**exhausting** 152:1

**exhibit** 15:14 16:11 17:6 21:17 24:10 26:5,9 29:7,12 31:13 32:13, 18,19 33:11,19,22 36:15 38:14 48:21 79:22 104:22 120:24 121:20 132:3,9 133:24 135:3,20 139:22 140:13 143:16 145:7 153:20,21 158:1

**exhibits** 65:23

**exist** 84:19 85:1,18

**existed** 35:4,7,14,22 36:9 154:7

**exists** 84:17 85:1,18

**exoneration** 113:14 117:14 156:18

**exonerations** 156:13

**expectations** 42:7

**experience** 41:10 50:23 80:5,9, 11,13 81:2,9,11,14,17,20 82:5,14, 15 83:5 84:18

**experiment** 53:16 84:15 89:9,12 92:5

**experimental** 51:4 52:16 53:6,11, 20 54:12 59:19,20,22,23 88:2 89:1, 8 92:18,20,21 93:1,2,11

**experiments** 52:17 53:18 59:24 84:20 87:23 88:17

**expert** 41:3,4,7 81:23 82:19 98:6, 17,22,23 102:16 115:11,21 128:8, 14

**expertise** 40:24 41:6 75:7 76:1,4 77:20 87:13

**experts** 45:10

**explain** 71:16 72:16 74:14 77:11, 13 108:16

**explained** 94:3 95:1 123:18

**explaining** 73:5 76:6

**explanatory** 74:10,13

**explication** 75:15

**explode** 68:9

**expressed** 150:17

**extent** 17:24 19:21 87:7 140:6 159:6

**extra** 125:2

---

## F

**fact** 10:15 62:11 67:8 96:4 157:14

**factors** 120:2

**facts** 95:21 123:5

**factual** 123:4

**factually** 85:20

**fair** 16:20 21:11 132:1

**fairly** 27:7

**fall** 59:3,5

**false** 39:14,18 40:4 42:12 43:4,7, 18,22 44:11,13 45:3,9,16,23 46:2, 3,23,24 47:15,18,23 48:3 50:9,17 53:13 58:13 61:21 62:16 66:23

67:4,18,22,23 68:5 69:18 70:9 71:1,5 72:11,24 73:3,12,14 74:3 76:9 77:1,9,16,23 78:9 79:8,9 80:21 84:8 88:23 89:5,9,11,18,23, 24 90:1,5,6,8,15,20,23 91:3,6,13, 16,21,22 92:1,2,3,4 93:3,4,6,12,16, 22 94:2,3,10,12,15,24 95:1,7,8,15, 17,20,24 96:5,8 97:11,13 98:1,8 99:24 100:12,21 101:1,19 102:3,8, 13,17,20,24 103:16,21 104:3 105:20 107:7,8 108:15 109:8 112:13 113:12,15 117:19,23 118:15 120:5,15 126:16 132:24 154:17 155:19 157:14,21 158:16

**falsely** 61:22 63:9 78:10,11 79:11 92:15 93:10 104:11,15

**falseness** 45:2

**falsified** 83:20

**falsify** 72:15

**fatally** 39:17

**favor** 113:4

**feasible** 38:24

**February** 16:1,4,8,21,23,24 17:2

**federal** 115:19,22

**Ferricci** 110:15

**field** 40:2,7,17,20 41:8,11,18 42:8 47:15 51:5 52:21 54:12,14 55:5,16, 17,23 56:10 58:2 59:18 60:8 67:5,8 68:8 69:24 71:10,13 72:6 77:14 80:20 84:6,20 85:10 86:2,5 87:3, 12,13,23 88:2,3,12 89:14,15,20

**fields** 42:24 64:21

**figure** 72:4 146:20 152:24

**file** 133:11,13,14,17 136:6

**filed** 5:9 139:9

**find** 57:14,19 59:7 60:5,10,14 88:22 89:1 97:1 100:12

**finding** 87:15

**findings** 86:18 88:3,6

**fine** 9:22 121:8,9 151:21

**finish** 8:18 79:5

**finished** 152:4,6

**finishing** 79:24

**firm** 24:7,8

**first-year** 85:21

**fit** 98:1 99:24

**five-minute** 32:2 57:3 59:7 121:6

**flat** 45:17,18 46:4

**flawed** 39:17

**Flewellen** 136:17 138:12 139:10 140:4

**Flewellen's** 135:21 140:7,12,14

**floor** 27:24 31:24 57:11

**focus** 122:24

**focusing** 62:11 95:2

**follow** 56:16 106:13 142:10,19

**followup** 152:20

**font** 147:23 148:3,4,7

**foot** 139:13

**footnote** 69:12,15

**forensic** 40:2 81:21 82:16 84:17 127:2

**forget** 106:13

**form** 11:17 15:3 17:13,23 19:4 21:15 23:24 24:5,16 25:11 28:17 30:20 34:6 35:10 36:2,13 38:20 39:24 41:9 46:5 62:19 68:1 70:3 71:2 73:15 77:3,17 78:13,21 81:18 85:13 89:6,19 90:17 91:10 94:16 95:18 101:13 104:18 107:17 131:5 133:9 134:15 137:16 138:16 143:2 144:4 145:4,9,24 146:7 147:7,12 149:6

**format** 27:7 142:10,19,21

**forum** 104:12,16

**forward** 52:4

**found** 126:20,24 127:1,6

**foundation** 147:8

**four-year** 21:7

**fourth** 149:19 155:5

**frame** 15:24 20:17

**frequently** 63:12

**front** 6:16,18,23 7:15,18 8:2,5,13, 22 9:3 10:4,7,13,23 11:2,20,22 12:8,12 13:6 26:21 27:3 54:1 122:5 125:4 155:15

**full** 55:2 80:1 140:1 150:22

**Fulton** 141:8 145:15

**future** 42:5

---

**G**

---

**G-O-U-L-D** 59:3

**Gabriel** 5:20 135:5

**Garcia** 111:2,10,17 112:17

**Gary** 109:14

**gather** 55:10 58:6 63:18 73:4 80:4

**gathered** 62:7 63:22 90:4,11,22

**gathering** 50:24 52:12 61:3 65:21 66:11 87:21

**gave** 108:15 112:9 154:16 158:3

**gears** 121:1,19

**general** 52:12 63:6 69:23 70:22 88:21 93:11 102:17 109:8

**generally** 7:8 20:11 21:24 41:11 43:7 50:10 67:1,9 68:11,12 70:9 75:5,21 76:18 92:16

**generated** 70:18 92:1 93:15

**generates** 72:6 93:6

**generating** 93:4,12

**Gillespie's** 140:11

**give** 14:6 18:4 32:2 58:24 60:17,24 81:9 100:4 103:1 150:23

**giving** 46:8

**global** 17:14 29:11

**Golden** 6:1 19:10 152:8,10,20 153:5,17 158:18

**Gomez** 144:19,22,23 145:3

**Gonzales** 116:14,17

**good** 5:1 6:14,15 32:11 46:12 47:15 120:24 153:18 159:13

**Gould** 59:3

**government** 105:15

**grad** 92:11

**graduate** 41:16,23 42:13 66:4 80:16 85:21

**greater** 86:18 87:14

**greatly** 75:7,17 76:12,16

**ground** 89:10

RICHARD LEO, 04/24/2023

**group** 52:24 53:1 137:2

**grouped** 141:5

**growing** 67:19

**guess** 24:18 25:5 26:19 49:2 51:23 62:3 75:17 87:5 92:24 95:10 104:4, 7 142:6 147:20

**guessed** 98:12

**guesses** 104:5

**guessing** 124:8

**Guevara** 5:8 6:4 11:2 152:15

**guilty** 46:19 73:20

---

**H**

**half** 26:15 27:16 60:23 62:18 140:14

**half-hour** 14:6

**Halloran** 139:12

**hand** 90:3

**handwriting** 7:5,8,10,13,19,21 8:6,8 12:3,12,19,21 13:2 129:11,13

**handwritings** 8:21

**handwritten** 7:16 9:3 10:4,8 11:3, 7,24 30:8,10 122:20 128:2 129:9 130:5,10,18 134:20,23 136:2

**happen** 57:20 108:17

**happened** 88:2 89:10 116:12

**hard** 8:2 10:24 12:20 56:16 122:4 137:6

**harder** 55:3

**harming** 61:23

**Harry** 72:22

**Harvard** 67:16

**hate** 126:3

**head** 24:17 53:16 58:12 96:23 100:16 126:5 156:15 157:23

**headache** 52:2

**heading** 38:23 39:12 43:3 66:22 137:12 138:3

**hear** 51:20 56:5,6,19 59:6 78:6 150:11 158:20,23

**heard** 118:21 119:6

**hearing** 104:12 105:6,11 106:1,5 108:1,7,11 109:24 110:1,4,5,8,9, 12,13,24 111:3,6,14,15 114:1,2 116:8 117:8 118:8,13,16,19 119:5, 21,24 120:9,10,19,20 154:9,10 156:14

