*DeLeon-Reyes v. Guevara, et al.*
Case No. 18 CV 01028

*Solache v. Guevara, et al.*
Case No. 18 CV 02312

# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ARIEL GOMEZ,                    )
                               )
            Plaintiff,         )
                               )
       vs.                     )    No. 18 CV 3335
                               )
REYNALDO GUEVARA, et al.,      )
                               )
            Defendants.        )


     The video-recorded deposition, via Zoom, of

RICHARD A. LEO, Ph.D., J.D., taken pursuant to

the Federal Rules of Civil Procedure, before

Donna M. Urlaub, Certified Shorthand Reporter

No. 084-000993, on Monday, October 2, 2023,

commencing at 11:10 a.m., pursuant to notice.

RICHARD A. LEO, PHD, JD, 10/02/2023                    Page 2..5

Page 2

APPEARANCES:

    LOEVY & LOEVY, by
        MR. ANAND SWAMINATHAN
        MR. SEAN C. STARR
        (311 North Aberdeen Street, Third Floor
        Chicago, Illinois  60607
        312.243.5900
        anand@loevy.com
        sean@loevy.com)
          appeared on behalf of the plaintiff
          Ariel Gomez;

    ROCK FUSCO & CONNELLY, LLC, by
        MS. EILEEN E. ROSEN
        (333 West Wacker Drive, 19th Floor
        Chicago, Illinois  60606
        312.494.1000
        erosen@rfclaw.com
          appeared on behalf of the defendant
          City of Chicago;
    THE SOTOS LAW FIRM, PC, by
        MR. KYLE T. CHRISTIE
        MR. JOSH ENGQUIST
        (141 West Jackson Boulevard, Suite 1240A
        Chicago, Illinois  60604
        630.735.3300
        kchristie@jsotoslaw.com
        jengquist@jsotoslaw.com
          appeared on behalf of individual
          police officer defendants except
          Reynaldo Guevara;

    LEINENWEBER BARONI & DAFFADA, LLC, by
        MR. MICHAEL J. SCHALKA
        (120 North LaSalle Street, Suite 2000
        Chicago, Illinois  60602
        847.251.4091
        mjs@ilesq.com)
          appeared on behalf of the defendant
          Reynaldo Guevara.

Page 3

ALSO PRESENT:

    VALERIE BARAJOS
    Paralegal
    Loevy & Loevy

    NICK TROTTA
    Legal Videographer
    Urlaub Bowen & Associates

    BRETT SCHATZLE
    Exhibit Technician
    Urlaub Bowen & Associates

            * * * *

Page 4

                    I N D E X

Witness:                                        Page

        RICHARD A. LEO, Ph.D., J.D.

            Examination by:

                Mr. Christie.................    8

                Ms. Rosen...................  296

                    E X H I B I T S
No.   Description                  Marked/Referenced
 1  Dr. Leo Final Report...................  14
    Dr. Richard A. Leo curriculum vitae
 2  March 2023...........................  19

 3  Expert Testimony list..................  20

 4  Case Summary..........................  21

 5  Materials Reviewed.....................  22

 6  Inside the Interrogation Room..........  28

 7  Photo of Gomez with Handcuff...........  86

 8  8/19/1997 Forensic Report..............  145

 9  6/14/1997 Supplemental Report..........  148

    The Problem of False Confessions in
10  the Post-DNA World - 2004..............  185

Page 5

                E X H I B I T S   (cont'd)

    No.   Description                  Marked/Referenced

    11  Consent to Search.....................  211
    12  Gomez deposition......................  263
    13  Dominguez deposition..................  264
    14  Invoice...............................  274

                (Exhibits attached/scanned.)

                        - - -

Urlaub Bowen & Associates, Inc.  312-781-9586

Page 6

VIDEO TECHNICIAN:  Good morning.  This is the beginning of media unit one.  We are now on the video record at 11:10 a.m.

This is the videotaped video-conferenced discovery deposition of Dr. Richard Leo being taken on October 2nd, 2023.

This deposition is being taken on the behalf of the defendant in the matter of Ariel Gomez versus Reynaldo Guevara, et al.  The case number is 18-cv-3335, filed in the Circuit Court of Cook County, Illinois, County Department, Law Division.

My name is Nick Trotta, legal videographer, representing Urlaub Bowen & Associates, with offices at 20 North Clark Street, Suite 600, Chicago, Illinois.

The court reporter today is Donna Urlaub, also of Urlaub Bowen & Associates.

Counsel please identify yourselves for the video record and the parties which you represent.

MR. CHRISTIE:  Kyle Christie on behalf of the defendant officers except for defendant Reynaldo Guevara.

Page 7

MR. ENGQUIST:  Josh Engquist on behalf of the same defendants.

MR. SCHALKA:  Michael Schalka on behalf of defendant Guevara.

MS. ROSEN:  Eileen Rosen on behalf of defendant City of Chicago.

MR. SWAMINATHAN:  Anand Swaminathan for plaintiff Ariel Gomez.

MR. STARR:  Sean Starr for plaintiff Ariel Gomez as well.

VIDEO TECHNICIAN:  Will the reporter please swear in the witness.

(Witness sworn.)

MS. ROSEN:  And, Kyle, before you get started, is Valerie -- I see an icon for Valerie --

MR. SWAMINATHAN:  Valerie is our paralegal.

MS. ROSEN:  Okay.  If we could just put on the record that she's attending.  Thanks.

MR. CHRISTIE:  Counsel, I think you should have received the email now for the exhibits, so those should be in your inbox.  We'll get to those in a few minutes.

Page 8

RICHARD A. LEO, Ph.D., J.D. called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. CHRISTIE:

Q.   Dr. Leo, how are you doing this morning?

A.   Good, thank you.

Q.   All right.  So I just want to go through some general ground rules.  I'm assuming this is not your first deposition, right?

A.   Correct.

Q.   So you are pretty familiar with the rules of depositions?

A.   I think so.

Q.   Well, just in case you need any breaks any time, just let me know, and we'll try to take a break at the most convenient spot.

I'll try to take a break every hour so, if that's fair.

A.   Great.

Q.   Okay.  Do you know how many civil cases you have sat for a deposition in?

A.   I think somewhere between 40 and 50

Page 9

would be my best guess.

Q.   Okay.  Do you have like a list of cases that you have been deposed in?

A.   I do, yes, but there are some states, as you may know, where in criminal cases the parties are allowed to depose witnesses and expert witnesses.

So what I'd have to do is look at that list and eliminate the criminal cases in order to answer your question.  And I -- I just don't remember how many of those were criminal.  But the vast majority were civil.

Q.   Okay.  So you don't know -- let me clarify my earlier question.  You don't know how many civil cases you have been deposed in.

A.   Correct.  I think the total number of depositions is 55, if I'm remembering correctly.  It might be 54, it might be 56, prior to today.

And so of those 55, I don't know the number that are criminal, and that's why I estimated 40 to 50 are civil because maybe a half a dozen to a dozen are criminal; but, again, I'd have to look at the list to give you the exact number.

Q.   No, that's fine.

RICHARD A. LEO, PHD, JD, 10/02/2023                    Page 10..13

Page 10

Of the civil cases that you have been deposed in, how many of those cases have you testified in at a civil trial?

A. I don't know. I don't know the number. I'd have to look at the -- I'd have to look at the master list and go through it.

Q. Okay. Let me -- have you ever testified at a civil trial?

A. I have, yes.

Q. Okay. But you do not know off the top of your head how many civil trials you have testified at?

A. Correct. Without looking at a list.

So I first started testifying in 1997, so the list goes back 26 years. And I've testified over 400 times total. I think the first deposition was in the year 2000.

So, again, there's just -- there's too many cases for me to remember the exact numbers off the top of my head.

Q. Okay. Just for civil cases and civil trials, do you know if you testified at more than ten or less than ten civil trials?

A. Without looking at my list, no. I'd

Page 11

have to look at a master list of all the cases in which I've testified at trial.

Q. Okay. That's fine.

Do you recall when's the last time you testified at a civil trial?

A. Again, I'd have to look at the list. I don't know if my memory of what I think is the most recent case is. I just -- without looking at a master list to refresh my recollection, I couldn't tell you with certainty what was the most recent time I testified in a civil trial.

Q. Okay. Let me phrase my question a bit differently then.

Do you recall a name of a civil trial that you have testified at?

A. Yes.

Q. And can you please provide me that name?

A. The Nicole Harris case.

Q. Okay. Do you recall what jurisdiction that civil case was tried in?

A. Yes. That was federal court in Chicago, the Seventh Circuit.

Q. Okay. And do you know approximately

Page 12

when that case was tried?

A. I think it was tried toward the end of 2017, maybe November 2017, if I'm remembering correctly.

Q. Okay. And do you recall what the outcome of that civil trial was?

A. Yes. My recollection is it was a judgment of no liability. I think that was the outcome.

Q. Okay. Prior to today's deposition, what did you do to prepare?

A. Well, I reviewed documents and consulted with counsel.

Q. Okay. And do you recall what documents you reviewed in preparation for your deposition today?

A. Yes. So I reviewed my report in this case. I reviewed notes that were provided to counsel as part of my -- opposing counsel as part of my report, and I also reviewed the reports that were provided by Dr. -- by David Balash and Mr. Filkins, James Filkins, Dr. Filkins. Oh, and I also reviewed part of my deposition testimony in the Reyes and Solache case.

Page 13

Q. And you indicated you consulted with counsel. Without getting into the substance of those conversations, obviously, do you recall how many times you consulted with counsel in preparation for this deposition?

A. Yes. I think four times.

Q. And do you recall the length of each of those conversations on average?

A. I think they ranged from a half hour to an hour and a half. That would be my best estimate.

Q. Okay. Did you do anything else to prepare for today's deposition?

A. No.

MR. SWAMINATHAN: Objection; form.

Go ahead.

BY MR. CHRISTIE:

Q. I'm sorry, your answer was no?

A. No. Yes, that's how I prepared for the deposition, thank you.

Q. Okay. Are there any documents in front of you right now?

A. Yes.

Q. And what documents are in front of you?

RICHARD A. LEO, PHD, JD, 10/02/2023                    Page 14..17

Page 14

A.   So I have in front of me four documents.  I've got my report in this case, I have the notes that were appended to the report that were provided to opposing counsel, and I have, as I mentioned earlier, the reports by David Balash and Dr. James Filkins.

Q.   Can you just let me know during this deposition if you're referring to those notes when providing an answer?

A.   Yes.

Q.   Thank you.

And do you have any screens open other than the current Zoom meeting screen?

A.   I do not.

Q.   All right.  And then to the exhibit coordinator -- I'm sorry, I forgot the name, there's so many on here -- Brett, can you please pull open what has been pre-marked Exhibit 1.

EXHIBIT TECH:  One moment.

BY MR. CHRISTIE:

Q.   And while that report's being pulled up, sir, for the documents that you have in front of you, starting with your report, are those -- are there any notes, annotations, or highlights on that

Page 15

report?

A.   Yes.

Q.   And how about for the notes that were provided to counsel, have you annotated any -- highlighted, noted, or annotated any of those --

A.   No.

Q.   Okay.  And how about Dr. Balash's report?

A.   Let me review.  I think so.

There's underlines and circles on Mr. Balash's or Dr. Balash's report.

Q.   And then how about Dr. Filkins's report?

A.   The same, yes.

Q.   Okay.  So, sir, I want to direct you back to the screen what has been pre-marked as Exhibit No. 1.

And, Brett, if you could just scroll through this very quickly to the last page.

And, sir, my question is going to be, is this your expert report in the Gomez case?

And you could scroll faster.

So, Dr. Leo, is this your final expert report in the Gomez matter?

A.   Yes.

Page 16

Q.   And you just saw on page 112 that was your signature?

A.   Correct.

Q.   Okay.

MS. ROSEN:  I hate to interrupt, but if Dr. Leo is going to be referring to a report that has been annotated in any way, then we want those annotated versions of the report or reports that he's referring to, if he's going to be utilizing those to answer questions.

MR. SWAMINATHAN:  I need to ask him whether he's relied on anything in any notes.  I'm assuming he's -- he's identified that he circled some things or highlighted or underlined some things.  So in any way in which that is -- requires that -- his copy to be shared, but you can -- we can debate that later.  But if you want to ask Leo whether he's relying on any notations he's made on a copy of these reports, you can ask him that.

MS. ROSEN:  Well, it's our position that if he is going to be utilizing documents in front of him that are different than the exhibits that we have put in front of him, then we're entitled to those before we ask the questions.

Page 17

Are you refusing to do that?

MR. SWAMINATHAN:  My understanding is he's not relying on anything different, he's relying on the exact same report that you have; he just has made in notes to himself or made some scribbles or underlines or whatever on his report.

MS. ROSEN:  Dr. Leo, have you written on the reports in front of you that you just talked about?  Have you written words other than highlights or underline?

THE WITNESS:  Yeah, I've written some words.

MS. ROSEN:  It's our position that we are entitled to that version of the report if he's going to have it in front of him to answer questions.

He can put it aside and not use it, but if he's going to use it, have it in front of him to answer questions, it's our position that we're entitled to it.

Are you going to provide those -- are you going to -- is he going to rely on those to answer questions?

MR. SWAMINATHAN:  Mr. Leo, are you going to rely on those to answer questions is the question

RICHARD A. LEO, PHD, JD, 10/02/2023                    Page 18..21

Page 18

that's being asked of you.

THE WITNESS: No, no. I think I'll rely on the substance of the report, and sometimes, for efficiency's sake, go to places where I underlined or highlighted something. So I might rely on underlines or highlighted portions kind of as a -- as a way of expediting and going straight to the heart of an answer to refresh my recollection to a question.

MS. ROSEN: It's our position we're entitled to those.

MR. SWAMINATHAN: So why don't we do it this way in order to see if we can avoid any unnecessary fights:

Professor Leo, why don't you put that copy to the side, and then you can just answer questions based on the report as it's being shown to you, or we can print another copy, if you'd like to have a hard copy, rather than the copy that they're going to show you on the screen, and then if at some point you need to, or say, look, I can get to the page that I care about by looking at this other copy, you can let us know that and we can decide --

Page 19

MS. ROSEN: Okay.

THE WITNESS: Okay. That sounds good. I'll just rely on the copy on the screen.

MR. CHRISTIE: Brett, can you please take down -- or can you please go to Exhibit No. 2. And if you could just quickly scroll through that.

BY MR. CHRISTIE:

Q. And, Dr. Leo, my question is going to be, is this your curriculum vitae that you attached to your expert report?

A. I believe it is. The date of the curriculum vitae would be at the top of page -- page 1.

Q. Okay. Brett, can you please go to page 1.

Do you see that there, March 2023?

A. Yes.

Q. Okay. And I'm assuming there have been updates to your c.v. --

A. Yes.

Q. -- since you published this report?

A. Yes.

Q. Okay. And have you sent us the recent updated version of your c.v. in this matter?

Page 20

A. I have not sent you the most current -- the most current version would be the September 2023 version. And I did not send that to you, no.

Q. Okay. I'm just going to ask that during a break, if counsel could please send Dr. Leo's most recent updated c.v. that he indicated was updated in September of 2023.

Brett, can you please move to Exhibit No. 3.

And just scrolling through that, sir, my question is going to be, is this a list of the cases for the past four years that you have testified in either at trial or at a deposition?

A. Yes. But through the dates that are provided on the top of that.

Q. So do you mean from March 2023 four years back -- oh, I see. April 2019 to April 2023?

A. Correct.

Q. Okay. And do you have an updated -- have you updated that list since publishing this report?

A. I haven't updated this specific list, but I have testified in other cases since April of 2023.

Page 21

Q. And do you recall what those cases were? I'm assuming one of them is Day versus City of Chicago?

A. That was a deposition, yes. I'd have to look at my list, but I -- I could give a couple names. I don't know that I would remember all the cases without looking at the list.

Q. Let's just move on then.

Can we please pull up Exhibit No. 5.

Oh, I'm sorry, Exhibit No. 4. I jumped one.

And scrolling through this really quickly, sir, can you please explain to me what Exhibit No. 4 is.

A. I'm just looking to look away while you're scrolling.

Q. Is that right?

A. It just bothers me. Yeah, I mean, it just causes eye strain that I don't want to deal with.

Q. All right. Let me ask it this way: Do we need to scroll through it for you to understand what Exhibit No. 4 is?

A. No.

RICHARD A. LEO, PHD, JD, 10/02/2023                    Page 22..25

Page 22

Q.   Okay.  Can you please explain to me what Exhibit No. 4 is?

A.   These are notes on the voluminous materials I reviewed in this case, and in the Reyes-Solache case, that are testimonial aids.

Q.   And what do you mean by testimonial aids?

A.   That they are aids to my testimony because I don't remember all the details of all the documents.  So if I was asked about a particular case, I could go into this list and refresh my recollection on some of the basic highlights from that case that were significant in my opinion.

Q.   Okay.  Understood.

Could we please move to Exhibit No. 5.  And just going to the first page -- or second page, I should say.

And, sir, at the top of this page it says, quote:  "Dr. Richard Leo Materials Reviewed."  Are these a list of the materials you reviewed in this case?

A.   I think they are a partial list of the materials reviewed.  I think a full list of the materials reviewed would be the -- and now I don't

Page 23

have my report in front of me, but the page 2 or 3 or 2, 3, forward in Section 2 of my report that says Materials Reviewed, and then, in addition to that, since writing the report, the only two materials I've reviewed are the Dr. Filkins and Mr. Balash reports.

Q.   So you did not review Dr. Filkins's or Dr. Balash's report before submitting your own report?

A.   Correct.

Q.   Okay.  And you kind of were jumping ahead to my questions here, but if you go to the bottom of page 4 on this exhibit, it only lists 73 materials, and then if you go back to Exhibit No. 1, starting with page 2, and there it indicates Materials Reviewed as well.

So I'm just trying to clear up some confusion because in your report you have a little over 270 items listed, whereas in Exhibit 5 you only have 73.

Can you please explain the discrepancy there?

A.   I don't know why a partial list of a full list was provided, but the full list, as I

Page 24

mentioned, is what we're looking at now, the 270-some-odd documents or enumerated list of documents plus the Filkins and Balash reports.

Q.   If we can move to page 12 of your report.

And if you scroll down, it indicates in this section the Overview of Case Specific Opinions; correct?

A.   Yes.

Q.   And from page 12 to page 16, I believe there's 22 specific opinions that you have summarized; is that fair to say?

A.   I believe so.

Q.   Okay.  And is this a summary of -- is this all of the opinions that you intend to express in your report?

A.   Yes.

Q.   And if we could go to opinions No. 21 and 22.

And, sir, just looking at opinions 21 and 22, is it fair to say that these opinions relate to the Monell claim that plaintiff has asserted in this matter?

A.   I mean, I think that's really a legal

Page 25

question.  I'm not offering a legal opinion.  These are pattern and practice opinions, yes, but it's for others to decide how that relates or whether that relates to Monell claims.

Q.   Okay.  That's fair to say.

So opinions No. 21 and 22 relate to the pattern and practices that you believe the Chicago Police Department has participated in?

MR. SWAMINATHAN:  Objection to form.

Go ahead.

THE WITNESS:  Yes, the detectives and supervisors have participated in or had knowledge of, yes.

BY MR. CHRISTIE:

Q.   Do those opinions -- strike that.

Okay.  In addition to the summary of opinions that you've listed here, do these -- does your report contain all the bases and reasons for those opinions?

A.   Well, to the best of my knowledge, yes, with just the caveat that, again, since I wrote the report, I've also reviewed the Filkins and Balash reports which I think also support some of the opinions in the report.

Urlaub Bowen & Associates, Inc.   312-781-9586

RICHARD A. LEO, PHD, JD, 10/02/2023                    Page 26..29

Page 26

Q. Okay. But when you were -- when you submitted this report, you did not rely on the Balash or Filkins expert reports; correct?

A. I had not read them, correct.

Q. Okay. And then for the documents that you listed on page 2 through 12, were those provided to you by counsel, plaintiff's counsel?

A. Yes. To the best of my knowledge.

Q. And do those documents contain all the facts and data that you relied on for your opinions in this report?

A. Yes.

Q. And then throughout your report you have several footnotes; is that fair to say?

A. Yes.

Q. And those footnotes reference materials such as articles, books, cases; correct?

A. Yes.

Q. Okay. And do those research materials support -- or strike that.

Are those research materials that you reference in those footnotes the basis for your opinions as well?

A. I would not say they're the basis for

Page 27

my opinion. I would say they -- I would characterize it a little bit different.

My knowledge of the research literature is the basis for the opinions there, and those are some of the citations, but by no means all, that support the opinions and analyses expressed in those sections.

Q. Okay. So if I'm understanding you correctly, there are other research materials that you might have relied on to come to your opinions that are not cited in the report?

A. Yes.

But the point I was trying to make is that there are other publications that support those opinions that it was unnecessary to cite, in addition to all the citations.

Q. Now, Brett, can you please pull open what has been titled, quote, "Inside the Interrogation Room" by Richard Leo? It's a different exhibit.

Okay, sir, do you see what appears to be on your screen?

A. I do.

Q. Okay. And we're going to just label

Page 28

this as Exhibit 6 for the record.

And, sir, is this an article that you authored?

A. Yes.

Q. And it's titled Inside the Interrogation Room; correct?

A. Correct.

Q. And it was published in 1996?

A. Correct.

Q. And it was published by the Journal of Criminal Law and Criminology, which is a Northwestern University publication; correct?

A. Correct.

Q. Okay. Brett, can you please turn to page 285 of that article. I'm not really sure what the actual page would be in terms of pdf.

And, sir, while she's getting to that page, was this part of your research dissertation, this article?

A. Well, the article is separate from the dissertation, but it was drawn from the dissertation, yes.

Q. What do you mean, it was drawn from the dissertation?

Page 29

A. Well, the data that was -- it -- data was collected and analyzed for the dissertation and then written up, and then the -- what was written up in the dissertation is sort of a rough draft -- parts of the dissertation are a rough draft of this article.

Q. Was this the first article you published after obtaining your Ph.D.?

A. I don't know if it was the first article. I don't think it was, but I'd have to look at my c.v. and figure out the sequence.

There were a number of articles in 1996, and there may have been some in 1994, when I received the Ph.D., and in 1995.

Q. Okay. That's okay.

Brett, can you please scroll down to the bottom of the page where it starts with the section, quote, "The Context and Outcome of Police Interrogation: Analyzing the Data"?

Do you see that there, sir?

A. Yes.

Q. Okay. And is it fair to say that this paragraph lists a lot of questions?

A. Yes.

Page 30

Q. Okay. Before you undertook this research article, did you have these questions in mind?

A. I suspect I did, yes.

Q. Okay. And maybe I -- strike that -- maybe rephrase that.

Before you undertook field work to collect data for this article, did you have research questions in mind?

A. Yes.

Q. Okay. And fair to say this was just a short list of the questions that you had pertaining to this research article, starting at the bottom of the page: "These are among the questions that I will seek to answer in this section"?

MR. SWAMINATHAN: Object to form.

Go ahead.

THE WITNESS: It doesn't look like a short list to me.

BY MR. CHRISTIE:

Q. There were additional questions that you had pertinent to this article that were not mentioned in this specific paragraph; fair to say?

Page 31

A. I would assume so, but I haven't reread this article in a long time, so without looking at the whole thing, I can't tell you. But it seems implied by the last sentence of this paragraph.

Q. Fair enough.

Now, Brett, can we move back up to page 268. And, Dr. Leo, you can look away. I understand.

Perfect, thank you.

And, sir, it indicates in the middle of the first paragraph that you conducted 500 hours of field work; is that fair to say?

A. Yes. Inside one of the police departments, yes.

Q. Okay. And that is the police department that you observed the 122 live interrogations?

A. Correct.

Q. Okay. And then you also reviewed 60 video-recorded interrogations from two separate police departments, right?

A. Correct.

Q. Okay. And so the 500 or so hours that encompassed the field work, did that include just

Page 32

the interrogations that you were reviewing or observing, or did that include additional work as well?

A. My recollection is that included all the time that I spent at the police department in which I observed the 122 interrogations, which included the interrogations, but also included time I was there not observing interrogations.

Q. Gotcha. What would that time encompass? Would it be reviewing reports? Interviewing police officers?

A. Yes. Sitting around and waiting to -- for an interrogation to occur, talking to police officers, reviewing case materials that they provided me.

Q. Gotcha.

And you indicated in this paragraph that you did a 47-question coding sheet?

A. Yes.

Q. Okay. And that's a quantitative coding?

A. Yes.

Q. Was this quantitative coding sheet created before you started observing the interrogations?

Page 33

A. I believe so.

Q. Is it because it's been so long that you don't know for sure?

A. I think that's standard protocol, yes. I haven't thought about that in a long time, but that would be my assumption that it was created ahead of time, yes.

Q. And, sir, I'm sorry, you said it was standard protocol?

A. Yes. To create the coding sheet -- I mean, it might be that in some research project researchers go back and revise the coding sheet, but I believe I -- to the best of my recollection -- obviously this was, you know, over 30 years ago when I first undertook this research. So that's my best recollection.

Q. Okay. Let me ask a more general question then. Why is it standard practice to draft a quantitative coding sheet like the one in this article before you observe -- or before you conduct your field work?

A. I think a lot of thought goes into the research questions that one is asking and the data one is looking for, and so I think the standard

RICHARD A. LEO, PHD, JD, 10/02/2023                    Page 34..37

Page 34

practice is to have a coding sheet, if you're going to code, before you observe the phenomenon.

But there's no reason I can think of, as I sit here right now, why a coding sheet couldn't be revised, right? If one had access to the data, you know, the first 20 cases you see something that you hadn't anticipated, one could either go back and revise parts of the coding sheet and go back and code that data, or if one didn't still have access to the data, one could revise the coding sheet going forward.

So I don't necessarily see any problem with that. But to the best of my recollection, as I sit here today, although I don't have, you know, a strong memory of this, to the best of my recollection, that was created beforehand.

Q. Okay. And, Brett, can you scroll down to the beginning of Section 2 of this article.

And, sir, this section is titled the Methodological Caveat: Observer Effects and the Problem of Bias. Is that correct?

A. Yes.

Q. And I know it's been a long time since

Page 35

you reviewed this article, but is it fair to say that this section describes some of the limitations of your research?

A. To the best of my knowledge, yes.

Q. And do you think it's fair to say that when conducting -- or when drafting a research article, it's important to plot out, like you did here, potential caveats or flaws or biases that might be present in the data that you observed and the conclusions that you drew?

A. If they're relevant, yes.

Q. And I know it's been a long time, but one of the flaws that you noted was the potential effect that your observations might have on the detectives because they knew that you were observing them; correct?

A. Yes, one of the potential limitations, yes.

Q. Commonly referred to as like the Hawthorne effect; does that sound correct?

A. I'm not recalling if that's the name given to it.

Q. Okay. But then you noted later on in this article that one way to control for that

Page 36

potential bias was that you reviewed those 60 video interrogations; correct?

A. I don't recall if I wrote that in there, but the 60 videos didn't have an observer present; they were electronically recorded.

Q. And that would be one way to account for the potential effect that your live interrogations might have had on the interrogator. Is that fair to say?

A. Well, certainly one could compare the two, yes.

Q. All right. And then, Brett, can you please scroll down to the end of this section.

Page 271, the last paragraph.

Sir, do you see the paragraph where it starts, quote: "That I tended to be (but was not always) excluded from the more serious cases raises the general methodological issue of bias, and more specifically the problem of the representativeness of my data within LPD and the generalizability of my findings beyond LPD."

Did I state that correctly?

A. Yes.

Q. Okay. And so one of the problems that

Page 37

you encountered in this article was that you had a limited sample size?

A. Well, the sample size I thought was quite large, actually, 122. But in order to be allowed to observe the interrogation, the detective or detectives needed to give me permission. So if they didn't give me permission, then I wasn't allowed to sit in on the interrogation.

Q. And that's a fair point. Let me rephrase my question.

Is it fair to say that the sample size wasn't representative of all the cases that the police were conducting interrogations on; correct?

MR. SWAMINATHAN: Objection to form.

Go ahead.

THE WITNESS: Well, I didn't have a master list of all the cases, so it wasn't a random sample.

I think of representativeness in degrees, not as binary, and so I think it was representative to a degree, but I don't know the exact degree since there was no master list to compare it to.

If what you mean by representative

RICHARD A. LEO, PHD, JD, 10/02/2023                    Page 38..41

Page 38

is, you know, the percentage of homicide versus the percentage of robbery versus the percentage of physical assault versus the percentage of sexual assault or burglary, the various types of crimes for which suspects are interrogated.

BY MR. CHRISTIE:

Q.   Yes, I think you understand my question correctly.

So you did not have a dataset indicating what cases you were observing, whether it be homicides or rapes or burglaries.

A.   There may be in this document or in my dissertation -- I don't remember -- there may be a list of the number of each -- each felony, the type of felony for which I observed interrogations.

But I don't have -- I didn't have a master list from the police departments, I didn't have a master list from Oakland saying, you know, in the nine months, our felony interrogations, here's the percentage for each crime. That's what I was referring to.

Q.   I understand. Okay. So if you reviewed only 5 percent of homicides, yet 10 percent of the -- or 10 percent of

Page 39

interrogations in that police department were homicides, that would be the divergence that you're talking about.

MR. SWAMINATHAN: Objection to form.

Go ahead.

THE WITNESS: Yeah; I mean, I wasn't really talking about diversions, but, yes, that the -- it may be that the number of homicides, the interrogations that I observed as a percentage of the interrogations I observed when I was there, was lower than the percentage of homicide interrogations relative to the whole interrogations that that police department did.

BY MR. CHRISTIE:

Q.   Okay. Gotcha. And then another issue is that you only observed three police departments; correct?

A.   Correct.

Q.   And I think you noted in this paragraph that it's difficult to extrapolate your findings from these police departments to potentially other police departments throughout the United States because it's not a representative sample of American police departments; correct?

Page 40

A.   Well, yeah; I mean, again, in degrees, yes, that -- that obviously -- you know, there's I think 18,000 police departments in the United States. This was only three departments in one geographical area.

But this -- this contributes to our literature, but it depends on what you mean, in my mind, by "extrapolate." And, again, I think of this in degrees.

Q.   So, yeah, let me define that. Maybe I should say a different term. Generalization. Taking the findings that you have in this article and generalizing it to American police departments in whole, that is the limitation of your article because you only reviewed three police departments; correct?

A.   I guess if you mean by "limitation," yes, that it's -- it -- I didn't study more than three departments, yes.

Q.   And I think, as we're kind of going on here, one easy way to fix that would just be to replicate this very same study involving different police departments.

A.   Well --

Page 41

MR. SWAMINATHAN: Object to form.

Go ahead.

THE WITNESS: Yeah, I mean, I don't -- I wouldn't choose the word "fix." I would say that if we had more studies of more police departments, that would contribute more data and findings to the research literature, and we could then compare and see whether the findings -- they're consistent with the findings or the degrees of difference or overlap, and so that would add to our knowledge base. But I wouldn't use the word "fix." I think that -- that's a little misleading.

BY MR. CHRISTIE:

Q.   That's fair to say. Maybe I shouldn't say "fix." But I think the point I'm trying to get at is the more you replicate a study, if the -- if the findings are similar, the more reliable that original finding is.

MR. SWAMINATHAN: Objection to form.

Go ahead.

THE WITNESS: In broad strokes, yes, the more -- the more the findings are consistent with findings from earlier studies, the greater confidence we have in those findings.

RICHARD A. LEO, PHD, JD, 10/02/2023                              Page 42..45

Page 42

BY MR. CHRISTIE:

Q. And by that version, the inverse is also true. If a replicated study finds different results, then that calls into question the reliability of the original study.

A. I think that your question really is too vague and ambiguous because studies are complicated. And so to merely say that it would call into question the original study, I think one would have to know more about what studies we're talking about, what findings we're talking about, the complexity of the studies, the issues. So I think it oversimplifies. I can't answer yes to that question.

Q. So just so I understand you, if you have an original study that has a finding that 75 percent of interviewees waive Miranda, and you have a subsequent study that tries to replicate those findings but finds that 25 percent of interviewees waive Miranda, then that second study calls into question the findings of the first study.

MR. SWAMINATHAN: Objection.

A. In that example, yes -- sorry.

Page 43

In that example, yes, but then we'd want to know a lot more. I mean, that's -- that's very little information, right? If there were ten studies that showed 75 percent were in range and they were of custodial suspects, and then there were this 25 percent study was of police officers who got interrogated, it wouldn't call into question because you would expect that police officers being interrogated would almost uniformly invoke, right?

So, again, we'd have to know more information about the studies and the questions and the data.

But I do appreciate that -- that you gave a specific example in that question.

BY MR. CHRISTIE:

Q. No, I appreciate your clarification, but what I -- when I say replication, I mean the second study tries to replicate the same methodology employed in the first study. So presumably many of the variables will be similar in terms of who's being observed, how many people are being observed, what type of observations are being made, right?

Page 44

MR. SWAMINATHAN: Objection.

THE WITNESS: Well, you're asking a hypothetical question, but -- sorry. Yeah, to the degree the studies are similar and to the degree findings from the study are different, then, yes. But, again, I would want to know more about the studies.

COURT REPORTER: Excuse me. Did you object, Mr. Swaminathan?

MR. SWAMINATHAN: Objection to form, yeah.

BY MR. CHRISTIE:

Q. And, Dr. Leo, quickly, did any of the interrogations that you observed in that article lead to a false confession?

A. I don't know because that was not part of the original study. And so I didn't track the outcomes of the cases and I didn't analyze whether or not they led to true or false confessions. So it was outside the scope of that particular research study to analyze that question.

Q. Do you know, of how many of those interrogations that led to a confession, how many of those suspects subsequently retracted their confession?

Page 45

A. I do not.

Q. Are you aware of any empirical research that shows how often a suspect retracts their confession?

A. Quantitatively, no, I can't think off the top of my head of a study that puts a percentage on that.

Q. Is there any empirical research that shows why a suspect retracts a confession?

A. Well, there's empirical research that discusses it, yes.

Q. But, more specifically, does it explain why a suspect retracts a confession?

A. Well, there's case studies of false confessions that describe people retracting their confessions because of assertions that they were coerced or innocent. So to that extent, yes.

I can't think of, off the top of my head, a single study just on retractions, but retractions have been discussed and analyzed in articles about coerced and false confessions.

Q. But every retracted confession is the product of a false confession.

MR. SWAMINATHAN: Objection to form.

RICHARD A. LEO, PHD, JD, 10/02/2023                    Page 46..49

Page 46

Go ahead.

THE WITNESS: I'm not sure I really heard the question fully. Can you repeat it?

BY MR. CHRISTIE:

Q. Yes. So, just to clarify, you indicated there are studies that have been conducted due to false confessions that show that people retract, suspects retract their confessions because of coercion; correct?

A. That's their explanation, yes.

Q. But what I'm trying to understand is coercion is not the only reason a suspect may retract their confession.

A. Correct. There may be other reasons.

Q. Trial strategy might be a reason?

MR. SWAMINATHAN: Objection to form.

Go ahead.

THE WITNESS: What do you mean by trial strategy?

BY MR. CHRISTIE:

Q. So a suspect retracts their confession on the advice of counsel in order to maybe file a motion to suppress and better their odds of obtaining an acquittal or a plea bargain?

Page 47

MR. SWAMINATHAN: Objection to form.

You can answer to the extent that -- you can go ahead.

THE WITNESS: I think that's a theoretical possibility, yes.

BY MR. CHRISTIE:

Q. Sir, in your report that we've labeled Exhibit 1, you use the term "empirical" within the context of like "empirical social science research" or "substantial empirical research literature" several times; correct?

A. Probably.

Q. A couple of dozen times you've used the term "empirical" in your report?

A. Well, I mean, we could answer that question by looking at the report, but, again, I -- oh, you're talking about the report. I thought you were talking about the 1996 article. Sorry.

Yeah, we could do a word search, and if you've done that, and there's a couple dozen references, then I don't doubt that -- that it does mention the word "empirical" that many times.

Q. Okay. Would you agree that the definition of empirical research is the systematic

Page 48

collection and analysis of data that is intended to answer a question related to a phenomenon?

A. I wouldn't word it that way, but I would agree with most of that definition.

Q. Okay. So let's parse this out.

Do you agree that empirical research requires a systematic collection of data?

A. Not necessarily, no. There is something called convenience samples in social science, and sometimes researchers do individual case studies.

So some empirical research is systematic and other empirical research is less systematic. So I would say in degrees. But it depends on the methodology that's being used, and I prefer a broader definition of empirical.

To me, empirical means going out and gathering data however one does that, and then analyzing and writing up that data. But primarily empirical means gathering the data.

Q. So you disagree that empirical does not require the systematic collection of data?

A. Correct. I think most empirical data gathering is systematic, but there's something

Page 49

called a convenience sample where you just have to kind of go where the data is, and it's not pre-designed in the way other studies that are more systematic would be.

It depends on the data, it depends on the methodology, maybe even on the research question. So I prefer to think of systematic as a matter of degree, and in my definition of empirical, I prefer to think of it as just going out and gathering data.

Q. So you said your definition of empirical, but is your definition supported by any authority?

A. Well, I can't cite to something, but what I meant by my definition is my understanding of the meaning of the word empirical in social science.

Q. So if research institutes indicate that empirical research requires the systematic collection of data, you would disagree with that definition?

MR. SWAMINATHAN: Objection to form and foundation.

Go ahead.

RICHARD A. LEO, PHD, JD, 10/02/2023                    Page 50..53

Page 50

Asked and answered.

THE WITNESS: No, I wouldn't disagree entirely; I would just say I have a broader definition.

I've given you a couple examples. You know, some research is exploratory, some empirical research is exploratory, and you don't know what you're going to find.

Now, it might be systematic in some ways, but different from, you know, a massive survey or experiments that really have to be pre-planned and thought out ahead of time.

So I just -- I just think that the definition there is too limiting. But I would have a much broader definition of the word empirical. And so it's not that I'm disagreeing, I'm just saying I think that's narrower than the term.

Q.   **Well, what I'm trying to understand is if researchers define empirical research requiring systematic collection of data, and they review your report saying empirical research, they're going to be misinterpreting your definition.**

MR. SWAMINATHAN: Objection to form and foundation.

Page 51

Go ahead.

THE WITNESS: You're asking me to speculate about what some other researcher is going to think when they're interpreting my report in this case?

I have no idea. I can't read of their minds.

BY MR. CHRISTIE:

Q.   **Well, I'm just trying to understand because the definition I provided to you is from several research institutes, so I'm just trying to understand where you get your definition, from what authority, what source?**

MR. SWAMINATHAN: Objection to form.

Go ahead.

THE WITNESS: Well, I have a Ph.D. and I've been a professor in the social sciences for 30 years. And so it's based on my training, on my research, on my experience. That's the authority for my definition of the very common word, in the social sciences, "empirical."

BY MR. CHRISTIE:

Q.   **And you said, under your definition of empirical, that it could include convenience samples?**

Page 52

A.   Correct.

Q.   **What is a convenience sample?**

A.   Where one doesn't -- isn't able to fully identify the dataset ahead of time, and so one kind of goes to a data point and sees what data point that leads to, and then goes to another data point, another data point. So it would be following the data to find additional data points.

Q.   **Can you please provide me an example of a convenience sample?**

A.   Off the top of my head, I can't think of a study that does a convenience sample. I'd have to give it more thought.

Q.   **And so do you agree that empirical research requires a methodology?**

A.   I don't know if empirical research requires a methodology. There might be some instance in which it doesn't require a methodology, but typically there is a methodology, right?

We're trained in methods to go out and gather data in the social sciences. So usually there is a methodology, and that's usually a non-issue.

Q.   **Because I -- I understand the**

Page 53

**importance of having a methodology is so that a study can be replicated.**

A.   I wouldn't agree with that. I think replication is important, but the importance of having a methodology would be so that there is a -- so that you could -- you knew how to go out and gather data, and that you'd have more confidence in the results of your data.

Q.   **And, yeah, I appreciate that clarification. I should reword my question.**

**One of the important reasons to have a methodology is so that it can be replicated by other researchers later on.**

A.   That certainly could be an important reason. There are many other important reasons. And not all studies are replicable.

Q.   **Not all empirical studies are replicable?**

A.   Correct. There might be reasons why one cannot replicate a particular study.

Q.   **Can you please provide me an example?**

A.   Well, sure. The famous Milgram experiment in the 1960s where in the Yale laboratory they basically pretended to torture

RICHARD A. LEO, PHD, JD, 10/02/2023                    Page 54..57

Page 54

people and then saw how far the subjects would go, for ethical reasons. Nobody could replicate that experiment today.

The Stanford prison experiment in the early 1970s, also a very famous study, I don't know whether we would be allowed to replicate that today at any university.

So sometimes for ethical reasons researchers can't replicate particular studies.

Q.   And that's a fair point.  I'm just trying to understand, outside of ethical limitations for -- like the examples you just provided, is there another reason why a study cannot be replicated?

A.   Well, there -- there might be many reasons.  You're asking me to speculate.

But imagine that somebody did an anthropological study of a tribe in some area of the world that -- when it's extinct, right?  I mean, you couldn't replicate that study.  Or if there was a very old study and the historical conditions had changed such that it couldn't be replicated.

So I can't tell you off the top of

Page 55

my head every example in which a study could not be replicated, but there might be other reasons that I'm not thinking about.

Again, replication is a good thing and a valuable thing, but I don't want to get locked into some absolute answer that studies can always be replicable, because they can't.

Q.   That's fair.  Let me ask a more specific question.

Are you aware of any studies that you have published that cannot be replicated?

A.   Off the top of my head, no.  I'd have to give it more thought.

Q.   Okay.  Well, what about your 2004 study with Professor Drizin titled The Problem With False Confessions in the Post DNA World?  You're familiar with that study; correct?

A.   Yes.

Q.   And that is the study that you and Professor Drizin co-authored?

A.   Correct.

Q.   Okay.  If a research -- researcher asked you for the data, the raw data that you relied on for that opinion, would they have access

Page 56

to it?

A.   Well, the -- they should be able to re-create that dataset.  I don't know that I have it anywhere.  I've moved so many times since then.

But there's a table in that article that lists all of the cases except for, I think a few juveniles who, for ethical reasons, we couldn't name, and so -- and then there's source material. So one could go through and re-create that dataset.

Now, that re-creation of the dataset and then coding of the data, that's not really a replication, right?  A replication typically would be gathering a new set of data to see whether or not the new set of data, analyzed in the same way, delivered the same analysis and findings, or to what degree it did or didn't.

So I think one could re-create that dataset because we named almost all of the cases, with a few exceptions, in that article.

Q.   Mr. Leo, I just want to, respectfully, push back a little bit.  You said replication is typically re-creating a methodology, but going out and collecting new raw data; correct?  Is that how I understand what you just said?

Page 57

MR. SWAMINATHAN:  Objection.  Go ahead.

THE WITNESS:  Yes, yes, typically that's what you would do -- sorry.  You would get a new dataset to see whether or not the findings replicated with the new data or in a new context.

COURT REPORTER:  Another -- excuse me.  Was that another objection?

MR. SWAMINATHAN:  Objection to form, yes.

BY MR. CHRISTIE:

Q.   But you disagree that replication is not reevaluating the same dataset to see if the new researcher comes to the same findings?

A.   That's not typically what's meant by replication in the social sciences.

The whole point of doing a replication study would be to go out and gather new data to see whether, with that new data, you could replicate the findings from the prior data.

Merely re-examining the prior data would not really be called a replication.  That would be more of a re-examination.

Q.   Okay.  So we're just using different terminology, but you understand it to be re-examination.

RICHARD A. LEO, PHD, JD, 10/02/2023                    Page 58..61

Page 58

A. I mean, I can't think of a study that's done that. I'm sure there are some. But, yes, that wouldn't be what's typically meant by replication.

Q. Okay. And with respect to that 2004 article I referenced earlier, you indicated that a researcher could go out and re-create the data themselves?

A. I believe they could, or most of the data.

Q. And -- did he freeze? Are you still there, Doctor?

VIDEO TECHNICIAN: It does look like he froze.

MR. SWAMINATHAN: Do you want to off --

MR. CHRISTIE: This is a good time for about a ten-minute break. So should we reconvene at 2:25?

MR. SWAMINATHAN: At 12:25, yeah.

MR. CHRISTIE: Did I say 2:25?

MR. SWAMINATHAN: Yes.

MR. CHRISTIE: 12:25. Thank you.

VIDEO TECHNICIAN: Going off the video record at 12:13 p.m.

(Recess taken.)

Page 59

MR. CHRISTIE: We can go back on the record.

VIDEO TECHNICIAN: This is the beginning of media unit two. We are going back on the video record at 12:25 p.m.

MR. CHRISTIE: All right. Dr. Leo, looks like your screen froze again.

All right. Let's go back off the record.

VIDEO TECHNICIAN: Going back off the record at 12:25 p.m.

(Discussion off the record.)

MR. SWAMINATHAN: I've been talking to Professor Leo. He says that the internet is down at his house, so there's no internet connection whatsoever in his home. It just went out for whatever reason. We were trying to see if we could get him on a hot spot. Apparently his desktop is not working with accessing the hot spot from his phone, so we're trying to figure out other options. The only other option he can think of right now is that he can just put his screen on his phone, like have the Zoom on his phone, but obviously you're videoing this. I don't know how much that's going to impact the video screen. And then he's going

Page 60

to -- you know, it could be hard to look at the screen, but he could look at underlying documents on his computer. But that seems to be the only option right now, unless his internet magically comes back.

MS. ROSEN: Yeah, I'm not sure the phone's a viable option. Plus we've got videotaping it and the exhibit issue.

Why don't we give it a few minutes and see if it comes back up, and let us chat for a minute too. And then why don't we circle back in like ten minutes.

MR. SWAMINATHAN: Okay.

(Recess taken.)

VIDEO TECHNICIAN: This is the beginning of media unit two. We are going back on the video record at 12:36 p.m.

BY MR. CHRISTIE:

Q. All right. Dr. Leo, after a few hiccups, we're back.

I think when you -- when we took our last break, we were discussing your 2004 article that you co-authored with Professor Drizin. Do you recall that conversation?

Page 61

A. Yes. And then I was in the middle of an answer, and then it got cut off. So I would like to finish the answer that I was in the middle of.

MR. CHRISTIE: If we could restate the question and then have the answer so I understand what you are answering, too.

(Record read as follows:

Q. So we're just using different terminology, but you understand it to be re-examination.

A. I mean, I can't think of a study that's done that. I'm sure there are some. But, yes, that wouldn't be what's typically meant by replication.

Q. Okay. And with respect to that 2004 article I referenced earlier, you indicated that a researcher could go out and re-create the data themselves.

A. I believe they could, or most of the data.)

THE WITNESS: So we froze earlier than I thought we froze.

To finish my answer to that question, what I would say is that a researcher could re-create that, and then I started to say in some ways an even better dataset out of that,

RICHARD A. LEO, PHD, JD, 10/02/2023                    Page 62..65

Page 62

because since 2004, numerous databases have improved. So Google's got better database, Lexis has got better database, Westlaw has got better database. There's Pacer, which did not exist, to my knowledge, in 2004 or the years before that.

In 2012, the National Registry of Exonerations, an online database, started, and many of the cases in the 2004 article are on the National Registry of Exonerations.

In addition, the Innocence Project in New York at some point I believe after 2004, in collaboration with firms, started posting some original documents in some of the DNA exonerations, some of which are in that article.

So all of this is to say that one could re-create that entire dataset, with the exception of the few unnamed juveniles, and maybe even have more information than Professor Drizin and I had access to at the time.

BY MR. CHRISTIE:

Q. And for that 2004 article, did you and Dr. -- Professor Drizin use a specific coding form?

A. I believe we did, yes.

Q. In other words, you coded the data that

Page 63

you were analyzing.

A. Some of it, yes.

Q. And do you have that coding sheet still?

A. I might. I don't know. It might even be at the end of that article, for all I know. I'd have to look for it. But I don't know if I have it.

Q. So you're not aware if you have the coding sheets used to come to the conclusions in your 2004 article?

A. Well, I wouldn't -- I think the question as asked is a little misleading.

There are a number of tables in the article where you could -- you could see exactly what we coded for. Whether I have the actual coding sheet, I don't know. I might; I might not.

Even if I had the coding sheet, that isn't the basis for all of the conclusions or opinions in the article.

Q. But you indicated that a reader like myself could look at the 2004 article and see what you coded for. I'm trying to understand is, is there a coding sheet that explains how you coded that data?

A. Well, I think that you could figure out

Page 64

how the quantitative data was coded from the categories in the tables in the article.

So going on memory here, I think there's one that breaks out the region of the countries from which these proven false confessions came, and maybe it has four, five, six regions, I don't remember, but we could say that the coding sheet would have listed those four, five, six regions, right? So we could reconstruct the coding sheet, I believe, in its entirety, just from the tables in the article. But I may be able -- I may still have it; I just have to look for it.

Q. But you don't know one way or the other if you have the original coding sheet.

A. I don't know off the top of my head if I still have it, yes. I may very well have it somewhere. I'd have to look for it.

Q. Do you have a similar coding sheet that you've used in other similar studies in your possession?

A. It's certainly possible, but in every study usually there might be -- the coding sheet might be different, you know, even if just a little bit different, but you just have to tell me which

Page 65

study, and I have to look and see.

I believe the coding sheet for the dissertation that you were asking about earlier is actually in the dissertation. But, again, I'd have to double-check that.

Q. Okay. We'll go back to this issue later on, then.

Can we please pull up -- Brett, can you please pull up Exhibit No. 1, and go to page 19, please.

And, sir, do you see Exhibit 1, page 19 on your screen?

A. I do.

Q. Okay. And I'm going to read a line from page 19. It says, quote: "To achieve this purpose, interrogators use techniques that seek to influence, persuade, manipulate and deceive suspects into believing that their situation is hopeless and that their best interest lies in confessing."

Do you see that there?

A. Yes.

Q. Did I read that correctly?

A. Yes.

RICHARD A. LEO, PHD, JD, 10/02/2023                    Page 66..69

Page 66

Q. Does a person have to believe that their situation is hopeless in order to believe that it is in their best interest to provide a self-incriminating statement?

A. Not necessarily.

Q. So why do you indicate that it is an interrogator's purpose to make a suspect believe their situation is hopeless?

A. I'm going to have to review the context of this.

Over the break I printed a clean copy, it has no markings from -- from me on it, that is a copy of exactly what you have on the screen, 112-page report. So if you give me just a moment --

Q. Please turn to page 19.

A. I think that what I'm saying is this is -- this is an effect of these techniques. I'm not saying it has to be the only effect of these techniques.

Q. You indicate it's the sole purpose of a custodial interrogation just the line before.

A. Yes, but what I'm referring to in that sentence is the sole purpose of an interrogation is

Page 67

to get a statement, admission and/or a confession.

Q. And my understanding is you -- you say that police do that by influencing, persuading, manipulating, and deceiving suspects to believe that their situation is hopeless.

A. Correct.

Q. Okay. But you now are saying that there are other ways interrogators can have a suspect provide a self-incriminating statement that does not require them to feel hopeless?

A. Yes. You could -- you could have somebody persuaded to believe that they should confess, and not feel hopeless, yes.

Q. Is it fair to say that the most common reason suspects confess is a recognition that they are guilty?

A. I don't -- I don't know that that's necessarily the case. It may be the case in some or many cases, but I don't know that it's the primary reason.

Q. You don't know if it's the most common reason.

A. As you phrase it, yes, I don't know if that's the most common reason.

Page 68

Q. Maybe -- I define "most common," I should say more likely than not, 50 plus one.

With that definition in mind, do you still understand it that it is true that more likely than not suspects confess because they recognize that they're guilty?

A. That may be the case. But it may be that if you did a survey of suspects and asked them what's the reason why they confessed, that they may come up with a different wording than that. So it certainly could be the case.

Q. Is it fair that suspects may confess because they are aware of incriminating evidence against them?

A. Yes.

Q. So is it fair to say that the sole purpose of police interrogations could be to persuade a suspect that they are in fact guilty when they are guilty?

MR. SWAMINATHAN: Objection to form.

Go ahead.

THE WITNESS: If I understand your question, I would say that it's not fair to say that because the purpose of an interrogation is to get a piece

Page 69

of evidence to get the presumed guilty suspect convicted or help the prosecution convict them. It's not to persuade them to confess because they're guilty.

That's certainly a good thing from the perspective of the investigators who presume the guilt of the suspect in the interrogation, but the goal is ultimately to get that presumption into an incriminating statement, admission, or confession, not just to have the person confess -- be persuaded that they're guilty.

BY MR. CHRISTIE:

Q. And for your assertion where you state that the sole purpose of the custodial interrogation is to achieve -- or to -- sorry -- influence, persuade, manipulate, and deceive suspects into believing that their situation is hopeless, what authority are you citing to to support that assertion?

A. So I think you're referring to the third sentence in the paragraph. But the word "sole" in your question is in the second sentence, and it refers to the first sentence.

With regard to the third sentence, I

Page 70

think footnote 13 is -- cites to Debrorah Davis and William O'Donohue's article, 2004 chapter, that's listed in that footnote. So that's -- that's the source that I'm citing to in that footnote, if that's your question.

Q. Maybe I should -- let me rephrase my question.

You're indicating that the sole purpose -- right? -- of interrogation is to overcome a suspect's denials and elicit incriminating statements and confessions, and to achieve that purpose, investigators seek to influence, persuade, manipulate, and deceive suspects into believing that their situation is hopeless; correct?

A. And that their best interest lies in confessing, correct.

Q. Okay. Can you please cite to me a police training manual that supports that assertion?

A. A police training manual would state it differently than I've stated it in that sentence. So they would not use the word "hopeless," but they would use -- they would describe techniques that sometimes have the effect of causing suspects,

Page 71

based on empirical research, to feel hopeless; and all the manuals would have, for the second part of that sentence, they have a lot of examples of techniques to persuade the suspect it's in their best interest to confess.

Q. So you're not aware of any manuals that indicate they want the suspect to feel hopeless.

A. Not as phrased. Yes, they would not phrase it that way.

Q. Brett, can you please move to page 33 of this pdf.

If you could just scroll down. And, sir, you can turn to page 33 on your hard copy, too, because I'll be referencing this as well.

A. Okay.

Q. Sorry, one second. I got to move around as well.

Okay. So this section is titled The Interrogation and Prosecutor-Written Confession Statements of Ariel Gomez on June 14, 1997; correct?

A. Yes.

Q. Okay. And in the Introduction section, you indicate there is no objective record of the interrogation that resulted in Mr. Gomez's

Page 72

prosecutor-written confession statement?

A. Correct.

Q. You then state that this case therefore presents a classic swearing contest, right? It's toward the end of the first paragraph.

A. Yes. Thank you.

Q. But you do note in the last sentence, quote: "There are some significant and overlapping commonalities in these accounts."

A. Right.

Q. Okay. So I just want to understand some of these commonalities between the account of Gomez and his co-defendants and the account of the police officers and the prosecutors.

So I think it's true, we can both agree, that on June 13, 1997, Concepcion Diaz was shot near the intersection of Cicero and Diversey around 11:30 p.m.?

A. I agree.

Q. Okay. Do you agree that Ariel Gomez had a gun in his car, the red Pathfinder, under the front hood of the car?

A. Yes.

Q. Do you agree that Ariel Gomez was

Page 73

driving around with his friends, Jose Dominguez, John Yacoub, Dragon Jovanovic, and Paul Yalda, on June 13, 1997?

A. Yes.

Q. And at some point in the night they approached the intersection of Cicero and Diversey, where they saw a large crowd of people?

A. Yes.

Q. And at some point when they approached this large crowd, they were throwing objects at the car, and potentially a brick that crashed through the window and hit Paul Yalda?

A. Yes.

Q. Okay. And afterwards, Mr. Gomez and his fellow co-defendants drove past the intersection, driving southbound on Cicero past Diversey, and they pulled over into some type of street or alleyway?

A. I believe so.

Q. Okay. And when they pulled over into the street or alleyway, Mr. Gomez got out of the car, the driver's side part of the car, and grabbed the gun that was underneath the hood?

A. I believe so.

RICHARD A. LEO, PHD, JD, 10/02/2023      Page 74..77

Page 74

Q. And Mr. Dominguez got into the driver's seat of the vehicle and Mr. Gomez got into the passenger seat?

A. Yes.

Q. Okay. And then Mr. Dominguez drove the vehicle, with the other passengers in the car, back to the intersection at Cicero and Diversey?

A. Yes.

Q. Okay. And somewhere near that intersection, it may have been in a strip mall or a parking lot, Mr. Gomez fired a shot from his gun.

A. Yes.

Q. And it's disputed, right, where he shot it, how many shots he shot, in what direction he shot; correct?

A. Well, I guess when you say "disputed," disputed by whom is what I wonder.

Q. Okay. So where he shot, the location -- where -- strike that.

The location of where he shot the gun is disputed.

MR. SWAMINATHAN: Objection to form.

Go ahead.

THE WITNESS: I guess there's not uniform

Page 75

agreement about where the gun was shot. I think maybe that's what you mean by your question?

BY MR. CHRISTIE:

Q. Okay. And where he pointed the gun when he shot it, that's disputed.

A. I guess I'm just having a hard time with this word "disputed." I mean, when I think of a dispute, I think of a dispute between parties, and I'm wondering who the parties are that dispute it, because, again, I reviewed, you know, Filkins' and Balash's reports, and they are experts, and there doesn't really seem to be much dispute in their expert opinions, nor does there seem to be much dispute about between the -- the five individuals on most of their account of the shooting of the gun one time.

So when you say "dispute," I guess I just want to know -- I'm -- you want me to agree that it's disputed among whom?

BY MR. CHRISTIE:

Q. Are you aware of any evidence -- sorry. Strike that.

Have you reviewed any evidence that indicates Mr. Gomez was pointing the gun at the

Page 76

crowd when he shot?

A. I thought he was pointing the gun in the air. But if you want to direct me to a piece of evidence that says he was pointing it at the crowd, I'm certainly happy to look at that.

Q. Okay. So Mr. Gomez is saying he shot the gun in the air, right?

A. That's my recollection, yes.

Q. Okay. You're not aware of any evidence that shows Mr. Gomez was firing the gun at the crowd?

MR. SWAMINATHAN: Object to form. Sorry. Sorry, Professor Leo. Go ahead.

THE WITNESS: Well, it might say that in the prosecutor-written statement, but if you -- I just ask you to point me to the evidence, right? If there's evidence, then show it to me, and I'd be happy to comment on it.

BY MR. CHRISTIE:

Q. I'm just asking the question of whether you're aware of any evidence that shows -- sorry -- that indicates that Mr. Gomez fired his gun at the crowd.

MR. SWAMINATHAN: Objection to form; asked

Page 77

and answered.

Go ahead.

THE WITNESS: I don't know what you're referring to. You'd have to tell me what you're referring to.

BY MR. CHRISTIE:

Q. Did you review the criminal trial transcripts in this case?

A. In preparing the report, yes.

Q. Okay. Did you review the trial transcript testimony of George Soria?

A. I think I did, but I'd have to look at the materials reviewed. If it's listed in -- if it's listed -- I mean, if it's listed in the materials reviewed, then I did.

Q. Sir, to make it easier for you, in the materials reviewed, you listed that you reviewed the deposition of George Soria.

A. Correct.

Q. Okay? Do you recall what Mr. Soria said about what he witnessed?

A. My recollection -- but I'd have to go back to confirm it's accurate -- is that in his trial testimony, he testified that there were two

RICHARD A. LEO, PHD, JD, 10/02/2023 Page 78..81

Page 78

to three shots fired. I don't remember more specifically than that.

And my recollection -- again, which I'd want to confirm against the document -- is that in his deposition, which was many, many years later, he didn't have a good recollection of the incident.

Q. And you don't recall what he said at his trial testimony, which was closer in time to the incident?

A. Other than what I've just said, no.

Q. Did you review the deposition transcript of Sandra Rodriguez?

A. If it's listed in the report, yes, I would have reviewed that. And, of course, the report is six months old, so I would have reviewed it prior to writing that many months ago.

Q. Did the name Sandra Rodriguez sound familiar?

A. Yes. Sandra Rodriguez I believe was one of the fact witnesses, if I'm remembering correctly.

Q. Yes. And do you recall what she testified to at her deposition?

Page 79

A. I would need you to refresh my recollection or be able to review it.

Or I think I need you to ask a more specific question. She testified -- you know, she answered all the questions that were posed to her.

Q. Okay. We'll move on.

So accepting Mr. Gomez's account that he shot straight up in the air, you agree that he was the first person to shoot the gun.

MR. SWAMINATHAN: Objection to form.

Go ahead.

Are you asking about the undisputed versus disputed evidence, or something else?

MR. CHRISTIE: Correct. Undisputed. It's undisputed that Mr. Gomez was the first person to fire a gun at Cicero and Diversey on June 14 -- or June 13, 1997, at this intersection of Cicero and Diversey.

THE WITNESS: You said "fire a gun" as opposed to "the gun"?

BY MR. CHRISTIE:

Q. So again accepting Mr. Gomez's account that there was more than one shooter, it is still undisputed that he was the first person to fire a

Page 80

gun on June 13, 1997, at the intersection of Cicero and Diversey, right?

A. I don't know whether it's undisputed that he was the first person to fire a gun at that location during that time.

Q. You reviewed Mr. Gomez's deposition testimony; correct?

A. In preparation for the report, yes.

Q. So do you recall his testimony when he said he fired one shot when he was leaning outside the car window, and then when he got back inside the car, he heard five more shots?

A. I recall the first part of the sentence and that he heard other shots, but I don't recall whether it was stated that way.

But if it's in his deposition, then I'm sure it was stated that way.

Q. So you're not aware one way or the other if it's undisputed that Mr. Gomez was the first person to fire a gun that night on Cicero and Diversey.

A. Correct. It's possible that somebody else fired a gun first at that intersection.

Q. Isn't that information that would be

Page 81

important to know before you draft your report?

MR. SWAMINATHAN: Objection to form and foundation. Argumentative.

Go ahead.

THE WITNESS: You're going to have to tell me why that would be important.

What I would be interested in is who fired the gun and who didn't fire the gun that ended up killing the victim, and how that matches or doesn't match with the statement or confession evidence.

The fact that other people fired guns is relevant, but who fired a gunshot first, not necessarily.

BY MR. CHRISTIE:

Q. Not necessarily relevant to your opinion.

A. Yeah, I -- I'd need to know more about why you think that would be relevant to the opinion.

If a hundred people fired a gun, gunshots, but only one gun, one bullet killed the victim, the background fact that a hundred people fired, yeah, that's relevant, but I'm more focused

Urlaub Bowen & Associates, Inc. 312-781-9586

RICHARD A. LEO, PHD, JD, 10/02/2023                    Page 82..85

Page 82

on the one that fired the shot and, again, how all of that matches or doesn't match the statement evidence.

Q. You're familiar with but-for causation; correct?

A. In law, yes.

Q. But for action A occurring, action B would not have occurred. That's a logical statement; correct?

A. Correct.

Q. So if we apply it here, but for Mr. Gomez firing the gun first, subsequent shots would not have been fired back.

MR. SWAMINATHAN: Objection to form and foundation.

You can answer -- you can answer if you can.

THE WITNESS: I think you're making a factual assertion, and I just don't know whether that factual assertion is right. I don't know or recall whether any other shots that night were fired in response to Mr. Gomez's shot.

BY MR. CHRISTIE:

Q. Brett, can you please move to page 34.

Page 83

And, sir, this section is titled subsection B, quote: "Ariel Gomez's Description of His Interrogation and Prosecutor-Written Confession Statement on June 14, 1997."

Did I state that right?

A. Yes.

Q. Okay. When you say Gomez's description of his interrogation and prosecutor-written confession statement, what specific facts are you relying on?

Strike that.

What specific documents are you relying on?

A. Well, his deposition testimony, and any other testimony that he would have given, and the -- the written statement.

Q. You're relying on his written statement to understand his description of the interrogation?

A. Not for his description of the interrogation, but it does state at the heading "the prosecutor-written statement," and also there are things in the written statement that might give you clues about what occurred during the interrogation.

Page 84

Q. Okay. So you may have relied on the statement, prosecutor-written statement -- or, sorry. Strike that.

You may have relied on the prosecution confession statement, Mr. Gomez's affidavit, and his deposition testimony.

Do you recall any other documents you relied on for this opinion?

A. Well, it's a description of what he says occurred during his unrecorded interrogation. So there may be other documents in here, in the 273, that I relied on, but I think those are the primary ones.

Q. And there's no way of knowing because you don't -- I'm sorry. Strike that.

In this section, you cite to the deposition of Ariel Gomez and the affidavit of Ariel Gomez from 2015. It appears that you don't cite to any other documents in this section, so I'm trying to understand if there's any other documents you relied on for Mr. Gomez's description.

If you want to scroll through Section B, feel free to.

A. Right. But usually I'm only citing

Page 85

documents when I'm -- in the section when I'm quoting him directly.

Q. Okay. But I don't know if you relied on any other documents when describing this section.

A. Well, if I did, they would be listed --

MR. SWAMINATHAN: Form; asked and answered.

THE WITNESS: Sorry.

If I did, they would be listed in the documents that I reviewed. I think -- I think his affidavit and the deposition are the primary documents I relied on.

BY MR. CHRISTIE:

Q. I want to direct your attention back to the report, Dr. Leo.

Focusing on the first paragraph under subsection B, it's in the middle of the paragraph, it states, quote: "At the station, Mr. Gomez was placed in a police interrogation room with one handcuff -- with one hand handcuffed to a pole, shortly after which he was photographed."

Do you see that there?

A. Yes.

Q. And did I read that correctly?

A. Yes.

RICHARD A. LEO, PHD, JD, 10/02/2023                    Page 86..89

Page 86

Q.   Okay.  Have you re- -- have you seen a photograph of Mr. Gomez handcuffed to a pole?

A.   Not that I recall.

Q.   Brett, if you could take down this exhibit very briefly, and there should be an exhibit and I'll give you the title of it.  It's Photo of Gomez with Handcuff.  If you could pull that up, and we'll label that Exhibit No. 7.

Okay.  Sir, do you see what is labeled now Exhibit No. 7 on your screen?

A.   Yes.

Q.   And is this the picture that you recall reviewing when Mr. Gomez describes that he was handcuffed to a pole in an interrogation room?

A.   No.  I said I didn't recall reviewing a transcript, and it may just be that I'm not recollecting at the moment.

Q.   Okay.  You don't recall it.

Does this picture refresh your memory at all of a picture you reviewed?

A.   No, it does not.

Q.   But it is in line with Mr. Gomez's statement that he was handcuffed to a pole in an interrogation room; correct?

Page 87

A.   I can't see where his left arm is, whether or not it's connected to a pole.

The description that I was providing on page 34 of the report was based on his description, his verbal description of what occurred.  I don't recall that it was based on any photographic pictures of him during the interrogation.

Q.   But this would corroborate his statement that he was photographed shortly after arriving at the station with one hand cuffed to a pole?

A.   I don't know because I don't see his hand, so I can't -- I can't answer that question unless I had more information.

I don't even know where the location is.  I don't have enough visual information to say that it does corroborate or doesn't corroborate.

Q.   Okay.  Well, sir, let me just ask more specifically about this picture then.  Do you see any bruising on Mr. Gomez's face?

A.   I don't see it right now, no.

Q.   Do you see any swelling on Mr. Gomez's face?

Page 88

A.   Not that I can tell, no.

Q.   Do you see any blood on Mr. Gomez's face?

A.   No.

Q.   Do you see any signs of physical abuse?

A.   I don't see any signs of physical abuse.

Q.   Is his T-shirt ripped?  Or sweater.  Sorry.  Strike that.

Is his sweater ripped?

A.   Not that I can tell.

Q.   Okay.  Brett, you could take this photograph down, please.  And if you could go back to page 34 of Exhibit 1.

Okay, sir.  Do you see that on your screen?

A.   Yes.

Q.   Okay.  I want to focus your attention on the second paragraph where it states, quote, "According to Mr. Gomez, Detective Guevara physically assaulted Mr. Gomez.  As Detective Guevara was hitting and beating Mr. Gomez on the right side of his face and head, Mr. Gomez was trying to avoid getting hit by ducking."  End quote.

Do you see that there?

Page 89

A.   Yes.

Q.   Did I read that correctly?

A.   Yes.

Q.   And where are you getting this information from?

A.   From Mr. Gomez's testimony in deposition, and his affidavit, and any other document that I reviewed among the 279 where he describes what occurred during his interrogation.

Q.   Are you aware of any other materials aside from his affidavit or deposition testimony where Mr. Gomez states that he was physically assaulted by Detective Guevara?

A.   Off the top of my head, no.  I'd have to review the file.

Q.   Okay.  The next sentence then says, quote:  "Mr. Gomez continued to deny Detective Guevara's angry accusations that he had committed a murder."  End quote.

Do you see that there?

A.   Yes.

Q.   And did you get that as well from either Mr. Gomez's affidavit or deposition testimony?

Page 90

A. Well, that's what I'm primarily drawing on in this section, I believe.

Q. Okay. But according to Mr. Gomez, after Detective Guevara physically assaulted him, he still denied committing a murder?

A. In the beginning, yes.

Q. On the next paragraph -- Brett, if you could scroll down just a little bit.

Thank you. That's perfect.

On the next paragraph it says, quote: "According to Mr. Gomez, when Detective Guevara was hitting and beating him, he was using his fist (as opposed to an open hand), and hitting Mr. Gomez on his right side of his body and his face while Mr. Gomez's left hand was handcuffed to the pole. Mr. Gomez continued to adamantly deny that he had killed anyone." End quote.

Do you see that there?

A. Yes.

Q. So Detective Guevara continued to hit him, and yet he still continued to deny any guilt for murdering Mr. Diaz?

A. Correct.

Q. Okay. And then it continues on and

Page 91

says, quote: "At some point Detective Mingey came into the interrogation room, and both he and Detective Guevara were hitting Mr. Gomez with their fists on the right side of his body and under his arm, as Mr. --" I'm assuming Mr. Gomez -- tried to duck the punches, as his left hand continued to be handcuffed to the pole." End quote.

I believe there's a typo there.

A. Correct. There was a typo, correct.

Q. Did I read it correctly while fixing that typo?

A. Yes.

Q. Okay. And yet still at this point Mr. Gomez has not admitted any guilt to committing the murder of Concepcion Diaz?

A. Correct.

Q. And then if we go to the -- two more sentences down it says, quote: "At one point, Detective Guevara hit Mr. Gomez in the face, which caused Mr. Gomez to start bleeding from below his nose and above his lip." End quote.

Do you see that there?

A. Yes.

Q. Brett, can you please move to page 36,

Page 92

and subsection C where it's titled, quote: "Risk Factors for False Confessions in Ariel Gomez's Account of his Custodial Interrogation and Prosecutor-Written Statement on June 14, 1997."

Do you see that there, Doctor?

A. Yes.

Q. Okay. And you indicated in the first sentence, quote: "Gomez provided a robust account of what he recalls occurring during his unrecorded interrogation on June 14, 1997 by Chicago police detective Guevara and Sergeant Mingey, as well as ASA Healy."

Correct?

A. Yes.

Q. What do you mean by "robust account"?

A. That it's not skeletal, that it involves a full description, you know, he describes a number of details of what he recalls from that interrogation.

Q. So do you have a specific methodology that you employ to determine if someone's account is robust?

A. No. That's just my opinion, analyzing his account. I'm not sure I would say it's a

Page 93

specific methodology.

Q. And then do you see, in the next paragraph, where it says Subsection 1 in italics, "Physical Abuse and Coercion"?

A. Yes.

Q. And is it fair to say in that paragraph you indicate that physical abuse is a well-established risk factor for causing false confessions?

A. Yes.

Q. Sir, I'm curious, what is your methodology for determining the reliability of someone who asserts for the first time in a recorded statement that they were physically abused by police officers during an interrogation when that alleged physical abuse occurred more than 15 years ago?

A. Well, I say in the report that I'm not a finder of fact; it's not for me to determine whether or not his account is reliable or not.

I'm saying if we take his account, here are the risk factors.

Q. Would it have been informative to have a recorded conversation of what Gomez said to his

RICHARD A. LEO, PHD, JD, 10/02/2023                    Page 94..97

Page 94

criminal trial attorney, Jack Friedlander, about his interrogation?

A. It could have been informative. It depends on -- it would depend on what questions were being asked and what answers were being given.

Q. Well, if Mr. Gomez never said he was physically assaulted in any conversation with Jack Friedlander, would that be informative?

A. It could be, depending on the context of those conversations. I'd need to know more. But it could be relevant, yes.

Q. And what do you mean, depending on the context of those conversations? What do you need to know more of?

A. Well, there are many cases in the criminal justice system where lawyers provide ineffective assistance, and defendants describe lawyers who speak to them for five or ten minutes once or twice before a trial.

I'm not saying that that's what happened here. I'm merely saying that in the way you describe this, I have no idea what questions were asked.

You're saying if he did not tell his

Page 95

lawyer. I would want to know what questions were asked by his lawyer. I would want -- I mean, you -- so I would need to -- I would need to know what occurred in the conversation, not just what you're saying is one outcome of the conversation.

Q. You're aware that his attorney filed a motion to suppress his confession?

A. I believe so.

Q. And did you review those proceedings, the motion to suppress proceedings?

A. I believe I did, yes.

Q. Within those motion to suppress proceedings, was there any argument or testimony that indicated Mr. Gomez was physically assaulted?

A. You're going to have to show it to me. I don't recall.

You want me to review it, I'll review it.

Q. You don't recall if in the motion to suppress hearing there's evidence that came out that Mr. Gomez was physically assaulted.

A. No, I don't recall. It's -- the record is the record. It's an easily answerable question. If you want me to review the record and answer it,

Page 96

I'm happy to do that. But off the top of my head, I do not recall.

Q. Did you review his criminal defense attorney's deposition testimony, Jack Friedlander?

A. I believe I did.

Q. Okay. And do you recall in that deposition him describing what he would have done if his client claimed that there was physical abuse by police during the interrogation?

A. Off the top of my head, no. You'd have to show me the document so I could refresh my recollection.

Q. Okay. You don't recall him saying that he would interview witnesses?

A. Again, yeah, off the top of my head, no. You'd have to show me the document.

Q. You don't recall him saying he would obtain photographic evidence to preserve?

MR. SWAMINATHAN: Objection; asked and answered.

Go ahead.

THE WITNESS: No. You'd have to show me the deposition, and then I could answer the question.

Page 97

BY MR. CHRISTIE:

Q. Okay. Do you recall him saying that he would have put his client on the stand to testify at a motion to suppress hearing if he was -- if the client was physically assaulted?

MR. SWAMINATHAN: Objection; asked and answered.

THE WITNESS: Without seeing the document, no, I don't recall.

BY MR. CHRISTIE:

Q. Would that information have been informative to you in drawing your opinion in subsection C (1) about the physical abuse and coercion?

A. Well, it depends on what you mean by "informative." It could be relevant, but it certainly wouldn't be dispositive.

Q. Right. It would be relevant, but not dispositive. It would be a factor to consider.

MR. SWAMINATHAN: Objection. Asked and answered.

Go ahead.

THE WITNESS: But I would want to know more -- sorry.

Page 98

BY MR. CHRISTIE:

Q. But if Mr. Friedlander said in his testimony that he would have obtained photographic evidence to preserve any signs of physical abuse, would that have been relevant to your opinion in subsection (1)?

A. I don't think it would have been very relevant to my opinion, no.

Q. Why is that?

A. Because I don't know whether he's telling the truth, number one. And, number two, because there's other evidence that this abuse did occur, that some of his co-defendants said they had heard him being abused.

Q. So, sir, I thought you weren't a fact finder. So your number one, that you don't know if Mr. Friedlander is telling the truth, how is that relevant?

A. Well, it's a hypothetical. He said if there had been, I would have taken photographs. But I don't know whether that's accurate or not. It's not a fact in the record that --

Q. But you know what --

A. I'm sorry, what's that?

Page 99

Q. It's not a fact in the record that you know of.

A. Correct, because he's describing a hypothetical scenario.

Q. Did you review Mr. Gomez's appeal, appellate briefs?

A. I don't recall if I did or not. If I did, it would be listed in the 279 listed materials reviewed.

Q. Well, you can go back to those materials and check if you reviewed any of his appellate briefs.

A. Okay. Yeah, I'll do that.
Well, No. 22 here is -- post conviction petition is -- it doesn't -- it doesn't say whether it's a brief, so I'd have to see that, but that might have been a brief that was reviewed.

Q. Let me make it easier. Do you recall reviewing the appellate order in this matter?

MR. SWAMINATHAN: Objection to form.
Go ahead.

THE WITNESS: Off the top of my head, no. You'd have to refresh my recollection.

Page 100

BY MR. CHRISTIE:

Q. Okay. So you're not aware one way or the other if it was argued on appeal that Mr. Gomez was physically assaulted by any of the officer defendants.

A. Without refreshing my recollection, no.

Q. Would it have been informative for your opinion if there is no argument by Mr. Gomez that he was physically assaulted by any of the defendant officers?

A. It could have been relevant, but sometimes there are strategic reasons why certain claims aren't prevented -- aren't presented, rather, that are -- are independent of whether or not the person asserts they occurred.

Q. So I understand this, we agreed -- you stated earlier that physical coercion is a well-established form of causing false confessions.

A. Correct.

Q. So you're saying there might be a strategic reason not to bring out on appeal that Mr. Gomez was physically assaulted?

A. Yes. I've studied cases where people who were physically assaulted or asserted they were

Page 101

physically assaulted have said that their attorney said don't bring this issue up in trial or appeal because it's not going to be believed, your testimony against the testimony of the other police officers. And so focus on the claims that are more likely to be believed by the trier of fact.
And so I can see a scenario where somebody could have asserted, for example, that something occurred, a physical abuse occurred, but for strategic reasons it wasn't incorporated into an argument or into an appeal. That's all I was saying.

Q. And you get that assertion because you reviewed other cases where suspects are saying the same thing, former criminal defendants?

A. Correct, where suspects have said and criminal defendants have said they were told by their attorneys no one would believe them and it would be seen as an implausible claim that would undermine their stronger legal claims, and so not to raise it.

Q. Have you obtained any evidence from an actual attorney that corroborated those suspects's claims?

RICHARD A. LEO, PHD, JD, 10/02/2023 Page 102..105

Page 102

A. I don't recall if I have or not.

Q. Okay. I'm going to move on here, but have you worked with the attorney Kathleen Zellner before?

A. Not to my recollection, no.

Q. Are you familiar with who Kathleen Zellner is?

A. Yes.

Q. Okay. How are you familiar with who Kathleen Zellner is?

A. She's a well-known attorney in the Chicago area, and so she's received a lot of press, and I know that she has been involved in a number of exonerations of wrongly convicted individuals.

Q. Okay. Do you understand her to be a competent attorney?

MR. SWAMINATHAN: Objection to form and foundation.

THE WITNESS: I understand her reputation to be a good one. I've never worked with her or had a -- to my recollection, had any personal interaction with her or reviewed the quality of her work, but I understand her to be a very well regarded attorney from the media accounts and

Page 103

reputationally.

BY MR. CHRISTIE:

Q. Okay. Are you familiar with the attorney Dan Coyne, a professor at the University of Illinois Chicago Kent School of Law?

A. Not that I recall.

Q. Okay. Are you aware that both Dan Coyne and Kathleen Zellner at one point represented Mr. Gomez?

A. Not that I recall.

Q. Okay. Sir, did you review any phone recorded conversations with Mr. Coyne or Ms. Zellner that they had with Mr. Gomez when he was incarcerated?

A. Not that I recall.

Q. And if you were to go to your materials reviewed, would you see any indication that you reviewed the transcripts of conversations between either Mr. Coyne or Ms. Zellner when Mr. Gomez was incarcerated?

A. I mean, I'd have to look at the list to see if it's listed.

Q. Please do. Have you had a chance to review your

Page 104

Materials Reviewed section?

A. Almost. Almost done.

Yeah, I just -- in quickly scrolling down, I don't see any documents that are labeled recorded conversations between Ariel Gomez and Ms. Zellner or Mr. Coyne.

Q. Okay. Would those conversations have been informative to you when forming your opinion about whether Mr. Gomez -- or about Mr. Gomez's physical abuse and coercion?

A. Well, it could have been relevant depending on what was said, yes.

Q. Okay. So none of those conversations ever mentioned -- strike that.

If none of those conversations, Mr. Gomez said he was physically abused, would that be informative to your opinion?

A. It could be relevant, but it wouldn't change my opinions.

Q. Did you review Mr. Gomez's pro se post-conviction petition?

A. I don't recall. If it's in the materials reviewed.

I know I reviewed his affidavit --

Page 105

his affidavits.

Q. You reviewed his 2015 affidavit, right?

A. His postconviction deposition -- petition, yes, and his affidavit, correct.

Q. His pro se petition.

A. I -- you'd have to refresh my recollection. I don't recall if it was pro se or not.

Q. So if he never mentioned in his pro se petition or pro se affidavit that he never alleged physical abuse, would that be informative for your opinions?

A. It could be relevant, but it wouldn't change my opinions. There may be reasons why he didn't mention it. He clearly mentions it elsewhere. There may be, again, strategic legal reasons why he was advised not to mention it.

Q. Well, sir, he -- pro se, so it's his own advice. He doesn't have counsel at this point.

A. If he was incarcerated, he might have been seeking legal advice from nonlawyers and acted on that legal advice. He might have read things in a law library that influenced the decision.

So it's very possible that he had a

RICHARD A. LEO, PHD, JD, 10/02/2023　　　　　　　　Page 106..109

Page 106

reason why he didn't mention it that had nothing to do with whether it occurred or not.

Q. So -- strike that.

I asked you earlier what your methodology was for determining the reliability of a statement where the suspect claims physical abuse 15 years after the event took place. And your answer was that would be a credibility assessment. Am I recollecting that correctly?

A. Yes, that I'm not determining the reliability of any piece of evidence in this case. I'm not a factor finder.

Obviously I have to analyze the materials put before me in order to come to my opinions, and this section that you have posted here is an analysis of the risk factors in his account.

Q. Okay. So you take his account at face value?

A. No, I think that mischaracterizes my testimony saying here is his account, and based on his account, here's what the risk factors would be.

I wouldn't say face value. I just say I'm not taking a position on whether his

Page 107

account is true or not. That's for the fact finder. But I'm saying if you take his account, here's how I analyzed it.

Later in the report, I do a similar thing for the law enforcement officers' account.

Q. Okay. So, sir, if Mr. Gomez said that, during his deposition, when he was being interrogated by Detective Guevara in 1997, that he was shot in the leg by Detective Guevara to force him to confess, would you take that account at face value?

A. Well, I'm trying to -- I'm trying to say that I wouldn't take anything necessarily at face value. I would describe it.

Obviously if there's -- there's no evi- -- something like that would leave physical evidence in a way that other things alleged in his account does not leave obvious physical evidence.

Q. Brett, can you please turn to page 37.

Sir, do you see that middle paragraph there where it says, "According to Mr. Gomez"?

A. Yes.

Q. Okay. And if we were to move down one

Page 108

sentence, it says, quote: "The physical assaults were so violent that they caused Mr. Gomez's right of his face to turn red and swell entirely and for him to bleed down from below his nose." End quote. Do you see that?

A. Yes.

Q. Okay. So Mr. Gomez is describing quite violent physical assault that was done by him, by Detective Guevara and Sergeant Mingey; correct?

A. Yes.

MR. SWAMINATHAN: Objection as to form.

Go ahead.

BY MR. CHRISTIE:

Q. And that violent assault caused his face to swell?

MR. SWAMINATHAN: Objection to form.

Go ahead.

THE WITNESS: My recollection is that that's what he testified to in his deposition, yes.

BY MR. CHRISTIE:

Q. And that his face turned red.

A. Correct.

Q. You're aware that swelling gets worse before it gets better, right?

Page 109

MR. SWAMINATHAN: Objection to form and foundation. Argumentative.

Go ahead.

THE WITNESS: No, I'm not aware of that.

BY MR. CHRISTIE:

Q. Have you ever seen a boxing match, sir?

MR. SWAMINATHAN: Objection to form; foundation and argumentative.

Go ahead.

THE WITNESS: Yes.

BY MR. CHRISTIE:

Q. Have you seen a boxer's face after he's been punched a few times in the face?

A. Yes.

Q. It's swollen? It's red?

A. Sometimes, yes.

Q. The injuries are quite visible?

A. Sometimes.

Q. Sometimes? If you get pummeled in the face a few times, your face is going to get swollen; correct?

MR. SWAMINATHAN: Objection to form and foundation.

You watched a boxing match, Kyle?

RICHARD A. LEO, PHD, JD, 10/02/2023                      Page 110..113

Page 110

How many times did you get hit in the face?

MR. CHRISTIE: I appreciate the speaking objection, but I am asking my question here to Dr. Leo.

MR. SWAMINATHAN: Go ahead. I mean, if you ask him a question, ask a question that has some real foundation. That's not what happens in a boxing match. The face doesn't swell after the first jab they take to the face.

Go ahead.

THE WITNESS: The last boxing match of the hundreds, if not thousands, that I've watched, involved the fighter Terence Crawford, and my recollection is that after twelve rounds, in which he definitely got hit in the face, he looked like he did in the first round.

I've seen a lot of boxing matches where the fighters were hit many times, at least by Compustat numbers, and you couldn't tell.

It depends on how you've been hit; it depends also on one's skin. So there's a lot of reasons why people getting hit in the face would not have visual injuries even in boxing matches, even in championship boxing matches that go twelve

Page 111

rounds.

Yes, I've seen many times where they have been hit in the face and they do have bruises.

I also thought that your question was going to, to use the boxing match analogy, what happens day two, day three, day four, day five. I don't know what these boxers look like on day two, day three, day four, day five. I don't know if their bruises get better or they get worse. I just don't know. That's not my area of expertise.

BY MR. CHRISTIE:

Q. Okay. So you don't know if, when someone has a swollen face, if it gets worse for a few hours before it gets better.

A. I don't know the progression, correct.

Q. Do you know how many days it takes for a swollen face to be healed?

A. I don't know, but I'm sure it depends on how swollen the face is.

Q. Okay. Well, Mr. Gomez is saying that Detective Guevara, with his fist closed, punched Mr. Gomez on the right side of his face; correct?

A. The right side of his body, and even on his face, yes.

Page 112

Q. And early on I'm referencing, if you want -- Brett, if you want to move to page 34.

A. Yeah, I think that's what you have on the screen, page 34, right?

Q. It was 37.

So right there, Brett, you can -- the last paragraph. Again it's saying "Mr. Gomez on his right side of his body and his face"; correct?

A. Correct.

Q. And at the end of that paragraph, "Detective Guevara hit him on the face which caused him to start bleeding from below his nose and above his lip."

A. Yes.

Q. And then, if we go back to page 37, again it indicates that "the physical assault was so violent that they caused Mr. Gomez's right of his face to turn red and swell entirely for him to bleed down from below his nose."

A. Correct.

Q. So his injuries would be quite visible.

A. They might or might not have been, yeah. It depends on whether they were cleaned up,

Page 113

and who was looking at them.

Q. So after Mr. Gomez alleges that he was physically assaulted by Detective Guevara and Sergeant Mingey, he states that he was taken then to ASA Healy in a conference room to take a statement?

A. Well, I'm looking at the report, and according to Mr. -- I'm on the bottom of page 34. According to Mr. Gomez's description, Detective Mingey told Detective Guevara to clean him up.

Q. So he was be able to clean up a swollen face?

A. Well, obviously he's referring to the blood that was going down Mr. Gomez's face, which is the preceding sentence that I was referring to, the bottom of page 34.

Q. Okay. Now, what I'm going towards next, though, is that Mr. Gomez was taken by Detective Guevara to a conference room where ASA Healy was, to obtain a statement?

A. At some point, yes.

Q. This was after the beatings?

A. In time, yes. In his description, yes.

Q. And in his descriptions, he still had

RICHARD A. LEO, PHD, JD, 10/02/2023                    Page 114..117

Page 114

yet to confess to the murder of Concepcion Diaz?

A.    Correct.

Q.    Okay.  Do you recall if ASA Healy ever corroborated Mr. Gomez's claims of physical abuse?

A.    My recollection is that ASA Healy denied that in his presence there was any physical abuse.

Q.    Okay.  Do you recall that Mr. Gomez was used as a filler in a lineup procedure later that evening, according to reports?

A.    Not as I sit here today, no.  I may have been aware of that when I prepared the report.

Q.    Okay.  If he was used in the lineup procedure and there was a photograph taken of that lineup procedure, that would have been informative of whether he in fact was physically abused.

A.    Well, depending on when.  It could be relevant, yes.

Q.    If it was that evening after he provided the confessor -- prosecution confession, would that have been informative?

A.    I think it could have been relevant, yes.

Q.    Okay.  And you didn't -- did you review

Page 115

that report in preparation for your report?

A.    If it's mentioned in the police reports, then, yes, I would have known that at the time.
      I assumed what you had been referring to earlier was a photographic picture of him in a lineup.  And I don't recall, as I sit here today, actually seeing a picture of him as filler in a lineup.

Q.    Right.  I under -- but at the time, that would have been evidence to corroborate any claim that he was physically abused.

A.    Well, it may or may not have been if it actually occurred and there's a picture of it, because people can be physically abused, like boxers, and not show any evidence of that, especially if they're cleaned up.

Q.    Including them cleaning up a swollen face?

A.    It would depend on how swollen the face is.  But, again, I'd want to see the picture from the alleged lineup.

Q.    Mr. Gomez was taken to Cook County Department of Corrections after his prosecutor-written statement -- or prosecutor statement was

Page 116

taken; correct?

A.    Yes.

Q.    You're aware that Cook County does intake of all new inmates?

A.    Yeah, there would always be some intake procedure, of course.

Q.    And that intake procedure includes documenting any injuries.

A.    I would assume so.  Any visible injuries, yes.

Q.    The cut that causes the bleeding would be visible?

A.    Well, again, it could have been cleaned up.  But it could have been visible too.  I don't know.

Q.    Are you aware that he was taken to a bond hearing on June 16th?

A.    I know he was taken to a bond hearing at some point.  I don't know when.

Q.    June 16th would be two days after, a little bit less -- oh, it depends.  It might -- it would be around two days after this alleged physical abuse?

A.    Correct, after the interrogation on

Page 117

June 14th.

Q.    And so if his face was swollen, it would have been visible at that time?

A.    Depending how swollen.

Q.    Well, the way Mr. Gomez, again, describes it, it was so violent that they were -- caused his right face to turn red and swell?

A.    Correct, two days earlier, yes.

Q.    And yet you don't know how long it takes for a swollen face to heal up?

A.    Correct.

Q.    You don't have any methodology for corroborating whether any physical abuse actually occurred?

A.    It's not my purpose here to corroborate whether physical abuse occurred.  That's for a finder of fact.
      I believe there is evidence in the record that is consistent with his account.  But the point of this section of the report is to say if this happened as he's alleging, here's what follows based on the social science research in this field.

Q.    In the hypothetical I gave you earlier

RICHARD A. LEO, PHD, JD, 10/02/2023                          Page 118..121

Page 118

that Mr. Gomez was shot in the leg by Detective Guevara, that would be something you'd want to see corroborating physical evidence of.

A.   Certainly I would want to see that as part of the record and materials that I analyzed for purposes of my opinions.  But if he had alleged that, I would have mentioned it in this section.

Q.   Brett, can you please turn to page 45 of the report?

And, sir, I'm almost done with this part of the deposition, so I think we could take a break here in about 15 minutes; okay?

A.   Okay.

Q.   So do you see where it says Subsection 6, Threats and Promises?

A.   Yes.

Q.   Okay.  And then you state at the beginning of this paragraph, quote:  "As discussed earlier in this report, the use of implicit and/or explicit threats (for example, physical harm, a higher charge, longer sentence or harsher punishment) in the absence of compliance and confession and implicit and/or explicit promises (for example, of leniency, immunity and/or a

Page 119

tangible benefit) in exchange for compliance and confession significantly increases the risk of eliciting false and/or unreliable statements, admissions, and/or confessions."

Do you see that there?

A.   Yes.

Q.   Did I read it correctly?

A.   Yes.

Q.   Okay.  Are you able to determine how much quantifiably that the threats or promises increase the risk of a suspect providing a false and/or unreliable statement?

A.   As a general matter, no.  There's something, experimental studies that involve deal making which involve implied promises, implied threats, and in those experimental studies you can see the correlation between the use of that technique and how often the person gives a confession.

But when you say quantitatively, what I assume you're saying is can I say if a threat is used, you'll get 10 percent, 20 percent, 30 percent, 40 percent false confessions -- I think that's what you're asking -- and there's no way of

Page 120

knowing that number.  We can only point to what we see in the research and draw the appropriate inferences from that.

Q.   So I'll state it slightly differently. Are you able to determine quantitatively how much threats and promises increase the risk of a suspect eliciting a false or unreliable statement in a murder case?

A.   You -- if you want to know that, you have to do that in an experimental study, and experimental studies, for ethical reasons, are not going to do interrogations of murder suspects.

Q.   Okay.  So what was your methodology used to conclude that threats or promises, quote, "significantly increase the risk of eliciting false and/or unreliable statements"?

A.   Well, it's a well established finding in the empirical research literature.

So when you say methodology, I'm applying my knowledge of a field to his description and saying, based on his description, there is a significant risk here of false confession.

There's no dispute that threats and promises increase the risk of eliciting false

Page 121

confession based on empirical studies in the field.

Q.   I'm just trying to understand your terminology "significantly increases."

A.   You see this over and over in false confession cases, that there were threats, that there were promises, implied and/or explicitly.

So, in my opinion, if what he describes occurred, it would substantially increase the risk of eliciting a false confession.

Q.   But you just stated earlier that we can't quantifiably how much threats increase the risk of eliciting a false or unreliable confession, so how can you then state it significantly increases the risk of eliciting a false and/or unreliable statement?

A.   Well, it's -- it's a qualitative statement.  I'm not giving -- I'm not saying it increases it by 20 percent or 30 percent or 40 percent, but I did say in laboratory studies you could measure that out, at least implied threats, implied promises, so I could point to those studies.

But this is well documented that over and over and over again you see threats and promises in the false confession cases.

Urlaub Bowen & Associates, Inc.   312-781-9586

RICHARD A. LEO, PHD, JD, 10/02/2023                    Page 122..125

Page 122

Q.   So that's how you come up with the term "significantly increases" instead of just "increases"?

A.   That's my opinion, that it significantly substantially, the kinds of threats, the promises, implied threats, implied promises he describes, explicit promises, yes.

Q.   Okay.  Brett, can we jump back to page 35 of this report.

And, Dr. Leo, do you see where it says in the middle paragraph, "after Detective Guevara beat Mr. Gomez, Detective Guevara took Mr. Gomez to another bigger room where there was a man eating a Big Mac, assistant attorney William Healy"?

A.   Yes.

Q.   Okay.  And it continues to state that when Detective Guevara was taking Mr. Gomez from the interrogation room to the larger room, he was -- told Mr. Gomez that if he signed a statement that Detective Guevara had written up, Mr. Gomez would be able to leave the police station and go home that day."  Do you see that?

A.   Yes.

Page 123

Q.   Okay.  Is that what you're referring to as a threat or promise?

A.   Yes.  It's an explicit promise and an implied threat.

Q.   Okay.  And fair to say that you continue on to describe how Mr. Gomez was promised he could go home if he signed papers?

A.   Yeah.  Or implicit -- implicitly, if not explicitly, yes.

Q.   Okay.  And Mr. Gomez, in this quote you've taken from his deposition, said that Gomez -- or Guevara, "Like just -- we're going to go in there.  We're going to talk to these people.  Now he was acting like he was on my side."

Do you see that there?

A.   Yes.

Q.   So Mr. Gomez is indicating now that Mr. Guevara is playing a good cop?

A.   Well, he's being friendly.  I don't know if playing the good cop is really the right way to describe it.  Acting like he's on his side, yes.

Q.   Okay.  So he -- fair to say Detective Guevara, according to Mr. Gomez, changed his

Page 124

attitude towards Mr. Gomez.

A.   I think that's a reasonable inference from the quote at that time, yes.

Q.   And at this time, is it your understanding, according to Mr. Gomez, that he has still not confessed?

A.   That's my best recollection at the moment.

Q.   Okay.  So after repeated beatings, according to Mr. Gomez, by Detective Guevara and Sergeant Mingey, he still had yet to confess?

A.   I think I --- I'd have to review this account.  I don't recall the exact point at which he -- at which he says he gave an oral confession.

Q.   I'll just point, though, Detective Guevara had accused Mr. Gomez of killing Concepcion Diaz; correct?

A.   Yes.

Q.   He made repeated accusations that Mr. Gomez had killed Concepcion Diaz?

A.   Yes.

Q.   And if we were just to scroll down just a little bit, Brett, towards the end of the page, so we could see the full paragraph.  Thank you.

Page 125

At this point indicates that Mr. Gomez signed the prosecutor's statement?

A.   (No response.)

Q.   I could read into the record.

A.   Yeah, I see it.  Yeah, I'm at the bottom of the paragraph.

Q.   Yeah, I'll just quote.  "Mr. Gomez did not read the prewritten confession statement before signing it, and did not know what was in the document."  End quote?

A.   Yes.

Q.   And then he later on says he still signed it, but did not read what was in the statement?

A.   Yes.

Q.   And he also indicates that he wasn't read his Miranda rights?

A.   I believe so.

Q.   Do you know if Mr. Gomez understood his Miranda rights?

A.   I don't recall.  I'd have to review his deposition, what he says about that.

Q.   So going back to the case a bit, do you recall that Mr. Gomez created a plan to crash the

RICHARD A. LEO, PHD, JD, 10/02/2023                    Page 126..129

Page 126

Pathfinder in which he shot the gun out of into a brick wall, and then tell his mother that the car was stolen, when he and his friends were at the Norridge theaters?

A. I just need you to refresh my recollection. That may have been discussed in his deposition, but I just don't recall it with any specificity.

Q. You recall that Mr. Gomez crashed the Pathfinder into a wall?

A. I believe so, but I don't recall that with any specificity at this moment.

Q. Do you recall that he told his mom that the car was stolen from him earlier that night?

A. I believe so.

Q. Yeah. And he fabricated that story because he didn't want to get in trouble with his mom?

MR. SWAMINATHAN: You just asked him if he remembers that testimony?

BY MR. CHRISTIE:

Q. Correct. Do you recall that testimony?

A. I don't recall exactly what he said.

Q. Crashing a car into a wall and then

Page 127

telling his mom that the car was stolen from him was a fabricated story not to get in trouble.

MR. SWAMINATHAN: Objection to -- are you asking --

BY MR. CHRISTIE:

Q. Is that your understanding?

MR. SWAMINATHAN: -- testimony or something along those lines?

MR. CHRISTIE: I'll rephrase.

BY MR. CHRISTIE:

Q. Is that your understanding that Mr. Gomez crashed the car into a wall and then told his mom that the car was stolen in order not to get into trouble?

A. Vaguely, yes.

Q. But according to Mr. Gomez, he thought he could go home after being accused of murder and being beaten if he just signed a statement?

A. Well, according to Mr. Gomez, he was told that by Detective Guevara, so, yes, he would have thought it if he was told that, I would assume.

Q. Do you know if Mr. Gomez has an intellectual disability?

A. I don't recall that he has an

Page 128

intellectual disability, that I was aware of.

But if I had reviewed any documents to that effect, they would be -- I would have -- I would have written about his intellectual disability in this report.

Q. Okay. Can you please point to me a proven false confession that you have studied where a person who was not intellectually disabled signed a confession to murder thinking that they could go home if they just signed the confession?

A. I'd have to give that more thought, but that's a very common pattern in the proven false confessions. So I just have -- I just have to -- off the top of my head, no, there's so many cases. I just have to look at a list and refresh my recollection.

But that's a very common statement by people who have confessed falsely, that they believed or were led to believe or were explicitly told that they could put an end to the interrogation and leave the station and/or go home if they provided the interrogating detective or detectives with what they wanted.

Q. So my question is a little bit more

Page 129

specific, but I appreciate it.

Can you identify a proven false confession of a person who was not intellectually disabled that signed a confession to murder thinking they could just go home if they signed that confession?

A. If I had more time, yes, I could. On the spot, no.

Q. Dr. Leo, I believe it's 12:00 o'clock where you are, so I think this might be a good time for a lunch break.

What are people thinking, 45 minutes or an hour?

MR. SWAMINATHAN: I think 45 is more than enough, but I'd defer to Professor Leo.

THE WITNESS: Yeah, I think 45 minutes is better than an hour.

MR. CHRISTIE: Okay. We'll return at 12:45 Pacific time, 2:45 Central time.

THE WITNESS: Thank you.

VIDEO TECHNICIAN: Going off the video record at 12:01 p.m.

(Recess taken.)

VIDEO TECHNICIAN: This is the beginning of

RICHARD A. LEO, PHD, JD, 10/02/2023                    Page 130..133

Page 130

media unit 3. We are going back on the video record at 2:47 p.m.

BY MR. CHRISTIE:

Q. Brett, can you please pull back open Exhibit No. 1 and go to page 37, starting with subsection 2.

Thank you.

Dr. Leo, do you see on your screen your report where it says, Subsection 2: Rush to Judgment Based on a Premature Presumption of Guilt, Presumption of Guilty Knowledge, and Investigative Bias.

Sir, you're on mute.

A. Sorry about that. Yes.

Q. Okay. In this section, you discuss police officers rush to judgment that a particular suspect is presumably guilty of a crime, and you discuss how that's a risk factor that leads to false confessions?

A. Correct, based on Mr. Gomez's description and the description of the other four as well.

Q. And what methodology do you employ to determine if an officer's actions equates to a

Page 131

presumption of guilt?

A. Well, it would be the same methodology as I apply in this entire section. I'm an expert in a body of knowledge, and I'm applying that knowledge to the specific description or case facts.

So it would be the same methodology that, for example, a medical doctor might apply when seeing some symptoms; drawing on their expert knowledge and looking at the symptoms and saying, this is my opinion, based on their training, research, experience, and expert knowledge.

I'm not talking about a psychiatrist who's opining in a field about which he has no training or expertise; I'm talking about a medical doctor who sees patients and observes physical symptoms. Same methodology.

Q. And maybe I'll be more specific. What symptoms are you looking for to determine if an officer's actions equates to a presumption of guilt?

A. The description -- well, first of all, again, I'm not a fact finder; I'm going on these accounts. But each of the accounts by Mr. Yalda, Mr. Yacoub, Mr. Gomez, Mr. Dominguez, Mr. Jovanovic, they all describe the same thing,

Page 132

an immediate rush to judgment, being yelled at and being accused of committing this crime.

So it's, from their descriptions, applying what we know about how interrogation works and the research in the field, it's very clear to me, in my opinion, that there was a premature presumption of guilt and a rush to judgment, and no attempt to follow it up.

So the analogy to the symptoms is the descriptions by all of them of what occurred in their unrecorded and lengthy interrogations and how Detective Guevara in particular behaved. That's the analogy.

Q. Okay. So I want to back up a little bit from the Gomez case, and just in general, when you're reviewing a case to determine if an officer's actions equate to presumption of guilt, what factors are you looking for to make that conclusion one way or the other?

A. Well, if there's a recorded interrogation, in how they interrogate. And if there's an unrecorded interrogation, I'm not a finder of fact, again, but I would be looking at the various accounts, and if asked to evaluate one

Page 133

account, if there's evidence that they rushed to judgment based on no evidence or incomplete or ambiguous evidence, and through their accusations and their behaviors, rush -- presumed guilt.

The real question here is the premature presumption of guilt. All -- well, you asked generally, but that's -- that's how.

Q. Okay. So you're looking to -- you're looking at the case, and you're looking to determine if, before the interrogator interviews or interrogates the suspect, you're looking for what evidence the interrogator has to determine whether to move forward with the interrogation?

MR. SWAMINATHAN: Objection to form.

THE WITNESS: Well, in part -- sorry. In part, but that doesn't fully characterize the question that I have -- answer that I gave prior to your question.

BY MR. CHRISTIE:

Q. So maybe I'm not just being clear enough. I'm just trying to find out how you determine if an officer, before an interrogation starts, has presumed that a certain suspect is guilty. How do you come to that finding?

RICHARD A. LEO, PHD, JD, 10/02/2023                    Page 134..137

Page 134

A.   Well, usually you would see that in the interrogation.  So usually the opinion would not be before interrogation starts, it would be at the beginning of the interrogation or as the interrogation proceeds.

And the giveaway to a presumption of guilt is the behavior of the interrogator in the interrogation.  It could be that an interrogator had a conversation prior to an interrogation in which they revealed a presumption of guilt.  But usually the presumption of guilt is visible, if it's recorded or described, once the interrogation has started, not prior to the interrogation.

Q.   Okay.  So what behaviors are you looking for from the interrogator to determine whether that interrogator is acting in such a way that he is acting -- presuming guilt?

A.   Well, okay, but the opinion here is a premature presumption of guilt.

But presuming guilt would be through the accusations and statements the interrogator makes.  That's the giveaway.  Or the description of them in an unrecorded interrogation.  That's what you evaluate -- that's what you have to evaluate,

Page 135

the interrogator's behavior and statements during the interrogation.

Q.   I'm just looking for maybe specific examples of what behavior you look to identify to make that determination.

A.   Accusations of guilt, attacking somebody's denials of innocence, calling somebody a liar.  Those would be examples of presuming some -- a liar, when they deny, of presuming their guilt.

Q.   And you said here there is a predetermined presumption of guilt, according to Mr. Gomez's account, by the defendant officers?

A.   I said premature, yes.  And I describe it in the report, the basis for that opinion.

Q.   And I'm just trying to understand what methodology you employ to reach that opinion.

A.   You asked the question, and I've already answered it.  It's the same answer I just gave a few questions ago.

The application of specialized expert knowledge to a set of facts in one's expertise.

Q.   And what set of facts do you typically look for to draw that conclusion?

Page 136

A.   Well, usually, in more recent cases, there would be a recording, and I would look to the record.

In a case like this, I have to evaluate the accounts separately.  But, again, a description or a record of the interrogator's statements, actions, and behaviors during an interrogation.

Q.   Do you look to determine if the interrogating officer or his colleagues had interviewed any witnesses before they interrogated a suspect?

A.   Well, when you say do you look, you mean in a -- in -- do I look -- can you finish the question?

Q.   When presented a case file, and you're making an assessment of whether there's a presumption of guilt, that an interrogator made a presumption of guilt of a certain suspect, when determining whether that conclusion exists, do you look to see if the officer or his colleagues had conducted any interviews of witnesses before that interrogation?

A.   That could be relevant --

Page 137

MR. SWAMINATHAN:  Go ahead, Professor Leo.

THE WITNESS:  I'm sorry.

BY MR. CHRISTIE:

Q.   And can you please explain to me why that would be -- why that could be relevant?

MR. SWAMINATHAN:  Objection to form.

Go ahead.

THE WITNESS:  Well, your question has to do with a presumption of guilt.  It could be relevant as to why the officer did or did not form a presumption of guilt, if I understand your original question.

BY MR. CHRISTIE:

Q.   My question was more of when you are determining whether a certain interrogator acted in such a way that they had a presumption of guilt, do you look to see if that interrogator or any of his colleagues had interviewed witnesses before their interrogation initiated?

A.   I might or might not.  I mean, but I think it could be relevant; that's what I'm trying to say.  You're asking a very general question, and I'm giving you an equally general answer.

Q.   Okay.  So if before an interrogation

Page 138

started police officers interviewed three witnesses and those three witnesses both said of the suspect they saw shoot at a crowd, would that be relevant to determining whether the officers acted with a presumption of guilt when they interviewed that suspect?

A. Yes --

MR. SWAMINATHAN: Objection to form; foundation.

Go ahead.

THE WITNESS: Yeah. Sorry about that.

BY MR. CHRISTIE:

Q. And why would that be relevant?

MR. SWAMINATHAN: Same objection.

Go ahead.

THE WITNESS: Well, depending on the particular facts of the hypothetical, it may be reasonable to question a suspect who had fired a weapon into -- a gun, a single shot into a crowd. That certainly could be relevant if somebody died in the crowd.

But that's not dispositive as to whether the person shot -- who fired the shot in the air actually fired the bullet that killed the

Page 139

victim.

So it would be a reasonable investigative move, but it would not necessarily be a reasonable conclusion that the person was guilty, without more information, and thus should be interrogated in a guilt-presumptive manner.

BY MR. CHRISTIE:

Q. Okay. So you -- they should be interviewed first before being interrogated.

A. Well, I think it would be --

MR. SWAMINATHAN: Objection to form; foundation.

THE WITNESS: Sorry.

In the hypothetical, I think it would be reasonable to interview someone, yes, under those hypothetical circumstances.

BY MR. CHRISTIE:

Q. Okay. So if we move to page 38 of your report. And it's the middle paragraph, Doctor.

It says, quote: "In my professional opinion, if Ariel Gomez's (and Jose Dominguez's, Paul Yalta's, John Yacoub's, and Dragon Jovanovic's) account are credited, Chicago police detective Guevara and Sergeant Mingey demonstrated

Page 140

reckless and incompetent disregard for the truth from almost the very beginning of their investigation of the Concepcion Diaz murder.

Do you see that there?

A. Yes.

Q. And what do you mean when you say reckless and incompetent disregard for the truth?

A. As I describe in this section, that it seemed that the mere fact that Mr. Gomez had shot a gun caused Guevara -- or based merely on that fact, with no serious investigation, Detective Guevara just assumed that Mr. Gomez shot the gun and, as I describe in the rest of the report, coerced Mr. Gomez into signing an incriminating statement, and coerced the four other, or tried to coerce the four other individuals.

So it was reckless because of the methods they describe using, and it was incompetent because there was no meaningful investigation about whether that gun was involved in the death of the individual who died, Mr. Diaz.

Q. What do you mean, there was no meaningful evidence?

A. There's no forensic evidence that links

Page 141

him to the crime. There -- there's contradictory and exculpatory evidence that was ignored or never pursued or never followed up on.

You have somebody shooting a gun in the air. That doesn't mean -- at a Puerto Rican Day parade, at a Chicago Bulls victory celebration. Lots of people out there. Other gunshots being heard. That mere fact is not --

(Court reporter interruption.)

It's merely a lead. It's not a reasonable basis, in my opinion, to start accusing somebody of committing the crime, especially in the manner that Detective Guevara is alleged to have done, not just with Mr. Gomez, but with the other four. Accusing them of guilty knowledge and trying to get them to incriminate Mr. Gomez and themselves is -- is not sufficient investigation to be making the kinds of accusations and using the kinds of techniques that they describe.

Q. What should they have done in order to avoid this presumption of guilt?

A. They should have done an investigation. As I describe in the report, they should have done a follow-up investigation. They shouldn't have

Page 142

pressured or badgered or tried to change the testimony of witnesses. They should have investigated further leads.

There was forensic evidence that was simply ignored prior to the -- what Mr. Gomez and the others describe as very lengthy, very coercive interrogations that seemed, based on their descriptions, designed merely to get them to repeat back Detective Guevara's preconceived assumptive or guilt-presumptive account of what had occurred, in the absence of meaningful investigation.

Q.   Okay. Meaningful investigation. So they should have interviewed witnesses?

A.   That's part of it. But we've got forensic evidence here.

As best I can tell or recollect, the only fact that Detective Guevara, meaningful fact he had, is that Mr. Gomez shot a gun in the air. That's it.

To my recollection, there's no other evidence, prior to these interrogations that are described as very coercive, implicating Mr. Guevara [sic] in the shooting death of Concepcion Diaz.

Page 143

So interviewing witnesses is a start if the witnesses are interviewed properly, but that's, just at that level of generality, that's not sufficient to, in my view, to start accusing somebody of committing the murder.

And if we credit the account of Mr. Gomez and Mr. Yalda and Mr. Yacoub and Mr. Jovanovic, there's no justification for the methods that they describe being used.

VIDEO TECHNICIAN:  It looks like we lost him. Looks like we lost Kyle.  Would you like to go off momentarily until he comes?

MS. ROSEN:  Yeah, his wi-fi just went out. He just texted me.

MR. ENGQUIST:  Yeah, he just sent a text.

MS. ROSEN:  Yeah, let's go off the record.

VIDEO TECHNICIAN:  Off the video record at 3:05 p.m.

(Brief pause.)

VIDEO TECHNICIAN:  This is the continuation of media unit 3.  Going back on the video record at 3:06 p.m.

(Last answer read.)

MR. CHRISTIE: Okay.  I think I know where

Page 144

we're at.

BY MR. CHRISTIE:

Q.   Dr. Leo, you mentioned forensic evidence; correct?  Do you recall that answer?

A.   Yes.

Q.   Okay.  Are you referring to the bullets collected from Mr. Diaz's body that were analyzed to the gun collected from Mr. Gomez's house?

A.   Yes.

Q.   Okay.  And are you stating that the officers should have received that analysis before they conducted an interrogation of Mr. Gomez?

A.   I think that would have been better practice, if possible, yes.  They could have interviewed Mr. Gomez, but the heavy handed guilt-presumptive psychologically coercive interrogation he describes, and the others describe, was not justified in the absence of better evidence, and I don't think that -- justified at all, actually.

Q.   Okay.  I just want to focus right now on the bullet evidence.

Do you know when that forensic analysis report was prepared by the investigator that conducted that analysis?

Page 145

A.   You'd have to refresh my recollection. No.  Off the top of my head, no.

Q.   Okay.  Brett, can you please pull up what has been exhibits -- let's see here -- I think it's -- August 19, 1997 report.

And are we at Exhibit 8?

EXHIBIT TECH:  Yes, we are.

BY MR. CHRISTIE:

Q.   Okay.  So we'll label this Exhibit 8.

Dr. Leo, do you see what appears on your screen?

A.   Yes.

Q.   Do you see where it says August 19, 1997?

A.   Yes.

Q.   Okay.  And this is the report that conducted the examination on the gun collected from Mr. Gomez's house to the bullets -- bullet collected from Mr. Diaz's body?

A.   Okay.

Q.   Do you see that there?

A.   Where it says --

Q.   You could scroll down a little bit, Brett.

Page 146

A. Okay. So what part of it did you want me to read?

Q. No, my indication is this report was published on August 19th; correct?

A. I think so, but I don't see the date anywhere.

Q. Okay, there we go. August 19th.

A. Yes.

Q. All right. And the shooting occurred on June 13th; correct?

A. Yes.

Q. Okay. And earlier I asked you should the police officers have waited for this forensic analysis report to come back before they began any interrogations of Mr. Gomez. Do you recall your answer?

A. Yeah. Given the fact that witnesses described multiple guns being fired, yes.

Q. Okay. So --

A. Multiple --

Q. -- they should have waited -- I'm sorry, what was that last part?

A. Multiple gunshots, I should say.

Q. So they should have waited more than

Page 147

two months before they conducted any interrogations of suspects?

A. Yes. By their train- -- unless they had independent reasonable evidence of that person's guilt, yes.

The mere fact that somebody shot a gun in the air is not evidence that the person killed the victim, when other shots were being fired.

I think an interview would have been appropriate, certainly, but not a guilt-presumptive interrogation based on that mere fact, especially given the witness evidence that they had.

Q. Brett, can you take down this exhibit? Thank you.

So you stated that witness evidence that they had. I just heard that correctly?

A. Yes.

Q. Okay. And what witness evidence did they have that demonstrated Mr. Gomez fired into the crowd?

A. Well, I don't know about fired in the crowd, but fired into the air. I mean, he admitted he fired into the air. The others described him

Page 148

firing into the air.

I don't recall what other witness evidence there was that he fired into the air, but I -- I don't think that is disputed.

Q. You're not aware of any witness evidence that indicates that Mr. Gomez shot into the crowd?

A. Unless you refresh my recollection, no.

Q. Brett, can you please pull open the June 14, 1997 supplemental report.

Sir, do you -- we'll label this Exhibit No. 9. I think that's where we're at.

Sir, do you see this report?

A. Yes.

Q. Okay. And, Brett, can you just please scroll through the 12 pages just so we see the exact entire report.

And, Dr. Leo, my question is going to be, do you recall reviewing this report before you prepared your own report?

Okay. Sir, do you recall reviewing this June 14, 1997 supplemental report before preparing your own report in this matter?

A. Not as I sit here today, no. If it's

Page 149

listed on the materials that I reviewed, then I would have reviewed it.

Q. Okay. And if I were to indicate to you that if we were to go through the materials reviewed list, it indicates that you reviewed the investigative file RFC003 to 128, it's No. 13 on your list?

A. Okay.

Q. And do you see where it says RFC Gomez 00038, and there's, you know, 39 and 37, and so on and so forth?

A. Yes.

Q. So that means that you would have reviewed this report before preparing your own report; correct?

A. Correct.

Q. Okay. And, Brett, can you please pull up -- scroll up a little bit to -- let's see, I think it goes -- Sandra Rodriguez is No. 2. It's probably page 3 or 4.

Maybe down -- I'm sorry. Go down again. I apologize. Maybe page 6.

One more page, please. There you -- one more. There you go.

RICHARD A. LEO, PHD, JD, 10/02/2023                    Page 150..153

Page 150

Sir, do you see the summary of Sandra Rodriguez?

A.   Yes.

Q.   Okay.  Do you see in that report where she says, quote, "She saw the Path- -- she saw the driver, quote, southbound lane and a male Hispanic is sitting out of the window on the passenger side with his arms extended over the hood of the vehicle firing shots at the crowd"?  Do you see that there?

A.   Yes.

Q.   So that's evidence that they saw Mr. Gomez firing shots at the crowd; correct?

A.   Yes, if that's an accurate description. I'm not sure that's the same description she gave in her deposition, but I'd have to double-check.

Q.   Well, sir, I could read a quote from her deposition right now.

Do you recall reading this?  It's line -- page 24, line 2 through 7.  Quote:  "In the moments later after they left, the guy, after the SUV drove off, then shortly after the SUV came back going the opposite direction, going north, and kind of stopped in the middle of the street, and I seen somebody shooting over the top of the hood of

Page 151

the SUV at the crowd that was on the northwest side."  End quote.

Do you recall reviewing that in her deposition transcript?

A.   Not specifically, but I don't doubt that that's in the deposition transcript.

Q.   Okay.  So that's evidence, though, that Mr. Gomez shot at the crowd; correct?

A.   It may be.  I'd have to see that. I don't know that she identifies him as shooting, but maybe she does.  I'd have to visually see that, or you'd have to read it to me again, or I'd have to see the context in which it's said.

Q.   No one's disputing that Mr. Gomez was in the passenger seat of the Pathfinder; correct?

A.   Correct.

Q.   So when she says she sees the person in the passenger seat firing at the crowd, the reasonable inference is that that is Mr. Gomez.

A.   Correct.

Q.   Okay.  Brett, can you please --

MR. SWAMINATHAN:  You want to just state for the record which page of the deposition you're

Page 152

citing, you're reading from?

MR. CHRISTIE:  Yeah.  It's page 24, line 2 through 7.

MR. SWAMINATHAN:  Thank you.

MR. CHRISTIE:  Brett, can you please move down to the summary of Anthony Quinones.

BY MR. CHRISTIE:

Q.   Okay.  And, sir, do you see there where he says he saw a passenger extended with his -- with his hands extended over the roof of the vehicle, shooting into the crowd?  Do you see that there?

A.   Give me just a second to catch up.

Q.   It's the last sentence.

A.   Yes.

Q.   Okay.  And do you recall reviewing Mr. Quinones' deposition transcript?

A.   I believe so.

Q.   Okay.  And do you recall on page 13, line 20 through 22, he says, quote:  "You know, his arms on the car, he was on this, and he was behind the driver and he was shooting at the crowd."  End quote.

Do you recall reviewing that?

Page 153

A.   Well, I believe I reviewed the deposition.  I don't recall that specific statement, but I'm not doubting that it's in the deposition.

Q.   Okay.  So that's the second witness so far that has indicated that he saw Mr. Gomez shoot at the crowd; correct?

A.   Yes, according to the description, yes.

Q.   Okay.  And, Brett, you can take down this report.  I appreciate it.  Thank you.

And, again, we talked about Mr. Soria earlier, Mr. George Soria earlier; correct?

A.   Um-hmm.  Yes.

Q.   Okay.  And do you recall that he testified at trial that he saw Mr. Gomez shoot at the crowd?

A.   I did not recall that.  I don't recall that as I sit here.

Q.   Okay.  So that's three witnesses, though, that have indicated that they saw Mr. Gomez shoot at the crowd?

A.   If Mr. Soria said that, yes.

Q.   Okay.  Brett, can you please pull up

RICHARD A. LEO, PHD, JD, 10/02/2023                    Page 154..157

Page 154

Exhibit 1 again, and return to page 38.

And if you'd just scroll down to the bottom of the page.

And, Dr. Leo, do you see where it says, quote: "Although there was no physical evidence or other evidence indicating that Mr. Gomez had fired the shot killing Mr. Diaz, as soon as George Soria provided the license plate number of the 1995 red Nissan Pathfinder belonging to Ariel Gomez's mother that Ariel Gomez had been driving that night, Detective Guevara immediately assumed that Ariel Gomez had shot and killed Mr. Diaz." Correct?

A.   That's what it says, yes.

Q.   Okay.  So when you state "no other evidence," are you accounting for the fact of Mr. Quinones', Ms. Rodriguez's, and Mr. Soria's testimony?

A.   I don't recall the sequence in which the events occurred as I sit here today.

Q.   Okay.  If they -- if the evidence demonstrates that the officers interviewed these witnesses before they interviewed Mr. Gomez, would that change your -- sorry.  Strike that.

Page 155

If the evidence indicates that Mr. Soria, Ms. Rodriguez, and Mr. Quinones were interviewed before Mr. Gomez was interrogated, that would change the assertion that there's no other evidence; correct?

A.   Well, but the sentence is "no other evidence indicating that he had fired the shot killing Mr. Diaz."  Not "no other evidence that he had fired a shot."

Q.   I had just recounted to you, they said that Mr. Gomez shot at the crowd, not shot up in the air.

A.   Correct.  But there was also evidence of multiple shots, so how would they have known -- how would Detective Guevara have known, without forensic analysis or other evidence, that the shot that nobody disputes Mr. Gomez made was the one that killed Mr. Diaz?

Q.   Okay.  So I just want to understand, in this circumstance, what police should do.  They have three witnesses indicating that Mr. Gomez shot at the crowd, and there's a man that's dead.  Are they supposed to wait two months before that forensic analysis comes back before they make any

Page 156

interrogation or arrest of Mr. Gomez?

A.   Under the circumstances that existed, where multiple shots were fired, and where there was contradictory witness evidence, again, I think it would have been reasonable to interview Mr. -- Mr. Gomez, but a heavy-handed guilt-presumptive interrogation, no.

If there was only one person who fired a bullet that night and there's one dead body, okay, that's a different story.  And if all the witness statements had lined up.  But there was contradictory exculpatory witness evidence.

There was also witnesses describing being pressured by Detective Guevara to change their accounts to fit his preconceived theory.  So --

Q.   Can you please identify those witnesses for me?

A.   Yes.  Well, they're in the report.  Maria -- this is at the bottom of 38.  Maria Castro and Debbie Daniels both described being pressured by Detective Guevara.  And Ruth Antonetty is the other witness that I mentioned.

So, to finish my answer to your

Page 157

prior question, I don't think it was reasonable to conduct a guilt-presumptive interrogation based on the standard training that police investigators receive, which is only interrogate when you've done a thorough investigation, you're reasonably certain that the person committed the crime.

I don't think it was reasonable to be certain that Mr. Gomez shot the bullet under these circumstances that killed Mr. Diaz merely by the three witness statements or portions of the witness statements that you read.

Q.   Aside from -- aside from Ms. Castro, Daniels, or Antonetty, do you recall any other witnesses stating that they saw more than one shooter?

A.   I think we've talked about all the witnesses here, right?  I think you had mentioned Sandra Rodriguez in an earlier question, and you mentioned George Soria.  So I think there were five or six witnesses, at least that I recall.

Q.   Okay.  So aside from George Soria, Quinones, and Rodriguez, who said they saw Mr. Gomez shoot at the crowd, there were other witnesses that just heard repetitive shots that

Urlaub Bowen & Associates, Inc.   312-781-9586

RICHARD A. LEO, PHD, JD, 10/02/2023                    Page 158..161

Page 158

sounded the same; correct?

A.   Correct.

Q.   And not -- that's just not Daniels or Castro or Antonetty, there were other witnesses too, than Castro and Rodriguez.

A.   Yes.

Q.   Okay.  So all these witnesses were interviewed, and do you recall when the evidence emerged that there was more than one shooter -- there was a claim that there was more than one shooter?

A.   Well, if the witnesses heard multiple repetitive shots, the -- no, I don't recall the exact moment, no.

           (Indiscernible.)

COURT REPORTER:  Kyle, you're not speaking into the mic.

MR. CHRISTIE:  Apologies.  Okay.

BY MR. CHRISTIE:

Q.   So, sir, on the next line of the end of the paragraph, you state:  "Not only did Detective Guevara not wait for any forensic analysis of the gun, and not only did he lack any witness evidence suggesting that Mr. Gomez shot Mr. Diaz."

Page 159

Then you go on to state that he suppressed evidence that contradicted Mr. Gomez shot Mr. Diaz.  Do you see that there?

A.   Yes.

Q.   So I just want to focus on the line "he lacked any witness evidence."

Do you see that there?

A.   Yes.

Q.   So you made that assertion after reviewing that June 14, 1997 supplemental report?

A.   Yes.

Q.   And that's when there are witnesses that indicate that Mr. Gomez shot the crowd?

A.   Yes.  But the sentence still holds. There's nobody who identified him shooting Mr. Diaz.

Q.   We have to make reasonable inferences when we investigate; correct?

A.   Yes.

Q.   Police officers have to make reasonable inferences when they investigate murders; correct?

A.   Correct.

Q.   So when several witnesses are saying they saw Mr. Gomez shoot at the crowd, and Mr. Diaz dies, and they didn't see any other shooter, is it

Page 160

not a reasonable inference that Mr. Gomez shot Mr. Diaz?

MR. SWAMINATHAN:  Objection; asked and answered.

Go ahead.

THE WITNESS:  If that were the only information.  But that's not the only information. There was a large crowd, and lots of other shots, and no direct witness evidence.

Again, I think an interview would have been appropriate, but there was no direct evidence that he fired the shot that killed Mr. Diaz.

BY MR. CHRISTIE:

Q.   Sir, that wasn't my question.  My question is, you state he lacked any witness evidence, but that's not true; correct?

A.   No, because you're mischaracterizing the sentence that I wrote by only reading a few words, "lacked any witness evidence" suggesting that Mr. Gomez shot Mr. Diaz, not that he shot at or above or into a crowd.

Q.   Okay.  Sir, do you believe your conclusions are blinded by television?

Page 161

A.   I'm sorry, did you ask blinded by television?  Is that what you said?

Q.   Correct.

MR. SWAMINATHAN:  Do you mean to say tunnel vision or television?

MR. CHRISTIE:  Tunnel vision.  Thank you.

THE WITNESS:  I thought you said television.

MR. SWAMINATHAN:  Objection; form, foundation, and argumentative.

Go ahead.

THE WITNESS:  I'm sorry.

I do not believe that my conclusions are blinded by television -- tunnel vision, rather, but that's for others to determine, obviously.

BY MR. CHRISTIE:

Q.   And why do you say that the police officers were blinded by tunnel vision when they had several witnesses indicating that Mr. Gomez fired at the crowd?

A.   Because there were multiple shots fired at the crowd.  There was no direct evidence that his shot was the one that killed Mr. Diaz.  And because from all of the descriptions, it looked like they -- the Detective Guevara was --

RICHARD A. LEO, PHD, JD, 10/02/2023                    Page 162..165

Page 162

immediately assumed that Mr. Gomez fired that shot, and that he tried to make all the evidence fit his assumption that it was Mr. Gomez who fired that shot.

And so, rather than consider exculpatory or contradictory or inconsistent evidence, like the witness statement that Ms. Antonetty provided, for example, it seemed to me there was a rush to get the confession from Mr. Gomez and to try to make all the other evidence fit to mold that -- that preconceived theory, and ultimately the confession.

Q.   Sir, on page 40, if we could move down one page, I think it's towards the top -- I'm sorry, it's actually the middle paragraph towards the end.

Sir, if I could direct you to the middle of the end of the middle paragraph, it says, quote: "Detective Guevara failed to gather physical evidence that could have corroborated or failed to corroborate Mr. Gomez's prosecutor-written statement?"

Do you see that there?

A.   Yes.

Page 163

Q.   Okay.  What evidence, physical evidence should Mr. Gomez [sic] have collected?

A.   Well, the forensic evidence of the weapon and the bullet.

Q.   Well, sir, they did send that in for analysis; correct?

A.   Correct.  I believe it was after the interrogation, but yes.

Q.   So what physical evidence should they have collected?

A.   You know, as I sit here, I'm just thinking about the gun.  I'm drawing a blank on what I was referring to in that sentence.  I'd have to give that more thought.

But clearly the gun and the bullet could corroborate whether or not he was the one who shot and killed Mr. Diaz, yeah.

Q.   So the police collected exculpatory evidence from Mr. Gomez.

A.   It was exculpatory, correct.

Q.   So they did their job; correct?

MR. SWAMINATHAN:  Objection to form; foundation, argumentative.

Go ahead.

Page 164

THE WITNESS:  Depends on what you mean by doing their job.

BY MR. CHRISTIE:

Q.   They collected evidence and then they obtained -- they had it analyzed and they went through evidence -- and they had the evidence reveal what the report said.  They didn't hide it; correct?

MR. SWAMINATHAN:  Objection to form and foundation.

THE WITNESS:  Correct that they collected ultimately the gun and the ballistics, yes.

BY MR. CHRISTIE:

Q.   And this evidence was introduced at trial.

A.   Correct.

Q.   Mr. Gomez was still found guilty.

A.   Correct, he was found guilty, yes.

Q.   And then at the end of this page, last paragraph, it's a rather lengthy sentence, but I want to direct your attention where it says: "Detective Guevara, Sergeant Mingey, or anyone else, or resulted in any efforts to conduct further investigation or figure out how to reconcile this

Page 165

fact with these statements."

And "this fact" is what you're referring to as the bullet analysis; correct?

A.   Where are you referring to?  Is it the bottom of that page?

Q.   Yeah, bottom of that page after the parentheses.

A.   Okay.  So the sentence that begins, "In my professional opinion"?  No.  The bottom paragraph.

Q.   It begins with "Of course."

A.   Okay.

Okay.  So what is the question?

Q.   And you see where it says that; correct?

A.   Yes.  The evidence -- right.  The -- they didn't have the evidence before the interrogation, correct.

Q.   Right.  And they --

A.   The evidence proved to be exculpatory.

Q.   Correct.  And you state they did not figure out how to reconcile this fact with these statements, right?

A.   Correct.

Q.   Okay.  And this report, again, as we

RICHARD A. LEO, PHD, JD, 10/02/2023                    Page 166..169

Page 166

found early -- or looked at earlier, came out on August 19th; correct?

A.   Correct.

Q.   So this is after charges had been approved by the state's attorney's office?

A.   I believe so.

Q.   So at this point, it's the state's attorney's office that conducts the investigation from this point forward; correct?

MR. SWAMINATHAN:  Objection to form and foundation.

THE WITNESS:  I don't know if that's the case or not.

BY MR. CHRISTIE:

Q.   And with respect to that they didn't reconcile this fact with his statements, do you recall that the argument was at the state's attorneys -- at the trial that the state's attorneys argued that did reconcile this fact?

A.   You're going to have to refresh my recollection.

Q.   Sure.  You recall that the theory that the judge found -- agreed with was that the -- Mr. Gomez and his co-defendants ditched the gun

Page 167

that was actually used?

MR. SWAMINATHAN:  Objection to form; foundation, mischaracterizes the testimony.

You can go ahead.

THE WITNESS:  Okay.  Was that a question?

BY MR. CHRISTIE:

Q.   Yeah, it was a question.  Isn't that reconciling the fact that the ballistics didn't match, that it was a theory that the state's attorney's office presented, that the judge accepted, and the appellate court accepted, that Mr. Gomez and his co-defendants used the -- the gun that they used to shoot in the crowd was abandoned, they got rid of it.

MR. SWAMINATHAN:  Objection to form and foundation.

Go ahead.

THE WITNESS:  That seems like a speculation, not a -- not an evidence-based reconciliation.

BY MR. CHRISTIE:

Q.   Mr. Gomez crashed his car into a wall, so he -- so -- Mr. Gomez crashed his car into a wall and told his mother that his car was stolen in order not to get in trouble; correct?

Page 168

A.   I believe so.

Q.   So is it not a reasonable inference that because they crashed the car, they were willing to get rid of the gun?

A.   No.  It's pure speculation.

MR. SWAMINATHAN:  Objection to form.

Go ahead.

THE WITNESS:  Sorry.

The two have nothing to do with one another.

Sorry, I need to allow more time before I answer the question.

MR. SWAMINATHAN:  Thank you.

BY MR. CHRISTIE:

Q.   All right.  Sir, I'm going to turn to page 41 of your -- there it is -- page 41 of your report, subsection 3.  Do you see where it starts with "Lengthy (Incommunicado) Interrogation, Exhaustion, and Fatigue"?

A.   Yes.

Q.   Okay.  I want to direct your attention to -- actually, sir, one second.  Let's go back really quickly to this issue about the gun.

Mr. Gomez was willing to crash his

Page 169

car into a brick wall to destroy evidence; correct?

A.   I'm not sure about the cause and effect there.  Can you spell it out?

Q.   Sure.  So Dominguez was driving the car.  After Gomez fired the shot into the air, according to Mr. Dominguez and the other co-defendants, they hit somebody when they were driving away.  They drove away and then hatched a plan to crash the car into a wall and fabricate a story that the car was stolen in order to destroy evidence.

A.   Are you talking about evidence for Mr. Gomez's mother?  Or for --

Q.   I'm talking about evidence for a crime.  For a crime that -- under Mr. Gomez's theory, for a crime hitting a person with a car -- hitting a person with their car as they drove away.

A.   Okay.

Q.   Didn't Mr. Dominguez say that they thought someone got their license plate number, so that's why they wanted to crash the car and lie that the car was stolen?

MR. SWAMINATHAN:  You're asking him if he remembers that?

Urlaub Bowen & Associates, Inc.   312-781-9586

Page 170

MR. CHRISTIE: Correct.

Do you recall that?

MR. SWAMINATHAN: So you can answer.

THE WITNESS: Not specifically, but I'm sure I reviewed it when I prepared the report. And I'm not disputing it if it's in the record.

BY MR. CHRISTIE:

Q.   Okay. So that's evidence that they tried to destroy evidence.

MR. SWAMINATHAN: Objection to form.

THE WITNESS: Not evidence of a murder, but ...

BY MR. CHRISTIE:

Q.   No, they tried to destroy evidence of any involvement in any crime.

A.   I'm not sure I agree with that characterization of "any crime."

Q.   Okay. Let's go back to page 41, Lengthy Interrogation, Exhaustion, and Fatigue. Directing your attention to the last paragraph where it starts with saying, quote, "Researchers consider the length of an interrogation to include both the time that a suspect is being questioned and/or accused, as well as any breaks between

Page 171

questioning/accusation sessions, because breaks between accusation and questioning add to the stress and fatigue of interrogation and sometimes are used as an interrogation technique itself." End quote.

Do you see that there?

A.   Yes.

Q.   And did I read that correctly?

A.   Yes.

Q.   Okay. And then you then state, quote, "It is the total amount of time in custody during interrogation that matters." Unquote.

Is that correct?

A.   Yes.

Q.   So, just to understand this, under your definition of length of interrogation, if a person was interrogated for one hour, and in custody but not interrogated for another six hours, that is the same as a person that was interrogated for seven hours straight.

A.   You would say that the period of interrogation custody is seven hours in both circumstances, yes. Just like if you were taking a seven-hour CLE and there were six hours of breaks

Page 172

but you were still at the CLE all day, yes, you would count the whole thing as seven hours.

Q.   So you're comparing continuing legal education to interrogation length of time?

A.   In my answer, yes.

MR. SWAMINATHAN: Objection; form, foundation, argument.

Go ahead.

THE WITNESS: Sorry.

By analogy, yes.

BY MR. CHRISTIE:

Q.   Okay. Move on to page 42, sir.

I'm sorry, Brett, move to page 42, please. Thank you. Appreciate it.

All right. In the middle of the paragraph it says, quote: "Empirical studies indicate that the overwhelming majority of routine custodial interrogations last less than one hour, whereas the combined time period of custody and interrogation in most interrogations leading to a false confession is more than six hours."

Do you see that there?

A.   Yes.

Q.   And so the first part of that sentence,

Page 173

"Empirical studies indicate that the overwhelming majority of routine custodial interrogations last less than one hour," you indicate footnote 48; is that right?

A.   Your voice got muffled at my end. Can you -- the last part of your answer I didn't -- question I didn't get.

Q.   Yeah. The first part of that sentence I just read to you ends with a reference to footnote 48.

A.   Okay.

Q.   Do you see that?

A.   Yes.

Q.   And then footnote 48, the first citation is to your article we looked at earlier, Inside the Interrogation Room; correct?

A.   Correct.

Q.   Okay. So you're supporting -- strike that.

You're citing to Inside the Interrogation Room to support your assertion that the overwhelming majority of routine custodial interrogations last less than one hour?

A.   That's one of the two cites, yes.

RICHARD A. LEO, PHD, JD, 10/02/2023        Page 174..177

Page 174

Q. Okay. So one of the two cites that's used to support that assertion.

A. Yes.

Q. Okay. Brett, can we please -- actually, strike that.

Did you -- do you recall if you defined, in the article Inside the Interrogation Room, the length of an interrogation?

A. You'd have to refresh my recollection.

Q. Brett, can you please open --

A. I'd have to see the article.

Q. Yeah. Can you please open Exhibit, I think it was 6, Inside the Interrogation Room. And if you could go to page 271, please.

And if you could go to the end of that page. So, sir, we looked at this paragraph earlier, where it says: "That I tended to be (but was not always) excluded from the more serious cases raises the general methodological issue of bias, and more specifically the problem of the representative -- representativeness of my data within LAPD, and the generalizability of my findings beyond LPD."

Do you see that there?

Page 175

A. Yes.

Q. Do you recall that conversation?

A. Yes.

Q. Okay. So even though you're stating in this article that the findings may not be generalizable, in your report you do generalize those findings to state that the overwhelming majority of custodial interrogations last less than one hour; correct?

A. Well, with regard to the first part of your question, I didn't say that the find- -- state that the findings weren't generalizable. I -- and recall my earlier answer was one of -- was thinking of this not as a binary yes/no, but as a matter of degree.

But other than that, yes, I agree with your question that this is what I state here and -- and what you previously read in the report is what I state in the report.

Q. Okay. Brett, can you move to page 279, please.

And, sir, I'll represent to you that when I reviewed this article, I couldn't find a definition of length of interrogation. But I

Page 176

will indicate to you on page 279, at the paragraph that starts with, "Of course," you state: "Of course, the interrogations in my sample also varied by length, ranging from literally seconds (when the suspect invoked before the detective even introduced himself) to four and a half hours."

Do you see that there?

A. Yes.

Q. So if you were measuring in this article an interrogation only lasting a few seconds, does that -- am I supposed to infer from that that that includes custodial time along with interrogation time?

A. It could have. In some of the interrogations they would say, you know, we just brought a suspect up. We're going to question him. Do you want to watch? And then I'd come in, and they would read the Miranda rights, and the person would invoke. Not many.

But that's what I could have meant by mere seconds, that literally after I walked in the interrogation room they -- they gave the Miranda warnings and there was an invocation.

Q. But you stated earlier, before the

Page 177

suspect was brought up, he was presumably in custody for at least a couple more seconds?

A. Well, possibly. But in the Oakland police department, there was a jail at the basement of the building, and so they might have had somebody in custody from an arrest the night before, and then the detectives in the morning go to get that person and bring them up to the interrogation room and then question him. I'm counting from the interrogation room forward, not being in custody, in jail, the night before, in the basement of the building.

Q. Okay. So if a suspect is arrested and he is brought in to the interrogation room for several hours but is not interrogated until the three-hour mark, do you not consider those first three hours as interrogation?

A. Yes, because -- or length of time, yes, because it's in the interrogation room.

Q. So --

A. The example I gave was not in the interrogation room.

Q. I understand that. So you differentiate between someone being in a jail cell for a couple

RICHARD A. LEO, PHD, JD, 10/02/2023         Page 178..181

Page 178

hours compared to being in an interrogation room for a couple hours?

A. Yes.

Q. So it depends on the type of room.

A. No, it doesn't -- I don't think that's a full characterization. It depends on the activity.

And, like I said, the bringing somebody into an interrogation room is sometimes a strategy; it was a strategy used in that department to get the person to experience fatigue, exhaustion, anxiety, to prime them for the accusations that followed, with the belief that it would help them more effectively get a confession.

If somebody is in the jail cell from the night before, you know, they might be awake, they might be sleeping, they might be lying on their back in a cot or whatever passes for a bed in a jail cell; it's the moment that the person is in interrogation custody, not just general custody. Sometimes police begin their interrogations at that point, sometimes they don't.

Q. You indicated that someone could be sleeping in a jail cell laying down, right? Did I

Page 179

hear that correctly?

A. Correct. Yes.

Q. Did they do that -- I'm sorry. Did you object?

A. No. Oh, sorry.

Q. Okay. Can't they do that -- can't a suspect sleep in an interrogation room?

A. It certainly could happen, yes.

Q. And can't officers use a jail cell to let a suspect stew?

A. Well, I've never heard the technique described that way that -- that they don't apply interrogation techniques in the jail cell. I suppose it's theoretically possible they could say, we'll just let him stay in the jail cell longer, but I've never seen them -- I can't recall ever seeing police or police trainers describe that as an interrogation technique.

Q. Do you still have the underlying data of these hundred and, was it -62 interrogations that you reviewed?

A. I doubt it. I might. I'd have to go back. I mean, this is 30 years ago, and computers were not as sophisticated then as they are now.

Page 180

I'm not even sure the program that I used to analyze the statistics even exists anymore. It may.

Q. Okay. So I'm supposed to rely on faith alone that these interrogations lasted -- sorry. Strike that.

I'm supposed to rely on faith alone that you measured these interrogations based on a custodial interrogation as --

MR. SWAMINATHAN: Objection; form and foundation and argumentative.

THE WITNESS: Your question as phrased is -- seems incomplete to me. You're supposed to rely on faith alone? I don't -- I'm not sure I understand what you're getting at there.

What is -- what is it that you're relying on?

BY MR. CHRISTIE:

Q. So I'm just trying to ask the question, if another researcher attempted to reanalyze or re-examine your data that you relied on for this report, Inside the Interrogation Room, would they be able to?

A. If they wanted to re-examine that data, unless I could find the data, no, they could not

Page 181

re-examine that data.

Q. Okay. So my next question, then, was are researchers supposed to rely on faith alone that your definition of interrogation in this report was based on total custody time plus total questioning time, as you defined it in your report?

A. Well, that's what I say in the report, yes, and that's what I said in this and other depositions, that's what other experts say.

So if I understand your question, yeah, that's the standard, as I understand it, measuring length of interrogation in the field.

Q. You also reviewed 60 video-recorded interrogations in addition to the live interrogations that compiled your report of Inside the Interrogation Room?

A. Correct.

Q. Okay. So how were you able to determine total custody time in order to measure total length of interrogation when reviewing just those video interrogations?

A. My recollection is that those police -- two police departments turned the video on as soon as the person entered the interrogation room.

RICHARD A. LEO, PHD, JD, 10/02/2023                    Page 182..185

Page 182

And so from the moment they entered the interrogation room to the conclusion of the interrogation, which was on videotape, that's how I measured the length of interrogation.

Q. And, again, there's no way for a second researcher to re-examine those video recordings to determine the accuracy of that assertion?

A. Well, I don't have copies of those video recordings. The -- if I had copies of data, it would be the coding sheets that listed the times of the interrogations. So whether the recorded interrogations or the unrecorded interrogations, there's no way a researcher could get access to those materials.

Obviously the only people who had access to the unrecorded interrogations were the people present and the -- for reasons I'm sure you could understand easily, it's -- the police did not give me those recordings. They let me view them, but I don't recall being able to take them with me.

In addition, even if I had the recordings, they might raise confidentiality issues, and so future researchers may -- would not -- I'm not sure they would be -- unless they

Page 183

could be anonymous somehow, with the permission of the department. So it becomes -- it -- I don't think, even if I had them, they would be re-reviewable.

If I did have them and they were re-reviewable, it would be the 60, not the 182.

Q. Brett, you could take this report down, and can you just quickly open up Exhibit 1 again. I think where we were just at, page -- page 42, please. There we go. Perfect.

Okay, sir. So earlier I had asked you a question about the first line of the sentence, "Empirical studies indicate that the overwhelming majority of routine custodial interrogations last less than one hour," and you cited to footnote 48.

There was also a second publication there; correct?

A. Yes.

Q. And it's a Barry Feld, Kids, Cops and Confessions?

A. Yes.

Q. Is that a book?

A. Yes.

Page 184

Q. Okay. So that was not produced to us then in response to our subpoena?

A. (No response.)

Q. Are you aware of that, or no?

A. Oh, you're asking me? I assume that you can purchase these books on Amazon, and so it's -- I -- I've never seen a deposition where one party produced books for another party. If that happens, I'm not aware of it.

Q. No, okay. I appreciate it. I'm just trying to understand it, that it is a book.

A. Yes.

Q. Okay. Now I want to move to the second line of that sentence where you say, quote -- actually, I want to get some water first. Excuse me.

Where you say, quote: "Whereas the combined time period of custody and interrogation in most interrogations leading to a false confession is more than six hours." End quote.

Do you see that there?

A. Yes.

Q. And then you cite to footnote 49; correct?

Page 185

A. Right, yes.

Q. Okay. And if we look at footnote 49, that's your 2004 article titled The Problem of False Confessions in the Post-DNA World?

A. Right.

Q. Is that right?

A. Yes.

Q. Brett, can you please open up the 2004 article Problems in False Confessions? I think that would be -- I think we're at Exhibit 9 or 10.

EXHIBIT TECH: Give me one second. It would be Exhibit 10.

MR. CHRISTIE: Okay. Thank you.

MR. SWAMINATHAN: Kyle, let's take a break when you get to a good stopping point.

MR. CHRISTIE: Yeah, I think after this question regarding the 2004 article, we could take a break hopefully that's about five minutes or so.

MR. SWAMINATHAN: Yes.

BY MR. CHRISTIE:

Q. Sir, do you see Exhibit 10 appear on your screen?

A. Yes, thank you.

Q. Okay. And it's correct that that's the

RICHARD A. LEO, PHD, JD, 10/02/2023                    Page 186..189

Page 186

2004 article that you and Professor Drizin co-authored?

A. Yes.

Q. And that's the article that you cited to to support your assertion that most interrogations that -- leading to false confession is more than six hours; correct?

A. Yes.

Q. Okay. Brett, can you go to page -- I think if you type in page 49, it will take you there.

If you go down to footnote 355.

Oh, is there no -- okay, it's probably a different report. Okay. Can you go to the end of the report? Go to footnote 355.

Maybe that -- okay, maybe it's page 50, then. Maybe it bled off -- over. You need to type in page 50. It might be there.

EXHIBIT TECH: Sorry about that. Is this the right one? Do I have it pulled up correctly?

MR. CHRISTIE: Yeah, it's the correct one.

EXHIBIT TECH: Okay.

MR. CHRISTIE: There it is. Okay.

Page 187

BY MR. CHRISTIE:

Q. And if you could zoom in for the doctor. I think it's probably hard to see for everybody.

Doctor, can you see footnote 355 clearly?

A. Yes.

Q. Okay. And the first part of this footnote states, quote: "We were only able to obtain the length of reported interrogation in slightly more than one third of the cases we studied." End quote.

Did I read that correctly?

A. Yes.

Q. And remind me again, do you recall how many cases you studied in this article?

A. 125.

Q. 125. So slightly more than one third of 125 is about 45 to 50, would you say?

A. Correct, yeah. And then it says on the next page, 44.

Q. Oh, it does. Oh, wonderful. Okay.

And if you continue on with this line, it says: "In some cases" and then it

Page 188

proceeds on to the next page "we possessed case records from which we could deduce the length of actual interrogation. In other cases, however, we were only able to obtain newspaper accounts of the reported length of the interrogation, and were not able to independently verify their accuracy. One potential problem that concerned us is that lawyers will sometimes report the length of time in custody as the length of actual interrogation." End quote.

Do you see that there?

A. Yes.

Q. Okay. So I want to break this down a little bit.

So of the 44 cases that you were able to determine the length of the interrogation, some of those did not come from primary sources, but secondary sources like newspapers? Is that correct?

A. Can you go back to the prior page just so I can read the beginning of the footnote?

Okay. Can you go down now back to the next page? Thank you.

So, yes, we relied on a number of materials, one of which was newspaper accounts.

Page 189

And if you classify those as secondary sources, then, yes, it looks like we were able to obtain -- I'm just reading this again -- the reported length, but not able to verify through case materials in some of the cases.

Q. You weren't able to verify the accuracy of the length of interrogation that was reported in those newspapers. Am I understanding that correctly?

A. Right. Through other sources, yes.

Q. Okay. And so of the 44 cases, do you know how many of those cases you had to rely on -- rely on secondary sources like newspapers to determine the actual length of interrogation?

A. Well, I -- I'm not sure what you mean by secondary source as opposed to primary source, right? But I don't know the answer to that the -- 20 years later, no.

Q. I appreciate that distinction, but I guess when I'm saying secondary sources here, I'm just referring to those newspaper accounts. So but you're not able to determine how many cases you relied on such as the actual, like, video recording compared to sources like newspapers?

RICHARD A. LEO, PHD, JD, 10/02/2023                    Page 190..193

Page 190

A.   I do not.

Q.   Okay.  And then you state: "One potential problem that concerned us is that lawyers will sometimes report the length of time in custody as the length of actual interrogation.  As a result, interrogation may be disputed between the parties."

Do you see that there?

A.   Yes.

Q.   Okay.  And then in the last sentence it states, quote: "If police electronically recorded interrogations from start to finish, there would be no disputes about how long the suspect was questioned."

So is it fair to say that when I read this -- sorry.  Strike that.

So when reviewing this footnote, is it fair to infer that you define length of interrogation as actual interrogation, and not length of time in custody plus length of actual interrogation?

A.   I don't think so because -- for two reasons.  One, my recollection is somebody -- an attorney might say, you know, their client was

Page 191

questioned for four or five days, but, you know, they were -- they were brought from the interrogation room down to the jail, next day back up to the, down to the jail, right?  So it's not like they were in the interrogation room for four or five days straight, so -- so there's a distinction between -- there's -- what I'm referring to is custody over the course of the interrogation, not police custody in a jail, right?

So it's a little ambiguous there, the word "custody," because it has two different meanings.  So that's the first reason why I don't think it's reasonable to infer that.

And the second is in the very last sentence, "if police electronically recorded their interrogations from start to finish, we'd have no disputes," that's all I'm talking about, the moment you walk into the interrogation room to the moment you walk out.  Whether -- if it occurs over multiple days, then the multiple days, time in/time out.  That's what I'm referring to.

And the full electronic recording, the interrogation start to finish, is when you -- when you go into the interrogation room.

Page 192

Q.   Well, sir, you didn't finish the sentence there.  It says, quote, "If police electronically recorded interrogations from start to finish, there would be no disputes about how long the suspect was questioned."

A.   Right.  But that's a synonym for interrogated, and interrogation includes length of time plus questioning or accusations.

Q.   What authority supports that assertion when you made the article?

A.   Well, I can't point you to a particular article.  That's why I have described in the section of the report that that's the way researchers count length of interrogation.  It's really custody and interrogation over the course of the interrogation typically measured by as time in the interrogation room.  And that's how I counted it, and that's how I believe others would count it or have counted it.

MR. CHRISTIE:  Okay.  Anand, I promised you a break, probably went a little bit over my time limit.  Let's take -- let's come back about 4:20, about a 12-minute break?  Is that fair for everybody?

Page 193

Doctor, is that good for you?

THE WITNESS:  Yeah, that sounds good.

MR. CHRISTIE:  I need to stretch my legs too.

THE WITNESS:  Ten minutes.  Okay.

VIDEO TECHNICIAN:  Going off the video record at 4:08 p.m.

(Recess taken.)

VIDEO TECHNICIAN:  This is the beginning of media unit 4.  We are going back on the video record at 4:21 p.m.

MR. CHRISTIE:  Brett, could you please pull up Exhibit 1, page 42, please.

Great.  Thank you.  And if we could scroll down a little bit so the footnotes are showing.  Perfect.  Okay.

BY MR. CHRISTIE:

Q.   So, Dr. Leo, before we took a break, we were going over your 2004 article that you co-authored with Professor Drizin; correct?

A.   Yes.

Q.   And the purpose of that questioning was to assess your assertion where it says, quote: "Whereas the combined time period of custody and interrogation in most interrogations leading to a

Urlaub Bowen & Associates, Inc.   312-781-9586

RICHARD A. LEO, PHD, JD, 10/02/2023                    Page 194..197

Page 194

false confession is more than six hours."  Right?

A.  Correct.

Q.  Okay.  And so the assertion you made in this report relies on your assessment in that 2004 article; correct?

A.  That's what we cite, yes.  I cite.

Q.  Okay.  And, as we just had gone over, that article has only obtained about 44 interrogations where you were able to determine the actual length of interrogation, right?

A.  Right.

Q.  And of those 44 interrogations, some of them you had to rely on newspaper accounts, right?

A.  That's what it appears to be from the way it's written, yes.

Q.  So you weren't able to determine with complete accuracy the total length of interrogation of those 44 interrogations that you measured; correct?

A.  No, I -- I think what I stated was in the article, that we relied on newspaper reports that we couldn't verify in some cases with other sources.  That doesn't necessarily mean that it was inaccurate.  It's two different statements.

Page 195

Q.  Okay.  But nonetheless you were just relying on 44 cases for your assertion --

A.  In the case study -- sorry.

Q.  Okay.  But that's the only study you point to in footnote 49.

A.  Correct.

Q.  Okay.  So the sample size to support your assertion that most interrogations leading to a false confession is more than six hours is 44 cases.

A.  Correct.

Q.  Towards the middle of this paragraph, where it says the Reid, 1986 Reid & Associates?  Do you see that?

A.  Yes.

Q.  Okay.  And you state, quote:  "The 1986 Reid and Associates police interrogation training manual (which was current version 1993) specifically recommends that police interrogate for no longer than four hours absent exceptional circumstance -- situations, and that most cases require considerably fewer than four hours.

Did I read that correctly?

A.  Yes, except there was a typo.  It

Page 196

should have said 1997, not 1993.

Q.  Okay.  So you're getting ahead of me then.  So I was just going to ask, the 1986 version was the most recent version in 1997?

A.  Correct.

Q.  Okay.  And you cite footnote 50.  And if we look at footnote 50, you cite to the manual, and you drop a pin cite of page 310.  Do you see that there?

A.  Yes.

Q.  Okay.  Do you have that manual with you?

A.  I do.  It's on my shelf.

Q.  You want -- how fast can you grab it?

A.  Probably about ten seconds.

Q.  All right.  I'll time you.  Get ready and go.

A.  Okay, I've got it.

Q.  All right.  Can you please flip to page 310 for me, please.

A.  Sure.

    Okay.  I'm on 310.

Q.  Are you there?

A.  Yes.

Q.  Okay.  And that is where in the Reid

Page 197

manual it asserts that rarely will a competent interrogator require more than approximately four hours to obtain a confession from an offender even in cases of a very serious nature?

    Do you see that line there?  I'm reading from the Reid manual.

A.  You're reading from the report, not from the book, right?

Q.  No, I'm reading from the book.

A.  Oh, okay.  So you're reading on page 310 of the book?

Q.  That's correct.  The pin cite that you dropped in your report, and it says, in the book -- it's the middle paragraph -- it says, quote: "Moreover, as to the time factor, rarely will a competent interrogator require more than approximately four hours to obtain a confession from an offender even in cases of a very serious nature."  End quote.

A.  Okay.

Q.  Do you see that there?

A.  Yes, yes.

Q.  Okay.  And is that what you are citing to to support your assertion that the Reid manual

Page 198

only require -- or only recommends interrogation for four hours absent exceptional circumstances?

A. Yes. But they use the word "exceptional situations" a couple sentences down on page 310.

Q. Yes. Okay. So I'll read that for the record too, then.

Quote: "Moreover, interrogation within the suggested four-hour period is less likely to be viewed by a court or jury as unreasonable than one that has extended over a longer period. Nevertheless, there should be no hard and fast rule in this respect because in exceptional situations there may be a need for a somewhat longer period." End quote.

Did I read that correctly?

A. Yes. And then, of course, it says "most cases require considerably fewer than four hours," yes.

Q. Okay. Fair enough.

And is that what you're relying on for your assertion that the Reid technique recommends no longer than four hours, absent exceptional situations, for an interrogation?

Page 199

A. Yes.

Q. Okay. Do you know if the Reid technique defines interrogation to include both custodial time and the length of questioning?

A. I don't know. I'd have to look through their manual to see if they define it, and if so, how they define it.

Q. Okay. So you're not aware currently.

A. Without looking at their current manual, no.

Q. By "current manual," do you mean the 1986 manual or the --

A. Well, you said -- yeah, sorry. You said "currently," so I assumed you meant the most recent one.

Q. I'm sorry. I meant in that 1986 manual.

A. No, I -- I'd have to look through it to see if they define how they measure length of interrogation.

Q. Sir, in previous depositions, have you been asked whether the Reid manual defines length of interrogation to include both custodial time and length of questioning?

A. I'm sure I have been asked, but I don't

Page 200

recall specifically.

Q. Okay. And since that time, you haven't determined whether Reid defines length of interrogation as both custodial time and questioning time?

A. I have not. That I recall, no.

Q. Okay. You could put that book aside. I appreciate you grabbing that.

Now, sir, can you please point to me any case law that measures the length of interrogation as the total time in custody during interrogation?

A. Off the top of my head, no.

Q. Okay. Are you aware that case law defines detention differently than length of interrogation?

A. Well, when you say case law, I mean, the case law would just be individual judges in individual cases. I'm sure there are cases where they -- yes, detention would be different than interrogation, but I'm -- I'm not sure there's a monolithic way of approaching this in judge-made case law.

Q. So when you say earlier in your report

Page 201

if -- Brett, can you just scroll up just a little bit? At the beginning of the paragraph.

Or you know what? It might be the page before. Sorry.

Page 41, when you say, quote: "Researchers consider the length of interrogation to include both the time that the suspect is being questioned and/or accused, as well as any breaks," you don't rely on case law to support that conclusion?

A. Correct.

Q. Okay. Can you point to me any empirical research that shows how long the average length of custodial noninterrogation time is in a murder case?

A. I'm sorry. So custodial non-interrogation time? No, I can't.

Q. Okay. Can you point to me empirical research that shows how long the average length of interrogation, under your definition, time is in a murder case?

A. Not exclusively in homicide cases, but 81 percent, I believe, of the 125 cases. So maybe 81 percent of the 44 cases, maybe higher, were

RICHARD A. LEO, PHD, JD, 10/02/2023                    Page 202..205

Page 202

homicide cases.

Q.   I'm sorry.  And what are you referencing?

A.   Oh, the 2004 article that we were just through.  So I was saying 81 percent, if I'm recalling correctly, of those proven false confessions were homicide cases.  So it might be the case that 81 percent of the 44 cases are homicide cases.  I believe most of the proven false confessions are homicide cases.

Q.   Okay.

A.   But I --

Q.   Go ahead, finish your sentence.

A.   No, no, but you asked about a study of just homicide cases.

Q.   Correct.  And I -- and not just cases involving false confessions.  I'm just asking, for cases involving a murder case, do you know how long -- sorry.  Do you know how -- do you know of any empirical research that shows how long the average length of interrogation time is?

A.   Exclusively for murder cases, no.  But most of the proven false confessions are mostly murder cases.

Page 203

Q.   Okay.  Are you aware of any research that shows that suspects stay in custody for hours before interrogations start?

A.   Well, not off the top of my head, no.  It might be that the aggregated case studies involve some cases like that.  But just a case study of that -- a study of that, no.

Q.   So when you state on page 42 that the empirical studies indicate that the overwhelming majority of routine custodial interrogations last less than one hour, that is encompassing all different types of criminal cases; correct?

A.   Yes.  I should have specified felony cases, but yes.  All different types of felony cases, correct.

Q.   Okay.  And correct me if I'm wrong, but didn't your article, Inside the Interrogation Room, indicate that cases that are often more complex or more serious often lead to longer interrogations?

A.   I don't recall, but I do believe that that -- that the more serious the case, yes, the longer the likely interrogation.

Q.   Okay.  If we go to page 41, and it's the first paragraph -- oh, sorry.  First paragraph

Page 204

of subsection 3.  Apologies, Brett.  Thank you.

So in this paragraph you analyzed the total length of interrogation for Mr. Gomez; correct?

A.   Yes.

Q.   Okay.

A.   Custody -- interrogation, custody, and interrogation, yes.

Q.   As you previously defined it; correct?

A.   Yes.  Although I think I clarified in the middle of the paragraph, I used both of those terms, yes.

Q.   Okay.  So that's where I want to go.  It says, quote:  "As best I can tell from the materials I reviewed, the interrogation custody interrogation of Mr. Gomez started sometime between 12:00 a.m. and 2:00 a.m. on June 14, 1997, when he was arrested and taken to Area 1 police department."  End quote.

Do you see that?

A.   Yes.

Q.   Okay.  And then you continue to conclude:  "Accordingly, as best I can tell for the purposes of this report, Mr. Gomez's period of

Page 205

interrogation and interrogation custody on June 14, 1997, was approximately 12 hours"?

A.   Yes.

Q.   Okay.  And am I understanding you correctly that you are subtracting the time that his statement was taken, which is 1:30 p.m., minus the time that he was arrested, to get to the 12 hours?

A.   Yes.

Q.   Okay.  I'm a lawyer, not a mathematician, so I just want to double-check my homework.

All right.  So what sources are you relying on to indicate that, to the best of your knowledge, Mr. Gomez's interrogation time started somewhere between 12:00 a.m. and 2:00 a.m.?

A.   I thought I was relying on testimony -- I'd have to go back through it, but the testimony -- the descriptions of when they were brought to the police station and the police reports and their own accounts.  I thought it was around midnight.

Q.   Okay.  And to be fair --

A.   Between midnight and 2:00 a.m., yeah.

Page 206

Q. Okay. And, to be fair, you do state at the end of this paragraph, in parentheses "(if I am provided with additional discovery on this point, I will revise my time estimate accordingly)." Correct?

A. Yes.

Q. Okay. Brett, can you please pull open the June 14, 1997 supplemental report. I believe we labeled it Exhibit 8 or 9?

Yes, thank you. And if you could -- I believe you could scroll down to where it has "Ariel Gomez" highlighted on the left. That would be page 10.

Okay. So do you see, sir, right above where it has "Gomez Ariel" highlighted, it says, quote: "At 6:30 hours, RDs first interviewed Ariel Gomez." End quote.

Do you see that there?

A. Yes.

Q. Okay. Does that help you indicate when the interview of Mr. Gomez started?

A. I just -- can you remind me what document this is? I know this is a police report, but it would -- if my recollection is accurate, it

Page 207

would seem to contradict other police reports.

Q. This is the June 14, 1997 supplemental report. It's about 12 pages in length.

A. Who wrote it?

Q. I believe it was Detective Ruiz and Detective Guevara are the signing detectives.

A. Okay.

Q. Okay? And, actually, Brett, if you go -- go ahead, if you want to complete your answer.

A. No, no, no, go ahead.

Q. Brett, if you'd go to page 3, I believe. Right there. Sorry. If you go -- it's page 5, it looks like.

Tough when you don't have the control.

One more.

Yeah, if you could just scroll down a little bit further. Here we go.

I'm sorry. Actually next page, please.

Okay. Here we go. Sir, do you see the top of the paragraph of this report?

A. Yes.

Q. Where it says: "RDs requested other

Page 208

detectives to go to 5542 West Grace, where the vehicle was registered, and see if anyone was there"?

A. Yes.

Q. Do you see that?

A. Yes.

Q. And that's the place where Mr. Gomez resided at this time?

A. Okay.

Q. Does that refresh your recollection?

A. I guess so, that that's where he resided.

Q. Okay. And according to this report, that's where they arrested Mr. Gomez and his co-defendants?

A. Okay.

Q. All right. And do you see where -- okay. Do you see the next paragraph where it says: "While at the scene, Detective Maher spoke to the owner of the vehicle, Ms. Celia Gomez, and asked where her vehicle was"?

A. Yes.

Q. And -- okay. And then at the end of that paragraph, it said, quote: "Detective Maher

Page 209

then asked both Ariel Gomez and Mrs. Gomez if there were any weapons in the house, and both stated no, and stated he could look in the house. Ms. Gomez then signed a Consent to Search for them."

Do you see that there? It's the end of the second paragraph.

A. Oh, okay. Yes, I see it.

Q. Okay. So would it indicate that at the time that Ms. Gomez signed the Consent to Search form is about the time that Mr. Gomez was arrested and brought to Area 5?

A. I don't think it says that, but maybe it implies that.

Q. Well, would it help to see that Consent to Search form where it indicates the exact time that it was signed?

A. Okay, but you're -- to what end? To say that that's probably when he was arrested?

Q. Correct, based on the statements in this report.

A. Okay.

Q. Would you agree that about the time that Ms. Gomez signed the Consent to Search form is about the same time that Mr. Gomez was arrested?

Page 210

A. I just don't recall. I'd like to see something that said when he was arrested. But there may be a factual dispute about when they say they were arrested and the interrogation started and when he says the interrogation or interview started.

Q. Sir, I'm just -- in your report you said, "If I'm provided with additional discovery on this point, I'd revise my estimate accordingly."

A. Yes.

Q. So I'm just trying to provide you additional discovery to see if we could narrow down the exact time Mr. Gomez was arrested.

A. Okay. But I don't understand why a Consent to Search would narrow that down necessarily, and I -- there could still be a factual dispute between what the -- what the police report says and what the -- Mr. Gomez and his co-defendants report.

Q. Okay. I appreciate if Mr. Gomez disputes the timing, but if he doesn't and the Consent to Search form was signed approximately at the same time he was arrested, would that help you revise your time estimate of when he was arrested?

Page 211

A. Well, it might lead me to revise it on those assumptions.

Q. Okay. Brett, can you please take down this exhibit and pull up what we'll label Exhibit No. 11, which is titled a Consent to Search, or it might be C. Gomez Consent to Search.

Okay. Sir, do you see Exhibit 11 on your screen?

A. Yes.

Q. Okay. And do you speak Spanish?

A. I do not.

Q. Okay. I'll represent to you that this is a Consent to Search form. And do you see Celia Gomez's name on the top there?

A. Yes.

Q. Okay. And do you see on the upper right corner where it says 0245?

A. Yes.

Q. Okay. So presumably this Consent to Search form was signed at 2:45 a.m.?

A. If it's accurate, yeah, around then, yes.

Q. Okay. So, again, if it's not disputed, based on the report I just showed you, and this

Page 212

Exhibit 11 that's in front of you, would that help you revise your time estimate as to when Mr. Gomez was arrested?

A. Well, I just don't understand the way you're using the word "help." If this is accurate, and if he was arrested at 2:45, and then if he -- he signed the statement I think at 1:30 p.m., then the time estimate would be from 2:45 till 1:30, which would be, I don't know, nine hours? Ten hours?

Q. Ten hours. Okay.

A. I'm not sure.

But we're making assumptions, and we don't know if those assumptions are accurate.

Q. Okay. And -- Brett, you can take this exhibit down. I appreciate it.

And did you review the motion to suppress hearings?

A. I believe I did when I was preparing the report.

Q. Okay. And if I represent to you that in the first day of the hearings, page 34, line 19 through 20, that Detective Guevara testified that Gomez and his defendants were brought in at about

Page 213

3:00 a.m. in the morning to Area 5, would that also help you estimate the time that they were arrested?

A. Again, the way you're using the word "help" doesn't make sense to me.

If Detective Guevara's accurate, and if it's 3:00 o'clock, then on that assumption, yes, I would answer the question by saying 3:00 till 1:30 is what, 10 1/2 hours? Instead of being approximately 12 hours, it would be approximately 10 1/2 hours.

Q. And does Mr. Gomez state in his deposition when his interrogation started with Detective Guevara after he was arrested?

A. I'd have to look at the deposition. I don't recall.

Q. So if it started at 6:30 in the morning, and he was arrested at 3:00 in the morning, do you still count those three and a half hours towards his custodial interrogation time?

A. It would depend on whether he was deposited -- in your hypothetical, deposited in the room at 3:00 -- in the interrogation room, or if he was not.

So I would count the moment from

RICHARD A. LEO, PHD, JD, 10/02/2023                    Page 214..217

Page 214

which he was put in an interrogation room to the conclusion of the interrogation. So if he was brought to a jail and left alone for three and a half hours, I would not count that, but if he was deposited in an interrogation room for three and a half hours, I would count that.

Q. Okay. And if he was interrogated -- strike that.

Hypothetically, if he was interrogated for an hour, and then brought back to a jail cell until his prosecutor-written statement, which occurred at 1:30, would that time that he spent in the jail cell account for custodial interrogation length?

A. Not as I would count it, no. It would just be the time in the interrogation room.

Q. Okay. Sir, earlier we were talking about guilt presumption. Do you recall that conversation?

A. Yes.

Q. Okay. And you indicated that one of the things the detectives should have done here was interview Mr. Gomez, right? Instead of interrogate him?

Page 215

A. I think I said it would be -- it would have been reasonable, yes, to interview him.

Q. Okay. And interviewing would be open-ended questions, right?

A. Yes. That are not leading, suggestive, directive, guilt-presumptive.

Q. Okay. And after police interview a suspect like Mr. Gomez, you would agree that they should verify his statement, so if he provides an alibi, he should -- they should interview alibi witnesses; if he explains that he shot up in the air instead of at the crowd, they should interview witnesses at the scene to see if they corroborate his account, right?

A. Yeah, they should gather other evidence, yes.

Q. Okay. So while they're gathering other evidence, if they keep the suspect in the interrogation room, do you still account for that as the length of interrogation?

A. I would, yes.

Q. Okay. So I just want to understand, what should police do in that case if they interview the suspect, the suspect has an alibi,

Page 216

and they go to corroborate that alibi, which I understand you're saying is what they should do, what should they do with the suspect?

A. Well, if they have probable cause to arrest him, they can arrest him and put him in jail. If they don't have probable cause, they should cut him loose.

Q. Okay. So if they have probable cause to remain -- or keep him detained or keep him or her detained, they should transfer him or her to a jail cell?

A. Well, that's one option. If they put the person in the interrogation room, they should recognize that, especially at that time overnight, they should recognize that that could contribute to a lengthy exhausting or fatiguing interrogation.

Q. So why is it better to transport the suspect to a jail cell instead of just keeping him -- him or her in the interrogation room?

A. Well, I'm not sure it's better. It depends on to what end we're talking about.

But if they deposit a suspect in a jail cell, it's -- it's just not part of an interrogation, it's not part of that event. It's

Page 217

separate, at least as we classify and analyze it.

I guess I would have to know more about the conditions of the two environments and what we meant by better to evaluate, whether it was better.

I'm just saying that this is how we classify it. And if he had been deposited in a jail cell, we wouldn't count the interrogation/custody clock is running.

Q. Okay. So my understanding is the longer an interrogation goes on, the longer the length, the greater the risk is that the suspect may falsely confess. Do I understand that correctly?

A. Yes. But the reason is because of exhaustion, fatigue. And obviously there are other factors at play.

Q. Okay. I'm just trying to understand why exhaustion or fatigue or other factors that might be at play are in play when the suspect's in an interrogation room versus if they're just in a jail cell.

A. Well, they can also be at play in a jail cell. It would depend on conditions in the

RICHARD A. LEO, PHD, JD, 10/02/2023                    Page 218..221

Page 218

jail cell.

Q.   Okay.  And what empirical research shows that a suspect becomes more exhausted or fatigued in an interrogation room compared to a jail cell?

A.   I'm not aware of any research that makes that comparison.

Q.   I asked you earlier if Mr. Gomez, hypothetically, if it's undisputed that he was arrested at 3:00 a.m. and deposited in the interrogation room at 3:00 a.m., but he was not interrogated till 6:00 a.m., those first three hours would still be considered the length of an interrogation; correct?

A.   Yes.

Q.   Okay.  Again, if police are interviewing other witnesses before they interrogate a suspect, what should they do with that suspect?

A.   I would think if they had probable cause to believe the suspect committed a crime, then they should detain the suspect, arrest the suspect or detain the suspect, and I would think if they don't have probable cause, unless they think

Page 219

the suspect is a danger, they should let the suspect be wherever the suspect will be.

Q.   Okay.  So presuming if they have probable cause, they should just arrest the subject and keep him or her in a jail cell instead of the interrogation room?

A.   They could.  It depends on the circumstances.

Q.   Okay.  If we could go back to Exhibit 1, page 43, please.

Okay.  And, sir, do you see that on your screen?

A.   Yes.

Q.   Okay.  I want to direct you to the last sentence before Subsection 4 where it states, quote: "As substantial empirical research supports, lengthy interrogation, as well as the fatigue, exhaustion and depletion of psychological resources it contributes to and produce, substantially increased the likelihood that Mr. Gomez would falsely comply and sign a prosecutor-written confession statement on June 14, 1997." End quote.

Do you see that there?

Page 220

A.   Yes.

Q.   And did I read that correctly?

A.   Yes.

Q.   Okay.  What methodology did you use to conclude that the length of the interrogation substantially increased the likelihood of a -- that Mr. Gomez would falsely comply with a signed -- and sign a prosecutor-written confession?

I want to focus on the language "substantially increased the likelihood."

A.   Again, the same methodology as before.  I'm just applying my expert knowledge of the body of research to the facts of this case.

Q.   Okay.  So are you able to determine how much quantitatively it increased the likelihood that he would comply and sign a confession statement?

A.   If you want a number zero to 100, no.

Q.   Sir, if we -- Brett, if we go to page 44.  Just scroll down a little bit.  And in Subsection 5, where it's titled False and Exaggerated Evidence Ploys.

Do you see that, sir?

A.   Yes.

Page 221

Q.   And in this section, is it fair to say that you explained that false evidence ploys are one of the situational risk factors that may cause a false and/or unreliable confession?

A.   Yes.

Q.   Can you please define a false evidence ploy for me?

A.   A representation that there is evidence that links the suspect to the crime that is false, unreliable, or exaggerated.

Q.   And when that ploy is introduced against the suspect, for it to be a false evidence ploy, does the interrogator need to know that the evidence they're introducing is false?  Do they know -- do they need to intentionally know that they are misrepresenting the evidence?

A.   No.

Q.   Okay.  So if a police officer makes an inference about what they believe the evidence would say, but they are later wrong, that would be considered a false evidence ploy.

A.   Correct.  If the investigator genuinely believed that the evidence was true, but it turned out to be false, we would still classify it as a

RICHARD A. LEO, PHD, JD, 10/02/2023                     Page 222..225

Page 222

false evidence ploy, correct.

Q. So false evidence ploys don't require intentional or knowing misconduct by an officer.

A. Correct.

Q. Okay. If we scroll down to page 44 -- oh, actually, so we are on 44. My fault.

Oh, there it goes. It's at the bottom of page 44. Do you see that, sir, where it says, quote: "As a century of basic psychological research on misinformation effects has shown"?

A. Yes.

Q. Okay. And if we scroll on to the next page, on 45 it continues there: "False evidence ploys are effective at eliciting compliance, confusing some suspects into believing that they have been framed or that such evidence really does not -- does exist, causing some suspects to doubt themselves (deferring to interrogators' authoritative assertions of irrefutable evidence despite knowing that they did not commit a crime) even causing some suspects to develop false beliefs and/or false memories of committing crimes."

Do you see that?

A. Yes.

Page 223

Q. So am I understanding you correctly that false evidence ploys may cause a suspect to doubt their own memory?

A. Yes.

Q. And at this point, a suspect may start deferring to an interrogator's assertions?

A. Correct.

Q. Okay. And suspects may start developing false memories based on that interrogator's assertions?

A. Yes.

Q. And that false memory might be a memory that they actually committed a crime when they actually did not; is that correct?

A. Yes.

Q. Okay. And then you indicated that there's significant research on the effects of misinformation?

A. Yes.

Q. Does that research indicate what conditions people are particularly susceptible to the impact of misinformation?

A. Where there's studies of misinformation effects across different situations, I -- I just --

Page 224

I'd have to review more of that literature to know if there's an article across it that tries to identify the specific conditions. I'm just not recalling as I sit here right now. That's the broader category.

The false evidence ploys, of course, is a narrower category, and -- and it's well documented that false evidence ploys increase the risk of false confessions.

Q. Okay. Well, let me give you a specific example. Does the passage of time from when an event occurred make a person more susceptible to the impact of misinformation?

A. It could.

Q. And why are you saying it could? Is it because memories fade over time, therefore making a person more susceptible?

A. Yeah. I mean, you're asking about the relatively rare situation of false memories in interrogation. But false memories are more common outside of interrogation, and outside of interrogation, false memories, one condition under which people would be more likely to develop a false memory would be the passage of time because

Page 225

memory decays essentially over time.

Q. Is another condition that a person might be susceptible to misinformation is that the person providing that misinformation is someone of authority like a police officer?

A. Yes.

Q. Okay. So people that are authoritative, it could be professors?

A. Well, it could be, but I'm not sure what context you're thinking of. But --

Q. Okay. Fair enough.

A. -- people tend to trust authoritative sources.

Q. So people may trust their attorneys?

A. They may trust their attorneys, yes.

Q. So they -- an attorney could be an authoritative source?

A. An attorney could be an authoritative source, yes.

Q. Are you aware of any research that indicates how people who are subject to misinformation may actually embrace it?

MR. SWAMINATHAN: Objection to form.

Go ahead.

RICHARD A. LEO, PHD, JD, 10/02/2023               Page 226..229

Page 226

THE WITNESS: Well, there -- there is a whole body of literature about the effects of misinformation, but I -- I'm only here talking about the narrow context of interrogation and confession.

There was a time when I used to teach that many years ago. But I haven't reviewed that body of research more generally recently.

MR. CHRISTIE: Brett, if we scroll back up to page 44.

THE WITNESS: I need to just take a one-minute break just to tell my daughter that I'm not going to be able to pick her up from school. Just text. So it will be like 30 seconds.

MR. CHRISTIE: Yeah, let's go off the record. I'm just going to grab some water anyways.

VIDEO TECHNICIAN: Going off the video record at 5:03 p.m.

(Brief pause.)

VIDEO TECHNICIAN: This is the beginning of media unit 5. We are going back on the video record at 5:05 p.m.

BY MR. CHRISTIE:

Q. If we could pull up Exhibit 1, page 44,

Page 227

please.

Sir, in the first paragraph under subsection 5 it says, quote: "The social science research literature has demonstrated that false evidence ploys are potentially psychologically coercive techniques that are virtually always present in, and substantially likely to increase the risk of eliciting false statements, admissions, and/or confessions."

Do you see that there?

A. Yes.

Q. Okay. How could false evidence ploys be potentially psychologically coercive -- a potentially psychologically coercive technique while at the same time substantially likely to increase the risk of false confessions?

A. Well, potentially psychologically coercive if they imply threat or promise. And whether psychologically coercive or not, in and of themselves likely to increase the risk that somebody would falsely confess for the reasons stated in the, I think bottom two sentences of that paragraph. Right?

They create or contribute to the

Page 228

suspect's perception that he's trapped, there's no way out, his conviction is inevitable, his situation is hopeless, he doesn't have much choice.

Q. Okay. And similar to my question before: What was the methodology used to conclude that a false evidence ploy is substantially likely to increase the risk of false statements, omissions, and/or confessions?

A. Well, it would be the same answer as before. My read of the research literature and the research that I have done applied to the facts of this case, if it's a case-specific conclusion or any of it.

Q. And, again, are you able to determine how much quantifiably it is substantially likely to increase the risk of false confessions?

A. No. If you mean a number between zero and a hundred, no.

In some of the experimental studies we can tell you the ratio at which it increased false relative to true confessions.

Q. And those are -- are those lab experiments involving college students?

A. Yes.

Page 229

Q. Okay. So I'm just trying to understand -- I think -- you said it's not possible to come up with a quantitative dataset to determine the likelihood that a false evidence ploy causes a false confession or statement?

A. Not unless we could randomly sample all interrogations in the United States and determine which ones had false evidence ploys and which ones did not, and determine what percentage led to false confessions versus not. And there's no known database that the government or a private organization collects of all interrogations. And even if there were, there would be some dispute about whether some were true or false.

So we can't come up with an estimate and say, if you use a false evidence ploy, you're going to get X or Y number of false confessions.

You'd also -- that would also be dependent not just on the interrogation technique, but on -- on prior investigation in the -- the ratio of innocent to guilty suspects being interrogated.

Q. Okay. But you stated that there need to be a representative sample of all interrogations

Page 230

that took place in America? Did I hear that correctly?

A. If -- to answer your question, yes. Not to answer every research question. But the question I understood you to be asking was, in order to generate a number between zero percent and a hundred percent of when false evidence ploys are used you get false confessions, and what I was saying is the dataset just doesn't exist for that because no organization, no government collects all interrogations, leading to confessions, not leading to confessions, and even if they did, there would still be some cases where we couldn't tell whether the confession was true or false.

Q. Okay.

COURT REPORTER: Wait. Somebody just said something. The end of the answer, "we couldn't tell whether the confession was true or false." Was there something after that?

THE WITNESS: I don't recall.

BY MR. CHRISTIE:

Q. And my question was a little bit more specific, and I appreciate the clarification. But did you indicate that there needed to be a

Page 231

representative sample of all American interrogations in order to obtain an answer to the question I posed earlier?

A. Yes. And the only way you could get that is -- it would have to be a random sample, not a representative sample. It would have to be a random sample of the full universe of cases.

Q. Okay. Illinois currently records all homicide interrogations; correct?

A. That's my understanding, yes.

Q. Okay. So is it possible to review a random sample of the video interrogations that take place in Illinois to help draw a conclusion about how quantifiably a false evidence ploy is to increase the likelihood of a false confession?

A. I still think it would be very difficult because first you would need the police to release the interrogations, as well as case files.

And, second, you'd still have the problem of some of the confessions would be indisputably true, some would be indisputably false, and there would be others where there was a dispute and there was no way of really adjudicating

Page 232

it to certainty.

So I think it would be extremely unlikely that you'd even get access to all that data, but if you did have access to that data, there'd still be cases where you couldn't tell if the confession was true or false.

Q. And just for the first point -- we'll get to the second point shortly -- the first point, I'm just curious, why couldn't you obtain that data since your article in 1996, Inside the Interrogation Room, you were able to obtain about a -- over 150 interrogations from three separate police departments.

A. Yes. So oftentimes police distrust researchers or don't want to open up their files for a variety of reasons. So you would need to get permission from the police. And a lot of times researchers are not successful.

I was successful in my circumstance, but there were some unique aspects to that.

Q. Okay. And then moving to the second paragraph under subsection 5 where it says: "As mentioned above," you state, quote: "According to Mr. Gomez, Detective Guevara told him that he had

Page 233

smelt the gun that Mr. Gomez used and had identified it as the weapon that killed Mr. Diaz." Correct?

A. Yes.

Q. Okay. And is that the false evidence ploy that you're referring to that was used in this case?

A. Yes.

Q. What do you understand "smelt the gun" to mean?

A. That based on his experience and knowledge and sense of smell, that he believed the gun that Mr. Gomez shot was the gun that killed Mr. Diaz.

Q. Okay. So he smelled it. Not smelt it like a blacksmith; is that your understanding?

A. Yeah. And maybe I used the wrong word, yeah.

Q. No, it's fair. I was trying to understand. I appreciate that.

Okay. And then on page 45 -- find it -- on page 45, the first paragraph, in the middle of the paragraph you state, quote: "Based on well-established basic and applied social

RICHARD A. LEO, PHD, JD, 10/02/2023                    Page 234..237

Page 234

scientific research going back decades, the detectives' multiple false evidence ploys in their interrogation of Ariel Gomez increased the risk of eliciting a false and unreliable confession."

Do you see that there? The top of page 45, middle of the paragraph --

A. Yes, yes.

Q. Okay. What do you mean by "multiple false evidence ploys"?

A. Yeah, I -- I think that was the only -- I think I mis- -- I think that's a mistake on my part. I think it was only -- if I'm remembering correctly, I think it was just that one false evidence ploy.

Q. Okay. Sir, if we go up to page -- Brett, can you go to page 48, please.

And, sir, do you see subsection 8 where it's titled Personality Traits As Risk Factors for False and/or Involuntary Confessions?

A. Yes.

Q. Okay. And is it fair to state this section describes particular groups or individuals that are vulnerable to the pressures of interrogation?

Page 235

A. Yes.

Q. Okay. And I understand that you identify three groups. Individuals that are mentally ill, juveniles, or individuals with a low IQ or low level of cognitive or intellectual functioning.

Are those the three groups?

A. Yes.

Q. Okay. With respect to Mr. Gomez, what group or groups does he fall into?

A. Mr. Gomez I believe was 17 years old, and so he would fall into the group of juveniles or youth who are at elevated risk, as described here, for some of the reasons described here.

Q. Okay. So you don't define Mr. Gomez to have a mental illness or be mentally ill?

A. Not based on the materials that I reviewed.

Q. And based on the materials you reviewed, you don't understand Mr. Gomez to have a low IQ or a low level of cognitive or intellectual functioning?

A. Correct.

Q. Okay. And for juveniles, do you define

Page 236

that to be anyone under the age of 18?

A. Yes. But the -- the research shows that, you know, the brain continues to develop into the early to mid 20s, and that has a lot to do with impulsiveness and increased suggestibility.

But, yeah, typically juvenile refers to anybody under 18.

Q. And you state in your report that the younger the juvenile, the greater risk that they will make or agree to a false confession; is that right?

A. Yes.

Q. Okay. So a 16-year-old is generally at a greater risk of falsely confessing than a 17-year-old?

A. Yes.

Q. Are you able to quantify how much of a greater risk?

A. No.

Q. So how do you come to that conclusion that a 16-year-old is generally at a greater risk of falsely confessing than a 17-year-old?

A. The literature on the development of the brain suggests that the less developed the

Page 237

pre-frontal cortex, the less developed the brain, the more suggestible and psychosocially immature the person will be; and so as their brain develops, as they get older and become more adult-like, the risk would go down.

Q. And you state that Mr. Gomez, who was 17 years old at the time of his interrogation on June 14th of 1997, was at a heightened risk of making and/or agreeing to a false and/or unreliable confession statement because of his personality traits and characteristics, specifically his relative youth and associated psychosocial immaturity?

A. Correct.

Q. And what do you mean by psychosocial immaturity?

A. That one's brain is not developed and one is more immature.

Q. Okay. And with respect to Mr. Gomez specifically, how were you able to determine that at age 17 he was psychosocially immature?

A. It's a -- it was a general observation that people of that age are generally considered to be -- to have these personality traits,

RICHARD A. LEO, PHD, JD, 10/02/2023                    Page 238..241

Page 238

psychosocial immaturity, impulsiveness, higher suggestibility, more naivete, et cetera.

So it wasn't specific to him in the sense that I didn't do a clinical evaluation or rely on a clinical report, but he's part of this group that we know, for a variety of reasons, are more likely to make or agree to a false confession, especially under conditions of coercion, and that was the basis for the conclusion.

Q. Okay. Did you or are you aware of anyone that tested Mr. Gomez for suggestibility?

A. I'm not aware of it as I sit here right now.

Q. Could such a test have been conducted?

A. I mean, yes, a test could have been conducted, sure.

Q. Okay. And what about did you or are you aware of anyone that tested Mr. Gomez for compliability?

A. For compliance, no.

Q. And could that test have been done?

A. In theory, yes.

Q. So generally a 17-year-old is at greater risk of falsely confessing than a 19-year-

Page 239

old; correct?

A. Correct.

Q. Okay. What about a street smart 17-year-old versus a naive 19-year-old?

A. Well, I'm not aware of any study that breaks it down into those two categories.

Q. Okay. Let me rephrase that.

A. We just have to hypothesize.

Q. Okay. Let me rephrase.

What about a 17-year-old with a misdemeanor record compared to a 19-year-old that has no criminal record?

A. I couldn't answer that question by pointing you to a study that looks at that specific comparison, gathers data on that specific comparison, analyzes data on that specific comparison.

You have to reason from general observations and principles.

Q. Let me ask a slightly different question then.

Is a juvenile that has a criminal record at a greater risk or a decreased risk of making or agreeing to false statements?

Page 240

A. I don't -- I can't think off the top of my head of a study that addresses that question.

I can think of reasons why it might go both ways.

Q. In your Inside the Interrogation Room 1996 article, correct me if I'm wrong, but were one of your findings that an individual with either a misdemeanor or felony background were more likely to assert their Miranda rights than a person that did not have a criminal background?

A. Correct. But I think it was a study of adults, not juveniles; but I'd have to go back and look to confirm that.

Q. Okay. So adults who have a felony or misdemeanor background are more likely to assert their Miranda rights than an adult that has no criminal background.

A. Correct.

Q. And you don't know that applies to 17-year-olds compared to 19-year-olds. Strike that. Sorry.

You don't know if that same finding of adults who are 18 or older applies to an individual who is 17 years old.

Page 241

A. There's no studies on that, yes, that I'm aware of.

Q. All right. Sir, I want to go to page 49 of your report.

And it's titled, Subsection D, Indicia of Unreliability. Do you see that there?

A. Yes.

Q. Okay. And do you use the term post narrative analysis or fit test interchangeably with indicia of unreliability?

A. No.

Q. Okay. And why is that?

A. Well, the fit between the confession and the suspect's knowledge of nonpublic facts not likely guessed by chance and the physical -- and/or the physical evidence is not the same necessarily as indicia of unreliability.

It may yield indicia of unreliability, but they're not identical concepts.

Q. Okay. So what are you trying to -- what is the purpose of this section titled Indicia of Unreliability?

A. The purpose is to say that based on the social science research on how we evaluate whether

Page 242

statements induced through an interrogation process are likely reliable or unlikely reliable or contain hallmarks or characteristics of reliability or unreliability, that's the purpose, to apply the standards of the field to the facts of this case as I understand them.

Q.   Okay.  And what --

A.   Indicia of reliability or indicia of unreliability.

Q.   Okay.  And what is the methodology that you employ when conducting this analysis indicia of reliability or unreliability?

A.   Broadly speaking, it's the same as the other methodologies that -- that we discussed, applying one's knowledge of the findings and methods and principles of a field in a substantial research literature to the facts of a particular case; but in particular, looking at whether the confession statement is corroborated, as it says at the top, by physical, forensic, medical, or other independent evidence that's credible, whether it leads to new or missing or derivative evidence, whether it contains any corroborable or nonpublic case facts that were not suggested to the suspect

Page 243

by the police or only the true perpetrator would know, and whether it's consistent with or contradicted by other case facts, logic, or evidence, or consistent with.

Q.   Okay.  I appreciate that.  I just want to break that down a bit.

So you might be looking for a -- in a statement or an interrogation by a suspect, you're looking to see if his statements are corroborated by potentially new evidence that is revealed?

A.   Correct.  Oftentimes in reliable or true confession cases, suspects will generate new evidence, essentially in their confessions lead police to new, missing, or derivative evidence that police were not aware of, and it may be of the type that only the true perpetrator or somebody involved in the crime would know.

Q.   Okay.  And would another potential way to determine if any confession has the indicia of reliability or unreliability is to determine whether the suspect is able to provide crime scene anomalies?

A.   Yes, if they are not likely guessed by

Page 244

chance and if they weren't independently known and they weren't suggested or fed to the suspect by the police.

Q.   Okay.  So a particular wound on a victim might be an anomaly that could determine whether a statement is corroborated or not, assuming that there's no contamination or scripting?

A.   And it's not likely guessed by chance, yes.

Q.   Okay.  Now -- strike that.

Are there reasons that a confession may not perfectly fit or have all the hallmarks of indicia of reliability?  In other words, it doesn't have a hundred percent passing grade?

MR. SWAMINATHAN:  Objection to the form.

Go ahead.

THE WITNESS:  Yeah, I don't really understand your question.  Can you reask it?

BY MR. CHRISTIE:

Q.   Sure.  Are there reasons that a suspect's confession may -- let me rephrase it.  Strike that.

Are there reasons a suspect's confession may contain indicia of unreliability but

Page 245

still be overall a reliable and true confession?

MR. SWAMINATHAN:  Objection to form.

Go ahead.

THE WITNESS:  Yeah.  I mean -- well, if I understand your question, you could have a partially reliable/partially unreliable confession with indicia of unreliability as well as indicia of reliability.

I'm not sure that's your question, but if it is, that would be my answer.  If it's not, then please ask --

BY MR. CHRISTIE:

Q.   So yes.  Thank you.  You answered my question.  I just -- and would maybe one reason be length of time from the event to the interrogation?  Memories fade, so the suspect's memory may not be perfect even if the suspect is in fact guilty?

A.   I think that's theoretically possible, but usually more salient events are remembered better.

So -- yeah, it would be more likely that somebody would remember a more salient event than a less salient event.

Q.   Okay.  Are you familiar with the term

Page 246

or the phenomenon repression?

A. Yes.

Q. Okay. And am I correct that repression is where individuals unconsciously push memories out of their conscious awareness?

A. That would be the definition, yes.

Q. Okay. So -- okay. Is another reason that a confession may not be entirely reliable is because of repression, that a suspect's memory is trying to push out memories of the conscious awareness?

A. I'd be very skeptical of that because memory researchers, memory scientists don't really believe that's how memory works. So the whole repressed memory concept has been discredited.

Q. Okay. What about suspects trying to minimize or moralize their actions to look at what they did in a better light? Could that be a reason why a statement may not be entirely reliable?

A. That could be a reason. They -- it also could be that they are regurgitating and repeating minimization scenarios that were suggested to them, as opposed to independently brought up by them.

Page 247

Q. And, sir, do you have any expertise on memory?

A. Well, it depends what you mean by expertise.

Q. Have you ever been an expert -- a memory -- strike that. Have you ever been admitted in court as a -- sorry. Strike that. Have you ever testified in court as a memory expert?

A. I have never, to my knowledge, or my memory, been offered or testified as an expert on memory in a courtroom setting.

Q. Have you conducted independent research on memory?

A. No. I've written a little bit, but not independent research just on memory, no.

Q. And when you say you've written a little bit, was it literature reviews?

A. Yes, reviews of literature and the application of memory research to interrogation and confessions.

Q. So you have reviewed research about memory, but you have yourself not conducted any of

Page 248

your own research; is that fair?

A. Outside of the context of interrogation and confession, yes.

Q. Okay. With respect to the top of page 49 you state, quote: "Ariel Gomez's prosecutor-written confession statement does not bear any of the traditional indicia of reliability that researchers and experts use to assess confession evidence. It is not supported or corroborated by any physical, forensic, medical, or other credible independent evidence; it did not lead to any new or missing evidence; did not contain any corroborating nonpublic case facts that only the true perpetrator, but not the public police -- but not the police detectives knew, and is inconsistent with and contradicted by numerous other case facts, logic, and evidence."

Do you see that there?

A. Yes.

Q. What do you mean when you say "other" quote "credible independent evidence"?

A. I think I just --

Q. Third line.

A. That there's no nonphysical,

Page 249

nonforensic, nonmedical, credible independent evidence linking him to the crime, that I recall.

Q. So are you crediting evidence?

MR. SWAMINATHAN: Object to form.

THE WITNESS: I'm not trying to credit evidence -- sorry, I'm trying to -- sorry. You want to state the -- I guess the court reporter didn't hear it. Do you want to --

MR. SWAMINATHAN: Yeah, objection to form. Go ahead, Professor Leo.

THE WITNESS: Sorry, that was my fault. No, I'm not trying to put myself in a position of a finder of fact here, I'm not making credibility judgments. I'm just engaging in the analysis based on the materials I've been provided and reviewed.

BY MR. CHRISTIE:

Q. And when you say there's no other credible independent evidence, are you not -- strike that. When you say there's no other credible independent evidence, what about the testimony of George Soria, Anthony Quinones, or Sandra Rodriguez that we mentioned earlier?

RICHARD A. LEO, PHD, JD, 10/02/2023                   Page 250..253

Page 250

A.   My best recollection is that they don't identify him as the shooter.  And even if they did, the scientific evidence always trumps testimonial evidence, especially in a situation like that, for research purposes at least.

But so I don't -- I just don't think, in my professional opinion, that they provide evidence that he shot the gun -- he shot the bullet, rather, that killed Mr. Diaz.  Their observations are too general.  And -- well, anyway, I'll just stop there.

Q.   Are you assessing the credibility of those witnesses' testimony?

A.   I'm not assessing their credibility.  That's for the finder of fact.  But in order to engage in this kind of analysis, I have to evaluate the -- and weigh the facts provided to me in the materials that I reviewed.  And, of course, if there was additional facts or materials to review, I would be open to changing my opinions.  But based on what I did review, there is nothing that convinced me that Mr. Gomez's statement had any indicia of unreliability, and the witness statements did not -- that you mentioned didn't

Page 251

change that.

Q.   Do you know what gun Mr. Gomez had on him at the time that he was -- that he shot the gun at Cicero and Diversey?

A.   I'd have to refresh my recollection.  I think it was a chrome automatic .45, but I'd need to review a -- some case documents to make sure I got that accurately.

Q.   Okay.  So you're crediting Mr. Gomez's testimony that that was the gun he fired when he shot at Cicero and Diversey?

A.   Well, I don't recall the source of my -- my belief that that was the gun, but I think there were others who also identified that as the gun, not just Mr. Gomez.

Q.   Are you aware that there's a witness that -- sorry.  Strike that.

Are you aware that there's a co-defendant that says at one point that there were two firearms in the car that night?

MR. SWAMINATHAN: Objection to form and foundation.

Go ahead.

THE WITNESS: I don't recall that as I sit

Page 252

here.  But, again, that's contradicted, even if that's true, by much stronger evidence that I reviewed.

BY MR. CHRISTIE:

Q.   What do you mean, stronger evidence?

A.   Well, if -- if you're suggesting that a second gun was fired by Mr. Gomez that led to Mr. Diaz's death, the stronger evidence would be the analysis by Dr. Filkins and Mr. Balash that both wounds were caused by one gun, one bullet, not the gun that Mr. Gomez had or shot.

Q.   Sir, are you an expert in firearms?

A.   I am not an expert in firearms.

Q.   And are you an expert in trajectory analysis?

A.   I am not an expert in trajectory analysis.

Q.   And I'm assuming you're not a medical examiner either?

A.   Correct.

Q.   Okay.  So are you relying on the opinions of Mr. Balash and Dr. Filkins for those parts of the testimony that you just mentioned?

A.   Yes.

Page 253

Q.   Brett, can you scroll down just a tad where the list starts --

A.   I mean, I'd also be relying on other information like that document that you showed me, as well, earlier.

Q.   Perfect.  Thank you.

So what document are you referring to?  Oh, the August 19, 1997 ballistics examination.

A.   Correct, correct.

Q.   And that's the one that indicated that the bullet collected from Mr. Gomez's -- or the gun that was collected from Mr. Gomez's house did not match the bullet that was collected from Mr. Diaz; correct?

A.   That's my recollection.

Q.   If a second gun was used, not the gun collected at Mr. Gomez's house, that finding would be negated.

A.   Yes, but --

MR. SWAMINATHAN: Objection to form.  Sorry.  Sorry, Professor Leo.  Objection to form and foundation.

Go ahead.

THE WITNESS: My recollection and analysis

Page 254

is that there's no evidence that a second gun was used. So, you know, you could say if a third or a fourth or a fifth or a sixth gun were used too, but it's purely speculation.

BY MR. CHRISTIE:

Q.   Sir, did you review the deposition of Paul Yalda?

A.   Yes.

Q.   Okay.  Did you review the deposition of Relono Lee [phonetic]?

A.   I don't recall.  I'd have to look at the materials that I reviewed.

Q.   I will stipulate to you, based on the materials listed on pages 2 through 12, it does not list Relono Lee's deposition transcript.

Are you aware that Paul Yalda made a statement to journalists from Northwestern?

A.   I'd have to refresh my recollection.

Q.   Do you recall reviewing any articles from Northwestern's School of Medill's journalism program?

A.   I don't recall as I sit here.  I'd have to look at the materials reviewed and then look at my files to see if I could refresh my recollection.

Page 255

Q.   So when you're saying it is purely speculative that there were two guns in Mr. Gomez's car that night, what are you basing that conclusion on that it is entirely speculative?

A.   I -- I thought what I was saying -- I mean, the hour is late, but I thought I was saying this was purely speculative that Mr. Gomez used a different gun.  There was no evidence linking him to a different gun, the gun that fired the bullet that killed Mr. Diaz.

So I was making a very -- a more specific statement than I think what you're saying in this question.

Q.   Understood.  It is speculative based on the evidence you reviewed; correct?

A.   Correct.

Q.   When you read Mr. Yalda's deposition, did you not want to review the deposition of Relono Lee or any of his Medill articles?

A.   So if I'm understanding you correctly, I don't -- you said the Relono Lee very fast.  I don't recall if I reviewed that or not.  And I don't recall if, when I was reviewing Mr. Yalda's deposition, I wanted to read the Medill journalism

Page 256

student's article that you're referring to, or to the deposition that you're referring to.  I would need more context.

Q.   Do you ask for documents from plaintiff's counsel, or were you just sent documents from plaintiff's counsel?

MR. SWAMINATHAN:  Can you reask the question? Sorry, Professor Leo, I wasn't sure if it made -- can you reask the question or can you have it read back?

MR. CHRISTIE:  Yeah.  Can you please read it back.

(Question read.)

MR. SWAMINATHAN:  Yeah, that question asks for communications between you and counsel which are privileged, so I'm instructing you not to answer at least for this question as phrased.

BY MR. CHRISTIE:

Q.   And, Dr. Leo, are you going to accept counsel's instruction not to answer?

A.   Yes.

Q.   Is it your practice to request documents when conducting -- or when preparing an expert report?

Page 257

MR. SWAMINATHAN:  You can answer that question.

THE WITNESS:  Yeah.  I mean, sometimes I do, sometimes I don't.  It depends on what is initially sent to me and whether I feel, as I go through those materials with my understanding of a case, I need additional documents.

BY MR. CHRISTIE:

Q.   Do you know if the gun that was found at Mr. Gomez's house was the same gun that he fired at the scene?

A.   I think he said it was the same gun he fired at the scene, and I think others described that as the gun that was fired at the scene.

Q.   Okay.  Sir, I want to go to bullet point No. 4 where it starts with, quote: "Concepcion Diaz had multiple entry wounds."  End quote.  Do you see that?

A.   Hold on a second.

Yes.

Q.   Okay.  What do you mean when you say he had multiple entry wounds?

A.   I can't really say anything more than what the words say there.

RICHARD A. LEO, PHD, JD, 10/02/2023                 Page 258..261

Page 258

Q.   Okay.  Let me rephrase it, then.  Are you saying that more than one bullet struck Mr. Diaz?

A.   No.  I'm just saying he had multiple entry wounds.  That was my understanding at the time I wrote this report.

Q.   Okay.  And who were you relying on to form that statement?

A.   I can't tell you specifically what document in the many documents I reviewed I was relying on.

Q.   You continue to state, quote: "However, Ariel Gomez, Paul Yalda, Jose Dominguez, John Yacoub, and Dragon Jovanovic testified that there were two bullets in the gun Ariel Gomez fired that evening.  One was fired earlier that night, and that there was only one bullet left in the gun when they arrived at Diversey and Cicero."

Did I read that correctly?

A.   Yes.

Q.   Okay.  Are you forming your opinion that Ariel Gomez only had two bullets in the gun based on his deposition testimony that the clip only had two bullets in it?

Page 259

A.   Well, it's not just -- so, first of all, this is for purposes of the analysis, right?  But he's not the only one who said that, according to my report and analysis, right?

Q.   Well, he's the one with personal knowledge.

MR. SWAMINATHAN:  Sorry, sorry, sorry.  Please don't cut him off.  Please don't cut him off.

MR. CHRISTIE:  I apologize.  Thank you.

THE WITNESS:  Ariel Gomez, Paul Yalda, Jose Dominguez, John Yacoub, and Dragon Jovanovic all testified that there were two bullets in the gun, it's my recollection, and only one left when they arrived at Diversey and Cicero.

BY MR. CHRISTIE:

Q.   All right.  And my next question was that Mr. Gomez is the one that had personal knowledge how many bullets were in the gun; correct?

A.   Well, he represented that he had personal knowledge, yes.

Q.   Okay.  Brett, can you please pull open Mr. Gomez's deposition transcript.  I think that would be Exhibit 11.  I just want to clarify

Page 260

something, please.

And if you'd just Control F, I think "clip," I'm sure the question I have will come up.

EXHIBIT TECH:  I'm actually on a Mac, so I don't think it's going to do ...

MR. CHRISTIE:  Okay.  One second.

EXHIBIT TECH:  Do you want me to stop sharing?  Do you want to bring it up if you have it on your --

MR. CHRISTIE:  Sure, I will bring it up on my screen once this deposition loads.

BY MR. CHRISTIE:

Q.   Okay.  Sir, I'm going to share with you my screen.  See if we can pull this up.

All right.  Sir, I'll represent to you that this is Mr. Gomez's deposition transcript.  And do you see on page 126, I'm going to start with line 18; okay?

A.   Okay.

Q.   "Question: Okay.  How did you know it had two bullets in it?

"Because when he gave it to me, he pulled down the clip and it had two bullets in it.

Page 261

"Okay.  So did you know how to eject the clip, the ammunition clip, from the gun and place it back into the gun?

"Yeah, he showed me."

Okay.  So is this -- do you recall -- strike that.

Do you recall reviewing this testimony?

A.   Generally, yes.

Q.   Okay.  And is this what you used to support your assertion that Mr. Gomez had two guns -- I'm sorry -- two bullets in his gun?

A.   I think there's other evidence I reviewed that also supported that.

Q.   Okay.  Sorry.  In addition to other evidence, is this the evidence from Mr. Gomez's personal knowledge that there was two bullets in the gun?

A.   Yes.

Q.   I'm going to stop sharing my screen.  And then, Brett, can you please pull up Exhibit No. 1 again?  Page 49, where we just were?

And do you recall that that was the first time Mr. Gomez said he fired that gun, on

RICHARD A. LEO, PHD, JD, 10/02/2023                    Page 262..265

Page 262

June 14th?

A.   I don't recall if that was the first time.

You're asking about whether he first said that in his deposition, or earlier?

Q.   No, sorry.  According to Mr. Gomez's deposition transcript, did he say that it was the first time he fired the gun was on June 14th at the intersection of Cicero and Diversey?

A.   I don't recall who fired -- who he said fired the first bullet in the gun that evening.

Q.   Let me clarify my question.
     I'm not talking about Mr. Dominguez.  I'm saying for Mr. Gomez, that was the first time he personally fired that gun.

A.   I just don't recall if that is the first time, if he says that's the first time.

Q.   Okay.  And then for Mr. Dominguez, you indicate that he fired one bullet; correct?

A.   I'm sorry, where do I indicate this?

Q.   Page 49, bullet point 4.

A.   It doesn't say that Mr. Dominguez was the one who fired the first bullet, does it?

Q.   Okay.  Fair enough.  Not in that part,

Page 263

but do you recall that Mr. Dominguez is the person that fired that bullet earlier that night?

A.   I'm sorry, I just don't recall that.

Q.   Okay.

A.   I'm not disputing it.  I just don't recall it as I sit here today.

Q.   No, that's fine.  Okay.
     Brett, can you please pull up in Mr. Dominguez's transcript labeled as Exhibit 12.  And I have the page number this time.
     Oh, I think that's his statement, although it says his transcript.

EXHIBIT TECH:  Sorry.

MR. CHRISTIE:  No, you're fine.  I appreciate it.  Thank you.
     And if you go to page 87, line 17.

BY MR. CHRISTIE:

Q.   Okay.  And do you see the question there, quote:
     "Would it be fair to say that you just stuck your left arm out the window and pulled the trigger and shot it?"
     End quote.
     And the answer is:  "Yes."

Page 264

Do you see that?

A.   Yes.

Q.   Does that help refresh your memory that Mr. Dominguez is the person that fired that bullet earlier that night?

A.   I believe so.

Q.   Okay.  And, accordingly, he just pulled the trigger and it shot?

A.   That's what he says, yes.

Q.   Okay.  Brett, you can stop sharing that exhibit.  And can you please pull Exhibit 1 back up again.

EXHIBIT TECH:  Sure.  And just to let you know, that one was Exhibit 13, and the Gomez transcript is Exhibit 12.

MR. CHRISTIE:  Okay.  Thank you.

EXHIBIT TECH:  Sorry.

MR. CHRISTIE:  No, I appreciate it.  I'm losing it.  The late hour.

BY MR. CHRISTIE:

Q.   Okay.  So, sir, back to that bullet point No. 4, after stating -- or after finding out that Mr. Dominguez is the one that fired that bullet earlier that night, you concluded that there

Page 265

was only one bullet left in the gun?

A.   Okay.

Q.   Is that correct?  Am I understanding that correctly?

A.   That's my understanding of the evidence, yes.

Q.   Okay.  And what is the significance of that testimony that there was only one bullet left in the gun, and that Concepcion Diaz had multiple entry wounds?  How does that make Mr. Gomez's confession less reliable?

A.   I don't know.  I think the indicia of unreliability are pretty strong.  I don't know that that fact, if it's accurately reported in my report, adds to what I think are overwhelming indicia of unreliability with respect to the gun and the bullet.
     And, again, for the reasons that I mentioned earlier that are fleshed out in the Filkins and Balash reports.

Q.   Okay.  Sir, have you ever fired a .45 caliber semi-automatic pistol before?

A.   I have not.

Q.   Do you know how a .45 caliber

Urlaub Bowen & Associates, Inc.  312-781-9586

RICHARD A. LEO, PHD, JD, 10/02/2023                    Page 266..269

Page 266

semi-automatic barrel -- pistol works?

A.   I do not.

Q.   Okay.  And, again, you're relying on Dr. Filkins' and Mr. Balash's opinions with respect to the bullet forensics and the trajectory?

A.   Correct.  But also the report that you mentioned.

So the gun he was firing, all the evidence suggests he was firing, the bullet in it didn't match ballistically, as I say, I believe, above bullet point No. 2.

Q.   And then bullet point No. 5, it says, quote:  "The prosecutor-written statement of Arial Gomez describes him firing over the roof of the vehicle and down into the crowd, hitting Concepcion Diaz.  But subsequent forensic analysis established that the bullet trajectory through the body of Mr. Diaz was not downward, but slightly upward."

Do you see that there?

A.   Yes.

Q.   Okay.  And what are you relying on to form that opinion?

A.   Well, I don't recall what I was relying on when I wrote the report specifically.  But I --

Page 267

I -- today I would be relying on the Filkins and Balash reports, which I think do a really good job of going into that particular point.

Q.   Were you asked by plaintiff's counsel to make the assumption that the forensic analysis establishes that the bullet trajectory through the body of Mr. Diaz was downward but -- not downward, but slightly upward?

MR. SWAMINATHAN:  I don't want you to -- Professor Leo, I don't want you to speak about our conversations or communications.  However, you can answer the -- a yes-or-no question as to whether or not we asked you to make any assumptions for purposes of your opinions in this case.

THE WITNESS:  No.

BY MR. CHRISTIE:

Q.   Okay.  So you just don't recall where you got that information from before you reviewed Mr. Balash's and Dr. Filkins's report?

A.   Correct, I don't recall what I was relying on when I wrote the report for that piece of my analysis.

Q.   And it's -- this part of the analysis is outside of your area of expertise; correct?

Page 268

A.   Well, if you're asking, as you did earlier, am I a ballistics or forensics or gun -- gunshot expert, then, yes.  But experts in my field rely on the reports and analyses of other experts to do the indicia of unreliability analysis.  And so that piece would not be outside my area of expertise.

Q.   Okay.

Brett, if you can move to the next page, please.

Okay.  Bullet point No. 5 says, quote:  "Based on the path of the Pathfinder which Mr. Gomez was driving at the time of the crime in the location of Concepcion Diaz, it appears that Mr. Gomez was always on the opposite side of the vehicle from Mr. Diaz."  End quote.

Do you see that?

A.   Yes.

Q.   Okay.  What is the significance of that bullet point in assessing whether Mr. Gomez's confession was reliable or not?

A.   So I think this is bullet point No. 6, and I just don't recall as I sit here today.  I'd have to refresh my recollection and spend more time

Page 269

reviewing some materials to answer that question.

Q.   Okay.  And, yes, you are correct that is bullet point No. 6.

But one of Mr. -- strike that.

So you just don't recall what the significance of that bullet point was?

A.   At this point in the deposition, no, without -- without looking at other documents to refresh my recollection.

Q.   Okay.  And if we go down to bullet point No. 8, it's the second to the last bullet point, it starts with the statement, quote:  "Multiple witnesses have testified to hearing other shots fired at the intersection from other locations.  This would, of course, explain why it could be the case that the bullet recovered from the -- Concepcion Diaz did not come from the Ariel Gomez's gun."  End quote.  Did I read that correctly?

A.   Yes.

Q.   So what do you mean by "hearing other shots"?

A.   Well, multiple shots, right?  The witnesses we've described, most of them, if I'm

RICHARD A. LEO, PHD, JD, 10/02/2023                    Page 270..273

Page 270

recalling correctly, heard multiple shots fired. And so it could have been that a bullet fired from a different gun, as it appears, was the -- not Mr. Gomez's gun, not the one he fired -- is the bullet and gun that ended up killing Mr. Diaz.

Q.   Are you aware that when a gun is fired in a crowded area like a city, that there's an echo effect that might cause witnesses to hear multiple gunshots?

MR. SWAMINATHAN:  Objection to form; foundation.

Go ahead.

THE WITNESS:  I -- no, I was not aware of an echo effect.

BY MR. CHRISTIE:

Q.   Okay.  And when we were saying "hearing other shots," do you know if the witnesses said they heard different sounding shots?

A.   I don't recall.

Q.   Okay.  Do you recall if the witnesses said they heard shots that weren't in quick succession but may have been broken up by a couple of seconds in time?

A.   I don't recall specifically.

Page 271

Q.   Have you ever testified in a civil trial with respect to the issue of indicia of reliability?

A.   I don't recall.

Q.   You don't recall?

A.   Well, I've testified generally about indicia of unreliability in many trials, but I don't recall specifically if I've testified about opinions about indicia of unreliability or reliability in a particular case in a civil trial.

I think I'd have to review -- there was one case I think I did, but I'm -- I'm not a hundred percent sure.  It's called the Beatrice 6, but there -- the DN -- the issue wasn't whether the confessions were false.  That was accepted by all parties, to the best of my recollection.

I may have testified about indicia of unreliability in that -- in that case.  I think I testified in two different civil trials in that case, but I'd have to review my records.

Q.   Can you please spell that case name to the best of your ability?

A.   Well, it goes by the name Beatrice 6, B-e-a-t-r-i-c-e.  The caption of the case, I

Page 272

don't -- of the six people who comprised the Beatrice 6, I don't recall who the lead plaintiff was.

Q.   Do you recall testifying -- so -- strike that.

You stated that you have testified about indicia of reliability generally in trials, whether criminal or civil?

A.   Again, I don't remember the specific cases, but, yes, all the time I testify generally about indicia of unreliability generally.

There may be some cases where I don't testify about it, but I just don't recall. The problem of having testified so many times is that it's hard to recall, especially in terms of general testimony, specifically what I said in one case versus another.

Q.   Okay.  Have you ever testified at a civil or criminal trial about whether a suspect's statement contained indicia of reliability or unreliability?

A.   I believe I have, but I can't tell you which case or cases off the top of my head.

Q.   Do you recall if any of those cases

Page 273

were civil trial cases?

A.   Off the top of my head, no.

Q.   Do you recall if you've been barred from testifying about whether a given statement contains the indicia of reliability or unreliability?

A.   I think I was in the Nicole Harris case.

Q.   Do you recall any other cases?

A.   In which I testified that I had been barred from analyzing indicia of unreliability in case-specific opinions, no.

I know there were other cases.  I just don't recall off the top of my head which case or cases.

MR. CHRISTIE:  Okay.  I think at this point, it might be a good stopping point to do another ten-ish minute break.

Nick, can you tell me how much time has been on the record?

VIDEO TECHNICIAN:  Sure.  Do you want to go off first?

MR. CHRISTIE:  Yes, please.

VIDEO TECHNICIAN:  We're going off the video

RICHARD A. LEO, PHD, JD, 10/02/2023                    Page 274..277

Page 274

record at 6:03 p.m.

(Recess taken.)

VIDEO TECHNICIAN: This is the beginning of media unit 6. We are going back on the video record at 6:22 p.m.

BY MR. CHRISTIE:

Q. Brett, can you please pull up the exhibit, I think it's Exhibit 13 now, titled Invoice.

Dr. Leo, do you see what appears on your screen?

A. Yes.

Q. Is this the invoice that you submitted for the Ariel Gomez case?

A. Yes.

Q. And it indicates it was submitted on April 28, 2023?

A. Correct.

Q. Is that when -- strike that.

So that does not encompass the time you spent preparing for today's deposition?

A. Correct.

Q. Okay. And your billable rate is $525 an hour; is that right?

Page 275

A. Correct.

Q. Is that the billable rate that you're charging -- strike that.

Is the billable rate for $525 an hour the billable rate that you are currently charging for cases that you're being retained on?

A. In private cases, yes.

Q. Okay. For civil cases. Okay.

Do you recall what your billable rate was in Solache-Reyes?

A. Might have been $400 an hour, or 375 an hour. I don't recall.

Q. Okay. So if it was $400 an hour, you have increased your billable rate by about $125 per hour?

A. No. I think I reduced my rate just in that case.

I don't think that was my normal private rate at that time.

Q. Brett, you can take that exhibit down. Thank you.

Sir, you concluded that, according to Mr. -- strike that.

If we were to credit Mr. Gomez's

Page 276

description of events, you opined that Mr. Gomez's interrogation was a coerced compliant confession?

A. If it's a false confession, yes. As he says, yes.

Q. You're not saying it's a proven false confession, right?

A. Correct.

Q. Okay. But under -- if we were to credit Mr. Gomez's description of events, it would be a coerced compliant false confession?

A. Yes, or if it's a false confession, it would be a coerced compliant false confession.

Q. Okay. If Mr. Gomez was not physically assaulted in this case by Detective Guevara and Detective Mingey, would you still opine that his confession was a coerced compliant confession?

MR. SWAMINATHAN: I'm sorry. I missed the first part of that question. Could you say that again?

MR. CHRISTIE: Sure.

BY MR. CHRISTIE:

Q. If Detective Guevara and Sergeant Mingey did not physically assault Mr. Gomez, would you still opine that Mr. Gomez's confession was a

Page 277

coerced compliant false confession?

A. If it's a false confession, and if they did not physically assault him, I would still opine that it's a coerced compliant false confession.

Q. Okay. And why would you still hold that opinion?

A. Because there's two types of interrogation-induced false confessions. One is where the person knowingly falsely confesses or knowingly complies, signing a confession statement, versus where one comes to remember committing a crime that -- one comes to confess to committing a crime that one doesn't remember.

It's not the second type, it's the first type. It would be a compliant false confession if it is a false confession. It would not be a false memory or false belief-type false confession, put differently.

Q. So it would not be a coerced compliant, just a compliant false confession?

A. No, let me -- let me just answer this a little bit -- with a little bit more context.

There's two types of interrogation induced false confessions. One is where the person

Page 278

is distressed or coerced into complying with the demands or requests of the interrogator and falsely complies and/or falsely confesses, knowingly complying or knowingly confessing falsely.

The other type, called persuaded false confession, is where the person comes to believe, as a result of the interrogation, that they committed the crime despite having no memory.

It's not that type, if it's a false confession, it's not a persuaded false confession. If it's a false confession, even if there was no physical abuse or coercion, it would still be a coerced compliant false confession. And, as you know, one of the opinions in the report is that it's a psychologically coerced confession statement. So it still would be, if false, called coerced compliant false confession.

Q. Okay. And you -- you hold that because there was -- it would be psychologically coercive?

A. Well, for the reasons I just said, yeah.

Q. Okay. Just seeking clarification.

And why would it still be a psychologically coercive compliant false confession?

A. Because he knowingly signed the

Page 279

statement and he didn't come to believe that he committed a crime he had no memory of committing.

Q. When -- did you coin the term "psychological coercion"?

A. No.

Q. Do you know when it was coined?

A. No.

Q. Are there different definitions of psychological coercion that have been used by other researchers in different publications?

A. There may have been different definitions.

Even if there are, I think the same core idea holds. I can't -- off the top of my head, I can't think of a different definition than the one I used.

Q. Okay. Can you point to me specific empirical research that establishes the reliability of the term "psychological coercion" so when you use it, you are defining it in a way that other professional colleagues will be defining it, like a medical diagnosis?

A. No, there's not any diagnostic and statistical manual for that term.

Page 280

Q. So what's your methodology for determining if a confession is psychologically coercive?

A. Again, applying my knowledge of the research literature and expertise to the facts of the case with the definition of psychological coercion that I mentioned in the report.

Q. So if a separate researcher were to assess if Mr. Gomez's confession was psychologically coercive, would they -- strike that.

If there's not a methodology for assessing whether a confession is psychologically coercive, how can a separate researcher come to the same conclusion that you did that Mr. Gomez's confession was psychologically coercive?

A. Well, in my prior answer, I told you what my methodology was. I didn't say there was no methodology.

To extend the analogy mentioned earlier, you could have two doctors, two specialists, two surgeons come to opposing conclusions. That happens sometimes, in science.

If it was a real expert, as opposed to somebody who just said they were an expert but

Page 281

wasn't trained in social science and wasn't a published or recognized expert in the field, then I wouldn't put much weight on their opinion. But it's certainly possible that a real social science expert in this field could come to a different conclusion than I do in some cases.

I can't see any circumstance at all, if you credit Mr. Gomez's account of what occurred during that interrogation, that any researcher who's credible would not conclude that he is describing a psychologically coercive interrogation.

Q. And, sir, you made a reference to some other expert. Was that an ad hominem attack against Dr. Welner?

MR. SWAMINATHAN: Objection; form, foundation.

Go ahead.

THE WITNESS: I didn't mention Dr. Welner by name, but I don't -- I don't think he's a recognized or legitimate expert in this field.

BY MR. CHRISTIE:

Q. Okay. Do you have to be a published researcher in order to be an expert in the field of false confessions? Strike that. Sorry.

RICHARD A. LEO, PHD, JD, 10/02/2023 Page 282..285

Page 282

Do you have to be a published researcher in false confessions in order to be an expert in false confessions?

A. Typically that's what's meant in the research community.

Courts may have a different view of that.

Q. Okay. What about a person with decades of interrogation experience assessing the credibility of confessions in a real life practice?

MR. SWAMINATHAN: Object to form; foundation.

Go ahead.

THE WITNESS: I would need to know more about what you mean, decades of experience, and what the alleged area of expertise is.

BY MR. CHRISTIE:

Q. So if someone for decades was reviewing confessions as a part of their profession to assess whether they are reliable or not, for a government institution, would that be sufficient to be an expert in the field of false confessions?

A. I would have to know more than that. I couldn't really answer that based just on those limited facts.

Page 283

Q. All right. Let me phrase it a different way.

Instead of being a researcher, if the -- a person was an actual practitioner of your field, would that person be an expert in false confessions?

A. I don't see how, without more information, that would be true. I'd need more information about this alleged person.

Q. I'm just trying to understand if there's any, you know, other ways to become an expert if you don't have the -- if you're not a published researcher in false confessions, in your opinion.

A. Well, one would have to have -- one would have to be trained in the methods to be able to evaluate the research, and one would have to have a mastery of the research and the conceptual core and the main findings; and typically the only way one gets that is through getting a Ph.D. in a social science and mastering that body, the methods and the body that are used to do the studies and the body of research.

So I can't think of, off the top

Page 284

of my head, a practitioner who would fit the description that you're describing in your question, who I would recognize as an expert.

Q. Okay. So someone that needs a Ph.D. that is able to understand and master the literature that has been published in this field?

A. Well, I said typically a Ph.D. is where one masters the social science research methods and the ability to evaluate social science studies.

There may be a circumstance where somebody without a Ph.D., somebody with a master's degree or an Ed.D. But I'd need to know more information.

Q. But someone with a Ph.D. would be a good indicator that they have the requisite skills to be an expert in this field?

A. Well, potentially. But, again, I would need to know more.

Q. Brett, can you please pull open page -- Exhibit 1, page 57.

Yes. Thank you.

Sir, do you see where it says Subsection C?

A. Yes.

Page 285

Q. Excuse me. Comparing -- okay. Thank you.

In this section, is it fair to say that you compare the two accounts of Ariel Gomez's description compared to that of Detective Guevara and ASA Healy's accounts?

MR. SWAMINATHAN: Sorry. Kyle, you cut out there.

MR. CHRISTIE: Sorry. I'll restate the question.

BY MR. CHRISTIE:

Q. Dr. Leo, is it fair to say that this section details your comparison of Ariel Gomez's description of his interrogation compared to that of Detective Guevara's and ASA Healy's?

A. Yes.

Q. And then at the end of that page -- Brett, if you could scroll down a little bit, to the bottom of the page. Thank you.

You state: "In my professional opinion, Mr. Gomez -- Mr. Gomez's more robust and detailed account of the lengthy, unrecorded interrogation on June 14, 1997 fits with the findings of the empirical and scientific research

Page 286

literature on how and why individuals can be moved to make or agree to false compliance and make or agree to a false and/or unreliable statement, admission, or confession. Detective Guevara's and ASA Healy's accounts do not."

Q. Did I read that correctly?

A. Yes.

Q. What do you mean that Mr. Gomez's account is more robust and detailed?

A. That it's a fuller account.

Q. Okay. So what do you mean by it's a fuller account?

A. There's just more to it.

Q. So his deposition transcript from 20 years after the event has more to it than the accounts of what was testified to at the motion to suppress hearing at the criminal trial and in police reports?

A. Yes, by Detective Guevara and by ASA Healy.

Q. So are you saying that Gomez's account is more reliable than that of ASA Healy's and Detective Guevara's?

A. I'm not making a reliability -- sorry.

Page 287

Go ahead. Sorry.

MR. SWAMINATHAN: No, go ahead. Sorry.

THE WITNESS: Sorry.

No, I'm not making a reliability determination of whose account of the unrecorded interrogation is more reliable. I'm saying that his account, Mr. Gomez's account, fits more with the research literature on how and why people make false and unreliable confessions when interrogated than --

BY MR. CHRISTIE:

Q. Okay. Can you state --

A. -- Detective Guevara's or ASA Healy's account. Sorry.

Q. And then you state afterwards that Detective Guevara and ASA Healy "fail to provide any explanation of how or why Mr. Gomez would have been moved to make or agree to and knowingly sign a confession statement that he has long maintained is false and that is supported by no indicia of reliability"? Did I read --

A. Correct.

Q. Okay. Don't suspects often retract their confessions?

Page 288

A. Was your question don't suspects often retract their confessions? Is that what your question was?

Q. Correct. Correct.

A. Yes. I don't know how -- I'm not aware of any study that quantifies how often suspects recant their confessions, but some suspects do recant their confessions, yes.

Q. And there are numerous reasons why they might recant their confessions, such as trial strategy, pressure from friends or family, the fact that they might serve a long prison sentence, right?

MR. SWAMINATHAN: Objection to form.

THE WITNESS: Sorry. Go ahead.

MR. SWAMINATHAN: Yeah. Objection to form. Go ahead, Professor Leo.

THE WITNESS: Those are all possible reasons, yes.

BY MR. CHRISTIE:

Q. Okay. So why do Detective Guevara and ASA Healy need to provide an explanation of why or how Mr. Gomez recanted his testimony and now maintains that it's false?

MR. SWAMINATHAN: Objection to form and

Page 289

foundation.

Go ahead.

THE WITNESS: Yeah; I mean, the sentence doesn't really say anything about recanting his confession.

What I'm saying is that if his confession is false, and there's no indicia of reliability in my analysis, and substantial indicia of unreliability, then his account of what occurred during the unrecorded interrogation is more in line with the research literature about how and why innocent people falsely confess than their account of what occurred during the unrecorded interrogation session.

BY MR. CHRISTIE:

Q. Brett, can we move to page 60? I think it's -- it should be the beginning of Subsection 9 -- or, actually, sorry, it might be 58. I might have typed it wrong. Yeah, okay.

Sir, this subsection -- or this section, the Interrogation and Confession Statements of Paul Yalda, Jose Dominguez, Yacoub and Jovanovic, what do you rely on for their accounts of their interrogation?

RICHARD A. LEO, PHD, JD, 10/02/2023                    Page 290..293

Page 290

A. Well, the materials that -- in which they testified that are listed in the Materials Reviewed section. So it would be depositions and pretrial and/or trial testimony to the extent given, and affidavits, if any.

Q. So if there -- if Paul Yalda's -- I'm sorry. Strike that.

You're aware that Paul Yalda testified at the motion to suppress?

A. I believe so.

Q. And that is the same with Mr. Yacoub, he also testified at a motion to suppress?

A. I believe so.

Q. Okay. So when their testimonies at their motion to suppress contradict their testimony at their depositions about 20 years afterwards, how do you assess which account to credit?

A. Well, it's -- it's not for me to credit an account -- to make a credibility assessment, but the -- for purposes of my analysis in the report, I think the -- the depositions -- I think they were -- if I'm recalling correctly, they were asked those questions and they answered them in their depositions, and their -- the testimony they give

Page 291

in the depositions are consistent with a lot of other evidence in this case and in cases in which Detective Guevara has been involved.

Q. Okay. So if they're saying that in 1999 they're interviewed by a detective that wasn't Detective Guevara, and now that they're saying they were interviewed by Detective Guevara, which account do you rely on for your description of their interrogation?

MR. SWAMINATHAN: Objection to form and foundation.

Go ahead.

THE WITNESS: I'm relying on the totality. You're pitching it as a binary, but I'm relying on the totality of their accounts.

BY MR. CHRISTIE:

Q. So if Paul Yalda said he was not interviewed by Detective Guevara in his motion to suppress hearing, but then says he was interviewed by Detective Guevara in his deposition, how do you consider that contradiction when describing Paul Yalda's description of his interrogation in your report?

A. I have to go back and look at the

Page 292

deposition and look at his pretrial motion to suppress to answer that question.

I don't recall at this moment. But I -- you know, I -- I just have to look at it because he may have said, but I don't remember, that he was mistaken and explained why he was mistaken in his deposition testimony, or he misidentified the detective, or he had some other reason, intentional or not, for saying that Detective Guevara did not interrogate him.

But without a fresh recollection of both of those documents, which I didn't review in preparation for today, I couldn't answer that question.

Q. Okay. So let me word it slightly differently.

When the testimony of the -- of a witness that they're -- strike that.

If a witness testifies under oath stating -- stating he was interviewed by Officer A, but not Officer B, and then 20 years later, under oath, he testifies that he was not interviewed by Officer A, but Officer B, how do you reconcile those contradictions?

Page 293

MR. SWAMINATHAN: Objection to form and foundation.

Go ahead.

THE WITNESS: I would need to know more. I think it's an incomplete hypothetical.

Just as the hypothetical's stated, I don't think it's answerable.

BY MR. CHRISTIE:

Q. How do you reconcile direct contradictions of a witness who has testified under oath in two different proceedings?

A. I would need to know the explanation by the witness, and I would also want to know the surrounding and contextual case facts to answer a question like that. And either the contradictory facts are reconcilable or they're not, but I would need to know more -- in my opinion. But I'd need to know more information.

Q. Sir, do you agree that empirical research shows actual jurors recognize that the use of false evidence ploys can be coercive?

A. It depends on -- yeah, I -- I'd have to review some studies, but I think so.

Q. Do you agree that empirical research

RICHARD A. LEO, PHD, JD, 10/02/2023                    Page 294..297

Page 294

shows actual jurors recognize that promises of leniency can be coercive?

A.  Yes, I believe so.

Q.  Do you believe that empirical research shows actual jurors recognize that confrontational tactics can be coercive?

A.  Some confrontational tactics, yes.

Q.  Do you agree that jurors recognize that depriving suspects of food can be coercive?

A.  Yes.

Q.  Do you agree that jurors recognize that depriving suspects of sleep can be coercive?

A.  Some, yes.

Q.  Do you agree that jurors recognize that juvenile suspects are more susceptible to falsely confessing than an adult suspect?

A.  I'd have to refresh my recollection of the survey studies that I think you're referring to.

Q.  Do you agree that jurors understand that physical abuse can lead to false confessions?

A.  Yes.

Q.  Do you agree that research shows, too, that potential jurors are more informed and less naive today about false confessions than at any

Page 295

time in the past?  Sir, does research show that potential jurors are more informed and less naive today about false confessions than at any time in the past?

A.  I think there's a 2018 study that shows in that sample potential jurors were more aware of false confessions than in -- as a percentage, than in five prior studies in the 2008-to-2011 time frame.

Q.  Do you agree that media coverage on wrongful convictions and false confessions has exploded in the last decade?

A.  I'm not sure in the last decade.  I would -- I would definitely say in the last three or four decades there's been a lot more since -- since DNA started being applied to exonerate innocence individuals, some of whom falsely confessed, yes, there's been more media attention than there was prior to the use of DNA to exonerate suspects.

MR. CHRISTIE:  Okay.  Sir, I appreciate your time today.  I have concluded my questions.  I do know that Ms. Rosen from Rock Fusco has questions for you, so I'm going to turn over the mic to her.

Page 296

EXAMINATION

BY MS. ROSEN:

Q.  Hi, Dr. Leo.  How are you?

A.  I'm good.  How are you?

Q.  I'm good.

With respect to your report, Exhibit No. 1, the portions of your opinion that address the City's pattern and practices, which begin at page 79 of your report, those opinions are substantially the same as the opinions you rendered in the Solache-Reyes matter regarding the City's pattern and practices; is that correct?

A.  Correct.

Q.  Okay.  Now let's talk about Appendix C, which I believe, Brett, is Exhibit No. 4.

If you can put that on the screen.

And if you can just go to the second page of this exhibit.

So these are the notes that you were using in the Solache-Reyes case during your deposition as an aid to your testimony; is that correct?

A.  That's my recollection, yes.

Q.  And you prepared these notes in the

Page 297

weeks leading up to your deposition because the materials were voluminous and you felt like you needed an aid to your memory in order to testify during that deposition; correct?

MR. SWAMINATHAN:  Professor Leo, I don't want you to talk about the drafting process, but I think you can answer that question without getting into that.

THE WITNESS:  These notes are to assist me in my deposition and/or trial testimony exactly for the reason you say, that the testimony is so -- I'm sorry -- the materials I've reviewed are so voluminous, and there are so many cases, that I couldn't possibly remember all the salient facts of all the cases.

BY MS. ROSEN:

Q.  Let me try that again.  These are the notes that you prepared in the weeks leading up to your deposition in Solache and Reyes to aid in your testimony, in your deposition testimony, in that case; correct?

MR. SWAMINATHAN:  Same -- same concern, Professor Leo, but I think you can answer this question yes or no.

Urlaub Bowen & Associates, Inc.   312-781-9586

RICHARD A. LEO, PHD, JD, 10/02/2023                    Page 298..301

Page 298

I shouldn't tell you --

THE WITNESS: I thought my last answer -- I thought my last answer was responsive to the question with the admonition from Mr. Swaminathan.

Yes, they were prepared as testimonial aids.

BY MS. ROSEN:

Q. You prepared them, right?

MR. SWAMINATHAN: Objection.

You're getting into the details of the report drafting process, and I'm instructing him not to answer on that. If you're asking him about if they were prepared in the weeks before his deposition, of course I'll let him answer that, I guess. Or in the weeks before his report was due, I'll let him answer that. But not questions about the preparation process.

MS. ROSEN: First of all, he has already -- he testified during the deposition in Solache-Reyes, when he was using the notes, to testify that they were notes he prepared. So I am simply asking him if the notes that represent Appendix C are the same notes that he prepared in the weeks leading up to his deposition to aid in his testimony.

Page 299

MR. SWAMINATHAN: You can answer that question without referring to or revealing information about the drafting and preparation process. But go ahead.

THE WITNESS: I think we're just going in circles here.

These are the same notes, with minor corrections, that I used in the -- as testimonial aids in the Reyes and Solache case, and in those depositions.

BY MS. ROSEN:

Q. And you prepared those notes.

MR. SWAMINATHAN: Objection. I'm instructing you not to answer about the preparation process between you and counsel, which is obviously privileged.

MS. ROSEN: He testified that he prepared the notes. I am simply asking him to affirm that he prepared the notes.

MR. SWAMINATHAN: I'm not -- I don't -- I don't know what you're referring to, but the idea that you're asking him about his preparation -- if you're saying he's already testified, but I don't know why you're saying he needs to answer it again.

Page 300

If you think you have him saying something, you have him saying something.

But what I'm telling you is conversations that he's had in the preparation process of information that are part of his drafts and part of his report here, I'm not having him answer questions about that. I think that's the exact same line my colleague held in the deposition in the Reyes case, so this should not come as any surprise.

MS. ROSEN: It is absolutely not. He has testified repeatedly that he prepared the note. It sounds like now you're saying that these notes were prepared in some kind of collaboration with plaintiff's counsel.

MR. SWAMINATHAN: I'm not saying anything. I'm telling you that that's exactly the kind of question that's improper to ask him.

MS. ROSEN: It is --

MR. SWAMINATHAN: And he's not answering it.

MS. ROSEN: So we -- we have -- we have addressed this issue before. Whether or not he prepared the notes or you prepared the notes for him, once he's reading them, then you guys waive

Page 301

everything. And he read from them to answer questions in Solache-Reyes.

So I'm going to ask one more time. We can stop debating it because we're running out of time. But I'm going to ask one more time, and you can decide to instruct him however you see fit, and then I guess if we need court assistance, we'll go and get court assistance.

BY MS. ROSEN:

Q. Dr. Leo, isn't it true that you prepared the notes that are now attached as Appendix C to your report in Gomez in preparation for your deposition in the Solache-Reyes matter as an aid to your memory?

MR. SWAMINATHAN: Professor Leo, you can answer that question as to every part of that question other than the preparation process of those notes.

THE WITNESS: I used these notes as an aid to my testimony in Reyes and Solache. And my recollection is the last deposition in this case you had the same argument with Steve Art, you said you were going to take it to a judge, and you shut down the deposition. And, to my knowledge, you

RICHARD A. LEO, PHD, JD, 10/02/2023                    Page 302..305

Page 302

never took it to a judge, and we're just relitigating, outside the presence of a judge, the same issue.

MS. ROSEN: I am referring to the deposition testimony you gave the first go around, before we even got the notes, where you testified that you prepared -- that when I asked you what you were reading from to answer my questions, and you told me the notes that you'd prepared in getting ready for your deposition, as an aid to your memory. And I am simply trying to verify that the notes that you have now appended as Appendix C to this report are the same notes that you were referencing in the first part of your deposition in Solache-Reyes that you testified you prepared as an aid to your memory. That's what I'm --

MR. SWAMINATHAN: Objection to form and foundation, but ultimately I'm instructing you the same way, Professor Leo, you can answer the question as to whether or not these are the same notes.

THE WITNESS: If my recollection is accurate, there were some additional notes in Reyes-Solache that I had in addition to these notes in front of

Page 303

me. And the same notes that I had in Reyes-Solache that I have here are only different in that there have been minor corrections for errors in the notes -- in the same notes that I had in Reyes-Solache.

BY MS. ROSEN:

Q. The notes that are now attached as Appendix C to your Gomez report are in a different order than the notes that were eventually produced to us after the first two days of your deposition. Why is that?

MR. SWAMINATHAN: You can answer that, Professor Leo, to the extent it doesn't involve revealing communications with counsel.

THE WITNESS: I don't remember why they're in a different order.

BY MS. ROSEN:

Q. If you look at the top of the page that's in front of you, that's referencing the Tony Bey case, it references your report at page 83. Do you see that there?

A. Yes.

Q. Let's go to Exhibit No. 1, which is his report in Gomez. And let's go to page -- what he

Page 304

numbers as 83 of his report.

Can you scroll to the bottom of the page.

I don't see any reference to Mr. Bey there, and this doesn't appear to me to be the section of your report where you discuss the cases that make up your notes in a less detailed fashion.

When you -- so do you agree with me when you look at page 83?

A. Yes, it doesn't correspond -- the report it's referring to I would hypothesize is the Reyes-Solache report, which I don't have in front of me, 83 of that report, not 83 of this report.

Q. And let's go to page 96, your page 96 of this report.

And if we scroll down a little bit, you can see there's the Tony Bey reference. You see that?

A. Yes.

Q. So the notes, Appendix C, are referencing the Solache-Reyes report? Is that your hypothesis?

A. The page number of the Solache-Reyes

Page 305

report, correct.

Q. And when you were preparing the Gomez report, I think you testified a little while ago that these notes have some corrections or something that were made? Is that right?

A. Yes, I think we discovered there were some minor errors in this after the Reyes-Solache deposition, and there were some minor corrections. At this time, I don't remember what they were, but that's my recollection.

Q. Who caught those errors?

MR. SWAMINATHAN: Objection to -- objection. Calls for information that's privileged under Rule 26.

I don't believe you can answer that question without revealing our communications, Professor Leo, so I instruct you not to answer.

BY MS. ROSEN:

Q. Let's go back to Exhibit No. 4.

And if we go -- if we go to -- skip a page and go to the next page, it's the Frank Bounds page. And there it references -- you can scroll back up for a second, just to the top of there, yeah.

RICHARD A. LEO, PHD, JD, 10/02/2023                    Page 306..309

Page 306

It references page 77 of the report. And I can represent to you that actually Frank Bounds is discussed on page 91 of the report.

Q. Is it your hypothesis that page 77 is a reference to Solache-Reyes?

A. Yes.

Q. And if we go to the next page of Exhibit No. 4, it's Mr. Burton's -- description of Mr. Burton's case, and it references 77 of the report. And I can represent to you that it doesn't appear on page 77 of the Gomez report.

Is it your hypothesis that this is referencing the Solache-Reyes report?

A. Yes.

Q. And I will represent to you that I went all the way through every page of the notes, and every reference to the report page for each of these summaries is referencing the Solache-Reyes report, and not the Gomez report.

Is your hypothesis the same, that when these notes were affixed as Appendix C to the Gomez report, somebody failed to properly reference the portion of the Gomez report where this information is intended to supplement the

Page 307

information in the report?

A. I think that we've been very clear that these are substantially the same typewritten notes. There were some additional notes I had Reyes-Solache, but these ones are substantially the same, and -- and so I -- nobody went through -- or I didn't go through and change the page numbers.

Q. But you said you made some other changes that you don't recall right now, or somebody made some other changes that you don't recall right now, right?

A. Yeah, there were some minor corrections. I don't recall where -- where they were.

Q. The page numbers did not get changed, right?

A. Correct.

Q. Because without the Solache-Reyes report, you wouldn't know, the reader would not know what's being cross-referenced in Appendix C, right?

A. The reader wouldn't know the page number that's being -- in the report that's being cross-referenced, correct.

Page 308

Q. And if the reader were interested in making a comparison between Appendix C and the report, they would have to word search the document, right?

A. Well, that would be one way of doing it. Another would just be to look at the -- the name of the case and then find it in the Gomez report.

Q. Right. And it would -- obviously the Gomez report is a hundred pages long, so it would be easier, right, if you just word searched. You talked about earlier when Mr. Christie was asking questions about how many times your report references empirical research, you mentioned that you could just word search the document and you'd find how many times it mentioned empirical research.

In the same way, you could word search the names that are listed in the notes; correct?

MR. SWAMINATHAN: Objection to form.

Go ahead.

THE WITNESS: Yes, one could do that word search.

Page 309

BY MS. ROSEN:

Q. And, similarly, one could word search the names in the report in Appendix C to figure out where the cross-referencing occurred in the notes, right?

A. Yes.

Q. Can you explain to me why Appendix C as produced to us is not word searchable?

MR. SWAMINATHAN: You can answer if you can answer without revealing attorney/client communications with us, Professor Leo.

THE WITNESS: All I can say is that I personally do not know how to do a word search in pdf's. I know how to do a word search in Word, and before that, WordPerfect. And, to my knowledge, when documents are turned over, they're turned over in pdf.

I don't know if that's the answer to your question or not because maybe somebody could do a word search in a pdf document, but I myself don't know how to do it.

BY MS. ROSEN:

Q. Well, I can represent to you that I can word search the pdf version of your report, I can

RICHARD A. LEO, PHD, JD, 10/02/2023                    Page 310..313

Page 310

word search the pdf version of your Materials Reviewed list, I can word search your c.v., all that are produced to us in pdf, but I cannot word search Appendix C, which is also a pdf, and I'm trying to understand why Appendix C is not word searchable in pdf.

MR. SWAMINATHAN: Professor Leo, same instruction. I think you've -- and objection; asked and answered.

But you could try again to the extent you can do so without revealing communications with us.

THE WITNESS: I do not know the answer to that question.

BY MS. ROSEN:

Q. Let's take a look at page 12, I think it would be, if we add the cover sheet.

This is a summary of a case that you titled Nevest Coleman and Derrell Fulton. Do you see that there?

A. Yes.

Q. And in the table that says Materials Provided Supporting Summary in Report, in the -- next to the transcript of testimony of Nevest

Page 311

Coleman, so the second row, or line, I guess, of that table, it says, in the cell to the right of the description of the testimony, PTP-N. Coleman 00001-00010, and then it says: (Typo in Leo report.) Do you see that there?

A. Yes.

Q. What is the typo that's being referenced there?

A. I believe it's a typo in the prior version of this document that was provided to you. And so this is an example of an error that was corrected.

Q. So it's your belief that in the notes that were provided -- in the version of the notes that was provided to us in the Solache-Reyes case, there was a typo, and this is denoting that typo. Is that what you mean?

A. Yes. Denoting and correcting the typo, yes.

Q. So this is the corrected page numbers, right?

A. I believe so.

Q. Okay. All right. And can you tell me, in preparing -- well, actually, let's do it this

Page 312

way: Let's go back to the second page of Exhibit 4.

And -- so that's the notes, the Appendix C.

And then, Dr. Leo, you have your report in front of you, right?

A. I do, yes.

Q. Okay. And if you could go to page 96 of your report, which is where this case is discussed, if we look at what you have in the -- what you have written in the report, it says: Tony Bey, a/k/a Tony Steward, 1988, and then it says: Detective Kato purportedly obtained a murder confession from Mr. Bey during an abusive interrogation. Mr. Bey alleged that Detective Kato put a pistol in his mouth and threatened to make him a statistic. Mr. Bey also alleges that Detective Summerville physically abused him during one of his post-arrest interrogations in Area 4. Mr. Bey was treated at a hospital for multiple lacerations after the interrogation -- after the interrogation complained of severe stomach pain and was diagnosed with acute appendicitis. And that cites to the Tony Bey complaint register and OPS investigation. And then it says, Bey was acquitted

Page 313

at trial, and it cites to Stewart versus -- Steward versus Kato, and then PTP-T Steward-Bey 00001 to 000157. Do you see that there?

A. Yes.

Q. And then if we look at Exhibit 4, the summary that is at the top of this page of this particular exhibit, is a cut and paste, right, from your report? It's verbatim, right?

A. The top portion, the summary portion is verbatim, yes.

Q. Okay. And then, if we scroll down, it says: Materials provided supporting summary in the report, and then it breaks down the citations, the PTP citations, right?

A. Yes.

Q. And did you, as you were preparing the notes to assist with your testimony in advance of your deposition in Solache-Reyes, go back through the materials in order to provide this more detailed citation to the materials that supported your analysis of the Bey case?

MR. SWAMINATHAN: Professor Leo, you can answer the question to the extent it doesn't involve revealing our -- your communications with

RICHARD A. LEO, PHD, JD, 10/02/2023                    Page 314..317

Page 314

counsel or your drafting or preparation process.

THE WITNESS: I don't think I can answer the question, then.

BY MS. ROSEN:

Q. What was the methodology that you utilized to provide the more detailed analysis of the Tony Bey case to supplement your opinions in Gomez?

MR. SWAMINATHAN: The same objection. You can respond as to methodology associated with your notes or your report, but not as to communications with counsel or report preparation.

THE WITNESS: I guess I don't understand. Methodology to prepare notes; is that what the question is?

BY MS. ROSEN:

Q. Well, these notes, if we just use Bey as an example, because we obviously don't have the time to go through each of them, so I'm just going to use this one as an example, but the -- there is a -- much more detail in these notes than there is in the summaries that were in your -- that are in your report, right?

A. Yes.

Page 315

Q. Okay. So I want to know what methodology you utilized to provide the additional detail that appears for each of these cases in Appendix C that didn't appear -- let me strike that and do this one more time.

I want to know the methodology that you utilized to provide the additional detail that appears in your analysis of all of the cases that are reflected in Appendix C.

MR. SWAMINATHAN: Same instruction, Professor Leo. You can answer with the exception of -- without revealing your communications with counsel and your preparation process.

THE WITNESS: I guess I'm hung up on the word "methodology" because I tend to think of methodology as what social scientists use methods to gather data. And so this word is being used differently.

But these were testimonial aids, and so the more salient facts that are not contained in my report are notated here, again, as testimonial aids to help me when I testify in deposition or at trial. So the more salient facts and the more salient sources.

Page 316

BY MS. ROSEN:

Q. What did you -- what methodology did you utilize to uncover the more salient facts that don't appear in your original report?

MR. SWAMINATHAN: The same objection.

You can answer to the extent you can without revealing your communications with counsel on your process of preparing, or to notes.

THE WITNESS: At the end, the -- there's a judgment call about which facts and which sources are more salient, and that's the answer to the question.

To me, it doesn't really make sense to say methodology. When one is summarizing a document, one is drawing out the most important or salient facts to help one for whatever one's purpose is. And so it's not a methodology like going and creating and gathering data.

BY MS. ROSEN:

Q. What did you do with the database that you had related to Mr. Bey's case to identify the salient facts that support Subsection A, Evidence of Coercion and Abuse?

MR. SWAMINATHAN: Same instruction, Professor

Page 317

Leo.

THE WITNESS: I can't really give an answer beyond what I've already answered.

BY MS. ROSEN:

Q. Did you review all of the materials -- in advance of the deposition in Solache-Reyes, did you review all of the materials related to Mr. Bey's case so that you could identify all of the salient facts to serve as a testimonial aid to your deposition?

MR. SWAMINATHAN: You can answer -- you can answer the question about what you reviewed in preparation for your report or your deposition in the Reyes case.

THE WITNESS: In the Reyes case, in preparation of the report, I reviewed all the documents listed in the report, and that I believe included, in Mr. Bey's case, the documents listed here.

I believe these documents are the same documents that are listed in the Materials Reviewed section of the Reyes-Solache report.

I don't recall specifically whether I reviewed all those documents or not in

Urlaub Bowen & Associates, Inc.   312-781-9586

RICHARD A. LEO, PHD, JD, 10/02/2023                    Page 318..321

Page 318

preparation for my deposition.

BY MS. ROSEN:

Q.   In -- under Evidence of Coercion and Abuse it says: "According to the district court opinion, Tony Bey was arrested at his home by Detective Summerville, and," quote, "kicked, kneed, and scraped with a metal rod by certain defendants while other stood by and watched." End quote. And then it cites the Steward case.

Do you see that there?

A.   Yes.

Q.   Is that something you remembered from when you prepared your report?

MR. SWAMINATHAN:  Objection to form, foundation.

You can answer, Professor Leo.

THE WITNESS:  I don't know -- when you say "remembered," remembered when?  Remember now?  Remember then?

BY MS. ROSEN:

Q.   Did you remember that quote as you were preparing for your deposition testimony and identifying salient facts that would serve as an aid to your testimony?

Page 319

MR. SWAMINATHAN:  You can answer as to -- I guess you can answer as to whether you remembered that when you were preparing for your deposition.  So you said you can't -- yeah, you can answer that.

THE WITNESS:  I don't remember if I remembered this when I was preparing for the Reyes-Solache deposition.

BY MS. ROSEN:

Q.   The next paragraph reads: "According to the district court opinion and the Complaint Register investigation No. 165728, Detective Kato placed a gun in Bey's mouth and threatened to, quote, 'make Bey a statistic,' end quote, citing Steward versus Summerville, and Complaint Register 165728 at page 22."

Is that information that is additional detail that isn't in your original report in Solache-Reyes or your original report in Gomez a salient fact that you remembered when you first reviewed all of the materials while you were preparing your report in the Solache-Reyes case?

MR. SWAMINATHAN:  You can answer that question, Professor Leo, to the extent you can.

THE WITNESS:  I don't remember, but I -- I --

Page 320

I believe this -- the document from which the quote comes was a document that I reviewed in preparation of the Solache-Reyes report.

BY MS. ROSEN:

Q.   And in the weeks leading up to your deposition testimony in Solache-Reyes, did you remember those quotes so that they could be included in the notes that you used as a testimonial aid to your deposition testimony?

MR. SWAMINATHAN:  You can answer as to whether you remembered them, yes.

THE WITNESS:  I don't remember if I did or not.

MS. ROSEN:  Why don't we take a break here for a second, and I want to get a time check.

VIDEO TECHNICIAN:  Going off the video record at 7:26 p.m.

(Recess taken.)

VIDEO TECHNICIAN:  This is the beginning of media unit 7.  We are going back on the video record at 7:37 p.m.

BY MS. ROSEN:

Q.   If we can put Exhibit No. 4 back up on the screen for a second, Brett.

Page 321

Dr. Leo, are all of the cases that you summarized in your report also referenced in Appendix C?

A.   I don't recall.

Q.   And with respect to the preparation of Exhibit C and all of the information -- well, let me strike that.

Did you prepare any of the information that is contained in Appendix C?

A.   Sorry, I didn't catch the first part of it.

Q.   Did you prepare any of the information that is contained in Exhibit C?

A.   Is that the same exhibit in front of us?

MR. SWAMINATHAN:  Same exhibit in front of us.  Same objection as previously.  I'm instructing you not to answer, Professor Leo, based upon our revealing communications and drafting processes.

MS. ROSEN:  And I take it, Dr. Leo, you're going to take Mr. Swaminathan's instructions.

THE WITNESS:  Correct.

BY MS. ROSEN:

Q.   In cases like Mr. Gomez where he is alleging fairly severe and noticeable evidence

Page 322

of physical coercion, do you look for any corroborating evidence of physical injury?

A.   Well, if it exists, yes, I consider it, of course.

Q.   Okay.  And in Mr. Gomez's case, did you look for any corroboration of Mr. Gomez's alleged physical injuries?

A.   Well, you see all the documents that I reviewed, yes.  I reviewed those documents, and I think there is some corroboration.

Q.   And what is the corroboration?

A.   The accounts of others who heard him being abused, and the pattern and practice of Guevara -- the allegations that Guevara beat other people in similar ways in Area 5, and the fact that he took the Fifth, I think, in his deposition, and refused to deny it, is possibly also indirect corroboration.

Q.   Anything else?

A.   As I sit here, that's what I recall.

Q.   Do you see any medical records to support his allegations of physical injury?

A.   Not that I recall.

Q.   Do you see any photographs to

Page 323

corroborate his allegations of physical injuries?

A.   Not that I recall.

Q.   You testified earlier that it was a common pattern in proven false confession cases for individuals to report that they believed they could go home if they signed the confession or agreed with the police version of events.

Do you recall that testimony generally?

A.   Generally, yes.

Q.   Okay.  And when you say it's a common pattern in the proven false confession cases, what did you mean?

A.   I don't recall if I used those words.  I might have.  It's in the record, obviously.

But what I meant is that oftentimes one sees that in proven false confessions that -- that there were either implied or explicit promises that the person could leave the interrogation, be done with it, and thus go home, if they signed the statement or made the statement that was being signed.

Q.   Mr. Gomez's case is not a proven false confession, though, right?

Page 324

MR. SWAMINATHAN:  Objection; asked and answered.

Go ahead.

THE WITNESS:  Well, I was not asked to evaluate whether it meets the criteria of a proven false confession.  That's beyond the scope of why I was retained in this case.  I have not classified it as a proven false confession.

BY MS. ROSEN:

Q.   One more thing about the notes, Appendix C.  You said you intend to utilize those to testify at trial?  Did I hear that correctly?

A.   Yes.  As testimonial aids if this case goes to trial and if permitted.

Q.   And is it your intention to use the notes as a testimonial aid, if permitted, in the Solache and Reyes trial, if those two cases go to trial?

A.   Yes.

Q.   With respect to Mr. Gomez's testimony that he ran the Pathfinder into a brick wall in order to -- well, what's your understanding -- let me strike that and start over.

You recall that Mr. Gomez testified

Page 325

that he drove the Pathfinder into a brick wall; correct?

A.   Yeah, my recollection was refreshed earlier in the deposition, yes.

Q.   And what was -- what's your recollection of Mr. Gomez's explanation for doing that?

A.   I think he was afraid of getting in trouble from his mother.  But as I sit here right now, I don't recall beyond that.  I need to have my recollection refreshed again.

Q.   And you don't recall him being afraid that in fact somebody saw that he -- saw his license plate number and there was a concern that they actually ran into somebody as they were leaving the parking lot, so they were afraid they were going to get caught?

A.   That was also mentioned --

MR. SWAMINATHAN:  Objection; form.

THE WITNESS:  Sorry.

MR. SWAMINATHAN:  Go ahead.

THE WITNESS:  Yeah, that was mentioned when my recollection was refreshed earlier.  Thanks.

COURT REPORTER:  Excuse me.  Was that an objection?

Page 326

MR. SWAMINATHAN: That was an objection to form, yes.

BY MS. ROSEN:

Q. And if somebody crashes a vehicle that was used in the commission of a crime, i.e., running somebody over and fleeing, so it would be a hit and run, would you consider that destroying evidence?

MR. SWAMINATHAN: Objection to form and foundation.

You can answer to the extent you can, Professor Leo.

THE WITNESS: I mean, it's a hypothetical question. Potentially, I'd need to know more information.

BY MS. ROSEN:

Q. What information would you need to know?

MR. SWAMINATHAN: Same objection.

Go ahead.

THE WITNESS: Okay. So I guess I'd have to know enough to determine whether or why that was destroying evidence of the hit and run.

I mean, if -- if a car hit somebody

Page 327

and there was blood all over the fender of the car, for example, and then the person ran the car into a wall, I don't think that would destroy all the evidence of the blood.

BY MS. ROSEN:

Q. Have you completed your answer?

A. Yes.

Q. You made an analogy earlier to getting CLE, that if you had one hour of CLE but you were there for six hours, you'd still count it as seven hours. Do you recall that generally?

A. Yes, yes.

Q. You don't mean that you would count that as seven hours of CLE, right?

A. Correct. Or -- or if you're being deposed for ten hours but there were three hours of break, I'd still say it's a ten-hour deposition.

MS. ROSEN: I don't have any more questions at this time.

MR. SWAMINATHAN: Anyone else on the defense side?

MR. ENGQUIST: Michael?

MR. SWAMINATHAN: I think Michael -- there's Michael. Okay.

Page 328

MR. ENGQUIST: Michael, you need to get unmuted.

MR. SWAMINATHAN: I think he's saying no questions. He's shaking -- Michael, is that a -- you're not asking any questions?

Okay. And no questions from me, so I think we're done.

MR. ENGQUIST: We're done.

MR. SWAMINATHAN: Okay.

MR. ENGQUIST: Waive or reserve?

MR. SWAMINATHAN: We'll reserve.

THE WITNESS: Thank you.

MS. ROSEN: Thanks, everyone.

VIDEO TECHNICIAN: Before we go off, do we want any orders, transcript and video?

MS. ROSEN: We want the transcript.

MR. SWAMINATHAN: Not from plaintiff.

MR. ENGQUIST: Thanks, guys.

VIDEO TECHNICIAN: This concludes media unit 7 of today's video deposition of Dr. Richard Leo.

We're going off the video record at 7:49 p.m.

(The proceedings adjourned at 7:49 p.m.)

Page 329

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ARIEL GOMEZ,                    )
                                )
          Plaintiff,            )
                                )
     vs.                        )   No. 18 CV 3335
                                )
REYNALDO GUEVARA, et al.,       )
                                )
          Defendants.           )

This is to certify that I have read my deposition taken on Monday, October 2, 2023, in the foregoing cause and that the foregoing transcript accurately states the questions asked and the answers given by me, with the changes or corrections, if any, made on the Errata Sheet attached hereto.

_____
          RICHARD A. LEO, Ph.D., J.D.

No errata sheets submitted (Please initial)
Number of errata sheets submitted_____ pages

Subscribed and sworn to
before me this _____ day
of _____ 2023.

_____
     Notary Public

RICHARD A. LEO, PHD, JD, 10/02/2023                     Page 330..331

Page 330

REPORTER'S CERTIFICATE

I, Donna M. Urlaub, do hereby certify that RICHARD A. LEO, Ph.D., J.D., was duly sworn by me to testify the whole truth, that the foregoing deposition was recorded stenographically by me and was reduced to computerized transcript under my direction, and that said deposition constitutes a true record of the testimony given by said witness.

I further certify that the reading and signing of the deposition was not waived, and the plaintiff's counsel was notified of the availability of the deposition transcript for review and signature. Pursuant to Rule 30(e) of the Federal Rules of Civil Procedure, if deponent does not appear or read and sign the deposition within 30 days, the deposition may be used as fully as though signed, and this certificate will then evidence such failure to appear as the reason for signature not being obtained.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Chicago, Illinois, this 23rd day of October 2023.

Illinois CSR No. 084-000993

Page 331

Errata Sheet

NAME OF CASE: ARIEL GOMEZ vs REYNALDO GUEVARA, et al.

DATE OF DEPOSITION: 10/02/2023

NAME OF WITNESS: Richard A. Leo, PhD, JD

Reason Codes:

1. To clarify the record.

2. To conform to the facts.

3. To correct transcription errors.

Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____

_____

Index: $125–20

RICHARD A. LEO, PHD, JD, 10/02/2023

**Exhibits**

**1 Leo 100223-1**  14:18 15:16 23:14,15 47:8 65:9,11 88:13 130:5 154:1 183:8 193:12 219:10 226:24 261:21,22 264:11 284:20 296:6,7 303:23

**2 Leo 100223-2**  19:5

**2a Leo 100223-2a**

**3 Leo 100223-3**  20:9

**4 Leo 100223-4**  21:10,14,23 22:2 296:15 305:19 306:8 312:1 313:5 320:23

**5 Leo 100223-5**  21:9 22:15,16 23:19

**6 Leo 100223-6**  28:1

**7 Leo 100223-7**  86:8,10

**8 Leo 100223-8**  145:6,9 206:9

**9 Leo 100223-9**  148:12 185:10

**10 Leo 100223-10**  185:12,21

**11 Leo 100223-11**  211:4,5,7 212:1 259:24

**12 Leo 100223-12**  263:9 264:15

**13 Leo 100223-13**  264:14 274:8

**14 Leo 100223-14**

**$**

**$125**  275:14

**$400**  275:11,13

**$525**  274:23 275:4

**(**

**(1)**  97:13 98:6

**-**

**-62**  179:20

**0**

**00001**  313:2

**00001-00010**  311:4

**000157**  313:3

**00038**  149:10

**0245**  211:17

**1**

**1**  14:18 15:16 19:13,15 23:15 47:8 65:9,11 88:13 93:3 130:5 154:1 183:8 193:12 204:18 219:10 226:24 261:22 264:11 284:20 296:7 303:23

**1/2**  213:8,10

**10**  38:24 119:22 185:10,12,21 206:13 213:8,10

**100**  220:18

**11**  211:5,7 212:1 259:24

**112**  16:1

**112-page**  66:14

**11:10**  6:3

**11:30**  72:18

**12**  24:4,10 26:6 148:16 205:2,8 207:3 213:9 254:14 263:9 264:15 310:16

**12-minute**  192:23

**122**  31:16 32:6 37:4

**125**  187:17,18,19 201:23

**126**  260:17

**128**  149:6

**12:00**  129:9 204:17 205:16

**12:01**  129:22

**12:13**  58:23

**12:25**  58:18,21 59:4,10

**12:36**  60:17

**12:45**  129:18

**13**  70:1 72:16 73:3 79:17 80:1 149:6 152:19 264:14 274:8

**13th**  146:10

**14**  71:20 79:16 83:4 92:4,10 148:10,22 159:10 204:17 205:1 206:8 207:2 219:22 285:23

**14th**  117:1 237:8 262:1,8

**15**  93:17 106:7 118:12

**150**  232:12

**16**  24:10

**16-year-old**  236:13,21

**165728**  319:11,15

**16th**  116:17,20

**17**  235:11 237:7,21 240:24 263:16

**17-year-old**  236:15,22 238:23 239:4,10

**17-year-olds**  240:20

**18**  236:1,7 240:23 260:18

**18,000**  40:3

**18-cv-3335**  6:10

**182**  183:6

**19**  65:10,12,15 66:16 145:5,13 212:22 253:8

**19-year-**  238:24

**19-year-old**  239:4,11

**19-year-olds**  240:20

**1960s**  53:23

**1970s**  54:5

**1986**  195:13,16 196:3 199:12,16

**1988**  312:11

**1993**  195:18 196:1

**1994**  29:13

**1995**  29:14 154:9

**1996**  28:8 29:13 47:18 232:10 240:6

**1997**  10:15 71:20 72:16 73:3 79:17 80:1 83:4 92:4,10 107:8 145:5,14 148:10,22 159:10 196:1,4 204:17 205:2 206:8 207:2 219:23 237:8 253:8 285:23

**1999**  291:5

**19th**  146:4,7 166:2

**1:30**  205:6 212:7,8 213:8 214:12

**2**

**2**  19:5 23:1,2,15 26:6 34:19 130:6,9 149:19 150:19 152:2 254:14 266:11

**20**  6:15 34:6 119:22 121:18 152:20

RICHARD A. LEO, PHD, JD, 10/02/2023

**189:18** 212:23 286:15 290:16 292:21

**2000** 10:17

**2004** 55:14 58:5 60:22 61:14 62:1, 5,8,11,21 63:9,20 70:2 185:3,8,17 186:1 193:18 194:4 202:4

**2008-to-2011** 295:8

**2012** 62:6

**2015** 84:18 105:2

**2017** 12:3

**2018** 295:5

**2019** 20:17

**2023** 6:6 19:16 20:3,7,16,17,24 274:17

**20s** 236:4

**21** 24:18,21 25:6

**22** 24:11,19,21 25:6 99:14 152:20 319:15

**24** 150:19 152:2

**25** 42:19 43:6

**26** 10:15 305:14

**268** 31:7

**270** 23:19

**270-** 24:1

**271** 36:14 174:14

**273** 84:12

**279** 89:8 99:8 175:20 176:1

**28** 274:17

**285** 28:15

**2:00** 204:17 205:16,24

**2:25** 58:17,19

**2:45** 129:19 211:20 212:6,8

**2:47** 130:2

**2nd** 6:6

**3**

**3** 20:9 23:1,2 130:1 143:21 149:20 168:17 204:1 207:11

**30** 33:14 51:17 119:23 121:18 179:23 226:14

**310** 196:8,19,21 197:11 198:5

**33** 71:10,13

**34** 82:24 87:4 88:13 112:2,4 113:8, 16 212:22

**35** 122:9

**355** 186:12,15 187:5

**36** 91:24

**37** 107:19 112:5,16 130:5 149:10

**375** 275:11

**38** 139:18 154:1 156:20

**39** 149:10

**3:00** 213:1,6,7,17,22 218:10,11

**3:05** 143:18

**3:06** 143:22

**4**

**4** 21:10,14,23 22:2 23:13 149:20 193:9 219:15 257:16 262:21 264:22 296:15 305:19 306:8 312:1, 18 313:5 320:23

**40** 8:24 9:21 119:23 121:19 162:13

**400** 10:16

**41** 168:16 170:18 201:5 203:23

**42** 172:12,13 183:9 193:12 203:8

**43** 219:10

**44** 187:21 188:14 189:11 194:8,12, 18 195:2,10 201:24 202:8 220:20 222:5,6,8 226:10,24

**45** 118:8 129:12,14,16 187:19 222:13 233:21,22 234:6 251:6 265:22,24

**47-question** 32:18

**48** 173:3,10,14 183:16 234:16

**49** 184:23 185:2 186:10 195:5 241:4 248:5 261:22 262:21

**4:08** 193:6

**4:20** 192:22

**4:21** 193:10

**5**

**5** 21:9 22:16 23:19 38:23 207:13

**209:11** 213:1 220:21 226:21 227:3 232:22 266:12 268:11 322:15

**50** 8:24 9:21 68:2 186:17,18 187:19 196:6,7

**500** 31:11,23

**54** 9:18

**55** 9:17,19

**5542** 208:1

**56** 9:18

**57** 284:20

**58** 289:19

**5:03** 226:18

**5:05** 226:22

**6**

**6** 28:1 118:15 149:22 174:13 268:22 269:3 271:13,23 272:2 274:4

**60** 31:20 36:1,4 181:13 183:6 289:16

**600** 6:16

**6:00** 218:12

**6:03** 274:1

**6:22** 274:5

**6:30** 206:16 213:16

**7**

**7** 86:8,10 150:19 152:3 320:20 328:20

**73** 23:14,20

**75** 42:17 43:4

**77** 306:1,4,9,11

**79** 296:9

**7:26** 320:17

**7:37** 320:21

**7:49** 328:22,24

**8**

**8** 145:6,9 206:9 234:17 269:11

**81** 201:23,24 202:5,8

RICHARD A. LEO, PHD, JD, 10/02/2023

**83** 303:21 304:1,10,14

**87** 263:16

---

**9**

---

**9** 148:12 185:10 206:9 289:18

**91** 306:3

**96** 304:15 312:7

---

**A**

---

**a.m.** 6:3 204:17 205:16,24 211:20 213:1 218:10,11,12

**a/k/a** 312:11

**abandoned** 167:13

**ability** 271:22 284:9

**absence** 118:22 142:11 144:18

**absent** 195:20 198:2,23

**absolute** 55:6

**absolutely** 300:11

**abuse** 88:5,6 93:4,7,16 96:8 97:13 98:4,12 101:9 104:10 105:11 106:6 114:4,7 116:23 117:13,16 278:12 294:20 316:23 318:4

**abused** 93:14 98:14 104:16 114:16 115:11,14 312:17 322:13

**abusive** 312:13

**accept** 256:19

**accepted** 167:11 271:15

**accepting** 79:7,22

**access** 34:5,10 55:24 62:19 182:13,16 232:3,4

**accessing** 59:18

**account** 36:6 72:12,13 75:15 79:7, 22 92:3,8,15,21,24 93:20,21 106:17,18,21,22 107:1,2,5,10,18 117:19 124:13 133:1 135:12 139:23 142:10 143:6 214:13 215:14,19 281:8 285:22 286:9,10, 12,21 287:5,7,14 289:9,13 290:17, 19 291:8

**accounting** 154:16

**accounts** 72:9 102:24 131:22 132:24 136:5 156:15 188:4,24 189:21 194:13 205:21 285:4,6

**accuracy** 182:7 188:6 189:6 194:17

**accurate** 77:23 98:21 150:13 206:24 211:21 212:5,14 213:5 302:22

**accurately** 251:8 265:14

**accusation** 171:2

**accusations** 89:18 124:19 133:3 134:21 135:6 141:18 178:13 192:8

**accused** 124:16 127:17 132:2 170:24 201:8

**accusing** 141:11,15 143:4

**achieve** 65:15 69:15 70:12

**acquittal** 46:24

**acquitted** 312:24

**acted** 105:21 137:15 138:4

**acting** 123:14,21 134:16,17

**action** 82:7

**actions** 130:24 131:19 132:17 136:7 246:17

**activity** 178:7

**actual** 28:16 63:14 101:23 188:3,9 189:14,23 190:5,19,20 194:10 283:4 293:20 294:1,5

**acute** 312:22

**ad** 281:13

**adamantly** 90:16

**add** 41:10 171:2 310:17

**addition** 23:3 25:16 27:16 62:10 181:14 182:21 261:15 302:24

**additional** 30:22 32:2 52:8 206:3 210:8,12 250:19 257:7 302:23 307:4 315:2,7 319:17

**address** 296:7

**addressed** 300:22

**addresses** 240:2

**adds** 265:15

**adjourned** 328:23

**adjudicating** 231:24

**admission** 67:1 69:9 286:4

**admissions** 119:4 227:8

**286:5,16** 289:24 291:15 322:12

**admitted** 91:14 147:23 247:7

**admonition** 298:4

**adult** 240:16 294:16

**adult-like** 237:4

**adults** 240:12,14,23

**advance** 313:17 317:6

**advice** 46:22 105:19,21,22

**advised** 105:17

**affidavit** 84:6,17 85:10 89:7,11,23 104:24 105:2,4,10

**affidavits** 105:1 290:5

**affirm** 299:18

**affixed** 306:21

**afraid** 325:7,11,15

**age** 236:1 237:21,23

**aggregated** 203:5

**agree** 47:23 48:4,6 52:14 53:3 72:16,19,20,24 75:18 79:8 170:16 175:16 209:22 215:8 236:10 238:7 286:2,3 287:18 293:19,24 294:8, 11,14,19,22 295:10 304:9

**agreed** 100:16 166:23 323:6

**agreeing** 237:9 239:24

**agreement** 75:1

**ahead** 13:16 23:12 25:10 30:18 33:7 37:16 39:5 41:2,20 46:1,17 47:3 49:24 50:12 51:1,14 52:4 57:1 68:21 74:23 76:13 77:2 79:11 81:4 96:21 97:22 99:21 108:12,17 109:3,9 110:5,10 137:1,7 138:10, 15 160:5 161:10 163:24 167:4,17 168:7 172:8 196:2 202:13 207:9,10 225:24 244:16 245:3 249:10 251:23 253:23 270:12 281:17 282:12 287:1,2 288:14,16 289:2 291:12 293:3 299:4 308:22 324:3 325:20 326:20

**aid** 296:21 297:3,19 298:24 301:14, 19 302:10,15 317:9 318:24 320:9 324:16

**aids** 22:5,7,8 298:6 299:9 315:19, 22 324:13

**air** 76:3,7 79:8 138:24 141:5 142:18 147:7,23,24 148:1,3 155:12 169:5 215:12

**alibi** 215:10,24 216:1

**allegations** 322:14,22 323:1

**alleged** 93:16 105:10 107:17 115:21 116:22 118:6 141:13 282:15 283:9 312:14 322:6

**alleges** 113:2 312:16

**alleging** 117:21 321:24

**alleyway** 73:18,21

**allowed** 9:6 37:5,8 54:6

**Amazon** 184:6

**ambiguous** 42:7 133:3 191:10

**America** 230:1

**American** 39:24 40:13 231:1

**ammunition** 261:2

**amount** 171:11

**analogy** 111:5 132:9,13 172:10 280:19 327:8

**analyses** 27:6 268:4

**analysis** 48:1 56:15 106:16 144:11,23,24 146:14 155:16,24 158:22 163:6 165:3 241:9 242:11 249:15 250:16 252:9,15,17 253:24 259:2,4 266:16 267:5,22,23 268:5 289:8 290:20 313:21 314:6 315:8

**analyze** 44:17,20 106:13 180:2 217:1

**analyzed** 29:2 45:20 56:14 107:3 118:5 144:7 164:5 204:2

**analyzes** 239:16

**analyzing** 29:19 48:19 63:1 92:23 273:11

**Anand** 7:7 192:20

**and/or** 67:1 118:19,23,24 119:3,4, 12 120:16 121:6,14 128:21 170:24 201:8 221:4 222:22 227:9 228:8 234:19 237:9 241:15 278:3 286:3 290:4 297:10

**angry** 89:18

**annotated** 15:4,5 16:7,8

**annotations** 14:24

**anomalies** 243:23

**anomaly** 244:5

**anonymous** 183:1

**answerable** 95:23 293:7

**answering** 61:7 300:20

**answers** 94:5

**Anthony** 152:6 249:23

**anthropological** 54:18

**anticipated** 34:7

**Antonetty** 156:22 157:13 158:4 162:8

**anxiety** 178:12

**anymore** 180:2

**Apologies** 158:18 204:1

**apologize** 149:22 259:10

**Apparently** 59:17

**appeal** 99:5 100:3,21 101:2,11

**appears** 27:21 84:18 145:10 194:14 268:14 270:3 274:10 315:3, 8

**appellate** 99:6,12,19 167:11

**appended** 14:3 302:12

**appendicitis** 312:22

**Appendix** 296:14 298:22 301:12 302:12 303:8 304:21 306:21 307:20 308:2 309:3,7 310:4,5 312:3 315:4,9 321:3,9 324:11

**application** 135:20 247:21

**applied** 228:11 233:24 295:16

**applies** 240:19,23

**apply** 82:11 131:3,7 179:12 242:4

**applying** 120:20 131:4 132:4 220:12 242:15 280:4

**approached** 73:6,9

**approaching** 200:22

**approved** 166:5

**approximately** 11:24 197:2,17 205:2 210:22 213:9

**April** 20:17,23 274:17

**area** 40:5 54:18 102:12 111:10 204:18 209:11 213:1 267:24 268:6 270:7 282:15 312:18 322:15

**argued** 100:3 166:19

**argument** 95:13 100:8 101:11 166:17 172:7 301:22

**argumentative** 81:3 109:2,8 161:9 163:23 180:10

**Arial** 266:13

**Ariel** 6:8 7:8,9 71:20 72:20,24 83:2 84:17,18 92:2 104:5 139:21 154:10,12 206:12,15,17 209:1 234:3 248:5 258:13,15,22 259:11 269:17 274:14 285:4,13

**arm** 87:1 91:5 263:21

**arms** 150:8 152:21

**arrest** 156:1 177:6 216:5 218:22 219:4

**arrested** 177:13 204:18 205:7 208:14 209:10,18,24 210:2,4,13, 23,24 212:3,6 213:2,13,17 218:10 318:5

**arrived** 258:18 259:15

**arriving** 87:11

**Art** 301:22

**article** 28:2,15,19,20 29:6,7,10 30:2,8,13,23 31:2 33:20 34:19 35:1,7,24 37:1 40:12,14 44:13 47:18 56:5,19 58:6 60:22 61:14 62:8,14,21 63:5,9,13,18,20 64:2,11 70:2 173:15 174:7,11 175:5,23 176:10 185:3,9,17 186:1,4 187:16 192:10,12 193:18 194:5,8,21 202:4 203:17 224:2 232:10 240:6 256:1

**articles** 26:17 29:12 45:21 254:19 255:19

**ASA** 92:12 113:5,20 114:3,5 285:6, 15 286:5,19,22 287:13,16 288:21

**asks** 256:14

**aspects** 232:20

**assault** 38:3,4 108:8,14 112:17 276:23 277:3

**assaulted** 88:20 89:13 90:4 94:7 95:14,21 97:5 100:4,9,22,24 101:1 113:3 276:14

**assaults** 108:1

**assert** 240:9,15

**asserted** 24:23 100:24 101:8

**assertion** 69:13,19 70:19 82:19,20 101:13 155:4 159:9 173:21 174:2 182:7 186:5 192:9 193:22 194:3 195:2,8 197:24 198:22 261:11

RICHARD A. LEO, PHD, JD, 10/02/2023

**assertions** 45:16 222:19 223:6,10

**asserts** 93:13 100:15 197:1

**assess** 193:22 248:8 280:9 282:18 290:17

**assessing** 250:12,14 268:20 280:12 282:9

**assessment** 106:8 136:17 194:4 290:19

**assist** 297:9 313:17

**assistance** 94:17 301:7,8

**assistant** 122:14

**Associates** 6:15,18 195:13,17

**assume** 31:1 116:9 119:21 127:21 184:5

**assumed** 115:4 140:12 154:12 162:1 199:14

**assuming** 8:10 16:12 19:18 21:2 91:5 244:7 252:18

**assumption** 33:6 162:3 213:6 267:5

**assumptions** 211:2 212:13,14 267:13

**assumptive** 142:9

**attached** 19:9 301:11 303:7

**attack** 281:13

**attacking** 135:6

**attempt** 132:8

**attempted** 180:19

**attending** 7:18

**attention** 85:13 88:17 164:21 168:21 170:20 295:18

**attitude** 124:1

**attorney** 94:1 95:6 101:1,23 102:3, 11,16,24 103:4 122:14 190:24 225:16,18

**attorney's** 96:4 166:5,8 167:10

**attorney/client** 309:10

**attorneys** 101:18 166:18,19 225:14,15

**August** 145:5,13 146:4,7 166:2 253:8

**authored** 28:3

**authoritative** 222:19 225:7,12,17, 18

**authority** 49:13 51:12,18 69:18 192:9 225:5

**automatic** 251:6

**average** 13:8 201:13,19 202:21

**avoid** 18:13 88:23 141:21

**awake** 178:16

**aware** 45:2 55:10 63:7 68:13 71:6 75:21 76:9,21 80:18 89:10 95:6 100:2 103:7 108:23 109:4 114:12 116:3,16 128:1 148:5 184:4,9 199:8 200:14 203:1 218:6 225:20 238:10,12,18 239:5 241:2 243:16 251:16,18 254:16 270:6,13 288:5 290:8 295:6

**awareness** 246:5,11

---

**B**

---

**B-E-A-T-R-I-C-E** 271:24

**back** 10:15 15:15 20:17 23:14 31:6 33:12 34:8,9 56:21 59:1,3,7,9 60:5, 10,11,16,20 65:6 74:6 77:23 80:11 82:13 85:13 88:12 99:10 112:16 122:8 125:23 130:1,4 132:14 142:9 143:21 146:14 150:22 155:24 168:22 170:18 178:18 179:23 188:19,21 191:3 192:22 193:9 205:18 214:10 219:9 226:9,21 234:1 240:12 256:10,12 261:3 264:11,21 274:4 291:24 305:19,23 312:1 313:18 320:20,23

**background** 81:23 240:8,10,15,17

**badgered** 142:1

**Balash** 12:21 14:5 23:6 24:3 25:22 26:3 252:9,22 265:20 267:2

**Balash's** 15:7,11 23:8 75:11 266:4 267:19

**ballistically** 266:10

**ballistics** 164:12 167:8 253:8 268:2

**bargain** 46:24

**barred** 273:3,11

**barrel** 266:1

**Barry** 183:20

**base** 41:11

**based** 18:17 51:17 71:1 87:4,6 106:21 117:22 120:21 121:1 130:10,20 131:10 133:2 140:10 142:7 147:12 157:2 180:7 181:5 209:19 211:24 223:9 233:11,23 235:17,19 241:23 249:15 250:21 254:13 255:14 258:23 268:12 282:23 321:17

**basement** 177:4,12

**bases** 25:18

**basic** 22:12 222:9 233:24

**basically** 53:24

**basing** 255:3

**basis** 26:22,24 27:4 63:17 135:14 141:11 238:9

**bear** 248:7

**beat** 122:12 322:14

**beaten** 127:18

**beating** 88:21 90:12

**beatings** 113:22 124:9

**Beatrice** 271:13,23 272:2

**bed** 178:18

**began** 146:14

**begin** 178:21 296:8

**beginning** 6:2 34:19 59:2 60:15 90:6 118:18 129:24 134:4 140:2 188:20 193:8 201:2 226:20 274:3 289:17 320:19

**begins** 165:8,11

**behalf** 6:8,22 7:1,3,5

**behaved** 132:12

**behavior** 134:7 135:1,4

**behaviors** 133:4 134:14 136:7

**belief** 178:13 251:13 311:13

**belief-type** 277:17

**beliefs** 222:21

**believed** 101:3,6 128:19 221:23 233:12 323:5

**believing** 65:18 69:17 70:14 222:15

**belonging** 154:9

**benefit** 119:1

RICHARD A. LEO, PHD, JD, 10/02/2023

**Bey** 303:20 304:5,18 312:11,13,14, 16,19,23,24 313:21 314:7,17 318:5 319:13

**Bey's** 316:21 317:8,18 319:12

**bias** 34:22 36:1,18 130:12 174:20

**biases** 35:8

**Big** 122:14

**bigger** 122:13

**billable** 274:23 275:2,4,5,9,14

**binary** 37:20 175:14 291:14

**bit** 11:12 27:2 56:21 64:24 90:8 116:21 124:23 125:23 128:24 132:15 145:23 149:18 188:13 192:21 193:14 201:2 207:18 220:20 230:22 243:6 247:16,19 277:22 285:18 304:17

**blacksmith** 233:16

**blank** 163:12

**bled** 186:17

**bleed** 108:4 112:20

**bleeding** 91:20 112:13 116:11

**blinded** 160:24 161:1,13,17

**blood** 88:2 113:14 327:1,4

**body** 90:14 91:4 111:23 112:8 131:4 144:7 145:19 156:10 220:12 226:2,8 266:17 267:7 283:21,22,23

**bond** 116:17,18

**book** 183:23 184:11 197:8,9,11,13 200:7

**books** 26:17 184:6,8

**bothers** 21:18

**bottom** 23:13 29:17 30:14 113:8, 16 125:6 154:3 156:20 165:5,6,9 222:8 227:22 285:19 304:2

**Bounds** 305:22 306:3

**Bowen** 6:14,18

**boxer's** 109:12

**boxers** 111:7 115:15

**boxing** 109:6,24 110:8,11,17,23, 24 111:5

**brain** 236:3,24 237:1,3,17

**break** 8:18,19 20:5 58:16 60:22 66:11 118:12 129:11 185:14,18

188:12 192:21,23 193:17 226:12 243:6 273:18 320:14 327:17

**breaks** 8:16 64:4 170:24 171:1,24 201:8 239:6 313:13

**Brett** 14:17 15:17 19:4,14 20:8 27:17 28:14 29:16 31:6 34:18 36:12 65:8 71:10 82:24 86:4 88:11 90:7 91:24 107:19 112:2,6 118:8 122:8 124:23 130:4 145:3,24 147:14 148:9,15 149:17 151:22 152:5 153:9,24 172:13 174:4,10 175:20 183:7 185:8 186:9 193:11 201:1 204:1 206:7 207:8,11 211:3 212:15 220:19 226:9 234:16 253:1 259:22 261:21 263:8 264:10 268:9 274:7 275:20 284:19 285:18 289:16 296:15 320:24

**brick** 73:11 126:2 169:1 324:21 325:1

**briefly** 86:5

**briefs** 99:6,12

**bring** 100:21 101:2 177:8 260:8,10

**bringing** 178:8

**broad** 41:21

**broader** 48:16 50:3,15 224:5

**Broadly** 242:13

**broken** 270:22

**brought** 176:16 177:1,14 191:2 205:20 209:11 212:24 214:3,10 246:24

**bruises** 111:3,9

**bruising** 87:21

**building** 177:5,12

**bullet** 81:22 138:24 144:21 145:18 156:9 157:8 163:4,15 165:3 250:9 252:10 253:11,13 255:9 257:15 258:2,17 262:11,19,21,23 263:2 264:4,21,24 265:1,8,17 266:5,9,11, 12,17 267:6 268:11,20,22 269:3,6, 10,11,16 270:2,5

**bullets** 144:6 145:18 258:15,22,24 259:13,19 260:21,24 261:12,17

**Bulls** 141:6

**burglaries** 38:11

**burglary** 38:4

**Burton's** 306:8,9

**but-for** 82:4

**C**

**c.v.** 19:19,24 20:6 29:11 310:2

**caliber** 265:22,24

**call** 42:9 43:7 316:10

**called** 8:2 48:9 49:1 57:20 271:13 278:5,16

**calling** 135:7

**calls** 42:4,21 305:13

**caption** 271:24

**car** 72:21,22 73:11,22 74:6 80:11, 12 126:2,14,24 127:1,12,13 152:21 167:21,22,23 168:3 169:1,5,9,10, 16,17,21,22 251:20 255:3 326:24 327:1,2

**care** 18:22

**case** 6:9 8:16 11:8,19,21 12:1,18, 24 14:2 15:20 22:4,5,11,13,21 24:7 32:14 45:14 48:11 51:4 67:18 68:7, 11 72:3 77:8 106:11 120:8 125:23 131:5 132:15,16 133:9 136:4,16 166:12 188:1 189:4 195:3 200:10, 14,17,18,23 201:9,15,21 202:8,18 203:5,6,21 215:23 220:13 228:12 231:18 233:7 242:5,18,24 243:3 248:13,17 251:7 257:6 267:14 269:16 271:10,12,18,20,21,24 272:17,23 273:8,14 274:14 275:17 276:14 280:6 291:2 293:14 296:20 297:21 299:9 300:9 301:21 303:20 306:9 308:7 310:18 311:15 312:8 313:21 314:7 316:21 317:8,14,15, 18 318:9 319:21 322:5 323:23 324:7,13

**case-specific** 228:12 273:12

**cases** 8:22 9:2,5,9,15 10:1,2,19,21 11:1 20:12,23 21:1,7 26:17 34:6 36:17 37:12,18 38:10 44:17 56:6, 18 62:8 67:19 94:15 100:23 101:14 121:5,24 128:14 136:1 174:19 187:11,16,24 188:3,14 189:5,11, 12,22 194:22 195:2,10,21 197:4,18 198:18 200:19 201:22,23,24 202:1, 7,8,9,10,15,16,18,22,24 203:6,12, 14,15,18 230:13 231:7 232:5 243:13 272:10,12,23,24 273:1,9, 13,15 275:6,7,8 281:6 291:2 297:13,15 304:7 315:3,8 321:1,23 323:4,12 324:17

RICHARD A. LEO, PHD, JD, 10/02/2023

**Castro** 156:20 157:12 158:4,5

**catch** 152:13 321:10

**categories** 64:2 239:6

**category** 224:5,7

**caught** 305:11 325:16

**causation** 82:4

**caused** 91:20 108:2,14 112:12,18 117:7 140:10 252:10

**causing** 70:24 93:8 100:18 222:17,21

**caveat** 25:21 34:21

**caveats** 35:8

**celebration** 141:6

**Celia** 208:20 211:13

**cell** 177:24 178:15,19,24 179:9,13, 15 214:11,13 216:11,18,23 217:8, 22,24 218:1,5 219:5 311:2

**Central** 129:19

**century** 222:9

**certainty** 11:10 232:1

**cetera** 238:2

**championship** 110:24

**chance** 103:24 241:15 244:1,8

**change** 104:19 105:14 142:1 154:24 155:4 156:14 251:1 307:7

**changed** 54:22 123:24 307:15

**changing** 250:20

**chapter** 70:2

**characteristics** 237:11 242:3

**characterization** 170:17 178:6

**characterize** 27:2 133:16

**charge** 118:21

**charges** 166:4

**charging** 275:3,6

**chat** 60:10

**check** 99:11 320:15

**Chicago** 6:16 7:6 11:23 21:3 25:8 92:10 102:12 103:5 139:23 141:6

**choice** 228:3

**choose** 41:4

**Christie** 6:22 7:19 8:5 13:17 14:20 19:4,7 25:14 30:21 38:6 39:14 41:13 42:1 43:16 44:11 46:4,20 47:6 51:7,21 57:9 58:15,19,21 59:1,5 60:18 61:5 62:20 69:12 75:3,20 76:19 77:6 79:14,21 81:15 82:23 85:12 97:1,10 98:1 100:1 103:2 108:13,20 109:5,11 110:2 111:11 126:21 127:5,9,10 129:18 130:3 133:19 137:3,13 138:12 139:7,17 143:24 144:2 145:8 152:2,5,7 158:18,19 160:14 161:6, 15 164:3,13 166:14 167:6,20 168:14 170:1,7,13 172:11 180:17 185:13,16,20 186:21,23 187:1 192:20 193:3,11,16 226:9,15,23 230:21 244:19 245:12 249:17 252:4 254:5 256:11,18 257:8 259:10,16 260:6,10,12 263:14,17 264:16,18,20 267:16 270:15 273:16,23 274:6 276:20,21 281:21 282:16 285:9,11 287:11 288:19 289:15 291:16 293:8 295:21 308:12

**chrome** 251:6

**Cicero** 72:17 73:6,16 74:7 79:16, 17 80:1,20 251:4,11 258:18 259:15 262:9

**circle** 60:11

**circled** 16:13

**circles** 15:10 299:6

**Circuit** 6:10 11:23

**circumstance** 155:20 195:21 232:19 281:7 284:10

**circumstances** 139:16 156:2 157:9 171:23 198:2 219:8

**citation** 173:15 313:20

**citations** 27:5,16 313:13,14

**cite** 27:15 49:14 70:18 84:16,19 184:23 194:6 196:6,7,8 197:12

**cited** 27:11 183:16 186:4

**cites** 70:1 173:24 174:1 312:23 313:1 318:9

**citing** 69:18 70:4 84:24 152:1 173:20 197:23 319:13

**city** 7:6 21:2 270:7

**City's** 296:8,11

**civil** 8:22 9:12,15,21 10:1,3,8,11, 21,23 11:5,11,14,21 12:6 271:1,10,

19 272:8,19 273:1 275:8

**claim** 24:22 101:19 115:11 158:10

**claimed** 96:8

**claims** 25:4 100:13 101:5,20,24 106:6 114:4

**clarification** 43:17 53:10 230:23 278:21

**clarified** 204:10

**clarify** 9:14 46:5 259:24 262:12

**Clark** 6:15

**classic** 72:4

**classified** 324:7

**classify** 189:1 217:1,7 221:24

**CLE** 171:24 172:1 327:9,14

**clean** 66:11 113:10,11

**cleaned** 112:24 115:16 116:13

**cleaning** 115:17

**clear** 23:17 132:5 133:20 307:2

**client** 96:8 97:3,5 190:24

**clinical** 238:4,5

**clip** 258:23 260:3,23 261:2

**clock** 217:9

**closed** 111:21

**closer** 78:9

**clues** 83:23

**co-authored** 55:20 60:23 186:2 193:19

**co-defendant** 251:19

**co-defendants** 72:13 73:15 98:13 166:24 167:12 169:7 208:15 210:19

**code** 34:2,9

**coded** 62:24 63:14,21,22 64:1

**coding** 32:18,20,22 33:10,12,19 34:1,4,8,11 56:11 62:22 63:3,8,15, 16,22 64:7,9,14,18,22 65:2 182:10

**coerce** 140:15

**coerced** 45:17,21 140:13,15 276:2,10,12,16 277:1,4,19 278:1, 13,15,17

**coercion** 46:9,12 93:4 97:14 100:17 104:10 238:8 278:12 279:4,

Index: coercive-confidence

RICHARD A. LEO, PHD, JD, 10/02/2023

9,19 280:7 316:23 318:3 322:1

**coercive** 142:6,22 144:16 227:6, 13,14,18,19 278:19,23 280:3,10, 13,15 281:11 293:21 294:2,6,9,12

**cognitive** 235:5,21

**coin** 279:3

**coined** 279:6

**Coleman** 310:19 311:1,3

**collaboration** 62:12 300:14

**colleague** 300:8

**colleagues** 136:10,21 137:18 279:21

**collect** 30:8

**collected** 29:2 144:7,8 145:17,19 163:2,10,18 164:4,11 253:11,12, 13,17

**collecting** 56:23

**collection** 48:1,7,22 49:20 50:20

**collects** 229:12 230:10

**college** 228:23

**combined** 172:19 184:18 193:23

**comment** 76:18

**commission** 326:5

**commit** 222:20

**committed** 89:18 157:6 218:21 223:13 278:8 279:2

**committing** 90:5 91:14 132:2 141:12 143:5 222:22 277:11,12 279:2

**common** 51:19 67:14,21,24 68:1 128:12,17 224:20 323:4,11

**commonalities** 72:9,12

**Commonly** 35:19

**communications** 256:15 267:11 303:14 305:16 309:11 310:12 313:24 314:11 315:12 316:7 321:18

**community** 282:5

**compare** 36:10 37:23 41:7 285:4

**compared** 178:1 189:24 218:4 239:11 240:20 285:5,14

**comparing** 172:3 285:1

**comparison** 218:7 239:15,16,17 285:13 308:2

**competent** 102:16 197:1,16

**compiled** 181:15

**complained** 312:21

**complaint** 312:23 319:10,14

**complete** 194:17 207:9

**completed** 327:6

**complex** 203:18

**complexity** 42:12

**compliability** 238:19

**compliance** 118:22 119:1 222:14 238:20 286:2

**compliant** 276:2,10,12,16 277:1,4, 15,19,20 278:13,17,23

**complicated** 42:8

**complies** 277:10 278:3

**comply** 219:21 220:7,16

**complying** 278:1,4

**comprised** 272:1

**Compustat** 110:19

**computer** 60:3

**computers** 179:23

**Concepcion** 72:16 91:15 114:1 124:16,20 140:3 142:24 257:17 265:9 266:15 268:14 269:17

**concept** 246:15

**concepts** 241:19

**conceptual** 283:18

**concern** 297:22 325:13

**concerned** 188:7 190:3

**conclude** 120:14 204:23 220:5 228:5 281:10

**concluded** 264:24 275:22 295:22

**concludes** 328:19

**conclusion** 132:19 135:24 136:20 139:4 182:2 201:10 214:2 228:12 231:13 236:20 238:9 255:3 280:14 281:6

**conclusions** 35:10 63:8,17 160:24 161:12 280:22

**condition** 224:22 225:2

**conditions** 54:22 217:3,24 223:21 224:3 238:8

**conduct** 33:21 157:2 164:23

**conducted** 31:11 46:7 136:22 144:12,24 145:17 147:1 238:14,16 247:14,24

**conducting** 35:6 37:13 242:11 256:23

**conducts** 166:8

**conference** 113:5,19

**conferenced** 6:5

**confess** 67:13,15 68:5,12 69:3,10 71:5 107:10 114:1 124:11 217:13 227:21 277:12 289:12

**confessed** 68:9 124:6 128:18 295:18

**confesses** 277:9 278:3

**confessing** 65:20 70:17 236:14, 22 238:24 278:4 294:16

**confession** 44:14,22,24 45:4,9, 13,22,23 46:13,21 67:1 69:10 71:19 72:1 81:10 83:3,9 84:5 95:7 114:20 118:23 119:2,19 120:22 121:1,5,9,12,24 124:14 125:8 128:7,9,10 129:3,4,6 162:9,12 172:21 178:14 184:20 186:6 194:1 195:9 197:3,17 219:22 220:8,16 221:4 226:5 229:5 230:14,18 231:15 232:6 234:4 236:10 237:10 238:7 241:13 242:19 243:13,20 244:11,21,24 245:1,6 246:8 248:3, 6,9 265:11 268:21 276:2,3,6,10,11, 12,16,24 277:1,2,4,10,16,18,20 278:6,10,11,13,15,17,23 280:2,9, 12,15 286:4 287:19 289:5,7,21 312:13 323:4,6,12,24 324:6,8

**confessions** 44:18 45:15,16,21 46:7,8 55:16 64:5 70:11 92:2 93:9 100:18 119:4,23 128:13 130:19 183:21 185:4,9 202:7,10,17,23 224:9 227:9,16 228:8,16,21 229:10,17 230:8,11,12 231:21 234:19 243:14 247:22 271:15 277:8,24 281:24 282:2,3,10,18,21 283:6,13 287:9,24 288:2,7,8,10 294:20,24 295:3,7,11 323:17

**confessor** 114:20

**confidence** 41:24 53:7

RICHARD A. LEO, PHD, JD, 10/02/2023

**confidentiality** 182:22

**confirm** 77:23 78:4 240:13

**confrontational** 294:5,7

**confusing** 222:15

**confusion** 23:18

**connected** 87:2

**connection** 59:14

**conscious** 246:5,10

**Consent** 209:4,9,14,23 210:15,22 211:5,6,13,19

**considerably** 195:22 198:18

**considered** 218:13 221:21 237:23

**consistent** 41:8,22 117:19 243:2, 4 291:1

**consulted** 12:13 13:1,4

**contained** 272:20 315:20 321:9,13

**contamination** 244:7

**contest** 72:4

**context** 29:18 47:9 57:5 66:9 94:9, 13 151:13 225:10 226:4 248:2 256:3 277:22

**contextual** 293:14

**continuation** 143:20

**continue** 123:6 187:23 204:22 258:12

**continued** 89:17 90:16,20,21 91:6

**continues** 90:24 122:17 222:13 236:3

**continuing** 172:3

**contradict** 207:1 290:15

**contradicted** 159:2 243:3 248:16 252:1

**contradiction** 291:21

**contradictions** 292:24 293:10

**contradictory** 141:1 156:4,12 162:6 293:15

**contribute** 41:6 216:15 227:24

**contributes** 40:6 219:19

**control** 35:24 207:15 260:2

**convenience** 48:9 49:1 51:23 52:2,10,12

**convenient** 8:18

**conversation** 60:24 93:24 94:7 95:4,5 134:9 175:2 214:19

**conversations** 13:3,8 94:10,13 103:12,18 104:5,7,13,15 267:11 300:4

**convict** 69:2

**convicted** 69:2 102:14

**conviction** 99:15 104:21 228:2

**convictions** 295:11

**convinced** 250:22

**Cook** 6:11 115:22 116:3

**coordinator** 14:16

**cop** 123:18,20

**copies** 182:8,9

**Cops** 183:20

**copy** 16:16,18 18:16,18,19,23 19:3 66:12,13 71:13

**core** 279:14 283:19

**corner** 211:17

**correct** 8:12 9:16 10:13 16:3 20:18 23:10 24:8 26:3,4,17 28:6,7,9,12, 13 31:18,22 34:22 35:16,20 36:2 37:14 39:17,18,24 40:16 46:9,14 47:11 48:23 52:1 53:19 55:17,21 56:23 67:6 70:15,17 71:20 72:2 74:15 77:19 79:14 80:7,22 82:5,9, 10 86:24 90:23 91:9,16 92:13 99:3 100:19 101:16 105:4 108:9,22 109:21 111:15,22 112:9,10,21 114:2 116:1,24 117:8,11 124:17 126:22 130:20 144:4 146:4,10 149:15,16 150:12 151:8,16,17,21 153:7,13 154:13 155:5,13 158:1,2 159:17,20,21 160:17 161:3 163:6, 7,20,21 164:8,11,16,18 165:3,14, 17,20,23 166:2,3,9 167:24 169:1 170:1 171:13 173:16,17 175:9 179:2 181:17 183:18 184:24 185:24 186:7,21 187:20 188:18 193:19 194:2,5,19 195:6,11 196:5 197:12 201:11 202:16 203:12,15, 16 204:4,9 206:5 209:19 218:14 221:22 222:1,4 223:7,14 231:9 233:3 235:23 237:14 239:1,2 240:6,11,18 243:12 246:3 252:20 253:9,14 255:15,16 259:19 262:19 265:3 266:6 267:20,24 269:2 274:18,22 275:1 276:7 287:22

288:4 296:12,13,22 297:4,21 305:1 307:17,24 308:20 321:21 325:2 327:15

**corrected** 311:12,20

**correcting** 311:18

**corrections** 115:23 299:8 303:3 305:4,8 307:13

**correctly** 9:17 12:4 27:9 36:22 38:8 65:23 78:22 85:23 89:2 91:10 106:9 119:7 147:17 171:8 179:1 186:20 187:13 189:9 195:23 198:16 202:6 205:5 217:14 220:2 223:1 230:2 234:13 255:20 258:19 265:4 269:19 270:1 286:6 290:22 324:12

**correlation** 119:17

**correspond** 304:11

**corroborable** 242:23

**corroborate** 87:9,18 115:10 117:15 162:21 163:16 215:13 216:1 323:1

**corroborated** 101:23 114:4 162:20 242:19 243:10 244:6 248:10

**corroborating** 117:13 118:3 248:13 322:2

**corroboration** 322:6,10,11,18

**cortex** 237:1

**cot** 178:18

**counsel** 6:19 7:19 12:13,19 13:2,4 14:4 15:4 20:5 26:7 46:22 105:19 256:5,6,15 267:4 299:15 300:15 303:14 314:1,12 315:12 316:7

**counsel's** 256:20

**count** 172:2 192:14,18 213:18,24 214:4,6,15 217:8 327:10,13

**counted** 192:17,19

**counting** 177:10

**countries** 64:5

**County** 6:11 115:22 116:3

**couple** 21:5 47:13,20 50:5 177:2, 24 178:2 198:4 270:22

**court** 6:10,17 11:22 44:8 57:6 141:9 158:16 167:11 198:10 230:16 247:7,9 249:7 301:7,8 318:4 319:10 325:23

RICHARD A. LEO, PHD, JD, 10/02/2023

**courtroom** 247:13

**Courts** 282:6

**cover** 310:17

**coverage** 295:10

**Coyne** 103:4,8,12,19 104:6

**crash** 125:24 168:24 169:9,21

**crashed** 73:11 126:9 127:12 167:21,22 168:3

**crashes** 326:4

**Crashing** 126:24

**Crawford** 110:13

**create** 33:10 227:24

**created** 32:23 33:6 34:16 125:24

**creating** 316:18

**credibility** 106:8 249:14 250:12,14 282:10 290:19

**credible** 242:21 248:11,21 249:1, 19,22 281:10

**credit** 143:6 249:5 275:24 276:9 281:8 290:17,18

**credited** 139:23

**crediting** 249:3 251:9

**crime** 38:20 130:17 132:2 141:1,12 157:6 169:14,15,16 170:15,17 218:21 221:9 222:20 223:13 243:18,22 249:2 268:13 277:12,13 278:8 279:2 326:5

**crimes** 38:4 222:22

**criminal** 9:5,9,11,20,22 28:11 77:7 94:1,16 96:3 101:15,17 203:12 239:12,22 240:10,17 272:8,19 286:17

**Criminology** 28:11

**criteria** 324:5

**cross-referenced** 307:20,24

**cross-referencing** 309:4

**crowd** 73:7,10 76:1,5,11,23 138:3, 19,21 147:21,23 148:7 150:9,12 151:1,8,19 152:11,22 153:7,17,22 155:11,22 157:23 159:13,23 160:8, 22 161:19,21 167:13 215:12 266:15

**crowded** 270:7

**cuffed** 87:11

**curious** 93:11 232:9

**current** 14:13 20:1,2 195:18 199:9, 11

**curriculum** 19:9,12

**custodial** 43:5 66:22 69:14 92:3 172:18 173:2,22 175:8 176:12 180:8 183:14 199:4,22 200:4 201:14,16 203:10 213:19 214:13

**custody** 171:11,17,22 172:19 177:2,6,11 178:20 181:5,19 184:18 188:8 190:4,20 191:8,9,11 192:15 193:23 200:11 203:2 204:7,15 205:1 217:9

**cut** 61:2 116:11 216:7 259:8 285:7 313:7

---

**D**

**Dan** 103:4,7

**danger** 219:1

**Daniels** 156:21 157:13 158:3

**data** 26:10 29:1,19 30:8 33:23 34:6,9,10 35:9 36:20 41:6 43:13 48:1,7,18,19,20,22,23 49:2,5,10,20 50:20 52:5,6,7,8,21 53:7,8 55:23 56:11,13,14,23 57:5,17,18,19 58:7, 10 61:16,17 62:24 63:23 64:1 174:21 179:19 180:20,23,24 181:1 182:9 232:4,10 239:15,16 315:17 316:18

**database** 62:2,3,4,7 229:11 316:20

**databases** 62:1

**dataset** 38:9 52:4 56:3,9,10,18 57:3,11 61:24 62:16 229:3 230:9

**date** 19:11 146:5

**dates** 20:14

**daughter** 226:12

**David** 12:21 14:5

**Davis** 70:1

**day** 21:2 111:6,7,8 122:23 141:6 172:1 191:3 212:22

**days** 111:16 116:20,22 117:8 191:1,6,20 303:10

**dead** 155:22 156:9

**deal** 21:19 119:14

**death** 140:20 142:23 252:8

**debate** 16:16

**debating** 301:4

**Debbie** 156:21

**Debrorah** 70:1

**decade** 295:12,13

**decades** 234:1 282:8,14,17 295:15

**decays** 225:1

**deceive** 65:17 69:16 70:13

**deceiving** 67:4

**decide** 18:24 25:3 301:6

**decision** 105:23

**decreased** 239:23

**deduce** 188:2

**defendant** 6:8,23 7:4,6 100:9 135:12

**defendants** 7:2 94:17 100:5 101:15,17 212:24 318:7

**defense** 96:3 327:20

**defer** 129:15

**deferring** 222:18 223:6

**define** 40:10 50:19 68:1 190:18 199:6,7,18 221:6 235:15,24

**defined** 174:7 181:6 204:9

**defines** 199:3,21 200:3,15

**defining** 279:20,21

**definition** 47:24 48:4,16 49:8,11, 12,15,21 50:4,14,15,22 51:9,11,19, 22 68:3 171:16 175:24 181:4 201:20 246:6 279:15 280:6

**definitions** 279:8,12

**degree** 37:21,22 44:4 49:8 56:16 175:15 284:12

**degrees** 37:20 40:1,9 41:9 48:14

**delivered** 56:15

**demands** 278:2

**demonstrated** 139:24 147:20 227:4

**demonstrates** 154:22

RICHARD A. LEO, PHD, JD, 10/02/2023

**denials** 70:10 135:7

**denied** 90:5 114:6

**denoting** 311:16,18

**deny** 89:17 90:16,21 135:9 322:17

**department** 6:11 25:8 31:16 32:5 39:1,13 115:23 177:4 178:10 183:2 204:19

**departments** 31:14,21 38:17 39:16,21,22,24 40:3,4,13,15,19,23 41:5 181:23 232:13

**depend** 94:4 115:19 213:20 217:24

**dependent** 229:19

**depending** 94:9,12 104:12 114:17 117:4 138:16

**depends** 40:7 48:15 49:5 94:4 97:15 110:20,21 111:18 112:24 116:21 164:1 178:4,6 216:21 219:7 247:3 257:4 293:22

**depletion** 219:18

**depose** 9:6

**deposed** 9:3,15 10:2 327:16

**deposit** 216:22

**deposited** 213:21 214:5 217:7 218:10

**deposition** 6:5,7 8:11,23 10:17 12:10,15,23 13:5,13,20 14:8 20:13 21:4 77:18 78:5,12,24 80:6,16 83:14 84:6,17 85:10 89:7,11,23 96:4,7,23 105:3 107:7 108:19 118:11 123:11 125:22 126:7 150:15,17 151:4,6,24 152:17 153:2,4 184:7 213:12,14 254:6,9, 15 255:17,18,24 256:2 258:23 259:23 260:11,16 262:5,7 269:7 274:21 286:14 291:20 292:1,7 296:21 297:1,4,10,19,20 298:14, 19,24 300:8 301:13,21,24 302:4, 10,14 303:10 305:8 313:18 315:22 317:6,10,13 318:1,22 319:3,7 320:6,9 322:16 325:4 327:17 328:20

**depositions** 8:14 9:17 181:9 199:20 290:3,16,21,24 291:1 299:10

**depriving** 294:9,12

**derivative** 242:22 243:15

**Derrell** 310:19

**describe** 45:15 70:23 94:17,22 107:14 123:6,21 131:24 135:13 140:8,13,18 141:19,23 142:6 143:9 144:17 179:17

**describes** 35:2 86:13 89:9 92:17 117:6 121:8 122:7 144:17 234:22 266:14

**describing** 85:4 96:7 99:3 108:7 156:13 281:11 284:2 291:21

**description** 83:2,7,18,19 84:9,21 87:3,5 92:17 113:9,23 120:20,21 130:21 131:5,20 134:22 136:6 150:13,14 153:8 276:1,9 284:2 285:5,14 291:8,22 306:8 311:3

**descriptions** 113:24 132:3,10 142:8 161:23 205:19

**designed** 142:8

**desktop** 59:17

**destroy** 169:1,10 170:9,14 327:3

**destroying** 326:7,23

**detail** 314:21 315:3,7 319:17

**detailed** 285:22 286:9 304:7 313:20 314:6

**details** 22:9 92:18 285:13 298:10

**detain** 218:22,23

**detained** 216:9,10

**detective** 37:5 88:19,20 89:13,17 90:4,11,20 91:1,3,19 92:11 107:8,9 108:9 111:21 112:12 113:3,9,10,19 118:1 122:11,12,18,21 123:23 124:10,15 127:20 128:22 132:12 139:24 140:11 141:13 142:9,17 154:11 155:15 156:14,22 158:21 161:24 162:19 164:22 176:5 207:5, 6 208:19,24 212:23 213:5,13 232:24 276:14,15,22 285:5,15 286:4,19,23 287:13,16 288:20 291:3,5,6,7,18,20 292:8,10 312:12, 14,17 318:6 319:11

**detectives** 25:11 35:15 37:6 128:23 177:7 207:6 208:1 214:22 248:15

**detectives'** 234:2

**detention** 200:15,20

**determination** 135:5 287:5

**determine** 92:21 93:19 119:9

120:5 130:24 131:18 132:16 133:10,12,22 134:15 136:9 161:14 181:19 182:7 188:15 189:14,22 194:9,16 220:14 228:14 229:3,7,9 237:20 243:20,21 244:5 326:22

**determined** 200:3

**determining** 93:12 106:5,10 136:20 137:15 138:4 280:2

**develop** 222:21 224:23 236:3

**developed** 236:24 237:1,17

**developing** 223:9

**development** 236:23

**develops** 237:3

**diagnosed** 312:22

**diagnosis** 279:22

**diagnostic** 279:23

**Diaz** 72:16 90:22 91:15 114:1 124:17,20 140:3,21 142:24 154:7, 13 155:8,18 157:9 158:24 159:3, 15,23 160:2,13,21 161:22 163:17 233:2,14 250:9 253:13 255:10 257:17 258:3 265:9 266:16,18 267:7 268:14,16 269:17 270:5

**Diaz's** 144:7 145:19 252:8

**died** 138:20 140:21

**dies** 159:24

**difference** 41:9

**differentiate** 177:23

**differently** 11:13 70:21 120:4 200:15 277:18 292:16 315:18

**difficult** 39:20 231:17

**direct** 15:14 76:3 85:13 160:9,11 161:21 162:17 164:21 168:21 219:14 293:9

**Directing** 170:20

**direction** 74:14 150:22

**directive** 215:6

**directly** 85:2

**disability** 127:23 128:1,5

**disabled** 128:8 129:4

**disagree** 48:21 49:20 50:2 57:10

**disagreeing** 50:16

**discovered** 305:6

RICHARD A. LEO, PHD, JD, 10/02/2023

**discovery** 6:5 206:3 210:8,12

**discredited** 246:15

**discrepancy** 23:22

**discuss** 130:15,18 304:6

**discussed** 45:20 118:18 126:6
242:14 306:3 312:9

**discusses** 45:11

**discussing** 60:22

**discussion** 59:11

**dispositive** 97:17,19 138:22

**dispute** 75:8,9,12,14,17 120:23
210:3,17 229:13 231:24

**disputed** 74:13,16,17,21 75:5,7,19
79:13 148:4 190:6 211:23

**disputes** 155:17 190:13 191:17
192:4 210:21

**disputing** 151:15 170:6 263:5

**disregard** 140:1,7

**dissertation** 28:19,21,22,24 29:2,
4,5 38:13 65:3,4

**distinction** 189:19 191:7

**distressed** 278:1

**district** 318:4 319:10

**distrust** 232:14

**ditched** 166:24

**divergence** 39:2

**Diversey** 72:17 73:6,17 74:7
79:16,18 80:2,21 251:4,11 258:18
259:15 262:9

**diversions** 39:7

**Division** 6:12

**DN** 271:14

**DNA** 55:16 62:13 295:16,19

**doctor** 58:12 92:5 131:7,15 139:19
187:3,5 193:1

**doctors** 280:20

**document** 38:12 78:4 89:8 96:11,
16 97:8 125:10 206:23 253:4,7
258:10 308:4,15 309:20 311:10
316:15 320:1,2

**documented** 121:22 224:8

**documenting** 116:8

**documents** 12:12,14 13:21,24
14:2,22 16:21 22:10 24:2 26:5,9
60:2 62:13 83:12 84:7,11,19,20
85:1,4,9,11 104:4 128:2 251:7
256:4,6,23 257:7 258:10 269:8
292:12 309:16 317:17,18,20,21,24
322:8,9

**Dominguez** 73:1 74:1,5 131:23
169:4,6,19 258:13 259:12 262:13,
18,22 263:1 264:4,23 289:22

**Dominguez's** 139:21 263:9

**Donna** 6:18

**double-check** 65:5 150:15 205:11

**doubt** 47:21 151:5 179:22 222:18
223:3

**doubting** 153:3

**downward** 266:18 267:7

**dozen** 9:22 47:13,20

**draft** 29:4,5 33:19 81:1

**drafting** 35:6 297:6 298:11 299:3
314:1 321:18

**drafts** 300:5

**Dragon** 73:2 139:22 258:14
259:12

**draw** 120:2 135:24 231:13

**drawing** 90:1 97:12 131:8 163:12
316:15

**drawn** 28:21,23

**drew** 35:10

**driver** 150:6 152:22

**driver's** 73:22 74:1

**driving** 73:1,16 154:11 169:4,8
268:13

**Drizin** 55:15,20 60:23 62:18,22
186:1 193:19

**drop** 196:8

**dropped** 197:13

**drove** 73:15 74:5 150:21 169:8,17
325:1

**duck** 91:6

**ducking** 88:23

**due** 46:7 298:15

**duly** 8:2

---

**E**

**earlier** 9:14 14:5 41:23 58:6 61:15,
19 65:3 100:17 106:4 115:5 117:8,
24 118:19 121:10 126:14 146:12
153:12 157:18 166:1 173:15
174:17 175:13 176:24 183:11
200:24 214:17 218:8 231:3 249:24
253:5 258:16 262:5 263:2 264:5,24
265:19 268:2 280:20 308:12 323:3
325:4,22 327:8

**early** 54:5 112:1 166:1 236:4

**easier** 77:16 99:18 308:11

**easily** 95:23 182:18

**easy** 40:21

**eating** 122:14

**echo** 270:7,14

**Ed.d.** 284:12

**education** 172:4

**effect** 35:14,20 36:7 66:18,19
70:24 128:3 169:2 270:8,14

**effective** 222:14

**effectively** 178:14

**effects** 34:21 222:10 223:17,24
226:2

**efficiency's** 18:4

**efforts** 164:23

**Eileen** 7:5

**eject** 261:2

**electronic** 191:22

**electronically** 36:5 190:11 191:15
192:3

**elevated** 235:13

**elicit** 70:10

**eliciting** 119:3 120:7,15,24 121:9,
12,14 222:14 227:8 234:4

**eliminate** 9:9

**email** 7:20

**embrace** 225:22

**emerged** 158:9

**empirical** 45:2,8,10 47:8,9,10,14,
22,24 48:6,12,13,16,17,20,21,23
49:9,12,16,19 50:7,15,19,21 51:20,

RICHARD A. LEO, PHD, JD, 10/02/2023

23 52:14,16 53:17 71:1 120:18 121:1 172:16 173:1 183:13 201:13, 18 202:20 203:9 218:2 219:16 279:18 285:24 293:19,24 294:4 308:14,16

**employ** 92:21 130:23 135:16 242:11

**employed** 43:20

**encompass** 32:10 274:20

**encompassed** 31:24

**encompassing** 203:11

**encountered** 37:1

**end** 12:2 36:13 63:5 72:5 88:23 89:19 90:17 91:7,21 108:4 112:11 124:23 125:10 128:20 151:2 152:22 158:20 162:16,18 164:19 171:5 173:5 174:15 184:20 186:15 187:12 188:9 197:19 198:15 204:19 206:2,17 208:23 209:5,17 216:21 219:23 230:17 257:17 263:23 268:16 269:18 285:17 316:9 318:8 319:13

**ended** 81:9 215:4 270:5

**ends** 173:9

**enforcement** 107:5

**engage** 250:16

**engaging** 249:14

**Engquist** 7:1 143:15 327:22 328:1,8,10,18

**entered** 181:24 182:1

**entire** 62:16 131:3 148:17

**entirety** 64:10

**entitled** 16:23 17:13,19 18:10

**entry** 257:17,22 258:5 265:10

**enumerated** 24:2

**environments** 217:3

**equally** 137:23

**equate** 132:17

**equates** 130:24 131:19

**error** 311:11

**errors** 303:3 305:7,11

**essentially** 225:1 243:14

**established** 93:8 100:18 120:17 266:16

**establishes** 267:6 279:18

**estimate** 13:11 206:4 210:9,24 212:2,8 213:2 229:15

**estimated** 9:21

**et al** 6:9

**ethical** 54:2,8,11 56:7 120:11

**evaluate** 132:24 134:24 136:5 217:4 241:24 250:16 283:17 284:9 324:5

**evaluation** 238:4

**evening** 114:10,19 258:16 262:11

**event** 106:7 216:24 224:12 245:15, 22,23 286:15

**events** 154:20 245:19 276:1,9 323:7

**eventually** 303:9

**evi-** 107:16

**evidence** 68:13 69:1 75:21,23 76:4,9,16,17,21 79:13 81:11 82:3 95:20 96:18 98:4,12 101:22 106:11 107:17,18 115:10,15 117:18 118:3 133:1,2,3,12 140:23,24 141:2 142:4,15,21 144:4,18,21 147:4,7, 13,16,19 148:3,6 150:11 151:7 154:6,16,21 155:1,5,7,8,13,16 156:4,12 158:8,23 159:2,6 160:9, 12,17,20 161:21 162:2,7,10,20 163:1,3,9,19 164:4,6,14 165:15,16, 19 169:1,11,12,14 170:8,9,11,14 215:16,18 220:22 221:2,6,8,12,14, 16,19,21,23 222:1,2,13,16,19 223:2 224:6,8 227:5,12 228:6 229:4,8,16 230:7 231:14 233:5 234:2,9,14 241:16 242:21,22 243:4,10,14,15 248:9,11,12,17,21 249:2,3,6,19,22 250:3,4,8 252:2,5, 8 254:1 255:8,15 261:13,16 265:6 266:9 291:2 293:21 316:22 318:3 321:24 322:2 326:8,23 327:4

**evidence-based** 167:19

**exact** 9:23 10:19 17:4 37:22 124:13 148:17 158:14 209:15 210:13 300:8

**exaggerated** 220:22 221:10

**examination** 8:4 145:17 253:8 296:1

**examined** 8:3

**examiner** 252:19

**examples** 50:5 54:12 71:3 135:4,8

**exception** 62:17 315:11

**exceptional** 195:20 198:2,4,14,24

**exceptions** 56:19

**exchange** 119:1

**excluded** 36:17 174:18

**exclusively** 201:22 202:22

**exculpatory** 141:2 156:12 162:6 163:18,20 165:19

**excuse** 44:8 57:6 184:15 285:1 325:23

**exhausted** 218:3

**exhausting** 216:16

**exhaustion** 168:19 170:19 178:12 217:16,19 219:18

**exhibit** 14:15,18,19 15:16 19:5 20:9 21:9,10,14,23 22:2,15 23:13, 14,19 27:20 28:1 47:8 60:8 65:9,11 86:5,6,8,10 88:13 130:5 145:6,7,9 147:14 148:12 154:1 174:12 183:8 185:10,11,12,21 186:19,22 193:12 206:9 211:4,7 212:1,16 219:10 226:24 259:24 260:4,7 261:21 263:9,13 264:11,13,14,15,17 274:8 275:20 284:20 296:6,15,18 303:23 305:19 306:8 312:1 313:5,7 320:23 321:6,13,14,15

**exhibits** 7:20 16:22 145:4

**exist** 62:4 222:17 230:9

**existed** 156:2

**exists** 136:20 180:2 322:3

**exonerate** 295:16,19

**exonerations** 62:7,9,13 102:14

**expect** 43:8

**expediting** 18:7

**experience** 51:18 131:11 178:11 233:11 282:9,14

**experiment** 53:23 54:3,4

**experimental** 119:14,16 120:10, 11 228:19

**experiments** 50:11 228:23

**expert** 9:6 15:20,23 19:10 26:3 75:13 131:3,8,11 135:21 220:12 247:5,10,12 252:12,13,14,16 256:24 268:3 280:23,24 281:2,5,

RICHARD A. LEO, PHD, JD, 10/02/2023

13,20,23 282:3,21 283:5,12 284:3, 16

**expertise** 111:10 131:14 135:22 247:1,4 267:24 268:7 280:5 282:15

**experts** 75:11 181:9 248:8 268:3,4

**explain** 21:13 22:1 23:21 45:12 137:4 269:15 309:7

**explained** 221:2 292:6

**explains** 63:22 215:11

**explanation** 46:10 287:17 288:21 293:12 325:6

**explicit** 118:20,23 122:7 123:3 323:18

**explicitly** 121:6 123:9 128:19

**exploded** 295:12

**exploratory** 50:6,7

**express** 24:15

**expressed** 27:7

**extend** 280:19

**extended** 150:8 152:9,10 198:11

**extent** 45:17 47:2 290:4 303:13 310:11 313:23 316:6 319:23 326:11

**extinct** 54:19

**extrapolate** 39:20 40:8

**extremely** 232:2

**eye** 21:19

**F**

**fabricate** 169:9

**fabricated** 126:16 127:2

**face** 87:21,24 88:3,22 90:15 91:19 106:18,23 107:10,14 108:3,15,21 109:12,13,20 110:1,8,9,15,22 111:3,13,17,19,22,24 112:8,12,19 113:12,14 115:18,19 117:2,7,10

**fact** 68:18 78:21 81:12,23 93:19 98:15,22 99:1 101:6 107:1 114:16 117:17 131:21 132:23 140:9,10 141:8 142:17 146:17 147:6,12 154:16 165:1,2,21 166:16,19 167:8 245:17 249:13 250:15 265:14 288:11 319:19 322:15 325:12

**factor** 93:8 97:19 106:12 130:18

197:15

**factors** 92:2 93:22 106:16,22 132:18 217:17,19 221:3 234:19

**facts** 26:10 83:9 131:5 135:21,23 138:17 220:13 228:11 241:14 242:5,17,24 243:3 248:13,17 250:17,19 280:5 282:24 293:14,16 297:14 315:20,23 316:3,10,16,22 317:9 318:23

**factual** 82:18,20 210:3,17

**fade** 224:16 245:16

**fail** 287:16

**failed** 162:19,21 306:22

**fair** 8:20 24:12,21 25:5 26:14 29:22 30:11,24 31:5,12 35:1,5 36:9 37:9, 11 41:14 54:10 55:8 67:14 68:12, 16,23 93:6 123:5,23 190:15,18 192:23 198:20 205:23 206:1 221:1 225:11 233:19 234:21 248:1 262:24 263:20 285:3,12

**fairly** 321:24

**faith** 180:3,6,13 181:3

**fall** 235:10,12

**false** 44:14,18 45:14,21,23 46:7 55:15 64:5 92:2 93:8 100:18 119:3, 11,23 120:7,15,22,24 121:4,9,12, 14,24 128:7,12 129:2 130:19 172:21 184:19 185:4,9 186:6 194:1 195:9 202:6,9,17,23 220:21 221:2, 4,6,9,12,14,21,24 222:1,2,13,21,22 223:2,9,12 224:6,8,9,19,20,22,24 227:4,8,12,16 228:6,7,16,21 229:4, 5,8,9,14,16,17 230:7,8,14,18 231:14,15,23 232:6 233:5 234:2,4, 9,13,19 236:10 237:9 238:7 239:24 271:15 276:3,5,10,11,12 277:1,2,4, 8,15,16,17,20,24 278:6,9,10,11,13, 16,17,23 281:24 282:2,3,21 283:5, 13 286:2,3 287:9,20 288:23 289:7 293:21 294:20,24 295:3,7,11 323:4,12,17,23 324:6,8

**falsely** 128:18 217:13 219:21 220:7 227:21 236:14,22 238:24 277:9 278:2,3,4 289:12 294:15 295:17

**familiar** 8:13 55:16 78:19 82:4 102:6,9 103:3 245:24

**family** 288:11

**famous** 53:22 54:5

**fashion** 304:8

**fast** 196:13 198:13 255:21

**faster** 15:21

**fatigue** 168:19 170:19 171:3 178:11 217:16,19 219:18

**fatigued** 218:4

**fatiguing** 216:16

**fault** 222:6 249:11

**fed** 244:2

**federal** 11:22

**feel** 67:10,13 71:1,7 84:23 257:5

**Feld** 183:20

**fellow** 73:15

**felony** 38:14,15,19 203:13,14 240:8,14

**felt** 297:2

**fender** 327:1

**fewer** 195:22 198:18

**field** 30:7 31:12,24 33:21 117:23 120:20 121:1 131:13 132:5 181:12 242:5,16 268:3 281:2,5,20,23 282:21 283:5 284:6,16

**fighter** 110:13

**fighters** 110:18

**fights** 18:14

**figure** 29:11 59:19 63:24 164:24 165:21 309:3

**file** 46:22 89:15 136:16 149:6

**filed** 6:10 95:6

**files** 231:19 232:15 254:24

**Filkins** 12:22 14:6 23:5 24:3 25:22 26:3 252:9,22 265:20 267:1

**Filkins'** 75:10 266:4

**Filkins's** 15:12 23:7 267:19

**filler** 114:9 115:7

**final** 15:22

**find** 50:8 52:8 133:21 175:23 180:24 233:21 308:7,16

**find-** 175:11

**finder** 93:19 98:16 106:12 107:2 117:17 131:21 132:23 249:13 250:15

RICHARD A. LEO, PHD, JD, 10/02/2023

**finding** 41:18 42:16 120:17 133:24 240:22 253:17 264:22

**findings** 36:21 39:20 40:12 41:6,8, 9,17,22,23,24 42:11,19,21 44:5 56:15 57:4,12,18 174:23 175:5,7, 12 240:7 242:15 283:19 285:24

**finds** 42:3,19

**fine** 9:24 11:3 263:7,14

**finish** 61:3,21 136:14 156:24 190:12 191:16,23 192:1,4 202:13

**fire** 79:16,19,24 80:4,20 81:8

**firearms** 251:20 252:12,13

**fired** 74:11 76:22 78:1 80:10,23 81:8,12,13,21,24 82:1,13,21 138:18,23,24 146:18 147:9,20,22, 23,24 148:3 154:7 155:7,9 156:3,9 160:12 161:19,20 162:1,3 169:5 251:10 252:7 255:9 257:10,13,14 258:15,16 261:24 262:8,10,11,15, 19,23 263:2 264:4,23 265:21 269:14 270:1,2,4,6

**firing** 76:10 82:12 148:1 150:9,12 151:19 266:8,9,14

**firms** 62:12

**fist** 90:13 111:21

**fists** 91:4

**fit** 156:15 162:2,11 241:9,13 244:12 284:1 301:6

**fits** 285:23 287:7

**fix** 40:21 41:4,11,15

**fixing** 91:10

**flaws** 35:8,13

**fleeing** 326:6

**fleshed** 265:19

**flip** 196:18

**focus** 88:17 101:5 144:20 159:5 220:9

**focused** 81:24

**Focusing** 85:15

**follow** 132:8

**follow-up** 141:24

**food** 294:9

**footnote** 70:1,3,4 173:3,10,14 183:16 184:23 185:2 186:12,15

187:5,9 188:20 190:17 195:5 196:6,7

**footnotes** 26:14,16,22 193:14

**force** 107:9

**forensic** 140:24 142:4,15 144:3,22 146:13 155:16,24 158:22 163:3 242:20 248:10 266:16 267:5

**forensics** 266:5 268:2

**forgot** 14:16

**form** 13:15 25:9 30:17 37:15 39:4 41:1,19 44:10 45:24 46:16 47:1 49:22 50:23 51:13 57:8 62:22 68:20 74:22 76:12,24 79:10 81:2 82:14 85:6 99:20 100:18 102:17 108:11,16 109:1,7,22 133:14 137:6,10 138:8 139:11 161:8 163:22 164:9 166:10 167:2,15 168:6 170:10 172:6 180:9 209:10, 15,23 210:22 211:13,20 225:23 244:15 245:2 249:4,9 251:21 253:20,21 258:8 266:22 270:10 281:15 282:11 288:13,15,24 291:10 293:1 302:17 308:21 318:14 325:18 326:2,9

**forming** 104:8 258:21

**forward** 23:2 34:11 133:13 166:9 177:10

**found** 164:17,18 166:1,23 257:9

**foundation** 49:23 50:24 81:3 82:15 102:18 109:2,8,23 110:7 138:9 139:12 161:9 163:23 164:10 166:11 167:3,16 172:7 180:10 251:22 253:22 270:11 281:16 282:11 289:1 291:11 293:2 302:18 318:15 326:10

**four-hour** 198:9

**fourth** 254:3

**frame** 295:9

**framed** 222:16

**Frank** 305:21 306:2

**free** 84:23

**freeze** 58:11

**fresh** 292:11

**Friedlander** 94:1,8 96:4 98:2,17

**friendly** 123:19

**friends** 73:1 126:3 288:11

**front** 13:21,24 14:1,22 16:21,23 17:8,14,17 23:1 72:22 212:1 302:24 303:19 304:13 312:5 321:14,15

**froze** 58:13 59:6 61:19,20

**full** 22:23 23:24 92:17 124:24 178:6 191:22 231:7

**fuller** 286:10,12

**fully** 46:3 52:4 133:16

**Fulton** 310:19

**functioning** 235:6,22

**Fusco** 295:23

**future** 182:23

---

**G**

**gather** 52:21 53:7 57:16 162:19 215:15 315:17

**gathering** 48:18,20,24 49:10 56:13 215:17 316:18

**gathers** 239:15

**gave** 43:15 117:24 124:14 133:17 135:19 150:14 176:22 177:21 260:22 302:5

**general** 8:10 33:17 36:18 119:13 132:15 137:22,23 174:19 178:20 237:22 239:18 250:10 272:16

**generality** 143:3

**generalizability** 36:21 174:22

**generalizable** 175:6,12

**Generalization** 40:11

**generalize** 175:6

**generalizing** 40:13

**generally** 133:7 226:8 236:13,21 237:23 238:23 261:9 271:6 272:7, 10,11 323:9,10 327:11

**generate** 230:6 243:13

**genuinely** 221:22

**geographical** 40:5

**George** 77:11,18 153:12 154:8 157:19,21 249:23

**give** 9:23 21:5 37:6,7 52:13 55:13 60:9 66:14 83:23 86:6 128:11 152:13 163:14 182:19 185:11 224:10 290:24 317:2

RICHARD A. LEO, PHD, JD, 10/02/2023

**giveaway** 134:6,22

**giving** 121:17 137:23

**goal** 69:8

**Gomez** 6:9 7:8,10 15:20,23 71:20 72:13,20,24 73:14,21 74:2,11 75:24 76:6,10,22 79:15 80:19 82:12 84:17,18 85:18 86:2,7,13 88:19,20,21,22 89:12,17 90:3,11, 14,16 91:3,5,14,19,20 92:8 93:24 94:6 95:14,21 100:3,8,22 103:9,13, 19 104:5,9,16 107:6,22 108:7 111:20,22 112:7 113:2,18 114:8 115:22 117:5 118:1 122:12,13,18, 20,21 123:6,10,12,17,24 124:1,5, 10,16,20 125:2,7,19,24 126:9 127:12,16,19,22 131:23 132:15 140:9,12,14 141:14,16 142:5,18 143:7 144:12,15 146:15 147:20 148:6 149:9 150:12 151:8,15,20 153:6,16,21 154:7,10,12,23 155:3, 11,17,21 156:1,6 157:8,23 158:24 159:2,13,23 160:1,21 161:18 162:1,3,10 163:2,19 164:17 166:24 167:12,21,22 168:24 169:5 204:3, 16 206:12,15,17,21 208:7,14,20 209:1,3,9,10,23,24 210:13,18,20 211:6 212:2,24 213:11 214:23 215:8 218:8 219:21 220:7 232:24 233:1,13 234:3 235:9,11,15,20 237:6,19 238:11,18 251:2,15 252:7,11 255:7 258:13,15,22 259:11,18 261:11,24 262:14 264:14 266:14 268:13,15 274:14 276:13,23 285:21 287:17 288:22 301:12 303:8,24 305:2 306:11,19, 22,23 308:7,10 314:8 319:19 321:23 324:24

**Gomez's** 71:24 79:7,22 80:6 82:22 83:2,7 84:5,21 86:22 87:21,23 88:2 89:6,23 90:15 92:3 99:5 104:9,20 108:2 112:18 113:9,14 114:4 130:20 135:12 139:21 144:8 145:18 154:10 162:21 169:13,15 204:24 205:15 211:14 248:5 250:22 251:9 253:11,12,17 255:2 257:10 259:23 260:16 261:16 262:6 265:10 268:20 269:18 270:4 275:24 276:1,9,24 280:9,14 281:8 285:4,13,21 286:8,21 287:7 322:5, 6 323:23 324:20 325:6

**good** 6:1 8:8 19:2 55:4 58:15 69:5 78:6 102:20 123:18,20 129:10 185:15 193:1,2 267:2 273:17 284:15 296:4,5

**Google's** 62:2

**Gotcha** 32:9,16 39:15

**government** 229:11 230:10 282:19

**grab** 196:13 226:16

**grabbed** 73:22

**grabbing** 200:8

**Grace** 208:1

**grade** 244:14

**Great** 8:21 193:13

**greater** 41:23 217:12 236:9,14,18, 21 238:24 239:23

**ground** 8:10

**group** 235:10,12 238:6

**groups** 234:22 235:3,7,10

**guess** 9:1 40:17 74:16,24 75:6,17 189:20 208:11 217:2 249:7 298:15 301:7 311:1 314:13 315:14 319:2 326:21

**guessed** 241:15 243:24 244:8

**Guevara** 6:9,24 7:4 88:19,21 89:13 90:4,12,20 91:3,19 92:11 107:8,9 108:9 111:21 112:12 113:3,10,19 118:2 122:12,18,21 123:12,18,24 124:10,16 127:20 132:12 139:24 140:10,11 141:13 142:17,23 154:11 155:15 156:14, 22 158:22 161:24 162:19 164:22 207:6 212:23 213:13 232:24 276:14,22 285:5 286:19 287:16 288:20 291:3,6,7,18,20 292:10 322:14

**Guevara's** 89:18 142:9 213:5 285:15 286:4,23 287:13

**guilt** 69:7 90:21 91:14 130:10 131:1,19 132:7,17 133:4,6 134:7, 10,11,17,19,20 135:6,9,11 136:18, 19 137:9,11,16 138:5 141:21 147:5 214:18

**guilt-** 144:15

**guilt-presumptive** 139:6 142:10 147:11 156:6 157:2 215:6

**guilty** 67:16 68:6,18,19 69:1,4,11 130:11,17 133:24 139:4 141:15 164:17,18 229:21 245:17

**gun** 72:21 73:23 74:11,21 75:1,4, 16,24 76:2,7,10,22 79:9,16,19,20

80:1,4,20,23 81:8,21,22 82:12 126:1 138:19 140:10,12,20 141:4 142:18 144:8 145:17 147:7 158:23 163:12,15 164:12 166:24 167:12 168:4,23 233:1,9,13 250:8 251:2,3, 10,13,15 252:7,10,11 253:11,16 254:1,3 255:8,9 257:9,10,12,14 258:15,17,22 259:13,19 261:3,12, 18,24 262:8,11,15 265:1,9,16 266:8 268:2 269:18 270:3,4,5,6 319:12

**guns** 81:13 146:18 255:2 261:12

**gunshot** 81:13 268:3

**gunshots** 81:22 141:7 146:23 270:9

**guy** 150:20

**guys** 300:24 328:18

---

**H**

**half** 9:21 13:9,10 176:6 213:18 214:4,6

**hallmarks** 242:3 244:12

**hand** 85:19 87:11,14 90:13,15 91:6

**handcuff** 85:19 86:7

**handcuffed** 85:19 86:2,14,23 90:15 91:7

**handed** 144:15

**hands** 152:10

**happen** 179:8

**happened** 94:21 117:21

**happy** 76:5,18 96:1

**hard** 18:19 60:1 71:13 75:6 187:3 198:13 272:15

**harm** 118:20

**Harris** 11:19 273:7

**harsher** 118:21

**hatched** 169:8

**hate** 16:5

**Hawthorne** 35:20

**head** 10:11,20 45:6,19 52:11 55:1, 12 64:15 88:22 89:14 96:1,10,15 99:22 128:14 145:2 200:13 203:4 240:2 272:23 273:2,14 279:15 284:1

RICHARD A. LEO, PHD, JD, 10/02/2023

**heading** 83:20

**heal** 117:10

**healed** 111:17

**Healy** 92:12 113:5,20 114:3,5 122:15 286:20 287:16 288:21

**Healy's** 285:6,15 286:5,22 287:13

**hear** 179:1 230:1 249:8 270:8 324:12

**heard** 46:2 80:12,14 98:14 141:8 147:17 157:24 158:12 179:11 270:1,18,21 322:12

**hearing** 95:20 97:4 116:17,18 269:13,21 270:16 286:17 291:19

**hearings** 212:18,22

**heart** 18:8

**heavy** 144:15

**heavy-handed** 156:6

**heightened** 237:8

**held** 300:8

**hiccups** 60:20

**hide** 164:7

**higher** 118:21 201:24 238:1

**highlighted** 15:5 16:14 18:5,6 206:12,15

**highlights** 14:24 17:9 22:12

**Hispanic** 150:6

**historical** 54:21

**hit** 73:12 88:23 90:20 91:19 110:1, 15,18,20,22 111:3 112:12 169:7 326:7,23,24

**hitting** 88:21 90:12,13 91:3 169:16 266:15

**hold** 257:19 277:5 278:18

**holds** 159:14 279:14

**home** 59:15 122:23 123:7 127:17 128:10,21 129:5 318:5 323:6,20

**homework** 205:12

**homicide** 38:1 39:11 201:22 202:1,7,9,10,15 231:9

**homicides** 38:11,23 39:2,8

**hominem** 281:13

**hood** 72:22 73:23 150:8,24

**hopeless** 65:19 66:2,8 67:5,10,13 69:18 70:15,22 71:1,7 228:3

**hospital** 312:19

**hot** 59:17,18

**hour** 8:19 13:9,10 129:13,17 171:17 172:18 173:3,23 175:9 183:15 203:11 214:10 255:6 264:19 274:24 275:5,11,12,13,15 327:9

**hours** 31:11,23 111:14 171:18,20, 22,24 172:2,21 176:6 177:15,17 178:1,2 184:20 186:7 194:1 195:9, 20,22 197:3,17 198:2,19,23 203:2 205:2,8 206:16 212:9,10,11 213:8, 9,10,19 214:4,6 218:13 327:10,11, 14,16

**house** 59:14 144:8 145:18 209:2,3 253:12,17 257:10

**hundred** 81:21,23 179:20 228:18 230:7 244:14 271:13 308:10

**hundreds** 110:12

**hung** 315:14

**hypothesis** 304:23 306:4,12,20

**hypothesize** 239:8 304:12

**hypothetical** 44:3 98:19 99:4 117:24 138:17 139:14,16 213:21 293:5 326:13

**hypothetical's** 293:6

**hypothetically** 214:9 218:9

---

**I**

---

**i.e.** 326:5

**icon** 7:15

**idea** 51:5 94:22 279:14 299:21

**identical** 241:19

**identified** 16:13 159:15 233:2 251:14

**identifies** 151:10

**identify** 6:19 52:4 129:2 135:4 156:17 224:3 235:3 250:2 316:21 317:8

**identifying** 318:23

**ill** 235:4,16

**Illinois** 6:11,16 103:5 231:8,13

**illness** 235:16

**imagine** 54:17

**immature** 237:2,18,21

**immaturity** 237:13,16 238:1

**immediately** 154:11 162:1

**immunity** 118:24

**impact** 59:24 223:22 224:13

**implausible** 101:19

**implicating** 142:22

**implicit** 118:19,23 123:8

**implicitly** 123:8

**implied** 31:4 119:15 121:6,20,21 122:6 123:4 323:18

**implies** 209:13

**imply** 227:18

**importance** 53:1,4

**important** 35:7 53:4,11,14,15 81:1,6 316:15

**improper** 300:18

**improved** 62:2

**impulsiveness** 236:5 238:1

**in/time** 191:20

**inaccurate** 194:24

**inbox** 7:21

**incarcerated** 103:14,20 105:20

**incident** 78:7,10

**include** 31:24 32:2 51:23 170:22 199:3,22 201:7

**included** 32:4,7 317:18 320:8

**includes** 116:7 176:12 192:7

**Including** 115:17

**Incommunicado** 168:18

**incompetent** 140:1,7,18

**incomplete** 133:2 180:12 293:5

**inconsistent** 162:6 248:16

**incorporated** 101:10

**increase** 119:11 120:6,15,24 121:8,11 224:8 227:7,16,20 228:7, 16 231:15

**increased** 219:20 220:6,10,15

228:20 234:3 236:5 275:14

**increases** 119:2 121:3,14,18 122:2,3

**incriminate** 141:16

**incriminating** 68:13 69:9 70:11 140:14

**independent** 100:14 147:4 242:21 247:14,17 248:11,21 249:1,19,22

**independently** 188:6 244:1 246:23

**indicating** 38:10 70:8 123:17 154:6 155:7,21 161:18

**indication** 103:17 146:3

**indicator** 284:15

**indicia** 241:6,10,17,18,21 242:8,11 243:20 244:13,24 245:7 248:7 250:23 265:12,16 268:5 271:2,7,9, 17 272:7,11,20 273:5,11 287:20 289:7,8

**indirect** 322:17

**Indiscernible** 158:15

**indisputably** 231:22

**individual** 48:10 140:21 200:18,19 240:7,24

**individuals** 75:15 102:14 140:16 234:22 235:3,4 246:4 286:1 295:17 323:5

**induced** 242:1 277:24

**ineffective** 94:17

**inevitable** 228:2

**infer** 176:11 190:18 191:13

**inference** 124:2 151:20 160:1 168:2 221:19

**inferences** 120:3 159:16,20

**influence** 65:17 69:16 70:13

**influenced** 105:23

**influencing** 67:3

**information** 43:3,12 62:18 80:24 87:15,17 89:5 97:11 139:5 160:7 253:4 267:18 283:8,9 284:13 293:18 299:3 300:5 305:13 306:24 307:1 319:16 321:6,9,12 326:15,17

**informative** 93:23 94:3,8 97:12,16 100:7 104:8,17 105:11 114:15,21

**informed** 294:23 295:2

**initially** 257:4

**initiated** 137:19

**injuries** 109:17 110:23 112:22 116:8,10 322:7 323:1

**injury** 322:2,22

**inmates** 116:4

**innocence** 62:10 135:7 295:17

**innocent** 45:17 229:21 289:12

**inside** 27:18 28:5 31:13 80:11 173:16,20 174:7,13 180:21 181:15 203:17 232:10 240:5

**instance** 52:18

**institutes** 49:18 51:10

**institution** 282:20

**instruct** 301:6 305:17

**instructing** 256:16 298:11 299:13 302:18 321:16

**instruction** 256:20 310:8 315:10 316:24

**instructions** 321:20

**intake** 116:4,5,7

**intellectual** 127:23 128:1,4 235:5, 21

**intellectually** 128:8 129:3

**intend** 24:15 324:11

**intended** 48:1 306:24

**intention** 324:15

**intentional** 222:3 292:9

**intentionally** 221:15

**interaction** 102:22

**interchangeably** 241:9

**interest** 65:19 66:3 70:16 71:5

**interested** 81:7 308:1

**internet** 59:13,14 60:4

**interpreting** 51:4

**interrogate** 132:21 157:4 195:19 214:23 218:18 292:10

**interrogated** 38:5 43:7,9 107:8 136:11 139:6,9 155:3 171:17,18,19 177:15 192:7 214:7,10 218:12 229:22 287:9

**interrogates** 133:11

**interrogating** 128:22 136:10

**interrogation** 27:19 28:6 29:19 32:13 37:5,8 66:22,24 68:24 69:7, 15 70:9 71:19,24 83:3,8,18,20,24 84:10 85:18 86:14,24 87:8 89:9 91:2 92:3,10,19 93:15 94:2 96:9 116:24 122:19 128:21 132:4,21,22 133:13,22 134:2,3,4,5,8,9,12,13,23 135:2 136:8,23 137:19,24 144:12, 16 147:12 156:1,7 157:2 163:8 165:17 168:18 170:19,22 171:3,4, 12,16,22 172:4,20 173:16,21 174:7,8,13 175:24 176:10,13,22 177:9,10,14,17,19,22 178:1,9,20 179:7,13,18 180:8,21 181:4,12,16, 20,24 182:2,3,4 184:18 187:10 188:3,5,9,15 189:7,14 190:5,6,19, 21 191:3,5,9,18,23,24 192:7,14,15, 16,17 193:24 194:10,17 195:17 198:1,8,24 199:3,19,22 200:4,11, 12,16,21 201:6,17,20 202:21 203:17,22 204:3,7,8,15,16 205:1, 15 210:4,5 213:12,19,22 214:1,2,5, 14,16 215:19,20 216:13,16,19,24 217:8,11,21 218:4,11,14 219:6,17 220:5 224:20,21,22 226:4 229:19 232:11 234:3,24 237:7 240:5 242:1 243:8 245:15 247:21 248:2 276:2 277:23 278:7 281:9,11 282:9 285:14,23 287:6 289:10,14,21,24 291:9,22 312:14,20,21 323:19

**interrogation-induced** 277:8

**interrogations** 31:17,20 32:1,6,7, 8,24 36:2,8 37:13 38:15,19 39:1,9, 10,12 44:13,22 68:17 120:12 132:11 142:7,21 146:15 147:1 172:18,20 173:2,23 175:8 176:3,15 178:21 179:20 180:4,7 181:14,15, 21 182:11,12,16 183:15 184:19 186:6 190:12 191:16 192:3 193:24 194:9,12,18 195:8 203:3,10,19 229:7,12,24 230:11 231:2,9,12,18 232:12 312:18

**interrogator** 36:8 133:10,12 134:7,8,15,16,21 136:18 137:15,17 197:2,16 221:13 278:2

**interrogator's** 66:7 135:1 136:6 223:6,10

**interrogators** 65:16 67:8

**interrogators'** 222:18

**interrupt** 16:5

RICHARD A. LEO, PHD, JD, 10/02/2023

**interruption** 141:9

**intersection** 72:17 73:6,16 74:7, 10 79:17 80:1,23 262:9 269:14

**interview** 96:14 139:15 147:10 156:5 160:10 206:21 210:5 214:23 215:2,7,10,12,24

**interviewed** 136:11 137:18 138:1, 5 139:9 142:13 143:2 144:15 154:22,23 155:3 158:8 206:16 291:5,7,18,19 292:20,22

**interviewees** 42:17,20

**interviewing** 32:11 143:1 215:3 218:17

**interviews** 133:10 136:22

**introduced** 164:14 176:6 221:11

**introducing** 221:14

**Introduction** 71:22

**inverse** 42:2

**investigate** 159:17,20

**investigated** 142:3

**investigation** 140:3,11,19 141:17, 22,24 142:11,12 157:5 164:24 166:8 229:20 312:24 319:11

**investigative** 130:11 139:3 149:6

**investigator** 144:23 221:22

**investigators** 69:6 70:12 157:3

**invocation** 176:23

**invoice** 274:9,13

**invoke** 43:10 176:19

**invoked** 176:5

**Involuntary** 234:19

**involve** 119:14,15 203:6 303:13 313:24

**involved** 102:13 110:13 140:20 243:17 291:3

**involvement** 170:15

**involves** 92:17

**involving** 40:22 202:17,18 228:23

**IQ** 235:5,21

**irrefutable** 222:19

**issue** 36:18 39:15 52:23 60:8 65:6 101:2 168:23 174:19 271:2,14 300:22 302:3

**issues** 42:12 182:23

**italics** 93:3

**items** 23:19

---

**J**

---

**J.D.** 8:1

**jab** 110:9

**Jack** 94:1,7 96:4

**jail** 177:4,11,24 178:15,19,24 179:9,13,15 191:3,4,9 214:3,11,13 216:6,11,18,23 217:8,22,24 218:1, 5 219:5

**James** 12:22 14:6

**job** 163:21 164:2 267:2

**John** 73:2 139:22 258:14 259:12

**Jose** 73:1 139:21 258:13 259:11 289:22

**Josh** 7:1

**Journal** 28:10

**journalism** 254:20 255:24

**journalists** 254:17

**Jovanovic** 73:2 131:24 143:8 258:14 259:12 289:23

**Jovanovic's** 139:23

**judge** 166:23 167:10 301:23 302:1, 2

**judge-made** 200:22

**judges** 200:18

**judgment** 12:8 130:10,16 132:1,7 133:2 316:10

**judgments** 249:14

**jump** 122:8

**jumped** 21:11

**jumping** 23:11

**June** 71:20 72:16 73:3 79:16,17 80:1 83:4 92:4,10 116:17,20 117:1 146:10 148:10,22 159:10 204:17 205:1 206:8 207:2 219:22 237:8 262:1,8 285:23

**jurisdiction** 11:20

**jurors** 293:20 294:1,5,8,11,14,19, 23 295:2,6

**jury** 198:10

**justice** 94:16

**justification** 143:8

**justified** 144:18,19

**juvenile** 236:6,9 239:22 294:15

**juveniles** 56:7 62:17 235:4,12,24 240:12

---

**K**

---

**Kathleen** 102:3,6,10 103:8

**Kato** 312:12,14 313:2 319:11

**keeping** 216:18

**Kent** 103:5

**kicked** 318:6

**Kids** 183:20

**killed** 81:22 90:17 124:20 138:24 147:8 154:12 155:18 157:9 160:12 161:22 163:17 233:2,13 250:9 255:10

**killing** 81:9 124:16 154:7 155:8 270:5

**kind** 18:6 23:11 40:20 49:2 52:5 150:23 250:16 300:14,17

**kinds** 122:5 141:18

**kneed** 318:6

**knew** 35:15 53:6 248:15

**knowing** 84:14 120:1 222:3,20

**knowingly** 277:9,10 278:3,4,24 287:18

**knowledge** 25:12,20 26:8 27:3 35:4 41:10 62:5 120:20 130:11 131:4,5,9,11 135:21 141:15 205:15 220:12 233:12 241:14 242:15 247:11 259:6,19,21 261:17 280:4 301:24 309:15

**Kyle** 6:22 7:14 109:24 143:11 158:16 185:14 285:7

---

**L**

---

**lab** 228:22

**label** 27:24 86:8 145:9 148:11 211:4

RICHARD A. LEO, PHD, JD, 10/02/2023

**labeled** 47:7 86:10 104:4 206:9 263:9

**laboratory** 53:24 121:19

**lacerations** 312:20

**lack** 158:23

**lacked** 159:6 160:16,20

**lane** 150:6

**language** 220:9

**LAPD** 174:22

**large** 37:4 73:7,10 160:8

**larger** 122:19

**lasted** 180:4

**lasting** 176:10

**late** 255:6 264:19

**law** 6:11 28:11 82:6 103:5 105:23 107:5 200:10,14,17,18,23 201:9

**lawyer** 95:1,2 205:10

**lawyers** 94:16,18 188:7 190:3

**laying** 178:24

**lead** 44:14 141:10 203:19 211:1 243:14 248:12 272:2 294:20

**leading** 172:20 184:19 186:6 193:24 195:8 215:5 230:11 297:1, 18 298:23 320:5

**leads** 52:6 130:18 142:3 242:22

**leaning** 80:10

**leave** 107:16,18 122:22 128:21 323:19

**leaving** 325:15

**led** 44:18,22 128:19 229:9 252:7

**Lee** 254:10 255:19,21

**Lee's** 254:15

**left** 87:1 90:15 91:6 150:20 206:12 214:3 258:17 259:14 263:21 265:1, 8

**leg** 107:9 118:1

**legal** 6:13 24:24 25:1 101:20 105:16,21,22 172:3

**legitimate** 281:20

**legs** 193:3

**length** 13:7 170:22 171:16 172:4 174:8 175:24 176:4 177:18 181:12,

20 182:4 187:10 188:2,5,8,9,15 189:3,7,14 190:4,5,18,20 192:7,14 194:10,17 199:4,18,21,23 200:3, 10,15 201:6,14,19 202:21 204:3 207:3 214:14 215:20 217:12 218:13 220:5 245:15

**lengthy** 132:11 142:6 164:20 168:18 170:19 216:16 219:17 285:22

**leniency** 118:24 294:2

**Leo** 6:5 8:1,6 15:22 16:6,17 17:7, 23 18:15 19:8 22:19 27:19 31:7 44:12 56:20 59:5,13 60:19 76:13 85:14 110:4 122:10 129:9,15 130:8 137:1 144:3 145:10 148:18 154:4 193:17 249:10 253:21 256:8,19 267:10 274:10 285:12 288:16 296:3 297:5,23 301:10,15 302:19 303:13 305:17 309:11 310:7 311:4 312:4 313:22 315:11 317:1 318:16 319:23 321:1,17,19 326:12 328:20

**Leo's** 20:6

**level** 143:3 235:5,21

**Lexis** 62:2

**liability** 12:8

**liar** 135:8,9

**library** 105:23

**license** 154:8 169:20 325:13

**lie** 169:21

**lies** 65:19 70:16

**life** 282:10

**light** 246:18

**likelihood** 219:20 220:6,10,15 229:4 231:15

**limit** 192:22

**limitation** 40:14,17

**limitations** 35:2,17 54:12

**limited** 37:2 282:24

**limiting** 50:14

**lined** 156:11

**lines** 127:8

**lineup** 114:9,13,15 115:6,8,21

**linking** 249:2 255:8

**links** 140:24 221:9

**lip** 91:21 112:14

**list** 9:2,9,23 10:6,13,15,24 11:1,6,9 20:11,20,22 21:5,7 22:11,20,22,23 23:23,24 24:2 30:12,20 37:18,22 38:14,17,18 103:21 128:15 149:5,7 253:2 254:15 310:2

**listed** 23:19 25:17 26:6 64:8 70:3 77:13,14,17 78:14 85:5,8 99:8 103:22 149:1 182:10 254:14 290:2 308:19 317:17,18,21

**lists** 23:13 29:23 56:6

**literally** 176:4,21

**literature** 27:4 40:7 41:7 47:10 120:18 224:1 226:2 227:4 228:10 236:23 242:17 247:19,20 280:5 284:6 286:1 287:8 289:11

**live** 31:16 36:7 181:14

**loads** 260:11

**location** 74:19,20 80:5 87:16 268:14

**locations** 269:15

**locked** 55:6

**logic** 243:3 248:17

**logical** 82:8

**long** 31:2 33:2,5 34:24 35:12 117:9 190:13 192:5 201:13,19 202:19,20 287:19 288:12 308:10

**longer** 118:21 179:15 195:20 198:12,15,23 203:19,22 217:11

**looked** 110:15 161:23 166:1 173:15 174:16

**loose** 216:7

**losing** 264:19

**lost** 143:10,11

**lot** 29:23 33:22 43:2 71:3 74:11 102:12 110:17,21 232:17 236:4 291:1 295:15 325:15

**lots** 141:7 160:8

**low** 235:5,21

**lower** 39:11

**LPD** 36:20,21 174:23

**lunch** 129:11

**lying** 178:17

## M

**Mac** 122:14 260:4

**made** 16:18 17:5 43:24 124:19 136:18 155:17 159:9 192:10 194:3 254:16 256:8 281:12 305:5 307:8, 10 323:21 327:8

**magically** 60:4

**Maher** 208:19,24

**main** 283:19

**maintained** 287:19

**maintains** 288:23

**majority** 9:12 172:17 173:2,22 175:8 183:14 203:10

**make** 27:13 66:7 77:16 99:18 132:18 135:5 155:24 159:16,19 162:2,10 213:4 224:12 236:10 238:7 251:7 265:10 267:5,13 286:2 287:8,18 290:19 304:7 312:15 316:13 319:13

**makes** 134:22 218:7 221:18

**making** 82:18 119:15 136:17 141:17 212:13 224:16 237:9 239:24 249:13 255:11 286:24 287:4 308:2

**male** 150:6

**mall** 74:10

**man** 122:14 155:22

**manipulate** 65:17 69:16 70:13

**manipulating** 67:4

**manner** 139:6 141:13

**manual** 70:19,20 195:18 196:7,11 197:1,6,24 199:6,10,11,12,16,21 279:24

**manuals** 71:2,6

**March** 19:16 20:16

**Maria** 156:20

**mark** 177:16

**markings** 66:12

**massive** 50:10

**master** 10:6 11:1,9 37:17,22 38:17,18 284:5

**master's** 284:11

**mastering** 283:21

**masters** 284:8

**mastery** 283:18

**match** 81:10 82:2 109:6,24 110:8, 11 111:5 167:9 253:13 266:10

**matches** 81:9 82:2 110:17,23,24

**material** 56:8

**materials** 22:4,19,20,23,24 23:3,5, 14,16 26:16,19,21 27:9 32:14 77:13,15,17 89:10 99:8,11 103:16 104:1,23 106:14 118:5 149:1,4 182:14 188:24 189:4 204:15 235:17,19 249:15 250:18,19 254:12,14,23 257:6 269:1 290:1,2 297:2,12 310:1,22 313:12,19,20 317:5,7,21 319:20

**mathematician** 205:11

**matter** 6:8 15:23 19:24 24:23 49:8 99:19 119:13 148:23 175:14 296:11 301:13

**matters** 171:12

**meaning** 49:16

**meaningful** 140:19,23 142:11,12, 17

**meanings** 191:12

**means** 27:5 48:17,20 149:13

**meant** 49:15 57:13 58:3 61:13 176:20 199:14,16 217:4 282:4 323:16

**measure** 121:20 181:19 199:18

**measured** 180:7 182:4 192:16 194:18

**measures** 200:10

**measuring** 176:9 181:12

**media** 6:2 59:3 60:16 102:24 130:1 143:21 193:9 226:21 274:4 295:10, 18 320:20 328:19

**medical** 131:7,14 242:20 248:10 252:18 279:22 322:21

**Medill** 255:19,24

**Medill's** 254:20

**meeting** 14:13

**meets** 324:5

**memories** 222:22 223:9 224:16, 19,20,22 245:16 246:4,10

**memory** 11:7 34:15 64:3 86:20 223:3,12 224:24 225:1 245:16 246:9,13,14,15 247:2,6,10,12,13, 15,17,21,24 264:3 277:17 278:8 279:2 297:3 301:14 302:10,15

**mental** 235:16

**mentally** 235:4,16

**mention** 47:22 105:15,17 106:1 281:18

**mentioned** 14:5 24:1 30:24 104:14 105:9 115:2 118:7 144:3 156:23 157:17,19 232:23 249:24 250:24 252:23 265:19 266:7 280:7, 19 308:14,16 325:17,21

**mentions** 105:15

**mere** 140:9 141:8 147:6,12 176:21

**metal** 318:7

**methodological** 34:21 36:18 174:19

**methodologies** 242:14

**methodology** 43:20 48:15 49:6 52:15,17,18,19,22 53:1,5,12 56:22 92:20 93:1,12 106:5 117:12 120:13,19 130:23 131:2,6,16 135:16 220:4,11 228:5 242:10 280:1,11,17,18 314:5,10,14 315:2, 6,15,16 316:2,14,17

**methods** 52:20 140:18 143:9 242:16 283:16,21 284:8 315:16

**mic** 158:17 295:24

**Michael** 7:3 327:22,23,24 328:1,4

**mid** 236:4

**middle** 31:10 61:1,3 85:16 107:20 122:11 139:19 150:23 162:15,18 172:15 195:12 197:14 204:11 233:23 234:6

**midnight** 205:22,24

**Milgram** 53:22

**mind** 30:3,9 40:8 68:3

**minds** 51:6

**Mingey** 91:1 92:11 108:9 113:4,10 124:11 139:24 164:22 276:15,23

**minimization** 246:22

**minimize** 246:17

**minor** 299:7 303:3 305:7,8 307:12

RICHARD A. LEO, PHD, JD, 10/02/2023

**minus** 205:6

**minute** 60:11 226:12 273:18

**minutes** 7:22 60:9,12 94:18 118:12 129:12,16 185:18 193:4

**Miranda** 42:17,20 125:17,20 176:18,23 240:9,16

**mis-** 234:11

**mischaracterizes** 106:20 167:3

**mischaracterizing** 160:18

**misconduct** 222:3

**misdemeanor** 239:11 240:8,15

**misidentified** 292:8

**misinformation** 222:10 223:18, 22,23 224:13 225:3,4,22 226:3

**misinterpreting** 50:22

**misleading** 41:12 63:11

**misrepresenting** 221:16

**missed** 276:17

**missing** 242:22 243:15 248:12

**mistake** 234:11

**mistaken** 292:6,7

**mold** 162:11

**mom** 126:13,18 127:1,13

**moment** 14:19 66:15 86:17 124:8 126:12 158:14 178:19 182:1 191:17,18 213:24 292:3

**momentarily** 143:12

**moments** 150:20

**Monell** 24:22 25:4

**monolithic** 200:22

**months** 38:19 78:16,17 147:1 155:23

**moralize** 246:17

**morning** 6:1 8:7 177:7 213:1,17, 18

**mother** 126:2 154:10 167:23 169:13 325:8

**motion** 46:23 95:7,10,12,19 97:4 212:17 286:16 290:9,12,15 291:18 292:1

**mouth** 312:15 319:12

**move** 20:8 21:8 22:15 24:4 31:6 71:10,16 79:6 82:24 91:24 102:2 107:24 112:2 133:13 139:3,18 152:5 162:13 172:12,13 175:20 184:13 268:9 289:16

**moved** 56:4 286:1 287:18

**moving** 232:21

**muffled** 173:5

**multiple** 146:18,20,23 155:14 156:3 158:12 161:20 191:20 234:2, 8 257:17,22 258:4 265:9 269:13,23 270:1,8 312:19

**murder** 89:19 90:5 91:15 114:1 120:8,12 127:17 128:9 129:4 140:3 143:5 170:11 201:15,21 202:18,22, 24 312:12

**murdering** 90:22

**murders** 159:20

**mute** 130:13

___

**N**

**naive** 239:4 294:24 295:2

**naivete** 238:2

**named** 56:18

**names** 21:6 308:19 309:3

**narrative** 241:9

**narrow** 210:12,15 226:4

**narrower** 50:17 224:7

**National** 62:6,9

**nature** 197:4,19

**necessarily** 34:12 48:8 66:5 67:18 81:14,16 107:13 139:3 194:23 210:16 241:16

**needed** 37:6 230:24 297:3

**negated** 253:18

**Nevest** 310:19,24

**newspaper** 188:4,24 189:21 194:13,21

**newspapers** 188:17 189:8,13,24

**Nick** 6:13 273:19

**Nicole** 11:19 273:7

**night** 73:5 80:20 82:21 126:14 154:11 156:9 177:6,11 178:16

251:20 255:3 258:16 263:2 264:5, 24

**Nissan** 154:9

**non-** 52:22 201:16

**nonetheless** 195:1

**nonforensic** 249:1

**noninterrogation** 201:14

**nonlawyers** 105:21

**nonmedical** 249:1

**nonphysical** 248:24

**nonpublic** 241:14 242:23 248:13

**normal** 275:18

**Norridge** 126:4

**north** 6:15 150:22

**northwest** 151:1

**Northwestern** 28:12 254:17

**Northwestern's** 254:20

**nose** 91:21 108:4 112:13,20

**notated** 315:21

**notations** 16:18

**note** 72:7 300:12

**noted** 15:5 35:13,23 39:19

**notes** 12:18 14:3,8,24 15:3 16:12 17:5 22:3 296:19,24 297:9,18 298:20,21,22,23 299:7,12,18,19 300:13,23 301:11,18,19 302:6,9, 11,13,21,23,24 303:1,4,7,9 304:7, 21 305:4 306:16,21 307:3,4 308:19 309:4 311:13,14 312:2 313:17 314:11,14,17,21 316:8 320:8 324:10,16

**noticeable** 321:24

**November** 12:3

**number** 6:10 9:16,20,23 10:4 29:12 38:14 39:8 63:12 92:18 98:11,16 102:13 120:1 154:9 169:20 188:23 220:18 228:17 229:17 230:6 263:10 304:24 307:23 325:13

**numbers** 10:19 110:19 304:1 307:7,15 311:20

**numerous** 62:1 248:16 288:9

RICHARD A. LEO, PHD, JD, 10/02/2023

## O

**O'Donohue's** 70:2

**Oakland** 38:18 177:3

**oath** 292:19,22 293:11

**object** 30:17 41:1 44:8 76:12 179:4 249:4 282:11

**objection** 13:15 25:9 37:15 39:4 41:19 42:23 44:1,10 45:24 46:16 47:1 49:22 50:23 51:13 57:1,7,8 68:20 74:22 76:24 79:10 81:2 82:14 96:19 97:6,20 99:20 102:17 108:11,16 109:1,7,22 110:3 127:3 133:14 137:6 138:8,14 139:11 160:3 161:8 163:22 164:9 166:10 167:2,15 168:6 170:10 172:6 180:9 225:23 244:15 245:2 249:9 251:21 253:20,21 270:10 281:15 288:13, 15,24 291:10 293:1 298:9 299:13 302:17 305:12 308:21 310:8 314:9 316:5 318:14 321:16 324:1 325:18, 24 326:1,9,19

**objective** 71:23

**objects** 73:10

**observation** 237:22

**observations** 35:14 43:23 239:19 250:10

**observe** 33:20 34:2 37:5

**observed** 31:16 32:6 35:9 38:15 39:9,10,16 43:22,23 44:13

**observer** 34:21 36:4

**observes** 131:15

**observing** 32:2,8,23 35:16 38:10

**obtain** 96:18 113:20 187:10 188:4 189:2 197:3,17 231:2 232:9,11

**obtained** 98:3 101:22 164:5 194:8 312:12

**obtaining** 29:8 46:24

**obvious** 107:18

**occur** 32:13 98:13

**occurred** 82:8 83:23 84:10 87:6 89:9 93:16 95:4 100:15 101:9 106:2 115:13 117:14,16 121:8 132:10 142:10 146:9 154:20 214:12 224:12 281:8 289:9,13 309:4

**occurring** 82:7 92:9

**occurs** 191:19

**October** 6:6

**odds** 46:23

**offender** 197:3,18

**offered** 247:12

**offering** 25:1

**office** 166:5,8 167:10

**officer** 100:4 133:22 136:10,21 137:10 221:18 222:3 225:5 292:20, 21,23

**officer's** 130:24 131:19 132:17

**officers** 6:23 32:11,14 43:6,9 72:14 93:15 100:10 101:5 130:16 135:12 138:1,4 144:11 146:13 154:22 159:19 161:17 179:9

**officers'** 107:5

**offices** 6:15

**oftentimes** 232:14 243:12 323:16

**older** 237:4 240:23

**omissions** 228:8

**one's** 110:21 135:21 151:15 237:17 242:15 316:16

**one-** 226:11

**online** 62:7

**open** 14:12,18 27:17 90:13 130:4 148:9 174:10,12 183:8 185:8 206:7 232:15 250:20 259:22 284:19

**open-** 215:3

**opine** 276:15,24 277:3

**opined** 276:1

**opining** 131:13

**opinion** 22:13 25:1 27:1 55:24 81:17,20 84:8 92:23 97:12 98:5,8 100:8 104:8,17 121:7 122:4 131:10 132:6 134:2,18 135:14,16 139:21 141:11 165:9 250:7 258:21 266:22 277:6 281:3 283:14 285:21 293:17 296:7 318:5 319:10

**opinions** 24:8,11,15,18,21,22 25:2,6,15,17,19,24 26:10,23 27:4, 6,10,15 63:18 75:13 104:19 105:12,14 106:15 118:6 250:20 252:22 266:4 267:14 271:9 273:12 278:14 296:9,10 314:7

**opposed** 79:20 90:13 189:16 246:23 280:23

**opposing** 12:19 14:4 280:21

**opposite** 150:22 268:15

**OPS** 312:23

**option** 59:20 60:4,7 216:12

**options** 59:19

**oral** 124:14

**order** 9:9 18:13 37:4 46:22 66:2 99:19 106:14 127:13 141:20 167:24 169:10 181:19 230:6 231:2 250:15 281:23 282:2 297:3 303:9, 16 313:19 324:22

**orders** 328:15

**organization** 229:12 230:10

**original** 41:18 42:5,9,16 44:16 62:13 64:14 137:11 316:4 319:17, 18

**outcome** 12:6,9 29:18 95:5

**outcomes** 44:17

**overcome** 70:10

**overlap** 41:10

**overlapping** 72:8

**overnight** 216:14

**oversimplifies** 42:13

**Overview** 24:7

**overwhelming** 172:17 173:1,22 175:7 183:14 203:9 265:15

**owner** 208:20

## P

**p.m.** 58:23 59:4,10 60:17 72:18 129:22 130:2 143:18,22 193:6,10 205:6 212:7 226:18,22 274:1,5 320:17,21 328:22,24

**Pacer** 62:4

**Pacific** 129:19

**pages** 148:16 207:3 254:14 308:10

**pain** 312:21

**papers** 123:7

**parade** 141:6

RICHARD A. LEO, PHD, JD, 10/02/2023

**paragraph** 29:23 30:24 31:4,11 32:17 36:14,15 39:19 69:21 72:5 85:15,17 88:18 90:7,10 93:3,6 107:21 112:7,11 118:18 122:11 124:24 125:6 139:19 158:21 162:15,18 164:20 165:10 170:20 172:16 174:16 176:1 195:12 197:14 201:2 203:24 204:2,11 206:2 207:22 208:18,24 209:6 227:2,23 232:22 233:22,23 234:6 319:9

**paralegal** 7:16

**parentheses** 165:7 206:2

**parking** 74:11 325:15

**parse** 48:5

**part** 12:19,23 28:18 44:15 71:2 73:22 80:13 118:5,11 133:15,16 142:14 146:1,22 172:24 173:6,8 175:10 187:8 216:23,24 234:12 238:5 262:24 267:23 276:18 282:18 300:5,6 301:16 302:14 321:10

**partial** 22:22 23:23

**partially** 245:6

**participated** 25:8,12

**parties** 6:20 9:6 75:8,9 190:7 271:16

**parts** 29:5 34:8 252:23

**party** 184:8

**passage** 224:11,24

**passenger** 74:3 150:7 151:16,19 152:9

**passengers** 74:6

**passes** 178:18

**passing** 244:14

**past** 20:12 73:15,16 295:1,4

**paste** 313:7

**path** 268:12

**Path-** 150:5

**Pathfinder** 72:21 126:1,10 151:16 154:9 268:12 324:21 325:1

**patients** 131:15

**pattern** 25:2,7 128:12 296:8,12 322:13 323:4,12

**Paul** 73:2,12 139:22 254:7,16

258:13 259:11 289:22 290:6,8 291:17,21

**pause** 143:19 226:19

**pdf** 28:16 71:11 309:17,20,24 310:1,3,4,6

**pdf's** 309:14

**people** 43:22 45:15 46:8 54:1 73:7 81:12,21,23 100:23 110:22 115:14 123:13 128:18 129:12 141:7 182:15,17 223:21 224:23 225:7,12, 14,21 237:23 272:1 287:8 289:12 322:15

**percent** 38:23,24 42:17,19 43:4,6 119:22,23 121:18,19 201:23,24 202:5,8 230:6,7 244:14 271:13

**percentage** 38:1,2,3,20 39:9,11 45:7 229:9 295:7

**perception** 228:1

**perfect** 31:9 90:9 183:10 193:15 245:17 253:6

**perfectly** 244:12

**period** 171:21 172:19 184:18 193:23 198:9,12,15 204:24

**permission** 37:6,7 183:1 232:17

**permitted** 324:14,16

**perpetrator** 243:1,17 248:14

**person** 66:1 69:10 79:9,15,24 80:4,20 100:15 119:18 128:8 129:3 138:23 139:4 147:7 151:18 156:8 157:6 169:16,17 171:16,19 176:18 177:8 178:11,19 181:24 216:13 224:12,17 225:2,4 237:3 240:9 263:1 264:4 277:9,24 278:6 282:8 283:4,5,9 323:19 327:2

**person's** 147:5

**personal** 102:21 259:5,18,21 261:17

**personality** 234:18 237:10,24

**personally** 262:15 309:13

**perspective** 69:6

**persuade** 65:17 68:18 69:3,16 70:13 71:4

**persuaded** 67:12 69:11 278:5,10

**persuading** 67:3

**pertaining** 30:13

**pertinent** 30:23

**petition** 99:15 104:21 105:4,5,10

**Ph.d.** 8:1 29:8,14 51:15 283:20 284:4,7,11,14

**phenomenon** 34:2 48:2 246:1

**phone** 59:19,21,22 103:11

**phone's** 60:6

**phonetic** 254:10

**Photo** 86:7

**photograph** 86:2 88:12 114:14

**photographed** 85:20 87:10

**photographic** 87:7 96:18 98:3 115:5

**photographs** 98:20 322:24

**phrase** 11:12 67:23 71:9 283:1

**phrased** 71:8 180:11 256:17

**physical** 38:3 88:5,6 93:4,7,16 96:8 97:13 98:4 100:17 101:9 104:10 105:11 106:6 107:16,18 108:1,8 112:17 114:4,6 116:23 117:13,16 118:3,20 131:15 154:5 162:20 163:1,9 241:15,16 242:20 248:10 278:12 294:20 322:1,2,7,22 323:1

**physically** 88:20 89:12 90:4 93:14 94:7 95:14,21 97:5 100:4,9,22,24 101:1 104:16 113:3 114:16 115:11, 14 276:13,23 277:3 312:17

**pick** 226:13

**picture** 86:12,19,20 87:20 115:5,7, 13,20

**pictures** 87:7

**piece** 68:24 76:3 106:11 267:21 268:6

**pin** 196:8 197:12

**pistol** 265:22 266:1 312:15

**pitching** 291:14

**place** 106:7 208:7 230:1 231:13 261:3

**places** 18:4

**plaintiff** 7:8,9 24:22 272:2 328:17

**plaintiff's** 26:7 256:5,6 267:4 300:15

RICHARD A. LEO, PHD, JD, 10/02/2023

**plan** 125:24 169:9

**plate** 154:8 169:20 325:13

**play** 217:17,20,23

**playing** 123:18,20

**plea** 46:24

**plot** 35:7

**ploy** 221:7,11,13,21 222:1 228:6 229:4,16 231:14 233:6 234:14

**ploys** 220:22 221:2 222:2,14 223:2 224:6,8 227:5,12 229:8 230:7 234:2,9 293:21

**point** 18:21 27:13 37:9 41:15 52:5, 6,7 54:10 57:15 62:11 73:5,9 76:16 91:1,13,18 103:8 105:19 113:21 116:19 117:20 120:1 121:21 124:13,15 125:1 128:6 166:7,9 178:22 185:15 192:11 195:5 200:9 201:12,18 206:3 210:9 223:5 232:7,8 251:19 257:16 262:21 264:22 266:11,12 267:3 268:11,20, 22 269:3,6,7,11,12 273:16,17 279:17

**pointed** 75:4

**pointing** 75:24 76:2,4 239:14

**points** 52:8

**pole** 85:20 86:2,14,23 87:2,12 90:16 91:7

**police** 25:8 29:18 31:13,15,21 32:5,11,13 37:13 38:17 39:1,13,16, 21,22,24 40:3,13,15,23 41:5 43:6,8 67:3 68:17 70:19,20 72:14 85:18 92:10 93:15 96:9 101:4 115:2 122:22 130:16 138:1 139:23 146:13 155:20 157:3 159:19 161:16 163:18 177:4 178:21 179:17 181:22,23 182:18 190:11 191:9,15 192:2 195:17,19 204:18 205:20 206:23 207:1 210:17 215:7, 23 218:16 221:18 225:5 231:17 232:13,14,17 243:1,15,16 244:3 248:15 286:18 323:7

**portion** 306:23 313:9

**portions** 18:6 157:10 296:7

**posed** 79:5 231:3

**position** 16:20 17:12,18 18:10 106:24 249:13

**possessed** 188:1

**possession** 64:20

**possibility** 47:5

**possibly** 177:3 297:14 322:17

**post** 55:16 99:14 241:8

**post-** 104:20

**post-arrest** 312:18

**Post-dna** 185:4

**postconviction** 105:3

**posted** 106:15

**posting** 62:12

**potential** 35:8,13,17 36:1,7 188:7 190:3 243:19 294:23 295:2,6

**potentially** 39:21 73:11 227:5,13, 14,17 243:10 284:17 326:14

**practice** 25:2 33:18 34:1 144:14 256:22 282:10 322:13

**practices** 25:7 296:8,12

**practitioner** 283:4 284:1

**pre-designed** 49:3

**pre-frontal** 237:1

**pre-marked** 14:18 15:15

**pre-planned** 50:12

**preceding** 113:15

**preconceived** 142:9 156:15 162:11

**predetermined** 135:11

**prefer** 48:16 49:7,9

**premature** 130:10 132:6 133:6 134:19 135:13

**preparation** 12:15 13:5 80:8 115:1 292:13 298:17 299:3,14,22 300:4 301:12,17 314:1,12 315:13 317:13,16 318:1 320:3 321:5

**prepare** 12:11 13:13 314:14 321:8, 12

**prepared** 13:19 114:12 144:23 148:20 170:5 296:24 297:18 298:5, 8,13,21,23 299:12,17,19 300:12, 14,23 301:11 302:7,9,15 318:13

**preparing** 77:9 148:23 149:14 212:19 256:23 274:21 305:2 311:24 313:16 316:8 318:22 319:3, 6,21

**presence** 114:6 302:2

**present** 35:9 36:5 182:17 227:7

**presented** 100:13 136:16 167:10

**presents** 72:4

**preserve** 96:18 98:4

**press** 102:12

**pressure** 288:11

**pressured** 142:1 156:14,21

**pressures** 234:23

**presume** 69:6

**presumed** 69:1 133:4,23

**presuming** 134:17,20 135:8,9 219:3

**presumption** 69:8 130:10,11 131:1,19 132:7,17 133:6 134:6,10, 11,19 135:11 136:18,19 137:9,11, 16 138:5 141:21 214:18

**presumptive** 144:16

**pretended** 53:24

**pretrial** 290:4 292:1

**pretty** 8:13 265:13

**prevented** 100:13

**previous** 199:20

**previously** 175:18 204:9 321:16

**prewritten** 125:8

**primarily** 48:19 90:1

**primary** 67:20 84:13 85:10 188:16 189:16

**prime** 178:12

**principles** 239:19 242:16

**print** 18:18

**printed** 66:11

**prior** 9:18 12:10 57:18,19 78:17 133:17 134:9,13 142:5,21 157:1 188:19 229:20 280:16 295:8,19 311:9

**prison** 54:4 288:12

**private** 229:11 275:7,19

**privileged** 256:16 299:16 305:13

**pro** 104:20 105:5,7,9,10,18

**probable** 216:4,6,8 218:20,24

219:4

**problem**  34:13,22 36:19 55:15 174:20 185:3 188:7 190:3 231:21 272:14

**problems**  36:24 185:9

**procedure**  114:9,14,15 116:6,7

**proceedings**  95:9,10,13 293:11 328:23

**proceeds**  134:5 188:1

**process**  242:1 297:6 298:11,17 299:4,14 300:5 301:17 314:1 315:13 316:8

**processes**  321:18

**produce**  219:19

**produced**  184:1,8 303:9 309:8 310:3

**product**  45:23

**profession**  282:18

**professional**  139:20 165:9 250:7 279:21 285:20

**professor**  18:15 51:16 55:15,20 59:13 60:23 62:18,22 76:13 103:4 129:15 137:1 186:1 193:19 249:10 253:21 256:8 267:10 288:16 297:5, 23 301:15 302:19 303:13 305:17 309:11 310:7 313:22 315:10 316:24 318:16 319:23 321:17 326:12

**professors**  225:8

**program**  180:1 254:21

**progression**  111:15

**project**  33:11 62:10

**promise**  123:2,3 227:18

**promised**  123:6 192:20

**promises**  118:15,23 119:10,15 120:6,14,24 121:6,21,24 122:6,7 294:1 323:18

**properly**  143:2 306:22

**prosecution**  69:2 84:5 114:20

**prosecutor**  115:24

**prosecutor's**  125:2

**prosecutor-**  115:23 162:21

**prosecutor-written**  71:19 72:1 76:15 83:3,8,21 84:2 92:4 214:11

**prosecutors**  72:14

**protocol**  33:4,9

**proved**  165:19

**proven**  64:5 128:7,12 129:2 202:6, 9,23 276:5 323:4,12,17,23 324:5,8

**provide**  11:17 17:20 52:9 53:21 66:3 67:9 94:16 210:11 243:22 250:8 287:16 288:21 313:19 314:6 315:2,7

**provided**  12:18,21 14:4 15:4 20:15 23:24 26:7 32:15 51:9 54:13 92:8 114:20 128:22 154:8 162:8 206:3 210:8 249:15 250:17 310:23 311:10,14,15 313:12

**providing**  14:9 87:3 119:11 225:4

**psychiatrist**  131:12

**psychological**  219:18 222:9 279:4,9,19 280:6

**psychologically**  144:16 227:5, 13,14,17,19 278:15,19,23 280:2, 10,12,15 281:11

**psychosocial**  237:12,15 238:1

**psychosocially**  237:2,21

**PTP**  313:14

**PTP-N**  311:3

**PTP-T**  313:2

**public**  248:14

**publication**  28:12 183:17

**publications**  27:14 279:10

**published**  19:21 28:8,10 29:8 55:11 146:4 281:2,22 282:1 283:13 284:6

**publishing**  20:20

**Puerto**  141:5

**pull**  14:18 21:9 27:17 65:8,9 86:7 130:4 145:3 148:9 149:17 153:24 193:11 206:7 211:4 226:24 259:22 260:14 261:21 263:8 264:11 274:7 284:19

**pulled**  14:21 73:17,20 186:20 260:23 263:22 264:7

**pummeled**  109:19

**punched**  109:13 111:21

**punches**  91:6

**punishment**  118:22

**purchase**  184:6

**pure**  168:5

**purely**  254:4 255:1,7

**purportedly**  312:12

**purpose**  65:16 66:7,21,24 68:17, 24 69:14 70:9,12 117:15 193:21 241:21,23 242:4 316:17

**purposes**  118:6 204:24 250:5 259:2 267:14 290:20

**pursued**  141:3

**push**  56:21 246:4,10

**put**  7:17 16:23 17:16 18:15 59:21 97:3 106:14 128:20 200:7 214:1 216:5,12 249:12 277:18 281:3 296:16 312:15 320:23

**puts**  45:6

---

**Q**

---

**qualitative**  121:16

**quality**  102:22

**quantifiably**  119:10 121:11 228:15 231:14

**quantifies**  288:6

**quantify**  236:17

**quantitative**  32:20,22 33:19 64:1 229:3

**quantitatively**  45:5 119:20 120:5 220:15

**question**  9:10,14 11:12 15:19 17:24 18:9 19:8 20:11 25:1 33:18 37:10 38:7 42:4,6,9,14,21 43:8,15 44:3,20 46:3 47:16 48:2 49:7 53:10 55:9 61:6,22 63:11 68:22 69:22 70:5,7 75:2 76:20 79:4 87:14 95:23 96:23 110:3,6 111:4 128:24 133:5, 17,18 135:17 136:15 137:8,12,14, 22 138:18 148:18 157:1,18 160:15, 16 165:13 167:5,7 168:12 173:7 175:11,17 176:16 177:9 180:11,18 181:2,10 183:12 185:17 213:7 228:4 230:3,4,5,22 231:3 239:13, 21 240:2 244:18 245:5,9,14 255:13 256:7,9,13,14,17 257:2 259:17 260:3,20 262:12 263:18 267:12 269:1 276:18 284:3 285:10 288:1,3

RICHARD A. LEO, PHD, JD, 10/02/2023

292:2,14 293:15 297:7,24 298:4 299:2 300:18 301:16,17 302:20 305:16 309:19 310:14 313:23 314:3,15 316:12 317:12 319:23 326:14

**questioned** 170:23 190:14 191:1 192:5 201:8

**questioning** 171:2 181:6 192:8 193:21 199:4,23 200:5

**questioning/accusation** 171:1

**questions** 16:10,24 17:15,18,22, 24 18:17 23:12 29:23 30:2,9,12,15, 22 33:23 43:12 79:5 94:4,22 95:1 135:19 215:4 290:23 295:22,23 298:16 300:7 301:2 302:8 308:13 327:18 328:4,5,6

**quick** 270:21

**quickly** 15:18 19:6 21:13 44:12 104:3 168:23 183:8

**Quinones** 152:6 155:2 157:22 249:23

**Quinones'** 152:17 154:17

**quote** 22:19 27:18 29:18 36:16 65:15 72:8 83:2 85:17 88:18,23 89:17,19 90:11,17 91:1,7,18,21 92:1,8 108:1,4 118:18 120:14 123:10 124:3 125:7,10 139:20 150:5,6,16,19 151:2 152:20,23 154:5 162:19 170:21 171:5,10 172:16 184:14,17,20 187:9,12 188:9 190:11 192:2 193:22 195:16 197:14,19 198:8,15 201:5 204:14, 19 206:16,17 208:24 219:16,23 222:9 227:3 232:23 233:23 248:5, 21 257:16,18 258:12 263:19,23 266:13 268:12,16 269:12,18 318:6, 8,21 319:13 320:2

**quotes** 320:7

**quoting** 85:2

---

**R**

**raise** 101:21 182:22

**raises** 36:18 174:19

**ran** 324:21 325:14 327:2

**random** 37:18 231:5,7,12

**randomly** 229:6

**range** 43:4

**ranged** 13:9

**ranging** 176:4

**rapes** 38:11

**rare** 224:19

**rarely** 197:1,15

**rate** 274:23 275:2,4,5,10,14,16,19

**ratio** 228:20 229:21

**raw** 55:23 56:23

**RDS** 206:16 207:24

**re-** 86:1

**re-create** 56:3,9,17 58:7 61:16,23 62:16

**re-creating** 56:22

**re-creation** 56:10

**re-examination** 57:21,24 61:10

**re-examine** 180:20,23 181:1 182:6

**re-examining** 57:19

**re-reviewable** 183:4,6

**reach** 135:16

**read** 26:4 51:5 61:8 65:14,23 85:23 89:2 91:10 105:22 119:7 125:4,8, 13,17 143:23 146:2 150:16 151:12 157:11 171:8 173:9 175:18 176:18 187:13 188:20 190:16 195:23 198:6,16 220:2 228:10 255:17,24 256:9,11,13 258:19 269:18 286:6 287:21 301:1

**reader** 63:19 307:19,22 308:1

**reading** 150:18 152:1 160:19 189:3 197:6,7,9,10 300:24 302:8

**reads** 319:9

**ready** 196:15 302:9

**real** 110:7 133:5 280:23 281:4 282:10

**reanalyze** 180:19

**reask** 244:18 256:7,9

**reason** 34:3 46:12,15 53:15 54:13 59:16 67:15,20,22,24 68:9 100:21 106:1 191:12 217:15 239:18 245:14 246:7,18,20 292:9 297:11

**reasonable** 124:2 138:18 139:2,4, 15 141:11 147:4 151:20 156:5 157:1,7 159:16,19 160:1 168:2

191:13 215:2

**reasons** 25:18 46:14 53:11,15,19 54:2,8,16 55:2 56:7 100:12 101:10 105:14,17 110:22 120:11 182:17 190:23 227:21 232:16 235:14 238:6 240:3 244:11,20,23 265:18 278:20 288:9,17

**recall** 11:4,14,20 12:5,14 13:3,7 21:1 36:3 60:24 77:20 78:8,23 80:9,13,14 82:20 84:7 86:3,12,15, 18 87:6 95:16,19,22 96:2,6,13,17 97:2,9 99:7,18 102:1 103:6,10,15 104:22 105:7 114:3,8 115:6 124:13 125:21,24 126:7,9,11,13,22,23 127:24 144:4 146:15 148:2,19,21 150:18 151:3 152:16,19,24 153:2, 15,18 154:19 157:13,20 158:8,13 166:17,22 170:2 174:6 175:2,13 179:16 182:20 187:15 200:1,6 203:20 210:1 213:15 214:18 230:20 249:2 251:12,24 254:11,19, 22 255:22,23 261:6,7,23 262:2,10, 16 263:1,3,6 266:23 267:17,20 268:23 269:5 270:19,20,24 271:4, 5,8 272:2,4,13,15,24 273:3,9,14 275:9,12 292:3 307:9,11,13 317:23 321:4 322:20,23 323:2,8,14 324:24 325:9,11 327:11

**recalling** 35:21 202:6 224:4 270:1 290:22

**recalls** 92:9,18

**recant** 288:7,8,10

**recanted** 288:22

**recanting** 289:4

**receive** 157:4

**received** 7:20 29:14 102:12 144:11

**recent** 11:8,10 19:23 20:6 136:1 196:4 199:15

**recently** 226:8

**recess** 58:24 60:14 129:23 193:7 274:2 320:18

**reckless** 140:1,7,17

**recognition** 67:15

**recognize** 68:6 216:14,15 284:3 293:20 294:1,5,8,11,14

**recognized** 281:2,20

**recollect** 142:16

RICHARD A. LEO, PHD, JD, 10/02/2023

**recollecting** 86:17 106:9

**recollection** 11:9 12:7 18:8 22:12 32:4 33:13,16 34:14,16 76:8 77:22 78:3,6 79:2 96:12 99:23 100:6 102:5,21 105:7 108:18 110:14 114:5 124:7 126:6 128:16 142:20 145:1 148:8 166:21 174:9 181:22 190:23 206:24 208:10 250:1 251:5 253:15,24 254:18,24 259:14 268:24 269:9 271:16 292:11 294:17 296:23 301:21 302:22 305:10 325:3,5,10,22

**recommends** 195:19 198:1,23

**reconcilable** 293:16

**reconcile** 164:24 165:21 166:16, 19 292:23 293:9

**reconciliation** 167:19

**reconciling** 167:8

**reconstruct** 64:9

**reconvene** 58:16

**record** 6:3,20 7:18 28:1 58:22 59:1,4,8,9,11 60:17 61:8 71:23 95:22,23,24 98:22 99:1 117:19 118:5 125:4 129:21 130:2 136:3,6 143:16,17,21 151:24 170:6 193:5, 10 198:7 226:15,17,22 239:11,12, 23 273:20 274:1,5 320:16,21 323:15 328:21

**recorded** 36:5 93:14,24 103:12 104:5 132:20 134:12 182:11 190:11 191:15 192:3

**recording** 136:2 189:23 191:22

**recordings** 182:6,9,19,22

**records** 188:2 231:8 271:20 322:21

**recounted** 155:10

**recovered** 269:16

**red** 72:21 108:3,21 109:15 112:19 117:7 154:9

**reduced** 275:16

**reevaluating** 57:11

**reference** 26:16,22 173:9 281:12 304:4,18 306:5,17,22

**referenced** 58:6 61:15 311:8 321:2

**references** 47:21 303:20 305:22 306:1,9 308:14

**referencing** 71:14 112:1 202:3 302:13 303:19 304:22 306:13,18

**referred** 35:19

**referring** 14:8 16:6,9 38:21 66:23 69:20 77:4,5 113:13,15 115:5 123:1 144:6 163:13 165:3,4 189:21 191:8,21 233:6 253:7 256:1,2 294:18 299:2,21 302:4 304:12

**refers** 69:23 236:6

**reflected** 315:9

**refresh** 11:9 18:8 22:11 79:1 86:19 96:11 99:23 105:6 126:5 128:15 145:1 148:8 166:20 174:9 208:10 251:5 254:18,24 264:3 268:24 269:9 294:17

**refreshed** 325:3,10,22

**refreshing** 100:6

**refused** 322:17

**refusing** 17:1

**regard** 69:24 175:10

**regarded** 102:24

**region** 64:4

**regions** 64:6,9

**register** 312:23 319:11,14

**registered** 208:2

**Registry** 62:6,9

**regurgitating** 246:21

**Reid** 195:13,17 196:24 197:6,24 198:22 199:2,21 200:3

**relate** 24:22 25:6

**related** 48:2 316:21 317:7

**relates** 25:3,4

**relative** 39:12 228:21 237:12

**release** 231:18

**relevant** 35:11 81:13,16,19,24 94:11 97:16,18 98:5,8,18 100:11 104:11,18 105:13 114:18,22 136:24 137:5,9,21 138:3,13,20

**reliability** 42:5 93:12 106:5,11 242:3,8,12 243:21 244:13 245:8 248:7 271:3,10 272:7,20 273:5 279:18 286:24 287:4,21 289:8

**reliable** 41:17 93:20 242:2 243:12 245:1 246:8,19 265:11 268:21

282:19 286:22 287:6

**reliable/partially** 245:6

**relied** 16:12 26:10 27:10 55:24 84:1,4,8,12,21 85:3,11 180:20 188:23 189:23 194:21

**relies** 194:4

**relitigating** 302:2

**Relono** 254:10,15 255:18,21

**rely** 17:21,24 18:2,5 19:3 26:2 180:3,6,12 181:3 189:12,13 194:13 201:9 238:5 268:4 289:23 291:8

**relying** 16:18 17:3 83:10,13,17 180:16 195:2 198:21 205:14,17 252:21 253:3 258:7,11 266:3,21,23 267:1,21 291:13,14

**remain** 216:9

**remember** 9:11 10:19 21:6 22:9 38:13 64:7 78:1 245:22 272:9 277:11,13 292:5 297:14 303:15 305:9 318:18,19,21 319:5,24 320:7,12

**remembered** 245:19 318:12,18 319:2,6,19 320:11

**remembering** 9:17 12:3 78:21 234:12

**remembers** 126:20 169:24

**remind** 187:15 206:22

**rendered** 296:10

**repeat** 46:3 142:8

**repeated** 124:9,19

**repeatedly** 300:12

**repeating** 246:22

**repetitive** 157:24 158:13

**rephrase** 30:6 37:10 70:6 127:9 239:7,9 244:21 258:1

**replicable** 53:16,18 55:7

**replicate** 40:22 41:16 42:18 43:19 53:20 54:2,6,9,20 57:18

**replicated** 42:3 53:2,12 54:14,23 55:2,11 57:4

**replication** 43:18 53:4 55:4 56:12, 21 57:10,14,16,20 58:4 61:13

**report** 12:17,20 14:2,3,23 15:1,8, 11,12,20,23 16:6,8 17:4,6,13 18:3, 17 19:10,21 20:21 23:1,2,4,8,9,18

RICHARD A. LEO, PHD, JD, 10/02/2023

24:5,16 25:18,22,24 26:2,11,13 27:11 47:7,14,16,17 50:21 51:4 66:14 77:9 78:14,16 80:8 81:1 85:14 87:4 93:18 107:4 113:7 114:12 115:1 117:20 118:9,19 122:9 128:5 130:9 135:14 139:19 140:13 141:23 144:23 145:5,16 146:3,14 148:10,13,17,19,20,22,23 149:14,15 150:4 153:10 156:19 159:10 164:7 165:24 168:17 170:5 175:6,18,19 180:21 181:5,6,7,15 183:7 186:14,15 188:8 190:4 192:13 194:4 197:7,13 200:24 204:24 206:8,23 207:3,22 208:13 209:20 210:7,18,19 211:24 212:20 236:8 238:5 241:4 256:24 258:6 259:4 265:15 266:6,24 267:19,21 278:14 280:7 290:20 291:23 296:6, 9 298:11,15 300:6 301:12 302:12 303:8,20,24 304:1,6,12,13,14,16, 22 305:1,3 306:1,3,10,11,13,17,19, 22,23 307:1,19,23 308:3,8,10,13 309:3,24 310:23 311:5 312:5,8,10 313:8,13 314:11,12,23 315:21 316:4 317:13,16,17,22 318:13 319:18,21 320:3 321:2 323:5

**report's** 14:21

**reported** 187:10 188:5 189:3,7 265:14

**reporter** 6:17 7:11 44:8 57:6 141:9 158:16 230:16 249:7 325:23

**reports** 12:20 14:5 16:8,19 17:8 23:6 24:3 25:23 26:3 32:10 75:11 114:10 115:2 194:21 205:21 207:1 265:20 267:2 268:4 286:18

**represent** 6:21 175:22 211:12 212:21 260:15 298:22 306:2,10,15 309:23

**representation** 221:8

**representative** 37:12,21,24 39:23 174:21 229:24 231:1,6

**representativeness** 36:20 37:19 174:21

**represented** 103:8 259:20

**representing** 6:14

**repressed** 246:15

**repression** 246:1,3,9

**reputation** 102:19

**reputationally** 103:1

**request** 256:22

**requested** 207:24

**requests** 278:2

**require** 48:22 52:18 67:10 195:22 197:2,16 198:1,18 222:2

**requires** 16:15 48:7 49:19 52:15, 17

**requiring** 50:19

**requisite** 284:15

**reread** 31:1

**research** 26:19,21 27:3,9 28:18 30:2,9,13 33:11,15,23 35:3,6 41:7 44:20 45:2,8,10 47:9,10,24 48:6, 12,13 49:6,18,19 50:6,7,19,21 51:10,18 52:15,16 55:22 71:1 117:22 120:2,18 131:11 132:5 201:13,19 202:20 203:1 218:2,6 219:16 220:13 222:10 223:17,20 225:20 226:8 227:4 228:10,11 230:4 234:1 236:2 241:24 242:17 247:14,17,21,23 248:1 250:5 279:18 280:5 282:5 283:17,18,23 284:8 285:24 287:8 289:11 293:20, 24 294:4,22 295:1 308:14,17

**researcher** 51:3 55:22 57:12 58:7 61:15,22 180:19 182:6,13 280:8,13 281:9,23 282:2 283:3,13

**researchers** 33:12 48:10 50:19 53:13 54:9 170:21 181:3 182:23 192:14 201:6 232:15,18 246:13 248:8 279:10

**reserve** 328:10,11

**resided** 208:8,12

**resources** 219:19

**respect** 58:5 61:14 166:15 198:13 235:9 237:19 248:4 265:16 266:4 271:2 296:6 321:5 324:20

**respectfully** 56:20

**respond** 314:10

**response** 82:22 125:3 184:2,3

**responsive** 298:3

**rest** 140:13

**restate** 61:5 285:9

**result** 190:6 278:7

**resulted** 71:24 164:23

**results** 42:4 53:8

**retained** 275:6 324:7

**retract** 46:8,13 287:23 288:2

**retracted** 44:23 45:22

**retracting** 45:15

**retractions** 45:19,20

**retracts** 45:3,9,13 46:21

**return** 129:18 154:1

**reveal** 164:7

**revealed** 134:10 243:11

**revealing** 299:2 303:14 305:16 309:10 310:11 313:24 315:12 316:7 321:18

**review** 15:9 23:7 50:20 66:9 77:7, 10 78:12 79:2 89:15 95:9,17,18,24 96:3 99:5 103:11,24 104:20 114:24 124:12 125:21 212:17 224:1 231:11 250:19,21 251:7 254:6,9 255:18 271:11,20 292:12 293:23 317:5,7

**reviewed** 12:12,15,17,18,20,23 22:4,19,20,23,24 23:3,5,16 25:22 31:19 35:1 36:1 38:23 40:15 75:10, 23 77:13,15,17 78:15,16 80:6 85:9 86:20 89:8 99:9,11,17 101:14 102:22 103:17,18 104:1,23,24 105:2 128:2 149:1,2,5,14 153:1 170:5 175:23 179:21 181:13 204:15 226:7 235:18,20 247:23 249:16 250:18 252:3 254:12,23 255:15,22 258:10 261:14 267:18 290:3 297:12 310:2 317:12,16,22, 24 319:20 320:2 322:9

**reviewing** 32:1,10,14 86:13,15 99:19 132:16 148:19,21 151:3 152:16,24 159:10 181:20 190:17 254:19 255:23 261:7 269:1 282:17

**reviews** 247:19,20

**revise** 33:12 34:8,10 206:4 210:9, 24 211:1 212:2

**revised** 34:5

**reword** 53:10

**Reyes** 12:24 297:19 298:20 299:9 300:9 301:20 317:14,15 324:17

**Reyes-** 303:4 307:4 319:6

**Reyes-solache** 22:5 302:23 303:1 304:13 305:7 317:22

RICHARD A. LEO, PHD, JD, 10/02/2023

**Reynaldo** 6:9,23

**RFC** 149:9

**RFC003** 149:6

**Rican** 141:5

**Richard** 6:5 8:1 22:19 27:19 328:20

**rid** 167:14 168:4

**rights** 125:17,20 176:18 240:9,16

**ripped** 88:7,9

**risk** 92:2 93:8,22 106:16,22 119:2, 11 120:6,15,22,24 121:9,12,14 130:18 217:12 221:3 224:9 227:8, 16,20 228:7,16 234:3,18 235:13 236:9,14,18,21 237:5,8 238:24 239:23

**robbery** 38:2

**robust** 92:8,15,22 285:21 286:9

**Rock** 295:23

**rod** 318:7

**Rodriguez** 78:13,18,20 149:19 150:2 155:2 157:18,22 158:5 249:24

**Rodriguez's** 154:17

**roof** 152:10 266:14

**room** 27:19 28:6 85:18 86:14,24 91:2 113:5,19 122:13,19 173:16,21 174:8,13 176:22 177:9,10,14,19,22 178:1,4,9 179:7 180:21 181:16,24 182:2 191:3,5,18,24 192:17 203:17 213:22 214:1,5,16 215:19 216:13, 19 217:21 218:4,11 219:6 232:11 240:5

**Rosen** 7:5,14,17 16:5,20 17:7,12 18:10 19:1 60:6 143:13,16 295:23 296:2 297:16 298:7,18 299:11,17 300:11,19,21 301:9 302:4 303:6,17 305:18 309:1,22 310:15 314:4,16 316:1,19 317:4 318:2,20 319:8 320:4,14,22 321:19,22 324:9 326:3,16 327:5,18 328:13,16

**rough** 29:4,5

**round** 110:16

**rounds** 110:14 111:1

**routine** 172:17 173:2,22 183:14 203:10

**row** 311:1

**Ruiz** 207:5

**rule** 198:13 305:14

**rules** 8:10,14

**run** 326:7,23

**running** 217:9 301:4 326:6

**rush** 130:9,16 132:1,7 133:4 162:9

**rushed** 133:1

**Ruth** 156:22

---

**S**

---

**sake** 18:4

**salient** 245:19,22,23 297:14 315:20,23,24 316:3,11,16,22 317:9 318:23 319:19

**sample** 37:2,3,11,18 39:23 49:1 52:2,10,12 176:3 195:7 229:6,24 231:1,5,6,7,12 295:6

**samples** 48:9 51:24

**Sandra** 78:13,18,20 149:19 150:2 157:18 249:24

**sat** 8:23

**scenario** 99:4 101:7

**scenarios** 246:22

**scene** 208:19 215:13 243:22 257:11,13,14

**Schalka** 7:3

**school** 103:5 226:13 254:20

**science** 47:9 48:10 49:17 117:22 227:3 241:24 280:22 281:1,4 283:21 284:8,9

**sciences** 51:16,20 52:21 57:14

**scientific** 234:1 250:3 285:24

**scientists** 246:13 315:16

**scope** 44:19 324:6

**scraped** 318:7

**screen** 14:13 15:15 18:20 19:3 27:22 59:6,21,24 60:2 65:12 66:14 86:10 88:15 112:4 130:8 145:11 185:22 211:8 219:12 260:11,14 261:20 274:11 296:16 320:24

**screens** 14:12

**scribbles** 17:5

**scripting** 244:7

**scroll** 15:17,21 19:6 21:22 24:6 29:16 34:18 36:13 71:12 84:22 90:8 124:22 145:23 148:16 149:18 154:2 193:14 201:1 206:11 207:17 220:20 222:5,12 226:9 253:1 285:18 304:2,17 305:23 313:11

**scrolling** 20:10 21:12,16 104:3

**Sean** 7:9

**search** 47:19 209:4,9,15,23 210:15,22 211:5,6,13,20 308:3,15, 19,24 309:2,13,14,20,24 310:1,2,4

**searchable** 309:8 310:6

**searched** 308:11

**seat** 74:2,3 151:16,19

**secondary** 188:17 189:1,13,16,20

**seconds** 176:4,11,21 177:2 196:14 226:14 270:23

**section** 23:2 24:7 29:18 30:16 34:19,20 35:2 36:13 71:18,22 83:1 84:16,19,23 85:1,4 90:2 104:1 106:15 117:20 118:7 130:15 131:3 140:8 192:13 221:1 234:22 241:21 285:3,13 289:21 290:3 304:6 317:22

**sections** 27:7

**seek** 30:15 65:16 70:12

**seeking** 105:21 278:21

**sees** 52:5 131:15 151:18 323:17

**self-incriminating** 66:4 67:9

**semi-automatic** 265:22 266:1

**send** 20:3,5 163:5

**sense** 213:4 233:12 238:4 316:13

**sentence** 31:4 66:24 69:21,22,23, 24 70:21 71:3 72:7 80:13 89:16 92:8 108:1 113:15 118:21 152:14 155:6 159:14 160:19 163:13 164:20 165:8 172:24 173:8 183:13 184:14 190:10 191:15 192:2 202:13 219:15 288:12 289:3

**sentences** 91:18 198:4 227:22

**separate** 28:20 31:20 217:1 232:13 280:8,13

**separately** 136:5

**September** 20:2,7

RICHARD A. LEO, PHD, JD, 10/02/2023

**sequence** 29:11 154:19

**Sergeant** 92:11 108:9 113:4 124:11 139:24 164:22 276:22

**serve** 288:12 317:9 318:23

**session** 289:14

**sessions** 171:1

**set** 56:13,14 135:21,23

**setting** 247:13

**seven-hour** 171:24

**Seventh** 11:23

**severe** 312:21 321:24

**sexual** 38:3

**shaking** 328:4

**share** 260:13

**shared** 16:16

**sharing** 260:7 261:20 264:10

**sheet** 32:18,22 33:10,12,19 34:1,4, 8,11 63:3,15,16,22 64:8,10,14,18, 22 65:2 310:17

**sheets** 63:8 182:10

**shelf** 196:12

**shoot** 79:9 138:3 153:6,16,22 157:23 159:23 167:13

**shooter** 79:23 157:15 158:9,11 159:24 250:2

**shooting** 75:16 141:4 142:23 146:9 150:24 151:11 152:11,22 159:15

**short** 30:12,19

**shortly** 85:20 87:10 150:21 232:8

**shot** 72:17 74:11,13,14,15,18,20 75:1,5 76:1,6 79:8 80:10 82:1,22 107:9 118:1 126:1 138:19,23 140:9,12 142:18 147:6 148:6 151:8 154:7,12 155:7,9,11,16,21 157:8 158:24 159:3,13 160:1,12,21 161:22 162:1,4 163:17 169:5 215:11 233:13 250:8 251:3,11 252:11 263:22 264:8

**shots** 74:14 78:1 80:12,14 82:12, 21 147:8 150:9,12 155:14 156:3 157:24 158:13 160:8 161:20 269:14,22,23 270:1,17,18,21

**show** 18:20 46:7 76:17 95:15 96:11,16,22 115:15 295:1

**showed** 43:4 211:24 253:4 261:4

**showing** 193:15

**shown** 18:17 222:10

**shows** 45:3,9 76:10,21 201:13,19 202:20 203:2 218:3 236:2 293:20 294:1,5,22 295:5

**shut** 301:23

**sic** 142:23 163:2

**side** 18:16 73:22 88:22 90:14 91:4 111:22,23 112:8 123:14,21 150:7 151:2 268:15 327:21

**sign** 219:21 220:8,16 287:18

**signature** 16:2

**signed** 122:20 123:7 125:2,13 127:18 128:8,10 129:4,5 209:4,9, 16,23 210:22 211:20 212:7 220:7 278:24 323:6,20,22

**significance** 265:7 268:19 269:6

**significant** 22:13 72:8 120:22 223:17

**significantly** 119:2 120:15 121:3, 13 122:2,5

**signing** 125:9 140:14 207:6 277:10

**signs** 88:5,6 98:4

**similar** 41:17 43:21 44:4 64:18,19 107:4 228:4 322:15

**similarly** 309:2

**simply** 142:5 298:21 299:18 302:11

**single** 45:19 138:19

**sir** 14:22 15:14,19 20:11 21:13 22:18 24:20 27:21 28:2,17 29:20 31:10 33:8 34:20 36:15 47:7 65:11 71:13 77:16 83:1 86:9 87:19 88:14 93:11 98:15 103:11 105:18 107:6, 20 109:6 118:10 130:13 148:11,13, 21 150:1,16 152:8 158:20 160:15, 23 162:13,17 163:5 168:15,22 172:12 174:16 175:22 183:11 185:21 192:1 199:20 200:9 206:14 207:21 210:7 211:7 214:17 219:11 220:19,23 222:8 227:2 234:15,17 241:3 247:1 252:12 254:6 257:15 260:13,15 264:21 265:21 275:22 281:12 284:22 289:20 293:19 295:1,21

**sit** 34:4,14 37:8 114:11 115:6 148:24 153:19 154:20 163:11 224:4 238:12 251:24 254:22 263:6 268:23 322:20 325:8

**sitting** 32:12 150:7

**situation** 65:18 66:2,8 67:5 69:17 70:14 224:19 228:3 250:4

**situational** 221:3

**situations** 195:21 198:4,14,24 223:24

**sixth** 254:3

**size** 37:2,3,12 195:7

**skeletal** 92:16

**skeptical** 246:12

**skills** 284:15

**skin** 110:21

**skip** 305:20

**sleep** 179:7 294:12

**sleeping** 178:17,24

**slightly** 120:4 187:11,18 239:20 266:18 267:8 292:15

**smart** 239:3

**smell** 233:12

**smelled** 233:15

**smelt** 233:1,9,15

**social** 47:9 48:9 49:16 51:16,20 52:21 57:14 117:22 227:3 233:24 241:24 281:1,4 283:21 284:8,9 315:16

**Solache** 12:24 297:19 299:9 301:20 303:5 307:5 319:7 324:17

**Solache-** 298:19

**Solache-reyes** 275:10 296:11,20 301:2,13 302:14 304:22,24 306:5, 13,18 307:18 311:15 313:18 317:6 319:18,21 320:3,6

**sole** 66:21,24 68:16 69:14,22 70:8

**some-odd** 24:2

**somebody's** 135:7

**someone's** 92:21

**sophisticated** 179:24

**Soria** 77:11,18,20 153:12,23 154:8 155:2 157:19,21 249:23

**Soria's** 154:17

**sort** 29:4

**sound** 35:20 78:18

**sounded** 158:1

**sounding** 270:18

**sounds** 19:2 193:2 300:13

**source** 51:12 56:8 70:4 189:16 225:17,19 251:12

**sources** 188:16,17 189:1,10,13, 20,24 194:23 205:13 225:13 315:24 316:10

**southbound** 73:16 150:6

**Spanish** 211:10

**speak** 94:18 211:10 267:10

**speaking** 110:2 158:16 242:13

**specialists** 280:21

**specialized** 135:20

**specific** 20:22 24:7,11 30:24 43:15 55:9 62:22 79:4 83:9,12 92:20 93:1 129:1 131:5,17 135:3 153:2 224:3,10 230:23 238:3 239:14,15,16 255:12 272:9 279:17

**specifically** 36:19 45:12 78:2 87:20 151:5 170:4 174:20 195:19 200:1 237:11,20 258:9 266:24 270:24 271:8 272:16 317:23

**specificity** 126:8,12

**speculate** 51:2 54:16

**speculation** 167:18 168:5 254:4

**speculative** 255:2,4,7,14

**spell** 169:3 271:21

**spend** 268:24

**spent** 32:5 214:13 274:21

**spoke** 208:19

**spot** 8:18 59:17,18 129:8

**stand** 97:3

**standard** 33:4,9,18,24 157:3 181:11

**standards** 242:5

**Stanford** 54:4

**Starr** 7:9

**start** 91:20 112:13 141:11 143:1,4

190:12 191:16,23 192:3 203:3 223:5,8 260:17 324:23

**started** 7:15 10:14 32:23 61:23 62:7,12 134:13 138:1 204:16 205:15 206:21 210:4,6 213:12,16 295:16

**starting** 14:23 23:15 30:13 130:5

**starts** 29:17 36:16 133:23 134:3 168:17 170:21 176:2 253:2 257:16 269:12

**state** 36:22 69:14 70:20 72:3 83:5, 20 118:17 120:4 121:13 122:17 151:23 154:15 158:21 159:1 160:16 165:20 171:10 175:7,11,17, 19 176:2 190:2 195:16 203:8 206:1 213:11 232:23 233:23 234:21 236:8 237:6 248:5 249:7 258:12 285:20 287:12,15

**state's** 166:5,7,17,18 167:9

**stated** 70:21 80:15,17 100:17 121:10 147:16 176:24 194:20 209:2,3 227:22 229:23 272:6 293:6

**statement** 66:4 67:1,9 69:9 72:1 76:15 81:10 82:2,9 83:4,9,16,17, 21,22 84:2,5 86:23 87:10 92:4 93:14 106:6 113:6,20 115:24 119:12 120:7 121:15,17 122:20 125:2,8,14 127:18 128:17 140:14 153:3 162:7,22 205:6 212:7 214:11 215:9 219:22 220:17 229:5 237:10 242:19 243:8 244:6 246:19 248:6 250:22 254:17 255:12 258:8 263:11 266:13 269:12 272:20 273:4 277:10 278:16 279:1 286:3 287:19 323:21

**statements** 70:11 71:20 119:3 120:16 134:21 135:1 136:7 156:11 157:10,11 165:1,22 166:16 194:24 209:19 227:8 228:7 239:24 242:1 243:9 250:24 289:22

**states** 9:4 39:22 40:4 85:17 88:18 89:12 113:4 187:9 190:11 219:15 229:7

**stating** 144:10 157:14 175:4 264:22 292:20

**station** 85:17 87:11 122:22 128:21 205:20

**statistic** 312:16 319:13

**statistical** 279:24

**statistics** 180:2

**stay** 179:15 203:2

**Steve** 301:22

**stew** 179:10

**Steward** 312:11 313:1 318:9 319:14

**Steward-bey** 313:2

**Stewart** 313:1

**stipulate** 254:13

**stolen** 126:3,14 127:1,13 167:23 169:10,22

**stomach** 312:21

**stood** 318:8

**stop** 250:11 260:7 261:20 264:10 301:4

**stopped** 150:23

**stopping** 185:15 273:17

**story** 126:16 127:2 156:10 169:10

**straight** 18:7 79:8 171:20 191:6

**strain** 21:19

**strategic** 100:12,21 101:10 105:16

**strategy** 46:15,19 178:10 288:11

**street** 6:15 73:18,21 150:23 239:3

**stress** 171:3

**stretch** 193:3

**strike** 25:15 26:20 30:5 74:19 75:22 83:11 84:3,15 88:8 104:14 106:3 154:24 173:18 174:5 180:5 190:16 214:8 240:20 244:10,22 247:6,8 249:20 251:17 261:6 269:4 272:5 274:19 275:3,23 280:10 281:24 290:7 292:18 315:4 321:7 324:23

**strip** 74:10

**strokes** 41:21

**strong** 34:15 265:13

**stronger** 101:20 252:2,5,8

**struck** 258:2

**stuck** 263:21

**student's** 256:1

**students** 228:23

**studied** 100:23 128:7 187:12,16

RICHARD A. LEO, PHD, JD, 10/02/2023

**studies** 41:5,23 42:7,10,12 43:4, 12 44:4,7 45:14 46:6 48:11 49:3 53:16,17 54:9 55:6,10 64:19 119:14,16 120:11 121:1,19,21 172:16 173:1 183:13 203:5,9 223:23 228:19 241:1 283:22 284:9 293:23 294:18 295:8

**study** 40:18,22 41:16 42:3,5,9,16, 18,20,22 43:6,19,20 44:5,16,20 45:6,19 52:12 53:2,20 54:5,13,18, 20,21 55:1,14,17,19 57:16 58:1 61:11 64:22 65:1 120:10 195:3,4 202:14 203:7 239:5,14 240:2,11 288:6 295:5

**subject** 219:4 225:21

**subjects** 54:1

**submitted** 26:2 274:13,16

**submitting** 23:8

**subpoena** 184:2

**subsection** 83:2 85:16 92:1 93:3 97:13 98:6 118:15 130:6,9 168:17 204:1 219:15 220:21 227:3 232:22 234:17 241:5 284:23 289:18,20 316:22

**subsequent** 42:18 82:12 266:16

**subsequently** 44:23

**substance** 13:2 18:3

**substantial** 47:10 219:16 242:16 289:8

**substantially** 121:8 122:5 219:20 220:6,10 227:7,15 228:6,15 296:10 307:3,5

**subtracting** 205:5

**successful** 232:18,19

**succession** 270:22

**sufficient** 141:17 143:4 282:20

**suggested** 198:9 242:24 244:2 246:23

**suggestibility** 236:5 238:2,11

**suggestible** 237:2

**suggesting** 158:24 160:20 252:6

**suggestive** 215:5

**suggests** 236:24 266:9

**Suite** 6:16

**summaries** 306:18 314:22

**summarized** 24:12 321:2

**summarizing** 316:14

**summary** 24:14 25:16 150:1 152:6 310:18,23 313:6,9,12

**Summerville** 312:17 318:6 319:14

**supervisors** 25:12

**supplement** 306:24 314:7

**supplemental** 148:10,22 159:10 206:8 207:2

**support** 25:23 26:20 27:6,14 69:19 173:21 174:2 186:5 195:7 197:24 201:9 261:11 316:22 322:22

**supported** 49:12 248:9 261:14 287:20 313:20

**supporting** 173:18 310:23 313:12

**supports** 70:19 192:9 219:17

**suppose** 179:14

**supposed** 155:23 176:11 180:3,6, 12 181:3

**suppress** 46:23 95:7,10,12,20 97:4 212:18 286:17 290:9,12,15 291:19 292:2

**suppressed** 159:2

**surgeons** 280:21

**surprise** 300:10

**surrounding** 293:14

**survey** 50:11 68:8 294:18

**susceptible** 223:21 224:12,17 225:3 294:15

**suspect** 30:4 45:3,9,13 46:12,21 66:7 67:9 68:18 69:1,7 71:4,7 106:6 119:11 120:6 130:17 133:11, 23 136:12,19 138:2,6,18 170:23 176:5,16 177:1,13 179:7,10 190:13 192:5 201:7 215:8,18,24 216:3,18, 22 217:12 218:3,18,19,21,22,23 219:1,2 221:9,12 223:2,5 242:24 243:8,22 244:2 245:17 294:16

**suspect's** 70:10 217:20 228:1 241:14 244:21,23 245:16 246:9 272:19

**suspects** 38:5 43:5 44:23 46:8 65:18 67:4,15 68:5,8,12 69:17 70:14,24 101:14,16 120:12 147:2 203:2 222:15,17,21 223:8 229:21 243:13 246:16 287:23 288:1,6,7

294:9,12,15 295:20

**suspects's** 101:23

**SUV** 150:21 151:1

**Swaminathan** 7:7,16 13:15 16:11 17:2,23 18:12 25:9 30:17 37:15 39:4 41:1,19 42:23 44:1,9,10 45:24 46:16 47:1 49:22 50:23 51:13 57:1, 8 58:14,18,20 59:12 60:13 68:20 74:22 76:12,24 79:10 81:2 82:14 85:6 96:19 97:6,20 99:20 102:17 108:11,16 109:1,7,22 110:5 126:19 127:3,7 129:14 133:14 137:1,6 138:8,14 139:11 151:23 152:4 160:3 161:4,8 163:22 164:9 166:10 167:2,15 168:6,13 169:23 170:3,10 172:6 180:9 185:14,19 225:23 244:15 245:2 249:4,9 251:21 253:20 256:7,14 257:1 259:7 267:9 270:10 276:17 281:15 282:11 285:7 287:2 288:13,15,24 291:10 293:1 297:5,22 298:4,9 299:1,13, 20 300:16,20 301:15 302:17 303:12 305:12 308:21 309:9 310:7 313:22 314:9 315:10 316:5,24 317:11 318:14 319:1,22 320:10 321:15 324:1 325:18,20 326:1,9,19 327:20,23 328:3,9,11,17

**Swaminathan's** 321:20

**swear** 7:12

**swearing** 72:4

**sweater** 88:7,9

**swell** 108:3,15 110:8 112:19 117:7

**swelling** 87:23 108:23

**swollen** 109:15,21 111:13,17,19 113:11 115:17,19 117:2,4,10

**sworn** 7:13 8:3

**symptoms** 131:8,9,16,18 132:9

**synonym** 192:6

**system** 94:16

**systematic** 47:24 48:7,13,14,22, 24 49:4,7,19 50:9,20

---

**T**

---

**T-SHIRT** 88:7

**table** 56:5 310:22 311:2

**tables** 63:12 64:2,11

RICHARD A. LEO, PHD, JD, 10/02/2023

**tactics** 294:6,7

**tad** 253:1

**takes** 111:16 117:10

**taking** 40:12 106:24 122:18 171:23

**talk** 123:13 296:14 297:6

**talked** 17:8 153:11 157:16 308:12

**talking** 32:13 39:3,7 42:11 47:17, 18 59:12 131:12,14 169:12,14 191:17 214:17 216:21 226:3 262:13

**tangible** 119:1

**teach** 226:7

**TECH** 14:19 145:7 185:11 186:19, 22 260:4,7 263:13 264:13,17

**TECHNICIAN** 6:1 7:11 58:13,22 59:2,9 60:15 129:21,24 143:10,17, 20 193:5,8 226:17,20 273:21,24 274:3 320:16,19 328:14,19

**technique** 119:18 171:4 179:11,18 198:22 199:3 227:14 229:19

**techniques** 65:16 66:18,20 70:23 71:4 141:19 179:13 227:6

**television** 160:24 161:2,5,7,13

**telling** 98:11,17 127:1 300:3,17

**ten** 10:23 43:3 60:12 94:18 193:4 196:14 212:9,11 327:16

**ten-hour** 327:17

**ten-ish** 273:18

**ten-minute** 58:16

**tend** 225:12 315:15

**tended** 36:16 174:17

**Terence** 110:13

**term** 40:11 47:8,14 50:17 122:2 241:8 245:24 279:3,19,24

**terminology** 57:23 61:9 121:3

**terms** 28:16 43:22 204:12 272:15

**test** 238:14,15,21 241:9

**tested** 238:11,18

**testified** 8:3 10:3,8,12,16,22 11:2, 5,11,15 20:13,23 77:24 78:24 79:4 108:19 153:16 212:23 247:9,12 258:14 259:13 269:13 271:1,6,8, 17,19 272:6,14,18 273:10 286:16 290:2,9,12 293:10 298:19 299:17,

23 300:12 302:6,15 305:3 323:3 324:24

**testifies** 292:19,22

**testify** 97:3 272:10,13 297:3 298:20 315:22 324:12

**testifying** 10:14 272:4 273:4

**testimonial** 22:5,6 250:3 298:6 299:8 315:19,21 317:9 320:9 324:13,16

**testimonies** 290:14

**testimony** 12:23 22:8 77:11,24 78:9 80:7,9 83:14,15 84:6 89:6,11, 24 95:13 96:4 98:3 101:4 106:21 126:20,22 127:7 142:2 154:18 167:3 205:17,19 249:23 250:13 251:10 252:23 258:23 261:8 265:8 272:16 288:22 290:4,15,24 292:7, 17 296:21 297:10,11,20 298:24 301:20 302:5 310:24 311:3 313:17 318:22,24 320:6,9 323:8 324:20

**text** 143:15 226:14

**texted** 143:14

**theaters** 126:4

**theoretical** 47:4

**theoretically** 179:14 245:18

**theory** 156:15 162:11 166:22 167:9 169:15 238:22

**there'd** 232:5

**thing** 31:3 55:4,5 69:5 101:15 107:5 131:24 172:2 324:10

**things** 16:13,14 83:22 105:22 107:17 214:22

**thinking** 55:3 128:9 129:5,12 163:12 175:13 225:10

**thought** 33:5,22 37:3 47:17 50:12 52:13 55:13 61:20 76:2 98:15 111:4 127:16,21 128:11 161:7 163:14 169:20 205:17,21 255:5,6 298:2,3

**thousands** 110:12

**threat** 119:22 123:2,4 227:18

**threatened** 312:15 319:12

**threats** 118:15,20 119:10,16 120:6,14,23 121:5,11,20,23 122:5, 6

**three-hour** 177:16

**throwing** 73:10

**till** 212:8 213:7 218:12

**time** 8:17 11:4,11 31:2 32:5,7,9 33:5,7 34:24 35:12 50:12 52:4 58:15 62:19 75:6,16 78:9 80:5 93:13 113:23 115:3,9 117:3 124:3, 4 129:7,10,19 168:11 170:23 171:11 172:4,19 176:12,13 177:18 181:5,6,19 184:18 188:8 190:4,20 191:20 192:8,16,21 193:23 196:15 197:15 199:4,22 200:2,4,5,11 201:7,14,17,20 202:21 205:5,7,15 206:4 208:8 209:9,10,15,22,24 210:13,23,24 212:2,8 213:2,19 214:12,16 216:14 224:11,16,24 225:1 226:6 227:15 237:7 245:15 251:3 258:6 261:24 262:3,8,14,17 263:10 268:13,24 270:23 272:10 273:19 274:20 275:19 295:1,3,8,22 301:3,5 305:9 314:19 315:5 320:15 327:19

**times** 10:16 13:4,6 47:11,13,22 56:4 109:13,20 110:1,18 111:2 182:10 232:17 272:14 308:13,16

**timing** 210:21

**title** 86:6

**titled** 27:18 28:5 34:20 55:15 71:18 83:1 92:1 185:3 211:5 220:21 234:18 241:5,21 274:8 310:19

**today** 6:17 9:18 12:16 34:14 54:3,7 114:11 115:7 148:24 154:20 263:6 267:1 268:23 292:13 294:24 295:3, 22

**today's** 12:10 13:13 274:21 328:20

**told** 101:17 113:10 122:20 126:13 127:12,20,21 128:20 167:23 232:24 280:16 302:8

**Tony** 303:20 304:18 312:11,23 314:7 318:5

**top** 10:11,20 19:12 20:15 22:18 45:6,18 52:11 54:24 55:12 64:15 89:14 96:1,10,15 99:22 128:14 145:2 150:24 162:14 200:13 203:4 207:22 211:14 234:5 240:1 242:20 248:4 272:23 273:2,14 279:14 283:24 303:18 305:23 313:6,9

**torture** 53:24

**total** 9:16 10:16 171:11 181:5,19, 20 194:17 200:11 204:3

Index: totality-Valerie

RICHARD A. LEO, PHD, JD, 10/02/2023

**totality** 291:13,15

**Tough** 207:14

**track** 44:16

**traditional** 248:7

**train-** 147:3

**trained** 52:20 281:1 283:16

**trainers** 179:17

**training** 51:17 70:19,20 131:10,14 157:3 195:17

**traits** 234:18 237:11,24

**trajectory** 252:14,16 266:5,17 267:6

**transcript** 77:11 78:13 86:16 151:4,6 152:17 254:15 259:23 260:16 262:7 263:9,12 264:15 286:14 310:24 328:15,16

**transcripts** 77:8 103:18

**transfer** 216:10

**transport** 216:17

**trapped** 228:1

**treated** 312:19

**trial** 10:3,8 11:2,5,11,15 12:6 20:13 46:15,18 77:7,10,24 78:9 94:1,19 101:2 153:16 164:15 166:18 271:2, 10 272:19 273:1 286:17 288:10 290:4 297:10 313:1 315:23 324:12, 14,17,18

**trials** 10:11,22,23 271:7,19 272:7

**tribe** 54:18

**trier** 101:6

**trigger** 263:22 264:8

**Trotta** 6:13

**trouble** 126:17 127:2,14 167:24 325:8

**true** 42:3 44:18 68:4 72:15 107:1 160:17 221:23 228:21 229:14 230:14,18 231:22 232:6 243:1,13, 17 245:1 248:14 252:2 283:8 301:10

**trumps** 250:3

**trust** 225:12,14,15

**truth** 98:11,17 140:2,7

**tunnel** 161:4,6,13,17

**turn** 28:14 66:16 71:13 107:19 108:3 112:19 117:7 118:8 168:15 295:24

**turned** 108:21 181:23 221:23 309:16

**twelve** 110:14,24

**type** 38:14 43:23 73:17 178:4 186:10,18 243:16 277:14,15 278:5, 9

**typed** 289:19

**types** 38:4 203:12,14 277:7,23

**typewritten** 307:3

**typically** 52:19 56:12,22 57:2,13 58:3 61:13 135:23 192:16 236:6 282:4 283:19 284:7

**typo** 91:8,9,11 195:24 311:4,7,9, 16,18

---

**U**

**ultimately** 69:8 162:12 164:12 302:18

**Um-hmm** 153:14

**unconsciously** 246:4

**uncover** 316:3

**underline** 17:10

**underlined** 16:14 18:4

**underlines** 15:10 17:6 18:6

**underlying** 60:2 179:19

**undermine** 101:20

**underneath** 73:23

**understand** 21:22 31:8 38:7,22 42:15 46:11 50:18 51:8,11 52:24 54:11 56:24 57:23 61:6,10 63:21 68:4,22 72:11 83:18 84:20 100:16 102:15,19,23 121:2 135:15 137:11 155:19 171:15 177:23 180:13 181:10,11 182:18 184:11 210:14 212:4 215:22 216:2 217:13,18 229:2 233:9,20 235:2,20 242:6 244:17 245:5 283:10 284:5 294:19 310:5 314:13

**understanding** 17:2 27:8 49:15 67:2 124:5 127:6,11 189:8 205:4 217:10 223:1 231:10 233:16 255:20 257:6 258:5 265:3,5 324:22

**understood** 22:14 125:19 230:5 255:14

**undertook** 30:1,7 33:15

**undisputed** 79:12,14,15,24 80:3, 19 218:9

**uniform** 74:24

**uniformly** 43:9

**unique** 232:20

**unit** 6:2 59:3 60:16 130:1 143:21 193:9 226:21 274:4 320:20 328:19

**United** 39:22 40:3 229:7

**universe** 231:7

**university** 28:12 54:7 103:4

**unmuted** 328:2

**unnamed** 62:17

**unnecessary** 18:13 27:15

**Unquote** 171:12

**unreasonable** 198:11

**unrecorded** 84:10 92:9 132:11,22 134:23 182:12,16 285:22 287:5 289:10,13

**unreliability** 241:6,10,17,19,22 242:4,9,12 243:21 244:24 245:7 250:23 265:13,16 268:5 271:7,9,18 272:11,21 273:6,11 289:9

**unreliable** 119:3,12 120:7,16 121:12,15 221:4,10 234:4 237:9 245:6 286:3 287:9

**updated** 19:24 20:6,7,19,20,22

**updates** 19:19

**upper** 211:16

**upward** 266:18 267:8

**Urlaub** 6:14,18

**utilize** 316:3 324:11

**utilized** 314:6 315:2,7

**utilizing** 16:9,21

---

**V**

**vague** 42:7

**Vaguely** 127:15

**Valerie** 7:15,16

RICHARD A. LEO, PHD, JD, 10/02/2023

**valuable** 55:5

**variables** 43:21

**varied** 176:3

**variety** 232:16 238:6

**vast** 9:12

**vehicle** 74:2,6 150:8 152:11 208:2, 20,21 266:15 268:16 326:4

**verbal** 87:5

**verbatim** 313:8,10

**verify** 188:6 189:4,6 194:22 215:9 302:11

**version** 17:13 19:24 20:2,3 42:2 195:18 196:3,4 309:24 310:1 311:10,14 323:7

**versions** 16:8

**versus** 6:9 21:2 38:1,2,3 79:13 217:21 229:10 239:4 272:17 277:11 313:1,2 319:14

**viable** 60:7

**victim** 81:9,23 139:1 147:8 244:5

**victory** 141:6

**video** 6:1,3,20 7:11 36:1 58:13,22 59:2,3,9,24 60:15,16 129:21,24 130:1 143:10,17,20,21 181:21,23 182:6,9 189:23 193:5,8,9 226:17, 20,21 231:12 273:21,24 274:3,4 320:16,19,20 328:14,15,19,20,21

**video-** 6:4

**video-recorded** 31:20 181:13

**videoing** 59:23

**videos** 36:4

**videotape** 182:3

**view** 143:4 182:19 282:6

**viewed** 198:10

**violent** 108:2,8,14 112:18 117:6

**virtually** 227:6

**visible** 109:17 112:22 116:9,12,14 117:3 134:11

**vision** 161:5,6,13,17

**visual** 87:17 110:23

**visually** 151:12

**vitae** 19:9,12

**voice** 173:5

**voluminous** 22:3 297:2,13

**vulnerable** 234:23

---

**W**

**wait** 155:23 158:22 230:16

**waited** 146:13,21,24

**waiting** 32:12

**waive** 42:17,20 300:24 328:10

**walk** 191:18,19

**walked** 176:21

**wall** 126:2,10,24 127:12 167:21,23 169:1,9 324:21 325:1 327:3

**wanted** 128:23 169:21 180:23 255:24

**warnings** 176:23

**watch** 176:17

**watched** 109:24 110:12 318:8

**water** 184:15 226:16

**ways** 50:10 61:24 67:8 240:4 283:11 322:15

**weapon** 138:19 163:4 233:2

**weapons** 209:2

**weeks** 297:1,18 298:13,15,23 320:5

**weigh** 250:17

**weight** 281:3

**well-** 93:7 100:17

**well-established** 233:24

**well-known** 102:11

**Welner** 281:14,18

**West** 208:1

**Westlaw** 62:3

**whatsoever** 59:15

**when's** 11:4

**wi-fi** 143:13

**William** 70:2 122:14

**window** 73:12 80:11 150:7 263:22

**witnessed** 77:21

**witnesses** 9:6,7 78:21 96:14 136:11,22 137:18 138:1,2 142:2,13 143:1,2 146:17 153:20 154:23 155:21 156:13,17 157:14,17,20,24 158:4,7,12 159:12,22 161:18 215:11,13 218:17 269:13,24 270:8, 17,20

**witnesses'** 250:13

**wonderful** 187:22

**wondering** 75:9

**word** 41:4,11 47:19,22 48:3 49:16 50:15 51:19 69:21 70:22 75:7 191:11 198:3 212:5 213:3 233:17 292:15 308:3,11,15,18,23 309:2,8, 13,14,20,24 310:1,2,3,5 315:15,17

**wording** 68:10

**Wordperfect** 309:15

**words** 17:9,11 62:24 160:20 244:13 257:24 323:14

**work** 30:7 31:12,24 32:2 33:21 102:23

**worked** 102:3,20

**working** 59:18

**works** 132:4 246:14 266:1

**world** 54:19 55:16 185:4

**worse** 108:23 111:9,13

**wound** 244:4

**wounds** 252:10 257:17,22 258:5 265:10

**writing** 23:4 48:19 78:17

**written** 17:7,9,11 29:3 83:16,17,22 115:24 122:21 128:4 162:22 194:15 247:16,18 312:10

**wrong** 203:16 221:20 233:17 240:6 289:19

**wrongful** 295:11

**wrongly** 102:14

**wrote** 25:21 36:3 160:19 207:4 258:6 266:24 267:21

---

**Y**

**Yacoub** 73:2 131:23 143:7 258:14 259:12 289:22 290:11

**Yacoub's** 139:22

RICHARD A. LEO, PHD, JD, 10/02/2023

**Yalda** 73:2,12 131:23 143:7 254:7, 16 258:13 259:11 289:22 290:8 291:17

**Yalda's** 255:17,23 290:6 291:22

**Yale** 53:23

**Yalta's** 139:22

**year** 10:17

**years** 10:15 20:12,17 33:14 51:17 62:5 78:5 93:17 106:7 179:23 189:18 226:7 235:11 237:7 240:24 286:15 290:16 292:21

**yelled** 132:1

**yes-or-no** 267:12

**yes/no** 175:14

**yield** 241:18

**York** 62:11

**younger** 236:9

**youth** 235:13 237:12

### Z

**Zellner** 102:3,7,10 103:8,13,19 104:6

**zoom** 14:13 59:22 187:2