**Heather** 135:8

**held** 104:13

**helpful** 9:17

**Henry** 113:8 155:3

**higher** 100:5,6

**highlighted** 146:14

**hired** 98:17,20 99:2

**historical** 53:5 66:12

**history** 27:14 78:20

**hold** 9:5 10:20 111:16

**holding** 46:4

**homicide** 107:23

**Horton** 158:3

**hospital** 139:12

**hour** 48:5,6 79:6 150:24

**hours** 13:17 16:2,4,21 17:3,18 18:13 20:8 21:1,8 22:8,15 24:20 25:1,2,5 28:10 31:22 32:22 33:4 106:17 125:2 149:9,18 150:8 151:12 159:11

**hours'** 22:13

**house** 27:24

**Hugo** 67:13

**hundreds** 68:15,21,23 69:4,8

**hung** 111:17 112:18

---

**I**

**idea** 69:21 78:9 79:9 89:16 103:1 104:8,21 149:18

**identification** 49:12

**identified** 35:8 72:8,11

**identifies** 27:19 49:2 126:17 132:10 135:4,6

**identify** 5:17 49:6 58:23 59:1 143:18

**ignorance** 85:2

**Illinois** 5:11,14 117:7 155:6

**implicate** 138:18

**implicated** 60:9

**implicates** 18:1

**implies** 10:9

**imply** 10:11

**Impossibility** 133:1

**impressions** 83:23

**improperly** 108:9 114:12,13

**in-court** 154:16

**in-person** 56:10 58:2 60:9

**inception** 16:15

**include** 55:5 144:1 146:21 154:3

**includes** 20:12 22:1

**including** 50:17 68:4 139:11

**inconsistent** 123:5

**incorrect** 80:14

**inculpatory** 112:10

**independent** 42:22 46:24

**independently** 127:20

**index** 140:22 141:2,11 148:10

**indexes** 122:19 137:4

**Indicia** 123:3

**individual** 6:2 49:8 73:10 77:14 89:3,16 90:14 91:19 99:1,17

**individuals** 39:21 46:4,14,19 127:4

**induced** 93:6

**information** 19:6 27:10 29:2 33:1 57:15 59:8 71:21 83:5 90:22 122:12 126:17 137:22 138:15

**injury** 139:13

**innocence** 142:4,18 144:8,11

**innocent** 44:13 76:8 78:11

**insert** 9:6

**insights** 62:16

**instruct** 18:2,6 19:7 125:23 127:14 132:17 134:9 136:13 138:2,22 139:4,20 140:19 141:14 143:3,22 144:5,17 145:10 146:12,24 148:24 149:7

**instructed** 128:4

**instructing** 130:8 147:14

**instruction** 19:14 127:23 129:16 132:22 138:6 144:13 157:6,8

**instructs** 128:21

**instrument** 72:3 96:24

**instruments** 74:16,24

**intend** 19:21

**interested** 101:9,12

**interrogate** 89:22

**interrogated** 62:14 64:16 108:14

**interrogating** 115:13,16

**interrogation** 39:13,18 41:13 42:12,20 44:11 50:9,16 53:21 55:2, 22 63:15 65:8 66:23 67:3 68:3,4 69:10 70:8 76:7 89:23 90:4,9 107:6 108:16 109:7,18 115:10,14,20,22, 24 117:18 118:14 135:3,5 156:4

**interrogation/disputed** 76:19

**interrogations** 40:4 41:1 53:12 54:22 55:1,3,9,20 56:11,14 58:5 63:17,23 67:19 71:4 88:13,14 120:1

**interrogators** 64:16 65:7 91:2

**interrupt** 51:10

**interruption** 56:1

**interview** 64:22 89:21 90:21

**interviewed** 40:20 65:7,8,9 81:24 82:21

**interviewing** 51:5 64:7 68:3

**interviews** 40:21 47:8 52:23 55:7 58:20 64:7,11,15 73:17 90:10,12, 18 91:1

**introduced** 43:22 44:22

**introduction** 43:6,12

**invades** 28:19

**investigate** 89:21

**investigation** 42:18

**invited** 63:13

**invoice** 15:1,21,22,24 17:7,8,9,13, 19,21 18:15,19,22 20:11,19 21:18, 20,24 22:17,22 23:20 24:11,12,20 25:6,9 26:5 29:6,8,11,20,24 31:11, 16,21 33:1,8,14,15 34:2,3,4,9,13,

16,20 35:3,6,9,13,17,21 36:9 38:18

**invoiced** 22:1

**invoices** 15:15,19 21:1,8 22:16 30:7

**invoicing** 20:12

**involve** 60:13 65:24 66:6,15

**involved** 37:6,20 46:14 54:19 56:13 58:9 59:20 60:6 75:23 156:5

**involves** 41:24 63:16

**involving** 41:13 61:9,19 102:12

**iphone** 14:20

**issue** 9:11 50:16 63:21 70:22 71:24 72:5 99:18 102:2,7 124:1 149:14 150:20,21 151:1,2,5,8 153:1 158:15,16

**issued** 129:21

**issues** 75:16 76:9 93:3

**item** 28:6 37:12 126:20,23

**itemization** 28:19 29:4,23

**itemize** 17:17 18:13 19:1 29:10 30:18

**itemized** 17:14 25:6 26:3,4 28:13 29:3,24 31:11,16 33:1,14,18 34:2, 3,8,13 35:3,6,13,16,21 36:9

**itemizes** 25:7

**items** 38:9 126:18,20

---

**J**

**Jacobs** 119:4

**jam** 52:1

**James** 72:22 105:10 110:23

**January** 10:19 17:10 20:7,18,23 21:3 23:1,11 26:11 27:8 103:9,13 105:1 133:19 142:22 149:15 150:15

**Jimmy** 117:1

**jog** 65:16

**jogger** 156:22 157:3

**John** 59:3 158:3

**join** 9:19 18:8

**joiner** 9:21

**joining** 129:1

**joint** 111:23

**joists** 57:12

**Jones** 111:21 112:9 155:1 157:12

**journal** 43:19 63:11

**journals** 74:7

**judge** 104:10,15,17 150:12,13

**judge's** 151:10

**judges** 64:19 156:12

**judgment** 76:20

**July** 17:9 20:7 37:15 111:17 112:18

**Jumper** 109:23

**jury** 75:7,17 76:13,16,17,18,23 77:6 96:3 111:17 112:18

**Justice** 115:18

---

**K**

**K-A-S-S-I-N** 54:7

**Kassin** 53:7,8 54:7 66:2 92:23 96:14

**Kassin/kiechel** 92:7

**Kathleen** 116:7

**keeping** 30:17 101:9,12

**Kentucky** 120:18

**key** 53:8 92:11,14

**Kiechel** 92:23

**killing** 61:24

**kind** 62:7,17 73:23 85:20 93:1,5 108:21,23

**kinds** 88:12

**KIW** 111:5

**knew** 150:14

**knowing** 83:21

**knowledge** 34:19 44:6 47:5 51:7 70:19 80:16

**Knowles** 120:9

**Knowles'** 120:14

**Kourchenko** 116:20,23

RICHARD LEO, 04/24/2023

**Kyle** 54:4

---
**L**
---

**laboratories** 52:17

**laboratory** 88:7 92:1,5 93:5,7

**laboratory-based** 93:4,16

**lack** 76:21

**lacked** 84:6

**lacking** 86:2

**lacks** 85:10

**laid** 91:20

**Lamb** 109:3

**lasted** 14:6

**late** 8:11 146:20

**Lavelle** 111:21 154:24 155:1

**law** 43:20 58:14 74:1 96:3 114:12 115:19 117:15

**lawyer** 128:8,17

**lawyer's** 128:5 158:8

**lawyers** 81:9

**lay** 78:17 87:4

**Lea** 5:15

**lead** 76:8 87:22

**leaders** 64:17

**leading** 20:19 122:9 131:10,21 132:4

**learn** 35:16

**Lee** 155:3

**left** 32:9 126:21,23 149:9

**Legal** 5:12

**legally** 154:6

**lengthier** 135:21

**lengthy** 39:8

**Leo** 5:5 6:8,14 9:5 15:17 19:17 25:23 27:22 57:6 121:22 137:8,12 138:3 142:13 145:21 146:14 147:24 149:2 153:18 159:13,15

**LEO2268** 6:24 10:16 122:2

**LEO2353** 125:20 126:13

**LEO2354** 127:11 129:8 130:6

**LEO2358** 7:1 122:3

**Leon** 113:9

**Leonard** 108:1

**level** 41:16 80:16 109:1

**license** 108:8,22 109:1

**licensing** 108:7,11

**lie** 30:2 156:6

**Lindsey** 155:13

**lines** 80:1 140:7

**linked** 127:3

**list** 23:2 26:19 52:15 100:11 101:4 104:23 105:4 153:22 154:3,8,14 157:17 158:1

**listed** 37:13 38:9 60:12 61:2 141:1 147:11 152:3

**literature** 42:23 43:6,8,13,23 44:2, 5,8,10,12 53:14 72:21 73:4 75:6, 16,24 76:3

**litigate** 149:11

**litigation** 45:11

**live** 89:23

**Loevy** 24:1,2,6 158:10

**log** 26:3 28:13

**logic** 45:8 123:6

**long** 14:2,12,20 37:1 48:8 56:4 57:5,20 61:11

**longer** 29:14 34:12 61:12,13 101:3 121:5

**longest** 122:12,13 124:23,24 125:1

**looked** 15:17 31:8 35:21 47:9 65:15 130:13

**lot** 21:5 56:15 66:7 99:5,9,13 122:12

**lots** 93:2

**loud** 52:2

**loved** 61:24 62:12

**Lowe** 119:20 155:13

**Lowe's** 120:4

**lower** 109:1

**lunch** 48:6 79:6

**Lyndarr** 118:5,9 155:10

---
**M**
---

**M-A-D-O-N** 54:5

**M-U-N-S-T-E-R-B-E-R-G** 67:14

**M.D.** 40:15

**made** 10:18 25:21 80:12 98:10 104:17 108:24 115:15 122:23 129:2 150:15

**Madon** 54:4,5

**maintain** 18:21,23 19:20,24 25:15 26:3 29:10,13 33:20 34:10 45:11 46:18 133:7,14,17,18

**maintained** 29:22 47:3,5

**make** 7:24 8:1,8 10:20 15:18 26:2 28:1 31:24 39:9 51:16,17 75:1,12 76:9,20 85:21,23 86:3,4,5,11 138:20 150:5 151:22

**makes** 9:21

**making** 46:21 62:15 104:5 124:7 128:9

**man** 149:18

**managers** 65:9

**Manuel** 105:4

**March** 21:21 24:21,22 33:23,24 34:14,18

**marked** 15:13 24:9 132:3 143:15

**Massachusetts** 115:12

**matched** 35:8

**material** 9:7 31:5 35:15 38:10 137:19

**materials** 20:14 21:12 22:3,4,23, 24 23:3,12,15 27:19 29:16 30:16, 24 31:3,6 34:22,23 35:17,21,23 36:6 38:17 53:4 67:18 81:5 98:24 99:5,10,12,13,17 125:1 132:3 137:19 138:7 142:13 144:1,9 145:18 155:15

**matter** 5:7 16:22 22:13 25:10 30:12 81:3 84:15 85:1 108:4

**Mccollum** 112:22 113:8 155:4 157:12

**Mccullon** 120:19

RICHARD LEO, 04/24/2023

**meaning** 27:9 49:18 80:8 117:12 122:20 125:18 126:10

**means** 50:21 80:24 83:4 85:17

**meant** 88:21

**measurement** 71:9,12,13,18,22 72:5,6 74:15,16,23,24

**meat** 54:15

**Media** 5:2 48:14 121:15 143:11

**medical** 40:5,6,12,18 71:20

**medication** 108:10

**medicine** 80:18

**meet** 28:22,23 76:24 77:5,9 94:2, 24 150:16

**meet-and-confer** 9:10 123:17,23

**meeting** 69:18 70:23

**meets** 45:23 46:3 73:10 77:15,21, 24 89:3,16 90:14 91:19,23 94:10 95:5 102:8 103:20 104:2

**Mejia's** 127:6

**members** 66:5

**memory** 12:6,24 38:21 65:16 100:24 121:23 124:21 137:18 140:16

**Mendez** 111:13,20

**mention** 77:10 156:6

**mentioned** 63:20 64:6 84:22 124:23 157:11

**met** 90:24 96:7,10 98:7 102:23 103:16 105:19,20 112:13 113:11 117:22 120:4,14 149:14 157:20

**method** 64:6 65:20 66:10,16 120:2

**methodological** 40:11 42:16 74:19

**methodologically** 41:19,21 42:21

**methodologies** 42:10 74:20 84:13 86:6,19 87:2,16 88:16 90:12

**methodology** 66:7,8 68:13 84:12 85:22 89:8 91:4,7,8,17 139:16 143:18,24 144:8

**methods** 42:1,6 54:20 60:13 68:4 84:21 87:19,21 109:7

**Michael** 6:3 81:10,11 108:4,6 158:20

**Michigan** 97:12,18 99:22

**middle** 43:5 75:4 154:24

**million** 47:11 113:5,6

**mind** 95:4 125:5 137:3 156:15

**minor** 115:17,19

**Minus** 16:12

**minute** 51:24

**minutes** 14:15 48:9 143:5 159:11

**mis-equates** 84:19

**mischaracterizes** 46:6 85:14

**misconstrued** 39:11

**misremembering** 113:16

**missing** 56:17,18

**Missouri** 114:15

**mistake** 104:17

**mistakenly** 50:24

**misunderstood** 10:17

**MMG** 110:12

**MMJ** 110:12

**moment** 83:13 93:17

**Monell** 122:18 131:1 133:5 139:22 142:18 147:2 149:3

**Montana** 109:2

**month** 132:4

**months** 17:19,21 18:16,18 106:12 108:22 114:6 118:19 149:15

**morning** 5:1 6:14,15 13:20 14:8, 12 122:3 133:23

**move** 149:17

**Moving** 143:23

**multi-day** 108:10

**multiple** 40:1 107:16 141:3

**Munsterberg** 67:13

**murder** 61:23 62:11,14 127:1,3

**muted** 121:10 158:21

**mutually** 95:21

_____

**N**

**named** 74:8

**names** 102:19 137:6

**natural** 52:22

**nature** 71:14 75:8 76:13 78:2

**necessarily** 21:12 62:22 98:13

**needed** 32:15

**neighborhood** 113:5

**neighboring** 115:13

**Nevada** 113:24 114:4

**Nevest** 141:7 145:15

**Nicholas** 110:23

**Nick** 5:12 121:10

**Nieves** 154:22 157:12

**noise** 56:2,16,19 57:8

**non-falsifiable** 82:1,23 83:1,19

**nonresearch-based** 82:1,23

**nonreviewable** 82:2,4,8,24

**Nora** 5:19 14:1,2,4,11

**normal** 27:13

**North** 5:14 58:14

**Northern** 5:10

**notation** 14:18

**notations** 8:6 10:7,18 11:3 12:1,2, 14,16,19 35:7 134:20,24

**note** 48:16,19,24 49:3 126:15 134:14,21 141:12,17,20 142:12 146:9,15

**notes** 6:20,23 7:3,9,13,16,20,24 8:1,8,16,20 9:3,13 10:4,9,12,13,14 11:3,7,10,13,19,24 12:1,12,21 13:1,21 14:5 112:16 121:2,22 122:9,16,19,24 123:9,13,16,20 124:1,4,18 125:4,11,14,17,18 126:9,10 127:9,11,20 128:2 129:9, 14,20 130:5,10,12,13,17,19 131:6, 21 132:2,15 133:7 134:2,4,13,17, 19,24 135:1,13,14,15,20 136:1,2,5, 9 137:23 139:1,18 140:13,16,21,22 142:10,18 143:1 144:2,10,14,18,21 145:2,7 146:21 147:10 148:18 150:1,7,22 152:21,22,24 159:6

**notice** 19:22 29:15 132:11 141:24 142:16 143:23 144:3

**noting** 50:1

**November** 139:10

RICHARD LEO, 04/24/2023

**number** 15:14 16:11,16,18 17:6 21:17 22:15 24:10,12 26:5,9 29:7, 12 31:13 32:13,18,19 33:11,19,22 36:15 38:14 51:2 53:20 54:6 61:1 65:14 69:1 83:22 96:20 97:14 98:7, 11,18 100:1,3,5,8,14,18 101:2,4,5, 6,7,12,18,21 102:18 103:1,2,11,24 104:7 115:15 121:20 123:14,15 126:23 127:2 133:24 135:20 139:22 140:4,13 141:3,7 143:16

**numbers** 5:9 69:5 104:6 138:13

**numerous** 54:12

## O

**Object** 132:21 138:16

**objecting** 17:24

**objection** 9:6,8,20 11:17 15:3 17:23 19:4 21:15 23:24 24:5,16 25:11,20 28:17,18 30:20 34:6 35:10 36:2,13 38:20 39:24 41:9 46:5 68:1 70:3 71:2 73:15 77:3,17 78:21 81:18 83:9 85:13 89:6,19 90:17 91:10 94:16 95:18 101:13 104:18 107:17 123:11,13 125:21 127:12,22 129:1,15 130:7 131:5 132:16,21 133:9 134:8,15 136:12 137:16 138:1,5,20 139:3,19 140:18 141:13,21 143:2,21 144:4,16 145:4,9,24 146:7,11,23 147:7,12 148:23 149:6 156:20 157:16

**objections** 9:21 123:15,19 124:9 129:2 144:12 150:5,6

**observation** 51:6 52:21 54:14,19 55:6,17,23 56:10 58:2 60:8 89:14, 15

**observational** 54:16

**observations** 55:16

**observe** 55:19 58:5 88:13

**observed** 54:21 90:3

**observing** 52:22 55:3 89:20 90:8

**obstructionist** 138:19

**obtain** 55:6

**occasion** 37:10

**occur** 91:4 106:12

**occurred** 47:11 131:15

**October** 16:2,8 31:20 32:22 33:3

**offer** 109:5 151:1

**offered** 41:15,16 49:2 109:6 124:2

**officer** 6:2 115:11 135:11

**officers** 135:4,6,8

**offices** 5:13

**official** 159:9

**Ofshe** 43:18 58:15 63:10

**oftentimes** 53:17

**Ohio** 110:15

**Okey-doke** 79:22

**one's** 42:21 50:22 133:7

**one-year** 21:22 29:9

**Op-eds** 47:8

**opening** 39:6

**opine** 39:13,17 99:18

**opining** 158:15

**opinion** 26:10 46:4 66:19 73:19 77:8 114:10,14 118:20 122:18 133:3 139:22

**opinions** 38:24 78:17 99:7 131:2

**opportunity** 150:19 151:3

**order** 23:8 132:14 144:14,15 145:8

**orders** 20:2

**original** 6:22 8:5,21 12:8,11,22 20:17,20,24 22:24 23:6 27:8 45:9 77:11 133:19 136:6,10 146:10

**originally** 92:22

**outcome** 90:19 109:11,20,24 110:4,8,13,21 111:4,6,14,20 112:20 118:16,18 119:1,14 120:10, 20

**Owens** 23:21,23 24:1

## P

**p.m.** 48:11,15 59:11,14 79:16,19 121:12,16 143:8,11 153:12,15 159:16

**packet** 123:3 132:3 135:19

**pages** 37:2 38:3,9 123:2,8 124:16, 17 135:13 136:1 139:14 148:14

**paid** 148:8

**pain** 139:13

**paints** 67:2

**paper** 52:1 97:22 133:11,13

**papers** 53:17

**paragraph** 38:23 39:7 43:5 45:1 47:14 70:5 71:8 74:9 80:1 84:5 86:14 92:6 93:19 96:13 137:21 138:7

**parent** 61:24

**Park** 46:12 47:2 156:22 157:3

**part** 21:11 24:7 40:12 41:23 42:2 55:21 56:13 57:10 58:9,20 60:4 65:6,14 75:13 82:4 134:23 156:4

**partial** 55:21 56:14

**partially** 58:10 60:21

**parties** 5:18 20:1 30:3 63:18

**parts** 60:3

**party's** 128:8

**past** 97:9

**Patrick** 37:13,18,20,23 38:4,16 49:1,7

**pattern** 137:1

**Pattern/practice** 132:11

**Pattern/practice/notice** 130:23 135:17

**patterns** 62:16

**pause** 59:12 143:9

**peer** 73:23

**peer-reviewed** 68:16 70:19 74:7 75:22

**people** 32:8 40:20,22 45:16 46:9, 23 57:6,9 62:13 66:8 73:18 76:8 78:5,6 79:3,7 81:7,10,21,24 82:17, 21 83:22 88:12 92:14 93:6,7,9,10 94:9

**people's** 78:17

**percent** 80:21

**percentage** 98:6 104:1 106:5

**perfect** 74:21

**period** 17:14 20:6,19 21:7,8,22 24:21 29:9 34:17 131:9 154:5

**permitted** 77:7,12 116:2 155:22

**perpetrator** 49:11 126:21

**perpetrators** 126:21

**person** 42:6 55:15,19 61:22 73:1, 19,24 74:3 99:1 115:16,17 146:6

**person's** 99:19

**personally** 59:20

**perspective** 149:20

**persuade** 159:7

**pharmacist** 108:6

**phase** 62:5

**Phd** 41:22,23 42:5 54:16,18 55:18 58:4 70:17

**phenomena** 52:22,24 74:15 85:7 86:7 89:20 90:9

**phenomenon** 79:7

**phone** 13:12

**phrase** 43:21 44:2 68:24 72:12 138:19 147:16

**phrased** 138:20 147:13

**phraseology** 68:19

**physical** 49:7 115:24 123:5 132:24

**physically** 115:15

**picture** 67:2

**piece** 71:20 96:5 127:2

**pieces** 62:22,23 63:7

**pin** 68:22

**place** 19:24 120:24

**plaintiff** 113:7 128:15,16 158:7

**plaintiff's** 158:8 159:7

**plaintiffs** 113:4,8 141:4

**plow** 52:4

**point** 21:11 39:2 47:20 53:14 85:9 87:16 126:18,19 135:20 140:4 151:22

**pointed** 137:4

**pointing** 67:20

**points** 125:19 126:12 132:12 133:1 139:17 143:18 144:2,10

**police** 39:13,18 40:3 41:13 42:12, 18,20 44:10 45:10 46:18 47:16 50:8,16 53:12 63:17 64:16,17 65:7,

8,9 66:3,4,23 67:3,19 68:3 70:8 71:4 76:7 89:21 91:1 109:6 115:10, 11,22 117:18 126:20 135:4,6,8,11 139:11

**policies** 131:3

**political** 66:8

**polygraph** 156:5,6,8,18

**polygraphs** 71:23

**populations** 64:22

**portion** 122:18 125:12 127:10 131:1 142:19 147:2 149:4

**position** 150:10,11,14,15,17 151:16

**posits** 45:1

**possession** 34:9

**possibly** 150:6 157:13

**post-conviction** 117:8 118:2,6, 10,13 119:20,24 120:9 154:9

**post-date** 157:19

**potential** 123:24

**power** 78:19,22

**powerful** 75:8 76:13 78:2 79:10

**practical** 80:5,9,11,13 81:2,9,11, 13,17,20 82:5,14 83:4 84:18

**practice** 89:21 137:2

**practices** 76:10 115:23 118:14 131:3

**precise** 100:8

**precisely** 61:6 99:23 126:5

**predate** 157:19

**preexisting** 71:20

**preju** 78:12

**prejudicial** 78:13 79:10

**preparation** 8:10 20:14,20 21:5, 13 22:4 23:4 34:23 36:7 38:11 79:2 143:1

**prepare** 13:9 15:11 17:18 18:14 21:2 25:9 29:14,20 123:9 124:18 125:11,19 126:12 127:20 131:6 132:20 147:9 149:4

**prepared** 26:16 122:9 123:13 124:24 125:3,13,14 131:20 132:2 133:19 134:4,5,6 140:16 149:2

**preparing** 24:15,23 36:11 71:19 147:24

**prescribing** 108:9

**present** 49:14,17,18 74:19

**Press** 69:15

**pressed** 92:13

**pretrial** 104:12 106:4

**pretty** 52:2 84:23

**prevent** 32:1

**prevented** 73:6

**previous** 95:11 123:12 124:22

**previously** 24:9 37:5 71:6 74:8 132:6

**Prince** 146:22

**print** 134:14 135:24

**printed** 23:18 38:17 134:16,19 135:1

**printer** 51:11,12 52:20

**printing** 22:3,23 34:22 35:15,18 51:23

**prior** 9:11 23:7 79:8 101:15,16 125:15 131:12,13 149:16 150:20 156:9

**prison** 73:18 81:8,22 82:17

**privately** 16:18

**privilege** 9:7,15 18:1 19:12 25:21 28:21 123:15,21 124:9 125:22 127:13,23 129:16 130:1,8 132:16 134:8 136:12 138:1,18,21 139:3,19 140:18 141:14 143:3,21 144:5,16 145:10 146:11,23 147:13,19 148:23 149:7,11,24 151:4,7

**privileged** 18:5 19:6

**privileges** 28:19

**pro** 98:19

**proactively** 77:6

**prob** 136:20

**problem** 104:5

**problematic** 44:7

**problems** 76:10

**proceeding** 118:2

**Proceedings** 59:12 143:9

RICHARD LEO, 04/24/2023

**process** 30:1 60:19 61:2,3 62:6,8, 20,24 63:4,5 73:22 90:9,18 123:17, 23 156:5

**processor** 134:5 136:11

**produce** 18:24 25:17 34:4,5

**produced** 6:21 7:12 9:13 10:14 12:4 123:20 144:14,22,23 145:7,8 150:1,7,8

**producing** 150:3

**production** 20:2

**professional** 80:17

**professor** 59:4 61:10 67:15,16 74:1 96:14

**professors** 40:10 42:24

**profusion** 54:23

**program** 41:23,24 42:5 148:5,6

**progress** 60:12,16,20 61:8 62:19

**Project** 117:14

**proliferation** 54:23

**pronounce** 119:17

**prosecuting** 115:18

**prosecution** 115:5,6,8

**prosecutor** 74:1

**prosecutors** 45:10 46:17 47:3,8, 16 64:18 65:9 72:24 74:4

**protocols** 74:19

**provably** 45:9 92:2

**prove** 45:19 46:9

**proven** 43:4,7,21 45:3,15,23 46:3 61:21 67:22 69:18 71:1 72:11,23 73:3,11 74:3 77:1,9,16,23 89:5,9, 17 90:6,7,15,20,23 91:3,6,13,16, 21,22 92:2 94:3,12,15 95:1,6,7,20, 24 96:7 97:11,13 98:1,8 99:24 100:12,21 101:1,19 102:2,8,13,17, 20,24 103:16,21 104:2 112:13 113:12,15 117:23 120:5,15 126:16 132:24 141:18 154:17 155:19 157:14,20 158:16

**proves** 46:13 49:8

**provide** 28:14 91:17

**provided** 7:4 17:7 23:15 37:23,24 52:14 61:17 98:24 99:16 112:9 138:7 142:14 144:9 145:14,19

**proving** 47:17,22 91:15

**Proxy** 63:16

**psychiatrist** 81:7,15,21 82:16

**psychiatry** 40:2 81:12

**psychological** 50:9,17 53:12 66:23 67:4 68:4 70:7,8 71:3,4 109:7 117:18 118:14

**psychologically** 68:5

**psychologist** 50:23 84:17

**psychologists** 70:17

**psychology** 41:17 42:18,24 67:16

**PTP-D-FLEWELLEN** 138:13

**PTP-FLEWELLEN** 139:14

**PTP-N** 145:20

**publication** 41:10 60:19,22 61:2 62:6,9,20,24 63:3,4,5,11 101:11 102:14

**publications** 65:14 69:17

**publicly** 96:24

**publish** 73:4,22

**published** 40:19,23 43:19 55:23 59:2 60:11,14,19 63:10 65:24 66:6 67:17 69:3,14 72:18,20 74:2,7 84:1 96:14,21

**punched** 133:12

**punishment** 109:1

**pure** 104:4

**purpose** 42:4 62:10,13 64:13 107:5,6

**purposes** 55:4 66:14 95:24 101:11 128:12

**pursuant** 127:13

**pursue** 19:21,23 151:4

**put** 15:14 31:24 32:3,10 40:14 45:14 48:21 54:15 64:11 66:12 77:4 108:15 128:14,23 153:20

**putting** 19:22

**Q**

**qualified** 39:13,17,23 40:1,6 50:19 104:24 153:23 154:4,7

**qualifier** 39:6

**qualifies** 89:17

**qualify** 45:3

**quantity** 68:9

**question** 8:18 9:12,15 10:1,9,11, 17 11:18 18:2,3,9,10,12 19:5,18 21:6 23:8 25:24 28:15 29:1 53:2 56:9 64:20,23 75:13,18 79:5 82:13 87:7,9 91:11 94:19 95:10,16 96:17, 23 97:1,24 99:22 101:16 124:6,10, 11,16,22 125:23 126:1,4,8 127:14, 17 129:18,20 130:14 133:10 134:16,22 136:3 138:17,21 141:14 144:20 145:10 147:13,16 149:20

**questioning** 17:24 152:4

**questions** 8:13 9:1,4,14 10:2,5 11:20,21 13:3,7 18:7 28:18 77:7 102:17 104:6 122:11 124:3 125:7 134:13 140:17 147:19 152:2,3,6,8, 13,18,21,23 153:3,19 157:11 159:1,4,6

**quick** 51:10 75:14

**quickly** 51:23

**quiet** 57:17

**quote** 93:20

**R**

**R-E-D-L-I-C-H** 54:3

**R-E-Y-O-S** 72:23

**Rachel** 48:18

**Racion** 119:16,17

**Ramey** 114:22 115:1

**randomized** 52:18

**range** 138:13

**ranges** 69:4

**rate** 71:9 72:3,4

**rates** 74:24

**re-creating** 93:3

**re-creation** 53:6 59:19

**re-creations** 51:5 52:16 53:11 59:20,22

**reach** 123:19 149:15 151:14

**reached** 124:1

**read** 9:16,24 18:10,11 37:4,22 41:2 71:6 82:11,12 102:15 124:12,13,15

RICHARD LEO, 04/24/2023

126:4,7

**reading** 37:5 152:1

**reads** 75:20 94:22

**real** 51:1,2 53:4 75:14 85:7 88:4,8,
10 141:4

**realism** 84:14

**realized** 115:14

**reask** 124:2,3

**reason** 18:24 25:17 40:2 47:15
90:5,20 91:3 138:24 152:17

**reasons** 26:5 32:15 40:1 50:18
57:13 61:16

**reassert** 124:9

**rebuttal** 6:19 7:15 11:11 22:5 23:3,
5,10 24:15,23 26:10,16 28:7 34:24
36:8 38:11,24 43:2 48:22 66:18
81:23 82:19 85:19 133:22 136:6,11
150:4 151:2,24 152:5,7,9,13,19
153:4 159:5

**recall** 8:4 13:5,8 23:2,5,15 36:24
37:1,11,17 38:2,3,5,6 62:3 96:18,
22 105:7,20,21 106:2,20,24 108:3
109:10 110:6,10 111:4,20 112:15
113:22,23 114:19 115:2 116:18
117:24 119:2,14 120:22 125:13,16
130:16 131:8,16 141:22 146:3,19
154:6,18 155:20 156:24 157:4,9,
21,22 158:17

**recalling** 78:23

**receive** 22:23

**received** 19:3 21:18 23:6 40:11
157:2

**receiving** 40:18

**recent** 22:17 24:12 27:14 78:15,19
144:18

**recently** 47:9 119:6

**recess** 48:12 57:2 79:17 121:13
153:13

**recognize** 26:14

**recognized** 78:5

**recollection** 10:6 14:6 54:9 58:16
65:15 79:1,3 98:5,8 103:5 119:18

**record** 5:3,18 8:19 9:24 18:11
25:7,13,16,18 40:21 48:11,14,17,
19 54:24 59:11,14 79:16,19 82:12
121:3,12,15 124:7,15 126:7 128:7,

24 143:8,11 149:10 151:17,18
153:12,15 159:9,15,17

**recorded** 55:6,9,15 58:9,10 60:9
88:14 115:14

**recordings** 55:1,22 56:13,14
58:19

**records** 17:17 18:13,21 19:1,21,23
25:7 26:4 30:18

**redacted** 31:21 32:21

**redeposition** 123:24

**Redlich** 54:2

**refer** 50:22 66:1 69:21 73:17 93:1
146:5 157:7

**reference** 20:17 67:12 69:23 80:2
88:2 136:18,20,22 146:15

**referenced** 43:9 61:20 69:15
102:16

**referencing** 57:7 68:10,11,12
88:10 96:16 146:2

**referred** 51:3 102:15

**referring** 10:8,18 14:17 29:21
31:17 43:13,14 44:9,19 51:8 58:10
61:8,11 69:20 71:6 81:20 82:15
88:11 146:18 154:21

**refers** 50:24 52:11 71:3

**reflect** 34:16

**reflected** 29:11 33:2 34:1 38:18
137:11

**reflection** 16:7 63:8,13

**reflects** 29:22

**refresh** 54:9 58:16

**Regalado** 105:24

**regard** 125:22 129:20

**register** 74:16

**regularly** 54:6

**Reid** 120:1

**reified** 104:6

**rejects** 49:3 50:3

**relate** 19:12 135:15 154:15

**related** 11:10,13 18:4 50:16
122:20,24 123:24 131:2 142:18
153:3 159:4

**relates** 125:11

**relation** 123:16 129:13 141:12
151:23 152:5,7,13

**relative** 62:1

**relatives** 62:15

**released** 118:3

**relevant** 41:18 52:23 64:7,10,14,
23 65:4,5 70:7,13,14 73:4 75:7,11,
16,18 76:1,4,5,6 90:10,12 99:18,19

**reliable** 45:12

**reliant** 90:12

**relies** 104:10

**remaining** 159:5

**remains** 150:17

**remarkably** 49:3 50:2

**remarks** 97:9

**remember** 37:5 53:18 61:6
100:20,22 101:4,18 108:20,24
118:11 122:8 125:5 137:6

**remote** 15:16 24:13 31:15 33:12
48:23 79:23 121:21 139:23 143:12
153:24

**repeatedly** 43:9 67:6 80:19

**rephrase** 147:9

**report** 6:19,20,22 7:15,18,22,23
8:2,5,9,12,21 9:2 10:3,6,7,10,19
11:2,6,11,14 12:8,11,20,21,22
13:1,6 20:15,18,20,24 21:3,5,13
22:5,24 23:3,5,6,10,13 24:15,23
25:3,4 26:16,21,24 27:3,6,8,20
28:7,8,16 29:14 34:24 36:8,11,16
38:10,12,15,22,23 39:1,7,8,10,16
43:2 44:20 48:22 50:20,24 66:2
67:1 75:3 77:5,10,11 80:10,20
84:24 85:15,19 87:24 88:17,19
95:12 96:8 103:9,10 104:22 112:16
113:17 122:11 123:10 124:20,23
125:12 129:21 131:2,12,14 133:19,
23 136:6,7,10,11,17,19,21,24
137:9,12,20 138:3,8 140:1 141:9
142:12,13,14,19,22 144:18,23
145:3,19,21 146:4,10,14,15,20
147:3,11 148:17,19 149:4 150:4
151:2,24 152:2,5,7,9,13,19,23
153:4,21 158:15,17 159:2,5

**reporter** 5:15 6:5 15:7 30:22 82:10
124:14 126:6

**reports** 27:14 81:6 122:13 125:6
134:6 147:24 148:1 154:17

RICHARD LEO, 04/24/2023

**represent** 5:18 23:23 117:13 128:15

**representing** 5:13 24:7 45:11 128:11

**represents** 24:3,8 85:7

**request** 16:14 21:19 26:2

**reread** 114:14

**research** 39:18 40:3,12,16,17,19 41:10,13,20,22 42:1,7,9,22 43:6, 13,22 44:10,12 50:15 51:7 53:2 55:4 64:20,23 65:1,7 68:10 69:3,10 70:6,12,14 74:6 75:6,15,24 76:3,11 78:4,5,15 81:1 84:11,13,19 85:3 87:23 88:12,13,14,23 93:20 94:1,2, 23,24 95:14,16,19,24 96:2,6 97:22 98:14 101:11,14 102:3,5,9,14

**researched** 98:16

**researcher** 42:5 80:16,17

**researchers** 54:6 64:22 66:2 67:6 70:16

**reservation** 123:21

**reserving** 149:12 150:10 151:11, 13 159:5

**resolution** 124:1 149:15

**resolve** 150:20

**resolved** 151:13

**resolves** 93:21 94:1,23 95:14,16 96:2

**respect** 29:7 33:10 50:7 53:12 54:14 58:2,8 59:19 62:11 69:16 72:7,10 115:23 123:10 124:19 125:17 126:8 127:16 143:16 145:15 152:9

**respond** 77:7

**response** 16:17 19:2 21:19 25:18 96:19 127:13

**rest** 149:12

**result** 105:5,10,24 106:12 107:10 108:18,20 111:24 113:21 114:1

**results** 88:18,19

**resume** 152:11

**retained** 16:18 98:20,21,23 99:2, 16,17 101:7,10,23 102:10,22 103:6 105:17,18 107:18 117:13 118:8 128:16 158:6

**retainer** 16:12,14

**retrial** 112:17

**retrieve** 32:3

**reverse** 119:9

**reversed** 114:7 119:7,22

**review** 13:13 20:13 22:3 28:11 29:15 31:6 34:22 35:20 37:10 58:14,16 64:5 73:23 75:14 77:20 83:24 84:2 90:1 93:14 105:22 125:19 126:11 127:10 132:14 155:7

**reviewed** 13:11,14 23:4,16 27:19 28:6 31:3 36:16 38:11,17 79:2 101:11 114:10 124:24 137:20 158:12

**reviewing** 13:15 15:9 21:12 25:3 28:15 30:16,18,24 35:23 36:6,22 37:17 38:6 58:22 144:1,9

**reviews** 42:23

**revising** 24:15,23 36:11

**revision** 20:15 22:4 34:23 36:7

**revocation** 109:1

**Reyes** 5:22 6:22 17:8 24:4,7,8 48:18 50:3 76:24 96:9 122:21 123:9 124:17,21 125:11 126:23 127:1,3 129:1 135:3

**Reyes'** 48:17 122:24 133:4 135:15

**Reyes/solache** 15:22 93:21

**Reynaldo** 5:8

**Reyos** 72:23

**rhetorical** 86:11

**Richard** 5:5 6:8 43:17 58:15 63:10 116:7 159:15

**Rickleffs** 105:10

**rid** 57:14

**riddled** 123:4

**risk** 107:7 120:2

**road** 124:8

**Robert** 119:12

**Robeson** 112:23

**Rockford** 158:4

**Rohr** 113:24 114:5

**role** 60:1,2 108:13,16

**Roman** 148:1,11,15,20

**Ronald** 119:4

**room** 57:11

**Rosales** 117:1,4

**Rosen** 5:23 6:13 9:22 15:5,8 19:8, 13,16 25:22 30:21,23 32:7,11,12 48:4,9,16,20 51:20 52:4,8,10 56:21 57:6,17,24 58:1 59:9,16 79:13,21 121:10,18 125:9 126:3,14 127:15 128:1,11,18 129:4,7,17 130:2,4 132:19 134:11 136:14 138:23 140:20 141:15 143:4,6,14 144:6 147:18,22 149:1,8,22 151:9,16 152:6 153:9 158:20,24 159:3,12

**roughly** 21:7

**round** 45:17

**rule** 18:1,6 19:6,11 125:22 127:13 129:3 132:17 134:9 150:2,11

**run** 52:15 57:12 71:19

**running** 59:23

**Russell** 118:23

**Ryan** 109:2

---

### S

**S-C-H-E-R-R** 54:5

**sake** 124:13

**sample** 71:19

**Saul** 54:7 66:2

**save** 128:9

**saved** 136:5 144:15

**scene** 72:2 123:5 126:22,24 127:5, 6

**Schalka** 6:3

**scheduling** 57:13

**Scherr** 54:4,5

**school** 40:5 117:15

**science** 39:18 40:9,12 41:13,18, 20,24 44:10 50:10 51:7 64:21 66:24 67:9 68:10 70:6,12,14 74:10, 13,14,17,21 75:2,5,6,15,21,23,24 76:3,11 78:13 80:24 85:2,12 93:20 94:1,22 95:14,16 96:2 108:17 117:18

**sciences** 40:17 72:4,5 74:15

**scientific** 42:8 50:8,13 66:22 67:3 68:3 71:10,13 84:20

**scientist** 41:11 73:1 84:11

**scientists** 65:21 66:9 70:18 73:16

**scope** 150:6

**screen** 15:14,16 24:13 26:15 31:15 33:12 48:21,23 56:8 79:23 121:21 132:9 139:23 143:12 153:24

**scroll** 16:13 20:5 26:18 140:1 145:13

**Sean** 5:21

**seconds** 32:3,7

**section** 69:21 141:23 142:7 143:17,23 144:7

**seeks** 74:14

**send** 18:22 29:5,11

**sense** 86:3,4,5

**sentence** 39:16 43:10 47:13 68:7 70:5 71:5,7,8 75:20 88:11 94:22 95:2,4,13 152:1,2

**sentences** 93:19

**separate** 10:8,12 11:10,13 17:17 18:12

**separately** 19:1

**separation** 36:10

**September** 8:11,14,23 9:2 10:3,14 11:21 12:23 13:4,7 23:7 121:23 122:7 131:10,15,19,20 132:4,5 158:2

**session** 9:8 149:19

**sessions** 13:3

**set** 28:20 44:15,18 55:8

**settings** 88:8,10

**settled** 112:1

**settlement** 47:11

**severe** 139:13

**SHALKA** 6:3 158:23 159:1

**share** 56:8

**sharing** 15:16 24:13 31:15 33:12 48:23 79:23 121:21 139:23 143:12 153:24

**sheet** 14:14,17 30:12 33:2,7 35:16

**sheets** 29:13,14,18 30:5,8,9,17 31:2,10 33:13,24 34:2,12 35:4,7, 13,22 36:8

**short** 48:4 57:21 153:10

**showing** 27:24

**side** 69:6 141:17

**sides** 118:19

**Sidney** 118:23

**signature** 26:24

**silence** 39:2

**similar** 49:3 50:2

**similarly** 109:17

**Simmons** 114:15,18

**simply** 50:20 67:23 71:9 73:2,24

**Singh** 106:18,21,22

**single** 127:2 141:5

**sit** 23:14 55:19 58:5,22 65:17 88:12 97:5 103:14 156:23

**sitting** 55:2 132:20

**situation** 91:2

**situations** 118:17

**skeptical** 78:8,10

**skipped** 142:6

**sleep** 63:21 64:3,4

**Slosar** 158:9

**small** 27:23 39:10 57:10

**Snyder** 5:19 14:1,11

**social** 39:18 40:12,16 41:11,13,16, 18,19,24 42:8,17 44:10 50:8,10,13 51:7 64:21 65:21 66:9,22,24 67:3,8 68:2,9 70:6,12,14,18 73:1,16 75:5, 6,15,21,23,24 76:2,11 78:12 80:23 84:11 85:2,12 93:20,24 94:22 95:13,16 96:2 108:17 117:18

**sociologists** 70:17

**Solache** 5:20 6:22 17:8 50:3 76:24 122:24 123:9 124:17,21 125:12 127:2,3 133:4 135:5,15

**Solache's** 96:10 122:21 126:24

**Solache/reyes** 16:9 29:5

**somebody's** 72:1

**sophisticated** 68:13

**sort** 52:12 54:1 138:10

**sound** 32:15

**Sounds** 32:11

**source** 55:11 127:4 132:10

**Sources** 130:23 132:10 135:16

**spans** 17:19 18:15

**speak** 13:19,24

**speaking** 7:8 14:23 20:11 138:20

**specific** 29:1 68:11 104:6 109:9 117:19 129:23 156:3,11,24 157:8

**specifically** 11:11,13 13:24 14:9 15:12 19:11 35:17 43:16 44:11 62:3 88:11,20,22 91:13,15 125:10, 16 155:17

**speculate** 25:1

**speculation** 24:24 36:4 104:19

**speculative** 104:4,5

**spelled** 54:3 72:23 141:7

**spelling** 67:14

**spend** 13:15 14:23

**spending** 30:11

**spent** 16:8 17:18 18:14 20:8,24 21:9 22:10 24:15,23 25:3,8 28:15, 19 29:4 36:5,11,22 37:17 38:6

**spirit** 21:6

**split** 108:21

**spoke** 13:12,20,23

**spoken** 83:22

**stabbed** 126:19

**stairs** 28:1 32:1

**stamp** 125:20 126:13

**stand** 83:17 155:22 156:9,18

**standard** 65:20 66:8 148:6

**standards** 115:11,23

**standing** 9:21

**standpoint** 78:13

**stands** 129:3

**Starr** 5:21 9:19,23 15:3 18:8 48:19

**start** 62:2

**started** 14:19 68:8,14 157:11

Index: starting-tape

RICHARD LEO, 04/24/2023

**starting** 123:3

**starts** 153:21

**stat** 106:7

**state** 80:2 105:4,9,23 106:18,22 107:1,24 109:2,14 110:3,7,15,23 111:2,10,13 112:2 113:18,24 114:4,15,20,22 116:14,20 117:1,7 118:5,22 119:11,19 120:8 155:6,9, 12

**stated** 26:6 104:15 128:24

**statement** 84:8 86:17 88:21 106:6, 19,23 108:2 112:10 114:3 119:5 126:20

**statements** 107:7,8 108:15 114:12 118:15

**states** 5:10 50:24 97:10 104:11 105:15 110:11 154:23

**statistic** 106:8

**status** 118:1

**stay** 32:6,8

**stepbrother** 113:9

**Stephanie** 54:3

**Steve** 14:1,3,11 58:14

**stop** 51:13,16,24 52:3 57:1,4

**stopped** 52:20

**straight** 137:3

**straightforward** 44:15,18

**Street** 5:14

**strengths** 74:22,23 88:17

**strictly** 42:11

**strike** 12:10 29:6 35:5 45:24 72:9

**structured** 64:15,24

**struggling** 94:7

**student** 85:21

**students** 92:10,11

**studied** 40:7,9 81:10,23 82:20 98:13

**studies** 40:3 42:22 50:16 53:18,20 54:3,4,12 55:14,20,24 56:10,11,12 58:3,16,18 59:21 60:2,5,12,16,18, 20,23 61:9 62:19 65:5 66:6 68:13, 16 69:5 72:19 74:15 75:22 86:6 88:3,4,7,15 89:1,15,20 92:18,21 93:2

**study** 39:13 50:8,13 52:23 53:1,2,8 54:8,10,11,16,18 55:9,17 59:2 60:3,4 61:5,8 62:10 63:16 64:13, 20,21 66:22 67:3,23 68:3 69:24 70:8 71:4,23 73:5 74:2 80:21 85:6 86:1 88:3 89:15 90:13 91:9 92:8, 10,20 93:1,5,12,13,15 96:13

**studying** 41:1 52:24 71:15,17 90:21

**subject** 9:12 64:22 68:16 123:21

**subjects** 70:20,21,22

**submit** 33:15

**submitted** 60:22 62:9 63:3

**subpoena** 19:2 21:19 25:18

**subsequent** 100:10 104:6 111:19

**subsequently** 90:4 123:18

**subset** 62:17 144:21

**substance** 40:9 117:16

**substantial** 46:15 47:17 70:19

**Substantially** 102:1

**substantive** 40:17 42:17,19

**substantively** 40:10 41:19 42:22

**suggested** 150:2

**suggests** 67:4

**Suite** 5:14

**sum** 22:15

**summaries** 122:16 139:1 147:1 148:18 149:3

**summarize** 141:8,10 147:5

**summarized** 122:14 123:11 147:2

**summarizing** 86:22 92:16

**summary** 34:4,16 135:21 137:8, 12,13 138:3,4,8 139:6 142:13,14, 15 145:14,19 146:14

**supervised** 42:23

**supplement** 21:19

**support** 79:9 89:16 91:8,12 139:5 142:15 143:19 144:2

**supported** 88:7

**Supporting** 138:8 142:14 145:19

**supposed** 151:23 157:6

**suppressed** 105:8,12 106:2,6,7,

19,20,23 108:2 110:2,14 111:1,8 116:8 119:5,6

**suppression** 105:5,11,24 106:5 108:1 109:23,24 110:4,5,8,9,12,13, 24 111:3,6,14,15 113:24 114:1 116:8 119:5,7,9 120:19 154:9 156:14

**surprising** 80:15

**survey** 65:22,23 66:3,7 78:24 79:8 96:13,16,17,21,24

**surveys** 51:6 53:1 65:18,20,24 66:4,6 79:8 87:23

**suspects** 64:16

**suspend** 149:8,13,23 151:6 152:16

**suspended** 108:22

**suspending** 151:11 152:15 159:3

**swear** 6:6

**switch** 121:1,19

**switched** 48:17

**sworn** 6:7,10

**synthesis** 20:14 64:5

**systematic** 55:8 65:22 73:16,21 137:1

**systematically** 55:10 73:3

---

**T**

---

**table** 69:3,9,10,11,17 70:4 138:10 139:1,5 145:18 150:3 151:1

**tabled** 150:21

**taking** 6:17 26:10 108:9 136:15 143:15 156:9

**talk** 23:12 69:17 71:21,22 81:7 85:24 86:4 96:13 121:2

**talked** 17:12 52:11 61:4 66:11 78:16 81:7,10,21 82:16 87:3 122:3

**talking** 10:22 23:13 53:7 59:17 64:9 67:22 68:2 69:24 85:3,11 86:12,24 87:1,11,13,18,19 109:17 133:8,23

**talks** 22:22 81:9

**tally** 101:9,12

**tape** 115:20

RICHARD LEO, 04/24/2023

**tar** 86:2,4

**task** 31:2,21 32:20

**tasks** 21:2 25:8

**Taylor** 36:17 37:6,9 38:15 49:1

**tech** 153:21

**technical** 56:1 128:14 158:22

**technique** 65:12

**techniques** 68:5 76:7,8,10 107:7 109:10,18 116:1

**telephone** 20:13 22:2 23:20 34:21

**ten** 48:9 53:11,21 54:13 143:5

**tend** 78:7

**tendered** 20:24 22:24 25:18 133:19 142:22

**Tennessee** 119:20 155:12

**term** 43:15 44:7 69:19 72:19 81:19 82:14 89:18

**terms** 68:19,22 129:21 157:5

**terrorizing** 115:19

**test** 71:20

**testified** 6:10 49:7 95:11 97:11,13, 20,24 98:6 100:11,19 101:21 102:20 104:24 106:4 110:19 111:24 116:10 122:4,7 131:19,24 132:6 153:23 154:15 157:14

**testify** 101:7 107:4 109:17 110:18 112:3 113:1 115:21 116:2 118:12 119:23 154:4,7 155:19,22 156:2,8, 10,12,17,22,24

**testifying** 101:24 102:10 107:15 157:2,18

**testimonial** 63:22

**testimony** 37:18,23 46:6 49:1 85:14 97:23 102:16 107:5,19 109:5,6,9 117:16 123:12 131:22 132:1 154:8,12,16,19 155:16 157:17

**testing** 75:23 127:4

**thing** 34:9 48:1 66:13 80:14

**things** 6:18 29:18 45:19 46:22 53:7 64:9 68:21,22 71:17 78:20 85:16,19 101:6

**thinking** 55:14 65:16 93:17

**thought** 10:18 58:24 60:24 73:5

**thousand** 80:21

**thousands** 68:16,21,23 69:4,7,8

**threatening** 115:19

**threats** 115:15,23

**three-hole** 133:12

**thrown** 33:7

**Thursday** 13:22

**time** 12:3,22 13:15 14:14,16,23 15:18,24 16:8 17:12,15 20:6,7,19 21:9,12,22 22:7,10,11 24:14,21,23 25:2,8,10 28:15,19 29:4,9,13,14,18 30:4,8,9,11,12,14,17 31:2,10 33:2, 7,13,24 34:2,12,17 35:3,7,13,16,22 36:1,6,8,11,21 37:17 38:6 49:18 52:15 65:11,13 78:18 97:14 98:2 100:2 104:1 124:2 125:1,14 128:3, 4,9 131:9 142:24 147:21 149:12 150:11,24 151:7,12,13,17,20 152:10 154:5 159:5,9

**times** 80:11 97:24 101:6,7,17 106:6 126:19 148:1,11,15,19 154:11 156:12

**timing** 123:24 150:21 151:1

**title** 27:10

**titled** 126:16

**today** 5:15 6:14,17 10:23 12:7,12 13:10 18:21 22:20 23:14 30:11 58:22 73:12 95:11 97:5 103:14 149:17 151:5,12 152:19 156:23

**today's** 9:11 149:16

**told** 92:11,13 94:8 106:9,12 118:18 155:18,20,21

**top** 24:17 27:11,24 53:16 58:12 87:5 88:1 96:23 97:9 100:16 110:11 135:3 136:16 141:17 142:11 156:15 157:23

**topic** 9:14 69:3,24 84:1 155:23 156:8,16

**topics** 63:6 116:3 156:1

**total** 13:17 16:1 17:3 22:7,10 31:22 147:1

**totals** 22:13

**touch** 92:11

**track** 14:22 101:5 103:2 154:11

**train** 42:4,6

**trained** 40:10 41:12 65:22 80:15 84:10,11

**trainers** 64:17 65:8

**training** 40:11,13 41:10,18,24 42:4,14,16,21 74:19 80:17 115:22

**trains** 40:15

**transcript** 36:22 37:1,2,4 38:3,7 155:7

**transcripts** 55:22 155:15

**transferred** 32:24

**transpired** 63:14

**treated** 139:13

**trial** 99:11 104:10,15,16 107:2,4,10 108:5,12,19 109:3,4,11,15,21 110:16,21 111:10,17,19 112:3,4,5 113:1,19,21 114:5,16,17,23 115:22 116:10,12,15,21 118:23 119:1,12 154:9

**trier** 96:4

**Trotta** 5:12

**true** 45:12 47:3 49:11 61:17 68:5 78:8 84:2,4 93:21 94:1,15,23 95:14 96:5 109:8 126:21

**truth** 89:10

**truthfully** 93:9

**turned** 150:24

**turning** 132:8

**two-cell** 138:10

**two-day** 125:7 134:14

**type** 18:5 31:16 64:5 65:1 66:13 74:17 92:18,20,22,24 93:5,11,14 137:22

**typed** 127:10 129:14 130:6,13,19 134:12 135:14 137:22 148:14

**types** 27:15 42:8 63:17 64:9,10 87:22 88:15 92:21

**typewritten** 7:4 122:19 134:24 135:1

**typical** 16:14,19 147:23

**typically** 14:22 36:5 42:2 76:19 89:22,24 90:18 91:5 148:1

**typing** 137:23

**typo** 145:20,23 146:2,9

RICHARD LEO, 04/24/2023

## U

**U.S.** 109:23 111:5 115:3 116:7 119:4,15

**Uh-huh** 63:1

**ultimately** 99:7

**undecided** 120:12

**underestimating** 100:7,9

**underline** 7:24 8:1

**underlining** 7:21 11:7 12:1,14,16

**underlinings** 10:10

**underlying** 122:20 133:4 135:15

**understand** 30:1,2 40:16 49:23 50:20 75:12 80:23 81:16,19 82:13 85:17 87:7,9 94:7,13,17 96:16 130:2 133:10 147:14 151:16

**understanding** 10:12 24:3 47:10 57:15

**understands** 86:12

**understood** 128:9

**undisputed** 45:2

**Unit** 5:2 48:14 121:15 143:11

**United** 5:9 105:15 110:11 154:23

**University** 67:16 69:14 117:14

**unnamed** 73:17

**Unreliability** 123:3

**unstructured** 82:1,22

**unsupported** 43:4 45:4,6,7,8

**unsystematic** 81:24 82:22

**Urlaub** 5:13,15

**usual** 121:5,6

**Utah** 108:6

**utilize** 143:18,24 147:23

**utilized** 65:11 91:7,8

**utilizing** 121:23 139:16

## V

**valid** 86:23

**validity** 67:7 84:7,14 85:4,8,11 86:1,3,8,15,18,19 87:1,12,14,19

89:2 91:18

**variety** 61:16 68:9 78:20

**vary** 99:7

**vast** 53:14

**veracity** 76:21

**verbal** 40:24

**verdict** 113:3,5

**verified** 69:5

**verify** 72:15 83:6

**version** 7:3,5 26:20 33:15,18 34:4, 8 36:9 130:6 133:18 136:5

**versus** 5:8 36:17 37:6,14 68:21 87:23 105:4,10,23 106:6,18,22 107:1,24 109:2,14,23 110:3,7,11, 15,23 111:2,5,10,13 112:23 113:18,24 114:4,15,22 115:3 116:7,14,20 117:1,7 118:5,22 119:4,11,15,20 120:9,19 138:12 154:22 155:1,2,9,13 158:3

**victim's** 127:6

**victims** 126:19 135:5

**victims'** 127:1

**video** 5:2,17 48:11,13 59:10,13 79:16,18 93:14 121:12,15 143:8,11 153:12,14 159:14,15

**video-conferenced** 5:4

**view** 45:3 47:14 73:8

**views** 78:17

**violating** 115:18

**violence** 115:24

**vitae** 60:15

**volume** 56:7

**voluminous** 125:1

**voluntary** 78:8

**vulnerable** 62:15

## W

**wait** 31:9

**waiving** 9:14

**wanted** 28:1 51:15,17 73:2 97:17 115:21 124:3 156:12

**waste** 150:23 151:17

**wasting** 128:3

**watching** 89:23

**ways** 51:2 64:24

**weaknesses** 74:22,23 88:17

**week** 13:22,23 14:5 15:20 85:22

**weekend** 13:14

**weeks** 122:9 131:9,21

**well-established** 75:5,21

**Welner** 6:19,20 23:10 36:16 37:13 38:15,16 39:12,22 45:1 49:6 50:2, 19 67:2 80:2,8 81:10,12 84:6,8 93:19 97:9,19 104:10

**Welner's** 7:18,20,22,23 8:2 11:6, 14 23:6 25:3,4 28:7,15 36:17,23 37:10,18,22 38:4 39:8,16 43:3 48:24 49:23 85:9

**wholly** 45:4,6,7,8

**wider** 67:7

**widespread** 137:1

**withdraw** 50:6

**witnesses** 107:8

**word** 46:7 50:21 77:18 92:24 98:21 134:5 136:11 148:5,6 156:6

**wording** 21:4 77:4

**words** 56:15,17,19,20 82:8

**work** 15:19 17:3 19:2 20:8,11 22:11,13,19 24:21 29:8,10 30:5 33:14 34:1,13,17 35:14 37:9,24 57:7 59:4 61:15 62:2 63:12 67:7 81:14 99:10 140:2

**worked** 25:10 30:13 73:18 81:8,22 82:18 98:12,19 101:17,19,20,22 115:6

**working** 16:9 29:5 30:4,11 61:5

**works** 51:1 76:7 85:7

**world** 45:17,18,19 46:4 51:1,3 53:4 80:4 84:17 85:8 88:4,8,10

**Worrell** 109:15

**worries** 52:8

**worth** 22:13

**Wright** 108:4,6 117:7,13 118:2 155:6

RICHARD LEO, 04/24/2023

**Wright's** 117:22

**write** 47:14 53:19 60:3 63:13 130:12 136:2

**write-up** 61:3

**writes** 93:19

**writing** 53:17

**writings** 129:23

**written** 10:9 47:8 60:21 85:15,16 98:14,16 118:20 122:13 135:14

**wrong** 46:9 69:7 72:22 73:2,5 74:3 80:22 85:20 98:3 118:3 159:7

**wrongful** 44:12 156:13,19 157:5,7

**wrote** 43:17 46:17 122:11 130:16, 18

---

### Y

**year** 22:8 42:2 53:19 136:17 142:11

**years** 16:16 47:11 53:11,22 54:13 61:16 62:4 63:12,14 72:18 81:8 93:15 157:17

**York** 69:14